# EXHIBIT 66

11/29/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

1

09:29:57    1    Judge Kennelly, November 29, 2016, 9:30 a.m., Fields v. City
09:30:46    2    of Chicago, trial.
09:39:19    3          THE CLERK:  Case No. 10 C 1168, Fields v. City of
09:39:25    4    Chicago.
09:39:28    5          THE COURT:  Good morning.
09:39:28    6          MR. LOEVY:  Good morning, your Honor.  Jon Loevy,
09:39:30    7    Steve Art, Anand Swaminathan, Candace Gorman and Tony for
09:39:36    8    Nathson Fields.
09:39:36    9          MR. NOLAND:
09:39:38   10          MR. MICHALIK:  Paul Michalik, Terry Burns and Dan
09:39:42   11    Noland for the defendant City of Chicago and Brannigan.
09:39:47   12          MR. KULWIN:  Shelly Kulwin and Rachel Katz on behalf
09:39:50   13    of Murphy.
09:39:50   14          THE COURT:  A couple of things we need to talk about.
09:39:52   15    One of them was a note I got from a juror yesterday.  I won't
09:39:56   16    give you the whole thing.  I won't read the whole thing.
09:39:59   17    Basically, this person works with clients, has to schedule
09:40:02   18    their appointments, she's been doing it after court.  She goes
09:40:07   19    back to the office and so the question is do you think I need
09:40:10   20    to push all my clients the week of December 16th by which I
09:40:17   21    think she means the week of December 12th to come after 5:00
09:40:21   22    p.m. or will we be done by the 12th?  If we do go into the
09:40:25   23    week of the 12/16, which again I think means the week of the
09:40:29   24    12th of December, will we still be done by 4:45?  Thank you.
09:40:32   25    I just need to be able to let my clients know.  They come in

                        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 3 of 140 PageID #:30898
***REALTIME UNEDITED TRANSCRIPT ONLY***

2

| | |
|---|---|
| 09:40:37 | 1 | every two to four weeks and can't work with anybody else. |
| 09:40:40 | 2 | I needed to talk to you today anyway about timing. |
| 09:40:43 | 3 | MR. LOEVY: Your Honor, we hope to close our case on |
| 09:40:45 | 4 | Wednesday. We are going to call -- I'll tell you right now. |
| 09:40:48 | 5 | We are going to call today our expert after Mr. Hawkins. |
| 09:40:51 | 6 | We're hoping to squeeze Mr. Wharrie in and obviously we are |
| 09:40:56 | 7 | slinking our witness exams a lot. There are some depositions |
| 09:41:00 | 8 | to read if we run out of witnesses today, we'd probably do |
| 09:41:03 | 9 | Murphy. Tomorrow is Kees, Murphy, I guess that would be, |
| 09:41:08 | 10 | yeah, tomorrow, Kees, Murphy, Conyers and Andrea line is on |
| 09:41:13 | 11 | stand by today as a short 15, 20 minute witness. That's it. |
| 09:41:19 | 12 | THE COURT: And the other excerpt is one that you |
| 09:41:22 | 13 | would call in rebuttal only? |
| 09:41:23 | 14 | MR. LOEVY: Yes. |
| 09:41:23 | 15 | THE COURT: The statistician? |
| 09:41:25 | 16 | MR. LOEVY: Yes. And I am not sure -- I'll tell you |
| 09:41:28 | 17 | putting our cards on the table. Mr. Brasfield is not going to |
| 09:41:31 | 18 | rely heavily on the statistics. I have a feeling the stats |
| 09:41:34 | 19 | are going to drop off. |
| 09:41:36 | 20 | THE COURT: You will have a feel later. |
| 09:41:38 | 21 | So assuming those are the people that they end up |
| 09:41:40 | 22 | calling, who is on the list on the defense side? |
| 09:41:46 | 23 | MR. MICHALIK: Obviously, we have our expert Bernie |
| 09:41:49 | 24 | Murray. |
| 09:41:50 | 25 | THE COURT: Yeah. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 4 of 140 PageID #:30899
***REALTIME UNEDITED TRANSCRIPT ONLY***

3

09:41:51  1      MR. MICHALIK:  We would probably be calling Daniel

09:41:53  2  Brannigan, there are some witnesses that we would be reading

09:41:56  3  in, Gerald Morris, Trammell Davis and Eugene Hunter.  Then we

09:42:06  4  might.

09:42:07  5      THE COURT:  You mean writted in or reading?

09:42:11  6      MR. MICHALIK:  Reading.  Like we did last time.

09:42:18  7      MR. NOLAND:  Mr. Sexton, Judge Hines.

09:42:25  8      MR. KULWIN:  Are they not calling Hogan?

09:42:27  9      MR. NOLAND:  Mr. Hogan, Mr. Poulos.

09:42:32  10      MR. KULWIN:  Possibly, possibly Mr. Rueckert and we

09:42:39  11  will be reading in excerpts from Ms. Langston.

09:42:43  12      THE COURT:  Okay.

09:42:43  13      MR. LOEVY:

09:42:46  14      MR. MICHALIK:  Also before I forget Mr. Maue.  We may

09:42:51  15  wiped up having to read in his trial testimony.

09:42:53  16      THE COURT:  You are still working on --

09:42:55  17      MR. MICHALIK:  Yeah.

09:42:55  18      MR. NOLAND:  Judge, last time it was by video

09:42:57  19  conference.

09:42:58  20      THE COURT:  Yep.

09:42:58  21      MR. NOLAND:  And he's down in southern Illinois.

09:43:00  22      THE COURT:  Yeah.

09:43:01  23      MR. NOLAND:  And if we could setup -- we could do

09:43:05  24  that or a reading in.

09:43:06  25      THE COURT:  For setting up the video conference, you

| | | |
|---|---|---|
| 09:43:09 | 1 | need to be talking to Pam because Pam needs to be talking to |
| 09:43:13 | 2 | the person who does that who needs to be talking to the |
| 09:43:15 | 3 | prison.  The way those things work is that the prisons, they |
| 09:43:18 | 4 | have time slots, and because they're getting video conference |
| 09:43:22 | 5 | requests from all over the place for, you know, prisoners |
| 09:43:25 | 6 | doing settlement conferences and other things and you have to |
| 09:43:28 | 7 | make sure that the time slot is available.  You have to get it |
| 09:43:34 | 8 | locked in. |
| 09:43:34 | 9 | MR. MICHALIK:  There may be an issue with that |
| 09:43:37 | 10 | regarding Mr. Maue and his ability to do that. |
| 09:43:42 | 11 | MR. KULWIN:  And Jackie Clay. |
| 09:43:43 | 12 | THE COURT:  Who? |
| 09:43:46 | 13 | MR. KULWIN:  Jackie Clay. |
| 09:43:47 | 14 | THE COURT:  I thought you were saying Jay Cutler. |
| 09:43:50 | 15 | MR. KULWIN:  I wouldn't mind that, just so I could |
| 09:43:52 | 16 | cross-examine someone easily. |
| 09:43:54 | 17 | THE COURT:  Yeah, that would be shooting fish in a |
| 09:43:57 | 18 | barrel. |
| 09:43:58 | 19 | Okay.  So, look, I guess what I -- I guess what I am |
| 09:44:04 | 20 | inclined to tell these people is that it's, A, it's difficult |
| 09:44:09 | 21 | to predict because I don't know exactly how long any |
| 09:44:14 | 22 | particular witness is going to take.  I think it's reasonable |
| 09:44:16 | 23 | to expect that the evidence and the arguments will finish by |
| 09:44:24 | 24 | the end of next week. |
| 09:44:25 | 25 | MR. KULWIN:  I think sooner. |

09:44:28  1    THE COURT:  I don't want to predict too much.  By the

09:44:31  2  end of next week, in other words, by the 9th, and then what

09:44:34  3  happens after that is up to the jury.  It's the length of the

09:44:36  4  deliberations which is up to them.  And so the question of

09:44:40  5  whether, you know, you're going to be still here the week of

09:44:44  6  the 12th, there is a decent chance you will and the schedule

09:44:48  7  will be largely up to the jury.  If you're in deliberations, I

09:44:53  8  have no problem with you stopping at 4:30 or 4:45 if you want,

09:44:57  9  so you need to figure how much planning ahead you need to do.

09:45:02  10  I want to keep it vague but keep some glimmer of light at the

09:45:06  11  end of the tunnel.

09:45:08  12    Two other things.  I got two early questions from Mr.

09:45:13  13  Hawkins.  I have two other questions, I don't know which, who

09:45:18  14  are the men sitting next to the witness Earl Hawkins?  We need

09:45:22  15  to figure out how to deal with that.  Or if or whether to deal

09:45:27  16  with that.  And then the other one I am just going to read to

09:45:29  17  you.  All the lawyers are showing statements and documents

09:45:31  18  from several court dates and trials.  Can we get the dates and

09:45:37  19  what the trial was for?  It's hard to keep up with what they

09:45:41  20  are talking about.  Maybe this was already said and I missed

09:45:45  21  it, question mark.

09:45:48  22    I guess what I'd be inclined to say to them is that

09:46:05  23  I'm going to try this on for you for sides.  I'll read part of

09:46:10  24  it.  I think I can tell them we have all heard evidence that

09:46:19  25  Mr. Fields had two criminal trials, one was in 2006 and one

| | |
|---|---|
| 09:46:24 | 1 | was from 2009 and a lot of the trials have been read from |
| 09:46:27 | 2 | those two dates.  I have tried to prompt the lawyers, is this |
| 09:46:30 | 3 | from the '86 trial or the 2009 trial.  There have also been |
| 09:46:34 | 4 | various other proceedings where people have testified at |
| 09:46:37 | 5 | various dates.  It's really, as a matter of evidence law, it's |
| 09:46:42 | 6 | not appropriate to go into the details of what those are.  And |
| 09:46:45 | 7 | you are just going to have to do your best to keep notes and |
| 09:46:48 | 8 | remember as you are going along.  That's what I am inclined to |
| 09:46:51 | 9 | say.  Does anybody have a better idea? |
| 09:46:55 | 10 |         MR. KULWIN:  I think that's fair, Judge. |
| 09:46:56 | 11 |         THE COURT:  Anybody have a problem with that or a |
| 09:46:58 | 12 | better idea. |
| 09:46:59 | 13 |         MR. KULWIN:  The proceedings related to this case. |
| 09:47:01 | 14 |         MR. LOEVY:  Some of them aren't.  I am going to |
| 09:47:03 | 15 | impeach him this morning with his testimony at these other |
| 09:47:08 | 16 | trials.  I am pretty sure that's what this stuff is about. |
| 09:47:11 | 17 |         THE COURT:  This stuff is flying pretty fast.  You |
| 09:47:14 | 18 | have had testimony from depositions that were given in this |
| 09:47:18 | 19 | test, you have testimony from the state proceeding, testimony |
| 09:47:20 | 20 | from the earlier trial in this case. |
| 09:47:22 | 21 |         MR. LOEVY:  Okay. |
| 09:47:22 | 22 |         THE COURT:  There's at least five things out there, |
| 09:47:25 | 23 | probably more.  We had a couple yesterday with Mr. Hawkins |
| 09:47:28 | 24 | where he had trials in various. |
| 09:47:30 | 25 |         MR. LOEVY:  That's going to happen this morning.  I |

11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

7

| | | |
|---|---|---|
| 09:47:31 | 1 | am going to impeach him -- should I say the name?  I was just |
| 09:47:35 | 2 | planning on saying, isn't it true you testified -- |
| 09:47:38 | 3 | THE COURT:  Just give dates. |
| 09:47:39 | 4 | MR. LOEVY:  Got it. |
| 09:47:40 | 5 | MR. NOLAND:  Judge, I have one thing to raise on that |
| 09:47:43 | 6 | issue which would be consistent with the sidebar we had about |
| 09:47:47 | 7 | confusing the 2013 hearing. |
| 09:47:49 | 8 | THE COURT:  Yeah. |
| 09:47:49 | 9 | MR. NOLAND:  With Sexton versus the 2014 hearing |
| 09:47:52 | 10 | before the court.  I would think the jury should know that the |
| 09:47:56 | 11 | defendants were not involved in the 2013 hearing.  It was a |
| 09:48:00 | 12 | separate proceeding, 2014, because otherwise -- |
| 09:48:05 | 13 | THE COURT:  That doesn't matter as a matter of |
| 09:48:07 | 14 | evidence law.  I mean, it doesn't matter.  To the extent the |
| 09:48:10 | 15 | stuff is admissible, it's admissible and whether somebody was |
| 09:48:13 | 16 | involved or not, it really -- it doesn't matter at least based |
| 09:48:16 | 17 | on any objection that I have had to rule on yet.  I am not |
| 09:48:19 | 18 | really inclined to do that.  The question was the way I read |
| 09:48:23 | 19 | this question is these dates are flying fast and furious, I am |
| 09:48:26 | 20 | having a hard time keeping up, can you kind of give me a key |
| 09:48:29 | 21 | to the dates and I am going to basically tell them no, I can't |
| 09:48:32 | 22 | give you a key.  There's a bunch -- there have been a bunch of |
| 09:48:35 | 23 | other proceedings in which people have testified.  It's not |
| 09:48:38 | 24 | appropriate as a matter of evidence law for me to give you a |
| 09:48:41 | 25 | list of those.  Just do your best to keep up.  I probably had |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 9 of 140 PageID #:30904
***REALTIME UNEDITED TRANSCRIPT ONLY***

8

| 09:48:47 | 1 | collectively to do a better job of remembering these things |
| 09:48:51 | 2 | than any one person would. |
| 09:48:53 | 3 | MR. KULWIN:  If you want, the it's up to them, |
| 09:48:56 | 4 | address it in closing argument. |
| 09:48:58 | 5 | THE COURT:  It may get addressed this closing |
| 09:49:00 | 6 | argument.  If you have a specific question about, you know, a |
| 09:49:03 | 7 | particular witness, if you have a specific question about |
| 09:49:07 | 8 | specific witnesses, what was the date on which the person |
| 09:49:09 | 9 | testified, put that in questions and we will cover it. |
| 09:49:11 | 10 | Okay.  So what else do we have to take up before we |
| 09:49:14 | 11 | start? |
| 09:49:14 | 12 | MR. LOEVY:  We are going to hand you a deposition for |
| 09:49:16 | 13 | Beseth that has some calls you have to make. |
| 09:49:19 | 14 | THE COURT:  For what who? |
| 09:49:21 | 15 | MR. LOEVY:  The guy's name is Beseth, the |
| 09:49:23 | 16 | investigator. |
| 09:49:23 | 17 | THE COURT:  When do I have to read it by? |
| 09:49:26 | 18 | MR. LOEVY:  For tomorrow. |
| 09:49:28 | 19 | THE COURT:  You are giving me designations and |
| 09:49:31 | 20 | objections, basically? |
| 09:49:32 | 21 | MR. LOEVY:  This is the man who testified at the |
| 09:49:33 | 22 | civil trial but has died since the civil trial.  What you have |
| 09:49:38 | 23 | are designations from his civil trial testimony. |
| 09:49:41 | 24 | THE COURT:  And whose -- do I know who's designating |
| 09:49:47 | 25 | the testimony?  Is it everybody is designating some? |

| | | |
|---|---|---|
| 09:49:51 | 1 | MR. KULWIN:  Everybody is designating some with |
| 09:49:53 | 2 | objections going back and forth. |
| 09:49:54 | 3 | THE COURT:  And it's testimony both from the previous |
| 09:49:57 | 4 | trial in this case and from the deposition. |
| 09:50:01 | 5 | MR. LOEVY:  We object to the deposition being read in |
| 09:50:04 | 6 | addition -- |
| 09:50:04 | 7 | THE COURT:  You say that in here? |
| 09:50:06 | 8 | MR. LOEVY:  Yes. |
| 09:50:06 | 9 | THE COURT:  I'll deal with it later. |
| 09:50:08 | 10 | MR. KULWIN:  What about the motion, Judge? |
| 09:50:10 | 11 | THE COURT:  Oh, yeah.  I'm open to suggestion. |
| 09:50:14 | 12 | MR. KULWIN:  I think I'm always a big fan of the |
| 09:50:18 | 13 | truth.  Just say Mr. Hawkins is in witness protection and |
| 09:50:23 | 14 | those are marshals. |
| 09:50:24 | 15 | MR. LOEVY:  We object to that, your Honor. |
| 09:50:25 | 16 | THE COURT:  What are we going to do? |
| 09:50:27 | 17 | MR. LOEVY:  Let's just ignore the question. |
| 09:50:28 | 18 | MR. KULWIN:  No.  They might think he's incarcerated |
| 09:50:32 | 19 | or something. |
| 09:50:33 | 20 | THE COURT:  They know he is not incarcerated.  He's |
| 09:50:35 | 21 | testified like six times or maybe four that he is not |
| 09:50:38 | 22 | incarcerated. |
| 09:50:39 | 23 | MR. LOEVY:  Because that would, you know, open a can |
| 09:50:41 | 24 | of worms, why is he in witness protection?  It's more |
| 09:50:44 | 25 | information than they need.  There is a Marshall there.  There |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 11 of 140 PageID #:30906
11/29/16 AM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

10

| | | |
|---|---|---|
| 09:50:47 | 1 | is a Marshall there. |
| 09:50:48 | 2 | MR. KULWIN:  I don't agree with that, Judge. |
| 09:50:50 | 3 | THE COURT:  So describe the can of worms. |
| 09:50:55 | 4 | MR. LOEVY:  Well, why is he in witness protection? |
| 09:50:58 | 5 | That sort of feeds their theory that other El Rukns want to |
| 09:51:00 | 6 | kill him because he testified against other El Rukns.  And, |
| 09:51:04 | 7 | you know, we haven't finished our threat theory. |
| 09:51:06 | 8 | THE COURT:  Is fact that -- no, he was still in |
| 09:51:10 | 9 | custody at the last trial.  Was there anybody who testified at |
| 09:51:12 | 10 | the last trial who was out of custody? |
| 09:51:16 | 11 | MS. KATZ:  Yes. |
| 09:51:17 | 12 | THE COURT:  Who? |
| 09:51:18 | 13 | MS. KATZ:  Kees. |
| 09:51:19 | 14 | THE COURT:  No, he was still in could you say towed. |
| 09:51:21 | 15 | MR. KULWIN:  Jackie Clay. |
| 09:51:23 | 16 | THE COURT:  Clay.  Did he have marshals here?  Was he |
| 09:51:26 | 17 | still -- |
| 09:51:27 | 18 | MR. NOLAND:  No, he was not. |
| 09:51:28 | 19 | THE COURT:  He was not in any witness protection.  So |
| 09:51:30 | 20 | it's a sui generis situation.  Lovely. |
| 09:51:33 | 21 | MR. LOEVY:  Because the inference would be he is in |
| 09:51:35 | 22 | witness protection because he faces threats which we object to |
| 09:51:38 | 23 | on its face, but also there could be an inference about Mr. |
| 09:51:42 | 24 | Fields and the easiest way is just to ignore it. |
| 09:51:44 | 25 | MR. KULWIN:  I don't agree, Judge. |

09:51:46   1        THE COURT:  Explain why you don't agree.

09:51:48   2        MR. KULWIN:  Because I think that the jury could draw

09:51:50   3   an inference that somehow he's done something wrong or that

09:51:53   4   he's maybe -- he might be free, but he's under some kind of

09:51:56   5   restriction and that there's something untrustworthy about

09:52:02   6   him.  Who else walks into court with two federal marshals?

09:52:05   7        THE COURT:  I understand.  By telling them he's there

09:52:09   8   because he is in the U.S. marshals witness security program,

09:52:12   9   then the obvious question is going to be why, and so there is

09:52:16   10  a can, whether it's a can of worms or a can of something else

09:52:19   11  that has been opened.  How am I going to deal with that?

09:52:23   12       MR. KULWIN:  Think of a benign way of dealing with

09:52:26   13  that, Judge, that's neutral.  You could just say that the two

09:52:33   14  marshals are part of -- they're U.S. marshals who have

09:52:39   15  assisted him in traveling to court as he's still participating

09:52:45   16  in the relocation program.

09:52:46   17       MR. LOEVY:  Same problem, your Honor, same problem

09:52:49   18  with the relocation.  The only point I would add is if there

09:52:53   19  weren't jury questions, they would just have to wonder.  It's

09:52:56   20  99 percent of the trials.  The jury just has to wonder.

09:53:06   21       MR. KULWIN:  I think something that's neutral:

09:53:08   22       THE COURT:  What?

09:53:10   23       MR. KULWIN:  To me if I'm sitting here seeing two

09:53:12   24  marshals, maybe they think they are protecting us from him

09:53:16   25  because he is a killer.

11/29/16 AM                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

12

09:53:18    1          THE COURT:  They saw me walk over right by the guy

09:53:20    2    six times.  Maybe they figure I'm like Jon Wayne or something.

09:53:24    3    I don't know.

09:53:25    4          MR. KULWIN:  You are tall and you look like Jon

09:53:27    5    Wayne.

09:53:27    6          THE COURT:  That is about the worse example of

09:53:29    7    sucking up to a judge I have ever heard in my entire life.  I

09:53:33    8    would -- in my entire life.

09:53:37    9          MR. KULWIN:  I have no shame.

09:53:38   10          THE COURT:  Okay.  Raise your hand if you think I

09:53:41   11    look like Jon Wayne.

09:53:43   12          MR. KULWIN:  I saw a picture in the paper recently,

09:53:49   13    it was my Johnnie dep moment.

09:53:51   14          THE COURT:  That would be item number two.

09:53:53   15          MR. KULWIN:  The inference could be a juror could

09:53:55   16    draw the inference that he is a dangerous person and that we

09:53:58   17    don't want him to close to members or --

09:54:01   18          THE COURT:  Look, I'm concerned, you know, for many

09:54:05   19    of the same reasons at the end of the first trial, after the

09:54:09   20    end of the first trial, one of the reasons -- one of the bases

09:54:13   21    on which I granted a new trial was my what I'll call just

09:54:19   22    colloquially inappropriate sloughing off of a jury

09:54:24   23    instruction.  It was to the instructions, so it was more that

09:54:29   24    the jury had to deal with, but it just seems to me as a

09:54:32   25    general matter if a juror is asking a question, that means

                       ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 14 of 140 PageID #:30909

***REALTIME UNEDITED TRANSCRIPT ONLY***

09:54:35  1  that there's something that there's likely to be speculation

09:54:38  2  about.  I don't know which way the speculation cuts.  I can

09:54:41  3  imagine it cutting any possible -- any number of ways.  I

09:54:45  4  would prefer to find a way to deal with it.  And so that's

09:54:52  5  what we are going to do.  We are going to find a way to deal

09:54:55  6  with it.

09:55:02  7        Look, as far as the can of worms is concerned, let me

09:55:07  8  just see if I can grab something here.

09:56:19  9        I am going to read something here.  What I am about

09:56:47  10  to read is something I propose to tell the jury.  I think it's

09:56:50  11  accurate.  I tried to write it in a way that's non--- sort of

09:57:03  12  as benign as possible.  I would say to the jury, if I can say

09:57:06  13  the whole thing without breaking into a coughing fit which is

09:57:10  14  not a foregone conclusion this morning.  There was a question

09:57:22  15  from the juror regarding who the gentleman were sitting by Mr.

09:57:28  16  Hawkins during the testimony and the answer to that question

09:57:29  17  is that they're federal marshals and they're there because Mr.

09:57:36  18  Hawkins is a participant in a relocation program that was part

09:57:40  19  of his overall agreement to cooperate with the federal

09:57:43  20  government in connection with several federal El Rukn trials

09:57:47  21  that you have heard some testimony about, none of those trials

09:57:50  22  involve Mr. Fields and you are not to draw any inference for

09:57:54  23  or against any party in the case based on what I just told

09:57:56  24  you.

09:57:57  25        MR. KULWIN:  Fine with us, Judge.

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 15 of 140 PageID #:30910
***REALTIME UNEDITED TRANSCRIPT ONLY***

14

| | | |
|---|---|---|
| 09:57:58 | 1 | MR. LOEVY:  We don't want it, but you made the call |
| 09:58:00 | 2 | and that's what it's going to be. |
| 09:58:03 | 3 | THE COURT:  Do we know if he's back there? |
| 09:58:07 | 4 | THE CLERK:  I don't know. |
| 09:58:07 | 5 | THE COURT:  I actually did not see them hanging |
| 09:58:09 | 6 | around this morning. |
| 09:58:11 | 7 | MR. ART:  I saw one of the marshals earlier. |
| 09:58:24 | 8 | THE COURT:  Do we have other things that we need to |
| 09:58:26 | 9 | talk about before Hawkins testifies? |
| 10:00:49 | 10 | (The jury enters the courtroom.) |
| 10:00:49 | 11 | THE COURT:  One final thing before we resume with Mr. |
| 10:00:53 | 12 | Hawkins' testimony.  I had gotten a couple of notes or |
| 10:00:55 | 13 | questions from jurors.  One of them has to do with scheduling. |
| 10:00:58 | 14 | We will talk about that later today.  There is another one I |
| 10:01:00 | 15 | will deal with after Mr. Hawkins is done.  There are a couple |
| 10:01:03 | 16 | of questions for Mr. Hawkins that I am going to hold until the |
| 10:01:05 | 17 | end of his testimony and we will will discuss with the |
| 10:01:10 | 18 | lawyers.  There is one I am going to deal with here. |
| 10:01:13 | 19 | A juror handed a note to my clerk asking who are |
| 10:01:16 | 20 | these guys over here sitting over to the side next to Mr. |
| 10:01:19 | 21 | Hawkins.  So I am just going to tell you what the answer is. |
| 10:01:21 | 22 | They are federal marshals.  They're there because Mr. Hawkins |
| 10:01:25 | 23 | is involved in a relocation program.  That's part of his |
| 10:01:29 | 24 | overall agreement to cooperate in connection with several |
| 10:01:33 | 25 | federal El Rukn trials that you have heard some things about. |

11/29/16 AM   Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 16 of 140 PageID #:30911
***REALTIME UNEDITED TRANSCRIPT ONLY***

15

| | | |
|---|---|---|
| 10:01:35 | 1 | None of those trials involve Mr. Fields and you are not to |
| 10:01:40 | 2 | draw any inference in favor of or against anybody in this |
| 10:01:45 | 3 | case.  I have now cleared up that issue.  Mr. Loevy, you are |
| 10:01:48 | 4 | now on redirect. |
| 10:01:49 | 5 | MR. LOEVY:  Thank you, your Honor. |
| 10:01:49 | 6 | - - - |
| 10:01:49 | 7 | EARL HAWKINS, REDIRECT EXAMINATION |
| 10:01:49 | 8 | BY MR. LOEVY: |
| 10:01:52 | 9 | Q.  I want to ask a few questions about the grand jury |
| 10:01:56 | 10 | statement. |
| 10:01:57 | 11 | Now, you told Mr. Kulwin that it was a very long |
| 10:02:00 | 12 | statement and there were a lot of details.  Do you remember |
| 10:02:02 | 13 | that question? |
| 10:02:02 | 14 | A.  Yes, sir. |
| 10:02:03 | 15 | Q.  The fact that Nate was involved in a murder, that was an |
| 10:02:08 | 16 | important detail, correct? |
| 10:02:09 | 17 | A.  Yes. |
| 10:02:10 | 18 | Q.  And you said repeatedly that you never said he was |
| 10:02:15 | 19 | involved in the Smith/Hickman murder? |
| 10:02:16 | 20 | A.  Yes. |
| 10:02:17 | 21 | Q.  But you were asked when he read it is this accurate, Nate |
| 10:02:20 | 22 | did the Smith/Hickman, and you said yes, it is accurate, |
| 10:02:22 | 23 | correct? |
| 10:02:23 | 24 | MR. KULWIN:  I'm sorry, Judge.  I didn't hear the |
| 10:02:25 | 25 | question.  I apologize. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 17 of 140 PageID #:30912
***REALTIME UNEDITED TRANSCRIPT ONLY***

16

10:02:26   1        THE COURT:  Rephrase the question.

10:02:27   2   BY MR. LOEVY:

10:02:28   3   Q.  When?

10:02:28   4        THE COURT:  There are too many its in there.  Make it

10:02:30   5   a little clearer.

10:02:31   6   BY MR. LOEVY:

10:02:32   7   Q.  When Mr. Hogan read the you statement, isn't it true Nate

10:02:35   8   Fields committed the Vaughn/White murder with you and Sumner,

10:02:38   9   your response was, yes, that's accurate, correct?

10:02:41   10       MR. KULWIN:  Judge, I am going to object.  That's not

10:02:44   11  what the statement says.  He misstated it.

10:02:46   12       THE COURT:  You are talking about the grand jury

10:02:47   13  statement.

10:02:47   14       MR. LOEVY:  Yes, I am.

10:02:48   15       THE COURT:  I think it makes more sense to just read

10:02:51   16  it rather than paraphrase it, or at least that part of it.  I

10:02:54   17  am not talking about reading the obviously thing, obviously.

10:03:34   18       MR. LOEVY:  Your Honor, I don't have the exact page.

10:03:38   19  May I ask a question about it or would you like me to find it?

10:03:42   20       THE COURT:  Go ahead and ask a question in the

10:03:44   21  interest of time.

10:03:44   22  BY MR. LOEVY:

10:03:45   23  Q.  What the grand jury statement was you, Mr. Sumner, and Mr.

10:03:51   24  Fields committed the Vaughn/White murder, correct?

10:03:52   25       MR. KULWIN:  Objection, Judge, that's not what it


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 18 of 140 PageID #:30913
***REALTIME UNEDITED TRANSCRIPT ONLY***

17

| | | |
|---|---|---|
| 10:03:54 | 1 | says. |
| 10:03:54 | 2 | THE COURT:  Do you have a copy of it? |
| 10:03:56 | 3 | MR. KULWIN:  If he hands me his, I am show him. |
| 10:03:59 | 4 | THE COURT:  Does somebody have a copy of it?  Thank |
| 10:04:01 | 5 | you.  Can Mr. Loevy borrow it so we can just ask the questions |
| 10:04:06 | 6 | about it? |
| 10:04:07 | 7 | This was shown. |
| 10:04:09 | 8 | MR. LOEVY:  It wasn't shown. |
| 10:04:10 | 9 | THE COURT:  Okay. |
| 10:04:11 | 10 | THE COURT:  Go ahead and show it to the witness.  If |
| 10:04:14 | 11 | you want to put it on the ELMO, you can do it so that he can |
| 10:04:17 | 12 | see it. |
| 10:04:18 | 13 | MR. LOEVY:  Thank you. |
| 10:04:18 | 14 | THE COURT:  And I will take it off the jury's |
| 10:04:20 | 15 | screens.  There you go.  Mr. Hawkins should be able to see |
| 10:04:24 | 16 | this. |
| 10:04:24 | 17 | BY MR. LOEVY: |
| 10:04:25 | 18 | Q.  Can you see those three lines, sir? |
| 10:04:27 | 19 | A.  Yes, sir. |
| 10:04:28 | 20 | Q.  That's not true, is it? |
| 10:04:29 | 21 | THE COURT:  Why don't you read it since the jury |
| 10:04:31 | 22 | can't see it. |
| 10:04:32 | 23 | BY MR. LOEVY: |
| 10:04:32 | 24 | Q.  At about the beginning of April 1985, Anthony Sumner, |
| 10:04:36 | 25 | Nathson Fields and I were involved in the murder of Joe White |

11/29/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:04:38 | 1 | and DeeEggars Vaughn, correct? |
| 10:04:41 | 2 | THE COURT:  Go to the next page because then there is |
| 10:04:43 | 3 | an answer. |
| 10:04:44 | 4 | BY MR. LOEVY: |
| 10:04:44 | 5 | Q.  The answer is on page 25.  Is that accurate so far to the |
| 10:04:49 | 6 | best of your recollection, Mr. Hawkins? |
| 10:04:51 | 7 | "ANSWER:  Yes, sir." |
| 10:04:53 | 8 | My first question is it's not true that Mr. Fields |
| 10:04:56 | 9 | was involved with you in the Vaughn/White murder, correct |
| 10:04:58 | 10 | A.  I never said that. |
| 10:05:00 | 11 | Q.  Okay.  That's not true, though, right? |
| 10:05:01 | 12 | A.  I never said that. |
| 10:05:03 | 13 | MR. LOEVY:  Your Honor, the only question is if he |
| 10:05:06 | 14 | was not involved. |
| 10:05:07 | 15 | BY MR. LOEVY: |
| 10:05:07 | 16 | Q.  Can we agree he had nothing to do with the crime? |
| 10:05:11 | 17 | A.  I said that all the time. |
| 10:05:12 | 18 | Q.  When they said to you is that accurate that he was |
| 10:05:14 | 19 | involved in a crime, you said to the grand jury that it was |
| 10:05:18 | 20 | accurate, correct? |
| 10:05:19 | 21 | A.  Sir, what do you want from me?  I said he wasn't in it. |
| 10:05:26 | 22 | THE COURT:  He is asking you about your testimony in |
| 10:05:28 | 23 | the grand jury.  That's what you are going to need to answer. |
| 10:05:29 | 24 | BY MR. LOEVY: |
| 10:05:30 | 25 | Q.  You told the grand jury that he was, correct? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 20 of 140 PageID #:30915
***REALTIME UNEDITED TRANSCRIPT ONLY***

19

| | | |
|---|---|---|
| 10:05:32 | 1 | A.  I didn't tell nobody nothing. |
| 10:05:34 | 2 | Q.  Are you saying that you made a mistake at the grand jury |
| 10:05:37 | 3 | or you didn't understand the question or you intended to say |
| 10:05:40 | 4 | that he was guilty? |
| 10:05:41 | 5 | MR. KULWIN:  Objection, multiple questions. |
| 10:05:42 | 6 | THE COURT:  Overruled. |
| 10:05:43 | 7 | THE WITNESS:  I never said he was nowhere, so what |
| 10:05:47 | 8 | are you talking about? |
| 10:05:48 | 9 | BY MR. LOEVY: |
| 10:05:49 | 10 | Q.  I want to focus on your intent. |
| 10:05:50 | 11 | A.  Okay. |
| 10:05:51 | 12 | Q.  At the time you gave that testimony? |
| 10:05:52 | 13 | A.  Okay. |
| 10:05:52 | 14 | Q.  Did you make a mistake or did you understand that the U.S. |
| 10:05:56 | 15 | attorney wanted you to say he was involved and you said that's |
| 10:05:59 | 16 | accurate? |
| 10:05:59 | 17 | A.  The USA attorney didn't tell me to say nothing, and no, I |
| 10:06:06 | 18 | didn't make a mistake.  Maybe he spoke too soon, maybe I |
| 10:06:10 | 19 | didn't see it, maybe because I was worried about me, it got |
| 10:06:13 | 20 | past me. |
| 10:06:14 | 21 | Q.  It got past you? |
| 10:06:15 | 22 | A.  I said maybe. |
| 10:06:16 | 23 | Q.  All right.  Now, your grand jury statement was the thing |
| 10:06:25 | 24 | that took a couple of years to prepare? |
| 10:06:28 | 25 | A.  Yes, sir. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 21 of 140 PageID #:30916
***REALTIME UNEDITED TRANSCRIPT ONLY***

20

| | | |
|---|---|---|
| 10:06:29 | 1 | Q.  And you carefully edited it? |
| 10:06:30 | 2 | A.  I edited it. |
| 10:06:31 | 3 | Q.  And it involved a lot of crimes and a lot of criminals, |
| 10:06:35 | 4 | correct? |
| 10:06:35 | 5 | A.  Yes, sir. |
| 10:06:35 | 6 | Q.  And that reference that we just read was the only place |
| 10:06:38 | 7 | that Nate Fields had anything to do with all those crimes and |
| 10:06:41 | 8 | all those criminals, correct? |
| 10:06:42 | 9 | A.  If you say so. |
| 10:06:44 | 10 | Q.  I'm asking you if that's true? |
| 10:06:45 | 11 |      THE COURT:  It was covered on direct, Mr. Loevy. |
| 10:06:47 | 12 | BY MR. LOEVY: |
| 10:06:48 | 13 | Q.  Let's move to the testimony about the actual events that |
| 10:06:50 | 14 | day that you talked about with the defense attorneys.  Fuddy |
| 10:06:53 | 15 | was not someone you actually knew well, correct? |
| 10:06:55 | 16 | A.  Yes. |
| 10:06:58 | 17 | Q.  Mr. Banks had to point out to you who Fuddy was, correct? |
| 10:07:02 | 18 | A.  Yes. |
| 10:07:02 | 19 | Q.  And if he hadn't pointed out to you who Fuddy was, you |
| 10:07:07 | 20 | wouldn't have known who he was, correct? |
| 10:07:08 | 21 | A.  Yes. |
| 10:07:10 | 22 | Q.  All right.  Let's talk about where you were -- if I |
| 10:07:15 | 23 | understood your testimony, the team was put together, you, |
| 10:07:19 | 24 | Carter, Andrews and Fields, that's the team, right? |
| 10:07:22 | 25 | A.  Yes, sir. |

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 22 of 140 PageID #:30917
***REALTIME UNEDITED TRANSCRIPT ONLY***

21

| | | |
|---|---|---|
| 10:07:23 | 1 | Q.  And then you drove to the scene on the day of the supposed |
| 10:07:26 | 2 | crime, the crime? |
| 10:07:27 | 3 | A.  Yes, sir. |
| 10:07:27 | 4 | Q.  All right.  And I'm going to show you can you see the |
| 10:07:33 | 5 | easel, sir? |
| 10:07:34 | 6 | A.  Yes, sir. |
| 10:07:34 | 7 | THE COURT:  If you need to move, just go ahead and |
| 10:07:36 | 8 | move. |
| 10:07:37 | 9 | BY MR. LOEVY: |
| 10:07:41 | 10 | Q.  You're familiar with the area, correct?  You were familiar |
| 10:07:45 | 11 | with the neighborhood, correct? |
| 10:07:46 | 12 | THE COURT:  You drew a box and a line.  The box is |
| 10:07:49 | 13 | the building I take it? |
| 10:07:52 | 14 | MR. LOEVY:  Yes. |
| 10:07:52 | 15 | BY MR. LOEVY: |
| 10:07:53 | 16 | Q.  You're familiar with the neighborhood? |
| 10:07:54 | 17 | A.  Somewhat. |
| 10:07:54 | 18 | Q.  The Fort was nearby the building was? |
| 10:07:56 | 19 | A.  Yes. |
| 10:07:58 | 20 | THE COURT:  Mr. Loevy, you are going to have to move |
| 10:08:00 | 21 | that back so the other lawyers can see it.  Move it back to |
| 10:08:04 | 22 | the space between the podium and your table. |
| 10:08:09 | 23 | MR. LOEVY:  Does this work, your Honor? |
| 10:08:10 | 24 | THE COURT:  Do your best to crane your neck, guys. |
| 10:08:13 | 25 | BY MR. LOEVY: |

11/29/16 AM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

22

| | | |
|---|---|---|
| 10:08:14 | 1 | Q. This as the judge recognized, that rectangle is the |
| 10:08:17 | 2 | building where Fuddy was shot, right? |
| 10:08:19 | 3 | THE COURT: Why don't you stand on the other side? I |
| 10:08:22 | 4 | know you're right-handed but whatever. |
| 10:08:24 | 5 | BY MR. LOEVY: |
| 10:08:24 | 6 | Q. This street out in front of the building is what, sir? |
| 10:08:28 | 7 | THE COURT: What street is that? |
| 10:08:31 | 8 | BY MR. LOEVY: |
| 10:08:31 | 9 | Q. The east-west street that the building is on? |
| 10:08:33 | 10 | A. The building is supposed to be on the other side of the |
| 10:08:35 | 11 | street. |
| 10:08:35 | 12 | Q. Well, if this is north going up? |
| 10:08:37 | 13 | THE COURT: North is going up. |
| 10:08:38 | 14 | BY MR. LOEVY: |
| 10:08:40 | 15 | Q. This is 39th Street, which is Pershing, correct, and this |
| 10:08:46 | 16 | is what, the north south street? |
| 10:08:48 | 17 | A. I told you I recognized him. You want to draw it again? |
| 10:08:51 | 18 | Q. I guess your memory matters. Do you know the north south |
| 10:08:54 | 19 | street? |
| 10:08:54 | 20 | A. I don't know your drawing. |
| 10:08:55 | 21 | Q. All right. This is Langley, right? |
| 10:08:57 | 22 | A. No. |
| 10:08:58 | 23 | Q. All right. There's another east-west street where you |
| 10:09:04 | 24 | first identified Fuddy, correct? |
| 10:09:05 | 25 | A. Yes. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 24 of 140 PageID #:30919
***REALTIME UNEDITED TRANSCRIPT ONLY***

23

| | | |
|---|---|---|
| 10:09:07 | 1 | Q.  What street was that? |
| 10:09:09 | 2 | A.  Langley. |
| 10:09:09 | 3 | Q.  When -- did you not tell Mr. Burns yesterday that you made |
| 10:09:13 | 4 | the identification on Oakwood? |
| 10:09:14 | 5 | A.  Oakwood, Langley, yes. |
| 10:09:17 | 6 | Q.  Well, this is Langley and this is Oakwood? |
| 10:09:20 | 7 | A.  No. |
| 10:09:20 | 8 | Q.  I am going to represent to you that this is in my drawing? |
| 10:09:23 | 9 | A.  Yeah, that's your drawing. |
| 10:09:24 | 10 | Q.  This is Oakwood.  And Oakwood and Langley intersect, |
| 10:09:27 | 11 | correct? |
| 10:09:27 | 12 | A.  Yes.  That's what I said, sir. |
| 10:09:29 | 13 | Q.  And your testimony has always been at the intersection of |
| 10:09:32 | 14 | Oakwood and Langley is where you identified Fuddy for the |
| 10:09:35 | 15 | guys, right? |
| 10:09:35 | 16 | A.  Yes. |
| 10:09:35 | 17 | Q.  You said that in 2009, correct? |
| 10:09:39 | 18 | A.  Yes, sir. |
| 10:09:39 | 19 | Q.  You said it in 2014? |
| 10:09:41 | 20 | A.  Yes, sir. |
| 10:09:42 | 21 | Q.  And you said it in 2012? |
| 10:09:44 | 22 | A.  Yes, sir. |
| 10:09:44 | 23 | Q.  Every time you have been asked the plan was you were up in |
| 10:09:48 | 24 | your cars, you got to Oakwood and Langley and you pointed out |
| 10:09:52 | 25 | to George and Nate, there's Fuddy, that's the guy you should |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 25 of 140 PageID #:30920

| | | |
|---|---|---|
| 10:09:57 | 1 | kill, correct? |
| 10:09:58 | 2 | A. Yes, sir. |
| 10:09:58 | 3 | Q. And showing you your testimony from the criminal trial, |
| 10:10:05 | 4 | this is page 96? |
| 10:10:06 | 5 | THE COURT: That one of the jury can see, so I am |
| 10:10:08 | 6 | going to put the jury's monitors on. |
| 10:10:16 | 7 | Are you done with the diagram you think now? |
| 10:10:19 | 8 | MR. LOEVY: I am going to go back to it in a minute, |
| 10:10:22 | 9 | your Honor. |
| 10:10:22 | 10 | BY MR. LOEVY: |
| 10:10:22 | 11 | Q. You did testify at the trial that the identification was |
| 10:10:25 | 12 | made on Oakwood? |
| 10:10:26 | 13 | A. Yes. |
| 10:10:26 | 14 | MR. KULWIN: Judge, asked and answered. |
| 10:10:29 | 15 | THE COURT: Overruled. |
| 10:10:29 | 16 | BY MR. LOEVY: |
| 10:10:30 | 17 | Q. Now, showing you this map, which is a little better than |
| 10:10:33 | 18 | my drawing I will acknowledge? |
| 10:10:35 | 19 | THE COURT: It's a photograph, so by definition, it's |
| 10:10:37 | 20 | better than a drawing. |
| 10:10:38 | 21 | BY MR. LOEVY: |
| 10:10:38 | 22 | Q. Can you see the map? |
| 10:10:39 | 23 | A. Yes. |
| 10:10:41 | 24 | Q. This is the building, right? |
| 10:10:42 | 25 | A. That's the topographical. I never was on an airplane and |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 26 of 140 PageID #:30921
11/29/16 AM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

25

| | | |
|---|---|---|
| 10:10:48 | 1 | seen down like that.  I never seen it like that before. |
| 10:10:52 | 2 | Q.  Fair enough.  You recognize in this picture that's the |
| 10:10:55 | 3 | building that Fuddy was shot in front of?  Let me orient you. |
| 10:10:59 | 4 | This is 39th Street going east-west.  There is Langley going |
| 10:11:06 | 5 | north south, this is Oakwood at the bottom of the map? |
| 10:11:09 | 6 | THE COURT:  Bottom of the map going across from left |
| 10:11:12 | 7 | to right is Oakwood? |
| 10:11:13 | 8 | MR. LOEVY:  Exactly. |
| 10:11:15 | 9 | BY MR. LOEVY: |
| 10:11:15 | 10 | Q.  This is Oakwood.  Can you point to the jury where you were |
| 10:11:18 | 11 | at Oakwood and Langley where you pointed out Fuddy? |
| 10:11:21 | 12 | THE COURT:  Where he was or where Fuddy was? |
| 10:11:23 | 13 | BY MR. LOEVY: |
| 10:11:24 | 14 | Q.  No, where he was when he pointed out Fuddy? |
| 10:11:26 | 15 | THE COURT:  You can go down. |
| 10:11:27 | 16 | THE WITNESS:  I was right around here. |
| 10:11:32 | 17 | BY MR. LOEVY: |
| 10:11:32 | 18 | Q.  Okay.  This is where Fuddy was.  You're here at Oakwood |
| 10:11:36 | 19 | and Langley? |
| 10:11:36 | 20 | A.  Oakwood and Langley, back here.  Somewhere around here, |
| 10:11:41 | 21 | yes. |
| 10:11:41 | 22 | Q.  In fact, there was a stipulation -- |
| 10:11:42 | 23 | THE COURT:  Just for the record. |
| 10:11:44 | 24 | THE WITNESS:  Stay close to the building, came up, |
| 10:11:48 | 25 | you couldn't see me from over here, but we could see them from |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 27 of 140 PageID #:30922
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| | | |
|---|---|---|
| 10:11:52 | 1 | over here. |
| 10:11:53 | 2 | BY MR. LOEVY: |
| 10:11:53 | 3 | Q.  This is the Lincoln center.  You say, guys, there's Fuddy, |
| 10:11:57 | 4 | right? |
| 10:11:58 | 5 | A.  Yes. |
| 10:11:58 | 6 | THE COURT:  Just so the record is clear, he pointed |
| 10:12:00 | 7 | to a spot just to the left of the building that's on the |
| 10:12:02 | 8 | northeast corner of Langley and Oakwood. |
| 10:12:05 | 9 | MR. LOEVY:  Correct. |
| 10:12:11 | 10 | THE COURT:  Left on the diagram, on the photograph I |
| 10:12:14 | 11 | mean. |
| 10:12:14 | 12 | BY MR. LOEVY: |
| 10:12:14 | 13 | Q.  Sir, isn't it true that that's more than 400 feet away, |
| 10:12:18 | 14 | 500 feet away? |
| 10:12:19 | 15 | A.  I don't know what -- how far it is away.  You can see it. |
| 10:12:22 | 16 | Q.  Showing you stipulation from the second criminal trial? |
| 10:12:25 | 17 | MR. LOEVY:  Your Honor, we'd ask that this be put on |
| 10:12:27 | 18 | the ELMO.  This is page 160. |
| 10:12:29 | 19 | THE COURT:  The jurors can see it. |
| 10:12:30 | 20 | BY MR. LOEVY: |
| 10:12:31 | 21 | Q.  It is stipulated between the parties that the shortest |
| 10:12:34 | 22 | distance between Oakley Boulevard and the entrance to the |
| 10:12:38 | 23 | breezeway of the building, which stood at 706 East 39th |
| 10:12:42 | 24 | Street, as they existed on August 28, 1948 is 500 feet.  That |
| 10:12:47 | 25 | was stipulated at Mr. Fields' trial.  Does that comport with |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 28 of 140 PageID #:30923
11/29/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

27

| | | |
|---|---|---|
| 10:12:50 | 1 | your recollection? |
| 10:12:50 | 2 | A.  Yes. |
| 10:12:51 | 3 | Q.  500 feet is ten times the length of this courtroom from |
| 10:12:54 | 4 | where you're sitting to that wall, would you agree with that? |
| 10:12:57 | 5 | A.  I saw him. |
| 10:12:59 | 6 | Q.  500 feet is triple? |
| 10:13:02 | 7 | A.  500 feet, 500 feet. |
| 10:13:04 | 8 | Q.  Is triple the distance where the boys were playing |
| 10:13:07 | 9 | baseball to the breezeway, correct? |
| 10:13:12 | 10 | MR. KULWIN:  Objection. |
| 10:13:12 | 11 | THE COURT:  Argumentative, sustained.  You will argue |
| 10:13:14 | 12 | this later, Mr. Loevy.  You have the stipulation in from the |
| 10:13:16 | 13 | trial. |
| 10:13:17 | 14 | BY MR. LOEVY: |
| 10:13:17 | 15 | Q.  The last question I want to ask is isn't it true that if |
| 10:13:20 | 16 | you were on Oakwood, at best you could have seen a spec in |
| 10:13:24 | 17 | front of that building? |
| 10:13:25 | 18 | A.  No. |
| 10:13:25 | 19 | Q.  You told Mr. Fields and Mr. Carter, that's the spec I want |
| 10:13:31 | 20 | you to murder? |
| 10:13:37 | 21 | MR. BURNS:  Objection, your Honor. |
| 10:13:38 | 22 | THE COURT:  Sustained to the form of the question. |
| 10:13:39 | 23 | BY MR. LOEVY: |
| 10:13:50 | 24 | Q.  Yesterday, you walked through with Mr. Burns some details |
| 10:13:53 | 25 | about a Charlie green and Minerva.  And a maroon Oldsmobile |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 29 of 140 PageID #:30924
***REALTIME UNEDITED TRANSCRIPT ONLY***

28

10:13:57  1  and a radio.  Do you remember answering those questions

10:14:00  2  yesterday?

10:14:01  3  A.  Yes, sir.

10:14:01  4  Q.  Now, those were the questions you went over with Mr. Burns

10:14:06  5  on Sunday, correct?

10:14:07  6  A.  Yes, sir.

10:14:07  7  Q.  If we had asked you those same questions last Friday

10:14:11  8  before the meeting with burns, you would not have been able to

10:14:15  9  give those same details?

10:14:16  10  A.  Probably not.

10:14:16  11  Q.  At the meeting, what you did you went over transcripts?

10:14:19  12  A.  No, I needed my memory refreshing.

10:14:22  13  Q.  They helped refresh your memory?

10:14:24  14  A.  Yeah.

10:14:25  15  Q.  Who was in the car when you were driving over to the

10:14:32  16  murder, sir, who were you with?

10:14:33  17  A.  Hank Andrews.

10:14:36  18  Q.  Are you sure of that?

10:14:37  19  A.

10:14:39  20       MR. BURNS:  Objection, your Honor.

10:14:40  21       MR. LOEVY:  All right.  Let me ask him another

10:14:42  22  question.

10:14:42  23  BY MR. LOEVY:

10:14:43  24  Q.  Do you remember testifying on October 1st, 1991, that you

10:14:45  25  were in the car with Nate Fields on the way to the murder?

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 30 of 140 PageID #:30925
***REALTIME UNEDITED TRANSCRIPT ONLY***

29

| | | |
|---|---|---|
| 10:14:49 | 1 | A.  That's what I said? |
| 10:14:55 | 2 | Q.  Isn't it true you also testified on July 29th, 1996, that |
| 10:15:00 | 3 | you, Nate, and Carter were in the same car and that Andrews |
| 10:15:03 | 4 | was by himself? |
| 10:15:05 | 5 | A.  Yes. |
| 10:15:08 | 6 | Q.  Isn't it true you're making it up each time you tell the |
| 10:15:12 | 7 | story? |
| 10:15:12 | 8 | A.  No. |
| 10:15:12 | 9 | Q.  So your testimony is that Mr. Fields hopped out of a car |
| 10:15:21 | 10 | with Jackie Clay wearing a ski mask, ran up to Fuddy and shot |
| 10:15:26 | 11 | him, basically? |
| 10:15:27 | 12 | A.  That's what happened. |
| 10:15:27 | 13 | Q.  And then they hopped into another car to make their get |
| 10:15:30 | 14 | away? |
| 10:15:30 | 15 | A.  Yes. |
| 10:15:31 | 16 | Q.  So you're saying on a busy morning with people out, they |
| 10:15:35 | 17 | jumped out of his own car and left his car at the scene? |
| 10:15:38 | 18 | A.  I never said that. |
| 10:15:42 | 19 | Q.  All right.  But you did just say he got out of his car in |
| 10:15:45 | 20 | a ski mask, ran over and shot him? |
| 10:15:47 | 21 | A.  You said that. |
| 10:15:48 | 22 | Q.  Okay.  Did he leave his car at the scene? |
| 10:15:49 | 23 | A.  You said that. |
| 10:15:50 | 24 | Q.  Did he leave his car at the scene? |
| 10:15:52 | 25 | A.  No, I said they came from behind the building.  See them. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 31 of 140 PageID #:30926
***REALTIME UNEDITED TRANSCRIPT ONLY***

30

| | | |
|---|---|---|
| 10:15:59 | 1 | The next time I seen them, they came through the breezeway. |
| 10:16:02 | 2 | That's my testimony, sir. |
| 10:16:03 | 3 | Q.  The idea was you picked people who weren't familiar with |
| 10:16:05 | 4 | the neighborhood, right? |
| 10:16:06 | 5 | A.  Correct. |
| 10:16:06 | 6 | Q.  Because they didn't want to be recognized, right? |
| 10:16:08 | 7 | A.  Correct. |
| 10:16:08 | 8 | Q.  And they're supposed to wear masks, right? |
| 10:16:10 | 9 | A.  Correct. |
| 10:16:11 | 10 | Q.  And you gave them masks in your story, correct? |
| 10:16:14 | 11 | MR. KULWIN:  Objection to your story, Judge. |
| 10:16:16 | 12 | THE COURT:  Overruled. |
| 10:16:17 | 13 | THE WITNESS:  Yes. |
| 10:16:18 | 14 | MR. KULWIN:  Objection. |
| 10:16:19 | 15 | THE COURT:  I overruled the objection.  I already |
| 10:16:22 | 16 | did.  You got a ruling. |
| 10:16:23 | 17 | MR. KULWIN:  Thank you. |
| 10:16:23 | 18 | BY MR. LOEVY: |
| 10:16:24 | 19 | Q.  Did you see them jump out of Mr. Fields' car? |
| 10:16:25 | 20 | A.  How can I see them jump out of a car and there is a |
| 10:16:28 | 21 | building.  I told you the next time that I seen him, don't try |
| 10:16:31 | 22 | to confuse me, the next time I seen them they were running |
| 10:16:36 | 23 | across the street. |
| 10:16:36 | 24 | THE COURT:  Stop, ask your questions slower, answer |
| 10:16:39 | 25 | the question directly, don't volunteer.  Or I am going to have |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 32 of 140 PageID #:30927
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

31

| | | |
|---|---|---|
| 10:16:44 | 1 | to strike testimony. |
| 10:16:44 | 2 | BY MR. LOEVY: |
| 10:16:45 | 3 | Q. Did you see Mr. Fields and Mr. Carter jump out of the car? |
| 10:16:47 | 4 | A. No, sir. |
| 10:16:48 | 5 | Q. Did you testify yesterday that you did? |
| 10:16:52 | 6 | THE COURT: The jury heard the testimony from |
| 10:16:53 | 7 | yesterday. You'll argue that later. |
| 10:16:55 | 8 | BY MR. LOEVY: |
| 10:16:55 | 9 | Q. All right. The team that was put together according to |
| 10:16:58 | 10 | you is George Carter, Nate Fields, Hank Andrews and you? |
| 10:17:03 | 11 | A. Yes, sir. |
| 10:17:04 | 12 | Q. That was a week before the shooting, the generals and Jeff |
| 10:17:06 | 13 | Fort who said put together the team, right? |
| 10:17:08 | 14 | A. Yes, sir. |
| 10:17:09 | 15 | Q. And that was always the team, Mr. Fields, you, Hank |
| 10:17:13 | 16 | Andrews and George Carter, that's your testimony, right? |
| 10:17:16 | 17 | A. What is you asking me. |
| 10:17:18 | 18 | Q. That was always the team, right? |
| 10:17:19 | 19 | A. Always what team? |
| 10:17:21 | 20 | Q. Never mind. |
| 10:17:22 | 21 | MR. LOEVY: May I move on, your Honor? |
| 10:17:24 | 22 | THE COURT: I'd like you to. |
| 10:17:25 | 23 | BY MR. LOEVY: |
| 10:17:25 | 24 | Q. All right. Now, the idea was to pick guys who weren't |
| 10:17:30 | 25 | familiar from the neighborhood, why did they pick you? |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 33 of 140 PageID #:30928
***REALTIME UNEDITED TRANSCRIPT ONLY***

32

| | | |
|---|---|---|
| 10:17:32 | 1 | A.  Because they wanted me to pick out the guy who it was. |
| 10:17:35 | 2 | Q.  But you didn't know the guy who it was? |
| 10:17:38 | 3 | A.  I didn't know them that familiar, but Rodell was telling |
| 10:17:41 | 4 | me that I knew him. |
| 10:17:42 | 5 | Q.  All right.  Wouldn't it have been better since you're well |
| 10:17:45 | 6 | known in the building to have you not involved? |
| 10:17:48 | 7 | A.  That was the plan. |
| 10:17:50 | 8 | Q.  The plan was it didn't matter if you were known or not |
| 10:17:52 | 9 | because you were going to be wearing masks isn't that true, |
| 10:17:55 | 10 | sir? |
| 10:17:55 | 11 | A.  You are making the plan. |
| 10:17:57 | 12 | Q.  Who did make the plan? |
| 10:17:59 | 13 | A.  I just told you who made the plan. |
| 10:18:02 | 14 | Q.  Who made the plan? |
| 10:18:03 | 15 | A.  We made the plan, the general in our offices in security |
| 10:18:06 | 16 | with Jeff Fort.  If you want to do something else, that's on |
| 10:18:09 | 17 | you. |
| 10:18:09 | 18 | Q.  All right.  Were you wearing a mask that day? |
| 10:18:11 | 19 | A.  No. |
| 10:18:12 | 20 | Q.  Were you concealing yourself in the car? |
| 10:18:15 | 21 | A.  Mostly I was down in the car like this, like this. |
| 10:18:21 | 22 | Q.  Isn't that kind of suspicious looking? |
| 10:18:23 | 23 |        THE COURT:  Just for the record he's lunched down |
| 10:18:24 | 24 | with his jacket kind of pulled up over the bottom of his face. |
| 10:18:29 | 25 | BY MR. LOEVY: |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 34 of 140 PageID #:30929
***REALTIME UNEDITED TRANSCRIPT ONLY***

33

| | | |
|---|---|---|
| 10:18:29 | 1 | Q.  Don't you think that would draw attention to yourself? |
| 10:18:32 | 2 | MR. KULWIN:  Objection, speculation. |
| 10:18:33 | 3 | THE COURT:  Sustained and argumentative. |
| 10:18:38 | 4 | MR. KULWIN:  And argumentative. |
| 10:18:39 | 5 | BY MR. LOEVY: |
| 10:18:40 | 6 | Q.  It's your testimony if I understand it with Mr. Burns that |
| 10:18:44 | 7 | Fuddy was standing outside the building for a good half hour |
| 10:18:46 | 8 | before the shooting happened? |
| 10:18:47 | 9 | A.  Yes, sir. |
| 10:18:51 | 10 | Q.  Because the idea was that Rodell Banks supposedly called |
| 10:18:54 | 11 | you and said he's out there and you then put everybody |
| 10:18:58 | 12 | together and you went over there and he was still out there, |
| 10:19:00 | 13 | right? |
| 10:19:00 | 14 | A.  Yes, sir. |
| 10:19:01 | 15 | Q.  And the whole time you were there, he was just standing |
| 10:19:04 | 16 | outside the building, right? |
| 10:19:06 | 17 | A.  Standing, people coming and going, talking to him, |
| 10:19:09 | 18 | speaking to him. |
| 10:19:10 | 19 | Q.  I want to focus on he was present in front of the building |
| 10:19:12 | 20 | for the whole time, right in? |
| 10:19:13 | 21 | THE COURT:  Who is the he? |
| 10:19:15 | 22 | MR. LOEVY:  He being Fuddy Smith. |
| 10:19:17 | 23 | THE WITNESS:  Yes. |
| 10:19:17 | 24 | BY MR. LOEVY: |
| 10:19:17 | 25 | Q.  Did he not disappear for ten minutes, did he?  He was out |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 35 of 140 PageID #:30930

| | | |
|---|---|---|
| 10:19:20 | 1 | there the whole time, right? |
| 10:19:21 | 2 | A.  Yes, sir. |
| 10:19:21 | 3 | Q.  He did not shortly before the shooting come walking |
| 10:19:24 | 4 | through a breezeway by himself, did he? |
| 10:19:26 | 5 | A.  No, sir. |
| 10:19:27 | 6 | Q.  And you said he was by himself for most of that time? |
| 10:19:33 | 7 | A.  Yes, sir. |
| 10:19:34 | 8 | Q.  He was not with Talman Hickman until the very last minute? |
| 10:19:37 | 9 | A.  What are you talking about? |
| 10:19:40 | 10 | Q.  Who is the other guy that got killed? |
| 10:19:41 | 11 | A.  Talman Hickman. |
| 10:19:42 | 12 | Q.  Talman Hickman showed up at the very last second, right? |
| 10:19:44 | 13 | A.  Yes. |
| 10:19:45 | 14 | Q.  All right.  So you can say definitively that Talman |
| 10:19:51 | 15 | Hickman and Fuddy did not walk out together shortly before the |
| 10:19:53 | 16 | shooting, correct? |
| 10:19:54 | 17 | A.  No, I did not say that. |
| 10:19:56 | 18 | Q.  I'm saying you say that didn't happen, right? |
| 10:19:59 | 19 | A.  No, I'm saying Fuddy was standing out there and the other |
| 10:20:02 | 20 | guy walked up. |
| 10:20:03 | 21 | Q.  At the last second, right? |
| 10:20:04 | 22 | A.  Yes. |
| 10:20:04 | 23 | Q.  Okay.  Now, let's talk a little bit about the bribe |
| 10:20:11 | 24 | testimony you did yesterday.  The conversations that you claim |
| 10:20:15 | 25 | Mr. Fields were part of -- strike that. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 36 of 140 PageID #:30931
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

10:20:17    1        Your attorney, Mr. Swano, was the one who made the

10:20:20    2    bribe, correct?

10:20:21    3    A.  Yes, he was a major part of it, yes.

10:20:24    4    Q.  And Mr. Fields had his own attorney, right?

10:20:28    5    A.  Yes.

10:20:28    6    Q.  And you claim that Mr. Swano talked about the bribe in Mr.

10:20:31    7    Fields' presence, if I understood your testimony yesterday?

10:20:34    8    A.  Yes.

10:20:34    9    Q.  In the bull pen is where you testified that happened,

10:20:36   10    correct?

10:20:36   11    A.  One of the places.

10:20:38   12    Q.  And in fact, when you first told the story, you said the

10:20:42   13    discussions were when he visited you in the basement at the

10:20:45   14    jail, correct?

10:20:45   15    A.  That was one of them.

10:20:47   16    Q.  This is your testimony from the April 14th hearing in this

10:20:54   17    case, page 2705.

10:20:56   18        "QUESTION:  Isn't it true, Mr. Hawkins, that when you

10:20:58   19    first -- when you told this story before about the discussions

10:21:02   20    with Mr. Swano, you testified that Mr. Swano visited you in

10:21:05   21    the basement of the jail with Mr. Fields to talk about the

10:21:07   22    bribe isn't that correct?

10:21:09   23    A.  Yes, sir.

10:21:09   24    Q.  That was your first story.  You changed it to the bull

10:21:12   25    pen, didn't you?

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 37 of 140 PageID #:30932
***REALTIME UNEDITED TRANSCRIPT ONLY***

36

| | | |
|---|---|---|
| 10:21:12 | 1 | MR. KULWIN:  Objection. |
| 10:21:13 | 2 | MR. BURNS:  Objection. |
| 10:21:14 | 3 | THE COURT:  Sustained.  Argumentative. |
| 10:21:17 | 4 | BY MR. LOEVY: |
| 10:21:18 | 5 | Q.  Now, as far as the time frame, you have no idea when these |
| 10:21:23 | 6 | conversations took place, correct? |
| 10:21:26 | 7 | A.  What do you mean? |
| 10:21:32 | 8 | Q.  Do you have any time frame when these conversations took |
| 10:21:35 | 9 | place, the time frame that Mr. Fields supposedly heard about |
| 10:21:37 | 10 | the bribe? |
| 10:21:39 | 11 | A.  When we were going to court, what are you talking about? |
| 10:21:43 | 12 | Q.  Did you ever have these conversations at Cook County? |
| 10:21:47 | 13 | A.  Yes, that's where we were at. |
| 10:21:49 | 14 | Q.  Isn't it true Mr. Fields and you were in different |
| 10:21:52 | 15 | divisions? |
| 10:21:52 | 16 | A.  Yes. |
| 10:21:53 | 17 | Q.  You were in six, he was in one? |
| 10:21:54 | 18 | A.  You got it backwards. |
| 10:21:56 | 19 | Q.  You were in one, he was in six? |
| 10:21:57 | 20 | A.  Yes. |
| 10:21:58 | 21 | Q.  Different. |
| 10:22:02 | 22 | All right.  Did Swano ever tell you he was working |
| 10:22:05 | 23 | with the judge to keep the money? |
| 10:22:07 | 24 | A.  No. |
| 10:22:09 | 25 | Q.  Your testimony on March 18th, 1993, lines 14, 4 through |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 38 of 140 PageID #:30933
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

37

| | | |
|---|---|---|
| 10:22:17 | 1 | 14? |
| 10:22:18 | 2 | MR. KULWIN:  I'm sorry, what was the date? |
| 10:22:20 | 3 | MR. LOEVY:  3/18/1993. |
| 10:22:22 | 4 | MR. KULWIN:  Can I see the transcript? |
| 10:22:24 | 5 | THE COURT:  Show it to him. |
| 10:22:26 | 6 | MR. KULWIN:  What case it's from? |
| 10:22:29 | 7 | THE COURT:  Actually, this is probably an appropriate |
| 10:22:31 | 8 | place to deal with a question one of the jurors asked.  There |
| 10:22:34 | 9 | was a question that one of the jurors asked, it really wasn't |
| 10:22:36 | 10 | a question for the witness, I'll paraphrase it.  The lawyers |
| 10:22:42 | 11 | are showing statements from or talking about statements from |
| 10:22:45 | 12 | several court dates and trials.  Can we get the dates and what |
| 10:22:49 | 13 | the trials were for.  It's hard to keep up with what they're |
| 10:22:53 | 14 | talking about.  Maybe I missed something. |
| 10:22:54 | 15 | So here's the answer to that question.  So you've |
| 10:22:58 | 16 | heard that there were two criminal trials of Mr. Fields.  1986 |
| 10:23:02 | 17 | and 2009.  And when questions have been asked about those, I |
| 10:23:06 | 18 | have tried to kind of pop in if the lawyers haven't identified |
| 10:23:08 | 19 | them to identify which criminal trial it is. |
| 10:23:10 | 20 | There have been other occasions on which various |
| 10:23:14 | 21 | witnesses have testified on matters relating to the issues |
| 10:23:16 | 22 | that we have here.  There's a whole bunch of them.  And as a |
| 10:23:21 | 23 | matter of evidence law, it's really not appropriate for me to |
| 10:23:24 | 24 | be going into for the lawyers to be going into exactly what |
| 10:23:27 | 25 | the proceeding involved.  So you're just going to have to do |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 39 of 140 PageID #:30934
***REALTIME UNEDITED TRANSCRIPT ONLY***

38

| | | |
|---|---|---|
| 10:23:30 | 1 | your best to keep notes and whatnot. |
| 10:23:34 | 2 | I will tell you this. It's been my consistent |
| 10:23:36 | 3 | experience over the quick math, 17 years I have been a judge, |
| 10:23:43 | 4 | about the same, 18 years that I was a lawyer before that, that |
| 10:23:47 | 5 | 12 of you will do way better than one of you at remembering |
| 10:23:50 | 6 | things. That's why we have 12 jurors as opposed to one. |
| 10:23:53 | 7 | MR. KULWIN: Judge, I'd like to be heard on this. |
| 10:23:55 | 8 | THE COURT: Let me see you at sidebar. |
| 10:24:02 | 9 | (The following proceedings were had at sidebar outside the |
| 10:24:04 | 10 | hearing of the jury:) |
| 10:24:04 | 11 | THE COURT: By the way, you have blown way through 20 |
| 10:24:07 | 12 | minutes. How much more do you have? You told me 20 |
| 10:24:09 | 13 | yesterday. |
| 10:24:09 | 14 | MR. LOEVY: I was trying to compress it to finish by |
| 10:24:12 | 15 | the day. |
| 10:24:12 | 16 | THE COURT: Life, one of the other things that life |
| 10:24:15 | 17 | has taught me, that most lawyers I give them overnight, they |
| 10:24:20 | 18 | shorten up. They shorten it. |
| 10:24:22 | 19 | MR. LOEVY: No. |
| 10:24:23 | 20 | THE COURT: So you're the exception that disproves |
| 10:24:25 | 21 | the rule. |
| 10:24:25 | 22 | MR. KULWIN: Shorter if I have more time. |
| 10:24:27 | 23 | THE COURT: What's the -- will the me look at this. |
| 10:24:30 | 24 | This is testimony from what proceeding? |
| 10:24:32 | 25 | MR. LOEVY: You told me not to read the trial name. |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 40 of 140 PageID #:30935

| | | |
|---|---|---|
| 10:24:35 | 1 | THE COURT:  U.S. v. Maloney.  What's the question? |
| 10:24:41 | 2 | MR. KULWIN:  My point is we weren't given any notice |
| 10:24:44 | 3 | that he was going to pull this transcript out.  Had he given |
| 10:24:47 | 4 | me in I notice, I would have gone and searched the transcript. |
| 10:24:50 | 5 | I don't know if this is the whole context or not.  He could |
| 10:24:53 | 6 | have six pages later clarified it.  I think it's unfair. |
| 10:24:59 | 7 | THE COURT:  Wow.  That objection is overruled. |
| 10:25:02 | 8 | MR. KULWIN:  Okay. |
| 10:25:02 | 9 | THE COURT:  I got to say something more about this. |
| 10:25:05 | 10 | Everybody knows about this witness' prior testimony.  I'll |
| 10:25:08 | 11 | just say this.  Okay?  These were, I'm looking at the |
| 10:25:11 | 12 | transcript from the Maloney trial, it's leading questions by |
| 10:25:15 | 13 | Mr. Hogan, Mr. Hogan being the lawyer who spent the most time |
| 10:25:20 | 14 | than anybody in the entire world with this witness, they are |
| 10:25:23 | 15 | leading questions from Mr. Hogan.  I mean, I think you can be |
| 10:25:27 | 16 | relatively comfortable. |
| 10:25:31 | 17 | MR. NOLAND:  Judge, I would like to bring out at the |
| 10:25:33 | 18 | last trial the Court barred, this Court, you barred us from |
| 10:25:37 | 19 | getting into prior consistent statement of both Hawkins in |
| 10:25:41 | 20 | July of '87 that he told the FBI and Pat Deedee that Fields |
| 10:25:45 | 21 | was surprised of the bribe.  Mr. Loevy just stated that isn't |
| 10:25:48 | 22 | it true the first time you told this story was in 2014.  That |
| 10:25:52 | 23 | is incorrect.  I think that has opened the door to this |
| 10:25:54 | 24 | statement.  It has two references in there that prior to the |
| 10:25:57 | 25 | trial, that he, Swano, talked to him about the bribe, he told |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 41 of 140 PageID #:30936

| | |
|---|---|
| 10:26:01 | 1 | Fields. |
| 10:26:01 | 2 | THE COURT: Show me. |
| 10:26:03 | 3 | MR. NOLAND: I highlighted both for the Court. |
| 10:26:05 | 4 | THE COURT: We can all look at it. The doctor said |
| 10:26:09 | 5 | it's likely just my asthma. |
| 10:26:15 | 6 | So really, the one thing -- the one part in here that |
| 10:26:33 | 7 | would potentially be admissible on this theory is the |
| 10:26:35 | 8 | statement on the second full paragraph on page 2 of this 302 |
| 10:26:40 | 9 | involving an interview on July 1, 1997, Defense Exhibit 113 |
| 10:26:45 | 10 | that Hawkins advised that based on his prior experience with |
| 10:26:47 | 11 | Swano who represented him on other cases he told Fields and |
| 10:26:51 | 12 | Carter that Swano probably asked for 20,000 for the judge and |
| 10:26:53 | 13 | would probably keep 5,000 for himself. It's a commission. |
| 10:26:59 | 14 | MR. LOEVY: Mr. Noland said that I said the first |
| 10:27:02 | 15 | time he ever told anybody, and I don't know if he is being |
| 10:27:04 | 16 | precise with his question, you have the realtime, I guess I |
| 10:27:07 | 17 | would want to know. |
| 10:27:08 | 18 | THE COURT: Let me look at it. I am glad I looked at |
| 10:27:55 | 19 | that. I think actually Mr. Noland let me say two things. |
| 10:28:01 | 20 | What the questions involved that Mr. Loevy asked was isn't it |
| 10:28:03 | 21 | a fact that the first time you told the story about Mr. Fields |
| 10:28:11 | 22 | being told about the bribe, you said that it happened in the |
| 10:28:15 | 23 | basement of the jail. So he didn't say that the first time he |
| 10:28:19 | 24 | told the story about Mr. Fields knowing that the bribe was |
| 10:28:22 | 25 | 2014. I don't see that in the transcript. So there's no |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 42 of 140 PageID #:30937

| | | |
|---|---|---|
| 10:28:24 | 1 | basis for a prior consistent. |
| 10:28:29 | 2 | (The following proceedings were had in open court in the |
| 10:28:41 | 3 | presence and hearing of the jury:) |
| 10:28:41 | 4 | THE COURT:  You can proceed. |
| 10:28:41 | 5 | BY MR. LOEVY: |
| 10:28:42 | 6 | Q.  The question was did Swano tell you that he was working on |
| 10:28:50 | 7 | the judge trying to keep the money? |
| 10:28:51 | 8 | A.  Yes, that came up before. |
| 10:28:53 | 9 | Q.  Why did you say no a minute ago? |
| 10:28:55 | 10 | MR. BURNS:  Objection, your Honor? |
| 10:28:56 | 11 | THE COURT:  Sustained.  Leave it for argument. |
| 10:28:58 | 12 | BY MR. LOEVY: |
| 10:28:59 | 13 | Q.  All right.  Another time you told the story, you claimed |
| 10:29:04 | 14 | the judge kept the money until the verdict isn't that true, |
| 10:29:07 | 15 | sir? |
| 10:29:07 | 16 | A.  Yeah. |
| 10:29:09 | 17 | Q.  Is that true that the judge kept the money until the |
| 10:29:12 | 18 | verdict? |
| 10:29:12 | 19 | A.  When I found out that he gave the money back, I thought |
| 10:29:16 | 20 | the verdict was in. |
| 10:29:17 | 21 | Q.  All right.  Another time you told the story, the judge |
| 10:29:20 | 22 | gave it back two days into the trial, isn't it true? |
| 10:29:26 | 23 | MR. KULWIN:  Judge, I am going to object to |
| 10:29:28 | 24 | foundation.  We don't have a foundation. |
| 10:29:29 | 25 | THE COURT:  Sustained. |

11/29/16 AM       Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 43 of 140 PageID #:30938
***REALTIME UNEDITED TRANSCRIPT ONLY***

42

| | | |
|---|---|---|
| 10:29:30 | 1 | BY MR. LOEVY: |
| 10:29:30 | 2 | Q.  Isn't it true you testified on October 29th, 19991, that |
| 10:29:34 | 3 | the judge gave the bribe money back two days into the trial, |
| 10:29:37 | 4 | did you give that testimony? |
| 10:29:38 | 5 | A.  Yes, sir. |
| 10:29:39 | 6 | Q.  Was that true? |
| 10:29:40 | 7 | A.  I thought it was, yes. |
| 10:29:42 | 8 | Q.  All right.  That's different than the other stores stories |
| 10:29:47 | 9 | is it not? |
| 10:29:47 | 10 | THE COURT:  Same, argumentative. |
| 10:29:49 | 11 | BY MR. LOEVY: |
| 10:29:50 | 12 | Q.  Did Swano ever say he was going to come up with the bribe |
| 10:29:52 | 13 | money from his own pocket? |
| 10:29:53 | 14 | A.  No, I never heard that. |
| 10:29:55 | 15 | Q.  This is your testimony on 3/18/1993 at page 1680. |
| 10:30:00 | 16 | "QUESTION:  Did Swano ever tell you that he was going |
| 10:30:02 | 17 | to come up with 6,000 out of his own pocket? |
| 10:30:04 | 18 | "ANSWER:  Yeah." |
| 10:30:06 | 19 | Did you give that testimony, sir? |
| 10:30:07 | 20 | A.  Yes. |
| 10:30:08 | 21 | Q.  When Swano told you that the money was giving the money |
| 10:30:15 | 22 | back, who was present for this conversation, sir? |
| 10:30:18 | 23 | A.  When he said he was giving the money back? |
| 10:30:21 | 24 | Q.  The judge was going to give the money back, who was |
| 10:30:24 | 25 | present? |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 44 of 140 PageID #:30939
***REALTIME UNEDITED TRANSCRIPT ONLY***

43

| | | |
|---|---|---|
| 10:30:24 | 1 | A.  Me and Swano and probably Jack sweeten. |
| 10:30:35 | 2 | Q.  Do you remember saying in 2013 that George Carter was |
| 10:30:40 | 3 | present? |
| 10:30:40 | 4 | A.  Yes. |
| 10:30:40 | 5 | Q.  Was he present? |
| 10:30:41 | 6 | A.  I thought he was. |
| 10:30:42 | 7 | Q.  His case had been severed long before, correct? |
| 10:30:44 | 8 | A.  Long before. |
| 10:30:44 | 9 | Q.  Right. |
| 10:30:46 | 10 | A.  No, it wasn't long before. |
| 10:30:47 | 11 | Q.  Was George Carter present when the bribe was talked about |
| 10:30:51 | 12 | or not, sir? |
| 10:30:51 | 13 | A.  No, not that I remember. |
| 10:30:54 | 14 | Q.  Okay.  Do you remember giving this testimony in August |
| 10:30:57 | 15 | 2013 at page 188, line 19: At some point during the trial, |
| 10:31:03 | 16 | later on in the trial, did you later -- did Swano give you |
| 10:31:05 | 17 | some bad news? |
| 10:31:06 | 18 | "ANSWER:  Yes. |
| 10:31:08 | 19 | "QUESTION:  Where did you talk to Swano? |
| 10:31:10 | 20 | "ANSWER:  In the bull pen |
| 10:31:11 | 21 | "QUESTION:  Who was present for that conversation? |
| 10:31:13 | 22 | "ANSWER:  Nathson Fields, George Carter. |
| 10:31:16 | 23 | "QUESTION:  What, if anything, did he tell you? |
| 10:31:18 | 24 | "ANSWER:  He said I got some bad news for you. |
| 10:31:21 | 25 | "QUESTION:  What did he say? |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 45 of 140 PageID #:30940
11/29/16 AM                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

44

| | | |
|---|---|---|
| 10:31:22 | 1 | "ANSWER:  I said what are you talking about?  He said |
| 10:31:25 | 2 | the judge -- he want to give the money back.  I said what? |
| 10:31:29 | 3 | Did you give that testimony, sir? |
| 10:31:31 | 4 | A.  Yes, sir. |
| 10:31:31 | 5 | Q.  You're making this up as you go along? |
| 10:31:34 | 6 | MR. KULWIN:  Objection. |
| 10:31:35 | 7 | THE COURT:  Sustained. |
| 10:31:37 | 8 | BY MR. LOEVY: |
| 10:31:38 | 9 | Q.  Do you recall whether there was a problem with getting the |
| 10:31:39 | 10 | bribe money together? |
| 10:31:41 | 11 | A.  Yes, sir. |
| 10:31:45 | 12 | Q.  What was the problem? |
| 10:31:46 | 13 | A.  That he wanted to make sure that it was for all his men, |
| 10:31:50 | 14 | that's my knowledge. |
| 10:31:51 | 15 | Q.  What's that? |
| 10:31:51 | 16 | A.  He wanted to make sure that it was for everybody, that was |
| 10:31:56 | 17 | in the situation. |
| 10:31:57 | 18 | Q.  Swano didn't have any money, right? |
| 10:31:59 | 19 | A.  I don't know what Swano had. |
| 10:32:00 | 20 | Q.  He didn't have the bribe money, wasn't that the problem? |
| 10:32:04 | 21 | A.  You are talking about getting him the money, yes. |
| 10:32:06 | 22 | Q.  Wasn't that a problem that Swano didn't have the bribe |
| 10:32:09 | 23 | money, there was some kind of delay, do you remember that, yes |
| 10:32:13 | 24 | or no? |
| 10:32:13 | 25 | MR. KULWIN:  Or I don't recall either. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 46 of 140 PageID #:30941
***REALTIME UNEDITED TRANSCRIPT ONLY***

45

| | | |
|---|---|---|
| 10:32:16 | 1 | THE COURT:  The question is -- no, do you remember |
| 10:32:18 | 2 | that? |
| 10:32:19 | 3 | MR. KULWIN:  Okay. |
| 10:32:20 | 4 | THE COURT:  It would have to be yes or no. |
| 10:32:23 | 5 | THE WITNESS:  Your question? |
| 10:32:24 | 6 | BY MR. LOEVY: |
| 10:32:25 | 7 | Q.  Was there some kind of unexplained delay in getting the |
| 10:32:27 | 8 | money?  Do you remember that being part of the story? |
| 10:32:30 | 9 | A.  It took time to get the money together and we got it to |
| 10:32:40 | 10 | him when we could, yes. |
| 10:32:41 | 11 | Q.  The criminal case got continued to June 11th, 1986, and |
| 10:32:47 | 12 | there was still no money, correct? |
| 10:32:49 | 13 | A.  Okay. |
| 10:32:49 | 14 | Q.  I'm asking.  Is that what happened? |
| 10:32:50 | 15 | A.  Okay. |
| 10:32:51 | 16 | Q.  Is that what happened? |
| 10:32:52 | 17 | A.  Okay. |
| 10:32:53 | 18 | Q.  No okay is ambiguous.  I'm asking you? |
| 10:32:56 | 19 | MR. KULWIN:  Judge, I am going to object. |
| 10:32:57 | 20 | Argumentative. |
| 10:32:57 | 21 | THE COURT:  Well, it may be argumentative, but it's |
| 10:33:00 | 22 | right.  So you need to answer it yes or no or I don't know: |
| 10:33:04 | 23 | Those are the possibilities. |
| 10:33:08 | 24 | THE WITNESS:  I don't know. |
| 10:33:08 | 25 | BY MR. LOEVY: |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 47 of 140 PageID #:30942
***REALTIME UNEDITED TRANSCRIPT ONLY***

46

| | | |
|---|---|---|
| 10:33:09 | 1 | Q.  Isn't it true you testified on March 18th, 1993, at page |
| 10:33:12 | 2 | 1553, lines 20 as follows: |
| 10:33:16 | 3 | "QUESTION:  Now, once again, was your case continued |
| 10:33:19 | 4 | from May 12th until June 11th? |
| 10:33:21 | 5 | "ANSWER:  Yes. |
| 10:33:22 | 6 | "QUESTION:  In that intervening period, sir, in May and |
| 10:33:25 | 7 | June, were there continuing conversations about trying to get |
| 10:33:28 | 8 | the money to Bill Swano? |
| 10:33:30 | 9 | "ANSWER:  Yes." |
| 10:33:33 | 10 | Do you remember that testimony, sir? |
| 10:33:34 | 11 | A.  Yes, sir. |
| 10:33:35 | 12 | Q.  Isn't it true you had to decide whether you were going to |
| 10:33:38 | 13 | pick a jury or a bench before you knew there was going to be a |
| 10:33:41 | 14 | bribe? |
| 10:33:41 | 15 | A.  I don't understand the question. |
| 10:33:45 | 16 | Q.  The money hadn't been gathered yet, correct? |
| 10:33:47 | 17 | A.  Okay. |
| 10:33:48 | 18 | Q.  So the bribe hadn't been paid, correct? |
| 10:33:50 | 19 | A.  Yes, sir. |
| 10:33:51 | 20 | Q.  So you had to choose jury or a bench before you knew if |
| 10:33:56 | 21 | there was going to be a bribe, correct? |
| 10:33:56 | 22 | A.  No, sir. |
| 10:33:57 | 23 | Q.  If there hadn't been any money, how could it have been |
| 10:34:00 | 24 | paid? |
| 10:34:00 | 25 | A.  The plan could have been in the making, they just didn't |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 48 of 140 PageID #:30943
***REALTIME UNEDITED TRANSCRIPT ONLY***

47

| | | |
|---|---|---|
| 10:34:04 | 1 | put the money on there. |
| 10:34:05 | 2 | Q. Was that the plan -- |
| 10:34:06 | 3 | A. That's what I thought was going on. |
| 10:34:08 | 4 | Q. But you knew no bribe had been paid at the time that the |
| 10:34:10 | 5 | criminal trial started, correct? |
| 10:34:12 | 6 | A. I don't understand your question. |
| 10:34:16 | 7 | Q. At the time the trial started, you knew that although you |
| 10:34:21 | 8 | had a plan, no bribe had been paid, correct? |
| 10:34:23 | 9 | A. I still don't understand. You're saying before the trial |
| 10:34:27 | 10 | started? |
| 10:34:28 | 11 | Q. Right. The trial started -- |
| 10:34:30 | 12 | THE COURT: He's asking whether the bribe was paid |
| 10:34:32 | 13 | before the trial started. |
| 10:34:33 | 14 | THE WITNESS: That's -- |
| 10:34:35 | 15 | THE COURT: Yes or no? |
| 10:34:38 | 16 | THE WITNESS: Before the trial started, if it's a |
| 10:34:39 | 17 | bribe, it would have to be paid before the trial started. |
| 10:34:42 | 18 | THE COURT: He's asking whether it was. |
| 10:34:45 | 19 | BY MR. LOEVY: |
| 10:34:45 | 20 | Q. You said there was a plan. I'm asking did the plan |
| 10:34:48 | 21 | happened before the trial started? |
| 10:34:49 | 22 | A. As I remember, yes. |
| 10:34:50 | 23 | Q. Okay. Do you remember this testimony, this is page 181 of |
| 10:34:53 | 24 | the 2013 proceeding. |
| 10:34:55 | 25 | "QUESTION: Did you have additional conversations with |

11/29/16 AM Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 49 of 140 PageID #:30944
***REALTIME UNEDITED TRANSCRIPT ONLY***

48

| | | |
|---|---|---|
| 10:34:59 | 1 | El Rukns on still trying to get the money together? |
| 10:35:01 | 2 | "ANSWER: Yes. |
| 10:35:01 | 3 | "QUESTION: Again, was your case -- |
| 10:35:03 | 4 | THE COURT: Slower, please. |
| 10:35:05 | 5 | BY MR. LOEVY: |
| 10:35:06 | 6 | Q. Again, was your case continued once more from June 11th, |
| 10:35:09 | 7 | to June 16th? Your answer yes. Did the case get continued to |
| 10:35:14 | 8 | the next date, June 17th? |
| 10:35:15 | 9 | "ANSWER: Yes. |
| 10:35:17 | 10 | "QUESTION: At that point you elected to either take a |
| 10:35:19 | 11 | bench trial or a jury trial? |
| 10:35:20 | 12 | "ANSWER: I don't think so |
| 10:35:22 | 13 | "QUESTION: Well, the first time that your case was |
| 10:35:24 | 14 | called that morning was Swano even there? |
| 10:35:26 | 15 | "ANSWER: I don't think so. I think they had to wait |
| 10:35:28 | 16 | on it. |
| 10:35:29 | 17 | "QUESTION: Did he finally appear to court on June |
| 10:35:31 | 18 | 17th? |
| 10:35:32 | 19 | "ANSWER: Yes. |
| 10:35:33 | 20 | "QUESTION: On that day, did you finally take or elect |
| 10:35:36 | 21 | to take a bench trial finally? |
| 10:35:38 | 22 | "ANSWER: Yes, sir. |
| 10:35:39 | 23 | "QUESTION: Did Fields take a bench trial on that date |
| 10:35:41 | 24 | as well? |
| 10:35:42 | 25 | "ANSWER: Yes, sir." |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 50 of 140 PageID #:30945

| | | |
|---|---|---|
| 10:35:43 | 1 | Did you give that testimony, sir |
| 10:35:44 | 2 | MR. KULWIN:  I object. |
| 10:35:45 | 3 | MR. LOEVY:  That has the date. |
| 10:35:46 | 4 | THE COURT:  Overruled. |
| 10:35:47 | 5 | THE WITNESS:  Yes, sir. |
| 10:35:47 | 6 | BY MR. LOEVY: |
| 10:35:48 | 7 | Q.  The date was June 17th, correct? |
| 10:35:51 | 8 | A.  Okay. |
| 10:35:53 | 9 | Q.  Now, when do you claim that you and Mr. Fields learned |
| 10:35:57 | 10 | that Maloney was giving the money back? |
| 10:36:00 | 11 | A.  We was in trial already. |
| 10:36:09 | 12 | Q.  The trial had already started, right? |
| 10:36:12 | 13 | A.  Yes. |
| 10:36:12 | 14 | Q.  So according to you, no, I'm sorry, this is your testimony |
| 10:36:16 | 15 | in this court before Judge Kennelly on April 2014 at page 267, |
| 10:36:22 | 16 | line 19. |
| 10:36:23 | 17 | "QUESTION:  Just to clarify in my mind, when was it |
| 10:36:28 | 18 | that you first learned that the money had been given back by |
| 10:36:31 | 19 | Judge Maloney at the time of the bribe?  When was the first |
| 10:36:34 | 20 | time you learned? |
| 10:36:34 | 21 | "ANSWER:  A couple of days before the trial. |
| 10:36:39 | 22 | "QUESTION:  Before the trial began or when?  And then |
| 10:36:44 | 23 | Judge Kennelly said he just said a couple of days before the |
| 10:36:47 | 24 | trial. |
| 10:36:48 | 25 | "QUESTION:  Okay.  And then Mr. Burns asked you |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 51 of 140 PageID #:30946
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

50

| 10:36:51 | 1 | MR. KULWIN: May I have a page, please, Judge? |

10:36:51   1   MR. KULWIN:  May I have a page, please, Judge?

10:36:53   2   MR. LOEVY:  2679 and 2680.

10:36:56   3   THE COURT:  That's what he said.

10:36:57   4   MR. LOEVY:  The question again was the money for the

10:36:59   5   bribe had been returned, though, correct, sir?  Yes, sir.  Did

10:37:03   6   you give that testimony in this court.

10:37:04   7   THE WITNESS:  Yes, sir.

10:37:04   8   BY MR. LOEVY:

10:37:05   9   Q.  All right.  Was it true?

10:37:06   10  A.  No, sir.

10:37:06   11  Q.  Did you intentionally give untruthful testimony in May

10:37:11   12  2014?

10:37:11   13  A.  No, sir.

10:37:12   14  Q.  If the money had been given back once the trial -- before

10:37:21   15  the trial began, as you testified in 2014, then would you have

10:37:26   16  known that the heat was on, correct?

10:37:27   17  A.  What's your question, sir?

10:37:30   18  Q.  Once the money was given back, then would you have known

10:37:34   19  that you have a problem, right?

10:37:34   20  A.  Yes.

10:37:36   21  Q.  All right.  And if the money was given back before the

10:37:38   22  trial and if that was true that it was given back before the

10:37:43   23  trial, then when you make an election, you knew you should

10:37:45   24  have stayed away from Judge Maloney, correct?

10:37:47   25  A.  What's your question, sir?

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 52 of 140 PageID #:30947
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

51

| | |
|---|---|
| 10:37:50 | 1 |
| 10:37:53 | 2 |
| 10:37:56 | 3 |
| 10:37:57 | 4 |
| 10:37:59 | 5 |
| 10:38:03 | 6 |
| 10:38:04 | 7 |
| 10:38:04 | 8 |
| 10:38:08 | 9 |
| 10:38:10 | 10 |
| 10:38:10 | 11 |
| 10:38:13 | 12 |
| 10:38:13 | 13 |
| 10:38:15 | 14 |
| 10:38:16 | 15 |
| 10:38:20 | 16 |
| 10:38:22 | 17 |
| 10:38:25 | 18 |
| 10:38:26 | 19 |
| 10:38:28 | 20 |
| 10:38:28 | 21 |
| 10:38:28 | 22 |
| 10:38:29 | 23 |
| 10:38:30 | 24 |
| 10:38:32 | 25 |

1  Q.  The reason the money coming back was a problem because
2  that would suggest you're in more trouble, right, he's going
3  to convict, right?
4  A.  That could be one way looking at it.
5  Q.  All right.  But you knew before the trial started that he
6  was giving the money back, didn't you?
7  A.  No.
8  Q.  And you knew before you had to elect a jury or bench that
9  he had given the money back, correct?
10  A.  No.
11  Q.  But that is what you testified to under oath in 2014?
12  A.  Yes.
13  Q.  When was Mr. Fields arrested, sir?
14  A.  I don't know.
15  Q.  Why did you tell Mr. Kulwin yesterday that --
16  A.  Because I thought.
17  Q.  Mr. Kulwin said isn't it true he was arrested in June 85
18  and you said yes, sir?
19         MR. KULWIN:  Objection, Judge.  I don't think I said
20  that.
21         THE COURT:  Overruled.
22  BY MR. LOEVY:
23  Q.  You said yes, sir, right?
24  A.  Okay.  A little while after me, I knew that.
25  Q.  But you didn't know the answer even though you said yes,

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 53 of 140 PageID #:30948
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

| | | |
|---|---|---|
| 10:38:35 | 1 | sir, correct? |
| 10:38:36 | 2 | A.  I don't know the answer to a lot of stuff you're saying |
| 10:38:39 | 3 | I'm saying yes, sir. |
| 10:38:40 | 4 | Q.  All right.  How about the questions he was asking you |
| 10:38:43 | 5 | about the prosecution memos.  Do you know exactly when you saw |
| 10:38:47 | 6 | the prosecution memos, was it before you testified, after you |
| 10:38:50 | 7 | testified, you don't know the sequence, do you? |
| 10:38:51 | 8 | A.  No, sir. |
| 10:38:52 | 9 | Q.  So when you asked you yesterday, isn't it true you had |
| 10:38:55 | 10 | already given all of your testimony and you already locked it |
| 10:38:57 | 11 | in before you saw the prosecution memos, why did you say yes, |
| 10:39:00 | 12 | sir to those questions? |
| 10:39:02 | 13 | THE COURT:  There is no human being that could have |
| 10:39:04 | 14 | understood all of the words that you said so quickly.  If you |
| 10:39:07 | 15 | want to ask the question, slow it down. |
| 10:39:10 | 16 | BY MR. LOEVY: |
| 10:39:11 | 17 | Q.  You have no idea at what point you saw the prosecution |
| 10:39:14 | 18 | memos, right? |
| 10:39:15 | 19 | A.  That's the question? |
| 10:39:16 | 20 | Q.  Yes. |
| 10:39:16 | 21 | A.  How do you know I know I did? |
| 10:39:18 | 22 | Q.  I thought you told me that three questions ago? |
| 10:39:20 | 23 | A.  I didn't tell you that.  You made it up. |
| 10:39:22 | 24 | Q.  Do you know the timing of when you saw the prosecution |
| 10:39:24 | 25 | memos? |

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 54 of 140 PageID #:30949
***REALTIME UNEDITED TRANSCRIPT ONLY***

53

| | | |
|---|---|---|
| 10:39:24 | 1 | A.  No, sir. |
| 10:39:25 | 2 | Q.  Okay.  Then we have established that. |
| 10:39:26 | 3 | Yesterday, when Mr. Kulwin started asking you |
| 10:39:29 | 4 | questions, he was saying to you isn't it true, sir, that you |
| 10:39:32 | 5 | didn't see the prosecution memos until after you had already |
| 10:39:36 | 6 | put Nate in the story, you said yes, sir, didn't you? |
| 10:39:38 | 7 | A.  Yes, sir. |
| 10:39:39 | 8 | Q.  Okay.  You said that even though you had no idea what he |
| 10:39:42 | 9 | was talking about, didn't you? |
| 10:39:43 | 10 | A.  I knew exactly what he was talking about. |
| 10:39:47 | 11 | Q.  Okay.  Same questions for when you first told O'Callaghan |
| 10:39:51 | 12 | that he was not involved in Vaughn/White.  Do you remember |
| 10:39:53 | 13 | what year it was that you first told O'Callaghan that Nate was |
| 10:39:57 | 14 | not involved in the Vaughn/White murder? |
| 10:39:58 | 15 | A.  No, sir. |
| 10:39:59 | 16 | Q.  Then why did you testify yesterday? |
| 10:40:01 | 17 | A.  Because it refreshed my memory, he refreshed my memory. |
| 10:40:05 | 18 | Q.  Is it still refreshed? |
| 10:40:10 | 19 | A.  Yes. |
| 10:40:10 | 20 | Q.  What year was it? |
| 10:40:11 | 21 | A.  I don't know, 78, 91, somewhere between there. |
| 10:40:15 | 22 | Q.  All right.  Let's talk about your memory of the events of |
| 10:40:19 | 23 | your capital murder trial. |
| 10:40:20 | 24 | Do you remember how you were identified -- how the |
| 10:40:23 | 25 | witnesses identified the people in the get away car? |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 55 of 140 PageID #:30950
***REALTIME UNEDITED TRANSCRIPT ONLY***

54

| | | |
|---|---|---|
| 10:40:25 | 1 | MR. KULWIN:  Judge, I am going to object.  This has |
| 10:40:27 | 2 | been asked and answered, gone over and outside the scope. |
| 10:40:29 | 3 | THE COURT:  Sustained. |
| 10:40:31 | 4 | BY MR. LOEVY: |
| 10:40:34 | 5 | Q.  Mr. Kulwin asked you some questions about Randy Langston |
| 10:40:37 | 6 | and James Speights.  Do you remember those questions from |
| 10:40:40 | 7 | yesterday? |
| 10:40:41 | 8 | A.  Yes, sir. |
| 10:40:41 | 9 | Q.  Isn't it true that the police were talking to you before |
| 10:40:43 | 10 | the retrial but they needed an explanation for why Randy's |
| 10:40:47 | 11 | testimony was all over the board? |
| 10:40:48 | 12 | MR. KULWIN:  Objection, argumentative. |
| 10:40:49 | 13 | THE COURT:  Sustained.  It was covered. |
| 10:40:52 | 14 | BY MR. LOEVY: |
| 10:40:53 | 15 | Q.  Mr. Kulwin asked you isn't it true you solved like 20, 30 |
| 10:40:56 | 16 | murders, do you remember those questions? |
| 10:40:57 | 17 | A.  Yes, sir. |
| 10:40:58 | 18 | Q.  Some of those murders you actually knew about and some of |
| 10:41:01 | 19 | them you didn't, isn't that true, sir? |
| 10:41:03 | 20 | A.  Some of them I had firsthand knowledge and some of them I |
| 10:41:07 | 21 | had second knowledge. |
| 10:41:08 | 22 | Q.  Some of them they read you that grand jury statement and |
| 10:41:11 | 23 | you said yes, sir? |
| 10:41:12 | 24 | MR. KULWIN:  Objection, argumentative. |
| 10:41:13 | 25 | THE COURT:  Sustained. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 56 of 140 PageID #:30951
***REALTIME UNEDITED TRANSCRIPT ONLY***

55

| | | |
|---|---|---|
| 10:41:13 | 1 | BY MR. LOEVY: |
| 10:41:14 | 2 | Q.  All right.  Let's talk about your sentence and the |
| 10:41:20 | 3 | calculations.  Do you remember when Mr. Kulwin was asking you |
| 10:41:22 | 4 | those questions yesterday about in this and that and this and |
| 10:41:25 | 5 | that.  Did you know into he was talking about? |
| 10:41:27 | 6 | A.  I knew exactly what he was talking about when he was |
| 10:41:29 | 7 | talking about my sentence. |
| 10:41:31 | 8 | Q.  In 2014 when you testified in this court, what was your |
| 10:41:34 | 9 | understanding of your out date? |
| 10:41:35 | 10 | A.  September 2016. |
| 10:41:38 | 11 | Q.  All right.  You allowed the Court and the participants to |
| 10:41:45 | 12 | have the impression that it was 2027, didn't you? |
| 10:41:50 | 13 | A.  That's not my fault. |
| 10:41:51 | 14 | Q.  Did you discuss with the attorneys in the context of your |
| 10:41:54 | 15 | testimony whether there's going to be something in it for you? |
| 10:41:57 | 16 | A.  No, sir. |
| 10:41:58 | 17 | Q.  It didn't come up at all? |
| 10:42:00 | 18 | A.  No, sir. |
| 10:42:01 | 19 | Q.  You did get a sentence break, did you not? |
| 10:42:07 | 20 | MR. BURNS:  Objection? |
| 10:42:07 | 21 | MR. LOEVY: |
| 10:42:08 | 22 | THE WITNESS:  Yes, sir. |
| 10:42:08 | 23 | BY MR. LOEVY: |
| 10:42:09 | 24 | Q.  You're saying you never talked about it with them? |
| 10:42:11 | 25 | THE COURT:  The objection to the previous question is |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 57 of 140 PageID #:30952
***REALTIME UNEDITED TRANSCRIPT ONLY***

56

10:42:14    1   overruled.

10:42:14    2   BY MR. LOEVY:

10:42:14    3   Q.  You say that when the attorneys were saying it was 2027?

10:42:17    4         MR. KULWIN:  Could you.

10:42:19    5   BY MR. LOEVY:

10:42:19    6   Q.  When Mr. Burns was saying in --

10:42:24    7   A.  I tried to, but they kept saying let's go.  I knew what it

10:42:28    8   was.

10:42:28    9   Q.  Did you explain that to Mr. Burns?

10:42:29   10   A.  I tried to explain it to anybody that was in any of these

10:42:32   11   hearings before we started, sir.

10:42:33   12   Q.  That's the critical part.  Before we even started, did you

10:42:36   13   try to explain that to Mr. Burns?

10:42:38   14   A.  Yes, sir.

10:42:38   15   Q.  Tell me what you remember about that?

10:42:41   16   A.  As I was explaining to people.

10:42:43   17         THE COURT:  I need to see the lawyers at sidebar.

10:42:48   18     (The following proceedings were had at sidebar outside the

10:42:54   19   hearing of the jury:)

10:42:54   20         THE COURT:  Okay.  So you're now 40 minutes which is

10:42:57   21   double the estimate and the only reason it's 40 as opposed to

10:43:03   22   50, your treading on thin ice because you are essentially

10:43:07   23   inviting him to bring out that there was a prior trial in the

10:43:10   24   case.  That's number one.  Actually that's number two.

10:43:13   25         No. 3 is that you are repeating the direct and just

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 58 of 140 PageID #:30953
***REALTIME UNEDITED TRANSCRIPT ONLY***

57

10:43:15    1   because a subject was covered on cross doesn't mean you get to

10:43:18    2   repeat the direct over again.  So I am going to ask you again,

10:43:22    3   or I guess fool me once, shame on me or you, fool me twice

10:43:27    4   shame on me or I don't know which way that works, whatever,

10:43:31    5   how much more do you have?

10:43:31    6            MR. LOEVY:  Less than five minutes even before you

10:43:33    7   said that.  I am at the very end.  This is an important

10:43:36    8   subject for this reason.  In 2014, Mr. Burns said you're in

10:43:40    9   until 2017.  Yesterday, Mr. Kulwin said you knew the whole

10:43:43   10   time you were getting out in 2016.  Those are 100 percent

10:43:47   11   opposite positions and it's a real problem.  One of them is

10:43:50   12   very wrong.

10:43:52   13            MR. KULWIN:  Well, I am going to say.

10:43:54   14            THE COURT:  Go ahead.

10:43:55   15            MR. KULWIN:  I want to say that's completely wrong.

10:44:03   16   Thing number one is what Mr. Burns brought out was I guess at

10:44:07   17   the 2014 trial, I wasn't here, when -- what was the out date.

10:44:12   18            THE COURT:  Yesterday, he said 2016.

10:44:15   19            MR. KULWIN:  What he thought was, that's what he

10:44:17   20   believed.  Okay?  And that's what led to the problem because

10:44:22   21   you were saying 2025 and he's going no, I think it's 2016.

10:44:26   22   It's right on the transcript.  He was under a belief different

10:44:30   23   from what all the lawyers were telling him.  I made that

10:44:32   24   perfectly clear.

10:44:33   25            MR. BURNS:  Just so we have the transcript from that

| 10:44:36 | 1 | prior proceeding. |
| 10:44:36 | 2 | THE COURT:  Page 2679. |
| 10:44:38 | 3 | MR. BURNS:  We did have a discussion.  He was talking |
| 10:44:41 | 4 | about the 2016 release.  The Court at that time, and you had |
| 10:44:44 | 5 | some concerns about going into other matters and what was |
| 10:44:47 | 6 | happening, so we stopped the testimony and did not get into an |
| 10:44:50 | 7 | explanation at that time.  That's what I believe the |
| 10:44:56 | 8 | transcript represents. |
| 10:44:56 | 9 | THE COURT:  Wow, okay.  I am going to say something |
| 10:44:59 | 10 | that lawyers say.  The fact that I am not responding to that |
| 10:45:02 | 11 | does not mean I agree with what you said because I don't. |
| 10:45:07 | 12 | Here's the deal.  We are getting off the field here. |
| 10:45:11 | 13 | You now have five minutes. |
| 10:45:13 | 14 | MR. LOEVY:  Yeah. |
| 10:45:13 | 15 | THE COURT:  Okay. |
| 10:45:18 | 16 | (The following proceedings were had in open court in the |
| 10:45:23 | 17 | presence and hearing of the jury:) |
| 10:45:23 | 18 | THE COURT:  Okay.  Proceed. |
| 10:45:23 | 19 | BY MR. LOEVY: |
| 10:45:31 | 20 | Q.  All right.  Sir, since 1996, you have not cooperated |
| 10:45:35 | 21 | against any people except Nate Fields, correct? |
| 10:45:39 | 22 | A.  Yes, sir. |
| 10:45:40 | 23 | Q.  And in 1994 or 1996, your out date was 2027, correct? |
| 10:45:46 | 24 | A.  As I told you many times and anybody else that's been |
| 10:45:55 | 25 | listening, my understanding of my out date was September 2016. |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 60 of 140 PageID #:30955

| | | |
|---|---|---|
| 10:45:59 | 1 | Q.  No, but that's after it got reworked, your deal got |
| 10:46:02 | 2 | reworked in 2009, right? |
| 10:46:04 | 3 | MR. BURNS:  Objection, argumentative, your Honor? |
| 10:46:05 | 4 | MR. LOEVY:  No. |
| 10:46:06 | 5 | THE COURT:  Overruled. |
| 10:46:06 | 6 | BY MR. LOEVY: |
| 10:46:07 | 7 | Q.  Your deal got reworked in 2009 -- |
| 10:46:09 | 8 | A.  I told you, sir, my understanding -- my out date. |
| 10:46:13 | 9 | Q.  Different question.  Different question, sir.  Your deal |
| 10:46:16 | 10 | got reworked when you testified against Mr. Fields in 2009, |
| 10:46:18 | 11 | right? |
| 10:46:18 | 12 | A.  Yes. |
| 10:46:19 | 13 | Q.  And that's when you believe your out date became 2016, |
| 10:46:22 | 14 | right? |
| 10:46:24 | 15 | A.  No. |
| 10:46:24 | 16 | Q.  You believed you were out sooner than 2016 before your |
| 10:46:27 | 17 | deal got reworked in connection with that testimony? |
| 10:46:29 | 18 | A.  I'm not saying that. |
| 10:46:30 | 19 | Q.  Your deal got reworked before you gave the deposition in |
| 10:46:33 | 20 | 2013, correct? |
| 10:46:34 | 21 | A.  Yes. |
| 10:46:35 | 22 | Q.  And after both of those times, after both those |
| 10:46:40 | 23 | reworkings, your out date was 2016, correct? |
| 10:46:42 | 24 | A.  It was always 2016. |
| 10:46:45 | 25 | Q.  Then why did it get reworked twice if it was always 2016. |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 61 of 140 PageID #:30956
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:46:49 | 1 | I don't understand.  Maybe you can explain? |
| 10:46:50 | 2 | MR. KULWIN:  I object.  He is conflating -- |
| 10:46:53 | 3 | THE COURT:  Overruled. |
| 10:46:54 | 4 | BY MR. LOEVY: |
| 10:46:56 | 5 | Q.  Do you understand the question? |
| 10:46:56 | 6 | A.  I understand crystal clear.  What is your answer? |
| 10:46:59 | 7 | Q.  If your out date was always 2016, then why was the deal |
| 10:47:04 | 8 | reworked in 2009 when you testified at the criminal trial and |
| 10:47:08 | 9 | why was it reworked again in 2013 when you testified at his |
| 10:47:11 | 10 | deposition? |
| 10:47:12 | 11 | A.  I don't know. |
| 10:47:13 | 12 | Q.  The answer to that is because they cut your time both |
| 10:47:16 | 13 | times isn't it true? |
| 10:47:18 | 14 | MR. KULWIN:  Objection, Judge.  Misstates the |
| 10:47:21 | 15 | evidence. |
| 10:47:21 | 16 | MR. LOEVY:  Objection, Judge, argumentative. |
| 10:47:23 | 17 | THE COURT:  Both objections are overruled. |
| 10:47:26 | 18 | THE WITNESS:  So your question? |
| 10:47:27 | 19 | BY MR. LOEVY: |
| 10:47:27 | 20 | Q.  They cut your time when you agreed to testify against |
| 10:47:30 | 21 | Nate, right? |
| 10:47:30 | 22 | MR. KULWIN:  Objection, foundation. |
| 10:47:32 | 23 | THE COURT:  Overruled. |
| 10:47:33 | 24 | THE WITNESS:  Yes, they took off a few years. |
| 10:47:37 | 25 | BY MR. LOEVY: |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 62 of 140 PageID #:30957
***REALTIME UNEDITED TRANSCRIPT ONLY***

61

| | | |
|---|---|---|
| 10:47:37 | 1 | Q. All right. Let's talk about your parole hearing when Mr. |
| 10:47:40 | 2 | Kulwin was asking you those questions yesterday, he said that |
| 10:47:43 | 3 | isn't it true that your first real parole hearing was 2014? |
| 10:47:46 | 4 | Do you remember him asking those questions? |
| 10:47:49 | 5 | A. Yes. |
| 10:47:49 | 6 | Q. Do you have any idea what he is talking about? |
| 10:47:51 | 7 | A. Yes. |
| 10:47:51 | 8 | Q. Why did you not have a real parole hearing in 2012? |
| 10:47:53 | 9 | A. Why didn't I have a real parole, because you have to do a |
| 10:47:57 | 10 | certain amount of time before you're eligible for parole. |
| 10:47:59 | 11 | Q. All right. So if this was your parole that mattered, by |
| 10:48:02 | 12 | the way, this is the first parole hearing that mattered after |
| 10:48:05 | 13 | your deal was reworked, correct? |
| 10:48:06 | 14 | A. No -- |
| 10:48:10 | 15 | MR. KULWIN: Objection, Judge. |
| 10:48:10 | 16 | THE COURT: Sustained, confusing. |
| 10:48:11 | 17 | BY MR. LOEVY: |
| 10:48:12 | 18 | Q. In 2013, they erased your state time so all you had left |
| 10:48:15 | 19 | was federal time, correct? |
| 10:48:16 | 20 | MR. KULWIN: Same objection, Judge. |
| 10:48:17 | 21 | THE COURT: Sustained. |
| 10:48:18 | 22 | BY MR. LOEVY: |
| 10:48:18 | 23 | Q. All right. In 2014 -- |
| 10:48:20 | 24 | THE COURT: Again, I think this was covered, this |
| 10:48:22 | 25 | point was covered sufficiently on direct. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 63 of 140 PageID #:30958
***REALTIME UNEDITED TRANSCRIPT ONLY***

62

| | | |
|---|---|---|
| 10:48:24 | 1 | BY MR. LOEVY: |
| 10:48:24 | 2 | Q.  All right.  Just two more questions. |
| 10:48:27 | 3 | In 2014 when you knew you were having an important |
| 10:48:31 | 4 | parole hearing, did you say to the defendants a couple of |
| 10:48:35 | 5 | months after you testified in this hearing I need you to keep |
| 10:48:40 | 6 | your commitment? |
| 10:48:40 | 7 | A.  Probably so. |
| 10:48:41 | 8 | Q.  Tell me what you remember about that. |
| 10:48:42 | 9 | A.  I told them that the time that he said they're cutting off |
| 10:48:47 | 10 | my sentence hasn't caught up with me yet. |
| 10:48:49 | 11 | Q.  And that you needed their help? |
| 10:48:50 | 12 | A.  I needed what you said that you were going to do to do, |
| 10:48:54 | 13 | the time. |
| 10:48:54 | 14 | MR. BURNS:  Objection. |
| 10:48:55 | 15 | THE COURT:  What's the objection? |
| 10:48:56 | 16 | MR. BURNS:  Misstates facts, your Honor. |
| 10:48:58 | 17 | THE COURT:  He is answering the question. |
| 10:48:59 | 18 | MR. BURNS:  The question calls for it.  We discussed |
| 10:49:02 | 19 | it yesterday. |
| 10:49:02 | 20 | MR. LOEVY:  No, your Honor. |
| 10:49:06 | 21 | THE COURT:  Which defendants are you talking about? |
| 10:49:08 | 22 | That's the question. |
| 10:49:09 | 23 | BY MR. LOEVY: |
| 10:49:09 | 24 | Q.  O'Callaghan and Murphy or just O'Callaghan? |
| 10:49:12 | 25 | A.  What are you talking about? |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 64 of 140 PageID #:30959
11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

63

| 10:49:14 | 1 | THE COURT:  For crying out loud. |
| 10:49:23 | 2 | MR. LOEVY:  Can we read back his answer? |
| 10:49:27 | 3 | (The following proceedings were had at sidebar outside the |
| 10:49:29 | 4 | hearing of the jury:) |
| 10:49:29 | 5 | THE COURT:  It's not a deal, it's an order.  It's not |
| 10:49:32 | 6 | a deal.  I don't require your agreement and I am not asking |
| 10:49:34 | 7 | for your agreement.  You just made the exact same mistake that |
| 10:49:37 | 8 | I had to instruct the jury on yesterday.  You had Mr. Murphy |
| 10:49:41 | 9 | doing something for Mr. Hawkins.  I had to instruct the jury |
| 10:49:43 | 10 | on that yesterday because you admitted that you blew it and |
| 10:49:47 | 11 | you did blow it.  Now I am going to have to instruct them |
| 10:49:49 | 12 | again and you're done. |
| 10:49:50 | 13 | MR. LOEVY:  Thank you. |
| 10:49:56 | 14 | (The following proceedings were had in open court in the |
| 10:49:57 | 15 | presence and hearing of the jury:) |
| 10:49:57 | 16 | THE COURT:  All right.  As I said yesterday, I am |
| 10:49:59 | 17 | going to say it again with regard to Mr. Murphy, there is no |
| 10:50:04 | 18 | -- Mr. Murphy did not write any letters or do anything for Mr. |
| 10:50:07 | 19 | Hawkins with regard to the parole board in 2014.  That's a |
| 10:50:11 | 20 | fact you are to take. |
| 10:50:13 | 21 | Recross based on the redirect. |
| 10:50:19 | 22 | MR. KULWIN:  Can I have one second, Judge? |
| 10:50:19 | 23 | - - - |
| 10:50:19 | 24 | EARL HAWKINS, RECROSS-EXAMINATION |
| 10:50:38 | 25 | BY MR. KULWIN: |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 65 of 140 PageID #:30960
***REALTIME UNEDITED TRANSCRIPT ONLY***

64

10:50:38  1  Q.  You were just asked a whole bunch of questions about your

10:50:41  2  out date and people cutting you a deal.  Do you remember those

10:50:44  3  questions just now?

10:50:44  4  A.  Yes, sir.

10:50:45  5  Q.  Okay.  The out date that you're talking about is your

10:50:48  6  federal out date, correct?

10:50:51  7       MR. LOEVY:  Objection, your Honor, covered on his

10:50:52  8  last exam.

10:50:53  9       THE COURT:  I am going to let you do a couple of

10:50:55  10  questions about this because I cut Mr. Loevy off at a fairly

10:50:59  11  early stage for repeating the direct and I am going to cut you

10:51:02  12  off at a fairly early stage for repeating the question.  I am

10:51:06  13  going to let you have a couple questions, so make them good

10:51:10  14  ones.

10:51:10  15       MR. KULWIN:  It's a good one.

10:51:10  16  BY MR. KULWIN:

10:51:13  17  Q.  The out date that you're referring is your federal out

10:51:16  18  date?

10:51:16  19  A.  Yes, sir.

10:51:17  20  Q.  And that never changed the entire time we are talking

10:51:19  21  about; is that correct?

10:51:20  22       MR. LOEVY:  Objection.

10:51:21  23       THE WITNESS:  Yes.

10:51:23  24       THE COURT:  Overruled.

10:51:24  25  BY MR. KULWIN:

| | | |
|---|---|---|
| 10:51:24 | 1 | Q.  Now, let's talk about the deals after that that was |
| 10:51:26 | 2 | reducing your time, the three years.  Do you remember those |
| 10:51:28 | 3 | questions, right? |
| 10:51:29 | 4 | A.  Yes, sir. |
| 10:51:29 | 5 | Q.  That's as counsel well knows, that's the state? |
| 10:51:33 | 6 | MR. LOEVY:  Objection, your Honor. |
| 10:51:34 | 7 | THE COURT:  What's the objection? |
| 10:51:35 | 8 | MR. LOEVY:  He said as counsel well knows. |
| 10:51:37 | 9 | MR. KULWIN:  I'll take that. |
| 10:51:38 | 10 | THE COURT:  No, you don't have to take it back.  It's |
| 10:51:41 | 11 | stricken. |
| 10:51:41 | 12 | MR. KULWIN:  Okay. |
| 10:51:42 | 13 | THE COURT:  It's improper.  The jury is directed to |
| 10:51:46 | 14 | disregard it.  I am just telling everybody right now.  The |
| 10:51:48 | 15 | next time somebody does something like that, I don't care who |
| 10:51:51 | 16 | it is, there's going to be a price to pay.  That's it. |
| 10:51:54 | 17 | Everybody get that?  I want to make sure everybody is looking |
| 10:51:57 | 18 | at me. |
| 10:51:58 | 19 | MR. KULWIN:  Got it. |
| 10:51:59 | 20 | BY MR. KULWIN: |
| 10:51:59 | 21 | Q.  The three years off that you were asked about in 2009, et |
| 10:52:05 | 22 | cetera, that was the state prosecutors making your deal for |
| 10:52:10 | 23 | state time, correct? |
| 10:52:11 | 24 | A.  Yes, sir. |
| 10:52:11 | 25 | Q.  Okay.  And that was in return for cooperation in |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 67 of 140 PageID #:30962
11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

66

| | |
|---|---|
| 10:52:19 | 1 |
| 10:52:24 | 2 |
| 10:52:26 | 3 |
| 10:52:26 | 4 |
| 10:52:33 | 5 |
| 10:52:48 | 6 |
| 10:52:51 | 7 |
| 10:52:52 | 8 |
| 10:52:53 | 9 |
| 10:52:57 | 10 |
| 10:52:57 | 11 |
| 10:52:58 | 12 |
| 10:53:01 | 13 |
| 10:53:03 | 14 |
| 10:53:03 | 15 |
| 10:53:05 | 16 |
| 10:53:05 | 17 |
| 10:53:06 | 18 |
| 10:53:08 | 19 |
| 10:53:08 | 20 |
| 10:53:10 | 21 |
| 10:53:21 | 22 |
| 10:53:26 | 23 |
| 10:53:31 | 24 |
| 10:53:39 | 25 |

proceedings in 2009 and in 2013 relating to state proceedings

relating to Mr. Fields, correct?

A.  Yes, sir.

Q.  Okay.  Now, your grand jury statement that you were asked

about so we're clear,  you walked into the grand jury

preparing for one year with Mr. Hogan and federal and state

investigators, right?  Do you remember that?

A.  Why he is.

Q.  Okay.  And it was a lengthy statement, true, 36 pages,

correct?

A.  Yes, sir.

Q.  And Mr. Hogan read the statement, right?

        MR. LOEVY:  Objection.  This was covered, your Honor.

        THE COURT:  Overruled.

BY MR. KULWIN:

Q.  Correct?

        THE COURT:  Let's get to it.

        MR. KULWIN:  I'm getting to it right now.

        THE WITNESS:  Yes, sir.

BY MR. KULWIN:

Q.  And I want to show it to you, he read -- he read you three

full pages of testimony, I want to show it to you, sir, about

a variety of matters including one sentence concerning

Vaughn/White before he asked you is that correct, two full

pages.  Let me check this.

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 68 of 140 PageID #:30963
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:54:23 | 1 | MR. KULWIN:  Hold on for a second, Judge. |
| 10:54:31 | 2 | I apologize. |
| 10:54:32 | 3 | BY MR. KULWIN: |
| 10:54:32 | 4 | Q.  By the time he got to the Vaughn/White statement, which |
| 10:54:36 | 5 | was one sentence, he had already been reading for 22 pages is |
| 10:54:40 | 6 | that right, sir?  Can you just take a look at that?  About 22 |
| 10:54:45 | 7 | pages before he even mentioned Vaughn/White, correct? |
| 10:54:48 | 8 | A.  Yes. |
| 10:54:51 | 9 | Q.  Okay.  And then before he said am I right so far, he read |
| 10:54:56 | 10 | a full another page about other matters as well where he says |
| 10:55:01 | 11 | is this accurate so far?  Do you see that?  Here's where you |
| 10:55:06 | 12 | first mention Vaughn/White on page 23, and then he goes |
| 10:55:09 | 13 | through a whole page on 24 before he says to you is that |
| 10:55:13 | 14 | accurate so far, do you see that, sir? |
| 10:55:16 | 15 | A.  Yes. |
| 10:55:16 | 16 | Q.  Now, with respect to all the photos that you were shown |
| 10:55:33 | 17 | and all this other stuff where you could see 500 feet, let me |
| 10:55:37 | 18 | ask you this, Fuddy Smith was out in front of '709 that day, |
| 10:55:41 | 19 | wasn't he? |
| 10:55:42 | 20 | A.  706. |
| 10:55:43 | 21 | Q.  706, right.  Fuddy Smith got shot in the back of the head |
| 10:55:47 | 22 | in front of 706 that day, right? |
| 10:55:49 | 23 | A.  Yes, sir. |
| 10:55:49 | 24 | Q.  You were there that day, right? |
| 10:55:51 | 25 | A.  Yes, sir. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:55:51 | 1 | Q.  You were asked some questions about whether you got the |
| 10:56:04 | 2 | details of when the bribe was and all that stuff when you |
| 10:56:08 | 3 | testified in 2014.  But you gave testimony perfectly |
| 10:56:12 | 4 | consistently in 2013 in another proceeding, didn't you? |
| 10:56:16 | 5 | THE COURT:  Just ask the question. |
| 10:56:18 | 6 | MR. KULWIN:  Sure. |
| 10:56:18 | 7 | BY MR. KULWIN: |
| 10:56:19 | 8 | Q.  Do you remember this question and answer in a proceeding |
| 10:56:22 | 9 | that took place on the 21st day of August 2013 in a proceeding |
| 10:56:27 | 10 | relating to Mr. Fields. |
| 10:56:29 | 11 | MR. LOEVY:  Page? |
| 10:56:30 | 12 | MR. KULWIN:  181. |
| 10:56:31 | 13 | MR. LOEVY:  Thank you. |
| 10:56:31 | 14 | BY MR. KULWIN: |
| 10:56:44 | 15 | Q. |
| 10:56:44 | 16 | "QUESTION:  Did he finally appear to court on June -- |
| 10:56:47 | 17 | I'm sorry. |
| 10:56:48 | 18 | "QUESTION:  Well, the first time your case was called |
| 10:56:50 | 19 | that morning was Swano there? |
| 10:56:52 | 20 | "ANSWER:  I don't think so.  I think they had to wait |
| 10:56:54 | 21 | on him. |
| 10:56:55 | 22 | "QUESTION:  Did he finally appear to court on June |
| 10:56:58 | 23 | 17th? |
| 10:57:00 | 24 | "ANSWER:  Yes |
| 10:57:01 | 25 | "QUESTION:  On that date did you finally take or elect |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 70 of 140 PageID #:30965
***REALTIME UNEDITED TRANSCRIPT ONLY***

69

10:57:03　1　to take a bench trial finally?

10:57:06　2　　　　　"ANSWER:  Yes, sir.

10:57:07　3　　　　　"QUESTION:  Did Fields take a bench trial on that date

10:57:10　4　as well?

10:57:11　5　　　　　"ANSWER:  Yes, sir

10:57:11　6　　　　　"QUESTION:  In fact, you recall the jury being

10:57:14　7　assembled outside as you were waiving the jury trial?

10:57:17　8　　　　　"ANSWER:  Yes, sir

10:57:17　9　　　　　"QUESTION:  Did you both waive jury together?

10:57:20　10　　　　　"ANSWER:  Yes

10:57:20　11　　　　　"QUESTION:  Did you talk to each other in the bull pen

10:57:23　12　on June 17th of '86?

10:57:25　13　　　　　"ANSWER:  Yes.

10:57:26　14　　　　　"QUESTION:  And were you constant, did you also talk in

10:57:29　15　the bull pen on June 16th, 1986?

10:57:33　16　　　　　"ANSWER:  Yes.

10:57:34　17　　　　　"QUESTION:  On June 17th, 1986, before you went out and

10:57:36　18　waived the jury trial, did you talk to Swano when he finally

10:57:39　19　appeared on that day?

10:57:40　20　　　　　"ANSWER:  Yes

10:57:41　21　　　　　"QUESTION:  What did he tell you that made you want to

10:57:42　22　take a bench trial?

10:57:43　23　　　　　"ANSWER:  He said he got the money and got to talk to

10:57:47　24　the judge.  He said he got, he could make it work.

10:57:49　25　　　　　"QUESTION:  Was Fields present when Swano told you this

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 71 of 140 PageID #:30966
***REALTIME UNEDITED TRANSCRIPT ONLY***

70

| | | |
|---|---|---|
| 10:57:52 | 1 | in the bull pen? |
| 10:57:53 | 2 | "ANSWER:  Yes. |
| 10:57:54 | 3 | "QUESTION:  Was Carter present? |
| 10:57:55 | 4 | "ANSWER:  Yes. |
| 10:57:56 | 5 | "QUESTION:  Did you then come out and waive jury trial? |
| 10:57:59 | 6 | "ANSWER:  Yes. |
| 10:57:59 | 7 | "QUESTION:  Did Fields waive jury trial? |
| 10:58:01 | 8 | "ANSWER:  Yes." |
| 10:58:04 | 9 | Did you give those answers in 2013 in a state |
| 10:58:07 | 10 | proceeding involving Mr. Fields back then? |
| 10:58:10 | 11 | A.  Yes, sir. |
| 10:58:10 | 12 | Q.  Now, more to the point -- oh, did you give the answers, |
| 10:58:18 | 13 | right?  You gave the answers? |
| 10:58:19 | 14 | A.  Yes, sir. |
| 10:58:19 | 15 | Q.  More to the point, Mr. Fields, any question in your mind |
| 10:58:26 | 16 | that the El Rukns? |
| 10:58:27 | 17 | THE COURT:  You said Mr. Fields, you mean Mr. |
| 10:58:29 | 18 | Hawkins. |
| 10:58:29 | 19 | BY MR. KULWIN: |
| 10:58:31 | 20 | Q.  Mr. Hawkins, I apologize. |
| 10:58:32 | 21 | A.  No problem. |
| 10:58:33 | 22 | Q.  Thank you. |
| 10:58:33 | 23 | Mr. Hawkins, is there any question in your mind, any |
| 10:58:36 | 24 | dispute whatsoever in your mind that the El Rukns provided |
| 10:58:41 | 25 | $10,000 to Bill Swano to bribe Judge Maloney? |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 72 of 140 PageID #:30967

| | | |
|---|---|---|
| 10:58:45 | 1 | MR. LOEVY:  Objection, covered. |
| 10:58:46 | 2 | THE COURT:  Sustained. |
| 10:58:47 | 3 | BY MR. KULWIN: |
| 10:59:07 | 4 | Q.  You were asked a number of questions about how this |
| 10:59:11 | 5 | happened, what happened.  In the 2009 hearing, Mr. Hawkins? |
| 10:59:26 | 6 | MR. KULWIN:  Can I have the ELMO, Judge? |
| 10:59:28 | 7 | THE COURT:  Yes. |
| 10:59:30 | 8 | MR. LOEVY:  What page? |
| 10:59:31 | 9 | MR. KULWIN:  9. |
| 10:59:33 | 10 | BY MR. KULWIN: |
| 10:59:35 | 11 | Q.  You were asked questions about whether you were familiar |
| 10:59:37 | 12 | with the 706 building, whether you were familiar with Fuddy. |
| 10:59:42 | 13 | You were asked those questions.  Did you give this truthful |
| 10:59:45 | 14 | testimony on? |
| 10:59:47 | 15 | MR. LOEVY:  We object to scope, your Honor. |
| 10:59:48 | 16 | THE COURT:  Let me see -- hang on a second.  The |
| 10:59:57 | 17 | scope objection is overruled. |
| 10:59:58 | 18 | BY MR. KULWIN: |
| 11:00:04 | 19 | Q.  Did you give this testimony on February 25th, 2009, in a |
| 11:00:09 | 20 | criminal trial -- in the criminal trial, people v. Nathson |
| 11:00:13 | 21 | Fields. |
| 11:00:15 | 22 | "QUESTION:  Okay.  Specifically back in the spring of |
| 11:00:18 | 23 | 1984, were you familiar with the address of 706 East Pershing? |
| 11:00:22 | 24 | "ANSWER:  Yes. |
| 11:00:23 | 25 | "QUESTION:  How were you familiar with that address? |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 73 of 140 PageID #:30968
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

11:00:26    1    "ANSWER: I've been living around there all my life and

11:00:29    2    I had a daughter that was born in the building.

11:00:30    3    "QUESTION: Would you be in the area of that address on

11:00:33    4    a fairly regular basis back in 1984?

11:00:35    5    "ANSWER: Yes, sir.

11:00:36    6    "QUESTION: Were you involved in the narcotics, sale of

11:00:39    7    narcotics back in 1984 in that area?

11:00:41    8    "ANSWER: Yes, sir.

11:00:42    9    "QUESTION: What type of narcotics did you sell back

11:00:44    10    then?

11:00:45    11    "ANSWER: Codeine syrup.

11:00:47    12    "QUESTION: Was that on behalf of the El Rukns street

11:00:50    13    gang?

11:00:50    14    "ANSWER: Partly, yes.

11:00:52    15    "QUESTION: Now, back in the spring much 1984, were you

11:00:54    16    aware of another gang that basically hung out in the area?

11:00:57    17    "ANSWER: Yes.

11:00:58    18    "QUESTION: What gang was that?

11:01:01    19    "ANSWER: The Goon Squad."

11:01:02    20    MR. LOEVY: I object to scope.

11:01:03    21    MR. KULWIN: I am getting to it.

11:01:04    22    THE COURT: Then let's get to it.

11:01:06    23    BY MR. KULWIN:

11:01:08    24    Q.    "QUESTION: Did you know who the leader of that gang

11:01:09    25    was?

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 74 of 140 PageID #:30969
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

73

| 11:01:10 | 1 | "ANSWER:  Fuddy |
| 11:01:11 | 2 | "QUESTION:  Do you know his real name? |
| 11:01:13 | 3 | "ANSWER:  Jerome Smith." |
| 11:01:17 | 4 | THE COURT:  Okay.  Based on that, the scope objection |
| 11:01:19 | 5 | is overruled. |
| 11:01:19 | 6 | BY MR. KULWIN: |
| 11:01:20 | 7 | Q.  You knew who Fuddy Smith was back then, right, back in |
| 11:01:26 | 8 | '84?  You knew who Fuddy Smith was? |
| 11:01:28 | 9 | A.  Yes. |
| 11:01:30 | 10 | Q.  You were asked questions about whether Nate Fields was |
| 11:02:18 | 11 | there or not, how he came in his own car.  In that same |
| 11:02:24 | 12 | proceeding, did you give this testimony in February 2009: |
| 11:02:31 | 13 | THE COURT:  This is also from the criminal trial? |
| 11:02:34 | 14 | MR. KULWIN:  Yes, your Honor. |
| 11:02:34 | 15 | THE COURT:  I am putting it up on the jury's monitor. |
| 11:02:38 | 16 | MR. KULWIN:  Thank you, your Honor. |
| 11:02:39 | 17 | BY MR. KULWIN: |
| 11:02:40 | 18 | Q. |
| 11:02:40 | 19 | "QUESTION:  Let me stop you for a minute.  When you saw |
| 11:02:43 | 20 | George Carter coming running towards your car |
| 11:02:45 | 21 | THE COURT:  Page number? |
| 11:02:46 | 22 | MR. KULWIN:  I'm sorry, Judge, page 42, the February |
| 11:02:49 | 23 | 2009 criminal proceeding, people v. Fields. |
| 11:02:52 | 24 | THE COURT:  Okay. |
| 11:02:53 | 25 | BY MR. KULWIN: |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 75 of 140 PageID #:30970
***REALTIME UNEDITED TRANSCRIPT ONLY***

74

| | | |
|---|---|---|
| 11:02:53 | 1 | Q. |
| 11:02:53 | 2 | "QUESTION:  Let me stop you for a minute.  When you saw |
| 11:02:57 | 3 | George Carter coming running towards your car after the |
| 11:02:59 | 4 | shooting, was his mask still on? |
| 11:03:01 | 5 | "ANSWER:  Yes. |
| 11:03:01 | 6 | "QUESTION:  Tell the judge how the mask was on his |
| 11:03:03 | 7 | head? |
| 11:03:04 | 8 | "ANSWER:  Rolled up on his head. |
| 11:03:06 | 9 | "QUESTION:  When Nathson Fields came back to the car |
| 11:03:09 | 10 | after the shooting, where was his mask on his face? |
| 11:03:11 | 11 | "ANSWER:  Rolled up on his head. |
| 11:03:13 | 12 | "QUESTION:  Could you see their faces when they ran to |
| 11:03:16 | 13 | the car? |
| 11:03:17 | 14 | "ANSWER:  Yes." |
| 11:03:18 | 15 | That was truthful testimony, correct, sir? |
| 11:03:21 | 16 | A.  Yes. |
| 11:03:21 | 17 | Q.  You were asked some questions about an alleged pros memo |
| 11:03:29 | 18 | that you allegedly saw back when you were about to testify in |
| 11:03:33 | 19 | the RICO trials against the El Rukns.  Do you remember those |
| 11:03:35 | 20 | questions? |
| 11:03:35 | 21 | A.  Yes, sir. |
| 11:03:36 | 22 | Q.  You don't know that it was a pros memo.  That's just |
| 11:03:39 | 23 | something counsel came up with, you don't know what it was? |
| 11:03:43 | 24 | MR. LOEVY:  Objection, your Honor, scope, |
| 11:03:44 | 25 | argumentative and form. |

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 76 of 140 PageID #:30971
***REALTIME UNEDITED TRANSCRIPT ONLY***

75

| | | |
|---|---|---|
| 11:03:45 | 1 | THE COURT:  The comment is stricken. |
| 11:03:49 | 2 | MR. KULWIN:  Okay. |
| 11:03:50 | 3 | MR. KULWIN:  I'll rephrase it. |
| 11:03:51 | 4 | BY MR. KULWIN: |
| 11:03:52 | 5 | Q.  You don't know that it was really a pros, you don't |
| 11:03:55 | 6 | remember that, do you? |
| 11:03:57 | 7 | MR. LOEVY:  Objection, scope. |
| 11:03:58 | 8 | THE COURT:  Overruled.  But it's -- |
| 11:04:00 | 9 | MR. KULWIN:  I'll get right to it, Judge. |
| 11:04:02 | 10 | THE WITNESS:  He showed me -- do you do, when I'm in |
| 11:04:05 | 11 | the cell, they said do you want to see these papers, I don't |
| 11:04:09 | 12 | want to see them papers, we will just slide them under your |
| 11:04:12 | 13 | door, no, I don't want to see them. |
| 11:04:14 | 14 | BY MR. KULWIN: |
| 11:04:14 | 15 | Q.  You don't know whether it was a pros memo one way or the |
| 11:04:17 | 16 | other? |
| 11:04:17 | 17 | A.  That's what they say it was.  They same. |
| 11:04:20 | 18 | THE COURT:  The question is do you know what it was? |
| 11:04:22 | 19 | BY MR. KULWIN: |
| 11:04:22 | 20 | Q.  Do you know? |
| 11:04:23 | 21 | A.  No, sir. |
| 11:04:23 | 22 | Q.  And you didn't look at them? |
| 11:04:24 | 23 | A.  No, sir. |
| 11:04:25 | 24 | Q.  And when you were asked about how you could say that you |
| 11:04:29 | 25 | knew it was after you had already cooperated, you don't know |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 77 of 140 PageID #:30972
***REALTIME UNEDITED TRANSCRIPT ONLY***

76

| | | |
|---|---|---|
| 11:04:32 | 1 | the specific dates of when you saw that or when you |
| 11:04:36 | 2 | cooperated, you don't know the specific dates like May 15th, |
| 11:04:39 | 3 | 1982 or things like that, right, you don't remember those |
| 11:04:42 | 4 | dates; is that fair? |
| 11:04:43 | 5 | A.  No. |
| 11:04:43 | 6 | Q.  But you do remember that when that document came out, you |
| 11:04:46 | 7 | had already cooperated, already provided information, and that |
| 11:04:50 | 8 | that had nothing to do with anything? |
| 11:04:51 | 9 | A.  Yes, sir, that's what I believe. |
| 11:05:03 | 10 | MR. KULWIN:  May I have one moment, Judge?  Your |
| 11:05:30 | 11 | Honor, at this time we have no further questions. |
| 11:05:31 | 12 | MR. BURNS:  I have none, your Honor.  Thank you. |
| 11:05:33 | 13 | MR. LOEVY:  Will you permit four questions, your |
| 11:05:35 | 14 | Honor? |
| 11:05:36 | 15 | THE COURT:  Okay.  Four. |
| 11:05:38 | 16 | - - - |
| 11:05:38 | 17 | EARL HAWKINS, REDIRECT EXAMINATION |
| 11:05:38 | 18 | BY MR. LOEVY: |
| 11:05:39 | 19 | Q.  You did -- you were told that these papers that they were |
| 11:05:43 | 20 | showing you were prosecution memos, that's what you just said, |
| 11:05:46 | 21 | right? |
| 11:05:46 | 22 | MR. KULWIN:  Objection. |
| 11:05:48 | 23 | THE COURT:  Sustained. |
| 11:05:50 | 24 | MR. KULWIN:  Argumentative. |
| 11:05:50 | 25 | THE COURT:  Sustained.  That is not a correct |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 78 of 140 PageID #:30973
***REALTIME UNEDITED TRANSCRIPT ONLY***

77

| | | |
|---|---|---|
| 11:05:51 | 1 | statement of what he said. |
| 11:05:53 | 2 | BY MR. LOEVY: |
| 11:05:53 | 3 | Q.  What did they tell you the papers were? |
| 11:05:55 | 4 | MR. KULWIN:  Objection, asked and answered, Judge. |
| 11:05:57 | 5 | THE COURT:  Well, based on the recross, no.  He can |
| 11:06:01 | 6 | answer the question. |
| 11:06:02 | 7 | THE WITNESS:  Who is they? |
| 11:06:03 | 8 | MR. LOEVY:  Does that not count as my question. |
| 11:06:08 | 9 | THE COURT:  You just gave the statement about what |
| 11:06:10 | 10 | these other guys -- |
| 11:06:11 | 11 | THE WITNESS:  I thought he was saying what the |
| 11:06:13 | 12 | prosecutors. |
| 11:06:13 | 13 | THE COURT:  The other guys at the MCC. |
| 11:06:15 | 14 | THE WITNESS:  They were saying they were some kind of |
| 11:06:17 | 15 | papers from the U.S. Attorney's Office, yes. |
| 11:06:19 | 16 | BY MR. LOEVY: |
| 11:06:19 | 17 | Q.  Weren't you at least a little bit curious to see what |
| 11:06:22 | 18 | those papers might be? |
| 11:06:23 | 19 | MR. KULWIN:  Objection, argumentative. |
| 11:06:25 | 20 | THE COURT:  Sustained. |
| 11:06:25 | 21 | BY MR. LOEVY: |
| 11:06:26 | 22 | Q.  Mr. Kulwin asked you, read you several pages of transcript |
| 11:06:29 | 23 | testimony from the April 2000 proceeding about the bribe.  Do |
| 11:06:33 | 24 | you remember those questions that he just asked you and read |
| 11:06:37 | 25 | you the two pages of questions? |

78

11:06:40    1          THE COURT:  Just ask the question.

11:06:42    2     BY MR. LOEVY:

11:06:43    3     Q.  The only response was yes, yes, yes, yes, yes, yes, yes,

11:06:48    4     and yes, sir?

11:06:49    5          MR. KULWIN:  Objection.

11:06:50    6     BY MR. LOEVY:

11:06:50    7     Q.  That's literally the only thing you said?

11:06:52    8     A.  Pretty much.

11:06:54    9          THE COURT:  All right.  I have a couple of questions

11:06:55   10     from the jurors that were handed to me.  I've got those.  Are

11:06:58   11     there other questions that anybody has?  I think I see --

11:07:02   12     nobody is writing.  Let me see the lawyers at sidebar.

11:07:06   13       (The following proceedings were had at sidebar outside the

11:07:19   14     hearing of the jury:)

11:07:19   15          THE COURT:  Just two questions.  Number one, what

11:07:22   16     date and month were you released from prison, anybody have a

11:07:25   17     problem with that?  He said it, but I'm not sure it's entirely

11:07:29   18     clear.  The second one says I'll quote it, I think this was

11:07:32   19     probably written out yesterday just to be clear because it was

11:07:35   20     handed to me this morning.

11:07:36   21          Regarding your appearance here today and your

11:07:38   22     statement, I made a commitment and that was part of it.  To

11:07:41   23     whom did you make the commitment and for what reason?

11:07:44   24     Basically, I think what I'd ask him is you testified yesterday

11:07:49   25     regarding your appearance here to testify today that you made

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 80 of 140 PageID #:30975

11:07:52  1  a commitment and this is part of it.  Who did you make the

11:07:54  2  commitment to and what was it?  Does anybody have a problem

11:07:57  3  with either one of those?

11:07:58  4        MR. LOEVY:  We do.  Because this witness is so

11:08:00  5  suggestible and leadable, he did say it in the context of

11:08:03  6  O'Callaghan the first time and he gave an answer.

11:08:07  7        THE COURT:  Okay.  That objection is overruled.

11:08:09  8        MR. KULWIN:  Judge, one other thing, I apologize.

11:08:13  9  Mr. Loevy just made a representation that all he said was yes

11:08:16  10  yes yes yes.  He didn't.  He specifically said he got the

11:08:18  11  money, he got to talk to the judge, he said he got, he could

11:08:22  12  make it work.

11:08:22  13        MR. LOEVY:  That's not what I said.

11:08:24  14        MR. KULWIN:  That misstates what he said.  I should

11:08:27  15  at least be --

11:08:29  16        MR. LOEVY:  Page 183, I'm sorry, your Honor.

11:08:31  17        THE COURT:  Go ahead.

11:08:32  18        MR. LOEVY:  Before he says that, I heard him start

11:08:35  19  reading on page 181 and he stopped right around George Carter.

11:08:39  20        MR. KULWIN:  No, I stopped all the way over here.

11:08:43  21        THE COURT:  Look, the answer is no.  You read the

11:08:47  22  testimony, he said something about it, it's been covered.

11:08:49  23        MR. LOEVY:  All right.

11:08:51  24    (The following proceedings were had in open court in the

11:08:55  25  presence and hearing of the jury:)

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 81 of 140 PageID #:30976

***REALTIME UNEDITED TRANSCRIPT ONLY***

80

| | |
|---|---|
| 11:08:55 | 1 |

11:08:55    1    THE COURT:  Okay.  Two questions.  What was -- what

11:08:57    2    date and what month -- when were you released were prison,

11:09:01    3    what month, what year?

11:09:02    4    THE WITNESS:  December 17th, 2014.

11:09:05    5    THE COURT:  Thank you.  Yesterday, you were asked

11:09:08    6    some questions about why you were appearing here today.  You

11:09:11    7    said something along the lines of I made a commitment and this

11:09:14    8    is part of it.  Do you recall that?

11:09:15    9    THE WITNESS:  Yes, sir.

11:09:15    10    THE COURT:  The question is who did you make the

11:09:17    11    commitment to?

11:09:18    12    THE WITNESS:  I guess when I was cooperating Mr. .

11:09:22    13    Nobody can hear what you are saying commitment to whom?

11:09:25    14    THE WITNESS:  When I agreed to cooperate, that's what

11:09:27    15    --

11:09:27    16    THE COURT:  Who were you making the commitment to is

11:09:29    17    the question.

11:09:29    18    THE WITNESS:  Whoever I agreed to cooperate, the

11:09:31    19    state and federal government, I guess.

11:09:33    20    THE COURT:  All right.  I think that covers it.

11:09:35    21    Follow-up based on those two questions?

11:09:38    22                              - - -

11:09:38    23    EARL HAWKINS, REDIRECT EXAMINATION

11:09:38    24    BY MR. LOEVY:

11:09:39    25    Q.  You were gesturing that way when you said who you made the

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

81

| | |
|---|---|
| 11:09:43 | 1 | commitment to? |
| 11:09:43 | 2 | THE COURT:  Well, he was gesturing that way and I |
| 11:09:47 | 3 | asked him to explain the answer, he explained the answer. |
| 11:09:49 | 4 | BY MR. LOEVY: |
| 11:09:50 | 5 | Q.  These are the gentlemen you were cooperating with? |
| 11:09:52 | 6 | A.  Yes. |
| 11:09:52 | 7 | MR. KULWIN:  Objection. |
| 11:09:54 | 8 | MR. BURNS:  Judge. |
| 11:09:55 | 9 | THE COURT:  The objection is sustained.  It's all |
| 11:09:58 | 10 | covered. |
| 11:09:58 | 11 | MR. KULWIN:  A follow-up on that, Judge, to clarify. |
| 11:10:00 | 12 | THE COURT:  I just sustained the objection.  Are we |
| 11:10:03 | 13 | now going to have follow up on questions on which I sustained |
| 11:10:07 | 14 | objections and didn't permit answers?  Go ahead.  Let's see if |
| 11:10:09 | 15 | you can ask a question, a sustained objection as I have told |
| 11:10:13 | 16 | the jury multiple times, questions are not evidence.  The jury |
| 11:10:17 | 17 | is not to consider questions on which I sustained objections. |
| 11:10:20 | 18 | So if you think that there's testimony that you need to follow |
| 11:10:23 | 19 | up on, please feel free to get up. |
| 11:10:26 | 20 | MR. KULWIN:  That's fine, Judge. |
| 11:10:26 | 21 | THE COURT:  Please feel free to get up. |
| 11:10:28 | 22 | MR. KULWIN:  No thanks. |
| 11:10:29 | 23 | THE COURT:  The witness is excused.  We are going to |
| 11:10:31 | 24 | take a break because we have so discuss some things before the |
| 11:10:34 | 25 | next testimony.  We will probably for probably about 15 |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 83 of 140 PageID #:30978
***REALTIME UNEDITED TRANSCRIPT ONLY***

82

| | | |
|---|---|---|
| 11:10:39 | 1 | minutes. |
| 11:11:54 | 2 | (The jury leaves the courtroom.). |
| 11:11:54 | 3 | THE COURT: Do you want to make a record on anything, |
| 11:11:58 | 4 | Mr. Kulwin? |
| 11:11:58 | 5 | MR. KULWIN: No, I've made my record to the best I |
| 11:12:01 | 6 | can make it. |
| 11:12:01 | 7 | THE COURT: In terms of what your questions were that |
| 11:12:03 | 8 | you wanted to ask. That's what I'm talking about. |
| 11:12:06 | 9 | MR. KULWIN: No. I withdrew my question, Judge. |
| 11:12:09 | 10 | That's what I did. |
| 11:12:09 | 11 | THE COURT: The next witness is who? |
| 11:12:11 | 12 | MR. LOEVY: Mr. Brasfield, plaintiff's expert on |
| 11:12:14 | 13 | Monell. |
| 11:12:15 | 14 | THE COURT: We need to deal with this thing that you |
| 11:12:16 | 15 | submitted yesterday that's called Plaintiff's Proffer Relating |
| 11:12:16 | 16 | Jones and Palmer. That's going to come up during the direct, |
| 11:12:20 | 17 | right? |
| 11:12:20 | 18 | MR. LOEVY: Correct, Judge. |
| 11:12:22 | 19 | THE COURT: So let me hear from the defense on this. |
| 11:12:25 | 20 | I think it would probably make sense, because it's in numbered |
| 11:12:28 | 21 | paragraphs, I think it would probably make sense for you to |
| 11:12:31 | 22 | start off by going through and telling me which parts do you |
| 11:12:35 | 23 | have an objection to and then we'll go back through them. |
| 11:12:39 | 24 | MR. LOEVY: Your Honor, may we suggest that our |
| 11:12:40 | 25 | expert be present so hear so he can hear what the rulings are |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 84 of 140 PageID #:30979
11/29/16 AM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

83

| | |
|---|---|
| 11:12:43 | 1 |
| 11:12:46 | 2 |
| 11:12:49 | 3 |
| 11:12:50 | 4 |
| 11:12:51 | 5 |
| 11:12:54 | 6 |
| 11:12:55 | 7 |
| 11:12:59 | 8 |
| 11:13:02 | 9 |
| 11:13:05 | 10 |
| 11:13:07 | 11 |
| 11:13:10 | 12 |
| 11:13:17 | 13 |
| 11:13:19 | 14 |
| 11:13:23 | 15 |
| 11:13:23 | 16 |
| 11:13:26 | 17 |
| 11:13:33 | 18 |
| 11:13:34 | 19 |
| 11:13:37 | 20 |
| 11:13:39 | 21 |
| 11:13:42 | 22 |
| 11:13:45 | 23 |
| 11:13:48 | 24 |
| 11:13:59 | 25 |

1  and know what he can say and what he can't say.

2         THE COURT:  That's a fair point.  He is an expert.

3  He is in the room.

4         MR. LOEVY:  Mr. Brasfield.

5         THE COURT:  Just have a seat, but listen.  Mr.

6  Noland, go ahead.

7         MR. NOLAND:  Judge, I guess just for the record, this

8  is the fourth time I think they have made one of those

9  proffers.  It seems like they're trickling it out.

10        THE COURT:  You know what, I am treating this as the

11  universe.  This thing -- this document is the universe.  I'm

12  not really dealing with the previous ones, to the extent there

13  were any.  I know there's been discussion about it before.  I

14  am treating this as the universe of what they intend to

15  present.

16        MR. NOLAND:  So it looks like on the proffer on page

17  2, the third and fourth line, they say the city officials were

18  aware that.

19        THE COURT:  Which paragraph number was this?

20        MR. NOLAND:  Paragraph 1.  That Jones could not have

21  committed the murder.  I think that should be may not have

22  committed the murder.  It was potentially exculpatory

23  evidence.

24        The next line.  Laverty's information was placed in a

25  so-called --

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 85 of 140 PageID #:30980
***REALTIME UNEDITED TRANSCRIPT ONLY***

84

11:13:54  1    THE COURT:  Slow down.

11:13:55  2    MR. NOLAND:  Laverty's information was placed in a

11:13:59  3    so-called street file which the CPD did not turn over to

11:14:02  4    prosecutors in the criminal defense.  My recollection was that

11:14:05  5    Mr. Hickey had stated that the understanding was that the memo

11:14:09  6    had been provided to the -- I think somebody named Dee and it

11:14:16  7    wasn't turned.  You know what?  I'll waive that.

11:14:19  8    THE COURT:  Okay.

11:14:20  9    MR. NOLAND:  Waived.

11:14:20  10   The next line as far as in spring of '82, Laverty

11:14:27  11   learned Jones was on trial for murder.  He told his commander

11:14:30  12   that than an innocent person was being prosecuted and his

11:14:31  13   commander did nothing.  Laverty informed Jones' criminal

11:14:35  14   defense attorney.  I think we are going beyond what's

11:14:37  15   necessary for the -- their notice argument, Judge, so I think

11:14:41  16   a lot of the details and I think that's going to be a lot of

11:14:44  17   our arguments hereafter.  Jones filed a Section 1983 lawsuit.

11:14:49  18   Again --

11:14:49  19   THE COURT:  This is paragraph 2?

11:14:50  20   MR. NOLAND:  Yeah, paragraph 2.  I think that is

11:14:53  21   unnecessary as well.  I think the jury -- as far as there was

11:15:00  22   litigation with respect to this incident I think is what the

11:15:03  23   Court had previously allowed.  So I would object to that

11:15:11  24   entire sentence.

11:15:12  25   And then paragraph 3 we would object to as far as of

11/29/16 AM        Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 86 of 140 PageID #:30981
***REALTIME UNEDITED TRANSCRIPT ONLY***

85

11:15:15    1    the CPD initiating disciplinary proceedings against Laverty.

11:15:20    2            THE COURT:  Keep going.

11:15:21    3            MR. NOLAND:  Paragraph B, or section B, paragraph 4,

11:15:27    4    they're talking again about the specifics of Palmer class

11:15:30    5    action, I think that the litigation was filed regarding -- and

11:15:35    6    as far as the policies and practices of suppressing

11:15:40    7    investigative materials and street files, we believe that

11:15:42    8    would open the door to the result in Palmer 2 which was that

11:15:46    9    there was no policy and practice, there was a single case and

11:15:51    10   Palmer 2 found it.  Basically, too much detail.

11:15:58    11           THE COURT:  What do you think would be an appropriate

11:16:01    12   amount of detail?

11:16:02    13           MR. NOLAND:  I think what the Court has already

11:16:03    14   allowed, which was that there was litigation that the city

11:16:10    15   changed its policy, the superintendent had the city change its

11:16:14    16   policy during the litigation as a result of the detectives

11:16:18    17   maintaining their notes and so I think that is I think what

11:16:25    18   should be allowed.  And that is why they changed their policy

11:16:28    19   without saying what the -- and that there was this issue in

11:16:32    20   the Jones case is acceptable too which I think the Court has

11:16:36    21   allowed before.

11:16:38    22           Then they get into a lot of detail about days after

11:16:42    23   the suit was filed, a federal judge order the city to preserve

11:16:45    24   all the street files.  And the department notice and et

11:16:49    25   cetera.  I think as far as the order preserving the street

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 87 of 140 PageID #:30982
***REALTIME UNEDITED TRANSCRIPT ONLY***

86

| | |
|---|---|
| 11:16:53 | 1 |
| 11:16:58 | 2 |
| 11:17:04 | 3 |
| 11:17:08 | 4 |
| 11:17:09 | 5 |
| 11:17:11 | 6 |
| 11:17:16 | 7 |
| 11:17:20 | 8 |
| 11:17:21 | 9 |
| 11:17:22 | 10 |
| 11:17:23 | 11 |
| 11:17:24 | 12 |
| 11:17:28 | 13 |
| 11:17:31 | 14 |
| 11:17:34 | 15 |
| 11:17:38 | 16 |
| 11:17:40 | 17 |
| 11:17:45 | 18 |
| 11:17:47 | 19 |
| 11:17:51 | 20 |
| 11:17:53 | 21 |
| 11:17:56 | 22 |
| 11:17:57 | 23 |
| 11:18:00 | 24 |
| 11:18:01 | 25 |

1 files for that time, it's probably okay.  So no objection to

2 that, but it would go into the general, the policy was changed

3 as a result by the superintendent.

4      The next line.

5      THE COURT:  Hang on a second.  So sentence 2 of

6 paragraph 5 says that the superintendent then issued a

7 departmental notice instructing that all notes be preserved.

8 Is there something wrong with that sentence?

9      MR. NOLAND:  That's okay.

10      THE COURT:  It's the following sentence?

11      MR. NOLAND:  It's the following sentence.

12      THE COURT:  The Court's order was amended in '82 when

13 the Court learned that the detectives were circumventing the

14 order and they were instructed to preserve all street files.

15 Let me ask, what was the amendment in September of '82?  Can I

16 ask plaintiff's counsel?

17      MR. ART:  So the amendment in '82 is the Court

18 reacting to the teletype.

19      THE COURT:  I'm asking something way more specific.

20 What was changed about the order?  This is a preliminary

21 injunction or the TRO, whichever it was?

22      MR. ART:  Right.

23      MR. SWAMINATHAN:  You're asking the difference from

24 the original 84?

25      THE COURT:  How was the order amended, that's the

***REALTIME UNEDITED TRANSCRIPT ONLY***

87

| | |
|---|---|
| 11:18:03 | 1 |
| 11:18:03 | 2 |
| 11:18:05 | 3 |
| 11:18:08 | 4 |
| 11:18:11 | 5 |
| 11:18:13 | 6 |
| 11:18:16 | 7 |
| 11:18:19 | 8 |
| 11:18:22 | 9 |
| 11:18:26 | 10 |
| 11:18:29 | 11 |
| 11:18:36 | 12 |
| 11:18:38 | 13 |
| 11:18:42 | 14 |
| 11:18:44 | 15 |
| 11:18:47 | 16 |
| 11:18:50 | 17 |
| 11:18:51 | 18 |
| 11:18:51 | 19 |
| 11:18:53 | 20 |
| 11:18:53 | 21 |
| 11:18:55 | 22 |
| 11:18:57 | 23 |
| 11:19:00 | 24 |
| 11:19:00 | 25 |

1   question?

2        MR. SWAMINATHAN:  The TRO was amended to make it

3   essentially a little more broad to say not just street files,

4   it's like street files plus any locations in which street

5   files may exist.  It was just --

6        THE COURT:  Okay.  Keep going, Mr. Noland.  You don't

7   have to talk about that one.

8        MR. NOLAND:  Paragraph 6, as far as the specifics of

9   the federal judge's finding on March 31st, 1983, we believe

10  all of that would is improper and would open the door and

11  require us to respond with Palmer 2 because specifically.

12       THE COURT:  When you say Palmer 2, I just want to

13  make sure -- I understand what you're talking about.  Which --

14  you're talking about one of the Court of Appeals?

15       MR. NOLAND:  Yes, 806 F.2d 1360.

16       THE COURT:  Which one is that?  Is that the one

17  that's partially affirmed and partially overturned in the

18  preliminary injunction?

19       MR. NOLAND:  No.

20       THE COURT:  That's the later one?

21       MR. NOLAND:  It's the later one where the Court said

22  the claim depends on there being exculpatory material in the

23  street file and there isn't any.

24       THE COURT:  Keep going.

25       MR. NOLAND:  And the argument on that would be --

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 89 of 140 PageID #:30984
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

88

11:19:02   1   their argument is this comes in as to notice.  And the city --

11:19:06   2   the superintendent, of course, the policy was changed and they

11:19:10   3   now about the litigation in '82 and '83.  However, they also

11:19:13   4   now that the plaintiffs weren't finding anything in these

11:19:15   5   alleged street files so the plaintiffs are trying to make it

11:19:18   6   seem like there's this incredibly, giving notice that the city

11:19:21   7   was on notice that there was an epidemic of withholding their

11:19:24   8   street files when that's not the case.

11:19:28   9          To continue, so that would be paragraph 6.

11:19:31   10          Paragraph 6B as to what the commanders interpreted.

11:19:40   11   This is all -- these are all things happening in advance of

11:19:43   12   the policy being rewritten for 83-1 and then 83-2.  So to us

11:19:50   13   it's irrelevant.  That all these details will confuse the jury

11:19:56   14   as to what they're being called upon here, whether or not

11:19:59   15   after 83-1, whether or not there was a practice of withholding

11:20:03   16   exculpatory material.

11:20:04   17          THE COURT:  Pause for a second.  So are you talking

11:20:07   18   -- are you talking about paragraph 7 yet?  Or you are not to

11:20:11   19   paragraph 7?

11:20:11   20          MR. NOLAND:  That was paragraph 6.

11:20:13   21          And it would be the same thing with respect to

11:20:27   22   paragraph 7 because the Court's finding, the District Court's

11:20:33   23   finding was overturned and so this insufficient -- the city

11:20:39   24   was on in the that its policy before owe.

11:20:41   25          THE COURT:  When was it overturned?  What was the

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 90 of 140 PageID #:30985
***REALTIME UNEDITED TRANSCRIPT ONLY***

89

| 11:20:43 | 1 | date? |

11:20:44   2   MR. NOLAND:  November of '86.  However, the
11:20:46   3   litigation was ongoing and the city wasn't on in the of any
11:20:49   4   other cases in that litigation and the appeal was filed in '84
11:20:54   5   as to that ruling.  And so the city was actually -- they're
11:20:58   6   trying to say the city was on notice of this epidemic of the
11:21:00   7   pre 83-1 policy when in fact the opposite is true, the facts
11:21:04   8   in the litigation developed that there wasn't.  It was simply
11:21:07   9   the Jones case, so this leads a misimpression and misleading
11:21:11   10  facts for the jury.  So that would be paragraph 7.
11:21:17   11  THE COURT:  Can I ask this question?  There's special
11:21:20   12  order 83-1 and then there's special order 83-2.  Right?
11:21:24   13  MR. NOLAND:  Yes, sir.
11:21:25   14  THE COURT:  Both of which Hickey -- somebody
11:21:28   15  testified about it?
11:21:29   16  MR. NOLAND:  Hickey testified about it.
11:21:30   17  THE COURT:  When was 83-2 adopted?
11:21:32   18  MR. NOLAND:  May of '83.
11:21:33   19  THE COURT:  Did Hickey testify about the background
11:21:37   20  for the change from 83-1 to 83-2?
11:21:41   21  MR. NOLAND:  Yes, he did.  He explained that it was
11:21:42   22  in conjunction with discussions relative to the litigation
11:21:50   23  with the corporation counsel's office, the plaintiff's
11:21:51   24  attorneys, I think -- and the -- I can't remember.  I think
11:21:56   25  specifically he probably would have said that people in the

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 91 of 140 PageID #:30986
***REALTIME UNEDITED TRANSCRIPT ONLY***

90

11:21:58  1   police department.

11:22:01  2        THE COURT:  Okay.  Have you covered what you needed

11:22:03  3   to cover?

11:22:04  4        MR. NOLAND:  Yes, your Honor.

11:22:05  5        THE COURT:  All right.  So, look, we had a lot of

11:22:12  6   discussion about this.  I am going to tell you what you can do

11:22:14  7   and what you can't do.

11:22:15  8        I'm going through this proffer as you've written it.

11:22:18  9        Paragraph 1 on page 2, I am not going to get into a

11:22:23  10  fight over may versus could in terms of whether Jones may or

11:22:28  11  may not have committed the murder, could, I am not going to

11:22:32  12  micro manage it to that level of detail.

11:22:36  13       The first three sentences I think are all appropriate

11:22:40  14  and admissible.  I don't think the fourth sentence that reads,

11:22:44  15  in spring 1982, Laverty learned Jones was on trial for murder,

11:22:49  16  he told his commander that an innocent person was being

11:22:54  17  prosecuted and his commander did nothing.  I don't think

11:22:54  18  that's necessary.  I am excluding that under 403.

11:22:57  19       The last two sentences are fine because they are

11:22:59  20  admissible to show notice as I have previously ruled.  That

11:23:03  21  topic is admissible, so the two sentences about telling Jones'

11:23:07  22  criminal defense attorney and declaring a mistrial and the

11:23:11  23  charges being dropped, those are appropriate.

11:23:13  24       As far as paragraph 2 is concerned, I think it goes

11:23:16  25  into too much detail regarding what the lawsuit said.  I think

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 92 of 140 PageID #:30987
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

91

| 11:23:20 | 1 | you can bring out that in 1983, Mr. Jones filed a civil |
| 11:23:25 | 2 | lawsuit challenging the practices that had been -- you know, |
| 11:23:30 | 3 | he claimed to have been exposed in that case, period. |
| 11:23:32 | 4 | Paragraph 3 about disciplinary proceedings against |
| 11:23:35 | 5 | Laverty, I don't see that as admissible.  I don't think it's |
| 11:23:38 | 6 | relevant.  Even if it is relevant, it's unfairly prejudicial |
| 11:23:43 | 7 | and gets us off into a side track.  That's excluded. |
| 11:23:45 | 8 | Paragraph 4, now we have flipped over to Palmer, I |
| 11:23:50 | 9 | think that on the first -- that on that sentence or first |
| 11:23:53 | 10 | sentence on that, I think the way it needs to be elicited is |
| 11:23:57 | 11 | that there was a class action lawsuit alleging a policy and |
| 11:24:03 | 12 | practice rather than it was filed to challenge the policy and |
| 11:24:06 | 13 | practice, it's a lawsuit alleging a policy and practice of |
| 11:24:09 | 14 | suppressing investigative materials.  The second sentence is |
| 11:24:13 | 15 | fine, city policy makers had notice and participated in the |
| 11:24:16 | 16 | lawsuit. |
| 11:24:17 | 17 | In terms of paragraph 5, days after the lawsuit was |
| 11:24:20 | 18 | filed, give a date.  You know it.  It's a court order.  You |
| 11:24:24 | 19 | know what the date is.  Let's give a date than the day after |
| 11:24:28 | 20 | the lawsuit was filed.  The first two sentences are fine.  On |
| 11:24:32 | 21 | whatever date the judge ordered that the CPD preserve all |
| 11:24:35 | 22 | street files and the superintendent issued a departmental |
| 11:24:37 | 23 | notice instructing that all notes be preserved.  I'll just |
| 11:24:41 | 24 | point out that the second sentence is already coming in I |
| 11:24:43 | 25 | think through Hickey. |

| | |
|---|---|
| 11:24:44 | 1 |
| 11:24:46 | 2 |
| 11:24:50 | 3 |
| 11:24:54 | 4 |
| 11:24:57 | 5 |
| 11:24:59 | 6 |
| 11:25:03 | 7 |
| 11:25:07 | 8 |
| 11:25:14 | 9 |
| 11:25:20 | 10 |
| 11:25:24 | 11 |
| 11:25:27 | 12 |
| 11:25:31 | 13 |
| 11:25:36 | 14 |
| 11:25:41 | 15 |
| 11:25:43 | 16 |
| 11:25:47 | 17 |
| 11:25:50 | 18 |
| 11:25:54 | 19 |
| 11:25:58 | 20 |
| 11:26:03 | 21 |
| 11:26:06 | 22 |
| 11:26:12 | 23 |
| 11:26:18 | 24 |
| 11:26:21 | 25 |

          I think that the amendment of the order, it's really
inconsequential for purposes of this and certainly the reasons
for it I don't think are terribly significant and so -- and it
gets us off into a side track, so I am excluding the third
sentence of paragraph 5.

          Paragraph 6 and 7, I am basically going to collapse
into one thing.  Because I don't really think it's either
necessary or appropriate to get into the details of the
judge's findings in the case.  I just want to look at one
thing.  Hang on a second.

          The details of the judge's findings in the case, so
the stuff about how there was a finding that how people were
applying it in an improperly restricted way and what
commanders were doing, how official reports from sometimes
prepared and so on, I don't think any of that is necessary.
However, I do think that -- I think if I didn't say this, I at
least hinted it pretty strongly in the order that I entered
previously on this topic, the written order, that I think that
you're entitled to bring in that there was -- that there was a
determination by a judge that special order 83-1 was
insufficient to accord criminal defendants the full rights to
which they were entitled.  But I do not think that the
specifics of that are relevant.  I mean, I think that you can
then -- you have a basis to link that up with Hickey's
testimony that in May of '83, there was a further amendment

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 94 of 140 PageID #:30989
***REALTIME UNEDITED TRANSCRIPT ONLY***

93

| | | |
|---|---|---|
| 11:26:26 | 1 | based on he testified, discussions with plaintiff's counsel, |
| 11:26:30 | 2 | so you can put in the first sentence of paragraph 7, not the |
| 11:26:33 | 3 | rest of it, not paragraph 6, and I continue to believe and I |
| 11:26:38 | 4 | am again ruling that what happened on the appeals is not |
| 11:26:40 | 5 | relevant because this is all being admitted for the purpose of |
| 11:26:43 | 6 | showing notice. And there was no finding on appeal until 1986 |
| 11:26:49 | 7 | besides. So there you go. |
| 11:26:51 | 8 | All right. Is everybody clear enough on all of that? |
| 11:26:53 | 9 | MR. LOEVY: I think so, your Honor. |
| 11:26:54 | 10 | THE COURT: All right. So take 10 minutes and then |
| 11:26:57 | 11 | we will resume. |
| 11:26:58 | 12 | MR. LOEVY: Thank you. |
| 11:26:58 | 13 | MR. KULWIN: Thanks, Judge. |
| 11:26:59 | 14 | (Short break.) |
| 11:35:24 | 15 | (The jury enters the courtroom.) |
| 11:35:32 | 16 | THE COURT: All right. Everybody can have a seat. |
| 11:35:34 | 17 | The next witness is on his way up. |
| 11:35:36 | 18 | (Witness sworn.) |
| 11:35:53 | 19 | THE COURT: Mr. Loevy, you can go ahead. |
| 11:35:55 | 20 | - - - |
| 11:35:55 | 21 | MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION |
| 11:35:55 | 22 | BY MR. LOEVY: |
| 11:35:56 | 23 | Q. Sir, if you'd state your name for the record. |
| 11:35:59 | 24 | A. Michael David Brasfield. |
| 11:36:01 | 25 | Q. What is your profession? |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 95 of 140 PageID #:30990

11:36:02   1   A.  I am retired from law enforcement after about 40 years and

11:36:05   2   I occasionally do an expert witness and consulting work.

11:36:08   3   Q.  Let's focus on your law enforcement career.  Tell the jury

11:36:11   4   a little bit about your history.

11:36:13   5   A.  As briefly as I can, I started in law enforcement in a

11:36:16   6   small agency in Washington state in 1968.  After a year there,

11:36:20   7   I transferred to the Seattle police department on January --

11:36:25   8   in January of 1969.  I stayed with the Seattle police

11:36:29   9   department until my retirement in January of 1995.  About 26

11:36:34   10  years.  While I was with the Seattle police department, I

11:36:37   11  served as a patrol officer, tock an exam and eventually became

11:36:43   12  a detective, served in a number of investigative units within

11:36:46   13  the police department.  I then was promoted to sergeant.  I

11:36:50   14  served in a number of positions as a sergeant including

11:36:54   15  internal affairs and vice and prosecution enforcement.  I was

11:36:59   16  eventually promoted in 1978 to lieutenant and I was assigned

11:37:06   17  at the time the city of Seattle had a contract to provide all

11:37:10   18  law enforcement training statewide in the statewide police

11:37:13   19  academy and I became a commander of that.  We train law

11:37:19   20  enforcement officers from approximately 130 different

11:37:24   21  agencies, provided them with the basic tools to become police

11:37:27   22  officers.

11:37:28   23          I was promoted to captain in 1980.  I was in command

11:37:33   24  of both the downtown commercial water front business precinct.

11:37:41   25  I was then transferred to the command of the internal

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 96 of 140 PageID #:30991
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

95

11:37:45    1    investigation section and I held that position for a couple of

11:37:50    2    years, investigated everything from officer involved shootings

11:37:54    3    to police misconduct, including felony accusations and

11:37:59    4    allegations against officers.

11:38:01    5            After the two years there, I was requested and was

11:38:04    6    assigned to be the commander of the university district, the

11:38:10    7    University of Washington, and a number of other universities

11:38:17    8    were and I stayed there for the two years.  He was then in the

11:38:21    9    city of Seattle captain is the highest civil service rank.  I

11:38:26    10   was tapped to become a major and was put in charge of the

11:38:30    11   instructional service division.  And in the inspectional

11:38:33    12   services definition, among many other things, we reviewed,

11:38:38    13   wrote, modified policies and practices throughout the

11:38:42    14   department including homicides, homicide investigations.  We

11:38:47    15   also conducted audits and inspections of units throughout the

11:38:52    16   police department.

11:38:53    17   Q.  Let me slow you down there for a second?

11:38:56    18   A.  Yes, sir.

11:38:57    19   Q.  You were talking about your ranks.  Did you achieve ranks

11:38:59    20   all the way up to assistant chief and chief?

11:39:02    21   A.  Yes.

11:39:02    22   Q.  Tell the jury about that?

11:39:03    23   A.  After I served as commander of the inspector services

11:39:08    24   division, I was promoted to assistant chief which is one step

11:39:12    25   below the chief of police and my responsibilities were as

11:39:17    1    assistant chief with the administrative services and that

11:39:21    2    included the records bureau, the maintenance of the subpoena

11:39:26    3    services, and a number of other units including 911 dispatch

11:39:32    4    services.

11:39:33    5    Q.  All right.  Did you eventually become a police chief?

11:39:35    6    A.  I did.  After retiring in January of '95, I was contacted

11:39:41    7    by the city of Fort Lauderdale Florida and in June or July of

11:39:46    8    1995, I was selected to be the police chief there.  And I

11:39:52    9    served in that capacity until I decided it was time for a

11:39:56   10    second retirement and I left as chief of police in Fort

11:40:02   11    Lauderdale in 2001.

11:40:03   12    Q.  After that?

11:40:03   13    A.  I returned to Washington state.  I kind of sat in the

11:40:11   14    retirement cabin for a little while and got bored and there

11:40:17   15    was an upcoming election for sheriff of Jefferson County,

11:40:20   16    Washington, predominantly a rural area.  I had never been

11:40:24   17    involved officially in politics.  And decided to run for

11:40:28   18    sheriff.  I was elected.  I completed my first term, ran for

11:40:32   19    reelection, was successful and started grooming a replacement

11:40:41   20    and about halfway through my second four-year term, I decided

11:40:46   21    to retire and my successor was appointed to fill that

11:40:50   22    position.

11:40:50   23    Q.  Now, you have some associations and memberships.  Can you

11:40:54   24    just summarize that?

11:40:54   25    A.  I was granted life membership with the international

11:40:58  1  associations of chiefs of police, life membership with the

11:41:02  2  police executive research forum, life membership with the

11:41:08  3  national sheriff's association,as well as a number of state

11:41:14  4  organizations.

11:41:14  5  Q.  And in that capacity, do you have the ability or the

11:41:17  6  opportunity to interact with other agencies and become

11:41:21  7  familiar with other police departments policies and practices?

11:41:23  8  A.  Yes, both in the process of writing policies and practices

11:41:27  9  and implementing them and monitoring them in the city of

11:41:30  10  Seattle as well as as a chief and as a sheriff, I have regular

11:41:38  11  and significant interaction with other agencies.

11:41:40  12  Q.  And you mentioned audits, and I cut you off at audits.

11:41:43  13  Briefly, did that give you experience and opportunity to learn

11:41:45  14  about other police departments too?

11:41:47  15  A.  Yes.  I was while on active duty, I participated in a

11:41:54  16  federal grant to inspect and provide audit information on the

11:42:01  17  delivery of police services to a number of cities nationwide

11:42:06  18  on the delivery of police services in public housing, and that

11:42:10  19  process, my portion of the team was to look at their records

11:42:12  20  keeping and their delivery of information to outside request

11:42:18  21  errs.

11:42:18  22  Q.  So that was actually the area of your expertise was record

11:42:21  23  keeping documentation and transmitting that stuff to outside?

11:42:24  24  A.  In that particular project, yes.

11:42:26  25  Q.  You also mentioned training.  Did that also in your

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 99 of 140 PageID #:30994
***REALTIME UNEDITED TRANSCRIPT ONLY***

98

| | | |
|---|---|---|
| 11:42:29 | 1 | training capacity, did that give you experience with other |
| 11:42:33 | 2 | departments too? |
| 11:42:33 | 3 | A.  Yes, one of the processes at training both at the entry |
| 11:42:36 | 4 | level police officer deputy training is to look at their |
| 11:42:41 | 5 | policies and practices.  You have an academy class, three |
| 11:42:49 | 6 | academy classes with officers from multiple agencies, you have |
| 11:42:53 | 7 | to become familiar with their policies and procedures and |
| 11:42:56 | 8 | tailored the training to reflect what they need to do in |
| 11:42:59 | 9 | theirs.  In that process, you're looking at their policies and |
| 11:43:04 | 10 | practices and there's not too many agencies that I am aware of |
| 11:43:07 | 11 | when you're doing policies like when I was at inspection |
| 11:43:12 | 12 | services or the chief or the sheriff, you are not always |
| 11:43:16 | 13 | hoping to reinvent the wheel.  You are looking to see what |
| 11:43:19 | 14 | some of the other agencies are doing nationwide. |
| 11:43:22 | 15 | Q.  You said you actually worked in records division for a |
| 11:43:24 | 16 | time, correct? |
| 11:43:25 | 17 | A.  As an assistant chief, I absorbed that division, yes. |
| 11:43:29 | 18 | Q.  Supervising? |
| 11:43:29 | 19 | A.  Yes. |
| 11:43:30 | 20 | Q.  And that would include homicide files as well, right? |
| 11:43:33 | 21 | A.  Yes. |
| 11:43:33 | 22 | Q.  When you were the chief in Fort Lauderdale, did that give |
| 11:43:36 | 23 | you jurisdiction over the policies and practices including |
| 11:43:38 | 24 | what you've called high risk policies and practices? |
| 11:43:40 | 25 | A.  Yes.  When I describe high risk policies, things that have |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 100 of 140 PageID #:30995
***REALTIME UNEDITED TRANSCRIPT ONLY***

99

11:43:49    1   the opportunity or the potential for significant impact either

11:43:53    2   budgetarily or legal liability and, in some instances, police

11:43:56    3   pursuits and use of deadly force that either citizens or

11:44:00    4   officer's lives are in danger.

11:44:02    5   Q.  All right.  Were you a detective -- did you have

11:44:05    6   supervision over detective over the course of your career?

11:44:07    7   A.  Yes, I had that opportunity both as a sergeant and as a

11:44:13    8   captain and as a chief and as a sheriff.

11:44:17    9   Q.  Have you investigated as a detective homicides?

11:44:19   10   A.  I have investigated traffic homicides, traffic fatalities

11:44:24   11   for hit and runs.  You have situations where you have a fatal

11:44:29   12   crash, you may or may not have a suspect at the scene, you

11:44:35   13   have to assemble the files.

11:44:36   14   Q.  All right.  And as a suspect in charge of internal

11:44:40   15   investigations and the assistant chief in Seattle, did you

11:44:42   16   regularly oversee and review detective doing homicide

11:44:46   17   investigations?

11:44:46   18   A.  Yes.

11:44:47   19   Q.  Is that a subject about which you have great familiarity?

11:44:50   20   A.  I am.

11:44:51   21   Q.  All right.  Let's talk about this real briefly, the

11:44:58   22   Washington state Attorney General homicide investigation

11:45:01   23   tracking system.

11:45:02   24   A.  The Washington state Attorney General instituted because

11:45:07   25   of dissatisfaction statewide with clearances of homicide

11/29/16 AM Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 101 of 140 PageID #:30996
***REALTIME UNEDITED TRANSCRIPT ONLY***

100

11:45:12   1   investigations and inconsistent procedures for homicide

11:45:17   2   investigations created what the acronym was HITS, homicide

11:45:25   3   investigation tracking system.  It consisted of 10 or 12

11:45:30   4   practitioners, the number varied from time to time including

11:45:33   5   what we call in Washington State prosecuting attorneys, police

11:45:37   6   investigators, and we would review problematic homicide cases

11:45:44   7   from around the state that were either coming to a dead end or

11:45:51   8   not seeming to have a coordination in the investigation.

11:45:56   9   Q.  All right.  In summary then, is the subject of policies

11:45:59   10  and practices about documenting and disclosing investigation

11:46:02   11  materials, is that something you have expertise in, sir?

11:46:04   12  A.  Yes, sir.

11:46:05   13  Q.  All right.  Since you've retired, you mentioned you do

11:46:08   14  some expert witness stuff?

11:46:09   15  A.  Yes.

11:46:09   16  Q.  Some consulting.

11:46:11   17       About how many cases have you been involved with?

11:46:13   18  A.  I have actually been retained somewhere between 120 or

11:46:21   19  130.  However, the distinction is how many I have been deposed

11:46:26   20  Oregon to trial on.

11:46:27   21  Q.  So let's break that down.  Sometimes you get retained and

11:46:31   22  you get a fee to review materials?

11:46:33   23  A.  Right, that's correct.

11:46:34   24  Q.  What's your first step when you get retained?

11:46:36   25  A.  I ask for copies of certain documents relative to the

11:46:41  1  litigation, whether it is the criminal -- the civil complaint,

11:46:47  2  any depositions that have already been taken, any statements,

11:46:52  3  any police reports, that type of thing and review them.

11:46:55  4  Q.  Then you do a review?

11:46:57  5  A.  Yes.

11:46:58  6  Q.  Does it matter who hires you as far as the opinion and the

11:47:02  7  money, explain?

11:47:03  8  A.  No, looked recently, about 60 to 66 percent of the cases

11:47:09  9  have been for governmental entities, for cities, counties,

11:47:16  10  state agencies, police departments.  The other 40 have been

11:47:18  11  for plaintiff's cases where someone is suing the agencies.

11:47:23  12  Q.  If a lawyer calls you and says they want you to review the

11:47:26  13  facts of the case, does that mean you automatically are going

11:47:29  14  to take their side or testify for them?

11:47:30  15  A.  No, depending on whether I had experience with the

11:47:33  16  attorney or the law firm in the past, I may agree to take a

11:47:38  17  quick look at some material to see if it's something that I

11:47:41  18  thought I could honestly be engaged in.  Oftentimes, I'll look

11:47:48  19  at the material and indicate I appreciate what you're trying

11:47:53  20  to do here, but I am not going to be a very good witness for

11:47:56  21  you because I don't feel that what was done was correct.

11:47:58  22  Q.  All right.  So you'll only do the cases where you believe

11:48:02  23  it was correct?

11:48:02  24  A.  Yes.

11:48:03  25  Q.  Do you generally charge an hourly rate to review materials

| 11:48:06 | 1 | in these cases? |
| 11:48:06 | 2 | A.  I do. |
| 11:48:07 | 3 | Q.  So you get paid that rate either way regardless of whether |
| 11:48:10 | 4 | you have good news or bad news for the attorney? |
| 11:48:12 | 5 | A.  That's correct. |
| 11:48:12 | 6 | Q.  All right.  In this case, you did a lot of work, did you |
| 11:48:15 | 7 | not? |
| 11:48:15 | 8 | A.  I did.  This was one.  Most time consuming. |
| 11:48:18 | 9 | Q.  How many hours would you say you've spent in this case? |
| 11:48:21 | 10 | A.  Somewhere between 100 and 150, perhaps. |
| 11:48:25 | 11 | Q.  Hours? |
| 11:48:25 | 12 | A.  Yes. |
| 11:48:26 | 13 | Q.  And what is your hourly rate? |
| 11:48:27 | 14 | A.  $300 an hour. |
| 11:48:28 | 15 | Q.  Is that commensurate with the hourly rate of people in |
| 11:48:32 | 16 | your industry? |
| 11:48:32 | 17 | A.  Yes, it is. |
| 11:48:33 | 18 | Q.  Has your rate stayed the same Oregon up overtime? |
| 11:48:36 | 19 | A.  I initially started out probably eight or nine years ago |
| 11:48:40 | 20 | at $250 an hour and four or five years ago I raised it to 3, |
| 11:48:46 | 21 | but it's been that way. |
| 11:48:47 | 22 | Q.  In addition to this case with the 100 to 150 hours, have |
| 11:48:53 | 23 | you had or cases to study the policies and practices of the |
| 11:48:56 | 24 | Chicago Police Department? |
| 11:48:57 | 25 | A.  I have. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 104 of 140 PageID #:30999
***REALTIME UNEDITED TRANSCRIPT ONLY***

103

11:48:58  1          MR. NOLAND:  Objection.

11:48:58  2          THE COURT:  I need to ask you about this at sidebar.

11:49:09  3      (The following proceedings were had at sidebar outside the

11:49:11  4   hearing of the jury:)

11:49:11  5          THE COURT:  Where are you going with this?  Is it

11:49:13  6   just yes or no?  Are you going to ask him details?

11:49:15  7          MR. LOEVY:  I was going to ask him you have spent how

11:49:19  8   many hours, I believe he would say 4 to 500 hours looking at

11:49:23  9   the Chicago's policies and practices.  Your Honor had a little

11:49:23  10  discussion about what this opens to and how far.  If they want

11:49:27  11  to say, isn't it true you did a bunch of cases against

11:49:29  12  Chicago, we are going to say, well, those cases say this and

11:49:32  13  that.  Just talk about, hey, I spent 4 to 500 hours looking at

11:49:37  14  the city's policies and practices.

11:49:38  15         THE COURT:  I understand.

11:49:39  16         Articulate the objection, Mr. Noland.

11:49:42  17         MR. NOLAND:  The objection is that that would I think

11:49:46  18  be a not disclosed opinion as to us as which is things he

11:49:51  19  relied on in the Fields case and what's in the Fields report.

11:49:55  20  I told Mr. Loevy it was unlikely I would be asking him about

11:49:59  21  other cases that Mr. Loevy's firm has hired Mr. Brasfield on

11:50:04  22  relative to the City of Chicago.

11:50:05  23         THE COURT:  Okay.  I am going to exclude it at this

11:50:07  24  point.  If you think that there's something that's covered on

11:50:09  25  cross that opens the door, then you'll tell me before the

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 105 of 140 PageID #:31000
***REALTIME UNEDITED TRANSCRIPT ONLY***

11:50:12   1   redirect.

11:50:12   2           MR. LOEVY:  Got it.

11:50:13   3     (The following proceedings were had in open court in the

11:50:16   4   presence and hearing of the jury:)

11:50:16   5           THE COURT:  Okay.  You can proceed.

11:50:18   6   BY MR. LOEVY:

11:50:19   7   Q.  All right.  Let's turn to your role in this case.  What

11:50:24   8   did you review as part of forming opinions?

11:50:28   9   A.  I looked at the depositions of the city's representative,

11:50:37  10   Mr. Hickey, I've looked at policies and procedures of the

11:50:44  11   Chicago Police Department, I've looked at records that have

11:50:47  12   been found or located or retained in the Chicago Police

11:50:51  13   Department, I've reviewed other depositions and other court

11:50:54  14   material.

11:50:55  15   Q.  All right.   Let's focus on the files that got found.  Can

11:50:59  16   you tell the jury what your understanding is what the files

11:51:00  17   were?

11:51:01  18   A.  Well, which files?

11:51:04  19   Q.  The files from the basement.

11:51:06  20   A.  Okay.  What are commonly referred to as the basement

11:51:10  21   files.  You want me to give the background?

11:51:13  22   Q.  Yes, please.

11:51:14  23   A.  There were literally hundreds of files that were located

11:51:22  24   in the basement of I believe area one pertaining to homicide

11:51:27  25   investigations.  They ranged in time period from I believe as

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 106 of 140 PageID #:31001
***REALTIME UNEDITED TRANSCRIPT ONLY***

11:51:31   1   early as the 1940s up through 2000s. They were files that had

11:51:39   2   not previously been disclosed.

11:51:42   3             MR. NOLAND: Objection, your Honor. Move to strike.

11:51:46   4             THE COURT: Well, the last sentence I am going to

11:51:48   5   strike not because it's right or wrong but because it's not

11:51:51   6   responsive to the question.

11:51:52   7             MR. LOEVY: All right.

11:51:53   8             THE COURT: Let's proceed on a question by question

11:51:55   9   basis.

11:51:55   10   BY MR. LOEVY:

11:51:56   11   Q. You're undertaking part of it was to examine some of those

11:51:59   12   files, correct?

11:51:59   13   A. That's correct.

11:52:00   14   Q. All right. Of those files from the basement, how did you

11:52:03   15   determine your sample, tell the jury what your sample was?

11:52:05   16   A. Well, the first -- the case in point here was one of the

11:52:13   17   driving, Mr. Fields' case, but also to pick out two groups of

11:52:20   18   files. A group of files that would represent a time period

11:52:23   19   roughly three years before and after Mr. Fields' first trial

11:52:29   20   and a second group of files that would as closely as possible

11:52:36   21   correspond to his second trial. That time period -- the first

11:52:40   22   time period was from 1983 to 1986. The second time period was

11:52:45   23   from 1999, I believe, to 2006, somewhere in there.

11:52:50   24   Q. All right. It was on both sides of both criminal trials,

11:52:53   25   right?

| | | |
|---|---|---|
| 11:52:53 | 1 | A. Yes. |
| 11:52:54 | 2 | Q. Six-year time periods? |
| 11:52:55 | 3 | A. Yes, six and seven. |
| 11:52:56 | 4 | Q. Just to lead you through it, it was your understanding |
| 11:52:58 | 5 | that the Fields file was disclosed many years after the fact, |
| 11:53:02 | 6 | the Fields investigative file, correct? |
| 11:53:03 | 7 | A. That's correct. |
| 11:53:04 | 8 | Q. And the Fields file was among some file cabinets that had |
| 11:53:08 | 9 | other files, correct? |
| 11:53:10 | 10 | A. Yes. |
| 11:53:11 | 11 | Q. And then one of the questions was whether the materials in |
| 11:53:13 | 12 | these investigative files had been disclosed to the criminal |
| 11:53:16 | 13 | justice system, that was one of the things you looked at? |
| 11:53:18 | 14 | A. That's correct. |
| 11:53:18 | 15 | Q. Did you analyze those files, the sample you just told us |
| 11:53:27 | 16 | about? |
| 11:53:27 | 17 | A. Yes, I did. |
| 11:53:28 | 18 | Q. And that was part of your opinions in this case, correct? |
| 11:53:31 | 19 | A. Yes. |
| 11:53:31 | 20 | Q. All right. Let's back up and tell the jury turning to |
| 11:53:37 | 21 | your opinions, do police departments have systems, are they |
| 11:53:41 | 22 | supposed to have systems for turning over exculpatory evidence |
| 11:53:43 | 23 | and can you explain? |
| 11:53:44 | 24 | A. Yes. What's commonly referred to as Brady v. Maryland, |
| 11:53:51 | 25 | which back I believe in 1963, but the process that officers |

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 108 of 140 PageID #:31003
***REALTIME UNEDITED TRANSCRIPT ONLY***

107

11:53:57  1   learn and more importantly, commanders and administrative

11:54:01  2   police agencies and sheriff's office develop systems so that

11:54:06  3   they have a as much as possible a consistent foolproof process

11:54:15  4   of delivering information, all information pertaining -- that

11:54:25  5   could be potentially useful to the prosecutor in determining

11:54:27  6   or the state's attorney in determining whether they want to

11:54:29  7   file charges and to the -- eventually if charges are filed to

11:54:37  8   the criminal defense attorney.

11:54:38  9   Q.  In your experience, do all modern police departments have

11:54:40  10  a responsibility to create such systems that work?

11:54:43  11  A.  Yes.

11:54:43  12  Q.  And you said documenting information.  Are detectives

11:54:46  13  supposed to document all potentially relevant information?

11:54:49  14  A.  Yes.

11:54:49  15  Q.  Can you explain?

11:54:50  16  A.  When a detective is developing leads, developing

11:54:56  17  information, whether it's in the field, on the phone, face to

11:55:00  18  face interviews, they gather, as you can well imagine, all

11:55:04  19  sorts of information.  Oftentimes, you don't know the

11:55:07  20  relevance of that information at the time.  So when someone

11:55:11  21  tells you that they were either in a place or not in a place

11:55:16  22  at a certain time, that's the kind of information you want to

11:55:19  23  document.  If they give you information about physical

11:55:23  24  evidence, a description of a car, a description of an

11:55:27  25  individual, information about something that they observed,

11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 11:55:32 | 1 | all of those kinds of things, as well as physical evidence, |
| 11:55:36 | 2 | obviously, should be documented. |
| 11:55:39 | 3 | Q.  Why is it important or necessary to document seemingly |
| 11:55:43 | 4 | benign details? |
| 11:55:44 | 5 | A.  Because if you -- it's much like if you picked up a who |
| 11:55:49 | 6 | done it novel, you don't know until you get towards the end |
| 11:55:55 | 7 | what the eventual solution is, if you will, or the outcome and |
| 11:55:59 | 8 | oftentimes, in fact, the times I'm familiar with, if you |
| 11:56:03 | 9 | picked up what's commonly referred to in police parlance as a |
| 11:56:07 | 10 | murder book, you see a number of different investigative |
| 11:56:12 | 11 | tracks or leads.  They go off in different directions. |
| 11:56:16 | 12 | Q.  All right.  So it is important to document everything? |
| 11:56:18 | 13 | A.  Yes. |
| 11:56:18 | 14 | Q.  Is that universal and throughout the country? |
| 11:56:19 | 15 | A.  In any that I have been familiar with, it is.  With |
| 11:56:24 | 16 | perhaps one exception. |
| 11:56:24 | 17 | Q.  And who does -- what's that one exception? |
| 11:56:26 | 18 | A.  Chicago Police Department. |
| 11:56:27 | 19 | Q.  Does Chicago stand out as an aberration in your review for |
| 11:56:33 | 20 | how well or poorly they do that job? |
| 11:56:34 | 21 |        MR. NOLAND:  Objection, your Honor.  Foundation. |
| 11:56:36 | 22 |        THE COURT:  Overruled. |
| 11:56:37 | 23 |        THE WITNESS:  In my opinion, based on the material |
| 11:56:39 | 24 | that I have had access to and reviewed, they have done a very, |
| 11:56:43 | 25 | very poor job of doing it through the years. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 110 of 140 PageID #:31005
***REALTIME UNEDITED TRANSCRIPT ONLY***

109

| | | |
|---|---|---|
| 11:56:47 | 1 | BY MR. LOEVY: |
| 11:56:47 | 2 | Q.  I'm saying compared to other departments? |
| 11:56:49 | 3 | A.  Compared to others, in not only my personal experience but |
| 11:56:55 | 4 | in my reading and in my visits and my audits of other agencies |
| 11:57:00 | 5 | and all over the 40-year period of time, the best way of doing |
| 11:57:06 | 6 | that is a centralized file, centralized records system.  As |
| 11:57:12 | 7 | soon as you split that off, then you start getting more and |
| 11:57:16 | 8 | more information in different units in different files and it |
| 11:57:23 | 9 | becomes harder. |
| 11:57:23 | 10 | Q.  Let me break in there. |
| 11:57:24 | 11 | So is it a standard in modern police departments to |
| 11:57:27 | 12 | have a single centralized place? |
| 11:57:28 | 13 | A.  That's correct. |
| 11:57:29 | 14 | Q.  And you started to explain why that's important.  By the |
| 11:57:33 | 15 | way, single centralized place where stuff relating to homicide |
| 11:57:37 | 16 | investigations is kept? |
| 11:57:38 | 17 | A.  Right. |
| 11:57:38 | 18 | Q.  Explain why that's important. |
| 11:57:39 | 19 | A.  Well, your technical term of stuff is as good as any.  You |
| 11:57:45 | 20 | need to be able for a half a dozen reasons, one is the |
| 11:57:49 | 21 | integrity of the investigation.  Everything has to be in one |
| 11:57:52 | 22 | location.  You're likely to have numerous detectives or |
| 11:57:58 | 23 | specialty lab individuals, gang squad, bomb and arson, they're |
| 11:58:05 | 24 | all under different chains of command oftentimes in different |
| 11:58:09 | 25 | agencies.  All that information has to come to a central |

11/29/16 AM | ***REALTIME UNEDITED TRANSCRIPT ONLY***

110

11:58:12  1  point.

11:58:14  2          From a purely administrative standpoint, it's

11:58:17  3  critical because you have to be able to have a supervisor and

11:58:20  4  a chain of command all the way up to the superintendent or the

11:58:23  5  chief knowing that the investigation is thorough and complete.

11:58:26  6  And you can't do that by sending for records here or sending

11:58:30  7  for records there.

11:58:31  8          Very important is for the discovery process to be

11:58:36  9  able -- let me back up one.  Is to present to a prosecutor or

11:58:42  10  a state's attorney a complete and thorough investigation, not

11:58:45  11  one that just says this person did it, this is the evidence we

11:58:52  12  have, wield's like to see charges on it.  There has to be an

11:58:55  13  opportunity for the prosecutor, the state's attorney to look

11:58:59  14  at all of the other things.

11:59:01  15  Q.  And is that -- is one way modern police departments do

11:59:05  16  that is to keep everything in one place?

11:59:06  17  A.  Yes.

11:59:06  18  Q.  All right.  How about an index, is that a necessary part

11:59:10  19  of a functioning process?

11:59:12  20  A.  Absolutely.  It becomes even more critical if an agency

11:59:16  21  should choose not to have centralized records.  Then it is

11:59:21  22  very important, but there has to be a central index too.

11:59:23  23  Q.  All right.  And then as far as training for subpoenaed

11:59:27  24  processing and stuff like that, is that important and

11:59:29  25  expected?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 11:59:29 | 1 | A. Yes. |
| 11:59:30 | 2 | Q. All right. Let's talk about the early '80s in the City of |
| 11:59:35 | 3 | Chicago. Is it your understanding that the City of Chicago |
| 11:59:38 | 4 | was put on notice for lack of a better word that there was a |
| 11:59:41 | 5 | problem in the early '80s? |
| 11:59:42 | 6 | A. Yes, they were. |
| 11:59:43 | 7 | Q. Can you summarize for the jury? |
| 11:59:45 | 8 | A. There were a couple of lawsuits that had allegations |
| 11:59:51 | 9 | contained in them from the superintendent on down were aware |
| 11:59:59 | 10 | of that indicated that there were separate street files and |
| 12:00:04 | 11 | that the information was not being shared. |
| 12:00:06 | 12 | Q. All right. Let me focus you on April 1982 and a boy named |
| 12:00:11 | 13 | George Jones. Can you briefly summarize what that was? |
| 12:00:14 | 14 | A. Yes. There was I believe a 12 year old girl who was |
| 12:00:18 | 15 | murdered. Her brother was also assaulted in the attack. |
| 12:00:26 | 16 | Q. Without getting the facts of the murder, how did that put |
| 12:00:29 | 17 | the city on notice that there was a street file problem? |
| 12:00:32 | 18 | A. That information, there were representatives of the police |
| 12:00:36 | 19 | department, high level command officials in the police |
| 12:00:39 | 20 | department that participated in the litigation, and ignoring |
| 12:00:46 | 21 | for a moment just the news media, but the formal notification |
| 12:00:51 | 22 | of the process in the legal system. |
| 12:00:52 | 23 | Q. And in that Jones case, how was it that it came to the |
| 12:00:55 | 24 | city's attention that there was a problem, there was a |
| 12:00:57 | 25 | detective named Laverty and what did he disclose? |

| | | |
|---|---|---|
| 12:01:00 | 1 | A.  Detective Laverty discovered or unearthed in the court of |
| 12:01:06 | 2 | his investigation information that would have cleared or |
| 12:01:12 | 3 | seriously impeded any decision to prosecute young Mr. George |
| 12:01:20 | 4 | Jones, and he wrote it up in an informal process that ended up |
| 12:01:26 | 5 | in an investigative feel.  That investigative file, the |
| 12:01:30 | 6 | contents of what detective Laverty put in there that would |
| 12:01:34 | 7 | have cleared George Jones was never disclosed to the defense |
| 12:01:38 | 8 | attorney. |
| 12:01:38 | 9 | Q.  And then did Laverty do something in response? |
| 12:01:41 | 10 | A.  When he -- when he completed his information and submitted |
| 12:01:46 | 11 | it, he had been -- received some reassurances that the |
| 12:01:51 | 12 | prosecution, the information would get to the state's |
| 12:01:54 | 13 | attorney. |
| 12:01:54 | 14 | Q.  Did he then inform the process, the justice system |
| 12:02:00 | 15 | participant? |
| 12:02:00 | 16 | A.  Yes, he did. |
| 12:02:01 | 17 | Q.  What did he inform them? |
| 12:02:02 | 18 | A.  He went to the -- he saw in the paper the prosecution in |
| 12:02:07 | 19 | fact was proceeding, and he went to the public -- the criminal |
| 12:02:11 | 20 | defense attorney and shared with him or her the information |
| 12:02:16 | 21 | about George Jones. |
| 12:02:18 | 22 | Q.  And about the street file practice? |
| 12:02:20 | 23 | A.  And the street file practice. |
| 12:02:21 | 24 | Q.  And then was there some litigation in '82 and '83 alleging |
| 12:02:24 | 25 | a policy and practice of suppressing investigative materials |

11/29/16 AM     Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 114 of 140 PageID #:31009
***REALTIME UNEDITED TRANSCRIPT ONLY***

113

| | | |
|---|---|---|
| 12:02:30 | 1 | in street files? |
| 12:02:32 | 2 | A.  There was a case referred to by the Palmer case where a |
| 12:02:36 | 3 | group of people alleged in court that there was a practice |
| 12:02:40 | 4 | within the Chicago police of doing just what had happened with |
| 12:02:45 | 5 | the George Jones case, and that became part of a legal suit. |
| 12:02:50 | 6 | Q.  All right.  And then on April 20th, 1982, shortly after |
| 12:02:54 | 7 | that lawsuit was filed, did a federal judge enter any orders? |
| 12:02:56 | 8 | A.  Yes. |
| 12:02:58 | 9 | Q.  Tell the jury about that. |
| 12:03:02 | 10 | A.  There was a direction, order from the court, that all |
| 12:03:06 | 11 | documents would be maintained and retained. |
| 12:03:11 | 12 | Q.  All right.  And was there a reason from the Jones case to |
| 12:03:15 | 13 | conclude that the policymakers had notice and participated in |
| 12:03:19 | 14 | the lawsuit, the city's policymakers? |
| 12:03:22 | 15 | A.  Yes, they were called upon to testify and gave testimony |
| 12:03:26 | 16 | and were very officially and clearly put on notice. |
| 12:03:32 | 17 | Q.  And then just to draw your attention to a finding in |
| 12:03:35 | 18 | February 3rd, 1983, did the judge make a ruling that -- by the |
| 12:03:40 | 19 | way, did the city enter -- create a special order in response |
| 12:03:43 | 20 | to this litigation? |
| 12:03:44 | 21 | A.  Yes. |
| 12:03:44 | 22 | Q.  What was that special order? |
| 12:03:46 | 23 | A.  82-1, that they would preserve. |
| 12:03:49 | 24 | THE COURT:  82-1? |
| 12:03:50 | 25 | MR. LOEVY:  82-1, was the first one which they |

| | | |
|---|---|---|
| 12:03:54 | 1 | preserved stuff. |
| 12:03:56 | 2 | BY MR. LOEVY: |
| 12:03:57 | 3 | Q.  And then? |
| 12:03:58 | 4 | A.  The subsequent one, which was to retain and not dispose of |
| 12:04:04 | 5 | and make available investigative files. |
| 12:04:06 | 6 | THE COURT:  Just put numbers on these. |
| 12:04:08 | 7 | MR. LOEVY:  The second one was 83.1, correct. |
| 12:04:11 | 8 | THE WITNESS:  83.1, yes. |
| 12:04:13 | 9 | BY MR. LOEVY: |
| 12:04:14 | 10 | Q.  Did the judge make a finding that 83.1 was insufficient to |
| 12:04:17 | 11 | afford criminal defendants the full rights to which they were |
| 12:04:20 | 12 | entitled? |
| 12:04:20 | 13 | A.  Yes. |
| 12:04:21 | 14 | THE COURT:  As we discussed, you need to put the date |
| 12:04:23 | 15 | on that.  It was a couple of questions ago. |
| 12:04:27 | 16 | THE WITNESS:  Sorry. |
| 12:04:28 | 17 | BY MR. LOEVY: |
| 12:04:28 | 18 | Q.  Do you have the date there before you, sir? |
| 12:04:30 | 19 | A.  I don't have it right in front of me, no. |
| 12:04:32 | 20 | Q.  It looks like the lawsuit was filed -- |
| 12:04:34 | 21 | THE COURT:  You can ask a leading question on the |
| 12:04:36 | 22 | date of the judge's order. |
| 12:04:37 | 23 | BY MR. LOEVY: |
| 12:04:37 | 24 | Q.  February 3rd, 1983. |
| 12:04:40 | 25 | A.  I believe that's correct. |

12:04:41    1    Q.  4/20/82?

12:04:57    2    A.  April 20th, 1982.

12:04:59    3         THE COURT:  Was what?

12:05:01    4         MR. LOEVY:  When was the judge's order?

12:05:03    5         MR. SWAMINATHAN:  The judge's order was the same

12:05:05    6    date.

12:05:06    7    BY MR. LOEVY:

12:05:07    8    Q.  4/20/82?

12:05:08    9         THE COURT:  It needs to be testimony.

12:05:11    10         THE WITNESS:  It was --

12:05:12    11         THE COURT:  Excuse me.  Ask a question, please.

12:05:15    12    BY MR. LOEVY:

12:05:15    13    Q.  What was the date of the order?

12:05:16    14    A.  The date of the order was April 20th, 1982.

12:05:19    15    Q.  All right.  After the order of the court was entered to

12:05:24    16    improve the system and the city enacted these policies, did

12:05:27    17    you see evidence that the problem persisted?

12:05:28    18    A.  Yes, I did.

12:05:29    19    Q.  And let's focus, for example on the investigative file in

12:05:35    20    this case.  Did you review the investigative file that was not

12:05:38    21    disclosed to Mr. Fields in this case?

12:05:39    22    A.  I did.

12:05:39    23    Q.  And was that evidence that the problem continued and can

12:05:44    24    you explain, please?

12:05:45    25    A.  Yes, over the course of two criminal trials and appeals,

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 117 of 140 PageID #:31012

12:05:49    1   there were at least six or seven formal either subpoenas or

12:05:55    2   written requests for disclosure of investigative file in the

12:06:01    3   Fields case.  And each time the city or the police

12:06:08    4   department's response was that there was no such material

12:06:13    5   available.  And in fact the city at one point initiated an

12:06:18    6   internal investigation to determine if there was an

12:06:23    7   investigative file and they produced a document, a written

12:06:28    8   conclusion that there was no investigative file.

12:06:30    9   Q.  What were the hallmarks of this investigative file file,

12:06:33   10   the field's investigative file, actually, it was the

12:06:38   11   Smith/Hickman investigative file that was outside the general

12:06:41   12   orders?

12:06:41   13   A.  When it was eventually discovered in 2010 or 11, that it

12:06:48   14   contained specific types of documents that were -- that were

12:06:58   15   described in the litigation as not to have been in that

12:07:05   16   format.

12:07:05   17   Q.  What kind of documents were those?

12:07:07   18   A.  They were to and from memos between detectives and between

12:07:13   19   chain of command, there were -- sorry.

12:07:22   20   Q.  Were notes --

12:07:25   21   A.  Yeah, handwritten notes were contained in it, notes were

12:07:30   22   not put onto official format and those documents -- even where

12:07:38   23   they were were not submitted.

12:07:40   24   Q.  How about inventories or lack thereof and things not in

12:07:43   25   supp reports?

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 118 of 140 PageID #:31013

12:07:44  1   A.  The inventory were required by the general orders and the
12:07:49  2   supplemental reports were not as required by the policies.
12:07:53  3   Q.  All right.  Did you see evidence when you reviewed that
12:07:57  4   sample of files from the basement that the Smith/Hickman file
12:08:02  5   was typical or atypical of other investigative files?
12:08:05  6   A.  In my review of the portions of the basement files as I
12:08:10  7   previously described, I found them to be consistent with or
12:08:16  8   the Hickman/Smith discovery files were similar.
12:08:22  9   Q.  And the same kinds of things you just talked about were
12:08:26  10  evident in the other files as well?
12:08:28  11  A.  Yes.
12:08:28  12  Q.  All right.  You did analyze those files, correct?
12:08:31  13  A.  I did.
12:08:32  14  Q.  And tell the jury how exhaustive your analysis of those
12:08:37  15  files was.
12:08:38  16  A.  Do you want me to describe the total number of files?
12:08:45  17  Q.  However you want to describe what you did when you got
12:08:48  18  those files.
12:08:49  19  A.  I mentioned earlier and discussed the fact that I took a
12:08:53  20  sample from the six-year time period, 83 to 89 and the second
12:09:00  21  year time period from 1999 to 2006, pulled out all of the
12:09:11  22  ones, the homicide investigation files for that time period,
12:09:14  23  then looked at the investigative file itself to determine what
12:09:22  24  it contained, what it did not contain.  I looked at the
12:09:27  25  permanent retention files that the city used or supposedly

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 119 of 140 PageID #:31014
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:09:31 | 1 | used to provide discovery. |
| 12:09:35 | 2 | Q.  So let me make sure I understand.  You had a basement file |
| 12:09:38 | 3 | that referred to an investigation and then you had also the |
| 12:09:40 | 4 | corresponding official file, right? |
| 12:09:42 | 5 | A.  That's correct. |
| 12:09:42 | 6 | Q.  All right.  Then continue. |
| 12:09:44 | 7 | A.  And that I would prefer to and the city does as a |
| 12:09:49 | 8 | permanent retention file that supposedly has everything about |
| 12:09:52 | 9 | the homicide case, but only if it's on an official |
| 12:09:57 | 10 | supplementary report on arrest report, a lab report, that type |
| 12:10:04 | 11 | of thing, but permanent retention file after review, I can go |
| 12:10:10 | 12 | no that if you want later. |
| 12:10:11 | 13 | Q.  Well, we are going to talk about your review.  Basically, |
| 12:10:14 | 14 | you described you did a stand alone of the investigative file? |
| 12:10:17 | 15 | A.  Yes. |
| 12:10:17 | 16 | Q.  And then you did a comparison with the permanent |
| 12:10:22 | 17 | retention? |
| 12:10:22 | 18 | A.  I looked at the permanent retention files by themselves. |
| 12:10:25 | 19 | Q.  Okay. |
| 12:10:26 | 20 | A.  So I looked at the investigative files, I looked at the |
| 12:10:29 | 21 | permanent retention files and then I looked and compared. |
| 12:10:32 | 22 | Q.  So that's a third thing? |
| 12:10:33 | 23 | A.  The permanent retention files as to what was, what they |
| 12:10:36 | 24 | had in them that were reflected, did they reflect what was of |
| 12:10:42 | 25 | substantive value in the investigative file. |

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 120 of 140 PageID #:31015
***REALTIME UNEDITED TRANSCRIPT ONLY***

119

12:10:44  1  Q.  So the third thing then was a comparison between the

12:10:47  2  investigative files and the permanent retention files?

12:10:50  3  A.  Yes.

12:10:50  4  Q.  Was there a fourth analysis you did?

12:10:52  5  A.  Yes.

12:10:52  6  Q.  Tell us about that.

12:10:53  7  A.  Also, through material provided to me, the criminal

12:10:58  8  defense files that corresponded with where there were criminal

12:11:06  9  defense files that corresponded with the investigative files

12:11:10  10  and the permanent retention files.  So I looked at those as a

12:11:13  11  stand alone process to see what was in there from as it

12:11:19  12  pertained to what was actually in the investigation and in the

12:11:22  13  permanent retention files.  And then finally, in the fifth

12:11:27  14  step was to compare what was in the criminal defense files and

12:11:32  15  the permanent retention files.

12:11:34  16  Q.  All right.  Based on that review, did you make any

12:11:38  17  findings about whether the practice that was supposed to have

12:11:41  18  stopped with the Palmer/Jones litigation persisted through and

12:11:47  19  continuing through Mr. Fields' trial?

12:11:49  20  A.  Yes.

12:11:49  21  Q.  What was that finding?

12:11:50  22  A.  In my professional opinion that the practices that were

12:11:54  23  the City of Chicago and the Chicago Police Department and its

12:11:58  24  command staff was aware of in as early as 1982 but should have

12:12:04  25  been much earlier than that was continuing and no substantive

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 121 of 140 PageID #:31016

| | | |
|---|---|---|
| 12:12:09 | 1 | changes, and in fact, evidence that there was no change at |
| 12:12:15 | 2 | all. |
| 12:12:15 | 3 | Q.  In refresh your recollection last answer, you said that |
| 12:12:17 | 4 | the command and the policy makers should have been aware |
| 12:12:20 | 5 | before the Jones litigation in '82.  Can you explain? |
| 12:12:22 | 6 | MR. NOLAND:  Objection. |
| 12:12:23 | 7 | THE COURT:  Sustained. |
| 12:12:24 | 8 | BY MR. LOEVY: |
| 12:12:24 | 9 | Q.  All right.  At this time, your Honor, plaintiff would move |
| 12:12:27 | 10 | to introduce Plaintiff's Exhibit 307 which is his summary |
| 12:12:31 | 11 | chart of the basis of his opinions. |
| 12:12:34 | 12 | THE COURT:  It's a demonstrative? |
| 12:12:35 | 13 | MR. LOEVY:  Yes, your Honor. |
| 12:12:36 | 14 | THE COURT:  Okay.  Go show it to him. |
| 12:12:45 | 15 | MR. NOLAND:  I'm sorry. |
| 12:12:46 | 16 | THE COURT:  Yeah.  That's fine. |
| 12:12:51 | 17 | MR. NOLAND:  Subject to our prior, the court's |
| 12:12:57 | 18 | ruling. |
| 12:12:57 | 19 | THE COURT:  If I already ruled, I already ruled. |
| 12:12:59 | 20 | This is -- you heard me use the word demonstrative. |
| 12:13:02 | 21 | It's a big legal word.  What this means is this is used to |
| 12:13:06 | 22 | illustrate testimony.  It's not part of the evidence.  You're |
| 12:13:08 | 23 | not going to actually have it back there.  It's used to |
| 12:13:11 | 24 | illustrate testimony.  If you want to take notes on it, do |
| 12:13:13 | 25 | that because you won't actually have -- |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 122 of 140 PageID #:31017

| | |
|---|---|
| 12:13:15 | 1 |
| 12:13:18 | 2 |
| 12:13:18 | 3 |
| 12:13:21 | 4 |
| 12:13:23 | 5 |
| 12:13:25 | 6 |
| 12:13:28 | 7 |
| 12:13:29 | 8 |
| 12:13:31 | 9 |
| 12:13:32 | 10 |
| 12:13:34 | 11 |
| 12:13:46 | 12 |
| 12:13:46 | 13 |
| 12:13:48 | 14 |
| 12:13:52 | 15 |
| 12:13:55 | 16 |
| 12:13:55 | 17 |
| 12:13:55 | 18 |
| 12:13:58 | 19 |
| 12:14:00 | 20 |
| 12:14:02 | 21 |
| 12:14:05 | 22 |
| 12:14:06 | 23 |
| 12:14:08 | 24 |
| 12:14:13 | 25 |

1   MR. LOEVY:  Actually, your Honor, after he lays the

2   foundation.

3   THE COURT:  For now, it's a demonstrative exhibit.

4   MR. LOEVY:  We do intend to move it into evidence

5   after he lays the foundation for it.

6   THE COURT:  We will worry about that when we have to

7   worry about it.

8   MR. LOEVY:  Can we ask Mr. Brasfield to come down and

9   explain it.

10   THE COURT:  The deal is he needs to keep his voice

11   up.  Which side are you going to have him stand on, right

12   here?

13   MR. LOEVY:  What do you prefer?

14   THE COURT:  You stand here so you are closer to the

15   mic.  Counsel can move down in order to see.

16   MR. NOLAND:  Thank you, your Honor.

17   BY MR. LOEVY:

18   Q.  Let's start with the middle column.  Can you explain to

19   the jury what we are looking at?  Your Honor, may we put it on

20   the ELMO too?

21   THE COURT:  Either way.  I don't care.

22   MR. LOEVY:  The computer, your Honor.

23   THE COURT:  Computer.

24   THE WITNESS:  This rainbow effect here, this blue

25   section here that has a number of columns in it are the

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 123 of 140 PageID #:31018

| | | |
|---|---|---|
| 12:14:19 | 1 | investigative file information and some of it, it's just |
| 12:14:21 | 2 | housekeeping, referring to what the lawyers call Bates numbers |
| 12:14:26 | 3 | that are stamped on the bottom of pages to identify things. |
| 12:14:30 | 4 | But one of the first things they did does the basement file |
| 12:14:36 | 5 | contain an inventory. |
| 12:14:39 | 6 | BY MR. LOEVY: |
| 12:14:40 | 7 | Q.  That's a yes, no, question? |
| 12:14:41 | 8 | A.  That's a simple yes, no, and as I said that's Bates |
| 12:14:45 | 9 | numbers.  If it did not, there's reference to that. |
| 12:14:49 | 10 | Is the inventory complete?  If there is an inventory |
| 12:14:52 | 11 | in the investigative file, I mean, that's good in and of |
| 12:14:56 | 12 | itself, but is the inventory actually reflect what is there, |
| 12:15:02 | 13 | what should be there? |
| 12:15:04 | 14 | Then we have the examples of items that were missing |
| 12:15:11 | 15 | from the inventory, so as I'm looking at that and making notes |
| 12:15:17 | 16 | to myself as to whether, okay, is this item in there, if it's |
| 12:15:23 | 17 | not in there, what is it?  Put a list on that. |
| 12:15:26 | 18 | Are there handwritten notes in the file?  The |
| 12:15:32 | 19 | handwritten notes themselves may or may not be important as to |
| 12:15:37 | 20 | their actual content, but what is very important is are they |
| 12:15:44 | 21 | supposed to be in there as handwritten notes?  That's a |
| 12:15:49 | 22 | violation of policy as to how they're in there.  So it's |
| 12:15:53 | 23 | two-fold.  One is the substantive value, if you will of the |
| 12:15:58 | 24 | material, but also demonstrating adherence to a policy. |
| 12:16:02 | 25 | And then I gave examples of specifics so that you can |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 124 of 140 PageID #:31019

| | | |
|---|---|---|
| 12:16:09 | 1 | look those up. |
| 12:16:10 | 2 | Are there to/from memos.  This is again the same |
| 12:16:13 | 3 | thing, the policies and procedures indicate that they are |
| 12:16:19 | 4 | supposed to be in there, are they in there, if yes, no, what |
| 12:16:25 | 5 | were they. |
| 12:16:27 | 6 | And then I gave again the Bates numbers a reference |
| 12:16:30 | 7 | so that with the sheer volume of this being able to go back, |
| 12:16:35 | 8 | look through and identify them. |
| 12:16:36 | 9 | BY MR. LOEVY: |
| 12:16:36 | 10 | Q.  If you could turn to the stand then. |
| 12:16:38 | 11 | A.  Thank you. |
| 12:16:38 | 12 | Q.  All right.  Now, when you did the analysis in the blue |
| 12:16:44 | 13 | column there, you weren't actually comparing the investigative |
| 12:16:48 | 14 | files to any other files? |
| 12:16:49 | 15 | A.  No. |
| 12:16:49 | 16 | Q.  Just looking at them themselves? |
| 12:16:50 | 17 | A.  As a stand alone. |
| 12:16:55 | 18 | Q.  Did you draw any conclusions about the investigative |
| 12:16:57 | 19 | files? |
| 12:16:57 | 20 | A.  I did. |
| 12:16:57 | 21 | Q.  Tell the jury what your findings were? |
| 12:16:59 | 22 | A.  That the information that I was seeing in these basement |
| 12:17:02 | 23 | files, particularly investigative files, were in my mind from |
| 12:17:08 | 24 | a professional standpoint evidence that the things that were |
| 12:17:14 | 25 | supposed to have changed that should have been done and |

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 125 of 140 PageID #:31020

12:17:20  1   accomplished after the city was put on notice were continuing.

12:17:23  2   Q.  Let's talk about the example you gave about handwritten

12:17:26  3   notes.  Now, they're supposed to take notes, but they're

12:17:30  4   supposed to be on GPRs, right?

12:17:32  5   A.  General progress reports, yes.

12:17:34  6   Q.  The jury has already heard testimony about what a GPR is.

12:17:38  7   Just real quickly?

12:17:39  8   A.  Just that your information that you made heaven forbid

12:17:46  9   written on the back of a business card or a McDonald's order

12:17:50  10  slip is put into a general progress report so that it's

12:17:54  11  formalized.

12:17:55  12  Q.  All right.  And was there evidence based on your review

12:17:58  13  that the department's rule change that all notes had to be

12:18:01  14  taken on general progress reports, was that being followed?

12:18:04  15  A.  No, it was not based on the material I looked at.

12:18:07  16  Q.  What was the statistical analysis for the period 83 to 89,

12:18:12  17  in what proportion of the cases was that policy not being

12:18:16  18  followed?

12:18:16  19  A.  I found that 82 percent of the cases that I looked at,

12:18:19  20  they were not being followed.

12:18:20  21  Q.  And then for the later time period?

12:18:22  22  A.  From the 1999 to 2006, 61 percent.

12:18:25  23  Q.  How about the existence of two from memos, those were

12:18:29  24  memos that were not on official supp reports; is that correct?

12:18:32  25  A.  That's correct.

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 126 of 140 PageID #:31021
***REALTIME UNEDITED TRANSCRIPT ONLY***

125

12:18:33    1    Q.  And that policy too was supposed to change with the policy

12:18:35    2    change, right?

12:18:36    3    A.  That's correct.

12:18:36    4    Q.  Did you see evidence that it did change?  Did or didn't?

12:18:45    5    A.  It did not.

12:18:46    6    Q.  Tell the jury.

12:18:46    7    A.  The initial period from 1983 to 1989, 43 percent of the

12:18:53    8    files that I reviewed continued to show unofficial informal

12:18:57    9    memorandums and that the 1999 to 2006 time period, that 17

12:19:03   10    percent of the files continued to show these supposedly not to

12:19:08   11    occur to/from memos.

12:19:10   12    Q.  Does that suggest to you whether the system was or wasn't

12:19:13   13    working from a supervisory perspective?

12:19:16   14    A.  From a supervisory, either a first line supervisor or as

12:19:19   15    an auditor within the department or as the superintendent, it

12:19:23   16    would give me a clear indication that it just wasn't working.

12:19:26   17    Q.  All right.  Have you seen that level of failure at other

12:19:30   18    departments around the country?

12:19:31   19    A.  No, I have not.

12:19:32   20    Q.  All right.  What percentage of the basement files had

12:19:38   21    evidence of violations of the policies and the special orders

12:19:42   22    that were put into place?

12:19:43   23    A.  100 percent.

12:19:44   24    Q.  All right.

12:19:46   25         MR. LOEVY:  Your Honor, if I could have the witness

11/29/16 AM  Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 127 of 140 PageID #:31022
***REALTIME UNEDITED TRANSCRIPT ONLY***

126

12:19:48  1  step down again to talk about the next column.

12:19:50  2      THE COURT:  That's fine.

12:19:51  3  BY MR. LOEVY:

12:19:56  4  Q.  Tell us about the purple and what this represents?

12:19:58  5  A.  The City of Chicago police department has -- had a

12:20:06  6  permanent retention file that was supposed to be the go to,

12:20:10  7  this is where if you want to know what happened in a

12:20:13  8  particular homicide and you want it for discovery purposes,

12:20:17  9  this is where it's going to be.  It's in the permanent

12:20:22  10  retention file.  So as I looked at that as a stand alone

12:20:25  11  process looking for the same types of things, whether there

12:20:29  12  were inventory sheet as required, what types of documents that

12:20:38  13  were supposedly in there were or were not, and also regardless

12:20:44  14  of how the City of Chicago interpreted permanent retention

12:20:48  15  file were there actually substantive information in the

12:20:52  16  investigative file that was not getting into the permanent

12:20:55  17  retention file.

12:20:55  18  Q.  Well, before we talk about the comparison, let's talk

12:20:58  19  about just the purple?

12:20:59  20  A.  Yes.

12:21:00  21  Q.  So tell the jury what the Fields were.

12:21:02  22  A.  We have again does the permanent retention file have an

12:21:12  23  inventory, the investigative file inventory complete, does it

12:21:17  24  have items missing?  I'm sorry to block your view.  You

12:21:23  25  probably can't see it.  Again, I talked about the Bates

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 128 of 140 PageID #:31023
***REALTIME UNEDITED TRANSCRIPT ONLY***

127

12:21:27   1   numbers.  Are there general progress reports from the basement

12:21:31   2   files in the permanent retention file?  And, again, I have to

12:21:35   3   acknowledge that the City of Chicago didn't feel that it was

12:21:37   4   necessary, but they weren't in there and I made a note of it.

12:21:43   5   And are there handwritten notes in the permanent retention

12:21:47   6   file?  If so, and then describe what they were and where they

12:21:53   7   were.  Are there to/from memos in the basement files that are

12:21:59   8   in the permanent retention file and yes or no and where

12:22:05   9   appropriate, identify those.

12:22:07   10          And then in general observations about some of those

12:22:10   11   individual permanent retention file.

12:22:12   12   Q.  All right.  Would you resume the stand, please.

12:22:15   13          Did you reach any conclusions regarding the permanent

12:22:26   14   retention file?

12:22:26   15   A.  Yes.

12:22:27   16   Q.  How many permanent retention files did you look at?

12:22:29   17   A.  There were a total of there were a total of 249 files

12:22:42   18   overall and as far as permanent retention file, they were on

12:22:47   19   the light number.

12:22:48   20   Q.  And did you form any conclusions about the city's policies

12:22:56   21   and practices after you performed the analysis you did to the

12:22:58   22   permanent retention file?

12:22:59   23   A.  I did.

12:22:59   24   Q.  Can you describe to the jury what those were?

12:23:01   25   A.  First and foremost if the City of Chicago police

| | | |
|---|---|---|
| 12:23:04 | 1 | department is going to use the permanent retention file as a |
| 12:23:07 | 2 | representation of the homicide investigation, it failed |
| 12:23:12 | 3 | miserably.  What I found in there is a single story line. |
| 12:23:17 | 4 | It's what I would refer to as a charging document that after a |
| 12:23:22 | 5 | detective or detectives have completed a homicide |
| 12:23:25 | 6 | investigation, they have gone down their various paths and |
| 12:23:28 | 7 | looked at all the various possibilities and eliminated |
| 12:23:32 | 8 | suspects and so forth, they just have a clean copy.  It's not |
| 12:23:38 | 9 | the murder book that you would expect to find that would show |
| 12:23:42 | 10 | that an anonymous caller said Bob Smith did it, but we |
| 12:23:49 | 11 | interview witnesses and determined that he had an alibi and so |
| 12:23:53 | 12 | on and so forth.  All the permanent retention file is this is |
| 12:24:00 | 13 | the arrest report, this is some lab reports, this is -- |
| 12:24:05 | 14 | Q.  Why we think this guy did it? |
| 12:24:07 | 15 | A.  Yes. |
| 12:24:07 | 16 | Q.  And is that aberrational, different, unlike other cities |
| 12:24:13 | 17 | that you have reviewed and audited? |
| 12:24:15 | 18 | A.  Yes. |
| 12:24:15 | 19 | Q.  How does it work in places that are functioning |
| 12:24:18 | 20 | legitimately? |
| 12:24:18 | 21 | MR. NOLAND:  Objection, argumentative. |
| 12:24:19 | 22 | THE COURT:  Overruled. |
| 12:24:21 | 23 | THE WITNESS:  You go into any homicide investigative |
| 12:24:28 | 24 | file either cold, just by looking at the book, or physically |
| 12:24:33 | 25 | into various agencies, you see a document that starts out with |

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 130 of 140 PageID #:31025
***REALTIME UNEDITED TRANSCRIPT ONLY***

129

12:24:38  1   the call from 911 or the discovery of whatever the gathering

12:24:45  2   of information inevitably, not inevitably, but quite often in

12:24:52  3   homicide initial investigations, there might be multiple

12:24:56  4   suspects, and somebody thinks, well, this person had a

12:25:01  5   domestic problem or the person was -- had a bad debt or

12:25:06  6   problems with the neighbor and so you have all of these

12:25:08  7   various avenues that you have to investigate, and then you

12:25:12  8   either eliminate them and document why they were eliminated

12:25:17  9   and there's other information that you're developing.

12:25:22  10  Oftentimes, again, as I said earlier that initially may not

12:25:26  11  seem like it's important at all, but you have to document it

12:25:28  12  and put it in the file.  This is obviously for a number of

12:25:31  13  reasons as I said before.

12:25:34  14        You have detectives or individuals from throughout

12:25:38  15  the police department that may have worked on a case, and they

12:25:41  16  have to go to a central location, to a central document to be

12:25:44  17  able to see what's been done and what hasn't been done and

12:25:48  18  that needs to be done.

12:25:48  19  BY MR. LOEVY:

12:25:50  20  Q.  You mentioned in your analogy you used a little bit ago

12:25:53  21  about a novel.  Would a plot twist fit in your analogy on the

12:25:57  22  way an investigation is supposed to be documented in a

12:26:00  23  permanent retention file?

12:26:00  24        MR. NOLAND:  Judge, I object based on foundation and

12:26:02  25  not disclosed.

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 131 of 140 PageID #:31026
***REALTIME UNEDITED TRANSCRIPT ONLY***

130

| 12:26:03 | 1 | THE COURT: Rephrase the question, please. |

12:26:03  1    THE COURT:  Rephrase the question, please.

12:26:05  2  BY MR. LOEVY:

12:26:05  3  Q.  All right.  In the investigative files you're talking

12:26:11  4  about from other jurisdictions, is it always linear, start to

12:26:15  5  finish?

12:26:15  6    THE COURT:  Sorry.  Something happened.

12:26:17  7    THE WITNESS:  No, it's not.

12:26:18  8  BY MR. LOEVY:

12:26:18  9  Q.  Can you explain?

12:26:19  10  A.  It can go off on tangents.  I have seen investigations

12:26:23  11  where literally weeks, if not months, can go into what in good

12:26:28  12  faith was thought to be a legitimate line of investigation

12:26:32  13  only determined for whatever reason that the individual that

12:26:37  14  was thought to be the best suspect was in fact not.

12:26:42  15  Q.  And in other jurisdictions, is all that stuff in the

12:26:45  16  permanent file?

12:26:45  17  A.  Yes.

12:26:46  18  Q.  And is that true in Chicago?

12:26:47  19  A.  No.

12:26:48  20    MR. NOLAND:  Judge, objection.

12:26:50  21    THE COURT:  Let me see the lawyers at sidebar,

12:26:52  22  please.

12:26:55  23  (The following proceedings were had at sidebar outside the

12:27:04  24  hearing of the jury:)

12:27:04  25    THE COURT:  So while we are at it, I am holding

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 132 of 140 PageID #:31027

12:27:06  1   myself in contempt for my cell phone going off, when I fine

12:27:10  2   myself at some later amount.

12:27:13  3          MR. NOLAND:  I think he's gone well beyond the

12:27:16  4   permanent retention file discussion from his report where he

12:27:19  5   said 34 and 35 where he is talking about perform rather than

12:27:22  6   this whole issue we just talked about for the last several

12:27:25  7   paragraphs as far as the investigation and a study of the

12:27:29  8   permanent retention files.

12:27:30  9          THE COURT:  So you want -- let me just -- is it, A,

12:27:36  10  starting on page 34?

12:27:41  11         MR. SWAMINATHAN:  Judge, this is also part of it.

12:27:45  12         THE COURT:  Let me look at it.  I think this is

12:27:56  13  fairly within the scope two paragraphs that precede the letter

12:27:59  14  that had an A on paragraph 34. Essentially what he's saying --

12:28:01  15  the way I'm getting it at least is what he saw is that the

12:28:05  16  permanent retention file basically tended to contain

12:28:08  17  information that supported the conclusion of the investigation

12:28:10  18  and it's supposed to include more than that, and I think

12:28:12  19  that's essentially what these two paragraphs say, so I

12:28:17  20  overrule the objection.

12:28:20  21    (The following proceedings were had in open court in the

12:28:23  22  presence and hearing of the jury:)

12:28:23  23         THE COURT:  Okay.  The objection is overruled.  You

12:28:25  24  can proceed.

12:28:26  25  BY MR. LOEVY:

| | | |
|---|---|---|
| 12:28:26 | 1 | Q. Do you remember the question? |
| 12:28:26 | 2 | A. No. |
| 12:28:29 | 3 | Q. You were saying in other jurisdictions and the plot twist |
| 12:28:34 | 4 | thing? |
| 12:28:35 | 5 | A. Yes. As I described or paraphrased. |
| 12:28:42 | 6 | THE COURT: Let me be more specific. The two |
| 12:28:45 | 7 | preceding questions were in other jurisdictions is all that |
| 12:28:49 | 8 | stuff in the permanent file? You said yes. And then there |
| 12:28:51 | 9 | was a question is that true in Chicago? Answer, no. And then |
| 12:28:55 | 10 | I think he was going to ask you to explain. |
| 12:28:57 | 11 | BY MR. LOEVY: |
| 12:28:58 | 12 | Q. Can you explain that? |
| 12:28:59 | 13 | A. The structure and the practice based on the material that |
| 12:29:05 | 14 | I have reviewed here is that there is an eventual |
| 12:29:14 | 15 | determination of who the police feel is the person that did |
| 12:29:19 | 16 | the crime. And oftentimes, there is a reverse engineering of |
| 12:29:25 | 17 | the plot. |
| 12:29:25 | 18 | MR. NOLAND: Objection. |
| 12:29:28 | 19 | THE COURT: Yeah, let's get more directly to the |
| 12:29:30 | 20 | point here. |
| 12:29:30 | 21 | BY MR. LOEVY: |
| 12:29:31 | 22 | Q. All right. |
| 12:29:31 | 23 | THE COURT: Ask a more leading question, if you |
| 12:29:33 | 24 | would. You understand from the sidebar where we are going |
| 12:29:36 | 25 | here, Mr. Loevy? |

12:29:37  1        MR. LOEVY:  I think it's been covered too.

12:29:38  2        THE COURT:  Fair enough.

12:29:39  3   BY MR. LOEVY:

12:29:40  4   Q.  Who does that protect if you do it the proper way and

12:29:42  5   document everything?

12:29:43  6   A.  Well, it protects the integrity of the criminal justice

12:29:48  7   system as a whole, it protects the -- it provides legal

12:29:55  8   protection for the individual who is eventually charged so

12:29:59  9   that the criminal defense attorney has a fair opportunity to

12:30:02  10  provide and mount a defense, and it provides I think in

12:30:07  11  fairness to the victims.

12:30:09  12  Q.  Is that something that other jurisdictions take seriously

12:30:12  13  and do effectively?

12:30:13  14  A.  Yes.

12:30:13  15  Q.  Does Chicago meet up to that standard?

12:30:15  16  A.  No, in my opinion Mr. .  Are you changing topics?

12:30:18  17        MR. LOEVY:  Yes.

12:30:18  18        THE COURT:  We are going to stop for lunch.  I have

12:30:21  19  one very short case at 1:30.  We should be able to start

12:30:25  20  within a few minutes of 1:30.  I will take the jury out.  (The

12:30:58  21  jury leaves the courtroom.)

12:30:58  22        THE COURT:  Okay.  Anything we need to discuss?

12:31:01  23        MR. LOEVY:  Your Honor, we had some issues whenever

12:31:03  24  your Honor is ready to talk about them.  We still have the

12:31:05  25  intimidation issue that's hanging out there.  We have a couple


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 135 of 140 PageID #:31030

12:31:08  1  of new issues too.

12:31:09  2       THE COURT:  Just tell me what they are and we are not

12:31:12  3  going to talk about them now.  Just tell me what they are.

12:31:15  4       MR. LOEVY:  The first issue is you ordered the

12:31:17  5  discovery on Mr. Kees's deal and you ordered them to give us

12:31:21  6  their emails and such.  We have written them an email saying

12:31:24  7  we think there are some gaps and deficiencies and to my

12:31:29  8  knowledge, they haven't yet responded; is that correct?

12:31:31  9       MR. ART:  That's correct.

12:31:32  10       MR. LOEVY:  At some point we are being to want to

12:31:34  11  raise with the Court, there are some holes in the production

12:31:36  12  and we want to talk about that with your Honor.

12:31:38  13       THE COURT:  Kees is testifying tomorrow, right?

12:31:39  14       MR. LOEVY:  Correct.

12:31:40  15       THE COURT:  We will talk about that at the end of the

12:31:42  16  day.  Just be prepared to talk about that at the end of the

12:31:46  17  day.

12:31:46  18       MR. LOEVY:  Other issue, your Honor, is yesterday a

12:31:47  19  photograph was put on the screen by Mr. Kulwin that was not in

12:31:51  20  the pretrial order --

12:31:54  21       MR. ART:  Mr. Burns.

12:31:56  22       MR. LOEVY:  I'm sorry.  I cannot tell these people

12:31:58  23  apart.

12:31:58  24       MR. KULWIN:  He continue tell me and Mr. Burns apart.

12:32:03  25       MR. LOEVY:  I keep saying defense counsel.

```
12:32:05   1         THE COURT:  You mistook me for Jon Wayne.
12:32:08   2         MR. KULWIN:  You do look like Jon Wayne.
12:32:11   3         THE COURT:  There you go between.
12:32:13   4         MR. LOEVY:  There was a photograph in the pretrial
12:32:15   5   order.
12:32:15   6         THE COURT:  What was the photo?
12:32:16   7         MR. LOEVY:  There was a photo with some initials on
12:32:18   8   it of where Mr. Hawkins was and where Mr. Langston was.
12:32:25   9         MR. SWAMINATHAN:  It's Defendants' Exhibit 384.
12:32:26  10         MR. LOEVY:  It was not an original exhibit.  We also
12:32:28  11   don't think we got it in discovery.  We are still checking
12:32:30  12   that, but we would ask, I don't know if you want to talk about
12:32:33  13   the issues now but we want no more new exhibits and no more
12:32:40  14   new photographs, because it's late.
12:32:43  15         THE COURT:  Go ahead, Mr. Noland, that's fine.
12:32:44  16         MR. NOLAND:  If you like now.
12:32:45  17         THE COURT:  On this point.  It looks like --
12:32:48  18         MR. NOLAND:  We had told the plaintiffs that those
12:32:49  19   exhibits were actually just the copies of the Plaintiff's
12:32:56  20   Exhibit 219 so our 388 through 391 are Plaintiff's Exhibit, a
12:33:00  21   part of Plaintiff's Exhibit 219.  They have it.
12:33:03  22         THE COURT:  I think he said this was 384, though.
12:33:06  23         MR. NOLAND:  I don't think it was.
12:33:08  24         THE COURT:  It wasn't 384.
12:33:09  25         MR. NOLAND:  384 is a photo that was used at the
```

Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 137 of 140 PageID #:31032

12:33:15    1    certificate of innocence proceeding with the plaintiff's

12:33:17    2    counsel, and so all the photos -- they were parties to that

12:33:22    3    proceeding.

12:33:23    4            MR. LOEVY:  Parties to the proceeding, but it wasn't

12:33:25    5    on the pretrial order, so we were was surprised by it.

12:33:29    6            THE COURT:  How are you harmed?  That's the question.

12:33:31    7            MR. LOEVY:  We want it to stop.  At least if they are

12:33:35    8    going to show something that's not in the pretrial order, show

12:33:38    9    me before they put it on the screen.  That's all I'm asking.

12:33:38   10            THE COURT:  That doesn't sound unreasonable.

12:33:41   11            MR. NOLAND:  All right, Judge.

12:33:42   12            MR. LOEVY:  We have been working together on

12:33:45   13    stipulations, your Honor.  There is a Buckles police report

12:33:47   14    and the Murphy GPR that are not in the Chicago Police

12:33:51   15    Department's files, and we're hopeful and remain hopeful we

12:33:54   16    are going to come to a stipulation, but if we don't, we have

12:33:57   17    asked the city to bring a record keeper here tomorrow who can

12:34:00   18    talk knowledgeably about those topics so we don't want there

12:34:04   19    to be any surprise that we do have a record keeper to say we

12:34:08   20    have looked and these things are not in the files.

12:34:10   21            THE COURT:  Okay.

12:34:10   22            MR. LOEVY:  Then there is the intimidation issue.

12:34:13   23            THE COURT:  That's it?

12:34:14   24            MR. LOEVY:  That's it.  That's my issue.

12:34:17   25            MR. KULWIN:  I don't understand.

11/29/16 AM    Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 138 of 140 PageID #:31033
***REALTIME UNEDITED TRANSCRIPT ONLY***

137

| | | |
|---|---|---|
| 12:34:18 | 1 | THE COURT:  It's the same issue that I've put off |
| 12:34:20 | 2 | several times and I talked about it several times.  There may |
| 12:34:22 | 3 | not be much more to talk about. |
| 12:34:24 | 4 | Who is up after this witness? |
| 12:34:26 | 5 | MR. LOEVY:  Mr. Wharrie the next witness? |
| 12:34:30 | 6 | MR. ART:  No. |
| 12:34:31 | 7 | MR. LOEVY:  Who is the next witness? |
| 12:34:33 | 8 | MR. ART:  Lyon. |
| 12:34:34 | 9 | MR. LOEVY:  Andrea Lyon. |
| 12:34:36 | 10 | THE COURT:  We are going to close out the |
| 12:34:38 | 11 | intimidation issue to the extent that there's anything more to |
| 12:34:41 | 12 | talk about at the end of the day.  We will deal with this Kees |
| 12:34:44 | 13 | issue that you mentioned at the end of the day.  The photo |
| 12:34:47 | 14 | thing I've dealt with.  The stipulations, you'll tell me when |
| 12:34:52 | 15 | you have something to talk about. |
| 12:34:54 | 16 | MR. ART:  A juror left his notebook in the front row. |
| 12:34:56 | 17 | THE COURT:  I'll get it.  Thanks. |
| 12:34:59 | 18 | MR. MICHALIK:  Judge, we just had an issue with |
| 12:35:01 | 19 | respect to Andrea Lyon, they let us know a couple of days ago |
| 12:35:06 | 20 | that they were intending to call her and we are uncertain for |
| 12:35:09 | 21 | the basis on which they are doing so.  To our knowledge. |
| 12:35:15 | 22 | THE COURT:  I'm listening. |
| 12:35:16 | 23 | MR. MICHALIK:  She was disclosed as someone who would |
| 12:35:19 | 24 | testify with about one of the files. |
| 12:35:25 | 25 | THE COURT:  Go ahead. |

12:35:26    1        MR. MICHALIK:  She was identified as a witness

12:35:28    2   regarding.

12:35:28    3        THE COURT:  Did she testify at the other trial?

12:35:30    4        MR. MICHALIK:  No.

12:35:30    5        THE COURT:  I don't remember.

12:35:31    6        MR. MICHALIK:  She was identified as a witness who

12:35:33    7   was going to testify about the people v.

12:35:37    8        THE COURT:  People v.?

12:35:38    9        MR. MICHALIK:  People v. Fuller which was one -- full

12:35:41   10   ton, I'm sorry, f-u-l-t-o-n, and that was one of the basement

12:35:47   11   files that Mr. Brasfield has not relied upon, so that's the

12:35:51   12   only basis that we can think of that she would testify about.

12:35:54   13        THE COURT:  What's that?

12:35:56   14        MS. GARVEY:  She is going to testify about the full

12:35:58   15   ton case, she was disclosed about the full ton case.  She was

12:36:01   16   one of our Monell cases.

12:36:02   17        THE COURT:  In other words, she is going to say I was

12:36:04   18   his lawyer, I was this person's lawyer, I didn't get the

12:36:07   19   stuff, something like that.

12:36:08   20        MR. SWAMINATHAN:  We identified specific pages for

12:36:10   21   them that she says she did not receive.  She is going to

12:36:14   22   testify about her case, what those pages were she hadn't

12:36:17   23   received.

12:36:18   24        MR. KULWIN:  I guess the question is --

12:36:19   25        MR. MICHALIK:  Our understanding is that she was post

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 140 of 140 PageID #:31035
***REALTIME UNEDITED TRANSCRIPT ONLY***

139

12:36:22  1  conviction counsel on that case, so I don't know how she could

12:36:24  2  testify as to what was or was not in the criminal defense

12:36:27  3  file.

12:36:28  4      MR. SWAMINATHAN:  She will be able to lay a

12:36:29  5  foundation for all of that.

12:36:30  6      THE COURT:  If she can't lay the foundation, you will

12:36:33  7  make the proper objection at the proper time and I will rule

12:36:35  8  on it.  I can conjure in my own mind what it is likely she

12:36:42  9  will say and you will argue it to me at the appropriate time.

12:36:45  10      MR. MICHALIK:  Okay.

12:36:45  11      THE COURT:  See you at 1:30.

12:36:47  12  (The trial was adjourned at 12:35 p.m. until 1:30 p.m. of

12:36:52  13  this same day and date.)

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 01:05:18 | 1 |
| 01:05:24 | 2 |

01:05:18   1   Judge Kennelly, November 29, 2016, 1:30 p.m. call and then

01:05:24   2   trial.

01:34:57   3         THE CLERK:  Case number 10 C 1168, Fields v. City of

01:35:01   4   Chicago.

01:35:01   5         THE COURT:  All right.  Is everybody good to go?

01:35:03   6         MR. LOEVY:  We are, your Honor.

01:35:04   7         THE COURT:  You can get the witness back on the

01:35:06   8   stand.  You can bring the jury in.

01:35:07   9         MR. LOEVY:  Could we get clarification if

01:35:12   10   Mr. O'Callaghan is going to cross on the Monell?

01:35:15   11         THE COURT:  I don't think that Mr. O'Callaghan would

01:35:17   12   be doing anything.  It would be Mr. Kulwin.

01:35:20   13         MR. KULWIN:  Good catch, Judge.

01:35:22   14         THE COURT:  I am as sharp as a tack.

01:35:23   15         MR. KULWIN:  I may have a few questions, yes, Judge.

01:35:27   16         MR. LOEVY:  We object to the tag team.

01:35:28   17         THE COURT:  Well, but you asked Mr. O'Callaghan a

01:35:32   18   whole bunch of questions about record keeping practices, so I

01:35:36   19   mean, you know, the testimony is -- I mean, it's primarily

01:35:42   20   obviously directed towards the Monell claim, but there's

01:35:44   21   certainly things that he says and issues about record keeping

01:35:48   22   that might be pertinent to the claim against Mr. O'Callaghan

01:35:52   23   too.  So the whole none duplication thing applies as it always

01:35:56   24   does.  I am not going to preclude somebody from

01:36:00   25   cross-examination.

11/29/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

2

| | | |
|---|---|---|
| 01:36:00 | 1 | MR. KULWIN:  Judge, I have an emergency phone call |
| 01:36:02 | 2 | that I have to take.  You can start without me. |
| 01:36:04 | 3 | THE COURT:  Seriously? |
| 01:36:05 | 4 | MR. KULWIN:  It will only take two minutes, literally |
| 01:36:08 | 5 | two minutes. |
| 01:36:47 | 6 | (The jury enters the courtroom.) |
| 01:36:48 | 7 | THE COURT:  Do you understand you are still under |
| 01:36:49 | 8 | oath? |
| 01:36:49 | 9 | THE WITNESS:  Yes, your Honor. |
| 01:36:50 | 10 | THE COURT:  Give it one second for everybody to get |
| 01:36:52 | 11 | situated. |
| 01:36:54 | 12 | All right.  Mr. Loevy, you can go ahead. |
| 01:36:56 | 13 | - - - |
| 01:36:56 | 14 | MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION CONTINUED |
| 01:36:56 | 15 | BY MR. LOEVY: |
| 01:36:57 | 16 | Q.  Mr. Brasfield, to orient you, you told us of the analysis |
| 01:37:00 | 17 | you did just looking at the investigative files themselves to |
| 01:37:03 | 18 | see if they complied with the policy, right? |
| 01:37:04 | 19 | A.  Yes. |
| 01:37:04 | 20 | Q.  And you also told us about your analysis of the permanent |
| 01:37:08 | 21 | retention files themselves to make observations about whether |
| 01:37:11 | 22 | they were the way you thought they were supposed to look, |
| 01:37:13 | 23 | right? |
| 01:37:14 | 24 | A.  Yes. |
| 01:37:14 | 25 | Q.  I want to ask you now about a third area of analysis.  Did |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 4 of 164 PageID #:31039
***REALTIME UNEDITED TRANSCRIPT ONLY***

3

| | | |
|---|---|---|
| 01:37:18 | 1 | you do any comparison between these files that were found in |
| 01:37:21 | 2 | the basement and their corresponding permanent retention |
| 01:37:26 | 3 | files? |
| 01:37:26 | 4 | A.  Yes, I did. |
| 01:37:26 | 5 | Q.  Tell the jury about that. |
| 01:37:28 | 6 | A.  Again, looking at the material that was in the basement |
| 01:37:32 | 7 | file, there were a lot of unofficial reports that were not |
| 01:37:36 | 8 | getting onto official forms and consequently not getting into |
| 01:37:42 | 9 | the permanent retention files and roughly somewhere, 50 |
| 01:37:49 | 10 | percent of those 89 files from the 80s did show the relevant |
| 01:37:55 | 11 | information, the unofficial notes going into the official |
| 01:38:03 | 12 | reports. |
| 01:38:03 | 13 | Q.  How many basement files did you say you had? |
| 01:38:05 | 14 | A.  The ones that I actually had to be able to compare to were |
| 01:38:08 | 15 | only found in the first time period, so there were 27 in the. |
| 01:38:16 | 16 | Q.  27 corresponding permanent retention files? |
| 01:38:20 | 17 | A.  Yes. |
| 01:38:20 | 18 | Q.  So there were 400 some basement files? |
| 01:38:23 | 19 | A.  220 million if you want to call it a universe. |
| 01:38:26 | 20 | Q.  That's what I'm getting at? |
| 01:38:27 | 21 | A.  Yes. |
| 01:38:27 | 22 | Q.  Then you found? |
| 01:38:29 | 23 | A.  23 in the first group and 27 in the second group. |
| 01:38:34 | 24 | Q.  All right.  Was that significant to you that 50 percent of |
| 01:38:41 | 25 | the permanent retention official files were missing from the |

11/29/16 PM         ***REALTIME UNEDITED TRANSCRIPT ONLY***

4

01:38:45    1   investigative files?

01:38:45    2   A.  Yes, I would expect there to be near 100 percent

01:38:48    3   compliance.

01:38:49    4   Q.  And is that consistent with your experience in other

01:38:51    5   places, is that an unfair or unrealistic representation?

01:38:58    6   A.  I don't feel in my experience at looking at other homicide

01:39:02    7   foils and homicide investigations that I would expect that

01:39:05    8   high of a deficiency.

01:39:06    9   Q.  50 percent struck you as an aberration?

01:39:10   10   A.  Yes.

01:39:10   11   Q.  Have you ever worked with or audited a department that

01:39:13   12   performed that poorly?

01:39:14   13   A.  Not in the case of homicide files, no.

01:39:18   14   Q.  All right.  Did you do the first line work to fill out the

01:39:22   15   boxes, whether it was an inventory, non-inventory, et cetera?

01:39:25   16   A.  No, I did not.

01:39:26   17   Q.  Tell the jury who you relied on to do that?

01:39:28   18   A.  Because of the sheer volume and I don't want to do that

01:39:34   19   kind of stuff, the initial material review, not review, the

01:39:41   20   material that was listed and documented put in the spreadsheet

01:39:45   21   was done by people from your office.

01:39:48   22   Q.  Staff hired by us, correct?

01:39:50   23   A.  Yes.

01:39:50   24   Q.  And did you then review the work that they had done to

01:39:54   25   compile the chart, the box?

                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

01:39:56   1   A.  Yes, the discussion initially was it was the best

01:40:01   2   utilization of my time because I value it is that that initial

01:40:05   3   work would be done and then I would have the Bates numbers and

01:40:08   4   the file numbers to go back and check and verify that that's

01:40:12   5   the way they were.

01:40:13   6   Q.  And you also charged $300 an hour, right?

01:40:16   7   A.  That's correct.

01:40:16   8   Q.  So that is probably not the most efficient use of your

01:40:19   9   time?

01:40:19  10   A.  It's not the most official and it's not the most

01:40:22  11   enjoyable.

01:40:22  12   Q.  Did you spend a lot of hours making sure it was accurate?

01:40:25  13   A.  I did.

01:40:25  14   Q.  Tell the jury, approximately, what you did to do that and

01:40:28  15   how long it took?

01:40:28  16   A.  Once the material was provided to me in electronic format,

01:40:31  17   I went through the files, looked at the corresponding Bates

01:40:36  18   numbers and if anything, it errs on the side of the city

01:40:41  19   because I looked at to verify when it said that things were

01:40:45  20   either to/from memos or handwritten notes or material that

01:40:50  21   should have been in a permanent retention file, I verified

01:40:55  22   that in fact what people that you had hired found was correct.

01:41:01  23   I did not go a further step and see if I could find some more

01:41:05  24   errors.

01:41:05  25   Q.  So you only caught errors going against you?

***REALTIME UNEDITED TRANSCRIPT ONLY***

6

| | | |
|---|---|---|
| 01:41:09 | 1 | A.  Yes. |
| 01:41:09 | 2 | Q.  Is it acceptable in your field and your industry to rely |
| 01:41:13 | 3 | on other people to do some of the data entry in this kind of |
| 01:41:15 | 4 | work? |
| 01:41:15 | 5 | A.  Yes. |
| 01:41:16 | 6 | Q.  All right.  I want to talk about your fourth analysis, and |
| 01:41:19 | 7 | that involves the criminal defense class? |
| 01:41:22 | 8 | A.  Yes. |
| 01:41:22 | 9 | Q.  Tell the jury what your fourth layer of analysis was? |
| 01:41:25 | 10 | A.  Well, part of the underlying issue here was whether |
| 01:41:29 | 11 | material was getting discovered if it was going to go to the |
| 01:41:34 | 12 | criminal defense attorney, and the most obvious way to |
| 01:41:39 | 13 | determine that is to determine how many criminal defense files |
| 01:41:42 | 14 | were available that correlated with information that was in |
| 01:41:46 | 15 | basement files and were in permanent retention files.  So |
| 01:41:51 | 16 | again people that were hired by you sought out the criminal |
| 01:41:55 | 17 | defense attorneys and were able to eventually receive criminal |
| 01:42:02 | 18 | defense attorney files for 27 cases in the first time period |
| 01:42:10 | 19 | -- or 23 in the first time period and 27 in the second. |
| 01:42:13 | 20 | Q.  All right.  So it was your understanding that as many |
| 01:42:15 | 21 | criminal defense files as possible were located to compare |
| 01:42:18 | 22 | with the basement files, correct? |
| 01:42:20 | 23 | A.  Yes. |
| 01:42:20 | 24 | Q.  And by the way, your Honor, at this time we do move |
| 01:42:23 | 25 | Plaintiff's Exhibit 307 into evidence under? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 8 of 164 PageID #:31043
***REALTIME UNEDITED TRANSCRIPT ONLY***

7

| | | |
|---|---|---|
| 01:42:27 | 1 | THE COURT:  1006. |
| 01:42:29 | 2 | MR. LOEVY:  Yeah, 1006. |
| 01:42:30 | 3 | THE COURT:  We will talk about that at the end of the |
| 01:42:32 | 4 | direct.  Let's -- we will do a sidebar at the end of the |
| 01:42:35 | 5 | direct to talk about it. |
| 01:42:37 | 6 | BY MR. LOEVY: |
| 01:42:37 | 7 | Q.  All right.  When you did this analysis of comparing the |
| 01:42:40 | 8 | available criminal defense files to the basement files, what |
| 01:42:43 | 9 | was your findings? |
| 01:42:43 | 10 | A.  Well, in 90 percent of the time out of the 50 cases, 45 of |
| 01:42:49 | 11 | them, they were investigating materials that were missing, |
| 01:42:52 | 12 | approximately 80 percent. |
| 01:42:53 | 13 | Q.  Before we leave that, I want to make sure I understand. |
| 01:42:56 | 14 | So in the basement files, 90 percent of the time the criminal |
| 01:42:59 | 15 | defense attorneys files did not have all the materials in the |
| 01:43:02 | 16 | basement files? |
| 01:43:03 | 17 | A.  That's correct. |
| 01:43:03 | 18 | Q.  All right.  Did you say -- what was the next number that |
| 01:43:08 | 19 | you -- |
| 01:43:09 | 20 | A.  Approximately 80 percent, 40 of the 50 were missing the |
| 01:43:13 | 21 | criminal defense files were missing handwritten notes that |
| 01:43:17 | 22 | were present in the basement files that detectives or others |
| 01:43:19 | 23 | had written down. |
| 01:43:22 | 24 | Q.  How about GPRs and to/from memos? |
| 01:43:25 | 25 | A.  Approximately 46 percent of the criminal defense files |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 9 of 164 PageID #:31044
11/29/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

8

| | | |
|---|---|---|
| 01:43:29 | 1 | were missing, general progress reports, that could be found in |
| 01:43:33 | 2 | the basement files. |
| 01:43:33 | 3 | Q.  And how many of the criminal defense attorney's files |
| 01:43:40 | 4 | showed evidence of having received the inventory? |
| 01:43:42 | 5 | A.  There were 36 percent of the cases, of the criminal |
| 01:43:50 | 6 | defense attorneys even received an inventory, and I might also |
| 01:43:55 | 7 | mention that only 20 -- 20 percent were missing to/from memos |
| 01:43:59 | 8 | that were in the basement files too. |
| 01:44:00 | 9 | Q.  Now, you just said whether the criminal defense attorneys |
| 01:44:03 | 10 | received it, but you don't actually know what they got and |
| 01:44:05 | 11 | what they didn't get? |
| 01:44:06 | 12 | A.  No, in my report, I made very clear, I had no firsthand |
| 01:44:10 | 13 | knowledge of what the criminal defense attorney received or |
| 01:44:14 | 14 | when it was received. |
| 01:44:15 | 15 | Q.  You had to use as a proxy their file, correct? |
| 01:44:17 | 16 | A.  That's correct. |
| 01:44:18 | 17 | Q.  And you don't claim -- do you claim that this would be a |
| 01:44:21 | 18 | perfect and, you know, unchallengeable procedure to guarantee |
| 01:44:25 | 19 | exactly every document that they did or didn't have? |
| 01:44:28 | 20 | A.  No. |
| 01:44:28 | 21 | Q.  All right.  Overall, though, did you see evidence of a |
| 01:44:34 | 22 | problem? |
| 01:44:34 | 23 | A.  I did.  There was a consistent pattern of the material |
| 01:44:40 | 24 | that I reviewed that would show the types of things that were |
| 01:44:43 | 25 | in the investigative file were not making into criminal |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 10 of 164 PageID #:31045
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

9

| | | |
|---|---|---|
| 01:44:49 | 1 | defense files. |
| 01:44:50 | 2 | Q. All right. You're familiar with the defense hired an |
| 01:44:53 | 3 | expert named Mr. Murray, correct? |
| 01:44:54 | 4 | A. Yes. |
| 01:44:55 | 5 | Q. And he spent quite a few hours going over the same |
| 01:44:59 | 6 | material, correct? |
| 01:45:00 | 7 | A. That's my understanding. |
| 01:45:00 | 8 | Q. All right. And there is -- it was detected that there was |
| 01:45:04 | 9 | a problem with your analysis of the Octavio Anima file, was |
| 01:45:08 | 10 | there not? |
| 01:45:10 | 11 | A. Yes. |
| 01:45:10 | 12 | Q. Tell the jury what the problem was? |
| 01:45:10 | 13 | A. In the spreadsheet that you see enlarged there, I made |
| 01:45:15 | 14 | reference to Bates numbers, and in one of the -- in a |
| 01:45:21 | 15 | particular case there was a range of pages where a digit was |
| 01:45:26 | 16 | transcribed, and, for example -- I can given you the exact |
| 01:45:33 | 17 | number. In any event, it was a typographical error, and it |
| 01:45:37 | 18 | should have been what was, a 1 should have been a 2 or a 2 |
| 01:45:42 | 19 | should have been a 1 so that the range instead of having a |
| 01:45:47 | 20 | hundred and some pages missing, there were only seven or eight |
| 01:45:51 | 21 | pages missing. |
| 01:45:53 | 22 | Q. How many pages is your document, sir, about 15? |
| 01:45:56 | 23 | A. It covers 439 different cases, so I don't know exactly how |
| 01:46:01 | 24 | many pages there are. |
| 01:46:02 | 25 | Q. All right. You are not claiming it is completely free of |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 11 of 164 PageID #:31046
***REALTIME UNEDITED TRANSCRIPT ONLY***

10

| 01:46:04 | 1 | all typos, are you? |
| 01:46:05 | 2 | A.  No, it was an effort to impartially examine what was |
| 01:46:10 | 3 | available. |
| 01:46:10 | 4 | Q.  All right.  Who is that on, the typo, was that on you or |
| 01:46:14 | 5 | somebody else, who takes responsibility on that? |
| 01:46:16 | 6 | A.  It's both on the initial typist, but it's also clearly on |
| 01:46:19 | 7 | me, so. |
| 01:46:20 | 8 | Q.  All right.  Does that change your opinions at all that you |
| 01:46:23 | 9 | were wrong about this Bates range? |
| 01:46:24 | 10 | A.  No.  In fact, even if the two possible things.  Even if |
| 01:46:31 | 11 | you completely removed that Octavia Anima case, it doesn't |
| 01:46:39 | 12 | change the overall pattern of everything that I looked at. |
| 01:46:42 | 13 | Secondly, there were things missing regardless of that one |
| 01:46:47 | 14 | particular typographical. |
| 01:46:48 | 15 | Q.  So notwithstanding the typo, there still were -- |
| 01:46:52 | 16 | A.  Yes. |
| 01:46:52 | 17 | Q.  How about the Christopher people's file, this is the one |
| 01:46:56 | 18 | from the 150 pages from the criminal defense lawyer.  Do you |
| 01:46:59 | 19 | want to give some context there? |
| 01:47:00 | 20 | A.  That very clearly out of the 50 was one that should not |
| 01:47:04 | 21 | have been included in the material for me to look at.  It |
| 01:47:08 | 22 | didn't represent a criminal defense file.  There were |
| 01:47:10 | 23 | documents there.  But I didn't feel it would be fair to either |
| 01:47:14 | 24 | side to say oh, well, this one, I don't like this one, I'll |
| 01:47:19 | 25 | take it out.  It was there, I looked at it, I did my process. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 12 of 164 PageID #:31047
***REALTIME UNEDITED TRANSCRIPT ONLY***

11

| 01:47:22 | 1 | Q. Has the defense or anybody else brought to your attention |
| 01:47:25 | 2 | any other significant errors that you are aware of? |
| 01:47:27 | 3 | A. No. |
| 01:47:27 | 4 | Q. Does the fact that that mistake was made, does that change |
| 01:47:32 | 5 | any of your overall opinions? |
| 01:47:34 | 6 | A. No, it does not. |
| 01:47:35 | 7 | Q. Does it affect your analysis of the blue column, the |
| 01:47:38 | 8 | purple column, the blue versus purple column? |
| 01:47:43 | 9 | A. No, it does not. |
| 01:47:44 | 10 | Q. The defense expert also said that some of the documents |
| 01:47:46 | 11 | that were missing from the criminal defense files were things |
| 01:47:49 | 12 | like court attendance sheets, notes like VIN records, stuff |
| 01:47:55 | 13 | that was administrative. Did that -- what's your opinion of |
| 01:47:57 | 14 | that criticism? |
| 01:47:58 | 15 | A. I don't think that is an accurate or fair explanation. As |
| 01:48:04 | 16 | I testified to before, you never know. |
| 01:48:06 | 17 | MR. NOLAND: Judge. |
| 01:48:07 | 18 | THE WITNESS: What is going to be. |
| 01:48:08 | 19 | MR. LOEVY: Mr. Brasfield, if you could hold on. |
| 01:48:10 | 20 | There is an objection. |
| 01:48:11 | 21 | THE COURT: Any hear it. |
| 01:48:12 | 22 | MR. NOLAND: None disclosed. |
| 01:48:13 | 23 | THE COURT: Let me see the lawyers at sidebar. Bring |
| 01:48:15 | 24 | the report. |
| 01:48:29 | 25 | (The following proceedings were had at sidebar outside the |

11/29/16 PM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

12

01:48:35   1    hearing of the jury:)

01:48:35   2         THE COURT:  The question on the table has to do with

01:48:37   3    material missing from criminal defense files?

01:48:40   4         MR. KULWIN:  It was actually the reason, he was

01:48:43   5    talking about his review of Mr. Murray, our expert's report.

01:48:47   6    They haven't disclosed any rebuttal from him with respect to

01:48:50   7    any review.

01:48:50   8         THE COURT:  Actually, it was in the question.  It was

01:48:53   9    in the question.  So why don't you word the questions in a

01:48:55   10   different way.

01:48:56   11        MR. LOEVY:  I would be happy to stay away from it if

01:48:58   12   they don't want to get into it.  If it's a disclosure issue,

01:49:02   13   fine.  If they're going to do it on cross.  I'd be happy to

01:49:05   14   stay away from the subject.

01:49:06   15        MR. NOLAND:  We are certainly going to ask him he

01:49:08   16   didn't review the prosecutor's files and show him some of

01:49:11   17   those things.  He's had that report for months and --

01:49:15   18        THE COURT:  Basically what you're saying is that he

01:49:17   19   can't comment on the other side's criticism of his report?  I

01:49:22   20   don't think I agree with that.

01:49:22   21        MR. NOLAND:  He didn't submit a rebuttal is all I'm

01:49:25   22   saying, your Honor.  Yes.

01:49:26   23        THE COURT:  When was his dep taken in terms of the

01:49:31   24   sequence between plaintiff's report, defendants' report,

01:49:35   25   deposition, where did it fall?

                          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 14 of 164 PageID #:31049

| | | |
|---|---|---|
| 01:49:36 | 1 | MR. NOLAND:  We took his deposition before we |
| 01:49:39 | 2 | disclosed our report. |
| 01:49:39 | 3 | THE COURT:  Okay. |
| 01:49:41 | 4 | MR. LOEVY:  I will stay away from it if they are not |
| 01:49:43 | 5 | going to bring it up.  The criticism I thought they were going |
| 01:49:46 | 6 | to do on cross is some of this stuff is benign.  If they are |
| 01:49:50 | 7 | not going there, we are done with it. |
| 01:49:52 | 8 | THE COURT:  I think you can probably word the |
| 01:49:53 | 9 | questions in a way that doesn't say the defendants' expert |
| 01:49:57 | 10 | says this.  I mean, I am not sure is going to happen here, I |
| 01:50:01 | 11 | suppose in theory somebody could say you did such a great job |
| 01:50:05 | 12 | on cross on this guy, we are not going to call this person. |
| 01:50:12 | 13 | (The following proceedings were had in open court in the |
| 01:50:13 | 14 | presence and hearing of the jury:) |
| 01:50:13 | 15 | THE COURT:  Okay.  You can proceed. |
| 01:50:15 | 16 | BY MR. LOEVY: |
| 01:50:17 | 17 | Q.  Some of the materials in the investigative files that were |
| 01:50:20 | 18 | not evidenced in the criminal defense attorney's files was |
| 01:50:23 | 19 | more significant than other materials, right? |
| 01:50:25 | 20 | A.  That is correct. |
| 01:50:26 | 21 | Q.  All right.  As far as any criticism that who cares if some |
| 01:50:31 | 22 | of this stuff was left out of the criminal defense attorney's |
| 01:50:33 | 23 | files, can you speak to that?  I am talking about |
| 01:50:36 | 24 | administrative documents, notes about a VIN number on a car, |
| 01:50:39 | 25 | that kind of thing. |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 15 of 164 PageID #:31050
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

14

| | | |
|---|---|---|
| 01:50:40 | 1 | A. As I had previously testified to, oftentimes, you don't |
| 01:50:46 | 2 | know what is important or what may have value either to |
| 01:50:50 | 3 | prosecution or defense. Administrative things such as who |
| 01:50:56 | 4 | appeared in court, you may discover later that the key part of |
| 01:51:02 | 5 | a prosecution is that an officer was on the street and saw |
| 01:51:05 | 6 | something, but in reality, you have the administrative |
| 01:51:08 | 7 | document that said they were in court on that day. I mean, |
| 01:51:11 | 8 | that's just an off-the-cuff example. But the administrative |
| 01:51:15 | 9 | type material can be important, oftentimes, it is not. But |
| 01:51:20 | 10 | until you have it or don't have it, you're in a quandary. |
| 01:51:25 | 11 | Q. All right. When you did your analysis, some of the |
| 01:51:28 | 12 | materials that you listed as undisclosed were probably truly |
| 01:51:33 | 13 | benign, right? |
| 01:51:34 | 14 | A. That's correct. Absolutely. |
| 01:51:36 | 15 | Q. You didn't attempting to through and sort oh, this page is |
| 01:51:39 | 16 | blank or this page is not exculpatory page by page, right? |
| 01:51:42 | 17 | A. I tried to be as objective and just put down what the |
| 01:51:46 | 18 | facts were. |
| 01:51:46 | 19 | Q. All right. Let's change topics then, sir. |
| 01:51:49 | 20 | Do you have any problem as a police practices expert |
| 01:51:52 | 21 | with police officers having a policy of destruction of notes, |
| 01:51:56 | 22 | and can you explain? |
| 01:51:57 | 23 | A. I don't have a problem. In fact, in my own career, I have |
| 01:52:04 | 24 | shredded for lack of a better word notes, but it's in the |
| 01:52:08 | 25 | context of having taken a two or three-word or two or |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM     Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 16 of 164 PageID #:31051
***REALTIME UNEDITED TRANSCRIPT ONLY***

15

| | | |
|---|---|---|
| 01:52:15 | 1 | three-line note that I may have scratched in the field and |
| 01:52:20 | 2 | elaborating that on an official document when I am back in the |
| 01:52:23 | 3 | office.  If I happen to go out to a bodega and talk to Sam |
| 01:52:31 | 4 | Smith at the bodega that may be a pencil note but when I come |
| 01:52:35 | 5 | back in, it is on such-and-such a date at such-and-such a date |
| 01:52:40 | 6 | on such-and-such a location, I interviewed whoever and this is |
| 01:52:44 | 7 | the context that I learned while it's fresh in my mind.  That |
| 01:52:48 | 8 | is the official document.  That reflects what was actually |
| 01:52:50 | 9 | done.  That scrap of paper then -- |
| 01:52:56 | 10 | Q.  So is there a national norm then that as long as you take |
| 01:52:58 | 11 | the information and put it in a report, you don't have to |
| 01:53:01 | 12 | preserve the notes, would you agree or disagree with that? |
| 01:53:03 | 13 | A.  It could be either way.  The key issue is the information |
| 01:53:09 | 14 | that was garnered put into a form that is available for either |
| 01:53:14 | 15 | review or discovery later. |
| 01:53:19 | 16 | Q.  Which means in the official file, right? |
| 01:53:21 | 17 | A.  Yes, in the official file. |
| 01:53:22 | 18 | Q.  Would you have a problem with a policy that allowed you to |
| 01:53:25 | 19 | disregard or destroy or withhold notes if it didn't go into an |
| 01:53:29 | 20 | official report? |
| 01:53:29 | 21 | A.  Absolutely. |
| 01:53:30 | 22 | Q.  And would that be an aberration? |
| 01:53:33 | 23 | A.  It would. |
| 01:53:34 | 24 | Q.  You were asked some questions previously about show me a |
| 01:53:37 | 25 | specific policy that, you know, from another city.  Do you |

| | | |
|---|---|---|
| 01:53:40 | 1 | remember being asked those questions? |
| 01:53:41 | 2 | A. During a deposition, yes. |
| 01:53:43 | 3 | Q. All right. Do you have the Tallahassee policy from 1982? |
| 01:53:47 | 4 | A. No, I do not. |
| 01:53:48 | 5 | Q. Do you have the el pass owe policy from 1984? |
| 01:53:50 | 6 | A. I have no files that contain historic policies and |
| 01:54:00 | 7 | procedures from other jurisdictions. |
| 01:54:02 | 8 | Q. Do you nonetheless have a familiarity request other |
| 01:54:06 | 9 | policies and procedures? |
| 01:54:07 | 10 | A. Yes. From the start of my college education in science in |
| 01:54:12 | 11 | the studying of policies of procedures and investigations and |
| 01:54:15 | 12 | then more importantly through my professional practice of |
| 01:54:21 | 13 | developing, not to go over the same ground, but I have visited |
| 01:54:26 | 14 | other police departments, I have audited other police |
| 01:54:29 | 15 | departments, I have reviewed their policies, I have looked in |
| 01:54:35 | 16 | the popular literature at the time and of those eras and I |
| 01:54:40 | 17 | actually was a commander in those eras and I am familiar with |
| 01:54:46 | 18 | what was the way things were written. |
| 01:54:50 | 19 | Q. All right. Back quickly to the comparison you did between |
| 01:54:55 | 20 | the criminal defense files and the basement files, why did you |
| 01:54:59 | 21 | choose -- well, first of all, you have an understanding that |
| 01:55:02 | 22 | the defense attorney did a different comparison, correct? |
| 01:55:05 | 23 | A. Yes. |
| 01:55:05 | 24 | Q. I'm sorry, the defense attorney hired an expert. And what |
| 01:55:08 | 25 | did the defense expert Mr. Murray compare the files to? |

11/29/16 PM Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 18 of 164 PageID #:31053
***REALTIME UNEDITED TRANSCRIPT ONLY***

17

| | | |
|---|---|---|
| 01:55:14 | 1 | MR. NOLAND:  Objection. |
| 01:55:14 | 2 | THE COURT:  Same basis as the previous one? |
| 01:55:16 | 3 | MR. NOLAND:  Yes, Judge. |
| 01:55:16 | 4 | THE COURT:  Again, I need to see the lawyers at |
| 01:55:18 | 5 | sidebar, please.  Bring the report. |
| 01:55:22 | 6 | (The following proceedings were had at sidebar outside the |
| 01:55:30 | 7 | hearing of the jury:) |
| 01:55:30 | 8 | THE COURT:  You did what I told you not to do.  The |
| 01:55:41 | 9 | defense expert did this, the defense expert did that.  I told |
| 01:55:45 | 10 | you not to word questions that way. |
| 01:55:46 | 11 | MR. LOEVY:  I apologize. |
| 01:55:48 | 12 | THE COURT:  Here's the deal.  I don't think that |
| 01:55:50 | 13 | there's anything inappropriate or beyond -- or outside the |
| 01:55:53 | 14 | scope of Rule 26(a)(2) and the part of Rule 37 that goes along |
| 01:55:57 | 15 | with it for him to be able to respond to criticism by a |
| 01:56:00 | 16 | defense expert, so either he gets to do it now or he is going |
| 01:56:05 | 17 | to get to bring him on later.  Do you have a preference? |
| 01:56:08 | 18 | MR. LOEVY:  We do. |
| 01:56:09 | 19 | THE COURT:  I'm asking you, put him on in rebuttal to |
| 01:56:13 | 20 | comment on what your guy said about him. |
| 01:56:15 | 21 | MR. NOLAND:  If that would be the ruling, then I |
| 01:56:17 | 22 | would rather have him do it now. |
| 01:56:18 | 23 | THE COURT:  That would be the ruling.  Let's have him |
| 01:56:23 | 24 | do it now. |
| 01:56:23 | 25 | (The following proceedings were had in open court in the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

18

| | | |
|---|---|---|
| 01:56:24 | 1 | presence and hearing of the jury:) |
| 01:56:24 | 2 | THE COURT: Okay. The objection is overruled. You |
| 01:56:27 | 3 | can proceed. |
| 01:56:27 | 4 | BY MR. LOEVY: |
| 01:56:27 | 5 | Q. Just as foundation, what is your understanding of the |
| 01:56:30 | 6 | analysis that the defense expert under took? |
| 01:56:34 | 7 | A. It is my understanding from reading his report and |
| 01:56:37 | 8 | deposition that he looked at. |
| 01:56:41 | 9 | Q. Same basement files, right? |
| 01:56:42 | 10 | A. Same basement files. |
| 01:56:43 | 11 | Q. What did he compare them to? |
| 01:56:45 | 12 | A. He compared them to state's attorney's office files. |
| 01:56:47 | 13 | Q. You compared the same basement files to the criminal |
| 01:56:50 | 14 | defense and then they compared them to the state's attorney's |
| 01:56:52 | 15 | office files, right? |
| 01:56:53 | 16 | A. That's correct. |
| 01:56:53 | 17 | Q. And neither of one of you did what the other one did? |
| 01:56:56 | 18 | A. That's correct. |
| 01:56:56 | 19 | Q. Why did you choose to compare the basement files to the |
| 01:57:00 | 20 | criminal defense files to determine what the criminal defense |
| 01:57:03 | 21 | attorneys had? |
| 01:57:03 | 22 | A. I tried to keep it as straightforward as possible. The |
| 01:57:09 | 23 | issue that I was asked to look at was material relevant to the |
| 01:57:13 | 24 | investigation of homicides being given and made available to |
| 01:57:19 | 25 | the criminal defense attorney. And the most straightforward |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| 01:57:22 | 1 | way to do that is to look at the criminal defense attorney's |
| 01:57:26 | 2 | files. |
| 01:57:26 | 3 | Q.  All right.  You've already testified that 90 percent of |
| 01:57:31 | 4 | the criminal defense attorney files were missing some |
| 01:57:35 | 5 | materials from the basement file.  Do you have any knowledge |
| 01:57:40 | 6 | as to what was in or wasn't in the state's attorney's files? |
| 01:57:46 | 7 | A.  No, I do not. |
| 01:57:47 | 8 | Q.  Let's talk about a few more areas. |
| 01:57:49 | 9 | You talked before lunch about why it's important to |
| 01:57:51 | 10 | have policies governing the subpoena unit and the subpoena |
| 01:57:55 | 11 | response unit.  Did the City of Chicago after they enacted the |
| 01:57:58 | 12 | changes we talked about this morning, did they fix the |
| 01:58:00 | 13 | subpoena unit problems? |
| 01:58:02 | 14 | A.  No, they did not. |
| 01:58:03 | 15 | Q.  Can you explain? |
| 01:58:04 | 16 | A.  The policies that were promulgated did nothing to |
| 01:58:11 | 17 | establish guidelines or policies and procedures or training or |
| 01:58:18 | 18 | follow up auditing or in worst case scenario, discipline for |
| 01:58:26 | 19 | the successful operation of the subpoena services unit.  There |
| 01:58:29 | 20 | was no checklist if you did a subpoena from a state's |
| 01:58:35 | 21 | attorney's office, you do this, this, and this.  It becomes |
| 01:58:37 | 22 | even more critically important to have that when you have a |
| 01:58:41 | 23 | police department with a culture of parallel files of |
| 01:58:50 | 24 | different sources of files.  You get a subpoena, and the staff |
| 01:58:54 | 25 | with no training is supposed to determine, well, how do I |

11/29/16 PM   Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 21 of 164 PageID #:31056
***REALTIME UNEDITED TRANSCRIPT ONLY***

20

| | |
|---|---|
| 01:58:59 | 1 | respond to this?  Do I send something in writing over to the |
| 01:59:03 | 2 | gang squad because the gang squad may have had involvement in |
| 01:59:06 | 3 | this but their records aren't included in the investigative |
| 01:59:12 | 4 | file?  Do I send for things from the photo lab or from the |
| 01:59:19 | 5 | crime lab?  You can say that an experienced employee would |
| 01:59:23 | 6 | know that, but given the turnover and the fact that there is |
| 01:59:27 | 7 | absolutely no evidence that I have seen of any type of |
| 01:59:33 | 8 | guideline, of any training, of any policy or procedure as to |
| 01:59:40 | 9 | how they will respond or what sources that they will examine |
| 01:59:45 | 10 | to get the material. |
| 01:59:47 | 11 | Q.  All right.  Did you review testimony by Mr. Hickey that |
| 01:59:49 | 12 | provided insight into this problem? |
| 01:59:51 | 13 | A.  A great deal of testimony from Mr. Hickey, yes. |
| 01:59:53 | 14 | Q.  And what did you conclude based on that? |
| 01:59:55 | 15 | A.  That he acknowledged as the city's expert in that field |
| 02:00:01 | 16 | that what I had just testified to was the case, that there was |
| 02:00:06 | 17 | no training, there were no guidelines, and in fact, material |
| 02:00:10 | 18 | that I reviewed, that there were instances where there was |
| 02:00:16 | 19 | confusion or question among staff as to what should be turned |
| 02:00:20 | 20 | over or what shouldn't be turned over, and that none of that |
| 02:00:28 | 21 | questioning was ever resolved or sent up the chain of command |
| 02:00:33 | 22 | to decide what to do. |
| 02:00:34 | 23 | Q.  All right.  In addition to the lack of -- basically, did |
| 02:00:40 | 24 | any of the new policies that got passed, did they govern the |
| 02:00:44 | 25 | subpoena unit? |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 22 of 164 PageID #:31057
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

21

| | | |
|---|---|---|
| 02:00:46 | 1 | A.  No. |
| 02:00:47 | 2 | Q.  Was there a lack of policies there? |
| 02:00:50 | 3 | A.  There was a lack of policy. |
| 02:00:51 | 4 | Q.  All right.  Let's talk about the policies that were |
| 02:00:52 | 5 | passed.  Did those solve the problem for the decentralized |
| 02:00:55 | 6 | divisions you've just described? |
| 02:00:57 | 7 | A.  No, they did not address anything about a centralized |
| 02:01:01 | 8 | record system process.  And I might add, the larger the |
| 02:01:05 | 9 | organization gets, the more critically important it is to have |
| 02:01:08 | 10 | a centralized record system. |
| 02:01:09 | 11 | Q.  How out of the norm is Chicago's deficiency in that |
| 02:01:14 | 12 | regard? |
| 02:01:14 | 13 | A.  As I have said on several occasions, it is totally alien |
| 02:01:22 | 14 | to my experience that the City of Chicago police department |
| 02:01:26 | 15 | would have that type of system. |
| 02:01:28 | 16 | Q.  Did the policies leave too much or too little discretion |
| 02:01:32 | 17 | to detectives as far as what to make into official files? |
| 02:01:35 | 18 | A.  Well, they used the term relevant and one of the |
| 02:01:45 | 19 | depositions that I reviewed, I believe it was from a gentleman |
| 02:01:49 | 20 | by the name of /STEUT I shall indicated that what might be |
| 02:01:54 | 21 | important or relevant. |
| 02:01:55 | 22 |          MR. NOLAND:  Objection, your Honor.  I believe that's |
| 02:01:57 | 23 | the subject of the discussion before the testimony. |
| 02:02:00 | 24 |          THE COURT:  Okay.  Well, the last part of the answer |
| 02:02:04 | 25 | was not responsive, so I am going to strike the last part.  I |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 23 of 164 PageID #:31058

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 02:02:09 | 1 am going to strike the whole answer.  Why don't you put the |
| 02:02:12 | 2 question again.  The answer really wasn't responsive. |
| 02:02:14 | 3 BY MR. LOEVY: |
| 02:02:15 | 4 Q.  Did you see any evidence either way that the system in |
| 02:02:17 | 5 Chicago left too much discretion to police officers to decide |
| 02:02:20 | 6 what to put in the official file? |
| 02:02:22 | 7       THE COURT:  That's just a yes or no. |
| 02:02:24 | 8       THE WITNESS:  Yes. |
| 02:02:24 | 9 BY MR. LOEVY: |
| 02:02:25 | 10 Q.  Can you explain? |
| 02:02:25 | 11       THE COURT:  Is this the issue where there is an |
| 02:02:27 | 12 objection? |
| 02:02:27 | 13       MR. NOLAND:  Yes, the reference to a particular name. |
| 02:02:29 | 14       THE COURT:  Bring the -- again, I need to talk to the |
| 02:02:32 | 15 lawyers at sidebar.  Bring the relevant ruling. |
| 02:02:46 | 16   (The following proceedings were had at sidebar outside the |
| 02:02:48 | 17 hearing of the jury:) |
| 02:02:48 | 18       THE COURT:  Is this my ruling?  You're talking about. |
| 02:02:53 | 19       MR. NOLAND:  The proffer. |
| 02:02:53 | 20       THE COURT:  You are talking about the proffer.  This |
| 02:02:58 | 21 is not Jones Palmer? |
| 02:03:02 | 22       MR. SWAMINATHAN:  No one knows that his reference to |
| 02:03:08 | 23 skive I shall testifying is him testifying in Jones and |
| 02:03:11 | 24 Palmer.  He is just saying a guy name skive I shall who is a |
| 02:03:15 | 25 commander said certain things. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 24 of 164 PageID #:31059
***REALTIME UNEDITED TRANSCRIPT ONLY***

23

| | | |
|---|---|---|
| 02:03:17 | 1 | MR. LOEVY:  In other words, that would have been |
| 02:03:19 | 2 | outside the Jones proffer but we are not offering it for the |
| 02:03:22 | 3 | Jones proffer.  It has nothing to do with the Jones proffer. |
| 02:03:25 | 4 | He just said I looked at /STEUB itch's testimony. |
| 02:03:28 | 5 | THE COURT:  Who is is it I object I shall? |
| 02:03:30 | 6 | MR. SWAMINATHAN:  He is a command he were for the |
| 02:03:32 | 7 | city. |
| 02:03:32 | 8 | THE COURT:  Testified in the Palmer case? |
| 02:03:34 | 9 | MR. SWAMINATHAN:  It was in the Palmer case. |
| 02:03:36 | 10 | MR. NOLAND:  It's the pre 83 policy, yes. |
| 02:03:38 | 11 | THE COURT:  Okay.  And what do you expect his |
| 02:03:40 | 12 | testimony to be on this? |
| 02:03:43 | 13 | MR. LOEVY:  Just what he said. |
| 02:03:44 | 14 | THE COURT:  Say it again. |
| 02:03:44 | 15 | MR. LOEVY:  That there was too much discretion left |
| 02:03:46 | 16 | to the detectives to decide what's in and what's out. |
| 02:03:49 | 17 | THE COURT:  And the problem with that is? |
| 02:03:50 | 18 | MR. NOLAND:  It was the pre 83 policy.  That was a |
| 02:03:55 | 19 | decision a change the policy.  He is talking about a different |
| 02:04:02 | 20 | policy before 83-1. |
| 02:04:06 | 21 | MR. MICHALIK:  It's misleading to discuss testimony |
| 02:04:11 | 22 | before 83-1 comes out. |
| 02:04:12 | 23 | THE COURT:  Reword the question so it doesn't do |
| 02:04:14 | 24 | that. |
| 02:04:15 | 25 | (The following proceedings were had in open court in the |

| | | |
|---|---|---|
| 02:04:19 | 1 | presence and hearing of the jury:) |
| 02:04:19 | 2 | THE COURT: Okay. The question is going to be |
| 02:04:21 | 3 | rephrased. |
| 02:04:21 | 4 | BY MR. LOEVY: |
| 02:04:22 | 5 | Q. All right. You looked at what happened in the City of |
| 02:04:27 | 6 | Chicago after they tried to solve the problem of the Jones |
| 02:04:29 | 7 | Palmer era, correct? |
| 02:04:31 | 8 | A. That's correct. |
| 02:04:31 | 9 | Q. And I believe you told us you think they did an inadequate |
| 02:04:35 | 10 | job of solving that problem? |
| 02:04:36 | 11 | A. Yes. |
| 02:04:36 | 12 | Q. Did they solve the problem with having too much or too |
| 02:04:40 | 13 | little discretion to detectives to decide what to memorialize? |
| 02:04:44 | 14 | A. No. |
| 02:04:45 | 15 | Q. They did not? |
| 02:04:46 | 16 | A. No. |
| 02:04:46 | 17 | Q. If you could explain a little bit about your reference to |
| 02:04:49 | 18 | Mr. /STEUB itch? |
| 02:04:51 | 19 | A. They used what I would consider vague terminology and left |
| 02:04:55 | 20 | it up to individual detectives to determine what was relevant |
| 02:04:58 | 21 | and what they did with the information that they thought was |
| 02:05:02 | 22 | relevant. |
| 02:05:04 | 23 | Q. And that's not in the norm in police practices? |
| 02:05:07 | 24 | A. No. |
| 02:05:07 | 25 | Q. You talked a little bit about training and just a few more |

02:05:10  1    questions, really.  But when they did these new policies and

02:05:14  2    these new practices, did they do the kind of training that

02:05:17  3    would be expected in your industry?

02:05:19  4    A.  Not for a significant policy such as discovery in

02:05:24  5    constitutional state crimes for individuals that and as

02:05:34  6    evidenced by the information I had available to me, that was

02:05:38  7    an inbreded cultural problem that needed very significant

02:05:47  8    training, planning for the training in advance, training

02:05:50  9    presented by high level commanders, perhaps even with an

02:05:55  10   introduction by the superintendent that it encompass everyone

02:06:00  11   that would have their hands-on an investigation, not just the

02:06:08  12   major crimes detectives as I mentioned before.  They should

02:06:13  13   include bomb and arson, gang squad, anyone that has an

02:06:16  14   investigative responsibility and to a lesser extreme, the

02:06:21  15   patrol officer, and it should not be a one time deal.  People

02:06:25  16   transfer in and out.  There are going to be questions arise in

02:06:29  17   time.  You have a major significant change in the culture as

02:06:35  18   to well, does this mean this, does that mean that, there needs

02:06:40  19   to be and often is additional follow-up training.

02:06:43  20   Q.  As a 40-year law enforcement person, do you regard this as

02:06:47  21   a significant change in the way of doing business?

02:06:51  22   A.  Yes.

02:06:51  23   Q.  Is a one-three-hour training of the detectives sufficient?

02:06:55  24   A.  No.

02:06:55  25   Q.  The last question is you described the culture as

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| | | |
|---|---|---|
| 02:06:58 | 1 | ingrained.  Can you explain from a police practices standpoint |
| 02:07:02 | 2 | how an organization can have culture resistance to change? |
| 02:07:05 | 3 | MR. NOLAND:  Objection, Judge, relevance. |
| 02:07:06 | 4 | THE COURT:  Overruled. |
| 02:07:09 | 5 | THE WITNESS:  For instance, when the requirement to |
| 02:07:18 | 6 | read suspects their rights which goes back decades and decades |
| 02:07:21 | 7 | and decades, that was not what police were used to doing and |
| 02:07:28 | 8 | thought that it was going to let the bad guys get away.  It's |
| 02:07:32 | 9 | a cultural thing that had to be totally turned around 180 |
| 02:07:36 | 10 | degrees.  The same is true about, for instance, warning shots. |
| 02:07:44 | 11 | Anyway, warning shots. |
| 02:07:46 | 12 | MR. KULWIN:  I will object. |
| 02:07:47 | 13 | THE COURT:  Sustained. |
| 02:07:48 | 14 | MR. KULWIN:  I ask that it be stricken. |
| 02:07:50 | 15 | THE COURT:  That comment is stricken. |
| 02:07:51 | 16 | MR. LOEVY:  I'm finished. |
| 02:07:53 | 17 | THE COURT:  What did you say? |
| 02:07:55 | 18 | MR. LOEVY:  I'm finished. |
| 02:07:56 | 19 | THE COURT:  You're finished. |
| 02:07:57 | 20 | Mr. Noland. |
| 02:07:58 | 21 | - - - |
| 02:07:58 | 22 | MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION |
| 02:07:58 | 23 | BY MR. NOLAND: |
| 02:08:40 | 24 | Q.  Now, Mr. Brasfield, before lunch, you talked a lot about |
| 02:08:44 | 25 | notes and that in the files you reviewed, you saw notes that |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM          Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 28 of 164 PageID #:31063
***REALTIME UNEDITED TRANSCRIPT ONLY***

27

| | | |
|---|---|---|
| 02:08:48 | 1 | were not on general progress report forms, do you remember |
| 02:08:51 | 2 | that testimony? |
| 02:08:52 | 3 | A.  Yes, I do. |
| 02:08:52 | 4 | Q.  And sometimes you might see it on the back of a piece of |
| 02:08:55 | 5 | paper or something not on the official general progress report |
| 02:08:58 | 6 | form, correct? |
| 02:08:59 | 7 | A.  That's not what I testified to this morning, but, yes, I |
| 02:09:02 | 8 | agree. |
| 02:09:02 | 9 | Q.  All right.  And now just recently after lunch, you've |
| 02:09:06 | 10 | acknowledged that you would shred your own notes as a police |
| 02:09:11 | 11 | officer after completing a report; isn't that true? |
| 02:09:16 | 12 | A.  That's correct. |
| 02:09:16 | 13 | Q.  And to you that's a perfectly acceptable practice, right? |
| 02:09:18 | 14 | A.  In the context of my explanation of transferring the |
| 02:09:21 | 15 | information in full onto official forms. |
| 02:09:25 | 16 | Q.  So you would not give your notes to the criminal defense |
| 02:09:28 | 17 | attorneys so he would have those notes in the courtroom in |
| 02:09:30 | 18 | order to cross-examine you with what you wrote |
| 02:09:32 | 19 | contemporaneously with your interview of somebody, correct, |
| 02:09:36 | 20 | yes or no? |
| 02:09:36 | 21 | A.  Yes. |
| 02:09:37 | 22 | Q.  And you would not give those notes to the prosecutor so he |
| 02:09:40 | 23 | could see what you wrote, he or she could see what you wrote |
| 02:09:43 | 24 | down contemporaneously with your investigation; isn't that |
| 02:09:43 | 25 | true? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:09:48 | 1 | A.  That's true. |
| 02:09:48 | 2 | Q.  And you have talked about a lot of criticism of Chicago's |
| 02:09:56 | 3 | policy.  We just heard that, correct? |
| 02:09:58 | 4 | A.  Yes. |
| 02:09:58 | 5 | Q.  Wouldn't you agree, sir, that in fact keeping notes, |
| 02:10:03 | 6 | retaining notes permanently so that they're available in the |
| 02:10:05 | 7 | criminal process is a better policy than your very own |
| 02:10:09 | 8 | personal policy of shredding your notes; isn't that true? |
| 02:10:13 | 9 | A.  No, it is not. |
| 02:10:14 | 10 | Q.  Now, Mr. Brasfield, you were never personally assigned as |
| 02:10:22 | 11 | a homicide detective is that true? |
| 02:10:23 | 12 | A.  That's true. |
| 02:10:24 | 13 | Q.  But you're aware that in the Seattle police department as |
| 02:10:29 | 14 | with your practice, the Seattle police officers would shred |
| 02:10:32 | 15 | their notes after completing a report, right? |
| 02:10:34 | 16 | A.  In that era. |
| 02:10:36 | 17 | Q.  Is that true? |
| 02:10:36 | 18 | A.  That's true. |
| 02:10:39 | 19 | Q.  And Mr. Brasfield, isn't it true that in all your time in |
| 02:10:43 | 20 | Seattle, all those 20 plus years, you never did anything to |
| 02:10:46 | 21 | change that policy; isn't that true? |
| 02:10:48 | 22 | A.  No, that's not true. |
| 02:10:48 | 23 | Q.  Isn't it true, Mr. Brasfield, that you didn't do anything |
| 02:10:51 | 24 | to change the policy at Seattle of detectives who threw their |
| 02:10:55 | 25 | notes away; isn't that true? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 30 of 164 PageID #:31065
***REALTIME UNEDITED TRANSCRIPT ONLY***

29

| | | |
|---|---|---|
| 02:10:57 | 1 | A.  That's not true. |
| 02:10:57 | 2 | Q.  Well, Mr. Brasfield, you were the chief of police in Fort |
| 02:11:02 | 3 | Lauderdale; is that correct? |
| 02:11:02 | 4 | A.  That's correct. |
| 02:11:02 | 5 | Q.  And you don't even know what the policy was in Fort |
| 02:11:06 | 6 | Lauderdale with respect to whether or not detectives could |
| 02:11:08 | 7 | destroy their notes after completing a report; isn't that |
| 02:11:08 | 8 | true? |
| 02:11:13 | 9 | A.  That's not entirely true, no. |
| 02:11:14 | 10 | Q.  At your deposition you told us you didn't know one way or |
| 02:11:18 | 11 | the other what the policy was in Fort Lauderdale? |
| 02:11:22 | 12 | MR. LOEVY:  Objection, page and line. |
| 02:11:24 | 13 | THE COURT:  Sustained.  That's not the proper way to |
| 02:11:28 | 14 | do it. |
| 02:11:31 | 15 | BY MR. NOLAND: |
| 02:11:36 | 16 | Q.  Page 327.  Line 10.  Isn't it true that you were asked |
| 02:11:51 | 17 | these questions. |
| 02:11:52 | 18 | "QUESTION: |
| 02:11:52 | 19 | MR. LOEVY:  Objection to the characterization with |
| 02:11:54 | 20 | respect to the policies.  Just the question and the answer. |
| 02:11:57 | 21 | THE COURT:  Ask the questions.  Read the questions |
| 02:11:58 | 22 | and answers, leave out the commentary. |
| 02:12:01 | 23 | BY MR. NOLAND: |
| 02:12:03 | 24 | Q. |
| 02:12:03 | 25 | "QUESTION:  But what did they do with the actual notes? |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 31 of 164 PageID #:31066
***REALTIME UNEDITED TRANSCRIPT ONLY***

30

| 02:12:06 | 1 | Did they throw them away? |
| 02:12:07 | 2 | "ANSWER: They were transcribed and the notes, I don't |
| 02:12:10 | 3 | have an independent recollection right now what they were, |
| 02:12:13 | 4 | what was done with them. So it's possible they were just |
| 02:12:15 | 5 | thrown away. The information would have been contained in the |
| 02:12:17 | 6 | file. It's possible. I said I have no independent |
| 02:12:20 | 7 | recollection. |
| 02:12:24 | 8 | So the question is, it's possible that the notes in |
| 02:12:26 | 9 | Fort Lauderdale that the detectives took after they |
| 02:12:29 | 10 | electronically called them in and had them transcribed or |
| 02:12:32 | 11 | typed them or did whatever that they did with them and put |
| 02:12:35 | 12 | them in the file could have been thrown away? |
| 02:12:37 | 13 | "ANSWER: That could have been." |
| 02:12:39 | 14 | A. That's correct. |
| 02:12:40 | 15 | MR. LOEVY: Objection, not impeaching. |
| 02:12:44 | 16 | THE COURT: I am going to overrule the objection. |
| 02:12:46 | 17 | When you read the things, say question and answer. You are |
| 02:12:50 | 18 | not going to do it again, but when you do it say question and |
| 02:12:53 | 19 | answer so the jury understands what's being read. |
| 02:13:06 | 20 | I am overruling the objection because it's a matter |
| 02:13:09 | 21 | of weight. |
| 02:13:09 | 22 | MR. NOLAND: Thank you, Judge. |
| 02:13:10 | 23 | BY MR. NOLAND: |
| 02:13:10 | 24 | Q. Isn't it true that as the chief of policy, you didn't have |
| 02:13:14 | 25 | a policy one way or the other with retention of notes in Fort |

| | | |
|---|---|---|
| 02:13:19 | 1 | Lauderdale? |
| 02:13:19 | 2 | A.  The policy. |
| 02:13:21 | 3 | MR. LOEVY:  Objection. |
| 02:13:22 | 4 | THE COURT:  The question is did you have a policy? |
| 02:13:24 | 5 | THE WITNESS:  We had a policy. |
| 02:13:25 | 6 | BY MR. NOLAND: |
| 02:13:26 | 7 | Q.  Page 328, line 1.  Isn't it true you were asked this |
| 02:13:29 | 8 | question and gave this answer: |
| 02:13:31 | 9 | "QUESTION:  And as chief of police, you didn't have a |
| 02:13:34 | 10 | policy one way or the other? |
| 02:13:35 | 11 | "ANSWER:  I don't recall what the policy.  I don't have |
| 02:13:37 | 12 | it in front of me now." |
| 02:13:39 | 13 | Isn't it truism objection, your Honor |
| 02:13:42 | 14 | THE COURT:  The objection is sustained.  Not |
| 02:13:44 | 15 | impeaching.  The jury is instructed to disregard. |
| 02:13:50 | 16 | BY MR. NOLAND: |
| 02:13:50 | 17 | Q.  Now, Mr. Brasfield, you acknowledged after lunch here that |
| 02:13:53 | 18 | the key in all of this with respect to the review that you've |
| 02:13:55 | 19 | done in your testimony here today is that the information is |
| 02:13:59 | 20 | provided in the criminal justice process so that the |
| 02:14:02 | 21 | prosecutors get the information and the information will be |
| 02:14:05 | 22 | tendered to the criminal defense attorney; is that fair? |
| 02:14:10 | 23 | A.  The information that the police have are supposed to give |
| 02:14:14 | 24 | to the prosecutor or the state's attorney's office, yes. |
| 02:14:16 | 25 | Q.  And it is true, isn't it, that if the police -- when the |

| | | |
|---|---|---|
| 02:14:21 | 1 | police provide the information to the prosecutor, the police |
| 02:14:23 | 2 | have fulfilled their duty to disclose under generally accepted |
| 02:14:30 | 3 | police practices; isn't that true? |
| 02:14:32 | 4 | A.  If they disclosed everything that they have, yes. |
| 02:14:35 | 5 | Q.  Yet, Mr. Brasfield, in this review you talked about with |
| 02:14:43 | 6 | plaintiff's counsel, you did not even look look at the |
| 02:14:46 | 7 | prosecutor's files in comparison to the 50 investigative files |
| 02:14:51 | 8 | from the basement, did you? |
| 02:14:52 | 9 | A.  That's correct. |
| 02:14:53 | 10 | Q.  Now, Mr. Brasfield, you've talked about a lot about |
| 02:15:06 | 11 | permanent retention files.  Do you remember that testimony? |
| 02:15:07 | 12 | A.  Yes. |
| 02:15:07 | 13 | Q.  Now, Mr. Brasfield, you understand that at the Chicago |
| 02:15:10 | 14 | Police Department there's a permanent retention file that has |
| 02:15:12 | 15 | a supplementary reports and the case reports, that's correct? |
| 02:15:15 | 16 | A.  That's correct. |
| 02:15:16 | 17 | Q.  And there's also the investigative file that is maintained |
| 02:15:20 | 18 | at the area while the investigation is ongoing; isn't that |
| 02:15:20 | 19 | true? |
| 02:15:24 | 20 | A.  That's one of the other files, yes. |
| 02:15:25 | 21 | Q.  And the investigative files are available to get requested |
| 02:15:32 | 22 | and subpoenaed in the criminal process by the prosecutors and |
| 02:15:35 | 23 | the criminal defense attorneys; isn't that true? |
| 02:15:38 | 24 | A.  There is though policy or practice that would indicate how |
| 02:15:41 | 25 | it's supposed to operate. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 34 of 164 PageID #:31069
***REALTIME UNEDITED TRANSCRIPT ONLY***

33

| | | |
|---|---|---|
| 02:15:41 | 1 | Q. Well, it's supposed to operate in that the detectives, the |
| 02:15:46 | 2 | special order requires that detectives be submit their |
| 02:15:49 | 3 | information that they generated or received in an |
| 02:15:53 | 4 | investigation into that investigative file for preservation, |
| 02:15:57 | 5 | isn't that what it says?  Isn't that what it says, yes or no? |
| 02:16:00 | 6 | A. That's what it says. |
| 02:16:03 | 7 | Q. Thank you. |
| 02:16:04 | 8 | And in this case, there is about 450 investigative |
| 02:16:13 | 9 | files that are listed on this table that the plaintiff's |
| 02:16:17 | 10 | attorneys gave you? |
| 02:16:18 | 11 | A. More than 29, yes. |
| 02:16:19 | 12 | Q. And by the way, you didn't prepare this, they prepared it, |
| 02:16:22 | 13 | and provided it to you, correct? |
| 02:16:23 | 14 | A. That's correct. |
| 02:16:23 | 15 | Q. And but only on 50 of those 429 cases did they provide you |
| 02:16:30 | 16 | with any criminal defense file is that true? |
| 02:16:32 | 17 | A. That's true. |
| 02:16:33 | 18 | Q. And on those criminal defense attorney's files, there were |
| 02:16:44 | 19 | almost all of them general progress reports and other notes |
| 02:16:49 | 20 | that were contained in those criminal defense attorneys files, |
| 02:16:53 | 21 | true? |
| 02:16:54 | 22 | A. Those. |
| 02:16:54 | 23 | Q. Is that true or not, sir? |
| 02:16:56 | 24 | A. No. |
| 02:16:56 | 25 | Q. You were aware that information from the investigative |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 35 of 164 PageID #:31070
11/29/16 PM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

| | | |
|---|---|---|
| 02:16:59 | 1 | files was produced in the criminal process, correct? |
| 02:17:03 | 2 | A.  You'll have to rephrase that. |
| 02:17:06 | 3 | Q.  There are -- you came across dozens and dozens of general |
| 02:17:12 | 4 | progress reports that were in these criminal defense |
| 02:17:14 | 5 | attorney's files that you reviewed; isn't that true? |
| 02:17:16 | 6 | A.  There were general progress reports in some of the files |
| 02:17:20 | 7 | that I looked at, yes. |
| 02:17:21 | 8 | Q.  So that was evidence that attorneys were getting material |
| 02:17:26 | 9 | from the investigative files, correct? |
| 02:17:28 | 10 | A.  In some instances, yes. |
| 02:17:30 | 11 | Q.  And in fact, it's your understanding that the practice at |
| 02:17:36 | 12 | Chicago or the policy is that the general progress reports do |
| 02:17:39 | 13 | not go into the permanent retention file, they go into the |
| 02:17:43 | 14 | investigative file, correct? |
| 02:17:44 | 15 | A.  That's correct. |
| 02:17:44 | 16 | Q.  Now, with respect to these 50 or so criminal defense |
| 02:17:57 | 17 | attorneys files that were provided to you, you didn't |
| 02:17:59 | 18 | personally do anything to independently verify that they were |
| 02:18:04 | 19 | complete or incomplete; is that right? |
| 02:18:06 | 20 | A.  I verified -- |
| 02:18:08 | 21 | Q.  Sir; is that right? |
| 02:18:12 | 22 | A.  I received. |
| 02:18:13 | 23 | Q.  Sir; is that right? |
| 02:18:15 | 24 | A.  Please ask the question again. |
| 02:18:16 | 25 | Q.  Isn't it true, sir, that of the 50 criminal defense |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 36 of 164 PageID #:31071
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

| | | |
|---|---|---|
| 02:18:20 | 1 | attorney's files that were provided to you by the plaintiff's |
| 02:18:22 | 2 | counsel, you did nothing to independently verify that they |
| 02:18:26 | 3 | were complete or incomplete; isn't that true? |
| 02:18:29 | 4 | A.  I took them at face value. |
| 02:18:31 | 5 | Q.  And you don't know how many times those files changed |
| 02:18:35 | 6 | hands from one attorney to another attorney to another |
| 02:18:37 | 7 | attorney over the years, true? |
| 02:18:38 | 8 | A.  That's true. |
| 02:18:39 | 9 | Q.  And most of these files were between 15 and some in excess |
| 02:18:43 | 10 | of 30 years old; isn't that right? |
| 02:18:46 | 11 | A.  That's possible. |
| 02:18:46 | 12 | Q.  And you don't know how many of these files were given to |
| 02:18:51 | 13 | appellate lawyers, right? |
| 02:18:52 | 14 | A.  That's correct. |
| 02:18:52 | 15 | Q.  You don't know how many were given -- how many post |
| 02:18:55 | 16 | conviction lawyers took those files, correct? |
| 02:18:57 | 17 | A.  All I know is they came from criminal defense attorneys. |
| 02:19:00 | 18 | Q.  And you didn't talk to any criminal defense attorneys and |
| 02:19:03 | 19 | say, hey, is this file complete, true? |
| 02:19:05 | 20 | A.  That's true. |
| 02:19:06 | 21 | Q.  Mr. Loevy brought up with you the Christopher Peoples |
| 02:19:21 | 22 | case, right, that was a case we talked about at your |
| 02:19:24 | 23 | deposition? |
| 02:19:24 | 24 | A.  Yes. |
| 02:19:25 | 25 | Q.  And that was a file that was provided to you by the |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 37 of 164 PageID #:31072
***REALTIME UNEDITED TRANSCRIPT ONLY***

36

| 02:19:31 | 1 | plaintiff's counsel, right? |
| 02:19:32 | 2 | A.  That's correct. |
| 02:19:33 | 3 | Q.  I'm going to show you what the plaintiffs have marked as |
| 02:19:38 | 4 | Plaintiff's Exhibit 383.  That is the criminal defense |
| 02:19:46 | 5 | attorney's file that the plaintiff's attorneys provided to |
| 02:19:49 | 6 | you; isn't that true? |
| 02:19:51 | 7 | A.  I believe so. |
| 02:19:52 | 8 | THE COURT:  Can you spell peoples? |
| 02:19:54 | 9 | MR. NOLAND:  It is p-e-o-p-l-e-s-. |
| 02:20:00 | 10 | THE COURT:  Thanks. |
| 02:20:00 | 11 | BY MR. NOLAND: |
| 02:20:02 | 12 | Q.  Sir? |
| 02:20:03 | 13 | MR. NOLAND:  Judge, could we have the computer? |
| 02:20:20 | 14 | MR. NOLAND:  If we could have 306-8. |
| 02:20:23 | 15 | THE COURT:  Is this in evidence? |
| 02:20:24 | 16 | MR. NOLAND:  This is Plaintiff's Exhibit. |
| 02:20:24 | 17 | THE COURT:  I understand.  That's not my question. |
| 02:20:26 | 18 | Just focus on my question.  Is it in evidence?  Let me ask it |
| 02:20:31 | 19 | a different way.  Is there an objection? |
| 02:20:32 | 20 | MR. LOEVY:  We do not object. |
| 02:20:33 | 21 | THE COURT:  Fine.  Then the jury will be able to see |
| 02:20:35 | 22 | it.  306-10? |
| 02:20:38 | 23 | MR. NOLAND:  018, your Honor. |
| 02:20:38 | 24 | BY MR. NOLAND: |
| 02:20:45 | 25 | Q.  Sir, while Laura is pulling that up, the first page of |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 38 of 164 PageID #:31073
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

37

| | | |
|---|---|---|
| 02:20:48 | 1 | that document has the name of the attorney for Christopher |
| 02:20:53 | 2 | Peoples, his name is Gary Scanlon is that true? |
| 02:20:55 | 3 | A.  That's correct. |
| 02:20:57 | 4 | THE COURT:  I did it again.  There's two defense |
| 02:21:00 | 5 | tables.  I put it on the wrong one.  My mistake.  Sorry about |
| 02:21:03 | 6 | that.  There you go. |
| 02:21:04 | 7 | BY MR. NOLAND: |
| 02:21:12 | 8 | Q.  Mr. Brasfield, on the screen in front of you, that is page |
| 02:21:17 | 9 | 17 of your attachment F to your report; is that true? |
| 02:21:22 | 10 | A.  That's correct. |
| 02:21:22 | 11 | Q.  And you prepared this page 17, correct? |
| 02:21:27 | 12 | A.  I did. |
| 02:21:28 | 13 | Q.  And this was officially based upon your review of the -- |
| 02:21:33 | 14 | this spreadsheet on the demonstrative exhibit that plaintiff's |
| 02:21:37 | 15 | counsel gave you, right? |
| 02:21:38 | 16 | A.  Yes. |
| 02:21:38 | 17 | Q.  And then you took that and did a file by file comparison |
| 02:21:42 | 18 | of the documents that were in the investigative files from the |
| 02:21:46 | 19 | police and the criminal defense attorney's files given to you, |
| 02:21:49 | 20 | right? |
| 02:21:49 | 21 | A.  That's correct. |
| 02:21:57 | 22 | MR. NOLAND:  Laura, can you highlight the entire |
| 02:22:00 | 23 | paragraph missing from criminal defense files. |
| 02:22:10 | 24 | BY MR. NOLAND: |
| 02:22:10 | 25 | Q.  There's actually 288 pages in that Chicago Police |

| | | |
|---|---|---|
| 02:22:13 | 1 | Department file, correct, that you note on attachment F? |
| 02:22:15 | 2 | A.  Yes. |
| 02:22:15 | 3 | Q.  And I have added them up beforehand, I think we talked |
| 02:22:22 | 4 | about it at your deposition, the documents you said were |
| 02:22:24 | 5 | missing from the criminal defense attorney's files were about |
| 02:22:27 | 6 | 250 pages or 257 pages; is that true? |
| 02:22:30 | 7 | A.  I don't recall. |
| 02:22:31 | 8 | Q.  Okay.  But it was somewhere in that ballpark, does that |
| 02:22:34 | 9 | sound about right? |
| 02:22:35 | 10 | A.  I would say that's fair. |
| 02:22:39 | 11 | MR. NOLAND:  Laura, if you could pull up Plaintiff's |
| 02:22:41 | 12 | Exhibit 383, pages. |
| 02:22:47 | 13 | THE COURT:  Is there any objection to this one? |
| 02:22:48 | 14 | MR. LOEVY:  What is it, your Honor? |
| 02:22:50 | 15 | THE COURT:  383. |
| 02:22:51 | 16 | MR. LOEVY:  Is it a file? |
| 02:22:53 | 17 | MR. NOLAND:  It's the file that's in front of him. |
| 02:22:55 | 18 | MR. LOEVY:  No objection. |
| 02:22:56 | 19 | THE COURT:  Okay.  Fine.  So the 306 was -- 306 dot |
| 02:23:04 | 20 | whatever was the page from the report, the 383 is the people's |
| 02:23:07 | 21 | file. |
| 02:23:08 | 22 | MR. NOLAND:  Thank you, Judge. |
| 02:23:09 | 23 | This would be base stamp pages 8651-52. |
| 02:23:16 | 24 | BY MR. NOLAND: |
| 02:23:36 | 25 | Q.  So, sir, on the copy in front of you and on the screen, in |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 40 of 164 PageID #:31075
***REALTIME UNEDITED TRANSCRIPT ONLY***

39

| | | |
|---|---|---|
| 02:23:40 | 1 | the middle of the document, there is a reference to the RD |
| 02:23:43 | 2 | number for this case.  That's the records division number; is |
| 02:23:43 | 3 | that right? |
| 02:23:46 | 4 | A.  Yes. |
| 02:23:46 | 5 | Q.  And that would be H H 358668, that's the records division |
| 02:23:53 | 6 | number relative to the homicide at issue relative to this |
| 02:23:59 | 7 | Christopher people's case? |
| 02:24:00 | 8 | A.  Yes. |
| 02:24:00 | 9 | Q.  And that's one page.  Can you go back to the other one, |
| 02:24:04 | 10 | Laura?  Under the subject line, Laura, could you highlight |
| 02:24:07 | 11 | that? |
| 02:24:08 | 12 | BY MR. NOLAND: |
| 02:24:08 | 13 | Q.  This is a request for prisoner to be held past next |
| 02:24:11 | 14 | scheduled court call, right? |
| 02:24:13 | 15 | A.  Yes. |
| 02:24:13 | 16 | Q.  Again, the subject of this document is it request for |
| 02:24:22 | 17 | prisoner to be held past court call, correct? |
| 02:24:25 | 18 | A.  Yes. |
| 02:24:25 | 19 | Q.  And again it's the same RD number that we just read, |
| 02:24:31 | 20 | correct? |
| 02:24:31 | 21 | A.  Correct. |
| 02:24:31 | 22 | Q.  Now, isn't it true, Mr. Brasfield, that there isn't any |
| 02:24:35 | 23 | other police report in that file, the criminal defense file |
| 02:24:39 | 24 | that the plaintiff's attorneys gave you that has the records |
| 02:24:43 | 25 | division number for the homicide at issue in that case? |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 41 of 164 PageID #:31076
***REALTIME UNEDITED TRANSCRIPT ONLY***

40

| | | |
|---|---|---|
| 02:24:46 | 1 | A.  I don't independently recall, but if that's what you |
| 02:24:48 | 2 | indicated, yes. |
| 02:24:49 | 3 | Q.  I'll represent to you that that is the case. |
| 02:24:52 | 4 | So when you received this file and you did your file |
| 02:24:59 | 5 | by file comparison, you wrote down all those documents as |
| 02:25:04 | 6 | missing from the criminal defense file that were inspect |
| 02:25:06 | 7 | basement file, true? |
| 02:25:08 | 8 | A.  That's correct. |
| 02:25:08 | 9 | Q.  So you accepted at that time when you issued your report |
| 02:25:11 | 10 | that this was a complete criminal defense file that the |
| 02:25:15 | 11 | plaintiff's attorneys were supplying to you? |
| 02:25:19 | 12 | A.  That's correct. |
| 02:25:19 | 13 | Q.  And you didn't notice at all even though there's only two |
| 02:25:23 | 14 | pages of requests to hold over a prisoner in that file that, |
| 02:25:26 | 15 | say, hey, wait a minute, this file is incomplete, you didn't |
| 02:25:30 | 16 | notice that? |
| 02:25:30 | 17 | A.  I acknowledge that that was in error. |
| 02:25:35 | 18 | MR. NOLAND:  Laura, could you pull up defense 245; |
| 02:25:49 | 19 | page 270.  Jon, this is from the prosecutor's file. |
| 02:25:52 | 20 | THE COURT:  Any objection to this? |
| 02:25:53 | 21 | MR. LOEVY:  No, your Honor. |
| 02:25:55 | 22 | THE COURT:  Okay. |
| 02:25:56 | 23 | MR. NOLAND:  Can you highlight the discovery receipt |
| 02:26:00 | 24 | part, Laura?  Thank you. |
| 02:26:03 | 25 | BY MR. NOLAND: |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 42 of 164 PageID #:31077
***REALTIME UNEDITED TRANSCRIPT ONLY***

41

| | | |
|---|---|---|
| 02:26:05 | 1 | Q. So Mr. Brasfield, you understand this document and it's |
| 02:26:10 | 2 | signed at the bottom by Gary Stanton; is that right? |
| 02:26:14 | 3 | A. The attorney in this case. |
| 02:26:15 | 4 | Q. Mr. Stanton was the public defender for Christopher |
| 02:26:19 | 5 | Peoples? |
| 02:26:19 | 6 | A. That's correct. |
| 02:26:19 | 7 | Q. You understand this document that he signed to be |
| 02:26:22 | 8 | acknowledging receipt of materials from the state's attorney's |
| 02:26:24 | 9 | office, true? |
| 02:26:25 | 10 | A. That's true. |
| 02:26:25 | 11 | Q. And the first line says RD, two pages, right? |
| 02:26:29 | 12 | A. Yes. |
| 02:26:30 | 13 | Q. Now, that would be the case report for the case where the |
| 02:26:33 | 14 | initial beat officers respond to the scene and report on what |
| 02:26:36 | 15 | they saw, right? |
| 02:26:37 | 16 | A. It may. |
| 02:26:40 | 17 | Q. You don't know it, you don't know what the RD is? |
| 02:26:42 | 18 | A. I know what an RD is, yes, of course. |
| 02:26:44 | 19 | Q. Is it or it is not the case report that the beat officers |
| 02:26:48 | 20 | did? |
| 02:26:48 | 21 | A. It may be, yes. |
| 02:26:49 | 22 | Q. And then the next line has supp report that's a page. |
| 02:26:54 | 23 | Then if we go down, there's one, two, three, four, five -- six |
| 02:26:59 | 24 | supplemental reports and they have the pages -- three pages |
| 02:27:01 | 25 | and two pages and three and 14 and 14, correct? |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 43 of 164 PageID #:31078
11/29/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

42

| | | |
|---|---|---|
| 02:27:05 | 1 | A.  That's correct. |
| 02:27:05 | 2 | Q.  Are any of those supplementary reports in that file in |
| 02:27:08 | 3 | front of you, sir? |
| 02:27:09 | 4 | A.  I would have to look through them. |
| 02:27:13 | 5 | Q.  I will represent to you that they are not in there? |
| 02:27:15 | 6 | A.  You represent that, I will accept that. |
| 02:27:20 | 7 |         MR. NOLAND:  Laura, can you go to the next page? |
| 02:27:26 | 8 | BY MR. NOLAND: |
| 02:27:26 | 9 | Q.  And the next page of this document, page 271, defendants' |
| 02:27:29 | 10 | 245, again has 8 more supplementary reports with the pages |
| 02:27:39 | 11 | listed on them, correct? |
| 02:27:40 | 12 | A.  That's correct. |
| 02:27:40 | 13 | Q.  Again, it's signed by Gary Stanton as receiving them, |
| 02:27:45 | 14 | right? |
| 02:27:45 | 15 | A.  That's correct. |
| 02:27:46 | 16 |         MR. NOLAND:  Can you go to the next page, Laura. |
| 02:27:50 | 17 | BY MR. NOLAND: |
| 02:27:58 | 18 | Q.  Even more supplementary reports to Mr. Stanton that aren't |
| 02:28:01 | 19 | in that file? |
| 02:28:01 | 20 | A.  That's correct. |
| 02:28:02 | 21 | Q.  Do you see the CS P R. About four lines down, do you know |
| 02:28:08 | 22 | what that is? |
| 02:28:09 | 23 | A.  I don't recall right off the top of my head the CS P R. |
| 02:28:13 | 24 | Q.  Isn't it true it's the crime scene processing report? |
| 02:28:17 | 25 | A.  Yeah. |

11/29/16 PM Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 44 of 164 PageID #:31079
***REALTIME UNEDITED TRANSCRIPT ONLY***

43

| | | |
|---|---|---|
| 02:28:19 | 1 | Q.  Are you aware it's the crime scene processing report? |
| 02:28:22 | 2 | A.  I was not aware -- |
| 02:28:29 | 3 | MR. MICHALIK:  Laura, can you highlight the GPRs 73. |
| 02:28:36 | 4 | BY MR. NOLAND: |
| 02:28:37 | 5 | Q.  What does this signify, Mr. Brasfield? |
| 02:28:38 | 6 | A.  That the public defender, Mr. Stanton, received 73 pages |
| 02:28:42 | 7 | of GPRs. |
| 02:28:43 | 8 | Q.  And you didn't notice at all when you were preparing your |
| 02:28:50 | 9 | report and reviewing the spreadsheet that all of these |
| 02:28:54 | 10 | documents that had been provided to Mr. Stanton, the public |
| 02:28:59 | 11 | defender, were missing from his file; is that correct? |
| 02:29:02 | 12 | MR. LOEVY:  Objection.  There is no foundation.  He |
| 02:29:05 | 13 | didn't have this document.  No foundation. |
| 02:29:08 | 14 | THE COURT:  Rephrase the question. |
| 02:29:09 | 15 | BY MR. NOLAND: |
| 02:29:10 | 16 | Q.  Wouldn't you have liked to have had this discovery receipt |
| 02:29:12 | 17 | before you made the representation in your report that the |
| 02:29:15 | 18 | Chicago Police Department withheld all of these documents from |
| 02:29:17 | 19 | Mr. Stanton?  Wouldn't you have liked to have had that? |
| 02:29:21 | 20 | A.  It certainly would have been helpful. |
| 02:29:22 | 21 | Q.  You wouldn't have made that mistake, would you, of missing |
| 02:29:25 | 22 | dozen and dozens of pages in your report, wouldn't you? |
| 02:29:29 | 23 | A.  I acknowledged -- |
| 02:29:30 | 24 | Q.  Sir, would you have made that mistake? |
| 02:29:32 | 25 | A.  I wouldn't have made that mistake. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 45 of 164 PageID #:31080
***REALTIME UNEDITED TRANSCRIPT ONLY***

44

02:29:33  1  Q.  Would this mistake have been made to you on the

02:29:37  2  spreadsheet by counsel if you had had this discovery receipt?

02:29:40  3  A.  No.

02:29:41  4  Q.  Sir, it was incumbent upon you as an expert before you

02:29:46  5  came in here and gave testimony to look at those prosecutor's

02:29:49  6  files before making any claim of what the Chicago Police

02:29:52  7  Department did or did not produce in any of these cases; isn't

02:29:52  8  that true?

02:29:55  9  A.  No, it is not.

02:30:22  10      MR. NOLAND:  Laura, are you pull up Plaintiff's

02:30:25  11  Exhibit 306-011.

02:30:28  12  BY MR. NOLAND:

02:30:34  13  Q.  Mr. Brasfield, referring your attention to another case,

02:30:39  14  you looked at a case called people v. James Crockett,; is that

02:30:39  15  true?

02:30:44  16  A.  Yes, I did.

02:30:44  17  Q.  And c-r-o-c-k-e-t-t, and this is a document you prepared

02:30:50  18  as attachment F to your report with respect to the allegedly

02:30:55  19  missing from criminal defense file pages, true?

02:30:57  20  A.  That's correct.

02:30:57  21  Q.  And this file had -- this investigative file had 159

02:31:03  22  pages, right?

02:31:04  23  A.  That's correct.

02:31:04  24  Q.  And by the way, Mr. Brasfield, you refer to these as the

02:31:07  25  basement files, correct?

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 46 of 164 PageID #:31081
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:31:08 | 1 | A.  Street files, basement files. |
| 02:31:11 | 2 | Q.  Mr. Brasfield, isn't it true that these files were put |
| 02:31:15 | 3 | into the Chicago Police Department, a basement for storage |
| 02:31:19 | 4 | purposes in the year 2012 when the CPD reorganized its areas |
| 02:31:24 | 5 | from areas 1, 2, 3, 4, and 5 to areas north, central, and |
| 02:31:29 | 6 | south, right? |
| 02:31:29 | 7 | A.  I have no personal knowledge as to how they were moved or |
| 02:31:33 | 8 | who moved them or why they were moved. |
| 02:31:34 | 9 | Q.  And Mr. Brasfield, I'll represent to you that in the |
| 02:31:45 | 10 | missing from criminal defense file section of your report |
| 02:31:47 | 11 | here, that there is approximately 107 pages that you contend |
| 02:31:51 | 12 | are missing, right? |
| 02:31:52 | 13 | A.  I haven't added them up, but that looks to be a fair |
| 02:31:57 | 14 | amount. |
| 02:31:57 | 15 | Q.  And included in this list of documents you say are missing |
| 02:32:05 | 16 | are supplementary reports, all of the general progress |
| 02:32:09 | 17 | reports, correct? |
| 02:32:09 | 18 | A.  I'm sorry.  Would you ask the question again? |
| 02:32:13 | 19 | Q.  Sure. |
| 02:32:14 | 20 | Included in the documents you say are missing are a |
| 02:32:16 | 21 | number of supplementary reports and a number of general |
| 02:32:20 | 22 | progress reports, right? |
| 02:32:20 | 23 | A.  That's correct. |
| 02:32:21 | 24 | Q.  Mr. Brasfield, I'm going to show you Plaintiff's Exhibit |
| 02:32:35 | 25 | 359 which is the criminal defense file that plaintiff's |

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 47 of 164 PageID #:31082
***REALTIME UNEDITED TRANSCRIPT ONLY***

46

| | |
|---|---|
| 02:32:38 | 1 |
| 02:32:52 | 2 |
| 02:33:02 | 3 |
| 02:33:07 | 4 |
| 02:33:08 | 5 |
| 02:33:13 | 6 |
| 02:33:21 | 7 |
| 02:33:31 | 8 |
| 02:33:34 | 9 |
| 02:33:37 | 10 |
| 02:33:40 | 11 |
| 02:33:44 | 12 |
| 02:33:45 | 13 |
| 02:33:54 | 14 |
| 02:33:55 | 15 |
| 02:33:57 | 16 |
| 02:34:03 | 17 |
| 02:34:25 | 18 |
| 02:34:25 | 19 |
| 02:34:29 | 20 |
| 02:34:33 | 21 |
| 02:34:34 | 22 |
| 02:34:41 | 23 |
| 02:34:44 | 24 |
| 02:34:49 | 25 |

1  counsel provided to you for this case.  Mr. Brasfield, I put

2  flags on that exhibit which I provided to you which identified

3  a couple of police reports that are in this file.

4  A.  All right.

5  Q.  If I could point you out the pages.  The first page is

6  Bates stamped 43388, and then the next one, the next report

7  would be 43392.  And then there's also an arrest report for

8  Mr. Crockett of 43116.

9      In reference to those pages, Mr. Brasfield, isn't it

10  true that there aren't any other Chicago Police Department

11  supplementary reports or arrest reports in that particular

12  file in front of you?

13  A.  Without going through the several hundred pages, I had no

14  way of telling.

15  Q.  Okay?

16      MR. NOLAND:  Laura, can you pull up plaintiff's 359,

17  page 43647.

18  BY MR. NOLAND:

19  Q.  Now, Mr. Brasfield, this was the state, the people of the

20  State of Illinois's answer to discovery in this Crockett case

21  that was provided to you, true?

22  A.  I imagine I will be answering some of your questions here.

23  I'm taking you at your word and what you are putting in front

24  of me, but I don't specifically recall this document as we are

25  speaking.  It's argumentative, but.

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 48 of 164 PageID #:31083
***REALTIME UNEDITED TRANSCRIPT ONLY***

47

02:34:52  1  Q. Sir, if you don't understand one of my questions or if you

02:34:56  2  think I'm being too argumentative, please let me know and I'll

02:34:59  3  rephrase it.

02:35:00  4  A. No. Ask your question for me, please, again.

02:35:05  5      MR. NOLAND: Laura, can you just show Mr. Brasfield

02:35:08  6  the whole document so he can see.

02:35:09  7  BY MR. NOLAND:

02:35:10  8  Q. Do you know what this -- first of all, this page, this

02:35:13  9  document was given to you, right?

02:35:14  10  A. It may have been, yes.

02:35:19  11  Q. Well, in the bottom right-hand corner here you have the

02:35:24  12  Bates range of the criminal defense files and this page starts

02:35:27  13  with 43647. This was in a Bates range that you represented in

02:35:33  14  your report that you received?

02:35:34  15  A. Yes, yes.

02:35:35  16  Q. All right.

02:35:36  17      MR. NOLAND: Laura, go back to the whole document so

02:35:41  18  Mr. Brasfield can see it.

02:35:42  19  BY MR. NOLAND:

02:35:43  20  Q. Mr. Brasfield, do you know what this document is?

02:35:44  21  A. It's labeled an answer to discovery from the -- it's

02:35:50  22  people of the State of Illinois, it begins and then three

02:35:57  23  defendants here.

02:35:58  24  Q. Do you know what the significance of this document is in

02:36:02  25  the criminal courts here in Cook County?

11/29/16 PM

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 49 of 164 PageID #:31084
***REALTIME UNEDITED TRANSCRIPT ONLY***

48

| | | |
|---|---|---|
| 02:36:03 | 1 | A.  It would be a -- probably an appeal situation. |
| 02:36:09 | 2 | Q.  Appeals? |
| 02:36:11 | 3 | A.  I don't know. |
| 02:36:12 | 4 | Q.  You don't know what this document is. |
| 02:36:14 | 5 | Sir, I'll represent to you that this document, and |
| 02:36:20 | 6 | you let me know if you disagree, that the people, the |
| 02:36:23 | 7 | prosecutors in the case are required during the case to |
| 02:36:28 | 8 | identify their witnesses and other information on the answer |
| 02:36:31 | 9 | to discovery to provide that to the criminal defense attorney |
| 02:36:34 | 10 | in advance of the trial? |
| 02:36:36 | 11 | A.  Yes, I understand. |
| 02:36:37 | 12 | Q.  Is your recollection refreshed? |
| 02:36:39 | 13 | A.  Yes. |
| 02:36:39 | 14 | Q.  Thank you. |
| 02:36:40 | 15 | And, sir, your understanding is that the names of the |
| 02:36:45 | 16 | witnesses, civilian witnesses and police officers that the |
| 02:36:49 | 17 | prosecutors get and put in these answers to discovery are |
| 02:36:52 | 18 | based upon the police reports that are supplied to them by the |
| 02:36:55 | 19 | police department? |
| 02:36:56 | 20 | A.  That would be one source, yes. |
| 02:37:02 | 21 | Q.  First of all, we have several witnesses, Kevin McElroy |
| 02:37:06 | 22 | m-c-E-l-r-o-y, Heywood Bobo b-o-b-o, and Tyrone Carr |
| 02:37:12 | 23 | c-a-r-r-on the first page.  Do you see that? |
| 02:37:14 | 24 | A.  Yes. |
| 02:37:14 | 25 | Q.  Mr. Brasfield, I'm going to represent to you that those |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 50 of 164 PageID #:31085

| | | |
|---|---|---|
| 02:37:39 | 1 | couple of police reports in the file, the criminal defense |
| 02:37:42 | 2 | file that's in front of you right now, that if you get all the |
| 02:37:46 | 3 | names of witnesses and police officers in those reports, the |
| 02:37:51 | 4 | only ones that could be found are the highlighted names on |
| 02:37:54 | 5 | this answer to discovery.  Okay?  I'm just going to represent |
| 02:37:58 | 6 | that to you.  I know -- you didn't do this analysis, did you? |
| 02:38:02 | 7 | A.  I'm sorry.  You got two questions going on here. |
| 02:38:05 | 8 | MR. LOEVY:  We accept the representation. |
| 02:38:08 | 9 | THE COURT:  Ask another question. |
| 02:38:09 | 10 | BY MR. NOLAND: |
| 02:38:10 | 11 | Q.  Did you conduct any analysis of the answer to discovery on |
| 02:38:13 | 12 | this Crockett case to see whether all the names in here could |
| 02:38:17 | 13 | have been derived from the police reports that are in the |
| 02:38:20 | 14 | criminal defense file provided to you? |
| 02:38:22 | 15 | A.  No, as I testified, I have looked at what material was -- |
| 02:38:28 | 16 | the pages that were in the criminal defense files. |
| 02:38:30 | 17 | Q.  Mr. Brasfield, assume hypothetically that these names that |
| 02:38:33 | 18 | I have highlighted are the only names that are found in that |
| 02:38:36 | 19 | criminal defense file that show up on this answer to discovery |
| 02:38:39 | 20 | that the people filled out and gave to the criminal defense |
| 02:38:43 | 21 | attorney? |
| 02:38:43 | 22 | MR. LOEVY:  Your Honor, we do object to the |
| 02:38:45 | 23 | assumption .  It hasn't been supplied -- we have no way to |
| 02:38:48 | 24 | check it. |
| 02:38:48 | 25 | THE COURT:  Finish the question. |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 51 of 164 PageID #:31086

02:38:49   1   BY MR. NOLAND:

02:38:50   2   Q.  Accepting that -- I'm asking you to accept that

02:38:54   3   hypothetically and that the other names that are not

02:38:56   4   highlighted on this document are found nowhere in that

02:39:00   5   criminal defense file.  Okay?  Those are the hypothetical

02:39:04   6   facts I'd like you to assume.

02:39:06   7   A.  All right.

02:39:07   8   Q.  Isn't it true, sir, that this would be evidence that the

02:39:09   9   criminal defense file supplied to you by the plaintiff's

02:39:12   10  counsel is incomplete because the state's attorney's clearly

02:39:17   11  would have gotten these names from police reports supplied to

02:39:20   12  them by the police department?

02:39:21   13          MR. LOEVY:  Objection.

02:39:21   14          THE COURT:  Is this going to be connected up with

02:39:25   15  another witness?  That's my question to you.

02:39:27   16          MR. NOLAND:  It would be through our expert.

02:39:28   17          THE COURT:  Okay.  Then I'll overrule the objection.

02:39:31   18  I remind the jury that a question is not evidence.

02:39:34   19          All right.  Go ahead and answer.

02:39:36   20          THE WITNESS:  That your hypothetical, I would assume

02:39:40   21  that because there are names here, they must have come from an

02:39:44   22  investigative file, is that your question?

02:39:47   23  BY MR. NOLAND:

02:39:47   24  Q.  That's the point.  Would you agree with that?

02:39:49   25  A.  In your hypothetical, yes.

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 52 of 164 PageID #:31087
***REALTIME UNEDITED TRANSCRIPT ONLY***

51

| | | |
|---|---|---|
| 02:39:55 | 1 | Q.  Thank you. |
| 02:39:57 | 2 | Because the prosecutors aren't -- I mean, in your |
| 02:40:00 | 3 | experience, they are not just making up names out whole cloth |
| 02:40:03 | 4 | as having relevant information to an investigation and |
| 02:40:08 | 5 | supplying it to the criminal defense attorney, correct? |
| 02:40:10 | 6 | MR. LOEVY:  Objection, your Honor. |
| 02:40:10 | 7 | THE COURT:  What's the basis for the objection? |
| 02:40:12 | 8 | MR. LOEVY:  Form of the question and foundation and |
| 02:40:14 | 9 | argumentative. |
| 02:40:14 | 10 | THE COURT:  Sustained. |
| 02:40:16 | 11 | BY MR. NOLAND: |
| 02:40:19 | 12 | Q.  So presuming my hypothetical is true, Mr. Brasfield, which |
| 02:40:22 | 13 | you just acknowledged, that would mean that the information on |
| 02:40:27 | 14 | this chart that was supplied to you and on your attachment F |
| 02:40:31 | 15 | that you typed out would be inaccurate because the criminal |
| 02:40:34 | 16 | defense attorney actually had other police reports that are |
| 02:40:36 | 17 | not in that file in front of you, correct? |
| 02:40:39 | 18 | A.  You would have to have the state's attorney's file to |
| 02:40:45 | 19 | determine that. |
| 02:40:46 | 20 | Q.  Okay. |
| 02:41:28 | 21 | MR. NOLAND:  Judge, could I switch the ELMO, please? |
| 02:41:31 | 22 | THE COURT:  Sure.  There you go. |
| 02:41:34 | 23 | BY MR. NOLAND: |
| 02:41:49 | 24 | Q.  I'm showing the witness what's been marked as Defense |
| 02:41:52 | 25 | Exhibit 203, page 7.  What is this document, Mr. Brasfield? |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 53 of 164 PageID #:31088
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

| | | |
|---|---|---|
| 02:41:57 | 1 | A.  The subpoena duces tecum. |
| 02:42:01 | 2 | MR. LOEVY:  We do object to the state's attorney's |
| 02:42:05 | 3 | files, no foundation for this witness. |
| 02:42:06 | 4 | THE COURT:  I don't know what it is and I'll wait |
| 02:42:08 | 5 | until I get a question. |
| 02:42:08 | 6 | BY MR. NOLAND: |
| 02:42:14 | 7 | Q.  Actually -- |
| 02:42:15 | 8 | THE COURT:  Go ahead and ask a question. |
| 02:42:16 | 9 | BY MR. NOLAND: |
| 02:42:16 | 10 | Q.  This is a document from the investigative files that |
| 02:42:18 | 11 | plaintiff's counsel supplied to you, correct? |
| 02:42:19 | 12 | MR. LOEVY:  I stand corrected, your Honor. |
| 02:42:21 | 13 | THE COURT:  There you go. |
| 02:42:22 | 14 | BY MR. NOLAND: |
| 02:42:22 | 15 | Q.  Mr. Brasfield, isn't this a document that you said was |
| 02:42:24 | 16 | missing from the criminal defense attorney's files that were |
| 02:42:27 | 17 | given to you? |
| 02:42:28 | 18 | A.  Given the volume of material here, I would have to take |
| 02:42:30 | 19 | the time to look and cross-check.  Again, to move things, if |
| 02:42:37 | 20 | you're telling me that that's what's in there, then I'll |
| 02:42:42 | 21 | accept it as an honest question. |
| 02:42:43 | 22 | Q.  I appreciate that for all of us, Mr. Brasfield. |
| 02:42:45 | 23 | Sir, this is a subpoena from the -- |
| 02:42:49 | 24 | MR. NOLAND:  Laura -- |
| 02:42:55 | 25 | BY MR. NOLAND: |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 54 of 164 PageID #:31089
***REALTIME UNEDITED TRANSCRIPT ONLY***

53

| 02:42:55 | 1 | Q. I'll just point here, from a man named Jon Dillon of the |
| 02:43:00 | 2 | state's attorney's office, correct? |
| 02:43:01 | 3 | A. Yes. |
| 02:43:01 | 4 | Q. D-i-l-l-o-n, and this is a document that on this |
| 02:43:07 | 5 | spreadsheet here that plaintiff's counsel told you was missing |
| 02:43:09 | 6 | and you accepted was missing investigative material, correct? |
| 02:43:13 | 7 | A. Yes, I assume that's correct. |
| 02:43:15 | 8 | Q. Mr. Brasfield, a subpoena at the Cook County state's |
| 02:43:21 | 9 | attorney's office that they created can't be missing |
| 02:43:24 | 10 | investigative material that the police department withheld |
| 02:43:27 | 11 | from the state's attorney's office, correct? |
| 02:43:29 | 12 | A. I'm sorry. You will have to ask that again. |
| 02:43:32 | 13 | Q. A subpoena that the state's attorney's office prepared |
| 02:43:35 | 14 | themselves is not investigative material of the police |
| 02:43:40 | 15 | department; isn't that true? |
| 02:43:41 | 16 | A. That would be -- normally, that would be the case. |
| 02:43:44 | 17 | Q. Under what -- and the police department can't withhold |
| 02:43:51 | 18 | from the prosecutor a document that the prosecutor created, |
| 02:43:56 | 19 | correct? |
| 02:43:56 | 20 | A. If a police agency receives copies of legal documents, |
| 02:44:04 | 21 | including subpoena duces tecum or arrest warrants or whatever |
| 02:44:09 | 22 | are generally included in the investigative file in my |
| 02:44:13 | 23 | experience. |
| 02:44:13 | 24 | Q. And the prosecutor has a copy, in your experience, the |
| 02:44:16 | 25 | prosecutor has a copy of the subpoena that he wrote and spent |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 55 of 164 PageID #:31090
***REALTIME UNEDITED TRANSCRIPT ONLY***

54

| 02:44:19 | 1 | to the police department, right? |
|---|---|---|
| 02:44:19 | 2 | A. You would hope so. |
| 02:44:20 | 3 | Q. And I'll show you another one of these pages or another |
| 02:44:27 | 4 | subpoena. |
| 02:44:41 | 5 | A. I recognize the name there. |
| 02:44:42 | 6 | Q. I didn't catch that? |
| 02:44:43 | 7 | THE COURT: Different Noland? |
| 02:44:45 | 8 | MR. NOLAND: That's a different Nolan. |
| 02:44:50 | 9 | THE COURT: Yours has a D. |
| 02:44:51 | 10 | BY MR. NOLAND: |
| 02:44:53 | 11 | Q. I'm showing you what's been marked as Defense Exhibit 287, |
| 02:44:58 | 12 | this is another page and I'll represent to you that it's on |
| 02:45:00 | 13 | this spreadsheet that plaintiff's attorneys and your he have |
| 02:45:04 | 14 | says is missing investigative material from the police |
| 02:45:08 | 15 | department? |
| 02:45:08 | 16 | A. Yes. |
| 02:45:08 | 17 | Q. This subpoena here from my namesake Dan yelled Nolan |
| 02:45:13 | 18 | public defender on behalf of the defendant Tyrone Brown is a |
| 02:45:17 | 19 | subpoena from the public defender to the police department, |
| 02:45:20 | 20 | correct? |
| 02:45:20 | 21 | A. Yes. |
| 02:45:20 | 22 | Q. And once again, a subpoena created by the public defender |
| 02:45:26 | 23 | is not investigative material of the police department, true? |
| 02:45:29 | 24 | A. I found a number of these types of documents in the |
| 02:45:34 | 25 | basement files. |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 56 of 164 PageID #:31091
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

55

| | | |
|---|---|---|
| 02:45:35 | 1 | Q.  And you included them on this spreadsheet, or you and the |
| 02:45:38 | 2 | plaintiff's counsel, as missing investigative material of the |
| 02:45:42 | 3 | police department isn't that true, what's on this spreadsheet? |
| 02:45:46 | 4 | A.  That's correct. |
| 02:45:46 | 5 | Q.  And I've got several more subpoenas and there are a bunch |
| 02:45:49 | 6 | of subpoenas that you included just like these ones on this |
| 02:45:52 | 7 | chart, correct? |
| 02:45:53 | 8 | A.  That's correct. |
| 02:45:59 | 9 | MR. LOEVY:  Object to relevance, your Honor. |
| 02:46:00 | 10 | THE COURT:  Overruled. |
| 02:46:06 | 11 | BY MR. NOLAND: |
| 02:46:10 | 12 | Q.  Mr. Brasfield, some more documents you included on your |
| 02:46:12 | 13 | chart are a series of Illinois state crime lab reports from |
| 02:46:22 | 14 | several of the files; is that true? |
| 02:46:24 | 15 | A.  Yes. |
| 02:46:24 | 16 | Q.  In this exhibit I'm showing you on the ELMO it is marked |
| 02:46:34 | 17 | defendants' 246, page 20.  And there is a cc in the bottom |
| 02:46:40 | 18 | left of this document, correct? |
| 02:46:42 | 19 | A.  Yes. |
| 02:46:42 | 20 | Q.  And who is the cc to? |
| 02:46:43 | 21 | A.  Assistant state's attorney David winter. |
| 02:46:47 | 22 | Q.  And there are -- I have several pages, approximately 10 or |
| 02:46:51 | 23 | 15 of similar Illinois state police reports in my hand.  You |
| 02:46:55 | 24 | would agree that there's several Illinois state police reports |
| 02:46:58 | 25 | with cc's to the prosecutors that you've included on this |

***REALTIME UNEDITED TRANSCRIPT ONLY***

56

| | | |
|---|---|---|
| 02:47:02 | 1 | table as missing investigative material of the Chicago Police |
| 02:47:06 | 2 | Department, true? |
| 02:47:07 | 3 | A.  That's correct. |
| 02:47:07 | 4 | Q.  Mr. Brasfield, what's a cc mean? |
| 02:47:18 | 5 | A.  In the old days, a carbon copy, but a copy. |
| 02:47:24 | 6 | Q.  That means a copy of this report is being supplied to the |
| 02:47:28 | 7 | assistant state's attorneys, correct? |
| 02:47:31 | 8 | A.  It was intended to be routed there, yes, that's correct. |
| 02:47:34 | 9 | Q.  And isn't it true, Mr. Brasfield, you don't have any |
| 02:47:38 | 10 | knowledge that the Illinois State Police, by the way, is the |
| 02:47:42 | 11 | Illinois State Police the same thing as the Chicago Police |
| 02:47:45 | 12 | Department? |
| 02:47:45 | 13 | A.  No. |
| 02:47:45 | 14 | Q.  The Illinois state police has a crime lab is your |
| 02:47:49 | 15 | understanding, right? |
| 02:47:49 | 16 | A.  That's correct. |
| 02:47:50 | 17 | Q.  And in Chicago at least as of 1995 and onward, Illinois |
| 02:47:53 | 18 | State Police handles the forensic, most of the forensic |
| 02:47:58 | 19 | responsibilities for crimes occurring in Chicago, right? |
| 02:48:00 | 20 | A.  That's my understanding. |
| 02:48:00 | 21 | Q.  And do you have any evidence, Mr. Brasfield, that the |
| 02:48:06 | 22 | Illinois State Police scientists when they say that they're |
| 02:48:09 | 23 | ccing a prosecutor are lying? |
| 02:48:14 | 24 | A.  No, it would be my belief and understanding that if it |
| 02:48:17 | 25 | said it was routed there, that's where it would be routed. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 58 of 164 PageID #:31093
***REALTIME UNEDITED TRANSCRIPT ONLY***

57

| | | |
|---|---|---|
| 02:48:19 | 1 | Q.  But, again, these are materials that you were saying? |
| 02:48:26 | 2 | MR. LOEVY:  Objection, your Honor, asked and |
| 02:48:28 | 3 | answered. |
| 02:48:29 | 4 | THE COURT:  Sustained. |
| 02:48:30 | 5 | BY MR. NOLAND: |
| 02:48:30 | 6 | Q.  Showing you the next group of documents, Mr. Brasfield. |
| 02:48:37 | 7 | This would be Exhibit 266, page 130.  It's a several page |
| 02:48:48 | 8 | document.  I am just showing the first page. |
| 02:48:49 | 9 | Mr. Brasfield, isn't it true that this document I am |
| 02:48:52 | 10 | showing you is a felony review blue back from the state's |
| 02:48:57 | 11 | attorney's office? |
| 02:48:57 | 12 | A.  I think that's the common terminology they use. |
| 02:48:59 | 13 | Q.  And once again, Mr. Brasfield, I'll represent to you that |
| 02:49:04 | 14 | this document is on the spreadsheet that the plaintiff's |
| 02:49:06 | 15 | attorneys provided, gave to you and that you guys identified |
| 02:49:08 | 16 | as missing investigative material? |
| 02:49:11 | 17 | A.  Yes. |
| 02:49:12 | 18 | Q.  As with the subpoena, Mr. Brasfield, the Chicago Police |
| 02:49:15 | 19 | Department can't withhold documents from the state's |
| 02:49:19 | 20 | attorney's office that the state's attorney's office actually |
| 02:49:21 | 21 | created, right? |
| 02:49:22 | 22 | A.  They can withhold documents. |
| 02:49:31 | 23 | Q.  So you're saying this document? |
| 02:49:34 | 24 | THE COURT:  I think it was an issue with the phrasing |
| 02:49:36 | 25 | of your question. |

| 02:49:37 | 1 | MR. NOLAND:  Thanks, Judge. |
| 02:49:39 | 2 | BY MR. NOLAND: |
| 02:49:41 | 3 | Q.  Isn't it true that the prosecutors would be in possession |
| 02:49:43 | 4 | of their own felony review blue back, right? |
| 02:49:47 | 5 | A.  I agree with that, yes. |
| 02:49:48 | 6 | Q.  And so this isn't a document that the police department |
| 02:49:53 | 7 | could be withholding from the prosecutors because the |
| 02:49:56 | 8 | prosecutors have it, right? |
| 02:49:57 | 9 | A.  From the prosecutors, but if it's subpoenaed from another |
| 02:50:01 | 10 | source, then that would be a different matter. |
| 02:50:04 | 11 | Q.  You have no evidence with respect to that particular |
| 02:50:10 | 12 | document that the prosecutors withheld it from the criminal |
| 02:50:13 | 13 | defense attorney, do you? |
| 02:50:14 | 14 | A.  No, I do not. |
| 02:50:15 | 15 | Q.  And you don't have any evidence that there was some |
| 02:50:18 | 16 | subpoena that the police department didn't comply with and not |
| 02:50:22 | 17 | provide that particular document to the criminal defense |
| 02:50:24 | 18 | attorney, do you? |
| 02:50:24 | 19 | A.  Not in this particular case, no. |
| 02:50:26 | 20 | Q.  Thank you. |
| 02:50:27 | 21 | Now, Mr. Brasfield, I am going to show you another |
| 02:50:36 | 22 | document, a representative document.  This one has got the |
| 02:50:44 | 23 | Bates stamp defendants' 244, page 120.  This is a statement of |
| 02:50:55 | 24 | Jerome h-o-l-m-e-s, correct? |
| 02:50:58 | 25 | A.  Yes. |

| 02:50:58 | 1 | Q. And Mr. Brasfield, there are dozens and dozens of pages in |
| 02:51:04 | 2 | the criminal defense attorney's files that have been |
| 02:51:06 | 3 | identified -- strike that. |
| 02:51:09 | 4 | There's dozens and dozens the pages from the |
| 02:51:12 | 5 | investigative files that you and the plaintiff's counsel have |
| 02:51:14 | 6 | identified as missing investigative material on this |
| 02:51:18 | 7 | spreadsheet, correct? |
| 02:51:19 | 8 | A. Yes. |
| 02:51:19 | 9 | Q. And these -- this page in front of you that's up on the |
| 02:51:24 | 10 | screen in front of jury and similar documents, this is a |
| 02:51:28 | 11 | document created by the assistant state's attorney from felony |
| 02:51:31 | 12 | review who goes to the police department and takes statements |
| 02:51:34 | 13 | from witnesses; isn't that true? |
| 02:51:37 | 14 | MR. LOEVY:  Objection, your Honor. |
| 02:51:37 | 15 | THE COURT:  Overruled. |
| 02:51:39 | 16 | THE WITNESS:  Correct. |
| 02:51:40 | 17 | THE COURT:  The answer can stand. |
| 02:51:41 | 18 | BY MR. NOLAND: |
| 02:51:42 | 19 | Q. Isn't it true, Mr. Brasfield, that the prosecutor, the |
| 02:51:45 | 20 | assistant felony review prosecutor who goes out to the police |
| 02:51:48 | 21 | department and takes statements like these brings the |
| 02:51:50 | 22 | originals of those statements back to his or her office after |
| 02:51:56 | 23 | taking them, correct? |
| 02:51:57 | 24 | A. I have no independent knowledge of how that works. |
| 02:52:01 | 25 | Q. Okay.  But if -- assuming hypothetically that is the way |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 61 of 164 PageID #:31096
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

60

| | | |
|---|---|---|
| 02:52:06 | 1 | it works, then the prosecutors would be in possession of all |
| 02:52:08 | 2 | of these documents as well? |
| 02:52:09 | 3 | MR. LOEVY:  Objection to the relevance, your Honor, |
| 02:52:11 | 4 | because every document is handled that way. |
| 02:52:13 | 5 | THE COURT:  When you say all of these, you need to |
| 02:52:15 | 6 | specify what all of these are. |
| 02:52:17 | 7 | MR. NOLAND:  Thank you, Judge. |
| 02:52:18 | 8 | THE COURT:  You mean similar documents like this one. |
| 02:52:20 | 9 | MR. NOLAND:  Yes, the Court phrased it a lot better |
| 02:52:22 | 10 | than I did. |
| 02:52:23 | 11 | THE WITNESS:  That if it is the practice of the |
| 02:52:26 | 12 | state's attorney or the prosecutor that generates these |
| 02:52:28 | 13 | documents and they take them back to their office, they would |
| 02:52:32 | 14 | be in possession of them if that's your question. |
| 02:52:36 | 15 | BY MR. NOLAND: |
| 02:52:36 | 16 | Q.  That is my question. |
| 02:52:37 | 17 | So once again, these wouldn't be documents that the |
| 02:52:40 | 18 | police department withheld from the prosecutors because the |
| 02:52:43 | 19 | prosecutors created them and have them, right? |
| 02:52:46 | 20 | A.  I can't agree with that. |
| 02:52:51 | 21 | Q.  It's the prosecutor's duty in the criminal justice |
| 02:53:02 | 22 | materials to provide the materials, the prosecutor receives |
| 02:53:05 | 23 | from the police on the case to the criminal defense attorney, |
| 02:53:07 | 24 | right? |
| 02:53:07 | 25 | A.  That's correct. |

| | | |
|---|---|---|
| 02:53:08 | 1 | Q. So if the prosecutors had these statements, it was |
| 02:53:11 | 2 | incumbent upon -- strike that. |
| 02:53:14 | 3 | If the prosecutors had these statements, these felony |
| 02:53:17 | 4 | review statements that the prosecutor prepared, it would be |
| 02:53:19 | 5 | the prosecutor's duty to provide that to the criminal defense |
| 02:53:22 | 6 | attorney, right? |
| 02:53:23 | 7 | A. I have to answer that question in the context of what I |
| 02:53:28 | 8 | examined, and that if a centralized homicide investigation. |
| 02:53:33 | 9 | MR. NOLAND: Judge. |
| 02:53:34 | 10 | THE WITNESS: Contains documents. |
| 02:53:35 | 11 | THE COURT: Finish the answer. |
| 02:53:39 | 12 | BY MR. NOLAND: |
| 02:53:40 | 13 | Q. Please, Mr. Brasfield. |
| 02:53:41 | 14 | THE COURT: You can finish the answer. |
| 02:53:43 | 15 | THE WITNESS: The police department should turn over |
| 02:53:47 | 16 | everything that they have to the state's attorney's office. |
| 02:53:51 | 17 | There will be duplicative items in there. There may be |
| 02:53:55 | 18 | material that the state's attorney already has, but if you get |
| 02:53:58 | 19 | to a system where you have to pick and choose, well, I think |
| 02:54:02 | 20 | .prosecutor already has this so I don't need to send it, the |
| 02:54:05 | 21 | next step is, well, they probably have this, but I don't need |
| 02:54:09 | 22 | to send it. The simple, keep it simple process is send |
| 02:54:15 | 23 | everything that you have in your files to the prosecutor. |
| 02:54:16 | 24 | BY MR. NOLAND: |
| 02:54:17 | 25 | Q. Mr. Brasfield, the point is that it's the duty of the |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 63 of 164 PageID #:31098
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:54:21 | 1 | prosecutor to provide it to the criminal defense attorney, |
| 02:54:25 | 2 | correct? |
| 02:54:26 | 3 | A.  Yes. |
| 02:54:26 | 4 | MR. LOEVY:  Objection, asked and answered, your |
| 02:54:27 | 5 | Honor. |
| 02:54:27 | 6 | THE COURT:  Overruled.  He can answer. |
| 02:54:30 | 7 | BY MR. NOLAND: |
| 02:54:30 | 8 | Q.  So this would be evidence that the criminal defense files |
| 02:54:34 | 9 | you were supplied are incomplete because you didn't find these |
| 02:54:39 | 10 | felony review state's attorney's documents in those criminal |
| 02:54:42 | 11 | defense files, isn't that fair, yes or no? |
| 02:54:45 | 12 | A.  I. |
| 02:54:45 | 13 | Q.  Yes or no, sir? |
| 02:54:46 | 14 | A.  Ask me the question once more, please. |
| 02:54:50 | 15 | Q.  Isn't it fair that if the -- these documents, these felony |
| 02:54:54 | 16 | review witness statements that we are talking about, you're |
| 02:54:57 | 17 | saying that some of them -- you didn't find them in the |
| 02:54:59 | 18 | criminal defense files, correct? |
| 02:55:01 | 19 | A.  That's correct. |
| 02:55:01 | 20 | Q.  Isn't it in fact true, sir, that that would be some |
| 02:55:04 | 21 | evidence that the criminal evidence files, because it's the |
| 02:55:09 | 22 | prosecutor's responsibility to provide those statements in the |
| 02:55:11 | 23 | prosecutor's possession to the criminal defense attorney, |
| 02:55:13 | 24 | isn't that fair? |
| 02:55:14 | 25 | A.  As I testified. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

63

| | | |
|---|---|---|
| 02:55:15 | 1 | Q.  Isn't that fair? |
| 02:55:17 | 2 | A.  Yes. |
| 02:55:18 | 3 | Q.  Thank you. |
| 02:55:20 | 4 | Showing the witness Exhibit defense 210, page 58. |
| 02:55:38 | 5 | Mr. Brasfield, this is another document.  Strike that. |
| 02:55:42 | 6 | What is this document? |
| 02:55:44 | 7 | A.  It's a post mortem examination report. |
| 02:55:46 | 8 | Q.  It's the autopsy? |
| 02:55:47 | 9 | A.  It's the autopsy report. |
| 02:55:48 | 10 | Q.  The autopsy of the murder victim in this particular case, |
| 02:55:51 | 11 | right? |
| 02:55:51 | 12 | A.  Yes. |
| 02:55:51 | 13 | Q.  And there's a number of post mortems that you identify on |
| 02:55:57 | 14 | this table and as missing investigative material from the |
| 02:56:02 | 15 | Chicago Police Department, right? |
| 02:56:02 | 16 | A.  Yes. |
| 02:56:03 | 17 | Q.  And are there -- are Chicago police officers doing the |
| 02:56:08 | 18 | post mortem? |
| 02:56:08 | 19 | A.  They should be attending them. |
| 02:56:10 | 20 | Q.  Okay.  Are Chicago police officer writing these reports? |
| 02:56:13 | 21 | A.  No. |
| 02:56:13 | 22 | Q.  These reports are done by the coroner, right? |
| 02:56:16 | 23 | A.  That's correct. |
| 02:56:17 | 24 | Q.  And, Mr. Brasfield, wouldn't you expect that in my murder |
| 02:56:27 | 25 | case that a minimally competent criminal defense attorney |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 65 of 164 PageID #:31100

| | | |
|---|---|---|
| 02:56:31 | 1 | would make sure to have the post mortem report on the cause of |
| 02:56:34 | 2 | death before that criminal defense attorney defended their |
| 02:56:38 | 3 | client in the courtroom, wouldn't you expect that? |
| 02:56:40 | 4 | A.  I would expect that. |
| 02:56:41 | 5 | Q.  And if they didn't have that post mortem, wouldn't you |
| 02:56:45 | 6 | expect that they would try to get it, true? |
| 02:56:48 | 7 | A.  I would expect that to be the case. |
| 02:56:54 | 8 | MR. LOEVY:  Objection to relevance, your Honor. |
| 02:56:55 | 9 | THE COURT:  Overruled.  It goes to weight. |
| 02:56:57 | 10 | BY MR. NOLAND: |
| 02:57:04 | 11 | Q.  I am not going to put them on the screen because they are |
| 02:57:07 | 12 | crime scene photographs that you have contended are missing |
| 02:57:10 | 13 | from the criminal defense attorney files.  Just as a |
| 02:57:14 | 14 | representative sample, I'm showing a stack that's about three |
| 02:57:18 | 15 | or four inches thick.  I represent to you that these are crime |
| 02:57:22 | 16 | scene photographs on this table that you and the plaintiff's |
| 02:57:25 | 17 | attorneys have prepared and suggested is missing investigative |
| 02:57:29 | 18 | material? |
| 02:57:29 | 19 | A.  Yes. |
| 02:57:30 | 20 | Q.  Do you accept that representation? |
| 02:57:31 | 21 | A.  Yes. |
| 02:57:34 | 22 | Q.  Same question on the crime scene photographs, sir. |
| 02:57:38 | 23 | Wouldn't you expect a criminal defense attorney, minimally |
| 02:57:41 | 24 | competent, would obtain crime scene photographs of the dead |
| 02:57:45 | 25 | bodies and the crime scene before they march into a courtroom |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 66 of 164 PageID #:31101
***REALTIME UNEDITED TRANSCRIPT ONLY***

65

| | | |
|---|---|---|
| 02:57:47 | 1 | before a jury and try to defend that case, wouldn't you expect |
| 02:57:52 | 2 | that?  Yes or no?  Yes or no, sir? |
| 02:57:54 | 3 | A.  Yes, with an explanation. |
| 02:57:55 | 4 | Q.  Wouldn't you expect that that the prosecutor needs to |
| 02:57:58 | 5 | prove -- one of the things a prosecutor needs to prove is that |
| 02:58:01 | 6 | somebody, in a homicide case, somebody was killed, right? |
| 02:58:04 | 7 |         MR. LOEVY:  Objection to relevance, your Honor. |
| 02:58:06 | 8 |         THE WITNESS:  Yes. |
| 02:58:06 | 9 |         THE COURT:  Overruled. |
| 02:58:07 | 10 | BY MR. NOLAND: |
| 02:58:07 | 11 | Q.  And wouldn't the way to do that, you don't bring the body |
| 02:58:11 | 12 | in, the dead body into the courtroom, do you, sir? |
| 02:58:13 | 13 | A.  Not under normal circumstances, no. |
| 02:58:16 | 14 | Q.  And so the way it's done is that photographs of the |
| 02:58:21 | 15 | victims are shown to the jury just like this jury has seen in |
| 02:58:24 | 16 | this case, right? |
| 02:58:25 | 17 | A.  Depending on the judge's ruling, yes. |
| 02:58:27 | 18 | Q.  Well, the judge might exclude them in case they're too |
| 02:58:31 | 19 | gruesome, right? |
| 02:58:32 | 20 | A.  That's one possibility, yes. |
| 02:58:33 | 21 | Q.  But the point is is that the prosecutor has to get these |
| 02:58:37 | 22 | crime scene photographs before the trial on a murder case in |
| 02:58:40 | 23 | order to prove their case in court isn't that fair? |
| 02:58:43 | 24 | A.  That would be part of a criminal defense attorney's |
| 02:58:48 | 25 | process, I would think. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 67 of 164 PageID #:31102
***REALTIME UNEDITED TRANSCRIPT ONLY***

66

| | | |
|---|---|---|
| 02:58:49 | 1 | Q. And the prosecutor, right? |
| 02:58:51 | 2 | A. I would hope. |
| 02:58:52 | 3 | Q. May I have them? |
| 02:58:55 | 4 | A. Please. |
| 02:58:56 | 5 | Q. But, again, you're contending that all these pages are |
| 02:58:59 | 6 | missing investigative materials from the criminal defense |
| 02:59:02 | 7 | files, right? |
| 02:59:03 | 8 | A. I'm contending that they were not in the criminal defense |
| 02:59:05 | 9 | files that I looked at. |
| 02:59:06 | 10 | Q. And that's it, right, that's all you're doing is that you |
| 02:59:09 | 11 | had a criminal defense attorney file on the one hand, you had |
| 02:59:12 | 12 | a police investigative file on the other, and all you're |
| 02:59:15 | 13 | saying is, well, this piece of paper is not in this pieces of |
| 02:59:18 | 14 | paper, so I'll put it on this chart, right? |
| 02:59:21 | 15 | A. That's correct. |
| 02:59:21 | 16 | Q. And you were make -- you were really not thinking at all |
| 02:59:25 | 17 | of whether or not that document in '99.9 percent likelihood |
| 02:59:31 | 18 | was the in the possession of that prosecutor at the time of |
| 02:59:33 | 19 | the trial, you didn't take that into account at all, did you? |
| 02:59:36 | 20 | MR. LOEVY: Objection to the suggestion that 99 |
| 02:59:38 | 21 | percent, your Honor. We have been accepting the |
| 02:59:41 | 22 | representations, but we don't accept that one. |
| 02:59:43 | 23 | THE COURT: The answer can stand. Sustained as to |
| 02:59:50 | 24 | the form of the question. What what understood of the |
| 03:00:03 | 25 | objection. |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 68 of 164 PageID #:31103
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

67

| | | |
|---|---|---|
| 03:00:03 | 1 | BY MR. NOLAND: |
| 03:00:06 | 2 | Q.  Mr. Brasfield, I think you characterized it as a mistake |
| 03:00:09 | 3 | with respect to the Anima case, do you remember that? |
| 03:00:12 | 4 | A.  Yes. |
| 03:00:12 | 5 | THE COURT:  Let's pause.  Let's take our mid |
| 03:00:14 | 6 | afternoon right here.  We are going to break for ten minutes. |
| 03:00:17 | 7 | I will be right back out. |
| 03:00:50 | 8 | (The jury leaves the courtroom.). |
| 03:00:50 | 9 | THE COURT:  Since you are being questioned by the |
| 03:00:52 | 10 | other side's lawyer, you can't discuss your testimony, but you |
| 03:00:55 | 11 | can take a break. |
| 03:00:55 | 12 | THE WITNESS:  Thank you, sir. |
| 03:00:57 | 13 | THE COURT: |
| 03:12:49 | 14 | (The jury enters the courtroom.) |
| 03:12:50 | 15 | THE COURT:  Okay.  Everybody can have a seat.  Mr. |
| 03:12:58 | 16 | Noland, you can go ahead. |
| 03:12:58 | 17 | MR. NOLAND:  Thank you, your Honor. |
| 03:12:59 | 18 | BY MR. NOLAND: |
| 03:13:03 | 19 | Q.  Mr. Brasfield, to pick up what we were talking about, you |
| 03:13:08 | 20 | did a side by side comparison of the police investigative file |
| 03:13:12 | 21 | on the one hand and then the criminal defense attorney's file |
| 03:13:15 | 22 | and then the documents that were not in the investigative file |
| 03:13:18 | 23 | and in the criminal defense file were labeled missing |
| 03:13:23 | 24 | investigatory? |
| 03:13:23 | 25 | A.  That's correct. |

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 69 of 164 PageID #:31104
***REALTIME UNEDITED TRANSCRIPT ONLY***

68

03:13:24   1   Q.  So the point I was making, you weren't doing any

03:13:28   2   qualitative analysis of the documents to think, you know what,

03:13:31   3   this document more than likely would have been in the criminal

03:13:35   4   defense attorney's files so that the criminal defense

03:13:38   5   attorney's files given to me have to be complete, you weren't

03:13:41   6   making that analysis, correct?

03:13:42   7   A.  No.

03:13:43   8   Q.  Mr. Brasfield, I'd like to talk to you about the Anima

03:13:46   9   case that Mr. Loevy brought up with you.

03:13:54   10              MR. NOLAND:  Laura, can you bring up Plaintiff's

03:14:00   11   Exhibit 306, page 19.  Thanks, Judge.

03:14:06   12   BY MR. NOLAND:

03:14:16   13   Q.  Mr. Brasfield, I'm showing you the portion of the Anima

03:14:18   14   file that I showed you at your deposition o-c-t-a-v-i-a, when

03:14:23   15   I brought this issue to your attention.  Do you remember that?

03:14:25   16   A.  Yes, I do.

03:14:26   17   Q.  And what we had talked about at the deposition is that you

03:14:28   18   were contending in your report that there were 110 pages from

03:14:32   19   the police investigative file that were not in the criminal

03:14:35   20   defense attorney's file, right?

03:14:36   21   A.  It's reflected in the spreadsheet, yes.

03:14:39   22   Q.  And that we had actually found in there that about 100 of

03:14:42   23   those pages actually were in the criminal defense attorney's

03:14:46   24   files and you guys missed it, right?

03:14:47   25   A.  That there was a typographical error in the spreadsheet.

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 70 of 164 PageID #:31105
***REALTIME UNEDITED TRANSCRIPT ONLY***

69

| | | |
|---|---|---|
| 03:14:51 | 1 | Q. And so you testified that that was a typographical error. |
| 03:14:54 | 2 | I'm showing you Plaintiff's Exhibit 306, page 19 up on the |
| 03:15:00 | 3 | screen. And this is the document that is attachment F to your |
| 03:15:04 | 4 | report, right? |
| 03:15:05 | 5 | A. Yes. |
| 03:15:05 | 6 | Q. And you typed up this report personally, right? |
| 03:15:07 | 7 | A. I did. |
| 03:15:08 | 8 | Q. And it was while you were doing the file by file |
| 03:15:10 | 9 | comparison, right? |
| 03:15:11 | 10 | A. Yes. |
| 03:15:11 | 11 | Q. And I've highlighted for you that I'll represent to you |
| 03:15:16 | 12 | the pages that you said were not in the criminal defense |
| 03:15:22 | 13 | attorney's file and that were in fact were and that the |
| 03:15:26 | 14 | typographical error had been made? |
| 03:15:28 | 15 | A. That's correct. |
| 03:15:28 | 16 | Q. You typed in Lee's report page 82189-91, correct? |
| 03:15:34 | 17 | A. Correct. |
| 03:15:34 | 18 | Q. And that's under the phrase missing from criminal defense |
| 03:15:37 | 19 | attorney file. Could you highlight that one? |
| 03:15:40 | 20 | A. That's correct. |
| 03:15:41 | 21 | Q. And then you typed in arrest report 82192, correct? |
| 03:15:49 | 22 | A. Correct. |
| 03:15:49 | 23 | Q. And then you typed in computer screen shot, correct? |
| 03:15:52 | 24 | A. Yes. |
| 03:15:52 | 25 | Q. And then you typed in criminal history report and you gave |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 71 of 164 PageID #:31106
***REALTIME UNEDITED TRANSCRIPT ONLY***

70

| | | |
|---|---|---|
| 03:15:55 | 1 | the number 82194, right? |
| 03:15:57 | 2 | A.  I typed all of those. |
| 03:15:58 | 3 | Q.  And that number 82194 is the number of the basement file |
| 03:16:02 | 4 | that you couldn't find in the criminal defense attorney's |
| 03:16:05 | 5 | file, right? |
| 03:16:05 | 6 | A.  It was not on the spreadsheet, yes. |
| 03:16:09 | 7 | Q.  And so what you -- and you said that you were conducting a |
| 03:16:14 | 8 | case by case comparison yourself, right? |
| 03:16:17 | 9 | A.  Yes. |
| 03:16:18 | 10 | Q.  Now, Mr. Brasfield, what's up on the screen before the |
| 03:16:24 | 11 | jury, that's quite a long typo, isn't it? |
| 03:16:27 | 12 | A.  Well, the typo represents, as I've said, on the |
| 03:16:30 | 13 | spreadsheet itself, I had that it was missing Bates pages 173 |
| 03:16:46 | 14 | to 2 something and in the back it should have been 2 something |
| 03:16:50 | 15 | to 2 something. |
| 03:16:51 | 16 | Q.  The typo was on the spreadsheet, right? |
| 03:16:54 | 17 | A.  It was an error, I admit that. |
| 03:16:56 | 18 | Q.  The typo was on the spreadsheet? |
| 03:16:59 | 19 | A.  Yes. |
| 03:17:00 | 20 | Q.  And when you were doing your case by case analysis then |
| 03:17:02 | 21 | and you typed in leads report 82189 and so and so on, you were |
| 03:17:09 | 22 | representing that you were looking at those two files side by |
| 03:17:12 | 23 | side and you were confirming that those pages were not in the |
| 03:17:15 | 24 | Anima file? |
| 03:17:16 | 25 | A.  That's what I should have been doing, yes. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 72 of 164 PageID #:31107
***REALTIME UNEDITED TRANSCRIPT ONLY***

71

| | | |
|---|---|---|
| 03:17:17 | 1 | Q. But for this particular case, it's pretty evidence, |
| 03:17:21 | 2 | Mr. Brasfield, you didn't do that case by case analysis at |
| 03:17:24 | 3 | all, did you? |
| 03:17:24 | 4 | A. That's not correct. I did. |
| 03:17:28 | 5 | Q. Mr. Brasfield, if you did a case by case analysis yourself |
| 03:17:33 | 6 | of this Anima case, how could you possibly include all of the |
| 03:17:37 | 7 | information that's highlighted on the jury that's in front of |
| 03:17:39 | 8 | them, how could that have happened? |
| 03:17:41 | 9 | A. I hate to admit it, but I made a mistake. |
| 03:17:46 | 10 | Q. So you thought that you saw LEADS report in the criminal |
| 03:17:51 | 11 | defense file and you typed it in? |
| 03:17:52 | 12 | A. I typed it in. This is my magic fingers on the computer. |
| 03:17:56 | 13 | I did it. |
| 03:17:56 | 14 | Q. And then you thought that you saw that arrest report 82192 |
| 03:18:01 | 15 | in that file and you typed it in? |
| 03:18:02 | 16 | A. That's correct. |
| 03:18:02 | 17 | Q. And you thought that you saw that computer screen shot in |
| 03:18:08 | 18 | the criminal defense file? |
| 03:18:10 | 19 | A. Yes. |
| 03:18:11 | 20 | Q. As you're sitting there comparing the files one next to |
| 03:18:14 | 21 | the other? |
| 03:18:14 | 22 | MR. LOEVY: Judge, asked and answered, your Honor. |
| 03:18:15 | 23 | THE COURT: Sustained. |
| 03:18:16 | 24 | BY MR. NOLAND: |
| 03:18:18 | 25 | Q. Mr. Brasfield, isn't it in fact true that you didn't do |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 73 of 164 PageID #:31108
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

| 03:18:21 | 1 | any case by case comparison of any of these cases, you just |
|---|---|---|

03:18:21   1   any case by case comparison of any of these cases, you just

03:18:25   2   accepted this spreadsheet that the plaintiff's attorneys gave

03:18:28   3   to you and regurgitated it onto your paper?

03:18:31   4   A.  That is not correct.

03:18:47   5        MR. NOLAND:  Judge, if I may go back the ELMO,

03:18:54   6   please.

03:18:54   7        THE COURT:  Okay.

03:18:55   8   BY MR. NOLAND:

03:19:00   9   Q.  Mr. Loevy had talked to you about something called a court

03:19:02   10   attendance report and you acknowledged with Mr. Loevy that you

03:19:13   11   included on this table and the plaintiff's attorneys did a

03:19:19   12   number of those court attendance sheets as missing

03:19:22   13   investigative material, correct?

03:19:23   14   A.  That's correct.

03:19:23   15   Q.  And just at the top, that's a court attendance report for

03:19:34   16   a detective Harrington who was required to show up in court

03:19:39   17   for this particular case, right?

03:19:40   18   A.  That's correct.

03:19:40   19   Q.  And I think you acknowledged that this is purely

03:19:44   20   administrative document that is not investigative in nature,

03:19:47   21   correct?

03:19:47   22   A.  No, I think what I said was is that it's intended as an

03:19:51   23   administrative document but could be used in some

03:19:54   24   investigative value to establish either a lead as to who might

03:20:00   25   have been possibly involved in the case that was not disclosed

03:20:05   1   or to either provide an alibi or discredit an alibi.

03:20:11   2   Q.  Mr. Brasfield, I just highlighted what it states on there.

03:20:15   3   Trial in progress, correct?

03:20:16   4   A.  Yes.

03:20:17   5   Q.  So this is a detective actually showing up in court while

03:20:19   6   the trial is proceeding.  That's what it appears to be, right?

03:20:22   7   A.  Yes.

03:20:23   8   Q.  And so is it your testimony that you want the Chicago

03:20:26   9   Police Department detectives and officers when they show up in

03:20:28   10  court and do their paperwork proving that that they're

03:20:31   11  supposed to fill out a court attendance report and turn it

03:20:35   12  into their supervisors, right, so they can get paid?

03:20:37   13  A.  That's correct.

03:20:37   14  Q.  And then you want them to also walk over to the criminal

03:20:40   15  defense attorneys and say, hey, by the way, I know you saw me

03:20:45   16  in court and hey, that's me?

03:20:47   17  A.  That's not what I am saying.  It should be included in the

03:20:50   18  centralized investigative file.

03:20:52   19  Q.  The point is it's not created until the time of trial, so

03:20:55   20  it couldn't have been produced to the criminal defense

03:20:57   21  attorney because they're at trial, it's created at trial,

03:21:01   22  right?

03:21:01   23  A.  It's part of the record.

03:21:02   24  Q.  Mr. Brasfield, I'm showing you a packet of documents from

03:21:36   25  the relative to the murder of Melvin Rodriguez which is one of

11/29/16 PM   Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 75 of 164 PageID #:31110
***REALTIME UNEDITED TRANSCRIPT ONLY***

74

| | | |
|---|---|---|
| 03:21:42 | 1 | the cases.  This is a document in a series of documents you |
| 03:21:46 | 2 | stated are missing investigative material.  It's Bates number |
| 03:21:49 | 3 | D-221-003.  I'm going to show you the date of this |
| 03:21:58 | 4 | document,May 2000.  And I'm going to represent to you that -- |
| 03:22:04 | 5 | I'll show it to you if you'd like that this packet all deals |
| 03:22:08 | 6 | with investigation in this particular homicide in the year |
| 03:22:11 | 7 | 2000.  Do you want to take a look at that? |
| 03:22:14 | 8 | A.  I have done a quick scan of it, yes. |
| 03:22:29 | 9 | Q.  On the first page, does that indicate when the homicide |
| 03:22:31 | 10 | occurred? |
| 03:22:32 | 11 | A.  I don't see it on the first page, right. |
| 03:22:39 | 12 | Q.  I thought I saw it on there.  If I could take a look at |
| 03:22:42 | 13 | it. |
| 03:22:43 | 14 | A.  It may be. |
| 03:22:45 | 15 | Q.  Just right here, above name prisoners wanted for the |
| 03:22:50 | 16 | investigation of a homicide from 1 July 1985.  Do you see |
| 03:22:53 | 17 | that? |
| 03:22:54 | 18 | A.  I see that.  I am not arguing with it.  It just says |
| 03:22:58 | 19 | investigation of a homicide from 1 July 1985.  If that means |
| 03:23:03 | 20 | that's when a homicide occurred. |
| 03:23:04 | 21 | Q.  Okay.  I'll represent to you, Mr. Brasfield, that this is |
| 03:23:09 | 22 | the Ruben Avalez, I don't know if you remember that name, the |
| 03:23:09 | 23 | Rube Avalez criminal defense attorney's file that the |
| 03:23:21 | 24 | plaintiff's counsel gave you and you put on your spreadsheet. |
| 03:23:21 | 25 | Do you remember that name? |

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 76 of 164 PageID #:31111
***REALTIME UNEDITED TRANSCRIPT ONLY***

75

| 03:23:22 | 1 | A.  It's possible.  There were a lot of names. |
| 03:23:23 | 2 | Q.  Now, isn't it true, Mr. Brasfield, that the criminal |
| 03:23:27 | 3 | defense attorneys that the plaintiff's attorneys supplied to |
| 03:23:30 | 4 | you was relative to a trial of Mr. Ruben Avalez that occurred |
| 03:23:35 | 5 | in the mid 1980s, do you remember that? |
| 03:23:38 | 6 | A.  I would have to look at my documents.  Again, if what |
| 03:23:43 | 7 | you're telling me is correct, then I'll just say yes. |
| 03:23:46 | 8 | Q.  Okay. |
| 03:23:47 | 9 | A.  Otherwise, if this was a criminal trial, I would be saying |
| 03:23:50 | 10 | I have to look at my records. |
| 03:23:51 | 11 | Q.  I think we all appreciate that.  Thank you. |
| 03:23:53 | 12 | A.  All right. |
| 03:23:54 | 13 | Q.  And the point I'm making is that the file given to you was |
| 03:23:58 | 14 | from a criminal prosecution in the mid 1980s and the packet of |
| 03:24:02 | 15 | documents in front of you which you state are missing from the |
| 03:24:06 | 16 | criminal defense attorney's file were created about 15 years |
| 03:24:09 | 17 | later.  Okay? |
| 03:24:10 | 18 | A.  All right. |
| 03:24:14 | 19 | Q.  Do you have that? |
| 03:24:15 | 20 | Mr. Brasfield, isn't it true that documents created |
| 03:24:18 | 21 | 15 years after the fact couldn't have been withheld from a |
| 03:24:22 | 22 | criminal defense attorney 15 years before in 1987? |
| 03:24:27 | 23 | A.  Sure. |
| 03:24:28 | 24 | Q.  So if you had thought about it at all before putting it on |
| 03:24:31 | 25 | this spreadsheet in your report, you would have said, wait a |

11/29/16 PM     Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 77 of 164 PageID #:31112
***REALTIME UNEDITED TRANSCRIPT ONLY***

76

| | | |
|---|---|---|
| 03:24:36 | 1 | minute, these documents were created after the fact so there |
| 03:24:39 | 2 | is no way they could have been in the criminal defense |
| 03:24:41 | 3 | attorney's file, correct? |
| 03:24:42 | 4 | A.  No, that's not correct.  What I tried to do herewith this |
| 03:24:46 | 5 | spreadsheet is to provide information that both sides can take |
| 03:24:51 | 6 | a look at and you can weigh the value, you can evaluate what |
| 03:24:57 | 7 | you want with it.  I strictly looked at what was in the |
| 03:25:00 | 8 | investigative file and what was in the criminal defense file. |
| 03:25:04 | 9 | That's just the objective process. |
| 03:25:06 | 10 | Q.  Without any thought one way or another of whether or not |
| 03:25:10 | 11 | the stuff in fact was withheld by the police from the criminal |
| 03:25:16 | 12 | defense, right? ; am I correct? I'm sorry.  I didn't get the |
| 03:25:22 | 13 | answer? |
| 03:25:22 | 14 | A.  I'm sorry.  Ask the question again. |
| 03:25:24 | 15 | Q.  That is without any thought whatsoever before stating that |
| 03:25:28 | 16 | it's missing investigative material in your report that in |
| 03:25:30 | 17 | fact it was withheld from the police department from the |
| 03:25:36 | 18 | criminal defense attorney, without thinking about that at all? |
| 03:25:38 | 19 | A.  That's correct. |
| 03:25:39 | 20 | Q.  Thank you. |
| 03:25:42 | 21 |     In fact, you don't have any personal knowledge on any |
| 03:25:45 | 22 | of these 50 cases at issue that any of the documents were |
| 03:25:49 | 23 | withheld from the Chicago Police Department from these |
| 03:25:51 | 24 | criminal defense counsel, correct? |
| 03:25:53 | 25 | A.  I can draw some generalized inferences which I did. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 78 of 164 PageID #:31113
***REALTIME UNEDITED TRANSCRIPT ONLY***

77

| 03:25:57 | 1 | Q. I'm asking you, you said you don't have any specific |
| 03:26:01 | 2 | knowledge that any specific piece of paper in any of these 50 |
| 03:26:04 | 3 | or 51 cases was actually withheld by the police department |
| 03:26:06 | 4 | from anybody in the criminal process, true? |
| 03:26:08 | 5 | A. I stated. |
| 03:26:09 | 6 | Q. That's it, yes or no, sir? |
| 03:26:10 | 7 | A. Yes, I've stated that in my report. |
| 03:26:13 | 8 | Q. I'm sorry. Did you say yes? |
| 03:26:14 | 9 | THE COURT: Okay. Enough. Next question. |
| 03:26:16 | 10 | MR. NOLAND: Thank you, Judge. |
| 03:26:17 | 11 | BY MR. NOLAND: |
| 03:26:21 | 12 | Q. Mr. Brasfield, you've talked about to/from memoranda? |
| 03:26:26 | 13 | A. Yes. |
| 03:26:26 | 14 | Q. And you identified some to/from memoranda in your report |
| 03:26:39 | 15 | as missing from the file, files. |
| 03:26:43 | 16 | Showing you a series of these. One is Exhibit D |
| 03:26:49 | 17 | 230-129. And you will see this is a September 23rd, 2014, |
| 03:27:01 | 18 | subpoena in this particular case; is that right? |
| 03:27:04 | 19 | A. Yes. |
| 03:27:04 | 20 | Q. And so similar to my last question to Mr. Brasfield, and |
| 03:27:10 | 21 | there is a packet of these, these documents that were created |
| 03:27:13 | 22 | well after the criminal defense attorney's files -- well after |
| 03:27:17 | 23 | the criminal trials could not have been in the criminal |
| 03:27:20 | 24 | defense attorney's files at the time of the criminal |
| 03:27:22 | 25 | prosecutions, correct? |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 79 of 164 PageID #:31114
***REALTIME UNEDITED TRANSCRIPT ONLY***

78

| | | |
|---|---|---|
| 03:27:22 | 1 | A. But they also represent -- |
| 03:27:24 | 2 | Q. Is that true, sir? |
| 03:27:25 | 3 | A. To your specific question, which is -- yes. |
| 03:27:29 | 4 | Q. But another specific question, you put them on the table |
| 03:27:34 | 5 | and in your report as missing investigative material, correct? |
| 03:27:37 | 6 | A. That's correct. |
| 03:27:37 | 7 | Q. Now, Mr. Brasfield, you talked about the Jones and Palmer |
| 03:27:51 | 8 | case a little bit about Mr. Loevy, correct? |
| 03:27:53 | 9 | A. Yes. |
| 03:27:53 | 10 | Q. And you talked about the process by which special order |
| 03:27:58 | 11 | 83-1 went into place in about January 1983, correct? |
| 03:28:02 | 12 | A. Yes. |
| 03:28:03 | 13 | Q. And you talked about how then with the Court and the |
| 03:28:07 | 14 | plaintiff's attorneys the special order was revised pursuant |
| 03:28:10 | 15 | to some of the Court's comments and that was done four months |
| 03:28:14 | 16 | later in May of 1983 by the police department, correct? |
| 03:28:17 | 17 | A. That's correct. |
| 03:28:17 | 18 | Q. Mr. Brasfield, you've also talked about, I think you |
| 03:28:26 | 19 | referenced something called a murder book, right? |
| 03:28:28 | 20 | A. Yes. |
| 03:28:28 | 21 | Q. So you've seen or at least in Seattle or some other |
| 03:28:31 | 22 | jurisdictions that investigative detectives would have a |
| 03:28:34 | 23 | murder book on a particular homicide, right? |
| 03:28:36 | 24 | A. Yes. |
| 03:28:36 | 25 | Q. Now, a murder book is simply another way of saying that |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 80 of 164 PageID #:31115
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

03:28:42    1    the file on that case in that particular jurisdiction?

03:28:46    2    A.  That's police parlance generally speaking for that.

03:28:49    3    Q.  And certainly in that murder book there could be documents

03:28:54    4    such as a crime lab type document, they might have a DNA

03:28:59    5    analysis in the recent times, not in the old times or some

03:29:03    6    type of other document that might have some source documents

03:29:08    7    elsewhere, correct?

03:29:09    8    A.  That's correct.

03:29:10    9    Q.  But if it was in the murder book and referenced in the

03:29:14    10   murder book that the prosecutors and the criminal defense

03:29:16    11   attorneys would know, oh, hey, the crime lab did a report on

03:29:19    12   this case, it's right here in the file, you know, maybe they

03:29:22    13   have some additional source documents I might want to get,

03:29:28    14   correct?

03:29:28    15   A.  No, that's not correct.  My response to your original

03:29:31    16   question was physical evidence.  Obviously, you are not going

03:29:33    17   to have shells from a gun or blood splatter, clothing, but

03:29:43    18   you'll actually have a report from the crime lab.

03:29:47    19   Q.  Sir, in fact, if you had an example of say if the Marine

03:29:51    20   patrol unit was involved in a particular case and there was a

03:29:54    21   reference to it in the murder book, that the prosecutor would

03:29:56    22   know, hey, you know, there could be some other documents over

03:29:59    23   at the marine patrol unit that I might want to grab; isn't

03:29:59    24   that true?

03:30:05    25   A.  Not in the types of murder investigations that I'm

03:30:07  1  familiar with.

03:30:07  2  Q.  Mr. Brasfield, at your deposition at page 201, line 9,

03:30:14  3  isn't it true that you were asked this question and gave this

03:30:17  4  answer?

03:30:17  5      "QUESTION:  So that the prosecutor will be able to read

03:30:20  6  that in the murder book and then they could also contact the

03:30:23  7  Marine patrol unit to see if they had any additional

03:30:26  8  documentation; is that correct?

03:30:27  9      "ANSWER:  That would be how -- that would be how it

03:30:30  10  would normally work."

03:30:31  11      MR. LOEVY:  Objection.

03:30:31  12  BY MR. NOLAND:

03:30:33  13  Q.  That question was asked and that answer was given?

03:30:36  14  A.  Yes.

03:30:36  15      MR. LOEVY:  We object, your Honor.  It's not

03:30:38  16  impeaching.

03:30:38  17      THE COURT:  It's a question.  The objection is

03:30:40  18  overruled.

03:30:41  19      THE WITNESS:  I would have to see it in the context.

03:30:43  20      MR. NOLAND:  Sir.

03:30:45  21      THE COURT:  I overruled the objection.  He said he

03:30:48  22  would have to see it in the context.

03:30:51  23  BY MR. NOLAND:

03:30:52  24  Q.  The question was that was asked --

03:30:55  25      THE COURT:  You are going to have to show it to him.

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 82 of 164 PageID #:31117
***REALTIME UNEDITED TRANSCRIPT ONLY***

81

| | | |
|---|---|---|
| 03:30:58 | 1 | There is a potential Rule 106 issue. |
| 03:31:00 | 2 | MR. NOLAND:  Okay. |
| 03:31:11 | 3 | THE WITNESS:  This section here? |
| 03:31:12 | 4 | BY MR. NOLAND: |
| 03:31:13 | 5 | Q.  Yeah, I read from you beginning at line 9 to 13.  That's |
| 03:31:18 | 6 | what I just read to you? |
| 03:31:19 | 7 | A.  That would be an accurate recounting of what I said at |
| 03:31:27 | 8 | that part of the deposition in the context of the entire |
| 03:31:30 | 9 | deposition. |
| 03:31:30 | 10 | Q.  Thank you, sir. |
| 03:31:31 | 11 | Just one question.  Did you rely -- I am going to |
| 03:32:07 | 12 | show you Exhibit F of your report.  Is there a case in here |
| 03:32:13 | 13 | called Fulton? |
| 03:32:14 | 14 | A.  In the attachment F which is the investigative base? |
| 03:32:30 | 15 | Q.  I'm showing you, yes, attachment F where you list on pages |
| 03:32:34 | 16 | 2 and 3, that's where you list the table of contents of the 50 |
| 03:32:39 | 17 | or so files that you compared? |
| 03:32:41 | 18 | A.  And the name you were asking? |
| 03:32:43 | 19 | Q.  Fulton. |
| 03:33:00 | 20 | A.  I don't see it initially. |
| 03:33:03 | 21 | Q.  Thanks. |
| 03:33:10 | 22 | MR. NOLAND:  If I may have a moment, your Honor. |
| 03:33:12 | 23 | THE COURT:  Sure. |
| 03:33:12 | 24 | (Brief pause.) |
| 03:33:18 | 25 | MR. NOLAND:  Thank you, Mr. Brasfield.  Thank you, |

***REALTIME UNEDITED TRANSCRIPT ONLY***

82

| 03:33:23 | 1 | your Honor. |
| 03:33:23 | 2 | THE COURT: Mr. Kulwin. |
| 03:33:24 | 3 | - - - |
| 03:33:24 | 4 | MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION |
| 03:33:24 | 5 | BY MR. KULWIN: |
| 03:34:31 | 6 | Q. Mr. Brasfield, a detective conducting a homicide |
| 03:34:53 | 7 | investigation isn't required to take notes in your opinion? |
| 03:34:57 | 8 | MR. LOEVY: Objection, your Honor. That subject was |
| 03:34:59 | 9 | covered. |
| 03:34:59 | 10 | MR. KULWIN: No, Judge. |
| 03:35:00 | 11 | MR. LOEVY: Notes was covered. |
| 03:35:02 | 12 | THE COURT: The objection is overruled to this |
| 03:35:03 | 13 | particular question. The rule of duplication applies. I'll |
| 03:35:08 | 14 | see where it goes. |
| 03:35:09 | 15 | BY MR. KULWIN: |
| 03:35:11 | 16 | Q. Let me start over. |
| 03:35:12 | 17 | Mr. Brasfield, a detective in a homicide |
| 03:35:14 | 18 | investigation isn't required to take notes as he gathers |
| 03:35:17 | 19 | information, correct? |
| 03:35:18 | 20 | A. It depends on the agency. |
| 03:35:21 | 21 | Q. Okay. But you agree that some detectives have super |
| 03:35:26 | 22 | memories and they can remember stuff, it looks in their mind |
| 03:35:31 | 23 | and then they can keep it in their mind until they write a |
| 03:35:35 | 24 | written report, correct? |
| 03:35:35 | 25 | A. It's theoretically possible, yes. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 84 of 164 PageID #:31119
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

83

| | | |
|---|---|---|
| 03:35:37 | 1 | Q. And you actually believe that yourself; isn't that true? |
| 03:35:41 | 2 | A. I don't think it's the best practice. |
| 03:35:42 | 3 | Q. But you agree it can be done, right? |
| 03:35:44 | 4 | A. It can be done. |
| 03:35:45 | 5 | Q. Okay. And in fact, isn't it true that at times when a |
| 03:35:54 | 6 | detective is talking to somebody, if someone says during the |
| 03:35:57 | 7 | course of their statement that they happen to remember seeing |
| 03:36:00 | 8 | such and such standing on a corner, they would lock it into |
| 03:36:03 | 9 | their memory, they being the detective, and by the time they |
| 03:36:06 | 10 | left to do a follow-up report if they were going to do one, |
| 03:36:08 | 11 | they would have that, correct? |
| 03:36:09 | 12 | A. If they did a follow-up report in a timely manner, within |
| 03:36:13 | 13 | a short period of time. |
| 03:36:14 | 14 | Q. Right. |
| 03:36:15 | 15 | So the answer is yes, you don't have a problem with a |
| 03:36:17 | 16 | detective talking to a witness? |
| 03:36:19 | 17 | MR. LOEVY: Objection, asked and answered, your |
| 03:36:20 | 18 | Honor. |
| 03:36:21 | 19 | THE COURT: Sustained. |
| 03:36:21 | 20 | BY MR. KULWIN: |
| 03:36:30 | 21 | Q. Now, did I hear you correctly that you said you spent 150 |
| 03:36:40 | 22 | hours preparing your report? |
| 03:36:40 | 23 | A. Somewhere in that -- not preparing the report, but in |
| 03:36:44 | 24 | reviewing the material. |
| 03:36:44 | 25 | Q. So you spent 150 hours in reviewing the material and then |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 85 of 164 PageID #:31120
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

84

| 03:36:50 | 1 | writing the report? |

03:36:50    1   writing the report?

03:36:50    2   A.  I billed, if I recall, somewhere in that area.

03:36:55    3   Q.  I just want to get the time right.  Are you saying that

03:37:01    4   between the time you first got the assignment from the

03:37:04    5   plaintiff's lawyers until the time you reviewed everything and

03:37:08    6   wrote the report, it was 150 hours?

03:37:10    7   A.  I was contacted by the attorney's office sometime in

03:37:17    8   December and I believe the date of my report is March 15th.

03:37:21    9   So I spent the time looking at material and writing my report.

03:37:25   10   Q.  All right.  And that was 150 hours is that your testimony?

03:37:30   11   A.  Billable hours.  I am pretty sure I spent a lot more time

03:37:35   12   on it than that.

03:37:35   13   Q.  Okay.  Well, do you remember giving a deposition in this

03:37:40   14   case in June of this year and being asked these questions and

03:37:45   15   giving these answers?

03:37:47   16        MR. LOEVY:  Page?

03:37:48   17        MR. KULWIN:  Page 265, line 13.

03:37:48   18   BY MR. KULWIN:

03:37:52   19   Q.    "QUESTION:  And so you had to squeeze it in, right?

03:37:57   20        "ANSWER:  I indicated that I spent approximately 60

03:37:59   21   hours on the case."

03:38:03   22        Go to the next page, page 266.

03:38:05   23        "QUESTION:  Now, the 60 hours that you spent, how many

03:38:08   24   hours did you spend actually reviewing the file before you

03:38:10   25   reached your conclusion?

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 86 of 164 PageID #:31121
***REALTIME UNEDITED TRANSCRIPT ONLY***

85

03:38:11  1      "ANSWER:  I can't give you a break down of how much it

03:38:14  2  was because the work was simultaneously, I was looking at the

03:38:17  3  files and working on my report, so I can't give you how much

03:38:20  4  of it was this and how much of it was that."

03:38:23  5      Were those questions asked and did you give those

03:38:26  6  answers?

03:38:26  7  A.  Yes.

03:38:26  8  Q.  All right.  Now, did I hear you correctly, sir, that part

03:38:43  9  of the basis for your opinions about what other -- that

03:38:49  10  Chicago is so different from other police reports is that in

03:38:54  11  your career, you've audited police departments?

03:38:56  12  A.  That's correct.

03:38:57  13  Q.  But the fact of the matter is, sir, I don't believe --

03:39:03  14  you've never audited any police department on the issue of

03:39:08  15  whether -- how they're properly maintaining their files and

03:39:12  16  disclosing it in criminal cases; isn't that true?

03:39:15  17  A.  That's correct.

03:39:16  18  Q.  The only audits?

03:39:17  19  A.  I misunderstood your question.  I thought you asked did I

03:39:21  20  testify in a criminal case on that.  No, I have reviewed

03:39:26  21  procedures and processes and discoveries in various cities.

03:39:29  22  Q.  My question -- maybe ships passing in the wind here.  Let

03:39:34  23  me be clear.

03:39:35  24      You've told the jury that part of the basis of your

03:39:38  25  opinion here is the auditing work you've done, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:39:40 | 1 | A.  Yes. |
| 03:39:40 | 2 | Q.  But the fact of the matter is, sir, that you have never, |
| 03:40:01 | 3 | you've never conducted any independent audit of any police |
| 03:40:11 | 4 | department on the issue of their disclosure of information in |
| 03:40:14 | 5 | criminal cases; isn't that true? |
| 03:40:23 | 6 | A.  I'll refer back to my testimony.  I have visited and |
| 03:40:28 | 7 | audited engaged to look at the delivery of police services |
| 03:40:33 | 8 | which included record keeping and discovery processes. |
| 03:40:38 | 9 | Q.  All right.  Going back to your deposition of June of this |
| 03:40:41 | 10 | year starting at page 319, line 24? |
| 03:40:44 | 11 | "QUESTION:  Okay.  And I want to be clear.  Your |
| 03:40:48 | 12 | testimony is that those other major cities, though, the way |
| 03:40:52 | 13 | they do it is every piece of information they get during a |
| 03:40:55 | 14 | homicide investigation is documented, put in a file and turned |
| 03:40:59 | 15 | over to either the defense attorneys or the prosecutor.  Do I |
| 03:41:03 | 16 | understand that correctly? |
| 03:41:04 | 17 | "ANSWER:  I'm saying that is the general practice. |
| 03:41:07 | 18 | "QUESTION:  Was that what was going on in New York and |
| 03:41:10 | 19 | Baltimore and all the places you did audits on? |
| 03:41:12 | 20 | "ANSWER:  My familiarity with the way it was done -- |
| 03:41:18 | 21 | I'm sorry.  My familiarity with the way it was done was that |
| 03:41:23 | 22 | was the desire.  Whether it occurred on each, I did not do and |
| 03:41:26 | 23 | have not done an independent audit of the New York police |
| 03:41:29 | 24 | department's homicide unit." |
| 03:41:31 | 25 | Then it goes on. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 88 of 164 PageID #:31123
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

87

| | | |
|---|---|---|
| 03:41:33 | 1 | MR. LOEVY:  Your Honor, that's not impeaching. |
| 03:41:35 | 2 | MR. KULWIN:  I am not done. |
| 03:41:36 | 3 | THE COURT:  I am going to wait until he is done. |
| 03:41:38 | 4 | BY MR. KULWIN: |
| 03:41:40 | 5 | Q.  Okay.  So you say in your resume you did some auditing, |
| 03:41:43 | 6 | you did auditing of police department? |
| 03:41:44 | 7 | A.  Yes. |
| 03:41:44 | 8 | Q.  Was it Baltimore or Oxford? |
| 03:41:49 | 9 | THE COURT:  Say the question, answer. |
| 03:41:49 | 10 | BY MR. KULWIN: |
| 03:41:53 | 11 | Q.  Question, wasn't it Baltimore or Oxford, where else? |
| 03:41:57 | 12 | "ANSWER:  I think there were six cities. |
| 03:41:57 | 13 | "QUESTION:  Yeah, Baltimore, Oxford.  Can you tell me, |
| 03:42:00 | 14 | it would help me out besides Baltimore and Oxford. |
| 03:42:02 | 15 | THE COURT:  Oxnard? |
| 03:42:05 | 16 | BY MR. KULWIN: |
| 03:42:06 | 17 | Q.  Sorry, Judge.  Seattle, Memphis, Oxnard, Baltimore, a city |
| 03:42:10 | 18 | in Ohio, I'll have to find it in here.  It goes on.  We'll get |
| 03:42:15 | 19 | back to it, but just let's stick with Baltimore, Oxnard, and |
| 03:42:19 | 20 | the city in Mississippi.  Where is Oxnard, is that in |
| 03:42:22 | 21 | Mississippi? |
| 03:42:23 | 22 | "ANSWER:  It's Oxnard, California. |
| 03:42:25 | 23 | "QUESTION:  Oh, sorry, I'm confused. |
| 03:42:28 | 24 | "ANSWER:  An area outside of Los Angeles. |
| 03:42:28 | 25 | "QUESTION:  How big is Oxnard? |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 89 of 164 PageID #:31124
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

88

03:42:32  1      "ANSWER:  As I recall at the time, it was maybe in the

03:42:34  2   couple hundred thousand.

03:42:35  3      "QUESTION:  All right.  All right.  Now, I want to be

03:42:37  4   clear.  You were asked to audit these city's police

03:42:41  5   departments like in --

03:42:43  6      "ANSWER:  It was part of a federal grant process to

03:42:46  7   examine delivery of police services.  And so in part of that,

03:42:49  8   as part of the team, we would meet with the chief of police,

03:42:52  9   we would meet with community leaders, we would look at the

03:42:54  10  functioning and organization and staffing levels and budgetary

03:43:01  11  appropriations for the organization.

03:43:02  12     "QUESTION:  In any of these cities, did you -- did you

03:43:05  13  investigate or audit their disclosure of information in

03:43:08  14  criminal cases?

03:43:09  15     "ANSWER:  No."

03:43:11  16     MR. LOEVY:  Objection, your Honor.  Not impeaching.

03:43:13  17  That's a discrete number of cities.

03:43:16  18     THE COURT:  Sustained.

03:43:19  19  BY MR. NOLAND:

03:43:21  20  Q.  In any of these -- in any of these investigations --

03:43:25  21     THE COURT:  Sustained.  I want to say it given your

03:43:28  22  facial reaction, given the question you asked at 3:39 in the

03:43:32  23  afternoon.  That is not impeaching.  The jury is directed to

03:43:35  24  disregard the reading from the deposition.

03:43:37  25     MR. KULWIN:  I will ask a different question.


             ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 90 of 164 PageID #:31125
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

89

03:43:39  1   BY MR. KULWIN:

03:43:39  2   Q.  In any of these investigations that you did, any audits

03:43:42  3   that you did, in any audits that you've done in your career

03:43:47  4   that you're referencing, did you look at or audit or try to

03:43:50  5   analyze whether they were fulfilling these -- these cities

03:43:54  6   were disclosing their disclosure obligations in homicide

03:44:00  7   cases?

03:44:00  8   A.  It was part of my what my duties and responsibilities as a

03:44:03  9   specialist in records in discovery to look at that.  But it

03:44:08  10  was a minor, the overall was the delivery of police services

03:44:12  11  to public housing, which included that process.

03:44:15  12  Q.  All right.  Now going back to your deposition, page 322,

03:44:19  13  line 5.  In any of these investigations, did you look at or

03:44:22  14  audit or try to analyze whether they were fulfilling their

03:44:25  15  disclosure obligations in homicide or other criminal cases?

03:44:29  16        "ANSWER:  No, that was not part of the mandate

03:44:31  17        MR. LOEVY:  Objection, your Honor.  The mandate is

03:44:33  18  talking about the federal mandate.

03:44:34  19        THE COURT:  Overruled.  Did he read that particular

03:44:38  20  question and answer correctly?

03:44:39  21        THE WITNESS:  Yes.

03:44:40  22  BY MR. KULWIN:

03:44:48  23  Q.  Now, if I understand it correctly, one of the ways that --

03:45:08  24  there are two legs to the information that you've employed in

03:45:13  25  determining that Chicago is an anomaly in how they handle

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 91 of 164 PageID #:31126
***REALTIME UNEDITED TRANSCRIPT ONLY***

90

| | | |
|---|---|---|
| 03:45:19 | 1 | their information and gather it and disclose it to -- in |
| 03:45:23 | 2 | criminal cases, am I right?  Two legs, right? |
| 03:45:26 | 3 | A.  Which two legs? |
| 03:45:27 | 4 | Q.  Well, one is you go to a bunch of conferences that you |
| 03:45:30 | 5 | attend with other police chiefs, right?  That was one of the |
| 03:45:33 | 6 | legs, right, that you told me about? |
| 03:45:35 | 7 | THE COURT:  He thinks you're saying line, you're |
| 03:45:38 | 8 | saying less, right? |
| 03:45:39 | 9 | BY MR. KULWIN: |
| 03:45:40 | 10 | Q.  I'm sorry, legs. |
| 03:45:41 | 11 | A.  I'm sorry. |
| 03:45:41 | 12 | Q.  Let me do it again.  My fault. |
| 03:45:43 | 13 | As I understand it from earlier testimony you've |
| 03:45:47 | 14 | given, there are two legs that you rely on in determining that |
| 03:45:52 | 15 | Chicago was an anomaly vis-à-vis production of information to |
| 03:45:59 | 16 | criminal defendants than other cities? |
| 03:46:02 | 17 | MR. LOEVY:  Objection, your Honor.  Given the entire |
| 03:46:06 | 18 | testimony, it's improper.  He's got to show him -- |
| 03:46:10 | 19 | THE COURT:  I think that question can be answered. |
| 03:46:13 | 20 | The objection is overruled. |
| 03:46:14 | 21 | BY MR. KULWIN: |
| 03:46:15 | 22 | Q.  Mr. Brasfield, do I have it? |
| 03:46:16 | 23 | A.  I am sorry.  You're losing me here. |
| 03:46:21 | 24 | Q.  Okay.  As I understand it, let me see if I can help you |
| 03:46:27 | 25 | out. |

| | | |
|---|---|---|
| 03:46:28 | 1 | You attend certain conferences of police chiefs, |
| 03:46:31 | 2 | right? |
| 03:46:31 | 3 | A.  I have over the years. |
| 03:46:32 | 4 | Q.  And that's one of the ways that you concluded how other |
| 03:46:36 | 5 | police departments handle their -- that's one of the ways on |
| 03:46:47 | 6 | which -- that you've articulated in your report the standard |
| 03:46:51 | 7 | is of how they handle their disclosure of information, |
| 03:46:55 | 8 | correct? |
| 03:46:55 | 9 | A.  I don't believe that's in my report. |
| 03:46:57 | 10 | Q.  Well, I guess maybe I'm not asking the question |
| 03:47:04 | 11 | accurately.  Let me see if I can try it again. |
| 03:47:06 | 12 | You went to a bunch of conferences in which police |
| 03:47:13 | 13 | chiefs talked about best practices, including the chief of |
| 03:47:16 | 14 | police of Chicago, and you're basing your knowledge here in |
| 03:47:19 | 15 | part that all major police departments fulfill your |
| 03:47:22 | 16 | professional standard that you've articulated in your report |
| 03:47:25 | 17 | based on what you've learned in those conferences is that |
| 03:47:28 | 18 | right? |
| 03:47:28 | 19 | MR. LOEVY:  Objection, compound, your Honor. |
| 03:47:29 | 20 | THE COURT:  Overruled. |
| 03:47:30 | 21 | THE WITNESS:  I think that's entirely a |
| 03:47:34 | 22 | misrepresentation of my testimony. |
| 03:47:36 | 23 | BY MR. KULWIN: |
| 03:47:36 | 24 | Q.  Okay. |
| 03:47:36 | 25 | A.  Or in my deposition.  I described -- |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 93 of 164 PageID #:31128
***REALTIME UNEDITED TRANSCRIPT ONLY***

92

03:47:39   1   THE COURT:  I think you have answered the question.

03:47:40   2   Ask another question.

03:47:41   3   BY MR. KULWIN:

03:47:41   4   Q.  Let me go back to your deposition and I'll ask you this

03:47:44   5   question.

03:47:46   6       MR. LOEVY:  Line and page number?

03:47:48   7       MR. NOLAND:

03:47:48   8       MR. KULWIN:  I am getting there.  Line 4, page 336.

03:47:53   9   BY MR. KULWIN:

03:47:54  10   Q.

03:47:54  11       "QUESTION:  I understand that and I'm going to leave

03:47:56  12   this topic and go onto another topic, same topic, but another

03:48:00  13   area.  All I'm trying to get at, sir, was, you know, you went

03:48:04  14   to a bunch of conferences in which police chiefs talked about

03:48:07  15   best practice including the chief of police of the City of

03:48:09  16   Chicago and you're basing your knowledge in part that all

03:48:12  17   major police departments fulfill your professional standard

03:48:16  18   that you've articulated in this report based in part on what

03:48:19  19   you've learned at those conferences about best practices?

03:48:22  20       "ANSWER:  That was a leg of it."

03:48:27  21   A.  That was a leg of it.

03:48:28  22   Q.  That's what I asked you.  That was a leg of it?

03:48:31  23   A.  The statement was yours, but the leg of it was mine.

03:48:35  24   Q.  All right.  Now, the fact is, though, sir, when you went

03:48:48  25   to these conferences that you're talking about that you're

03:48:51  1   basing your conclusions that this is all these other cities do

03:48:55  2   it, you don't have any written material from any of those

03:48:57  3   conferences that substantiate your view; isn't that right?

03:49:01  4   A.  You're totally misrepresentation my testimony.

03:49:04  5   Q.  Sir, can you answer my question?  Do you have any written

03:49:07  6   material from any of those conferences that you attended that

03:49:09  7   substantiate that they told you that these are the best

03:49:12  8   practices at these conferences?  Do you have anything like

03:49:16  9   that?

03:49:16  10  A.  I indicated that I had gone to conferences in response to

03:49:21  11  a question of how I formed my opinion.  That was an

03:49:26  12  insignificant portion of it.  No, I don't have any documents

03:49:30  13  from that.

03:49:31  14  Q.  All right.  And you can't name one police chief as you're

03:49:37  15  sitting there today from any major city who stood up and said,

03:49:40  16  yeah, we produce a hundred percent of everything that we get

03:49:46  17  in a criminal investigation, we turn it over to the criminal

03:49:48  18  defendants?

03:49:48  19          MR. LOEVY:  Objection to the question, your Honor.

03:49:50  20  Relevance.

03:49:50  21          THE COURT:  Overruled.

03:49:51  22          MR. LOEVY:  Same with the hundred percent.

03:49:55  23          THE COURT:  Overruled.  Goes to weight.

03:49:56  24          THE WITNESS:  You're talking about a very minor

03:50:00  25  portion of what I based my opinion on.  I've said in my

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 95 of 164 PageID #:31130
***REALTIME UNEDITED TRANSCRIPT ONLY***

94

| | | |
|---|---|---|
| 03:50:08 | 1 | deposition that among dozens of things, I also go to |
| 03:50:13 | 2 | conferences and talk to police chiefs informally, discuss |
| 03:50:18 | 3 | various issues that are on the front burner at the time, |
| 03:50:22 | 4 | whether they're use of force, police pursuits, whatever. |
| 03:50:25 | 5 | BY MR. KULWIN: |
| 03:50:26 | 6 | Q.  Sir, the question is at these conferences that you went |
| 03:50:30 | 7 | to, no police chief that you can name as you're sitting there |
| 03:50:34 | 8 | today said, yeah, we do a hundred percent disclosure, you |
| 03:50:39 | 9 | can't name one, can you? |
| 03:50:40 | 10 | A.  When we -- I would. |
| 03:50:42 | 11 | Q.  Sir, the question was can you? |
| 03:50:44 | 12 | A.  I would not. |
| 03:50:44 | 13 | Q.  Can you is the question? |
| 03:50:49 | 14 | A.  I will not. |
| 03:50:49 | 15 | Q.  Not will you not, you couldn't isn't that true, you |
| 03:50:52 | 16 | couldn't name one particular one; isn't that true? |
| 03:50:55 | 17 | A.  That's not true. |
| 03:50:55 | 18 | Q.  Okay.  Do you remember this question.  Page 332 at line |
| 03:51:04 | 19 | 14.  At line 24.  No, no, no, first answer my question.  Did |
| 03:51:11 | 20 | anyone say -- I'm sorry.  Line 14.  Page 332. |
| 03:51:16 | 21 | "QUESTION:  I'm going to get to the rest of the |
| 03:51:18 | 22 | information, but I'm focusing on these conferences.  In these |
| 03:51:21 | 23 | conferences |
| 03:51:22 | 24 | "ANSWER:  Okay. |
| 03:51:23 | 25 | "QUESTION:  Nobody that you can identify, not one chief |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 96 of 164 PageID #:31131
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

95

03:51:25  1  of police that you can identify stood up and said this is how

03:51:29  2  we're dealing with disclosure of investigative information in

03:51:32  3  criminal cases, we do it X, Y, and Z, and we have 100 percent

03:51:37  4  compliance rate.  Nobody said that, correct?

03:51:41  5          "ANSWER:  What was the discussion?

03:51:42  6          "QUESTION:  No, no, no.  First answer my question.  Did

03:51:45  7  anyone say that?

03:51:46  8          "ANSWER:  I can't give you names of particular

03:51:49  9  individuals, but because it was such a hot topic of court

03:51:54  10 cases and disclosure, that was an item of discussion and we

03:51:56  11 would, people would give their horror stories of what happened

03:52:00  12 when they failed to do it and why it was so important that we

03:52:05  13 all as a professional group changed our ways

03:52:07  14          MR. LOEVY:  Objection.

03:52:08  15 BY MR. KULWIN:

03:52:09  16 Q.  That was the question and that was your answer; isn't that

03:52:09  17 true?

03:52:11  18          MR. LOEVY:  Objection.

03:52:11  19          THE COURT:  Overruled.

03:52:12  20          THE WITNESS:  Yes.

03:52:12  21 BY MR. KULWIN:

03:52:17  22 Q.  And in fact, what they were telling you, what you were

03:52:28  23 hearing at these conferences from these police chiefs, was,

03:52:32  24 look, we have successes, we've got failures, we're doing our

03:52:35  25 best, that's what you heard.  You didn't hear a hundred

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 97 of 164 PageID #:31132
***REALTIME UNEDITED TRANSCRIPT ONLY***

96

| 03:52:38 | 1 | percent, right? |
| 03:52:40 | 2 | A.  That's not what I stated. |
| 03:52:41 | 3 | MR. LOEVY:  Objection. |
| 03:52:42 | 4 | BY MR. KULWIN: |
| 03:52:43 | 5 | Q.  What? |
| 03:52:43 | 6 | A.  That's not what I stated. |
| 03:52:44 | 7 | THE COURT:  The answer can stand. |
| 03:52:46 | 8 | BY MR. KULWIN: |
| 03:52:46 | 9 | Q.  So you never heard a hundred percent, right? |
| 03:52:48 | 10 | A.  I answered the question the best I can. |
| 03:52:53 | 11 | Q.  Now, another one of the legs, another one of the legs that |
| 03:53:08 | 12 | you relied on for your conclusion that Chicago is an anomaly |
| 03:53:12 | 13 | on how major cities disclose information that they gather in |
| 03:53:19 | 14 | criminal cases is the federal government's funding of various |
| 03:53:24 | 15 | institutions isn't that right?  Information you get from that |
| 03:53:27 | 16 | isn't that true? |
| 03:53:28 | 17 | A.  The information I get from literature either produced by |
| 03:53:32 | 18 | the federal government or funded by the federal government, I |
| 03:53:35 | 19 | think that that was the context of my answer. |
| 03:53:36 | 20 | Q.  All right.  So another leg is the federal government has |
| 03:53:42 | 21 | expended a tremendous amount of money, the national institute |
| 03:53:44 | 22 | of justice, the bureau of justice statistics, the bureau of |
| 03:53:48 | 23 | justice administration, the FBI, the whole alphabet of soup of |
| 03:53:52 | 24 | agencies and universities to examine the rise of violent crime |
| 03:53:55 | 25 | and strategies to address it.  You look at that literature, |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 98 of 164 PageID #:31133

03:53:57   1   right?

03:53:58   2   A.  Yes.

03:53:58   3   Q.  And that's one of the bases for your conclusions, that

03:54:02   4   literature, that Chicago is an anomaly in how they deal with

03:54:11   5   their disclosure of information, right?

03:54:13   6   A.  I'm sorry.  You are losing me.  My statement in my

03:54:23   7   deposition is what it was.

03:54:24   8   Q.  I know that.  But my question is, my question is that one

03:54:31   9   of the things that you say that you rely on in your report to

03:54:36   10  reach the conclusion that you've given the jury that Chicago

03:54:40   11  is an anomaly are these statistics and things of that nature

03:54:44   12  from all these different federal agencies, right?

03:54:47   13  A.  That it forms a basis of knowledge about how things are

03:54:54   14  done in the United States in police agencies.

03:54:57   15  Q.  All right.  But you're not saying that this work by the

03:55:02   16  Department of Justice substantiates your standard of a hundred

03:55:05   17  percent disclosure of all information gathered in a homicide

03:55:09   18  investigation, those agencies research doesn't substantiate

03:55:14   19  that at all, does it?

03:55:15   20  A.  In the context of the question that I was asked during the

03:55:18   21  deposition as to what I form my opinion on was how other law

03:55:23   22  enforcement agencies respond to discovery requests and that it

03:55:28   23  was based on centralized records keeping, accurate indexing,

03:55:34   24  and full disclosure, all of which was not the case that I had

03:55:38   25  seen in Chicago.

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 99 of 164 PageID #:31134

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:55:39 | 1 | Q.  Right.  And my question to you, sir, is one of the bases |
| 03:55:43 | 2 | for that opinion is all this information from these federal |
| 03:55:46 | 3 | agencies and you don't have any information from those |
| 03:55:49 | 4 | agencies that substantiates that conclusion; isn't that right? |
| 03:55:54 | 5 | A.  I disagree with how you're presenting that. |
| 03:55:58 | 6 | Q.  All right.  Here's the question from your deposition? |
| 03:56:07 | 7 | MR. LOEVY:  Page? |
| 03:56:08 | 8 | MR. KULWIN:  Page 338. |
| 03:56:09 | 9 | BY MR. NOLAND: |
| 03:56:09 | 10 | Q. |
| 03:56:09 | 11 | "QUESTION:  You just said, you just said that a key leg |
| 03:56:13 | 12 | of your conclusion was that the Department of Justice was |
| 03:56:16 | 13 | doing all these investigations about violent crimes and police |
| 03:56:20 | 14 | chiefs all over the country were aware of it.  Okay?  But |
| 03:56:24 | 15 | there were -- there's, but you're not saying that any of |
| 03:56:27 | 16 | these, that this work by the Department of Justice |
| 03:56:28 | 17 | substantiates your standard that it's a hundred percent |
| 03:56:31 | 18 | disclosure a hundred percent of all the information? |
| 03:56:34 | 19 | "ANSWER:  That's the goal, and that -- that's -- |
| 03:56:38 | 20 | "QUESTION:  That's the goal? |
| 03:56:40 | 21 | "ANSWER:  And |
| 03:56:42 | 22 | "QUESTION:  That's the goal? |
| 03:56:43 | 23 | "ANSWER:  Close from a practical standpoint that your |
| 03:56:46 | 24 | cases and the way you operate are conducted in that manner." |
| 03:56:50 | 25 | It's a goal |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:56:51   1       MR. LOEVY:  Objection, your Honor.  That's an

03:56:54   2   unintelligible question.

03:56:56   3       THE COURT:  Sustained.

03:56:56   4   BY MR. KULWIN:

03:57:08   5   Q.  As you sit there today, sir, can you name any departments,

03:57:11   6   any police departments that you gleaned from looking at this

03:57:18   7   Department of Justice information that reaps this hundred

03:57:22   8   percent disclosure rule?

03:57:24   9       MR. LOEVY:  Objection to this hundred percent.  This

03:57:26  10   was the subject of a motion in limine.

03:57:28  11       THE COURT:  Sustained.  You can't word the question

03:57:30  12   that way.

03:57:31  13   BY MR. KULWIN:

03:58:03  14   Q.  Sir, if I understand it, if I understand it, sir, in your

03:58:15  15   professional opinion, the issue in this case is that Chicago

03:58:18  16   doesn't maintain their records appropriately and as a result

03:58:20  17   of that, that leads to failure to disclose everything which

03:58:24  18   leads to problems, that's what we're talking about, right?

03:58:26  19   A.  That's a major portion of it, yes.

03:58:30  20   Q.  Okay.  And as you said before, you think it's an anomaly

03:58:36  21   to other cities doing that same stuff, right?

03:58:38  22   A.  That's what I stated.

03:58:40  23   Q.  Okay.  But you haven't done an analysis or a comparison of

03:58:47  24   any major city with a similar in size of population and the

03:58:53  25   number of homicides as Chicago that were occurring between

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 101 of 164 PageID #:31136

| | | |
|---|---|---|
| 03:58:57 | 1 | 1983 and 2006 to come to that conclusion, correct? |
| 03:59:01 | 2 | A.  That I haven't done a study? |
| 03:59:05 | 3 | Q.  Yeah, you have not done any study of any major city of |
| 03:59:09 | 4 | similar size as Chicago with the same type of number of |
| 03:59:13 | 5 | homicides between 1983 and 2006, you have done no comparison |
| 03:59:19 | 6 | between Chicago and those cities on that issue, have you? |
| 03:59:21 | 7 | A.  I testified to the fact that during the time period that |
| 03:59:25 | 8 | we are discussing here for both time periods, I was aware of |
| 03:59:29 | 9 | and familiar with policies and procedures in other states, |
| 03:59:33 | 10 | other cities in average cities included. |
| 03:59:36 | 11 | Q.  But you've done no such analysis isn't that true? |
| 03:59:40 | 12 | A.  I was not hired to do an analysis and I did not do an |
| 03:59:43 | 13 | analysis, but I can very comfortably and faithfully say that I |
| 03:59:48 | 14 | am familiar with the policies and procedures of those |
| 03:59:53 | 15 | jurisdictions and that they are not consistent with the way |
| 03:59:55 | 16 | the City of Chicago does it. |
| 03:59:56 | 17 | Q.  Let me break that down.  I don't care about just what you |
| 04:00:00 | 18 | retained here.  Never in your? |
| 04:00:02 | 19 | MR. LOEVY:  Objection, your Honor.  Asked and |
| 04:00:04 | 20 | answered. |
| 04:00:06 | 21 | MR. KULWIN:  Sorry, Judge. |
| 04:00:08 | 22 | THE COURT:  Yeah, if you want to go beyond the |
| 04:00:10 | 23 | report. |
| 04:00:11 | 24 | MR. KULWIN:  No. |
| 04:00:11 | 25 | THE COURT:  No, because you just are about to. |

| | | |
|---|---|---|
| 04:00:14 | 1 | That's the way your question is being worded. |
| 04:00:19 | 2 | MR. KULWIN: Sorry, Judge. |
| 04:00:22 | 3 | THE COURT: I will read back to you what you said. |
| 04:00:24 | 4 | MR. KULWIN: No, I got it. |
| 04:00:24 | 5 | THE COURT: Let me break it down, I don't care just |
| 04:00:27 | 6 | about what you were retained for in your report, never in your |
| 04:00:31 | 7 | entire, dot, dot, dot. |
| 04:00:33 | 8 | BY MR. KULWIN: |
| 04:00:36 | 9 | Q. Okay. Sir, you've not done an analysis of any comparison |
| 04:00:44 | 10 | that's similar in size of population and similar in the number |
| 04:00:47 | 11 | of homicides that were occurring from 1983 to 2006 that you |
| 04:00:53 | 12 | compared to Chicago to come to the conclusion that Chicago is |
| 04:00:57 | 13 | an anomaly on that issue? |
| 04:00:59 | 14 | MR. LOEVY: Same objection, your Honor. |
| 04:01:00 | 15 | THE COURT: Can I see the lawyers at sidebar, please. |
| 04:01:09 | 16 | (The following proceedings were had at sidebar outside the |
| 04:01:17 | 17 | hearing of the jury:) |
| 04:01:17 | 18 | THE COURT: The way you worded the question, it's a |
| 04:01:19 | 19 | universe of one. Way city of similar population with a |
| 04:01:24 | 20 | similar number of homicide during the period of 1983 to 2006, |
| 04:01:26 | 21 | means it's a universe of one. What would the other city be? |
| 04:01:30 | 22 | MR. KULWIN: I don't know. New York? |
| 04:01:31 | 23 | THE COURT: No. |
| 04:01:32 | 24 | MR. KULWIN: Los Angeles. |
| 04:01:33 | 25 | THE COURT: Much bigger population, smaller number of |

11/29/16 PM   Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 103 of 164 PageID #:31138
***REALTIME UNEDITED TRANSCRIPT ONLY***

102

04:01:35  1  homicides, a smaller number of homicides in the second one.

04:01:39  2  It's a universe of one, so I am going to sustain the

04:01:42  3  objection.

04:01:45  4     (The following proceedings were had in open court in the

04:01:46  5  presence and hearing of the jury:)

04:01:46  6          THE COURT:  The objection is sustained.

04:01:49  7  BY MR. KULWIN:

04:02:12  8  Q.  Sir, in the city where you were chief of police, Seattle,

04:02:15  9  they had a about what, 55 homicides a year?

04:02:18  10  A.  I was not the chief of police in Seattle.  I was the

04:02:21  11  assistant chief in Seattle.  I was the chief of police in Fort

04:02:26  12  Lauderdale, Florida.

04:02:26  13  Q.  So when you were assistant chief of Seattle, they had

04:02:30  14  what, 55 homicides a year?

04:02:31  15  A.  I think the all time record might have been pushing 100,

04:02:34  16  but on average, somewhere, I haven't looked at it recently,

04:02:37  17  but that's probably a ballpark figure.

04:02:42  18  Q.  Ballpark, as of June of 2016, isn't that what you thought

04:02:46  19  it was, 50, 55?

04:02:47  20  A.  I believe that's what I testified to.

04:02:50  21  Q.  Okay.  And Fort Lauderdale, and I think that Fort

04:02:57  22  Lauderdale you thought had maybe 10 or 20?

04:02:59  23  A.  They were -- I have gone back and checked and probably

04:03:03  24  closer to the 20, 25 range.

04:03:05  25  Q.  Okay.  And when you were the sheriff, maybe one in a bad

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 104 of 164 PageID #:31139

| | | |
|---|---|---|
| 04:03:09 | 1 | year? |
| 04:03:09 | 2 | A.  Yeah, that's true. |
| 04:03:10 | 3 | Q.  And the Seattle detectives while you were out there, each |
| 04:03:16 | 4 | detective was handling maybe two or three homicides per year, |
| 04:03:19 | 5 | correct? |
| 04:03:19 | 6 | A.  No, it was a much smaller homicide unit, so they were |
| 04:03:24 | 7 | carrying a larger caseload than that. |
| 04:03:27 | 8 | Q.  This question, page 317.  In the city that has an average |
| 04:03:45 | 9 | -- to line 17.  We were talking about Seattle.  In a city that |
| 04:03:49 | 10 | has about an ample 50, it 55, you got two or three homicides |
| 04:03:53 | 11 | per detective, right? |
| 04:03:55 | 12 | "ANSWER:  On ample on active cases, two or three |
| 04:04:00 | 13 | A.  Active cases. |
| 04:04:01 | 14 | MR. LOEVY:  Objection. |
| 04:04:02 | 15 | THE COURT:  The objection is overruled. |
| 04:04:03 | 16 | BY MR. KULWIN: |
| 04:04:04 | 17 | Q.  You don't even recall the number of detectives, homicide |
| 04:04:07 | 18 | detectives you had in Fort Lauderdale, correct? |
| 04:04:09 | 19 | A.  I don't recall what my answer was in the deposition. |
| 04:04:10 | 20 | Q.  Do you recall now what -- you don't recall, do you recall |
| 04:04:13 | 21 | now? |
| 04:04:14 | 22 | A.  No, there are probably 10 or 12. |
| 04:04:17 | 23 | Q.  So they were handling maybe one or two per year of |
| 04:04:20 | 24 | homicides, right? |
| 04:04:21 | 25 | A.  They were handling more than that. |

11/29/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

104

04:04:27  1   Q.  If you had 10 or 12 and you only had 20 to 25 homicides

04:04:33  2   per year that are active cases per year, maybe one or two?

04:04:39  3   A.  As a group.  I won't argue the point with you.

04:04:41  4   Q.  Finally, sir, you were asked some questions about, you

04:04:46  5   know, how an investigation goes and I think you referred to

04:04:51  6   some be novelest bar /ET or something, it's like a novel, you

04:04:56  7   never know how it's going to end, right, wasn't that your

04:04:58  8   analogy?

04:04:59  9   A.  That was an analogy, yes.

04:05:00  10  Q.  Okay.  So one question I have for you is when you were

04:05:04  11  reviewing all these files, you didn't take any notes, right?

04:05:08  12  A.  I took -- I think I testified in the deposition that as I

04:05:14  13  did any of my cases, I do my work on a computer, I maintain

04:05:24  14  what I am doing there and it is a living document.

04:05:26  15  Q.  But the living document is actually the report that you're

04:05:29  16  writing, that's the living document, the novel in this case,

04:05:31  17  right?

04:05:31  18  A.  Yes.

04:05:32  19  Q.  So you have all these investigative reports, you've got

04:05:34  20  your okay report to plaintiff's counsel on Fields v. City of

04:05:39  21  Chicago, you've got it in your report format, you're starting

04:05:42  22  with that, right?

04:05:42  23  A.  Yes.

04:05:42  24  Q.  Okay.  Then you've got all the files that you're looking

04:05:45  25  at and what you're doing is you are not going through the

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 106 of 164 PageID #:31141

| 04:05:48 | 1 | files and saying this one or that one, you're just typing into |
| 04:05:52 | 2 | the report, right? |
| 04:05:52 | 3 | MR. LOEVY: Objection to the form of the question. |
| 04:05:53 | 4 | MR. KULWIN: I will rephrase it if you want, Judge. |
| 04:05:55 | 5 | MR. LOEVY: I will withdraw the objection. |
| 04:05:57 | 6 | THE COURT: Okay. |
| 04:05:58 | 7 | BY MR. KULWIN: |
| 04:05:58 | 8 | Q. You are not actually creating a document that just |
| 04:06:01 | 9 | analyzes what's in what, right? |
| 04:06:03 | 10 | A. I'm looking at the electronic versions on the split screen |
| 04:06:08 | 11 | of the material that I've -- depending on the case that I'm |
| 04:06:12 | 12 | looking at and then I'm typing in whatever is relevant at the |
| 04:06:16 | 13 | time. |
| 04:06:16 | 14 | Q. Right into what's going to be the final report, correct? |
| 04:06:21 | 15 | A. If I understand your question, yes. |
| 04:06:25 | 16 | Q. And the last point on that, sir, on this novel idea, you |
| 04:06:35 | 17 | agree, sir, that criminal investigations take twists and |
| 04:06:38 | 18 | turns, right? |
| 04:06:39 | 19 | A. Yes. |
| 04:06:39 | 20 | Q. And it's easy to look back as a detective to another |
| 04:06:45 | 21 | detective's work and go, wow, he should have done this and he |
| 04:06:49 | 22 | should have done that and why didn't he see that and why |
| 04:06:52 | 23 | didn't he see that, hindsight is 20/20, isn't it sir? |
| 04:06:56 | 24 | A. That's not what I testified to. |
| 04:06:57 | 25 | Q. I'm not asking what you testified to. I'm asking, you're |

| | | |
|---|---|---|
| 04:07:02 | 1 | an expert; isn't that true? |
| 04:07:04 | 2 | A.  Hindsight is 20/20? |
| 04:07:05 | 3 | Q.  Yes. |
| 04:07:06 | 4 | A.  Yes. |
| 04:07:07 | 5 | Q.  Any detective or any expert or any lawyer can look back at |
| 04:07:10 | 6 | what a detective did 30 years ago and said he made this |
| 04:07:14 | 7 | mistake, that mistake and this mistake; isn't that right? |
| 04:07:17 | 8 | A.  Individually, that's certainly true.  As an aggregate when |
| 04:07:20 | 9 | you look at dozens of cases or hundreds ever cases, that's a |
| 04:07:23 | 10 | different matter with different detectives. |
| 04:07:27 | 11 | MR. KULWIN:  If I may have a second. |
| 04:07:29 | 12 | (Brief pause.) |
| 04:07:34 | 13 | MR. KULWIN:  Nothing else, your Honor.  Thank you. |
| 04:07:36 | 14 | THE COURT:  Redirect. |
| 04:07:37 | 15 | MR. LOEVY:  Thank you, your Honor. |
| 04:07:37 | 16 | - - - |
| 04:07:37 | 17 | MICHAEL DAVID BRASFIELD, REDIRECT EXAMINATION |
| 04:07:37 | 18 | BY MR. LOEVY: |
| 04:07:38 | 19 | Q.  You were just asked if it's easy to look back and look at |
| 04:07:42 | 20 | a detective's work and say they should have done this, they |
| 04:07:45 | 21 | should have done that.  My question, sir, is are you able to |
| 04:07:48 | 22 | look a back at detectives and say they should have done this |
| 04:07:51 | 23 | and should have done that if they don't document and |
| 04:07:55 | 24 | memorialize things? |
| 04:07:56 | 25 | A.  No, it makes it extremely possible. |

04:07:58  1   Q.  You were asked if having a high homicide load causes

04:08:02  2   problems, is that?

04:08:03  3          MR. KULWIN:  Objection, Judge, I didn't ask him that.

04:08:07  4          THE COURT:  Overruled.

04:08:08  5   BY MR. LOEVY:

04:08:08  6   Q.  Is it a valid excuse not to document things if you have a

04:08:11  7   caseload of homicides?

04:08:12  8   A.  No.

04:08:13  9   Q.  Is that too much to expect from a municipality with a high

04:08:16  10  level of homicides that they document things?

04:08:18  11  A.  I would -- as I have said before, it becomes even more

04:08:23  12  critically important that procedures and processes are in

04:08:27  13  place and centralized record keeping.

04:08:29  14  Q.  You were asked about your report being a living document.

04:08:32  15  Are police reports supposed to be living documents that can be

04:08:35  16  edited as the facts come in, or are they supposed to be set,

04:08:40  17  finalized and submitted?

04:08:41  18  A.  They are not supposed to be manipulated, if I understand

04:08:47  19  your question correctly.

04:08:48  20  Q.  In other words, let's say you have an event that happens

04:08:50  21  on Monday and you have another event that happens on Thursday

04:08:52  22  and another happens on next Tuesday, are you allowed to keep

04:08:56  23  your report unwritten as a living document until you see where

04:08:59  24  it's going or are you supposed to submit at each event?

04:08:59  25          MR. KULWIN:  Leading and argumentative.

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 109 of 164 PageID #:31144
***REALTIME UNEDITED TRANSCRIPT ONLY***

108

| | | |
|---|---|---|
| 04:09:00 | 1 | THE COURT: Overruled. |
| 04:09:01 | 2 | THE WITNESS: You're supposed to put the information |
| 04:09:04 | 3 | as close to the time that you gathered it or learned of it and |
| 04:09:09 | 4 | then you put it in there. |
| 04:09:11 | 5 | BY MR. LOEVY: |
| 04:09:11 | 6 | Q. You were asked about some detectives might have super |
| 04:09:16 | 7 | memories. Is there an exemption to the need to document |
| 04:09:19 | 8 | things for detectives who believe that they themselves can |
| 04:09:22 | 9 | remember things? |
| 04:09:23 | 10 | A. Absolutely not. |
| 04:09:23 | 11 | Q. Can you explain? |
| 04:09:24 | 12 | A. You are not -- no one has an infallible memory and even if |
| 04:09:29 | 13 | one had Carnac the Magnificent and was able to absolutely |
| 04:09:33 | 14 | recall things, they have to document to put in the report so |
| 04:09:38 | 15 | that it's available for others to see it any time. I'm sorry |
| 04:09:44 | 16 | about the poor analogy. But the detective can get hit by a |
| 04:09:48 | 17 | bus and if he's got three weeks' worth of information in his |
| 04:09:53 | 18 | wonderful memory it does no one any good. |
| 04:09:56 | 19 | Q. And memories do fade? |
| 04:09:58 | 20 | MR. KULWIN: Objection, he is not an expert. |
| 04:10:01 | 21 | THE COURT: Overruled as to what he is talking about. |
| 04:10:03 | 22 | BY MR. LOEVY: |
| 04:10:03 | 23 | Q. If I can have the ELMO? |
| 04:10:05 | 24 | THE COURT: You've got it. |
| 04:10:06 | 25 | BY MR. LOEVY: |

| | | |
|---|---|---|
| 04:10:06 | 1 | Q.  8625.  This is a police report for Nathson Fields dated |
| 04:10:11 | 2 | June the 17th and then submitted July the 7? |
| 04:10:14 | 3 | MR. KULWIN:  Objection, Judge to the premise.  That's |
| 04:10:18 | 4 | inaccurate.  It's a misstatement of the evidence. |
| 04:10:21 | 5 | MR. LOEVY:  Just ask the question. |
| 04:10:22 | 6 | BY MR. LOEVY: |
| 04:10:23 | 7 | Q.  If a police officer does an interview on June 13th of an |
| 04:10:26 | 8 | important witness, a suspect in a homicide case, is it |
| 04:10:29 | 9 | consistent or inconsistent with police practices to rely on |
| 04:10:33 | 10 | your memory and not create the police report until four days |
| 04:10:36 | 11 | later with no notes? |
| 04:10:37 | 12 | A.  I would expect the report to be done the same day and even |
| 04:10:40 | 13 | if it entailed unpaid overtime that before they went home for |
| 04:10:45 | 14 | the night, that would be written up. |
| 04:10:47 | 15 | Q.  How universal is that expectation? |
| 04:10:48 | 16 | A.  That's an expectation on the front line supervisor, |
| 04:10:53 | 17 | sergeants, lieutenants, captains, commanders. |
| 04:10:57 | 18 | Q.  How universal in the country as a law enforcement expert |
| 04:11:01 | 19 | is that? |
| 04:11:01 | 20 | A.  That's common practice.  That's my experience. |
| 04:11:03 | 21 | Q.  All right.  You were asked about, you said you spent a |
| 04:11:08 | 22 | range of 100 to 150 hours on the case? |
| 04:11:11 | 23 | A.  Yes. |
| 04:11:12 | 24 | Q.  And how many of those 100 to 150 hours in the case, you |
| 04:11:15 | 25 | did other things than review the file? |

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 111 of 164 PageID #:31146
***REALTIME UNEDITED TRANSCRIPT ONLY***

110

04:11:17    1    A.  Yes.

04:11:17    2    Q.  Tell the jury what else you did besides review the file?

04:11:22    3    A.  I reviewed at least three or four portions because

04:11:26    4    sometimes the depositions, for instance, with Mr. Hickey, were

04:11:31    5    done over several days, and so there were hours and hours

04:11:35    6    worth of transcribed depositions that I reviewed.  The

04:11:40    7    policies and procedures that I have reviewed, case.

04:11:44    8    Q.  Drafting the report as well?

04:11:45    9    A.  Drafting the report, yes.

04:11:47    10   Q.  You estimated you spent about 60 hours on the files.  Was

04:11:53    11   that a sufficient amount of time to accomplish the project

04:11:55    12   that you accomplished?

04:11:55    13   A.  In the parameters that I had, yes.

04:11:58    14   Q.  All right.  Returning to Mr. Noland's questions, if there

04:12:02    15   were 57, 745 criminal defense file pages and 88,290 basement

04:12:10    16   file pages for a total of about 140,000, I'll ask you to

04:12:14    17   assume that, did you do a page by page audit of all 140,000

04:12:19    18   pages?

04:12:19    19   A.  No.

04:12:19    20   Q.  How much would that have cost for you to look through

04:12:22    21   every page and see if it should be in or out and putting

04:12:26    22   thought into every page?

04:12:27    23   A.  I can't even begin to imagine how many weeks or months

04:12:31    24   that would have taken.

04:12:32    25   Q.  All right.  You have come to learn that the defendant

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 112 of 164 PageID #:31147

04:12:34  1  spent quite a bit of time and money doing that audit, correct?

04:12:37  2  A.  Yes.

04:12:37  3  Q.  And they have confronted you with some of the mistakes you

04:12:40  4  made, correct?

04:12:42  5  A.  Yes.

04:12:42  6  Q.  All right.  After having been confronted with those pages

04:12:45  7  that should have been on one side of the line and you put them

04:12:48  8  on the other side of the line, does that change anything about

04:12:50  9  your opinions?

04:12:50  10  A.  No, it does not.

04:12:51  11  Q.  In fact, several hundred pages out of a sample size that

04:12:55  12  bad, is that a terrible rate of error?

04:12:58  13          MR. KULWIN:  Objection, leading.

04:12:59  14          THE COURT:  Overruled.

04:13:00  15          THE WITNESS:  Well, I would prefer to have no errors,

04:13:02  16  obviously, but it's not significant in the pattern that I was

04:13:07  17  observing.

04:13:07  18  BY MR. LOEVY:

04:13:08  19  Q.  Talk about that for a minute, if you would, sir.  They

04:13:11  20  showed you examples of specific pages that shouldn't have been

04:13:14  21  on.  Tell me about the broader patterns you saw.

04:13:18  22  A.  In the individual cases that I looked at, there were very

04:13:25  23  specific listing of individuals who were identified as

04:13:30  24  possible suspects or alternative suspects in the

04:13:36  25  investigation, that there were witnesses that had information

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 113 of 164 PageID #:31148

| | |
|---|---|
| 04:13:41 | 1 |
| 04:13:48 | 2 |
| 04:13:52 | 3 |
| 04:13:55 | 4 |
| 04:13:57 | 5 |
| 04:14:01 | 6 |
| 04:14:03 | 7 |
| 04:14:04 | 8 |
| 04:14:06 | 9 |
| 04:14:06 | 10 |
| 04:14:08 | 11 |
| 04:14:10 | 12 |
| 04:14:11 | 13 |
| 04:14:12 | 14 |
| 04:14:13 | 15 |
| 04:14:13 | 16 |
| 04:14:17 | 17 |
| 04:14:18 | 18 |
| 04:14:26 | 19 |
| 04:14:31 | 20 |
| 04:14:40 | 21 |
| 04:14:45 | 22 |
| 04:14:51 | 23 |
| 04:14:55 | 24 |
| 04:14:58 | 25 |

1  that was not followed up on, or that there was contradictory

2  information, for instance, a witness seeing someone but was

3  too far away to identify them or they were wearing masks.

4  Q.  All right.  That kind of pattern, was that evident

5  notwithstanding the fact that some of the court records should

6  have been listed as produced and not produced?

7            MR. NOLAND:  Objection, argumentative.

8            THE COURT:  Sustained.

9  BY MR. LOEVY:

10  Q.  All right.  Mr. Noland asked you if you were lying about

11  having performed the case by case analysis.  Do you remember

12  that question?

13  A.  Yes, I do.

14  Q.  Were you lying, sir?

15  A.  No.

16  Q.  Tell the jury what you did to do that review, sir, where

17  you were, provide some context.

18  A.  I have a home office set up with a couple of computers and

19  an iPad and as I have the material electronically, I open up

20  the files, I look at them, I as thoroughly as I try to be put

21  that material there, I'll start a spreadsheet, I'll start a

22  list of material reviewed, I'll start a list of bibliography

23  and as I am getting more information and it's kind of like a

24  homicide investigation, as you're getting more information,

25  you're adding to it, and you eventually finish and develop

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 114 of 164 PageID #:31149

113

| | |
|---|---|
| 04:15:01 | 1 | your product.  That's the way I do it. |
| 04:15:04 | 2 | Q.  All right.  You said this morning that you started at 90 |
| 04:15:07 | 3 | percent of the investigative files were missing -- the |
| 04:15:11 | 4 | criminal defense files were missing investigative materials, |
| 04:15:14 | 5 | did I get that right? |
| 04:15:15 | 6 | A.  Yes. |
| 04:15:15 | 7 | Q.  Even after the examples that they pointed out at your |
| 04:15:18 | 8 | deposition, what is the number of criminal defense files that |
| 04:15:20 | 9 | were missing investigative material, what percentage? |
| 04:15:22 | 10 | A.  100 percent. |
| 04:15:23 | 11 | Q.  So the fact that they were able to provide you some |
| 04:15:28 | 12 | examples of files, of documents that you thought were missing |
| 04:15:31 | 13 | but weren't missing, did that change the overall number of |
| 04:15:35 | 14 | files that were missing documents? |
| 04:15:36 | 15 | A.  No, when you're looking at all of these files and you take |
| 04:15:41 | 16 | out either, you know, one and, for instance, in Anima, there |
| 04:15:49 | 17 | were still pages that were missing, but you can even say, |
| 04:15:55 | 18 | okay, I am going to give the city the absolute benefit of the |
| 04:16:04 | 19 | doubt and throw the case away, it doesn't change my opinion. |
| 04:16:06 | 20 | Q.  You did the 60-hour job which was obviously a rough way of |
| 04:16:10 | 21 | doing it? |
| 04:16:11 | 22 | A.  Yes. |
| 04:16:12 | 23 | MR. KULWIN:  Objection, objection, argumentative. |
| 04:16:14 | 24 | THE COURT:  Sustained. |
| 04:16:15 | 25 | BY MR. LOEVY: |

04:16:15   1   Q.  If I understood your answers to Mr. Kulwin and Mr. Noland,

04:16:19   2   you were saying you weren't actually considering each page and

04:16:21   3   say was -- you know, let me look at the context of a page.  It

04:16:25   4   was just yes or no, is it in one file, is it in the other

04:16:29   5   file, is that a fair summary?

04:16:31   6   A.  Yes.

04:16:31   7   Q.  Even though you did it in very rough page and didn't

04:16:35   8   analyze the page, was it still a useful exercise?

04:16:38   9   A.  Yes, it was.

04:16:38   10  Q.  You were asked about the 50 criminal defense attorneys

04:16:41   11  foils and those were the files that could be located, correct?

04:16:45   12  A.  Yes.

04:16:45   13  Q.  If more could have been located?

04:16:47   14       MR. NOLAND:  Objection, Judge, foundation as to that

04:16:49   15  last statement.

04:16:50   16       THE COURT:  Overruled.

04:16:51   17  BY MR. LOEVY:

04:16:51   18  Q.  Is your any understanding there was any cherry-picking at

04:16:54   19  all as far as criminal defense files weren't given to you?  If

04:16:56   20  they were located, you were supposed to get them?

04:16:58   21       MR. NOLAND:  Objection.

04:16:58   22       THE COURT:  Overruled.

04:16:59   23       THE WITNESS:  Yes.

04:17:00   24  BY MR. LOEVY:

04:17:00   25  Q.  All right.  You admitted you didn't interview defense

| | | |
|---|---|---|
| 04:17:04 | 1 | attorneys.  You did not interview these 50 defense attorneys, |
| 04:17:09 | 2 | right? |
| 04:17:09 | 3 | A.  That's right. |
| 04:17:10 | 4 | Q.  All right.  You were asked if a document that was created |
| 04:17:14 | 5 | 15 years later could have been withheld.  Do you remember that |
| 04:17:17 | 6 | question? |
| 04:17:17 | 7 | A.  I believe so. |
| 04:17:18 | 8 | Q.  All right.  Of course in Mr. Fields' case, if he was |
| 04:17:20 | 9 | convicted in '86 and he had a retrial in 2009, a document that |
| 04:17:24 | 10 | was created 15 years later very well could have been withheld |
| 04:17:27 | 11 | and been material, correct? |
| 04:17:29 | 12 | A.  Yes. |
| 04:17:29 | 13 | Q.  You don't know going into an investigation what's going to |
| 04:17:31 | 14 | be material and what's not, right? |
| 04:17:32 | 15 | A.  Correct. |
| 04:17:33 | 16 | Q.  That's why you need processes that work? |
| 04:17:35 | 17 | A.  Yes. |
| 04:17:35 | 18 | Q.  All right.  You were asked about Mr. Noland put on the |
| 04:17:39 | 19 | screen, there was a bunch of names and he asked you isn't it |
| 04:17:41 | 20 | true some of these names were in the police reports, do you |
| 04:17:44 | 21 | remember that question? |
| 04:17:44 | 22 | A.  Yes. |
| 04:17:44 | 23 | Q.  You did not analyze all the police reports and all the |
| 04:17:47 | 24 | names in these 140,000 files, correct? |
| 04:17:49 | 25 | A.  No, I did not. |

11/29/16 PM          Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 117 of 164 PageID #:31152
***REALTIME UNEDITED TRANSCRIPT ONLY***

116

| | | |
|---|---|---|
| 04:17:50 | 1 | Q.  And you never purported to, correct? |
| 04:17:52 | 2 | A.  No. |
| 04:17:52 | 3 | Q.  The fact that a name is in a police report, does that mean |
| 04:17:56 | 4 | that all the exculpatory information relating to the name |
| 04:17:59 | 5 | that's also in the investigative file has been given to the |
| 04:18:02 | 6 | criminal defendant? |
| 04:18:03 | 7 | A.  No, absolutely not. |
| 04:18:04 | 8 | THE COURT:  Hang on. |
| 04:18:05 | 9 | MR. NOLAND:  Objection, argumentative.  It misstates |
| 04:18:09 | 10 | -- |
| 04:18:09 | 11 | THE COURT:  Everybody was talking at the same time. |
| 04:18:11 | 12 | I'll just look at what you said.  Overruled.  It wasn't |
| 04:18:19 | 13 | attempting to paraphrase a question. |
| 04:18:21 | 14 | BY MR. LOEVY: |
| 04:18:21 | 15 | Q.  For example, document number 8609 has a reference to a |
| 04:18:26 | 16 | Delbert Edwards, correct? |
| 04:18:27 | 17 | A.  Yes. |
| 04:18:27 | 18 | Q.  And the jury has seen these do you mean.  But just because |
| 04:18:30 | 19 | Delbert Edwards is in the official file does not mean that the |
| 04:18:34 | 20 | defense attorney is getting a copy of plaintiff's 1-69 from |
| 04:18:38 | 21 | the investigative file with additional information, correct? |
| 04:18:40 | 22 | A.  That's absolutely correct. |
| 04:18:41 | 23 | Q.  So is it sufficient just to put a name in a police report? |
| 04:18:44 | 24 | A.  No. |
| 04:18:44 | 25 | Q.  Now, you were asked about court attendance sheets.  And |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 118 of 164 PageID #:31153

| | | |
|---|---|---|
| 04:18:49 | 1 | you were asked isn't it true some of them might not be |
| 04:18:51 | 2 | helpful, right? |
| 04:18:52 | 3 | A.  Yes. |
| 04:18:52 | 4 | Q.  You were also asked isn't it true that if it happened in |
| 04:18:56 | 5 | court it couldn't possibly be exculpatory, do you remember |
| 04:18:57 | 6 | that? |
| 04:18:58 | 7 | A.  Yes. |
| 04:18:58 | 8 | Q.  Let me give you a hypothetical.  Let's say in Nate Fields |
| 04:19:01 | 9 | case in 1986, there was a court attendance sheet that showed |
| 04:19:04 | 10 | O'Callaghan was present in court on a day he wasn't scheduled |
| 04:19:07 | 11 | to be there but Randy Langston was there? |
| 04:19:10 | 12 | MR. KULWIN:  I'm going to object to the nature. |
| 04:19:12 | 13 | There is no basis for that question. |
| 04:19:14 | 14 | THE COURT:  I am going to say it's beyond the scope |
| 04:19:16 | 15 | of the report.  You'll argue it later. |
| 04:19:18 | 16 | BY MR. LOEVY: |
| 04:19:19 | 17 | Q.  May I ask then, there are ways in which even |
| 04:19:22 | 18 | administrative documents might turn out to be exculpatory, |
| 04:19:25 | 19 | right? |
| 04:19:25 | 20 | A.  Absolutely. |
| 04:19:25 | 21 | Q.  And that's why everything should be turned over? |
| 04:19:27 | 22 | A.  Yes. |
| 04:19:27 | 23 | Q.  All right.  You were asked about the Crockett file.  Do |
| 04:19:31 | 24 | you remember those questions? |
| 04:19:32 | 25 | A.  Yes. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 119 of 164 PageID #:31154
***REALTIME UNEDITED TRANSCRIPT ONLY***

118

04:19:32   1   Q.  I am going to move to the end here.

04:19:37   2        You were asked about criminal defense attorney files

04:19:40   3   having subpoenas.  Do you remember those questions?

04:19:42   4   A.  Yes.

04:19:42   5   Q.  Does the fact that the Chicago Police Department has

04:19:46   6   documents that are in the state's attorney's file mean that

04:19:51   7   they are not withholding anything?

04:19:52   8   A.  Would you rephrase?  I'm sorry.  Say that again.

04:19:55   9   Q.  I'm going to show you Plaintiff's Exhibit 312105.  This is

04:20:00   10  from the sees he will Robinson file?

04:20:03   11  A.  Yes.

04:20:04   12  Q.  Do you remember examples where criminal defendants sent

04:20:09   13  subpoenas c-e-c-i-i-l, sent documents directly to the Chicago

04:20:13   14  Police Department?

04:20:13   15       MR. KULWIN:  Judge, I am going to object here for a

04:20:15   16  second on this particular document and ask to take it off the

04:20:20   17  ELMO and ask to be heard.

04:20:21   18       MR. LOEVY:  Your Honor, I will withdraw it.  I don't

04:20:23   19  want to waste any more time.

04:20:24   20       THE COURT:  Fine.

04:20:26   21  BY MR. LOEVY:

04:20:28   22  Q.  All right.  Now, you were asked a lot of questions of your

04:20:38   23  comparison between blue and green which is the investigative

04:20:42   24  files and the defense files?

04:20:42   25  A.  That is correct.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 120 of 164 PageID #:31155
***REALTIME UNEDITED TRANSCRIPT ONLY***

119

04:20:43    1    Q.  Let's say you got everything wrong on the comparison

04:20:46    2    between the criminal defense files and the investigative

04:20:49    3    files, do you understand my hypothetical?

04:20:49    4    A.  Yes, I do.

04:20:50    5    Q.  Does that have anything to do with the opinion you gave,

04:20:53    6    the blue problem, all the problems with the investigative

04:20:55    7    files as a stand alone problem, does that have any effect on

04:20:58    8    that at all?

04:20:59    9    A.  Absolutely none.

04:21:00    10   Q.  How about your analysis on the permanent retention files,

04:21:03    11   do any of the typos and missing documents have any effect on

04:21:06    12   any of the opinions you've given here in court about the

04:21:08    13   problems with the permanent retention files?

04:21:12    14   A.  No, they do not.

04:21:13    15   Q.  Does it have any problem that the stuff in the

04:21:16    16   investigative files wasn't getting into the permanent

04:21:18    17   retention files?

04:21:18    18   A.  It has absolutely no effect on it.

04:21:20    19   Q.  And as far as the problems they showed you that some.

04:21:27    20   Documents you thought had been withheld from the criminal

04:21:29    21   defense attorneys files weren't, you understand that the

04:21:33    22   state's attorney, they have done a similar review of the

04:21:36    23   state's attorney's documents, correct?

04:21:38    24   A.  I am aware of that.

04:21:40    25   Q.  If 60 percent of the files from the state's attorney's

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 121 of 164 PageID #:31156

04:21:43   1   office did not have material from the basement files, is that

04:21:46   2   an acceptable percentage?

04:21:47   3   A.  No, it's not.

04:21:48   4   Q.  Okay.  Let me confer for a moment?

04:21:51   5      (Brief pause.)

04:21:57   6          MR. LOEVY:  Your Honor, we would want to admit 307,

04:22:01   7   if there's any additional information from the witness.

04:22:04   8          THE COURT:  No it's not a foundational.  Anything

04:22:10   9   else, Mr. Noland?

04:22:12  10          MR. NOLAND:  Just quickly, Judge.

04:22:12  11                           - - -

04:22:12  12          MICHAEL DAVID BRASFIELD, RECROSS-EXAMINATION

04:22:12  13   BY MR. NOLAND:

04:22:14  14   Q.  Mr. Loevy, was asking you about a color, the blue color

04:22:17  15   thing with the permanent retention files and your opinions?

04:22:21  16   A.  The blue was the investigative files.

04:22:23  17   Q.  Okay.  And the investigative files about whether or not

04:22:27  18   there are notes not on a GPR form in those types of files, is

04:22:31  19   that the blue section?

04:22:32  20   A.  I'm sorry.  Say that again.

04:22:35  21   Q.  What is the blue section?

04:22:36  22   A.  The blue section is the investigative files.

04:22:39  23   Q.  But you are not saying?

04:22:42  24   A.  The basement files, mischaracterized basement files.

04:22:47  25   Q.  That wasn't the section dealing with the comparison with

04:22:49   1   the criminal defense files, correct?

04:22:51   2   A.  I'm sorry.  Say that again.

04:22:55   3   Q.  I'm sorry.  I was confused with the question with

04:22:58   4   plaintiff's counsel and probably my fault.

04:23:00   5       What I'm asking you is that the comparison with the

04:23:05   6   -- the only comparison you made with respect to whether or not

04:23:08   7   documents were missing from criminal defense files were on

04:23:12   8   those 50 cases that you and I spent some time with, right?

04:23:15   9   A.  Yes.

04:23:15  10   Q.  So all the other opinions you've given with respect to

04:23:23  11   permanent retention files and anything else and investigative

04:23:25  12   files, you're not offering any opinion that anything from

04:23:28  13   those files were withheld in those criminal cases; am I

04:23:36  14   correct? You are just giving an opinion about the compliance

04:23:38  15   or non-compliance with the special order, right?

04:23:40  16   A.  I've testified what I testified to.  The material, when we

04:23:47  17   were looking at the criminal -- when I was looking at the

04:23:49  18   criminal defense files, whether they contained or did not

04:23:53  19   contain documents.  I also testified that I looked at the

04:23:59  20   investigative files as a stand alone process, what was in it,

04:24:02  21   what wasn't in it, I looked at the permanent retention files,

04:24:06  22   what was in it, what weren't in it, and then a comparison

04:24:10  23   between the investigative file and the basement file so the

04:24:15  24   permanent retention file.

04:24:15  25   Q.  And my question was that the only aspect of your review

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 123 of 164 PageID #:31158
***REALTIME UNEDITED TRANSCRIPT ONLY***

122

04:24:20  1  related to what the CPD produced or didn't produce had to do

04:24:24  2  with the comparison with those 50 criminal defense files,

04:24:27  3  correct?

04:24:27  4  A.  Not entirely.

04:24:29  5  Q.  Isn't it true that you had no basis to say that in any of

04:24:39  6  those -- nothing to evaluate with with any of the files other

04:24:43  7  than those 50 files, you have the 400 or so?

04:24:46  8          MR. LOEVY:  Objection, scope, your Honor.

04:24:48  9          THE COURT:  Hang on a second.  Let me hear the whole

04:24:50  10  question.

04:24:51  11  BY MR. NOLAND:

04:24:51  12  Q.  That anything was withheld from criminal defense attorneys

04:24:53  13  in those cases?

04:24:54  14          THE COURT:  Hang on a second.  I am going to sustain

04:25:00  15  the objection under Rule 403.

04:25:04  16          MR. NOLAND:  Nothing else.  Thanks, Judge.

04:25:07  17          THE WITNESS:  Thank you.

04:25:08  18          MR. KULWIN:  Nothing else, Judge.

04:25:09  19          MR. LOEVY:  We could try to call the next witness,

04:25:11  20  your Honor.

04:25:11  21          THE COURT:  Well, do you have any more questions

04:25:13  22  based on the redirect?

04:25:14  23          MR. LOEVY:  No.

04:25:15  24          THE COURT:  Do any of the jurors have any questions?

04:25:17  25          We are definitely going to start with the next

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 124 of 164 PageID #:31159
***REALTIME UNEDITED TRANSCRIPT ONLY***

123

| 04:25:36 | 1 | witness. |
| 04:25:40 | 2 | THE COURT: Let me see the lawyers at sidebar. |
| 04:25:42 | 3 | (The following proceedings were had at sidebar outside the |
| 04:25:48 | 4 | hearing of the jury:) |
| 04:25:48 | 5 | THE COURT: Okay. I am going to read these. What |
| 04:25:55 | 6 | did you mean by this -- the early part of miss testimony, what |
| 04:25:58 | 7 | did you mean by this case herewith Mr. Fields was the driving |
| 04:26:02 | 8 | file, the word is driving. I honestly don't remember it. |
| 04:26:05 | 9 | MR. LOEVY: I don't understand the question. |
| 04:26:07 | 10 | THE COURT: You referred to the -- the juror thought |
| 04:26:13 | 11 | he said something along the lines the case herewith Mr. Fields |
| 04:26:17 | 12 | was the driving file. I really don't -- |
| 04:26:20 | 13 | MR. BURNS: Early on when you were identifying files, |
| 04:26:23 | 14 | you identified Fields first. |
| 04:26:24 | 15 | MR. LOEVY: I was trying to say was it typical of the |
| 04:26:27 | 16 | others or do they mean running file? |
| 04:26:29 | 17 | MR. KULWIN: I think -- the way I take it, what I |
| 04:26:32 | 18 | heard was that it was like the driving thing that led to his |
| 04:26:36 | 19 | retention and why he was. |
| 04:26:38 | 20 | THE COURT: Maybe I will just ask him a leading |
| 04:26:40 | 21 | question about that. |
| 04:26:41 | 22 | The second question, were the other files, the |
| 04:26:44 | 23 | basement files that he looked at, were they all homicide |
| 04:26:48 | 24 | files, anybody have a problem with that? |
| 04:26:53 | 25 | MR. NOLAND: No. |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 125 of 164 PageID #:31160

04:26:54  1          THE COURT:  You stated that there was not enough

04:26:56  2   police training for constitutional safeguards for individual,

04:26:58  3   will you elaborate on constitutional safeguards for

04:27:02  4   individuals, what individuals?

04:27:04  5          MR. KULWIN:  Can I have that one again?

04:27:06  6          THE COURT:  Just look at it.

04:27:10  7          MR. KULWIN:  There was not enough police training for

04:27:13  8   constitutional safeguards, what individuals?  You can ask

04:27:17  9   that, Judge.

04:27:19  10          THE COURT:  Okay.  Fine.

04:27:22  11          Who is the next witness?

04:27:24  12          MR. LOEVY:  Andrea Lyon.

04:27:26  13          MR. NOLAND:  The only point I was trying to make at

04:27:29  14   the end, the last objection you sustained, what I was trying

04:27:34  15   to get at was a motion in limine, he couldn't say anything

04:27:37  16   other than the criminal defense files and those other 400 or

04:27:40  17   so he looked at that anything was withheld.  We had a motion

04:27:45  18   in limine on that.

04:27:45  19          THE COURT:  It wasn't what it sounded like to me, so

04:27:49  20   I overruled it.

04:27:53  21    (The following proceedings were had in open court in the

04:27:54  22   presence and hearing of the jury:)

04:27:54  23          THE COURT:  I think it was somewhere early in your

04:27:57  24   direct examination, I think a question may have been asked

04:28:00  25   that referred to Mr. Fields' case as kind of the driving file.

| 04:28:06 | 1 | Is it fair to say that what prompted you to be retained in |
| 04:28:10 | 2 | this case was the Fields matter? |
| 04:28:11 | 3 | THE WITNESS:  Yes. |
| 04:28:12 | 4 | THE COURT:  Okay.  The other basement files that you |
| 04:28:15 | 5 | looked at, were they all homicide cases? |
| 04:28:18 | 6 | THE WITNESS:  Yes. |
| 04:28:18 | 7 | THE COURT:  Okay.  And then the last question is you |
| 04:28:20 | 8 | made, you gave some testimony along the lines of there wasn't |
| 04:28:23 | 9 | enough training involving constitutional safeguards for |
| 04:28:27 | 10 | individuals.  And the question is who are the individuals you |
| 04:28:30 | 11 | are talking about?  Are you talking about defendants in |
| 04:28:32 | 12 | criminal cases? |
| 04:28:32 | 13 | THE WITNESS:  That would be part of the group, yes. |
| 04:28:35 | 14 | THE COURT:  Okay.  Follow-up based on that, |
| 04:28:38 | 15 | Mr. Loevy? |
| 04:28:38 | 16 | MR. LOEVY:  No, your Honor. |
| 04:28:40 | 17 | THE COURT:  Anybody else? |
| 04:28:40 | 18 | MR. NOLAND:  No, your Honor. |
| 04:28:41 | 19 | THE COURT:  You are excused. |
| 04:28:42 | 20 | THE WITNESS:  Thank you, your Honor. |
| 04:28:44 | 21 | THE COURT:  Please call the next witness. |
| 04:28:47 | 22 | MR. SWAMINATHAN:  Plaintiff calls Andrea line. |
| 04:29:53 | 23 | THE COURT:  Come on up. |
| 04:29:56 | 24 | (Witness sworn.) |
| 04:29:56 | 25 | - - - |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 127 of 164 PageID #:31162
***REALTIME UNEDITED TRANSCRIPT ONLY***

126

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 04:29:56 | 1  | ANDREA LYON, DIRECT EXAMINATION                              |
| 04:30:10 | 2  | BY MR. SWAMINATHAN:                                           |
| 04:30:10 | 3  | Q.  Good afternoon, could you please state your name.        |
| 04:30:13 | 4  | A.  Andrea Lyon, L-y-o-n.                                     |
| 04:30:16 | 5  | Q.  Please tell the jury what you do?                         |
| 04:30:18 | 6  | A.  I am the dean of the Valparaiso university law school.    |
| 04:30:21 | 7  | Q.  What does that position entail?                           |
| 04:30:23 | 8  | A.  A lot of things.  I run the law school, I teach, set      |
| 04:30:26 | 9  | policy, fund raise, deal with personnel issues, there is seems |
| 04:30:32 | 10 | to be at least one crises a day seems to be part of it.      |
| 04:30:35 | 11 | Q.  Do you loss have a private practice?                      |
| 04:30:38 | 12 | A.  I have some cases that I work on.  I wouldn't call it a   |
| 04:30:42 | 13 | business.  My students work with me.                          |
| 04:30:45 | 14 | Q.  What kind of cases do you work on?                        |
| 04:30:47 | 15 | A.  Right now I have one that is in state post conviction and |
| 04:30:51 | 16 | one that is in state appeals court.                           |
| 04:30:52 | 17 | Q.  When you say state post conviction, are these criminal    |
| 04:30:56 | 18 | cases?                                                        |
| 04:30:56 | 19 | A.  Yes, they are both criminal cases.                        |
| 04:30:58 | 20 | Q.  Criminal cases in an appeals phase?                       |
| 04:31:00 | 21 | A.  Correct.                                                  |
| 04:31:01 | 22 | Q.  Do you have experience doing criminal trials?            |
| 04:31:03 | 23 | A.  I do.                                                     |
| 04:31:04 | 24 | Q.  How many -- let me ask you, do you have experience doing  |
| 04:31:08 | 25 | homicide trials?                                              |

04:31:09  1  A.  I do.

04:31:09  2  Q.  Approximately how many homicide trials do you think you've

04:31:12  3  done?

04:31:12  4  A.  It's actually I know the number, it's 138 murder trials

04:31:16  5  that I have defended.

04:31:16  6  Q.  And when did you first begin doing homicide trials?

04:31:20  7  A.  Now I have to tell my age.  1979.

04:31:24  8       MR. KULWIN:  Judge, I am going to object to all of

04:31:26  9  this on relevancy grounds based on what we were surprised for

04:31:29  10  the purpose of this witness.

04:31:30  11       THE COURT:  I think you're pretty close to getting to

04:31:32  12  the point tip point, Mr. Swaminathan.

04:31:35  13       MR. SWAMINATHAN:  All right.

04:31:36  14  BY MR. SWAMINATHAN:

04:31:37  15  Q.  When you started doing outside cases were you working at

04:31:40  16  the Cook County public defender's office?

04:31:41  17  A.  I was.

04:31:43  18  Q.  When you worked there, did you work in the homicide

04:31:46  19  division?

04:31:46  20  A.  I did.

04:31:47  21  Q.  What position did you hold there?

04:31:48  22  A.  I was one of the members of the task force and then I was

04:31:51  23  a supervisor and then I was the chief.

04:31:52  24  Q.  When you worked there, did you become familiar with the

04:31:55  25  file keeping practices?

04:31:57    1   A.  Yes.

04:31:57    2   Q.  And what was the practice?

04:31:58    3   A.  The practice was you kept absolutely every piece of paper.

04:32:01    4           MR. KULWIN:  Judge, I am going to object on this and

04:32:03    5   ask to be heard.

04:32:05    6           THE COURT:  Okay.

04:32:15    7     (The following proceedings were had at sidebar outside the

04:32:22    8   hearing of the jury:)

04:32:22    9           MR. KULWIN:  We were told, we were told -- we were

04:32:25   10   told that the only purpose for this witness was to come in and

04:32:28   11   say I worked on this specific file that I remember I got this

04:32:32   12   stuff or didn't get this stuff.  They have now tried to shoe

04:32:36   13   horn her as an expert in criminal defense and now they are

04:32:40   14   trying to get her to give an expert opinion on the practices

04:32:43   15   of the public defender's office and what their retention

04:32:46   16   policies is, it wasn't disclosed, it has never been disclosed

04:32:49   17   and my view of it is they are it's highly prejudicial,

04:32:55   18   undisclosed.

04:32:55   19           MR. LOEVY:  Both side disclosed a number of Monell

04:32:58   20   witnesses.  We deposed just about every state's attorney they

04:33:01   21   disclosed.  They didn't disclose Ms. Lyon.  She is barely

04:33:04   22   listed on the pretrial order.  She is a witness in the case.

04:33:12   23           MR. BURNS:  She is disclosed.

04:33:13   24           THE COURT:  Let me look at it.

04:33:18   25           MR. MICHALIK:  Page 7, Judge.

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 130 of 164 PageID #:31165
***REALTIME UNEDITED TRANSCRIPT ONLY***

129

04:33:28  1        MR. BURNS:  She was disclosed here.

04:33:31  2        THE COURT:  What were you going to show me,

04:33:33  3  Mr. Michalik?

04:33:34  4        MR. MICHALIK:  It was that page and I'll also

04:33:36  5  represent the only document that was produced, there was no

04:33:38  6  criminal defense file produced in the Fulton case for which

04:33:41  7  she has been disclosed.  The only document was an unsigned

04:33:44  8  undated petition of the post conviction.  So any testimony as

04:33:50  9  to policies, practices, of the public defender goes far beyond

04:33:54  10  the scope of anything that was disclosed here.

04:33:56  11        MR. LOEVY:  The only thing I would add is they

04:33:58  12  disclosed, how many states attorneys have they disclosed?

04:34:02  13        MR. SWAMINATHAN:  20 to 25.

04:34:05  14        MR. LOEVY:  We deposed a lot of them.  They disclosed

04:34:09  15  25 Monell witnesses, we disclosed roughly the same number B

04:34:13  16  yeah, but I mean people make judgments about who to depose

04:34:16  17  based on what the disclosure is and the way I'm reading that

04:34:19  18  disclosure was that she was disclosed as somebody who was

04:34:22  19  going to testify about a particular case and now she's been

04:34:25  20  asked a question about policies and practices.  My view of

04:34:28  21  this is it's not admissible on direct.  It may be admissible

04:34:32  22  on redirect depending on what the cross is about whatever.

04:34:35  23  But you can't do it on direct.

04:34:37  24        MR. LOEVY:  All right.

04:34:38  25        MR. SWAMINATHAN:  The state's attorneys, they have

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 131 of 164 PageID #:31166

04:34:42   1   disclosed for specific cases that they have said in their

04:34:44   2   depositions and we expect them to say they are not going to

04:34:47   3   have they have any knowledge about the specific cases.

04:34:50   4   Instead, they are going to testify about the practices in the

04:34:52   5   department because they don't have any memory of the specific

04:34:54   6   files they have been disclosed for so really each of the

04:34:58   7   people they have identified.

04:34:59   8           THE COURT:  You don't -- starting to walk away --

04:35:04   9           MR. SWAMINATHAN:  Given that context, she is

04:35:06   10  essentially doing the same thing, the only difference being

04:35:08   11  they don't know exactly what she is going to be saying because

04:35:11   12  they chose not to depose her.

04:35:13   13          THE COURT:  Look, what I'm saying is that you cannot

04:35:19   14  ask this question in this way.  I don't know exactly what

04:35:22   15  she's going to testify to.  My understanding is she is going

04:35:25   16  to say that certain documents weren't in the file that she

04:35:28   17  reviewed as post conviction attorney.  Right?  Did I basically

04:35:32   18  the primary thrust of her testimony?  Whether you can get this

04:35:36   19  in in some other way in the context of, you know, what is it

04:35:39   20  that make her think that the file is complete, I don't know, I

04:35:42   21  am going to have to wait until I see it.  But there you go.

04:35:47   22          MR. KULWIN:  I want to be heard on that point.  I'm

04:35:49   23  very sorry.

04:35:50   24          THE COURT:  Is there going to be a question on cross,

04:35:52   25  do you have any idea if the file is complete.

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 132 of 164 PageID #:31167

04:35:55   1      MR. KULWIN:  No, I am not going to ask her that.  I

04:35:57   2   don't think that they can now set her up with the answer was

04:36:03   3   stricken and them announcing do you know whether in this file

04:36:06   4   this stuff was in there, they can ask that, but they can't say

04:36:11   5   how down and then she is going to know that the policy of the

04:36:14   6   public defender's office.

04:36:16   7      THE COURT:  It's going to be what happened.

04:36:17   8      MR. SWAMINATHAN:  She is going to explain for this

04:36:19   9   file why she has a complete file, she wept and got the file,

04:36:24   10   she went to the police department, and now with regard to this

04:36:29   11   file, the basement file.

04:36:33   12      MR. MICHALIK:  What I am hearing.

04:36:35   13      THE COURT:  What time is it right now?

04:36:40   14      MR. KULWIN:  4:40.

04:36:42   15      THE COURT:  We are going to stop here.  We are not

04:36:45   16   even close to finishing her direct.

04:36:47   17      MR. SWAMINATHAN:  Five to seven minutes.

04:36:51   18      THE COURT:  Let's see where we get.

04:36:59   19   (The following proceedings were had in open court in the

04:36:59   20   presence and hearing of the jury:)

04:36:59   21      THE COURT:  All right.  The objection is sustained.

04:37:01   22   The last question and answer are stricken.  The jury is

04:37:03   23   directed to disregard it.  Mr. Swaminathan, you can go ahead.

04:37:05   24   BY MR. SWAMINATHAN:

04:37:08   25   Q.

04:37:08   1        MR. KULWIN:  We have a question in the back from a

04:37:10   2   juror.

04:37:10   3        THE JURY:   I got up to 1979 with some.  I couldn't

04:37:15   4   hear.

04:37:15   5        THE COURT:  Okay.  You can't do that.  If you have --

04:37:18   6   I am going to say it again.  I said at the beginning of the

04:37:21   7   trial.  If you have a question, ask it then.  And it's

04:37:26   8   completely appropriate, it's completely appropriate for a

04:37:29   9   juror to ask I missed something, can you please repeat this.

04:37:32  10   That's completely appropriate because sometimes miss things.

04:37:36  11   The lawyers have been working with these for a long time.  You

04:37:38  12   guys are getting it all cold, that's just fine.  I need you to

04:37:41  13   do it in the way I described is you can write it out.  Go

04:37:45  14   ahead.

04:37:46  15   BY MR. SWAMINATHAN:

04:37:47  16   Q.  I want to turn to the present day.

04:37:48  17   A.  Sure.

04:37:49  18   Q.  At some point did you become aware that there was a file,

04:37:51  19   a street file that was not disclosed to Mr. Fields long after

04:37:54  20   his criminal trial?

04:37:55  21   A.  I did.

04:37:56  22   Q.  Okay.  And did you become aware that there were other

04:37:58  23   homicide files that were possibly in the same location as

04:38:01  24   where Mr. Fields' street file was located?

04:38:04  25   A.  Yes.

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 134 of 164 PageID #:31169
***REALTIME UNEDITED TRANSCRIPT ONLY***

133

| | | |
|---|---|---|
| 04:38:05 | 1 | Q. Okay. And did you learn that one of those files related |
| 04:38:07 | 2 | to a case of yours? |
| 04:38:08 | 3 | A. I did. |
| 04:38:09 | 4 | Q. What was that case? |
| 04:38:10 | 5 | A. I represent Jon Fulton in the post conviction criminal |
| 04:38:15 | 6 | case that I referred to earlier. |
| 04:38:16 | 7 | Q. And what is he charged with? |
| 04:38:18 | 8 | A. He's actually been convicted of murder. That's the -- |
| 04:38:23 | 9 | Q. Approximately when was the crime for which he's been |
| 04:38:26 | 10 | charged? |
| 04:38:26 | 11 | A. 2003. |
| 04:38:26 | 12 | Q. Okay. And do you have a file, a file that you keep |
| 04:38:30 | 13 | related to Mr. Fulton's case? |
| 04:38:32 | 14 | A. I do. |
| 04:38:32 | 15 | Q. Now, you said that you're his post conviction lawyer which |
| 04:38:35 | 16 | means you did not represent him at the original criminal |
| 04:38:37 | 17 | trial, correct? |
| 04:38:38 | 18 | A. That's right. |
| 04:38:38 | 19 | Q. Approximately when was that trial? |
| 04:38:40 | 20 | A. That was in 2003. I started representing him, I believe |
| 04:38:44 | 21 | it was 2011. |
| 04:38:45 | 22 | Q. Okay. And how do you end up with the file for Mr. Fulton? |
| 04:38:51 | 23 | A. Once I started representing him and I got a release from |
| 04:38:54 | 24 | him and then I went to all the lawyers that had represented |
| 04:38:57 | 25 | him previously, trial lawyers, appellate lawyers, and got the |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 135 of 164 PageID #:31170
***REALTIME UNEDITED TRANSCRIPT ONLY***

134

| | | |
|---|---|---|
| 04:39:00 | 1 | files from them to begin working on the post conviction |
| 04:39:04 | 2 | petition. |
| 04:39:04 | 3 | Q.  Okay.  And did those attorneys then give you their files? |
| 04:39:07 | 4 | A.  They did. |
| 04:39:08 | 5 | Q.  Did any of them withhold their files? |
| 04:39:10 | 6 | A.  No. |
| 04:39:10 | 7 | Q.  Did any of them tell you they're not giving you the |
| 04:39:13 | 8 | complete files? |
| 04:39:13 | 9 | A.  No, they wouldn't. |
| 04:39:15 | 10 | Q.  What is your understanding of the completeness of the file |
| 04:39:17 | 11 | you have? |
| 04:39:17 | 12 | A.  I believe I have -- |
| 04:39:20 | 13 | THE COURT:  As compared to what is the request yes. |
| 04:39:23 | 14 | BY MR. SWAMINATHAN: |
| 04:39:24 | 15 | Q.  In other words, do you have you have a complete set of all |
| 04:39:26 | 16 | the material from the prior attorneys that were representing |
| 04:39:29 | 17 | Mr. Fulton? |
| 04:39:29 | 18 | A.  I do. |
| 04:39:30 | 19 | Q.  And did you take any other steps to ensure that you had a |
| 04:39:32 | 20 | complete file other than speaking to criminal defense |
| 04:39:34 | 21 | attorneys? |
| 04:39:35 | 22 | A.  I did.  After I filed the post conviction petition and |
| 04:39:39 | 23 | therefore was in court and could issue a subpoena, we issued a |
| 04:39:44 | 24 | subpoena, well a number of subpoenas, one of them was to the |
| 04:39:46 | 25 | Chicago Police Department for a full set of the police reports |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 136 of 164 PageID #:31171
***REALTIME UNEDITED TRANSCRIPT ONLY***

135

| 04:39:49 | 1 | just to double-check. |
| 04:39:50 | 2 | Q. And what was in that set of police reports? |
| 04:39:52 | 3 | A. The same police reports I received previously. There was |
| 04:39:56 | 4 | no difference. |
| 04:39:56 | 5 | Q. Okay. Now, later on you obtained a file that was found in |
| 04:40:01 | 6 | the same basement or the same area where Mr. Fields' street |
| 04:40:04 | 7 | file was found, correct? |
| 04:40:05 | 8 | A. That's correct. |
| 04:40:06 | 9 | Q. So that was not in response -- the subpoena that you |
| 04:40:09 | 10 | September to the Chicago Police Department? |
| 04:40:10 | 11 | A. That's correct. It was quite a few months after that. |
| 04:40:13 | 12 | Q. Were any of the materials in that new file in the file, |
| 04:40:16 | 13 | materials you got from the Chicago Police Department when you |
| 04:40:18 | 14 | issued your earlier subpoena? |
| 04:40:19 | 15 | A. You mean the basement file? |
| 04:40:22 | 16 | Q. That's correct. |
| 04:40:23 | 17 | A. There were about 12 pages or so that I had never seen. |
| 04:40:28 | 18 | Q. Okay. Now, let me take a step back. At some point you |
| 04:40:32 | 19 | basically had a file that consisted of all the materials from |
| 04:40:35 | 20 | the criminal defense attorneys previously plus the material |
| 04:40:38 | 21 | you got from the police department? |
| 04:40:39 | 22 | A. Correct. |
| 04:40:39 | 23 | Q. In response to your subpoena, correct? |
| 04:40:41 | 24 | A. Yes. |
| 04:40:41 | 25 | Q. And then subsequently you got a copy of the basement file, |

| 04:40:44 | 1 | correct? |
| 04:40:44 | 2 | A.  Right. |
| 04:40:44 | 3 | Q.  Okay.  Now, that basement file, what did you do with that |
| 04:40:47 | 4 | file? |
| 04:40:47 | 5 | A.  I sat down and compared it page by page to see if there |
| 04:40:52 | 6 | was anything new in there that I hadn't seen before and as I |
| 04:40:55 | 7 | said, there were about a dozen pages that were totally new. |
| 04:40:58 | 8 | Q.  Okay.  Those pages that were totally new, did they contain |
| 04:41:02 | 9 | information that was also new to you? |
| 04:41:04 | 10 | A.  Some of them did, yes. |
| 04:41:06 | 11 | Q.  Okay.  Up say it was approximately 12 pages? |
| 04:41:18 | 12 | A.  That's my memory, correct. |
| 04:41:19 | 13 | Q.  If I may hand you a document.  This is Plaintiff's Exhibit |
| 04:41:22 | 14 | 638-145.  Can you tell the jury what this document is?  Can |
| 04:41:36 | 15 | you tell me what this is? |
| 04:41:36 | 16 | A.  This is part of the file that I received once the basement |
| 04:41:39 | 17 | file was produced to me and this is a page that was brand new |
| 04:41:42 | 18 | to me. |
| 04:41:42 | 19 | Q.  Okay.  And is this one of the pages that you then |
| 04:41:45 | 20 | identified as being a page you did not receive previously? |
| 04:41:48 | 21 | A.  That's correct. |
| 04:41:48 | 22 | Q.  Okay.  I'd like to show it to the jury. |
| 04:41:52 | 23 | MR. NOLAND:  Let me see it. |
| 04:41:53 | 24 | THE COURT:  From the ELMO?  It's on. |
| 04:41:56 | 25 | MR. SWAMINATHAN:  From the ELMO. |

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 138 of 164 PageID #:31173
***REALTIME UNEDITED TRANSCRIPT ONLY***

137

| | |
|---|---|
| 04:41:57 | 1 | BY MR. SWAMINATHAN: |
| 04:42:13 | 2 | Q.  Plaintiff's Exhibit 638-145, this is what's on the |
| 04:42:16 | 3 | document.  So this is the document you're referring to? |
| 04:42:19 | 4 | A.  It is. |
| 04:42:20 | 5 | Q.  Can you tell me if -- what is new about this document? |
| 04:42:23 | 6 | A.  Well, everything.  There's a different RD number which is |
| 04:42:28 | 7 | the number by which the Chicago Police Department keeps track |
| 04:42:31 | 8 | of cases, there was a plate number of a car, there was a date, |
| 04:42:37 | 9 | there was a name I hadn't heard of before, there were two |
| 04:42:41 | 10 | phone numbers I hadn't heard of before, reference to a car, |
| 04:42:44 | 11 | nobody knew anything about. |
| 04:42:46 | 12 | Q.  Is this information that was -- that you ended up putting |
| 04:42:49 | 13 | to use in some way? |
| 04:42:51 | 14 | A.  We have been investigating it, yes. |
| 04:42:52 | 15 | Q.  Tell us about what you did or what was actionable about |
| 04:42:55 | 16 | this? |
| 04:42:55 | 17 | A.  After we received this, we issued a subpoena based on the |
| 04:43:00 | 18 | new RD number and received some police reports in response to |
| 04:43:04 | 19 | that regarding the incident with this car.  Would you like me |
| 04:43:09 | 20 | to describe that? |
| 04:43:10 | 21 | Q.  Please. |
| 04:43:12 | 22 | A.  So what had happened was there was some kind of a car |
| 04:43:16 | 23 | accident involving the car with these plates and then |
| 04:43:23 | 24 | apparently, according to the police report, the man was |
| 04:43:28 | 25 | driving the car was disrespectful or otherwise unkind to the |

04:43:31  1  woman whose car he hit whereupon her son, it was a Hispanic

04:43:37  2  name, I am not remembering the name, I'm sorry, got out of the

04:43:40  3  car and hit the person who was driving the car, like

04:43:43  4  physically hit him, and ended up charged with a battery and I

04:43:48  5  think some other car related charges, but I am not certain.

04:43:50  6  Q.  Why is that important to you in the context of your

04:43:52  7  defense of Mr. Fulton?

04:43:53  8  A.  Well, it's very interesting to me that this occurred on

04:43:57  9  the right date in a similar neighborhood close by to where the

04:44:02  10  homicide had occurred that these were witnesses that I knew

04:44:06  11  nothing about and it appeared that it was a lead possibly to

04:44:13  12  some other evidence and definitely needed to be followed up

04:44:16  13  on.

04:44:16  14  Q.  Do you think that this is a potentiality alternate suspect

04:44:23  15  or did you consider this a potentiality gnat suspect?

04:44:25  16  A.  I did and I still do.

04:44:27  17  Q.  I am going to show her Plaintiff's Exhibit 638-86 can you

04:44:38  18  tell me what that document is?

04:44:39  19  A.  That's also a document that I had not seen in the police

04:44:41  20  reports before.

04:44:41  21  Q.  It is one.  Documents you identified -- strike that.

04:44:44  22       Is this information that you believe was important to

04:44:59  23  your defense of Mr. Fulton?

04:45:01  24  A.  Yes.

04:45:01  25  Q.  And did you put it to some use?  Strike that.  Let me ask

04:45:05  1  | you a different question.  In what way is this important

04:45:08  2  | information to you?

04:45:09  3  | A.  This, Mr. Fulton's case is, our position was wrongly

04:45:15  4  | convicted as a result of a false confession obtained from him

04:45:18  5  | when he was 18 years old and a senior in high school after

04:45:22  6  | four entire days of interrogation.

04:45:25  7  |           MR. KULWIN:  Objection to four --

04:45:27  8  |           THE WITNESS:  And this photograph shows.

04:45:28  9  |           THE COURT:  Hang on.  When you hear an objection, as

04:45:30  10 | you know, as you know, you stop talking.

04:45:32  11 |           THE WITNESS:  Sorry, Judge.

04:45:35  12 |           THE COURT:  Overruled.  It's the only way that

04:45:37  13 | relevance can be explained.  Let's get to the point.  Go ahead

04:45:40  14 | and continue your answer.

04:45:41  15 |           THE WITNESS:  And so the photograph of my client

04:45:49  16 | looking like he was in distress or disarray or under dressed

04:45:53  17 | in the area or et cetera would have been relevant or helpful

04:45:56  18 | in the defense of the trial itself.

04:45:59  19 | BY MR. SWAMINATHAN:

04:45:59  20 | Q.  Okay.  I am not going to show you additional documents.

04:46:03  21 | Were there other documents as well that you put to use that

04:46:05  22 | you found in the basement file that you didn't previously

04:46:08  23 | have?

04:46:08  24 | A.  Yes.

04:46:09  25 | Q.  Okay.  And you say you put them to use .  What -- strike

| | |
|---|---|
| 04:46:14 | 1 |
| 04:46:14 | 2 |
| 04:46:17 | 3 |
| 04:46:20 | 4 |
| 04:46:26 | 5 |
| 04:46:31 | 6 |
| 04:46:34 | 7 |
| 04:46:38 | 8 |
| 04:46:40 | 9 |
| 04:46:43 | 10 |
| 04:46:46 | 11 |
| 04:46:48 | 12 |
| 04:46:52 | 13 |
| 04:46:57 | 14 |
| 04:46:58 | 15 |
| 04:47:00 | 16 |
| 04:47:05 | 17 |
| 04:47:07 | 18 |
| 04:47:09 | 19 |
| 04:47:11 | 20 |
| 04:47:19 | 21 |
| 04:47:20 | 22 |
| 04:47:20 | 23 |
| 04:47:26 | 24 |
| 04:47:27 | 25 |

1  that.

2        What is the type of material that was in those other

3  documents that was important to you that you put to use?

4  A.  Some of it was not particularly important.  Some of it

5  was, there was a report regarding an interview with one.

6  Eyewitnesses that had some details in it that were not in

7  another report.  The fact that this eyewitness existed was

8  known, but that these other statements had been made was not

9  known, and this is something that could have been followed up

10  on and used in the original trial as well.

11        There were many items of this nature.

12  Q.  Was the basement file material that you expected to have

13  been available to your client available at his original trial?

14        MR. MICHALIK:  Objection.

15        THE COURT:  I need a basis.

16        MR. MICHALIK:  Foundation.  And improper opinions.

17        THE COURT:  I didn't hear the second part.

18        MR. MICHALIK:  It's an opinion.  It's a legal

19  opinion.

20        THE COURT:  Overruled.  I don't agree.

21  BY MR. SWAMINATHAN:

22  Q.  You can answer.

23  A.  Yes it's what I expected to receive.

24        MR. SWAMINATHAN:  Nothing further.

25        THE COURT:  We are going to stop here.  Tomorrow same

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 142 of 164 PageID #:31177
***REALTIME UNEDITED TRANSCRIPT ONLY***

141

| | |
|---|---|
| 04:47:29 | 1 |
| 04:47:33 | 2 |
| 04:47:36 | 3 |
| 04:47:39 | 4 |
| 04:48:40 | 5 |
| 04:48:42 | 6 |
| 04:48:47 | 7 |
| 04:48:51 | 8 |
| 04:48:54 | 9 |
| 04:48:56 | 10 |
| 04:48:58 | 11 |
| 04:49:00 | 12 |
| 04:49:03 | 13 |
| 04:49:05 | 14 |
| 04:49:08 | 15 |
| 04:49:10 | 16 |
| 04:49:12 | 17 |
| 04:49:15 | 18 |
| 04:49:18 | 19 |
| 04:49:18 | 20 |
| 04:49:20 | 21 |
| 04:49:23 | 22 |
| 04:49:26 | 23 |
| 04:49:27 | 24 |
| 04:49:29 | 25 |

1    as today.  Be ready at 9:30.  We will probably start a few

2    minutes after that.  Don't discuss the case with each other or

3    anyone else.  I will take the jury out and be right back.

4      (The jury leaves the courtroom.)

5            THE WITNESS:  Judge, would it be at all possible to

6    take my cross at nor time?  I'm very booked tomorrow.  I can

7    cancel the counsel of deans meeting if I need to.

8            THE COURT:  You're the boss, right?

9            THE WITNESS:  Actually not there, the president of

10   the university is there.  I am the boss otherwise.

11           MR. LOEVY:  Your Honor, we have asked the defendants

12   if there is a possibility they might not cross her, they are

13   going to think about that, so that's also in the mix.

14           THE COURT:  That's what any lawyer would say in this

15   situation is that I would think about it.  I think I have to

16   assume there's going to be some cross.

17           THE WITNESS:  Judge, I will be back here at 9:30

18   unless I hear differently from counsel.  Have a good evening,

19   sir.

20           THE COURT:  The jurors reminded me on the way out

21   that I forgot to give them the whole thing about scheduling.

22   I'll remember to do that in the morning.

23           MR. KULWIN:  Which one, Judge?

24           THE COURT:  The question that they had asked about

25   scheduling and how long the trial is going to go.  I will deal

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 143 of 164 PageID #:31178

04:49:31    1    with that in the morning.

04:49:33    2         The things that I have on my list that I need to deal

04:49:37    3    with would be number one -- hang on a second.  The emails

04:49:47    4    regarding Kees, number two, the intimidation issue, No. 3, if

04:49:52    5    I have to deal with it, stipulations about non-present reports

04:49:58    6    in certain files.

04:49:59    7         On the Kees thing, so what's the issue?  You think

04:50:05    8    you haven't gotten something that should be turned over?

04:50:11    9         MR. SWAMINATHAN:  The issue with Kees the government

04:50:14   10    and Mr. Kees, we got a response back.  The response with

04:50:17   11    regard to counsel's answers were we think fine.  We don't have

04:50:21   12    any quibble with that.  In terms of the responses of

04:50:24   13    Mr. Murphy and Mr. O'Callaghan themselves, we have some

04:50:27   14    concerns.  The answers are very sparse.

04:50:30   15         THE COURT:  Can I see them?

04:50:31   16         MR. SWAMINATHAN:

04:50:33   17         MR. SWAMINATHAN:  Yes.

04:50:36   18         THE COURT:  Just pop it on the ELMO.  This one is

04:50:50   19    Mr. Murphy's response.

04:50:52   20         THE COURT:  At no time did defendant Murphy or

04:50:54   21    defendants' attorneys ask Mr. Hogan or anybody at the U.S.

04:50:58   22    Attorney's Office to offer any benefit to Kees.  I assume what

04:51:00   23    you're telling me is that's not comprehensive enough.  What do

04:51:03   24    you think it should include?

04:51:04   25         MR. SWAMINATHAN:  The issue is that you had said,

04:51:06  1  report anything regarding Kees.  This is a narrow version of

04:51:09  2  that, which may be totally innocuous.  Our question to them

04:51:13  3  was could you just confirm that this is actually a complete

04:51:16  4  response to what Kennelly ordered you to do, the judge ordered

04:51:21  5  you to do, everything regarding Kees, can you make that

04:51:23  6  representation.

04:51:23  7          THE COURT:  I am trying to remember.  Was there a

04:51:25  8  written order on this or was it verbal?

04:51:27  9          MR. KULWIN:  Oral.

04:51:28  10         THE COURT:  So I can go back and look at what I said.

04:51:31  11         MR. SWAMINATHAN:  You did issue an order.

04:51:33  12         THE COURT:  There is an order.  I thought there was.

04:51:36  13         MR. NOLAND:  The court -- judge, you identified four

04:51:38  14  questions.

04:51:38  15         THE COURT:  Here it is.  I think this is it.  Any

04:51:48  16  communications by defendants or their counsel regarding Kees

04:51:51  17  with any agency of the government, any attorney for the

04:51:53  18  government, Kees or his attorney from the date of the 2014

04:51:56  19  trial and this case to the present.  That's what I directed.

04:52:03  20         So as I'm reading that and as I'm looking at the

04:52:07  21  answer, the answer refers to a number of conversations, but

04:52:11  22  kind of the clean up at the end was there was no offer of a

04:52:17  23  benefit to Kees.

04:52:18  24         MR. SWAMINATHAN:  And just to be clear.

04:52:19  25         MR. NOLAND:  Your Honor is reading it correctly.

04:52:21    1          MR. SWAMINATHAN:  Everything above that is

04:52:23    2   communications that counsel is representing to us which we

04:52:25    3   have no problem with.  This is the only sentence that refers

04:52:28    4   to Mr. Murphy.

04:52:32    5          THE COURT:  Let me just ask this question.  Is the

04:52:34    6   correct reading of the answer that Mr. Murphy had no

04:52:38    7   communications regarding Mr. Kees or any agency of the

04:52:42    8   government, any attorney for the government, Mr. Kees or his

04:52:44    9   attorney?

04:52:45   10          MR. NOLAND:  Yes, your Honor.

04:52:45   11          THE COURT:  There you go.

04:52:46   12          MR. NOLAND:  You --

04:52:47   13          THE COURT:  Yes is good enough.  There you go.  There

04:52:50   14   is your answer.

04:52:50   15          MR. SWAMINATHAN:  The other issue.

04:52:52   16          MR. NOLAND:  Other than there was an email we

04:52:53   17   attached, which we produced it.

04:52:55   18          MR. SWAMINATHAN:  The other issue with Mr.

04:52:57   19   O'Callaghan, it's loosely related to Mr. Murphy.  Basically,

04:53:00   20   the issue is we got this single document produced to us.

04:53:04   21          THE COURT:  I think somebody showed this to me the

04:53:06   22   other day.

04:53:07   23          MR. SWAMINATHAN:  This was probably in the packet you

04:53:09   24   got.

04:53:09   25          THE COURT:  Yeah, it looks like what happened is that

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 146 of 164 PageID #:31181
***REALTIME UNEDITED TRANSCRIPT ONLY***

145

04:53:11   1   Mr. Hogan sent Mr. Brannigan, Mr. O'Callaghan and Mr. Murphy a
04:53:15   2   copy of the government's motion to reduce Mr. Kees's sentence.
04:53:18   3        MR. SWAMINATHAN:  Yes.  So this is the single
04:53:20   4   communication we have in which O'Callaghan or Murphy is
04:53:23   5   communicating with anyone from the federal government or
04:53:25   6   Mr. Kees.
04:53:25   7        THE COURT:  Right.
04:53:26   8        MR. SWAMINATHAN:  So potentially the understanding is
04:53:28   9   they only have a single communication, in this case to Mr.
04:53:31  10   O'Callaghan's personal email address in the last two and a
04:53:34  11   half years.  That's possible.  We said could you just confirm
04:53:37  12   that he did a proper search because when we look at his
04:53:41  13   response.
04:53:41  14        THE COURT:  Who is the owe, this is Mr. O'Callaghan
04:53:43  15   at this point?
04:53:44  16        MR. SWAMINATHAN:  This is Mr. O'Callaghan now.
04:53:45  17        THE COURT:  It says Mr. O'Callaghan advised that to
04:53:47  18   the best of his recollection he's had no communications with
04:53:50  19   anyone in the federal government, Kees and/or Kees's attorneys
04:53:53  20   during the relevant period, had anything concerning Kees's
04:53:56  21   testimony in this matter and/or benefits he may or may not
04:53:59  22   have received as a result of testifying in this matter.
04:54:02  23        MR. SWAMINATHAN:  So on this one all we said.
04:54:04  24        THE COURT:  Are you ever going to get anything better
04:54:07  25   than the best of his recollection.

| | | |
|---|---|---|
| 04:54:08 | 1 | MR. SWAMINATHAN:  The issue only is to the best of |
| 04:54:09 | 2 | his recollection, does that mean he conducted some diligent |
| 04:54:12 | 3 | search, that's all we asked. |
| 04:54:13 | 4 | THE COURT:  I think you've got an answer to the |
| 04:54:16 | 5 | interrogatory.  That's that issue.  I'm scratching that off |
| 04:54:19 | 6 | the list. |
| 04:54:19 | 7 | On the intimidation thing, so I have previously said |
| 04:54:26 | 8 | multiple times, I've lost count at this point, if it was |
| 04:54:29 | 9 | introduced at the criminal trial one or two, then what was |
| 04:54:34 | 10 | introduced at the trial comes in.  On Mr. Hawkins, I dealt |
| 04:54:38 | 11 | with it already.  Mr. Hawkins is now on and off the witness |
| 04:54:41 | 12 | stand. |
| 04:54:42 | 13 | And so then the other specific item that's discussed |
| 04:54:46 | 14 | in the motion that was filed called motion for curative |
| 04:54:49 | 15 | instruction and to bar future testimony has to do with this |
| 04:54:52 | 16 | quote-unquote witness protection program issue regarding |
| 04:54:56 | 17 | Mr. Morris.  Didn't I deal with that? |
| 04:54:58 | 18 | MR. LOEVY:  No, your Honor. |
| 04:54:58 | 19 | THE COURT:  I didn't deal with it? |
| 04:55:01 | 20 | MR. LOEVY:  I no. |
| 04:55:04 | 21 | THE COURT:  Tell me what it is that you're asking me |
| 04:55:06 | 22 | to do. |
| 04:55:06 | 23 | MR. LOEVY:  Document docket 550 was your order on the |
| 04:55:10 | 24 | motion in limine. |
| 04:55:10 | 25 | THE COURT:  Um-hmm. |

04:55:11  1    MR. LOEVY:  And you said each defendant proposes to

04:55:16  2    testify regarding El Rukn intimidation of witnesses and others

04:55:19  3    and you quite clearly said that they are barred from providing

04:55:22  4    this testimony from the stand, it does not bar all such

04:55:28  5    evidence.  No defendant is allowed to talk about El Rukn

04:55:31  6    witness intimidation.  On direct Mr. Kulwin asked Mr.

04:55:37  7    O'Callaghan, first question Mr. O'Callaghan, at the time based

04:55:39  8    on your experience, was Mr. Morris in a dangerous situation?

04:55:43  9    That is so far beyond what you permitted at trial for the

04:55:46  10   purpose you permitted at trial.  Mr. Morris' testimony at

04:55:51  11   trial was what it was.  You can't ask him and I'll put it on

04:55:53  12   the screen.

04:55:54  13            THE COURT:  Go ahead.

04:55:55  14            MR. LOEVY:  I apologize.

04:55:59  15            THE COURT:  This is the rough transcript.

04:56:00  16            MR. LOEVY:  This is rough transposed to a memo.

04:56:03  17            MR. KULWIN:  This redirect?  Is this redirect,

04:56:07  18   recross?

04:56:08  19            THE COURT:  Whose examination is this?

04:56:10  20            MR. LOEVY:  This is Mr. Kulwin's.

04:56:12  21            MR. ART:  Direct.

04:56:13  22            THE COURT:  Well.

04:56:14  23            MR. KULWIN:  Which direct?

04:56:15  24            MR. LOEVY:  I went first and then he went.

04:56:17  25            THE COURT:  Mr. Kulwin's initial examination of Mr.

04:56:19  1   O'Callaghan?

04:56:19  2           MR. LOEVY:  That's my understanding.

04:56:20  3           MR. ART:  Yes.

04:56:23  4           MR. LOEVY:  So here is your order, your Honor.  I'll

04:56:25  5   let you read that.  I'll show you the order.

04:56:30  6           THE COURT:  Hang on a second.  The first question,

04:56:32  7   Mr. O'Callaghan, at the time based on your experience, was

04:56:34  8   Mr. Morris in a dangerous situation?

04:56:37  9           "ANSWER:  Yes.

04:56:38  10          "QUESTION:  Based on your experience at the time,

04:56:40  11  without getting far afield, you understand?

04:56:42  12          "ANSWER:  I understand

04:56:43  13          "QUESTION:  What was the danger that he was in?  There

04:56:45  14  was a sidebar.  I assume at the sidebar, you shut it down

04:56:49  15  because after the sidebar there's no more questions asked

04:56:51  16  about it.  I'm sorry.  I don't remember what I said at the

04:56:54  17  side war.  The next question is you were asked a lot of

04:56:56  18  questions about trips you made up to Milwaukee regarding

04:56:58  19  Mr. Morris and his family.  Do you remember those questions?

04:57:00  20          "ANSWER:  Yes.

04:57:02  21          "QUESTION:  Was the purpose of those trips to assist

04:57:04  22  him in the move with his family as part of the witness

04:57:06  23  protection that the state's attorney's office was running?

04:57:08  24          "ANSWER:  Yes."

04:57:10  25           Okay.  Now I get it.  Okay

| | |
|---|---|
| 04:57:13 | 1 |
| 04:57:16 | 2 |
| 04:57:21 | 3 |
| 04:57:23 | 4 |
| 04:57:23 | 5 |
| 04:57:27 | 6 |
| 04:57:27 | 7 |
| 04:57:28 | 8 |
| 04:57:29 | 9 |
| 04:57:31 | 10 |
| 04:57:33 | 11 |
| 04:57:36 | 12 |
| 04:57:36 | 13 |
| 04:57:40 | 14 |
| 04:57:43 | 15 |
| 04:57:47 | 16 |
| 04:57:50 | 17 |
| 04:57:52 | 18 |
| 04:57:53 | 19 |
| 04:57:58 | 20 |
| 04:58:01 | 21 |
| 04:58:02 | 22 |
| 04:58:05 | 23 |
| 04:58:08 | 24 |
| 04:58:11 | 25 |

1    MR. LOEVY:  May I show you the order then, this is
2    the motion in limine that we claim they blew right past.
3        THE COURT:  That's the thing you just referred to.
4        MR. LOEVY:  Yes.
5        THE COURT:  Docket No. 550 which is from March of
6    2014.
7        MR. LOEVY:  Yes.
8        THE COURT:  Let me hear from Mr. Kulwin.
9        MR. KULWIN:  Can you put the transcript backup?
10       THE COURT:  That previous page.
11       MR. LOEVY:  Steve, give me the whole thing.  We've
12   got it.
13       MR. KULWIN:  This is enough.  Not to bore the court
14   with the orphan who cries I'm sorry after they murder their
15   parents, look at the question that precedes it.  Now, you were
16   asked a lot of questions about whether Mr. Morris got a
17   specific threat from the El Rukns before he was placed in that
18   program.
19       THE COURT:  I see where you're reading.  So what
20   you're saying was that there was questioning on Mr. Loevy's
21   examination before this?
22       MR. KULWIN:  Absolutely.  He spent an inordinate
23   amount of time.  I'll tell you, Judge, I don't have the
24   photographic memory of some people.  I can't tell you chapter
25   and verse.  There is no way I go into that unless he goes

04:58:15    1    into, you don't have any evidence of specific threats, you

04:58:17    2    took him out there because it was a benefit, all this other

04:58:20    3    stuff.  And it was invited, there was a sidebar, they leave

04:58:24    4    out what's in the sidebar, and then the next question is, you

04:58:27    5    were asked a lot of questions about trips you made up to

04:58:29    6    Milwaukee, which he was.  Do you remember those questions?

04:58:32    7    Was the purpose of those trips to assist him in a move as part

04:58:35    8    of the witness protection, yes, no objection.  Obviously, it

04:58:38    9    was --

04:58:39    10           THE COURT:  Presumably that's because I made a ruling

04:58:41    11   at the sidebar, although I have to say I don't know because I

04:58:43    12   don't have the sidebar.  Sidebar.

04:58:45    13           MR. KULWIN:  I don't have the sidebar.

04:58:47    14           MR. LOEVY:  Do you have the sidebar, Steve?

04:58:49    15           MR. ART:  I have the whole transcript here.

04:58:51    16           THE COURT:  Just pop it up on the screen there for a

04:58:54    17   second.  All right.  Flip it over to the next page.  Slide it

04:59:05    18   down, slide it down so I can see the rest of it.  Some of that

04:59:14    19   is kind of garbled.  Flip over to the next page.  Yeah, so it

04:59:35    20   -- it looks like what I -- what I did at the sidebar is I side

04:59:40    21   you're not going to be able to go into the reasons that Mr.

04:59:44    22   Kulwin wasn't going to be able to go into whatever reasons why

04:59:48    23   Mr. Morris was and what was referred to as a witness

04:59:50    24   protection program, and that's where I cut it off.  I would

04:59:55    25   cut him off in the middle of a sentence if he started trying

| | | |
|---|---|---|
| 04:59:58 | 1 | to give the reasons.  Flip over to the next page for a second. |
| 05:00:01 | 2 | Yeah. |
| 05:00:08 | 3 | MR. ART:  Do you want to see the start of the |
| 05:00:09 | 4 | testimony? |
| 05:00:10 | 5 | THE COURT:  No, you have refreshed my memory well |
| 05:00:12 | 6 | enough. |
| 05:00:12 | 7 | MR. LOEVY:  Our position is, it's a very clear motion |
| 05:00:15 | 8 | in limine ruling.  He can talk about what happened at trial, |
| 05:00:17 | 9 | he can talk about there were or weren't threats, which is what |
| 05:00:20 | 10 | I called O'Callaghan, there were no threats.  What they |
| 05:00:23 | 11 | weren't supposed to say tell the jury which doesn't go to a |
| 05:00:26 | 12 | claim or defense, why Gerald was in reasonable fear.  If you |
| 05:00:31 | 13 | wanted to revisit that, your Honor, he could have.  He blew |
| 05:00:34 | 14 | right past it. |
| 05:00:35 | 15 | THE COURT:  Time out, though, I am going to say the |
| 05:00:37 | 16 | same thing to you that I said about eight times to Mr. Kulwin |
| 05:00:41 | 17 | in overruling his objections, I cut it off.  A question is not |
| 05:00:45 | 18 | evidence.  And so I cut it off. |
| 05:00:49 | 19 | MR. LOEVY:  Your Honor, the testimony continues. |
| 05:00:50 | 20 | THE COURT:  In terms of the reasons, that's what I |
| 05:00:52 | 21 | cut off.  That's where you drew the line.  That's where I drew |
| 05:00:55 | 22 | the line.  If I drew the line in the wrong place, that's why |
| 05:00:58 | 23 | God invented courts of appeal.  That's it.  I am really |
| 05:01:02 | 24 | honestly not going to revisit this at this point in time. |
| 05:01:04 | 25 | MR. LOEVY:  There is still the representation. |

05:01:05   1        THE COURT:  Is there any other witness who is going

05:01:07   2   to testify about Morris?

05:01:09   3        MR. KULWIN:  Yes, Judge.

05:01:10   4        THE COURT:  Who?

05:01:11   5        MR. NOLAND:  Brian Sexton.

05:01:12   6        MR. KULWIN:  And Jack Hines -- well, at the last

05:01:17   7   trial, Judge, you had Mr. Hines testify about what he called

05:01:22   8   witness protection but was victim witness.  You also asked Ms.

05:01:27   9   Conyers on cross-examination testify in her experience, it was

05:01:32  10   not rare that it happened, that victims and witnesses were

05:01:36  11   relocated.  I wanted to elicit both of that.  Because what the

05:01:40  12   defendant -- what the plaintiff has done is and what they're

05:01:43  13   trying to do in my view and I know your patience on this is

05:01:46  14   justifiably thin, so I will be short, is they have made this

05:01:50  15   argument to the jury that Mr. O'Callaghan -- that Mr.

05:01:55  16   O'Callaghan has threatened these witnesses, coerced them, that

05:01:57  17   they live in fear of him.  Okay?  And that the whole -- or if

05:02:01  18   it's not that, then he's making these trips up to Milwaukee

05:02:04  19   trying to bribe him with appliances and gifts.  It's false,

05:02:08  20   it's miss representative, and I can't -- I'm entitled to

05:02:12  21   defend against that.  When he says it's not part of any claim,

05:02:15  22   that's part of his whole case.  His entire case is that either

05:02:19  23   O'Callaghan had no reasonable basis to not recommend but to

05:02:24  24   present the case for probable cause to the state's attorney

05:02:26  25   because assuming everything was totally legit, on the up and

11/29/16 PM      Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 154 of 164 PageID #:31189
***REALTIME UNEDITED TRANSCRIPT ONLY***

153

05:02:30   1   up, he should have said, there's not enough here, I got to get

05:02:33   2   more before I go to him, or alternatively, assuming the

05:02:37   3   argument that what he had was enough, he shouldn't have done

05:02:39   4   it because he knew it was all phony because he had coerced him

05:02:43   5   or bribed him to get it.  That is his case and I should be

05:02:47   6   able to respond and he's made that case over and over and over

05:02:50   7   again with every witness.  With Randy Langston, you were

05:02:52   8   afraid of him.  With Eric Lange, you were scared of them.  And

05:02:56   9   on and on.

05:02:57   10          THE COURT:  Last word.

05:02:57   11          MR. LOEVY:  Thank you, your Honor.

05:02:58   12          THE COURT:  Keep it short.

05:02:59   13          MR. LOEVY:  We disagree with him, but the evidence is

05:03:02   14   in.  O'Callaghan said way more than we wanted about threats.

05:03:07   15   Gerald, his wife and children were put into the witness

05:03:09   16   protection program and we still are asking you to correct that

05:03:12   17   as a factual matter.

05:03:13   18          THE COURT:  Here is the deal.  When are we expecting

05:03:15   19   to see Mr. Sexton or Mr. Hines.

05:03:18   20          MR. KULWIN:  In our case.  Sexton is in their case.

05:03:22   21          THE COURT:  Stop.  I am asking Mr. Burns a question.

05:03:26   22   I have to preface everything.  Mr. Murphy is is going to

05:03:30   23   testify about this too.

05:03:31   24          MR. BURNS:  If he is asked a question that he deals

05:03:33   25   with the Milwaukee trip, this is where it comes from, so

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 155 of 164 PageID #:31190
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 05:03:36 | 1 | Mr. Loevy would control that. |
| 05:03:37 | 2 | THE COURT:  Here is what I am going to direct.  Are |
| 05:03:39 | 3 | you calling Mr. Murphy? |
| 05:03:40 | 4 | MR. LOEVY:  Yes. |
| 05:03:40 | 5 | THE COURT:  When? |
| 05:03:41 | 6 | MR. LOEVY:  Tomorrow if we get to him and we are |
| 05:03:43 | 7 | hoping to. |
| 05:03:43 | 8 | THE COURT:  And are you calling Mr. Sexton? |
| 05:03:46 | 9 | MR. LOEVY:  Unlikely because we are going to have to |
| 05:03:49 | 10 | finish our case. |
| 05:03:50 | 11 | THE COURT:  Are you calling Mr. Hines. |
| 05:03:52 | 12 | MR. LOEVY:  Probably not, same reason. |
| 05:03:53 | 13 | THE COURT:  There's three people that's been |
| 05:03:55 | 14 | identified and only three people that this issue is going to |
| 05:03:58 | 15 | come up.  I am going to tell you guys to do the same thing I |
| 05:04:01 | 16 | told plaintiff to do on a number of things.  I want a proffer, |
| 05:04:04 | 17 | this is what we propose to have Murphy testify about, this is |
| 05:04:06 | 18 | what we propose to have Hines testify about, this is what we |
| 05:04:09 | 19 | propose to have Sexton testify about this, and if -- and then |
| 05:04:14 | 20 | I need some sort of little short justification, it can be |
| 05:04:17 | 21 | repeating what you just told me, but I need it in one place so |
| 05:04:20 | 22 | I don't have to draw together 14 places that we have talked |
| 05:04:22 | 23 | about this. |
| 05:04:23 | 24 | MR. KULWIN:  Do you want it typed or do you want it |
| 05:04:25 | 25 | orally? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 156 of 164 PageID #:31191

***REALTIME UNEDITED TRANSCRIPT ONLY***

155

| | | |
|---|---|---|
| 05:04:25 | 1 | THE COURT:  No, like every time I have asked for this |
| 05:04:28 | 2 | from the plaintiff, I need it in writing. |
| 05:04:29 | 3 | MR. KULWIN:  Sure, Judge. |
| 05:04:30 | 4 | THE COURT:  I apologize in advance to Ms. Katz.  She |
| 05:04:35 | 5 | didn't catch it. |
| 05:04:36 | 6 | MS. KATZ:  I did.  I thought I put it in writing, but |
| 05:04:41 | 7 | I didn't apparently. |
| 05:04:42 | 8 | MR. KULWIN:  It's not just Ms. Katz. |
| 05:04:43 | 9 | MR. LOEVY:  Still unresolved is our request that you |
| 05:04:46 | 10 | tell the jury that Gerald Morris, his wife and his children |
| 05:04:49 | 11 | were not placed into the witness protection program.  There |
| 05:04:51 | 12 | was no good faith basis to ask that, it's not true and the |
| 05:04:56 | 13 | jury has been lied to. |
| 05:04:57 | 14 | THE COURT:  Look, I mean, I'm collecting my thoughts |
| 05:05:12 | 15 | to just give me a minute.  I am reasonably certain that if you |
| 05:05:26 | 16 | were to ask Mr. Sexton and Mr. Hines both of whom were |
| 05:05:30 | 17 | assistant state's attorneys at the relevant time whether Cook |
| 05:05:34 | 18 | County state's attorney's office had anything called a witness |
| 05:05:36 | 19 | protection program they would say no.  I am equally certain |
| 05:05:40 | 20 | that if you were to ask them whether the Cook County state's |
| 05:05:43 | 21 | attorney's office had a victim witness program, they would say |
| 05:05:45 | 22 | yes and I am reasonably certain and pretty close to a moral |
| 05:05:48 | 23 | certainty that they would say that that was a program |
| 05:05:51 | 24 | sometimes used to relocate witnesses, you know, who were for |
| 05:05:55 | 25 | whatever reason concerned about their safety.  Okay?  I am |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM    Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 157 of 164 PageID #:31192
***REALTIME UNEDITED TRANSCRIPT ONLY***

156

| | | |
|---|---|---|
| 05:05:58 | 1 | confident of this.  I know this because I lived in that world |
| 05:06:02 | 2 | not as much as some of the people in this room did but enough |
| 05:06:05 | 3 | to know.  Okay?  So honestly, I'm not -- I don't think that's |
| 05:06:12 | 4 | an appropriate instruction.  Now, if once all of the evidence |
| 05:06:15 | 5 | on this is in, okay, I need everybody's attention here for a |
| 05:06:19 | 6 | second. |
| 05:06:22 | 7 | MS. KATZ:  Sorry. |
| 05:06:22 | 8 | THE COURT:  Thank you.  Once all of the evidence on |
| 05:06:24 | 9 | this is in, you know, after I make whatever rulings I make, |
| 05:06:28 | 10 | after I get the proffer about Mr. Murphy and Mr. Hines and Mr. |
| 05:06:33 | 11 | Sexton and that testimony comes in, you can revisit this |
| 05:06:36 | 12 | before closing argument to talk to me about what people should |
| 05:06:39 | 13 | and shouldn't be able to say and that is the next time I am |
| 05:06:41 | 14 | going to deal with that part of it.  Okay?  So the second -- |
| 05:06:44 | 15 | actually, the second to the next time.  The next time is when |
| 05:06:47 | 16 | I rule on this proffer and then the last time, the second and |
| 05:06:50 | 17 | last time is going to be when you're making a motion, if you |
| 05:06:52 | 18 | make it before closing argument. |
| 05:06:54 | 19 | So now we're going to move on to the next thing, |
| 05:06:57 | 20 | which I don't think there is anything else. |
| 05:06:59 | 21 | MR. LOEVY:  I don't think there is, your Honor. |
| 05:07:00 | 22 | THE COURT:  Okay.  You guys got any issues for me? |
| 05:07:03 | 23 | MR. KULWIN:  The proffer is just to explain what they |
| 05:07:05 | 24 | are going to say about witness protection, right. |
| 05:07:07 | 25 | THE COURT:  It's really what they are going to say |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 158 of 164 PageID #:31193

| | | |
|---|---|---|
| 05:07:09 | 1 | about this issue as it relates to Morris. |
| 05:07:11 | 2 | MR. KULWIN:  We got it. |
| 05:07:12 | 3 | THE COURT:  This issue as it relates to Morris. |
| 05:07:14 | 4 | MS. KATZ:  Okay. |
| 05:07:15 | 5 | THE COURT:  But if there's going to be -- if you're |
| 05:07:17 | 6 | intending to elicit some testimony that goes beyond Morris |
| 05:07:20 | 7 | specifically and what this program was in the Cook County |
| 05:07:23 | 8 | state's attorney's office, I want to see that too. |
| 05:07:24 | 9 | MR. KULWIN:  We will do that. |
| 05:07:25 | 10 | MR. LOEVY:  Are we talking about witness, threats, |
| 05:07:27 | 11 | intimidation. |
| 05:07:28 | 12 | THE COURT:  I am talking about what I am talking |
| 05:07:29 | 13 | about.  Now we are moving onto the next issue for crying out |
| 05:07:33 | 14 | loud.  Do you have other issues. |
| 05:07:34 | 15 | MR. LOEVY:  No, your Honor. |
| 05:07:35 | 16 | THE COURT:  Thanks.  Stop talking. |
| 05:07:36 | 17 | THE COURT:  Do you have other issues. |
| 05:07:37 | 18 | MR. KULWIN:  One other issue. |
| 05:07:38 | 19 | THE COURT:  What? |
| 05:07:39 | 20 | MR. KULWIN:  It deals with Derrick Kees. |
| 05:07:41 | 21 | THE COURT:  Derrick Kees. |
| 05:07:43 | 22 | MR. KULWIN:  Derrick Kees, Judge.  Derrick Kees is |
| 05:07:46 | 23 | going to testify, I think, I'm getting calls, I believe |
| 05:07:52 | 24 | Mr. Kees I have been surprised is here tonight and I believe. |
| 05:07:56 | 25 | THE COURT:  Here here as in what? |

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 159 of 164 PageID #:31194
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 05:07:58 | 1 | MR. KULWIN:  Here in this building. |
| 05:07:59 | 2 | THE COURT:  I haven't seen the marshals lurking in |
| 05:08:02 | 3 | the back hallway. |
| 05:08:03 | 4 | MR. KULWIN:  He wouldn't be in the back hallway.  I |
| 05:08:05 | 5 | believe he comes through the U.S. Attorney's Office.  I think |
| 05:08:07 | 6 | he is in lock up. |
| 05:08:10 | 7 | THE COURT:  He is still in custody. |
| 05:08:12 | 8 | MR. KULWIN:  He is still in custody.  Anyway, and I |
| 05:08:16 | 9 | believe if he is going to get out of here needs to go on first |
| 05:08:19 | 10 | thing in the morning, so I am communicating that.  But that's |
| 05:08:22 | 11 | not my purpose.  I just thought I would advise you of that. |
| 05:08:25 | 12 | That's what I heard. |
| 05:08:26 | 13 | THE COURT:  People -- we are going to finish with Ms. |
| 05:08:29 | 14 | Lyon first.  Are we okay with putting Kees on after that? |
| 05:08:33 | 15 | MR. LOEVY:  We burned with Hawkins. |
| 05:08:35 | 16 | THE COURT:  So Kees is the next witness. |
| 05:08:37 | 17 | MR. KULWIN:  The question becomes about this Rule 35. |
| 05:08:40 | 18 | I imagine that the plaintiff is going to cross him on the Rule |
| 05:08:46 | 19 | 35. |
| 05:08:46 | 20 | THE COURT:  Well, I don't think you have to imagine |
| 05:08:48 | 21 | that. |
| 05:08:49 | 22 | MR. KULWIN:  Well, you know.  Whatever.  So I imagine |
| 05:08:52 | 23 | that, and the question I want is guidance on what's allowed in |
| 05:08:57 | 24 | the -- |
| 05:08:57 | 25 | THE COURT:  Well, ask me something specific. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

159

05:08:59  1      MR. KULWIN:  I want to go into the Rule 35.  I want

05:09:01  2  to show it to him, how he got it.

05:09:02  3      THE COURT:  Ask me something specific.  What is it --

05:09:05  4  the document is not going to go into evidence.  Okay?  So what

05:09:08  5  is it you want to go into about it?

05:09:10  6      MR. KULWIN:  This is a Rule 35 motion that the

05:09:12  7  government gave you, provided you.  You're a lawyer, asked

05:09:16  8  them to file it, they filed it on your behalf, correct and who

05:09:19  9  signed it, okay?  All right.  You know, and who is the

05:09:23  10  signature line and all that stuff.  And, you know.

05:09:27  11      THE COURT:  Has it been ruled on yet?

05:09:29  12      MR. KULWIN:  Yeah.  What I'm concerned is that

05:09:34  13  they're going to make it look like or try to, those guys over

05:09:38  14  there, and he'll point over to us, we're somehow behind it.  I

05:09:43  15  don't want that to happen.

05:09:44  16      THE COURT:  Now we are down to hand gestures are

05:09:50  17  unfairly prejudicial.

05:09:51  18      MR. KULWIN:  Yes, they are.

05:09:52  19      THE COURT:  The record will reflect laughing by Mr.

05:09:58  20  Kulwin and by the judge even though I am laughing on the

05:10:00  21  inside.

05:10:00  22      MR. KULWIN:  With all seriousness --

05:10:04  23      THE COURT:  Honestly, are you going to argue that

05:10:06  24  there's something inappropriate with him eliciting that it was

05:10:09  25  the U.S. government that moved for the reduction in sentence?

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 PM
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 161 of 164 PageID #:31196
***REALTIME UNEDITED TRANSCRIPT ONLY***

160

| | | |
|---|---|---|
| 05:10:11 | 1 | That's a question.  Just answer it. |
| 05:10:12 | 2 | MR. LOEVY:  The answer is no. |
| 05:10:13 | 3 | THE COURT:  Okay.  I think it's completely |
| 05:10:15 | 4 | appropriate for you to elicit that it was the U.S. government |
| 05:10:18 | 5 | that moved for the reduction of the sentence. |
| 05:10:20 | 6 | MR. KULWIN:  And that I want to show him the |
| 05:10:22 | 7 | document, I want to show him who signed it.  Okay? |
| 05:10:24 | 8 | THE COURT:  Who signed it? |
| 05:10:25 | 9 | MR. KULWIN:  Farden and Yonan. |
| 05:10:27 | 10 | THE COURT:  Okay. |
| 05:10:28 | 11 | MR. KULWIN:  Because that's important to me. |
| 05:10:30 | 12 | MR. ART:  The Rule 35 motion is not signed by Hogan. |
| 05:10:35 | 13 | MS. KATZ:  Jason -- |
| 05:10:36 | 14 | THE COURT:  I read it. |
| 05:10:38 | 15 | MR. KULWIN:  Jason Yonan, I saw it. |
| 05:10:43 | 16 | MR. KULWIN:  I want that in evidence. |
| 05:10:45 | 17 | MR. LOEVY:  Your Honor, the inference here is that |
| 05:10:47 | 18 | the government has some interest in helping and we do have the |
| 05:10:51 | 19 | email copying O'Callaghan and Murphy where William Hogan sends |
| 05:10:56 | 20 | the Rule 35 and Joe Murphy says, thanks for the help. |
| 05:11:00 | 21 | MR. KULWIN:  Right. |
| 05:11:01 | 22 | MR. LOEVY:  Thanks for the help. |
| 05:11:01 | 23 | THE COURT:  Nothing wrong with you bringing that up. |
| 05:11:03 | 24 | What we don't want them to suggest -- by the way, this Rule 35 |
| 05:11:06 | 25 | motion was filed during our trial.  What Mr. Kulwin is milling |

| 05:11:11 | 1 | around the edges is edges is the government has reasons to do |
| 05:11:18 | 2 | it.  We wanted to bar Kees, your Honor disagreed, but we |
| 05:11:21 | 3 | certainly want to cross-examine on it and Mr. Kulwin should |
| 05:11:24 | 4 | not be allowed to suggest this is unrelated to his clients. |
| 05:11:27 | 5 | MR. KULWIN:  Hold the phone, Judge.  If they are |
| 05:11:29 | 6 | going to say -- first of all, it was Mr. Murphy, not my client |
| 05:11:33 | 7 | that said thanks for the help.  The purpose why the government |
| 05:11:37 | 8 | did it is highly relevant because they want to make it look |
| 05:11:40 | 9 | like we went to the government and said, help us out in the |
| 05:11:46 | 10 | civil case, we're hurting here. |
| 05:11:47 | 11 | THE COURT:  You are not going to get any of this out |
| 05:11:49 | 12 | of Mr. Kees; am I correct?  Mr. Kees -- is there any |
| 05:11:53 | 13 | possibility on God's green earth that Mr. Kees has some |
| 05:11:58 | 14 | insight because he is, if I can borrow a phrase, Carnac The |
| 05:12:02 | 15 | Magnificent into what the government's motivation was? |
| 05:12:05 | 16 | MR. KULWIN:  No. |
| 05:12:06 | 17 | THE COURT:  So it's not going to come out of |
| 05:12:08 | 18 | Mr. Kees.  I assume that you are going to attempt to do is |
| 05:12:11 | 19 | elicit this from Mr. Hogan. |
| 05:12:12 | 20 | MR. KULWIN:  Absolutely. |
| 05:12:12 | 21 | THE COURT:  Am I right? |
| 05:12:12 | 22 | MR. KULWIN:  Yes. |
| 05:12:12 | 23 | THE COURT:  When is Mr. Hogan going to testify? |
| 05:12:15 | 24 | MR. KULWIN:  In our case. |
| 05:12:16 | 25 | THE COURT:  Not yet? |

05:12:17    1          MR. KULWIN:  Not yet.

05:12:18    2          THE COURT:  I will address at that point in time or

05:12:20    3    before that point in time exactly what can be testified to or

05:12:24    4    not.  It's unlikely that you are going to be able to go into

05:12:27    5    some whole chapter and verse on that.  It's almost certain

05:12:30    6    that I am going to permit you to elicit from Mr. Hogan that

05:12:32    7    this -- assuming it's true, is this a decision made by the

05:12:36    8    U.S. Attorney's Office, did you get any input from any of the

05:12:40    9    defendants in this case, did you get input from any of the

05:12:42   10    defense lawyers in this case, was this a decision that was

05:12:44   11    made at the U.S. Attorney's Office based on what you

05:12:46   12    considered to be the merits, those are all going to be proper

05:12:49   13    questions because you're entitled to attempt to disassociate

05:12:53   14    that motion from the defendants in this case.

05:12:58   15          On the other hand, the plaintiff is entitled to

05:12:59   16    elicit that Mr. Kees is getting a benefit for his testimony in

05:13:02   17    this case because that's exactly what the motion says.  Okay?

05:13:06   18    So it says that.

05:13:07   19          MR. KULWIN:  But that's -- I don't -- we can do this

05:13:10   20    later.

05:13:10   21          THE COURT:  I'm just giving you the parameters.  None

05:13:13   22    of this is going to come in.  None of the government's

05:13:17   23    motivation is properly admissible through Mr. Kees.  If it's

05:13:20   24    admissible, the extent it's admissible is going to be from

05:13:24   25    somebody who knows.

Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 164 of 164 PageID #:31199
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

163

05:13:25   1        MR. KULWIN:  At that point, then, Mr. Loevy should be

05:13:27   2   precluded from putting this thing under his face and say the

05:13:30   3   reason you got this, it says right in your motion was because

05:13:33   4   they wanted to give you a benefit for testifying in this case.

05:13:37   5   He shouldn't be allowed to do that without me being able to

05:13:40   6   say, yeah, the reason they wanted to do that was because what?

05:13:43   7        THE COURT:  Those are two different things, Mr.

05:13:46   8   Kulwin, and I know that you know the rules of evidence well

05:13:48   9   enough to understand the distinction.  I mean, what he

05:13:52   10  understood is that he was getting a benefit that was based on

05:13:58   11  the testimony he's given in the case.  That is perfectly

05:14:02   12  admissible what the government's motivation was, you can't get

05:14:07   13  in through him, period.

05:14:09   14       Now, is there any other topics we need to talk about.

05:14:12   15       MR. LOEVY:  Not from the plaintiff.

05:14:13   16       MR. KULWIN:  Not until Mr. Hogan is going to testify.

05:14:15   17       THE COURT:  I want some lead time on it.

05:14:16   18       MR. KULWIN:  Absolutely.

05:14:17   19       THE COURT:  Okay.

05:14:18   20       MR. LOEVY:  Thank you.

05:14:29   21    (The trial was adjourned at 5:15 p.m. until 9:30 a.m. on

05:14:38   22  November 30, 2016.)

           23

           24

           25