# EXHIBIT 71

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 2 of 175 PageID #:32612
***REALTIME UNEDITED TRANSCRIPT ONLY***

1

| 01:31:10 | 1 | Judge Kennelly, December 6, 2016, 1:30 p.m. call and trial. |
| 01:39:51 | 2 | (The following proceedings were had in open court in the |
| 01:39:52 | 3 | presence and hearing of the jury:) |
| 01:39:52 | 4 | THE COURT:  Everybody can have a seat.  I have |
| 01:39:56 | 5 | allowed Mr. Kulwin to go into one topic, one additional topic |
| 01:39:59 | 6 | on his direct.  Mr. Kulwin, you can go ahead. |
| 01:40:01 | 7 | MR. KULWIN:  Thank you, your Honor. |
| 01:40:02 | 8 | - - - |
| 01:40:02 | 9 | JACK HYNES, DIRECT EXAMINATION CONTINUED |
| 01:40:02 | 10 | BY MR. KULWIN: |
| 01:40:04 | 11 | Q.  Judge Hynes, I think you testified earlier this morning |
| 01:40:08 | 12 | that after you were done looking at everything, you spoke with |
| 01:40:14 | 13 | Mr. DiBenedetto about the Vaughn/White murder.  Do you |
| 01:40:18 | 14 | remember I asked you about that? |
| 01:40:20 | 15 | A.  Yes, sir. |
| 01:40:20 | 16 | Q.  Did you tell Mr. DiBenedetto, did you provide information |
| 01:40:27 | 17 | to Mr. DiBenedetto about your review of the Vaughn/White |
| 01:40:31 | 18 | files? |
| 01:40:32 | 19 | A.  Yes, I did. |
| 01:40:33 | 20 | Q.  And did you discuss with him specifically the issue of |
| 01:40:36 | 21 | eyewitnesses? |
| 01:40:37 | 22 | A.  Yes, I did. |
| 01:40:37 | 23 | Q.  Can you tell the ladies and gentlemen of the jury what you |
| 01:40:40 | 24 | told Mr. DiBenedetto at that time? |
| 01:40:42 | 25 | A.  I told Mr. DiBenedetto that there were two young children |

| | | |
|---|---|---|
| 01:40:46 | 1 | in the apartment at the time of the murders that were I |
| 01:40:50 | 2 | believe hiding in a bedroom or some room there, that they did |
| 01:40:56 | 3 | see some stuff, but there were some problems with the |
| 01:41:00 | 4 | identifications, misidentifications and the like, and I said |
| 01:41:03 | 5 | that other than that, I didn't know of any witnesses to the |
| 01:41:06 | 6 | offense. |
| 01:41:06 | 7 | Q.  And as a result of that, is that reflected on your felony |
| 01:41:14 | 8 | review thing where you say no eyewitnesses? |
| 01:41:19 | 9 | A.  That's correct. |
| 01:41:20 | 10 | Q.  And did that conversation occur before or after you wrote |
| 01:41:24 | 11 | on here that charges were approved by Ernie DiBenedetto? |
| 01:41:28 | 12 | A.  That conversation occurred before. |
| 01:41:40 | 13 |        MR. KULWIN:  If I may have one moment. |
| 01:41:45 | 14 |        THE COURT:  Okay. |
| 01:41:45 | 15 |        MR. KULWIN:  I don't have anything further, your |
| 01:41:47 | 16 | Honor. |
| 01:41:47 | 17 |        THE COURT:  All right.  Mr. Loevy. |
| 01:41:48 | 18 |              - - - |
| 01:41:48 | 19 |       JACK HYNES, CROSS-EXAMINATION |
| 01:41:48 | 20 | BY MR. LOEVY: |
| 01:41:56 | 21 | Q.  Isn't it true, sir, that the warrant and charges were |
| 01:42:01 | 22 | approved on the Vaughn/White murder more than a month before |
| 01:42:03 | 23 | you got involved? |
| 01:42:04 | 24 | A.  The warrant may have been approved, but I don't know that |
| 01:42:10 | 25 | the charges were approved. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 4 of 175 PageID #:32614
***REALTIME UNEDITED TRANSCRIPT ONLY***

3

| | | |
|---|---|---|
| 01:42:11 | 1 | Q. All right. But that would have had nothing to do with |
| 01:42:14 | 2 | you, right, back in May? |
| 01:42:15 | 3 | A. Correct. |
| 01:42:16 | 4 | Q. All right. Let's back up. |
| 01:42:18 | 5 | You learned about at some point you came to learn |
| 01:42:22 | 6 | Sumner had lied about Nate's involvement in the murder, |
| 01:42:25 | 7 | correct? |
| 01:42:26 | 8 | A. In 1992, yes. |
| 01:42:29 | 9 | Q. What was your understanding for why Sumner had lied on |
| 01:42:32 | 10 | Nate? |
| 01:42:33 | 11 | THE COURT: You are asking him what Mr. Sumner said |
| 01:42:36 | 12 | about that? |
| 01:42:37 | 13 | MR. LOEVY: Yeah. |
| 01:42:37 | 14 | THE WITNESS: Again I think I memorialized that, I |
| 01:42:40 | 15 | don't know if you have the statement there, but I memorialized |
| 01:42:44 | 16 | it in the statement as to why he. |
| 01:42:48 | 17 | BY MR. LOEVY: |
| 01:42:48 | 18 | Q. That's what I'm asking. |
| 01:42:50 | 19 | A. Yeah. And what he said was that he was confused or |
| 01:42:56 | 20 | something to that effect and that he was mad at Nathson Fields |
| 01:43:01 | 21 | because he had put his mother out of one of the houses. |
| 01:43:04 | 22 | Q. All right. You've reviewed all these documents to prepare |
| 01:43:10 | 23 | for today, correct? |
| 01:43:11 | 24 | A. I have reviewed what I have seen, yes, sir. |
| 01:43:13 | 25 | Q. And Nate -- Sumner also told you that he had lied about |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 5 of 175 PageID #:32615

| | | |
|---|---|---|
| 01:43:16 | 1 | another murder, correct? |
| 01:43:17 | 2 | A.  Yes. |
| 01:43:18 | 3 | Q.  And did you know why they were creating this statement in |
| 01:43:22 | 4 | 1992 to correct some Sumner lies? |
| 01:43:27 | 5 | MR. KULWIN:  Objection, Judge. |
| 01:43:28 | 6 | THE COURT:  Rephrase the question. |
| 01:43:30 | 7 | BY MR. LOEVY: |
| 01:43:30 | 8 | Q.  Do you have any idea of the circumstances why Sumner was |
| 01:43:33 | 9 | amending some of his stories? |
| 01:43:34 | 10 | MR. KULWIN:  Objection, Judge, argumentative. |
| 01:43:36 | 11 | THE COURT:  Overruled. |
| 01:43:36 | 12 | THE WITNESS:  I don't know. |
| 01:43:40 | 13 | BY MR. LOEVY: |
| 01:43:42 | 14 | Q.  All right.  You were asked about -- by the way, when you |
| 01:43:48 | 15 | took the statement for Sumner saying he had lied about |
| 01:43:50 | 16 | Vaughn/White? |
| 01:43:52 | 17 | A.  Yes. |
| 01:43:52 | 18 | Q.  Why didn't you ask him, by the way, did you lie about the |
| 01:43:55 | 19 | other murder you put Nate into? |
| 01:43:57 | 20 | A.  I asked him about has he been truthful about everything |
| 01:44:02 | 21 | else that he's testified to either to the U.S. attorneys, the |
| 01:44:05 | 22 | state's attorneys or any local or federal law enforcement, and |
| 01:44:10 | 23 | he said other than these two incidents, these were the only |
| 01:44:14 | 24 | times he lied. |
| 01:44:14 | 25 | Q.  All right.  But you had to prove felony murder charges on |

***REALTIME UNEDITED TRANSCRIPT ONLY***

5

| | | |
|---|---|---|
| 01:44:17 | 1 | Smith/Hickman based in part on this informant, correct? |
| 01:44:20 | 2 | A. Correct. |
| 01:44:21 | 3 | Q. So why didn't you say, Mr. Sumner, I need to understand if |
| 01:44:24 | 4 | you lied about the other case you put Nate in why didn't you |
| 01:44:30 | 5 | ask him that request he? |
| 01:44:31 | 6 | MR. KULWIN: Objection, asked and answered. |
| 01:44:33 | 7 | THE COURT: Overruled. |
| 01:44:33 | 8 | THE WITNESS: I asked him about everything. |
| 01:44:35 | 9 | BY MR. LOEVY: |
| 01:44:36 | 10 | Q. I'm asking -- |
| 01:44:37 | 11 | A. I didn't single out one particular crime or another. |
| 01:44:40 | 12 | Q. I understand but I'm asking why you didn't. Mr. Sumner, |
| 01:44:44 | 13 | did you lie about Nate about the other crime you put him in? |
| 01:44:47 | 14 | A. I can't answer that, counsel. I don't know. |
| 01:44:49 | 15 | Q. All right. You were told that there were -- I'm showing |
| 01:44:56 | 16 | you Plaintiff's Exhibit 77. These are your notes on |
| 01:44:58 | 17 | Vaughn/White, correct? |
| 01:44:59 | 18 | A. That's correct. |
| 01:44:59 | 19 | Q. And your notes say no eyewitnesses, eye wits to the |
| 01:45:05 | 20 | incident, correct? |
| 01:45:06 | 21 | A. Correct. |
| 01:45:06 | 22 | Q. And when you wrote into eye wits to the incident, did you |
| 01:45:12 | 23 | believe that to be a true statement? |
| 01:45:12 | 24 | A. Based on what I learned, yes. |
| 01:45:14 | 25 | Q. All right. In fact, there were two eyewitnesses, correct? |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 7 of 175 PageID #:32617
12/06/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

6

| 01:45:18 | 1 | A.  There were two young children who were there. |
| 01:45:21 | 2 | Q.  And those two young children had previously participated |
| 01:45:24 | 3 | in lineups, correct? |
| 01:45:25 | 4 | A.  Correct. |
| 01:45:25 | 5 | Q.  And they had identified the wrong two men, correct? |
| 01:45:29 | 6 | A.  They had identified different people. |
| 01:45:31 | 7 | Q.  Different people than the known offenders, right? |
| 01:45:34 | 8 | A.  Different people. |
| 01:45:36 | 9 | Q.  And in fact, Mr. O'Callaghan was involved in those |
| 01:45:39 | 10 | lineups, correct? |
| 01:45:40 | 11 | MR. KULWIN:  Objection, lack of foundation, your |
| 01:45:41 | 12 | Honor. |
| 01:45:41 | 13 | THE COURT:  Lay the foundation. |
| 01:45:42 | 14 | BY MR. LOEVY: |
| 01:45:43 | 15 | Q.  You spoke with Mr. O'Callaghan about the Vaughn/White |
| 01:45:45 | 16 | murders, correct? |
| 01:45:47 | 17 | A.  Correct. |
| 01:45:47 | 18 | Q.  And in fact, his name is right there, Detective |
| 01:45:50 | 19 | O'Callaghan, right? |
| 01:45:51 | 20 | A.  That's correct. |
| 01:45:51 | 21 | Q.  Did he explain to you how the two children misidentified |
| 01:45:57 | 22 | the wrong men during one of his lineups? |
| 01:45:59 | 23 | A.  I don't remember the details. |
| 01:46:03 | 24 | Q.  Did the eyewitnesses to Vaughn/White ever identify Sumner |
| 01:46:12 | 25 | or Hawkins or Fields? |

12/06/16 PM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

7

01:46:13    1    A.  Not that I know of.

01:46:17    2    Q.  Did you ask the detectives before we approve charges here,

01:46:20    3    should we make sure that the kids can actually recognize Nate

01:46:25    4    Fields?

01:46:25    5    A.  No.

01:46:25    6    Q.  How old were you in 1985?

01:46:28    7    A.  Different question, isn't it?

01:46:34    8          THE COURT:  You're under oath.

01:46:36    9          THE WITNESS:  That's why I went to law school.  29.

01:46:42    10   BY MR. LOEVY:

01:46:42    11   Q.  What year did you graduate law school?

01:46:44    12   A.  82.

01:46:45    13   Q.  So one of the first assignments in the state's attorney's

01:46:47    14   office is usually felony review, correct?

01:46:48    15   A.  It's one of the progressions, not the first.

01:46:51    16   Q.  One of the -- one of the earlier steps, correct?

01:46:54    17   A.  One of the steps.

01:46:55    18   Q.  And oftentimes you have very young lawyers being asked to

01:46:58    19   approve felony charges with experienced homicide detectives,

01:47:02    20   correct?

01:47:02    21          MR. KULWIN:  Judge, objection to the general nature

01:47:04    22   of the question.

01:47:05    23          THE COURT:  Sustained.

01:47:05    24   BY MR. LOEVY:

01:47:08    25   Q.  All right.  Now, you did no investigation of your own on

                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:47:19 | 1 | Vaughn/White, correct? |
| 01:47:20 | 2 | A.  No. |
| 01:47:20 | 3 | Q.  That is correct, right? |
| 01:47:22 | 4 | A.  That is correct. |
| 01:47:22 | 5 | Q.  You relied entirely on what Mr. O'Callaghan and |
| 01:47:26 | 6 | Mr. Robertson told you, correct? |
| 01:47:27 | 7 | A.  That is incorrect. |
| 01:47:29 | 8 | Q.  Did you speak to the informants? |
| 01:47:30 | 9 | A.  I spoke to Ernest DiBenedetto. |
| 01:47:33 | 10 | Q.  The question was did you speak to the informants? |
| 01:47:36 | 11 | A.  No, I did not. |
| 01:47:37 | 12 | Q.  So everything you knew at the time was things you had been |
| 01:47:40 | 13 | told, correct? |
| 01:47:41 | 14 | A.  Correct. |
| 01:47:41 | 15 | Q.  Did -- were you told that the two eyewitnesses had |
| 01:47:47 | 16 | approved someone other than Nate for the murder? |
| 01:47:50 | 17 | MR. KULWIN:  Objection, Judge, asked and answered. |
| 01:47:52 | 18 | THE COURT:  Sustained. |
| 01:47:53 | 19 | BY MR. LOEVY: |
| 01:47:53 | 20 | Q.  Did you consider for probable cause that the eyewitnesses |
| 01:47:56 | 21 | had considered someone other -- had identified someone other |
| 01:47:59 | 22 | than Nate? |
| 01:48:00 | 23 | MR. KULWIN:  Same objection. |
| 01:48:01 | 24 | THE COURT:  Overruled. |
| 01:48:02 | 25 | THE WITNESS:  Is this in the Vaughn/White murders? |

| 01:48:06 | 1 | BY MR. LOEVY: |
| 01:48:06 | 2 | Q.  Yeah. |
| 01:48:07 | 3 | A.  Yes. |
| 01:48:07 | 4 | Q.  All right.  You also approved charges for the Vaughn/White |
| 01:48:10 | 5 | murder, correct?  I'm sorry, the Smith/Hickman, correct? |
| 01:48:14 | 6 | A.  Correct. |
| 01:48:15 | 7 | Q.  And these events were a long time ago, right? |
| 01:48:17 | 8 | A.  Correct. |
| 01:48:17 | 9 | Q.  And this is something you did every day at that period of |
| 01:48:20 | 10 | your life? |
| 01:48:22 | 11 | A.  Yes. |
| 01:48:22 | 12 | Q.  And you said you were working these huge shifts, right? |
| 01:48:25 | 13 | A.  Correct. |
| 01:48:25 | 14 | Q.  One after another you'd go to these murders and approve |
| 01:48:28 | 15 | charges or not approve charges, right? |
| 01:48:30 | 16 | A.  It wasn't every day we had a murder charge or one day |
| 01:48:35 | 17 | after another, but there were other cases, murder cases that I |
| 01:48:38 | 18 | worked on. |
| 01:48:38 | 19 | Q.  A lot of murders back in those days, right? |
| 01:48:41 | 20 | A.  Yes. |
| 01:48:41 | 21 | Q.  Are you saying that you actually remember everything you |
| 01:48:43 | 22 | described in court this morning or you've reviewed the papers, |
| 01:48:46 | 23 | you've reviewed your prior testimony and you're relating what |
| 01:48:49 | 24 | you believe happened? |
| 01:48:50 | 25 | A.  I have an independent recollection of what occurred, but I |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 11 of 175 PageID #:32621
***REALTIME UNEDITED TRANSCRIPT ONLY***

10

| | | |
|---|---|---|
| 01:48:55 | 1 | did review certain things. |
| 01:48:57 | 2 | Q. All right. But you do claim independent recollection? |
| 01:49:01 | 3 | A. Right. |
| 01:49:01 | 4 | Q. Did you review the charges -- did you approve the charges |
| 01:49:05 | 5 | in the Vaughn/White case, sir? |
| 01:49:06 | 6 | A. I did. |
| 01:49:06 | 7 | Q. Okay. Do you remember being asked this question in |
| 01:49:09 | 8 | October 2013 at page 25. |
| 01:49:12 | 9 | "QUESTION: On which case, both? |
| 01:49:16 | 10 | "ANSWER: I know I approved charges on the |
| 01:49:18 | 11 | Smith/Hickman murder. I'm not sure if the charges approved |
| 01:49:23 | 12 | charges on the other murder." |
| 01:49:25 | 13 | Did you give that answer, sir? |
| 01:49:27 | 14 | A. I did. |
| 01:49:27 | 15 | Q. That was accurate, right? |
| 01:49:28 | 16 | A. It was not accurate actually. |
| 01:49:30 | 17 | Q. Well, it was accurate that you weren't sure when you gave |
| 01:49:33 | 18 | the answer, right? |
| 01:49:33 | 19 | A. Correct. |
| 01:49:34 | 20 | Q. You've since gone back at the papers and had a chance to |
| 01:49:37 | 21 | refamiliarize yourself with the events, correct? |
| 01:49:39 | 22 | A. Correct. |
| 01:49:40 | 23 | Q. Now, you've spoken with the defense counsel to prepare |
| 01:49:48 | 24 | your testimony, correct? |
| 01:49:49 | 25 | A. Correct. |

12/06/16 PM         ***REALTIME UNEDITED TRANSCRIPT ONLY***

11

01:49:50   1   Q.  Mr. Kulwin?

01:49:51   2   A.  Yes.

01:49:51   3   Q.  How many approximate conversations have you had with Mr.

01:49:55   4   Kulwin?

01:49:55   5   A.  I met with him once.

01:49:56   6   Q.  And how many conversations?

01:49:58   7   A.  Just one.

01:49:59   8   Q.  One substantive conversation?

01:50:02   9   A.  Yes.

01:50:02   10  Q.  All right.  You guys talked about the questions he was

01:50:04   11  going to ask you, correct?

01:50:05   12  A.  He just asked me if I could relay what had occurred and I

01:50:10   13  basically told him what happened.

01:50:11   14  Q.  All right.  Let's talk about the date you interviewed Nate

01:50:16   15  Fields.  Do you remember what date that was?

01:50:17   16  A.  That was June 14th of 1985.

01:50:22   17  Q.  And you took notes on your felony review folder, did you

01:50:24   18  not?

01:50:25   19  A.  I took some notes there, yes.

01:50:26   20  Q.  This is Plaintiff's Exhibit 77.  These are your felony

01:50:29   21  review notes, correct?

01:50:30   22  A.  Yes.

01:50:30   23  Q.  And tell the jury why felony review prosecutors take

01:50:34   24  felony review notes on their felony review jackets?

01:50:37   25  A.  It's a thumbnail sketch to allow the people in the grant

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 01:50:44 | 1 | 66 to have an idea what the case is about. |
| 01:50:48 | 2 | Q. All right. Because you might not -- you weren't going to |
| 01:50:51 | 3 | be the next prosecutor in court, right? |
| 01:50:53 | 4 | A. No. |
| 01:50:53 | 5 | Q. You were the felony review guy before it gets to court? |
| 01:50:55 | 6 | A. Correct. |
| 01:50:55 | 7 | Q. All right. And then you didn't write this memo, if I |
| 01:50:58 | 8 | understand, until about six weeks later, correct? |
| 01:51:01 | 9 | A. That's correct. |
| 01:51:01 | 10 | Q. This is the memo Mr. Kulwin showed you? |
| 01:51:03 | 11 | A. Yes. |
| 01:51:05 | 12 | Q. All right. And the six weeks that went by, I guess you |
| 01:51:09 | 13 | said you were real busy, lots going on, right? |
| 01:51:12 | 14 | A. There were a lot of things going on, yes. |
| 01:51:14 | 15 | Q. All right. But one of the -- regardless of the reasons |
| 01:51:17 | 16 | why the six weeks went by, by the time you wrote your memo, |
| 01:51:20 | 17 | your memory was no longer as fresh as it would have been had |
| 01:51:24 | 18 | it been a contemporaneous memo, right? |
| 01:51:27 | 19 | A. I had the notes to refresh my memory. |
| 01:51:28 | 20 | Q. All I asked was your memory wasn't as good six weeks |
| 01:51:32 | 21 | later, right? |
| 01:51:32 | 22 | A. No. |
| 01:51:33 | 23 | Q. You did have Mr. O'Callaghan's police report, correct, |
| 01:51:35 | 24 | when you wrote this memo? |
| 01:51:36 | 25 | A. I believe I looked at it. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 14 of 175 PageID #:32624
***REALTIME UNEDITED TRANSCRIPT ONLY***

13

| | | |
|---|---|---|
| 01:51:38 | 1 | Q. All right. Showing you, for example, in Plaintiff's |
| 01:51:42 | 2 | Exhibit 86-26, this sentence says, Fields went on to say that |
| 01:51:46 | 3 | he is presently a member of the El Rukns and that he holds the |
| 01:51:49 | 4 | title of ambassador. He states that his main duties are to |
| 01:51:52 | 5 | keep records, pay bills as far as the utilities in the |
| 01:51:55 | 6 | buildings owned by the nation. Do you see that? |
| 01:51:57 | 7 | A. Yes. |
| 01:51:57 | 8 | Q. Okay. Your memo, for example, tracks that pretty closely, |
| 01:52:01 | 9 | does it not, in summary, Fields stated that he was an |
| 01:52:04 | 10 | ambassador with the El Rukn street gang and his duties were to |
| 01:52:07 | 11 | keep records and pay utility bills on the buildings owned by |
| 01:52:10 | 12 | the El Rukns, correct? |
| 01:52:11 | 13 | A. That's what my memo says. |
| 01:52:12 | 14 | Q. Okay. So when you were creating your memo, one of the |
| 01:52:15 | 15 | sources you relied on was Mr. O'Callaghan's police report, |
| 01:52:18 | 16 | correct? |
| 01:52:18 | 17 | A. I relied on my notes. |
| 01:52:20 | 18 | Q. All right. But you also had the police report, right? |
| 01:52:24 | 19 | A. I did. |
| 01:52:24 | 20 | MR. KULWIN: Asked and answered, Judge. |
| 01:52:25 | 21 | THE COURT: Overruled. |
| 01:52:26 | 22 | BY MR. LOEVY: |
| 01:52:26 | 23 | Q. Let's turn to the interrogation. To be clear, Nate denied |
| 01:52:29 | 24 | any and all involvement in the Vaughn/White murder, correct? |
| 01:52:32 | 25 | A. That's correct. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 15 of 175 PageID #:32625
***REALTIME UNEDITED TRANSCRIPT ONLY***

14

| | | |
|---|---|---|
| 01:52:32 | 1 | Q.  And he denied any and all involvement in the Smith/Hickman |
| 01:52:36 | 2 | murder? |
| 01:52:36 | 3 | A.  Right. |
| 01:52:36 | 4 | Q.  He never wavered on that, correct? |
| 01:52:38 | 5 | A.  Correct. |
| 01:52:38 | 6 | Q.  Now, who brought up the Smith/Hickman murder, you or Nate? |
| 01:52:44 | 7 | A.  I brought up the murder. |
| 01:52:47 | 8 | Q.  All right.  Are you sure about that? |
| 01:52:49 | 9 | A.  Well, I mean, I asked him -- first I asked him if he knows |
| 01:52:55 | 10 | why you're here, yeah, I'm here for the two. |
| 01:52:59 | 11 | Q.  Because he had already been interviewed by O'Callaghan, |
| 01:53:01 | 12 | right, by the time you got to him? |
| 01:53:03 | 13 | A.  Yes. |
| 01:53:03 | 14 | Q.  So your understanding was O'Callaghan had already asked |
| 01:53:06 | 15 | him questions, right? |
| 01:53:07 | 16 | A.  Correct. |
| 01:53:07 | 17 | Q.  About Smith/Hickman, right? |
| 01:53:09 | 18 | A.  Correct. |
| 01:53:09 | 19 | Q.  All right.  Who brought up the nickname Fuddy, your side |
| 01:53:14 | 20 | or Nate's side? |
| 01:53:15 | 21 | A.  I can't recall. |
| 01:53:18 | 22 | Q.  All right.  This is page 22 of your testimony at the same |
| 01:53:24 | 23 | proceeding, line 17.  Do you remember being asked these |
| 01:53:28 | 24 | questions and giving these answers.  At the time of this when |
| 01:53:32 | 25 | you asked about these murders, the Smith/Hickman and |

| 01:53:34 | 1 | Vaughn/White, how did, for example, when you asked about the |
| 01:53:37 | 2 | Smith/Hickman, how did you identify the crime to Mr. Fields? |
| 01:53:39 | 3 | How did you phrase the question? |
| 01:53:40 | 4 | "ANSWER: Well, I think I asked him if he was familiar, |
| 01:53:43 | 5 | you know, with the murder that occurred over there at 706 East |
| 01:53:48 | 6 | 39th Street involving a couple, you know. I think disciples, |
| 01:53:53 | 7 | I think it was Fuddy Smith, I might have used the nickname |
| 01:53:56 | 8 | Fuddy Smith and Hickman Talman, Talman Hickman and he told you |
| 01:54:01 | 9 | he was not aware, he was not involved." |
| 01:54:03 | 10 | Did you give those answers, sir? |
| 01:54:05 | 11 | A. Yes. |
| 01:54:05 | 12 | Q. You don't claim to remember 30 years later that he brought |
| 01:54:08 | 13 | up the name Fuddy, do you? |
| 01:54:09 | 14 | A. I don't. |
| 01:54:12 | 15 | Q. You don't, right? |
| 01:54:13 | 16 | A. Correct. |
| 01:54:13 | 17 | Q. In fact, your belief is you would have been the one that |
| 01:54:15 | 18 | asked him, that's what you said in 2013, correct? |
| 01:54:17 | 19 | A. That's what I said in 2013. |
| 01:54:18 | 20 | Q. All right. Who brought up the name Talman Hickman, you, |
| 01:54:23 | 21 | your side or Nate? |
| 01:54:24 | 22 | A. What do you mean by side? |
| 01:54:26 | 23 | Q. All right. You and O'Callaghan are on one side of the |
| 01:54:28 | 24 | table, right? |
| 01:54:29 | 25 | MR. KULWIN: Object, Judge. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 17 of 175 PageID #:32627
***REALTIME UNEDITED TRANSCRIPT ONLY***

16

| | | |
|---|---|---|
| 01:54:31 | 1 | THE COURT: Rephrase the question. No, you can |
| 01:54:36 | 2 | answer that. |
| 01:54:36 | 3 | THE WITNESS: I did the questioning of Mr. Fields at |
| 01:54:39 | 4 | that time. |
| 01:54:39 | 5 | BY MR. LOEVY: |
| 01:54:40 | 6 | Q. Okay. But you and Mr. O'Callaghan were on one side of the |
| 01:54:43 | 7 | table literally, right? |
| 01:54:44 | 8 | A. No. |
| 01:54:44 | 9 | Q. And Mr. Fields was on the other side of the table, right? |
| 01:54:46 | 10 | A. Not correct. |
| 01:54:47 | 11 | Q. Where was Mr. O'Callaghan? |
| 01:54:48 | 12 | A. He was not next to me. |
| 01:54:51 | 13 | Q. All right. Do you remember that from memory or practice? |
| 01:54:53 | 14 | A. Memory. |
| 01:54:54 | 15 | Q. All right. Who was sitting next to you at the next |
| 01:54:58 | 16 | interrogation you did? |
| 01:54:59 | 17 | A. What next interrogation? |
| 01:55:01 | 18 | Q. All right. In think event, who brought up George Carter's |
| 01:55:06 | 19 | possible involvement, you or Mr. Fields, the name George |
| 01:55:10 | 20 | Carter? |
| 01:55:10 | 21 | A. I asked him if he knew George Carter. |
| 01:55:14 | 22 | Q. Are you sure that before Nate said the name George Carter, |
| 01:55:17 | 23 | you brought it up? |
| 01:55:26 | 24 | MR. KULWIN: Asked and answered, Judge. |
| 01:55:28 | 25 | THE WITNESS: I think I mentioned George Carter. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 18 of 175 PageID #:32628
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

17

01:55:30    1   BY MR. LOEVY:

01:55:30    2   Q.  Do you remember being asked this question and giving this

01:55:33    3   answer on page 14.

01:55:35    4       "QUESTION:  Did you ask him about his associations with

01:55:38    5   Earl Hawkins and George Carter?

01:55:39    6       "ANSWER:  Yes."

01:55:40    7       Did you give that answer?

01:55:42    8   A.  Yes.

01:55:42    9   Q.  So it's not an I think, you did, right?

01:55:44   10       MR. KULWIN:  Judge, objection, not impeaching.

01:55:47   11       THE COURT:  Overruled.

01:55:47   12   BY MR. LOEVY:

01:55:48   13   Q.  In fact, your memo specifically says that Fields was

01:55:52   14   questioned regarding his associations with Carter among

01:55:56   15   others, right?

01:55:56   16   A.  Correct.

01:55:57   17   Q.  That would not have been unusual in a murder interrogation

01:56:00   18   if a guy says I had nothing to do with it for the interrogator

01:56:03   19   to say, well, how about George Carter, right?

01:56:05   20   A.  Correct.

01:56:06   21   Q.  Who brought up the Guerilla squad, you or Mr. Fields?

01:56:17   22   A.  I think he brought that up.

01:56:18   23   Q.  All right.  Do you remember being asked this question --

01:56:20   24   by the way, before -- can I withdraw that, your Honor?

01:56:24   25       THE COURT:  Fine.

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 19 of 175 PageID #:32629
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

18

| 01:56:24 | 1 | BY MR. LOEVY: |
| 01:56:24 | 2 | Q. You are aware substantively on the witness stand that it's |
| 01:56:27 | 3 | an issue for the defense that Mr. Fields supposedly brought up |
| 01:56:30 | 4 | these topics, you are aware of that, right? |
| 01:56:32 | 5 |     MR. KULWIN: I am going to object. |
| 01:56:33 | 6 |     THE COURT: Argumentative, sustained. |
| 01:56:35 | 7 | BY MR. LOEVY: |
| 01:56:35 | 8 | Q. Have you discussed that with Mr. Kulwin? |
| 01:56:37 | 9 | A. No. |
| 01:56:38 | 10 | Q. All right. This is page 10, line 21. Well, for example, |
| 01:56:47 | 11 | when you asked Mr. Fields about, for example, when you asked |
| 01:56:51 | 12 | him about the Guerillas? |
| 01:56:54 | 13 |     "ANSWER: Yes. |
| 01:56:55 | 14 |     "QUESTION: The special unit? |
| 01:56:56 | 15 |     "ANSWER: Yes |
| 01:56:58 | 16 |     "QUESTION: Did you ask him about the Guerilla squad? |
| 01:57:02 | 17 |     "ANSWER: I believe he volunteered that information |
| 01:57:04 | 18 |     "QUESTION: Do you recall? |
| 01:57:05 | 19 |     "ANSWER: Not specifically |
| 01:57:07 | 20 |     MR. KULWIN: Objection, Judge. |
| 01:57:08 | 21 |     THE COURT: Overruled. |
| 01:57:08 | 22 | BY MR. LOEVY: |
| 01:57:09 | 23 | Q. Did you give that answer, sir? |
| 01:57:10 | 24 | A. Yes. |
| 01:57:11 | 25 | Q. Wouldn't it be fair to say 30 years ago, you have no idea |

01:57:16   1   in response to any of these questions whether you brought it

01:57:19   2   up or he brought it up?

01:57:20   3   A.  I am just trying to relate what I remember about the

01:57:25   4   conversation.

01:57:25   5   Q.  Who brought up this idea about officers or generals that

01:57:30   6   -- this part here that he said the shootings are typically

01:57:34   7   planned and executed by the higher-ups in the gangs such as

01:57:37   8   the generals.  Who brought that up?  You don't remember, do

01:57:40   9   you?

01:57:40  10   A.  No.

01:57:42  11   Q.  Who brought up that supposedly the Goon Squad was having,

01:57:51  12   you know, isn't it true this was about retaliation with the

01:57:54  13   Goon Squad, you don't remember that either, do you?

01:57:56  14   A.  Once again, as I testified, I believe he was the one who

01:57:59  15   gave me that information.

01:58:00  16   Q.  But you don't remember, right?

01:58:02  17              MR. KULWIN:  Objection, Judge.

01:58:03  18              THE COURT:  Overruled.

01:58:03  19              THE WITNESS:  That's the way I remember it.

01:58:04  20   BY MR. LOEVY:

01:58:05  21   Q.  Who brought up Earl Hawkins?

01:58:06  22   A.  I believe I did.

01:58:08  23   Q.  Who brought up the address of the murders?

01:58:10  24   A.  I did.

01:58:11  25   Q.  Who brought up Hank Andrews?

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 21 of 175 PageID #:32631
***REALTIME UNEDITED TRANSCRIPT ONLY***

20

| 01:58:13 | 1 | A.  I believe I did. |
| 01:58:14 | 2 | Q.  All right.  If Mr. Fields was asked, hey, isn't it true |
| 01:58:27 | 3 | this shooting was about some retaliation with the Goon Squad |
| 01:58:31 | 4 | and he had said no, couldn't that later be argued that it was |
| 01:58:34 | 5 | incriminating because he was lying about the reason about the |
| 01:58:37 | 6 | motive? |
| 01:58:38 | 7 | MR. KULWIN:  Objection, Judge, argumentative. |
| 01:58:39 | 8 | THE COURT:  Sustained. |
| 01:58:39 | 9 | BY MR. LOEVY: |
| 01:58:42 | 10 | Q.  Isn't it true that was a question that a person in an |
| 01:58:45 | 11 | interrogation room couldn't win with that question? |
| 01:58:49 | 12 | MR. KULWIN:  Objection, argumentative. |
| 01:58:50 | 13 | THE COURT:  Sustained. |
| 01:58:51 | 14 | BY MR. LOEVY: |
| 01:58:55 | 15 | Q.  All right.  By the way, there was no such shooting |
| 01:58:58 | 16 | referenced in the statement about that the Goon Squads and the |
| 01:59:02 | 17 | El Rukns supposedly were fighting over a shooting, correct? |
| 01:59:04 | 18 | A.  I don't understand your question, sir. |
| 01:59:07 | 19 | Q.  To this day, you've never been provided any corroboration |
| 01:59:10 | 20 | by the detectives or anybody else that there really was a |
| 01:59:13 | 21 | shooting that precipitated Fuddy's murder, correct? |
| 01:59:16 | 22 | A.  I am still not understanding your question. |
| 01:59:21 | 23 | Q.  Do you remember what Mr. Fields was asked about whether |
| 01:59:25 | 24 | there was retaliation and the shooting that business? |
| 01:59:28 | 25 | A.  Sure. |

01:59:28  1  Q.  All right.  Then the question is isn't it true O'Callaghan

01:59:30  2  was never able to give you any proof that there was such a

01:59:33  3  shooting?

01:59:34  4      MR. KULWIN:  Objection, Judge, argumentative, calls

01:59:35  5  for hearsay.

01:59:36  6      THE COURT:  Overruled.

01:59:37  7      THE WITNESS:  I don't know if there was a shooting or

01:59:40  8  not.

01:59:41  9  BY MR. LOEVY:

01:59:42  10  Q.  All right.  Did O'Callaghan tell you that Randy Langston

01:59:48  11  was a Goon Squad member?

01:59:49  12  A.  Randy Langston?

01:59:53  13  Q.  Yeah.

01:59:54  14  A.  I don't recall that.

01:59:55  15  Q.  He told you -- the eyewitnesses Randy Langston, Gerald

02:00:00  16  Morris, that they weren't gang members, didn't he?

02:00:02  17  A.  Correct.

02:00:02  18  Q.  All right.  And you now know that that wasn't true, right?

02:00:05  19  A.  I don't know that.

02:00:06  20  Q.  If that wasn't true, if Randy Langston and Gerald Morris

02:00:10  21  were gang members, that might have been a piece of the puzzle

02:00:14  22  you would have considered in approving charges, correct?

02:00:16  23  A.  It could be.

02:00:16  24  Q.  Especially if they were in the gang of the victim, right?

02:00:19  25  A.  It could be.


