# EXHIBIT 74

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 2 of 114 PageID #:32787

| | | |
|---|---|---|
| 09:28:27 | 1 | Judge Kennelly, December 7, 2016, 9:30 a.m. call and trial |
| 09:30:47 | 2 | continued. |
| 09:39:25 | 3 | THE CLERK:  Case number 10 C 1168, U.S. v. Fields. |
| 09:39:38 | 4 | THE COURT:  Good morning. |
| 09:39:39 | 5 | MR. LOEVY:  Good morning, your Honor.  Jon Loevy, |
| 09:39:41 | 6 | Steve Art, Anand Swaminathan, and Candace Gorman for the |
| 09:39:45 | 7 | plaintiff Nathson Fields. |
| 09:39:46 | 8 | MR. NOLAND:  Dan Noland, Terry Burns and Paul |
| 09:39:49 | 9 | Michalik for the city and Mr. Murphy. |
| 09:39:51 | 10 | MR. KULWIN:  Good morning, your Honor.  Shelly Kulwin |
| 09:39:53 | 11 | and Rachel Katz for Dave O'Callaghan. |
| 09:39:57 | 12 | THE COURT:  Three things I want to deal with.  There |
| 09:40:01 | 13 | is a motion regarding billing information for one of the |
| 09:40:04 | 14 | defense experts, Mr. Murray.  If I'm understanding this right, |
| 09:40:09 | 15 | he testified in the deposition about how much work he had done |
| 09:40:13 | 16 | up to that point in time, he testified about his hourly rate, |
| 09:40:16 | 17 | he said he hadn't yet sent a bill and now you've got an email |
| 09:40:19 | 18 | which basically says he's done another X number of -- not an |
| 09:40:25 | 19 | email but at least a verbal statement that he's done X |
| 09:40:28 | 20 | additional number of hours and still hasn't sent a bill is |
| 09:40:31 | 21 | that right? |
| 09:40:32 | 22 | MR. ART:  Right.  So all we are missing is Roberts |
| 09:40:36 | 23 | and noble. |
| 09:40:36 | 24 | THE COURT:  So it's not about Murray.  It's the other |
| 09:40:38 | 25 | two. |

09:40:39   1        MR. ART:  We understand that Murray hasn't issued a
09:40:41   2   bill and we understand the hours and we can do the math.  It's
09:40:45   3   the other ones.
09:40:46   4        THE COURT:  What about the other two?
09:40:49   5        MR. BURNS:  In regard to noble, Jeff noble, he is
09:40:52   6   bringing that information for counsel, so we will have that.
09:40:55   7        MR. LOEVY:  Thank you.
09:40:56   8        MR. BURNS:  As soon as he arrives here in the
09:40:58   9   building, we can provide that to them.  I will make copies of
09:41:01  10   it.
09:41:02  11        MR. ART:  Thank you.
09:41:02  12        MR. MICHALIK:  And Roberts, I think most of that
09:41:04  13   information was previously produced in response to a subpoena
09:41:06  14   and I can just.
09:41:08  15        THE COURT:  You will need to update it, in other
09:41:10  16   words, like how many more hours.
09:41:11  17        MR. MICHALIK:  I can tell them approximately what the
09:41:13  18   total is.
09:41:13  19        MR. LOEVY:  Thank you, your Honor.
09:41:14  20        THE COURT:  That's all good enough.  That's item
09:41:16  21   number one.
09:41:17  22        Item number two is Mr. Maue.  Look, you're right on
09:41:24  23   the plaintiff's side, it's not a deposition, but it's as good,
09:41:30  24   and I think that, you know, there's this potential disconnect
09:41:36  25   between rule 32-A 4 and Rule 80.04 of rules of evidence, but I

09:41:42  1  think that under the circumstances, you know, the rules don't

09:41:46  2  necessarily contemplate you're going to be doing a trial over

09:41:49  3  and the witness is going to be testifying the same thing.  I

09:41:52  4  think the trial testimony qualifies under 32-A 4 B and I think

09:41:56  5  a sufficient showing has been made.  You can do the

09:41:59  6  deposition.

09:41:59  7       And then the third issue, so the motion to admit

09:42:03  8  Maue's prior testimony is granted.  That's 1151.  Pam, the

09:42:08  9  motion to compel is going to say 1155 is moot based on the

09:42:12  10  statements made in court.

09:42:13  11       And then the other one has to do with the

09:42:15  12  supplemental -- two supplemental reports for Murray, so can

09:42:18  13  somebody address that on the defense side.

09:42:20  14       MR. NOLAND:  Yes.  The first point was the hatchet

09:42:23  15  case.  It was a case that we had requested from the

09:42:25  16  prosecutors back in February.  They couldn't find it

09:42:29  17  initially.  I then located it, reviewed it for privilege and

09:42:32  18  produced it in October in advance of the deposition of the

09:42:36  19  prosecutor who we had identified as relevant to the case, a

09:42:39  20  guy by the name of Ted logger well.

09:42:42  21       THE COURT:  They had it.

09:42:44  22       THE COURT:  The deposition of who?

09:42:45  23       MR. NOLAND:  Ted logger well.

09:42:48  24       THE COURT:  Did you have it for the deposition of

09:42:50  25  Mr. Murray.

09:42:51   1    MR. NOLAND:  Mr. Murray didn't have it either.

09:42:54   2  Mr. Murray looked at the documents and plaintiff had claimed

09:42:57   3  that 23 pages were missing from the criminal defense file.  In

09:43:00   4  fact 22 out of the 23 pages are included and that there are

09:43:03   5  discovery receipts establishing that they were produced.  So,

09:43:06   6  Judge, we would submit that this was out of our control.  We

09:43:10   7  had requested it in time.  It's a pretty simple fact, it

09:43:12   8  either is or isn't in there.  We didn't plan on going into

09:43:16   9  details on this case with Mr. Murray, so we weren't going to

09:43:20  10  be utilizing it as just part of the general documents that he

09:43:25  11  reviewed and relied upon.  So I don't think the case would

09:43:28  12  even be on my direct mentioned specifically.

09:43:31  13    THE COURT:  What about the second thing?

09:43:32  14    MR. NOLAND:  And the second thing is response to

09:43:34  15  Andrea Lyon's testimony last week.  The Court will recall that

09:43:41  16  plaintiff's disclosure of Andrea Lyon was less than really

09:43:42  17  fulsome.

09:43:42  18    THE COURT:  No, that's exactly wrong.  I mean, I

09:43:46  19  concluded at a sidebar that she had been properly disclosed.

09:43:50  20  It was on the spreadsheet right there next to that file.

09:43:53  21    MR. NOLAND:  What I am talking about is with respect

09:43:56  22  to opinions about the significance of a document in that case.

09:43:59  23  She offered opinions that this particular page was an

09:44:05  24  alternative suspect in the case, and that was something that

09:44:07  25  took us by surprise.  Mr. Murray had stated in his report that

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 6 of 114 PageID #:32791
***REALTIME UNEDITED TRANSCRIPT ONLY***

5

09:44:11  1   the documents at issue, it's a handwritten note, was an RD

09:44:15  2   number, a different RD number so he thought that the document

09:44:20  3   was misfiled.  After Ms. Lyon gave that opinion testimony last

09:44:24  4   week which we were unaware of, we obtained the police report

09:44:29  5   from the police department, we gave that to Mr. Murray, he

09:44:32  6   looked at it and we disclosed a supplemental report last night

09:44:35  7   to the plaintiffs in which he explains that it was traffic

09:44:41  8   accident that occurred two days after the murder, the two

09:44:45  9   individuals involved, and they had a little dispute after the

09:44:49  10  fender-bender.  The two individuals involved were contacted by

09:44:54  11  the detectives, a car was left and a month later the

09:45:00  12  detectives talked to them, talked to him about the case and

09:45:04  13  that didn't go anywhere.  There is no indication whatsoever

09:45:06  14  that it had any indication to that /KHRA*Z homicide at issue

09:45:12  15  and on its face it appears that it's unrelated.  We would

09:45:16  16  simply ask to respond to Ms. Lyon's opinions that we learned

09:45:19  17  last week.

09:45:20  18       THE COURT:  So under rule -- first of all, both of

09:45:22  19  these disclosures are untimely.  So that gets you to Rule 37 C

09:45:27  20  which requires me to determine whether it substantially

09:45:31  21  justified or harmless.

09:45:33  22       The first one, the one relating to the file that you

09:45:38  23  got late from the state's attorney's office, it's not harmless

09:45:44  24  because it came after the deposition and too late for the

09:45:48  25  plaintiff to be able to inquire of Mr. Murray on it.

09:45:51  1      The second one is not substantially justified.  You

09:45:54  2  could have taken Ms. Lyon's deposition.  You would have

09:45:57  3  learned this before.  The motion is granted.  The supplemental

09:46:00  4  opinion is excluded.  There is a matter I need to talk to you

09:46:02  5  about at sidebar.

09:46:08  6     (The following proceedings were had at sidebar:)

09:46:11  7      THE COURT:  I will have Pam make copies of this for

09:46:17  8  you, but it's -- I'm for the moment putting a protective order

09:46:21  9  on it.  I am just going to read it.  This is from a juror

09:46:24  10  named Brenda.  I didn't get a chance to look at which one that

09:46:24  11  is, but you'll figure it out.

09:46:27  12      I'm just going to read it.  This may just be a -- I

09:46:29  13  think she means coincidence, but she says quidinkidink,

09:46:33  14  q-u-i-d-i-n-k-i-d-i-n-k, quidinkidink.  This may just be a

09:46:42  15  coincidence, but I haven't seen or been tagged in over four

09:46:45  16  years.  I don't really know what gangs are what, but this was

09:46:48  17  done sometime between Monday after 10:00 p.m. and Tuesday

09:46:52  18  5:30 a.m.  My husband told me about it last night.  Otherwise,

09:47:00  19  I would have told you yesterday.  I have been going to work

09:47:02  20  after court every day and getting home -- this is the same

09:47:05  21  juror that had the thing about seeing clients -- going to work

09:47:08  22  after court every day and getting home between 9:30 and

09:47:11  23  10:00 p.m., 11:00 p.m. last night, so no real time to talk.  I

09:47:13  24  hope this doesn't have to do with the case.

09:47:15  25      And then she attaches these three pictures.  This was

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 8 of 114 PageID #:32793

| | | |
|---|---|---|
| 09:47:18 | 1 | her garage.  This is on the neighbor's garage door, so |
| 09:47:22 | 2 | directly across.  So if she opens her garage door, she sees |
| 09:47:25 | 3 | it.  It's across the alley.  This is on the door across the |
| 09:47:28 | 4 | alley right outside her bedroom window. |
| 09:47:33 | 5 | I mean, actually, they're kind of different styles. |
| 09:47:37 | 6 | But it kind of looks like the neighborhood has been hit, or at |
| 09:47:40 | 7 | least the block has been hit. |
| 09:47:42 | 8 | I need you to think about and we will address it at |
| 09:47:47 | 9 | lunch what, if anything, I should do or say. |
| 09:47:54 | 10 | MR. KULWIN:  I just wanted to let you know I filed |
| 09:47:55 | 11 | something this morning. |
| 09:48:04 | 12 | THE COURT:  The U.S. Attorney's Office internal |
| 09:48:05 | 13 | documents found at MCC Longley called the pros memo should be |
| 09:48:08 | 14 | admitted into evidence. |
| 09:48:10 | 15 | MR. KULWIN:  We were going to talk about this at |
| 09:48:12 | 16 | lunch, I thought. |
| 09:48:14 | 17 | THE COURT:  Okay.  Fine. |
| 09:48:19 | 18 | (The following proceedings were had in open court outside |
| 09:48:21 | 19 | the presence and hearing of the jury:) |
| 09:48:21 | 20 | THE COURT:  So anything else before we get the jury |
| 09:48:26 | 21 | out here? |
| 09:48:27 | 22 | MR. LOEVY:  Not from the plaintiff, your Honor. |
| 09:48:29 | 23 | THE COURT:  So we were where? |
| 09:48:37 | 24 | MR. LOEVY:  We were reading Gerald Morris. |
| 09:48:38 | 25 | THE COURT:  We are going to read the 2009. |

12/07/16 AM    \*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*

8

| | |
|---|---|
| 09:48:40 | 1       MR. LOEVY: Exactly. |

09:48:40  1       MR. LOEVY:  Exactly.

09:48:41  2       THE COURT:  Let's get the jury on out then.  My goal,

09:48:46  3   by the way, is to get you a draft of the jury instructions by

09:48:50  4   the end of the day today.  And not to interfere unduly with

09:48:58  5   Mr. Kulwin's haircut appointment, but we may be -- I may ask

09:49:02  6   you to come in on Friday at 9:00 to do a little bit of work on

09:49:06  7   those between 9:00 and 10:00.

09:49:08  8       MR. KULWIN:  I'll let him know.  And, Judge, we are

09:49:11  9   just going to need the ELMO at one point during this just to

09:49:14  10  give you a head's up.

09:49:15  11      THE COURT:  Thanks.  My other intention is to tell

09:49:21  12  the jury, talk to the jury at the end of the day about

09:49:27  13  scheduling, timing, about Friday morning and we will also have

09:49:32  14  a better idea then when we are going to end.  I'll caucus with

09:49:36  15  you first.  My sense is that we will finish Monday, but it's

09:49:39  16  hard to say.

09:49:40  17      MR. LOEVY:  It's not out of the question this week,

09:49:42  18  your Honor, it's really not.

09:49:44  19      THE COURT:  Yeah, it is.

09:49:45  20    (The jury enters the courtroom.) Is

09:50:09  21      THE COURT:  Okay.  Everybody can have a seat.  Good

09:50:11  22  morning.

09:50:11  23      So we're going to pick up where we left off and that

09:50:14  24  is with we are going to start the reading of Gerald Morris'

09:50:20  25  testimony from the 2009 criminal trial and again this is not

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 10 of 114 PageID #:32795

09:50:24  1   the actual witness, not the actual lawyer, lawyers.  At some

09:50:29  2   point, is he going to come down and point to stuff?

09:50:33  3              MS. KATZ:  He may.

09:50:34  4              THE COURT:  All right.  You can go ahead, Ms. Katz.

09:50:36  5              MS. KATZ:  For the record, this is March 25th, 2009,

09:50:38  6   and this is the direct examination by the prosecutor

09:50:41  7   Mr. Sexton.

09:50:42  8                              - - -

09:50:42  9    GERALD MORRIS, DIRECT EXAMINATION, PREVIOUS TESTIMONY

09:50:42  10  BY MS. KATZ:

09:50:44  11  Q.  Gerald, in a nice loud voice could you introduce yourself

09:50:47  12  to the Court and spell your last name for the benefit of the

09:50:50  13  court reporter?

09:50:50  14  A.  Gerald Morris, Gerald Morris.

09:50:53  15  Q.  Mr. Morris, how old are you?

09:50:56  16  A.  47.

09:50:57  17  Q.  Did you have any children?

09:50:59  18  A.  Yes.

09:51:00  19  Q.  How many children do you have?

09:51:01  20  A.  I have five kids, well, four now.

09:51:04  21  Q.  Sir, directing your attention back to April of 1984, do

09:51:09  22  you recall where you were living?

09:51:10  23  A.  I was living at 39th, 706 building.

09:51:13  24  Q.  Is that the address 706 East 39th Street in the City of

09:51:18  25  Chicago?

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 11 of 114 PageID #:32796
***REALTIME UNEDITED TRANSCRIPT ONLY***

10

09:51:18    1    A.  Yes.

09:51:19    2    Q.  The County of Cook?

09:51:20    3    A.  Yes.

09:51:20    4    Q.  Is that a high rise project building?

09:51:25    5    A.  Yes.

09:51:26    6    Q.  How long had you been living there?

09:51:27    7    A.  A couple months.

09:51:28    8    Q.  Who were you living there with?

09:51:29    9    A.  The Langston family, my girlfriend Sandra Langston, her

09:51:33   10    mother and stepfather.

09:51:33   11    Q.  Were your kids living there as well?

09:51:35   12    A.  Yes.

09:51:36   13    Q.  How many kids did you have become then?

09:51:38   14    A.  Two back then, and one on the way.

09:51:41   15    Q.  That apartment, how many floors to that apartment?

09:51:45   16    A.  Two.

09:51:46   17    Q.  I am going to direct your attention back to April 28th,

09:51:49   18    1984, about 10:00 o'clock in the morning.

09:51:51   19            Do you remember where you were?

09:51:52   20    A.  Yes, I was in the room upstairs gazing out the window

09:51:58   21    talking to Fuddy at that time.

09:51:59   22    Q.  Were you looking out that window -- when you were looking

09:52:02   23    out that window, what are you looking out at?

09:52:04   24    A.  The parking lot, towards Ida B. Wells.

09:52:06   25    Q.  Is that the front or back of the 706 building?


***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 09:52:09 | 1 | A. That's the back. |
| 09:52:10 | 2 | Q. You were looking out into the parking lot? |
| 09:52:13 | 3 | A. Yes. |
| 09:52:13 | 4 | Q. Could you see to the left the street of Langley? |
| 09:52:17 | 5 | A. Yes. |
| 09:52:17 | 6 | Q. And to the right, is that the entrance to the rear of the |
| 09:52:20 | 7 | breezeway that goes to the front? |
| 09:52:23 | 8 | A. Yes. |
| 09:52:24 | 9 | Q. Who was Fuddy? |
| 09:52:25 | 10 | A. Jerome Smith. |
| 09:52:26 | 11 | Q. Was he a friend of yours? |
| 09:52:29 | 12 | A. Yes. |
| 09:52:29 | 13 | Q. How long had you known Fuddy? |
| 09:52:31 | 14 | A. About five years. |
| 09:52:32 | 15 | Q. Was Fuddy a member of any gang that you're aware of? |
| 09:52:36 | 16 | A. Gangsters Goon Squad. |
| 09:52:37 | 17 | Q. Did he have any rank? |
| 09:52:39 | 18 | A. Yes, he's the king. |
| 09:52:40 | 19 | Q. Were you a member of that same gang? |
| 09:52:44 | 20 | A. Yes. |
| 09:52:44 | 21 | Q. About how long were you a member of the same gang? |
| 09:52:47 | 22 | A. At the time, over six years. |
| 09:52:50 | 23 | Q. Did you have any rank in that gang? |
| 09:52:52 | 24 | A. No. |
| 09:52:52 | 25 | Q. At that time were you aware of any tension between the |

12/07/16 AM | ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 09:52:57 | 1 | Goon Squad and the gang known as the El Rukns? |
| 09:53:00 | 2 | A.  Yes. |
| 09:53:00 | 3 | Q.  Was there shooting between those gangs at that time? |
| 09:53:05 | 4 | A.  One I can recall, yes. |
| 09:53:06 | 5 | Q.  In fact, are you aware of where the headquarters of the El |
| 09:53:11 | 6 | Rukns were at? |
| 09:53:11 | 7 | A.  Yes, down the street from Ida B. Wells. |
| 09:53:14 | 8 | Q.  Was that 39th and Drexel? |
| 09:53:16 | 9 | A.  Yes. |
| 09:53:16 | 10 | Q.  Now, how long were you talking to Fuddy? |
| 09:53:20 | 11 | A.  A couple of minutes. |
| 09:53:21 | 12 | Q.  And you stated you were on the top floor of your |
| 09:53:24 | 13 | apartment; is that correct? |
| 09:53:25 | 14 | A.  Correct. |
| 09:53:25 | 15 | Q.  When you're looking out that window, how far above the |
| 09:53:30 | 16 | ground is the window to the ground? |
| 09:53:31 | 17 | A.  Five feet. |
| 09:53:32 | 18 | Q.  What were you talking to him about, if you recall? |
| 09:53:36 | 19 | A.  It was before Paul Hailey, he was locked up with time, he |
| 09:53:41 | 20 | was telling me that he's standing outside to wait for him. |
| 09:53:44 | 21 | Q.  After you were talking to him briefly, did Fuddy have |
| 09:53:46 | 22 | occasion to go anywhere that you saw? |
| 09:53:48 | 23 | A.  No, he was going around, under the breezeway and waiting |
| 09:53:52 | 24 | for Paul to get out. |
| 09:53:54 | 25 | Q.  And what did you do then? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 14 of 114 PageID #:32799

| | | |
|---|---|---|
| 09:53:55 | 1 | A.  I stood in the window for kind of a brief moment. |
| 09:53:58 | 2 | Q.  And did you have occasion to go anywhere? |
| 09:54:00 | 3 | A.  Yes, I told him I was going to come down there after I put |
| 09:54:03 | 4 | my shirt on, downstairs and wait for him. |
| 09:54:06 | 5 | Q.  Where did you go to put your shirt on? |
| 09:54:08 | 6 | A.  I went in the next room. |
| 09:54:09 | 7 | Q.  Now, before you went to get your shirt on, did you see |
| 09:54:13 | 8 | anybody else pass after Fuddy went to the rear of the |
| 09:54:17 | 9 | breezeway? |
| 09:54:17 | 10 | A.  Yes. |
| 09:54:17 | 11 | Q.  What did you see? |
| 09:54:18 | 12 | A.  I seen two guys get out of the car and walk towards under |
| 09:54:23 | 13 | the breezeway. |
| 09:54:23 | 14 | Q.  The same direction that Fuddy went? |
| 09:54:26 | 15 | A.  Same direction. |
| 09:54:26 | 16 | Q.  How much time passed between the time that you saw Fuddy |
| 09:54:32 | 17 | go under the breezeway to the rear and the time that you saw |
| 09:54:35 | 18 | these two individuals, these two males follow? |
| 09:54:37 | 19 | A.  I'll say about two to three minutes. |
| 09:54:39 | 20 | Q.  Okay.  You were still standing at the same window? |
| 09:54:42 | 21 | A.  Yes. |
| 09:54:42 | 22 | Q.  Could you describe those individuals? |
| 09:54:45 | 23 | A.  One was light skinned with a beard, braids, and a red |
| 09:54:49 | 24 | jacket on.  The other one had dark clothing on and a cap, |
| 09:54:52 | 25 | beard and braids. |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 15 of 114 PageID #:32800

| | | |
|---|---|---|
| 09:54:53 | 1 | Q. Who was taller, the light skinned one or the dark? |
| 09:54:56 | 2 | A. The light skinned one. |
| 09:54:58 | 3 | Q. And did you see anything on the top of their heads? |
| 09:55:00 | 4 | A. They had a skull. |
| 09:55:03 | 5 | Q. What, if anything, did you see? |
| 09:55:04 | 6 | A. I seen him, you know, with a stocking cap on their head, |
| 09:55:10 | 7 | we call a skull cap. |
| 09:55:11 | 8 | Q. Did it obstruct the view of their face? |
| 09:55:14 | 9 | A. No, it wasn't pulled down. |
| 09:55:16 | 10 | Q. Did you get a look at their faces? |
| 09:55:18 | 11 | A. Yes. |
| 09:55:19 | 12 | Q. Mr. Morris, what is a skull cap? |
| 09:55:22 | 13 | A. We call a skull cap, it is a knitted cap, baseball cap, |
| 09:55:27 | 14 | no, not a baseball, knitted cap. |
| 09:55:29 | 15 | Q. All right. How far is it? How far does it go down or |
| 09:55:34 | 16 | anything like that, besides a knitted cap, can you pull it |
| 09:55:38 | 17 | down over your face? |
| 09:55:39 | 18 | A. Yes. |
| 09:55:39 | 19 | Q. Let me ask you this. Was it covering their faces at the |
| 09:55:43 | 20 | time? |
| 09:55:43 | 21 | A. No. |
| 09:55:44 | 22 | Q. Thank you. |
| 09:55:45 | 23 | How close did they get to you as they passed on their |
| 09:55:50 | 24 | way to the rear of the breezeway? |
| 09:55:51 | 25 | A. Ask that again. |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 16 of 114 PageID #:32801
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 09:55:54 | 1 | Q.  How close did they get to that window you were at? |
| 09:55:57 | 2 | A.  Five feet. |
| 09:55:58 | 3 | Q.  Again, did you get a look at their face when they passed |
| 09:56:02 | 4 | by you five feet away? |
| 09:56:03 | 5 | A.  Yes. |
| 09:56:03 | 6 | Q.  This was 10:00 o'clock in the morning? |
| 09:56:06 | 7 | A.  Yes. |
| 09:56:06 | 8 | Q.  Was it sunny out? |
| 09:56:08 | 9 | A.  Yes. |
| 09:56:08 | 10 | Q.  And was there anything obstructing your view of their |
| 09:56:11 | 11 | face? |
| 09:56:12 | 12 | A.  No. |
| 09:56:12 | 13 | Q.  If you answered this I apologize, the dark skinned one, |
| 09:56:17 | 14 | what kind of facial hair, the dark skinned one, what kind of |
| 09:56:21 | 15 | facial hair did he have? |
| 09:56:24 | 16 | A.  He had a beard, moustache. |
| 09:56:24 | 17 | Q.  Did he have braids? |
| 09:56:25 | 18 | A.  Yes. |
| 09:56:25 | 19 | Q.  Can you describe his physical build compared to the taller |
| 09:56:29 | 20 | light skinned one? |
| 09:56:30 | 21 | A.  Kind of stocky like. |
| 09:56:32 | 22 | Q.  He was stockier than the tall one? |
| 09:56:35 | 23 | A.  Yes. |
| 09:56:35 | 24 | Q.  Than the tall one? |
| 09:56:37 | 25 | Q.  Did you see where they walked to then? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 17 of 114 PageID #:32802
***REALTIME UNEDITED TRANSCRIPT ONLY***

