# EXHIBIT 75

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
| | ) | Case No. 19-cv-6508 |
| *Plaintiff*, | ) | |
| | ) | Judge Franklin U. Valderrama |
| *v.* | ) | |
| | ) | Magistrate Judge Maria Valdez |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, STEVE GAWRYS, | ) | |
| ANTHONY RICCIO, ROBERT BIEBEL, | ) | |
| and the CITY OF CHICAGO | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

---

# EXHIBIT 40

## Brasfield Report in *Fields*

***Michael Brasfield and Associates, Inc.***

641 Olele Point Road                                   Phone: 360-301-4465
Port Ludlow, WA 98365                          E-mail: brasfield@commandscene.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### Nathson E. Fields v. City of Chicago, et al.
Cause: 1:10-cv-01168

### Report of Plaintiff's Expert – Michael D. Brasfield

### March 15, 2016

### Introduction

The law firm of Loevy & Loevy, representing the plaintiff in this matter, contacted me in December of 2015 to review the Chicago Police Department's (the "CPD") policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as concerning the *Fields v. City of Chicago* case discussed below, and more broadly.  To that end, I reviewed documents regarding CPD's policies and practices governing homicide investigative files.  I also reviewed numerous files created by CPD detectives during homicide investigations and compared those files to defense attorneys' files to assess whether relevant investigative material was disclosed or withheld.  I have concluded, to a reasonable degree of professional certainty, that the CPD's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative material deviated substantially from generally accepted police practices and resulted in the routine failure to disclose important investigative materials to criminal defendants.

Police departments have long recognized the need to ensure that information and evidence collected during a criminal investigation is properly documented, stored, and ultimately disclosed for use in the criminal trials.  The standard practice is relatively straightforward, and consists of a few key components: (a) requiring investigating officers to document the information they learn during the course of an investigation; (b) collecting, inventorying, and maintaining all of the investigative materials and information, in one central location; (c) applying policies or guidelines to ensure that the investigative material in the central file is disclosed to prosecutors and criminal defendants in response to formal requests for information; and (d) administering training around all of these issues to ensure the policies are followed.

CPD did not comply with these standards, instead allowing detectives and other investigating officers to utilize multiple, parallel files for each investigation.  The use of parallel files itself creates a significant risk that important investigative materials will not be disclosed, but that risk was exacerbated by the CPD's failure to provide any training or policies regarding proper response to subpoenas and discovery requests.  The result is predictable: a routine failure to disclose all relevant investigative materials to criminal defendants.

CPD's problem of failing to turn over all relevant materials was brought to light by two federal cases in the early 1980s, but despite being acutely aware of the problem, CPD did little to address the practice. The policies it issued were a superficial attempt to resolve the problem and were deficient on their face – as they still allowed, and even required, multiple, parallel files to be created for each investigation. Moreover, CPD took almost no steps to train, supervise, or implement those policies. Finally, the policies did nothing to ensure that there was a system in place to properly respond to subpoenas and discovery requests.

I have reviewed numerous Chicago homicide files, including criminal defense files and corresponding police investigative files. My review confirmed that because of, the deficient policies and widespread practices described above, criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases, and that the written policies did little to alter the ingrained practice of keeping clandestine, parallel files. Finally, I reviewed the files that were withheld from Mr. Fields during his criminal trial and concluded that those files were withheld as a result of the same set of practices and policies (or lack thereof), and contained relevant and important investigative materials that should have been disclosed under standard police procedures.

## Table of Contents

I.    Standard police practices for maintaining and disclosing investigative files requires a single, comprehensive file

II.   *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

III.  CPD personnel consistently use multiple files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

   A.  Multiple files are created for a single investigation, creating a serious risk that investigative materials are not disclosed.

   B.  The CPD's *ad hoc* response to subpoenas exacerbates the problem

IV.   Criminal defense files show that important investigative materials are regularly withheld from criminal defendants

   A.  Background on the "basement files"

   B.  Criminal defense files are missing pages from the basement files

   C.  Issuing a subpoena does little to ensure disclosure of all relevant materials

   D.  The missing pages contain important and relevant information that should have been disclosed to criminal defendants

V.  CPD's policies after *Jones* and *Palmer* don't ensure disclosure of all relevant investigative materials

    A.  The policies are insufficient to remedy the "street files" problem

    B.  The City failed to provide proper training and oversight to ensure compliance with its policies

VI.  The basement files show that the directives were not properly implemented

    A.  The basement files from the 1983-1989 time period show that CPD's policies were not followed

        1.  Handwritten notes, not on general progress reports, are still routinely used

        2.  To-from memos are still being used

        3.  All relevant information in unofficial documents is not transcribed in official reports

            a.  Review of Permanent Retention Files

        4.  Inventories are missing or incomplete

        5.  The basement files show that the "Investigative Files" did not serve as the central repository for investigative materials

    B.  The basement files from the 1999-2006 show that the policies were not followed and that the problem has continued unabated into the 2000s

    C.  The basement files confirm that there was no training, auditing, or oversight to ensure compliance with the policies

VII.  The failure to turn over files in Nathson Fields' criminal case was a direct result of these practices and inadequate policies

# Expert Witness Qualifications

I began my 40-year law enforcement career in 1968 as a patrol officer with the City of Mercer Island, Washington. In 1969, I joined the Seattle Police Department and served Seattle as a police officer, detective, sergeant, lieutenant, captain, major, and assistant chief. In addition to uniformed patrol, my investigative assignments as a detective included traffic, homicide investigation, burglary and theft, and vice (gambling and prostitution). As a sergeant, I served in patrol, the tactical squad, and internal investigations. As a lieutenant, I served as a watch commander in charge of 50 patrol officers, and later as the commander of the Washington State Criminal Justice Training Commission's Basic Law Enforcement Academy for 2 years. This academy was responsible for developing and providing the initial law enforcement training for all commissioned law enforcement officers in Washington State. As a captain, I served as commander at both the downtown and north precincts, with responsibility for over 125 officers at each location. I also served as the commander of the Internal Investigations section of the Seattle Police Department for 2 years. I was the commander of the inspectional services division for 4 years. This division was responsible for developing, implementing, and monitoring departmental policies and procedures. This division was also responsible for developing and administering a budget in excess of $120 million. My last 5 years with the Seattle Police Department were served as assistant chief in command of the support services bureau. I was responsible for, and oversaw the activity of, nine uniquely different divisions including: internal investigations; training; personnel, intelligence; crime prevention; communications; records & evidence; data processing; and fiscal, property, & fleet management.  In this capacity I routinely served as Seattle's acting Chief of Police. I retired from that agency in 1995.

I was selected by the City of Fort Lauderdale as its Police Chief in 1995. The 33-square-mile city has a full time resident population of 165,000. An estimated additional 60,000 "snow bird" residents return to second homes in the city during the 6-month winter season. Fort Lauderdale serves as the seat of government for the county of 1.5 million and is in the heart of a diverse tri-county (Dade, Broward, and Palm Beach) population of 4 million. As one of the premier tourist destinations in South Florida, over 12 million passengers come through the airport each year. The ocean port handles the second largest number of cruise ship sailings in the world. Fort Lauderdale serves as the governmental and business hub of the County. The Fort Lauderdale Police Department had a budget of $60 million and consisted of 500 sworn positions and 300 civilian positions. In 2000, the department received 600,000 calls for service, dispatched over 200,000 of those calls, made over 20,000 arrests, and issued 65,000 traffic citations. The Department is now nationally recognized as an innovative leader in the field of community policing and was one of only a handful of cities nationwide to be selected as a Community Policing Demonstration Site by the Department of Justice. I oversaw the operation of the only municipal jail in the state of Florida. Under my tenure, Fort Lauderdale became the first major agency to obtain accreditation. After over 6 years as the police chief of Fort Lauderdale, I retired from law enforcement a second time and returned to the Seattle area in the fall of 2001.

After retiring as Chief of the Fort Lauderdale Police Department I returned to my retirement home in Washington State.  About a year later I chose to run for, and was elected to, the office of Jefferson County Sheriff. I served in that capacity for over 6 years, and retired from active-duty law enforcement for the third (and final) time in the spring of 2009.

As both a Police Chief (6 years) and Sheriff (6 years), I have reviewed and approved policies and procedures of every kind. These included (but are not limited to) policies and procedures on criminal investigations, maintenance of police records, complaints against police officers, training, supervision, and discipline. I believe that of specific relevance to this case is that I was the chair of the Washington State Board on Law Enforcement Training, Standards, and Education. Through that position I regularly examined and reviewed issues and criteria that define standards and norms related to the practice and administration of law enforcement practices and operations. I also served 2 years as Commander of the Washington State Basic Law Enforcement Academy in Burien, Washington. In that position I was responsible for the administration of the training program provided to all Washington State Law Enforcement Officers. This was also my role as the Assistant Chief of the Seattle Police Department responsible for in-service and advanced training at the Academy over a subsequent 5-year period. Finally, for 6 years, I was the Commander of the Seattle Police Department's Inspectional Services Division and responsible for the development, formulation and updating all police policy and procedures, including those involved in proper investigation procedures.

As an independent consultant and sub-contractor, I have completed on-site visits to analyze 6 major U.S. city police agencies (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle) to evaluate community policing in public housing. I have also served as a visiting management assessor for the cities of New Orleans (LA), Columbus (OR), Portland, (OR), San Francisco (CA), Bremerton (WA). Upon my return to Seattle in 2001, I provided contract professional services as a consultant and program director for the non-profit South Downtown Foundation. I had responsibility for administering several million dollars for improving public safety in the International District, SoDo, and Pioneer Square neighborhoods of Seattle. In this capacity I coordinated efforts with the City of Seattle, the Seattle Police Department, and various interest and civic groups in the area.

As Sheriff of Jefferson County, I held a gubernatorial appointment to the Washington State Sentencing Guidelines Commission, serving as the only law enforcement official on this body of judicial, legislative, and executive-branch representatives. I also chaired the Washington State Criminal Justice Training Commission's Board on Law Enforcement Training, Standards, and Education. Members of this board monitored and evaluated the training of police officers and participated in law enforcement decertification hearings.

Over the last 40 years I have received extensive, specialized professional training in nearly all areas of law enforcement. There has been particular emphasis in the areas of training, internal investigations, criminal investigations, traffic homicide investigations, use of force, ethics, and police liability. I was awarded "life member" status with the International Association of Chiefs of Police in 2005. I was also awarded "life member" status with the Washington Association of Sheriffs and Police Chiefs in 2009. I am also a "life member" of the National Sheriffs Association. I have also been a member of the Washington State Sheriffs Association and served on the executive board of that organization.

During my career, I have been required to investigate and/or review hundreds of internal investigations. I have supervised hundreds of officers, and have had to review their compliance

with standards of behavior and integrity. As both a supervisor, and later a commander of internal investigations with the Seattle Police Department, I have reviewed and evaluated the thoroughness of well over hundreds of such investigations. As a police chief and as a sheriff, I have had the ultimate responsibility of passing judgment on such actions by law enforcement officers in situations ranging from traffic stops to fatal shootings.

I have had the opportunity to conduct audits and systematic reviews of police departments throughout my career. As the commander (Major) of the Seattle Police Department's Inspectional Services Division, I conducted both periodic performance inspections of various Departmental units, as well as special audits of high liability units, divisions and bureaus.

As a police practices expert, I was part of a team that performed audits of police department service delivery provided by municipal agencies in 6 major U.S. cities (Boston, Baltimore, Memphis, Oxnard, Cleveland & Seattle).

While working for the Seattle Police Department, I was part of a management assessment team for the cities of New Orleans (LA), Columbus (OH), Portland, (OR), San Francisco (CA), and Bremerton (WA).

As an appointed board member of the Washington State Attorney General's Homicide Investigation Tracking System (HITS), I participated in audits of ongoing and cold case homicide investigations throughout the State of Washington.

In addition, when appointed as the Police Chief in Fort Lauderdale (FL) and when elected Sheriff of Jefferson County (WA), I initiated and oversaw the audits of high risk units and functions within those agencies.

I received a Bachelor of Arts degree in Criminal Justice from the University of Washington in Seattle. I also am a graduate of the Senior Management Institute for Police (SMIP) of the Police Executive Research Forum.

I have been retained in over 65 lawsuits as a police practices expert witness - approximately 66% for law enforcement defendants and 33% for civil rights plaintiffs or individuals claiming injury by law enforcement officers. These include federal district courts in Illinois, Pennsylvania, Florida, Washington State, Idaho, Oregon, Colorado, and Louisiana, and state courts in Washington, Alaska, California, Oregon, Arizona, Pennsylvania, Florida, Wyoming, Texas, and Kentucky.

I.      **Standard Police Practices For Maintaining And Disclosing Investigative Files Requires A Single, Comprehensive File**

Every police department in the country must address how to properly document their criminal investigations. All information and evidence from an investigation must be properly collected, documented and preserved so that it can be disclosed to prosecutors and criminal defendants for use in criminal trials.

