# EXHIBIT 80

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GERALDO IGLESIAS,

    *Plaintiff,*

    *v.*

REYNALDO GUEVARA, the ESTATE of
ERNEST HALVERSON, STEVE GAWRYS,
ANTHONY RICCIO, ROBERT BIEBEL,
and the CITY OF CHICAGO

    *Defendants.*

Case No. 19-cv-6508

Judge Franklin U. Valderrama

Magistrate Judge Maria Valdez

JURY TRIAL DEMANDED

---

# EXHIBIT 44

## Defendants' Reply in Support of their Post-Trial Motions

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATHSON E. FIELDS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 1168 |
| | ) | |
| CITY OF CHICAGO, et al. | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | Magistrate Judge Geraldine Soat Brown |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
COMBINED POST-TRIAL MOTIONS**

ATTORNEYS FOR DEFENDANTS,
City of Chicago and Joseph Murphy

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 South Wacker, Suite 2300
Chicago, Illinois 60606

ATTORNEYS FOR DEFENDANT,
David O'Callaghan

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark Street
Suite 2500
Chicago, Illinois 60601

## TABLE OF CONTENTS

### Table of Contents

**Page**

I.    **Defendants' Post-Trial Arguments Were Properly Preserved.** ................................ 1

    A.    **Defendants' Rule 50(b) Arguments Were Preserved.** ..................................... 1

    B.    **Defendants' Rule 59 Arguments Were Also Preserved.** ................................... 2

II.    **Defendants' Rule 50(b) Motion Should Be Granted.** ...................................... 3

    A.    **Plaintiff Failed to Prove His Due Process Claim with Respect to 1986 Trial.** .................................................................................................... 3

    B.    **Plaintiff Failed to Prove His Due Process Claim with Respect to 2009 Trial.** .................................................................................................... 5

    C.    **Defendants are Entitled to Judgment on Plaintiff's *Monell* Claim.** ................. 5

III.    **Alternatively, The City is Entitled to a New Trial on the *Monell* Claim.** ................. 11

IV.    **Prejudicial Evidentiary Rulings Warranting a New Trial (Rule 59)** ........................ 13

    A.    **The Wiretaps** ........................................................................................ 13

    B.    **Excluded Evidence Regarding Plaintiff's Credibility/Guilt** ........................... 14

    C.    **1972 Conviction** ................................................................................... 14

    D.    **The Treddest Murray Incident/Fields April 29, 1985 Arrest** ........................ 15

    E.    **Firearms Found at the African Hut on May 18, 1985** ................................. 15

    F.    **2000 Riot at Cook County Jail** ............................................................... 15

    G.    **Vaughn/White Evidence** ........................................................................ 15

    H.    **Hunter's Statement that Fields was an Assigned Killer** ............................... 16

    I.    **Hawkins' Rulings** ................................................................................. 17

    J.    **Carter's Statement That He Kills People** .................................................. 17

    K.    **Relocation of Witnesses** ........................................................................ 17

    L.    **Other El Rukn Evidence** ........................................................................ 18

**M.**     **The Prejudicial Hallway Jury View** ...................................................................... 18

**N.**     **The Denial of Plaintiff's Petition for Certificate of Innocence ("COI")** ........ 18

**O.**     **ASA Randy Rueckert's Testimony** ...................................................................... 18

**P.**     **"Pros Memo"** ........................................................................................................... 19

**Q.**     **Curative Instruction Regarding ASA Sexton's Testimony** ............................ 19

**R.**     **2011 Affidavit of Gerald Morris** ....................................................................... 20

**S.**     **O'Callaghan's Credibility & Improper Instruction Relating to Morris** ....... 20

**V.**     **Counsel's Prejudicial Misconduct Warrants a New Trial.** .............................. 20

    **A.**     **Plaintiff's Counsel's Improper Examination of Witnesses.** ............................ 21

    **B.**     **Improper Examination of Defendant O'Callaghan** ........................................ 23

    **C.**     **Bad-Faith Questioning Implying Murphy's Destruction of Evidence.** .......... 24

    **D.**     **Improper Questions & Argument Relating to CPD Reports.** ......................... 25

    **E.**     **Questions Regarding Photographs.** .................................................................... 26

    **F.**     **Questions About Kees Testifying From a Transcript.** ..................................... 27

    **G.**     **Questions that Violate Pre-Trial Rulings.** ......................................................... 27

    **H.**     **Improper, Inflammatory Statements/Comments Made by Counsel.** ............. 29

    **I.**     **Improper Closing Arguments** ............................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*,
    520 U.S. 397 (1997)......................................................................................................7

*Christmas v. City of Chi.*,
    682 F.3d 632 (7th Cir. 2012) ....................................................................................2

*City of Canton v. Harris*,
    498 U.S. 378 (1989)....................................................................................................11

*Cleveland v. Peter Kiewit Sons' Co.*,
    624 F.2d 749 (6th Cir. 1980) ..................................................................................22

*Connick v. Thompson*,
    131 S.Ct. 1350 (2011)................................................................................................11

*Craft v. Flagg*,
    2010 U.S. Dist. LEXIS 132982 (N.D. Ill. 2010) ..................................................10

*Daniel v. Cook County*,
    833 F.3d 728 (7th Cir. 2016) ....................................................................................7

*Estate of Novack v. Cty. of Wood*,
    226 F.3d 525 (7th Cir. 2000) ....................................................................................7

*Gasperini v. Ctr. for Humanities*,
    518 U.S. 415 (1996)....................................................................................................21

*Gerhartz v. Richert*,
    779 F.3d 682 (7th Cir. 2015) ..................................................................................21

*Glisson v. Indiana DOC*,
    2017 WL 680350 (7th Cir. 2017) ..........................................................................10

*Jimenez v. City of Chi.*,
    877 F.Supp.2d 649 (7th Cir. 2013) ........................................................................1

*King v. Kramer*,
    680 F.3d 1013 (7th Cir. 2012) ..................................................................................9

*Klotz v. Sears, Roebuck & Co.*,
    267 F.2d 53 (7th Cir. 1959) ....................................................................................22

*Kyles v. Whitley*,
    514 U.S. 419 (1995)......................................................................................................8

*Laborers' Pension Fund v. A&C Env.*,
    301 F.3d 768 (7th Cir. 2002) ......................................................................1

*Monell v. Dept. of Social Services*,
    436 U.S. 658 (1978).......................................................................... passim

*Naeem v. McKesson Drug Co.*,
    444 F.3d 593 (7th Cir. 2006) ......................................................................3

*Oklahoma City v. Tuttle*,
    471 U.S. 808 (1985)....................................................................................7

*Palmer v. City of Chi.*,
    806 F.2d 1316 (7th Cir. 1986) .........................................................8, 12, 13

*Park West Galleries v. Hochman*,
    692 F.3d 539 (6th Cir. 2012) ....................................................................21

*Petit v. City of Chi.*,
    239 F.Supp.2d 761 (N.D. Ill. 2002) ...........................................................1

*R–BOC Rep. v. Minemyer*,
    2017 WL 543045 (N.D.Ill. Feb. 10, 2017) ...............................................29

*Rankin v. Evans*,
    133 F.3d 1425 (7th Cir. 1998) ....................................................................1

*Rodriguez v. Woodall*,
    189 Fed. Appx. 522 (7th Cir. 2006).............................................................3

*U.S. v. Agurs*,
    427 U.S. 97 (1976)......................................................................................8

*U.S. v. Alden*,
    476 F.2d 378 (7th Cir. 1973) ......................................................................4

*U.S. v. Peak*,
    856 F.2d 825 (7th Cir. 1988) ......................................................................4

*U.S. v. Riley*,
    621 F.3d 312 (3d Cir. 2010).......................................................................21

*U.S. v. Sanchez*,
    176 F.3d 1214 (9th Cir. 1999) ..................................................................23

*U.S. v. Schimmel*,
    943 F.2d 802 (7th Cir. 1991) ....................................................................23

*U.S. v. Smith*,
354 F.3d 390 (5th Cir. 2003) ................................................................23

*U.S. v. Zuniga–Galeana*,
799 F.3d 801 (7th Cir. 2015) ................................................................29

*Vodak v. City of Chi.*,
639 F.3d 738 (7th Cir. 2011) ................................................................10

*Wilson v. Williams*,
182 F.3d 562 (7th Cir. 1999) ................................................................3

## RULES

Fed. R. Evid. 103(a) ................................................................3

## I.     Defendants' Post-Trial Arguments Were Properly Preserved.[1]

### A.     Defendants' Rule 50(b) Arguments Were Preserved.

A recurring theme in Plaintiff's Response is that Defendants failed to properly preserve their arguments. Contrary to Plaintiff's interpretation of the law, Rule 50(a) motions need not include every specific contention in support of judgment as a matter of law on a claim, so long as the parties and the court know the arguments based on the entirety of the proceedings. *See Laborers' Pension Fund v. A&C Env.*, 301 F.3d 768, 777 (7th Cir. 2002); *Petit v. City of Chi.*, 239 F.Supp.2d 761, 767 (N.D. Ill. 2002). It is undisputed Defendants filed Rule 50(a) motions on all of the claims raised in their Rule 50(b) motions.[2] Plaintiff cites no law, and there is none, that would require each individual point made in the Rule 50(b) motion to have already been detailed in the Rule 50(a) motion, particularly where the arguments were raised numerous other times throughout this litigation. *Id.; Rankin v. Evans*, 133 F.3d 1425, 1431-32 (7th Cir. 1998). Defendants' motions were more than sufficient to provide notice as to the bases for relief—bases that had been raised at numerous other points throughout the litigation.

