# EXHIBIT 87

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GERALDO IGLESIAS, | ) | |
|  | ) | Case No. 19-cv-6508 |
| *Plaintiff*, | ) | |
|  | ) | Judge Franklin U. Valderrama |
| *v.* | ) | |
|  | ) | Magistrate Judge Maria Valdez |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, STEVE GAWRYS, | ) | |
| ANTHONY RICCIO, ROBERT BIEBEL, | ) | |
| and the CITY OF CHICAGO | ) | |
|  | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

# EXHIBIT 51

## City's Motion for New Trial in *Rivera*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUES RIVERA, | **)** | |
| | ) | |
| Plaintiff, | ) | Case No. 12 C 4428 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## <u>DEFENDANT CITY OF CHICAGO'S RULE 59(a) MOTION FOR A NEW TRIAL</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD ...................................................................................................... 1

I.    THE JURY'S VERDICT ON THE *MONELL* CLAIM WAS AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE ............................................................... 2

    A.   A Verdict Against the City Regarding its Investigative File Production Practice is
Against the Manifest Weight of the Evidence. ...................................................... 2

        1.........Plaintiff Failed To Provide a Sufficient Foundation For the Alleged Investigative
Files and Record Keeping Evidence He Relied Upon. .................................... 2

        2.A Jury Verdict Based on Theory of an Express Written Policy Is Against the Manifest
Weight of the Evidence ...................................................................... 4

        3.......A Jury Verdict Based on a Theory of Widespread Practice Is Against the Manifest
Weight of the Evidence ...................................................................... 6

        4............A Jury Verdict Based On A Theory of A Gap In Policy Is Against the Manifest
Weight of the Evidence ...................................................................... 8

        5..........A Jury Verdict Based Upon a Theory of Failure to Train Is Against the Manifest
Weight of the Evidence ...................................................................... 10

    B.   A Verdict Against the City Regarding its Practice of Documentation of Filler
Identifications is Against the Manifest Weight of the Evidence. ......................... 12

        1...... A Jury Verdict Based Upon a Theory of an Express Policy Is Against the Manifest
Weight of the Evidence ...................................................................... 12

        2............. A Jury Verdict Based Upon A Theory of a Widespread Practice Is Against the
Manifest Weight of the Evidence. .................................................... 13

        3.........A Jury Verdict Based Upon a Theory of A Gap in Policy Is Against the Manifest
Weight of the Evidence ...................................................................... 13

        4...... A Jury Verdict Based Upon Failure to Train Is Against the Manifest Weight of the
Evidence ........................................................................................... 14

II.   THE JURY'S VERDICT WAS THE RESULT OF ERRONEOUS EVIDENTIARY
RULINGS ...................................................................................................... 14

    A.   The Court's Rulings Allowed For Abusive Questioning Of Certain Defendants ......... 14

    B.   The Court Erred in Allowing Dr. Wells to Testify. ....................................... 18

III.  ERRORS IN THE JURY INSTRUCTIONS WARRANT A NEW TRIAL. ................... 20

    A.   It Was Prejudicial To Refuse Defendants' Proposed Jury Instruction Which Would
Have Instructed The Jury On The Proper Use Of Speculative Evidence To Support A *Brady*
Claim ............................................................................................... 20

    B.   It Was Prejudicial Not to Provide the Jury with the City's Proposed Limiting Instruction
Regarding the Fifth Amendment. ............................................................ 21

C. The Jury Was Improperly Instructed on The Legal Standard for Evaluating Municipal Liability......................................................................................................................... 23

D. It Was Prejudicial To Instruct The Jury On Municipal Liability Based On Instructions That Were Not Supported By The Evidence. .................................................... 24

1. A practice of failing to train employees of the City of Chicago or the Chicago Police Department........................................................................................................ 25

2. A decision or policy statement, including a decision not to adopt a needed policy....... 26

CONCLUSION.................................................................................................................... 27

## CASES

*Barber v. City of Chi.,* 725 F.3d 702, 715 (7th Cir. 2013) ............................................................ 2

*Bd. of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397 (1997) ....... 9, 10, 11, 23, 25

*Brady v. Maryland,* 373 U.S. 83 (1963) ............................................................................... 1

*Byrd v. Illinois Dep't of Pub. Health,* 423 F.3d 696, 705 (7th Cir. 2005) ................................... 20

*C.W. v. Textron, Inc.,* 807 F.3d 827 at 835 (7th Cir. 2015) ............................................................ 7

*Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005) ................................................... 5, 8, 10

*Canton v. Harris,* 489 U.S. 378, 388 (1988) ..................................................................... 10, 14

*Christmas v. City of Chi.,* 682 F.3d 632, 639-40 (7th Cir. 2012) ................................................. 1

*City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822-24 (1985) ................................................... 5

*Clarett v. Roberts,* 657 F.3d 664, 674 (7th Cir. 2011) ................................................................. 1

*Connick v. Thompson,* 563 U.S. 51, 62 (2011) ............................................................... passim

*Daniel v. Cook,* 833 F.3d 728, 735 (7th Cir. 2016) ..................................................................... 13

*Davis v. Carter,* 452 F.3d 686. 694 (7th Cir. 2006) .................................................................... 13

*Doe ex. rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258, 1266 n. 2 (9th Cir. 2000) ........................ 16

*Emerson v. Wembley U.S.A., Inc* ................................................................................................. 22

*Estate of Novack v. County of Wood,* 226 F. 3d 525, 531 (7th Cir. 2000) ..................................... 6

*General Electric Company v. Joiner,* 118 S.Ct. 512, 519 (1997) ................................................. 3

*Glanzer,* 232 F.3d at 1266 n. 2 .................................................................................................. 16

*Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 414 (7th Cir. 2015) ............................ 2

*Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 786 (7th Cir. 2017) ................................... 7

*Graystone Nash, Inc.,* 25 F.3d 187, 192 (3rd Cir. 1994) ............................................................ 16

*Harris v. Kuba,* 486 F.3d 1010, 1014 (7th Cir. 2007) ................................................................. 7

*Huff v. Sheahan,* 493 F.3d 893, 899 (7th Cir. 2007)................................................................. 20

*Humphrey v. Staszak,* 148 F.3d 719 724 (7th Cir. 1998) ........................................................... 24

*Jenkins v. Bartlett,* 487 F.3d 482, 493 (7th Cir. 2007) ............................................................... 3

*Kingsley v. Hendrickson,* 801 F.3d 828, 831 (7th Cir. 2015) ................................................... 23

*Konots v. Kontos,* 968 F.Supp. 406 (S.D. Ind. 1997) ................................................................ 22

*LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir. 1995) ................................... 16

*McNabola v. Chicago Transit Authority,* 10 F.3d 501, 511 (7th Cir. 1993)............................... 23

*Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978) ............................. 23

*Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011) .................................. 3

*Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986) ..................................................................... 14

