# EXHIBIT 90

1           IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   JACQUES RIVERA,                      ) No. 12 CV 4428
                                         )
4           Plaintiff,                   )
                                         )
5   vs.                                  ) Chicago, Illinois
                                         )
6   REYNALDO GUEVARA, STEVE GAWRYS,      )
    DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
7   JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN )
    MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
8   RUSSELL WEINGART, ESTATE OF ROCCO    )
    RINALDI, CITY OF CHICAGO,            ) June 15, 2018
9                                        )
            Defendants.                  ) 9:26 o'clock a.m.
10
                        VOLUME 9-A
11           TRANSCRIPT OF PROCEEDINGS - Trial
          BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                    and a jury

13  APPEARANCES:

14  For the Plaintiff:    LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
15                             MR. STEVEN E. ART
                               MR. ANAND SWAMINATHAN
16                        311 North Aberdeen Street
                          3rd Floor
17                        Chicago, Illinois  60607

18                        MacARTHUR JUSTICE CENTER
                          Northwestern University School of Law
19                        BY:  LOCKE E. BOWMAN III
                          357 East Chicago Avenue
20                        Chicago, Illinois  60611
                          (312) 503-0844
21

22  Court reporter:           Blanca I. Lara
                          Official Court Reporter
23                        219 South Dearborn Street
                              Room 2504
24                        Chicago, Illinois 60604
                              (312) 435-5895
25                        blanca_lara@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2

 3   For the Individual        THE SOTOS LAW FIRM
     Defendants:               BY:   MR. JEFFREY N. GIVEN
 4                                   MR. JAMES G. SOTOS
                                     MS. CAROLINE P. GOLDEN
 5                                   MR. JOSEPH POLICK
                                     MR. DAVID A. BRUEGGEN
 6                             550 East Devon Avenue, Suite 150
                               Itasca, Illinois  60143
 7

 8   For the Defendant         ROCK FUSCO & CONNELLY, LLC
     City of Chicago:          BY:   MS. EILEEN E. ROSEN
 9                                   MS. CATHERINE M. BARBER
                                     MS. THERESA B. CARNEY
10                             321 North Clark Street, Suite 2200
                               Chicago, Illinois  60654
11

12   For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
     Guevara:                  BY:   MR. THOMAS E. LEINENWEBER
13                                   MR. JAMES V. DAFFADA
                               120 North LaSalle Street, Suite 2000
14                             Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

1   (Jury out.  Proceedings heard in open court:)

2        THE COURT:  Good morning.

3        MR. LOEVY:  Good morning, Your Honor.

4        THE COURT:  I wanted to -- is everybody here?  Yes?

5   No?

6        MR. LOEVY:  Yes, for the plaintiff.

7        THE COURT:  I just wanted to make the record clear on

8   that posting of the transcript that was the basis for the

9   defense motion for a mistrial yesterday.

10   (Discussion off the record.)

11        THE COURT:  Okay.  Page 1753 of the transcript, it

12   looks like -- if you have the times on this, but what I have

13   indicates that at 11:12:07 -- that is 12 minutes and 7 seconds

14   after 11 -- Mr. Loevy asked to post the page 90, line 7 through

15   21 -- I need to keep that closed.

16        COURT SECURITY OFFICER:  Yes.

17        THE COURT:  Thank you.

18        How long after that it actually went up, you know, I

19   have no idea, but that was 11:12:07.

20        And then Mr. Loevy said, "Take it off the screen" at

21   11:12:26, which looks like at most about 19 seconds.  And if

22   anybody wants -- I'm trying to get the piece of the transcript

23   so we can put that in the record, too.  Okay?

24        MR. LOEVY:  Your Honor, can I just add to that that it

25   doesn't load immediately.  The experience that the trial has

1  shown, it takes awhile for Ann to type it in --

2           THE COURT:  I'm sure.  I'm sure.

3           MR. SOTOS:  And it doesn't come down immediately

4  either, both sides.

5           THE COURT:  No.  Okay.

6           Are we ready for the jury when they're ready for us?

7           MR. LEINENWEBER:  Judge, there was one issue that I

8  wanted to bring up to Your Honor.

9           THE COURT:  Yes.

10          MR. LEINENWEBER:  With my cross of Ms. Linzer

11  yesterday, I attempted to use Exhibits 102 and 103, and there

12  was objections because those are Ms. Cynthia Estes' --

13          THE COURT:  Yes.

14          MR. LEINENWEBER:  -- they're the -- handwritten notes

15  are 102, and the typewritten notes are 103.

16          Judge, it's our belief that those exhibits are going

17  to come into evidence when Ms. Estes testifies, I believe, next

18  week.

19          So coming into evidence under her, I believe should be

20  able to question this witness about that, because as Your Honor

21  knew from the testimony yesterday, the two of them were

22  conducting the interview.

23          THE COURT:  And maybe I -- I don't always know what's

24  happening, but you didn't question her yesterday about these?

25          MR. LEINENWEBER:  Oh, no, I did, Judge.

1        THE COURT:  Okay.

2        MR. LEINENWEBER:  I wanted to -- I wanted to bring it

3   in evidence.  I wanted to put it on the Elmo.  I wanted to show

4   it to the jury.

5        THE COURT:  All right.  Is that it, Ben?  Okay.

6        Let me just for the record, this is what seemed to go

7   up was page, it looks like 89 -- I don't know.  I don't even

8   know what this is.

9        THE LAW CLERK:  It's Gawrys' deposition.

10       THE COURT:  Okay.  So it says -- and I gather that the

11  part that concerned the defense is a question from this

12  transcript:  "Are you aware that lawyers from the office of --

13  or from Sidley & Austin had been hired by" --

14       MR. SOTOS:  That's not it, Judge.

15       THE COURT:  Oh.

16       MR. LOEVY:  I can clarify, Your Honor.

17       THE COURT:  Okay.  Line 24:  "Were you aware that your

18  partner, Rey Guevara, was being investigated by the FBI?"

19       That's where it starts.  It starts with Guevara --

20       MR. LOEVY:  Yes.

21       THE COURT:  -- was being investigated by the FBI in

22  conjunction with the criminal acts submitted by Joe

23  Miedzianowski.

24       Ms. Ekl made an objection, form, assumes facts not in

25  evidence.  The witness said, "No, I have no idea."

1    MR. LOEVY:  Your Honor, the -- only the first four

2  lines go up.  What we did was we played video impeachment, and

3  four lines trail.  So nothing else on the page went up.

4    And we can confirm -- it's either three lines, four

5  lines, or five lines, but the page didn't go up.  Just what I

6  called out was page 90, line 7 through 21, and she put up line

7  7 through either three or four lines following line 7.

8    And the only thing I want to add is on page 91, lines

9  7 through 21 is the precise impeachment.  And I'm going to file

10  that.  So I actually got the wrong page by one page.

11    THE COURT:  So what went up?

12    MR. LOEVY:  Either three or four lines after line 7 or

13  actually two or three after --

14    THE COURT:  Not what I just read?

15    MR. ART:  Yes, Your Honor.

16    MR. LOEVY:  Part of what you just read.  So I called

17  out lines 7 through 21.

18    THE COURT:  Right.

19    MR. LOEVY:  So lines 7, 8, 9, and possibly 10 and

20  possibly 11 went up.  No further.

21    THE COURT:  That is not what I just read.  Seven --

22    MR. LOEVY:  On page 9 --

23    THE COURT:  I don't know.  Why don't -- page 90, line

24  7 through 10?

25    MR. LOEVY:  Either 10 or 10 through 11, no further.

1          THE COURT:  It says by Mr. Ainsworth:  "You've never

2    seen the FBI report regarding Rey Guevara's activities with Joe

3    Miedzianowski?

4          "Answer:  No, never seen anything."

5          I don't know.  I mean, Ben, why don't you just give

6    that to counsel.  We can get more copies of it.  All right.  I

7    think it's 9:30.

8          MR. LEINENWEBER:  Thanks, Your Honor.

9          MR. LOEVY:  We had a quick issue with the next

10   witness, Ms. Linzer.

11         THE COURT:  Quick, quick.

12         MR. LOEVY:  The quick issue is they -- you know, it

13   was always everybody's understanding that there were going to

14   be two lawyers questioning Ms. Linzer, Mr. Leinenweber and an

15   attorney with Ms. Rosen's office.

16         They've now said they're going to add an attorney from

17   Mr. Sotos' office, Mr. Sotos.

18         We are going to be objecting to asked and answered if

19   any of the same subject matter that Mr. Leinenweber covered --

20         THE COURT:  Well, I would appreciate that objection.

21   I'm not sure I'm always going to get it right, but I would

22   appreciate that objection so we can get this case moving.

23         MR. LOEVY:  They've already --

24         THE COURT:  I'm not going to prevent anybody from

25   cross-examining.

1      MR. SOTOS:  For what it's worth, Judge, I have less

2 than five minutes with her, so --

3      THE COURT:  Well, as I say, when you've won, just

4 surrender.  Okay?  All right.

5      MR. SOTOS:  I apologize.

6      MR. BOWMAN:  With respect to the notes, the issue that

7 Mr. Leinenweber raised, if the premise is that notes go in with

8 the foundation of the witness' testimony -- in other words,

9 Estes notes come in through Ms. Estes --

10      THE COURT:  I know what you're talking about.

11      MR. BOWMAN:  -- then our position would be that

12 Ms. Linzer's note regarding coaching, Plaintiff's Exhibit 260,

13 would come in through Ms. Linzer under the same premise.

14      THE COURT:  I ruled on this yesterday.  I didn't --

15      MR. BOWMAN:  I think you -- I think you said we'd

16 think about it and decide later.

17      THE COURT:  Oh.

18      MR. LOEVY:  It's just hard to imagine it's different

19 than the notes Mr. Leinenweber wants to get in, which aren't

20 even Linzer's.

21      THE COURT:  What's the difference?

22      MR. LEINENWEBER:  Well, the difference is -- is as we

23 said, one is a 17-page typed-up report about an interview, and

24 the other is like a handwritten note --

25      THE COURT:  I don't think that's a significant

1   difference.  You can use it.

2          Let's get the jury.

3          COURT SECURITY OFFICER:  All rise.

4     (Jury in.)

5          THE COURT:  Good morning, ladies and gentlemen.

6   Please be seated.

7          Mr. Leinenweber, whenever you're ready.  Oh, we have

8   to get the witness.  I guess that would help.  Sorry.

9          MR. LEINENWEBER:  It's a little easier that way,

10  Judge.

11         MR. BOWMAN:  I'm sorry, Judge.

12    (Witness enters courtroom.)

13         THE COURT:  Ms. Linzer, you may retake the witness

14  stand.

15         MR. LEINENWEBER:  May I proceed, Your Honor?

16         THE COURT:  You may.

17         MR. LEINENWEBER:  Thank you, Judge.

18      JENNIFER LINZER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

19                 CROSS-EXAMINATION (Continued)

20  BY MR. LEINENWEBER:

21  Q.  Good morning, Ms. Linzer.

22  A.  Good morning.

23  Q.  You recall yesterday I had asked you a few questions about

24  the conversations that you and Ms. Estes had on the way down --

25  the way from Chicago to Cleveland, correct?

1  A.  Yes.

2  Q.  And there was some talk -- and I think that there had been

3  some notes that I had shown to you --

4          MR. LEINENWEBER:  And, Judge, if I can approach.

5          THE COURT:  Yes.

6  BY THE WITNESS:

7  A.  Thank you.

8  BY MR. LEINENWEBER:

9  Q.  Thank you.  But that's Exhibit -- Defendants' Exhibit 102

10  for identification.

11          Those were the -- you had previously seen these notes

12  at your deposition; is that correct?

13  A.  Yes.

14  Q.  And I think you said that may have been the first time you

15  saw those notes?

16  A.  Yes.

17  Q.  And those are Ms. Estes' notes that she made on the way to

18  Cleveland, correct?

19  A.  I believe so.

20  Q.  Okay.  And I believe you said that there were some of the

21  things in the -- you talked about some of the things that you

22  had hoped to speak to Mr. Orlando -- Mr. Lopez about during the

23  ride, correct?

24  A.  Sure.

25  Q.  And, in fact, when you got to Cleveland, you said you

1 knocked on the door, and then you had to wait about an hour or

2 so for Mr. Lopez to return to his house, correct?

3 A. Yes.

4 Q. And so I assume at that point it's nerve-racking, exciting,

5 all those adjectives, correct?

6 A. Yes.

7 Q. Okay. And I assume that the main topic of conversation

8 again was, "My gosh, we're going to finally talk to Orlando

9 Lopez, and we're going to finally get some answers," correct?

10 A. We were hoping this was the right person.

11 Q. Right. So -- exactly.

12     You're hoping that this is the Mr. Lopez that you've

13 been looking for for years. You're hoping that this is -- that

14 Mr. Lopez would be willing to talk to you, and you're hoping

15 that Mr. Lopez will tell you what he remembers and what

16 actually happened, correct?

17         MR. LOEVY: Objection, asked and answered.

18         MR. BOWMAN: Asked and answered.

19         THE COURT: Sustained.

20         MR. LEINENWEBER: Judge, I would move Exhibit 102 into

21 evidence.

22         MR. LOEVY: Your Honor, that is a different exhibit

23 that we talked about. These are Ms. Estes' notes before they

24 talked to Orlando Lopez.

25         THE COURT: Has there been any questioning about that

1  other than that those were notes she took on the way?

2      MR. LEINENWEBER:  Exactly.  That was the only

3  questioning yesterday about them.

4      MR. BOWMAN:  And there's no --

5      THE COURT:  I don't think that they're relevant if

6  that's it.

7      MR. LEINENWEBER:  No problem, Judge.

8      If I can approach again, Judge.

9      THE COURT:  Sure.

10  BY MR. LEINENWEBER:

11  Q.  Thank you.

12  A.  Thank you.

13  Q.  I've shown you Exhibit 103 -- Defendants' Exhibit 103 for

14  identification.

15      These are the notes we talked about yesterday,

16  correct?

17  A.  This is the report you mean?

18  Q.  Exactly.  Ms. Estes' report of your meeting with Mr. Lopez,

19  those are the ones we talked about yesterday?

20  A.  Yes.

21      MR. LEINENWEBER:  Okay.  Judge, I would move those

22  into evidence.

23      MR. LOEVY:  No objection, Your Honor.

24      THE COURT:  And they are received.

25      MR. LEINENWEBER:  Thank you.

1    (Defendants' Exhibit 103 received in evidence.)

2  BY MR. LEINENWEBER:

3  Q.  And I'm not going to beat a dead horse with you, but I just

4  wanted to take you through those notes if I could.

5        MR. LEINENWEBER:  Judge, if I could publish those to

6  the jury.

7        THE COURT:  Sure.

8        MR. LEINENWEBER:  Dave, can you -- sorry, Judge.

9  Thank you.

10  BY MR. LEINENWEBER:

11  Q.  Okay.  So as we see here, on the front, that's -- this is

12  the report that we've been talking about, correct?

13  A.  Yes.

14  Q.  And this is a 17-page report typed up by Ms. Estes about

15  your meeting, correct?

16  A.  Yes.

17  Q.  Okay.  And I'm going to ask you to turn to, let's see, page

18  8.  Again, this is some of the stuff we went over yesterday,

19  but I just wanted to clarify a couple issues with you.

20        So you see where I'm writing here?  So Mr. Lopez said,

21  "He didn't think that Mr. Rivera was going to be convicted

22  because he understood that Mr. Rivera had an alibi."

23        Do you remember Mr. Lopez telling you that?

24  A.  Yes.

25  Q.  Okay.  And he said, "He knew that when he testified it was

1  not the right guy, and he knew he wasn't doing the right thing,

2  but by then he was already a Pee Wee In the MLDs."  And you

3  understood that to be Maniac Latin Disciple, correct?

4  A.  That's correct.

5  Q.  Okay.  And he didn't really care about a Latin King.

6         So that -- did that jibe with your memory of what

7  happened that day?

8  A.  Yes.

9  Q.  Okay.  And then at the bottom of the page there -- again,

10 you're talking to him, and I know it's all coming out, like as

11 you said, like a dam bursting, but he's trying to explain

12 everything.  He's been waiting for 20 years.

13        And so one of the things he says to you is -- you

14 asked -- "We asked how he's mistaken.  He said after the

15 shooting, the police were all over, and he told somebody he

16 knew who did it," correct?

17 A.  Yes.

18 Q.  Okay.  Let me ask you to turn to the next page.  That would

19 be page 9.

20        And then it says, you know, "We asked" -- do you see

21 there -- "We asked if we could go back to what happened right

22 after the shooting.  Mr. Lopez said the cops didn't show up

23 right away because Israel tried driving Felix to the hospital

24 and ended up wrecking the car, so the cops went first to that

25 scene."

1    That jibes with your memory of, again, what he's

2    talking about?

3    A.  Yes.

4    Q.  Okay.  "And when the police finally showed at Cortland" --

5    and Cortland is where you understood where Mr. Lopez to live,

6    correct?

7    A.  Correct.

8    Q.  Okay.  So when they finally show up, "he told them what he

9    saw.  The police came to his house and showed him picture books

10   of Latin Kings and looked at many photos.  He said he just got

11   sick of looking at them and picked out someone who looked

12   similar to the real shooter.  And Mr. Lopez said the real

13   shooter had lighter hair in the back."

14       Again, that's -- this seems accurate to you, correct?

15   A.  Yes.

16   Q.  Okay.  And then if I could ask to you turn to page 11.

17   And, again, I know the conversation, I think you had said, was

18   free flowing.  Is that a good way of putting it?

19   A.  Yeah.

20   Q.  Yeah, he's talking a lot?

21       THE COURT:  Whose Post-it notes are these all over?

22       MR. LEINENWEBER:  Oh, I'm sorry, Judge.  Those are

23   mine.  Sorry.

24       THE COURT:  Thanks.

25       MR. LEINENWEBER:  No problem.  I apologize, Your

1  Honor.

2  BY MR. LEINENWEBER:

3  Q.  But, again, the conversation is free flowing.  He's -- he's

4  telling everything he knows, right, trying to?

5  A.  Trying to, yes.

6  Q.  Okay.  So then it says, "I asked" -- and that's Ms. Estes,

7  I take it?

8  A.  Sorry.

9  Q.  Where it says, "I asked Mr. Lopez if we could go through

10  the order in which he identified our client," I take it that's

11  Ms. Estes asking that question?

12  A.  Yes.

13  Q.  Okay.  And it says, "Mr. Lopez said the cops brought the

14  mugshot book to his house, and he picked the guy.  Then he

15  thinks he may have picked him from a lineup a few days later.

16  He thinks a few days after that they showed him more photos,

17  and that's when he told them Rivera was not the guy, but the

18  lady wouldn't listen."

19          Again, I know it's a silly question, but that jibes

20  with your memory of what he said to you?

21  A.  Yes.

22  Q.  Okay.  And then it says, "We asked which lady.  He said she

23  was not in uniform, maybe she was a lawyer, older with blonde

24  hair and had some white hair.  Mr. Lopez pointed to my hair."

25  Presumably Ms. Estes, correct?

1  A.  Yes.

2  Q.  And said, "Kind of like yours.  Mr. Lopez said thinks it

3  was the third he was brought back, and he tried to tell me he

4  had the wrong guy."

5          THE COURT REPORTER:  I'm sorry, Mr. Leinenweber.

6          MR. LEINENWEBER:  I'm sorry.  Let me start that again,

7  Nancy.

8          THE COURT REPORTER:  Thank you.

9  BY MR. LEINENWEBER:

10  Q.  "Mr. Lopez says he thinks it was a third time he was

11  brought back that he tried to tell them that they had the wrong

12  guy, but by then no one wanted to hear that."

13          Again, does that jibe with your memory of what

14  happened?

15  A.  Yes.

16  Q.  Okay.  And then he said -- he said, "He kept saying to him

17  he didn't need to be afraid.  He seemed to think they didn't

18  really want to hear him.  He was young and alone at the

19  station."

20          That, again, is what he told you?

21  A.  Yes.

22  Q.  Okay.  If you turn to the next page, page 12, he said that

23  "the white-haired lady and one of the cops kept saying it's all

24  right; you don't need to be afraid."  Okay?

25          "Mr. Lopez said he never told them he was afraid.

1  Just he told them it wasn't the right guy and then went into

2  this whole speech about him being young and afraid.  Mr. Lopez

3  says he wants us to know the cops did not coerce him into

4  picking anybody out.  They just didn't want to hear it when he

5  tried to make it right"?

6  A.  Yes.

7  Q.  That seems to be exactly what he said?

8  A.  Yes, to the best of my recollection.  This was eight years

9  ago.

10  Q.  Sure.

11  A.  Yeah.

12  Q.  And, again, and that's why, you know --

13  A.  Yeah.

14  Q.  -- that's why the reports are made so -- because if eight,

15  ten, twelve years down the line someone has to testify about

16  it, no one can rely on their memory, correct?

17  A.  Well, you know, I do have a memory of that day.

18  Q.  Sure.  Of course.  But you would agree with me that the --

19  that a typed paper written at the time of the conversation is

20  probably going to be more accurate than relying on your own

21  memory; is that fair to say?

22  A.  Well, this is not my report.

23  Q.  Understood.  In general, though, if you're talking about

24  your memory, it's probably more likely than not that if someone

25  wrote down what happened -- Ms. Estes in this case -- that

1  that's probably more accurate than your own recollection?

2  A.  That's fair.

3  Q.  Okay.  And it says further that Mr. Lopez said "he," Lopez,

4  "exaggerated on the stand.  I asked him if he knew it was the

5  right guy when he was testifying.  He said, yes, right.  He

6  knew it wasn't the guy.  Already gotten so far.  It was like

7  there was no way to stop it.  He heard the guy had an alibi, so

8  he figured he'd be found not guilty.  Mr. Lopez he said he did

9  not really care about what happened to a Latin King but neither

10  did the white-haired lady."

11      That's accurate, correct?

12  A.  I think the first part -- you know, I remember him saying

13  the first part of the sentence.  You know, I don't recall the

14  second half of the sentence.

15  Q.  Okay.  But at least looking back at this report, you

16  believe this report is accurate, as you said yesterday?

17  A.  Yes.

18  Q.  Then I'm going to ask you to turn to page 14 if you

19  wouldn't mind.  And in the middle of there -- the middle of the

20  second paragraph, it says, "Mr. Lopez said they asked him three

21  times if he was sure, and it was the third time at the police

22  station he told them he was wrong.  I asked if there were

23  police present.  He said the white-haired lady and the cop were

24  talking to him, but there were cops all over the place.  He

25  wished he could have been stronger."

1      Again, that jibes with your memory?

2  A.  Yes.

3  Q.  And then finally -- I promise I'm almost done -- turn to

4  page 16, the next to last page, at the very bottom, he says, "I

5  asked about the white-haired lady.  He said he can't remember

6  much."

7      If you turn to 17, "She was older and had blondish

8  hair with white in it.  Mr. Lopez is pretty sure it was the

9  third time he was brought back and shown the photos.  He

10  pointed to the guy he had picked and said that's not the right

11  guy.  He told them the real guy was an IG, and he was a

12  neighborhood guy."

13      Again, does that jibe with your memory of what

14  happened that day?

15  A.  Yes.

16      MR. LEINENWEBER:  Judge, can I have one moment,

17  please?

18      THE COURT:  Sure.

19   (Counsel conferring.)

20      MR. LEINENWEBER:  Nothing further.  Thank you, Your

21  Honor.

22      Thank you, ma'am.  Appreciate it.

23                      CROSS-EXAMINATION

24  BY MR. SOTOS:

25  Q.  Good morning, Ms. Linzer.

1  A.  Good morning.

2  Q.  You'll be pleased to know I only have about two or three

3  minutes of questions.

4  A.  Okay.

5  Q.  Okay.  I'll get you out of here as quickly as we can.

6        I just want to follow up on an area that wasn't

7  covered, and it relates to the -- well, let me provide some

8  context.

9        So you talked to Mr. Lopez on five or six occasions in

10  2010.  Does that sound about right?

11  A.  Well, there were -- there was a meeting in February, and

12  there was a meeting in April, and then there were a half a

13  dozen phone conversations.  And then I saw him the following

14  year when he came to Chicago.

15  Q.  But most of the conversations were in 2010 in between --

16  A.  Yeah.

17  Q.  -- like, February and June?

18  A.  Yeah, that's fair.

19  Q.  And most of those conversations you talked about the case,

20  right?

21  A.  Yes, I think that's fair to say, some --

22  Q.  All right.  And --

23  A.  Yeah.

24  Q.  And in all of those cases -- in all of those

25  conversations -- and when you were talking to him, there were

1  no representatives with you other than representatives of the

2  Mr. Rivera, correct?

3  A.  That's correct.

4  Q.  All right.  And so there was nothing inhibiting the

5  conversation that you were having with him?

6  A.  Correct.

7  Q.  All right.  And in all of those conversations, he never

8  said that he was ever coerced or told who to pick by any police

9  officer, correct?

10  A.  That's correct.

11  Q.  And you had testified yesterday about a note that you made

12  of a conversation that occurred on, I think it was, March 2nd,

13  2010?

14  A.  Right.

15  Q.  Do you remember all that?

16  A.  Yes.

17  Q.  So let me hand you that.  Do you have it in front of you or

18  no?

19  A.  I don't have that one.

20  Q.  I'm going to show you what's been marked as Plaintiff's

21  Exhibit No. 260.

22  A.  Thank you.

23  Q.  And ask you, are those the notes that were being discussed

24  yesterday?

25  A.  Yes.

1   Q.  And you prepared that note, correct?

2   A.  This is my handwriting.

3           MR. SOTOS:  All right.  And, Your Honor, we'd move to

4   admit Plaintiff's 260.

5           THE COURT:  Plaintiff's 260, I assume no objection?

6           MR. LOEVY:  Your Honor, we already moved to admit that

7   same exhibit yesterday.

8           MR. SOTOS:  Oh, I didn't know it was admitted, Judge.

9   We can just move on, then.

10          THE COURT:  Well, it's received in any event.

11          MR. SOTOS:  Sorry to waste the time.

12          THE COURT:  Yes, actually, it was yesterday.

13          MR. SOTOS:  Okay.  Can we publish it to the jury,

14  please?

15          THE COURT:  Sure.

16          MR. SOTOS:  I guess we're going to put it on the Elmo.

17  BY MR. SOTOS:

18  Q.  So does the -- so is that the note that was being discussed

19  yesterday during your examination, Ms. Linzer?

20  A.  Yes.

21  Q.  And it -- let's start with the bottom first.  It says,

22  "3-2-10."  That's March 2nd, 2010?

23  A.  Yes.

24  Q.  All right.  And that's when you -- it looks like you placed

25  a call -- you were writing there that you placed a call to

1  Mr. Lopez, correct?

2  A.  Yes.

3  Q.  You had written "from" and then thought about it, realized

4  it was -- you had called him and --

5  A.  Yeah, maybe he called me, and I called him back.

6  Q.  All right.

7  A.  I don't remember, yeah.

8  Q.  That's fine.  And if you go to the top of it, it says, "The

9  more" plus/minus.  Is that your shorthand for something?

10  A.  I think that's "I."

11  Q.  "The more I think about it."  Got it.

12         It says, "The more I think about it, I was coached,"

13  correct?

14  A.  Yes.

15  Q.  And below that it says, "I can't believe I said"?

16  A.  Yes.

17  Q.  And when he said -- when you wrote "I can't believe I

18  said," you were writing something Mr. Lopez told you in

19  relation to his trial testimony, correct?

20  A.  Yes.

21  Q.  All right.  And that was about more than a year and a half

22  after he was arrested and charged with the crime, correct?  Do

23  you remember that?

24  A.  Yes.

25  Q.  All right.  And when you wrote, "I was coached," that was

1  in reference to his trial testimony, correct?

2  A.  I believe so.

3  Q.  All right.  And so it wasn't -- and his trial testimony,

4  again, was about a year and a half after he was already

5  arrested and charged?

6  A.  Right.

7  Q.  And at least a year and a half after all of these

8  identification procedures that you were talking back and forth

9  with him and that we've been talking about during the trial,

10  correct?

11  A.  Yes.

12  Q.  All right.  So you didn't -- when you talked to him, he

13  wasn't -- when he said he was coached, he wasn't talking about

14  any of the things that the police did with him in connection

15  with him identifying Mr. Rivera, correct?

16  A.  It's my recollection that he was referring to his trial

17  testimony.

18  Q.  Right.  And when he said he was coached, he was talking

19  about his preparation for testimony?

20  A.  Perhaps.

21  Q.  That was your impression at the time, right?

22  A.  Yes, what he testified to at trial.

23  Q.  Okay.  And he didn't say anything about knowing who -- at

24  the time who had even prepared him to testify, correct?

25  A.  It was the same two people that had shepherd him --

1  shepherded him through the system.  At least that was what I

2  understood, the white-haired lady and the male cop.

3  Q.  So do you remember -- so when you were preparing for your

4  deposition, did you -- or excuse me.

5       When you were preparing for your trial testimony, did

6  you review your deposition that you gave in the case?

7  A.  I did.

8  Q.  All right.  And do you remember being asked this question

9  and being -- and giving this answer in connection --

10         MR. LOEVY:  Can I have the page?

11         MR. SOTOS:  Yeah, it's page 112, starting at line

12  17 -- well, no, starting at line 7.

13  BY MR. SOTOS:

14  Q.  "Question:  So you've written down here

15              'I can't believe I said,' and

16              do you recall what it is that he

17              said?  'I can't believe I said'

18              that you didn't write down?"

19         And you said:

20              "Answer:  That was in reference to

21              his trial testimony."

22  A.  Right.

23  Q.  Okay.  All right.  And then he said:

24              "I assume what this is, right?

25              He said to you, 'The more I

1        think about it, I was coached'?"
2        And you said:  "Yes."
3           "Question:  And did he say who
4           coached him?
5           "He was telling me that he had lied
6           on the stand and identified the wrong
7           person, and he did not know the names
8           of the people that had prepared him
9           for his testimony.  He could only give
10          descriptions.
11          "And what descriptions did he give you
12          of the people that prepared him for
13          testimony?
14          "Answer:  The white-haired lady and
15          the cop.
16          "Question:  And he said that they're
17          the ones that prepared him to testify?
18          "Answer:  That would be a reach to me.
19          You know, I don't -- I don't remember
20          the specifics that he said that they
21          prepared me, but he said I was coached."
22       Does that sound familiar?
23  A.  That's what I said, yes.
24  Q.  All right.  So as -- as you were giving your deposition,
25  you weren't sure who he was talking about in terms of who

1  prepared him for his testimony?

2  A.  Sure.  That's fair.

3  Q.  All right.  Whether it was at a -- an Assistant State's

4  Attorney who was putting him on the stand or any one of a

5  number of people who he didn't really tell you?

6  A.  Yes.

7        MR. SOTOS:  Thank you, Ms. Linzer.  I don't have

8  anything else for you.

9                    CROSS-EXAMINATION

10  BY MS. BARBER:

11  Q.  Good morning, Ms. Linzer.  I only have a couple questions

12  as well.

13        In the course of your work at Northwestern, you

14  sometimes issue FOIA requests, right?

15  A.  Yes.

16  Q.  And FOIA stands for the Freedom of Information Act?

17  A.  Yes.

18  Q.  Okay.  And is it fair to say that you would use FOIA to

19  obtain government records, public records, things like that?

20  A.  Yes.

21  Q.  Okay.  I want to show you, Ms. Linzer, City Exhibit 48.

22        MS. BARBER:  If we can turn on defense table 2.

23  BY MS. BARBER:

24  Q.  Do you see what's in front of you?

25  A.  Let me take -- yes.

1  Q.  And that's a FOIA request you issued to the Chicago Police

2  Department, correct?

3  A.  That's correct.

4  Q.  Okay.  And you'll agree with me it's asking for the front

5  and back copies of all photos included in inventory No. 544-008

6  652, right?

7  A.  Correct.

8      MS. BARBER:  Your Honor, I move for the admission of

9  City Exhibit 14.

10     THE COURT:  Any objection?

11     MR. BOWMAN:  No objection.

12     THE COURT:  It is received.

13   (City Exhibit 14 received in evidence.)

14  BY MS. BARBER:

15  Q.  Flipping to Defendants' Exhibit 1.13, which has already

16  been admitted into evidence, if you could look at the second

17  page.

18     Ms. Linzer, you would agree with me that the portion

19  there that says "Evidence, No. 544008 (652) photos" is the same

20  number on your FOIA request, correct?

21  A.  Yes.

22  Q.  All right.  Now I'd like to show you, Ms. Linzer, what

23  we've marked as City Exhibit 49.

24     And this is a letter directed to you from FOIA

25  Officer -- Police Officer Christopher Bove; is that right?

1    A.  Yes.

2    Q.  And you'll agree with me that it references the photos

3    included in the inventory No. 544-008652, correct?

4    A.  Yes.

5         MS. BARBER:  Your Honor, I'd move for the admission of

6    City Exhibit 49.

7         THE COURT:  Any objection?

8         MR. BOWMAN:  No.

9         THE COURT:  It is received.

10   (City Exhibit 49 received in evidence.)

11        MS. BARBER:  If we can publish that to the jury.  Yes.

12   Thank you.

13        THE COURT:  Sure.

14   BY MS. BARBER:

15   Q.  So, Ms. Linzer, in the second -- well, you see that the

16   date of the request here says May 10th, 2011, right?

17   A.  Let's see.  Yes.

18   Q.  Okay.  And the second paragraph states:  "In our May 16th,

19   2011, phone conversation, I requested that you send a subpoena

20   for the photos due to the fact that you are currently in court

21   for this case."  Do you see that?

22   A.  Yes.

23   Q.  Okay.  And you would agree with me that in May -- May 10th,

24   2011, the post-conviction proceeding was underway, right?

25   A.  Yes.

1   Q.  And do you recall that conversation on May 16th, 2011?

2   A.  Not specifically.

3   Q.  Okay.  And then the letter goes on to say, "You express

4   concern that you may not have the ability to obtain a subpoena

5   and would get back to me.  However, due to the strict FOIA

6   timeline, I am treating your request as withdrawn.  If you are

7   unable to procure a subpoena, please contact me at

8   (312) 745-5308 or by mail at the below address, and I will

9   reopen this request."  Do you see that?

10  A.  Yes.

11  Q.  Okay.  And you did not issue a subpoena for the photos,

12  right?

13  A.  I -- I would not have issued a subpoena.

14  Q.  Did you prepare it for anyone else to issue?

15  A.  No.

16  Q.  And to your knowledge, did anyone from the Northwestern

17  post-conviction team issue a subpoena for the photos?

18  A.  I do not know.

19  Q.  So you can't say that they did?

20  A.  I cannot -- I do not know.

21  Q.  Okay.  And have you seen a copy of that subpoena in

22  preparation for your deposition or trial?

23  A.  No.

24  Q.  Okay.  And you'll agree with me that in that letter,

25  nowhere does it say the photos don't exist, right?

1    A.  That's correct.

2    Q.  In fact, it suggests the opposite, because it's asking you

3    to issue a subpoena for them, correct?

4    A.  Yes.

5         MS. BARBER:  Okay.  Thank you.  I have no further

6    questions.

7         THE COURT:  Okay.  Anything further from plaintiff?

8         MR. BOWMAN:  Yes, please.  Thank you, Judge.

9                   REDIRECT EXAMINATION

10   BY MR. BOWMAN:

11   Q.  Good morning, Ms. Linzer.  I'll try and be brief, too.

12        I want to start by asking you about the 17 pages of

13   notes that you, I believe, still have in front of you; is that

14   right?

15   A.  The report?

16   Q.  Yes.

17   A.  Uh-huh.

18   Q.  And there was some questioning about the value of notes.

19        What would you say the value of having this record of

20   exactly what -- of what Orlando Lopez said to you and Cynthia

21   Estes in February of 2010 is for all of us today?

22   A.  It was very helpful to recall that day.

23   Q.  And obviously, if you don't have a record, you don't have

24   complete notes of a conversation, it's a lot harder for us all

25   to know what was said?

1  A.  Correct.

2  Q.  And these notes, to the best of everyone's ability, are

3  they, indeed, the best record of -- the best record of what

4  Mr. Lopez said to you and to Cynthia Estes?

5  A.  Yes.

6  Q.  So I have some questions about specific pages of the notes

7  as well.

8        MR. BOWMAN:  I'm so sorry, Judge.  Give me just one

9  second.  I apologize.

10 BY MR. BOWMAN:

11 Q.  First of all, Mr. Lopez said in no uncertain terms that the

12 guy who is in prison is not the right guy, right?

13 A.  Correct.

14 Q.  Mr. Lopez said that he thinks the real shooter was named

15 something like Izzy or Gizzy, yes?

16 A.  Yes.

17 Q.  And did he tell you and Cynthia Estes about any gang

18 affiliation that this Izzy or Gizzy had?

19 A.  Well, he believed that he was an Imperial Gangster.

20 Q.  And Mr. Lopez also described the process of looking through

21 photo books to -- at the request of the police, did he not?

22 A.  Yes.

23 Q.  And did he tell you that he looked at photo books the cops

24 brought of the Latin Kings, and he kept looking at photos and

25 couldn't pick anybody out, but then he saw Rivera's photo, and

1  it looked like the shooter, but it wasn't until a few days

2  later or maybe a week or more later when he saw the actual

3  shooter again?

4      He told you that, right?

5  A.  Yes.

6  Q.  And Mr. Leinenweber, when he was -- when he was reading to

7  you from pages 11 and 12, he skipped part of the -- part of the

8  notes, didn't he?

9  A.  Yes.

10  Q.  In fact, the bottom of page 11, Mr. Lopez said, "He is so

11  sorry about all of this.  He said when you are 11 and you are

12  trying to tell the adults something they do not want to hear,

13  it's hard."

14      He said that, right?

15  A.  Yes.

16  Q.  He also said, the white-haired lady and one of the cops

17  kept saying it's all right.  You don't need to be afraid.  And

18  Mr. Lopez said he never told them he was afraid.  He told them

19  it wasn't the right guy, and they went into this whole speech

20  about being young and afraid."

21      He said those things, right?

22  A.  Yes.

23  Q.  Now, looking on page 16 of the notes, did Mr. Lopez say he

24  had been mad at himself for years, and he's mad at the State

25  because they really didn't want to hear the truth when he tried

1  to tell them?

