# EXHIBIT 91

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION

3   JACQUES RIVERA,                               ) No. 12 CV 4428
                                                  )
4              Plaintiff,                         )
    vs.                                           ) Chicago, Illinois
5                                                 )
    REY GUEVARA, STEVE GAWRYS, DANIEL NOON,       )
6   JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,    )
    PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN      )
7   LEONARD, EDWARD MINGEY, RUSSELL WEINGART,     ) June 26, 2018
    ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,     )
8                                                 )
               Defendants.                        ) 9:30 o'clock a.m.
9
                        VOLUME 16 A
10               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JOAN B. GOTTSCHALL
11                    and a jury

12  APPEARANCES:

13  For the Plaintiff:    LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
14                             MR. STEVEN E. ART
                               MR. ANAND SWAMINATHAN
15                          311 North Aberdeen Street
                            3rd Floor
16                          Chicago, Illinois  60607

17                        MACARTHUR JUSTICE CENTER
                          Northwestern University School of Law
18                        BY:  Locke E. Bowman, III
                          357 East Chicago Avenue
19                        Chicago, Illinois 60611
                          (312) 503-0844
20

21
    Court reporter:          Blanca I. Lara
22                        Official Court Reporter
                          219 South Dearborn Street
23                          Room 2504
                          Chicago, Illinois 60604
24                          (312) 435-5895
                          blanca_lara@ilnd.uscourts.gov
25

1  Appearances  (continued:)

2

3

   For the Individual        THE SOTOS LAW FIRM
4  Defendants:               BY:   MR. JEFFREY N. GIVEN
                                   MR. JAMES G. SOTOS
5                                  MS. CAROLINE P. GOLDEN
                                   MR. JOSEPH M. POLICK
6                                  MR. DAVID A. BRUEGGEN
                             550 East Devon Avenue
7                            Suite 150
                             Itasca, Illinois   60143
8

9  For the Defendant         ROCK FUSCO & CONNELLY, LLC
   City of Chicago:          BY:   MS. EILEEN E. ROSEN
10                                 MS. CATHERINE M. BARBER
                                   MS. THERESA B. CARNEY
11                           321 North Clark Street
                             Suite 2200
12                           Chicago, Illinois   60654

13
   For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
14 Guevara:                  BY:   MR. THOMAS E. LEINENWEBER
                                   MR. JAMES V. DAFFADA
15                           120 North LaSalle Street
                             Suite 2000
16                           Chicago, Illinois   60602

17

18

19

20

21

22

23

24

25

1          (The following proceedings were had out of the

2          presence of the jury in open court:)

3          THE COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Okay.  Very quickly.  We're going to try

09:32:59   5   to have rulings on as many of the instructions as we can by the

6   end of lunchtime.

7          I have one thing I want to know from the plaintiff,

8   but I don't have time now.  Maybe a short argument before we

9   break for lunch on one issue, which is, I'm going to want to

09:33:20  10   know -- you're requesting an exfoliation instruction and I need

11   to know what evidence, what evidence there's been of documents

12   that were destroyed; okay?  I just need to know what the basis

13   is for that.

14          Okay.  Then one of the jurors has a doctor's

09:33:42  15   appointment tomorrow afternoon for which she must leave at

16   4:00 p.m.  So we cannot go late.  But they are getting prepared

17   to shorten their lunch break.  Okay?

18          So I think with that, we're ready, right?

19          MS. ROSEN:  Judge, did you have a chance to take a

09:34:00  20   look at Mr. Murray's opinions about the issue of the scope of

21   his --

22          THE COURT:  You know what?  I did everything but his

23   -- but the ruling on the motion in limine, which is sitting on

24   my desk.

09:34:15  25          Can you just pull it?

1       COURT'S LAW CLERK:  Yes.

2       THE COURT:  Sorry about that.  All these instructions

3   issues got in the way of everything else.

4       (Brief pause).

09:34:27    5       THE COURT:  Can you just do the first couple of

6   questions while I'm looking at that ruling?

7       MS. ROSEN:  Well --

8       THE COURT:  I mean, it certainly talked about a lot of

9   defense files in this report, which I did read.

09:34:43    10      MS. ROSEN:  Right.  And that's the point, is that he

11  can talk about more than just the seven or eight files that are

12  specifically used as examples.

13      THE COURT:  So I guess I got to get the ruling.  And

14  is that what you want to do, first thing?

09:34:56    15      MS. ROSEN:  Yeah.  I mean, sort of in a general way,

16  that he looked at more than just the files that --

17      THE COURT:  You know what?  I'm trying to get the

18  jury --

19      THE LAW CLERK:  Here it is.

09:35:05    20      THE COURT:  Okay.  We got it.

21      MR. SWAMINATHAN:  The issue, Judge, is not an issue of

22  the ruling.  It's an issue of the disclosure of the report.

23      MR. LOEVY:  The issue is of his opinions about those

24  nine files.

09:35:10    25      THE COURT:  Well, I don't know what -- Ms. Rosen has

1    said that the ruling on the motion in limine deals with this.
2            (Brief pause).
3            THE COURT:  Okay:
4            "... Murray analyzed nine of the files ..."
5             Okay.
6             "... He analyzes the missing documents to
7             critique Brasfield's opinions ..."
8             "... plaintiff argues that Murray should be
9             limited to his disclosed opinions on the files
10            he actually reviewed  ..."
11            "... Rivera argues that the court should bar
12            Murray from testifying about his opinion on what
13            a comparison of all of the files would have
14            revealed ..."
15            "... This request is denied.  On the two pages
16            prior to the comparison of nine specific files
17            plaintiff cites, Murray levels systemic
18            criticisms of Brasfield's analysis ..."
19            He begins by asserting that some of the documents are
09:35:56    20   not substantive investigative materials.  Explains that some
21   documents, such as medical examiner reports, would be present
22   in an investigative file but disclosed by a third party.
23            "... explicitly bases his analysis on the
24            summary of the files Brasfield reviewed attached
25            to his report ..."

1          "... Plaintiff ignores this portion of Murray's

2          report in his reply ..."

3          So I guess I have to look at the report again, which

4   is also on my desk.

09:36:32   5          MS. ROSEN:  The other point, Judge --

6          THE COURT:  Hold on.  Just hold on.

7          MS. ROSEN:  Okay.

8          THE COURT:  Well, go ahead.  I guess you have to be

9   because the jury is getting ready to come in.

09:36:38  10          MS. ROSEN:  At page 4, at the paragraph that begins:

11          "... Second, plaintiff claims that Murray --

12          (Court Security officer opens the door to the

13   courtroom.)

14          THE COURT:  Give us just a minute.  Thank you.

15          COURT SECURITY OFFICER:  Yes.

16          MS. ROSEN:  (Continuing reading:)

17          -- and defendants in general, should be barred

18          from expressing the opinion that the files

19          produced during discovery in this case by the

20          Cook County Public Defender or private defense

21          attorneys are incomplete.  Rivera contends that

22          Murray did not disclose such an opinion or that

23          his opinion only "hints" at it.  The court

24          cannot agree.  Murray's critique of Brasfield's

25          methodology begins  ..."

1        So, I mean, I think he can talk about his general

2   review of the files even though he doesn't specifically detail

3   in his report more than just seven or eight.

4        THE COURT:  I think that's right.

09:37:18   5        MR. LOEVY:  Our only objection is, he can't talk about

6   files that he didn't disclose, that's all we're saying.

7        THE COURT:  Specific files.

8        MR. LOEVY:  Yes.  Exactly.

9        THE COURT:  All right.  Well, I don't think he's going

09:37:24  10   to do that.  He's going to make some general --

11        MR. LOEVY:  Yes, Your Honor --

12        THE COURT:  We're ready.

13        MS. ROSEN:  Do you want him to take the stand, Judge?

14        THE COURT:  Yes.

09:37:58  15        THE COURT SECURITY OFFICER:  All rise.

16        (The following proceedings were had in the

17         presence of the jury in open court:)

18        THE COURT:  Please be seated, everyone.

19     BERNARD MURRAY, DEFENDANT CITY'S WITNESS, PREVIOUSLY SWORN

09:38:46  20             DIRECT EXAMINATION (resumed)

21   BY MS. ROSEN:

22   Q.  Good morning, Mr. Murray.

23   A.  Good morning.

24   Q.  Where we left off yesterday I believe was talking generally

09:38:54  25   about your general opinion regarding Mr. Brasfield's

1  conclusions regarding the criminal defense files and whether or
2  not you could infer from the review of the files that the files
3  that we have today are not in the same condition or complete
4  like they were back in the late 1980's, correct?

09:39:25  5  A.  Yes.

6  Q.  Okay.  So I want to go back to that part of your opinion.

7  And in connection with the work you did, did you
8  review files in connection with this case?

9  A.  Yes.

09:39:40  10  Q.  And what types of files did you review?

11  A.  Well, there were the -- in addition to the police files --
12  or the criminal defense attorney files, there were prosecutor
13  files as well.

14  Q.  Okay.  And how many prosecutor files were obtained that

09:40:01  15  were companion files to the criminal defense files and the
16  police files that we have?

17  A.  26 of the eventually 38 files that the plaintiff's expert
18  relied upon.

19  Q.  Okay.  And how many files did Mr. -- how many state's

09:40:23  20  attorney files did Mr. Brasfield review is it your
21  understanding?

22  A.  He claimed to review seven prosecutor files as examples
23  where material was missing from the criminal defense files, as
24  well as the prosecutor files.

09:40:34  25  Q.  And did you look for those 7 state's attorney files?

1  A.  I did.

2  Q.  And did you find 7 -- the 7 state's attorney files that Mr.

3  Brasfield claimed to have reviewed?

4  A.  I only found six.  There was one of the 7 files where there

09:40:55  5  was not a state's attorney file.

6  Q.  And which file was it that Mr. Brasfield claimed included a

7  state's attorney file but the state's attorney file we didn't

8  have?

9  A.  If I can refer to my report?

09:41:11  10  Q.  Absolutely.

11  A.  Samuel Slack.

12  Q.  Okay.  Did you review the criminal defense file in Slack?

13  A.  I examined the documents that plaintiff's expert claimed

14  were missing from Slack, as well as missing from the

09:41:35  15  prosecutor's file, even though there wasn't a prosecutor's

16  file.

17  Q.  Okay.  And can you -- I've given you, just to sort of speed

18  things along, the files that you reviewed in connection with

19  your opinion.

09:41:55  20      So can you take a look at the Samuel Slack file, which

21  contains the documents, only the documents that Mr. Brasfield

22  identified as being missing.

23  A.  Right.  I have that.

24  Q.  Okay.  So as an initial matter, can you look through the

09:42:21  25  file and tell me is there a subpoena in that file from the

1    Assistant Public Defender in the case?

2    A.  Yes, there is.

3    Q.  Okay.  And the fact that there's a subpoena -- the fact

4    that Mr. Brasfield identifies the subpoena as a document that

09:42:49    5    he says is missing from the criminal defense file, does that

6    inform your opinion regarding the completeness of the criminal

7    defense attorney file?

8    A.  Well, it's another example of my belief that you -- that

9    it's unreasonable to assume that the files as they exist now,

09:43:10    10    the criminal defense attorney files as they exist now are in

11    the same conditions as they were back upwards to 30 years

12    earlier.

13        Obviously the criminal defense attorney at the time

14    issued a subpoena for documents, and yet that's -- that same

09:43:26    15    subpoena now is not found in the criminal defense attorney file

16    today.

17    Q.  Okay.  And then with respect to some of the other documents

18    that Mr. Brasfield identified as missing, I want to direct your

19    attention to the document that is a request for latent

09:43:47    20    fingerprint comparison.

21    A.  Yes.

22    Q.  And what is the request for latent fingerprint comparison?

23    A.  It's a document filled out by the detectives, commonly

24    filled out by detectives involved in the investigation, asking

09:44:05    25    the -- at the time the Chicago Police Department's crime lab to

1   examine recovered evidence for fingerprints, fingerprints that

2   were found in the evidence and compare it to somebody, either

3   the defendant or a suspect.

4   Q.  And did you analyze the totality of the police file in the

09:44:27   5   Slack case and arrive at some opinions about whether or not the

6   information, even if this page had been missing back in the

7   1980's, whether or not the information that's in the request

8   was withheld from the criminal defendant?

9   A.  There's an examination of the criminal defense attorney's

09:44:55   10   file shows there's ample evidence to support the fact that the

11   defense attorney in his file had the results of the comparison.

12   This document is only the request to the crime lab to

13   make the comparisons.  The actual results were found in

14   numerous documents in criminal defense attorney's file as they

09:45:15   15   exist today.

16   Moreover, in the criminal defense attorneys file, the

17   report found that the defendant's fingerprints were not found

18   on the latent fingerprints.  So the criminal defense attorney

19   has subpoenaed the crime lab people to court numerous times.

09:45:31   20   So the significance of the absence of the fingerprints of the

21   defendant were significant to the criminal defense attorney.

22   Q.  Okay.  We'll put Mr. Slack's file aside.

23   Now, I want to direct your attention to the Quinones

24   and Andres files.

09:46:23   25   A.  I have them.

1  Q.  Based on your review of the files, do you have an

2  understanding that Mr. Andres and Mr. Quinones were

3  codefendants in the prosecution, homicide prosecution?

4  A.  That's correct.

09:46:35    5  Q.  And was there a third criminal defendant?

6  A.  Yes, there was.

7  Q.  And what was his name?

8  A.  Mark Johnson.

9  Q.  And did we have -- did we have for your review or Mr.

09:46:49   10  Brasfield's review Mr. Johnson's criminal defense attorney's

11  file?

12  A.  No, just Quinones and Andres.

13  Q.  And taking a look at the Quinones file, do you see in that

14  file multiple subpoenas issued by the various public defenders

09:47:24   15  that were involved in the case?

16  A.  I see the material that was claimed to be missing.  I see

17  one in the Quinones file from his attorney.

18  Q.  Okay.  So, again, what do you infer from the fact that Mr.

19  Brasfield has identified a subpoena from -- issued by the

09:47:58   20  criminal defendant's attorney regarding the completeness of the

21  criminal defense attorney's file?

22  A.  It's the same analysis.  Currently that the file -- there's

23  an indication that the criminal defense attorney's file is not

24  complete today as it existed back at the time of the trial.

09:48:15   25           Again, the defense attorney for Mr. Quinones issued a

1   subpoena for documents from the police department and now that

2   document, that subpoena is claimed to be missing.

3   Q.  Okay.  And then I also want to direct your attention to

4   another document that is identified as missing on Mr.

09:48:37   5   Brasfield's chart from the criminal defense attorney's file,

6   the court-reported statement of Mr. Quinones.

7   A.  Yes.

8   Q.  Do you see that there?

9       What is a court-reported statement?

09:48:50   10   A.  On occasion, a defendant was making a statement to the

11   police and to an Assistant State's Attorney.  A court reporter

12   would be brought to the police station and would type down the

13   interviewer, which was on un-reviewed and signed by the

14   defendant at a later date -- at a later time.

09:49:09   15   Q.  And during the course of a court-reported statement, is

16   there a representative from the Cook County State's Attorney's

17   Office present for the statement?

18   A.  Yes.

19   Q.  And who keeps possession of the original court-reported

09:49:30   20   statement, the police or the State's Attorney's Office?

21   A.  The State's Attorney's Office.

22   Q.  Okay.  And during the course of a criminal prosecution,

23   what, if anything, does the State's Attorney's Office do with

24   court-reported statements they've obtained during the course of

09:49:48   25   a criminal investigation?

1    A.  Well, it would be provided during pretrial discovery, a

2    copy of it to the criminal defense attorney, and it would be

3    used during the prosecutions of case-in-chief as evidence of

4    the defendant's guilt.

09:50:01    5    Q.  And what, if anything, do you infer from the fact regarding

6    the completeness of the criminal defense attorney's file of the

7    fact that the court-reported statement of Mr. Quinones is

8    identified as missing in Mr. Brasfield's review?

9    A.  Well, it's obvious that the criminal defense attorney's

09:50:24    10    file as they exist today is incomplete.  There is absolutely no

11    way that that document was not presented to defense attorney

12    pretrial and used at trial.

13    Q.  I also want to direct your attention in the same file to a

14    handwritten statement.

09:50:43    15    Can you describe to the ladies and gentlemen of the

16    jury what a handwritten statement is.

17    A.  Similar to the court-reported statement, on occasion

18    prosecutors would take a handwritten statement from a witness,

19    and that's so it's not -- it's not used against the defendant

09:51:03    20    necessarily, it could be, though.  This one happens to be a

21    witness statement.  It's about two pages long.

22    So same similar process to the court-reported

23    statement.  It's the information that the witness provided.

24    It's reviewed by the witness and then signed by all parties as

09:51:19    25    witnesses to the statement.

1  Q.  And I'm sorry, I don't know if you said it, but is there a
2  representative of the Cook County State's Attorney's Office?
3  A.  Yes.
4  Q.  Would writes out the statement, a state's attorney or a
09:51:29  5  police officer?
6  A.  Commonly the prosecutor would write it down.
7  Q.  Okay.  And who keeps possession of the original handwritten
8  statement?
9  A.  Same as with the court-reported statement, the prosecutor's
09:51:43  10  office would maintain possession of the original statement.
11  Q.  And what would happen during the course of criminal
12  discovery with this handwritten statement that the original is
13  in the hands of the Cook County State's Attorney's Office?
14  A.  They xerox.  A photostatic copy would be made of it and
09:52:01  15  provided to the defense attorney, much like the statement of
16  the defendant.
17  Q.  Okay.  And what, if anything, does the fact that Mr.
18  Brasfield identified this handwritten statement as missing from
19  the criminal files tell you about the completeness of the
09:52:14  20  files?
21  A.  Again, it shows that the criminal defense attorney files as
22  it appears today is incomplete.
23  Q.  Okay.  Then I also want to direct your attention to another
24  document that Mr. Brasfield identified as missing in this
09:52:29  25  Quinones file.  It's the page RFC 06332.  And can you describe

1    what that document is?

2    A.   I'm sorry, can you give me the number again?

3    Q.   Sure.   RFC 06332.

4    A.   I have it.

09:52:50    5    Q.   Okay.   What is that?

6    A.   It's an otherwise blank piece of paper with what appears to

7    me to be a municipal case number.

8    Q.   What is a municipal case number?

9    A.   When a felony case is brought to Court, the first 30 days

09:53:07   10    the case is in the preliminary hearing courtroom, a felony

11    preliminary hearing courtroom.   That branch of the Circuit

12    Court of Cook County uses its own case numbers.   And the

13    numbers, you can notice the significance that it's a municipal

14    number by the amount of digits and the way they're displayed.

09:53:26   15          This one is 871 and then 17788701.   And from being

16    experienced of seeing these numbers in the past, I know that

17    the first number, 871, means the Chicago municipal part of the

18    clerk -- of the Cook County Clerk's Office.

19          So it's a Chicago municipal number as opposed to a

09:53:49   20    suburban municipal number.   And the rest of it is just the case

21    number with "01," meaning the first of maybe more than one

22    defendant.

23    Q.   And --

24    A.   So this number is used in the first 30 days when the case

09:54:01   25    is in the preliminary hearing courtroom.

1    Q.  And did your review of the file lead you to any conclusions

2    about whether or not this number was related to this case?

3    A.   The document -- this number was found in order that the

4    documents were numbered.  It was following a request for police

09:54:27    5    officers to come to Court.  So it's possible that this is the

6    municipal case number for one of the three defendants, Mr.

7    Quinones.  And when the notification came in for the three

8    police officers, someone wrote this number on the back of it to

9    identify what case they were going to court on.

09:54:46   10    Q.  Okay.  And when you say -- you just said, "when the police

11    officers were notified."  What does that mean to notify a

12    police officer?

13    A.  Well, there's a reason that there's a hearing or something

14    going on in court.  The prosecutor's office would notify the

09:55:03   15    police department that they needed certain officers to appear

16    in court the following day or a few days later on that case.

17         So that's the prosecutor notifies the police

18    department to send certain police employees, police officers to

19    court.

09:55:19   20    Q.  And that notification where the State's Attorney's Office

21    is notifying the police department to notify certain police

22    officers to come to court, when does that happen in the

23    process, before the case is charged or after the case is

24    charged?

09:55:33   25    A.  After the case is charged.

1    Q.  Okay.  I'm also going to ask you to take a look at RFC

2    06334.  And can you describe what that is?

3    A.  334?

4    Q.  Yes.

09:56:21    5    A.  Is this in Andres' file or in Quinones' file?

6    Q.  It's in Quinones' file.

7            (Brief pause).

8    BY THE WITNESS:

9    A.  I'm sorry, I don't have 334 in here.

09:56:46    10    Q.  Let me just hand it to you.

11            (Document tendered to the witness).

12    BY MS. ROSEN:

13    Q.  Can you describe that document?

14    A.  RFC 6334 is an otherwise blank piece of paper with the

09:57:00    15    number 94 CR 0105701.

16    Q.  Okay.  And what is that number?

17    A.  After the 30-day period, if there's a finding of probable

18    cause or for a grand jury indictment, the case then goes to the

19    Cook County criminal courts, whether it be city or suburbs.

09:57:22    20    That's when the Clerk of the Circuit Court assigns the CR

21    number to the file.  So much like we have the 87 municipal

22    number, this is now the 94 CR number indicating a felony

23    criminal matter.

24    Q.  And what was the date of this -- of this note that was on

09:57:40    25    the blank piece of paper?

1    A.   The number "94" indicates it's from 1994.

2    Q.   And criminal prosecution of Mr. Quinones, Mr. Johnson, and

3    Mr. Andres, what CR number did that have on it?

4    A.   It had an 87 CR number.

09:57:57    5    Q.   So what does that tell you about the comparison between the

6    94 number and the 87 number?

7    A.   Well, it's -- the number is 7 years later.  So it didn't

8    exist at the time of the prosecution.  This is a document that

9    it may be misfiled or maybe someone wrote it on the back of one

09:58:17    10   of the existing documents years later, but it's something that

11   could not be in existence at the time of the trial.  So it is

12   of no significance to the case.

13   Q.   Okay.  And then one last document to take a look at in the

14   Quinones file.  If you could take a look RFC 6443, is the

09:58:37    15   request for identification photos.

16   A.   Yes.

17   Q.   What is that?

18   A.   It's a form used by the Chicago Police Department, and also

19   the prosecutor's office would use this form, too, requesting

09:58:50    20   photographs of people who were in the -- in the bureau of --

21   the Chicago Police Department's Bureau of Identification

22   database.

23        So if you have an IR number, that means here's a

24   mugshot of a person somewhere.  So this form is used by a

09:59:07    25   detective to request on this form three photographs.  You could

1    fit 7 on there, but three photographs.

2    Q.  And did Mr. Brasfield draw conclusions, specific

3    conclusions about this documentary and what it meant?

4    A.  He indicated that one of the three names on here is a name

09:59:30    5    that's not found anywhere in the Quinones file.  So he

6    speculated that it may be another suspect that was not

7    disclosed or not made available to the prosecution or to the

8    defense.

9    Q.  And did you analyze the police file and this criminal

09:59:55    10    defense file to test Mr. Brasfield's speculation on that point?

11    A.  The -- the -- the name of the person, Harris, was not found

12    in the prosecutor's -- in the police files.  However, to say

13    that it's someone undisclosed in this case is -- is really --

14    it's not the -- the form that's used to order the photographs

10:00:24    15    is not necessarily tied to this case only.

16         In other words, it's common for police detectives or

17    even prosecutors to ask for photographs of people related to

18    different investigations.  So it could be as equally that this

19    person's name, Harris, was completely unrelated to this case

10:00:45    20    and just put on the form ordering the photographs as a matter

21    of convenience from the detective.

22    Q.  Is there a records division number on the form?

23    A.  No, there's not.

24    Q.  Okay.  So it's not tied to any particular investigation?

10:01:00    25    A.  It's not tied to any one case.  There's 7 lines on there.

1  Technically, you could be requesting photographs for people

2  related to 7 different investigations.

3  Q.  And then what, if anything, on this form there are -- there

4  are IR numbers, correct?

10:01:19  5  A.  Yes.  IR numbers are tied to the specific person's

6  photograph.

7  Q.  And the individual who Mr. Brasfield speculated was an

8  alternative suspect, Mickey Harris, what did you conclude based

9  on his IR number?

10:01:36  10  A.  It was issued at a far earlier time than the other two

11  names.  So I assumed that he's a much older person or older

12  compared to the two photographs of people that were related to

13  the investigation.

14  Q.  Okay.  Did you compare the documents that Mr. Brasfield

10:02:02  15  identified in the Quinones file to the documents that Mr.

16  Brasfield identified in the Andres file as being missing?

17  A.  Yes.

18  Q.  And do both of those files have the same missing documents?

19  A.  Mostly, I think, but not precisely.

10:02:29  20  Q.  Okay.  And what, if any -- well, during the course of a

21  criminal case when there's multiple defendants and the

22  prosecutor answers discovery, do all of the defendants get all

23  of the same discovery?

24  A.  Yes.  Even though they're represented by different defense

10:02:48  25  attorneys, the prosecutor's office copies all the police

1    reports and all the other discovery information and then gives

2    the same amount of information to both defense attorneys.

3    Q.  So when, if any, conclusions did you draw from the fact

4    that there are some documents identified as missing in Mr.

10:03:06    5    Andres' file that are actually in Mr. Quinones' file, and vice

6    versa, regarding the completeness of the criminal defense

7    attorney files?

8    A.  I think, again, it demonstrates how that even from one

9    defense attorney to another defense attorney, their files as

10:03:21   10    they exist today are currently incomplete in different ways as

11    they were when the case was pending for trial.

12    Q.  Okay.  Now, I'm going to ask you to take a look at the

13    Borrotto file.  And I want you to take a look at the document

14    that's marked RFC 16276, which is a document, again, that Mr.

10:04:02   15    Brasfield identified as missing from the criminal defense

16    attorney's file.

17         Can you tell us what that document is?

18    A.  Did you say 16276?

19    Q.  Correct.

10:04:14   20    A.  That is a letter generated by the prosecutor's office by

21    the Assistant State's Attorney who handled the matter,

22    informing one of the police officers involved in the case that

23    the defendant had been convicted and had been sentenced.

24    Q.  So when is that document, that letter generated by the Cook

10:04:39   25    County State's Attorney's Office?

1   A.  Might be one of the last things that are done by the

2   prosecutor before he sends his file to the warehouse.  It's

3   after trial and after sentencing.

4   Q.  Okay.  So would it surprise you that that document wasn't

10:04:55   5   in the police file at the time that discovery was tendered in

6   the case?

7   A.  It would not surprise me.

8   Q.  And then if you look through the file, are there, again,

9   subpoenas in the file both from the assistant public defenders

10:05:16   10   and the state's attorneys that were involved in the case?

11   A.  Two from two different prosecutes, two from the same

12   criminal defense attorney.  So at least four subpoenas that

13   I've noticed already.

14   Q.  Okay.  And what does that tell you about the likelihood

10:05:36   15   that this criminal defense attorney file is complete?

16   A.  Well, again, the criminal defense issued the subpoenas back

17   at the time that the case was pending and now they don't have

18   their own subpoenas in their file today, indicates that the

19   file today is not complete.

10:05:57   20   Q.  And then I just want you to take a look the subpoena

21   RFC 6310 that was issued by the -- by the Assistant State's

22   Attorney.

23          And if you can just take a look at the documents that

24   are being issued -- the documents that are being requested from

10:06:18   25   the Chicago Police Department, and if you could let us know

1   what documents are being sought in this subpoena.

2   A.  Well, it's a list of all police reports that might be

3   expected to be found during the course of an investigation.  So

4   police reports, arrest reports, rap sheets, in quotation marks,

10:06:46   5   street files, also known as office unit or working files,

6   general progress notes, investigative files, major crime

7   worksheet, inventory slips, evidence technician reports, and

8   lab reports, all prepared in connection in the above case.

9        Also listing the RD number, the arrest number of the

10:07:05  10   defendant, and the IR number of the defendant, for information

11   related to those specific numbers.

12   Q.  Okay.  And this subpoena was issued in what year?

13   A.  It's a '91 CR case, so I'm assuming it was -- I'm sorry,

14   December 3rd, 1992, it looks like when it was issued.

10:07:34  15   Q.  Okay.  So certainly at least by this time it was common

16   knowledge in the State's Attorney's Office to request of the

17   Chicago Police Department documents that are termed

18   investigative files and General Progress Reports, and there's

19   even a reference to street files, correct?

10:07:56  20   A.  That common terminology, that terminology was commonly used

21   in all subpoenas issued by prosecutors.

22   Q.  And do you have an understanding of why prosecutors

23   commonly use the terminology street files?

24   A.  Well, I know that prior to when I was working for the

10:08:13  25   State's Attorney's Office, there was cases about street files

1    and whether they were preserved.  So when it came around to

2    requesting police reports, we used those phrases, which were

3    often repetitive, but making clear that we were requesting

4    every possible document from the investigative file, as well as

10:08:34    5    the RD file.

6    Q.  And you started in Felony courtroom, I think you said, in

7    1988?

8    A.  Yes.

9    Q.  At that point in time, was that the practice in the State's

10:08:47    10    Attorney's Office to string out that litany of descriptors when

11    requesting documents from the Chicago Police Department?

12    A.  Yes, it was.

13    Q.  And so would it be accurate to say that the RD file or the

14    permanent retention file was the only discovery that was used

10:09:06    15    by prosecutors in criminal prosecution?

16    A.  No.

17    Q.  If you take a look at RFC 16324 in that file.  Can you tell

18    us what that document is?

19    A.  This is a complaint for preliminary examination for the

10:09:30    20    defendant Miguel Borrotto.

21    Q.  And then if you look at the next page, RFC 16325, what is

22    that document?

23    A.  It's also a complaint for preliminary examination for

24    Miguel Borrotto.

10:09:46    25    Q.  And what is a complaint for preliminary examination?

1  A.  As explained before, when a defendant is charged with a

2  felony, he first appears in the preliminary hearing courtroom

3  for approximately a 30-day period.  This is the legal document

4  that calls him into that court.  It's the complaint against

10:10:05    5  him.

6  Q.  And is that a document that is prepared by the state or --

7  by the Cook County State's Attorney's Office or the police

8  department?

9  A.  It's almost all -- well, I shouldn't say "always," but

10:10:21  10  commonly prepared by the police department.

11  Q.  And is it -- when the Assistant State's Attorney first

12  appears in court at that initial court hearing, does the Cook

13  County State's Attorney's Office have the original or a copy of

14  that complaint?

10:10:40  15  A.  The original of the complaint is in the Clerk's file, which

16  is present in court.  The prosecution usually has a copy of it

17  at that point.

18  Q.  And is it part of the Cook County State's Attorney's

19  responsibility to ensure that the criminal defendant has copies

10:10:59  20  of the complaint also?

21  A.  It's commonly made available either shortly after the first

22  date in court, but it's also available for examination by the

23  defense attorney from the court's file right there in court.

24  Q.  Okay.  So the fact that Mr. Brasfield identified these two

10:11:17  25  documents as missing from the criminal defense attorney file,

1  how does that inform your opinion, once again, about the

2  completeness of the criminal defense attorney file?

3  A.  Well, these document would be provided during the discovery

4  process, almost universally done.  So I would assume that if

10:11:35  5  they're missing from the criminal defense attorney file today,

6  it's further indication that the files that exist today are

7  incomplete.

8  Q.  And then the next two documents in your file are RFC 16326

9  and 16327, what are those documents?

10:11:50  10  A.  They're referred to as 101 forms.

11  Q.  And the jury has already heard a little bit about those

12  felony 101 forms.  How does the Cook County Prosecutor's Office

13  use those forms?

14  A.  They're, again, present in the prosecutor's files during

10:12:11  15  the preliminary hearing per the 30 days.  The prosecutors use

16  them during that time period.  They use them to find out maybe

17  the name of the detective or a witness they need to talk to

18  during that time period.

19          They also use them administratively as a way to record

10:12:30  20  what the new number would be, the new CR number that's written

21  on there after an indictment.

22  Q.  And is that the type of document that, despite the fact

23  that it's created by a police officer, as the type of document

24  that the Cook County State's Attorney's Office would have to

10:12:47  25  provide during criminal discovery?

1  A.  It's usually -- it is provided during discovery.

2  Q.  So the fact that Mr. Brasfield has identified these felony

3  101's as missing from this file, does that impact your opinions

4  regarding the completeness of the files?

10:13:05  5  A.  It's further evidence that the criminal defense attorney

6  file as they exist today is incomplete.

7  Q.  Okay.  And now I want to direct your attention to the next

8  page in the file RC 16335, which is a license plate sticker

9  replacement.  And can you -- well, let me back up for a second.

10:13:29  10      Do you have that document in front of you?

11  A.  I do.

12  Q.  Did Mr. Brasfield draw some conclusions about this

13  particular document?

14  A.  There were two other sets of reports that were related to

10:13:46  15  Miguel Borrotto's Nissan vehicle.  And he drew the conclusion

16  that Mr. Borrotto did not own -- he owned a Nissan vehicle with

17  a different license plate number that was not disclosed to --

18  to -- was missing from the defense file.

19  Q.  The license plate renewal replacement form, do you have an

10:14:13  20  understanding based on your review of the file of where this

21  particular document was located?

22  A.  The document was located in the pocket of the jacket of the

23  person who committed the murder.  He abandoned the jacket or

24  dropped the jacket during the time of the murder.  So this

10:14:29  25  document was in the pocket.

1    Q.  And whose name appears on the document?

2    A.  The defendant, Miguel Borrotto, and a person who is his

3    wife.

4    Q.  Okay.  And is there a VIN number on the license plate

5    renewal sticker?

10:14:44

6    A.  Yes, there a vehicle identification number is on there.

7    Q.  And did your review of the file indicate whether or not the

8    VIN number on the license plate renewal form matched the number

9    of the car that Mr. Borrotto owned?

10   A.  Yes.  The number for either license plate, the YUK, YVk

10:15:01

11   670, were the number that Mr. Brasfield says was not disclosed

12   and the vehicle identification number matches to that number.

13        I would add that Mr. Brasfield said that the ZZ

14   number, license plate number, was not disclosed to the defense

15   attorney.  But it is on this form, and this form, this

10:15:30

16   document, was provided to the criminal defense attorney and

17   found in his file.

18   Q.  Okay.  So if we take a look now RFC 16386 in the same file.

19   And can you tell us what that document is?

20   A.  16386 is a criminal offense case report.

10:15:51

21   Q.  And in this particular file it's a two-page document,

22   correct?

23   A.  Yes, it is.

24   Q.  And Mr. Brasfield identified the first page of the document

25   as being missing, correct?

10:16:09

1    A.   That's correct.

2    Q.   And what, if anything, does that tell you about the

3    completeness of the file?

4    A.   That the criminal defense attorney file as exists today is

10:16:23    5    incomplete.   The case report is the first document created when

6    a crime happens usually by a patrol officer.   And to have the

7    second page, but not the first page, shows that this criminal

8    defense attorney file is incomplete as it exists today.

9    Q.   Okay.   Now let's talk about the Demetrius Johnson file.

10:17:09   10        (Brief pause).

11   BY MS. ROSEN:

12   Q.   Did you review the criminal defense file that we have in

13   this case as it relates to Mr. Johnson?

14   A.   I did.

10:17:22   15   Q.   And did you draw any conclusions just by looking at the

16   file about whether or not it's complete?

17   A.   The criminal defense attorney file in this case, Demetrius

18   Johnson, doesn't have any police reports.

19   Q.   Okay.   And the fact that it has no police reports, what, if

10:17:49   20   any, conclusions did you draw from that?

21   A.   Well, two main conclusions.   One, obviously that the

22   criminal defense attorney file as it exists today is

23   incomplete; that's pretty obvious.

24        But, also, in this section of Mr. Brasfield's report,

10:18:03   25   his methodology claim was to use files where documents were

1    missing from the criminal defense attorney file and were

2    missing from the prosecutor's file.  He also said that he would

3    not use files that were transferred from one criminal defense

4    attorney to another criminal defense attorney.

10:18:22    5         So, here, his own methodology, he didn't follow it,

6    because this file was transferred from one criminal defense

7    attorney to another criminal defense attorney.  And the

8    complete absence of any Chicago Police Department reports, I

9    don't know how he is able to make a comparison that something

10:18:40   10   was missing from a criminal defense attorney file, as well as a

11   prosecutor file.

12   Q.   Okay.  And then with respect to what was locked in the

13   criminal defense attorney's file or what was in the criminal

14   defense attorney's file as it exists today, did you see

10:19:00   15   something that's been referred to in court as a Blue Back?

16   A.   I did find Blue Back.

17   Q.   And what is it?

18   A.   That was in the prosecutor's file.

19   Q.   What is a Blue Back?

10:19:10   20   A.   A Blue Back is a group of pages that's used by prosecutors

21   every time they go to court.  Essentially, is a diary where

22   they write down the date they're in court and what happened in

23   court, as well as referring to reminders to themselves to do

24   things and order reports.  Also, it can include reports that

10:19:33   25   were provided in court on that day.

1  Q.  And in your review of the Blue Back, were you able to

2  determine that, in fact, during the course of the criminal

3  discovery phase of the criminal prosecution, that the Cook

4  County State's Attorney that was involved tendered police

10:19:58  5  reports in the case?

6  A.  Yeah.  Mainly on two separate dates they provided numerous

7  police reports, and they would list them as RD, or GPRs, or

8  notes, or firearms reports.  Whatever they tendered, they were

9  listed on two separate entries.

10:20:14  10  Q.  And so was that further evidence of the fact that the file

11  that we have is not the complete file?

12  A.  Yes.

13  Q.  And in that same case, you reviewed the investigative file

14  and the permanent retention file, correct?

10:20:39  15  A.  Yes.

16  Q.  And the jury saw during Mr. Brasfield's testimony two

17  lineup reports, one that was identified from the permanent

18  retention file and one that was identified from the

19  investigative file regarding a lineup with an individual by the

10:21:01  20  name of Bryant Johns.  Do you recall those two reports?

21  A.  I do.

22  Q.  And do you have an opinion about whether or not both of

23  those reports should've been produced during the criminal

24  discovery in the case?

10:21:15  25  A.  Yes.  Those are the type of reports that would be produced

1　during discovery.

2　Q.　And did you see evidence in the Blue Back that, in fact,

3　both RD supplemental reports and GPRs, which would be documents

4　that are only contained in the investigative file, were

10:21:31　5　produced in the case?

6　A.　And those are the two separate entries I referred to on the

7　state's attorney's Blue Back indicating that they provided GPR

8　materials and police report, supplementary report materials.

9　Q.　Okay.　Now, let's take a look at Mr. Pacheco's file.

10:22:11　10　　　　　So in addition to reviewing specifically the files

11　that Mr. Brasfield had indicated he reviewed both the criminal

12　defense attorney's file and the state's attorney's file, did

13　you do a detailed review of two other files?

14　A.　Yes.

10:22:35　15　Q.　And why did you pick those two files?

16　A.　Well, going the other 20 prosecutor's files that Mr.

17　Brasfield didn't look at, they contained many of the

18　investigative materials that Mr. Brasfield had claimed was not

19　in the -- was missing from the criminal defense attorney's

10:22:55　20　files, but there were a couple of files where investigative

21　material was not found in the prosecutor's file as well.

22　Q.　And so were those the two files that you chose to look at?

23　A.　Yes.

24　Q.　To examine further.

10:23:09　25　A.　Yes.

1  Q.  Okay.  And so with respect to Mr. Pacheco's file, first of

2  all, if you take a look RFC 7148 and 7149, those the documents

3  that were identified missing.  What are those?

4  A.  These are documents, again, generated by the State's

10:23:30  5  Attorney's Office at the conclusion of the trial.

6  Q.  Okay.  And so they would not have been in existence during

7  the criminal discovery process?

8  A.  No, they would not.

9  Q.  And then also in that file, is there something called a

10:23:46  10  report of postmortem examination?

11  A.  Yes.

12  Q.  And what is that?

13  A.  This is a report generated by a deputy medical examiner who

14  works for the Cook County Medical Examiner's Office, and it's

10:24:02  15  an examination of the deceased external and internal

16  examination for evidence of injury determining the manner and

17  cause of death.

18  Q.  And that's obviously not prepared by the police department,

19  correct?

10:24:15  20  A.  It's generated -- no, it's not.

21  Q.  Okay.  And during the course of any homicide prosecution,

22  is it incumbent upon the Cook County State's Attorney's Office

23  to ensure that a criminal defendant gets a copy of the report

24  of postmortem examination?

10:24:34  25  A.  Right.  We would normally photocopy our -- copy the report

1  that we obtained directly from the Medical Examiner's Office.

2  Q.  And so does the fact that this report is missing from the

3  criminal defense attorney's file inform your opinion about

4  whether or not this particular file was complete?

10:24:52  5  A.  Well, the postmortem examination report is provided on

6  every murder case, every homicide case.  So to say that it's

7  missing now from the criminal defense attorney's file as it

8  exists today shows that, as it exists today, the file is

9  incomplete.

10:25:08  10  Q.  Okay.  And there's also the next page, there's a toxicology

11  report from the Medical Examiner's Office.  Again, that's

12  something prepared by the Medical Examiner's Office?

13  A.  Yes, it is.

14  Q.  And something that the state's attorney would provide?

10:25:23  15  A.  That's correct.

16  Q.  Okay.  And then if we take a look at, then, the next two

17  pages that Mr. Brasfield identified as missing RFC 7158 and 59.

18  Can you describe what that is?

19  A.  It's a supplementary report.

10:25:42  20  Q.  And supplementary reports are something that should be

21  provided, correct?

22  A.  Yes.  Routinely.

23  Q.  Okay.  And then in this particular case, the information

24  that's memorialized in the supplementary report, what does it

10:26:02  25  say about who was involved in whatever is being described in

1 this case?

2 A.  It's a report with two detectives' names at the bottom,

3 indicating that they conducted an interview with -- of a

4 witness with -- and this interview is conducted in the presence

10:26:26  5 of Assistant State's Attorney's Off -- assistant state's

6 attorneys in the State's Attorney's Office.

7 Q.  Okay.  So, clearly, the interview that's being described

8 here is known to the prosecutors, right?

9 A.  That's correct.

10:26:39  10 Q.  And so in your opinion, what's the likelihood that

11 prosecutors that were involved in an interview would not have

12 turned over the report or would not have noticed that the

13 report didn't exist in the documents they got from the police

14 department?

10:26:58  15         MR. LOEVY:  Objection to speculation, Your Honor.

16         THE COURT:  Overruled.

17 BY THE WITNESS:

18 A.  Well, in the body of the report it indicates that the

19 prosecutors took a written statement from this witness

10:27:08  20 implicating a codefendant in the case.

21         So first off, the state's attorneys would've

22 maintained possession of that written statement.

23         Second, if they didn't receive this report, they would

24 know this report was out there.  They should obtain it and

10:27:23  25 provide it to the criminal defense attorney during discovery.

1  Q.  And so how does that -- does that in any way inform your

2  complete about the completeness of the criminal defense

3  attorney's file?

4  A.  I mean, this is key evidence against a codefendant that

10:27:34   5  would be provided to both defendants.  So it indicates to me

6  that the criminal defense attorney file today is incomplete.

7  Q.  Okay.  And now if we take a look at the next couple of

8  pages in this file, RFC 7160 and 61.

9        And what is that report?

10:27:54   10  A.  It's a two-page supplementary report.  It is a lineup

11  report.

12  Q.  And who was present during this lineup?

13  A.  In addition to the police personnel and obviously the

14  people in the lineup, there was an Assistant State's Attorney,

10:28:13   15  as well as an Assistant Public Defender -- I'm sorry, two

16  Assistant Public Defenders.

17  Q.  Okay.  So, obviously, those two Assistant Public Defenders

18  and the State's attorney knew that a lineup had occurred?

19  A.  That's correct.

10:28:26   20  Q.  And if, for some reason, the Chicago Police Department

21  failed to produce that lineup report, they would have specific

22  knowledge to go back and ask for it, right?

23  A.  Everyone would.

24  Q.  Okay.  And so what does that tell you about the

10:28:38   25  completeness of the file?

1    A.  As it exists today, it indicates it's incomplete, as it

2    exists today.

3    Q.  Okay.  And now if we look at the next two pages, is that

4    another lineup report with the same PD's and Assistant State's

10:28:56    5    Attorneys?

6    A.  Yes, it is.  It's a separate lineup report.

7    Q.  And so, again, does the same analysis apply that were just

8    talking about?

9    A.  Right.

10:29:17    10    Q.  Let's look at one more file.  This a second file that you

11    looked at where you earlier described documents were identified

12    as missing from both the criminal defense file and the state's

13    attorney file, and that's Mr. Robinson's case?

14    A.  That's correct.

10:29:34    15    Q.  And, again if we look at the first couple of pages, is

16    there another report of postmortem examination?

17    A.  Yes.  The claim to be missing from the criminal defense

18    attorney file.

19    Q.  And the toxicology report?

10:29:49    20    A.  Yes.

21    Q.  So same analysis, right?  That the Cook County State's

22    Attorney's Office would've provided that irrespective of

23    anything that the Chicago Police Department would've done?

24    A.  That's correct.

10:29:57    25    Q.  And then if you flip to RFC 13512, is that another

1    disposition report that we talked about earlier that would've
2    been prepared after the case had concluded?
3    A.   It's another State's Attorney's Office generated form
4    regarding the disposition of the case after the case had been
5    resolved in court.
6    Q.   And then the next page, is that another letter from the
7    State's Attorney's Office at the conclusion of the case
8    informing police personnel of the resolution?
9    A.   Yes.   It's another letter informing one of the officers
10   involved in the case that the case has been resolved and the
11   defendant had been sentenced.
12   Q.   And then there's some subpoenas in this one, too, right?
13   A.   Yes.
14   Q.   And then if you take a look at RFC 13591 through 94, and
15   it's 92 and 94 that are identified as missing from Mr.
16   Brasfield's analysis, right?
17   A.   Correct.
18   Q.   And what is that four-page document?
19   A.   It is a copy of a court-reported statement of a witness
20   regarding this shooting.
21   Q.   Okay.   So two of the four pages appear to be, according to
22   Mr. Brasfield, missing?
23   A.   Right.
24   Q.   And what does that tell you about the likelihood that this
25   file is complete?

1  A.  Well, I mean, you got two of the four pages, but two are

2  missing.  Obviously, the file today is incomplete.

3  Q.  Okay.  And then, finally, I would like you to a look at

4  RFC 13648.

10:31:51  5  A.  Yes.

6  Q.  And that's a note that I think the jury saw also with Mr.

7  Brasfield's report -- Mr. Brasfield's testimony.  It was a

8  typewritten note about an anonymous phone call.

9         And can you -- do you recall what Mr. Brasfield

10:32:09  10  concluded about that particular document?

11  A.  He -- he -- he thought it indicated that it was not

12  provided to -- was missing from -- I'm sorry, missing from the

13  criminal defense attorney's file and it may have implicated

14  someone else who committed the crime instead of Mr. Robinson.

10:32:28  15  Q.  And do you agree with that?

16  A.  No, I don't.

17  Q.  Why not?

18  A.  Well, the nature of the note, it indicates that this

19  anonymous witness had knowledge that the police had picked up

10:32:42  20  and charged two people, and they wanted to add that there's a

21  third participant that maybe the police were not aware of that

22  they should follow up on.

23         So by the content of the note, it wasn't ruling out

24  the charged defendant, Mr. Robinson, was saying -- the

10:33:01  25  anonymous person was saying there's a third person out there

1   you should be pursuing.

2   Q.  Okay.  And there's one last area that I want to talk about

3   as it relates to court attendance reports.

4           The jury has heard about court attendance reports.

10:33:19   5   And Mr. Brasfield identified numerous court attendance reports

6   being missing from various criminal defense attorney files.

7   What are court attendance reports?

8   A.  It's a Chicago Police Department generated form that

9   indicates an officer went to court, was present in court for

10:33:36   10   whatever reason, a motion or a trial.

11   Q.  And when are those documents generated, before or after

12   charging?

13   A.  After charging they're generated for the court appearances.

14   Again, the case is already charged, it's in the system, there

10:33:55   15   may be a defense motion on some topic or actually be a trial

16   and the officers are required to come to court.

17   Q.  By time that occurs, where -- what is the status of at

18   least the majority of the criminal discovery at that point?

19   A.  The discovery is probably complete by then.

10:34:13   20   Q.  And so when you say discovery is complete, what does that

21   mean in terms of the production of police reports and things of

22   that nature?

23   A.  Well, the -- the prosecutors would've subpoenaed the

24   investigative file, and the RD file, and all the other forensic

10:34:30   25   reports, and things of that nature.  They would've produced

1    their answer to discovery with those documents, they would've

2    tendered those documents to the criminal defense attorney.

3         The court attendance reports now, if it's relating to

4    a motion, obviously the criminal defense attorney who is filing

10:34:43    5    a motion on the case for some purpose.  So we're well past

6    discovery.

7    Q.  So based on your understanding of how that all works, do

8    you think that those court attendance reports go in after the

9    discovery is complete?

10:34:54    10    A.  Yes.

11         MS. ROSEN:  If I could just have 1 minute.

12         (Brief pause).

13         MS. ROSEN:  I have no further questions.

14         THE COURT:  Let's start.

10:35:05    15         MR. LOEVY:  Yeah.  I'd like to start.

16              CROSS EXAMINATION

17    BY MR. LOEVY:

18    Q.  Good morning, sir.

19    A.  Good morning.

10:35:12    20    Q.  All right.  You did understand that Mr. Brasfield's

21    exercise was not to identify every single page that mattered,

22    but rather, just to identify every single page that was not --

23    that was in the investigative files and didn't make it into the

24    criminal defense attorney's files, correct?

10:35:28    25    A.  He was identifying documents that were missing from the

1  criminal defense attorney files as they exist today.

2  Q.  Right.  But he wasn't claiming that every single piece of

3  paper that was missing mattered.  You understood that, right?

4  A.  Well, he said that, but then he did claim that the missing

5  documents mattered.

6  Q.  All right.  Plenty of those were facially irrelevant

7  documents, right?  Like some of the ones you talked about,

8  right?

9  A.  Yes.

10  Q.  A fingerprint card, a license plate sticker, a subpoena,

11  the fact that those were in the investigative file didn't get

12  turned over, that's of no constitutional significance.  We

13  agree about that, right?

14  A.  Well, you're saying they weren't turned over.  I'm saying

15  to you that --

16  Q.  Well, I'm asking --

17  A.  -- the defense attorney files are incomplete.  So they may

18  have been turned over and just the files are incomplete today.

19  Q.  Well, my question was, even if they weren't turned over, it

20  would've been irrelevant, right?

21  A.  The ones you described, yes.

22  Q.  All right.  And you probably could've gone on for at least

23  another hour talking about documents that were in the

24  investigative file in the Chicago Police Department that didn't

25  make it to the criminal justice system that were totally

1   irrelevant, right?

2          MS. ROSEN:  Objection.

3   BY THE WITNESS:

4   A.  Well, again, presuming they didn't make it to the criminal

10:36:36    5   justice system, and I'm not presuming that.

6   BY MR. LOEVY:

7   Q.  All right.  Well, just stay with my question, then, right?

8          You could've gone on, you could've given us hundreds

9   more examples of irrelevant documents, right?

10:36:41   10   A.  Yes.

11   Q.  All right.  And not only were a lot of these documents that

12   Mr. Brasfield found missing from the criminal defense files, a

13   lot of them were missing from the state's attorney's files,

14   too, correct?

10:36:55   15   A.  Some documents were, yes.

16   Q.  All right.  And, in fact, if it was in the investigative

17   files at the Chicago Police Department, then it turned out

18   neither side in the criminal case got it, that suggests a

19   problem, not that the criminal defense didn't get it, the

10:37:07   20   prosecutors didn't get it.  That subset of documents is a

21   bigger problem, right?

22   A.  Well, you're again presuming that the prosecutor didn't get

23   those documents.  I'm also not claiming that the prosecutor's

24   files as they exist today are complete as they existed at the

10:37:21   25   time of trial.

1  Q.  All right.  But you acknowledge there was a large subset of

2  documents that were in these investigative files of the Chicago

3  Police Department that weren't in either side's files, right?

4  A.  For the prosecutors, I wouldn't say a large subset, but

10:37:34   5  there are documents that are now not in the prosecutor's files.

6  Q.  All right.  In fact, there was not a single prosecutor file

7  you saw or looked at that had all of the documents from the

8  Chicago Police Department investigative files.  That's true, is

9  it not?

10:37:46  10  A.  The -- the 20 --

11  Q.  That's true, right?

12  A.  It's not true.

13  Q.  Okay.  And, I'm sorry.  Can you explain.

14  A.  The 20 files that Mr. Brasfield -- the 20 prosecutor's

10:37:58  15  files that Mr. Brasfield didn't look at, when I examined them,

16  I found most, if not all, of the investigative material in the

17  prosecutor's files, such as case reports, supplemental reports,

18  arrest reports, defendant's statements, witness statements.

19  They were found in the prosecutor's files.

10:38:13  20  Q.  All right.  Then maybe we misunderstood each other.  I

21  wasn't saying every document was withheld from the state's

22  attorney.  I said, isn't it true that there was not one state's

23  attorney files that had all of the documents from the

24  investigative file?

10:38:24  25          MS. ROSEN:  Objection.

1  BY THE WITNESS:

2  A.  As the prosecutor's files exist today, that's true.

3  BY MR. LOEVY:

4  Q.  All right.  So you can say "yes" to that, right?

10:38:29   5  A.  As the files exist today, yes.

6  Q.  All right.  Now, while we could go on and on about

7  documents that were in the investigative files that didn't make

8  it to the prosecutors or the criminal defendants and whether

9  those mattered or not, you would have to agree that some of the

10:38:45  10  documents that were found in these investigative files at the

11  police department, some of those documents should have been

12  produced.  Do you agree about that, sir?

13  A.  I'm saying the investigative documents --

14       MS. ROSEN:  Objection.

10:38:58  15       THE COURT:  I'm sorry.  If there's an objection, I

16  can't hear it.

17       MS. ROSEN:  Sorry.  Objection to the form.

18       THE COURT:  Overruled.

19  BY THE WITNESS:

10:39:05  20  A.  I'm sorry, what was --

21  BY MR. LOEVY:

22  Q.  Sure.  You understand that the Fields investigative file

23  was found in a place and then they found a bunch of other files

24  with it, right?

10:39:16  25  A.  The Fields case, yes.

1  Q.  I'm sorry.  Not Fields.  Let's stay with Rivera.

2        In Rivera, they found the file and there were other

3  files with it, right?

4  A.  I'm not aware of where the Rivera file was found.

10:39:27  5  Q.  Did you know any circumstances about 20 years later about

6  how it was located?

7        MS. ROSEN:  Objection.

8  BY THE WITNESS:

9  A.  I do not.

10:39:31  10  BY MR. LOEVY:

11  Q.  All right.  You did do work in the Fields case, right?

12  A.  Yes.

13  Q.  In fact, you incorporate that work in your report

14  expressly, right?

10:39:39  15  A.  Yes.

16  Q.  So what you know is that they found the Fields

17  investigative file in a set of file cabinets in the basement,

18  right?

19  A.  At one of the areas, I believe, yes.

10:39:46  20  Q.  And it was with hundreds of other files that had not been

21  produced -- by everybody's agreement -- that had not been

22  produced to the criminal justice system, correct?

23  A.  All the other documents that were not produced, I'm not

24  aware of that.

10:39:58  25  Q.  No, the files.  They found a bunch of files in the

1  basement, and the police said, Oops, we just found hundreds of

2  files that we never produced to the criminal justice system in

3  these investigative files.  That's what happened in Fields,

4  right?

10:40:09   5  A.  I'm aware of that part of it.  I was aware that the initial

6  reports on Fields case itself were not provided.

7  Q.  Okay.  You billed more than $100,000 in the Fields case,

8  right?

9  A.  $85,000.

10:40:20   10  Q.  You did a whole lot of work, right?

11  A.  Yes.

12  Q.  And you're saying right now, me telling you is the first

13  time you're hearing that the police department acknowledged

14  that the files they found in the file cabinets in the basement

10:40:31   15  with the Fields file, that those had not previously been

16  produced to the criminal justice system?

17          MS. ROSEN:  Objection to the foundation, Judge.

18          MR. LOEVY:  It's his case, Your Honor.

19          THE COURT:  Wait a minute.  The question is, does the

10:40:41   20  witness --

21          MS. ROSEN:  And he already answered that he didn't.

22  So now we're repeating it.

23          THE COURT:  Well, if it's asked and answered, it

24  wasn't the objection.  I'm going to allow this.  Let's proceed.

10:40:50   25  BY THE WITNESS:

1  A.  I was aware that documents, a lot of documents related to a

2  whole bunch of different cases were found in one of the area --

3  basement area.

4          On the Fields case specifically, I know that the

10:41:06  5  police department acknowledged that there was a set of police

6  reports that were not provided during the discovery process.

7  Q.  Well, they acknowledged that the whole investigative file

8  wasn't provided during the discovery process, right?

9  A.  Right.

10:41:15  10  Q.  And they acknowledged that those file cabinets were full of

11  hundreds of other investigative files that were also not

12  provided.  The files themselves were not provided during the

13  criminal justice process, right?

14  A.  Well, I don't if I agree with, because my work -- my work

10:41:28  15  on that case, there were numerous documents that were found in

16  prosecutor's files that were provided.

17  Q.  Exactly.  Your work in Fields was the same work you did

18  here, right?

19  A.  Very similar.

10:41:37  20  Q.  In other words, we got a set of investigative files that

21  didn't get turned over.  And your job was to determine if the

22  documents in those investigative files mattered or if they were

23  turned over in other places and other sources, right?

24          MS. ROSEN:  Objection.

10:41:48  25  BY MR. LOEVY:

1  A.  Is that the gist of your work?

2         MS. ROSEN:  Object to the form of the question.

3         THE COURT:  Sustained.

4  BY MR. LOEVY:

10:41:55  5  Q.  All right.  I'll try to ask it simply.

6         In Fields and in this case -- let's say in Fields.

7  There was a set of investigative files that the police

8  department found, right?

9  A.  Yes.

10:42:04  10  Q.  And they asked you and Mr. Brasfield -- we asked Mr.

11  Brasfield, look at the documents and those investigative files

12  and draw some conclusions about whether they got to the

13  criminal justice system in some other form; right?

14  A.  I don't know if Mr. Brasfield did that, but I did that.

10:42:23  15  Q.  All right.  And you said, Well, even if these investigative

16  files were withheld, a lot of the documents in them made it to

17  the criminal justice system in other forms, you know, maybe the

18  permanent retention file had them, that kind of thing, that was

19  your exercise, right?

10:42:35  20  A.  Well, in Fields as in Rivera, I didn't say that they were

21  withheld.  I said they were missing from the criminal defense

22  attorney's files as they exist now.  And I found evidence that

23  they were provided from the prosecutor's office.

24  Q.  All right.  But what I was asking, though, that's true,

10:42:48  25  right?  Your job was to determine if all the investigative

1  files, all the documents in the investigative files were

2  withheld, did it matter or were they produced in some other

3  form?  That was the gist of your exercise, right?

4  A.  Not --

10:43:00    5         MS. ROSEN:  Objection.  Asked and answered.

6         THE COURT:  I'm not sure it's been answered.  So I'm

7  going to overrule the objection.

8  BY THE WITNESS:

9  A.  Again, not that they withheld, but just that they were

10:43:13   10  currently missing from defense attorney files.  So looking to

11  see if the information that we could discern from the

12  prosecutor's files, if they had been provided during discovery.

13  BY MR. LOEVY:

14  Q.  All right.  And in Fields, there was a whole lot of

10:43:26   15  documents that turned up in those file cabinets in the basement

16  that were irrelevant, right?

17  A.  Yes.

18  Q.  And you walked through in Fields hundreds of examples of

19  documents that were in the basement, but it wouldn't matter if

10:43:38   20  they got turned over or not because they were either turned

21  over in other forms, or the prosecutors had them, or, you know

22  that kind of thing, right?

23  A.  Yes.

24  Q.  All right.  But there were some documents that were only in

10:43:49   25  the investigative files that were neither in the criminal

1  defense attorney files or the prosecutor files that caused you

2  concern?

3  A.  There were some documents that were missing from the

4  prosecutor's files and the criminal defense attorney's files as

10:44:01  5  they existed a few years ago.

6  Q.  My question was, that caused you concern, right?

7  A.  Caused me to examine them further, yes.

8  Q.  Because there was a lot of investigative material in those

9  basements that was irrelevant, but there was a lot of

10:44:14  10  investigative material in those basement files that actually

11  should have been turned over, right?

12  A.  Well, the information was whether it was turned over or

13  not, but then it was -- I wouldn't say not a lot.  We went

14  through the exercise where we found the information contained

10:44:26  15  in other reports or found in the prosecutor's files.

16  Q.  My question, though, was, should have been turned over,

17  right?

18  A.  Investigative files should be turned over, yes.

19  Q.  No.  The files from the basement contained materials that

10:44:38  20  should have been turned over, correct?

21  A.  Contained investigative material that should have been

22  turned over.

23  Q.  And it wasn't?

24  A.  Well, that was not our contention.  The files that existed

10:44:49  25  show that pages were missing, but that doesn't mean they

1    weren't turned over at the time of discovery.

2    Q.  All right.  Every single piece of paper in the basement

3    from those files that didn't make it to the criminal justice

4    system, maybe every single one of those pieces of paper made it

10:45:03    5    in some other form, or some other Supp. Report, or some other

6    oral communication, right?

7    A.  Or maybe they were tendered at the time of discovery and

8    are now just missing from sloppy files 30 years later.

9    Q.  Every single page that's missing is just sloppy, right?

10:45:15    10    A.  I'm not saying all of them, but it's possible.

11    Q.  All right.  Let's look at the files you looked at in this

12    case.  The universe in Rivera was 190 files, right?

13    A.  Well, I was looking at the universe that he narrowed it

14    down to.

10:45:30    15    Q.  It got narrowed, but it started at 190 investigative files

16    found with the Rivera file, right?

17    A.  I'll take your word for that.

18            MS. ROSEN:  Object to the foundation for that.

19            MR. LOEVY:  May I have a moment, Your Honor?

10:45:40    20            THE COURT:  Yes.

21        (Brief pause)

22    BY MR. LOEVY:

23    Q.  Have you gotten any clearer on exactly where the Rivera

24    file was found in this case?

10:45:58    25    A.  No.

1  Q.  All right.  In all of your review and discussions with

2  counsel reviewing documents, do you know why it was missing for

3  those 20 years?

4          MS. ROSEN:  Objection, Judge.  Foundation.  There's no

10:46:08  5  foundation for the fact that it was missing.

6          MR. LOEVY:  Well, never been produced until 2010.

7          MS. ROSEN:  Judge, there is no foundation for that.

8  There was a stipulation read into evidence --

9          THE COURT:  What is the stipulation?

10:46:19  10          MS. ROSEN:  It's --

11          THE COURT:  Let me have the stipulation.

12          MR. LOEVY:  It's the Wronkowski stipulation.  Could we

13  read it?

14          (Brief pause)

10:46:44  15          MR. LOEVY:  While they're looking for it, Your Honor,

16  I'm going to move to another area.  We can print it at the

17  break and read it.

18          THE COURT:  All right.

19  BY MR. LOEVY:

10:46:50  20  Q.  You looked at files in this case, right?

21  A.  Yes.

22  Q.  One of the files you looked at was the Samuel Robinson

23  case, right?

24  A.  Yes.

10:46:56  25  Q.  So you had an understanding that the City of Chicago came

1 up with an investigative file for the Robinson case, right?

2      MS. ROSEN:  Objection to the form of the question,

3 "came up with."

4      THE COURT:  Sustained.

10:47:07  5 BY MR. LOEVY:

6 Q.  All right.  Your understanding was the City of Chicago made

7 available an investigative file for the Robinson case, right?

8 A.  Yes.

9 Q.  All right.  And your job and Mr. Brasfield's job was to

10:47:17 10 determine whether the documents in the City's investigative

11 file made it to the criminal justice system, right?

12 A.  Well, Mr. -- Mr. Brasfield just looked at missing pages.

13 Q.  All right.  And "missing" meaning --

14 A.  They were --

10:47:31 15 Q.  -- they didn't make it to the criminal defense attorneys,

16 right?

17 A.  They were not in the criminal defense attorney files as

18 they exist today.

19 Q.  And you looked at whether it made it to the prosecutor's

10:47:40 20 files, right?

21 A.  Whether there was evidence that it was provided during

22 discovery.

23 Q.  All right.  So now here's my next question, there were

24 plenty of documents from those investigative files, including

10:47:48 25 the Robinson file, that were neither in the prosecutor's file

1  or the criminal defense file, right?

2  A.  I, again, wouldn't say "plenty."

3  Q.  There were some, right?

4  A.  Yes.

10:47:57  5  Q.  All right.  Let's take a look at the document you asked

6  with Ms. Rosen.  This is 154 J.

7          This is a memo that's an example from the Robinson

8  file --

9  A.  I'm sorry --

10:48:06  10  Q.  -- that you're familiar with, correct?

11  A.  I'm sorry, which file is it?

12  Q.  The Robinson file.

13  A.  Yes.

14  Q.  All right.  It looks like it's dated 7 May '91, and it's

10:48:12  15  someone named Rowley, right?

16  A.  Yes.

17  Q.  All right.  This is an example of the kinds of

18  investigative materials that were found in the investigative

19  files, right?

10:48:23  20  A.  On this case, yes.

21  Q.  All right.  This isn't supposed to exist, right?  Because

22  it's supposed to be on a GPR, et cetera, right?

23          MS. ROSEN:  Objection to form.

24          THE COURT:  It isn't supposed to exist?  Sustained.

10:48:34  25  BY MR. LOEVY:

1  Q.  Doesn't the policy say we're not supposed to have

2  handwritten notes anymore from people to people?

3  A.  I became aware much later that the police department wanted

4  things, notes of this type to be included on a form called a

10:48:50   5  general progress report.

6  Q.  Right.  And that requirement went in in 1983, right?

7  A.  Yes.

8  Q.  So 8 years afterwards, this should not have been recorded

9  informally like this, right?

10:49:00  10       MS. ROSEN:  Objection to the form of question,

11  "informally."

12       THE COURT:  You mean just in a typed note?

13       MR. LOEVY:  Yeah.

14  BY MR. LOEVY:

10:49:08  15  Q.  Typed notes were supposed to have been banned.  It was

16  supposed to all be in GPR reports, right?

17  A.  That's --

18       MS. ROSEN:  Objection.  Foundation.

19  BY THE WITNESS:

10:49:15  20  A.  -- my understanding.

21       THE COURT:  Overruled.

22  BY MR. LOEVY:

23  Q.  All right.  This is an example of something that says, Got

24  a phone call from an anonymous citizen, there might've been a

10:49:21  25  third-party in the murder, or whatever the crime was, the

1  shooting, right?

2  A.  Yeah.  Yes.

3  Q.  And so you said to Ms. Rosen, "Well, maybe the criminal

4  defense attorney wouldn't want that," right?

10:49:33  5  A.  I didn't say.

6  Q.  All right.  Then I misunderstood you.  I thought you were

7  saying something about, "Well, it's a third person, who cares,

8  we've already got two"?

9  A.  No.  My point was in the context of the note, it doesn't

10:49:43  10  exclude Mr. Robinson or the other defendant who was arrested,

11  the person who had knowledge of who was already picked up and

12  charged, and this anonymous citizen was suggesting there's a

13  third person you need to go look at.

14  Q.  All right.  But you and I would agree, would we not, that

10:50:01  15  this is absolutely Brady material, right?

16  A.  Yes.  It should be tendered during the discovery process.

17  Q.  No equivocation on your mind.  In your courtroom, if you

18  found out that the police department had this in a file back at

19  the station, you would say, "You get me this document.  I'm

10:50:14  20  giving it to the criminal defense attorney," right?

21  A.  That's correct.

22  Q.  All right.  So it did cause you concern that this document

23  was neither in the prosecutor's file or the criminal defense

24  attorney's file for the Robinson case, correct?

10:50:21  25  A.  That is missing from both those files as those files exist

1  today.

2  Q.  All right.  And, in fact, it was missing from all police

3  reports, right?

4  A.  I did not see a reference in the police report.

5  Q.  Exactly.  And if the system worked the way it works on

6  paper, then this handwritten or typewritten note would've been

7  transferred to a Supp. Report, right?

8  A.  It's commonly what's done, but not universally.

9  Q.  All right.  And that Supp. Report would've been produced,

10  right?

11  A.  And this would've been produced.

12  Q.  All right.  But wasn't, was it?

13  A.  As the files exist today, that document is not in either

14  one of the files.  So it doesn't mean it was not produced

15  during discovery back at the time of the trial.

16       THE COURT:  Mr. Loevy, when you reach a convenient

17  stopping point, we should take a break.

18       MR. LOEVY:  All right.  You want me to go until noon

19  or sooner?  I could go till noon.

20       THE COURT:  It's actually ten to 11:00.

21       (Laughter in the courtroom)

22       MR. LOEVY:  Oh!  Morning break.  I'm trying to get

23  ready for lunch.  Sorry.

24       THE COURT:  No.  No. We're not going until then.

25       MR. LOEVY:  Sorry.  I'm ready.

                 1          THE COURT:  Okay.  10 minutes, ladies and gentlemen.

                 2          COURT SECURITY OFFICER:  All rise.

                 3          (The following proceedings were had out of the

                 4          presence of the jury in open court:)

10:51:34         5          THE COURT:  So what is the argument about this?

                 6          MR. LOEVY:  Your Honor, Ms. McLaughlin found a file in

                 7  2010 and provided it to Darren O'Brien.

                 8          THE COURT:  Okay.

                 9          MR. LOEVY:  And then it went to a warehouse in 2011.

10:52:18        10          THE COURT:  Okay.

                11          MR. LOEVY:  Nobody has been able to account for it

                12  before 2010 or why it wasn't produced to the criminal justice

                13  system.

                14          MS. ROSEN:  Judge, Ms. McLaughlin didn't find it.

10:52:27        15  Ms. McLaughlin was asked by Darren O'Brien for a copy of the

                16  file because he did not have the original trial --

                17          THE COURT:  I'm trying to just figure out what this

                18  stipulation has to say about the argument people are having

                19  here.

10:52:41        20          MS. ROSEN:  The file wasn't missing.  It was --

                21          THE COURT:  Well, whoever Mr. Wronkowski is, he had no

                22  knowledge of where the file was prior to 2011.

                23          MS. ROSEN:  He was instructed to retrieve it.  And

                24  then the only other testimony on it is that Ms. McLaughlin was

10:52:58        25  asked by Darren O'Brien during the course of the

10:53:18

1  post-conviction proceeding to get -- to obtain a copy of the

2  police reports because his entire file was missing.  There was

3  no file in the -- in connection with the Valentin murder

4  prosecution.  So she ordered the file.  I mean, it was never

5  missing.  It's where it was stored.

6          MR. LOEVY:  It didn't get turned over to Mr. Wadas.

7  They're saying --

8          THE COURT:  Well, that's the contention.  Okay.

9          MR. LOEVY:  We have a file inventory control card that

10:53:33

10  we want to show Your Honor.

11          THE COURT:  Well, I want to know the stipulation.  I

12  don't want to spend the whole break talking to you.  I want to

13  know what the stipulation has to do with that argument.

14          The argument, as I understand it, was that three was

10:53:41

15  no foundation for a question about some files being lost for

16  some number of years.

17          MR. LOEVY:  Well, that was the Fields file, Your

18  Honor.  I can read the stipulation to the jury and there would

19  be no ambiguity.

10:53:53

20          THE COURT:  I don't see what a stipulation has to do

21  with that.

22          MS. ROSEN:  We can look at the stipulation and --

23          THE COURT:  All right.  Enough.  Enough.

24          (Recess from 10:53 a.m. until 10:59 a.m.)

25

1    (Jury out.)

2        THE COURT:  So the prediction that was made to me

3  yesterday that we're going to be done by noon today was absurd.

4  I mean, I can't even accept that it was in good faith.

10:59:53   5        How much more -- I mean, what witnesses are left?

6        MR. LOEVY:  We're going to finish hopefully by noon,

7  it's my intention, with this witness.

8        THE COURT:  You're going to finish with this witness

9  by noon?

11:00:03  10        MR. LOEVY:  Yes.

11        THE COURT:  That's lovely.  And then what?

12        MS. ROSEN:  And then we have the one -- the reading of

13  Mr. Lopez's criminal trial testimony, which is super short.

14        THE COURT:  Yeah.

11:00:11  15        MS. ROSEN:  And then one more witness, right?

16        MR. SOTOS:  (Nodding.)

17        MS. ROSEN:  Dr. Wixted.  And then that's it.

18        THE COURT:  Dr. Who?

19        MS. ROSEN:  Wixted.

11:00:18  20        MR. GIVEN:  Wixted.

21        THE COURT:  How long is that going to take?

22        MR. GIVEN:  Probably a couple hours.

23        THE COURT:  I mean, it's ridiculous.  We were going to

24  end today.  I mean, it's --

11:00:24  25        MS. ROSEN:  Yeah.

1     THE COURT:  We're going to end today.  Otherwise, I
2  don't know what's going to happen to this case.
3     MR. SOTOS:  Wixted's the last witness, Judge.  So
4  that's it.
11:00:33   5     THE COURT:  Well, you better figure out a way to get
6  it done.
7     We're not going to have rebuttal witnesses or anything
8  like that?
9     MR. LOEVY:  Not as it stands.
11:00:40  10     MR. SOTOS:  Plaintiff said no, so --
11     THE COURT:  Okay.  So we've got a deposition and we
12  got Wixted.
13     MR. POLICK:  Trial testimony.
14     MS. ROSEN:  Trial -- it's -- yeah.
11:00:47  15     MR. POLICK:  Yeah, this is trial testimony.
16     THE COURT:  So you -- okay.  So you better figure out
17  how to get Wixted in to some limited amount of time.  I mean,
18  what is his -- what is the -- remind me what he's about.
19     MS. ROSEN:  He rebuts Dr. Wells on the lineup issue.
11:01:02  20     THE COURT:  Okay.
21     MS. ROSEN:  And he also speaks to memory malability.
22     THE COURT:  So how long -- why should that take hours?
23     MS. ROSEN:  It -- well, from our perspective --
24     MR. GIVEN:  From our -- I was anticipating -- when I
11:01:14  25  said a couple hours, I was including cross-examination as well.

1       THE COURT:  Better figure out how to make it brief,

2  because I intend to have this evidence done by the time we

3  adjourn today.

4       MR. LOEVY:  Your Honor, one possibility would be to

11:01:25    5  bar reading Lopez's criminal testimony.  We've heard it.

6       And you have -- you have discretion.  In fact, there's

7  a Seventh Circuit case on it we can give you.

8       THE COURT:  We've heard it already?

9       MR. LOEVY:  We've heard summaries of it, and we've

11:01:38   10  seen --

11       THE COURT:  So, you know --

12       MR. LOEVY:  -- excerpts of it.

13       THE COURT:  -- I don't think that your ideas, Mr.

14  Loevy, about how to keep the defense from putting on a case --

11:01:44   15       MR. LOEVY:  Well, Your Honor, we have a Seventh

16  Circuit case --

17       THE COURT:  -- counts.

18       MR. LOEVY:  We have a Seventh Circuit case directly on

19  point where they tried to read the criminal transcript to the

11:01:51   20  jury, and Judge Kennelly said, "No.  You have to summarize it

21  or you have to put in the relevant parts," and the Seventh

22  Circuit affirmed that when they appealed it, so --

23       MR. SOTOS:  So, Judge, we're not reading the criminal

24  trial transcript of all the witnesses.  We're reading one

11:02:03   25  transcript that should take --

1       MR. POLICK:  20 minutes.

2       MR. SOTOS:  Maybe a little longer than that.

3       MR. POLICK:  Maybe 20 minutes to a half hour.

4       MS. ROSEN:  Well, just Orlando Lopez.

11:02:08   5       MR. SOTOS:  A half hour.  And that's it.

6       THE COURT:  Do we need to read the whole thing?  Can

7  you cut it down to the relevant parts?

8       MR. SOTOS:  Well, then we run into the back-and-forth

9  with trying to get agreements, which may not be --

11:02:16  10       THE COURT:  Well, I -- you know what?  I think the

11  lawyers in this case have been totally irresponsible.  I've

12  never had a case where people could not make agreements on

13  simple stuff like what you need on this trial testimony.

14       Can't you figure out what's relevant?  Forget about

11:02:31  15  them.  Can't you figure out what's relevant?

16       MR. SOTOS:  Can we cut it down and then just present

17  that?  Sure.

18       THE COURT:  Yeah.

19       MR. SOTOS:  We can do that.

11:02:36  20       THE COURT:  Well, it's your evidence.

21       MS. ROSEN:  Right.

22       MR. SOTOS:  Right.  Yeah, we were trying to -- okay.

23       THE COURT:  That would be helpful.

24       MR. SOTOS:  Right.

11:02:42  25       MR. LOEVY:  Well, Your Honor --

11:02:49

1    THE COURT:  But I am more concerned about Wixted than

2    I am about a trial transcript.

3    MR. LOEVY:  If they're going to read a trial

4    transcript, we're going to have to designate -- you know, they

5    can't just pick out of context --

6    THE COURT:  Well, you'll have to show me that -- after

7    the incredible argument you made about how they shouldn't be

8    allowed to do it, you're going to have to show me why you

9    should be allowed -- get the jury.

11:03:04

10    MR. SOTOS:  The other thing, Judge, is that witness,

11    that's going to occur before lunch, if this witness ever gets

12    -- if he gets off the stand.  So there won't be a break to do

13    that unless it's over lunch.  And I don't know how much longer

14    they have with this witness.  If he finishes --

11:03:17

15    THE COURT:  Well, I don't know either.  But everything

16    you've told to me I could just -- I could burn, you know, for

17    all the usefulness it is.

18    MR. SOTOS:  Well, I don't have any idea how long this

19    witness is.

11:03:27

20    MR. LOEVY:  I'm going to go as long as counsel went.

21    That's my goal.  And I think we'll finish before noon.

22    THE COURT:  All right.

23    MR. SOTOS:  If the -- my point is that if we do, then

24    that other read will be ready to start right then.  So it

11:03:38

25    probably makes more sense to just start it and do it rather

1  than take the lunch to -- unless you want to break a little

2  early for lunch so we could try and cut it down during lunch.

3        THE COURT:  Well, if Mr. Loevy takes as much time as

4  Ms. Rosen did --

11:03:50  5        MR. SOTOS:  We'll be at lunch.

6        THE COURT:  -- there is not going to be time for

7  anything before lunch.

8        MR. SOTOS:  Then we'll do it at lunch.

9        THE COURT:  Unless we cut the lunch shorter.  And I

11:03:58  10  don't think it's fair to do that today.  They're not prepared.

11  Tomorrow, they're going to order something in.

12        MR. LOEVY:  All right.  Let's do it.

13        THE COURT:  And then if you want to rebut with the

14  missing testimony, and you haven't already presented it, you

11:04:09  15  know, then you can make that argument.

16        MR. LOEVY:  Well, I think --

17        MR. SOTOS:  That's why it probably makes more sense to

18  just read it.

19        MR. LOEVY:  It does.

11:04:16  20        MR. SOTOS:  Because that's what'll end up happening.

21        MR. LOEVY:  It does, rather than two chunks.

22        MR. SOTOS:  And we'll just go with one lawyer, and

23  it's --

24        THE COURT SECURITY OFFICER:  All rise.

11:04:45  25   (Jury in.)

1    THE COURT:  Please be seated, everyone.

2    MR. LOEVY:  All right.  Your Honor, I'm told that

3   154-J was actually not on the Elmo when we were talking about

4   it.  So if we could have the Elmo for the jury?

11:05:00    5   BY MR. LOEVY:

6   Q.  So, sir, I apologize for going backwards here, but this is

7   the typewritten document that we were talking about before the

8   break, right?

9   A.  It is.

11:05:08   10   Q.  Where there's an anonymous concerned citizen, talking about

11   a third participant, something about a dope dealer, and, you

12   know, information that should have been turned over.

13    No dispute about that, right?

14   A.  And it may have been turned over.

11:05:23   15   Q.  May have, may not have, right?

16   A.  The -- based upon the files that we have today, it was not

17   in either one of the prosecutor or the defense attorney's file.

18   Q.  The question I asked you, though, was, should have been

19   turned over, right?

11:05:34   20   A.  This material should be turned over in discovery, yes.

21   Q.  And there are -- to use your phrase, there are indications

22   it wasn't turned over.

23    It didn't end up in any police reports, did it?

24   A.  Well, it's not in police reports, no.

11:05:46   25   Q.  All right.  And it's not in either the prosecutor's files

1  or the criminal defense files?

2  A.  As it exists today, it's not.

3  Q.  All right.  You were asked some questions about where

4  Mr. Fields' file was -- I'm sorry, Mr. Rivera's file was found,

11:05:58  5  and I'm going to show you the stipulation regarding Anthony

6  Wronkowski, which has already been read to the jury.  I'm going

7  to focus your attention here on the last paragraph.

8          No knowledge of where the file was prior to 2011, no

9  knowledge of the condition of the file, no knowledge of the

11:06:12  10  rules that would have governed the creation and maintenance of

11  the files in '88.

12          Do you have a different understanding than that, sir?

13  A.  I am not familiar with the way the police department

14  preserves their files.

11:06:22  15  Q.  All right.  And showing you Plaintiff's Exhibit 22.

16          You're familiar -- this is the inventory control card

17  you discussed with Ms. Rosen, right?

18  A.  Yes.

19  Q.  All right.  And this inventory control card suggests

11:06:33  20  that -- suggests something about the first date on the control

21  is 2011, right?

22          MS. ROSEN:  Object to the foundation, form of the

23  question.

24          THE COURT:  Is the witness familiar with this file?

11:06:44  25  With this document?

BY MR. LOEVY:

Q.  Are you familiar with this kind of document?

A.  This type of document I'm familiar with.

Q.  All right.  Have you ever seen --

THE COURT:  Overruled, overruled.

BY MR. LOEVY:

Q.  Have you ever seen the Felix Valentin investigative control card?

A.  I may have.  I don't recall at this time.

Q.  All right.  Another file you talked about with Ms. Rosen was the Demetrius Johnson file, right?

A.  Yes.

Q.  And that's the one where there's the two lineup reports regarding Bryant -- what's the guy's name?

MR. SWAMINATHAN:  Bryant Johns.

BY MR. LOEVY:

Q.  Bryant Jones?  Johns?  Bryant Johns, right?

A.  Last name is Johns.

Q.  Yeah.  And that's the one -- both lineup reports created by Guevara.  One said that there was an I.D.  One said there wasn't an I.D., right?

A.  That's correct.

Q.  And they were within a half hour of each other and the same witnesses, right?

A.  I'm not sure of the exact time, but in short order.

1    Q.  Yeah.  Maybe same day, but short order, right?

2    A.  Yes.

3    Q.  All right.  And the -- one of the reports was in the

4    official file, right?

11:07:39    5              MS. ROSEN:  Objection to form.

6    BY MR. LOEVY:

7    Q.  The permanent retention file?

8    A.  Yes.

9    Q.  And one of the reports was in the investigative file?

11:07:45    10    A.  That's correct.

11    Q.  And that's true for both the state's attorneys and the

12    criminal defense attorneys?

13    A.  Well, there are no police reports in the criminal defense

14    attorney's files in this case.

11:07:54    15    Q.  All right.  But it was true of the state's attorney's

16    files, right?

17    A.  I'm sorry.  Say again.

18    Q.  That was true of the state's attorney's file, correct?

19    A.  What was true?

11:08:03    20    Q.  That it wasn't -- only one of them, not the other one.

21    A.  At -- on this one -- yeah, the state's attorney's file on

22    this was not complete either, that's correct.

23    Q.  All right.  There was -- also you talked about with Ms.

24    Rosen the Quinones file, correct?

11:08:21    25              Let me show you the document.  It's 154-N.  This is

1 what you talked about with Eileen Rosen on McLaughlin
2 requesting photos, right?
3      MS. ROSEN:  I -- I'm sorry.  Form of the question.
4 "Eileen Rosen" what?
11:08:34   5      MR. LOEVY:  Talked about with -- I started to call her
6 "Eileen" and then I tried to say "Rosen."
7      MS. ROSEN:  So Ms. --
8      MR. LOEVY:  So Ms. Rosen.
9      MS. ROSEN:  And, you know, Judge, these are not
11:08:41  10 admitted into evidence.  I didn't move them --
11      MR. LOEVY:  All right.  I would move 154-N into
12 evidence.
13      THE COURT:  Any objection?
14      MS. ROSEN:  No objection.
11:08:49  15      THE COURT:  154-N is received.
16   (Said Plaintiff's Exhibit 154-N received in evidence.)
17 BY MR. LOEVY:
18 Q.  All right.
19 A.  I'm sorry.  What's this -- what file is this from again?
11:08:54  20 Q.  This is from Quinones.
21 A.  Quinones.  I remember the document, yes.
22 Q.  All right.  You discussed that this guy in the middle
23 (indicating) was the guy charged, right?
24 A.  Correct.
11:09:05  25 Q.  And this guy --

1  A.  One of the victims.

2  Q.  -- at the bottom was not charged, but he was a suspect,

3  right?

4  A.  It's definitely part of the police reports, yes.

11:09:13    5  Q.  And then this guy on top is nowhere referenced anywhere in

6  the file, correct?

7  A.  That's correct.

8  Q.  And you speculated -- and I think it's fair to use the word

9  "speculation" -- that maybe this guy is a request on a

11:09:23   10  different case, right?

11  A.  Yes, I did.

12  Q.  All right.  But it is, of course, an emergency request for

13  three names, correct?

14  A.  Yes.

11:09:31   15  Q.  So this might have been McLaughlin looking for information

16  on all three of these people for the same case.  We can make

17  the same speculation the other way, right?

18  A.  Yes.

19  Q.  All right.  And if that is the case, then there should be

11:09:45   20  more investigative and, in fact, official police documents

21  explaining why this person was a suspect or was excluded, if my

22  hypothetical was correct instead of yours, right?

23          MS. ROSEN:  Object to the form of the question.

24          THE COURT:  Overruled.

11:09:57   25          MS. ROSEN:  As to "official."

1  BY THE WITNESS:

2  A.  If somehow a person by the name of Harris was interviewed

3  or came to the police attention, there may be a GPR related to

4  it.

11:10:06   5  BY MR. LOEVY:

6  Q.  All right.  There should be a GPR, right?

7  A.  If he had been interviewed, yes.

8  Q.  All right.  But there's no such GPR in the official file,

9  right?

11:10:12  10  A.  Harris' name was nowhere found in the file.

11  Q.  All right.  So there is no such GPR in the official file,

12  right?

13  A.  Right.

14  Q.  All right.  Let's talk about the Borrotto case.  That's the

11:10:21  15  one where you said they found a note in the guy's pocket that

16  had some significance?

17  A.  It's a form, a license plate change form.

18  Q.  All right.  And that document wasn't in either the criminal

19  defense attorney's file or the prosecutor's file, right?

11:10:33  20  A.  No.  That document was in the defense attorney file as well

21  as the prosecutor file.  It was other documents researching the

22  sale of the car --

23  Q.  I see.

24  A.  -- and the LEADS inquiry, which were not found in the

11:10:44  25  defense attorney's file.

1  Q.  All right.  And then showing you 154-Q.  This is another
2  document from the same file.
3       MR. LOEVY:  And, Your Honor, we'd move this one into
4  evidence.  It's the note.
5       MS. ROSEN:  No objection.
6       THE COURT:  And the number is?
7       MR. LOEVY:  154-Q.
8       THE COURT:  Okay.  It is received.
9    (Said Plaintiff's Exhibit 154-Q received in evidence.)
10  BY MR. LOEVY:
11  Q.  Here's an example of a document in the investigative file
12  that was missing from both the Cook County file and the
13  criminal defense file, right?
14  A.  That's correct.
15  Q.  All right.  And so we'll never know without a GPR or
16  without a report what investigative material this related to,
17  right?
18  A.  Well, this document could have been tendered during
19  discovery as well.
20  Q.  All right.  But it -- there's no evidence it was tendered,
21  right?
22  A.  There's -- the only evidence now is that it's missing from
23  both files now.
24  Q.  All right.  So there is no evidence that it was tendered,
25  right?

1    A.  It is a type of document that would be tendered at the
2    time.
3    Q.  All right.  But there's no evidence that it was tendered,
4    right?
11:11:31    5    A.  There's no evidence that it wasn't tendered.
6    Q.  Well, except for the fact that neither the criminal
7    defendant attorney has it in their file and the state's
8    attorney doesn't have it in their file.  That's some evidence
9    it wasn't tendered, right?
11:11:41    10    A.  From files from 30 years later, yes.
11    Q.  But that is some evidence it wasn't tendered, right?
12    A.  Yes.
13    Q.  All right.  You also were asked by Ms. Rosen about the
14    Kirkland file.
11:11:53    15         MR. LOEVY:  And this is a document that I'll move --
16    154-K.  Another note.
17         MS. ROSEN:  I didn't ask about Kirkland.
18         MR. LOEVY:  All right.
19    BY MR. LOEVY:
11:12:01    20    Q.  The Kirkland file -- sorry -- was one of the six or seven
21    you looked at.
22         How many did you look at?
23    A.  The -- Mr. Brasfield claimed that there was seven files
24    that were also state's attorney files.  There's only six.  But
11:12:13    25    I looked at all seven.

1  Q.  All right.  Well, the question was, how many files did you
2  look at?
3  A.  Those seven, then two others, and then on and on.  But
4  specifically seven.
11:12:20  5  Q.  All right.  Seven is the answer.
6          So the Kirkland file is one of the seven, right?
7  A.  One of the seven, yes.
8  Q.  All right.  This note --
9          MR. LOEVY:  And then this is Plaintiff's Exhibit 154.
11:12:28  10  We move this into evidence, Your Honor.
11          THE COURT:  154-K?
12          MR. LOEVY:  Yes, K.
13          THE COURT:  Is there an objection?
14          MS. ROSEN:  No objection.
11:12:34  15          THE COURT:  It is received.
16    (Said Plaintiff's Exhibit 154-K received in evidence.)
17  BY MR. LOEVY:
18  Q.  All right.  This is an example of a document that wasn't in
19  either the criminal defense file and it wasn't in the state's
11:12:41  20  attorney's file, right?
21  A.  That's correct.
22  Q.  All right.  And that is suggestive that -- and it was in
23  the investigative file back at the police department, right?
24  A.  Correct.
11:12:49  25  Q.  That is some evidence that the police department was

1  keeping evidence in the investigative files that it wasn't

2  turning over to the criminal justice system, right?  We can

3  make that inference?

4  A.  Your -- that's your speculation, but I don't agree with it.

11:13:00  5  Q.  All right.  Well, you did make a lot of inferences with Ms.

6  Rosen, right?

7  A.  Yes.

8  Q.  All right.  This document says -- it looks like Ernest was

9  the guy with the rope; this guy, Michael, was the guy with the

11:13:13  10  bat; and maybe it says Carien -- I can't read the name -- had

11  the brick.

12       You see that, right?

13  A.  I see that.

14  Q.  And this was in a case, you remember from your review,

11:13:22  15  where there was like a beating and a bunch of people beat up a

16  guy or something like that?

17  A.  Possibly eight people beat a person to death.

18  Q.  All right.  And all the people in the liquor store saw it.

19       That could blow a case open, couldn't it, that kind of

11:13:35  20  information?

21            MS. ROSEN:  Object to the form of the question.

22            THE COURT:  Sustained.

23  BY MR. LOEVY:

24  Q.  All right.  That's the kind of information that needs to

11:13:39  25  get turned over to the criminal defense attorney, right?

1   A.  Yes.

2   Q.  And even if the person wants to remain anonymous, that

3   still has to be turned over to the criminal defense attorney,

4   right?

11:13:48   5   A.  That's correct.

6   Q.  All right.  So while there was evidence that some of the

7   documents in these investigative files didn't matter, there's

8   also some evidence that some of the documents in the CPD

9   investigative files should have been turned over, right?

11:14:04   10   A.  And, likely, they were turned over.

11   Q.  Well, you say likely they were.  You have no idea either

12   way whether, for example, this document was turned over

13   (indicating), right?  You have no idea either way whether this

14   was turned over?

11:14:14   15   A.  I don't.

16   Q.  All right.  And all you know is it wasn't in anybody's

17   files, right?

18   A.  As the files exist 30 years later, yes.

19   Q.  And all you know is it's not referenced in any police

11:14:22   20   reports, right?

21   A.  No, that's not true.  The people -- maybe not the exact

22   sentences that are written here, but the people's names were

23   listed on a GPR that was provided to the criminal defense

24   attorney back at the time of trial.

11:14:33   25   Q.  Exactly.  The criminal defense attorney got the names,

1  right?

2  A.  At least.

3  Q.  But it did not get with the rope, with the bat, or with the

4  brick?

11:14:43    5  A.  I don't know if they did not receive it.  They may have

6  received it during discovery.

7  Q.  All right.  But not in the official reports, right?

8       You reviewed this very carefully.

9  A.  I reviewed this, and this document was not found in the

11:14:53   10  criminal defense attorney file.

11  Q.  Not asking about this document on the file.  I'm talking

12  about this information.

13       With the rope, with the bat, and with the brick is not

14  in the GPR, is it?

11:15:02   15  A.  Well, the --

16  Q.  That's an easy one to answer yes or no.

17  A.  I don't know if it's easy, because there was numerous

18  people discussed and who had what.  I know the four people's

19  names were provided in a GPR report and referencing where

11:15:17   20  they -- what their involvement may be.

21  Q.  Would it refresh your recollection to look at the GPR to

22  see if the information about the rope, the bat, and the brick

23  weren't in the official GPR?

24  A.  In the official GPR or the official RD?

11:15:29   25  Q.  The GPR you just referenced.  Do you want to see --

1  A.  Sure.

2  Q.  -- the GPR?  All right.  See if that refreshes your

3  recollection.

4          MR. LOEVY:  Anand, could I get another copy, please?

11:15:39  5  Thank you.

6          Your Honor, we would move this into evidence.

7          THE COURT:  And it is?

8          MR. LOEVY:  This is --

9          MR. SWAMINATHAN:  154-M.

11:15:52  10          MR. LOEVY:  -- 154-M.

11          THE COURT:  Any objection?

12          MS. ROSEN:  No objection.

13          THE COURT:  It is received.

14    (Said Plaintiff's Exhibit 154-M received in evidence.)

11:15:54  15  BY MR. LOEVY:

16  Q.  All right.  The GPR you're referencing had the people's

17  names, right?

18  A.  Yes.

19  Q.  But it doesn't have the information that they were among

11:16:01  20  the attackers, does it?

21  A.  It does not.

22  Q.  All right.  So a system -- let's say in this particular

23  example, if the police department kept in the investigative

24  file alternate suspects with murder weapons and put into the

11:16:14  25  official reports their names but left out that information,

1  that would be a problem, right?

2  A.  I don't know if that happened here, though, but --

3  Q.  We don't know if it happened, but it would be a problem if

4  it did, right?

11:16:24  5  A.  They should include the -- at least the GPR you just

6  displayed to me.

7  Q.  All right.  That should have been in there, and it's a

8  problem if if wasn't, right?

9  A.  It should be included and provided during discovery.

11:16:34  10  Q.  All right.  And then in addition to the seven files you

11  looked at, there were other examples that had investigative

12  material missing, correct?

13  A.  The seven were -- Mr. Brasfield said there was a prosecutor

14  file.

11:16:46  15  Q.  In addition to the seven files you -- you looked at seven

16  files, right?

17  A.  Well, more than that.  But I looked at those seven that

18  were -- Mr. Brasfield claimed that there was prosecutorial

19  material missing as well.

11:16:57  20  Q.  All right.  There was stuff missing in other files, too,

21  right?

22  A.  Allegedly missing, yes.

23  Q.  And, in fact, the -- which file was it -- was it Kirkland

24  the one that you flagged?  Didn't -- you said Brasfield looked

11:17:10  25  at some and then you looked at two more.  Which were the two

1   more?

2   A.  Pacheco and Robinson.

3   Q.  All right.  The Robinson one.

4           So the one we started with with that -- the to/from

5   memo that we started with after the break -- the Rolle to/from

6   memo?

7   A.  Yes.

8   Q.  That wasn't cited by Mr. Brasfield.  You found that file.

9   This one (displaying document), right?

10  A.  Yes.

11  Q.  All right.  So was that like a spot-check by you?

12          Like, "Mr. Brasfield's talking about six or seven

13  files.  I'll look at another file.  And, well, in this file,

14  there's something that probably should have been turned over."

15  A.  The other 20 files -- the other 20 examples where there

16  were prosecutors' files and Mr. Brasfield didn't look at, I was

17  examining those documents for investigative material that was

18  missing from the prosecutor's file, and that's an example of

19  investigative material that was missing from the prosecutor's

20  file.

21  Q.  All right.  In the *Fields* case, there was some very

22  important investigative material withheld from the criminal

23  justice system, correct?

24  A.  *Fields*?

25  Q.  Yes.

1    MS. ROSEN:  Object to the form of the question.

2    THE COURT:  Overruled.

3  BY THE WITNESS:

4  A.  My understanding is on the *Fields* case that the initial

11:18:15    5  crime scene supplemental reports and GPRs were not provided to

6  the criminal defense attorneys at the time of trial.

7  BY MR. LOEVY:

8  Q.  And showing you 146-A, which is already in evidence, from

9  the *Fields* street file that was found in the basement.

11:18:27   10    The jury has seen this, but there were brothers who

11  said they were going to kill the victim.  Do you remember that?

12  A.  Vaguely.

13  Q.  And there was a GPR that didn't get turned over, that the

14  guy named Rodell Banks was the person who shot the people,

11:18:40   15  right?

16  A.  Yes.

17  Q.  And that was troublesome, right?

18  A.  That was material that should have been provided during

19  discovery.

11:18:45   20  Q.  And if, in fact, it was the practice that investigative

21  materials that were in the investigative files weren't making

22  it to the criminal justice system, that would be a problem,

23  right?

24  A.  Yes.

11:18:55   25  Q.  All right.  In the Kluppelberg problem, same sort of

1  situation.  Very important investigative material in that file,

2  too, right?

3  A.  I'm not familiar with that file.

4  Q.  Were you asked about it at your -- you were not asked about

11:19:07  5  Kluppelberg at *Fields*?

6  A.  No.

7  Q.  How about the Crocket file?  Were you asked about that one?

8         MS. ROSEN:  Objection, Judge.

9  BY MR. LOEVY:

11:19:12  10  Q.  I think this is --

11         MS. ROSEN:  Asked about it when?

12  BY MR. LOEVY:

13  Q.  I think this is a file you're familiar with, correct?  The

14  Crocket file?

11:19:18  15         MS. ROSEN:  Objection, Judge.  Sidebar.

16         THE COURT:  Well, I handled a big argument yesterday

17  about undisclosed opinions.  Are we back in undisclosed

18  opinions?

19         MR. LOEVY:  No, Your Honor.  This was a file --

11:19:25  20         MS. ROSEN:  Judge --

21         MR. LOEVY:  -- he reviewed --

22         MS. ROSEN:  -- I've never seen --

23         MR. LOEVY:  -- in *Fields*.

24         MS. ROSEN:  -- the file.

11:19:29  25         THE COURT:  I don't think -- I don't see why we need a

1  sidebar.  Has this been shared with both sides?

2          MR. SWAMINATHAN:  It has been disclosed.  It's

3  discussed by Mr. Murray in his *Fields* report, which is

4  incorporated into his report in this case.

11:19:41  5          MR. LOEVY:  It's Attachment A to his *Rivera* report.

6  It's discussed expressly.

7          THE COURT:  All right.

8  BY MR. LOEVY:

9  Q.  All right.  You're familiar with the file, right?

11:19:49  10  A.  The name sounds familiar, yes.

11  Q.  All right.  And this was an example of --

12          MR. LOEVY:  And then we would move 146-O into

13  evidence, Your Honor.  This is a GPR from that file.

14          MS. ROSEN:  I'm objecting to this document.

11:19:59  15          THE COURT:  Okay.  You're objecting on the grounds

16  that it hasn't been turned over?

17          MS. ROSEN:  Correct.

18          THE COURT:  And show me where it was turned over.

19          MR. LOEVY:  Let's find the --

11:20:07  20          MR. SWAMINATHAN:  I mean, Mr. Murray obviously had it

21  because he was opining --

22          THE COURT:  Well, I --

23          MR. SWAMINATHAN:  -- about it in his report.

24          THE COURT:  Yeah.  That's not the test, though.

11:20:12  25          MR. LOEVY:  What page is the Crocket?  Do you know,

1   Anand?

2          MR. SWAMINATHAN:  It's part of Plaintiff's Exhibit --

3   tell you in one moment.

4          MR. LOEVY:  See if you can find the Crocket in here.

11:20:21   5   I'm going to keep moving forward.

6          THE COURT:  Why don't you do something else, because

7   we're trying to move this.

8          MR. LOEVY:  All right.

9   BY MR. LOEVY:

11:20:30   10  Q.  Okay.  Now, part of your analysis in this case and in

11  *Fields* was to determine if the stuff was in the Cook County

12  state's attorney's files, then it wouldn't matter if it wasn't

13  in the criminal defendant's files.  Is that a fair summary?

14  A.  Well, in the Cook County state's attorney's files, even as

11:20:51   15  they exist today, it's indicative that it was provided during

16  discovery.

17  Q.  All right.  But you found out in the *Fields* case that there

18  was a problem with relying on the fact that the documents were

19  in the Cook County files, correct?

11:21:01   20  A.  I did not find that.

21  Q.  Didn't you find out that in 2014, when all those files were

22  found in the basement with the Fields file, the City of Chicago

23  turned over dozens and dozens of files to the state's attorney

24  to put into their files in 2014?

11:21:18   25          MS. ROSEN:  Objection to the foundation for any of

1    this.

2           THE COURT:  Yeah.  If the witness knows it, I -- I

3    think --

4           MR. LOEVY:  He's testified about it, Your Honor.  He

11:21:24    5    knows.

6           THE COURT:  Well, I -- I don't want to hear it from

7    you.

8           MR. LOEVY:  All right.

9    BY MR. LOEVY:

11:21:28   10    Q.  Can we hear it from you?

11    A.  I'm familiar with the topic, and I would disagree with the

12    way you categorize it.

13    Q.  All right.  Do you remember being -- giving this testimony?

14           MR. LOEVY:  Page 4652, lines 10 through 19.

11:21:39   15           MS. ROSEN:  What are we reading from?

16           MR. LOEVY:  This is the -- his *Fields* testimony, this

17    witness' testimony.

18           MS. ROSEN:  Deposition?  Trial?

19           MR. LOEVY:  His trial testimony.

11:21:47   20    BY MR. LOEVY:

21    Q.      "So in 2014, every document that was allegedly withheld

22    was sent to the Cook County State's Attorney's Office, right?"

23           And then there was an objection that was overruled.

24           And you said:   "They sent over the investigative files

11:21:59   25    that were found at the Area Central of the basement, all of

1  them with the stamps on them."

2      Did you give that testimony?

3  A.  Yes.

4  Q.  All right.

11:22:05  5      MS. ROSEN:  Objection.

6      THE COURT REPORTER:  I'm sorry?

7      MS. ROSEN:  Objection, not impeaching.

8      THE COURT:  Overruled.

9  BY MR. LOEVY:

11:22:10  10  Q.  All right.  And that was before you did your analysis to

11  see if the documents were in the state's attorney's files,

12  right?

13  A.  Yes.

14  Q.  So they sent over at least 50 files?  Or 50 or so?

11:22:22  15  A.  I don't remember the exact number, but it was in that

16  vicinity.

17  Q.  All right.  And if you're saying the fact that documents

18  are in the state's attorney's file proves that they were turned

19  over back during the trial back in the '80s, it's a problem for

11:22:36  20  your analysis if, in fact, they were turned over in 2014 when

21  they got located?  Do we agree about that?

22  A.  But that's not what happened in the *Fields* case.

23  Q.  That's not what happened when?

24  A.  That's not what happened in the *Fields* case.

11:22:47  25  Q.  In the *Fields* case, they located the documents in the

1  2013-2014 period in the basement, right?

2  A.  Yes.

3  Q.  And then some number of files were turned over to the Cook

4  County State's Attorney's Office at that time, right?

11:23:01  5  A.  Correct.

6  Q.  So for at least -- whatever was turned over at that time,

7  you'd no longer be able to do an analysis and say, "Well, if

8  it's in the state's attorney's file, that means it was in the

9  state's attorney's file back at the time of the criminal

11:23:12  10  trial," right?  For that subset.

11  A.  Those documents were not commingled into the documents I

12  was examining.

13  Q.  Do you have any personal knowledge as to whether they were

14  commingled or not?

11:23:20  15  A.  Just by looking at them, you could tell they weren't

16  commingled.

17  Q.  All right.  But you didn't look at the files yourself,

18  right?

19  A.  I looked at most of them, yes.

11:23:26  20  Q.  Well, you're saying you did an analysis as to whether

21  documents have been commingled?

22  A.  My recollection on this is that there was also a

23  stipulation that there may have been a handful of trials that

24  were -- files that were provided to the Post-Conviction Unit,

11:23:40  25  and I did not examine those post-conviction files when I was

1   conducting my analysis.

2   Q.  Post-conviction, separate topic.  I'm going to talk about

3   that in a second.

4          I'm just talking about the fact that the Cook County

11:23:50   5   State's Attorney's Office received documents from investigative

6   files in 2014 long after the fact, right?

7   A.  Yes.

8   Q.  All right.  So that creates at least some problems for your

9   analysis by saying, "Well, I just talked about documents that

11:24:05   10   were in the state's attorney's files.  Maybe those documents

11   got in in 2014," right?

12   A.  But those documents were not put into the State's Attorney

13   trial files, which were the ones we examined.

14   Q.  You have no personal knowledge either way, correct?

11:24:14   15   A.  But looking at them, you could tell they were not put in

16   there.

17   Q.  Well, let's say there was a file, and you looked at it --

18   and you looked at them electronically, right?

19   A.  Usually paper.

11:24:22   20   Q.  Okay.  How would you know if the document was in there back

21   in the day or it got put in in 2014 when they sent them over?

22   You can't tell?

23   A.  You can tell by the -- the texture of the documents, number

24   one, whether they're old or freshly printed.  That'd be number

11:24:37   25   one.

1  Q.  Weren't you doing that electronically?

2  A.  No.

3  Q.  Oh, you were physical -- I thought Dykema went over there

4  and you didn't see any of the pages.

11:24:44  5          MS. ROSEN:  Objection, Judge.

6          THE COURT:  I couldn't even hear the question.  I am

7  going to sustain the objection.

8          MR. LOEVY:  Okay.

9          THE COURT:  Because it went by too fast for me to even

11:24:50  10  process it.

11  BY MR. LOEVY:

12  Q.  In -- I'm sorry.  But in *Fields*, you didn't go to the Cook

13  County State's Attorney's Office, did you?

14  A.  No.

11:24:55  15  Q.  All right.  So you didn't have the originals, right?

16  A.  When they --

17  Q.  You didn't have the originals, right?

18  A.  I had copies from the trial files.  That's what I'm trying

19  to say to you.

11:25:05  20  Q.  All right.  So you can't tell from the texture from a copy?

21  A.  You can tell from the -- a lot of the police reports,

22  prosecutors had written notes on them, things of that nature.

23          You could also tell that when the modern discovery was

24  done, that they were scanned almost pristinely.  So there's a

11:25:26  25  big difference.

1   Q.  All right.  There was supposed to be a stamp that was put

2   on the documents that were sent over in 2014, right?

3   A.  Right.

4   Q.  But there was a problem with the stamping process, right?

11:25:35   5   A.  On some of them, when you printed it, the stamp got cut off

6   somehow.

7   Q.  Right.  Somehow, the State's Attorney's Office -- they

8   wanted to be sure that the documents were clearly marked as

9   having gotten there in 2014.  That was the idea of the stamp,

11:25:47   10   right?

11   A.  That's correct.

12   Q.  After they sent a whole -- a batch over without a stamp,

13   there was complaints, and then they said, "All right.  We'll

14   mark the ones that they're just getting here in 2014," right?

11:25:56   15   A.  Yes.

16   Q.  But the problem was somehow the state's attorneys, when

17   they printed them, did some kind of enlarge/shrink function

18   that printed the stamp off, something like that?

19   A.  Somehow, the stamp was not visible.

11:26:08   20   Q.  All right.  That is a problem for your analysis, right?

21   A.  But my understanding is at the time, they went through all

22   those documents, and I did not review any documents that were

23   not already in the prosecutors' files.

24   Q.  All right.  You -- who did you -- if you didn't do the

11:26:28   25   analysis of -- you didn't go page by page and make a slash what

1  was missing, right?

2  A.  Are you talking about in the *Rivera* case?

3  Q.  Let's talk about *Fields* first.

4  A.  No.

11:26:37  5  Q.  Who did that?

6  A.  That was personnel for the City's attorneys' office.

7  Q.  All right.  So you, like Mr. Brasfield, relied on attorneys

8  to do the frontline work, right?

9  A.  That's correct.

11:26:49  10  Q.  All right.  Is there anything wrong with relying on defense

11  counsel, different defense counsel to do the analysis of the

12  files and tell you what's missing, what's not?

13  A.  Missing, that's not a problem, but then what is missing and

14  the significance compared to what's found in the prosecutor's

11:27:08  15  file is different.

16  Q.  All right.  You interpreted what the significance was,

17  right?

18  A.  Yes.

19  Q.  But you relied entirely on the defense attorneys to put the

11:27:15  20  numbers in the boxes.  Is that a fair way to say it?

21  A.  Not entirely, no.

22  Q.  All right.  Well, the attorneys for the City went page by

23  page and did the analysis by themselves, correct?

24  A.  Yes.

11:27:27  25  Q.  And then they --

1    MS. ROSEN:  Your Honor --

2    BY MR. LOEVY:

3    Q.  -- sent you --

4    THE COURT:  I'm sorry?

11:27:31    5    MS. ROSEN:  I'm sorry.  Are you still talking about

6    *Fields*?

7    MR. LOEVY:  Yes.

8    MS. ROSEN:  Okay.

9    BY MR. LOEVY:

11:27:33    10    Q.  And then they sent you the pages that were missing, right?

11    A.  Yes.

12    Q.  All right.  Now you came to this case, and you didn't

13    repeat that exercise, did you?

14    A.  I was not asked to do -- to do a page-by-page analysis in

11:27:44    15    this case.

16    Q.  Okay.  Just one step at a time, though.

17    You did not repeat the page-by-page analysis from

18    *Fields* to *Rivera*, right?

19    A.  No.

11:27:51    20    Q.  All right.  And the next question you anticipated was you

21    weren't asked to do that exercise here?

22    A.  No.

23    Q.  And that is because in *Fields*, the numbers weren't so

24    favorable when you went page by page and looked at what was

11:28:02    25    missing.  You didn't like the results, right?

1    A.  Say again?

2    Q.  The reason why you didn't perform the *Fields* exercise in

3    this case is because when you went page by page in *Fields*, it

4    didn't work out so good for your client.

11:28:16    5    A.  I would disagree with that analysis.

6    Q.  All right.  In fact, you do understand that the exercise

7    was done page by page in this case; just by someone, not you,

8    right?

9    A.  Yes.

11:28:32    10    Q.  So, in other words, you understood that the attorneys

11    actually did go page by page, right?

12    A.  And I did a lot as well.

13    Q.  All right.  And then you were not asked to reform or render

14    any opinions on what that page-by-page analysis would show,

11:28:47    15    right?

16    A.  No.  I -- I did that in part.  It's in my report.

17    Q.  All right.  Sir, do you remember giving a deposition in

18    this case and being asked the following questions at page 254,

19    lines 11 through 22?

11:29:02    20         "Question" --

21         MR. LOEVY:  Can I put this on the Elmo, Your Honor, so

22    I can read it slower?

23         MS. ROSEN:  I object to that process.

24         THE COURT:  All right.

11:29:13    25    BY MR. LOEVY:

1  Q.    "In all but one of the instances that you did a

2  comparison of the criminal defense file and the materials that

3  were missing from the state's attorney's files, you found

4  materials that were missing from both files, correct?"

11:29:23   5         And this is referring back to *Fields.*

6  A.  Yes.

7  Q.  And you said -- well, sorry.  I'm still reading.

8         "In all but one case, some material was missing from

9  both?"

11:29:32  10         And I said:  "Yes."

11         And you said:  "That sounds right."

12         And then here's the question:

13         "And did you conduct any type of analysis like that in

14  this case?"

11:29:38  15         And your answer was:  "No."

16  A.  That's correct.

17  Q.  Was that truthful?

18  A.  That's truthful.

19  Q.  All right.  Ms. Rosen showed you a subpoena in 1992 for

11:30:01  20  street files.  Do you remember that?

21  A.  Yes.

22  Q.  All right.  Does that --

23    (Document published.)

24         MS. ROSEN:  Objection.  That isn't in evidence, so

11:30:10  25  just --

1    THE COURT:  I'm sorry?  I can't hear.

2    MS. ROSEN:  I did not move that into evidence, so it's

3    not --

4    THE COURT:  Okay.

11:30:15    5    MR. LOEVY:  I won't either, Your Honor.  I won't

6    either, then.

7    THE COURT:  All right, all right.

8    BY MR. LOEVY:

9    Q.  Even in 1992, nine years after the Chicago Police

11:30:20   10   Department supposedly banned the street files practice, people

11   were still having to subpoena street files, correct?

12   A.  They still use that nomenclature in the body of the

13   subpoenas, yes.  To this day, probably.

14   Q.  And the City of Chicago is supposed to have banned the

11:30:35   15   practice, right?

16   A.  Well, that's a different question related to the

17   nomenclature used in the subpoena.

18   Q.  All right.  You were in the Gang Crimes Prosecution Unit

19   for eight years, you told Ms. Rosen, right?

11:30:52   20   A.  Right.

21   Q.  Many of those cases had Gang Crime specialists/officer

22   involvement, correct?

23   A.  Yes.

24   Q.  Isn't it true that when you were prosecuting all those

11:30:59   25   years, you never, almost never saw any of the Gang Crime

1   people's notes?

2   A.  Correct.

3   Q.  So this rule about GPRs and you had to put your notes in

4   the GPRs, the Gang Crimes people were basically exempt from

5   that as far as you could tell?

6   A.  I didn't consider them exempt from it.  They -- they file

7   their own reports which supplement -- their own supplementary

8   reports, which include their information.

9   Q.  All right.  But they didn't turn over their notes, right?

10  A.  I don't know if they had notes.

11  Q.  They didn't turn over any notes, right?

12  A.  I don't know if they had notes to turn over.

13  Q.  They didn't turn over any notes, right?

14  A.  Again, I don't know if they had notes.  I never saw notes

15  from a Gang Crime specialist.

16  Q.  All right.  Saw plenty of notes from detectives, right?

17  A.  Who are given primary responsibility on investigations

18  upfront.

19  Q.  The answer is yes, right?

20  A.  Yes.

21  Q.  All right.  Every single case, you saw a lot of detective

22  notes, right?

23  A.  Yes.

24  Q.  All right.  But you saw no Gang Crimes investigator notes

25  ever?

1      MS. ROSEN:  Objection, asked and answered.

2      THE COURT:  No, it hasn't been answered.  Overruled.

3   BY THE WITNESS:

4   A.  If there's a Gang Crimes investigator note, it would be

5   included in the investigative file.

6   BY MR. LOEVY:

7   Q.  All right.  But you didn't see that in your experience?

8   A.  If I did, it was rare.

9   Q.  All right.  In your career, have you ever heard of a humper

10  report?

11  A.  I have never heard of a humper report.

12  Q.  All right.  Did you -- eight years you prosecuted gangs --

13  Gang Crimes cases, you worked with Gang Crimes specialists,

14  correct?

15  A.  That's correct.

16  Q.  All right.  I'm going to show you Exhibit 177, which is

17  already in evidence.

18      In all those years, you never saw a Gang Specialist

19  Daily Activity Report -- Summary?

20  A.  Is that the same thing you're referring to as the humper

21  report?

22  Q.  I believe so.  That's been the testimony.

23  A.  I've never seen that.

24  Q.  All right.  And showing you this line here, "Department" --

25  sorry.  "This is not an investigative report and will not

1   include information normally contained on official Department

2   reporting documents."  Do you see that language?

3   A.  I do see it.

4   Q.  That looks like an official unofficial document, doesn't

5   it?

6          MS. ROSEN:  Object to the form.

7   BY THE WITNESS:

8   A.  I'm not sure if I under --

9          THE COURT:  Sustained.

10  BY MR. LOEVY:

11  Q.  All right.  It says, "In this official document, we're not

12  going to include information that we put in our official

13  reports," right?

14  A.  I understand the reading of the words, yes.

15  Q.  All right.  If you found out that gang specialists were

16  doing this every day and writing about -- hypothetically, were

17  writing about the gang -- the cases you were prosecuting and

18  submitting these to the Chicago Police Department -- you and I

19  haven't agreed on a lot today, but you would agree that is

20  troublesome to you that that didn't get turned over?

21  A.  I wouldn't use the word "troublesome."  I'd have more

22  questions to ask.

23         This form, by that sentence you just read, seems to be

24  that it intends to be some sort of administrative form to

25  report to their bosses what they were working on.

1  Q.  Yeah.

2  A.  It's not necessarily including any information they

3  gathered from a witness or from another source.

4  Q.  Sir, you prosecuted these cases.  You took seriously your

11:33:48  5  responsibility to turn over discoverable information, correct?

6  A.  Yes.

7  Q.  Did you try to err on the side of giving everything to the

8  criminal defense attorney?

9  A.  Absolutely.

11:33:55  10  Q.  Why?

11  A.  We -- the requirements from the Supreme Court and from

12  other requirements as far as discovery responsibility, we erred

13  on the side of turning everything over.

14  Q.  All right.  And if you had known that

11:34:10  15  specialists/investigators working on cases you were prosecuting

16  were creating reports where they were accounting for their

17  activity, whether talking to witnesses, interviewing witnesses,

18  dates, et cetera, you would have said, "Sir, I need you to go

19  back to your police department right now and give me that

11:34:25  20  information so I can give it to the criminal defense attorney,"

21  wouldn't you have?

22  A.  I would err on the side of tendering that report, but I'm

23  not sure it's investigative material.  It sounds like, by the

24  nature of that sentence you read to me, that it's intended to

11:34:36  25  be some sort of way for the police department to track what

1  their officers are doing.

2  Q.  It sounds like you have no idea what it is, right?

3  A.  I've never seen it before, sir.

4  Q.  All right.  And in those eight years, if anybody would have

11:34:45  5  told you, "You know what?  There's a question about when I

6  talked to a witness, if I talked to him on the 27th or I talked

7  to him on the 28th or I talked to him on the 29th, but there's

8  actually a document that will say when I talked to him," there

9  is no doubt in your mind, you would have made it your business

11:35:00  10  to get that document to get it to the criminal defense

11  attorney, right?

12  A.  Well, I don't know when the documents were created.  You're

13  saying it's daily, but I don't understand the dating process

14  or --

11:35:09  15  Q.  Well, I don't know either, but it does say it's a daily

16  activity summary, right?

17  A.  Yes.

18  Q.  All right.  Well, can we get back to my question?  Then you

19  would agree with me, as an upstanding prosecutor, you would

11:35:19  20  say, "I am not going to prosecute this for another second until

21  I get this information to make it available to the criminal

22  defense attorneys"?

23  A.  I would tender -- I would err on the side of tendering all

24  these type of documents, but, again, I don't know the

11:35:29  25  significance of this document.

1  Q.  Because you never even heard of it and it never came to

2  your attention, right?

3  A.  That's correct.

4  Q.  Does that bother you?

11:35:36   5  A.  Well, again, it -- I would err on the side of tendering it.

6  But, again, the sentence you read, it seems to be intending to

7  be an administrative report and not a part of the

8  investigation.

9  Q.  Do you believe that the Chicago Police Department can make

11:35:47  10  its own rules and say, "You know what?  This report's going to

11  have stuff not on official reporting documents.  Therefore,

12  it's exempt from discovery"?  Does that make any sense to you?

13          MS. ROSEN:  Objection to form.

14          THE COURT:  Sustained.

11:35:58  15  BY MR. LOEVY:

16  Q.  Calling this document administrative doesn't change its

17  exculpatory potential, does it?

18  A.  It could.

19  Q.  All right.  And it might not, right?

11:36:09  20          Let's talk about administrative stuff.  I think you

21  said a lot of the stuff that is missing from the prosecutor's

22  files and the defense attorney's files, some of that could be

23  characterized as administrative, correct?

24  A.  Correct.

11:36:25  25  Q.  Things like court attendance records, that could be

1  relevant, though, couldn't it?

2  A.  I don't see how it's relevant to the investigation at all.

3  Q.  Let's say Mr. Guevara brought Orlando Lopez to court one

4  day.  If the -- if the defense attorney didn't know that,

5  wouldn't that have exculpatory potential?

6  A.  No.

7  Q.  All right.  How about attendance and assignment records?

8  You declared those as administrative.  So even if they weren't

9  turned over, you didn't have a problem with that, right?

10  A.  That's right.

11  Q.  All right.  Well, what if in a particular case, the

12  attendance and assignment record turned out to be extremely

13  important?

14  A.  Well, then you have a materiality issue to determine

15  whether it's incredibly important.

16  Q.  All right.

17  A.  On its face, it's not.

18  Q.  All right.  Well, let's say there was an issue about, for

19  example, whether Ms. McLaughlin was working on a given day.

20  Might turn out that the A&A sheet is really the biggest

21  document in the case, right?

22  A.  You're going to have to establish materiality, sir.

23  Q.  All right.  But your point as a prosecutor is you don't

24  have to establish any materiality.  You have to turn it all

25  over, right?

1  A.  But that document on its face is not part of investigating,

2  who committed the crime and what witnesses said and what

3  evidence was collected.

4  Q.  Sir, if you were the prosecutor and you had an A&A sheet

11:37:30  5  that showed that Gillian McLaughlin was working, say

6  hypothetically, on the 29th of August, would you have made a

7  decision, "You know what?  He doesn't need to get that"?

8  A.  Well, A&A reports were not provided to -- during discovery,

9  so I wouldn't have that report to begin with.

11:37:45  10  Q.  What if it was in the investigative file and you received

11  the investigative file?

12          So here's my last question on the subject.

13          You wouldn't have pulled it out of the investigative

14  file and turned over the investigative file without it, right?

11:37:54  15  A.  No.  I tended to Xerox everything and provide everything.

16  Q.  All right.  And inventories was another example of

17  something you said was administrative --

18  A.  Yes.

19  Q.  -- rather than exculpatory, right?

11:38:07  20  A.  Or inculpatory.

21  Q.  All right.  In your experience, it was typical or atypical

22  that this index would get produced to you as a prosecutor?

23  A.  I think I -- I can recall receiving it about half the time,

24  not all the time.

11:38:20  25  Q.  All right.  And that's -- it probably should have been all

1  the time, right?

2  A.  I don't know what -- when the CPD said they wanted this, to

3  include that or not, but it's -- again, to me, it's a listing

4  of documents, it's not the actual documents itself, so I

11:38:37  5  wouldn't expect to receive it.

6  Q.  Well, the rules say it gets turned over in every case,

7  right?

8  A.  That's what the Chicago Police Department's rules say.

9  Q.  All right.  So --

11:38:45  10  A.  But it's not a discovery rule.

11  Q.  And you -- you're -- you don't dispute Brasfield's numbers,

12  because you didn't audit it, right?

13  A.  Say again.

14  Q.  If Brasfield says it's only turned over in less than 10% --

11:38:56  15  it's only in less than 10% of the criminal defense attorneys'

16  files, you didn't -- let me just ask it carefully -- you didn't

17  perform any similar-type analysis to see if it was in their

18  files?

19  A.  No.  But it's 10% of the files as it exists today.

11:39:08  20  Q.  Right.  So let's look at the Exhibit 19-A, which is the

21  Rivera investigative file inventory.

22       Let's say you were performing your analysis for Ms.

23  Rosen, and you came across this document.  Would you -- let's

24  say it was in the Crocket file.  Would you have determined this

11:39:22  25  as something that should have been turned over or it didn't

1  matter if it didn't get turned over?

2  A.  It didn't matter.  It's an administrative document.

3  Q.  Well, how about if this particular document showed that

4  there's supposed to be seven GPRs and the police department

5  only gave you five?  Suddenly, we got a different situation,

6  right?

7  A.  If the police department gave the prosecutor only --

8  Q.  Right.

9  A.  Well, but I'm receiving the documents during discovery.

10  That's what I'm concerned about.

11  Q.  But let's say in the -- we have the investigative file from

12  the *Rivera* case.  You've seen it, right?

13  A.  I've never seen it.

14  Q.  All right.  Would it surprise you if that file, as

15  maintained by the Chicago Police Department, only has five

16  GPRs, not seven?

17  A.  Well, you -- it would surprise me only to the fact that how

18  did the file exist at the time it was created and how does the

19  file exist today.

20  Q.  No.  I'm talking about the Chicago Police Department file.

21      Was it your experience that police reports would go

22  missing from their investigative files?

23  A.  Not in my experience.  Not in my experience, no.

24  Q.  Have you ever heard of a lost -- we've been using the word

25  "missing."  Have you ever heard of a police report being

1  destroyed or unaccounted for at the Chicago Police Department?

2  A.  My experience has been that the police reports were in the

3  RD file or the investigative file.

4  Q.  All right.  So if we have a situation here where there's

11:40:41  5  seven GPR pages listed and there's only five in existence,

6  that's extraordinary, right?

7  A.  The -- and they're not in the investigative file?

8  Q.  Right.  That's what I'm telling you.

9  A.  I'd want to know why they're not in there.

11:40:55  10  Q.  All right.  And, in fact, if you were prosecuting the case

11  back in 1988 and you had this inventory, you could ask that

12  question, right?  Right?

13  A.  I could, yes.

14  Q.  And if you didn't have this inventory, then you couldn't

11:41:06  15  say to the police department, "I only got five.  Where's the

16  other two," right?

17  A.  Well, there's other ways to discern whether there should be

18  a GPR or not based upon the reports I would have received.

19  Q.  But not everybody has to be a detective.  That's why you

11:41:18  20  have an inventory index, right?

21  A.  When I review discovery to be tendered over, I look for the

22  supplemental reports, who was interviewed, and I expect to see

23  a GPR connected to it.  So if there were interviews of

24  witnesses that were on -- the GPRs were missing, I would ask

11:41:33  25  the police where are the GPRs without using an inventory.

1  Q.  All right.  Mr. Brasfield created a bunch of charts,

2  correct?  You've seen them in this case?

3  A.  Yeah.

4  Q.  All right.  So has the jury.

11:41:47  5  Did you audit them or check them or, you know, see if

6  they were accurate or inaccurate?

7  A.  Only as referred to the analysis I did on the seven and two

8  cases and then looking through for supplemental reports in the

9  prosecutor's file.

11:41:59  10  Q.  All right.  Would it be a fair summary that your analysis

11  was focused on comparing the stuff missing from the criminal

12  defense files and the investigative files in the state's

13  attorney files to see, you know, what we've been talking about?

14  To see which was missing, right?

11:42:18  15  A.  Starting out with the titles of the documents and then

16  looking for the reports in the prosecutor's file.

17  Q.  All right.  Mr. Brasfield issued opinions about the

18  investigative files themselves, correct?  The blue columns?  Do

19  you remember that?

11:42:35  20  A.  I relied more so on F, but I did look at G, which is that

21  document.

22  Q.  All right.  But my question was Mr. Brasfield rendered

23  opinions about the fact that the investigative files continued

24  to show evidence of handwritten stuff even after the rules were

11:42:50  25  supposed to have changed, right?

1    A.  Yes.

2    Q.  All right.  And you had a choice whether you were going to

3    offer an opinion about that or not, right?

4    A.  Whether -- I'm sorry.  About handwritten notes compared to

11:43:01    5    GPRs?

6    Q.  Yes, about -- do you remember the rules said, "We're

7    supposed to put it all in GPRs.  We're supposed to stop having

8    those informal documents," right?

9    A.  Yes.

11:43:10    10    Q.  Okay.  That's what the rules said, right?

11    A.  That's what the Chicago Police Department rules said.

12    Q.  And Mr. Brasfield did an audit and found wide-scale

13    noncompliance with that, correct?

14          MS. ROSEN:  Objection, asked and answered.

11:43:18    15          THE COURT:  Overruled.  I don't think it's been

16    answered.

17    BY THE WITNESS:

18    A.  Mr. Brasfield made that comparison.

19    BY MR. LOEVY:

11:43:26    20    Q.  All right.  Did you make an opinion about whether that was

21    true or not?

22    A.  My --

23    Q.  Let me start with yes or no and then you can explain.

24          Did you make any such comparisons?

11:43:35    25    A.  To the titles of the documents -- the types of documents, I

1  made an analysis of whether the documents were included or not,

2  but I didn't care whether they were on a handwritten note or a

3  GPR.

4  Q.  Okay.  The answer was "No" then.  You didn't look to see if

11:43:49  5  they were following the rules about using the GPR form, right?

6  A.  That was not my concern.

7  Q.  All right.  So that -- first, you didn't do it.  Now my

8  next question is why not?  Why wasn't it your concern?

9  A.  The concern is over the alleged missing documents and

11:44:02  10  whether they are commonly provided in discovery and was -- is

11  there evidence that they were provided during discovery by the

12  prosecutor.

13  Q.  All right.

14  A.  So that was the main part of my focus.  And the titles of

11:44:13  15  many documents, they could be administrative or they could be

16  investigative material.  And finally, as a prosecutor, I

17  don't -- the CPD might have a rule on using the general

18  progress report form, but for me, what's important is getting

19  the information.

11:44:27  20  Q.  All right.  Well, the rules required doing it a certain

21  way, right?

22  A.  The Chicago Police Department rules did.

23  Q.  And you saw, in practice, widespread noncompliance with

24  those rules on that subject?

11:44:38  25  A.  I don't know about widespread, but I saw it, yes.

1  Q.  And, in fact, you didn't take issue with Mr. Brasfield's

2  number that it was more than half of the files had

3  noncompliance, right?

4  A.  I didn't make a qualitative analysis of the numbers.

11:44:49  5  Q.  All right.  Would you agree with me that if the police

6  department allows widespread noncompliance with the rules, in

7  practice that that could create problems?

8  A.  The problems would be if they didn't preserve the notes.

9  Q.  All right.  Well, I did ask a slightly different question,

11:45:06  10  which is:  If you got rules on the books and you implicitly or

11  expressly say to the detectives, "Don't worry about the rules.

12  Do it how you want to do it," that could create problems?

13  A.  I don't know what they said to the detectives about that,

14  but from a discovery point of view, for a prosecutor, that's

11:45:20  15  not important.

16  Q.  Well, the to/from memo practice continued notwithstanding

17  the rules barring it, too, correct?

18  A.  It may.  It -- they may -- it continued for a time period,

19  but I haven't seen a lot of those recently.

11:45:33  20  Q.  Well, recently being, like, in 2018, right?

21  A.  Yeah.

22  Q.  All right.  But back when you reviewed the documents when

23  Mr. Rivera was convicted, it was a continuing problem, just

24  like Mr. Brasfield said, right?

11:45:44  25  A.  Well, he -- either not using the GPR form, I understand his

1    analysis there, but they are preserving the document.  That's

2    what's important to the prosecutor and for the criminal justice

3    system.

4    Q.  I was asking, they banned the to/from thing, and you were

11:45:58    5    supposed to put it in an official report, right?

6                MS. ROSEN:  Objection to the form and foundation as to

7    "banned."

8                THE COURT:  Sustained.

9                MR. LOEVY:  All right.

11:46:06   10    BY MR. LOEVY:

11    Q.  Mr. Brasfield also offered opinions about things in the

12    investigative file not making it into the permanent retention

13    official reports.

14                You reviewed Mr. Brasfield's opinions, right?

11:46:17   15    A.  Right.

16    Q.  All right.  That is also not a subject that you decided to

17    rebut, correct?

18    A.  No, I did not make -- do an analysis on that.

19    Q.  And you didn't even look at the permanent retention files,

11:46:30   20    correct?

21    A.  I looked at them for other purposes, but not for that.

22    Q.  All right.  So you limited your analysis to what you

23    discussed with Ms. Rosen, which was seeing if the missing

24    documents were important or not and which were and which

11:46:47   25    weren't?

1  A.  And if they were --

2  Q.  If they're missing at all?

3  A.  And if they were missing at all and if they were probably

4  tendered during discovery, among other things.

11:46:54   5  Q.  All right.  Showing you this demonstrative.

6       MR. LOEVY:  Your Honor, we would like permission to

7  publish, as we've been publishing, you know, charts.

8       MS. ROSEN:  If I could have a second to look at it?

9       I have an objection to using this document with this

11:47:23  10  witness, but --

11       THE COURT:  Well, I don't have the document, and

12  we're -- everybody's under strict time constraints at this

13  point, so let's move this along.

14     (Document tendered to Court.)

11:47:34  15       MR. LOEVY:  This is -- we've invoked the easel rule,

16  Your Honor, and I could write it.

17       THE COURT:  Well, the objection is that -- what's the

18  problem?

19       MS. ROSEN:  I just don't understand why it's relevant

11:47:43  20  for this witness.

21       MR. LOEVY:  These were Mr. Brasfield's opinions.

22       THE COURT:  Right, yeah, I don't -- all right.  If

23  that's the objection, why don't we see if it is relevant with

24  this witness.  I don't know.

11:47:52  25       MR. LOEVY:  May I publish it, then, Your Honor?

1    THE COURT:  Well, why don't you, I mean, figure out if

2    the witness knows anything about it.

3        Is this -- does this relate to this witness'

4    testimony?

11:48:02    5    MR. LOEVY:  Yeah.

6    BY MR. LOEVY:

7    Q.  You reviewed all Mr. Brasfield's opinions, right?

8    A.  I read his report.

9    Q.  And then you chose which ones you were going to rebut and

11:48:08    10   which ones you were going to let stand unrebutted?

11   A.  I was asked to examine the files that I examined.

12   Q.  All right.  But in consultation with counsel, you decided

13   which ones you were going to rebut and which ones you weren't

14   going to rebut, right?

11:48:19    15   MS. ROSEN:  Object to the form of the question.

16        THE COURT:  Sustained.

17        MR. LOEVY:  All right.  Your Honor, we'd ask

18   permission to publish these numbers and ask him if he disputes

19   any of them.

11:48:26    20   THE COURT:  Are these Mr. Brasfield's numbers?

21        MR. LOEVY:  Yes, Your Honor, yes.

22        THE COURT:  All right.  With the understanding that

23   these are Mr. Brasfield -- and Mr. Brasfield's terms, I assume?

24        MR. LOEVY:  Yes, Your Honor.

11:48:34    25   THE COURT:  All right.  Well, you can ask the witness

1   if he agrees or disagrees.

2          MR. LOEVY:  All right.  So I may publish?

3          THE COURT:  Yeah.

4   BY MR. LOEVY:

11:48:40   5   Q.  All right.  Showing you Mr. Brasfield's blue column,

6   Investigative Street Files Failing to Follow Special Orders.

7          These are his conclusions.  You understand that,

8   right?

9   A.  Yes.

11:48:50   10   Q.  61% not on GPRs.  Files without inventories at all, 37%.

11   Files containing at least one failure to follow the policies, a

12   hundred percent.

13          You don't dispute any of those numbers, correct?

14   A.  I have no way to confirm or dispute them.

11:49:04   15   Q.  All right.  And then the permanent retention file review --

16          MS. ROSEN:  Judge, I'm objecting to this.

17          THE COURT:  Yeah.  If the witness didn't opine on

18   these issues, I am -- it's ridiculous to ask him about this.

19          MR. LOEVY:  All right.

11:49:14   20   BY MR. LOEVY:

21   Q.  You had a choice about whether you were or weren't going to

22   opine on them?

23          MS. ROSEN:  Objection, Judge.

24          THE COURT:  No.  It's sustained.

11:49:19   25          MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  Last area, then, and that is the Rivera investigative file.

            MS. ROSEN:  Judge, objection.  He didn't review the

Rivera file or opine on it.

11:49:31            MR. LOEVY:  Your Honor, what we'd like to show him is

examples of documents and ask him if it had investigative value

to get his methodology and protocol.

            MS. ROSEN:  Objection.

            MR. LOEVY:  If he's saying it did or didn't.

11:49:42            THE COURT:  No, I'm not -- we're not going to use an

expert for purposes for which he was not called.  Sustained.

            MR. LOEVY:  All right.  May I have a moment, Your

Honor?

            THE COURT:  Sure.

11:49:49     (Counsel conferring.)

            MR. LOEVY:  Done.  Thank you.

            THE COURT:  Ms. Rosen, do you have anything further?

            MS. ROSEN:  I just have two questions.

            THE COURT:  I am going to hold you to that.

11:49:56            MS. ROSEN:  Okay.

     (Laughter.)

            THE COURT:  Two.  It doesn't mean six.

            MS. ROSEN:  Yeah.

                      REDIRECT EXAMINATION

11:50:02 BY MS. ROSEN:

1  Q.  With respect to the entirety of your review -- I have to

2  stand over here because it's kind of blocking me.  Actually,

3  you know what?

4          THE COURT:  Why don't we get rid of it.

11:50:11  5          MR. LOEVY:  I got it.

6      (Easel taken down.)

7          MS. ROSEN:  Thank you.

8  BY MS. ROSEN:

9  Q.  With respect to your review in this case of all of the

11:50:23  10  files that you reviewed, did you arrive at a conclusion

11  regarding whether or not either the state's attorney files or

12  the criminal defense attorney files were complete as they exist

13  today?

14          MR. LOEVY:  Objection, Your Honor.  That was covered

11:50:36  15  on the last exam.

16          THE COURT:  Overruled.

17  BY THE WITNESS:

18  A.  They were not complete as they exist today, either one of

19  them.

11:50:42  20  BY MS. ROSEN:

21  Q.  With respect to the review that you did in the *Fields* case,

22  which had to do with the files that were found in a basement,

23  according to Mr. Loevy, did you arrive at general conclusions

24  about whether or not the files that were reviewed that came

11:50:55  25  from the State's Attorney's Office or the criminal defense

     1   attorney's office were complete or incomplete?

     2   A.  They were incomplete.

     3          MS. ROSEN:  I have no further questions.

     4          THE COURT:  Anything further?

11:51:02     5                  RECROSS-EXAMINATION

     6   BY MR. LOEVY:

     7   Q.  They were found in the basement of the Area in file

     8   cabinets, correct?

     9          MS. ROSEN:  Objection.

11:51:08    10          THE COURT:  That's been asked --

    11          MR. LOEVY:  All right.

    12          THE COURT:  -- and answered many times.

    13          MR. LOEVY:  No further questions, Your Honor.

    14          THE COURT:  Okay.  Done?  Thank you, sir.  You may

11:51:14    15   step down.

    16          THE WITNESS:  Thank you.

    17      (Witness excused.)

    18          THE COURT:  Now, I think we have time to read that

    19   deposition.  Okay?

11:51:20    20          And the lawyers have assured me that after the reading

    21   of the deposition, there is only one remaining witness.  Right?

    22          MS. ROSEN:  Correct.

    23          THE COURT:  And I am going to make sure that we get

    24   that witness on and off before we end today, no matter what the

11:51:34    25   cost, because I am not going to be a liar based on what I

1    promised you all yesterday.

2         So let's do the deposition.  Then let's take a lunch

3    break.

4         MR. SOTOS:  We're going to tell the --

11:51:44    5         THE COURT:  Oh, it's not a deposition.  I'm incorrect

6    about that. It's a transcript.

7         MR. SOTOS:  Criminal trial testimony.

8         THE COURT:  Yeah, criminal trial testimony.

9         MR. SOTOS:  We're going to tell the witness to read

11:51:51    10   quickly, but clearly.

11     (Laughter.)

12         MR. LOEVY:  And if we could get the date.

13         THE COURT REPORTER:  Judge, could I have the name of

14   the reader, please?

11:51:56    15         MR. POLICK:  Yeah, we'll get it off there.

16         THE COURT:  Yes.  Sir, what is your name?

17         THE READER:  Dan McGinnis, M-c-G-i-n-n-i-s.

18         THE COURT:  Thank you.

19         THE COURT REPORTER:  Thank you.

11:52:05    20     (Counsel conferring.)

21         MR. SOTOS:  Judge, so everybody knows, this is the

22   criminal trial testimony of Orlando Lopez.

23         THE COURT:  Okay.

24         MR. LOEVY:  And the date?  The date?

11:52:19    25         MR. POLICK:  Yes.  The date is April 5th, 1990.

1        This is the direct examination by Mr. Victorson for

2   the State.

3             JOSEPH POLICK and DAN McGINNIS

4        called as readers herein, to read all questions by

5         Mr. Victorson and all answers given by Mr. Lopez:

6           TRIAL TESTIMONY OF ORLANDO LOPEZ

7             "DIRECT EXAMINATION

8   "BY MR. VICTORSON" (Read by Mr. Polick):

9   Q. "State your name, please.

10  A. (Read by Mr. McGinnis) "Orlando Lopez.

11  Q. "Mr. Lopez, how old are you?

12  A. "Thirteen.

13  Q. "Mr. Lopez, do you know what it means to tell the truth?

14  A. "Yes.

15  Q. "And do you know what happens if you don't tell the truth?

16  A. "I'll be punished.

17  Q. "And you have just taken an oath to tell the truth here

18  today in court?

19  A. "Yes.

20  Q. "And that's what you're going to do?

21  A. "Yes.

22       "MR. VICTORSON: Your Honor.

23       "THE COURT: I find him competent.

24  "BY MR. VICTORSON:

25  Q. "Mr. Lopez, do you recall where you were on the 27th day of

1  August at about 3:40 in the afternoon?

2  A.  "I was downstairs to go to the store.

3  Q.  "Were you going downstairs to go to the store?

4  A.  "Yes.

11:53:09  5  Q.  "When you say downstairs, do you mean your house?

6  A.  "Yes.

7  Q.  "Where were you living at that time?

8  A.  "On the building, 3320 West Cortland.

9  Q.  "And where was the store you were going to?

11:53:22  10  A.  "Kenmore and --

11  Q.  "Kimball and Cortland.  Now, was that a whole block away

12  from your house or just on the corner?

13  A.  "On the corner.

14  Q.  "About half a block from your house?

11:53:32  15  A.  "Yes.

16  Q.  "Not even a half a block?

17  A.  "Not half.

18  Q.  "This is 3:40 in the afternoon and it's light out?

19  A.  "Yes.

11:53:38  20  Q.  "What type of store were you going to?

21  A.  "The video game store with the candy and stuff.

22  Q.  "Were you going to buy some candy?

23  A.  "Yes.

24  Q.  "When you came out of your house, did you see anything

11:53:49  25  unusual that attracted your attention?

1  A.  "Yes, when they were shooting Felix.  When they were

2  shooting him, I started running to the store instead of just

3  going to the store.

4  Q.  "When you came out of the house and you say they were

11:54:02  5  shooting Felix, exactly what did you see?

6  A.  "When they were shooting at him.

7  Q.  "Was Felix in the car?

8  A.  "Yes.

9  Q.  "What color car?

11:54:09  10  A.  "Red.

11  Q.  "And where was the car parked?

12  A.  "In the alley.

13  Q.  "The alley by your house?

14  A.  "Yes.

11:54:14  15  Q.  "The alley that runs between Kimball and what street?

16  A.  "Cortland.

17  Q.  "It's got to run between Kimball and another north-south

18  street, doesn't it?

19  A.  "The alley is on the -- Courtland is" on the way [sic] to

11:54:27  20  -- "the alley's cut through, between.

21  Q.  "The car was parked in the alley by your house?

22  A.  "Yes.

23  Q.  "I'll show you what's been marked as People's Exhibit 2 for

24  identification.  I ask you if this is the car that the deceased

11:54:40  25  Felix Valentin was in?

1  A.  "Yes.

2  Q.  "At the time that he was sitting in that car, that car

3  wasn't all smashed up like that, was it?

4  A.  "No.

11:54:52  5  Q.  "Was he sitting in that car by himself?

6  A.  "Yes.

7  Q.  "You say you heard gunshots?

8  A.  "Yes.  It was not loud.  It was low.

9  Q.  "Not very loud?

11:55:00  10  A.  "Not loud.

11  Q.  "And did you see who was holding the gun?  Who had the gun?

12  A.  "Yes.

13  Q.  "At that time, did you see the person's face who had the

14  gun?

11:55:10  15  A.  "No.  He had his back turned shooting at Felix.

16  Q.  "Felix was in the car?

17  A.  "Yes.

18  Q.  "How far was this man from -- with the gun from Felix?

19  A.  "Real close.

11:55:19  20  Q.  "You knew Felix before, is that right?

21  A.  "Yes.

22  Q.  "Because he's a friend of your sister's?

23  A.  "Yes.

24  Q.  "So when you say he was close to Felix, about five feet,

11:55:27  25  maybe?

1  A.  "Real close.

2  Q.  "What did you do when you saw this man shooting Felix?

3      "By the way, what was the man wearing?  You saw him

4  from the back?

11:55:36  5  A.  "All black.

6  Q.  "What?

7  A.  "Black.

8  Q.  "All black?

9  A.  "Yes.

11:55:40  10  Q.  "Do you recall what color or type of shoes he had on?

11  A.  "Gym shoes.

12  Q.  "About how tall was the man?

13  A.  "Like 5'9, 5'10.

14  Q.  "Aside from being dressed in black, did he have any other

11:55:52  15  colors on?

16  A.  "His hair was brown or gold.

17  Q.  "His hair was what?

18  A.  "Gold or brown.

19  Q.  "Was part of it dyed, you mean?

11:55:58  20  A.  "Yes.

21  Q.  "Was he wearing the colors of black and yellow and black

22  and gold?

23  A.  "Yes.

24  Q.  "Are you familiar with the gangs in your area?

11:56:06  25  A.  "You know, I don't talk to them.

1  Q.  "But you know about them, something about the gangs?

2  A.  "Not that much.

3  Q.  "Do you know the colors of the gangs?

4  A.  "Yes.

11:56:13  5  Q.  "What colors do the Latin Kings use?

6  A.  "Black and yellow.

7  Q.  "Those are the colors that you saw this man had who was

8  doing the shooting?

9  A.  "Yes.

11:56:21  10  Q.  "What did you do when you saw this going on?

11  A.  "I went to the store to tell the store to call the police.

12  They didn't want to do that, so I ran back.

13  Q.  "When you ran back, where did you go?

14  A.  "By my house.  There's a dent right here, and I hid right

11:56:36  15  here.

16  Q.  "A dent?

17  A.  "Yes.

18  Q.  "Indentation?

19  A.  "Yes.

11:56:42  20  Q.  "Let me show you what's been marked as People's Exhibit No.

21  3 and ask you if you can identify what's depicted in that

22  photograph?

23  A.  "Depicted?

24  Q.  "What does it show?

11:56:54  25  A.  "That the car was right here.

1    Q.  "It shows the alley where the car that Felix was parked?

2    A.  "Yes.  And he was right here, and I was hiding over here.

3    Q.  "You were hiding on the other side of this indentation?

4    A.  "Yes.

11:57:07    5    Q.  "So approximately how far were you from where -- you came

6    back to the store and you say you hid behind the indentation?

7    A.  "Yes.

8    Q.  "Approximately how far were you when you were hiding from

9    the man with the gun?

11:57:18    10    A.  "Not far.

11    Q.  "When you got back there, what -- when you got to your

12    hiding place, what was going on?

13    A.  "He shot the last time.  He ran back to the car.

14    Q.  "When he ran back to the car, to that red car?

11:57:32    15    A.  "He turned around to look who was around, so I didn't see

16    nobody.  So he put the gun right here.  So he ran to the car,

17    to the passenger, and started, and the car went.

18    Q.  "Where was that red car parked?

19    A.  "In the alley.

11:57:49    20    Q.  "That he ran and parked in the middle of the street?

21         "Was there another person in the car?

22    A.  "Yes, driving.

23    Q.  "When he ran back to the car, did he run by where you were?

24    A.  "No.

11:58:00    25    Q.  "But when he turned, did he face you?

1   A.  "No -- yes, he did, he face me, but he didn't saw me.

2   Q.  "He didn't see you?

3   A.  "No.

4   Q.  "Because you were hiding behind the indentation?

11:58:13   5   A.  "Yes.

6   Q.  "How far was he from you when he turned and ran back to the

7 car?

8   A.  "Like, you know, three feet away.

9   Q.  "Did you have a clear view of his face?

11:58:25  10   A.  "Yes.

11   Q.  "The man that you saw turn around and run back to the red

12 car --

13   A.  "To the brown car.

14   Q.  "To the brown car.  Pardon me.  That was a brown car?

11:58:34  15   A.  "Yes, he ran to.

16   Q.  "Do you know what kind of car it was?

17   A.  "Chevy.

18   Q.  "When you saw him turn around and run back to the Chevy,

19 did you recognize that person?

11:58:42  20   A.  "Yes.

21   Q.  "That was the person you had seen before?

22   A.  "Yes.

23   Q.  "Where did you know that person from?

24   A.  "Humboldt.

11:58:50  25   Q.  "Humboldt Park?

1  A.  "Yes.

2  Q.  "What did you used to see that person doing at Humboldt

3  Park?

4  A.  "Playing baseball.

11:58:55  5  Q.  "Do you see that person in court today?

6  A.  "Yes.

7  Q.  "Point him out.

8       "The man with the sweater on over there?

9  A.  "Yes.

11:59:04  10      "MR. VICTORSON:  For the record, the in-court

11  identification of the defendant, Jacques Rivera.

12  "BY MR. VICTORSON:

13  Q.  "Did you know this" -- "his name at that time?

14  A.  "No.

11:59:11  15  Q.  "How many times had you seen him at Humboldt Park prior to

16  the time you saw him shooting Israel Valentin?

17  A.  "Three to two.

18  Q.  "Two or three times?

19  A.  "Yes.

11:59:22  20  Q.  "What did you do after he got in the car?

21  A.  "I stood there, and that's when Israel came down running to

22  the car, got in the car, pushed his brother to the other side

23  so he could go to take his brother to the hospital.  And that's

24  when he left and I stood outside.

11:59:40  25  Q.  "Israel Valentin was the deceased -- in this case, his

1  brother; is that right?

2  A.  "Yes.

3  Q.  "The dead man, Felix Israel, was his brother?

4  A.  "Right.

11:59:48  5  Q.  "What did you do after -- let me ask you one more question

6  about Mr. Rivera.

7       "When he got into the brown car, the car took off; is

8  that right?

9  A.  "Yes.

11:59:56  10  Q.  "Where did he go?

11  A.  "Right through Spaulding.

12  Q.  "And then you lost sight of it?  What did you do after

13  Felix Valentin's brother came down and tried to take him to the

14  hospital?

12:00:05  15  A.  "My sister came down and my sister asked me who did it.  I

16  told her I didn't -- I know.

17  Q.  "You told her you knew?

18  A.  "Yes.

19  Q.  "Then what happened?

12:00:17  20  A.  "She walked to go to her house, to Felix's house, and this

21  lady picked me up to go take my two sisters to her house; and

22  then we took her, and then [sic] she went to call the police

23  over there.  She told what happened.  And the lady that drove

24  me over there with my two sisters took me back home.

12:00:35  25  Q.  "And that night at your home, did some police officers come

1   over?

2   A.   "Yes.

3   Q.   "And did you tell them what you had seen?

4   A.   "Yes.

12:00:41  5   Q.   "Did you tell them what color you had seen Mr. Rivera

6   wearing and the fact that part of his hair was dyed yellow?

7   A.   "Yes.

8   Q.   "And did they bring some book for you to look at?

9   A.   "Yes.

12:00:51  10  Q.   "What type of books were those, do you know?

11  A.   "Gang books, faces.

12  Q.   "They were -- they had photographs of gang members?

13  A.   "Of gangs.

14  Q.   "Do you know which gang they were showing you?

12:01:02  15  A.   "Kings.

16  Q.   "How long did you look at those gang photograph books?

17  A.   "An hour.

18  Q.   "And how many books did you look through?

19  A.   "Two.

12:01:10  20  Q.   "Do you recall how many photographs were in each book?

21  A.   "Four.

22  Q.   "Four photographs on each page, you mean?

23  A.   "Five.

24  Q.   "On each page?

12:01:18  25  A.   "Yes.

1    Q.   "How many pages in the book, in each book?

2    A.   "Like 50, around there.

3    Q.   "And in the first book, you didn't pick out anyone at all?

4    A.   "No.

12:01:27    5    Q.   "Did you go through most of the second book before you came

6    to --

7    A.   "Yes.

8    Q.   "And when you saw Mr. Rivera, did you see a photograph

9    there that you recognized?

12:01:34    10    A.   "Yes.

11    Q.   "Whose photograph was it?

12    A.   "Jacques Rivera.

13    Q.   "The defendant in this case?

14    A.   "Yes.

12:01:41    15    Q.   "When you came to his photograph, what did you do?

16    A.   "Tell the police that that was him.

17    Q.   "And when did the police leave?

18    A.   "Not then, started asking me more questions, and they left

19    after.  They asked me like three questions and then they left.

12:01:55    20    Q.   "Now, on the 15th day of September, 1988, at about 7:15 in

21    the evening, did you have occasion to be at Area 5 Violent

22    Crimes at 300 Central?

23    A.   "Yes.

24    Q.   "How did you get over there?

12:02:06    25    A.   "The police took me over there.

1  Q.  "The purpose of going over there was what?

2  A.  "To pick out who did it.

3  Q.  "You were going to see a lineup?

4  A.  "Yes.

12:02:13  5  Q.  "And did you, in fact, view a lineup?

6  A.  "Yes.

7  Q.  "Did you see the person in the lineup who had committed

8  this murder?

9  A.  "Yes.

12:02:21  10  Q.  "Who did you pick out of the lineup?

11  A.  "Jacques Rivera.

12  Q.  "I'll show you what I have marked as People's Exhibit No. 4

13  for identification.  I'll ask you if this photograph correctly

14  and accurately depicts and shows the lineup that you viewed on

12:02:35  15  the 15th of September, 1988.

16  A.  "Him in the middle.

17  Q.  "Is that the photograph of the lineup that you saw?

18  A.  "Yes.

19  Q.  "Put an X over the head of the person you identified.

12:02:49  20      "MR. VICTORSON:  Indicating for the record, Your

21  Honor, the defendant, Jacques Rivera, in the middle.

22  "BY MR. VICTORSON:

23  Q.  "Everything you testified to here today in court occurred

24  here in Chicago, Cook County, Illinois?

12:02:58  25  A.  "Yes."

1      MR. POLICK:  This is now the cross-examination by

2  Mr. Wadas on behalf of Mr. Rivera.

3                "CROSS-EXAMINATION

4  "BY MR. WADAS:

12:03:07   5  Q.  "Mr. Lopez, on this date, this was a Saturday; is that

6  right?

7  A.  "Yes.

8  Q.  "And this happened in the afternoon, is that right?

9  A.  "Yes.

12:03:13  10  Q.  "And this happened in the late afternoon?

11  A.  "Yes.

12  Q.  "Do you know about what time?

13  A.  "3:42.

14  Q.  "When you came out of your home, how far was your house

12:03:25  15  from where Felix's car was?

16  A.  "It was close.

17  Q.  "Well, like what, one house, less or what?

18  A.  "No, because there was a landing, and this is my house

19  right there; and when I came down, I saw him.

12:03:36  20  Q.  "How far from your house?

21  A.  "Not far.

22  Q.  "Was the car parked like right in front of your house?

23  A.  "Side of my house.

24  Q.  "Like one house away, maybe, or a half a house away?

12:03:45  25  A.  "No.

1   Q.  "The alley runs right next to your house, is that right?

2   A.  "Yes.

3   Q.  "His car was parked in the alley?

4   A.  "Yes.

12:03:51  5   Q.  "You come down and then the car like is over to your right?

6   A.  "Yes.

7   Q.  "And someone whose back to you was firing at Felix?

8   A.  "Yes.

9   Q.  "How long have you known Felix?

12:03:59  10   A.  "Like a year.

11   Q.  "He was, what, dating your sister?

12   A.  "No.  It was a friend of my sister's.

13   Q.  "Just a friend of your sister.

14        "Felix was in a gang, is that right?

12:04:07  15   A.  "No.

16   Q.  "The Campbell Boys, as a matter of fact, is that right?

17   A.  "The brothers were.

18   Q.  "Felix's brothers were Campbell Boys?

19   A.  "Yes.

12:04:15  20   Q.  "But Felix was not a Campbell Boy?

21   A.  "No.

22   Q.  "Do you know the colors of the Campbell Boys?

23   A.  "Yes.

24   Q.  "What's that?

12:04:21  25   A.  "Red and blue.

1  Q.  "Red and blue?

2  A.  "Yes.

3  Q.  "Do you know a gang called the Imperial Gangsters?

4  A.  "Yes.

12:04:27  5  Q.  "What's their colors?

6  A.  "Pink and black.

7  Q.  "Was the man that was shooting at Felix wearing a hat?

8  A.  "No.

9  Q.  "Did you see the man inside the car, by the way?

12:04:36  10  A.  "No.

11  Q.  "Could you tell how he was dressed?

12  A.  "I didn't see him because I was looking.  I was right there

13  when the guy was shooting at Felix.

14  Q.  "Now, at that point in time, you didn't see the man's face?

12:04:48  15  A.  "No, sir.

16  Q.  "Did you then run to the store?

17  A.  "Yes, to tell to call the police.

18  Q.  "When you went to the store, how long did it take you to

19  run down to the store, about?

12:04:58  20  A.  "Ten seconds, or five, less than ten.

21  Q.  "You didn't call the police from there, is that right?

22  A.  "No.

23  Q.  "You just told somebody else to call the police?

24  A.  "Yes.

12:05:07  25  Q.  "Then you ran back to your house?

1  A.  "No.  To hide in one of the -- you know, where I was hiding

2  at.

3  Q.  "Was that back at your house?

4  A.  "No.

12:05:16   5  Q.  "Where was that?

6  A.  "In front of where they were shooting at him.  There was --

7  right here.  It's just like just grass.

8  Q.  "Now I'm showing you this photograph that's marked as

9  People's Exhibit No. 3 for identification.  That's the one you

12:05:32  10  identified already.

11  A.  "Yes.

12  Q.  "Where was the car where Felix was in?

13  A.  "Right here.

14  Q.  "Right by the alley?

12:05:38  15  A.  "Yes.

16  Q.  "In this photograph, the building that's shown in that

17  photograph, is that where you live?

18  A.  "Yes.

19  Q.  "And is the doorway that you came out of shown in that

12:05:47  20  photograph?

21  A.  "No.

22  Q.  "How far off of this photograph is the doorway where you

23  came out of your house?

24  A.  "That's -- if you look, it right here, a little more over

12:05:57  25  here.

1  Q.  "And Felix's car was right in the mouth of that alley here?

2  A.  "Yes, parked more close to the wall.

3  Q.  "Does this picture show where the hiding place was?

4  A.  "No.

12:06:08  5  Q.  "Was the hiding place on this side of the street?

6  A.  "It was that side, but over here this way.

7  Q.  "Further down this way?

8  A.  "Yes.

9  Q.  "The car was right here?

12:06:18  10  A.  "Yes.

11  Q.  "Where was the shooting where the" -- "Where the shooting

12  was happening?

13  A.  "Yes.

14  Q.  "When was the first time that you saw what you say Mr.

12:06:26  15  Rivera's face was?  Was it right after he stopped shooting?

16  A.  "When he stopped shooting, that's when he ran and tried to

17  look around.

18  Q.  "That's when you saw his face?

19  A.  "Yes.  That's when I saw his face.

12:06:37  20  Q.  "You were not three feet from him at that point?  Three

21  feet, do you know what three feet is?

22  A.  "Yes.

23  Q.  "This would be like about three feet, for the record, from

24  me to you.  You were not three feet from where Felix was being

12:06:48  25  shot, is that right?

1   A.  "Yes, because it was like, you know.

2   Q.  "You were three feet from where he was being shot?

3   A.  "No.

4   Q.  "Your hiding place was on the same side of the street as

12:06:59  5  shown in this photograph?

6   A.  "Yes.

7   Q.  "But off the photograph here?

8   A.  "Yes.

9   Q.  "Was it like over by the next building, next door?

12:07:04  10  A.  "No.

11   Q.  "What was it?  In a gangway or where was it?

12   A.  "The door was right here, and then as soon as you go out of

13  the door, there's another place right here.  Right here I hid.

14   Q.  "So it was like in a doorway?

12:07:18  15  A.  "No.  The door was right here.  And then when I came out,

16  and when I came back to the store, instead of going in there, I

17  came close to the door, this far away from the door.

18   Q.  "The door of your building?

19   A.  "Yes.

12:07:32  20  Q.  "Were you like behind a tree or something?  Or bushes?

21   A.  "I was behind the thing right there, like the -- the park.

22   Q.  "I don't know if that picture would help you.

23   A.  "This right here.  I was sitting right here, but I was on

24  the other side.

12:07:48  25  Q.  "Where was the building?  For the record, like where the

1  building protrudes out a little bit, there's a place where you

2  would like --

3  A. "Hide.

4  Q. "Maybe one feet or two feet where you could stand back and

12:07:59   5  not be seen?  This picture, People's Exhibit No. 3 for

6  identification, shows that building protruding close to where

7  the shooting occurred, but you were on the opposite side of

8  that?

9  A. "Yes."

12:08:09   10        MR. POLICK:  By Mr. Victorson:  "Does this picture,

11  People's No. 3 for identification, show where the other car

12  was?  Not the one that Mr. Valentin was in.

13        "THE WITNESS:  No, it doesn't show.

14        "MR. VICTORSON:  But it wasn't in the alley, was it?

12:08:22   15        "THE WITNESS:  Felix's car was in the alley.

16        MR. POLICK:  Continuing.

17  "BY MR. WADAS:

18  Q. "The other car?

19  A. "No.

12:08:27   20  Q. "Where was that car?  Was it on the street?

21  A. "It was on the street, on the street up --

22  Q. "Now, was it on -- would it have been to the -- farther

23  away from you, from the alley or would it have been closer to

24  you?

12:08:39   25  A. "Farther away.

1  Q.  "So after the person did the shooting, he then went further

2  away from you to the car?

3  A.  "He went like this.  The car right here.  He was right

4  here, so he ran the other way.  He ran this way where the car

12:08:54  5  was.

6  Q.  "After the shooting, did he not walk towards you, walk

7  further away?

8  A.  "Further away.

9  Q.  "Now, was the person wearing any kind of hat at all?

12:09:02  10  A.  "No.

11  Q.  "And did he have a jacket?

12  A.  "Yes, a black jean jacket.

13  Q.  "Black jean jacket?

14  A.  "Yes.

12:09:08  15  Q.  "Jeans?

16  A.  "And jeans.

17  Q.  "Were they blue jeans or black?

18  A.  "Black.

19  Q.  "His hair was?

12:09:14  20  A.  "In the back, brown.

21  Q.  "Brown, but there was like a gold?

22  A.  "Yes.

23  Q.  "Dyed thing?

24  A.  "Yes, dyed.

12:09:21  25  Q.  "Ponytail like?

1 A. "Yes.

2 Q. "When you came back to that hiding place that you were at,

3 you never got any closer to the car that Felix was in; is that

4 right?

12:09:30    5 A. "No, right.

6 Q. "When this person stopped shooting, he then --

7 A. "Turned around, but like further away. He ran and then he

8 further went. He ran kind of where he turned around and I saw

9 his face.

12:09:44    10 Q. "That was the first time you saw his face?

11 A. "Yes.

12 Q. "You saw his face for a very brief moment?

13 A. "Yes.

14 Q. "And then you didn't see his face again until when you saw

12:09:52    15 you picked out the photograph later?

16 A. "Yes.

17 Q. "Then the police brought you to the police station a few

18 days later?

19 A. "Yes.

12:09:59    20 Q. "Then you viewed a lineup?

21 A. "Yes.

22 Q. "Now, how far from Humboldt Park do you live?

23 A. "Like a mile.

24 Q. "And do you go to Humboldt Park?

12:10:07    25 A. "Yes, sometimes.

1  Q.  "By yourself?

2  A.  "With my friends.

3  Q.  "You don't belong in a gang, is that right?

4  A.  "No.

12:10:12  5  Q.  "You're saying that you had seen Mr. Rivera in Humboldt

6  Park playing baseball a few times before that, and that's how

7  you knew it was him?

8  A.  "Yes.

9  Q.  "When you went to the store after the shooting, how many

12:10:22  10  shots did you hear initially?

11  A.  "When I went to the store?

12  Q.  "When you first came out of your house, there was shooting

13  going on right away?

14  A.  "Yes, like four times.

12:10:32  15  Q.  "And you ran to the store?

16  A.  "Yes.

17  Q.  "And is the store like the next building over or how far

18  away is the store?

19  A.  "Not far away from the house.  It's at the corner.

12:10:41  20  Q.  "Is your house on the corner?

21  A.  "No.

22  Q.  "How many houses off the corner is your house?

23  A.  "Off the corner, the building.

24  Q.  "Your building is one of those large buildings that takes

12:10:50  25  up more or less than part of the street, is that right?

1  A.  "Yes.

2  Q.  "So it took you about ten seconds to get to the store, is

3  that right?

4  A.  "Yes.

12:10:57   5  Q.  "And how long were you in the store?

6  A.  "Five seconds.

7  Q.  "To tell them to call the police?

8  A.  "Yes.

9  Q.  "Who did you talk to in the store?

12:11:03  10  A.  "The one who owns the store.

11  Q.  "What did he say?

12  A.  "He said he didn't see anything.  So I started running

13  back.

14  Q.  "When you run back --

12:11:11  15  A.  "Yes.

16  Q.  -- "you run back real fast?

17  A.  "Like ten seconds or less.

18  Q.  "To get back?

19  A.  "Yes.

12:11:16  20  Q.  "And the man was still shooting?

21  A.  "After I got back, he shot last time.  He ran.

22  Q.  "Mr. Lopez, you told -- you talked to the police, is that

23  right?

24  A.  "Yes.

12:11:26  25  Q.  "When at" -- "When at first, night?

1    A.   "In the night.

2    Q.   "And they interviewed you about this case, is that right?

3    A.   "Yes.

4    Q.   "Did you -- were you re-interviewed about the case at a

12:11:37    5    later point in time?

6    A.   "First, they asked me and then they came.  Some other

7    police came again.

8    Q.   "You were interviewed quite a few times about this, is that

9    right?

12:11:47    10    A.   "Yes.

11    Q.   "Now, did you ever tell the police that you were coming out

12    of the store at the corner of Kimball and Cortland when you

13    saw -- listen to me very carefully.

14         "Did you ever tell the police you were coming out of

12:11:59    15    the store at the corner of Kimball and Cortland and that you

16    observed a copper-color General-Motors-type car coming out of

17    the alley traveling northbound.  The vehicle turned eastbound

18    at Cortland, stopped at 331 West Cortland; and then at that

19    point in time, two men were in the vehicle.  One exited from

12:12:17    20    the passenger's side of the vehicle and walked to where

21    Valentin was seated in his vehicle, and then you heard three

22    shots?  Did you ever tell the police that?

23         "Do you understand the question?

24    A.   "No.

12:12:29    25    Q.   "Did you ever -- let me break it down.

1      "Did you ever tell the police that you were already in

2    the store and coming out of the store and that the shooting

3    didn't start happening until after you came out of the store?

4    Did you ever tell the police that?

12:12:41   5    A.  "When I went down, he was shooting.  He -- and when I went

6    to the store.

7    Q.  "Just listen to me.  When you talked to the police

8    officers, did you tell them that there was no shooting until

9    after you came out of the store?

12:12:54  10    A.  "No.

11    Q.  "Did you ever tell the police that you saw two men in the

12    car?

13    A.  "Saw one man.

14    Q.  "So you never told the police that you saw two men in the

12:13:02  15    car?

16    A.  "Wait up.  Okay.  When I went to ran, the one man was in

17    the car and he was out there.  Then after he finished shooting,

18    that's when I came in and there was two people and he finished

19    shooting.  That's when he left.

12:13:19  20    Q.  "Do you remember telling the police that this shooting did

21    not start until after you came out of the store?

22    A.  "I do not remember.

23    Q.  "You never told the police about being in some hiding

24    place, is that right?

12:13:29  25    A.  "Yes, I did tell them I was in a hiding place at the time

1    he was shooting.

2    Q.  "Now, when you viewed that lineup, you were also shown a

3    photograph of some other person?

4    A.  "Some other people with him, yes.  There was some other

12:13:41    5    people with him in the lineup.

6    Q.  "After the lineup or at the time of the lineup, were you

7    shown some photographs there?

8    A.  "I don't remember.

9    Q.  "Were you ever shown a photograph of a man named Rodriguez

12:13:51    10    that was in the Imperial Gangsters?  Did the police ever show

11    you his photograph?

12    A.  "No.

13    Q.  "They did not?

14    A.  "They showed me some other pictures of some other gang

12:14:00    15    members.

16    Q.  "Did you see any Imperial Gangsters photographs?

17    A.  "I do not remember Gangsters.  I don't even know Gangsters.

18    Q.  "Do you remember telling the police that a man named Jose

19    Rodriguez was not the shooter?

12:14:13    20    A.  "I do not know.

21    Q.  "After looking at his photograph, did that ever happen?

22    A.  "I don't remember."

23         MR. POLICK:  Redirect examination by Mr. Victorson for

24    the State.

12:14:22    25                    "REDIRECT EXAMINATION

1  "BY MR. VICTORSON:

2  Q.  "Mr. Lopez, when Mr. Rivera turned after he was done

3  shooting Felix Valentin to run back to the car, he got in on

4  the passenger's side of that car?

12:14:32  5  A.  "Yes.

6  Q.  "When he turned, did you get a clear view of his face?

7  A.  "Yes.

8  Q.  "And how close now were you to him when you saw his face at

9  that time?  As close as I am to you now?

12:14:43  10  A.  No, further.

11  Q.  "When it's about the same distance, tell me to stop.  Okay?

12  A.  "Up to you [sic], you know, where those people are over

13  there.

14  Q.  "Right here?

12:14:51  15  A.  "Over there.

16  Q.  "These people back here?

17  A.  "Yes.

18  Q.  "Right about there?  This would be about the distance you

19  were?

12:14:57  20  A.  "Yes.

21        "MR. VICTORSON:  For the record" --

22        MR. POLICK:  Mr. Wadas interrupts:  "35, 40 feet.

23        "THE COURT:  No.

24        "MR. VICTORSON:  25, 30.  That's all I have.

12:15:09  25  "BY MR. VICTORSON:

1    Q.  "In all these photographs that you viewed, People's

2    Exhibits 2, 3, and 4, they all correctly and accurately depict

3    the car, the red car, and your building in the alley, and the

4    lineup; is that correct?

12:15:21    5    A.  "Yes."

6            MR. POLICK:  That concludes the testimony, Your Honor.

7        I have some exhibits to admit.

8            THE COURT:  Okay.  And it's exactly the time for lunch

9    break.  Let's take an hour, ladies and gentlemen.  We'll start

12:15:33    10   at 1:15.

11      (Jury out.)

12           THE COURT:  Okay.  Number one, I want to hear briefly

13   from plaintiff on that one instruction issue.  Then I am going

14   to try to rule on all the instruction issues by the end of

12:16:13    15   lunchtime.

16           So what is the evidence that the plaintiff wants to

17   point out to support a spoliation instruction that you've

18   submitted?

19           MR. ART:  So four categories of documents that are

12:16:27    20   missing.  The first is the missing GPRs on the --

21           THE COURT:  I don't think missing, though, does what

22   you need.

23           MR. ART:  Right.

24           THE COURT:  You need spoliation.

12:16:34    25           MR. ART:  Well --

1      THE COURT:  You got to show destruction.

2      MR. ART:  Right.  So --

3      THE COURT:  Okay.

4      MR. ART:  So the evidence that we're going to talk

12:16:39   5   about --

6      THE COURT:  Okay.

7      MR. ART:  -- is the two missing GPRs.

8      THE COURT:  Okay.

9      MR. ART:  The investigative file inventory shows seven

12:16:46  10   logged.

11      THE COURT:  Wait.  Two missing GPRs.  Did you say

12   something else about them?

13      MR. ART:  Yep.  Can I put it up on the screen for you?

14      THE COURT:  That's fine.

12:16:54  15     (Document published.)

16      MR. ART:  The investigative file inventory shows that

17   there should be seven GPRs --

18      THE COURT:  Yes.

19      MR. ART:  -- there.  We have five of them.

12:17:00  20      THE COURT:  Okay.

21      MR. ART:  So we know there are missing GPRs from

22   August 27th and 28th, 1988 relating to this investigation,

23   because they're on the log and they no longer exist.

24      MR. LOEVY:  That's not missing from criminal defense

12:17:11  25   files, the prosecutor files.  That's -- the CPD has the

1    original with the punches.

2    THE COURT:  Right.  This is the file as it was found

3    whenever --

4    MR. LOEVY:  Wherever and whenever.

12:17:21   5    THE COURT:  And this sheet was at the beginning of the

6    file?

7    MR. LOEVY:  Right.

8    THE COURT:  Okay.

9    MR. ART:  So this is Plaintiff's Exhibit 19.

12:17:27   10   THE COURT:  And just -- let me see.  GPR -- where are

11   they?

12   MR. ART:  It says three pages here, three pages here,

13   and one page here.

14   THE COURT:  So seven pages.

12:17:37   15   MR. ART:  Correct.  And we have five pages of GPRs in

16   the file.

17   THE COURT:  All right.

18   MR. ART:  So that's category 1 documents.

19   Category 2 is Orlando Lopez picked a photograph of

12:17:47   20   Jacques Rivera purportedly from a gang photo book.  That

21   photograph no longer exists, and there's no record of that

22   photograph recorded at any point in time.

23   So that's our second category of documents.  Third,

24   multiple officers who worked with the Gang Crimes unit on this

12:18:03   25   case testified that they would have taken notes, would have

1  done daily activity reports, and would have made files relating

2  to the case.

3          There was testimony that those Gang Crime files would

4  have been stored at Gang Crimes North at Belmont and Western

12:18:16  5  for a period of time before they were destroyed.

6          There was also testimony that the Gang Crime files

7  collectively moved from there to Maxwell Street when Gang

8  Crimes was consolidated, and from there, disappeared entirely.

9          THE COURT:  All right.  Now, who testified that they

12:18:30  10  took notes?

11          MR. ART:  I mean -- so Spratte testified about what

12  the practices were for taking notes during the investigation.

13  Gawrys testified.

14          MR. LOEVY:  Well, I -- we would like -- primarily on

12:18:44  15  Spratte, he wasn't part of the investigation.  He was

16  designated by the City solely to talk about the City's

17  practices, and he said took notes.  You know, he had -- he kept

18  them in his basement and then he moved them to his garage.  He

19  tried to say that they were only intel notes, but he

12:18:58  20  acknowledged --

21          THE COURT:  Wait.  But this is Spratte taking notes,

22  right?

23          MR. LOEVY:  No, but Spratte was only relevant because

24  the City designated Spratte to be the City's 30(b)(6) designee

12:19:08  25  on the City's practices.

1          THE COURT:  Right.  But how did Spratte's testimony

2     establish that these Gang Crimes officers took notes?

3          MR. ART:  Well, I mean, so with respect to these Gang

4     Crimes officers, we know that Guevara and Gawrys wrote one

12:19:20  5     report, because it ended up ultimately in the investigative

6     file.  There's a lot of testimony about the investigative steps

7     that they took in this case.  And I guess our point is that

8     there's -- it's good circumstantial evidence when you combine

9     Spratte, when you combine the fact that there is a September

12:19:34  10    16th report from these Gang Crimes officers that they were

11    taking notes during this investigation.

12          THE COURT:  All right.  Where is the September 16th

13    report you're relying on?

14          MR. LOEVY:  That's Plaintiff's Exhibit 1.  That's the

12:19:43  15    one we keep calling the false report, Your Honor, that they

16    wrote at the end.

17          THE COURT:  Oh, right.  Okay.

18          MR. LOEVY:  It was all -- it has the backdated.

19          MR. ART:  Do you have a copy of that one?

12:19:49  20          MR. LOEVY:  The I.D.

21          THE COURT:  Okay.

22          MR. LOEVY:  And we think Mr. Gawrys did admit he took

23    notes.  That is our recollection collectively.

24          THE COURT:  I don't remember.  But --

12:19:57  25          MR. ART:  And so that's that report, Your Honor.

1          THE COURT:  Okay.  So Mr. Gawrys, you say he testified

2    he took notes, but you don't have notes?

3          MR. LOEVY:  Yes.  Because, Your Honor, what -- his

4    testimony was consistent with everybody's is, "I would take

12:20:08    5    notes.  That's how I knew how to write my report."

6          MR. GIVEN:  No.

7          MR. LOEVY:  This is written on the 16th.  So he said

8    he took his notes and he destroyed them after he made his

9    report, because it -- you know, he's not making -- that's how

12:20:18   10    you do it.

11          THE COURT:  Yes.

12          MR. GIVEN:  I don't believe Mr. Gawrys testified that

13    he took notes.  If you find it in the transcript, let me know.

14          THE COURT:  Well, I --

12:20:25   15          MR. GIVEN:  Otherwise, I don't want --

16          THE COURT:  -- simply don't remember.

17          MR. GIVEN:  -- your recollection.

18          THE COURT:  So I am going to need some transcript.

19          Go ahead.  What else?

12:20:29   20          MR. ART:  Okay.  We will work on the transcript for

21    that.

22          And then the fourth category is Mr. Noon testified on

23    the stand that he would have written a major incident report on

24    the day that he was assigned to this investigation.  That

12:20:39   25    report's gone.

1    MR. LOEVY:  And he said he hasn't seen it since.

2    THE COURT:  Okay.  And refresh my recollection as to

3  what his role was.

4    MR. LOEVY:  He was a Gang Crimes specialist who was

12:20:50   5  assigned to the case.

6    THE COURT:  Yeah.

7    MR. LOEVY:  He's the guy that when the defendants keep

8  showing the case report, it says "Noon notified."

9    THE COURT:  Oh, yeah.

12:20:57  10    MR. ART:  And so he's on this report here about the

11  gang book I.D. August 29th.

12    THE COURT:  So he says he wrote a report, but that

13  report doesn't exist?

14    MR. LOEVY:  Correct, Your Honor.

12:21:07  15    THE COURT:  All right.  So does the defense want to

16  say anything on all this?

17    MS. ROSEN:  We do.

18    So with respect to the gang book identification, there

19  is a record of the gang book identification that's memorialized

12:21:25  20  in the report at page 16-D, whatever, whatever, in the supp.

21  report.  So the idea that there's no notation or documentation

22  of the gang book report is erroneous.

23    That's one of the arguments.  It is true --

24    THE COURT:  So you're saying -- the plaintiff is

12:21:42  25  saying that the photo is gone, and you're saying but there's a

1   notation that it took place?

2           MS. ROSEN:  There's a specific notation in -- as far

3   as the specific gang book that it was taken from and the

4   specific photograph that was chosen for the gang book.

12:21:56   5           It is true that there was some point in time in the

6   Chicago Police Department's history that they stopped utilizing

7   gang books, I think in the 1990s.  And so those gang books no

8   longer exist.  But it was certainly available to Mr. Wadas.

9   There was testimony about it.  And he could have subpoenaed it,

12:22:14   10  just like he subpoenaed the gang book -- or the gang book that

11  Mr. Letrich used.  So it's not fair to say that now here, 30

12  years later --

13          THE COURT:  Okay.

14          MS. ROSEN:  So that's the issue on the gang book.  And

12:22:25   15  with respect to the --

16          MS. CARNEY:  Spratte file.

17          THE COURT:  Pages of GPRs.

18          MS. ROSEN:  The -- yeah.  The pages of the GPRs, the

19  testimony on the pages of the GPRs -- I don't recall it, quite

12:22:39   20  frankly, at this moment.  Does somebody recall what --

21      (Counsel conferring.)

22          MS. ROSEN:  The GPRs.

23          THE COURT:  The missing pages, two pages.

24          MS. ROSEN:  Missing pages from the inventory log.  Did

12:22:51   25  anybody establish that those -- the testimony on that?

1       MR. SOTOS:  No.

2       MS. ROSEN:  Okay.

3       THE COURT:  Okay.

4       MS. ROSEN:  With respect to the --

12:23:03   5       MS. CARNEY:  The reports and the Gang Crimes notes.

6       MS. ROSEN:  The Gang Crimes notes, Mr. Spratte on the

7   -- the 30(b)(6) witness, was very clear that the notes they

8   took had to do with the intelligence activities that they did.

9       So from the City's perspective and the 30(b)(6)

12:23:16  10   perspective, his -- the note-taking that he is talking about is

11   note-taking regarding intelligence-gathering and not

12   note-taking regarding criminal -- any particular criminal

13   investigation.

14       Mr. Gawrys, it's our collective recollection, did not

12:23:30  15   say that he took notes in this case.  And so if there are no

16   notes that have been -- if there's no testimony on any specific

17   notes in this case, then the spoliation instruction is not

18   relevant.

19       MS. CARNEY:  Humper reports.

12:23:44  20       MS. ROSEN:  With respect to the humper reports, Judge,

21   that -- the testimony here has been very clear that that's an

22   administrative document that notates assignments.  That would

23   be like saying that their time records have been destroyed.

24       THE COURT:  Right.

12:23:59  25       MS. ROSEN:  There's no evidence that that's

1    substantive in any way, or even anybody in this particular case

2    took one -- prepared a humper related to the Valentin

3    investigation.

4         The major incident crime report that Mr. Noon talked

12:24:13    5    about, the only testimony we have on what the substance of that

6    is is that it was a document that simply recounted all of the

7    information off of the general offense case report, which

8    everybody has.  So there's no reason to think that there's

9    anything in there of any import.

12:24:26   10         Again, that's another administrative document that's

11    prepared for the City, for the Chicago Police Department

12    downtown to keep track of, you know, the crime that's

13    happening.

14         THE COURT:  So I'm waiting for the Gawrys testimony.

12:24:39   15         MR. LOEVY:  We think we found --

16         MR. ART:  We found some already, and we'll submit it

17    to the Court at lunchtime.

18         MR. LOEVY:  Why don't you read it?

19         MR. SWAMINATHAN:  I'll read some of it for you.

12:24:45   20         Page 1732:  "Were you making notes on why you thought

21    a particular person was a suspect or not?

22         "Answer:  From this -- from the IR sheet.

23         "Question:  Were you making notes of that kind of

24    things back in the '80s?

12:24:57   25         "Answer:  We would, yes, I think so, sometimes."

1         Page 1796:  "Would you shred your notes -- as a Gang

2   Crimes specialist, would you shred your notes after you wrote

3   up your report?

4         "Answer:  Yes, I did."

12:25:09  5         MR. GIVEN:  Judge, that's --

6         THE COURT:  You know, I can hear.  Wait.  I can hear.

7         MR. GIVEN:  Okay.  But I do have a response.

8         THE COURT:  Go ahead.

9         MR. GIVEN:  That testimony was about general

12:25:17  10  practices.

11        THE COURT:  I heard that.

12        MR. GIVEN:  Okay.  I just want to be clear, there's no

13  testimony that he took notes in this investigation.

14        MR. ART:  And, Your Honor, there's a transcript.  We

12:25:25  15  disagree with that.  We will submit additional citations to the

16  Court.

17        THE COURT:  Well, the time for submitting this -- you

18  may --

19        MR. ART:  It's now, and we understand that.

12:25:31  20        And could I respond on a couple other points that they

21  made?

22        THE COURT:  Oh, boy.

23        MR. ART:  First of all, the humper report, the thing

24  that's described as an administrative document, says:  Each

12:25:39  25  day, describe what you did in your investigations.  I mean,

1    it's not administrative at all.  This is a document the Gang

2    Crimes specialists have testified they were required to fill

3    out -- you know, that's what Spratte said -- and this would

4    have been a record of investigative activity.

12:25:53    5    THE COURT:  But there's no evidence that any of these

6    Gang Crimes officers did this.

7    MR. LOEVY:  It was required, Your Honor.

8    MR. ART:  Well, it was their --

9    THE COURT:  Well, yeah, yeah.  So were a lot of

12:26:02    10    things.

11    MR. ART:  Okay.  I mean, it was their practice.  And

12    we think the 30(b)(6) designee saying they were required to

13    fill this thing out and give it to their next shift each day,

14    because it's a daily activity summary, is sufficient to

12:26:12    15    establish that these things would have existed in this

16    investigation and no longer do.

17    THE COURT:  All right.  Well --

18    MS. ROSEN:  Judge, one more thing on that.

19    On some of these documents, there are specific

12:26:21    20    retention schedules with the Chicago Police Department that

21    where a lot of the stuff is destroyed pursuant to the regular

22    retention schedules.

23    So you can't say that this is a spoliation issue when

24    it's --

12:26:31    25    THE COURT:  Well --

1    MS. ROSEN:  -- during the normal course.

2    THE COURT:  -- there are two pages missing from the --

3  the two pages missing from the GPRs were not destroyed pursuant

4  to any retention schedule, because, otherwise, the whole

12:26:42    5  document would have been destroyed.

6    But spoliation is a -- that's a big burden, so I'm

7  going to have to look at all this.

8    MR. SOTOS:  And, Judge, that -- just briefly, that's

9  why I wanted to address the GPRs.

12:26:52   10    You know, there's been a lot of testimony about what

11  was available back at the time.  And if Mr. Wadas wanted GPRs,

12  he could have gotten the GPRs.

13    So there's no reason to think that back at that time,

14  there's anything other than this administrative snafu that led

12:27:02   15  to this.

16    So for 30 years later, to support a spoliation

17  instruction with all the inferences that go with it, we think

18  to be far beyond pale of the evidence that they've been able to

19  accumulate.  That's it.

12:27:13   20    THE COURT:  Okay.  All right.  I think I've heard

21  enough.  Thank you.

22    MR. ART:  Thank you, Your Honor.

23   (Pause.)

24    THE COURT:  By the way, we're going to finish with

12:28:49   25  this witness this afternoon, so you got to figure out -- I

1    mean, I would say an hour/an hour, and then there will be time

2    for the -- you know, the cleaning up afterwards.

3          There's nothing else we can do.  I mean, we've made a

4    commitment to this jury and -- okay?

12:29:01    5    MR. SOTOS:  Well, I think --

6          THE COURT:  I'm going to cut you off.

7     (Pause.)

8          MR. GIVEN:  Judge, we've talked about it.  Mr. -- or

9    Dr. Wixted has two distinct opinions that he's talked about.

12:32:20    10         THE COURT:  Yes.

11         MR. GIVEN:  One has to do with the fillers.  One has

12   to do with memory issues.

13         THE COURT:  Yes.

14         MR. GIVEN:  Ms. Barber and I have talked about it.  We

12:32:26    15   think we need more like an hour and a half.

16         THE COURT:  Well --

17         MR. GIVEN:  Hopefully less.  But to cover both of

18   those opinions --

19         THE COURT:  But I don't have --

12:32:32    20         MR. GIVEN:  -- in their entirety.

21         THE COURT:  I can't give you that time.  We're

22   starting at 1:15, and I promised the jury, based on your

23   promise, that we'd be done by noon today.

24         I promised the jury that we'd finish the evidence

12:32:43    25   today.  Okay?  So we've got -- we're starting at 1:15.  We've

```
          1    got -- I don't know.  I mean --
          2             MR. LOEVY:  We want an hour.
          3             MR. SOTOS:  An hour and 15?  Judge --
          4             THE COURT:  I'm sorry.  I can't --
12:32:55  5             MR. LOEVY:  We just want to make sure we get the same
          6    time.  That's what we're asking.
          7             THE COURT:  Well, if you both take an hour and a half,
          8    it's not happening.
          9             MR. LOEVY:  No, we can't.
12:33:02  10            MR. SOTOS:  An hour and 15, Judge?
          11            THE COURT:  Well, if -- an hour and 15 --
          12            MR. SOTOS:  We're already cutting it down.
          13            THE COURT:  -- that's a combination of two and a half.
          14            Do we have two and a half?
12:33:11  15            MR. SOTOS:  That's about exactly, I think, where we're
          16   at.
          17            MS. ROSEN:  Yeah, 1:15.  And then if we take a
          18   15-minute break --
          19            THE COURT:  A ten-minute break.
12:33:17  20            MS. ROSEN:  If it's -- yeah.  So that's --
          21            MR. SOTOS:  We got five minutes to spare.
          22            MR. LOEVY:  So then to allocate as we want with
          23   direct, redirect, re, re, re?
          24            THE COURT:  Well, you're going to have to divide your
12:33:24  25   time up so that you save whatever time, because at 4:00
```

1    o'clock, we're done.

2              MR. LOEVY:  Fair enough.

3              MS. ROSEN:  Okay.  Thank you.

4              THE COURT:  Okay.

12:33:29    5         MR. LOEVY:  We just want the same time.

6              MR. GIVEN:  Thank you, Judge.

7              THE COURT:  What?

8              MR. LOEVY:  We just want the same time.  I think we're

9    in agreement.

12:33:39   10      (Recess from 12:33 p.m. until 1:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3           We, Blanca I. Lara and Colleen M. Conway, do hereby

4   certify that the foregoing is a complete, true, and accurate

5   transcript of the Trial proceedings, Volume 16-A,

6   had in the above-entitled case before the

7   HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court,

8   at Chicago, Illinois, on June 26, 2018.

9

10          /s/ Blanca I. Lara, CP, CSR, RPR        06/27/18

11

12          /s/ Colleen M. Conway, CSR, RMR, CRR     06/27/18

13                 Official Court Reporters             Date
                 United States District Court
14               Northern District of Illinois
                     Eastern Division
15

16

17

18

19

20

21

22

23

24

25
```

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    JACQUES RIVERA,                      ) No. 12 CV 4428
                                          )
4              Plaintiff,                 )
                                          )
5    vs.                                  ) Chicago, Illinois
                                          )
6    REYNALDO GUEVARA, STEVE GAWRYS,      )
     DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
7    JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN )
     MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
8    RUSSELL WEINGART, ESTATE OF ROCCO    )
     RINALDI, CITY OF CHICAGO,            ) June 26, 2018
9                                         )
               Defendants.                ) 1:15 o'clock p.m.
10
                          VOLUME 16-B
11              TRANSCRIPT OF PROCEEDINGS - Trial
             BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                       and a jury

13   APPEARANCES:

14   For the Plaintiff:    LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
15                              MR. STEVEN E. ART
                                MR. ANAND SWAMINATHAN
16                         311 North Aberdeen Street
                           3rd Floor
17                         Chicago, Illinois  60607

18                         MacARTHUR JUSTICE CENTER
                           Northwestern University School of Law
19                         BY:  LOCKE E. BOWMAN III
                           357 East Chicago Avenue
20                         Chicago, Illinois  60611
                           (312) 503-0844
21

22   Court reporter:            Blanca I. Lara
                             Official Court Reporter
23                         219 South Dearborn Street
                                  Room 2504
24                         Chicago, Illinois 60604
                                (312) 435-5895
25                         blanca_lara@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2

 3   For the Individual        THE SOTOS LAW FIRM
     Defendants:               BY:   MR. JEFFREY N. GIVEN
 4                                   MR. JAMES G. SOTOS
                                     MS. CAROLINE P. GOLDEN
 5                                   MR. JOSEPH POLICK
                                     MR. DAVID A. BRUEGGEN
 6                             550 East Devon Avenue, Suite 150
                               Itasca, Illinois  60143
 7

 8   For the Defendant         ROCK FUSCO & CONNELLY, LLC
     City of Chicago:          BY:   MS. EILEEN E. ROSEN
 9                                   MS. CATHERINE M. BARBER
                                     MS. THERESA B. CARNEY
10                             321 North Clark Street, Suite 2200
                               Chicago, Illinois  60654
11

12   For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
     Guevara:                  BY:   MR. THOMAS E. LEINENWEBER
13                                   MR. JAMES V. DAFFADA
                               120 North LaSalle Street, Suite 2000
14                             Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

1          (Jury out.  Proceedings heard in open court:)

2          THE COURT:  All right.  Very quickly, how are we going

3    to do this timekeeping?  At an hour and quarter per side, am

4    I -- do you want me -- when the hour and a quarter is gone, I'm

01:14:24   5    just going to say you're done?

6          MR. LOEVY:  And if you could give us a little warning,

7    that would be great, too.

8          THE COURT:  Are you going to save any time?

9          MS. ROSEN:  I believe we are going save a little

01:14:32  10    bit --

11          MR. GIVEN:  We're going to try to, Judge.

12          MS. ROSEN:  Yeah.  We're keeping track on our side,

13    too.  I mean, if we -- if we hit the hour and 15 and we've

14    missed it, then let us know.

01:14:40  15          THE COURT:  So should I give you an hour and five?

16          MS. ROSEN:  Sure.

17          MR. GIVEN:  That would be great.

18          THE COURT:  All right.  And I'll do the same for you.

19          All right.  Now, I got some kind of a brief five

01:14:48  20    minutes ago from the plaintiff on instructions.

21          Let me just tell you, I am not a -- you know, I am not

22    the Energizer Bunny.  We were working on something, and it's

23    just too late.  It's too late.

24          MR. ART:  We just wanted to let the Court know that

01:15:02  25    we're withdrawing particular claims.  There's a settlement of

1  the punitive damages claims against Ms. McLaughlin, so that's

2  not going to be included.

3  THE COURT:  Okay.  Well, that wasn't part of the

4  disputed instructions, I don't think.

01:15:12  5  MR. ART:  I don't think so.

6  THE COURT:  Okay.

7  MR. ART:  And we are also letting the Court know that

8  we were withdrawing an aspect of the *Monell* instruction and --

9  MR. LOEVY:  So they're deletions, Your Honor.

01:15:20  10  MR. ART:  Yeah.  We're just -- we didn't know how

11  much --

12  THE COURT:  Well, let me just say this.  If you get

13  this, which I'm going to try to get to you by the end of the

14  afternoon, if you get this and any of it's moot, act

01:15:32  15  accordingly.

16  MR. ART:  We shall.

17  THE COURT:  I've got two minutes, and I intend to use

18  it.

19  The instruction No. 10 from the defendants on the

01:15:41  20  imputation of adverse inferences from Guevara and Mingey are

21  going to be refused.  This will explain it.

22  Agreement No. 14 will be given as revised.  It's the

23  impeachment instruction.  I do not need to list for the jury

24  who has been impeached.  That's for argument.

01:15:58  25  I'm refusing both missing evidence and spoliation

1  instructions.  That does not mean you cannot argue what you

2  want to argue, but I'm not instructing them.

3  Your instruction on personal involvement, everything

4  that's been submitted is inadequate.  The City's -- or the

01:16:19  5  defendants do not address the plaintiff's failure to intervene

6  in conspiracy theories.  The defendants' doesn't give the City

7  what it's entitled to on personal involvement.

8  I would hope that by the tomorrow morning you can come

9  up with something.  I mean, just, you know, nothing has been

01:16:36  10  submitted that I can -- that I can use.

11  Everything else is going to be covered, including

12  where I'm going with the malicious prosecution.  I'm basically

13  writing it based on *Colbert* and *Reed*.  And you'll get this this

14  afternoon.

01:16:53  15  So I think with that, we're ready and --

16  MR. DAFFADA:  Your Honor?

17  THE COURT:  Yeah.

18  MR. SOTOS:  Can I just address something very quickly?

19  You had said before you would give a limiting

01:17:01  20  instruction about the post-conviction proceeding in the same

21  way that you did about the certificate of innocence.

22  I have one that we drafted.  Plaintiffs have --

23  plaintiffs have not agreed to it.  It's the best I can do, and

24  I wanted to send it --

01:17:12  25  THE COURT:  For this afternoon?

1          MR. SOTOS:  Even when you read the instructions, I

2     just want you to have it.

3          THE COURT:  All right.  Well, we need to get the jury,

4     because it's coming off of everybody's time.

01:17:21      5          MR. SOTOS:  I just want to tender it so you can see

6     the language.

7          THE COURT:  Okay.

8          MR. SOTOS:  All right.  And then the last, Judge,

9     is --

01:17:25     10          THE COURT:  Let's get the jury.  We need this jury.

11          MR. SOTOS:  The last thing is, Judge, we're also going

12     to ask that you give a limiting instruction with regard to the

13     Nieves and Rodriguez issue to the extent that there's no issue

14     in this case as to whether or not they were the actual killers,

01:17:38     15     and that's not an issue to be concerned about.

16          THE COURT:  You know, I'm -- basically, it was your

17     side that kept bringing up Nieves yesterday.  So I have ruled

18     on this as many times as I intend to.

19          MR. SOTOS:  Right.  And, again, I'm not talking about

01:17:51     20     asking you to reconsider.  I'm just asking about a limiting

21     instruction given --

22          THE COURT:  I'm not doing it.

23          MR. ART:  Your Honor, on the post-conviction

24     instruction they just handed you, the Court proposed an

01:18:01     25     instruction already on this issue that we would agree to.  It's

1    in the June 19 --

2         THE COURT:  I'm trying to get these instructions

3    ready.  If you've got something you want me to look at --

4         MR. ART:  Should I just submit it?

01:18:08    5         THE COURT:  Yes.

6         MR. ART:  Thank you, Judge.

7         MR. DAFFADA:  We also have a 404(b) limiting

8    instruction.

9         THE COURT:  I'm really busy.  I'm sorry.  I'm trying

01:18:14    10   to get this to you.  This is not for me.  It's for you.  And

11   I'm trying to get it to you so that you can plan your closing

12   arguments overnight.

13        How much time have we decided we're going to have for

14   closing arguments?

01:18:25    15        MR. LOEVY:  The only thing we decided is we want to

16   fit it in a day, and it's going to matter a little bit on how

17   long you're going to take to read the instructions, Your Honor.

18        THE COURT:  Well, I don't know, because I don't even

19   have the instructions yet.

01:18:36    20        MR. POLICK:  So the one juror has to leave by 4:00

21   tomorrow, Your Honor?  Is that --

22        THE COURT:  Yes.

23        MR. DAFFADA:  That's tomorrow?  Okay.

24        THE COURT:  I mean, if I have to -- if the

01:18:42    25   instructions have to go over to Thursday morning, that's the

1      least of our problems, frankly.

2            MR. SOTOS:  So with that understanding, Judge, it will

3      either be two hours and a half apiece, or I think

4      two-and-a-half hours apiece.

01:18:55   5      MR. LOEVY:  Well, I think we're asking for shorter,

6      but we're going to -- it is going to depend on the schedule.

7            If we go from 9:30 to 4:00 with a lunch break --

8      should we talk about it at the end of day, Your Honor, and

9      start this witness or --

01:19:09  10      THE COURT:  Well, I'm waiting for the jury.

11            MR. LOEVY:  Let's see.  9:30 to 12:00 is

12      two-and-a-half hours.  1:00 to 4:00 is three hours.  That's

13      five and a half, plus there's an extra fifteen minutes.  I

14      think we're going to cut the lunch break, right?

01:19:25  15      THE COURT:  Fifteen minutes we're going to cut the

16      lunch break by.  And if you can save me an hour for the

17      instructions, that would be, you know -- we're ready.

18            COURT SECURITY OFFICER:  All rise.

19            (Jury in.)

01:19:54  20      THE COURT:  Please be seated, everyone.  Okay.

21            MS. BARBER:  Your Honor, the defendants call Dr. John

22      Wixted.

23            THE COURT:  Sir, would you come up here, please.

24      Please raise your right hand.

01:20:11  25            (Witness sworn.)

1      THE COURT:  You may be seated.

2          JOHN WIXTED, Ph.D., DEFENSE WITNESS, SWORN

3                    DIRECT EXAMINATION

4  BY MS. BARBER:

01:20:19   5  Q.  Good afternoon, Dr. Wixted.

6          Can you introduce yourself to the jury, please?

7  A.  My name is John Wixted.  I'm a professor of psychology at

8  the University of California, San Diego.  I've been there for

9  30 years.

01:20:31   10  Q.  You've been at the University of San Diego for 30 years?

11  A.  University of California, San Diego, yes.

12  Q.  And what is -- can you tell us about your educational

13  background, starting with college?

14  A.  I actually got my undergraduate degree, double majored in

01:20:46   15  biology and psychology, at the University of California,

16  San Diego.  Then I went off to get my Ph.D. in clinical

17  psychology at Emory University in Atlanta, George.

18          I did a clinical internship at the Medical College of

19  Pennsylvania for two years and then back as a professor at

01:21:06   20  UC-San Diego.

21  Q.  And what are your particular areas of expertise in terms of

22  your research?

23  A.  My areas of expertise are nicely captured by the classes I

24  teach.  So one class I teach is called "Memory and Amnesia."

01:21:18   25  That's an area of expertise.  And the other is "Psychology and

1    the Law," especially eyewitness memory.

2    Q.  Okay.  And I understand that you have published recently

3    some -- in recent years from groundbreaking research in the

4    area of eyewitness identification; is that right?

01:21:35    5    A.  Yep.  Some people call it groundbreaking anyway.

6    Q.  Can you briefly describe that for us?

7    A.  It was actually several lines of research that sort of

8    changed how people were thinking of eyewitness memory.

9         One line of research had to do with the type of

01:21:50    10    lineups that the police use.  One type of lineup is a

11    simultaneous lineup where you show six photos at all once.

12    Another is sequential where you show the photos to the

13    eyewitness one at a time.  People thought that sequential

14    lineups were superior for a lot of years, but recent research

01:22:04    15    has shown that it's the other way around, actually.

16         Also for many years eyewitness identification

17    researchers thought that the confidence that an eyewitness

18    expresses doesn't really tell you much about whether or not you

19    should trust what they're saying, but recent research shows

01:22:17    20    conclusively it's the opposite.  As long as you're talking

21    about the first memory test, confidence tells you just about

22    everything you want to know in terms of how reliable the

23    information is.

24    Q.  Okay.  And that research has significantly changed the

01:22:29    25    field; is that right?

1  A.  It has, uh-huh.

2  Q.  And I also understand that in recent years you've had

3  publications dealing with complicated statistical analysis; is

4  that right?

01:22:40  5  A.  Yes.  We just recently published a paper in a journal

6  called *Jurimetrics*, which is a journal that lies at the

7  intersection of the law and the statistics.

8  We published a Bayesian statistical analysis in that

9  journal.

01:22:56  10  Q.  And have you been given any professional awards in your

11  career?

12  A.  Yes.  I won a number of awards.  The highest honor I

13  received is from a society called the Society of Experimental

14  Psychologists.  It's an elected society of the top 5 percent of

01:23:13  15  experimental psychologists in North America.

16  That society awarded me their highest honor, the

17  Warren Medal, in 2001.  That medal is given to the researcher

18  who they believe has done the most important work in the

19  previous five years.

01:23:27  20  Q.  And you were asked to be an expert in this case, correct?

21  A.  Correct.

22  Q.  And you were paid for your work?

23  A.  Correct.

24  Q.  And what is your hourly rate?

01:23:35  25  A.  $300 an hour for professional work, and then I also charge

1  $150 an hour door-to-door travel.

2  Q.  Okay.  And specifically, you were asked to give opinions in

3  relation to the expert report of Dr. Gary Wells, right?

4  A.  Yes, that's one of the things I was asked to do.

01:23:52  5  Q.  So you reviewed his report?

6  A.  I did.

7  Q.  And what was the precise question that you considered in --

8  in relation to Dr. Wells' report in your analysis?

9  A.  If I understand your question, the issue had to do with the

01:24:08  10  Chicago Police Department failing to record filler

11  identifications when eyewitnesses identified a filler, what are

12  the implications of that in terms of what we can infer about

13  their practices.

14  Q.  So without going into all the details just yet, in general

01:24:27  15  terms, what were -- what was your opinions as to that issue?

16  A.  That the practices of the Chicago Police Department fall

17  within the norm of police departments.

18       Police departments differ in their practices, but

19  within the range of normal police department practices, Chicago

01:24:45  20  fell within that range.

21  Q.  Okay.  So in conducting your analysis, did you have the

22  opportunity to review the deposition testimony of James Hickey,

23  the City's designee on the issue of lineups?

24  A.  I did.

01:24:59  25  Q.  And from reading his deposition, what was your

01:25:18

1  understanding of how the City documented lineups when a filler

2  was picked back in the 1980s?

3  A.  Well, his claim about what they did, which is consistent

4  with a lot of other police departments -- actually consistent

5  what researchers themselves often do -- he said the important

6  question is whether or not the witness identifies the suspect,

7  because it's when a suspect is identified that that's what

8  they're wondering; that they put the suspect in a lineup, they

9  wonder do we have the right guy.  We're going to show it to the

01:25:36

10  eyewitness to see if we have the right guy.

11          And from their point of view, the question is whether

12  or not that witness was identified if the witness -- I mean,

13  whether the suspect was identified.  If the suspect is

14  identified, you record it as a suspect ID.  If the suspect is

01:25:50

15  not identified, you record it as a non-ID.

16          Researchers often do that.  Police departments often

17  do that.  He said they do that as well.

18          And so what appears to be zero filler IDs is actually

19  bundled into the non-IDs, the filler IDs.  Because from their

01:26:05

20  point of view -- there's even a paper that just came out

21  recently in the scientific literature about Chicago Police

22  Department lineups that said in a way that's correct.  It

23  isn't -- they didn't identify the suspects.

24          So from the question -- with respect to the question

01:26:15

25  that the police have, it's -- from their perspective, it's

01:26:30

01:26:45

01:26:57

01:27:20

01:27:31

1    correct to record it as a non-ID.  For record keeping purposes,

2    it would be better to record it as a filler ID, because that's

3    actually what it was.

4    Q.  And you're saying that sometimes researchers also combine

5    those two categories; is that correct?

6    A.  They definitely do that.  Not all researchers, by any

7    means, but lots -- because researchers are concerned with

8    finding eyewitness identification procedures that make it more

9    likely that eyewitnesses will correctly identify a guilty

10   suspect and less likely that they'll incorrectly identify an

11   innocent suspect.

12        So researchers, too, are focused on the suspect IDs,

13   because those are the consequential IDs.  The person is

14   imperiled when they're identified.  That's why researchers

15   don't -- often don't really care that much about whether when

16   you don't identify a suspect if it's a filler ID or a non-ID.

17   Q.  Okay.  In terms of the exculpatory value of a filler versus

18   a no -- a no identification, do you have any opinion on the

19   exculpatory value difference between those two?

20   A.  Yes.  There's been some work done.  So if you start with

21   the idea that -- so let's say the suspect's in the lineup.  You

22   might think there's a 50-50 chance that it's the guy who did

23   it.  Let's just say -- you know, you have to think that, but

24   let's say we're just uncertain.  We are at 50-50.

25        Now something happens, and it's going to move you off

01:27:45

1    50-50.  For example, if the witness identifies the suspect, now

2    you're going to be more confident that it really is the guy who

3    committed the crime.  You might not go all the way to 100

4    percent certainty, but if the witness lands on the suspect,

5    you're not going to stay at 50-50.  You're going to go like --

6    there's now -- you're more confident that's the guy who did it.

7         The question of interest is, okay, well, what happens

8    if the witness lands on a filler or the witness rejects the

9    lineup, should that move you off 50-50?  Should it lower your

01:28:00

10   odds?  And the answer is, yes, it should.

11        In both cases, it provides slight evidence that it's

12   not the right guy.  Not strong evidence, slight evidence.  And

13   the evidence that it provides -- so it might -- you might start

14   at 50-50 and now you might think 60-40 innocent -- you know,

01:28:15

15   more likely to be innocent than guilty, given that they landed

16   on a filler.

17        And if they reject the lineup, it's the same

18   information value.  You go to about 60-40, that the probative

19   value of a filler ID is virtually identical to the probative

01:28:32

20   value of a non-ID, which is, again, why it's not that critical

21   to separate them.  This is work published by Gary Wells in

22   2015.

23   Q.  Okay.  So let's go into the details of your analysis a

24   little bit.

01:28:45

25        Can you explain the very first step you took in terms

1    of analyzing the issue here about whether the Chicago data

2    stood out in any way?

3    A.   I started with the assumption that it's -- it's treated as

4    a two-outcome situation, just like Detective Hickey, I think --

01:29:04    5    Q.   Right.

6    A.   -- suggested and as researchers often treat it, that you

7    either identify the suspect or you don't.

8         So there's a certain percentage of suspect

9    identification in the Chicago data.  I think it came out to be

01:29:15    10   about 54 percent of the time the suspect's identified.  That

11   means that 46 percent of the time a suspect's not identified.

12   It's like heads or tails.  It's one or the other.

13        Now, the nonidentifications can be lots of things.  It

14   could be a filler ID; it could be a non-ID.  They might not

01:29:31    15   even say what happened.  But the first thing I did was I

16   dichotomized it the way that police departments often do and

17   that researchers often do and the way that that detective said

18   they did.

19        And then I asked, is that percentage, 54 percent,

01:29:44    20   suspect IDs?  I compared it to the 11 studies that Gary Wells

21   had looked at in his report.  And I simply visually plotted it

22   and asked, does that value fall within the range of the other

23   police departments?  And it falls within that range, which --

24   yes?

01:29:58    25   Q.   No, that's good.

1    I'd like to show you -- show you and the Court and the

2  parties at the moment City's Demonstrative No. 10.

3    MS. BARBER:  Your Honor, a copy has been provided to

4  plaintiff's counsel.  I'd ask for permission to publish it.

01:30:15    5    MR. LOEVY:  No objection, Your Honor.

6    THE COURT:  You may.

7  BY MS. BARBER:

8  Q.  Dr. Wixted, can you see that on your screen?

9  A.  Yes, I can see it.

01:30:24   10  Q.  And can you tell us, what does this represent?

11  A.  What I plotted here -- so on the vertical axis, it's the

12  percentage of time, percentage of witnesses, percentages of

13  lineups where the witness identified a suspect.  And it's about

14  54 percent in the Chicago Police Department data.

01:30:40   15    And then there are -- those open circles in blue, I

16  guess it is, those are the 11 field studies of police

17  departments where they collected their records to see how often

18  in other departments' lineups end up with a suspect

19  identification.  And that's what those blue circles -- open

01:31:02   20  circles are.

21    And the first question -- the question we're wondering

22  about is, are the Chicago data -- do they -- is Chicago an

23  outlier?  That's the question.  Do they stand out from the

24  crowd?  Are they different from the normal range of police

01:31:16   25  practices?

01:31:27

01:31:41

01:31:58

01:32:19

01:32:31

1       And step one is to just visually plot the data, as

2  I've done here.  And if the value falls within the range, as it

3  does here -- it's at the upper end of range, but it's within

4  the range -- actually, you're already all done.  You don't have

5  to be an expert.  You don't have to perform any statistical

6  analysis.  It's already immediately obvious that it doesn't

7  stand out from the crowd.  It's not an outlier.  It's within

8  the range of normal practices, as best you can tell from these

9  data.  That's the first step.

10  Q.  Okay.  And what was the next step that you did in your

11  analysis?

12  A.  I then did perform a statistical analysis using a weak test

13  that asked the question is -- is that orange data point an

14  outlier?  I computed the average -- that's the mean of the blue

15  circles -- and a standard deviation, which is just a measure of

16  how variable those numbers are.  The more variable -- the more

17  they spread out, the higher the standard deviation will be.

18       And a standard but weak test for whether a number is a

19  statistical outlier is to ask, does it fall -- does the orange

20  point fall more than two standard deviations from the average

21  of the points that you see there on the screen, which is like

22  about the middle of them?

23       A point has to at least fall more than two standard

24  deviations from the mean before you even entertain the

25  possibility that it's an outlier.  And in this case, it does

1  not fall more than two standard deviations from the mean.

2  It's exactly analogous to what we ask when we have a

3  patient who we're wondering, is this patient an amnesic?  If

4  they're amnesic, they stand out from normal people.

01:32:44  5  People have memories, different memories.  Some people

6  have good memories; some people have bad memory.  There's a

7  normal range of memory.

8  And let's say we gave everybody a memory test, and on

9  the vertical axis was how many errors they made.  So the worst

01:32:59  10  guy made almost 60 percent errors on the memory test.  And then

11  we test this guy that we think might be an amnesic.  Does he

12  have an especially terrible memory.

13  And if he scores about 54 percent errors, you would

14  not consider him an outlier.  He would not fall more than two

01:33:13  15  standard deviations from the mean.  You'd say he doesn't have a

16  great memory, but he's within the normal range.  It's exactly

17  analogous to that kind of question.

18  Q.  Okay.  And then you also did a statistical analysis -- or

19  what you were just talking was with the rate of suspect IDs,

01:33:28  20  correct?

21  A.  Yes.

22  Q.  And then did you also do another statistical analysis?

23  A.  Yes, for the nonsuspect IDs, the nonIDs, with everything

24  collected together in the way that researchers do and police

01:33:38  25  departments often do.  Even to this day, about a third of

1    police departments do that.

2         So it's just the other side of the coin.  So it's

3    basically all of these numbers sort of reversed.  So now the

4    orange dot would still be in the crowd of points, but it would

01:33:51    5    now be at the low end.  The percentage of filler -- of

6    nonsuspect IDs aggregated together, filler IDs, non-IDs,

7    nonreported, and it's the same conclusion.

8    Q.  Same conclusion.  Okay.

9         And you're aware that Dr. Gary Wells performed a

01:34:08    10    chi-square analysis in his report?

11    A.  Yes.

12    Q.  Why do you -- what is your opinion about whether or not

13    that was the appropriate analysis to apply?

14    A.  It's -- the most important thing before you compute any

01:34:19    15    statistic is to be clear about what question the statistic

16    answers, because statistics -- there's nothing wrong with that

17    statistic.  I use a chi-square statistic all the time.  But the

18    question is, does it address the question you're trying to

19    answer?

01:34:32    20         Here, my understanding is, the question we're trying

21    to answer is whether or not Chicago is an outlier in terms of

22    its police practices and number of suspect IDs or nonsuspect

23    IDs.

24         The chi-square statistic does not address that

01:34:47    25    question.  The approach that I just described does.  The chi

1    square answers a different question.

2         The question that the chi square answers is, if we

3    take all of those 11 field studies and just aggregate the data

4    across 11 field studies, treat them as if it's one police

5    department.  And then we can ask, is Chicago statistically

6    different from that sort of aggregate jurisdiction?  That's the

7    question it addresses.

8         And note that that is not -- that's a different

9    question.  And you could ask that same question about, say,

10   the -- the point that falls the lowest on that graph there, you

11   could ask, okay, well, I want to ask, does that police

12   department -- is it significantly different from the remaining

13   10 if I aggregate them together?

14        And if that's my question, I would compute a chi

15   square.  My guess is it would be significantly different.  But

16   that's not the question.

17        Police departments differ in many ways.  Some police

18   departments use sequential lineups, which tend to lower the

19   suspect ID rate.  In fact, that lowest point there is a -- is a

20   jurisdiction that uses a sequential lineup.  That's one of the

21   reasons why it's low.

22        Other jurisdictions use a simultaneous lineup.  Those

23   are known to result in higher suspect IDs.

24        So the question is, across the range of police

25   practices in performing lineups, does Chicago fall within that

1  range or are they an outlier?  That's the question.  It

2  requires a different analysis.

3  Q.  And your ultimate conclusion is what?

4  A.  That Chicago's falls within the range of normal police

5  practices, not outside of that range.

6  Q.  And you're offering those conclusions today with a

7  reasonable degree of scientific certainty?

8  A.  I am.

9      MS. BARBER:  Thank you, Your Honor.  I have no further

10  questions.

11      THE COURT:  Okay.

12                  DIRECT EXAMINATION

13  BY MR. GIVEN:

14  Q.  Good afternoon, Dr. Wixted.

15  A.  Good afternoon.

16      MR. GIVEN:  Good afternoon, ladies and gentlemen.

17  BY MR. GIVEN:

18  Q.  Just in advance, I'm going to give you a copy -- did you do

19  a report in this case?

20  A.  Yes.

21      MR. GIVEN:  Judge, may I approach?

22      THE COURT:  Certainly.

23      MR. GIVEN:  Judge, would you like a copy also?

24      THE COURT:  I would love a copy.  Thank you.

25      MR. GIVEN:  I'll give you the one that says, "Copy for

1    Judge."

2         THE COURT:  That's the only one I'll accept.  Thank

3    you.

4    BY MR. GIVEN:

01:37:08    5    Q.  Dr. Wixted, you told Ms. Barber you had an expertise in the

6    field of memory studies.

7         Could you tell the jury a little more about that,

8    please?

9    A.  Yeah.  I spent about the first 20 to 25 years of my career

01:37:21   10    studying how memory works.  It wasn't about memory in the real

11    world or anything.  It was how memory works in the brain.

12         Right now your brain is forming a memory of what's

13    happening.  There's a brain structure known as the hippocampus

14    that I'll just mention.  It's one of the brain structures that

01:37:38   15    I have studied and still study to this day.  It's crucial for

16    forming memories.

17         You all have a functional hippocampus.  So you're

18    making a memory right now.  Your brain is doing it, so that

19    tomorrow when you think back to this moment in time, you'll

01:37:47   20    remember some of what I said.  You won't remember everything

21    because your brain cannot process everything.  But you're

22    laying down a memory record of what's happening, and your brain

23    is doing it right now.  If you were an amnesic, your brain

24    couldn't do that.  But you're not, so it can.

01:37:59   25         And so that's called encoding.  That's making a

1  memory.  And then later we refer to retrieval, remembering the

2  memory trace that you laid down in your brain.

3  Q.  And you've also -- so that's the sort of theoretical study

4  of memory.

01:38:16

5  Have you also done some studies with regard to how

6  memory plays out in the real world?

7  A.  Yes.  So after doing that kind of work on the -- how the

8  memory works for 20 or 25 years, then I turned my attention to

9  how people were investigating memory in the real world.

01:38:31

10  That's when I realized a lot of them don't have

11  expertise and training in understanding of memory and that I

12  could make a contribution that hadn't yet been made.

13  And that's what I've been doing in the last six or

14  seven years, basically studying eyewitness identification, in

01:38:48

15  particular, and especially when it's reliable and when it's not

16  reliable.  Under what conditions is eyewitness memory reliable,

17  and under what conditions is it unreliable?  That's the

18  critical distinction.

19  Q.  Have you ever testified as an expert witness before on the

01:39:03

20  subject of memory and eyewitness identification?

21  A.  I have.

22  Q.  And how much of your total income derives from your expert

23  consulting work?

24  A.  Approximately 10 percent, maybe a little bit more than

01:39:16

25  that.

1  Q.  Okay.  Were you retained by the defendants in this case to

2  offer opinions about issues having to do with memory?

3  A.  Yes.

4  Q.  And did you write a report?

01:39:26    5  A.  I did.

6  Q.  And did you review documents in forming your opinions in

7  this case?

8  A.  I did.

9  Q.  Could you tell the jury briefly what kind of documents you

01:39:34    10  reviewed?

11  A.  A lot of documents.  Deposition testimony from a lot of

12  different people, interview records, affidavits from a variety

13  of people.  I'm not sure if that's answering your question.

14  Q.  That's fine.  We'll cover some of the specifics.

01:39:50    15      Can you briefly explain to the jury, in a very general

16  way, how memory works?

17  A.  Well, as I said, first your brain lays down a memory record

18  of your experience, the experience you're having right now.

19  That's encoding.

01:40:05    20      Later when you're asked to remember, do you remember

21  Dr. Wixted talking about how memory works, you'll think back,

22  and you'll remember some of what I said.  That's called

23  retrieval.

24      Now, a critical issue with respect to memory in the

01:40:20    25  legal setting is that sometimes when you retrieve the memory

01:40:39

1    trace that you laid down, you're right.  You're remembering

2    what actually happened.  But memory traces can be altered,

3    unbeknownst to you, unbeknownst to anybody, so that later when

4    you're remembering what you think happened, even if you can

5    remember it with high confidence, it's not what actually

6    happened.

7         What we learned in the 1970s, 1980s is that memory is

8    malleable.  Memory with can be changed, which is related to

9    what I said before.  Because that's true, it's why it's so

01:40:55

10   essential to ask the question, under what conditions can we

11   trust memory and under what conditions does it become not so

12   trustworthy because it has changed?

13   Q.  So in your experience, have you encountered various common

14   misperceptions about memory and how memory works?

01:41:13

15   A.  I have.  So, for example, your average person and many in

16   the legal system tend to believe that memory is accurate across

17   the board.  If somebody says, I remember something happened,

18   you can take that to the bank; it almost certainly did happen.

19   That's what a lot of people think.

01:41:28

20        For 25 years, researchers have been saying, you can

21   never trust eyewitness memory.  Eyewitness memory is completely

22   fallible.  Memory is not trustworthy.

23        But I've been arguing in recent years, and people have

24   come around to this way of thinking, that, you know, both camps

01:41:44

25   were half right.  The lay public and the experts were half

1    right.  There are conditions under which memory is highly

2    reliable.  All my colleagues resisted that notion initially,

3    but the lay public was right about that.  But the researchers

4    were right that there are also conditions under which it's not

01:41:57    5    reliable.

6        And -- and that's sort of the new understanding in the

7    field, that there are conditions under which actually

8    eyewitness memory is very trustworthy.  And I was sort of an

9    outlier myself.  I was an outlier initially saying -- daring to

01:42:12    10    suggest that eyewitness memory is reliable under certain

11    conditions.

12    Q.  So have you heard the phrase "false memory"?

13    A.  Yes.

14    Q.  And could you explain to the jury what false memory

01:42:22    15    consists of?

16    A.  False memory is just like I said.  It's a memory where it

17    feels real to you, but it didn't actually happen.  There's lots

18    of examples of it that you've seen.

19        So you might have remembered a few years ago the

01:42:32    20    newscaster, Brian Williams, talking about on the news how he

21    was in a helicopter in Iraq, and they came under fire and had

22    to land.  And it turned out to be -- when they looked back at

23    the military records, that was completely false, and people

24    thought he was lying.

01:42:45    25        And I would not accuse him of lying.  I have no doubt

1    that he thought back and remembered being in a helicopter and

2    getting shot at.  The likely explanation, I don't know for

3    sure.  But the way a false memory could be created almost

4    undoubtedly before you get -- that was back when there was

01:42:59    5    conflict -- more conflict than there is now in Iraq.

6              Before they put a newscaster on a helicopter, they

7    presumably said to him, look, this is a combat zone.  We could

8    come under fire.  We might have to land this helicopter

9    quickly.

01:43:10   10              He probably mentally rehearsed that many times.  He

11   was probably nervous about it.  He thought about it repeatedly.

12   And then years later when he thought back, he failed to

13   appreciate that that familiar memory of landing a helicopter

14   under fire was actually something he had just rehearsed.  It

01:43:28   15   didn't actually happen.  That's a false memory.  It felt

16   totally -- I'm thinking it felt totally real to him, but it

17   wasn't real.

18              It's an example of how memories can be changed.  His

19   actual memory of being in that helicopter got supplanted by

01:43:43   20   this -- probably this rehearsal that he had done in preparation

21   for it.

22   Q.  Okay.  I take it from some of your earlier answers, you

23   know Dr. Gary Wells, correct?

24   A.  Yes.

01:43:52   25   Q.  In fact, the groundbreaking report that you mentioned was

1  written with Dr. Wells, right?

2  A.  Yes.  We wrote it together.

3  Q.  Dr. Wells testified in this case that eyewitness memory is

4  malleable.

01:44:02

5       Do you agree with that?

6  A.  I definitely agree with that.

7  Q.  And you mentioned it briefly, but can you tell the jury

8  briefly what memory malleability is?

9  A.  It's you form an initial memory, and it gets changed.  So

01:44:13

10  for right now you're forming a memory as I described it.  If

11  after today's testimony or at some later time, let's say --

12  you're not supposed to talk about the case -- but let's say at

13  some later time you're talking about this and somebody starts

14  telling you what Wixted said, and it's not what I said.  And

01:44:28

15  they tell you it repeatedly, and you start thinking about maybe

16  I did say that.

17       It would change your memory of -- the memory that

18  you're laying down right now can be changed by those

19  experiences after the fact, so that later when you try to

01:44:42

20  remember what I said, you'll remember the changed memory, not

21  the -- not the memory that you laid down in court.

22  Q.  Thanks.  Dr. Wells also testified in this case that

23  improper interviewing techniques can cause people to have false

24  memories.

01:44:54

25       Do you agree with that?

1    A.  I definitely agree with that.

2    Q.  And can you tell the jury briefly why you agree?

3    A.  It's a hard lesson that we've learned in the field multiple

4    times over the years where the way you ask somebody a

01:45:08    5    question -- when you're trying to find out from memory what

6    actually happened, the way you ask the question can

7    accidentally implant false memories.  Nobody is doing anything

8    intentionally wrong.

9        So the best example I have is the McMartin Preschool

01:45:23    10    case.  You may remember that from decades ago, maybe not.  But

11    it was a case where a mother became concerned that her child

12    might have been sexually abused in daycare.  And so they

13    interviewed that child.  And then other parents heard about

14    this, and they interviewed all the children.  And eventually,

01:45:37    15    they became convinced that hundreds, maybe thousands of

16    children were being sexually abused in daycare centers all

17    across the nation.  There was a hysteria across this nation.

18    It was on national news constantly.

19        Later they realized what went wrong.  What happened

01:45:51    20    was, when they first asked -- these were people sincerely

21    trying to get at the truth.  When they asked the children, you

22    know, did this man touch you here?  Did you play that game with

23    this man?  The children said no.  They all said no.

24        When they said, tell me what happened, the children

01:46:05    25    didn't have much to say.  The interviewers kept probing, kept

1   changing the question, kept asking questions like this:  Did he

2   touch you here?  Notice that's saying something that the child

3   didn't say.  It's a sincere attempt to get at what happened,

4   but it's suggesting something to the child.

01:46:22   5   And the child began to cooperate and say yes.  And

6   eventually, that blossomed into false memories where they were

7   agreeing to the fact that there was satanic ritual abuse.  And

8   finally people realized, hey, wait a second, none of this can

9   be real.  And they looked back at what happened.

01:46:37   10   The questions that were asked were asked the wrong

11   way, ways that suggested information to the children that they

12   incorporated into their memory.

13   We've learned this happens to adults, too.  It's

14   special -- it's an especially big problem with children, but

01:46:49   15   the same problem exists when interviewing adults.

16   There are now interview protocols.  People are trained

17   on how to interview people on that first view to make sure that

18   you don't do that.

19   Q.  So in reviewing this case, can you -- did you come to any

01:47:02   20   opinions about whether some aspects of Orlando Lopez's

21   recantation displayed any telltale signs of false memory?

22   A.  Yes, I came to an opinion about that.

23   So I've basically been a broken record for years now

24   saying to people that if you're trying to use someone's memory

01:47:23   25   to get at the truth of what happened, take your eyes off of

1    everything except for the first memory test.  And on that first

2    memory test, that's where you get the best information.  Not

3    necessarily true, but that's your most reliable information,

4    the first memory test.

01:47:33    5    Q.  Let me -- we're going to come to that in a minute.

6    A.  Okay.

7    Q.  But before we do, I'd like to ask you to tell the jury a

8    little bit what a telltale sign of a false memory is.

9    A.  It's that when you first ask them about a memory, they tell

01:47:46    10    you one thing.  It doesn't -- it's -- it doesn't have much

11    detail.  There's not much to it.

12            But then you ask them again, and now there's more

13    detail.  And you ask them again later, and now it's an

14    increasingly clear detailed memory.

01:47:58    15            And at first -- the other thing that happens is

16    confidence in that memory increases.  So by the time you get to

17    the end and you've asked them the tenth time, you know, like in

18    an initial interview, a second interview, a deposition, now

19    they're completely confident.  You can see the change happen.

01:48:14    20    You can actually see the memory get implanted.

21            That is what I call a telltale sign of a false memory.

22    Q.  Okay.  What -- as you reviewed the documents in this case

23    to come to your conclusions, what did you review -- what did

24    you consider to be the initial interview in this case --

01:48:31    25    A.  All right.  So --

1    Q.   -- with respect to the recantation?

2    A.   Yeah.  Usually when I'm talking about the first memory test

3    and I say, put your eyes on the first memory test, ignore every

4    later memory test, I'm talking about like within a few days of

01:48:44    5    the crime, the police show a lineup, do an interview.  That's

6    the first memory test.

7            And this case is different because those things

8    happened decades ago, and now we're revisiting it.  So what I'm

9    calling with regard to the recantation the first memory test is

01:48:58    10   the first interview conducted with the witness by Estes and

11   Linzer, I think their names were.  That first interview -- I

12   think it was at a Starbucks -- that's the first memory test

13   with respect to the recantation.

14   Q.   And -- and do you have any concerns as an expert in memory

01:49:14    15   about the way in which that initial interview was conducted?

16   A.   Well, I wouldn't call it a concern.  I would say I would

17   describe it as not being conducted the way somebody trained to

18   conduct an interview would do it.

19           They did introduce information -- the one thing you

01:49:31    20   don't do -- you're trained to do when you do an interview is

21   not to suggest any piece of information that didn't come from

22   the witness' mouth.  You don't do that.  Because if you do,

23   they'll have a tendency to incorporate it into their own memory

24   without realizing it, and later they're going to be sure about

01:49:46    25   that.

1          So they were -- you know, I don't have any, you know,

2     serious concerns, but I did notice that it didn't strike me

3     that they were trained in interview technique, because they

4     occasionally inserted information that didn't come out of the

01:49:58    5     witness' mouth.

6     Q.   In fact, do you remember what they inserted?

7     A.   Yes, I do.   They told him about an interview conducted with

8     the victim in this crime where he had said that some member of

9     a different gang committed the crime.

01:50:21   10     Q.   And do you remember what they reported Orlando Lopez's

11     reaction to that?

12     A.   Yeah, he got angry in response to that information, that

13     why didn't anybody tell him.

14     Q.   Is there a concept in memory research called "retrospective

01:50:36   15     bias"?

16     A.   Yes.

17     Q.   And can you tell the jury what that is?

18     A.   Yeah.   So another way that memory can change is when you

19     think back to your childhood -- or it doesn't have to be

01:50:46   20     childhood.

21          When you think back long ago and you're trying to

22     retrieve memories from long ago, well, they're not going to be

23     very strong memories, for the most part, because many years

24     have gone by.

01:50:52   25          And when we think back at our behavior, we tend --

1    have a tendency -- it's just human nature -- to remember our

2    actions as being more consistent with our current self view

3    than maybe what is the truth.

4         So if I think of myself as a good and honest person

01:51:09   5    and I'm thinking back to a class where I was accused of

6    cheating or something, even if I did cheat, I might remember as

7    actually I was trying to stop cheating, or something like that.

8    I'll remember it as being consistent with my current view of

9    myself as a good person.  It's just a normal human tendency to

01:51:27  10    do that.

11    Q.  So after you reviewed the notes of the initial interviews

12    by Linzer and Estes, did you review other documents reflecting

13    Mr. Lopez's statements about his recantation?

14    A.  Yes, I did.

01:51:40  15    Q.  And why did you do that?

16    A.  Well, to see if there were any signs of possible false

17    memories, because, see, every one of those documents that I

18    review -- I think of it as another memory test, right?  All of

19    these are memory tests where he -- the first interview, the

01:51:57  20    affidavit, the revisions of the affidavits, the post-conviction

21    testimony, I think it's called, they're all asking about his

22    memory.  The deposition, they're asking about what he

23    remembers.

24         These are all memory tests.  And, I mean, I'm a broken

01:52:15  25    record.  If you want the truth, it's the first one.  But I -- I

01:52:29

01:52:36

01:52:48

01:53:01

01:53:11

1    looked at the others not to find the truth but to look for

2    signs that maybe false --

3    Q.  And are among the signs that you're looking for

4    consistencies and inconsistencies between the retellings?

5    A.  Yeah, especially --

6              MR. LOEVY:  Objection, leading, Your honor.

7              THE COURT:  I'm sorry?

8              MR. LOEVY:  Never mind.  I withdraw the objection.

9    BY THE WITNESS:

10   A.  Especially -- especially the growth of a memory from

11   basically almost nothing to something detailed, that's --

12   BY MR. GIVEN:

13   Q.  What is the significance, if any, to the question of false

14   memory of finding consistencies between an initial interview

15   and later interviews?

16   A.  Well, if it's consistent -- to me, it means if it's

17   consistent, it was there in the first interview.  Right?

18              And so I'm saying just look at the first interview.

19   But, yeah, what's consistent was there in the first interview,

20   and it's the best information you have about what happened.

21   Q.  And did you find any consistencies as you reviewed from the

22   initial interview through the deposition that you --

23   A.  Yes.

24   Q.  -- referred to?

25   A.  So let's see.  Now you're testing my memory.

1          He told the white-haired lady that he had picked the

2     wrong guy.  He consistently said he picked the wrong guy, that

3     he lied, basically.

4          He consistently said that the police showed him a mug

01:53:35    5     book from the night of the crime, and he looked through that

6     mug book, and he picked Rivera out of that mug book because

7     Rivera resembled -- and that's the other thing -- he

8     consistently said Rivera resembled the guy who did it,

9     physically looked like the guy who did it.

01:53:54   10          He emphatically said from that first interview on that

11     the police never pressured him to do anything like this.  He

12     did it on his own accord.

13          I might be forgetting some, but those -- those

14     strike -- those were there in that first interview, and they

01:54:11   15     never changed.

16     Q.  Do you recall whether he said anything consistent or

17     inconsistent about when he looked at the mug books?

18     A.  Yes.  The -- the day of the crime, I guess.  The day of the

19     crime is when they brought the mug book to his house.  I guess

01:54:25   20     after the police first went -- I guess it was a car accident

21     taking the victim to the hospital.  They first went there, and

22     then they went to his house with the mug book.

23     Q.  Okay.  We have limited time, so I'm going to move you

24     along.

01:54:37   25          What, if any, were the primary inconsistencies that

1  you saw as you reviewed the initial interview through the

2  deposition?

3  A.  Okay.  So in the initial interview, there's one lineup.  In

4  later interviews, there's two lineups.

01:54:51  5       In the initial interview, he says to the white-haired

6  lady, I got the wrong guy, wrong guy.  And sometimes there's

7  another cop present, and sometimes there's not.  And then that

8  cop who's a sometimes present cop in the initial interview

9  grows in specificity over time and later becomes, you know,

01:55:15  10  plain clothed.

11       See, the white-haired lady is described in physical

12  detail right from the outset.  She has white hair.  She's an

13  older lady.  There was -- non-uniformed, so like physical

14  descriptors are there.  But the cop, there's just nothing like

01:55:27  15  that in the interview.

16  Q.  Okay.

17  A.  But over time --

18  Q.  You know what, we'll go through each of those in a little

19  more detail.

01:55:33  20  A.  Yeah.

21  Q.  In fact, let's start with the first one, the one lineup

22  versus the two lineups.

23       What is the basis -- and maybe you've already said

24  this.  But what is the basis for your opinion that the second

01:55:45  25  lineup has telltale signs of being a false memory?

1    A.  That it just wasn't there in the one and only memory test

2    that you get, and that's the first one.

3    Q.  Okay.  I'm going to ask Mr. Brueggen to help us and move

4    along here.

01:56:02    5         MR. GIVEN:  Could you put the typed Estes report up

6    and --

7         MR. BRUEGGEN:  Could I have the Elmo, please.

8    Interview.

9         MR. GIVEN:  And do you remember what exhibit number

01:56:07   10    this is?  It's been introduced into evidence, Judge.

11         MR. BRUEGGEN:  Defendants' Exhibit 103.

12         THE COURT:  Okay.

13         MR. GIVEN:  Page 11, please.

14    BY MR. GIVEN:

01:56:14   15    Q.  Do you have that up on your screen, Doctor?

16    A.  Yes, I do.

17    Q.  Is that what you're referring to when you say the initial

18    interview talks about one lineup?

19    A.  Let's see.  Mug book to his house.  He picked the guy,

01:56:31   20    thinks he may have picked him from a lineup a few days later.

21    There's a lineup.  And a few days after that they showed him

22    more photos.

23         So they got the mug book, the lineup, and more photos.

24    Fairly uncertain memories, which makes sense because it's so

01:56:44   25    long ago.  That's the state of his memory in that initial

1    interview.

2         MR. GIVEN:  And then can you put the June 12, 2010,

3    affidavit up, please?

4    BY MR. GIVEN:

01:56:53    5    Q.  Do you have that in front of you?

6    A.  I do.

7    Q.  And if you look at paragraph 14, in particular.  Notice any

8    change?

9    A.  Yes.  And now we see a second lineup, and that's always the

01:57:08   10    way it is, with the unintentional insertion of false memories.

11    It's not definitely a false memory.  It shows the signs of a

12    false memory.  That's my point, and the fact that it emerged in

13    the later test.

14         It's the sort of thing that has led to miscarriages of

01:57:23   15    justice and wrongful convictions over the years.  That's why my

16    most important message to the legal system is always stay away

17    from every later memory test.  Focus on the first.

18    Q.  And then as you read the post-conviction testimony and the

19    deposition, was there -- did there continue to be uncertainty

01:57:38   20    or certainty with regard to the second lineup?

21    A.  He then became certain and certain of other factors, like

22    he became certain that he picked Rivera early on.  There's

23    uncertainty about whether he picked Rivera from the lineup.  He

24    becomes certain later that he did.

01:57:51   25    Q.  And did you notice anything in the documents that you read

1  that seemed to contradict this second lineup idea that he had

2  or story he was telling?

3  A.  Well, I don't know if I saw anything that contradicted it.

4  I think there was no record anywhere of that second lineup, if

01:58:06  5  that's what you mean, but --

6  Q.  Do you remember reading his criminal testimony -- criminal

7  trial testimony?

8  A.  Back in like 1990?

9  Q.  Right.

01:58:14  10  A.  Yes.  And there was no mention of it there, either, back

11  when memory was fresher.  No mention of a second lineup back

12  then.

13  Q.  So what do you conclude about whether Lopez's story about

14  two lineups might be a false memory?

01:58:27  15  A.  It shows all the signs of being a false memory.  It doesn't

16  necessarily mean it's a false memory.  It's that its

17  information value is low.

18        It's just hard to say whether or not that's a real

19  memory -- that's what I mean when it says, telltale signs of a

01:58:37  20  false memory.  Not that it's definitely false, but that it's

21  untrustworthy information, kind of information that the legal

22  system has mistakenly relied on a lot over many years.

23  Q.  Okay.  I'm going to cut you short.

24  A.  Yeah.

01:58:51  25  Q.  Let's talk about the second inconsistency you mentioned, to

1   whom Mr. Lopez made his "wrong guy, wrong guy" statement.

2       What is the basis for your opinion that this aspect of

3   his recantation might be a false memory?

4   A.  Because in that initial interview, if I remember correctly,

5   he sometimes -- he always mentions that white-haired lady as

6   the person he said it to.  Then there's some reference to a cop

7   saying to him -- back to him, along with the white-haired lady,

8   that, don't worry, we'll protect you, which is kind of a weird

9   response, but that's what he remembers.

10      Then later you have all these physical details

11  associated with the white-haired lady, none associated with

12  this cop.

13  Q.  So let me --

14      MR. GIVEN:  So, Dave, could you put on the Elmo the

15  post-conviction at pages 58 and 59, please.

16  BY MR. GIVEN:

17  Q.  And at the bottom, if you could see that.

18              "At some point you were

19          asked to see a second lineup?

20              "Correct.

21              "Now, do you recall when

22          this would have happened?

23              "I remember the lineup.

24          I don't recall the date.

25              "Did it happen after you had

1          this observation?"

2          And then what does he say, Doctor?

3   A.  "Yes, I saw -- after that -- when I saw that, I went to the

4   second lineup, and I end up telling some lady with white hair

02:00:21    5   that he was the wrong -- it was the wrong guy."

6          That message is a consistent message.

7          MR. GIVEN:  And, Dave, if you could flip quickly to

8   page 84.

9   BY MR. GIVEN:

02:00:39   10   Q.  Question in the middle of the page:

11             "Who was the first person

12             you said it wasn't Rivera to?  I

13             thought that was her?

14             "Answer:  That was her.  She

02:00:47   15             was the only one."

16          Is that -- do you recall who he's referring to there?

17   A.  Yes, he's still talking about that white-haired lady.

18   Q.  So is that among the documents you are relying on in saying

19   that he has this consistent telling about the white-haired

02:01:02   20   lady?

21   A.  Yes, he clearly has a strong detailed memory of that.

22   Q.  And then you mentioned that -- throughout these documents,

23   there is a mention of a cop, correct?

24   A.  Correct.

02:01:09   25   Q.  And what, as you recall, do you -- is telling to you about

1    his description of the cop?

2    A.  He does not have a clear memory of that cop.  It seems like

3    a weak, nondetailed, uncertain memory at the beginning.  That's

4    how it starts.

02:01:25    5    Q.  So just so the jury can see what we're talking about, this

6    is the Estes typed report at the top.

7            "He said the white-haired lady and one of the cops

8    kept saying, it's all right, you don't need to be afraid."

9            At the bottom -- interestingly, on the same page at

02:01:44    10    the bottom, Mr. Lopez said he didn't really care about what

11    happened to a Latin King, but neither did that white-haired

12    lady.

13            What does that tell you?

14    A.  Again, she's clear and involved in his memory.  He has a

02:01:54    15    clear memory of that.  And the cop is clearly a much vaguer,

16    uncertain memory with no detail associated with it.

17            MR. GIVEN:  So, Dave, if you could quickly put on the

18    affidavit, please, the June 2010 affidavit.  This is about four

19    months -- four or five months afterwards.  Paragraph 14.

02:02:14    20    BY MR. GIVEN:

21    Q.  Doctor, if you could just read -- start reading paragraph

22    14, please.

23    A.  "About two weeks after the shooting, the police asked me to

24    come to the police station in order to view a second lineup.

02:02:27    25    It was at this point that I told a nonuniformed police

1  officer" -- now that's a new detail -- "that Jacques Rivera was

2  not the shooter and that the real shooter was an Imperial

3  Gangster and a neighborhood guy.  I told the same thing to a

4  woman who could have been a lawyer."

02:02:38   5  Q.  Okay.  So what does that tell us about the progression that

6  we've seen?

7  A.  It's -- it's what I call the telltale sign of a false

8  memory.  It's a detail that wasn't there on the one and only

9  memory test that you should focus on.  It's there later.  It's

02:02:52  10  hard to know what to make of details like that, because memory

11  is malleable, as I explained.

12       MR. GIVEN:  Okay.  Dave, if you could put the

13  deposition transcript, pages 95 and 96, please.

14       Judge, this is actually faster than doing it on the

02:03:08  15  computer.

16       THE COURT:  All right.

17  BY MR. GIVEN:

18  Q.  And at the bottom:

19            "Now, in terms of the

02:03:25  20        gentleman who was there, I

21        understand you to say it was

22        the same detective with the fro

23        who you testified about before.

24        Is that accurate?"

02:03:32  25       And what is his answer, continuing on 96?

1    A.  "I just don't know.  Like I said, I think it was him.  Him

2    and then" -- there's something blocking my view there.

3    Q.  "I just don't know" --

4    A.  Yeah.

02:03:45    5    Q.  -- what does that -- what does that tell you as a memory

6    researcher?

7    A.  Well, at this point, it's a weak memory, and he's

8    uncertain.  And that's the way -- you know, malleable memories

9    don't jump from absent to complete certainty.  They grow in

02:03:57   10    time.  You become somewhat certain of things, and it continues.

11    Q.  Okay.  So what do you conclude about whether Mr. Lopez's

12    recantation about telling a white-haired lady and a cop about a

13    wrong guy, whether that may or may not be a false memory?

14    A.  Well, I don't have any reason to believe what he told the

02:04:15   15    white -- that he told the white-haired lady who was older and

16    nonuniformed, I have no reason really to doubt that, except

17    that it's a 20-year-old memory.  But sort of setting that aside

18    for the moment and just talking about starting from that first

19    memory test, no reason to doubt that.

02:04:29   20            But his memory of the cop, it just showed -- this is

21    what we mean by memory is malleable, and you just see its

22    detail and confidence and it grow over time.

23    Q.  Okay.  Let's finally talk about Mr. Lopez's description of

24    this cop.

02:04:43   25            Did you come to any conclusions about whether this

1  aspect of Mr. Lopez's recantation bore the telltale signs of

2  being a false memory?

3  A.  Yes, because it went from what we saw in that document,

4  it's just a cop, sometimes there, sometimes not, to fleshed-out

02:05:01  5  detail.

6  He's a Hispanic guy.  He has glasses.  He has a fro.

7  He's a nonuniformed detective.  All these details that were

8  missing and then later they're there, that is just -- I mean,

9  to me it's like a textbook example of a false memory.

02:05:16  10  Again, I'm not saying he's for sure wrong about that.

11  I cannot say that.  It's just untrustworthy information, is all

12  I'm saying.

13  Q.  So -- and I think I'm getting close to my time --

14  Dr. Wixted you're not saying Orlando Lopez's recantation is a

02:05:31  15  complete false memory, are you?

16  A.  No, I am not saying that.

17  Q.  Can you tell the ladies and gentlemen of the jury, in light

18  of your specialized knowledge, training, and experience in the

19  study of memory, what your opinion is about whether Mr. Lopez's

02:05:45  20  recantation has the telltale signs of a false memory?

21  A.  The recantation itself?

22  Q.  His -- his telling of the recantation over time.

23  A.  Oh, well, it's a mixture of recollections that show no

24  signs of -- of false memory, none of those telltale signs, and

02:06:03  25  others that show very clear signs of it, indicating to me that

1    that's untrustworthy information.

2        And it's just another way of saying, the most

3    important thing I can say today is focus on the initial memory

4    test.  It's my constant message to the legal system.

02:06:18    5    Q.  And that initial test is the typewritten report of Cynthia

6    Estes, correct?

7    A.  Yes, and the handwritten notes that go along with that --

8    Q.  Right.

9    A.  -- if there's any discrepancy between the two.

02:06:26   10        MR. GIVEN:  I have no further questions, Judge.

11        THE COURT:  All right.  And you've got 16 more

12    minutes, 17 maybe if I'm generous.

13        MR. GIVEN:  I may or may not share them with

14    Ms. Barber.  I'll negotiate with her.

02:06:37   15        THE COURT:  That's total.

16                    CROSS-EXAMINATION

17    BY MR. LOEVY:

18    Q.  All right, sir.  Good afternoon.

19    A.  Good afternoon.

02:06:40   20    Q.  This memory theory that you've laid out, it cuts both ways

21    in terms of this case, right?

22    A.  I don't know what you mean by that.

23    Q.  For example, Orlando Lopez's memory that he wasn't

24    manipulated by the police back in 1988, you don't regard that

02:06:53   25    to be a reliable memory either, do you, sir?

1  A.  I don't see any of the telltale signs of it being a false

2  memory.  But if you're saying can I say it's definitely right,

3  no, I can't.

4  Q.  No.  You view it as unreliable, don't you?

02:07:06    5  A.  I'm not sure why you say that.

6  Q.  All right.  Do you remember giving a deposition, sir?

7  A.  Yes.

8  Q.  And do you remember being asked this question.  This is

9  page 200, lines 14 through 22.

02:07:16    10                "There are reasons to doubt

11                Lopez's retrospective account that

12                no one pushed him, correct?"

13                        And you said, "Correct.

14                "And it may be true; it may

02:07:25    15                not be true, but from a psychologist's

16                standpoint, the fact that he presently

17                believed that doesn't necessarily make

18                it true; is that correct?"

19                        And your answer was, "Correct," right?

02:07:35    20  A.  Yes.

21                MR. GIVEN:  Well --

22                MR. LOEVY:  And, Your Honor --

23                MR. GIVEN:  -- for purposes of completion, the next

24  question was:  "Can you explain?"  And he explained.

02:07:42    25                MR. LOEVY:  Your Honor, I ask permission to do my

1  cross-examination.

2      THE COURT:  Well, if there's a rule of completeness

3  objection, I have to respond to it.

4      MR. LOEVY:  I'm going to give you a copy of the

02:07:54  5  deposition, Your Honor.

6      THE COURT:  Okay.  But a lot of this can also be

7  covered on redirect.

8      MR. LOEVY:  Exactly.

9      THE COURT:  What page?

02:08:01  10      MR. LOEVY:  This is page 200, lines 14 through 22.  He

11  goes on for almost a page, Your Honor, after that.

12      MR. GIVEN:  It was give and take.

13      THE COURT:  Well, hold on.  I don't need your

14  argument.  I just need to find the page.

02:08:17  15      Well, I think that -- you know, basically, this is all

16  that was -- it was covered in the opening examination.  I think

17  it can be covered in redirect.  It's repetitive.

18  BY MR. LOEVY:

19  Q.  All right.  The fact that Orlando Lopez presently

02:08:38  20  believes -- maybe he believes it in his soul -- that he wasn't

21  steered, that doesn't make it a reliable memory, right?

22  A.  Correct.  Everything he said 20 years later might not be

23  reliable.  That's true.

24  Q.  And he's a child at that time, right?

02:08:51  25  A.  Yes.

1    Q.  And you see a lot of hallmarks of false memories on that

2    kid's part, right, a lot of hallmarks?

3    A.  The ones I talked about, yes.

4    Q.  Well, you talked about ones from 20 years later.

02:08:58    5         How about hallmarks of false memories from 1988 and

6    1990?

7    A.  I haven't focused on that for purposes of this testimony,

8    but there's probably some there, too, because that's a normal

9    thing -- it's a normal thing for false memories to be

02:09:11   10    implanted.

11   Q.  Sure.  Children are more vulnerable to manipulation; would

12   you agree?

13   A.  I would.

14   Q.  Explain to the jury why it's easier for an adult to

02:09:18   15   manipulate a child without that child realizing it.

16   A.  Well, because they don't understand that they can -- as

17   well as adults do that they can be manipulated.  And so, yeah,

18   a child can be more easily manipulated than an adult.

19   Q.  So on the same theory that you talked about with Mr. Given,

02:09:30   20   a 12-year-old could have come out of his interactions with the

21   Chicago Police Department believing he wasn't steered, and he

22   very well might have been, right?

23   A.  I can't say one way or that -- he might not have been; he

24   might have been definitely.  Those are both possibilities.

02:09:45   25   Q.  All right.  You said that people have a retrospective

1  bias --

2  A.  Yes.

3  Q.  -- to remember how they want to remember it, right?

4      So when he's saying at his deposition when he's 37

02:09:53  5  years old that he wasn't manipulated, that might be a

6  retrospective bias, right?

7      MR. GIVEN:  Objection.  I'm sorry.  I'm going to have

8  to object to these questions about manipulation back when he

9  was 12 years old.  That -- you ruled that's out of the case.

02:10:06  10      MR. LOEVY:  Your Honor, this is a memory expert, and

11  they did a wide-ranging exam --

12      THE COURT:  Wait.  If there's been a ruling, I told

13  everybody I need to see ruling, because I can't remember all

14  the rulings.

02:10:10  15      MR. GIVEN:  It was on summary judgment, Your Honor.

16      THE COURT:  I don't --

17      MR. GIVEN:  I don't want to say --

18      THE COURT:  We don't have time for this, so let's --

19      MR. GIVEN:  This is part of -- it's been out of the

02:10:19  20  case.

21      MR. LOEVY:  Your Honor --

22      MR. GIVEN:  And it's beyond the scope -- it's beyond

23  the scope of his --

24      THE COURT:  Overruled -- you know, I have to overrule

02:10:25  25  it, because everybody is on a time frame.  And I just -- I told

1    you if you're going to rely on a ruling, I need to see the

2    ruling.

3    BY THE WITNESS:

4    A.   And I guess can I ask you to be clear about if you're

02:10:34   5    asking me a question about memory or if you're asking a

6    question about something else, because that objection just made

7    me wonder if when your questions are about memory versus

8    something else.

9    BY MR. LOEVY:

02:10:43   10   Q.   Sounds like what you're saying, you're a broken record, the

11   first story is the one that matters, right?

12             THE COURT:   Sustained.

13             MR. GIVEN:   Objection.

14             MS. ROSEN:   Objection, Judge.

02:10:50   15   BY THE WITNESS:

16   A.   That's not how I put it.

17   BY MR. LOEVY:

18   Q.   Well, when you said when you're looking at what's a memory

19   that's reliable and what's not, I thought you said like six

02:10:58   20   times that it's the first story that counts?

21   A.   No.   I said you get the best information from the first

22   memory test.

23   Q.   All right.   Let's take a look at Plaintiff's Exhibit 12,

24   sir.   And I'll represent to you that this is the first known

02:11:08   25   memory test of Orlando Lopez.   All right?

1     Have you ever seen this document?

2   A.  What year is it, first of all?

3   Q.  This is dated the 28th of August --

4   A.  Oh, we're back there, yes.

02:11:16    5   Q.  -- 1988, which is the day after the shooting.

6       This is an account, I'll represent to you, of Orlando

7   Lopez saying he was by the store, and then a car came through

8   the alley, turned east, a guy gets out, does the shooting.

9       Do you see that?

02:11:30    10  A.  I do.

11  Q.  Okay.  If this is his first account, by your accounts of

12  what's going to be a reliable memory, this is the most

13  important account, right?

14  A.  Yes.  If it's in response to a properly phrased question, I

02:11:43    15  would say, yes, definitely.

16  Q.  All right.  Well, let's say Officer McLaughlin asked him an

17  open-ended question:  Young Orlando, what did you see?  And

18  this is what he said.

19  A.  Yes.

02:11:49    20  Q.  This is the one that counts, right?

21  A.  I would definitely say so.

22  Q.  This one counts more than the third version or the sixth

23  version or the deposition version or the PC version, right?

24  A.  I -- yep.  That's what I'm a broken record on.

02:12:00    25  Q.  All right.  So if he was by the store the first time he was

1  asked and then later, say two years later at the criminal

2  trial, he says, actually, I was by my house, I saw a guy

3  shooting, I ran to the store, I talked to the clerk, I bought

4  some stuff, I ran back, I hid, I saw the last eight shots, and

02:12:18   5  that's where I got my view that second time, that would be --

6  have the hallmarks of an unreasonable memory.  We can agree

7  about that, right?

8  A.  To the extent that it differs from this first account.

9  Q.  No, I just really --

02:12:28  10  A.  Is that what you're saying?

11  Q.  -- if this is his first account, and then he gets to trial

12  two years later, that account he told at the trial two years

13  later has all the hallmarks of being a false memory, right?

14  A.  Well, I can't really say that because I haven't -- I

02:12:41  15  haven't -- it might.  I would want to sit down and read

16  everything he said in this interview and read everything he

17  said later.  Can we -- I can do that now if you want me to.

18  Q.  Well, you can't --

19  A.  Oh.

02:12:48  20  Q.  -- because the police officers didn't write it down, did

21  they?

22        MS. ROSEN:  Objection, Judge.

23  BY THE WITNESS:

24  A.  I don't know if they did.

02:12:52  25        THE COURT:  Sustained.  You know, let's stop the

1  argument.

2  BY MR. LOEVY:

3  Q.  All right.  Did the defense counsel show you any notes,

4  like with the detail of Cynthia Estes' notes about what Orlando

02:12:57   5  said in his second interview and his first interview and his

6  third interview?  Did you see any notes like that from 1988?

7          MS. ROSEN:  Objection, Judge.

8          THE COURT:  Sustained.  Is this witness' opinion

9  limited to the recent events?

02:13:12  10          MR. LOEVY:  Your Honor --

11          MR. GIVEN:  Yes.

12          MR. LOEVY:  -- he is a memory expert.

13          THE COURT:  Well, I know that, but he's here --

14          MR. LOEVY:  And he talked about all this in his

02:13:18  15  deposition, Your Honor.  This is -- this is -- I won't go over

16  time, but this is my time.  This is how I want to use it, Your

17  Honor.  It's fair cross-examination.

18          THE COURT:  Well, if it's not within his opinion --

19          MR. LOEVY:  It's all things he's talked about, and

02:13:28  20  it's all part of the case, Your Honor.

21          MS. ROSEN:  Judge, it's not part of his opinions at

22  all.  He did not --

23          THE COURT:  All right.  Well, I'm not going to -- I'm

24  not going waste all of Mr. Loevy's time with argument.

02:13:37  25          MR. LOEVY:  I will use --

1          THE COURT:  I think the witness has obviously

2    testified about what are the most reliable memories.  So I

3    think that's probably within his expertise.

4          MR. LOEVY:  All right.

02:13:48   5          THE COURT:  But, yes, let's not spend too much time on

6    what happened in '88 if he hasn't covered that.

7    BY MR. LOEVY:

8    Q.  You were shown a lot of detailed notes taken by

9    Northwestern, right?

02:13:57  10   A.  Yes.

11   Q.  Okay.  Did you see any comparable notes or do you know of

12   any existence that would report his first story?

13   A.  I can't --

14          MR. GIVEN:  Judge, objection.

02:14:07  15          MR. LOEVY:  His first story --

16          THE COURT:  Overruled.

17   BY THE WITNESS:

18   A.  My understanding of what I'd be asked about today was what

19   happened -- his recantation.  So I haven't reviewed all that

02:14:14  20   again.  So I'm not sure, is my answer.

21   BY MR. LOEVY:

22   Q.  All right.  But if your theory is it's the first story that

23   matters, why did you start your inquiry 20 years after the

24   fact?

02:14:23  25   A.  My -- first of all, my claim is not that it's the first

1  story that matters.

2       It's that the first memory test properly conducted has

3  the most reliable information.  That's the way I would like to

4  word it rather than rephrasing it the way you put --

02:14:34   5  Q.  All right.  Putting it your way, then why did you start 20

6  years --

7       MS. ROSEN:  Objection.

8       MR. GIVEN:  Objection, Judge.  He's interrupting him.

9       THE COURT:  Yeah, you are.

02:14:40  10  BY MR. LOEVY:

11  Q.  All right.  Wording it how you wanted to word it, why did

12  you start 20 years later?

13  A.  Well, for this testimony, my understanding was that's what

14  people were going to ask me about.

02:14:50  15       For my initial report, I was asked about the

16  reliability of that first ID from a mug book.  And my story

17  back then, which I haven't reviewed recently because I didn't

18  know you'd be asking me about it -- I would have if I realized

19  that -- was that that was the first eyewitness identification.

02:15:07  20  By all accounts, it was made with high confidence; and

21  therefore, even though it was made by a child, it was

22  relatively reliable identification.

23       That was my story back then.  The first --

24  Q.  All right, sir.  I think -- are you done answering that

02:15:15  25  question?

1    A.  Yes.

2    Q.  All right.  You also were asked at your deposition about

3    the lineups that Mr. Lopez looked at, right?

4          How about yes, no?  You were asked about the lineups,

02:15:27    5    right?

6          MR. GIVEN:  Judge, this is beyond the scope.

7          MR. LOEVY:  Your Honor --

8          THE COURT:  Well, he testified about lineups.

9          MR. LOEVY:  He sure did.

02:15:34   10          THE COURT:  I sat here listening to that.  Overruled.

11    BY MR. LOEVY:

12    Q.  All right, sir.

13    A.  I don't remember him testifying about -- did you use the

14    word, plural, "lineups" or lineup?

02:15:42   15    Q.  All right.  Let's keep it lineup.

16          Isn't it your opinion, sir, that once Orlando Lopez

17    has seen that photo, then the lineup becomes a meaningless

18    procedure, the live lineup?

19    A.  I would definitely say so.

02:15:52   20    Q.  All right.  So if he's shown that mug book procedure, say,

21    hypothetically, on August 27 and then they put him in a lineup

22    later, the lineup has no evidentiary value at all because he's

23    already seen the picture, right?

24    A.  Which is what I always say.  Focus on the first test.

02:16:06   25    Q.  All right.  So his memory has been contaminated as soon as

1  he's seen the photo?

2  A.  Yeah.  Police often don't realize that, but that's true.

3  Q.  All right.

4  A.  Especially back then, they didn't realize it.

02:16:14
5  Q.  All right.  You were asked some questions about how certain

6  Orlando Lopez was that the guy he saw was Jacques Rivera.

7       Do you remember Mr. Given asking you those questions?

8  A.  Yes.

9  Q.  Now, there's no contemporaneous documentation about how

02:16:31
10  certain he was when he saw that photo, right?

11  A.  That's correct.

12  Q.  So what you're relying on when you're saying he was certain

13  was his 20-years-later account that, oh, yeah, I remember I was

14  certain, right?  That's true, right?

02:16:44
15  A.  Well, I would know better if I had reviewed the information

16  from the 1980s and 1990s in preparation.  But I believe -- I

17  could be wrong -- that back then that testimony -- he testified

18  that the cops asked him if he was certain, and he said that he

19  was.

02:16:57
20       I could wrong about that, but that's my memory.

21  Q.  All right.  But I'm just curious.  If you were coming in

22  here to be a memory expert and you were saying that the first

23  memories are the ones, however you said it, then why didn't you

24  review his original statement?

02:17:07
25  A.  His original statement about what?

1  Q.  About anything, about everything.  Why did you start 20

2  years later?

3  A.  I didn't start 20 years later.  For the purpose of this

4  testimony, their understanding was I'd be asked about what

5  happened starting from his recantation.

6         So for this -- I've been involved in this case for

7  more than a year.  I started at the beginning -- back at the

8  beginning.  For this, my understanding was I was going to be

9  asked about --

10 Q.  All right.

11 A.  -- his recantation.  And so I made sure I reviewed that so

12 it's fresh in my mind.

13        You're asking me questions about things that I didn't

14 know I'd be asked about, and so they're not fresh in my mind.

15 That's all.

16 Q.  All right.

17        MS. ROSEN:  Judge, can we get a -- we need to have a

18 quick sidebar about this issue.

19        THE COURT:  I don't think we need one.  Let me just --

20 I think, Mr. Loevy, if you want to --

21        MR. LOEVY:  I'll keep moving, Your Honor.

22        THE COURT:  -- ask this witness about his theories

23 about memory, you can use them however you want.  But he's here

24 to testify about later events, and I think from now on we need

25 to keep it there.

1    MS. ROSEN:  And, Your Honor --

2    MR. LOEVY:  All right.  Your Honor, I -- then I'll

3  respect your ruling, Your Honor, but I'd like to move forward.

4  BY MR. LOEVY:

02:18:04    5  Q.  High confidence reporting now doesn't mean he, in fact, was

6  highly confident then, correct?

7  A.  Correct.

8  Q.  That's an actual phenomenon in the literature, right?

9  A.  Well, when you say it's an actual phenomenon --

02:18:14   10  Q.  In other words -- I'm sorry.  Go ahead.

11  A.  -- it's the case that people sometimes remember having been

12  confident when, in fact, they weren't.

13  Q.  Exactly.

14  A.  Yeah.

02:18:22   15  Q.  And the only indications you've seen are at least 20 years

16  old when he's saying he was confident; the only ones you've

17  seen, right?

18  A.  I don't believe that's true, because I have a memory --

19  again, I didn't review it, but my memory is back in 1990, he

02:18:34   20  declared that the cops asked him if he was confident, and he

21  said yes at the trial, I think.

22        But I could be wrong about that.

23  Q.  All right.  Well, now you're the one invoking the earlier

24  stuff, right?

02:18:44   25        You're saying at the trial he said he was highly

1    confident?

2    A.  He may have.  I'm not sure.

3    Q.  All right.  Because memory is fallible, right?

4            MR. GIVEN:  Objection.  He's arguing with the witness.

02:18:51    5            THE COURT:  Sustained.

6    BY THE WITNESS:

7    A.  But, see, notice I'm expressing a little confidence.  It is

8    fallible --

9    BY MR. LOEVY:

02:18:56    10   Q.  All right.

11   A.  -- but usually people can tell you when they're not sure.

12   Q.  If, in fact, he didn't say at the trial that he was very

13   confident, would you change your opinion?

14   A.  You mean if I read it and I didn't --

02:19:03    15   Q.  Yes.  Would that change your opinion?

16   A.  Well, which opinion?

17           MR. GIVEN:  Judge, I'm sorry.  I'm going to reraise my

18   objection to this whole line.

19           MR. LOEVY:  Obstruction, Your Honor.

02:19:11    20           MR. GIVEN:  And I do have a ruling on summary

21   judgment.

22           THE COURT:  Good.  Could you please hand it to me?

23           MR. GIVEN:  Sure.  This is with regard to a claim with

24   an unduly suggestive lineup.

02:19:26    25           MR. LOEVY:  This is not about an unduly suggestive

1    lineup.

2            THE COURT:  Oh, just stop it for a minute.

3            I don't know.  You know, I don't even know how that

4    relates to this, but I'm telling you what the ground rules are.

02:19:50    5            The ground rules are you can ask the witness anything

6    about his theories of memory, and you can use it however you

7    want.  But he is here to testify about things later than the

8    trial.  And it is unfair to him to be questioning him based on

9    things he wasn't prepared for.

02:20:06    10   BY MR. LOEVY:

11   Q.  You came to court prepared to testify, correct?

12   A.  Correct.

13   Q.  And your whole theory of memory is the earliest, most

14   contemporaneous accounts are the ones that matter, right?

02:20:15    15   A.  Properly conducted memory test, earliest ones, yes.

16   Q.  All right.  And you deliberately chose not to review --

17   A.  No.

18   Q.  -- his earliest contemporary accounts?

19   A.  No.  I did review --

02:20:27    20           MR. GIVEN:  Objection to form.

21           THE COURT:  Sustained.

22   BY MR. LOEVY:

23   Q.  All right.  You were asked questions about leading

24   questions, right?

02:20:34    25   A.  Yes.

1    Q.  And, in fact, that tends to distort memory and create false

2    memories, right?

3    A.  It can do that.

4    Q.  All right.  Let's take a look at some of the questions that

02:20:44    5    Mr. Lopez was asked about his first accounts about what the

6    shooter was looking at -- would look like.

7            This is Plaintiff's Exhibit -- Defendants' Exhibit

8    5.1, page 12 from the criminal trial.

9    A.  What year are we talking about?

02:20:58   10    Q.  This is the criminal trial, 1990.

11            MR. GIVEN:  Judge, I object based on --

12            MR. LOEVY:  Your Honor, I have my time.  This is a

13    leading question example.

14            THE COURT:  You have your time, but I gave everybody

02:21:06   15    really strict time limits.  And the defense decided what they

16    were going to do with this witness, and it is really unfair to

17    open this up.

18            MR. LOEVY:  Your Honor --

19            THE COURT:  You know, the whole game is up.

02:21:17   20            MR. LOEVY:  May I -- may I ask my questions?  These

21    are examples of how a memory can be distorted, exactly what Mr.

22    Given was talking about.

23            MR. GIVEN:  Except the difference is, Judge, this is

24    from 1990.

02:21:26   25            MR. LOEVY:  Your Honor, this is --

1    THE COURT:  Well, let me hear the question --

2    MR. LOEVY:  Thank you.

3    THE COURT:  -- then make your objection.

4  BY MR. LOEVY:

02:21:31    5  Q.  All right.  The first time he was asked at trial, he

6  said -- Orlando Lopez said the guy was wearing all black,

7  correct?

8  A.  Let's see.  By the way, what's the man wearing?  You

9  saw him -- sorry.  Can you ask the question again?

02:21:42   10  Q.  The first time he was asked at the trial, he said, you saw

11  the man shooting.  What was he wearing?  He says all black,

12  right?

13  A.  Well, I can't --

14  Q.  All right.

02:21:49   15  A.  Again, I didn't prepare.  I can't guarantee this is the

16  first time he's asked but --

17  Q.  All right.  He's also asked --

18    THE COURT REPORTER:  I'm sorry.  One at a time.

19    MS. ROSEN:  Judge, let him answer the question.

02:21:57   20    MR. LOEVY:  Your Honor, just trying to obstruct, Your

21  Honor.

22    MR. GIVEN:  And also, Judge, I'll renew the same thing

23  that he just said.  We're not going back 20 years, and this --

24  these examples --

02:22:04   25    THE COURT:  Well, I told you to make an objection, and

1  I'd sustain it.  I'm sitting here, and no one's objection.

2          MR. LOEVY:  Your Honor, the next question is --

3          MR. GIVEN:  Your Honor, objection, foundation, beyond

4  the scope.

02:22:13  5          THE COURT:  Sustained.

6  BY MR. LOEVY:

7  Q.  He was -- he was also asked at the trial he was wearing the

8  colors --

9          MR. GIVEN:  Objection.

02:22:15  10  BY MR. LOEVY:

11  Q.  -- of black and yellow, black and gold, and he said yes.

12          My question is, isn't that an example of the

13  phenomenon you described with Mr. Given --

14          MS. ROSEN:  Objection, Judge.

02:22:24  15  BY MR. LOEVY:

16  Q.  -- that if you asked a leading question, you distort

17  memory?

18          MS. ROSEN:  Objection, Judge.

19          THE COURT:  Sustained.

02:22:31  20  BY MR. LOEVY:

21  Q.  Do you -- would it change your opinion about his memories

22  if instead of him saying at trial that the hair -- he described

23  the hair as brown, and then it was suggested to him in a

24  question, wasn't the hair dyed gold, wasn't it a ponytail,

02:22:46  25  that's the kind of question that creates false memories,

             1   correct?

             2          MR. GIVEN:  Objection, form, foundation, and scope.

             3   Same thing, Judge.  Those questions were asked --

             4          THE COURT:  So are you attacking the way we conduct

   02:22:59  5   trials with direct impeding questions?  I mean, I don't know

             6   what we're doing.

             7          MR. LOEVY:  No, Your Honor.

             8   BY MR. LOEVY:

             9   Q.  You gave a -- you gave testimony -- and I'll try to make it

   02:23:05 10   clearer -- that witness memory is distorted by the nature of

            11   the questioning, right?

            12   A.  Yes.  But just to be clear, that is definitely correct if

            13   the question is introducing information that hasn't already

            14   been raised by the witness.

   02:23:19 15   Q.  All right.

            16   A.  So that's true.  If it's for the first time you're asking

            17   somebody and you're specifying details that the witness has not

            18   mentioned, yes, that is an example of a leading question that

            19   can cause them to incorporate that information into their

   02:23:35 20   memory.

            21          If that's what you're asking me, I'm saying yes.

            22   Q.  All right.  Let's talk about the reliability of his

            23   account.

            24          There were a lot of reasons to doubt that Orlando

   02:23:43 25   Lopez saw anything, correct?

1        MR. GIVEN:  Objection.  I want to know which account

2    he's asking about, Judge.

3        MR. LOEVY:  His original account.

4        MR. GIVEN:  Original account?

02:23:48   5        THE COURT:  Sustained.

6    BY MR. GIVEN:

7    Q.  He got a glimpse of the shooter, right?

8        MS. ROSEN:  Judge --

9        MR. GIVEN:  Objection.

02:24:00  10        THE COURT:  I can't allow this.  It's not fair.

11        MR. LOEVY:  All right.  I don't know how to even

12    attack the opinions he elicited that it's a false memory that

13    he's talking about 20 years later if I can't get at the

14    underlying memories, Your Honor.

02:24:07  15        MR. GIVEN:  Judge, the memories that he's talking

16    about are the recantation starting in 2010.

17        MR. LOEVY:  But they're based on the recantation of

18    events that happened in 1988.

19        MR. GIVEN:  Judge, they are entirely self-contained

02:24:18  20    from 2010 forward.  Those are the -- those are the statements

21    that Dr. Wixted was opining on.

22        THE COURT:  I don't know what to do, because his

23    opinion -- he's here to testify about certain things, and

24    you're way, way into a different area.

02:24:30  25        I told you that if you can ask questions about his

1  theories, I will allow them and allow you to do whatever kind

2  of argument you want about them.  But I can't let you ask him

3  questions about the trial transcript and things like that that

4  he hasn't even reviewed.

02:24:44

5  MR. LOEVY:  Oh, he has reviewed them.  Maybe he said

6  he hasn't for trial.  He was asked about them --

7  THE COURT:  I don't know, but he's not here to

8  testify --

9  MR. LOEVY:  All right.  I'll ask it differently.

02:24:50

10  BY MR. LOEVY:

11  Q.  The same emerging memory theory that you talked about with

12  Mr. Given with Northwestern, that would also apply in 1990,

13  right?

14  A.  The principles that I talked about?

02:25:01

15  Q.  Exactly.

16  A.  Correct.

17  Q.  All right.  So if he gives a statement to the police in

18  1988 and he's asked about them again in 1990, the same

19  principles you discussed with Mr. Given about the malleability

02:25:12

20  of memory, about the possibility of false memory, about adding

21  details, the same problems would be in both subsets, right?

22  A.  You're saying hypothetically if those things happened back

23  in 1988, would my answer be the same?  And yes.

24  Q.  No, I guess -- all right.  Maybe I misunderstood.

02:25:29

25  What I'm saying is, you've explained why some of the

1    things that Mr. Given believes are false memories are false

2    memories, right?

3            MR. GIVEN:  Objection, form.

4    BY THE WITNESS:

02:25:40    5    A.  No.

6            MR. GIVEN:  I don't have any opinions about whether

7    things are or are not false memories.

8            MR. LOEVY:  I'll ask a different question, Your Honor.

9            THE COURT:  Yeah.  Ask a different question.

02:25:50    10   BY MR. LOEVY:

11   Q.  All right.  The boy saw what he saw in 1988, right?

12   A.  Sorry.  I didn't hear that.

13   Q.  The boy saw what he saw in 1988, right?

14   A.  Right.

02:25:56    15   Q.  And then he gives testimony in 1990, right?

16   A.  Correct.

17   Q.  And I think your testimony is, his first account is the

18   most reliable, right?

19   A.  Properly conducted first memory test, yes.

02:26:06    20   Q.  All right.  Now, all the principles you talked about with

21   Mr. Given, about false memories, about things being suggested

22   to him, about inconsistencies, about stories changing, those

23   would apply equally to the testimony he gave two years later at

24   the trial, right?

02:26:21    25   A.  To the extent that the same phenomena were observed back

1    then, yes, I would say so.

2    Q.  All right.  Let's talk about some questions you talked

3    about with Mr. Given.

4            You said you thought that the Estes interview had --

02:26:30    5    you didn't say that his memories were false what he said to

6    Ms. Estes, correct?

7    A.  Correct.

8    Q.  All right.  Now, if the interview was conducted as

9    Ms. Estes said -- and this is Defendants' Exhibit 102 -- and it

02:26:42    10    was conducted with an open-ended question, "What do you recall

11    about the Jacques Rivera case" --

12            MR. GIVEN:  Judge, objection, foundation.  The

13    testimony is that those notes were not used as part of those

14    interviews.

02:26:54    15            MR. LOEVY:  Objection to the speaking objection.

16            MR. GIVEN:  It was very clear from Ms. Linzer.

17            THE COURT:  Overruled.  Overruled.

18    BY MR. LOEVY:

19    Q.  All right.  If, in fact, Ms. Estes testified at her

02:27:05    20    deposition that these were the notes she took in the car of the

21    things they were going to ask Orlando Lopez and assume,

22    hypothetically, that they asked an open-ended question, "What

23    do you recall about the Jacques Rivera case," that would be the

24    right way to do it, right?

02:27:15    25    A.  That's a great question.

1  Q.  And it is your understanding from reviewing Ms. Estes and

2  Ms. Linzer's testimony that they said basically they turned on

3  a faucet, and this guy just unloaded on them, right?

4         MR. GIVEN:  Objection, form.

02:27:29   5         THE COURT:  Overruled.

6  BY THE WITNESS:

7  A.  What testimony are you referring to when you say --

8  BY MR. LOEVY:

9  Q.  Did you read Ms. Linzer and Ms. Estes' account to how this

02:27:36  10  interview you've been talking about with Mr. Given, how this

11  interview took place?  Did you read their account of it?

12  A.  Which date -- which account?

13  Q.  When Ms. Linzer and Ms. Estes were deposed in this matter

14  to explain how they took this interview, did you review that?

02:27:51  15  A.  Oh, yes.

16  Q.  All right.  And their -- their explanation was, we asked

17  him a question, and he just started crying, and he just started

18  talking, and we started writing, right?

19  A.  Right.

02:27:59  20  Q.  And that's -- that's a reliable way to elicit the

21  information, right?

22  A.  If that's all they did, yeah, I would say so.

23  Q.  Especially if he show -- if they show up many years after

24  the fact, unannounced, and don't give him warning, right?

02:28:07  25  A.  Right.

1    Q.  And in the interview notes looks like he said, a few days

2    later, after they showed him more photos, that's when he told

3    them Rivera was not the guy.  He thinks it was the third time

4    brought back.  He tried to tell them they had the wrong guy,

5    but nobody wanted to hear it.  He was young and alone at the

6    station.  His mother and father didn't go with him.  He asked

7    us what kind of parents would let their 11-year-old go to the

8    station.  Said he's so sorry for all this, but when you're 11

9    and you are trying to tell them something they don't want to

10   hear, it's hard.  He said the white-haired lady and one of the

11   cops kept saying, don't be afraid.  Paraphrasing, he said it

12   wasn't a fear problem.  He was saying that he just -- they just

13   didn't want to hear when he tried to make it right.

14          This doesn't have hallmarks of a false memory, does

15   it?

16   A.  No.

17   Q.  And, in fact, he said he wanted us to know the cops did not

18   coerce him.  That's his word, right?

19   A.  Right.

20   Q.  A coercing is not the same thing as steering or suggesting,

21   right?

22   A.  Well, I don't know if I would draw that distinction, but --

23   Q.  All right.  But you've already said --

24   A.  -- you can.

25   Q.  -- that even if he didn't believe he was steered, that

1  could be a false memory, right?

2  A.  Sure.  It could be.

3  Q.  All right.  You did criticize with Mr. Given that later in

4  the interview they asked -- they asked him, hey, did you know

02:29:27     5  anything about this guy who supposedly shot Felix, a guy named

6  Jose Rodriguez, right?

7  A.  I'm sorry?  Can you --

8           MR. GIVEN:  Objection to form, foundation.

9  BY MR. LOEVY:

02:29:36   10  Q.  All right.  Do you begrudge the investigators later in the

11  interview to say, "Thank you for all this information.  Do you

12  know a boy named Jose Rodriguez who we heard shot him"?

13           MR. GIVEN:  Objection, Judge, foundation.  About Jose

14  Rodriguez?  There's no --

02:29:49   15           MR. LOEVY:  Your Honor, there was questions about --

16           THE COURT:  Well, wait a minute.  I guess I need to

17  see you at side.  I don't know what's going on here.

18           MR. LOEVY:  Your Honor, should I ask a different

19  question so we don't have to go to sidebar?  I think --

02:29:56   20           THE COURT:  That would be a good idea.

21  BY MR. LOEVY:

22  Q.  All right.  You talked to Mr. Given about they told the boy

23  about an Imperial Gangster, right?

24  A.  Right.

02:30:03   25  Q.  Okay.  That's what I'm talking about.

1          So what's wrong with telling the guy, after he's told

2     you this whole account, saying, hey, do you know this Imperial

3     Gangster, trying to learn information?  Is there a problem with

4     that?

02:30:14     5          MR. GIVEN:  Objection, foundation.  That's not what

6     the record shows.

7     BY THE WITNESS:

8     A.  Can you --

9          THE COURT:  Well, I don't know what the record shows.

02:30:20    10     What does the record show?

11          MR. GIVEN:  The record --

12          THE COURT:  Is there any evidence that that is the

13     question he was asked?

14          MR. LOEVY:  Yes, Your Honor.  That's why they were

02:30:28    15     talking about Jose Rodriguez.

16          MR. GIVEN:  Judge, first of all, this constant

17     reference to Jose Rodriguez is entirely improper.

18          THE COURT:  Well, if you wouldn't constantly object, I

19     think we could get on with this.  Overruled.

02:30:38    20          MR. GIVEN:  If he wouldn't ask objectionable

21     questions, Judge, I wouldn't.

22     BY MR. LOEVY:

23     Q.  All right.  In this interview, they asked special

24     permission from the attorneys to get permission to mention the

02:30:48    25     subject and ask about it, right?

1  A.  I don't remember that, but I'm not denying it.

2  Q.  All right.  And they duly recorded in their notes that,

3  hey, we want to be real clear that, you know, we brought this

4  up.  That's a very responsible thing to do, isn't it?

02:31:02
5  A.  I don't know.  I suppose it is.

6  Q.  All right.  The police certainly didn't make a record of

7  the things they brought up with Jose Rod -- Orlando Lopez, did

8  they?

9        MS. ROSEN:  Object.

02:31:11
10        THE COURT:  Sustained.  This has nothing to do with

11  his -- with memory.

12        MR. LOEVY:  All right.

13  BY MR. LOEVY:

14  Q.  You were asked by Mr. Given about first lineup and second

02:31:18
15  lineup, and you told Mr. Given there was no mention of the

16  second lineup at trial.

17        Do you remember that testimony with Mr. Given?

18  A.  At trial back in 1990?

19  Q.  Right.

02:31:29
20  A.  Yeah, that's my memory of that.

21  Q.  And that's exactly what you told Mr. Given, right?

22  A.  I think so, yes.

23  Q.  All right.  Would your opinion change if Orlando Lopez did

24  talk about two lineups at that criminal trial?

02:31:41
25  A.  Would my opinion about whether or not he talked about one

1  or two lineups?

2          Yeah, if you showed me documentation that he talked

3  about two lineups, I would then say, yeah, he talked about two

4  lineups.  I was wrong.

02:31:52   5  Q.  I'm going to ask something different.

6          Mr. Given said, isn't it true that the fact that

7  there's two lineups has the hallmarks of a false memory?

8  That's what he was asking you about, right?

9  A.  Yes.

02:32:00  10  Q.  All right.  And one of the reasons you cited is because he

11  originally talked about one lineup, and now he's talking about

12  two lineups; that's the whole gist of your testimony, right?

13  A.  Well, that's one thing I testified about, yes.

14  Q.  All right.  If he, in fact, talked about two lineups back

02:32:10  15  at the criminal trial, that would surely change your opinion

16  about that being a false memory then, correct?

17  A.  I don't know that it would.  I would have to see exactly

18  what he said.  It still shows signs of --

19  Q.  All right.

02:32:20  20  A.  -- changing over time 20 years later, so it would puzzle

21  me.  But, yeah.

22  Q.  Let's take a look at what he said back in 1990.  This is

23  Defendants' Exhibit 5.1, page 32.

24                  "When the person stopped

02:32:30  25                  shooting, he then turned around

1      but, like, farther away.  He ran,

2      and then he went farther.  He kind

3      of ran where he turned around, and

4      I saw his face.

02:32:37    5           "That was the first time you

6      saw his face?

7           "Yes.

8           "You saw his face for a brief

9      moment?

02:32:41   10           "Yes.

11           "And then you didn't see his

12      face again until when you went and

13      picked the photograph out later?"

14      And then the next page:

02:32:48   15           "Yes.

16           "Then the police brought you

17      to the station a few days later?

18           "Yes.

19           "Then you viewed a lineup?

02:32:54   20           "Answer:  Yes."

21      Do you see that?

22  A.  I do.

23  Q.  All right.  And then showing you in the same testimony at

24  page 21:

02:32:59   25           "Now, on the 15th day of

1          September" -- which is more than two

2          weeks after the shooting -- "at about

3          7:15 in the evening, did you have

4          occasion to be at Area Crimes?

02:33:08    5               "Yes.

6               "How did you get over there?"

7          MR. SOTOS:  Objection, Judge.  The question doesn't

8  say anything about two weeks after the shooting, and there's no

9  testimony here to suggest he's talking about --

02:33:15   10          THE COURT:  You know, there's no dispute about that in

11  this case.  Overruled.

12  BY MR. LOEVY:

13  Q.  "The purpose of going over there was what?

14               "To pick out who did it.

02:33:24   15               "You were going to see a lineup?

16               "Yes."

17          Do you see that, sir?

18  A.  I do.

19  Q.  All right.  So even back then he was talking about a lineup

02:33:28   20  a few days after the shooting, and he was talking about a

21  lineup a few weeks later on September 15th, correct?

22          MR. SOTOS:  Objection, Your Honor.  The transcript

23  doesn't support what he's saying about it.  It doesn't show --

24          MR. LOEVY:  Should we read it again, Your Honor?

02:33:38   25          MR. SOTOS:  Can I finish?

1          The transcript doesn't show --

2          THE COURT:  Well, I think it's obvious.  You're saying

3    the transcript doesn't support it, and Mr. Loevy says the

4    transcript does support it.  It sounds to me -- I mean, where

02:33:47   5    does the transcript not support it?

6          MR. SOTOS:  It doesn't support the idea that the

7    witness is talking about two separate lineups.

8          MR. LOEVY:  Your Honor, this is just argument.

9          MR. SOTOS:  It's a question about a lineup --

02:33:54  10          THE COURT:  No, I think I'm going to overrule this

11   objection.  I think this is just using all of one party's time,

12   and it's not fair.

13   BY MR. LOEVY:

14   Q.  All right.  You said that you felt pretty confident that

02:34:04  15   this memory about the woman he was telling that it was the

16   wrong guy, that that was a real memory, right?

17   A.  Did I finish answering your last question about two

18   lineups?  I didn't feel like -- I had something to say about

19   that.

02:34:18  20   Q.  Let me ask you a question.

21          If, in fact, he talked about two lineups even 20 years

22   earlier, you have to change your testimony that that's a new

23   detail emerging 20 years later, right?

24   A.  But I don't consider what you showed me a discussion of two

02:34:32  25   lines.  That's all I wanted to say.

1    Q.   Okay.

2    A.   Because people are known to be really terrible at

3    estimating times.  They're really terrible at estimating

4    heights, distances.  Continuous variables, they're awful.

02:34:43   5         So a few days, a couple weeks, I wouldn't say --

6    myself, I wouldn't interpret that as a discussion of two

7    lineups, but I can see why you are interpreting it that way.

8    Q.   All right.  But that goes both ways.

9         Everything that's unreasonable is not the stuff that's

02:34:55  10   good for them and bad us for, right?  I mean --

11        MS. ROSEN:  Objection, Judge.

12        THE COURT:  Sustained.

13   BY MR. LOEVY:

14   Q.   All right.  The memory of the woman who he was telling,

02:35:02  15   look, I was telling her it's the wrong guy, that -- that's a

16   strong memory, right?

17   A.   It seems to be.

18   Q.   All right.  And you have to doubt that that's a reliable

19   memory, correct?

02:35:10  20   A.   I would not put it that way.  I'll explain.

21        So one has to start with the understanding that the

22   most reliable information comes from that first memory test.

23   No doubt about it.  But at the same time, I'm not saying I have

24   no doubt that even the consistent memories are necessarily

02:35:27  25   reliable.

1          I have no reason to challenge their reliabilities, is

2   how I would put.  I wouldn't say definitely reliable memory,

3   but, yeah, I have no reason to challenge it.

4   Q.  Yeah.  You're not here to say who is telling the truth and

02:35:37   5   who is lying --

6   A.  Correct.

7   Q.  -- that's not your function, right?

8   A.  Correct.

9   Q.  But this has the hallmarks of reliable memory, somebody

02:35:42   10   showing up at my door 20 years later, knocks on the door

11   unannounced, says tell me your story, and he just keeps talking

12   about how he told that woman, and she didn't want to hear it;

13   that has the hallmarks of a reliable memory, right, if that

14   happened?

02:35:55   15   A.  Yeah.

16   Q.  All right.  Now, you're saying you were less comfortable

17   when she was talking about the cop that was involved in hearing

18   that you didn't want to hear it, right?

19   A.  No, I didn't say I was uncomfortable.

02:36:04   20   Q.  Well, you said you thought that wasn't as strong a memory,

21   right?

22   A.  Yeah, not as detailed a memory.  It was lacking in detail,

23   unlike the white lady, which she was described in detail.

24   Q.  All right.  Well, when you say described in detail, all he

02:36:17   25   said was, it was a lady older than me -- I thought you said --

1   A.  Older, white hair, nonuniformed.

2   Q.  All right.  So that's not a whole lot of detail, is it?

3   A.  Well, it's detail.  We can --

4   Q.  All right.

02:36:29   5   A.  We can argue about whether those three points are a lot or

6   a little.

7   Q.  All right.  So he has memory of two people, a cop and a

8   woman, right?

9   A.  Well, he has a clear memory of the woman and somewhat

02:36:42   10  vaguer memory of a cop.

11  Q.  Right.  And the reason you say it's vaguer is because he

12  also remembered the woman's hair color?

13  A.  Well, because remembered multiple details about the lady,

14  it's remained absolutely consistent throughout his testimony,

02:36:55   15  and the cop is sometimes not even there when he says who he

16  told.

17  Q.  All right.  But sometimes he does talk about the cop,

18  right?

19  A.  And when he does, he's -- in that first interview, it's the

02:37:03   20  cop saying, don't worry, we'll protect.

21       It's not -- I don't think he says in that -- unless I

22  missed it; maybe you can show me -- I don't remember him saying

23  in that first interview, I said these words to any cop.

24  Q.  Right.  But he's saying in the first interview that I can

02:37:17   25  protect you, I can protect you.  What he's communicating in

1  that first interview is, he's telling them it's the wrong guy,

2  and they're saying, don't worry, don't be afraid, right?

3  A.  He's telling the white-haired lady that, and two people are

4  saying that back to him.

02:37:30  5  Q.  Right.

6  A.  Yeah, that's how I read him as saying.

7  Q.  All right.  And we shouldn't view this 20-years-later

8  interview, 17-page typed statement as like a transcript of what

9  happened, right?  In other words, details can be all over the

02:37:40  10  place?

11           MR. GIVEN:  Objection, foundation.

12           THE COURT:  I'm going to sustain an objection to the

13  form of the question since I don't understand it.

14           MR. LOEVY:  All right.  It was a poor question.

02:37:51  15  BY MR. LOEVY:

16  Q.  Let me throw another hypothesis and ask you if this is

17  possible.

18           Maybe the boy wasn't asked to give a physical

19  description of the cop.  That might have happened, too, right?

02:38:00  20  A.  Maybe the boy wasn't asked -- well --

21  Q.  That could have happened, right?

22  A.  Well, my ability to answer that question is no better than

23  the jurors' ability.  I have no special expertise in addressing

24  that question any -- yeah.

02:38:14  25  Q.  Well, did you review Ms. Estes' deposition where she said,

1  look, the interview ended before we wanted it to.  Maybe I

2  didn't get to ask every single question.  We didn't want to get

3  the guy off track.  I had reasons not to ask for every detail

4  at the first interview.  Sometimes that happens, too, right?

02:38:33    5  A.  Yeah, and she didn't even ask about the details of the

6  lady.  If I remember correctly, he spontaneously -- spontaneous

7  information is the best information.

8  Q.  All right.  So spontaneously he mentioned her hair color,

9  and he didn't mention the cop's hair color?

02:38:47   10  A.  And her nonuniformed and that she's older.  I mean, it

11  seems like it's a memory --

12  Q.  Okay.

13  A.  -- of her.

14  Q.  Fair enough.  Let's talk about your filler opinions.

02:38:56   15       You say, if I understand you, that Chicago is not an

16  outlier.  This is Plaintiff's Demonstrative 28.  This has

17  already been on the screen.

18       The fact that the City of Chicago has no fillers

19  picked ever is not an outlier?

02:39:17   20  A.  Well, remember, even to this day, 33 percent of police

21  departments, roughly, based on a survey that was done in 2013,

22  don't record filler IDs as filler IDs.  They count them as no

23  IDs.

24       But if you're saying that -- if it were the case, if

02:39:35   25  we knew for a fact that literally there was zero filler IDs,

1  it's not just that they recorded as no IDs, but literally there
2  were no filler IDs --
3  Q.  That's impossible?
4  A.  -- that would be an outlier.
02:39:46  5  Q.  Yeah.  Impossible is probably a strong word, but that may
6  be --
7  A.  Yeah, I would be saying that's an outlier, yeah.
8  Q.  All right.  Well, it would be more than an outlier.  That
9  would be a staggering statistical aberration, right?
02:39:57  10  A.  Well, I'll call it an outlier.
11  Q.  That's all you'd call it is an outlier?  If you did 980
12  lineups, the baseline you expect on fillers is about a quarter
13  of them, right?  Is that true, sir?
14  A.  Not really, but I'll go along -- I could explain why no,
02:40:14  15  but let's just say tentatively yes.
16  Q.  All right.  Do you want to go, say, 20 percent instead of
17  to 23 percent?
18  A.  No, because, see, that's --
19  Q.  What percent would you say?  In field studies, what do
02:40:23  20  people pick -- how often do they pick the filler?  You tell us.
21  A.  Well, see, to answer that question, you want to look at the
22  subset of field studies that use simultaneous lineups, that use
23  the same instructions that they use in Chicago, and that
24  included known person IDs, because in the -- in the studies
02:40:36  25  where you get that 23.7 percent, they excluded known person

1    IDs.  They included sequential lineups.  They included

2    jurisdictions that use powerful instructions to discourage

3    people from making an ID that are not even comparable to

4    Chicago.

02:40:50    5         So that's just my caveat, but I'll go with you and say

6    let's just say roughly 23 percent.

7    Q.  You gave a lot of opinions about the field studies, right?

8    When you were talking to defense counsel, you said --

9    A.  I gave opinions, yes.

02:41:00   10    Q.  All right.  And the field studies, if you total them up,

11    this is Gary Wells' Attachment 1, correct?

12         You've reviewed Gary Wells' Attachment 1, the table?

13    A.  Correct.

14         MR. LOEVY:  All right.  Your Honor, I'd ask permission

02:41:14   15    to move that into evidence and publish it.

16         MS. ROSEN:  I think it's already in.

17         MR. LOEVY:  It might already be.

18         THE COURT:  It's already in evidence.

19    BY MR. LOEVY:

02:41:19   20    Q.  All right.  These were the field studies that we're aware

21    of, right?

22    A.  That looks like them.

23    Q.  All right.  And you don't dispute Gary Wells' number that

24    the total number of lineups was about 6,700 in the field

02:41:30   25    studies and that about 1,600 of those picked a filler?

02:41:48

1    A.  Yeah, but I'm emphasizing, they bundled all those 6,700

2    together as if they all use the same kind of lineup.

3          Many of these lineups were totally different from

4    Chicago's, but it's not a big deal.  I'm agreeing with you that

5    whatever that number is, yeah, it would be an aberration to

6    have zero percent.  I'm agreeing with that 100 percent.

7    Q.  Well, I'm actually going further.

8          I'm saying a tremendously unlikely --

9    A.  Well, you can describe it -- if you want to describe it

02:41:56

10    that way, I'll let you.

11    Q.  I mean, outliers are like, hey, Chicago had 56, and, you

12    know, the base is 40, right?  That's an outlier?

13    A.  Say again.

14    Q.  An outlier is like, hey, in all the field studies, the

02:42:09

15    suspect got picked 40 times -- 40 percent of the time, but in

16    Chicago, the suspect got picked 56 percent of the time; that's

17    an outlier, right?

18    A.  That's definitely not an outlier.

19    Q.  That's not an outlier?

02:42:17

20    A.  Correct, that is not an outlier.

21    Q.  Let's talk about that.

22          You had that chart that shows that it's on the top,

23    right?

24    A.  Let's see.  I'm not sure what you're getting at there.

02:42:33

25    Q.  This is the chart.  This is the orange dot?

1  A.  Oh, yes.

2  Q.  All right.  When you say it's not an outlier, it is the

3  second highest, right?

4  A.  It's misleading to think along those lines, but in that

02:42:42  5  chart it's true.

6  Q.  I mean, your counsel made this chart, right?

7  A.  Yes, to show that even when -- even when you bias it

8  against Chicago, even then it's not an outlier.

9        The reason why it's biased against Chicago is because

02:42:53  10  the Chicago -- there's a paper that just came out on Chicago

11  lineups in the scientific literature on this exact issue, a

12  paper in the scientific literature talking about this exact

13  issue.

14        And one of the issues that came up is that in

02:43:04  15  Chicago -- if you have your neighbor -- if you say my neighbor

16  committed the crime -- should I wait?

17  Q.  Sorry.

18  A.  Oh.

19  Q.  Just checking on my time.

02:43:13  20  A.  If you say that your neighbor committed the crime, the

21  police will put that neighbor in the lineup just for -- just

22  for record keeping purposes, and you will definitely identify

23  that suspect.

24        So in field studies, we take those out.  That lowers

02:43:25  25  the suspect ID percentages in the field studies.

1          In the Chicago data, those are in there.  If you

2    recalculate the numbers based on the study that just came out

3    on Chicago lineups, that orange dot would move down to 48

4    percent.

02:43:37    5          But, yeah, even biased against Chicago, it's still not

6    an outlier.  It's within the range of normal police practices,

7    is what I'm saying.

8    Q.  All right.  Showing you the field studies, the way they got

9    that was IDs of suspects, right?  How many -- how many possible

02:43:51   10    IDs and how many suspect IDs, right?

11    A.  Yes.

12    Q.  And they came up with a percentage, right?

13    A.  Correct.

14    Q.  And all these percentages are the dots on your chart,

02:43:59   15    right?

16    A.  Right.  And they all excluded known person --

17    Q.  How about yes?  All the -- all the dots on your chart --

18          MS. ROSEN:  Objection, Judge --

19    BY MR. LOEVY:

02:44:05   20    Q.  -- are these percentages, right?

21          MS. ROSEN:  -- to how about yes.

22          THE COURT:  You know, the question can be answered yes

23    or no.  Let's just say that.

24    BY THE WITNESS:

02:44:12   25    A.  Yes.

1    BY MR. LOEVY:

2    Q.  Okay.  And the one -- the only dot that's higher than

3    Chicago, that had a very small end, 134 lineups, correct?

4    A.  And it excluded known person IDs, correct.

02:44:24    5    Q.  All right.  So that one was a -- you know, obviously, the

6    smaller the sample, the more likely you're to get an outlier,

7    right?

8    A.  Yes.  But if you're going to bring in other considerations,

9    you have to do it for Chicago, too.  It's not fair to bring in

02:44:37    10   considerations for one department and then leave the Chicago

11   number where it is.

12        Actually, there's a lot wrong with this -- where that

13   Chicago number is, but it doesn't matter because it falls

14   within the normal range --

02:44:47    15   Q.  Is that yes?

16   A.  -- even biased against Chicago, it falls normally.

17        But if you're going to bring in those considerations,

18   I have to bring in the considerations with respect to Chicago.

19   That's going to show even more convincingly that it's not a

02:44:57    20   outlier.

21   Q.  But you did say yes before the rest of the answer, right?

22   A.  To the question?  Which question?

23   Q.  I don't even remember.

24   A.  I think I did, though.

02:45:05    25   Q.  Now, in Chicago -- well, let me ask you a different

1  question.

2  Can you -- you said that it's within the national norm

3  to conclude that fillers are non-IDs?  Did you say that?

4  A.  To record fillers as non-IDs, because from the perspective

02:45:27    5  of the police and many researchers, that's their significance.

6  Q.  Just start with a yes/no, though.

7  You said that is within the norm?

8  A.  If I did, I would like to elaborate that it is commonly

9  done --

02:45:39   10  Q.  Right.

11  A.  -- in that sense.  It's not necessarily majority of the

12  time it's done, but if that's what you mean by in the norm --

13  Q.  How about tell me another police department in the United

14  States of America that records fillers -- when people pick a

02:45:50   15  filler, records it as non-ID?

16  A.  So this paper that just came out by Nancy Steblay published

17  in *Psychology Public Policy and Law* --

18  Q.  Are you going to answer the question, though?

19  A.  Yes, yes.

02:46:02   20  Q.  Okay.

21  A.  It has the answer to your question in that paper, and she

22  cites that fact that -- I can't name them, but she says that 33

23  percent of police departments to this day, even now that

24  researchers have been saying you should record filler IDs, to

02:46:14   25  this day, 33 percent of police departments do that.

1      You're asking me --

2   Q.  Do you have that paper here?

3   A.  I have it on my computer.  I can call it up.

4   Q.  All right.  Because Gary Wells said, same paper, City of

02:46:23    5   Sacramento and the City of Vancouver are the only two cities

6   that record it that way, that he's ever heard of in his entire

7   career?  Did you --

8   A.  Well, he should read that paper.  It's by his colleague,

9   Nancy Steblay, who is quoted in his expert report.

02:46:33   10   Q.  All right.

11   A.  She just published this paper, and she says that --

12   Q.  We're going to take a look at that.  Can you give us the

13   name --

14   A.  It's Steblay, 2000 --

02:46:39   15   Q.  The exact cite, if you could.  Check your computer, if you

16   would.

17   A.  Oh, all right.  It's really worth reading.  Her first --

18   Q.  I just need the cite, and maybe we could do it at a break,

19   because I'm obviously not going to have to read it now.

02:47:01   20      But you have --  we'll get it.

21      MR. LOEVY:  Have we had an afternoon break yet, Your

22   Honor?

23      THE JURY:  No.

24      THE COURT:  No.

02:47:10   25      MR. LOEVY:  All right.  Maybe this would be a good

1   time for that.

2           THE COURT:  Well, all right.

3           MR. LOEVY:  We built in the time for the break, Your

4   Honor.  We did.

02:47:14   5           THE COURT:  Okay.  So ten minutes, ladies and

6   gentlemen.

7           COURT SECURITY OFFICER:  All rise.

8           (Jury out.)

9           MR. LOEVY:  How much time did I use, Your Honor?

02:47:39  10           THE COURT:  Well, I have to recalculate everything

11  since you called the break.  But you were going to be at one

12  hour and five minutes at 3:10.  Now you're going to be at one

13  hour and five minutes at 3:20.

14           MR. LOEVY:  Okay.  Thank you.

02:47:52  15           THE COURT:  That gives you ten more minutes beyond

16  that.

17           But I have to ask you something about the

18  instructions.  At some point, there was an intentional

19  infliction of emotional distress instruction submitted, and we

02:48:07  20  haven't gotten that in any subsequent versions.

21           MR. LOEVY:  I don't think we're pursuing that claim,

22  Your Honor.

23           THE COURT:  Okay.  That's what I assumed.  All right.

24           MR. LOEVY:  Can I ask the witness for the cite so we

02:48:18  25  don't waste time?

1        THE WITNESS:  Yeah, I'm getting it.

2        THE COURT:  Sure.  I think the witness is getting you

3    the cite.

4        MR. LOEVY:  All right.  Thank you.

5        THE COURT:  Okay.  We'll take ten.

6        MR. LOEVY:  Thank you.

7        THE COURT:  Well, we have to keep on schedule,

8    everybody.

9        (Recess.)

1          (Jury out.)

2               THE COURT:  Okay, I think we're ready.

3               MR. ART:  Your Honor, could I correct something that

4     Mr. Loevy said while I was out of the room.

02:59:13   5          THE COURT:  Go ahead, but we've got to get the jury or

6     we're going to run out of time.

7               MR. ART:  We do have proposed instructions on

8     intentional infliction.

9               THE COURT:  Then why has no one given them to me?

02:59:24  10          MR. ART:  They're at Docket 433-1.  When we did our

11    first conference, we went through Instruction 42 just about,

12    and the other ones were left unresolved, and it's just the IIED

13    instruction and the damages instruction.

14               THE COURT:  So is it resolved or is it disputed?

02:59:38  15          MR. ART:  I think we're very -- the parties are very

16    close on it.

17               THE COURT:  Well, I hope so because tomorrow you're

18    arguing.

19               Can we find that, Ben?  You know where it is?  But

02:59:50  20    it's not -- it's not agreed at this point.

21               MR. ART:  I think there are slight differences, yes,

22    Your Honor.

23               THE COURT:  Well, what in the world do you expect me

24    to do?  I mean, I have to sleep tonight.  I mean, I can't do

03:00:02  25    all your work for you.

1          MR. POLICK:  Judge, we'll look them over.

2          THE COURT:  I mean, this is ridiculous.  We're

3    actually trying to write instructions because everything you've

4    given me is so inadequate.  I mean, some of these things, what

5    are we struggling with?

6          THE LAW CLERK:  Personal involvement.

7          THE COURT:  Personal involvement?  I mean, I've got to

8    write that instruction?  That's absurd.

9          I mean, if I can just reject everybody's, that would

10   probably be the easiest thing to do.

11         THE LAW CLERK:  Do you want me to print it for you?

12         THE COURT:  Well, they're not agreed, so -- we're

13   ready.

14         COURT SECURITY OFFICER:  All rise.

15         (Jury enters courtroom.)

16         THE COURT:  Please be seated, everyone.

17   BY MR. LOEVY:

18   Q.  All right, sir, if a witness picks a filler, that makes

19   that witness less reliable of an eyewitness.  Would you agree

20   with that?

21   A.  I would not.

22   Q.  All right.  I thought you said it goes from, like, 50/50 to

23   60/40 they get less reliable.

24   A.  No.  What I said was that when you have a single lineup and

25   you're not sure whether the suspect is innocent or guilty,

1    that's what you're trying to find out.

2         So let's just say it's 50/50, you're not sure, and

3    then an event happens and now you're no longer going to be

4    50/50.  Your interpretation of his guilt is going to change.

03:01:52    5    It's either going to go up if they pick the suspect, or it's

6    going to go down, your estimate of his likely guilt is going to

7    go down if they pick a filler or reject the lineup.

8         It's going to go up to like 70 or 80/20 if he picks a

9    suspect.  It's going to go down 60/40 probably innocent if they

03:02:10   10    pick a filler or reject the lineup.  It's evidence, it's slight

11    evidence of innocence if -- for the suspect.  You're a suspect

12    in a lineup.  If somebody picks a filler or rejects the lineup,

13    it's slight evidence of your innocence.

14    Q.  And maybe I am asking a different question.

03:02:26   15         I'm asking -- let's say I'm an eyewitness and I claim

16    to have seen something.  All right?

17         Are you with me on my hypothetical?

18    A.  Yes.

19    Q.  And I have a lineup of the five people sitting at my table,

03:02:33   20    and the suspect is Anand -- it's always Anand.  Sorry, Anand.

21      (Laughter.)

22    BY MR. LOEVY:

23    Q.  And I pick Ann, all right?  And are you saying that doesn't

24    make me less reliable of an eyewitness?

03:02:45   25    A.  Not without you giving me one more piece of critical

1  information.

2  Q.  All right.  What piece of information is that?

3  A.  How confident are you when you picked that filler?

4  Q.  Let's say I'm very confident.

03:02:54  5  A.  Well, then, yes.  Then I would say if you're absolutely --

6  that doesn't happen very often at all.

7  Most of the time when witnesses pick fillers, they let

8  you know it's inconclusive by saying "I have low confidence."

9  Q.  Let's say I say, "No.  It wasn't Anand.  I'm very confident

03:03:07  10  it was Ann."  Doesn't that make me a worse eyewitness if it

11  really was Anand?

12  A.  I would say probably yes.

13  Q.  All right.  So that is exculpatory.

14  A.  Wait a second.  Yeah, if you pick a filler, it's

03:03:19  15  exculpatory.

16  Q.  All right.  So shouldn't Chicago turn over the fact that I

17  picked a filler because that's exculpatory?  We agree.

18  A.  Wait a second.  Are you asking me a question about memory

19  or something else?

03:03:31  20  Q.  You weren't trying to agree, huh?

21  A.  I'm just not sure what you're asking me.

22  Q.  All right.  You just acknowledged, did you not, that if I'm

23  really confident it's Ann and it turns out it really wasn't

24  Ann, that Chicago Police Department should have turned that

03:03:44  25  over because that makes me less reliable as an eyewitness,

1  right?

2  A.  No.  Your -- I'm talking about memory.  You're talking

3  about what Chicago should have done.

4  Q.  Well, you've given a lot of opinions here about the filler

03:03:54  5  policy, right?  Isn't it true that if an eyewitness picks a

6  filler, you shouldn't record it as they didn't make an ID.  You

7  should say they picked a filler?

8  A.  No.  I'm not saying that, because the information is equal.

9  The probative value that -- of the suspect's likely guilt, the

03:04:18  10  information you get about that is exactly the same whether the

11  witness says I don't see him in the lineup or the witness says

12  it's that filler.  You're asking me about that witness.

13  Q.  Right.  I'm asking about the witness.  So I'm an

14  eyewitness.

03:04:30  15  A.  Yeah.

16  Q.  And I miss Anand, I pick Ann, and then two weeks later, I

17  pick Anand.  You know, wouldn't it be relevant that I missed

18  the first time?

19  A.  With high confidence?

03:04:44  20  Q.  Yeah.

21  A.  I would say if it was a high -- because usually they're

22  made with low confidence, so the witness is fine, they're

23  letting you know, but if it's high confidence, then that

24  witness is probably unreliable, yeah.

03:04:52  25  Q.  All right.  So if the fact that I picked a filler is

1  indicative of me being an unreliable witness, then that

2  information should be disclosed to the criminal justice system,

3  right?

4  A.  I have no expertise in making a judgment call on that.

03:05:05    5  You're asking me what Chicago should do.  I don't know what

6  Chicago -- it seems reasonable to me that they could do that,

7  but I have no expertise.  The jury has as much expertise on

8  that as I do.

9  Q.  If you have no expertise, how can you say that Chicago's

03:05:17   10  policies are within the norm of the law

11  enforcement community --

12  A.  That's a statistical question.  It's statistically within

13  the norm.  I do have expertise in statistics.

14  Q.  You didn't mean to imply that their policy was within the

03:05:28   15  norm.

16  A.  No, their outcomes, their statistical outcomes are within

17  the norm.

18  Q.  All right.  Zero is not within the norm though, right?

19  A.  Correct.

03:05:34   20  Q.  Zero is zero, and that's an outlier.

21          MS. ROSEN:  Objection, Judge.  Asked and answered.

22          THE COURT:  Sustained.

23  BY MR. LOEVY:

24  Q.  Now, you referenced a study by Gary Wells, *The Psychology*

03:05:49   25  *of Lineup Identifications*?

1    A.  Yes, if it's the 2015 paper on *Law and Human Behavior*, yes.

2            MR. LOEVY:  All right.  I'm going to approach, Your

3    Honor, with a copy of that study.  May I approach?

4            THE COURT:  Yes.

03:05:59    5    BY MR. LOEVY:

6    Q.  Is this the study you're talking about?

7    A.  No.

8    Q.  It's called *The Psychology of Lineup Identifications* by

9    Gary Wells?

03:06:07   10    A.  No, this is a 1984 study.  This is a very out-of-date

11    study.  I was talking about a 2015 study.

12    Q.  All right.  In Gary Wells's study, when you made a

13    non-identification and versus you made an inaccurate

14    identification on Page 4 there, the chart --

03:06:24   15    A.  Wait, let's see.

16    Q.  Page 4, turn to Page 4.

17    A.  Of this paper?

18    Q.  Would you agree with me that Gary Wells reported that if an

19    eyewitness picks a filler instead of makes no identification,

03:06:36   20    then their reliability goes down by almost half?

21            MS. ROSEN:  I'm going to object to the use of this

22    document from 1988.  I was confused about what he's --

23            THE COURT:  I think it's just a question, right?

24    We're not -- you're not using the document, right?

03:06:51   25            MR. LOEVY:  I'm asking if that's what Gary Wells

 1   reported.

 2              MS. ROSEN:  Well, that's then hearsay.  I mean --

 3              THE COURT:  Well --

 4              MR. GIVEN:  Judge, it's also highly confusing between

03:06:59  5   2015 and 1988.

 6              THE COURT:  Why don't you just rephrase it and ask the

 7   question.

 8              THE WITNESS:  Yeah, what's your question?

 9   BY MR. LOEVY:

03:07:05 10   Q.  Is there support in the literature that if I pick a filler,

11   I'm now a much less reliable eyewitness because I swung and

12   missed?

13   A.  No, because all the old literature such as this, they used

14   to believe that confidence tells you nothing, and I've been

03:07:19 15   saying in recent years it tells you almost everything.  And for

16   years people thought filler IDs tell you something terrible

17   about that witness.

18              Only recently, 2016, only -- it's the only study in

19   the entire scientific literature where real eyewitnesses,

03:07:33 20   where, when they picked fillers, they asked them how confident

21   they were, and we discovered that they rarely have high

22   confidence.

23              And so most of the old studies didn't realize that

24   most of the witnesses, actually they were not discrediting

03:07:46 25   themselves.  They were basically just saying this guy is the

1  most familiar one in the lineup, but I'm letting you know it's

2  not a conclusive match.  I'm telling you it's made with low

3  confidence.

4          That's a new consideration.  2016 was the first time

03:07:59   5  anybody realized that.

6  Q.  You're not meaning to imply that law enforcement agencies

7  shouldn't turn over if the witness picks a filler, right?

8  That's outside your expertise.

9  A.  I'm not talking about -- yeah, outside of my -- what law

03:08:09  10  enforcement agencies should do, yeah, as a policy matter,

11  that's -- I'm a memory expert.  That's it.

12  Q.  The takeaway should not be that Dr. Wixted came to court

13  and said if Chicago's reporting is a negative instead of as a

14  filler ID, that that's okay; you're not saying that.

03:08:23  15          MS. ROSEN:  Objection, Judge.

16  BY THE WITNESS:

17  A.  I am not saying that -- oh.

18          THE COURT:  Overruled.

19          Overruled.  Can you answer.

03:08:26  20  BY THE WITNESS:

21  A.  I'm not saying that's okay or not okay.  I'm not weighing

22  in on that.

23  BY MR. LOEVY:

24  Q.  All right.  Some of the things that would lead someone to

03:08:33  25  pick a filler instead of the suspect include the distance from

1  the event, right?

2  MR. GIVEN:  Judge, I'm going to object.  This is

3  beyond the scope of Ms. Barber's questioning and my

4  questioning.  This is not at issue in this case.  What the --

03:08:50  5  what indicators affect --

6  THE COURT:  You don't have to make a speech.  I mean,

7  all that does is waste time.

8  Sustained.

9  BY MR. LOEVY:

03:08:57  10  Q.  All right.  Did you have an understanding as to whether Mr.

11  Lopez was confident or not confident?

12  MS. ROSEN:  Objection, Judge.  Scope.  It's the same

13  thing as from before.

14  MR. LOEVY:  Your Honor, if they're not going to let me

03:09:10  15  ask any questions, then --

16  THE COURT:  Overruled.  Overruled.

17  BY MR. LOEVY:

18  Q.  Did you have an understanding that Mr. Lopez was confident

19  or not confident?

03:09:16  20  A.  In what?

21  Q.  In his identification of Jacques Rivera.

22  A.  From the mug book on the night of the crime?

23  Q.  Well, on his initial story?

24  A.  Well, if you're looking at the mug book that he looked

03:09:27  25  through the night of the crime, my understanding is that

1  retrospectively he stated that it was confident.

2      What you said earlier is also true, there's no

3  contemporaneous record of how confident he was.

4  Q.  And what we said earlier is also true is you don't put

03:09:38   5  stock in his retrospective reporting of his confidence; that's

6  accurate, right?

7  A.  Well, I wouldn't use -- I wouldn't phrase it that way.  I

8  wouldn't say I don't put stock in it.  It's the only

9  information we have.  It's not nothing, but it's not

03:09:48  10  conclusive.  We don't know how confident he was.

11  Q.  And obviously police departments, you're here as an expert,

12  they should write down contemporaneously how confident he was.

13  That's an opinion you have, correct?

14  A.  Yeah, and in 2014, the National Academy of Sciences weighed

03:10:01  15  in with that exact recommendation.  I endorse that

16  recommendation.  Police departments now know that they should

17  do that.

18  Q.  All right.

19      Showing you Plaintiff's Demonstrative No. 29, if we

03:10:10  20  could have the ELMO here, in Chicago do you dispute Gary

21  Wells's numbers that the suspect got picked 56 percent of the

22  time, and no identification got picked 31 percent of the time?

23  A.  And then no outcome reported 11.5 percent of the time.

24  Yeah, those look right to me.

03:10:28  25  Q.  All right.  Do you have any explanation for why there's

1    more than 10 percent of the lineups go completely unreported in

2    Chicago?

3    A.   Yes.  And it's mentioned in that paper that I just emailed

4    to you by Nancy Steblay that sometimes the police regard it as

03:10:44    5    just no information, and they don't even record the outcome,

6    yeah.

7        So I would say those were probably not suspect

8    identifications.  It's the only reasonable explanation.

9        MR. LOEVY:  May I have a moment, Your Honor?

03:10:55    10        THE COURT:  Sure.

11        (Counsel conferring.)

12        MR. LOEVY:  No further questions, Your Honor.

13        THE COURT:  Okay.  Defense?

14        MS. BARBER:  No further questions, Your Honor.

03:11:05    15        MR. GIVEN:  Judge, I have a couple quick follow-ups.

16        THE COURT:  Okay.

17            REDIRECT EXAMINATION

18    BY MR. GIVEN:

19    Q.   Hello again.

03:11:13    20    A.   Hello.

21    Q.   To your knowledge in 1988, did it violate police procedures

22    around the country to show a witness a lineup after first

23    showing the witness gang book photos?

24        MR. LOEVY:  Your Honor, I would --

03:11:24    25        MR. GIVEN:  That was a question that he asked.

1    THE COURT:  Wait, wait.  I know that.

2    Overruled.

3    MR. LOEVY:  Okay.

4    BY THE WITNESS:

03:11:29   5    A.  I'm sorry, did you -- can you repeat that question?

6    MR. GIVEN:  Sure.

7    BY MR. GIVEN:

8    Q.  To your knowledge and expertise in 1988, did it violate

9    police procedures around the country to show a witness a lineup

03:11:41   10   after first showing that same witness gang book photos?

11   MR. LOEVY:  Object, Your Honor.  He has no knowledge

12   of police procedures by his own admission.

13   BY MR. GIVEN:

14   Q.  Let me ask you this.  Did it violate scientific principles

03:11:52   15   back in 1988?

16   A.  No.  Science was being worked out back then, and only --

17   science wasn't translated into policy recommendations by any

18   official body until 1999, and, really, the most authoritative

19   translation didn't occur until 2014.  The National Academy of

03:12:09   20   Sciences weighed in with recommendations about that, and that's

21   the body that has standing to do that.

22   So that's -- before that, the police didn't really

23   have -- police can't translate science into policy.  They don't

24   know how to do that.  There's an organization that does that.

03:12:20   25   It's called the National Academy of Sciences.

1  Q.  So along those same lines, in 1988, did police departments

2  to your knowledge know or did science tell police departments

3  to record confidence levels?

4          MR. LOEVY:  Objection, Your Honor.  It's outside his

03:12:34    5  area of expertise.

6          THE COURT:  Overruled.

7          MR. GIVEN:  Judge, I asked about science.

8  BY MR. GIVEN:

9  Q.  Go ahead.

03:12:38   10  A.  The science at the time wouldn't -- wouldn't have led to

11  that recommendation because the science at the time seemed to

12  suggest that confidence tells you nothing.  It's uninformative.

13  That's what people thought.  It doesn't tell you anything about

14  you shouldn't listen to a witness if they're more confident

03:12:51   15  compared to their less confidence, it's not telling you

16  anything.  That's probably what the science would have said.

17          There are researchers at the time who thought that

18  confidence should be recorded anyway, individual researchers

19  who thought that, because if it was low confidence at the

03:13:05   20  beginning and it grew to high confidence, you could use that to

21  impeach the witness at trial.  There are individual researchers

22  who had that idea at the time, but there was no translation.

23  Nobody -- no independent body that translated the scientific

24  evidence into policy recommendations for the police.  That

03:13:21   25  hadn't been done at that time.

1  Q.  So I'm going to end by giving you a couple memory tests.

2      Do you remember when Mr. Loevy was firing a lot of

3  questions at you, one of those questions involved comparing the

4  level of description Mr. Lopez gave to the white-haired lady

03:13:38   5  versus the cop.

6      Do you remember those questions generally?

7  A.  I do.

8  Q.  And he was saying, well, geez, all he said was white-haired

9  lady and she was older.  That's not much of a description.

03:13:48  10      Do you remember that?

11  A.  I do.

12  Q.  In fact, do you recall whether he also described the

13  white-haired lady as wearing a long dress and carrying one of

14  these Redwelds like the lawyers do?

03:14:00  15  A.  Oh, yeah.

16  Q.  Do you remember that?

17  A.  I had forgotten those two details as well.

18      MR. LOEVY:  Your Honor, we just object to which

19  testimony.  He implied it was in the Linzer notes, and I don't

03:14:09  20  think it was.

21      THE COURT:  Well, I guess it would be helpful, based

22  on everything else, to say when that --

23  BY MR. GIVEN:

24  Q.  Do you remember?

03:14:16  25  A.  Well, I now think it might have been in those written-up

1  notes from that first interview that those additional details

2  were there; but, honestly, I'm not a hundred percent sure.

3      I remember reading about those details, too.  I'm just

4  not sure.

03:14:28  5  Q.  And what's your memory of the level of detail between how

6  Mr. Lopez described the white-haired lady versus how he

7  described the cop?

8  A.  See, from my point of view as a memory expert, there's just

9  no comparison.  One is a looks like a real memory with detail.

03:14:45  10  The other looks like a virtual non-memory, super-weak memory,

11  vulnerable to malleability.  That's the kind of memory that's

12  easily changed.

13  Q.  And if I'd been listening to you, and it's fascinating to

14  do so, the first initial retelling is the most important,

03:15:03  15  right?

16  A.  Yeah.  First properly conducted memory test, and that one

17  was pretty close to properly conducted.

18  Q.  What was Lopez's first description to Estes and Linzer

19  about the person other than the white-haired lady?  How did he

03:15:16  20  describe that person?

21  A.  The cop?

22  Q.  Right.

23  A.  No further details than that.

24  Q.  Anything else besides cop?

03:15:24  25  A.  No.

1  Q.  And do you read -- here's, I think, my final memory test

2  for you.   Do you recall when the first time was that Mr. Lopez

3  said the cop was a Hispanic detective with a 'fro and a

4  mustache and glasses?

03:15:39   5          Do you remember the first time that happened?

6  A.  I just remembered it's very late, either at the PC,

7  post-conviction testimony, or in the later deposition.  It's

8  after many memory tests that those details were there that

9  hadn't been there at the beginning, a telltale sign of a false

03:15:59  10  memory.

11  Q.  Would it surprise you if I told you that it was in June of

12  2011 at the post-conviction, a year after he first met with

13  Northwestern and a year after he's had conversations and

14  meetings and communications with Northwestern --

03:16:13  15          MR. LOEVY:  Objection, Your Honor.  Leading --

16  BY MR. GIVEN:

17  Q.  -- would that surprise you?

18          THE COURT:  Sustained.

19          MR. GIVEN:  I have no further questions.

03:16:19  20          MR. LEINENWEBER:  Excuse me, Judge.  I have just a

21  couple questions.

22          THE COURT:  Okay.

23                      DIRECT EXAMINATION

24  BY MR. LEINENWEBER:

03:16:24  25  Q.  Good afternoon, sir.

1    A.  Good afternoon.

2    Q.  So we're talking about the initial meeting, which I think

3    you had said -- which is the first and the best memory test,

4    that's the one where Ms. Estes and Ms. Linzer went and met with

03:16:41    5    Mr. Lopez.  Do you recall that?

6    A.  Yes.

7    Q.  Okay.  And I'm going to show you what's been previously put

8    into evidence as Exhibit No. -- Defendants' Exhibit No. 102.

9         If one of the open-ended -- I think you said the

03:16:51    10    open-ended questions are the best type of questions to ask?

11    A.  Yes.

12    Q.  Okay.  If one of the open-ended questions that was asked by

13    the investigators was "talk about Guevara" or "talk about Rey

14    Guevara," if Mr. Lopez in that first memory test didn't say

03:17:06    15    anything about Mr. Guevara, didn't say anything about him at

16    all, what would that suggest to you?

17    A.  Sorry, is your question if he was specifically asked about

18    Guevara yet still didn't provide details?

19    Q.  That's my -- you put it much better than I did.

03:17:20    20    A.  That would suggest to me that there's no memory of that

21    person in his brain.  There's just nothing there.

22         That's a retrieval cue.  When I talked earlier about

23    the way you get memories is you give a retrieval cue, it brings

24    you back to the initial memory.  But if you give that retrieval

03:17:37    25    cue and nothing -- no details come out, it's just -- there's no

1    memory there.

2             MR. LEINENWEBER:  Thank you.

3             Judge, there's nothing further.

4             THE COURT:  Mr. Loevy.

03:17:45    5                    RECROSS EXAMINATION

6    BY MR. LOEVY:

7    Q.  All right.  You were asked about the interview notes, and

8    we do have a very, very good record of what was said at that

9    interview and what was going to be asked, et cetera, et cetera,

03:17:54    10   right?

11   A.  Very good?  It's pretty good, yeah.

12   Q.  I mean, unusually good, right?  You have an agenda here,

13   you've got almost word-for-word notes.  We have a very clear

14   indication of what happened, right?

03:18:06    15   A.  I -- well, we have this indication.

16   Q.  Fair enough.

17   A.  I don't know how you want to judge it.  It's good.  It's

18   pretty good.

19   Q.  All right.  And there's a question on the outline "Talk

03:18:13    20   about Guevara?" Do you see that?

21   A.  Yes.

22   Q.  Do you know if they were -- did decide to talk about

23   Guevara?

24   A.  I don't know.

03:18:20    25   Q.  In fact, there's no suggestion in the interview notes that

1    they did talk about Guevara, is there?

2    A.  Not that I recall.

3    Q.  All right.  And he did describe the white-haired lady --

4    Mr. Given was asking about a dress and a Redweld.

03:18:35    5         That wasn't in these interview notes, was it?

6    A.  I said I'm not sure.  I remember them talking about it, but

7    I can't remember when he was talking about those details.

8    Q.  All right.

9         All I'd want to know, sir, though, isn't it true he

03:18:45   10    was talking about a cop and he was talking about a lady with

11    hair, right?  He was talking about those things, right?

12    A.  Yeah, but with more detail about the lady.

13    Q.  Because she had white hair, right?

14    A.  Non-uniformed, older, white-haired lady who may have been a

03:18:58   15    lawyer, I think he might have said.  I can't remember.

16    Q.  All right.  It's also possible that he wasn't asked to

17    describe the cop because he was focused more on the lady.

18    That's possible, too, right?

19    A.  Yeah, I don't even know if he was asked to describe the

03:19:10   20    lady.  That's why I said earlier it seems like a spontaneous

21    memory, and that's the best kind of memory.

22         When you're interviewing anybody, what they

23    spontaneously tell you that's on that first memory test is the

24    best information.

03:19:20   25    Q.  And he spontaneously talked about a lady and a cop, right?

1    A.  Right.

2    Q.  All right.  And why is it that the best memory in this case

3    is something -- the best indicator of memory is something that

4    happened so many years later?  Why is that -- why isn't it

03:19:35    5    better in 1988 and 1990?

6    A.  See, you have to remember when I say it's the best, I don't

7    mean it's necessarily that good.  It is 20 years later.  I want

8    to make that clear.  Everything he says 20 years later can

9    be -- you can question.

03:19:48    10        It's based like -- if this interview had been

11    conducted one week after the events, I would say that

12    everything he remembers with high confidence has more than

13    90 percent accuracy.

14        What they're asking him in that first meeting 20 years

03:20:00    15    later, I don't know what the baseline level of accuracy is.

16    It's not 90 percent.  It's going to be lower than that.

17        But I'm saying whatever it is, whether it's 70 percent

18    correct or 80 percent correct, it's not super-reliable,

19    whatever it is, it's the best information you have about that,

03:20:14    20    and then it gets worse.

21    Q.  But hypothetically if we had this kind of notes from 1988,

22    that would be the single best indicator, right?

23    A.  About what they were asked about then, yes.

24        MR. LOEVY:  All right.  I have no further questions,

03:20:30    25    Your Honor.

1          THE COURT:  Anything further?

2          MR. GIVEN:  Nothing, Your Honor.

3          THE COURT:  Okay.  Thank you, sir.  You may step down.

4          (Witness excused.)

03:20:39  5          MR. SOTOS:  Defendants rest, Your Honor.

6          MR. LOEVY:  No rebuttal, Your Honor.

7          THE COURT:  Okay, ladies and gentlemen, here we are.

8    The evidence concluded.  I didn't tell you an untruth, although

9    I had my doubts as the day went on.  I think we'll take a break

03:20:52  10   for the evening.  We will start at 9:30 tomorrow morning.

11         COURT SECURITY OFFICER:  All rise.

12         THE COURT:  It will be a long day.  I know we're going

13   to end at 4:00, but we're going to take a kind of compressed

14   lunch, and it's going to be intense.

03:21:08  15         (Jury exits courtroom.)

16         THE COURT:  Okay.  Well, happily we have a little

17   time.

18         MR. LOEVY:  We do have that Rule 50 motion.  We didn't

19   want to say it in front of the jury, but we're moving for

03:21:38  20   Rule 50, and I understand we're filing a written one.

21         THE COURT:  Okay.  And I'm reserving whatever I can

22   reserve.

23         MS. ROSEN:  And we're renewing, if we need to renew,

24   the Rule 50 that we've already filed.

03:21:48  25         THE COURT:  Okay.  And I'm reserving on that, too.

1    MR. LEINENWEBER:  As am I, Judge.

2    THE COURT:  And yours, too, everybody.

3    All right.  What -- Eugene, let's start with that --

4    do you have your notes for that personal responsibility thing

03:22:00    5    handy, where you were with the drafting?  Let's see if we can

6    get that and see if we can get going.  Print the current one.

7    It's just for me at this point.

8    THE LAW CLERK:  Yes, Judge.

9    THE COURT:  Do the lawyers have the little opinion we

03:22:45    10    finished at lunchtime?

11    THE LAW CLERK:  They do not.

12    MR. SOTOS:  Are we in recess, Judge, or can I address

13    a housekeeping matter?

14    THE COURT:  Well, we're not in recess because I want

03:22:53    15    to talk about instructions.  So I don't know if everybody's

16    here, but housekeeping sounds to me okay.

17    MR. SOTOS:  I just want to do -- when I rested, I

18    meant to say subject to admission of a couple of exhibits, and

19    I didn't say that.

03:23:05    20    THE COURT:  And that's fine.

21    MR. SOTOS:  So do you want to deal with that now?  I

22    think they're relatively noncontroversial, but should we wait

23    for Jon to come back?  We'll talk about it and then bring it to

24    the Court.

03:23:15    25    THE COURT:  Okay.

1    MR. SOTOS:  If there's an issue, we'll raise it.

2    THE COURT:  If you can agree, then just tell me what

3  they are.

4    MR. SOTOS:  That's what we're going to do.

03:23:23  5    MR. ART:  That's what we'll do.  We'll put all the

6  exhibits together.

7    THE COURT:  Okay.  So can I get to everybody's --

8  whoever needs to pay attention to this 7.2 general requirement

9  of personal involvement?  Everybody here who needs to be here?

03:23:36  10    MR. ART:  For plaintiff's side, yes.

11    MR. SOTOS:  Yes.  Yes, Judge, for the defendants' side

12  as well.

13    THE COURT:  Okay.  So the problem, as I think I

14  described or at least I hope I described, because we have this

03:23:47  15  little opinion, but that hasn't gone out yet?

16    THE LAW CLERK:  I'm afraid not.

17    THE COURT:  Is that close to ready do you know?

18    THE LAW CLERK:  It's ready.  It's a technology

19  problem.

03:23:55  20    THE COURT:  Can Nancy print it?  Okay.  Because that

21  would be helpful to have that out of the way.

22    All right.  The problems with what you gave me are

23  that when we're dealing with personal involvement, the rule is

24  different for the different claims.  For instance, is

03:24:20  25  fabrication a separate claim, the suppression of evidence a

1    separate claim?

2         I'm not sure what the separate claims are because I

3    don't have a final set of instructions, but the general rule is

4    true for that.  It's not true for conspiracy or failing to

03:24:36    5    intervene, and it's not true with respect to malicious

6    prosecution because that's a state law claim for which there's

7    respondeat superior.

8         So somehow we have to make this instruction

9    appropriate to those three situations.

03:24:56    10         MR. SOTOS:  You do know there's only one defendant on

11    the malicious prosecution claim though.

12         THE COURT:  Right, but it isn't -- it is not true

13    that -- let's see.  They don't have to prove that the other --

14    that the other elephant in the room, who is the City, was

03:25:17    15    personally involved in that claim.  That's the problem.

16         We're instructing them that for certain claims, the

17    plaintiff has to prove by a preponderance of the evidence that

18    each of the officers was personally involved, and they may not

19    hold any of these officers liable for what others did or did

03:25:36    20    not do.

21         That is not true for the malicious prosecution claim

22    because there's respondeat superior, and it's not true for

23    conspiracy or for failure to intervene because proof as to one

24    of the officers can implicate other officers.

03:25:56    25         MS. ROSEN:  With respect to the personal involvement,

1    I think that doesn't apply to state law at all.  I think
2    malicious prosecution, any of the state law claims stand alone.
3            THE COURT:  So in the malicious prosecution
4    instruction, do we have an instruction about respondeat
5    superior?
6            MR. POLICK:  I don't think we do, and I thought that
7    the way we were going to handle that is that that was just
8    going to be by operation of law.  I believe Ms. Rosen's
9    position was that the City didn't need to be there at all, you
10   know, by operation of law, if --
11           THE COURT:  Oh, okay.
12           MR. SOTOS:  The City pays compensatory damages.
13           THE COURT:  All right.  So we don't actually need to
14   instruct them on that.  Malicious prosecution is just Guevara.
15           MR. POLICK:  Right.
16           MS. ROSEN:  Correct.
17           THE COURT:  So that makes this whole thing easier.
18           MR. ART:  Right, right.
19           MR. POLICK:  So then on the other issue you're
20   raising, Judge, if I'm understanding you correctly, how do I
21   reconcile this personal involvement instruction with the
22   failure to intervene --
23           THE COURT:  And the conspiracy.
24           MR. POLICK:  So there's a Seventh Circuit case that
25   speaks on that --

1          THE COURT:  Yes.

2          MR. POLICK:  -- which we did cite, that *Sanchez vs.*

3   *City of Chicago*, and it explains how to reconcile the two.

4          THE COURT:  Well, could you help me?  Because we're

03:26:59   5   trying to do this.  Otherwise, I'm going to have to leave it to

6   you for tonight, and I don't have a good feeling about that.

7          MR. POLICK:  I think this was the filing that Mr. Art

8   was referring to earlier.  It's Document No. 433, and we did --

9   the defendants' submission does talk about how to reconcile the

03:27:19  10   two.  I mean, it's all over my notes, but --

11          THE COURT:  Is there something somebody could hand up

12   to me, either the case or the brief?  I will give it back to

13   you if you remind me to.

14          MR. POLICK:  You'll have to excuse my notes, Judge.

03:27:32  15          THE COURT:  They're the least of my problems.  Let's

16   see.

17          MR. POLICK:  I think that second paragraph, at least I

18   think it addresses what you're trying to get at.

19          (Tendered.)

03:27:42  20          THE COURT:  Oh.  Is this sentence agreed:  "A

21   defendant's failure to intervene in the wrongful conduct of

22   another defendant, despite a reasonable opportunity to do so,

23   can be a form of personal involvement and wrongful conduct"?

24   Is that agreed?

03:27:58  25          MR. ART:  I think that's true, but I think an

1    instruction about personal involvement in a case where the

2    concept of personal involvement applies to only one of the

3    claims at issue, and that's the due process claim, is going to

4    be intensely confusing to the jury because you're going to

03:28:13    5    essentially instruct the jury on one of the seven claims you're

6    considering, consider only the defendant's individual conduct.

7    So that's our objection.  This instruction shouldn't

8    be given at all in a situation where it is just going to mess

9    things up for the jury.

03:28:28    10    THE COURT:  Well, don't we give them the general

11    instruction about how they have to -- they have to judge each

12    defendant on his own conduct?

13    MR. ART:  With respect to every single instruction,

14    that's part of the preamble of the instruction, on the elements

03:28:41    15    of the claim, and it's also on the verdict form.

16    There's not an issue here about whether the jury's

17    going to be properly instructed on the due process claims that

18    each defendant you have to show the elements as to that

19    defendant.  So a separate instruction on personal involvement

03:28:58    20    in this case with the claims that are at issue will only serve

21    to confuse the jury.

22    THE COURT:  Well, which claims require personal

23    involvement and which claims don't?

24    MR. ART:  I mean, all of them require personal

03:29:10    25    involvement in one sense; but with a conspiracy claim, as the

1  Court said, and with a failure to intervene claim, this concept

2  of personal involvement that's in Pattern 7.02 simply doesn't

3  apply, and that's what the pattern says.

4      It says there are some cases where this might not be

03:29:24  5  an appropriate instruction, and our submission is that this is

6  such a case.

7      THE COURT:  But aren't there a number of claims in

8  this case in which it is appropriate?

9      MR. ART:  Well, it's appropriate as to the due process

03:29:35  10  claim, the first claim, and as to --

11      THE COURT:  How many claims are there?

12      MR. ART:  Well, there's the due process, there's the

13  conspiracy claim, there's the failure to intervene claim, and

14  there's a *Monell* claim, and there's state law claims.  So it's

03:29:47  15  going to confuse the jury to give a separate instruction --

16      THE COURT:  I think it would be less confusing if we

17  gave them an instruction on each separate claim.

18      MR. ART:  Well, the due process claim, as it's

19  currently stated, does say as to each defendant you're

03:29:59  20  considering, the plaintiff must prove these following things,

21  that that defendant suppressed the evidence, that that

22  defendant fabricated evidence.

23      THE COURT:  Well, where do we tell them what they

24  should consider on the failure to intervene claim?  Where do we

03:30:12  25  tell them what to consider on the conspiracy claim?

1          MR. ART:  In the elements instructions for those

2     claims.

3          THE COURT:  Well, I mean, not having instructions the

4     night before where you're going to close is pretty distressing.

03:30:23     5     I don't know what to do.  I don't know what to look at.  I have

6     millions of alternative sets.

7          MR. ART:  So the due process claim is No. 29.

8          THE COURT:  Well, what is the name of the set that I

9     look at, or what is the docket number?

03:30:32    10          MR. ART:  It's Docket No. 543.

11          THE COURT:  Do we have 543 printed out?  Could I get

12     it?

13          MR. ART:  I think you might have printed it yesterday.

14          THE COURT:  I'll have it in a second.

03:30:58    15          Do you have that little opinion yet, or am I still

16     trying to get you that little opinion?

17          MR. ART:  I don't think we've seen it yet, Judge.

18          THE COURT:  I don't know what kind of technical

19     problems we're having that are preventing us from printing out

03:31:10    20     a three-page opinion.

21          Oh, Mr. Given, I think that I have something that

22     belongs to you here.

23          MR. GIVEN:  Oh, yes.  Thank you, Judge.

24          (Tendered.)

03:31:26    25          MR. GIVEN:  Thank you very much.

1    THE COURT:  Let me see if I can -- oh, good.

2    And what's the story with that little opinion?

3    THE LAW CLERK:  It's been sent to Marlan.

4    (Discussion held off the record.)

03:32:03    5    THE COURT:  Oh, it's been sent to Marlan to be

6    entered.  Okay.  That's great.

7    All right.  So I have the revised proposed jury

8    instructions, Docket 543, and what am I looking at?

9    MR. ART:  So due process is No. 29 on Page 29.

03:32:17    10    THE COURT:  Hold on.  Let me look at due process,

11    Page 29.

12    MR. ART:  So at the top it says, "To succeed on this

13    claim as to the particular defendant you are considering, the

14    plaintiff must prove each of the things by a preponderance of

03:32:35    15    the evidence, that the defendant," and so it's already

16    instructing on personal responsibility.

17    THE COURT:  I don't know, is the defense happy with

18    that?

19    MR. POLICK:  No.  We objected to this instruction.  I

03:32:45    20    think -- and we submitted a revised version last night or maybe

21    early this morning with regard to this.

22    THE COURT:  I can't keep track of all the stuff you're

23    submitting to me.

24    MR. POLICK:  Right.  Well, I mean the big issue is --

03:32:54    25    THE COURT:  Let's just fix it.

1    MR. POLICK:  We needed to reinsert the, you know, the

2  reasonable diligence element of this claim, which was omitted

3  from this instruction.  This instruction we were looking at is

4  when, you know, the Court made the ruling on reasonable

03:33:07  5  diligence, and then midstream, you know, plaintiff reversed

6  course on that, so now we have to reinsert that into -- that

7  element into this instruction.

8    THE COURT:  Well, I don't know about that.  I'm

9  talking about personal involvement.

03:33:21 10    MR. GIVEN:  Judge --

11    THE COURT:  I can only talk about one thing at a time.

12    MR. GIVEN:  -- for purposes of the due process

13  claim --

14    THE COURT:  Yes.

03:33:30 15    MR. GIVEN:  -- we don't, the defendants do not dispute

16  that there has to be personal involvement.  The issue that we

17  have has to do with the federal conspiracy and the failure to

18  intervene claim, where we also believe that you need personal

19  involvement, and --

03:33:50 20    THE COURT:  So you're saying that the due process

21  instruction is fine?  Because that's the one I'm trying to fix.

22    MR. POLICK:  Well, no.

23    MR. GIVEN:  If it incorporates the need for personal

24  responsibility, yes.

03:34:02 25    THE COURT:  Well, I'm asking you.  I'm not the lawyer

1    in this case.  I'm asking you.

2          The plaintiff says it does.  I'm asking you if, from

3    your point of view, if it does.

4          MR. GIVEN:  I can answer you in a minute, Judge.

03:34:19   5        (Pause.)

6          MR. POLICK:  Yes, it speaks to the defendant that is

7    being considered.

8          THE COURT:  All right.  So that's -- now, are --

9    Sparks and Zacharias are out of this case, aren't they?

03:34:26  10        MR. ART:  You're correct.  They're out.

11         THE COURT:  Are you going to be fixing all this

12   tonight?

13         MR. ART:  Absolutely.

14         THE COURT:  All right.  So the due process instruction

03:34:31  15   is okay except you say that that has to have the due diligence

16   reinserted.

17         MR. POLICK:  Yes, reasonable diligence.

18         THE COURT:  Reasonable diligence.

19         MR. ART:  Your Honor --

03:34:43  20        MR. POLICK:  We have the one that was submitted last

21   night.  I got a copy of it.

22         THE COURT:  All right.  Good.  Can you give it --

23         MR. POLICK:  Yeah, sure.

24        (Tendered.)

03:34:50  25        MR. ART:  On the reasonable diligence issue, we agree

1    that the pattern instruction on the first element should be

2    inserted there.  They have provided a different --

3            THE COURT:  Look, I don't know what you're talking

4    about, so you're going to have to tell me.

03:35:02    5            MR. ART:  Let me hand you the pattern instruction.

6            THE COURT:  Well, just tell me what to insert in it,

7    and then we can all talk about it.

8            MR. ART:  I shall read it in a moment.

9            So the first --

03:35:41    10            THE COURT:  So do I understand correctly that what I'm

11    looking at, which is Plaintiff's 29, talks about this whole

12    problem is a violation of due process, and the defense proposes

13    that it's concealment of exculpatory evidence/fabrication of

14    evidence, so we don't even agree on what we're instructing on?

03:36:01    15            MR. ART:  Your Honor, to be clear, we went through

16    this instruction at the conference.  What you are holding,

17    which is 543 -- Docket 543, Page 29 --

18            THE COURT:  Yep.

19            MR. ART:  -- is your rulings on everything except the

03:36:11    20    reserved question, which was reasonable diligence.

21            THE COURT:  Okay.

22            MR. ART:  So now we are agreeing that reasonable

23    diligence gets reinserted, and Pattern Instruction 7.14, which

24    for some reason I don't have in front of me right now, has

03:36:28    25    language in the first element about reasonable diligence, which

1   we will add.  We agree with the defendants.  Here's the

2   disagreement on this issue.

3          THE COURT:  Yeah, that would be nice.

4          MR. ART:  The agreement on reasonable diligence is

03:36:38    5   they proposed a separate definition of reasonable diligence in

6   the instruction they just handed you that is essentially a

7   state law negligence standard that has absolutely nothing to

8   do with --

9          THE COURT:  Is there a Seventh Circuit pattern on the

03:36:49    10  subject?

11         MR. ART:  Yes, and we will add that to the first

12  element --

13         THE COURT:  Well, could we see it or could they see it

14  so we know what we're talking about?

03:36:57    15  MR. POLICK:  There's not a Seventh Circuit pattern on

16  reasonable diligence.

17         MR. ART:  Yeah, it's in the first element of that

18  instruction.

19         MR. POLICK:  Oh, he's talking about the element, not

03:37:04    20  the definition.

21         THE COURT:  I don't know.  I don't have it, so this

22  can go on indefinitely.  I don't care.

23         MR. POLICK:  What we're using is the pattern

24  instruction.

03:37:10    25  MR. ART:  The definition that they have proposed to

1    you is not from the pattern. I'm getting the pattern right now.

2         THE COURT:  That's why I asked you to get me the

3    pattern.

4         MR. ART:  Thank you.

03:37:19   5         MR. POLICK:  The pattern includes the element but not

6    a definition.

7         Do you want the pattern, Your Honor?

8         THE COURT:  Well, you said there is no pattern, so

9    what are you giving me?

03:37:58  10         MR. POLICK:  No, no, no, there's a pattern -- I think

11   we're talking over each other.

12         THE COURT:  We are.

13         MR. POLICK:  There is a pattern for this due process

14   claim.  The pattern contains the element of reasonable

03:38:14  15   diligence, and it's part of the pattern instruction as an

16   element of the *Brady* aspect of it.  What the pattern does not

17   contain is a definition of what is reasonable --

18         THE COURT:  Okay, could I see it?

19         MR. POLICK:  Yes.  That's what I'm tendering.

03:38:26  20         (Tendered.)

21         THE COURT:  Okay.  Well, that's clear.  So where --

22   what kind of definition are you proposing?

23         MR. ART:  From the plaintiff's perspective, there

24   should be nothing beyond what's in the pattern.  They have

03:38:46  25   proposed a definition that is based on a state law negligence

1  concept that has absolutely no application in this context.

2         THE COURT:  And what is this, Dan?

3         THE LAW CLERK:  This is the order.

4         THE COURT:  Oh, okay.  Well, I've already ruled on

5  this.  Defendants' request for reasonable diligence

6  exceeding -- oh, this is in the opinion that's going out today?

7         THE LAW CLERK:  That's correct, Your Honor.

8         THE COURT:  Okay.  I'm just going to give the Seventh

9  Circuit pattern.  That's it.  That's always the best course.

10        Okay.  So that's due process.  Where is our conspiracy

11 instruction?

12        MR. ART:  We've submitted separate conspiracy

13 instructions, Your Honor.  It was initially submitted, and the

14 Court asked for new conspiracy instructions.  Yesterday both

15 sides submitted those proposed instructions.

16        THE COURT:  Okay.  Do we have those, Ben?  His dueling

17 conspiracy instructions?  Or do you have what you submitted?

18        MR. POLICK:  Yes.

19        THE COURT:  The lawyers have them.

20        (Tendered.)

21        THE COURT:  That's one.  There's the other.

22        (Tendered.)

23        MR. ART:  Thank you.

24        THE COURT:  Okay.  Can anyone direct me to what you're

25 disagreeing about?

03:40:38

1    MR. ART:  There's not a whole lot of disagreement.  At
2  the jury instruction conference, we had put definitions about
3  what it means to join an agreement in that first element, and
4  the Court asked us to move that out of the first element.  I
5  think that's really the only real substantive disagreement
6  right now.
7        We would submit that our proposed definition of what
8  it means to join an agreement below the elements there in
9  Docket 649 at 1 --
10       THE COURT:  Yeah, I've got it.
11       MR. ART:  -- that that's a more fulsome definition
12  based on the law of conspiracy than the defendants have put in
13  their Element 1, but --
14       THE COURT:  Well, the plaintiff has the defendant
15  joined an agreement between two or more persons to violate the
16  plaintiff's due process right to a fair trial.  That's yours,
17  right?
18       MR. ART:  Correct.
19       THE COURT:  And the defendants' is "Plaintiff must
20  prove that there was an agreement between two or more persons
21  to conceal material, exculpatory and/or impeachment evidence
22  and/or to fabricate evidence that was used against plaintiff in
23  the criminal case."
24       Does that exhaust the possibilities?
25       MR. ART:  Yes, Your Honor.

1          THE COURT:  "Plaintiff must prove that the parties

2  having shared this common purpose, does not have to prove that

3  each participant knew all the details."

4          Well, what's wrong with that?  I mean, I don't see

03:41:37   5  anything wrong with that.  Does the plaintiff see anything

6  wrong with that?

7          MR. ART:  No, we just don't think that it's a complete

8  definition of joining an agreement, which is what we --

9          THE COURT:  That you don't think it's what?

03:41:45  10          MR. ART:  A complete definition of what it means to

11  join an agreement in a conspiracy, and so the paragraph that we

12  put below Element 4 in our proposed instruction we think

13  completes the idea.

14          THE COURT:  Could you tell me what it is rather than

03:41:56  15  give me numbers?

16          MR. ART:  "In order to show that the defendant joined

17  an agreement, the plaintiff must prove that the participant

18  shared a common purpose.  The plaintiff does not have to prove

19  that there was a formal agreement or plan in which all involved

03:42:08  20  met together and worked out the details.  He also does not have

21  to prove that each participant knew all of the details of the

22  agreement or the identity of all of the participants."

23          MR. POLICK:  That's very convoluted, Your Honor.

24          THE COURT:  I'm sorry, hold on.  Oh, it does, too?

03:42:25  25  Bottom of 3?

1          THE LAW CLERK:  I have copies of the two orders that

2    will be entered.

3          THE COURT:  Oh, all right.

4          So if we use the defendants' prefatory paragraphs and

03:42:50  5    we use -- that was used in *Fields*, right?  And then we use

6    the -- let me see if we can figure out exactly.

7          (The Court conferred with her law clerk.)

8          THE COURT:  Let me try to figure this out.  This is

9    covered in the opinion, but the opinion was done in a hurry,

03:44:00  10   makes no sense at all.

11          All right.  So we're going to use the first paragraph

12   of the defendants' proposal.  We're going to use the second

13   paragraph of the defendants' proposal.

14          Then -- okay.  Then I think we can go -- then, because

03:44:24  15   we've actually defined conspiracy in the defendants' first

16   paragraph, then we can go to the plaintiff's more simple

17   Elements 1, 2, 3, 4.

18          And let's see.

19          So then the only thing left in dispute is this, "In

03:44:59  20   order to show that the defendant joined an agreement, plaintiff

21   must prove that the parties shared a common purpose.  The

22   plaintiff does not have to prove that there was a formal

23   agreement or plan."

24          They're so similar.  I don't even know what we're

03:45:19  25   talking about.  I think if we start off with paragraphs 1 and 2

1    of the defendants', we then use the plaintiff's four elements,

2    and we then use the rest of the plaintiffs.

3           Somebody tell me what's wrong with that.  I think it

4    makes sense.

03:45:33    5           MR. POLICK:  I think that the paragraph that starts

6    out, "In order to show" is just convoluted.  There was no

7    evidence in this case about agreements and all of that that's

8    in here.  The instruction should be based on the evidence --

9           THE COURT:  Well, yeah, but why doesn't your first

03:45:44   10    element do exactly the same thing?

11           MR. POLICK:  It encapsulates it.  It basically says

12    very succinctly, "A conspiracy is an agreement to accomplish an

13    unlawful purpose or to accomplish a lawful purpose by unlawful

14    means."  I don't know why we have to go --

03:45:59   15           THE COURT:  No, no, no.  I'm reading your instruction.

16    It says, "Plaintiff must prove that there was an agreement

17    between two or more persons to conceal material, exculpatory

18    and/or impeachment evidence, to fabricate evidence that was

19    used against plaintiff in a criminal case.  Plaintiff must

03:46:09   20    prove that the parties have shared this common purpose, but

21    does not have to prove that each participant knew all the

22    details of the conspiratorial plan or the identity" -- I mean,

23    it's the exact same thing.

24           MR. POLICK:  But we're using plaintiff's --

03:46:21   25           THE COURT:  Well, I know because I'm not using yours.

1    MR. GIVEN:  Judge --

2    THE COURT:  They're identical.

3    MR. GIVEN:  The other problem with the additional

4    language in plaintiff's is the next sentence that says, "The

03:46:30    5    plaintiff does not have to prove that there was a formal

6    agreement or plan" when, in fact, our position is you have to

7    prove an agreement or a plan.

8    THE COURT:  Where -- where -- oh --

9    MR. GIVEN:  The additional language under No. 4 on the

03:46:42    10    plaintiff's.

11    THE COURT:  That plaintiff does not have to prove that

12    there was a formal agreement or plan?

13    MR. ART:  That's the law is conspiracy.

14    THE COURT:  That is the law of conspiracy.  No

03:46:51    15    question about that.  I know that like the back of my hand.

16    He has to show that the defendant joined an agreement

17    between two or more persons to violate the plaintiff's due

18    process right, and he knowingly became a member.  I think

19    that's what we're going to do.

03:47:07    20    Right or wrong, we're going to use defendants'

21    Paragraph 1, Paragraph 2, and we're going to use the rest of

22    the plaintiff, and that's going to be the conspiracy

23    instruction, and you can forget anything that that opinion may

24    say, comprehensible or incomprehensible, to the contrary.

03:47:26    25    All right.  So, and then what -- and does this have

1  what it needs to say about -- anything it needs to say about

2  personal involvement?

3          MR. ART:  Yeah, up at the top, Your Honor.

4          THE COURT:  All right.  And what about failure to

5  intervene?

6          MR. ART:  Failure to intervene we did at the last

7  conference.  It should be done.

8          THE COURT:  All right.  Well, then I don't think we

9  need a personal involvement instruction.

10          All right.  What else needs to be resolved?

11          MR. ART:  So I want to direct the Court's attention in

12  the same Docket 543 at Page 35 and 37.

13          THE COURT:  Yep.

14          MR. ART:  There's the two *Monell* instructions.

15          Is Ms. Rosen here?

16          MS. ROSEN:  Is there a ruling?  I'm trying to figure

17  that out.

18          MR. ART:  Is there a ruling on it?

19          MS. ROSEN:  Yeah, I was just reading it now, trying to

20  figure out --

21          THE COURT:  Oh.

22          MR. ART:  And I apologize, Judge, I haven't had the

23  opportunity.

24          THE COURT:  This got thrown together so fast, I

25  don't -- I mean, I guess I have to take responsibility for it,

1    but God only knows what's in it.

2           So which page are you looking at, Ms. Rosen?

3           MS. ROSEN:  So your ruling -- well, there's two pieces

4    of paper that were handed to me, so I guess it's the one that's

03:48:24   5    just the order.

6           THE COURT:  Oh, I've got it.

7           MS. ROSEN:  Page 4?

8           THE COURT:  Yeah.

9           MS. ROSEN:  So now I was just trying to figure out

03:48:31  10    what --

11           MR. ART:  Right, so --

12           THE COURT:  Yeah, I got it.

13           MR. ART:  So earlier this afternoon, we filed a thing

14    saying in Element 2 of Proposed Instruction No. 34 --

03:48:50  15           THE COURT:  Yep.

16           MR. ART:  -- which is the first *Monell* one, it should

17    simply read, "The City of Chicago had a policy of concealing

18    material, exculpatory and/or impeachment evidence."  Period.

19    "The term policy means" -- so in other words, what we had

03:49:06  20    listed as (b) and (c) there would be eliminated.

21           THE COURT:  Wait.  So I'm looking at -- am I looking

22    at 543?

23           MR. ART:  543, Page 35.

24           THE COURT:  Page 35, okay.  So --

03:49:18  25           MR. ART:  Element 2.

1    THE COURT:  "The City of Chicago had a policy of ..."

2    MR. ART:  And then we'll delete the (a), and it would

3  say "of concealing material, exculpatory and/or impeachment

4  evidence."  Period.

5    THE COURT:  Period.

6    MR. ART:  And then we'll say, "The term policy means"

7  and it will pick up the rest of the instruction.

8    THE COURT:  So all of this fabrication and stuff is

9  out.

10    MR. ART:  Correct, Your Honor.

11    THE COURT:  That's simplifying, okay.

12    And then what else do you propose?

13    MR. ART:  So nothing else on that one.

14    And then turning to Plaintiff's Proposed 35, which is

15  Docket No. 543 at 37.

16    THE COURT:  Wait.

17    MR. ART:  Same -- same idea with the second element of

18  that instruction.

19    So it would say, "The City of Chicago knew that

20  exculpatory and/or impeachment information would not be

21  disclosed."

22    THE COURT:  Period.

23    MR. ART:  Well, and it would go on to the "because."

24  You see the "because" there?

25    THE COURT:  Yes.

1           MR. ART:  So it would essentially limit the (b) clause

2   and pick up "because there was a pattern of ..." and go to the

3   end.

4           THE COURT:  All right.  So let me see what if that

03:50:28  5   opinion then is contradictory to that.

6           MS. ROSEN:  No, I think, Judge, it incorporates the

7   filing from this afternoon.

8           THE COURT:  All right.  So defendants, if we go to

9   Plaintiff's 35 and we get rid of the (b) and (c) elements in

03:50:45 10   Paragraph 2, what else do you want to critique on that -- on

11   that fifth claim, policy claim, against the City of Chicago?

12           MS. ROSEN:  Well, we are, you know, reserving whatever

13   objections we had before.

14           THE COURT:  Right.

03:51:01 15           MS. ROSEN:  I don't recall what they are, standing

16   here today, but with respect to how the evidence now has played

17   out, I don't think there's any evidence of (c), a decision or

18   policy statement including a decision not to adopt the needed

19   policy made by the City of Chicago.

03:51:16 20           And quite frankly, the failure to train, I mean, we

21   address that in our Rule 50 motion.  It's a very high standard,

22   and the only evidence is that Mr. Brasfield said three or

23   six hours wasn't enough on the new policy.

24           So that's, I guess, maybe a different issue on the

03:51:32 25   Rule 50, but --

1          THE COURT:  Yeah, I don't think failure to train has

2    been made out, so -- so let's get rid of that.

3          And then you're saying that (c) also is not supported?

4          MS. ROSEN:  Correct.  So are you saying that the

03:51:44    5    failure to train is out?

6          THE COURT:  Yeah, I don't see failure to train as

7    developed in this case.

8          MR. ROSEN:  Yes.

9          MR. ART:  Well, Your Honor, here's our position on

03:51:51   10    that subject, which is that there's an entrenched practice

11    established of maintaining these street files, and a new policy

12    is put in place, and the testimony is that there was somewhere

13    between three and eight hours of training one time for the

14    detectives to sort of, you know, displace --

03:52:08   15          THE COURT:  I remember the evidence, but the jury is

16    supposed to speculate on what's enough training?

17          MR. ART:  No, it's not specu- -- you have experts who

18    have come into court and said that's not enough training to put

19    to the side this entrenched practice of keeping secret

03:52:23   20    clandestine files.  So we think that there's certainly enough

21    evidence for the jury to consider the question whether there

22    was a failure to train on that point.

23          MS. ROSEN:  Well, Judge, you know, under the case law

24    on failure to train, it's a very high --

03:52:36   25          THE COURT:  Well, I think you're right, but I don't

1    know what that case law says.  I mean, many cases get thrown

2    out on that.

3              MR. ART:  And we also have, Your Honor --

4              THE COURT:  But there is some evidence.  It's not a

03:52:51   5    great deal of evidence, but there's some.

6              MS. BARBER:  I believe if it's a lack of training, it

7    has to be so abundantly obvious, or along those lines.  I can't

8    quite remember.

9              MR. ART:  And our position, Your Honor, is that it was

03:53:02  10    obvious because they had this multi-decade practice of keeping

11    clandestine trials, and they did --

12              THE COURT:  And it didn't get fixed.

13              MR. ART:  -- one afternoon of training, and then you

14    have all this evidence that it didn't get fixed.  That's the

03:53:11  15    evidence in *Fields* that went to the jury on failure to train.

16              THE COURT:  What about the other thing, the decision

17    or policy statement including a decision not to adopt a needed

18    policy?

19              MR. ART:  That one's even clearer.  Right?  So the

03:53:22  20    decision not to adopt a policy that covered anyone other than

21    detectives is one example of adopting a written policy that --

22              THE COURT:  All right.  You know, we don't have a lot

23    of time.  I'm going to give it.  I'm going to give it as

24    submitted.

03:53:34  25              37 now we go to?

1          MR. ART:  So we're done with 34.

2          Are we done with 35 from the City's perspective?

3          MS. ROSEN:  Well, 35, the City has the same objection

4     on the failure to train, supervise, I see there's still this

03:53:48   5     discipline language, but I guess that's probably going to be --

6          MR. ART:  The discipline language will be cut.  That

7     was included erroneously.

8          MS. ROSEN:  And failure to train and supervise --

9     well, failure to train, my objection is the same as it was --

03:54:00  10          THE COURT:  Yeah.

11          MS. ROSEN:  -- in the proceeding, and then failure to

12    supervise, I don't know what we're talking about.

13          MR. ART:  That, Your Honor, on that point, it's the

14    auditing point, right?  It's almost the flip side of failure to

03:54:10  15    train.

16          If you don't audit ever whether your policies are

17    working, then you have failed to supervise whether those

18    policies are being enforced, and you permit the widespread

19    practice to persist.

03:54:22  20          MS. ROSEN:  Judge, we don't believe there's evidence

21    to sustain a failure to supervise.

22          THE COURT:  Yeah, I think supervision is dangerous.  I

23    don't think that audit necessarily equates to supervision.  So

24    let's get rid of the supervision at least.

03:54:34  25          MR. ART:  On 35, Your Honor.

|   |   |
|---|---|
| | 1 THE COURT:  On Page 37.  I don't know -- |
| | 2 MR. ART:  Proposed 35. |
| | 3 MS. ROSEN:  Proposed 35. |
| | 4 THE COURT:  -- proposed 35. |
| 03:54:45 | 5 All right.  Then the next one is -- |
| | 6 MR. ART:  I think we're on to malicious prosecution, |
| | 7 which is I understand the Court is -- |
| | 8 THE COURT:  That one I basically rewrote.  I don't |
| | 9 know if it's right or it's wrong, but it's the best I could do |
| 03:54:57 | 10 based on the cases. |
| | 11 MR. ART:  So that gets us through what we had gone |
| | 12 through prior to or at the last conference, Your Honor.  And |
| | 13 then the only issue left to resolve is in instructions we |
| | 14 didn't go through, and so that is in Docket No. 433, and I'll |
| 03:55:19 | 15 hand these up to the Court. |
| | 16 Sorry, Locke. |
| | 17 433-1 and -2. |
| | 18 (Tendered.) |
| | 19 MR. ART:  And we're looking at the Proposed |
| 03:55:38 | 20 Instruction 43, which should be on Page 46 of both documents. |
| | 21 So what you've got is one plaintiff's proposed and one |
| | 22 defendants' proposed. |
| | 23 THE COURT:  I'm looking at Page 46 on both.  Is that |
| | 24 what I'm looking at? |
| 03:55:50 | 25 MR. ART:  Yep.  And we're looking at intentional |

1    infliction of emotional distress then.

2         THE COURT:  Okay.

3         MR. ART:  And I guess we both think our instructions

4    are right.

03:56:03   5         THE COURT:  Well, tell me what's -- you know, I've got

6    about ten more minutes to spend with you, so you'd better

7    direct my attention to the problem.

8         MR. ART:  You know, I -- I think that ours is simpler

9    and correctly states the elements under Illinois law and should

03:56:17   10   be given because it's simpler with the last two paragraphs that

11   the Court has already ruled is going to be in every

12   instruction.

13        THE COURT:  So is the City a named defendant in this

14   claim?

03:56:26   15        MR. ART:  You -- at the last conference with respect

16   to malicious prosecution, you said the City should get struck

17   from this claim because, as an operation of law, they'll be

18   liable.  We can do that on this one as well.

19        THE COURT:  Okay.  Let's do that.

03:56:39   20        And then is there any other difference, or are we just

21   quibbling over details?

22        MR. ART:  We're quibbling over simplicity, Your Honor,

23   and we think the plaintiff's side is more simple.

24        THE COURT:  And there's nothing in the defendants'

03:56:53   25   much longer instruction that the defendant really wants or

1  needs or something?

2       MR. POLICK:  I think a definition of what severe

3  emotional distress is.

4       THE COURT:  Where is that?

03:57:04  5       MR. POLICK:  That would be on the next page.

6       MR. ART:  And, Your Honor, that gets into --

7       THE COURT:  Wait, wait.  Let me hear one person at a

8  time.

9       MR. POLICK:  It's just on the next page, Judge.  It

03:57:13  10  would be Page 47 of Document 433-2.

11       THE COURT:  Well, what are we talking about, 21 years

12  in prison?

13       MR. ART:  Yeah, I mean, Your Honor, this is not the

14  kind of term that needs to be subdefined in an instruction.

03:57:31  15  Severe emotional distress --

16       THE COURT:  I get your point.

17       Well, I think it's kind of absurd when this is what

18  you're talking about, but it is -- I think it is a correct

19  statement of the law that this is how I -- what IIED is, so why

03:57:59  20  don't I give -- why don't I give the plaintiff's simple one and

21  then give the defendants' Page 47?

22       MR. ART:  I mean, I guess the problem with that, Your

23  Honor, is if you give the defendants' case-law-based definition

24  of severe emotional distress, another thing the case law

03:58:13  25  establishes very clearly is, you know, one thing a jury should

1  consider in the context of intentional infliction is whether

2  someone abused a position of authority, and we'd like that to

3  be in there, too, if their case-law-based definition --

4              THE COURT:  Well, have you submitted it?

03:58:27  5          MR. ART:  We did.  It was in the one that we filed

6  last night, which is docket --

7              THE COURT:  There's no -- I take it there's no Seventh

8  Circuit instruction on this, and there's no state court --

9              MR. ART:  That's correct.

03:58:38  10         THE COURT:  -- instruction.  We're making it all up.

11             MR. ART:  That's right.

12             THE COURT:  I mean, I don't know, frankly, why this

13  isn't clearly established if liability is shown.  I mean, how

14  can -- how can this -- how can this not be -- you know,

03:59:07  15  21 years?  I mean, really.

16             MR. ART:  Right, so --

17             THE COURT:  So then what do we do?

18             MR. ART:  I think the simplest thing to do is to say

19  the defendants' conduct caused plaintiff's severe emotional

03:59:19  20  distress.

21             None of those terms have a particular legal meaning

22  that is particularly exotic, and if the jury finds that the

23  facts support, as the Court's saying, that 21 years behind bars

24  for a crime that everyone concedes this guy's innocent of isn't

03:59:36  25  severe emotional distress --

1    THE COURT:  All right.  I'm going to go with the

2    plaintiff on this.  If there's no pattern, I'm going to go with

3    the simplest instruction because I really don't think that's

4    where this case is going to come down.  I mean, this case --

03:59:52   5    really, okay.

6    So we're going to go with the plaintiff's.  What else

7    do we have to do?

8    MR. ART:  Okay.  Same docket numbers, the 433 docket

9    numbers --

04:00:01   10    THE COURT:  Yep.

11    MR. ART:  -- Page 48, proposed instructions from both

12    sides, 45.  These are the civil conspiracy instructions.

13    In plaintiff's mind, this issue is resolved

14    essentially by the ruling on the constitutional conspiracy

04:00:16   15    claim.

16    THE COURT:  What's the difference?

17    MR. ART:  I mean, we can have these follow what the

18    Court has already ruled on the Section 1983 conspiracy.

19    THE COURT:  Oh, this is a conspiracy to maliciously

04:00:25   20    prosecute.

21    MR. ART:  Right.

22    MS. ROSEN:  But there's only one defendant left for

23    the malicious prosecution.

24    THE COURT:  Oh, so how can we be talking about

04:00:42   25    conspiracy?

1          MR. ART:  You know, we think that they may be right

2     about that.

3               THE COURT:  I think they are right.

4               MR. ART:  We will withdraw that instruction.

04:00:49    5          THE COURT:  Okay.  Beautiful.

6          Next?

7               MR. ART:  Then we're on to damages.

8               THE COURT:  Okay.

9               MR. ART:  We have two preamble instructions, same

04:00:57   10    Docket Numbers, Page 49, Plaintiff's Proposed 46 and

11    Defendants' Proposed 46.

12               THE COURT:  Wait, Page 46?  No.

13               MR. ART:  Page 49, Your Honor.

14               THE COURT:  Page 49, Instruction 46.

04:01:07   15          MR. ART:  And here's our pitch on this one.  Theirs is

16    really one-sided.  It says if plaintiff loses, stop.  Ours is

17    two-sided.  It says, if plaintiff wins, keeping going.

18               THE COURT:  Wait a minute.  Wait a minute.  Wait a

19    minute.  I'm not even up to you yet.

04:01:24   20          You're looking at 46 and you're saying there's some

21    change?  There's no change of any consequence.  I mean, no

22    difference of any consequence.

23               MR. ART:  Theirs says if you decide for the defendant,

24    stop here.

04:01:38   25          MR. POLICK:  That's the pattern.

1      MR. ART:  Ours says, If you stop for the defendants,

2  stop here.  If you decide for the plaintiff, keep going.

3      THE COURT:  I got it.  I got it.  I got it.

4      Okay.  I'm going to go with the plaintiff's.

04:01:48    5  Next?

6      MR. ART:  Compensatory damages.

7      THE COURT:  Yes.

8      MR. ART:  We're all on the same page here, I think,

9  except for whether -- so let me say two things.  Let me strike

04:01:56   10  that and start again.

11      We're all on the same page here.  Plaintiff is

12  withdrawing Paragraph 3 of his instruction about lost wages.

13      THE COURT:  Yes, okay.

14      MR. ART:  Okay.  So then we have the same language

04:02:08   15  except plaintiff has separated physical, mental and emotional

16  pain and suffering out from loss of a normal life.

17      THE COURT:  It doesn't matter.  I will go with the

18  plaintiff's, as I usually do when I can't decide any

19  difference.  Plaintiff's is fine.

04:02:24   20  Next?

21      MR. ART:  Punitive damages, I don't think there's a

22  disagreement anymore.  There's no evidence of inability to pay

23  presented at this trial, so it shouldn't be instructed.

24      THE COURT:  Fine.  So there's no difference?  You know

04:02:35   25  what to do?

1          MR. ART:  To the extent there's any difference, how

2    about this?  We'll use defendants' version.

3          THE COURT:  Fine.

4          MR. ART:  But with respect to those factors, there's

04:02:45    5    no inability to pay.

6          MR. POLICK:  So we'll just strike the financial

7    condition element.

8          MR. ART:  Right.

9          MR. POLICK:  Okay.  I got you.

04:02:50   10          THE COURT:  So we'll use defendants', okay?

11          Next?

12          MR. ART:  Defendants have proposed at 433-2, Page 53,

13    an instruction about the jury not considering Section 1988

14    attorneys' fees.  We don't think there's any place for that

04:03:05   15    instruction.

16          THE COURT:  No, no, no.  They don't -- I don't think

17    we have to instruct them on that.

18          MR. ART:  Then we have agreed instructions through the

19    end.

04:03:14   20          THE COURT:  Okay.  Are we done?

21          MR. ART:  We'll have a revised --

22          MS. ROSEN:  Did you do these, the ones the defendants'

23    filed?

24          MR. ART:  I'm sorry.

04:03:23   25          MS. ROSEN:  Yeah.

1          MR. POLICK:  So Defendants' 50, 51 and 52 I think

2     we're all in agreement.  Those are just the patterns on the

3     final instructions to the jurors.

4          THE COURT:  Okay.

04:03:35    5          MS. ROSEN:  But then we have 54, evidence of other

6     acts by Guevara.

7          MR. ART:  So you have a new version of that, right?

8          MR. DAFFADA:  You have it.

9          THE COURT:  Oh, Page 5 of the order.

04:03:53   10          MS. ROSEN:  Did you address this, the new stuff?

11          MR. POLICK:  No, we didn't get to the new stuff.

12          MS. ROSEN:  Oh, I just didn't read the whole order

13     yet.

14          THE COURT:  Wait a minute.  Are you talking about

04:04:04   15     404(b)?  What are you talking about?

16          MR. POLICK:  There was a submission last night, Judge.

17          THE COURT:  Yeah, tell me what it's about.

18          MR. POLICK:  Some additional ones.  Just let me grab

19     ahold of it.  I apologize.  Maybe Ms. Rosen --

04:04:13   20          MS. ROSEN:  It's Defendants' Proposed Instruction

21     No. 54 in the filing.  It's evidence of other acts by Defendant

22     Guevara.

23          THE COURT:  Yeah.

24          MR. ART:  And, Your Honor, we have been working with

04:04:22   25     Defendant Guevara's counsel on this, and we have a version --

1          MS. ROSEN:  This is whatever was filed.

2          THE COURT:  I don't know if this goes to -- show me

3     what your issue is because I've got to get out of here.

4          MR. ART:  Judge, I don't think that there's an issue.

04:04:36    5     We're handing you Defendants' Proposed Jury Instruction 54 now.

6          THE COURT:  Let me read it.  Let me read it.  This is

7     agreed?  It's not agreed.  Is it agreed?

8          MR. ART:  I just got handed it, so I'll read it the

9     same time as you, and I think it is agreed, Your Honor.

04:04:49   10          THE COURT:  All right.  Let me read it.

11          That is an appropriate 404(b) instruction.

12          MR. ART:  And it is agreed.

13          THE COURT:  It's agreed.  That's good.

14          MS. ROSEN:  Okay.  And then the next one is

04:05:05   15     Defendants' 55, which is agreed as it relates to the Chicago

16     Police Department regulations that are not -- they're not

17     constitutional violations.

18          MR. ART:  This is Docket 650.  I'll hand it up.

19          (Tendered.)

04:05:20   20          THE COURT:  Okay.  Defendants' Proposed 55, and that

21     is also a correct instruction, and that should be given.

22          MR. ART:  Yes, Your Honor.  We agree.

23          MS. ROSEN:  And the last one is Defendants' Proposed

24     Jury Instruction 56, and I probably can just hand it to you.

04:05:39   25     "Police officer duty to disclose to the prosecutor, not the

1   criminal defendant."

2           THE COURT:  Let me just read it.

3           (Tendered.)

4           MR. ART:  And, Your Honor, we object to this one.  We

5   don't think it's supported by the pattern comment, and we also

6   don't think it's really a dispute in this case.

7           THE COURT:  Well, I tell you how much of it I think is

8   okay.  I think a police officer's not responsible for turning

9   over evidence directly to the defense in a criminal case;

10  rather, the officer's constitutional obligation is to provide

11  the exculpatory information to the prosecutor who is

12  responsible for turning it over to the defense.  I think

13  that's --

14          MR. ART:  But there's no fact dispute in this case

15  about whether the prosecutor failed to turn over information.

16  There's zero evidence in the record.

17          THE COURT:  Well, that's true because Mr. -- whatever

18  his name is -- said that he turned over everything.

19          MR. ART:  Every single prosecutor came in and said, of

20  course, I handed over everything.  Every expert on both sides.

21  There's just no dispute.

22          THE COURT:  All right.

23          MS. ROSEN:  But, Judge, that goes to the practice,

24  right?  It's all the Brasfield "It's in this file, it's not in

25  this file; it's in this file, it's not in this file," so I

1  think for the practice part of the case on the issue of

2  investigative files where we have an expert --

3      THE COURT:  Well, you know what?  Okay.  Let me

4  compromise.  I think as long as I'm not going to hear any

04:07:13  5  stupid argument about how Mr. Wadas was required to subpoena

6  the police directly, I think we could say that a police officer

7  is not responsible for turning over evidence directly to the

8  defense in a criminal case.  Rather, the officer's obligation,

9  forget constitutional, is to provide the information to the

04:07:32  10  prosecutor.

11      MR. ART:  Your Honor, we have the same objection.

12  There's still no factual dispute in the individual case.  If we

13  give this instruction to the jury, they're going to think that

14  they should be thinking about what was turned over to

04:07:44  15  prosecutors in Jacques Rivera's case.

16      There's no evidence supporting any instruction about

17  whether or not a prosecutor handed something over to the

18  defense.  This should not be given --

19      THE COURT:  Let me hear from the defense fast, and I'm

04:07:56  20  going to make a call and I'm leaving.

21      MS. ROSEN:  Judge, our position is it goes right to

22  the way that the policy claim went in on the investigative

23  files, and Brasfield's testimony that went on and on and on

24  about criminal defense files and that the police department

04:08:12  25  should be turning it over and things not getting to the

1  criminal justice system, so --

2         THE COURT:  All right.  I am going to give it, but

3  only to the end of the prosecutor, period.

4         MS. ROSEN:  So just so that we're clear, "A police

04:08:26      5  officer is not responsible for turning over evidence directly

6  to the defense in a criminal case.  Rather, the officer's

7  obligation is to provide the exculpatory information to the

8  prosecutor," period.

9         THE COURT:  That's -- that's all I will give.

04:08:38     10         MS. ROSEN:  Thank you, Judge.

11         MR. ART:  Your Honor, can I say one more word on that?

12         THE COURT:  Yeah, but I'm leaving.

13         MR. ART:  If the issue is that they want this on a

14  policy claim, then it should say something about a policy, not

04:08:48     15  the individual case.

16         THE COURT:  I don't know what's going to be argued,

17  and I just think that the jury could be confused about this.

18  There was a lot of discussion -- I mean, there's no question

19  that, and it can be argued that the prosecutor gave the

04:09:02     20  defendant everything.

21         I mean, there's no dispute about that, right?

22         MR. ART:  Right, which is exactly why this shouldn't

23  be given because it's going to confuse the jury when you tell

24  them --

04:09:09     25         THE COURT:  Well, I think it could confuse the jury

1  the other way because the jury could really think from a lot of
2  this evidence that there was some obligation to -- for the
3  police to do something, and that is not -- I mean, it was, in
4  fact, inserted into this case many, many times.
5              This is what it's going to be.
6              MR. ART:  Thank you, Judge.
7              THE COURT:  If the opinion makes no sense, I sort of
8  understand.
9     (Court adjourned, to reconvene at 9:30 a.m. on 6/27/18.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

04:09:24

```
 1                    C E R T I F I C A T E

 2

 3

 4              We, Nancy L. Bistany and Kathleen M. Fennell, do

 5     hereby certify that the foregoing is a complete, true, and

 6     accurate transcript of the Trial proceedings, Volume 16-B, had

 7     in the above-entitled case before the HONORABLE JOAN B.

 8     GOTTSCHALL, one of the Judges of said Court, at Chicago,

 9     Illinois, on June 26, 2018.

10

11

12
               /s/ Nancy L. Bistany                06/27/18
13     _____

14

15             /s/ Kathleen M. Fennell             06/27/18
       _____        _____
16              Official Court Reporters            Date
                United States District Court
17              Northern District of Illinois
                     Eastern Division
18

19

20

21

22

23

24

25
```