**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Judge Mary M. Rowland |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT OFFICERS' LOCAL RULE 56.1 STATEMENT OF UNCONTESTED
FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, Edward Mingey, Fernando Montilla, Roland Paulnitsky and JoAnn

Halvorsen as Special Representative of Ernest Halvorsen (deceased), (collectively "Defendant

Officers,")[1] by and through their attorneys, hereby submit the following statement of uncontested

facts pursuant to Local Rule 56.1 in support of their motion for partial summary judgment:

**JURISDICTION AND VENUE**

1.     This matter is brought pursuant to 42 U.S.C. §1983 and Illinois law. This Court has

jurisdiction over Jose Juan Maysonet, Jr.'s ("Maysonet") federal claims pursuant to 28 U.S.C.

§1331, and supplemental jurisdiction over Maysonet's state law claims pursuant to 28 U.S.C.

§1367. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at

¶¶ 14-15.)**

---

[1] Maysonet agreed to dismiss, and this Court subsequently dismissed, all claims against Lee Epplen with
prejudice. (Dkt. 342.)

2.     Venue is proper under 28 U.S.C. § 1391(b). **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 15.)**

## PARTIES

3.     Maysonet and Alfredo Gonzalez were arrested, prosecuted, and convicted of the May 25, 1990, murders of Kevin and Torrence Wiley ("Wiley Brothers"). **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 38; Ex. 2, Certified Statement of Conviction Jose Maysonet; Ex. 3, 90CR21787 Indictment; Ex. 4, 92CR10146 Indictment; Ex. 5, Certified Statement of Conviction Alfredo Gonzalez.)**

4.     Justino Cruz was arrested and pled guilty to the May 25, 1990, murders of the Wiley Brothers. Justino's plea remains valid today. **(Ex. 6, Certified Statement of Conviction Justino Cruz; Ex. 3, 90CR21787 Indictment.)**

5.     A fourth individual, Christopher Goossens,[2] was also arrested and prosecuted for the May 25, 1990, murders of the Wiley Brothers, but was found not guilty on August 10, 1995. **(Ex. 7, Certified Statement of Conviction Christopher Gossens; Ex. 4, 92CR10146 Indictment.)**

6.     At all relevant times, Defendants Reynaldo Guevara ("Guevara"), was a detective with the Chicago Police Department ("CPD") and assigned to the Area 5 Violent Crimes Unit. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 17; Ex. 8, 1995-08-10 Trial Trans. at 188:14-23[3]; Ex. 9, Guevara Training Records "Pre-Service Detective TRNG. Program," at RFC_Maysonet 6681.)** Guevara is a Spanish speaker.

---

[2] Goossens' name is spelled incorrectly in numerous court documents. The correct spelling of his name according to his deposition is Goossens.

[3] Defendants' citations for all the trial transcripts refer to the page number from the court reporter that aligns with the table of contents for the transcript.

**(Ex. 8, 1995-08-10 Trial Trans. (Guevara), at 72:20-22.)** Guevara became a detective in early August 1990. **(Ex. 8, 1995-08-10 Trial Trans. (Guevara), at 188:14-23; Ex. 9, Guevara Training Records "Pre-Service Detective TRNG. Program," at RFC_Maysonet 6681.)** Prior to making detective in August of 1990, Guevara was part of the Gang Crimes North team. **(Ex. 10, Gawrys Dep., at 74:10-19.)** Guevara and Halvorsen did not begin working together until Guevara made detective in August 1990. **(Ex. 9, Guevara Training Records "Pre-Service Detective TRNG. Program," at RFC_Maysonet 6681; Ex. 15, Halvorsen Dep., at 51:9-11, 52:1-53:11.)**

7.    At all relevant times, Roland Paulnitsky ("Paulnitsky") was a detective with the CPD and assigned to the Area 5 Violent Crimes Unit. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 17; Ex. 11, Paulnitsky Dep., at 115:8-9, 126:11-13.)** Paulnitsky does not speak Spanish. **(Ex. 12, Montilla Dep., at 192:1-7.)**

8.    At all relevant times, Defendant Fernando Montilla ("Montilla") was a detective with the CPD and assigned to the Area 5 Property Crimes Unit. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 17; Ex. 12, Montilla Dep., at 80:7, 104:4-7, 110:3-24.)** Montilla is a Spanish speaker. **(Ex. 12, Montilla Dep., at 58:17-18.)**

9.    At all relevant times, Defendant Ernest Halvorsen ("Halvorsen") was a detective with the CPD and assigned to the Area 5 Violent Crimes Unit. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 17.)** Defendant Halvorsen died on January 26, 2020, during the pendency of this action. **(Ex. 13, Dkt. 116, Halvorsen Statement of Death Upon Record.)** He was substituted as a party-defendant by his surviving spouse, JoAnn Halvorsen, who was appointed by this Court to serve in this case as Special

Representative for Ernest Halvorsen, deceased. **(Ex. 14, Dkt. 122, Order, March 26, 2020.)** Halvorsen did not speak Spanish. **(Ex. 15, Halvorsen Dep.[4], at 129:22-23.)**

10.    At all relevant times, Defendant Edward Mingey ("Mingey") was a Sergeant with the CPD assigned to the Area 5 Detective Division. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 19; Ex. 16, Mingey Dep., at 73:7-8, 75:23-76:8.)** Mingey does not speak Spanish. **(Ex. 16, Mingey Dep., at 183:25-184:2.)**

11.    Defendant City of Chicago is an Illinois municipal corporation that employed Defendants Guevara, Paulnitsky, Montilla, Halvorsen, and Mingey at the time of the events giving rise to this suit. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶¶ 17, 19, 21.)**

12.    At all relevant times, Defendants Guevara, Paulnitsky, Montilla, Halvorsen, and Mingey were acting under color of state law and in the scope of their employment. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 23.)**

### MAYSONET, HUMBOLDT PARK & THE LATIN KINGS

13.    Maysonet moved from Puerto Rico to the Humboldt Park area of Chicago, Illinois when Maysonet was in elementary school. **(Ex. 17, Maysonet Dep., at 35:1-36:13.)** Maysonet spoke Spanish, and according to Maysonet, he spoke very little English in the 1990s and generally did not understand English. **(Ex. 17, Maysonet Dep., at 417:6-418:7.)**

14.    While in Chicago, Maysonet completed junior high school where his classes were a mix of Spanish and English. **(Ex. 17, Maysonet Dep., at 37:20-39:1.)** Maysonet also attended

---

[4] Halvorsen passed away before he testified in this case, but he gave a deposition in the *Serrano & Montanez* consolidated cases 17-CV-450 & 17-CV-2869, on February 6, 2019, in which he provided substantive testimony.

two years of high school in Chicago, where his first period and second period classes were in English. **(Ex. 17, Maysonet Dep., at 39:2-15.)**

15.    Maysonet joined the gang known as the Latin Kings in elementary school and went by the nickname "Double J". **(Ex. 17, Maysonet Dep., at 57:4-58:11.)**

16.    The Latin Kings controlled the west side of Humboldt Park all the way to Grand Avenue/Garfield Park. **(Ex. 18, Veras Dep., at 97:3-98:13.)**

17.    During high school, Maysonet began selling drugs. **(Ex. 17, Maysonet Dep., at 55:9-13.)** In the 1980s into 1990, Maysonet was selling marijuana and cocaine. **(Ex. 17, Maysonet Dep., at 125:6-20.)** Maysonet was successful selling drugs, making up to $1,000 a day. **(Ex. 17, Maysonet Dep., 131:21-132:18.)**

18.    In 1990, Maysonet's specific set of the Latin Kings was located at the corner of Kimball and Wabansia and controlled territory about two-three blocks in every direction from that corner. **(Ex. 17, Maysonet Dep., at 57:4-8, 61:22-24, 64:23-65:17, 75:22-76:6, 210:8-15.)** This territory was bounded by St. Louis on the west, Kedzie on the east, North Avenue on the south, to Wabansia on the north. **(Ex. 17, Maysonet Dep., at 64: 23-65:17, 75:22-76:6, 210:8-15;** *see also* **below map at ¶ 43.)**

19.    Alfredo Gonzalez was a member of Maysonet's set of the Latin Kings and went by the nickname "Lluvia." **(Ex. 17, Maysonet Dep., at 95:12-96:7.)** Maysonet knew Lluvia from growing up with him in the Humboldt Park neighborhood. **(*Id.*)** Lluvia sold marijuana and cocaine. **(Ex. 19, Gonzalez Dep., at 41:13-42:15.)**

20.    Justino Cruz was also a member of Maysonet's set of the Latin Kings and went by the nickname "Tino." **(Ex. 17, Maysonet Dep., at 96:8-97:8, 98:2-6.)** Maysonet knew Tino

from growing up in the Humboldt Park neighborhood and through school. (**Id.**) Tino also sold marijuana. **(Ex. 20, Cruz Dep., at 126:21-23, 136:16-19.)**

21.    Christopher Goossens was a member of the Latin Kings, but not a member of Maysonet's set, and went by the nickname "Fro." **(Ex. 17, Maysonet Dep., at 98:23-100:16.)** Maysonet knew Fro from growing up and going to school together. **(Ex. 17, Maysonet Dep. at 98:23-99:12.)**