***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 23 of 175 PageID #:32633
***REALTIME UNEDITED TRANSCRIPT ONLY***

22

| | | |
|---|---|---|
| 02:00:22 | 1 | Q. But you do remember being told that they weren't gang |
| 02:00:26 | 2 | members, correct? |
| 02:00:26 | 3 | A. Correct. |
| 02:00:26 | 4 | Q. You were asked about sometimes the state's attorney would |
| 02:00:40 | 5 | give people money to relocate. Do you remember those |
| 02:00:42 | 6 | questions? |
| 02:00:43 | 7 | A. Yes. |
| 02:00:43 | 8 | Q. Who would typically be the one that would help them move |
| 02:00:46 | 9 | and relocate, the state's attorneys have vectors that did |
| 02:00:49 | 10 | that? |
| 02:00:49 | 11 | A. Yes. |
| 02:00:50 | 12 | Q. I mean, there was people whose job it was to do that, |
| 02:00:53 | 13 | right? |
| 02:00:53 | 14 | A. Sometimes, yes. I mean, it depends on the manpower. |
| 02:00:57 | 15 | Q. All right. But it would not typically be the lead |
| 02:01:01 | 16 | detective in the case, correct? |
| 02:01:02 | 17 | A. It varied from one situation to the next. |
| 02:01:05 | 18 | Q. But not typically, right? |
| 02:01:07 | 19 | MR. KULWIN: Judge, objection, asked and answered. |
| 02:01:08 | 20 | THE COURT: Overruled. |
| 02:01:10 | 21 | THE WITNESS: I don't know that there's any typical |
| 02:01:12 | 22 | when it comes to relocation. |
| 02:01:13 | 23 | BY MR. LOEVY: |
| 02:01:13 | 24 | Q. All right. You were asked if you heard prior to 92 that |
| 02:01:22 | 25 | Sumner had recanted. Do you remember that? |

12/06/16 PM | ***REALTIME UNEDITED TRANSCRIPT ONLY***

23

| 02:01:24 | 1 | A.  Yes. |
| 02:01:24 | 2 | Q.  You're quite sure that the first time anybody told you was |
| 02:01:27 | 3 | 1992, right? |
| 02:01:28 | 4 | A.  From what I recall, yes. |
| 02:01:30 | 5 | Q.  And if anybody had known in the '80s, 88, 89, then you |
| 02:01:35 | 6 | would have wanted to have known that, right? |
| 02:01:39 | 7 | A.  Correct. |
| 02:01:39 | 8 | Q.  All right.  You were asked Nate Fields if he was treated |
| 02:01:43 | 9 | well by the police.  Why did you ask that? |
| 02:01:45 | 10 | A.  I always ask that. |
| 02:01:46 | 11 | Q.  All right.  And was there a concern on your part? |
| 02:01:53 | 12 | A.  No. |
| 02:01:53 | 13 | Q.  All right.  He was held overnight for a crime that he |
| 02:01:57 | 14 | contends he didn't commit, correct? |
| 02:01:58 | 15 | A.  I don't know what he contends, sir. |
| 02:02:01 | 16 | Q.  Well, you do know that.  You spoke to him, right? |
| 02:02:03 | 17 | A.  Yeah. |
| 02:02:04 | 18 | Q.  He told you I had nothing to do with the crime, right? |
| 02:02:07 | 19 | A.  All right. |
| 02:02:07 | 20 | Q.  He was forthcoming with information, though, was he not? |
| 02:02:11 | 21 | A.  Yes. |
| 02:02:11 | 22 | Q.  You said he didn't seem surprised.  Was that going from |
| 02:02:14 | 23 | memory? |
| 02:02:14 | 24 | A.  He, you know, just the conversation like I say, he was |
| 02:02:21 | 25 | calm, he was alert, there was no surprise, no outbursts or |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 25 of 175 PageID #:32635
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

| | | |
|---|---|---|
| 02:02:26 | 1 | anything like that. |
| 02:02:27 | 2 | Q.  No outbursts, but you're not intending to imply like he |
| 02:02:31 | 3 | knew you were going to charge him with Vaughn/White, did he? |
| 02:02:33 | 4 | A.  I don't know what he knew. |
| 02:02:34 | 5 | Q.  All right.  But is that the implication you're trying to |
| 02:02:37 | 6 | give, that he expected to be charged with Vaughn/White? |
| 02:02:41 | 7 | MR. KULWIN:  Objection. |
| 02:02:41 | 8 | THE COURT:  Sustained. |
| 02:02:42 | 9 | BY MR. LOEVY: |
| 02:02:44 | 10 | Q.  All right.  As the felony review prosecutor, you're |
| 02:02:46 | 11 | aligned with the prosecution, correct? |
| 02:02:47 | 12 | A.  I am there to determine if there is evidence for probable |
| 02:02:53 | 13 | cause. |
| 02:02:53 | 14 | Q.  And one of the things you have to do to make that |
| 02:02:59 | 15 | determination is rely on what's told to you, correct? |
| 02:03:02 | 16 | A.  Yes. |
| 02:03:03 | 17 | Q.  And the reason you have to do that is because you don't |
| 02:03:08 | 18 | speak necessarily to the witnesses, right? |
| 02:03:09 | 19 | A.  Depending on the case, sometimes you do, sometimes you |
| 02:03:13 | 20 | don't. |
| 02:03:13 | 21 | Q.  Did you speak to Randy Langston? |
| 02:03:14 | 22 | A.  No, I did not. |
| 02:03:15 | 23 | Q.  Did you speak to Gerald Morris? |
| 02:03:16 | 24 | A.  No, I did not. |
| 02:03:18 | 25 | Q.  Did you speak to Eric Langston? |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 26 of 175 PageID #:32636

| | | |
|---|---|---|
| 02:03:19 | 1 | A.  No, I did not. |
| 02:03:20 | 2 | Q.  So when you decided there was probable cause to approve |
| 02:03:23 | 3 | murder charges against Nate, would it be fair to say that you |
| 02:03:28 | 4 | were relying entirely on Mr. O'Callaghan? |
| 02:03:31 | 5 | A.  That's not correct. |
| 02:03:32 | 6 | Q.  All right.  Randy Langston, Gerald Morris, Eric Langston,a |
| 02:03:36 | 7 | and your interview with Nate where he told you that he had |
| 02:03:36 | 8 | nothing to do with it.  What else factored into your probable |
| 02:03:38 | 9 | cause decision? |
| 02:03:38 | 10 | A.  Well, I knew that the felony review assistance along with |
| 02:03:43 | 11 | the gang prosecution unit had interviewed these witnesses. |
| 02:03:46 | 12 | Q.  These witnesses? |
| 02:03:47 | 13 | A.  I spoke to the supervisor, had spoken to witnesses, I knew |
| 02:03:51 | 14 | that the -- |
| 02:03:53 | 15 | Q.  Can we restrict it? |
| 02:03:54 | 16 | MR. KULWIN:  Judge. |
| 02:03:55 | 17 | THE COURT:  Complete the answer.  He's answering the |
| 02:03:58 | 18 | question you asked him.  Complete the answer. |
| 02:03:59 | 19 | THE WITNESS:  I knew that Ernest DiBenedetto was |
| 02:04:03 | 20 | aware of that. |
| 02:04:04 | 21 | BY MR. LOEVY: |
| 02:04:04 | 22 | Q.  That's on Vaughn/White, right? |
| 02:04:05 | 23 | A.  That's on both cases. |
| 02:04:06 | 24 | Q.  Okay.  Smith/Hickman, Ernie DiBenedetto hadn't spoken to |
| 02:04:12 | 25 | Randy Langston or Gerald Morris or any of those people either, |

12/06/16 PM   Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 27 of 175 PageID #:32637
***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| | | |
|---|---|---|
| 02:04:14 | 1 | right? |
| 02:04:14 | 2 | A.  I don't believe he personally spoke to them. |
| 02:04:16 | 3 | Q.  All right.  Were you -- was it represented to you by the |
| 02:04:18 | 4 | police officers that the identifications by these eyewitnesses |
| 02:04:21 | 5 | were legit? |
| 02:04:23 | 6 | A.  That they made positive identifications. |
| 02:04:26 | 7 | Q.  Right.  But were they represented to be legitimate |
| 02:04:29 | 8 | positive identifications? |
| 02:04:30 | 9 | A.  I don't know what you mean by the term. |
| 02:04:32 | 10 | Q.  In other words, I could say you did it, right?  Anybody |
| 02:04:36 | 11 | could say anything.  Did the police officers satisfy you that |
| 02:04:40 | 12 | they hadn't been coached, they hadn't been led, they had legit |
| 02:04:44 | 13 | mately identified nature? |
| 02:04:46 | 14 | MR. KULWIN:  Objection. |
| 02:04:47 | 15 | THE COURT:  Overruled. |
| 02:04:48 | 16 | THE WITNESS:  Once again, this was an ongoing |
| 02:04:51 | 17 | investigation and there were other people looking at this |
| 02:04:53 | 18 | before me. |
| 02:04:54 | 19 | BY MR. LOEVY: |
| 02:04:54 | 20 | Q.  I'm only asking about you because you are the one who |
| 02:04:57 | 21 | approved the charges, right, sir? |
| 02:04:59 | 22 | A.  Yes. |
| 02:04:59 | 23 | Q.  Did Mr. O'Callaghan in communicating with you assure you |
| 02:05:02 | 24 | that these eyewitnesses were legitimately identifying Nate |
| 02:05:07 | 25 | Fields, yes or no? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 28 of 175 PageID #:32638
***REALTIME UNEDITED TRANSCRIPT ONLY***

27

02:05:07   1   A.  Yes.

02:05:07   2   Q.  And when you decided to approve charges, at least in part,

02:05:13   3   you relied on the fact that eyewitnesses pointed the finger at

02:05:16   4   Nate and said he did it, right?

02:05:18   5   A.  Correct.

02:05:18   6   Q.  And in addition to the eyewitnesses, you had Anthony

02:05:28   7   Sumner, right?

02:05:28   8   A.  Yes.

02:05:29   9   Q.  But the police had not come for probable cause charges

02:05:35   10  based on Sumner alone before they had the eyewitnesses,

02:05:38   11  correct?

02:05:39   12          MR. KULWIN:  Objection, Judge.

02:05:40   13          THE COURT:  The question is difficult to understand.

02:05:42   14  Why don't you rephrase it.

02:05:44   15  BY MR. LOEVY:

02:05:44   16  Q.  All right.  The police came for charges after they had

02:05:47   17  Sumner plus the eyewitnesses to corroborate, correct?

02:05:49   18  A.  Yes.

02:05:53   19  Q.  All right.  When they just had Sumner without the

02:05:55   20  eyewitnesses, they did not seek murder charges, that's the

02:05:59   21  point I'm trying to make.  That's true, right?

02:06:01   22  A.  That's my understanding.

02:06:01   23  Q.  Sumner alone was not sufficient to have probable cause for

02:06:09   24  murder, correct?

02:06:09   25  A.  Well, I can't answer that in a vacuum, sir.

| | | |
|---|---|---|
| 02:06:16 | 1 | Q.  Showing you Plaintiff's Exhibit 133, page 12, this is the |
| 02:06:24 | 2 | evidence -- this is in evidence, your Honor. |
| 02:06:28 | 3 | THE COURT:  What's the exhibit number again? |
| 02:06:30 | 4 | MR. LOEVY:  133. |
| 02:06:31 | 5 | THE COURT:  Thanks. |
| 02:06:32 | 6 | MR. LOEVY:  Page 12. |
| 02:06:33 | 7 | BY MR. LOEVY: |
| 02:06:36 | 8 | Q.  Can you tell the jury what we're looking at here? |
| 02:06:38 | 9 | A.  This looks like a grand jury indictment account. |
| 02:06:43 | 10 | Q.  All right.  And it's hard to read, but it says that the |
| 02:06:48 | 11 | following people without justification shot and killed the |
| 02:06:53 | 12 | victims, right? |
| 02:06:54 | 13 | A.  Yes. |
| 02:06:54 | 14 | Q.  Okay.  And Nate Fields is on there, right? |
| 02:06:58 | 15 | A.  Yes. |
| 02:06:58 | 16 | Q.  But he is on there in handwriting, right? |
| 02:07:00 | 17 | A.  Correct. |
| 02:07:00 | 18 | Q.  Tell the jury who it originally said shot and killed |
| 02:07:04 | 19 | Talman Hickman? |
| 02:07:05 | 20 | A.  I can't see that. |
| 02:07:08 | 21 | Q.  All right. |
| 02:07:10 | 22 | MR. LOEVY:  May I approach, your Honor? |
| 02:07:11 | 23 | THE COURT:  That's fine. |
| 02:07:12 | 24 | BY MR. LOEVY: |
| 02:07:14 | 25 | Q.  It says Earl Hawkins and George Carter, doesn't it? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 30 of 175 PageID #:32640
12/06/16 PM                  ***REALTIME UNEDITED TRANSCRIPT ONLY***

29

| | | |
|---|---|---|
| 02:07:16 | 1 | A.  I can't really tell. |
| 02:07:32 | 2 | Q.  Can you see the screen?  It's blown up a little bit? |
| 02:07:35 | 3 | A.  A little too much. |
| 02:07:36 | 4 | Q.  All right.  This is Carter here at the bottom, right? |
| 02:07:40 | 5 | That looks like Carter, would you agree? |
| 02:07:41 | 6 | A.  It looks like it, yes. |
| 02:07:43 | 7 | Q.  And this sure looks like Earl, doesn't it? |
| 02:07:45 | 8 | A.  It does. |
| 02:07:47 | 9 | Q.  So are you the one who scratched out Earl Hawkins and |
| 02:07:50 | 10 | George Carter and wrote in Nathson Fields as the shooters? |
| 02:07:53 | 11 | A.  No. |
| 02:07:54 | 12 | Q.  Do you know who did? |
| 02:07:56 | 13 | A.  No. |
| 02:07:57 | 14 | Q.  Do you know why it used to say Earl Hawkins and George |
| 02:08:00 | 15 | Carter were the shooters? |
| 02:08:02 | 16 | A.  I know at one time, I believe they were charged before |
| 02:08:06 | 17 | Nathson Fields was charged. |
| 02:08:07 | 18 | Q.  It doesn't say -- it says that they actually shot and |
| 02:08:11 | 19 | killed, correct? |
| 02:08:13 | 20 | MR. KULWIN:  Judge. |
| 02:08:15 | 21 | THE COURT:  Sustained. |
| 02:08:16 | 22 | BY MR. LOEVY: |
| 02:08:20 | 23 | Q.  Let's just talk briefly about the interrogation then.  Did |
| 02:08:24 | 24 | you explain to Nate that you were a prosecutor and not a |
| 02:08:27 | 25 | defense attorney? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 31 of 175 PageID #:32641
***REALTIME UNEDITED TRANSCRIPT ONLY***

30

02:08:28   1   A.  Correct.

02:08:28   2   Q.  Were you confident he understood what you were saying?

02:08:31   3   A.  Yes.

02:08:32   4   Q.  And did you explain he had a right to talk to you without

02:08:35   5   a lawyer?

02:08:35   6   A.  Yes.

02:08:36   7   Q.  And were you confident you communicated that?

02:08:41   8   A.  Yes.

02:08:43   9        MR. LOEVY:  Your Honor, my colleagues tell me that it

02:08:45  10   wasn't on the jury's screen.

02:08:46  11        THE COURT:  Maybe that thing isn't working.  I'll let

02:08:51  12   you put it backup.

02:08:52  13        MR. LOEVY:  Thank you, your Honor.

02:08:52  14        THE COURT:  You're right.  I had the jury monitor

02:08:55  15   turned off.  For some reason that thing isn't working down

02:08:58  16   there.  Maybe it's coming back on.

02:09:01  17        Okay.  So this is what he was pointing to earlier

02:09:04  18   when he was trying to make out the names.

02:09:06  19        All right.  The jury will have all these exhibits

02:09:08  20   back during the deliberations.

02:09:10  21   BY MR. LOEVY:

02:09:10  22   Q.  Without lawful justification unintentionally and knowingly

02:09:16  23   shot and killed and that's where it says Earl Hawkins and

02:09:19  24   George Carter you believe, correct, sir?

02:09:20  25   A.  It looks like it.


             ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 32 of 175 PageID #:32642
12/06/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

31

| | | |
|---|---|---|
| 02:09:21 | 1 | THE COURT:  All right.  You can go ahead.  Thanks for |
| 02:09:23 | 2 | catching me on that. |
| 02:09:24 | 3 | BY MR. LOEVY: |
| 02:09:25 | 4 | Q.  All right.  You believe you communicated in clearly |
| 02:09:28 | 5 | understandable language that he did not have to talk to you |
| 02:09:31 | 6 | about these murders without a lawyer, correct? |
| 02:09:33 | 7 | A.  Correct. |
| 02:09:33 | 8 | Q.  He nonetheless chose to do that, correct? |
| 02:09:36 | 9 | A.  That's correct. |
| 02:09:36 | 10 | Q.  And he told you, according to your memo, that he was |
| 02:09:42 | 11 | basically the guy in charge of paying the bills and keeping |
| 02:09:45 | 12 | the upkeep of the building, correct? |
| 02:09:46 | 13 | A.  Yes. |
| 02:09:46 | 14 | Q.  He told you the murders and such were planned by the |
| 02:09:49 | 15 | higher-ups in the organization and he had nothing to do with |
| 02:09:51 | 16 | it, correct? |
| 02:09:51 | 17 | A.  Correct. |
| 02:09:52 | 18 | Q.  And he was very firm about that, correct? |
| 02:09:53 | 19 | A.  That's what he said. |
| 02:10:00 | 20 | MR. LOEVY:  I have no further questions, your Honor. |
| 02:10:02 | 21 | THE COURT:  Mr. Kulwin. |
| 02:10:05 | 22 | - - - |
| 02:10:05 | 23 | JACK HYNES, REDIRECT EXAMINATION |
| 02:10:05 | 24 | BY MR. KULWIN: |
| 02:10:18 | 25 | Q.  Mr. Hynes, you were just shown this document.  Judge |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 33 of 175 PageID #:32643
***REALTIME UNEDITED TRANSCRIPT ONLY***

32

02:10:25  1  Hynes.  133-12 and 13 and 14 and 15.  I want to go over those

02:10:45  2  for a second, if I may, Judge.

02:10:47  3       Now, you didn't put anybody in front of the grand

02:10:59  4  jury on any of these murders, right?

02:11:01  5  A.  Correct.

02:11:01  6  Q.  Do you know who did?

02:11:03  7  A.  No.

02:11:04  8  Q.  Okay.  Now, this appears that this is a form murder charge

02:11:13  9  that actually?

02:11:14  10       MR. LOEVY:  Objection, leading, your Honor.

02:11:15  11       THE COURT:  Sustained.

02:11:17  12  BY MR. KULWIN:

02:11:18  13  Q.  Are you aware that in fact Mr. Carter and Mr. Hawkins were

02:11:21  14  charged in the murder of Talman Hickman and Jerome Smith?

02:11:28  15  A.  Well, I knew that Hawkins was charged in both murders.  I

02:11:33  16  also knew that Hawkins and Carter were charged in the

02:11:38  17  Smith/Hickman murder.

02:11:39  18  Q.  So you don't know whether the prosecutor who put this in

02:11:45  19  front of a grand jury just simply used the Carter Hawkins form

02:11:52  20  and put it in front of the grand jury?

02:11:53  21  A.  No.

02:11:54  22       THE COURT:  I will just remind the jury as I have

02:11:57  23  done about a dozen times that questions are not evidence.

02:12:00  24  BY MR. KULWIN:

02:12:02  25  Q.  Another document that's in the file is this one, 113-11.

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 34 of 175 PageID #:32644

| | | |
|---|---|---|
| 02:12:06 | 1 | First of all, let me just zoom out on this for a second. |
| 02:12:14 | 2 | Have you seen forms like this before? |
| 02:12:16 | 3 | A.  Yes. |
| 02:12:16 | 4 | Q.  What is it? |
| 02:12:17 | 5 | A.  It's a charging form that would be filled out by the |
| 02:12:23 | 6 | assistant state's attorney at some point during the grand jury |
| 02:12:28 | 7 | process setting forth the charges and the particulars set |
| 02:12:35 | 8 | forth on that form. |
| 02:12:36 | 9 | Q.  It says TQ on the top, who is TQ? |
| 02:12:41 | 10 | A.  That would be Tim Quinn. |
| 02:12:42 | 11 | Q.  And what was his position? |
| 02:12:44 | 12 | A.  He was supervisor of grant 6 of. |
| 02:12:47 | 13 | Q.  And right there it says Larry Wharrie? |
| 02:12:50 | 14 | A.  Yes. |
| 02:12:50 | 15 | Q.  At the bottom it says -- and then it lists four separate |
| 02:12:54 | 16 | murder charges, correct? |
| 02:12:55 | 17 | A.  Correct. |
| 02:12:55 | 18 | Q.  At the bottom it says see attached indictment for |
| 02:13:01 | 19 | co-defendant.  Use same language.  Do you see that? |
| 02:13:04 | 20 | A.  Yes. |
| 02:13:05 | 21 | Q.  And of course, with the co-defendant, that's exactly what |
| 02:13:08 | 22 | he did, he used the same language, right, that's what it says? |
| 02:13:12 | 23 | A.  Yes. |
| 02:13:13 | 24 | MR. LOEVY:  Objection, your Honor. |
| 02:13:13 | 25 | THE COURT:  Overruled to that particular question. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 35 of 175 PageID #:32645
***REALTIME UNEDITED TRANSCRIPT ONLY***

34

| | | |
|---|---|---|
| 02:13:16 | 1 | BY MR. KULWIN: |
| 02:13:17 | 2 | Q.  This is PX 113-12.  And PX? |
| 02:13:25 | 3 | THE COURT:  PX means Plaintiff's Exhibit. |
| 02:13:28 | 4 | MR. KULWIN:  Sorry about that, Judge. |
| 02:13:29 | 5 | BY MR. KULWIN: |
| 02:13:30 | 6 | Q.  Plaintiff's Exhibit 113-13, right? |
| 02:13:34 | 7 | A.  All right. |
| 02:13:34 | 8 | Q.  And then Plaintiff's Exhibit 113-14, right? |
| 02:13:39 | 9 | A.  Yes. |
| 02:13:40 | 10 | Q.  And then Plaintiff's Exhibit 113-15, right, same language |
| 02:13:47 | 11 | each time, right? |
| 02:13:48 | 12 | A.  Yes. |
| 02:13:48 | 13 | Q.  Now, you were asked some questions about who brought up |
| 02:13:54 | 14 | what first.  Do you remember those questions? |
| 02:13:56 | 15 | A.  Yes. |
| 02:13:56 | 16 | Q.  Okay.  Now, in your memo, though, you note this. |
| 02:14:11 | 17 | Detective O'Callaghan also informed witnesses on both cases |
| 02:14:14 | 18 | had been previously interviewed by assistant state's |
| 02:14:17 | 19 | attorney's from gang crimes unit and felony review, I then |
| 02:14:20 | 20 | read all the available reports, right? |
| 02:14:22 | 21 | A.  Yes. |
| 02:14:22 | 22 | Q.  And in the reports it did show in fact that lot of the |
| 02:14:25 | 23 | witnesses in both these cases at least in the Vaughn/White |
| 02:14:28 | 24 | case in particular had been interviewed by assistant state's |
| 02:14:32 | 25 | attorney in the gang crime unit? |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 36 of 175 PageID #:32646
12/06/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

35

02:14:34   1          MR. LOEVY:  Objection.

02:14:34   2          THE COURT:  Sustained.

02:14:34   3   BY MR. KULWIN:

02:14:36   4   Q.  Do you recall that's what the report indicated, sir?

02:14:38   5   A.  That's what I recall.

02:14:39   6   Q.  Now, then in your report, you say, when you say that you

02:14:46   7   were questioning in your report, it says Fields was then

02:14:49   8   questioned regarding his association with Earl Hawkins and

02:14:51   9   George Carter who were previously charged with the murders.

02:14:55   10  Right?  You specifically note that he was questioned about a

02:14:58   11  specific topic?

02:14:59   12  A.  Yes.

02:14:59   13         MR. LOEVY:  Objection, leading, your Honor.

02:15:01   14         THE COURT:  Stop leading, please.

02:15:04   15  BY MR. KULWIN:

02:15:04   16  Q.  Okay.  Immediately before the guerrilla, I'll point your

02:15:12   17  attention to the bottom of page one of your report.

02:15:18   18  A.  Yes.

02:15:20   19  Q.  Okay.  Now, right before it says in summary, is there

02:15:29   20  anything in there that says Fields was questioned right before

02:15:32   21  in summary on the bottom, the last paragraph, sir, in the

02:15:36   22  bottom?

02:15:37   23  A.  In summary, Fields stated.

02:15:38   24  Q.  Before you read that, I apologize, does it say Fields was

02:15:42   25  questioned about it right there or does it just say in

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 37 of 175 PageID #:32647
***REALTIME UNEDITED TRANSCRIPT ONLY***

36

| | | |
|---|---|---|
| 02:15:44 | 1 | summary? |
| 02:15:45 | 2 | MR. LOEVY: Objection, your Honor. |
| 02:15:46 | 3 | THE COURT: I think we can all read what it says. |
| 02:15:49 | 4 | Let's get to an actual question. |
| 02:15:51 | 5 | BY MR. KULWIN: |
| 02:15:52 | 6 | Q. Sorry about that. |
| 02:15:53 | 7 | THE COURT: Okay. |
| 02:15:53 | 8 | BY MR. KULWIN: |
| 02:15:54 | 9 | Q. What does it say, can you read for it us what it says Mr. |
| 02:15:58 | 10 | Fields said in summary? |
| 02:15:58 | 11 | A. In summary, Fields stated that he was an ambassador with |
| 02:16:01 | 12 | the El Rukn street gang and that his duties were to keep |
| 02:16:03 | 13 | records and to pay utility bills on the buildings owned by the |
| 02:16:06 | 14 | El Rukns. |
| 02:16:07 | 15 | Q. Keep going on the next page, what does he say he said, Mr. |
| 02:16:14 | 16 | Fields said? |
| 02:16:15 | 17 | MR. LOEVY: Objection, your Honor. It does not say |
| 02:16:17 | 18 | that. |
| 02:16:17 | 19 | THE COURT: It says he said. So, yeah, it does. |
| 02:16:23 | 20 | BY MR. KULWIN: |
| 02:16:23 | 21 | Q. Go ahead? |
| 02:16:24 | 22 | A. He said that he was an original member of the Blackstone |
| 02:16:28 | 23 | Rangers in the '60s and that now he is an El Rukn trying to |
| 02:16:29 | 24 | rise through the organization by showing his loyalty to the |
| 02:16:31 | 25 | gang. He went on to deny any involvement in either the March |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 38 of 175 PageID #:32648
***REALTIME UNEDITED TRANSCRIPT ONLY***

37

| | |
|---|---|
| 02:16:36 | 1 | 28th, 1985, double murder or the April 28th, 1984 double |
| 02:16:40 | 2 | murder.  He said shootings are typically planned and executed |
| 02:16:44 | 3 | by higher-ups in the gangs such as generals.  Fields said that |
| 02:16:48 | 4 | there is a group within the El Rukns known as the gorillas who |
| 02:16:53 | 5 | handled special assignments such as hits for large drug |
| 02:16:56 | 6 | transactions. |
| 02:16:56 | 7 | Q.  Let me stop you right there for a second.  This |
| 02:16:58 | 8 | information that you put in here, where did it come from |
| 02:17:02 | 9 | before he put it in the memo? |
| 02:17:03 | 10 | A.  That came from Mr. Fields. |
| 02:17:04 | 11 | Q.  Okay.  Now, go on, the in ex paragraph? |
| 02:17:08 | 12 | A.  Fields was then questioned regarding his association with |
| 02:17:11 | 13 | Earl Hawkins and George Carter who were previously charged |
| 02:17:14 | 14 | with the murders.  Fields said he knew Earl Hawkins because he |
| 02:17:18 | 15 | is a general in the El Rukns and he knew Hawkins rode with |
| 02:17:22 | 16 | Anthony Sumner.  He also stated that he knew George Carter who |
| 02:17:26 | 17 | was also a general in the El Rukns, and he knew Carter rode |
| 02:17:31 | 18 | with Henry Andrews.  Fields also said he heard that Jerome |
| 02:17:36 | 19 | Smith, AKA Fuddy was a member of the Goon Squad disciples and |
| 02:17:40 | 20 | that he was shot in retaliation for the shooting of two El |
| 02:17:44 | 21 | Rukns by the disciples.  Fields said this was all he knew of |
| 02:17:47 | 22 | the incident. |
| 02:17:48 | 23 | Q.  Let me stop you right there.  Where did this information |
| 02:17:50 | 24 | come from? |
| 02:17:50 | 25 | A.  From Mr. Fields. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 39 of 175 PageID #:32649
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

38

| 02:17:52 | 1 | Q. Now, you were asked a bunch of questions whether 30 years |

02:17:52    1    Q.  Now, you were asked a bunch of questions whether 30 years

02:17:55    2    later can you remember who said did you bring it up, did he

02:17:59    3    bring it up, is this memo the best record of how the

02:18:02    4    conversation went as far as you can recall?

02:18:03    5    A.  As far as I can recall.

02:18:04    6    Q.  Okay.  You were asked some questions about how you

02:18:08    7    remember how Mr. Fields looked or how he reacted, look at the

02:18:11    8    last paragraph.  Can you read that one for us?

02:18:14    9    A.  During the entire conversation, knowledge that the entire

02:18:16    10    was alert, calm and sober.  He was not handcuffed during my

02:18:20    11    conversation with him.  Though threats or promises were made

02:18:22    12    to Fields and no force of any kind was used against him.

02:18:25    13    Q.  Is that a true statement at the time you wrote it?

02:18:27    14    A.  Yes.

02:18:27    15    Q.  So, again, you were asked these questions -- I'll withdraw

02:18:35    16    that question.

02:18:36    17        Now, you were asked some questions about whether or

02:18:54    18    not the first time you saw charges, approved charges against

02:18:59    19    Nate Fields was after he was arrested, do you remember those

02:19:02    20    questions?  Let me withdraw that.  That was a poor question.

02:19:06    21        You were asked some questions about whether you had

02:19:09    22    approved charges before June 14th, 1985.  You were asked those

02:19:15    23    questions?

02:19:15    24    A.  Yes.

02:19:15    25    Q.  Judge Hynes, was the first time that Mr. Fields was

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 40 of 175 PageID #:32650
***REALTIME UNEDITED TRANSCRIPT ONLY***

39

02:19:23   1   arrested and in custody June 14th, 1985, to the best of your

02:19:26   2   knowledge?

02:19:26   3   A.  I am not sure I understand that.

02:19:29   4   Q.  Okay.  When was the first time -- when you were presented

02:19:35   5   the opportunity whether or not you were going to approve

02:19:39   6   charges or not, how long after that request was made had Mr.

02:19:44   7   Fields been arrested, if you know?

02:19:45   8   A.  I believe the day before he was stopped for a traffic

02:19:49   9   violation.

02:19:50   10  Q.  Okay.  And, of course, you were asked asked some questions

02:19:56   11  about whether or not you interviewed witnesses.  Do you

02:20:00   12  remember those questions?

02:20:00   13  A.  Yes.

02:20:01   14  Q.  In this case, you interviewed the main witness, didn't

02:20:04   15  you, Nathson Fields?

02:20:07   16  A.  Yes.

02:20:08   17  Q.  You were asked some questions on whether you relied,

02:20:35   18  whether the only thing you relied on or one of the main things

02:20:38   19  you relied on was whether or not O'Callaghan told you it was a

02:20:41   20  quote-unquote legitimate identification.  Do you remember

02:20:44   21  those questions?

02:20:44   22  A.  Yes.

02:20:45   23  Q.  Were you advised whether by Detective O'Callaghan, were

02:20:52   24  you advised whether Mr. Fields had been placed in lineups that

02:20:55   25  night?

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 41 of 175 PageID #:32651
***REALTIME UNEDITED TRANSCRIPT ONLY***

40

| 02:20:55 | 1 | A.  Yes. |
| 02:20:55 | 2 | Q.  What did he tell you about what happened at the lineups? |
| 02:20:57 | 3 | A.  He said he was identified by three eyewitnesses, |
| 02:21:02 | 4 | positively identified. |
| 02:21:02 | 5 | Q.  By the way, did you ever hear of any evidence that during |
| 02:21:08 | 6 | the interview, during the lineups, Detective O'Callaghan came |
| 02:21:12 | 7 | around out of the viewing room, into the lineup room, stood in |
| 02:21:16 | 8 | front of the people using the lineup, picked up Mr. Fields' |
| 02:21:19 | 9 | sleeves while a cameraman took pictures of the entire thing, |
| 02:21:24 | 10 | did you ever hear anything like that? |
| 02:21:25 | 11 | MR. LOEVY:  Objection, foundation. |
| 02:21:26 | 12 | THE COURT:  Overruled. |
| 02:21:27 | 13 | THE WITNESS:  No. |
| 02:21:28 | 14 | BY MR. KULWIN: |
| 02:21:29 | 15 | Q.  Did Mr. Fields that very night say to you at any time, |
| 02:21:32 | 16 | listen, by the way, this lineup I was just in was really |
| 02:21:36 | 17 | weird, can I talk to you about that, did he say that? |
| 02:21:38 | 18 | MR. LOEVY:  Objection. |
| 02:21:38 | 19 | THE COURT:  Sustained. |
| 02:21:39 | 20 | BY MR. KULWIN: |
| 02:21:40 | 21 | Q.  Did he bring up -- you said you were alone for him for |
| 02:21:44 | 22 | several minutes after the detectives left, right? |
| 02:21:47 | 23 | A.  Yes. |
| 02:21:47 | 24 | Q.  Did he relate to you anything unusual while the detectives |
| 02:21:50 | 25 | were out of the room about what happened during the lineup in |

12/06/16 PM | ***REALTIME UNEDITED TRANSCRIPT ONLY***

41

| | | |
|---|---|---|
| 02:21:53 | 1 | which he was positively identified? |
| 02:21:55 | 2 | A.  No. |
| 02:21:55 | 3 | Q.  You were asked some questions about what side of the table |
| 02:22:07 | 4 | you were on and which side of the table you're aligned, do you |
| 02:22:10 | 5 | remember those questions? |
| 02:22:10 | 6 | A.  Yes. |
| 02:22:11 | 7 | Q.  Judge Hynes, when you're an assistant state's attorney in |
| 02:22:14 | 8 | felony review and you're reviewing information, did you |
| 02:22:17 | 9 | understand at that time the seriousness of the job that you |
| 02:22:22 | 10 | had? |
| 02:22:22 | 11 | MR. LOEVY:  Objection, your Honor. |
| 02:22:23 | 12 | THE COURT:  Overruled. |
| 02:22:24 | 13 | THE WITNESS:  Yes. |
| 02:22:27 | 14 | BY MR. KULWIN: |
| 02:22:27 | 15 | Q.  Did it matter that you had only been out of law school for |
| 02:22:31 | 16 | three years, did that affect your ability to perceive the |
| 02:22:33 | 17 | seriousness of the job that you had? |
| 02:22:35 | 18 | A.  No, it did not. |
| 02:22:36 | 19 | Q.  Did you feel after three -- how many cases had you been on |
| 02:22:39 | 20 | felony review before you had that case? |
| 02:22:40 | 21 | A.  Well, I don't know.  You know, probably hundreds. |
| 02:22:44 | 22 | Q.  Were you the type of prosecutor who just said, gosh, I |
| 02:22:50 | 23 | don't really know what I'm doing, I think I'll just rely on |
| 02:22:53 | 24 | these experienced detectives? |
| 02:22:54 | 25 | THE COURT:  The objection is sustained. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 43 of 175 PageID #:32653
***REALTIME UNEDITED TRANSCRIPT ONLY***

42

| | | |
|---|---|---|
| 02:22:55 | 1 | BY MR. KULWIN: |
| 02:22:56 | 2 | Q. Did you rely on your own ability, training as a lawyer, |
| 02:22:59 | 3 | training as a state's attorney and the seriousness of the |
| 02:23:02 | 4 | position that you held in determining whether serious charges |
| 02:23:05 | 5 | should be brought in this case? |
| 02:23:06 | 6 | MR. LOEVY: Same objection. |
| 02:23:07 | 7 | THE COURT: Overruled. |
| 02:23:08 | 8 | THE WITNESS: Yes. |
| 02:23:08 | 9 | BY MR. KULWIN: |
| 02:23:12 | 10 | Q. You were asked some questions about whether or not Mr. |
| 02:23:16 | 11 | Fields firmly denied that he was ever involved in either of |
| 02:23:20 | 12 | those murders, do you remember those questions? |
| 02:23:22 | 13 | A. Yes. |
| 02:23:22 | 14 | Q. And whether he voluntarily spoke to you without a lawyer. |
| 02:23:25 | 15 | Do you remember those questions? |
| 02:23:25 | 16 | A. Yes. |
| 02:23:25 | 17 | Q. Sir, in your experience, was it unusual for people to say |
| 02:23:30 | 18 | I'll talk to you without a lawyer, that happened? |
| 02:23:32 | 19 | A. Yes. |
| 02:23:33 | 20 | Q. Okay. And sometimes they admitted the crime and sometimes |
| 02:23:41 | 21 | they denied the crime? |
| 02:23:42 | 22 | MR. LOEVY: Objection. |
| 02:23:42 | 23 | THE COURT: Sustained. |
| 02:23:42 | 24 | BY MR. KULWIN: |
| 02:23:47 | 25 | Q. Did the fact that Mr. Fields was denying the crime in your |

12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

43

02:23:50   1   view based on all the evidence that you had seen with respect

02:23:53   2   to Smith/Hickman make you think I shouldn't approve charges

02:23:57   3   here?