16

| | | |
|---|---|---|
| 09:56:38 | 1 | A.  They walked up under the breezeway. |
| 09:56:41 | 2 | Q.  Now, after they walked under the breezeway, what, if |
| 09:56:44 | 3 | anything, did you have occasion to do? |
| 09:56:45 | 4 | A.  I was going to get my shirt out the other room. |
| 09:56:49 | 5 | Q.  Where was your shirt? |
| 09:56:50 | 6 | A.  In the next room. |
| 09:56:51 | 7 | Q.  And did anything unusual occur as you were putting on your |
| 09:56:54 | 8 | shirt? |
| 09:56:55 | 9 | A.  Yes, I heard several gunshots at that time. |
| 09:56:57 | 10 | Q.  About how much time passed between the time that you |
| 09:57:01 | 11 | observed these two individuals go under the breezeway and the |
| 09:57:04 | 12 | time that you heard several gunshots? |
| 09:57:06 | 13 | A.  A couple a minutes, about five minutes, a couple of |
| 09:57:11 | 14 | minutes. |
| 09:57:11 | 15 | Q.  What did you do after you heard those gunshots? |
| 09:57:13 | 16 | A.  I ran outside. |
| 09:57:14 | 17 | Q.  Now, did you have occasion to look out anywhere? |
| 09:57:17 | 18 | A.  I looked, yes, out the back window. |
| 09:57:19 | 19 | Q.  Is that the window where you were putting your shirt on? |
| 09:57:22 | 20 | A.  Yes, yes. |
| 09:57:23 | 21 | Q.  That's a different window than when you were talking to |
| 09:57:27 | 22 | Fuddy? |
| 09:57:27 | 23 | A.  Yes. |
| 09:57:27 | 24 | Q.  Did you happen to see anything when you looked out that |
| 09:57:31 | 25 | other window? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 18 of 114 PageID #:32803
***REALTIME UNEDITED TRANSCRIPT ONLY***

17

| | | |
|---|---|---|
| 09:57:32 | 1 | A.  The same guy started, they were running back to the same |
| 09:57:36 | 2 | -- to the car. |
| 09:57:37 | 3 | Q.  Were they doing anything as they were running back to the |
| 09:57:39 | 4 | car? |
| 09:57:39 | 5 | A.  They was taking their face masks off. |
| 09:57:42 | 6 | Q.  Did you see where they ran to? |
| 09:57:43 | 7 | A.  Yes, they ran back to the car, they got out. |
| 09:57:46 | 8 | Q.  Could you describe that car for us? |
| 09:57:49 | 9 | A.  It was a four-door Cadillac, white top. |
| 09:57:51 | 10 | Q.  What color was it, if you recall? |
| 09:57:53 | 11 | A.  Like a blue-ish green. |
| 09:57:56 | 12 | Q.  Did you see anything in their hands as they were running |
| 09:57:59 | 13 | towards the car? |
| 09:58:00 | 14 | A.  They had a gun. |
| 09:58:01 | 15 | Q.  And what happened once they got to the car? |
| 09:58:03 | 16 | A.  The light skinned one got in first while the other one had |
| 09:58:09 | 17 | the door open.  As they got there, threw the guns in, took |
| 09:58:14 | 18 | their caps off, the other guy in. |
| 09:58:14 | 19 | Q.  Who got in first? |
| 09:58:16 | 20 | A.  Hawkins got in first. |
| 09:58:17 | 21 | Q.  What was Fields doing at that time? |
| 09:58:19 | 22 | A.  He was looking around. |
| 09:58:20 | 23 | Q.  Well, you stated that Hawkins got in first, correct? |
| 09:58:25 | 24 | A.  Right. |
| 09:58:25 | 25 | Q.  Where was the other individual? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 19 of 114 PageID #:32804
***REALTIME UNEDITED TRANSCRIPT ONLY***

18

| | | |
|---|---|---|
| 09:58:27 | 1 | A. He was standing by the car, had the door open. |
| 09:58:31 | 2 | Q. And what did Hawkins do when he got in the car? |
| 09:58:34 | 3 | A. He took his gun, throwed it in the car. |
| 09:58:36 | 4 | Q. And got in the car? |
| 09:58:37 | 5 | A. Yes. |
| 09:58:37 | 6 | Q. What did the other individual do? |
| 09:58:40 | 7 | A. He stood outside holding the door open. |
| 09:58:42 | 8 | Q. All right. What did he do after that, after Hawkins got |
| 09:58:47 | 9 | in the car? |
| 09:58:47 | 10 | A. He just looked around and got in the car after him. |
| 09:58:49 | 11 | Q. When he looked around, was the ski mask up? |
| 09:58:55 | 12 | A. Yes, it was up. |
| 09:58:56 | 13 | Q. Could you see his face? |
| 09:58:58 | 14 | A. Yes. |
| 09:58:58 | 15 | Q. Do you see that person here in the courtroom today? |
| 09:59:01 | 16 | A. Yes. |
| 09:59:01 | 17 | Q. Could you please point and identify something that he is |
| 09:59:03 | 18 | wearing? |
| 09:59:03 | 19 | A. A suit. |
| 09:59:04 | 20 | Q. Could you please point physically point? |
| 09:59:07 | 21 | A. Right there. |
| 09:59:08 | 22 | Q. Judge, let the record reflect the witness has pointed out |
| 09:59:12 | 23 | the defendant Nathson Fields. |
| 09:59:13 | 24 | Did Mr. Fields then get in the car? |
| 09:59:17 | 25 | A. Yes. |

| 09:59:17 | 1 | Q. And how many people were in the car? |
| 09:59:18 | 2 | A. I'll say four, four people. |
| 09:59:21 | 3 | Q. Did the car take off? |
| 09:59:22 | 4 | A. Yes. |
| 09:59:22 | 5 | Q. Had you ever seen Hawkins before that date? |
| 09:59:26 | 6 | A. A couple of times around, yes. |
| 09:59:28 | 7 | Q. Did you know him to be a member of any gang? |
| 09:59:31 | 8 | A. Yes. |
| 09:59:31 | 9 | Q. What gang is that? |
| 09:59:33 | 10 | A. The El Rukns. |
| 09:59:34 | 11 | Q. After you saw that car take off, what did you do then? |
| 09:59:38 | 12 | A. Then I ran downstairs and ran outside. |
| 09:59:41 | 13 | Q. Where specifically did you run to? |
| 09:59:43 | 14 | A. Up under the breezeway right around the corner. |
| 09:59:45 | 15 | Q. The front or the back of the building? |
| 09:59:47 | 16 | A. Front of the building. |
| 09:59:49 | 17 | Q. Did you see anything there? |
| 09:59:50 | 18 | A. That's where I seen Fuddy and Talman lying on the ground. |
| 09:59:56 | 19 | Q. Was Talman Hickman a member of any gang? |
| 09:59:58 | 20 | A. No. |
| 09:59:58 | 21 | Q. Did the police eventually arrive on the scene at 706 East |
| 10:00:03 | 22 | 39th Street? |
| 10:00:03 | 23 | A. They arrived a little bit of time afterwards. |
| 10:00:06 | 24 | Q. And at some point that night, did you talk to a police |
| 10:00:10 | 25 | officer? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 21 of 114 PageID #:32806
***REALTIME UNEDITED TRANSCRIPT ONLY***

20

| | | |
|---|---|---|
| 10:00:10 | 1 | A.  Yes. |
| 10:00:11 | 2 | Q.  Do you know the name of the police officer? |
| 10:00:13 | 3 | A.  No, I don't remember the name. |
| 10:00:15 | 4 | Q.  Did you tell the police officer anything? |
| 10:00:17 | 5 | A.  Yes, I told him I seen something.  They told me they will |
| 10:00:21 | 6 | get back to me.  It took them about a year later, they came |
| 10:00:25 | 7 | back. |
| 10:00:25 | 8 | Q.  In fact, going to direct your attention to May 16th, 1985, |
| 10:00:30 | 9 | did the police get back to you? |
| 10:00:31 | 10 | A.  Yes. |
| 10:00:31 | 11 | Q.  Did you talk to a detective by the name of O'Callaghan? |
| 10:00:35 | 12 | A.  Yes. |
| 10:00:36 | 13 | Q.  And can you describe what he looks like? |
| 10:00:38 | 14 | A.  He is a white guy, white hair, tall and big stomach, I |
| 10:00:43 | 15 | guess. |
| 10:00:43 | 16 | Q.  Did you have occasion to talk to him at the state's |
| 10:00:47 | 17 | attorney's office on the 13th floor, May 16th, 1985? |
| 10:00:51 | 18 | A.  Yes. |
| 10:00:51 | 19 | Q.  And did you have occasion to look at some photographs? |
| 10:00:54 | 20 | A.  Yes. |
| 10:00:54 | 21 | Q.  About how many pictures did you look at? |
| 10:00:58 | 22 | A.  About 30. |
| 10:00:59 | 23 | Q.  Did you pick anybody out of those pictures who you |
| 10:01:03 | 24 | remembered as the persons you saw going or walking past before |
| 10:01:08 | 25 | the shots and then running to the car afterwards? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 22 of 114 PageID #:32807
***REALTIME UNEDITED TRANSCRIPT ONLY***

21

| | | |
|---|---|---|
| 10:01:13 | 1 | A. Yes. |
| 10:01:13 | 2 | Q. Who did you pick out? |
| 10:01:15 | 3 | A. Hawkins, the light-skinned guy and the dark skinned guy. |
| 10:01:18 | 4 | Q. And one of the individuals you picked out, is that the |
| 10:01:21 | 5 | same individual that you picked out in court today? |
| 10:01:23 | 6 | A. Yes. |
| 10:01:24 | 7 | Q. Did you tell anything to Detective O'Callaghan when you |
| 10:01:26 | 8 | picked those individuals out from those photographs? |
| 10:01:28 | 9 | A. No. |
| 10:01:28 | 10 | Q. Well, when you picked those photos out, did you say |
| 10:01:32 | 11 | anything about wanting to see them in person? |
| 10:01:35 | 12 | A. I wanted to see a lineup. |
| 10:01:36 | 13 | Q. Why did you say that? |
| 10:01:38 | 14 | A. Because I wanted to be sure that these are the guys. |
| 10:01:41 | 15 | Q. Did Detective O'Callaghan ever tell you who to pick out? |
| 10:01:45 | 16 | A. No. No. |
| 10:01:46 | 17 | Q. Now, directing your attention to May 18th, 1985, did you |
| 10:01:51 | 18 | have occasion to view a lineup? |
| 10:01:52 | 19 | A. Yes. |
| 10:01:53 | 20 | Q. I'm going to show you what has been marked as people's |
| 10:01:57 | 21 | number 19 A. Do you recognize that? |
| 10:02:00 | 22 | A. Yes. |
| 10:02:00 | 23 | Q. Is that a photo of the lineup that you saw on that date? |
| 10:02:03 | 24 | A. Yes. |
| 10:02:03 | 25 | Q. And did you identify anybody in that lineup? |

| | | |
|---|---|---|
| 10:02:07 | 1 | A. Yes. |
| 10:02:08 | 2 | Q. Who did you identify? |
| 10:02:09 | 3 | A. The light-skinned guy. |
| 10:02:12 | 4 | Q. Okay. Did Detective O'Callaghan ever tell you who to pick |
| 10:02:16 | 5 | out? |
| 10:02:16 | 6 | A. No. |
| 10:02:17 | 7 | Q. Did you view a lineup by yourself? |
| 10:02:20 | 8 | A. Yes. |
| 10:02:20 | 9 | Q. No other witnesses were in with you? |
| 10:02:23 | 10 | A. No. |
| 10:02:23 | 11 | Q. Nobody told you who to pick out? |
| 10:02:27 | 12 | A. No. |
| 10:02:27 | 13 | Q. The person that you picked out, you stated that it was the |
| 10:02:30 | 14 | light skinned fellow; is that correct? |
| 10:02:32 | 15 | A. Yes. |
| 10:02:32 | 16 | Q. And that's the person that you knew as Hawkins? |
| 10:02:35 | 17 | A. Yes. |
| 10:02:35 | 18 | Q. Is that the same person that you had seen around the |
| 10:02:38 | 19 | building before as well? |
| 10:02:40 | 20 | A. Yes. |
| 10:02:40 | 21 | Q. Does this fairly and accurately portray the way the lineup |
| 10:02:45 | 22 | looked at the time that you identified the light-skinned guy? |
| 10:02:48 | 23 | A. Yes. |
| 10:02:49 | 24 | Q. And, again, you indicated that is the same person that was |
| 10:02:54 | 25 | the taller, skinnier one, correct? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 24 of 114 PageID #:32809
***REALTIME UNEDITED TRANSCRIPT ONLY***

23

| | | |
|---|---|---|
| 10:02:56 | 1 | A.  Correct. |
| 10:02:56 | 2 | Q.  Going to direct your attention to June 14th, 1985.  Did |
| 10:03:02 | 3 | you have occasion to go back down to area one police |
| 10:03:04 | 4 | headquarters? |
| 10:03:05 | 5 | A.  Yes. |
| 10:03:05 | 6 | Q.  And did you view another lineup? |
| 10:03:07 | 7 | A.  Yes. |
| 10:03:08 | 8 | Q.  Judge, showing the witness for the record what's been |
| 10:03:11 | 9 | marked as people's number 16. |
| 10:03:14 | 10 | Is that the lineup that you viewed? |
| 10:03:15 | 11 | A.  Yes. |
| 10:03:15 | 12 | Q.  Did you identify anybody in that lineup? |
| 10:03:19 | 13 | A.  Yes. |
| 10:03:19 | 14 | Q.  And who did you identify in that lineup? |
| 10:03:22 | 15 | A.  The dark skinned guy. |
| 10:03:24 | 16 | Q.  Is that the same person that you identified here in court |
| 10:03:28 | 17 | today? |
| 10:03:28 | 18 | A.  Yes. |
| 10:03:29 | 19 | Q.  Is that the same individual that was the darker skinned, |
| 10:03:33 | 20 | more solidly built individual that was with the taller, light |
| 10:03:37 | 21 | complected individual that you saw back on April 28th, 1984? |
| 10:03:41 | 22 | A.  Yes. |
| 10:03:41 | 23 | Q.  Now, again, is there also an X above that person that you |
| 10:03:46 | 24 | identified on people's number 19? |
| 10:03:48 | 25 | A.  Yes. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 25 of 114 PageID #:32810
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

| | | |
|---|---|---|
| 10:03:48 | 1 | Q. And is that the X he put on there back in June of 1986 |
| 10:03:54 | 2 | when you testified in this case? |
| 10:03:55 | 3 | A. Yes. |
| 10:03:56 | 4 | Q. And is this the same individual that you identified as the |
| 10:04:00 | 5 | same person that you saw going past following Fuddy and then |
| 10:04:04 | 6 | hearing the shots and then running back towards the car and |
| 10:04:08 | 7 | then looking around and getting in the car? |
| 10:04:10 | 8 | A. Yes. |
| 10:04:10 | 9 | Q. Just so we're clear, you saw his face several times, |
| 10:04:14 | 10 | correct? |
| 10:04:15 | 11 | A. Yes. |
| 10:04:15 | 12 | Q. First, showing you people's 3-A, do you recognize that, |
| 10:04:21 | 13 | Mr. Morris? |
| 10:04:22 | 14 | A. Yes, Talman Hickman. |
| 10:04:23 | 15 | Q. Mr. Hickman? |
| 10:04:25 | 16 | A. Yes. |
| 10:04:25 | 17 | Q. Showing you people's No. 4, do you recognize that? |
| 10:04:29 | 18 | A. Yes, that's Fuddy. |
| 10:04:31 | 19 | Q. Does that fairly and accurately portray the way they |
| 10:04:35 | 20 | looked back after you heard the shots and went down to see |
| 10:04:39 | 21 | what happened? |
| 10:04:39 | 22 | A. Yes. |
| 10:04:39 | 23 | Q. Now, after you identified, after you viewed the lineup on |
| 10:04:43 | 24 | June 14th, 1985, I'm directing your attention to March of '86, |
| 10:04:50 | 25 | this case was set for trial, did you have occasion to be |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 26 of 114 PageID #:32811
***REALTIME UNEDITED TRANSCRIPT ONLY***

25

| 10:04:52 | 1 | relocated by the state's attorney's office? |
| 10:04:55 | 2 | A. Yes. |
| 10:04:55 | 3 | Q. And did you get relocated to out of state? |
| 10:04:59 | 4 | A. I moved to my mother's house out of state. |
| 10:05:01 | 5 | Q. Eventually did their office pay for you to get relocated? |
| 10:05:06 | 6 | A. Yes. |
| 10:05:06 | 7 | Q. To out of state? |
| 10:05:07 | 8 | A. Yes. |
| 10:05:07 | 9 | Q. In fact, was your whole family moved? |
| 10:05:10 | 10 | A. Yes, my whole family was moved. |
| 10:05:12 | 11 | Q. Your kids as well as Sandra Langston? |
| 10:05:15 | 12 | A. Yes. |
| 10:05:15 | 13 | Q. Was she your girlfriend at the time or your wife? |
| 10:05:18 | 14 | A. My girlfriend at the time. |
| 10:05:20 | 15 | Q. Did we pay for those expenses to move you? |
| 10:05:23 | 16 | A. Yes. |
| 10:05:24 | 17 | Q. Were you working at that time? |
| 10:05:26 | 18 | A. No. |
| 10:05:27 | 19 | Q. Was Sandra working at that time? |
| 10:05:29 | 20 | A. No. |
| 10:05:29 | 21 | Q. And the kids were staying with you, correct? |
| 10:05:32 | 22 | A. Yes, before I moved, yes. |
| 10:05:34 | 23 | Q. Gerald, I'm going to show you what's been marked as |
| 10:05:38 | 24 | Defendant's Exhibit 388.  Do you recognize that? |
| 10:05:51 | 25 | A. Yes, the building I stayed in. |

| | | |
|---|---|---|
| 10:05:54 | 1 | Q.  And do you recognize the window that is already circled? |
| 10:05:58 | 2 | A.  Yes, that's my side view window.  I can look outside. |
| 10:06:01 | 3 | Q.  Is that the same window that you were talking to Fuddy out |
| 10:06:04 | 4 | of? |
| 10:06:05 | 5 | A.  Yes. |
| 10:06:05 | 6 | Q.  And is that a view taken from the street Langley looking |
| 10:06:09 | 7 | towards the rear of the 706 building? |
| 10:06:11 | 8 | A.  Yes. |
| 10:06:11 | 9 | Q.  In fact, do you see some gang insignia on that building? |
| 10:06:16 | 10 | A.  Yes. |
| 10:06:17 | 11 | Q.  Can you tell us what that stands for? |
| 10:06:19 | 12 | A.  Black Gangster Goon Squad. |
| 10:06:21 | 13 | Q.  B G G S; is that correct? |
| 10:06:23 | 14 | A.  Yes. |
| 10:06:24 | 15 | Q.  Was that building considered the 706 building considered |
| 10:06:30 | 16 | to be territory or a building belonging to the Goon Squad |
| 10:06:34 | 17 | gang? |
| 10:06:35 | 18 | A.  Yes. |
| 10:06:35 | 19 | Q.  Showing you what's been marked as Defendant's Exhibit 389. |
| 10:06:55 | 20 | Do you recognize that? |
| 10:06:56 | 21 | A.  Yes, that's the top window I was looking out when I was |
| 10:06:59 | 22 | talking to Fuddy. |
| 10:07:00 | 23 | Q.  Is that window circled as well? |
| 10:07:03 | 24 | A.  Yes. |
| 10:07:03 | 25 | Q.  In fact, did you circle both those -- did you yourself |

12/07/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | |
|---|---|
| 10:07:07 | 1 make those marks back when you testified back in June of '86 |
| 10:07:10 | 2 in this trial? |
| 10:07:11 | 3 A.  Yes. |
| 10:07:11 | 4 Q.  The two windows that are circled in both 389 and 388, are |
| 10:07:18 | 5 those the exact same windows? |
| 10:07:19 | 6 A.  Yes. |
| 10:07:19 | 7 Q.  All right.  And looking at Defendant's Exhibit 389, do you |
| 10:07:24 | 8 see the street Langley? |
| 10:07:25 | 9 A.  Yes, street right here. |
| 10:07:27 | 10 Q.  That is to the right of the picture? |
| 10:07:30 | 11 A.  Yes. |
| 10:07:30 | 12 Q.  Where was the breezeway that connects the front of the |
| 10:07:40 | 13 building? |
| 10:07:40 | 14 A.  That would be left of the building. |
| 10:07:41 | 15 Q.  Left of Defendant's Exhibit 389? |
| 10:07:44 | 16 A.  Yes. |
| 10:07:44 | 17 Q.  Do those photos fairly and accurately portray the scene |
| 10:07:49 | 18 back the way it appeared back in April 28, 1984? |
| 10:07:52 | 19 A.  Yes. |
| 10:07:52 | 20 Q.  Showing you Defendant's Exhibit 389, you stated that they |
| 10:08:00 | 21 got about five feet from the window; is that correct? |
| 10:08:02 | 22 A.  Yes. |
| 10:08:03 | 23 Q.  Can you please put an X to indicate where they were when |
| 10:08:07 | 24 they passed by your window on Defendant's Exhibit 389 on their |
| 10:08:11 | 25 way to the rear of the breezeway? |

***REALTIME UNEDITED TRANSCRIPT ONLY***

***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 10:08:12 | 1 | THE COURT:  Again, everybody agrees that this is what |
| 10:08:15 | 2 | the witness did during the trial. |
| 10:08:20 | 3 | THE WITNESS:  All right.  It's that way, sidewalk |
| 10:08:22 | 4 | right up in here. |
| 10:08:23 | 5 | BY MS. KATZ: |
| 10:08:25 | 6 | Q.  For the record, all right.  This is like the standard |
| 10:08:27 | 7 | picture.  Everything you are pointing out is not on that |
| 10:08:31 | 8 | photo.  Is the sidewalk on the photo, Mr. Morris? |
| 10:08:33 | 9 | A.  The grass area right here. |
| 10:08:37 | 10 | Q.  I asked if the sidewalk was in that photo? |
| 10:08:41 | 11 | A.  No, no, it is not. |
| 10:08:42 | 12 | Q.  Did they walk on the grass or on the sidewalk? |
| 10:08:45 | 13 | A.  Sidewalk. |
| 10:08:46 | 14 | Q.  That's when they walked in front of you? |
| 10:08:49 | 15 | A.  Yes. |
| 10:08:49 | 16 | Q.  Okay.  Now, showing you Defendant's Exhibit 390, do you |
| 10:09:06 | 17 | recognize that? |
| 10:09:07 | 18 | A.  Yes, that's my back window. |
| 10:09:11 | 19 | Q.  Now, is that the back window that you looked out when you |
| 10:09:14 | 20 | were getting your shirt, you saw the individual with guns in |
| 10:09:18 | 21 | their hands taking their masks off and running to the car that |
| 10:09:22 | 22 | you described? |
| 10:09:22 | 23 | A.  Yes. |
| 10:09:22 | 24 | Q.  Does that window, was that boarded up back in April of |
| 10:09:27 | 25 | '84? |

| | | |
|---|---|---|
| 10:09:27 | 1 | A. No, that wasn't boarded up. |
| 10:09:28 | 2 | Q. All right. Besides that, does that photo fairly and |
| 10:09:32 | 3 | accurately portray the way it appeared in April of '84? |
| 10:09:35 | 4 | A. Yes. |
| 10:09:36 | 5 | Q. In fact, you also see the same gang insignia to indicate |
| 10:09:41 | 6 | that it is a Goon Squad building? |
| 10:09:42 | 7 | A. Yes. |
| 10:09:43 | 8 | Q. The same B G G S? |
| 10:09:45 | 9 | A. Yes. |
| 10:09:45 | 10 | Q. Does that window look out onto Langley? |
| 10:09:51 | 11 | A. Yes. |
| 10:09:51 | 12 | Q. Again, does that fairly and accurately portray the way the |
| 10:09:56 | 13 | building appeared in April of '84? |
| 10:09:57 | 14 | A. Yes. |
| 10:09:57 | 15 | Q. Besides the boarded up window? |
| 10:09:59 | 16 | A. Yes. |
| 10:10:00 | 17 | Q. Showing you Defendant's Exhibit 391, do you recognize |
| 10:10:17 | 18 | that? |
| 10:10:17 | 19 | A. Yes. |
| 10:10:18 | 20 | Q. What do you recognize that as? |
| 10:10:21 | 21 | A. That's a car, where the car was parked at. This is the |
| 10:10:24 | 22 | sidewalk where they came and left from, right here, sidewalk |
| 10:10:29 | 23 | past my window. |
| 10:10:30 | 24 | Q. Do you see a car that's already marked there? |
| 10:10:32 | 25 | A. Yes, right here. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 31 of 114 PageID #:32816
***REALTIME UNEDITED TRANSCRIPT ONLY***

30

| | | |
|---|---|---|
| 10:10:33 | 1 | Q. Did you put that marking there back in June of 1986 when |
| 10:10:37 | 2 | you testified in this case? |
| 10:10:38 | 3 | A. Yes. |
| 10:10:38 | 4 | Q. Was that approximately where the car was that you |
| 10:10:43 | 5 | described where you saw the individuals get out and walk past |
| 10:10:47 | 6 | you? |
| 10:10:47 | 7 | A. Yes. |
| 10:10:47 | 8 | Q. In fact, do you also see a marking on Defendant's Exhibit |
| 10:10:51 | 9 | 391, an X and a line? |
| 10:10:54 | 10 | A. Yes. |
| 10:10:54 | 11 | Q. And what does that X and line, did you put that mark there |
| 10:10:59 | 12 | back in June of 1986 when you testified in this case? |
| 10:11:02 | 13 | A. Yes. |
| 10:11:02 | 14 | Q. What does that signify? |
| 10:11:05 | 15 | A. Where they had came from, there is where they ended up |
| 10:11:09 | 16 | right here. |
| 10:11:09 | 17 | Q. Okay. Now, does that also indicate approximately -- is |
| 10:11:15 | 18 | that approximately the same way that they went back into the |
| 10:11:17 | 19 | car as well? |
| 10:11:18 | 20 | A. No, no. |
| 10:11:19 | 21 | Q. Okay. |
| 10:11:23 | 22 | A. This is when they came back, to get back into the car |
| 10:11:26 | 23 | right here. |
| 10:11:26 | 24 | Q. Okay. |
| 10:11:28 | 25 | A. Came back this way, the car was parked here. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 32 of 114 PageID #:32817
***REALTIME UNEDITED TRANSCRIPT ONLY***

31

10:11:31  1   Q.  Okay.  Now, showing you what's been marked as Defendant's

10:11:35  2   Exhibit 387, do you recognize that?