The standard police practice, across the country, is relatively straightforward: a lead detective is assigned to every major investigation, and that lead detective is in charge of compiling all investigative materials in a single centralized location. Although multiple detectives may work on an investigation, all information must be centralized and organized. These standards are in place to help police officers effectively solve crimes: they ensure that, during the investigation, information is not lost because it is dispersed among various detectives and that the information is organized and stored so that a supervisor or other detectives can locate and understand the evidence collected by their colleagues. This standard police practice also ensures that once charges are filed, everything that does exist from the investigation is complete, identifiable, inventoried, and maintained in its entirety in a central location. Whether it is referred to as an investigative file, a "murder book," a completed investigation, an open investigation, or something else, everything should be in one package that can be located and produced – for whatever reason it is needed.

Standard police practices also require the disclosure of all investigative material in the police file, whether centralized (standard, and preferable) or not. There should not be picking and choosing. Performing these disclosure requirement is not an informal practice; it is done pursuant to written policies and procedures, in conjunction with training on those policies and procedures, to ensure compliance to this crucial step in ensuring fair trials. As a practical matter, this disclosure for use in a criminal case usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard, the criminal defendant or his counsel will subpoena the police investigative materials directly. In response to the subpoena, all investigative materials should be disclosed.

It is also standard police practice to keep and catalogue every document or piece of information pertaining to an investigation. The police investigative role is to search for and document facts – all facts regardless of where those facts fit into some pre-conceived theory of the investigation. Not all facts, information, or individuals will necessarily enhance the prosecution of an identified suspect. Nonetheless, those facts have to be included in the investigation– to help prevent tendencies like tunnel vision, and also in fairness to the victims, the prosecutor, the defense, the court, and the jury. The judge will eventually rule on what is relevant and admissible. And investigators routinely offer explanatory information that puts that information in perspective, or explains why the detectives gave it little weight. But based on my experience, police officers are expected to, and are specifically trained on the importance of preserving all investigative materials and including those materials in a centralized location. Police departments typically emphasize this point because, in order to meet the needs of police agencies and the courts, case files must be maintained in a manner that make them secure but accessible, and the case contents should be arranged in an orderly and consistent manner.

As a corollary, all of the information must be inventoried, indexed, or documented in such a manner as to be easily located and so that the content of the inventory is clearly understood. To that end, a copy of the investigative file inventory will typically be placed in an official police department file so that the department can maintain a single, accurate list of all

available material, and that inventory is typically disclosed to prosecutors and criminal defendants so that they can ensure that they have everything. In this way, it serves not as a solution to the problem of ensuring that all investigative material is disclosed, but as a necessary backstop to try to prevent the possibility of non-disclosure despite the existence of other policies and procedures.

My knowledge of these standards is based on my extensive experience with police practices, including my familiarity with the policies used by other police departments nationwide, as well as industry standards established by organization like the International Association of Chiefs of Police. These standards have also been documented in homicide guides and reference materials for decades. For a summary of these texts, please see **Attachment E.**

## II.   *Jones* and *Palmer* litigation highlight Chicago's "Street File" problem

In the early 1980s, two federal court cases highlighted the fact that the Chicago Police Department had no systems in place to ensure that investigative materials were collected centrally and disclosed during criminal cases, and in fact important materials were consistently withheld from criminal defendants.

### A.  The George Jones Prosecution

In 1981, twelve-year-old Sheila Pointer was raped and bludgeoned to death; and her 10-year-old brother Purvy was beaten unconscious in their home.[1] George Jones – a senior at a nearby high school, who edited the school newspaper and was nicknamed "Bookworm" – was ultimately arrested and prosecuted for the crime. During the CPD investigation of the Pointer murder, detectives gathered evidence that undermined the witnesses who had implicated Jones, and which Jones could have used to help defend himself, but this information was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files."[2]

After George Jones had been charged, a detective, Frank Laverty, who was investigating the case interviewed the victim's brother, Purvy, who told Laverty that there were two assailants and both were wearing stocking masks. Laverty also documented other strong evidence that Jones was not the perpetrator.  That information was also placed in the street file.[3] Laverty was told that, in light of these facts, the prosecution of Jones had been abandoned. However, in the spring of 1992, Detective Laverty read in the newspaper that George Jones was on trial for the Pointer murder.[4]  Laverty went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action. Laverty then went directly to Jones' criminal defense attorney and told the attorney about the information in the street file. After the court

---

[1] *Jones v. City of Chicago*, 856 F.2d 985, 988 (7th Circuit 1988)
[2] Ibid (at 988-991)
[3] Ibid (at 990-91)
[4] Ibid (at 991)

declared a mistrial, the State's Attorney dropped all charges against Jones.[5]

The United States Court of Appeals for the Seventh Circuit described the CPD's reaction to these events as follows:

> Laverty should have been commended for his adherence to the principles of honesty, decency, and justice, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for misconduct in the arrest and prosecution of George Jones.[6]

After the charges against him were dismissed, Jones filed a civil lawsuit. He was awarded a substantial amount in damages for the violation of his rights. Notably, among other things, the jury found that the City was liable to Jones for its custom of maintaining "street files" that were withheld from the State's Attorney and therefore unavailable to Jones and the rest of the criminal justice system.[7] The Seventh Circuit explained that the practice of "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."[8]

### B. The Palmer Litigation

On April 16, 1982, shortly after Jones' prosecution, a class of plaintiffs filed a lawsuit in federal court to prevent the use of street files.[9] The plaintiffs immediately moved for a temporary restraining order (TRO). A TRO issued on April 20, 1982, and amended on September 24, 1982, required the CPD to preserve all street files and documents formerly placed in street files.[10] The TRO was amended because of allegations that detectives were continuing to keep investigative materials as their personal property and therefore not subject to CPD control.[11]

District Judge Milton Shadur oversaw the preliminary injunction hearing. Based on the evidence presented by the plaintiffs and by the City of Chicago, Judge Shadur found the following (among other things):

- The CPD does not provide its detectives or other personnel with guidelines as to the extent to which "official reports" (which Judge Shadur defined as case reports,

---

[5] Ibid. (at 991)
[6] Ibid. (at 991-92)
[7] Ibid. (at 995-96)
[8] Ibid. (at 995).
[9] *Palmer v. City of Chicago*, No. 82 C 2349
[10] Ibid (at NF-L 005606-07)
[11] Ibid (NF-L 005607)

supplementary reports, closing reports, etc.) have to embody information in "unofficial reports" (defined as notes, witness interviews, worksheets, memoranda, etc.) In particular, Judge Shadur found that "Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that – though highly relevant and sometimes exculpatory of the defendant charged with the offense – the preparer does not deem 'pertinent.'"[12]

- The existence and use of unofficial reports is well known throughout CPD. Parallel files containing these reports are referred to as "street files," "running files," "office files" or "working files."

- Potentially relevant information contained among the CPD's various investigative files and materials for a particular crime is not necessarily included in official reports. There has been and is no police rule, regulation, procedure, or practice that requires all relevant information to be placed in official reports or to be transmitted to the CPD's Records Division for permanent retention.[13]

- the CPD responds to requests for documents as follows:
  ° In response to a subpoena, CPD produces only official reports maintained at Records Division along with photographs and lab reports. CPD does not produce unofficial reports maintained at the Area or unofficial reports in the possession of individual detectives.[14]
  ° In response to a defendant's discovery motion, Assistant State's Attorneys (ASAs) order official reports by phone. CPD Records Division employees respond to these requests by producing official reports and do not contact individual Areas or other units or divisions of the CPD for unofficial documents.[15]

Judge Shadur found that the exclusion of relevant information from official reports "was not random or infrequent."[16] In fact, by the City's admission, there were hundreds street files in active use during the *Palmer* litigation itself. In granting the injunction, Judge Shadur found that the use of street files created a "grave risk" of non-disclosure of exculpatory information, including information that could be used to impeach witnesses.

On appeal, the Seventh Circuit reversed Judge Shadur in part, although it did order the CPD to preserve and produce street files for those plaintiffs who had been convicted of felonies.[17] It vacated the preliminary injunction in all other respects because the court found that the plaintiffs either lacked standing or should have asked for relief in the state courts. It did not revisit the factual findings that Judge Shadur made.

### III.    CPD personnel routinely use multiple, parallel files during a criminal investigation, and fail to disclose all relevant materials to criminal defendants.

---

[12] Ibid (NF-L 005609-10)
[13] Ibid (NF-L 005612)
[14] Ibid (NF-L 005614)
[15] Ibid (NF-L 005614)
[16] Ibid (NF-L 005615)
[17] *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985); CPD Special Order 83-2A.

As the *Jones* and *Palmer* cases highlighted, the CPD has a long history of using multiple, parallel files during the course of a criminal investigation, which are frequently withheld from criminal defendants.

### A. Multiple Files Are Created For A Single Investigation, Creating A Serious Risk That Investigative Materials Are Not Disclosed.

From at least 1977[18] to as late as 2006, the Chicago Police Department has maintained multiple, parallel files relating to a single investigation and has had no system in place to ensure that all important investigative materials from these multiple files are collected and provided to the prosecutors and criminal defendants.

The only "centralized" repository of investigative information maintained by CPD is the "permanent retention file" maintained by the Records Division. But the CPD policy and practice is to only include the official reports in the permanent retention file.[19] This practice of having an "official" file that does not include all of the investigative notes, documents, and materials deviates from standard police practice, which would have one single repository with all the information.

Instead of utilizing the permanent retention file as the central repository of information, CPD practice is to use multiple, parallel files while an investigation is ongoing. These multiple, parallel files have been variously referred to at different times as "street files" "working files," "running files," "unit files," "Area files," or "investigative files," among other terms. These files are used by detectives and other investigating officers, while an investigation was ongoing to gather relevant investigative materials; to communicate steps taken and steps to be taken in an investigation; and to record the personal opinions of the officers investigating a crime. The files contained notes (sometimes handwritten on scraps of paper), memos, reports, photographs, and various other forms of information about the case that were developed as the investigation unfolded. Among other things, information in these various, parallel files included details about the crime and the physical evidence, information about the observations or statements of witnesses, identification of potential leads and suspects, and items obtained from victims or witnesses (*e.g.*, a victim's telephone book or a witness's telephone messages). The files also contained other criminal history information and police reports pertaining to other cases, which were utilized in suspect identification and elimination.

---

[18] The City's designated witness, in this and other cases involving the City's practice regarding maintenance and production of investigative files, James K. Hickey, testified that the practice of using street files started at least as early as 1977, when he arrived at Area 1 homicide. Similarly, during hearings on the use of street files in *Palmer v. City of Chicago*, John Stibich, a former commanding officer in Area 4 homicide, testified that during his time there, from December 1974 to December 1977, Area 4 homicide had a practice of using street files. Following Hickey's sampling of the various violent crimes units in 1982, Hickey determined that each of the Areas used street files.

[19] Hickey *Kluppelberg* Deposition [2015] 22-23, 95-96

Detectives working a case necessarily take notes during witness interviews and must communicate that information to other detectives. That is an inevitable and important part of an investigation. The problem with the Chicago Police Department's practice is that these notes are stored across multiple files—both during and after an investigation—and are never consolidated into the official file which is permanently maintained by the CPD. Thus, even after an investigation concludes, there are still multiple files containing different sets of investigative materials scattered in various locations, and which are regularly withheld from criminal defendants.

There are a variety of reasons that multiple, parallel files are created within the CPD environment:

- Multiple detectives working on the same case, each take notes, resulting in multiple sets of investigative materials, but there is no formal place for detectives to keep these notes, and as a result they are kept on tables, coat racks, in cars, in filing cabinets, or desk drawers in the Areas and are never collected in a central repository.[20]
- In 1980, the CPD was re-organized, and the Detective Division was split into six geographical areas (Areas One through Six) and two subject matters (Violent Crimes and Property Crimes).[21] Detectives from different divisions or units of CPD often investigate a case together, but report to different supervisors, and work out of different units or Areas, resulting in multiple files kept at the different geographical locations throughout the City.
- In addition to detectives, there are many others involved in investigating major crimes such as homicides, including patrol officers as well as specialized unit officers like Gang Crimes and Bomb & Arson. No set of policies or practices governed the investigative practices of these additional investigators or required them to coordinate with the Detective Division, resulting in the creation of yet more files, unknown to and uncoordinated by CPD.
- There is no centralized log of the various parallel files created for each investigation, and thus no way to know how many files exist or where they are located.
- Files that are kept in an Area may be moved during CPD re-organization or are relocated to a storage warehouse. If multiple files for the same homicide are stored at an Area, they are not necessarily stored or moved together, and there is no system in place, or documentation, for tracking the movement of these files.[22]
- The documents in the files at the Area are never consolidated into the permanent, official files stored in CPD's centralized Records Division.
- Detectives also do not routinely not transcribe all information obtained during an investigation into an official report, resulting in different information maintained in the official and unofficial documents.
- The permanent file, kept in the Records Division, therefore, does not contain all the relevant and important investigative materials.

---

[20] *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1071 (N.D. Ill. 1983).
[21] James K. Hickey Deposition in *Kluppelberg v. Burge* at 64 (NF-L 001004).
[22] Loughran Deposition 43-44.

This practice of using of multiple, parallel files creates an unacceptable risks that information will not be discoverable in response to a subpoena and will, therefore, be withheld from prosecutors and defendants. Where detectives keep their own files, or files are kept at multiple areas or units throughout the City, there is no way for any detective or supervisor to know how many parallel files have been created for a particular case, or whether they have all been collected. This is why standard practice is to have a lead investigator responsible for keeping a single, known repository of information.