Plaintiff claims the following arguments have been forfeited (Resp. at n.2), but it is clear from Defendants' Rule 50(a) motions and the record in this case that they were not:

***Monell.*** The City's Rule 50(a) motion detailed Plaintiff's failure to present a legally sufficient evidentiary basis for *Monell* liability. Dkt. 1145. The City pointed out that because the alleged practice (a systematic underproduction of documents) was in and of itself not unlawful or unconstitutional, and Plaintiff offered no evidence of a series of prior problems or constitutional

---

[1] Defendants refer herein to their Combined Post-Trial Motions (Dkt. 1180) as PTM. For consistency, citations herein to the 2016 trial transcript will refer to Plaintiff's exhibits, designated as "P.Ex." Defendants' exhibits to the PTM or further exhibits attached to this reply are designated as "D.Ex."

[2] Plaintiff's reliance on *Jimenez v. City of Chi.*, 877 F.Supp.2d 649, 672 (7th Cir. 2013) is misplaced. In *Jimenez*, this Court, distinguishing *Petit* and *Laborers' Pension*, held that defendants waived certain Rule 50(b) arguments by failing to file any Rule 50(a) motion in the first place. *Id.* at 673-74.

violations resulting from the alleged practice, there was no basis for a jury to find the City deliberately indifferent to a known risk. *Id*. at 4-7. That finding was essential to the *Monell* claim, whether Plaintiff tried to prove it as an express policy, a widespread practice, the act of an official policymaker, a failure to train, or a failure to supervise. There was no waiver.

**Due Process.** . Although Murphy's Rule 50(a) motion on the due process claim did not reiterate that he did not know of the street file and did not fabricate information in the GPR, his position on those issues has been clear and central to his defense throughout this litigation. These issues were not "forfeited." Plaintiff also claims Defendants waived the argument that there is no *Brady* claim following an acquittal. This argument was raised in Defendants' Rule 50(a) motions (Dkt. 1147, at 2; Dkt. 1146, at 2, n.2), and elsewhere throughout this litigation (*e.g.*, Dkt. 443, at 8; Dkt. 704, at 6). Moreover, as it is a purely legal argument, it gives rise to relief under Rule 59 and need not have been raised in the Rule 50(a) motion (which it was anyway).

**Intentional Infliction of Emotional Distress.** Plaintiff submits O'Callaghan failed to preserve the issue that there was insufficient evidence to support the IIED claim. Resp. at 12. Contrary to Plaintiff's restrictive interpretation, the specificity requirement of Rule 50(b) is not a technical one. *See* p.1, *supra*. O'Callaghan's Rule 50(a) motion clearly notified Plaintiff that he was claiming there was no evidence to support the IIED claim. O'Callaghan's argument in the Rule 50(b) motion that his conduct was not "extreme and outrageous" does not present new grounds for relief that would warrant a finding of waiver.

###### B. Defendants' Rule 59 Arguments Were Also Preserved.

Plaintiff again claims waiver as to nearly all of Defendants' evidentiary arguments under Rule 59 based on the purported legal proposition that "[w]ithout contemporaneous objections, challenges to evidentiary rulings are waived." Resp. at 26. Plaintiff's cited case law does not support his attempted application of waiver. *Christmas v. City of Chi.*, 682 F.3d 632, 640 (7th

2

Cir. 2012), affirmed a finding of waiver where the attorney waited until the end of the testimony to ask the court to admonish the witness to adhere to court rulings. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006), found the defendants waived an objection because it was not raised during the testimony, in motions *in limine*, nor any other time during the trial.

These cases do not suggest a party is required to continually reassert objections on issues the Court has already definitively ruled upon. Nor could they, as Fed. R. Evid. 103(a) explicitly provides that, "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error." *Accord Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999). This Court's rulings were certainly definitive – in fact, this Court made clear that its prior rulings would stand. P.Ex.1, at 228; D.Ex.63, at 4-5. Those rulings are therefore preserved for review.

## II.     Defendants' Rule 50(b) Motion Should Be Granted.[3]

### A.     Plaintiff Failed to Prove His Due Process Claim with Respect to 1986 Trial.

Plaintiff's Response flips the burden to Defendants to prove causation. However, it was Plaintiff who had to prove the alleged exculpatory, impeachment or fabricated evidence had a reasonable likelihood of affecting the outcome of the case, and that he was damaged as a result of the concealment/fabrication of the evidence. Dkt. 1169, at 11; *see Rodriguez v. Woodall*, 189 Fed. Appx. 522, 527 (7th Cir. 2006). He had to prove causation in the context of the undisputed facts that Judge Maloney was bribed and the trial was corrupted. The Court allowed the due process claim to proceed on the possibility Maloney based his decision to return the bribe and convict Plaintiff on the strength of the State's case. Dkt. 483 at 10. But Plaintiff presented no evidence that this was Maloney's motivation, and the only evidence of Maloney's motive was to

---

[3] Defendant O'Callaghan relies on the arguments set forth in his post-trial motion regarding the IIED claim, which need not be repeated here. Plaintiff's primary argument in response was waiver. As discussed above, the issue was properly preserved in O'Callaghan's Rule 50(a) motion.

the contrary.[4] *See* PTM at 2-3. Plaintiff likewise presented no evidence that had the State's case been weaker, Swano would not have thought the bribe necessary. Again, the evidence presented demonstrated otherwise. *Id.* at 3.

In an attempt to cleanse the bribe from his due process claim, Plaintiff discusses the criminal trial in the abstract, asking whether there would have been sufficient evidence to convict Plaintiff at a trial had the allegedly fabricated evidence not been introduced. Resp. at 2. Causation cannot be analyzed in the abstract. Whether a theoretical factfinder in a theoretical uncorrupted trial would have convicted Plaintiff absent the allegedly fabricated evidence is not relevant. The facts here are that this trial was entirely corrupted.[5]

Even if Plaintiff's burden of proof is put to the side and the issue is narrowed to whether Maloney's criminal acts were a superseding intervening cause of Plaintiff's conviction, the evidence still does not support a finding of a due process violation arising from the 1986 trial. Plaintiff claims there was "nothing about Maloney's conduct" that "rendered the consequences of Defendants' actions unforeseeable." Resp. at 5, n.9. The question is whether Maloney's intentional and criminal conduct was within any possible scope of the risk created by Defendants' alleged conduct. Restatement (Second) of Torts §442B; Dkt. 1084, at 6-8. That Maloney would corrupt the entire trial due to a bribe was not foreseeable. In the words of the Restatement, Maloney deliberately assumed control of the trial's outcome, which shifted to him all responsibility for the consequences of his act. *Id.*

---

[4] Plaintiff argues (Resp. at n.6) Defendants failed to make an offer of proof as to Maloney's motive, thereby forfeiting their argument. The Seventh Circuit, however, "does not require that a formal offer of proof be made or that the grounds of error be precisely specified." *U.S. v. Peak*, 856 F.2d 825, 832 (7th Cir. 1988). Rather, the court has long applied the "obviousness" rule, under which an offer of proof is considered to have been made "where the record shows, either from the form of the question asked or otherwise, what the substance of the proposed evidence is." *U.S. v. Alden*, 476 F.2d 378, 381 (7th Cir. 1973). The substance of this evidence was obvious here, so no offer of proof was necessary. In any event, no offer of proof was needed because evidence of Maloney's motive was introduced.

[5] Indeed, that corruption was the very reason Plaintiff obtained post-trial relief.