*Phelan v. Cook County,* 463 F. 3d773, 790 (7th Cir. 2006) ...................................................... 26

*Row v. Gibson,* 798 F.3d 622, 627 (7th Cir. 2015) .................................................................... 19

*Ruiz-Cortez v. Lewellen*, No. 11 C 1420, 2017 WL 2080300, *10 (N.D. Ill. May, 5 2017) .......... 1

*Schobert v. Illinois Dep't of Transp.,* 304 F.3d 725, 729 (7th Cir. 2002)................................... 20

*Sebastian v. City of Chicago,* 2008 WL 2875255, *34 (N.D. Ill. 2008)...................................... 22

*Spesco, Inc. v. General Electric,* 719 F.2d 233, 239 (7th Cir. 1983).......................................... 24

*State Farm Mut. Auto. Ins. Co. v. Abrams,* 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000) ... 22

*Tuttle,* 471 U.S. 808, 822-23 (1985) ........................................................................................... 9

*United States v. Agurs*, 427 U.S. 97, 112 (1976) ........................................................................ 7

*United States v. Bagley*, 473 U.S. 667, 682 (1985) ..................................................................... 6

*United States v. Lee,* 399 F.3d 864 (7th Cir. 2015) ..................................................................... 8

*United States v. Robinson,* 585 F.2d 274 (7th Cir. 1979) ........................................................... 20

*United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006)....................................................... 21

*Valbert v. Pass,* 866 F.2d 237, 239 (7th Cir. 1989) ........................................................................... 1

*Vanskike v. ACF Industries, Inc.,* 665 .2d 188 (7th Cir. 1981) ...................................................... 24

Defendant City of Chicago, (the "City") by its undersigned counsel, hereby moves for a new trial, pursuant to Fed. R. Evid. 59(a). In support, the City states as follows:

## INTRODUCTION

In 2012, Plaintiff brought this lawsuit alleging violations of his constitutional rights when he was arrested, charged and convicted of the 1988 murder of Felix Valentin. The case proceeded to trial on June 5, 2018 alleging due process claims against four defendant officers, specifically that they concealed exculpatory evidence and fabricated evidence against him in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). The case proceeded against the City on a *Monell* claim pursuant to 42 U.S.C. §1983. On June 29, 2018, the jury returned a verdict against Defendants Guevara, Mingey, Gawrys and City, awarding Plaintiff $17 million in compensatory damages and $175,000 in punitive damages. The City has filed a separate motion under Fed. R. Civ. P. 50(b) for judgment as a matter of law. Should the Court deny that motion, the City moves here for a new trial pursuant to Rule 59(a).

## LEGAL STANDARD

A court "has great discretion in determining whether to grant a new trial." *Valbert v. Pass,* 866 F.2d 237, 239 (7th Cir. 1989). "A new trial is appropriate where the verdict was against the weight of the evidence or the trial was otherwise unfair to the moving party." *Ruiz-Cortez v. Lewellen*, No. 11 C 1420, 2017 WL 2080300, *10 (N.D. Ill. May, 5 2017) (citing *Clarett v. Roberts,* 657 F.3d 664, 674 (7th Cir. 2011). "A trial is unfair if it 'improperly admitted evidence that had a substantial influence over the jury, and the result reached was inconsistent with substantial justice.'" *Id. (*citing *Christmas v. City of Chi.,* 682 F.3d 632, 639-40 (7th Cir. 2012). "In other words, to warrant a new trial, the improperly admitted evidence must have "affect[ed] a substantial right of the party" or had a significant chance of swaying the jury's verdict. *Id.*; *see*

*also, Barber v. City of Chi.,* 725 F.3d 702, 715 (7th Cir. 2013). A new trial may also be awarded where "jury instructions did not fairly and accurately state[] the law… and is warranted only if an instruction error caused prejudice." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414 (7th Cir. 2015). Each of these types of errors occurred in this case.

## I. THE JURY'S VERDICT ON THE *MONELL* CLAIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

As set forth in its Rule 50(b) motion, Plaintiff failed to provide a legally sufficient evidentiary basis to support a verdict on a *Monell* claim based on (1) an express municipal policy, (2) a widespread practice that was so permanent and well settled as to constitute a custom or usage with the force of law, (3) a decision or policy statement, including a decision not to adopt a needed policy or (4) a failure to train. The inadequate evidentiary basis for Plaintiff's *Monell* claim is discussed in the City's Rule 50(b) motion which is adopted herein by reference. If this Court disagrees that the City is entitled to relief under Rule 50(b), the City should be granted relief under Rule 59 because the jury's verdict on the *Monell* claim was against the manifest weight of the evidence.

### A. A Verdict Against the City Regarding its Investigative File Production Practice is Against the Manifest Weight of the Evidence.

#### 1. Plaintiff Failed To Provide a Sufficient Foundation For the Alleged Investigative Files and Record Keeping Evidence He Relied Upon.

At the outset, Plaintiff's *Monell* theory regarding the Chicago Police Department's ("CPD's") Investigative Files and record keeping practice fails because the evidence relied upon by Plaintiff's expert as a foundation for his opinions suffers from a foundational deficiency that is fatal to his opinions. Specifically, Plaintiff's *Monell* claim was grounded in the theory that the City withheld the Valentin Investigative File from Plaintiff as a result of the City's policy of routinely withholding Investigative Files from the "criminal justice system.," and, instead turning

over the "permanent retention" files (aka Records Division, "RD" Files), which were used by the Cook County State's Attorney's Office ("CCSAO") for prosecution. (*See,* Exhibit A, Trial Transcripts at 2175:2-5; 2201:7-13; 2214:9-11; 2215:24-2216:6). This theory was based entirely on the testimony of Plaintiff's expert, Michael Brasfield, and his comparison of certain CPD Investigative Files and RD Files stored at the CPD Warehouse with corresponding files from Cook County Public Defender's Office ("CCPD"). If a document from the CPD Investigative File was not found in the corresponding CCPD file, Brasfield opined that the document generally did not "make it into the criminal justice system." First and foremost, Plaintiff failed to present any evidence to establish that the CCPD files were in the same condition at the time of the comparison as they were when the criminal defendants went to trial. (Ex. A (Brasfield) at 2290:25-2291:11). As this Court previously recognized, such evidence was a "necessary link in the chain of reasoning needed to support a finding for plaintiff on his *Monell* 'street files' claim." (Dkt. 554 at pg. 4) *citing Jenkins v. Bartlett,* 487 F.3d 482, 493 (7th Cir. 2007). In fact, the City presented unrebutted evidence that the files reviewed by Brasfield were *not* in the same condition at the time of the comparison as they were thirty years ago. (Ex. A (Murray) at 3798:14-24). Plaintiff's failure to establish that the CCPD files were complete at the time of the comparison is fatal to Brasfield's analysis and renders his opinions nothing more than *ipse dixit. See e.g. General Electric Company v. Joiner,* 118 S.Ct. 512, 519 (1997)("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."), *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011) (excluding expert testimony where expert failed to support his inferences and conclusions with anything more than his *ipse dixit*).