2          Did he say that?

3  A.  Yes.

4  Q.  Did he say, "Once they got the story they wanted, they had

5  him stick to it"?  Did he say that to you?

6  A.  Yes.

7  Q.  Did he say that he was surprised they didn't look more

8  closely at this story, because there is all this stuff he has

9  learned about eyewitness testimony, and he was only 11?  He

10  said they should have had more than that to convict the guy.

11          Did Mr. Lopez say that to you?

12  A.  Yes.

13  Q.  And then you had a conversation with -- with Mr. Lopez

14  about two or three days later, right?

15  A.  Yes.

16  Q.  And he said, "The more I think about it, I was coached,"

17  right?

18  A.  Right.

19  Q.  He didn't -- he didn't say he was coerced.  He said, "I was

20  coached."  That's the way he put it, right?

21  A.  Yes.

22  Q.  Not exactly the same thing?

23  A.  Correct.

24  Q.  And you -- you said he described a process of being

25  shepherded through the system, you said, by a white-haired lady

1  and a cop?

2  A.  Yes.

3  Q.  And did you testify yesterday about the description that

4  Mr. Lopez provided you of the cop?

5  A.  Yes.

6  Q.  And remind us what that was.

7  A.  He said the female was a -- had white blondish hair, and

8  she was a bit older, and the male cop had glasses, a fro,

9  Caucasian features, and a Latino name.

10  Q.  Now, I want to ask you, Ms. Linzer, at any time in 2010,

11  did you personally or anyone else, to your knowledge, at

12  Northwestern know the physical description of Reynaldo Guevara?

13  A.  No.

14  Q.  In 2010 did the folks at Northwestern undertake any efforts

15  to find out what they didn't know what Mr. Rivera looked

16  like -- I'm sorry -- Mr. Guevara looked like?

17  A.  I reached out to a reporter.

18  Q.  And was that investigation successful?  Was he able to

19  provide you with any information about what this guy looked

20  like?

21  A.  No.

22  Q.  So you didn't know?

23  A.  I did not.

24  Q.  So one other question.

25      I want you to assume with me hypothetically that it

1  didn't go down the way it went down, that you and Ms. Estes got

2  in your car and you drove all the way over to a suburb of

3  Cleveland, Ohio, knocked on Orlando Lopez's door, and instead

4  of telling you "Wrong guy, wrong guy," he said, "Oh, well, you

5  know, I'm quite confident it was Jacques Rivera who shot -- who

6  shot Felix Valentin."  What would you have done then?

7  A.  We would have turned around and got in the car and driven

8  home.

9  Q.  And how bad would that have been for Northwestern if you

10  had had to do that?

11  A.  We would have moved on to the next case.

12  Q.  Right.

13        MR. BOWMAN:  That's all I have.  Thank you.

14        THE COURT:  Okay.  Mr. Leinenweber.

15        MR. LEINENWEBER:  Very briefly, Judge.

16                    CROSS-EXAMINATION

17  BY MR. LEINENWEBER:

18  Q.  As Mr. Bowman said, obviously, the written record is the

19  best record of what was said, correct?

20  A.  Yes.

21  Q.  Okay.  And in that written record -- and, again, I'm

22  pointing now to Ms. Linzer's -- excuse me -- Ms. Estes'

23  report -- it doesn't say anything about a Hispanic cop,

24  correct?  Those words do not appear in that report?

25  A.  This is Cynthia's report.

1  Q.  I understand that, ma'am.

2        But the words "Hispanic cop" do not appear in that

3  report; am I correct?

4  A.  That's correct.

5  Q.  And the words "fro" or "glasses" or, indeed, any type of

6  description, even male or female, of the cop does not appear in

7  that, correct?

8  A.  Correct.

9  Q.  Okay.  And in terms of -- when Mr. Bowman was asking, you

10 had said, I believe, that Mr. Rivera described to you Hispanic

11 officer with a fro and glasses, you have no notes of that

12 yourself, correct?

13 A.  You mean Mr. Lopez?

14 Q.  Did I say -- Mr. Lopez.  Pardon me.

15 A.  Okay.  Just ask me the question again.

16 Q.  Sorry.

17 A.  That's okay.

18 Q.  Of course.

19 A.  That's okay.

20 Q.  The question is is that I believe you said that Mr. Lopez

21 told you --

22 A.  Right.

23 Q.  -- the description of the cop, that he was Hispanic with

24 fro, glasses, some words to that effect, correct?

25 A.  Correct.

1   Q.  Okay.  And my question to you is, there's no written -- you

2   have no written notes or you've seen no written notes or you've

3   seen no written report of him saying that, correct?

4   A.  That's correct.

5   Q.  Okay.  And in terms of -- I believe Mr. Bowman asked you

6   you did not know what Mr. Guevara looked like.  You certainly

7   knew his name, correct?

8   A.  Yes.

9   Q.  Reynaldo Guevara, so you knew it was obviously of a

10  Hispanic nature; is that fair to say?

11  A.  Sure.  Yes.

12          MR. LEINENWEBER:  Judge, I don't think I have anything

13  further.

14          Thank you, ma'am.

15          THE COURT:  Okay.  Mr. Sotos.

16                      CROSS-EXAMINATION

17  BY MR. SOTOS:

18  Q.  Just a couple of follow-up, Ms. Linzer.

19  A.  Okay.

20  Q.  Mr. Bowman said to you about this March 2nd note that it

21  wasn't -- didn't reference exactly the same time as the

22  identification procedures.  Do you recall that?

23  A.  Sorry.  I don't understand your question.

24  Q.  When Mr. Bowman asked you about the March 2nd note --

25  A.  Right.

1  Q.  -- where Mr. Lopez said, "The more I think about it, I was

2  coached" --

3  A.  Yes.

4  Q.  -- he said that wasn't at exactly the same time as when he

5  identified -- he initially identified Mr. Rivera to the police,

6  correct?

7        MR. LOEVY:  Objection, Your honor.  That wasn't part

8  of Mr. Bowman's exam.  That was part of Mr. Sotos' exam the

9  first time.

10        MR. SOTOS:  I think he just brought it up.

11        THE COURT:  I'm going to overrule the objection.

12  BY THE WITNESS:

13  A.  Okay.  So ask me one more time, because I'm just --

14  BY MR. SOTOS:

15  Q.  Let me ask it this way.

16  A.  -- trying to follow --

17  Q.  I just want to make sure everybody's clear.

18  A.  Okay.

19  Q.  The point in time that Mr. Lopez was referencing when he

20  said, "The more I think about it, I was coached" was his trial

21  testimony -- in connection with the preparation for his trial

22  testimony about a year and a half after he had already gone

23  through the identification procedures with the police?

24  A.  That's what I recall.

25        MR. LOEVY:  Same objection, Your Honor, scope.  He

1    just wants -- he's doing his exam again.

2            THE COURT:  Yeah, I mean, you're --

3            MR. SOTOS:  Judge, I object to that.  I'm following

4    up.

5            THE COURT:  Well, you know what, it's asked and

6    answered.  And I have committed to the lawyers that I will try

7    to keep the jury --

8            MR. SOTOS:  All right.

9            THE COURT:  -- from having to hear things multiple

10   times.

11           MR. SOTOS:  I will -- I will move on, Judge.

12           THE COURT:  All right.

13   BY MR. SOTOS:

14   Q.  And after you had this conversation, you wrote it down,

15   correct, because you thought it might be important?

16   A.  Right.

17   Q.  You're not a lawyer.  You didn't know how important, but

18   you thought it was worth noting?

19   A.  That's right.

20   Q.  And so I take it you told Ms. Raley or --

21   A.  Yes.

22   Q.  -- about it?

23   A.  Yes.

24   Q.  And so she could use it for whatever purposes she thought

25   important?

1  A.  Yes, I deferred to her.

2  Q.  Did you actually give her the note and just tell her about

3  it?

4  A.  I probably told her about it and gave it to her.

5  Q.  All right.  And did you ever -- did you have any discussion

6  with her after that -- after that about it?

7  A.  Not that I recall.

8  Q.  And you sent several different versions of affidavits to

9  Mr. Lopez in the -- in between, like, February of 2010 and 6 --

10  and June of 2010 when you guys were trying to get an affidavit

11  from -- or working to get his affidavit so you could use it in

12  the post-conviction proceeding?

13          MR. LOEVY:  Objection, Your Honor, scope.  Mr. Bowman

14  didn't cover the affidavits --

15          THE COURT:  Yes, I think we're --

16          MR. SOTOS:  I'm not going to get into the affidavits

17  at all.

18          MR. LOEVY:  Well, then we object.

19          THE COURT:  So is this a prelude to something else?

20          MR. SOTOS:  It's right -- the same issue, Judge, and

21  I'll be done in a minute.

22          THE COURT:  All right.  Overruled.

23  BY MR. SOTOS:

24  Q.  You had a chance to review the different affidavits,

25  correct?

1   A.  Yeah, in a very general way.  I wasn't editing the

2   affidavits.

3   Q.  You -- the statement that Mr. Lopez made about being

4   coached, that was never included in any affidavits that were

5   used in the post-conviction proceeding, correct?

6          MR. LOEVY:  Objection to scope, Your Honor.  We're on

7   a -- way off the --

8          THE COURT:  Overruled.  Overruled.

9   BY THE WITNESS:

10  A.  Correct.

11  BY MR. SOTOS:

12  Q.  And when you got ready for your testimony here, I assume

13  you met with Mr. Bowman, correct?

14  A.  Yes.

15  Q.  Reviewed some documents, talked about some questions he

16  wanted to ask you, correct?

17  A.  Yes.

18  Q.  Talked about some questions that we might ask you?

19  A.  Yes.

20  Q.  All right.  And when Mr. Lopez said that he was coached for

21  his testimony, he didn't say anything more about what that

22  meant, correct?

23  A.  Correct.

24  Q.  Whether it meant he was being prepared to testify or

25  anything else; is that true?

1    A.  True.

2            MR. SOTOS:  Nothing further, Judge.  Thank you.

3            THE COURT:  Ms. Barber.

4            MS. BARBER:  No further questions, Your Honor.

5            THE COURT:  Okay.  Anything more?

6            MR. BOWMAN:  Nothing, Your Honor.

7            THE COURT:  Thank you, Ms. Linzer.  You may step down.

8    Watch your step.

9            THE WITNESS:  Thank you.

10     (Witness excused.)

11            MR. GIVEN:  Judge, I think we're going to have

12   Mr. Gawrys come back up.

13            THE COURT:  Oh, sure.  Mr. Gawrys.

14            MR. GIVEN:  And, Judge, before I begin, these are the

15   stack of documents that were on the witness stand when

16   Mr. Gawrys left.

17            THE COURT:  Okay.

18            MR. GIVEN:  So I'm going to give these back to him.

19            THE COURT:  Sure.

20        STEVE GAWRYS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

21                CROSS-EXAMINATION (Continued)

22   BY MR. GIVEN:

23   Q.  Good morning, Mr. Gawrys.

24   A.  Good morning.

25            MR. GIVEN:  Good morning, ladies and gentlemen.

1  BY MR. GIVEN:

2  Q.  When we left off yesterday, we were walking through some of

3  the documents that were in the investigative file that you have

4  reviewed in this case.  And I want to -- we had left off at

5  Defendants' Exhibit 1.26.

6       MR. GIVEN:  Dave, if you could pull it up.

7  BY MR. GIVEN:

8  Q.  Do you have that in front of you?

9  A.  Yes.

10  Q.  And that's an arrest report dated August 30th for Jacques

11  Rivera; is that correct?

12  A.  Correct.

13  Q.  Who wrote that report?

14  A.  Reynaldo Guevara.

15  Q.  And is your name on that report?

16  A.  Pardon me?

17  Q.  Is your name on that report?

18  A.  No, it is not.

19  Q.  And the fact that Rey Guevara wrote that report, does that

20  indicate -- well, what does that indicate his role in the

21  activities shown there?

22  A.  That I was not present.

23  Q.  Right, but what did -- what was -- what was Mr. Guevara's

24  role in this arrest report?

25  A.  Well, he typed up the report.

1  Q.  Let me just ask.

2       Does it mean he was one of the arresting officers?

3  A.  He was -- yeah, he was one of the arresting officers.

4  Q.  And are there additional Gang Crime specialists shown on

5  the report?

6  A.  Yes.

7  Q.  And could you tell the ladies and gentlemen who those are?

8  A.  Specialists Paul Zacharias, Joseph Sparks, Joseph Fallon.

9  Q.  Okay.  Let me just stop you there for a minute.

10      If you look at box 7 about halfway down on the page

11  near on the left-hand side, it says, "Transported by Sparks and

12  Fallon."  Do you see that?

13  A.  Correct.

14  Q.  What does transport mean?

15  A.  That they brought the -- Jacques in.  They transported him

16  into the area.

17  Q.  Area 5?

18  A.  Correct.

19  Q.  Okay.  And I think you already pointed out, your name does

20  not appear on this report, correct?

21      MR. LOEVY:  Objection, asked and answered, Your Honor.

22      THE COURT:  Sustained.

23  BY MR. GIVEN:

24  Q.  Okay.  In your experience, if you had been working that day

25  and had been involved, would your name have been on that

1  report?

2  A.  Yes.

3  Q.  Okay.  What I want to do now -- you can put that report

4  down.

5      And, Judge, instead of putting things up on the

6  screen, to move things along, I'm going to ask Mr. Gawrys if

7  you could look at three reports.  These are Defendants' Exhibit

8  1.28, 1.15, and 1.27.  They all refer to Mr. Rodriguez.

9      Do you see those in the stack that you have?

10  A.  1.28, 1.29, and 1.15, you said?

11  Q.  Correct.

12  A.  Okay.

13  Q.  Do you have those?

14  A.  Yes, I have the three of them.

15  Q.  Okay.  And I'm not going to publish these to the jury right

16  now because it will take too long to put them on the screen one

17  at a time.

18      MR. GIVEN:  So ladies and gentlemen, if you have any

19  questions, I'll be happy to put them up.

20  BY MR. GIVEN:

21  Q.  1.28, what is that report?

22  A.  1.28 is an arrest report.

23  Q.  And who is that signed by?

24  A.  Oh, that's -- Letrich is on it.

25  Q.  Okay.  Who are the arresting officers?

1  A.  Arresting Moriarty and Vergara and Wojcik.

2  Q.  Okay.  Are any of those Gang Crime specialists, to your

3  knowledge?

4  A.  No, they're not.

5  Q.  Okay.  What's 1.29?

6  A.  Okay.

7  Q.  What is that document, briefly?

8  A.  That's a Detective Division, Area 5 Violent Crimes.  It's a

9  request that the below listed prisoner be held past the

10 regularly scheduled court call.

11 Q.  Is that commonly referred to as a hold past court call?

12 A.  Hold papers, yes.

13 Q.  And then 1.15, what's that?

14 A.  That's a Supplementary Report made out by Letrich and

15 Moriarty.

16 Q.  Okay.  And all of those three reports, what are -- what

17 date -- let me rephrase it.

18      Can you tell what date they were created?

19 A.  Yes.  Well, we'll start with the arrest report --

20      MR. GIVEN:  Actually, to move things along, Judge --

21 BY THE WITNESS:

22 A.  -- was made out on 31 --

23      THE COURT:  No, hold on a second.  Yes.

24 BY MR. GIVEN:

25 Q.  Just to move things along, if you look at those reports,

1  would it be fair to say that all three of them were created on
2  August 31st?
3  A.  Yes.
4  Q.  And tell the jury briefly again who Letrich and Moriarty
5  are.
6         MR. LOEVY:  Objection, asked and answered, Your Honor.
7         THE COURT:  Overruled.
8  BY THE WITNESS:
9  A.  They work in the 14th District, I believe.
10  BY MR. GIVEN:
11  Q.  Were they Gang Crimes specialists?
12  A.  No.
13  Q.  What were they?
14  A.  They were tactical officers.
15  Q.  Okay.  And if you look at 1.28 --
16         MR. GIVEN:  And, Dave, actually, if you could put that
17  up on the screen, please.
18  BY MR. GIVEN:
19  Q.  -- do you see in the description of the activity there,
20  among other things, it says, "Identification made from photos
21  in the Imperial Gangster photo book"?  Do you see that?
22  A.  Yes.
23  Q.  So, to your knowledge, did the 14th District Tactical Unit
24  have its own set of gang books?
25  A.  Yes, they may have, yeah.

1  Q.  So based on your experience in looking at this report,

2  would you say that the photo book that was shown to

3  Mr. Valentin came from the 14th District?

4  A.  In this case, yes, I would assume so.

5  Q.  And by the way, where is the 14th District located?  Do you

6  remember?

7  A.  Back then it was -- I don't know where it is today, if

8  they -- it was on California Avenue, south of Milwaukee, I

9  think.

10  Q.  2150?

11  A.  There you go.

12  Q.  Sound right?

13  A.  Somewhere about there, yes.  It's north of Armitage.

14  Q.  And by the way, having that same document in front of you,

15  do you see where it says that the victim was shot five times?

16  A.  Yes.

17  Q.  To your knowledge, is that accurate?

18  A.  No.

19  Q.  It's a mistake, right?

20  A.  Yes, it's a mistake.

21  Q.  Okay.  Okay.  Let's put those documents to the side.

22       MR. GIVEN:  Dave, you can take it down.

23  BY MR. GIVEN:

24  Q.  And I want to show you -- or I want you to look at

25  Defendants' Exhibit 1.27 and 1.22.

1    Do you have those in front of you?

2  A.  Yes, I have them.

3  Q.  Okay.  And, again, could you just tell the jury what these

4  two documents are?

5  A.  1.27 is, again, a Detective Division, Area 5 Violent

6  Crimes.  It's a hold paper.  It's requesting for Jacques Rivera

7  to be held past the court call.

8    MR. GIVEN:  Dave, put it up.

9  BY MR. GIVEN:

10  Q.  And 1.22 -- so is that -- ladies and gentlemen, can you see

11  that?  Is that --

12    THE JURY:  No.

13    MR. GIVEN:  No?

14  (Brief pause.)

15  BY MR. GIVEN:

16  Q.  Okay.  Defendants' Exhibit 1.22, what's that?

17  A.  This is a release of person in custody, dated 31 August.

18  Q.  And these two documents and the hold and release and the

19  hold past court call documents that you just looked at for

20  Mr. Rodriguez, are those Gang Crime reports or are those

21  Detective Division reports?  Who does those reports?

22  A.  This is Detective Division reports.

23  Q.  All right.  And do Gang Crimes specialists, they can't --

24  A.  No, we don't.

25  Q.  -- hold past court call, correct?

1   A.  No, we do not.

2   Q.  And they can't release people, right?

3   A.  No.

4   Q.  That's detectives that do that?

5   A.  Not generally, no.

6   Q.  Okay.  The next document I want you to take a look at is

7   Defendants' Exhibit 1.13?

8          MR. GIVEN:  And, Dave, if you could pull this up and

9   show the jury, please.

10  BY MR. GIVEN:

11  Q.  Do you have that, Mr. Gawrys?

12  A.  I'm searching.

13  Q.  Okay.  It's a September 1st, Supp. Report.

14         THE COURT:  Do you want to help the witness find it

15  maybe?

16         MR. GIVEN:  Sure.

17         THE COURT:  Thank you.

18         MR. GIVEN:  A lot of documents up here, Judge.

19         THE WITNESS:  Okay.

20  BY MR. GIVEN:

21  Q.  I mean, I kind of let the cat out of the bag.

22         Can you tell the jury what this is again, please?

23  A.  This is a Detective Division Supplementary Report.

24  Q.  And who wrote it?

25  A.  Gillian McLaughlin and Jack Leonard.

1  Q.  And when was it written?

2  A.  It was completed on 1 September 1988 at 1:00 in the

3  morning.

4  Q.  And I want to talk about that just a little bit.

5       You said it was completed.  In fact, box 91, what does

6  that box say exactly?

7  A.  "Dated this report submitted."

8  Q.  So a submitted report-- what does it mean to submit a

9  report?

10 A.  Well, you turn a report in to the office for approval.

11 Q.  So that's when the report -- so what that box indicates is

12 the date and the time that the report is handed in; is that

13 fair to say?

14 A.  Fair to say.

15 Q.  And the report is obviously written over the course of time

16 while it's -- before it's submitted, correct?

17 A.  Correct.

18 Q.  Okay.  And can you tell from a report like this how long it

19 would have taken to write that report?

20      MR. LOEVY:  Objection to foundation, Your Honor.

21 BY MR. GIVEN:

22 Q.  It doesn't -- well, let me put it this way.

23      It doesn't have a start time on it, right?

24 A.  No, it doesn't, no.

25 Q.  And in your experience, how long would it take to type up a

1  three-page report, ballpark?

2  A.  Well --

3        MR. LOEVY:  Same objection.

4        THE COURT:  Overruled.

5        MR. GIVEN:  Well, he has experience.

6  BY THE WITNESS:

7  A.  It would have taken me a couple hours.

8  BY MR. GIVEN:

9  Q.  Okay.  Are any Gang Crime specialists reflected on this

10 report as arresting officers?

11 A.  Yes.

12 Q.  Who?

13 A.  Guevara, Fallon, Sparks, and Zacharias.

14 Q.  Is your name anywhere on it?

15 A.  No, it's not.

16 Q.  Does that tell you anything about whether you were involved

17 in any of the activities that were described in this report?

18 A.  No, I wasn't there.

19 Q.  I want to just talk about a couple of things that are

20 reflected in this report.  It's been talked about a lot, so

21 we're not going to cover too much on it.

22        But do you see on page 2, about halfway on the page,

23 there's a paragraph that describes some unsuccessful efforts to

24 locate the witness to view a lineup?

25        MR. LOEVY:  Objection, Your Honor.  This has been

1  covered and read to the jury.

2        MR. GIVEN:  I have some different questions that have

3  not been asked, Judge, and I'm just --

4        THE COURT:  Overruled if that's the case.

5  BY THE WITNESS:

6  A.  Yes, I see it.

7  BY MR. GIVEN:

8  Q.  In your experience, was it unusual not to be able to find

9  witnesses in gang cases?

10        MR. LOEVY:  Objection, Your Honor.

11        THE COURT:  Asked and answered?

12        MR. LOEVY:  No, also relevance and earlier rulings.

13        THE COURT:  Overruled.

14  BY MR. GIVEN:

15  Q.  Do you remember the question?

16  A.  Yes, it was difficult sometimes.

17  Q.  Okay.  Now, there's been some suggestions made by Mr. Loevy

18  in questions to other people about, well, wouldn't it have been

19  easy just to find a 12-year-old boy?  Just go to school where

20  he goes to school.  Do you remember those questions?

21  A.  Yes.

22  Q.  Based on your knowledge and experience in Chicago Public

23  Schools, was -- were Chicago Public Schools in session in

24  August of 1988?

25  A.  I don't think so.

1   Q.  They usually start after Labor Day, right?

2   A.  Usually, I believe, yes.

3   Q.  Now, if you look on page 3 of that report, it describes

4   when Ms. McLaughlin and Mr. Leonard went to the hospital, and

5   it describes a bed moving from side to side.

6           Do you see that?

7   A.  Yes.

8   Q.  Have you ever seen a victim in the hospital in a bed that

9   moves side to side?

10  A.  Yes, I have.

11  Q.  How many times?

12  A.  Just once.

13  Q.  And it's fair to say that you don't know who the victim was

14  in that one instance, is that --

15  A.  No, I don't remember who I saw in the bed.

16  Q.  But you've only seen it once?

17  A.  Just once.

18  Q.  Okay.

19          MR. GIVEN:  All right.  Dave, you can take that one

20  down.  Thank you.

21  BY MR. GIVEN:

22  Q.  Have you seen in your review any reports that were dated

23  after September 1st and before September 15th?

24  A.  Any reports of --

25  Q.  That you recall -- do you recall seeing any reports after

1  the one we just looked at and before September 15th?

2  A.  No, not really.

3  Q.  Okay.  Do you recall if you were -- if you arrested

4  Mr. Rivera sometime after September 1st?

5  A.  Yes.

6  Q.  Okay.  Do you remember the date of that arrest?

7  A.  It would be the 15th.

8       MR. GIVEN:  Okay.  Dave, can you pull up Defendants'

9  Exhibit 1.21, please.

10  BY MR. GIVEN:

11  Q.  Do you have that in front of you, Mr. Gawrys?

12  A.  Yes, I do.

13  Q.  And could you tell the jury what that report is?

14  A.  It's an arrest report for Jacques Rivera.

15  Q.  Okay.  Does it reflect that you were involved in that

16  arrest?

17  A.  Yes, I was.

18  Q.  Okay.  And can you tell from that report what time

19  Mr. Rivera was transported to Area 5?

20  A.  Well, it says 1500 hours, which is 3:00 in the afternoon.

21  Q.  Do you remember why you were bringing Mr. Rivera to Area 5?

22  A.  It's from -- we're notified by a Detective Division, called

23  and said to bring -- to pick up Jacques Rivera.

24  Q.  Okay.  And I'm going to -- and in an effort to move things

25  along a little bit, can you also have in front of you

1   Defendants' Exhibit 1.20 and 1.10?

2          And I'll be asking you questions about all three of

3   those, but if you have them in front of you, it will make it go

4   faster.

5          MR. GIVEN:  And, Dave, at some point, I'll ask you to

6   pull things up, but --

7   BY MR. GIVEN:

8   Q.  Got those?

9   A.  Got them.

10  Q.  Okay.  And so do those notes help refresh your recollection

11  as to who told you to bring Mr. Rivera in to Area 5?

12  A.  Yeah, Detective Borsch [sic] -- Dorsch and Detective Boyle

13  is on both of these reports.

14  Q.  And do you know why you were bringing him in to Area 5,

15  from those reports?

16  A.  Yes, because the victim had passed away.

17  Q.  And was there any particular procedure that was being

18  anticipated that needed Mr. Rivera to be brought to Area 5?

19  A.  There would have to be another lineup -- a lineup.

20  Q.  If you look at Defendants' Exhibit 1.10 --

21         MR. GIVEN:  And, Dave, why don't you put this up for

22  the jury.

23  BY MR. GIVEN:

24  Q.  -- about halfway down the page -- well, what is this report

25  called, in your experience?

1  A.  It's called a "Field Investigation/Cleared by Arrest,

2  Open."

3  Q.  Okay.  What does that mean?

4  A.  That means that an arrest was made and that there's still

5  additional suspects out there, offenders.

6  Q.  Is this report sometimes referred to as a Closing Report or

7  Closing Supp.?

8  A.  Yes.  Yes.

9  Q.  And who is in charge of writing the report that closes a

10  murder investigation, detectives or Gang Crimes specialists?

11  A.  Detectives.

12  Q.  And that's who wrote this report, correct?

13  A.  Correct.

14  Q.  Who wrote this report, according to the report?

15  A.  I would say, because the first name in the box is Detective

16  Dorsch.

17  Q.  Okay.  And does this Closing Supp. indicate whether a

18  lineup took place on September 15th?

19  A.  Yes.

20  Q.  Okay.  And there was also a lineup report that was

21  generated as a result of that lineup, correct?

22  A.  Yes, correct.

23  Q.  And that's Defendants' Exhibit 1.20, right?

24  A.  Correct.

25  Q.  And let's look at that.

1          MR. GIVEN:  Okay.  Dave, if you can pull 1.20 up,

2    please.

3    BY MR. GIVEN:

4    Q.  Do you have that in front of you?

5    A.  Yes, I do.

6    Q.  Does that lineup report reflect your name as participating

7    in that lineup?

8    A.  Yes.

9    Q.  In some way, shape, or form?

10   A.  Yes, on page 2.

11   Q.  Okay.  And who wrote -- who wrote this report, this lineup

12   report?

13   A.  Well, I would say John Boyle, Detective John Boyle.

14   Q.  Okay.  So according to this lineup report, who conducted

15   the lineup?

16   A.  Well, the lineups would always be conducted by the

17   detectives.

18   Q.  So if you look on page 1 where it says, "Persons conducting

19   lineup," that would be Dorsch and Boyle, and they're

20   detectives, right?

21   A.  Right.

22   Q.  And what does it mean?

23          MR. GIVEN:  And, Judge, if I've asked this, Mr. Loevy

24   will tell me, but I don't think I have.

25   BY MR. GIVEN:

1  Q.  Can you explain what conducting a lineup means?

2          MR. LOEVY:  Objection, asked and answered.

3          THE COURT:  Overruled.

4  BY THE WITNESS:

5  A.  Detectives actually run the lineup.  Like in this case, we

6  brought Jacques Rivera in.  So they take over everything else,

7  and then we just become other duties we take.  You know, we do

8  the -- kind of like gophers.  We go get -- look for fillers, go

9  get the witness, something like that.

10          There would be a list of things that we'll do after

11  that, but it's up to the detectives to take it up, and then

12  they run with it.

13  Q.  Who decides which fillers get put into a lineup?

14  A.  I think that -- well, we look at fillers --

15  Q.  Well, let me pause and just -- because I want you to ask

16  the question, because we're trying to move along in time.

17          MR. LOEVY:  Well, Your Honor, could he answer the

18  question?

19          MR. GIVEN:  I'm happy -- Judge, I'm trying to direct

20  him to save time.  That's all.

21          THE COURT:  Well, but I think the witness didn't

22  finish his answer.

23  BY MR. GIVEN:

24  Q.  Okay.  I'm sorry.  Go ahead, Mr. Gawrys.  Finish.

25  A.  All right.  We may have gone to get fillers, people that

1   looked similar, whatever, for the lineup.

2   Q.  Right.  But who has the final say as to whether a person is

3   going to go into a lineup or not?  Is that Gang Crime

4   specialists or is that detectives?

5   A.  No, that's detectives.

6   Q.  Because that's part of conducting the lineup?

7   A.  That's right, that's their job.

8   Q.  And they have to make sure that the lineup is correct; is

9   that a fair statement?

10  A.  Yes, it's their responsibility.

11  Q.  Okay.  So on September 15th of 1988, whose responsibility

12  would it have been to decide whether Jose Rodriguez should be

13  put into that lineup?

14  A.  Detectives.

15  Q.  Dorsch and Boyle?

16  A.  Right.

17  Q.  And by the way --

18          MR. LOEVY:  I object to foundation for that, Your

19  Honor.  These are events he wasn't there.  He knows nothing

20  about.

21  BY MR. GIVEN:

22  Q.  Based on your experience --

23          THE COURT:  This is just on the report -- based on

24  what's in the report or based on -- what are we basing it on?

25          MR. GIVEN:  Based on the report and based on his

1  experience in knowing how lineups are conducted.

2            MR. LOEVY:  He doesn't know who made the decision.

3            THE COURT:  I don't think -- wait a minute.

4            I don't think the witness knows who was doing what in

5  this instance as far as we know.

6            MR. GIVEN:  Well, I'm asking as a general matter,

7  based on his experience, in having the report in front of him

8  so he knows who the players are, which of the people, in terms

9  of the Gang Crimes specialists or the detectives who were

10  there, whose responsibility would it have been --

11            THE COURT:  All right.  All right.  Overruled.

12  BY MR. GIVEN:

13  Q.  Can you answer the question?

14  A.  Can you ask it again?  I'm sorry.

15  Q.  Sure.  Whose responsibility would it have been to decide

16  whether Jose Rodriguez should be in that lineup on September

17  15th?

18  A.  It would be the detectives.

19  Q.  Dorsch and Boyle, right?

20  A.  Yes.

21  Q.  Okay.  Now --

22            MR. LOEVY:  Well, I object to Dorsch and Boyle, Your

23  Honor, because we don't know which detectives.  It could have

24  been other detectives.

25            THE COURT:  Well, I don't know what -- who are the

1  universe of relevant detectives at this point?

2  BY MR. GIVEN:

3  Q.  Who are the detectives reflected on the report?

4  A.  On the lineup report or the --

5  Q.  Sure, on the lineup report.

6  A.  Detective John Boyle and William Dorsch.

7  Q.  Okay.  Do you see any other detectives listed in

8  Defendants' Exhibit 120, the lineup report, or Defendants'

9  Exhibit 1.10, the Closing Supp. that we talked about?  Do you

10  see any other detectives --

11  A.  No, I do not.

12  Q.  -- mentioned in there?

13       Okay.  And, in fact, from the paperwork that you've

14  reviewed, who were the detectives who had been assigned to this

15  case back on August 27th when the shooting occurred?

16  A.  Originally, yeah, it was Gillian McLaughlin and Detective

17  Leonard.

18  Q.  And based on your experience, on September 15th, would

19  McLaughlin and Leonard have been running that lineup if they

20  had been on duty that day?

21       MR. LOEVY:  Same objection, foundation, Your Honor.

22       MR. GIVEN:  Judge --

23       THE COURT:  Overruled.

24       MR. LOEVY:  He doesn't know.

25       THE COURT:  Overruled.

1    BY THE WITNESS:

2    A.  Yes, they would have taken up the case then again.

3    BY MR. GIVEN:

4    Q.  So based on your experience, looking at these reports where

5    McLaughlin and Leonard are not reflected as conducting the

6    lineup, does that indicate to you whether they were on duty

7    that day?

8    A.  They were probably not on duty.

9    Q.  Because if they were --

10   A.  They would have received the case, yes.

11   Q.  Okay.  Now, if you look back at the lineup report, 1.20,

12   second page, again, to move things along a little faster, you

13   see where it says, "Persons present during lineup," and it has

14   your name and Mr. Guevara's name?

15   A.  Correct.

16   Q.  What does it mean to be present for a lineup or present

17   during a lineup?

18   A.  You're in the building or on the floor.

19   Q.  And what are the possibilities of what you're doing while

20   you're in the building?

21   A.  Well, we're -- during a lineup, we may be -- go get the

22   witness, any number of things.  Looking at other cases.  It's a

23   long list of things we could have been possibly doing during

24   this.

25   Q.  Okay.  But you're not conducting the lineup, though, right?

1   A.  No, no, we don't.

2   Q.  Do you remember in this specific lineup what you were doing

3   that day?

4   A.  Not specifically, no.  But normally, I try to stay out of

5   the lineup room.  I just feel like it's too much -- too many

6   police in there, whatever, so -- and I'm reviewing other

7   reports.  I'm trying to catch up here probably.  I'm just

8   guessing, so --

9   Q.  Okay.  By the way, speaking of detective -- at that time,

10  Detective McLaughlin, did you know Gillian that well back in

11  1988?

12  A.  Pretty well, yes.

13  Q.  Yeah.  Well enough to remember -- accurately remember what

14  her hair color was?

15  A.  No.  I know that came up, but obviously, I was thinking of

16  somebody else.

17  Q.  Do you remember if she wore dresses or skirts to work?

18  A.  No, I don't remember.

19  Q.  Do you remember anything on September 15th about Gillian

20  coming to you and saying, "Oh, hey, the witness said wrong guy,

21  wrong guy," or anything like that?  Does that ring a bell to

22  you?

23  A.  No, not at all.

24  Q.  Do you remember Rey Guevara telling you something like

25  that?

1    A.   No.

2    Q.   Do you remember anybody telling you that, "wrong guy, wrong

3    guy"?

4    A.   No, I don't.

5    Q.   Okay.  What time did the lineup on September 15th take

6    place?  If you can find that, it's listed on both the lineup

7    report and the Closing Supp.

8    A.   From reading, this 7:15.

9    Q.   Okay.  And do you remember -- well, I think you've already

10   told the jury what you were doing between 3:00 when you

11   transported him and 7:30.

12          Any other memories of what you might have been doing

13   in that four-and-a-half-hour time frame?

14   A.   No.  Like I said, it could be any number of things.  I

15   mean, getting something to eat.  I don't know.  Reading other

16   reports.

17   Q.   Could have been getting the fillers?

18   A.   Or getting the fillers, like I said.

19   Q.   Tell -- in fact, I'm not sure we've covered this.

20          Can you tell the ladies and gentlemen how you find

21   fillers -- how detectives find fillers to put into the -- into

22   the lineup?

23   A.   Well, fillers are found various places.  The first place

24   you look is the lockup.  Depending on the time of day, if it's

25   like now, it's pretty good because there were a lot of arrests

1 during the day, and so you can go through those arrest reports.
2 It would be the 25th District on the first floor of the
3 Detective Division.

4 You go in the lockup or you go to the front desk and
5 you start looking at all the arrest reports that are stacked
6 up -- they're lined up -- of who's in custody and sitting in
7 the back in the lockup.

8 So you just go through those and try to look and see
9 who matches as close as you can get to the description of your
10 suspect. And then you take them, and you sign them out.
11 There's a place to sign these people out. And then you bring
12 them upstairs.

13 And you can also go on the street and ask and find
14 somebody that matches and bring them in. Those are volunteers.
15 And a lot of times that happened. And you check other
16 districts if you had to.

17 So in this case, we're looking for a Spanish person,
18 so we would call probably 14-2 also if the 25th District didn't
19 have anything. And we would maybe take a ride there to look
20 at -- the same process. You look at all the arrest reports
21 that are lined up and make a decision then.

22 Q. And it sounds a little surprising to us, perhaps, but do
23 people actually volunteer, people on the street say, "Oh, yeah,
24 I'll come in. I'll be a" --
25 A. Oh, yeah, they volunteer.

1  Q.  In fact, you heard some of the testimony from --

2          MR. LOEVY:  Objection, leading, Your Honor.

3          THE COURT:  Sustained.

4  BY MR. GIVEN:

5  Q.  Okay.  Do you recall any witnesses who have testified here

6  about volunteering to come in?

7          MR. LOEVY:  Objection to the relevance, Your Honor.

8          I'll withdraw, Your Honor.

9          THE COURT:  Overruled.

10  BY THE WITNESS:

11  A.  Once again?  I'm sorry.

12  BY MR. GIVEN:

13  Q.  Do you remember any witnesses testifying in this case about

14  volunteering to come in --

15  A.  Yes, yes.

16  Q.  And one last thing, and then I'll move on.

17          Is it fair to say that people who are in the station

18  waiting for one lineup could be used by detectives in another

19  case in their lineup?

20  A.  Yes.

21  Q.  Does that happen a lot?

22  A.  Not a lot, but it does happen, yes.

23  Q.  Okay.  So Mr. Rivera -- again, I'm going to try to move on

24  and summarize a little bit and have you look at 1.10 as I ask

25  you this question.