22.    Efrain Cruz was also a member of Maysonet's set of the Latin Kings and went by the nickname "King." **(Ex. 17, Maysonet Dep., at 101:14-23.)** Francisco Veras was a Latin King, but not a member of Maysonet's set, and went by the nickname, "Cisco." **(Ex. 17, Maysonet Dep., at 102:20-104:5.)** Although not a part of the set, Cisco would hang out with Maysonet's set. (**Id.; Ex. 18, Veras Dep., at 94:4-95:9.)** Cisco also sold cocaine and marijuana. **(Ex. 18, Veras Dep. at 98:22-99:8.)**

23.    King and Tino were also Lluvia's nephews. **(Ex. 18, Veras Dep., at 110:8-12.)**

24.    Because Maysonet's set controlled and sold drugs in the area of Kimball and Wabansia, no one could come into that territory without the set's permission. **(Ex. 17, Maysonet Dep., at 64:3-66:5.)** If an outsider came in and tried to sell drugs in the neighborhood, the Latin Kings would not want that happening and would "take care of it." **(Ex. 21, Goossens Dep., at 108:20-24, 117:5-10.)**

25.    Maysonet carried his gun on him, including when dealing drugs. **(Ex. 17, Maysonet Dep., at 128:4-129:7.)**

26.    In the late 1980s, the Latin Kings were a violent gang. **(Ex. 17, Maysonet Dep., at 89:20-90:9.)** Maysonet had been shot prior to his arrest for the Wiley Brothers' murders. **(Ex. 17, Maysonet Dep., 113:4-115:14.)** In the summer of 1990, the Latin Kings were at war with

6

a rival gang known as the YLODs, whose territory was West of the Latin Kings. **(Ex. 18, Veras Dep. at 117:20-25.)**

27.     In May 1990, Maysonet was living with his then girlfriend Rosa Bello at 1302 N. Homan in Chicago. **(Ex. 17, Maysonet Dep., at 76:7-10, 205:14-18, 206:12-18; Ex. 22, Bello Dep., at 11:13-23; Ex. 23, 1992-03-26 Gonz. Trial Trans. (Bello), at 89:5-12.)** Maysonet dated Bello for approximately six years before his arrest for the Wiley Brothers' murders. **(Ex. 17, Maysonet Dep., at 207:19-22.)** Bello spoke both Spanish and English. **(Ex. 17, Maysonet Dep., at 207:9-11; Ex. 22, Bello Dep. at 48:8-11.)**

### THE WILEY BROTHERS' MURDERS

28.     In the early morning hours of May 25, 1990, at approximately 1:00 AM, the Wiley Brothers, two African America men in their mid-20s, were shot and killed in the area of 3428 W. North Ave., Chicago. **(Ex. 1, Dkt. 146, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 38; Ex. 8, 1995-08-10 Jury Trial Trans. (Stip.), at 240:11-17.)**

29.     Non-defendant 014 District Chicago Police Officers William Dones and Luis Montalvo responded to a call of shots fired in the area of 3430 W. North Ave., where they found the Wiley Brothers who had sustained multiple gunshot wounds. **(Ex. 24, 1995-08-09 Trial Trans. (Dones), at 63:20-22, 64:19-67:16.)** One of the brothers was found on the sidewalk in front of 3428 W. North Ave., and the other brother was found adjacent to the southeast corner of the building next to the vacant lot. **(Ex. 24, 1995-08-09 Trial Trans. (Butler), at 92:14-93:15, 95:9-12.)** Below is a photograph of where the Wiley Brothers were found. **(Ex. 24, 1995-08-09 Trial Trans. (Butler), at 98:1-11.)**



30.     Officers immediately called for an ambulance, but the Wiley Brothers passed

prior to the ambulance's arrival. **(Ex. 24, 1995-08-09 Trial Trans. (Dones), at 68:11-21.)**

Officers Dones and Montalvo confirmed the identities of the shooting victims as Kevin and

Torrence Wiley. **(*Id.* at 68:22-70:12.)** Both the mobile crime lab and Area 5 violent crimes

detectives were notified. **(*Id.* at 71:2-18.)** No other civilians were in the area of 3430 W. North

Ave. when the police arrived and there was no traffic. **(*Id.* at 71:19-72:3, 84:2-5.)**

31.     Non-defendant Chicago Police Forensic Investigators ("FI") John Butler and

Thomas Bachelder responded to the area of 3428 W. North Ave. and photographed the scene and

collected physical evidence. **(Ex. 24, 1995-08-09 Trial Trans. (Butler), at 89:20-92:20.)**

32.     FI Butler and FI Bachelder recovered four 9mm fired cartridge casings

approximately 4 feet north of the North Avenue sidewalk near the east wall of the building

located at 3428 W. North Ave. Below is a photograph of where the casings were found. **(Ex. 24, 1995-08-09 Trial Trans. (Butler), at 98:21-99:16.)**



33.     CPD Area 5 detectives also responded to the scene of 3428 W. North Ave., and non-defendant Detectives Willie Ware and Joseph Kondal canvassed the area and spoke to sisters Alma Preceeo and Carmen Macias. Preceeo and Macias informed detectives that around midnight they heard two males, who sounded African American, arguing about missing the last bus, mentioning "Lulu."[5] Preceeo heard one man yell "I'm going to kill you" and "I'm trying to

---

[5] Lulu was a nickname for the Wiley Brothers' sister, Jolanda. **(Ex. 25, Richard Wiley Wortham Declaration at ¶ 4.)**

help you." Preceeo and Macias estimated this argument lasted an hour. Preceeo later heard four shots and called the police. **(Ex. 26, Ware and Kondal 5/25/90 Supp. Report; Ex. 27 Macias Dep., at 27:2-30:12, 30:23-31:8, 32:5-24.)**

34.    The Wiley Brothers' wallets were recovered off their persons, and detectives found no evidence the Wiley Brothers were affiliated with any gang. **(Ex. 24, 1995-08-09 Trial Trans. (Dones), at 68:22-70:12; Ex. 28, Boyle and Brennan 5/25/90 Supp. Report; Ex. 29, Boyle and Tapkowski 5/25/90 Supp. Report.)** Interviews with the victims' relatives and a canvass of the area of the murder revealed no leads with detectives noting that the motive for the crime was "unknown at this time." **(Ex. 28, Boyle and Brennan 5/25/90 Supp. Report; Ex. 29, Boyle and Tapkowski 5/25/90 Supp. Report.)**

35.    FI Butler and FI Bachelder also responded to the Cook County Medical Examiner's Office, where they examined and photographed the bodies of Kevin and Torrence Wiley. **(Ex. 24, 1995-08-09 Trial Trans. (Butler), at 97:1-16.)** Medical Examiner Barry Lifschultz also recovered a metal jacket lead bullet from Kevin Wiley and a fired bullet from the clothing of Torrence Wiley. **(*Id.* at 132:1-11, 132:21-133:9, 139:10-20, 140:9-15.)** Kevin Wiley's wounds indicated he was shot at close range. **(*Id.* at 131:4-11, 131:16-21.)**

36.    The area of 3428 W. North Ave., Chicago, was an area controlled by Maysonet's set of the Latin Kings. **(Ex. 17, Maysonet Dep., at 210:5-15.)**

### CISCO AND KING JUNE 1990 LINEUPS[6]

37.    According to Cisco, in June 1990, in the early evening hours, Guevara and "his partner" approached Cisco and King and asked them to be fillers in a lineup. **(Ex. 18, Veras Dep., at 45:12-17, 46:9-11, 46:17-24, 47:19-23, 49:12-14, 115:14-23.)**

---

[6] These facts are undisputed for purposes of summary judgment only. Defendants reserve the right to contest these facts at trial.

38.     According to Cisco, Guevara and his partner brought him to Area 5 and placed him in a lineup with King and other individuals he did not recognize. **(Ex. 18, Veras Dep., at 50:8-11, 54:3-23.)** Cisco did not know the name of Guevara's partner, could only describe him as white and late forties and when asked if the name Halvorsen rang a bell, stated "no." **(*Id.,* at 42:24-43:7.)** Once in the lineup, he heard a knock on the window when he and King both stepped forward, which he took to mean that he and Efrain were identified. **(*Id.,* at 55:2-16, 55:21-24, 56:17-57:5.)** After this lineup, according to Cisco, he and Efrain were asked to stand in a second lineup where he again heard the knock on the window when he and King stepped forward. **(*Id.,* at 57:6-58:3.)**

39.     According to Cisco, after the lineups, he was taken into an interrogation room and asked about his, King's and Jeffrey Watts's (a/ka/ "Slick,") involvement in a double murder that happened on North Avenue near a restaurant called Donald Duks. **(Ex. 18, Veras Dep., at 58:16-21, 59:4-20, 60:2-5, 60:6-18.)** According to Cisco, he was interviewed by five or six detectives, but the only detective he knew was Guevara. **(*Id.,* at 60:6-18, 70:14-16, 70:17-72:4, 119:10-19.)**