02:23:58   4            MR. LOEVY:  Objection, your Honor.

02:23:58   5            THE COURT:  Overruled.

02:23:59   6            THE WITNESS:  No.

02:24:00   7            MR. KULWIN:  If I may have a moment, your Honor.

02:24:15   8     (Brief pause.)

02:24:43   9   BY MR. KULWIN:

02:24:44  10   Q.  You were asked some questions, sir, about whether the

02:24:49  11   information from Anthony Sumner was sufficient to approve

02:24:53  12   charges.  In the Vaughn/White case, what was the -- what was

02:24:57  13   the office relying onto approve the charges?

02:24:59  14   A.  Well.

02:25:02  15            THE COURT:  You can't ask that question that way.

02:25:04  16   It's covered by a prior ruling.

02:25:05  17            MR. KULWIN:  Judge, I put it the wrong way.

02:25:08  18   BY MR. KULWIN:

02:25:09  19   Q.  On another topic, to your knowledge, can final approval

02:25:13  20   for charges, felony charges, be brought against somebody while

02:25:17  21   -- before they're arrested, before they're in custody?  Do you

02:25:20  22   know?

02:25:20  23   A.  That's a hard question to answer in a hypothetical.

02:25:26  24   Q.  I'm sorry?

02:25:27  25   A.  It's a hard question to answer in a hypothetical.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 45 of 175 PageID #:32655

| | | |
|---|---|---|
| 02:25:30 | 1 | Q.  All right. |
| 02:25:32 | 2 | MR. KULWIN:  I don't have any other questions, Judge. |
| 02:25:35 | 3 | THE COURT:  Was there going to be a recross? |
| 02:25:38 | 4 | MR. LOEVY:  Just one. |
| 02:25:39 | 5 | THE COURT:  Okay. |
| 02:25:41 | 6 | - - - |
| 02:25:41 | 7 | JACK HYNES, RECROSS-EXAMINATION |
| 02:25:41 | 8 | BY MR. LOEVY: |
| 02:25:42 | 9 | Q.  Given the seriousness of the probable cause determination, |
| 02:25:46 | 10 | you as the felony review prosecutor necessarily had to have in |
| 02:25:50 | 11 | place quite a bit of trust in the detective who was telling |
| 02:25:55 | 12 | you that these identifications were legit, can we agree on |
| 02:25:58 | 13 | that? |
| 02:25:59 | 14 | A.  I trusted the detectives. |
| 02:26:01 | 15 | MR. LOEVY:  No further questions, your Honor. |
| 02:26:03 | 16 | THE COURT:  Do any of the jurors have any questions |
| 02:26:04 | 17 | for the witness?  Thanks.  You're excused. |
| 02:26:07 | 18 | THE WITNESS:  Thank you, Judge. |
| 02:26:08 | 19 | THE COURT:  Please call the next witness. |
| 02:26:11 | 20 | MR. MICHALIK:  Defense calls Robert Evans.  Be. |
| 02:26:45 | 21 | MR. KULWIN:  Your Honor, can we be heard at sidebar |
| 02:26:47 | 22 | real quick? |
| 02:26:48 | 23 | THE COURT:  No.  I am pretty sure I know what it's |
| 02:26:51 | 24 | about.  It's going to wait until a break.  The break is going |
| 02:26:54 | 25 | to be at about 3:00. |

12/06/16 PM

45

| | | |
|---|---|---|
| 02:26:57 | 1 | MR. KULWIN:  All right.  Thanks. |
| 02:26:58 | 2 | THE COURT:  Judges are mind readers just so you know. |
| 02:27:01 | 3 | It's pre-employment qualification.  You have to go through a |
| 02:27:04 | 4 | test. |
| 02:27:31 | 5 | (Witness sworn.) |
| 02:27:31 | 6 | - - - |
| 02:27:31 | 7 | ROBERT EVANS, DIRECT EXAMINATION |
| 02:27:31 | 8 | BY MR. MICHALIK: |
| 02:27:44 | 9 | Q.  Good afternoon.  Could you please state and spell your |
| 02:27:46 | 10 | name for the record? |
| 02:27:47 | 11 | A.  My name is Robert Evans, last name is spelled Evans. |
| 02:27:51 | 12 | Q.  You previously were a member of the Chicago Police |
| 02:27:55 | 13 | Department? |
| 02:27:55 | 14 | A.  I was. |
| 02:27:56 | 15 | Q.  When did you start with the police department? |
| 02:27:58 | 16 | A.  I was hired on as a civilian back in 1968 as a police |
| 02:28:03 | 17 | cadet and then in 1971, in July, I went on the job as a sworn |
| 02:28:11 | 18 | police officer. |
| 02:28:11 | 19 | Q.  As a patrolman? |
| 02:28:14 | 20 | A.  Yes, sir. |
| 02:28:15 | 21 | Q.  Did you eventually become a detective? |
| 02:28:16 | 22 | A.  That was in August of 1982. |
| 02:28:18 | 23 | Q.  All right.  In August of 1982, where were you assigned as |
| 02:28:23 | 24 | a detective? |
| 02:28:23 | 25 | A.  I was assigned to area one violent crimes. |

12/06/16 PM     Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 47 of 175 PageID #:32657
***REALTIME UNEDITED TRANSCRIPT ONLY***

46

| | | |
|---|---|---|
| 02:28:26 | 1 | Q. Now, we've heard about area one violent crimes. Are there |
| 02:28:30 | 2 | different detective units at area one at that time? |
| 02:28:33 | 3 | A. At that time, there were two different detective units. |
| 02:28:37 | 4 | Q. What were they? |
| 02:28:38 | 5 | A. Violent crimes and property crimes. |
| 02:28:41 | 6 | Q. What would the homicide fall under the violent crimes of |
| 02:28:50 | 7 | the detective division? |
| 02:28:51 | 8 | A. Yes, it did. |
| 02:28:51 | 9 | Q. Were you assigned to area one violent crimes in April of |
| 02:28:55 | 10 | 1984? |
| 02:28:57 | 11 | A. I was. |
| 02:28:57 | 12 | Q. How long did you remain as a detective with the Chicago |
| 02:29:02 | 13 | Police Department? |
| 02:29:02 | 14 | A. I was promoted to sergeant in December of 1986. |
| 02:29:05 | 15 | Q. Did you eventually receive another promotion? |
| 02:29:09 | 16 | A. I was promoted then to lieutenant in December of 1988. |
| 02:29:13 | 17 | Q. How long did you serve as a lieutenant? |
| 02:29:15 | 18 | A. For approximately 12 years. |
| 02:29:17 | 19 | Q. Okay. Did you then get another promotion? |
| 02:29:21 | 20 | A. I was promoted to captain in the year 2000. |
| 02:29:24 | 21 | Q. Any further promotions? |
| 02:29:26 | 22 | A. I was promoted commander in 2005. |
| 02:29:30 | 23 | Q. How long did you serve as a commander with the Chicago |
| 02:29:33 | 24 | Police Department? |
| 02:29:33 | 25 | A. For three years. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 48 of 175 PageID #:32658
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

47

| | | |
|---|---|---|
| 02:29:35 | 1 | Q.  Did you retire as a commander? |
| 02:29:37 | 2 | A.  Yes, I did. |
| 02:29:38 | 3 | Q.  When was that? |
| 02:29:39 | 4 | A.  November of 2008. |
| 02:29:41 | 5 | Q.  Sir, I'd like to take you back in time to April 28, 1984, |
| 02:29:48 | 6 | a Saturday morning.  Were you working that day? |
| 02:29:49 | 7 | A.  Yes, I was. |
| 02:29:50 | 8 | Q.  Were you working as a violent crimes detective at area |
| 02:29:55 | 9 | one? |
| 02:29:55 | 10 | A.  I was, yes. |
| 02:29:56 | 11 | Q.  Did you have a partner that day? |
| 02:29:57 | 12 | A.  Steven Hood. |
| 02:29:59 | 13 | Q.  What, if anything, happened around 10:15 or 10:30 that |
| 02:30:04 | 14 | morning? |
| 02:30:04 | 15 | A.  We were on our way back into the station and we heard what |
| 02:30:09 | 16 | is referred to as an all call broadcast. |
| 02:30:12 | 17 | Q.  What is an all call broadcast? |
| 02:30:14 | 18 | A.  An all call broadcast would be an emergency situation |
| 02:30:17 | 19 | where the dispatcher would send the call out to a number of |
| 02:30:24 | 20 | radio zones across the city for any -- for responses from any |
| 02:30:29 | 21 | units that would hear the call. |
| 02:30:31 | 22 | Q.  What was the information that was provided in that all |
| 02:30:34 | 23 | call on the morning of April 28, 1984? |
| 02:30:37 | 24 | A.  The call was two men shot on the street at 706 East 39th |
| 02:30:43 | 25 | Street. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 49 of 175 PageID #:32659
***REALTIME UNEDITED TRANSCRIPT ONLY***

48

| | | |
|---|---|---|
| 02:30:43 | 1 | Q. Did you do anything after you got that call? |
| 02:30:46 | 2 | A. Yes, we proceeded to the scene directly. |
| 02:30:50 | 3 | Q. Okay. Can we see Defendant's Exhibit 1 H. |
| 02:31:00 | 4 | MR. MICHALIK: Judge, this is in evidence. |
| 02:31:12 | 5 | THE COURT: I'll flip it so the jury can see it. |
| 02:31:14 | 6 | BY MR. MICHALIK: |
| 02:31:15 | 7 | Q. Can you describe what you see here on Exhibit 1 H, please? |
| 02:31:18 | 8 | A. That appears to be the 706 East 39th Street building with |
| 02:31:25 | 9 | a number of people out in front. |
| 02:31:28 | 10 | Q. Does this reflect the scene at 706 East 39th Street when |
| 02:31:33 | 11 | you arrived on the morning of April 28, 1984, in response to |
| 02:31:38 | 12 | the all call? |
| 02:31:38 | 13 | A. Yes, there were several police uniformed police units |
| 02:31:43 | 14 | already at the scene, but the crowd, this accurately depicts |
| 02:31:49 | 15 | the size of the crowd, in fact, it probably even got bigger. |
| 02:31:52 | 16 | Q. Okay. And that was you and Detective Hood who responded |
| 02:31:54 | 17 | to that scene? |
| 02:31:55 | 18 | A. Yes, sir. |
| 02:31:56 | 19 | Q. All right. Now, what did you and Detective Hood first do |
| 02:32:04 | 20 | upon arriving at the scene? |
| 02:32:05 | 21 | A. When you get a call of that nature, we try to render first |
| 02:32:11 | 22 | aid if at all possible. |
| 02:32:13 | 23 | Q. Were you able to do so? |
| 02:32:14 | 24 | A. No, it appeared that both of these individuals had been |
| 02:32:16 | 25 | shot in the head. |

| 02:32:18 | 1 | Q.  What did you do next? |
| 02:32:20 | 2 | A.  Well, an ambulance arrived shortly after that and we |
| 02:32:26 | 3 | realized that there was -- both these individuals had passed |
| 02:32:29 | 4 | away. |
| 02:32:29 | 5 | Q.  Were there any other Chicago Police Department personnel |
| 02:32:34 | 6 | at the scene when you arrived? |
| 02:32:35 | 7 | A.  Yes, we utilized them to control the access to the crime |
| 02:32:40 | 8 | scene because this actually was before the days of crime scene |
| 02:32:45 | 9 | tape, now it seems to be everywhere, but we had to use |
| 02:32:49 | 10 | physical bodies to keep people back from the crime scene at |
| 02:32:52 | 11 | that time. |
| 02:32:52 | 12 | Q.  And you used actual police officers to cordon off the |
| 02:32:56 | 13 | crime scene area? |
| 02:32:58 | 14 | A.  Correct. |
| 02:32:58 | 15 | Q.  Did you do anything to preserve the scene? |
| 02:33:00 | 16 | A.  Well, what we try to do is make sure that everything is as |
| 02:33:06 | 17 | it was when we -- when it first occurred, and we then |
| 02:33:10 | 18 | contacted the crime lab unit would come and process for any |
| 02:33:15 | 19 | evidence on the scene. |
| 02:33:17 | 20 | Q.  Did you and your partner conduct any sort of an |
| 02:33:20 | 21 | investigation at the scene? |
| 02:33:21 | 22 | A.  Yes, we did. |
| 02:33:22 | 23 | Q.  What did you do? |
| 02:33:23 | 24 | A.  We interviewed several people, we noted exactly who was on |
| 02:33:31 | 25 | the scene itself, we contacted our office, sergeant McCrae was |

| | | |
|---|---|---|
| 02:33:37 | 1 | working that day, and he responded to the scene with |
| 02:33:40 | 2 | additional detectives. |
| 02:33:42 | 3 | Q.  Did you and the other detectives canvass the area? |
| 02:33:45 | 4 | A.  Yes, we did. |
| 02:33:45 | 5 | Q.  All right.  And do you have any recollection of |
| 02:33:50 | 6 | approximately how many different individuals you talked to at |
| 02:33:53 | 7 | the scene? |
| 02:33:53 | 8 | A.  A countless number. |
| 02:33:57 | 9 | Q.  Were any -- |
| 02:33:58 | 10 | A.  Sometimes people are reluctant to speak to the police |
| 02:34:02 | 11 | given the circumstances. |
| 02:34:03 | 12 | Q.  Were any of them willing to give you information? |
| 02:34:05 | 13 | A.  Some were. |
| 02:34:06 | 14 | Q.  Now, if you talked to someone at the scene who was unable |
| 02:34:10 | 15 | or unwilling to provide you with information, would you write |
| 02:34:13 | 16 | that down? |
| 02:34:13 | 17 | A.  There's no need to. |
| 02:34:15 | 18 | Q.  Why not? |
| 02:34:16 | 19 | A.  It would be a waste of time first of all. |
| 02:34:19 | 20 | Q.  If you talked to someone who said he or she did have some |
| 02:34:21 | 21 | information, would you interview that person? |
| 02:34:23 | 22 | A.  We would attempt to, yes. |
| 02:34:25 | 23 | Q.  All right.  You said that some other detectives were |
| 02:34:28 | 24 | assigned to this scene? |
| 02:34:29 | 25 | A.  Yes, there were. |

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

51

| 02:34:30 | 1 | Q. And there was VanBerschot, Carol and Fields? |
| 02:34:34 | 2 | A. Correct. |
| 02:34:35 | 3 | Q. And sergeant McCrae also came out to the scene? |
| 02:34:38 | 4 | A. Yes, he did. |
| 02:34:39 | 5 | Q. Now, I'd like to ask you some questions about your |
| 02:34:44 | 6 | reporting responsibilities.  As the first detectives who |
| 02:34:47 | 7 | arrived at the scene, did you have any particular |
| 02:34:51 | 8 | responsibilities with respect to report preparation? |
| 02:34:54 | 9 | A. Our responsibility was to prepare the initial crime scene |
| 02:34:59 | 10 | report. |
| 02:34:59 | 11 | Q. And that's because you were the first detectives at the |
| 02:35:02 | 12 | scene? |
| 02:35:02 | 13 | A. Yes, sir. |
| 02:35:02 | 14 | Q. And did you have that responsibility for the Smith/Hickman |
| 02:35:07 | 15 | murders? |
| 02:35:08 | 16 | A. Yes, we did use. |
| 02:35:15 | 17 | MR. MICHALIK:  If I could see Defendant's Exhibit 60. |
| 02:35:18 | 18 | BY MR. MICHALIK: |
| 02:35:18 | 19 | Q. All right.  Do you recognize what's on the screen as |
| 02:35:21 | 20 | Defense Exhibit number 60? |
| 02:35:23 | 21 | A. Yes, I do. |
| 02:35:23 | 22 | Q. What is it? |
| 02:35:31 | 23 | A. It looks like the front page of our supplementary report |
| 02:35:35 | 24 | regarding the Hickman Smith double homicide. |
| 02:35:39 | 25 | Q. And this is what you referred to earlier as the scene |

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:35:41 | 1 | report? |
| 02:35:42 | 2 | A.  Correct. |
| 02:35:42 | 3 | Q.  Who prepared this report? |
| 02:35:46 | 4 | A.  I did. |
| 02:35:46 | 5 | Q.  Who typed it up? |
| 02:35:48 | 6 | A.  I did. |
| 02:35:48 | 7 | Q.  What is the date of this report? |
| 02:35:51 | 8 | A.  The date of report is the 28th of April 1984, the day the |
| 02:35:56 | 9 | incident occurred. |
| 02:35:57 | 10 | Q.  And when is the date that you typed it up? |
| 02:35:59 | 11 | A.  It was the 28th of April. |
| 02:36:00 | 12 | Q.  Did you sign this report? |
| 02:36:02 | 13 | A.  I did. |
| 02:36:02 | 14 | Q.  Is that your signature reflected in the lower left-hand |
| 02:36:06 | 15 | corner on the first page of Exhibit 60? |
| 02:36:09 | 16 | A.  It is. |
| 02:36:10 | 17 | Q.  Did your partner sign the report as well? |
| 02:36:13 | 18 | A.  Yes, he did. |
| 02:36:14 | 19 | Q.  And that's Steven Hood? |
| 02:36:16 | 20 | A.  Correct. |
| 02:36:16 | 21 | Q.  And then finally, did a supervisor approve and sign this |
| 02:36:21 | 22 | report? |
| 02:36:21 | 23 | A.  Yes, sergeant braid b-r-i-n-GE. |
| 02:36:26 | 24 | Q.  And his signature is reflected in the lower right-hand |
| 02:36:29 | 25 | corner? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 54 of 175 PageID #:32664
***REALTIME UNEDITED TRANSCRIPT ONLY***

53

02:36:29  1  A.  Correct.

02:36:29  2  Q.  And it looks like the report was approved on April 28,

02:36:32  3  1984?

02:36:32  4  A.  Yes, it was.

02:36:33  5  Q.  At what point during your shift on April 28, 1984, did you

02:36:38  6  prepare this report?

02:36:39  7  A.  That was at the end of our shift.

02:36:41  8  Q.  All right.  I'd like to go through some of the details of

02:36:46  9  the report.

02:36:47  10         First off, in preparing a report like this, is there

02:36:53  11  any particular format that Chicago detectives were supposed to

02:36:55  12  follow?

02:36:56  13  A.  Yes, there is a homicide format that we follow.

02:36:58  14  Q.  Is that homicide form generally provide various lists of

02:37:03  15  information that are to be included in a scene report?

02:37:06  16  A.  Yes, it does.

02:37:06  17  Q.  Did you follow those guidelines in preparing this

02:37:11  18  particular report?

02:37:12  19  A.  Yes, we did.

02:37:13  20  Q.  All right.  If we start off on the first page here, it

02:37:17  21  looks like the first section is victim.  And there are two

02:37:22  22  victims listed?

02:37:22  23  A.  Yes.

02:37:23  24  Q.  All right.  What information is included in that

02:37:27  25  particular section?

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 55 of 175 PageID #:32665
***REALTIME UNEDITED TRANSCRIPT ONLY***

54

02:37:27  1  A.  The names of the victims, the sex, race, age, date of

02:37:34  2  birth, address, telephone number, marital status, employment

02:37:39  3  status, Social Security number, and the Chicago police

02:37:43  4  department identification records number.

02:37:44  5  Q.  All right.  What is the Chicago Police Department

02:37:47  6  identification records number refer to?

02:37:49  7  A.  When someone is arrested by the Chicago Police Department

02:37:53  8  and fingerprinted and photographed, they receive a Chicago

02:37:59  9  Police Department records number.

02:38:00  10  Q.  Okay.  So these individuals both had some previous contact

02:38:04  11  with the Chicago Police Department?

02:38:05  12  A.  Correct.

02:38:05  13  Q.  All right.  If we could go to the next page, 60-2.

02:38:14  14       All right.  The next section I want to ask you about,

02:38:17  15  sir, is the section that says wanted.  Do you see that?

02:38:20  16  A.  Yes, I do.

02:38:21  17  Q.  At the top of this second page.

02:38:23  18       All right.  This information here, what is that based

02:38:34  19  on?

02:38:34  20  A.  That's based on the individuals that we spoke with at the

02:38:38  21  scene who gave us a description of people that were involved

02:38:42  22  in the shooting.

02:38:45  23       MR. MICHALIK:  If we could see Plaintiff's Exhibit

02:38:47  24  21, please.

02:38:48  25  BY MR. MICHALIK:

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 56 of 175 PageID #:32666

| | | |
|---|---|---|
| 02:38:52 | 1 | Q. All right. For the record, this is Plaintiff's Exhibit 21 |
| 02:38:55 | 2 | which is 8 pages of general progress reports. The first page |
| 02:38:59 | 3 | here, does this contain your writing? |
| 02:39:00 | 4 | A. Yes, it is. |
| 02:39:02 | 5 | Q. So you were using these GPR forms in April of 1984 when |
| 02:39:06 | 6 | you were investigating this particular double homicide? |
| 02:39:09 | 7 | A. Correct. |
| 02:39:09 | 8 | Q. All right. If I could take a look at page 7, 21-7. |
| 02:39:15 | 9 | BY MR. MICHALIK: |
| 02:39:18 | 10 | Q. Can you tell me what this particular page is? |
| 02:39:22 | 11 | A. That looks like it was prepared by detective Jon |
| 02:39:26 | 12 | VanBerschot. |
| 02:39:26 | 13 | Q. And that's also on the general progress report? |
| 02:39:28 | 14 | A. Correct. |
| 02:39:29 | 15 | Q. Looking at the top third of this particular exhibit, do |
| 02:39:38 | 16 | you see that there, sir? |
| 02:39:39 | 17 | A. Yes, I do. |
| 02:39:40 | 18 | Q. What information does that reflect? |
| 02:39:48 | 19 | A. A description of the offender is given by Eric Benson. |
| 02:39:53 | 20 | Q. All right. Eric Benson's name here is on the second from |
| 02:39:56 | 21 | the bottom line that we are seeing on the cut out? |
| 02:39:59 | 22 | A. Correct. |
| 02:39:59 | 23 | Q. And he's listed to be nine years old? |
| 02:40:03 | 24 | A. Yes. |
| 02:40:03 | 25 | Q. Does this information reflect -- does this particular |

12/06/16 PM    Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 57 of 175 PageID #:32667
***REALTIME UNEDITED TRANSCRIPT ONLY***

56

| | | |
|---|---|---|
| 02:40:09 | 1 | section of the GPR reflect information that was obtained by |
| 02:40:11 | 2 | Detective VanBerschot? |
| 02:40:13 | 3 | A.  Yes, it does. |
| 02:40:14 | 4 | Q.  And according to this note, what does Eric Benson tell |
| 02:40:22 | 5 | Detective VanBerschot that he saw? |
| 02:40:24 | 6 | A.  The individuals came from behind, each had a gun, and each |
| 02:40:32 | 7 | shot one of the victims in the back of the head. |
| 02:40:34 | 8 | Q.  Did Eric Benson provide Detective VanBerschot with any |
| 02:40:39 | 9 | description of the individuals he saw? |
| 02:40:41 | 10 | A.  He said that one had long hair down to the neck, he gave a |
| 02:40:47 | 11 | clothing description as well. |
| 02:40:48 | 12 | Q.  And looking over here, does it also say that one of the |
| 02:40:54 | 13 | offenders had earrings in the right ear? |
| 02:40:57 | 14 | A.  Correct. |
| 02:40:57 | 15 | Q.  If we could now see Plaintiff's Exhibit 21-5, please. |
| 02:41:13 | 16 | BY MR. MICHALIK: |
| 02:41:16 | 17 | Q.  Do you recognize the writing on this particular page? |
| 02:41:18 | 18 | A.  I believe that's my partner's. |
| 02:41:20 | 19 | Q.  All right.  And that was Detective Hood? |
| 02:41:24 | 20 | A.  Detective Hood. |
| 02:41:24 | 21 | Q.  All right.  Toward the bottom, do you see a reference |
| 02:41:28 | 22 | here, at the very bottom to a Cleveland Ball? |
| 02:41:30 | 23 | A.  Yes, I do. |
| 02:41:31 | 24 | Q.  Did you and Detective Hood speak to Cleveland Ball on |
| 02:41:34 | 25 | April 28, 1984? |

12/06/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

02:41:36   1   A.  Yes, we did.

02:41:37   2   Q.  And was Mr. Ball the source of the information that is

02:41:40   3   shown in the bottom third of this particular note?

02:41:43   4   A.  It is.

02:41:44   5   Q.  Did Mr. Ball provide a description of the shooters?

02:41:58   6   A.  Yes, he did.

02:42:00   7   Q.  What did he is?

02:42:01   8   A.  He said that it the one in the blue jogging suit was five,

02:42:07   9   11, 23 years of age medium build and had a red skull cap.

02:42:12   10  Q.  Did he provide a description of the other offenders?

02:42:15   11  A.  Yes, that an individual was wearing a red and blue jacket

02:42:22   12  and he had a dark skull cap.

02:42:24   13  Q.  All right.  Mr. Baldwin told you and Detective Hood that

02:42:30   14  the offenders were wearing skull caps, correct?

02:42:32   15  A.  That is correct.

02:42:32   16  Q.  Did Cleveland Ball ever tell you and Detective Hood that

02:42:36   17  the offenders were wearing ski masks?

02:42:39   18  A.  No.

02:42:40   19  Q.  According to Mr. Ball, there were four offenders?

02:42:45   20  A.  Yes, sir.

02:42:45   21  Q.  According to Mr. Ball, two were in the car and two got

02:42:56   22  into the car?

02:42:56   23  A.  Correct.

02:42:56   24  Q.  Did Mr. Ball describe what type of car it was?

02:43:02   25  A.  Mr. Ball said it was a two-door blue 79 Cadillac coupe

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 59 of 175 PageID #:32669
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

58

| | | |
|---|---|---|
| 02:43:09 | 1 | DeVille. |
| 02:43:10 | 2 | Q. It was a two-door coupe DeVille? |
| 02:43:13 | 3 | A. Correct. |
| 02:43:13 | 4 | Q. If I could go back to the scene report, page 60-2, |
| 02:43:18 | 5 | Defendant's Exhibit 60-2. |
| 02:43:20 | 6 | BY MR. MICHALIK: |
| 02:43:25 | 7 | Q. Let's go back to the section that says wanted. Could you |
| 02:43:33 | 8 | please read what your report says as to the description of the |
| 02:43:37 | 9 | wanted offenders. |
| 02:43:38 | 10 | A. Wanted, four offenders. |
| 02:43:41 | 11 | Number one, a male black, 21 to 25 years of age, |
| 02:43:46 | 12 | five-foot ten to six feet, medium build, last seen wearing a |
| 02:43:51 | 13 | blue jogging suit and a red skull cap. |
| 02:43:54 | 14 | Number two, male black, 20 to 24 years of age, |
| 02:43:57 | 15 | five-foot seven to foot foot nine, medium build, last seen |
| 02:44:04 | 16 | wearing a Clark colored jacket and a dark colored skull cap. |
| 02:44:08 | 17 | Hair worn long and had an earring. |
| 02:44:10 | 18 | Three and four subjects unknown. Both stayed in the |
| 02:44:13 | 19 | vehicle described below. |
| 02:44:14 | 20 | Q. The information as to offenders number 1 and No. 2, |
| 02:44:18 | 21 | they're unknown, correct? |
| 02:44:19 | 22 | A. Correct. |
| 02:44:19 | 23 | Q. But these descriptions are based on the information that |
| 02:44:22 | 24 | was provided to you and Detective VanBerschot by witnesses |
| 02:44:27 | 25 | Eric Benson and Cleveland Ball? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 60 of 175 PageID #:32670
***REALTIME UNEDITED TRANSCRIPT ONLY***

59

| | | |
|---|---|---|
| 02:44:28 | 1 | A.  Correct. |
| 02:44:29 | 2 | Q.  And all of that information is reflected here in the |
| 02:44:31 | 3 | supplementary report? |
| 02:44:32 | 4 | A.  It is. |
| 02:44:33 | 5 | Q.  If we could go to the next section of the supplementary |
| 02:44:43 | 6 | report, wanted vehicle.  Why is that section included in a |
| 02:44:46 | 7 | scene report? |
| 02:44:47 | 8 | A.  Well, this vehicle was seen, the offenders were seen |
| 02:44:52 | 9 | entering the vehicle and the individuals involved in the |
| 02:44:57 | 10 | murder along with their compatriots were driving in this 1979 |
| 02:45:06 | 11 | Cadillac coupe DeVille, medium blue in color, license number |
| 02:45:11 | 12 | was unknown. |
| 02:45:11 | 13 | Q.  And what was the source of that information? |
| 02:45:13 | 14 | A.  That was the information that we got from the people we |
| 02:45:16 | 15 | interviewed. |
| 02:45:17 | 16 | Q.  Including Cleveland Ball? |
| 02:45:18 | 17 | A.  Cleveland Ball, correct. |
| 02:45:19 | 18 | Q.  Incidentally, let me ask you this, sir, when you were |
| 02:45:25 | 19 | preparing your supplementary report in the evening of April |
| 02:45:30 | 20 | 28, 1984, did you have available to you your notes, GPRs, and |
| 02:45:35 | 21 | the GPRs from Detective VanBerschot? |
| 02:45:37 | 22 | A.  Everybody at the scene submitted their notes and we |
| 02:45:42 | 23 | compiled the report based upon those. |
| 02:45:44 | 24 | Q.  If we could look at some of the other sections in this |
| 02:45:54 | 25 | supplementary report.  In particular, we see the date and time |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 61 of 175 PageID #:32671
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

60

| 02:45:57 | 1 | here at the bottom of page 2. |
| 02:46:02 | 2 | A.  Yes, sir, that was Saturday April 28th at approximately |
| 02:46:05 | 3 | 10:17 hours. |
| 02:46:06 | 4 | Q.  And that reflects the time of the shooting, correct? |
| 02:46:08 | 5 | A.  Yes, it does. |
| 02:46:09 | 6 | Q.  All right.  If we could go to page 3 of this report.  At |
| 02:46:17 | 7 | the very top, weather and lighting, what did you report were |
| 02:46:21 | 8 | the weather and lighting conditions at the time of the |
| 02:46:23 | 9 | shooting? |
| 02:46:23 | 10 | A.  That it was warm, high in the '60s, and sunny, and it was |
| 02:46:28 | 11 | good natural lighting. |
| 02:46:32 | 12 | Q.  Going down a little bit, I don't want to spend time on all |
| 02:46:35 | 13 | of these sections, but I do want to ask you about the next one |
| 02:46:39 | 14 | toward the bottom of the page.  It says personnel assigned. |
| 02:46:42 | 15 | Do you see that, sir? |
| 02:46:43 | 16 | A.  Yes. |
| 02:46:43 | 17 | Q.  And I think it continues onto the next page.  For the |
| 02:46:49 | 18 | record, this is Defendant's Exhibit 60-3 and 4. |
| 02:46:56 | 19 | Whose names are included in the section designated |
| 02:47:02 | 20 | personnel assigned? |
| 02:47:03 | 21 | A.  Anyone from the Chicago Police Department assigned to the |
| 02:47:07 | 22 | scene or happened on the scene, we got their information. |
| 02:47:10 | 23 | Q.  All right.  In looking at the list of personnel at the |
| 02:47:13 | 24 | scene, does it indicate anywhere that sergeant -- then |
| 02:47:18 | 25 | Sergeant Murphy was at the scene during the investigation on |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 62 of 175 PageID #:32672

| | | |
|---|---|---|
| 02:47:22 | 1 | April 28, 1984? |
| 02:47:23 | 2 | A.  No, sir. |
| 02:47:24 | 3 | Q.  Does it indicate whether or not Detective O'Callaghan was |
| 02:47:28 | 4 | one of the detectives who was assigned to the scene on April |
| 02:47:31 | 5 | 28, 1984? |
| 02:47:33 | 6 | A.  No, sir. |
| 02:47:33 | 7 | Q.  Okay.  Continuing on looking at page 4 of Exhibit 60, it |
| 02:47:44 | 8 | indicates witnesses and there are two that are listed there. |
| 02:47:47 | 9 | Do you see that? |
| 02:47:47 | 10 | A.  Yes, I do. |
| 02:47:48 | 11 | Q.  Okay.  And they are Eric Benson and Cleveland Ball? |
| 02:47:51 | 12 | A.  Correct. |
| 02:47:51 | 13 | Q.  You've told us about them already.  Just a couple of quick |
| 02:47:54 | 14 | questions. |
| 02:47:55 | 15 | Under I can Benson in parentheses it says I-oral, do |
| 02:48:00 | 16 | you see that there? |
| 02:48:01 | 17 | A.  Yes, I do. |
| 02:48:02 | 18 | Q.  What did you mean by that? |
| 02:48:03 | 19 | A.  Eye meaning eyewitness as opposed to a circumstantial |
| 02:48:08 | 20 | witness and oral, he gave an oral statement. |
| 02:48:10 | 21 | Q.  You said as opposed to a circumstantial witness, is that |
| 02:48:13 | 22 | what you got designated for Cleveland Ball where you have |
| 02:48:16 | 23 | parentheses circumstance, c-i-r-c-oral? |
| 02:48:20 | 24 | A.  Correct. |
| 02:48:20 | 25 | Q.  What does that mean, circumstantial witness? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 63 of 175 PageID #:32673
***REALTIME UNEDITED TRANSCRIPT ONLY***

62

| | | |
|---|---|---|
| 02:48:23 | 1 | A. Circumstantial witness would be someone that would perhaps |
| 02:48:27 | 2 | hear a gun so the and see somebody running as in this case it |
| 02:48:30 | 3 | was with Cleveland Ball. |
| 02:48:31 | 4 | Q. Thank you. |
| 02:48:32 | 5 | Now, the next section it is labeled interview. Do |
| 02:48:38 | 6 | you see that there? |
| 02:48:38 | 7 | A. Yes. |
| 02:48:38 | 8 | Q. All right. What is included in that section of a scene |
| 02:48:42 | 9 | report? |
| 02:48:42 | 10 | A. Individuals that gave us information or told us what they |
| 02:48:48 | 11 | had -- what they saw and were willing to be identified. |
| 02:48:51 | 12 | Q. And if we look at page 4 going onto page 5 of the scene |
| 02:48:57 | 13 | report, you have seven individuals listed there? |
| 02:48:59 | 14 | A. Correct. |
| 02:48:59 | 15 | Q. Were all of those individuals persons that were |
| 02:49:03 | 16 | interviewed at the scene? |
| 02:49:05 | 17 | A. No, they were not. |
| 02:49:05 | 18 | Q. All right. How many were from the scene? |
| 02:49:07 | 19 | A. The first five and the last two were interviewed |
| 02:49:12 | 20 | elsewhere. |
| 02:49:12 | 21 | Q. All right. Is there any indication anywhere on this scene |
| 02:49:16 | 22 | report that any of the detectives talked to a young man named |
| 02:49:20 | 23 | Cornell Jefferson? |
| 02:49:21 | 24 | A. No, sir. |
| 02:49:21 | 25 | Q. All right. If we could go to page 60-7 please. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 64 of 175 PageID #:32674
***REALTIME UNEDITED TRANSCRIPT ONLY***

63

| | | |
|---|---|---|
| 02:49:33 | 1 | About halfway down in the report, there's a paragraph |
| 02:49:45 | 2 | here that says the reporting detectives, by the way, is that |
| 02:49:49 | 3 | you and Detective Hood? |
| 02:49:50 | 4 | A. Yes, it's referring to myself and my partner. |
| 02:49:52 | 5 | Q. It says that you proceeded to the forensic institute. Do |
| 02:49:56 | 6 | you see that there? |
| 02:49:57 | 7 | A. Yes, sir. |
| 02:49:58 | 8 | Q. What is the forensic institute? |
| 02:49:59 | 9 | A. It's also known as the morgue and that's where anyone who |
| 02:50:05 | 10 | is murdered, suspicious deaths, things like that, people die |
| 02:50:11 | 11 | in a hospital for an unknown reason, they would be taken to |
| 02:50:15 | 12 | the forensic institute. |
| 02:50:15 | 13 | Q. All right. According to the report here, it says that you |
| 02:50:19 | 14 | and Detective Hood did a cursory examination of the victims? |
| 02:50:24 | 15 | A. That's correct. |
| 02:50:25 | 16 | Q. What does that mean? |
| 02:50:26 | 17 | A. This was prior to the formal autopsy that was going to be |
| 02:50:31 | 18 | held. |
| 02:50:31 | 19 | Q. All right. Then the next line indicates there would be a |
| 02:50:36 | 20 | more thorough examination at the time of the autopsy? |
| 02:50:38 | 21 | A. Correct. |
| 02:50:38 | 22 | Q. Did you attend the autopsy? |
| 02:50:40 | 23 | A. No, we did not. Area one was at the time was one of two |
| 02:50:45 | 24 | areas in the city that had detectives actually assigned to the |
| 02:50:49 | 25 | morgue or the forensic institute because of the number of |

12/06/16 PM    Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 65 of 175 PageID #:32675
***REALTIME UNEDITED TRANSCRIPT ONLY***

64

| | | |
|---|---|---|
| 02:50:53 | 1 | bodies that were being handled every week. |
| 02:50:59 | 2 | Q.  If we could go back to page 6 of the report, please. |
| 02:51:03 | 3 | Let me ask you something else about the interview |
| 02:51:08 | 4 | with Cleveland Ball.  You can highlight that section. |
| 02:51:12 | 5 | You told us a little bit about Cleveland Ball and the |
| 02:51:16 | 6 | description of the offenders, and the car, but he provided |
| 02:51:20 | 7 | some additional information as well, correct? |
| 02:51:22 | 8 | A.  Yes, he did. |
| 02:51:23 | 9 | Q.  And he provided some information about the Goon Squad? |
| 02:51:29 | 10 | A.  Yes, sir. |
| 02:51:29 | 11 | Q.  What did he tell you about the Goon Squad? |
| 02:51:31 | 12 | A.  That the day before, an incident involved this young man |
| 02:51:37 | 13 | by the name of Delbert Edwards from another building in the |
| 02:51:40 | 14 | area there, 730 East 39th Street, was involved with some Goon |
| 02:51:46 | 15 | Squad members.  his younger brother actually got into some |
| 02:51:51 | 16 | squabble with these Goon Squad members and that Delbert |
| 02:51:57 | 17 | Edwards came out and fired a gun at those gang members. |
| 02:52:00 | 18 | Q.  Before that conversation with Cleveland Ball, had you ever |
| 02:52:03 | 19 | heard of the Goon Squad before? |
| 02:52:04 | 20 | A.  I had not, no. |
| 02:52:05 | 21 | Q.  Had you known Delbert Edwards before hearing that name |
| 02:52:09 | 22 | from Cleveland Ball? |
| 02:52:10 | 23 | A.  I did not, no. |
| 02:52:12 | 24 | Q.  All right.  This appears to involve an incident that |
| 02:52:16 | 25 | occurred the day before the shooting which would have been |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 66 of 175 PageID #:32676

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:52:19 | 1 | April 27th? |
| 02:52:20 | 2 | A.  Correct. |
| 02:52:20 | 3 | Q.  Why did you include this information in your report? |
| 02:52:23 | 4 | A.  Well, it was a possible lead. |
| 02:52:27 | 5 | Q.  Did Cleveland Ball provide you with any further |
| 02:52:31 | 6 | information about the getaway car? |
| 02:52:33 | 7 | A.  Just the fact that it went north on Langley which is runs |
| 02:52:40 | 8 | adjacent to the murder scene and away from the murder scene |
| 02:52:45 | 9 | itself. |
| 02:52:45 | 10 | Q.  All right.  And the murder scene was on 39th? |
| 02:52:49 | 11 | A.  Correct. |
| 02:52:50 | 12 | Q.  All right.  If we could go back to page 7 of the scene |
| 02:53:01 | 13 | report, please. |
| 02:53:02 | 14 | All right.  I am going to ask you about one of the |
| 02:53:04 | 15 | witnesses that you previously listed or that you had |
| 02:53:06 | 16 | interviewed, I had you had say.  An individual named Louis |
| 02:53:09 | 17 | Carter? |
| 02:53:10 | 18 | A.  Yes, sir. |
| 02:53:10 | 19 | Q.  Did you and Detective Hood investigate someone by the name |
| 02:53:14 | 20 | of Louis Carter as part of the investigation on April 28, |
| 02:53:18 | 21 | 1984? |
| 02:53:18 | 22 | A.  We did. |
| 02:53:19 | 23 | Q.  All right.  This is a man named Louis Carter, correct, not |
| 02:53:22 | 24 | George Carter? |
| 02:53:22 | 25 | A.  No, this is Louis J. Carter, sir. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 67 of 175 PageID #:32677
***REALTIME UNEDITED TRANSCRIPT ONLY***

66

02:53:25  1  Q.  All right.  How did Louis Carter come to your attention?