10:11:50  3   A.  Yes.

10:11:51  4   Q.  What do you recognize that as?

10:11:54  5   A.  That's a car, where the car was parked at.

10:11:57  6   Q.  Where it says car and a box, does that indicate

10:12:00  7   approximately where the car was that you saw them get out of

10:12:03  8   and run back into?

10:12:04  9   A.  Yes.

10:12:04  10  Q.  Where it was positioned at?

10:12:09  11  A.  Yes.

10:12:09  12  Q.  Just so we're clear, that's not the same car?

10:12:13  13  A.  That's not the same car.

10:12:14  14  Q.  Do you remember what kind of model car it was?

10:12:17  15  A.  Cadillac.

10:12:18  16  Q.  Something like that?

10:12:19  17  A.  Yes.

10:12:19  18  Q.  Do these photos, Defendant's Exhibit 391 and 387, fairly

10:12:25  19  and accurately portray the way the scene was back on April

10:12:29  20  28th, 1984?

10:12:30  21  A.  Yes.

10:12:32  22  Q.  Mr. Morris, I'm going to show you what's been marked as

10:12:36  23  Defendant's Exhibit 181-2 on the ELMO.

10:12:47  24       Do you recognize this?

10:12:48  25  A.  Yes.

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 33 of 114 PageID #:32818
12/07/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

32

| | | |
|---|---|---|
| 10:12:48 | 1 | Q.  Is that something -- well, is that something that you |
| 10:12:55 | 2 | signed? |
| 10:12:55 | 3 | A.  Yes. |
| 10:12:55 | 4 | Q.  Back in August the 25th, 1999? |
| 10:13:01 | 5 | A.  Yes. |
| 10:13:01 | 6 | Q.  Now, when is the first time you spoke to lawyers for |
| 10:13:05 | 7 | Nathson Fields? |
| 10:13:06 | 8 | A.  Oh, been a while. |
| 10:13:08 | 9 | Q.  Let me ask you this.  The day that you signed that, was |
| 10:13:12 | 10 | that the first time that you had spoke to the lawyers for |
| 10:13:14 | 11 | Nathson Fields? |
| 10:13:15 | 12 | A.  Yes, first time. |
| 10:13:16 | 13 | Q.  And about two weeks prior to that, had you spoken to |
| 10:13:20 | 14 | somebody concerning your knowledge about this case? |
| 10:13:22 | 15 | A.  Two weeks prior, no, I don't think so, no. |
| 10:13:25 | 16 | Q.  Well, do you see the underlined portion there? |
| 10:13:30 | 17 | A.  Yes. |
| 10:13:30 | 18 | Q.  Now, there are some portions that are not underlined; is |
| 10:13:36 | 19 | that correct? |
| 10:13:36 | 20 | A.  Yes. |
| 10:13:36 | 21 | Q.  Now, when you were -- when you gave that, signed that |
| 10:13:41 | 22 | recant, was that in Milwaukee? |
| 10:13:42 | 23 | A.  Yes. |
| 10:13:42 | 24 | Q.  And that's where you were living with your kids and your |
| 10:13:45 | 25 | wife, correct? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 34 of 114 PageID #:32819
***REALTIME UNEDITED TRANSCRIPT ONLY***

33

| | | |
|---|---|---|
| 10:13:46 | 1 | A.  Correct. |
| 10:13:46 | 2 | Q.  Some portions are underlined and some are not, correct? |
| 10:13:51 | 3 | A.  Correct. |
| 10:13:51 | 4 | Q.  Now, did you say some of those things to lawyers and did |
| 10:13:56 | 5 | you not say some of those things to the lawyers? |
| 10:13:58 | 6 | A.  Yes and no. |
| 10:13:59 | 7 | Q.  When you say yes, what did you say to the lawyers that |
| 10:14:02 | 8 | appears in that recant? |
| 10:14:03 | 9 | A.  On April 28th, they was asking me where I lived, I said |
| 10:14:09 | 10 | Chicago, Illinois in the morning I was in the apartment. |
| 10:14:12 | 11 | Q.  Mr. Morris, take your time.  Read that document before you |
| 10:14:16 | 12 | start saying anything.  Take your time. |
| 10:14:18 | 13 | A.  Okay. |
| 10:14:20 | 14 | Q.  Judge, withdraw the question. |
| 10:14:22 | 15 | That document I just showed you, Defendant's Exhibit |
| 10:14:24 | 16 | 181-2, when did you sign that?  Why did you sign that?  I |
| 10:14:31 | 17 | apologize? |
| 10:14:31 | 18 | A.  I just -- I wanted it over.  I didn't want to be involved. |
| 10:14:34 | 19 | I didn't want to deal with it.  I was kind of -- my kids were |
| 10:14:40 | 20 | staying there.  I knew a couple of El Rukns that had moved up |
| 10:14:43 | 21 | there. |
| 10:14:43 | 22 | Q.  Had they moved up there at about the same time you signed |
| 10:14:46 | 23 | this recant? |
| 10:14:47 | 24 | A.  Yes, same time. |
| 10:14:48 | 25 | Q.  Were you aware of the El Rukns intimidating witnesses? |

12/07/16 AM | ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

| 10:14:51 | 1 | A.  Yes. |
| 10:14:52 | 2 | Q.  In fact, that is the reason why you wanted to be |
| 10:14:57 | 3 | relocated; is that correct? |
| 10:14:57 | 4 | A.  Yes. |
| 10:15:06 | 5 |        MR. HEPPELL:  This is cross-examination by Mr. |
| 10:15:09 | 6 | Fields' defense attorney Ms. Conyers. |
| 10:15:03 | 7 |                  - - - |
| 10:15:03 | 8 |   GERALD MORRIS, CROSS-EXAMINATION, PREVIOUS TESTIMONY |
| 10:15:03 | 9 | BY MR. HEPPELL:  (Reading:) |
| 10:15:13 | 10 | Q.  Mr. Morris, you told us earlier you were a gangster Goon |
| 10:15:18 | 11 | Squad member for about six years? |
| 10:15:19 | 12 | A.  Yes. |
| 10:15:19 | 13 | Q.  In 1984, you had been a gangster Goon Squad member for how |
| 10:15:23 | 14 | many years? |
| 10:15:24 | 15 | A.  1984? |
| 10:15:25 | 16 | Q.  In 1984. |
| 10:15:26 | 17 | A.  About six years, yes, six years. |
| 10:15:28 | 18 | Q.  And the building that you lived in was a gangster Goon |
| 10:15:31 | 19 | Squad building? |
| 10:15:32 | 20 | A.  Yes, that's where we hangout.  Yes. |
| 10:15:33 | 21 | Q.  Well, you lived there, right? |
| 10:15:35 | 22 | A.  I lived there. |
| 10:15:35 | 23 | Q.  You hung out there also? |
| 10:15:37 | 24 | A.  Yes, I lived there. |
| 10:15:39 | 25 | Q.  And did you have gang meetings there? |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 36 of 114 PageID #:32821
12/07/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

| | | |
|---|---|---|
| 10:15:40 | 1 | A. Gang meetings? |
| 10:15:41 | 2 | Q. Yes. |
| 10:15:42 | 3 | A. No, we never had gang meetings.  We partied and drank |
| 10:15:45 | 4 | there, yes. |
| 10:15:46 | 5 | Q. Now, the insignia that the state showed you, that shows |
| 10:15:50 | 6 | that the building was a gangster Goon Squad building, right? |
| 10:15:54 | 7 | A. Yes. |
| 10:15:54 | 8 | Q. And that there was drugs sold out of that building on |
| 10:15:57 | 9 | behalf of the gangster Goon Squad? |
| 10:15:59 | 10 | A. No. |
| 10:16:00 | 11 | Q. The gangster Goon Squad had conflict with other rival |
| 10:16:03 | 12 | gangs? |
| 10:16:03 | 13 | A. Yes, I mean, yes. |
| 10:16:04 | 14 | Q. And some of those conflicts were resolved by violence? |
| 10:16:07 | 15 | A. Yes. |
| 10:16:07 | 16 | Q. In fact, on April 28, Fuddy was waiting outside for Paul |
| 10:16:12 | 17 | Hailey to be released from the county jail? |
| 10:16:14 | 18 | A. Yes. |
| 10:16:14 | 19 | Q. And Paul Hailey, you thought, was going to be released. |
| 10:16:18 | 20 | He had been arrested for shooting at rival gang members? |
| 10:16:21 | 21 | A. I can't recall that. |
| 10:16:22 | 22 | Q. And you were going outside to wait with Fuddy for Paul? |
| 10:16:25 | 23 | A. Yes. |
| 10:16:26 | 24 | Q. Now, in addition to yourself, Sandra Langston was also in |
| 10:16:31 | 25 | the window with you when you spoke with Fuddy? |

12/07/16 AM  Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 37 of 114 PageID #:32822
***REALTIME UNEDITED TRANSCRIPT ONLY***

36

| | | |
|---|---|---|
| 10:16:35 | 1 | A.  Yes, standing beside me. |
| 10:16:36 | 2 | Q.  Standing on the side of you? |
| 10:16:37 | 3 | A.  Yes. |
| 10:16:38 | 4 | Q.  And you spoke with Fuddy for a couple of minutes? |
| 10:16:41 | 5 | A.  Yes. |
| 10:16:41 | 6 | Q.  And then he went under the breezeway? |
| 10:16:44 | 7 | A.  Under the breezeway. |
| 10:16:45 | 8 | Q.  Okay.  You could not really see him once he went under |
| 10:16:48 | 9 | that breezeway? |
| 10:16:49 | 10 | A.  No, I couldn't see him. |
| 10:16:50 | 11 | Q.  You can't see anyone once they turn and go into the |
| 10:16:53 | 12 | breezeway? |
| 10:16:53 | 13 | A.  Right. |
| 10:16:54 | 14 | Q.  And you waited and you heard gunshot within minutes of |
| 10:17:00 | 15 | seeing Fuddy at your window? |
| 10:17:02 | 16 | A.  Yes. |
| 10:17:02 | 17 | Q.  Did you see where Fuddy came from? |
| 10:17:03 | 18 | A.  He was coming off of Langley. |
| 10:17:05 | 19 | Q.  Pardon me? |
| 10:17:06 | 20 | A.  Coming off of Langley, Langley. |
| 10:17:07 | 21 | Q.  Did you see Talman Hickman before he was shot that day? |
| 10:17:11 | 22 | A.  No, I didn't see him. |
| 10:17:12 | 23 | Q.  And you saw Fuddy by himself? |
| 10:17:14 | 24 | A.  Yes. |
| 10:17:14 | 25 | Q.  And no one else? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 38 of 114 PageID #:32823
***REALTIME UNEDITED TRANSCRIPT ONLY***

37

| | | |
|---|---|---|
| 10:17:17 | 1 | A. No. |
| 10:17:17 | 2 | Q. And when you got to the front of the building where Fuddy |
| 10:17:20 | 3 | and Talman were, did you see other people out there? |
| 10:17:23 | 4 | A. No, I didn't see anybody else out there. |
| 10:17:26 | 5 | Q. When they were shot, you came out, you didn't see anyone |
| 10:17:30 | 6 | else out there? |
| 10:17:30 | 7 | A. No, not out there. |
| 10:17:32 | 8 | Q. Now, the police came to your apartment that night? |
| 10:17:35 | 9 | A. Yes. |
| 10:17:35 | 10 | Q. Apartment 106? |
| 10:17:39 | 11 | A. Yes. |
| 10:17:39 | 12 | Q. And were you present when they interviewed Sandra |
| 10:17:44 | 13 | Langston? |
| 10:17:44 | 14 | A. I think I was still outside. |
| 10:17:46 | 15 | Q. You were still outside? |
| 10:17:47 | 16 | A. Yes. |
| 10:17:48 | 17 | Q. Were you present when they interviewed Randy Langston? |
| 10:17:51 | 18 | A. I think I was in the house with Randy, yes. |
| 10:17:53 | 19 | Q. I'm sorry? |
| 10:17:54 | 20 | A. Yes, I was probably in the house, yes. |
| 10:17:57 | 21 | Q. You were in the house when they interviewed Randy? |
| 10:18:00 | 22 | A. Yes. |
| 10:18:00 | 23 | Q. And you know Randy Langston? |
| 10:18:02 | 24 | A. Yes, he's my brother-in-law. |
| 10:18:03 | 25 | Q. And Eric Langston? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 39 of 114 PageID #:32824
***REALTIME UNEDITED TRANSCRIPT ONLY***

38

| | | |
|---|---|---|
| 10:18:05 | 1 | A. Yes, my brother-in-law. |
| 10:18:06 | 2 | Q. When were you and Sandra Langston married? |
| 10:18:09 | 3 | A. Back in '86. |
| 10:18:11 | 4 | Q. And do you remember -- you don't remember the officer that |
| 10:18:15 | 5 | you spoke to in 1985? |
| 10:18:17 | 6 | A. The first officer that came up, no, I can't remember his |
| 10:18:20 | 7 | name. |
| 10:18:20 | 8 | Q. You don't? |
| 10:18:21 | 9 | A. No. |
| 10:18:21 | 10 | Q. You don't remember the description of that officer? |
| 10:18:26 | 11 | A. No. |
| 10:18:27 | 12 | Q. And you spoke with that officer for approximately 10, 15 |
| 10:18:29 | 13 | minutes that night? |
| 10:18:30 | 14 | A. Yes. |
| 10:18:31 | 15 | Q. And you didn't speak with the police that were on the |
| 10:18:34 | 16 | streets after the shooting? |
| 10:18:35 | 17 | A. No. |
| 10:18:36 | 18 | Q. Fuddy was one of your closest friends? |
| 10:18:39 | 19 | A. Yes. |
| 10:18:39 | 20 | Q. And you ran out, you didn't see anybody else out there and |
| 10:18:44 | 21 | you ran away? |
| 10:18:45 | 22 | A. Yes, I went to my friend's house. |
| 10:18:47 | 23 | Q. So you didn't wait for the police to tell them anything? |
| 10:18:50 | 24 | A. No, at the time I was upset, I just left. |
| 10:18:52 | 25 | Q. And when you came back, the police were still out there? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 40 of 114 PageID #:32825
***REALTIME UNEDITED TRANSCRIPT ONLY***

39

| | | |
|---|---|---|
| 10:18:55 | 1 | A.  Yes, that's when everybody was out there, when I came back |
| 10:18:58 | 2 | over there. |
| 10:18:59 | 3 | Q.  And you still did not speak with the police when you came |
| 10:19:02 | 4 | back? |
| 10:19:02 | 5 | A.  No, at the time, no. |
| 10:19:04 | 6 | Q.  I'm sorry? |
| 10:19:05 | 7 | A.  No. |
| 10:19:05 | 8 | Q.  Mr. Morris, the men that you say you saw running back to |
| 10:19:12 | 9 | the car, did you not see their faces, did you? |
| 10:19:14 | 10 | A.  Yes, they were running back to the car. |
| 10:19:16 | 11 | Q.  You said that you saw two men running back to the car, two |
| 10:19:19 | 12 | men with guns? |
| 10:19:20 | 13 | A.  Yes. |
| 10:19:20 | 14 | Q.  You did not see their faces, did you? |
| 10:19:23 | 15 | A.  Yes. |
| 10:19:23 | 16 | Q.  Well, Mr. Morris, you testified in this matter in June of |
| 10:19:26 | 17 | 1986, right? |
| 10:19:28 | 18 | A.  Yes. |
| 10:19:28 | 19 | Q.  And page 126 of the transcript, you were asked this |
| 10:19:32 | 20 | question: Mr. Morris, well, could you see their faces as they |
| 10:19:37 | 21 | ran by on the side window?  And your answer was, no, I |
| 10:19:41 | 22 | couldn't see them, but I knew it was them. |
| 10:19:44 | 23 | That was the testimony in 1986, wasn't it? |
| 10:19:47 | 24 | A.  Yes. |
| 10:19:47 | 25 | Q.  And you were asked again on page 348, line 17, but you |

12/07/16 AM          Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 41 of 114 PageID #:32826
***REALTIME UNEDITED TRANSCRIPT ONLY***

40

| | | |
|---|---|---|
| 10:19:53 | 1 | didn't see their faces this time, did you?  And your answer |
| 10:19:56 | 2 | for the second time was, no, I didn't see the face. |
| 10:20:00 | 3 | That was your testimony in June of 1986? |
| 10:20:06 | 4 | A.  Yes. |
| 10:20:06 | 5 | Q.  Now, in June of 1999, a lawyer named Jon Stainthorpe came |
| 10:20:10 | 6 | to see you in Milwaukee? |
| 10:20:12 | 7 | A.  Yes. |
| 10:20:12 | 8 | Q.  And he brought with him a young lady named Al son forker? |
| 10:20:17 | 9 | A.  Yes. |
| 10:20:18 | 10 | Q.  And you agreed to meet with Mr. Stainthorpe? |
| 10:20:20 | 11 | A.  Outside of my apartment, yes. |
| 10:20:21 | 12 | Q.  Outside your apartment? |
| 10:20:23 | 13 | A.  Yes. |
| 10:20:23 | 14 | Q.  Let me rephrase that. |
| 10:20:26 | 15 | You met Tim Lohraff in June of '99? |
| 10:20:30 | 16 | A.  Yes. |
| 10:20:30 | 17 | Q.  And when you met with Mr. Lohraff, he asked you questions |
| 10:20:35 | 18 | about this April 1984 shooting? |
| 10:20:37 | 19 | A.  Yes. |
| 10:20:38 | 20 | Q.  And you did not tell Mr. Lohraff you wouldn't speak to |
| 10:20:43 | 21 | him, you spoke to him? |
| 10:20:43 | 22 | A.  I spoke to him because I didn't want to be bothered |
| 10:20:45 | 23 | anymore.  I was kind of afraid for my family.  They was up |
| 10:20:48 | 24 | there in Milwaukee.  I knew a couple -- |
| 10:20:50 | 25 | Q.  You said that you lived at 706 east 39th? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 42 of 114 PageID #:32827
***REALTIME UNEDITED TRANSCRIPT ONLY***

41

| | | |
|---|---|---|
| 10:20:53 | 1 | A. Yes. |
| 10:20:54 | 2 | Q. On April 28, 1984? |
| 10:20:57 | 3 | A. Yes. |
| 10:20:57 | 4 | Q. And that you were in your apartment and heard gunshots? |
| 10:20:59 | 5 | A. Yes. |
| 10:21:00 | 6 | Q. And you told them in 1999 you looked out of your window |
| 10:21:05 | 7 | and saw two men running towards the car? |
| 10:21:07 | 8 | A. Yes. |
| 10:21:07 | 9 | Q. And you also told them these men had masks on and you |
| 10:21:12 | 10 | could not see their faces? |
| 10:21:13 | 11 | A. Running up from under the breezeway? |
| 10:21:15 | 12 | Q. Yes. |
| 10:21:16 | 13 | A. No. |
| 10:21:17 | 14 | Q. Well, you told Mr. Stainthorpe and Mr. Lohraff you did not |
| 10:21:23 | 15 | see these men before? |
| 10:21:24 | 16 | A. Yes, I was telling them that so they would leave me alone. |
| 10:21:27 | 17 | I was in fear of retaliation for my family if I keep getting |
| 10:21:32 | 18 | moved and I knew a couple El Rukns moved up there. I just |
| 10:21:35 | 19 | wanted them to leave. |
| 10:21:36 | 20 | Q. We will talk about that in a minute. Would you answer my |
| 10:21:39 | 21 | question, you told Mr. Stainthorpe and Mr. Lohraff that did |
| 10:21:42 | 22 | you not see these men before you heard that shot? |
| 10:21:45 | 23 | A. Yes, I did. I told them. |
| 10:21:47 | 24 | Q. And you told them that you do not know who these men were |
| 10:21:50 | 25 | that you saw running away? |

12/07/16 AM  Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 43 of 114 PageID #:32828
***REALTIME UNEDITED TRANSCRIPT ONLY***

42

| | | |
|---|---|---|
| 10:21:52 | 1 | A.  Yes. |
| 10:21:53 | 2 | Q.  You also told them that a long time after the shooting, |
| 10:21:56 | 3 | Detective O'Callaghan showed you four photographs to see if |
| 10:22:00 | 4 | you could identify anyone? |
| 10:22:02 | 5 | A.  Yes. |
| 10:22:02 | 6 | Q.  And you told them that you picked out photographs by |
| 10:22:07 | 7 | intuition? |
| 10:22:07 | 8 | A.  I don't remember saying that.  I wouldn't say that. |
| 10:22:10 | 9 | Q.  And that not because you recognized the photographs as |
| 10:22:14 | 10 | people involved in the shooting? |
| 10:22:15 | 11 | A.  Intuition, I don't think I would ever use that. |
| 10:22:19 | 12 | Q.  And you also told Mr. Lohraff and Mr. Stainthorpe that |
| 10:22:23 | 13 | after you picked out the photographs, O'Callaghan said that's |
| 10:22:27 | 14 | him, right? |
| 10:22:28 | 15 | A.  He didn't say anything to me. |
| 10:22:30 | 16 | Q.  But that's what you told? |
| 10:22:33 | 17 | A.  Yes, I told him that was him, that was the guy. |
| 10:22:35 | 18 | Q.  You told attorneys Lohraff and Stainthorpe that after you |
| 10:22:39 | 19 | picked out the photographs, O'Callaghan said that's him, |
| 10:22:43 | 20 | correct? |
| 10:22:43 | 21 | A.  No. |
| 10:22:44 | 22 | Q.  I'll show you what's been previously marked as Defendant's |
| 10:22:51 | 23 | Exhibit 181-2.  That is your signature on that document? |
| 10:23:03 | 24 | A.  Yes. |
| 10:23:03 | 25 | Q.  That document is notarized? |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 44 of 114 PageID #:32829
***REALTIME UNEDITED TRANSCRIPT ONLY***

43

| | | |
|---|---|---|
| 10:23:10 | 1 | A.  Yes. |
| 10:23:10 | 2 | Q.  And it's dated August 25th, 1999? |
| 10:23:15 | 3 | A.  Yes. |
| 10:23:15 | 4 | Q.  A-l-l-i-s-o-n, f-o-r-k-e-r-.  ^  and that contained |
| 10:23:23 | 5 | statements that you signed your name to? |
| 10:23:25 | 6 | A.  Yes. |
| 10:23:25 | 7 | Q.  For attorneys Stainthorpe and Lohraff? |
| 10:23:28 | 8 | A.  Yes. |
| 10:23:28 | 9 | Q.  Now, you also spoke with the state's attorneys in this |
| 10:23:33 | 10 | matter in January 2000; is that correct? |
| 10:23:35 | 11 | A.  Yes, that's about right. |
| 10:23:36 | 12 | Q.  Now, when you spoke with attorney Stainthorpe and Lohraff |
| 10:23:40 | 13 | in 1999, they told you that they represented Nathson Fields? |
| 10:23:44 | 14 | A.  Yes. |
| 10:23:44 | 15 | Q.  And at that time, you did not contact the state's |
| 10:23:48 | 16 | attorney's office, did you? |
| 10:23:49 | 17 | A.  No. |
| 10:23:49 | 18 | Q.  You didn't call the state's attorneys in August or before |
| 10:23:53 | 19 | you had agreed to meet with Mr. Lohraff and Mr. Stainthorpe? |
| 10:23:57 | 20 | A.  No. |
| 10:23:57 | 21 | Q.  And you didn't tell the state's attorneys that you had any |
| 10:24:00 | 22 | fear for yourself or your family? |
| 10:24:02 | 23 | A.  Well, before these people came up there? |
| 10:24:05 | 24 | Q.  Right. |
| 10:24:05 | 25 | A.  I was uncomfortable, nobody was able to find me, these |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 45 of 114 PageID #:32830
***REALTIME UNEDITED TRANSCRIPT ONLY***

44

10:24:09   1   guys found me.  I figured if anybody wants to, they could find

10:24:13   2   me too.