## B. The CPD's Ad Hoc Response To Subpoenas Exacerbates The Problem

In Chicago, the risks created by using multiple files are exacerbated by the fact that the CPD Subpoena Service Unit, which is responsible for responding to requests for records, is untrained and lacks any policies governing how it responds to subpoenas and requests for files.

According to Hickey, when a request for investigative documents is made to the Chicago Police Department, that request goes to the Records Division, Subpoena Service Unit.[23] A sergeant was in charge of the Subpoena Service Unit, and that sergeant reported to the assistant director and director of the Records Division.[24] It was the Record Division director's responsibility to set policy at the Subpoena Service Unit.[25]

The Chicago Police Department had no written policy that Hickey was aware of dictating how the Subpoena Service Unit should search for documents responsive to a subpoena or request for records.[26] In addition, there were no directives addressing "policies, safe checks, [or] procedures . . . to ensure that when a request came in either by a subpoena or by an informal request from and Assistant State's Attorney . . . that all of the necessary information including exculpatory information was provided by the subpoena services unit in response to that request."[27]

The subpoena service unit was staffed by non-sworn personnel with the title "clerk."[28] There was no formal training of personnel assigned to respond to subpoenas.[29] Whether all of the different units that worked on a given investigation were searched for documents responsive to a subpoena depended in large part on the discretion and experience of the personnel searching for the documents, such that a subpoena for all documents under a certain records number

---

[23] Hickey *Kluppelberg* Dep 358(NF-L 001299)
[24] Hickey, *Rivera v. Guevara, et al.*, No. 12 C 4428, pages 146-47 (NF-L 000312-13)
[25] Ibid, pages 159-60 (NF-L 000316)
[26] Ibid, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3
[27] Ibid, page160 (NF-L 000316)
[28] Ibid, pages 147-48 (NF-L 000313)
[29] Ibid, page 39 (NF-L 000274)

number[30] would not necessarily result in the production of all documents corresponding to that particular investigation.[31] Hickey described the Subpoena Service Unit's effort to respond to document requests as an "art."[32] He acknowledged that it is possible in a case with multiple units working on the same investigation that the subpoena could only go to one of those units.[33]

All of this was true as well with respect to requests for documents made by the Cook County State's Attorney's Office to the Chicago Police Department.[34] This system was in place before Mr. Fields' conviction and continued in force until 2009.[35] In fact, the City's expert on the CPD's policies in 2009 explained that, even if a subpoena is forwarded to an Area or unit, there is no system or procedure to follow up if the Area or unit fails to respond.[36]

This system, or lack thereof,[37] for responding to requests for documents and producing investigative materials, including important investigative information, is deficient. Because there are multiple files in multiple locations pursuant to the special orders and CPD's design, there is an acute need for policies, practices and training to ensure that all relevant information was produced to prosecutors and criminal defendants. The lack of such safeguards represents a significant departure from accepted police practices.

### IV. Criminal Defense Files Show That Important Investigative Materials Are Regularly Withheld From Criminal Defendants

From a police practices perspective, criminal defense attorney files contain all of the documents disclosed and made available to the attorneys that provided counsel to defendant(s) in the homicide cases that I reviewed. By standard police policy and practice, criminal defendants should get everything that was available from the police investigation to aid the defendant in presenting his or her defense at trial. It would be a dangerous departure from standard police policies to permit a practice of picking through police files to select which investigative materials to turn over.

As a practical matter, this disclosure of information usually occurs in one of two ways: either the police fulfill their obligations by disclosing their entire investigative file to the prosecutor (rather than picking and choosing which parts of a file to disclose), who in turn disclose it to the criminal defense attorney; or, in some cases, independently and as a safeguard,

---

[30] A Records Division number is a unique identifier assigned to a particular criminal investigation. The letters represent the year that the investigation began and investigations are assigned the numbers sequentially as they had.

[31] Ibid, pages 43-46 (NF-L 000275-76)

[32] Ibid, page 162 (NF-L 000316); Hickey *Kluppelberg* Deposition 362-63(NF-L 001303-04)

[33] Hickey *Kluppelberg* Deposition 362-63 (NF-L 001303-04)

[34] Hickey, *Rivera*, page 125(NF-L 000296); Loughran Deposition, page 50.

[35] Ibid, pages 151-53 (NF-L 000314); Loughran Deposition 14.

[36] Loughran Deposition 15.

[37] Hickey, *Rivera*, pages 36-37 (NF-L 000273-74); City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago, p.2-3.

the criminal defendant or his counsel will subpoena the police investigative materials directly, rather than relying exclusively on what was provided by the prosecutor. In response to the subpoena, all investigative materials should be disclosed.

The basic principle is that a criminal defendant is not supposed to be tried in the dark. He is entitled to understand the full breadth of the evidence against him; and he is entitled to any evidence that may help him prove his innocence. As a matter of police practices, a well-trained detective would understand that information should be disclosed even if it is only supportive – but not conclusive - proof of innocence. As long as information known to the police or prosecution might contribute to doubt about the defendant's guilt in the mind of a reasonable person, it is relevant and must be disclosed.

Based on the criminal defense files reviewed in this case, as explained below, it is clear that these standard police practices are not followed in the Chicago Police Department, and as a result investigative materials that should be disclosed under normal police procedures are routinely withheld from criminal defendants. Moreover, these documents were withheld even where defendants issued subpoenas specifically requesting those documents. And finally, the material withheld was often relevant, exculpatory investigative information that should have been disclosed under generally accepted police practices. I discuss each conclusion in turn below.

## A. Background On The "Basement Files"

In 2011, years after Mr. Fields' criminal trials and multiple subpoenas by his trial and appellate attorneys for all files related to his case, the City of Chicago turned over during this civil case a new file to Mr. Fields for the first time. As discussed below, in Section VII, (pages 39-44) that file consisted of more than 100 pages of documents related to the police investigation into the crimes of which Mr. Fields was convicted, and it contained numerous highly relevant pieces of evidence, including witness statements and a number of alternate suspects.

Mr. Fields' attorneys then investigated the filing cabinets where the new file was found. They discovered that it contained hundreds of homicide files containing investigative material, from multiple Areas of the CPD, spanning several decades (hereinafter, the "basement files"). Mr. Fields' attorneys asked to investigate the other files in those cabinets, and they were given access to all of the "cleared" cases—that is, those where at least one individual had been charged with the homicide at issue—from 1979 through 2006.

For the purposes of this report, I was asked to focus on files from two time periods: First, files concerning homicides committed between 1983 and 1989, the period of three years before and after Mr. Fields' first criminal trial in 1986; and, second, files concerning homicides committed between 1999 and 2006, the set of basement files nearest in time to his 2009 re-trial.

Mr. Fields' attorneys provided me with a spreadsheet that served as an index of basement files pertaining to those two time periods, which I reviewed and double-checked extensively. That spreadsheet is attached to this report as **Attachment G.**[38]

The basement files came from multiple Areas throughout the City of Chicago. Specifically, in the time period between 1983 and 1989, there were 89 files: 48 from Area One; one from Area Two; nine from Area Three; and 31 from Area Four. In time period between 1999 and 2006 there were 340 files: 308 from Area One; one from Area 2; 28 from Area Four; and three from unknown locations.

## B. Criminal Defense Files are Missing Pages from the Basement Files

I also had access to criminal defense attorney files that corresponded to certain of these basement files. Mr. Fields' attorneys attempted to locate defense attorney files for as many of these homicide investigations as possible. Through their efforts, they located 51 files for 50 different homicide investigations.[39] Each CPD homicide investigation is assigned a "Records Division" (RD) number that is used to identify materials corresponding to a particular investigation. I reviewed all of the criminal defense attorney files counsel was able to obtain; none were withheld from me.[40]

The 51 defense attorney files covered cases from both time periods: For the first group of basement files, in the time period from 1983 to 1989, I compared a total of 28 criminal defense files[41] to 27 corresponding basement files and 27 corresponding permanent retention files. For the second group of basement files, in the time period from 1999 to 2006, I compared a total of 23 criminal defense files to 23 basement files.[42]

I conducted a case-by-case analysis of what documents are included in basement files but are missing from criminal defense files. I did not make any inferences about what documents were turned over to criminal defendants – I based my conclusions on observations about actual differences between files. The results of my file-by-file comparison are contained in **Attachment F.**

---

[38] I intend to rely on the spreadsheet included as Attachment G at trial to help explain the differences between the particular files to the jury.

[39] Plaintiff located two defense attorney files for the 1985 investigation assigned RD G-468726, one for defendant Albert Spraggins, and one for defendant Maurice Spraggins

[40] In a few instances, there were sparse criminal defense attorney files indicating that the case had been turned over to another attorney. In those instances, the defense attorney file would almost certainly be missing substantial investigative material in the police file. Rather than count those cases against the City, they were excluded from the review.

[41] These 28 files concerned 27 separate cases. Plaintiff located two defense attorney files for the 1985 investigation assigned RD G-468726, one for defendant Albert Spraggins, and one for defendant Maurice Spraggins.

[42] There were no permanent retention files for the second timeframe, 1999-2006.

My comparison of the Area 1[43] basement files to corresponding defense attorney files revealed that more than 90 percent of defense attorney files are missing investigative material that was contained in the basement file.

The documents missing from the defense attorney files are important investigative materials. For example, the following significant discoverable items were routinely absent, and are precisely the kinds of documents that should be routinely disclosed to a criminal defendant under normal police practices.

**Handwritten Notes:** More than 40 of the criminal defense files (or approximately 80%) reviewed above were missing handwritten notes that were present in the basement files (some Bates examples at 3844, 5024, 5572, 6053, 7160, 8992): These are often found on backs of official forms, on plain sheets of paper, on the margins of official forms, and on scraps of paper, none of which were the official GPRs on which such information was supposed to documented. There were hundreds of handwritten notes contained in the basement files reviewed that were not in criminal defense files. They are often not inventoried, or if they are, they lack any type of specificity to assist in investigation and discovery. They are documents recording the type of information– from alternative suspects, to witnesses, to vehicle information, to alternative theories of the crime – that should be disclosed to defendants under normal police practices.

**General Progress Reports**: Almost half (23 of the 51 files) were missing General Progress Reports that were present in the basement files. Like handwritten notes, GPRs contain the information regarding witness interviews that should be routinely disclosed to criminal defendants according to normal police practices.

**To-From Memos:** Approximately 20% of the criminal defense files were missing to-from memos that were present in the basement files: (see cases G-165272; G-215280; G-248336; G-321886; G-468726; G-032399; HH-749335; HK-416661; HK-470751; and HK-639684) Handwritten and typed to-from memos, not on GPRs, are another classic type of document typically contained in "street files" that were supposed to be prohibited during the relevant time period from 1983-1989 and 1999-2006. I saw numerous examples of to-from memos contained in the basement files that were not in the criminal defense attorney files. Like handwritten notes, they contain a wide range of information – from alternative suspects, to witnesses, to vehicles, to alternative theories of the crime.

**Investigative File inventories:** only 18/51 of the criminal defense files that I reviewed included any type of inventory to serve as an index of documents in the police investigative files.

As discussed above in Section I, pages 6-8, normal police practices and procedures require the creation and dissemination of an inventory that serves the purpose of providing a compilation of all of the investigative materials related to a criminal investigation. The inventory sheet was apparently designed to be used as an index of

---

[43] Area 1 became Area Central in 2012.

documents in an Investigative File. Even when an inventory sheet is available, they were often incomplete (i.e., missing entries that were listed on the investigative file inventory or not listing handwritten notes or other documents) or were so generic as to be worthless (e.g., including overly generic entries, such as "GPR," with no date, number of pages, or author).

**Crime Laboratory Reports** (some Bates examples at 8941, 9007, 14792, 20830): These reports are of critical importance in the judicial process. They form objective analysis of everything from fingerprints, to blood, to ballistics. Over 15 defense attorney files were missing reports that were included in the defense attorney file. .

**Photographs:** Approximately half of the files are missing photographs, either crime scene photographs or identification photographs. Photographs are relevant investigative information that should always be disclosed to a criminal defendant. Particularly, whenever there is a dispute about identification, photographs of the suspect and alternate suspects are materials that are disclosed under normal police practices.

As discussed below in Section VII, (page 42), these same problems infected the Fields files as well.

### C. Issuing a subpoena does little to ensure disclosure of all relevant materials

Even in cases where a criminal defense attorney went out of his or her way to send a subpoena requesting the "investigative" or "street files," my analysis reveals that there was no guarantee that a defense attorney would receive all the relevant investigative materials beyond the official reports in the permanent retention file. In fact, in at least one case that I reviewed, (RD # E-010765, Defendant Cecil Robinson) the criminal defense attorney issued a subpoena for all investigative material other than official reports, asking the CPD to search all of the various locations and types of parallel files (including, as stated in the subpoena, "any and all police reports, notes and memoranda contained in the Chicago Police Department 'street files' also known as 'office, unit or working files or running files"). CRIM.DEF FILES - FIELDS 037044. The defense attorney's file contained a memo in response to the subpoena claiming that no investigative file or other investigative material existed, when in fact there was a basement file containing relevant investigative information. CRIM.DEF FILES - FIELDS 037110.