**B.** **Plaintiff Failed to Prove His Due Process Claim with Respect to 2009 Trial.**

Plaintiff overstates the record to suggest ASA Sexton admitted the street file contained exculpatory, impeachment or fabricated evidence that was material.[6] Sexton and other attorneys may have testified the street file should have been disclosed, but that testimony does not equate to evidence that the documents within the file were material. *See* Resp. at 9-10.

In response to Defendants' argument that Plaintiff failed to show any allegedly "fabricated evidence" was withheld or material to the prosecutors' decision to proceed to the 2009 trial, Plaintiff claims there was "ample evidence of fabricated witness accounts." Resp. at 10. But Defendants' point, which Plaintiff does not dispute, is that the Langston and Morris recantations and issues regarding their identification of Plaintiff as the perpetrator were known to prosecutors long before the 2009 trial. P.Ex.25, at 12, 15, 56, 102-103, 147-48. The prosecutors also met with Randy and Morris prior to presenting them as witnesses in 2009. *Id*. There was no "withheld" witness account that was material to the prosecutor's decision to proceed to trial. Plaintiff also fails to refute that there was no plausible evidence O'Callaghan manipulated the lineup, or that the date on the May 14, 1985 GPR was not exculpatory, impeaching or material.

**C.** **Defendants are Entitled to Judgment on Plaintiff's *Monell* Claim.**

*Express Policy* - Plaintiff failed to present sufficient evidence of an express CPD policy of withholding investigative materials. The policy in question, Detective Division Special Order 83-1, expressly required the maintenance and retention of files, investigatory documents, and personal notes generated by homicide detectives during an investigation. P.Ex.45, § III. Plaintiff offered evidence of no other express CPD policy pertaining to the issue of the maintenance and disclosure of investigative materials.

---

[6] Defendants maintain Plaintiff's due process claim cannot succeed due to his acquittal, but in the interest of economy will not restate this argument. *See* PTM, at 4-5.

Plaintiff suggests a conscious decision to not adopt or omit a needed policy could be the basis for municipal liability. Resp. at 14. This possibility is inapplicable here because the City did adopt a policy that expressly required the maintenance and disclosure of investigative materials. Plaintiff next urges 83-1 is facially deficient in that detectives "could choose what investigative materials to maintain and turn over based on a subjective evaluation of whether they were relevant." *Id*. That argument badly mischaracterizes 83-1, which explicitly directs that any and all relevant information obtained by detectives during the course of an investigation be recorded and preserved, whether that information tended to indicate the accused's possible guilt or possible innocence. Plaintiff's criticisms of 83-1 for "approving parallel investigative files" fails for the same reason: whether a supplementary report, general progress report ("GPR"), or note on a piece of paper, the express policy directed that the information be preserved and made available to prosecutors and criminal defendants. P.Ex.15, at 41-43.

Plaintiff next suggests CPD policymakers "chose to exclude any instruction that all investigative materials be disclosed" and that they "intentionally omitted" written directives for the Subpoena Unit. Resp. at 15. The record cited by Plaintiff fails to support his accusation that policymakers "intentionally omitted" or "chose to exclude" anything regarding the disclosure of investigative materials. 83-1 expressly states that the investigative file, which was to contain all manner of documents generated during an investigation, "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned department members with a comprehensive account of the subject criminal case." P.Ex.45, §IV(A). 83-1 also intended that proper notice be given to prosecutors, the courts, and defense counsel of "all existing documents pertaining to the subject investigation." *Id*., §IV(D).

The language of the policy itself contradicts the claim that policymakers "disregarded a known risk" regarding the disclosure of investigative materials.

Plaintiff concludes his argument regarding "express policies" by suggesting the failure of the CPD to produce the street file until after his exoneration supported a jury conclusion that "the City was liable for express policies." Resp. at 15. To the extent the CPD failed to tender the file at issue to Plaintiff, its non-production was contrary to the CPD's express policy.

***Widespread Practice*** - Plaintiff similarly failed to present sufficient evidence of a practice that was so widespread and enduring that it had the force of law. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 400 (1997). Because the CPD's alleged practice in and of itself was not unlawful, and Plaintiff offered no evidence of a series of prior incidents involving a relevant constitutional violation, there was insufficient evidence to support a jury determination that the City was deliberately indifferent to a known risk.

Plaintiff suggests the City is wrong on the law, and that he need only show a repeated pattern of behavior that provides notice of a risk of harm. Resp. at 16. Plaintiff's phrasing of the law, albeit artful, dilutes what *Monell* requires. Where there is no unconstitutional express policy, a plaintiff must show more than a single constitutional violation to establish municipal liability. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Estate of Novack v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000). These cases establish that a plaintiff's own injury, without more, does not allow for a jury to infer deliberate indifference to a known risk of constitutional violations. *See Bryan County*, 520 U.S. at 408-09.

Plaintiff references *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016),[7] but *Daniel* acknowledges that "to prove an official policy, custom, or practice within the meaning of

---

[7] As stated in the City's Rule 50(a) motion (Dkt. 1145, at 6-7), *Daniel* is inapplicable here. The "general pattern of repeated behavior" in *Daniel* was an unlawful (*i.e.* unconstitutional) practice even though it had

*Monell*, [the plaintiff] must show more than the deficiencies specific to his own experience." *Id.* at 734. Here, Plaintiff presented no evidence, other than his own case, in which allegedly material evidence of an exculpatory or impeaching nature was withheld from a criminal defendant. Plaintiff points to *Jones/Palmer* as evidence of other cases involving *Brady* violations. But of course, *Jones* and *Palmer* preexisted DDSO 83-1. Moreover, *Palmer II* established there were no *Brady* violations in the "street files" examined by those plaintiffs' counsel.[8] *Palmer v. City of Chi.,* 806 F.2d 1316, 1317 (7th Cir. 1986); PTM, at 22-23. The evidence related to the cases of *Fulton, Malone,* and *Crockett* (Resp. at 17) similarly did not provide evidence of a pattern of constitutional harm that would permit an inference official policymakers were deliberately indifferent to a known risk of harm. There was no testimony or evidence to prove the allegedly missing information in the *Fulton, Malone,* or *Crockett* cases was of an exculpatory or impeaching nature or was material evidence for purposes of *Brady*.

Plaintiff provides examples of evidence from the trial he believes establishes a custom of suppressing/failing to produce investigative materials, such as To/From memos, incomplete file inventories, and "departures" from written policies. Resp. at 17-18. While these examples suggest non-compliance with 83-1, they do not provide evidence of the CPD's purported "failure to produce investigatory materials," which is the essence of his *Monell* practice claim.[9] Other examples (Nos. 3, 4, and 5) relate to the opinions of Plaintiff's expert, Brasfield, for which there was an inadequate evidentiary foundation. *See* PTM, at 13-15.

---

not previously caused harm to other inmates. In contrast, the "repeated behavior" identified by Plaintiff in this case is the nondisclosure of every document in the file, which in and of itself is not a *Brady* violation. *See U.S. v. Agurs*, 427 U.S. 97, 111 (1976); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995).

[8] As will be discussed *infra*, plaintiff's use of *Palmer* as evidence to support the *Monell* claim unfairly and prejudicially left the jury with a misimpression about what actually happened in *Palmer*.

[9] As the jury was instructed, non-compliance with CPD regulations does not equate to a constitutional violation. Dkt. 1169, at 16.

The Response fails to substantively address the legal defects in Plaintiff's *Monell* "underproduction" theory, the lack of foundation for Brasfield's conclusions and demonstrative exhibit, and the improper methodology behind his conclusions. It simply suggests (at 18) the City made no contemporaneous objection to these issues during Brasfield's testimony. There was no need, as this evidence was only admitted after extensive briefing and this Court's definitive ruling on the City's motions *in limine*, which preserved those issues. *See* Dkt. 1076.

***Action of Final Policymaker*** - The Response (at 20) suggests the City's policymaker "took patently inadequate action" in response to the "street files problem," and cites *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012), for the proposition that a municipality may not "adopt a policy of inaction." That is not the evidence in this case. In response to a perceived problem, and contrary to a "policy of inaction," the City developed 83-1.

Moreover, Plaintiff presented no evidence of any problem or constitutional injury to another criminal defendant after the implementation of 83-1 that would have put the Superintendent (or other official policymaker) on notice the policy did not adequately address the alleged "street files" issue. Restating it in terms of Plaintiff's novel *Monell* theory, there was no evidence presented at trial showing the alleged practice of "underproducing" documents led to a problem or constitutional violation in any other cases that would have alerted policymakers to the alleged risk. In other words, Plaintiff presented no evidence of an unconstitutional practice or *known* risk to which the Superintendent was deliberately indifferent.