Furthermore, Brasfield admitted that in each and every criminal defense attorney file he reviewed, he found documents that were exclusively maintained in the Investigative Files, and not in the permanent retention file (which he opined - erroneously - was the only file produced by CPD and used by the CCSAO for prosecution.) (Ex. A (Brasfield) at 2175:2-5; 2214:9-11; 2296:12-20). Brasfield's admission not only undermines his testimony that the CPD RD File is the only file that "makes it into the criminal justice system," it also further establishes that the files as they exist today are incomplete. Accordingly, Plaintiff's evidence was insufficient and did not support a verdict against the City on the *Monell* claim.

However, even if this Court does not find the foundational deficiencies in Plaintiff's *Monell* evidence to be fatal to his claim, the jury's verdict was against the manifest weight of the evidence for each permeation of Plaintiff's *Monell* theory.

## 2. A Jury Verdict Based on Theory of an Express Written Policy Is Against the Manifest Weight of the Evidence.

First, Plaintiff did not offer any evidence to support a claim Detective Division Special Order ("DDSO") 86-3, the City's written policy pertaining to Investigative Files and record keeping was unconstitutional as written. Accordingly, any conclusion by the jury that the City had an express written policy that violated Plaintiff's constitutional rights (as set forth in the jury instructions) or that the City was deliberately indifferent to its facially unconstitutional policies was against the manifest weight of the evidence. In fact, Plaintiff never argued that the City's written policies were facially unconstitutional. Rather, Plaintiff claimed that the City's policies were "deficient" for various reasons (*e.g.,* because the policies only applied to the Detective Division and did not have any impact on or requirement for other units; the policies did not have a clear definition of what would be contained in the file; and the policies allowed CPD to maintain "parallel files") and that these deficiencies caused a violation of his due process rights. (Ex. A

(Brasfield) at. 2187:23-2188-6). This type of *Monell* claim, which is akin to a "widespread practice" theory addressed below, requires proof of more than a single incident to support liability. *E.g., City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822-24 (1985) *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005). As discussed in the next section, no such evidence was presented.

Moreover, the City presented evidence, through James Hickey, the City's 30(b)(6) witness, about 1) the development of Detective Division Special Order 83-1[1] ("DDSO") (CPD's written record keeping policy) and its progeny, 2) the absence of any other similar policy in municipal departments across the country at the time it was developed, 3) the intent behind the policy, and 4) the training provided to all members of the Detective Division, including sergeants, lieutenants, exempt commanders and members of the youth division who handed homicide cases. (Ex. A (Hickey) at 3215-3217, 3220-3226, 3313). Hickey also testified that the development of the written policy included regular communication with CPD attorneys, the City's Law Department, certain plaintiffs' attorneys and other outside counsel. (Ex. A (Hickey) at 3217-3218). Furthermore, the City's expert, Jeff Noble, testified that in the 1980s (and even today) decentralized files were standard, that CPD's policies went above and beyond the generally accepted practices at the time, and that to date, there is no model policy contradicting CPD's policy as it relates to file-keeping. (Ex. A (Noble) at 3441-3442). Accordingly, any conclusion by the jury that the City had an express written policy, or even deficient written policies, that violated plaintiff's constitutional rights or that the City was deliberately indifferent is against the manifest weight of the evidence.

---

[1] While DDSO 86-3 was the policy in place at the time of the Valentin Homicide Investigation and Plaintiff's subsequent arrest and prosecution, the bulk of the testimony and evidence presented at trial pertained to the development of its predecessor DDSO 83-1, which originated the use of Investigative Files. While DDSO 86-3 implemented certain updates, the policy was substantially similar.

### 3. A Jury Verdict Based on a Theory of Widespread Practice Is Against the Manifest Weight of the Evidence.

A conclusion that Plaintiff sustained a constitutional injury due to a widespread CPD practice similarly is against the manifest weight of the evidence. When a municipal policy is facially constitutional, a "series of unconstitutional acts" is necessary to demonstrate deliberate indifference to the deficiencies in that policy." *Estate of Novack v. County of Wood,* 226 F. 3d 525, 531 (7th Cir. 2000). Those constitutional violations must arise in "similar" circumstances – otherwise, a municipality lacks notice that the policy deficiencies "will cause violations of constitutional rights[.]". *Connick v. Thompson,* 563 U.S. 51, 62 (2010). As the Seventh Circuit previously explained in *Calhoun,* in the "widespread practice implicit policy cases … what is needed is evidence that there is a true municipal policy at issue, not a random event." 408 F.3d at 380. Put another way, Plaintiff needed to provide evidence of a series of "similar *Brady* violations," specifically, a series of instances where CPD failed to produce an Investigative File to the CCSAO.

Here, even if Plaintiff presented some evidence that the Valentin Investigative File was not produced to him, he failed to prove that that failure was pursuant to CPD's written policies. In fact, Plaintiff offered no evidence that it was CPD's written policies that caused the failure to produce the Valentin Investigative File. As a result, to prevail, Plaintiff was required to prove that despite CPD's written policies, as a matter of practice, CPD failed to produce Investigative Files.

Nor did Plaintiff present evidence of other "similar *Brady* violations." Specifically, Plaintiff must have presented evidence that, on similar facts, alleged exculpatory evidence was withheld, and that, in each case, there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v. Bagley,* 473 U.S. 667, 682 (1985), after considering that evidence "in the context of the entire

record" of that proceeding, *United States v. Agurs*, 427 U.S. 97, 112 (1976). While Plaintiff elicited evidence from his expert, about investigative material in four other criminal cases – Fields, Robinson, Kluppelberg, and Johnson –he failed to establish a *Brady* violation occurred in any of them. (*See,* City's Rule 50(b) Motion at Section D). Ultimately, Plaintiff's expert's testimony proved fatal to this theory because he admitted that in each and every file that he reviewed he found evidence that the relevant Investigative File had been produced. (Ex. A (Brasfield) at 2296:12-20).

Further undercutting Plaintiff's *Monell* claim, the methodology used by Plaintiff to identify documents that were allegedly "missing" was fundamentally and critically flawed. Not only did Brasfield admit that he only reviewed six of the twenty-six available files from the CCSAO, he further conceded that numerous documents he identified as "missing" from the CCPD files reviewed were, in fact, contained in the CCSAO file today. As the City previously argued, both at summary judgment (Dkt. 306) and in its motion in limine to bar Brasfield (Dkt. 424), the Court must exclude an opinion where there is "too great an analytical gap between the data and the opinion proffered." *C.W. v. Textron, Inc.*, 807 F.3d 827 at 835 (7th Cir. 2015). Brasfield's testimony clearly failed to provide any trustworthy explanation to "bridge the analytical gap" regarding his opinion that documents were "withheld" or even "missing" from the criminal defense files, or the criminal justice system when the documents were found in the CCSAO file. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 786 (7th Cir. 2017) (concluding expert failed to bridge the analytical gap because his opinion was based on a faulty premise that was unsupported by the evidence in the case).