1    After Mr. Rivera was identified in the lineup, does
2    looking at this report help you remember what happened after he
3    was selected?  If you look on page 2.
4    A.  Yes.  Okay.
5    Q.  It says --
6    A.  What happened afterwards?  He was -- say that again.
7    Q.  Bottom -- if you look at the bottom paragraph to refresh
8    your recollection as to what happened after he was selected.
9    A.  Well, he was given his rights or advised of his rights.  He
10   indicated that he understood.
11        He -- if he wanted to cooperate any further in the
12   investigation, which time he stated that he wanted to speak to
13   his lawyer.  At this time all questioning ceased.
14   Q.  And that --
15   A.  That pretty much ended that part.
16   Q.  You know what, I was going to ask a question that's been
17   asked and answered.  I'll move on.
18   A.  Oh.
19        THE COURT:  And I think it's sort of time for the
20   midmorning break if this is a --
21        MR. GIVEN:  Sure, Judge.  This is a -- actually, can I
22   ask one more question?
23        THE COURT:  Sure.  Sure.
24   BY MR. GIVEN:
25   Q.  If you look on page 3 -- I'm sorry, ladies and gentlemen.

1  It will only take a second.

2       If you look on the last page of that report --

3  A.  Yes.

4  Q.  -- what does it indicate happened next in terms of the

5  investigation?  Who was called?

6  A.  Who was called was ASA Julie Rosner.

7  Q.  And do you have an understanding of what her role was in

8  this?

9  A.  Oh, yes, yes, she's the State's Attorney that reviewed a

10  file, do interviews, and then make a decision on charging.

11  Q.  Is that referred to as Felony Review?

12  A.  Yes.

13       MR. GIVEN:  Okay.  This would be great, Judge.

14       THE COURT:  Okay.  Ten minutes, ladies and gentlemen.

15       COURT SECURITY OFFICER:  All rise.

16   (Jury out.  Recess from 10:46 a.m. to 10:55 a.m.)

17       THE COURT:  Yes.

18       MR. LOEVY:  Your Honor, after we finish Mr. Gawrys, we

19  are going to ask to do the hallway view and the judicial notice

20  we talked about.

21       THE COURT:  Yes.

22       MR. ART:  May I?

23       MR. LOEVY:  No, that's not the instruction, though.

24       THE COURT:  The instruction looked fine to me, unless

25  somebody has a problem with it.

1          MR. ART:  Here's a proposed version that will apply to

2     this, both on judicial notice and on the demonstration.

3          MR. LOEVY:  We've shown the defense.  When he says

4     "both," they're paper clipped.  There's two versions -- two

5     pages.

6          THE COURT:  I'll tell you.  Two versions?

7          MR. LOEVY:  I'm sorry.  Two pages.

8          MR. ART:  So one's about judicial notice of the

9     distance, and the other is about the demonstration itself in

10    the hallway.

11         THE COURT:  Okay.  Does the defense have any issues

12    with any of this?

13         MS. ROSEN:  Did we see that instruction?  Did somebody

14    see it?

15         MR. GIVEN:  I haven't seen it.

16         MR. ART:  Jim saw it.

17         MR. SOTOS:  I saw the stipulation.

18         MS. ROSEN:  Can we see the instruction?

19         THE COURT:  Let me know at lunchtime.  We don't need

20    to have a huge discussion about it.

21         MR. LOEVY:  Well, we were going to do it before lunch.

22    That's why we raised it.  After Mr. Gawrys -- they've seen

23    both.  They have seen both, and it is the instruction --

24         THE COURT:  Well, let me hear if they have any

25    comments.

1          MR. SOTOS:  I didn't see what's on the bottom.  I saw
2   the top two.  I didn't see the bottom.
3      (Counsel conferring.)
4          THE COURT:  Hurry, everybody.  Let's move.
5          MS. ROSEN:  Okay.  The only thing we have an objection
6   to is the sentence in the first paragraph that says the lawyers
7   vetted it.
8          THE COURT:  I'm sorry.  This is the second page?
9          MS. ROSEN:  It's in the proposed instruction, right.
10         THE COURT:  Yes.
11         MS. ROSEN:  So it's the first paragraph, and it's the
12  sentence that says, "The lawyers have vetted it."
13         MR. ART:  We can take that out, Your Honor.
14         THE COURT:  Yes.  Well, it's coming out.  No need for
15  it.
16         MR. LOEVY:  We just do it from the *Fields*
17  instruction that Kennelly gave.  We don't object --
18         THE COURT REPORTER:  I'm sorry.  Please --
19         MR. LOEVY:  Sorry.  I withdraw that comment.
20         THE COURT:  Anything else?  Let me just hear from the
21  defense.  You gave me what you want me to read.
22         MR. SOTOS:  You know, Judge, we're trying to read it.
23  Literally we didn't see it before.
24         THE COURT:  Yeah, I know, but it's not -- you know,
25  you know how to read.  So, please.

1    (Brief pause.)

2          MR. SOTOS:  Okay.  Okay.

3          MR. LOEVY:  Jim, it is on your table.

4          THE COURT:  It's a brilliant instruction.  Thank you,

5    Judge Kennelly.

6          COURT SECURITY OFFICER:  All rise.

7    (Jury in.)

8          THE COURT:  Please be seated, everyone.

9    BY MR. GIVEN:

10   Q.  Mr. Gawrys, in your experience, when a Felony Review

11   Assistant State's Attorney -- I'm sorry.

12          In your experience, when a Felony Review Assistant

13   State's Attorney arrives, does he or she talk to Gang Crimes

14   specialists or do they talk to the detectives?

15          MR. LOEVY:  Objection, Your Honor.

16          THE COURT:  Hold on one second.

17          MR. GIVEN:  Just based on his experience, Judge.

18          THE COURT:  But is there any way that that experience

19   is necessarily relevant to this case because --

20          MR. GIVEN:  Yes, in fact, it is, because there's been

21   a suggestion made that somehow Mr. Gawrys and Mr. Guevara

22   steered the Felony Review person --

23          THE COURT:  So I think we first have to establish that

24   the witness has no recollection of what happened in this

25   case --

1          MR. GIVEN:  Sure.

2          THE COURT:  -- if that's the case, and then he can

3    tell us what his experience is.

4          MR. GIVEN:  Sure.

5    BY MR. GIVEN:

6    Q.  Do you have any recollection in this case of whether you

7    spoke with the Felony Review ASA?

8    A.  No, I do not.

9    Q.  In your experience, when a Felony Review ASA shows up at an

10   area to follow up on a murder investigation, does the ASA talk

11   to -- well, let me ask it this way.

12         Who does the Felony Review ASA talk to?

13   A.  Detectives.

14   Q.  And why is that?

15   A.  Because they have the overall responsibility of the case.

16   Q.  If the Felony Review ASA had wanted to talk to you as a

17   Gang Crimes specialist, would you have talked to her?

18   A.  Oh, sure.

19   Q.  So after the ASA arrives, do you have any recollection of

20   what you were doing at that time while she was talking to

21   the -- or he or she was talking to the detectives?

22   A.  No, I don't.

23   Q.  In fact, I say he or she.  The report that we were looking

24   at indicates it was a woman named Julie Rosner, correct?

25   A.  Correct.

1  Q.  Okay.  So based on your experience, after Mr. Rivera's
2  picked from the lineup and the ASA shows up to talk to the
3  detectives, what would you be doing at that point in time?
4  A.  Probably looking at reports, starting my reports.  It could
5  be any number of things.
6  Q.  Possibly you might have had to take fillers back to where
7  you got them?
8  A.  Probably take fillers back, yes.
9  Q.  Do you remember if charges were approved in this case?
10  A.  Yes, they were.
11  Q.  And, in fact, if you look at Defendants' Exhibit 1.18 --
12        MR. GIVEN:  Dave, if you can pull that up, please.
13  BY MR. GIVEN:
14  Q.  -- do you have that in front of you?
15  A.  I'm searching.
16  Q.  Sure.  It's a lot -- a lot of paper.
17  A.  Okay.
18  Q.  What is that document?
19  A.  It's a complaint -- felony complaint.
20  Q.  And who signs that -- who signed that?
21  A.  Detective William Dorsch.
22  Q.  And what is it a complaint for?
23  A.  It's a complaint for first degree murder.
24  Q.  And any idea -- does that document indicate what time it
25  was done -- completed?

1  A.  No, no time on it.

2  Q.  And is there anything in --

3      MR. GIVEN:  Well, I'm torn between trying to be

4  thorough and move things along, Judge.

5  BY MR. GIVEN:

6  Q.  If you look at the Closing Supp., Defendants' Exhibit 1.10,

7  is there anything in that Closing Supp. that tells us what time

8  the complaint was written or signed by Dorsch?

9  A.  What was the exhibit again, 1 --

10 Q.  1.18 -- I'm sorry.  The Closing Supp. is 1.10.  Just to

11 move --

12 A.  Okay.  We have it up on the screen.

13 Q.  Just to move things along, would you take my word that

14 there's nothing in the Closing Supp. about what time the

15 complaint was signed?

16 A.  No, no.

17 Q.  Okay.  And then Mr. Loevy showed you yesterday and had some

18 questions for you about the document that is Defendants'

19 Exhibit 1.19.

20      MR. GIVEN:  Can you pull that up, Dave, please?  Thank

21 you.

22 BY MR. GIVEN:

23 Q.  Do you have that in front of you?

24 A.  No.

25 Q.  Let me know when do you.

1  A.  I'm working on it here.

2  Q.  I understand.

3  A.  Okay.  Okay.

4  Q.  What --

5  A.  This is -- yeah.

6  Q.  What is -- what is that?

7  A.  That's a felony minute sheet.  It's a State's Attorney's

8  office form.

9  Q.  Who fills that out, in your experience?

10  A.  Detectives fill it out.

11  Q.  And who decides who is a -- at the bottom there, there's

12  something that says, "Prosecuting witness."  Do you see that?

13  A.  Yes.

14  Q.  Who fills that out?

15  A.  Detectives.

16  Q.  And do you remember in this case if Dorsch or Boyle came to

17  you to say, "Hey, Steve, you're going to be a prosecuting

18  witness" or "do you think you should be a prosecuting witness"

19  or anything like that?

20  A.  No, no.

21  Q.  Not consulted in any way?

22  A.  No, not at all.

23          MR. LOEVY:  Objection, foundation.  He doesn't

24  remember, Your Honor.

25          THE COURT:  To the best of the witness' recollection,

1  he can answer.

2  BY MR. GIVEN:

3  Q.  To the best of your recollection, were you consulted?

4  A.  No.

5  Q.  And I think we established yesterday, you were never called

6  as a witness at the criminal trial, correct?

7  A.  Correct.

8  Q.  Not by the prosecution or Mr. Wadas, right?

9  A.  Correct.

10  Q.  Okay.  So you can put that down.

11          And my next set of questions are going to involve

12  Defendants' Exhibit 1.3.  Do you have that?  We spent some time

13  on it yesterday.

14  A.  Okay.  Found it.

15  Q.  Do you have it in front of you?

16  A.  Yes.

17  Q.  So at some point after Mr. Rivera was charged, did you

18  write a report in this case?

19  A.  Yes, I did.

20  Q.  And was that report required that you had to write it?

21  A.  Actually, no, it was not.

22  Q.  So why did you write it?

23  A.  I wrote it so that other gang specialists that were working

24  on the case through this whole time, they would get credit for

25  the -- what they did.

1  Q.  And what do you mean credit?

2  A.  Well, we're -- everybody is evaluated.  So here we're

3  judged.  In here we're evaluated by supervisors as to your work

4  that you're doing.

5  Q.  So let me just ask.  The title of this report at the very

6  top left-hand corner, it says "Supplementary Report."

7       Do you see that?

8  A.  Yes.

9  Q.  And we've been talking a lot about Supp. Reports from

10 detectives.  Do you recall that generally?

11 A.  Yes.

12 Q.  Is the kind of Supplementary Report that you did in

13 Defendants' 1.3 the same kind of Supp. Report that, for

14 instance, 1. -- the Closing Supp. is, 1.10?

15 A.  No.  This is a -- I would say a Patrol Division

16 supplementary report --

17 Q.  And could you tell the ladies and gentlemen --

18 A.  -- because there's a difference between Patrol Division and

19 Detective Division.

20 Q.  And what are those differences, if you just summarize them?

21 A.  Well, just they might ask probably more -- there's more

22 information in a Detective Supplementary than there is in a

23 Patrol Division.

24      So Patrol Division is your beat cars that you see

25 every day.  Gang Crimes specialists, we're in the Patrol

1 Division, and that's the way it's divided up.  You have Patrol

2 Division and then a number of units underneath it.

3          And then you have Detective Division, and then they

4 have their own set of rules and regulations and policy along

5 with the Patrol Division stuff.

6          MR. GIVEN:  So, Judge, it's going to take about 30

7 seconds.  I apologize, but because the jury doesn't have their

8 own reports -- Dave, could you just quickly put on 1.3?  It's

9 two pages.  Could you just show the front page of 1.3 for a

10 second?  And then flip to the second page very quickly.

11          And then put up Defendants' Exhibit 1.10.  And could

12 you actually put the front page of each of those side by side?

13 That would actually be the fastest and most efficient way.

14 Front page.

15 BY MR. GIVEN:

16 Q.  So, Mr. Gawrys, do you have 1.3 and 1.10 in front of you?

17 A.  Yes.

18 Q.  Okay.  And if you look at those two front pages of the two

19 Supp. Reports, is that a fair description of what you were

20 telling the ladies and gentlemen about how the Detectives Supp.

21 Report has more boxes and more information than the Patrol

22 Division Supp. Report?

23 A.  Correct, it does.

24 Q.  Okay.

25          MR. GIVEN:  Thanks, Dave.  You can take that off for

1  the time being.

2  BY MR. GIVEN:

3  Q.  So is the Supp. Report that you wrote, Defendants' 1.3, is

4  that considered the Closing Supp. that's used to close the case

5  officially?

6  A.  No.

7  Q.  And that would be the Dorsch/Boyle Closing Supp. that we

8  talked about --

9  A.  Yeah, the Detective Division supplementary.

10  Q.  -- right?

11      All right.  Did you see -- let me just put this up

12  very quickly.  Mr. Loevy showed you a timeline yesterday.

13  A.  Okay.

14  Q.  A timeline of "Valentine," it's misspelled.  He has

15  "Valentine."  In fact, it's "Valentin."

16      "A Timeline of Valentine Investigation," do you see

17  anywhere -- he wrote "Fake Report" for your report.  Do you

18  remember that?

19  A.  No, not really.

20      MR. LOEVY:  I changed it to "Misstatement."

21      THE COURT:  I think that was changed.

22  BY MR. GIVEN:

23  Q.  Okay.  Do you see anywhere on this timeline that Mr. Loevy

24  prepared, do you see the Dorsch/Boyle closing report, the

25  official closing report on this timeline?

1   A.  No, I do not.

2   Q.  Okay.  Kind of a fake timeline.  All right.

3           MR. LOEVY:  Your Honor, we object to the argumentative

4   nature of that question.

5           THE COURT:  I'm sorry.  I didn't hear that.

6           MR. LOEVY:  I'll withdraw it, Your Honor.

7           THE COURT:  Okay.

8   BY MR. GIVEN:

9   Q.  Okay.  So let's look a little bit at your report.

10          Can you tell the ladies and gentlemen of the jury what

11  time this report was submitted?

12  A.  16 September at 12:30.

13  Q.  12:30 in the morning?

14  A.  Yes, in the morning.

15  Q.  Based on -- well, based on either your recollection or your

16  experience and practice, where would you have written this

17  report?

18  A.  Oh, in Area 5.

19  Q.  And why would you write your report at Area 5 instead of

20  going back to Belmont and Western?

21  A.  Because all the other reports are in Area 5 Detective

22  Division file.

23          MR. LOEVY:  Object to the speculation, Your Honor.

24  BY MR. GIVEN:

25  Q.  Are you speculating on that?

1  A.  No, no.

2        MR. LOEVY:  He doesn't know where he wrote the report.

3  He doesn't remember.

4        MR. GIVEN:  Judge --

5        THE COURT:  I'm sorry.  Does the report indicate where

6  it was written?

7        MR. GIVEN:  The report itself does not.  I asked --

8  BY MR. GIVEN:

9  Q.  Do you have a specific recollection of writing this report

10  at Area 5?

11  A.  No.  It's my practice --

12  Q.  Do you --

13  A.  -- that I stay in the area and write it there.

14  Q.  Okay.  Thank you.

15        Taking a look at this report, what kinds of things

16  would you have to do to get ready to write a report like this?

17  A.  Well, you would need the Opening Supp.  The General Offense

18  Case Report, we'd look at that, and then all the other reports

19  that are in the working file -- the Detective Division working

20  file.

21  Q.  And you'd have to read those, I assume --

22  A.  Yes, you would --

23  Q.  -- and refresh your recollection?

24  A.  Right --

25  Q.  And --

1  A.  -- in between it being used, so --

2  Q.  Can you tell from looking at the two pages of this

3  report -- do you have any recollection how long it would have

4  taken you to type this?

5  A.  It would have taken awhile, because I'm referring back

6  and -- back to the other report.  So I would have to read and

7  do a little writing and back and forth.

8  Q.  And I think you may have told us earlier, you would have

9  had to wait to start this report until after ASA Rosner had

10  decided whether to file charges; is that correct?

11  A.  That's correct.

12  Q.  So do you know what time that was?

13  A.  No, I do not.

14  Q.  Okay.  And when you sit down to write a report, so you look

15  through -- you write a report like this, you go back, and you

16  review the other reports like you just told us, right?

17  A.  Correct.

18  Q.  And then do you sit down and just start typing and not stop

19  at all until you're done, or do you start, stop, start, stop,

20  in your experience?

21  A.  Start and stop, because the file's being used.  It's --

22  there's only one.  So for me to read, I can't -- what do I

23  say -- is, like, keep it for myself and just sit down and just

24  go through the whole thing.

25          So I have to read it, then give it to the detectives

1    so they go through it, because it's more important that they

2    figure out what they need out of the thing than I do.  I can

3    just wait.  And then when the file sits, I get back to it, and

4    I go reading again.

5    Q.  Okay.  And you're using -- I think we established, you're

6    using typewriters back in 1988, right?

7    A.  Yeah, with carbon paper.

8    Q.  And these are typewriters -- oh, I'm sorry.  Carbon paper?

9    A.  Yes, carbon paper in these reports.

10   Q.  And do you often have to --

11   A.  Flip the report and then put the carbon back in there.

12   Q.  Right.  And I -- it's been -- I was going to say it's been

13   awhile since I've used carbon paper except over at Daley

14   Center.  They still use it every day.

15           Do you have to switch -- can you tell the ladies and

16   gentlemen -- there might be some jurors who actually don't know

17   what carbon paper is.  Can you explain that real quickly?

18   A.  Every report that's in a department -- except for Detective

19   Division is typed straight up.  There's no -- there isn't any

20   carbon.

21           But if you look at, you know, like our Supp. Patrol

22   Division case reports, we call these, and you have General

23   Offense Case Report, that's the original case that is started

24   by the beat car.

25           Well, all these reports have what is called carbon

1   paper in between it.  So you have to tear it out and then flip

2   it and put the carbon paper in the right way so it's going to

3   print on the side you want it to print on.  And then when

4   you're finished, you take it out and reverse it and put it

5   back, so --

6   Q.  Sometimes you have to switch out carbon paper; it runs out

7   of carbon?  Is that --

8   A.  Well, yeah, if you start making mistakes, well, then you

9   got to start all over because there's no backspace.  So it's

10  just -- you know, you start the report all over again or

11  whatever.

12  Q.  Okay.  And you don't have any recollection of if you had to

13  start this report over for any reason; is that fair to say?

14  A.  No, I don't, no.

15  Q.  Okay.  And do you have your own typewriter when you work at

16  Area 5?

17  A.  No.

18  Q.  You have to use somebody else's?

19  A.  I used the department typewriter.

20  Q.  And at some point -- you have to share that typewriter with

21  other people as well; is that fair to say?

22  A.  Yes, you have to go claim it, so --

23  Q.  Right.  And --

24  A.  Once you start, it's yours, so then nobody can throw you

25  off.

1  Q.  Okay.  So let's go through your report a little bit.

2      Mr. Loevy spent a lot of time yesterday talking about

3  the part on the first page where it says, "Gang Crimes

4  Specialist Noon, Guzman, Sparks, and Zacharias located a

5  witness on 29 August '88."  Do you recall those questions?

6  A.  Yes.

7  Q.  And then it says, "This witness was brought in to Gang

8  Crimes North to view gang photo books."

9      Do you remember those questions?

10 A.  Yes.

11 Q.  Okay.  And you explained this or you tried to explain this

12 yesterday.  Mr. Loevy was not -- well --

13     MR. LOEVY:  Your Honor --

14     MR. GIVEN:  I'll stop.  I withdraw it.

15 BY MR. GIVEN:

16 Q.  Could you tell the jury very briefly, again, where you got

17 that information?

18 A.  I got it from Detectives Supplementary Reports.

19     MR. LOEVY:  You know, Your Honor, we object to

20 foundation.  He has no memory of writing this report.

21 BY MR. GIVEN:

22 Q.  Based on your experience for all the times that you were

23 writing reports like this, where would you have gotten that

24 information?

25 A.  From Detectives Supps.

1  Q.  And do you recall ever seeing in the Detective Supps. that

2  the witness was brought in to Gang Crimes North to view gang

3  photo books?

4  A.  No.

5  Q.  So you were explaining yesterday that you made that

6  assumption.  Can you tell the jury why you made that

7  assumption?

8          MR. LOEVY:  Objection to leading, Your Honor.

9          THE COURT:  Overruled.

10  BY THE WITNESS:

11  A.  Is it -- I'm sorry.

12  BY MR. GIVEN:

13  Q.  You can answer.

14  A.  Why?  Oh, because it's --

15  Q.  What led you -- what led you to make that assumption?

16  A.  It's -- Gang Crimes, the policy is to not remove the books

17  from the office because these are -- we don't want them,

18  whatever -- something happened to them.  They could be stolen,

19  whatever, out of the squad cars.

20          So as a policy, they -- the office really frowned upon

21  taking these books out unless there was some kind of

22  circumstances that would dictate that, for you to remove them

23  and use them and put them back.

24          MR. GIVEN:  And I think we went through those

25  circumstances yesterday, right, Judge?  So we won't go through

1   those again.

2           THE COURT:  Okay.

3   BY MR. GIVEN:

4   Q.  And I think we also established yesterday -- and, in fact,

5   I got the page cites -- that Mr. Lopez in his post-conviction

6   transcript that we read yesterday, in fact, stated that he

7   looked at photo books --

8           MR. LOEVY:  Objection, Your Honor.  He's just talking

9   about what people testified about.

10          THE COURT:  Well, is there going to be a question at

11  the end of it?

12          MR. GIVEN:  Yes.

13          THE COURT:  Overruled.

14  BY MR. GIVEN:

15  Q.  Let me set the foundation question.

16          Is it your understanding now that the -- the gang book

17  photo identification that's in your report is happening on 29

18  August '88 at Gang Crimes North?  Is that correct or incorrect?

19  A.  Well, I put the wrong date down.

20  Q.  And, in fact, you also put Gang Crimes North, correct?

21  A.  Correct.

22  Q.  And is that -- is that accurate?

23  A.  No.

24  Q.  And --

25  A.  It's mistyped.

1  Q.  And how do you know it's not accurate?

2  A.  From reading the reports and hearing testimony.

3  Q.  Okay.  So it's not really a typo like Mr. Loevy kept trying

4  to say?  "Oh, it's just a typo, typo."

5        It's not a typo, right?

6  A.  No.

7  Q.  Okay.  It's a misunderstanding, is that --

8  A.  Well, I took it off of, I believe, one of the first couple

9  Detective Supps. that were made.

10  Q.  And you made a mistake in assumption, right?

11  A.  Yes.

12  Q.  Okay.

13        MR. LOEVY:  Objection, leading, Your Honor.

14        THE COURT:  Overruled.

15  BY MR. GIVEN:

16  Q.  So you talked at length yesterday with Mr. Loevy about the

17  entry in your report --

18        MR. GIVEN:  Let's go to page 2, Dave.

19  BY MR. GIVEN:

20  Q.  -- about -- and it starts, "Numerous attempts were made to

21  interview the victim at Cook County Hospital."  I won't

22  continue to read it.  It's up on the screen.

23        Do you remember those questions?

24  A.  Yes.

25  Q.  Okay.  So let's talk a little bit about that.

1      And when you wrote the 10th of September, was that

2  your best recollection of the date, or were you working off of

3  notes?

4  A.  No, that was our best, how you say, that we can remember, a

5  guess.

6  Q.  Did you have notes?

7  A.  No, I didn't have any notes.

8  Q.  Should you have had notes?

9  A.  Probably, yes.

10  Q.  So the fact that you didn't have notes and you're working

11  off memory, how did you come up with September 10th?

12  A.  It's just -- I don't know.  I don't remember how we did it.

13  It's just --

14  Q.  Well, let me ask you this.

15      Is there any doubt in your mind that you -- if you

16  wrote that you went to interview the victim and had -- were

17  able to have the victim view a gang photo book and an

18  identification was made, do you have any doubt in your mind

19  that that happened?

20  A.  That it did happen?

21  Q.  Yeah.  Did you make that up or did it happen?

22  A.  No, no, we didn't make it up.  No, I wouldn't do that.  It

23  happened.

24  Q.  Have you ever interviewed a victim in a hospital before?

25  A.  Yes.

1  Q.  And have you ever shown gang books or photo arrays to

2  victims who couldn't talk?

3  A.  Yes.

4  Q.  About approximately how many times in your career would you

5  say that's happened?

6  A.  Not many.

7  Q.  More than five?

8  A.  You know, no, I don't think so.  Thinking about it, I know

9  the question was asked before, but I don't think it was more

10  than five.  Maybe around five.

11  Q.  Okay.

12  A.  I'm not sure.  I never counted.

13  Q.  Okay.  So in those approximately five times, how would you

14  communicate with a victim who couldn't talk?

15  A.  Depending on their condition, blinking of the eyes, blink

16  once, blink twice could be either yes or no.  Tapping the

17  finger could be one or two.  Or whatever the condition was, you

18  may -- you adjust to get the identification.  You explain that

19  to them.

20  Q.  And I think you told -- well, that's asked and answered.

21  I'll move on.

22      And, again, Mr. Loevy pressed you a lot, and I just

23  asked you again, but I think it's important that we ask one

24  more time.

25      You'd agree it would have been a better practice if

1  you had written a report of what transpired at the hospital

2  whatever day it was; is that correct?

3  A.  Oh, yes.

4  Q.  Any idea why you wouldn't have written a report?

5  A.  I didn't write -- I'm guessing.  I don't know.  I can only

6  assume that the ID was unreliable, so we didn't write a report

7  on it.  We just thought we would come back, but that never

8  happened, for whatever reason.

9        But if we would have had a good ID that I felt

10  confident about, then we would have notified detectives and

11  made a report out.

12  Q.  Well, so let me ask you this.

13        Why would you write down in this Closing Supp. -- this

14  Supplementary Report that you're writing to summarize what

15  happened, why would you put an unreliable identification in

16  this report but not do what you just said you probably should

17  have done?

18  A.  I think that it was -- I didn't know if I should mention it

19  or not.  And then I thought, well, okay, it's better that I

20  just mention it and instead of trying to hide something.

21        So that's what I did.  I think that was my decision on

22  it.

23  Q.  And let -- now that he was dead, let prosecutors -- let

24  somebody else decide if it was important or not?

25  A.  Right.

1  Q.  The case had been charged, right, by the time you're

2  writing this?

3  A.  Yes, I believe so, yes.

4  Q.  So let the prosecutors know that this happened, and they

5  could make whatever use of it that they wanted, right?

6  A.  Yeah, when they read it, getting ready, then -- for court,

7  then, yeah, they can decide whatever or call me in, and I'll

8  explain it.

9  Q.  Do you remember whether any prosecutors or Mr. Wadas ever

10  asked you about this identification?

11  A.  No.

12  Q.  No, you don't remember; or, no, they didn't?

13  A.  I don't believe they did.

14  Q.  In fact, you recall Mr. Wadas said he never reached out to

15  you, right?

16  A.  No.

17  Q.  And, in fact, Mr. Wadas testified -- you were in court when

18  he said this whole report never made it into the criminal

19  trial.  Do you remember that?

20  A.  Yes.

21  Q.  And none of the information about this identification was

22  ever introduced into evidence, correct?

23  A.  Correct.

24  Q.  Okay.  Oh, one other thing.

25      Yesterday Mr. Loevy asked you a lot of questions where

1  it says, "Numerous attempts were made to interview the victim."

2  Do you remember those?

3  A.  Yes.

4  Q.  So I'm not going to ask you to go through all the reports,

5  but fair to say that you've reviewed a report where McLaughlin

6  and Leonard went to the hospital to make an attempt for -- to

7  interview the witness, right?  You've heard testimony to that

8  effect?

9  A.  Correct.

10  Q.  And you've seen it in a report, right?

11  A.  Yes.

12  Q.  And Letrich and Moriarty went to the hospital to attempt to

13  interview the victim?

14        MR. LOEVY:  Objection, leading and just --

15        THE COURT:  Sustained.

16  BY MR. GIVEN:

17  Q.  Are there any reports that you've seen that indicate

18  anybody besides McLaughlin and Leonard went to the hospital to

19  interview the victim?

20  A.  Yes.

21  Q.  Who is that?

22  A.  Moriarty and Letrich.

23  Q.  And then you and Mr. Guevara went to the hospital to try to

24  interview the witness; is that correct?

25        MR. LOEVY:  Object.

1    THE COURT:  Are you objecting?

2    MR. LOEVY:  Yes, it's leading.

3    THE COURT:  Sustained.  Leading.

4  BY MR. GIVEN:

5  Q.  Did you and Mr. Guevara, according to this report, go to

6  the hospital?

7  A.  Yes.

8  Q.  So those are three attempts right there, correct?

9  A.  Correct, yeah.

10  Q.  Numerous attempts?

11  A.  Yes, correct.

12  Q.  Is that what you meant?

13    Okay.  Let's -- let's go to the last paragraph,

14  because we spent some time on this yesterday.

15    MR. GIVEN:  And I'm getting close to the end, Judge,

16  relatively.

17  BY MR. GIVEN:

18  Q.  Mr. Loevy yesterday was basically accusing you of

19  fabricating that last paragraph.  Do you remember that?

20  A.  Yes.

21  Q.  And he said, "You wrote that, but it never happened,"

22  right?

23  A.  Not that I remember, no.

24  Q.  Okay.  So -- well, let's listen to my question.

25    Do you remember Mr. Loevy accusing you of saying,

1  "Well, that never happened.  You just made that up"?  Do you

2  remember that yesterday?

3  A.  Yes, correct.

4  Q.  Okay.  Is that true?  Did you just make this up?

5  A.  No.

6  Q.  You wrote it; it happened, right?

7  A.  Correct.

8  Q.  Okay.  So let's talk a little bit about that.

9          Do you remember whether Dorsch or Boyle told you to

10  show photographs of Rodriguez and Nieves to Mr. Lopez?

11  A.  I don't remember ever doing this.

12  Q.  In your experience, would that be something that detectives

13  might ask you to do?

14  A.  They may have.  They may have asked us to help them out a

15  little.

16  Q.  Okay.  And I think you and Mr. Loevy both agreed it would

17  be improper procedure to show Lopez only those two photographs,

18  right?

19  A.  Right.

20  Q.  Because that's sort of, you know, fish in a barrel, right?

21  A.  Correct.

22  Q.  So based on your experience, if you had shown photographs

23  of Mr. Rodriguez and Mr. Nieves, would you have shown him only

24  two, or would you have shown him a photo spread, or would you

25  have gotten gang books?  How would you have done it, in your

1  experience?

2  A.  Either a photo spread or a gang book.

3  Q.  Now, in your review of these documents from the

4  investigative file that you've been looking at and since you've

5  been sued and since we've been on trial, have you seen any

6  photographs of Mr. Rodriguez or Mr. Nieves in the investigative

7  file?

8  A.  I think I have, yes.

9  Q.  In the investigative file?

10  A.  Well, I'm not sure.  No, I'm not sure.  I'm not sure.

11  Q.  Okay.  Well, would -- if there were no photographs of

12  Mr. Nieves and Mr. Rodriguez at Area 5 where you were writing

13  this report, you'd have to get some photographs of them, right?

14        MR. LOEVY:  Objection.  He's leading.  He's just

15  trying to testify.

16        THE COURT:  Sustained.

17  BY MR. GIVEN:

18  Q.  Would you have needed to get photographs in order to comply

19  with what Dorsch and Boyle would have asked you to do?

20  A.  Yes.

21  Q.  So in your experience, would Area 5 have had those sorts of

22  photographs?

23  A.  They may have.

24        MR. LOEVY:  Objection, Your Honor.

25        THE COURT:  I'm sorry.  Objection?

1          MR. LOEVY:  He has no memory.  Mr. Given is just
2    testifying.
3          MR. GIVEN:  I'm not.  I'm asking him if based on his
4    experience if Area 5 had photo books -- you know, gang photo
5    books.
6          THE COURT:  Well, wait a minute.  The question is, did
7    Area 5 have gang photos?
8          MR. GIVEN:  Well, let me rephrase it.  I'll try to
9    redo this.
10          THE COURT:  Yeah, that doesn't sound like a question.
11    BY MR. GIVEN:
12    Q.  Based on your experience, would Area 5 have had the kinds
13    of photographs you needed to show Mr. Lopez photographs of
14    Nieves and Rodriguez?
15    A.  They may have.
16    Q.  And if they did, you would have used those, right?
17    A.  Correct.
18    Q.  And if they didn't, you'd have to find them somewhere else;
19    is that fair to say?
20    A.  Yes.
21    Q.  Okay.  So if the photographs weren't -- and you don't have
22    a memory one way or the other to be clear, right?
23    A.  Right, correct.
24    Q.  So if -- let me ask you a hypothetical.
25          If the photographs were not at Area 5, where would you

1  have to go to get them?

2  A.  Well, we'd have to find them either in the 14 or back to

3  our office.

4  Q.  Okay.  And then would -- is it possible, hypothetically, if

5  you were going to go over to 14 to get the photographs or go

6  over to Belmont and Western to get the photographs, it's

7  possible you might have taken Orlando Lopez with you?

8          MR. LOEVY:  Objection, leading, Your Honor.

9          MR. GIVEN:  I'm asking if it's possible, Judge.

10         THE COURT:  Well, anything is possible.  I'm going to

11 sustain the objection.  I know you're trying to go quickly.

12         MR. GIVEN:  I am.

13         THE COURT:  But you can't lead.

14         MR. GIVEN:  Okay.  Fair enough.

15 BY MR. GIVEN:

16 Q.  Based on your experience, if you have a witness that you

17 want to show photographs to in a situation like this, what

18 would your experience be with regard to bringing the

19 photographs to the witness or bringing the witness to the

20 photographs?

21 A.  This type of case, we probably would go get the photos and

22 bring them back.

23 Q.  14th, was it 21-something California?

24 A.  Correct.

25 Q.  And Gang Crimes North was Belmont and Western?

1   A.  That's correct.

2   Q.  Okay.  And is it fair to say that if you had to go to

3   Belmont and Western or to 21-whatever California to the 14th

4   District, you would have had to stop writing your report?

5               MR. LOEVY:  Objection, leading and relevance.

6               THE COURT:  It is leading.  That is for sure.

7   Sustained.

8   BY MR. GIVEN:

9   Q.  What would have -- what would have happened -- well, you

10  said earlier that it was a stop-and-start kind of process,

11  right?

12  A.  Correct.

13  Q.  So if you had to run off somewhere else, what would have

14  been the stop or start status of your report at that time?

15  A.  I'd be stopping and starting.  I mean, it's --

16  Q.  Right.  You can't be typing at Area 5 when you're off

17  getting photographs; fair to say?

18  A.  Correct, correct.

19  Q.  Okay.  And when you stopped typing, you had said earlier,

20  you know, you'd claim a typewriter, and then when you're

21  sitting there, nobody else can take it from you.  That's what

22  you said a little while ago, right?

23  A.  Yes.

24  Q.  If you're going to take off from the area for 20 minutes or

25  30, however long it takes, you don't get -- you take your

1  report out of the typewriter, don't you?

2  A.  Yeah, you could, yes.  You would take it with you if you're

3  not going to be there, because you don't want to leave it

4  laying around, so . . .

5  Q.  Right.  And then once you're done with it, whether you take

6  the witness to the photos or you bring the photos to the

7  witness, when you come back to the -- you eventually come back

8  to the area; is that fair to say?

9  A.  Yes.

10        MR. LOEVY:  Objection, leading, Your Honor.  He's

11  telling a story that the witness is --

12        THE COURT:  Yes, I think this is all leading.  So this

13  is --

14        MR. GIVEN:  Judge, I'll try to --

15        THE COURT:  Please.

16  BY MR. GIVEN:

17  Q.  Once -- in this hypothetical about going to get photos,

18  once you got the photos, where would you go next?

19  A.  You'd come back to Area 5 in this case, yes.

20  Q.  And what would you do once you got to Area 5 with the

21  photos?

22  A.  We would show them to the witness.

23  Q.  Okay.  And then once the witness did whatever the witness

24  did, what would you do next?

25  A.  You would leave a report.  We would or the detectives

1  would.

2  Q.  You would --

3  A.  Probably call the detectives and let them see what we were

4  doing, and then let them add whatever to the report.

5  Q.  Would you then finish your report?

6  A.  Yes.

7  Q.  And possible -- well, how many -- how many typewriters are

8  over at Area 5?

9  A.  I have no idea.

10  Q.  Is it possible that you would have gone to the exact same

11  one that you were using before or a different one?

12  A.  It could have been a different one, because if you're

13  leaving, you're going to gather up your papers and leave.

14        So they need the typewriters because we're not the

15  only case that's going on up in the -- in the detective --

16  there's other things that are going on, and people are moving

17  in and out.  And they're all trying to catch up on their

18  paperwork.

19  Q.  Okay.  So if I remember Mr. Loevy's theory that he was

20  running by you yesterday, pretty -- came at you pretty fast, so

21  I was having a hard time writing it down, but I think I got it

22  right.