40.     According to Cisco, Guevara attempted to get him to confess to the murders and implicate King and Slick in the murders, including by telling him he was picked out of the lineups. **(Ex. 18, Veras Dep., at 61:3-22, 62:5-11, 62:20-24.)** However, Cisco denied involvement and had been arrested and was in custody at the time of the murders, and once he informed detectives of this fact, he was released. **(*Id.* at 60:6-9, 67:10-13, 14-21, 70:20-71:11.)** He was later told that Double J (a.k.a. Maysonet) and Rosey, Double J's girlfriend, had been the ones to pick him out of the lineup. **(*Id.* at 68:11-18.)**

## JULY 3, 1990, GANG SHOOTING

41.     On July 3, 1990, at approximately 10:00 PM, there was a drive-by shooting in the vicinity of Wabansia and Keystone in which three YLOD gang members were shot nonfatally ("July 3 shooting"). Detectives suspected the shooting was possibly gang related. Three spent 9mm cartridge casings were recovered from the scene. **(Ex. 30, Holec 7/4/90 Supp. Report; Ex. 31, 1995-01-10 Mtn. to Quash Trans., at 13:1-8.)**

42.     Paulnitsky was one of the investigating detectives. During the course of the investigation, detectives learned that the victims obtained a photo of a group of Latin Kings from a female friend and advised detectives that the shooter was in the photo wearing a white sweatshirt with "Leo" in script over a multi-colored design. **(Ex. 30, Holec 7/4/90 Supp. Report.)** This person was known to Paulnitsky as Maysonet. **(Ex. 32, Paulnitsky 7/16/90 Supp. Report.)**

**MAP OF EVENTS**

43.     Below is a map of the location of the relevant crimes and Maysonet's Latin Kings territory:



**MAYSONET'S JULY 15, 1990, ARREST**

44.     On July 15, 1990, Maysonet was arrested for the non-fatal July 3 shooting. **(Ex. 11, Paulnitsky Dep., at 182:25-184:16, 190:17-23, 196:16-198:17; Ex. 33, Maysonet July 15, 1990, Arrest Report; Ex. 17, Maysonet Dep., at 212:6-11.)** According to police reports, Maysonet was identified in a live lineup by victims Oscar Molina and William Vale, as well as witnesses Robert Hernandez, Flor Gonzalez, Steve Ortiz, and Anibal Rivera. **(Ex. 34, Paulnitsky and Bongiorno 7/15/90 Supp. Report.)**

45.     After the lineup, Maysonet was questioned about the July 3 shooting through a Spanish interpreter. **(Ex. 17, Maysonet Dep., at 217:17-218:12, 225:9-226:15.)** Maysonet also spoke to a prosecutor about the July 3 shooting. **(*Id*. at 227:19-228:18.)**

46.     No police officer used physical force against him during the questioning about the July 3 shooting; they just asked him questions. **(Ex. 17, Maysonet Dep., at 229:4-10.)** Maysonet was subsequently charged with the attempted murder for the July 3 shooting. **(*Id*. at 229:11-13; Ex. 31, 1995-01-10 Mtn. to Quash Trans., at 13:1-4.)**

47.     According to detectives, while he was in custody on July 15, because both the July 3 shooting and the Wiley Brothers' shooting involved a 9mm gun, Maysonet was interviewed by Mingey with the assistance of Spanish-speaking Detective Montilla regarding the Wiley Brothers' murders, at which time Maysonet admitted to giving a 9mm gun to three Latin Kings the night of the murders. According to detectives, Maysonet refused to give the name of the three Latin Kings to whom he supplied the gun. **(Ex. 31, 1995-01-10 Mtn. to Quash Trans., at 11:12-12:24; Ex 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report; Ex. 31, 1995-01-10 Mtn. to Quash Trans, at 51:9-53:19.)** No notes were taken of this interview, although it was subsequently memorialized in Halovrsen, Guevara, Gawrys,

Paulnitsky and Montilla's August 23, 1990, Supplemental Report. **(Ex 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report; Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 46:15-17, 48:21-49:5, 58:18.)**

### AUGUST 1, 1990, INTERVIEW OF MAYSONET

48.     While incarcerated at the Cook County Jail ("CCJ") on the attempted murder charge for the July 3 shooting, Mingey with the assistance of Spanish speaking Detective Montilla went to CCJ to speak with Maysonet again about the Wiley Brothers' murders. **(Ex. 17, Maysonet Dep., at 245:4-11, 246:11-23; Ex. 31, 1995-01-10 Mtn. to Quash Trans, at 55:5-14.)** Before the interview, Maysonet signed a form waiving his right to an attorney. **(Ex. 17, Maysonet Dep., at 245:9-17, 246:4-6; Ex. 31, 1995-01-10 Mtn. to Quash Trans, at 55:5-57:16.)**

49.     With Sergeant Mingey asking questions, and Montilla interpreting for him, according to detectives, Maysonet told them that he was present during the shooting of the Wiley Brothers but that he did not do the actual shooting. **(Ex. 31, 1995-01-10 Mtn. to Quash Trans, at 57:21-58:8.)** According to detectives, Maysonet asked to make a deal, and when he was informed Mingey and Montilla could not make a deal, Maysonet refused to cooperate further. **(*Id*. at 58:2-22; Ex 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report.)** No notes were taken of this interview, although it was subsequently memorialized in Halovrsen, Guevara, Gawrys, Paulnitsky and Montilla's August 23, 1990, Supplemental Report. **(Ex 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report; Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 46:15-17, 48:21-49:5, 58:18.)**

## AUGUST 1990 ARRESTS AND INTERROGATIONS
## OF MAYSONET, LLUVIA, AND TINO

50.     Maysonet subsequently made bond for the attempted murder charge for the July 3

shooting and was released from custody on or about August 14, 1990. **(Ex. 17, Maysonet Dep.,**

**at 230:15-16, 244:10-12.)** On August 22, 1990, Maysonet appeared at the Cook County criminal

courthouse in Room 101 for a courtroom assignment on his attempted murder case. (***Id.*** **at**

**258:8-16.)**

51.     According to Maysonet, when he got out of court, Paulnitsky grabbed his hand,

pushed him against a wall and handcuffed him. **(Ex. 17, Maysonet Dep., at 262:22-263:8,**

**263:18-23.)** Paulnitsky then put him in a car and two detectives drove him to the police station.

(***Id.*** **at 266:1-9.)**

52.     According to Maysonet, once he got to the police station, two detectives put him

in an interview room, he was handcuffed to the wall, and Maysonet waited 3-5 hours. During this

time, Paulnitsky kept checking on him. **(Ex. 17, Maysonet Dep., at 269:2-270:8.)**

53.     At some point, according to Maysonet, Montilla came in and "asked me some

questions and stuff." This conversation was brief. **(Ex. 17, Maysonet Dep., at 269:2-270:8,**

**271:9-11, 273:5-22.)** Montilla asked him who brought him into the station, and Maysonet

pointed to Paulnitsky. According to Maysonet, when he pointed at Paulnitsky, Paulnitsky

grabbed him by the shirt and said, "if I [Maysonet] would say anything bad about – about

[Paulnitsky] or call him a white --- a white guy, that he was going to bust my face," and then

slapped Maysonet in the face pushing him down to the floor. **(Ex. 17, Maysonet Dep., at**

**271:12-272:1, 275:1-11, 277:3-7; Ex. 36, 1995-01-31 Mtn. to Supp. Trans., at 107:2-19.)**

54.     After this encounter, according to Maysonet, he was placed in the lockup room.

**(Ex. 17, Maysonet Dep., at 273:2-4, 277:15-21.)** While in lockup, Maysonet fell asleep. (***Id.*** **at**

277:22-278:6.) Around 8:00 PM, Guevara came to lockup and got him out of the cell and back into an interview room where Maysonet was handcuffed in the back with his handcuffs attached to a ring on the wall. **(*Id.* at 28:7-12, 289:5-16; Ex 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report.)** At this time, according to Maysonet, Guevara asked him if he knew why he was at the police station. Maysonet told him no and attempted to offer Guevara some money, but Guevara did not take it. **(*Id.* at 278:13-279:8.)**

55.     According to Maysonet, when Guevara refused the money, Guevara left the room and came back with a flashlight, a yellow book, and pair of black gloves, and asked if Maysonet was ready to talk. **(Ex 17, Maysonet Dep., at 279:9-14, 281:16-20.)** Maysonet told Guevara that he did not have anything to talk about and asked for his lawyer. At that point, Guevara told Maysonet that Maysonet was going to talk one way or the other and left the room**. (*Id.* at 279:15-22.)**

56.     According to Maysonet, when Guevara came back to the room again, Guevara slapped him once and hit him on the head with the yellow book several times, then got the flashlight and placed the yellow book next to Maysonet's head and then ribs and started hitting the book with the flashlight. Guevara also hit him multiple times in the groin with the flashlight. **(Ex 17, Maysonet Dep., at 279:22-280:10, 283:14-284:12, 284:17-22, 285:10-286:19, 287:5-288:24.)** Guvara would stop, leave, come back, attempt to question Maysonet, and when Maysonet did not give him answers, Guevara would hit him in the same spots repeatedly. **(*Id.* at 288:18-24, 291:23-292:2, 293:2-294:11.)** This went on for multiple hours until Maysonet told Guevara that he would say whatever Guevara wanted him to say so Guevara would stop hitting him. **(*Id.* at 295:5-296:4.)**