02:53:27  2  A.  Louis Carter was driving his father's vehicle which

02:53:31  3  happened to be a blue coupe DeVille Cadillac which is similar

02:53:40  4  as the wanted vehicle.

02:53:43  5  Q.  That was the wanted vehicle you had listed earlier in the

02:53:47  6  report, correct?

02:53:48  7  A.  Correct.

02:53:48  8  Q.  Did you talk to Louis Carter?

02:53:50  9  A.  Yes, we did.

02:53:51  10  Q.  Where did you talk to him?

02:53:53  11  A.  We talked to him in the gang crimes unit at 51st and

02:53:58  12  Wentworth, it's just downstairs of our headquarters.

02:54:01  13  Q.  All right.  Had he been stopped and brought in?

02:54:03  14  A.  Yes, he was brought in by members of the gang crimes unit.

02:54:08  15  Q.  Who was present when you talked to Louis Carter?

02:54:10  16  A.  Me and my partner.

02:54:12  17  Q.  All right.  What, if anything, did Louis Carter tell you?

02:54:14  18  A.  He told us that he was at his sister's house, which is at

02:54:18  19  625 east 38th place, then he went and dropped some friends off

02:54:24  20  at 40th and federal, and from there he went to pick up his

02:54:27  21  mother at 652 west Garfield which Garfield was 5500 south, 652

02:54:36  22  would be about union, and they brought his mother back to his

02:54:40  23  sister's house.

02:54:41  24  Q.  So in other words, Louis Carter provided you with an alibi

02:54:45  25  for his whereabouts at the time of the shooting on April 28,

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 68 of 175 PageID #:32678
***REALTIME UNEDITED TRANSCRIPT ONLY***

67

02:54:48    1    1984?

02:54:49    2    A.  Correct.

02:54:50    3    Q.  Can you explain to the ladies and gentlemen of the jury

02:54:53    4    how you as a detective would go about checking someone's alibi

02:54:57    5    in the 1984 time period?

02:54:58    6    A.  One thing we would always do would be first of all

02:55:02    7    interviewing the people individually, not collectively.  It

02:55:06    8    would be one-on-one, and we would then ask them open-ended

02:55:13    9    questions and have them explain to us exactly what they did,

02:55:17   10    for example, in this case, we would say, you know, what did

02:55:20   11    you do today, and from the time they got up until the time

02:55:23   12    that the police had them, which is another point too because

02:55:28   13    back in 1984, there was though such thing as instant

02:55:31   14    communication, nobody could whip out a cell phone or text

02:55:36   15    somebody or instant message somebody.  If somebody was in

02:55:41   16    police custody, they had no communication with anyone else

02:55:45   17    other than the police.

02:55:45   18    Q.  So if I understand it, you would ask open-ended questions

02:55:50   19    to have the alibi witness provide independent information

02:55:53   20    corroborating what it was that the suspect was telling you?

02:55:56   21    A.  Correct.  And then we would go and talk to the individuals

02:56:00   22    and in this case, his mother and talk to her individually as

02:56:06   23    well, and she would --

02:56:07   24    Q.  Let me ask you about that in a minute?

02:56:10   25    A.  Sure.

02:56:10   1   Q.  I just have a question about the general process.  When

02:56:13   2   you would interview the alibi witnesses, would you do so by

02:56:16   3   person or by telephone?

02:56:18   4   A.  Always in person especially in homicide cases.

02:56:21   5   Q.  Now, could you tell us what you did to verify Louis

02:56:24   6   Carter's alibi?

02:56:25   7   A.  We spoke with Louis Carter's mother and she gave us the

02:56:28   8   same information that Louis did.

02:56:30   9   Q.  So you were able to verify his alibi?

02:56:33  10   A.  We were.

02:56:34  11   Q.  All right.  If we could look at the bottom of page 7 of

02:56:40  12   this supp report and at the top of the next page, page 8.

02:56:44  13   There is a paragraph here regarding an individual named

02:56:47  14   Delbert Edwards.  Do you see that there?

02:56:48  15   A.  Yes, I do.

02:56:49  16   Q.  He was the individual that was mentioned by Cleveland

02:56:53  17   Ball?

02:56:53  18   A.  Yes.

02:56:54  19   Q.  And Delbert and his younger brother got into some sort of

02:56:59  20   scrap with the Goon Squad?

02:56:59  21   A.  Correct.

02:57:00  22   Q.  What, if anything, was done to look for Delbert Edwards by

02:57:03  23   you and your partner?

02:57:03  24   A.  Well, detectives, other detective went and left a business

02:57:08  25   card at Delbert Edwards's apartment.

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 70 of 175 PageID #:32680
***REALTIME UNEDITED TRANSCRIPT ONLY***

69

| | | |
|---|---|---|
| 02:57:14 | 1 | Q. Did you eventually speak to Delbert Edwards? |
| 02:57:15 | 2 | A. Yes, we did. |
| 02:57:17 | 3 | Q. When did that take place? |
| 02:57:18 | 4 | A. That took place at area one, his father, Delbert Edwards's |
| 02:57:24 | 5 | brought him into the area. |
| 02:57:25 | 6 | Q. When did that take place? |
| 02:57:26 | 7 | A. That took place sometime after we got back and after we |
| 02:57:32 | 8 | spoke to Mr. Carter. |
| 02:57:33 | 9 | Q. You talked to Delbert Edwards? |
| 02:57:34 | 10 | A. Yes, we did. |
| 02:57:35 | 11 | Q. Who was present at the time? |
| 02:57:36 | 12 | A. My partner and myself. |
| 02:57:38 | 13 | Q. What did Delbert tell you? |
| 02:57:40 | 14 | A. He said that because of the trouble that was happening |
| 02:57:45 | 15 | with the day before which we checked out and it turned out |
| 02:57:49 | 16 | that actually Delbert Edwards was the one that was shot at, it |
| 02:57:52 | 17 | wasn't the other way around, and his father brought over to |
| 02:57:59 | 18 | his aunt's house at 51st and low, which was actually not too |
| 02:58:04 | 19 | far from our station. |
| 02:58:05 | 20 | Q. All right. So he also provided an alibi for his |
| 02:58:09 | 21 | whereabouts at the time of the shooting? |
| 02:58:10 | 22 | A. Yes, he said he didn't get up until 11:30. |
| 02:58:13 | 23 | Q. What, if anything, did you do to check out Delbert |
| 02:58:15 | 24 | Edwards's alibi? |
| 02:58:16 | 25 | A. We went over and spoke to his aunt at 51st and local. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 71 of 175 PageID #:32681
12/06/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

70

| | | |
|---|---|---|
| 02:58:21 | 1 | Q.  Did his alibi check out? |
| 02:58:23 | 2 | A.  It did. |
| 02:58:24 | 3 | Q.  If I could now see Defendant's Exhibit 57, pages 11 and |
| 02:58:28 | 4 | 12. |
| 02:58:40 | 5 | We are now looking at what was marked as Defendant's |
| 02:59:05 | 6 | Exhibit 57, pages 11 and 12.  Do you recognize what that is? |
| 02:59:07 | 7 | A.  Yes, I do. |
| 02:59:08 | 8 | Q.  What is it? |
| 02:59:09 | 9 | A.  It's a supplementary report regarding the Hickman Smith |
| 02:59:16 | 10 | double homicide. |
| 02:59:17 | 11 | Q.  And does this reflect an interview conducted by you and |
| 02:59:20 | 12 | Detective Hood on April 30, 1984? |
| 02:59:22 | 13 | A.  That's correct. |
| 02:59:22 | 14 | Q.  Who was interviewed at that time? |
| 02:59:24 | 15 | A.  Carlos Willis. |
| 02:59:25 | 16 | Q.  Where did you interview Mr. Willis? |
| 02:59:28 | 17 | A.  I believe it was at his house. |
| 02:59:32 | 18 | Q.  Okay.  What, if anything, did Carlos Willis tell you |
| 02:59:36 | 19 | regarding the Smith/Hickman incident? |
| 02:59:37 | 20 | A.  Well, that he was across the street when he saw what |
| 02:59:47 | 21 | happened regarding the shooting. |
| 02:59:47 | 22 | Q.  Okay.  He saw the shooting? |
| 02:59:49 | 23 | A.  Correct. |
| 02:59:50 | 24 | Q.  Did he tell you anything else about what he saw after the |
| 02:59:54 | 25 | shooting? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 72 of 175 PageID #:32682
***REALTIME UNEDITED TRANSCRIPT ONLY***

71

| | | |
|---|---|---|
| 02:59:54 | 1 | A.  That the individuals ran back through the breezeway as |
| 03:00:00 | 2 | they call it and ran away from the scene.  The door slammed |
| 03:00:12 | 3 | and squeal of the tires as the car peeled away from the car. |
| 03:00:16 | 4 | Q.  Mr. Willis told you that he saw the two offenders fleeing |
| 03:00:19 | 5 | through the breezeway, correct? |
| 03:00:20 | 6 | A.  Correct. |
| 03:00:20 | 7 | Q.  Did he ever tell you at any time that either of the |
| 03:00:23 | 8 | offenders was wearing a ski mask? |
| 03:00:26 | 9 | A.  He did not, no. |
| 03:00:27 | 10 | Q.  If he did tell you that, would that have been reflected in |
| 03:00:31 | 11 | this supplementary report? |
| 03:00:32 | 12 | A.  Absolutely. |
| 03:00:33 | 13 | Q.  You indicated that he heard the car door slam and the |
| 03:00:36 | 14 | squeal of tires? |
| 03:00:36 | 15 | A.  Yes, sir. |
| 03:00:37 | 16 | Q.  Did he ever see the vehicle that he heard? |
| 03:00:41 | 17 | A.  No, he did not. |
| 03:00:42 | 18 | Q.  The car never came back toward him on 39th Street? |
| 03:00:46 | 19 | A.  No, sir, it did not. |
| 03:00:48 | 20 | Q.  Now, at this time, you had been investigating the |
| 03:00:53 | 21 | Smith/Hickman murder for three or four days.  Did you have any |
| 03:00:57 | 22 | specific individuals in mind at that time as suspects in these |
| 03:01:01 | 23 | homicides? |
| 03:01:02 | 24 | A.  No named individuals, no. |
| 03:01:04 | 25 | Q.  All right.  If I could see Plaintiff's Exhibit 1, page |

12/06/16 PM  Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 73 of 175 PageID #:32683
***REALTIME UNEDITED TRANSCRIPT ONLY***

72

| 03:01:10 | 1 | 104. Locking at what was Plaintiff's Exhibit 1-104, it's a to |
| 03:01:32 | 2 | from memo that is reportedly put in evidence.  Do you see that |
| 03:01:37 | 3 | there? |
| 03:01:37 | 4 | A.  Yes, I do. |
| 03:01:38 | 5 | Q.  Do you recall seeing this memo in 1984? |
| 03:01:40 | 6 | A.  To tell you the truth, no, I don't recall it, this |
| 03:01:43 | 7 | particular memo. |
| 03:01:44 | 8 | Q.  All right.  According to this memo, there's some |
| 03:01:46 | 9 | information provided by James Langston regarding the Baldwin |
| 03:01:51 | 10 | brothers? |
| 03:01:51 | 11 | A.  Correct. |
| 03:01:51 | 12 | Q.  Did you and Detective Hood investigate any of this |
| 03:01:53 | 13 | information about the Baldwin brothers in the -- the Baldwin |
| 03:01:58 | 14 | brother in the passenger seat? |
| 03:01:59 | 15 | A.  We did not. |
| 03:02:00 | 16 | Q.  Why not? |
| 03:02:00 | 17 | A.  Because Detectives Minogue and Bogdalek were following up |
| 03:02:06 | 18 | on that angle. |
| 03:02:07 | 19 | Q.  Okay.  According to the information reflected this this |
| 03:02:10 | 20 | memo, James Langston said that he saw the car go south on |
| 03:02:13 | 21 | Langley, then west on 39th.  Do you see that there? |
| 03:02:17 | 22 | A.  I do. |
| 03:02:17 | 23 | Q.  Was that the same information that you had obtained from |
| 03:02:21 | 24 | witnesses that you talked to? |
| 03:02:22 | 25 | A.  No, that's contrary to what we were told by two other |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 74 of 175 PageID #:32684
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

73

| | | |
|---|---|---|
| 03:02:25 | 1 | people. |
| 03:02:25 | 2 | Q.  And you were told what by two other people? |
| 03:02:32 | 3 | A.  That they never saw the car come north on 39th Street, so |
| 03:02:35 | 4 | it went north on Langley away from the murder scene. |
| 03:02:35 | 5 | Q.  Would that be Cleveland Ball and Carlos Willis? |
| 03:02:37 | 6 | A.  Correct. |
| 03:02:38 | 7 | Q.  All right.  After the first week of May 1984, did you have |
| 03:02:42 | 8 | any further involvement in the investigation of the |
| 03:02:47 | 9 | Smith/Hickman murders? |
| 03:02:47 | 10 | A.  No, sir. |
| 03:02:48 | 11 | Q.  Why not? |
| 03:02:50 | 12 | A.  Well, we ran down all the leads that we had and when the |
| 03:02:55 | 13 | case became cold, we just moved onto the other cases because |
| 03:03:00 | 14 | there was plenty of them to do. |
| 03:03:01 | 15 | Q.  Okay.  If I could see Plaintiff's Exhibit 21-7? |
| 03:03:07 | 16 |           THE COURT:  Are you changing topics here? |
| 03:03:08 | 17 |           MR. MICHALIK:  I am. |
| 03:03:09 | 18 |           THE COURT:  We are going to take our break here.  We |
| 03:03:11 | 19 | will break for ten minutes and then resume.  I will be right |
| 03:03:15 | 20 | back out. |
| 03:03:53 | 21 |   (The jury leaves the courtroom.) . |
| 03:03:53 | 22 |           THE COURT:  Okay.  Do we have something to discuss? |
| 03:03:56 | 23 |           MR. KULWIN:  Judge, I believe Mr. Kuhn is here. |
| 03:03:58 | 24 |           THE COURT:  Well, why don't you all talk to him and |
| 03:04:01 | 25 | figure out what the story is.  (Short break. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 75 of 175 PageID #:32685
***REALTIME UNEDITED TRANSCRIPT ONLY***

74

03:15:11    1          THE COURT:  Can somebody give me an update.

03:15:13    2          MR. LOEVY:  The government, Mr. Kuhn, has given us a

03:15:16    3   document that's single spaced and about 15 pages.  Mr. Kuhn

03:15:20    4   doesn't have personal knowledge, but he believes that

03:15:22    5   Mr. Hogan believes that this is the document that was taken by

03:15:26    6   the cooperators.

03:15:28    7          THE COURT:  Okay.

03:15:30    8          MR. LOEVY:  We haven't read it, obviously.

03:15:31    9          THE COURT:  Yeah, of course.

03:15:32   10          MR. LOEVY:  And we do oppose the introduction of this

03:15:37   11   memo now.

03:15:37   12          THE COURT:  That's really not the question on the

03:15:39   13   table at this point.

03:15:40   14          MR. LOEVY:  All right.  Sorry, I guess I don't know

03:15:43   15   what the question is.

03:15:44   16          THE COURT:  The question on the table at this point

03:15:46   17   had to do with the assertion of the deliberative process

03:15:50   18   privilege.

03:15:50   19          MR. KULWIN:  There's two issues on the table.  One is

03:15:52   20   the assertion of deliberative process.  What Mr. Kuhn just

03:15:56   21   advised us is that the government will waive the deliberative

03:15:59   22   process privilege to the extent that Mr. Hogan can talk about

03:16:03   23   or the ultimate conclusion he derived from participating in

03:16:09   24   discussions about whether or not --

03:16:09   25          THE COURT:  That is way too cryptic for me to get.

12/06/16 PM     Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 76 of 175 PageID #:32686
***REALTIME UNEDITED TRANSCRIPT ONLY***

75

| | | |
|---|---|---|
| 03:16:13 | 1 | No, I want to hear from the lawyers in my case.  That's what I |
| 03:16:16 | 2 | want to hear from. |
| 03:16:17 | 3 | MR. KULWIN:  As I understand it, the government is |
| 03:16:18 | 4 | saying that Mr. Hogan is free to discuss his participation in |
| 03:16:25 | 5 | the discussions of the Rule 35 motion.  Its purpose. |
| 03:16:31 | 6 | THE COURT:  Now I understand.  Thank you. |
| 03:16:32 | 7 | MR. KULWIN:  Things of that nature.  What they're |
| 03:16:34 | 8 | saying, if I understand it correctly, what he can't say is and |
| 03:16:37 | 9 | then Zack Farden said this or Gary Shapiro said that or |
| 03:16:41 | 10 | whatever.  He can't talk about that. |
| 03:16:43 | 11 | THE COURT:  He can't talk about the discussions in |
| 03:16:45 | 12 | other words. |
| 03:16:45 | 13 | MR. KULWIN:  He can talk about his personal knowledge |
| 03:16:47 | 14 | that he derived from it. |
| 03:16:48 | 15 | THE COURT:  We will deal with that later. |
| 03:16:51 | 16 | MR. KULWIN:  Number two, the other issue I believe |
| 03:16:53 | 17 | with respect it this was. |
| 03:16:54 | 18 | THE COURT:  This document? |
| 03:16:55 | 19 | MR. KULWIN:  Yes.  I was going to elicit from him, |
| 03:16:57 | 20 | what prompted this was. |
| 03:16:58 | 21 | THE COURT:  From Mr. Hogan? |
| 03:17:00 | 22 | MR. KULWIN:  Yes, Mr. Hogan.  I apologize, your |
| 03:17:02 | 23 | Honor.  From Mr. Hogan, you know, what was taken because |
| 03:17:05 | 24 | there's been all this discussion about a pro memo, wags it the |
| 03:17:10 | 25 | pros memo, he is going to say, no, what was it?  X, Y, and Z. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:17:16   1   What was the date of that document?  X, Y, and Z.  They

03:17:19   2   oppose.

03:17:20   3          THE COURT:  I'll hear from Mr. Loevy why he opposes

03:17:22   4   it.

03:17:23   5          MR. KULWIN:  That's what they said this morning.

03:17:24   6          THE COURT:  Okay.  So are you in a position to

03:17:27   7   address this now, Mr. Loevy?

03:17:28   8          MR. LOEVY:  What I will address, your Honor, is on

03:17:30   9   November 18th, during the trial, we got a letter from the U.S.

03:17:34  10   Attorney's Office from Mr. Kuhn on behalf of the United States

03:17:36  11   saying it has been further determined that the production of

03:17:39  12   any prosecution or other internal United States attorney's

03:17:44  13   office memos obtained by Derrick Kees, Trammell Davis, Earl

03:17:48  14   Hawkins, Jackie Clay, Eugene Hunter will not be authorized.

03:17:51  15   Prosecution memos --

03:17:52  16          THE COURT:  You're reading from something I take it.

03:17:54  17          MR. LOEVY:  Yeah.

03:17:54  18          THE COURT:  Thank you, Mr. Art.

03:18:00  19          MR. LOEVY:  In other words, we have now called every

03:18:02  20   witness that we could have cross-examined and the guy that

03:18:05  21   states asserted this privilege.

03:18:06  22          THE WITNESS:  All the witnesses are now gone.  We

03:18:09  23   can't corroborate from this this is what they saw, what they

03:18:13  24   didn't saw.  We can't ask them questions about it.  The United

03:18:17  25   States can't waive the privilege right before the examination

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

77

| | | |
|---|---|---|
| 03:18:20 | 1 | of Mr. Hogan because the first four examinations -- |
| 03:18:23 | 2 | THE COURT:  We will deal with this later.  Assuming |
| 03:18:25 | 3 | Mr. Hogan hits the stand. |
| 03:18:27 | 4 | MR. KULWIN:  I don't believe he will. |
| 03:18:28 | 5 | THE COURT:  If he does, you have to avoid this topic. |
| 03:18:31 | 6 | I am going to get the jury.  We will talk at the end of the |
| 03:18:34 | 7 | day about how and when. |
| 03:18:38 | 8 | MR. KULWIN:  Thank you. |
| 03:19:54 | 9 | (The jury enters the courtroom.) |
| 03:19:54 | 10 | THE COURT:  Okay.  Everybody can have a seat. |
| 03:20:01 | 11 | Mr. Michalik, you can go ahead. |
| 03:20:02 | 12 | MR. MICHALIK:  Thank you. |
| 03:20:03 | 13 | BY MR. MICHALIK: |
| 03:20:04 | 14 | Q.  If I could have Plaintiff's Exhibit 21, page 7. |
| 03:20:11 | 15 | Mr. Evans, we previously talked about this document. |
| 03:20:21 | 16 | This was the GPR that was prepared by Detective VanBerschot? |
| 03:20:27 | 17 | A.  Correct. |
| 03:20:28 | 18 | Q.  And this is one of the pages you had that you relied on in |
| 03:20:36 | 19 | preparing your supplementary report? |
| 03:20:37 | 20 | A.  That is correct. |
| 03:20:38 | 21 | Q.  If we could go down to the bottom half of this memo.  Do |
| 03:20:46 | 22 | you see here where there is a reference in quotes to Goon |
| 03:20:51 | 23 | Squad? |
| 03:20:51 | 24 | A.  Yes, sir. |
| 03:20:51 | 25 | Q.  And then the line below that refers to Fuddy's friends? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 79 of 175 PageID #:32689
***REALTIME UNEDITED TRANSCRIPT ONLY***

78

| | | |
|---|---|---|
| 03:20:58 | 1 | A. Correct. |
| 03:20:58 | 2 | Q. Okay. And then there is a line here about the goons. |
| 03:21:03 | 3 | Could you read that, please? |
| 03:21:04 | 4 | A. Goons trying to take over the league, Black Gangster Goon |
| 03:21:11 | 5 | Squad also fighting El Rukns. |
| 03:21:11 | 6 | Q. All right. So as of April 28, 1984, the police at least |
| 03:21:17 | 7 | had some information that Fuddy's gang was in a dispute with |
| 03:21:21 | 8 | the El Rukns? |
| 03:21:22 | 9 | A. Correct. |
| 03:21:22 | 10 | Q. Okay. Everybody knows what Plaintiff's Exhibit No. 1 is |
| 03:21:47 | 11 | by this time. |
| 03:21:48 | 12 | In April of 1984, how long had you been working as a |
| 03:21:52 | 13 | homicide detective in area one? |
| 03:21:54 | 14 | A. Approximately two years. |
| 03:21:56 | 15 | Q. All right. During the course of this work in area one as |
| 03:21:59 | 16 | a homicide detective, did you become familiar with the El Rukn |
| 03:22:02 | 17 | street gang? |
| 03:22:03 | 18 | A. Yes, sir. |
| 03:22:04 | 19 | Q. All right. As of April 28, 1984, were you familiar with |
| 03:22:08 | 20 | an individual named Earl Hawkins? |
| 03:22:09 | 21 | A. Yes, sir. |
| 03:22:11 | 22 | Q. What was your familiarity with Earl Hawkins at that time? |
| 03:22:14 | 23 | A. Earl Hawkins was a member of the upper echelon of the El |
| 03:22:20 | 24 | Rukns and he was thought to be involved in a number of |
| 03:22:23 | 25 | homicides. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 80 of 175 PageID #:32690
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

| | | |
|---|---|---|
| 03:22:23 | 1 | Q. All right. If I could have Plaintiff's Exhibit 1-1 and |
| 03:22:29 | 2 | 1-2 side by side. |
| 03:22:33 | 3 | MR. MICHALIK: If I may approach, your Honor? |
| 03:22:35 | 4 | THE COURT: Sure. |
| 03:22:36 | 5 | BY MR. MICHALIK: |
| 03:22:38 | 6 | Q. I'm going to show you a photograph that corresponds with |
| 03:22:40 | 7 | plaintiff's exhibit 1-1. I'd ask you to take a look at that. |
| 03:22:47 | 8 | A. That's a photo of Earl Hawkins. |
| 03:22:49 | 9 | Q. All right. If you could flip it over, there's some |
| 03:22:51 | 10 | writing on the back. |
| 03:22:53 | 11 | A. The writing is in my script on Earl Hawkins is what it |
| 03:22:57 | 12 | says, Hawkins, Earl. |
| 03:22:59 | 13 | Q. Thank you. |
| 03:23:00 | 14 | If I could see plaintiff's 1-125 and 126. Do you |
| 03:23:20 | 15 | recognize what this document is, sir? |
| 03:23:21 | 16 | A. This is commonly referred to as a rap sheet, but it's a |
| 03:23:26 | 17 | criminal sheet on Mr. Earl Hawkins. |
| 03:23:28 | 18 | Q. Okay. Now, during the course of your investigation of the |
| 03:23:32 | 19 | Smith/Hickman homicides in April and early May of 1984, did |
| 03:23:36 | 20 | any witness or person that you interviewed suggest that Earl |
| 03:23:40 | 21 | Hawkins was involved in the murders? |
| 03:23:42 | 22 | A. No, sir. |
| 03:23:42 | 23 | Q. Do you recall ever showing anyone this photograph of Earl |
| 03:23:48 | 24 | Hawkins? |
| 03:23:48 | 25 | A. No, sir, I never did. |

| | | |
|---|---|---|
| 03:23:49 | 1 | Q.  Did you develop -- did you ever develop any information in |
| 03:23:53 | 2 | April and early May 1984 that Earl Hawkins was involved in the |
| 03:23:57 | 3 | Smith/Hickman shootings? |
| 03:23:58 | 4 | A.  No, sir. |
| 03:23:58 | 5 | Q.  As of April 8, 1984, were you familiar with an individual |
| 03:24:08 | 6 | named William Doyle? |
| 03:24:10 | 7 | A.  Yes, sir. |
| 03:24:11 | 8 | Q.  Was that due to your work as apparently area one homicide |
| 03:24:14 | 9 | detective? |
| 03:24:14 | 10 | A.  Y-yes, it was. |
| 03:24:15 | 11 | Q.  What was your familiarity with William Doyle? |
| 03:24:18 | 12 | A.  That he was also a high ranking member of the El Rukns and |
| 03:24:20 | 13 | he was also thought to be involved in a number of homicides. |
| 03:24:24 | 14 | Q.  If I could have plaintiff's exhibit 1-41 and 42 side by |
| 03:24:28 | 15 | side. |
| 03:24:29 | 16 | |
| 03:24:30 | 17 | MR. MICHALIK:  If I may approach. |
| 03:24:31 | 18 | THE COURT:  Okay. |
| 03:24:32 | 19 | BY MR. MICHALIK: |
| 03:24:35 | 20 | Q.  Mr. Evans, do you recognize this photograph which |
| 03:24:37 | 21 | corresponds to the Plaintiff's Exhibits that are on the |
| 03:24:40 | 22 | screen? |
| 03:24:41 | 23 | A.  Yes, it's the photograph, the Chicago Police Department |
| 03:24:45 | 24 | photograph of Mr. William Doyle and that's my script on the |
| 03:24:49 | 25 | back, Doyle, William. |

| | | |
|---|---|---|
| 03:24:50 | 1 | Q. Thank you. |
| 03:24:53 | 2 | If I could see Plaintiff's Exhibit 1-127 and 128, |
| 03:25:05 | 3 | please. |
| 03:25:16 | 4 | Sir, do you see this document? |
| 03:25:17 | 5 | A. Yes, I do. |
| 03:25:18 | 6 | Q. What is it? |
| 03:25:19 | 7 | A. It's a criminal history of a Mr. William Doyle. |
| 03:25:22 | 8 | Q. All right. And it looks like actually page 128 is the |
| 03:25:29 | 9 | first page of this rap sheet? |
| 03:25:30 | 10 | A. Correct. |
| 03:25:30 | 11 | Q. And 127 is the second page? |
| 03:25:33 | 12 | A. Yes, it is. |
| 03:25:34 | 13 | Q. There's some writing at the bottom of the second page |
| 03:25:37 | 14 | which is Plaintiff's Exhibit 1-127. Do you see that there, |
| 03:25:40 | 15 | sir? |
| 03:25:40 | 16 | A. I do. |
| 03:25:41 | 17 | Q. Do you know whose writing that is? |
| 03:25:43 | 18 | A. That's my script. |
| 03:25:44 | 19 | Q. If I could see Plaintiff's Exhibit 1-121. |
| 03:25:52 | 20 | All right. If we look at the bottom here -- well, |
| 03:26:06 | 21 | can you tell us what these are that reelected in this exhibit? |
| 03:26:10 | 22 | A. There's actually two different documents. The first top |
| 03:26:12 | 23 | one is an arrest card typically used to keep a file on |
| 03:26:19 | 24 | individuals who are arrested in the Chicago Police Department |
| 03:26:23 | 25 | through this manner. |

| | | |
|---|---|---|
| 03:26:23 | 1 | Q.  If we could see the bottom one, please.  Is this also an |
| 03:26:28 | 2 | arrest card for someone? |
| 03:26:30 | 3 | A.  It is for the gang crimes unit.  They used it to keep |
| 03:26:34 | 4 | their individual. |
| 03:26:34 | 5 | Q.  Who is the individual that's referenced in this card? |
| 03:26:36 | 6 | A.  William Doyle. |
| 03:26:38 | 7 | Q.  All right.  Do you see here for nickname, there's |
| 03:26:41 | 8 | something written in there.  Do you see that, sir? |
| 03:26:43 | 9 | A.  Yes, I do. |
| 03:26:44 | 10 | Q.  All right.  And that says sundown? |
| 03:26:48 | 11 | A.  Yes, it does. |
| 03:26:48 | 12 | Q.  You told us before that you were familiar based on your |
| 03:26:51 | 13 | work as an area one homicide detective with William Doyle, |
| 03:26:54 | 14 | correct? |
| 03:26:55 | 15 | A.  Correct. |
| 03:26:55 | 16 | Q.  Were you familiar with his nickname of sundown? |
| 03:26:57 | 17 | A.  I was not, no. |
| 03:26:58 | 18 | Q.  During the course of your investigation of the |
| 03:27:03 | 19 | Smith/Hickman homicides in April and early May of 1984, did |
| 03:27:08 | 20 | you develop any lead or information that William Doyle was |
| 03:27:11 | 21 | involved in the Smith/Hickman murders? |
| 03:27:12 | 22 | A.  No, sir. |
| 03:27:12 | 23 | Q.  Do you recall ever showing this photograph of William |
| 03:27:18 | 24 | Doyle to any witness? |
| 03:27:19 | 25 | A.  No, sir, we did not. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 84 of 175 PageID #:32694
***REALTIME UNEDITED TRANSCRIPT ONLY***

83

03:27:20  1   Q.  Is there any reason why you wouldn't show a photograph of

03:27:26  2   William Doyle or Earl Hawkins to any other witnesses that you

03:27:30  3   were talking to?

03:27:31  4   A.  We had no foundation to do so.  They were not named and if

03:27:37  5   you were to show just an individual photo like that, you would

03:27:41  6   taint a future identification.

03:27:42  7   Q.  So you would not show a photograph to a witness unless he

03:27:45  8   first brought up the name of a suspect?

03:27:47  9   A.  That is correct, and at that time, if I would show it, I

03:27:53  10  would show it in a photo array, not just an individual photo,

03:27:56  11  I would show photos of like looking individuals along with the

03:28:00  12  suspect.

03:28:00  13  Q.  Thank you.

03:28:01  14          Just a few more questions, sir.

03:28:05  15          During your examination of the Smith/Hickman murders

03:28:07  16  in late April and early May of 1984, did the name of Anthony

03:28:12  17  Sumner ever come up?

03:28:12  18  A.  No, sir.

03:28:13  19  Q.  Did any witness or anyone tell you that Anthony Sumner was

03:28:16  20  involved in the Smith/Hickman murders?

03:28:18  21  A.  No, sir.

03:28:19  22  Q.  Did anyone ever suggest to you that someone with the

03:28:22  23  nickname of sundown was involved in the Smith/Hickman

03:28:26  24  homicides?

03:28:26  25  A.  No, sir.

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 85 of 175 PageID #:32695
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

84

| | | |
|---|---|---|
| 03:28:27 | 1 | Q.  Did you know Nathson Fields prior to April 28, 1984? |
| 03:28:33 | 2 | A.  No, sir. |
| 03:28:34 | 3 | Q.  Did you know of him? |
| 03:28:35 | 4 | A.  No, sir. |
| 03:28:36 | 5 | Q.  Did the name of Nathson Fields ever come up at any time |
| 03:28:40 | 6 | during your investigation of the Smith/Hickman murders in |
| 03:28:42 | 7 | April and May 1984? |
| 03:28:44 | 8 | A.  No, sir. |
| 03:28:45 | 9 | Q.  Did you ever prepare a report or note suggesting that Mr. |
| 03:28:51 | 10 | Fields was involved in the Smith/Hickman homicides? |
| 03:28:53 | 11 | A.  No, sir. |
| 03:28:53 | 12 | Q.  Did you ever prepare a note or report indicating that Mr. |
| 03:28:57 | 13 | Fields was not involved in the Smith/Hickman homicides? |
| 03:29:00 | 14 | A.  No, sir. |
| 03:29:05 | 15 |         MR. MICHALIK:  If I can have a moment, your Honor? |
| 03:29:08 | 16 |         THE COURT:  Sure. |
| 03:29:10 | 17 |   (Brief pause.) |
| 03:29:20 | 18 |         MR. MICHALIK:  No further questions. |
| 03:29:20 | 19 |         THE COURT:  Mr. Kulwin, do you have any questions? |
| 03:29:22 | 20 |         MR. KULWIN:  No. |
| 03:29:22 | 21 |         THE COURT:  Mr. Loevy. |
| 03:29:23 | 22 |         MR. LOEVY:  Thank you. |
| 03:29:24 | 23 |                        - - - |
| 03:29:24 | 24 |             ROBERT EVANS, CROSS-EXAMINATION |
| 03:29:24 | 25 | BY MR. LOEVY: |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 86 of 175 PageID #:32696
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

85

| 03:29:27 | 1 | Q. All right. Mr. Evans, you performed a canvass of the |
| 03:29:31 | 2 | building, correct? |
| 03:29:31 | 3 | A. A canvass of the area. |
| 03:29:34 | 4 | Q. Showing you a copy of plaintiff's 194-43. Back on the |
| 03:29:39 | 5 | ELMO then, your Honor? |
| 03:29:40 | 6 | THE COURT: Yes. There you go. |
| 03:29:45 | 7 | BY MR. LOEVY: |
| 03:29:45 | 8 | Q. This is the way you do a canvass report, right? |
| 03:29:48 | 9 | A. This is -- this is the report. |
| 03:29:53 | 10 | Q. It's a GPR, right? |
| 03:29:55 | 11 | A. Pardon me? |
| 03:29:56 | 12 | Q. It's a GPR? |
| 03:29:57 | 13 | A. It's a GPR, right. |
| 03:29:58 | 14 | Q. Which you took notes on, right? |
| 03:30:00 | 15 | A. Correct. |
| 03:30:00 | 16 | Q. And if you talked to Martha Robinson, you wrote down her |
| 03:30:05 | 17 | name and information and the fact that she heard two gunshots, |
| 03:30:08 | 18 | correct? |
| 03:30:08 | 19 | A. Correct. |
| 03:30:09 | 20 | Q. And if you talked to Dorothy Benson, a female black, no |
| 03:30:09 | 21 | phone, heard four shots, looked out the window, two boys |
| 03:30:12 | 22 | lying, you wrote that down, right? |
| 03:30:13 | 23 | A. I did. |
| 03:30:15 | 24 | Q. That's how you were trained, right? |
| 03:30:16 | 25 | A. Pardon me? |

03:30:17    1   Q.  That's how you were trained, that if you were a police

03:30:20    2   officer interviewing people who had any information, you'd

03:30:22    3   write it down, right?