10:24:14   3   Q.  You didn't call the state's attorneys?

10:24:15   4   A.  No, I did not.

10:24:16   5   Q.  Mr. Morris, when the attorneys for Nathson Fields came to

10:24:20   6   see you, Jon Stainthorpe and Tim Lohraff, they first came to

10:24:25   7   see you in June of 1999?

10:24:27   8   A.  Yes.

10:24:27   9   Q.  And they came back and took the written statement from you

10:24:31   10  in August of 1999?

10:24:33   11  A.  Yes.

10:24:34   12  Q.  Between June and August of 1999, you did not call the

10:24:39   13  state's attorneys and tell them that you were in fear?

10:24:42   14  A.  No.

10:24:42   15  Q.  That you were worried about your children?

10:24:45   16  A.  No.

10:24:45   17  Q.  And you spoke with the state's attorneys in January of

10:24:49   18  2000 when they contacted you?

10:24:52   19  A.  Yes.

10:24:52   20  Q.  Mr. Morris, when is the last time you saw Detective

10:24:59   21  O'Callaghan?

10:24:59   22  A.  I seen him, say, about five years ago, about five years

10:25:03   23  ago I guess on September 16th I seen him again.

10:25:06   24  Q.  September 16?

10:25:07   25  A.  2008.

12/07/16 AM Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 46 of 114 PageID #:32831
***REALTIME UNEDITED TRANSCRIPT ONLY***

45

| | | |
|---|---|---|
| 10:25:08 | 1 | Q. 2008? |
| 10:25:08 | 2 | A. Um-hmm. |
| 10:25:10 | 3 | Q. And you were scheduled to testify here last month? |
| 10:25:13 | 4 | A. Yes. |
| 10:25:13 | 5 | Q. You were not available for trial last month in February? |
| 10:25:18 | 6 | A. Right. |
| 10:25:18 | 7 | Q. And at that time, you were trying to avoid coming to court |
| 10:25:21 | 8 | to testify? |
| 10:25:23 | 9 | A. No. |
| 10:25:23 | 10 | Q. The police found you? |
| 10:25:25 | 11 | A. I called. |
| 10:25:26 | 12 | Q. The police? |
| 10:25:27 | 13 | A. I called up O'Callaghan, Dave O'Callaghan. |
| 10:25:30 | 14 | Q. And who is Dave O'Callaghan? |
| 10:25:31 | 15 | A. That's the sergeant I talked to prior in this case. |
| 10:25:35 | 16 | Q. In 1985, that night -- April 28, 1984, you did not give |
| 10:25:45 | 17 | the Chicago police a description of the two men you saw? |
| 10:25:48 | 18 | A. No, I didn't talk to anyone back then. |
| 10:25:53 | 19 | MR. HEPPELL: Nothing further. |
| 10:25:54 | 20 | THE COURT: Is there any more? |
| 10:25:58 | 21 | MS. KATZ: This is the Redirect Examination by |
| 10:26:00 | 22 | Mr. Sexton. |
| 10:25:56 | 23 | - - - |
| 10:25:56 | 24 | GERALD MORRIS, REDIRECT EXAMINATION, PREVIOUS TESTIMONY |
| 10:25:56 | 25 | BY MR. KATZ: |

12/07/16 AM Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 47 of 114 PageID #:32832
***REALTIME UNEDITED TRANSCRIPT ONLY***

46

| | | |
|---|---|---|
| 10:26:02 | 1 | Q. That night, April 28, 1984, the same night of the |
| 10:26:07 | 2 | shooting, did some unknown police officer talk to you after |
| 10:26:10 | 3 | the shooting? |
| 10:26:11 | 4 | A. Prior to the shooting? |
| 10:26:12 | 5 | Q. After the shooting. |
| 10:26:13 | 6 | A. Yes, I talked to someone. |
| 10:26:14 | 7 | Q. Did you tell them you could identify who did it? |
| 10:26:16 | 8 | A. Yes, yes. |
| 10:26:17 | 9 | Q. And nobody got back to you? |
| 10:26:18 | 10 | A. No, about a year later. |
| 10:26:19 | 11 | Q. And counsel asked you some questions about when you |
| 10:26:23 | 12 | testified before about what you saw, the two individuals after |
| 10:26:28 | 13 | the shots running back to the car, correct? |
| 10:26:30 | 14 | A. Yes. |
| 10:26:31 | 15 | Q. Now, were you asked this question and did you give this |
| 10:26:34 | 16 | answer when you testified back in June of 1986.  Page 325. |
| 10:26:41 | 17 | "QUESTION:  And the men that got in the car were at the |
| 10:26:44 | 18 | car when you say they opened the door and turned in your |
| 10:26:47 | 19 | direction? |
| 10:26:48 | 20 | "ANSWER:  Yes." |
| 10:26:52 | 21 | A. Yes. |
| 10:26:52 | 22 | Q. And that's when you got a look at their face again? |
| 10:26:55 | 23 | A. Yes. |
| 10:26:55 | 24 | Q. Now, that wasn't the first time you saw their face? |
| 10:26:59 | 25 | A. No. |

12/07/16 AM

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 48 of 114 PageID #:32833
***REALTIME UNEDITED TRANSCRIPT ONLY***

47

| | | |
|---|---|---|
| 10:26:59 | 1 | Q.  You saw their faces when they followed Fuddy when they |
| 10:27:04 | 2 | walked past your window? |
| 10:27:05 | 3 | A.  The breezeway, yes. |
| 10:27:06 | 4 | Q.  Now, when these attorneys for Mr. Fields came to Milwaukee |
| 10:27:12 | 5 | to talk to you, you didn't sign this the first time you talked |
| 10:27:14 | 6 | to the attorneys, correct? |
| 10:27:15 | 7 | A.  No, no.  That's the second time they came. |
| 10:27:17 | 8 | Q.  The second time? |
| 10:27:18 | 9 | A.  Yes. |
| 10:27:19 | 10 | Q.  In fact, when you talked to the first two, the first time |
| 10:27:23 | 11 | you talked to them, that was sometime before this, correct? |
| 10:27:26 | 12 | A.  Yes. |
| 10:27:27 | 13 | Q.  And were they writing any notes at that time you talked to |
| 10:27:30 | 14 | them? |
| 10:27:31 | 15 | A.  No. |
| 10:27:31 | 16 | Q.  Did you ever tell them that there were only four |
| 10:27:35 | 17 | photographs that Detective O'Callaghan showed you? |
| 10:27:38 | 18 | A.  No. |
| 10:27:39 | 19 | Q.  In fact, the only thing that you told them then was that |
| 10:27:42 | 20 | you didn't see the person before you heard the shots, you |
| 10:27:45 | 21 | didn't know who those men were that were running away, |
| 10:27:49 | 22 | correct? |
| 10:27:49 | 23 | A.  Yes. |
| 10:27:49 | 24 | Q.  Is that the only thing you told them? |
| 10:27:51 | 25 | A.  Yes. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 49 of 114 PageID #:32834
***REALTIME UNEDITED TRANSCRIPT ONLY***

48

| | | |
|---|---|---|
| 10:27:51 | 1 | Q.  Again, why is it that you told them that? |
| 10:27:54 | 2 | A.  Because I wanted them to leave.  I didn't want to be |
| 10:27:57 | 3 | bothered with the case anymore.  I was kind of afraid of my |
| 10:28:00 | 4 | kid, my family staying there, you know, I was afraid of them |
| 10:28:04 | 5 | getting hurt. |
| 10:28:05 | 6 | Q.  In fact, we talked to you in January of 2000 about why you |
| 10:28:09 | 7 | signed, correct?  And do you remember us talking to you in a |
| 10:28:15 | 8 | restaurant in Milwaukee, Wisconsin, on January 10th, 2000? |
| 10:28:18 | 9 | A.  Yes. |
| 10:28:19 | 10 | Q.  In fact, didn't you tell us that you told that to the |
| 10:28:24 | 11 | attorneys because you were hoping they would leave you alone |
| 10:28:26 | 12 | and you wouldn't be involved any further, that you have |
| 10:28:29 | 13 | children and that you were worried if the attorneys could find |
| 10:28:32 | 14 | you, so could friends of the defendant? |
| 10:28:36 | 15 | A.  Yes. |
| 10:28:36 | 16 | Q.  Did you also tell us that you knew El Rukns had moved to |
| 10:28:39 | 17 | Milwaukee from Chicago and that you were scared? |
| 10:28:42 | 18 | A.  Yes. |
| 10:28:42 | 19 | Q.  Did those two attorneys that were talking to you, did they |
| 10:28:47 | 20 | ever tell you that they were going to come back and ask you to |
| 10:28:49 | 21 | sign something? |
| 10:28:50 | 22 | A.  No, no. |
| 10:28:51 | 23 | Q.  And about how long did they talk to you? |
| 10:28:55 | 24 | A.  About five, ten minutes. |
| 10:28:56 | 25 | Q.  And they weren't writing any notes? |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 50 of 114 PageID #:32835
***REALTIME UNEDITED TRANSCRIPT ONLY***

49

| 10:28:58 | 1 | A. No. |
| 10:28:58 | 2 | Q. Did they have a tape recorder? |
| 10:29:00 | 3 | A. No, not that I seen. |
| 10:29:01 | 4 | Q. Could you describe one of the attorneys your Honor talking |
| 10:29:05 | 5 | to? |
| 10:29:05 | 6 | A. He had black hair, sort of short, chubby guy. |
| 10:29:09 | 7 | Q. Was the other attorney taller? |
| 10:29:11 | 8 | A. Yes. |
| 10:29:12 | 9 | Q. When they came, when the attorneys talked to you back -- |
| 10:29:16 | 10 | the attorneys talked to you August 25th, 1999, and you signed |
| 10:29:22 | 11 | this, did you read it? |
| 10:29:22 | 12 | A. No, I just signed them so I can let them go. |
| 10:29:27 | 13 | Q. What was your emotional state at that time? |
| 10:29:29 | 14 | A. I was afraid of my family. |
| 10:29:31 | 15 | Q. When you signed this, August 25th, 1999, how long did you |
| 10:29:36 | 16 | talk to them? |
| 10:29:36 | 17 | A. About a couple minutes, I guess. |
| 10:29:38 | 18 | Q. And showing you Defendant's Exhibit 181-2 again, did the |
| 10:29:46 | 19 | lawyer that you described, did he sign anywhere? |
| 10:29:49 | 20 | A. No. |
| 10:29:49 | 21 | Q. Who was the only one that signed it? |
| 10:29:53 | 22 | A. A lady. |
| 10:29:54 | 23 | Q. Who is that lady? |
| 10:29:56 | 24 | A. I can't -- I don't know her name. |
| 10:29:58 | 25 | Q. Some lady? |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 51 of 114 PageID #:32836

| | | |
|---|---|---|
| 10:29:59 | 1 | A.  Yes. |
| 10:30:00 | 2 | Q.  Basically, where it says notary public, correct? |
| 10:30:05 | 3 | A.  Yes. |
| 10:30:05 | 4 | Q.  Now, I believe you testified on cross that you were asked |
| 10:30:09 | 5 | whether you told the attorneys that you picked one of the |
| 10:30:12 | 6 | photographs out by intuition, correct? |
| 10:30:15 | 7 | A.  Yes. |
| 10:30:15 | 8 | Q.  What was your educational level back then? |
| 10:30:18 | 9 | A.  I finished 9th grade. |
| 10:30:20 | 10 | Q.  9th grade was the last grade you went to? |
| 10:30:23 | 11 | A.  Yes. |
| 10:30:23 | 12 | Q.  Have you ever used the word intuition back then? |
| 10:30:28 | 13 | A.  No. |
| 10:30:28 | 14 | Q.  In fact, when we talked to you back in January 10th, 2000, |
| 10:30:32 | 15 | again showing you Defendant's Exhibit 181-2, when we talked to |
| 10:30:36 | 16 | you back in the restaurant to go over the recantation isn't it |
| 10:30:42 | 17 | at that time that you underlined the parts that you did not |
| 10:30:45 | 18 | tell the attorneys? |
| 10:30:46 | 19 | A.  Right. |
| 10:30:46 | 20 | Q.  And the parts that are not underlined, you admitted |
| 10:30:49 | 21 | telling that to the attorneys? |
| 10:30:51 | 22 | A.  Yes. |
| 10:30:51 | 23 | Q.  You told us why you did? |
| 10:30:53 | 24 | A.  Yes. |
| 10:30:54 | 25 | Q.  Counsel asked you about coming to court the last court |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 52 of 114 PageID #:32837
***REALTIME UNEDITED TRANSCRIPT ONLY***

51

| | | |
|---|---|---|
| 10:30:58 | 1 | date, about coming to trial.  I believe you testified you |
| 10:31:01 | 2 | called Detective O'Callaghan, correct? |
| 10:31:04 | 3 | A.  Correct. |
| 10:31:04 | 4 | Q.  Why didn't you get on the plane? |
| 10:31:06 | 5 | A.  Why I didn't get on the plane, I didn't have a way to get |
| 10:31:11 | 6 | on the plane at that time. |
| 10:31:11 | 7 | Q.  Are you working? |
| 10:31:12 | 8 | A.  I am not working. |
| 10:31:14 | 9 | Q.  Did you have any way of getting to the airport? |
| 10:31:16 | 10 | A.  No, I didn't. |
| 10:31:17 | 11 | Q.  In fact, did you call Detective O'Callaghan to explain to |
| 10:31:20 | 12 | him after you missed your plane? |
| 10:31:22 | 13 | A.  Yes. |
| 10:31:22 | 14 | Q.  And did you ask for transportation to get on the plane |
| 10:31:25 | 15 | this time? |
| 10:31:26 | 16 | A.  Yes. |
| 10:31:26 | 17 | Q.  So you weren't trying to avoid coming to court? |
| 10:31:30 | 18 | A.  No. |
| 10:31:30 | 19 | Q.  Just real quick, counsel asked you questions about running |
| 10:31:36 | 20 | to the car.  Showing you what's been marked as people's No. 5, |
| 10:31:40 | 21 | do you recognize this? |
| 10:31:40 | 22 | A.  Yes. |
| 10:31:41 | 23 | Q.  And you had marked that back on June of '86 when you |
| 10:31:45 | 24 | testified in this case, correct? |
| 10:31:46 | 25 | A.  Correct. |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 53 of 114 PageID #:32838
12/07/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

52

| | | |
|---|---|---|
| 10:31:46 | 1 | Q. In fact, do you see an X to indicate? |
| 10:31:51 | 2 | A. One X indicates the front of the building. |
| 10:31:53 | 3 | Q. All right. |
| 10:31:54 | 4 | A. The back of the building. |
| 10:31:55 | 5 | Q. Now, the X I'm pointing to, the X above, the furthest |
| 10:32:00 | 6 | above on 706, is that the window you were at when they first |
| 10:32:04 | 7 | passed by? |
| 10:32:04 | 8 | A. Yes. |
| 10:32:04 | 9 | Q. That's when you saw both of their faces? |
| 10:32:08 | 10 | A. Yes. |
| 10:32:08 | 11 | Q. This second window marked X on the side, is that the |
| 10:32:12 | 12 | window you saw them running towards the car? |
| 10:32:14 | 13 | A. Yes. |
| 10:32:14 | 14 | Q. Okay. And do you also see a box to indicate the car they |
| 10:32:18 | 15 | ran to? |
| 10:32:19 | 16 | A. Yes. |
| 10:32:19 | 17 | Q. And is that by the car when they turned back in your |
| 10:32:23 | 18 | direction? |
| 10:32:23 | 19 | A. Yes. |
| 10:32:24 | 20 | Q. In fact, it was Mr. Fields, the person you identified in |
| 10:32:29 | 21 | open court, that took off his mask and looked around before he |
| 10:32:33 | 22 | got in the car? |
| 10:32:34 | 23 | A. Right. |
| 10:32:34 | 24 | Q. And his face was in your direction? |
| 10:32:36 | 25 | A. Yes. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 54 of 114 PageID #:32839
***REALTIME UNEDITED TRANSCRIPT ONLY***

53

| | | |
|---|---|---|
| 10:32:36 | 1 | Q.  And does this diagram fairly and accurately portray the |
| 10:32:41 | 2 | way the area was back in April of '84? |
| 10:32:45 | 3 | A.  Yes. |
| 10:32:45 | 4 | Q.  Counsel asked you when you came down after you heard the |
| 10:32:48 | 5 | shots.  Counsel asked if you saw anyone else out there, |
| 10:32:51 | 6 | correct? |
| 10:32:51 | 7 | A.  Yes. |
| 10:32:51 | 8 | Q.  Now, you didn't see anyone else by the bodies, correct? |
| 10:32:57 | 9 | A.  Right. |
| 10:32:57 | 10 | Q.  Do you know if anybody else was on the streets or the |
| 10:32:59 | 11 | sidewalk or anywhere else? |
| 10:33:00 | 12 | A.  I can't remember that, no. |
| 10:33:02 | 13 | Q.  Is it fair to say your attention was focused on seeing |
| 10:33:06 | 14 | your friend dead on the ground? |
| 10:33:08 | 15 | A.  Yes. |
| 10:33:09 | 16 | MS. KATZ:  No further questions. |
| 10:33:12 | 17 | - - - |
| 10:33:12 | 18 | GERALD MORRIS, RECROSS-EXAMINATION, TESTIMONY READ |
| 10:33:12 | 19 | BY MR. HEPPELL:  (Reading:) |
| 10:33:14 | 20 | Q.  Mr. Morris, you testified in June 1986 under oath that you |
| 10:33:19 | 21 | could not see the faces of the two men that were running |
| 10:33:23 | 22 | towards the car? |
| 10:33:25 | 23 | A.  They was running towards the car, no.  I couldn't see them |
| 10:33:28 | 24 | as they ran towards the car. |
| 10:33:30 | 25 | MR. HEPPELL:  Nothing further. |

12/07/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

54

| | | |
|---|---|---|
| 10:33:32 | 1 | MS. KATZ:  We are done, your Honor. |
| 10:33:33 | 2 | THE COURT:  Is that the end of it? |
| 10:33:35 | 3 | You can step down.  Next, a witness or more reading? |
| 10:33:39 | 4 | MR. NOLAND:  Mr. Murray. |
| 10:33:40 | 5 | THE COURT:  Okay. |
| 10:35:20 | 6 | (Witness sworn.) |
| 10:35:25 | 7 | THE COURT:  Mr. Noland, you can go ahead. |
| 10:35:30 | 8 | MR. NOLAND:  Thank you, Judge. |
| 10:35:31 | 9 |                    - - - |
| 10:35:31 | 10 | BERNARD MURRAY, DIRECT EXAMINATION |
| 10:35:31 | 11 | BY MR. NOLAND: |
| 10:35:32 | 12 | Q.  Please state your name. |
| 10:35:32 | 13 | A.  My name is Bernard Murray. |
| 10:35:34 | 14 | Q.  Mr. Murray, what do you do for a living? |
| 10:35:37 | 15 | A.  I am an attorney, licensed to practice law and retired |
| 10:35:41 | 16 | presently. |
| 10:35:42 | 17 | Q.  And when did you graduate law school, Mr. Murray? |
| 10:35:47 | 18 | A.  1983. |
| 10:35:49 | 19 | Q.  Are you from the Chicago area? |
| 10:35:51 | 20 | A.  Yes, I am. |
| 10:35:52 | 21 | Q.  Did you go to law school in Chicago? |
| 10:35:53 | 22 | A.  Went to DePaul law school. |
| 10:35:55 | 23 | Q.  And what did you do after you graduated law school? |
| 10:35:58 | 24 | A.  I achieved a position with the Cook County state's |
| 10:36:04 | 25 | attorney's office. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 56 of 114 PageID #:32841
***REALTIME UNEDITED TRANSCRIPT ONLY***

55

| | | |
|---|---|---|
| 10:36:04 | 1 | Q. And did you work for the state's attorney's office for a |
| 10:36:06 | 2 | number of years? |
| 10:36:07 | 3 | A. Yes, from 1983 until I retired from that office in |
| 10:36:13 | 4 | December of 2008. |
| 10:36:14 | 5 | Q. And by the way, Mr. Murray, did my office ask you to |
| 10:36:19 | 6 | review some materials and an expert report by the name of Mike |
| 10:36:24 | 7 | Brasfield and evaluate those materials? |
| 10:36:26 | 8 | A. Yes, you did. |
| 10:36:26 | 9 | Q. And that's the position in which you are called to testify |
| 10:36:30 | 10 | here today? |
| 10:36:30 | 11 | A. Yes. |
| 10:36:30 | 12 | Q. Mr. Murray, can you please describe your -- run through |
| 10:36:36 | 13 | your history at the Cook County state's attorney's office, |
| 10:36:39 | 14 | beginning in 1983? |
| 10:36:40 | 15 | A. I started in the criminal appeals division in that office, |
| 10:36:46 | 16 | approximately ten months there. Then moved to the juvenile |
| 10:36:53 | 17 | prosecution bureau. In that assignment, we prosecute cases |
| 10:36:53 | 18 | both with delinquent minors and abused and neglected children |
| 10:36:59 | 19 | as well. |
| 10:36:59 | 20 | Q. That would have been in the 1984, '85 time frame? |
| 10:37:03 | 21 | A. I was in appeals in 1983 into late 1984, so that was 1984 |
| 10:37:08 | 22 | to early 1986. |
| 10:37:09 | 23 | Q. And in that position with respect to juvenile |
| 10:37:13 | 24 | prosecutions, did you become familiar with Chicago Police |
| 10:37:17 | 25 | Department records on crimes? |

| | |
|---|---|
| 10:37:19 | 1 |
| 10:37:23 | 2 |
| 10:37:27 | 3 |
| 10:37:29 | 4 |
| 10:37:32 | 5 |
| 10:37:32 | 6 |
| 10:37:36 | 7 |
| 10:37:39 | 8 |
| 10:37:42 | 9 |
| 10:37:44 | 10 |
| 10:37:48 | 11 |
| 10:37:50 | 12 |
| 10:37:51 | 13 |
| 10:37:54 | 14 |
| 10:38:00 | 15 |
| 10:38:05 | 16 |
| 10:38:08 | 17 |
| 10:38:14 | 18 |
| 10:38:18 | 19 |
| 10:38:18 | 20 |
| 10:38:21 | 21 |
| 10:38:24 | 22 |
| 10:38:25 | 23 |
| 10:38:30 | 24 |
| 10:38:33 | 25 |

1  A.  Yes, part of the responsibility of prosecuting the

2  delinquency cases as well as the abuse cases was obtaining

3  police reports from the Chicago Police Department.