In many other instances, the defense attorney issued a subpoena specifically for "street files," and that subpoena appears in the basement file, but not all the documents in the basement file were disclosed in response to a subpoena: For example, subpoenas specifically for "street files" were issued by defense counsel in the following cases, but as described in **Attachment F,** not all the documents were turned over in response: **G-108642 (**subpoena at ACB 010444); **G-148403** (subpoena at ACB 011197); **G-248336 (**subpoenas at ACB 014370, 014378, 014416); **G-321886** (subpoena at ACB 016656-57); **G-468276** (subpoena at ACB 20877-78); **G-159857** (subpoena at ACB 011767); **J-418229** (subpoena at ACB 047015); **M-690700** (subpoena at ACB 047759-60); **M-568343** (Subpoena at ACB 048117); **M-569727** (subpoena at ACB 048157); **M-580592** (subpoena at ACB 048240-243); **M-587998** (subpoena at ACB 048376-77, 048403-05); **G-570120** (subpoena at ACB 023352).

These subpoena responses suggest deficiencies with regard to the two most basic requirements of a process to ensure complete disclosures to defendants: (1) the City did not know what files it had and where (not centrally located or indexed); and (2) it did not have policies or procedures to ensure that whatever investigative material was found was turned over in its entirety. The latter finding is particularly troubling: it suggests that CPD personnel were picking and choosing which investigative materials in the files to turn over.

## D. The Missing Pages Contain Important And Relevant Information That Should Have Been Disclosed to Criminal Defendants

Finally, entirely consistent with the findings above, in the majority of cases I reviewed investigative material in the basement files was not disclosed to criminal defendants, included significant amounts of relevant information that would have aided the defendant and therefore should have been disclosed under standard police procedures. In my experience, given the volume of investigative material that was not disclosed, it was inevitable that relevant information helpful to a criminal defendant would be withheld. That is exactly what I found.

Below are some examples from the comparison of the defense attorney files and the corresponding basement files that demonstrate this problem:

**D-192218:** Dion Dorn and Steven Spears allegedly participated in the fatal shooting of Telly Howell, a stick-up man who had previously robbed their gang. Police were informed of Spears' and Dorn's participation in the incident by an anonymous caller. Spears, who was 16 at the time of the murder, pled guilty and was sentenced to 25 years. A GPR that is missing from the Public Defender's file contains names, contact information, and handwritten notes of past arrests and convictions for four individuals (John Barlett, Leola Barlett, Jamie Gordon, and Paul Lamont Jones) and whose connection to the case is unexplained. (ACB 003844)

**D-322218:** Rodolfo Garcia was convicted for the murder of Pablo Gomez. After his arrest, Garcia participated in a lineup and gave a videotaped statement. At trial and on appeal, Garcia moved to suppress the statement, alleging that he had asked for his attorney, GiGi Gilbert, who was at the police station shortly after his arrest, but was denied access. Garcia did not have any records to prove that he had actually retained Gilbert prior to his arrest, or that Gilbert was present at the police station, but the basement file contains a copy of Gilbert's business card, ARDC card, and Sheriff's ID card. (ACB 004441; 004504)

**D-579065:** Defendant Jimmy Velasquez allegedly fatally shot victim Raul Herrera after a drug deal went wrong. Officers arrived on the scene around 1:20 p.m. and eyewitnesses described the escape vehicle as a white 2-door car. The license plate from the white car was tracked to Velasquez's sister. At trial, there was a question about which car Velasquez drove. He testified that he had his own working car at the time of the incident, a blue Camaro. In the basement file, a handwritten note (not on a GPR form) documents the statement of Tamonie Bustamantez. (ACB 005024). She reported that around 2 pm the day of the shooting she saw Velasquez was with "another guy" in a 4-door blue car. The same page of handwritten notes also includes the name "Hector Gonzalez" with no additional explanation. Detectives recorded

a statement from Hector Gonzalez in a GPR that was also withheld from Velasquez (ACB 005022). That handwritten note corroborating Velasquez's testimony that he was driving his blue Camaro, and identifying potential alibi witnesses, was missing from the defense attorney's file.

**F-048933:** Christino Garcia was convicted of shooting and killing Carlos Vasquez after an argument in a bar on February 9, 1984. The officers listed a series of cars and license plates found at the scene on a GPR at CRIM.DEF FILES - FIELDS 038408, 038410, 038412. But in a handwritten note, not contained in the defense attorney file, there is a description of a "Yellow T-bird ZKW987." (ACB 006096). There is no mention of a Yellow T-Bird in the defense file.

**G-011889:** Earl Stademeyer and James Turner were arrested for beating and stabbing a man to death. Stademeyer was charged and Turner was released without charging. A Lab reports give serological analysis of the blood recovered at the scene. Given that there were two men arrested, the blood types of all those involved could have provided evidence about who was involved. (ACB 008941-942)

**G-014815:** Guy Johns was charged with the murder of Gregory Tucker on January 12, 1985. A Laboratory report documented serology tests on blood found on multiple exhibits that could have excluded Johns or implicated someone else. (ACB 00 9007-9009). This lab report was not included in the defense attorney's file.

**G-165272:** William Goodin was convicted of stabbing and killing his boyfriend Ronald Anderson. The defense attorney file contains only official police reports. It does not include any handwritten notes, GPRs, or to-from memos from the basement file. A to-from memo (ACB 089330-31) describes efforts to locate Goodin, and notes that a neighbor who was shown a picture of Goodin said she hadn't seen him around for some time. A Supplemental Report (ACB 089363-89365) was missing from the defense file. In that report, officers document an interview with Kim Lee Duckett, where she reported that "Frosty" was one of the offenders. A Supplemental Report that was not included in the PD file identifies a man named Tony Murray as "Frosty." (ACB 089411-089412, 089414). It also includes statements from individuals named Gene Pendleton, Robert Brown, and Jack Thomas, whose names and statements are not included in the file.

**G-257089:** Freddy Brown was charged with stabbing a man after an argument about a locked gangway gate. A GPR missing from the defense attorney's file states that 'a bunch of kids were down there by [illegible] stabbing" (ACB 014811). The kids are not referenced elsewhere and are significant because they are potential witnesses.

**G-267826:** James Walker was charged for shooting 4-year-old Angel Hendrix after Walker and Fred Williams allegedly got in a fight in front of his home. Three GPR contain information that was omitted from the defense attorney file. First, a GPR describing an interview with Fred Williams states that "He had an attitude" (ACB 015426). The substance of Williams' statement was present in the defense file, but not the officer's impression of Williams' "attitude." Another GPR lists the name "John Dawson" who reported hearing the arguments and someone say "kiss my ass." (ACB 015428) Only the witnesses that were near the shooting heard

this statement. But Dawson's name and contact information were not included in the defense attorney's file. Finally, another GPR lists a potential witness who was not disclosed (ACB 015421). That GPR lists the name "Hawkins, Jarita" contact information, and a note that states "went in car." As a potential witness, this name and contact information should have been disclosed.

**G-284291:** Lucille Pye was charged with stabbing and killing Lenita Williams with a fingernail file on July 24, 1985. Pye and Williams were fighting over a man, Michael Jeffery. Information from several witnesses was missing from the defense file: Officers described statements from John Jenkins and Denise Williams (ACB 16220-21), in a to-from memo and included contact information for both witnesses that does not appear in the defense attorney's file. Officers also wrote a handwritten note with the names Jean Jenkins, Debra Thomas, and Lucille Jeffery that was not included in the defense file. (ACB 16270)

**G-321886 –** James Crockett, Manuel Rios, and Willie Mullen were charged with murder. GPR list names and interview notes from potential witnesses that were not disclosed in the defense file. (ACB 16774-75; ACB 16836)

**G-326467:** George Frison, Edward Ware, and Anthony Mason allegedly shot and killed Kennedy Brooks. The basement file contains information regarding a potential witness, named Monique Kizer, who is not mentioned in the Public Defender's file. Handwritten notes at ACB 017185 include Kizer's name and contact information. Officers also investigated Kizer's arrest history, keeping a printout in the file. (ACB 017275).

**G-468726**: Albert Spraggins & Maurice Spraggins were charged with shooting and murdering Albert Black on November 22, 1985. Police relied on eye-witness testimony and the confession of Maurice Spraggins. Plaintiff's attorneys obtained copies of the defense attorney files for both Maurice and Albert. Neither file contained identification pictures of the defendants that were in the basement file (ACB 02865-02868, ACB 020914-020915

**G-570120:** Crisino and Filberto Bravo were charged for fatally shooting Juan Olmeda based on eyewitness identifications. The basement file also contains details about a possible alternate suspect. A handwritten GPR includes a statement from Antonio Vasquez, a witness to the shooting, that the shooter "looked like Spade." (ACB 23421). According to a Supplemental Report, contained only in the basement files, officers showed Vasquez photographs of men who use the nickname "Spade" and asked him to identify the man he saw shooting. Vasquez identified a man named Alonzo Velasco. (ACB 23456). Velasco was brought in and participated in a lineup, and Vasquez again identified Velasco. The defense attorney's file contains a report listing Velasco as a participant in a lineup, but it does not include the fact that Vasquez identified Velasco as "Spade." (*Id.*)
Police also recovered a gun and casings and submitted them for testing. The ISP Forensic Reports (ACB 023470-47) finding no latent fingerprints suitable for comparison on the gun or the casings were withheld from Crisino Bravo.

**G-705434:** Norman McIntosh allegedly killed Devon Hobson in a gang-related shooting and in retaliation for a robbery earlier that day. Hobson was with his brother, James, and his

cousin Darius Thompson, and a friend Aaron Smith walking down the street. Police reports in the Public Defender's file state that Darius Thompson saw man in a gray car "driving slowly in their direction." McIntosh was identified by James Hobson and Darius Thompson. A GPR, at ACB 027247, however, records an interview with Thompson, suggests that the car was following them from behind, undermining the witnesses' accounts of what they saw.

**HH-175723:** Maurice Brown was charged for the fatal shooting of Antonio Willis. Police questioned Stanley Foots as an alternate suspect, but he was apparently ruled out because his girlfriend served as his alibi witness. (CRIM.DEF FILES - FIELDS 008064, 008118). A handwritten note that was withheld from Brown, however, states "Stanley confronted with Girlfriend's contradiction." (ACB 049385). There is no reference to a contradiction between Stanley and his girlfriend's statement in the Public Defender's file. The same note also identifies potential alternate suspects. The note states "Martez Haywood and Lil Arthur did it on 3519 S. Federal. White dude? found as well." (*Id.*) Neither name appears in the Public Defender's file.

**HH-358668:** Christopher Peoples, Marcel White, and James Mitchell, allegedly shot and killed Brian Campbell, the husband of Ninner Powers, during an attempt to forcefully collect on a debt Powers owed to White. Powers recognized and identified White and Mitchell, but she did not recognize the third offender. The basement file identifies possible alternate suspects in documents that are absent from the Public Defender's file. Lawrence Harper was an acquaintance and neighbor of Powers and the victim Campbell. According to supplemental reports, Harper was across the street at the time of the shooting, witnessed one man jump off the porch of the victim's home, and then went to the victim's home and stole a watch and ring from the victim's body. (ACB 031348; 031464-65). Harper also reported that the man he saw running from the porch may have been "Squirt" and, from photographs, identified two other individuals he knew with that nickname. (ACB 031465; 31491). It does not appear that Harper, or the two men he identified, are referenced in the Public Defender's file.

**HK-211174:** Lakesha Collins, Laquita Calhoun, Terrence Jones, and Jeanette Daniels were charged with the kidnapping and murder of Alonzo Jones. Jones was found in an alley and had apparently been beaten and run over by a car, apparently in retaliation for molesting Laquita Calhoun's children. Police reports indicate that several people beat Jones and put him in the trunk of a car, and but that at one point during the incident, Collins tried (unsuccessfully) to help Jones escape. In Collins' statement, she asserted that, though she got into the car, she got out before Jones was killed. Illinois State Police lab results included in the basement file, but which are absent from Lakesha Collins' Public Defender file, provide corroboration for that statement: those reports exclude, Collins as the source of DNA on several cigarette butts found on the scene. See ACB 038172-175 and ACB039216-217. ISP reports at ACB 038171 and 038232, which are again absent from the Public Defender's file, state the no latent fingerprints were found on a knife and other pieces of evidence. Finally, the basement file states that neighbors may have seen part of the brawl. A GPR states that "1st floor neighbors of Jeanette see dude hit victim cause they come out of Apt. Came home for 1/2 hour then left for work" (ACB038292), but the Supplemental Report corresponding to those notes, which is included in the Public Defenders' file, states that officers interviewed "1st floor residents about the beating and murder of Alonzo Jones. The occupants were highly intoxicated and uncooperative with the

investigation. they denied all knowledge of any crimes and refused to give an person information" (ACB038265-86).

**J-418229:** Officers were investigating a shooting at a motel in room 114. There are a number of witnesses who heard the gunshots. A GPR lists the name "Andre Woods," a phone number, and the phrase 'out with P.O. Tuesday.' On the next page a handwritten note reads 'PO Keith Calloway 5256'- Neither Andre Woods or this officer are mentioned elsewhere. (ACB 046940-941). Two other witnesses are listed in GPRs in the basement file, but not in the supplemental reports in the defense attorney file. First, a note that "B.U. →I didn't see nothing/ I didn't hear nothing/ I didn't do nothing." The note includes a large red 'x' over it. (ACB 046944). Another witness named Russell Bolden, who "Heard Shot Saw Nothing" was omitted from the supplemental reports (ACB 046966). All potential witnesses should have been disclosed to the defense.