Plaintiff urges the City violated his rights in his 1988 lawsuit when it "claimed no file existed while continuing its suppression." Resp. at 21.[10] Even if Plaintiff's assertion was

---

[10] To support this assertion, Plaintiff cites to his Exhibit 44. That exhibit is a Complaint Register file, not a pleading in the 1988 lawsuit. And, it states only that the investigator was "unable to establish" the existence of any street file pertaining to the Smith/Hickman homicides. P.Ex.44, at 5.

accurate, he does not explain, nor is it apparent, how a response in litigation rises to the level of an act by a person with final policymaking authority. "A person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government - by the city council, for example, rather than by the police officer who made an illegal arrest." *Vodak v. City of Chi.*, 639 F.3d 738, 747 (7th Cir. 2011). Plaintiff presented no evidence that the "claim" in the 1988 lawsuit was promulgated at the level of an official policymaker.[11] Plaintiff's argument that the actions of the CPD's subpoena unit are tantamount to the actions of an official policymaker similarly fails under the principles explained in *Vodak*. Plaintiff presented no evidence to suggest his failure to obtain the file in question was authorized or directed by the Superintendent, rather than by the failings of someone in the subpoena unit.

***Failure to Train*** - Plaintiff's Response confirms his entire failure to train theory rests on the need to do "more or better," which is insufficient to establish municipal liability. *Craft v. Flagg*, 2010 U.S. Dist. LEXIS 132982, *7-8 (N.D. Ill. 2010), *citing City of Canton v. Harris*, 498 U.S. 378, 391-92 (1989). Plaintiff suggests the City should have offered training to more than just detectives, required more than a single session of training, and/or provided better training regarding use of GPRs and inventory lists. Resp. at 22. All of these criticisms can be summarized as the CPD needing to do "more or better" training, which, as set forth above, is insufficient to establish causation in a *Monell* claim. And again, Plaintiff failed to offer evidence of a series of prior incidents that would have put official policymakers on notice the alleged "underproduction" of documents was causing constitutional harm such that their alleged failure

---

[11] Plaintiff vaguely cites to *Glisson v. Indiana DOC,* 2017 WL 680350 (7th Cir. 2017) for the general proposition that municipal policy can be expressed in different ways. (Resp. at 21). *Glisson* does not suggest a response to an allegation in a lawsuit equates to an act of an official policymaker.

to provide adequate or additional training reflected deliberate indifference. *City of Canton*, 498 U.S. at 391-92; *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011)("Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights").[12]

*Failure to Supervise* - Plaintiff's Response appears to be advocating de facto *respondeat superior* against the City under the guise of failure to supervise. Plaintiff's suggestion that municipal liability for failure to supervise could be based on the individual defendants' own misconduct (Resp. at 23) is nothing more than imposition of *respondeat superior* liability on the City, which is improper. *Monell v. Dept. of Social Services*, 436 U.S. 658, 693-94 (1978). Plaintiff also urges the jury could have found liability based on the City's failure to supervise the disclosure of investigative files if it determined the City knew more supervision was needed to avoid the risk that exculpatory information would not be disclosed. Resp. at 23. But Plaintiff offered no evidence of any problem or constitutional injury to another criminal defendant after the implementation of DDSO 83-1 that would have made that "risk" known to the official policymaker. If the jury found against the City based on the failure to supervise theory advocated in the Response, its verdict necessarily would have been based on pure speculation.

## III. Alternatively, The City is Entitled to a New Trial on the *Monell* Claim.

*Rule 59: Manifest Weight of the Evidence* - If this Court disagrees the City is entitled to relief under Rule 50(b), the City should be granted relief under Rule 59 because the jury's verdict on the *Monell* claim was against the manifest weight of the evidence. Plaintiff's Response references forfeiture and the standards applicable to setting aside verdicts based on

---

[12] Plaintiff's Response (footnote 19) incorrectly contends the City objected to the portion of the *Monell* instruction on failure to train based on sufficiency of the evidence, but not to the form of the instruction itself. As reflected in the record, the City did object to the form of the *Monell* instruction, and the Court addressed that objection. (P.Ex.35, at 10-13).

manifest weight of the evidence, but provides no substantive discussion. As set forth in the PTM (at 18-22), it would have been against the manifest weight of the evidence for the jury to conclude the City violated Plaintiff's constitutional rights through an express written policy, a widespread CPD practice, an action authorized or directed by an official at the policymaking level of government, a failure to train, or a failure to supervise. As set forth above (§I(B), *supra*), the City did not waive or forfeit any of the arguments asserted in the Rule 59 motion.

***Rule 59: The Jones/Palmer Litigation*** - The Court's rulings regarding the admissibility of some but not all details of the *Palmer* litigation severely prejudiced the City on the *Monell* claim. For the 2016 trial, the Court reconsidered its 2014 ruling and agreed Plaintiff could present limited discussion of *Jones/Palmer* for the issue of notice to the City's policymakers. Dkt. 1076, at 6-11. However, Plaintiff candidly admits he relied on *Palmer* for much more than the issue of notice. Because the City was unable to present the circumstances of *Palmer II*, an incomplete and misleading picture of *Palmer* was presented to the jury.

The Response (at 25) suggests the Court "carefully tailored" what Plaintiff was allowed to offer regarding *Palmer* and rejected most of what he proffered. In its ruling on the proffer (discussed in the PTM, at 23), the Court reemphasized *Palmer II* was not relevant because the *Palmer* evidence was "being admitted for the purpose of showing notice." P.Ex.18, at 93. Plaintiff certainly did rely on *Palmer* for the issue of notice, and then evidence was presented the City developed 83-1 in response to that notice. And that should have been it. But Plaintiff used *Palmer* for more substantive purposes beyond "notice." PTM, at 23-24

Plaintiff's Response continues using *Palmer* substantively for more than the issue of notice. Plaintiff claims *Palmer* provided "direct evidence" of *Brady* violations in cases prior to his conviction. Resp. at 17. *Palmer II* directly contradicts this assertion, as the Seventh Circuit

pointedly observed that the *Palmer* plaintiffs found *no* exculpatory materials in the street files they examined. 806 F.2d at 1321, 1324. When ruling on motions in *limine*, the Court left open the possibility of limited questioning of what happened on appeal in *Palmer* if "necessary to avoid leaving the jury with a possible misimpression about what ultimately happened in *Palmer*." Dkt. 1076, at 10. In the end, the jury was left with the very "misimpression about what ultimately happened in *Palmer*" that caused this Court to issue its cautionary statement.

## IV. Prejudicial Evidentiary Rulings Warranting a New Trial (Rule 59)

### A. The Wiretaps[13]

Contrary to Plaintiff's forfeiture arguments (Resp. at 37), all of the wiretap recordings were provided to the Court in 2014.[14] Plaintiff also incorrectly argues Defendants did not proffer any translation of the code or offer "any witness competent to translate." *See* Dkt. 512 (extensive discussion of foundation for admission of translated wiretap transcripts). Plaintiff claims certain conversations within the wiretaps should not be admitted because it is not clear what they mean (Resp. 38-39), but that argument overlooks that the translations have long been accepted by federal courts and deemed admissible in eight previous federal trials.

Plaintiff (*id*. at 37) also argues the wiretaps were not "categorically barred" because some references to the wiretaps were permitted. Evidence that a wiretap existed is different from admitting their content as evidence. As set forth in Defendants' PTM (27-32), the wiretaps

---

[13] Because Plaintiff's Response does not contain any new arguments that the wiretap evidence should be excluded as hearsay, Defendants will not repeat their position here.

[14] Plaintiff claims any reference to Judge Biebel's opinion in the COI proceedings regarding the wiretaps should be stricken because "[the opinion] was not proffered before or during trial, so it can hardly support a Rule 59 argument that the Court somehow erred in failing to consider it." Resp. at 39, n.29. To the contrary, it was proffered before the 2014 trial. Defendants filed Judge Biebel's opinion the day after it was issued. Dkt. 542. Two days later, Defendants filed a "Motion Regarding Evidentiary Issues Related to the Circuit Court of Cook County's Order Denying Plaintiff's Petition for COI and Response to Plaintiff's Motion *in Limine*." Dkt. 544.

13

contained a wealth of evidence relating to the bribe, El Rukn intimidation, coercion and fabrication of evidence relating to the Smith/Hickman trial.