Finally, there can be no *Brady* claim against the police where the material in question is in the possession of the prosecutors. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007).

Additionally, Brasfield's concession that many documents he identified as "missing" from the CCPD file originated from the CCSAO, such as felony computer printouts created by the CCSAO and court reported witness statements wherein the CCSAO was present further dooms Plaintiff's theory. (Ex. A (Brasfield) at 2292:15-18; 2311:11-16). Other documents Plaintiff argued were withheld were documents drafted by the criminal defense attorney, specifically, subpoenas issued by the criminal defense attorney to the police department, and therefore in his or her possession at the time of the criminal trial and, certainly not something CPD was required to produce. *See e.g., United States v. Lee,* 399 F.3d 864 (7th Cir. 2015) (*Brady* deals with the concealment of exculpatory evidence unknown to the criminal defendant). (Ex. A (Brasfield) at 2292:19-24). In sum, this evidence proved only that the methodology used by Plaintiff to identify documents that were "making it into the criminal defense files" was fundamentally flawed.

In contrast, the City provided affirmative evidence, through its expert, Bernard Murray, not only that the files reviewed were, in fact, incomplete, but that many of the documents that Brasfield claimed were "missing" were in fact in the CCSAO's possession, created by the CCSAO or were documents created by the criminal defense attorneys. (Ex. A (Murray) at 3798:14-.3799:14; 3809:24-3844:10). Accordingly, a jury verdict that Plaintiff sustained a constitutional injury due to a widespread CPD practice as it pertains to Investigative Files and record keeping is against the manifest weight of the evidence.

### 4. A Jury Verdict Based On A Theory of A Gap In Policy Is Against the Manifest Weight of the Evidence.

As explained in *Calhoun, Monell* claims attacking gaps in express policies require evidence that there is a true municipal policy at issue, not a random event. 408 F.3d 375 (7th Cir. 2005). In *Calhoun,* the plaintiff, relying exclusively upon his own experience, argued that the chain of events demonstrated deliberate indifference to his medical needs, specifically, that his injuries were the

result of a gap in the jail's medical policy that made no provision for advance verification of medication. *Id.*

On appeal, the Seventh Circuit determined that Calhoun's exclusive reliance on his own experience was insufficient, concluding that when attacking omissions in an express policy, the claim requires more evidence than a single incident to establish liability. *Id., citing Tuttle,* 471 U.S. 808, 822-23 (1985). This is because it is "necessary to understand what the omission means." *Id.* If the same problem has arisen many times and the municipality has acquiesced to the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that *Brown* held cannot support municipal liability. *Id., citing Bd. of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397 (1997).

Here, Plaintiff argued that certain "gaps" in CPD's policies resulted in the Valentin Investigative File not being produced to his criminal defense attorney, and as a result, that exculpatory material was not disclosed to him in violation of his constitutional rights. Specifically, (1) that CPD *should* have included language in DDSO 83-1 and its progeny explicitly mandating that Investigative Files be produced, and (2) that DDSO 83-1 and its progeny should have been applicable department wide, and in particular to gang crimes[2]. (Ex. A (Brasfield, Closing Argument) at 2187:25-2188:6; 2191:5-22; 4192:5-10).

However, Plaintiff offered insufficient evidence to conclude that exculpatory material was not disclosed to him, let alone evidence of a series of "similar *Brady* violations" necessary to prove a *Monell* claim based upon these purported omissions in policy. *Connick,* 563 U.S. at 62. Similar to *Calhoun,* Plaintiff cannot point to any language in CPD's policy that was unconstitutionally

---

[2] Plaintiff argued various other "gaps" in policy, including the lack of an audit provision (*See,* City's Rule 50(b) Motion at Section D) however, he did not link such "gaps" to the purported failure to produce the Investigative File. Accordingly, any verdict based upon those gaps are against the manifest weight of the evidence.

suspect, and therefore, he must provide enough evidence of custom to permit an inference that CPD has chosen an impermissible way of operating. *Calhoun,* 408 F.3d at 381. Rather, all Plaintiff showed was the possibility that other investigative materials were not disclosed to other criminal defendants, without providing any meaningful record of their criminal proceedings. Furthermore, Plaintiff failed to provide evidence that the City was on notice of the possibility of this occurring based upon their written policies. Accordingly, such evidence is simply not enough to support a *Monell* claim based on a gap in policy such that a verdict rendered against the City on that basis necessarily is against the manifest weight of the evidence.

### 5. A Jury Verdict Based Upon a Theory of Failure to Train Is Against the Manifest Weight of the Evidence.

Finally, no jury verdict could properly be based upon a claim or theory that CPD failed to train its employees. The United States Supreme Court has found that a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for the purposes of § 1983 in limited circumstances. *Connick* 563 U.S. at 62. To prevail on a failure to train theory, a plaintiff must prove that the municipality's failure to train its employees about a particular legal duty must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id., citing Canton v. Harris,* 489 U.S. 378, 388 (1988). Deliberate indifference is a stringent standard of fault, which requires proof that a municipal actor disregarded a known or obvious consequence of his action. *Id., citing Brown,* 520 U.S. at 410. Put another way, city policy makers must have been on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights. *Id.*

As with the other aspects of Plaintiff's *Monell* claim, Plaintiff relied exclusively on Brasfield's testimony. Brasfield's training testimony was limited to the directives that were issued

10

post *Jones/Palmer,* wherein he admitted that there was "initial training" but claimed it was insufficient because it was too short, was conducted by a detective, and failed to include a presentation by a high-ranking member of the chain of command, either in person or via videotaped introduction, explaining the need for the changes. (Ex. A (Brasfield) at 2186:20-2187:10). Brasfield offer no basis for these "opinions" other than his own say so.

In contrast, Hickey, testified that he himself conducted the face to face training, attended by all members of the Detective Division, including sergeants, lieutenants, commanders and members of the youth division who handled homicide suspects. (Ex. A (Hickey) at 3313:16-23). Further, the training on file creation and storage practices became part of the established curriculum for detective training. (Ex. A (Hickey) at 3314:2-4). In fact, Detective McLaughlin, who became a detective in 1980, testified that she attended additional training related to record-keeping and note taking in 1983, and that CPD was really stringent in the training about note-taking. (Ex. A (McLaughlin) at 876:13-20). Specifically, during the training, detectives were told that CPD wanted a more accurate compilation of notes, and as such, all notes were to be retained and turned in with the written/typed report. (Ex. A (McLaughlin) at 876:25-877:4). Furthermore, while CPD didn't want notes "scrabbled on any paper[,]" if it did happen, then that note needed to be retained. (Ex. A (McLaughlin) at 877:4-6).