23        The way he has this theory, you didn't write that

24  paragraph at all?

25        MR. LOEVY:  Judge, he's arguing with --

1          THE COURT:  I'm sorry?

2          MR. LOEVY:  He's just arguing at this point.

3          MR. GIVEN:  I'm setting up the question, Judge.

4          THE COURT:  I think you better just ask the question.

5          MR. GIVEN:  Sure.

6          THE COURT:  I think this is problematic.

7   BY MR. GIVEN:

8   Q.  Did you -- did you write this report and take it to Gang

9   Crimes North and show it to Ed Mingey without that last

10  paragraph in there?

11  A.  No.

12  Q.  And did Mr. Mingey, under Mr. Loevy's theory, say, "Whoa,

13  whoa, whoa, we got a big problem here.  You got to write that

14  last paragraph -- you got to fill something in in that last

15  paragraph" --

16          MR. LOEVY:  Objection.

17  BY MR. GIVEN:

18  Q.  -- "about those photos"?  Did something like that happen?

19          THE COURT:  Sustained.

20  BY MR. GIVEN:

21  Q.  Let me ask this.  How long have you known Ed Mingey?

22  A.  Long time, many years.

23  Q.  In your experience, if you had taken a report to Sergeant

24  Mingey back then, is it -- would he have said, "Hey, Steve, you

25  got to add another paragraph about -- about these photos"?

1  A.  Yeah, if he reviewed it and he knew about the case, yes, he

2  may have.

3  Q.  If Mr. -- if Sergeant Mingey said, "Hey, you got to fix

4  this problem and make something up," is that something, in your

5  experience, Ed Mingey would do?

6  A.  No, never.

7  Q.  And if Ed Mingey told to you do that, would you have done

8  it?  Would you have put in something that wasn't true?

9  A.  No, never.

10  Q.  So after you submitted your report, do you remember any

11  other involvement that you had with the Felix Valentin case up

12  until the time you were sued?

13  A.  No, nothing.

14  Q.  And by the way, if Mr. Wadas had issued a subpoena for the

15  investigative file that contained all these reports in the

16  Detective Division, is that something you would have been

17  responsible for responding to?

18  A.  No, not at all.

19  Q.  Just a few more questions.

20       Mr. Loevy asked you yesterday some questions about a

21  guy named Bill Dorsch, whose name has come up a little bit.

22       Do you remember -- do you know who Bill Dorsch is?

23  A.  Yes.

24  Q.  Who was he?

25  A.  He was a detective up in Area 5 Violent Crimes.

1  Q.  Okay.  Are you aware that Mr. Dorsch claims you were

2  present when Mr. Rivera did -- pointed at a picture for a

3  witness improperly?  Are you aware of that?

4  A.  Yes, I've heard stories about it.

5  Q.  Is that true?

6  A.  No, it's not true.

7  Q.  Okay.  If Mr. Dorsch said that, "Oh, yeah, everybody at

8  Area 5 -- I've told everybody at Area 5 about this.  Everybody

9  knew," you were at Area 5 for how long?

10  A.  About six years.

11  Q.  Did you ever hear that story?

12  A.  No, I did not.

13         MR. LOEVY:  Objection, asked and answered.

14  BY MR. GIVEN:

15  Q.  Did you anybody ever come to you --

16         THE COURT:  I'm sorry.  Because I don't know -- this

17  is the same story that --

18         MR. LOEVY:  That he just said he did hear.

19         THE COURT:  Well, then -- okay.  Let's --

20  BY MR. GIVEN:

21  Q.  Okay.  Let's be clear.

22         Where did you hear that story for the first time?

23  A.  I don't remember where I heard it.

24  Q.  Did you hear it at Mr. Dorsch's deposition where you were

25  attending?

1  A.  Oh, yes.

2  Q.  Had you heard it before then?

3  A.  I don't know.  I don't remember.

4  Q.  Okay.  I think Mr. Loevy asked you yesterday a little about

5  Cortland Street where the shooting took place.

6          Was it your understanding -- what was your

7  understanding of Cortland's -- that particular block of

8  Cortland in terms of it being Latin King or Imperial Gangster?

9  A.  I thought it was Imperial Gangster area.

10  Q.  Okay.  That's your -- that's what you thought?  That's what

11  you remember thinking?

12  A.  Yeah, that's what I, yeah, remember.

13  Q.  You could be wrong, though, right?

14  A.  Pardon me?

15  Q.  You could be wrong on that?

16  A.  I could be, but I think it was --

17  Q.  Okay.

18  A.  -- Gangster territory.

19  Q.  Looking back on this investigation, is there anything you

20  would have done differently in this case if you could do it

21  over again?

22  A.  Yes.

23  Q.  What would that be?

24  A.  I'd probably write a better report, a little more detail

25  put into it.

1  Q.  And you've heard Mr. Loevy ask some witnesses in this case

2  if they have any regrets about this case.

3          Do you have any regrets about this case?

4  A.  Well, I have for Jacques Rivera a regret that it's -- it's

5  too bad that you had to put up with this wrong.  But, you know,

6  Orlando Lopez is the one person that lied.  He lied to the

7  police.  He lied during the whole court proceedings.

8          And this wrong now is continued here -- we're here

9  today for this wrong that he committed.  And I just hope that

10 some day that you come to -- some kind of peace in your life

11 comes.

12 Q.  And this lawsuit where you're being sued for the wrong that

13 you just mentioned, how does that make you feel?

14 A.  Well, I don't like it.  I mean, it's something we didn't --

15 none of us did.  We would never do that.

16          MR. LOEVY:  Objection, Your Honor.

17 BY MR. GIVEN:

18 Q.  Do you feel wrongly accused?

19          THE COURT:  Wait.

20          MR. LOEVY:  He said, "We would never do that."

21          THE COURT:  Well, I think the witness can talk about

22 what he would do.

23          MR. LOEVY:  Okay.

24 BY THE WITNESS:

25 A.  So I feel that we're being wronged now because of all the

1    circumstances before with Orlando Lopez.

2            MR. GIVEN:  I have no other questions right now,

3    Judge.

4            THE COURT:  Okay.  Are there any other defense

5    questions?

6            MR. LEINENWEBER:  No, Your Honor.

7            MS. ROSEN:  No, Your Honor.

8            THE COURT:  Okay.

9                    REDIRECT EXAMINATION

10   BY MR. LOEVY:

11   Q.  All right.  You said that "We would never do that."

12           You and your partner Rey Guevara would never frame

13   somebody?

14   A.  No, never do that.

15   Q.  Okay.  Of course, you did more than a dozen times, didn't

16   you?

17           MR. GIVEN:  Objection, Your Honor, foundation.

18           MR. LOEVY:  They brought it up, Your Honor.

19           THE COURT:  Well, hold on a minute.  Foundation.

20           MR. GIVEN:  Judge, can we have a sidebar on this?

21           THE COURT:  I suppose.

22     (Proceedings heard at sidebar on the record:)

23           MR. LOEVY:  Your Honor, I don't know if it's

24   inexperience or sloppiness, but to ask a guy, "Isn't it true

25   you would never do this" gives the jury the impression --

1          MR. GIVEN:  Well, I did not ask him --

2          THE COURT REPORTER:  I'm sorry.

3          THE COURT:  Wait.

4          THE COURT REPORTER:  Judge, I'm sorry.  I can only do

5     one at a time.

6          THE COURT:  I know.  I know.  And I can only think

7     through one thing at a time.

8          THE COURT REPORTER:  Thank you.

9          MR. LOEVY:  So the point is, knowingly and

10    intentionally, he just told the jury, "I know I didn't do it

11    here because we would never do that."

12         THE COURT:  Well, let me ask you this.

13         MR. GIVEN:  I --

14         THE COURT:  The objection was a foundation objection.

15    Is this witness involved in any of these 404(b)?

16         MR. LOEVY:  He was his partner for 10 years --

17         THE COURT:  Yeah, I know.  I know that.

18         MR. LOEVY:  -- including -- and we went over which

19    ones --

20         THE COURT:  I know that.  I know that.

21         MR. LOEVY:  And, yes, he is -- he is alleged in at

22    least some of them, probably not all of them.

23         MR. GIVEN:  Can I respond?

24         THE COURT:  Sure.

25         MR. GIVEN:  First of all, I did not elicit that.  I

1  did not intentionally ask that question.

2          THE COURT:  I know, but he said that.

3          MR. GIVEN:  I understand what he said, but Mr. Loevy

4  said that I intentionally asked him that.

5          THE COURT:  Well, I don't -- I don't care about all

6  this lawyer stuff.

7          MR. GIVEN:  Okay.  That's number one.

8          Number two, in terms of 404(b), the plaintiffs have

9  been clear in their pretrial order, before the pretrial order

10  that the only 404(b) witnesses that they have offered are about

11  Mr. Guevara, not Mr. Gawrys.

12         THE COURT:  Well, I know who the 404(b) witnesses are.

13  And my question is, did they involve Mr. Gawrys or not?

14         MR. LOEVY:  At least some of them do.  There's --

15         MR. GIVEN:  The only one would be --

16         THE COURT:  One person at a time.

17         MR. GIVEN:  I'm sorry.  Go ahead.

18         MR. LOEVY:  Maybe the way we could cure this is if I

19  ask him, "When you said, 'we wouldn't do this,' you say, 'Well,

20  I wouldn't do this.'"

21         THE COURT:  Well, that's what I tried.  I tried to

22  coach him, actually, to do that, but it didn't do any good.

23         Yeah, I mean, if you can --

24         MR. GIVEN:  That's --

25         THE COURT:  Do you want to go in and clear it up, or

1  do you want to go in and clear it up?

2         MR. GIVEN:  You can do that.

3         MR. LOEVY:  All right.  I'll try to clear it up and --

4         THE COURT:  Let's get it cleared up.  Excellent.

5         MR. LOEVY:  Let's try.

6    (End of sidebar proceedings.)

7  BY MR. LOEVY:

8  Q.  Sir, you mentioned a second ago that "We would never do

9  that; we would never frame people."  And you used the word

10  "we."

11         I want to ask you specifically, did you mean "I would

12  never do that" or you and your partner, "We, Rey Guevara, would

13  never do that"?

14  A.  I think all of us here.

15         MR. LOEVY:  Well, then, Your Honor --

16         THE COURT:  Okay.

17  BY MR. LOEVY:

18  Q.  All right.  Isn't it true, sir, that all of you here, being

19  you and Mr. Guevara and specifically, are participants in more

20  than a dozen and a half investigations by which there's been an

21  exoneration based on misconduct committed by the police

22  officers?

23         MR. GIVEN:  Objection to foundation.

24         MS. ROSEN:  Objection.

25         THE COURT:  Well, you know, I'll talk to you briefly

1    at the side, but I think -- well, let's go to the side.

2      (Proceedings heard at sidebar on the record:)

3          THE COURT:  Okay.  I mean, things happen during trials

4    despite all of your best efforts to keep it from happening.

5          MS. ROSEN:  I appreciate that, Judge.  But I think

6    where he's going is there's -- that you and your partner have

7    now been accused because there's 10 additional lawsuits that

8    have been filed.

9          Those are just allegations.  That's not 404(b).

10          THE COURT:  So let me say what I think we need to do

11    here.

12          I mean, I think we have to make clear on these 404(b)

13    cases, these are cases that have been concluded, right?  There

14    have been findings.

15          MR. LOEVY:  Yeah, people are exonerated.

16          MR. GIVEN:  And none of them --

17          MR. LOEVY:  Of the 18 I want to ask him about --

18          THE COURT:  Come a little closer.

19          MR. LOEVY:  I want to ask him about the 18 convictions

20    that were overturned based on, you know, these allegations.

21          THE COURT:  Based on -- let me ask you this.  Is he

22    involved?

23          MR. LOEVY:  Well, at least some of them, Your Honor.

24    We got past that when I tried to say "I" --

25          THE COURT:  Yeah, yeah, true.

1          MR. LOEVY:  -- and he said "we."

2          MR. GIVEN:  Which one?  The only one is Juan Johnson.

3          MR. LOEVY:  Well, we can ask him about Juan Johnson.

4     I said "I."  We would have been fine if he said "I."

5          THE COURT:  Well, he just exonerated every defendant

6     in this case.  Okay?  I mean, what are we supposed to do?

7          MS. ROSEN:  Well, Judge, so let's talk about it --

8          THE COURT:  Yeah.

9          MS. ROSEN:  -- you know, in order.

10         Okay.  So we have of the 404(b) witnesses that the

11    Court has permitted.

12         THE COURT:  Right.

13         MS. ROSEN:  Of the 404(b) witnesses that the Court has

14    permitted, the only one that is -- that implicates in any way

15    Mr. Gawrys, as I understand it, is witnesses related to the

16    Juan Johnson case.

17         Who that is as it relates to the 404(b) witnesses

18    allowed, I'm not sure at this moment standing here.  But as far

19    as the question that was about to be asked or was going to be,

20    "Isn't it true that there's 12 or 18 convictions that have been

21    overturned" --

22         MR. LOEVY:  I thought I did ask that.

23         MS. ROSEN:  No, no.

24         THE COURT:  Keep talking to me.

25         MS. ROSEN:  Thank you.

1    The 12 or -- we don't know that any of these

2    convictions were specifically overturned based on misconduct.

3    That Mr. Rivera's conviction was overturned not based on

4    misconduct.  It was based on newly discovered evidence, so --

5    THE COURT:  So how are we going to fix -- how are we

6    going to fix this, practically speaking?  Because we have a

7    problem now, and --

8    MR. LOEVY:  Maybe I should move past it and -- by

9    agreement.  You know, and then we can decide after how -- how

10   -- what we tell the jury about what.  I'm okay with that if

11   they are.

12   MR. GIVEN:  That sounds like a reasonable way to

13   proceed.

14   THE COURT:  Okay.  Okay.

15   MS. ROSEN:  Thank you.

16   THE COURT:  Are we going to finish in order to take

17   our field trip by lunchtime?

18   MR. LOEVY:  I hope so.

19    (End of sidebar proceedings.)

20   BY MR. LOEVY:

21   Q.  All right.  I'm going to move on.  All right?

22   There was a team of detectives involved in the

23   prosecution and investigation of Mr. Rivera, correct?

24   A.  Yes.

25   Q.  And Mr. -- that's normal, right?

1    A.  Correct.

2    Q.  And Mr. -- Mr. Given showed you a whole bunch of reports,

3    some of which didn't have your name on them, correct?

4    A.  Correct.

5    Q.  And there was also a lot of reports that did have your name

6    on it, right?

7    A.  Right.

8    Q.  The arrest report when he was -- when the charges were

9    approved, that's you and Guevara, right?

10   A.  Correct.

11   Q.  And the lineup report we were talking about -- if we could

12   have the Elmo back, thank you -- your name right there on the

13   lineup report, correct?

14   A.  Correct.

15   Q.  And, of course, your name is on the report that you wrote,

16   you and Guevara, right?

17   A.  Correct.

18   Q.  And your name is listed ahead of Dorsch and Boyle on the

19   prosecuting witnesses, correct?

20   A.  Correct.

21   Q.  So you're not suggesting you weren't involved in the

22   investigation, right?

23   A.  No.

24   Q.  All right.  Let's talk about the August 31st either lineup

25   or not lineup.

1        You don't remember if a lineup happened because you

2    don't remember anything about it, right --

3    A.  No.

4    Q.  -- the first lineup?  You agree, right?

5    A.  Correct.

6    Q.  Now, was there -- were you trying to imply or suggest that

7    there was a lineup, but it was in a different case?

8    A.  No.

9    Q.  In other words, I was listening to the questions and

10   answers.

11       Were you saying that we got the guys, and we did a

12   lineup, but it was probably for a different case?  Is that what

13   you're trying to imply or not trying to imply?

14   A.  I'm not implying anything.

15   Q.  All right.  Mr. Lopez didn't particularly want to

16   participate, did he?

17   A.  I have no idea.

18   Q.  Well, Mr. Given asked you:  "Isn't it true that people

19   would sometime resist being eyewitnesses, pointing their

20   fingers at people.  All things being equal, they probably

21   didn't want to do that," right?  I mean, he asked you that,

22   right?

23   A.  Yes.

24   Q.  All right.  So how were you, the police, able to overcome

25   Orlando's resistance if he didn't want anything to do with

1  this?

2  A.  I had nothing to do with it.  I can't --

3  Q.  Okay.  Was Orlando given a choice whether he really wanted

4  to go through with this or did the police lean on him to go

5  through with it?

6        MR. GIVEN:  Objection, form, foundation, competence to

7  answer that.  Also assumes facts not in evidence.

8        THE COURT:  Overruled.  Overruled.

9  BY THE WITNESS:

10  A.  Can you ask your question again, please?

11  BY MR. LOEVY:

12  Q.  Sure.  Was he given a choice?

13  A.  I have no idea.

14  Q.  All right.  The chronology you were asked about, Mr. Given

15  pointed out that Labor Day is the start of school, and that's

16  at the beginning of September, correct?

17  A.  Yes.

18  Q.  All right.  So there was a lot -- a lot of days where you

19  knew exactly where Orlando was before the 14th and Valentin's

20  death, right?

21        MR. GIVEN:  Objection, form and foundation.

22        THE COURT:  Overruled.

23  BY THE WITNESS:

24  A.  You're asking me what is it now again?  I'm sorry.

25  BY MR. LOEVY:

1    Q. You told Mr. Given that you couldn't find Orlando because

2    he wasn't in school till Labor Day, but as soon as Labor Day

3    passes, then you could have found Orlando, at a minimum, at his

4    school, right?

5         MR. GIVEN: Judge, that mischaracterizes both the

6    question and the answer.

7         THE COURT: I don't understand. Overruled.

8    BY THE WITNESS:

9    A. I was not involved in the beginning of the case.

10    BY MR. LOEVY:

11    Q. All right. Well, there was -- in your involvement and

12    experience in the case, there was no issue finding Orlando

13    Lopez, right? He lived with his parents, right?

14    A. I have no idea.

15    Q. The problem was, on the first lineup, Orlando identified

16    the wrong guy and burned himself as a witness. That's why

17    there was no lineup, not because you couldn't find him; isn't

18    that true?

19         MR. GIVEN: Objection, argumentative.

20         THE COURT: Sustained.

21    BY MR. LOEVY:

22    Q. All right. On the subject of lineups -- by the way, you

23    guys had a drawer full of photographs, right, that you would

24    use for fillers for photo arrays?

25    A. What do you mean "guys"?

1 Q. You guys, the Gang Crimes specialists, sorry.

2 There was, like, a box or a drawer where you could

3 pull out photos and make photo arrays, correct?

4 A. Yes, there were some.

5 Q. All right. So you didn't need to go get fillers off the

6 streets to create photo arrays; you had photos available,

7 correct?

8 A. We had photos available.

9 Q. The only reason you'd get guys off the street was if you

10 were actually going to do a lineup, right?

11 A. Well, that's what I testified to.

12 Q. All right. Then the answer is yes, right?

13 A. Right.

14 Q. All right. Let's talk about why Jacques was brought back

15 on the 15th.

16 You wanted to bring him in for a lineup after Valentin

17 died, right?

18 A. Detectives did.

19 MR. GIVEN: Objection.

20 THE COURT: I'm sorry. What's the objection?

21 MR. GIVEN: Foundation and mischaracterizes.

22 MR. LOEVY: It's a question, Your Honor.

23 MR. GIVEN: He said "you."

24 THE COURT: Well, overruled.

25 BY MR. LOEVY:

1  Q.  Do you remember the question?

2  A.  No.  Go ahead.

3  Q.  After Valentin died, the investigators working on the case,

4  yourself included, decided it made sense to bring Jacques back

5  to participate in the second lineup, correct?

6  A.  No.

7  Q.  What --

8  A.  Detectives did.

9  Q.  Sir, were you just -- you know, Detective Dorsch, who

10 conducted the second lineup on the 15th, right?

11 A.  Correct.

12 Q.  He had zero involvement in the entire case from the

13 shooting until the 15th.  Do we agree on that?

14 A.  Yes.

15 Q.  There is not a single scrap of paper that says Bill Dorsch

16 even heard of this case until the 15th of September, correct?

17 A.  Correct.

18 Q.  All right.  You, on the other hand, are on the paper from

19 the time of the shooting doing events all the way up until the

20 15th of September, right?

21      MR. GIVEN:  Judge, that mischaracterizes the last --

22      MR. LOEVY:  It's a question, Your Honor.

23      MR. GIVEN:  -- testimony.

24      THE COURT:  I'm going to overrule the objection.  It's

25 a question.  The witness can answer yes or no.

1  BY MR. LOEVY:

2  Q.  When on the -- are you going to answer, sir?

3  A.  No, no, I'm just -- can you ask it again?

4  Q.  Sure.  On the 15th of September when you guys did the

5  lineup that Dorsch and Boyle were -- well, actually Boyle

6  signed it, and Dorsch was the backup?

7  A.  Correct.

8  Q.  Dorsch, Boyle, Guevara, and Gawrys are the detectives who

9  participated, correct?

10  A.  Correct.

11  Q.  So although Dorsch and Boyle are detectives and you're a

12  Gang specialist, the only two people on this page who knew

13  anything about this case were you and Guevara, right?

14  A.  Correct.

15  Q.  All right.  So when you say Dorsch made the call, you had

16  to tell Dorsch who to put in the lineup, didn't you?

17  A.  No.

18  Q.  How would Dorsch have known who to even put in the lineup

19  if he had no involvement in the case until that day?

20  A.  Because when he passed -- when the victim passed away, they

21  get -- I think the Detective Division gets notified, and then

22  the Detective Division called Gang Crimes North.

23  Q.  All right.  And Dorsch is, like, "I don't know anything

24  about this; it's not my case," right?

25  A.  I don't know what he's saying.

1  Q.  And he would have talked to you and Guevara, right?

2  A.  Right.

3  Q.  So when -- so, I mean, there's not like a wall of

4  separation between Gang Crimes and detectives, right?

5  A.  No.

6  Q.  You worked together to solve this crime, right?

7  A.  We do, yes.

8  Q.  All right.  And there's no reason to believe Dorsch would

9  have even known to have Orlando Lopez view the lineup or to put

10  Jacques in it unless you told Dorsch, "Hey, let's do this,"

11  right?

12  A.  No.

13  Q.  And, in fact, all of Dorsch's role basically at that point

14  was to set up a lineup where you told him who should be in it,

15  and you told him who the witness should be -- you and

16  Guevara -- and Dorsch executed the lineup.  They said, "Hey,

17  kid, you see anybody?"  And that was his role, right?

18  A.  No.

19  Q.  Did he do any other investigative steps other than what I

20  just described; take the suspect you identified, the witness

21  you identified, and say, "Hey, kid, do you see anybody in

22  there"?

23        What else did Bill Dorsch do investigatively?

24  A.  He would have to read the file if he was assigned to it.

25  Q.  All right.  Maybe he would have read the file.

1    He took no further investigative steps in the entire

2    case other than say, "Hey, kid, is that the guy" that you told

3    him who to put in there and you told him who the kid was?

4    That was the single only investigative steps he took,

5    right?

6    MR. GIVEN:  Objection, form, argumentative.

7    THE COURT:  Overruled.

8    BY THE WITNESS:

9    A.  I didn't tell him what to do.

10   BY MR. LOEVY:

11   Q.  All right.  The only reason Mr. Rivera was brought to the

12   station on the 15th -- was there a reason to arrest Rivera to

13   put him in this lineup?

14   A.  We were asked to bring him in.

15   Q.  And the reason you were asked to bring him in is because

16   you wrote a report where you made a claim that on September

17   10th, 1988, you got the victim to identify Jacques Rivera,

18   right?

19   A.  There was other reports that identified him.

20   Q.  All right.  You told Dorsch, "We should arrest Jacques

21   Rivera, put him in a lineup, because I went to the hospital,

22   and the victim identified Jacques," right?  That was part of

23   your briefing?

24   A.  No.

25   Q.  You kept that from Dorsch?

1  A.  I never talked to him about it.

2  Q.  Well, in fairness, sir, you either talked to him or you

3  didn't.  You can't remember anymore, right?  That's more

4  accurate, right?

5  A.  What are you asking, though?

6  Q.  I'm asking, you are not saying, as you sit here on the

7  witness stand, "I remember I never spoke to the detective."

8          You're just saying, "I just have no memory of the

9  events," right?  That's more accurate?

10  A.  No memory of it.

11  Q.  Right.  And you answered a lot of questions with Mr. Given

12  about what you would have expected you would have done under

13  those circumstances, right?

14  A.  Yes.

15  Q.  And under the circumstances where Dorsch is running a

16  lineup in a case he hasn't been involved with and you and

17  Guevara are the only people who do have involvement, you

18  probably would have briefed Dorsch on why you were arresting

19  Jacques Rivera, right?

20  A.  No, I don't think so.

21  Q.  All right.  Is your belief based on your experience that

22  although on September 10th, 1988, the victim supposedly

23  identified Jacques; you forgot to mention that to Dorsch?

24  A.  Forgot to mention what?

25  Q.  That the reason you were arresting Jacques Rivera is

1   because you went to the hospital, and the victim supposedly

2   identified him; would you have told Dorsch that?

3   A.  Probably.

4   Q.  All right.  Would you have expected him to believe you?

5   A.  I would expect him to.

6   Q.  Did you tell him actually you were -- this -- you know,

7   that's not true?

8   A.  What's not true?

9   Q.  The fact that you went to the hospital and got a reliable

10  identification?

11  A.  It wasn't reliable.

12  Q.  All right.  Did you explain that to the prosecutors that it

13  wasn't reliable?

14  A.  I don't remember.

15  Q.  Now, you probably should have, though, right?

16  A.  I don't remember.

17  Q.  All right.  After -- you're not claiming, though, that --

18  let me just -- I guess before I leave this, you don't remember

19  if you told Dorsch, "We're going to arrest Jacques; you're the

20  detective; you're going to do this lineup with this kid" -- you

21  don't remember if you told him the reason you're arresting him

22  was because the victim had picked out Jacques?  You can't

23  remember either way, right?

24  A.  I wouldn't have told him that, I don't think.  I'm pretty

25  sure.

1  Q.  Why not?

2  A.  It's listed in the reports.

3  Q.  All right.  So you would have given this report to Dorsch?

4  A.  No.  I didn't complete this report until the end, that

5  evening on the 15th.

6  Q.  All right.  Explain why you wouldn't have told Dorsch that

7  you got an ID --

8  A.  Because if he's assigned the case, it would be his

9  responsibility to go through the whole file.

10  Q.  But nobody knew but you.  You said you were keeping it in

11  your head?

12  A.  I haven't completed that.

13  Q.  All right.  So tell me again why you wouldn't have told

14  Dorsch that the victim in the case identified Jacques.

15  A.  I don't remember.  But it would be his responsibility to go

16  through the file to read it.

17  Q.  But there would have been nothing in the file to give it --

18  to say that, right?

19  A.  If you're talking about my report, yes.

20  Q.  And then there's nothing else in the file dated September

21  10th that this supposedly happened, right?

22  A.  Correct.

23  Q.  And there should have been, correct?

24  A.  If it was a reliable identification.

25  Q.  All right.  And, in fact, showing you your deposition --

1    this is page 197, line 19 through 7.

2            MR. GIVEN:  197?

3            MR. LOEVY:  197, lines 19 through the following page,

4    line 7.

5     (Said video/audio recording played in open court.)

6    BY MR. LOEVY:

7    Q.  All right.  Was that -- your supposed to have done it on

8    September 10th, right?

9    A.  Correct.

10   Q.  And you didn't?

11   A.  No, because it was unreliable.

12   Q.  All right.  If it was unreliable when you wrote your

13   report, if we go back, why didn't you write on September 10th

14   we were able to identify the victim, and then he made an

15   unreliable identification of Jacques as the person who shot the

16   victim?

17           Why did you imply that it was reliable if it wasn't?

18   A.  It's just mistyped on my part.

19   Q.  All right.

20   A.  I should have added more facts to it.

21   Q.  All right.  And we had some question about whether it's a

22   typo or a mistake.  Is this a typo or a mistake?

23   A.  Just a mistake.

24   Q.  All right.  A consequential mistake, would you agree?

25   A.  I don't know.

1      MR. GIVEN:  Objection, form, foundation.

2      THE COURT:  Overruled.

3  BY MR. LOEVY:

4  Q.  Sir, you testified that you have no regrets about what

5  happened to Jacques except for what Orlando Lopez did to him.

6      Do you have any regrets about writing a police report

7  saying the victim identified him if the victim didn't identify

8  him?

9  A.  Well, I have regrets for him that what --

10  Q.  No, I say, do you have regrets about writing a report

11  saying the victim identified him if the victim didn't identify

12  him?

13      MR. GIVEN:  Objection, misstates the record, misstates

14  his testimony.

15      THE COURT:  Overruled.

16  BY THE WITNESS:

17  A.  Would you ask it again?

18  BY MR. LOEVY:

19  Q.  You have regrets about what Orlando Lopez did or didn't do

20  you said, right?

21  A.  What he went through.

22  Q.  All right.  I'm talking about Orlando Lopez, the witness.

23  A.  Oh, okay.

24  Q.  I heard you on the stand say it's all Orlando's -- you're

25  saying basically it's Orlando's fault, right?

1   A.  Pardon me?

2   Q.  Sir, do you regret writing on your report that the victim

3   identified Jacques when, in fact, the victim didn't identify

4   Jacques?

5   A.  Yes, I could have done a better job of writing it.

6   Q.  Is that the kind of thing you did from time to time?

7   A.  No, I don't think so.

8   Q.  Is this the only time in your career you did something like

9   that?

10  A.  Probably my first time, yes.

11  Q.  First time ever?  Did you do it on purpose?

12  A.  No.  Wouldn't do that.

13  Q.  All right.  Let's talk about Ms. McLaughlin.

14          Yesterday Mr. Given asked you would you push off her

15  from the case?  Do you remember those questions?

16  A.  Yes.

17  Q.  Okay.  She was the lead investigator, right?

18  A.  Yes.

19  Q.  From August 27th until the 15th, she was the lead

20  investigator, right?

21  A.  No.

22  Q.  When did she stop becoming a lead investigator?

23  A.  I have no idea.

24  Q.  Well, she was pushed off the case, wasn't she?

25  A.  I have no idea.

1        MR. GIVEN:  Objection to form, foundation,

2    argumentative, lacks foundation.

3        THE COURT:  Sustained.  Sustained.

4    BY MR. LOEVY:

5    Q.  All right.  How did Mr. Dorsch happen to be the guy running

6    the lineup if this was her case?

7    A.  I have no idea.

8        MR. GIVEN:  Judge, asked and answered.

9        THE COURT:  Sustained.

10   BY MR. LOEVY:

11   Q.  All right.  You said you never spoke to the State's

12   Attorney -- well, I mean in this case.

13        At some point the State's Attorney was called to

14   pros -- to press charges against Jacques, right?

15   A.  Correct.

16   Q.  And are you saying you never would speak to the Felony

17   Review people ever when you were a Gangs Crime specialist?

18   A.  Not ever.  It's rare.  They would talk --

19   Q.  Sometimes, right?

20   A.  -- talk to detectives first.

21   Q.  Sure.  But sometimes the Gang Crime people would talk to

22   Felony Review, right?

23   A.  If they wanted to know something.

24   Q.  All right.  And sometimes you would talk to Felony Review,

25   right?

1  A.  No, not really.

2  Q.  Never?

3  A.  Well, not never.

4  Q.  Well, that's what I'm asking.

5  A.  It could happen.

6  Q.  Sometimes -- yeah, it would happen?  Sometimes --

7      MR. GIVEN:  Objection.  He's just badgering.  He's

8  trying to answer the question.

9      THE COURT:  Well, let me just say this.  I think we

10 have to get back to the point where one person is talking at a

11 time.

12 BY MR. LOEVY:

13 Q.  In this case, you have no memory either way whether you

14 spoke to the Felony Review person, right?

15 A.  Correct.

16 Q.  But from time to time, maybe not usually, maybe not always,

17 maybe not even most times, but sometimes the Gang Crime people

18 would speak to the Felony Review people, correct?

19 A.  They could.

20 Q.  All right.  So you certainly can't rule out that since you

21 were the one who had the information and you and Dorsch and

22 Boyle and Guevara were the only people listed on the lineup

23 report, that you were the one who maybe interacted with the

24 Felony Review person?  You can't rule that out, right?

25 A.  No.

1  Q.  And, in fact, the Felony Review person came away -- and by

2  the way, when I say "you," you and Guevara, correct?  You can't

3  rule that out?

4  A.  Correct.

5  Q.  And the Felony Review person must have come away -- this is

6  the Felony Review minutes, Plaintiff's Exhibit 19 -- I don't

7  know what letter it is -- "I" --

8       THE COURT REPORTER:  I'm sorry, Plaintiff's Exhibit

9  19 --

10      MR. LOEVY:  19-I.

11      THE COURT REPORTER:  Thank you.

12  BY MR. LOEVY:

13  Q.  The Felony Review minutes reflect that the Felony Review

14  person came away believing that Guevara --

15      MR. GIVEN:  Objection.  I'm sorry.  Go ahead, Jon.

16  BY MR. LOEVY:

17  Q.  -- and Gawrys were the first two prosecuting witnesses

18  after Orlando Rivera, correct?

19      MR. GIVEN:  Judge, that mischaracterizes this document

20  completely.

21  BY MR. LOEVY:

22  Q.  All right.  That's what it says on the page, correct?

23      MR. GIVEN:  It doesn't say what the ASA believed.

24      THE COURT:  All right.  Sustained.

25  BY MR. LOEVY:

1  Q.  This document was created by ASA for court, right?

2         MR. GIVEN:  Judge --

3         MR. LOEVY:  That's a question.

4         THE COURT:  Now there are questions about the

5  document.

6         MR. GIVEN:  Right.  So he just misstated -- he said

7  this is created by the State's Attorney --

8         MR. LOEVY:  Let's ask him.

9         MR. GIVEN:  -- and it's not.

10         THE COURT:  Well, I think the witness --

11         MR. GIVEN:  It's contrary to the evidence.

12         THE COURT:  The witness should be able to answer this

13  yes or no.

14  BY MR. LOEVY:

15  Q.  This is the felony minute sheet, Assistant State's Attorney

16  for State's Attorneys use only, right?

17  A.  Correct.

18  Q.  And it has the court branch and the defendant, right?

19  A.  Correct.

20  Q.  And it has the date of the offense and the brief

21  description, right?

22  A.  Right.

23  Q.  And this description, by the way, tracks what's in your

24  report, correct?

25  A.  In my report?

1  Q.  Yes.

2  A.  No, it tracks what's in the file.

3  Q.  Is there anything in here that's not in your report?

4  A.  Yeah, there's things in here that's not in my report.

5  Q.  Okay.  Which?  Which?

6  A.  Which part?

7  Q.  You said there's things in here not in your report.  What's

8  in there that's not in your report?

9  A.  Well, I'd have to sit here and compare them.

10  Q.  All right.  Well, let's not do that then.

11      It does say, prosecuting witness, Orlando Rivera,

12  Guevara and Gawrys ahead of Dorsch and Doyle.  Does it not say

13  that?

14  A.  Yes.

15  Q.  All right.  You thought maybe you were not in the -- you

16  know, even though you were -- it says here that you were part

17  of the lineup.  You thought with Mr. Given maybe you were

18  working on other cases, working on other reports.  Is that the

19  testimony you gave?

20  A.  No.

21  Q.  Okay.  What were you saying about working on other cases

22  being in other parts of the building?

23  A.  That was during lineups.  Time gaps between the time we

24  arrested and the time the lineup's done.

25  Q.  Because you were present at the lineup, right?

1   A.  I was in the building.

2   Q.  Well, that's -- then we are missing each other.

3        Not only were you in the building, you were present

4   during the lineup.  One, two, three, four, that's you and

5   Guevara, three and four, right?

6   A.  Correct.

7   Q.  So you were more than in the building.  You were

8   participating in the lineup, right?

9   A.  No, not me.

10  Q.  How about Guevara?

11  A.  I have no idea.

12  Q.  All right.  You said that you were -- Mr. Given said maybe

13  you were taking the fillers back, so you were -- that's why

14  maybe you weren't present.  Do you remember that testimony with

15  Mr. Given?

16  A.  Yes.

17  Q.  Is that where you were, you were driving the fillers home?

18  A.  I don't remember.

19  Q.  All right.  Take a look at Plaintiff's Exhibit 49.  This is

20  already in evidence.

21       This is the affidavit of Mr. Olivero.  Remember, he

22  was one of the filler guys who testified last week?  Do you

23  remember him and his affidavit?

24       MR. GIVEN:  Judge --

25       MR. LOEVY:  This is in evidence.

1          MR. GIVEN:  -- objection, mixing apples and oranges.
2     I think he's --
3          THE COURT:  You know, again, I haven't heard a
4     question, so I don't know what kind of fruits we're mixing up
5     here.  Let me hear the question.
6     BY MR. LOEVY:
7     Q.  All right.  You told Mr. Given you thought you weren't
8     present for the important events because you were driving the
9     fillers home, right?
10         MR. GIVEN:  Misstates the --
11    BY THE WITNESS:
12    A.  I didn't say that.
13    BY MR. LOEVY:
14    Q.  What did you say?
15    A.  I said I may have been doing it.
16    Q.  All right.  You may have been driving the fillers home?
17    A.  Correct.
18    Q.  All right.  Let's take a look at paragraph 10 of the same
19    affidavit.
20         MS. ROSEN:  Judge, can we just get some clarification
21    about what date we're talking about?
22         MR. LOEVY:  This is the affidavit of Carlos Olivero --
23         MS. ROSEN:  No, the premise for the question based
24    on -- the date that we're asking Mr. Gawrys was taking filler
25    witnesses home, what date.