57.     At one point, Maysonet asked for his nerve medication, and he was permitted to call his sister, who brought him the medication to the station, and he took the medication. **(Ex. 17, Maysonet Dep., at 297:10-300:7.)** Maysonet spoke briefly to his sister, and then was permitted to talk to Bello. **(*Id*. at 300:8-302:9.)** According to Maysonet, he told Bello that Guevara had threatened to take her kids away and Bello told Maysonet to cooperate. **(*Id*. at 301:11-302:9.)**

58.     On August 23 at approximately 4:30 AM Assistant Cook County State's Attorney ("ASA") Borowitz from the CCSAO Felony Review Unit, arrived at Area 5. **(Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report.)** ASA Borowitz interviewed Maysonet in the presence of Guevara and Montilla although what was said in this interview is disputed. **(*Id*.)** According to Maysonet, he told ASA Borowitz that Guevara was beating him up. ASA Borowitz told Maysonet that if he did not cooperate "Guevara is a very mean man," and she left. **(Ex. 17, Maysonet Dep., at 305:6-307:10.)**

59.     According to Maysonet, when he would not cooperate with the State's Attorney, Guevara came back in the room and continued striking Maysonet again until Guevara was out of breath. Maysonet claims that Guevara beat Maysonet through the night and refused to let Maysonet use the restroom, to the point that Maysonet urinated and defecated on himself. **(Ex. 17, Maysonet Dep., at 307:11-308:13.)**

60.     On August 23 at approximately 6:30 AM ASA Frank DiFranco arrived at Area 5. **(Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report.)** At this time, ASA DiFranco interviewed Maysonet in the presence of Guevara and Montilla, although what was said in this interview is disputed. **(*Id*.)** ASA DiFranco also conducted a second interview of Maysonet at approximately 7:10 AM, although what was said in this interview is

disputed. (*Id.*) According to Maysonet, while he was covered in urine and feces, he spoke to ASA DiFranco, with Montilla translating. **(Ex. 17, Maysonet Dep., at 308:14-309:18.)** Maysonet told DiFranco that he wanted his lawyer and that Guevara was beating him up. **(*Id.* at 312:8-14.)** DiFranco left, and Guevara continued to beat up Maysonet including grabbing Maysonet by the groin and pulling him down. **(*Id.* at 312:8-313:12.)**

61.     According to Maysonet, at this point, Maysonet agreed to implicate other people in the Wiley Brothers' murders, so Maysonet gave him the names Cisco, Jeffrey and Efrain. **(Ex. 17, Maysonet Dep*., *at 303:10-23, 313:1-22.)** After he gave these names to Guevara, police went and looked for Cisco, Jeffrey and Efrain. **(*Id.* at 303:21-304:13.)** Guevara was gone for a while, and when he came back, he told Maysonet that the names Maysonet gave him did not work because they were arrested on the night of the murders. Maysonet then gave Guevara the names Lluvia, Tino and Fro. **(*Id.* at 303:21-304:13, 314:2-8.)** At this point, Guevara finally stopped beating him. **(*Id.* at 314:14-19.)**

62.     Guevara was the only detective who used physical force and threatened Maysonet, and no one else was present at the time Guevara used physical force and threatened him. **(Ex. 36, 1995-01-31 Mtn. to Supp. Trans. (Maysonet), at 290:10-13, 120:22-121:5, 145:1-5, 145:11-16; Ex. 11, Paulnitsky Dep., at 299:15-25; Ex. 12, Montilla Dep., at 331:17-22, 339:10-20; Ex. 37, Epplen Dep., at 127:24-128:10, 248:8-249:20, 265:23-266:7, 348:12-18; Ex 17, Maysonet Dep., at 279:22-280:10, 283:14-284:12, 284:17-22, 285:10-286:19, 287:5-288:24, 288:18-24, 291:23-292:2, 293:2-294:11, 295:5-296:4.)**

63.     On August 22, 1990, Bello arrived at Area 5 and spoke to a prosecutor and a police officer. **(Ex. 38, Bello Dep. Part II**[7]**, at 62:12-17.)** At her deposition, Bello summarized

_____

[7] Bello was re-deposed in the *Gonzalez*, matter, 22-CV-6496.

her conversation with detectives by saying, "I basically turned around and told them that [Maysonet] just asked me to give him what was wrapped in the plastic, and him and his friends left." (*Id. at 62:24–63:2.*) In response to her statement, the state's attorney said, "Oh, I don't believe you," and then informed Bello that "We can take your kids away if you're not telling the truth." Although the comment made Bello mad, she replied, "Do whatever you needed to do," because she said, "I did tell the truth." (***Id*. at 63:4–64:9.**)

64.     Bello told detectives that she was home with Maysonet on May 24, 1990, around 11:30 p.m., when Lluvia, Fro, and Tino came to their apartment and asked Maysonet for a gun. Maysonet handed Lluvia a 9mm handgun wrapped in a towel in a plastic bag and Maysonet, Lluvia, Fro and Tino all left the apartment together. (**Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 8/23/90 Supp. Report.**) To this day, Bello maintains that she was truthful in her statement to police. (**Ex. 22, Bello Dep., at 47:13-24; Ex. 38, Bello Dep. Part II, at 86:9-22.**)

65.     On August 23, 1990, at approximately 9:28 AM, ASA DiFranco in the presence of Montilla and court reporter Szybist, took a court-reported statement of Maysonet. (**Ex. 39, Maysonet Court Reported Stmt.; Ex. 40, Szybist Dep., at 25:4-28:12.**) If anyone else had been present for the statement, Szybist would have noted it in the transcript. (**Ex. 40, Szybist Dep., at 28:13-24.**) According to detectives and ASA DiFranco, at this time, Maysonet confessed to his involvement in the Wiley Brothers' murders. (**Ex. 39, Maysonet Court Reported Stmt.**)

66.     According to Maysonet, he sat down with a court reporter, ASA DiFranco, Montilla and Guevara. According to Maysonet, Mingey and other officers were "off and on," in the room. (**Ex. 17, Maysonet Dep., at 315:13-22.**) According to Maysonet, ASA DiFranco

assisted in fabricating Maysonet's statement and told Montilla what Maysonet needed to say in his statement. **(Ex. 36, 1995-01-31 Mtn. to Supp. Trans. (Maysonet), 118:13-119:22; Ex. 45, Dkt. 1, Pl. Compl., ¶¶ 74-75.)** Maysonet would speak in Spanish to Montilla and Montilla would interpret, but Maysonet did not understand anything Montilla told ASA DiFranco in English. **(*Id.* at 403:15-24.)** Afterwards, Maysonet was presented with papers to sign, but he refused. **(*Id.* at 315:23-316:6.)** However, the next morning, Bello came into the station to see him and told him to sign the papers so Maysonet could go home. **(*Id.* at 316:2-317:21.)** That is when Maysonet decided to sign the court-reported statement. **(*Id.* at 317:19-21.)**

67. Maysonet signed the court-reported statement, and now claims the statement is false. **(Ex. 39, Maysonet Court Reported Stmt; Ex. 17, Maysonet Dep., at 320:13-322:17.)**

68. After Maysonet was finished giving the court-reported statement, Szybist took a Polaroid photograph of Maysonet. **(Ex. 40, Szybist Dep., at 32:24-34:12.)** Szybist wrote the date, time and place on the back of the photograph, along with the individuals present: Maysonet, DiFranco, and Montilla. **(*Id.* at 34:19-36:3.)** Maysonet, DiFranco, and Montilla signed the photograph. **(Ex. 17, Maysonet Dep., at 324:8-326:23.)**

69. Below is the front and back of that Polaroid photograph taken by Szybist after Maysonet's court-reported statement:



PEOPLE V. JOSE MAYSONET
INDICTMENT NO. 92CR-10146
PEOPLE'S EXHIBIT NO.



70.     According to ASA DiFranco and detectives, ASA DiFranco, Maysonet, Montilla

and Paulnitsky then left Area 5 and went to the scene of the shootings where Maysonet explained

what occurred during the May 25, 1990, shooting. **(Ex. 24, 1995-08-09 Trial Trans., at 187:24-190:9; 1995-08-10 Trial Trans. at 109:20-110:22, 141:4-14.)** Maysonet alleges this never occurred. **(Ex. 73, Dkt. 136, Pl. Am. Compl., ¶ 92.)**

71.     In the early morning hours of August 23, 1990, Lluvia was seen on the street by non-defendant Detective Gawrys and Defendant Sergeant Mingey. At that time, Lluvia was brought into Area 5 for questioning. **(Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky and Montilla 08/23/90 Supp. Report.)**

72.     On August 23, 1990, at approximately 2:10 PM, Bello gave a handwritten statement to ASA DiFranco and Montilla which reflected the same information she had told detectives earlier. **(Ex. 41, Bello Stmt.)** As part of the statement, Bello identified photos of Lluvia and Fro as two of the men who came to her house the night of the Wiley Brothers' murders. **(Id.)** Bello then signed the statement. **(Id.; Ex. 22, Bello Dep., at 43:8-45:3.)**

73.     On August 23, 1990, at approximately 6:00 PM, ASA DiFranco approved felony charges against Maysonet for two counts of first-degree murder. **(Ex. 42, Guevara and Halvorsen 08/24/90 Supp. Report.)** Maysonet was taken to lockup in Area 5 and later transferred to CCJ. **(Ex. 17, Maysonet Dep., at 328:1-12.)**