03:30:23    4   A.  That depends.

03:30:26    5   Q.  All right.  The kind of information we see on this report,

03:30:29    6   were you trained to write that down, sir?

03:30:30    7   A.  The names and addresses, absolutely.

03:30:33    8   Q.  You did it for Minnie White here on page 48 here as well,

03:30:37    9   the woman who called the police, right?

03:30:39   10   A.  No, that's not my handwriting.

03:30:40   11   Q.  I'm sorry.  Hood was your partner?

03:30:42   12   A.  He was, yes.

03:30:43   13   Q.  All right.  So that's his handwriting?

03:30:44   14   A.  It appears to be, yes.

03:30:46   15   Q.  All right.  You said you searched for physical evidence,

03:30:53   16   things -- the crime lab came out, correct?

03:30:55   17   A.  Correct.

03:30:55   18   Q.  There was no blood or footprint evidence or any other

03:31:00   19   forensic evidence ever connecting Nate to this crime, correct?

03:31:03   20   A.  Not to my knowledge.

03:31:04   21   Q.  All right.  You said you get your reports done by the end

03:31:07   22   of the shift, is that what you said?

03:31:09   23   A.  No, sir.  We do the report at the end of our investigation

03:31:13   24   and it took us absolutely a lot longer than the regular shift.

03:31:15   25   Q.  All right.  I thought you said you did it at the end of

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 88 of 175 PageID #:32698
***REALTIME UNEDITED TRANSCRIPT ONLY***

87

| 03:31:19 | 1 | your tour of duty? |
| 03:31:19 | 2 | A.  Pardon me? |
| 03:31:20 | 3 | Q.  I thought you said it at the end of do you remember of |
| 03:31:24 | 4 | duty? |
| 03:31:24 | 5 | A.  At the end, sir. |
| 03:31:26 | 6 | Q.  Showing you plaintiff's 94, this is your April 28th |
| 03:31:30 | 7 | report? |
| 03:31:30 | 8 | A.  Correct. |
| 03:31:30 | 9 | Q.  It has a Bates stamp of April 30th, right? |
| 03:31:33 | 10 | A.  I don't know where that stamp came from. |
| 03:31:36 | 11 | Q.  It does have an April 30th Bates stamp? |
| 03:31:38 | 12 | A.  It does, yes. |
| 03:31:39 | 13 | Q.  Is it the policy -- are you familiar with the policies and |
| 03:31:42 | 14 | practices of the Chicago Police Department? |
| 03:31:43 | 15 | A.  Some, yes, not all. |
| 03:31:45 | 16 | Q.  All right.  Back in the '80s, was it the policy of the |
| 03:31:48 | 17 | police department that after you did a police report like this |
| 03:31:50 | 18 | one, your Honor supposed to hold it until you were done |
| 03:31:53 | 19 | investigating or you were supposed to submit it as it was |
| 03:31:56 | 20 | created? |
| 03:31:56 | 21 | A.  No, we submitted it immediately that day. |
| 03:31:59 | 22 | Q.  All right.  Then that's what I got confused on.  I thought |
| 03:32:02 | 23 | you said end of tour you submit it, right? |
| 03:32:04 | 24 | A.  At the end of our tour, I mean, our tour isn't over until |
| 03:32:07 | 25 | this investigation -- until we take it as far as we can. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 89 of 175 PageID #:32699
***REALTIME UNEDITED TRANSCRIPT ONLY***

88

03:32:10    1   Q.  I probably got --

03:32:11    2   A.  I'm sorry.  Maybe I wasn't clear on that.

03:32:13    3   Q.  I was using the fancy police work tour of duty.  I think I

03:32:18    4   screwed it up.  I mean end of shift?

03:32:19    5   A.  We went overtime.  When sergeant binge /AOE signed it, it

03:32:24    6   says 2150, that's 9:50 people.  Our shift ended at 5:00

03:32:28    7   o'clock.

03:32:29    8   Q.  The point is and the only point I was trying to make is

03:32:32    9   when you have a police report, you get it submitted as soon as

03:32:34   10   possible, right?

03:32:35   11   A.  Absolutely.

03:32:35   12   Q.  And if this information in the report had to change, you

03:32:38   13   do a different report, right?

03:32:39   14   A.  Yes.

03:32:39   15   Q.  All right.  Sorry about the tour of duty confusion.

03:32:43   16        Was this your uniform practice when you were a

03:32:49   17   detective to make sure you submitted your reports promptly?

03:32:51   18   A.  Absolutely.

03:32:52   19   Q.  Have you ever heard of an official police report, the

03:32:55   20   official original version with signatures going missing?

03:32:58   21   A.  Official signatures?

03:33:03   22   Q.  Yeah, a real original police report,have you ever heard of

03:33:06   23   those going missing in your career?

03:33:08   24   A.  No, I really haven't.  No.

03:33:09   25   Q.  How many years were you a police officer?

| | | |
|---|---|---|
| 03:33:11 | 1 | A.  37 years, three months and 20 days. |
| 03:33:14 | 2 | Q.  Some people talk about their prison sentences like that, |
| 03:33:18 | 3 | you know. |
| 03:33:19 | 4 | A.  I am not talking about marriage now. |
| 03:33:22 | 5 | THE COURT:  My strong advice to you is stop right |
| 03:33:24 | 6 | there. |
| 03:33:26 | 7 | BY MR. LOEVY: |
| 03:33:27 | 8 | Q.  You said the reports don't reflect anybody interviewing |
| 03:33:31 | 9 | Cornell Jefferson, correct? |
| 03:33:32 | 10 | A.  My report, no, I didn't. |
| 03:33:34 | 11 | Q.  Of course, none of the reports from 84 reference Gerald |
| 03:33:37 | 12 | Morris, correct? |
| 03:33:38 | 13 | A.  Not that I know of, no, sir. |
| 03:33:40 | 14 | Q.  And none of the reports from 84 reflect the participation |
| 03:33:43 | 15 | by Richard Buckles, correct? |
| 03:33:45 | 16 | A.  Not that I am aware of. |
| 03:33:46 | 17 | Q.  The people you spoke to had the car going north on |
| 03:33:50 | 18 | Langley, correct? |
| 03:33:51 | 19 | A.  Yes, sir. |
| 03:33:52 | 20 | Q.  So if we can get the map real fast, wherever the car was, |
| 03:34:00 | 21 | it was on this north south street, right? |
| 03:34:02 | 22 | A.  I believe that -- is that Langley, sir? |
| 03:34:05 | 23 | Q.  Building, Pershing, Langley, north south? |
| 03:34:09 | 24 | A.  Okay. |
| 03:34:09 | 25 | Q.  Everybody you talked to had the car driving away from the |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 91 of 175 PageID #:32701
***REALTIME UNEDITED TRANSCRIPT ONLY***

90

| 03:34:12 | 1 | vacant lot, correct? |
| 03:34:13 | 2 | A. Correct, away from the murder scene. |
| 03:34:16 | 3 | Q. Away from the murder scene? |
| 03:34:18 | 4 | A. Yes, sir. |
| 03:34:18 | 5 | Q. All right. You were asked this question about the El |
| 03:34:26 | 6 | Rukns. Who was the source of this information here? Can you |
| 03:34:29 | 7 | tell from -- |
| 03:34:30 | 8 | MR. KULWIN: Judge. |
| 03:34:31 | 9 | MR. LOEVY: This is plaintiff's 21. |
| 03:34:33 | 10 | MR. KULWIN: Can we have Mr. Loevy's handwriting |
| 03:34:36 | 11 | taken off. |
| 03:34:36 | 12 | THE COURT: Do you have another copy? |
| 03:34:38 | 13 | MR. LOEVY: I don't. |
| 03:34:39 | 14 | THE COURT: It's his handwriting. Everybody knows |
| 03:34:41 | 15 | it's his handwriting. Go ahead. |
| 03:34:42 | 16 | MR. LOEVY: Thank you. |
| 03:34:43 | 17 | BY MR. LOEVY: |
| 03:34:44 | 18 | Q. Can you tell from the note whose the source of this |
| 03:34:47 | 19 | information? |
| 03:34:48 | 20 | A. The source of the information for me was detective |
| 03:34:51 | 21 | VanBerschot. |
| 03:34:52 | 22 | Q. But who did he get it from? |
| 03:34:53 | 23 | A. I don't know, sir. |
| 03:34:55 | 24 | Q. I mean, shouldn't you be able to tell from the document |
| 03:34:58 | 25 | who is claiming it was El Rukns? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 92 of 175 PageID #:32702
***REALTIME UNEDITED TRANSCRIPT ONLY***

91

| | | |
|---|---|---|
| 03:35:01 | 1 | A. You can tell. I can't, sir. |
| 03:35:02 | 2 | Q. You have looked and tried, right? |
| 03:35:03 | 3 | A. I don't know who. |
| 03:35:05 | 4 | Q. You've looked and tried, right? |
| 03:35:06 | 5 | A. No, I didn't look and try. I got it from Detective |
| 03:35:11 | 6 | VanBerschot. |
| 03:35:11 | 7 | Q. Take a look and see if you can tell who the source of the |
| 03:35:13 | 8 | information is. All I know is you tried before trial? |
| 03:35:19 | 9 | A. No, I can't. |
| 03:35:19 | 10 | Q. Because you have looked at it, right? |
| 03:35:21 | 11 | A. Right. |
| 03:35:21 | 12 | Q. And you cannot make sense of where that information came |
| 03:35:24 | 13 | from, correct? |
| 03:35:24 | 14 | A. It came from Detective VanBerschot. |
| 03:35:27 | 15 | Q. All right. You were asked about Louis Carter and his |
| 03:35:34 | 16 | alibi, correct? |
| 03:35:35 | 17 | A. Yes, sir. |
| 03:35:35 | 18 | Q. And this is page 98 of Plaintiff's Exhibit 2, 58. Now, |
| 03:35:44 | 19 | you properly documented in a supp report that he had an alibi, |
| 03:35:47 | 20 | right? |
| 03:35:47 | 21 | A. Yes, sir. |
| 03:35:48 | 22 | Q. And then it got turned over to the criminal defendant, |
| 03:35:50 | 23 | correct? |
| 03:35:50 | 24 | A. Pardon me? |
| 03:35:52 | 25 | Q. If it's in an official -- it's supposed to go into an |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 93 of 175 PageID #:32703
***REALTIME UNEDITED TRANSCRIPT ONLY***

92

| | | |
|---|---|---|
| 03:35:56 | 1 | official supp report is it's a matter for everybody to see and |
| 03:35:58 | 2 | review, right? |
| 03:35:59 | 3 | A.  Okay. |
| 03:36:00 | 4 | Q.  That's the way you're supposed to do it, right? |
| 03:36:02 | 5 | A.  Okay. |
| 03:36:02 | 6 | Q.  You are not supposed to check out people's alibis in |
| 03:36:05 | 7 | parallel files that don't go into the supp report, would you |
| 03:36:08 | 8 | agree with that? |
| 03:36:08 | 9 | A.  Oh, correct. |
| 03:36:10 | 10 | Q.  What's that? |
| 03:36:11 | 11 | A.  Correct. |
| 03:36:11 | 12 | Q.  Okay.  Correct. |
| 03:36:12 | 13 |       Now, we took a look at a supp report where Eric |
| 03:36:18 | 14 | Benson gave a description, I believe a man had hair or an |
| 03:36:22 | 15 | earring.  Do you remember that supp report or the GPR you saw? |
| 03:36:25 | 16 | A.  Right. |
| 03:36:25 | 17 | Q.  Why did the GPR description not make it into Plaintiff's |
| 03:36:32 | 18 | Exhibit 186, page 7 and 8 of your report? |
| 03:36:36 | 19 | A.  It didn't make it on that page, but it made in the page of |
| 03:36:43 | 20 | the offenders. |
| 03:36:43 | 21 | Q.  You're talking about the composite description? |
| 03:36:46 | 22 | A.  Correct. |
| 03:36:46 | 23 | Q.  All right.  At the beginning, your report has that list of |
| 03:36:52 | 24 | people wanted for the murder, correct? |
| 03:36:53 | 25 | A.  Yes, sir. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 94 of 175 PageID #:32704
***REALTIME UNEDITED TRANSCRIPT ONLY***

93

| 03:36:54 | 1 | Q.  And that report does not attribute the information to Eric |
| 03:37:01 | 2 | Benson, correct? |
| 03:37:02 | 3 | A.  Not in that section, no, sir. |
| 03:37:05 | 4 | Q.  So how would -- let's say Eric Benson came to trial and |
| 03:37:09 | 5 | someone wanted to cross-examine him, wouldn't it have made |
| 03:37:13 | 6 | sense to put Eric Benson's description in Eric Benson's |
| 03:37:18 | 7 | description? |
| 03:37:21 | 8 | THE COURT:  You mean in Eric Benson's section of the |
| 03:37:23 | 9 | report? |
| 03:37:24 | 10 | MR. LOEVY:  Exactly.  Thank you, your Honor. |
| 03:37:25 | 11 | THE WITNESS:  Eric Benson's description is in the |
| 03:37:28 | 12 | report. |
| 03:37:31 | 13 | BY MR. LOEVY: |
| 03:37:31 | 14 | Q.  All right.  For the record, can we agree that Eric |
| 03:37:34 | 15 | Benson's description is not in the section titled Eric Benson? |
| 03:37:39 | 16 | A.  That's correct. |
| 03:37:39 | 17 | Q.  The description is in a separate GPR, right? |
| 03:37:42 | 18 | A.  Yes.  It's also on the supplementary report. |
| 03:37:47 | 19 | Q.  All right.  Delbert Edwards, you said you checked out his |
| 03:37:51 | 20 | alibi, right? |
| 03:37:52 | 21 | A.  Correct. |
| 03:37:52 | 22 | Q.  He was a victim of the shooting, right? |
| 03:37:55 | 23 | A.  Correct. |
| 03:37:57 | 24 | Q.  And that whole Edwards scenario had nothing to do with the |
| 03:38:00 | 25 | El Rukns, correct? |

12/06/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

94

03:38:01    1   A.  As far as I know, yes.

03:38:02    2   Q.  And you did not check out the other Edwards' brothers

03:38:05    3   alibis, did you?

03:38:06    4   A.  No, sir.

03:38:08    5   Q.  All right.  Showing you Plaintiff's Exhibit 1-69, did you

03:38:16    6   know at the time that these other Edwards brothers were

03:38:19    7   overheard plotting to kill Fuddy?

03:38:22    8   A.  I did not, no.

03:38:23    9   Q.  Is this the kind of information that's supposed to be in a

03:38:26   10   supp report?

03:38:26   11   A.  It could be.

03:38:28   12   Q.  But it also could be in a parallel file that doesn't get

03:38:32   13   in the supp reports?

03:38:33   14   A.  I don't understand what you mean about parallel file.

03:38:35   15   Q.  Well, you do presently understand that this note was found

03:38:40   16   in a parallel file in 2011, right?

03:38:42   17   A.  Correct.

03:38:44   18   Q.  In fact, you were one of the people who had to answer the

03:38:48   19   lawsuit about whether information was being withheld, right?

03:38:51   20   A.  I was, yes.

03:38:52   21   Q.  And you said no information was being withheld, right?

03:38:55   22   A.  Not by me, no, sir.

03:38:56   23   Q.  You now know that these notes were withheld, right?

03:38:59   24   A.  From my understanding, they found this information.

03:39:01   25   Q.  Okay.  Then that's what I meant by a parallel file that

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM    Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 96 of 175 PageID #:32706
***REALTIME UNEDITED TRANSCRIPT ONLY***

95

| 03:39:05 | 1 | was not produced? |
| 03:39:06 | 2 | A.  Okay. |
| 03:39:06 | 3 | Q.  Did the rules and regulations of the police department |
| 03:39:09 | 4 | permit detectives to create parallel files and maintain them |
| 03:39:12 | 5 | and not produce the information like this? |
| 03:39:14 | 6 | A.  No. |
| 03:39:15 | 7 | Q.  All right.  Cleveland Ball, you had a description here in |
| 03:39:25 | 8 | the GPR of -- you attributed this description to Cleveland |
| 03:39:29 | 9 | Ball as opposed to eye net at that Watts or -- |
| 03:39:33 | 10 | A.  I believe that's from Cleveland.  See, I didn't prepare |
| 03:39:35 | 11 | that, that was my partner Steven Hood. |
| 03:39:37 | 12 | Q.  All right.  So you don't know if this is -- |
| 03:39:39 | 13 | A.  I believe it is Cleveland Ball. |
| 03:39:40 | 14 | Q.  You believe it is, but that's a guess, right? |
| 03:39:43 | 15 | A.  You know at the time that we were doing this, he was |
| 03:39:45 | 16 | sitting across the table from me when I was typing the report. |
| 03:39:48 | 17 | I would have verified all the information that's in the report |
| 03:39:50 | 18 | with my partner before I put it on paper. |
| 03:39:53 | 19 | Q.  The only thing I'm asking you, sir, is it's not clear |
| 03:39:56 | 20 | whose description that is.  That's a guess, right? |
| 03:39:58 | 21 | A.  I guess you could guess that, yes. |
| 03:40:00 | 22 | Q.  Now, why didn't that description, jogging suit, skull cap, |
| 03:40:06 | 23 | jacket, make it into the report when you summarized what |
| 03:40:10 | 24 | Cleveland Ball saw? |
| 03:40:11 | 25 | A.  The description, I think we just gone over this with the |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 97 of 175 PageID #:32707

03:40:15   1   other individual, that those descriptions go into the allotted

03:40:21   2   section of the report.

03:40:21   3   Q.  And that's the way the police department policies and

03:40:24   4   practices works?

03:40:24   5   A.  Back in 1984 it did, yes.

03:40:27   6   Q.  Let's say Cleveland Ball came to court and for my

03:40:31   7   hypothetical, I pick out him in a lineup, are you with me?

03:40:33   8          MR. KULWIN:  Judge, I object to hypotheticals.

03:40:35   9          THE COURT:  Overruled.

03:40:36   10   BY MR. LOEVY:

03:40:36   11   Q.  Are you with me?

03:40:37   12   A.  Go ahead.

03:40:37   13   Q.  He comes to court and he says that was Nate Fields.  Nate

03:40:43   14   Fields wants to say, hold on a second, you just described a

03:40:47   15   guy that's 23 and I'm 31.

03:40:49   16   A.  I see it.

03:40:50   17   Q.  Then Cleveland Ball could say based on this report, I

03:40:52   18   didn't describe anybody.  You can't attribute that composite

03:40:56   19   description to me, right?

03:40:57   20   A.  No, because we got the information from Cleveland Ball.

03:41:02   21   Q.  All right.  But it would really depend on Mr. Fields

03:41:07   22   getting the notes also, right?

03:41:08   23   A.  Well, the GPR that has Cleveland Ball's information on it

03:41:13   24   is something that he got, I believe.

03:41:15   25   Q.  And you'd like to hope in most cases it gets there, right?

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 98 of 175 PageID #:32708
***REALTIME UNEDITED TRANSCRIPT ONLY***

97

| | | |
|---|---|---|
| 03:41:19 | 1 | A.  Yeah, exactly. |
| 03:41:19 | 2 | Q.  But did the policy require you to put it into the supp |
| 03:41:22 | 3 | report and attribute it to the person? |
| 03:41:25 | 4 | MR. MICHALIK:  Objection, Judge. |
| 03:41:25 | 5 | THE COURT:  Overruled. |
| 03:41:27 | 6 | THE WITNESS:  The policy of the police department? |
| 03:41:29 | 7 | BY MR. LOEVY: |
| 03:41:30 | 8 | Q.  Right, back then? |
| 03:41:31 | 9 | A.  The practice at the time was to do exactly how we prepared |
| 03:41:33 | 10 | that report. |
| 03:41:33 | 11 | Q.  In other words, the one description at the beginning |
| 03:41:39 | 12 | attributable to no witness, this is page 14, sort of a one |
| 03:41:45 | 13 | description, right? |
| 03:41:47 | 14 | A.  Are you talking about number 1 or No. 2? |
| 03:41:50 | 15 | Q.  Both of them.  One description for the whole report, |
| 03:41:54 | 16 | right? |
| 03:41:54 | 17 | A.  That's a description of two of the wanted. |
| 03:41:56 | 18 | Q.  That's the only description in the report, correct? |
| 03:41:59 | 19 | A.  Correct. |
| 03:41:59 | 20 | Q.  And you're saying that that description was given by |
| 03:42:03 | 21 | Martha Robinson, Kenya Robinson, Inetta Watts, Willie |
| 03:42:09 | 22 | Langston, Eric Benson, Cleveland Ball, everybody gave that |
| 03:42:12 | 23 | description? |
| 03:42:12 | 24 | MR. MICHALIK:  Objection, Judge. |
| 03:42:13 | 25 | THE COURT:  Overruled. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 99 of 175 PageID #:32709

03:42:13    1    BY MR. LOEVY:

03:42:14    2    Q.  Did everybody give that description?

03:42:17    3    A.  I don't recall.

03:42:17    4    Q.  You are not claiming everybody gave the same description,

03:42:19    5    are you?

03:42:20    6    A.  I would never do that, no.

03:42:21    7    Q.  But this is not an aberration, this is the way it's

03:42:27    8    supposed to be documented, one description, don't attribute it

03:42:30    9    to any witness?

03:42:31   10            MR. KULWIN:  Objection, Judge.  Asked and answered.

03:42:33   11            THE COURT:  Sustained.

03:42:34   12    BY MR. LOEVY:

03:42:36   13    Q.  All right.  You said that Mr. Fields, you'd hope, would

03:42:41   14    get the GPRs, right?

03:42:42   15    A.  Pardon?

03:42:44   16    Q.  You said the reason you felt you weren't worried about the

03:42:47   17    GPR being in the description of the GPR is because you thought

03:42:49   18    the GPRs went to the criminal defendants, correct?

03:42:52   19    A.  They should go to everybody.

03:42:53   20            MR. KULWIN:  Objection.

03:42:54   21            THE COURT:  Hang on a second.  There was an

03:42:56   22    objection.  It's overruled.  Now ask another question.

03:42:59   23    BY MR. LOEVY:

03:42:59   24    Q.  They didn't always go, did they?

03:43:01   25    A.  I don't know that.

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 100 of 175 PageID #:32710
***REALTIME UNEDITED TRANSCRIPT ONLY***

99

| | | |
|---|---|---|
| 03:43:02 | 1 | Q.  Showing you Plaintiff's Exhibit 1-98, this is a GPR saying |
| 03:43:07 | 2 | Rodell Banks was the shooter.  Do you see that? |
| 03:43:09 | 3 | A.  I do. |
| 03:43:10 | 4 | Q.  That didn't make it into a supp report, did it? |
| 03:43:13 | 5 | MR. MICHALIK:  Objection, foundation. |
| 03:43:14 | 6 | THE COURT:  Well, I am going to sustain the objection |
| 03:43:16 | 7 | on the ground it's been sufficiently covered by other |
| 03:43:19 | 8 | witnesses. |
| 03:43:20 | 9 | BY MR. LOEVY: |
| 03:43:20 | 10 | Q.  All right.  Showing you 194-43, this is a note that you |
| 03:43:24 | 11 | took? |
| 03:43:24 | 12 | A.  Correct. |
| 03:43:26 | 13 | Q.  And it describes a woman named Kenya Robinson, right? |
| 03:43:31 | 14 | A.  11 year old. |
| 03:43:32 | 15 | Q.  And she's an eyewitness apparently, right? |
| 03:43:36 | 16 | A.  She heard some gunshots and she saw two people running. |
| 03:43:39 | 17 | Q.  Where does it say that in the supp report that she could |
| 03:43:43 | 18 | -- an 11 year old was out there who saw the offenders well |
| 03:43:46 | 19 | enough to give a description of what they were wearing?  It's |
| 03:43:49 | 20 | not in your supp report, is it? |
| 03:43:50 | 21 | A.  The information that she gave is in the supp report. |
| 03:43:54 | 22 | Q.  And you're talking about generally, is this what you mean |
| 03:43:59 | 23 | the information that she gave? |
| 03:44:00 | 24 | A.  Correct. |
| 03:44:00 | 25 | Q.  I thought you said Cleveland Ball gave that information? |

03:44:03    1          MR. KULWIN:  Objection, Judge, argumentative.

03:44:04    2          THE COURT:  Sustained.  For the record, Mr. Loevy was

03:44:08    3   pointing to the first two paragraphs on page 2 of what

03:44:12    4   exhibit?

03:44:12    5          MR. LOEVY:  194-14.

03:44:14    6          THE COURT:  Thanks.

03:44:15    7   BY MR. LOEVY:

03:44:15    8   Q.  All right.  Would you agree, though, sir, being familiar

03:44:17    9   with your own report, that there is no summary of what Kenya

03:44:22   10   Robinson supposedly said other than this on page dash 16,

03:44:27   11   Kenya Robinson, 11 years of anal of this address heard four

03:44:31   12   gunshots and saw two subjects run north from under the

03:44:34   13   breezeway and then west around the building, correct?

03:44:36   14   A.  Correct.

03:44:37   15   Q.  That's the sum total of the information in your report?

03:44:39   16   A.  In the supplementary report, correct.

03:44:40   17   Q.  And if someone in Mr. Fields' shoes received only your

03:44:45   18   supp report, he would know would he that there was an 11 year

03:44:48   19   old who was claiming to have seen this, this being the GPR?

03:44:51   20   A.  If the only thing he had to look at was the supp report.

03:44:54   21   Q.  Right.

03:45:03   22          THE COURT:  I don't think there was -- was that your

03:45:06   23   answer or were you asking a question back?

03:45:08   24          THE WITNESS:  Yes.

03:45:08   25          THE COURT:  I wasn't clear whether there was a

| | | |
|---|---|---|
| 03:45:11 | 1 | question mark at the end.  There wasn't.  Go ahead. |
| 03:45:12 | 2 | BY MR. LOEVY: |
| 03:45:13 | 3 | Q.  Carlos Willis, you've looked at his report, correct? |
| 03:45:16 | 4 | A.  Correct. |
| 03:45:16 | 5 | Q.  In fact, you've looked at a lot of these reports to |
| 03:45:19 | 6 | prepare for your testimony today, correct? |
| 03:45:21 | 7 | A.  I did. |
| 03:45:22 | 8 | Q.  That was how you were able to refresh your recollection? |
| 03:45:24 | 9 | A.  As best I could. |
| 03:45:26 | 10 | Q.  When you're testifying about I did this, then I did this, |
| 03:45:29 | 11 | then I did this, would it be more accurate to say you reviewed |
| 03:45:32 | 12 | the reports and you believe you did this? |
| 03:45:33 | 13 | A.  What do you mean I believe I did this? |
| 03:45:36 | 14 | Q.  In other words, are you claiming an independent |
| 03:45:38 | 15 | recollection of all of these interviews? |
| 03:45:40 | 16 | A.  No, absolutely not. |
| 03:45:41 | 17 | Q.  It's been way too many years to remember this stuff, |
| 03:45:44 | 18 | right? |
| 03:45:44 | 19 | A.  Correct. |
| 03:45:44 | 20 | Q.  To if I was to tell you Kenya Robinson's interview vest |
| 03:45:48 | 21 | Inetta Watts interview, no way you could remember those |
| 03:45:51 | 22 | interviews, right? |
| 03:45:51 | 23 | A.  Correct. |
| 03:45:51 | 24 | Q.  Because you did this too often at your job? |
| 03:45:54 | 25 | A.  Unfortunately, you're right. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 103 of 175 PageID #:32713
***REALTIME UNEDITED TRANSCRIPT ONLY***

102

| | | |
|---|---|---|
| 03:45:57 | 1 | Q. You've now looked at the Carlos Willis report? |
| 03:46:01 | 2 | A. I have. |
| 03:46:01 | 3 | Q. And there is no indication in the Carlos Willis report |
| 03:46:03 | 4 | that he gave -- had any ability to give a description, would |
| 03:46:07 | 5 | you agree? |
| 03:46:07 | 6 | A. Other than the fact that he was across the street. |
| 03:46:09 | 7 | Q. I'm saying a description? |
| 03:46:10 | 8 | A. And saw what happened. |
| 03:46:11 | 9 | Q. He had no description of the offenders faces, hair, |
| 03:46:15 | 10 | nothing like that, correct? |
| 03:46:15 | 11 | A. He might have given. I am not quite sure. |
| 03:46:18 | 12 | Q. If he had, you would have written it down, right? |
| 03:46:21 | 13 | A. It would have been, exactly. I don't see anyone here. |
| 03:46:28 | 14 | Q. All right. So there would have been no reason to put him |
| 03:46:31 | 15 | in a lineup, would there? |
| 03:46:33 | 16 | MR. MICHALIK: Objection, Judge. |
| 03:46:34 | 17 | THE COURT: Sustained. |
| 03:46:35 | 18 | BY MR. LOEVY: |
| 03:46:38 | 19 | Q. All right. Let's talk about the Hawkins photo and the |
| 03:46:42 | 20 | Hawkins report. This is your handwriting on the back of Earl |
| 03:46:46 | 21 | Hawkins, right? |
| 03:46:46 | 22 | A. It is. |
| 03:46:47 | 23 | Q. So you were the one who requested Earl Hawkins's photo, |
| 03:46:50 | 24 | right? |
| 03:46:50 | 25 | A. I don't know that to be a fact. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 104 of 175 PageID #:32714
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:46:52 | 1 | Q. Well, tell the jury why you guys -- what this means, |
| 03:46:57 | 2 | issued on inquiry April 27th? |
| 03:46:58 | 3 | A. Whenever you would request a criminal history on someone, |
| 03:47:04 | 4 | they would Bates stamp it, hand stamp it. |
| 03:47:07 | 5 | Q. And this one sometimes they forgot to turn it over a day, |
| 03:47:11 | 6 | didn't they? |
| 03:47:11 | 7 | A. Evidently. |
| 03:47:12 | 8 | Q. Because that should say April 28th, you believe? |
| 03:47:14 | 9 | A. It should or later. |
| 03:47:15 | 10 | Q. When you requested the rap sheet, the reason you guys |
| 03:47:19 | 11 | would do that is so that you could get a photograph of the |
| 03:47:22 | 12 | suspect, correct? |
| 03:47:22 | 13 | A. We would also request a photograph. |
| 03:47:24 | 14 | Q. All right. And you would request a photograph if you had |
| 03:47:28 | 15 | some reason to believe that the person might be involved, |
| 03:47:31 | 16 | right? |
| 03:47:31 | 17 | A. Well, also to identify who you are talking to if you have |
| 03:47:35 | 18 | to go out and speak with them. |
| 03:47:36 | 19 | Q. All I'm saying is at some point, you had to have some |
| 03:47:40 | 20 | reason to believe Earl Hawkins had something to do with this |
| 03:47:44 | 21 | sometime around April 28th, 1984, correct? |
| 03:47:47 | 22 | A. No. |
| 03:47:47 | 23 | Q. You didn't pull the photograph of everybody in the |
| 03:47:50 | 24 | universe, did you? |
| 03:47:51 | 25 | A. He was an El Rukn general. We had information that the El |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 105 of 175 PageID #:32715

03:47:57  1  Rukns were involved.

03:47:58  2  Q.  And by information, you're talking about that one report

03:48:01  3  reference that is unattributable to anybody that said

03:48:04  4  something about an El Rukn, correct?

03:48:05  5       MR. KULWIN:  Objection, argumentative.

03:48:07  6       THE COURT:  Overruled.  The answer correct -- the

03:48:09  7  answer said correct.  The answer can stand.

03:48:11  8       THE WITNESS:  Correct.

03:48:12  9  BY MR. LOEVY:

03:48:12  10  Q.  All right.  There is also not one word in the file

03:48:15  11  anywhere about why somebody thought Hawkins was a suspect, do

03:48:19  12  we agree on that?

03:48:20  13  A.  In the file, meaning --

03:48:23  14  Q.  Anywhere written down, not one word?

03:48:25  15  A.  As far as our investigation goes?

03:48:27  16  Q.  As far as any piece of paper you've ever seen ever?

03:48:30  17  A.  Not that I know of.

03:48:31  18  Q.  And that there's no GPR, there's no report, there's no

03:48:35  19  note, nothing that explains why on April 28th, Earl Hawkins

03:48:39  20  was a suspect, do we agree?

03:48:42  21       MR. KULWIN:  Objection, asked and answered.

03:48:42  22       THE COURT:  Sustained.  You covered it.

03:48:43  23  BY MR. LOEVY:

03:48:46  24  Q.  And the reason you pulled the photograph is to show

03:48:50  25  people, correct?

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 106 of 175 PageID #:32716
***REALTIME UNEDITED TRANSCRIPT ONLY***

105

| | | |
|---|---|---|
| 03:48:52 | 1 | A.  I said I'm not sure whether or not I did pull the |
| 03:48:54 | 2 | photograph. |
| 03:48:55 | 3 | Q.  Well, it's your handwriting on the back of the photograph, |
| 03:48:57 | 4 | right? |
| 03:48:57 | 5 | A.  There's no doubt, that is my handwriting. |
| 03:49:00 | 6 | Q.  And you talked to people who at least saw something, |
| 03:49:05 | 7 | correct? |
| 03:49:05 | 8 | A.  Yes. |
| 03:49:06 | 9 | Q.  And if any of those people had identified Earl Hawkins as |
| 03:49:10 | 10 | the suspect, you would have written that down, right? |
| 03:49:12 | 11 | A.  I would have. |
| 03:49:14 | 12 | Q.  And is there any doubt in your mind that if you had |
| 03:49:17 | 13 | photographs available of possible suspects and you had |
| 03:49:20 | 14 | witnesses who had seen something, you would have shown the |
| 03:49:23 | 15 | witnesses the photographs? |
| 03:49:24 | 16 | A.  Well, like I described before, I would have shown a photo |
| 03:49:30 | 17 | array with an individual that was suspected of this crime in |
| 03:49:34 | 18 | the photo array.  I wouldn't show it one-on-one, no. |
| 03:49:36 | 19 | Q.  But you showed either individually or in a group, did |
| 03:49:40 | 20 | anybody identify Earl Hawkins in 1984? |
| 03:49:42 | 21 | A.  No. |
| 03:49:43 | 22 | Q.  You were also apparently pulled the photo of someone named |
| 03:49:54 | 23 | sundown, correct? |
| 03:49:56 | 24 | A.  I didn't know that nickname. |
| 03:49:58 | 25 | Q.  Well, you don't know either way whether you know that, |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 107 of 175 PageID #:32717

| | | |
|---|---|---|
| 03:50:01 | 1 | would that be more accurate? |
| 03:50:02 | 2 | MR. MICHALIK:  Objection, Judge, argumentative. |
| 03:50:04 | 3 | THE COURT:  Overruled. |
| 03:50:07 | 4 | BY MR. LOEVY: |
| 03:50:07 | 5 | Q.  Do you remember the question? |
| 03:50:08 | 6 | A.  Whether or not I pulled a photograph of someone named |
| 03:50:11 | 7 | sundown? |
| 03:50:11 | 8 | Q.  Showing you Plaintiff's Exhibit 121, Doyle's nickname was |
| 03:50:15 | 9 | sundown, correct? |
| 03:50:16 | 10 | A.  It shows it on there, yes, sir. |
| 03:50:18 | 11 | Q.  All right.  So you're not saying 30 years ago I remember I |
| 03:50:22 | 12 | didn't know his nickname was sundown, did you? |
| 03:50:24 | 13 | A.  I didn't remember the nickname at all. |
| 03:50:26 | 14 | Q.  You might have known Hawkins and sundown in 1984, correct? |
| 03:50:30 | 15 | MR. KULWIN:  Objection, argumentative. |
| 03:50:31 | 16 | THE COURT:  Sustained. |
| 03:50:31 | 17 | BY MR. LOEVY: |
| 03:50:32 | 18 | Q.  Is there any indication in the file why the police were |
| 03:50:34 | 19 | looking for Hawkins and sundown? |
| 03:50:36 | 20 | A.  Is there any indication that they were looking for him? |
| 03:50:40 | 21 | Q.  Why they were? |
| 03:50:41 | 22 | A.  Not to my knowledge, no. |
| 03:50:44 | 23 | Q.  Is there any indication why they were looking for someone |
| 03:50:46 | 24 | named Doyle whose nickname was sundown? |
| 03:50:48 | 25 | A.  Not to my knowledge, no. |

```
03:50:50   1   Q.  Is that consistent with the policies and practices of the
03:50:54   2   police department that there wouldn't be a recording of why
03:50:57   3   the police were looking for a Hawkins and sundown?
03:51:00   4              MR. MICHALIK:  Judge, if I could be heard on this
03:51:02   5   issue.
03:51:02   6              THE COURT:  Take the document off the screen.  Bring
03:51:05   7   it to sidebar, please.
03:51:14   8     (The following proceedings were had at sidebar outside the
03:51:16   9   hearing of the jury:)
03:51:16  10              THE COURT:  Yes, sir.
03:51:19  11              MR. MICHALIK:  Here is the problem that I see with
03:51:20  12   this line of questioning.  It's not so much the document but
03:51:22  13   this whole line of questioning as to whether -- I deliberately
03:51:26  14   did not ask him very specific questions as to why the
03:51:30  15   detectives would have just automatically suspected El Rukns.
03:51:35  16   On this line of questioning, I think I am going to ask you any
03:51:39  17   reason why a detective investigating a murder at that location
03:51:41  18   without any other information would suspect El Rukns.
03:51:44  19              THE COURT:  After he said about six times because he
03:51:47  20   was asked six times that he doesn't know why this was done,
03:51:50  21   why this was pulled.
03:51:52  22              MR. KULWIN:  He didn't say that, Judge.  He said --
03:51:55  23              THE COURT:  Go ahead.  I'm listening.
03:51:57  24              MR. KULWIN:  He said it three or four times.  But his
03:51:59  25   initial answer was because we had information that the El
```

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 109 of 175 PageID #:32719
***REALTIME UNEDITED TRANSCRIPT ONLY***

108

03:52:02   1   Rukns were involved and then another answer because he was an

03:52:05   2   El Rukn general and another answer was because the El Rukns

03:52:08   3   from dealing drugs there.  He said all of those things.