4  Q.  Okay.  And then what was your next assignment after

5  juvenile court?

6  A.  After juvenile court I was assigned to the felony review

7  unit for approximately one year, and then from there to the

8  preliminary hearings courtroom for again almost a year.

9  Q.  Is that called branch 66?

10  A.  That's one of the assignments of the preliminary

11  courtrooms, that was the final assignment.  I was assigned to

12  that area as well.

13  Q.  Can you explain what branch 66 is for the jury, please?

14  A.  Branch 66 is called violence court, it handles the

15  homicide and rape cases.  It's primarily a unit associated

16  with the initial bond hearings, initial appearance there, and

17  the grand jury leading up to and including the indictment of

18  people for first degree murder and aggravated criminal sexual

19  assault.

20  Q.  And where physically is branch 66 located?

21  A.  It's on the fourth floor of the courthouse at 2650 south

22  California.

23  Q.  And oftentimes in the Chicago legal community, people

24  refer to the criminal courts as 26th and Cal or 26th and

25  California?

12/07/16 AM　Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 58 of 114 PageID #:32843
***REALTIME UNEDITED TRANSCRIPT ONLY***

57

| | | |
|---|---|---|
| 10:38:34 | 1 | A.  That's correct. |
| 10:38:34 | 2 | Q.  In branch 66, would there be a certain police related |
| 10:38:39 | 3 | documents that are provided to the prosecutors to present the |
| 10:38:43 | 4 | cases? |
| 10:38:43 | 5 | A.  In branch 66, the police officer would bring the notes or |
| 10:38:52 | 6 | supplemental, supplementary reports that they compiled at that |
| 10:38:55 | 7 | time, they would also provide a felony 101 form for the grand |
| 10:39:00 | 8 | jury processing of the case. |
| 10:39:02 | 9 | Q.  And after your time in preliminary hearings, what was your |
| 10:39:06 | 10 | next assignment and when? |
| 10:39:07 | 11 | A.  In 1987, I was assigned to the felony trial division. |
| 10:39:13 | 12 | It's at 26th and California.  I was assigned to various felony |
| 10:39:17 | 13 | courtrooms.  The way the Cook County state's attorney's office |
| 10:39:21 | 14 | maintains those courtrooms, there's three prosecutors in each |
| 10:39:25 | 15 | courtroom.  My first step in that assignment would be a third |
| 10:39:29 | 16 | chair, so since I was the least experienced of the three |
| 10:39:31 | 17 | prosecutors in the courtroom.  I eventually proved by being |
| 10:39:36 | 18 | more experience by trying cases achieved the level of first |
| 10:39:41 | 19 | chair in the felony trial division. |
| 10:39:42 | 20 | Q.  And how long were you trying cases in the felony trial |
| 10:39:46 | 21 | division? |
| 10:39:46 | 22 | A.  In that assignment, I tried cases in 1987 all the way to |
| 10:39:52 | 23 | 1990. |
| 10:39:53 | 24 | Q.  And then did you continue to try cases in the felony trial |
| 10:39:56 | 25 | division throughout the 1990s? |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 59 of 114 PageID #:32844
12/07/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

58

10:39:58    1    A.   Throughout my career, but specifically assignment of the

10:40:01    2    felony trial division as the first or second or third chair

10:40:04    3    was during that time period.

10:40:05    4    Q.   Can you explain to the jury how the process works, how a

10:40:09    5    case is worked up between the first chair, second chair and

10:40:11    6    third chair?

10:40:12    7    A.   When a new file is arraigned and assigned to a felony

10:40:20    8    courtroom, the prosecutors begin the process of gathering all

10:40:24    9    the police reports and all the relevant documents that need to

10:40:27   10    be provided during the discovery process to the criminal

10:40:30   11    defense attorney.  So initially a third chair would be getting

10:40:35   12    maybe drug cases or stolen car cases until they become

10:40:38   13    familiar with the processes that are used at 26th and

10:40:43   14    California.  So as I gained more experience, I was then

10:40:48   15    entrusted to work up the homicide cases.

10:40:51   16    Q.   Mr. Murray, what was your next assignment in 1990?

10:40:55   17    A.   1990, I was assigned to the gang crimes prosecution unit.

10:41:00   18    Q.   And how long did you have that assignment?

10:41:02   19    A.   I had that assignment until approximately 1997, early --

10:41:09   20    mid 1997.  In that assignment too I also obtained a deputy

10:41:14   21    supervisor position in that unit.

10:41:16   22    Q.   Throughout that assignment, were you involved in the

10:41:20   23    discovery process on serious criminal matters?

10:41:22   24    A.   Yes, the cases that prosecutors are assigned to in the

10:41:27   25    gang crimes unit, they are primarily first degree murder

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 60 of 114 PageID #:32845
***REALTIME UNEDITED TRANSCRIPT ONLY***

59

10:41:31  1   cases.

10:41:31  2   Q.  And at some point during that assignment, did you have an

10:41:38  3   additional assignment that was put in addition to it?

10:41:41  4   A.  Yes, during that time period, I was cross designated to

10:41:45  5   work with the U.S. Attorney's Office on an investigation and

10:41:49  6   subsequent indictment of the gangsters disciples narcotics

10:41:53  7   conspiracy.

10:41:53  8   Q.  What does it mean to be cross designated?

10:41:56  9   A.  Had the ability to try cases in federal court as well as

10:42:00  10  trying the case in state court.  And then, of course, being

10:42:04  11  allowed to look at documents that are provided to a federal

10:42:07  12  grand jury as opposed to exclusively to a state grand jury.

10:42:12  13  Q.  What was your next assignment, Mr. Murray?

10:42:14  14  A.  After 1997, I became a trial supervisor back in the felony

10:42:20  15  trial division.  The felony trial supervisor is also known as

10:42:25  16  a wing supervisor.  You're responsible for supervising six

10:42:29  17  felony courtrooms.  Again, they have the three prosecutors in

10:42:32  18  each courtroom, so 18 prosecutors, and the day-to-day

10:42:37  19  responsibilities if there's cases in there where they need

10:42:41  20  additional help or if they need advice on how to charge a case

10:42:44  21  or how to maybe reduce a case for a plea, so that's some of

10:42:49  22  the primary responsibilities.

10:42:50  23        I also continued to try cases with the -- in those

10:42:54  24  courtrooms on my wing.

10:42:55  25  Q.  In that capacity, Mr. Murray, if there were any problems

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 61 of 114 PageID #:32846
***REALTIME UNEDITED TRANSCRIPT ONLY***

60

| 10:42:59 | 1 | that the lawyers under you were having with getting documents |
| 10:43:02 | 2 | from the Chicago Police Department, would you expect they |
| 10:43:03 | 3 | would have brought that to your attention? |
| 10:43:06 | 4 | A.  Yes. |
| 10:43:06 | 5 | Q.  Were any issues like that brought to your attention as a |
| 10:43:09 | 6 | supervisor? |
| 10:43:09 | 7 | A.  No. |
| 10:43:09 | 8 | Q.  What was your next position, Mr. Murray? |
| 10:43:12 | 9 | A.  I went back to the special prosecution's bureau and I was |
| 10:43:17 | 10 | a deputy bureau chief for the special prosecutions bureau. |
| 10:43:20 | 11 | That bureau has a number of units underneath it, including the |
| 10:43:23 | 12 | gang crimes prosecution unit. |
| 10:43:25 | 13 | Q.  And how many lawyers then do you have under you at that |
| 10:43:28 | 14 | time, Mr. Murray? |
| 10:43:29 | 15 | A.  It varies, but approximately 75 attorneys. |
| 10:43:34 | 16 | Q.  And, again, those attorneys were involved in trying and |
| 10:43:40 | 17 | working up serious criminal activity or criminal allegations |
| 10:43:44 | 18 | in the City of Chicago? |
| 10:43:45 | 19 | A.  Yes.  The gang crimes prosecution unit had the bulk of the |
| 10:43:50 | 20 | first degree murder cases but the other units had serious |
| 10:43:53 | 21 | felony cases as well. |
| 10:43:54 | 22 | Q.  Again, in that capacity, would you expect that the |
| 10:43:56 | 23 | approximately 75 lawyers working under you, if they were |
| 10:44:00 | 24 | having any issues obtaining documents from the Chicago Police |
| 10:44:03 | 25 | Department that would have been brought to your attention? |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 62 of 114 PageID #:32847
12/07/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

61

| | | |
|---|---|---|
| 10:44:05 | 1 | A. I would expect that, yes. |
| 10:44:06 | 2 | Q. Was anything like that brought to your attention? |
| 10:44:08 | 3 | A. No. |
| 10:44:08 | 4 | Q. What was your next assignment, Mr. Murray and when? |
| 10:44:14 | 5 | A. In May of 2001, I became the bureau chief to the criminal |
| 10:44:15 | 6 | prosecutions bureau. |
| 10:44:17 | 7 | Q. And what is the criminal prosecution's bureau? |
| 10:44:20 | 8 | A. It's the largest of the prosecutor bureaus in the state's |
| 10:44:28 | 9 | attorney's office. There are approximately 525 prosecutors |
| 10:44:32 | 10 | assigned to that bureau. Anything from a misdemeanor court, |
| 10:44:37 | 11 | appeals, domestic violence courtrooms, and then the felony |
| 10:44:42 | 12 | trial courtrooms, again in the city as well as in the five |
| 10:44:45 | 13 | suburban courthouses. |
| 10:44:46 | 14 | Q. And how many lawyers -- how long have you had that |
| 10:44:50 | 15 | position as chief of the criminal prosecution bureau of the |
| 10:44:54 | 16 | Cook County state's attorney's office? |
| 10:44:55 | 17 | A. From May 2001 until I left in December 2008. |
| 10:44:59 | 18 | Q. And how many lawyers total were there in the Cook County |
| 10:45:03 | 19 | state's attorney's office, approximately, during that time |
| 10:45:06 | 20 | frame? |
| 10:45:06 | 21 | A. Somewhere around 875. There would sometimes would be |
| 10:45:16 | 22 | grant positions which might be closer to 900 attorneys, but |
| 10:45:19 | 23 | approximately 875 prosecutors in that time frame. |
| 10:45:22 | 24 | Q. Again, of those 875 prosecutors, how many of those were |
| 10:45:24 | 25 | under your supervision for those seven years? |

10:45:28  1  A.  Approximately 525.

10:45:28  2  Q.  Mr. Murray, would you expect that if the 525 prosecutors

10:45:34  3  under your supervision at that time would have been having

10:45:37  4  problems with getting documents from the Chicago Police

10:45:39  5  Department on serious crimes that that would have been brought

10:45:42  6  to your attention?

10:45:43  7  A.  I would expect that, yes.

10:45:44  8           MR. LOEVY:  This does open the door to any problems.

10:45:47  9           THE COURT:  That's not a basis for an objection.

10:45:49  10  It's a basis for something else.  The objection is overruled.

10:45:53  11  BY MR. NOLAND:

10:45:54  12  Q.  Was that brought to your attention?

10:45:56  13  A.  No.

10:45:56  14  Q.  And, Mr. Murray, what was your next assignment after that?

10:45:59  15  A.  That was my final assignment with the Cook County state's

10:46:02  16  attorney's office.

10:46:02  17  Q.  All right.  And then where did you go to next?

10:46:06  18  A.  I took a position with the DuPage county state's

10:46:10  19  attorney's office from January 2009 until December of 2014.

10:46:15  20  Q.  And what were your assignments in the due page county

10:46:18  21  state's attorney's office?

10:46:19  22  A.  Initially, I was assigned to a community prosecution unit.

10:46:24  23  I was quickly assigned as a deputy chief.  My responsibilities

10:46:28  24  as a deputy chief in DuPage County state's attorney's office

10:46:32  25  was to supervise the six felony courtrooms that due page

| | | |
|---|---|---|
| 10:46:37 | 1 | county maintained. |
| 10:46:38 | 2 | Q. And were you trying cases as well out in do you page |
| 10:46:41 | 3 | county? |
| 10:46:41 | 4 | A. Yes, I was. |
| 10:46:42 | 5 | Q. Were you working with various municipalities and police |
| 10:46:48 | 6 | departments in DuPage county? |
| 10:46:49 | 7 | A. Yes, I was. |
| 10:46:49 | 8 | Q. Mr. Murray, returning to your time when you were in |
| 10:46:53 | 9 | Chicago, you became familiar with records that the Chicago |
| 10:46:57 | 10 | Police Department would have on a homicide case? |
| 10:47:00 | 11 | A. Yes. |
| 10:47:00 | 12 | Q. Can you please describe what the main records are in a |
| 10:47:05 | 13 | homicide case that you became familiar with? |
| 10:47:07 | 14 | A. The records that prosecutors would seek out from the |
| 10:47:13 | 15 | Chicago Police Department were the investigative material and |
| 10:47:15 | 16 | the RD materials, the typed reports. This includes documents |
| 10:47:22 | 17 | such as the arrest report, the initial case report, |
| 10:47:26 | 18 | supplemental reports, and notes also referred to as general |
| 10:47:31 | 19 | progress reports, as well as mug shots, and rap sheets. |
| 10:47:35 | 20 | Q. And were there two main investigatory type files that you |
| 10:47:41 | 21 | would obtain from the Chicago Police Department? |
| 10:47:43 | 22 | A. The two main investigative files that are obtained are the |
| 10:47:49 | 23 | investigative file that's maintained at the area, we call the |
| 10:47:52 | 24 | investigative file, it's also known as the street file or the |
| 10:47:57 | 25 | running file. And also the RD file which is the permanent |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 65 of 114 PageID #:32850
***REALTIME UNEDITED TRANSCRIPT ONLY***

64

10:48:01   1   retention records that are maintained usually at headquarters,

10:48:07   2   11th and state or 35th and Michigan.

10:48:09   3   Q.  And would you also obtain on homicide cases, would you

10:48:13   4   need to obtain photographs?

10:48:14   5   A.  Yes, photographs either of mug shot photographs either of

10:48:21   6   the defendant or witnesses who may have had a mug shot taken

10:48:25   7   before and rap sheets.  They were maintained by part of the

10:48:29   8   Chicago Police Department that was referred to as the bureau

10:48:32   9   of identification.

10:48:32   10  Q.  And would you ever proceed to in your practice and the

10:48:39   11  practice of those working under you, proceed to try a case

10:48:43   12  without crime scene photographs?

10:48:44   13  A.  No, crime scene photographs were taken by forensic

10:48:48   14  investigators who were working for the Chicago Police

10:48:49   15  Department.  They were taken on all first degree murder cases

10:48:54   16  that I am aware of and prosecutors would routinely order those

10:48:58   17  and we would not proceed to trial without those photographs.

10:49:01   18  Q.  Shifting gears a little bit, Mr. Murray, what is the

10:49:07   19  prosecutor's role in the discovery process on a criminal case?

10:49:10   20  A.  The prosecutors have the primary responsibility to provide

10:49:15   21  the investigative material to the criminal defense attorney

10:49:19   22  prior to trial during the process called discovery .  The

10:49:24   23  Chicago Police Department has the obligation statutorily to

10:49:27   24  provide those materials to us.  When they provide the

10:49:30   25  materials to us, it's our obligation as prosecutors to provide

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 66 of 114 PageID #:32851

| | | |
|---|---|---|
| 10:49:34 | 1 | them to the criminal defense attorney. |
| 10:49:36 | 2 | Q.  And are there certain rules, discovery obligations that |
| 10:49:40 | 3 | prosecutors have under the law? |
| 10:49:42 | 4 | A.  The Illinois Supreme Court has a rule called Illinois |
| 10:49:46 | 5 | Supreme Court rule 412 which indicates that a prosecutor |
| 10:49:50 | 6 | should provide defendant information and statements whether |
| 10:49:56 | 7 | they're oral or recorded, witness statements, whether they're |
| 10:50:00 | 8 | again oral or recorded, material gathered during the course of |
| 10:50:04 | 9 | the investigation, tangible evidence such as maybe a murder |
| 10:50:08 | 10 | weapon or evidence collected at the crime scene, and any |
| 10:50:11 | 11 | books, photographs, reports, materials that are tended to use |
| 10:50:17 | 12 | during the course of the prosecution.  That also includes any |
| 10:50:20 | 13 | forensic reports that are created, whether it be crime scene |
| 10:50:25 | 14 | photographs or examinations of evidence and any sort of mental |
| 10:50:28 | 15 | health or expert reports that are created during the course of |
| 10:50:30 | 16 | the investigation. |
| 10:50:31 | 17 | Q.  And are there as well some Supreme Court of the United |
| 10:50:37 | 18 | States rulings that exact upon a prosecutor's duty in a |
| 10:50:41 | 19 | criminal case? |
| 10:50:41 | 20 | MR. LOEVY:  Objection, your Honor, to the law, |
| 10:50:43 | 21 | instruction on the law. |
| 10:50:44 | 22 | THE COURT:  I think overruled, but let me just chat |
| 10:50:48 | 23 | with you briefly at sidebar about that. |
| 10:51:00 | 24 | (The following proceedings were had at sidebar outside the |
| 10:51:00 | 25 | hearing of the jury:) |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 67 of 114 PageID #:32852
12/07/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

66

10:51:00  1    THE COURT:  I think -- it's pretty much a necessary

10:51:04  2  predicate for testimony of a witness like this, but I think

10:51:08  3  what I'm inclined to say is that to the extent that what the

10:51:12  4  witness says differs from any instruction that I give the jury

10:51:15  5  later, then you have to follow my instructions.

10:51:18  6    MR. NOLAND:  Great.  We have no problem with that.

10:51:22  7  He's going to reference braid material.

10:51:28  8    THE COURT:  That's what I assume.

10:51:29  9  (The following proceedings were had in open court in the

10:51:30  10  presence and hearing of the jury:)

10:51:30  11    THE COURT:  I am going to overrule the objection.

10:51:31  12  What I am going to say to the jury is if and to the extent

10:51:34  13  what a witness says differs from any instruction I give you

10:51:38  14  later on what the law is in this regard, you have to follow my

10:51:41  15  instruction.

10:51:41  16    Go ahead, Mr. Noland.

10:51:42  17  BY MR. NOLAND:

10:51:44  18  Q.  Mr. Murray, the question is were there -- are there -- is

10:51:46  19  there some precedent, some rules by the Supreme Court of the

10:51:52  20  United States that exact a prosecutor's role in the discovery

10:51:55  21  process?

10:51:55  22  A.  The U.S. Supreme Court by their opinions have required

10:51:59  23  prosecutors to provide any material that might be exculpatory,

10:52:04  24  in other words, which may help to show the defendant is not

10:52:07  25  the person who committed the crime, as well as any information

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 68 of 114 PageID #:32853
***REALTIME UNEDITED TRANSCRIPT ONLY***

67

10:52:11  1  that may affect the credibility of witnesses who testify or

10:52:14  2  who are part of the investigation.

10:52:17  3  Q.  Mr. Murray, does the law require that every scrap of paper

10:52:25  4  in a file on a case has to be produced?

10:52:28  5  A.  Not every scrap of paper.  The material -- the relevant

10:52:36  6  investigative material should be provided.

10:52:38  7  Q.  Do you -- I next want to talk about how a prosecutor goes

10:52:44  8  about obtaining documents from the police department.  I am

10:52:47  9  going to direct your attention to the 1980s time frame.

10:52:50  10          How would you go about getting documents from the

10:52:53  11  CPD?

10:52:53  12  A.  The primary method that we would use to obtain the

10:52:57  13  investigative material would be by subpoena.  We would also

10:53:02  14  use phone calls to the detectives if we were still missing

10:53:05  15  some reports and we would also use some of the forms that the

10:53:11  16  Chicago Police Department themselves used within their office

10:53:13  17  to obtain documents or photographs, things of that nature.

10:53:17  18  The two offices maintained an interoffice and intra office

10:53:22  19  mail service so we can send those forms by interoffice mail to

10:53:25  20  obtain those documents or photographs.

10:53:27  21  Q.  And how does a police department discharge its duty in the

10:53:33  22  discovery process?

10:53:34  23  A.  When they provide the investigative materials that are

10:53:37  24  requested by the prosecutor and they provide it to the

10:53:41  25  prosecutor's office.

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 69 of 114 PageID #:32854
***REALTIME UNEDITED TRANSCRIPT ONLY***

68

10:53:41    1   Q. You mentioned subpoenas.

10:53:46    2       MR. NOLAND: Laura, if you could pull up defense 213,

10:53:50    3   page 23.

10:53:52    4       THE COURT: Sorry. Let me switch it over. There you

10:53:57    5   go. 213, you said?

10:54:00    6       MR. NOLAND: Yes, your Honor, page 23.

10:54:02    7   BY MR. NOLAND:

10:54:04    8   Q. Mr. Murray, showing you Defense Exhibit 213. What is that

10:54:08    9   document?

10:54:08   10   A. This is an example of a subpoena issued by a prosecutor in

10:54:17   11   a 1989 criminal case sent to the Chicago Police Department at

10:54:21   12   11th and state requesting all the relevant investigative

10:54:27   13   material.

10:54:33   14       MR. NOLAND: Laura, if you could tear out the part

10:54:35   15   about any and all police reports.

10:54:36   16   BY MR. NOLAND:

10:54:39   17   Q. Mr. Murray, this states any and all police reports, arrest

10:54:42   18   reports, rap sheets, street files also known as office unit or

10:54:46   19   working file, general progress notes, investigative files,

10:54:49   20   major crime worksheet, inventory slips, evidence technician

10:54:52   21   reports, and lab reports, prepared in connection with the

10:54:54   22   above-captioned case. And it goes on. Mr. Murray, why is

10:55:00   23   that kind of laundry list of things included in that subpoena?

10:55:04   24   A. I think part of it was sometimes documents had different

10:55:10   25   names, such as, you know, the investigative material could

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 70 of 114 PageID #:32855
***REALTIME UNEDITED TRANSCRIPT ONLY***

69

10:55:14    1    also be known as a street file or a GPR or a note could be

10:55:18    2    known as a street file, so that's -- that language would be in

10:55:21    3    there including office unit or working file, general progress

10:55:25    4    reports.  It's a little bit redundant, but it's to make it

10:55:29    5    clear when they're sending it the police department that any

10:55:32    6    sort of investigative materials that may be known by different

10:55:35    7    names should be provided.

10:55:36    8    Q.  And just to back up a little bit.  You started at the

10:55:41    9    office, the state's attorney's office in 1983?

10:55:43    10   A.  December of 1983.

10:55:44    11   Q.  Were you aware shortly before you started of a case that

10:55:50    12   some referred to as the street files case?

10:55:52    13   A.  I am not sure when I became aware of it, but it was

10:55:56    14   decided before I became a prosecutor.

10:55:58    15   Q.  So you always worked in the era after that case?

10:56:02    16   A.  That's correct.

10:56:03    17   Q.  So in the time -- your entire career, were you aware that

10:56:08    18   the Chicago Police Department had investigative files and

10:56:11    19   general progress reports and notes?

10:56:14    20   A.  During my entire career I was aware of investigative files

10:56:17    21   that were maintained at the areas, yes.

10:56:19    22   Q.  And in your experience, do you have an opinion about

10:56:22    23   whether or not the criminal defense attorneys that you dealt

10:56:24    24   with over the years had the same information, same knowledge?