In several of these cases, there are handwritten notes, or GPRs that list names and contact information of individuals without additional context or explanation of their relationship to the investigation. In my experience, it is likely that these were individuals whose names came up during the investigation as possible suspects or witnesses that a detective would want to remember and follow up on. And in fact, as explained below, several similar notes in the Fields basement file listing names without any explanation, were in fact referring to important alternate suspects.[44] These examples emphasize how important it is to disclose all investigative materials, because the importance or relevance of certain pieces is not always apparent looking at a document in isolation.

Moreover, the fact that the relationship of various names is not explained elsewhere in the basement files is indicative of the practice of using multiple, parallel files for an investigation: there is no evidence that explains where the names came from, or evidence of any follow up to investigate those names. That suggests that detectives continued to store that information in separate files, that were not ultimately stored with the basement files.

## V.     CPD's Policies after *Jones* and *Palmer* Don't Ensure Disclosure of All Relevant Investigative Materials

All police officials are aware of the challenges of ensuring that, over the course of an evolving criminal investigation involving multiple investigators developing evidence at different locations and times, that investigating officers document their findings and that such investigative material is collected, preserved, compiled and disclosed. In the CPD's case, it was acutely aware of these challenges since 1982, at the time of the *Jones* case, and the problems created by using multiple, parallel files. Yet, it has made only superficial attempts to resolve its "street files" problem. It issued written directives, but they were incomplete and insufficient in their scope, and beyond that they were not supplemented with the training, auditing and monitoring necessary to ensure that the necessary changes in practice occurred. Unsurprisingly, then, the street files problem continued.

---

[44] See Section VII, pages 42-43, describing CITY-NF-001062; CITY-NF-001076; CITY-NF-001085, which list names of alternate suspects without any additional information

1. A department-wide teletype issued during the *Palmer* litigation;
2. Detective Division Notice 82-2 (Detective Division Notice - File Control);
3. Special Order 83-1 (Detective Division Special Order – File Control);
4. Special Order 83-2 (Detective Division Special Order – Investigative Files);
5. Special Order 86-3 (Detective Division Special Order – Investigative Files); and
6. Standard Operating Procedures (SOP) 1988

Instead of using the *Jones* and *Palmer* litigation as an opportunity to reform its practices and implement standard police procedure of creating one single, centralized file for each investigations, those directives actually instructed detectives to create multiple, parallel files, each with different information and did nothing to address the fundamental problems regarding: (1) allowing officers discretion about what to document in the official reports; and (2) the absence of any system or training for responding to subpoenas and ensuring complete disclosures of investigative material. Moreover, the CPD provided only minimal training on these orders, and failed to conduct any audit, supervision, or oversight to ensure that detectives were following these new directives.[45]

## A.  The Policies are Insufficient to Remedy the "Street Files" Problem

### 1.  The Teletype and Detective Division Notice 82-2

In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued two documents: (1) Detective Division Notice 82-2[46] and (2) a 1-paragraph teletype to commanding officers alerting them to the TRO.[47]  As Hickey explained, Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable."[48]

Notice 82-2 and the corresponding teletype were concerned only with preservation and were silent about procedures to collect or inventory their notes, memos, or other documents. Although it coined the term "Unit Investigative File," it did not require detectives to put notes or memos into Unit Investigative Files; and it did not specify whether detectives had to preserve notes or memos that were not in the file.[49]

Even with Notice 82-2's limited requirements and scope, the CPD showed little commitment to implementing that Notice. There is no evidence of training to implement the Notice, and six months after its implementation, Commander Stibich testified that it was still the prevailing view that if a detective kept his own personal notes or memos – or considered those to be his personal property – then Notice 82-2 did not require the detective to put those notes or

---

[45] Hickey *Fields* Dep. at 10, 43.

[46] NF-L 008751

[47] NF-L 008754; Hickey, *Kluppelberg* Deposition 201 (NF-L 001141)

[48] Hickey *Kluppelberg* Deposition 221-22, 224; (NF-L 001161-62, NF-L 001164); Brzezcek Test. NF-L 007517

[49] NF-L 008751-53; Hickey *Kluppelberg* Deposition 212-13 (NF-L 001152-53)

memos in the file and detectives felt they could do whatever they wanted with those notes or memos, including destroying them.[50]

Based on this and other testimony, Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2."[51] The comments of Commander Stibich and the findings of Judge Shadur make clear to me that the practice of keeping information in parallel files that were not shared with prosecutors or criminal defendants was an ingrained problem within the police department, and one that would require the sort of dramatic change in attitude and culture that could only be achieved through extensive training, monitoring, and discipline.

### 2. Special Order 83-1

On January 3, 1983, Detective Division Notice 82-2 was replaced by Special Order 83-1. Special Order 83-1 applied only to the field investigations of detectives assigned to Violent Crimes.[52] Special Order 83-1 defined certain terms and created procedures for documenting and preserving investigative documents. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. According to the terms of Special Order 83-1, an Investigative File Case Folder was to be created either when certain categories of violent crimes occurred[53] or when a violent crime investigation resulted in an arrest and approval of felony charges.[54] Special Order 83-1 also created an "Investigative File inventory sheet," which was supposed to identify each document placed in the Investigative File.[55] The inventory sheet was to be forwarded to the Records Division anytime felony charges were lodged.[56] Finally, Special Order 83-1 created General Progress Reports ("GPRs").[57] The GPR forms were to be used by detectives whenever they were taking handwritten notes or writing memoranda to other detectives.

Unlike Notice 82-2, Special Order 83-1 created an affirmative obligation for detectives to submit handwritten GPRs or investigative materials for review and inclusion in the basement file. It also mandated that detectives transcribe relevant information previously recorded on a

---

[50] Stibich Test. (NF-L 007468-70)

[51] NF-L 005615-16

[52] NF-L 007223-27

[53] Those categories of violent crimes were identified in Special Order 83-1, V(A)(1): Homicides/Medical Examiner Cases; Police-related shooting incidents; Batteries likely to result in death; Rapes and Deviate Sexual Assaults, and Any other major violent crime field investigation that the unit supervisor deems appropriate.

[54] Special Order 83-1, V(A)(1) & (2)

[55] Special Order 83-1 IV(D)

[56] Special Order 83-1, IV(D)

[57] Special Order IV(E); Hickey *Kluppelberg* Deposition 170 (NF-L 001110)

GPR or other miscellaneous documents on an official CPD case report form (general offense case reports, supplementary reports, etc.).[58]

In reviewing Special Order 83-1, Judge Shadur identified several deficiencies, including:

• Unless the crime being investigated fit one of the specified of violent crimes, there was no obligation to create an Investigative Case File Folder unless and until the offender was arrested and felony charges were approved. According to Judge Shadur, and in line with standard police practices, this continued to pose the same type of risk that information would not be retained and disclosed because there was nothing to prevent against selective retention while the case is investigated;[59]

• It only required detectives to include "relevant" information in the official reports and offered no guidance about what information a detective should deem "relevant," leaving discretion for detectives to withhold information based on their assessment that it was not relevant.[60]

• It did not include information to ensure that any detective who has or receives information relating to a violent crime field investigation not assigned to him will forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder;[61] and

• It omits any provision defining how the CPD responds to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding.[62]

Moreover, the training on 83-1 was inadequate. Hickey testified that he provided a one-time training to about 1,000 detectives.[63] He said each training session was done in groups of 30-40 people, and lasted approximately 3 hours.[64] During that three-hour training session, he went over Special Order 83- 1. One training session was wholly insufficient to try to change a decades-long practice, especially one so ingrained in the culture of the police department.

### 3. Special Order 83-2

On May 2, 1983, Special Order 83-2 was issued. Three of the changes in Special Order 83-2 were (1) a requirement that detectives create records reflecting all relevant information, V(B)(1); (2) a requirement that where a detective receives information about another crime, he or

---

[58] Special Order 83-1 V(B)(1) & (2), NF-L 008772-73

[59] NF-L 005620

[60] Special Order 83-1 V(B) (NF-L 005620); Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20.

[61] NF-L 005621

[62] NF-L 005621

[63] Hickey *Kluppelberg* Deposition 308-309 (NF-L 001249-50); NF-L 008808

[64] Hickey *Kluppelberg* Deposition 309 (NF-L 001250); NF-L 008808

she pass that information along to the detective investigating that other crime, V(B)(6); and (3) that a copy of the Investigative File Inventory Sheet will be transmitted to either the Office of Legal Affairs (in case of a subpoena from a criminal defendant) or the State's Attorney's Office (in case of a discovery motion) so that the inventory sheet is disclosed to defense counsel in a criminal case, V(B)(6).[65] Hickey also testified that Special Order 83-2 also created the Investigative File Control Card, IV(F).[66] This Control Card was supposed to act like a library card so that the Investigative File could be accounted for.

Despite these new requirements in 83-2, there is no evidence that CPD provided any additional training to update detectives on the differences between 83-1 and 83-2.

Moreover, even if detectives had been adequately trained on Special Order 83-2, it was still deficient. Here are some of the deficiencies that should have been apparent to CPD policymakers.

- **Special Order 83-2 still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **Special Order 83-2 applied only to detectives**, and it explicitly excluded from its directives all other officers involved in investigating major crimes, such as gang crimes officers, officers from bomb and arson, and officers from patrol, among others.

- **Special Order 83-2 provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."[67]** Relevance is of course subjective and, as Commander Stibich testified, what is relevant to one detective may not be relevant to another.[68] In fact, Hickey testified that a detective would only have to put information in a supplemental report if the detective deemed it pertinent at the time that the detective wrote the supplemental report, regardless of whether the detective considered the information relevant when he or she received it.[69] For example, Hickey testified that CPD policy did not require suspects who had been eliminated through investigative activity to be documented in any way.[70] Based on my experience, this is inconsistent with standard police practices. Alternate suspect information, for example, is highly relevant information and its documentation and disclosure to criminal defendants is critical.[71]

---

[65] NF-L 008746-50

[66] Hickey *Kluppelberg* Deposition 228-29 (NF-L 001168-69)

[67] Hickey *Kluppelberg* Deposition 238; (NF-L 001178); Hickey *Kluppelberg* Deposition [2015] 20

[68] Stibich Test. NF-L 007474

[69] Hickey *Kluppelberg* Deposition [2015] 24-25, 33

[70] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)

[71] This does not prevent an investigating officer from also documenting information explaining why the suspect was eliminated.

- **Special Order 83-2 provided no guidance about how information should be communicated or documented among detectives**, for example when one detective learned something about a crime being investigated by another detective; or when one unit learned something about a crime that is also being investigated by another unit. While section V(B)(6) of Special Order 83-2 codifies the obligation to "forward" information about a crime to the assigned detective, it does not require either detective – the detective passing along information or the receiving detective – to document that information.[72] Similarly, even where the detective passing along the information may have created a document memorializing that information – *e.g.*, a memorandum or GPR – there is no requirement in Special Order 83-2 that the resulting memorandum or GPR be distributed to other detectives or units investigating that crime.[73]

- **Nowhere does Special Order 83-2 state that an investigative file should must be disclosed in response to a discovery motion or subpoena, or provide procedures for doing so.** Despite the underlying circumstances of *Jones* and Judge Shadur's admonishment about the failure to "defin[e] the CPD's duty or procedure in responding to a criminal subpoena or request by the State's Attorney to produce information relating to a criminal proceeding," Special Order 83-2 included absolutely no policy directive or procedure to ensure production of investigative files. This is a straightforward requirement of any policy regarding maintenance and disclosure of investigative materials, and, as explained above, standard practice is to simply provide the single investigative file to the prosecutor or directly to the defense attorney to ensure all documents are disclosed.

- **Special Order 83-2 relies on inventory sheets instead of actual disclosure of the files.** special orders 83-1 and 83-2 introduced the inventory sheet, which was apparently designed to be used as an index of investigative materials so that members of the CPD and other actors in the criminal justice system had a way to determine what information existed in police files. Special Order 83-2, required "whenever a subpoena or discovery motion is received in any case, two copies of the Investigative File Inventory Sheet will be forwarded to the Office of Legal Affairs . . . .so that one of such copies may be transmitted to the attorney for the defendant."[74] But the Order does not require that the actual documents in the file be disclosed, nor does is require that documents maintained in other units not covered by the Order (e.g. gang crimes unit) be turned over.