### B.    Excluded Evidence Regarding Plaintiff's Credibility/Guilt

Plaintiff claims the jury had a balanced view of his background and role in the El Rukns. Resp. at 40-41. But the unfairness arose not only from a lack of balance in the evidence, but also from Plaintiff's unchecked freedom to offer testimony and arguments that affirmatively separated him from the nefarious activities of the El Rukns. Plaintiff argues he was not unfairly sanitized because the jury heard a "tremendous amount of evidence about illegal El Rukn activities." *Id.* The amount was not "tremendous," and in light of Plaintiff's accusations about the legitimacy of the federal investigation, the evidence was relevant. More to the point, evidence of other El Rukns' activities is not the same as evidence about *Plaintiff's* activities. A major theme of Plaintiff's case was his separation from the rest of the El Rukns who were involved in the illegal activities. *See* P.Ex.36, at 239-40. In defending against that theme, evidence of El Rukn activities is not a substitute for evidence of Plaintiff's personal activities. The proffered evidence relating to Plaintiff directly contradicted the sanitized self-portrait Plaintiff painted for the jury.

### C.    1972 Conviction

Plaintiff contends the conviction was not actually barred and, again, that Defendants' arguments were forfeited. Resp. at 42-46. Defendants have argued throughout this litigation the nature and facts of the conviction are relevant to damages and the issue of materiality, and this Court previously agreed. D.Ex.6, at 424-42. The Court initially ruled the 1972 conviction, including the fact it was a murder conviction, was relevant to materiality and any unfair prejudice did not significantly outweigh its probative value. *Id.* at 425-32. Plaintiff's statement to ASA Montemurro was deemed admissible on the issue of materiality because it also was

admitted in the sentencing portion of plaintiff's 1986 trial. *Id.* at 439. The appellate court opinion stating Fields was found guilty of the Watkins murder on the basis of accountability was admissible. *Id.* at 440-41. Regarding forfeit, Defendants' PTM (at 49-50) explains why the Court was incorrect to reverse its prior rulings and bar the 1972 murder conviction in the 2016 trial.

### D. The Treddest Murray Incident/Fields April 29, 1985 Arrest

Plaintiff urges that admitting the "extra gang-stalking allegation" relating to Murray "would have been gratuitous" given that Derrick Kees testified Plaintiff asked to join his hit team. Resp. at 48. Evidence is not "gratuitous" when it directly contradicts Plaintiff's testimony that he did not engage in such activities. It also would support Kees' credibility. Moreover, Defendants' PTM does not contain a "new and improved" proffer. Defendants provided the Court with Kees' testimony regarding this incident prior to the 2014 trial. *See* Dkt. 558. Plaintiff's claim of discrepancies in defense counsel's later summaries of the proffers are irrelevant to the admissibility of the evidence. *See* Resp. at 48-49. The Court properly found the Treddest Murray evidence relevant and admissible in 2014 based on the proffer of Kees' testimony, and the Court should not have reversed its ruling in 2016.

### E. Firearms Found at the African Hut on May 18, 1985

Defendants stand on the arguments asserted in their motion. PTM at 39.

### F. 2000 Riot at Cook County Jail[15]

The jail riot is important because it was not isolated, but a part of Plaintiff's long history of corrupting the judicial process. Dkt. 517 at 23-24. Plaintiff's attempt to defraud the judicial system and recruit other inmates to join the conspiracy also has direct relevance to his damages.

### G. Vaughn/White Evidence

---

[15] Plaintiff's claim (Resp. at 51) of forfeit on the prison riot issue is demonstrably false. Dkt. 983 at 11.

Defendants never disputed Plaintiff could present evidence Sumner improperly implicated Fields in Vaughn/White. What Plaintiff could not do, but which he did, was to then introduce irrelevant Vaughn/White propensity evidence. PTM at 56-57. This was especially problematic since Plaintiff knew, but consistently misled the jury about, the absence of evidence tying Defendants to the Vaughn/White investigation. Plaintiff compounded the error by repeatedly engaging in bad faith questioning of O'Callaghan about investigative actions in Vaughn/White in which he had no role. *See, e.g.*, P.Ex.8, at 31, 58-63. Plaintiff also asked questions to improperly imply O'Callaghan interviewed Sheree Vaughn and was part of the felony review process where two suspects were wrongfully charged with the murders to suggest he was previously involved in a coerced, false witness identification. P.Ex.14, at 110.

By admitting Defendants were not involved in the Vaughn/White investigation, Plaintiff has conceded there was no good faith basis for offering such evidence.[16] Once Plaintiff abandoned the incredible argument that he was placed in a lineup for the Vaughn/White murders where he saw "little heads" through the one-way glass, the Vaughn/White evidence became nothing more than improper propensity evidence, the admission of which is more than sufficient to demonstrate severe prejudice warranting a new trial.

### H. Hunter's Statement that Fields was an Assigned Killer

Plaintiff claims a "total lack of foundation" for Hunter's statement that Fields was an assigned killer. It is unclear what Plaintiff means. Hunter's role in the El Rukns and familiarity with Plaintiff was well-established through his deposition testimony and other evidence in the case. If Plaintiff is referring to the argument he raised in objecting to other Hunter testimony

---

[16] At the first trial, Plaintiff accused O'Callaghan of trying to coerce the Vaughn/White children to falsely identify him in a lineup. Absent that allegation, there was nothing to tie O'Callaghan to any misconduct relative to Vaughn/White and therefore no reason to introduce the Vaughn/White evidence.

during trial—that Hunter is relying upon his transcript in *U.S. v. Andrews* and does not have independent knowledge—the Court properly rejected that argument. Dkt. 1150.

### I.     Hawkins' Rulings

***Prior Statements*** - Plaintiff claims that Hawkins making Plaintiff's guilt known to AUSA Poulos around 1991, before repeating it later, is "of no significance." Resp. at 31. Yet, Plaintiff repeatedly attacked the credibility of the information Hawkins and other El Rukns provided to federal prosecutors. Also, the evidentiary basis for these prior statements was properly presented to the Court and preserved. D.Ex.11, 4/23/14 PM Tr. at 2726-2730, 2787-90; P.Ex.18, at 39-41.

***Reasons for Parole*** – Plaintiff incorrectly contends (Resp. at 33) Defendants never proffered the actual reasons for Hawkins' parole. Defendants refer Plaintiff to the 2016 briefing on motions *in limine*, in which those reasons were explained. Dkt. 983, at 22-23.

### J.     Carter's Statement That He Kills People

Plaintiff incorrectly argues Defendants forfeited this issue by not re-raising it after the Court ruled it inadmissible during the 2014 trial. *See* § I.B., *supra.* Plaintiff claims there was no need for this evidence because it was "crystal clear" that El Rukns "like Carter" were hitmen. Resp. at 35. If the jury reached that conclusion, which cannot be presumed, it was the opposite of what Plaintiff was trying to show (Carter, like Plaintiff, was falsely accused in Smith/Hickman). Defendants were precluded from showing Carter was a self-admitted killer. That Defendants were permitted to impeach Carter's credibility with a cocaine conviction and prior admission of drug addiction is nowhere near as probative as his admission he was a hit man.

### K.     Relocation of Witnesses

Plaintiff incorrectly claims Defendants received "massive leeway" to ask about witness relocation and intimidation. Resp. at 35. Defendants may have been able to ask about witness

17

relocation, but they were unable to explain why the relocation was necessary or present evidence of specific witness intimidation—only that the relocation was for "safety" reasons.

### L.    Other El Rukn Evidence

Plaintiff does not dispute part of his strategy was to show law enforcement was improperly targeting El Rukns and trying to put an end to the gang by "lawless and illegal tactics." Resp. at 28-29; PTM at 41. Given this strategy, lack of relevance of other El Rukn activities is a specious argument for Plaintiff to make.

### M.    The Prejudicial Hallway Jury View

The law relating to the circumstances in which jury views are warranted overwhelmingly pertain to a view of the actual scene of the incident. The fact that the hallway viewing was nothing like the actual scene of the murders is what made it all the more improperly prejudicial.

### N.    The Denial of Plaintiff's Petition for Certificate of Innocence ("COI")

Defendants rest on the arguments raised in their PTM (50-51) in support of the admissibility of the COI proceeding. Plaintiff has failed to provide any substantive response to the argument that the denial of the COI is relevant to compensatory and punitive damages. Plaintiff also failed to address the argument that the Court should have instructed the jury about the COI proceeding as it did during the 2014 trial. PTM at 52. The jury was not "unambiguously informed," as Plaintiff claims, that Defendants had no role in the "prior proceeding" or the deals and benefits in connection with that proceeding.