Moreover, Plaintiff elicited no evidence of a "pattern of similar constitutional violations" as required to demonstrate deliberate indifference for purposes of failure to train as it relates to CPD's policies pertaining to file creation and maintenance. *See, Brown,* 520 U.S. 397. Accordingly, for these reasons, and those reasons set forth in the City's Rule 50(b) Motion, Plaintiff failed to present a sufficient evidentiary basis to support a failure to train or failure to

supervise claim, such that a verdict rendered against the City on that basis necessarily would be against the manifest weight of the evidence.

### B. A Verdict Against the City Regarding its Practice of Documentation of Filler Identifications is Against the Manifest Weight of the Evidence.

Plaintiff also proceeded on a *Monell* theory that the City had a pattern and practice of failing to document filler identifications in their written line-up reports. This theory was based on the testimony of Plaintiff's expert, Dr. Gary Wells, who testified that the City had a policy and practice of not recording filler identifications. (Ex. A (Wells) at 1101:13-18; 1104:11-14). More specifically, because he concluded that the rate of no-identifications in the data he reviewed from Chicago was too low to include both the expected rate of filler identifications and no-identifications combined, he speculated that there may be approximately 100 reports documenting filler identifications that were missing from the Chicago data that he reviewed. (Ex. A (Wells) at 1107-1108). As explained more fully below, this testimony was not disclosed in Wells' Rule 26(a) Disclosures and should have been barred. (*See,* Section 3.B. below). Furthermore, in ruling on the City's Rule 50(a) Motion, this Court concluded that the jury instructions did not embrace the practice described by Wells, making a Rule 50 analysis unnecessary. (Dkt. 676 at pp. 9-10). The City agrees, and believes that the Court's ruling indicates that it was in error to allow Dr. Wells testimony at all. Accordingly, the jury's verdict was against the manifest weight of the evidence for any *Monell* theory based upon Wells' testimony.

### 1. A Jury Verdict Based Upon a Theory of an Express Policy Is Against the Manifest Weight of the Evidence.

At the outset, Plaintiff conceded that on their face, the general orders addressing line up documentation were adequate. (Ex. A (Wells) at 1220:6-9). Accordingly, any conclusion by the jury that the City had an express written policy that violated Plaintiff's constitutional rights or that

the City was deliberately indifferent would necessarily be against the manifest weight of the evidence.

### 2. A Jury Verdict Based Upon A Theory of a Widespread Practice Is Against the Manifest Weight of the Evidence.

Furthermore, a jury verdict based upon a theory of some sort of widespread practice is against the manifest weight of the evidence. Despite Wells' testimony, Plaintiff never argued that a filler identification was recorded consistent with the widespread practice that Wells described when he testified. Accordingly, such a policy could not have been the moving force behind the constitutional violation found by the jury since Plaintiff claimed that McLaughlin fabricated documents to create the impression that an attempted line up did not occur, rather than failing to record a filler identification.

### 3. A Jury Verdict Based Upon a Theory of A Gap in Policy Is Against the Manifest Weight of the Evidence.

Similarly, a jury verdict based on a theory that there was a gap in policy, or a decision not to adopt a needed policy is against the manifest weight of the evidence. In fact, Wells conceded that CPD's policy pertaining to documenting lineups, in particular where a filler was picked, was a "pretty good policy." (Ex. A (Wells) at 1220:23-25). Rather, it was the practice that he found inadequate. *Id.* Such testimony forecloses Plaintiff's ability to argue that there was a gap in policy at all, let alone one that was "so pervasive that acquiescence on the part of policymakers" it was apparent and amounted to a policy decision." *Daniel v. Cook,* 833 F.3d 728, 735 (7th Cir. 2016). Furthermore, but for Wells' "guess" that there were approximately 100 missing reports, Plaintiff failed to provide any evidence tending to show a general pattern of repeated behavior (*i.e.,* something greater than a mere isolated event). *Davis v. Carter,* 452 F.3d 686. 694 (7th Cir. 2006).

Accordingly, any jury verdict on this particular theory is against the manifest weight of the evidence.

> **4. A Jury Verdict Based Upon Failure to Train Is Against the Manifest Weight of the Evidence.**

Finally, there was absolutely no evidence presented to overcome the stringent standard of fault necessary for a failure to train theory as it relates to documenting line-ups. In fact, there was absolutely no evidence to establish that the training provided to detectives regarding conducting and documenting lineups was insufficient at all, let alone amounted to a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick,* 563 U.S. 51, 63 (2011). Any jury verdict based on a failure to train theory would necessarily result in a *de facto respondeat superior* liability on the City, and would be improper. *Canton,* 489 U.S. at 395; *see also, Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)

## II. THE JURY'S VERDICT WAS THE RESULT OF ERRONEOUS EVIDENTIARY RULINGS

> **A. The Court's Rulings Allowed For Abusive Questioning Of Certain Defendants.**

The City was prejudiced by an unprecedented exploitation of two Defendants' assertion of their Fifth Amendment Right, specifically, Defendant Mingey. Rather than simply informing the jury that Mingey was exercising his right under the Fifth Amendment not to testify, the Court allowed Plaintiff to question Mingey for over an hour, ensuring that the jury would repeatedly hear him say that he was declining to answer the question on the grounds that he was being "compelled to be a witness against [himself]," or "same answer." (Ex. A (Mingey) at 2481:2-2543-3). Furthermore, Plaintiff's counsel used his questioning of Mingey, as a conduit to create an entirely new, alternative *Monell* theory. Specifically, that gang crimes maintained "street files" in file cabinets and lockers that were not "disclosed to the criminal justice system." (Ex. A (Mingey) at

14

2516:7-20).  Plaintiff offered no evidence to corroborate this theory.  Rather, Plaintiff asked Mingey a series of questions regarding the operations of gang crimes, alleging through his questions, that certain officers were allowed to maintain private personal files that did not get disclosed.  (Ex. A (Mingey) at 2515:5-8).

Despite Plaintiff's representations to the Court during the trial, there was no good faith basis to ask Mingey any of the *Monell* related questions in the fashion that he did.  While Plaintiff purported to rely upon various clips from Mingey's deposition testimony as the purported foundation for certain questions, the clips were largely taken out of context or were answers to very fact specific questions that had no relation to the broad, overly generalized and argumentative question that were asked at trial.  For example, Plaintiff asked Mingey "So, Gang Crimes, even after the Special Orders that we talked about in court yesterday, Gang Crimes was allowed to maintain private personal files that didn't get disclosed, wasn't it?"  (Ex. A (Mingey) at 2515:5-14.)  As purported foundation for this question, Plaintiff played a video clip where Mingey was asked generally whether or not gang crimes specialists would have police reports with them about pending investigations, not "private personal files" or "files that didn't get disclosed."  (Exhibit B, Mingey Deposition Testimony at 134:16-135:2).  Plaintiff deliberately did not play the full context for that line of questioning which clearly shows that Mingey was being asked at his deposition about "copies" of police reports during that line of questioning.  (Ex. B at 134:16-135:2).  This is just one example of Plaintiff's failure to establish any foundation for the *Monell* related questions he asked of Mingey.   In every instance the purported foundation for the question was mischaracterized, taken out of context or outright non-existent.  (Ex. A (Mingey) at 2514-2552).  This targeted line of improper questioning went on for several minutes, with the Court overruling all Defense objections.