1      THE COURT:  So the date of the lineup according to
2  this affidavit?
3      MR. LOEVY:  This affidavit -- I can clarify, I think.
4      THE COURT:  All right.
5  BY MR. LOEVY:
6  Q.  This is the affidavit of the guy who says he participated
7  in the August 31st lineup that you say didn't happen, right, or
8  that you don't know if it happened, right?
9  A.  I don't know.  I don't see his document.
10 Q.  Do you remember Mr. Olivero, Mr. Villafane, they said that
11 they were asked to come to the station; they participated in a
12 lineup, and then there was some questions about why they let a
13 gang member drive them home?
14      Do you remember those questions?
15 A.  Correct.  Yes.
16 Q.  All right.  Take a look at paragraph 10.  Mr. Olivero said,
17 "After the lineup was over, I was told I could go home.  The
18 police did not give me a ride home as promised."
19      First of all, that might explain why he had to take a
20 ride home from a person who was associated with a gang,
21 correct?
22 A.  What day --
23      MS. ROSEN:  Objection, Judge, foundation.
24      THE COURT:  Sustained.
25 BY MR. LOEVY:

1  Q. All right. Sometimes you guys would say to fillers, "Hey,

2  if you come in, we'll give you a ride home" and then not take

3  them home; did that happen, sir?

4  A. It could happen.

5  Q. All right. Let's talk about your report about getting

6  credit.

7          You said that you wrote this report to give credit for

8  the prosecution of Mr. Rivera?

9  A. Yes.

10 Q. All right. Why was it you and Guevara of all the people at

11 the Chicago Police Department who got to write the report

12 saying who gets credit for this arrest and prosecution?

13 A. Because we were there for the end of it.

14 Q. Well, you were there for the middle of it and the beginning

15 of it, too, weren't you?

16 A. No.

17          MR. GIVEN: Objection --

18          THE COURT: Sustained.

19          MR. GIVEN: -- assumes facts not in evidence.

20 BY MR. LOEVY:

21 Q. You and Mr. -- Mr. Guevara arrested Jacques Rivera twice,

22 right?

23 A. Wrong.

24          MR. GIVEN: Objection, assumes facts not in evidence.

25 BY MR. LOEVY:

1  Q.  We have two arrest reports with Mr. Guevara's name on them

2  where Jacques Rivera was arrested; once on the 30th of August

3  and once on the 15th of September, correct?

4  A.  Yes.

5  Q.  And both of those reports were written by Detective

6  Guevara, correct?

7  A.  Correct.

8  Q.  And your name is on the second one, right?

9  A.  Yes.

10  Q.  All right.  So why did you get to be the one to decide who

11  gets the credit for this investigation?

12          MR. GIVEN:  Asked and answered, Your Honor.

13          MR. LOEVY:  He hasn't answered it yet.

14          THE COURT:  Overruled.

15  BY THE WITNESS:

16  A.  Why did I decide?

17  BY MR. LOEVY:

18  Q.  Yeah.

19  A.  I'm just trying to give guys credit that worked on the case

20  from the beginning.

21  Q.  Including yourself, right?

22  A.  Correct.

23  Q.  And one of the things you wanted credit for was getting the

24  victim to identify Jacques, right?

25          MR. GIVEN:  Objection, form.

1  BY MR. LOEVY:

2  Q.  You wanted credit for that, right?

3  A.  I'm not getting credit for that.

4       MR. LOEVY:  I'm sorry, Your Honor.

5       THE COURT:  Go ahead.

6  BY MR. LOEVY:

7  Q.  And another thing you wanted credit for was that you ruled

8  out Rodriguez and Nieves, correct?

9  A.  Correct.  But there's no credit for that.

10  Q.  All right.  And Mr. Given was asking you questions about

11  whether that got added later or carbons or Mingey.  Did you

12  understand his questions?

13  A.  Yes.

14  Q.  All right.  You testified yesterday in no uncertain terms

15  that that didn't get added later, correct?

16  A.  Correct.

17  Q.  You stand by that?

18  A.  Yes.

19  Q.  All right.  So all -- everything you were saying with Mr.

20  Given about how this carbon and you started and you left and

21  then you came back and you started over, that's wrong, right?

22  A.  I said it could have happened.

23  Q.  All right.  But your belief is it would have been improper

24  to add things later, right?

25  A.  Yes.

1  Q.  And you didn't add this later, is your testimony, right?

2  A.  Right.

3  Q.  But you agree with me that when we examined the actual

4  piece of paper, it has the physical appearance of being added

5  later?

6  A.  It did look like it, yes.

7  Q.  All right.  Mr. Given asked you if you had seen this report

8  yesterday.  This is the beat report.  This is Plaintiff's

9  Exhibit 11.  Remember the one with Machos Lopez from the scene?

10  A.  Okay.

11  Q.  Do you remember Mr. Given asking you questions about seeing

12  the beat report?

13  A.  He asked some questions about the beat report, yes.

14  Q.  All right.  Now, my question for you, sir, is showing you

15  Plaintiff's Exhibit 19-C, which version did you see?

16          Did you see the version in the permanent retention

17  file which has Macho listed as a witness on the 27th of August,

18  or did you see the version from the investigative file, same

19  date, same exact report, that doesn't have Orlando Lopez listed

20  as a witness?  Which version would you have seen back then?

21  A.  I think I saw the first one.

22  Q.  The one with him listed?

23  A.  Yes.

24  Q.  Do you know why the one without him listed was in the

25  investigative file?

1   A.  No, I don't.  Is this page 2 of the --

2   Q.  I'm going to show you both reports, and I just want you to

3   confirm it's the exact same report in every respect except for

4   the name and description by Orlando Lopez.

5   A.  I haven't seen this other report.

6   Q.  Well, they're identical reports, right?

7   A.  Identical?

8   Q.  Yeah.  The text is the same except -- the only thing that's

9   different except for the addition of Orlando's name.  Would you

10  agree with that?

11          MR. LOEVY:  Can I get the one without -- that's 19-C.

12  BY THE WITNESS:

13  A.  No, they're not the same.

14  BY MR. LOEVY:

15  Q.  Okay.  What's different?

16  A.  Well, Lopez's name is not on the --

17  Q.  Yeah, but I said except for Lopez.  That's what I was

18  asking.

19  A.  Then in the offender's box, it has a description of driver

20  and lists how many offenders.

21  Q.  Right.  I said Lopez and his description are what got added

22  to the second version of this report, right?

23          MR. SOTOS:  Judge, objection.  He said the only

24  difference.  There's several differences.

25          THE COURT:  You know, I'm going to sustain the

1  objection.

2  BY MR. LOEVY:

3  Q. All right. If I wasn't clear, let me explain again.

4      The only thing that's been added is Lopez and his

5  description of the offenders. That's exactly what I said

6  before, isn't it?

7      MR. SOTOS: Object -- Judge, same objection. It's

8  showing him one small part of the report. There's a number of

9  differences.

10 BY MR. LOEVY:

11 Q. Take your time, sir. Tell us what's different. Take your

12 time.

13     THE COURT: So you want the -- you want the witness to

14 actually compare these two reports?

15     MR. LOEVY: I'm saying I have compared them. I see no

16 differences.

17     THE COURT: Well, I don't -- I don't -- yeah, but the

18 question is to the witness --

19 BY MR. LOEVY:

20 Q. All right. Do you see any differences --

21     THE COURT: -- and it might take awhile.

22     THE COURT REPORTER: Mr. Loevy.

23     MR. LOEVY: My fault. My fault. I do apologize.

24 Time is --

25     THE COURT: I mean, unless the lawyers can have some

1    agreement about this and we could just do it that way.

2            MR. SOTOS:  There's a number of differences.

3            MR. LOEVY:  It looks like we're going to have a lunch

4    break.  Maybe the witness could study it at lunch, and then we

5    can come back to this part of the questioning?

6            THE COURT:  If that's -- we need to take a lunch break

7    now --

8            MR. LOEVY:  Well, I'm not -- I mean, I can finish the

9    rest of it, I think, or keep moving.  Whatever your preference,

10   Your Honor.

11           THE COURT:  Well, is there some way -- I mean, I

12   assume that counsel in this case knows what, if any,

13   differences there are between these documents, so --

14           MR. LOEVY:  Your Honor, we've looked at it, and we

15   don't see any differences.  If Mr. Sotos sees differences,

16   maybe I'm missing it.

17           THE COURT:  Well, I'm trying to see if we can save the

18   witness --

19           MR. LOEVY:  Maybe Mr. Sotos could point them out, what

20   the differences are.

21           THE COURT:  Okay.  Why don't we do it that way then.

22           MR. LOEVY:  All right.

23           MR. SOTOS:  Now I have to get the report, and I have

24   to grab them both and look at them.

25           THE COURT:  So my guess is that this is not the first

1    time the lawyers in the case have looked at these documents.

2              MR. LOEVY:  Yeah.

3              THE COURT:  I'd be surprised.

4              MR. LOEVY:  And -- well, it was shown to him on -- on

5    direct.

6              THE COURT:  Yeah.  Just can you ask a question that

7    doesn't require --

8              MR. LOEVY:  All right.

9              THE COURT:  -- the witness to do what you're asking

10   him to do?

11             MR. LOEVY:  All right.  These are my copies.  Here's

12   another copy.  All right.

13     (Counsel conferring.)

14   BY MR. LOEVY:

15   Q.  All right.  The -- if there is another difference, it's

16   minor.  Would you agree?

17             They are the same report.  Do you want to read it?

18   Here, read what it says in summary.

19             "In summary, victim and witness, Valentin, Israel went

20   to the above address to pick up eyewitness, Valentin's

21   girlfriend."  Do you see that text, sir?

22   A.  Yes.

23   Q.  Now I'm going to show you the version with the name on it.

24             "In summary," it's the exact same language in the

25   exact same place, right?

1   A.  Okay.

2   Q.  All right.  Do you disagree with that, sir?

3   A.  Do I what?

4   Q.  Do you disagree that this looks like the same report?

5   A.  Well, there are some differences in the report.

6   Q.  Okay.

7   A.  It's not approved and --

8   Q.  The difference is Orlando Lopez --

9         THE COURT:  All right.  I think we're going to have to

10  take a break.

11        MR. LOEVY:  Okay.

12        THE COURT:  You know, there's no way the witness can

13  do this --

14        MR. LOEVY:  Okay.

15        THE COURT:  -- without having time to look at the

16  documents.

17        MR. LOEVY:  I'll tell you what.  I'll move on, Your

18  Honor.

19        THE COURT:  Okay.

20  BY MR. LOEVY:

21  Q.  You were asked if Mr. Wadas --

22        MR. LOEVY:  Your Honor, maybe we --

23  BY MR. LOEVY:

24  Q.  Well, you were asked if Mr. Wadas had called you and asked

25  you about your report.  Do you remember those questions, sir?

1  A.  Yes.

2  Q.  If Mr. Wadas, Jacques' criminal defense attorney, said,

3  "Listen, Mr. Gawrys, I need to ask you some questions about

4  your report," would you have talked to him?

5  A.  With the State's Attorney present.

6  Q.  All right.  Let's say that he set it up, and the State's

7  Attorney said, "All right.  Mr. Gawrys, Mr. Wadas, let's all

8  have a conversation."

9        If they would have -- if Mr. Wadas would have said,

10  "Sir, let's go line by line through your report.  Is this false

11  or true," would you have said, "Oh, actually, that's false"?

12  A.  It depends what he said -- he asked.

13  Q.  Well, what if he would have said, "What you wrote in this

14  first paragraph on page 2 of your report, is that true or

15  false," what would you have said?

16  A.  I believed it to be true.

17  Q.  Right.  No matter what Wadas would have asked you, you

18  would have said, "My reports are accurate," right?

19        MR. GIVEN:  Objection to the foundation of that

20  question.

21        THE COURT:  Overruled.

22  BY THE WITNESS:

23  A.  Ask again, please.

24  BY MR. LOEVY:

25  Q.  Sure.  Was it Mr. Wadas' fault for not asking you "Did you

1  lie in these reports"?

2  A.  I don't think so.

3        MR. SOTOS:  Objection to the form of the question.

4  BY THE WITNESS:

5  A.  I don't know.  I have no idea.

6        THE COURT:  Sustained to the form.

7  BY MR. LOEVY:

8  Q.  All right.  Did Mr. Wadas, when he was representing

9  Jacques, have the right to rely on the premise that you were

10  going to accurately report the dates, times, and places and

11  events without him having to call you and saying, "Sir, is your

12  report untrue"?

13        MR. GIVEN:  Objection.

14  BY MR. LOEVY:

15  Q.  Did he have a right to rely on it?

16        THE COURT:  What's the objection?

17        MR. GIVEN:  Mischaracterizes, foundation.

18        THE COURT:  Overruled.

19  BY THE WITNESS:

20  A.  Say it again once more.

21  BY MR. LOEVY:

22  Q.  Mr. Wadas has been criticized for not being diligent by

23  calling you.

24        And the question is, from your perspective, did

25  Mr. Wadas have a right to rely on the premise that the dates,

1  places, and events in your report were true?

2        MR. SOTOS:  Judge, objection.  That mischaracterizes

3  what happened.  Nobody criticized Wadas for not calling him.

4  That never happened.

5        THE COURT:  Overruled.

6  BY THE WITNESS:

7  A.  No, he would expect that it was right.

8  BY MR. LOEVY:

9  Q.  All right.  Is there anything in this report that's true?

10 A.  It's true as far as I wrote it, yes.

11 Q.  No, is there -- well, we've already said what's not true.

12 Gang Crimes North, didn't happen there.  Date's wrong.  This

13 event didn't happen.  You said this didn't happen --

14       MR. SOTOS:  Objection.  Objection, Judge.

15       THE COURT:  Sustained.

16       MR. LOEVY:  All right.  I'll go slower, Your Honor.

17 And this will be my last question maybe before we take a break.

18       THE COURT:  That would be fine.

19       MR. LOEVY:  All right.

20 BY MR. LOEVY:

21 Q.  This date here, August 29th, is wrong.  This location, Gang

22 Crimes North, is wrong.  The identification depicted in the

23 first paragraph on page 2 is wrong.

24       MR. GIVEN:  Objection, that mischaracterizes --

25       THE COURT:  Yes.  Sustained.

1  BY MR. LOEVY:

2  Q. All right. Is this wrong? "On September 10th, 1988, the

3  r/i's were able to have the victim view a gang book, and then

4  an identification was made of Jose Rios as the person who shot

5  the victim." Is that right or wrong?

6        MR. GIVEN: That's compound, Judge. I don't know how

7  he's supposed to answer that question.

8        MR. LOEVY: Well, let's let him try.

9        THE COURT: Overruled. Overruled. You're asking if

10  the whole thing is correct?

11        MR. LOEVY: Yes.

12  BY MR. LOEVY:

13  Q. On September 10th, 1998, you and Guevara, r/i's, were able

14  to have the victim view a gang book, and then an identification

15  was made of Jose Rios as the person who shot the victim.

16        That's inaccurate, right?

17  A. Well, it was done from memory, so we made a --

18  Q. All right. But it was inaccurate?

19  A. So we made a mistake, yes.

20  Q. All right. So let's return to the first question I was

21  asking you.

22        The date, August 29th, was wrong. The location, Gang

23  Crimes North, was wrong. The identification that supposedly

24  happened on the 10th was wrong. And the idea that Jose Rios

25  was shown photos rather than a photo array, that was wrong,

1    too, right?

2              MS. ROSEN:  Objection.

3              THE COURT:  I'm sorry.  You misspoke.

4    BY MR. LOEVY:

5    Q.  I'm sorry.  Jose Rodriguez.

6              MR. LOEVY:  Thank you, Your Honor.

7    BY MR. LOEVY:

8    Q.  This was inaccurate, too, wasn't it?

9    A.  I don't remember.

10   Q.  You claimed with Mr. Given that that was really a photo

11   array, and you wrote it wrong, right?

12   A.  I don't think so.

13   Q.  All right.  Is there anything in this report that's true?

14             MR. GIVEN:  Asked and answered.

15             THE COURT:  I don't think -- I don't recall an answer

16   if it --

17             MR. LOEVY:  I'll tell you what.  We can take a lunch

18   break then, Your Honor.

19             THE COURT:  All right.  Let's take a lunch break.

20             Okay.  1:15, ladies and gentlemen.

21             COURT SECURITY OFFICER:  All rise.

22     (Jury out.)

23             THE COURT:  Okay.  We're on day eight, just in case,

24   you know, someone's not counting.

25             MS. ROSEN:  Judge, on behalf of the City, I am

1    counting.

2           THE COURT:  I bet you are counting.

3      (Laughter.)

4           MR. LOEVY:  Just to update you on the schedule, Your

5    Honor, we're hopeful that this witness will finish quickly.

6    And then we're going to start Mr. -- well, actually, we're

7    probably going to call a short damage witness.

8           MR. ART:  Hallway.

9           MR. LOEVY:  What's that?

10          MR. ART:  Hallway.

11          MR. LOEVY:  And the hallway view.

12          And then we're going to get our plaintiff's expert out

13   of the way.  That would be Mr. Brasfield.

14          On Monday, we have two City witnesses --

15          THE COURT:  We're going to get Mr. Brasfield out of

16   the way in an hour and a half.  I'm looking forward to that.

17     (Laughter.)

18          MS. ROSEN:  Judge, I don't see that happening but --

19          MR. LOEVY:  That's a good point.

20          THE COURT:  And then what's going to happen Monday?

21          MR. LOEVY:  Monday we have a damage witness, Juan

22   Rivera.  We have a damage witness, Richard Rivera.  We have

23   Hickey and Spratte.  And then we're very close to the end.

24          We might have -- we have Mr. Sparks, but we're hopeful

25   Monday, which would be two weeks, which is what we -- our case

1    would be two weeks, because we started a day late.

2           THE COURT:  Well, I -- yeah, I've never seen anything

3    short that you told me was going to be short end up being

4    short.

5           MR. LOEVY:  That's true.

6           THE COURT:  So I think maybe sometime this weekend to

7    try to constrict this, because, you know, people are going to

8    get edgy.  And I'm getting edgy.

9           MR. LOEVY:  All right.  Thank you, Your Honor.

10          MS. ROSEN:  Thanks, Judge.

11      (Adjournment at 12:20 p.m. until 1:15 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| | NORTHERN DISTRICT OF ILLINOIS | |
| 2 | EASTERN DIVISION | |

```
 3   JACQUES RIVERA,                            ) No. 12 CV 4428
                                                )
 4           Plaintiff,                         )
                                                )
 5   vs.                                        ) Chicago, Illinois
                                                )
 6   REYNALDO GUEVARA, STEVE GAWRYS,            )
     DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON,   )
 7   JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN     )
     MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY,   )
 8   RUSSELL WEINGART, ESTATE OF ROCCO          )
     RINALDI, CITY OF CHICAGO,                  ) June 15, 2018
 9                                              )
             Defendants.                        ) 1:15 o'clock p.m.
10
                           VOLUME 9-B
11            TRANSCRIPT OF PROCEEDINGS - Trial
          BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                       and a Jury

13   APPEARANCES:

14   For the Plaintiff:    LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
15                              MR. STEVEN E. ART
                                MR. ANAND SWAMINATHAN
16                          311 North Aberdeen Street
                            3rd Floor
17                          Chicago, Illinois  60607

18                          MacARTHUR JUSTICE CENTER
                            Northwestern University School of Law
19                          BY:  LOCKE E. BOWMAN III
                            357 East Chicago Avenue
20                          Chicago, Illinois  60611
                            (312) 503-0844
21

22   Court reporter:           Blanca I. Lara
                            Official Court Reporter
23                          219 South Dearborn Street
                                  Room 2504
24                          Chicago, Illinois 60604
                                (312) 435-5895
25                       blanca_lara@ilnd.uscourts.gov
```

```
 1   APPEARANCES:  (Continued)

 2

 3   For the Individual    THE SOTOS LAW FIRM
     Defendants:           BY:  MR. JEFFREY N. GIVEN
 4                              MR. JAMES G. SOTOS
                                MS. CAROLINE P. GOLDEN
 5                              MR. JOSEPH M. POLICK
                                MR. DAVID A. BRUEGGEN
 6                         550 East Devon Avenue, Suite 150
                           Itasca, Illinois  60143
 7

 8   For the Defendant     ROCK FUSCO & CONNELLY, LLC
     City of Chicago:      BY:  MS. EILEEN E. ROSEN
 9                              MS. CATHERINE M. BARBER
                                MS. THERESA B. CARNEY
10                         321 North Clark Street, Suite 2200
                           Chicago, Illinois  60654
11

12   For the Defendant     LEINENWEBER BARONI & DAFFADA, LLC
     Guevara:              BY:  MR. THOMAS E. LEINENWEBER
13                              MR. JAMES V. DAFFADA
                           120 North LaSalle Street, Suite 2000
14                         Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

1    (Jury out.  Proceedings heard in open court:)

2          THE COURT:  Are we ready?

3          MR. LOEVY:  We have a couple of issues to raise with

4    Your Honor.

5          THE COURT:  Sounds like we do, yes.

6          MR. LOEVY:  Well, we got to keep it moving.  But the

7    404(b) issue, what we propose to do -- because we said we would

8    talk about it.

9          THE COURT:  Yeah.

10   (Witness returns to stand.)

11         MR. LOEVY:  What we propose to do is ask the witness

12   if he had any involvement in the cases of which the person was

13   either exonerated or not convicted due to the misconduct

14   allegations against Mr. Guevara, and we'll accept his answers

15   "Yes," "No," or, you know, "I don't remember."

16         THE COURT:  Okay.

17         MR. BOWMAN:  The witness is on the stand.

18         THE COURT:  Oh, sorry.  All right.  You want to go at

19   the side?

20         MR. LOEVY:  Yeah, maybe it's -- although, if that's

21   acceptable, I think we'll just move forward.

22         THE COURT:  You worked that out at lunchtime?

23         MS. ROSEN:  No, we didn't.

24         MR. GIVEN:  No.

25         MS. ROSEN:  This is the first we've heard of it.

1          MR. LOEVY:  No, we didn't.

2          MR. GIVEN:  Judge, we haven't.

3          THE COURT:  You don't have to tell me and scream,

4     "Judge."

5          MR. GIVEN:  Sorry.

6          THE COURT:  I just asked.

7          MR. GIVEN:  You're right.  We have not seen it.

8          THE COURT:  All right.  Quick, because we are wasting

9     time.

10       (Proceedings heard at sidebar on the record:)

11          MR. LOEVY:  So that's our proposal.  It seems to be --

12          THE COURT REPORTER:  Are we on?

13          THE COURT:  Yes, we're on.

14          MR. LOEVY:  Our proposal is -- the minimalist way to

15    do it would be to ask him about the allegations.  "You said you

16    guys would never do this.  You said you" -- we, "We would never

17    do this."

18          THE COURT:  Well, now, now, now -- no, wait a minute.

19    Now we're going into argument.  You're going to -- tell me the

20    question you want to ask him.

21          MR. LOEVY:  "Isn't it true you and Mr. Guevara and

22    other defendants were involved in the Juan Johnson case?"

23    "Isn't it true you were involved in John Sierra?"  And I would

24    preface it by saying --

25          THE COURT:  Yeah, but then where do we go from there?

1        MR. LOEVY:  I would say, "Isn't it true that all of
2   these men were exonerated due to problems with Mr. Guevara's
3   misconduct?"
4        MS. ROSEN:  But --
5        THE COURT:  I don't know if that's true.
6        MS. ROSEN:  Incorrect.
7        MR. GIVEN:  It's incorrect --
8        MS. ROSEN:  Yes.
9        MR. GIVEN:  -- on many levels.
10       MS. ROSEN:  I'm not sure they were all exonerated.
11       MR. GIVEN:  Or detentions.
12       MR. LOEVY:  Exonerated is a fair point, because some
13  of them weren't actually convicted, but these are the list of
14  18 people with Guevara allegations.
15       THE COURT:  But I am going to have to review this to
16  see if there was any finding that Guevara was responsible,
17  because I don't know that right off the bat.
18       MR. LOEVY:  Well, I think the defendants would
19  stipulate that these are Guevara cases.
20       THE COURT:  Well, I know that.  And no one's arguing
21  with that.
22       MR. LOEVY:  And I think they would stipulate that
23  there were -- these are the ones where there's allegedly
24  misconduct by Guevara and others.  And that's what this list
25  is.

1        THE COURT:  Allegedly.

2        MR. LOEVY:  Right.  And so I'd like to ask him --

3        THE COURT:  Okay.  Go ahead.  We have to do this fast.

4        MS. ROSEN:  Well, Judge, the point is on a 404(b)

5    analysis, it has to be -- the allegations have to be tied to,

6    right, the allegations in the case.  And we don't even know

7    what the basis was for overturning any of these convictions or

8    what precisely the allegations are.  There's a whole list of --

9        THE COURT:  Let me ask you.

10       MS. ROSEN:  -- you know, 20 names here.

11       THE COURT:  Because I don't know what we've -- what

12   are you going to -- you're going to call witnesses on some of

13   these things?

14       MR. LOEVY:  No.

15       THE COURT:  No.

16       MR. LOEVY:  Probably not.  And we're out of 404(b)

17   now.  I'm now impeaching him with --

18       THE COURT:  Well, I know, but refresh my recollection

19   as to what you did with Guevara.

20       MR. LOEVY:  Same thing, basically, except you limited

21   us to a certain set of cases with Guevara.

22       THE COURT:  Right.  But what was the question?  That's

23   what I'm trying to --

24       MR. LOEVY:  "Isn't it true that you were involved in

25   allegedly suggesting to" -- not even allegedly.  "Isn't it true

1  you suggested to witnesses who to pick out?"  "Isn't it true
2  you told witnesses who to pick out?"  And, "Isn't it true you
3  caused these wrongful convictions?"  We did that with six
4  cases.
5         THE COURT:  And what do we know about this person's
6  involvement in those cases?
7         MR. LOEVY:  We know he was partners with Guevara
8  during this date range.
9         MR. GIVEN:  Judge --
10        MR. LOEVY:  We know --
11        THE COURT:  Wait.
12        MS. ROSEN:  Sorry.
13        MR. GIVEN:  Sorry, Judge.  Sorry, Judge.
14        MR. LOEVY:  We know at least some of them he's
15  involved with and some of them he's presumably not, and I'd
16  propose to ask him.
17        MR. GIVEN:  He's not involved in most of those cases
18  as a partner, and you know it because you've sued --
19        THE COURT:  Well, let's do this.
20        MR. GIVEN:  -- people on this.
21        THE COURT:  Let's do this.  Let's start by figuring
22  out which of these cases he worked on --
23        MR. GIVEN:  Okay.
24        THE COURT:  -- period, period.  Okay?  The ones that
25  you questioned Guevara about, which of these did he work on.

1          MR. LOEVY:  I know --

2          THE COURT:  And then when we know what the answer is,

3     then maybe we should have another sidebar.

4          MR. LOEVY:  Although, I'm more impeaching the "we."

5     You know, he said "Guevara."  He didn't just say "me."  So I

6     want to impeach -- when he said, "We would never do this," I

7     want to say, "Isn't it true Guevara did that?"  Maybe that

8     would be even simpler.

9          MR. GIVEN:  Judge, I have one suggestion, which he's

10    not going anywhere, so he can be re-called once we've hashed

11    out -- this is -- we haven't even seen this just yet, and I

12    think --

13         THE COURT:  All right.

14         MR. GIVEN:  -- we're rushing into something --

15         THE COURT:  Let's do that.  Let's --

16         MR. GIVEN:  -- instead of just handing it to me now.

17    It's not --

18         THE COURT:  Let's not do it today.

19         MR. LOEVY:  All right.

20         THE COURT:  Okay?

21         MR. LOEVY:  The thing I do want to do, though, is with

22    Mingey -- because he did also say, "Sergeant Mingey would never

23    do anything like that."  Sergeant Mingey was -- he specifically

24    said, "Mingey, my supervisor, wouldn't do anything wrong."  And

25    we have an allegation against Mingey in the *Montanez* case that

1    he was involved in the alleged misconduct by Guevara.

2              THE COURT:  Well, I think --

3              MR. LOEVY:  So that's one case, one --

4              THE COURT:  I think we're going to have to re-call

5    him.  Okay?  We'll excuse him today.  Because we need to figure

6    out what we're going to do with this before we're into it.

7    We've got plenty to do, and --

8              MR. LOEVY:  Maybe --

9              THE COURT:  -- why don't we just --

10             MR. LOEVY:  Maybe the defense would agree to finish

11   the Mingey point.  That's the only thing I was going to --

12             MR. GIVEN:  No, I would not agree to that.

13             THE COURT:  They're not agreeing to anything, but I

14   think we can just say --

15             MS. ROSEN:  Well, don't you have other argue --

16             MR. LOEVY:  I have other questions.

17             MS. ROSEN:  Yeah.

18             MR. LOEVY:  And not much.  But I would like to get

19   this done, and I'd take a minimalist approach.  And I realize

20   we're --

21             THE COURT:  Well, I don't know what a minimalist

22   approach is, and I have to get this jury.

23             MR. LOEVY:  Yeah.  Is there anything --

24             THE COURT:  Now, what else is there?

25             MR. LOEVY:  -- you guys could live with?  If there's

1   anything the defense could live with, I'd do.

2          MR. GIVEN:  Jon, this is why we had an hour for

3   lunch --

4          THE COURT:  Yeah.  Could I --

5          MR. GIVEN:  -- and you didn't raise it.

6          THE COURT:  Could I please ask what else?  Because I

7   am going to call the jury right now.

8          MR. LOEVY:  Right.  We have a Brasfield issue.

9          THE COURT:  What is that?

10          MR. LOEVY:  There is a ruling you made on the motions

11  *in limine* that we don't want to run afoul of.  You said he

12  wasn't supposed to talk about the Subpoena Service unit because

13  reasonable diligence was out of the case.

14          THE COURT:  He wasn't -- wait a minute.  Remind me

15  what's --

16          MR. LOEVY:  Sorry.

17          THE COURT:  Yes.  Slow down.

18          MR. LOEVY:  One of Brasfield's opinions is the City of

19  Chicago had a bad policy for distributing information in the

20  Subpoena Services.

21          THE COURT:  Right.  Right, right.

22          MR. LOEVY:  And your opinion expressly said because

23  reasonable diligence is out of the case --

24          THE COURT:  Yes.

25          MR. LOEVY:  -- 403 tips it.  Reasonable diligence is

1   now not out of the case --

2            THE COURT:  Okay.

3            MR. LOEVY:  -- so we would like -- and we would like

4   to ask Mr. Brasfield --

5            THE COURT:  So what is it you're going to ask him?

6            MR. LOEVY:  "Isn't it true that you have" -- "as an

7   expert have a problem with the Subpoena Services?"  He's going

8   to explain what it is.  That's a big part of his opinion.

9            THE COURT:  That you have a problem with the Subpoena

10  Services, meaning that --

11           MR. LOEVY:  No, no.

12           THE COURT:  -- you have to separately subpoena

13  different parts of the city?  What --

14           MR. LOEVY:  Yeah, that's the gist of it.

15           THE COURT:  Okay.

16           MR. LOEVY:  The City of Chicago has set up this

17  terrible system for getting --

18           THE COURT:  All right.  I -- what's -- do you have a

19  -- I don't think there's anything wrong with that.

20           MR. GIVEN:  Well, except that Mr. Wadas never served a

21  subpoena in his case.  That's the problem.  There's no

22  connection.

23           MS. ROSEN:  So it's not relevant.

24           MR. LOEVY:  Well, there is a subpoena.

25           MR. GIVEN:  It isn't relevant.