74.     Lluvia was subsequently questioned by Guevara and Halvorsen, although what was said in these interviews is disputed. **(Ex. 42, Guevara and Halvorsen 08/24/90 Supp. Report.)**

75.     Lluvia agreed to give a court-reported statement, and on August 24, 1990, at approximately 2:00 AM, ASA Jennifer Borowitz, in the presence of Guevara and court reporter Janet Lupa, took Lluvia's statement. **(Ex. 43, Gonzalez Ct. Rpt. Stmt.)** Lluvia signed the

23

statement. **(Ex. 17, Gonzalez Dep., at 169:10-172:10, 175:6-16, 176:4-6, 176:15-20, 177:2-4, 177:9-11.)**

76.     Lluvia's statement indicated that he was walking home when Maysonet, Fro and Tino offered him a ride, after which they drove to an alley north of North Avenue and Maysonet then shot two men on North Avenue before driving away. **(Ex. 43, Gonzalez Ct. Rpt. Stmt.)** Lluvia admitted to being asked the questions and giving the answers reflected in his court-reported statement, but now alleges the statement was coerced from him. **(Ex. 19, Gonzalez Dep., at 177:22-178:13.)**

77.     After Lluvia finished his court-reported statement on August 24 at 3:05 AM, court reporter Lupa took a Polaroid photograph of Lluvia, which Guevara, ASA Borowitz and Lluvia all signed the back of. **(Ex. 19, Gonzalez Dep., at 191:14-192:18.)**

78.     Below is the front and back of the Polaroid photograph taken by Lupa after Lluvia's court-reported statement:





79.     After Lluvia's court reported statement, ASA Borowitz approved charges against Lluvia for two counts of first-degree murder. **(Ex. 42, Halvorsen & Guevara 08/24/90 Supp. Report.)**

80.     On August 24, 1990, at approximately 3:30 AM, Tino was taken into custody by Guevara and transported to Area 5. **(Ex. 42, Halvorsen & Guevara 08/24/90 Supp. Report)** According to reports, Tino was subsequently interviewed by non-defendant Detectives Schak and Smitka. **(Ex. 44, Smitka & Schak 08/24/90 Supp. Report.)** Tino, however, claims that he was arrested and interviewed only by Guevara and a white officer. **(Ex. 20, Cruz Dep., at 37:21-45:16, 153:10-16, 212:11-22, 213:4-8.)**

81.     Tino subsequently was interviewed by ASA John Perkaus, and on August 24, 1990, at approximately 2:45 PM, Tino provided a handwritten statement to ASA Perkaus and Detective Schak, which he signed. **(Ex. 20, Cruz Dep., at 152:7-13, 154:5-17.)** Tino's statement indicates that he, Lluvia, and Fro went to Maysonet's house on May 24, 1990, and picked up a gun. **(Ex. 46, Cruz Stmt.)** The four men (Tino, Lluvia, Fro and Maysonet) left, and then Maysonet drove them near the intersection of North Ave. and St. Louis Ave. (approximately

3450-3500 W. North Ave), where Lluvia and Fro got out of the car and approached two Black guys. **(*Id.*)** Tino heard 5-6 shots and saw Lluvia and Fro running back to the car, with the gun in Lluvia's hand. **(*Id.*)**

82.    After Tino's handwritten statement, ASA Perkaus approved charges for Tino for two counts of First-Degree Murder. **(Ex. 44, Smitka & Schak 08/24/90 Supp. Report; Ex. 47, Perkaus Dep., at 88:20-89:3.)**

### NOVEMBER 1990 INTERROGATION OF FRO

83.    On November 23, 1990, Fro was located and taken into custody for questioning regarding the Wiley Brothers' Murder. **(Ex. 48, Schalk & Bogucki 11/24/90 Supp. Report.)** Fro was interviewed by non-defendant Detectives Schalk and Bogucki, and separately by ASA Richard Cenar on November 23 into November 24. **(*Id.*)** During these interviews, Fro denied any knowledge of or involvement in the murders and was released without charges on November 24. **(*Id.*)**

### TINO, LLUVIA, MAYSONET AND FRO'S CRIMINAL PROCEEDINGS

84.     Maysonet's Gerstein and bond hearing occurred on August 24, 1990, for the Wiley Brothers Murders. **(Ex. 49, *People v. Jose J. Maysonet*, Case Summary 90111987901.)**

85.    Maysonet, Lluvia and Tino were all subsequently indicted by a grand jury on September 27, 1990, for the First-Degree Murder of Kevin and Torrence Wiley. **(Ex. 3, 90CR21787 Indictment.)** Halvorsen testified at the grand jury. **(*Id.*; *see also* Ex. 77, Grand Jury Trans. (Halvorsen) 90CR21787.)** Halvorsen testified that the investigation revealed the Wiley Brothers were shot and killed in the area of 3428 W. North Ave., that Maysonet, Lluvia and Tino were present, armed with a gun, that Lluvia shot the Wiley Brothers, that Tino was the

lookout and Maysonet drove the car, and that all three were members of the Latin Kings and planned to shoot the Wiley Brothers. **(Ex. 77, Grand Jury Trans. (Halvorsen) 90CR21787.)**

86.     On March 13, 1992, Tino entered into a plea agreement with the State's Attorney, where he agreed to provide truthful testimony in the trials of Llvuia and Fro in exchange for a recommendation of a 22-year sentence. **(Ex. 6, Certified Copy of Conviction, *People v. Cruz*, 90CR2178703; Ex. 50, 1992-03-27 Gonz. Trial Trans. (Cruz), at 14:12-14, 14:24-16:3, 19:16-20:8.)**

87.     Lluvia's criminal case proceeded to trial on March 26, 1992. **(Ex. 23, 1992-03-26 Gonz. Trial. Trans., *generally*.)** On this day, Bello testified consistent with her handwritten statement given to detectives, that on the night of May 24, 1990, Tino, Fro and Lluvia came to her and Maysonet's apartment, that she retrieved a gun wrapped in a towel and plastic bag that Maysonet kept in their bedroom, handed the gun to Lluvia, and then Tino, Fro, Lluvia and Maysonet all left the apartment. **(Ex. 23, 1992-03-26 Gonz. Trial. Trans. (Bello), 87:10-.89:15, 90:19-98:23.)** To this day, Bello maintains that her testimony in Lluvia's criminal trial was truthful. **(Ex. 22, Bello Dep., at 34:4-40:4.; Ex. 38, Bello Dep. Part II, at 31:4-12, 86:9-87:20.)**

88.     On March 27, 1992, as part of Lluvia's criminal trial, Tino testified consistently with his handwritten statement given to detectives that he, Lluvia and Fro went to Bello and Maysonet's apartment and obtained a gun. Then he, Lluvia, Fro and Maysonet left, Maysonet drove them around until they stopped in the area of North Avenue and St. Louis in the alley, Fro and Lluvia got out and approached 2 Black guys, and shortly after he heard 5-6 shots and saw Lluvia and Fro running back to the car, and Llvuia had the gun in his hand. **(Ex. 50, 1992-03-27 Gonz. Trial Trans. (Cruz), at 23:17-27:3, 41:17-57:3.)**

89.     On March 30, 1992, Lluvia testified in his own defense. **(Ex. 51, 1992-03-30 Gonz. Trial Trans. (Gonzalez), at 6:5-13, 8:8-19:2.)** At that time, Lluvia testified consistently with his court-reported statement, that is, that he was walking home when he got a ride from Maysonet, Tino and Fro, and that Maysonet subsequently shot the Wiley Brothers. **(*Id.*)**

90.     That same day on March 30, a jury found Lluvia guilty of First-Degree Murder of Kevin and Torrence Wiley. **(Ex. 51, 1992-03-30 Gonz. Trial Trans., at 122:2-7.)**

91.     Because Fro was already incarcerated in IDOC for a July 7, 1991 murder, a writ was issued and he was arrested for the Wiley Brothers murders on April 14, 1992, based on Tino's cooperation with the State. **(Ex. 52, Halvorsen & Guevara 5/1/92 Supp. Report; Ex. 21, Goossens Dep., at 84:4-85:19, 336:12-137:3.)**

92.     On May 5, 1992, Maysonet was reindicted, and Fro was indicted by a grand jury, for the First-Degree Murder of Kevin and Torrence Wiley. **(Ex. 4, Indictment 92CR10146.)** Paulnitsky testified at the grand jury proceedings. **(*Id.; Ex. 78, Grand Jury Trans. (Paulnitsky) 92CR10146.)** Specifically, Paulnitsky testified that the criminal investigation revealed that: (i) Maysonet provided the gun to Lluvia; (ii) Maysonet drove Lluvia, Fro and Tino to the area of North Avenue and St. Louis; (iii) and that after Lluvia shot the Wiley Brothers, Maysonet drove off with Lluvia, Fro and Tino. **(Ex. 78, Grand Jury Trans. (Paulnitsky) 92CR10146.)**

93.     On August 4, 1992, Maysonet moved to suppress his statements. **(Ex. 53, Mtn. to Supp.)** As part of the basis for his motion to suppress, Maysonet claimed he was questioned after he had elected to remain silent and/or sought representation and that his statement was not voluntary in that he had "inhaled substantial quantities of cocaine for a sustained period of time immediately prior to his questioning; and . . . ingested an unknown quantity of the prescription drug 'Lorazepam' after being taken into custody." **(*Id.*)**

28

94.     Maysonet then filed a subsequent Motion to Quash Arrest and Suppress Statements on April 22, 1994. **(Ex. 54, Mtn to Quash and Supp.)** In that motion, Maysonet claimed that he was arrested without probable cause or a warrant on August 22, 1990, that his statements were the result of physical coercion, promises that charges would be dropped, comments about the safety of his family, and material misrepresentations as to the evidence detectives had in the case. (***Id***.)