03:52:11   4           THE COURT:  Let me go look.

03:52:47   5           So the gist of what he said was he pulled the photo

03:52:51   6   because he was an El Rukn general and he had information that

03:52:56   7   El Rukns were involved, there was a question along the lines

03:52:59   8   of, is that a reference to that one reference in the report

03:53:02   9   that doesn't attribute it to anybody, he says correct.  And

03:53:05   10  then Mr. Loevy asked him a series of questions about is there

03:53:09   11  anything written down anywhere that explains this and he

03:53:12   12  basically says no to that several times.

03:53:15   13          MR. MICHALIK:  There is nothing written down.

03:53:16   14          THE COURT:  What are you expecting his answer to be

03:53:18   15  to the question that you want to ask.

03:53:22   16          MR. MICHALIK:  I don't want to go beyond any rulings

03:53:24   17  about El Rukns in general, and so when I ask him why, I am not

03:53:30   18  exactly sure what he is going to say.

03:53:31   19          THE COURT:  Ha ha.  Yeah.  Have you talked to him?

03:53:36   20          MR. MICHALIK:  No.

03:53:39   21          THE COURT:  Okay.  I'll take your semi educated guess

03:53:42   22  on what he is going to say.

03:53:43   23          MR. KULWIN:  My semi educated guess and Paul can hit

03:53:47   24  me in the head if I'm wrong.

03:53:48   25          MR. MICHALIK:  My guess is because of the location of

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 110 of 175 PageID #:32720
***REALTIME UNEDITED TRANSCRIPT ONLY***

109

03:53:50  1  that, 706 right down the street from the Fort, you would

03:53:55  2  automatically.

03:53:56  3       THE COURT:  Assume it was maybe an El Rukn was

03:54:00  4  involved.

03:54:00  5       MR. LOEVY:  I he has already been asked because

03:54:03  6  Hawkins was an El Rukn general and I had information, so what

03:54:06  7  additional relevant information is missing?  That's our point,

03:54:09  8  your Honor.

03:54:09  9       MR. KULWIN:  It's --

03:54:11  10       MR. LOEVY:  He has been asked and he answered it.

03:54:13  11       MR. KULWIN:  That's their version of reality.  We

03:54:14  12  have a different version of reality.

03:54:16  13       THE COURT:  So here's the way I put it to you.  I

03:54:19  14  think that you can ask is there some -- was there some reason

03:54:22  15  why you would have been pulling Mr. Hawkins' photo, and you

03:54:33  16  don't know what the answer is going to be, if it's something I

03:54:37  17  excluded, you want to start again on Monday.  Seriously, I'm

03:54:40  18  telling you, you're going to wing a question at him you told

03:54:43  19  me right here, both of you told me you do not know the answer

03:54:46  20  to the question, you are going to wing a question to him, I

03:54:49  21  don't think any door has opened far enough to violate a motion

03:54:54  22  in limine.  You act at your peril.

03:54:55  23       MR. KULWIN:  Five seconds to bring him over to

03:54:58  24  sidebar.  It's done all the time that way you avoid all that

03:55:01  25  and you can find out exactly what he is going to say.  They

12/06/16 PM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

03:55:03    1    did open the door.  And he should be entitled to testify.

03:55:06    2            MR. LOEVY:  He already has been voir dired.  You

03:55:08    3    asked the question.  He was asked the question he said he was

03:55:13    4    because he was an El Rukn general.

03:55:15    5            THE COURT:  Okay.  So what you're telling me is you

03:55:17    6    want me to send the jury out.

03:55:18    7            MR. KULWIN:  You don't have to do that.

03:55:20    8            THE COURT:  I am not going to bring a witness over to

03:55:22    9    sidebar.

03:55:23    10           MR. KULWIN:  Yeah.

03:55:23    11           THE COURT:  You may have seen that done.  I haven't.

03:55:26    12   I am not going to do it.  You want me to send the jury out so

03:55:28    13   I can do this?  It's a yes or no?  Just say yes or no.  It's a

03:55:33    14   yes or no question.  Answer it yes or no.

03:55:35    15           MR. KULWIN:  I think a voir dire.

03:55:36    16           THE COURT:  You want me to send the jury out so I can

03:55:38    17   voir dire him.  That's the only way to voir dire him.

03:55:41    18           MR. KULWIN:  Yes.

03:55:41    19           THE COURT:  Just say it.

03:55:42    20           MR. LOEVY:  The jury looks very bored.

03:55:45    21           MR. KULWIN:  Because your examination is boring.

03:55:49    22     (The following proceedings were had in open court in the

03:55:50    23   presence and hearing of the jury:)

03:55:50    24           THE COURT:  We will deal with the issue we had at

03:55:51    25   sidebar after the conclusion of the cross.


         ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 112 of 175 PageID #:32722
12/06/16 PM              ***REALTIME UNEDITED TRANSCRIPT ONLY***

111

03:55:54    1          Go ahead, Mr. Loevy.

03:55:55    2          MR. LOEVY:  Thank you, your Honor.

03:55:55    3    BY MR. LOEVY:

03:56:05    4    Q.  All right.  Fair to say that based on memory alone, you

03:56:08    5    can't remember anymore exactly why Hawkins and sundown's

03:56:12    6    photos were pulled, that's probably true, isn't it?

03:56:16    7          THE COURT:  I'm sorry?

03:56:18    8          MR. KULWIN:  I withdraw it.  I apologize.

03:56:23    9          THE WITNESS:  Correct, other than the fact owe that

03:56:26   10    was El Rukn territory.

03:56:26   11    BY MR. LOEVY:

03:56:27   12    Q.  Were you showing the witnesses the photos that you had

03:56:29   13    pulled of these El Rukns, Mr. Hawkins and sundown?

03:56:33   14    A.  No, I said before and I'm saying again, I did not show any

03:56:38   15    photographs.

03:56:40   16    Q.  And you said because if you showed an eyewitness a

03:56:43   17    photograph, that could taint them?

03:56:45   18    A.  If you don't do it correct, the photo array, it possibly

03:56:49   19    could.

03:56:50   20          MR. LOEVY:  I have no further questions, your Honor.

03:56:51   21          THE COURT:  And based on what he answered, I don't

03:56:53   22    think you need the sidebar.  We don't need a further sidebar

03:56:56   23    at this point.

03:56:58   24          MR. MICHALIK:  Agreed, your Honor.

03:56:59   25          THE COURT:  That's fine.

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

112

03:57:00   1        MR. MICHALIK:  Very briefly.  Do you have questions?

03:57:05   2        MR. KULWIN:  Am I allowed to ask?  He's first anyway.

03:57:09   3        THE COURT:  Yeah, go ahead.  Hand him a note.

03:57:12   4        MR. KULWIN:  Am I allowed to ask afterwards?

03:57:16   5        THE COURT:  You are forgetting something.  Okay.

03:57:19   6        MR. KULWIN:  You first.

03:57:22   7                        - - -

03:57:22   8            ROBERT EVANS, REDIRECT EXAMINATION

03:57:22   9   BY MR. MICHALIK:

03:57:23   10  Q.  If I could have defendants' 60-4 back up on the screen,

03:57:28   11  please.

03:57:29   12       We are looking at a page from your scene report,

03:57:42   13  correct?

03:57:43   14  A.  Correct.

03:57:43   15  Q.  You were asked some questions about Eric Benson and

03:57:45   16  Cleveland Ball.  And how anybody could tell that they were the

03:57:49   17  individuals who provided the description that you included in

03:57:54   18  the wanted section of the report.  Do you remember those

03:57:56   19  questions?

03:57:57   20  A.  Yes.

03:57:57   21  Q.  All right.  If we look over here, you have them listed as

03:58:02   22  witnesses?

03:58:03   23  A.  Correct.

03:58:03   24  Q.  And then right below that, you have some individuals

03:58:09   25  identified as interviewed, do you see that there?

                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 03:58:11 | 1 | A.  I do. |
| 03:58:11 | 2 | Q.  All right.  And Eric Benson is identified as an |
| 03:58:16 | 3 | eyewitness? |
| 03:58:17 | 4 | A.  Correct. |
| 03:58:17 | 5 | Q.  And would that be an indication that he was one of the |
| 03:58:22 | 6 | individuals who provided you with a description? |
| 03:58:25 | 7 | A.  Correct. |
| 03:58:25 | 8 | Q.  And there are only two witnesses listed here, true? |
| 03:58:28 | 9 | A.  Correct. |
| 03:58:29 | 10 | Q.  And that's Eric Benson and Cleveland Ball? |
| 03:58:31 | 11 | A.  Yes. |
| 03:58:33 | 12 | MR. MICHALIK:  Your Honor, if I could have one |
| 03:58:34 | 13 | moment. |
| 03:58:35 | 14 | THE COURT:  Okay. |
| 03:58:39 | 15 | (Brief pause.) |
| 03:59:24 | 16 | BY MR. MICHALIK: |
| 03:59:24 | 17 | Q.  One last question from me.  The eight pages of GPRs that |
| 03:59:27 | 18 | we were talking about? |
| 03:59:28 | 19 | A.  Yes. |
| 03:59:28 | 20 | Q.  Have you ever been told that those were not ever provided |
| 03:59:31 | 21 | to Mr. Fields? |
| 03:59:32 | 22 | A.  I was not, no. |
| 03:59:35 | 23 | MR. MICHALIK:  All right.  No further questions, |
| 03:59:37 | 24 | Judge. |
| 03:59:38 | 25 | MR. KULWIN:  No. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 115 of 175 PageID #:32725
***REALTIME UNEDITED TRANSCRIPT ONLY***

114

| | | |
|---|---|---|
| 03:59:39 | 1 | MR. LOEVY:  Just one. |
| 03:59:40 | 2 | THE COURT:  One recross examination croak. |
| 03:59:42 | 3 | BY MR. LOEVY: |
| 03:59:42 | 4 | Q.  This description, the composite description on the ELMO? |
| 03:59:46 | 5 | THE COURT:  I got to switch it back the ELMO.  It was |
| 03:59:49 | 6 | on the computer for a second.  Just a second. |
| 03:59:55 | 7 | BY MR. LOEVY: |
| 03:59:56 | 8 | Q.  Of a man who appeared as young at 20 or 21, do you see |
| 03:59:59 | 9 | that? |
| 03:59:59 | 10 | A.  Yes. |
| 03:59:59 | 11 | Q.  That does not describe someone who is in their 30s, would |
| 04:00:02 | 12 | you agree with that? |
| 04:00:03 | 13 | MR. KULWIN:  Objection, asked and answered, outside |
| 04:00:04 | 14 | the scope. |
| 04:00:05 | 15 | THE COURT:  Argumentative.  Sustained. |
| 04:00:07 | 16 | MR. LOEVY:  I have no further questions. |
| 04:00:08 | 17 | THE COURT:  Any of the jurors have questions for the |
| 04:00:09 | 18 | witness?  I see none.  You're excused. |
| 04:00:12 | 19 | THE WITNESS:  Thank you. |
| 04:00:12 | 20 | THE COURT:  All right.  Next.  Is it a live witness, |
| 04:00:15 | 21 | are we reading something? |
| 04:00:16 | 22 | MR. KULWIN:  We are reading two things, Judge. |
| 04:00:18 | 23 | THE COURT:  Okay.  What is it we are reading? |
| 04:00:47 | 24 | MS. KATZ:  Gerald Morris.  There's two transcripts |
| 04:00:49 | 25 | that we are going to be reading.  We will start with the first |

04:00:51   1   one.

04:00:51   2          THE COURT:  Got it.  Can I just see you quickly at

04:00:55   3   sidebar?  I want to tell the jury what transcripts, but I want

04:00:58   4   to ask you at sidebar first.

04:01:00   5          MS. KATZ:  Sure.  (Brief pause) .

04:01:13   6          THE COURT:  As I understand it the first one you are

04:01:17   7   requesting to read from is Mr. Morris' criminal trial.

04:01:23   8          MS. KATZ:  Yes.  And to give you a head's up, we are

04:01:25   9   going to be using an Elmo for one exhibit.

04:01:28  10          THE COURT:  Got it.  It's on the ELMO; again, this is

04:01:32  11   just somebody reading testimony and somebody reading questions

04:01:34  12   and answers not the actual witnesses.  Go ahead.  This is.

04:01:39  13          MS. KATZ:  This is the direct of Mr. Rueckert.

04:01:44  14          THE COURT:  You mean by Rueckert.  I don't think he

04:01:47  15   was a witness,.

04:01:47  16                           - - -

04:01:47  17          GERALD MORRIS, DIRECT EXAMINATION

04:01:47  18   BY MS. KATZ:

04:01:51  19   Q.  Mr. Witness, I am going to ask you to keep your voice up

04:01:53  20   so everyone can hear us.

04:01:55  21   A.  Okay.

04:01:56  22   Q.  Tell us your name and spell your last name for the court

04:02:00  23   reporter?

04:02:00  24   A.  My name is Gerald Morris, Morris.

04:02:03  25   Q.  How old are you, Gerald?

12/06/16 PM                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

116

| | | |
|---|---|---|
| 04:02:04 | 1 | A.  23. |
| 04:02:05 | 2 | Q.  Gerald, I want to direct your attention to April of 1984. |
| 04:02:08 | 3 | Can you tell the Court where you were living in April of 1984? |
| 04:02:12 | 4 | A.  I was living on 38 east Pershing road, 706 building. |
| 04:02:18 | 5 | Q.  Is that the building at the corner of Langley and Pershing |
| 04:02:20 | 6 | road? |
| 04:02:21 | 7 | A.  Yes. |
| 04:02:21 | 8 | Q.  What apartment are you living in at that building? |
| 04:02:24 | 9 | A.  106. |
| 04:02:25 | 10 | Q.  And that's the front or the back of the building? |
| 04:02:28 | 11 | A.  That's in the back of the building. |
| 04:02:30 | 12 | Q.  How many floors did your apartment have? |
| 04:02:32 | 13 | A.  Two. |
| 04:02:33 | 14 | Q.  Now, I want to direct your attention specifically to April |
| 04:02:37 | 15 | 28th, 1984, about 10:00 o'clock in the morning.  Can you tell |
| 04:02:41 | 16 | the Court where you were at about 10:00 o'clock that morning? |
| 04:02:44 | 17 | A.  I was looking out the window, talking to Fuddy. |
| 04:02:47 | 18 | Q.  When you say you were talking to Fuddy, who was Fuddy? |
| 04:02:50 | 19 | A.  That's Jerome Smith. |
| 04:02:52 | 20 | Q.  And was Fuddy a friend of yours? |
| 04:02:56 | 21 | A.  Yes. |
| 04:02:56 | 22 | Q.  How long had you known Fuddy? |
| 04:02:58 | 23 | A.  I had known him about five years. |
| 04:02:59 | 24 | Q.  When you say you were looking out the window talking to |
| 04:03:03 | 25 | Fuddy, would that be the window on the first floor or the |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 118 of 175 PageID #:32728

| | | |
|---|---|---|
| 04:03:07 | 1 | second floor of your apartment? |
| 04:03:08 | 2 | A.  Second floor. |
| 04:03:09 | 3 | Q.  And as you look out of that window, what can you see? |
| 04:03:12 | 4 | A.  I can see everything. |
| 04:03:14 | 5 | Q.  Is there a parking lot behind your building? |
| 04:03:16 | 6 | A.  Yes. |
| 04:03:17 | 7 | Q.  Could you see the parking lot? |
| 04:03:18 | 8 | A.  Yes. |
| 04:03:19 | 9 | Q.  How long did you talk to Fuddy? |
| 04:03:22 | 10 | A.  A couple of minutes. |
| 04:03:24 | 11 | Q.  And did you see where Fuddy went after you were finished |
| 04:03:27 | 12 | talking to him? |
| 04:03:28 | 13 | A.  Yes, up on the breezeway. |
| 04:03:30 | 14 | Q.  All right.  Gerald, I'm going to ask you to take a look at |
| 04:03:34 | 15 | this drawing which has been marked as People's Exhibit No. 5. |
| 04:03:37 | 16 | Do you recognize what that is a drawing of? |
| 04:03:40 | 17 | A.  Yes. |
| 04:03:41 | 18 | Q.  And what is that a drawing of? |
| 04:03:42 | 19 | A.  That's a map of the Ida B. Wells homes. |
| 04:03:45 | 20 | Q.  Do you see the building where you live in? |
| 04:03:47 | 21 | A.  Yes, 706. |
| 04:03:49 | 22 | Q.  Do you see the apartment you live in? |
| 04:03:51 | 23 | A.  Yes. |
| 04:03:52 | 24 | Q.  Would you come down here and put an X on the apartment you |
| 04:03:56 | 25 | lived in? |

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

                                                              118

04:03:57    1   A.  Yes.

04:03:57    2   Q.  Now, you testified there was a parking lot in your

04:04:01    3   building; is that correct?

04:04:02    4   A.  Yes.

04:04:03    5   Q.  Do you see that parking lot?

04:04:04    6   A.  Yes.

04:04:05    7   Q.  Would you point to the parking lot?

04:04:07    8   A.  Right here.

04:04:08    9   Q.  The big area right there?

04:04:10   10   A.  Yes.

04:04:11   11   Q.  You say you were in a window of your apartment.  Can you

04:04:16   12   put maybe a couple of lines indicating a window in the

04:04:21   13   apartment you were looking out of?

04:04:22   14   A.  Here is the window here.

04:04:23   15   Q.  Put an X.  That's fine.

04:04:25   16        Is that the window you were talking out of to Fuddy?

04:04:28   17   A.  Yes.

04:04:28   18   Q.  All right.  And you say you saw Fuddy go to the breezeway.

04:04:33   19   Can you draw a line where you saw Fuddy go?

04:04:35   20   A.  The breezeway is like this.

04:04:38   21   Q.  You can sit back down.

04:04:40   22        I'm going to show you what has been marked as

04:04:42   23   Defendant's Exhibit 388 for identification.

04:04:52   24        THE COURT:  Everybody agrees that's the thing that he

04:04:54   25   was referring to during the trial?


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

04:04:55   1        MS. KATZ:  Correct, your Honor.

04:04:56   2   BY MS. KATZ:

04:04:58   3   Q.  Do you recognize what is -- this is a picture of?

04:05:02   4   A.  That's my -- yeah, that's my building.

04:05:05   5   Q.  Do you see your apartment in there?

04:05:08   6   A.  Yes.

04:05:08   7   Q.  Do you see the window in that exhibit where you were

04:05:10   8   talking to Fuddy?

04:05:11   9   A.  Yes.

04:05:11  10   Q.  At this point, would you come down.

04:05:17  11        THE COURT:  Again, as with the last witness,

04:05:18  12   everybody agrees that he came down and is going to point to

04:05:21  13   whatever he is about to point to there.

04:05:23  14        MS. KATZ:  Thank you, your Honor.

04:05:25  15   BY MS. KATZ:

04:05:26  16   Q.  Circle the window you were talking to Fuddy from.

04:05:30  17        May the record reflect, Judge, the witness has

04:05:33  18   circled the window, the second floor of this window

04:05:36  19   Defendant's Exhibit 388.

04:05:37  20        Now, as you look at that picture right now, is there

04:05:39  21   anything different about that picture, the condition of your

04:05:42  22   apartment in that particular picture than from April 14th?

04:05:47  23   A.  Yes.

04:05:47  24   Q.  What's different?

04:05:48  25   A.  We got boards up there now, but we had windows.

04:05:51   1   Q.  There are boards in the window in this picture?

04:05:53   2   A.  Yes.

04:05:53   3   Q.  And there were windows are glass in the windows when you

04:05:57   4   were there?

04:05:57   5   A.  Yes.

04:05:57   6   Q.  Except for that, does this clearly and accurately depict

04:06:01   7   your apartment -- the apartment you looked in?

04:06:04   8   A.  Yes.

04:06:04   9   Q.  Judge, I would ask this picture be admitted into evidence

04:06:08  10   at this time.

04:06:09  11        Now, Gerald, after Fuddy went around the corner, did

04:06:22  12   you stay in the window?

04:06:22  13   A.  Yes.

04:06:23  14   Q.  And did you see anyone or anything unusual as you sat in

04:06:27  15   the window after Fuddy left?

04:06:29  16   A.  Yes.

04:06:29  17   Q.  What did you see?

04:06:30  18   A.  I seen two males walk right behind him.

04:06:33  19   Q.  Do you see -- did you see where they were coming from?

04:06:35  20   A.  No, I didn't.

04:06:37  21   Q.  Where is the first place you saw them?

04:06:40  22   A.  Entering from the parking lot.

04:06:41  23   Q.  All right.  Which way were they walking when you first saw

04:06:45  24   them?

04:06:45  25   A.  Walking in the same direction Fuddy was going.

| | | |
|---|---|---|
| 04:06:47 | 1 | Q. Would that be toward you? |
| 04:06:49 | 2 | A. Yes. |
| 04:06:50 | 3 | Q. Can you see these people's faces? |
| 04:06:53 | 4 | A. Yes. |
| 04:06:53 | 5 | Q. Can you describe these two guys? |
| 04:06:56 | 6 | A. Yes, the light skinned one he had on the red jacket and |
| 04:07:01 | 7 | the dark skinned one, he had on all blue. |
| 04:07:03 | 8 | Q. Now, you said they were light skinned and dark skinned. |
| 04:07:06 | 9 | Were they both black? |
| 04:07:08 | 10 | A. Yes. |
| 04:07:08 | 11 | Q. The light-skinned guy, how tall is he? |
| 04:07:11 | 12 | A. He was taller than the dark skinned guy, about five, nine. |
| 04:07:15 | 13 | Q. How tall would you say the dark skinned guy was? |
| 04:07:18 | 14 | A. About five, six. |
| 04:07:20 | 15 | Q. Now, was the light-skinned guy heavier or skinnier than |
| 04:07:23 | 16 | the dark skinned guy? |
| 04:07:26 | 17 | A. Skinnier. |
| 04:07:27 | 18 | Q. Could you see how these guys wore their hair? |
| 04:07:30 | 19 | A. Yes, they had braids in their hair. |
| 04:07:31 | 20 | Q. Both of them? |
| 04:07:32 | 21 | A. Yes. |
| 04:07:32 | 22 | Q. Could you see whether or not either one of these people |
| 04:07:36 | 23 | had hair on their face? |
| 04:07:37 | 24 | A. Yes, the dark skinned one had a beard and the other one |
| 04:07:40 | 25 | had a little beard, he didn't have that much. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 123 of 175 PageID #:32733

| | | |
|---|---|---|
| 04:07:42 | 1 | Q.  How close did these people get to you? |
| 04:07:45 | 2 | A.  About five feet. |
| 04:07:47 | 3 | Q.  And were you still in the second floor window when you saw |
| 04:07:50 | 4 | them? |
| 04:07:50 | 5 | A.  Yes, I was still there. |
| 04:07:52 | 6 | Q.  Did you see where these guys walked to? |
| 04:07:55 | 7 | A.  Yes, they walked up under the breezeway too. |
| 04:07:58 | 8 | Q.  I'm going to ask you to come off the witness stand again |
| 04:08:05 | 9 | with this pen mark the entire route you saw them walk. |
| 04:08:09 | 10 | A.  All right.  They walked about like this in front of the |
| 04:08:12 | 11 | place. |
| 04:08:13 | 12 | Q.  May the record reflect, Judge, the witness has placed a |
| 04:08:18 | 13 | purple line on people's Exhibit No. 5.  It would be the top |
| 04:08:22 | 14 | most line in this picture. |
| 04:08:23 | 15 | I'm going to show you what has been marked as |
| 04:08:27 | 16 | Defendant's Exhibit 389 for identification. |
| 04:08:45 | 17 | Gerald, is that also a picture of your apartment? |
| 04:08:49 | 18 | A.  Yes. |
| 04:08:49 | 19 | Q.  And do you see in there the window that you were in when |
| 04:08:52 | 20 | you were talking to Fuddy? |
| 04:08:53 | 21 | A.  Yes. |
| 04:08:54 | 22 | Q.  Is that the same window you saw the two individuals walk |
| 04:08:57 | 23 | by? |
| 04:08:57 | 24 | A.  Yes. |
| 04:08:58 | 25 | Q.  Would you circle that window, please. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 124 of 175 PageID #:32734

04:09:08   1              Now, do you see in there the entrance to the

04:09:10   2    breezeway?

04:09:13   3    A.  Yes.

04:09:13   4    Q.  All right.  Where in this particular picture is the

04:09:18   5    entrance to the breezeway?

04:09:19   6    A.  Right here.

04:09:20   7    Q.  All right.  Can you write like a B on the entrance to the

04:09:25   8    breezeway?  May the record reflect, Judge, Defendant's Exhibit

04:09:32   9    389 the witness has circled the second window from the right

04:09:35   10   on the second floor and he has placed the letter B on the

04:09:38   11   farthest left-hand portion of the picture.

04:09:42   12             Is that the corner you saw Fuddy go around?

04:09:43   13   A.  Yes.

04:09:44   14   Q.  Is that also the corner you saw these other two guys go

04:09:47   15   around?

04:09:47   16   A.  Yes.

04:09:47   17   Q.  Judge, I would ask that these be admitted into evidence.

04:09:52   18             Gerald, I'm going to ask you to stand up and look

04:10:06   19   around the courtroom.  Do you see the two guys in court today

04:10:09   20   you saw walk past your window?

04:10:11   21   A.  Yes.

04:10:11   22   Q.  Would you point them out, please?

04:10:14   23   A.  Right there and right there.

04:10:15   24   Q.  What did this guy have on when he walked by the window,

04:10:19   25   the defendant, Earl Hawkins?

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 125 of 175 PageID #:32735

| | | |
|---|---|---|
| 04:10:21 | 1 | A. He had on a red jacket and blue jogging pants. |
| 04:10:24 | 2 | Q. And when you say Nathson, for this guy, Nathson Fields |
| 04:10:31 | 3 | what did he have on when he walked by the window? |
| 04:10:33 | 4 | A. All blue. |
| 04:10:34 | 5 | Q. May the record reflect, Judge, the witness has identified |
| 04:10:37 | 6 | both defendants in open court. |
| 04:10:38 | 7 |     Gerald, after you saw the defendant Hawkins and |
| 04:10:41 | 8 | Fields walk by your window, where did you go? |
| 04:10:44 | 9 | A. I went to the next room to get my shirt. |
| 04:10:46 | 10 | Q. Were you going to go somewhere after you got your shirt? |
| 04:10:48 | 11 | A. Yes, I was going to go downstairs and talk to Fuddy. |
| 04:10:50 | 12 | Q. While you were in the next room getting your shirt, what |
| 04:10:54 | 13 | happened? |
| 04:10:54 | 14 | A. I heard several gunshots and I looked out the side window |
| 04:10:58 | 15 | and I seen the same defendants run back out. |
| 04:11:01 | 16 | Q. Now, when they walked past you the first time, did they |
| 04:11:04 | 17 | have anything in their hands? |
| 04:11:06 | 18 | A. No. |
| 04:11:06 | 19 | Q. When they ran by you the second time, did they have |
| 04:11:09 | 20 | anything in their hands? |
| 04:11:10 | 21 | A. Yes. |
| 04:11:10 | 22 | Q. What did they have in their hands at that time? |
| 04:11:13 | 23 | A. They had guns. |
| 04:11:14 | 24 | Q. Did each one of them have guns? |
| 04:11:17 | 25 | A. Yes. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 126 of 175 PageID #:32736

| | | |
|---|---|---|
| 04:11:17 | 1 | Q. Could you see where they were running? |
| 04:11:20 | 2 | A. Yes, to a car. |
| 04:11:22 | 3 | Q. Where was the car parked? |
| 04:11:24 | 4 | A. The car was parked on Langley. |
| 04:11:26 | 5 | Q. Do you see where the car was parked on people's Exhibit |
| 04:11:30 | 6 | No. 5 there? |
| 04:11:30 | 7 | A. Yes. |
| 04:11:31 | 8 | Q. Would you point to it, please? |
| 04:11:33 | 9 | A. Right here. |
| 04:11:34 | 10 | Q. Judge, may the record reflect the witness is pointing to a |
| 04:11:39 | 11 | purple X on people's No. 5. |
| 04:11:40 | 12 | Did you see what the two guys did when they got to |
| 04:11:43 | 13 | their car? |
| 04:11:44 | 14 | A. Yes. |
| 04:11:44 | 15 | Q. What is the first thing they did? |
| 04:11:47 | 16 | A. The light skinned one, he tossed his car into the gun and |
| 04:11:51 | 17 | he climbed in first, and then the dark skinned one stood |
| 04:11:54 | 18 | around and owned the door, held the door while the other one |
| 04:11:58 | 19 | gets in. |
| 04:11:58 | 20 | Q. What did the dark skinned guy do after the light-skinned |
| 04:12:02 | 21 | guy got in the car? |
| 04:12:03 | 22 | A. He looked around. |
| 04:12:04 | 23 | Q. And then what did he do? |
| 04:12:05 | 24 | A. Then he got in the car and the car drove off. |
| 04:12:07 | 25 | Q. Were those the same two guys you seen by go by your front |

| | | |
|---|---|---|
| 04:12:13 | 1 | window? |
| 04:12:13 | 2 | A.  Yes. |
| 04:12:13 | 3 | Q.  Did you see what the car did after they got in? |
| 04:12:17 | 4 | A.  Yes, it took off. |
| 04:12:18 | 5 | Q.  Which way did it go? |
| 04:12:20 | 6 | A.  It went up Langley. |
| 04:12:21 | 7 | Q.  When you say up, are you talking about to the top of that |
| 04:12:25 | 8 | picture there? |
| 04:12:25 | 9 | A.  Yes. |
| 04:12:26 | 10 | Q.  That would be north, right? |
| 04:12:28 | 11 | A.  Yes. |
| 04:12:29 | 12 | Q.  What did you do, Gerald, after the car drove off? |
| 04:12:33 | 13 | A.  I had ran downstairs and went outside and I seen Talman |
| 04:12:38 | 14 | first. |
| 04:12:38 | 15 | Q.  When you say Talman, who are you talking about? |
| 04:12:40 | 16 | A.  Talman, I don't recall his last name. |
| 04:12:41 | 17 | Q.  Talman Hickman? |
| 04:12:43 | 18 | A.  Yes, Hickman, and I had went around the corner and I seen |
| 04:12:47 | 19 | Fuddy laying down there. |
| 04:12:48 | 20 | Q.  What did you do after you saw Talman and Fuddy laying down |
| 04:12:52 | 21 | there? |
| 04:12:52 | 22 | A.  Well, I had ran to the Ida B. Wells and I was telling |
| 04:12:55 | 23 | everybody that Fuddy and Talman had got shot. |
| 04:12:57 | 24 | Q.  Did you talk to some police later that night? |
| 04:13:00 | 25 | A.  Yes. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 128 of 175 PageID #:32738
***REALTIME UNEDITED TRANSCRIPT ONLY***

127

| | | |
|---|---|---|
| 04:13:01 | 1 | Q.  Where was that? |
| 04:13:02 | 2 | A.  That was at my apartment. |
| 04:13:04 | 3 | Q.  Did you tell the police what you had seen? |
| 04:13:06 | 4 | A.  Yes. |
| 04:13:07 | 5 | Q.  Did you indicate whether you could identify the guys if |
| 04:13:11 | 6 | you saw them? |
| 04:13:11 | 7 | A.  Yes. |
| 04:13:12 | 8 | Q.  What did you tell them? |
| 04:13:14 | 9 | A.  I told them that I can identify someone. |
| 04:13:16 | 10 | Q.  Did the police leave then? |
| 04:13:18 | 11 | A.  Yes, they said they would contact me. |
| 04:13:21 | 12 | Q.  Were you still living in the building when they left, |
| 04:13:26 | 13 | correct? |
| 04:13:26 | 14 | A.  Correct. |
| 04:13:26 | 15 | Q.  When is the next time you were contacted by the police, |
| 04:13:29 | 16 | Gerald? |
| 04:13:30 | 17 | A.  A year later. |
| 04:13:30 | 18 | Q.  Now, Gerald, when is the next time you were contacted by |
| 04:13:36 | 19 | the police? |
| 04:13:37 | 20 | A.  A year later. |
| 04:13:37 | 21 | Q.  Do you remember the month? |
| 04:13:38 | 22 | A.  It was -- no, I can't recall the month. |
| 04:13:41 | 23 | Q.  Well, when the police contacted you, did they ask you to |
| 04:13:45 | 24 | do anything? |
| 04:13:45 | 25 | A.  Yes, they asked me to come look at some photos. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 129 of 175 PageID #:32739
***REALTIME UNEDITED TRANSCRIPT ONLY***

128

| | | |
|---|---|---|
| 04:13:48 | 1 | Q. Did you go with the police somewhere? |
| 04:13:50 | 2 | A. Yes. |
| 04:13:51 | 3 | Q. Where did you go? |
| 04:13:52 | 4 | A. I came here. |
| 04:13:54 | 5 | Q. And did the police show you anything when they got you |
| 04:13:58 | 6 | here? |
| 04:13:58 | 7 | A. Yes, they showed me some photos. |
| 04:14:00 | 8 | Q. Approximately how many photos did they show you? |
| 04:14:02 | 9 | A. About 20 to 25. |
| 04:14:04 | 10 | Q. Did you identify any photos from that group? |
| 04:14:08 | 11 | A. Yes. |
| 04:14:09 | 12 | Q. How many? |
| 04:14:10 | 13 | A. Three. |
| 04:14:11 | 14 | Q. All right.  Do you see pictures -- do you see the guys in |
| 04:14:16 | 15 | court today that you identified pictures of? |
| 04:14:18 | 16 | A. Yes. |
| 04:14:19 | 17 | Q. Are they the same two guys you identified? |
| 04:14:22 | 18 | A. Yes. |
| 04:14:22 | 19 | Q. After you made those identifications, were you contacted |
| 04:14:26 | 20 | by the police again? |
| 04:14:27 | 21 | A. Yes. |
| 04:14:28 | 22 | Q. When was that? |
| 04:14:30 | 23 | A. May 16th, 1985. |
| 04:14:32 | 24 | Q. Well, the next time the police contacted you, Gerald, what |
| 04:14:36 | 25 | did they ask you to do? |

12/06/16 PM

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 130 of 175 PageID #:32740
***REALTIME UNEDITED TRANSCRIPT ONLY***

129

| | | |
|---|---|---|
| 04:14:38 | 1 | A. They asked me to look at a lineup. |
| 04:14:39 | 2 | Q. All right. Did you look at a lineup? |
| 04:14:42 | 3 | A. Yes. |
| 04:14:42 | 4 | Q. Where was that? |
| 04:14:44 | 5 | A. That was at area one. |
| 04:14:45 | 6 | Q. And when you looked at the lineup, did you identify |
| 04:14:49 | 7 | anybody from the lineup? |
| 04:14:50 | 8 | A. Yes. |
| 04:14:51 | 9 | Q. Who did you identify from the first lineup? |
| 04:14:54 | 10 | A. I can't recall his name. |
| 04:14:56 | 11 | Q. Do you see him in court today? |
| 04:14:58 | 12 | A. Yes. |
| 04:14:58 | 13 | Q. Which guy did you identify from the first lineup, right? |
| 04:15:03 | 14 | A. Right here, the light skinned. |
| 04:15:05 | 15 | Q. The light skinned person? |
| 04:15:07 | 16 | A. Yes. |
| 04:15:07 | 17 | Q. May the record reflect, Judge, the in court identification |
| 04:15:10 | 18 | of Earl Hawkins. |
| 04:15:11 | 19 | A couple days after the lineup, were you contacted by |
| 04:15:14 | 20 | police again? |
| 04:15:15 | 21 | A. Yes. |
| 04:15:16 | 22 | Q. Did you look at another lineup? |
| 04:15:18 | 23 | A. Yes. |
| 04:15:18 | 24 | Q. Did you identify anybody in that lineup? |
| 04:15:22 | 25 | A. Yes. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 131 of 175 PageID #:32741

| | | |
|---|---|---|
| 04:15:22 | 1 | Q. Do you see that person in court today? |
| 04:15:25 | 2 | A. No. |
| 04:15:26 | 3 | Q. A while after that, did the police contact you again? |
| 04:15:30 | 4 | A. Yes. |
| 04:15:31 | 5 | Q. What did they ask you to do the third time they contacted |
| 04:15:35 | 6 | you? |
| 04:15:35 | 7 | A. To look at another lineup. |
| 04:15:37 | 8 | Q. Did you go somewhere to look at that lineup? |
| 04:15:39 | 9 | A. Yes. |
| 04:15:40 | 10 | Q. Where did you go? |
| 04:15:41 | 11 | A. To area one. |
| 04:15:43 | 12 | Q. To look at a lineup on that day? |
| 04:15:45 | 13 | A. Yes. |
| 04:15:46 | 14 | Q. Did you identify anyone from that third lineup? |
| 04:15:49 | 15 | A. Yes. |
| 04:15:49 | 16 | Q. Do you see that person in court today? |
| 04:15:52 | 17 | A. Yes. |
| 04:15:53 | 18 | Q. Would you please point him out? |
| 04:15:55 | 19 | A. Yes, right here. |
| 04:15:57 | 20 | Q. The dark skinned guy? |
| 04:15:59 | 21 | A. Yes. |
| 04:15:59 | 22 | Q. May the record reflect, Judge, again the identification of |
| 04:16:02 | 23 | Nathson Fields. |
| 04:16:03 | 24 | Gerald, did anyone tell you to identify -- to |
| 04:16:07 | 25 | identify from those lineups? |

| | | |
|---|---|---|
| 04:16:09 | 1 | A.  No. |
| 04:16:09 | 2 | Q.  Gerald, I'm going to show you what has been marked as |
| 04:16:13 | 3 | Defendant's Exhibit 390. |
| 04:16:26 | 4 | Do you recognize what is in this photo? |
| 04:16:31 | 5 | A.  That is my building. |
| 04:16:33 | 6 | Q.  Is that your apartment? |
| 04:16:35 | 7 | A.  Yes. |
| 04:16:35 | 8 | Q.  You testified you went in a different room to get a shirt. |
| 04:16:39 | 9 | Do you see that window in that room? |
| 04:16:41 | 10 | A.  Yes. |
| 04:16:42 | 11 | Q.  Would you circle that window, please. |
| 04:16:47 | 12 | THE COURT:  Again, it's agreed that this is what the |
| 04:16:48 | 13 | person did. |
| 04:16:53 | 14 | MS. KATZ:  May the record reflect, Judge, that the |
| 04:16:55 | 15 | witness has placed a circle around the window, top right, in |
| 04:16:58 | 16 | Defendant's Exhibit 390. |
| 04:17:02 | 17 | BY MS. KATZ: |
| 04:17:02 | 18 | Q.  Is that the window you saw the people running to the car |
| 04:17:04 | 19 | from? |
| 04:17:05 | 20 | A.  Yes. |
| 04:17:05 | 21 | Q.  Gerald, I'm going to show you what has been marked as |
| 04:17:09 | 22 | Defendant's Exhibit 391 for identification.  Do you recognize |
| 04:17:26 | 23 | what that is a picture of? |
| 04:17:29 | 24 | A.  The parking lot, yes. |
| 04:17:30 | 25 | Q.  What is that a picture of? |

04:17:32   1   A.  The parking lot.