10:56:28    25            MR. LOEVY:  Your Honor, I just object to an

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 71 of 114 PageID #:32856
***REALTIME UNEDITED TRANSCRIPT ONLY***

70

| | | |
|---|---|---|
| 10:56:32 | 1 | undisclosed opinion. |
| 10:56:33 | 2 | THE COURT:  Let me see you at sidebar. |
| 10:56:35 | 3 | MR. LOEVY:  I tell you what.  I'll withdraw it. |
| 10:56:36 | 4 | THE COURT:  Okay.  The objection is withdrawn. |
| 10:56:38 | 5 | You can proceed. |
| 10:56:38 | 6 | THE WITNESS:  It was my experience the prosecutors |
| 10:56:42 | 7 | and the criminal defense attorneys were aware of the way the |
| 10:56:46 | 8 | files were maintained. |
| 10:56:47 | 9 | BY MR. NOLAND: |
| 10:56:48 | 10 | Q.  Sometimes criminal defense attorneys would send similar |
| 10:56:51 | 11 | subpoenas to the one up on the screen? |
| 10:56:52 | 12 | A.  Yes, including some of the same descriptive terms that are |
| 10:56:57 | 13 | included in this exhibit were included in their subpoenas as |
| 10:57:00 | 14 | well. |
| 10:57:00 | 15 | Q.  Mr. Murray, is this language, this kind of form language, |
| 10:57:05 | 16 | has this been used throughout the years? |
| 10:57:07 | 17 | A.  Yes. |
| 10:57:08 | 18 | Q.  So? |
| 10:57:09 | 19 | A.  To my knowledge, all the way up until I left that office, |
| 10:57:14 | 20 | it's a very similar subpoena to this one here would be issued. |
| 10:57:17 | 21 | If there was more than one defendant, you might have more than |
| 10:57:20 | 22 | one defendants' names listed, but you might have -- but the |
| 10:57:25 | 23 | handle here has remained remarkably the same over the years. |
| 10:57:30 | 24 | Q.  How would you then transmit the materials that you |
| 10:57:33 | 25 | received -- strike that. |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 72 of 114 PageID #:32857
***REALTIME UNEDITED TRANSCRIPT ONLY***

71

| | | |
|---|---|---|
| 10:57:34 | 1 | What would you do with the materials you received |
| 10:57:36 | 2 | from the Chicago Police Department? |
| 10:57:37 | 3 | A.  The materials I would copy them and initially create, use |
| 10:57:44 | 4 | them to create my answer to discovery, and then at the time I |
| 10:57:48 | 5 | filed the answer to discovery or maybe even before I filed the |
| 10:57:51 | 6 | answer to discovery, I would tender the documents in open |
| 10:57:54 | 7 | court to the criminal defense attorney. |
| 10:57:56 | 8 | Q.  And would you produce everything that you had received? |
| 10:57:59 | 9 | A.  Yes. |
| 10:58:00 | 10 | Q.  Mr. Murray, what was your experience with respect to the |
| 10:58:10 | 11 | Chicago Police Department's compliance with subpoenas? |
| 10:58:12 | 12 | A.  My experience was they complied with the subpoenas for the |
| 10:58:17 | 13 | materials requested. |
| 10:58:18 | 14 | Q.  How about with respect to investigative files? |
| 10:58:22 | 15 | A.  Same, that they complied with the subpoenas requesting the |
| 10:58:27 | 16 | investigative materials of the investigative files. |
| 10:58:30 | 17 | Q.  In in your experience, were there times when you had to |
| 10:58:34 | 18 | follow up to get materials from the Chicago Police Department? |
| 10:58:36 | 19 | A.  There would be occasions where maybe the final supp -- the |
| 10:58:41 | 20 | closing supplementary report had not been completed and |
| 10:58:44 | 21 | obviously there's -- maybe not obviously, but there's general |
| 10:58:48 | 22 | progress reports that are associated with that report, so |
| 10:58:50 | 23 | before it's completed or signed off by supervisory staff that |
| 10:58:57 | 24 | might not have been included in the investigative file.  So |
| 10:59:00 | 25 | realizing that that material is missing, I would follow-up |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 73 of 114 PageID #:32858
12/07/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

| 10:59:04 | 1 | either by phone calls or with another subpoena. |

10:59:04   1   either by phone calls or with another subpoena.

10:59:06   2   Q.  Mr. Murray, were there ever times when you subpoenaed

10:59:14   3   investigative files or used this form subpoena that we just

10:59:17   4   looked at on a homicide case where you wouldn't get anything

10:59:21   5   in the investigative file which would include notes, any notes

10:59:25   6   from the investigative file or GPRs?

10:59:26   7   A.  The times that I subpoenaed those documents, there was

10:59:35   8   always investigative file subpoena was complied with or GPRs

10:59:40   9   related to the investigation, interviews of witnesses or

10:59:42   10   information collected about witnesses.

10:59:43   11   Q.  And how many homicide -- how many homicide cases did you

10:59:47   12   try?

10:59:48   13   A.  I've tried probably at least a hundred homicide cases.

10:59:54   14   Q.  And how many have you been involved -- additional ones

10:59:58   15   have you been involved in the discovery process working up the

11:00:02   16   case?

11:00:02   17   A.  Discovery process a lot more.  I was assigned to a felony

11:00:07   18   trial courtroom.  There were numerous first degree murder

11:00:10   19   files that I would help working the file up, but I may not be

11:00:14   20   involved in the trial of it or the case may have entered a

11:00:18   21   plea of guilty and never went to trial.

11:00:20   22   Q.  I'm going to ask you a hypothetical question.  Assume

11:00:25   23   hypothetically that you sent one of those subpoenas that we

11:00:27   24   just looked at and when the file came back from the police

11:00:31   25   department, it didn't -- on a murder case, it didn't have any

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 74 of 114 PageID #:32859
***REALTIME UNEDITED TRANSCRIPT ONLY***

73

| | |
|---|---|
| 11:00:35 | 1 | detective notes or general progress reports.  What would you |
| 11:00:38 | 2 | do in that situation? |
| 11:00:39 | 3 | A.  I would usually call the detective assigned to the case |
| 11:00:43 | 4 | and ask him to bring the investigative file to the courthouse |
| 11:00:49 | 5 | so it could be copied. |
| 11:00:50 | 6 | Q.  And would you look at -- you'd ask him to bring the |
| 11:00:56 | 7 | original investigative file? |
| 11:00:57 | 8 | A.  Yes. |
| 11:00:57 | 9 | Q.  And would you ask detectives to bring original |
| 11:01:00 | 10 | investigative files for other reasons as well? |
| 11:01:02 | 11 | A.  The -- when we're getting close to finishing off all the |
| 11:01:11 | 12 | discovery documents or maybe there was a motion filed in the |
| 11:01:13 | 13 | case regarding the investigation, a motion filed by the |
| 11:01:16 | 14 | defense attorney, during that time period as we're getting |
| 11:01:21 | 15 | ready to proceed with that motion, we wanted to ensure that |
| 11:01:23 | 16 | all the documents had been provided and gave a chance to |
| 11:01:27 | 17 | examine the file at that point as well. |
| 11:01:32 | 18 | Q.  If even after taking no steps, you still didn't get the |
| 11:01:40 | 19 | general progress notes on a homicide case, would there be |
| 11:01:44 | 20 | recourse in the court relative to the subpoena that had been |
| 11:01:49 | 21 | issued? |
| 11:01:49 | 22 | A.  If a subpoena had been issued and if for some reason they |
| 11:01:55 | 23 | didn't comply with it, the court could order the Chicago |
| 11:01:59 | 24 | Police Department to comply. |
| 11:01:59 | 25 | Q.  So assuming hypothetically if a criminal defense attorney |

| | | |
|---|---|---|
| 11:02:03 | 1 | sent a subpoena to the Chicago Police Department for a |
| 11:02:06 | 2 | homicide investigative file and the criminal defense attorney |
| 11:02:09 | 3 | didn't receive any general progress reports, what would -- |
| 11:02:14 | 4 | what in your experience -- first of all, do you recall that |
| 11:02:17 | 5 | happening? |
| 11:02:17 | 6 | A.   There may be times where a criminal defense attorney |
| 11:02:22 | 7 | didn't get all the documents for whatever reason, and they |
| 11:02:25 | 8 | would usually come to me or my colleagues in the courtroom and |
| 11:02:29 | 9 | say I don't think I got everything here, and at that point, |
| 11:02:34 | 10 | the prosecutor would reach out to the police department to |
| 11:02:37 | 11 | make sure if they didn't have the documents, to make sure that |
| 11:02:42 | 12 | the original subpoena had been complied with and the documents |
| 11:02:45 | 13 | were made available both to the prosecutor and the criminal |
| 11:02:48 | 14 | defense attorney. |
| 11:02:48 | 15 | Q.   And if the criminal defense attorney still felt that he or |
| 11:02:51 | 16 | she didn't get satisfaction from that request to the |
| 11:02:53 | 17 | prosecutor, would there be other things available to the |
| 11:02:55 | 18 | criminal defense attorney to follow up with with application |
| 11:02:58 | 19 | to the court? |
| 11:02:59 | 20 | A.   They could apply to the court and ask the Court to make |
| 11:03:04 | 21 | the Chicago Police Department comply, but I don't think I ever |
| 11:03:08 | 22 | recall that happening. |
| 11:03:08 | 23 | Q.   Mr. Murray, do you have an opinion based on your |
| 11:03:12 | 24 | experience whether or not the Chicago Police Department |
| 11:03:14 | 25 | complies with its discovery obligations and responses to |

| | | |
|---|---|---|
| 11:03:21 | 1 | subpoena in homicide cases? |
| 11:03:24 | 2 | MR. LOEVY:  Same objection as before, your Honor. |
| 11:03:25 | 3 | THE COURT:  The one we dealt with at sidebar or the |
| 11:03:31 | 4 | one you withdrew. |
| 11:03:32 | 5 | MR. LOEVY:  The opened the door. |
| 11:03:34 | 6 | THE COURT:  The is objection is overruled. |
| 11:03:35 | 7 | BY MR. NOLAND: |
| 11:03:35 | 8 | Q.  That's in your experience, Mr. Murray? |
| 11:03:37 | 9 | A.  In my experience the Chicago Police Department did comply |
| 11:03:40 | 10 | with the subpoenas for investigative material in my |
| 11:03:45 | 11 | experience. |
| 11:03:48 | 12 | THE COURT:  Mr. Noland, we are going to take a break |
| 11:03:51 | 13 | somewhere in here.  I forgot to tell you.  We are going to |
| 11:03:53 | 14 | take a lunch break a little earlier today, like 12:10 |
| 11:03:57 | 15 | something like that.  Are you changing topics? |
| 11:03:58 | 16 | MR. NOLAND:  Yes. |
| 11:03:59 | 17 | THE COURT:  We are going to break right here for ten |
| 11:04:01 | 18 | minutes. |
| 11:04:35 | 19 | (The jury leaves the courtroom.) |
| 11:04:35 | 20 | THE COURT:  Can I just see the lawyers at sidebar for |
| 11:04:37 | 21 | a moment. |
| 11:04:38 | 22 | (The following proceedings were had at sidebar outside the |
| 11:04:42 | 23 | hearing of the jury:) |
| 11:04:42 | 24 | THE COURT:  So I made a color copy for each party of |
| 11:04:48 | 25 | this.  Let me just say one thing.  We are going to talk about |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 77 of 114 PageID #:32862
12/07/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

76

| | | |
|---|---|---|
| 11:05:02 | 1 | this.  What I don't want to have happen is I don't want to |
| 11:05:05 | 2 | have the neighborhood to be blanketed with police officers. |
| 11:05:07 | 3 | That would be extremely unadvisable.  Don't be giving this to |
| 11:05:10 | 4 | people and say go figure out what's going on because that |
| 11:05:15 | 5 | doesn't happen for sort of average tagging in the City of |
| 11:05:17 | 6 | Chicago.  We are going to talk about this first, and I wanted |
| 11:05:19 | 7 | you to have a copy of it. |
| 11:05:19 | 8 |         All right. |
| 11:05:20 | 9 |         MR. LOEVY:  We are not going to talk about it now, |
| 11:05:22 | 10 | though? |
| 11:05:22 | 11 |         THE COURT:  No, after the lunch break.  Don't have it |
| 11:05:30 | 12 | out.  It's closed to the public. |
| 11:17:39 | 13 |   (Short break.) |
| 11:17:42 | 14 |   (The jury enters the courtroom.) |
| 11:17:42 | 15 |         THE COURT:  Everybody can have a seat.  Mr. Noland. |
| 11:17:44 | 16 | BY MR. NOLAND: |
| 11:17:46 | 17 | Q.  Mr. Morris, in this case back in January, did we contact |
| 11:17:48 | 18 | you to look at some materials? |
| 11:17:50 | 19 | A.  Yes. |
| 11:17:50 | 20 | Q.  And Mr. Murray, what did we ask you to do? |
| 11:17:53 | 21 | A.  Asked to examine the Cook County state's attorney's office |
| 11:18:05 | 22 | files and compare them to the documents claimed to be missing |
| 11:18:08 | 23 | by the plaintiff. |
| 11:18:09 | 24 | Q.  And did we also provide you ultimately some time later |
| 11:18:12 | 25 | with Mr. Michael Brasfield's report relative to some files |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 78 of 114 PageID #:32863
***REALTIME UNEDITED TRANSCRIPT ONLY***

77

| | |
|---|---|
| 11:18:17 | 1 that he reviewed? |
| 11:18:17 | 2 A.  That was done somewhere in the beginning of the process |
| 11:18:20 | 3 too.  I don't remember the exact date, but his report was |
| 11:18:23 | 4 provided as well. |
| 11:18:23 | 5 Q.  And Mr. Murray, did you make some observations after |
| 11:18:29 | 6 reviewing Mr. Brasfield's report about the report? |
| 11:18:34 | 7 A.  Yes.  I thought it had a fundamental flaw in it in that |
| 11:18:43 | 8 Mr. Brasfield, he did a cold comparison between the criminal |
| 11:18:47 | 9 defense attorney's files and the Chicago Police Department |
| 11:18:55 | 10 investigative file's and if a page was in the investigative |
| 11:18:57 | 11 file but not found in the criminal defense attorney's file, he |
| 11:19:01 | 12 deemed that to be withheld by the Chicago Police Department. |
| 11:19:05 | 13 The problem I had with that is he was not allowing for the |
| 11:19:09 | 14 fact that these sometimes 20, 25 or 30 year old files were not |
| 11:19:14 | 15 complete, nor also did he seek out the prosecutor's files to |
| 11:19:22 | 16 examine them to see if the Chicago Police Department had |
| 11:19:24 | 17 provided those investigative materials to the Cook County |
| 11:19:27 | 18 state's attorney's office. |
| 11:19:29 | 19 Q.  And did you see in Mr. Brasfield's report whether or not |
| 11:19:35 | 20 any qualitative assessment was made about the types of |
| 11:19:39 | 21 documents that he asserted and the plaintiffs asserted were |
| 11:19:43 | 22 so-called missing from the criminal defense attorney files |
| 11:19:48 | 23 supplied to him? |
| 11:19:49 | 24 A.  No, it was merely a page count.  In other words, he didn't |
| 11:19:52 | 25 examine the page that was missing from the criminal defense |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 79 of 114 PageID #:32864
***REALTIME UNEDITED TRANSCRIPT ONLY***

78

11:19:56    1   attorney.  He didn't look at the page for what the substance

11:20:02    2   was, whether it was information at all or whether it was

11:20:07    3   investigative material or whether it was the cover of an

11:20:10    4   envelope, for example, did he not make that examination.

11:20:14    5        If it was investigative material, he also did not

11:20:17    6   examine to see if the information on that was first off, was

11:20:22    7   it relate would to the case at hand or was it somehow

11:20:27    8   misfiled.  If it was related to the case at hand, was that

11:20:29    9   information somehow recorded elsewhere, maybe in a timed

11:20:33   10   report or another report.

11:20:34   11   Q.  Can you please explain that.  Why would you bring up the

11:20:37   12   information?  What's the issue with information versus paper?

11:20:42   13   A.  Well, some of the -- the pages or paper that was missing

11:20:48   14   was either not information or merely had the name of a

11:20:52   15   detective on the back of a piece of paper, so it was not

11:20:57   16   investigative material.  It was how the -- maybe the report

11:21:02   17   was sent to a detective inside the office.  It might have been

11:21:05   18   like I said a blank envelope, it could have been the envelope

11:21:08   19   that normally holds the photographs, so those pages by

11:21:12   20   themselves are not investigative material.  They're just

11:21:15   21   pages.

11:21:16   22   Q.  All right.  And is it the information that you are

11:21:19   23   concerned with as the prosecutor?

11:21:21   24   A.  Right.  If there's -- if there's a note or report that

11:21:27   25   contains information, investigative material related to the

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 80 of 114 PageID #:32865
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

| | | |
|---|---|---|
| 11:21:30 | 1 | case, that's the information we, as prosecutors, need to |
| 11:21:33 | 2 | gather from the Chicago Police Department and then provide to |
| 11:21:35 | 3 | the criminal defense attorney during discovery and prior to |
| 11:21:40 | 4 | trial. |
| 11:21:40 | 5 | Q.  Does it necessarily matter whether the information is on a |
| 11:21:45 | 6 | blank page, on a legal pad, on a general progress report for a |
| 11:21:51 | 7 | typewritten supplementary report, does it really matter to |
| 11:21:54 | 8 | you? |
| 11:21:54 | 9 | A.  To me, it doesn't matter in the format or typed or |
| 11:21:57 | 10 | handwritten or what document was used as long as I obtain the |
| 11:22:03 | 11 | information. |
| 11:22:03 | 12 | Q.  And did you understand that then my office under took |
| 11:22:06 | 13 | efforts to request the prosecutors' files of the corresponding |
| 11:22:13 | 14 | files that had been provided to Mr. Brasfield? |
| 11:22:15 | 15 | A.  Yes. |
| 11:22:16 | 16 | Q.  And how many -- just taking a step back, how many |
| 11:22:23 | 17 | investigative files, if you recall, does Mr. Brasfield were |
| 11:22:28 | 18 | supplied to Mr. Brasfield from the plaintiffs? |
| 11:22:30 | 19 | A.  Something like 457 files were provided to the plaintiffs |
| 11:22:34 | 20 | and Mr. Brasfield. |
| 11:22:35 | 21 | Q.  And how many criminal defense files did the plaintiffs and |
| 11:22:40 | 22 | Mr. Brasfield obtain, did the plaintiffs obtain? |
| 11:22:44 | 23 | A.  59. |
| 11:22:44 | 24 | Q.  And how many of those 59 files did Mr. Brasfield rely upon |
| 11:22:50 | 25 | in his report, to refresh your recollection recollection? |

| | | |
|---|---|---|
| 11:22:52 | 1 | A.  At some point after the beginning of this whole process, |
| 11:22:55 | 2 | he narrowed it down to 51. |
| 11:22:57 | 3 | Q.  And now going back to my original question, you were aware |
| 11:23:01 | 4 | that my office made requests of the state's attorney's office |
| 11:23:04 | 5 | for the state's attorney's office to try to find these 59 |
| 11:23:06 | 6 | files that plaintiffs had initially identified? |
| 11:23:10 | 7 | A.  Yes. |
| 11:23:10 | 8 | Q.  And how many of those 59 files did the state's attorney's |
| 11:23:15 | 9 | office find? |
| 11:23:15 | 10 | A.  They found. |
| 11:23:16 | 11 | Q.  Let me ask you this, was it 43? |
| 11:23:19 | 12 | A.  There was 43. |
| 11:23:20 | 13 | Q.  And so ultimately, you -- were you able to then make a |
| 11:23:25 | 14 | comparison between some of the documents? |
| 11:23:27 | 15 | A.  Yes, I was. |
| 11:23:28 | 16 | Q.  And which documents were those? |
| 11:23:30 | 17 | A.  The documents that the plaintiffs claimed were missing |
| 11:23:35 | 18 | from the criminal defense file, so then the examination was to |
| 11:23:39 | 19 | see if those documents were found in the prosecutors' files. |
| 11:23:44 | 20 | Q.  And did my office and people from my office assist in |
| 11:23:50 | 21 | pouring through the prosecutors' files to see if those pieces |
| 11:23:53 | 22 | of paper were actually in there? |
| 11:23:54 | 23 | A.  Yes. |
| 11:23:55 | 24 | Q.  And then did we bring that to your attention? |
| 11:23:57 | 25 | A.  Yes, after people from your office made that examination, |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 82 of 114 PageID #:32867
***REALTIME UNEDITED TRANSCRIPT ONLY***

81

| | |
|---|---|
| 11:24:02 | 1 |
| 11:24:08 | 2 |
| 11:24:12 | 3 |
| 11:24:16 | 4 |
| 11:24:19 | 5 |
| 11:24:23 | 6 |
| 11:24:30 | 7 |
| 11:24:35 | 8 |
| 11:24:38 | 9 |

1   what they would do is take a copy of the alleged missing
2   paperwork, compare it to the prosecutors' file, at this time,
3   the prosecutor's office was still maintaining their files in
4   an office so it was over in their office.  If the people from
5   your law firm, if they found that the alleged missing document
6   was in the prosecutor's file, they'd put a Magic Marker slash,
7   primarily blue but whatever marker they had so I would know
8   going forward that that page that was alleged to be missing
9   was actually found in the prosecutor's file.
10  Q.  And at some time later did you -- is it your understanding
11  that my office actually received these 43 prosecutors' files?
12  A.  At some time later, they were all provided, all the files
13  were provided to your office.
14  Q.  And did I give you disks or some type of zip drive with
15  respect -- of those 43 prosecutors' files?
16  A.  Yes.
17  Q.  And did you confirm that the blue slashed pages we found
18  in the prosecutors' files were in fact in the prosecutors'
19  files?
20  A.  Sometime later I did.
21  Q.  How did you do that?
22  A.  Just looking at the document that -- the page number that
23  was alleged to be missing and comparing it to the documents
24  that were found, so I could see that, yes, the blue slashed
25  documents were actually in the prosecutors' file.

12/07/16 AM  ***REALTIME UNEDITED TRANSCRIPT ONLY***

82

11:25:30    1    Q.  Mr. Murray, I have just rolled up a series of files.  What

11:25:54    2    are these?

11:25:54    3    A.  Those are the 43 Chicago Police Department investigative

11:26:02    4    files in which a corresponding Cook County state's attorney's

11:26:07    5    office file was also located.

11:26:12    6         MR. NOLAND:  Your Honor, I spoke to Mr. Loevy.  I

11:26:13    7    wasn't planning on identifying each one of these for the

11:26:16    8    record.  I do have a list of what they are.

11:26:17    9         THE COURT:  Okay.

11:26:19   10    BY MR. NOLAND:

11:26:20   11    Q.  And so these are the Chicago Police Department

11:26:24   12    investigative files?

11:26:26   13    A.  Right.

11:26:26   14    Q.  And are these what you understand the plaintiffs to be

11:26:28   15    characterizing as the so-called basement files?

11:26:32   16    A.  That's the phrase I've seen, yes.

11:26:34   17    Q.  And what -- do these -- what do these files look like to

11:26:39   18    you?

11:26:39   19    A.  They are the xeroxed copies of the original investigative

11:26:47   20    file that was maintained at the area where the detectives

11:26:50   21    would be working on the case, so it's not the RD file, it's

11:26:53   22    not the file that's typed up.  It's maintained downtown.

11:26:58   23    Q.  And would these 43 files in front of you, have you

11:27:01   24    reviewed all of these?

11:27:02   25    A.  Yes.