- **Inventory sheets are an inadequate mechanism for ensuring disclosure of documents generated during the police investigation.** While the investigative file inventory sheet is designed to be used as an index of documents in the file, there is no guidance about what level of detail is needed in the inventory sheet to ensure that it

---

[72] Hickey 236-37 *Kluppelberg* Deposition (NF-L 001176-77)
[73] Hickey *Kluppelberg* Deposition [2015] 39, 43, 46
[74] Special Order 83-2, V(B)(6), NF-L 008832

serves its purpose. Indeed, my review of the records demonstrates that the inventories are largely useless because the entries are too general, often missing dates, descriptions and numbers of pages, such that one cannot tell whether they have the document referenced. In addition, that sheet is only distributed beyond the Area or investigating unit if felony charges are placed IV(D); V(B)(6). This creates multiple problems:

- o If an inventory only has to be filled out and sent at the issuance of charges – as opposed to filled out as the investigation proceeds – there is a risk that documents will be left off the inventories that the detective no longer deems relevant or that are potentially harmful to the prosecution's case. That leaves the individual detective far too much discretion about what to include on the inventory once charges are filed;

- o If any additional investigation is done after charges have been lodged (for example, if there are multiple offenders) there is no provision that requires anyone to fill out or distribute an updated inventory;

- o Inventories do not contain the substance of information obtained during an investigation;

- o It assumes that inventories would have to be complete, accurate, and consistently turned over; as discussed below, my review of files shows that this rarely occurred.

- **Finally, there is no provision in Special Order 83-2 requiring an audit or oversight to ensure compliance with the special orders.**

### 4. Special Order 86-3

On May 29, 1986, the CPD issued Special Order 86-3. Special Order 86-3 largely replicates its predecessor with some minor adjustments, most of which actually limited, rather than expanded, to policies governing disclosure of investigative materials to prosecutors and defense attorneys. For example, Special Order 86-3 more explicitly limits the creation of Investigative File Case Folders to homicides or felony investigations where charges have been approved, or an arrest warrant issued; it eliminates the requirement that the inventory sheet be forwarded when a criminal subpoena or discovery motion is received; it eliminates the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)" and instead only states that such notes must be "submitted."

In these ways, Special Order 86-3 actually deviated further from standard police practices than the special orders that came before it:

- **It still did not comply with standard police practice to require a single repository for all investigative information maintained by a lead investigator**.

- **It permitted detectives to maintain their handwritten notes as personal files for longer periods of time,** by removing the requirement that they turn in the notes and investigative materials "promptly (normally at the end of each tour of duty)." Thus,

even if detectives retained their handwritten notes on their person, or in their locker for extended periods of time, it would not clearly violate the Order. In my experience, that level of discretion is a gross deviation from standard police practices, especially in light of the ingrained problem in CPD.

- **It still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant."**

- **Finally, it removed even the inadequate stop-gap measure of providing the inventory sheet to defense attorneys**, leaving defense attorneys with no mechanism to determine whether they had received all the relevant investigative materials.

Special Order 86-3 included a section VI, titled "Inspection." That section requires "[e]xempt members of the Detective Division" to "conduct periodic, unscheduled inspections of the subject files to ensure compliance." According to Stibich, however, he had no idea if, when, how often, or in what manner such inspections were conducted.[75] Likewise, the City has produced no documentation that any such inspections were ever conducted. Hickey testified that no audits were done subsequent to Special Order 82-2 and detectives were not routinely disciplined for failure to comply with the special orders.[76] Nor is there any evidence that detectives were trained on this new policy. In short, I have not been presented with any evidence that policymakers trained, reviewed, or supervised subordinates to ensure that Order 86-3 was implemented or followed.

### 5. Standard Operating Procedures (SOP) 1988

In 1988, Chief of Detectives John Townsend wrote standard operating procedures to govern the work of detectives. Chapter 18 deals with investigative files. Chapter 18 contains "no substantive changes of any kind" from Special Order 86-3.[77]

### 6. Summary

The policies implemented by the CPD were inadequate to remedy the "street files problem" and deviated from standard police practices regarding documenting and disclosing investigative materials.

First, none of the policies required a single repository for all investigative information maintained by a lead detectives. In fact, in reviewing the materials provided, I identified at least three different files that would be created relating to any criminal investigation pursuant to the special orders. First, there would be a permanent retention file in the Records Division, containing only supplementary reports, general offense case reports and the arrest report filed under the accompanying RD number.[78] Second, there would be a unit RD file: Hickey testified that this was a slim file kept in the homicide drawer at the Area to identify that there is a case

---

[76] Hickey *Fields* Dep. at 10, 43. Hickey *Kluppelberg* Deposition 213. (NF-L 001153)

[77] Hickey *Rivera* Deposition pages 250-51 (NF-L 000338-39)

[78] Hickey *Kluppelberg* Deposition [2015] 22-23, 95-96.

open.[79]  Like the permanent retention file, it would contain all the known official police reports: original case offense report, supplementary reports, and reports sent to the investigative unit from support units.[80]  Third, there would be the investigative file maintained by the area or any specialized unit.[81]  This file would contain documents that individual detectives assigned to investigate the case have determined should be in there.[82] As noted above, none of the files had to have the same documents in them: In fact, by design, they did not.[83]  Likewise, Hickey admitted that the files did not even necessarily have the same *information* in them.[84]

Moreover, additional files would also be created by other units of the Chicago Police Department, because the policies only applied to the Detective Division.  So, in addition to the multiple files above, Gang Crimes officers, other special unit investigators, and patrol officers, could each have additional sets of files related to a homicide investigation, and the special orders are silent as to those additional files.

This was an apparent omission. In fact, Hickey testified that he raised the fact that Special Order 83-1 was only addressed to the Detective Division and that the Department might want to look beyond the detective division to see if the problem extended to other units.[85]  And at some point, Hickey suggested that perhaps Research and Development and Auditing Internal Controls Division should get involved because there may be department-wide implications to the use of street files.[86] But there was no response from the chain of command to Hickey's concerns and CPD never looked to see if the problem of street files went beyond the Detective Division. This failure to look beyond the detectives – notwithstanding the fact that they worked closely with other units in investigating crimes – was deficient and allowed yet more parallel files to be created in other parts of the Department.

The problems created by such an unwieldy system are obvious: It creates the potential for information and documents to go missing because they are not centrally controlled. Moreover, because the files are designed to be different and to be retained in different locations, there is no way to ensure that the complete investigative file is produced during any criminal prosecution.

 Second, the policies also left detectives with far too much discretion about what information to document in official reports and when to turn in investigative materials.  This is particularly true because the status quo had previously been not to record or document information – at least not on official documents that would be maintained by CPD and disclosed to the prosecution and defense. As a result, to overcome this culture – and this citywide practice

---

[79] Hickey *Kluppelberg* Deposition 115-16 (NF-L 001055-56)

[80] Hickey *Kluppelberg* Deposition 115-16 (NF-L 001055-56); S.O. 86-3

[81] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)

[82] Hickey *Kluppelberg* Deposition 297-300 (NF-L 001238-41)

[83] See for examples Hickey *Kluppelberg* Deposition [2015] describing documents that would go in the investigative file but not in the permanent retention file at 71-72, 81, 91, 94, 100, 103, 105, 108-110

[84] Hickey *Kluppelberg* Deposition [2015] at 100

[85] Hickey *Kluppelberg* Deposition 207-208 (NF-L 001147-48)

[86] Hickey *Kluppelberg* Deposition 208 (NF-L 001148)

– CPD had to be explicit in its requirements and provide direct guidance about what did or did not have to be documented; it is not enough to leave it up to the individual officer.

The most egregious example of the problems of officer discretion relate to the lack of a requirement to document elimination of suspect. Indeed, Hickey testified that it was not the policy of the CPD to require detectives to document suspects who were eliminated.[87]  To the contrary, it was permissible and consistent with the special orders not to document the identity or investigative steps taken to eliminate a suspect if a detective did not think that information was relevant or if the detective discounted it for some reason.[88] This is a significant departure from standard police practice, which calls for officers to err on the side of documentation and disclosure of such information, which is often crucial to other investigators on a case and highly likely to contain exculpatory information.

### B. The City failed to provide proper training and oversight to ensure compliance with the special orders

On a department-wide scale, there was no action taken whatsoever to ensure that the special orders were being followed. The only training provided was one three-hour session after 83-1 was issued. But, as explained above, one three-hour training session was wholly insufficient to try to change a decades-long practice. In fact, Hickey testified that the years after Special Order 83-1, he learned that unit detectives were reverting back to carrying their own files on the street separate and apart from the file maintained by CPD.[89]  Nothing, however, was done about this.

Hickey also explained that although he did a sampling prior to the special orders being issued, he did not do one at any time after Notice 82-2 and was not aware of anyone else conducting such an audit.[90]  On a more individual scale, Hickey testified that members of the police department were supposed to conduct inspections pursuant to Special Order 83-2 but Hickey could not identify any instances of audits or investigations.[91]  Similarly, Commander Stibich testified that supervisors were supposed to review files but he had no idea how often, when or the manner in which that review was conducted.[92]

In fact, it appears that there was no oversight to ensure that the special orders were being enforced and that the street files practice was eliminated. This is particularly troubling given the importance and scope of the problem and is certainly deficient. You cannot expect a department-wide, decades-long practice to be eliminated by simply issuing an order that was read at roll call a few times. Based on my experience, this requires extensive and ongoing training (not a one-time session of a couple of hours), careful auditing and monitoring, and meaningful discipline

---

[87] Hickey *Kluppelberg* Deposition 237-38 (NF-L 001177-78)
[88] Hickey *Kluppelberg* Deposition 339 (NF-L 001280); Hickey *Kluppelberg* Deposition [2015] at 66-67.
[89] Hickey *Kluppelberg* Deposition 321, 327 (NF-L 001262, NF-L 001268)
[90] Hickey *Kluppelberg* Deposition 160-61, 166, 167 (NF-L 001100-01, NF-L 001106-07)
[91] Hickey *Kluppelberg* Deposition 375-76 (NF-L 001316-17)
[92] Stibich Testimony NF-L 007461-62

when the new special orders were not followed. Based on my review of the record, almost none of this occurred. Accordingly, CPD leadership either knew or was deliberately ignorant of the fact that the street files problem continued unabated after issuance of the special orders.

## VI.   The Basement files show that the directives were not properly implemented

### A.  The basement files from the 1983-1989 time period show that the special orders were not followed

I reviewed the 89 basement files from 1983-1989 to evaluate whether the basement files, standing on their own (i.e. without comparing to a permanent retention file or defense file) demonstrated compliance with the 1982, 1983, and 1986 special orders. The files show that the special orders were not followed in several ways:

#### 1.  Handwritten notes, not on General Progress Reports, are still routinely used

As discussed above, the special orders directed officers to use GPRs to take notes, and were intended to eliminate the use of handwritten notes on loose sheets of paper without any context of who wrote the note and when.  Reviewing the 89 basement files from 1983-1989 demonstrates that detectives consistently used handwritten notes despite the direction in the special orders. 73 out of the 89 contained handwritten notes not on GPRs.

#### 2.  To-From memos are still being used

As discussed above, the special orders also directed officers to stop using to-from memos to communicate investigative information, and to instead include that information in GPRs and Supplemental Reports.  The 89 basement files from 1983-1989, however, show that detectives continued using to-from memos: 38 out of the 89 files contained to-from memos not on official police forms.

#### 3.  All relevant information in unofficial documents is not transcribed in official reports

The special orders state that all relevant information must be transcribed into an official report, in an effort to ensure that the permanent retention file, which contains only official reports, provides a complete picture of the investigation.

But, the case files I reviewed are replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information. These handwritten notes contained critical investigative information, including: 1) Leads on different or additional avenues of investigation or suspects (Bates 048422); 2) Names or descriptions of additional witnesses found in at least 50% of the basement files); 3) References to other CPD or outside law enforcement involvement in the investigation (Bates 06139-41; 011669); and 4) Handwritten diagrams, scene and area maps, evidence locations (Bates 020928; 016773; 015652; 031512). These citations are examples only, and not an exhaustive list of instances where these trends were seen.

In the vast majority of the cases that I reviewed, there is no companion entry on official

CPD forms that documents this critical information, leaving this potentially exculpatory information solely in handwritten notes or in informal memos contained in the Investigative Files. By not transcribing it into an official report, it is less likely to get into the permanent retention file, and as observed above, to criminal defendants. Some examples of these omissions include:

- In custody detention log (G-266841A – Bates 05194-95) shows suspect detained in stationhouse from 6/27/01 @ 3:00 PM until 6/28/01 @ 10:55 PM – nearly 32 hours (time of last entry – nothing to show when he was booked or released). Log is written on a GPR – all in the same hand and appears to be done after the fact, all entries made at one time.

- In handwritten note (M-587998 – Bates 48422) on a plain piece of paper provided by CPD Officer William Freeman on 1/9/90 @ 1930 hours, is the following:

> *To whom this may concern Dalmar Milton in 141 N. Wolcott #301*
> *Andrew in 141 N. Wolcott #305*
> *an (sic) another boy that lives in 1850 #603*
> *Killed Fat Ed behine (sic) the boys club on Christmas night they beat him to death with a golf club. Someone saw it but they are afraid to come fort (sic).*
> *Thank you*
> *? ? ?*

The permanent retention files that I reviewed similarly demonstrate that the official reports that become part of the Permanent Retention File provide an incomplete picture of an investigation.

If the special orders were being followed, this should not happen. Under the special orders, all relevant information learned during the investigation is supposed to be transcribed into an official report, and so the official reports contained in the permanent retention file should for all intents and purposes contain all of the same information (although not necessarily all of the same document) about the investigation, including any exculpatory and impeaching information developed during the investigation.