### O.    ASA Randy Rueckert's Testimony

Plaintiff suggests Rueckert's proffered testimony was peripheral, undisclosed, cumulative and not probative of any fact to be proved at trial. Resp. at 55. To the contrary, it would have rebutted Fields' alleged lack of knowledge of the bribe. (PTM, at 32-33). Rueckert's observations cannot be seen as peripheral, nor can they be seen as cumulative since no one else

could have testified to what Rueckert observed. Plaintiff also challenges Rueckert because he never memorialized what he observed. There is no requirement, however, that a witness must first memorialize his personal observations in order to testify as to those observations. Further, Defendants' Rule 26 disclosure was sufficiently specific to include Rueckert's observation testimony. *See* PTM, at 33-34. Plaintiff's choice not to depose Rueckert is of no consequence. Defendants' disclosure put Plaintiff on notice that Rueckert was a potential witness.

### P. "Pros Memo"

Plaintiff submits the Court properly excluded the pros memo because the USAO refused to produce it during discovery and allegedly only decided to do it when it was in the Defendants' best interest. Resp. at 34. The USAO initially denied Plaintiff's request for the pros memo on relevancy grounds because the Court had ruled, during the 2014 trial, the pros memo was irrelevant and Plaintiff was barred from even inquiring about it. D.Ex.64, at 3. But the USAO also advised Plaintiff it was "open to discussions if there are any new developments." *Id*. Those new developments arose when Plaintiff decided to examine Hawkins, Kees and Clay on the pros memo issue. The USAO produced the pros memo to both Plaintiff and Defendants due to those "new developments," and not because it was in the Defendants' "best interests."[17]

### Q. Curative Instruction Regarding ASA Sexton's Testimony

Plaintiff contends the Court's instruction was appropriate without addressing the prejudicial nature of the instruction, which undermined the evidence as well as the credibility of Sexton and defense counsel. Plaintiff does not address that the prejudice was compounded by the Court giving the instruction a second time. The minimal difference between Richardson's actual 2009 testimony, which was read during Conyers' examination, and Sexton's recollection of that

---

[17] Also unavailing is the argument that the memo was inadmissible because Hogan's testimony was at odds with Judge Conlon's finding. Judge Conlon's opinion has absolutely no bearing on the admissibility of the document.

testimony as told to the jury, did not warrant an instruction that twice gave the jury the impression Sexton lied and the defense was attempting to introduce false evidence.

### R. 2011 Affidavit of Gerald Morris

Failing to address the merits, Plaintiff simply contends there was no error since Defendants made arguments regarding Morris' 2011 affidavits during closing. But the affidavits should never have been admitted in the first place. Once admitted, Defendants were not required to refrain from mentioning them in order to preserve the argument that they were inadmissible.[18]

### S. O'Callaghan's Credibility & Improper Instruction Relating to Morris

Plaintiff (Resp. at 55) urges the Court's instruction regarding O'Callaghan's "unsolicited blurt" was proper.[19] The problem is that Plaintiff's counsel, with full knowledge of the protective order, asked O'Callaghan why he did not speak with Morris after he became aware of the 2011 affidavits (knowing the protective order precluded such contact). The apparent purpose was to try and open the door for the admission of the motion for protective order, which counsel knew was otherwise inadmissible. Immediately after O'Callaghan responded to the question, counsel, in front of the jury, moved to admit it into evidence, which the Court denied. P.Ex.9, at 183-86. Counsel tried twice again to back door the motion into evidence through Sexton, which the Court also denied. P.Ex.25, at 26, 142-45. Although the strategy did not work, Plaintiff still benefitted from eliciting a response that drew an instruction with negative connotations for O'Callaghan.

## V. Counsel's Prejudicial Misconduct Warrants a New Trial.

Plaintiff fails to address the appropriate Rule 59(a) standards, instead focusing solely on Rule 60(b)(3). *See* PTM, at 58 & fn.9. Objections are not necessary to preserve the issue of

---

[18] Plaintiff fails to address Defendants' argument that the Court erred in denying Defendants' motion to depose Morris. As such, Plaintiff has forfeited any argument that could have been raised.

[19] Defendants still maintain: (1) O'Callaghan had a factual basis for his testimony; (2) that it should not have been struck and; (3) the Court's instruction to the jury was improper. Dkt. 1120, at 9-10.

attorney misconduct in a Rule 59 motion for a new trial. *E.g., Park West Galleries v. Hochman*, 692 F.3d 539, 548 (6th Cir. 2012). The Court has expansive power under Rule 59, which permits a district court to prevent what it considers to be a miscarriage of justice. *Gasperini v. Ctr. for Humanities,* 518 U.S. 415, 433 (1996); *Gerhartz v. Richert*, 779 F.3d 682, 686-87 (7th Cir. 2015).

Plaintiff does not address the gravamen of Defendants' motion – the cumulative result of the overwhelming prejudice deprived Defendants of a fair trial.[20] Instead, Plaintiff attempts to explain a number of his attorney's transgressions individually, dismissing them as inadvertent, honest mistakes and misunderstandings that were not fatally prejudicial, were cured by instructions and admonishments, or were not properly preserved. Contrary to Plaintiff's arguments of waiver and piecemeal attempts to minimize the prejudice, the conduct of his counsel ("Counsel") clearly deprived Defendants of their fundamental right to a fair trial.

### A.    Plaintiff's Counsel's Improper Examination of Witnesses.

Plaintiff simply offers an excuse, *i.e.*, "most witnesses were antagonistic to Fields." Resp. at 59. To allow an attorney to evade court rulings and fair advocacy simply because a witnesses was "antagonistic" would undermine the very foundation of the legal system and would permit attorneys to violate rules simply because they did not like a witness' testimony.

***Improper Argumentative Questions -*** Plaintiff asserts Defendants suffered no prejudice because the Court contemporaneously dealt with any problems that arose. In the face of Counsel's numerous inappropriate statements, questions, and arguments throughout the trial, the Court's actions could not possibly minimize the resulting harm. *E.g., U.S. v. Riley*, 621 F.3d 312, 339 (3d Cir. 2010). Although it is presumed juries follow cautionary instructions when a judge sustains an objection, a presumption is not an ultimate conclusion and is easily overcome here as

---

[20] The many examples of argumentative questions outlined in Defendants' PTM clearly establish that no amount of corrective action could have possibly cured the prejudicial effect. PTM, at 69-70. Indeed, the Court's repeated admonishments did nothing to deter Counsel from continuing to engage in such conduct.

the cumulative effect of Counsel's willful misconduct deprived the Defendants of a fair trial, confused the jury, and resulted in a verdict that was not supported by the admissible evidence in the case. *Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 759 (6th Cir. 1980) (After a jury's repeated exposure to prejudicial information, cautionary instructions would have little if any effect in eliminating the prejudicial harm); *Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53, 55 (7th Cir. 1959).

*Improper Questions that Assumed Facts Not In Evidence*[21] - Plaintiff contends there was evidence to support the questions with which Defendants take issue. Resp. at 61. Most of the "evidence" Plaintiff relies on to support the challenged questions is hearsay and was admitted only for purposes of materiality with respect to Plaintiff's *Brady* claim. The 1986 testimony of Cleveland Ball, Eric Benson, Gerald Morris, Carlos Willis and others was not substantive evidence so as to allow Counsel to submit such facts to the jury. Even assuming the above testimony was admissible for substantive purposes, it does not support the facts Plaintiff now claims were in evidence. For example, Ball's testimony (read at trial) reveals he was not asked to view a lineup and, at most, was shown photos by unknown officers when he was interviewed the day after the murder, *i.e., one year before O'Callaghan was assigned to the case.*[22] P.Ex.7, at 28-31. There is no evidence that O'Callaghan ever interviewed Ball. Plaintiff does not contest the absence of evidence to support the questions asked relating to Richard Buckles. Nor does Plaintiff point to evidence to support the specific questions relating to Cornell Jefferson. In sum, there was no factual basis for the improper questioning in which Counsel tarred O'Callaghan with highly improper conduct that never occurred. Counsel repeatedly asked questions that

---

[21] Plaintiff's argument that there was only one occasion in which the Court agreed with Defendants' "assumed facts not in evidence" objection (Resp. at 61) is belied by the record. *E.g.* P.Ex.10, at 82, 93; P.Ex.11, at 122; P.Ex.14, at 61; P.Ex.21, at 125; P.Ex.23, at 12; P.Ex.27, at 118.