15

While permissive adverse inference in a civil case does not place too high a cost on the assertion of the Fifth Amendment, failure to testify *alone* cannot be used as an admission of guilt, without regard to other evidence. *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir. 1995); *see also, Doe ex. rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258, 1266 n. 2 (9th Cir. 2000) ("the assertion of the privilege necessarily attaches only to the question being asked and the information sought by that particular question," each "specific fact being questioned" must be "corroborated by other evidence" in the record); *Graystone Nash, Inc.,* 25 F.3d 187, 192 (3rd Cir. 1994) (Because of the constitutional magnitude of asserting the Fifth Amendment, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.)

As shown above, Plaintiff had no good faith basis to ask any of the *Monell* questions and the Court's failure to sustain the City's objections was error, despite the fact that the City's counsel, at sidebar, explained to the Court that the line of questioning in its entirety was improper and intended to portray the evidence in an incomplete manner. (Ex. A (Mingey) at 2520:2-2522:6). Specifically, the City's counsel explained that Plaintiff was using the adverse inference to establish a *Monell* claim based upon gang crimes supposed creation and maintenance of personal street files that did not get disclosed, despite no other corroboration for that theory. (Ex. A (Rosen) at 2515:5-8; 2516:7-8). There is absolutely no authority that permits a party to use the "adverse inference" where, as here, there was no independent corroboration for the "evidence." *See Glanzer,* 232 F.3d at 1266 n. 2 (each "specific fact being questioned" must be "corroborated by other evidence" in the record.)

Not only was there no foundation for the questions from Mingey's deposition testimony, there was direct evidence introduced at trial that contracted the "facts" Plaintiff sought to establish

via the adverse inference. As discussed *supra,* Hickey testified at length regarding the development and implementation of DDSO 83-1 and its progeny. (Ex. A (Hickey) at 3210-3232). Hickey testified DDSO 83-1 and its progeny applied to everyone within the Detective Division, because detectives, not gang crime specialists or any other unit within CPD, had the responsibility for investigating violent crimes. (Ex. A (Hickey) 3220:10-17). Moreover, Hickey testified that the Detective Division alone had the authority and responsibility to close a case, as it is their report that is the final word in the criminal investigation. (Ex. A (Hickey) 3220:17-20). While other units of the CPD were involved in criminal investigations, including the gang crimes units, the ultimate and final responsibility was that of the Detective Division. (Ex. A (Hickey) at 3221-15-3222:7). Those other units all had an obligation to put information they gathered into a supplementary report or provide it verbally to the detective area. (Ex. A (Hickey) 3251:6-11).

James Spratte, the City's 30(b)(6) witness who testified about various gang crimes unit policies and practices, offered unrebutted testimony that the unit was "intelligence" driven. (Ex. A (Spratte) at 3363:7-9). Specifically, that the detectives handled the investigation of each case, while the unit "did more the intelligence[]" because they "knew the players." (Ex. A (Spratte) at 3329:15-18). Members of the unit understood that the detectives were the driving force behind the criminal investigations, and as such, were directed by them to prepare the appropriate Patrol Division Supplementary Reports when they obtained pertinent information regarding an investigation. (Ex. A (Spratte) at 3333:7-3334:8.) Finally, Spratte testified that Gang Crime Specialists did not maintain case files or files that pertained to any particular criminal investigation. (Ex. A (Spratte) at 3337:15-18). Rather, they maintained "incident folders" which included copies of paperwork that had been generated if an arrest was made for the purpose of attending court if

17

necessary.  (Ex. A (Spratte) at 3415:11-3416:6).  There were no original documents maintained in these files.  (Ex. A (Spratte) at 3430:17-3431:4)

Accordingly, Plaintiff's use of Mingey as a conduit to create an entirely new, uncorroborated, alternative *Monell* theory that was contradicted in its entirety by evidence offered by the City, was improper and this Court's failure to sustain the City's objections to the entire line of questioning was error necessitating a new trial.

### B.  The Court Erred in Allowing Dr. Wells to Testify.

The City moved *in limine* to bar Wells from testifying at trial arguing that his methodology was not scientifically reliable and that any testimony he would provide would be more prejudicial than probative under Rule 403 because his testimony was so tenuously connected to the facts of this particular case.  (Dkt. 387).  In denying the City's motion, the Court found Wells' opinions to be admissible, relying primarily on its summary judgment opinion, which found that the Wells' report created a fact issue on how to explain the discrepancy between the field studies' rates of negative identifications and the rates in the Chicago data and that his testimony, while prejudicial, was not overly so.  (*See,* Dkt. 547 at pp. 3-5).  As was now borne out by the trial, the purported discrepancy between the field studies and the Chicago data were irrelevant to any of the issues at trial.

In fact, as this Court has now acknowledged in its ruling on the City's Rule 50(a) Motion, the jury instructions did not embrace the practice described by Wells, making a Rule 50 analysis unnecessary.  (Dkt. 676 at pp 9-10).  Accordingly, Wells' testimony in its entirety had no probative value and only served to unfairly prejudice the City by confusing the issues and misleading the jury.  *See,* Fed. R. Evid. 403.

18

Furthermore, Wells admitted that he did not prepare the data that he relied upon and that he could not vouch for its reliability. (Ex. A (Wells) at 1113-1114). Moreover, Plaintiff failed to establish that the process of coding the lineup reports was mechanical and could be completed by a non-expert. In fact, Wells acknowledged several errors in the data, including the difficulty of drawing conclusions from redacted files, and failed to provide the jury any way to verify the accuracy of the data. (Ex. A (Wells) at 1233-1234). As a result, the jury was provided no basis for which to assess the reliability of his conclusions and his opinions were insufficient to establish a widespread practice or custom and therefore was inadmissible under Fed. R. Evid. 702.

Finally, the error was compounded by the Court's decision to allow Wells to testify, over the City's objection, to evidence that went beyond the scope of Wells' disclosed opinions. (Ex. A (Wells) at 1107-1108). Specifically, Wells concluded, without evidence or support, that the rate of no-identifications in the Chicago data was too low to include both the expected rate of filler identifications and no-identifications combined, so he surmised there may be approximately 100 reports documenting filler identifications missing from the data he reviewed. (Ex. A (Wells) at 1107-1108). Not only does his guess of 100 missing reports not appear anywhere in his report (thus making his "opinion" undisclosed and therefore improper pursuant to Fed. R. Civ. P. 26(a)(2)), he did not provide the jury with any methodology or analysis of how he reached that conclusion. As a result, Wells' testimony was supported by his *ipse dixit* alone, and therefore, does not establish that the City failed to create any report when a witness identified a filler. *See Row v. Gibson,* 798 F.3d 622, 627 (7th Cir. 2015) ("[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.)