```
 1          MR. LOEVY:  There is a DeLeon subpoena.
 2          MS. ROSEN:  But that's not Mr. Wadas' subpoena.
 3          MR. LOEVY:  Well --
 4          THE COURT:  I think --
 5          MS. ROSEN:  DeLeon did not work on the case.
 6   Mr. Wadas said that he did not partner with DeLeon.
 7          MR. GIVEN:  DeLeon is not a witness.
 8          MS. ROSEN:  The evidence from DeLeon --
 9          THE COURT REPORTER:  I didn't get your comment, Mr.
10   Given.
11          THE COURT:  You know, I --
12          MR. GIVEN:  DeLeon is not a witness.
13          THE COURT:  I don't think this is that complicated.
14   If he -- he can suppress an opinion on that, and you can argue
15   whatever you can argue, and you can argue whatever you want on
16   it.
17          MR. LOEVY.  And then the last point --
18          THE COURT:  Yes.
19          MR. LOEVY:  -- is the Palmer II.
20          THE COURT:  Yeah.
21          MR. LOEVY:  Remember the Seventh Circuit said that
22   when the PLO got the files, they didn't find anything
23   exculpatory.  We object to the hearsay use of that.  That's --
24   Palmer and Jones are in for notice, that the City had a
25   problem.
```

1          THE COURT:  Right.

2          MR. LOEVY:  Judge Posner speculated that there was

3     nothing in the files.

4          THE COURT:  Well, what's coming in?  Because I --

5     Judge Posner's dicta, I see no way that comes in --

6          MR. LOEVY:  That's right.

7          THE COURT:  -- unless somebody tells me they want to

8     bring it in.

9          MS. ROSEN:  Well, depending on what he says on his

10    direct, I might want to bring it up.

11         THE COURT:  Well, then we'll bring it up.  We're not

12    going to get there today.

13     (Counsel conferring.)

14         MR. LOEVY:  Oh, a very good point.

15         We made a deal, Your Honor, to shrink the trial.  We

16    are not going to call Mallul, who's the defense expert.

17         Let me just preface it.  In other words, Mr. Brasfield

18    is both a *Monell* expert and a police practices expert.

19         MR. ART:  No, let me -- may I do this?

20         THE COURT:  Is this something you talked about and

21    agreed on?

22         MR. LOEVY:  Yes, this, we agree.

23         THE COURT:  Okay.  So I don't --

24         MR. GIVEN:  So far, we agreed to it.

25         MR. LOEVY:  Mr. Mallul is the defense police practices

1  expert.  They're not going to call him.  We are not going to

2  ask Mr. Brasfield non-*Monell* questions.

3         Now, Mr. Art -- what I propose is that Mr. Art is

4  going to explain to you where we're drawing that line so that

5  when one side or the other objects, you'll have some context

6  for what the line --

7         THE COURT:  Is Mr. Brasfield --

8         MR. LOEVY:  -- we've drawn.

9         THE COURT.  -- the next witness?

10        MR. LOEVY:  Yes.

11        THE COURT:  Oh, okay.

12        MR. ART:  So let me try to be clear about --

13        THE COURT:  Yes.

14        MR. BOWMAN:  That's -- yes.

15        MR. ART:  -- the agreement.  So we've made an

16  agreement that the -- there's two police practices.

17        THE COURT:  But two more witnesses and --

18        MS. ROSEN:  Let him --

19        THE COURT:  -- this field trip?

20        MR. ART:  Yeah.

21        MS. ROSEN:  Yeah.

22        THE COURT:  Oh, we're going to take our break.

23        MR. ART:  Okay.

24        MR. LOEVY:  Okay.

25        MS. ROSEN:  Okay.

1    THE COURT:  We're going to do this --

2    MR. ART:  Thank you, Judge.

3  (End of proceedings at sidebar.)

4    THE COURT:  We are ready.

5  (Pause.  Jury in.)

6    THE COURT:  Please be seated, ladies and gentlemen.

7    STEVE GAWDRYS, DEFENDANT HEREIN, PREVIOUSLY SWORN

8    REDIRECT EXAMINATION (Resumed)

9  BY MR. LOEVY:

10  Q.  All right.  Good afternoon, sir.

11  A.  Good afternoon.

12  Q.  Did you have a chance to look at the two versions of the

13  beat report over lunch?

14  A.  No.

15  Q.  All right.  Well, your -- hopefully, your attorneys did.

16    Do you have them in front of you, 19-C and 20-A?

17  A.  Yes, I believe I do.

18  Q.  All right.  Would you agree with me -- and we're going to

19  go a little slower because we're not trying to beat the lunch

20  break here.  You would agree with me that the text boxes on the

21  first two pages of these reports are the same, correct?

22  Victim, witness, there is some text, and then it continues on

23  the next page with some text?

24  A.  Yes.

25  Q.  And then if you look at the other version of the report

1  that has Orlando's name on it, it looks like the same text,

2  right?

3  A.  Yes.

4  Q.  Now, there are other differences between the two versions

5  of the document.  For example, there's more signatures on the

6  one that's Plaintiff's Exhibit 11, right?  There's more

7  supervisor signatures?

8  A.  Correct.

9  Q.  And, in fact, the second one continues with a couple of

10  pages of notifications and more text, correct?

11  A.  Correct.

12  Q.  So I am not saying that they're exactly identical, but when

13  we're focused on this part here (indicating), which is the top

14  boxes here, there is a description that has Orlando Lopez with

15  some descriptions of the offenders on the version that's

16  Plaintiff's Exhibit 11; and then on the similar report, there's

17  another version that doesn't have Orlando and doesn't have the

18  descriptions, right?

19  A.  Right.

20  Q.  And based on your experience, what that suggests is that

21  Orlando/Macho must be attributed to what these descriptions are

22  (indicating)?  Is that a fair inference based on your

23  understanding of how this all worked?

24  A.  If he's listed as an offender?

25  Q.  Well, they're looking for offenders, right?

Gawdrys - redirect by Loevy
1   A.  Right.

2   Q.  And when they talked to these two people, they had nothing

3   listed, right (indicating)?

4   A.  Okay.

5   Q.  And then when they added Orlando's name, it said, "No

6   further description of the driver," and they said, "Passenger,

7   yellow baseball hat," right?

8   A.  Right.

9   Q.  And it looks like the age is about 16 to 18, correct?

10  A.  Correct.

11  Q.  All right.  16 to 18 is a high school kid, right?

12  A.  Yes.

13  Q.  And a 23-year-old, that is someone -- although Jacques

14  didn't go to college, that's after college age, right?

15  A.  Yes.

16  Q.  23 is?  Could be, right?

17  A.  Could be.

18  Q.  All right.  Do you know what happened to the "baseball hat"

19  part of the description?

20  A.  No idea.

21  Q.  All right.  You said you had no memory of the September

22  15th lineup, but we agree McLaughlin is not on the paper for

23  that lineup, right?

24  A.  I didn't say that.  You said September 15th?

25  Q.  Yeah.  The second lineup, September 15th.

1  A.  I was there for that.

2  Q.  I thought you said you had no memory of it.

3  A.  No.  Oh, no memory of it, but I --

4  Q.  Right.  That's what I asked.

5  A.  Okay.

6  Q.  I mean, you know you were there because you can see your

7  name on the paper, right?

8  A.  Right, that's it.

9  Q.  But as you think back, you're like, "Look, I did a lot of

10  lineups that year," and this one doesn't stand out to you?

11  A.  Right.  I don't remember it.

12  Q.  All right.  That's all I was asking you.

13  A.  Great.

14  Q.  Then you also see that McLaughlin's name is not on the

15  paper, right?

16  A.  Correct.

17  Q.  And so that led you to draw some inferences in response to

18  Mr. Given's questions, right?

19  A.  Right.

20  Q.  And one of your inferences you drew from your experience is

21  maybe she wasn't working that day, right?

22  A.  Right.

23  Q.  Another possible inference is that maybe she didn't -- she

24  absented herself from that lineup?  That's a possible

25  inference, too, correct?

1  A.  Maybe.  Could be.

2  Q.  And all I'm saying is you are not purporting to say which

3  of those two things is true.  You don't know either way, right?

4  A.  Right.

5  Q.  And wouldn't it have been a little weird if it was her case

6  and she was the lead detective, and so much time had gone by

7  between when the investigation went dormant and the second

8  lineup on the 15th?  Why schedule it on a day when she's --

9        MR. SOTOS:  Objection, mischaracterization of the

10  second lineup, Your Honor.

11        THE COURT:  Sustained.

12        MR. LOEVY:  All right.

13  BY MR. LOEVY:

14  Q.  The -- you guys -- all right.

15        The September 15th lineup.  A lot of time went by.

16  Why was it scheduled on a day when the lead detective wasn't

17  there, if, in fact, she wasn't there?

18  A.  I have no idea.

19  Q.  All right.  It would be normal to -- if a detective had

20  been in charge of the case from the beginning of the case till

21  the 15th to let that detective finish the case?  Wouldn't that

22  be normal?

23  A.  Yes.

24  Q.  And if there was -- I mean, there's nothing magical about

25  September 15th that the lineup had to be done that day, right?

1  A.  No.

2  Q.  Could have been done the 16th, right?

3  A.  Could have.

4  Q.  Could have been done the 14th, right?

5  A.  I have -- well, I don't know.  I mean --

6  Q.  Well, you got the I.D. that led to Jacques' arrest on the

7  10th of September, right?

8  A.  Right.

9  Q.  So you could have had the lineup --

10         MR. SOTOS:  Objection to the --

11  BY MR. LOEVY:

12  Q.  -- on the 10th.

13         MR. SOTOS:  Objection to the mischaracterization about

14  the I.D. that led to his arrest on the 14th.  A

15  mischaracterization of his testimony.

16         THE COURT:  Overruled.

17  BY THE WITNESS:

18  A.  Well, there was a previous I.D.

19  BY MR. LOEVY:

20  Q.  All right.  Why would -- you were -- you participated in

21  the arrest of Jacques Rivera on the 15th, right?

22  A.  Correct.

23  Q.  Okay.  If all the time had gone by between the 31st and

24  15th, why did you arrest Jacques on the 15th?

25  A.  We were asked to.

1  Q.  You don't remember that, right?

2  A.  No.  That's from reports.

3  Q.  The report doesn't say anybody asked you to arrest Jacques,

4  does it?

5        MR. SOTOS:  Objection, Your Honor.

6        MR. LOEVY:  That's a question, Your Honor.

7        MR. SOTOS:  Objection, Your Honor.  It's a

8  mischaracterization of his September 15th report.

9        MR. LOEVY:  It's a question.

10        THE COURT:  Overruled.

11  BY MR. LOEVY:

12  Q.  There's no report that says anybody asked you to arrest

13  Jacques Rivera, is there?  Unless I'm mistaken.  I stand

14  corrected if I am.

15  A.  The Detective Division called Gang Crimes North and asked

16  that Rivera be picked up.

17  Q.  All right.

18  A.  It's in the report.

19  Q.  So -- and the report says that?  Am I wrong?

20  A.  Should be in -- unless I'm mistaken.

21  Q.  I'll tell you what.  I will withdraw the question.  I will

22  stand corrected if that's the case.

23        MR. LOEVY:  Does it say that?

24  BY MR. LOEVY:

25  Q.  Okay.  My counsel are telling me it is correct.  15th was

1    the date chosen.

2          Do you know why the date was chosen that McLaughlin

3    wasn't at work?

4    A.  No.  I have no idea.

5    Q.  If she wasn't at work, right?  You don't know either way?

6    A.  No.

7          MS. ROSEN:  Objection, Judge, asked and answered about

8    a hundred times.

9          THE COURT:  Sustained.

10         MR. LOEVY:  All right.

11   BY MR. LOEVY:

12   Q.  This chart was referred to as the fake chart.  I'll give

13   you a copy, an 8-and-a-half-by-11 copy.

14         Aside from the fact that Valentine is not Valentin, is

15   there anything about this chart that's inaccurate?

16   A.  No, I don't think so.

17   Q.  All right.  So it would not be a true or accurate

18   characterization to call it a fake chart, would it?

19   A.  Well, you're saying fake report here?  Chart?

20   Q.  No.  Mr. Given said -- oh, we said fake report to mistaken

21   report.

22   A.  Okay.

23   Q.  That's not on your copy.

24   A.  And what was the question again?

25   Q.  There's nothing misleading or fake about this chart, is

1   there, sir?

2   A.  I don't think so, no.

3   Q.  All right.  Let's talk about the date that the book

4   identification supposedly happened.

5       You agree that the reports call it on the 29th, right?

6   A.  It says it here.

7   Q.  Well, all -- every existing piece of paper says the book

8   identification happened on the 29th, your report and

9   McLaughlin's report, correct?

10  A.  Okay.

11  Q.  And the 2 -- report on the 27th created by McLaughlin says

12  nothing about the book, right?

13  A.  I'd have to go through it again.  I don't know.

14  Q.  Well, actually, we did that yesterday.  I'm not going to do

15  that again.

16  A.  Okay.

17  Q.  But when Mr. Given asked you how could you maybe have

18  pulled it off McLaughlin's report, you wouldn't have pulled it

19  off of the report on the 27th because it's not in that report,

20  is it?

21  A.  The identification?

22  Q.  All right.  I'm going to ask you questions about the

23  second -- no, the identification that happened on the 10th of

24  September.

25      I think you told Mr. Given you're not sure that was

1   the 10th of September?

2   A.  Correct.

3        MR. LOEVY:  Okay.  Can you play the deposition at page

4   242, lines 2 through 16.

5     (Said video with audio played in open court.)

6   BY MR. LOEVY:

7   Q.  All right.  Did you give those answers under oath?

8   A.  Yes.

9   Q.  All right.  You are changing your testimony here at trial

10  only because you've heard what's happened at trial, is that

11  accurate?

12       MR. SOTOS:  Objection, Your Honor, to the

13  characterization he's changing his testimony.

14       THE COURT:  Overruled.

15  BY THE WITNESS:

16  A.  Not quite.

17  BY MR. LOEVY:

18  Q.  You are changing your testimony, right?

19  A.  No.  I believe that was the date when I wrote it.

20  Q.  No.  You were asked at your deposition, was it on the 10th,

21  and you said, "If I wrote the 10th, it was the 10th," right?

22  A.  Right.

23  Q.  And you want to change that testimony, right?

24  A.  No.  I believed it was the 10th.

25  Q.  All right.  You said that what happened on the 10th was

1   sometimes you would get identification from people who were in

2   bad shape?  Is that -- by blinking, I think you said with

3   Mr. Given?

4           MR. GIVEN:  Mischaracterizes, Your Honor.  Objection.

5           THE COURT:  Overruled.

6   BY MR. LOEVY:

7   Q.  Do you remember that testimony?

8   A.  Say it again?

9   Q.  Sometimes you said from time to time, you would -- you and

10  Mr. Guevara would get identifications from witnesses who

11  weren't doing so well in their hospital beds.

12  A.  Correct.

13  Q.  And I think you said they would sometimes blink for the

14  identification?

15  A.  Yes.

16  Q.  Is that what happened here, that Jose Valentin blinked and

17  you decided that he identified Jacques Rivera?

18  A.  I don't remember.

19  Q.  All right.  And you -- was he -- was he responsive at all

20  to any of your questions that day?

21  A.  I don't remember.

22  Q.  Was he conscious?

23  A.  I don't remember.

24  Q.  And the reason you're saying you don't remember is because

25  you don't want to say "No," do you?

1  A.  I don't remember.

2  Q.  And that's because you're scared.  If you answer

3  truthfully, you could create a problem for yourself.

4        MR. GIVEN:  Objection, Your Honor, argumentative.

5        THE COURT:  Sustained.

6  BY MR. LOEVY:

7  Q.  All right.  Just a few more questions, sir.

8        You did apologize, and I want to convey to you that

9  that is appreciated.  You are the first person ever from any --

10  that side to apologize, and that --

11        MR. GIVEN:  Objection.

12  BY MR. LOEVY:

13  Q.  -- is a nice thing to do.

14        MS. ROSEN:  Speech.

15        THE COURT:  No lawyer speeches, please.

16        MR. LOEVY:  All right.

17  BY MR. LOEVY:

18  Q.  Your apology, though, was sort of limited, if I heard it

19  correctly, and you'll correct me.

20        Were you limiting your apology to what Orlando Lopez

21  did, sir?

22        MR. GIVEN:  Objection to the form of the question,

23  Your Honor.

24        THE COURT:  Overruled.

25  BY THE WITNESS:

1    A.  No.

2    BY MR. LOEVY:

3    Q.  All right.  Are you apologizing for anything that any

4    police officer did wrong, sir?

5    A.  No.

6    Q.  So when you say you're sorry to Jacques Rivera for what

7    happened to him, does that apology include any acceptance of

8    responsibility whatsoever for a single thing that a police

9    officer did wrong?

10            MR. GIVEN:  Objection to the form.

11            THE COURT:  Overruled.

12   BY THE WITNESS:

13   A.  No.

14   BY MR. LOEVY:

15   Q.  So what are --

16   A.  Just what he went through.  That's all.

17   Q.  All right.  So you're apologizing for what he went through,

18   you're apologizing for Orlando Lopez, but you are not

19   apologizing for anything the police did?

20   A.  I am not apologizing for Orlando Lopez.

21   Q.  Then what are you apologizing for?

22   A.  That he had to go through what he did.

23   Q.  Are you --

24   A.  Any wrong created by Orlando Lopez.

25   Q.  And so you are blaming Orlando Lopez?

1   A.  I blame him for his lies.

2   Q.  Are you apologizing for adding the last paragraph of that

3   report after the fact?

4   A.  No.

5   Q.  Are you apologizing for saying that the victim identified

6   Jacques even though the victim didn't?

7   A.  No.

8   Q.  Are you apologizing for not act -- interviewing Jose

9   Rodriguez, to ask him what he had to do with the crime?

10  A.  No.

11  Q.  Are you apologizing for either not taking notes or

12  destroying your notes without creating reports?

13  A.  No.

14  Q.  Are you apologizing for the missing GPRs?

15  A.  No.

16  Q.  Are you apologizing for the fact that Orlando Lopez, when

17  he tried to get the police to make it stop by saying, "Wrong

18  guy, wrong guy," wouldn't accept that?  Are you apologizing for

19  that?

20  A.  No.

21  Q.  Are you apologizing for coming to court and, even though

22  you have no memory of the events whatsoever, trying to move

23  around dates to fit your story?

24          MR. GIVEN:  Objection, argumentative.

25          THE COURT:  Sustained.

1  BY MR. LOEVY:

2  Q.  All right.  You said you were very busy back in the day

3  when you were doing these investigations, right?

4  A.  Correct.

5  Q.  There was a lot of cases, right?

6  A.  Yes.

7  Q.  That doesn't justify cutting corners, does it?

8  A.  No.

9  Q.  In fact, it's a very serious job to investigate homicides,

10  correct?

11  A.  Correct.

12  Q.  And the consequences are very high, both for the victim and

13  the accused, right?

14  A.  Right.

15  Q.  And the police have a responsibility to do their job right,

16  don't they?

17  A.  Yes.

18  Q.  And that's not what happened in this investigation, is it?

19  A.  There are some problems with it.

20        MR. LOEVY:  I have no further questions, Your Honor.

21        THE COURT:  Anything further?

22        MR. GIVEN:  Good afternoon, Mr. Gawrys.  Good

23  afternoon, ladies and gentlemen.  I will be brief.

24                    RECROSS-EXAMINATION

25  BY MR. GIVEN:

1  Q.  There's a lot that got covered, but I'm only going to ask

2  you a few things.

3        Mr. Loevy kept saying:  Why pick the 15th?  Why pick

4  the 15th?  What happened to make this lineup happen on the

5  15th?

6        Can you look at Defendants' Exhibit 1.10.  It's the

7  closing --

8  A.  Yes.

9  Q.  -- that's up.  Do you have that in front of you?

10 A.  I do.

11 Q.  If you go to page 2.

12       Did something happen to Felix Valentin to change the

13 case from an aggravated battery to a homicide?

14 A.  Yes.  He died --

15 Q.  What was --

16 A.  -- on the 14th.

17 Q.  Died on the 14th.  Thank you.

18       Based on the timeline -- it's not that it's

19 inaccurate.  Is this -- in your view, based on all the

20 documents that you've been looking at for the last day, is this

21 timeline complete?

22 A.  Well, I have it here.  Wait.  Is this the same one?

23 Q.  Let's see.  Yes.

24       Is that complete?  Does it have all the reports

25 that --

1          MR. LOEVY:  Your Honor --

2  BY MR. GIVEN:

3  Q.  -- we were talking about?

4          MR. LOEVY:  -- objection to leading.  He just led him.

5          THE COURT:  Sustained.

6  BY MR. GIVEN:

7  Q.  Is that document complete, timeline complete?

8  A.  I don't think so.

9  Q.  Okay.  The last question I want to ask --

10          MR. GIVEN:  Eileen, I don't remember what we wound

11  up -- this is the original investigative file.  I just don't

12  remember what it was.

13          MS. ROSEN:  50, 5-0.

14          MR. GIVEN:  City 50, 5-0.

15          MS. ROSEN:  Wrong one.  Sorry.

16          MS. CARNEY:  43.

17          MR. GIVEN:  City 43?

18  BY MR. GIVEN:

19  Q.  I'm going to hand you in just a second City Exhibit 43,

20  which is the original investigative file.  And to speed things

21  up, I put a tab on two sets of documents so that we wouldn't

22  have to sit waiting for him to -- okay.

23          MR. GIVEN:  May I approach, Your Honor?

24          THE COURT:  You may.

25          MR. GIVEN:  Thank you.

1  BY MR. GIVEN:

2  Q.  Mr. Gawrys, take a look at City Exhibit 43 for a minute and

3  tell the jury what that is.  Just the whole document, if you

4  could tell the jury what that is.

5  A.  43?

6  Q.  No, the document -- no, no, no.  You misunderstand.  That

7  whole document is called Exhibit 43.

8  A.  Oh, the whole thing.  Okay.

9  Q.  I'm not asking you to look at page 43.

10  A.  Okay.

11  Q.  What is that exhibit that you are holding in your hand?

12  A.  This is a working file, Detective Division --

13  Q.  And is it --

14  A.  -- file.

15  Q.  -- for the Felix Valentin case?

16  A.  Yes.

17  Q.  Okay.  Do you see I put a yellow sticky note --

18  A.  Right.

19  Q.  -- on two sets of documents?

20  A.  Okay.

21  Q.  What's the first document that I put it on?  How many pages

22  are there?

23  A.  Four pages.

24  Q.  And what is that?

25  A.  It's a general offense case report.

1  Q.  And that's the thing Mr. Loevy -- one of the two documents

2  Mr. Loevy was showing you.

3        And then if you look at the second sticky note, what

4  is that?

5  A.  It's a general offense case report.

6  Q.  How many pages?

7  A.  Two.

8  Q.  So do those documents that I just pointed to you, are those

9  the two documents Mr. Loevy was asking you lots of questions

10  about why is this different and how is it different, one from

11  the other?

12  A.  Yes, appears to be.

13  Q.  And both documents are actually in the file, correct?

14  A.  Correct.

15        MR. GIVEN:  Okay.  Thankfully, ladies and gentlemen, I

16  have no other questions.

17        THE COURT:  Anything further?

18              FURTHER REDIRECT EXAMINATION

19  BY MR. LOEVY:

20  Q.  The file Mr. Given showed you, that was the working

21  investigative file, right?

22  A.  Looks like it, yes.

23  Q.  That's not the file that routinely got turned over to

24  criminal defendants, isn't that true?

25  A.  I have no idea.

1          MR. GIVEN:  Objection, foundation, Your Honor.

2          THE COURT:  If the witness knows.  Overruled.

3  BY MR. LOEVY:

4  Q.  Do you know, sir?

5  A.  No, I don't know.

6  Q.  In fact, that -- another word for that is a street file,

7  right?

8  A.  I don't think you call it street -- it's a working file.

9  Q.  All right.  That's the file you guys maintained in the

10  Area, right?

11  A.  Yes.

12  Q.  And isn't it true that there was an understanding and an

13  expectation by the detectives, when you were a detective, that

14  the Area file was outside of discovery, criminal discovery?

15  A.  No.

16          MR. LOEVY:  I have no further questions, Your Honor.

17          THE COURT:  Anything further?

18          MR. GIVEN:  Nothing further on my part, Your Honor.

19          THE COURT:  Okay.  No other questions?

20          Thank you, sir.

21          THE WITNESS:  Thank you.

22          THE COURT:  You may step down.  Watch your step.

23   (Witness excused.)

24          MR. LOEVY:  Hallway.

25          THE COURT:  Oh, the hallway?

1          MR. LOEVY:  Yes.

2          THE COURT:  Okay.  All right.  Ladies and gentlemen,

3     we're going to take a very short field trip now.

4          There is something called judicial notice, and what

5     that means is if something is essentially beyond dispute, I can

6     actually find it and instruct you on it.

7          And what I am going to take judicial notice of is the

8     diagonal distance between the corner store at Kimball and

9     Cortland and -- that's A, the corner store at Kimball and

10    Cortland, and, B, the mouth of the alley where Felix Valentin

11    was shot.

12         MR. LOEVY:  Your Honor --

13         THE COURT:  And that that --

14         MR. LOEVY:  -- I put that on the screen because that

15    was the intention.

16         THE COURT:  That's fine.  And that's -- I am taking

17    judicial notice of the fact that that was 191 feet.

18         Now, you are instructed that this distance is accurate

19    based on satellite images from Google Maps.

20         And you've heard some evidence about distances, about

21    191 feet to be specific.  So we're going to go out in the

22    hallway and there's going to be a person standing at a

23    particular place.

24         And, now, are there going to be two people standing

25    out there?  Or what is -- how is this set up?

1        MR. LOEVY:  I think --

2        MR. ART:  One person is standing at a spot 191 feet

3   away.

4        THE COURT:  191 feet away from what, though?

5        MR. LOEVY:  From where the --

6        MR. ART:  From the other spot where we got it measured

7   for the jury to stand.

8        THE COURT:  Oh, where -- from where the jury's going

9   to be?  Okay.

10       So you're going to be in one place, somebody's going

11  to be 191 feet away, and then everyone will have an opportunity

12  to see that distance, and then we'll come back here.

13       And I want to say one thing to caution you about

14  first.  This is not intended to duplicate whatever the

15  conditions were at the scene of the Valentin shooting because

16  that crime was not committed in the hallway.

17       Nothing about the lighting, obstructions, angles of

18  view, how dark or how light it was, and other things like that,

19  nothing is going to be duplicated out in the hallway.  We're

20  just going to try to show you the distance.  And that is the

21  entire purpose of this demonstration.

22       So let us all go into the hallway.

23       And, counsel, you're going to have to point out to the

24  court security officer where the jury needs to stand at this

25  point --

1    (Whereupon, the jury, judge, court reporter, and all involved

2     parties exit courtroom into hallway to view a demonstration

3     and proceedings herein heard on the record:)

4         THE COURT:  Let me just clarify.  The jury is not all

5    lined up in one row.

6         Where does the measurement begin?

7         MR. ART:  Right there at that white X, Your Honor

8    (indicating).

9         THE COURT:  At the white X?  Thank you.

10        Everybody see the white X?

11   (Jurors nodding.)

12        THE COURT:  Okay.  And then where is our -- oh, is

13   that our person (indicating)?

14        MR. ART:  Yes.

15        THE COURT:  Could you wave your hand, please.

16   (Unidentified person at end of hall waving.)

17        THE COURT:  All right.  Everybody see that person?

18   Okay.  And that's 191 feet.

19        Okay.  I think we can go back.

20        THE COURT SECURITY OFFICER:  Okay.  Follow me back in.

21   (Whereupon, the above-mentioned resume inside the courtroom.)

22   (Witness enters.)

23        THE COURT:  Please raise your right hand.

24   (Witness duly sworn.)

25        THE COURT:  You may be seated.

1      JENNIFER RIVERA, PLAINTIFF'S WITNESS, SWORN

2                   DIRECT EXAMINATION

3  BY MR. BOWMAN:

4  Q.  Good afternoon.

5  A.  Good afternoon.

6  Q.  Could you tell us your name, please.

7  A.  Jennifer Rivera.

8  Q.  Are you any relation to Jacques Rivera, who's sitting over

9  at counsel table?

10  A.  I'm his daughter.

11  Q.  Ms. Rivera, are you employed?

12  A.  I am.

13  Q.  Can you tell the jury what you do for a living and where

14  you work?

15  A.  I am a server.  I work at an incredible restaurant called

16  Roka Akor.

17  Q.  And do you live in Chicago?

18  A.  I do.

19  Q.  Been here all your life?

20  A.  My whole life.

21  Q.  Ms. Rivera, I'm going to ask you if you could tell us your

22  date of birth, please.

23  A.  It's May 27th, 1988.

24  Q.  So you were born the same year that your father went -- was

25  charged with killing Felix Valentin, is that right?

1  A.  That's correct.

2  Q.  In 1990, when your dad went to prison, how old were you?

3  A.  Two years old.

4  Q.  Do you have any memory of your father before he went to

5  prison?

6  A.  I do not.

7  Q.  Do you have memories of your father being in prison?

8  A.  Many.

9  Q.  When you were a child, did you visit your father in prison?

10  A.  Yes.

11  Q.  What prison was that, ma'am?

12  A.  Stateville penitentiary.

13  Q.  Can you tell the folks on the jury how you'd go about

14  getting down to the prison when you were a child.

15  A.  My aunts would drive us, my mom would drive us, our family.

16  Q.  And when you say "our family," who does that include in

17  addition to yourself?

18  A.  My brothers, my grandmother, all of my aunts.

19  Q.  And when you were a young child, how frequently would you

20  make that trip?

21  A.  I would say maybe once a month.

22  Q.  And did the frequency of those trips taper off as you got

23  older?

24  A.  They did.

25  Q.  Could you tell the jury about that?

1  A.  I think just the older that I got -- I joined soft -- you
2  know, softball, sports.  I did choir.  I did a lot of things
3  outside of school, and so that just required more time.
4  Q.  Now, at Stateville prison, when you'd go down there, did
5  the prison have rules about how many members of your family
6  could come in and visit your dad at the same time?
7  A.  Yeah.  My recollection is three people at a time.
8  Q.  So you had more than three people in the car.  How did your
9  family deal with that?
10  A.  We would have to wait until the visitation was over and
11  then come back next time.
12  Q.  Do you remember how you kids would decide which of you
13  would get to go in and see dad?
14  A.  It was literally like drawing straws.
15  Q.  Now, would there be times when the family would go down to
16  Stateville prison and you'd be turned away?
17  A.  There were.  If you weren't in tune with the rest of the
18  family in regards to who was going to visit him when, then you
19  could be turned away from visitation.
20  Q.  So for folks on the jury who may not have done this, can
21  you tell what the process is to go into Stateville prison and
22  visit somebody there?
23  A.  Yeah.  You had to wait probably an hour before even being
24  led into the jail and then you'd walk a mile into the jail,
25  passing the, you know, bar doors and things like that, until

1   you got into the visitation room.

2   Q.  Did you have to get searched?

3   A.  Every time.

4          MS. GOLDEN:  Objection, Your Honor.  I think we're

5   venturing into her damages and not her father's.

6          THE COURT:  Well, this is -- has got to be relevant,

7   obviously, to Mr. Rivera's damages --

8          MR. BOWMAN:  It is.  And --

9          THE COURT:  -- and we're going to go there.

10         MR. BOWMAN:  And I'm simply setting the scene as to

11  where Mr. Rivera --

12         THE COURT:  Yeah.  Okay.

13         MR. BOWMAN:  -- experienced the family visits.

14         THE COURT:  I am going to overrule the objection.

15  BY MR. BOWMAN:

16  Q.  So you referred to bar doors.  What do you mean by that?

17  A.  We had to be let in by other officers through several doors

18  before we could get into the visitation room.

19  Q.  And what's a visitation room?

20  A.  It's a room bigger than this size with hundreds of people

21  visiting other inmates.

22  Q.  In that visitation room, was there noise?

23  A.  Lots of noise.

24  Q.  Can you describe it for the jury?

25  A.  If it's -- you know, everyone's visiting their in -- their

1  loved ones in jail.  It's a hundred people talking all at the
2  same time, trying to be heard.
3  Q.  Can you describe the furnishings in the visiting room?
4  A.  Absolutely.  It was shorter-size tables with three round
5  stools on one side and one stool on the opposite side.
6  Q.  And you'd see your father there.  Tell me how the family
7  would gather in that environment.
8  A.  Yeah.  So we'd have, like, a small -- a shorter period of
9  time to, like, say our hellos.  We were very limited on, you
10  know, embraces.  And, you know, once we were seated at the
11  table, if we wanted to get a soda from the machine or something
12  like that, my dad wasn't able to, you know, go to the machines
13  with us.
14    (Witness crying.)
15  BY MR. BOWMAN:
16  Q.  Now, tell the folks -- this is hard for you, isn't it?
17  A.  It is.
18  Q.  We'll take it slow.
19        Tell the folks on the jury, do you have some memories
20  of things that your dad would do with you and the kids seated
21  at one of these visiting tables?
22  A.  Yeah.  He would make it the best situation he could.  And I
23  just remember playing, like, "one potato" with him as a kid.
24  Q.  So, Ms. Rivera, there are some -- there are some tissues
25  there to your right, if you need them.

1          I am going to move past the visits, and I am going to

2     ask you something else.  Okay?

3          When you were growing up, did your dad write cards and

4     letters to you?

5     A.  All the time.

6     Q.  And what did you do with them?

7     A.  I kept them as long as -- I still have them.

8     Q.  Why'd you keep them?

9     A.  It's the only part of my dad I could keep with me.

10    Q.  All right.  So I'm going to have to show you some

11    documents.  The first is -- I'm going to identify it.  This is

12    within 95.  95-B for identification is pages 12 and 13 of

13    Plaintiff's Exhibit 95.  Here.

14         Can you tell us, Ms. Rivera, what that is?

15    A.  It's a card from my dad.

16    Q.  And is it addressed to you?

17    A.  It is.

18    Q.  Is it something that your father wrote to you when he was

19    in prison?

20    A.  It is.

21         MR. BOWMAN:  Your Honor, based on that, we move the

22    admission of 95-B.

23         THE COURT:  And it's B?  Sorry.

24         MR. BOWMAN:  Yes.

25         THE COURT:  Okay.  Any objection?

1      MS. GOLDEN:  We object, Your Honor.

2      THE COURT:  Sorry?

3      MS. GOLDEN:  Hearsay.

4      MR. BOWMAN:  It's not offered for the truth, Judge.

5      THE COURT:  Overruled.  It is received.

6    (Said Plaintiff's Exhibit 95-B received in evidence.)

7      MR. BOWMAN:  I'll show this to the jury.

8  BY MR. BOWMAN:

9  Q.  So that's the first page of this card that you got from

10  your father, is that right?

11  A.  That's correct.

12  Q.  Do you know who did this drawing?

13  A.  My dad.

14  Q.  He'd personalize the birthday cards for you?

15  A.  He would.

16  Q.  All right, Jennifer.  I'm going to ask you if you could

17  open up this old card and have a look at what's inside, and if

18  you could tell us -- first of all, do you see the date?

19  A.  I do.

20  Q.  May 27, is that a special day of the year for you?

21  A.  It's my birthday.

22  Q.  1997, you would have been how old?

23  A.  Nine.

24  Q.  Could you read what your dad -- could you read what your

25  dad wrote to you.

1  A.  It's:  "Jenny.  Well, this is your 9th birthday and I wish

2  I could be with you, but you will have many more, and I'm

3  hoping I will be there with you then, but for now, have fun and

4  enjoy this special day.  And this is a special day for me as

5  well.  This is the day the Lord bless me by giving me you.

6          "Enjoy your birthday, my love.  Love you with all my

7  heart, Dad."

8  Q.  You had a card like that every year?

9  A.  Every year.

10  Q.  For how many years?

11  A.  As long as I can remember.

12  Q.  Did your father also write to you on special occasions in

13  your life apart from your birthday?

14  A.  Always.

15  Q.  Let me hand you what I have marked for identification as

16  95-C.  I'm sorry.  Yes, 95-C.  It is two pages, pages 49 and

17  50, of Exhibit 95.

18          MS. GOLDEN:  Same objection.

19          THE COURT:  Overruled.

20  BY MR. BOWMAN:

21  Q.  Can you tell us what that is?

22  A.  It's a Congratulations card.

23  Q.  And did your father write this card to you?

24  A.  He did.

25          MR. BOWMAN:  Based on that, Your Honor, we move the

1  admission of 95-C.

2          THE COURT:  And I assume the same objection?  And it

3  is -- the objection is overruled, and the exhibit is received.

4     (Said Plaintiff's Exhibit 95-C received in evidence.)

5  BY MR. BOWMAN:

6  Q.  Now, this is the first page of the exhibit you have in

7  front of you.

8          Who did that?

9  A.  My dad.

10  Q.  It's a drawing, right?

11  A.  It is.

12  Q.  It says "Congratulations"?

13  A.  It does.

14  Q.  So if we could open up this card, you see it has the date

15  on it, right?

16  A.  It does.

17  Q.  Can you tell us what that date is?

18  A.  June 21st, 2002.

19  Q.  And on June 21st, 2002, how old were you?

20  A.  Maybe 13 or 14.

21  Q.  And did something special happen for you that year?

22  A.  I graduated from 8th grade.

23  Q.  And what, in your understanding, was the purpose of your

24  dad's sending this card to you at that time?

25  A.  I finally graduated from another milestone in my life.

1  Q.  Okay.  I am not going to have you read the whole thing, but
2  could you read the first couple of sentences to the jury,
3  please.
4  A.  "My loving daughter Jennifer.  Sweetheart, my heart is
5  filled with joy and thankfulness; joy because I'm proud of you
6  and the first completion of your education.  I'm also proud
7  that you have a dream and a goal to be somebody."
8  Q.  Thank you, Jennifer.
9       I want to show you one last one.  Okay?  I have marked
10 for identification as Plaintiff's Exhibit 95-D pages 41 through
11 45 of Exhibit 95.
12      Do you recognize that?
13 A.  I do.
14 Q.  And do you recognize that to be a letter that your father
15 sent to you from prison?
16 A.  It's another letter.
17      MR. BOWMAN:  And based on that, we move the admission
18 of 95-D.
19      MS. GOLDEN:  Same objection.
20      THE COURT:  Okay.  The objection is overruled.  The
21 exhibit is received.
22   (Said Plaintiff's Exhibit 95-D received in evidence.)
23 BY MR. BOWMAN:
24 Q.  Now, you see a date on this letter?
25 A.  I do.

1  Q.  And can you tell us what date that is?

2  A.  It's August 31st, 2005.

3  Q.  And August 31st, 2005, how old are you now?

4  A.  16.

5  Q.  And where were you -- at what point in your education were

6  you at that point?

7  A.  I was -- I was probably a junior, going to be a senior in

8  high school.

9  Q.  And, Jennifer, I'd like you to look at the second paragraph

10 and just read the first three sentences to the jury.

11 A.  "Hello, My Princess.  It was truly good to have heard from

12 you and to know that you are doing well.  No need to apologize,

13 my love.  I know you are busy with school.  I'm just thankful

14 to our Lord that he has given you the strength & guidance to

15 make it through and finish.  That's great, my love, that you

16 are already applying for different colleges, and I can imagine

17 that it can be hard & nerve wrecking, but as you stated here -

18 'Your life is in God's hands and you will trust Him to lead you

19 the right way.'"

20 Q.  Thank you.  Now, let's shift gears one last time.  Okay?

21 Are you doing all right?

22 A.  I'm okay.

23 Q.  Did there come a time when your dad was released from

24 prison?

25 A.  Yes.

1   Q.  And do you remember that day?

2   A.  I do.

3   Q.  Tell us what it was, please.

4   A.  October 4th, 2011.

5   Q.  And October of 2011, how old were you?

6   A.  23.

7   Q.  And do you remember, were you present when your dad walked

8   free from prison?

9   A.  I was.

10  Q.  Can you tell the folks on the jury about that?

11  A.  It was unbelievable to know that he finally was going to be

12  released and to finally see my dad, you know, outside for the

13  first time and to see him in, you know, not a jumpsuit anymore

14  for the first time in my life.  It was very surreal.

15  Q.  Jennifer, you said you saw your dad for the first time

16  outside.  What do you mean by that?

17  A.  Like outside of a building, underneath the sun for the

18  first time.

19  Q.  Prior to that date, had you ever seen your father outside?

20  A.  Never.

21          MR. BOWMAN:  That's it.  That's all I have.

22          THE COURT:  Any cross-examination?

23          MS. GOLDEN:  Just a few.  I think they're easy

24  questions.

25          THE WITNESS:  Sure.

1    CROSS-EXAMINATION

2 BY MS. GOLDEN:

3 Q.  Ms. Rivera, you have had some college courses, correct?

4 A.  I have.

5 Q.  They're easy like this, I swear.

6        And you graduated from high school, right?

7 A.  I did.

8 Q.  And the college courses you took were in what area?

9 A.  Journalism.

10 Q.  Okay.  And you have a dental certificate?

11 A.  I do.

12 Q.  And you said you love your job, right?

13 A.  I do.

14 Q.  Okay.  What are you -- you are a server where?

15 A.  At Roka Akor.

16 Q.  Okay.  And you've been a dental hygienist before, right?

17 A.  I've been a dental assistant.

18 Q.  Okay.  Oh.  And then when you gave your deposition, I think

19 you were working as a receptionist, and you really enjoyed that

20 job as well, right?

21 A.  I did.

22 Q.  I understand you're close with your mother and your

23 brothers --

24 A.  Absolutely.

25 Q.  -- correct?  Richard and Jacques?

1    A.  That's correct.

2    Q.  Okay.  You're a close-knit family?

3    A.  Yeah.

4    Q.  You guys get together regularly?

5    A.  We do.

6    Q.  Okay.  And you see your dad as often as you can now, right?

7    A.  Absolutely.

8            MS. GOLDEN:  Okay.  Thank you.

9            THE COURT:  Anything further?  Anybody?

10           MS. ROSEN:  No, Judge.

11           MR. BOWMAN:  Not from us, no.

12           THE COURT:  Okay.  Thank you.  You may step down.

13           THE WITNESS:  Thank you, Judge.

14           THE COURT:  Watch your step.

15           THE WITNESS:  Thank you very much.

16           Do I (holding up documents) --

17           THE COURT:  Oh, just leave everything there.

18       (Witness excused.  Witness hugs and kisses plaintiff.)

19           THE COURT:  Do we need to resolve the issue that we

20   were talking about over the lunch break?

21           MR. LOEVY:  Probably not before we get to a break,

22   Your Honor.

23           THE COURT:  Okay.

24           MR. LOEVY:  All right.  At this time, the plaintiff

25   would call Mike Brasfield.

1    (Witness enters.)

2         THE COURT:  I think that is Mr. Brasfield.

3         MR. LOEVY:  It is.

4         THE COURT:  Sir, if you would step up here, please.

5    Please raise your right hand.

6    (Witness duly sworn.)

7         THE COURT:  You may be seated.

8         THE WITNESS:  Thank you.

9         MICHAEL BRASFIELD, PLAINTIFF'S WITNESS, SWORN

10                    DIRECT EXAMINATION

11   BY MR. LOEVY:

12   Q.  Good afternoon, sir.

13        If you would tell the jury your name.

14   A.  Michael Brasfield, B-r-a-s-f-i-e-l-d.

15   Q.  And where do you live?

16   A.  I'm currently in the Seattle, Washington area.

17   Q.  And where did you spend your career doing -- in what

18   profession, sir?

19   A.  Law enforcement for about 40 years.

20   Q.  Tell the jury about your 40-year law enforcement career.

21   A.  I started out in 1968 with a small agency near Seattle,

22   waiting to successfully pass the exam for Seattle.

23        After a year there, I spent 26 years with the Seattle

24   Police Department.  Started out as a patrol officer.  Took an

25   examination, took training, joined the Detective Division.

1    After working in the Detective bureau, I then was

2 promoted to sergeant.  I was a patrol sergeant for a period of

3 time and then I was a sergeant supervisor in the -- what we

4 referred to as the Tac squad, Tactical operations, as well as a

5 sergeant investigator within the Seattle Police Department's

6 Internal Affairs or Internal Investigations section.

7 Q.  Did you rise up -- how high did you get in the Seattle

8 Police Department?

9 A.  Up until the assistant chief.  There were three assistant

10 chiefs within the Seattle Police Department.

11    I also from time to time, as the assistant chiefs did,

12 if the chief was absent for any reason, acted as the acting

13 chief.

14 Q.  All right.  Did you serve with any other department, sir?

15 A.  Yes.  After I retired from the Seattle Police Department, I

16 was approached by the City of Fort Lauderdale, Florida, and I

17 was recruited and became the police chief in Fort Lauderdale,

18 and I served there for a little over six years as the chief.

19 Q.  And was there any elected law enforcement positions?

20 A.  Yes.  After I retired again, I returned to the Washington

21 State area, and after about a year of kind of sitting around, I