95.     Maysonet's criminal attorney, Richard Bueke, interviewed Maysonet before filing the motion to quash Maysonet's arrest and suppress his statements, including about his court-reported statement. **(Ex. 55, Bueke Dep. at 68:21–69:21.)** Maysonet's court-reported statement mentioned that Lluvia, Fro, Tino, Cisco and King, came to his house after the murders and that Cisco put a gun to his head and threatened to kill him if he talked. **(Ex. 39, Maysonet Stmt.)** Bueke would have considered this statement as part of his strategy in the motion "to explain why [Maysonet] may have said certain things, that they had threatened to kill him . . . his own fellow gang members." **(Ex. 55, Bueke Dep., at 125:17–126:15.)** Bueke, however, does not recall speaking with Maysonet, King, or Cisco about these statements, and because he no longer has his file that may contain notes of his interviews with Maysonet or witnesses, he cannot refresh his memory. (***Id.* at 127:3–20.)**

96.     On January 10, 1995, the criminal court held a hearing on the portion of Maysonet's April 22, 1994, motion that sought to quash his arrest, at which Maysonet, Montilla, and Paulnitsky testified. **(Ex. 31, 1995-01-10 Mtn. to Quash Trans., *generally*.)** This motion was denied. **(*Id*.)**

97.     Subsequently on January 31, 1995, the criminal court held a hearing on Maysonet's motions to suppress his statements in which Maysonet, his sister Rose, Montilla, and

Guevara testified. **(Ex. 31, 1995-01-31 Mtn. to Supp. Trans., *generally*.)** This motion was denied. **(*Id.*)**

98.     On July 19, 1995, Tino pled guilty to Count I of the indictment, First-Degree Murder, and was sentenced to 22 years in IDOC. **(Ex. 6, Certified Copy of Conviction, *People v. Cruz*, 90CR2178703.)** Tino's plea remains valid today. **(*Id.*)**

99.     On August 9, 1995, Maysonet's and Fro's simultaneous criminal trials commenced, with Maysonet proceeding before a jury and Fro electing a bench trial. **(Ex. 24, 1995-08-09 Trial Trans., *generally*)**. At trial, Maysonet was prosecuted based on an accountability theory premised on his provision of a firearm used in the fatal shooting and presence during the shooting. **(Ex. 24, 1995-08-09 Trial Trans., at 43:11-48:10; Ex. 56, 1995-08-11 Trial Trans., at 7:7-25:23; 58:6-70:20; 82-86 (jury instructions).)**

100.     On August 9, the State called non-defendant Officer Dones who testified about his arrival on scene after receiving a call of shots fired, non-defendant FI Butler who testified about his collection of evidence, and Barry Lifschultz, the medical examiner who conducted the autopsies of the Wiley Brothers. **(Ex. 24, 1995-08-09 Trial Trans., *generally*.)** In addition, the State called Ernest Warner, a firearms analyst who testified about the firearms evidence, including that the 9mm casings recovered from the scene were all fired from the same gun and that the three 9mm bullets recovered from the Wiley Brothers and their clothing were fired from the same gun. **(*Id.* (Warner), at 157:14-18, 161:8-24.)**

101.     The State also called Montilla on August 9, who testified regarding Maysonet's statements on July 15, 1990, that he had knowledge of three Latin Kings who came to his house and picked up a 9mm handgun the night of the shootings, and that on August 1, 1990, Maysonet refused to give any additional information and instead wanted a deal on his July 3 shooting case.

**(Ex. 24, 1995-08-09 Trial Trans. (Montilla), at 173:22-191:12.)** Montilla also testified that he spoke to Maysonet after his arrest on August 22, 1990, but did not testify about the contents of those statements. **(Id.)** Montilla laid the foundation for Maysonet's court-reported statement but did not testify about the contents of the statement. **(Id.)** Finally, Montilla testified that he, Maysonet, Paulnitsky and ASA DiFranco went to the scene of the shooting and Maysonet described what happened on scene. **(Id.)**

102.     The next day on August 10, 1995, Montilla resumed his testimony, and testified about knowledge of death threats that were made to Maysonet, Montilla's interactions with Maysonet's sister, Rose, the prescription pills that Rose brought to Maysonet to take while Maysonet was in custody, information he gave to Halvorsen in Halvorsen's preparation of police reports, and again about Maysonet's July 15 and August 1 statements. **(Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 34:2-108:15.)**

103.     Also on August 10, the State called ASA DiFranco, who testified about the content of Maysonet's court-reported statement and testified to the scene visit. **(Ex. 8, 1995-08-10 Trial Trans. (DiFranco), at 109:13-187:11.)** The State also called Defendant Guevara, who testified about Maysonet's statements made in his interviews with Maysonet, that Maysonet identified Lluvia and Fro, and that Guevara, Gawrys and Mingey drove to Humboldt Park, where Maysonet pointed out where Lluvia and Fro lived. **(Id. (Guevara), at 188:2-234:1.)**

104.     Also on August 10, after Maysonet's jury was excused, and in Fro's bench trial only, in the State's case-in-chief, the parties stipulated as to the life and death of the Wiley Brothers and that Tino would testify consistently with his testimony from Lluvia's trial. **(Ex. 8, 1995-08-10 Trial Trans. (Stip.), at 240:11-21, 241:8-242:5.)** The State then rested as to Fro, and Fro was found not guilty. **(Id. at 241:24-243:13.)**

105.    After Fro was found not guilty, Maysonet's jury was called back, and the State entered the stipulation into evidence as to the life and death of the Wiley Brothers **(Ex. 8, 1995-08-10 Trial Trans. (Stip.), at 243:23-244:24.)** The State then offered, and the court received, State Exhibits 1-26 and 28-31 into evidence. **(*Id.* at 245:2-16.)** Exhibits 1-3 were crime scene photos, Exhibits 4-8 were crime scene photos of the body of Torrence Wiley, Exhibits 9-11 were crime scene photos of Kevin Wiley's body, Exhibits 12-13 were the cartridge casings recovered on scene and a bullet recovered from Torrence's clothing, Exhibits 14-24 were morgue photos, Exhibits 25-26 were the bullets recovered from the Wiley Brothers' bodies, Exhibit 28 was the attorney waiver form signed by Maysonet, Exhibit 29 was Maysonet's court-reported statement and photographs, Exhibit 30 was another scene photo, and Exhibit 31 was a demonstrative diagram. **(Ex. 57, CCSAO Impound Order; Ex. 56, 1995-08-11 Trial Trans. at 3:12-4:17.)** The State then rested its case-in-chief against Maysonet. **(*Id.*)**

106.    Finally on August 10, the defense called Maysonet's sister, Rose, who testified about Paulnitsky arresting Maysonet on August 22, 1990, in the courthouse and testified about her interactions with Montilla, and the fact that she retrieved her mother's pills and gave them to Maysonet while Maysonet was at Area 5. **(Ex. 8, 1995-08-10 Trial Trans. (Rose), at 246:2-274:2.)** The defense then rested, and no witnesses were called in rebuttal. **(*Id.*, at 274:5-6; Ex. 56, 1995-08-11 Trial Trans., at 6:8-11.)**

107.    On August 11, 1995, a jury found Maysonet guilty of the First-Degree Murders of Kevin and Torrence Wiley. **(Ex. 56, 1995-08-11 Trial Trans., at 94:22-95:3.)**

108.    Subsequently on October 16, 1995, Maysonet pled guilty to three counts of Attempted Murder for the July 3 shooting. **(Ex. 79, *People v. Maysonet*, 90CR1841901 Disposition.)**

32

## MAYSONET'S POST-CONVICTION PROCEEDINGS

109.     On October 26, 2016, the State's Attorney agreed to vacate Maysonet's

conviction and retry him based on a *per se* conflict, that Richard Beuke, Maysonet's criminal

trial attorney, also represented Guevara in unrelated matters. **(Ex. 58, 2016-10-26 Trans., at**

**2:13-17; Ex. 55, Beuke Dep., at 14:5-15, 55:19-25, 63:25-64:6, 136:8-138:1.)**

110.     On October 12, 2017, at a status hearing on Maysonet's retrial, Will Fahy

appeared for Guevara, Dan Herbert appeared for Mingey and Halvorsen, and Tim Grace

appeared for Paulnitsky and Montilla. **(Ex. 59, 2017-10-12 Trans., 5:18-22, 6:13-19, 6:24-7:4,**

**26:12-19.)** There was an indication that these detectives might take the Fifth if called to testify in

the re-trial. **(*Id.*)**

111.     The State's attorney subsequently dismissed the charges against Maysonet via

*nolle prosequi* on November 15, 2017. **(Ex. 60, 2017-11-15 Trans., at 3:11-14.)** In so doing

ASA Sussman explained that:

> The State's Attorney's Office has consistently maintained and continue to
> maintain that Mr. Maysonet is guilty of the murder of the Wiley brothers consistent
> with the jury's verdict in August of 1995. The State also maintains as you've seen
> through the pleadings that Mr. Maysonet's numerous statements were not the
> result of any abuse or improper police conduct. Nevertheless, we have been
> advised over the last several days, including just now, by counsel for the former
> police detectives that each detective will invoke their 5th Amendment right not to
> incriminate themselves and will refuse to testify. Without the cooperation and
> testimony of the Chicago police detectives, the State is unable to meet our burden
> at this hearing or at the underlying case. So it is with deep regret and sadness for
> the families of the victims in this case that we request that the Court nolle the case
> against the defendant, Mr. Maysonet.