04:17:32   2   Q.  Do you see on there where the car was parked you said you

04:17:36   3   saw these guys running to?

04:17:38   4   A.  Yes.

04:17:38   5   Q.  Would you draw a square on that picture where you saw the

04:17:43   6   car?  Judge, may the record reflect the witness has placed a

04:17:52   7   large square around the car that is parked right in the middle

04:17:55   8   of this exhibit.

04:17:55   9        Do you see here, Gerald, the car to the parking lot

04:17:58  10   where these guys were walking when you say you saw them?

04:18:01  11   A.  Yes, they was coming this way.

04:18:03  12   Q.  Just draw a line with an X or an arrow.  I'm sorry.

04:18:07  13   Judge, may the record reflect the witness has placed an X

04:18:11  14   right-hand side of Defendant's Exhibit 391.

04:18:14  15        Gerald, does this picture accurately depict the way

04:18:17  16   the area looked when you saw them on April 28th?

04:18:20  17   A.  Yes.

04:18:20  18   Q.  Again, there are boards in the windows of this apartment,

04:18:26  19   previous exhibit.  When you saw them on April 28th.  I'm

04:18:30  20   sorry.  When you lived there, were there boards on the windows

04:18:33  21   or glass?

04:18:34  22   A.  There was glass.

04:18:34  23   Q.  So except for that, this looked the same way?

04:18:38  24   A.  Right.

04:18:38  25   Q.  Gerald, I'm going to show you what has been marked as

04:18:43  1   people's Exhibit No. 18 for identification.  Do you recognize

04:18:47  2   what that is a picture of?

04:18:48  3   A.  That is a picture of the lineup.

04:18:51  4   Q.  Which lineup is that?

04:18:52  5   A.  This is the first lineup.

04:18:54  6   Q.  Do you see the person in there that you identified?

04:18:57  7   A.  Yes.

04:18:58  8   Q.  Would you place an X over his head.

04:19:02  9       Judge, may the record reflect the witness has placed

04:19:05  10  an X over the first person to the left in this lineup, the

04:19:09  11  picture of Earl Hawkins.

04:19:10  12      I show you what has been marked as People's Exhibit

04:19:15  13  No. 19 for identification.  Do you recognize what that is a

04:19:18  14  picture of?

04:19:19  15  A.  Yes, this is a third lineup.

04:19:21  16  Q.  All right.  Is that the way the lineup looked when you

04:19:24  17  looked at it?

04:19:25  18  A.  Yes.

04:19:26  19  Q.  Do you see the person in there you identified?

04:19:29  20  A.  Yes.

04:19:30  21  Q.  Would you place an X over his head, please?  Judge, may

04:19:35  22  the record reflect the witness has placed an X over the person

04:19:38  23  under number 1 in People's Exhibit No. 19.

04:19:41  24      Gerald, I'm going to show you what is depicted as

04:19:46  25  People's Exhibit No. 1 for identification.  Do you recognize

| | | |
|---|---|---|
| 04:19:50 | 1 | that? |
| 04:19:50 | 2 | A.  Yes. |
| 04:19:51 | 3 | Q.  What is depicted in that photo? |
| 04:19:53 | 4 | A.  Fuddy and Talman. |
| 04:19:55 | 5 | Q.  Is that the way you saw Fuddy and Talman that day when you |
| 04:19:59 | 6 | went down there? |
| 04:20:00 | 7 | A.  Yes. |
| 04:20:00 | 8 | Q.  I want to show you what has been marked as People's |
| 04:20:05 | 9 | Exhibit No. 20.  Do you recognize who is in that photo? |
| 04:20:08 | 10 | A.  Yes. |
| 04:20:09 | 11 | Q.  Who is that? |
| 04:20:10 | 12 | A.  That's Fuddy. |
| 04:20:11 | 13 | Q.  Finally, People's Exhibit No. 21 for identification, do |
| 04:20:17 | 14 | you recognize who is in that photo? |
| 04:20:18 | 15 | A.  Yes, that is Talman. |
| 04:20:18 | 16 | - - - |
| 04:20:18 | 17 | ROBERT EVANS, CROSS-EXAMINATION |
| 04:20:18 | 18 | BY MR. HEPPELL:  (Reading:) |
| 04:20:36 | 19 | Q.  Mr. Morris, my name is Bill Swano.  I met you in July of |
| 04:20:39 | 20 | 1985.  Do you remember that? |
| 04:20:41 | 21 | A.  Yes. |
| 04:20:42 | 22 | Q.  May I call you Gerald? |
| 04:20:46 | 23 | A.  Go ahead. |
| 04:20:46 | 24 | Q.  How long have you known Fuddy? |
| 04:20:48 | 25 | A.  Five years. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 136 of 175 PageID #:32746

04:20:48   1   Q.  And from the building where you lived, you knew Fuddy?

04:20:51   2   A.  No, through another friend of mine.

04:20:52   3   Q.  And you knew that Fuddy was the leader or the head of the

04:20:55   4   Goon Squad?

04:20:55   5   A.  Yes.

04:20:55   6   Q.  And you were a member of the Goon Squad?

04:20:57   7   A.  I was.

04:20:57   8   Q.  How long have you been a member?

04:21:00   9   A.  I really can't remember.

04:21:01   10  Q.  Well, a couple of years?

04:21:03   11  A.  I can't remember.

04:21:04   12  Q.  A month, two months, a year, two years, do the best you

04:21:09   13  can.

04:21:09   14  A.  About three years.

04:21:10   15  Q.  And you have a cousin by the name of Randy Langston?

04:21:14   16  A.  That is my brother-in-law.

04:21:15   17  Q.  He was also a member of the Goon Squad?

04:21:18   18  A.  Yes.

04:21:19   19  Q.  Now, when you were living in this apartment, what was the

04:21:22   20  apartment number?

04:21:23   21  A.  I think 106.

04:21:24   22  Q.  How long had you been living there?

04:21:26   23  A.  I was about a month.

04:21:29   24  Q.  It wasn't your family's apartment, it was the Langston's

04:21:33   25  apartment?

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 137 of 175 PageID #:32747
***REALTIME UNEDITED TRANSCRIPT ONLY***

136

| | | |
|---|---|---|
| 04:21:33 | 1 | A.  Right. |
| 04:21:34 | 2 | Q.  And it is your testimony that you had lived there for a |
| 04:21:36 | 3 | month? |
| 04:21:36 | 4 | A.  Yes. |
| 04:21:37 | 5 | Q.  Or did you just stay there sometimes? |
| 04:21:39 | 6 | A.  Just lived there for a month.  I came to move there with |
| 04:21:42 | 7 | them.  It was about a month. |
| 04:21:43 | 8 | Q.  You had actually moved your clothes and everything in? |
| 04:21:45 | 9 | A.  Um-hmm, about a month. |
| 04:21:47 | 10 | Q.  About a month? |
| 04:21:47 | 11 | A.  Um-hmm. |
| 04:21:48 | 12 | Q.  And then how long did you live there after the shooting |
| 04:21:52 | 13 | incident? |
| 04:21:52 | 14 | A.  About two months after, I guess. |
| 04:21:54 | 15 | Q.  Were you employed in April of '84? |
| 04:21:57 | 16 | A.  Uhn-uhn. |
| 04:21:58 | 17 | Q.  Are you employed now? |
| 04:21:59 | 18 | A.  Uhn-uhn. |
| 04:22:00 | 19 | Q.  Now, you testified that you were speaking with Fuddy; is |
| 04:22:00 | 20 | that right? |
| 04:22:05 | 21 | A.  Yes. |
| 04:22:05 | 22 | Q.  How long had you been looking out the window before you |
| 04:22:09 | 23 | saw Fuddy that day? |
| 04:22:10 | 24 | A.  I was looking out for a long time. |
| 04:22:12 | 25 | Q.  Well, when you say a long time, how long? |

| | | |
|---|---|---|
| 04:22:14 | 1 | A.  A couple -- about a couple minutes at the most. |
| 04:22:17 | 2 | Q.  Two minutes? |
| 04:22:18 | 3 | A.  Yes. |
| 04:22:19 | 4 | Q.  And during that two minutes, did you see other people out |
| 04:22:23 | 5 | in the parking lot and in the playground? |
| 04:22:25 | 6 | A.  No. |
| 04:22:25 | 7 | Q.  The only person you saw was Fuddy is that right? |
| 04:22:29 | 8 | A.  Fuddy, yes. |
| 04:22:30 | 9 | Q.  Now, you were on the second floor, correct? |
| 04:22:34 | 10 | A.  Correct. |
| 04:22:34 | 11 | Q.  Was Fuddy downstairs on the sidewalk? |
| 04:22:37 | 12 | A.  Yes. |
| 04:22:38 | 13 | Q.  And how long did you talk to Fuddy? |
| 04:22:40 | 14 | A.  About a couple of minutes. |
| 04:22:42 | 15 | Q.  What did you talk about? |
| 04:22:44 | 16 | A.  I asked him was Paul, did Paul get out of jail and he said |
| 04:22:48 | 17 | no.  That's when he went around the front to stand and see to |
| 04:22:53 | 18 | wait for him.  I told him I would be down as soon as I got |
| 04:22:56 | 19 | through ironing my shirt. |
| 04:22:57 | 20 | Q.  Do you know Paul's last name? |
| 04:22:59 | 21 | A.  No. |
| 04:22:59 | 22 | Q.  Paul had been arrested the day before regarding the |
| 04:23:02 | 23 | shooting incident, correct? |
| 04:23:03 | 24 | A.  Correct. |
| 04:23:04 | 25 | Q.  And that shooting incident involved a person by the name |

12/06/16 PM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 04:23:08 | 1 | of Delbert Edwards, correct?  Paul had been shooting at |
| 04:23:12 | 2 | Delbert Edwards the day before, correct? |
| 04:23:14 | 3 | A.  I don't know what he was charged with. |
| 04:23:16 | 4 | Q.  Paul's last name was Paul Bailey; is that correct? |
| 04:23:20 | 5 | A.  I don't recall his last name, just know the first name. |
| 04:23:24 | 6 | Q.  Paul lived in the same apartment as Fuddy did, correct? |
| 04:23:26 | 7 | A.  Correct. |
| 04:23:26 | 8 | Q.  And they were good friends? |
| 04:23:29 | 9 | A.  Right. |
| 04:23:29 | 10 | Q.  Other than asking Fuddy whether Paul had gotten out of |
| 04:23:33 | 11 | jail, what else did you talk about during that conversation? |
| 04:23:35 | 12 | A.  That's all. |
| 04:23:36 | 13 | Q.  Now, that conversation took place in two minutes? |
| 04:23:40 | 14 | A.  Yes. |
| 04:23:40 | 15 | Q.  When you were looking out the window, was anybody looking |
| 04:23:44 | 16 | out the same window you were? |
| 04:23:45 | 17 | A.  That's my girlfriend, I was looking out the window with |
| 04:23:49 | 18 | her. |
| 04:23:49 | 19 | Q.  What was her name? |
| 04:23:50 | 20 | A.  Sandra Langston. |
| 04:23:51 | 21 | Q.  And Sandra Langston lived in that same apartment? |
| 04:23:54 | 22 | A.  Yes. |
| 04:23:55 | 23 | Q.  106? |
| 04:23:56 | 24 | A.  Yes. |
| 04:23:57 | 25 | Q.  Randy Langston lived there? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:23:59   1   A.  Yes.

04:23:59   2   Q.  Eric Langston?

04:24:01   3   A.  Yes.

04:24:01   4   Q.  James Langston?

04:24:02   5   A.  Yes.

04:24:03   6   Q.  And you lived there?

04:24:04   7   A.  Yes.

04:24:04   8   Q.  Was Sandra speaking with Fuddy as you were?

04:24:07   9   A.  No, she was just standing out there.

04:24:10   10  Q.  She was standing near the window?

04:24:12   11  A.  Yes.

04:24:12   12  Q.  Was she leaning out the window?

04:24:14   13  A.  Yes.

04:24:15   14  Q.  Were you leaning out the window?

04:24:18   15  A.  Yes, both of us.

04:24:19   16  Q.  So both of you were hanging out the window but you were

04:24:23   17  talking to Fuddy?

04:24:24   18  A.  I was talking to Fuddy.

04:24:25   19  Q.  And she had no conversation with Fuddy; is that correct?

04:24:28   20  A.  Yes.

04:24:29   21  Q.  And there was nobody else in the playground or the parking

04:24:33   22  lot at that time?

04:24:34   23  A.  No.

04:24:34   24  Q.  Now, after Fuddy left and went into the breezeway, you

04:24:39   25  then went to get a T-shirt on or a shirt?

| | | |
|---|---|---|
| 04:24:41 | 1 | A.  No, I stayed in the window. |
| 04:24:43 | 2 | Q.  Well, for how long? |
| 04:24:45 | 3 | A.  Oh, about a couple of minutes. |
| 04:24:47 | 4 | Q.  How much time passed from the time Fuddy went into the |
| 04:24:51 | 5 | breezeway until you saw these two fellows? |
| 04:24:53 | 6 | A.  I'd say about a good five minutes. |
| 04:24:56 | 7 | Q.  About five minutes past after Fuddy went out the |
| 04:25:00 | 8 | breezeway, correct? |
| 04:25:01 | 9 | A.  Yes. |
| 04:25:01 | 10 | Q.  During that five minutes, did anybody else walk along that |
| 04:25:05 | 11 | sidewalk? |
| 04:25:05 | 12 | A.  No. |
| 04:25:06 | 13 | Q.  The first time you saw these two people, as you were |
| 04:25:10 | 14 | looking out the window, was when they were approximately down |
| 04:25:14 | 15 | from the window, right? |
| 04:25:15 | 16 | A.  Yes. |
| 04:25:16 | 17 | Q.  And that was the first time you laid eyes on them that |
| 04:25:20 | 18 | day? |
| 04:25:21 | 19 | A.  Um-hmm. |
| 04:25:21 | 20 | Q.  And of course, you were what, about 25 feet up? |
| 04:25:24 | 21 | A.  No, I was -- I'd say five feet from the ground. |
| 04:25:27 | 22 | Q.  About five feet from the ground? |
| 04:25:29 | 23 | A.  Um-hmm. |
| 04:25:30 | 24 | Q.  And you were looking down, so you could see the tops of |
| 04:25:34 | 25 | their heads? |

| 04:25:34 | 1 | A. You could see it straight as they walked in. |
| 04:25:37 | 2 | Q. And they didn't stop and talk with you, did they? |
| 04:25:40 | 3 | A. No. |
| 04:25:40 | 4 | Q. They walked right by? |
| 04:25:41 | 5 | A. Right. |
| 04:25:42 | 6 | Q. And then after that, you went and got your shirt? |
| 04:25:45 | 7 | A. Yes. |
| 04:25:46 | 8 | Q. Where did Sandra go? |
| 04:25:49 | 9 | A. I don't remember. I can't remember where she went to. |
| 04:25:51 | 10 | Q. Did Sandra stay in the window? |
| 04:25:54 | 11 | A. I can't remember where she went to. |
| 04:25:56 | 12 | Q. When you left the window, was Sandra still there? |
| 04:25:59 | 13 | A. I can't remember where she went to. |
| 04:26:00 | 14 | Q. You can't remember if she was still in the window? |
| 04:26:03 | 15 | A. No, I can't. |
| 04:26:04 | 16 | Q. How much time passed then after you went to get your shirt |
| 04:26:10 | 17 | until you heard shots? |
| 04:26:11 | 18 | A. I can't remember that. |
| 04:26:12 | 19 | Q. Well, was it like five or ten minutes? |
| 04:26:15 | 20 | A. I can't remember that. |
| 04:26:16 | 21 | Q. Was it a short time? |
| 04:26:18 | 22 | A. I'd say a good five minutes. |
| 04:26:20 | 23 | Q. After the two men walked under your window and into the |
| 04:26:24 | 24 | breezeway, how long did you remain looking out the window? |
| 04:26:27 | 25 | A. After they walked up under the breezeway, I got out the |

| | | |
|---|---|---|
| 04:26:32 | 1 | window. |
| 04:26:32 | 2 | Q.  Right after they walked by? |
| 04:26:33 | 3 | A.  Right after they walked by and went up under the |
| 04:26:37 | 4 | breezeway. |
| 04:26:37 | 5 | Q.  Now, you had your own bedroom? |
| 04:26:40 | 6 | A.  Yes, me and her, yes. |
| 04:26:41 | 7 | Q.  Showing you Defendant's Exhibit 390.  Is your bedroom -- |
| 04:27:03 | 8 | was your bedroom, is it shown by one of those windows? |
| 04:27:06 | 9 | A.  Right here, that is my bedroom. |
| 04:27:07 | 10 | Q.  Indicating the circled window. |
| 04:27:12 | 11 | And is that the room that you went in to get your |
| 04:27:15 | 12 | shirt? |
| 04:27:18 | 13 | A.  Yes. |
| 04:27:18 | 14 | Q.  And is that the room that you were in that you heard |
| 04:27:21 | 15 | shots? |
| 04:27:22 | 16 | A.  Yes. |
| 04:27:22 | 17 | Q.  And then you looked out that window and you saw men |
| 04:27:26 | 18 | running towards Langley, correct? |
| 04:27:28 | 19 | A.  Yes. |
| 04:27:28 | 20 | Q.  Now, as they were running, their backs were to you, |
| 04:27:33 | 21 | correct? |
| 04:27:33 | 22 | A.  Correct. |
| 04:27:34 | 23 | Q.  You could see the back of their head? |
| 04:27:36 | 24 | A.  I could see, yes. |
| 04:27:38 | 25 | Q.  And they had already passed this portion of the building |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 144 of 175 PageID #:32754

04:27:43  1  running towards Langley; is that right?

04:27:44  2  A.  Yes.

04:27:44  3  Q.  Now, did you see anybody in the car over on Langley?

04:27:49  4  A.  No, it was too far off.

04:27:51  5  Q.  You couldn't see anybody in that car?

04:27:53  6  A.  No, it was too far for me to really see.

04:27:56  7  Q.  So when you went to the second lineup and identified

04:28:00  8  George Carter, you couldn't say whether or not he was in that

04:28:03  9  car, can you?

04:28:04  10  A.  No, not really.

04:28:06  11  Q.  You can't say George Carter was in the car?

04:28:09  12  A.  No.

04:28:09  13  Q.  The car was too far away for you to see who was in it,

04:28:13  14  correct?

04:28:14  15  A.  Yes.

04:28:14  16  Q.  Now, these men ran in a straight frontal running motion,

04:28:19  17  right, they didn't run backwards?

04:28:21  18  A.  No.

04:28:21  19  Q.  And the men that got in the car were at the car when you

04:28:25  20  say they opened the door and turned in your direction?

04:28:29  21  A.  Yes.

04:28:29  22  Q.  Now, Talman and Fuddy were friends of yours, right?

04:28:35  23  A.  No, not Talman.  Fuddy was.

04:28:37  24  Q.  Fuddy was a good friend of yours, right?

04:28:40  25  A.  Right.

| | | |
|---|---|---|
| 04:28:40 | 1 | Q. He was the head of the gang that you were in, right? |
| 04:28:42 | 2 | A. Yes. |
| 04:28:43 | 3 | Q. And in addition to being the head of the gang, he was a |
| 04:28:46 | 4 | good friend of yours? |
| 04:28:47 | 5 | A. Yes. |
| 04:28:48 | 6 | Q. And after the shooting, you went down and saw these two |
| 04:28:52 | 7 | men lying on the sidewalk or lying on the front of the |
| 04:28:54 | 8 | building? |
| 04:28:54 | 9 | A. Yes. |
| 04:28:55 | 10 | Q. And the police arrived? |
| 04:28:57 | 11 | A. Not right then, no. |
| 04:28:58 | 12 | Q. Well, eventually the police arrived. You were there when |
| 04:29:02 | 13 | the police came there? |
| 04:29:03 | 14 | A. No, I had left and went through Ida B. Wells. |
| 04:29:05 | 15 | Q. You didn't wait for the police? |
| 04:29:07 | 16 | A. No. |
| 04:29:07 | 17 | Q. You had, according to your testimony, witnessed possibly |
| 04:29:12 | 18 | the two perpetrators of this crime and you didn't wait to tell |
| 04:29:16 | 19 | the police? |
| 04:29:17 | 20 | A. No, not then, no. |
| 04:29:19 | 21 | Q. You didn't call the police? |
| 04:29:21 | 22 | A. I didn't have a phone to call the police. |
| 04:29:23 | 23 | Q. But you didn't go to a pay phone to call the police? |
| 04:29:25 | 24 | A. No. |
| 04:29:26 | 25 | Q. You didn't call them. Why? |

04:29:29    1   A.  Because I didn't have a phone.

04:29:30    2   Q.  Well, you went over to another CHA housing after the

04:29:35    3   shooting, right?

04:29:36    4   A.  Um-hmm.

04:29:36    5   Q.  And did you come back to the building then?

04:29:39    6   A.  Yes, I came back.

04:29:40    7   Q.  And when you came back, were the police still there?

04:29:44    8   A.  Yes, they were still there.

04:29:45    9   Q.  And they were looking for witnesses?

04:29:47   10   A.  That night they came.

04:29:49   11   Q.  Well, I'm talking about that day.

04:29:51   12   A.  That day, not right then, no.

04:29:53   13   Q.  Were they gone by the time you came back?

04:29:55   14   A.  No, they were still there.  There was nobody looking for

04:29:59   15   no witnesses right then.

04:30:00   16   Q.  Did you go up to the police when you came back after going

04:30:04   17   over to the other project and telling them you seen two men?

04:30:07   18   A.  No.

04:30:08   19   Q.  Did you tell them you saw two men running into a car?

04:30:12   20   A.  No.

04:30:12   21   Q.  Did you tell them you saw two men running with guns into a

04:30:16   22   car?

04:30:16   23   A.  No.

04:30:17   24   Q.  You didn't speak to the police?

04:30:19   25   A.  I spoke to the police that night.

12/06/16 PM    Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 147 of 175 PageID #:32757
***REALTIME UNEDITED TRANSCRIPT ONLY***

146

04:30:21    1  Q.  No, but I mean, at that time?

04:30:23    2  A.  No.

04:30:24    3  Q.  Okay.  Now, that night then, police came to your apartment

04:30:28    4  and talked to Randy Langston, right?

04:30:30    5  A.  Yes.

04:30:31    6  Q.  And were you there when they came and talked to Randy?

04:30:34    7  A.  Yes, I was there.

04:30:35    8  Q.  Did you hear Randy tell the police that he had seen one

04:30:39    9  man with a red ski mask, did you hear Randy Langston tell the

04:30:44   10  police that?

04:30:44   11  A.  No.

04:30:44   12  Q.  Did you hear what Randy had to say to the police?

04:30:47   13  A.  No, I wasn't paying no attention to what Randy had to say

04:30:50   14  to the police.

04:30:51   15  Q.  Did you then tell the police what you had seen earlier

04:30:53   16  that day?

04:30:54   17  A.  I told them that I had seen something and they said that,

04:30:58   18  all right, we will contact, and I didn't hear from them until

04:31:01   19  a year later.

04:31:02   20  Q.  Do you remember the names of the officers that you told

04:31:05   21  that to?

04:31:06   22  A.  No, I can't recall.

04:31:09   23  Q.  Was it the same officers that were speaking to Randy

04:31:12   24  Langston?

04:31:12   25  A.  Yes, they were the same.

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 148 of 175 PageID #:32758
***REALTIME UNEDITED TRANSCRIPT ONLY***

147

04:31:13  1   Q.  Does Detective Minogue, does that ring a bell with you as

04:31:18  2   the detective that was speaking to you that night?

04:31:20  3   A.  I can't remember.

04:31:21  4   Q.  If you saw him again, would you remember him?

04:31:23  5   A.  No, if it's been too long, I don't think I will.

04:31:26  6   Q.  When the police spoke with you that night, did they talk

04:31:29  7   to Sandra also?

04:31:31  8   A.  I can't remember.

04:31:31  9   Q.  Did they speak with Eric or James?

04:31:34  10  A.  I can't remember.

04:31:35  11  Q.  Now, you have been provided housing or lodging from the

04:31:40  12  state's attorney's office, correct?

04:31:41  13  A.  Correct.

04:31:41  14  Q.  Did you also receive some sort of job from the police

04:31:46  15  department or through the police?

04:31:47  16  A.  No, Dave told me where they was hiring and told me to go

04:31:51  17  down and check it out.

04:31:52  18  Q.  Dave O'Callaghan?

04:31:54  19  A.  Yes.

04:31:54  20  Q.  The officer that is in the back or was here earlier?

04:31:57  21  A.  Yes.

04:31:57  22  Q.  He tried to help you get a job?

04:32:00  23  A.  He had told me where they was hiring.

04:32:03  24  Q.  And that was in May of 1985, right?

04:32:06  25  A.  Um-hmm.

| | | |
|---|---|---|
| 04:32:06 | 1 | Q. Well, do you know how much money you've received? |
| 04:32:10 | 2 | A. No, I do not. |
| 04:32:12 | 3 | Q. Now, you testified that you saw a lineup on May 16th, |
| 04:32:17 | 4 | 1985? |
| 04:32:17 | 5 | A. Yes. |
| 04:32:18 | 6 | Q. Is that the date that you saw the lineup or is that the |
| 04:32:21 | 7 | date the police came and first talked to you after the initial |
| 04:32:24 | 8 | day? |
| 04:32:24 | 9 | A. No, that's -- I saw photos on May 16th. |
| 04:32:28 | 10 | Q. May 16th, you saw photos? |
| 04:32:30 | 11 | A. Yes. |
| 04:32:30 | 12 | Q. And did O'Callaghan show you those photos? |
| 04:32:33 | 13 | A. Yes. |
| 04:32:34 | 14 | Q. And did he tell you that he had information as to who the |
| 04:32:37 | 15 | four people were that had done the killing? |
| 04:32:39 | 16 | A. Uhn-uhn. |
| 04:32:40 | 17 | Q. Did he show you Earl Hawkins's photographs? |
| 04:32:43 | 18 | A. No, I had to pick it out. |
| 04:32:45 | 19 | Q. Did you pick out a photograph of George Carter? |
| 04:32:49 | 20 | A. I don't know George Carter. |
| 04:32:49 | 21 | Q. Well, did you identify anybody in that group of photos as |
| 04:32:56 | 22 | somebody that was in the car? |
| 04:32:56 | 23 | A. Yes, I had. |
| 04:32:58 | 24 | Q. So you did identify somebody then as somebody that was |
| 04:33:01 | 25 | sitting in the car, correct? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 150 of 175 PageID #:32760

| | | |
|---|---|---|
| 04:33:03 | 1 | A.  Um-hmm. |
| 04:33:04 | 2 | Q.  But you just testified now that the car was too far away |
| 04:33:09 | 3 | and you couldn't see who was in the car? |
| 04:33:12 | 4 | A.  Yes, it was too far away. |
| 04:33:14 | 5 | Q.  It was what? |
| 04:33:14 | 6 | A.  It was too far away for me to see. |
| 04:33:16 | 7 | Q.  Well, if that is the case, how did you pick out a picture |
| 04:33:21 | 8 | of the man who was in the car if you hadn't seen anybody in |
| 04:33:25 | 9 | the car? |
| 04:33:25 | 10 | A.  I don't know. |
| 04:33:27 | 11 | Q.  You don't remember? |
| 04:33:28 | 12 | A.  Uhn-uhn. |
| 04:33:34 | 13 | MR. HEPPELL:  This is reflects cross-examination by |
| 04:33:37 | 14 | Mr. Fields' attorney Mr. Smeeton. |
| 04:33:38 | 15 | THE COURT:  Still in the 1986 trial? |
| 04:33:39 | 16 | MR. HEPPELL:  Correct. |
| 04:33:42 | 17 | BY MR. HEPPELL: |
| 04:33:43 | 18 | Q.  Mr. Morris, when you say you spoke to detectives the night |
| 04:33:46 | 19 | of this incident, they were white detectives? |
| 04:33:47 | 20 | A.  Yes. |
| 04:33:47 | 21 | Q.  And they spoke with Randy too that night? |
| 04:33:50 | 22 | A.  Yes. |
| 04:33:50 | 23 | Q.  Well, you don't recall whether they talked to James or |
| 04:33:54 | 24 | sandy also? |
| 04:33:55 | 25 | A.  Uhn-uhn. |

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 151 of 175 PageID #:32761

04:33:55  1  Q.  And the names Minogue and Bogdalek ring no bell to you as

04:34:01  2  the officers you talked to?

04:34:02  3  A.  No.

04:34:02  4  Q.  You did not tell those police officers that night or give

04:34:05  5  them a description of the people that you saw, did you?

04:34:08  6  A.  No.

04:34:09  7  Q.  You didn't describe in detail to those detectives the

04:34:12  8  circumstances or what you saw out your window that night, did

04:34:16  9  you?

04:34:16  10  A.  No, I didn't.

04:34:17  11  Q.  Did you hear Randy telling the detectives everything that

04:34:21  12  he saw?

04:34:21  13  A.  No.

04:34:23  14  Q.  You didn't hear it?

04:34:24  15  A.  No, I can't remember.

04:34:27  16  Q.  You don't remember?

04:34:28  17  A.  No.

04:34:29  18  Q.  You told these detectives, I know something, but you

04:34:34  19  didn't tell them what it was and they didn't ask you any

04:34:37  20  questions about what you knew, what you saw, or who you saw?

04:34:41  21  A.  No, they didn't.

04:34:43  22  Q.  And you testified that you picked out a photo of George

04:34:49  23  Carter on May 16th of '85 as being in the car.  You testified

04:34:53  24  you really couldn't see it?

04:34:55  25  A.  Right.

| | | |
|---|---|---|
| 04:34:55 | 1 | Q. And not only that you did pick out his photo, but on May |
| 04:35:00 | 2 | 16th, 1985, you picked George Carter out of a lineup and |
| 04:35:05 | 3 | identified him as being in that car, didn't you? |
| 04:35:08 | 4 | A. Yes. |
| 04:35:09 | 5 | Q. But you really couldn't see him because he was too far |
| 04:35:13 | 6 | away? |
| 04:35:13 | 7 | A. Yes. |
| 04:35:14 | 8 | Q. Did somebody tell you to pick Carter out of that lineup? |
| 04:35:17 | 9 | A. No. |
| 04:35:17 | 10 | Q. You did that on your own? |
| 04:35:20 | 11 | A. Yes, I went in and picked George Carter. |
| 04:35:22 | 12 | Q. And you said that was the man that was sitting in the car? |
| 04:35:26 | 13 | A. Yes. |
| 04:35:26 | 14 | Q. And when you say the two men you've identified as the |
| 04:35:32 | 15 | defendants got in the car, did you see the ski masks? |
| 04:35:35 | 16 | A. No, I didn't see the ski masks. |
| 04:35:36 | 17 | Q. Could you see the guns? |
| 04:35:38 | 18 | A. Yes. |
| 04:35:39 | 19 | Q. You saw them throw the guns in the car? |
| 04:35:42 | 20 | A. Yes. |
| 04:35:42 | 21 | Q. So you could see their hands? |
| 04:35:44 | 22 | A. Yes. |
| 04:35:45 | 23 | Q. When you saw Detective O'Callaghan in May, I believe you |
| 04:35:50 | 24 | said the first time you saw him in May, like the 16th or so of |
| 04:35:54 | 25 | '85, did he knock on your door? |

04:35:56 | 1 | A. No, I wasn't around there. I had moved.

04:35:59 | 2 | Q. Where were you?

04:36:00 | 3 | A. I was in the Ida B. Wells.

04:36:03 | 4 | Q. You were in the Ida B. Wells at that time?

04:36:04 | 5 | A. Um-hmm.

04:36:05 | 6 | Q. When O'Callaghan came to your door, did he knock on the

04:36:09 | 7 | door?

04:36:09 | 8 | A. My door?

04:36:10 | 9 | Q. Yes.

04:36:11 | 10 | A. Yes.

04:36:12 | 11 | Q. Had you talked to him, to Mr. O'Callaghan prior to that

04:36:17 | 12 | day when you talked to him for the first time?

04:36:20 | 13 | A. No, that was the first time I seen him.

04:36:22 | 14 | Q. First time you seen him?

04:36:23 | 15 | A. Yes.

04:36:23 | 16 | Q. Do you know how he found you?

04:36:25 | 17 | A. No, uhn-uhn.

04:36:27 | 18 | Q. When he knocked on your door, who were you home with?

04:36:30 | 19 | A. Me and my girlfriend.

04:36:31 | 20 | Q. When you saw the lineup wherein Mr. Fields stood up, was

04:36:38 | 21 | there anybody else down at the police station when you viewed

04:36:40 | 22 | that lineup?

04:36:41 | 23 | A. Yes, but we were in separate rooms.