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 84 of 114 PageID #:32869
***REALTIME UNEDITED TRANSCRIPT ONLY***

83

| | | |
|---|---|---|
| 11:27:02 | 1 | Q.  And were these typical of the investigative files that you |
| 11:27:07 | 2 | would receive in the course of your 32 years at the Cook |
| 11:27:12 | 3 | County state's attorney's office? |
| 11:27:12 | 4 | A.  Yes. |
| 11:27:12 | 5 | Q.  Was there anything unusual about these files? |
| 11:27:14 | 6 | A.  Nothing unusual about these that I saw.  It was a typical |
| 11:27:20 | 7 | investigative file. |
| 11:27:21 | 8 | Q.  And what did -- did you compare these files to something? |
| 11:27:25 | 9 | A.  I compared those files to the documents that were found in |
| 11:27:34 | 10 | the Cook County state's attorney's office files. |
| 11:27:37 | 11 | Q.  The next group of documents I am going to put in front of |
| 11:27:42 | 12 | you, Mr. Murray, are defense Group Exhibit 392.  And we had |
| 11:27:56 | 13 | discussed this beforehand, Mr. Murray, of what these documents |
| 11:27:59 | 14 | we compiled? |
| 11:28:00 | 15 | A.  Yes. |
| 11:28:01 | 16 | Q.  What are those? |
| 11:28:02 | 17 | A.  That exhibit is the pages that were claimed to be missing |
| 11:28:06 | 18 | by the plaintiff, missing from the criminal defense attorney |
| 11:28:09 | 19 | file. |
| 11:28:10 | 20 | Q.  And if I could actually put these on the floor, I am |
| 11:28:28 | 21 | putting 392 on the ground right next to the stack of |
| 11:28:31 | 22 | investigative files. |
| 11:28:34 | 23 | Mr. Murray, so 392 are the documents that the |
| 11:28:38 | 24 | plaintiff had identified and Mr. Brasfield that from the 43 I |
| 11:28:46 | 25 | haves that they claim were so-called missing from the criminal |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 85 of 114 PageID #:32870

| 11:28:48 | 1 | defense file; is that right? |
| 11:28:49 | 2 | A.  That's right. |
| 11:28:50 | 3 | Q.  All right.  Showing you defense 393? |
| 11:28:55 | 4 | A.  Yes. |
| 11:28:55 | 5 | Q.  Mr. Murray, what is this next stack of documents? |
| 11:28:59 | 6 | A.  Those are the documents that were found in the Cook County |
| 11:29:08 | 7 | state's attorney's files, so from the original stack that the |
| 11:29:11 | 8 | plaintiff claimed were missing, the criminal defense files, |
| 11:29:14 | 9 | those files were actually found in the state's attorney foils. |
| 11:29:19 | 10 | Q.  Is there a Bates stamp at the? |
| 11:29:21 | 11 | A.  Yes, the format for the Bates stamp is SAO-N F and then a |
| 11:29:27 | 12 | number of digits after that. |
| 11:29:30 | 13 | Q.  What would be the SAO signify? |
| 11:29:32 | 14 | A.  The state's attorney's office. |
| 11:29:33 | 15 | Q.  It would show that these documents came from the state's |
| 11:29:38 | 16 | attorney's office files? |
| 11:29:38 | 17 | A.  Right. |
| 11:29:38 | 18 | Q.  And, Mr. Murray, I'm showing you what I believe is Defense |
| 11:29:50 | 19 | Exhibit 394.  What is Defense Exhibit 394? |
| 11:29:54 | 20 | A.  394 are the documents that were not found in the |
| 11:30:02 | 21 | prosecutor's file. |
| 11:30:03 | 22 | Q.  So these would be the documents from these 43 |
| 11:30:08 | 23 | investigative files that the plaintiffs identified that we |
| 11:30:12 | 24 | were unable to locate currently in the state's attorney's |
| 11:30:17 | 25 | files? |

| | | |
|---|---|---|
| 11:30:17 | 1 | A.  That's correct. |
| 11:30:18 | 2 | Q.  So Mr. Murray, what did you do then with respect to -- you |
| 11:30:27 | 3 | were working on this, this was an ongoing process is that |
| 11:30:30 | 4 | fair? |
| 11:30:31 | 5 | A.  That's fair. |
| 11:30:31 | 6 | Q.  We were supplying you information about what was found in |
| 11:30:35 | 7 | the state's attorney's files as you worked on the case? |
| 11:30:39 | 8 | A.  That's correct. |
| 11:30:39 | 9 | Q.  You spent a lot of time on this case? |
| 11:30:41 | 10 | A.  Yes. |
| 11:30:41 | 11 | Q.  How much? |
| 11:30:42 | 12 | A.  Over 413 hours. |
| 11:30:47 | 13 | Q.  And what's your hourly rate? |
| 11:30:49 | 14 | A.  $200 an hour. |
| 11:30:50 | 15 | Q.  And so what does that total up? |
| 11:30:52 | 16 | A.  Approximately $83,000. |
| 11:30:53 | 17 | Q.  And you're going to be issuing a bill to us and the City |
| 11:30:58 | 18 | of Chicago for that? |
| 11:30:58 | 19 | A.  That's correct. |
| 11:30:58 | 20 | Q.  So what did you do in all that time with respect to this |
| 11:31:03 | 21 | case? |
| 11:31:03 | 22 | A.  Well, when we get down to the pages that are not all the |
| 11:31:10 | 23 | work into examining the pages themselves, but now a lot of the |
| 11:31:15 | 24 | time consuming part of it was examining the documents to see |
| 11:31:18 | 25 | are they investigative material or not, and if if they are |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 87 of 114 PageID #:32872
***REALTIME UNEDITED TRANSCRIPT ONLY***

86

| | | |
|---|---|---|
| 11:31:25 | 1 | ostensibly investigative material trying to determine their |
| 11:31:29 | 2 | relevance to the case, are they relevant to this case or |
| 11:31:32 | 3 | somehow misfiled, and if they are relevant to the case, is it |
| 11:31:36 | 4 | material found elsewhere in documents provided to the criminal |
| 11:31:40 | 5 | defense attorney. |
| 11:31:40 | 6 | Q.  And these are -- you were doing that on 59 separate murder |
| 11:31:45 | 7 | investigations; is that right? |
| 11:31:46 | 8 | A.  That's correct. |
| 11:31:46 | 9 | Q.  And did you then write 116-page single spaced report based |
| 11:31:56 | 10 | on all this paper you had looked at? |
| 11:31:58 | 11 | A.  Yes. |
| 11:31:58 | 12 | Q.  And in here do you have descriptions of the, summary |
| 11:32:06 | 13 | descriptions of the facts of each one of these homicides? |
| 11:32:08 | 14 | A.  Right, of the 43 cases here but also of the total 59 cases |
| 11:32:14 | 15 | I tried to compile a relatively brief spatial summary of the |
| 11:32:22 | 16 | crime and the result of the prosecution was before any other |
| 11:32:26 | 17 | examination took place. |
| 11:32:27 | 18 | Q.  Mr. Murray, based on the documents that were found in the |
| 11:32:34 | 19 | state's attorney file from these 43 files, investigative |
| 11:32:37 | 20 | files, do you have an opinion about whether or not the Chicago |
| 11:32:42 | 21 | Police Department produced these 43 investigative files in the |
| 11:32:45 | 22 | course of the criminal discovery process for these 43 cases? |
| 11:32:49 | 23 | MR. LOEVY:  Objection to foundation, your Honor. |
| 11:32:50 | 24 | THE COURT:  Overruled. |
| 11:32:55 | 25 | THE WITNESS:  My opinion is that the Chicago Police |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 88 of 114 PageID #:32873
12/07/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

87

11:32:57    1    Department did comply with their requirements of providing

11:33:02    2    investigative material to the prosecutors' office and from

11:33:07    3    them to the defense attorney.

11:33:08    4         MR. LOEVY:  Your Honor, move to strike as

11:33:09    5    nonresponsive to the question.

11:33:13    6         THE COURT:  Let me just go back and look at

11:33:16    7    something.  Yeah, the last part of the opinion was not

11:33:28    8    responsive and I think is beyond what is permitted.  So the

11:33:33    9    answer is stricken.  You're -- let me just talk to you at

11:33:37   10    sidebar for a second.

11:33:45   11      (Sidebar.)

11:33:45   12         THE COURT:  You asked him about Chicago Police

11:33:48   13    Department complying with his obligations and he tacked on

11:33:50   14    something about providing stuff to defense counsel.

11:33:52   15         MR. NOLAND:  You're right.  I think I can lay the

11:33:55   16    foundation for him to do that.

11:33:56   17         THE COURT:  Yeah.  You need to work through some

11:33:59   18    steps.  Was that your objection?

11:34:00   19         MR. LOEVY:  No.  My objection was the question Dan

11:34:02   20    asked was is it your opinion they turned over these

11:34:04   21    investigative files, and then the witness said, I believe they

11:34:06   22    turned over the information and documents.  He's implying --

11:34:09   23         THE COURT:  Well, that's a matter for cross, though.

11:34:10   24    Nonresponsiveness is really more an objection for the

11:34:14   25    questioner, I think.

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 89 of 114 PageID #:32874
***REALTIME UNEDITED TRANSCRIPT ONLY***

88

11:34:15  1     MR. LOEVY:  My foundation objection is he can't

11:34:18  2   answer --

11:34:18  3     THE COURT:  That wasn't your objection.  Your

11:34:19  4   objection was nonresponsive.

11:34:22  5     MR. LOEVY:  All right.  I am making a foundation

11:34:23  6   objection.  That's what I meant.  He can't say that those

11:34:25  7   files were or weren't turned over.  He didn't even purport to

11:34:29  8   the first time around.  He said I think the documents and the

11:34:34  9   information got turned over.  He can't say I think those 59

11:34:34  10   files were turned over.

11:34:34  11     THE COURT:  I don't think he said files.

11:34:35  12     MR. LOEVY:  That's what the question was, files.

11:34:37  13     MR. NOLAND:  The pages.

11:34:38  14     THE COURT:  Let's just back up a few steps.  I will

11:34:41  15   strike the question and answer, and you can just kind of do it

11:34:43  16   over.

11:34:46  17     MR. NOLAND:  Thanks, Judge.

11:34:47  18     (The following proceedings were had in open court in the

11:34:48  19   presence and hearing of the jury:)

11:34:48  20     THE COURT:  So the question and answer are stricken.

11:34:50  21   The jury is directed to disregard it.  Mr. Noland is going to

11:34:53  22   back up a couple of stems.  Go ahead.

11:34:54  23   BY MR. NOLAND:

11:34:56  24   Q.  Mr. Murray, you talked about the criminal discovery

11:34:58  25   process and the obligations in that regard?

12/07/16 AM        \*\*\*REALTIME UNEDITED TRANSCRIPT ONLY\*\*\*

89

| | | |
|---|---|---|
| 11:35:01 | 1 | A.  Yes. |
| 11:35:01 | 2 | Q.  What is -- what was in your experience in your practice, |
| 11:35:04 | 3 | what would you do with documents that you received from the |
| 11:35:09 | 4 | Chicago Police Department? |
| 11:35:09 | 5 | A.  I would provide them to the criminal defense attorney, I |
| 11:35:14 | 6 | would also use them myself in my case -- in my case and in my |
| 11:35:18 | 7 | preparation of my answer to discovery. |
| 11:35:19 | 8 | Q.  And when the comparison was made between these |
| 11:35:23 | 9 | investigative files and the state's attorney's files, did you |
| 11:35:27 | 10 | form an opinion about whether or not the documents in these 43 |
| 11:35:32 | 11 | files were in the state's attorney's files? |
| 11:35:35 | 12 | A.  Yes, they were for the most part. |
| 11:35:38 | 13 | Q.  For the most part except for this stack Exhibit 394, |
| 11:35:42 | 14 | right? |
| 11:35:42 | 15 | A.  That's correct. |
| 11:35:43 | 16 | Q.  So based upon that, do you have an opinion about whether |
| 11:35:46 | 17 | or not these documents in these files were supplied by the |
| 11:35:49 | 18 | Chicago Police Department to the prosecutors and that the |
| 11:35:52 | 19 | practice would have been to turn them over to the criminal |
| 11:35:54 | 20 | defense attorneys? |
| 11:35:55 | 21 | MR. LOEVY:  Same objection. |
| 11:35:56 | 22 | THE COURT:  Overruled. |
| 11:35:56 | 23 | THE WITNESS:  It's my -- I believe my opinion that |
| 11:35:59 | 24 | they were provided by the Chicago Police Department and then |
| 11:36:01 | 25 | turned -- to the state's attorney's office and then tendered |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 91 of 114 PageID #:32876
***REALTIME UNEDITED TRANSCRIPT ONLY***

90

| | | |
|---|---|---|
| 11:36:05 | 1 | to the criminal defense attorney. |
| 11:36:06 | 2 | BY MR. NOLAND: |
| 11:36:09 | 3 | Q.  Mr. Murray, you brought -- I saw you walk in with a brown |
| 11:36:14 | 4 | folder, are he had weld? |
| 11:36:16 | 5 | A.  Yes. |
| 11:36:16 | 6 | Q.  Do you have a copy of this Exhibit 394 in that folder? |
| 11:36:21 | 7 | A.  Yes, I do. |
| 11:36:22 | 8 | Q.  In preparation for trial here today, you've made some post |
| 11:36:27 | 9 | it and stickies so we can move this as quickly as we can; is |
| 11:36:27 | 10 | that right? |
| 11:36:31 | 11 | A.  That's true.  Yes. |
| 11:36:31 | 12 | Q.  Okay.  Mr. Murray, I'm going to ask you to turn to the |
| 11:36:40 | 13 | first grouping of documents in defense 394, and it's Bates |
| 11:36:53 | 14 | stamped 394, 1 through 236.  Okay? |
| 11:37:06 | 15 | A.  Okay. |
| 11:37:07 | 16 | Q.  Mr. Murray, what times of documents are these? |
| 11:37:10 | 17 | A.  The first grouping -- well, they're primarily |
| 11:37:18 | 18 | administrative -- I would term them administrative documents. |
| 11:37:21 | 19 | MR. NOLAND:  Laura, could you pull up page number D |
| 11:37:26 | 20 | 394, the first page. |
| 11:37:28 | 21 | BY MR. NOLAND: |
| 11:37:48 | 22 | Q.  The first -- this page 394, defense 394, Mr. Murray, that |
| 11:37:55 | 23 | is displayed to the jury, what is this document? |
| 11:37:57 | 24 | A.  It's a Chicago Police Department form which is entitled |
| 11:38:00 | 25 | investigative file control. |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 92 of 114 PageID #:32877
***REALTIME UNEDITED TRANSCRIPT ONLY***

91

| | | |
|---|---|---|
| 11:38:01 | 1 | Q.  What's that? |
| 11:38:02 | 2 | A.  It's a -- actually, it's more of a card rather than a full |
| 11:38:07 | 3 | 8 and a half by 11 inch document.  The Chicago Police |
| 11:38:11 | 4 | Department uses it to designate when police personnel sign out |
| 11:38:16 | 5 | the investigative file from the area for whatever reasons.  In |
| 11:38:20 | 6 | other words, the file is maintained at the area in a |
| 11:38:24 | 7 | sergeant's office, and whenever the file is taken out of the |
| 11:38:28 | 8 | sergeant's office, this card is filled out and left in its |
| 11:38:31 | 9 | place and the file is taken out. |
| 11:38:33 | 10 | Q.  And we counted up in this remainder pages that we couldn't |
| 11:38:38 | 11 | now find in the prosecutor's files, we totalled about 22 of |
| 11:38:42 | 12 | these? |
| 11:38:42 | 13 | A.  22 pages, yes. |
| 11:38:43 | 14 | Q.  Is there any investigative information at all on these |
| 11:38:46 | 15 | pages? |
| 11:38:46 | 16 | A.  None. |
| 11:38:48 | 17 | MR. NOLAND:  Laura, could you go to page D 394. |
| 11:39:06 | 18 | 394-023. |
| 11:39:18 | 19 | BY MR. NOLAND: |
| 11:39:19 | 20 | Q.  What is this document, Mr. Murray? |
| 11:39:20 | 21 | A.  It's another police department detective, this one is |
| 11:39:25 | 22 | entitled to the daily mainly incident log. |
| 11:39:28 | 23 | Q.  Can you explain to the jury what the daily mainly incident |
| 11:39:30 | 24 | log is? |
| 11:39:31 | 25 | A.  The detective difficulties maintained a daily running log |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 93 of 114 PageID #:32878
***REALTIME UNEDITED TRANSCRIPT ONLY***

92

| | |
|---|---|
| 11:39:36 | 1 |
| 11:39:41 | 2 |
| 11:39:46 | 3 |
| 11:39:50 | 4 |
| 11:39:54 | 5 |
| 11:39:59 | 6 |

1  of major incidents that happened during that shift or during

2  that part of the day.  It's maintained by a sergeant of the

3  detective division who acts as a watch commander.  It lists

4  just what it says major incidents, whether it be usually a

5  murder case, but it could also list other page crimes that may

6  occur during the course of that shift.

7  Q.  Where does the sergeant get the information to include in

8  this log?

9  A.  The sergeant gets all the information from the detectives

10  who are actually investigating the case or have been assigned

11  to investigate the case.

12  Q.  And is this information then derivative of information

13  from the supplementary reports?

14  A.  That's correct.  The sergeant does not personally -- is

15  not personally involved in the investigation.

16  Q.  How many pages of this document are there?

17  A.  42.

18  Q.  So would you have an opinion that the information in those

19  daily mainly incident logs are included in -- generally

20  included in supplementary reports and tendered in the criminal

21  discovery process?

22  A.  Yes, the information is taken from the detectives who are

23  compiling either their general progress reports or their

24  supplementary reports.  This document is provided to the chief

25  of detectives and possibly the superintendent for their

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 94 of 114 PageID #:32879
***REALTIME UNEDITED TRANSCRIPT ONLY***

93

| 11:41:01 | 1 | review. |
|---|---|---|
| 11:41:02 | 2 | Q. Just in case they get a phone call from the media or some |
| 11:41:05 | 3 | higher up to see what's going on in your area on that |
| 11:41:09 | 4 | particular day? |
| 11:41:09 | 5 | A. That's correct. |
| 11:41:10 | 6 | Q. The next group of documents? |
| 11:41:12 | 7 | MR. NOLAND: Laura, this would be D 394, page 65. |
| 11:41:16 | 8 | BY MR. NOLAND: |
| 11:41:17 | 9 | Q. The next group of documents you compiled are -- what are |
| 11:41:21 | 10 | these? |
| 11:41:21 | 11 | A. It's the investigative file inventory. It's a document, |
| 11:41:27 | 12 | it's a listing of the documents that are in the investigative |
| 11:41:32 | 13 | file. |
| 11:41:32 | 14 | Q. And would you say these are investigative or |
| 11:41:37 | 15 | administrative in nature? |
| 11:41:38 | 16 | A. Administrative in nature. |
| 11:41:39 | 17 | Q. And did you receive these from time to time in your |
| 11:41:43 | 18 | career? |
| 11:41:44 | 19 | A. Yeah, in response to subpoenas I sent for the |
| 11:41:50 | 20 | investigative file, they would be on occasion included in the |
| 11:41:53 | 21 | response to a subpoena. |
| 11:41:53 | 22 | Q. And if you got them, what would you do with them? |
| 11:41:56 | 23 | A. If I got them, I would provide them to the criminal |
| 11:41:58 | 24 | defense attorney. |
| 11:41:59 | 25 | Q. Did you ever make a point of -- if you didn't get this |

12/07/16 AM   Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 95 of 114 PageID #:32880
***REALTIME UNEDITED TRANSCRIPT ONLY***

94

| | | |
|---|---|---|
| 11:42:03 | 1 | document reaching out for anybody to try to get it? |
| 11:42:05 | 2 | A.  No. |
| 11:42:05 | 3 | Q.  Why not? |
| 11:42:06 | 4 | A.  It was not part of the investigation.  In other words, |
| 11:42:11 | 5 | there's no interviews of witnesses, there's no forensic |
| 11:42:14 | 6 | evidence gathered or any of that nature.  It's just a listing |
| 11:42:17 | 7 | of the documents that are in the file. |
| 11:42:18 | 8 | Q.  Do you have any recollection of any criminal defense |
| 11:42:20 | 9 | attorney ever asking you, say, hey Bernie, I didn't get the |
| 11:42:26 | 10 | investigative file inventory for this one, can you go ask for |
| 11:42:28 | 11 | it? |
| 11:42:28 | 12 | A.  In my experience, criminal defense attorney never asked me |
| 11:42:33 | 13 | for it. |
| 11:42:33 | 14 | Q.  How many pages are in this exhibit? |
| 11:42:35 | 15 | A.  There are 51 pages. |
| 11:42:37 | 16 | Q.  Turning to the next grouping, Laura, could you turn to |
| 11:42:41 | 17 | page D 394, page 116. |
| 11:42:44 | 18 | BY MR. NOLAND: |
| 11:42:49 | 19 | Q.  Mr. Murray, what's this -- how many pages are |
| 11:42:51 | 20 | approximately in this grouping? |
| 11:42:53 | 21 | A.  It's approximately 23. |
| 11:42:54 | 22 | Q.  And what have you grouped together here? |
| 11:42:58 | 23 | A.  These are memos or on occasion maybe a subpoena in here |
| 11:43:05 | 24 | for -- first off the memos are from the office of the |
| 11:43:08 | 25 | superintendent, the office of legal affairs.  It's usually a |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 96 of 114 PageID #:32881
***REALTIME UNEDITED TRANSCRIPT ONLY***

95

| | | |
|---|---|---|
| 11:43:12 | 1 | request for material from the investigative file in response |
| 11:43:15 | 2 | to a civil subpoena often filed years later and often filed |
| 11:43:21 | 3 | after the criminal case has long been closed and prosecuted. |
| 11:43:26 | 4 | Q.  So would you have an opinion -- are these investigative |
| 11:43:30 | 5 | relative to who did the murder in the case at issue? |
| 11:43:35 | 6 | A.  No, they are not investigative. |
| 11:43:36 | 7 | Q.  The next grouping of documents? |
| 11:43:41 | 8 | MR. NOLAND:  Laura, if you could bring up page 139. |
| 11:43:43 | 9 | BY MR. NOLAND: |
| 11:43:46 | 10 | Q.  What are these? |
| 11:43:46 | 11 | A.  These are court attendance reports.  It's another |
| 11:43:55 | 12 | administrative document that's created by the Chicago Police |
| 11:44:00 | 13 | Department to track when a detective or a police officer is |
| 11:44:04 | 14 | testifying in court.  I am not exactly sure the reasons they |
| 11:44:09 | 15 | compile those, but they're administrative.  They're often |
| 11:44:13 | 16 | created at the time a witness is testifying at the actual |
| 11:44:17 | 17 | trial or maybe at a motion.  It has no investigative material |
| 11:44:20 | 18 | at all. |
| 11:44:20 | 19 | Q.  And about how many of these are there in this group? |
| 11:44:24 | 20 | A.  13. |
| 11:44:26 | 21 | MR. NOLAND:  Laura, can you turn to page 152. |
| 11:44:30 | 22 | BY MR. NOLAND: |
| 11:44:36 | 23 | Q.  Then we have grouped together the next group of 13 pages |
| 11:44:40 | 24 | or so.  What are these documents in your opinion? |
| 11:44:43 | 25 | A.  In my opinion, these documents have been misfiled. |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 97 of 114 PageID #:32882
***REALTIME UNEDITED TRANSCRIPT ONLY***

96

| | | |
|---|---|---|
| 11:44:50 | 1 | Q.  And how did you determine that these documents were |
| 11:44:53 | 2 | misfiled in general? |
| 11:44:54 | 3 | A.  In general. |
| 11:44:56 | 4 | MR. LOEVY:  Objection, your Honor.  He has to |
| 11:44:57 | 5 | foundation. |
| 11:45:01 | 6 | THE COURT:  He can explain the answer.  Overruled. |
| 11:45:03 | 7 | THE WITNESS:  Well, I would examine the documents to |
| 11:45:07 | 8 | determine their relevance to the case that the investigative |
| 11:45:15 | 9 | file they are found in and try and determine if any of the |
| 11:45:17 | 10 | information on the document related to the investigative file. |
| 11:45:21 | 11 | MR. NOLAND: |
| 11:45:23 | 12 | BY MR. NOLAND: |
| 11:45:24 | 13 | Q.  And with this particular case we are looking at was this |
| 11:45:28 | 14 | one solved in the summer of 1999? |
| 11:45:31 | 15 | A.  Right.  This case none of the names on here related to any |
| 11:45:34 | 16 | names in the investigative file or the RD file and one of the |
| 11:45:39 | 17 | names on the bottom right side, it lists that the person had a |
| 11:45:45 | 18 | 2000 resisting and obstructing case eluding the police and |
| 11:45:52 | 19 | there was a warrant for him for that case.  This case was a |
| 11:45:55 | 20 | 1999 case, so a 2000 resisting and obstructing, and this case |
| 11:46:00 | 21 | was solved in 2000 -- I'm sorry -- in the preceding year, so |
| 11:46:06 | 22 | the resisting obstruction case could not have happened.  In |
| 11:46:10 | 23 | addition to the names not appearing in the police reports, |
| 11:46:13 | 24 | that indication there assumes to me that it's from a later |
| 11:46:16 | 25 | case. |

12/07/16 AM  Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 98 of 114 PageID #:32883
***REALTIME UNEDITED TRANSCRIPT ONLY***

97

| | | |
|---|---|---|
| 11:46:16 | 1 | Q.  Just by way of another example, Laura, could you turn to |
| 11:46:22 | 2 | page 73.  I'm sorry, Laura, page 73.  My mistake.  I have |
| 11:47:07 | 3 | given the wrong number, 156. |
| 11:47:09 | 4 | BY MR. NOLAND: |
| 11:47:25 | 5 | Q.  Can you start describing while we're pulling it up. |
| 11:47:32 | 6 | This is an Illinois State Police lab report? |
| 11:47:34 | 7 | A.  Yes, it's an Illinois State Police lab report from April |
| 11:47:38 | 8 | 19th, 2002.  The RD on this case is not the RD in the file |
| 11:47:47 | 9 | that it was found.  And the name of the victim is not the |
| 11:47:51 | 10 | victim from the case in which this document was found. |
| 11:47:58 | 11 | Q.  The victim here states Tyrone Taylor? |
| 11:48:02 | 12 | A.  Yes. |
| 11:48:02 | 13 | Q.  But that wasn't the victim in this particular case? |
| 11:48:05 | 14 | A.  It is not.  It's actually a two-page document.  So that |
| 11:48:07 | 15 | led me to believe it was misfiled. |
| 11:48:09 | 16 | Q.  And there is a series of other documents in here that you |
| 11:48:17 | 17 | made the same analysis to determine that the documents were |
| 11:48:19 | 18 | misfiled? |
| 11:48:20 | 19 | A.  That's correct. |
| 11:48:29 | 20 | MR. NOLAND:  Laura, can you turn to page 165, please. |
| 11:48:32 | 21 | BY MR. NOLAND: |
| 11:48:41 | 22 | Q.  This grouping of documents is about how many pages that we |
| 11:48:44 | 23 | put together, Mr. Murray? |
| 11:48:45 | 24 | A.  62 pages. |
| 11:48:46 | 25 | Q.  And what in your opinion are these documents? |

12/07/16 AM    Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 99 of 114 PageID #:32884
***REALTIME UNEDITED TRANSCRIPT ONLY***

98

11:48:48    1   A.  These are documents that have no investigative material,

11:48:53    2   sometimes no material at all.