### a. Review of Permanent Retention Files

I reviewed the investigative and permanent retention files (permanent retention files) for the years 1983-1989 and intends to rely on all the permanent retention files produced in that period to demonstrate the City's failure to train, follow, or implement its special orders.

I was provided with digital copies of 27 permanent retention files, corresponding to 27 basement files from the time period 1983 - 1989. I examined, compared and contrasted the 27 permanent retention files with their corresponding basement files (IF). **See Attachment F**

Although all of the basement files had the required inventory sheet, only approximately 15% of the permanent retention files contained the required copy, a violation of the special orders.

In addition, for the 15% of cases where inventory sheets were included in the permanent retention files, they were often incomplete or the description of the documents were so generic or general so as to be unusable. Items in the Investigative File routinely missing from the permanent retention file version of the Investigative File inventory sheets included:

Handwritten names, addresses, vehicle license plates, phone numbers, physical descriptions, dates, unknown abbreviations, symbols, other case numbers, and miscellaneous notes found throughout most of the Investigative Files. These types of items were found written across official forms, on plain paper, and on file folder covers. Most were not referenced or located in any permanent retention file inventories, and may have had value for discovery purposes.

### 4. Inventories are Missing or Incomplete

I also noted that documents were often added to the inventory sheet long after they were initially created. In some instances, some inventory sheet entries were not created until after an offender had been charged. In other files, the dates are either illegible, or do not appear at all. In other instances, there are stamped dates, but nothing shown as entered. In other instances, an item is shown as entered, but not date or individual entering. In other instances, a large quantity of GPRs and supplemental reports were entered all on the same date. Some limited examples:

D-1922128
F-048933
F-380662
M-587998
G-268444

The delay in creating an inventory sheet reveals three problems. One, it again demonstrates the amount of discretion that officers could exercise when deciding what to put into an Investigative File: if an inventory sheet is only created after an individual is charged, detectives can exercise discretion over what they deem relevant at the end of an investigation. Second, if the documents are not logged on the inventory sheet until after the charges are brought, that indicates that documents are being stored in other, undisclosed locations during the course of the investigations, which was precisely the problem the special orders should have addressed. Finally, if detectives obtain additional information after charges are brought, there is no mechanism in place to update the inventory sheet in the Records Division, or in the inventory sheet disclosed (albeit rarely) to criminal defendants.

### 5. The basement files show that the "Investigative Files" did not serve as the central repository for investigative materials

The files I reviewed demonstrate that the basement files were not the central repository

for information. My review of the files revealed numerous cases where information that should be included was absent from the basement file, suggesting that it may have been lost or stored in separate files. Examples of such missing information include:

- No explanation on photographs, such as when or where the photo was taken, who/what is depicted in the photograph or why the detectives believe it is relevant to the investigation. (e.g. Bates 07182; 006121; 008989; 011312; 046887-91). The missing information suggests that the paperwork, notes, or other investigative materials that led to the photograph were maintained separately from the basement files.

- Missing reports including ballistic reports, AFIS reports, crime lab reports, CAD and 911 reports. In some basement files there are reports indicating that the lab was unable to find evidence (i.e., fingerprints) that would tie the suspect to the murder (Bates 0000047); or notations that the case has been cleared – do not resubmit (Bates 0000046); or no comparisons (Bates 006082).

- Missing forms, such as missing property inventories and Major Crime Worksheets. For example, M-566742 contains no Major Crimes Worksheet and is representative of many of the basement files

- Other missing forms or documents including missing medical records, missing property inventory forms, or missing search warrant affidavits, and missing search warrant returns. (e.g. F-229039; G-165272; G-176242; G-259321)

- Some cases have investigatory computer generated phone records (Bates 006142-47), in others they are hand written by an unknown investigator but not included in official reports, suggesting that the original source for the phone records was stored separately or not properly retained.

- Blank or missing chain of command homicide review forms (e.g., Bates 211174; 065188)

- Many basement files are missing crime scene photos, suggesting that the reports from Crime Scene technicians were not included in the basement file. For example, the investigation under M-566742 includes an Evidence Report at Bates 047630 that documents many different photographs taken of the crime scene. Those photographs do not appear in the basement file.

In some instances, the basement file specifically referenced a piece of evidence, a statement, or other information, but the corresponding evidence or statement was not documented in the file.

- References in handwritten notes or documents in file as to the involvement of other units or outside agencies, but not included in official reports, and involvement not described (e.g. FBI business card – Bates 006149; Letter (in Spanish) from Mexican Consulate – Bates 06139-41; Assistant U.S. Attorney business card – Bates 011669)

- No live lineup photos, where there are lineup reports. For example, at Bates 027279-027281, lineup documents indicate 3 separate lineups 3 separate witnesses for the investigation under G-705434, but there are no photographs in the basement file. In another case, G-570120, there are lineup photos at Bates 023000-07, but no lineup documents appear in the basement file.

- Reference to other units or outside agencies processing evidence, but no documentation in official reports, no results, and no chain of custody.

- Cryptic handwritten notes with no explanations as to source, relevance, or why included. Notes such as "50,000.00 checking acct." (e.g. Bates 0000091; 2 paragraphs 0000059) referring to individuals that may/may not have relevant information. Similarly, descriptions of vehicles (Bates 006096).

- Numerous Xeroxed handwritten spacer/filler pages with A/4-VC; A/1-VC; A/3-VC which would indicate other sources for relevant documents that may, or may not, have been included (Bates 0000044; 020156; 011326; 011688). Other examples include listing detective's names and unit numbers on Plain pages – or officers from other agencies - suggesting that information is coming from other, unidentified sources. (Bates 005586; 005630; 005701; 006051; 006106).

The basement files contain only a portion of the investigative materials that, based on my experience would typically be included in a comprehensive homicide investigation file.[93] And, as the examples above demonstrate, in many instances, documents in these basement files make explicit reference to documents, notes, or information that are not included in the basement files.

This is evidence that parallel files related to these investigations were maintained and contained additional investigative materials, regardless of what terminology is used to describe the files: If the City contends that the basement files are supposed to be Investigative Files as defined under the special orders, then, the files demonstrate that other, parallel files were maintained containing additional investigative material. If the City contends they are not Investigative Files as defined under the special orders, then the basement files are themselves examples showing that the parallel file system continued unabated after issuance of the special orders.

Finally, these repeated and consistent failures to properly document and include all investigative information within the basement files, demonstrates the CPD's top down pattern and practice of failing to seriously try to correct bad practices or overcome the harmful outcomes shown in prior relevant successful litigation against CPD.

---

[93] **Attachment E** provides background materials regarding what kinds of investigative documents should appear in a homicide investigation, including examples of checklists used during criminal investigations.

**B. The basement files from the 1999-2006 show that the special orders were not followed and that the problem has continued unabated into the 2000s**

According to the spreadsheet provided by Plaintiff's counsel, there were 340 files in the Area 1 Basement filing cabinets from the time period 1999-2006. Based on the spreadsheet, the same problems that I observed in the 1980s files were present in this second group of files.

1. Handwritten notes not on GPRs: 209/340 (approximately 61%) files contained handwritten notes, not on GPRs, and without any context about who wrote the note and when, which was prohibited by the special orders
2. To-from memos: 59/340 (approximately 17%) of the Investigative Files from this time period contain to-from memos, which were likewise prohibited by the special orders
3. Inventories: 334/340 (approximately 98%) of the Investigative Files contained incomplete or missing inventories.

Unsurprisingly, the street files problem did not solve itself. The City's failure to meaningfully address the problem in the 1980s allowed it to continue unabated into the 2000s. And as described above, in Section IV(D), pages 19-23, the continued use of parallel files and failures to follow CPD policy resulted in repeated failures to disclose important and relevant information to criminal defendants throughout the 2000s.

**C. The basement files confirm that there was no training, auditing, or oversight to ensure compliance with CPD's policies**

These consistent failures to follow the requirements of the special orders reveal that detectives were not properly trained on the special orders and that there was no proper supervision or oversight to ensure that these special orders were followed.[94]

Had there been any systematic audit or review of these files, these trends would be immediately apparent.[95] But a review of the 89 basement files from 1983-1989 also shows no signs of an audit or review. Though the CPD had forms designed to facilitate oversight and supervision, those forms were routinely missing or blank in the files I examined:

**Homicide File (Chain of Command) Review** (some Bates examples at 15511, 41049, 49240, 65188)**:** This form is designed to document that the chain of command responsible for overseeing the investigation and compliance with relevant departmental policies and procedures has actually done so. Most of the files that I reviewed either were missing the form, had only a single signature, or in the example had no signatures as all. That is, there is essentially no documentation of supervisory review in the basement files. This demonstrates a willful disregard among supervisors for ensuring that detectives were following the policies.

---

[94] See Section V(B) above, page 32
[95] See Section VI(A)-(B) above, pages 33-38

**Investigative Case File Control** (some Bates examples at 5756, 6214, 8990, 1539): Over 35 of these are missing from criminal defense files. This form is designed to maintain case integrity and chain of custody of investigative files. It is common during an investigation for a file to be routinely removed for a multitude of legitimate reasons (crime lab, consultation with other units, review by prosecutor, court appearances, etc.) The case file control form documents the file's movements so that it is clear whether and when information may have been copied or removed. In most of the cases that I reviewed they are either missing, have so few entries as to be unbelievable, or have not entries at all – an impossibility. This is another critically important form for discovery purposes because it should reveal all the individuals that may have contributed to the file, including from other divisions or units. The failure to systematically utilize them properly, and the concurrent institutional failure to enforce compliance, indicates a pattern and practice of indifference to the policies for maintaining Investigative Files.

**Detective Division Personnel Form**: This sheet is designed to quickly track and identify detective division employees, where they are assigned, working hours, and equipment. It does not necessarily account for officers from other units. Regardless, in the majority of the cases reviewed, this form is missing altogether.

**Case Assignment Slip** (some Bates examples at 5573, 7077, 16653, 20863): The Case Assignment Slip is designed to document initial detective(s) assigned and conclusion status. These are key individuals to seek out in discovery for depositions. Again, enough of these forms are missing to demonstrate a clear pattern and practice of disregard for the policy.

As discussed above, without ongoing monitoring through audits and other means to ensure that the new special orders were being followed and that prosecutors and criminal defendants were receiving complete disclosures, it was almost certain that the ingrained practice of using street files would continue.

My review of records in this case and others shows that the continuation of the practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files. As discussed above, 100% of the Investigative Files I reviewed contained evidence that the special orders were not being followed, and 90% of defense attorney files were missing information from the Investigative File; even superficial audits of small samples of records would have revealed these problems.

The failure to audit or discipline for non-compliance with the policies signals that the old ways – the ways of "street files" that the CPD should have been trying to correct – are acceptable. It is not only that best practices require enforcement of special orders to give them teeth, but also, in my experience with Internal Affairs, given the circumstances here, strict adherence was necessary to create a new culture and practice so that detectives would not continue with the ingrained practice of keeping parallel files.

**VII.    The failure to turn over files in Nathson Fields' case was a direct result of these practices and inadequate policies**

Nathson Fields was convicted of the double murder of Jerome Smith and Talman Hickman in 1986. Fields' conviction was thrown out after a court granted his petition for post-conviction relief, but he was re-tried in 2009 and acquitted. He then filed a civil rights lawsuit against the City of Chicago in 2010, and during discovery for the civil lawsuit, a file "of over a hundred pages of police reports concerning the Smith/Hickman murders were located in a nondescript file cabinet at the Area 1 police station, along with files relating to other murders."[96]

The original arrest, trial, conviction, appeals, re-trial, and eventual exoneration of Nathson Fields spans a 30-year time period. The volume of police reports, criminal and civil court records, and litigation filings pertaining to the matter form tens of thousands of pages. For my purposes, it is best summarized by the following:

*Nathson Fields and Earl Hawkins were convicted at a 1986 bench trial before Cook County Circuit Court Judge Thomas J. Maloney of the murders two years earlier of Jerome Smith and Talman Hickman, members of the Goon Squad, an offshoot of the Black Gangster Disciples street gang.[97] Fields and Hawkins requested a jury at the sentencing hearing.[98] At the sentencing hearing, prosecution witness Randy Langston recanted his trial testimony and admitted that he never saw the faces of the shooters.[99] The jury concluded that both men were eligible for the death penalty and Maloney sentenced them to death.[100]*

*A year later, a federal prosecutor negotiated a deal under which Hawkins would be removed from death row in exchange for testifying against other gang members in unrelated cases.[101] Fields remained on death row. Then, in 1993, Judge Maloney was convicted on federal charges of, among other things, accepting a $10,000 bribe from a corrupt lawyer named William Swano to acquit Hawkins of murdering Smith and Hickman.[102] When Maloney learned that he was under investigation by the FBI, he returned the money to Swano and proceeded to convict Hawkins, as well as his co-defendant Fields.[103]*

*In light of Maloney's conviction, a state court judge ordered a new trial for Fields in 1996.[104] While the retrial was pending, a second key witness in the case named Gerald Morris recanted. Along with Randy Langston, Morris had testified at the 1986 trial that he had seen Fields and Hawkins shoot Smith and Hickman outside a public housing project on April 28, 1984. But in their new affidavits Morris and Langston stated that police and prosecutors had*

---

[96] Fields v. City of Chicago, Memorandum Opinion and Order, [Document # 483] page 2
[97] Ibid. p. 2-3
[98] Ibid p. 3-4
[99] Ibid p. 4
[100] Ibid p. 4
[101] Ibid p. 4-5
[102] Ibid p. 3
[103] Ibid p. 4
[104] Ibid p. 5

*coerced them to falsely identify Fields and Hawkins. According to the affidavits, Morris and Langston had no idea who killed Smith and Hickman because the killers had worn masks.*

*Despite the recantations, rather than dropping the charges prosecutors made a deal with Hawkins under which he would testify against his former co-defendant. got Randy Langston and Gerald Morris[105] to recant their recantations. Fields remained in custody until 2003 when he was released on bond.[106]*

*On-going appeals by the prosecution delayed the Fields retrial another six years,[107] but when it finally occurred Judge Gaughan found Hawkins and the two other witnesses unworthy of belief. Fields was acquitted.[108]*

I have familiarized myself with the underlying facts in the *Fields* case, and have reviewed the various sets of police files produced to Mr. Fields at different times during his criminal case and during this civil litigation, including (a) the permanent retention file (CITY-NF-07531-07558), and the two new files disclosed to Mr. Fields in 2011 during this litigation: (b) the file produced by the City, which was located in a CPD warehouse (CITY-NF-07559-07652) (hereinafter the "warehouse file"), and (c) a file found in the filing cabinet in the basement of Area 1 (CITY-NF-001023-CITY-NF-001117) (hereinafter the "basement file").

The City has admitted that it "does not know where the [basement file] was maintained after June 1984 until it was located in Area 1 after the filing of this case in 2010."[109] In fact, Mr. Fields filed an earlier lawsuit in 1988 looking for additional files related to the Hickman/Smith murders, and the Chicago Police Department opened an internal investigation.[110] But the investigator assigned to the case wrote a memorandum stating that, although he received the "complete investigative package which was recorded under RD number F-151922 which concerns the Talman HICKMAN and Jerome SMITH Homicides . . . it was noted that the 'Street Files' were not included in the investigative file."[111] Ultimately, this CPD investigation was "unable to establish the existence of any 'Street Files' connected with the HICKMAN & SMITH homicides."[112]

Then, in response to a 1991 subpoena requesting all documents related to the Smith/Hickman murders, Fred Miller, Commander of Area 1 stated 'There are no documents on file at Detective Division One pertaining to the above subject."[113]

Nonetheless, over 100 pages were located in 2011 in the basement file found at Area 1.

---

[105] Morris later recanted yet a third time and provided an extensive affidavit outlining the years of coercion by police and prosecutors to obtain his cooperation in testifying against Fields.
[106] Fields v. City of Chicago, Memorandum Opinion and Order, [Document # 483] page 5
[107] Ibid.
[108] Ibid p. 6
[109] City's Third Amended Answer to Interrogatories 4 and 5, page 2.
[110] City's Third Amended Answer to Interrogatories 4 and 5, page 8-9.
[111] City's Third Amended Answer to Interrogatories 4 and 5, page 9.
[112] City's Third Amended Answer to Interrogatories 4 and 5, page 9.
[113] City's Third Amended Answer to Interrogatories 4 and 5, page 8.

Those files were disclosed to Mr. Fields for the first time in this litigation.[114] It is clear, then, that the undisclosed Fields basement file is caused by, and additional evidence of, the street files problem, that is, a parallel file unaccounted for by CPD and not disclosed despite repeated, specific requests.

The documents newly produced in the basement file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. In fact Nathson Fields name was never mentioned as a possible suspect in any of these documents. Below are some examples of documents in the basement file, which were withheld from Mr. Fields and which contained relevant investigative information:

- CITY-NF-000972-1027: Identification photographs of alternate suspects and witnesses, with handwritten notes identifying the pictures
- CITY-NF-001029: Undated handwritten notes regarding a check for a 9 mm handgun related to other homicides
- CITY-NF-001030: Undated handwritten note regarding the wife of Talman Hickman, Margot Hickman
- CITY-NF-001035; 001037: Undated handwritten notes regarding what appear to be descriptions of the perpetrators
- CITY-NF-001038: Request for identification photos of three possible suspects
- CITY-NF-001039-40: Undated handwritten note related to Lawrence and Marshall Edwards, possible alternate suspects, including a statement that a witness heard them talking about "killing Fuddy" because of a previous shooting. The notes also state that a witness saw them at about 9:00 in the morning talking, and Lawrence said he'd get a gun, and they would put on masks, and he wouldn't live through the night, and then he "won't be jumping on you anymore."
- CITY-NF-001041: Undated handwritten note regarding an anonymous call reporting that "Ronald" and "Donald," who were "Stones" were the driver and passenger of the vehicle used to commit the crime
- CITY-NF-001042: Undated handwritten note regarding comparisons of all 9mm guns that are suitable for comparison to identify the gun used during the shooting
- CITY-NF-001043: Undated handwritten note referencing "Delbert Edwards" and his IR number (which is used to locate an individual's criminal history) with no additional context. A criminal history report for Delbert Edwards is also included in the file at CITY-NF-001067. According to a Supplemental Report, Delbert Edwards was also shot at by members of the Goon Squad, and would have had a motive to retaliate, but officers claimed to have verified his alibi with his family members. (CITY-NF-001050-51) (See also, CITY-NF-001086-88 arrest report from the shooting at Edwards the night prior to the H/S homicides and the arrests of two Goon Squad members).
- CITY-NF-001052: Notes from an anonymous tip that "Black P Stones" gang was involved in the crime which also provided a description and information regarding a suspect. A handwritten note states "Steve, need report by 11Jun84"
- CITY-NF-001053- 001059: Report and rap sheet for an individual arrested with drugs

---

[114] Fields v. City of Chicago, Memorandum Opinion and Order, page 2.

within a few days of the homicide in the area of the homicide and in a similar car as the getaway car

- CITY-NF-001061: Undated handwritten note regarding Simeon Johnson, aka Cameo, Joseph Fritz, and John Rogers, with contact information and identifying features. The note does not provide any additional context for how these individual relate to the investigation, but an April 29, 1984 General Progress Report appears to describe interviews of Fritz and Rogers, in which Fritz reported that a man named Simeon owns a blue Cadillac, similar to the one used in the crime. Fritz also reported that he "heard that stones wearing masks killed some goons." (CITY-NF-001113). Officers apparently asked Rogers about his whereabouts the night of the murder, and Rogers reported visiting various family members. (CITY-NF-001113).
- CITY-NF-001062: Undated handwritten note regarding mother of Ricky Baldwin, a man who was killed by a member of the Goon Squad (Jimmie Greene) in a previous shooting. The note suggests a possible motive for Hickman and Smith murders: namely that another Baldwin was seeking reprisal for Ricky Baldwin's death. The note also references "Chico" and "Cameo" without further description. Several criminal histories and arrest reports related to various members of the Baldwin family appear throughout the file: CITY-NF-001065-66 (Paul Baldwin); CITY-NF-001071 (Shawn Baldwin); CITY-NF-001073 (Timothy Baldwin); Greg (aka Chico) cousin of Ricky Baldwin with description of Greg (CITY-NF-001108).
- CITY-NF-001069-70: April 29, 1984 General Progress Report describes an anonymous call implicating Rodell Banks in the shooting; and an arrest card for Rodell Banks is also included in the file.
- CITY-NF-001075: Undated to-from memo between detectives describing an interview with 14-year-old James Langston, who was playing ball across the street and said offenders were wearing skullcaps to conceal their identities. Identifies Ricky Baldwin as a passenger in the car used to carry out the killings. The memo also discusses an interview with Sandra Langston who described both offenders as having a light complexion.
- CITY-NF-001076: Undated handwritten note regarding Carlos Willis and John "Bay Rogers" without additional context or explanation of their connection to the investigation.
- CITY-NF-001077: Typed to-from memo between detectives describing anonymous call implicating Edward Stewart as the driver of the vehicle used in the murder, and stating that Stewart was with "Chico" and Darryl Baldwin. The memo also describes detectives' efforts to locate Edward Stewart and Chico, and to identify Chico's real name.
- CITY-NF-001085: Undated handwritten note referencing "Chico" and "Poncho" and possible addresses, with no additional context or description.
- CITY-NF-001100-06: photos of possible suspect Edward Stewart, arrest report showing an inquiry issued on day of H/S homicides, arrests reports and rap sheets.
- CITY-NF-001107-09: Efforts to identify individuals with the name of "Chico." Arrest cards list Damien Prince and Martel Ray (or "Mertel Rey"). A handwritten note states that "Chico" = Greg, cousin to a Baldwin
- CITY-NF-001112: May 1, handwritten General Progress Report referencing Clifford Marshall and Lawrence Edwards, as possible suspects and discussing the Edwards' brothers possible alibis. Also references Darryl Baldwin with "Chico" and efforts to verify their alibi.

- CITY-NF-001113: April 29, 1984.handwritten General Progress Report from Detective Minogue discussing what appears to be an interview of a possible witnesses or suspects Joseph Fritz and John Rogers.
- CITY-NF-001114: arrest report for individual who associated with Martel Ray.
- CITY-NF-001116: Undated handwritten note regarding an anonymous tip that said Edward Stewart was the driver of the vehicle used in the commission of the murders and that Darryl Baldwin and Chico were with him. Contact information for girlfriend of Baldwin- Olivia Wallace. (The basement file contains other information regarding Wallace, including her rap sheet CITY-NF-001109-001110)
- CITY-NF-001117: Undated printout related to a Mark Brown with no additional context. His name also appears on pages CITY-NF-001063-64.

As the list above reveals, the basement file demonstrates the same problems observed in the set of 89 basement files. There are numerous handwritten notes, not on GPRs, which are undated, unsigned, and provide no context. As these notes demonstrate, detectives often wrote names of alternate suspects or important witnesses on blank pages, with no additional context. Detectives also communicated important information about witnesses and alternate suspects in to-from memos between detectives. This information was not transcribed into the official reports. Finally, the basement file contains no inventory sheet.

The basement file is not the only file that was not turned over to Mr. Fields. As explained above, the City also produced for the first time a file containing investigative materials related to the Smith and Hickman murders that was located in the warehouse. Notably, this file did not include any of the handwritten notes or to-from memos between detectives. This is a prime example of the use of multiple, parallel files, in addition to the permanent retention file, which are stored separately, and make no reference to one another.

This file, too, suffers from the same systemic problems observed in the basement files as a whole: Although there is an inventory sheet in the warehouse file, it is incomplete. (CITY-NF-7560-61). It lists only 8 pages of GPRs and makes no reference of the 100 pages that were in the basement file and in any event was not contained in any of the defense attorneys' files or the permanent retention file. The warehouse file also includes relevant investigative information. There is a criminal history report for Henry Adams, who was potentially also involved in the murder (CITY-NF-07632), and a handwritten note documenting negative results from a request to compare the gun used in the Smith and Hickman homicide against a firearm used in another homicide. (CITY-NF-07613).

The documents in the basement and warehouse files are highly relevant to the investigation, implicate multiple alternate suspects, and suggest potential witnesses, vehicles used in the crime, and items of physical evidence. These documents should have been produced to Mr. Fields before his original criminal trial in 1986 (and at every other point at which he engaged with the criminal justice system after that). These documents would have been produced under generally accepted police practices related to creating, retaining, and disclosing investigative materials.

Finally, these files suggest that there may be yet more investigative materials that have

not been disclosed. For example, in the to-from memo relating to the interview with James Langston (CITY-NF 001075) the memo says "see our notes for more details." Those notes do not appear in the files that have been disclosed to Mr. Fields. Similarly, a report of an anonymous tip includes a statement "Steve, need report by 11Jun84," (CITY-NF-001052) but there is no report corresponding to that request in the files. The files that have now been located and disclosed provide no indication of how many additional files may exist, or where to locate them. This inability to determine where all relevant materials are stored is a direct result of the failure to follow standard police practice of creating a single, comprehensive file for an investigation.

### Concluding Statement

I have provided my opinions based upon my training, experience, and after a careful evaluation of the totality of circumstances in this matter. I utilized all of the facts and data known to me, and applied generally accepted police management principles and methods. I have concluded that CPD had deficient policies related to creating, maintaining, and disclosing investigative materials, and further that there was a widespread practices of keeping multiple, parallel files for single investigation. As a result of those deficient policies and widespread practice, criminal defendants were routinely denied substantive and relevant investigative materials related to their criminal cases. The files withheld from Mr. Fields during his criminal trial were withheld as a result of the same set of practices and policies (or lack thereof), and contained relevant and important investigative materials that should have been disclosed under standard police procedures.

In sum, it is my professional opinion to a reasonable degree of professional certainty in the law enforcement community, and based on longstanding and well-accepted law enforcement practices, that the defendants engaged in a pattern and practice of routinely failing to disclose material in criminal cases to defendants that should have been disclosed, These failures to disclose exculpatory and impeachable information was well outside the norm that law enforcement officials and institutions know needs to be disclosed.

I reserve the right to supplement or modify this report and my opinions expressed in the report to the extent that additional information is presented to me and to the extent permitted by rules.

Pursuant to 28 U.S.C Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Michael D. Brasfield

Michael D. Brasfield