[22] Ball was interviewed by Detectives Evans and Hood in 1984 as documented in PX 86. *See* P.Ex.50.

contained facts not in or supported by the record, which likely confused the jury into believing that facts communicated through the repeated statements, though couched as questions, had been admitted as evidence. *See U.S. v. Smith*, 354 F.3d 390, 396 (5th Cir. 2003).

*Improper Hypotheticals* - The issue is not whether a hypothetical question in general is improper, but whether it is improper to use O'Callaghan's name in a hypothetical posed to another witnesses based on facts not in evidence. The latter is improper. Such questions risked unfair prejudice to the jury, which might wrongly assume the truth of the hypothetical facts and conclude O'Callaghan engaged in such conduct. *Smith, supra*.

*Improper Impeachment* - Plaintiff improperly used an otherwise inadmissible document, *i.e.,* the government's Response to Kees' 1994 Rule 35 motion, to impeach Hogan. *U.S. v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999)(improper under the guise of artful cross-examination to tell jury substance of inadmissible evidence). Plaintiff submits in response the use of the document was authorized by the Court "based on an agreement between counsel." Resp. at 62. At no time did Defendants ever "agree" to allow Plaintiff to use the 1994 Rule 35 Response. Prior to Kees' and Hogan's examinations, Defendants' objected to Plaintiff's proposed use of the document. P.Ex.20, at 2-3, 4; P.Ex.21, at 85-89. After the Court overruled Defendants' objection and allowed Plaintiff to use the document to impeach Kees, Defendants fronted the issue with Hogan, knowing Plaintiff would be permitted to use the document on cross-examination.

### B. Improper Examination of Defendant O'Callaghan

Relying on *U.S. v. Schimmel*, 943 F.2d 802 (7th Cir. 1991), Plaintiff argues his Counsel's inappropriate conduct is excused because of "the unique difficulties [O'Callaghan] created." Resp. at 62. In *Schimmel*, the court held the prosecutor's "aggressive tenor" was appropriate where the defendant refused to answer the questions he was asked and was admonished by the court nearly 35 times. *Id*. at 807. *Schimmel* in no way states that a lawyer may violate the rules of

evidence and/or ask improper questions simply because a witness allegedly gives "improper answers." Counsel's attempt to blame his misconduct on the witness is disingenuous and self-serving, placing his personal judgment over that of this Court. This is particularly true when Counsel's questions frequently were confusing, compound and difficult to follow.[23]

Counsel attempts to downplay the significance of the Court sustaining 126 objections during O'Callaghan's examination by stating it represents "one sustained objection for every five minutes of exam." It is unclear how this fact undermines Defendants' position. Indeed, it confirms Counsel engaged in a sustained pattern of misconduct throughout his entire examination of a crucial witness for the purpose of undermining the jury's ability to fairly evaluate that witness's testimony. Counsel's improper questions forced Defendants to constantly object and appear as if they were trying to "hide" information from the jury. Plaintiff's argument also ignores the many Court admonitions throughout Counsel's examination of O'Callaghan.[24]

### C.    Bad-Faith Questioning Implying Murphy's Destruction of Evidence.

Tacitly acknowledging the egregiousness of this transgression, Plaintiff avoids the actual word choice used by Counsel when asking questions about Murphy's handwritten notes (DX 72). Counsel did not simply ask Murphy about "gaps" on the pages, as mischaracterized in the Response (at 63). At trial, with no factual basis to do so, Counsel stated affirmatively that Murphy "whited out" sections of his notes. P.Ex.22, at 128. The Court acknowledged this

---

[23] *E.g.*, P.Ex.9, at 30-31 (Court: You have this habit of changing your question in the middle starting all over and it ends up as a complete mish mosh of information…that makes it triply difficult to get responsive answers, and the jury isn't going to be able to track on it…you got paper flying all over the place up there. You are going to have to do this in a tighter way); *see also*, P.Ex.10, at 79; P.Ex.20, at 4.

[24] Plaintiff claims "Defendants' characterization that the Court repeatedly 'reprimanded and/or admonished' counsel during O'Callaghan's exam is not supported by the pages Defendants cite." Resp. at 62, fn.42. Of the 11 citations, however, only one is incorrect: the citation for Ex. 19 should have been page 59, not 69.

problem and directed Counsel to "lay the foundation first that something was whited out." *Id.* Of course, there was no such foundation laid.

Plaintiff complains Defendants "have never been able to produce the original version of Murphy's notes." Resp. at 64. But Plaintiff received the copy of the notes directly from the USAO, ***not Defendants***. Moreover, Plaintiff did not raise with Defendants or the Court any issue with respect to the authenticity of the USAO copies until the twelfth day of trial.

Plaintiff also claims it was entirely appropriate to ask questions that assumed, as a fact, Murphy rewrote his notes (*i.e.*, fabricated the GPR). Counsel alluded to this assumed fact when he informed the Court (and unfortunately the jury) he would later "prove it up" that in April 1986, when proceeding to trial, Defendants "needed a document that reflected [Fields'] confession," so Murphy then created the GPR and backdated it. P.Ex.23, at 20. There never was any such prove-up. The only evidence relating to the GPR was: Murphy's testimony that he created the GPR in May 1985; the GPR was produced to Fields prior to his 1986 trial; and, the El Rukns were in possession of the GPR no later than April 1986 (per wiretaps), more than one month before Plaintiff claims Murphy "rewrote" it. *Id.* at 23; P.Ex.22, at 124.

### D. Improper Questions & Argument Relating to CPD Reports.

Plaintiff incorrectly claims there was no ruling that precluded O'Callaghan or any other witness from explaining why there was no CPD report documenting O'Callaghan's interviews with the El Rukn cooperators. There were. *See e.g.*, Dkt. 550 & 561; *see also* P.Ex.8, at 64. Plaintiff incorrectly contends (without citation) he had to face Hawkins at his 2009 criminal trial "without any paper." Resp. at 65. Plaintiff's attorney at his 2009 criminal trial, Jean Synder, testified at the 2014 trial that in addition to receiving documents from the USAO relating to Hawkins, she went to the federal courthouse and to the warehouse where she "went through volumes and volume of documents." D.Ex.65, at 1926, 1940. Counsel also conceded at trial he

25

had within his possession copies of O'Callaghan's and Murphy's notes from interviews with Hawkins. P.Ex.22, at 104; P.Ex.23, at 121. The record refutes Counsel's alleged good-faith basis for telling the jury that Murphy and O'Callaghan purposely withheld and/or failed to document information they obtained from cooperating El Rukns during the late 1980s that was relevant to Fields' 2009 trial. P.Ex.9, at 144-46; P.Ex.14, at 60.

Plaintiff elsewhere states the real problem is no reports and/or notes relating to Kees, federal or otherwise, exist. Resp. at 66. While such reports do exist (*see* DX 171 & 172), Plaintiff misses the point. The question is not whether such reports exist, the question is whether Defendants were required to create a ***CPD report*** in the first instance (which they were not) and whether it was required to be turned over to Plaintiff prior to 2009 (which it was not). Indeed, the Court acknowledged it was inappropriate to suggest that when an officer is detailed to a federal task force he is required to prepare a CPD report. P.Ex.22, at 113-15.

### E. Questions Regarding Photographs.

Plaintiff admits he "erred" when he asked O'Callaghan questions about why he had Willis view a lineup if Willis had previously seen photos and failed to make an identification. Attempting to excuse this "error," Plaintiff claims he was really referring to Ball and therefore there was no prejudice since Ball did in fact testify that he was shown photos, could not make an identification, and was nonetheless asked to view a lineup. Resp. at 66. But as noted above, Ball's testimony was not admitted for substantive purposes. Even if it was, Ball did not testify as Plaintiff contends. Even more problematic is the fact that Counsel misstated the evidence again during closing arguments, which Counsel also concedes. Resp. at 66, fn.44.

Plaintiff asserts it was at all times clear to the jury that a photo of Fields' head (which was cropped from the lineup photo) came from the lineup and was not the photo shown to any of the witnesses during the investigation. Resp. at 67. However, the record suggests Counsel was

asking the jury to draw the exact inference Defendants argue prejudiced them. *See, e.g.*, P.Ex.9, at 51. Counsel's conduct in placing the cropped photo next to the lineup photo while asking "if you had shown Willis your photograph" clearly suggested to the jury that O'Callaghan did show Willis that exact photo immediately before viewing the lineup of Fields (both of which never occurred), resulting in Willis identifying Fields as one of the offenders (which also did not happen). Counsel cannot in good faith argue what was or was not "clear to the jury."

### F.    Questions About Kees Testifying From a Transcript.

Again, Counsel acknowledges his "error" but claims that his question was "fair" because Defense counsel proceeded in using the questions from the transcript before the Court directed counsel to do so. That is not accurate. Defense counsel specifically informed the Court that he was going to base his examination on the examination used at the 2014 trial ***before*** Kees took the stand. P.Ex.20, at 25-26 (Kulwin: I am basing my examination off what was allowed at the last trial…***I am actually using the questions and answers***). Indeed, Counsel offered the same excuse at trial (P.Ex.21, at 160), which the Court outright rejected (*id.* at 160-61).[25]

### G.    Questions that Violate Pre-Trial Rulings.

***Prosecution Memo***[26] **-** The Court warned the parties several times both before and during trial that if they violated one of its pretrial rulings, there would be a mistrial and sanctions. *E.g.* P.Ex.3, at 8-9. Still, Counsel asked a question knowing full well that it would elicit testimony in violation of the Court's prior ruling. Even assuming Counsel had a good-faith belief that such testimony was admissible, it was incumbent upon him to first raise the issue with the Court.

---

[25] Further attempting to excuse this behavior, Counsel submits the defense engaged in even more serious misconduct. Resp. at 67. Unsurprisingly, he fails to identify or even cite to any such alleged misconduct.

[26] During the 2014 trial, the Court ruled that Plaintiff could not mention allegations that Kees took a prosecution memo from Hogan back to the MCC and discussed it with Hawkins and Hunter. D.Ex.9, at 2456-58.

Counsel now seeks to redirect the blame. Fairness requires that the wrongdoer bear the consequences.[27]

***Kees' Alleged Agreement with Hogan -*** Plaintiff argues this issue arose because Defendants wanted to inform the jury about the government's role in the 2016 Kees Rule 35 motion, which opened the door to the government's position with respect to Kees' 1994 Rule 35 motion. Resp. at 69. It was Plaintiff, not Defendants, who wanted to introduce the fact that the government filed a Rule 35 motion in 2016. Plaintiff wanted to ask Kees about the government's response to his 1994 Rule 35 motion so as to imply that the government previously believed Kees to be a liar, so when the government filed the Motion in 2016, they were doing so at Defendants' behest. Additionally, this Court's 2014 ruling had nothing to do with the government's position in 1994. The Court had ruled, pursuant to Rule 404(b), Plaintiff was prohibited from attributing to O'Callaghan or Hogan a "side deal" made to Kees that he would do less than 99 years of his sentence. D.Ex.9, at 2424-25, 2461-65.

***Improper Discovery-Related Question Posed to Hogan -*** Plaintiff argues his misconduct with respect to Hogan was "not a big deal" because the Court sustained Defendants' objection. Counsel's alleged "mistakes" and "misunderstandings," which took place over and over again throughout the entirety of a long trial, cannot reasonably be argued as unintentional, minor, or "not the stuff of motions for new trials." Rather, Counsel's pervasive misconduct is exactly the kind of "stuff" that mandates the granting of a new trial. Also, it is disingenuous to suggest the Court's ruling on Defendants' objection "could have gone either way" and may have been based on "asked and answered" grounds. In sustaining the objection, the Court stated "Matters about

---

[27] Counsel goes to great lengths to argue that the prior ruling only applied to Sexton as Sexton, unlike Kees and others, had no knowledge of the pros memo. If Counsel truly believed this, then he would not have asked Sexton the following: "And he had access to the ***prosecution memos*** wherein the government laid out the theory of a lot of cases one of which was Smith/Hickman, correct? P.Ex.24, at 28.

discovery aren't supposed to be brought up in front of the jury. You are supposed to deal with those with me." P.Ex.35, at 121.

### H. Improper, Inflammatory Statements/Comments Made by Counsel.[28]

Plaintiff submits his Counsel does not perceive himself as having demonstrated contempt for the Court's rulings by repeatedly asking improper questions after being directed to stop and making speaking objections. *Id*. at 71. It matters not how Counsel perceived himself; the issue is whether there is a likelihood his pervasive misconduct improperly influenced the jury.

*Improperly Commenting on Randy Langston Looking Over at Defense Table* - Contrary to Plaintiff's position, Defendants do deny that Randy was looking over at the defense table before answering difficult questions. In any event, it was up to the jury to decide if and why Randy was doing so. Plaintiff implies his Counsel had a basis for asking such questions because defense counsel met with Randy before trial. The notion that the jury should draw a negative inference about defense counsel meeting with Randy is particularly inappropriate and contrary to the jury instructions given in this case. Dkt. 1169, at 5.

*Improperly Commenting on Hawkins' Alleged Gesture* - Plaintiff is correct that it was up to the jury to decide whether Hawkins gestured at Defendants and what that gesture meant. However, Plaintiff is incorrect when he argues that it was appropriate for Counsel to disclose his own interpretation as to Hawkins' alleged gestures to the jury.

*Orange Crush Issue* - Counsel claims his "mistaken reference" was the result of his not understanding the basis of the objection. Resp. at 72. But the first time Counsel used the phrase "orange crush," defense counsel articulated the very basis for his objection, *i.e.,* "as to orange

---

[28] Plaintiff fails to address the improper comments with respect to Kees, Hogan and O'Callaghan and therefore has waived any such arguments. *U.S. v. Zuniga–Galeana*, 799 F.3d 801, 803 (7th Cir. 2015) (Failure to respond to argument generally results in waiver); *R–BOC Rep. v. Minemyer*, 2017 WL 543045 (N.D.Ill. Feb. 10, 2017)(failure to raise argument in responsive post-trial brief results in waiver).

crush." P.Ex.20, at 107. The basis of the objection was made even clearer after the Court sustained a second objection, stating "that's [orange crush] not what it is called." P.Ex.21, at 95. Counsel cannot feign a lack of understanding when he used the phrase yet a third time. *Id*. at 96.

## I.     Improper Closing Arguments

Once again, Plaintiff's waiver argument is unavailing. §V, *supra*, at 20-21. Plaintiff contends his argument to the jury that Defendants were freeing serial killers was appropriate because it was relevant to Defendants' lack of remorse and the outrageousness of their conduct for purposes of assessing punitive damages. Resp. at 74. However, as Counsel knew, Defendants did not have the authority or ability to make deals or give El Rukn cooperators a break in their sentences. Rather it is the government and the Parole Board vested with such power. Asking the jury to impose punitive damages for "outrageous conduct" for which Defendants could never be responsible is entirely improper. Plaintiff's suggestion the Court cured any prejudice by instructing the jury that it heard the evidence and should make its own determination as to whether to credit Counsel's argument is without merit. The Court did not sustain Defendants' objection or instruct the jury Counsel had misstated the evidence. In the end, the jury was told Defendants acted outrageously in "letting serial killers out of jail" when they did no such thing.

In a footnote, Plaintiff contends Counsel did not err in arguing that Hogan drafted witness grand jury statements before speaking to them because Hogan testified to doing exactly that. *Id*. fn.47. The record cited by Plaintiff, however, reveals otherwise. P.Ex.35, at 65, 103-04.

WHEREFORE, Defendants City, O'Callaghan, and Murphy request that this Court grant the relief requested in their Combined Post-Trial Motion (Dkt. #1180).

Dated: April 3, 2017                               Respectfully submitted,

By:   s/ Paul A. Michalik                       By:     s/ Shelly B. Kulwin

30

ATTORNEYS FOR DEFENDANTS,
City of Chicago and Joseph Murphy

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Dykema Gossett PLLC
10 South Wacker, Suite 2300
Chicago, Illinois  60606

ATTORNEYS FOR DEFENDANT,
David O'Callaghan

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark Street
Suite 2500
Chicago, Illinois 60601

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 3, 2017, I electronically filed the foregoing **Reply in**

**Support of Their Combined Post-Trial Motions** with the Clerk of the Court using the ECF

system, which sent electronic notification of the filing on the same day to:

Jon Loevy
Steve Art
Anand Swaminathan
Sarah Grusin
D. Samuel Heppell
Anthony Balkissoon
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
steve@loevy.com
anand@loevy.com
grusin@loevy.com
sam@loevy.com
tony@loevy.com

H. Candace Gorman
Law Office of H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
312.427.2313
hcgorman1@gmail.com

Shelly B. Kulwin
Rachel A. Katz
Kulwin, Masciopinto & Kulwin, LLP
161 N. Clark Street
Suite 2500
Chicago, IL 60601
312.641.0300
312.855.0350 (fax)
skulwin@kmklawllp.com
rkatz@kmklawllp.com

s/ Paul A. Michalik