### III. ERRORS IN THE JURY INSTRUCTIONS WARRANT A NEW TRIAL.

A new trial should be awarded "when the instructions 'misstate the law or fail to convey the relevant legal principles in full' and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant." *Huff v. Sheahan,* 493 F.3d 893, 899 (7th Cir. 2007) *citing Byrd v. Illinois Dep't of Pub. Health,* 423 F.3d 696, 705 (7th Cir. 2005). While the trial court is not required to issue an "idealized set of perfect jury instructions," the instructions "must be correct legal statements and must be supported by the evidence. *Id., citing Schobert v. Illinois Dep't of Transp.,* 304 F.3d 725, 729 (7th Cir. 2002). There were several prejudicial errors in the jury instructions which warrant a new trial. Specifically, (1) the failure to instruct on the sufficiency (or lack thereof) of speculative evidence to support a *Brady* claim; (2) the failure to give a limiting instruction as to the invocation of the Fifth Amendment as it pertains to certain Defendants; (3); the failure to give the pattern instructions pertaining to municipal liability; and (4) allowing definitions of a policy within the instructions on municipal liability that were not supported by the evidence.

#### A. It Was Prejudicial To Refuse Defendants' Proposed Jury Instruction Which Would Have Instructed The Jury On The Proper Use Of Speculative Evidence To Support A *Brady* Claim.

The Court erred when it rejected Defendants' proposed jury instruction regarding the sufficiency of speculation as to the existence of other documents. (Dkt. 433-2, Defts' Proposed Instruction No. 37 at pg. 39). Specifically, Defendants proposed a jury instruction that accurately explained that the law does not permit speculation as to the existence of other documents to support a claim that an officer deliberately withheld exculpatory or impeachment evidence. *Id., citing United States v. Robinson,* 585 F.2d 274 (7th Cir. 1979). While the Seventh Circuit's Pattern Jury Instructions instruct a jury that it is allowed to make reasonable inferences, those inferences must

be based upon the evidence in the case. (Dkt. 433-1, Plaintiff's Agreed Proposed Instruction No. 11 at pg. 11). With this additional instruction, the Defendants sought to ensure that the jury did not give improper weight to purely speculative evidence, in particular, the testimony of Plaintiff's expert, Michael Brasfield, which this Court even recognized as being purely speculative. (Trial Tr. 2420:14-15).

The need for this instruction became even more apparent during the testimony of Defendant Mingey. As discussed *supra*, Plaintiff used Defendant Mingey's invocation of the Fifth Amendment to create a theory of "gang crimes street files" from whole cloth. Specifically, asking Defendant Mingey overly broad and argumentative questions regarding the record keeping practices within the gang crimes unit*,* without independent evidence to corroborate any of the questions, left the jury with nothing but speculation that such a thing called a "gang crimes street file" existed, despite the clear evidence to the contrary.

The reliance on purely speculative evidence continued when Plaintiff argued that the investigative file inventory sheet indicated that McLaughlin prepared two additional GPRs that were missing. (Ex. A (McLaughlin) at 1405-12). There was in fact no evidence that these GPRs existed, or if they did, what if anything they reported, let alone that they documented material, exculpatory evidence. *See United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (without pointing to any specific exculpatory evidence, *Brady* claim does not "get off the ground").

### B. It Was Prejudicial Not to Provide the Jury with the City's Proposed Limiting Instruction Regarding the Fifth Amendment.

The Court also erred when it rejected Defendants' proposed jury instruction that sought to limit evidence concerning certain Defendants' assertion of their Fifth Amendment Rights. (Dkt. 433-2 Defts' Proposed Instruction No. 10 at pg. 10). Specifically, Defendants sought to limit the jury's ability to impute the adverse inference against non-invoking Defendants, including the City.

21

"Courts that have addressed this issue have rejected bright-line rules, and instead concluded that the party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference." *State Farm Mut. Auto. Ins. Co. v. Abrams,* 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000). Ultimately, the question of whether a nonparty's refusal to testify may be used against a party is determined on a case-by-case basis and depends on whether such an adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *See, generally Sebastian v. City of Chicago,* 2008 WL 2875255, *34 (N.D. Ill. 2008), *citing Konots v. Kontos,* 968 F.Supp. 406 (S.D. Ind. 1997) (internal quotations omitted).

Similarly, in *Emerson v. Wembley U.S.A., Inc.,* when a plaintiff attempted to impute an adverse inference from a non-party witness' invocation of the Fifth Amendment to non-invoking defendants, the court noted that the "adverse inference [p]laintiff seeks is massive in scope" because it would involve an inference on "nearly all of the questions posed." *Id.* The court ultimately denied the imputation because "to grant the adverse inference would be unfair on many levels," specifically (1) the inference would be untrustworthy because the non-party invoking witness was not the only source of the answer to several of plaintiff's questions, and (2) the questions posed to the non-party witness lacked foundation and "to grant an inference in Plaintiff's favor on questions such as these would allow Plaintiff to bypass several required steps in proving her claim." *Id.,* at 1213-14.

A review of the evidence Plaintiff offered shows that the inference he sought from Mingey's invocation of the Fifth Amendment was similarly massive in scope and in fact sought to do each of the things the court in *Emerson* sought to protect against. Not only did Plaintiff use the inference to prop up his claims against the other Defendants, but he used the inference to create an

entirely new *Monell* theory regarding "gang crimes street files." Furthermore, the questions posed lacked the proper foundation, and were not supported by the evidence in the case, and as such Plaintiff was allowed to bypass several required steps in proving his claims against the City. Finally, the use of the inference was in fact untrustworthy because the invoking witness was not the only source of the answer to Plaintiff's questions as they related to the City's policies and practices. Accordingly, this Court's refusal to give Defendants' proposed limiting instruction was in error and prejudicial to the Defendants, in particular the City.

### C. The Jury Was Improperly Instructed on The Legal Standard for Evaluating Municipal Liability.

In order to obtain a new trial based on an incorrect jury instruction, the City must establish that the instruction failed to properly state the law, and that it was prejudiced by the error because the jury was likely to be misled or confused. *Kingsley v. Hendrickson,* 801 F.3d 828, 831 (7th Cir. 2015) (remand for a new trial warranted where jury was incorrectly instructed on standard of "subjective intent" because of risk that jury's assessment of officer's conduct did not satisfy applicable law). The instructions proffered to the jury regarding municipal liability did both.

A local governing body be liable for monetary damages under §1983 if the unconstitutional act complained of was caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978). A municipality is only responsible for its employees' actions if taken pursuant to an unconstitutional policy or custom of the municipality itself. *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 511 (7th Cir. 1993). It is well settled, that local governments are not vicariously liable under § 1983 for their employees' actions. *Monell,* 436 U.S., at 691; *Brown,* 520 U.S. 397 (1997) (collecting cases). The Seventh Circuit found the

inclusion of this legal standard for evaluating municipal liability important enough to include in the recently revised pattern instructions, yet the instructions read to the jury failed to include this this standard.

As outlined *supra* and at length in the City's Rule 50(b) motion, Plaintiff failed to provide a sufficient evidentiary basis to support either of his *Monell* claims. Despite this lack of evidence, the Court's instructions essentially allowed the jury to find the City liable on a *respondeat superior* theory rather than a policy claim, because they failed to instruct the jury that the City could not be held liable for simply employing one or more of the Defendants. Without this language, the instructions, as they read, presuppose liability on the City and a layperson may be likely to understand the instruction to allow a finding of liability against the City for simply employing the defendant officers. Defendants' proffered instruction mirrored the pattern instruction in that it included this language, but the Court refused this instruction. (Dkt. 433-2 Defts' Proposed Instruction No. 34 at pg. 35).

### D. It Was Prejudicial To Instruct The Jury On Municipal Liability Based On Instructions That Were Not Supported By The Evidence.

Jury instructions wholly unrelated to any of the issues raised during the course of trial are generally improper. *See Humphrey v. Staszak,* 148 F.3d 719 724 (7th Cir. 1998), *citing Spesco, Inc. v. General Electric,* 719 F.2d 233, 239 (7th Cir. 1983). The primary purpose of jury instructions is to "clarify issues for the jury and to educate the jury about what factor are probative on those issues." *Id.* (construing *Vanskike v. ACF Industries, Inc.,* 665 .2d 188 (7th Cir. 1981)). The instruction regarding the Plaintiff's policy claim against the City of Chicago instructed the jury that they could find a "policy of concealing material exculpatory and/or impeachment evidence" in one of four ways. However, two of the four policy definitions were not supported by

any of the evidence presented at trial. Accordingly, it was error in this case to instruct the jury on those elements.

### 1. A practice of failing to train employees of the City of Chicago or the Chicago Police Department.

As outlined *supra,* in order to prove a practice of failing to train, a Plaintiff must adhere to the stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Connick,* 563 U.S. at 62, *citing, Brown,* 520 U.S. 397. Despite this clear standard of fault for a possible failure to train claim, the jury instructions included both options for the jury to find a "practice of failing to train employees of the City of Chicago or the Chicago Police Department" as well as an instruction regarding the definition of "failure to train." (Dkt. 433-1 P's Proposed Instruction Nos 34, 35; Dkt. 671 Final Jury Instructions at pgs. 26, 27). Neither of these instructions were supported by the evidence presented by Plaintiff. Furthermore, there was direct, virtually unrebutted evidence presented regarding CPD's training pertaining to the creation, maintenance and preservation of investigative files and detective notes (Ex. A (McLaughlin and Hickey) 876:13-877:6; 3313:12-3314:10). While Plaintiff's expert testified that the detective training was not sufficient, post *Jones/Palmer,* such testimony does not give rise to the "deliberate indifference" standard required, especially in light of the evidence that the City did not have notice of other constructional violations that occurred because of CPD's file keeping practices (Ex. A at 3232:5-8). *See e.g., Connick,* 563 U.S. at 63 (2011) (Finding that four overturned convictions because of *Brady* violations was not sufficient to put the municipality on notice that the office's *Brady* training was inadequate.) Finally, Hickey testified that the Subpoena Service Unit received on-the-job training because it was a small unit with little turn-over. (Ex. A (Hickey) at 3233). Plaintiff offered nothing to contradict this testimony besides his expert's bald conclusion that the training was not good enough, which he presented without any methodological

25

reasoning or analysis, leaving nothing for which the jury could use to credit his opinion. In addition, CPD's training of the members of the Subpoena Service Unit is particularly irrelevant, considering Plaintiff did not elicit evidence that he issued a subpoena in his case. Even this Court recognized that failure to train was not developed in this case. (Ex. A at 4110:1-4111:5).

Finally, even assuming that Plaintiff arguably adduced evidence regarding deficiencies in the training processes for the various gang crimes units as it relates to note taking, Plaintiff proffered no evidence of a pattern of violations by the gang crimes units or that CPD was on notice of constitutional violations being caused by their note taking process. Without notice that a course of training is deficient in a particular respect, a decision maker can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. Rather, because the jury instructions were not supported by the evidence, this case allowed for a less stringent standard of fault for a possible failure-to-train claim, which results in a *de facto respondeat superior* liability on municipalities.

### 2. A decision or policy statement, including a decision not to adopt a needed policy.

Similarly, in order to prove that there was in fact a "gap in policy," Plaintiff was required to show that the "unlawful practice" was "so pervasive that acquiescence on the part of the policy makers was apparent and amounted to a policy decision." *Phelan v. Cook County,* 463 F. 3d773, 790 (7th Cir. 2006). Put simply, this means Plaintiff needed to provide evidence tending to show a general pattern of repeated behavior, or something greater than a mere isolated event. Plaintiff did neither. In fact, Plaintiff failed to develop any evidence of such behavior in order to support the inclusion of this definition in the instructions. Plaintiff's articulated example of such a gap in policy was that CPD generally decided "not to adopt a policy that covered anyone other than detectives[.]" (Ex A at 4111:19-21). Put another way, Plaintiff believes that DDSO 83-1 and its

progeny *should* have been department wide general orders rather than detective division special orders. Such an argument ignores the evidence from the City's 30(b)(6) witnesses which outlined the reasoning behind the implementation of the orders as well as the different assignments and duties for various police personnel.

Putting aside what Plaintiff believes *should* have happened, he failed to develop evidence at trial that the City was in fact aware that the written policies that were put in place after *Jones/Palmer* were insufficient. Furthermore, given this affirmative evidence, Plaintiff needed to develop evidence that the City was aware that the development of such policies fell short in some way, leaving a gap in policy that was likely to cause a violation of someone's constitutional rights in order to rise to the level of deliberate indifference, and the inclusion of this policy definition was wholly improper.

## CONCLUSION

WHEREFORE, Defendant, City of Chicago, respectfully requests this Honorable Court grant its Motion for A New Trial pursuant to Fed. R. Civ. P. 59(a) and for any other relief as it deems just and reasonable.

Dated: August 31, 2018                                 Respectfully submitted,

                                                        City of Chicago

Eileen E. Rosen                                  By: _____/s/ *Eileen E. Rosen*_____
Catherine M. Barber                                         One of its attorneys
Theresa Berousek Carney
ROCK FUSCO & CONNELLY, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
erosen@rfclaw.com