22 foolishly decided to run for elected sheriff of a small county

23 that I was living in, and I was successful.

24    And then after the first term of four years, I ran

25 again, was elected.  And then after about halfway through my

1  tenure of the second term, I decided to retire again.

2  Q.  All right.  And also covering other parts of your law

3  enforcement experience, when you were in Washington, did you

4  have involvement on the board of trainings and standards and

5  education?

6  A.  Yes.  They have a statewide under -- commissioned under the

7  governor's office for standards and training for law

8  enforcement officers.  It consists of educators and sworn

9  personnel to set standards and provide policy and training.

10 Q.  Have you had an opportunity to review the policies and

11 practices of other police departments, say through audits or

12 visits?

13 A.  Yes.  I have both through an all-encompassing federal

14 program visited and audited the delivery of police services in

15 public housing in Baltimore, in Boston, in Memphis, in

16 Cleveland, in Oxnard, California, as well as Seattle after I

17 was there.

18      I have also provided management input and auditing

19 with San Francisco and New Orleans, and I think there are a

20 couple of others.

21 Q.  While you were a chief and an assistant chief at some of

22 the departments you've talked about, did you have policy-making

23 functions in terms of creating policies?  And can you explain?

24 A.  Yes.  Two specific assignments within the Seattle Police

25 Department.  I served six years as a major in charge of

1  Inspectional Services.  Primary responsibility of that unit or
2  division was to research and formulate policies for everything
3  from high-risk police pursuits to use of force, to such mundane
4  things as impounding vehicles.
5         But in that process, it is more effective and more
6  efficient to survey other departments to find out what their
7  policies and practices are and then you kind of pick and choose
8  and modify policies that have the best attributes.
9  Q.  Were you involved with -- I believe it's called CALEA
10 accreditation?  And can you explain?
11 A.  Yes.  The Commission for Accreditation of Law Enforcement
12 is an organization that is -- provides accreditation.  Monitors
13 come in from other agencies to look at your practices and
14 procedures and your policies and then later comes back to make
15 sure that what you have in your policies and procedures you're
16 actually adhering to.
17 Q.  All right.  Over the course of your law enforcement career
18 and some of the other things you've been talking about, did you
19 become familiar with how detectives conduct homicide
20 investigations?
21 A.  Yes.  In a number of areas, one -- in my experience
22 nationwide, an investigation is an investigation.  The
23 television portrayal and the novels will certainly point out
24 how homicide investigations are so important, but the nuts and
25 bolts of an investigation, whether it's crimes against property

1    or a burglary investigation, any particular criminal

2    investigation conducted by police should have certain standards

3    and formats, practices, if you will.

4    Q.  And were you, in fact, personally involved in

5    investigations as a detective?

6    A.  Yes, I was.  I was -- had Homicide Traffic, which dealt

7    with homicides involving vehicular accidents, hit-and-runs,

8    that type of thing, pedestrians, with Vice and Narcotics and

9    Organized Crime, but as I moved up the ladder in both Internal

10   Affairs or Internal Investigations, overseeing police-involved

11   shootings and reviewing the homicide investigation reports of

12   those, and then as well as when I was the precinct commander in

13   two different precincts, and as a chief, and as -- as a police

14   chief and a sheriff, reviewing homicide investigations that

15   were conducted by subordinates.

16          And, in addition, when I was the assistant chief in

17   Seattle, I was responsible for among -- everything from the 911

18   system to personnel, to training.  One of them was the Records

19   Bureau, and the servicing of subpoenas for file cases, and in

20   that regard, I had a highly-trained staff that would make sure

21   that when the cases came in, and before they were delivered for

22   discovery, were properly made.

23   Q.  And I want to focus there on training you mentioned.

24          In Washington State, did you have involvement in the

25   law enforcement academy on -- in that capacity?

1   A.  Yes.  At the time, there were some 120 or 130 law

2   enforcement agencies in the State of Washington.

3           When I was a basic training commander, as a lieutenant

4   in the training, we provided under contract -- the City of

5   Seattle did -- the training for everyone except the state

6   patrol and, I think later, Kane County Sheriff's Office.  But

7   the hundred-and-other-20-some-odd agencies fell under my

8   purview, and I had to review lesson plans and presentations and

9   the delivery of training.

10  Q.  All right.  So these are subjects you know something about?

11  A.  Yes.

12  Q.  You have since retired, and do you now have a consulting

13  business?

14  A.  Yes, I do.

15  Q.  Tell the jury --

16  A.  Part time.

17  Q.  -- about that.

18  A.  I accidentally, before I retired a third time, became

19  involved in some civil litigation and was asked to be a --

20  provide some input to one party or the other and reference

21  recommendations.  It kind of just unfolded over the years and

22  to the point where I would be contacted by either the state

23  risk pool for -- on behalf of the defendant cities or counties

24  or state agencies and from time to time for plaintiffs that

25  were involved in litigation against governmental police

1   agencies.

2          And over the years, I've -- since I started doing

3   that, I have had about 150 or so that I've been retained on.

4   The ratio has been generally about two-thirds on behalf of the

5   law enforcement agencies, what I refer to as on the side of the

6   angels.  The other times for the plaintiff.

7   Q.  All right.  Let's --

8   A.  No disrespect.

9   Q.  Yeah.  There's angels on both sides, correct?

10  A.  Yes.

11  Q.  All right.  You are someone sometimes contacted.  Do you

12  take every case?

13  A.  No.  That's the nice thing about not being a government

14  employee anymore.  You get to pick and choose.

15         And oftentimes, even law firms that I respect very

16  highly, and I've had experience with before, may bring a case

17  to me and ask me to look it over and see if it would be

18  something that I could assist them with, and there are times

19  where I have to tell them I would probably be your own worst

20  enemy in this because I don't think what you're defending or

21  what you're pleading, if it's a plaintiff, that I would agree

22  with.

23  Q.  And that sometimes happens?

24  A.  Yes.

25  Q.  Now, you said about two-thirds or 60% for the defendants.

1  So, in other words, you are not adverse to taking positions
2  that are adverse to police departments?
3  A.  No, I am not.
4  Q.  All right.  You have, in fact, done some work here in
5  Chicago on cases, correct?
6  A.  That's correct.
7  Q.  And tell the jury a little bit about that work.
8  A.  The work in Chicago has tended to be much more
9  time-intensive.  A lot of the work that I do outside of the
10  City of Chicago are single-event.  An officer is involved in a
11  shooting, and I am asked to opine as to whether the shooting
12  was appropriate or the use of force was appropriate.
13         My experience in the City of Chicago has been with --
14  on a number of cases for the -- stemmed from wrongful
15  convictions where there have been issues involved whether the
16  investigation was conducted as it would have been normally in
17  most jurisdictions and to evaluate not only the specific -- or
18  opine on not only the specific investigation, but the practices
19  of the Chicago Police Department during certain time periods.
20  Q.  And some of that work, you've been involved with my firm
21  and Mr. Bowman's firm, correct?
22  A.  That's correct.
23  Q.  And how many -- in particular, when -- the work you
24  mentioned, the second part about looking at the policies and
25  practices, has this become a focus of your post-law-enforcement

1    professional career?

2    A.  It has in the City of Chicago, yes.

3    Q.  Can you explain?

4    A.  Well, it had -- the legal term is *Monell* where you're

5    looking at patterns and practices that can also go beyond just

6    what the written policy says is supposed to be done and examine

7    whether that -- A, whether policies and practices on their face

8    appear to be appropriate and, if not -- pardon me -- if not,

9    then look at individual investigations -- I'm -- pardon me.

10   I'm sorry.

11             MR. LOEVY:  You got some water up there for you.

12             THE WITNESS:  I could use a little bit --

13             THE COURT:  That's it.

14             THE COURT:  -- right here.  Thank you, Your Honor.

15        (Witness pours and drinks water.)

16   BY THE WITNESS:

17   A.  Where you're looking at an aggregate of situations.

18             So in a particular event or litigation, there are the

19   fact patterns specifically to that event.  But in the Chicago

20   situations, in a lot of the cases I'm involved in is to look at

21   a whole number of, and in this case, homicide investigations,

22   and I think I've probably in -- the last time I looked, I

23   physically examined well over 2,000 homicide cases that have

24   been produced in the City of Chicago in certain time periods.

25   BY MR. LOEVY:

1  Q.  So you've looked at the file for literally thousands of
2  homicide investigations in Chicago?
3  A.  Yes.
4  Q.  And that was not just in this litigation, but in a series
5  of cases you've been involved with?
6  A.  That's correct.
7  Q.  And what were the names of those cases?
8  A.  One of the most recent was Nathan fields.  I had -- James
9  Kluppelberg was a plaintiff.  There are, I think -- like I
10  mentioned, Mr. Taylor, because it's been through discovery.  I
11  have been involved with a case involving Deon Patrick, Percy
12  Coleman.
13  Q.  But let's focus on the street-file cases.
14  A.  Okay.
15  Q.  Approximately how many hours would you estimate you've
16  spent looking at the investigative files from the Chicago
17  homicide files in connection with the Fields case, the
18  Kluppelberg case, and this case?
19  A.  I haven't added them up, but I know in this case alone,
20  it's probably a hundred or more.  And the others --
21  Kluppelberg, in particular, and Fields, they were even a larger
22  data set.  So I'd have to say at least -- well, as I said, I've
23  looked at over 2,000 of them, and the hours I -- it would have
24  to be four or five hundred hours, I would think.
25  Q.  All right.  And you've also done other work in addition to

1    looking at the investigative files, correct?

2    A.  That's correct.

3    Q.  And you are paid for your time, correct?

4    A.  I am.

5    Q.  Are you paid in a way that is commensurate with your

6    understanding of how professionals in your field are paid?

7    A.  Yes.  I'm kind of in the middle of the ballpark, I guess.

8    Q.  All right.  Let's talk about your role in this case.

9         Tell the jury, if you would, a little bit about the

10   opinions you're here to offer about the files in the Chicago

11   Police Department in this case.

12   A.  To provide opinions on the record-keeping practices of the

13   Chicago Police Department, specifically as it obtains --

14   pertains to homicide investigative files; to look at whether

15   the system that's been in place and the actual practice enables

16   efficient discovery of criminal investigative files, so that

17   once a case is presented to the state's attorney and it goes to

18   trial, is everything that was developed and learned in the

19   course of the investigation made available through discovery to

20   the criminal defense attorney.

21   Q.  Tell the jury what you reviewed.

22   A.  I reviewed a series of policies and procedures.  I reviewed

23   a couple of very significant court cases involving the City of

24   Chicago and the police department.  I reviewed approximately

25   190 homicide investigative files in a time period -- I don't

1  know if you want me to go into that detail, but --

2  Q.  Well, we'll talk about that in a bit.

3  A.  Okay.

4  Q.  But you reviewed files, you reviewed policies, you reviewed

5  some depositions as well?

6  A.  Yes, a significant number of depositions during the course

7  of litigation.  It's typical, as in this case, where both

8  attorneys for both the plaintiff and the defendant will depose

9  people that have knowledge or have some information that would

10  be relevant.

11  Q.  And if you could provide a general overview, if you had to

12  characterize your opinions, what did you conclude after

13  reviewing all that information as far as policies and practices

14  at the City of Chicago?

15  A.  That the policies -- the written policies were deficient,

16  especially after having been put on notice on a couple of very

17  significant miscarriages of justice, that the Chicago Police

18  Department knew or should have known about their deficiencies

19  in their policies.  And then to examine -- forgetting what the

20  ink on the paper was about the policies, what did they actually

21  do in providing continuity, consistency, thoroughness, and as

22  importantly being able to make that information available so

23  that you have a good outcome, whether guilt or innocence,

24  either way, but a good outcome for the victim, a good outcome

25  for the community, a good outcome for the defendant.

1  Q.  And did you form an opinion about whether Chicago's
2  policies and practices were deficient or not?
3  A.  Yes.  In my opinion, based on not only my review of this
4  material, but based also -- at least aware of my experience and
5  looking at others, but specifically for this one, that they
6  were deficient.
7  Q.  All right.  How unusual would you characterize the
8  deficiencies that you've seen here in the City of Chicago from
9  all of your work?  Can you put it in any context?
10 A.  First, I have to put it in chronological context.  I'm
11 talking about a period of time in the early '80s into perhaps
12 the early '90s, depending on the case.  But since I was heavily
13 involved in -- right during that period of time with audits
14 inspections and policies and reviews, it was -- out of the norm
15 would be kind.  It was not, in my experience, the way that
16 investigative material was maintained, accessed, or revealed
17 through discovery compared to other cities, regardless of size.
18 Q.  All right.
19 A.  And -- I'm sorry.
20 Q.  That's okay.  I'm going to take it one step at a time.
21 A.  All right.
22 Q.  I think we should back up a little bit and tell the jury
23 about a police department's role in -- we've heard the term
24 *Brady*, but in ensuring that exculpatory evidence is turned
25 over.  Can you give a little bit of background?

1  A.  Yes.  Back in 1963, without going into detail -- I'm not an

2  attorney, obviously, but there was a case called

3  *Brady/Maryland*, and it came forth, even before I started in

4  police work in 1968 -- this was five years before I was even a

5  rookie cop -- that required information be disclosed so that an

6  adequate defense could be made for -- in the trial, so that it

7  would be a fair trial.

8  Q.  And what's the police department's role in making sure that

9  exculpatory information's turned over?

10 A.  Well, since the police department is basically the only

11 game in town when it comes to doing the investigation, they're

12 responsible for making sure that the investigation is thorough,

13 that all the documents that are produced should be produced --

14 when I say "produced," I'm talking about documented as the

15 investigation is going on -- so that if they're gathering

16 information, that it is put into a central location.

17        In most agencies across the country, the -- probably

18 because of modern television and books, it's referred to as a

19 murder book.  But that all of the information that's developed

20 during the course of an investigation goes into the central

21 location.  And the responsibility of the police department is

22 to be able to readily access everything that was developed

23 during the course of the investigation.  And --

24 Q.  And what are you calling a murder book, so we have some

25 context?

1    A.   It would -- it would be -- besides the original offense
2    report, it would include arrest reports, it would include
3    witness statements, it would include evidence and lab reports,
4    it would include photographs, it would include autopsy reports,
5    it would include medical reports, literally anything that is
6    developed during the course of an investigation in a homicide
7    case.

8            And quite often, even in what the law enforcement
9    community might call an open and shut case in a homicide, it
10   would generally run hundreds of pages and it would oftentimes,
11   and should, read pretty much like a novel in that you're going
12   down through this investigation, and the initial detectives may
13   decide that they are pretty sure that Sam Smith did it.  And
14   for a week or two during the investigation, you see that trail
15   going there, but you should see other things in an
16   investigation where someone may have offered an alternative
17   theory or some witness said this that isn't consistent with
18   what might eventually be the outcome.  And it may be, in fact,
19   a dubious piece of information, but it needs to be put in there
20   for any number of investigative and administrative reasons so
21   that you're not duplicating effort, you're not overlooking
22   something that you thought somebody did, but turns out they
23   didn't.  It's for the integrity of the investigation itself.
24   It's so that it helps the -- in the State of Illinois, it helps
25   the State's Attorney's Office avoid surprises and

1   embarrassments when you go to prosecute the case, that you

2   don't, all of a sudden, find out that your investigation wasn't

3   what it was supposed to be.

4   Q.  And when you're investigating at the beginning of the case,

5   it might be hard to know what's going to end up being important

6   at the end of the case, right?

7   A.  Absolutely.  Some very mundane thing initially in an

8   investigation might seem unimportant, a parking ticket that was

9   found at the scene of the crime or a -- what would normally be

10  an administrative issue of, you know, attendance at a trial or

11  whatever.

12          But you may find it -- in the homicide investigations

13  I'm familiar with across the country, you will find these

14  little pieces of information.  They can be in any type of

15  format.  I mean, it could be a cleaning stub, as I said, a

16  parking ticket.  It could be whatever, a receipt from

17  McDonald's.  But it needs to be documented.

18          And I'm not indicating necessarily that that actual

19  piece of paper has to be someplace, but the fact that it was

20  found has to be put in there, date, and time, who found it.

21  Q.  Now, from your review of literally hundreds of Chicago

22  homicide files, did Chicago comport with that standard that

23  you've identified?

24  A.  Not generally, no.

25  Q.  And -- all right.  You can explain.

1    A.   There is -- and there may be some argument as to

2    terminology, but there are -- the City of Chicago has what they

3    call permanent retention files, which is what is turned over

4    for discovery and is what is used by the state's attorney for

5    prosecution.

6         There are parallel files, at least during the time

7    periods that I'm familiar with and have looked at, where there

8    will be investigative files.  And in those investigative files,

9    there will be all sorts of things that don't make it into the

10   permanent retention file.

11        They can be handwritten notes.  They can be to-from

12   memos.  They can be what Chicago Police Department calls

13   general progress reports.  But I've seen time and time again

14   handwritten notes with a name or an address or an indication

15   that some person said -- approached a detective or an anonymous

16   call came in that said such-and-such person was involved in

17   this, but it appears not to have felt -- or not to have fit the

18   theory of the investigation.  And it's not written up into a

19   form that would be required to go into the permanent retention

20   file, and so it's -- in many of the cases I've been involved

21   with, they don't come to light until years and years after the

22   conviction.

23   Q.   Is that how it's supposed to be?

24   A.   No.  That should be just the opposite.

25   Q.   All right.  Just finishing this area of it, are police

1  departments supposed to create systems or protocols by which,

2  either centralized or otherwise, they can convey the

3  information they got to the criminal justice system?

4  A.  Yes.  It's incumbent upon them to do that.  It becomes even

5  more critical the larger the agency becomes.

6       Most law enforcement agencies that I've said that I'm

7  familiar with have a central location.  Everybody that works on

8  a homicide investigation, whether they're an official detective

9  in a criminal investigation division or the bureau, or whether

10  they're a gang squad member or whatever, all of the information

11  flows into one place.

12       And the general and accepted practice, to save

13  everybody a lot of wear and tear, if you get a subpoena, a law

14  enforcement agency or you get a request from a state's attorney

15  or the county prosecutor, you just turn the whole file over.

16  Q.  Is that -- does that happen in Chicago?

17  A.  No.

18  Q.  Can you explain why?

19  A.  Well, again, what is turned over is the permanent retention

20  file.  And, as I've mentioned, without going into long, gory

21  detail is that there are things that should have been

22  disclosed.  Whether it would have made a difference

23  necessarily, that would be for a trial judge or jury to

24  determine and how much weight they wanted to put on it.  But

25  it's extremely difficult for a defense attorney to mount a

1  defense when you've got basically one hand tied behind your
2  back.  And I'm not advocating that the bad guys get away with
3  anything, but the fact of the matter, if it's going to be a
4  fair process, everybody has to have the information.
5         It's also very unfair to the state's attorney not to
6  know about this information that's there.
7  Q.  And you saw that this problem was happening not just
8  isolated, but systemically; would that be a fair --
9  A.  Yes.  And that's -- that's the -- what makes it so
10 time-consuming on these cases in Chicago, is you're looking at
11 hundreds and hundreds and hundreds of cases.
12 Q.  Now, are you saying that there -- that the only way a
13 police department of this size can set it up is a centralized
14 location or is that best practices?  Or what are you saying
15 exactly?
16 A.  Well, it's logical, it's what most large law enforcement
17 agencies do.  But I am not saying that if you have certain
18 information in one location or one division or one bureau and
19 some in another one, and yet more in the Records bureau that
20 you can't devise ways to make it work.  You're violating the
21 "Keep it simple, Stupid" process.  But if you want this very
22 awkward system, you need to have failsafe guidelines, very
23 specific guidelines so that you know that everything that is in
24 the police department, wherever it is in the police department,
25 is going to be disclosed in discovery.

1     It makes it even a further problem when you have a

2  large organization from time to time that will go through

3  reorganizations.  What might have been a function in one

4  division or bureau is now a function in another one.  They may

5  move a unit, a gang squad or an arson/bomb squad or whatever,

6  from one area of physical location to another, and it just --

7  each of those iterations makes it more and more difficult.

8  Q.  And specific to Chicago, did they have a decentralized

9  system?  And did that create a problem, in your opinion?

10  A.  In my professional opinion, they had a very decentralized

11  system, and it routinely and consistently created problems.

12  Q.  And how is that?

13  A.  When you have -- and I don't know that -- you may ask me

14  later about General Orders and so forth.  But the requirements

15  should be department-wide for discovery; that if you work in a

16  Traffic unit or you work in the Marine patrol or you work in

17  the Gang unit or you work in Bomb/Arson, wherever you work, you

18  have the same requirements and specific guidelines, that you

19  eliminate discretion, if you will.  When you have policies or

20  procedures or practices where the discretion is left entirely

21  up to hundreds of different personalities, "Well, I don't think

22  this is relevant, so I don't think I will submit this," or

23  where you allow people to consider handwritten notes that they

24  generated to be their own personal property and not submit it,

25  where you don't provide the training or have specific

1    checklists as to what you do when you get --
2    Q.  And the way Chicago was set up, their responsive system,
3    are there different nodes that where everybody's hands didn't
4    know what the other hands were doing?  Can you explain?
5    A.  They -- in the material I reviewed, they lacked a clear
6    guidance as to what needed to be shared, how they -- if they
7    did share it, whether they documented it, and it's just --
8    there was no real system in place.
9    Q.  All right.  Let's talk about whether the City of Chicago
10   got put on notice of a problem in the early '80s.
11           MR. LOEVY:  And, Your Honor, this might be a place to
12   take a break.
13           THE COURT:  Okay.  Let's take ten minutes, ladies and
14   gentlemen.
15           MR. LOEVY:  Okay.
16     (Jury out.)
17           MR. LOEVY:  All right.  Your Honor, left unresolved is
18   we wanted to explain to Your Honor the line that Mr. Art talked
19   about with defense counsel.  And I don't think it would hurt to
20   have Mr. Brasfield listen to this so he knows what the line is,
21   too, but -- so everybody is playing by the same rules.  But
22   maybe what makes sense is to have Mr. Art --
23           THE COURT:  Sure.
24           MR. LOEVY:  -- explain what he thinks the line is.
25           MR. ART:  So, Your Honor, there are two police

1    practices experts in this case.  Neither expert will discuss

2    the investigation or quality of the investigation in the

3    Valentin case specifically.  They will discuss, instead,

4    policies and practices.  Is that correct?

5              MS. ROSEN:  That's correct.

6              MR. ART:  And the one sort of caveat is that to the

7    extent that the -- what was in the Valentin homicide file is

8    relevant to Mr. Brasfield's opinions about policies and

9    practices, he will be discussing that homicide file, but not

10   the specific steps in the investigation.

11             THE COURT:  Okay.  I don't know if I fully understand

12   what you're saying, and I don't know if it matters to the

13   defense or not.  Does it?

14             MS. ROSEN:  I think I understand it.

15             THE COURT:  Oh.

16             MS. ROSEN:  I can articulate it, and my --

17             THE COURT:  Okay.  Why don't we reach an agreement.

18             MS. ROSEN:  Yeah.  My understanding is that while he

19   might opine about documents that are contained within the files

20   that are related to the Valentin investigation --

21             THE COURT:  Okay.

22             MS. ROSEN:  -- he can comment upon those, but he will

23   not comment upon investigative steps that could or should have

24   been taken or things of that nature.

25             THE COURT:  All right.  So you're saying that any

1  documents in this investigation are fair game for

2  Mr. Brasfield, but that investigative steps like the police

3  taught would not be?

4         MS. ROSEN:  Correct.  And the documents, to the extent

5  that they support this idea that the -- with respect to the

6  *Monell* claim about the City's policies and practices as it

7  relates to discovery obligations and that sort of thing.

8         THE COURT:  Okay.  Now, I think I understand, but I

9  don't probably know as much weeds as you all do, but it sounds

10 to me like you're in agreement.

11        MS. ROSEN:  I think we are.

12        MR. ART:  Yeah.  And we are -- we are in agreement

13 there.  And to the extent that there's any disagreement about

14 where that line falls on the file, I assume Ms. Rosen can make

15 an objection and we can discuss it.

16        MS. ROSEN:  Yeah.

17        THE COURT:  All right.  So I think, then, we can take

18 our break, right?

19        MS. ROSEN:  Yeah.

20        MR. POLICK:  We may.

21        MS. ROSEN:  Yeah.

22        MR. ART:  Thank you, Judge.

23        THE COURT:  Okay.  We'll start again at ten to.  And

24 is this going to save us some time?

25        MR. LOEVY:  It is.

1    MR. ART:  Yes.

2    MR. POLICK:  So, Judge, you won't be getting what you

3  ordered the other day about Mallul, his opinions and his bases,

4  so --

5    THE COURT:  Sounds wonderful.

6  (Recess.)

7    THE COURT:  Everybody is here, right?

8    MR. LOEVY:  Yes, Your Honor.

9    THE COURT:  Okay.

10  (Jury in.)

11    THE COURT:  Please be seated, everyone.

12    MR. LOEVY:  May I proceed, Your Honor?

13    THE COURT:  You may.

14  BY MR. LOEVY:

15  Q.  All right, sir.  Did there come a time in the early, mid

16  '80s when the Chicago Police Department and the City of Chicago

17  got put on notice that there was a problem?  And can you

18  explain?

19  A.  Yes.  There were two kind of landmark cases that came.  The

20  first one was referred to as the Jones case.  There was a

21  12-year-old girl -- Pointer was the last name -- who was

22  brutally assaulted, raped, and murdered, and her brother, who

23  was at the scene, was severely assaulted and was unconscious

24  for a while.

25    Eventually, the Chicago Police Department, during the

1   course of an investigation, arrested Mr. Jones, who was a

2   senior in high school.  He was, I think, the publisher -- or,

3   excuse me, the editor of the school newspaper and was charged

4   for that and convicted.

5        The -- there was an investigator by the name of

6   Laverty that was involved with the investigation partially, and

7   he was eventually able to interview the brother, the surviving

8   brother, and was able to learn that, in fact, the -- there were

9   two assailants, and both of them were -- had their faces

10  covered.  This was contrary to what was in the official records

11  and that what was used for prosecution, sufficient to say that

12  there was more than adequate information that young Mr. Jones

13  was not the perpetrator of the crime.

14       The Detective Laverty shared that with his superiors

15  and was informed that there would not be a prosecution based on

16  the information that he had.  But the memo and the information

17  that he had was in an investigative file that didn't make it

18  into the permanent retention file.

19       And it was about a year later that Detective Laverty

20  saw in the newspaper that, in fact, young Mr. Jones was going

21  to be tried, and he went to his supervisors, superiors again,

22  without any success, and eventually took it upon himself to

23  contact the defense attorney that was defending Mr. Jones, and

24  that caused the charges to be put off.

25  Q.  And it also set in motion a chain of other events as well,

1 correct?

2 A. Yes, it did.

3 Q. Now, you mentioned an investigative file and the official

4 file. What did Mr. Laverty disclose the existence of as far as

5 a practice?

6 A. Well, what he uncovered was -- or made known outside the

7 police department was this parallel file system. These

8 investigative files that were not routinely being disclosed for

9 discovery and resulted in a lawsuit involved in testimony and

10 depositions all the way up the chain of command in the police

11 department and was to be the catalyst for a change in a way the

12 Chicago Police Department conducted its investigations and its

13 record-keeping.

14 Q. So what year was that?

15 A. I believe the homicide was in '91 and -- or, excuse me,

16 '81, and I believe the -- it was '82 that Laverty came forth.

17 Q. And then there were a series of hearings, you said, that

18 actually took place in this building, did they not?

19 A. That's my understanding, yes.

20 Q. And who testified at these hearings? And what happened?

21 A. Well, it -- the high-level individuals within the agency, I

22 think a deputy superintendent, people involved with -- from the

23 Detective Division, from Records, a -- from my own experience

24 in law enforcement, it would -- would have been well known

25 throughout the chain of command.

1  Q.  And, in fact, the chief of detectives and the

2  superintendent, Richard Brzeczek, also were made aware, were

3  they not?

4  A.  They were.

5  Q.  So in the aftermath of that case, was there another

6  litigation that also drew attention to the problem that there

7  was this parallel set of investigative files?

8  A.  Yes.  About the same time period or shortly thereafter was

9  what was referred to as Palmer, and it was a group of

10  individuals who had been investigated, charged, and convicted,

11  and they sued, as part of it, relevant to the parallel file

12  system and the undisclosed and undiscovered information.

13  Q.  And as the aftermath of that litigation, was the City put

14  on notice of any deficiencies in its file-keeping practices?

15  A.  Yes.  There were some rather scorching remarks from the

16  judge in the case, and more specifically with things that were

17  being done incorrectly and what needed to be done to correct

18  the situation.

19  Q.  And what kinds of things were those?

20  A.  That they should have a series of very specific policies to

21  describe what should go into investigations, where they should

22  be housed, how they should be made available for discovery, all

23  along that line.

24  Q.  And in the aftermath of these public problems, did the City

25  of Chicago take steps to nominally at least address what the

1  problem that had been identified was?

2  A.  Yes.  Started out with an initial teletype, directing units

3  to maintain and not destroy investigative files.  It was

4  followed by a number of Special Orders, not -- in my

5  professional opinion, none were sufficient, either on their

6  face or in practice, to solve the problem.

7  Q.  All right.  Is it hard to change a culture of an

8  organization like a police department?

9  A.  In any organization that's been around for a long time, it

10  is.  Police departments, I'm ashamed to say, are probably the

11  most intransigent in going to do the changes that are directed

12  or needed or ordered.  There's a general attitude of, "We've

13  always done it this way.  It's worked for us, and we'll just

14  keep doing it."  There has to be -- if you're really going to

15  have any real change to an organization or a culture, it has to

16  come from the top down.  It has to be reinforced, that it isn't

17  lip service, that you really want these changes.  There has to

18  be training, there has to be monitoring, a whole series of

19  things that need to be done.

20  Q.  And when Chicago passed these General Orders after the

21  Jones/Palmer problem, was there that kind of commitment from

22  the top from what you observed?

23  A.  No.  The initial training -- only one of the series of

24  orders, which, I should point out, were only towards the

25  detectives, didn't include gang squad members or anyone else

1    that are heavily involved in investigations of homicides, it

2    was a three-hour training session conducted by a gentleman who

3    at the time was a detective himself.  I think his name was

4    Mr. Hickey.  But I would expect, and I'm familiar with those

5    kinds of things, you would either -- if not an in-person

6    presentation by a high-ranking member of the chain of command,

7    at the very least, a videotaped introduction from the

8    superintendent explaining why we need to have these changes and

9    that all of us will be held accountable, so on and so forth,

10   and then some specific steps, checklists, and guidelines.

11   Q.  Did you see any evidence either way, in your opinion,

12   whether Chicago made that kind of commitment to solve the

13   problem?

14   A.  In what I have reviewed, both in the policies on the face

15   and in the actual practices subsequent to those policy changes,

16   no.

17   Q.  All right.  Talk about the policy first.

18        They enacted something called 83-1, a Special Order,

19   correct?

20   A.  Yes.

21   Q.  And describe that and describe your view of whether it

22   sufficed to solve the problem.

23   A.  83-1, I believe, was where they had the three-hour in

24   groups of 30 or 40 detectives that were presented with this.

25        But the deficiencies, again, were that it only

1  pertained to the Detective Division.  It didn't have any impact
2  on or requirement for other units and divisions that regularly
3  were involved with investigations.  It did not have a clear
4  definition of what would be in the official file.  It still
5  maintained the parallel files so that you were compounding or
6  continuing the lack of discovery.
7          I mentioned the lack of real -- any training.  It
8  still did not tighten up the area of discretion.  It left wide
9  open the issue of what I might feel is relevant to be kept and
10  documented and discovered might not be what any one of the
11  jurors -- you could have six or eight or ten different opinions
12  in the same case as to what should be relevant and what isn't.
13  Q.  Is that how it's supposed to be?  Like leaving discretion
14  to detectives or other police personnel to decide what's
15  relevant, what goes in the file, is that -- how far out of the
16  bounds of the standards of the day was that?
17  A.  It was an abnormality that just wasn't the way that it was
18  done.  And I am -- will be the first in defense of law
19  enforcement that it is a stressful situation.  And a lot of
20  times, life and death decisions have to be made, et cetera.
21  But when we're looking at an investigatory process, there is no
22  reason for shortcuts, there's no reason for discretion about
23  things.
24          And I don't even argue -- if someone makes a policy
25  decision and says, "We are not going to include such-and-such,"

1   that's fine, but then there should be a checklist and a very

2   clear, bright line that says, "This is what you will include,

3   and this is what you will not include." But to let an

4   individual, well-intentioned as they may or may not be, decide

5   independently what is relevant, it just doesn't -- it won't

6   work.

7   Q. All right. You also, I believe, mentioned the subpoena

8   process about, you know, whether the General Orders solved the

9   problem of getting it to the criminal defense attorneys.

10        Did they -- did the General Orders that was enacted

11  after Jones and Palmer provide a better way to be responsive to

12  subpoenas?

13  A. No. In my review of the historical material and the cases

14  that -- over this period of time, the issue of what do we tell

15  Subpoena Services how to handle these? If they get a request

16  from the state's attorney for all records or they get a

17  subpoena from a public defender or a criminal defense attorney,

18  how do you handle it? It would depend entirely upon the

19  experience level. They were civilian clerks in the Subpoena

20  unit. You might have one who had been around for a number of

21  years and was quite thrilled with their job and would say, "Oh,

22  I see this one happened" -- and I am just making an example,

23  but, "This happened on a waterfront. I better send a copy of

24  this down to the Marine unit so any records that they might

25  have will get those also." Or if it involved a

1  shooting/robbery which resulted in a homicide, but then later

2  there were -- the suspect's vehicle was involved in a traffic

3  accident, "I better send this to the Traffic Division to get

4  any records that they have," which points out the difficulty of

5  not having a centralized point for all your records.

6  Q.  And there might be records at ERPS, there might be records

7  at other places, and there's nothing centralized?

8  A.  That's correct.

9  Q.  All right.  Is that the right way to organize a police

10  department?

11  A.  No, it is not.  From a professional standpoint, and I think

12  even from a layperson's standpoint, that's just not the way to

13  run a railroad.

14  Q.  And you had experience during this time period with other

15  police departments around the country, correct?

16  A.  That's correct.

17  Q.  Was Chicago an aberration in that regard?

18  A.  Yes.  I've used that exact word before.

19  Q.  And I used the word Subpoena Response unit, but they --

20  would that unit also respond to all requests for discovery?  It

21  didn't actually take a subpoena, right?  A motion for discovery

22  would request information from the police department.  Is it

23  supposed to matter how the information was requested from the

24  police department?

25  A.  Well, I failed to see a -- in any clear, bright line about

1 how they differentiated between a phone request from a Cook
2 County state's attorney, assistant state attorney, or a written
3 subpoena from -- issued by a court from a criminal defense
4 attorney or anyone else, for that matter.
5 Q. All right. You mentioned that you thought that the new
6 policies that got passed didn't help because they didn't apply
7 to Gang Crimes, for example, among other subunits of the
8 department. Can you explain why that created a problem?
9 A. Well, in the several thousand homicide investigations that
10 I've looked at, there has been a history of -- understandably
11 so -- of involvement of gang squad investigators or gang squad
12 officers or gang squad -- at some point, their titles changed
13 over the years. But they were often doing exactly the same
14 kind of work that detectives were doing. They were going out,
15 talking to witnesses, interviewing suspects, bringing them in
16 for lineups, doing all of the things. And while they might
17 argue that they weren't paid the same or they were paid the
18 same or whatever, the fact of the matter is that the General
19 Orders that were promulgated did not require them to do and
20 maintain and submit and make available for discovery the types
21 of things that detectives were.
22 Q. As far as you could see, were there any rules governing
23 what the gang detectives had to turn over or disclose or
24 memorialize?
25 A. No.

1  Q.  Is that a problem?

2  A.  Absolutely, for many of the reasons I've just mentioned.

3  Q.  Is that unusual?

4  A.  Yes, it is.  Generally, you're speaking, in my experience

5  throughout the -- my travels of the United States and with the

6  other agencies that I've been involved with, that especially

7  when it comes to issues related to discovery and *Brady* -- and

8  it's now been 37, 47 -- over half a century, that those

9  policies and procedures should be universal within the

10  agency --

11  Q.  All right.  There was --

12  A.  -- for all employees.

13  Q.  There was a change in '86, Special Order 86.3.  Can you --

14  A.  86.3 --

15  Q.  -- go on and explain that.

16  A.  -- was supposedly going to improve and address some of

17  these issues, but, in fact, at least in my examination and look

18  at it, it made it -- it didn't help.  You still had the issue

19  of the parallel files.  You didn't address the process for

20  discovery.  In some cases, it was -- I would say it was -- it

21  was harmful, more harmful because it reinforced, if you will,

22  this concept that work product made by a detective was their

23  own personal property.  If they took notes or gathered

24  information, that was their property.  It wasn't the police

25  department's property.  And I'm somewhat generalizing that.

1    But that's the effect of it.

2         The other is that it eliminated any timely -- it took

3    away the earlier General -- or Special Orders talked about when

4    they were supposed to turn material in.  And in 8 -- the case

5    of 86.3, that loosened it up.

6    Q.  All right.  And then specifically to the investigative file

7    phenomenon that you described, you said you made it worse.

8         Basically, 86.3 formalized the police department's

9    procedure of keeping a parallel file in the area; is that a

10   fair summary?

11   A.  That's a fair summation, yes.

12   Q.  So the file in this case, City Exhibit 50, I believe --

13   it's a --

14        MS. ROSEN:  It's actually Trial 45.

15   BY MR. LOEVY:

16   Q.  45.  Sorry.  It's the Felix Valentin investigative file

17   that apparently was kept in the Area.

18        Is it your understanding that the department kept

19   separate files in the Area from the permanent retention files

20   that were kept at Records?

21   A.  Yes.

22   Q.  And was that also true of the other cases that you

23   reviewed, the Kluppelberg case and the Fields case?

24   A.  Yes.  It was a pattern and a practice.

25   Q.  All right.  Why was it a problem to keep parallel files?

1  A.  Well, for any number of reasons is -- it -- as I have -- I

2  don't mean to belabor it, but that the information, handwritten

3  notes, to-from memos, general progress reports, an awful lot of

4  information that should have been discoverable, by policy, was

5  not going into the permanent retention file, and so weren't --

6  it wasn't being discovered.

7        It also -- you had no real control or accountability

8  for those parallel files, the investigative files or street

9  files, whatever you want to call them.

10  Q.  And we'll talk about your file review in a bit, but did you

11  see a lot of evidence that the documents in the investigative

12  files weren't making it to the criminal justice system, even

13  the prosecutors and the criminal defense attorneys?

14  A.  That was my -- that was my experience in reviewing that,

15  yes.

16  Q.  Was that an isolated basis or a systemic problem?

17  A.  It was a systemic problem.  And that's where the

18  time-consuming part of reviewing these, literally, thousands of

19  cases or, in this particular matter, almost 200 files.

20  Q.  Now, 86.3 also enacted the procedure of a GPR, a general

21  progress report, correct?

22  A.  That's correct.

23  Q.  And the jury here has heard that when police officers take

24  notes, now they had to put it on the general progress note

25  report, correct?

1  A.  That's correct.

2  Q.  Did you see -- and based on your review of hundreds of

3  files, did you see evidence of where the general progress

4  reports generally went?  Did they go in the official file that

5  got to Records or did they go into the investigative file?

6  A.  They went into the investigative, non-official file.

7  Q.  All right.  Was -- in the changes that we've talked about,

8  83, 86.3, and the Special Orders, was there ever any

9  affirmative statement by the City that, "We've made these

10  changes.  Now you actually have to disclose the investigative

11  files that we've now formalized"?

12  A.  No.  There was some language in the -- most policies and

13  procedures in police departments will have kind of a little

14  philosophical, "This is what we're attempting to accomplish,"

15  and there was some reference that that's what we want to have

16  happen, but there was no -- no guideline, no specificity as to

17  how it was going to be accomplished or who was going to

18  accomplish it.

19  Q.  All right.  And how about the Gang Crimes problem, the fact

20  that Gang Crimes apparently didn't have any rules?  Did that

21  get solved by any of these Special Orders?

22  A.  No, it did not.

23          MR. LOEVY:  All right.  May I have a moment, Your

24  Honor?

25          THE COURT:  Sure.

1    (Counsel conferring.)

2  BY MR. LOEVY:

3  Q.  All right.  How about training and auditing?  Did the new

4  policies provide there was supposed to be auditing?

5  A.  Yes.  There is some specific language in there.  But the

6  material that I've read in depositions and in the files

7  themselves, there is no indication that any audits were ever

8  actually done.

9  Q.  Can you explain?

10  A.  Generally, when you have a new practice or a new policy

11  come out, you have the training and you tell the people that --

12  your target audience, you're going to tell them what you're

13  going to teach them, you teach them, and then you follow it up

14  by, "This is what I've taught you," and then you instill upon

15  them and put in place that you're going to do an audit

16  periodically to make sure that everyone either understood --

17  perhaps it wasn't clear enough or perhaps a policy wasn't

18  drafted well, or perhaps there are some obstinate people that

19  just don't want to change their ways.  But you have an audit

20  process so you can go through and see if, in fact, what you

21  claim to want to happen is actually happening.  And in this

22  particular set of circumstances, that was never done.

23  Q.  All right.  We've had some testimony here about shredding

24  police notes.  Is there -- if notes are used to create reports

25  and all the information goes into the reports, is there any

1   problem with destroying notes?

2   A.  Well, I've -- without going into -- I have been hoisted on

3   my own petard, if you will, in -- a detective can be out in the

4   field and talking to someone on the corner and will either have

5   someone approach them or will notice something, and they may

6   jot down "Wabash" and someplace else, "Sally Smith."  They are

7   then trained and should be going back to their work area and

8   writing up what that little note meant.  "I was at the corner

9   of such-and-such on July such-and-such at about 2:00 o'clock in

10  the afternoon.  I was approached by Sally Smith.  She informed

11  me of such-and-such."  I put that all in there and put that in

12  the report so that it's -- it is memorialized in the report and

13  it is placed in the official investigation so that it can be

14  discovered or it can be relied on as a tool or a process of

15  elimination of a suspect, whatever.  But it's there.

16          Is it necessary or is it a practice in the United

17  States for police agencies then to keep that original little

18  handwritten note?  I don't have any problem if they do keep it,

19  as long as the material that it represents is transcribed into

20  an official report in a timely manner.  Then each agency can

21  decide whether they want to shred that note so it doesn't end

22  up in the janitor's basket or whatever, and that I -- I've seen

23  it done either way.  But the big important part is to

24  memorialize what that was.

25  Q.  All right.  Is that -- you said if you took a note and it

1   was not on a standard report, you're okay if it gets destroyed
2   under some circumstances you've described.  Is that the same or
3   different than testimony that at the end of the investigation,
4   Gang Crimes people took all their notes and shredded them?
5   A.  That's an entirely different set of circumstances.  Gang
6   squad in the material that I have reviewed, they had forms that
7   they were supposed to fill out daily.  They were also -- should
8   have been filling out forms that were similar in nature.  But
9   in effect, they were never required to keep those or to place
10  them into a centralized file.
11  Q.  I'm going to show you a copy of Plaintiff's Exhibit 177,
12  which is an example, I think, of the kinds of forms that the
13  police department created for Gang Crimes officers.
14          MR. LOEVY:  This is Plaintiff's Exhibit 177, Your
15  Honor.  We would move this into evidence.  It's the summary
16  report.
17          MS. ROSEN:  Okay.
18          THE COURT:  Any objection?
19          MS. ROSEN:  No objection.
20          THE COURT:  177 is received.
21     (Said Plaintiff's Exhibit 177 received in evidence.)
22  BY MR. LOEVY:
23  Q.  All right.  The police department did have forms that the
24  Gang Crimes people were supposed to create, right?
25  A.  Yes.  And this particular exhibit is referred to as a Gang

1   Specialist Daily Activity Summary.

2   Q.  Now, did you see any examples of these kinds of documents

3   in the files that got turned over?

4   A.  No.

5   Q.  And when I say -- when you say "No," are we at zero or, you

6   know --

7   A.  We're no, none.

8   Q.  Zero?

9   A.  Zero.

10  Q.  All right.  Did you see any evidence of any gang

11  investigator crime notes in any of the files you looked at?

12  A.  No.

13  Q.  Do you have any idea, you know, what the City was doing

14  with all the gang-file stuff?

15  A.  I can only -- I can testify that I didn't see them and they

16  were not kept.  They would have been an excellent investigative

17  tool for the -- on behalf of the investigation.  They would

18  have been valuable for any number of reasons.

19          And I haven't even touched on the issue of quality

20  control and supervisory management of units.  If you're going

21  to measure work output and effectiveness and so forth, you need

22  that kind of stuff.  But that's another matter.

23  Q.  So you reviewed, literally, hundreds of files from Chicago

24  investigations and saw no evidence that the Gang Crimes people

25  were creating documents that were getting turned over to the --

1  A.  I have --

2  Q.  -- permanent files?

3  A.  I have seen in depositions and in information that they --
4  that that form existed and that they were required to fill them
5  out as part of their work product, but I have never seen them
6  completed in part of discovery.

7  Q.  And in any of the hundreds of homicide files you looked at,
8  did you see evidence that the Gang Crimes people were putting
9  notes at all into the file, the investigative file or the
10 permanent retention file, or any file?

11 A.  No.

12 Q.  All right.  After the City changed its policies -- and
13 we've been talking about the policies on paper, Special Order
14 83, Special Order 86, right?

15 A.  Yes.

16 Q.  And it sounds like you do have an opinion as to whether or
17 not those policies were good policies?

18 A.  On paper, I would -- I would accept that it was an attempt
19 to write a policy and -- but whether -- my professional opinion
20 is that it was not sufficient to address the issues that were
21 raised and that the superintendent on down were aware of in the
22 Jones and Palmer cases.

23 Q.  All right.  Let's turn from the policies to the practices.

24       Did your review and examination of the actual
25 practices, based on your review of the files, did that

1   reinforce your view that the policies didn't work?

2   A.  That -- you said it better than I could.

3   Q.  Okay.

4   A.  They were not working.

5   Q.  All right.  What is the evidence you have that they weren't

6   working?  Can you talk about the data that you reviewed?

7   A.   In this and in other cases, to try and be as objective as

8   possible, is to look at the permanent retention files -- these

9   are the ones that were supposedly to be turned over and to be

10  used in trial -- and then to examine investigative files for

11  the same case, and then to look at files that were housed in a

12  public defender's office for the criminal defense bar that used

13  for these.

14          So you're looking at what was in the permanent

15  retention files, what were in the investigative files, what

16  were in the criminal defendant attorney files.

17  Q.  And you're comparing, right?

18  A.  Yes.

19  Q.  And you're trying to see what's -- what made it all the way

20  from the police department to the criminal defense attorney?

21  A.  Yes.

22  Q.  All right.  How many files were in the subset for the

23  Rivera case that you looked at?  And if you could walk us

24  through that.

25  A.   Initially, there were -- there was a lot of material that

1  was not made available during the trial of Mr. Rivera.  They

2  weren't discovered, they weren't produced.  But eventually,

3  material was found, and it's -- they were in what was referred

4  to as Area North, and there were -- as a set of what I

5  examined, there were 52 from that area --

6  Q.  Let me slow you down.

7        So the investigative file in this case that pertained

8  to the Felix Valentin file, that didn't show up till like 2010,

9  correct?

10  A.  That's correct.

11  Q.  And what is your understanding of where it showed up and

12  what it showed up with?  It was with other files?

13  A.  It was with other homicide files, yes.

14  Q.  All right.  And it is -- there's -- in this litigation, the

15  attorneys did some discovery and produced a subset of those

16  files; is that your understanding?

17  A.  Yes.

18  Q.  Tell the jury how big that subset was and what your

19  understanding of it was.  How many cases and --

20  A.  Well, the initial one, as I recall, was 55.  Subsequent

21  iteration were 69 pages.

22  Q.  Not that file.  The number of cases.

23  A.  Oh, the number of cases.  I'm sorry.

24        Well, there are 52 in Area North, and there were 138

25  in the Records area.

1    Q.  So about 190 cases?

2    A.  Roughly, yes.  And I think there were actually 194, but

3    there were multiple defendants or subjects in four of the

4    cases, so we were down to 190.

5    Q.  And these were the files that also Dr. Wells looked at is

6    your understanding?  On the stipulation about the sample size?

7        MS. ROSEN:  Objection, beyond the scope of his

8    disclosure.

9        MR. LOEVY:  I'm just establishing that they were the

10   same files that Dr. Wells talked about.

11       THE COURT:  Well, I think the witness -- look, I don't

12   know what was in the disclosure, but if he's just describing --

13   if the witness knows that he looked at the same files.

14   BY MR. LOEVY:

15   Q.  Do you know if you looked at the same universe of files?

16   A.  My understanding is there was no dispute that we both

17   looked at the same thing.

18   Q.  All right.  And these files that you looked at, you had

19   looked at another set of similar files in the Kluppelberg case

20   and another similar set of similar files in the Fields case?

21   A.  That's correct.

22   Q.  Were those bigger sample sizes?

23   A.  I think in one of the cases, it was just under 500, and

24   there was a larger set in another one.

25   Q.  What is your understanding of where they found the set in

1    the Fields case, where those were located and when?

2    A.   Those were in -- what were referred to as, I believe,

3    basement files.

4    Q.   Do you remember why they were called that?

5    A.   Because they got, for lack of a better term, lost, and the

6    department didn't know where they were, and they were

7    eventually discovered in the basement of, I think, Area 5.  I'm

8    not sure.

9    Q.   And that was in the late -- or in the 2010 to 2015 period?

10   A.   I would have to look at my report, but I believe so.

11   Q.   All right.  And when the basement files got found, the

12   issue was that they had not -- those files had not been

13   produced to the criminal defendants back in the '80s and '90s,

14   correct?

15   A.   That's correct.

16   Q.   And then your job was to compare the basement files that

17   never got produced to the official files, and for what purpose?

18   A.   To see if material that would have been of use to the

19   criminal defense attorney was, in fact, produced and

20   discovered.

21   Q.   And then how about the Kluppelberg files?  What is your

22   understanding of what those files were?

23   A.   Similar situation, that you had files that were not

24   produced at the time of discovery and --

25   Q.   In the criminal cases?

1   A.  In the criminal case.  But eventually were produced in

2   civil litigation later.

3   Q.  They were found on a pallet at the police department?

4   A.  In a -- yes.

5   Q.  And you reviewed hundreds of those files as well?

6   A.  That's correct.

7   Q.  Same comparison?

8   A.  Same process, yes.

9   Q.  All right.  And you -- I think you said maybe between 500

10  and 600 hours, more than 500 hours, less than 500 hours?

11  A.  Somewhere in that neighborhood, yes.

12  Q.  And what is your hourly rate, sir?

13  A.  $300.

14  Q.  Now, has this project become a significant part of your

15  professional life over the years you've been doing it?

16  A.  Yes, it has.

17  Q.  And we heard about a term from Dr. Wells, spot-checking.

18          Did you spot-check the files or did you do something

19  more comprehensive?

20  A.  We -- what -- the files were actually recovered or taken

21  into possession by your law firm, representatives of your firm

22  in conjunction with the City's folks.

23          There were too many for me, even had I wanted to, to

24  go through each of those files to look for the missing material

25  or the anomalies, and what I agreed to do was if I was provided

1  a spreadsheet where someone else at, perhaps, a cheaper hourly
2  rate would go through these files and make notes of what
3  appeared to be missing or what should have been but wasn't, and
4  then it would allow me, with that spreadsheet, to go through
5  and say:  Okay.  On Records Division case number such-and-such,
6  these are things that are alleged to be missing or shouldn't
7  have been where they were supposed to or whatever, and then I
8  electronically had copies of all of those hundreds of -- in
9  this case, 190, and then I could spot-check.  And that's what I
10 did.
11 Q.  And did you ultimately look through some or all or most of
12 the files or how many of the 500-plus?
13 A.  All of them --
14 Q.  Every single file?
15 A.  -- eventually, yes.
16 Q.  All right.  And that was expensive, was it not?
17 A.  It was.
18 Q.  Did you make any errors in reviewing hundreds, if not
19 thousands, of files?
20 A.  I don't believe I did in this particular case.  In the
21 Fields files, I think out of 400-some-odd or whatever, there
22 were one or two where I -- where -- shame on me, but where I
23 transposed or did not recognize a transposition on the number
24 of pages that were in there and -- but I have to say that even
25 if you exclude -- and if you do the percentage of, you know,

1   half of a quarter or whatever of 1%, it doesn't change my

2   opinion as to what I was looking at.

3   Q.  And do you feel comfortable as a professional in your field

4   of expertise to have relied on either contractors or attorneys

5   to compile the data subject to your review?

6   A.  That's the way I'm familiar with it being done by not only

7   myself, but others in the field.

8   Q.  And do you feel comfortable and did you feel comfortable

9   that if you had made mistakes or anybody had made mistakes that

10  this was an adversarial process by which those mistakes would

11  be pointed out to you?

12  A.  Absolutely.

13  Q.  All right.  Let's talk about your work product.

14          And you have your report up there, do you, sir?

15  A.  Yes, I do.

16          MR. LOEVY:  Your Honor, at this time, we would like to

17  introduce Mr. Brasfield's charts, which I've talked to Ms.

18  Rosen about.  This is, I believe, Exhibit F to Mr. Brasfield's

19  report.  And we move for introduction of the chart, which is --

20  does it have an exhibit number?

21          THE WITNESS:  Yes.  I believe that actually may be G.

22          MR. SWAMINATHAN:  It's attachment G to his report.

23          MR. LOEVY:  It's attachment G.  It's Plaintiff's Trial

24  Exhibit 144, Your Honor.

25          THE COURT:  144.

1    MR. LOEVY:  And we move admission of the charts under

2  Rule 1006.

3         THE COURT:  Any objection?

4         MS. ROSEN:  No objection.

5         THE COURT:  It is received.

6    (Said Plaintiff's Exhibit 144 received in evidence.)

7         MR. LOEVY:  And permission to publish it, then, Your

8  Honor.

9         THE COURT:  You may.

10  BY MR. LOEVY:

11  Q.  All right.  Mr. Brasfield, if you could step down and walk

12  us through a little bit of your work on the case.

13         THE COURT REPORTER:  Could you put a lavalliere on the

14  witness, please.

15         MR. LOEVY:  Sure.  Let's give it to Mr. Brasfield.

16    (Lavalliere tendered to witness.)

17         THE COURT:  Let me ask you this.  Hold on a second.

18  Do you have a hard copy of what you're showing the witness?

19         MR. LOEVY:  Yes, we do, Your Honor.

20         MR. ART:  We do, Your Honor.

21         THE COURT:  Okay.  Thank you.

22         MR. LOEVY:  The only problem is it's a little bit

23  small.

24         MS. ROSEN:  I have a bigger one.

25         THE COURT:  Thank you.

1   (Document tendered to Court.)

2        THE WITNESS:  This -- oh, I'm sorry.

3        MR. LOEVY:  Eileen, do you have a bigger one for me?

4        MS. ROSEN:  No.

5        MR. LOEVY:  I'm pushing my luck.

6        MS. ROSEN:  I only had -- we ran out of big paper, so

7   I only have two.

8        MR. LOEVY:  That's okay.  Mine came out a little

9   small.

10  BY MR. LOEVY:

11  Q.  All right, Mr. Brasfield.  The blue says Investigative

12  File.  Can you explain to the jury what we're looking at here?

13  A.  Yeah.  We -- as background, here, the left-hand column is

14  just a numeric sequential number so that we can identify rather

15  than going through the records file number, whatever.

16  Q.  So these are individual files?

17  A.  Yes.  And in some cases, there will be more than one

18  defendant.

19        But the blue investigative file information, there's a

20  series of questions.  And this is where the contractor, if you

21  will, or the employees that did the initial, for lack of a

22  better word, grunt work on this, the questions would be:  Does

23  the investigative file include an inventory?  And by the

24  policy, even though it's not a good way to do it, there's

25  supposed to be an inventory sheet that catalogs everything in

1  that folder or file.

2        Does it have an inventory sheet?  And then it's either

3  a yes or no.

4  Q.  Let me stop you right there, Mr. Brasfield, because we've

5  been dealing with Plaintiff's Exhibit 19-A, which is the

6  inventory for the Rivera file sheet.

7  A.  Yes.

8  Q.  Is that what we're talking about?

9  A.  That's what we're talking about.

10  Q.  So it's the inventory that lists the reports in the case?

11  A.  That's correct.  In the specific case of the Rivera, it's a

12  two-page inventory sheet.

13  Q.  All right.  And what was your finding, if you recall, about

14  whether or not the investigative files -- all right.  I'm

15  going out to --

16  A.  I'm going to have to get my --

17  Q.  I'll tell you what.  Walk us through and then we'll talk

18  about your findings.

19  A.  All right.  All right.

20        The question on this is just a yes/no, is there an

21  inventory?  There's supposed to be, but is there an inventory?

22        If there is an inventory, the legal folks here stamp

23  everything and call it a Bates file.  It's Bates page number 1,

24  2, 3, 4, 5 so they can keep it straight.  So that if there's an

25  inventory, this is the Bates number that it was assigned to.

1  Obviously, if there was no Bates -- or no inventory, there's no
2  Bates number.

3         Is the inventory complete?  There are some guidelines
4  as to what's supposed to be on the inventory.  You're supposed
5  to do -- you know, are there Special Order -- or supplementary
6  reports or are there arrest reports?  Are there general
7  progress reports?  This is -- it doesn't go into great detail,
8  which is another problem, but is the inventory complete?  And
9  by looking at what's in the file and seeing if it's on the
10 inventory sheet, the answer is either yes or no, or in the case
11 if there's no inventory, not applicable.

12        Examples of items missing from the inventory.  And
13 as -- do you want me to use examples here or not?
14 Q.  Sure.
15 A.  In this particular one, examples of items missing from the
16 inventory, subpoena for street files, handwritten notes,
17 general offense case report, receipts for exhibits, arrest
18 information card, arrest reports, postmortem toxicology report,
19 body diagram, supplemental report.

20        So that the initial person that's going through this
21 is listing what's not on -- what's in the file, but what's not
22 on the inventory.  And then my process was to -- this saved an
23 enormous amount of time -- is saying okay, fine.  Then I'll go
24 double-check and see what's -- if I agree with that.
25 Q.  And you did double-check --

1  A.  Yes.

2  Q.  -- through each file?

3  A.  Each file.  And the next column was, are there handwritten

4  notes in the file that are not on the general progress reports,

5  which are required to be, but if there were or not.

6         In this particular example, are there handwritten

7  notes in the file that weren't put on the general progress

8  reports?  Yes.  And then the Bates numbers that identify each

9  one of those there.

10        Are there to and from memos from the file?  Not on

11  general progress reports.  Again, the issue of handwritten

12  notes, to-from memos supposedly are to be put on official forms

13  so that they can be made available for discovery.  And then if

14  that's the case, what's the Bates number.

15        And that's -- that's the column for looking at

16  investigative files.

17  Q.  All right.  If you could go back, let's talk about that for

18  now.

19  A.  Okay.

20  Q.  The investigative files were supposed to have been

21  created --

22        THE WITNESS:  Am I going to double the mike here?

23        THE COURT REPORTER:  You can just turn it off.  That

24  way, there is no echo.  Thank you, sir.

25        THE WITNESS:  Okay.  I'm sorry.

1    MR. LOEVY:  No.  That's fine.

2  BY MR. LOEVY:

3  Q.  So based on your comprehensive review of all these files,

4  did you see evidence whether the policy as implemented on paper

5  was being enforced in the files in the practice?

6  A.  As a result of my review of those cases, it became apparent

7  to me that they were not.

8  Q.  And, for example, the handwritten notes problem, not making

9  it into GPR, in what percentage of cases was that problem

10  recurrent?

11  A.  In 61% of all of those cases that are on the list, page

12  after page, 61% of the cases reviewed showed continued use of

13  unofficial handwritten notes.

14  Q.  So that was a problem that was supposed to have been

15  corrected and wasn't?

16  A.  That's true, yes.

17  Q.  How about the to-from memos?  Tell the jury a little bit

18  about what a to-from memo is and why it might be relevant to

19  the criminal justice system.

20  A.  You can have -- in a -- on a police memo, to-from from

21  detective such-and-such to gang officer such-and-such, or to

22  the sergeant or vice versa, and that to-from memo could have

23  literally anything on it.  And if it -- it was supposed to be

24  documented on a general progress report so that it could be

25  retrieved and discovered.

1 Q. And did you see evidence that under the old regime,

2 pre-Palmer, pre-Jones, they were doing that, right? That's how

3 they used to do it, and they --

4 A. They would write to-from memos -- police departments loved

5 to do that.

6 Q. And did that create problems for discovery?

7 A. Yes.

8 Q. Why is that?

9 A. Because there was no way of having it in -- since Chicago

10 chose to use permanent retention files for discovery, there was

11 no way to ensure that they got there.

12 Q. All right. So these new policies, 83 and 86.3, they were

13 supposed to fix that.

14 Did you see evidence, based on your file review, that

15 they actually did fix that problem?

16 A. No. Based on the file review, that was a continuing

17 problem that had not been solved.

18 Q. And in approximately what percentage of the cases?

19 A. I'd -- somewhere around 20%.

20 Q. How about the percentage of files that you reviewed that

21 had at least one problem in terms of not complying with the new

22 rules? What percentage of the hundred-and-90-some files were

23 noncompliant with the rules?

24 A. 100%.

25 Q. All right. And not every noncompliance was super -- you

1  know --

2  A.  No.

3  Q.  A smoking gun?

4  A.  And I have to be very clear on that.  There were some that,

5  you know -- I wouldn't even want to stay here with a straight

6  face and say that they were critically important, but the fact

7  of the matter is that there were examples in 100% of the files

8  where the system wasn't working.

9  Q.  All right.  And was those -- was that number and the other

10  numbers you've talked about consistent with your findings in

11  the Kluppelberg and the Fields subsets of files, too?

12  A.  Yes.

13  Q.  And the Fields and the Kluppelberg subsets were before some

14  of the changes, correct?

15  A.  Yes.

16  Q.  Did the changes fix the problem based on your review?

17  A.  No.

18  Q.  All right.  If you could walk down again and tell us about

19  the next column, the permanent retention file comparison -- or

20  the first -- what is the -- you've talked about the permanent

21  retention file, right?

22  A.  Yes.

23  Q.  So tell us what is going on with the purple.

24  A.  The permanent retention file, which I've alluded to here --

25  and I don't know how much the jury has heard about the

1   requirements for permanent retention files and so forth, but it
2   is the group of files that is the official:  This is what we
3   turn over to the state's attorney.  This is what we turn over
4   to criminal defense, and if we get any kind of subpoenas, this
5   is where it comes from, separate from the good stuff in the
6   investigative files.
7           Was a permanent retention file produced?  Well, some
8   of them here had some pretty heavy redaction because of other
9   litigation or information that -- and so don't even address
10  those, and that's left blank.  But if it's a yes, good on them.
11  That's what it was supposed to be.  But then we have -- as the
12  pages go on, we'll find some that --
13  Q.  In other words, we haven't really explained that to the
14  jury.
15  A.  Yeah.
16  Q.  We have many, many pages.
17  A.  Yeah.  Hopefully, we won't put you through all of those
18  pages.
19  Q.  We can just tell them there are a lot of pages.
20  A.  Yeah, there are a lot of pages.
21          The next one is an investigative file inventory in the
22  permanent retention file, and that's where what was supposedly
23  to help solve this problem of failure to disclose in discovery
24  is that things that weren't in the permanent retention file
25  that were over here (indicating) --

1  Q.  In the investigative file?

2  A.  -- in the investigative file would at least have been

3  inventoried, such as the one that you've seen or --

4  Q.  19-A.

5  A.  And if the system's even marginally effective, that an

6  inventory file list has to be there.

7  Q.  So, in other words, if the inventory at least got turned

8  over in the permanent retention file, then at least the person

9  receiving the file wouldn't know the universe of documents

10  that's supposed to exist?

11  A.  In theory.

12  Q.  In theory.  All right.

13  A.  In theory.

14  Q.  And maybe --

15  A.  But there are issues with that, but yeah.  But if there's

16  no inventory list at all, what do you know to ask for?  Well,

17  it's just not there.

18       Was there anything in the investigative file missing

19  from the permanent retention file?  And I've talked about some

20  things that automatically weren't going to go there.  That's

21  just because that's the way it was run.  But there are other

22  things that everyone agreed under this new system would make it

23  there.

24  Q.  I'll tell you what.  Before we get to the comparison, if

25  you could have your seat back.

1  A.  Sure.

2  Q.  I'm going to ask you some questions.  I want to ask you

3  some questions about your review of the permanent retention

4  files.  Those were the official records/files that got turned

5  over in discovery is your understanding of the practice, right?

6  A.  That's correct.

7  Q.  And you told us earlier in your testimony they're supposed

8  to read like a murder story with lots of chapters and, you

9  know, some loose ends, but fulsome information, right?

10  A.  That's correct.

11  Q.  Tell the jury whether the permanent retention files that

12  you reviewed, the hundreds of them, comported with what they

13  were supposed to turn over, what was supposed to be in them.

14  A.  They did not.  What -- in my experience, police departments

15  around the country will end up with a charging document, which

16  is just black and white:  Police department thinks this person

17  did it for these reasons.  This is our evidence.  There's our

18  document.

19        In the murder investigations and investigative files,

20  and what I would expect in a permanent retention file under

21  Chicago's system, you would also see the fits and starts of

22  blind-alley investigations or, if you discounted an eyewitness,

23  not just discard the information, but an explanation of why the

24  individual could not have been a witness to what they saw

25  because they were proven to be in Hawaii at the time, that kind

1   of thing.

2   Q.  Now, why is that important?  If your suspect is your

3   suspect, you have reports showing that there are other suspects

4   and you don't think those guys are guilty, why do you need to

5   document and make reports about the other suspects?

6   A.  It is for discovery and fairness.  I mean, you have to --

7   there's a relationship between the police department and the

8   prosecutor or the state's attorney that has to be -- rely on

9   history of thoroughness and trust before that prosecutor or

10  state's attorney makes a decision to charge somebody.

11          I mean, you're wasting resources if you're -- if

12  there's things that you get blindsided on later.  That needs to

13  be in there.  It needs to be in there so that -- really

14  importantly for the criminal defense attorney.

15          If you or I or anyone in our family gets charged with

16  a crime, you want to have at least as much information as the

17  police do so that you can say -- I mean, and it will be up to

18  the jury or the court to decide how much weight they want to

19  put on it, but you're entitled to put some kind of a defense

20  together.  And if you don't have that information available to

21  your criminal defense attorney, you're at a loss.

22  Q.  And you've reviewed police departments all over the

23  country, right?

24  A.  Yes.

25  Q.  And in the files in other places, was the standard that if

1 there were dead ends or suspects that turned out to be not

2 guilty, that you actually would have information about those

3 suspects so you could develop a defense?

4 A. Yes.

5 Q. And in Chicago -- we've had a lot of testimony about this

6 case, but talking systemically, what -- were the files missing

7 chapters, to use your analogy, were they missing follow-up

8 about people that may have done it other than the accused?

9 A. Yes. And that's especially proven in the permanent

10 retention files.

11 Q. And did you make any findings about the purple column

12 there, about the permanent retention files missing all of the

13 chapters in the murder, not just about the suspect?

14 A. Well, I again -- and I will be the first to acknowledge

15 that some of them were not as important as others, but that in

16 100% of the permanent retention files, there was evidence that

17 the policies were not effective and that the actual practice

18 was inconsistent with what would be expected.

19 Q. Now, we could -- if we wanted to spend the time, we could

20 find some rather trivial examples when you say a hundred

21 percent, right?

22 A. Absolutely. But what in -- my process of going through

23 there was to be objective. And if it -- you know, if it

24 favored one plaintiff or defense in this particular litigation,

25 it was not important to me. It's just a matter of was

1  information there that should have been there.  And if someone

2  else during a criminal trial would feel that it was totally

3  unimportant, that's fine, but it still should be there.

4  Q.  All right.  Now I'd like you to explain the comparison

5  between the investigative file and the permanent file.

6         So there was -- the file that got -- the Records

7  Division that got turned over to the system and then there was

8  the investigative file that, you know, was in the Area.  Did

9  you compare the two?

10  A.  Yes, I did.  But I have to emphasize that there is

11  initially a standalone within the investigative files,

12  examining them for the things that should or should not have

13  been in there, and then the same with the permanent retention

14  files.  And then the third step is to then cross-check between

15  the two, which is, I think, what your question was.

16  Q.  Exactly.  I thought we're caught up to the cross-check.

17  A.  Okay.

18  Q.  So, do you need the chart to explain it or do you want to

19  explain it from your seat?

20  A.  I don't think it's necessary, but -- to come down there.

21  But the -- to compare what was in the permanent retention file,

22  did it reflect what was in the investigative file that was, by

23  policy, supposed to have been transferred over to the permanent

24  retention file, and consistently systemically, that was not

25  occurring.  There were errors.

1  Q.  Was there examples of, like, notes or GPRs or other things
2  that weren't making it into the permanent retention file?
3  A.  Those were primarily the types of things.  And what I would
4  consider important, especially important, were the handwritten
5  notes, the to-from, and the general progress reports.
6          Now, if a general progress report was on a
7  supplemental or the information, that would be a different
8  matter, but they were not showing up.  There was information
9  that should have been made available in discovery.
10 Q.  All right.  Did you quantify the difference between the
11 investigative files and permanent retention file or is that the
12 green column?
13 A.  Well, I talked about the permanent retention file.  Fifty
14 percent of them didn't have inventories.  And those that were
15 there -- well, and that that's a requirement.  There should
16 have been 100% of them, but there were only 50% that had them.
17 And that those were oftentimes incomplete.  They would not have
18 anything on the inventory, but there would actually be material
19 that should have been on the inventory list.
20 Q.  All right.  Have you exhausted the critiques with that?
21 A.  The permanent retention file versus investigative street
22 file, I have categorized it that they were replete with
23 examples of relevant information on official notes and memos,
24 so --
25 Q.  All right.  Let's talk about the green column, then.  And

1  if you could walk down and walk us through this in our

2  remaining time here.

3  A.  As a further exercise, the law firm that retained me, Loevy

4  & Loevy, were able to obtain criminal defense attorney files.

5       Now, out of a hundred and -- we've said 190, but

6  actually I think we were down to 180 because of some redactions

7  or appeals that were going on.  It is -- since we're talking

8  about a time period back in the 1980s where attorney firms have

9  either closed shop, consolidated, retired, whatever, the best

10 source for accessing criminal defense attorney files was the

11 Public Defender's Office.  It's an institution that outlives

12 individual attorneys and has requirements and practices for

13 maintaining their records.  So --

14 Q.  And let me interrupt you for a second.

15      The idea was you were going to look at the criminal

16 defense attorney files and determine whether or not the

17 documents that you found in the police department records were

18 making it to the criminal defense files.  Is that a fair

19 summary?

20 A.  That's a fair summary.

21 Q.  All right.  If you could continue.

22 A.  This is a -- by necessity, was a smaller subset.  We don't

23 have 180 criminal defense attorney files.  But what I found and

24 what -- the questions for this, has a criminal defense attorney

25 file been produced?  And this is from those that were

1   subpoenaed, which was a smaller number, in the 40s, actually.

2          And if -- is there any investigative material missing

3   from the defense attorney's file?  And all of these here

4   (indicating) that are no, no, no, no, no, because there's been

5   no criminal defense attorney files found or submitted, but you

6   get to one here where yes, there was a criminal defense

7   attorney file and it's been produced and examined.

8          Is there any --

9   Q.  Have you discovered how many files there were where you

10  were able to do the comparison?

11  A.  As I recall right now, 44, somewhere in that, 42.

12         And when it was found, is there any investigative

13  material missing from the defense attorney file?  And yes.  And

14  then we're back to the Bates number.  They've identified what

15  it was that was missing.

16         Does the defense attorney file contain an inventory

17  sheet?  In this particular case, it did.  The material that

18  they got from the permanent retention file had, in fact, an

19  inventory.  But, as I said, 50% of the permanent retention

20  files were missing in inventory, so in this example down here

21  (indicating), no.

22         If yes, does it match the inventory in the

23  investigative file?  And we can talk about that as you go down

24  the line.  But are GPRs, the general progress reports, from the

25  investigative file missing from the attorney file?

1  Q.  So, in other words, the GPRs that you found in the Area

2  file were with the criminal defense attorneys files reflect

3  that they had received them?

4  A.  Correct.  That was the question in the examination.  And if

5  there were any missing, what were the GPR numbers that were

6  found in the investigative files or permanent retention files.

7          Are handwritten notes from the investigative file

8  missing from the attorney file?  Bates numbers for the missing

9  handwritten notes.

10          Are to and from memos from the investigative file

11  missing from the attorney file?  And if they are, what are the

12  Bates numbers.

13  Q.  All right.

14  A.  So --

15  Q.  So you did the comparison between the criminal defense

16  attorney files and the investigative files and the permanent

17  retention files.  And before we talk specifically about what

18  the percentages were, can you sort of summarize as to whether

19  you have an opinion about whether the stuff in the

20  investigative files was making it into the criminal defense

21  attorneys systematically?

22  A.  Systematically, no, it was not.

23  Q.  All right.

24  A.  Based, based on the objective looking at what was there.

25  And I'm sorry, but you'll hear some discussion about that, not

1    from me.  But objectively looking at what was produced as a

2    result of the subpoena from the criminal defense file with what

3    you would expect based on what was in the police files.

4    Q.  For example, how many of the criminal defense files

5    reflected the absence of having been given handwritten notes?

6    A.  I'll have to look at my list here.  More than 90% of the

7    time, there were investigative materials missing.

8            Approximately 74% were missing handwritten notes that

9    were present in the investigative or street files.

10           Approximately 10% were missing general progress

11   reports.

12           Only 6 of 38 cases had to-from memos, whether they

13   were on GPRs or not.  And my understanding is that it was

14   routine to use the to-from memos so they were not -- they were

15   only there in six.

16           And in 8%, the criminal defense attorneys -- in only

17   8% did they have an inventory list.

18   Q.  So if I understood you correctly, in more than 90% of the

19   criminal defense attorney files, there were documents reflected

20   in the investigative files that were back at the Area in the

21   file cabinets that didn't get into the criminal defense files?

22   A.  They were not in the material that I reviewed.

23           MR. LOEVY:  All right.  Your Honor, it is a few

24   minutes early, but it's been a long week.

25           THE COURT:  That's what I was going -- I was going to

1  say when you reach a convenient stopping point, and I think
2  you've done that.
3         Let's take our weekend break, ladies and gentlemen.
4  Have a good weekend.  9:30 Monday.
5         As soon as I feel safe giving you a status report, I
6  will, but I don't quite feel safe yet.
7   (Jury out.)
8         THE COURT:  Okay.  Let's see.  Anything that we need
9  to talk about now or that you can anticipate that we'll need to
10 talk about Monday morning?
11        If there's something Monday morning that you need me
12 for before 9:30, just send us an e-mail.  Okay?
13        MS. ROSEN:  Sounds good.
14        MR. LOEVY:  We'll try to work out the 404(b) by
15 agreement this weekend.  If not, we'll be in touch.
16        THE COURT:  Lovely.  Okay.  Thank you.
17        MR. GIVEN:  Thanks, Judge.
18        MR. LOEVY:  Thank you, Judge.
19        MS. ROSEN:  It's really hard --
20        THE COURT:  I want to say, I really appreciate this
21 large one, but I couldn't read it.
22        MS. ROSEN:  It's so hard to read.
23        MR. LOEVY:  You can't imagine how hard it is at this
24 size (indicating).
25        THE COURT:  Yeah.  Well, even at this size, I couldn't

1  read it, so --

2   (Adjournment at 3:58 p.m. until 9:30 a.m., 6/18/18.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5              We, Nancy L. Bistany and Colleen M. Conway, do

 6     hereby certify that the foregoing is a complete, true, and

 7     accurate transcript of the Trial proceedings, Vols. 9-A and

 8     9-B, had in the above-entitled case before the

 9     HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court,

10     at Chicago, Illinois, on June 15, 2018.

11

12            /s/ Nancy L. Bistany, CSR, RPR, FCRR        06/16/18

13            /s/ Colleen M. Conway, CSR, RMR, CRR        06/16/18

14                 Official Court Reporters                Date
                United States District Court
15              Northern District of Illinois
                     Eastern Division
16

17

18

19

20

21

22

23

24

25
```