**(Ex. 60, 2017-11-15 Trans., at 2:18-3:14.)**

112.     Maysonet later sought a Certificate of Innocence, but the Court denied

Maysonet's petition, finding Maysonet did not meet his burden of proof that he was innocent

based, among other reasons, on his court-reported statement, the photograph taken by Zybist, and Bello's statements. **(Ex. 61, 2022-08-15 Trans., at 2:16-20:12.)**

## LATIN KING RETALIATION

113.    While Maysonet was awaiting trial, members of the Latin Kings threw a Molotov cocktail into his mother's apartment. **(Ex. 17, Maysonet Dep., at 367:5-368:1.)**

114.    Tino also was placed in protective custody while incarcerated in the Illinois Department of Corrections and drafted a letter to State's Attorney's voicing his concern for his safety in fear of retaliation from the Latin Kings. **(Ex 20, Cruz Dep., at 222:6-225:3.)**

115.    During the pendency of Maysonet's and Lluvia's trial, prior to Bello testifying in Lluvia's criminal trial, multiple attempts were also made on Bello's life, including a time when someone tried to run her and her child over. **(Ex. 22, Bello Dep., at 20:19-21:4, 21:18-22:11.)**

116.    The CCSAO helped relocate Bello because of the threats to her life. **(Ex. 23, 1992-03-26 Gonz. Trial Trans. (Bello), at 98:24-99:17.)**

## DEFENDANT MONTILLA

117.    Montilla first became involved with the Wiley Brothers' murder investigation when he was asked to serve as an interpreter for Mingey in the July 15 and August 1 interviews of Maysonet. **(Ex. 12, Montilla Dep., at 200:16-201:1, 202:19-21, 208:9-209:1, 280:15-349:9-350:2.)** Montilla was also present for Maysonet's court-reported statement taken by ASA DiFranco in case ASA DiFranco needed something interpreted. **(*Id.*, at 230:2-10, 242:11-14.)**

118.    Montilla did not use any physical force on Maysonet, was not present for Guevara's interviews with Maysonet, did not observe Guevara use force against or threaten Maysonet, and was not alleged to be present when Maysonet claims Guevara used force or threatened him. **(Ex. 12, Montilla Dep., at 227:1-16, 331:17-332:2, 339:10-20; Ex. 36, 1995-**

**01-31 Mtn. to Supp. Trans. (Maysonet), at 290:10-13, 120:22-121:5, 145:1-5, 145:11-16; Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 08/23/90 Supp. Report; Ex 17, Maysonet Dep., at 279:22-280:10, 283:14-284:12, 284:17-22, 285:10-286:19, 287:5-288:24, 288:18-24, 291:23-292:2, 293:2-294:11, 295:5-296:4; Ex. 8, 1995-08-10 Trial Trans. (Guevara), at 216:4-11; Ex. 62 Montilla Int. Resp., at ¶¶ 18, 20.)**

119.    While Montilla was present for interview with ASA Borowitz and Guevara in the early morning hours of August 23, 1990, Maysonet does not allege any force was used against him at this time. **(Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 75:10-78:12, 79:16-81:10; Ex. 17, Maysonet Dep., at 305:6-307:10.)** The State did not introduce evidence of these interviews, and on cross-examination, Montilla did not testify as to the specific content of these interviews at Maysonet's trial. **(Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 75:10-78:12, 79:16-81:10.)**

### DEFENDANT MINGEY

120.    Mingey interviewed Maysonet on July 15 and August 1 with the assistance of Montilla. During these interviews, Maysonet spoke Spanish. Mingey did not speak Spanish and therefore could not understand Maysonet's answers to questions. **(Ex. 16, Mingey Dep., at 173:23-176:2, 176:19-179:11, 203:18-205:11, 235:14-236:3, 237:1-8, 238:4-14, 242:4-16, 326:23-327:6; Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 08/23/90 Supp. Report; (Ex. 24, 1995-08-09 Trial Trans. (Montilla), at 40:6-42:5, 49:18-50:12, 52:12-16, 53:15-57:20.)**

121.    Mingey was not present for any of Guevara's interviews of Maysonet, did not see nor was aware of Guevara using any alleged force or threats against Maysonet, and was not alleged to be present when Maysonet claims Guevara used force or threatened him. **(Ex. 16, Mingey Dep., at 355:14-356:9, 391:24-393:20; Ex. 35, Halvorsen, Guevara, Gawrys,**

Paulnitsky, Montilla 08/23/90 Supp. Report; Ex. 36, 1995-01-31 Mtn. to Supp. Trans. (Maysonet), at 290:10-13, 120:22-121:5, 145:1-5, 145:11-16; Ex 17, Maysonet Dep., at 279:22-280:10, 283:14-284:12, 284:17-22, 285:10-286:19, 287:5-288:24, 288:18-24, 291:23-292:2, 293:2-294:11, 295:5-296:4; 1995-08-10 Trial Trans.(Guevara), at 216:4-11; Ex. 63, Mingey Int. Resp., at ¶¶ 18, 20.)

122.    There is no evidence Mingey had any substantive interactions with Maysonet after August 1. **(Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 08/23/90 Supp. Report.)**

123.    Mingey did not author any reports and did not testify in any criminal proceedings. **(Ex. 16, Mingey Dep., at 237:1-19, 235:14-236:3; Ex. 24, 1995-08-09 Trial Trans. (Montilla), at 49:1-5, 58:1-59:3.)**

## DEFENDANT PAULNITSKY

124.    Paulnitsky's only involvement in the Wiley Brothers' murder investigation was arresting Maysonet on August 22, a brief interaction with Maysonet and Montilla at Area 5 that same day, and a scene visit with Maysonet, ASA DiFranco and Montilla. **(Ex. 11, Paulnitsky Dep., at 243:13-23, 261:16-266:2, 266:8-15.)**

125.    Paulnitsky was not present for any of Guevara's interviews of Maysonet and did not see Guevara use any force or threaten Maysonet, nor was he otherwise aware of any alleged force or threats used against Maysonet and he was not alleged to be present when Maysonet claims Guevara used force or threatened him. **(Ex. 11, Paulnitsky Dep., at 299:15-25; Ex. 17, Maysonet Dep., at 279:22-280:10, 283:14-284:12, 284:17-22, 285:10-286:19, 287:5-288:24, 288:18-24, 291:23-292:2, 293:2-294:11, 295:5-296:4; Ex. 36, 1995-01-31 Mtn. to Supp.**

Trans. (Maysonet), at 290:10-13, 120:22-121:5, 145:1-5, 145:11-16; Ex. 64, Paulnitsky Int. Resp., at ¶¶ 18, 20.)

### DEFENDANT HALVORSEN

126.     Halvorsen had no personal knowledge of any officers' interactions with Maysonet. He did not personally interview Maysonet at any point, nor was he present for any interviews of Maysonet, nor is there evidence Halvorsen was otherwise aware of any alleged force or threats against Maysonet. Guevara and Montilla provided the information to Halvorsen regarding their interviews with Maysonet. **(Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 63:13-17, 67:13-22, 94:13-17, 98:13-22, 104:9-17; 1995-08-10 Trial Trans.(Guevara), at 216:4-11, 219:21-220:9; Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 08/23/90 Supp. Report; Ex. 65, Halvorsen Int. Resp., at ¶¶ 9, 12, 17, 18, 19, 20, 22.)**

127.     Halvorsen was also not present for any scene visit with Maysonet. Montilla would have provided this information to Halvorsen. **(Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 94:13-17, 98:13-22, 104:9-17; Ex. 35, Halvorsen, Guevara, Gawrys, Paulnitsky, Montilla 08/23/90 Supp. Report; Ex. 65, Halvorsen Int. Resp., at ¶¶ 9, 12, 17, 18, 19, 20, 22.)**

128.     When asked about Maysonet in his first deposition in the *Serrano/Montanez* case, 17-CV-2869/17-CV-4560, Defendant Halvorsen invoked his Fifth Amendment privilege. **(Ex. 76, Halvorsen 4/20/2018 Dep., at 380:25-401:22.)**

129.     Later, Defendant Halvorsen disavowed his assertion of the Fifth Amendment and sat for a second deposition in the matter of *Serrano/Montanez* case, 17-CV-2869/17-CV-4560 during which he answered all questions posed to him by the plaintiffs' attorneys.[8] **(Ex. 15, Halvorsen Dep., *generally*.)**

---

[8] Maysonet's attorney represent Serrano and questioned Halvorsen at his second deposition.

130.     Defendant Halvorsen died before his deposition was taken in this action. **(Ex. 13, Dkt. 116, Halvorsen Statement of Death Upon Record.)** He provided substantive answers to Maysonet's complaint and written discovery, and he did not assert the Fifth Amendment. **(Ex. 66, Dkt. 65, Defendant Officers' Answer to Plaintiff's Amended Complaint, at ¶ 15.; Ex. 65, Halvorsen Int. Resp.)** Halvorsen denied allegations of wrongdoing as alleged by Maysonet, including Maysonet's allegations of a conspiracy. **(Ex. 66, Dkt. 65, Defendant Officers' Answer to Plaintiff's Complaint, at ¶¶ 9, 17, 45, 87, 88, 89, 90, 91, 92, 105-158.)** Halvorsen also provided substantive answers in his answers to Maysonet's interrogatories before he died. **(Ex. 65, Halvorsen Int. Resp., at ¶¶ 6, 9, 12, 17, 18, 19, 20, 22.)**

## POLICE REPORTS

131.     The supplementary report prepared by Halvorsen, with the assistance of Guevara, Paulnitsky, Gawrys and Montilla was marked as Exhibit 27 by the State in Maysonet's criminal trial and used to refresh Montilla's recollection during his testimony in Maysonet's trial regarding the July 15 and August 1 interviews with Maysonet. **(Ex. 24, 1995-08-09 Trial Trans. (Montilla), at 178:20-180:3.)** On cross, the defense also used the report to refresh Montilla's memory about the substance of Montilla's August 22 conversation with Maysonet. **(Ex. 8, 1995-08-10 Trial Trans. (Montilla), at 103:24-107:2.)** Additionally on cross, the defense used the report to cross Guevara regarding his testimony about the route taken by Maysonet on the night of the murders. **(Ex. 8, 1995-08-10 Trial Trans. (Guevara), at 220:10-223:4.)** This report was not entered into evidence and did not go back to the jury. **(Ex. 57, CCSAO Impound Order; Ex. 56, 1995-08-11 Trial Trans. at 3:12-4:17.)**

**MAYSONET'S CONTENTION INTERROGATORY RESPONSES**

132.    Maysonet contends that Mingey, Paulnitsky and Montilla "did not disclose Plaintiff had made no such incriminating statements and statements attributed to him in the supplemental reports were . . . fabricated," and "did not disclose to the defense that Plaintiff had denied involvement and knowledge about the murder and had provided defendant Mingey with an alibi for the time the crime was committed when they questioned Maysonet on July 15 at Area 5, and August 1, 1990, at the Cook County jail. **(Ex. 67, Pl. Am. Ans. to Def. Mingey's First Set of Interrog., No. 1; Ex. 68, Pl. Ans to Def. Montilla's Second Set of Interrog., No. 14; Ex. 69, Pl. Ans. to Def. Paulnitsky Second Rogs., No. 14, 15.)**

133.    Maysonet contends that Mingey, Paulnitsky and Montilla "did not memorialize" the July 15 and August 1 interviews with Maysonet, but "to the extent they claim that they did otherwise do so, they withheld this evidence, or destroyed it." **(Ex. 67, Pl. Am. Ans. to Def. Mingey's First Set of Interrog., No. 1; Ex. 68, Pl. Ans. to Def. Mingey's Third Set of Interrog., No. 15; Ex. 69, Pl. Ans. to Def. Paulnitsky Second Rogs., No. 14, 15.)**

134.    Maysonet contends that generally the Defendant Officers withheld evidence in that there are no reports regarding what was done to investigate the Wiley Brothers' homicides from May 25, 1990, until August 22, 1990. **(Ex. 69, Pl. Ans. to Def. Paulnitsky Second Rogs., No. 14, 15.)**

135.    Maysonet contends that the Defendant Officers concealed reports and/or GPRs which would reflect his exculpatory statements that he was not involved in the Wiley Brothers' murders and that the Defendant Officers concealed their own misconduct when questioning witnesses (including Bello), and the co-defendants, concealing the fact that they made Tino and Llvuia confess, and concealing their own misconduct in other cases. **(Ex. 71, Pl. Ans. to Def.**

Halvorsen Second Rogs., No. 18; Ex. 72, Pl. Ans. to Def. Halvorsen First Rog., No. 3.)
Further, Maysonet contends that the Defendant Officers withheld and/or suppressed their arrests
and interrogations of King and Cisco, and any resulting reports and GPRs. **(Ex. 72, Pl. Ans. to**
**Def. Halvorsen First Rog., No. 3; Ex. 70, Pl. Ans. to Def. Mingey Third Rogs., No. 18.)**

136.    Maysonet alleges that Guevara "physically coerced" Lluvia and Tino "to confess
to the crimes and both men were charged and then later wrongfully convicted of the Wiley
brothers' murder." **(Ex. 73, Dkt. 136, Pl. Am. Compl., ¶ 81.)** Maysonet further contends,
pointing to Lluvia's post-conviction petition, that Defendant Guevara "attempted to coerce" Fro
"into falsely confessing to the murders." (**Ex. 74, Pl. Am. Ans. to Def. Halvorsen's First Set of**
**Interrog., No. 3; Ex. 75, Gonzalez's PC Pet., ¶ 170, at MAYSOENT 15448 ("Guevara or**
**one of his co-conspirators suppressed exculpatory statements by" Fro.)**

137.    Maysonet contends that Montilla and ASA Defendant DiFranco suppressed
"tactics . . . used to secure a false statement from Ms. Bello," specifically they "threatened to
take her kids from her, thereby obtaining false information that was used to build a case against
Maysonet." **(Ex. 74, Pl. Am. Ans. to Def. Halvorsen's First Set of Interrog., No. 3; Ex. 68, Pl.**
**Ans to Def. Montilla's Second Set of Interrog., No. 10; Ex. 73, Dkt. 136, Pl. Am. Compl., ¶**
**82–86.)**

138.    Finally, Maysonet contends that all Defendants collaborated to have Halvorsen
draft a police report "replete with false and fabricated statements that served to justify Plaintiff's
unlawful arrest and bolster the bogus investigation," and that Defendants Montilla and Guevara
then repeated these false statements on the stand during Maysonet's criminal proceedings. **(Ex.**
**72, Pl. Ans. to Def. Halvorsen First Rogs., No. 6; Ex. 45, Dkt. 1, Pl. Compl., ¶¶ 86-98.)**
Maysonet also contends that Halvorsen gave perjured testimony before the grand jury and

Paulnitsky falsely testified in front of the subsequent grand jury and in the Motion to Quash Arrest hearing. **(Ex. 72, Pl. Ans. to Def. Halvorsen First Rogs., No. 1; Ex. 69, Pl. Ans. to Def. Paulnitsky Second Rogs., No. 10.)**

Dated: July 15, 2024                Respectfully submitted,

                                         /s/ Josh M. Engquist
                                         Josh M. Engquist, Attorney No. 06242849
                                         Special Assistant Corporation Counsel
                                         *One of the Attorneys for Individual Defendants*

James G. Sotos
Josh M. Engquist
Caroline P. Golden
David A. Brueggen
Jeffrey R. Kivetz
Kyle T. Christie
Allison L. Romelfanger
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
630-735-3300
jengquist@jsotoslaw.com

## CERTIFICATE OF SERVICE

I, Josh M. Engquist, certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on **Wednesday, July 17, 2024,** I electronically filed the foregoing **Defendant Officers' Local Rule 56.1 Statement of Uncontested Facts in Support of Their Motion for Partial Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record on the below Service List.

*Attorneys for Plaintiff:*

Jennifer A. Bonjean
Ashley B. Cohen
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
(718) 875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

Steven A. Greenberg
Greenberg Trial Lawyers
53 W. Jackson, Suite 315
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

*Attorneys for Defendant DiFranco:*

Michael Stephenson
James Lydon
Robert Shannon
Michael F. Iasparro
Stephen Mehr
Hinshaw & Culbertson LLP
151 N. Franklin, Suite 2500
Chicago, Illinois 60606
(312) 704-3000
mstephenson@hinshawlaw.com
jlydon@hinshawlaw.com
rshannon@hinshawlaw.com
miasparro@hinshawlaw.com
smehr@hinshawlaw.com

*Attorneys for Defendant Guevara:*

Steven Blair Borkan
Timothy P Scahill
Borkan & Scahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, IL 60603
(312) 580-1030
sborkan@borkanscahill.com
tscahill@borkanscahill.com

*Attorneys for City of Chicago:*

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Patrick Moran
Stacy Benjamin
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com
pmoran@rfclaw.com
sbenjamin@rfclaw.com
lferrise@rfclaw.com

*Attorneys for Cook County:*

Kenneth S. Ulrich
W. Kyle Walther
Goldberg Kohn, Ltd.
550 E. Monroe, Suite 3300
Chicago, IL 60603
Kenneth.ulrich@goldbergkohn.com
Kyle.walther@goldbergkohn.com

                                                        /s/ Josh M. Engquist
                                                        Josh M. Engquist