04:36:43 | 24 | Q. Who else was down there?

04:36:44 | 25 | A. It was me, Randy, and Eric.

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

153

04:36:45   1   Q.  Do you know who looked at the lineup first?

04:36:48   2   A.  I think I looked at it first.

04:36:50   3   Q.  Were you able to see the people who stood in the lineup?

04:36:53   4   A.  It was a three -- it was a three-way glass like.

04:37:01   5   Q.  Probably two-way?

04:37:03   6   A.  Two-way.

04:37:04   7   Q.  How many people stood in the lineup?

04:37:05   8   A.  I can't remember.

04:37:06   9   Q.  Do you remember who the police officer was that stood with

04:37:08   10   you when you did that lineup, looked at the lineup with Mr.

04:37:11   11   Fields in it?

04:37:11   12   A.  Stood with me?

04:37:12   13   Q.  Yes.

04:37:14   14        Let me ask you.  Was Dave O'Callaghan with you when

04:37:17   15   you viewed the lineup with him and Nathson Fields?

04:37:20   16   A.  Yes.

04:37:20   17   Q.  And Dave O'Callaghan was also with you when you viewed the

04:37:23   18   lineup of George Carter, picked Carter out, wasn't he?

04:37:28   19   A.  No.

04:37:29   20   Q.  He wasn't there?

04:37:30   21   A.  No, he wasn't there.

04:37:31   22   Q.  Do you know who was?

04:37:32   23   A.  No, I can't remember who was with me.

04:37:34   24   Q.  What did the people in the lineup do?

04:37:36   25   A.  They stepped forward and stepped back.

12/06/16 PM

| | | |
|---|---|---|
| 04:37:38 | 1 | Q.  When they stepped forward, how far did they step forward? |
| 04:37:41 | 2 | A.  Not that close. |
| 04:37:42 | 3 | Q.  I'm sorry? |
| 04:37:43 | 4 | A.  Not that close. |
| 04:37:44 | 5 | Q.  How far -- did you stand with your face right up near the |
| 04:37:48 | 6 | window? |
| 04:37:48 | 7 | A.  No. |
| 04:37:48 | 8 | Q.  I'm sorry? |
| 04:37:49 | 9 | A.  No. |
| 04:37:50 | 10 | Q.  How far from the wall where the window was were the people |
| 04:37:55 | 11 | that were standing in the lineup? |
| 04:37:56 | 12 | A.  I don't know. |
| 04:37:57 | 13 | Q.  About five feet, ten feet? |
| 04:37:59 | 14 | A.  I don't know. |
| 04:37:59 | 15 | Q.  Could you show in the courtroom here from where you are to |
| 04:38:02 | 16 | where the chairs are or where to where the lawyer is or how |
| 04:38:06 | 17 | far? |
| 04:38:06 | 18 | A.  I would say right, about right there to where I'm |
| 04:38:10 | 19 | standing. |
| 04:38:11 | 20 | Q.  To where? |
| 04:38:13 | 21 | A.  To them chairs to where I am. |
| 04:38:14 | 22 | Q.  A distance of about eight or nine feet. |
| 04:38:17 | 23 | When you say the people in the lineup stepped |
| 04:38:20 | 24 | forward, how far did they step forward? |
| 04:38:21 | 25 | A.  About up to the typewriter and back. |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 156 of 175 PageID #:32766
***REALTIME UNEDITED TRANSCRIPT ONLY***

155

| | | |
|---|---|---|
| 04:38:24 | 1 | Q. About four feet from the window or halfway to the window? |
| 04:38:28 | 2 | A. Halfway to the window. |
| 04:38:29 | 3 | Q. And when you looked at photographs on or about May 16th of |
| 04:38:33 | 4 | '85, you weren't able to make a positive identification of |
| 04:38:36 | 5 | either Mr. Hawkins or Mr. Fields, were you? |
| 04:38:38 | 6 | A. No. |
| 04:38:39 | 7 | Q. And did the length of time that had passed make it -- the |
| 04:38:45 | 8 | year that had passed make it difficult for you to recognize |
| 04:38:48 | 9 | those people? |
| 04:38:48 | 10 | A. Ain't nothing made it difficult. |
| 04:38:50 | 11 | Q. Well, did the faces look different in the picture than the |
| 04:38:53 | 12 | people you saw? |
| 04:38:54 | 13 | A. No. |
| 04:38:54 | 14 | Q. What was your hesitancy of being able to positively |
| 04:38:58 | 15 | identify the people in the pictures? Was it something |
| 04:39:01 | 16 | different about the pictures than the people you saw that day? |
| 04:39:05 | 17 | A. No, it wasn't nothing different. |
| 04:39:06 | 18 | Q. So the people in the pictures, they didn't look the same |
| 04:39:09 | 19 | then as the people that you saw in the streets that day? |
| 04:39:13 | 20 | A. Uhn-uhn, the clothes possibly, but not the faces. |
| 04:39:16 | 21 | Q. Well, if their faces were the same, but you still could |
| 04:39:19 | 22 | not make a positive identification, could you? |
| 04:39:21 | 23 | A. No, I requested lineups. |
| 04:39:23 | 24 | Q. What did you say when you saw the pictures? |
| 04:39:26 | 25 | A. I asked them, can I see a lineup to make a positive |

| | | |
|---|---|---|
| 04:39:30 | 1 | identification. |
| 04:39:30 | 2 | Q.  What did you say about the pictures? |
| 04:39:33 | 3 | A.  What did I say about? |
| 04:39:36 | 4 | Q.  Before you identified the lineup, did you say something |
| 04:39:38 | 5 | about the people in the pictures? |
| 04:39:40 | 6 | A.  No. |
| 04:39:41 | 7 | Q.  Or didn't you say anything at all? |
| 04:39:44 | 8 | A.  I looked at the pictures and I pointed them out and I |
| 04:39:46 | 9 | asked the officers, can I see a lineup to make positive |
| 04:39:49 | 10 | identification. |
| 04:39:50 | 11 | Q.  Now, when you say you were looking out the window talking |
| 04:39:55 | 12 | to Fuddy, you say the window slides open? |
| 04:39:57 | 13 | A.  Yes. |
| 04:39:57 | 14 | Q.  So when the window slides open, is half the window then |
| 04:40:01 | 15 | exposed? |
| 04:40:02 | 16 | A.  Um-hmm. |
| 04:40:02 | 17 | Q.  How wide are those windows? |
| 04:40:04 | 18 | A.  I would say like three feet. |
| 04:40:05 | 19 | Q.  So when you opened the windows, there was about a foot and |
| 04:40:08 | 20 | a half opening then? |
| 04:40:10 | 21 | A.  No. |
| 04:40:10 | 22 | Q.  Well, how big was it? |
| 04:40:12 | 23 | A.  It was big enough for your body to fit out of it. |
| 04:40:15 | 24 | Q.  Yet if it was just big enough for you yet you and Sandra |
| 04:40:19 | 25 | Langston were both hanging out that window, right? |

04:40:21   1   A.  She was standing up.

04:40:23   2   Q.  I'm sorry?

04:40:24   3   A.  She was standing up in the window with me.  I was leaning

04:40:28   4   over.  She was standing in the window.

04:40:30   5   Q.  Well, when you testified on direct examination, you were

04:40:34   6   both leaning out the window, you were mistaken then?

04:40:37   7   A.  Yes, I was.

04:40:38   8   Q.  So now only you are hanging out the window and she was

04:40:43   9   not?

04:40:43  10   A.  She wasn't hanging out the window.

04:40:48  11   Q.  You testified that the offenders, the two people you seen

04:40:53  12   previously, when they ran to the car, were they running?

04:40:56  13   A.  Yes, they were running.

04:40:57  14   Q.  When they got to the car, one of the people opened the

04:40:59  15   door?

04:40:59  16   A.  Yes.

04:40:59  17   Q.  Is it your testimony that -- before they got in the car,

04:41:02  18   they stopped and they turned around and looked back in your

04:41:05  19   direction?

04:41:05  20   A.  No, they didn't stop and turn around.  They kept going.

04:41:08  21   The heavy set one had the door open while the other one jumped

04:41:13  22   in.

04:41:13  23   Q.  Well, you weren't able to see their faces then as they got

04:41:16  24   in the car?

04:41:16  25   A.  Yes, as they were running past.  They were pulling their

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 159 of 175 PageID #:32769
***REALTIME UNEDITED TRANSCRIPT ONLY***

158

| | | |
|---|---|---|
| 04:41:21 | 1 | masks off. |
| 04:41:21 | 2 | Q. They were pulling them off as they ran by you? |
| 04:41:23 | 3 | A. Yes, as they ran by. |
| 04:41:25 | 4 | Q. Well, you were looking directly out at the car, right? |
| 04:41:28 | 5 | A. Yes, from the back window, right. |
| 04:41:30 | 6 | Q. From the side window? |
| 04:41:32 | 7 | A. Yes, the back window. |
| 04:41:33 | 8 | Q. And is this the window where your bedroom is? |
| 04:41:35 | 9 | A. Yes. |
| 04:41:36 | 10 | Q. And you can't see them until they get in front of your |
| 04:41:39 | 11 | window; is that correct? |
| 04:41:41 | 12 | A. Yes, that's correct. |
| 04:41:41 | 13 | Q. And once they get in front of your window, you are behind |
| 04:41:45 | 14 | them isn't that correct? |
| 04:41:46 | 15 | A. Yes. |
| 04:41:47 | 16 | Q. So you are looking at the backs of their heads, correct? |
| 04:41:51 | 17 | A. Not really. |
| 04:41:52 | 18 | Q. Not really? |
| 04:41:53 | 19 | A. No. |
| 04:41:54 | 20 | Q. Well, could you see their faces as they ran by you on the |
| 04:41:57 | 21 | side window? |
| 04:41:58 | 22 | A. No, I couldn't see them, but I knew it was them. |
| 04:42:00 | 23 | Q. You couldn't see their faces then? |
| 04:42:02 | 24 | A. Yes. |
| 04:42:04 | 25 | Q. And you couldn't see their faces as they got in the car |

04:42:07    1   either, could you?

04:42:07    2   A.  Yes.

04:42:08    3   Q.  Well, when they got to the car, they had to have turned

04:42:11    4   around to look for you to see them, didn't they?

04:42:14    5   A.  I knew it was them.

04:42:15    6   Q.  But you didn't see their faces, you knew it was them

04:42:18    7   because you saw them before, is that what you're saying?

04:42:21    8   A.  They had on the same thing that they had on when they

04:42:24    9   walked past, that's how I knew it was them.

04:42:26   10   Q.  But you didn't see their faces this time, did you?

04:42:28   11   A.  No, I didn't see their faces.

04:42:30   12   Q.  Did you tell Fuddy when you were talking with him that you

04:42:34   13   were going to come down and meet with him downstairs, you had

04:42:37   14   to get your shirt?

04:42:38   15   A.  Yes.

04:42:38   16   Q.  Did he say he would meet you downstairs?

04:42:41   17   A.  Yes, said he would be standing in front.

04:42:43   18   Q.  Was there anything in particular that you and him had to

04:42:46   19   discuss?

04:42:49   20   A.  Not really.  I was asking him about had he seen Paul, and

04:42:53   21   he said Paul hadn't gotten out of jail yet, and that's what he

04:42:56   22   was standing under the breezeway for, to wait for Paul.

04:43:02   23   A.  I probably was going to mention it, yes.

04:43:03   24   Q.  So you told him I'll come downstairs to meet you?

04:43:06   25   A.  Yes.

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 161 of 175 PageID #:32771
***REALTIME UNEDITED TRANSCRIPT ONLY***

160

| | | |
|---|---|---|
| 04:43:07 | 1 | Q.  But instead of going right to your bedroom and getting |
| 04:43:10 | 2 | your shirt to go down and see him, you stood staring out the |
| 04:43:13 | 3 | window for five more minutes? |
| 04:43:16 | 4 | A.  Yes. |
| 04:43:16 | 5 | Q.  And during that five minutes, nobody out of that big |
| 04:43:20 | 6 | complex happened by your window but you say these two men? |
| 04:43:24 | 7 | A.  Right. |
| 04:43:25 | 8 | Q.  And then after these two men happened to come by, five |
| 04:43:29 | 9 | minutes later, that's when you went to get your shirt and go |
| 04:43:32 | 10 | down and see Fuddy? |
| 04:43:34 | 11 | A.  Yes. |
| 04:43:34 | 12 | Q.  And when you viewed the lineup where you said you picked |
| 04:43:39 | 13 | out -- strike that.  Earl Hawkins, was Carlos Willis down |
| 04:43:43 | 14 | there? |
| 04:43:43 | 15 | A.  No. |
| 04:43:44 | 16 | Q.  Do you know Carlos? |
| 04:43:46 | 17 | A.  Yes, I know him. |
| 04:43:47 | 18 | Q.  Was Eric Benson down there? |
| 04:43:49 | 19 | A.  No. |
| 04:43:49 | 20 | Q.  Do you know him? |
| 04:43:50 | 21 | A.  No, I don't know Darryl Benson. |
| 04:43:53 | 22 | Q.  I'm sorry? |
| 04:43:54 | 23 | A.  No. |
| 04:43:54 | 24 | Q.  You don't know Eric Benson? |
| 04:43:56 | 25 | A.  Uhn-uhn. |

| | | |
|---|---|---|
| 04:43:57 | 1 | Q.  Do you know Torrence White? |
| 04:43:58 | 2 | A.  We probably call him by a different name. |
| 04:44:01 | 3 | Q.  Do you know Richard Buckles? |
| 04:44:02 | 4 | A.  Yes, I do, Richard. |
| 04:44:04 | 5 | Q.  Did you see Richard that day? |
| 04:44:06 | 6 | A.  No, I didn't see him. |
| 04:44:08 | 7 | Q.  How do you know Richard? |
| 04:44:09 | 8 | A.  Through Fuddy. |
| 04:44:10 | 9 | Q.  Richard is a member of the Goon Squad, right? |
| 04:44:14 | 10 | A.  Yes, he was. |
| 04:44:15 | 11 | Q.  Now, Randy's brother, James, he is not; is that correct? |
| 04:44:19 | 12 | A.  No. |
| 04:44:20 | 13 | Q.  And Carlos Willis, he was not a member of the Goon Squad |
| 04:44:23 | 14 | either, was he? |
| 04:44:24 | 15 | A.  He was. |
| 04:44:25 | 16 | Q.  When was he? |
| 04:44:26 | 17 | A.  I can't recall the day that he was, but he was. |
| 04:44:33 | 18 |         MS. KATZ:  That's the end of 1986. |
| 04:44:35 | 19 |         THE COURT:  That's where we are going to stop.  Okay. |
| 04:44:37 | 20 | Thanks. |
| 04:44:37 | 21 |         We'll resume at -- let me just check quickly.  Yeah, |
| 04:44:42 | 22 | we'll resume about the same time tomorrow, 9:30, 9:35. |
| 04:44:47 | 23 | Somewhere in there.  Don't discuss the case with each other or |
| 04:44:54 | 24 | anybody else. |
| 04:45:30 | 25 |   (The jury leaves the courtroom.). |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 163 of 175 PageID #:32773
***REALTIME UNEDITED TRANSCRIPT ONLY***

162

| | | |
|---|---|---|
| 04:45:30 | 1 | THE COURT:  Is the 2009 Morris testimony about that |
| 04:45:45 | 2 | same length, longer or shorter. |
| 04:45:47 | 3 | MS. KATZ:  I think it's a little bit shorter.  I |
| 04:45:49 | 4 | think Mr. Sexton gets through a little faster and the print is |
| 04:45:52 | 5 | actually bigger, so it should take a little less time.  That's |
| 04:45:56 | 6 | my anticipation. |
| 04:45:56 | 7 | THE COURT:  That took exactly 45 minutes. |
| 04:45:58 | 8 | MS. KATZ:  Sam, yeah? |
| 04:46:01 | 9 | MR. HEPPELL:  Yeah. |
| 04:46:02 | 10 | THE COURT:  Or 44, I guess. |
| 04:46:04 | 11 | So just kind of reviewing the bidding on where we are |
| 04:46:10 | 12 | then, so tomorrow you've got to finish the Morris testimony |
| 04:46:15 | 13 | and then what else? |
| 04:46:19 | 14 | MR. BURNS:  Davis. |
| 04:46:21 | 15 | THE COURT:  Davis testimony.  You have Hunter, I |
| 04:46:23 | 16 | mean, I am going to do my best to get through it tonight. |
| 04:46:27 | 17 | Davis testimony.  Do you have a sense how long that is? |
| 04:46:30 | 18 | MR. NOLAND:  Davis is about 20 minutes. |
| 04:46:31 | 19 | THE COURT:  20 minutes. |
| 04:46:33 | 20 | MR. NOLAND:  That's a video, your Honor. |
| 04:46:34 | 21 | THE COURT:  That's a video, that's right.  Hunter |
| 04:46:36 | 22 | assuming it's all read would be how long, about?  Hunter? |
| 04:46:44 | 23 | Longer or shorter than Davis?  Laura, longer. |
| 04:46:51 | 24 | MR. LOEVY:  But shorter than Morris. |
| 04:46:53 | 25 | THE COURT:  What else after that? |

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 164 of 175 PageID #:32774
***REALTIME UNEDITED TRANSCRIPT ONLY***

163

| | | |
|---|---|---|
| 04:46:54 | 1 | MR. NOLAND: The experts, Mr. Murray, Mr. Noble, and |
| 04:46:59 | 2 | Ms. Roberts. |
| 04:47:01 | 3 | THE COURT: And then Mr. Hogan? |
| 04:47:03 | 4 | MR. KULWIN: No. And then we would hope to read |
| 04:47:06 | 5 | Sandra Langston depending on how you rule. |
| 04:47:11 | 6 | THE COURT: Langston testimony. |
| 04:47:13 | 7 | MR. KULWIN: We are going to submit -- as soon as we |
| 04:47:16 | 8 | get theirs. |
| 04:47:16 | 9 | THE COURT: I don't have anything on that yet right? |
| 04:47:19 | 10 | MR. KULWIN: Remember. |
| 04:47:20 | 11 | THE COURT: You talked about it early this morning. |
| 04:47:22 | 12 | I don't remember what. |
| 04:47:22 | 13 | MR. KULWIN: They are going to give their |
| 04:47:25 | 14 | designations and objections on availability. |
| 04:47:27 | 15 | THE COURT: Just remind me on that. Sandra Langston, |
| 04:47:30 | 16 | is the issue going to be an availability issue? That's the |
| 04:47:32 | 17 | one with the availability issue potentially? |
| 04:47:34 | 18 | MR. KULWIN: Yes. |
| 04:47:35 | 19 | MR. ART: Yes. |
| 04:47:36 | 20 | MR. LOEVY: We haven't fully investigated. We got |
| 04:47:39 | 21 | notice last night. |
| 04:47:40 | 22 | THE COURT: Then we have Maue. |
| 04:47:42 | 23 | MR. MICHALIK: Correct, Judge. |
| 04:47:43 | 24 | THE COURT: I am not saying all tomorrow. We have |
| 04:47:45 | 25 | Maue and Hogan. |

04:47:47  1          MR. MICHALIK:  Poulos.

04:47:48  2          THE COURT:  Poulos and Hogan.  Who am I missing?

04:47:54  3          MR. KULWIN:  We are still working on possibly

04:47:57  4   Mr. Rueckert, but we haven't -- Mr. Rueckert, but we haven't

04:47:59  5   been able to talk to him or missing phone calls or whatever.

04:48:03  6   That's the latest I have heard.

04:48:04  7          THE COURT:  That covers the universe?

04:48:08  8          MR. KULWIN:  That covers my universe.

04:48:09  9          THE COURT:  Okay.  All right.

04:48:13  10         MR. KULWIN:  I have charted it out, Judge, my rough

04:48:16  11  guess is depending on what Mr. Loevy does, Thursday or Friday

04:48:21  12  morning.

04:48:22  13         THE COURT:  Well, not Friday morning, but Friday

04:48:24  14  afternoon.

04:48:25  15         MR. KULWIN:  Friday afternoon.  So we are definitely

04:48:27  16  not doing Friday morning?

04:48:28  17         THE COURT:  Well, I'm still, you know -- I'm supposed

04:48:34  18  to be at this other thing.  It's really going to kind of

04:48:37  19  depend on where we are and how badly we need it.  That's what

04:48:40  20  it's going to boil down to.  I think the odds are I am going

04:48:43  21  to tell you we are starting at noon or something like that.

04:48:46  22         Okay.  So I guess we need to at some point here

04:48:53  23  finish off these two Hogan issues.  On Maue, there's another

04:49:02  24  one where there is an availability -- there's an admissibility

04:49:05  25  question on the prior testimony or there was something

| | | |
|---|---|---|
| 04:49:07 | 1 | discussed about this this morning. |
| 04:49:09 | 2 | MR. ART:  He is the one in southern Illinois. |
| 04:49:12 | 3 | THE COURT:  All right.  When are we going to talk |
| 04:49:15 | 4 | about that? |
| 04:49:16 | 5 | MR. MICHALIK:  You asked us to put something in |
| 04:49:17 | 6 | writing, Judge.  We could talk about it. |
| 04:49:20 | 7 | THE COURT:  No, put something in writing. |
| 04:49:21 | 8 | So we got these two Hogan issues.  So Hogan, I mean, |
| 04:49:29 | 9 | you might have gotten to him today, but now you are going to |
| 04:49:32 | 10 | do a whole bunch of other stuff before you get to him. |
| 04:49:35 | 11 | MR. KULWIN:  Right. |
| 04:49:35 | 12 | THE COURT:  I think the thing to do then is let's -- |
| 04:49:39 | 13 | including experts, you are going to do experts before you get |
| 04:49:42 | 14 | to Hogan. |
| 04:49:43 | 15 | MR. MICHALIK:  Yes. |
| 04:49:43 | 16 | MR. KULWIN:  He is going to be the last witness. |
| 04:49:45 | 17 | THE COURT:  Let's figure we are going to talk about |
| 04:49:47 | 18 | Hogan either right before the lunch break or right after the |
| 04:49:51 | 19 | lunch break tomorrow. |
| 04:49:52 | 20 | MR. KULWIN:  Okay. |
| 04:49:53 | 21 | THE COURT:  That will give everybody a chance to |
| 04:49:55 | 22 | process these documents, think about these documents.  Can I |
| 04:49:57 | 23 | keep these copies? |
| 04:49:58 | 24 | MR. KULWIN:  Yes. |
| 04:49:59 | 25 | MR. LOEVY:  Yes. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

04:49:59   1          MR. ART:  You can keep those, Judge.

04:50:01   2          MR. KULWIN:  The government made those for you.

04:50:02   3          MR. ART:  Mr. Kuhn mentioned that he wanted the

04:50:05   4   documents he showed to be under the protective order until

04:50:07   5   whatever is decided.

04:50:10   6          THE COURT:  Okay, under a protective order.

04:50:18   7          MR. LOEVY:  We want to talk about an issue, too, when

04:50:20   8   it's our turn.

04:50:21   9          THE COURT:  Okay.

04:50:21   10         MR. LOEVY:  The issue is Kuhn.  Mr. Kulwin and I have

04:50:24   11   now had about three conversations with I him and each time he

04:50:28   12   tells us the first thing which is.

04:50:29   13         THE COURT:  That's a start.

04:50:30   14         MR. LOEVY:  No, you'd be surprised, your Honor.

04:50:33   15         THE COURT:  He tells you the same thing which is.

04:50:35   16         MR. LOEVY:  He has been told that Murphy's notes are

04:50:38   17   not in the possession.

04:50:39   18         THE COURT:  Oh, we are back to the notes?

04:50:40   19         MR. LOEVY:  Yes, because during that time period,

04:50:43   20   there was no live investigation by which they would have

04:50:46   21   received those notes and if called to testify, he would say we

04:50:51   22   did not -- I have been told, he has no personal knowledge, he

04:50:55   23   would say I have been told that the U.S. Attorney's Office did

04:50:57   24   not accept these notes.  Now, he hasn't checked.

04:51:00   25         THE COURT:  Did you see he tell you who he is told

12/06/16 PM
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 168 of 175 PageID #:32778
***REALTIME UNEDITED TRANSCRIPT ONLY***

167

| | | |
|---|---|---|
| 04:51:03 | 1 | this by? |
| 04:51:04 | 2 |        MR. LOEVY:  No. |
| 04:51:04 | 3 |        THE COURT:  Three guesses and the first don't count. |
| 04:51:08 | 4 |        MR. LOEVY:  A guy named Deady. |
| 04:51:10 | 5 |        MR. KULWIN:  Yeah. |
| 04:51:11 | 6 |        THE COURT:  Deady was involved in the very early |
| 04:51:14 | 7 | stages. |
| 04:51:14 | 8 |        MR. KULWIN:  It was Bogart to Deady to Hogan. |
| 04:51:17 | 9 |        MR. LOEVY:  What we have here that I would like to |
| 04:51:19 | 10 | tender to you is a proposed stipulation. |
| 04:51:21 | 11 |        THE COURT:  Deady is still around? |
| 04:51:22 | 12 |        MR. KULWIN:  Yeah, he represented. |
| 04:51:24 | 13 |        THE COURT:  I seen him recently. |
| 04:51:26 | 14 |        MR. KULWIN:  He represented a fellow in the city |
| 04:51:27 | 15 | thing with the patronage years ago.  I can't remember his |
| 04:51:30 | 16 | name. |
| 04:51:30 | 17 |        THE COURT:  The city thing with the patronage.  That |
| 04:51:33 | 18 | doesn't narrow it down. |
| 04:51:35 | 19 |        MR. KULWIN:  Sorich.  The Sorich going to.  That |
| 04:51:38 | 20 | could cover a lot of territory.  He's very active. |
| 04:51:41 | 21 |        MR. LOEVY:  Your Honor, Mr. Murphy testified that the |
| 04:51:45 | 22 | reason he doesn't have these original notes with the |
| 04:51:46 | 23 | redactions is because he gave them to time U.S. Attorney's |
| 04:51:48 | 24 | Office.  That's inconsistent with what we were told. |
| 04:51:51 | 25 |        THE COURT:  Say what you just said again. |

04:51:52    1          MR. LOEVY:  Sure.  Remember, the issue.

04:51:54    2          THE COURT:  Just tell me again.  I didn't hear it

04:51:58    3  largely because I was coughing.

04:51:59    4          MR. LOEVY:  Sorry.  Mr. Murphy had original notes

04:52:03    5  that, remember how --

04:52:05    6          THE COURT:  I know what the notes, that's the thing

04:52:07    7  with the little dashes in it and whatnot.

04:52:08    8          MR. LOEVY:  And the missing stuff.  And we said where

04:52:11    9  are your original notes and he said several things.  One of

04:52:14   10  the things he said was he put them in the investigative file,

04:52:17   11  another thing he said was I gave the originals to the U.S.

04:52:21   12  Attorney's Office.  Well, I guess then I may stand corrected

04:52:28   13  on that.  I thought he said he gave them to the U.S.

04:52:30   14  Attorney's Office.  All right.

04:52:32   15          THE COURT:  I have no memory.

04:52:33   16          MR. ART:  He said the first thing Mr. Loevy said.  He

04:52:36   17  said that he gave the notes to another law enforcement agency

04:52:39   18  or the state's attorney's office, one or the other, and then

04:52:42   19  there was representations made by attorneys during his

04:52:44   20  examination that they were -- the originals were likely in the

04:52:47   21  possession of the U.S. Attorney's Office.

04:52:48   22          THE COURT:  That's how we got off on this whole

04:52:50   23  thing.

04:52:51   24          MR. ART:  Right.

04:52:52   25          THE COURT:  There was this whole reason we got into

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 170 of 175 PageID #:32780

04:52:55  1   this whole thing with the U.S. Attorney's Office.  I wouldn't

04:52:56  2   have thought of that on my own.  Are we talking about Murphy?

04:53:01  3              MR. BURNS:  Murphy said at the time the notes were

04:53:05  4   prepared, the GPR was prepared, the people who were present

04:53:08  5   including representatives from the U.S. Attorney's Office,

04:53:10  6   state's attorney's office and law enforcement all wanted

04:53:12  7   copies and he made those notes of the GPR available for the

04:53:16  8   purpose of coping.  He said he didn't know where they went

04:53:19  9   from there.  As far as the other, I mean, we could probably

04:53:22  10  get a rough transcript or get the transcript to you so you

04:53:24  11  could look at that.

04:53:25  12             THE COURT:  Do that.

04:53:26  13             MR. BURNS:  More specifically.

04:53:28  14             THE COURT:  Do that so we are not guessing.

04:53:30  15             MR. KULWIN:  I have gotten confused about these notes

04:53:33  16  because there's so many different dates.  Let me just make

04:53:36  17  sure we are all on the same proverbial page.  I believe what

04:53:40  18  we are talking about is lieutenant Murphy's notes while he's

04:53:44  19  in the state's attorney's offices in the gang crimes while

04:53:48  20  they're debriefing Anthony Sumner and what we have heard so

04:53:54  21  far.

04:53:54  22             THE COURT:  It's a multi page document where he was

04:53:56  23  going through various events.

04:53:57  24             MR. KULWIN:  Right.  And I believe the accurate facts

04:54:01  25  are and I think we have heard testimony about this, I am not a

| | | |
|---|---|---|
| 04:54:04 | 1 | hundred percent, is that at that time, it would have been |
| 04:54:06 | 2 | Deady, definitely not Hogan, he wasn't involved then, Deady |
| 04:54:10 | 3 | was probably there, I believe Brannigan testified that Deady |
| 04:54:13 | 4 | was there, Brannigan remembered he was there, he testified he |
| 04:54:16 | 5 | was there, he went out to get a drink of water every once in a |
| 04:54:19 | 6 | while, blah, blah, blah, I believe Wharrie testified that he |
| 04:54:24 | 7 | was there, I'm pretty sure that Wharrie testified that he was |
| 04:54:27 | 8 | part of that debriefing and then you had other law enforcement |
| 04:54:29 | 9 | people. So the debriefing there were a lot of cases at that |
| 04:54:33 | 10 | time. Murphy was, I believe -- I believe the testimony was |
| 04:54:36 | 11 | that he came in at one point, he went out, and those are the |
| 04:54:39 | 12 | notes at issue. And I believe -- I believe Mr. Burns |
| 04:54:43 | 13 | represented it correctly as to what's going on with that. |
| 04:54:47 | 14 | As far as where the U.S. attorney comes in, I believe |
| 04:54:50 | 15 | for purposes of this case, I could stand corrected me, I will |
| 04:54:56 | 16 | leave it to anybody that wants to correct me, is that at some |
| 04:54:59 | 17 | point, Dan, you can correct me if I'm wrong, at some point in |
| 04:55:07 | 18 | other litigation involving the U.S. Attorney's Office, these |
| 04:55:09 | 19 | notes, copies of these notes were made. And then retained in |
| 04:55:16 | 20 | the U.S. Attorney's Office. Where the U.S. Attorney's Office |
| 04:55:19 | 21 | got the copies of the notes, I think is up in the air. I |
| 04:55:24 | 22 | don't know. And what Mr. Kuhn also said is that it's his |
| 04:55:30 | 23 | understanding that they didn't have these original notes, but |
| 04:55:34 | 24 | he also said that he hasn't looked through all 482 boxes. I |
| 04:55:38 | 25 | think he's just looking it could be one of the places. |

04:55:42   1          THE COURT:  He is getting information from somebody

04:55:44   2   else that he didn't have this.  It might be worthwhile just

04:55:47   3   somebody asking Mr. Kuhn who did you get that information

04:55:49   4   from.

04:55:50   5          MR. KULWIN:  I'm pretty confident.

04:55:51   6          MR. LOEVY:  Could we get him here to put it on the

04:55:53   7   record.

04:55:54   8          THE COURT:  Can I not be involved in everything in

04:55:55   9   this case?  That's my request.  Can you like ask him first?

04:55:58   10          MR. LOEVY:  Your Honor, he told us the information on

04:56:00   11   the stipulation.

04:56:01   12          THE COURT:  I know.  Now it's a different question.

04:56:03   13   Where did you get this information from?

04:56:05   14          MR. KULWIN:  Sure.

04:56:05   15          THE COURT:  He probably didn't general right it on

04:56:08   16   his own.  Where did you get this information from so we can

04:56:11   17   figure out how to deal with it.

04:56:13   18          MR. KULWIN:  Okay.

04:56:13   19          THE COURT:  If he won't tell you, he won't tell you,

04:56:16   20   then ask him to come.

04:56:17   21          MR. KULWIN:  I'm sure he'll tell us, Judge.  I have

04:56:20   22   no doubt.

04:56:21   23          MR. LOEVY:  I guess, your Honor, what we don't want

04:56:22   24   to do is the trial to end without it having been resolved.

04:56:25   25          THE COURT:  I am not even seeing the light at the end


                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 04:56:28 | 1 |
| 04:56:31 | 2 |
| 04:56:33 | 3 |
| 04:56:36 | 4 |
| 04:56:37 | 5 |
| 04:56:37 | 6 |
| 04:56:40 | 7 |
| 04:56:45 | 8 |
| 04:56:48 | 9 |
| 04:56:49 | 10 |
| 04:56:55 | 11 |
| 04:56:57 | 12 |
| 04:56:59 | 13 |
| 04:57:02 | 14 |
| 04:57:05 | 15 |
| 04:57:08 | 16 |
| 04:57:12 | 17 |
| 04:57:16 | 18 |
| 04:57:18 | 19 |
| 04:57:19 | 20 |
| 04:57:19 | 21 |
| 04:57:21 | 22 |
| 04:57:26 | 23 |
| 04:57:29 | 24 |
| 04:57:35 | 25 |

1 of the tunnel at this point.  I am not even sure there is an

2 end of the tunnel.  I am told there is an end of the tunnel.

3 There is a rumor that there is a light, but I am not seeing

4 either one of them.

5          MR. KULWIN:  I can --

6          MR. LOEVY:  We are hopeful.  But our issue on the

7 notes is there is original notes he had possession of them.

8 We want to cut off his testimony or suggestion or --

9          THE COURT:  What's the his?

10          MR. LOEVY:  Murphy.  Murphy took the notes, they're

11 original and they're important.  That's our position.

12          MR. KULWIN:  A different point and the reason I am

13 not willing to stipulate to what they proposed aside from the

14 fact that I think it's inaccurate is maybe it's probably just

15 me, but I don't think that this is a material issue.  I think

16 that this is an issue for the plaintiff, they want to make a

17 big deal of it.  There is zero evidence that the originals --

18          THE COURT:  There's plenty of stuff that comes into

19 evidence that isn't critical.

20          MR. KULWIN:  Right.

21          THE COURT:  There's plenty of stuff that people

22 stipulate to that isn't critical .  That's usually the stuff

23 they stipulate to, the stuff that isn't critical.  I can

24 imagine somebody coming up with, you know, some other way of

25 dealing with this, in other words, you could come up with

04:57:39  1  something that everybody agrees that a diligent search has

04:57:41  2  been made for the originals of Mr. Murphy's notes and they

04:57:45  3  can't be located without being attributed, that might be a

04:57:50  4  possibility, they can't be located which means they aren't

04:57:53  5  anywhere, but I'm not sure why you have to put it in the U.S.

04:57:56  6  Attorney's Office.  But I'll say this.

04:57:59  7          Number one, I want you to collectively gather

04:58:01  8  Mr. Murphy's testimony so I can see it.

04:58:04  9          MR. LOEVY:  Right.

04:58:04  10          THE COURT:  Point me to where it is.

04:58:05  11          Number two, think about the alternative I proposed or

04:58:08  12  maybe another alternative.

04:58:10  13          No. 3, I can't force somebody to stipulate about

04:58:13  14  something, so you need to be thinking of what plan B is.

04:58:15  15          MR. LOEVY:  What we want to do.

04:58:16  16          THE COURT:  You probably are thinking about it.  I

04:58:18  17  just want you to -- you don't have to tell me.  Just be

04:58:22  18  thinking about it.

04:58:22  19          MR. LOEVY:  Will do.

04:58:23  20          THE COURT:  Anything else before we go?

04:58:25  21          MR. LOEVY:  Yes.  An expert tomorrow, Mr. Murray,

04:58:28  22  gave us a supplemental supplement.

04:58:31  23          THE COURT:  A supplemental supplement?

04:58:32  24          MR. LOEVY:  Yes on November 3rd, 2016.  We'll file

04:58:37  25  it.  I haven't read it.  Your Honor, in fairness to the

Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 175 of 175 PageID #:32785

04:58:43   1   defense, we have not yet given this to them.

04:58:45   2         THE COURT:  Okay.  Then everybody can look at it and

04:58:48   3   talk about it in the morning.  Let me just skim it real quick.

04:58:53   4   It's pretty short.

04:59:11   5         Okay.  I guess my preference would be -- I mean, it's

04:59:26   6   basically a page and a half.  My preference would be that you

04:59:29   7   could file something so we don't have to take time out of the

04:59:31   8   jury on that.  That's my preference.  Do what you want to do.

04:59:35   9         MR. ART:  Thanks, Judge.

04:59:36   10        THE COURT:  Talk to you tomorrow.  Thanks.

04:59:37   11        MR. KULWIN:  Thanks, Judge.

05:00:19   12    (The trial was adjourned at 5:00 p.m. until 9:30 a.m. on

05:00:28   13   December 7, 2016.)

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25