11:48:54    3   Q.  So by way of example, this first page, what's this?

11:48:58    4   A.  It's a name, s-w-i-t-s-k-i, and then A crosshatch 4 V C.

11:49:08    5   Switski is the name of a violent crimes detective, A is area

11:49:14    6   four and V C refers to violent crimes.

11:49:17    7   Q.  Why do you think that this document is not investigative?

11:49:19    8   A.  The practice of in the Chicago Police Department that they

11:49:26    9   were sending maybe a rap sheet or an arrest report or a lab

11:49:30   10   report inside their own office, they send it to each other,

11:49:34   11   the agency that was sending it to the detective would write

11:49:37   12   his name on the back of the envelope -- sorry, the back of the

11:49:45   13   document.  Then one of two things would happen, it would go in

11:49:49   14   an envelope and sent through inn he, the document would be

11:49:54   15   folded over and stapled, so in effect his name on the document

11:49:58   16   is the outside of a mailing envelope.  That would also happen

11:50:04   17   -- I'm sorry.  That would happen if the documents were sent

11:50:07   18   inside the Chicago Police Department.

11:50:07   19   Q.  And do you recall what this -- what this name Switski was

11:50:11   20   on the back of in this particular case?

11:50:13   21   A.  It was on the back of -- if my recollection is correct, it

11:50:20   22   was on the back of an arrest report.

11:50:22   23   Q.  There's a lot of these types much documents in this

11:50:25   24   grouping of detective's names; is that right?

11:50:28   25   A.  That's right.

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 100 of 114 PageID #:32885

11:50:29    1   Q. Generally speaking, what kinds of documents were being

11:50:31    2   sent to detectives?

11:50:32    3   A. Commonly, they would be arrest reports, wrap sheets, and

11:50:37    4   forensic reports such as lab reports.

11:50:41    5   Q. In this particular document, in the upper half, you can

11:50:44    6   see does that appear to be anything that would indicate how

11:50:47    7   this was sent?

11:50:48    8   A. Yeah, in the top above the -- slightly above the letter S,

11:50:57    9   you can see the staple holes, two staples holes, so as I

11:51:01   10   described before, the documents could also be followed would

11:51:04   11   over and stapled, and with this one, that could be an

11:51:08   12   indication of what happened here.

11:51:09   13   Q. By the way, was Switski's name in this investigative file

11:51:13   14   in other places?

11:51:13   15   A. Yes, he was a detective assigned to this case and his name

11:51:16   16   was throughout the supplemental and investigative material.

11:51:20   17   Q. Would you see any reason whatsoever to identify this

11:51:22   18   document as missing investigative material?

11:51:24   19   A. No.

11:51:25   20   Q. Did Mr. Brasfield do that?

11:51:27   21   A. He did.

11:51:30   22         MR. NOLAND: Can we go to the next page, Laura.

11:51:33   23   BY MR. NOLAND:

11:51:34   24   Q. What's this?

11:51:34   25   A. This document lists the RD number of the case. That it's

11:51:40  1   a homicide file and the 83-11 indicates that it's a 1983 case,

11:51:48  2   maybe the 11th investigation handled by that area.

11:51:51  3   Q.  Does this have investigative information on the case?

11:51:54  4   A.  No, it does not.  It's just the title of the case.

11:51:58  5        MR. NOLAND:  Laura, can you go to page 170.

11:52:01  6   BY MR. NOLAND:

11:52:08  7   Q.  Is this another example of just a detective's name?

11:52:11  8   A.  Right.

11:52:11  9   Q.  And again?

11:52:13  10  A.  That's his name, his star and his unit assignment.  And

11:52:19  11  he's a detective whose name was also present in the other

11:52:22  12  police reports.

11:52:22  13  Q.  And there are many pages like this one in this group of

11:52:26  14  materials that we put together?

11:52:27  15  A.  That's correct.

11:52:30  16        MR. NOLAND:  Laura, could you go to page 189.

11:52:45  17  BY MR. NOLAND:

11:52:46  18  Q.  What's this show?

11:52:47  19  A.  That's the investigative file inventory document we

11:52:51  20  discussed earlier.  In this instant, it's just a blank one.

11:52:56  21  There is no indication of it being used in any investigation.

11:53:02  22        MR. NOLAND:  Laura, can you go to page 193.

11:53:04  23  BY MR. NOLAND:

11:53:08  24  Q.  What's this, Mr. Murray?

11:53:09  25  A.  That's the back of a property inventory sheet.  When the

11:53:15　1　Chicago Police Department during the course of investigation

11:53:22　2　grab or accumulate property, it might be in a homicide case,

11:53:25　3　it could be a weapon, it could be shell casings, it could be

11:53:29　4　bloody clothes or something like that, they have a property

11:53:32　5　inventory system for maintaining that evidence for testing and

11:53:35　6　use at trial.  So the front side of this document is that

11:53:38　7　inventory sheet.  The backside is the use for inventories of

11:53:46　8　items that are taken pursuant to the search warrant.

11:53:52　9　　　　Throughout the plaintiff's expert's report, there are

11:53:58　10　a number of these back sides to the inventory sheet which are

11:54:02　11　blank which have no information at all.

11:54:04　12　Q.  And he was claiming all this stuff is investigative

11:54:07　13　material that he was counting against the police department?

11:54:09　14　A.  Right.

11:54:10　15　　　　MR. LOEVY:  Objection, your Honor, he made no such

11:54:12　16　claim.

11:54:13　17　　　　THE COURT:  Overruled.  The jury has heard the

11:54:18　18　evidence and they'll make their own decisions about whether

11:54:22　19　that's right or not.

11:54:23　20　BY MR. NOLAND:

11:54:24　21　Q.  Mr. Murray, do you remember in his report, he had some

11:54:26　22　attachments where he had a whole column that was labeled

11:54:29　23　missing investigative material.  Do you remember that?

11:54:32　24　A.  Yes.

11:54:33　25　Q.  And in that column, did he list -- did he include all of

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 103 of 114 PageID #:32888
***REALTIME UNEDITED TRANSCRIPT ONLY***

102

11:54:37  1  these documents?

11:54:38  2  A.  He included them throughout his report as that type of

11:54:45  3  material and then I believe he summarized it in that column on

11:54:49  4  his exhibit.

11:54:51  5  Q.  And you focused more on his report and some other

11:54:54  6  attachments?

11:54:55  7  A.  Yes.

11:54:55  8  Q.  And based upon a review of his report, is there no doubt

11:54:58  9  he was counting these things as missing investigative

11:55:01  10  material?

11:55:01  11  A.  That's true.

11:55:05  12      MR. NOLAND:  Can you go to the next page, Laura,

11:55:07  13  which would be 224.  Not the next page, but can you go to 224.

11:55:14  14  BY MR. NOLAND:

11:55:22  15  Q.  What's this?

11:55:22  16  A.  It appears to be the back of a case report, but, again,

11:55:32  17  it's blank.  It's not been used in a case at all.

11:55:37  18  Q.  Can you go to the next page, 225.

11:55:40  19      What's this?

11:55:42  20  A.  It's a Chicago Police Department mailing envelope am that

11:55:49  21  has no other markings on it other than preprinted information

11:55:53  22  that it's a Chicago Police Department mailing envelope.

11:55:55  23  Q.  Mr. Murray, do you have an opinion about whether any of

11:55:59  24  the documents in this stack, all these blank documents and

11:56:02  25  detective's names and these other things, are these

| | | |
|---|---|---|
| 11:56:05 | 1 | investigative in any way? |
| 11:56:06 | 2 | A.  They are not investigative, they did not contain |
| 11:56:09 | 3 | investigative material. |
| 11:56:10 | 4 | Q.  Mr. Murray, I am going to direct you to the next grouping |
| 11:56:21 | 5 | that we put together.  What can you summarize the grouping of |
| 11:56:30 | 6 | documents in our next group, beginning with on yours 170 -- |
| 11:56:39 | 7 | did I forget one?  Yeah. |
| 11:56:44 | 8 | What's this next grouping of documents, |
| 11:56:46 | 9 | administrative documents in your opinion? |
| 11:56:48 | 10 | A.  It's a grouping of 10 pages which were requests for |
| 11:56:54 | 11 | documents or requests for photographs.  It wasn't the actual |
| 11:57:00 | 12 | document or photograph.  It was a request for it.  In other |
| 11:57:05 | 13 | words, a detective was looking for maybe mug shots or he was |
| 11:57:09 | 14 | looking for crime scene photographs and he would send a |
| 11:57:13 | 15 | request through his inner office mail for those documents, for |
| 11:57:17 | 16 | those photographs. |
| 11:57:18 | 17 | MR. NOLAND:  Laura, pull up 227. |
| 11:57:20 | 18 | BY MR. NOLAND: |
| 11:57:21 | 19 | Q.  This is one of those requests up in the top left-hand |
| 11:57:24 | 20 | corner? |
| 11:57:24 | 21 | A.  Yes, it's a request for evidence identification |
| 11:57:26 | 22 | photographs. |
| 11:57:26 | 23 | Q.  Next page, Laura. |
| 11:57:29 | 24 | BY MR. NOLAND: |
| 11:57:30 | 25 | Q.  In the middle, there is a checked off box that says page |

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 105 of 114 PageID #:32890

| 11:57:34 | 1 | 228.  Is this another request? |
| 11:57:37 | 2 | A.  In this one of the detective is requesting the office of |
| 11:57:42 | 3 | emergency communication that they archive all voice |
| 11:57:46 | 4 | transmissions relative to an incident and requesting a |
| 11:57:50 | 5 | recording, so he's asking for those -- that those items not be |
| 11:57:56 | 6 | erased or destroyed and to give him a copy of those recordings |
| 11:58:00 | 7 | on a cassette. |
| 11:58:01 | 8 | Q.  And, Mr. Murray, are there similar documents -- let's do a |
| 11:58:07 | 9 | couple more. |
| 11:58:08 | 10 | If you go to the next page, Laura, 229. |
| 11:58:15 | 11 | A.  That's another request for evidence identification |
| 11:58:18 | 12 | photographs as part of the investigation.  So this is no the |
| 11:58:23 | 13 | -- the photograph, it's the interoffice request asking for the |
| 11:58:28 | 14 | photograph. |
| 11:58:28 | 15 | Q.  So is it the photographs that are important and not the |
| 11:58:32 | 16 | request? |
| 11:58:32 | 17 | A.  Right.  The request -- the photographs are what's |
| 11:58:37 | 18 | important. |
| 11:58:38 | 19 | MR. NOLAND:  Can you go to the next page, Laura, |
| 11:58:40 | 20 | let's make it 231. |
| 11:58:43 | 21 | BY MR. NOLAND: |
| 11:58:44 | 22 | Q.  Now, what's this one?  Are we on 230? |
| 11:58:46 | 23 | A.  When the forensic investigators, Chicago police officers, |
| 11:58:49 | 24 | when they would take pictures at a crime scene, they would |
| 11:58:56 | 25 | take a picture of this, I guess it would be a document that |

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 106 of 114 PageID #:32891
***REALTIME UNEDITED TRANSCRIPT ONLY***

105

| | | |
|---|---|---|
| 11:58:59 | 1 | they created so they would be able to know back in the old |
| 11:59:04 | 2 | days on their roll of film, they would know when a new case |
| 11:59:07 | 3 | started and an older set of photographs ended.  So this is the |
| 11:59:12 | 4 | information that's available throughout the file, the RD |
| 11:59:16 | 5 | number, the date the photographs were taken and the |
| 11:59:20 | 6 | photograph's names and stars and their unit assignment. |
| 11:59:23 | 7 | Q.  When you got crime scene photographs on a particular RD |
| 11:59:25 | 8 | number, would you usually get these placards? |
| 11:59:28 | 9 | A.  Yes, maybe not every case, but often they were included as |
| 11:59:32 | 10 | well. |
| 11:59:32 | 11 | Q.  Okay.  If the crime lab technician took them and put them |
| 11:59:37 | 12 | on that roll of film, would you expect to routinely get this |
| 11:59:41 | 13 | placard? |
| 11:59:41 | 14 | A.  Yes. |
| 11:59:42 | 15 | Q.  We couldn't happen to find this particular one in this |
| 11:59:45 | 16 | case? |
| 11:59:46 | 17 | A.  My recollection is we didn't find this one in this case. |
| 11:59:51 | 18 | Q.  Okay.  But is it investigative material that would be of a |
| 11:59:58 | 19 | concerning nature to you? |
| 11:59:58 | 20 | A.  No. |
| 12:00:02 | 21 | MR. NOLAND:  Can you go to the next page, Laura. |
| 12:00:04 | 22 | BY MR. NOLAND: |
| 12:00:05 | 23 | Q.  What is this document, page 231? |
| 12:00:07 | 24 | A.  It's -- I don't recall the acronym chess stands for but |
| 12:00:14 | 25 | it's a part of the Chicago Police Department where the cold |

12:00:18   1   case squad has done some investigation on a case that

12:00:24   2   previously was unsolved and they've got reports that they

12:00:30   3   generated and they're trying to make sure that those reports

12:00:34   4   are added to the investigative file as well as to the typed RD

12:00:40   5   to the RD file as well. This was apparently the process that

12:00:43   6   they did to make sure those records were maintained.

12:00:46   7   Q. So this chess memos, there's a few other pages like this,

12:00:51   8   they are not the actual investigation, they are memos to get

12:00:54   9   documents into the file?

12:00:55   10   A. That's correct. It's not the investigative material.

12:00:58   11   It's a memo saying add this material to the file.

12:01:01   12   Q. Mr. Murray, the next grouping of documents that we put

12:01:07   13   together, so we are off the administrative documents, right?

12:01:11   14   A. Yes.

12:01:11   15   Q. I am going to start with a predicate question. When you

12:01:26   16   were working on a case, would you -- was it your practice to

12:01:29   17   in advance of trial to obtain updated rap sheets or criminal

12:01:34   18   history reports on witnesses and defendants?

12:01:37   19   A. Yes. In addition to the material that I accumulated as

12:01:45   20   part of the Chicago Police Department and police department,

12:01:49   21   cases took a while before they got to trial, so I would and

12:01:53   22   the colleagues I worked with, we would routinely update

12:01:57   23   criminal histories of witnesses that we may be calling to the

12:02:00   24   witness stand. Also witnesses that might have been provided

12:02:06   25   to us from the defense or even the defendant himself, make

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 108 of 114 PageID #:32893

12:02:09  1  sure we had the up to date rap sheets and provided them to

12:02:13  2  defense counsel before trial.

12:02:15  3  Q.  And this grouping of documents that we are about to talk

12:02:19  4  about, can you generally characterize what we are about to

12:02:25  5  look at for the jury?

12:02:26  6  A.  Generally background information on witnesses or

12:02:29  7  defendants.

12:02:29  8  Q.  Does it have -- does this grouping of pages have

12:02:34  9  information about witness interviews or other substantive

12:02:39  10  information about who did the crime?

12:02:40  11  A.  No, it does not.

12:02:42  12  Q.  It does have names or people involved?

12:02:45  13  A.  That's correct.

12:02:45  14  Q.  And did you go through the pages that were currently in

12:02:53  15  the state's attorney's files or that the plaintiffs

12:02:57  16  acknowledge were in the state's attorney's to make sure that

12:03:00  17  the names of the individuals in this group of materials were

12:03:03  18  in those files?

12:03:07  19  A.  Yes.

12:03:07  20  Q.  So the names would have been available to the prosecutors

12:03:10  21  and the criminal defense attorneys?

12:03:11  22  A.  Yes.

12:03:11  23  Q.  But we could not locate this grouping of pages in the

12:03:14  24  state's attorney's files?

12:03:16  25  A.  That's correct.

| | | |
|---|---|---|
| 12:03:16 | 1 | Q.  Does that necessarily mean that these were never in the |
| 12:03:20 | 2 | possession of the state's attorney's files? |
| 12:03:22 | 3 | A.  No.  Either this original document or the original rap |
| 12:03:27 | 4 | sheet would have been in the prosecutors' file during the |
| 12:03:30 | 5 | course of discovery initially and prior to trial. |
| 12:03:33 | 6 | MR. LOEVY:  Objection to the foundation, how he would |
| 12:03:36 | 7 | know that. |
| 12:03:37 | 8 | THE COURT:  Overruled.  It's a matter for cross. |
| 12:03:40 | 9 | MR. NOLAND:  Your Honor, may I switch the ELMO, |
| 12:03:51 | 10 | please, just briefly. |
| 12:03:52 | 11 | THE COURT:  Yes. |
| 12:04:00 | 12 | BY MR. NOLAND: |
| 12:04:00 | 13 | Q.  Mr. Murray, we talked about whether criminal defense files |
| 12:04:05 | 14 | are necessarily complete or incomplete a little bit.  Do you |
| 12:04:12 | 15 | remember those questions? |
| 12:04:12 | 16 | A.  Yes. |
| 12:04:12 | 17 | Q.  In your opinion, were the state's attorney's files that |
| 12:04:18 | 18 | were provided by the state's attorney's office all necessarily |
| 12:04:21 | 19 | complete? |
| 12:04:23 | 20 | A.  No.  Again, looking at some of these 20 or 30 year old |
| 12:04:29 | 21 | state's attorney's files, some of them were not complete |
| 12:04:31 | 22 | either. |
| 12:04:31 | 23 | Q.  And showing you defense 286, part 1-474, which is an |
| 12:04:39 | 24 | excerpt from the court case, do you remember reviewing this |
| 12:04:45 | 25 | case? |

12:04:45    1    A.  Yes, I do.

12:04:46    2    Q.  In the state's attorney's file in this case were there any

12:04:50    3    street files and GPRs?

12:04:51    4    A.  The prosecutors' file did not have GPRs, general progress

12:04:56    5    reports, notes, or street file material.

12:04:59    6    Q.  And this document I'm showing you, what is this generally?

12:05:02    7    A.  This is a document, a diary or a docket sheet that

12:05:08    8    prosecutors maintained within their file.  It was called a

12:05:11    9    blue back because it was a blue colored document that held it

12:05:17   10    all together.  So on the blue back, the prosecutors record

12:05:22   11    when the case was up in court, what happened in court, and if

12:05:25   12    they had to do something for the next date in court.  On here

12:05:29   13    on the bottom of this document, you can see a court date of

12:05:32   14    June 4th, 1990, in front of judge ray in a and C X 2 means the

12:05:42   15    defendants were present in custody and in court.  There was a

12:05:45   16    motion held.  The highlighted material, the prosecutor

12:05:48   17    indicates on that day that they received the street file and

12:05:52   18    GPRs, street file and GPRs received.

12:05:56   19    Q.  Again, the prosecutor's file that was produced to us in

12:05:58   20    this case, did it have any GPRs?

12:06:00   21    A.  No.

12:06:01   22    Q.  Then the next page of this blue back, does it have another

12:06:08   23    entry, Mr. Murray, dated June 26, 1990?

12:06:12   24    A.  And that is the next court date from the date where they

12:06:19   25    indicated, the prosecutors indicated they received the street

12/07/16 AM
Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 111 of 114 PageID #:32896
***REALTIME UNEDITED TRANSCRIPT ONLY***

110

12:06:22  1   files, GPRs.  Now they are indicating on this court date that

12:06:25  2   they have tendered complete street file to each defendant and

12:06:29  3   then there's other indications of the next court date.

12:06:34  4   Q.  Mr. Murray I think you talked about this earlier, but

12:06:37  5   remind us.  Tell us again what's the street file, what's that

12:06:42  6   parlance for?

12:06:43  7   A.  Street file was -- it applies to a lot of things.  I think

12:06:49  8   it primarily was used with notes that detectives took during

12:06:52  9   the course of the investigation.  So it could be notes, it

12:06:54  10  could be general progress reports.  It also came to be the

12:06:59  11  investigative file that was maintained at the area, so it was

12:07:04  12  probably inaccurate or sometimes misleading, but it generally

12:07:10  13  referred to the general progress reports and the notes that

12:07:15  14  the detective maintained in the investigative file.

12:07:19  15          MR. NOLAND:  Your Honor, if we could go back to the

12:07:21  16  computer, please.

12:07:22  17          THE COURT:  Sure.  We are going to take our break in

12:07:24  18  a couple minutes just so you know.

12:07:30  19          MR. NOLAND:  Thanks, Judge.

12:07:33  20          Laura, going back to this grouping of background

12:07:35  21  material we were talking about, Mr. Murray, Laura, can you

12:07:39  22  pull up page 237.

12:07:40  23  BY MR. NOLAND:

12:07:45  24  Q.  Can you highlight -- thank you, Laura.

12:07:48  25  BY MR. NOLAND:

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 112 of 114 PageID #:32897

12:07:49  1  Q.  At the top, Laura, LEADS responses, can you highlight

12:07:52  2  that, please.  And then the name d-i-o-n, d-o-r-n, at the top

12:07:58  3  left.

12:07:59  4       What is this, Mr. Murray?

12:08:00  5  A.  It's a response from the LEADS database, the LEADS

12:08:05  6  database is maintained by the Illinois State Police, so all

12:08:08  7  police agencies can check to find out if they're searching for

12:08:13  8  someone, if they just had his name or his date of birth or

12:08:16  9  they might have some sort of other identifying information.

12:08:19  10 So what happened here was a police officer or detective was

12:08:24  11 trying to find information on a Dion Dorn and this is the

12:08:28  12 responsibilities they received from the database, the computer

12:08:31  13 database.

12:08:32  14 Q.  And who is Dion Dorn?

12:08:34  15 A.  Dion Dorn was the criminal defendant in this case.

12:08:38  16 Q.  Does this investigative and material about whether Dion

12:08:46  17 did the crime or not?

12:08:48  18 A.  No.

12:08:48  19      MR. NOLAND:  Laura, can you go to page 242, please.

12:08:48  20 BY MR. NOLAND:

12:09:01  21 Q.  What is this page, Mr. Murray?

12:09:03  22 A.  This is the back page of a document, the stamp suspect

12:09:07  23 kind of faint, but it's -- you can barely read it, but it says

12:09:13  24 issued on inquiry, that's the top line, then the date, and I

12:09:19  25 couldn't begin to tell you what the bottom line is.  But it's

| | |
|---|---|
| 12:09:24 | 1 |
| 12:09:28 | 2 |
| 12:09:31 | 3 |
| 12:09:35 | 4 |
| 12:09:38 | 5 |
| 12:09:41 | 6 |

1  when a police officer in the Chicago Police Department,

2  detective or police officer would request a rap sheet or an

3  arrest report from the other part of the office, the bureau of

4  identification, when they would print up that rap sheet for

5  the police officer, they would stamp it with this and send it

6  to him.

7  Q.  And this is in the sees I will Robinson case which is one

8  of the groupings in 43?

9  A.  Yes.

10  Q.  And what was this?  What was this on the back of?

11  A.  The back of a burglary warrant arrest report for sees I

12  will Robinson.  This case had gone unsolved for a number of

13  years until fingerprints that sees I will Robinson had left at

14  the crime scene were matched into a database, no the Chicago

15  Police Department's database for fingerprints.  So the

16  detectives are now trying to find out where this person, sees

17  I will Robinson might live.  They ordered an old arrest

18  report, not that old, but one that was already on file to

19  determine, you know, his hate, weight, physical appearance and

20  last known addresses.

21  Q.  So in this particular incidence, did this issue on inquiry

22  stamp have any pertinence to the investigation?

23  A.  No.

24        MR. NOLAND:  Laura, can you go to the next page.

25        THE COURT:  We are going to stop.  The jury will be

Case: 1:10-cv-01168 Document #: 1185-30 Filed: 02/24/17 Page 114 of 114 PageID #:32899
***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 12:10:52 | 1 | 1:10.  The lawyers can be back at 1:10 so we can talk about |
| 12:10:59 | 2 | some things.  That's where we will pick up. |
| 12:10:59 | 3 | (The trial was adjourned at 12:10 p.m. until 1:10 p.m. of |
| 12:10:59 | 4 | this same day and date.) |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |