*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Judge Mary M. Rowland |
| | ) | Magistrate Judge Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, JOANN | ) | |
| HALVORSEN as SPECIAL REPRESENTATIVE | ) | |
| TO THE ESTATE OF ERNEST HALVORSEN, | ) | |
| deceased, EDWARD MINGEY, EPPLEN, | ) | |
| FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS JOANN HALVORSEN AS SPECIAL
ADMINISTRATOR FOR THE ESTATE OF ERNEST HALVORSEN,
EDWARD MINGEY, LEE EPPLEN, FERNANDO MONTILLA, AND ROLAND
PAULNITSKY'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

Defendants JoAnn Halvorsen, as Special Representative for the Estate of Ernest

Halvorsen, deceased, Edward Mingey, Lee Epplen, Fernando Montilla and Roland Paulnitsky

("Answering Defendants"), by their attorneys The Sotos Law Firm, P.C., and for their answer to

Plaintiff's Complaint state:

## INTRODUCTION

1.      Plaintiff, Jose Juan Maysonet, Jr., spent 27 years incarcerated in the Illinois

Department of Corrections for the murders of Torrence and Kevin Wiley ("the Wiley brothers")

– a crime he did not commit.

**ANSWER:      The Answering Defendants admit that Plaintiff was incarcerated in the
                Illinois Department of Corrections in part for the murder of Torrence and**

> **Kevin Wiley, but deny, on information and belief, the remaining allegations in this paragraph.**

2.      In and around August 22, 1990, the Police Officer Defendants conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murders of the Wiley brothers while indifferent to the fact that he was innocent.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

3.      Former Assistant Cook County State's Attorney defendant Frank DIFRANCO, while acting in an investigatory function and prior to the existence of any probable cause to believe Plaintiff committed the crime, conspired with the defendant officers to procure a fabricated confession from Plaintiff.

**ANSWER:     The Answering Defendants admit that Frank DiFranco was a Cook County Assistant State's Attorney; deny the remaining allegations in this paragraph as they pertain to them; but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

4.      All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murders by attributing fabricated oral admissions to the Plaintiff, by coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murders, and by physically coercing a fabricated court-reported statement from Plaintiff that was transcribed in English even though Plaintiff spoke little to any English at the time of his arrest.

**ANSWER:     The Answering Defendants admit that Plaintiff provided admissions in a court-reported statement that was transcribed in English and that other witnesses made statements implicating Plaintiff in the murders, but deny that Plaintiff spoke "little to any English" at the time of his arrest and deny that there was any physical coercion. Further answering, the Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

5.      There were no eyewitnesses to the murders, no plausible motive, and no physical evidence connecting Plaintiff to the crime.  Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

**ANSWER:      The Answering Defendants deny that there were no witnesses to the murder, no plausible motive, that Plaintiff's statements were false, and that there was any physical coercion of Plaintiff, but admit that Plaintiff made inculpatory statements. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

6.      For nearly three decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension.

**ANSWER:      The Answering Defendants admit that they receive police pensions. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

7.      On October 19, 2016, Cook County Circuit Court Judge Ricky Jones vacated Plaintiff's convictions without objection from the State after it was discovered that his trial attorney, Richard Beuke, labored under a *per se* conflict of interest while defending Plaintiff against the double murder charges.  Unbeknownst to Plaintiff, at the time of his trial, Mr. Beuke was simultaneously representing defendant GUEVARA in unrelated child-support proceedings.

**ANSWER:      The Answering Defendants admit, on information and belief, that Plaintiff's conviction was vacated, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

8.      On November 15, 2017, the State moved for an order to *nolle prosequi* the charges against Plaintiff after *all* of the defendant officers represented through counsel that they would exercise their Fifth Amendment rights to remain silent in response to questions about their

3

investigation of the Wiley brothers' murders.  That same day, Plaintiff was released from custody after having spent 27 years of his life in the Illinois Department of Corrections.

**ANSWER:**    **The Answering Defendants admit, on information and belief, that Plaintiff was released from prison on November 15, 2017 and that Plaintiff had been incarcerated for about 27 years on two separate charges. Further answering, the Answering Defendants deny that *all* the defendant officers represented through counsel that they would assert their Fifth Amendment rights, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

9.      Sadly, Plaintiff is among a growing group of Latino men from Humboldt Park who have proven that they were framed for crimes they did not commit at the hands of the defendant officers.  Just by way of example, defendant GUEVARA, HALVORSEN, and MINGEY framed Armando Serrano and Jose Montanez for the 1993 murder of Rodrigo Vargas.  Serrano and Montanez were exonerated on July 20, 2016, following the Illinois Appellate Court's issuance of a pair of scathing decisions acknowledging GUEVARA's pattern and practice of misconduct.  *People v. Serrano,* 2016 IL App (1st) 133493 (June 7, 2016) & *People v. Montanez*, 2016 IL App (1st) 133726 (June 7, 2016).  Serrano and Montanez received Certificated of Innocence in November 2016 and both filed federal civil rights actions that are currently pending in this Court.  *See Serrano v. Guevara, et al*., 17-cv-2869 ad *Montanez v. Guevara, et al*. 17-cv-4560.

**ANSWER:**    **The Answering Defendants admit, on information and belief,  that Serrano and Montanez were convicted of the 1993 murder of Rodrigo Vargas; that Serrano and Montanez were released from incarceration on July 20, 2016 after the Illinois Appellate Court issued opinions in *People v. Serrano,*  2016 IL App (1st) 133493 & *People v. Montanez*, 2016 IL App (1st) 133726; that Serrano and Montanez received Certificates of Innocence in November 2016; and that Serrano and Montanez filed federal civil rights actions that are currently pending in this Court.  The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

10.     Defendants GUEVARA, MINGEY and deceased officer HALVORSEN framed Roberto Almodovar, Jr. and William Negron for the murders of Jorge Rodriguez and Amy Merkes in September 1994.  Both men were exonerated in April 2017 and received Certificates of Innocence on November 20, 2017.

**ANSWER:     The Answering Defendants admit, on information and belief, that Almodovar, Jr. and Negron were convicted of the September 1994 murders of Jorge Rodriguez and Amy Merkes; that Almodovar, Jr. and Negron were released from incarceration on that matter; and that Almodovar, Jr. and Negron received Certificates of Innocence in November 2017.  The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

11.     Defendants GUEVARA and MINGEY also framed Jacques Rivera who was wrongfully convicted of the 1988 murder of Felix Valentin.  The Cook County State's Attorney's office vacated Rivera's conviction on October 4, 2011, and he received a Certificate of Innocence on September 5, 2012.  Rivera's civil suit against GUEVARA and MINGEY is currently pending in this Court.  *Rivera v. Guevara, et al.,* 12-cv-4428.

**ANSWER:     The Answering Defendants admit, on information and belief, that Rivera was convicted of the 1988 murder of Felix Valentin; that Rivera was released from incarceration in 2011; that Rivera received a Certificate of Innocence in 2012; and that Rivera filed a federal civil rights suit against Guevara and Mingey. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

12.     Since Plaintiff's exoneration less than a year ago, the State has vacated murder convictions of at least five other individuals who have demonstrated that they were framed by GUEVARA, HALVORSEN and MINGEY, including Arturo Reyes, Garbriel Solache, Thomas Sierra, Ariel Gomez, and Ricardo Rodriguez.

**ANSWER:     The Answering Defendants admit, on information and belief, that since Plaintiff was released from incarceration, Reyes, Solache, Sierra, Gomez and**

Rodriguez have been released from incarceration. The Answering
Defendants deny the remaining allegations in this paragraph as they pertain
to them, but otherwise lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.

13.     Plaintiff now seeks compensation for the incalculable hardship and injury he

suffered as a result of the Defendants' egregious misconduct.

**ANSWER:     The Answering Defendants admit Plaintiff is seeking a monetary award
based on his allegations of misconduct. The Answering Defendants deny the
remaining allegations in this paragraph as they pertain to them, but
otherwise lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.**

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of state law of Plaintiff's rights as secured by the United States Constitution as well

as the deprivation of rights under Illinois state law.

**ANSWER:     The Answering Defendants admit Plaintiff brings this action pursuant to 42
U.S.C. § 1983 and Illinois state law to redress alleged deprivations under
color of state law of Plaintiff's rights as secured by the United States
Constitution and Illinois law.  The Answering Defendants deny the
remaining allegations in this paragraph as they pertain to them, but
otherwise lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.**

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.  Venue is proper

under 28 U.S.C. § 1391 (b), because the parties reside in this judicial district, and the events

given rise to the claims asserted herein occurred in this judicial district.

**ANSWER:     The Answering Defendants admit this Court has jurisdiction under 28 U.S.C.
§§1331 and 1367 and venue is proper under 28 U.S.C. §1391(b). The
Answering Defendants admit that they reside within this judicial district.
The Answering Defendants deny the remaining allegations in this paragraph
as they pertain to them, but otherwise lack knowledge or information
sufficient to admit or deny the remaining allegations in this paragraph.**

## PARTIES

16.     Plaintiff Jose Juan Maysonet, Jr., a 49-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

17.     At all relevant times hereto, Defendants Reynaldo GUEVARA (Star No. 16345), Roland PAULNTISKY (Star No. 6503) and now deceased officer Ernest HALVORSEN (Star No. 6036) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Fernando MONTILLA (Star No. 16410) was a member of the Chicago Police Department assigned to Area Five Property Crime Unit. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, coerce fabricated statements, and maliciously prosecute Plaintiff for the murder of the Wiley brothers.

**ANSWER:     The Answering Defendants admit that at certain relevant times Guevara, Halvorsen and Paulnitsky were members of the Chicago Police Department assigned to the Area Five Violent Crimes Unit and Montilla was a member of the Chicago Police Department assigned to the Area Five Property Crimes Unit. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

18.     JoAnn Halvorsen, the Special Representative for the Estate of Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of the Estate of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

**ANSWER:**     Answering Defendants admit JoAnn Halvorsen, the Special Representative for the Estate of Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of the Estate of Ernest Halvorsen, deceased to defend this action on behalf of her late husband. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph.

19.     Defendants Sergeant Edward MINGEY (Star No. 1731) and Sergeant EPPLEN (Star No. 890) were members of the Chicago Police Department and assigned to the Area Five's Violent Crimes Unit.  MINGEY and EPPLEN were, at all relevant times, supervisors of the Police Officer Defendants.  They facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.  In addition, Defendant MINGEY directly fabricated oral statements of the Plaintiff that were later used to convict him.

**ANSWER:     The Answering Defendants admit that at certain relevant times Mingey and Epplen were members of the Chicago Police Department assigned to the Area Five Detective Division and that at certain times supervised one or more of the Police Officer Defendants.  The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

20.     Defendant Frank DIFRANCO, at all relevant times, was an Assistant Cook County State's Attorney.  Defendant DIFRANCO, while acting in an investigatory fashion, helped procure fabricated statements from Plaintiff and his girlfriend that were later introduced at trial and used to wrongfully convict Plaintiff.  Defendant DIFRANCO is sued for conspiring with the Defendant Officers to frame Plaintiff while acting in an investigatory capacity and without probable cause to believe Plaintiff committed a crime.

**ANSWER:     The Answering Defendants admit at certain relevant times , DiFranco was an Assistant Cook County State's Attorney.  The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

21.     Defendant CITY OF CHICAGO is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

**ANSWER:** **The Answering Defendants admit the Defendant City of Chicago is an Illinois municipal corporation which employed the Police Officer Defendants. The Answering Defendants deny the remaining allegations in this paragraph as they relate to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

22.     Defendant COOK COUNTY is a governmental entity within the State of Illinois which provides funding for the COOK County State's Attorney's office which is responsible for paying and judgment entered against the defendant Frank DIFRANCO.

**ANSWER:** **The Answering Defendants admit Defendant Cook County is a governmental entity within the State of Illinois but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph**.

23.     Each of the individual Chicago Police officer defendants and defendant DIFRANCO are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

**ANSWER:** **The Answering Defendants admit the individual Chicago Police officer defendants are sued in their individual capacities and DiFranco is sued in his individual capacity. The Answering Defendants further admit that they acted under color of state law and in the scope of their employment at all times relevant to this lawsuit. The Answering Defendants deny the remaining allegations in this paragraph as they relate to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

## FACTUAL ALLEGATIONS

24.     In the mid-1980's, Plaintiff lived with his mother, step-father, and siblings in the Humboldt Park area of Chicago. Plaintiff had spent much of his childhood in Puerto Rico but settled in Chicago to attend high school.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

25.    Plaintiff struggled academically since he did not fluently speak English.  He

dropped out of high school around his junior year.  Like many of the young men in his

community, Plaintiff became a member of the Latin Kings street gang.

**ANSWER:    The Answering Defendants admit that Plaintiff was a member of the Latin Kings street gang, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

26.    Shortly after dropping out of high school, Plaintiff moved into the basement of his

family building with his girlfriend Rosa Bello and her two daughters.

**ANSWER:    The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

### A "Deal with the Devil"

27.    As a member of the Latin Kings street gang, Plaintiff was involved in selling

narcotics in the area of Pierce and Kedzie.  In the summer of 1988, defendant GUEVARA and

Joseph Miedzianowski,[1] both officers from the 25th district gang crimes unit, raided Plaintiff's

home searching for drugs and guns.  Although the officers came up empty handed, defendant

GUEVARA told Plaintiff (in Spanish) that he wasn't "dumb" and knew what Plaintiff was up to

(i.e., selling drugs) and that if Plaintiff didn't want trouble from them [the police] there was a

"price to pay."  At the time, Plaintiff did not give much thought to GUEVARA's statements.

**ANSWER:    The Answering Defendants admit that Plaintiff was a member of the Latin Kings street gang and sold narcotics. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

28.    After the raid, Plaintiff and Rosa Bello (and her children) moved out of Plaintiff's

mother's building into an apartment on North Homan Avenue.

---

[1] Joseph Miedzianowski is currently serving a life sentence in the federal Bureau of Prisons after being convicted of racketeering and drug conspiracy in April 2001.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

29.     Several months later, Plaintiff was formally introduced to defendant GUEVARA and Miedzianowski in the kitchen of a Cuban restaurant on North Avenue.  Plaintiff was friendly with the owner of the restaurant who was involved in the drug trade and used the restaurant mostly as a front for narcotics activity.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

30.     Plaintiff vividly recalls the day he met GUEVARA and Miedzianowski in the kitchen of the Cuban restaurant.  Plaintiff had finished eating a meal and walked to the kitchen to drop off his dirty plate when he noticed the owner speaking to defendant GUEVARA and Miedzianowski.  Plaintiff recognized the officers from the raid of his home several months earlier.  The owner introduced Plaintiff to GUEVARA and Miedzianowski and told him that if he ever had any problems with other officers in the neighborhood, GUEVARA and Miedzianowski could be of assistance.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

31.     Defendant Guevara spoke in Spanish to Plaintiff and told him that he remembered him from the raid of his home.  Defendant GUEVARA confirmed that he could help protect Plaintiff from arrest for his drug activities but that there was a cost involved.  Plaintiff asked GUEVARA what type of "cost" was involved and Defendant GUEVARA told him that he would talk to him later about the details.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

32.     After another conversation a week later, Plaintiff began paying defendant GUEVARA protection money in the amount of $1000 per week so that Plaintiff and a small crew with whom he worked could sell drugs without police interference.  Plaintiff did not feel at liberty to decline defendant GUEVARA's offer.  GUEVARA made it clear that if Plaintiff did not pay him the fee he was charging, he and his crew would be targeted for arrest.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

33.     For roughly a year, Plaintiff paid GUEVARA his weekly fee and GUEVARA delivered on his promise to protect Plaintiff from police interference in his drug sales.  However, in late 1989, Plaintiff and GUEVARA had a "falling-out" when Area Five detectives arrested and falsely charged one of Plaintiff's best friends, Santiago Sanchez ("Macho") with attempt murder.  Upset that his friend had been charged, Plaintiff confronted GUEVARA about the situation.  GUEVARA was unsympathetic to Plaintiff's complaint and told Plaintiff, in sum and substance, that Sanchez was getting "hooked up" and there was nothing Plaintiff could do about it.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

34.     Plaintiff reluctantly continued to pay GUEVARA his weekly "protection" fee, fearful that the notorious "hook-up" artist might turn his sights on him.  But that all changed on May 21, 1990.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

35.     On May 21, 1990, Sanchez, who was out on bond, missed a court appearance for his attempt murder case.  Later that day Sanchez committed suicide by shooting himself in a car near Crystal and Kedzie avenues.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

36. Although violence was commonplace in the Humboldt Park community, suicide was highly unusual which made this period of time striking and memorable. Plaintiff was devastated by the loss of his friend and blamed GUEVARA and the crooked Area Five detectives for the tragedy. Plaintiff stopped making "protection payments" to defendant GUEVARA from that day forward.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

37. On the morning of May 25, 1990, Plaintiff attended Sanchez's funeral along with numerous other friends and fellow Latin Kings from the neighborhood.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

### The Wiley Brothers' Murders

38. Earlier on the morning of May 25, 1990 at roughly 1:00 a.m., Torrence and Kevin Wiley, two African American men in their late 20s, were shot and killed in front of a vacant lot at 3428 W. North Avenue. The brothers were not associated with any street gangs or drug activity and did not live in Humboldt Park.

**ANSWER:** **The Answering Defendants admit, on information and belief, the allegations in this paragraph.**

39. There were no eyewitnesses to the crime, but two women who lived on the block told the police that they heard an argument between two black males just before the shooting. The argument lasted for about an hour and the voices they heard were of African-American men, not men speaking Spanish or speak English with Puerto Rican accents. The women heard bits and pieces of the argument, including the statements, "I'm trying to help you," and "I'm going to

kill you first" and "you said we would get the last bus." Of particular note, the men kept saying

the name "Lulu Dog."

**ANSWER:** **The Answering Defendants admit, on information and belief, that two women who lived on the block heard bits and pieces of two English speaking men arguing for about one hour just before hearing gunshots, and that the men stated "I'm trying to help you," "I'm going to kill you first" and "you said we would get the last bus" and also referenced "Lulu dog" a number of times. The Answering Defendants deny that there were no witnesses to the crime and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

40.    After an initial canvas of the neighborhood that yielded little information,

defendant MINGEY, who was the supervising sergeant on the case, decided that he would close

the case by finding a gang-banger to pin the murders on rather than conduct a meaningful

investigation designed to identify the real offenders. Police reports show that detectives made no

further attempts to locate potential witnesses who lived or worked on the busy street were the

shooting occurred. Incredibly, detectives did nothing to identify or track down "Lulu Dog" even

though the victims' sister confirmed that he was a person known to the victims and provided a

phone number and address for him.

**ANSWER:** **The Answering Defendants admit there was a canvas of the neighborhood that yielded little information but deny the remaining allegations in this paragraph as they pertain to them.**

41.    Area Five detectives supervised by defendant MINGEY had no interest in solving

this senseless murder of two young black men but instead saw it as an opportunity to frame

"gang bangers."

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

42.    A couple of weeks after the Wiley brothers' murders, defendants GUEVARA and

HALVORSEN arrested two Latin Kings from the area, Efrain Cruz ("King") and Francisco

Veras ("Cisco") for the petty offense of "mob action." Cruz was being targeted by GUEVARA, HALVORSEN and MINGEY because he had recently beat an armed robbery case.  It was a known practice of Area Five detectives that if a gangbanger "beat" a case, he would be prioritized for a "frame-up."

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether a couple of weeks after the Wiley brothers' murders, Guevara and Halvorsen arrested Latin Kings Efrain Cruz ("King") and Francisco Veras ("Cisco") for the petty offense of "mob action" and whether Cruz had recently beaten an armed robbery case. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

43.    Cruz and Veras were taken to Grand and Central where they were interrogated and accused of killing the Wiley brothers.  The men were put in line-ups and falsely told they were identified as the shooters, presumably in hopes that they would make an inculpatory statement that could be used against them or, more like, would make an exculpatory statement pointing the finger at someone else, thereby providing probable cause to arrest that person who could then be interrogated and tricked, manipulated or coerced into pointing the finger back at Cruz and Veras.  This tactic was standard operating procedure for Area Five detectives under the supervision of defendant MINGEY.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Cruz and Veras were taken to Grand and Central, interrogated, accused of killing the Wiley brothers, put in line-ups, and falsely told they were identified as the shooters. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

44.    Defendants GUEVARA and HALVORSEN told both Cruz and Veras that they knew another Latin King was the get-away driver and that whomever implicated the other first would get leniency.  Neither Cruz nor Veras took the bait.  The men were eventually released

from Grand and Central after they figured out that they had been in police custody at the time of the Wiley brothers' murders.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

45.   As fate would have it, Santiago Sanchez's visitation on the evening of May 24, 1990 had raised tensions in the neighborhood and that same evening, officers conducted a sweep on North Avenue that resulted in the Arrests of more than a dozen Latin Kings, including Cruz and Veras. Thus, Cruz and Veras were sitting in a police lock-up at the exact time the Wiley brothers were shot and killed.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

46.   With airtight alibis for the night of the Wiley brothers' murders, detectives GUEVARA, HALVORSEN, and MINGEY realized that they could not pin the murders on Cruz and Veras or any of the other Latin Kings who were in custody that night. Unfortunately for Plaintiff, on the night of May 24, 1990 after attending Sanchez's visitation, he spent a quiet night at home with his girlfriend, mourning the loss of his close friend.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Cruz and Veras had alibis and whether Plaintiff attended Sanchez's visitation on the night of May 24, 1990. The Answering Defendants deny Plaintiff spent a quiet night at home mourning the loss of his close friend on May 24-25, 1990. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

### Plaintiff's July 15, 1990 Arrest

47.   On July 15, 1990, defendant PAULNITSKY arrested Plaintiff in connection with an unrelated shooting that occurred on July 3, 1990.

**ANSWER:** **The Answering Defendants admit, on information and belief, the allegations in this paragraph.**

48.     Plaintiff was brought to Area Five, Grand and Central, where he was placed in a line-up and purportedly identified as being involved in the unrelated July 3, 1990 shooting. With the assistance of a Spanish-speaking police officer, Defendant PAULNITSKY interviewed Plaintiff about the July 3, 1990 shooting. Plaintiff denied his involvement in the shooting and exercised his right to counsel. Defendant PAULNITSKY stated, in sum and substance that "he didn't need a statement from Plaintiff, because he was identified and was getting charged." However, defendant PAULNITSKY told Plaintiff that his supervisor, defendant MINGEY, wanted to talk to him about another matter.

**ANSWER:     The Answering Defendants admit Plaintiff was brought to Area 5 for a July 3, 1990 unrelated shooting and placed in a line-up where he was identified as the shooter by victims and witnesses. Defendants admit Defendant Paulnitsky interviewed Plaintiff, deny Plaintiff's initial interview required the assistance of an interpreter, but admit after Plaintiff was advised he was identified in the lineup he requested an interpreter who assisted temporarily until Plaintiff again began speaking English. The Answering Defendants deny Plaintiff requested an attorney but admit that he denied shooting anyone. Answering Defendants further admit that after felony review approved charges, Defendant Paulnitsky stated something to the effect of "he didn't need a statement from Plaintiff, because he was identified and was getting charged" and that his supervisor Defendant Mingey wanted to talk to Plaintiff about another crime.**

49.     Plaintiff was brought into a different interview room where he was interviewed by defendants MINGEY and MONTILLA. MINGEY did the questioning while MONTILLA acted as an interpreter. Defendant MINGEY asked Plaintiff where he was in the early morning hours of May 25, 1990. Plaintiff responded that he was at home because he was mourning the loss of his good friend, Santiago Sanchez, and that they buried him the morning of May 25, 1990. Plaintiff asked MINGEY why he was asking for his whereabouts during that time period.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff mentioned he was mourning his friend who**

**was buried on May 25, 1990 and admit, on information and belief, the
remaining allegations in this paragraph.**

50.     Defendant MINGEY told Plaintiff that two "brothers" had been shot on North

Avenue and that the ballistics evidence found at the scene of the murders suggested that the

weapon used in the murder of the Wiley brothers was the same caliber weapon used in the

shooting that Plaintiff had just been arrested for.  Recognizing defendants MINGEY and

MONTILLA's design to implicate Plaintiff in the double murders, Plaintiff told the detectives

that they were on some "bullshit" and that he wanted his lawyer.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to
admit or deny whether at some point Plaintiff told them they were on some
"bullshit" and what if anything Plaintiff allegedly recognized, but deny that
Plaintiff requested a lawyer. Further answering, the Answering Defendants,
admit on information and belief, the remaining allegations in this paragraph.**

51.     Defendant MINGEY stated in sum and substance [through defendant

MONTILLA], "you'll be hearing from us again.  We know where to find you." Plaintiff was

then taken to the Cook County Jail on charges for attempted murder related to the July 3, 1990

shooting.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to
admit or deny the allegations in this paragraph.**

**Defendants MINGEY and MONTILLA Make a Surprise Visit to Cook County Jail**

52.     Two weeks later on August 1, 1990, a correctional officer retrieved Plaintiff from

Division 2 of the Cook County Jail where he was being housed.  Plaintiff followed the

correctional officer to Division 5 where he was met by an older supervising Cook County sheriff

dressed in jeans and a white shirt.  The sheriff directed Plaintiff to sign a piece of paper and

Plaintiff complied without question.  Plaintiff did not read the paper as it was written in English

and assumed it was just protocol. No one translated the paper to Plaintiff or explained its contents.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

53. After signing the paper, the sheriff brought Plaintiff into an interview room where Plaintiff was surprised to see defendants MINGEY and MONTILLA seated at a table. MINGEY and MONTILLA told Plaintiff to sit down. Again, MONTILLA was acting as an interpreter, translating from English to Spanish and vice versa. Plaintiff complied but told the detectives that he had nothing to say to them and that they should contact his lawyer, William Swano. Plaintiff had Swano's business card in his pocket and pulled it out and handed it to the detectives.

**ANSWER:** **The Answering Defendants deny that Plaintiff stated he had nothing to say, advised Mingy and Montilla to contact his attorney and provided them Swano's business card and affirmatively state that Plaintiff was advised of his right to counsel in Spanish and signed an attorney waiver form. Further answering, the Answering Defendants admit that Mingey and Montilla were at the Cook County Jail seated at a table in an interview room with Plaintiff and Montilla translated, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

54. Defendants MINGEY and MONTILLA told Plaintiff that they weren't calling his lawyer and only wanted to talk to him about the murders of those "niggers" on North Avenue. Plaintiff went to grab a telephone that was in the interview room and defendant MINGY grabbed it out of his hand. MINGEY told Plaintiff "we have a CTA bus full of people who identified you." Plaintiff responded by stating, "then why are you here talking to me?" Plaintiff stood up with an intent to leave the room and the detectives also stood up aggressively and began yelling at Plaintiff to sit down. The conversation got so heated that the Cook County sheriff came into the room and stated something sternly to the detectives. The sheriff looked at Plaintiff and asked him, "you ok?" and then escorted Plaintiff out of the interview room.

**ANSWER:** **The Answering Defendants admit Mingey and Montilla advised Plaintiff that they wanted to discuss the Wiley brothers' murder, but deny the remaining allegations in this paragraph.**

55.     On August 16, 1990, Plaintiff made bond on the attempted murder case and was

released from Cook County Jail.

**ANSWER:** **The Answering Defendants admit, on information and belief, the allegations in this paragraph.**

### Plaintiff's August 22, 1990 Arrest for the Wiley Brothers' Murders

56.     Shortly before 9:00 a.m. on August 22, 1990, Plaintiff appeared before the Chief

Judge of the criminal division of the Circuit Court of Cook County (Room 101) at 26th California

for assignment of his attempted murder case.  Plaintiff was accompanied by a friend and his

sister Rose Maysonet.

**ANSWER:** **The Answering Defendants admit that Plaintiff was at the criminal courthouse at 26th and California on August 22, 1990, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

57.     Plaintiff noticed that defendant PAULNITSKY entered the courtroom and seemed

surprised to see Plaintiff out of custody.  Defendant PAULNITSKY quickly left room 101.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph.**

58.     Plaintiff's case was called shortly after 9:00 a.m. and acting Chief Judge Bastone

told Plaintiff that his case was assigned to Judge Loretta Lee Morgan and ordered him to appear

in her courtroom, located in the same building, *instanter*.  Plaintiff's attorney William Swano

had previously told Plaintiff that he would meet Plaintiff in the assigned court room.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

59.     Plaintiff walked out of courtroom 101 and toward the elevator bank that led to

Judge Morgan's courtroom when he was grabbed and physically pushed up against the wall by

defendant PAULNITSKY in the hallway outside courtroom 101.  Defendant's bi-lingual sister

immediately questioned the detective in English, "what are you doing?" and PAULNITSKY told

Plaintiff's sister that Plaintiff was wanted for two murders and that he had to go with him.

Plaintiff, with the assistance of his sister, told defendant PAULNTISKY that he wanted his

attorney who was waiting for him in Judge Morgan's courtroom.  Defendant PAULNITSKY

ignored Plaintiff's request, handcuffed him, and took him to the other side of the building that

housed the administrative offices.

**ANSWER:** **The Answering Defendants admit that Paulnitsky advised Plaintiff that Detectives wanted to question Plaintiff and then took Plaintiff to   an administrative area of the courthouse, but deny the remaining allegations in this paragraph.**

60.     Defendant PAULNTISKY took Plaintiff up to the offices of the Cook County

State's Attorney where he made a phone call.  Defendant PAULNITSKY then brought Plaintiff

to the basement of the building where he was brought outside, placed in a marked police car, and

driven to the police station at Grand and Central.  Plaintiff never made it to Judge Morgan's

courtroom.

**ANSWER:** **The Answering Defendants admit that Paulnitsky took Plaintiff to an office area used by police and then took Plaintiff outside the courthouse to a marked police car that drove Plaintiff to Area Five, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

61.     Meanwhile, Plaintiff's sister contacted Plaintiff's attorney to tell him that Plaintiff

had just been arrested in the courthouse.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

62.     Once at a Grand and Central, Plaintiff was placed in an interview room. Defendants MONTILLA and MINGEY entered the room and Plaintiff immediately told the detectives that he wanted to speak to his attorney, William Swano.

**ANSWER:     The Answering Defendants admit that Plaintiff was placed in an interview room at Area Five with Montilla and Mingey, but deny the remaining allegations in this paragraph.**

63.     Speaking in Spanish, defendant MONTILLA asked Plaintiff who arrested him, and Plaintiff pointed at defendant PAULNTISKY who was standing outside the interview room. Upon seeing Plaintiff pointing at him, defendant PAULNTISKY ran into the interview room, grabbed Plaintiff by the throat and threw Plaintiff to the floor while hitting him in the face. Defendant PAULNTISKY threatened to "bust" his face if Plaintiff ever spoke about him in Spanish again.

**ANSWER:     The Answering Defendants admit that Montilla spoke to Plaintiff in Spanish, lack knowledge or information sufficient to admit or deny whether Montilla asked Plaintiff who arrested him and whether Plaintiff pointed to Paulnitsky, but deny the remaining allegations in this paragraph.**

64.     After the assault, Plaintiff was taken to the lock-up for the better part of the afternoon. During that time, William Swano called Area Five numerous times but was repeatedly told that Plaintiff was not there. Plaintiff's sister went to Grand and Central to locate her brother and was falsely told that he was not there.

**ANSWER:     The Answering Defendants deny there was an assault and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

65.     Plaintiff was held *in communicado* until defendants GUEVARA and HALVORSEN arrived to grand and Central to start their shift. GUEVARA was eager to frame Plaintiff for the murders since Plaintiff had stopped paying "protection money" to GUEVARA

and knew that Plaintiff had information about GUEVARA that could expose GUEVARA as a corrupt officer.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff was held "*in communicado*" and admit that Guevara and Halvorsen arrived at Area Five to start their shift and then interviewed Plaintiff. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

66.     At roughly 5:00 p.m. defendant GUEVARA retrieved Plaintiff from the lock up and brought him to an interview room.  GUEVARA told Plaintiff that he wanted Plaintiff to tell him "about them two niggers that was shot on North Avenue."  Plaintiff responded that he knew nothing about the murders and wanted to speak to his attorney William Swano.

**ANSWER:** **The Answering Defendants admit that Guevara interviewed Plaintiff about the Wiley brothers' murder when he started his shift. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

67.     Defendant GUEVARA left the interrogation room and returned with a telephone book and large black flashlight.  Detective Guevara asked Defendant whether he was "ready to talk."  Plaintiff again exercised his right to counsel by saying, "I want my lawyer."  Defendant GUEVARA put on black leather gloves and began beating Defendant in the head and body with the phonebook.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny whether Guevara left the interrogation room and whether Plaintiff asked for his lawyer, but deny the remaining allegations in this paragraph.**

68.     Guevara left the interview room a number of times only to return and continue the beating by placing the telephone book on various parts of Defendant's body, including his head and genitals, striking the book with the flashlight with all of his force.  During the beating,

Guevara repeatedly asked Defendant "do you still want to talk to your lawyer?" Guevara also falsely told Defendant that he already knew that he was involved in the shooting and that they had witnesses who said it was him. Defendant eventually began to cry, and Guevara said, "you wasn't crying like a little bitch when you shot those two niggers?" Guevara eventually left, and detective MONTILLA returned to the interview room.

**ANSWER:** **The Answering Defendants deny that Guevara physically abused Plaintiff with a telephone book and flashlight, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

69.     Defendant MONTILLA told Plaintiff to calm down and that he would allow Plaintiff to see his sister who was at the police station and had some anxiety medicine for him. MONTILLA uncuffed Plaintiff and brought him to another interview room. Shortly after being brought to another room, MONTILLA returned to the room with Plaintiff's sister, Rose Maysonet. Plaintiff and Rose had a short conversation and Rose gave him an anxiety pill that she obtained from her mother.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

70.     Defendant MONTILLA also brought Plaintiff's pregnant and live-in girlfriend, Rosa Bello, to the interview room to speak with Plaintiff. Rose was terrified because detective told her that she could have her kids taken away if Plaintiff didn't cooperate with their investigation. Rosa tried to persuade Plaintiff to "talk" to the officers, but Plaintiff told her that he had no knowledge about the shootings. Rosa expressed her fear that the police were going to arrest her and take the kids from her and begged him to "cooperate."

**ANSWER:** **The Answering Defendants admit, on information and, admit that Plaintiff was allowed to speak with his girlfriend. Further answering, the Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

71.     Defendant MONTILLA told Rosa she had to leave and after escorting her out, MONTILLA returned and asked Plaintiff in sum and substance, "do you want your kids to grow up without their family?  Just tell us what happened," Plaintiff again asked for his attorney.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny whether Montilla told Rosa to leave and escorted her out, but deny the remaining allegations in this paragraph.**

72.     After some time, GUEVARA returned to the interview room and again began beating Plaintiff with the phone book and flashlight, yelling at him in Spanish to tell him about the murders.  Plaintiff lost track of time but after several hours, a female State's attorney came into the interview room to speak with him.  The female State's Attorney, ASA Jennifer Borowitz, read Plaintiff his rights with defendant MONTILLA translating and asked Plaintiff what he knew about the murders on North Avenue.  Plaintiff told the ASA that he knew nothing and wanted his lawyer.  ASA Borowitz then got up and left the room.

**ANSWER:     The Answering Defendants admit that Guevara returned to the interview room; that ASA Borowitz was in the interview room and had Montilla provide Plaintiff his Miranda rights in Spanish; that Plaintiff made a statement to ASA Borowitz and agreed to give a court reported statement; and that subsequently ASA Borowitz left the interview room. The Answering Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff lost track of time or how much time passed but deny the remaining allegations in this paragraph.**

73.     Sometime after ASA Borowitz left, defendant GUEVARA returned to the room and began threatening Plaintiff again.  Apart from the physical punishment, GUEVARA told Plaintiff that he would get the death penalty if he did not admit his involvement in the murders and that he just needed to admit that the was present at the shooting not that he was the shooter. GUEVARA repeatedly asked Plaintiff for the names of other people who may have done the shooting and urged Plaintiff to point the finger at someone else.  GUEVARA also continually threated to "lock up" Plaintiff's girlfriend and sister.

**ANSWER:** **The Answering Defendants deny that Plaintiff was physically abused and deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

74.     After nearly 20 hours in custody, much of it involving physical and psychological abuse by defendants GUEVARA and MONTILLA, Plaintiff's will was overborne, and he agreed to tell GUEVARA whatever he wanted him to say.  Plaintiff was overcome with fear that the beatings would continue and that the detectives would arrest his sister and girlfriend and place Rosa's children with DCFS.

**ANSWER:** **The Answering Defendants admit that Plaintiff had been at the police station for nearly 20 hours at the time ASA Borowitz left and that Plaintiff confessed to his involvement in the murders. The Answering Defendants deny that Plaintiff was physically abused and deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

75.     Assistant State's Attorney defendant DIFRANCO arrived at Area Five shortly after Plaintiff succumbed to defendant GUEVARA's physical abuse and agreed to "cooperate." At roughly 7:00 am., defendants GUEVARA, MONTILLA, and DIFRANCO met in a room with Plaintiff to construct a false narrative that Plaintiff would regurgitate in front of a court-reporter. DIFRANCO knew that Plaintiff had been physically beaten and had exercised his right to counsel to ASA Borowitz, but nonetheless approved of, conspired with, and aided GUEVARA and MONTILLA in creating a false narrative that Plaintiff would repeat under oath before a court reporter.

**ANSWER:** **The Answering Defendants admit that DiFranco arrived at Area Five at approximately 6:30 a.m., met in a room with Plaintiff, Guevara and Montilla, and that Plaintiff cooperated and agreed to provide a court reported statement. The Answering Defendants deny remaining allegations in this paragraph.**

76.     However, defendant DIFRANCO realized that Plaintiff would not be able to give a statement in English and DIFRANCO did not speak Spanish. Defendant DIFRANCO wrote out the questions and answers in English on a yellow pad of paper, and defendant MONTIlLA translated the questions and answers in Spanish. Plaintiff was then instructed to study the pad of paper.

**ANSWER:     The Answering Defendants admit that DiFranco did not speak Spanish, that Montilla translated parts of the conversation with Plaintiff, but deny the remaining allegations in this paragraph.**

77.     Approximately two hours later, a court-reporter arrived at the station to transcribe a statement from Plaintiff. Defendant DIFRANCO began questioning Plaintiff in English according to the script the group had previously prepared. Defendant MONTILLA translated the question into Spanish for Plaintiff, and Plaintiff responded in Spanish as he had practiced. MONTILLA provided the English translation of Plaintiff's response, and the court-reporter transcribed the English provided by MONTILLA. At no point did any party put on the record that Plaintiff was speaking only in Spanish.

**ANSWER:     The Answering Defendants admit that a court reporter arrived about two hours later, DiFranco questioned Plaintiff, and no party put on the record that Plaintiff was speaking Spanish because he was not, but deny the remaining allegations in this paragraph.**

78.     Plaintiff's court-reported statement was taken on August 23, 1990 at 9:28 a.m.

**ANSWER:     The Answering Defendants admit, on information and belief, the allegations of this paragraph.**

79.     Consistent with the false narrative concocted by defendants, Plaintiff falsely confessed that on May 20, 1990 at around 12:45 a.m. Alfredo Gonzalez ("Lluvia") came to his house at 1320 North Homan to ask him to hide a .9 mm pistol. Lluvia returned to his home between 11:30 p.m. and 12:00 p.m. on May 24, 1990 with two other Latin Kings, Christopher

Hernandez who went by the nickname "Fro," and "Tino" Curz. According to the physically coerced false statement, Plaintiff stated that Lluvia, Fro, and Tino told him that "they got two guys on Drake and North avenue waiting for dope." Plaintiff then falsely stated that he drove to Drake and North with Lluvia, Fro and Tino. Plaintiff drove the car; Lluvia was in the front passenger seat with the gun, and Fro and Tino were in the back. According to the false statement, when they got to the area, Plaintiff waited in the car while Lluvia, Fro and Tino approached the two black men. Plaintiff could see them talking and then heard five or six shots and saw the two men on the found and Lluvia pointing the .9 mm at them. The three returned to Plaintiff car and he drove away. According to the false statement, Lluvia, Fro, Tino, Cisco (Francisco Veras) and King (Efrain Cruz) came to his house on August 16, 1990, and King put a gun to his head and threatened to kill him if he talked.

**ANSWER: The Answering Defendants admit Plaintiff confessed and admit the statements attributed to Plaintiff set forth in his court reported statement but deny Plaintiff's characterization of those statements. Answering Defendants deny that Plaintiff's statement was a false narrative concocted by Defendants, was physically coerced and any other remaining allegations in this paragraph.**

80. Plaintiff was unable to read English but signed the statement per DIFRANCO's direction. The statement was false in its entirety and procured from Plaintiff through physical abuse and threats and other coercive tactics.

**ANSWER: The Answering Defendants admit that Plaintiff signed his statement. In further response, the Answering Defendants deny Plaintiff's statement was false and procured from Plaintiff through physical abuse and threats and other coercive tactics, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

81. Subsequent to Plaintiff's false and physically coerced statement, Area Five detectives arrested Alfredo Gonzalez ("Lluvia"), Justino Cruz ("Tino"), and Christopher Goosens ("Fro"). Like Plaintiff, Gonzalez and Cruz were also physically coerced by defendant

GUEVARA to confess to the crimes and both men were charged and then later wrongfully

convicted of the Wiley brothers' murders. Goosens was charged but acquitted after a bench trial.

**ANSWER:** **The Answering Defendants deny Plaintiff's statement was false and physically coerced and deny that Plaintiff, Gonzalez and Cruz were physically coerced and/or wrongfully convicted, but admit, on information and belief, the remaining allegations of this paragraph.**

**Coerced and Manipulated Statement of Rosa Bello**

82. After coercing Plaintiff's court-reported statement, defendants MONTILLA and

DIFRANCO threatened and coerced a statement from Plaintiff's pregnant girlfriend Rosa Bello.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

83. On August 23, 1990 at 2:10 p.m., Bello provided a hand-written statement in

which she falsely stated that Lluvia, Fro, and Tino came to the house she shared with Plaintiff

and retrieved a .9mm weapon at roughly 11:30 p.m. on May 24, 1990.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the time at which Bello provided a hand-written statement, deny that her statement was false, but admit, on information and belief, the contents of her statement as alleged.**

84. Defendants MONTILLA and DIFRANCO told Bello that Plaintiff had already

confessed to the murders and that her kids would be taken away from her if she did not admit

that she saw the men retrieve a gun from the house on that particular date.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

85. After spending over 24 hours at the police station, Bello eventually agreed to sign

whatever statement the assistant state's attorney and the detective prepared for her.

**ANSWER:** The Answering Defendants admit that Bello agreed to and signed a statement, lack knowledge or information about who prepared Bello's signed statement and deny the remaining allegations in this paragraph.

86.    Defendants DIFRANCO and MONTILLA knew that they had fed a false statement to Bello and that she signed the statement out of fear that she would lose custody of her kids if she did not cooperate with the defendants.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

**Defendant HALVORSEN Authors a False and Fabricated Supplemental Police Report with the Help of All the Defendants**

87.    After Plaintiff and his co-defendants were charged with the double murder of the Wiley brothers, defendant DIFRANCO realized that Plaintiff's court-reported statement was subject to suppression since no probable cause existed to justify his arrest in the first place. Indeed, no evidence existed whatsoever that suggested Plaintiff was involved in the Wiley brother's murder.

**ANSWER:** The Answering Defendants deny that no evidence existed that suggested Plaintiff was involved in the Wiley brothers' murder and there was no probable cause to arrest Plaintiff. Further answering, the Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

88.    With the collaboration of all of the defendants, defendant HALVORSEN put his report-writing skills to work and began drafting a supplemental police report replete with false and fabricated statements that served to justify Plaintiff's unlawful arrest and bolster the bogus investigation. The report was written on the evening of August 24, 1990 and approved by defendant sergeant EPPLEN at 11:45 p.m. – long after Plaintiff was charged.

**ANSWER:** **The Answering Defendants admit that Halvorsen drafted a supplemental report that was approved by Epplen on or about 23:45 on August 24, 1990, but deny the remaining allegations of this paragraph.**

89.     Defendants MINGEY and MONTILLA directed Defendant HALVORSEN to falsely report that on July 15, 1990, Plaintiff told them he *did* have knowledge of the murders of the two black youths on North Avenue, and that on the night of the murders, three Latin Kings came to his house to get a 9mm pistol. Plaintiff never made this statement; its contents are false in their entirety and completely fabricated by the defendants. No police report or General Progress Report ("GPR") reflects that Plaintiff made this statement on July 15, 1990. Defendant EPPLEN approved this false and fabricated oral statement even though the defendant officers and defendant MINGEY could not provide a writing of any kind that suggested it ever occurred.

**ANSWER:** **The Answering Defendants lack sufficient knowledge to admit or deny whether there are reports or GPR's memorializing the statements Plaintiff made on July 15, 1990 and admit those statements attributed to Plaintiff set forth in the investigation documents but deny Plaintiff's characterization of those statements, characterization of the report and characterization of Epplen's approval of the report. The Answering Defendants deny the remaining allegations in this paragraph.**

90.     Defendant HALVORSEN further reported (at defendant MINGEY's direction) that Plaintiff told defendants MONTILLA and MINGEY at Cook County Jail on August 1, 1990 that he was involved in the murders of the black men but that he was not the shooter and was only present for the shooting. According to the fabricated statement, Plaintiff told MINGEY and MONTILLA that he knew who the shooter was but only reveal the information in exchange for leniency on his attempt murder case. Plaintiff never made this statement; its contents are false in their entirety, completely contrived by the defendants. No police report or GPR reflects that Plaintiff made these admissions on August 1, 1990. Defendant EPPLEN approved this false and

fabricated oral statement even though the defendant officers and defendant MINGEY could not provide a writing of any kind that suggested it ever occurred.

**ANSWER:** **The Answering Defendants lack sufficient knowledge to admit or deny whether there are reports or GPR's memorializing the statements Plaintiff made on August 1, 1990 and admit those statements attributed to Plaintiff set forth in the investigation documents, but deny Plaintiff's characterization of those statements, characterization of the report and characterization of Epplen's approval of the report. The Answering Defendants deny the remaining allegations in this paragraph.**

91.    According to the supplemental police report signed by the defendant officers but authored by defendant HALVORSEN, Plaintiff admitted his involvement in the shooting to defendant GUEVARA on August 22, 1990 at approximately 8:00 p.m. Plaintiff never admitted his involvement in the murders of the Wiley brothers to defendant GUEVARA.  Only after being physically abused and threatened for nearly 24 hours by GUEVARA and his accomplices did Plaintiff eventually agree to repeat a false and fabricated statement that was fed to him by GUEVARA, MONTILLA and DIFRANCO and later recorded by a court reporter.

**ANSWER:** **The Answering Defendants admit those statements attributed to Plaintiff set forth in the investigation documents but deny Plaintiff's characterization of those statements. The Answering Defendants deny the remaining allegations in this paragraph.**

92.    Defendant HALVORSEN also falsely reported that after providing a court-reported statement, Plaintiff drove to the area of 3428 W. North Ave., the scene of the murders, with defendants MONTILLA, PAULNITSKY, and DIFRANCO to "corroborate" his court-reported statement.  Plaintiff never drove to the crime scene with the defendants nor did he demonstrate or point out any of the facts set forth in his physically coerced and fabricated statement.

**ANSWER:** **The Answering Defendants admit, on information and belief, to those actions of driving Plaintiff to have him identify the scene of the murder as described in the investigation documents, but deny Plaintiff's characterization of those**

actions. The Answering Defendants deny the remaining allegations in this paragraph.

## Plaintiff's Wrongful Conviction

93. Defendants HALVORSEN and PAULNITSKY falsely testified before the grand jury that Plaintiff had supplied the murder weapon that was used to shoot the Wiley brothers and that Plaintiff had driven the car to and from the murder scene.

**ANSWER:** **The Answering Defendants admit only the testimony of Halvorsen and Paulnitsky as set forth in the grand jury transcript and deny Plaintiff's characterization of that testimony.**

94. Prior to Plaintiff's trial, Plaintiff was forced to hire a new attorney after his attorney William Swano was indicted in connection with allegations that he had "payed[sic] off" a judge in exchange for a favorable outcome case. Unfortunately for Plaintiff, Plaintiff's new attorney, Richard Beuke, was no more ethical than his prior one.

**ANSWER:** **The Answering Defendants admit that Plaintiff hired attorney Richard Beuke, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

95. While Beuke was defending Plaintiff against these double murder charges, he was concurrently representing defendant GUEVARA (the State's key witness against Plaintiff) in unrelated family and child-support proceedings. Indeed, Beuke and GUEVARA had a decade-long personal and professional friendship that Beuke failed to disclose to Plaintiff. Unsurprisingly, Beuke's efforts at challenging the State's evidence and cross-examining his buddy defendant GUEVARA were feeble and ineffectual.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

96. At Plaintiff's trial, defendant MONTILA falsely testified that Plaintiff made inculpatory statements to him and defendant MINGEY on July 15, 1990 and August 1, 1990 as

set out in detail above. Defendant MONTILLA also falsely testified at Plaintiff's trial that Plaintiff made a voluntary confession to the murders as described in detail above.

**ANSWER:** **The Answering Defendants admit only the testimony of Montilla as set forth in the trial transcript and deny Plaintiff's characterization of that testimony.**

97. Defendant PAULNTISKY falsely testified at Plaintiff's trial that he had knowledge of Plaintiff's inculpatory oral statements made on July 15 and August 1, 1990 when he arrested Plaintiff on August 22, 1990. Defendant PAULNITSKY had no knowledge about those statements as Plaintiff never made the statements and the defendants did not fabricate the statements until after Plaintiff's arrest on August 22, 1990.

**ANSWER:** **The Answering Defendants admit only the testimony of Paulnitsky as set forth in the trial transcript and deny Plaintiff's characterization of that testimony.**

98. Defendant GUEVARA falsely testified that Plaintiff first orally confessed his involvement to him for the murders of the Wiley brothers as reflected above. GUEVARA denied that he used any sort of physical coercion or threats to coerce those statements. GUEVARA further denied that he supplied the false narrative that Plaintiff regurgitated before a court reporter on August 23, 1990.

**ANSWER:** **The Answering Defendants admit only the testimony of Guevara as set forth in the trial transcript, and lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

99. Defendant DIFRANCO falsely testified at Plaintiff's trial that he conversed with Plaintiff in English and that Plaintiff had no difficulties communicating with him in English. DIFRANCO falsely testified that Plaintiff gave his court-reported statement in English and that it was a voluntarily given statement free from physical coercion or suggestion. DIFRANCO further falsely testified that he accompanied Plaintiff and defendants MONTILLA and

PAULNITSY to the crime scene so that Plaintiff could "act out" the shooting. This fieldtrip to the crime scene never happened.

**ANSWER:** **The Answering Defendants admit only the testimony of DiFranco as set forth in the trial transcript and deny Plaintiff's characterization of said testimony and further deny that the visit to the crime scene never happened. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

100. Although Plaintiff wanted to testify, his attorney (whose conflict was so disabling that Plaintiff was essentially left without counsel at all) told him that no one would believe him and that he shouldn't testify.

**ANSWER:** **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

101. Based on the foregoing false and fabricated testimony, a jury convicted Plaintiff of two counts of first-degree murder and Plaintiff was sentenced to a prison term of natural life imprisonment.

**ANSWER:** **The Answering Defendants admit that Plaintiff was convicted of two counts of murder; lack knowledge sufficient to admit or deny the term of his sentence; and deny the remaining allegations in this paragraph.**

### Plaintiff's Exoneration

102. Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the 1990 murders of the Wiley brothers.

**ANSWER:** **The Answering Defendants deny that Plaintiff's incarceration and conviction were wrongful, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

103. Plaintiff, through his counsel, filed a successor post-conviction petition, alleging Plaintiff's actual innocence. Plaintiff further claimed that Plaintiff's sixth Amendment right to conflict free counsel was violated when his trial attorney, Richard Beuke, simultaneously represented defendant GUEVARA on unrelated family/child support proceedings.

**ANSWER:** **The Answering Defendants admit, on information and belief, the allegations in this paragraph.**

104. The State agreed that Beuke labored under a *per se* conflict of interest and on October 19, 2016, the State consented to the court vacating Plaintiff's convictions and sentence. The matter was set for a new trial scheduled to commence on November 15, 2017. However, the State moved to *nolle prosequi* all charges against Plaintiff after *all* of the defendant officers indicated that they would plead the Fifth Amendment in response to any questions regarding their investigation of the Wiley brothers' murders.

**ANSWER:** **The Answering Defendants admit, on information and belief, that the State agreed that Beuke had a conflict of interest and moved to *nolle prosequi* all charges against Plaintiff. Further answering, the Answering Defendants deny that *all* the defendant officers indicated that they would assert their Fifth Amendment rights, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

105. After spending 27 years in Illinois Department of Corrections, Plaintiff was released from custody on November 2017.

**ANSWER:** **The Answering Defendants admit, on information and belief, the allegations in this paragraph.**

### Defendants GUEVARA, HALVORSEN and MINGEY's
### History of Framing Innocent Persons

106. Tragically, Plaintiff's wrongful conviction at the hands of defendant GUEVARA and his accomplices, including defendants HALVORSEN and MINGEY, is not an isolated miscarriage of justice. Over the course of two decades, the trio framed literally dozens of other innocent men who have all lodged independent accusations of similar misconduct against him.[2]

**ANSWER:** **The Answering Defendants admit, on information and belief, that other individuals have made allegations of misconduct against Mingey, Halvorsen and Guevara. The Answering Defendants deny the remaining allegations in**

---

[2] https://www.buzzfeed.com/melissasegura/detective-GUEVARAs-witnesses?utm term=.tymQzXk3Yn#.ilhx2y8nb1B

this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

107.    GUEVARA, HALVORSEN, and MINGEY are the subject of an ever-growing number of litigations both in criminal and civil courts.  All three defendants are now refusing to testify about any of their activities as Chicago police officer on grounds that truthful testimony would subject them to criminal liability.

**ANSWER:**    **The Answering Defendants admit, on information and belief, that other individuals have made allegations of misconduct against Mingey, Halvorsen and Guevara. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph**.

108.    Defendant GUEVARA has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, physical coercion of inculpatory statements, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons.  There are dozens of identified cases in which GUEVARA has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as he did in this case.  In many of these cases, detective HALVORSEN worked hand-in-hand with GUEVARA and MINGEY supervised the rogue detectives, approved their investigations, and sometimes played an even more active role in framing suspects.

**ANSWER:**    **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

109.    Given this extensive history, it is apparent that GUEVARA, HALVORSEN, and MINGEY engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline then [sic] for doing so.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

110. Regarding their role in framing Plaintiff, the Defendant Officers have all indicated that they will assert their Fifth Amendment rights to silence when questioned about: whether they physically coerced a court-reported statement from Plaintiff, whether they manipulated, threatened and coerced a statement from Plaintiff's girlfriend, and whether they attributed false oral statements to Plaintiff, and whether they prepared false reports.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph.**

111. On at least seven occasions in the last few years, defendant GUEVARA has invoked his Fifth Amendment right and refused to answer any questions about allegations that he physically coerced suspects and/or manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below. And recently, defendants HALVORSEN and MINGEY have begun asserting their Fifth Amendment rights to refuse to answer questions about their involvement in Area Five investigations, most recently in response to interrogatories propounded to them in the federal civil rights litigation brought by Armando Serrano and Jose Montanez.

**ANSWER:** **The Answering Defendants admit that Guevara, Mingey and Halvorsen have, at times, invoked their Fifth Amendment rights in response to questions about their employment with the Chicago Police Department and that Halvorsen and Mingey so invoked initially in response to interrogatories in the *Montanez* case. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

112.    Bill Dorsch is a former Area Five Chicago police detective.  While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant GUEVARA brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place [sic] of the shooter.

**ANSWER:    The Answering Defendants admit Bill Dorsch is a former Area Five Chicago police detective, but lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

113.    Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter.  While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant GUEVARA pointed to the suspect's photo and told the juvenile "that is him."  The juvenile then agreed with GUEVARA, saying that was the person who committed the shooting.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

114.    Dorsch then directed Defendant GUEVARA to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

115.    Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant GUEVARA being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting.  After prosecutors spoke to the two juveniles, the suspect was released.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

116.     Defendant GUEVARA's activities have drawn the interest of federal law enforcement officers.  In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associated, including defendant GUEVARA.  The report details that defendant GUEVARA, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble."[sic]  According to the report, GUEVARA also took bribes to alter both positive and negative lineups of murder suspects.  Finally, the report states that GUEVARA, using an attorney [Richard Beuke] as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

117.     In 1989, Defendant GUEVARA coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez.  Defendant GUEVARA put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder.  Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

118.     In 1989, Defendant GUEVARA also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

ANSWER:     The Answering Defendants deny the allegations in this paragraph to the
            extent they pertain to them, but lack knowledge or information sufficient to
            admit or deny the remaining allegations in this paragraph.

119.    Juan Johnson was later exonerated and brought suit against Defendant

GUEVARA.  A federal jury found that GUEVARA framed Johnson for murder and awarded

Johnson $21 million in damages.

ANSWER:     The Answering Defendants, upon information and belief, admit that Juan
            Johnson sued Defendant Guevara and that a jury returned a verdict in Juan
            Johnson's favor, deny the allegations in this paragraph to the extent they
            pertain to them, but lack knowledge or information sufficient to admit or
            deny the remaining allegations in this paragraph.

120.    In 1989, Defendant GUEVARA coerced Virgilio Muniz into making a false

identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the

murderer, Muniz would "go down for the murder."

ANSWER:     The Answering Defendants deny the allegations in this paragraph to the
            extent they pertain to them, but lack knowledge or information sufficient to
            admit or deny the remaining allegations in this paragraph.

121.    In 1989, Defendant GUEVARA coerced Virgilio Calderon Muniz (unrelated to

Virgilio Muniz, described in the above paragraph) into making a false identification by telling

him who to identify and making a veiled threat as to what would happen if he did not.

ANSWER:     The Answering Defendants deny the allegations in this paragraph to the
            extent they pertain to them, but lack knowledge or information sufficient to
            admit or deny the remaining allegations in this paragraph.

122.    In 1991, Defendant GUEVARA coerced Wilfredo Rosario into making a false

identification and giving false testimony before the Grand Jury by threatening Rosario that if he

did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder.

GUEVARA fed Rosario details of the crime, such as the number of shots fired, the type of

vehicle used in the crime, and the participants in the crime.  Rosario recanted his identification of

Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court

overturned the conviction based on the lack of sufficient evidence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the**
**extent they pertain to them, but lack knowledge or information sufficient to**
**admit or deny the remaining allegations in this paragraph.**

123. In 1991, Defendant GUEVARA physically coerced sixteen-year-old David

Velazquez into making a false identification and giving false testimony by taking him to a rival

gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for

anything I can" if he did not talk. All of the false details of Velazquez's statement were provided

by GUEVARA.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the**
**extent they pertain to them, but lack knowledge or information sufficient to**
**admit or deny the remaining allegations in this paragraph.**

124. In 1993, Defendant GUEVARA coerced an identification from Carl Richmond by

threatening Richmond that he could make his life very uncomfortable if Richmond did not

identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, was familiar

with GUEVARA's tactics, believed that GUEVARA would honor this threat.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the**
**extent they pertain to them, but lack knowledge or information sufficient to**
**admit or deny the remaining allegations in this paragraph.**

125. In 1995, Defendant GUEVARA arrested Edwin Davila and, in an attempt to

coerce a confession, chained him to the wall of an interrogation room and told him that he was

going to frame him for murder. After Davila told GUEVARA that he did not do it, GUEVARA

forced Davila to participate in a lineup in which two witnesses identified Davila as the

perpetrator, despite the fact that each of those witnesses had previously told the police that they

had not been able to see the shooter.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

126.    In 1991, Defendant GUEVARA told Efrain and Julio Sanchez to pick David Colon out of a lineup.  As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant GUEVARA's misconduct to light.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

127.    In 1995, Defendant GUEVARA coerced Evelyn Diaz into make a false identification and providing false testimony to the Grand Jury by threatening Diaz that is she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

128.    In 1995, Defendant GUEVARA told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything.  Figueroa identified Diaz but recanted his identification at trial.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

129.    In 1995, Defendant GUEVARA coerced Gloria Ortiz Bordoy into making a false statement and testifying against Santos Flores at trial.  During Ortiz Bordoy's six-to-eight-hour interrogation, GUEVAR yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  Finally, without reading its contents, Ortiz Bordoy

signed a statement that the detectives wrote out for her because she just wanted to "get out of

there."

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

130. In 1995, Defendant GUEVARA coerced Rodolfo Zaragoza, who was a victim and

an eyewitness to a crime, into making a false identification and providing false testimony.

Zaragosa was intimidated by GUEVARA and identified Ricardo Rodriguez and the offender

because GUEVARA told him that Rodriguez was the shooter.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

131. In 1995, Defendant GUEVARA engaged in misconduct when he told Jose

Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the

shooter. Melendez identified Sierra but recanted his identification at trial. Thomas Sierra was

exonerated last year but only after serving his enter[sic] sentence .

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

132. In 1996, Defendant GUEVARA coerced Maria Rivera into making a false

identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later

told the prosecutor that she had falsely identified an individual in a lineup at GUEVARA's

direction. The prosecution later abandoned murder charges against the individual whom Rivera

falsely identified in the lineup.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

133.    In 1997, Defendant GUEVARA coerced Robert Ruiz into making a false identification.  GUEVARA detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom.  Though Ruiz kept telling GUEVARA that he had not seen the shooter or the driver involved in the crime, GUEVARA told Ruiz who to identify and what to say in his statement.  Ruiz finally implicated Freddy and Concepcion Santiago in the murder because RUIZ believed that GUEVARA would continue to harass him until he changed his story.  Ruiz recanted his identification at trial, and the judge found Freddy Concepcion Santiago not guilty.  The trial judge found it disturbing that GUEVARA was the lead detective in the case because the victim was his GUEVARA's nephew.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

134.    In 1997, Defendant GUEVARA withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez.  Gomez was accused of firing multiple shots from a car into a crow.  Ruth Antonetty told GUEVARA that she heard multiple shots coming from within the crowd, not from Gomez's vehicle.  GUEVARA continued to pressure her to change her account, and when she would not, he told her he " had other witnesses" and "didn't need her."  As a result, Ariel Gomez did not have access to key *Brady* material at his trial.  Gomez was also exonerated last year.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

135.    In 1998, Defendant GUEVARA used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he

had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial.

Ultimately, the State's Attorney dropped all charges against Rivera. Rivera was awarded a

Certificate of Innocence and his federal civil rights action is currently pending in this Court.

**ANSWER:** **The Answering Defendants admit, on information and belief, that Rivera was convicted of the 1988 murder of Felix Valentin, that Rivera was released from incarceration and received a Certificate of Innocence. The Answering Defendants deny that Lopez testified he had never been able to identify Rivera as the murderer. Further answering, the Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

136. In 1982, Defendant GUEVARA and another officer arrested and physically

assaulted Annie Turner for smoking on a bus. GUEVARA called her a "bitch" and pushed her

out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so

tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing

and called her a "nigger bitch." Turner sough medical treatment and filed a complaint with the

Office of Professional Standards.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

137. In 1982, Defendant GUEVARA and three other officers broke through Almarie

Llyod's locked front door and conducted a warrantless search of her home. When Llyod asked

who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two

children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional

Standards the next day.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

138. In 1983, Defendant GUEVARA and other officers forcibly removed LeShurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was eaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

139. In 1984, Defendant GUEVARA and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. GUEVARA repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was dislocated/broken and she spent, one week in the hospital.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

140. In 1985, Defendant GUEVARA attempted to coerce a false statement from Reynaldo Munoz. GUEVARA handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people GUEVARA was asking about, GUEVARA repeatedly hit him in the mouth with his fist. GUEVARA then took Munoz to rival gang territory where he allowed rival gang members to sit on Munoz and beat Munoz about the head. Munoz was later

47

framed by defendant HALVORSEN for the murder of HALVORSEN induced a false identification from an alleged witness to the shooting.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

141.   In 1986, Defendant GUEVARA threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head.  Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).  Although GUEVARA denied the charge, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head.  After an investigation into the incident, OPS found that GUEVARA had lied about the incident and recommended that GUEVARA be suspended for two days.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

142.   In 1986, Defendant GUEVARA and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation.  Pena was taken to see a doctor where he complained about being beaten by the police.  The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

143.   In 1986, Defendant GUEVARA pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. GUEVARA called Warren a "nigger dog" and "threatened to tear [Warren's] head off."  GUEVARA hit Warren in the face with a

closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that GUEVARA initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that GUEVARA had physically and verbally assaulted him and recommended that GUEVARA be reprimanded.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

144. In 1989, Defendant GUEVARA coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

145. In 1991, Defendant GUEVARA coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. GUEVARA told Rivera that if he confessed, he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. GUEVARA then promised Rivera that if he signed a statement, he could go home.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

146. In 1991, Defendant GUEVARA coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en-route to the police station, GUEVARA threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5,

Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by GUEVARA's partner, Defendant HALVORSEN in the chest and torso. GUEVARA provided details of the crime to Rodriguez to include in Rodriguez's false confession.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

147. In 1992, Defendant GUEVARA engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

148. In 1993, Defendant GUEVARA arrested fifteen-year-old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. GUEVARA also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

149. In 1993, Defendant GUEVARA used physical force and threats to coerce a false confession rom Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant GUEVARA, and beaten by two other officers. Though isolated in a locked interrogation room, Friaz-Munoz could hear his wife screaming and his son crying in another

room.  GUEVARA threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney.  Friaz-Munoz spoke in Spanish and GUEVARA translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

**ANSWER:**  **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

150.  In 1994, Defendant GUEVARA, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement.  When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.  Duta complained to his father of being struck in the head and stomach by GUEVARA.

**ANSWER:**  **The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

151.  In 1994, defendants GUEVARA and HALVORSEN manipulated, coerced and induced false identifications of Robert Almodovar and William Negron from Kennelly Saez and Jacqueline Grande for the murders of Jorge Rodriguez and Amy Merkes.  Saez admitted that GUEVARA showed him and Grande photos of Almodovar and Negron prior to having them view a line-up.  Almodovar and Negron were wrongfully convicted of the murders based on these fabricated eye-witnesses' identifications and sentenced to natural life imprisonment.  Both men were exonerated and received Certificates of Innocence in November 2017.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

152. In 1995, Defendants GUEVARA and HALVORSEN coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his request for an attorney. During the course of the 11-hour interrogation, GUEVARA yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess, he would never see the light of the day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

153. In 1997, Defendant GUEVARA coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by GUEVARA without *Miranda* warning, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

154. In 1998, Defendant GUEVARA repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Rosauro never confessed and was finally released after being held in custody for three days.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

155.    In 1998, Defendant GUEVARA repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

156.    In 1998, Defendant GUEVARA repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement.  After two days of isolation and interrogation, Reyes provided a false statement.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

157.    In 1998, Defendant GUEVARA repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room.  After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing lost to his left ear.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph to the extent they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

158.    Reyes and Solache were also exonerated last year and released from prison. Reyes recently filed a civil rights action in this Court, *Deleon-Reyes v. Guevara, et al*. 18-cv-1028.

**ANSWER:    The Answering Defendants admit, on information and belief,  the allegations in this paragraph.**

### Plaintiff's Damages

159.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct.  Plaintiff faced the risk of being executed for a crime he did not commit and spent 27 years of his life

imprisoned for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family or child again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

**ANSWER:** **The Answering Defendants deny that Plaintiff was incarcerated for 27 years solely for the murders of the Wiley brothers and the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

160. Over the course of his 27 years of imprisonment, Plaintiff was separated from his son who was not even born when he was incarcerated. Plaintiff lost the chance to raise, care for, and mentor his child who was a grown man by the time Plaintiff was released from prison.

**ANSWER:** **The Answering Defendants admit, on information and belief, Plaintiff was incarcerated for 27 years, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

161. As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**COUNT I**
**42 U.S.C. § 1983 – Due Process: False Confession**

162. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

163. In the manner described more fully above, the Police Officer Defendants and Defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff

of committing any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth And Fourteenth Amendments.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

164. In addition, the Police Officer Defendants and defendant DIFRANCO, acting as an investigator and without probable cause to suspect cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

165. Similarly, Defendant DIFRANCO, acting individually, jointly, and in conspiracy with the Police Officer Defendants, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments when he knowingly solicited a physically coerced statement from the Plaintiff that he knew to be false. Indeed, DIFRANCO directly participated in crafting the false statements with the defendant officers that was then fed to the

Plaintiff who will had been overborne by the physical and psychological abuse he incurred at the hands of the Defendant officers.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

166. In addition, the Police Officer Defendants and defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

167. Specifically, Police Officer Defendants and defendant DIFRANCO conducted, participated in, encouraged, advised, and ordered an unconstitutional 24-hour interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the murder of Kevin and Torrence Wiley.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

168. Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff who was forced to regurgitate the statements before a court reporter.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

169.     Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case.  They were the reason the Plaintiff was prosecuted and convicted of the Wiley brothers' murders.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

170.     The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

171.     As a result of Defendants' misconduct described in this County,[sic] Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

172.     The misconduct described in this County[sic] by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT II
### 42 U.S.C. § 1983 – Due Process: Fabrication of Evidence

173.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

174.     As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

175.     In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Rosa Bello implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

176.     The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

177. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murders of the Wiley brothers. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

178. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

179. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

180. The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT III
### 42 U.S.C. § 1983 – *Brady* Violations

181.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

182.    As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

183.    Defendant DIFRANCO, while acting in an investigatory function, also withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction.

**ANSWER:    The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

184.    The Police Officer Defendants and defendant DIFRANCO continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 27 years in prison for a crime he did not commit.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

185.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

186.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

187.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT IV
## 42 U.S.C. § 1983 – Malicious Prosecution

188.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**    **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

189.    In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

**ANSWER:**    **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

190.    The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:**    **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

191.    Similarly, defendant DIFRANCO, acting in an investigatory function, exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probably cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

**ANSWER:**    **The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

192.     In so doing, the Defendant officers and Defendant DIFRANCO caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

193.     The Defendant officers and defendant DIFRANCO subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

194.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

195.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:**   **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

196.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in County VII.

**ANSWER:**   **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy

197.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:**   **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

198.    All of the individual Police Officer Defendants, defendant DIFRANCO, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of confessions, admissions, witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

**ANSWER:**   **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

199.    All of the individual Police Officer Defendants, defendant DIFRANCO, and other

co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst

themselves to deprive Plaintiff of material exculpatory evidence and information to which he

was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's

constitutional rights, and described above.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

200.    In this manner, the Police Officer Defendants and defendant DIFRANCO acting

in concert with other known and unknown co-conspirators conspired to accomplish an unlawful

purpose by an unlawful means.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

201.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts

and was an otherwise willful participant joint activity.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

202.    This misconduct described in the Count was objectively unreasonable and was

undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

203.    As a direct and proximate result of this of this[sic] illicit agreement referenced

above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing

injuries and damages.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

203.    The misconduct described above in this Count by the Defendant officers was

undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner

more fully described below in Count VII.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT VI
## 42 U.S.C. § 1983 – Failure to Intervene

204.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

205.    In the manner described above, one or more of the individual Police Officer

Defendant, defendant DIFRANCO, and other unknown individuals, stood by without intervening

to prevent the alleged constitutional violations, despite having an opportunity to do so.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

206.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

**ANSWER:      The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

207.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**ANSWER:      The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

208.     The misconduct described above in this County by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**ANSWER:      The Answering Defendants deny the allegations in this paragraph as they pertain to them and the practice of the Chicago Police Department more fully described in Count VII, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

### COUNT VII
### 42 U.S.C. § 1983 – *Monell* Policy Claim

**Count VII of Plaintiff's Complaint is not directed at the Answering Defendants, and therefore they answer Count VII only to the extent the allegations herein are adopted and**

re-alleged in other counts of Plaintiff's Complaint.

209.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

210.     The Chicago Police Department is responsible for scores of miscarriages of
justice.  Since 1986, no fewer than 75 documented cases have come to light in which Chicago
Police Detectives amassed "evidence" against an innocent person for a serious crime that he did
not commit.  There are undoubtedly many more such cases that have not yet been discovered.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

211.     The false charges against innocent people include numerous cases in which
Chicago Police Officers used the very same tactics that Defendants GUEVARA, HALVORSEN,
MINGEY, PAULNITSKY, and MONTILLA employed against Plaintiff in this case, including:
(1) physical abuse and coercion to procure an inculpatory statement/confession; (2) concealment
of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications;
and (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other
tactics to secure the arrest, prosecution and conviction of a person without regard to his actual
guilt or innocence of the offense.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

212.     At all times relevant hereto, members of the Chicago Police Department,
including but not limited to the Defendants in this action, systematically used prolonged physical
violence and psychological coercion to force suspects to make false inculpatory and

incriminating statements against themselves.  As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

213.     Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to regurgitate a false and fabricated confession that was later used as the primary piece of evidence against at his trial for the murders of the Wiley brothers.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

214.     At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system.  As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as art of the official file.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

215.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's court-reported statement was involuntary and procured through physical coercion, that Plaintiff's girlfriend's statement was procured through manipulation, threats and coercion, that certain oral statements attributed to the Plaintiff were fabricated and all police reports reflecting that two other suspects (Efrain Cruz and Francisco Veras) were interrogated and allegedly identified as the perpetrators of the Wiley brother's murders.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

216.     At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purposes of influencing their testimony to confirm to a false narrative contrived by the officers themselves.  As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

217.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of Rosa Bello to falsely implicate Plaintiff in the shooting of the Wiley brothers' by threatening to take her children away from her.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

218.     The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient admit or deny the remaining allegations in this paragraph.

219.     Prior to and during 1990, the year in which Plaintiff was falsely charged with the Wiley brothers' murders, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

220.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:** The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and

> customs alleged in this paragraph, but lack knowledge or information
> sufficient to admit or deny the remaining allegations in this paragraph.

221.     As a result of the City of Chicago's established practice of not tracking and

identifying police officers who are repeatedly accused of the same kinds of serious misconduct,

failing to investigate cases in which the police are implicated in a wrongful charge or conviction,

failing to discipline officers accused of serious misconduct and facilitating a code of silence

within the Chicago Police Department, officers (including the Defendants here) have come to

believe that they may violate the civil rights of members of the public and cause innocent

persons to be charged with serious crimes without fear of adverse consequences.  As a result of

these policies and practices of the City of Chicago, members of the Chicago Police Department

act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they
pertain to them and that they acted pursuant to the policies, practices, and
customs alleged in this paragraph, but lack knowledge or information
sufficient to admit or deny the remaining allegations in this paragraph.**

222.     The defendant officers have a long history of engaging in the kind of investigative

misconduct that occurred in this case, including the physical coercion of fabricated confessions,

manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of

maliciously prosecuting innocent persons.  There are approximately 40 known cases in which

GUEVARA and HALVORSEN have engaged in serious investigative misconduct, including

many cases in which they have manipulated and coerced witnesses and fabricated and concealed

evidence, as he did in this case.  Defendants engaged in such misconduct because he had no

reason to fear that the City of Chicago and its Police Department would ever discipline him for

doing so.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they
pertain to them and that they acted pursuant to the policies, practices, and**

**customs alleged in this paragraph, but lack knowledge or information
sufficient to admit or deny the remaining allegations in this paragraph.**

223.     The City of Chicago and its Police Department failed in 1994 and in the years

prior to provide adequate training to Chicago Police Detectives and other officers in any of the

following areas, among others:

a.     The constitutional requirement to disclose exculpatory evidence, including
how to identify such evidence and what steps to take when exculpatory
evidence has been identified in order to ensure that the evidence is made
part of the criminal proceeding.

b.     The need to refrain from manipulation or potentially coercive conduct in
relation to witnesses.

c.     The need to refrain from using physical violence, threats of violence, and
psychological coercion to procure involuntary statements from suspects.

d.     The risks of wrongful conviction and the steps police officers should take
to minimize risks.

e.     The risks of engaging in tunnel vision during investigation.

f.     The need for full disclosure, candor, and openness on the part of all
officers who participate in the police disciplinary process, both as
witnesses and as accused officers, and the need to report misconduct
committed by fellow officers.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they
pertain to them and that they acted pursuant to the policies, practices, and
customs alleged in this paragraph, but lack knowledge or information
sufficient to admit or deny the remaining allegations in this paragraph.**

224.     The need for police officers to be trained in these areas was and remains obvious.

City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph

Proximately caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they
pertain to them and that they acted pursuant to the policies, practices, and
customs alleged in this paragraph, but lack knowledge or information
sufficient to admit or deny the remaining allegations in this paragraph.**

225.    The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendants GUEVARA, HALVORSEN, and MINGEY effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case.  Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

226.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

227.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of the constitutional rights described herein.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

228.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more

interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

     a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

     b.    manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

     c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches:" and otherwise covering up the true nature of those interviews and/or interrogations.

     d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants GUEVARA and HALVORSEN.

     e.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police offices to perjure themselves in criminal cases where they and their fellow officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

229.     The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

230.     As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

231.     The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that they acted pursuant to the policies, practices, and customs alleged in this paragraph, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**COUNT VIII**
**State Law Claim – Malicious Prosecution**

232.     Plaintiff repeats and re-alleges all of the paragraphs n this Complaint as if fully set forth herein.

**ANSWER:** **The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

233.     All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were

instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them and that the underlying criminal proceeding was terminated in a manner indicative of Plaintiff's innocence, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

234. The Defendants accused Plaintiff of murdering the Wiley brothers, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers and defendant DIFRANCO knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

235. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

236. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limier to, emotional distress, as is more fully alleged above.

**ANSWER:** **The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.**

## COUNT IX
## State Law Claim – Civil Conspiracy

237.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

238.     As described more fully in the preceding paragraphs, the individual Defendant officers and defendant DIFRANCO acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

239.     In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

240.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

241.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

WHEREFORE, the Answering Defendants request judgment in their favor and against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT X
### State Law Claim – Intentional Infliction of Emotional Distress

242.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

243.     The acts and conduct of the individual Defendants as set forth above were extreme and outrageous.  The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever[sic], emotional distress to Plaintiff.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein. The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

244.     The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

245.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**ANSWER:     The Answering Defendants deny the allegations in this paragraph as they pertain to them, but lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

246.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered

injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**ANSWER:    The Answering Defendants deny the allegations in this paragraph as they
pertain to them, but lack knowledge or information sufficient to admit or
deny the remaining allegations in this paragraph.**

**WHEREFORE, the Answering Defendants request judgment in their favor and
against the Plaintiff, costs of suit and attorneys' fees, and such other relief as the Court
deems appropriate.**

## COUNT XI
### State Law Claim- *Respondeat Superior*

**Count XI of Plaintiff's Complaint is not directed at the Answering Defendants, and
therefore they answer Count XI only to the extent the allegations herein are adopted and
re-alleged in other counts of Plaintiff's Complaint.**

247.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully
set forth herein.

**ANSWER:    The Answering Defendants hereby reincorporate and reassert their answers
to the foregoing paragraphs of this complaint as though fully set forth herein.**

248     When they committed the acts alleged in this Complaint, the individual

Defendant officers were members and agents of the Chicago Police Department, an agency of

the City of Chicago, acting at all relevant times within the scope of their employment and under

color of law.

**ANSWER:    The Answering Defendants admit that the individual Defendant Officers
were members and agents of the Chicago Police Department, an
agency of the City of Chicago, during the relevant times set forth in Plaintiff's
Complaint and further admit that they were acting in the scope of their
employment and under color of law. The Answering Defendants deny the
remaining allegations in this paragraph as they pertain to them, but
otherwise lack knowledge or information sufficient to admit or deny the
remaining allegations in this paragraph.**

249.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:     The Answering Defendants deny they committed any torts and deny that this is a correct or complete statement of the law.**

## COUNT XI (sic)
## State Law Claim – Indemnification

**Count XII of Plaintiff's Complaint is not directed at the Answering Defendants, and therefore they answer Count XII only to the extent the allegations herein are adopted and re-alleged in other counts of Plaintiff's Complaint.**

250.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**ANSWER:     The Answering Defendants hereby reincorporate and reassert their answers to the foregoing paragraphs of this complaint as though fully set forth herein.**

251.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

**ANSWER:     The Answering Defendants, upon information and belief, admit that Illinois law requires public entities to pay any tort judgment for compensatory damages awarded against its employees acting within the scope of their employment activities. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

252.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:     The Answering Defendants admit that the individual Defendant Officers were employees of the Chicago Police Department, an agency of the City of Chicago, and that they acted in the scope of their employment at all relevant**

**times in the Complaint. The Answering Defendants deny the remaining allegations in this paragraph as they pertain to them, but otherwise lack knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.**

253.     Defendant Cook County is responsible for any judgment entered against

defendant DIFRANCO.

**ANSWER:     The Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in this paragraph.**

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

At all times material hereto, Answering Defendants were law enforcement officers who performed discretionary functions.  A reasonable law enforcement officer objectively viewing the facts and circumstances that confronted Answering Defendants could have believed his actions to be lawful, in light of clearly established law.  Answering Defendants are therefore entitled to qualified immunity on Plaintiff's federal claims.

### Second Affirmative Defense

Plaintiff fails to state a claim for "federal malicious prosecution" in Count IV.

### Third Affirmative Defense

Plaintiff's claim under Illinois law for intentional infliction of emotional distress is barred by the one-year statute of limitations under the Illinois Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101, because it was not filed within one year after it accrued.

### Fourth Affirmative Defense

Answering Defendants are absolutely immune from civil liability for any claim alleged based on their testimony given in judicial proceedings in plaintiff's underlying criminal case.

*Rehberg v. Paulk*, 566 U.S. 356 (2012); *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Jurgensen v. Haslinger*, 295 Ill.App.3d 139; 692 N.E.2d 347 (3rd Dist. 1998).

### Fifth Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because at all times relevant to this complaint they were public employees, namely police detectives and sergeants, who were engaged in the execution and enforcement of the law, and none of their acts or omissions in the execution or enforcement of any law constituted willful and wanton conduct. 745 ILCS 10/2-202.

### Sixth Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person. 745 ILCS 10/2-204.

### Seventh Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because their alleged decisions regarding the investigation and the arrest of Plaintiff were decisions that involved the determination of policy and the exercise of discretion for which they are immune from liability. 745 ILCS 10/2-201.

### Eighth Affirmative Defense

As to the state law claims, the Answering Defendants are not liable for any of the claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

### Ninth Affirmative Defense

As to the state law claim of Intentional Infliction of Emotional Distress, Punitive damages cannot be awarded for this claim based on Illinois law. *Knierim v. Izzo*, 22 Ill. 2d 73 (1961).

### Tenth Affirmative Defense

As to the state law claims, Punitive damages cannot be awarded for these claims because the Illinois Governmental Tort Immunity Act does not allow punitive damages. 745 ILCS 10/2-102.

### Eleventh Affirmative Defense

Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff are required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

### Twelfth Affirmative Defense

Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations.

### JURY DEMAND

The Answering Defendants request a trial by jury.

Dated: July 2, 2020            /s/ *Josh M. Engquist* _____
                                        JOSH M. ENGQUIST, Attorney No. 06242849
                                        Special Assistant Corporation Counsel

                                        James G. Sotos
                                        Jeffrey N. Given
                                        Caroline P. Golden
                                        Josh M. Engquist
                                        David A. Brueggen
                                        Special Assistant Corporation Counsel
                                        **THE SOTOS LAW FIRM, P.C.**
                                        141 W. Jackson, Suite 1240A
                                        Chicago, Illinois 60604
                                        Tel: (630) 735-3300
                                        jengquist@jsotoslaw.com
                                        *One of the Attorneys for Individual Defendants*

## CERTIFICATE OF SERVICE

I certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746, that on July 2, 2020, I electronically filed foregoing **Defendants Joann Halvorsen, Edward Mingey, Lee Epplen, Fernando Montilla, and Roland Paulnitsky's Answer to Plaintiff's Amended Complaint** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the below service list.

***Attorneys for Plaintiff:***
Jennifer A. Bonjean
Ashley B. Cohen
100 Dean Street, Suite 422
Brooklyn, NY 11238
(718) 875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd.
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

***Attorneys for Cook County Defendants:***
Edward M. Brener
David Adelman
Cook County State's Attorney's Office
50 W. Washington St., Room 500
Chicago, IL 60602
(312) 603-3369
edward.brener@cookcountyil.gov
david.adelman@cookcountyil.gov

***Attorneys for City of Chicago:***
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Rusco & Connelly, LLC
312 N. Clark, Suite 2200
Chicago, IL 60654
(312) 494-1000
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

***Attorneys for Defendant Guevara:***
James V. Daffada
Thomas M. Leinenweber
Kevin E. Zibolski
Justin L. Leinenweber
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
jim@ilesq.com
thomas@ilesq.com
kevin@ilesq.com
justin@ilesq.com

/s/ *Josh M. Eng*quist
JOSH M. ENGQUIST

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS            NUMBER 92CR1014601

     JOSE      MAYSONET

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

Charging the above named defendant with:

     38-9-1-A(1)                    F M    MURDER
     38-9-1-A(2)                    F M    MURDER
     38-9-1-A(1)                    F M    MURDER
     38-9-1-A(2)                    F M    MURDER
The following disposition(s) was/were rendered before the Honorable Judge(s):


05/07/92 IND/INFO-CLK OFFICE-PRES JUDGE      06/09/92 1701
06/09/92 CASE ASSIGNED                       06/09/92 1702
      LOCALLO, DANIEL M.
06/09/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
06/09/92 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
06/09/92 DEFENDANT ARRAIGNED
      MORGAN, LORETTA HALL
06/09/92 PLEA OF NOT GUILTY
      MORGAN, LORETTA HALL
06/09/92 ADMONISH AS TO TRIAL IN ABSENT
      MORGAN, LORETTA HALL
06/09/92 CONTINUANCE BY AGREEMENT            06/11/92
      MORGAN, LORETTA HALL
06/11/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
06/11/92 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
06/11/92 WITNESSES ORDERED TO APPEAR         06/11/92 1702
      MORGAN, LORETTA HALL
06/11/92 CONTINUANCE BY AGREEMENT            08/06/92
      MORGAN, LORETTA HALL
08/06/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
08/06/92 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL

JGS_MAYSONET 01306

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 002

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/06/92 WITNESSES ORDERED TO APPEAR          08/06/92
     MORGAN, LORETTA HALL
08/06/92 CONTINUANCE BY AGREEMENT          09/10/92
     MORGAN, LORETTA HALL
09/10/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/10/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/10/92 CONTINUANCE BY AGREEMENT          09/22/92
     MORGAN, LORETTA HALL
09/22/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/22/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/22/92 CONTINUANCE BY AGREEMENT          10/02/92
     MORGAN, LORETTA HALL
10/02/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
10/02/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
10/02/92 CONTINUANCE BY AGREEMENT          11/05/92
     MORGAN, LORETTA HALL
11/05/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/05/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/05/92 MOTION TO WITHDRAW                    S        2
     ATTY SPECTOR
     MORGAN, LORETTA HALL
11/05/92 APPEARANCE FILED
     MORGAN, LORETTA HALL
11/05/92 CONTINUANCE BY AGREEMENT          11/24/92
     MORGAN, LORETTA HALL
11/24/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/24/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL

JGS_MAYSONET 01307

```
            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 003

        PEOPLE OF THE STATE OF ILLINOIS

                        VS                  NUMBER 92CR1014601

        JOSE        MAYSONET

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
11/24/92 CONTINUANCE BY AGREEMENT              12/03/92
       MORGAN, LORETTA HALL
12/03/92 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
12/03/92 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
12/03/92 CONTINUANCE BY AGREEMENT              12/18/92
       MORGAN, LORETTA HALL
12/18/92 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
12/18/92 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
12/18/92 CONTINUANCE BY AGREEMENT              02/05/93
       MORGAN, LORETTA HALL
02/05/93 DEFENDANT IN CUSTODY
02/05/93 PRISONER DATA SHEET TO ISSUE
02/05/93 WITNESSES ORDERED TO APPEAR           02/05/93 1702
02/05/93 CONTINUANCE BY AGREEMENT              03/11/93
03/11/93 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
03/11/93 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
03/11/93 CONTINUANCE BY AGREEMENT              05/06/93
       MORGAN, LORETTA HALL
05/06/93 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
05/06/93 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
05/06/93 CONTINUANCE BY AGREEMENT              06/29/93
       MORGAN, LORETTA HALL
06/29/93 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
06/29/93 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
06/29/93 CONTINUANCE BY AGREEMENT              08/23/93
       MORGAN, LORETTA HALL
08/23/93 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
```

JGS_MAYSONET 01308

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 004

PEOPLE OF THE STATE OF ILLINOIS

VS                        NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/23/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
08/23/93 WITNESSES ORDERED TO APPEAR          08/23/93 1702
        MORGAN, LORETTA HALL
08/23/93 CONTINUANCE BY AGREEMENT             09/29/93
        MORGAN, LORETTA HALL
09/29/93 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
09/29/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
09/29/93 CONTINUANCE BY AGREEMENT             10/06/93
        MORGAN, LORETTA HALL
10/06/93 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
10/06/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
10/06/93 WITNESSES ORDERED TO APPEAR          10/06/93 1702
        MORGAN, LORETTA HALL
10/06/93 CONTINUANCE BY AGREEMENT             12/15/93
        MORGAN, LORETTA HALL
12/15/93 DEFENDANT IN CUSTODY
12/15/93 PRISONER DATA SHEET TO ISSUE
12/15/93 WITNESSES ORDERED TO APPEAR          12/15/93 1702
12/15/93 CONTINUANCE BY AGREEMENT             12/17/93
12/17/93 DEFENDANT IN CUSTODY
12/17/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
12/17/93 CONTINUANCE BY AGREEMENT             01/07/94
        MORGAN, LORETTA HALL
01/07/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
01/07/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
01/07/94 WITNESSES ORDERED TO APPEAR          01/07/94 1702
        MORGAN, LORETTA HALL
01/07/94 MOTION DEFT - CONTINUANCE - MD       02/18/94
        MORGAN, LORETTA HALL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 005

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE          MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/18/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
02/18/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
02/18/94 CONTINUANCE BY AGREEMENT                03/14/94
        MORGAN, LORETTA HALL
03/14/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
03/14/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
03/14/94 WITNESSES ORDERED TO APPEAR             03/14/94 1702
        MORGAN, LORETTA HALL
03/14/94 CONTINUANCE BY AGREEMENT                04/25/94
        MORGAN, LORETTA HALL
04/25/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
04/25/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
04/25/94 WITNESSES ORDERED TO APPEAR             04/25/94 1702
        MORGAN, LORETTA HALL
04/25/94 CONTINUANCE BY AGREEMENT                05/23/94
        MORGAN, LORETTA HALL
05/23/94 DEFENDANT IN CUSTODY
05/23/94 PRISONER DATA SHEET TO ISSUE
05/23/94 WITNESSES ORDERED TO APPEAR             05/23/94 1702
05/23/94 CONTINUANCE BY AGREEMENT                06/28/94
06/28/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
06/28/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
06/28/94 WITNESSES ORDERED TO APPEAR             06/28/94 1702
        MORGAN, LORETTA HALL
06/28/94 CONTINUANCE BY AGREEMENT                08/15/94
        MORGAN, LORETTA HALL
06/28/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
06/28/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL

JGS_MAYSONET 01310

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 006

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE          MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/28/94 WITNESSES ORDERED TO APPEAR          06/28/94 1702
     MORGAN, LORETTA HALL
06/28/94 CONTINUANCE BY AGREEMENT          08/15/94
     MORGAN, LORETTA HALL
08/15/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
08/15/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
08/15/94 CONTINUANCE BY AGREEMENT          08/25/94
     MORGAN, LORETTA HALL
08/25/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
08/25/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
08/25/94 CONTINUANCE BY AGREEMENT          09/07/94 1702
     MORGAN, LORETTA HALL
09/07/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/07/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/07/94 CONTINUANCE BY AGREEMENT          09/22/94
     MORGAN, LORETTA HALL
09/22/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/22/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/22/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
09/22/94 CONTINUANCE BY AGREEMENT          10/18/94
     MORGAN, LORETTA HALL
10/18/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
10/18/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
10/18/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
10/18/94 CONTINUANCE BY AGREEMENT          10/24/94
     MORGAN, LORETTA HALL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 007

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/24/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
10/24/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
10/24/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
10/24/94 CONTINUANCE BY AGREEMENT              11/03/94
     MORGAN, LORETTA HALL
11/03/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/03/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/03/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
11/03/94 CONTINUANCE BY AGREEMENT              12/12/94
     MORGAN, LORETTA HALL
12/12/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
12/12/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
12/12/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
12/12/94 CONTINUANCE BY AGREEMENT              01/10/95
     MORGAN, LORETTA HALL
01/10/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
01/10/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
01/10/95 MOTION TO QUASH ARREST                     D       2
     MORGAN, LORETTA HALL
01/10/95 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
01/10/95 CONTINUANCE BY AGREEMENT              01/24/95
     MORGAN, LORETTA HALL
01/24/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
01/24/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL

JGS_MAYSONET 01312

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 008

PEOPLE OF THE STATE OF ILLINOIS

VS                        NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/24/95 WITNESSES ORDERED TO APPEAR
       MORGAN, LORETTA HALL
01/24/95 CONTINUANCE BY AGREEMENT            01/25/95
       MORGAN, LORETTA HALL
01/25/95 DEFENDANT IN CUSTODY
       HETT, THOMAS A.
01/25/95 PRISONER DATA SHEET TO ISSUE
       HETT, THOMAS A.
01/25/95 CONTINUANCE BY AGREEMENT            01/31/95
       HETT, THOMAS A.
01/31/95 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
01/31/95 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
01/31/95 MOTION TO SUPPRESS                          D        2
       STATEMENT
       MORGAN, LORETTA HALL
01/31/95 CONTINUANCE BY AGREEMENT            02/06/95
       MORGAN, LORETTA HALL
02/06/95 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
02/06/95 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
02/06/95 MOTION TO WITHDRAW AS ATTORNEY              S        2
       MORGAN, LORETTA HALL
02/06/95 WITNESSES ORDERED TO APPEAR
       MORGAN, LORETTA HALL
02/06/95 CONTINUANCE BY AGREEMENT            05/08/96
       MORGAN, LORETTA HALL
06/26/95 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
06/26/95 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
06/26/95 CONTINUANCE BY AGREEMENT            08/08/95
       MORGAN, LORETTA HALL
08/08/95 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL

JGS_MAYSONET 01313

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 009

PEOPLE OF THE STATE OF ILLINOIS

VS       NUMBER 92CR1014601

JOSE       MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/08/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
08/08/95 JURY IMPANELED AND SWORN
      MORGAN, LORETTA HALL
08/08/95 WITNESSES ORDERED TO APPEAR       08/08/95
      MORGAN, LORETTA HALL
08/08/95 CONTINUANCE BY AGREEMENT       08/09/95
      MORGAN, LORETTA HALL
08/09/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
08/09/95 WITNESSES ORDERED TO APPEAR       08/09/95
      MORGAN, LORETTA HALL
08/09/95 CONTINUANCE BY ORDER OF COURT       08/10/95
      MORGAN, LORETTA HALL
08/10/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
08/10/95 CONTINUANCE BY ORDER OF COURT       08/11/95
      MORGAN, LORETTA HALL
08/10/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
08/10/95 WITNESSES ORDERED TO APPEAR
      MORGAN, LORETTA HALL
08/10/95 CONTINUANCE BY ORDER OF COURT       08/11/95
      MORGAN, LORETTA HALL
08/11/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
08/11/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
08/11/95 FINDING OF GUILTY       C001
      MORGAN, LORETTA HALL
08/11/95 FINDING OF GUILTY       C002
      MORGAN, LORETTA HALL
08/11/95 FINDING OF GUILTY       C003
      MORGAN, LORETTA HALL
08/11/95 FINDING OF GUILTY       C004
      MORGAN, LORETTA HALL
08/11/95 PRE-SENT INVEST. ORD, CONTD TO       08/11/95
      MORGAN, LORETTA HALL

JGS_MAYSONET 01314

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 010

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 92CR1014601

JOSE          MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/11/95 BAIL REVOKED
      MORGAN, LORETTA HALL
08/11/95 CONTINUANCE BY ORDER OF COURT          09/08/95
      MORGAN, LORETTA HALL
09/08/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
09/08/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
09/08/95 MOTION DEFENDANT - NEW TRIAL                    E        2
      MORGAN, LORETTA HALL
09/08/95 CONTINUANCE BY AGREEMENT          09/28/95
      MORGAN, LORETTA HALL
09/28/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
09/28/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
09/28/95 CONTINUANCE BY AGREEMENT          10/06/95
      MORGAN, LORETTA HALL
10/06/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
10/06/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
10/06/95 CONTINUANCE BY AGREEMENT          10/16/95
      MORGAN, LORETTA HALL
10/16/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
10/16/95 MOTION DEFENDANT - NEW TRIAL                    D        2
      MORGAN, LORETTA HALL
10/16/95 DEF SENT TO LIFE IMPRISONMENT     C001
      LIFE IMPRISONMENT
      MORGAN, LORETTA HALL
10/16/95 DEF SENT TO LIFE IMPRISONMENT     C003
      LIFE IMPRISONMENT
      MORGAN, LORETTA HALL
10/16/95 LET MITTIMUS ISSUE/MITT TO ISS
      MORGAN, LORETTA HALL
10/16/95 DEF ADVISED OF RIGHT TO APPEAL
      MORGAN, LORETTA HALL

JGS_MAYSONET 01315

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 011

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/16/95 SENTENCE TO RUN CONCURRENT
    CONCURRENT W/90CR18419
    MORGAN, LORETTA HALL
10/16/95 NOTICE OF APPEAL FILED, TRNSFR
    MORGAN, LORETTA HALL
10/16/95 ILL STATE APPELLATE DEF APPTD
    MORGAN, LORETTA HALL
10/16/95 NOTICE OF APPEAL FILED, TRNSFR
10/17/95 NOTICE OF NOTICE OF APP MAILED
10/17/95 CONTINUANCE BY ORDER OF COURT              10/20/95 1713
10/20/95 ILL STATE APPELLATE DEF APPTD
10/20/95 O/C FREE REPT OF PROCD ORD N/C
10/20/95 MEMO OF ORDS & NOA PICKED-UP
10/24/95 APPELLATE COURT NUMBER ASGND                     95-3642
11/01/95 REPT OF PRCDS ORD FR CRT RPT
03/15/96 TRANS PROC REC/FILED CLKS OFF
03/21/96 REPORT OF PROCEEDINGS PREPARED
03/21/96 COMMON LAW RECORD PREPARED
03/21/96 COMMON LAW RECORD PREPARED
03/21/96 REPORT OF PROCEEDINGS PREPARED
04/04/96 CLR RECD BY APP COUNSEL
    STATE APPELLATE DEFENDER
04/04/96 REPRT/PROCDS RECD BY APP ATTRY
    STATE APPELLATE DEFENDER
04/11/96 SUPPL REPORT OF PRCD PREPARED
04/16/96 SUPPL REC RECD BY APPL COUNSEL
    STATE APPELLATE DEFENDER
04/22/96 REPT OF PRCDS ORD FR CRT RPT
08/01/96 SUPP TRAN PRO REC/FILE CLK OFF
08/02/96 SUPPL REPORT OF PRCD PREPARED
08/15/96 SUPPL REC RECD BY APPL COUNSEL
    STATE APPELLATE DEFENDER
10/17/96 REPT OF PRCDS ORD FR CRT RPT
11/27/96 SUPP TRAN PRO REC/FILE CLK OFF
12/03/96 SUPPL REPORT OF PRCD PREPARED
12/10/96 SUPPL REC RECD BY APPL COUNSEL
    SAD

JGS_MAYSONET 01316

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS       Page 012

PEOPLE OF THE STATE OF ILLINOIS

                    VS            NUMBER 92CR1014601

     JOSE       MAYSONET

     CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

     I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/25/97 REPT OF PRCDS ORD FR CRT RPT
03/27/97 SUPP TRAN PRO REC/FILE CLK OFF
04/02/97 SUPPL REPORT OF PRCD PREPARED
04/08/97 SUPPL REC RECD BY APPL COUNSEL
     STATE APPELLATE DEFENDER
08/20/97 MANDATE FILED                         08/28/97 1701
08/28/97 REVIEW COURT AFFIRMANCE
     HABERKORN, CATHERINE M.
03/13/98 MANDATE FILED                         03/26/98 1701
03/26/98 REVIEW COURT AFFIRMANCE
     WOOD, WILLIAM S.
05/03/06 POST-CONVICTION FILED                 00/00/00
05/03/06 HEARING DATE ASSIGNED                 05/09/06 1701
05/09/06 CASE ASSIGNED                         05/09/06 1702
     BIEBEL, PAUL JR.
05/09/06 DEFENDANT NOT IN COURT                00/00/00
     JONES, RICKEY
05/09/06 CONTINUANCE BY ORDER OF COURT         05/15/06
     JONES, RICKEY
05/15/06 DEFENDANT NOT IN COURT                00/00/00
     JONES, RICKEY
05/15/06 CONTINUANCE BY ORDER OF COURT         05/24/06
     JONES, RICKEY
05/16/06 DEFENDANT NOT IN COURT                00/00/00
     JONES, RICKEY
05/16/06 CONTINUANCE BY ORDER OF COURT         06/08/06
     JONES, RICKEY
06/08/06 DEFENDANT NOT IN COURT                00/00/00
     JONES, RICKEY
06/08/06 PUBLIC DEFENDER APPOINTED             00/00/00
     JONES, RICKEY
06/08/06 SPECIAL ORDER                         00/00/00
     CASE DOCKETED99
     JONES, RICKEY
06/08/06 CONTINUANCE BY ORDER OF COURT         06/29/06
     JONES, RICKEY
06/29/06 DEFENDANT NOT IN COURT                00/00/00
     JONES, RICKEY

JGS_MAYSONET 01317

```
            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 013

        PEOPLE OF THE STATE OF ILLINOIS

                        VS                  NUMBER 92CR1014601

        JOSE        MAYSONET

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/29/06 CONTINUANCE BY AGREEMENT            09/13/06
      JONES, RICKEY
08/28/06 SPECIAL ORDER                       00/00/00 F      2
      MOTION-SUPPLEMENTAL P.C.PETITION.
08/28/06 HEARING DATE ASSIGNED               09/01/06 1702
09/01/06 DEFENDANT ON BOND                   00/00/00
      EGAN, JAMES D.
09/01/06 CONTINUANCE BY AGREEMENT            09/22/06
      EGAN, JAMES D.
09/22/06 CONTINUANCE BY ORDER OF COURT       09/29/06
      JONES, RICKEY
09/29/06 CONTINUANCE BY ORDER OF COURT       10/02/06
      JONES, RICKEY
10/02/06 DEFENDANT NOT IN COURT              00/00/00
      JONES, RICKEY
10/02/06 CONTINUANCE BY ORDER OF COURT       12/14/06
      JONES, RICKEY
12/14/06 DEFENDANT ON BOND                   00/00/00
      JONES, RICKEY
12/14/06 CONTINUANCE BY AGREEMENT            03/22/07
      JONES, RICKEY
03/22/07 DEFENDANT NOT IN COURT              00/00/00
      JONES, RICKEY
03/22/07 CONTINUANCE BY AGREEMENT            06/14/07
      JONES, RICKEY
06/14/07 CONTINUANCE BY AGREEMENT            09/27/07
      CLAY, EVELYN B.
09/27/07 DEFENDANT NOT IN COURT              00/00/00
      JONES, RICKEY
09/27/07 MOTION DEFT - CONTINUANCE - MD      12/20/07
      JONES, RICKEY
12/20/07 DEFENDANT NOT IN COURT              00/00/00
      FORD, NICHOLAS R.
12/20/07 MOTION DEFT - CONTINUANCE - MD      01/11/08
      FORD, NICHOLAS R.
01/11/08 MOTION DEFT - CONTINUANCE - MD      04/10/08
      JONES, RICKEY
```

JGS_MAYSONET 01318

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 014

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR1014601

     JOSE          MAYSONET

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

     I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/10/08 DEFENDANT ON BOND                          00/00/00
         JONES, RICKEY
04/10/08 MOTION DEFT - CONTINUANCE - MD             07/10/08
         JONES, RICKEY
07/10/08 DEFENDANT NOT IN COURT                     00/00/00
         JONES, RICKEY
07/10/08 MOTION DEFT - CONTINUANCE - MD             10/02/08
         JONES, RICKEY
10/02/08 DEFENDANT NOT IN COURT                     00/00/00
         JONES, RICKEY
10/02/08 MOTION DEFT - CONTINUANCE - MD             12/18/08
         JONES, RICKEY
12/18/08 DEFENDANT NOT IN COURT                     00/00/00
         JONES, RICKEY
12/18/08 PUBLIC DEFENDER APPOINTED                  00/00/00
         JONES, RICKEY
12/18/08 MOTION DEFT - CONTINUANCE - MD             02/24/09
         JONES, RICKEY
02/24/09 DEFENDANT NOT IN COURT                     00/00/00
         JONES, RICKEY
02/24/09 PUBLIC DEFENDER APPOINTED                  00/00/00
         JONES, RICKEY
02/24/09 MOTION DEFT - CONTINUANCE - MD             05/28/09
         JONES, RICKEY
05/28/09 DEFENDANT NOT IN COURT                     00/00/00
         JONES, RICKEY
05/28/09 PUBLIC DEFENDER APPOINTED                  00/00/00
         JONES, RICKEY
05/28/09 MOTION DEFT - CONTINUANCE - MD             07/22/09
         JONES, RICKEY
07/22/09 DEFENDANT NOT IN COURT                     00/00/00
         JONES, RICKEY
07/22/09 PUBLIC DEFENDER APPOINTED                  00/00/00
         DEFT. FILE PET. FOR  P.C.R AND 651 (C) CERTICATE
         JONES, RICKEY
07/22/09 CONTINUANCE BY ORDER OF COURT              10/22/09
         JONES, RICKEY

JGS_MAYSONET 01319

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 015

PEOPLE OF THE STATE OF ILLINOIS

VS        NUMBER 92CR1014601

JOSE       MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

  I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/22/09 DEFENDANT NOT IN COURT
     JONES, RICKEY
10/22/09 SPECIAL ORDER                 00/00/00
     STATE FILES MOTION TO DISMISS
     JONES, RICKEY
10/22/09 MOTION DEFT - CONTINUANCE - MD     01/07/10
     JONES, RICKEY
11/10/09 CLR RETURNED CLKS OFF/WAREHOUS    00/00/00 95-3642
     1 VOL, 2 SUPP VOL
11/10/09 REPT OF PROCD RETD CLKS OFF/WH    00/00/00 95-3642
     7 VOL
01/07/10 SPECIAL ORDER                 00/00/00
     DEF FILES RESPONSE TO STATES MTN TO DISMISS
     JONES, RICKEY
01/07/10 CONTINUANCE BY AGREEMENT       02/24/10
     ARGUMEBTS & RULING
     JONES, RICKEY
02/24/10 CONTINUANCE BY AGREEMENT       03/03/10
     JONES, RICKEY
03/03/10 SPECIAL ORDER                 00/00/00
     HRG HELD ON STATES MOTION TO DISMISS
     JONES, RICKEY
03/03/10 POST-CONV PETITION DISMISSED     00/00/00
     JONES, RICKEY
03/03/10 NOTICE OF APPEAL FILED, TRNSFR    00/00/00
     JONES, RICKEY
03/03/10 CHANGE PRIORITY STATUS     M   00/00/00
     JONES, RICKEY
03/03/10 NOTICE OF APPEAL FILED, TRNSFR    03/03/10
03/04/10 NOTICE OF NOTICE OF APP MAILED    00/00/00
03/04/10 HEARING DATE ASSIGNED         03/12/10 1713
03/04/10 NOTIFICATION SENT TO DEFENDANT    00/00/00
03/12/10 ILL STATE APPELLATE DEF APPTD    00/00/00
     BIEBEL, PAUL JR.
03/12/10 O/C FREE REPT OF PROCD ORD N/C   00/00/00
     BIEBEL, PAUL JR.
03/12/10 MEMO OF ORDS & NOA PICKED-UP    00/00/00
     BIEBEL, PAUL JR.

JGS_MAYSONET 01320

```
        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 016

     PEOPLE OF THE STATE OF ILLINOIS

                     VS              NUMBER 92CR1014601

     JOSE        MAYSONET

         CERTIFIED STATEMENT OF CONVICTION / DISPOSITION


   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
03/22/10 APPELLATE COURT NUMBER ASGND          00/00/00 10-0701
03/24/10 COMMON LAW RECORD PREPARED            00/00/00 10-0701
     ONE (1) VOLUME
03/25/10 CLR RECD BY APP COUNSEL               00/00/00 10-0701
     STATE APPELLATE DEFENDER - ONE VOLUME
04/07/10 REPT OF PRCDS ORD FR CRT RPT          00/00/00
04/06/10 SPECIAL ORDER                         00/00/00 95-3642
     SAD RECD 1 VOL CLR, 1 VOL SUPP CLR, 7 VOL ROP, 1 VOL SUPP ROP
07/23/10 TRANS PROC REC/FILED CLKS OFF         00/00/00
     ONE VOLUME
08/03/10 REPORT OF PROCEEDINGS PREPARED        00/00/00 10-0701
     ONE VOLUME
08/04/10 REPRT/PROCDS RECD BY APP ATTRY        00/00/00 10-0071
     STATE APPELLATE DEFENDER - ONE VOLUME
07/15/11 POST-CONVICTION FILED                 00/00/00
07/15/11 MOTION APPT ATTY - FILED              00/00/00
07/15/11 HEARING DATE ASSIGNED                 07/22/11 1702
07/22/11 DEFENDANT NOT IN COURT                00/00/00
     JONES, RICKEY
07/22/11 CONTINUANCE BY ORDER OF COURT         08/01/11
     JONES, RICKEY
08/01/11 DEFENDANT ON BOND                     00/00/00
     JONES, RICKEY
08/01/11 CONTINUANCE BY ORDER OF COURT         08/29/11
     JONES, RICKEY
08/29/11 CONTINUANCE BY ORDER OF COURT         08/30/11
     JONES, RICKEY
08/30/11 SPECIAL ORDER                         00/00/00
     DEFT. PET. FOR PCR-DENIE CLERK TO MAIL DEFT A COPY OF ORDER WITHIN 10 DAY
     JONES, RICKEY
09/12/11 NOTIFICATION SENT TO DEFENDANT        00/00/00
10/03/11 MANDATE FILED                         10/13/11 1776
     10-0701
10/03/11 NOTICE OF APPEAL FILED, TRNSFR        08/30/11
10/06/11 NOTICE OF NOTICE OF APP MAILED        00/00/00
10/06/11 HEARING DATE ASSIGNED                 10/14/11 1713
10/11/11 CLR RETURNED CLKS OFF/WAREHOUS        00/00/00 10-0701
     1 VOL
```

JGS_MAYSONET 01321

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 017

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR1014601

JOSE          MAYSONET

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/11/11 REPT OF PROCD RETD CLKS OFF/WH         00/00/00 10-0701
     1 VOL
10/11/11 CLR RETURNED CLKS OFF/WAREHOUS         00/00/00 95-3642
     1 VOL, 1 SUPP VOL
10/11/11 REPT OF PROCD RETD CLKS OFF/WH         00/00/00 95-3642
     7 VOL, 1 SUPP VOL
10/13/11 REVIEW COURT AFFIRMANCE                00/00/00
     BIEBEL, PAUL JR.
10/13/11 MOTION TO WITHDRAW AS ATTORNEY         00/00/00 S
     STATE APPELLATE DEFENDER
     BIEBEL, PAUL JR.
10/14/11 ILL STATE APPELLATE DEF APPTD          00/00/00
     BIEBEL, PAUL JR.
10/14/11 O/C FREE REPT OF PROCD ORD N/C         00/00/00
     BIEBEL, PAUL JR.
10/14/11 MEMO OF ORDS & NOA PICKED-UP           00/00/00
     BIEBEL, PAUL JR.
11/15/11 APPELLATE COURT NUMBER ASGND           00/00/00 11-3102
12/06/11 REPT OF PRCDS ORD FR CRT RPT           00/00/00
12/07/11 COMMON LAW RECORD PREPARED             00/00/00 11-3102
     ONE VOLUME
12/13/11 SPECIAL ORDER                          00/00/00 95-3642
     SAD RECD 1 VOL CLR, 1VOL SUPP CLR, 7 VOL ROP, 1 VOL SUPP ROP
12/13/11 SPECIAL ORDER                          00/00/00 10-0701
     SAD RECD 1 VOL CLR, 1 VOL ROP
12/15/11 CLR RECD BY APP COUNSEL                00/00/00 11-3102
     STATE APPELLATE DEFENDER - ONE VOLUME
03/23/12 TRANS PROC REC/FILED CLKS OFF          00/00/00
     ONE VOLUME
03/27/12 REPORT OF PROCEEDINGS PREPARED         00/00/00 11-3102
     ONE VOLUME
04/03/12 REPRT/PROCDS RECD BY APP ATTRY         00/00/00 11-3102
     STATE APPELLATE DEFENDER - ONE VOLUME
09/24/13 MANDATE FILED                          10/01/13 1776
     11-3102
10/01/13 SPECIAL ORDER
     PEOPLES MOTION FOR SUMMARY DISPOSITION AND REMAND GRANTED
     BYRNE, THOMAS J.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 018

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/01/13 CASE ASSIGNED                      10/03/13 1702
      BYRNE, THOMAS J.
10/10/13 DEFENDANT IN CUSTODY
      JONES, RICKEY
10/10/13 PUBLIC DEFENDER APPOINTED
      JONES, RICKEY
10/10/13 CONTINUANCE BY AGREEMENT           11/06/13 1702
      JONES, RICKEY
11/06/13 DEFENDANT NOT IN COURT
      JONES, RICKEY
11/06/13 PUBLIC DEFENDER APPOINTED
      JONES, RICKEY
11/06/13 CONTINUANCE BY AGREEMENT           01/17/14 1702
      JONES, RICKEY
01/17/14 DEFENDANT NOT IN COURT
      JONES, RICKEY
01/17/14 MOTION DEFT - CONTINUANCE - MD     04/15/14 1702
      JONES, RICKEY
03/18/14 CASE ADVANCED                      04/15/14 1702
03/18/14 NOTICE OF MOTION/FILING            03/25/14 1702
      TO FILE AN APPEARANCE
03/25/14 DEFENDANT NOT IN COURT
      JONES, RICKEY
03/25/14 MOTION TO WITHDRAW AS ATTORNEY
      JONES, RICKEY
03/25/14 APPEARANCE FILED
      JONES, RICKEY
03/25/14 MOTION DEFT - CONTINUANCE - MD     04/09/14 1702
      JONES, RICKEY
04/09/14 CONTINUANCE BY AGREEMENT           05/22/14 1702
      COGHLAN, MATTHEW E.
04/09/14 CASE ADVANCED                      05/22/14 1702
04/09/14 HEARING DATE ASSIGNED             04/22/14 1702        $       4
04/15/14 DEFENDANT NOT IN COURT
      JONES, RICKEY
04/15/14 MOTION DEFT - CONTINUANCE - MD     06/17/14 1702
      JONES, RICKEY

JGS_MAYSONET 01323

```
          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 019

     PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 92CR1014601

     JOSE          MAYSONET

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/22/14 DEFENDANT NOT IN COURT
     JONES, RICKEY
04/22/14 MOTION DEFT - CONTINUANCE - MD         06/24/14 1702
     JONES, RICKEY
06/17/14 DEFENDANT NOT IN COURT
     JONES, RICKEY
06/17/14 SPECIAL ORDER
     ON CALL ON ERROR
     JONES, RICKEY
06/17/14 CONTINUANCE BY ORDER OF COURT          06/24/14 1702
     JONES, RICKEY
06/24/14 DEFENDANT NOT IN COURT
     JONES, RICKEY
06/24/14 CONTINUANCE BY AGREEMENT               08/05/14 1702
     JONES, RICKEY
08/05/14 DEFENDANT NOT IN COURT
     JONES, RICKEY
08/05/14 MOTION DEFT - CONTINUANCE - MD         10/21/14 1702
     JONES, RICKEY
10/21/14 MOTION DEFT - CONTINUANCE - MD         11/24/14 1702
     JONES, RICKEY
11/24/14 CONTINUANCE BY AGREEMENT               01/06/15 1702
     COGHLAN, MATTHEW E.
01/06/15 DEFENDANT NOT IN COURT
     JONES, RICKEY
01/06/15 CONTINUANCE BY AGREEMENT               02/10/15 1702
     JONES, RICKEY
02/10/15 DEFENDANT NOT IN COURT
     JONES, RICKEY
02/10/15 MOTION DEFT - CONTINUANCE - MD         03/16/15 1702
     JONES, RICKEY
03/16/15 DEFENDANT NOT IN COURT
     JONES, RICKEY
03/16/15 SPECIAL ORDER
     DEFT FILES AMEND PCP
     JONES, RICKEY
03/16/15 MOTION DEFT - CONTINUANCE - MD         06/04/15 1702
     JONES, RICKEY
```

JGS_MAYSONET 01324

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 020

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014601

JOSE        MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
03/25/15 NOTICE OF MOTION/FILING              03/31/15 1702
03/31/15 DEFENDANT NOT IN COURT
    JONES, RICKEY
03/31/15 MOTION FOR DISCOVERY                       F        2
    JONES, RICKEY
03/31/15 SPECIAL ORDER
    DEFT FILES ADDL EXHIBITS
    JONES, RICKEY
03/31/15 CONTINUANCE BY AGREEMENT             04/24/15 1702
    STATE TO RESPND
    JONES, RICKEY
04/24/15 DEFENDANT IN CUSTODY
    JONES, RICKEY
04/24/15 CONTINUANCE BY ORDER OF COURT        04/30/15 1702
    JONES, RICKEY
04/30/15 SPECIAL ORDER                 Y
    ON CALL IN ERROR
    JONES, RICKEY
04/30/15 CONTINUANCE BY ORDER OF COURT        05/11/15 1702
    JONES, RICKEY
05/11/15 DEFENDANT IN CUSTODY
    JONES, RICKEY
05/11/15 CONTINUANCE BY AGREEMENT             06/15/15 1702
    JONES, RICKEY
06/15/15 DEFENDANT IN CUSTODY
    JONES, RICKEY
06/15/15 CONTINUANCE BY ORDER OF COURT        06/16/15 1702
    JONES, RICKEY
06/16/15 DEFENDANT IN CUSTODY
    JONES, RICKEY
06/16/15 CONTINUANCE BY AGREEMENT             07/21/15 1702
    JONES, RICKEY
07/21/15 DEFENDANT NOT IN COURT
    JONES, RICKEY
07/21/15 CONTINUANCE BY AGREEMENT             08/17/15 1702
    JONES, RICKEY
08/17/15 DEFENDANT IN CUSTODY
    JONES, RICKEY

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 021

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 92CR1014601

JOSE          MAYSONET

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/17/15 MOTION STATE - CONTINUANCE -MS        10/06/15 1702
     JONES, RICKEY
10/06/15 DEFENDANT IN CUSTODY
     JONES, RICKEY
10/06/15 CONTINUANCE BY AGREEMENT              12/17/15 1702
     JONES, RICKEY
12/17/15 DEFENDANT IN CUSTODY
     PETRONE, ANGELA MUNARI
12/17/15 CONTINUANCE BY AGREEMENT              01/20/16 1702
     PETRONE, ANGELA MUNARI
01/20/16 DEFENDANT NOT IN COURT
     JONES, RICKEY
01/20/16 CONTINUANCE BY AGREEMENT              03/01/16 1702
     JONES, RICKEY
03/01/16 DEFENDANT IN CUSTODY
     JONES, RICKEY
03/01/16 CONTINUANCE BY AGREEMENT              03/22/16 1702
     JONES, RICKEY
03/22/16 DEFENDANT IN CUSTODY
     JONES, RICKEY
03/22/16 CONTINUANCE BY AGREEMENT              04/12/16 1702
     JONES, RICKEY
04/12/16 DEFENDANT IN CUSTODY
     JONES, RICKEY
04/12/16 CONTINUANCE BY AGREEMENT              05/19/16 1702
     JONES, RICKEY
05/19/16 DEFENDANT IN CUSTODY
     JONES, RICKEY
05/19/16 CONTINUANCE BY AGREEMENT              06/15/16 1702
     JONES, RICKEY
06/15/16 DEFENDANT IN CUSTODY
     JONES, RICKEY
06/15/16 CONTINUANCE BY AGREEMENT              08/04/16 1702
     JONES, RICKEY
08/04/16 DEFENDANT IN CUSTODY
     JONES, RICKEY
08/04/16 CONTINUANCE BY AGREEMENT              09/15/16 1702
     JONES, RICKEY

```
         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 022

     PEOPLE OF THE STATE OF ILLINOIS

                      VS              NUMBER 92CR1014601

        JOSE         MAYSONET

           CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
09/15/16 DEFENDANT IN CUSTODY
      JONES, RICKEY
09/15/16 CONTINUANCE BY AGREEMENT          10/26/16 1702
      JONES, RICKEY
10/19/16 REQ EXT MEDIA COVERAGE - FILED    10/26/16 1799
10/14/16 NOTICE OF MOTION/FILING           10/26/16 1702
10/26/16 DEFENDANT IN CUSTODY
      JONES, RICKEY
10/26/16 M/D VACATE PLEA, FNDG, VRDCT                  S        2
      JONES, RICKEY
10/26/16 VACATE ORDER
      STATE ADMITS TO DEF S POST CONVICTION CLAIM OF INEFFECTIVE ASSISTANCE OF
      JONES, RICKEY
10/26/16 VACATE ORDER
      COUNCIL DUE TO PER SE CONFLICT OF INTEREST; WHEREFORE THE FINDING OF GUIL
      JONES, RICKEY
10/26/16 VACATE ORDER
      JUDGEMENT AND SENTENCE IS VACATED. DEF GRANTED POST CONVICTION RELIEF
      JONES, RICKEY
10/26/16 DEF REM CUST CC SHERIF
      DEF REMANDED TO CCJ; NO BAIL; MITT TO HOSPITAL; MITT TO REFLECT DEF TO BE
      JONES, RICKEY
10/26/16 DEF REM CUST CC SHERIF
      HELD IN PROTECTIVE CUSTODY
      JONES, RICKEY
10/26/16 NO BAIL
      JONES, RICKEY
10/26/16 CONTINUANCE BY AGREEMENT          11/02/16 1702
      JONES, RICKEY
11/02/16 DEFENDANT IN CUSTODY
      JONES, RICKEY
11/02/16 BAIL AMOUNT SET                              D      $ 500000
      JONES, RICKEY
11/02/16 CONTINUANCE BY AGREEMENT          11/15/16 1702
      JONES, RICKEY
11/02/16 MOTION FOR DISCOVERY                         F        2
11/02/16 HEARING DATE ASSIGNED             11/15/16 1702
```

JGS_MAYSONET 01327

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 023

PEOPLE OF THE STATE OF ILLINOIS

                     VS              NUMBER 92CR1014601

     JOSE          MAYSONET

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
11/15/16 DEFENDANT IN CUSTODY
       JONES, RICKEY
11/15/16 CONTINUANCE BY AGREEMENT              12/07/16 1702
       JONES, RICKEY
12/07/16 DEFENDANT IN CUSTODY
       JONES, RICKEY
12/07/16 CONTINUANCE BY AGREEMENT              12/15/16 1702
       JONES, RICKEY
12/15/16 DEFENDANT IN CUSTODY
       JONES, RICKEY
12/15/16 WITNESSES ORDERED TO APPEAR
       JONES, RICKEY
12/15/16 CONTINUANCE BY AGREEMENT              01/23/17 1702
       JONES, RICKEY
01/23/17 DEFENDANT IN CUSTODY
       JONES, RICKEY
01/23/17 WITNESSES ORDERED TO APPEAR
       JONES, RICKEY
01/23/17 MOTION STATE - CONTINUANCE -MS        02/22/17 1702
       JONES, RICKEY
02/07/17 REQ EXT MEDIA COVERAGE - FILED
02/07/17 HEARING DATE ASSIGNED                 02/22/17 1702
02/16/17 OBJ/PARTY EXT MEDIA COVER FILE
02/16/17 HEARING DATE ASSIGNED                 02/22/17 1702
02/17/17 DEFENDANT IN CUSTODY
       MARTIN LEROY K JR
02/17/17 CONTINUANCE BY AGREEMENT              02/22/17 1702
       MARTIN LEROY K JR
02/22/17 DEFENDANT IN CUSTODY
       MARTIN LEROY K JR
02/22/17 CASE ASSIGNED                         02/22/17 1729
       MARTIN LEROY K JR
02/22/17 OFF CALL
       ON CALL IN ERROR
       STEPHENSON DOMENICA A
02/22/17 DEFENDANT IN CUSTODY
       JOYCE TIMOTHY JOSEPH

JGS_MAYSONET 01328

```
        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 024

     PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 92CR1014601

     JOSE        MAYSONET

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION
```

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

```
02/22/17 CONTINUANCE BY AGREEMENT           03/09/17 1729
     JOYCE TIMOTHY JOSEPH
03/09/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
03/09/17 CONTINUANCE BY AGREEMENT           04/20/17 1729
     JOYCE TIMOTHY JOSEPH
04/17/17 NOTICE OF MOTION/FILING            04/20/17 1729
04/18/17 NOTICE OF MOTION/FILING            04/20/17 1729
04/20/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
04/20/17 CONTINUANCE BY AGREEMENT           06/07/17 1729
     JOYCE TIMOTHY JOSEPH
04/21/17 APPEARANCE FILED
04/21/17 HEARING DATE ASSIGNED              06/07/17 1729
05/18/17 NOTICE OF MOTION/FILING            06/07/17 1729
05/31/17 NOTICE OF MOTION/FILING            05/31/17 1956
     QUASH SUBPOENA
05/31/17 NOTICE OF MOTION/FILING            05/31/17 1956
     REPLY IN SUPPORT OD MOTION TO QUASH SUBPOENA
06/07/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
06/07/17 MOTION TO SUPPRESS                            S     2
     MOTION TO QUASH SUBPOENA
     JOYCE TIMOTHY JOSEPH
06/07/17 MOTION TO SUPPRESS                            S     2
     DEF TO BE HELD AT CCDOC
     JOYCE TIMOTHY JOSEPH
06/07/17 CONTINUANCE BY AGREEMENT           07/27/17 1729
     JOYCE TIMOTHY JOSEPH
07/27/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
07/27/17 CONTINUANCE BY AGREEMENT           08/16/17 1729
     JOYCE TIMOTHY JOSEPH
08/16/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
08/16/17 CONTINUANCE BY AGREEMENT           09/18/17 1729
     JOYCE TIMOTHY JOSEPH
```

JGS_MAYSONET 01329

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 025

PEOPLE OF THE STATE OF ILLINOIS

                    VS                NUMBER 92CR1014601

JOSE          MAYSONET

         CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
09/18/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
09/18/17 WITNESSES ORDERED TO APPEAR
     JOYCE TIMOTHY JOSEPH
09/18/17 CONTINUANCE BY AGREEMENT          10/12/17 1729
     JOYCE TIMOTHY JOSEPH
10/12/17 DEFENDANT IN CUSTODY
     JOYCE TIMOTHY JOSEPH
10/12/17 WITNESSES ORDERED TO APPEAR
     JOYCE TIMOTHY JOSEPH
10/12/17 CONTINUANCE BY AGREEMENT          11/15/17 1729
     JOYCE TIMOTHY JOSEPH
11/08/17 MOTION TO SUPPRESS                     F        2
11/08/17 HEARING DATE ASSIGNED             11/15/17 1729
11/08/17 NOTICE OF MOTION/FILING           11/15/17 1729
11/15/17 DEFENDANT IN CUSTODY
     STERBA, DAVID P.
11/15/17 NOLLE PROSEQUI              CALL
     STERBA, DAVID P.
11/16/17 EVIDENCE ORDERED IMPOUNDED REC

                    I hereby certify that the foregoing has
                    been entered of record on the above
                    captioned case.
                    Date 01/29/18

                    DOROTHY BROWN
          CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JGS_MAYSONET 01330

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 3

G.J. No. 111
GENERAL NO. 90 CR- 21787

------------------------------

CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT
        CRIMINAL DIVISION
            September, 1990
------------------------------

The People of the State of
            Illinois
                v.        e/
    Jose Maysonet
    Alfredo Gonzalez 02
    Justino Cruz     03

    *******************
    * INDICTMENT FOR *
    *******************

FIRST DEGREE MURDER
------------------------------

            A TRUE BILL
            -----------

*Joseph Marten*
Foreman of the Grand Jury

==============================
            WITNESSES
OFF. ERNEST HALVORSEN
_____
_____
_____
_____
_____
_____
_____
_____
==============================
Filed  9-27  ,19 90
_____ Clerk
Bail $_____
==============================

JGS MAYSONET 01291

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF ILLINOIS )
                    ) SS.
COUNTY OF COOK   )

The September, 1990 Grand Jury of the

Circuit Court of Cook County.


The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about MAY 25, 1990 at and within the County of Cook

JOSE MAYSONET
ALFREDO GONZALEZ
JUSTINO CRUZ

committed the offense of    FIRST DEGREE MURDER


in that     THEY, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND

KNOWINGLY SHOT AND KILLED TORRENCE WILEY

WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1-A(1) OF THE ILLINOIS REVISED

STATUTES 1987, AS AMENDED, AND


contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1606


JGS_MAYSONET 01292

********************************************************************

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about MAY 25, 1990 at and within the County of Cook

JOSE MAYSONET
ALFREDO GONZALEZ
JUSTINO CRUZ

committed the offense of      FIRST DEGREE MURDER

in that      THEY, WITHOUT LAWFUL JUSTIFICATION SHOT

AND KILLED TORRENCE WILEY WITH A GUN

KNOWING THAT SUCH SHOOTING WITH A GUN

CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY

HARM TO TORRENCE WILEY, IN VIOLATION

OF CHAPTER 38, SECTION 9-1-A(2) OF THE ILLINOIS

REVISED STATUTES 1987, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1607



JGS_MAYSONET 01293

**************************************************************************

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about MAY 25, 1990 at and within the County of Cook

JOSE MAYSONET
ALFREDO GONZALEZ
JUSTINO CRUZ

committed the offense of    FIRST DEGREE MURDER

in that    THEY, WITHOUT LAWFUL JUSTIFICATION SHOT

AND KILLED KEVIN WILEY WITH A GUN

KNOWING THAT SUCH SHOOTING WITH A GUN

CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY

HARM TO KEVIN WILEY, IN VIOLATION

OF CHAPTER 38, SECTION 9-1-A(2) OF THE ILLINOIS

REVISED STATUTES 1987, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1607

JGS_MAYSONET 01294

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 4

```
G.J. No.    977
GENERAL NO. 92 CR- 10146
```

------------------------------

```
CIRCUIT COURT OF COOK COUNTY
       COUNTY DEPARTMENT
       CRIMINAL DIVISION
          April, 1992
```

------------------------------

```
The People of the State of
            Illinois
              v.
       Jose Maysonet
       Christopher Gossens
       AKA: Christopher Fernandez
```

```
       ******************
       * INDICTMENT FOR *
       ******************
```

FIRST DEGREE MURDER
                    et. al.

------------------------------

A TRUE BILL
-----------

*Chau G. Stawskaw*
----------------------------------
Foreman of the Grand Jury

==============================
WITNESSES
DET. PAULNITSKY

----------------------------------
----------------------------------
----------------------------------
----------------------------------
----------------------------------
----------------------------------
----------------------------------
----------------------------------
----------------------------------

==============================
Filed ___5-5___ , 19 _92_
*Aurelio Pucinski* , Clerk
Bail $_____
==============================

JGS_Maysonet 000022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about MAY 25, 1990 at and within the County of Cook

JOSE MAYSONET
CHRISTOPHER GOSSENS

also known as          CHRISTOPHER FERNANDEZ

committed the offense of          FIRST DEGREE MURDER

in that     THEY, WITHOUT LAWFUL JUSTIFICATION SHOT

AND KILLED KEVIN WILEY WITH A GUN

KNOWING THAT SUCH SHOOTING WITH A GUN

CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY

HARM TO KEVIN WILEY, IN VIOLATION

OF CHAPTER 38, SECTION 9-1-A(2) OF THE ILLINOIS

REVISED STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1607

JGS_Maysonet 000023

*********************************************************************

The Grand Jurors chosen, selected, and sworn, in and for the County
of Cook, in the State of Illinois, in the name and by the authority of
the People of the State of Illinois, upon their oaths aforesaid present
that on or about MAY 25, 1990 at and within the County of Cook

                          JOSE MAYSONET
                          CHRISTOPHER GOSSENS
                              CHRISTOPHER FERNANDEZ

also known as

committed the offense of      FIRST DEGREE MURDER

in that    THEY, WITHOUT LAWFUL JUSTIFICATION SHOT

           AND KILLED TORRENCE WILEY WITH A GUN

           KNOWING THAT SUCH SHOOTING WITH A GUN

           CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY

           HARM TO TORRENCE WILEY, IN VIOLATION

           OF CHAPTER 38, SECTION 9-1-A(2) OF THE ILLINOIS

           REVISED STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same
People of the State of Illinois.

                              Charge ID Code: 1607

JGS_Maysonet 000024

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about MAY 25, 1990 at and within the County of Cook

|                        | JOSE MAYSONET          |
|                        | CHRISTOPHER GOSSENS    |
| Also known as          | CHRISTOPHER FERNANDEZ  |
| committed the offense of | FIRST DEGREE MURDER  |

in that    THEY, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND

KNOWINGLY SHOT AND KILLED KEVIN WILEY

WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1-A(1) OF THE ILLINOIS REVISED

STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1606

JGS_Maysonet 000025

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATE OF ILLINOIS )
                   ) SS.
COUNTY OF COOK    )

The April, 1992 Grand Jury of the

Circuit Court of Cook County.

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about MAY 25, 1990 at and within the County of Cook

                         JOSE MAYSONET
                         CHRISTOPHER GOSSENS
also known as           CHRISTOPHER FERNANDEZ

committed the offense of    FIRST DEGREE MURDER

in that     THEY, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND

            KNOWINGLY SHOT AND KILLED TORRENCE WILEY

            WITH A GUN, IN VIOLATION OF CHAPTER 38,

            SECTION 9-1-A(1) OF THE ILLINOIS REVISED

            STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

                          Charge ID Code: 1606

JGS_Maysonet 000026

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK    )

The April, 1992 Grand Jury of the

Circuit Court of Cook County.

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about MAY 25, 1990 at and within the County of Cook

JOSE MAYSONET
CHRISTOPHER GOSSENS
also known as      CHRISTOPHER FERNANDEZ

committed the offense of      FIRST DEGREE MURDER

in that      THEY, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND

KNOWINGLY SHOT AND KILLED TORRENCE WILEY

WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1-A(1) OF THE ILLINOIS REVISED

STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1606

JGS_Maysonet 000027

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about MAY 25, 1990 at and within the County of Cook

Also known as

committed the offense of

JOSE MAYSONET
CHRISTOPHER GOOSENS
CHRISTOPHER FERNANDEZ
FIRST DEGREE MURDER

in that      THEY, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND

KNOWINGLY SHOT AND KILLED KEVIN WILEY

WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1-A(1) OF THE ILLINOIS REVISED

STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1606

JGS_Maysonet 000028

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid present that on or about MAY 25, 1990 at and within the County of Cook

JOSE MAYSONET
CHRISTOPHER GOSSENS
CHRISTOPHER FERNANDEZ

also known as

committed the offense of      FIRST DEGREE MURDER

in that      THEY, WITHOUT LAWFUL JUSTIFICATION SHOT

AND KILLED TORRENCE WILEY WITH A GUN

KNOWING THAT SUCH SHOOTING WITH A GUN

CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY

HARM TO TORRENCE WILEY, IN VIOLATION

OF CHAPTER 38, SECTION 9-1-A(2) OF THE ILLINOIS

REVISED STATUTES 1989, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

Charge ID Code: 1607

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 5

```
        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 001

     PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 90CR2178702

     ALFREDO     GONZALEZ

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

Charging the above named defendant with:

   38-9-1-A(1)                     F M     MURDER
   38-9-1-A(1)                     F M     MURDER
   38-9-1-A(2)                     F M     MURDER
   38-9-1-A(2)                     F M     MURDER
The following disposition(s) was/were rendered before the Honorable Judge(s):


09/27/90 IND/INFO-CLK OFFICE-PRES JUDGE      10/03/90 1701
     FITZGERALD, THOMAS R.
10/03/90 DEFENDANT NOT ARRAIGNED
     BASTONE, ROBERT P.
10/03/90 CASE ASSIGNED                       10/03/90 1702
     BASTONE, ROBERT P.
10/03/90 PUBLIC DEFENDER APPOINTED
     MORGAN, LORETTA HALL
10/03/90 APPEARANCE FILED
     MORGAN, LORETTA HALL
10/03/90 DEFENDANT ARRAIGNED
     MORGAN, LORETTA HALL
10/03/90 PLEA OF NOT GUILTY
     MORGAN, LORETTA HALL
10/03/90 MOTION FOR DISCOVERY                        E        2
     MORGAN, LORETTA HALL
10/03/90 ADMONISH AS TO TRIAL IN ABSENT
     MORGAN, LORETTA HALL
10/03/90 CONTINUANCE BY AGREEMENT            12/26/90
     MORGAN, LORETTA HALL
12/04/90 CASE ADVANCED                       12/04/90 1702
     MORGAN, LORETTA HALL
12/04/90 CONTINUANCE BY ORDER OF COURT       12/19/90
     MORGAN, LORETTA HALL
12/19/90 CONTINUANCE BY AGREEMENT            01/09/91
     MORGAN, LORETTA HALL
```

JGS_MAYSONET 01331

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 002

PEOPLE OF THE STATE OF ILLINOIS

                  VS                 NUMBER 90CR2178702

ALFREDO      GONZALEZ

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/09/91 CONTINUANCE BY AGREEMENT          02/04/91
     MORGAN, LORETTA HALL
02/04/91 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
02/04/91 CONTINUANCE BY AGREEMENT          03/07/91
     MORGAN, LORETTA HALL
03/07/91 MOTION TO WITHDRAW                          S        2
     P.D.
     MORGAN, LORETTA HALL
03/07/91 APPEARANCE FILED
     MORGAN, LORETTA HALL
03/07/91 CONTINUANCE BY AGREEMENT          04/11/91
     MORGAN, LORETTA HALL
04/11/91 WITNESSES ORDERED TO APPEAR       04/11/91 1702
     MORGAN, LORETTA HALL
04/11/91 CONTINUANCE BY AGREEMENT          06/25/91
     MORGAN, LORETTA HALL
06/25/91 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
06/25/91 MOTION FOR SEVERANCE                        E        2
     MORGAN, LORETTA HALL
06/25/91 WITNESSES ORDERED TO APPEAR       06/25/91 1702
     MORGAN, LORETTA HALL
06/25/91 CONTINUANCE BY AGREEMENT          09/24/91
     MORGAN, LORETTA HALL
09/24/91 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/24/91 CONTINUANCE BY AGREEMENT          12/03/91
     MORGAN, LORETTA HALL
12/03/91 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
12/03/91 CONTINUANCE BY AGREEMENT          12/05/91
     MORGAN, LORETTA HALL
12/05/91 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
12/05/91 WITNESSES ORDERED TO APPEAR       12/05/91 1702
     MORGAN, LORETTA HALL

JGS_MAYSONET 01332

```
              IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS         Page 003

        PEOPLE OF THE STATE OF ILLINOIS

                     VS                    NUMBER 90CR2178702

        ALFREDO       GONZALEZ

              CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
12/05/91 CONTINUANCE BY AGREEMENT              12/09/91
        MORGAN, LORETTA HALL
12/09/91 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
12/09/91 WITNESSES ORDERED TO APPEAR           12/09/91 1702
        MORGAN, LORETTA HALL
12/09/91 CONTINUANCE BY AGREEMENT              01/21/92
        MORGAN, LORETTA HALL
01/21/92 WITNESSES ORDERED TO APPEAR           01/21/92 1702
        MORGAN, LORETTA HALL
01/21/92 CONTINUANCE BY ORDER OF COURT         01/22/92
        MORGAN, LORETTA HALL
01/22/92 DEFENDANT IN CUSTODY
01/22/92 DEF DEMAND FOR TRIAL
01/22/92 WITNESSES ORDERED TO APPEAR           01/22/92 1702
01/22/92 CONTINUANCE BY ORDER OF COURT         01/27/92
01/27/92 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
01/27/92 WITNESSES ORDERED TO APPEAR           01/27/92 1702
        MORGAN, LORETTA HALL
01/27/92 MOTION STATE - CONTINUANCE -MS        02/10/92
        MORGAN, LORETTA HALL
02/10/92 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
02/10/92 WITNESSES ORDERED TO APPEAR           02/10/92 1702
        MORGAN, LORETTA HALL
02/10/92 MOTION STATE - CONTINUANCE -MS        02/18/92
        MORGAN, LORETTA HALL
02/18/92 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
02/18/92 WITNESSES ORDERED TO APPEAR           02/18/92 1702
        MORGAN, LORETTA HALL
02/18/92 MOTION STATE - CONTINUANCE -MS        02/21/92
        MORGAN, LORETTA HALL
02/21/92 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
02/21/92 WITNESSES ORDERED TO APPEAR           02/21/92 1702
        MORGAN, LORETTA HALL
```

JGS_MAYSONET 01333

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 004

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 90CR2178702

ALFREDO      GONZALEZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/21/92 CONTINUANCE BY AGREEMENT              02/24/92
     MORGAN, LORETTA HALL
02/24/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
02/24/92 WITNESSES ORDERED TO APPEAR           02/24/92 1702
     MORGAN, LORETTA HALL
02/24/92 CONTINUANCE BY AGREEMENT              02/25/92
     MORGAN, LORETTA HALL
02/25/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
02/25/92 WITNESSES ORDERED TO APPEAR           02/25/92 1702
     MORGAN, LORETTA HALL
02/25/92 CONTINUANCE BY AGREEMENT              03/24/92
     MORGAN, LORETTA HALL
03/24/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/24/92 WITNESSES ORDERED TO APPEAR           03/24/92 1702
     MORGAN, LORETTA HALL
03/24/92 CONTINUANCE BY ORDER OF COURT         03/25/92
     MORGAN, LORETTA HALL
03/25/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/25/92 JURY IMPANELED AND SWORN
     DEFT WAIVES JURY IN SENTENCING PHASE
     MORGAN, LORETTA HALL
03/25/92 WITNESSES ORDERED TO APPEAR           03/25/92 1702
     MORGAN, LORETTA HALL
03/25/92 CONTINUED JURY TRIAL                  03/26/92
     MORGAN, LORETTA HALL
03/26/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/26/92 WITNESSES ORDERED TO APPEAR           03/26/92 1702
     MORGAN, LORETTA HALL
03/26/92 CONTINUED JURY TRIAL                  03/27/92
     MORGAN, LORETTA HALL
03/27/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL

JGS_MAYSONET 01334

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 005

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 90CR2178702

ALFREDO      GONZALEZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
03/27/92 WITNESSES ORDERED TO APPEAR          03/27/92 1702
     MORGAN, LORETTA HALL
03/27/92 CONTINUED JURY TRIAL                 03/30/92
     MORGAN, LORETTA HALL
03/30/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/30/92 VERDICT OF GUILTY               CALL
     MORGAN, LORETTA HALL
03/30/92 JGMT ON FINDING/VERDICT/PLEA                 V
     MORGAN, LORETTA HALL
03/30/92 CHANGE PRIORITY STATUS          M
     MORGAN, LORETTA HALL
03/30/92 BAIL REVOKED
     MORGAN, LORETTA HALL
03/30/92 PRE-SENT INVEST. ORD, CONTD TO       04/30/92
     MORGAN, LORETTA HALL
04/30/92 MOTION DEFENDANT - NEW TRIAL                 D
     MORGAN, LORETTA HALL
04/30/92 SPECIAL ORDER
     DEFT IS ELIGIBLE FOR DEATH PENALTY
     MORGAN, LORETTA HALL
04/30/92 SPECIAL ORDER
     CT. FINDS MITIGATION FACTORS SUFFICIIENT TO OVER COME IMPOSITON OF DEATH
     MORGAN, LORETTA HALL
04/30/92 DEF SENT TO LIFE IMPRISONMENT    CALL
     LIFE IMPRISONMENT
     MORGAN, LORETTA HALL
04/30/92 DEF ADVISED OF RIGHT TO APPEAL
     URSO, JOSEPH J.
04/30/92 LET MITTIMUS ISSUE/MITT TO ISS
     URSO, JOSEPH J.
04/30/92 ILL STATE APPELLATE DEF APPTD
     URSO, JOSEPH J.
04/30/92 NOTICE OF APPEAL FILED, TRNSFR
05/13/92 NOTICE OF NOTICE OF APP MAILED
05/13/92 CONTINUANCE BY ORDER OF COURT        05/19/92 1713
05/19/92 ILL STATE APPELLATE DEF APPTD
     FITZGERALD, THOMAS R.

JGS_MAYSONET 01335

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 006

PEOPLE OF THE STATE OF ILLINOIS

                    VS                NUMBER 90CR2178702

ALFREDO      GONZALEZ

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/19/92 O/C FREE REPT OF PROCD ORD N/C
        FITZGERALD, THOMAS R.
05/20/92 MEMO OF ORDS & NOA PICKED-UP
06/05/92 COMMON LAW RECORD PREPARED
06/09/92 CLR RECD BY APP COUNSEL
        S.A.D.
06/11/92 APPELLATE COURT NUMBER ASGND                92-1605
06/12/92 REPT OF PRCDS ORD FR CRT RPT
10/26/92 TRANS PROC REC/FILED CLKS OFF
12/17/92 REPORT OF PROCEEDINGS PREPARED
12/30/92 REPRT/PROCDS RECD BY APP ATTRY
        SAD
09/27/93 DEFENDANT NOT IN COURT
        MORGAN, LORETTA HALL
09/27/93 DEFT SERVING SENTENCE
        MORGAN, LORETTA HALL
10/04/93 SUPPL REPORT OF PRCD PREPARED
10/05/93 SUPPL REC RECD BY APPL COUNSEL
        FRED COHN
01/24/95 MANDATE FILED                      02/03/95 1701
02/03/95 REVIEW COURT AFFIRMANCE
        BROWNFIELD, GARY L.
04/25/03 M/D PETN FOR TRNSCT,COMLAW RCD     00/00/00 F        2
04/25/03 HEARING DATE ASSIGNED              05/02/03 1702
05/02/03 CONTINUANCE BY ORDER OF COURT      05/14/03
        SACKS STANLEY J.
05/14/03 DEFENDANT IN CUSTODY               00/00/00
        RILEY, JAMES G.
05/14/03 DEFENDANT NOT IN COURT             00/00/00
        RILEY, JAMES G.
05/14/03 M/D PETN FOR TRNSCT,COMLAW RCD     00/00/00 G
        RILEY, JAMES G.
05/14/03 SPECIAL ORDER                      00/00/00
        CT. REPORTER TO TRANSCRIBE
        RILEY, JAMES G.

JGS_MAYSONET 01336

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 007

PEOPLE OF THE STATE OF ILLINOIS

                      VS                  NUMBER 90CR2178702

    ALFREDO        GONZALEZ

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

                      I hereby certify that the foregoing has
                      been entered of record on the above
                      captioned case.
                      Date 01/29/18

                              DOROTHY BROWN
            CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JGS_MAYSONET 01337

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 6

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                NUMBER 90CR2178703

JUSTINO      CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

Charging the above named defendant with:

    38-9-1-A(1)                    F M     MURDER
    38-9-1-A(1)                    F M     MURDER
    38-9-1-A(2)                    F M     MURDER
    38-9-1-A(2)                    F M     MURDER
The following disposition(s) was/were rendered before the Honorable Judge(s):


09/27/90 IND/INFO-CLK OFFICE-PRES JUDGE      10/03/90 1701
     FITZGERALD, THOMAS R.
10/03/90 DEFENDANT NOT ARRAIGNED
     BASTONE, ROBERT P.
10/03/90 CASE ASSIGNED                       10/03/90 1702
     BASTONE, ROBERT P.
10/03/90 DEFENDANT ARRAIGNED
     MORGAN, LORETTA HALL
10/03/90 PLEA OF NOT GUILTY
     MORGAN, LORETTA HALL
10/03/90 MOTION FOR DISCOVERY                        E       2
     MORGAN, LORETTA HALL
10/03/90 ADMONISH AS TO TRIAL IN ABSENT
     MORGAN, LORETTA HALL
10/03/90 CONTINUANCE BY AGREEMENT            12/26/90
     MORGAN, LORETTA HALL
12/04/90 CASE ADVANCED                       12/04/90 1702
     MORGAN, LORETTA HALL
12/04/90 CONTINUANCE BY ORDER OF COURT       12/19/90
     MORGAN, LORETTA HALL
12/19/90 CONTINUANCE BY AGREEMENT            01/09/91
     MORGAN, LORETTA HALL
01/09/91 CONTINUANCE BY AGREEMENT            02/04/91
     MORGAN, LORETTA HALL
02/04/91 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL

JGS_MAYSONET 01295

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 002

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 90CR2178703

JUSTINO          CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/04/91 MOTION TO WITHDRAW                                    S        2
      P.D. AND PRIVATE ATTY LEAVE TO WITHDRAW
      MORGAN, LORETTA HALL
02/04/91 CONTINUANCE BY AGREEMENT              03/07/91
      MORGAN, LORETTA HALL
03/07/91 CONTINUANCE BY AGREEMENT              04/11/91
      MORGAN, LORETTA HALL
04/11/91 WITNESSES ORDERED TO APPEAR           04/11/91 1702
      MORGAN, LORETTA HALL
04/11/91 CONTINUANCE BY AGREEMENT              06/25/91
      MORGAN, LORETTA HALL
06/25/91 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
06/25/91 MOTION FOR SEVERANCE                            E        2
      MORGAN, LORETTA HALL
06/25/91 MOTION TO QUASH ARREST                         E        2
      MORGAN, LORETTA HALL
06/25/91 MOTION TO SUPPRESS                             E        2
      STATEMENTS
      MORGAN, LORETTA HALL
06/25/91 WITNESSES ORDERED TO APPEAR           06/25/91 1702
      MORGAN, LORETTA HALL
06/25/91 CONTINUANCE BY AGREEMENT              08/21/91
      MORGAN, LORETTA HALL
08/21/91 WITNESSES ORDERED TO APPEAR           08/21/91 1702
      MORGAN, LORETTA HALL
08/21/91 CONTINUANCE BY AGREEMENT              09/24/91
      MORGAN, LORETTA HALL
09/24/91 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
09/24/91 WITNESSES ORDERED TO APPEAR           09/24/91 1702
      MORGAN, LORETTA HALL
09/24/91 CONTINUANCE BY AGREEMENT              12/03/91
      MORGAN, LORETTA HALL
12/03/91 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
12/03/91 CONTINUANCE BY AGREEMENT              12/05/91
      MORGAN, LORETTA HALL

JGS_MAYSONET 01296

```
        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 003

    PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 90CR2178703

    JUSTINO      CRUZ

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
12/05/91 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
12/05/91 CONTINUANCE BY AGREEMENT           12/13/91
      MORGAN, LORETTA HALL
12/13/91 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
12/13/91 CONTINUANCE BY AGREEMENT           12/18/92
      MORGAN, LORETTA HALL
12/18/91 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
12/18/91 CONTINUANCE BY AGREEMENT           01/09/92
      MORGAN, LORETTA HALL
01/09/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
01/09/92 CONTINUANCE BY AGREEMENT           01/24/92
      MORGAN, LORETTA HALL
01/24/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
01/24/92 CONTINUANCE BY AGREEMENT           02/05/92
      MORGAN, LORETTA HALL
02/05/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
02/05/92 CONTINUANCE BY AGREEMENT           02/11/92
      MORGAN, LORETTA HALL
02/11/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
02/11/92 WITNESSES ORDERED TO APPEAR        02/11/92 1702
      MORGAN, LORETTA HALL
02/11/92 CONTINUANCE BY AGREEMENT           03/13/92
      MORGAN, LORETTA HALL
03/13/92 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
03/13/92 MOTION TO WITHDRAW                      S       2
      MD TO W/D MOTION TO QUASH AND MOTION TO SUPPRESS STATEMENT ALLOWED
      MORGAN, LORETTA HALL
03/13/92 SPECIAL ORDER
      MS TO TRANSFER CUSTODY OF DEFENDANT TO SAO WITNESS QUARTERS ALLOWED.
      MORGAN, LORETTA HALL
```

JGS_MAYSONET 01297

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 004

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 90CR2178703

    JUSTINO      CRUZ

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
03/13/92 CONTINUANCE BY AGREEMENT              03/30/92
     MORGAN, LORETTA HALL
03/30/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/30/92 CONTINUANCE BY AGREEMENT              05/27/92
     MORGAN, LORETTA HALL
05/27/92 DEFENDANT NOT IN COURT
     MORGAN, LORETTA HALL
05/27/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
05/27/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
05/27/92 CONTINUANCE BY AGREEMENT              07/22/92
     MORGAN, LORETTA HALL
07/22/92 DEFENDANT IN CUSTODY
07/22/92 PRISONER DATA SHEET TO ISSUE
07/22/92 CONTINUANCE BY AGREEMENT              07/23/92
07/23/92 DEFENDANT IN CUSTODY
07/23/92 PRISONER DATA SHEET TO ISSUE
07/23/92 CONTINUANCE BY AGREEMENT              09/28/92
09/28/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/28/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/28/92 DEFENDANT NOT IN COURT
     DEFT IN SAOWQ
     MORGAN, LORETTA HALL
09/28/92 CONTINUANCE BY AGREEMENT              10/02/92
     MORGAN, LORETTA HALL
10/02/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
10/02/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
10/02/92 SPECIAL ORDER
     DEFT WILL ASSERT HIS 5TH AMENDMENT RIGHT
     MORGAN, LORETTA HALL
10/02/92 WITNESSES ORDERED TO APPEAR          10/05/92 1702
     MORGAN, LORETTA HALL

JGS_MAYSONET 01298

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS       Page 005

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 90CR2178703

JUSTINO     CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/02/92 CONTINUANCE BY AGREEMENT                    11/05/92
     MORGAN, LORETTA HALL
11/05/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/05/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/05/92 DEFENDANT NOT IN COURT
     MORGAN, LORETTA HALL
11/05/92 CONTINUANCE BY AGREEMENT                    11/24/92
     MORGAN, LORETTA HALL
11/24/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/24/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/24/92 CONTINUANCE BY AGREEMENT                    01/08/93
     MORGAN, LORETTA HALL
01/08/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
01/08/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
01/08/93 CONTINUANCE BY AGREEMENT                    02/05/93
     MORGAN, LORETTA HALL
02/05/93 DEFENDANT IN CUSTODY
02/05/93 PRISONER DATA SHEET TO ISSUE
02/05/93 CONTINUANCE BY AGREEMENT                    03/11/93
03/11/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/11/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
03/11/93 CONTINUANCE BY AGREEMENT                    05/06/93
     MORGAN, LORETTA HALL
05/06/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
05/06/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
05/06/93 CONTINUANCE BY AGREEMENT                    06/29/93
     MORGAN, LORETTA HALL

JGS_MAYSONET 01299

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 006

PEOPLE OF THE STATE OF ILLINOIS

VS                         NUMBER 90CR2178703

JUSTINO     CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/29/93 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
06/29/93 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
06/29/93 WITNESSES ORDERED TO APPEAR          06/29/93
      MORGAN, LORETTA HALL
06/29/93 CONTINUANCE BY AGREEMENT             08/23/93
      MORGAN, LORETTA HALL
08/23/93 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
08/23/93 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
08/23/93 CONTINUANCE BY AGREEMENT             09/29/93
      MORGAN, LORETTA HALL
09/29/93 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
09/29/93 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
09/29/93 CONTINUANCE BY AGREEMENT             10/06/93
      MORGAN, LORETTA HALL
10/06/93 DEFENDANT ON BOND
      MORGAN, LORETTA HALL
10/06/93 CONTINUANCE BY AGREEMENT             12/15/93
      MORGAN, LORETTA HALL
12/15/93 DEFENDANT IN CUSTODY
12/15/93 PRISONER DATA SHEET TO ISSUE
12/15/93 CONTINUANCE BY AGREEMENT             12/17/93
12/17/93 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
12/17/93 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
12/17/93 CONTINUANCE BY AGREEMENT             01/07/94
      MORGAN, LORETTA HALL
01/07/94 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
01/07/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL

JGS_MAYSONET 01300

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 007

PEOPLE OF THE STATE OF ILLINOIS

                        VS                  NUMBER 90CR2178703

JUSTINO        CRUZ

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/07/94 CONTINUANCE BY AGREEMENT              02/18/94
        MORGAN, LORETTA HALL
02/18/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
02/18/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
02/18/94 CONTINUANCE BY AGREEMENT              03/14/94
        MORGAN, LORETTA HALL
03/14/94 CONTINUANCE BY AGREEMENT              03/16/94
        LOCALLO, DANIEL M.
03/14/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
03/14/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
03/14/94 CONTINUANCE BY AGREEMENT              04/25/94
        MORGAN, LORETTA HALL
03/16/94 TRANSFERRED                           04/25/94 1702
        MADDEN, JOHN K.
04/25/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
04/25/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
04/25/94 CONTINUANCE BY AGREEMENT              05/23/94
        MORGAN, LORETTA HALL
05/23/94 DEFENDANT IN CUSTODY
05/23/94 PRISONER DATA SHEET TO ISSUE
05/23/94 CONTINUANCE BY AGREEMENT              06/28/94
06/28/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
06/28/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
06/28/94 CONTINUANCE BY AGREEMENT              08/15/94
        MORGAN, LORETTA HALL
06/28/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
06/28/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL

JGS_MAYSONET 01301

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 008

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 90CR2178703

JUSTINO      CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/28/94 CONTINUANCE BY AGREEMENT              08/15/94
       MORGAN, LORETTA HALL
08/15/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
08/15/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
08/15/94 CONTINUANCE BY AGREEMENT              08/25/94
       MORGAN, LORETTA HALL
08/25/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
08/25/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
08/25/94 CONTINUANCE BY AGREEMENT              09/07/94 1702
       MORGAN, LORETTA HALL
09/07/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
09/07/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
09/07/94 CONTINUANCE BY AGREEMENT              09/22/94
       MORGAN, LORETTA HALL
09/22/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
09/22/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
09/22/94 WITNESSES ORDERED TO APPEAR
       MORGAN, LORETTA HALL
09/22/94 CONTINUANCE BY AGREEMENT              10/18/94
       MORGAN, LORETTA HALL
10/18/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
10/18/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
10/18/94 CONTINUANCE BY AGREEMENT              10/24/94
       MORGAN, LORETTA HALL
10/24/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
10/24/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL

JGS_MAYSONET 01302

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 009

PEOPLE OF THE STATE OF ILLINOIS

VS                      NUMBER 90CR2178703

JUSTINO     CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/24/94 CONTINUANCE BY AGREEMENT               11/03/94
        MORGAN, LORETTA HALL
11/03/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
11/03/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
11/03/94 CONTINUANCE BY AGREEMENT               12/12/94
        MORGAN, LORETTA HALL
12/12/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
12/12/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
12/12/94 WITNESSES ORDERED TO APPEAR
        MORGAN, LORETTA HALL
12/12/94 CONTINUANCE BY AGREEMENT               01/10/95
        MORGAN, LORETTA HALL
01/10/95 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
01/10/95 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
01/10/95 CONTINUANCE BY AGREEMENT               01/25/95
        MORGAN, LORETTA HALL
01/25/95 DEFENDANT ON BOND
        HETT, THOMAS A.
01/25/95 CONTINUANCE BY AGREEMENT               01/31/95
        HETT, THOMAS A.
01/31/95 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
01/31/95 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
01/31/95 CONTINUANCE BY AGREEMENT               02/06/95
        MORGAN, LORETTA HALL
02/06/95 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
02/06/95 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
02/06/95 CONTINUANCE BY AGREEMENT               05/08/95
        MORGAN, LORETTA HALL

JGS_MAYSONET 01303

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 010

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 90CR2178703

JUSTINO      CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
05/08/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
05/08/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
05/08/95 CONTINUANCE BY AGREEMENT          07/06/95
      MORGAN, LORETTA HALL
07/06/95 DEFENDANT IN CUSTODY
      GOLNIEWICZ, JR., FRANCIS X.
07/06/95 PRISONER DATA SHEET TO ISSUE
      GOLNIEWICZ, JR., FRANCIS X.
07/06/95 CONTINUANCE BY AGREEMENT          07/19/95
      GOLNIEWICZ, JR., FRANCIS X.
07/06/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
07/06/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
07/06/95 CONTINUANCE BY AGREEMENT          07/19/95
      MORGAN, LORETTA HALL
07/19/95 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
07/19/95 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
07/19/95 NOLLE PROSEQUI                C002
      MORGAN, LORETTA HALL
07/19/95 NOLLE PROSEQUI                C003
      MORGAN, LORETTA HALL
07/19/95 NOLLE PROSEQUI                C004
      MORGAN, LORETTA HALL
07/19/95 PG JW FINDING GUILTY          C001
      MORGAN, LORETTA HALL
07/19/95 DEF SENTENCED ILLINOIS DOC    C001
            22 YRS
      MORGAN, LORETTA HALL
07/19/95 CREDIT DEFENDANT FOR TIME SERV
      CREDIT FOR 1794 DAYS TIME SERVED
      MORGAN, LORETTA HALL
07/19/95 DEF ADVISED OF RIGHT TO APPEAL
      MORGAN, LORETTA HALL

JGS_MAYSONET 01304

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 011

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 90CR2178703

JUSTINO      CRUZ

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
07/19/95 LET MITTIMUS ISSUE/MITT TO ISS
     MORGAN, LORETTA HALL

I hereby certify that the foregoing has
been entered of record on the above
captioned case.
Date 01/29/18

CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JGS_MAYSONET 01305

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 7

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 001

PEOPLE OF THE STATE OF ILLINOIS

VS                         NUMBER 92CR1014602

CHRISTOPHE  GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

Charging the above named defendant with:

| | | | |
|---|---|---|---|
| 38-9-1-A(1) | F | M | MURDER |
| 38-9-1-A(2) | F | M | MURDER |
| 38-9-1-A(1) | F | M | MURDER |
| 38-9-1-A(2) | F | M | MURDER |

The following disposition(s) was/were rendered before the Honorable Judge(s):

05/07/92 IND/INFO-CLK OFFICE-PRES JUDGE        06/09/92 1701
06/09/92 CASE ASSIGNED                         06/09/92 1702
     LOCALLO, DANIEL M.
06/09/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
06/09/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
06/09/92 DEFENDANT ARRAIGNED
     MORGAN, LORETTA HALL
06/09/92 PLEA OF NOT GUILTY
     MORGAN, LORETTA HALL
06/09/92 ADMONISH AS TO TRIAL IN ABSENT
     MORGAN, LORETTA HALL
06/09/92 CONTINUANCE BY AGREEMENT              06/11/92
     MORGAN, LORETTA HALL
06/11/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
06/11/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
06/11/92 WITNESSES ORDERED TO APPEAR           06/11/92 1702
     MORGAN, LORETTA HALL
06/11/92 CONTINUANCE BY AGREEMENT              08/06/92
     MORGAN, LORETTA HALL
08/06/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
08/06/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL

JGS_MAYSONET 01338

```
              IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 002

        PEOPLE OF THE STATE OF ILLINOIS

                    VS               NUMBER 92CR1014602

        CHRISTOPHE   GOSSENS

              CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/06/92 CONTINUANCE BY AGREEMENT                 09/10/92
     MORGAN, LORETTA HALL
09/10/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/10/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/10/92 CONTINUANCE BY AGREEMENT                 09/22/92
     MORGAN, LORETTA HALL
09/22/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
09/22/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
09/22/92 CONTINUANCE BY AGREEMENT                 10/02/92
     MORGAN, LORETTA HALL
10/02/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
10/02/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
10/02/92 CONTINUANCE BY AGREEMENT                 11/05/92
     MORGAN, LORETTA HALL
11/05/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/05/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/05/92 CONTINUANCE BY AGREEMENT                 11/24/92
     DEFT FILES MOTION FOR I.D.
     MORGAN, LORETTA HALL
11/24/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/24/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/24/92 SPECIAL ORDER
     ORAL ARGUMENT HEARD PEOPLES MOT TO DISQUALIFY ATTY ABRANES
     MORGAN, LORETTA HALL
11/24/92 CONTINUANCE BY AGREEMENT                 12/03/92
     MORGAN, LORETTA HALL
12/03/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
```

JGS_MAYSONET 01339

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 003

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014602

CHRISTOPHE  GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
12/03/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
12/03/92 MOTION TO WITHDRAW                              S       2
     MOTION TO DISQUALIFY  ATTORNEY GRAHMS IS ALLOWED
     MORGAN, LORETTA HALL
12/03/92 CONTINUANCE BY AGREEMENT           12/18/92
     MORGAN, LORETTA HALL
12/18/92 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
12/18/92 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
12/18/92 CONTINUANCE BY AGREEMENT           01/28/93
     MORGAN, LORETTA HALL
01/28/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
01/28/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
01/28/93 CONTINUANCE BY AGREEMENT           02/05/93
     MORGAN, LORETTA HALL
02/05/93 DEFENDANT IN CUSTODY
02/05/93 PRISONER DATA SHEET TO ISSUE
02/05/93 CONTINUANCE BY AGREEMENT           03/11/93
03/11/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
03/11/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
03/11/93 CONTINUANCE BY AGREEMENT           05/06/93
     MORGAN, LORETTA HALL
05/06/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
05/06/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
05/06/93 CONTINUANCE BY AGREEMENT           06/29/93
     MORGAN, LORETTA HALL
06/29/93 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
06/29/93 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL

JGS_MAYSONET 01340

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 004

PEOPLE OF THE STATE OF ILLINOIS

VS                         NUMBER 92CR1014602

CHRISTOPHE    GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/29/93 CONTINUANCE BY AGREEMENT                    08/23/93
        MORGAN, LORETTA HALL
08/23/93 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
08/23/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
08/23/93 CONTINUANCE BY AGREEMENT                    09/29/93
        MORGAN, LORETTA HALL
09/29/93 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
09/29/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
09/29/93 CONTINUANCE BY AGREEMENT                    10/06/93
        MORGAN, LORETTA HALL
10/06/93 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
10/06/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
10/06/93 CONTINUANCE BY AGREEMENT                    12/15/93
        MORGAN, LORETTA HALL
12/15/93 DEFENDANT IN CUSTODY
12/15/93 PRISONER DATA SHEET TO ISSUE
12/15/93 CONTINUANCE BY AGREEMENT                    12/17/93
12/17/93 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
12/17/93 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
12/17/93 CONTINUANCE BY AGREEMENT                    01/07/94
        MORGAN, LORETTA HALL
01/07/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL
01/07/94 PRISONER DATA SHEET TO ISSUE
        MORGAN, LORETTA HALL
01/07/94 CONTINUANCE BY ORDER OF COURT               02/18/94
        MORGAN, LORETTA HALL
02/18/94 DEFENDANT IN CUSTODY
        MORGAN, LORETTA HALL

JGS_MAYSONET 01341

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 005

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 92CR1014602

CHRISTOPHE   GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/18/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
02/18/94 CONTINUANCE BY AGREEMENT              03/04/94
      MORGAN, LORETTA HALL
03/04/94 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
03/04/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
03/04/94 CONTINUANCE BY ORDER OF COURT         03/14/94
      MORGAN, LORETTA HALL
03/14/94 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
03/14/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
03/14/94 CONTINUANCE BY AGREEMENT              04/25/94
      MORGAN, LORETTA HALL
04/25/94 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
04/25/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
04/25/94 WITNESSES ORDERED TO APPEAR           04/25/94 1702
      MORGAN, LORETTA HALL
04/25/94 CONTINUANCE BY AGREEMENT              05/23/94
      MORGAN, LORETTA HALL
05/23/94 DEFENDANT IN CUSTODY
05/23/94 PRISONER DATA SHEET TO ISSUE
05/23/94 CONTINUANCE BY AGREEMENT              06/28/94
06/28/94 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
06/28/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL
06/28/94 CONTINUANCE BY AGREEMENT              08/15/94
      MORGAN, LORETTA HALL
06/28/94 DEFENDANT IN CUSTODY
      MORGAN, LORETTA HALL
06/28/94 PRISONER DATA SHEET TO ISSUE
      MORGAN, LORETTA HALL

JGS_MAYSONET 01342

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 006

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014602

CHRISTOPHE    GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/28/94 CONTINUANCE BY AGREEMENT                    08/15/94
       MORGAN, LORETTA HALL
08/15/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
08/15/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
08/15/94 CONTINUANCE BY AGREEMENT                    08/25/94
       MORGAN, LORETTA HALL
08/25/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
08/25/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
08/25/94 CONTINUANCE BY AGREEMENT                    09/07/94 1702
       MORGAN, LORETTA HALL
09/07/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
09/07/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
09/07/94 CONTINUANCE BY AGREEMENT                    09/22/94
       MORGAN, LORETTA HALL
09/22/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
09/22/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
09/22/94 WITNESSES ORDERED TO APPEAR
       MORGAN, LORETTA HALL
09/22/94 CONTINUANCE BY AGREEMENT                    10/18/94
       MORGAN, LORETTA HALL
10/18/94 DEFENDANT IN CUSTODY
       MORGAN, LORETTA HALL
10/18/94 PRISONER DATA SHEET TO ISSUE
       MORGAN, LORETTA HALL
10/18/94 MOTION TO QUASH ARREST                           E        2
       MORGAN, LORETTA HALL
10/18/94 WITNESSES ORDERED TO APPEAR
       MORGAN, LORETTA HALL
10/18/94 CONTINUANCE BY AGREEMENT                    10/24/94
       MORGAN, LORETTA HALL

JGS_MAYSONET 01343

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 92CR1014602

CHRISTOPHE    GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/24/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
10/24/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
10/24/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
10/24/94 CONTINUANCE BY AGREEMENT                11/03/94
     MORGAN, LORETTA HALL
11/03/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
11/03/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
11/03/94 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
11/03/94 CONTINUANCE BY AGREEMENT                12/12/94
     MORGAN, LORETTA HALL
12/12/94 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
12/12/94 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
12/12/94 CONTINUANCE BY AGREEMENT                01/10/95
     MORGAN, LORETTA HALL
01/10/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
01/10/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
01/10/95 CONTINUANCE BY AGREEMENT                01/26/95
     MORGAN, LORETTA HALL
01/26/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
01/26/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
01/26/95 CONTINUANCE BY AGREEMENT                02/06/95
     MORGAN, LORETTA HALL
02/06/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
02/06/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL

JGS_MAYSONET 01344

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 008

PEOPLE OF THE STATE OF ILLINOIS

                    VS              NUMBER 92CR1014602

CHRISTOPHE   GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/06/95 MOTION TO WITHDRAW AS ATTORNEY                    S        2
     MORGAN, LORETTA HALL
02/06/95 APPEARANCE FILED
     MORGAN, LORETTA HALL
02/06/95 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
02/06/95 CONTINUANCE BY AGREEMENT              05/08/95
     MORGAN, LORETTA HALL
05/08/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
05/08/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
05/08/95 WITNESSES ORDERED TO APPEAR
     MORGAN, LORETTA HALL
05/08/95 CONTINUANCE BY AGREEMENT              06/26/95
     MORGAN, LORETTA HALL
06/26/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
06/26/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
06/26/95 WITNESSES ORDERED TO APPEAR           06/26/95
     MORGAN, LORETTA HALL
06/26/95 CONTINUANCE BY AGREEMENT              08/08/95
     MORGAN, LORETTA HALL
08/08/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL
08/08/95 PRISONER DATA SHEET TO ISSUE
     MORGAN, LORETTA HALL
08/08/95 JURY WAIVED
     MORGAN, LORETTA HALL
08/08/95 WITNESSES ORDERED TO APPEAR           08/08/95
     MORGAN, LORETTA HALL
08/08/95 CHANGE PRIORITY STATUS        R
     MORGAN, LORETTA HALL
08/08/95 CONTINUANCE BY AGREEMENT              08/09/95
     MORGAN, LORETTA HALL
08/09/95 DEFENDANT IN CUSTODY
     MORGAN, LORETTA HALL

JGS_MAYSONET 01345

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 009

PEOPLE OF THE STATE OF ILLINOIS

VS       NUMBER 92CR1014602

CHRISTOPHE  GOSSENS

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/09/95 WITNESSES ORDERED TO APPEAR       08/09/95
    MORGAN, LORETTA HALL
08/09/95 CONTINUANCE BY ORDER OF COURT     08/10/95
    MORGAN, LORETTA HALL
08/10/95 DEFENDANT IN CUSTODY
    MORGAN, LORETTA HALL
08/10/95 CONTINUANCE BY ORDER OF COURT     08/11/95
    MORGAN, LORETTA HALL
08/10/95 DEFENDANT IN CUSTODY
    MORGAN, LORETTA HALL
08/10/95 NOT NOT GUILTY         C001
    MORGAN, LORETTA HALL
08/10/95 NOT NOT GUILTY         C002
    MORGAN, LORETTA HALL
08/10/95 NOT NOT GUILTY         C003
    MORGAN, LORETTA HALL
08/10/95 NOT NOT GUILTY         C004
    MORGAN, LORETTA HALL
08/10/95 DISCHARGED           C001
    MORGAN, LORETTA HALL
08/10/95 DISCHARGED           C002
    MORGAN, LORETTA HALL
08/10/95 DISCHARGED           C003
    MORGAN, LORETTA HALL
08/10/95 DISCHARGED           C004
    MORGAN, LORETTA HALL

I hereby certify that the foregoing has been entered of record on the above captioned case.
Date 01/29/18

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JGS_MAYSONET 01346

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 8

```
 1    STATE OF ILLINOIS   )
                          )  SS:
 2    COUNTY OF C O O K   )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
      THE PEOPLE OF THE       )
 5    STATE OF ILLINOIS,      )
                              )
 6            Plaintiff,      )
                              )
 7            vs.             )  No. 92 CR 10146
                              )
 8    JUAN MAYSONET a/k/a     )
      JOSE MAYSONET and       )
 9    CHRISTOPHER GOSSENS,    )
                              )
10            Defendants.     )

11                    REPORT OF PROCEEDINGS at the jury trial

12    (Maysonet) and bench trial (Gossens) of the

13    above-entitled cause, before the HONORABLE LORETTA

14    HALL MORGAN on the 10th day of August 1995.

15
      P P E A R A N C E S:
16            HON. JACK O'MALLEY
              State's Attorney of Cook County
17            BY:  MS. ELLEN MANDELTORT and
                   MR. FRANK MAREK
18            Assistant State's Attorneys
                   Appeared on behalf of the People;
19
              MR. RICHARD BEUKE
20                 Appeared on behalf of Jose Maysonet;

21            MR. RANDY RUECKERT
                   Appeared on behalf of Christopher
22                 Gossens.

23    JO ANN KROLICKI, CSR
      Official Court Reporter
24    License 84-002215
```

1

JGS_MAYSONET 4749

1                              I N D E X

2

3        People vs. Juan Maysonet a/k/a Jose Maysonet and

4                      Christopher Gossens

5        Date of Hearing:  8-10-95

6        Page Numbers:  1 to 277

7

8                            PROCEEDINGS

9                                                          PAGE

10                            DX       CX      RDX     RCX
         FERNANDO MONTILLA              34      97     103
11       FRANK DI FRANCO      109      141
         REYNALDO GUEVARA     188      204
12       STIPULATION                                    240
         FINDING ON DEFENDANT GOSSENS                   243
13       STATE RESTS                                    245
         ROSE MAYSONET                246
14

15

16                            EXHIBITS
                                                REC.
17       People's 29                            128
         People's 1 thru 26                     237
18       People's 28 thru 31                    237

19

20

21

22

23

24


                                2

JGS_MAYSONET 4750

```
 1                    (WHEREUPON, the following was

 2                    had in chambers, outside

 3                    presence of the jury:)

 4          THE COURT:  All right.  Let the

 5   record reflect that all parties are in chambers, all

 6   parties to the jury trial of Mr. Maysonet are in

 7   chambers around the issue of jury instructions.

 8                    The record should reflect that we had

 9   an informal jury conference, a jury instruction

10   conference last evening, and now we're going to go on

11   the record.

12                    Again, Mr. Beuke, I'm going to assume

13   there's no objection unless I hear otherwise.

14                    People's 1 is I.P.I. 1.01.

15                    These are being given without

16   objection.

17                    People's 2 is I.P.I. 1.02.

18                    People's 3 is I.P.I. 1.03.

19                    People's 4 is I.P.I. 2.01.

20                    People's 5 is I.P.I. 2.02.

21                    People's 6 is I.P.I. 2.03.

22                    Defendant's 1, now, what is that

23   going to be?  This is that he did not testify?

24          MS. MANDELTORT:  Do we know yet?
```

3

JGS_MAYSONET 4751

```
 1              MR. BEUKE:  We don't know yet.  I don't
 2    want to be coy about it, but I talked to him last
 3    night and --
 4              THE COURT:  Then I'm going to turn it this
 5    this way so I'm alert that we have to make a decision
 6    about that at some point.
 7              Do you have the second one made with
 8    the second paragraph?
 9              MS. MANDELTORT:  Yes.
10              THE COURT:  So Defendant's 1, the
11    instruction 2.04 relative to the situation where the
12    defendant does not testify, that issue is still
13    undecided, and we will come back to that at the
14    appropriate time.
15              Defendant's 2 is a non-I.P.I.
16    instruction tendered by Mr. Beuke on behalf of
17    Mr. Maysonet.  Does everybody have a copy of that?
18              MS. MANDELTORT:  Yes.
19              THE COURT:  "Although the defendant does
20    not have to actively participate in the overt act,
21    mere presence at the scene, even with knowledge
22    that the crime is being committed, is not sufficient
23    to establish accountability for the actions of
24    others."
```

4

JGS_MAYSONET 4752

```
1                    That's come out of some case, I would
2       assume?
3                    MR. BEUKE:  Judge, I cited the case at the
4       bottom, People versus Carasalis.  It's a 1st
5       District, November 25, 1992, case.
6                    THE COURT:  Right.  But I don't know why I
7       would want to give that as an instruction.  The rule
8       about I.P.I. instructions essentially is that they
9       are sometimes necessary when, in the view of the
10      Court, the I.P.I. instructions do not fully and
11      clearly state the law.
12                   When I look at the I.P.I.
13      instruction, and I'm looking at the unannotated
14      version, it's certainly something you can argue, but
15      the Court is not inclined to instruct on it.  A
16      person is legally --
17                   MR. MAREK:  Also, Judge, if this were the
18      state of the evidence, he would be entitled to a
19      directed verdict.
20                   THE COURT:  You got that right.
21                   "A person is legally responsible for
22      the conduct of another person when, either before or
23      during the commission of an offense, and with the
24      intent to promote or facilitate the commission of an
```

JGS_MAYSONET 4753

1   offense, he knowingly solicits, aids, abets, agrees

2   to aid, or attempts to aid the other person in the

3   planning or commission of the offense."

4               The Court thinks that that adequately

5   and fully states the law.  This is kind of a --

6   Defendant's 2 is kind of axiomatic.  I mean, the

7   instruction, I.P.I. 5.03, clearly requires that there

8   be something other than just standing around.  I

9   don't know that that needs to be restated some other

10   way.

11               That may have been the language in a

12   case, but obviously, that is not an I.P.I.

13   instruction.  I don't see anything the matter with

14   5.03.  I think that fully covers and clearly states

15   what the law is.  And that instruction clearly

16   indicates that something has to happen besides just

17   standing there.

18               Certainly that's something you can

19   argue.  That's an issue that can be argued.

20       MR. BEUKE:  Just for the record, your

21   Honor, as I understand the evidence as it pertains to

22   Mr. Maysonet, which basically comes through his

23   statement, he was approached by individuals, asked to

24   provide a gun that he was apparently holding for

JGS_MAYSONET 4754

1   these individuals.  He did that.  After he provided

2   the gun, he was asked something to the effect of, do

3   you want to come with us or drive a car.

4           There really isn't, I don't think,

5   any clear evidence as to where they were going or

6   what they were going to do.

7           THE COURT:  That's something for you to

8   argue, Counsel.

9           MR. BEUKE:  The four instructions that I

10  have tendered, Judge, the non-I.P.I. instructions,

11  our position just as to each one of them would be

12  that I believe that they more clearly define what the

13  law of accountability is as it's been held in these

14  various cases that I have cited.

15          It's clear, Judge, in this case,

16  that's the state's theory, and our theory is that

17  he's not accountable based on the actions that are

18  set forth in his statement.

19          And given that that's the paramount

20  issue in the case, what I'm seeking to do is have the

21  jury more completely instructed as to what

22  participation involves, what promote or facilitate

23  involves, the fact that flight from the scene is not

24  evidence or cannot be in and of itself evidence of

JGS_MAYSONET 4755

1    guilt, and the final instruction, Judge, I think is

2    the most complete of all of them.

3                      I understand your Honor's position,

4    Judge.  I just tender these --

5            THE COURT:  Essentially, though, it's for

6    the jury to determine whether or not based on the

7    evidence they find participation.  That's for them to

8    decide.  That's the jury's province.

9                      The issue that I have to decide when

10   somebody submits a non-I.P.I. is whether or not the

11   instruction that's being given that is an I.P.I.

12   instruction in some way fails to adequately, clearly,

13   and fully state the law.  I don't find that to be the

14   case.  I think that instruction is straight up and

15   straight out.

16                      The Court also feels that these are

17   things you can argue.  I don't see any reason to

18   augment the instruction, the I.P.I.

19           MS. MANDELTORT:  The state's position,

20   Judge, is that the four proffered instructions that

21   are non-I.P.I. not be given as well for the same

22   reason.

23           THE COURT:  Yes.  A non-I.P.I. instruction

24   can be given where the Court feels that the

8

JGS_MAYSONET 4756

1    instructions that are prepared and approved by I.P.I.

2    don't somehow adequately cover the law. And that

3    sometimes happens in a particular case on a

4    particular fact situation. But I don't feel that's

5    the case here.

6           So most respectfully, defendant's

7    tendered instruction 2, 3, 4, and 5, all of which

8    attempt to explicate further than the I.P.I.

9    instruction does the law of accountability, for the

10    reasons aforementioned are most respectfully denied.

11    The Court declines to give those instructions.

12           Now, in doing that --

13        MR. BEUKE: Now we should be at 7.

14        THE COURT: Right.

15           What I'm concerned about is that

16    these get put together and made part of the common

17    law record.

18           Okay. That's the one we turned

19    around. So I'm on 7, circumstantial evidence.

20        MS. MANDELTORT: Right, 3.02.

21        THE COURT: 7 is 3.02.

22           People's 8 is 3.06-3.07.

23           People's 9 is 5.03, what we just

24    discussed.

9

JGS_MAYSONET 4757

1          MR. BEUKE:  Judge, as to People's 9, I

2  would just ask the Court to consider not including

3  the second paragraph:  "The word, conduct, includes

4  any criminal act done in furtherance of the planned

5  or intended act."

6          MR. MAREK:  Well, we believe it applies,

7  because the court-reported statement, which the Court

8  has not heard yet, is that --

9          THE COURT:  I don't think I have ever heard

10  it.

11          MR. MAREK:  -- what was contemplated,

12  according to Mr. Maysonet, is they were going to kill

13  or rob somebody.  And so if the intended act was a

14  robbery, that's a situation where you put any

15  criminal act done in furtherance of the planned or

16  intended act.

17           The planned and intended act

18  may very well have been just to rob the

19  victims, according to Mr. Maysonet.  The murder then

20  develops from the planned and intended

21  act, and that's what that last paragraph is

22  there for.

23          MR. BEUKE:  Judge, I think that's possibly

24  one interpretation of the court-reported statement,

JGS_MAYSONET 4758

1    but I think there's a fair and reasonable

2    other interpretation, and that involves -- you

3    haven't heard the court-reported statement yet,

4    Judge, but I think in it what Mr. Marek's referring

5    to is the fact that when someone -- the question

6    that's asked is when someone wears a hoody, what

7    does that usually mean to you, and then he says, to

8    kill or rob or steal a car or something to that

9    effect.

10              It doesn't -- it's not clear from the

11   court-reported statement that Mr. Maysonet knows that

12   that's what they're going to do when he goes with

13   them in the car.

14              In fact, I think there's a part of

15   the court-reported statement that says, what were you

16   going over there for, and he said they were waiting

17   for some dope, and then that's crossed out, and

18   something is inserted.

19              And then -- so I think from the

20   evidence that you haven't really heard yet, but you

21   will hear, that action may not be as clear as

22   Mr. Marek makes it sound.

23              THE COURT:  But I think that's for the jury

24   to decide.

11

1              Okay.  All right.  So this one is

2    being given over defense objection.  This is 5.03

3    with the second paragraph.  Okay.  That's 9.

4              10 is 5.06.

5         MR. BEUKE:  Judge, our only objection as to

6    that one is that we tendered our instructions that we

7    think would more adequately instruct the jury for the

8    record.

9         THE COURT:  Very well.  In our meeting

10   in September, I'll let the committee know how you

11   feel.

12        MR. BEUKE:  You can cite me, Judge.

13        THE COURT:  People's 11 is 7.01, definition

14   of first degree.

15             7.02 is the issues in first degree as

16   to Torrence.  That's People's 12.

17             People's 13 is the issues in first

18   degree as to Kevin.

19             I'm saying that solely because I'm

20   looking to see if that's true.

21             People's 14 is 26.01.  Have you --

22        MS. MANDELTORT:  I left it for him.  I gave

23   him the new ones based on the corrections we had last

24   night.

12

JGS_MAYSONET 4760

1     MR. BEUKE:  Okay.

2     THE COURT:  With the offenses of first

3  degree murder.  So it now reads as we all agreed last

4  night.  We discussed that paragraph last night --

5     MR. BEUKE:  No objection.

6     THE COURT:  -- having some concern because

7  we were suddenly talking about counts, which sort of

8  isn't anyplace else, and we kind of tried to make it

9  clearer to the jury that there are, in fact, two

10  offenses charged, and that's why they're getting four

11  verdict forms.  That's 14, 26.01.

12     Then we've got not guilty, first

13  degree murder of Torrence; guilty, first degree

14  murder of Torrence.  Guilty, first degree murder of

15  Kevin; not guilty, first degree murder of Kevin.

16     The only thing left out is the

17  ultimate decision about the defendant's testifying.

18  Just remember, if he isn't, we'll do it, and we'll

19  leave that in abeyance until that decision is made.

20  These need to go into the court file.

21     MR. RUECKERT:  This is in the case of

22  People versus Chris Gossens.  Judge, I assume from

23  the way the evidence is going in that they're going

24  to publish the statement of Jose Maysonet today.  And

13

JGS_MAYSONET 4761

```
1      I also presume that the Court is aware of the law,

2      but if you will allow me --

3                THE COURT:  Thank you very much.

4                MR. RUECKERT:  -- but if you'll allow me

5      to move in limine for you not to consider the

6      statement and/or the photographs attached to that

7      statement in the case against Mr. Gossens, that will

8      be my motion.

9                THE COURT:  Very well.  Well, the Court

10     does confess that it really does understand that

11     statements of one defendant cannot be moved in or

12     considered against another defendant unless there's a

13     conspiracy issue or something like that, which is not

14     the case here.

15                    But certainly, I am listening to the

16     evidence.  I am the trier of fact in your case, and

17     I'm listening to the evidence of facts that goes to

18     Mr. Gossens.  Mr. Maysonet's statement is not

19     anything I would consider.  That's not a case I'm the

20     trier of fact in.  That's the jury's business.

21                MR. RUECKERT:  And the photographs attached

22     to that statement.  Okay.  Another thing, Rick and I

23     both --

24                THE COURT:  Are there photographs attached?
```

14

JGS_MAYSONET 4762

1          MR. RUECKERT:  Yes, there are.

2          THE COURT:  I'm not going to consider any

3    evidence that goes only to Maysonet.

4          MR. BEUKE:  Judge, after we talked

5    yesterday and I saw the chart that the state had

6    brought down yesterday -- Judge, when we went through

7    the testimony with the beat officer, and I think -- I

8    don't know if any of the officers may have testified

9    as to the actual dimensions of the scene, there was

10   some confusion as to where streets are.

11         THE COURT:  There sure was.

12         MR. BEUKE:  The state's attorneys brought

13   down in the afternoon a plat or a chart that I

14   think -- I'm not sure, but they may have used in the

15   trial of Alfredo Gonzales.

16              I looked at that plat, and my

17   recollection from being out at the scene is that that

18   plat is inaccurate as to how it shows the streets or

19   the positioning of the streets.  After court last

20   night, Randy and I went out to the scene, and we

21   drove the scene, and I think it is inaccurate.

22         MR. MAREK:  In what way?

23         MR. BEUKE:  St. Louis and Drake --

24         MR. RUECKERT:  St. Louis is clearly west of

15

JGS_MAYSONET 4763

1    the scene of the crime.  It's clearly west, and it's

2    west by half a block, and St. Louis does go through.

3    St. Louis ends at North Avenue.  You have to jog east

4    and then turn north.

5            THE COURT:  The problem is the two of you

6    cannot testify.

7            MR. BEUKE:  Right.  And that's why this

8    morning, Mr. Rueckert and another attorney from our

9    office went out to the scene.  She went through the

10   scene.  Her name is Joanna Chalcom (phonetic), and

11   she's viewed the scene.  She's driven it this

12   morning.

13           I don't know if any of the detectives

14   are going to testify --

15           THE COURT:  I have no idea.

16           MR. BEUKE:  -- on the plat.

17           THE COURT:  I have no idea.

18           MS. MANDELTORT:  We hadn't --

19           MR. MAREK:  I hadn't planned to use it

20   except that the cross of the beat officer, which we

21   think was way beyond the scope, seemed to confuse the

22   issue.

23           THE COURT:  I don't think anybody followed

24   any of that, because I certainly didn't, and I'm

JGS_MAYSONET 4764

1    reasonably intelligent.  Trying to visualize all that

2    jigging and jogging from mere testimony is hard.  You

3    obviously had some issue --

4              MR. BEUKE:  Right, Judge.

5              THE COURT:  Right.  I'm saying that having

6    done that without some demonstrative evidence, my

7    guess is -- I mean, I just gave up at some point.

8              MR. BEUKE:  I'm going to use the plat if

9    they're not going to use it.

10             MS. MANDELTORT:  If it's inaccurate --

11             MR. BEUKE:  What has to be

12   demonstrated -- and I think what the plat does is, at

13   least, it sets the street.

14             THE COURT:  I'm not going to allow it to be

15   used if it's established to me that it's inaccurate.

16   Now, if somebody wants to draw a new one, that's

17   fine.  That doesn't make sense.  You're claiming that

18   it's inaccurate, then you want to use it.

19             MR. RUECKERT:  Can Joanna testify to the

20   scene?

21             MS. MANDELTORT:  I have a problem with her

22   coming in out of the blue.

23             MR. RUECKERT:  You can interview her.

24             THE COURT:  You're entitled to put someone

17

JGS_MAYSONET 4765

1    on if you think it's inaccurate.  What I'm saying is

2    if it's conceded -- and I don't know that it is

3    inaccurate in some significant way.

4         MR. RUECKERT:  Somebody is going to have

5    to describe these streets.  Now, if the police

6    officer --

7         THE COURT:  You don't have to do anything

8    but die and pay taxes.

9         MR. RUECKERT:  And if the police officers

10   can't do that, you don't have a problem with bringing

11   in this witness to do it then?

12        MR. BEUKE:  I mean, we'll make her

13   available for the state to interview her.

14        THE COURT:  Well, I think we need to go

15   back to the plat.  Because I'm telling you,

16   somebody --

17        MR. RUECKERT:  We can make the plat work if

18   you cross out the streets.

19        MR. MAREK:  There's nothing inaccurate on

20   that plat.

21        MR. RUECKERT:  Absolutely, Frank.

22        MR. BEUKE:  Well, they can use the plat,

23   and if it's not inaccurate, that's fine.

24        THE COURT:  You guys are jumping over a

18

JGS_MAYSONET 4766

1    more fundamental issue; okay?  That is to establish

2    whether or not it's inaccurate.  I, as the judge in

3    this trial, am not going to allow some inaccurate

4    plat to be used.

5              Do you have the plat down here?

6         MS. MANDELTORT:  Yes.

7         THE COURT:  Would you get it?

8         MR. BEUKE:  I'm just saying, if --

9         THE COURT:  This case is going to Monday,

10   I can see it.  To both sides, this is what I'm

11   really saying, because I really see the issues

12   somewhat differently, and I have a different

13   responsibility.

14              If positioning of streets, et cetera,

15   is really something that needs to be addressed, then

16   it needs to be addressed with accuracy.  If it's

17   somehow a pivotal issue -- and I would assume,

18   vaguely remembering the first trial, that it really

19   is.

20              And I think to expect the jury to

21   keep all this stuff in their heads in terms of

22   some visual picture without the aid of a plat is

23   nutty.

24        MS. MANDELTORT:  What's inaccurate?

19

JGS_MAYSONET 4767

```
 1              MR. RUECKERT:  This is.  It doesn't work

 2     this way.  Drake, you turn off St. Louis, and you go

 3     down, and there is no street in here, Frank.  This is

 4     wrong, and this is wrong.  This is St. Louis.

 5              MR. MAREK:  No, here's St. Louis.

 6              MR. RUECKERT:  No, it isn't, Frank.  I was

 7     out there.

 8              MR. MAREK:  I drove down this street, and

 9     you get to North Avenue, and it jogs, and you pick it

10     up over here.

11              MR. RUECKERT:  If you drive down

12     St. Louis, you run into 3506.

13              MR. MAREK:  No, you come to the middle of a

14     block.

15              MR. RUECKERT:  Frank, I was there this

16     morning at 8:00 o'clock in the morning, and Joanna

17     will testify to that.

18              MR. BEUKE:  All right.  If that's accurate

19     as to your recollection --

20              MR. MAREK:  I mean, what does it have to do

21     with anything?

22              MR. BEUKE:  It's good for the jury to know.

23     He says in the statement the route he took.  I think

24     it's going to be helpful for the jury to know the
```

20

JGS_MAYSONET 4768

1       streets.

2               THE COURT:  What is the inaccuracy that is

3       substantive in any way?

4               MR. BEUKE:  Well, Judge, my recollection is

5       Drake doesn't go through south to north on North

6       Avenue.

7               MS. MANDELTORT:  It doesn't.  It stops

8       right here.

9               MR. BEUKE:  This is North Avenue.  My

10      recollection is you can't turn and go southbound on

11      Drake off of North Avenue.

12              THE COURT:  Well, it's clear to me -- does

13      somebody have a map of Chicago?

14              MR. BEUKE:  That's my recollection.  And if

15      the detectives --

16              MS. MANDELTORT:  Then we just won't use it.

17      If they're maintaining it's not accurate, then we

18      won't use it, and that alleviates the issue of its

19      accuracy.

20              MR. BEUKE:  Judge, here's my position.  I

21      can make this plat work if one of the detectives or

22      if Miss Chalcom can testify.  I think I can make it

23      work.

24              THE COURT:  Testify and say what?

21

JGS_MAYSONET 4769

1          MR. BEUKE:  Well, just to set the scene,

2     your Honor.  Just to set where St. Louis is, where

3     Drake is, where Central Park is, where the alleys

4     are.  I think that's all critical to their

5     determination --

6          THE COURT:  And you're saying that's not

7     where Drake and St. Louis and the alley are?

8          MR. BEUKE:  No, Judge.  This is the way the

9     streets fall; okay?  Homan, St. Louis, Drake, and

10    Central Park.  I'm saying south of North Avenue,

11    there really isn't a Drake because the streets run

12    from St. Louis to Central Park.  They run in an east

13    and west direction.  There is no break for Drake

14    Street.

15         THE COURT:  I really don't understand what

16    you're saying.

17         MS. MANDELTORT:  My understanding from what

18    the defendant told the police how this all comes to

19    be, and this is just how they get to the scene, is

20    that they take Potomac to St. Louis, and then he says

21    North to Drake -- he considered this the other leg of

22    Drake -- and over to the alley.  According to the

23    police, this break.  According to you, it's

24    St. Louis.

JGS_MAYSONET 4770

1          MR. BEUKE:  Okay.  Well, we can make this

2     plat work.

3          THE COURT:  Do you have a dick over there

4     from the area that knows?

5          MR. MAREK:  Rivera says this is Drake.

6     This becomes Drake right here.

7          THE COURT:  I mean, it is what it is.

8          MR. BEUKE:  And the streets, like you said,

9     Judge, it's not easy for me to remember.

10          THE COURT:  It's not like whatever that

11     street is is labeled.  That street isn't labeled.

12     Who knows what it is?  I don't know what it is.

13          MR. BEUKE:  Judge, for the record,

14     Detective Guevara is here.

15          THE COURT:  He's not on the record in terms

16     of testimony.  He is not sworn.  But you know the

17     area pretty well?

18          DETECTIVE GUEVARA:  Yes, I do.  St. Louis

19     ends right here.  Drake picks up here.  However,

20     St. Louis picks up again over here to the right, and

21     it goes north.

22          MS. MANDELTORT:  They're maintaining now

23     that Drake doesn't go to North Avenue.

24          DETECTIVE GUEVARA:  It does not.  This is

JGS_MAYSONET 4771

```
 1    definitely wrong.  This is dead right there.
 2              THE COURT:  This dead ends here?  What's
 3    here?
 4              DETECTIVE GUEVARA:  Nothing.  Drake only
 5    ends right here at North Avenue.  It doesn't pick up
 6    again.  St. Louis picks up again east going north.
 7              MR. BEUKE:  So Drake starts here?
 8              DETECTIVE GUEVARA:  It starts at North
 9    Avenue.
10              MS. MANDELTORT:  So when they say they
11    went St. Louis to Drake, this is the leg they picked
12    up?
13              DETECTIVE GUEVARA:  Right.
14              THE COURT:  This unlabeled thing is Drake?
15              DETECTIVE GUEVARA:  Drake, definitely.
16              THE COURT:  What you're saying is this
17    comes here, and it ends just because it doesn't go
18    through?
19              DETECTIVE GUEVARA:  Correct.
20              THE COURT:  You've got to do this to pick
21    up Drake again.  Well, then that's not incorrect.
22              MS. MANDELTORT:  Just, this is a dead end.
23              THE COURT:  But it's dead ended by the
24    structures.
```

24

```
1                    DETECTIVE GUEVARA:  No, no.  There is no
2    Drake going south of North Avenue.  There is no
3    street here.  Central Park comes here, goes this way.
4    Drake goes this way.
5                    MR. BEUKE:  I mean, it's not an issue.  He
6    doesn't say he uses Drake south of North Avenue.
7                    THE COURT:  Right, but that's incorrect.
8    Randy is correct.  There is no Drake Street here.
9                    DETECTIVE GUEVARA:  No.
10                   MS. MANDELTORT:  But the map is deceiving
11   to the jury that there's a street there that doesn't
12   exist.
13                   DETECTIVE GUEVARA:  Your Honor, the map is
14   accurate as far as St. Louis going to Drake and Drake
15   north.
16                   THE COURT:  There just is no street here.
17                   DETECTIVE GUEVARA:  Going south.
18                   MR. BEUKE:  I've got to use it, though,
19   Judge.  I'll use it if I can use it through Detective
20   Guevara.
21                   MS. MANDELTORT:  I don't want the jury
22   being shown a diagram that's not right.
23                   THE COURT:  Do you have anybody up there
24   that can white out those lines?
```

25

JGS_MAYSONET 4773

1          MR. RUECKERT:  A secretary can do that with

2     Whiteout.

3          THE COURT:  It looks to me like all we have

4     to do is get rid of this and just extend these lines

5     over.  Get rid of that street.  I'll do it if

6     somebody has a black ink pen.

7               I thought what you were saying -- I

8     thought you were saying St. Louis is where the wrong

9     Drake is here.  Do you understand what I'm saying?

10    There just isn't any street there at all.  It's just

11    that there's no street called Drake going south of

12    North Avenue.

13         MR. BEUKE:  There is no street called Drake

14    going south of North Avenue.

15         MR. MAREK:  You're saying it's different

16    from what he says?

17         MR. BEUKE:  This address where they have

18    the lot is not directly opposite St. Louis.

19         MR. MAREK:  No, I think you're right.  It

20    isn't.  St. Louis jogs this way probably

21    approximately to where this alley is.  Because

22    St. Louis is 3500 here.  Do you know what I'm saying?

23         MR. BEUKE:  Yes, I do remember that you

24    come out at a different spot.

26

JGS_MAYSONET 4774

1          THE COURT:  What's the address of the

2    incident?

3          MR. BEUKE:  3426.

4          MS. MANDELTORT:  So that's wrong, too.

5          MR. BEUKE:  You know what I'm saying,

6    Judge?  See, these are accurate as to the addresses

7    of the streets, the westbound addresses.

8          THE COURT:  There's a street on there that

9    does not exist.

10         MS. MANDELTORT:  If there's other problems,

11   let's figure it out.  If you're saying this isn't

12   accurate, what's the point of using this?

13         MR. BEUKE:  I think Guevara could clear it

14   up if he testifies.

15         MR. MAREK:  We can't use it.  It's all

16   screwed up.

17         THE COURT:  No, I'm not going to allow you

18   to use something that somebody has to clear up.  One

19   of the criteria for the judge allowing the use of

20   demonstrative evidence is that it's accurate, and

21   that's not accurate.

22              Because you're saying that if you go

23   up St. Louis, right, and you get to North Avenue, you

24   are not facing 3430 and 3428, and that the lot is not

27

JGS_MAYSONET 4775

```
 1    in the same place in relationship to St. Louis.
 2              MR. MAREK:  You're further west.
 3              MR. BEUKE:  It's about a block to the lot.
 4              MS. MANDELTORT:  The other point of the
 5    diagrams -- if all it's going to do is make it
 6    worse --
 7              THE COURT:  I'm suggesting to both of
 8    you that somebody needs to do a plat, because
 9    otherwise --.
10              MR. RUECKERT:  Wait a minute.  Why don't
11    you just white out all the numbers, and then let
12    Guevara put them in?
13              THE COURT:  Now, that's an --
14              MR. BEUKE:  Idea.
15              MS. MANDELTORT:  I don't know if Guevara
16    knows the numbers off the top of his head.
17              MR. RUECKERT:  You can figure it out.
18              THE COURT:  Is that the right number of
19    structures?  And Frank is also saying that that's not
20    where Drake goes when it picks up again.
21              MR. RUECKERT:  No, because this number is
22    wrong.  That's the only reason.  The number is wrong.
23    If you white out the numbers, you don't have a
24    problem.
```

28

JGS_MAYSONET 4776

```
1              MS. MANDELTORT:  He's saying the whole
2    block of buildings isn't in the place where it's
3    supposed to be.
4              MR. RUECKERT:  Sure, it is.
5              MS. MANDELTORT:  He's saying, no.
6              THE COURT:  You're saying that St. Louis
7    picks up again after the dog leg?
8              MR. MAREK:  Right.
9              THE COURT:  My understanding, Frank, is
10   that you were saying that when you dog leg to pick
11   up Drake again, it's not way over here.  That it's
12   more --
13             MR. MAREK:  Right.  You jog.  You're not
14   this close to the scene of the crime.  The scene of
15   the crime is farther back here.
16             MR. RUECKERT:  I'll tell you exactly
17   what's wrong with this plat.  This is not St. Louis.
18   This is St. Louis.  This street in here doesn't
19   exist.
20             THE COURT:  See, it's all wrong.
21             MR. RUECKERT:  No, listen to me.  This is
22   St. Louis, and this is 3506.  You come up, and you
23   run right into 3506.  You take a right, and that's
24   St. Louis.  You take a left, and that's Drake.
```

29

JGS_MAYSONET 4777

1          MR. BEUKE:  I mean, that's how it could be

2     all cleared up.

3          MR. RUECKERT:  And the lot is right here at

4     this alley.  It's real easy to clear up.

5          THE COURT:  It's not easy to clear up.  I'm

6     not going to allow it as a piece of demonstrative

7     evidence.  That's inaccurate.

8          MS. MANDELTORT:  It can also all be done

9     through verbal testimony.  I can count on a hand the

10    number of times I use diagrams as opposed to people

11    just testifying.

12         MR. BEUKE:  Judge, if you are in this

13    alley, at some point you turn into the alley at

14    Drake.  Until you get to St. Louis, and even past

15    St. Louis until you get to this vacant lot, you

16    can't see the street until you get to this vacant

17    lot.

18              Now, they may have testimony that

19    says when Maysonet took them out there, he took them

20    directly to this vacant lot, and that's where

21    Maysonet said he parked when he saw whatever it was

22    that he saw.  I mean, if that's their testimony,

23    that's fine.

24              But like Randy says, this plat would

30

JGS_MAYSONET 4778

1     be right if St. Louis was just taken out and it was

2     put where Drake is, and Drake is taken out and put

3     where Central Park is.

4           THE COURT:  If you guys can fix it.  I'm

5     just saying I'm not going to allow it with any

6     inaccuracies in it.

7           MR. BEUKE:  You see what I'm saying, Frank?

8           MR. MAREK:  Yes, but it's too wrong.  I

9     think we discarded it last time for that reason.

10          THE COURT:  I don't remember.  I really

11    don't remember.  Except, see, last time, these

12    weren't really an issue, Drake and St. Louis.  It was

13    just this around here (indicating.)

14         MR. BEUKE:  Randy is right, though.  If I

15    can white out St. Louis and put St. Louis here and

16    white out Central Park and put Central Park, he goes

17    here, he comes up to Drake, and then he comes down

18    past St. Louis and into the lot.

19         THE COURT:  That's up to you guys.  All I'm

20    saying to you is I listen to trials all the time, and

21    I think I finally put my pen down with all that

22    jigging and jogging.  Nobody has a visual picture of

23    that.

24         MR. BEUKE:  That's my point.  My theory of

31

JGS_MAYSONET 4779

```
1    the case is so important and the plat can be made to
2    work if we just do that.
3              THE COURT:  It's too wrong.  It's spatially
4    incorrect.
5              MR. BEUKE:  Judge, it isn't.  If we just
6    move St. Louis up one street and Drake up one street,
7    it's absolutely right.
8              THE COURT:  If you guys can fix it so it's
9    accurate, that's fine.  But I'm telling you now, I'm
10   not going to use it with any inaccuracies.
11             MS. MANDELTORT:  May I suggest this?  Why
12   don't we finish Detective Montilla, which has
13   nothing to do with this.  Maybe we'll take the
14   witnesses out of order, and we can resolve this this
15   afternoon.
16             THE COURT:  All right.  I mean, the
17   foundation for even admitting it is does this fairly
18   represent, and if the answer is, no, you've got a
19   problem.
20                       (WHEREUPON, the following was
21                        had in open court, outside the
22                        presence of the jury:)
23             THE DEFENDANT MAYSONET:  Good morning, your
24   Honor.
```

JGS_MAYSONET 4780

```
 1              THE COURT:  Good morning.
 2              THE INTERPRETER:  Good morning, your Honor.
 3    Martha Cruz, Spanish interpreter, for the record.
 4                        (WHEREUPON, the following was
 5                         had in open court, in the
 6                         presence of the jury:)
 7              THE COURT:  Good morning, ladies and
 8    gentlemen of the jury.
 9              THE JURY:  Good morning.
10              THE COURT:  State, are you ready to
11    return --
12              MS. MANDELTORT:  Judge, I believe it's time
13    for cross, but I'll get the witness.
14                        (Brief pause.)
15              THE WITNESS:  Good morning, your Honor.
16              THE COURT:  Good morning, Detective.  You
17    understand that you are still under oath?
18              THE WITNESS:  Yes, ma'am.
19              THE COURT:  Very well.  Mr. Beuke?
20              MR. BEUKE:  Thanks, Judge.
21
22
23
24
```

JGS_MAYSONET 4781

1     WHEREUPON,

2                          FERNANDO MONTILLA,

3     the witness on the stand at the time of recess,

4     having been previously first duly sworn, under oath

5     was further examined and testified as follows:

6                          CROSS EXAMINATION

7                          BY MR. BEUKE:

8          Q.    Good morning, Detective.

9                          Detective, when you were asked

10    some questions yesterday by the assistant

11    state's attorney, Miss Mandeltort, do you recall

12    being asked as to how you initially got involved in

13    this investigation?

14         A.    Yes.

15         Q.    And I believe your testimony was that at

16    some point on July 15th of 1990, Sergeant Mingey came

17    to you and asked you to assist him in some way;

18    correct?

19         A.    Yes, sir.

20         Q.    Mr. Maysonet, my client, was in custody

21    at Area 5 that afternoon -- or that evening;

22    correct?

23         A.    Yes, sir.

24         Q.    And you were working on that day;

34

JGS_MAYSONET 4782

1     correct?

2          A.     Yes, sir.

3          Q.     You are, I think you described for us

4     yesterday, normally a property crimes detective?

5          A.     At that time, yes, sir, I was.

6          Q.     And as a property crimes detective, you

7     basically would handle burglaries, thefts, basic

8     property-related crimes, criminal?

9          A.     Yes, sir.

10         Q.     Possession of stolen motor vehicles, things

11    like that?

12         A.     Yes.

13         Q.     So Sergeant Mingey was not your supervisor

14    back then, was he?

15         A.     Correct.

16         Q.     He was the supervisor of the Violent Crimes

17    Section?

18         A.     Yes, sir.

19         Q.     And just so it's clear for the ladies and

20    gentlemen, the Area 5 Detective Division is divided

21    up into a Property Crimes Section and a Violent

22    Crimes Section?

23         A.     Yes, sir.

24         Q.     Okay.   When Sergeant Mingey came to you,

35

JGS_MAYSONET 4783

1    Detective, he asked you to translate for him;

2    correct?

3        A.   Yes, sir.

4        Q.   He needed somebody to speak with

5    Mr. Maysonet who could speak Spanish?

6        A.   Yes, sir.

7        Q.   Apparently, there weren't any other

8    detectives on the violent crimes side that evening,

9    or whatever it was, who spoke Spanish?

10        A.   Yes, sir, that's correct.

11        Q.   And you certainly agreed to help him?

12        A.   Yes, sir.

13        Q.   You don't have any information, do you,

14    Detective, as to whether or not Sergeant Mingey had

15    spoken with Mr. Maysonet prior to your going into the

16    room?

17        A.   Can you --

18        Q.   Do you know if Sergeant Mingey or any other

19    detectives on July 15th had spoken to Mr. Maysonet

20    prior to you going in the room?

21        A.   That's correct.

22        Q.   Okay.  So you and Sergeant Mingey were the

23    first detectives to speak with him that day?

24        A.   That I know of, yes, sir.

JGS_MAYSONET 4784

1       Q.   That you know of?

2       A.   Yes, sir.

3       Q.   There may have been others who spoke to him

4  that day, but you weren't aware of that?

5       A.   That's correct.

6       Q.   When you initially -- did Mingey brief you

7  before you went in to speak with Mr. Maysonet as to

8  what you were going to be questioning him about?

9       A.   No, sir.

10       Q.   So you had absolutely no knowledge of what

11  you were going in there and being asked to talk with

12  Maysonet about; correct?

13       A.   That's correct.

14       Q.   And the way the conversation initially

15  started was Mingey had you introduce yourself to

16  Mr. Maysonet; correct?

17       A.   Yes, sir.

18       Q.   Which you did?

19       A.   Yes.

20       Q.   And did you explain to him that he was

21  going to be asked some questions and that you were

22  going to interpret for Sergeant Mingey?

23       A.   Yes.

24       Q.   The questions came from Sergeant Mingey; is

JGS_MAYSONET 4785

```
 1    that fair to say?
 2         A.    No.   Prior to that, no.   When I first went
 3    in, it wasn't Sergeant Mingey asking questions.
 4         Q.    Okay.   Well, when you went in and met
 5    Maysonet for the first time --
 6         A.    Yes, I introduced myself.
 7         Q.     -- was Mingey there?
 8         A.    Yes.
 9         Q.    And at some point -- at that point, you
10    didn't know anything about the double murder on North
11    Avenue?
12         A.    Well, I knew about the murder.
13         Q.    Did you know any of the facts of the
14    murder?
15         A.    Yes.   When it originally happened, I was
16    working.   I responded to the scene.
17         Q.    Okay.   All right.   So you had some idea
18    as to where the bodies were found and the
19    approximate -- or the address of where it
20    happened and the date it happened and all of those
21    things?
22         A.    Yes, sir.
23         Q.    You had your own independent knowledge?
24         A.    Yes.
```

38

JGS_MAYSONET 4786

1   Q. But you hadn't worked on the investigation

2 at all from May 25th to July 15th, had you?

3   A. No, I did not, no.

4   Q. Okay. After you introduced yourself, at

5 some point, you told -- Sergeant Mingey had you

6 advise Mr. Maysonet of his constitutional rights;

7 correct?

8   A. Yes.

9   Q. And I think you told Miss Mandeltort

10 earlier, you did that in both Spanish and English;

11 correct?

12   A. Yes.

13   Q. Now, was it your impression after you had a

14 little bit of a conversation with Mr. Maysonet that

15 he understood some English, but he was more

16 comfortable in Spanish?

17   A. Yes, that's correct.

18   Q. When you advised him of his rights, did

19 you first do it in English and then in Spanish,

20 or did you do it in Spanish first and then in

21 English?

22   A. I do it in English. I give him the first

23 right in English, and then I repeat it in Spanish. I

24 do each right separately.

JGS_MAYSONET 4787

1      Q.   So you have a right to remain silent, you
2    did it in English and then in Spanish?

3      A.   And then in Spanish, yes.

4      Q.   And you did that with all the rights?

5      A.   Yes, sir.

6      Q.   And at that point on July 15th, Detective,
7    as best you knew, there was no attorney who had been
8    representing Mr. Maysonet; correct?

9      A.   Yes, sir, that's correct.

10     Q.   And the incident that he was there for was
11   something other than what you and Mingey were talking
12   to him about, that being the double murder?

13     A.   Yes, sir.

14     Q.   Okay.  Mingey wasn't the detective working
15   on this other case, was he?

16     A.   On which other case, sir?

17     Q.   On the other case that Mr. Maysonet was
18   there for?

19     A.   I don't know.

20     Q.   In any event, Detective, after you advised
21   him of his rights, it was Mr. Maysonet's decision to
22   agree to speak with you; correct?

23     A.   Yes, sir.

24     Q.   And I believe your testimony yesterday was

JGS_MAYSONET 4788

1    that at that time you had a conversation with him;

2    correct?

3          A.    Yes.

4          Q.    Well, the conversation really was Mingey

5    telling you questions to ask to Maysonet, and

6    Maysonet giving you answers; correct?

7          A.    Yes.

8          Q.    The conversation lasted about how long?

9          A.    A few minutes.  It wasn't real long.

10         Q.    What is the first question you asked him?

11         A.    The first question I asked was -- Sergeant

12   Mingey asked was, what are you trying to tell the

13   sergeant.

14         Q.    And what was Mr. Maysonet's response?

15         A.    About two guys that were killed.

16         Q.    And what was Mingey's next question?

17         A.    Who was the guys -- or where did it happen.

18         Q.    And what was his response?

19         A.    It happened on North Avenue someplace, but

20   he doesn't know the exact place.

21         Q.    Okay.  And what was the next question?

22         A.    Who did the murder.

23         Q.    Okay.  And what was Mr. Maysonet's

24   response?

41

JGS_MAYSONET 4789

1        A.   He didn't give any response.  No, I

2   don't -- you know, I'm not going to say.

3        Q.   Now, was that basically the extent of the

4   conversation on the 15th?

5        A.   Yes, sir.

6        Q.   Okay.  So he told you, I want -- I'm trying

7   to tell him something about a murder; right?

8        A.   Yes.

9        Q.   And he wasn't sure where the murder

10  happened?

11       A.   Yes.

12       Q.   And he wasn't sure of the date?

13       A.   Correct.

14       Q.   There were two guys that were killed on

15  North Avenue?

16       A.   Yes.

17       Q.   And then Mingey asked him who did it, and

18  he said, I couldn't tell?

19       A.   I can't -- he wanted to cut a deal.  Mingey

20  said, we don't make deals.

21       Q.   Okay.  But I'm talking about July 15th,

22  Detective.  Was there any discussions about a deal on

23  the 15th?

24            MS. MANDELTORT:  Judge, if we could have a

42

JGS_MAYSONET 4790

```
 1    sidebar?

 2              THE COURT:  Very well.

 3                   (WHEREUPON, the following was

 4                   had outside the

 5                   hearing of the jury:)

 6              MS. MANDELTORT:  Judge, I have

 7    admonished this witness per the Court's ruling

 8    not to go into the fact that there was a shooting or

 9    aggravated battery or the charge.  My concern is the

10    response to these questions may get into the fact

11    that he's trying to do something on this incident

12    involving the nine millimeter in exchange for

13    information on the murder.

14                   My concern is -- you know, we've kind

15    of dealt very carefully with what he's there on.

16              THE COURT:  You have to keep that in mind

17    as you put the questions, because if something comes

18    tumbling out --

19              MS. MANDELTORT:  My concern is if you keep

20    going into it, that's what's going to come out.

21              THE COURT:  The point is well-taken.  Just

22    think carefully how you pose the question.

23              MS. MANDELTORT:  Maybe lead him.

24
```

43

JGS_MAYSONET 4791

```
 1                    (WHEREUPON, the following was
 2                    had in open court, in the
 3                    hearing of the jury:)
 4   BY MR. BEUKE:
 5        Q.   Detective, just so you're clear, I'm
 6   talking about the incident -- the conversation on the
 7   15th of July; okay?
 8        A.   Okay.
 9        Q.   Now, was there any discussion about him
10   wanting a deal from you guys on the 15th?  You later
11   spoke to him in the Cook County Jail; correct?
12        A.   Yes, right.  Okay.  Yeah.
13        Q.   Is that when the topic of this deal came
14   up?
15        A.   In County Jail, yes.
16        Q.   So on the 15th, there really wasn't any
17   discussion about give me a deal or something?
18        A.   No, that's true.
19        Q.   So essentially, when you and Mingey left
20   the room on July 15th, you know, after that couple
21   minute conversation that you had with Maysonet who
22   basically told you, I know something about it, wasn't
23   sure where it happened or when it happened, but the
24   double murder on North Avenue, but he wouldn't give
```

44

JGS_MAYSONET 4792

1    you any names?

2         A.    No, he wouldn't give any names.

3         Q.    Okay.  Now, at that point, basically what

4    he told you --

5              THE COURT:  Shut the door.

6                   I'm sorry, Counsel.

7    BY MR. BEUKE:

8         Q.    -- basically what he had told you really

9    didn't help you all that much; correct?

10        A.    Yeah.  The point about the gun and

11   everything didn't put a lot of stuff together.

12        Q.    Okay.  I mean, it looked like he might know

13   something, but he really -- based on what he told you

14   guys on the 15th, he wasn't of any help to you guys

15   solving this crime?

16        A.    Correct.

17        Q.    Now, this was an open double murder on the

18   books at Area 5 for, at that point, almost two

19   months; correct?

20        A.    Yes, sir.

21        Q.    Would it be fair to say, Detective, that

22   double murders are some of the most serious offenses

23   that you guys work on up there?

24        A.    Yes.

JGS_MAYSONET 4793

1          Q.    That, you know, the potential

2     punishments --

3               MS. MANDELTORT:   Objection, Judge.

4               THE COURT:   Sustained.   Sustained.   Strike

5     that.   It will be stricken from the record.   The jury

6     is instructed to disregard.

7     BY MR. BEUKE:

8          Q.    Detective, when you left him on the 15th,

9     you never went back in to see him, did you?

10         A.    No, sir.   I went and did my property crime

11    jobs.

12         Q.    You had other jobs that you were working

13    on; correct?

14         A.    Yes, sir.

15         Q.    Did you take any notes during your

16    conversation with Mr. Maysonet on the 15th?

17         A.    No, sir, I did not.

18         Q.    You're familiar, are you not, Detective,

19    with what's commonly known as GPRs or general

20    progress report notes?

21         A.    Yes, sir.

22         Q.    Tell the ladies and gentlemen of the jury

23    what those are?

24         A.    It's a blank piece of paper.   It says,

46

JGS_MAYSONET 4794

1 General Progress Report.  We take those down when we

2 talk to victims, witnesses.  When they tell us

3 information, we write this down on that report.  We

4 use that for our notes.

5    And also, we keep that as a permanent

6 file with our records.  They go into files that are

7 later on needed for court.

8  Q. In addition to that, General Progress

9 Report notes, you use them, don't you,

10 Detective?

11  A. Yes, I do.

12  Q. You use them when you're taking down, like

13 you told the ladies and gentlemen, information from

14 witnesses.  You also use them when you're talking to

15 defendants, don't you?

16  A. Yes, sir.

17  Q. Okay.  That's an aid, at least, in --

18 something that aids you in the preparation of

19 ultimate police reports in the case; correct?

20  A. Yes, sir.

21  Q. You also use it as an aid when you're

22 working on an ongoing investigation; correct?

23  A. Yes, sir, to reflect --

24  Q. Sometimes investigations are passed on

47

JGS_MAYSONET 4795

1    from you to people who come on on the next shift;

2    correct?

3        A.    Yes, sir.

4        Q.    And if you have notes of witnesses that you

5    have spoken to, the next shift can take a look at

6    your notes and maybe get something in addition to

7    that?

8        A.    Yes.  We follow up each other from our

9    notes.

10       Q.    That's the purpose of writing notes down on

11   a General Progress Report form; correct?

12       A.    Yes, sir.

13       Q.    And those notes are always maintained at

14   Area 5 for any detective team that works on any case;

15   correct?

16       A.    Yes, they go with the street files.

17       Q.    Have you had an opportunity to review the

18   General Progress Report notes as they apply to this

19   case?

20       A.    No.

21       Q.    Have you ever seen the General Progress

22   Report notes prepared by any of the detectives that

23   worked on this case?

24       A.    No.

48

JGS_MAYSONET 4796

1       Q.   You didn't -- your work on this case on the

2   15th in terms of your conversation with Mr. Maysonet

3   was never reduced to any General Progress Report

4   note, was it?

5       A.   That's correct.

6       Q.   And on the 16th or the 17th or the 18th or

7   the 19th or the 20th, I'm assuming you worked on a

8   whole number of other cases?

9       A.   Yes.

10       Q.   Do you remember any of those cases?

11       A.   No.  Kind of vague.  I do property crime

12   jobs.  I probably responded to districts to process

13   prisoners.

14       Q.   In any event, Detective, between the 15th

15   and August 1st, would it be fair to say that you may

16   have worked on 50, 60 cases?

17       A.   On both, yes, sir.

18       Q.   On August 1st, Detective Mingey came to you

19   again; correct?

20       A.   Correct.

21       Q.   And on August 1st, you had a conversation

22   with Mingey in Area 5?

23       A.   Yes, sir.

24       Q.   He asked you to go with him to the County

JGS_MAYSONET 4797

```
 1     Jail; correct?
 2         A.    Yes, sir.
 3         Q.    Now, was it your understanding, Officer,
 4     that -- well, obviously, Detective, you went to the
 5     County Jail because Mr. Maysonet was in custody;
 6     correct?
 7         A.    Yes.
 8             MS. MANDELTORT:  Objection, Judge.  Well,
 9     no.
10     BY MR. BEUKE:
11         Q.    Well, that's where he was at; correct?
12         A.    Yes.
13             THE COURT:  We've been over that a million
14     times.  Proceed, Counsel.
15     BY MR. BEUKE:
16         Q.    When you went to the County Jail with
17     Sergeant Mingey initially on August 1st, did you
18     attempt to check either with the clerk's office or
19     with Mr. Maysonet as to whether or not an attorney
20     had been either appointed or retained by Mr. Maysonet
21     or his family to represent him?
22             MS. MANDELTORT:  Objection, Judge.
23             THE COURT:  Basis?
24             MS. MANDELTORT:  Ask for a sidebar.
```

JGS_MAYSONET 4798

```
 1                     (WHEREUPON, the following was
 2                     had outside the
 3                     hearing of the jury:)
 4          MS. MANDELTORT:  Judge, my concern at
 5   this point is, as the Court is aware, when a
 6   defendant retains an attorney for case A, and the
 7   police want to go and talk to him about case B, there
 8   is not an obligation on them to notify the attorney
 9   from case A, because his representation is unique to
10   that case.
11          My concern is that this line of
12   questioning leaves this jury to believe that
13   that attorney's representation somehow carried into
14   this representation, which is not true, and I don't
15   want the jury to be deceived as to the state of the
16   law on that.  He didn't have a lawyer on that
17   investigation.
18          MR. BEUKE:  They're the ones that put in
19   this waiver --
20          THE COURT:  Counsel, Counsel, Counsel.
21   What you need -- I know the point you're trying
22   to make, and you're entitled to make that point.  But
23   I don't want any confusion to this jury
24   that there was some duty on the part of this officer.
```

JGS_MAYSONET 4799

```
 1              MR. BEUKE:  I'll stay away from that,
 2    Judge.
 3              THE COURT:  You can certainly ask was there
 4    an attorney present when you spoke with him.  You're
 5    entitled to go into it, but I don't want the
 6    impression that they somehow did something wrong.
 7              MR. BEUKE:  Okay, Judge.
 8                        (WHEREUPON, the following was
 9                         had in open court, in the
10                         hearing of the jury:)
11    BY MR. BEUKE:
12        Q.   Detective, when you went with Sergeant
13    Mingey to the Cook County Jail on August 1st, there
14    was no attorney for Mr. Maysonet who was present;
15    correct?
16        A.   Correct.
17        Q.   Was it your understanding that Mr. Maysonet
18    had an attorney representing him on an unrelated
19    case?
20              MS. MANDELTORT:  Objection, Judge.
21              THE COURT:  Sustained.
22    BY MR. BEUKE:
23        Q.   Well, you went, and initially you have to
24    check in at, I think, Division 1 and speak with
```

JGS_MAYSONET 4800

1    people in the Internal Affairs Section to arrange the

2    meeting; correct?

3        A.    Yes.

4        Q.    And Mr. Maysonet was brought down from

5    wherever he was at within the complex, and he was

6    brought into a room with you; correct?

7        A.    Yes.

8        Q.    There was a form that was written out

9    by you or Sergeant Mingey?  Do you recall, Detective?

10       A.    I think it was filled out by the sheriff's

11   officer.

12       Q.    Okay.  In any event, Mr. Maysonet signed

13   this form?

14       A.    Yes, sir.

15       Q.    Okay.  And you had a conversation with

16   Mr. Maysonet on August 1st; correct?

17       A.    Yes, sir.

18       Q.    The conversation was, again, you and

19   Sergeant Mingey and him?

20       A.    Yes, sir.

21       Q.    And once again, before you spoke to him,

22   you advised him of his rights both in English and

23   Spanish?

24       A.    Yes, sir.

JGS_MAYSONET 4801

1      Q.    And so it's clear for the ladies and

2  gentlemen, Detective, on August 1st, again, you

3  weren't really working on this double murder;

4  correct?

5      A.    No, sir.

6      Q.    You were there as kind of an aid to

7  Sergeant Mingey for the purposes of interpreting his

8  questions to Mr. Maysonet and Mr. Maysonet's answers

9  to him?

10     A.    Yes, sir.

11     Q.    And again, that was all done in Spanish?

12     A.    Yes, sir.

13     Q.    When you spoke to him on the 1st of August,

14  Miss Mandeltort asked you some questions yesterday

15  about that conversation.  Do you recall those

16  questions?

17     A.    Vaguely.

18     Q.    And I think what you told the ladies and

19  gentlemen of the jury is that he basically told you

20  the same thing that he told you the first time;

21  correct?

22     A.    Yes, sir.

23     Q.    And he basically -- but at that point,

24  the conversation, at least out of Mr. Maysonet's

JGS_MAYSONET 4802

```
 1    mouth, for the first time came out something

 2    about a deal or some help or something;

 3    correct?

 4         A.   Yes, sir.

 5         Q.   And it was your understanding clearly that

 6    he was -- he wasn't a guest of the Cook County Jail?

 7    He was there on an unrelated case; correct?

 8         A.   Yes, sir.

 9              MS. MANDELTORT:  Objection, Judge.

10              THE COURT:  Sustained, Counsel.  That has

11    been established.  Let's proceed.

12              MR. BEUKE:  All right, Judge.

13    BY MR. BEUKE:

14         Q.   When you spoke to him at that time, you

15    and/or Sergeant Mingey through you told him that you

16    weren't in a position to make any deals with him;

17    correct?

18         A.   Yes, sir.

19         Q.   And again, I'm assuming, Detective, that

20    this was a very short conversation?

21         A.   Yes, sir.

22         Q.   When you say he told you basically the

23    same thing he told you the first time, again, he told

24    you there was two kids killed on North Avenue;
```

55

JGS_MAYSONET 4803

1    correct?

2        A.   Yes, sir.

3        Q.   And he wasn't sure of the date and

4    wasn't actually sure of exactly where it happened;

5    correct?

6        A.   Yes, sir.

7        Q.   And he didn't give you guys any names on

8    the 1st, also; is that correct?

9        A.   That's correct.

10        Q.   Again, when you went there, Detective, you

11    and Sergeant Mingey were there for the express

12    purpose of hoping to get some names; correct?

13        MS. MANDELTORT:  Objection, Judge, to the

14    form of the question.

15        THE COURT:  Sustained.

16    BY MR. BEUKE:

17        Q.   Well, when you and Sergeant Mingey went

18    to the County Jail on August 1st, you went there to

19    talk to Mr. Maysonet and follow up on that

20    conversation you had with him on July 15th; is that

21    fair to say?

22        A.   Yes, sir.

23        Q.   And on July 15th, he didn't tell you the

24    names -- or any names of individuals involved; is

JGS_MAYSONET 4804

1      that fair to say?

2          A.    Yes, sir.

3          Q.    Did you believe that he may know the names

4      of the people who may have been involved and that was

5      one of the reasons you went back on August 1st?

6          A.    Yes, sir.

7          Q.    On August 1st, again, he didn't give you

8      any names; correct?

9          A.    That's correct.

10          Q.    And you told him clearly, I can't make you

11     a deal?

12              THE COURT:   Sustained, Counsel.   That's

13     been said three times.

14     BY MR. BEUKE:

15          Q.    To the best of your knowledge, Detective,

16     did any of the Area 5 detectives, Sergeant Mingey,

17     any of the other people working on this homicide

18     between July 15th and August 1st, develop any new

19     leads on that double homicide?

20          A.    Not that I know of.

21          Q.    And after you left the County Jail on

22     August 1st, Detective, you and Mingey, I assume, went

23     back to Area 5; correct?

24          A.    Yes, sir.

JGS_MAYSONET 4805

```
1        Q.    And did you and Mingey prepare a
2   police report concerning your visit to the County
3   Jail?
4        A.    No, sir.
5        Q.    Did you prepare any sort of report that
6   documented that you and Sergeant Mingey had a
7   conversation with Mr. Maysonet or any of the contents
8   of the conversation on August 1st?
9        A.    No, sir.
10       Q.    On August 2nd?
11       A.    No, sir.
12       Q.    You never prepared a report about it?
13       A.    No.
14       Q.    Did you or Mingey take any notes again
15  during that conversation?
16       A.    No, sir.
17       Q.    General Progress Report notes, I mean?
18       A.    No.
19       Q.    So as far as you know, the only people who
20  knew about the conversation that you had with
21  Mr. Maysonet either on the 15th or August 1st were
22  you and Mingey?
23       A.    Yes, sir.
24       Q.    There were no written reports that were
```

58

JGS_MAYSONET 4806

1    prepared that could have been reviewed by any other

2    detectives working on this case; fair to say?

3         A.    Right.

4         Q.    On -- if you can Detective,

5    Miss Mandeltort, again, I think she then asked

6    you some questions about the date of August 22nd

7    of 1990, and you at some point had occasion to

8    once again become involved in this investigation;

9    correct?

10        A.    Yes, sir.

11        Q.    Now, I think you indicated earlier

12   that you were normally a midnight detective back

13   then?

14        A.    I was the early car.  I started at

15   11:00 o'clock.  I would arrive around 10:15, 10:30 at

16   night.

17        Q.    When you start that early, what time do you

18   normally finish?

19        A.    7:00, 7:30 in the morning.

20        Q.    Now, did you work the evening of the 21st

21   into the morning of the 22nd?

22        A.    I think I did.

23        Q.    And did you work overtime into, you

24   know, the afternoon hours on any other particular

59

JGS_MAYSONET 4807

```
 1     case?

 2         A.   I think I did.

 3         Q.   Okay.  Did you just happen to be in the

 4     area when Mr. Maysonet was brought in?

 5         A.   Yes, sir.

 6         Q.   Okay.  Did you see him brought in?

 7         A.   No, sir.

 8         Q.   Now, Detective Paulnitsky was the

 9     person who brought him in?  You're aware of that;

10     correct?

11             MS. MANDELTORT:  Objection, Judge.  He said

12     he didn't see him brought in.

13             THE COURT:  Sustained.

14     BY MR. BEUKE:

15         Q.   Well, do you know how Mr. Maysonet got

16     there?

17             MS. MANDELTORT:  Objection, Judge.

18     BY MR. BEUKE:

19         Q.   When was the first time you saw

20     Mr. Maysonet on the 23rd -- I'm sorry -- the 22nd?

21         A.   I can't recall the time.

22         Q.   Do you know if it would have been in the

23     morning hours, afternoon hours, or the evening

24     hours?
```

JGS_MAYSONET 4808

1     A.   I think it was towards closer to the

2  afternoon hours.

3     Q.   Can you pin it down any better, Detective,

4  or not?

5     A.   No, sir.

6     Q.   How was it that you got involved in the

7  investigation on that day?

8     A.   I was asked by Detective Paulnitsky that he

9  needed me to do some interpreting.

10    Q.   Okay.  Kind of similar to what Mingey had

11 asked you to do?

12    A.   Yes, sir.

13    Q.   Paulnitsky, did you see him in the violent

14 crimes offices up there on the second floor at Grand

15 and Central?  I mean, is that where you found each

16 other?

17    A.   Yes, sir.

18    Q.   And do you know if Paulnitsky had

19 interviewed or had been with Mr. Maysonet prior to

20 your getting there?

21         MS. MANDELTORT:  Objection, Judge.  How

22 would he know if he wasn't there?

23         MR. BEUKE:  That's what I'm asking, Judge.

24         THE COURT:  How would he know except by

61

JGS_MAYSONET 4809

```
 1    hearsay if he wasn't there when he got there?
 2    BY MR. BEUKE:
 3         Q.    Well, you don't have any knowledge, do you,
 4    Detective, as to what -- or if Mr. Maysonet was
 5    spoken to by anyone prior to your meeting him that
 6    afternoon; fair to say?
 7         A.    Yes, sir.
 8         Q.    Paulnitsky comes and gets you, and you
 9    again go into the room with Mr. Maysonet;
10    correct?
11         A.    Yes, sir.
12         Q.    And when you met Mr. Maysonet, I mean, you
13    had met him twice before?  You knew who he was?
14         A.    Yes, sir.
15         Q.    Did you, again, how are you doing, or words
16    to that effect?
17         A.    Yes, sir.
18         Q.    Was Mr. Maysonet handcuffed or --
19         A.    I believe he was.
20         Q.    There's a ring on the wall in the interview
21    rooms at Area 5?
22         A.    Yes, sir.
23         Q.    And would that have been what he was
24    handcuffed to?
```

JGS_MAYSONET 4810

```
 1          A.   Yes, sir.

 2          Q.   When -- at some point, you had a

 3     conversation with him again; correct?

 4          A.   Yes, sir.

 5          Q.   And the conversation, again, was questions

 6     posed to you by Paulnitsky, and then you would refer

 7     the questions to Maysonet?

 8          A.   Yes, sir.

 9          Q.   And I think you testified, Detective, that

10     at that time, he repeated basically his previous

11     statements that he had given to you and Mingey;

12     correct?

13          A.   That's correct.

14          Q.   Did he tell you, Detective, at that time

15     that he could not provide any further information

16     because he had been threatened by Latin King gang

17     members with the death of himself, his wife, and

18     child if he informed to the police?

19          A.   That's correct.

20          Q.   You were still asking him to provide you

21     with names of the guys who had done these murders;

22     correct?

23          A.   I believe so.

24          Q.   And after he told you that, that he had
```

JGS_MAYSONET 4811

```
 1    been threatened by these Latin King gang members who
 2    were going to kill him, his wife, and his kid, you or
 3    Detective Paulnitsky decided to place him in custody
 4    for the murders; correct?
 5         A.   Yes, sir.
 6         Q.   Now, that was sometime in the afternoon
 7    hours, Detective, as best you recall?
 8         A.   Yes, sir.
 9         Q.   Once again, that conversation that you and
10    Paulnitsky had with Maysonet, it wasn't a very long
11    conversation; fair to say?
12         A.   That's correct.
13         Q.   And again, you advised him of his rights,
14    gave him his Miranda rights in English and Spanish;
15    correct?
16         A.   Yes, sir.
17         Q.   Okay.  Did you have any information when
18    you went into that room to speak with Mr. Maysonet on
19    the 22nd as to whether or not he had an attorney?
20              MS. MANDELTORT:  Objection, Judge.
21              THE COURT:  Sustained.
22    BY MR. BEUKE:
23         Q.   Well, Detective Montilla, when you spoke
24    with Mr. Maysonet, one of the rights you gave him
```

JGS_MAYSONET 4812

1    was, Mr. Maysonet, you understand you have a right to

2    have an attorney; correct?

3        A.    Yes, sir.

4        Q.    And another right you gave him was, do you

5    understand that you have a right to have your

6    attorney present with you while you're being

7    questioned; correct?

8        A.    Yes, sir.

9        Q.    And is it your recollection that

10   Mr. Maysonet at that point when you and Paulnitsky

11   were speaking to him told you, I understand that, and

12   I don't want a lawyer?

13       A.    I -- yes, sir.  I rephrased the question.

14   I emphasized the lawyer a lot, especially when you do

15   it in Spanish.  You have to.

16       Q.    Okay.  So it's your recollection that he

17   talked to you and gave you basically the same

18   statement as the other two times without having an

19   attorney present?

20       A.    That's correct.

21       Q.    He agreed to do that?

22       A.    Yes, sir.

23       Q.    Now, after he was charged or placed in

24   custody for the murders, did you attempt to contact

65

JGS_MAYSONET 4813

```
 1    any state's attorney from the Felony Review

 2    Division?

 3         A.   I don't do it.

 4         Q.   Okay.  Did Paulnitsky to your knowledge?

 5         A.   Not that I know of, sir.

 6         Q.   Okay.  Did you stay at Area 5, or did you

 7    go off duty?

 8         A.   No, I went home to sleep because I had to

 9    return that night to work at 11:00 o'clock.

10         Q.   Okay.  At some point later on that evening,

11    Detective, is it your testimony that you returned

12    back to Area 5?

13         A.   Yes, sir.

14         Q.   Okay.  Do you recall in the evening hours,

15    Detective, meeting a young lady who identified

16    herself as Mr. Maysonet's sister?

17         A.   Not that I recall.

18         Q.   Do you ever recall meeting a young lady in

19    the evening hours of August 22nd who identified

20    herself as Rose Maysonet?

21         A.   I think I did.

22         Q.   Okay.  And that would have been either in

23    the detective offices or in the first floor of that

24    facility; correct?
```

66

JGS_MAYSONET 4814

```
 1          A.   That's correct.

 2          Q.   Did you learn that that was his sister?

 3          A.   No, sir.

 4          Q.   But you recall speaking to a Rose Maysonet?

 5          A.   Yes.

 6          Q.   Is it fair to say, Detective, that you had

 7     a few conversations with her during the evening

 8     hours?

 9          A.   I can't recall that.

10          Q.   Do you recall her asking you, Detective,

11     about what was happening with her brother?

12               MS. MANDELTORT:   Objection, Judge, to what

13     she said.  It's hearsay.

14               THE COURT:   Sustained.  Sustained.

15               MR. BEUKE:   Judge, can I have a sidebar on

16     this?

17                         (WHEREUPON, the following was

18                          had outside the

19                          hearing of the jury:)

20               MR. BEUKE:   Judge, I would be -- I'm

21     telling the Court that I am going to call

22     Miss Maysonet.  She is going to be a witness for

23     me.  She will testify about conversations that she

24     had --
```

JGS_MAYSONET 4815

1          THE COURT:  But he has said he did not talk

2     to the sister.  He said he talked to the mother.

3          MR. BEUKE:  No, he didn't say that, Judge.

4     He said he talked to Rose Maysonet.  He wasn't sure

5     if it was his sister.

6          THE COURT:  That is not the testimony.

7          MR. BEUKE:  Judge --

8          THE COURT:  Did you talk to the mother was

9     your second question.  He says, yes.

10          MR. BEUKE:  No, that wasn't my question.

11          THE COURT:  Do you want it read back?

12          MR. BEUKE:  Yes.

13               (WHEREUPON, the record was

14                read as requested.)

15          MS. MANDELTORT:  Judge, my concern is, she

16     can come in and testify to it, but it's a little

17     premature putting it in through him first.

18          THE COURT:  But he can lay his impeachment,

19     which I'm assuming he's doing.

20               (WHEREUPON, the following was

21                had in open court, in the

22                hearing of the jury:)

23     BY MR. BEUKE:

24          Q.   Detective, just to get us back on track,

JGS_MAYSONET 4816

1    you had this conversation, or you recall speaking

2    with Rose Maysonet; correct?

3         A.    Yes.

4         Q.    In the evening hours of the 22nd?

5         A.    Yes.

6         Q.    Do you ever recall Rose Maysonet and you

7    having a conversation concerning what was happening

8    with her brother, Juan?

9         A.    I remember talking to her, but I

10   can't recall every -- you know, what it was all

11   about.

12        Q.    Do you recall when you spoke to her,

13   Detective, telling her something to the effect that

14   he may be -- he's being questioned upstairs about

15   something, there's a chance that he's going to be

16   released in 72 hours?

17        A.    That -- I don't recall that.

18        Q.    Did you ever recall speaking with Rose

19   Maysonet in the evening hours of August 22nd of 1990

20   about Mr. Maysonet's physical condition?

21        A.    I don't recall talking to her.

22        Q.    Do you ever recall speaking specifically

23   with Rose Maysonet and asking her about whether or

24   not Mr. Maysonet, Juan, took nerve pills or pills for

JGS_MAYSONET 4817

1    his nervous condition?

2        A.   I think she mentioned something to that

3    effect, yes.

4        Q.   Do you ever recall telling Miss Maysonet to

5    go home and get him his pills?

6        A.   I think I did.

7        Q.   And when she went -- at some point, did you

8    see her leave the area where you were speaking with

9    her?

10       A.   Yes.

11       Q.   And at some point, do you recall

12   Miss Maysonet coming back with some pills?

13       A.   Yes, she had some vials.

14       Q.   And were those pills given to you,

15   Detective?

16       A.   I don't think I took them.  I think someone

17   else took them.

18       Q.   Could that have been Detective Guevara?

19       A.   It might have been.  I'm not sure.

20       Q.   Detective Guevara is another Hispanic

21   detective who speaks Spanish?

22       A.   Yes.

23       Q.   When you spoke with Rose Maysonet, or when

24   she brought these pills back to the area, are you

70

JGS_MAYSONET 4818

1    aware of the fact that Mr. Maysonet was allowed to

2    take the pills?

3        A.    No.

4        Q.    Were you present at all when the pills were

5    brought to either Detective Guevara or some other

6    member of the department?

7        A.    I was in the area, but I don't remember who

8    got the pills or what.

9        Q.    Okay.  Detective, do you recall speaking

10   with a young lady by the name of Rosabella?

11       A.    The name sounds familiar, but I can't place

12   her.

13       Q.    Was there a young lady who was there with

14   Rose Maysonet who you -- who either identified

15   herself to you or you learned was Mr. Maysonet's

16   common-law wife?

17       A.    Yes.

18       Q.    Do you ever recall speaking with her that

19   evening, Detective?

20       A.    I think I did.

21       Q.    At some point, Detective, Rosabella was

22   brought in and allowed to speak with Mr. Maysonet;

23   correct?

24       A.    I think so, yes.

JGS_MAYSONET 4819

 1          Q.    That was done by you?

 2          A.    Yes, myself, I think, with Paulnitsky, or

 3    someone was there.

 4          Q.    And they were allowed to speak; that is,

 5    Mr. Maysonet and his wife; correct?

 6          A.    Yes.

 7          Q.    Now, Detective, at some point, Rosabella

 8    was taken out of the room; correct?

 9          A.    Yes.

10          Q.    And do you know when that would have

11    been in relationship to these pills coming to the

12    area?

13          A.    No, sir.

14          Q.    When the topic of the pills were discussed,

15    Detective, did you observe anything physically about

16    Mr. Maysonet that caused you to allow an individual

17    to take some pills in your station?

18                MS. MANDELTORT:  Objection, Judge.

19                THE COURT:  Sustained.

20                MS. MANDELTORT:  Assuming facts not in

21    evidence.

22                THE COURT:  There's no such evidence.

23    BY MR. BEUKE:

24          Q.    Did Mr. Maysonet appear to be very nervous

72

JGS_MAYSONET 4820

1      or hyper?

2           A.    Yes.

3           Q.    Did he appear to be sweating or things like

4      that physically?

5           A.    Yes.

6           Q.    Did he appear to be incoherent at times?

7           A.    No, sir.

8           Q.    Did he ask you for the pills?

9           A.    I think he had said he had to take some

10     kind of pill for nerves or something.

11          Q.    Okay.  Now, Detective, at some point --

12     that was in the evening hours of August 22nd;

13     correct?

14          A.    Yes, sir.

15          Q.    And you worked through your shift into the

16     early morning hours; correct?

17          A.    Yes, sir.

18          Q.    Did you do anything or did you participate

19     in this investigation after you brought Rosabella in

20     or after the pills were brought or after you spoke

21     with Rose Maysonet?

22          A.    What do you mean by --

23          Q.    I mean, did you go out and look for

24     witnesses, or did you go out and --

JGS_MAYSONET 4821

1       A.    No.   My job was assisting to interpret.     I

2  do my property crime jobs.   I wait around.   If they

3  need me again, I assist again.

4       Q.    And just so it's clear again, Detective, I

5  don't mean to belabor the point, but you didn't take

6  any notes about any of the conversations you had with

7  him or getting the pills or talking with Rosabella or

8  Rose Maysonet?   You didn't take any notes of that;

9  correct?

10      A.    No.   The investigating detectives, they do

11 all that.

12      Q.    Do you recall them taking notes of that?

13      A.    As far -- I think they took, I'm not

14 sure.

15      Q.    At 4:30 -- I believe Miss Mandeltort asked

16 you yesterday, were you present then at approximately

17 9:28 at Area 5 Violent Crimes when a court reporter

18 was present?   Do you recall those questions?

19      A.    Yes, sir.

20      Q.    And you were there; correct?

21      A.    Yes, sir.

22      Q.    Now, prior to that, Detective, you had a

23 number of other conversations with Mr. Maysonet,

24 didn't you?

JGS_MAYSONET 4822

```
 1        A.    Yes.

 2        Q.    Okay.  This didn't just jump from 11:30 or

 3   the afternoon hours of the 22nd to 9:28 in the

 4   morning on the 23rd, did it?

 5        A.    Correct.

 6        Q.    Miss Mandeltort didn't ask you about a

 7   conversation that you had with Mr. Maysonet at 4:30

 8   in the morning, did she?

 9        A.    Not that I recall, no.

10        Q.    You were present for a conversation

11   at 4:30 in the morning; is that correct, Detective?

12        A.    Yes.

13        Q.    A state's attorney was there; correct?

14        A.    Yes.

15        Q.    Did the state's attorney -- do you recall

16   his or her name?

17        A.    I think it was Borowitz, a female.

18        Q.    Was it a female?

19        A.    Yes.

20        Q.    The state's attorney that was present,

21   Detective, was in there with you and Guevara;

22   correct?

23        A.    Yes, sir.

24        Q.    Now, did you and Guevara sit with the
```

JGS_MAYSONET 4823

1    state's attorney prior to going in and meeting

2    Mr. Maysonet at 4:30?

3        A.   No, sir.

4        Q.   Did you ever brief Miss Borowitz about the

5    status of the investigation as you knew it prior to

6    going in to talk to him at 4:30?

7        A.   No.

8        Q.   Did Guevara ever brief her in your

9    presence?

10         MS. MANDELTORT:  Objection, Judge, as to

11    what someone else did.

12         MR. BEUKE:  In his presence, Judge.

13         THE COURT:  Overruled.  He can answer if he

14    knows.

15    BY THE WITNESS:

16        A.   I don't know.

17    BY MR. BEUKE:

18        Q.   The conversation that you and Borowitz had

19    with Mr. Maysonet at 4:30 in the morning, how long

20    did that last?

21        A.   A short while.  Not long.

22        Q.   And that conversation, Detective, that was

23    again in Spanish; correct?

24        A.   Yes.

JGS_MAYSONET 4824

```
 1          Q.    Miss Borowitz, do you know if she speaks

 2     Spanish?

 3          A.    Not that I know of.

 4          Q.    So questions were asked either by

 5     Miss Borowitz to you or Guevara, and then in

 6     Spanish, they were related to Maysonet;

 7     correct?

 8          A.    Yes.

 9          Q.    And answers were given by Maysonet in

10     Spanish and then related to Miss Borowitz;

11     correct?

12          A.    Yes.

13          Q.    Was Miss Borowitz making any notes?

14          A.    She's a -- yes, she was taking notes.

15          Q.    Okay.  Have you ever seen those notes,

16     Detective?

17          A.    No, sir.

18          Q.    Do you recall that she made them,

19     though?

20                MS. MANDELTORT:  Objection, asked and

21     answered.

22                THE COURT:  Sustained.  Asked and answered,

23     Counsel.  We heard it the first time.

24
```

JGS_MAYSONET 4825

1    BY MR. BEUKE:

2        Q.    Okay.   How long did that conversation last,

3    Detective?

4        A.    Not long.   I couldn't give you -- I think I

5    left prior to Guevara leaving.   I think I left first,

6    and Guevara stood there speaking with ASA Borowitz

7    and Maysonet.

8        Q.    So at some point, you left the room?

9        A.    Yes.

10       Q.    And at some point, did you see Guevara and

11   Borowitz leave the room?

12       A.    Yes.

13       Q.    Now, again, sometime a couple of hours

14   later -- Miss Borowitz was the state's attorney from

15   felony review; correct?

16       A.    That's correct.

17       Q.    What's a felony review state's attorney?

18   Can you explain that for the ladies and gentlemen of

19   the jury?

20       A.    They assist the detectives in processing a

21   case.   They come over and see if we have enough

22   evidence to proceed with the case and charge, you

23   know, and put formal charges on the person and send

24   them to court.

78

```
 1          Q.   Okay.  Miss Borowitz, did she continue on

 2     the investigation as far as you know, or did she

 3     leave?

 4          A.   I think she continued on it.

 5          Q.   Okay.  How long did she continue if you

 6     know?

 7          A.   I can't recall.

 8          Q.   Was it more than a couple of hours?

 9          MS. MANDELTORT:  Objection, Judge.  He

10     can't recall.

11          THE COURT:  He may answer if he knows even

12     though he said he can't recall.

13     BY MR. BEUKE:

14          Q.   Was it more than a few hours, Detective?

15          A.   I'm not sure.

16          Q.   Did you see or did you speak with Maysonet

17     and her again that morning?

18          A.   I think we did.

19          Q.   Do you remember approximately what time

20     that would have been, how long after the first

21     conversation?

22          A.   I don't know.  Maybe a half hour, 45

23     minutes.  I'm not sure.

24          Q.   Again, that was a conversation where you
```

JGS_MAYSONET 4827

```
 1    gave him his rights again in Spanish and in English;
 2    correct?
 3         A.   No, I don't think so.
 4         Q.   Did you give him his rights during that
 5    conversation or no?
 6         A.   I don't think I did it.
 7         Q.   Did Guevara -- was he present for that
 8    one?
 9         A.   I think so.
10         Q.   Okay.  Did he give Maysonet his rights in
11    that second conversation with Borowitz?
12         A.   I don't think he did.
13         Q.   Was he given his rights to the best --
14         A.   He was given his rights earlier, yes.
15         Q.   So he wasn't re-advised on the second
16    conversation?
17         A.   I think he was just advised that he was
18    advised of his rights prior to the other
19    questioning.
20         Q.   Something to the effect, do you remember
21    the rights we gave you earlier, you've still got
22    those rights?
23         A.   Yes.
24         Q.   The second conversation with you, Borowitz,
```

JGS_MAYSONET 4828

```
 1    and Maysonet, was the state's attorney taking notes
 2    during that conversation, too?
 3         A.    I think she was.
 4         Q.    And that conversation lasted for five, ten
 5    minutes?
 6         A.    I think so.
 7         Q.    And basically, nothing new was said during
 8    that conversation as was said during the first
 9    conversation; is that fair to say?
10         A.    That's fair.
11         Q.    Okay.  Detective, at 6:30 in the morning,
12    you again went in and spoke with Mr. Maysonet in the
13    presence of another assistant state's attorney;
14    correct?
15         A.    Yes.
16         Q.    And that was a Mr. DiFranco?
17         A.    Yes, sir.
18         Q.    And that was again with Detective Guevara;
19    correct?
20         A.    Yes.
21         Q.    And at this time, DiFranco and you and
22    Guevara, he was advised of his rights, or was he
23    advised in the same fashion, you remember the rights
24    we told you about before?
```

81

JGS_MAYSONET 4829

1          A.    No.    ASA DiFranco read him his rights

2     entirely.

3          Q.    And did you translate that into Spanish?

4          A.    Guevara translated.

5          Q.    And then Maysonet gave his answers in

6     Spanish; correct?

7          A.    Yes.

8          Q.    And then there was a conversation after all

9     of that was done; correct?

10         A.    Yes.

11         Q.    And the conversation, was it DiFranco

12    asking something to the effect of, you know, I

13    know -- I heard you made a statement to the

14    detectives, what did you tell them, or was it a

15    question-and-answer conversation?

16              MS. MANDELTORT:  Objection, Judge.

17              THE COURT:  Sustained.  Counsel, don't

18    testify.  Put a question to him.

19    BY MR. BEUKE:

20         Q.    How did the conversation begin?

21         A.    DiFranco read him his rights and then

22    started asking him questions.

23         Q.    What was the first question?

24         A.    I don't remember.

82

JGS_MAYSONET 4830

1      Q.    Second question?

2      A.    I think he asked him his name, age,

3  birthday, and everything, just information about

4  him.

5      Q.    And after he got through the preliminaries,

6  do you recall the first question he asked him about

7  the case?

8      A.    I think, what do you want to say about

9  this case, or something like that.  I'm not

10  sure.

11      Q.    Do you remember Maysonet's response?

12      A.    No.

13      Q.    Was the state's attorney making notes?

14           MS. MANDELTORT:  Objection, Judge.  Ask for

15  a sidebar.

16                    (WHEREUPON, the following was

17                     had outside the

18                     hearing of the jury:)

19           MR. MAREK:  Judge, this is beyond the

20  scope.  Secondly, he's putting in conversations with

21  his own client.  We have not put in this

22  conversation.

23           THE COURT:  Not only that, this is not the

24  officer that took the statement.  He's there as an

JGS_MAYSONET 4831

```
1     interpreter.  I'm trying to give you latitude, but I

2     do think you're beating it to death.

3                   MR. BEUKE:  I understand, but he certainly

4     is a witness to the statement, and furthermore,

5     Judge, I have now got this detective to tell me that

6     the state's attorney was taking notes in his

7     presence.  I have never been tendered any copy of any

8     notes by any state's attorney.

9                   THE COURT:  It may not be something that

10    was discoverable.  This guy is not really part of the

11    investigation.  He's there as interpretation.  The

12    state has not been objecting, but he's saying he

13    thinks, maybe so.  Wind it up with this witness on

14    these issues.

15                         (WHEREUPON, the following was

16                          had in open court, in the

17                          hearing of the jury:)

18    BY MR. BEUKE:

19        Q.   Detective, the conversation that you had

20    with DiFranco at 6:30, after that was over, you had

21    another conversation with DiFranco and Maysonet and

22    Guevara, didn't you?

23                   MS. MANDELTORT:  Judge, same objection,

24    same argument at sidebar.
```

JGS_MAYSONET 4832

```
 1              THE COURT:  The form of the question is
 2    kind of strange.  The Court doesn't understand that
 3    he's having a conversation with DiFranco.  He can
 4    certainly establish that another conversation took
 5    place.
 6    BY MR. BEUKE:
 7        Q.    Okay.  Detective, I want to direct you to
 8    about 40 minutes later.  At 7:10, were you present
 9    when a conversation was had between the
10    state's attorney, Mr. DiFranco; Mr. Maysonet;
11    yourself; and Guevara?
12        A.    Yes, sir.
13        Q.    Was that the same -- basically the same
14    kind of a conversation you had 40 minutes
15    earlier?
16        A.    Yes, sir.
17        Q.    Mr. Maysonet was in that conversation
18    moved from one room to a conference room;
19    correct?
20        A.    Yes, sir.
21        Q.    And that's where DiFranco was again
22    posing questions, and one of you were interpreting
23    the questions for Maysonet; correct?  You or
24    Guevara?
```

85

JGS_MAYSONET 4833

1          A.    Yes, sir.

2          Q.    And you were giving Maysonet's answers

3     back to DiFranco from Spanish to English;

4     correct?

5          A.    Yeah, right.

6          Q.    That conversation, is it fair to say,

7     didn't last that long; correct?

8          A.    That's correct.

9          Q.    And then you left?

10         A.    Yes.

11         Q.    Now, Miss Mandeltort asked you some

12    questions about you being present during the 9:28

13    conversation.  Do you recall those questions?

14         A.    Yes.

15         Q.    That was when a court reporter was present

16    in the room; correct?

17         A.    Yes.

18         Q.    The court reporter similar to this

19    beautiful young lady here?

20         A.    Yes.

21         Q.    And when that conversation was had,

22    Mr. DiFranco began it by advising Mr. Maysonet of his

23    rights; correct?

24         A.    Yes, sir.

JGS_MAYSONET 4834

1         Q.    You were present for that?

2         A.    I was present, yes.

3         Q.    You didn't interpret the rights from

4 English to Spanish during that conversation; is that

5 correct?

6         A.    That is correct.

7         Q.    And Mr. Maysonet gave answers to the

8 questions in English; correct?

9         A.    Yes, sir.

10        Q.    Is it fair to say you stood, and you

11 listened to his answers to the questions that were

12 posed; correct?

13        A.    Yes, sir.

14        Q.    He gave basically the same version

15 during that court-reported conversation that he

16 had given to you at 4:30, at 6:30, and at 7:10;

17 correct?

18        A.    Basically, yes.

19        Q.    There weren't any significant changes;

20 correct?

21        A.    I'm pretty sure there weren't.

22        Q.    There were not?

23        A.    No.

24        Q.    So what eventually ended up in People's

JGS_MAYSONET 4835

1 Exhibit -- what eventually ended up in People's

2 Exhibit Number 29 was basically the same questions

3 and answers that you were present for at 4:30, 6:30,

4 and 7:10; correct?

5   A. Yes.

6   Q. Now, Detective, at this point, would it be

7 fair to say that you had a pretty good knowledge of

8 the facts of this case; correct?

9   A. Yes.

10   Q. I mean, you knew where the bodies were

11 found, didn't you?

12   A. Yes, sir.

13   Q. I mean, you knew that two bodies were found

14 in front of 3430 -- I'm sorry -- 3428 West North

15 Avenue?

16   A. Yes, sir.

17   Q. The victims were two male blacks; correct?

18   A. Yes, sir.

19   Q. They were nine millimeter casings that were

20 found at the scene; correct?

21   A. Yes, sir.

22   Q. That these individuals were shot in certain

23 parts of their body; correct?

24   A. Yes, sir.

JGS_MAYSONET 4836

```
 1          Q.    Detective, do you recall during that
 2    conversation -- do you recall also knowing that the
 3    crime happened at 1:00 o'clock in the morning on the
 4    25th?
 5          A.    Yes, sir.
 6          Q.    Maysonet told you that the crime happened
 7    at 12:30; is that correct?
 8          A.    I don't recall the time.
 9          Q.    During the course of those conversations
10    that you have told us about?
11          A.    I don't think he gave me a time.
12          Q.    Well, do you recall being present when the
13    court-reported statement was taken by Mr. DiFranco in
14    your presence?
15          A.    Yes, sir.
16          Q.    Do you recall when Mr. Maysonet was
17    asked --
18          MS. MANDELTORT:  Judge, I would object to
19    reading from a document that is not yet in evidence
20    before this jury.
21          THE COURT:  Sustained.  Sustained.
22          MR. BEUKE:  Judge, then I would just ask
23    that the detective be allowed to remain, and I'll
24    call him in my case.
```

JGS_MAYSONET 4837

```
 1              THE COURT:  Fine.
 2    BY MR. BEUKE:
 3         Q.    Do you recall, Detective, that
 4    Mr. Maysonet in the conversation you were
 5    present for at 9:28 said that the two guys were
 6    standing on the corner?  Do you recall him
 7    saying that?
 8         A.    No, I don't recall that.
 9         Q.    Do you recall Mr. Maysonet saying in that
10    conversation that he drove his car with these other
11    individuals in the car and got to the corner of
12    St. Louis and North Avenue and then went to Drake and
13    parked in the alley?
14         A.    Yes.
15              MS. MANDELTORT:  Judge, objection.  Same
16    objection from sidebar.
17              THE COURT:  Let's have a sidebar in
18    chambers.
19                   (WHEREUPON, the following was
20                   had in chambers, outside
21                   presence of the jury:)
22              MR. BEUKE:  I'll wind it up.
23              THE COURT:  I'm not going to allow you to
24    introduce the statement that the state has not
```

JGS_MAYSONET 4838

```
 1    introduced by way of cross-examination.  That's all
 2    I'm going to say, so get off it.
 3              MR. MAREK:  It's beyond the scope.
 4              THE COURT:  Of course, but it's not
 5    the witness to do it with anyway.  That statement
 6    is not evidence.  You're trying to put the substance
 7    of the statement in.  No.  That's all I want to
 8    say.
 9                        (WHEREUPON, the following was
10                         had in open court, in the
11                         presence of the jury:)
12    BY MR. BEUKE:
13         Q.   Detective, finally, after that
14    court-reported statement was finished, at some point,
15    the court-reported statement was signed in your
16    presence; correct?
17         A.   Yes, sir.
18         Q.   That was reviewed by Mr. Maysonet; correct?
19    Or you and DiFranco and Maysonet; correct?
20         A.   Yes, sir.
21         Q.   You testified yesterday about going out to
22    the scene; correct?
23         A.   Yes, sir.
24         Q.   And that was whose idea?
```

JGS_MAYSONET 4839

```
 1            A.    I think State's Attorney DiFranco's.

 2            Q.    And you were now, obviously, an active

 3      participant in this investigation; fair to

 4      say?

 5            A.    Yes, sir.

 6            Q.    You went out to the scene with Paulnitsky;

 7      correct?  And Maysonet and the state's attorney?

 8            A.    Yes, sir.

 9            Q.    Where did you go?

10            A.    We went --

11            Q.    Where did you start your investigation at

12      that point?

13            A.    I think we went right to the scene by the

14      alley.

15            Q.    Okay.  Did you go to St. Louis, or did you

16      drive in any way down the route that Mr. Maysonet had

17      described for you?

18            A.    No, we did not.

19            Q.    So you didn't attempt to drive down

20      St. Louis northbound and hit North Avenue?

21                  MS. MANDELTORT:  Objection, asked and

22      answered.

23                  THE COURT:  Sustained.

24
```

JGS_MAYSONET 4840

```
 1      BY MR. BEUKE:

 2          Q.   Okay.  How long were you out at the scene,

 3      Detective?

 4          A.   15, 20 minutes maybe.

 5          Q.   After you got back from the scene, did you

 6      or DiFranco or Paulnitsky or Guevara ever attempt to

 7      speak to Mr. Maysonet again?

 8              MS. MANDELTORT:  Objection, Judge.

 9              THE COURT:  Basis?

10              MS. MANDELTORT:  Judge, I believe he

11      can testify for what he was present for, whether he

12      spoke to him, but whether other officers

13      did I don't believe he's capable of answering,

14      Judge.

15              THE COURT:  Within his knowledge, he may

16      answer what he knows.

17              THE WITNESS:  Repeat that?

18              MR. BEUKE:  Could you read it back?

19                      (WHEREUPON, the record was

20                      read as requested.)

21      BY THE WITNESS:

22          A.   Not that I recall.

23      BY MR. BEUKE:

24          Q.   Detective, just so I'm clear, this report
```

JGS_MAYSONET 4841

```
1      that Miss Mandeltort showed you yesterday, I

2      believe it was marked as People's Exhibit Number

3      27 --

4                 THE COURT:  27.

5      BY MR. BEUKE:

6           Q.    -- that's a report that was prepared by

7      you and the other officers involved in this

8      investigation; correct?

9           A.    Yes.

10          Q.    Okay.  The report physically wasn't typed

11     by you, was it?

12          A.    No, it was not.

13          Q.    But the information that's contained in

14     there concerning various aspects of the investigation

15     that you participated in was provided to the person

16     who was doing the typing; right?

17          A.    Yes, sir.

18          Q.    I mean, you didn't each type your own

19     separate part of the report?

20                THE COURT:  Sustained.  Counsel, that's

21     clear.

22     BY MR. BEUKE:

23          Q.    Well, I mean, the report -- Judge, can I

24     have a moment?
```

JGS_MAYSONET 4842

```
 1                    THE COURT:  Sure.

 2                    MR. BEUKE:  Thanks, your Honor.

 3                         (Brief pause.)

 4                    MR. BEUKE:  Just a couple other questions,

 5      Judge.

 6      BY MR. BEUKE:

 7          Q.    Detective, just to back up a little bit,

 8      in the conversations that you had with Rose

 9      Maysonet, okay, the evening of the 22nd -- do you

10      follow me?

11          A.    Yes.

12          Q.    The young lady that identified herself as

13      Rose Maysonet?  Did she ever tell you that an

14      attorney by the name of Swano was trying to contact

15      her brother?

16                    MS. MANDELTORT:  Objection, Judge.

17                    THE COURT:  Overruled.  He may answer.

18      BY THE WITNESS:

19          A.    I don't recall her asking me that.

20      BY MR. BEUKE:

21          Q.    Did she ever tell you that she wanted you

22      to call her attorney -- or her brother's attorney,

23      Mr. Swano?

24                    MS. MANDELTORT:  Objection.  It assumes
```

95

JGS_MAYSONET 4843

```
 1    facts not in evidence.
 2              THE COURT:  Approach.
 3                    (WHEREUPON, a discussion was
 4                    had off the record outside the
 5                    hearing of the jury and
 6                    court reporter.)
 7              THE COURT:  That's two questions,
 8    Counsel.
 9    BY MR. BEUKE:
10        Q.   Did she ever tell you, Detective, that
11    she had spoken with Mr. Swano, and Swano had told
12    her that he had called Area 5, and Mr. Maysonet
13    was --
14              MS. MANDELTORT:  Objection.
15              THE COURT:  Sustained.  Sustained.
16    Sustained.  That's double hearsay.  The jury is
17    instructed to disregard the last question.  It shall
18    be stricken.
19    BY MR. BEUKE:
20        Q.   Do you recall the name, Bill Swano, being
21    brought up, Detective, by Miss Maysonet?
22        A.   No, sir, I do not.
23        Q.   Did Juan Maysonet ever in any of the
24    however many conversations it was that you had with
```

JGS_MAYSONET 4844

```
 1    him, ever talk with you about an attorney that he

 2    had?

 3          A.    No, sir, he did not.

 4                MR. BEUKE:  Nothing further.

 5                MS. MANDELTORT:  Just briefly, Judge.

 6                     REDIRECT EXAMINATION

 7                BY MS. MANDELTORT:

 8          Q.    Detective Montilla, is it unusual in Area 5

 9    or in any police headquarters that when one person is

10    in the area on an unrelated incident that they might

11    be able to supply some information to you on another

12    case?

13                MR. BEUKE:  Objection.

14                THE COURT:  Overruled.

15    BY MS. MANDELTORT:

16          Q.    Is that unusual, sir?

17          A.    No, it's not.

18          Q.    Does it happen quite often that when

19    someone is in the area on one incident they might

20    have information on another incident?

21          A.    Yes.

22          Q.    And that's what happened with Mr. Maysonet

23    on July 15th; isn't that right?

24          A.    Yes.
```

JGS_MAYSONET 4845

1      Q.    Now, counsel made it pretty clear that you

2   didn't take any notes during your conversations on

3   July 15th and August 1st?

4      A.    That's correct.

5      Q.    Can you tell the ladies and gentlemen of

6   the jury why you didn't actually take any notes

7   during those conversations?

8      A.    It's very difficult to write when you're

9   interpreting from English to Spanish, Spanish to

10  English.  You have to stop and think and then rewrite

11  everything, so the person with you, you normally let

12  them take the notes for you.

13     Q.    And counsel also talked to you about

14  People's 27, the police report.  In fact, your

15  involvement of what you did in this case and

16  your conversations is memorialized or contained in

17  that?

18     A.    Yes.

19     Q.    Because you gave that information to who

20  actually prepared the reports for this case; isn't

21  that right?

22     A.    Yes.

23           THE INTERPRETER:  Can you please slow down?

24           MS. MANDELTORT:  Oh, sure.

JGS_MAYSONET 4846

1   BY MS. MANDELTORT:

2       Q.   Now, you talked to him on July 15th, 1990;

3   correct?

4       A.   Yes.

5       Q.   And then you talked to him again on August

6   1st of 1990?

7       A.   Yes.

8       Q.   Now, on August 1st of 1990 at the jail, he

9   told you that he wanted to make a deal with you for

10  that information; isn't that right?

11      A.   Yes.

12      Q.   Did that in any way, sir, change your

13  belief as to whether the information he had was

14  accurate or whether he had information?

15           MR. BEUKE:  Objection, Judge.

16           THE COURT:  Sustained.  Rephrase, Counsel.

17  BY MS. MANDELTORT:

18      Q.   Did the fact that he wanted a deal for

19  information change anything in terms of your belief,

20  sir, whether he actually had good information?

21           MR. BEUKE:  Objection.

22           THE COURT:  Basis?

23           MR. BEUKE:  State of mind I don't think is

24  relevant.

JGS_MAYSONET 4847

1           THE COURT:  Counsel, you asked whether or

2    not he believed, even though the defendant was not --

3    he believed that he had information, so I believe she

4    can cross on that issue.

5    BY MS. MANDELTORT:

6           Q.   Again, sir, the fact that he offered to

7    make you a deal for that information, did that

8    change your belief on the accuracy of that

9    information?

10          A.   No.

11          Q.   Did you believe at that time that he had

12   good information on the double murder?

13          A.   Yes, I did.

14          THE COURT:  Shut the door.

15   BY THE WITNESS:

16          A.   Yes.

17   BY MS. MANDELTORT:

18          Q.   Now, counsel talked to you about the

19   conversation that you had with the defendant on the

20   2nd of August of 1990; is that right?

21          A.   Yes.

22          Q.   Well, the conversation you had on the 22nd

23   of August, 1990, was a little different than the

24   conversations you had had with him on July 15th and

JGS_MAYSONET 4848

1      on August 1st; isn't that right?

2                    MR. BEUKE:  Objection.

3                    THE COURT:  Basis?

4                    MR. BEUKE:  He testified it was basically

5      the same information.

6                    THE COURT:  She's redirecting.  Overruled.

7                    MR. BEUKE:  Well, it misstates the

8      evidence, Judge.

9                    THE COURT:  Counsel --

10                   MR. BEUKE:  The form of that question, your

11     Honor.

12                   THE COURT:  Don't argue with the Court.

13                   MR. BEUKE:  I'm not, Judge.

14                   THE COURT:  I overruled it.  Your objection

15     is noted.

16     BY MS. MANDELTORT:

17          Q.   Just so we're clear, on July 15 and

18     August 1, 1990, he basically gave you the same

19     information?

20          A.   Yes.

21          Q.   But on August 1st, he wanted to make

22     a deal for some more information; isn't that

23     right?

24          A.   Yes.

101

JGS_MAYSONET 4849

1     Q.    Now, on August 22nd he was arrested for the

2   murder of Torrence Wiley and the murder of Kevin

3   Wiley; correct?

4     A.    Yes.

5     Q.    And prior to that arrest, he told you

6   something a little different than what he had

7   told you on July 15th and August 1st; isn't that

8   right?

9     A.    Yes.

10     Q.    In fact, he had told you that he was

11   present at the murder, but was not the shooter?

12          MR. BEUKE:  Objection.

13          THE COURT:  Sustained, leading.

14   BY MS. MANDELTORT:

15     Q.    Did he tell you anything different as to

16   where he was at the time of the murder on August 22nd

17   when you spoke to him?

18     A.    Yes.

19     Q.    What did he tell you?

20     A.    He said he was there when the incident

21   happened, but he didn't do the actual shooting.

22     Q.    Did he also on August 22nd give you some

23   additional information as to where the gun for that

24   murder had come from?

102

JGS_MAYSONET 4850

```
1           A.    Yes.

2           Q.    What did he tell you on August 22nd that he

3    hadn't told you earlier?

4           A.    He had the gun in his house.  Three Kings

5    came, picked it up.

6           Q.    Now, earlier, you knew that three people

7    had come to his house, but he had told you that he

8    had given them the actual gun on the 22nd; isn't that

9    right?

10          MR. BEUKE:  Objection, Judge, leading and

11   suggestive.

12   BY THE WITNESS:

13          A.    Yes.

14          THE COURT:  Overruled.  That's been

15   elicited by both you and the state's attorney, so

16   it's nothing new.

17          MS. MANDELTORT:  Judge, if I can just have

18   one moment?

19                      (Brief pause.)

20          MS. MANDELTORT:  Judge, I have no further

21   redirect.

22                RECROSS EXAMINATION

23                BY MR. BEUKE:

24          Q.    Detective, Miss Mandeltort asked you some
```

JGS_MAYSONET 4851

```
 1    questions about your participation in the preparation

 2    of that police report, People's Exhibit Number 27; is

 3    that correct?

 4              MS. MANDELTORT:  Objection, Judge.  That is

 5    not what I asked.

 6              THE COURT:  Overruled.  Counsel, why don't

 7    you just ask the question?

 8    BY MR. BEUKE:

 9        Q.    You indicated, Detective, that you gave

10    your information in terms of your participation in

11    the investigation to the detectives who prepared the

12    report and typed it; correct?

13        A.    Yes.

14        Q.    And the report details that -- People's

15    Exhibit Number 27 details your August 22nd

16    conversation with Mr. Maysonet, does it not?

17        A.    Yes.

18        Q.    The police report says, Detective, that --

19              MS. MANDELTORT:  Objection, Judge.

20              THE COURT:  Sustained, Counsel.  Sustained.

21    BY MR. BEUKE:

22        Q.    Well, is there anything in the portion of

23    that police report concerning your conversation with

24    Juan Maysonet on August 22nd in the afternoon hours
```

JGS_MAYSONET 4852

1     that indicates that Juan Maysonet told you he was

2     present for the murders?

3          A.    Can you just rephrase it a little?  I don't

4     catch the point.

5          Q.    Sure, Detective.  Well, let me show

6     you what's been marked as People's Exhibit Number 27.

7               MR. BEUKE:  If I can approach, your Honor?

8               THE COURT:  Very well.

9     BY MR. BEUKE:

10         Q.    And I would direct you, Detective, to Page

11    5, at the very top paragraph.  Does that paragraph

12    detail your conversation with Juan Maysonet on August

13    27th or August 22nd in the afternoon hours?

14         A.    Yes.

15         Q.    And that is the sum and substance of

16    that conversation was what you told the detectives

17    who prepared the report Maysonet told you;

18    correct?

19         A.    Yes.  They made just a brief summary of it,

20    yes.

21         Q.    Is there anything in there -- in that

22    report that indicates that Maysonet said he was

23    present for the murders?

24         A.    Not on this first paragraph.

105

JGS_MAYSONET 4853

```
1          Q.    Well, that's the paragraph that details
2     your conversation with Maysonet; correct?  On the
3     22nd?
4          A.    Usually, they put a date above it.  I don't
5     see a date above it that says what date it was.
6          Q.    Well, if I can just flip back --
7          A.    And what time.  I don't see it.
8          Q.    -- maybe that would help you, to Page 4,
9     and ask you to look at the bottom paragraph, August
10    22nd, '90, see if that brings it into context?
11         A.    Well, that was Paulnitsky.
12         Q.    I understand that, but can you read that,
13    and then read the following paragraph on Page 5.
14               THE COURT:  Sir, if you're going to be in
15    the courtroom, have a seat.
16               A VOICE:  Okay.
17    BY MR. BEUKE:
18         Q.    Detective, it's fair to say, is it not, on
19    the top of Page 5, it indicates the sum and substance
20    of your conversation with Maysonet in the afternoon
21    of the 22nd?
22         A.    Basically, yes.
23         Q.    There's nothing in there, Detective, that
24    indicates Maysonet told you he was present for the
```

106

JGS_MAYSONET 4854

1    murders, is there?

2        A.   No, there's nothing in that paragraph.

3        Q.   That's the only written record of your

4    conversation with Juan Maysonet that afternoon, isn't

5    it?

6            MS. MANDELTORT:  Objection.

7            THE COURT:  Sustained.

8    BY MR. BEUKE:

9        Q.   Did you prepare any notes about that

10   conversation?

11           MS. MANDELTORT:  Objection, asked and

12   answered.

13           THE COURT:  Sustained.  That's been asked

14   and answered, Counsel.

15   BY MR. BEUKE:

16        Q.   You indicated in response to

17   Miss Mandeltort's questions that you don't take notes

18   because it's difficult when you're interpreting.  Do

19   you recall those questions and answers?

20        A.   Yes.

21        Q.   Am I correct in assuming that you didn't

22   take notes in any of the conversations because that

23   was the problem that you saw?

24        A.   When I'm doing it for a different unit, I

JGS_MAYSONET 4855

1     don't take the notes.

2          Q.   All right.  You were -- other than that

3     August 22nd -- the conversation we just talked about,

4     you were with Maysonet alone; correct?  Or I'm sorry.

5     You were with Paulnitsky?

6          A.   Yes, sir.

7          Q.   Was Paulnitsky taking notes?

8          A.   I can't recall.

9               MS. MANDELTORT:  Objection, Judge.

10              THE COURT:  Counsel, do you have anything

11    else that elaborates on the testimony of this

12    witness?

13              MR. BEUKE:  No, Judge.

14              MS. MANDELTORT:  Nothing further.

15              THE COURT:  Detective, you are excused.

16              THE WITNESS:  Thank you, your Honor.

17                   (Witness excused.)

18              THE COURT:  If I can see counsels at the

19    bench, please?

20                        (WHEREUPON, a discussion was

21                        had off the record outside the

22                        hearing of the jury and

23                        court reporter.)

24              THE COURT:  Deputy Woodard, we're going to

JGS_MAYSONET 4856

```
 1    take just a five-minute break.  We're going to
 2    hear another witness before we break for lunch.  But
 3    just in case you need to get a drink of water or
 4    whatever, we're going to break just for five
 5    minutes.
 6                        (WHEREUPON, a recess was had in
 7                         the above matter.)
 8              THE COURT:  Very well.  You may be seated.
 9                    Please swear the witness.
10                    (Witness sworn.)
11              THE CLERK:  You can be seated.
12    WHEREUPON,
13                    FRANK DI FRANCO,
14    called as a witness on behalf of the People of
15    the State of Illinois, having been first duly
16    sworn, under oath was examined and testified as
17    follows:
18                    DIRECT EXAMINATION
19                    BY MS. MANDELTORT:
20         Q.    Good afternoon, sir.  Can you please
21    introduce yourself to the ladies and gentlemen of the
22    jury?
23         A.    Hi.  My name is Frank DiFranco,
24    D-i-F-r-a-n-c-o.
```

109

JGS_MAYSONET 4857

```
 1          Q.    And, sir, what is your occupation or
 2     profession?
 3          A.    I'm an attorney.
 4          Q.    Are you licensed to practice in the State
 5     of Illinois?
 6          A.    Yes.
 7          Q.    How long have you been so licensed?
 8          A.    Over eight years.
 9          Q.    And where do you work now, sir?
10          A.    I have a private practice in Park Ridge,
11     Illinois.
12          Q.    Directing your attention back to
13     August of 1990, were you employed as an attorney
14     then?
15          A.    Yes.
16          Q.    And by whom?
17          A.    Cook County State's Attorney's Office.
18          Q.    And specifically, on August 23rd of 1990,
19     where specifically within the State's Attorney's
20     Office were you assigned?
21          A.    I was assigned to the Felony Review
22     Unit.
23          Q.    Could you briefly explain to the ladies and
24     gentlemen what the Felony Review Unit is?
```

JGS_MAYSONET 4858

1          A.    The Felony Review Unit is a unit of the

2     State's Attorney's Office that has state's

3     attorneys available 24 hours a day.  We work 12 hours

4     shifts.  So we start at 6:00 a.m., and we end at

5     6:00 p.m.

6                    We're assigned a car.  There's a

7     police radio in there; there's a state's attorney's

8     radio in there.  And when there are certain

9     cases, felonies, that Chicago Police are involved

10    with -- because that's the area we handled in

11    Cook County -- we would be notified through a

12    dispatcher.

13                    The detective would call the

14    dispatcher, which is the main office.  He would get

15    ahold of us, and we were segmented into different

16    areas of the city.  I was on the north side.  I would

17    get a call.  I would go to that area or that crime

18    scene or wherever the detective needed me.  Or by

19    phone, if possible.

20         Q.    And did you talk to people as part of the

21    Felony Review Unit?

22         A.    Oh, absolutely.  That was part of your job.

23    You would go out and interview victims.  You would

24    interview witnesses, and you would interview

JGS_MAYSONET 4859

1    suspects.

2       Q.   Now, directing your attention to about

3    6:20 in the morning on the 23rd of August 1990,

4    were you taken -- or did you go to Area 5

5    Violent Crimes at 555 West Grand in the City of

6    Chicago?

7       A.   Yes.

8       Q.   And how is it that you were directed to

9    that location at that time?

10       A.   When I arrived at work at 6:00 a.m., I

11    called in, and they informed me that there was a

12    job waiting.  And they told me that it was at Area 5

13    and what type of case it is, and which detective to

14    see.

15       Q.   And, in fact, were you, in fact, going to

16    Area 5 with regards to the double homicide involving

17    Torrence Wiley and Kevin Wiley?

18       A.   Yes.

19       Q.   Now, directing your attention to about 6:30

20    in the morning, did you have the occasion at Area 5

21    to be in an interview room?

22       A.   Yes.

23       Q.   And other than yourself, was anyone else in

24    that room?

JGS_MAYSONET 4860

```
1          A.    Yes.

2          Q.    Who was in the room at that time?

3          A.    Two Area 5 detectives.  It was Montilla and

4    Guevara.

5          Q.    And other than yourself and the two

6    detectives, was anyone else in the room?

7          A.    Yes.

8          Q.    And who was that?

9          A.    Jose Maysonet.

10         Q.    Now, the person that you saw in the room,

11   who you spoke to and knew as Jose Maysonet, do you

12   see him in court today?

13         A.    Yes.  He's sitting at the bench next to

14   counsel, to the left of Mr. Beuke wearing a green or

15   olive suit (indicating.)

16               MS. MANDELTORT:  Your Honor, may the record

17   reflect the in-court identification of the defendant,

18   Jose Maysonet.

19               THE COURT:  Very well.

20   BY MS. MANDELTORT:

21         Q.    And did you have the occasion at 6:30 to

22   have a conversation with Mr. Maysonet in the presence

23   of those police officers regarding the murder of the

24   Wiley brothers?
```

113

JGS_MAYSONET 4861

1      A.    Yes.

2      Q.    Now, before you ever spoke -- well, let me

3  put it this way.

4            When you went in the room, what's the

5  first thing you said to Mr. Maysonet?

6      A.    The first thing I do is I go in and

7  introduce myself.  I tell him my name is Frank

8  DiFranco.  I'm an assistant state's attorney.  That's

9  an attorney that works with the police.  And I told

10  him that I am not his attorney.

11     Q.    And after that, did you say anything else

12  to him?

13     A.    I asked him if he was read his Miranda

14  warnings previously from the police officers, and he

15  told me that he was.

16            I asked him if he understood those

17  warnings.  He told me that he did.

18            And I told him that I still have to

19  read him his warnings again.

20     Q.    And did you do that, sir?

21     A.    Yes, I did.

22     Q.    Now, the conversation that you were having,

23  was that in English or in Spanish?

24     A.    In English.

114

JGS_MAYSONET 4862

1   Q. Sir, do you speak Spanish?

2   A. No.

3   Q. Was anybody translating for you during this

4 conversation?

5   A. No.

6   Q. Was the defendant responding to you in

7 English?

8   A. Yes.

9   Q. And were his answers responsive to the

10 questions that you were asking?

11   A. Yes.

12   Q. And he acknowledged to you that he

13 understood his rights, and he was willing to talk

14 with you?

15   A. Yes.

16   Q. And did you have a conversation with

17 him?

18   A. Yes.

19   Q. And did you speak with him at that time

20 about his knowledge of what happened in regards to

21 the murders of Torrence and Kevin Wiley that had

22 happened on the 25th of May 1990?

23   A. Yes.

24   Q. After that conversation, did there come a

JGS_MAYSONET 4863

1      time, sir, when you were alone with Mr. Maysonet?

2      A.   Yes.   After I spoke with Mr. Maysonet

3      with the detectives present, I asked the detectives

4      to leave the room, and at that time, I talked to

5      the individual in this case, Mr. Maysonet, by

6      myself.

7                     I asked him how he was treated by the

8      police.   I asked him if he was threatened,

9      if he was promised anything.   And pretty much

10     just to see that it was a free and voluntary

11     statement.

12     Q.   And how did he respond to those questions

13     when you asked him how he had been treated by the

14     police when you were outside the presence of the

15     police?

16     A.   He said he was treated fine by the

17     police and that he wasn't threatened or promised

18     anything.

19     Q.   Did you have occasion then to have the

20     detectives, Guevara and Montilla, come back in the

21     room?

22     A.   Yes.   After I had the conversation with him

23     alone and I felt comfortable that everything was

24     fine, I asked the detectives to come back in the

JGS_MAYSONET 4864

1    room.

2         Q.    Then, sir, did you have a conversation with

3    the defendant somewhere after 7:00 o'clock that

4    morning in terms of memorializing his statement to

5    you that he had given you earlier?

6         A.    Right.  I talked to Mr. Maysonet, and I

7    explained to him the different ways that we can

8    record his statement.  And I explained to him that

9    one way is to do what's called a handwritten

10   statement.  That's where I write down everything that

11   Mr. Maysonet told me regarding what happened.

12              The other way of doing it is to call

13   in a court reporter, and I explained to him

14   a court reporter is like what we have today, someone

15   who types down everything you say, and the court

16   reporter will type it up, and then we can review it

17   and make any changes that you want to do.

18        Q.    And did the defendant indicate to you at

19   that time what type of statement he would be willing

20   to give to you?

21        A.    Yes.  He indicated that he wanted to do the

22   court-reported statement.

23        Q.    At that time, sir, did you make any sort of

24   notifications for a court reporter?

117

JGS_MAYSONET 4865

1      A.   I called back to my office to the

2    dispatcher, informed them that we need a

3    court reporter sent to the area.

4      Q.   Sometime later, did a court reporter by the

5    name of Joe Szybist arrive at Area 5 pursuant to your

6    notification?

7      A.   Yes, he did.

8      Q.   I'd like to talk to you about 9:28 in

9    the morning.  Were you then in a room with the

10   defendant for purposes of taking a court-reported

11   statement?

12     A.   Yes.

13     Q.   Now, other than yourself and the defendant

14   and the court reporter, were any police personnel

15   present for that statement?

16     A.   Yes, Detective Montilla.

17     Q.   And could you tell the ladies and gentlemen

18   of the jury how that court-reported statement was

19   taken at that time?

20     A.   The court-reported statement is almost a

21   mirror image of the statement when I first talked to

22   him.  I start out the same way.  I just tell everyone

23   that we're here in an interview room, say who's

24   present in the interview room, inform him that I'm

JGS_MAYSONET 4866

1    not his attorney, but a state's attorney, ask

2    him if he's been read his Miranda warnings before,

3    and I begin reading the Miranda warnings again.  And

4    then it's just question-answer.  I ask him a

5    question, and he gives me the answer.

6        Q.    Now, after that statement was completed,

7    after you were done asking the questions and

8    Mr. Maysonet was done answering those questions, what

9    was the next thing that happened?

10       A.    Then the court reporter would leave or just

11   go out of the interview room and type up the

12   statement that we just took.

13       Q.    And was that statement, in fact, typed

14   up on to regular paper for you by the

15   court reporter?

16       A.    Yes.

17       Q.    And was it returned back to you?

18       A.    Yes.

19       Q.    And when you received it, sir, what is the

20   next thing you did with the actual court-reported

21   statement that had been typed up by the court

22   reporter?

23       A.    We had the statement in the interview room

24   with Mr. Maysonet, myself, and the detective, and the

JGS_MAYSONET 4867

1     first thing I do is ask him to read aloud the

2     beginning portion so I'm sure that he can read and

3     understand the statement.

4         Q.   And did he do that?

5         A.   Yes.

6         Q.   And did he read that statement in English

7     to you?

8         A.   Yes.

9         Q.   And what happened after that?  In regards

10    to reviewing the statement, what happened?

11        A.   Well, then we continued through the

12    statement page by page, and he's informed -- or I

13    told him that he can make any additions or

14    corrections that he wished, and we would go through

15    and make additions or corrections, initial the

16    addition or correction until we completed the whole

17    statement.

18        Q.   And were corrections made by the defendant

19    during the course of the reviewing of that

20    court-reported statement?

21        A.   Yes.

22        MS. MANDELTORT:  Judge, I'm showing counsel

23    what's previously been marked and shown to him,

24    People's Exhibit Number 29 for identification.  May I

JGS_MAYSONET 4868

1    approach, Judge?

2              THE COURT:  Yes, you may.

3    BY MS. MANDELTORT:

4        Q.    Sir, I'm showing you what's been marked as

5    People's Exhibit Number 29 for identification.  Could

6    you tell the ladies and gentlemen of the jury if you

7    recognize that document?

8        A.    Yes.

9        Q.    And what is that document, sir?

10       A.    This is the original court-reported

11   statement that we took on that day.

12       Q.    And, sir, do any signatures appear on the

13   first page of that court-reported statement?

14       A.    Yes.

15       Q.    And whose signatures appear there?

16       A.    My signature, Detective Montilla's

17   signature, and Jose Maysonet's signature.

18       Q.    And were those signatures placed there

19   after the reviewing of the court-reported statement

20   as you described to the ladies and gentlemen of the

21   jury?

22       A.    Yes.  After we got completely done with the

23   statement, with all the changes, we'd initial the

24   changes first.  Then we would sign the first and last

JGS_MAYSONET 4869

1     page.

2          Q.   And did the defendant sign the front of

3     that statement in your presence?

4          A.   Yes.

5          Q.   I'd like to take you now to the last page;

6     that is, Page 7 of that statement.   Does

7     the defendant's signature again appear on that page?

8          A.   Yes.

9          Q.   And did the defendant sign that in your

10    presence?

11         A.   Yes.

12         Q.   And likewise, did you and Detective

13    Montilla sign as witnesses at that point?

14         A.   Yes.

15         Q.   Now, directing your attention, sir, to Page

16    3, is there, in fact, a correction on

17    Page 3?

18         A.   Yes.

19         Q.   Could you tell the ladies and gentlemen of

20    the jury how that correction came to be made?

21         A.   Mr. Maysonet had used a word, and then

22    he wanted to change it.   He said, can I change that?

23    And I said, yes.

24              And we put a line through it.   He

JGS_MAYSONET 4870

1    told me what he wanted to write down.  I printed it

2    in, and we all initialed the change.

3         Q.   And likewise, on Page 4, is there a similar

4    change with the initials?

5         A.   Yes.

6         Q.   And Page 5?

7         A.   Page 5 has two changes, yes.

8         Q.   And Page 6?

9         A.   Yes.

10        Q.   And did the defendant initial those

11   changes, sir, in your presence upon your making those

12   corrections at his direction?

13        A.   Yes.  Except the one on Page 6 was a

14   misspelled word or a typo.  They spelled force.  It

15   was F-o-r, and we inserted the c-e, so that wasn't at

16   his direction.  That was just a misspelled word.

17        Q.   Now, during the course of that

18   court-reported statement, sir, did you show the

19   defendant anything?

20        A.   I showed the defendant exhibits,

21   photographs.

22             MS. MANDELTORT:  Showing counsel

23   what's marked as People's Exhibits Number 29A

24   and 29B.

JGS_MAYSONET 4871

1          May I approach, Judge?

2          THE COURT:  Yes, you may.

3   BY MS. MANDELTORT:

4     Q.   Sir, I'm showing you what's been marked as

5   People's Exhibit Number 29A.  Do you recognize that

6   photograph, sir?

7     A.   Yes.

8     Q.   And what is that photograph?

9     A.   This is a photograph that I had marked as

10  People's Exhibit Number 1 of the statement in regards

11  to an individual that he had mentioned during his

12  statement, to identify that individual, and he

13  identified this individual.

14    Q.   And likewise, People's Exhibit 29B for

15  identification, do you recognize that photograph?

16    A.   Yes.

17    Q.   And what is that a photograph of?

18    A.   That's -- again, it's an individual in the

19  statement that he was telling about, and he

20  identified this photograph as the person that he was

21  talking about.

22    Q.   And during the course of that statement, he

23  actually referred -- you showed him those actual

24  photographs during the course of the statements

124

JGS_MAYSONET 4872

1    and marked them as Exhibits 1 and 2 as you have

2    stated?

3         A.   Yes.  Well, the court reporter marks them,

4    but right.

5         Q.   They were marked in your presence?

6         A.   Right.

7         Q.   Likewise, sir, after the taking of the

8    court-reported statement, and it was reviewed and

9    signed, were any photographs taken of the

10   defendant?

11        A.   Yes.

12        Q.   And could you tell the ladies and gentlemen

13   how that happened?

14        A.   We always take a picture of the individual

15   after we take a statement.  It's a Polaroid camera

16   just in the room.  You ask if they can -- you can

17   take their picture, and you take their photograph.

18             MS. MANDELTORT:  May the record reflect I'm

19   showing counsel what is marked as People's Exhibit

20   29C for identification.

21   BY MS. MANDELTORT:

22        Q.   Sir, I'm showing you People's Exhibit

23   Number 29C for identification.  Could you tell the

24   ladies and gentlemen if you recognize that

125

JGS_MAYSONET 4873

1      photograph?

2           A.    Yes.    This is a photograph of Jose Maysonet

3      taken after the statement.

4           Q.    Does that photograph truly and accurately

5      show the way the defendant appeared after the

6      review -- after the taking, review, and signing of

7      that court-reported statement?

8           A.    Yes.

9           Q.    And does his signature appear anywhere on

10     that photograph?

11          A.    Yes.    His signature appears, then my

12     signature, and then Detective Montilla's signature.

13          Q.    Sir, after the court-reported statement,

14     did you have the occasion to leave Area 5 with the

15     defendant?

16          A.    Yes.

17          Q.    And for what purpose did you leave Area 5

18     with the defendant after the court-reported

19     statement?

20          A.    We actually went to the scene.    He agreed

21     to take us to where the murders took place, and he

22     directed us, and we drove to the actual scene to

23     corroborate his statement to what he explained to me

24     happened.

JGS_MAYSONET 4874

 1          Q.    And when you were out at the scene, did

 2     that happen?  Did he explain to you what happened and

 3     what he was able to see?

 4          A.    Yes.  We actually had the police car parked

 5     where he said he had parked the car at the time of

 6     the shooting, and we could see the angle that he was

 7     looking at at the time of the shooting, and we could

 8     see that it was an unobstructed view.

 9          Q.    Sir, I'd like to direct your attention back

10     to People's Exhibit Number 29, that court-reported

11     statement.  That is the actual statement that was

12     taken that evening; is that correct?

13          A.    Yes.

14          Q.    And is that a true and accurate copy, sir,

15     of the questions you asked the defendant and the

16     answers that he gave you?

17          A.    Yes.

18          Q.    And is that statement in substantially the

19     same condition as when it was taken on August 23,

20     1990?

21          A.    Yes.

22          MS. MANDELTORT:  Judge, if I could just

23     have one moment?

24                          (Brief pause.)

127

JGS_MAYSONET 4875

1    MS. MANDELTORT:  Your Honor, at this time,

2    I would offer People's Exhibit Number 29 into

3    evidence, ask that the identification marks be

4    stricken, and that the witness be allowed to publish

5    that statement to the jury subject, of course, to

6    counsel's cross-examination.

7         MR. BEUKE:  No objection.

8         THE COURT:  Very well.  The witness may

9    publish the statement.  That's People's Number 29

10   which has been received by the Court into evidence.

11                    (WHEREUPON, People's Exhibit

12                    Number 29 was received in

13                    evidence.)

14        THE WITNESS:  Do you wish me to publish it

15   now, Judge?

16        THE COURT:  Yes, sir.

17        THE WITNESS:  The top page of the

18   statement:  "Re:  Investigation (shooting deaths of

19   Torrence and Kevin Wiley.)

20                    "Statement of Jose Maysonet,

21                    taken in an interview room, second

22                    floor, Area 5 Violent Crimes

23                    Headquarters, 5555 West Grand Avenue,

24                    Chicago, Cook County, Illinois, on

128

JGS_MAYSONET 4876

```
 1          Thursday, August 23, 1990, at the hour
 2          of 9:28 a.m.
 3                    "Present:  Mr. Frank DiFranco,
 4          Assistant State's Attorney; Detective
 5          Fred Montilla, Star Number 16410, Area
 6          5 Violent Crimes.
 7                    "Reported by:  Joseph A.
 8          Szybist, CSR.  Book Number 9008-23."
 9                    It says:  "Ms. DiFranco:  Let
10          the record reflect that we are in an
11          interview room at Area 5 Violent
12          Crimes.  Today's date is August 23,
13          1990.  The time is 9:28 a.m.  present
14          in the room with me, Assistant State's
15          Attorney Frank DiFranco, are Detective
16          Frank Montilla, the court reporter, and
17          Jose Maysonet.
18                    "We are here to take the
19          statement of Jose Maysonet concerning
20          the investigation of the shooting
21          deaths which occurred on May 25, 1990,
22          at 3428 North Avenue, Chicago,
23          Illinois.
24                    "By Mr. DiFranco:
```

JGS_MAYSONET 4877

1        "Question:  Now, I talked to

2        you earlier and explained that I am an

3        assistant state's attorney, a lawyer

4        working with the police and not your

5        lawyer; is that correct?

6             "Answer:  Yes.

7             "Question:  And before we

8        spoke, I advised you of your

9        constitutional rights; is that

10       correct?"

11            Bottom of the page, there's

12       three signatures.

13            "Answer:  Yes.

14            "Question:  I am going to

15       advise you of your rights again.

16            "Do you understand you have a

17       right to remain silent?

18            "Answer:  Yes.

19            "Question:  Do you understand

20       that anything you say can be used

21       against you in a court of law?

22            "Answer:  Yes.

23            "Question:  Do you understand

24       you have a right to talk to a lawyer

JGS_MAYSONET 4878

```
 1          and have him present with you while you

 2          are being questioned?

 3                  "Answer:  Yes.

 4                  "Question:  Do you understand

 5          if you cannot afford to hire a lawyer,

 6          one will be appointed by the court to

 7          represent you before any questioning if

 8          you wish one?

 9                  "Answer:  Yes.

10                  "Question:  Understanding these

11          rights, do you wish to talk to us now?

12                  "Answer:  Yes.

13                  "Question:  On May 20, 1990, at

14          approximately 12:45 p.m., where were

15          you?

16                  "Answer:  Home.

17                  "Question:  Where do you live?

18                  "Answer:  1302 North Homan.

19                  "Question:  Did anything

20          unusual happen at that time?

21                  "Answer:  Yes.  Lluvia came to

22          my house.  He told me that if I can

23          hide a pistol for him.

24                  "Question:  What did you say to
```

JGS_MAYSONET 4879

1    Lluvia?

2     "Answer:  I told him I can hide

3    the pistol for you, but you can go to

4    get it back as soon as possible.

5     "Question:  What did Lluvia say

6    then?

7     "Answer:  He said, don't worry

8    about it.  I will pick it up as soon as

9    possible.

10     "Question:  What kind of pistol

11    or gun did Lluvia give?

12     "Answer:  Nine millimeter.

13     "Question:  On May 24, 1990,

14    about 11:30 p.m. to 12:00 p.m., where

15    were you?

16     "Answer:  Home.

17     "Question:  What if anything

18    happened about that time?

19     "Answer:  Lluvia, Fro, Tino

20    came to my house.

21     "Question:  All right.  Now, I

22    ask you to look at Exhibit 1.  Can you

23    please identify who that is in this

24    picture?

JGS_MAYSONET 4880

1     "Answer:  Lluvia.

2     "Question:  And I will ask you

3    to look at Exhibit 2.  Can you please

4    tell us who is in that picture?

5     "Answer:  Fro.

6     "Question:  Do you know Fro by

7    any other names?

8     "Answer:  Christopher.  I

9    forget his last name.

10     "Question:  Hernandez?

11     "Answer:  Yeah, Hernandez.

12     "Question:  Okay.  And do you

13    know what Tino's real name is?

14     "Answer:  Tino Cruz.

15     "Question:  Are these

16    individuals the member of any gang?

17     "Answer:  Latin Kings.

18     "Question:  Were you a member

19    of the Latin Kings?

20     "Answer:  I was a member.

21     "Question:  What happened when

22    Lluvia and Tino came over?

23     "Answer:  They came over that

24    night, and they told me they needed the

JGS_MAYSONET 4881

1     pistol.

2          "Question:  What did they say

3     they needed the pistol for?

4          "Answer:  They got the two guys

5     on Drake and North Avenue waiting for

6     dope."

7          And the "dope" is scratched off.

8  There's a line across it, and he wanted it changed to

9  "waiting for something."  And then we all initialed

10  it.

11          "Question:  What was Lluvia

12     wearing that evening?

13          "Answer:  A black hooded sweat

14     shirt.

15          "Question:  What significance

16     does it have when a Latin King wears a

17     black hooded sweat shirt?

18          "Answer:  Kill somebody, rob

19     somebody, or rob a car.

20          "Question:  All right.  And

21     what were they going to do that

22     evening?

23          "Answer:  What they were going

24     to do that evening is they were going

JGS_MAYSONET 4882

1     to go to the two guys that were waiting

2     for dope."

3       Again, he asked to change it.  We

4 crossed it off.  It now says "something," and it's

5 initialed.

6       "Question:  When you left, who

7     drove?

8       "Answer:  I drove.  Lluvia was

9     in the front passenger's side.

10      "Question:  Where was Fro?

11      "Answer:  In the back of

12     Lluvia.

13      "Question:  Where was Tino?

14      "Answer:  In my back, in the

15     back behind the driver's seat.

16      "Question:  Who had the gun at

17     that time?

18      "Answer:  Lluvia.

19      "Question:  Where did you go?

20      "Answer:  I go -- I took Homan

21     to Potomac, Potomac all the way to

22     St. Louis, St. Louis all the way to

23     North Avenue, North Avenue to Drake,

24     and parked in the alley.

JGS_MAYSONET 4883

1     "Question: When you parked in

2    the alley, what happened then?

3     "Answer: Lluvia got out of the

4    car. He put the hood on his head and

5    put the front seat front -- to the

6    front. Fro came out of the car, and

7    Tino came out of the car.

8     "Question: Was anyone else

9    around at the time?

10     "Answer: Two guys.

11     "Question: Where were those

12    two guys?

13     "Answer: By the corner.

14     "Question: Okay. Where was

15    the gun at this time?

16     "Answer: Lluvia got the gun in

17    his front pocket.

18     "Question: Okay. What did

19    Lluvia, Fro, and Tino do then?

20     "Answer: They started walking

21    towards the guys.

22     "Question: What happened next?

23     "Answer: They waited. They

24    were talking about five minutes, and

JGS_MAYSONET 4884

1        then the shooting happened.  Shot about

2        five to six times.

3                "Question:  What did you see

4        when you heard the five or six shots?

5                "Answer:  I looked, and when I

6        looked, the two guys was on the floor

7        laying down, and Lluvia had -- had the

8        nine millimeter in his hand pointing it

9        at the guy to see if he was going to

10       move or not.

11               "Question:  What happened next?

12               "Answer:  And then when he

13       didn't see --" and then it's crossed

14       off, and it says:  "-- them move, he

15       started walking towards my car with the

16       pistol in his hand.

17               "Question:  Where was Tino and

18       Fro?

19               "Answer:  They started walking

20       towards my car, too.

21               "Question:  All right.  And

22       what happened then?

23               "Answer:  And they went inside

24       the car.  So then I drove all the way

137

JGS_MAYSONET 4885

```
 1              to 1302 North Homan.

 2                   "Question:  What happened when

 3              you got back home?

 4                   "Answer:  When I got back home,

 5              I got out of the car.  Lluvia jumped in

 6              the driver's side, and he left with the

 7              car."

 8                   And then it's inserted, printed in on

 9    defendant's instructions to add in:  "And the gun.

10    They left with the car and the gun."  It's initialed.

11                   "Question:  Approximately what

12              time was it when Lluvia shot the two

13              men?

14                   "Answer:  About 12:30.  I

15              didn't have no watch.  About 12:30.

16                   "Question:  All right.  When

17              did you next see Lluvia that day?

18                   "Answer:  I seen Lluvia that

19              day at 11:00 a.m.

20                   "Question:  Where did you see

21              Lluvia?

22                   "Answer:  At LeMoyne and

23              Spaulding.

24                   "Question:  What if anything
```

138

JGS_MAYSONET 4886

1      did Lluvia say to you?

2           "Answer:  I killed two black

3      motherfuckers.

4           "Question:  What happened next?

5           "Answer:  Then they told me,

6      you are not going to say nothing;

7      right?  I said, no, I wasn't going to

8      say nothing.  They said, keep it under

9      your hat.  Keep my mouth shut.

10          "Question:  On August 16, 1990,

11     about 10:00 p.m., where were you?

12         "Answer:  Home.

13         "Question:  What if anything

14     happened then?

15         "Answer:  Lluvia, Fro, Tino,

16     Cisco, King, they came out to my house.

17         "Question:  What happened when

18     they came to your house?

19         "Answer:  They put a nine

20     millimeter to my head.

21         "Question:  Who put the nine

22     millimeter to your head?

23         "Answer:  King.

24         "Question:  What did he say?

JGS_MAYSONET 4887

1              "Answer:  You know about the

2          two murders.  If you talk, we're going

3          to put you six feet under.

4              "Question:  Did anyone force or

5          threaten you to make this statement?"

6              That's where the correction is with

7     the force.  We added the c-e and initialed it.

8              "Answer:  No.

9              "Question:  Are you giving this

10         statement freely and voluntarily?

11             "Answer:  Uh-huh, yes.

12             "Question:  How have you been

13         treated by the police?

14             "Answer:  Good.

15             "Question:  How have you been

16         treated by myself?

17             "Answer:  Good.

18             "Question:  Has anyone made any

19         promises to you for your statement?

20             "Answer:  No.

21             "By Mr. DiFranco:  It is now

22         9:38 a.m., and this concludes the

23         statement of Jose Maysonet."

24             And then it's signed by Jose

140

JGS_MAYSONET 4888

1    Maysonet.  Witnesses to the signatures, myself and

2    Detective Montilla.

3    BY MS. MANDELTORT:

4        Q.   Mr. DiFranco, when you went out to

5    the scene at the direction of Mr. Maysonet after

6    the court-reported statement, were you parked

7    in an alley behind a vacant lot by North and

8    Kimball?

9        A.   Yes.

10       Q.   And it's at that point that the defendant

11   described to you, as he had in the court-reported

12   statement, what happened at the time that Torrence

13   and Kevin Wiley were shot?

14       A.   Yes.

15           MS. MANDELTORT:  Judge, I have no further

16   questions.  I would tender the witness.

17           THE COURT:  Very well.  Mr. Beuke?

18           MR. BEUKE:  Thanks, Judge.

19               CROSS EXAMINATION

20               BY MR. BEUKE:

21       Q.   Good afternoon, Mr. DiFranco.

22       A.   Good afternoon, Mr. Beuke.

23       Q.   Sir, I think you told the ladies and

24   gentlemen of the jury that you have been an

JGS_MAYSONET 4889

```
 1    attorney -- I'm sorry -- for how many years?
 2         A.    Eight years.
 3         Q.    And you obviously have had the benefit of
 4    graduating from high school, graduating from college,
 5    going to law school and successfully completing that
 6    and becoming a licensed attorney in the State of
 7    Illinois; correct?
 8         A.    Yes.
 9         Q.    You had -- after you left -- or after you
10    graduated law school, Mr. DiFranco, did you
11    immediately begin your career as a lawyer in the
12    State's Attorney's Office?
13         A.    Yes.
14         Q.    So you came right out of law school into
15    the State's Attorney's Office?
16         A.    Yes.
17         Q.    There is a kind of a procedure for younger
18    assistants as they work their way through the office.
19    Did you follow that typical procedure?
20         A.    Yes.
21         Q.    Begin your career in the Appellate
22    Division?
23         A.    Correct.
24         Q.    And then got promoted to another division,
```

142

JGS_MAYSONET 4890

1      First Municipal or Juvenile Division?

2          A.    Actually, I went to traffic first.

3          Q.    Traffic.  After you finished in traffic,

4      did you get promoted to the next step in the

5      office?

6          A.    First Municipal.

7          Q.    And at some point, you went into the Felony

8      Review Unit; correct?

9          A.    Yes.

10         Q.    Did you spend any time in the Felony Trial

11     Division prior to going into the Felony Review Unit

12     when you were there in 1990?

13         A.    No.

14         Q.    You had obviously had the benefit prior to

15     going into the Felony Review Unit of prosecuting

16     cases, had you not?

17         A.    Yes.

18         Q.    You certainly were aware of the elements of

19     the prosecution of a number of different crimes;

20     correct?

21         A.    Yes.

22         Q.    You were familiar with different theories

23     of prosecution; is that fair to say?

24              MS. MANDELTORT:  Objection, Judge, to the

143

JGS_MAYSONET 4891

1    form of the question.

2              THE COURT:  Sustained.

3    BY MR. BEUKE:

4         Q.   Well, Mr. DiFranco, how long had you spent

5    in the Felony Review Unit prior to May of 1990?

6              MS. MANDELTORT:  Objection, Judge.

7    BY THE WITNESS:

8         A.   You mean prior to the statement?  I came in

9    felony review, May of 1990.  This actually was my

10   first day on the street.

11   BY MR. BEUKE:

12        Q.   Okay.  So this would have been your first

13   experience as a felony review assistant

14   state's attorney; is that correct?

15        A.   On my own.  Previously, before you go out

16   on the street, you have what's called ride-alongs

17   where you go with another assistant state's attorney

18   that's already in the unit, and they show you the

19   ropes or teach you how you do the case.

20              But, yes, this was the first time I

21   was alone or on my own.

22        Q.   So you were trained by another assistant

23   state's attorney prior to May -- or I'm sorry --

24   prior to August 23rd of 1990 as to how to do your

JGS_MAYSONET 4892

1    job; fair to say?

2         A.   Yes.

3         Q.   Okay.  You had -- had you taken

4    court-reported statements prior to that August 23rd

5    of 1990 day?

6         A.   No.  This was the first court-reported

7    statement I had ever taken.

8         Q.   Had you been present when other

9    court-reported statements had been taken?

10        A.   No.

11        Q.   Did you receive any training from any of

12   your supervisors as to the process of taking

13   court-reported statements?

14        A.   Not at this time, no.

15        Q.   Okay.  When you originally -- I think you

16   talked about coming to work that morning, and you

17   were notified of an assignment of a pending case at

18   Area 5; is that correct?

19        A.   Yes.

20        Q.   And you got that notification, am I

21   correct, by calling in to the dispatcher who sits up

22   on the 14th floor across the way, and they told you,

23   Frank, you've got a case?

24        A.   Correct.

JGS_MAYSONET 4893

```
 1          Q.   At that point, the dispatcher in the felony

 2     review office, he didn't tell you anything about the

 3     case, did he?

 4          A.   No, no specifics at all.

 5          Q.   He told you that there's a murder or

 6     something to that effect?

 7          A.   Right.  He told me there's a double

 8     homicide and which detective to call or ask for.

 9          Q.   Did he tell you the detective to call?  Do

10     you remember who that was?

11          A.   Right now, no.

12          Q.   Anyway, you got in your car, and you went

13     immediately to Area 5; is that correct?

14          A.   Yes.

15          Q.   You got there, I think you said, sometime

16     around 6:20; correct?

17          A.   Right.

18          Q.   When you got there at 6:20, did you review

19     or did you speak with a detective?

20          A.   Yeah.  Whoever was on the case, I spoke

21     with the detective.

22          Q.   All right.  Do you recall which

23     detective -- do you recall speaking with a Detective

24     Paulnitsky?
```

JGS_MAYSONET 4894

```
1          A.    Not at -- I don't recall if it was

2    Paulnitsky at this time.  I think that

3    Montilla and Guevara were the two detectives

4    that I spoke to that were working on the case

5    at this time.

6          Q.    Okay.  You got there at 6:20, and by 6:30,

7    you were in the interview room with Mr. Maysonet;

8    correct?

9          A.    Yes.

10         Q.    The conversation that you had with either

11   Guevara or Montilla, would it be fair to say that it

12   was a very brief conversation?

13         A.    Yes.

14         Q.    And they were the only people you spoke

15   with prior to going in and seeing Maysonet; correct?

16         A.    That I recall, yes.

17         Q.    Okay.  Did Guevara or Montilla brief you as

18   to the status of the investigation at that point, or

19   did they just ask you to come on in and talk to this

20   guy?

21         A.    Well, I guess if you -- brief me, we talked

22   for a couple of minutes about the case, you know,

23   what type of case it was.

24         Q.    I mean, you knew at that point --
```

147

JGS_MAYSONET 4895

1          MS. MANDELTORT:  Objection, Judge.

2          THE COURT:  Sustained.  Let him finish.

3          MR. BEUKE:  I'm sorry, Judge.

4    BY THE WITNESS:

5          A.    Just basically that it was a double murder

6    and who was in custody, who wasn't in custody, and

7    that this individual was making a statement.

8    BY MR. BEUKE:

9          Q.    So as to anything that transpired, either

10   other witness testimony or other parts of this

11   investigation that transpired before you got there,

12   you really weren't told anything about that at that

13   point?

14         A.    No.

15         Q.    You obviously didn't have an opportunity to

16   read or review any police reports prior to going in

17   to talk to Maysonet, did you?

18         A.    If I did, it was briefly.  I don't -- I

19   don't recall.  It was --

20         Q.    You don't recall if you read anything?

21         A.    Normally what you would do is you'd

22   look at whatever report they had, and they would

23   brief you, tell you what the case was about,

24   and then you would go in and meet him and talk

JGS_MAYSONET 4896

```
 1    to him.
 2         Q.    Well, in this case, Mr. DiFranco, it's fair
 3    to say, is it not, that when you got there, you
 4    talked briefly with the detectives, and you went in
 5    to talk to him?
 6         A.    Correct.
 7         Q.    Do you recall seeing any -- do you know
 8    what general progress report notes are?
 9         A.    Yes.
10         Q.    Okay.  They are notes that are used by the
11    detectives in the Chicago Police Department for the
12    purposes of compiling different
13    portions of their investigation; is that fair
14    to say?
15              MS. MANDELTORT:  Objection, Judge.
16              THE COURT:  Sustained.
17    BY MR. BEUKE:
18         Q.    Did you see any General Progress Report
19    notes before you went in to talk to Maysonet?
20              MS. MANDELTORT:  Objection, relevance.
21              THE COURT:  If he can answer.
22    BY THE WITNESS:
23         A.    No, no, I don't recall reviewing any
24    progress notes.
```

149

JGS_MAYSONET 4897

1    BY MR. BEUKE:

2         Q.    So I'm clear, Mr. DiFranco, when the felony

3    review assistant state's attorney generally is called

4    is at some point in time when the detectives are

5    asking you for either your approval of their case to

6    that point or some advice; is that correct?

7              MS. MANDELTORT:  Objection, Judge.

8              THE COURT:  Sustained to what is

9    generally done.  Ask him what he did in this

10   case.

11   BY MR. BEUKE:

12        Q.    Well, ultimately, the decision as to

13   whether or not --

14             MS. MANDELTORT:  Objection, Judge, ask for

15   a sidebar.

16                        (WHEREUPON, the following was

17                         had outside the

18                         hearing of the jury:)

19             MS. MANDELTORT:  My concern at this

20   point -- and for the record, my understanding is the

21   whole process of charging, of approving charges or

22   rejecting charges is not a proper inquiry either for

23   the state or the defense.

24             MR. MAREK:  There's case law to that, that

                              150

JGS_MAYSONET 4898

1      we can't bring that out.

2                  THE COURT:  What's the point?

3                  MR. BEUKE:  Judge, he has a purpose in

4      being there.  I'm trying to get to his purpose for

5      being there.

6                  THE COURT:  His purpose was to take a

7      statement.

8                  MR. BEUKE:  Well, his purpose is also to

9      evaluate the status of the detective's case.

10                 THE COURT:  I'm not going to let you get

11     into that.  Now, you know better than that.

12                      (WHEREUPON, the following was

13                       had in open court, in the

14                       hearing of the jury:)

15                 MR. BEUKE:  May I proceed, Judge?

16                 THE COURT:  Sure.

17     BY MR. BEUKE:

18          Q.    Mr. DiFranco, when you went in and talked

19     with Maysonet at 6:30 in the morning, the other two

20     detectives came in with you; correct?

21          A.    Yes.

22          Q.    And when you talked to Maysonet in that

23     conversation, you indicated to the ladies and

24     gentlemen, I believe, that you originally introduced

JGS_MAYSONET 4899

1      yourself, told him you were a prosecutor, I'm

2      working with the police, I'm not your lawyer;

3      correct?

4          A.    Correct.

5          Q.    Did you -- or were you given any

6      information about Maysonet by the detectives insofar

7      as whether or not he had a lawyer on another case at

8      that time?

9              MS. MANDELTORT:  Objection, Judge.

10             THE COURT:  Sustained.

11     BY MR. BEUKE:

12         Q.    Did you ask Mr. Maysonet during the course

13     of your conversation with him as to whether or not he

14     had an attorney?

15         A.    I asked him if he wanted an attorney.  I

16     didn't ask him if he had an attorney.  I asked him if

17     he wanted an attorney.

18                  I told him that the attorney could be

19     present for his -- before the questioning, but I

20     never -- I guess I didn't phrase it, do you have an

21     attorney.  Just do you want an attorney or do you

22     want one present.

23         Q.    Mr. DiFranco, when you went in and spoke to

24     him, it's your recollection that you did not use

                            152

1    either of the two detectives to translate for you; is

2    that correct?

3         A.    Absolutely.

4         Q.    You did not ask -- Guevara wasn't sitting

5    there relating your questions to Mr. Maysonet or

6    Mr. Maysonet's answers to you?

7         A.    No.

8         Q.    And Montilla, likewise, wasn't doing that

9    either?

10        A.    No.

11        Q.    So the entire conversation that you had

12   with this individual was in English; correct?

13        A.    Correct.

14        Q.    You had an opportunity to sit with him for

15   about, fair to say, maybe ten minutes?

16        A.    The first -- the first time I spoke with

17   him 10-to-15 minutes, yes.

18        Q.    And initially, your conversation with him

19   after the introductions and the rights, as to the

20   conversation about what you were there for, the

21   double homicide, would it be fair to say that that

22   occupied maybe half that time, a little more, a

23   little less?

24        A.    Probably a little more.

JGS_MAYSONET 4901

1      Q.   And during the course of that time that you

2   had to spend with him, that ten-or-so-minute period

3   of time, did you ever ask him how far he had gone in

4   school?

5      A.   I don't recall.

6      Q.   Did you ever make any -- did you have any

7   problem understanding him?  I mean -- I don't mean --

8   strike that, Judge.

9                Did he speak with a Spanish accent,

10  Hispanic accent?

11     A.   To be honest with you, I don't -- I don't

12  remember what his accent was.

13     Q.   Okay.  The conversation that you say you

14  had with him, after it was over, you left the room;

15  correct?

16     A.   The first conversation I had with him, I

17  asked the detectives to leave the room.  I stayed in

18  the room alone with him.

19     Q.   All right.  When the detectives left the

20  room, you and Mr. Maysonet were there alone together;

21  correct?

22     A.   Yes.

23     Q.   And you told the ladies and gentlemen that

24  was for the purpose of you assuring yourself that

154

JGS_MAYSONET 4902

1      Mr. Maysonet was talking to you freely and

2      voluntarily; correct?

3            A.    Right, and that there was no force or

4      coercion or threats.

5            Q.    You asked him that; correct?

6            A.    Yes.

7            Q.    And he didn't tell you that there was any

8      force or coercion; right?

9            A.    Correct.

10           Q.    And the detectives came back in the room?

11           A.    There was a short period of time.  I don't

12     know exactly how many minutes, if it was ten, 20

13     minutes, or what it was, and then I called the

14     detectives back into the room, yes.

15           Q.    Well, is it your testimony that you

16     remained in the room with Mr. Maysonet alone for

17     ten-or-20 minutes after the detectives left?

18           A.    No, I can't -- I can't remember if I stayed

19     in there the whole time, or if I came out of the

20     interview room from him and looked for the detectives

21     to tell them to come back in.

22           Q.    If I understand you correctly,

23     Mr. DiFranco, your purpose in doing that was to make

24     sure for your own benefit if he was telling you what

155

JGS_MAYSONET 4903

```
 1      he told you freely and voluntarily?
 2                  MS. MANDELTORT:  Objection.
 3                  THE COURT:  Sustained, Counsel.  He's
 4      answered that question.
 5      BY MR. BEUKE:
 6          Q.   Well, did that take any more than one or
 7      two questions?
 8          A.   Well, yeah.  It's not just a matter of just
 9      saying two words.  I mean, you ask him how he's
10      doing, if he wants something to eat or drink, are you
11      okay, how have you been treated by the police, has
12      anyone threatened you, forced you.  I mean, it's a
13      little conversation.
14      BY MR. BEUKE:
15          Q.   Did you ask him when the last time it was
16      that he had slept?
17          A.   No.
18          Q.   Did you ask him how long he had been at the
19      police station?
20          A.   I don't recall.
21          Q.   Did you ask him whether or not -- or how he
22      had got to the police station?
23          A.   No, I don't remember that.
24          Q.   Did you ask him whether or not he had had
```

156

JGS_MAYSONET 4904

1    an opportunity to speak with his family?

2         A.   No, I didn't.

3         Q.   Did you -- or were you ever told,

4    Mr. DiFranco, that Mr. Maysonet had been given pills

5    the prior evening for a nervous

6    condition?

7              MR. MAREK:   Objection.

8              THE COURT:   Sustained.

9    BY MR. BEUKE:

10        Q.   Well, did you ever ask him if he was taking

11   any medication?

12        A.   No, I never asked him if he was under

13   medication.

14        Q.   In any event, Mr. DiFranco, at some point,

15   you had him moved to a different room; correct?

16        A.   To accommodate the court reporter, yes, I'm

17   sure we did.

18        Q.   You at that point made a decision to take a

19   statement from him; correct?   If he wanted to give

20   one?

21        A.   You mean -- are you talking about the

22   court-reported statement now?

23        Q.   Let me make it clear.   After you had this

24   alone conversation with him, at some point,

157

JGS_MAYSONET 4905

1    Mr. Maysonet was taken out of that interview room;

2    correct?

3         A.    Well, no, not at that time.  I mean, he's

4    left in the interview room.  We have the subsequent

5    conversation with the two detectives where we

6    determine or ask whether he would like to memorialize

7    the statement and the different type of statements,

8    and that's when he agreed to do a court-reported

9    statement.

10              And when the court reporter came,

11   normally, we move to a different room to accommodate

12   the court reporter because these interview rooms

13   aren't as big, and there's not enough room to fit the

14   people and the court reporter.  So, yes --

15        Q.    So it's your recollection the second

16   conversation was at 7:10; correct?

17        A.    I couldn't tell you the exact time.

18        Q.    Would that be about approximately correct?

19        A.    If I got there -- if I started the

20   first one around 6:20 or 6:30, I imagine it would be

21        Q.    And that second conversation, let's assume

22   for the purposes of our conversation, that that was

23   at 7:10.  Your recollection is that that occurred in

24   the same interview room that you had talked to him

JGS_MAYSONET 4906

1    earlier?

2            MS. MANDELTORT:  Objection, Judge, as to

3    counsel's assumption.

4            THE COURT:  Sustained as to assumptions.

5    BY MR. BEUKE:

6       Q.   Where did that conversation take place,

7    Mr. DiFranco?

8       A.   I believe that was the same room.

9       Q.   And that conversation, Montilla and Guevara

10   were present again; correct?

11      A.   Yes.

12      Q.   And your recollection of that conversation

13   is there wasn't any interpreting going on by either

14   Montilla or Guevara?  You were talking directly to

15   Maysonet?

16      A.   Yes.

17      Q.   And that conversation, if I'm --

18   correct me if I'm wrong, was just to determine if he

19   wanted to give a court-reported statement or not?

20      A.   Well, that was the main purpose of it.  We

21   still talked about what had happened, but, yes, that

22   was the --

23      Q.   All right.  There was nothing substantially

24   different in terms of what he was telling you about

159

JGS_MAYSONET 4907

1    what he knew about this -- these homicides that

2    changed from 6:30 to 7:10; fair to say?

3         A.   Yes.

4         Q.   And I think you told Miss Mandeltort that

5    the court-reported statement that you took at 9:28,

6    that was essentially the same thing he told you at

7    6:30 and at 7:10; correct?

8         A.   Yes.

9         Q.   Okay.  Now, you told the ladies and

10   gentlemen of the jury a little bit about the

11   different types of statements that you explained to

12   Mr. Maysonet, one of them being a handwritten

13   statement; correct?

14        A.   Yes.

15        Q.   And that would be where you wrote out

16   everything; correct?

17        A.   Correct.

18        Q.   And you explained to him about a

19   court-reported statement?

20        A.   Correct.

21        Q.   And it was Mr. Maysonet's decision

22   to have a court-reported statement taken;

23   correct?

24        A.   Yes.

160

JGS_MAYSONET 4908

```
 1          Q.   Now, Mr. DiFranco, did you between 7:10 --
 2     or strike that.
 3                    When you left the interview room at
 4     7:10, what did you do?
 5                    MS. MANDELTORT:   Objection, Judge, as to
 6     the times, assuming facts not in evidence.
 7                    THE COURT:   I don't remember at which point
 8     he's talking about.
 9                    MR. BEUKE:   After 7:10, Judge.
10                    THE COURT:   Has he testified he left
11     at 7:10?   I don't remember that being his testimony.
12     BY MR. BEUKE:
13          Q.   How long were you in the interview room
14     when the 7:10 conversation lasted?
15          A.   The second conversation was ten minutes.
16     It was not very long.
17          Q.   After the 7:10 conversation ended, did you
18     leave the interview room?
19          A.   Yes.
20          Q.   And what did you do?
21          A.   I called my office to the dispatcher to
22     call for a court reporter.
23          Q.   Okay.   After you made that phone call --
24     fair to say that took a minute or so?
```

JGS_MAYSONET 4909

```
 1        A.    Yeah.

 2        Q.    What did you do then?

 3        A.    Then I imagine I was -- I would review

 4   anything I had, reports.  I would talk to

 5   Mr. Maysonet.

 6        Q.    Did you have another conversation with

 7   Maysonet between seven, say, twenty and 9:30 or

 8   9:28?

 9        A.    I'm sure I did before the court-reported

10   statement.  I mean, I can't remember exactly, but I'm

11   sure I did.  I'm sure I did when we moved.

12        Q.    Mr. DiFranco, was it your practice when you

13   interviewed people, either witnesses, suspects,

14   police -- well, not police officers, but witnesses or

15   suspects, to take notes?

16        A.    No.

17        Q.    You didn't take any notes concerning your

18   conversations with Mr. Maysonet at 6:30 or 7:10;

19   correct?

20        A.    No.

21        Q.    And you made no written notes of any

22   subsequent conversation that you may have

23   had prior to the court-reported statement;

24   correct?
```

JGS_MAYSONET 4910

1          A.    Do you mean did I make notes subsequent to

2     the court-reported?

3          Q.    No, prior to?

4          A.    Prior to the court-reported statement, no.

5          Q.    So you were talking to him kind of cold;

6     fair to say?

7                MS. MANDELTORT:  Objection, Judge.

8                THE COURT:  Sustained to the form of the

9     question.

10    BY MR. BEUKE:

11         Q.    Well, did you ever ask the detectives prior

12    to the court reporter coming to go with you and

13    Mr. Maysonet out to the scene?

14         A.    Yes.

15         Q.    And that was prior to the court reporter

16    coming?

17         A.    Oh, prior to the court reporter, no.  That

18    would have been after the court reporter.

19         Q.    There was nothing to prevent you from going

20    to the scene prior to the court-reported statement;

21    is that fair to say?

22         A.    Sure.

23         Q.    You could have -- you had the authority to

24    ask the detectives at that point to do anything that

163

JGS_MAYSONET 4911

1    you saw fit for the purposes of advancing this

2    investigation; is that fair to say?

3            MS. MANDELTORT:  Objection to the form of

4    the question.

5            THE COURT:  Counsel, where are you going?

6            MR. BEUKE:  I'll tie it up, Judge.

7            THE COURT:  He said he did not do that.

8            MR. BEUKE:  I'll tie it up, Judge.

9            THE COURT:  In the next question, tie it

10   up.

11   BY THE WITNESS:

12      A.   I don't know if I have -- we don't order

13   the police.  We more assist.  So we can suggest or

14   recommend, but I have no control over Chicago

15   policemen or a detective.  I'm not his boss or

16   supervisor.

17           I can't tell him what to do, but I

18   certainly can suggest things or ask him things that I

19   think that would help the investigation or the case,

20   yes.

21   BY MR. BEUKE:

22      Q.   Okay.  When you spoke to Maysonet, you knew

23   that the bodies were found in a certain location; is

24   that correct?

JGS_MAYSONET 4912

```
 1        A.    Me personally know?

 2        Q.    Yes.

 3        A.    No, I didn't know before I had spoke to him

 4   where the bodies were found.

 5        Q.    Okay.  When did you learn where the bodies

 6   were found by the police?

 7              MS. MANDELTORT:  Objection, Judge.  It

 8   assumes facts not in evidence.

 9              THE COURT:  Sustained.

10   BY MR. BEUKE:

11        Q.    Did you ever learn where the bodies were

12   found from the police?

13        A.    When we went to the scene after the

14   court-reported statement, we actually went to the

15   location, but that wasn't from the police, per se.

16   That was Mr. Maysonet showing me where the bodies

17   were or would have been.

18        Q.    All right.  So I'm clear -- again, I don't

19   want to belabor the point, but the court-reported

20   statement was -- I think you described it as kind of

21   a mirror image of the conversation that you had with

22   him at 6:30?

23        A.    Well, the court-reported is a mirror image

24   in that it's the way I read who I tell him I am, the
```

JGS_MAYSONET 4913

1    rights, and the questions answered, you know, who is

2    who, what time, where were you, what happened next,

3    like that form, question-answer, yes.

4        Q.    There is nothing to prevent you from asking

5    any question you want once the court-reported

6    statement is started; is that fair to say?

7        A.    Sure, I can ask any question I want.

8        Q.    You can control basically the tone or the

9    tenor of the conversation by your questions?

10        MS. MANDELTORT:  Objection to the form of

11    the question.

12        THE COURT:  Sustained.

13    BY MR. BEUKE:

14        Q.    Well, you have an opportunity once the

15    court reporter starts typing to ask this young man

16    anything you want; correct?

17        THE COURT:  Sustained, asked and answered.

18    He just answered that question.

19    BY MR. BEUKE:

20        Q.    Well, do you have the statement in front of

21    you, Mr. DiFranco?

22        A.    Yes.

23        Q.    Can you turn to Page 3 at the bottom.  Do

24    you see this question and answer?

JGS_MAYSONET 4914

1              "Question:  What happened when

2        Lluvia and Tino came over?

3              "They came over that night, and

4        they told me they needed the pistol.

5              "Question:  What did they say

6        they needed the pistol for?

7              "Answer:  They got the two guys

8        on Drake and North Avenue waiting for

9        dope."

10             Do you recall that?

11       A.    Yes.

12       Q.    And so it's clear, when you took the

13   court-reported statement, Mr. Maysonet's response was

14   "dope."  It wasn't "something"; right?  That's not a

15   typo?

16       A.    Right.  His response was "dope," and then

17   he wanted to change it.

18       Q.    Now, your next question was:

19             "What was Lluvia wearing that

20        evening"; correct?

21       A.    Yes.

22       Q.    And after that, the answer was:

23             "A black hooded sweat shirt";

24   correct?

167

JGS_MAYSONET 4915

1     A.    Yes.

2     Q.    Did you ever ask Mr. Maysonet if Lluvia and

3     Tino or Fro ever told him that they were going over

4     to North Avenue and Drake to go shoot two guys?

5     A.    Did I ever ask him that question?

6     Q.    Yes.

7     A.    In this statement or previously?

8     Q.    Well, your testimony is that this statement

9     basically mirrors what your conversation with him was

10    earlier; correct?

11    A.    The form that the statement is in,

12    question, answer.  The questions and the answers

13    aren't mirrored.  I didn't ever, like, write down

14    what I was going to ask him and then do the same

15    thing.  But just the form of the way the statement

16    would go, question-answer format.

17    Q.    Did you ever ask him that question in this

18    statement?

19    A.    In this statement?

20    Q.    Yes.

21    A.    Did I ever ask him if he knew he was going

22    to kill them?

23    Q.    Yes.

24    A.    I didn't ask him in that form, but he said

JGS_MAYSONET 4916

1    that he knew when they wore the sweat shirt, that's

2    what they did.  They either killed somebody, robbed

3    somebody, or robbed a car.  I mean --

4         Q.   Well, did you follow that up with a

5    question, what did you think you were going over

6    there for?  Did you ask him that question?

7         A.   No, I didn't ask him.  It just says:

8              "All right.  What were you -- and

9         what were they going to do that evening?"

10        Q.   And what was his answer?

11        A.    "That they were going to go to the two

12        guys that were waiting for some dope."

13        Q.   And did you ever then follow that up with a

14   question, well, did you know they were going over

15   there to shoot somebody?

16        A.   No, that's not the next question I

17   asked.

18        Q.   Well, it's not anywhere in this statement,

19   is it?

20        A.   No.

21        Q.   Mr. DiFranco, a little further down on Page

22   4, you go through -- you spend maybe four or five

23   questions as to where everybody is sitting in the

24   car; is that correct?

JGS_MAYSONET 4917

1  A. Yes.

2  Q. And did you think that was important, where

3 everybody was sitting in the car?

4   MS. MANDELTORT: Objection, Judge.

5   THE COURT: Sustained to the form of the

6 question.

7 BY MR. BEUKE:

8  Q. Why did you ask those questions?

9   MS. MANDELTORT: Objection, Judge.

10   THE COURT: Basis?

11   MS. MANDELTORT: Withdrawn.

12 BY THE WITNESS:

13  A. Why did I ask those questions?

14 BY MR. BEUKE:

15  Q. Yes.

16  A. Well, the reason I asked those questions is

17 to understand exactly what happened.  I mean, detail

18 and description is kind of important.  The way they

19 went there, who was sitting where, who had the gun, I

20 mean, it paints a picture.

21   I could understand what he was

22 telling me, what happened, that he was telling me the

23 truth.  I mean, that's why I asked those questions,

24 and then it could be corroborated later.

170

JGS_MAYSONET 4918

1      Q.   Was it more important than asking him the
2   question, did Lluvia --
3           THE COURT:  Sustained.  Sustained.
4   BY MR. BEUKE:
5      Q.   -- or Tino ask you or tell you --
6           THE COURT:  Counsel, sustained.  That's
7   argumentative.  Sustained.  Now move on.
8   BY MR. BEUKE:
9      Q.   Now, a little further down, Mr. DiFranco,
10  Mr. Maysonet goes through his route with you;
11  correct?
12     A.   Yes.
13     Q.   Homan to Potomac, Potomac all the way to
14  St. Louis, St. Louis all the way to North Avenue,
15  North Avenue to Drake, and parked in the alley;
16  correct?
17     A.   Yes.
18     Q.   Now, you say that after you took this
19  statement and after it was signed, you went out to
20  the scene; correct?
21     A.   Yes.
22     Q.   Did you drive that route, Mr. DiFranco,
23  with the detectives?
24     A.   No.  This was the route he took from his

171

JGS_MAYSONET 4919

1    house.  We left from Area 5, Grand and Central.  We

2    didn't -- we didn't drive from Homan or his house.

3         Q.   Well, I mean, this was another part of the

4    statement that he made.  When you were out on the

5    street, was there anything to prevent you from

6    corroborating that?

7              MS. MANDELTORT:  Objection, Judge.

8              THE COURT:  Sustained.

9    BY MR. BEUKE:

10        Q.   Anything to prevent you from telling the

11   detectives, let's take Homan to Potomac, Potomac to

12   St. Louis?

13             MS. MANDELTORT:  Objection.

14             THE COURT:  Sustained as to anything that

15   prevented him.

16   BY MR. BEUKE:

17        Q.   How far was 1300 North Homan from 3428 West

18   North Avenue?

19        A.   I don't know.

20        Q.   Did you ever ask during the course of the

21   court-reported statement Mr. Maysonet, where in the

22   alley did you park?

23        A.   No.

24        Q.   You mean, he told you he turned off Drake

                           172

```
 1    into the alley; correct?

 2         A.    In the statement?

 3         Q.    Yes.

 4         A.    He said North Avenue, Drake, and that he

 5    parked in the alley.

 6         Q.    Later on, a couple of questions down, you

 7    say:  "Where were those two guys?"  Do you recall

 8    that question?

 9         A.    Yes.

10         Q.    His answer was what?

11         A.    "By the corner."

12         Q.    Did you learn where the bodies were when

13    you went out to the scene?

14         A.    Yes.  He showed me where they were.

15         Q.    They were in the middle of the block;

16    correct?

17              MS. MANDELTORT:  Objection, Judge.

18    BY MR. BEUKE:

19         Q.    Between Homan and St. Louis?

20         A.    Well, they're actually at the corner.

21              THE COURT:  Hold on.  There's an objection.

22              MS. MANDELTORT:  Judge, I'll withdraw.

23              THE COURT:  When there's an objection, you

24    need to wait until the Court rules.
```

JGS_MAYSONET 4921

```
 1                  THE WITNESS:  I'm sorry, Judge.

 2                  THE COURT:  Sustained.

 3                  MS. MANDELTORT:  Judge, I'll withdraw my

 4      objection.

 5                  THE COURT:  Well, if he remembers the

 6      question.

 7      BY THE WITNESS:

 8          A.   The corner that he was speaking of was the

 9      corner of the empty lot, is what I inferred is what

10      he meant.

11      BY MR. BEUKE:

12          Q.   Where in that statement, Mr. DiFranco, does

13      it say that the corner I'm referring to is the corner

14      of the empty lot?

15          A.   It doesn't.

16          Q.   Did you ever ask him the question, what

17      corner are you referring to, Juan?

18          A.   No.

19          Q.   Mr. DiFranco, when you went out to the

20      scene -- or strike that.

21                  MR. BEUKE:  Judge, can I approach the

22      witness?

23                  THE COURT:  Sure.

24
```

JGS_MAYSONET 4922

1    BY MR. BEUKE:

2        Q.   I'm going to show you, Mr. DiFranco, what's

3    been marked People's Exhibit Number 30 and ask you to

4    take a look at that.  Does that photograph accurately

5    depict the view from the alley looking back through

6    the vacant lot?

7        A.   Yes.

8        Q.   There's some snow on the ground in that

9    picture?

10        A.   Right.

11        Q.   That wasn't there in May or in August?

12        A.   No.

13        Q.   Where you and the detectives and

14    Maysonet sat in the car, is that shown in that

15    photograph?

16        A.   Where -- no, it doesn't show the

17    alley.  It's taken from the view of where you would

18    be.

19        Q.   Okay.  Would it be fair to say that the

20    right portion of the photograph is to the west and

21    the left portion to the east?  Is that your

22    recollection?

23        A.   This would be east.

24        Q.   No, this would be west.

JGS_MAYSONET 4923

1      A.   This would be east, this would be south,

2    and that would be north.  Yes, I believe so.

3      Q.   How far from the west to east portion of

4    the lot did Mr. Maysonet direct you?  I mean,

5    were they on the west end, middle, east end?  Where

6    were they, or where did he direct you and the

7    detectives?

8      A.   As I recall, it was on the west side.  It

9    was over towards this -- it would be this side

10   looking straight that way (indicating.)

11     Q.   Okay.  Can you take my pen, and if you

12   would --

13          THE COURT:  That photograph, as far as I

14   know, is not in evidence, so it should not be

15   displayed to the jury.

16          THE WITNESS:  I'm sorry, Judge.

17   BY MR. BEUKE:

18     Q.   Judge, I'm going to ask him to place an X

19   in the area where Mr. Maysonet directed him, or where

20   he said that their car was parked.

21     A.   (Indicating.)

22          MS. MANDELTORT:  Judge, I would object to

23   him marking -- well, withdrawn.

24          THE COURT:  Mr. Beuke, just because I was

176

JGS_MAYSONET 4924

1    distracted by the clerk, he's marking the photograph

2    to reflect what?

3              MR. BEUKE:   I believe, Judge, he's marking

4    the photograph depicting where Mr. Maysonet directed

5    him and the detectives that Mr. Maysonet's car was at

6    when this incident occurred.

7    BY MR. BEUKE:

8         Q.   Fair to say, Mr. DiFranco?

9         A.   That's the question.   I understand the

10   question.   But actually, if you see the photograph,

11   there's no place in the photograph where the car

12   would be.   You can't see it.

13        Q.   Okay.   But your recollection is, it

14   was at the furtherest west end of the lot; correct?

15        A.   That's what I remember.   I mean, it was

16   five years ago.

17        Q.   Okay.   In the statement, Mr. DiFranco,

18   Mr. Maysonet in response to one of your questions

19   indicates:

20                    "Question:   Okay.   What did

21             Lluvia, Fro, and Tino do then?

22                    "Answer:   They started walking

23             towards the guys.

24                    "Question:   What happened next?

177

JGS_MAYSONET 4925

```
 1                          "They waited, they were talking
 2               about five minutes, and then shooting
 3               happened.  Shot about five-to-six
 4               times."
 5                    Do you recall that question and
 6    answer?
 7          A.   Yes.
 8          Q.   Did you ever ask Mr. Maysonet if he saw the
 9    shooting?
10          A.   In the statement, no.
11          Q.   Yes.  You never asked him that question?
12          A.   Not in the statement, no.
13          Q.   Did you ever ask Mr. Maysonet in the
14    statement if he saw who did the shooting?
15          A.   He just said that Lluvia had the gun right
16    as he heard the shots and the two bodies were laying
17    on the ground.
18          Q.   Well, he told you in the statement, am I
19    correct, that he was able to see the two bodies on
20    the ground?
21          A.   Yes.
22          Q.   Mr. DiFranco, I'm going to show you what's
23    been marked as People's Exhibit Number 2 and ask you
24    to take a look at that photograph and ask you if you
```

JGS_MAYSONET 4926

1    have ever seen that photograph before?

2        A.    No, I don't recall ever seeing that

3    photograph.

4        Q.    Did you ever have any conversation with the

5    detectives either prior to going out to the scene or

6    subsequent to going out to the scene about where the

7    second body was recovered or found?

8        A.    No.  Because this -- the shooting was in

9    May, and this was in August.  I never saw any crime

10   photos or anything.

11       Q.    Mr. DiFranco, just a couple other

12   questions.  At one point, Mr. Maysonet is asked to

13   identify a photograph or -- I'm sorry.  You indicated

14   that he identified two photographs for you?

15       A.    Yes.

16       Q.    Do you recall which individual is which in

17   29A or B?

18       A.    Do I?

19       Q.    Yes.

20       A.    A was Lluvia.

21             THE COURT:  Sir, please don't display

22   those.

23             THE WITNESS:  I'm sorry, Judge.

24

JGS_MAYSONET 4927

```
 1     BY THE WITNESS:

 2         A.   Yes.

 3     BY MR. BEUKE:

 4         Q.   A is who?

 5         A.   Is Lluvia.  I thought he pronounced it

 6     Juvia or Lluvia.  I don't know how you pronounce the

 7     name.

 8         Q.   And B is Tino?

 9         A.   B is Fro.

10         Q.   And when you went on to question him about

11     Christopher, he told you Christopher's --

12     he didn't remember Christopher's last name; correct?

13         A.   Yes.

14         Q.   And then you gave a last name to him;

15     correct?

16         A.   Yes.

17         Q.   Fernandez?

18         A.   Yes.

19         Q.   And he said something like, yes, that's it

20     or something?

21         A.   He said, yeah, Hernandez.

22         Q.   That was -- well, strike that.

23              Mr. DiFranco, when you went out to

24     the scene, so I'm clear, the detectives went with
```

JGS_MAYSONET 4928

1     you; correct?

2          A.    Yes.

3          Q.    And the court reporter was at Area 5 typing

4     up the statement, or did the court reporter finish

5     typing up the statement?

6          A.    The court reporter -- we didn't -- I

7     believe the court reporter was done.  That was signed

8     and done.

9          Q.    What time did you go out to the scene with

10    Mr. Maysonet?

11         A.    Well, whatever the ending time was on the

12    court-reported, I can't remember.  I don't know if it

13    was, like, 10:00 o'clock -- it ended at 9:40.  The

14    court reporter typed it up, and then we went through

15    it, and that would have probably been at least an

16    hour.  So it was sometime between, I would imagine,

17    11:00 and 12:00.

18         Q.    You're not sure, though?

19         A.    No.

20         Q.    Mr. DiFranco, did you ever request the

21    detectives to get an evidence technician to come with

22    you and Mr. Maysonet to photograph your observations

23    out at the scene with him?

24         A.    No.

JGS_MAYSONET 4929

1      Q.   That was certainly something that the

2   detectives or you could have requested; fair to

3   say?

4      A.   I guess you could request anything, yes.

5      Q.   The court-reported statement that you

6   took from Mr. Maysonet, it never -- Mr. Maysonet

7   never told you that when he turned into the

8   alley off Drake, he went all the way down that

9   alley, across St. Louis, halfway down the alley

10  between St. Louis and Homan and parked the car, did

11  he?

12     A.   He told me he drove in the alley and

13  stopped.

14     Q.   Okay.  So my question is, he didn't

15  tell you that in the court-reported statement;

16  correct?

17          MS. MANDELTORT:  Objection, Judge, asked

18  and answered.

19  BY THE WITNESS:

20     A.   What he told me is in here.

21  BY MR. BEUKE:

22     Q.   Well, what does he say?

23     A.   I can't remember it.

24          THE COURT:  Counsel, Counsel, that is in

JGS_MAYSONET 4930

1 evidence, and it speaks for itself.

2 BY MR. BEUKE:

3   Q. All right.  He told you:  "I go -- I took

4 Homan to Potomac, Potomac all the way to

5 St. Louis, St. Louis all the way to North Avenue,

6 North Avenue to Drake and parked in the alley";

7 correct?

8   A. Yes.

9   Q. So I'm clear now, Mr. Maysonet had

10 described for you when you went out to the scene

11 something in addition to that; correct?

12    MS. MANDELTORT:  Objection, Judge.

13 BY MR. BEUKE:

14   Q. Well, he told you where he parked; correct?

15   A. He showed us where he parked.

16   Q. He showed you where he parked?

17   A. Yes.

18   Q. Did you ever make any written memorandum of

19 that subsequent trip out to the scene?

20   A. No.  I don't fill out any reports for -- I

21 don't fill out, like, police reports or anything like

22 that, no.

23   Q. Well, you're familiar with what is called a

24 felony review memorandum, are you not?

JGS_MAYSONET 4931

1      A.    No.

2      Q.    Have you ever seen a felony review

3    memorandum?

4      A.    We have felony review folders, and I have

5    heard of murder memos, but I have never heard of a

6    felony review memorandum.

7      Q.    Tell the ladies and gentlemen of the jury

8    what murder memos are?

9      A.    A murder memo, on certain types of cases,

10    normally, it's on a murder case, the state's attorney

11    will fill out a murder memo, it's called, and it

12    usually depends.  If it's a handwritten statement

13    or it's an oral statement, you're more likely

14    going to have a murder memo.  It will explain what

15    would probably be in a court-reported statement, or

16    it's just some other way to memorialize the

17    statement.

18              Besides having the handwritten and

19    the oral, you would have something substantive like a

20    murder memo, which is you would just write down

21    everything that would be in the court-reported or

22    what you said before.

23      Q.    Well, am I clear that a murder memo is a

24    memorandum to your supervisor?

184

JGS_MAYSONET 4932

```
1              THE COURT:  Counsel, Counsel, he has
2     already testified.  We don't need you to repeat what
3     he just said.  We're all here, and we all heard it.
4     Put another question.
5     BY MR. BEUKE:
6         Q.    Who is the memo to?
7              MS. MANDELTORT:  Objection, Judge,
8     relevance.
9              THE COURT:  I'm sorry.  I didn't hear the
10    question.
11             MR. BEUKE:  Who is the memo to?
12             MS. MANDELTORT:  Objection, Judge.  He said
13    he didn't do one.
14             THE COURT:  He didn't do one.  Sustained.
15    BY MR. BEUKE:
16        Q.    Did you make any written documentation of
17    anything you did that day to your supervisors or to
18    the ultimate state's attorneys who would be handling
19    this case?
20        A.    Yes.  I fill out what's called a felony
21    review folder, and in the felony review folder, it's
22    all preprinted form, and you write down all the
23    information, all the witnesses, any victims,
24    their cause of death, their injuries, and you
```

185

JGS_MAYSONET 4933

```
 1    would write down the oral statement, or if

 2    it's a court-reported statement, you would just

 3    make a notation of that, and you'd write down the

 4    facts.

 5                    And then it would go to the next

 6    state's attorney that would handle the case, which

 7    is preliminary hearings or the grand jury unit

 8    depending on what type of felony or what type of

 9    case it is.

10        Q.    Who did you write down as witnesses in this

11    case?

12                MS. MANDELTORT:  Objection, Judge.

13                THE COURT:  Sustained.

14    BY MR. BEUKE:

15        Q.    Did you write anything down as to

16    witnesses?

17                MS. MANDELTORT:  Objection, Judge.

18                THE COURT:  Counsel, sustained.

19    BY MR. BEUKE:

20        Q.    That was all you wrote down; is that

21    correct?

22                MS. MANDELTORT:  Objection.

23                THE COURT:  Sustained.

24
```

JGS_MAYSONET 4934

```
 1      BY MR. BEUKE:

 2          Q.    Did you ever talk to Mr. Maysonet

 3      again after you got back from the scene,

 4      Mr. DiFranco?

 5          A.    No, I don't think I have talked to him

 6      since or seen him since.

 7              MR. BEUKE:  Thank you, sir.

 8              MS. MANDELTORT:  Judge, I have no redirect

 9      based on that cross.

10              THE COURT:  Very well.  Mr. DiFranco, you

11      are excused.

12              THE WITNESS:  Thank you, Judge.

13                      (Witness excused.)

14              THE COURT:  I'm not going into recess, but

15      anybody who needs to step out for five minutes may do

16      so.

17                      (WHEREUPON, a recess was had

18                       in the above matter.)

19              THE COURT:  Everyone be seated.

20                  Call your next witness.

21              MS. MANDELTORT:  Thank you, Judge.

22                      (Witness sworn.)

23              THE CLERK:  Be seated.

24
```

JGS_MAYSONET 4935

1    WHEREUPON,

2                    REYNALDO GUEVARA,

3    called as a witness on behalf of the People of

4    the State of Illinois, having been first duly

5    sworn, under oath was examined and testified as

6    follows:

7                    DIRECT EXAMINATION

8                    BY MS. MANDELTORT:

9        Q.    Good afternoon.  Please introduce yourself

10   to the ladies and gentlemen of the jury.

11       A.    Detective Reynaldo Guevara, G-u-e-v-a-r-a.

12   My star number is 20861, and I'm assigned to the

13   Chicago Police Department Violent Crimes Unit.

14       Q.    How long have you been a Chicago Police

15   Officer?

16       A.    Almost 23 years.

17       Q.    Sir, where specifically are you assigned

18   within the police department?

19       A.    I'm assigned to the Violent Crimes Office

20   in Area 5.

21       Q.    And how long have you been a detective in

22   Area 5?

23       A.    Five years.

24       Q.    I'd like to talk to you about the 22nd of

JGS_MAYSONET 4936

1     August 1990.  Were you working that day in Area 5

2     Violent Crimes?

3          A.    Yes, I was.

4          Q.    And that day, sir, do you recall if you

5     were working alone or with any partners?

6          A.    I was working with several.

7          Q.    Do you recall any of their names?

8          A.    Yes.  Detective Steven Gawrys.

9          Q.    How do you spell that?

10         A.    G-a-w-r-y-s.  Detective Ernest Halvorsen,

11    H-a-l-v-o-r-s-e-n, and Sergeant Mingey.

12         Q.    And do you recall what shift you were

13    working back then?

14         A.    I was working the third watch, which is

15    from 3:00 o'clock in the afternoon to 11:30 at

16    night.

17         Q.    At some point on the 22nd of August of

18    1990, sir, did you become involved in the

19    investigation into the murders of Torrence and Kevin

20    Wiley?

21         A.    Yes, I did.

22         Q.    In fact, sir, did you take over that

23    investigation on the 22nd of August 1990 from other

24    detectives?

JGS_MAYSONET 4937

1      A.    Yes, I did.

2      Q.    And directing your attention to about

3   8:00 o'clock in the evening, did you have the

4   occasion, sir, to be in an interview room at

5   Area 5?

6      A.    Yes.

7      Q.    And at 8:00 o'clock, sir, other than

8   yourself, who else was present in that interview

9   room?

10      A.    The defendant, Maysonet.

11      Q.    Could you please point to him and describe

12   something he is wearing today?

13      A.    The gentleman sitting over there with the

14   suit and tie (indicating.)

15           MS. MANDELTORT:   Your Honor, may the record

16   reflect the in-court identification of the defendant,

17   Jose Maysonet.

18   BY MS. MANDELTORT:

19      Q.    And when you first spoke to Mr. Maysonet,

20   what did you say to him?

21      A.    I introduced myself to him, and this --

22   before I asked him any questions, I gave him his

23   constitutional rights.

24      Q.    And was that from memory, sir, or from some

190

JGS_MAYSONET 4938

1    preprinted source?

2        A.   A preprinted card that I carry with me.

3        Q.   And, sir, did you do that in English or in

4    Spanish?

5        A.   I did it both.  I first did it in English,

6    and again, I did it in Spanish for him.

7        Q.   And did the defendant acknowledge to you

8    that he understood those rights?

9        A.   Yes, he did.

10       Q.   And did he indicate to you at that time

11   that he would be willing to talk to you?

12      A.   Yes, he did.

13      Q.   Did you then, sir, have a conversation with

14   him?

15      A.   Yes, I did.

16      Q.   Can you tell the ladies and gentlemen

17   of the jury, during that conversation, what happened?

18      A.   Well at first, I asked him if -- whether he

19   wanted to speak to me in English or Spanish, and he

20   decided Spanish.  And we went into the conversation

21   as to what happened.

22           And he first indicated to me he

23   was -- on the 20th of May, he was at home when fellow

24   members -- fellow gang members came over, one known

JGS_MAYSONET 4939

1    to him as Lluvia, and brought him a gun.  They told

2    him to save it for them, and that was a nine

3    millimeter weapon.

4              He then went on to say that on

5    the -- four days later, on the 24th of May,

6    Lluvia returned back with two other members of his

7    gang.

8         Q.   Did he give you the names --

9         A.   Yes, he did.

10        Q.    -- or refer to those individuals in any

11   way?

12        A.   Yes, he did.  He says one of them was Fro.

13   The other one was Tino.  And at that point, he said

14   that they came back to get the gun, the nine

15   millimeter.  They wanted it back because they had to

16   meet two guys on Drake and North Avenue?

17        Q.   At that time, did he indicate to you

18   whether they told him what they needed to see those

19   two guys about?

20        A.    Yes.  He went on to say that they needed to

21   see the two guys for some dope, and that's why they

22   needed a gun.

23        Q.   And at that time, sir, did he say

24   anything to you about what any of those individuals

192

JGS_MAYSONET 4940

1  was wearing when they came over to his house on the

2  late evening of the 24th of May 1990?

3        MR. BEUKE:  Judge, I'm going to object to

4  the leading.

5        THE COURT:  Overruled.

6  BY THE WITNESS:

7        A.  Yes, he did.  As they walked out of the

8  apartment, he noticed that Lluvia was wearing a black

9  hooded sweat shirt, and he knew that to be when they

10  go out on the road.

11  BY MS. MANDELTORT:

12        Q.  When they go out on the road?

13        A.  It means to go and kill somebody or shoot

14  at somebody.

15        Q.  What did he say then?

16        A.  He then said that they asked him if he

17  wanted to drive the car, and he says, yes, he would

18  drive the car.

19              He then went on to say that he got

20  into the car with them, and he drove down Homan to

21  Potomac and then Potomac to St. Louis, then went

22  northbound on St. Louis to North Avenue, then left

23  on North Avenue into Drake and into the alley on

24  Drake.

JGS_MAYSONET 4941

1   Q. Did he indicate to you at that time what

2 happened when he stopped the car in the alley?

3   A. Yes, he did.

4   Q. What did he tell you happened then?

5   A. He said that Lluvia, Fro, and Tino exited

6 the car and walked toward two guys that were standing

7 on the sidewalk.  He seen two guys standing on the

8 sidewalk, and they walked toward them.

9   Q. Did he tell you what happened then?

10   A. He says approximately five minutes, he

11 heard five-to-six shots.  He turned around and

12 looked and saw two bodies, the two guys laying

13 on the sidewalk, and saw Lluvia with the nine

14 millimeter gun pointing it at them to see if

15 they moved.  He noticed that the guy did not move,

16 so then they all three came back to the car and

17 left.

18   Q. Did he tell you after they got back in the

19 car where they went?

20   A. Yes, he did.  He said that he drove

21 to his house.  He got out of the car.  Lluvia

22 then jumped back into the driver's seat and drove

23 off.

24   Q. Did he indicate to you in that conversation

JGS_MAYSONET 4942

1    the next time he saw Lluvia?

2    A.   Yes, he did.

3    Q.   What did he tell you?

4    A.   He says the same day, around 11:00 o'clock

5    in the morning, he saw Lluvia over by LeMoyne and

6    Spaulding.  Lluvia came up to him, and Lluvia told

7    him that he had just killed the two black

8    motherfuckers.

9    Q.   Did he tell Mr. Maysonet anything else?

10    A.   He then told Maysonet not to say anything

11    about it.

12    Q.   After that conversation, sir, did you have

13    the occasion to meet a woman by the name of

14    Rosabella?

15    A.   Yes, I did.

16    Q.   Was that at Area 5 as well?

17    A.   Yes, it was.

18    Q.   And at about 9:00 o'clock, were you present

19    for a conversation between Rosabella and the

20    defendant, Jose Maysonet?

21    A.   Yes, I was.

22    Q.   And when Rosabella first came in that room

23    with you and the defendant, what did the defendant

24    say to Rosabella?

JGS_MAYSONET 4943

```
 1                    MR. BEUKE:  Objection, Judge.

 2                    THE COURT:  Basis?

 3                    MR. BEUKE:  Well, I'll withdraw it, Judge.

 4        BY THE WITNESS:

 5             A.   He told Rosabella that he had already

 6        told me the truth, and he wanted her to tell the

 7        truth.

 8        BY MS. MANDELTORT:

 9             Q.   And then did you have another conversation

10        with the defendant in the presence of Rosabella?

11             A.   Yes, I did.

12             Q.   And at that time, what did the defendant

13        tell you?

14             A.   He told me that he would take me and show

15        me the houses where two other guys lived.

16             Q.   And did you, sir, then leave Area 5 with

17        the defendant?

18             A.   Yes, I did.

19             Q.   And do you recall, sir, was there anyone

20        else in the car besides yourself and the defendant at

21        this time?

22             A.   At this time, it was myself; my partner,

23        Steven Gawrys, and if I recall, Sergeant Mingey was

24        also present with me.
```

JGS_MAYSONET 4944

1        Q.   And as you were driving with the defendant,

2   where did Jose Maysonet direct you to?

3        A.   He directed to Kedzie.

4        Q.   And when you got to Kedzie, did he point

5   out any particular structure?

6        A.   He pointed out a building.  He says, this

7   is where Lluvia lived.  And from there, he directed

8   me to 1035 North Spaulding and pointed out the house

9   1035 and said, that's where Fro lives.

10       Q.   And as you were out in the vehicle and

11  after he pointed out where Lluvia lived and where Fro

12  lived, did you see anyone on the street?

13       A.   Yes, I did.

14       Q.   Tell the ladies and gentlemen of the jury

15  who you saw?

16       A.   As I was going back to the office, went

17  northbound on Spaulding, and when we got to Spaulding

18  and LeMoyne, Lluvia was standing on the corner.  And

19  he pointed him out and said, that's Lluvia.

20       Q.   At that time, did you take any action in

21  terms of arresting or apprehending Lluvia at that

22  time?

23       A.   No, I did not.

24       Q.   Why not?

JGS_MAYSONET 4945

```
 1        A.    Because I didn't want to front him off.

 2        Q.    When you say, front him off, what do you

 3   mean, sir?

 4        A.    I didn't want Lluvia to see that this is

 5   the guy that said he did it.

 6        Q.    Did there come a time, sir, when you got

 7   back to Area 5?

 8        A.    Yes, I did.

 9        Q.    At that time, sir, did you show

10   Mr. Maysonet any photographs?

11        A.    Yes, I did.

12        Q.    And who did you show him a photograph of?

13        A.    I showed him a photograph of Fro.

14              MS. MANDELTORT:  Counsel, People's Exhibit

15   29B.

16                    May I approach, Judge?

17              THE COURT:  Very well.

18   BY MS. MANDELTORT:

19        Q.    I'm showing you what's been marked as

20   People's Exhibit Number 29B.  Do you recognize that

21   photograph?

22        A.    Yes, I do.

23        Q.    And what do you recognize that photograph

24   to be?
```

JGS_MAYSONET 4946

1     A.   This is the photo of Fro, the one that I

2    showed Maysonet.

3     Q.   At the time you showed Mr. Maysonet that

4    photograph, did he identify that person to you as

5    Fro?

6     A.   Yes.  He said, this is Fro, the one that

7    came to my house and the one that was with us.

8     Q.   Now, you said when you were out on the

9    street, you saw Lluvia?

10    A.   Yes, I did.

11    Q.   Did you ever determine Lluvia's real name?

12    A.   After, yes, I did.

13    Q.   Did you determine that name to be Alfredo

14   Gonzales?

15    A.   Yes, ma'am.

16    Q.   I'm showing you what's been marked as

17   People's Exhibit Number 29A.  Do you recognize who

18   that is a picture of?

19    A.   This is a picture of, I believe --

20    Q.   Do you recognize that person?

21    A.   I recognize him, but the name, yeah,

22   doesn't -- but I do recognize one of them.

23    Q.   Okay.  Is that photograph a photograph of

24   the person that you saw on the street that he pointed

JGS_MAYSONET 4947

```
 1    out as Lluvia that day?

 2         A.    Yes.

 3              MS. MANDELTORT:   If I could just have one

 4    moment?

 5                        (Brief pause.)

 6    BY MS. MANDELTORT:

 7         Q.    Sir, you have testified that the defendant

 8    told you the route that he drove to where the Wiley

 9    brothers got killed; is that right?

10         A.    He showed me the route.

11         Q.    Sir, would using a diagram aid you in

12    explaining your testimony to the ladies and gentlemen

13    of the jury?

14         A.    Yes.

15              THE COURT:   It's 31; right?

16              MS. MANDELTORT:   31, Judge.

17                   I'm showing counsel what's previously

18    been shown to them as People's Exhibit Number 31.

19    May I approach, Judge?

20              THE COURT:   Very well.

21    BY MS. MANDELTORT:

22         Q.    Sir, I'm showing you what's been marked as

23    People's Exhibit Number 31 for identification.   Do

24    you recognize that?
```

JGS_MAYSONET 4948

1       A.    Yes.  This is a map of the 14th District

2    in the immediate area of where the shooting took

3    place.

4       Q.    And, sir, would using that diagram aid you

5    in explaining your testimony to the ladies and

6    gentlemen of the jury?

7       A.    Yes.

8       Q.    And, sir, you indicated that the defendant

9    told you the route.  Did you indicate also that you

10    drove that route?

11       A.    No, no.  He showed me the route.  He told

12    me the route.

13       Q.    Sir, could you mark with this pen -- first

14    of all, you indicated the defendant said that he left

15    from his house on Homan; is that correct?

16       A.    That's correct.

17       Q.    Do you see where that house would be

18    located on that map?

19       A.    Yes.  More or less, yes.

20       Q.    Could you, sir, put an X at the house -- at

21    the approximate location of where the defendant's

22    house was and where they left from?

23       A.    (Indicating.)

24       MS. MANDELTORT:  Your Honor, may the record

JGS_MAYSONET 4949

1    reflect the witness has put an X on the map on Homan

2    very close to Potomac.

3    BY MS. MANDELTORT:

4        Q.   And, sir, could you take that pen and draw

5    the route that the defendant told you they drove from

6    his house to the alley?

7        A.   He went Homan to Potomac.  He made a

8    right on Potomac to St. Louis, made another

9    right on St. Louis, went northbound on St. Louis

10   to North Avenue, made a left on North Avenue to

11   Drake, made a right on Drake to the alley,

12   made another right on the alley past St. Louis

13   across to the empty lot about around here

14   (indicating.)

15        MS. MANDELTORT:  Your Honor, may the

16   record reflect that the witness has, in fact, as

17   he's indicated those streets made a line with the red

18   pen.

19   BY MS. MANDELTORT:

20        Q.   Sir, do you see approximately where the

21   vacant lot is on this exhibit?

22        A.   About here (indicating.)

23        Q.   Could you take this red -- I guess we'll

24   call it a stick pin, and could you put that red

JGS_MAYSONET 4950

1    stick pin on the approximate location of that vacant

2    lot?

3        A.    (Indicating.)

4            MS. MANDELTORT:  Your Honor, may the record

5    reflect that the witness has, in fact, put a stick

6    pin off the alley between St. Louis and Kimball off

7    of North Avenue.

8    BY MS. MANDELTORT:

9        Q.    After that day, your involvement in the

10   murder investigation continued, did it not?  After

11   the 22nd of August 1990?

12       A.    I was there until the 23rd, about 7:15 in

13   the morning.

14       Q.    Are you aware, sir, that Lluvia or Alfredo

15   Gonzales was subsequently arrested?

16       A.    Yes.

17       Q.    And likewise, sir, Justino Cruz was

18   subsequently arrested after that day; is that

19   correct?

20       A.    Yes.

21           MS. MANDELTORT:  If I could just have one

22   moment, Judge?

23                    (Brief pause.)

24           MS. MANDELTORT:  Judge, I have no further

203

JGS_MAYSONET 4951

1    questions.  I would tender the witness.

2                    CROSS EXAMINATION

3                    BY MR. BEUKE:

4        Q.    Detective, let me see if I understand

5    this.  You were out on the street with

6    Mr. Maysonet and Sergeant Mingey and Detective

7    Gawrys, and he pointed out an individual that

8    he told you had committed a double murder;

9    correct?

10       A.    Correct.

11       Q.    That was this Lluvia person; correct?

12       A.    Correct.

13       Q.    And you and Sergeant Mingey and Detective

14   Gawrys let Lluvia go, let him stay out on the

15   street?

16       A.    Yes, we did.

17       Q.    And your testimony is that you did

18   that for the express purpose of not fronting

19   off Mr. Maysonet to Lluvia out on the street;

20   correct?

21       A.    Not only to Lluvia, to the rest of the guys

22   that were standing there with him, yes.

23       Q.    Well, were there -- did you have a radio in

24   your car?

JGS_MAYSONET 4952

1    A.    Yes, I did.

2    Q.    Did you ever consider calling another

3    car and asking him to go over there and pick up

4    Lluvia?

5    A.    No, I did not.

6    Q.    You guys drove back into the station?

7    A.    That's correct.

8    Q.    And let Lluvia stay out on the street?

9    A.    That's correct.

10    Q.    Later on that day, Lluvia at some point, I

11    think you have indicated, was brought in to Area 5;

12    correct?

13    A.    Yes.

14    Q.    And Mr. Maysonet was shown Lluvia;

15    correct?

16    A.    Yes, he was.

17    Q.    And that was in an interview room at Area

18    5; correct?

19    A.    That's correct.

20    Q.    Do you think that fronted him off?

21          MS. MANDELTORT:  Objection, Judge.

22          THE COURT:  Sustained.

23    BY MR. BEUKE:

24    Q.    Well, a couple of hours earlier, you were

JGS_MAYSONET 4953

1    real concerned about Mr. Maysonet's situation as to

2    how things looked with these other gang members;

3    correct?

4        A.    Correct.

5        Q.    And then in the station a couple of hours

6    later, you put him either in the same interview room

7    or in front of the door of the same interview room

8    where this guy was; correct?

9        A.    Yes.

10        Q.    And at that time, Lluvia was in custody?

11        A.    Correct.

12        Q.    When did you lose this concern about

13    Mr. Maysonet's safety?

14            MS. MANDELTORT:   Objection, Judge.

15            THE COURT:   Sustained.

16    BY MR. BEUKE:

17        Q.    Well, Detective, let me see if I get this

18    right.  Before August 22nd of 1990, you had no

19    involvement in this investigation; correct?

20        A.    Correct.

21        Q.    You had not prepared one report; correct?

22        A.    Correct.

23        Q.    You had not read one report; correct?

24        A.    Correct.

JGS_MAYSONET 4954

1       Q.   You had not read one progress report note;

2  correct?

3       A.   Correct.

4       Q.   You didn't know anything about where the

5  bodies were found, how the people had been shot,

6  whether or not there had been any witnesses, none of

7  that; correct?

8       A.   No, I did have knowledge as to where the

9  shooting took place.  Yes, I did.

10      Q.   All right.  The general knowledge of 3428

11  North Avenue; correct?

12      A.   Correct.

13      Q.   Two kids are shot; correct?

14      A.   Correct.

15      Q.   All right.  And on August 22nd of 1990,

16  starting earlier that morning, there had been a

17  number of detectives working on this case; is that

18  correct?

19      A.   I learned about it when I came in, yes.

20      Q.   Okay.  You at some point were, I

21  think you said, turned over this investigation;

22  correct?

23      A.   Correct.

24      Q.   Now, when did that investigation get turned

JGS_MAYSONET 4955

1      over to you?

2           A.   Approximately, I would say, around 3:30,

3      4:00 o'clock.

4           Q.   Okay.  When you came to work; correct?

5           A.   Correct.

6           Q.   Now, what did you do when the investigation

7      was turned over to you?

8           A.   At that point -- at that point, I started

9      reading through the reports and talking to the two

10     detectives that turned it over to me.

11          Q.   Tell the ladies and gentlemen what reports

12     you read?

13          A.   The reports, the supplementary

14     report that had been prepared on the day of the

15     shooting.

16          Q.   Well, that was the report from May 25th of

17     '90; correct?

18          A.   That's correct.

19          Q.   There were no reports that were done by

20     anybody after that date; correct?  In May?

21          A.   I don't recall that there were any other

22     reports made after the May 20th.

23          Q.   Well, do you recall if there were any

24     reports dated May 26th or 27th or 28th?

208

JGS_MAYSONET 4956

```
 1          A.    I don't recall if there were any.

 2          Q.    Tell the ladies and gentlemen how many

 3    reports you read.

 4                MS. MANDELTORT:  Objection, Judge.

 5                THE COURT:  Sustained, Counsel.  Counsel,

 6    number one, the objection is sustained.

 7                MR. BEUKE:  I'm sorry, Judge.

 8                THE COURT:  And number two, where are you

 9    going?

10                MR. BEUKE:  Well, do you want to have a

11    sidebar, Judge?

12                THE COURT:  No, I just want you to ask the

13    question and move on.

14                MR. BEUKE:  Okay.

15    BY MR. BEUKE:

16          Q.    Detective, do you know how many reports you

17    read?

18                MS. MANDELTORT:  Objection, asked and

19    answered.

20                THE COURT:  No, he didn't answer that

21    question because I interjected.

22                      If you know, you may answer.

23    BY THE WITNESS:

24          A.    Supplementary report, whatever was in the
```

JGS_MAYSONET 4957

1    file.  I don't know exactly how many.

2    BY MR. BEUKE:

3        Q.    Were there any reports that you read

4    when this investigation was turned over to you

5    that indicated Jose Maysonet was a suspect in this

6    case?

7        A.    That I learned from the detectives that

8    turned the case over to me.

9        Q.    Now, that would have been Detective

10   Montilla; correct?

11       A.    I believe so.

12       Q.    Okay.  Detective Montilla had been speaking

13   to Mr. Maysonet, you learned, earlier that afternoon

14   and earlier that morning;

15   correct?

16       A.    Correct.

17       Q.    Okay.  And did Detective Montilla tell you

18   what Mr. Maysonet had told him or not?

19       A.    I believe Mr. Maysonet had not told

20   Detective Montilla anything at that point.

21       Q.    Okay.  So sometime around 8:00 o'clock that

22   evening, you show your face to Mr. Maysonet for the

23   very first time; correct?

24           MS. MANDELTORT:  Judge, object to the form

JGS_MAYSONET 4958

1    of the question.

2                THE COURT:  Sustained to the form of the

3    question.

4    BY MR. BEUKE:

5         Q.    What time, Detective, did you first meet

6    Jose Maysonet?

7         A.    Approximately about 8:00 o'clock at night.

8         Q.    Prior to that, you had never seen this man

9    before; correct?

10        A.    No, I have seen Jose Maysonet many times

11   before.

12        Q.    Well, prior to 8:00 o'clock at night, you

13   had never seen Mr. Maysonet at Area 5; correct?

14        A.    Correct.

15        Q.    You walked in; correct?

16        A.    Yes.

17        Q.    You introduced yourself to him; correct?

18        A.    Correct.

19        Q.    You determined that he felt more

20   comfortable speaking in Spanish than in English;

21   correct?

22        A.    No, he determined that.

23        Q.    Well, you advised him of his rights in

24   English and in Spanish; correct?

JGS_MAYSONET 4959

```
 1        A.    Correct.

 2        Q.    And at that point, Mr. Maysonet did what?

 3        A.    At that point, he decided to speak to me in

 4   Spanish.

 5        Q.    Well, what did he tell you at that point?

 6        A.    At that point, he told me that he prefers

 7   to talk to me in Spanish.

 8        Q.    Okay.  And then you had a conversation with

 9   him in Spanish; correct?

10        A.    Yes.  Yes, I did.

11        Q.    And that conversation was -- what did he

12   start out telling you?  What was the first thing he

13   said?

14        A.    The first thing he said was the 20th --

15   the May 20th incident when they came over to the

16   house, Lluvia came over to the house and gave him

17   the gun and asked him to put it away, to save it for

18   him.

19        Q.    Okay.  So you walk in there, give him his

20   rights, start speaking to him in Spanish, and for the

21   first time, this man decides to lay everything out

22   for you; correct?

23              MS. MANDELTORT:  Objection, Judge.

24              THE COURT:  Sustained, Counsel.  Counsel,
```

JGS_MAYSONET 4960

```
 1    don't repeat the testimony.
 2    BY MR. BEUKE:
 3         Q.   Did you ever talk to him about his wife,
 4    Rosabella?
 5         A.   No, I did not.
 6         Q.   Did you ever talk to him about his family?
 7         A.   No, I did not.
 8         Q.   Did you ever talk to him about a nervous
 9    condition that he had?
10         A.   No, sir.
11         Q.   Did you ever go down and speak to any
12    member of his family about pills?
13         A.   No, sir.  I don't recall that I ever did,
14    no.
15         Q.   Do you ever recall asking somebody or
16    giving Mr. Maysonet some pills?
17         A.   I don't recall.
18         Q.   Well, do you recall some pills being
19    brought to Area 5 by a member of Mr. Maysonet's
20    family?
21         A.   I don't remember, Counsel.
22         Q.   Well, you have testified in a prior hearing
23    on this case, have you not, Detective?
24         A.   Yes.
```

JGS_MAYSONET 4961

1        Q.   And when you testified on that date, you

2   were under oath; correct?

3        A.   Correct.

4        Q.   You were asked certain questions by the

5   attorney for Mr. Maysonet and the attorneys for the

6   prosecutors; correct?  Miss Mandeltort and Mr. Marek;

7   correct?

8        A.   Correct.

9        MR. BEUKE:  Judge, can I have a moment?

10              (Brief pause.)

11  BY MR. BEUKE:

12        Q.   Page 62.  Sir, do you recall testifying at

13   a hearing in this case on January 31st of

14   1995?

15        A.   Yes.

16        Q.   And that was in front of Judge Morgan;

17   correct?

18        A.   Correct.

19        Q.   Do you recall being asked these questions

20   and giving these answers?

21            "Question:  It was Rosabella

22          that told you at 2100 hours, I got to

23          give him his pills?

24            "Answer:  Somewhere around that

JGS_MAYSONET 4962

```
 1              time, yes.

 2                      "Question:  And you let her?

 3                      "Answer:  I believe I gave it

 4          to him."

 5                      Do you recall giving those answers to

 6      those questions?

 7          A.    Yes, 2100 hours.

 8          Q.    9:00 o'clock; correct?

 9          A.    Correct.

10          Q.    For the ladies and gentlemen?

11          A.    Correct.

12          Q.    You gave him pills that evening?

13                MS. MANDELTORT:  Objection, asked and

14      answered.

15                THE COURT:  Sustained.

16      BY MR. BEUKE:

17          Q.    Well, do you recall giving Mr. Maysonet

18      nerve pills?

19          A.    At this time, I don't recall.

20                THE COURT:  That was his answer before.

21      BY MR. BEUKE:

22          Q.    You gave those answers to those questions

23      back on January 31st of 1995; correct?

24                MS. MANDELTORT:  Objection, asked and
```

215

JGS_MAYSONET 4963

1     answered.

2              THE COURT:  Sustained.

3     BY MR. BEUKE:

4        Q.   Well, Detective, that 8:00 o'clock

5     conversation that you had with Mr. Maysonet lasted

6     approximately how long?

7        A.   Oh, I would say about 35, 40 minutes.

8        Q.   And it was just you and him; correct?

9        A.   Yes.

10       Q.   There was nobody else in there?

11       A.   No.

12       Q.   And would you tell the ladies and gentlemen

13    of the jury how many notes you took about that

14    conversation -- during that conversation?

15       A.   Not one note.

16       Q.   And did you prepare any General Progress

17    Report note concerning that conversation that you

18    say you had with Maysonet on August 22nd or 23rd of

19    1990?

20       A.   I haven't prepared a progress report in 23

21    years.

22       Q.   You don't use -- you didn't write any of

23    what Mr. Maysonet told you down at that time;

24    correct?

216

JGS_MAYSONET 4964

1       A.      Correct.

2       Q.      This was a person who, according to you,

3   was confessing to some involvement in this case;

4   correct?

5       A.      That's correct.

6       Q.      And according to you, at some point,

7   Mr. Maysonet was taken out to the scene and asked to

8   point out certain houses; correct?

9       A.      Correct.

10      Q.      He was cooperating with you; correct?

11      A.      That's correct.

12      Q.      He was giving you all the information you

13  needed to solve this crime; correct?

14      A.      That's correct.

15      Q.      He was taking you to where the shooter

16  lived; correct?

17      A.      Correct.

18      Q.      According to you, he pointed out the

19  shooter to you; correct?

20      A.      Yes, he did.

21      Q.      Now, you testified that Mr. Maysonet

22  subsequently told you where it was that -- or the

23  route that he took; was that your testimony,

24  Detective?

217

JGS_MAYSONET 4965

```
 1      A.    Yes.

 2      Q.    Okay.  Now, I believe you testified that he

 3  said he took Homan to Potomac; correct?

 4      A.    Correct.

 5      Q.    Potomac to St. Louis; correct?

 6      A.    Correct.

 7      Q.    St. Louis to North Avenue; correct?

 8      A.    Correct.

 9      Q.    And he turned left on North Avenue;

10  correct?

11      A.    Correct.

12      Q.    So he would have been going west?

13      A.    Correct.

14      Q.    Okay.  Where is St. Louis from the

15  intersection of -- well, strike that.

16            When he turned left onto North

17  Avenue, he was going to Drake; correct?

18      A.    Correct.

19      Q.    And he turned onto Drake; correct?

20      A.    Correct.

21      Q.    And he pulled into the alley behind Drake;

22  correct?

23      A.    He turned into the alley.

24      Q.    Okay.  And he parked?
```

JGS_MAYSONET 4966

1      A.    No, he didn't say he parked.

2      Q.    Well, you at some point collaborated with

3  other detectives in the preparation of a police

4  report in this case; correct?

5      A.    Collaborated with -- I didn't collaborate

6  with no one.

7           THE COURT:  Counsel --.

8           MR. BEUKE:  Well, is there a police

9  report --

10           THE COURT:  Counsel, you must let the

11  witness answer your question.

12                I didn't hear the end of that,

13  Miss Court Reporter, when the witness was answering.

14                (WHEREUPON, the record was

15                 read as requested.)

16           THE COURT:  Very well.

17  BY MR. BEUKE:

18      Q.    Well, who prepared the police report

19  concerning your involvement with this investigation,

20  and when was that prepared?

21      A.    It was probably prepared by my partner,

22  because I didn't prepare it either.

23      Q.    Did you assist him in preparing them?

24      A.    Oh, yes.

JGS_MAYSONET 4967

1      Q.    How?

2      A.    By telling him what I have learned from

3  Maysonet.

4      Q.    When?

5      A.    Everything that Maysonet told me.

6      Q.    When did you tell him that?

7      A.    It was probably done the next day or the

8  same day.  I couldn't tell you exactly unless I look

9  at the report.

10     Q.    Well, okay.  I'm going to show you what I

11  believe has been previously marked State's Exhibit

12  Number 27 and ask you to take a look at that document

13  and tell the judge and the ladies and gentlemen of

14  the jury if you recognize it, sir, and if you do,

15  what you recognize it to be?

16     A.    This was prepared on the 23rd of August

17  1990.

18     Q.    Okay.  And that would have been

19  sometime after you had talked with Mr. Maysonet;

20  correct?

21     A.    Correct.

22     Q.    That was approximately a day later;

23  correct?

24     A.    Correct.

JGS_MAYSONET 4968

```
 1          Q.   And you, according to you, gave your
 2     information as to what Maysonet told you to
 3     who?
 4          A.   To my partner.
 5          Q.   Well, you were working with several
 6     guys?
 7          A.   Yeah, my partner, Detective Halvorsen.
 8          Q.   So Halvorsen is the person who typed this
 9     report up; correct?
10          A.   Correct.
11          Q.   Now, you have had an opportunity to review
12     it a number of times since you have been involved in
13     this case, haven't you, Detective?
14          A.   Very little.
15          Q.   Pardon?
16          A.   Very little time.
17          Q.   I'm sorry.  I didn't hear you?
18          A.   I said, very little time.
19               THE COURT:  Very little time.
20     BY MR. BEUKE:
21          Q.   Very little time?
22          A.   Mm-hmm.
23          Q.   You have had an opportunity certainly to
24     review it before you testified today?
```

221

JGS_MAYSONET 4969

1       A.   I had the opportunity to look through it,

2   yes.

3       Q.   You had an opportunity to speak with

4   Miss Mandeltort and Mr. Marek prior to testifying

5   here today?

6       A.   Yes, I have.

7       Q.   You had an opportunity to discuss with them

8   your testimony; correct?

9       A.   Correct.

10      Q.   Okay.  In the portion of the police report

11  that alludes to your conversation with Maysonet,

12  nowhere in that report does it indicate that Maysonet

13  told you that he drove into the alley and then

14  continued to drive past St. Louis and park next to

15  the vacant lot, does it?

16      A.   Well, he told me he went into the alley.

17  Whether he stopped there -- he stopped there -- in

18  fact, he says he went down the alley, but there's

19  nowhere in there that's said.

20      Q.   Well, if he would have told you that,

21  Detective, was that something that you would

22  have thought important to include in the police

23  report?

24         MS. MANDELTORT:  Objection.

222

JGS_MAYSONET 4970

```
 1                THE COURT:  Sustained.
 2    BY MR. BEUKE:
 3         Q.    Well, that's not in the report, is it?
 4         A.    Right.
 5         Q.    You have had an opportunity to see
 6    Mr. Maysonet's court-reported statement, haven't
 7    you?
 8         A.    No, I haven't.
 9         Q.    You have not?
10         A.    I have not seen the court-reported
11    statement.
12         Q.    According to you, Detective, Mr. Maysonet
13    told you that when Fro and Tino and Lluvia came over
14    to his house, they told him that they had something
15    to do with two guys at Drake and North Avenue;
16    correct?
17         A.    Correct.
18         Q.    That involved dope?
19         A.    Correct.
20         Q.    He never told you that they told him they
21    were going over there to shoot them, did he?
22         A.    No.
23         Q.    You said that he told you Lluvia was
24    wearing a black hooded sweat shirt; correct?
```

223

JGS_MAYSONET 4971

```
 1        A.    Correct.

 2        Q.    What was Tino wearing?

 3        A.    I don't think he mentioned anything that

 4   Tino was wearing.

 5        Q.    Did you ask him?

 6        A.    No.

 7        Q.    What was Fro wearing?

 8        A.    He didn't mention that either.

 9        Q.    Did you ask him?

10        A.    No.

11        Q.    He said that they were using a light blue

12   over dark blue Pontiac; correct?

13        A.    Correct.

14        Q.    And that car belonged to a Latin King named

15   Jeffrey?

16        A.    Correct.

17        Q.    Did you ever go looking for Jeffrey?

18        A.    No, sir.

19        Q.    Did you ever go looking for a light blue

20   over dark blue Pontiac Bonneville?

21        A.    No, sir.

22        Q.    When Miss Mandeltort or you were giving

23   some answers to her questions concerning

24   Mr. Maysonet's statement to you, did you talk about
```

224

JGS_MAYSONET 4972

```
 1      Mr. Maysonet's visit from -- on August 16th of
 2      1990?
 3           A.    Yes.
 4           Q.    According to you, Mr. Maysonet told you
 5      that he was visited by some people; correct?
 6           A.    That's correct.
 7           Q.    And the people that he was visited by were
 8      Lluvia, Fro, Tino, Cisco, and King;
 9      correct?
10           A.    Correct.
11           Q.    Did you ever go looking for Cisco?
12           A.    No.
13           Q.    Did you ever go looking for King?
14           A.    No.
15           Q.    He told you that when they came by his
16      house, King put a gun to his head and told him that
17      if he ever talked about the two murders he'd be six
18      feet under; correct?
19           A.    Correct.
20           Q.    Do you recall who gave you his pills?
21           A.    No.
22           MS. MANDELTORT:  Objection, Judge.
23           THE COURT:  Counsel, he really has answered
24      that for you twice.  Anything else, Counsel?
```

JGS_MAYSONET 4973

```
 1      BY MR. BEUKE:

 2          Q.    Detective, you went to the scene; correct?

 3          A.    No, I did not.

 4          Q.    Well, have you been out to that scene?  You

 5    have been a Chicago Police Officer for 20-some years;

 6    correct?

 7          A.    Correct.

 8          Q.    Prior to being at Area 5 Violent Crimes,

 9    you were assigned to Gang Crimes North for a number

10    of years; correct?

11          A.    Correct.

12          Q.    You're familiar with that whole area, are

13    you not, Detective?

14          A.    That's correct.

15          Q.    You were familiar with that area back in

16    May of '90; correct?

17          A.    That's correct.

18          Q.    You're familiar with it today; correct?

19          A.    Correct.

20          Q.    When you turn into the alley on Drake,

21    okay, going westbound or eastbound through that

22    alley, can you see the front sidewalk in front of

23    3428 West North Avenue?

24          A.    Yes, you can.
```

JGS_MAYSONET 4974

```
1        Q.    When is the first time that you become able
2   to see that sidewalk after you turn in the alley off
3   Drake?
4        A.    You turn in the alley, you go down the
5   alley.  You have to --
6        Q.    I'm talking about when you first enter the
7   alley; okay?  Off Drake?
8        A.    No, you wouldn't be able to.
9        Q.    There are businesses up and down the north
10  side of North Avenue; correct?  Buildings?
11       A.    Correct.
12       Q.    Some are even two, three stories high
13  correct?
14       A.    Not three stories.  Two stories I think is
15  the highest.
16       Q.    And behind those buildings behind Drake
17  Street, a lot of those buildings have garages;
18  correct?
19       A.    Some of them.
20       Q.    If you parked in the alley behind Drake
21  Street, you could not see the sidewalk at 3428
22  North -- West North Avenue; correct?
23            MS. MANDELTORT:  Objection, Judge.  It
24  depends where you park.
```

JGS_MAYSONET 4975

1           THE COURT:  Sustained.

2           MR. BEUKE:  Well, I'm asking him, Judge.

3           THE COURT:  Counsel, that's not properly

4    put.  That's the objection.  The objection is

5    sustained.

6           MR. BEUKE:  All right.

7    BY MR. BEUKE:

8      Q.   When you first turn into the alley at

9    the west-most point of that alley -- do you

10   understand?

11     A.   Correct.

12     Q.    -- can you see that address, the street on

13   North Avenue?

14     A.    Immediately turning the alley --

15   immediately turning the alley, no, you cannot see.

16     Q.   How about when you go in one door, one lot?

17     A.   No.

18     Q.   How about the second lot, the third lot,

19   the fourth lot?

20     A.   You have to drive through past St. Louis to

21   3428.

22     Q.   Okay.  All right.  So you can't see the

23   front sidewalk of 3428 West North Avenue at any point

24   as you go down the alley between Drake and St. Louis;

228

JGS_MAYSONET 4976

1    fair to say?

2         A.    Until you get to the empty lot.

3         Q.    Well, the empty lot is not between Drake

4    and St. Louis, is it?

5         A.    No, it's between St. Louis and Kimball.

6         Q.    Okay.  Now, let's take you across the

7    street, across St. Louis.  When you get first into

8    the alley, going eastbound in that alley going

9    towards Kimball -- okay?

10        A.    Correct.

11        Q.    -- when you park in the very first lot

12   behind the very first building, you can't see that

13   sidewalk, can you?

14        A.    No, not if you park right on the immediate

15   corner there.

16        Q.    Okay.  The second lot, you can't see that

17   sidewalk; correct?

18        A.    It's about the third house down, the third

19   building down.  Then you can see.

20        Q.    Okay.  The empty lot that you're talking

21   about is approximately halfway between Kimball and

22   St. Louis; correct?

23        A.    It's approximately three buildings down,

24   yes.

229

1        Q.    Is it fair to say it's approximately

2    halfway?

3        A.    It's a small block, yes.

4        Q.    So I'm clear, Detective, did you ever make

5    any report that indicated that Mr. Maysonet told you

6    he parked the car directly behind that vacant lot in

7    the alley between St. Louis and Kimball?

8              MS. MANDELTORT:   Judge, objection, asked

9    and answered.

10             THE COURT:   Sustained.  He said he never

11   made a report at all, so it seems to me that that's a

12   fair conclusion, Counsel.

13             MR. BEUKE:   Okay.

14   BY MR. BEUKE:

15       Q.    After you finished speaking with

16   Mr. Maysonet, Detective, did you have a number of

17   other conversations with him that evening?

18       A.    Personally me talking with him?

19       Q.    Yes.

20       A.    No.

21       Q.    Now, at some point, the investigation was

22   turned over the next morning to a state's attorney;

23   correct?

24             MS. MANDELTORT:   Objection to the form of

JGS_MAYSONET 4978

```
 1    the question, Judge.

 2              THE COURT:  Sustained.

 3    BY MR. BEUKE:

 4         Q.   Well, Mr. DiFranco, you know who he is,

 5    don't you?

 6         A.   Yes.

 7         Q.   And you're aware of the fact that

 8    Mr. DiFranco took a court-reported statement from

 9    him; correct?

10         A.   Yes.

11         Q.   Were you ever present at 6:30 a.m. with

12    Detective Montilla and Mr. DiFranco and Mr. Maysonet

13    when a conversation was had between Mr. DiFranco and

14    Mr. Maysonet?

15         A.   Yes, I was.

16         Q.   Do you recall interpreting that

17    conversation?

18         A.   I never interpreted anything.

19         Q.   So if Detective Montilla indicated that you

20    interpreted --

21              MS. MANDELTORT:  Objection, Judge.

22              THE COURT:  Sustained.  Sustained.  That's

23    an improper question, Counsel.

24
```

231

JGS_MAYSONET 4979

1    BY MR. BEUKE:

2        Q.    Well, did you have another conversation at

3    7:10 with Mr. Maysonet and Montilla and the

4    state's attorney?

5        A.    I did not have another -- I was present.  I

6    did not have.

7        Q.    You were present for a conversation?

8        A.    Yes.

9        Q.    Where did that conversation take place?

10       A.    In an interview room.

11       Q.    Was it in a different interview room than

12   the one you had spoken to him earlier?

13       A.    I don't remember if it was or not.  I

14   believe it was the same.

15       Q.    Anything that would refresh your

16   recollection?

17       A.    I believe it was the same room.

18       Q.    You believe it was the same room?

19       A.    Yes.

20       Q.    Do you recall again, Detective,

21   contributing to the preparation of the police report

22   that was done regarding your involvement

23   in this investigation on August the 22nd and

24   23rd?

JGS_MAYSONET 4980

1      A.    Yes.

2      Q.    You have had an opportunity, have you not,

3   Detective, to review that report?

4      A.    Yes, I have.

5      Q.    I'm going to show you that report and ask

6   you to look at Page 8 at the very top?

7      A.    Yes.

8      Q.    Okay.  Does that report indicate whether or

9   not Mr. Maysonet was moved from the first interview

10  room at the 6:30 conversation to another room?

11     A.    No, it does not.

12     Q.    What does it say regarding where that

13  second 7:10 conversation occurred?

14     A.    He was moved.

15     Q.    So it says he was moved?

16     A.    Yes.

17            MR. BEUKE:  Judge, can I have one moment,

18  please?

19                  (Brief pause.)

20            MR. BEUKE:  Nothing further.

21            MS. MANDELTORT:  Judge, if I can just have

22  a moment?

23                  (Brief pause.)

24            MS. MANDELTORT:  Judge, I have no further

233

JGS_MAYSONET 4981

1    questions based on the cross.

2            MR. RUECKERT:  Judge, may I approach the

3    bench?

4            THE COURT:  Sure.

5            MR. RUECKERT:  Thank you.

6                    (WHEREUPON, a discussion was

7                    had off the record outside the

8                    hearing of the jury and

9                    court reporter.)

10                  (WHEREUPON, the following was

11                  had in open court, outside

12                  presence of the jury:)

13            MS. MANDELTORT:  Judge, for the record, at

14    this time, the People would be offering --.

15            THE COURT:  You've got 1 through 31.

16            MS. MANDELTORT:  One is a police report.

17            THE COURT:  1 through 26 and 28 through 31.

18            MR. RUECKERT:  Judge, when the state rests,

19    is it okay if Chris goes back and I go?

20            THE COURT:  I don't have a problem with

21    that.

22            MS. MANDELTORT:  Judge, at this time, the

23    People would be offering 1 through 26 into evidence

24    and 28 through 31 and ask that the identification

JGS_MAYSONET 4982

1   symbols be stricken.  We're asking they all be

2   admitted into evidence.

3            THE COURT:  Mr. Beuke?

4            MR. BEUKE:  No objection, Judge.

5            THE COURT:  Just so you understand, I do it

6   in two stages.  Admissibility is the issue now.  At

7   some future point, we'll discuss what will go to the

8   jury, but right now, it's just admissibility.

9            So what's being offered as 1 through

10  26 and 28 through 31, there's no objection?

11           MR. BEUKE:  No.

12           MR. RUECKERT:  Well, I'm going to object to

13  the statement and the photographs attached to the

14  statement.

15           THE COURT:  Whatever alludes to you, and

16  certainly anything involved specifically with

17  Maysonet, such as his statement and statements made

18  by him.  But the scene photos, et cetera --.

19           MR. RUECKERT:  No, I don't have any

20  objection to scene photos.

21           THE COURT:  Okay.  All right.  Then as to

22  both defendants, 1 through 13 will be received into

23  evidence.  There's no objection.  I think that's

24  applicable.

JGS_MAYSONET 4983

```
 1                    Do you have a list, Mr. Rueckert?  1

 2    through 13 are scene photographs.  1 and 13 are the

 3    cartridges that were recovered.

 4              MR. RUECKERT:  I have no problem.

 5              THE COURT:  14 through --.

 6              MS. MANDELTORT:  26.

 7              THE COURT:  -- 26 are essentially morgue

 8    photos of various wounds of the recovered spent

 9    bullets out of the bodies.

10              MR. RUECKERT:  I have no objection to

11    those.

12              THE COURT:  Then 14 through 16 are being

13    admitted as to both defendants.

14              MS. MANDELTORT:  Okay.

15              THE COURT:  It seems to me that the rest of

16    them, 28 through 31, are being admitted as to

17    Mr. Maysonet only.

18              MS. MANDELTORT:  Okay.

19              THE COURT:  Does that comport with

20    everybody else's records?

21              MS. MANDELTORT:  Yes, Judge.

22              THE COURT:  Mr. Rueckert, 28 through 31 are

23    being admitted -- and, Mr. Beuke, only as to those

24    two as it goes to Mr. Maysonet.
```

JGS_MAYSONET 4984

```
 1                      (WHEREUPON, People's Exhibit
 2                      Numbers 1 through 26 and 28
 3                      through 31, inclusive, were
 4                      received in evidence.)
 5           THE COURT:  Very well.  That having been
 6      done, is there any other issue, Mr. Beuke or Mr. --
 7           MS. MANDELTORT:  There will be one other
 8      thing.  There is one brief stipulation as to life and
 9      death of the victims that I'll read before the jury
10      before we rest and admit into evidence just so the
11      Court is aware.
12           THE COURT:  All right.  And I'll hear that.
13      That would seem to go to him, too.
14           MS. MANDELTORT:  Right.
15           THE COURT:  All right.  Do you want to do
16      your directed motion at this point while they're not
17      here, or do you want to do it tomorrow morning?
18           MR. BEUKE:  We can do it tomorrow morning.
19           THE COURT:  Okay.  Just so you don't forget
20      it.
21           MR. BEUKE:  Yes.  Judge, I don't know if
22      this will be an appropriate time after they have
23      rested, but we discussed your having a conversation
24      with Mr. Maysonet about his right to testify.
```

237

JGS_MAYSONET 4985

1          THE COURT:  Oh, what you're saying is

2     because then you can rest right after she goes on?

3     Is that what you want to do?

4          MR. BEUKE:  Judge, I would prefer after I

5     put her on to rest.

6          THE COURT:  Okay.  Then maybe I can have

7     that conversation with him now.

8          MS. MANDELTORT:  Okay.  That's fine, Judge.

9          THE COURT:  Mr. Maysonet, I need to speak

10     with you outside the hearing of the jury.  It is my

11     understanding that through your attorney, Mr. Beuke,

12     that you have made the decision not to testify in

13     your own defense; is that correct?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Mr. Maysonet, what I have to be

16     sure that you understand is that you certainly have a

17     right, a personal right to testify if you so choose.

18     You have a personal right not to testify.

19               What's important is that is not a

20     right that can be waived by your attorney.  It must

21     be waived by you, and the Court has to be sure that

22     you have discussed it with your attorney, and you

23     have reached that decision yourself personally; is

24     that correct?

JGS_MAYSONET 4986

```
1              THE DEFENDANT:  Yes.

2              THE COURT:  Is there anything about that

3    decision, Mr. Maysonet, that you have concerns about

4    or questions about or anything you want to ask the

5    Court about that decision?

6              THE DEFENDANT:  No, I don't want to

7    testify.

8              THE COURT:  Very well.  Then the record

9    should reflect that the Court has inquired directly

10   of Mr. Maysonet, and the Court's understanding

11   based on his responses to the Court's questioning is

12   that he has made the personal decision after

13   discussing it with his attorney that he does not wish

14   to testify.

15             MR. BEUKE:  Judge, just for the record, I

16   would just like to indicate that Mr. Maysonet and

17   I have talked about this decision on a

18   number of occasions, and we've discussed pluses and

19   minuses to that decision, and on each and every

20   occasion that we've discussed it, he's indicated to

21   me that it was his preference not to testify.

22                  And I, again, before we came out

23   today, discussed it again with him, and he again

24   indicated, as he did to your Honor, that he did not
```

239

JGS_MAYSONET 4987

1    want to testify.

2            THE COURT:  Very well.  Okay.  It's

3    his decision.  So the state -- if you want to

4    enter your stipulation, you can rest as to both of

5    them.

6            MS. MANDELTORT:  All right, Judge.  I will

7    just enter my stipulation, offer the exhibits and

8    rest.

9            THE COURT:  Okay.  I thought you were going

10   to do it now.

11           MS. MANDELTORT:  Okay.  Judge, it's

12   stipulated as to both defendants on May 25, 1990,

13   Torrence Wiley was 27 years of age and resided at 11

14   South Parkside, and Kevin Wiley was 26 years of age

15   and resided at 2334 West Maypole, and prior to the

16   incident, each was alive and well on May 25, 1990,

17   and that Torrence and Kevin Wiley were brothers.

18           THE COURT:  So stipulated on behalf of

19   Mr. Maysonet?

20           MR. BEUKE:  So stipulated.

21           MR. RUECKERT:  Yes, so stipulated.

22           THE COURT:  Very well.

23           MR. RUECKERT:  I think you also want me to

24   stipulate to testimony?

JGS_MAYSONET 4988

1          MS. MANDELTORT:  Are you going to be back

2     tomorrow?  We can do that tomorrow morning after the

3     jury goes out.

4          THE COURT:  Well, why?  I mean, can't we

5     just do it now and be done with that?

6          MR. MAREK:  Do you want to maybe do it

7     after they go home?

8          MS. MANDELTORT:  Judge, at this time, there

9     would be a stipulation by and between the parties,

10    Christopher Gossens, and by the People that if

11    Justino Cruz were called to testify, he would testify

12    in the same manner consistent with the transcript

13    that will be submitted to the Court from March 27th

14    of 1992 when he testified before this Court in

15    regards to another trial as to another defendant,

16    that being Alfredo Gonzales, and we would be offering

17    that testimony as to the defendant in court today,

18    that being Mr. Gossens only.

19         THE COURT:  All right.  So as far as

20    Mr. Gossens is concerned, the state is now resting;

21    is that correct?

22         MS. MANDELTORT:  Judge, give me one minute.

23              (Brief pause.)

24         MS. MANDELTORT:  Nothing further.  We would

241

JGS_MAYSONET 4989

1    rest as to Mr. Gossens.

2         MR. RUECKERT:  I'll stipulate that's the

3    way he testified on March 27, 1992, and I'll

4    stipulate that's the way he'd probably testify

5    today.

6         THE COURT:  Okay.

7         MR. RUECKERT:  If they're resting, I'd ask

8    for a finding of not guilty for the very basic

9    reason, he's never been identified.

10        THE COURT:  Are you resting?

11        MR. RUECKERT:  Yes.

12        MS. MANDELTORT:  I would ask the Court

13   delay any ruling until after the jury is out

14   tomorrow.  We'd just -- he's been here for

15   this trial, and then all of a sudden, he's

16   disappeared.

17        THE COURT:  It's not in the middle of

18   trial.  He's got nothing to do with it.

19        MR. MAREK:  If we can just delay it until

20   after we finished the evidence today.

21        MS. MANDELTORT:  And then that would make

22   sense if he wasn't here.

23        MR. RUECKERT:  We don't have anything to do

24   with Mr. Beuke's defense, so why should we be sitting

242

JGS_MAYSONET 4990

1    here even for that?

2           THE COURT:  They've got nothing to do with

3    that, and where he is is not anything they should be

4    concerned about.  They may not even realize who it is

5    he's supposed to be.

6                Very well.  Are you resting?

7           MR. RUECKERT:  Yes.

8           THE COURT:  Based on all the evidence that

9    has been adduced as to Christopher Gossens, there is

10   a finding of not guilty as to all counts, and the

11   defendant is discharged on this case.  And I say that

12   because I don't know whether he's got anything else

13   pending anywhere.

14          MS. MANDELTORT:  Judge, I believe he's

15   under sentence from another courtroom.

16          THE COURT:  Is that correct?

17          MS. MANDELTORT:  So he should be remanded

18   to the Illinois Department of Corrections.

19          THE COURT:  The defendant then is remanded

20   to IDOC to serve his sentence in another matter.

21                Are we ready to proceed?

22          MS. MANDELTORT:  State's ready.

23          THE COURT:  All rise for the jury.

24

JGS_MAYSONET 4991

```
 1                    (WHEREUPON, the following was
 2                    had in open court, in the
 3                    presence of the jury:)
 4          THE COURT:  You may be seated.
 5                    Very well.  State?
 6          MS. MANDELTORT:  Judge, at this time, we're
 7     going to proceed by way of stipulation.
 8                    Ladies and gentlemen, it is agreed by
 9     and through the defendant, Jose Maysonet, through his
10     attorney, Mr. Beuke, and the People
11     of the State of Illinois, through myself and
12     Frank Marek, that on May 25, 1990, Torrence Wiley
13     was 27 years of age, and he lived at 11 South
14     Parkside.
15                    Also, it is stipulated that Kevin
16     Wiley was 26 years of age as of May 25, 1990, and
17     resided at 3334 West Maypole.
18                    Further, that Torrence Wiley and
19     Kevin Wiley were brothers, and that prior to the
20     incident that took place on May 25, 1990, both
21     Torrence Wiley and Kevin Wiley were alive and in good
22     health.
23                    So stipulated?
24          MR. BEUKE:  So stipulated, your Honor.
```

JGS_MAYSONET 4992

1              THE COURT:  Very well.

2              MS. MANDELTORT:  Judge, with the admission

3      of that stipulation, at this time, the People would

4      offer Exhibits 1 through 26 and 28 through 31 into

5      evidence and ask that the identification marks be

6      stricken.

7              MR. BEUKE:  No objection.

8              THE COURT:  Very well.  People's 1 through

9      26 and People's 28 through 31, the identification

10     marks may be stricken, and they will be received by

11     the Court into evidence.

12             MS. MANDELTORT:  Judge, with the receipt of

13     those items of evidence into evidence before this

14     jury, Judge, at this time, the people would formally

15     rest their case-in-chief against the defendant, Jose

16     Maysonet.

17             THE COURT:  Thank you, Miss Mandeltort.

18                  Mr. Beuke, is the defense ready to

19     proceed?

20             MR. BEUKE:  We are, your Honor.  Thank you.

21     We would call Rose Maysonet to the stand, Judge.

22                  (Witness sworn.)

23             THE CLERK:  You may be seated.

24

JGS_MAYSONET 4993

```
 1     WHEREUPON,

 2                    ROSE MAYSONET,

 3     called as a witness on behalf of the defendant,

 4     having been first duly sworn, under oath was examined

 5     and testified as follows:

 6                    DIRECT EXAMINATION

 7                    BY MR. BEUKE:

 8          Q.   Ma'am, would you please state your full

 9     name and spell your last name for the benefit of the

10     court reporter here?

11          A.   My name is Rose Maysonet, M-a-y-s-o-n-e-t.

12          Q.   Rose, I'm going to ask you to speak up

13     loud, if you would, so the ladies and gentlemen in

14     the back of the jury box can hear you; okay?

15                    Rose, how old are you?

16          A.   I'm 22.

17          Q.   And are you related to Jose Maysonet?

18          A.   Yes, I am.

19          Q.   Will you tell the ladies and gentlemen of

20     the jury what your relationship is to him?

21          A.   He's my brother.

22                    THE INTERPRETER:  I'm sorry, your Honor.

23     The interpreter cannot hear.

24                    THE COURT:  You have to keep your voice up.
```

JGS_MAYSONET 4994

```
 1    She has to hear you.  Everybody in the courtroom --
 2    everybody in the courtroom has to hear you.
 3                   Would you make that answer again so
 4    that she can interpret?
 5                   THE WITNESS:  He's my brother.
 6    BY MR. BEUKE:
 7         Q.    Rose, where do you live currently?
 8         A.    3644 North Kimball.
 9         Q.    And who do you live there with?
10         A.    I live with my mother.
11         Q.    Do you have any children, Rose?
12         A.    Yes, I do.
13         Q.    How many children do you have?
14         A.    I have two.
15         Q.    Rose, are you currently enrolled in school?
16         A.    Yes, I am.
17         Q.    Where do you go to school?
18         A.    I go to St. Augustine College.
19         Q.    What are you studying there?
20         A.    A caseworker.
21         Q.    How long have you been enrolled at
22    St. Augustine?
23         A.    It's going to be, like, two, three months.
24         Q.    Rose, I want to direct your attention back
```

JGS_MAYSONET 4995

```
 1    to the month of May through the month of August of

 2    1990.  Can you tell the ladies and gentlemen of the

 3    jury where you were living back then?

 4         A.   I was living 3412 West Potomac.

 5         Q.   And who did you live there with?

 6         A.   I lived there with my mom.

 7         Q.   And do you know where your brother, Jose

 8    Maysonet, lived?

 9         A.   He lived next-door.

10         Q.   And what type of a building is located

11    there?

12         A.   It's a six unit.

13         Q.   Was Jose's apartment different from yours

14    and your mother's apartment?

15         A.   It was the same thing.

16         Q.   I mean, was it a different apartment?

17         A.   Oh, yeah.

18         Q.   Separate?

19         A.   Yeah.

20         Q.   Did you live there with your children?

21         A.   Yes, I did.

22         Q.   Rose, back -- I want to direct your

23    attention to the date of July 15th of 1990; okay?

24    Did you learn that your brother, Jose, was in custody
```

248

JGS_MAYSONET 4996

1    in Area 5 Violent Crimes?

2        A.    Yes, I did.

3        Q.    And did you learn that your brother

4    subsequent to that date was charged with an offense?

5        A.    Yes, I did.

6        Q.    I want to direct your attention to July

7    17th of 1990, two days later, and ask you if you were

8    present in a courtroom located at Belmont and

9    Western?

10       A.    Yes, I was.

11       Q.    Did you see your brother appear in court

12   that day?

13       A.    Yes, I was with him.

14       Q.    Did you appear in court that day?

15       A.    Yes, I did.

16       Q.    Was your brother represented by an

17   attorney?

18       A.    Yes, he was.

19       Q.    Do you recall the name of the attorney who

20   represented your brother in court that day?

21       A.    His name was Martin Abrams.

22            MS. MANDELTORT:   I'm sorry, Judge?

23            THE COURT:   Martin Abraham, I think she's

24   saying.

JGS_MAYSONET 4997

BY MR. BEUKE:

    Q.   Rose, did you and your mother personally go and speak with this attorney and hire him?

    A.   Yes, we did.

        MS. MANDELTORT:  Judge, objection, relevance.

        THE COURT:  I do wonder what the relevance is, Counsel, but I'll let it stand.

BY MR. BEUKE:

    Q.   After you appeared or you were in court on July 17th, did your brother's case get continued?

    A.   Yes, it did.

    Q.   I want to direct your attention now to August 8th of 1990.  Did you again appear and were you present in that same courtroom at Belmont and Western, and did you see your brother in court that day?

    A.   Yes, I did.

    Q.   Did another attorney represent him in court that day?

    A.   Yes.

    Q.   Do you recall the name of that attorney?

    A.   Swano.

JGS_MAYSONET 4998

```
 1         Q.    Who hired Mr. Swano to represent your
 2    brother?
 3         A.    My mom and I.
 4         Q.    I'm sorry?
 5         A.    My mom and I.
 6         Q.    Did you personally speak with Mr. Swano?
 7         A.    Yes, I did.
 8         Q.    When prior to August 8th of 1990 did you
 9    and your mother hire Mr. Swano to represent your
10    brother?
11         A.    Pardon me?
12         Q.    When prior to August 8th of 1990 did you
13    and your mom hire Mr. Swano?
14         A.    Yes, we hired him August 5th.
15         Q.    Did Mr. Swano appear in court that day?
16         A.    Yes, he did.
17         Q.    And was your brother there, also?
18         A.    Yes, he was.
19         Q.    Was there some sort of a hearing in front
20    of the judge?
21         A.    Yeah.
22               MS. MANDELTORT:   Judge, objection,
23    relevance.
24               THE COURT:   Sustained, Counsel.   Sustained.
```

JGS_MAYSONET 4999

```
 1    BY MR. BEUKE:

 2        Q.   Did the case get continued?

 3        A.   Yes, it did.

 4        Q.   Do you know what the next date your brother

 5    was supposed to appear in court?

 6        A.   Yes, I do.

 7        Q.   What date was that?

 8        A.   August 22nd.

 9        Q.   Did you and your mother -- were you able to

10    make bail for your brother between the date of August

11    8th and August 22nd?

12        A.   Yes, we did.

13        Q.   Did you bond your brother out of

14    Cook County Jail?

15        A.   Yes, we bonded him out.

16        Q.   Do you recall what date that was?

17        A.   August 16th.

18        Q.   And did your brother come home?

19        A.   Yes, he did.

20        Q.   On August 22nd of 1990, Rose, did you come

21    with your brother to court that day?

22        A.   Yes, I did.

23        Q.   Do you recall what courtroom your brother

24    was supposed to appear in that day?
```

252

JGS_MAYSONET 5000

```
 1      A.    We were supposed to go to 101.

 2      Q.    Is that 101 in this building?

 3      A.    Yes.

 4      Q.    Was that court on the first floor?

 5      A.    Yeah.

 6      Q.    Did you come with him?

 7      A.    Yes, I did.

 8      Q.    Did anybody else accompany you and your

 9   brother to court that day?

10      A.    Yes.

11      Q.    Do you recall who that was?

12      A.    Rosabella and Pantojas.

13      Q.    Now, is that a friend of your brother's?

14      A.    Yeah, he was a friend of the family.

15            THE COURT:  Would you have her spell that

16   name for the court reporter, the friend's name?

17   BY MR. BEUKE:

18      Q.    Do you know, Rose, how to spell that?

19      A.    Yeah, P-a-n-t-o-j-a-s.

20            THE COURT:  Thank you.

21   BY MR. BEUKE:

22      Q.    Did you arrive at this building on August

23   22nd of 1990?

24      A.    Yes, I did.
```

253

JGS_MAYSONET 5001

```
 1          Q.    What time did you and your brother and
 2    Pantojas and Rosabella get here?
 3          A.    We were there 9:00 o'clock.
 4          Q.    And was that the time you were scheduled to
 5    appear?
 6          A.    Yes.
 7          Q.    Did you go to courtroom 101?
 8          A.    Yes, we did.
 9          Q.    Was your brother's case eventually called
10    in Room 101?
11          A.    Yes, they did.
12          Q.    Did he approach a bench?
13          A.    Yes, he did.
14          Q.    What happened after he went up in front of
15    the judge?
16          A.    They sent us to Room 302 because the judge
17    wasn't there.
18          Q.    At some point, did you leave that
19    courtroom?
20          A.    Yes, we did.
21          Q.    By that courtroom, I mean Room 101?
22          A.    Yes.
23          Q.    What happened -- or did anything
24    happen as you and your brother, Rosabella and
```

JGS_MAYSONET 5002

```
 1      Pantojas left the courtroom after the case was

 2      called?

 3           A.   Well, as soon as we got -- we left out of

 4      the courtroom, the police officer came up to us.

 5           Q.   The police officer that came up to you, do

 6      you know his name?

 7           A.   Pauzinski.

 8           Q.   Could it be Paulnitsky?

 9           A.   Paulnitsky.

10           Q.   Can you describe him for the ladies and

11      gentlemen of the jury?

12           A.   Well, he's bald.  He got brown hair, and he

13      got a big mustache.

14           Q.   When he came up and approached your

15      brother, where did that physically happen, Rose?

16           A.   It happened right in front of Room 101.

17           Q.   As you walked out the door?

18           A.   Yes.

19           Q.   Did he say anything to your brother when he

20      approached you guys?

21           A.   He told my brother he needed to talk to my

22      brother.

23           Q.   And did your brother say anything to him?

24                MR. MAREK:  Objection.
```

JGS_MAYSONET 5003

```
 1              THE COURT:  Sustained as to this

 2   conversation.

 3   BY MR. BEUKE:

 4        Q.   Well, did you see the detective do anything

 5   to your brother?

 6        A.   He told my brother he needed to talk to my

 7   brother.

 8              MS. MANDELTORT:  Objection to what he told

 9   him.

10              THE COURT:  Sustained.

11   BY MR. BEUKE:

12        Q.   Without saying what your brother said and

13   without saying what the detective said, did you see

14   Detective Paulnitsky physically do anything to your

15   brother?

16        A.   My brother wouldn't talk to him.  He put

17   him against the wall and handcuffed him.

18        Q.   Did he put handcuffs on him?

19        A.   Yes, he did.

20        Q.   Did you say anything to the detective at

21   that time?

22        A.   I told him we were supposed to go to Room

23   302, but he didn't listen to me.

24        Q.   Did you see the detective take your brother
```

JGS_MAYSONET 5004

1    anywhere at that time?

2        A.    Yes, he did.  I followed him to the

3    elevator.

4        Q.    And the elevator that he took your brother

5    to, what happened when they got to the elevator?

6        A.    Well, he got into the elevator.  I was

7    going to get in with him, and he told me I couldn't.

8        Q.    Did your brother get in with him?

9        A.    Yes, he did.

10       Q.    Was he handcuffed still at that time?

11       A.    Yes, he was.

12       Q.    Did the elevator close?

13       A.    Yes, he did.

14       Q.    What did you do and what did Rosabella do

15   and Pantojas?

16       A.    We ran up the stairs to the third floor.

17       Q.    And at that point, you were supposed to go

18   to Room 302?

19       A.    Yes, we were.

20       Q.    Did you go -- when you got to the third

21   floor, Rose, did you see your brother?

22       A.    No, I didn't.

23       Q.    Did you see the detective?

24       A.    No, I didn't.

JGS_MAYSONET 5005

```
1        Q.   What did you do after you got up to the
2   third floor, and you didn't see your brother or the
3   detective?
4        A.   I went to Room 302.
5        Q.   302 is two floors below this; correct?
6        A.   Yes.
7        Q.   This floor?
8        A.   Yes.
9        Q.   When you got into the courtroom in Room
10  302, was Rosa with you?
11       A.   Yes, she was.
12       Q.   Was Pantojas with you?
13       A.   Yes, they were.
14       Q.   Did you wait in that courtroom?
15       A.   Yes, we did.
16       Q.   Did you ever see your brother come into
17  that courtroom?
18       A.   No, I didn't.
19       Q.   Did you ever see Detective Paulnitsky in
20  that courtroom?
21       A.   No, I didn't.
22       Q.   How long did you wait in Courtroom 302?
23       A.   We waited until court was over.
24       Q.   And at some point, did you leave that
```

JGS_MAYSONET 5006

1    courtroom?

2            A.    Yes, I did.

3            Q.    When you left the courtroom, Rose, where

4    did you go?

5            A.    I stood in front of the building.

6            Q.    Who did you stand in front of the building

7    with?

8            A.    Rosabella and Pantojas.

9            Q.    Why did you stand in front of the building?

10           A.    I figured the police officer was going to

11   take my brother out of there, or I would see my

12   lawyer.

13           Q.    Did you ever see Mr. Swano that afternoon?

14           A.    No, I didn't.

15           Q.    Did you ever attempt to call Mr. Swano?

16           A.    Yes, I did.

17           Q.    When was the first time that you tried to

18   call Mr. Swano?

19           A.    As soon as I was downstairs.

20           Q.    Where did you call him from?

21           A.    From the pay phone.

22           Q.    Did you get through to his office?

23           A.    No, he wasn't there.

24           Q.    Did you leave a message for him?

259

JGS_MAYSONET 5007

1          A.    Yes, I did.

2          Q.    Now, how long did you and Rosabella and

3     Pantojas wait out in front of the building?

4          A.    Two hours.

5          Q.    About what time, Rose, was it that you

6     decided to leave?

7          A.    2:00 o'clock.

8          Q.    And when you left, how did you -- how did

9     you go home?

10         A.    I went home in the car.

11         Q.    Whose car?

12         A.    Pantojas.

13         Q.    About what time, if you can remember, Rose,

14    was it that you got home?

15         A.    I got home around 3:00 o'clock.

16         Q.    And when you got home, did you make any

17    phone calls?

18         A.    Yes, I did.

19         Q.    Can you tell the ladies and gentlemen of

20    the jury what phone calls you made when you got home?

21         A.    When I got home, I made three phone calls.

22    They were to different police stations.

23         Q.    And what stations, if you can recall, did

24    you call?

260

JGS_MAYSONET 5008

```
 1          A.   I called 14th District, and I called
 2    Belmont and Western and Area 5.
 3          Q.   Did you speak with police officers or
 4    police personnel at those three police stations?
 5          A.   Yes, I did.
 6          Q.   What were you asking those people?
 7          A.   I was asking them if they had my brother in
 8    custody.
 9          Q.   Did anybody tell you that your brother was
10    there?
11               MS. MANDELTORT:   Objection, Judge.
12               THE COURT:   Sustained.
13    BY MR. BEUKE:
14          Q.   At some point, Rose, did you go to a police
15    station?
16          A.   Yes, I did.
17          Q.   Can you tell the ladies and gentlemen what
18    station you went to?
19          A.   I went to Area 5.
20          Q.   And where is Area 5 located?
21          A.   It's on 5555 West Grand.
22          Q.   What time was it approximately that you got
23    to Area 5?
24          A.   4:00 o'clock.
```

JGS_MAYSONET 5009

```
 1          Q.    When you got to Area 5, did you approach

 2     anyone or speak with anyone?

 3          A.    Yes, I did.

 4          Q.    And were you on the first floor or the

 5     second floor?

 6          A.    First floor.

 7          Q.    Who did you speak with on the first floor?

 8          A.    The officers on the desk.

 9          Q.    Did you ask them any questions?

10          A.    I asked them if they had my brother there.

11          Q.    Did they direct you anywhere?

12          A.    They told me to go to the second floor.

13          Q.    Did you go up to the second floor?

14          A.    Yes, I did.

15          Q.    When you got up to the second floor, Rose,

16     did you speak with any Chicago Police detectives?

17          A.    Yes, I did.

18          Q.    Do you recall his name?

19          A.    Montilla.

20          Q.    Did he tell you his name?

21          A.    Yes, he did.

22          Q.    When you spoke to Detective Montilla, what

23     did you say to him?

24          A.    I asked him if my brother was there.  He
```

262

JGS_MAYSONET 5010

```
 1    told me that my brother was there.

 2              THE INTERPRETER:  I'm sorry, your

 3    Honor --

 4              THE WITNESS:  I asked him if my brother was

 5    in custody.  He said, yeah.

 6    BY MR. BEUKE:

 7        Q.   Did -- was Rosabella with you?

 8        A.   Yes, she was.

 9        Q.   Now, did you stay on the second floor,

10    Rose, or did you -- were you told to go somewhere?

11        A.   Officer Montilla told me to go downstairs

12    to the lobby.

13        Q.   Did you follow his instructions?

14        A.   Yes, I did.

15        Q.   And is there a lobby down on the first

16    floor?

17        A.   There's, like, a little waiting room.

18        Q.   Did you go there?

19        A.   Yes, I did.

20        Q.   Who were you with?

21        A.   I was with Rosabella and Pantojas.

22        Q.   How long did you wait in that lobby, Rose?

23        A.   I waited for a couple of hours.

24        Q.   And at some point while you were
```

JGS_MAYSONET 5011

1    waiting in the lobby, did you ever see Detective

2    Montilla?

3          A.    Yes, I did.

4          Q.    About what time was it that you saw

5    Detective Montilla?

6          A.    Around 4:30.

7          Q.    And when you saw him, where did you see

8    him?

9          A.    He went downstairs where I was at.

10         Q.    Did you talk with him?

11         A.    Yes, I did.

12         Q.    What did you say to him?

13         A.    I asked him why my brother was there, and

14   he told me he was there for questioning.

15         Q.    Did you ask him anything else?

16         A.    No, I didn't.

17         Q.    Did Montilla stay there, or did he leave?

18         A.    No, he left.

19         Q.    Did you ever ask to see him?

20         A.    My brother?  Yes.

21         Q.    Did he allow you to see him?

22         A.    He allowed me to see him around

23   5:00 o'clock.

24         Q.    The first time you spoke with him, did he

JGS_MAYSONET 5012

```
 1     allow you to see him?

 2          A.   No, he didn't.

 3          Q.   Now, after you spoke with Montilla this

 4     time, did you make any phone calls?

 5          A.   Yes, I did.

 6          Q.   Who did you call?

 7          A.   I called my lawyer.

 8          Q.   Who was the lawyer you called?

 9          A.   Swano.

10          Q.   Did you get through to Mr. Swano?

11          A.   Yes, I did.

12          Q.   Did Mr. Swano come to Area 5?

13          A.   He told me to call him back --

14               MS. MANDELTORT:   Objection to what he told

15     her.

16               THE COURT:   Sustained.

17     BY MR. BEUKE:

18          Q.   Well, without going into what he said,

19     Rose, did he ever come to Grand and Central?

20          A.   No, he didn't.

21          Q.   How many times did you call him attempting

22     to get him to Area 5?

23          A.   I called him three times.

24          Q.   Now, Rose, after you made that phone call,
```

JGS_MAYSONET 5013

```
 1    did you go back to the waiting room?

 2         A.    Yes, I did.

 3         Q.    At some point after you got back to the

 4    waiting room, did you again see Detective Montilla?

 5         A.    Yes, I did.

 6         Q.    About what time was it that you saw

 7    Detective Montilla the next time?

 8         A.    6:00 o'clock.

 9         Q.    When you saw Detective Montilla on that

10    occasion, where was it that you saw him?

11         A.    I seen him downstairs.

12         Q.    Did you speak with him?

13         A.    Yes, I did.

14         Q.    When you spoke with Detective Montilla at

15    that time, what did you say to him?

16         A.    Well, he told me that my brother had a

17    nervous breakdown and that he was asking for some

18    pills.

19         Q.    Did you say anything to him?

20         A.    I told him, what would I do.  He said for

21    me to go get them.

22         Q.    On August 22nd of 1990, do you know if your

23    brother was taking any medication for

24    nerves?
```

266

JGS_MAYSONET 5014

```
 1        A.    Yes, I do.
 2        Q.    And what did you do after Detective
 3   Montilla told you that?
 4        A.    I went home.
 5        Q.    How did you get home?
 6        A.    In a car.
 7        Q.    When you got -- was that the house on
 8   Potomac?
 9        A.    Yes, it was.
10        Q.    When you got home, Rose, did you get any
11   nerve pills?
12        A.    Well, I went to my brother's house.  I
13   couldn't find my brother's, so I took my mom's.
14        Q.    Now, what's your mother's name?
15        A.    Mirim LaJara.
16        Q.    Can you spell your mom's name for the court
17   reporter?
18        A.    M-i-r-i-m, L-a-J-a-r-a.
19        Q.    Did you get your mother's nerve pills?
20        A.    Yes, I did.
21        Q.    What did you do once you got your mom's
22   nerve pills?
23        A.    I went back to Area 5.
24        Q.    And about what time was it, Rose, that you
```

JGS_MAYSONET 5015

```
 1     got back to Area 5 with the nerve pills?

 2          A.    Around 6:15, 6:20.

 3          Q.    When you got back there, where did you go?

 4          A.    I went upstairs.

 5          Q.    When you got upstairs, did you speak with

 6     any detectives?

 7          A.    Yes.

 8          Q.    And which detective did you speak with?

 9          A.    Montilla.

10          Q.    What did you say to him?

11          A.    I told him I had the nerve pills.

12          Q.    What did he do?

13          A.    He told me I could went and give it to my

14     brother.

15          Q.    And did he let you go in there?

16          A.    Yes, he did.

17          Q.    Did you give the nerve pills to your

18     brother?

19          A.    Yes, I did.

20          Q.    Did you stay with your brother in that

21     room?

22          A.    For a few seconds.

23          Q.    And what happened after a few seconds?

24          A.    Well, I give him the pills, he swallowed
```

268

JGS_MAYSONET 5016

1    them, and then Montilla told me I have to leave.

2         Q.    Did you leave?

3         A.    Yes, I did.

4         Q.    Was Rosabella with you when you went into

5    the room with the nerve pills?

6         A.    Yes, she was.

7         Q.    Did she stay in the room, or did she leave?

8         A.    She was outside the door.

9         Q.    After you were told to leave, where did you

10   go?

11        A.    I went downstairs to the lobby.

12        Q.    Back to where you had been before?

13        A.    Yeah.

14        Q.    Now, how long did you stay in the lobby

15   after you got back down there?

16        A.    I stood there until 8:30.

17        Q.    What happened at 8:30?

18        A.    Well, before I went home, it was around

19   7:00 o'clock, Officer Montilla told Rosabella to go

20   upstairs by herself.

21        Q.    At 7:00 o'clock, did Detective Montilla

22   come back down by you and Rosa?

23        A.    Yes, he did.

24        Q.    What happened when he came downstairs by

269

```
 1    you?
 2         A.   He told Rosabella he needed to talk to her.
 3         Q.   Did they talk in front of you?
 4         A.   No.
 5         Q.   She went upstairs?  How long was Rosabella
 6    gone?
 7         A.   For an hour.
 8         Q.   At some point, did Rosabella come back
 9    downstairs?
10         A.   Yes, she did.
11         Q.   Was that at approximately 8:00 o'clock?
12         A.   Mm-hmm.
13         Q.   When Rosabella came back downstairs, did
14    you leave or did you stay at Area 5?
15         A.   We stood a couple of minutes.
16         Q.   And at some point after Rosa came back
17    downstairs, did you speak with Detective Montilla
18    again?
19         A.   Yes, I did.
20         Q.   What did you say to him?
21         A.   I asked him what was going on.  He told me
22    that I could go home, that my brother would be out in
23    72 hours.
24         Q.   When you spoke with Detective Montilla at
```

JGS_MAYSONET 5018

1    that time, was Rosa there?

2         A.   Yes, she was.

3         Q.   Did you stay at Area 5?

4         A.   No, we went home.  He sent us home.

5         Q.   Did you ask to see your brother before you

6    left?

7         A.   Yes, I did.

8         Q.   Did he allow you to see him?

9         A.   No, he didn't.

10        Q.   Rose, about what time was it that you got

11   home that evening?

12       A.   Around a quarter to 9:00.

13       Q.   After you got home that evening, did you

14   make any further phone calls to try to contact

15   Mr. Swano?

16       A.  I --

17        MS. MANDELTORT:  Judge, objection,

18   relevance.

19        THE COURT:  Sustained, Counsel.  Sustained.

20   BY MR. BEUKE:

21       Q.   Rose, did you speak to your brother on the

22   phone at all between the time you left the station at

23   8:30 and the following day?

24       A.   No, I didn't.

JGS_MAYSONET 5019

```
 1                    MR. BEUKE:  I have nothing further.  Thank

 2      you.

 3                    MS. MANDELTORT:  Judge, if we could just

 4      have a moment?

 5                         (Brief pause.)

 6                    MR. BEUKE:  Oh, Judge, I'm sorry.  I just

 7      have one other question.

 8      BY MR. BEUKE:

 9          Q.    Ma'am, do you know where Rosabella is

10      today?

11          A.    No, I don't.

12          Q.    When is the last time you have seen

13      her?

14          A.    Like a month after my brother got locked

15      up.

16                    MR. BEUKE:  Nothing further.

17                    MS. MANDELTORT:  Judge, if we could have a

18      brief sidebar?

19                         (WHEREUPON, the following was

20                          had outside the

21                          hearing of the jury:)

22                    MS. MANDELTORT:  Judge, we objected several

23      times during counsel's examination as to the

24      references to the attorney, but I wasn't sure where
```

272

JGS_MAYSONET 5020

1    he was tying it up.  My concern is this jury has been

2    left with the impression that he was somehow entitled

3    to a lawyer, that the lawyer from the first case had

4    some right to represent him on the second

5    investigation.

6                   Only the defendant can assert his

7    right to an attorney, and I think this jury has been

8    left with the impression that somehow she could go

9    out and get the lawyer and, therefore, exercise his

10   right to the attorney.  My concern is, that's not the

11   law.  I thought it was going to be tied up in some

12   other fashion.

13             THE COURT:  I don't know that's what they

14   think because I don't know that they have a framework

15   to think that.  It's not like they heard anything

16   new.  He's gone through with every detective about

17   this.  What do you propose to do about it?

18             MR. MAREK:  We'd ask to strike the

19   testimony.

20             THE COURT:  No, I'm not going to do that.

21                   (WHEREUPON, the following was

22                   had in open court, in the

23                   hearing of the jury:)

24             MR. MAREK:  No cross, your Honor.

273

JGS_MAYSONET 5021

1          THE COURT:  Thank you, ma'am.  You may step

2     down.

3          MR. BEUKE:  Thank you, ma'am.

4               (Witness excused.)

5          MR. BEUKE:  Judge, with that, Mr. Maysonet

6     would rest.

7          THE COURT:  Very well.  We've had some

8     brief discussion among us about the schedule from

9     here on in.  Ladies and gentlemen, I had spoken with

10     you the day that you were selected and indicated to

11     you that we hoped to finish this case today.  We,

12     obviously, are not going to finish it today, but we

13     will certainly finish it up in the morning.  Whether

14     or not the state is going to rest in rebuttal, I

15     don't know that yet.

16               But in any event, we're going to

17     conclude this matter first thing in the morning.

18     But, Counsels, I think if we plan to be started by

19     10:00 o'clock in the morning?  Tomorrow is

20     probation day, so there's not much of a call.  Let's

21     hope we don't have any hangups like we had this

22     morning.

23               You will be given the case tomorrow.

24     One thing that's very interesting about trial law is

JGS_MAYSONET 5022

1     you really can't see around the horns no matter how

2     much you think you sort of have a sense of how

3     long a case may take.  Just as we don't know with

4     exactitude how many jurors we're going to need for a

5     jury, we can't know with exactitude how long a case

6     will last.

7                     So I do need you back tomorrow

8     morning at 9:30 for the conclusion of this case.  You

9     will be instructed tomorrow, hear the arguments, and

10    the case will be given to you.  Because the other

11    possibility would be to try to do that today, and

12    then once you start deliberating, I would have to

13    lock you up for the night.  And my honest feeling is

14    most people really prefer to go home unless there's

15    some compelling reason not to.

16                     I mean, it's only 5:15.  We possibly

17    could conclude tonight, but by the time we did all of

18    that, it becomes problematic as to whether or not

19    you'd be in a position to reach a verdict tonight.

20    And if you didn't by some reasonable hour, you'd be

21    the guest of the county, and it's just my presumption

22    you'd probably rather go home.

23                     So 9:30 tomorrow morning.  Enjoy the

24    rest of the beautiful day.  Remember the admonitions.

JGS_MAYSONET 5023

```
1       It's terribly important now because you have heard so

2       much evidence now, and the one thing that I haven't

3       said that I'm hoping is when I say don't discuss it

4       with anyone, I mean even with each other.  It's not

5       the time for you to be discussing the case.  Both

6       sides have not rested in its entirety, and you really

7       should not discuss the case until after you have been

8       instructed in the law so that you kind of know what

9       to talk about.

10                      So all the admonitions I have given

11      you in the past are still applicable for this

12      evening.  See you in the morning.  Have a great

13      evening.

14                      (WHEREUPON, the above matter

15                       was continued to August 11,

16                       1995.)

17

18

19

20

21

22

23

24
```

JGS_MAYSONET 5024

1      STATE OF ILLINOIS    )

2                           ) SS:

3      COUNTY OF C O O K    )

4           I, JO ANN KROLICKI, an Official Shorthand

5      Reporter for the Circuit Court of Cook County, County

6      Department, Criminal Division, do hereby certify that

7      I reported in shorthand the proceedings had in the

8      above-entitled cause, and that the foregoing is a

9      true and correct transcript of my shorthand notes so

10     taken before Judge Loretta Hall Morgan on August 10,

11     1995.

12

13

14          JO ANN KROLICKI, CSR, RPR
            OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

277

JGS_MAYSONET 5025

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 9

## FILED UNDER SEAL

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 10

# In The Matter Of:

*Maysonet v.*
*Guevara*

*Stephen Gawrys*
*October 8, 2021*



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

1

1          IN THE UNITED STATES DISTRICT COURT FOR
           THE NORTH EASTERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION
           CASE NO.  18 CV 02342
3

4          ----------------------
           JOSE JUAN MAYSONET,
5          JR.,                          CIVIL ACTION

6              Plaintiff(s),             Deposition of
                                         STEPHEN GAWRYS
7              v.

8          REYNALDO GUEVARA, et
           al.,
9
               Defendant(s).
10         ----------------------

11

12

13              T R A N S C R I P T of the stenographic
    notes of the proceedings in the above-entitled

14  matter as taken by and before DIANE M. HOLMES, a

15  Certified Court Reporter and Notary Public of the

16  State of New Jersey, held via videoconference on

17  Friday, October 8, 2021, commencing at approximately

18  11:02 a.m. (Eastern Time) in the morning, pursuant

19  to notice.

20

21

22

23

24

25

2

1   A P P E A R A N C E S:

2

3   BONJEAN LAW GROUP, PLLC
    Attorneys for Plaintiff Jose Juan Maysonet, Jr.
4        750 Lexington Avenue, 9th Floor
         New York, New York 10022
5        718.875.1850
         Jennifer@bonjeanlaw.com
6   BY:  JENNIFER BONJEAN, ESQ.
         ASHLEY COHEN, ESQ.
7        HALEY COOLBAUGH, Paralegal

8

9   LEINENWEBER BARONI & DAFFADA, LLC
    Attorneys for Defendant Reynaldo Guevara
10       1150 Wilmette Avenue, Suite D
         Wilmette, Illinois 60091
11       847.251.4091
         mkm@ilesq.com
12  BY:  MEGAN MC GRATH, ESQ.

13

14  THE SOTOS LAW FIRM, P.C.
    Attorneys for Defendants JoAnn Halvorsen, Edward
15  Mingey, Lee Epplen, Fernando Montilla and Ronald
    Paulnitsky
16       141 W. Jackson Boulevard, Suite 1240A
         Chicago, Illinois 60604
17       630.735.3303
         jenquist@jsotoslaw.com
18  BY:  JOSH ENQUIST, ESQ.

19

20

21

22

23

24

25

3

1   A P P E A R A N C E S: (Cont'd)

2

3   ROCK, FUSCO & CONNELLY, LLC
    Attorneys for Defendant City of Chicago
4        321 N. Clark Street, Suite 2200
         Chicago, Illinois 60654
5        312.494.1000
         arahe@rfclaw.com
6   BY:  AUSTIN RAHE, ESQ.
         JESSICA ZEHNER, ESQ.
7

8

    HINSHAW & CULBERTSON, LLP
9   Attorneys for Frank Di Franco
         151 North Franklin Street
10       Suite 2500
         Chicago, Illinois 60606
11       312.704.3127
         echoi@hinshawlaw.com
12  BY:  ESTHER CHOI, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

4

## I N D E X

STEPHEN GAWRYS
DIRECT EXAMINATION BY MS. BONJEAN                    5


## E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Gawrys-1 | Investigative file | 115 |

5

1   S T E P H E N  G A W R Y S, (no address given), is

2               duly sworn/affirmed by a Notary Public

3               of the State of New Jersey and

4               testifies under oath as follows:

5   DIRECT EXAMINATION BY MS. BONJEAN:

6       Q.     Good morning, Mr. Gawrys.

7       A.     Good morning.

8       Q.     My name is Jennifer Bonjean.  That's

9   B-O-N-J-E-A-N, and I represent the plaintiff in this

10  federal civil rights action Jose Maysonet.  That's

11  M-A-Y-S-O-N-E-T.

12             Also present from our side is my

13  paralegal, Haley Coolbaugh, who you'll see on the

14  Zoom ledger there, and possibly Ashley Cohen.  I'm

15  not seeing her, but, anyway, Ashley Cohen who is an

16  attorney with my office as well.

17            MS. BONJEAN:  And before we get started

18  today, I would ask that the other attorneys place

19  their appearances on the record.  Okay.

20            MR. RAHE:  This is Austin Rahe for the

21  City of Chicago.  Also here from my firm is Jess

22  Zehner.

23            MS. MC GRATH:  Megan Mc Grath on behalf

24  of Defendant Guevara.

25            MR. ENQUIST:  Josh Enquist on behalf of

6

1    the other remaining individual police officer

2    defendants and also representing Mr. Gawyrs.

3              MS. CHOI:   Esther Choi on behalf of

4    Defendant Di Franco.

5         Q.    Mr. Gawrys, I know the answer to this

6    question, but have you ever had your deposition

7    taken before?

8         A.    Yes.

9         Q.    How many times have you been deposed?

10        A.    Maybe three times.  I think two or

11   three times.

12        Q.    You cut out the beginning of that

13   answer?

14        A.    Probably two or three times.  Let me

15   move this closer.

16        Q.    I don't know what happened.

17        A.    I'll speak louder.  That's all.

18        Q.    Yeah.  Sometimes it gets a little

19   glitchy.  Sometimes we have some technical

20   difficulties.

21              So if at any point that happens, I

22   might ask you to repeat an answer or we'll take a

23   break or something of that nature.  Okay?

24        A.    Okay.

25        Q.    On that point, have you ever had your

7

1    deposition taken by way of Zoom like what we're

2    doing?

3          A.     No.  This is the first time.

4          Q.     Okay.  It's the same rules with some of

5    them being more important in this context.  One is

6    I -- it's very natural to end up jumping on each

7    other's answers or you're anticipating my questions

8    so you begin to answer, and sometimes I will

9    inadvertently cut you off in your answer.

10           So it's really important to let me

11    finish my question before you start answering, and I

12    will, of course, try not to interrupt your answer

13    before you are finished completing your answer.

14    Okay?

15          A.     Okay.

16          Q.     That's always important, but it's

17    particularly important in the Zoom context because

18    we're not in the same room, and it's hard for the

19    court reporter to get a clean record.  All right?

20          A.     Okay.

21          Q.     If at any point you don't understand

22    one of my questions, will you please let me know?

23          A.     I will.

24          Q.     And if you answer one of my questions,

25    I am going to assume that you understood the

8

1    question.  Is that fair?

2         A.    Fair.

3         Q.    Also, if you need to take a break -- we

4    talked about this, but if you need to take a break,

5    that's no problem.  Just let us know and we can

6    break.

7              I just ask if there is a question

8    pending that you go ahead and answer that question

9    before we break.  Okay?

10        A.    Okay.

11        Q.    All right.  And you understand that

12   you're under oath here today, right?

13        A.    Right.

14        Q.    Okay.  Same oath you would take in a

15   court of law if you testified in a court of law.  Do

16   you understand that?

17        A.    Right.  I do.

18        Q.    All right.  So you said you had your

19   deposition taken before two or three times

20   previously.  Is that right?

21        A.    Yeah, previously.

22        Q.    Okay.  In what matters have you been

23   deposed previously?

24        A.    Other cases and one other civil case.

25   I think two civil cases and then one -- well,

9

1  they're both civil, and one for a -- related to

2  work, my other job.

3       Q.    All right.  So let's start with the two

4  civil cases you referenced that are unrelated to

5  your other job.

6           What were the names of those cases or

7  the parties, if you know the parties in those cases?

8       A.    Well, one of them was Rivera, and there

9  was one before that, Johnson case.  That was about

10  it, and then the other one was just some private

11  matter from work we got deposed.

12       Q.    Okay.  So you were deposed in the

13  Jacques Rivera case.  Is that right?

14       A.    Yes.

15       Q.    And you were a named defendant in this

16  litigation.  Is that right?

17       A.    Pardon me?

18       Q.    You were a named defendant in that

19  litigation, correct?

20       A.    Correct.

21       Q.    And, in fact, you testified also at the

22  civil trial that was brought by Mr. Rivera, correct?

23       A.    Correct.

24       Q.    And if I'm not mistaken, the jury

25  returned a judgment against you in connection with

10

1    that matter.  Is that right?

2         A.    That's right.

3         Q.    And then Johnson, which Johnson is

4    that?  What's the first name, if you know?

5         A.    Juan Johnson.  I think it's Juan

6    Johnson.

7         Q.    All right.  Just making sure.  There is

8    a couple Johnsons out there that have brought

9    federal suits.

10        A.    Yeah.  I understand.

11        Q.    So you were sued as a party in Juan

12   Johnson's case or were you a third-party witness in

13   that matter?

14        A.    I think I was just -- you know, I'm not

15   sure.  I know I didn't have to testify in that case.

16        Q.    You mean at the trial?

17        A.    Right.

18        Q.    Did you sit through a trial in that

19   case?

20        A.    No, I did not.

21        Q.    And in both of those matters there were

22   co-defendants including Rey Guevara.  Isn't that

23   right?

24        A.    Well, I know Rey was.  I don't know who

25   else was there.

1      Q.    Right.

2           At least Rey Guevara wasn't in both of

3  those cases, correct?

4      A.    Rivera and Juan Johnson?

5      Q.    Yeah.

6      A.    Yes.

7           MS. BONJEAN:  Okay.  I don't know if

8  anybody notices this, Josh.  There's like this delay

9  when he starts to answer where he can't hear it

10  which is cutting off the beginning of his answers.

11          MR. ENQUIST:  There's no delay on this

12  end at all.

13          MS. BONJEAN:  Right.  I just don't --

14  listen, if Diane can get it, I'm saying when he

15  starts to answer, sometimes the beginning of his

16  answers are not there, and I don't want something to

17  get mistaken, for instance, if he said yes and he

18  really meant no.  You know, not a good thing.

19          I don't know if there's a solution to

20  that, but we can keep going.

21          MR. ENQUIST:  Yeah.  I'm not quite

22  sure.  If he's coming across more glitchy and

23  there's some issues with being able to understand

24  what he's saying, let us know, and I'm not sure what

25  we can do tech side here, but I'll try to figure

**12**

1    something out maybe.

2         A.    You want me to answer maybe slower?

3         Q.    Yeah.  I don't know what the issue is.

4    It's like when you start to answer it just --

5    there's no sound, and then we can piece it together

6    kind of what you're saying, but it's a little --

7    it's a lot of work for the court reporter, and let's

8    keep going and see how it shakes out.  Okay?

9         A.    Okay.

10        Q.    And you said there was a private matter

11   in which you were deposed.  What type of private

12   matter was that?

13        A.    It was at work.  I'm presently employed

14   with the Cook County Assessor's Office.  I'm chief

15   of investigations.

16             We investigate property that is --

17   claims are being made for exemptions and leases,

18   that kind of thing, but there was a -- my boss, my

19   immediate boss was suing an individual for -- I

20   think it was slander.  Some kind of political deal,

21   and then things were said, letters were written or

22   whatever.

23             So I had to briefly give a deposition

24   on that and testify in the trial as far as the work

25   going.

13

1     Q.     I see.  You weren't a named party to

2   that.  You were a witness?

3     A.     A witness.  That's all.

4     Q.     Okay.  Any other cases you can think of

5   in which you have been deposed other than the three

6   you have identified?

7     A.     No.  I can't think of any.

8     Q.     And have you been a party to a lawsuit

9   in any other cases other than the cases you've

10   identified and I think Jacques Rivera's case?

11     A.     No.  I don't think so.  No.

12     Q.     You don't think you've been sued in any

13   other cases other than Jack Rivera?

14     A.     No.  It's the only case I can think of.

15     Q.     Are you being sued in Geraldo

16   Iglesias's case presently?

17     A.     I think, yeah.  Yeah, it's come up.

18     Q.     I'm sorry?

19     A.     It has come up.

20     Q.     You are being sued in that case?

21     A.     I believe so.

22     Q.     So that's a pending matter in which you

23   are a defendant in a federal civil rights case,

24   right?  Right?

25     A.     Right.

**14**

1     Q.    Okay.  And any other, again, lawsuits

2  you can think of in which you are either currently

3  named as a defendant or have previously been named

4  as a defendant?

5     A.    Not that I could think of, no.

6     Q.    All right.  If anything comes to mind

7  along the way, will you please let me know?

8     A.    Sure.

9     Q.    And Iglesias's case, that's another

10  case in which Rey Guevara is a defendant, correct?

11     A.    I don't know.  You'd have to tell me.

12     Q.    So have you read -- have you read the

13  complaint, the lawsuit in that case?

14     A.    No, I have not.

15     Q.    Is there any reason you haven't read

16  the complaint in a case in which you've been sued?

17     A.    Say that again.

18     Q.    Is there any reason why you haven't

19  read the complaint in a case in which you are being

20  sued?

21     A.    I haven't gotten to that case yet.

22     Q.    Okay.  Do you have a copy of the

23  complaint?

24     A.    No.

25     Q.    Okay.  So you don't -- so how does this

15

1   work?

2              If I get sued, I get a complaint.  I

3   read it.  I'm concerned I'm being sued.  I look at

4   it.  I think that's a lot of people's experience.

5              What happens in your experience?

6   Having been sued now a couple of times, what

7   happens?

8              You don't -- you don't even get a copy

9   of the complaint or just the city lets you know

10  you've been sued?

11             And, again, I'm not looking for

12  communications with you and your attorneys, but,

13  generally speaking, how does the process work when

14  you get sued?

15       A.    I get notified by the attorneys, my

16  attorneys, and then they -- we take one case at a

17  time.

18             In this case, we have this one here,

19  and then this Iglesias case is coming up.  So we'll

20  get to that one after this.

21       Q.    So you don't necessarily take it upon

22  yourself to sort of dig in and figure out who the

23  person is, what the allegations are.  You just sort

24  of let your attorneys handle it, and when you need

25  to -- when you need to know, they'll let you know.

16

1   Is that right?

2          A.      Pretty much so.  Yes.

3          Q.      All right.  In the Rivera case, was

4   there a punitive awards or punitive judgment --

5   punitive awards judgment entered against you in that

6   case?

7          A.      What's that again?

8          Q.      In Jacques Rivera's case, was there a

9   punitive judgment entered against you, punitive

10  awards?

11         A.      Yes.

12         Q.      Okay.  What was the amount that was

13  entered against you?

14         A.      I thought it was 20,000.

15         Q.      You testified in that case, right?

16         A.      Correct.

17         Q.      You did not invoke your Fifth Amendment

18  right to remain silent there.  Is that fair?

19         A.      No.

20         Q.      And then am I correct that Edward

21  Mingey was also a defendant in that case, Jacques

22  Rivera's case?

23         A.      Yes.

24         Q.      And he did invoke his Fifth Amendment

25  right, right?

17

1      A.     I don't remember what he did.

2      Q.     Okay.  All right.  So any other cases

3  before we move on from here in which you have been

4  named as a defendant that you can think of?

5      A.     No, I cannot.

6      Q.     Any cases in which you've sued anybody?

7      A.     No, I have not.

8      Q.     What did you do to prepare for your

9  deposition here today?

10     A.     I read police reports.

11     Q.     And did you read the police reports in

12  Mr. Maysonet's file?

13     A.     Maysonet, yes.

14     Q.     I mean -- that wasn't a great question.

15            Did you read the police reports that

16  were prepared in connection with the double homicide

17  of the Wiley brothers?

18            MR. ENQUIST:  Objection to the form.

19  Go ahead.

20     A.     State it again.

21     Q.     Did you read the investigative file in

22  this case?

23     A.     Yes, cases.  I read case, press report

24  and my testimony.

25     Q.     All right.  So let me ask you this out

**18**

1    of the gate.

2              Did you have any independent

3    recollection of this particular investigation, this

4    being the investigation that resulted in Mr.

5    Maysonet's prosecution, prior to reading the reports

6    that you did in preparation for your deposition here

7    today?

8         A.    If I had any previous knowledge of it?

9    No.  I couldn't remember the case.

10        Q.    Yeah.

11              My question was did you have an

12   independent recollection of the case before reading

13   the reports?

14        A.    No.

15        Q.    That's a no?

16        A.    That's a no.

17        Q.    After reading the reports in the case,

18   did it refresh your recollection about the case that

19   we are here about today?

20        A.    Yes.

21        Q.    Okay.  All right.  Before we get there,

22   did you do anything else to prepare for your

23   deposition today?

24        A.    Talked to the attorneys.

25        Q.    Okay.  And, again, I'm not looking for

19

1    any answers that might reveal communications with

2    your counsel, but can you tell me how many times you

3    spoke to your attorneys in connection with the

4    deposition that you're here today on?

5           A.      Maybe three times.

6           Q.      And, in total, do you know how many

7    hours you spent talking to your counsel about a case

8    you were testifying about here today?

9           A.      I don't know.  I didn't keep track.

10          Q.      So I would like to just go through a

11   little bit of your background before we get to the

12   meat and potatoes of this case if you don't mind.

13                  I know presently you are not a Chicago

14   police detective.  Is that right?

15          A.      Correct.

16          Q.      So let's try to move through your

17   background as quickly as we can, but I may stop

18   along the way and ask some follow-up questions.

19   Okay?  Where did you grow up?

20          A.      In Chicago.

21          Q.      Particular neighborhood?

22          A.      South side around 47th and Cicero.

23          Q.      And remind me, sir, what your date of

24   birth is?

25          A.      ███████████████

20

1      Q.     Do you have any other members of your
2   family who were police officers?
3      A.     No.
4      Q.     What made you want to become a police
5   officer?
6      A.     I don't know.  It was steady work.  I
7   wanted to try it.  Give it a challenge.
8      Q.     Where did you graduate from high
9   school?
10     A.     St. Rita.  It's on the south side of
11  the city.
12     Q.     All boys school?
13     A.     Yes.  I think it still is today.
14     Q.     Is there a corresponding all girls
15  school too?
16     A.     Oh, I have no idea.
17     Q.     And what year then did you graduate
18  from high school?
19     A.     1971.
20     Q.     Okay.  What did you do after your
21  graduation from high school whether it be military
22  service, education, work?
23     A.     I went to school.  I started going to a
24  junior college.  Then I switched to electronic
25  school, technician school.  It was DeVry and then

21

1    graduated from there.

2         Q.     What junior college did you go to?

3         A.     City College, the Daley College.

4         Q.     What did you study there?

5         A.     Just general courses, English, things

6    like that.  Courses that needed to be taken,

7    requisites.

8         Q.     And then you switched gears and went to

9    a vocational school, right?

10        A.     Yeah.  It's technical school.

11        Q.     What did you study at DeVry Technical

12   School?

13        A.     Electronics.

14        Q.     And you studied electronics with the

15   goal of doing what with that knowledge?

16        A.     To be electronic technician.

17        Q.     Did you graduate from DeVry?

18        A.     Yes.

19        Q.     What year did you graduate?

20        A.     Tough.

21        Q.     If you don't know --

22        A.     1973.

23        Q.     I know.  If it's an estimate, that's

24   fair enough.

25               Okay.  So you graduated in 1973 with a

22

```
 1    degree in electronics, and did you end up using that
 2    degree to do electronic technical work or whatever
 3    they would call it?
 4            A.      Yes, I did.
 5            Q.      Where did you go to work?
 6            A.      I went to work for Lowry Electronics.
 7    They basically made electronic organs.
 8            Q.      This sounds really ridiculous.  You're
 9    talking about the instrument or the body?
10            A.      Yeah, the instrument that you play.
11    Yeah, electronic organ.
12            Q.      How long did you do that?
13            A.      A few years, two, three, four.  I don't
14    remember.
15            Q.      Okay.  Couple years.
16                    Then what did you do?
17            A.      Then I -- what did I do?  I went to
18    another company.  I think it was called Automatic
19    Electric, and there was just constructing -- it's
20    kind of hard to explain, but it was doing wiring for
21    buildings, electronics, telephones, things like
22    that.  You had to use blueprints.
23            Q.      Okay.  And how long did you do that
24    roughly?
25            A.      Not long.
```

23

1      Q.    Well, what about after -- after working

2  for the -- what was it called?  I can't read my

3  writing.

4      A.    Lowry Electronics.  Automatic Electric.

5      Q.    Automatic Electric, you worked there

6  for a little bit, and then where did you go?

7      A.    Then I think I went to the police

8  department.

9      Q.    Okay.  So what year was it that you

10  applied to be a Chicago police officer?

11      A.    I'm guessing.

12      Q.    Okay.  When were you hired by the

13  Chicago Police Department?

14      A.    November of 1977.

15      Q.    So would it be fair to say that,

16  between your graduation from high school in 1971 to

17  the hiring of yourself in November of 1977 by the

18  Chicago Police Department, you completed some

19  schooling and then worked largely as I guess an --

20  someone doing electrical -- I don't know.  It's not

21  electrician, right?

22      A.    No.  It's not electrician.  No.  That's

23  a whole different field.

24      Q.    Right.

25           What do you call it?

**24**

1          A.      It's electronic technician.

2          Q.      Got it.  Okay.

3                  So between 1971 and 1977 you went to

4    school and then you became an electronic technician

5    and worked in that field.  Is that right?

6          A.      Correct.  Yes.

7          Q.      And then in November of 1977 you

8    shifted gears altogether and became a Chicago police

9    officer, correct?

10         A.      Yes.

11         Q.      And I'm assuming you did not serve in

12   the military at any point then.  Is that right?

13         A.      No, I did not.

14         Q.      Okay.  Now, after your hiring by the

15   Chicago Police Department in November of 1977, did

16   you complete a police academy?

17         A.      Yes.

18         Q.      And how long was the police academy, if

19   you remember?

20         A.      I'm not sure.  The whole period back

21   then I believe went for you're on probation for 18

22   months from the day you started and 18 months and

23   then that was it.  In the academy, I don't know.

24   I'd be guessing.

25         Q.      And can you summarize for me what --

25

1   what the academy involved in terms of training?

2          A.     We had a lot of classes, physical ed.,

3   firearms training, the law, policy and procedures of

4   the department, rules and regs.  Regulations I

5   should say.

6          Q.     And when you say rules and regs, you're

7   talking about rules and regs of the Chicago Police

8   Department?

9          A.     Yes.

10         Q.     And, also, you looked at the policies

11  and procedures of the Chicago Police Department?

12         A.     Yes.  They were called general orders.

13         Q.     And what -- if you were to explain to

14  somebody who had no knowledge about what you did as

15  a Chicago police officer, how would you describe

16  what a general order is?

17         A.     It's the general policy of the police

18  department.  Procedures I believe.  I don't remember

19  how much how it is.

20                They also had special something.

21  Special orders or whatever that they used, and I

22  couldn't -- I can't tell you the difference between

23  it now.  I don't remember.

24         Q.     Were these orders that dictated how you

25  should conduct your job as a Chicago police officer?

26

1      A.      Yeah, one of them did.

2      Q.      Okay.  And did it give you, as a

3  Chicago police officer, guidance on what was

4  acceptable practices in carrying out your

5  responsibilities as a law enforcement officer?

6      A.      Yes.  You could say that.

7      Q.      You said you also studied law, and tell

8  me a little bit about that.

9      A.      We were required by the state to have

10  so many hours of curriculum, and part of that

11  curriculum is -- a portion of it is for law.  How

12  many hours it is, I have no idea.  I don't remember.

13      Q.      Okay.  And does that mean you were

14  required to sort of keep up with the developments of

15  law in criminal practice or constitutional law, that

16  type of thing?

17              MR. ENQUIST:  Object to the form.  It's

18  vague, confusing.  Go ahead.

19      Q.      If you understood.  I can rephrase if

20  you don't.

21      A.      Ask me again.  What are you asking?

22      Q.      So in terms of studying the law, okay,

23  as part of the police academy, did that cover such

24  matters as what was -- what the courts were

25  requiring in terms of procedure, constitutional

27

1    laws?  It relates to arrest.  Those types of things?

2         A.    Yes.

3         Q.    Okay.  Still not well phrased, but just

4    so long as you understood what I meant.

5         A.    I understand.

6         Q.    Okay.  And then, for instance,

7    something like report writing as an example, was

8    that something that you covered in the police

9    academy?

10        A.    Yes.

11        Q.    All right.  Now, after you completed

12   the police academy, what was your first assignment?

13        A.    You're frozen.

14        Q.    Yeah.  You're frozen for me too.

15              (Whereupon, a discussion was held off

16   the record.)

17        Q.    All right.  Moving on, what was your

18   first assignment after the police academy?

19        A.    I was assigned to the Second District

20   at 51st and Wentworth.

21        Q.    And the second district at 51st and

22   Wentworth, what year was that?  What year would that

23   have been?

24        A.    1978.

25        Q.    All right.  In 1978, were there violent

28

1    crimes divisions?

2          A.     Where?

3          Q.     In the Chicago Police Department, were

4    there violent crimes division within the Chicago

5    Police Department, like Area 1, 2?

6          A.     They had areas at the time.  Yeah.  I

7    don't know how they were divided up in the detective

8    division.

9                 Over the years the names have changed.

10   They'd call it violent crimes.  They'd call it

11   homicide.  They'd call it sex unit, homicide and

12   sex.  I don't know.

13         Q.     So at Second District, I assume you

14   were assigned as a patrol officer.  Is that right?

15         A.     Yes.

16         Q.     And what were your duties and

17   responsibilities as a patrol officer assigned to the

18   Second District at 51st and Wentworth in 1978?

19         A.     I worked a beat car.  Mainly, it was in

20   the public housing buildings.  So it was just

21   patrol.  It was vertical patrol, answer calls, do

22   reports.

23         Q.     What's vertical patrol mean?

24         A.     Walking the building like up the 18th

25   story and then back down.

1      Q.     And which public housing building were
2  you working in primarily?
3      A.     I primarily -- I couldn't tell you.
4  There was Stateway Gardens.  There's another one.
5      Q.     Is that Robert Taylor homes or no?
6      A.     Robert Taylor homes were on 48th street
7  I believe, and Stateway Gardens were -- I'm not sure
8  anymore.
9              I was assigned different beats
10 different times to work with different people,
11 especially when you're new.  You're new.  That's
12 what you do.
13     Q.     And did you work with a partner or by
14 yourself?
15     A.     A partner.  A training officer most of
16 the time.
17     Q.     And I assume you would sometimes make
18 an on-scene arrest if you saw someone committing
19 crimes?  Is that one of your responsibilities?
20     A.     Yes.
21     Q.     Was there a lot of drug activity in the
22 housing projects in 1978?
23     A.     Yes.
24     Q.     So would it be fair to say, just as an
25 example, if you saw someone doing a hand-to-hand

1    transaction in one of the public housing buildings,

2    that would be something that you could investigate

3    on the scene and make an arrest, if necessary?

4         A.    Yes.

5         Q.    Now, if there was something more

6    violent that occurred, like a murder, I'm assuming

7    you were not responsible as a patrol officer in the

8    Second District to investigate that type of crime

9    back in 1978 when you were assigned to the Second

10   District, right?

11        A.    I do a preliminary investigation.

12        Q.    Okay.  And then somehow I guess the

13   detective division would then be notified.  Is that

14   right?

15        A.    Correct.  Yes.

16        Q.    Okay.  So, in 1978, if there was a

17   violent crime that occurred at the -- in a public

18   housing building within Second District, which

19   detective division would respond?  Do you remember?

20        A.    Area 1.

21        Q.    Okay.  How long did you work at -- in

22   the Second District as a patrol officer?

23        A.    About three years I believe.  Somewhere

24   in there.  I'm not sure anymore.

25        Q.    Did you say three -- I'm sorry.  You

1    cut out right at the beginning there.

2         A.    About three years.  Maybe four.

3         Q.    Okay.  Did you work with the same

4    partner the entire time or did you change it up?

5         A.    Changed.  Changed partners.

6         Q.    And when you say change, was it like

7    every day at roll call you'd have a different

8    partner or did you have like partners for extended

9    periods of time and then maybe you might have

10   another one, you know, a year later or something?

11        A.    Yeah.  They would change.  You'd work

12   with one individual for a while and then they change

13   you up with somebody else.

14        Q.    Do you recall any of your partners from

15   your days -- early days at Second District?

16        A.    No.

17        Q.    These are not people that you stayed in

18   contact with over the course of your career, right?

19        A.    I did not.

20        Q.    Now, after your stint at Second

21   District as a patrol officer, where were you

22   assigned?

23        A.    I went to -- I stayed in the same

24   building at 51st and Wentworth and went to a unit

25   called special operations group.

32

1      Q.      Is that SOP?

2      A.      SOG.

3      Q.      SOG?

4      A.      SOG.  Yeah, special operations group.

5      Q.      And your rank was patrol officer,

6  though, correct?

7      A.      Yes.

8      Q.      And what did you do as a patrol officer

9  in the special operations group?

10              I'm guessing this is now we're now into

11  the early 1980s, right?

12      A.      Yes.

13      Q.      Okay.  What did you do there?

14      A.      That unit was specifically made to

15  handle -- to be mobile across the city.  There were

16  three areas at the time doing the same thing.

17              We were assigned to the south side

18  districts.  So wherever there were special needs or

19  special problems that arose in neighborhoods, then

20  we would go in there and flood the areas.

21      Q.      And when you say special problems, what

22  do you mean by that?

23      A.      Well, there might be a burglary mission

24  going on, a problem with burglaries.  There may be

25  auto thefts out of one area.  There may be

33

1   robberies.  It could be sexual assaults.  So they

2   would send us in there as a group.

3        Q.    Okay.  And how many people made up the

4   south side unit of the SOG when you were there?

5        A.    I can't remember.

6        Q.    I mean, generally, was it like 10 or

7   was it like a handful or did it vary?

8        A.    No.  There were -- you always worked

9   with a partner.  There pretty much you worked with

10   the same person.  Yeah.

11           There were a lot of -- in an evening

12   you might go out with -- there might be 10 cars

13   assigned.

14        Q.    Okay.  Did you work --

15        A.    I'm just guessing.  I don't know how

16   many people were in the unit.

17        Q.    That's fine.

18           Did you work in plain clothes or

19   uniform?

20        A.    Uniform.

21        Q.    Would you call in a sort of special

22   tactical group?

23        A.    You could say that.

24        Q.    And it was generally -- it was a

25   citywide -- there was citywide units that would

**34**

1  address specific trends of crime in different areas.

2  Is that right?

3      A.    I don't know if you'd call it citywide.

4  Once in a while we'd be sent to the north side of

5  Chicago.  I only remember a couple instances that we

6  did up in the Humboldt Park area.  There might be a

7  gang problem up there that's just overwhelming a

8  district.  Say the 14th District.

9          So they'd send us in there to work in

10  the 14th District.  Most of the time our time was

11  spent on the south side probably in Englewood,

12  Second District, those type of places, because they

13  had a high crime rate.

14      Q.    Okay.  And how long were you assigned

15  to the special operations group?

16      A.    Maybe three years.

17      Q.    Okay.  So this would have been --

18  again, I'm going to estimate.  You tell me if I get

19  this right.  Maybe like from '81 to '84?

20      A.    That could be right, yeah.  I'm not

21  sure.

22      Q.    What was the predominant gang on the

23  south side where you were primarily working between

24  1981 and 1984, gang or gangs?

25      A.    Well, you had the Disciples.  There

1  were a lot of little offshoot gangs there,

2  especially in the projects.  That's about it.

3      Q.    Okay.  But the gang the Disciples was

4  one of the larger gangs operating on the south side

5  during that time period.  Is that right?

6      A.    They were large, but, also, we had the

7  El Rukns.  They had their -- what you call their

8  fort at 39th and Oakwood I believe it was.

9      Q.    Were the Disciples and the El Rukns

10  friends or foes?

11      A.    I'm not sure anymore.

12      Q.    Okay.  At the time, did you have to

13  become familiar with the inner workings of these

14  gangs?

15      A.    At that time, no.  It wasn't a real

16  responsibility of ours.

17      Q.    So when you said, for instance, like

18  you might have been called out to the 14th District

19  if they were having a real issue with gangs up in

20  Humboldt Park, what specifically was your role then

21  with this, quote/unquote, gang problem as a remember

22  of the SOG?

23      A.    Well, we would monitor the district

24  radio and maybe respond to calls of shots fired or

25  whatever the case may be, suspicious vehicles, that

36

1   kind of thing.

2        Q.    Got it.

3              It wasn't your job, for instance, to

4   gather intelligence.  Would that be fair?

5        A.    No.  No.

6        Q.    Okay.  If you happen to gather some

7   intelligence about some gang activity, whether it

8   was on the south side or up in any other area, would

9   you -- how would you pass that information along to

10  the appropriate people?

11       A.    Part of the SOG unit became gang

12  specialists.  Her name was changed, I don't know

13  what year, to the gang crimes unit, and within that

14  unit, we were gang tactical officers.

15             They changed our name for whatever

16  reason, politics or whatever, and then there were

17  actually gang specialists that investigated gang

18  cases.

19       Q.    Do you know what -- well, strike that.

20             Let me make sure I understand that.

21  You're saying that at some point the SOG converted

22  or was folded into the gang crimes unit.  Did I get

23  that right or am I misstating what you testified to?

24       A.    No.  You're pretty much right.  They --

25  I think Jane Byrne was the mayor at the time, and

1   there was a big gang problem.  So they created this

2   gang unit.  They didn't create it.  They just

3   changed the name of it and kind of changed our

4   duties a little bit.

5                  Mostly, we would sometimes support the

6   gang specialists in their -- whatever they had

7   going.  They would ask for help or whatever, and

8   then that's what we would do, but we were still

9   basically a patrol unit.  They would go into certain

10  areas.

11                 So we may not work maybe in Englewood

12  for two days and then go somewhere else for a few

13  days or whatever.

14       Q.     And when you were working in the SOG

15  mobile unit, was there a separate gang crimes unit

16  or there was not such a thing?

17       A.     I believe there was.  I'm not too sure

18  about it.  They came out of Maxwell Street was the

19  gang office for the city.

20                 I'm not sure how that worked.  So I

21  don't know.

22       Q.     Okay.  Okay.  So you said you worked in

23  the SOG mobile unit from, I don't know, I guess

24  sounds like to about '84-ish.

25                 Where did you go after that?

38

1      A.      I got promoted to gang crimes

2  specialist.  I can't think of the year, and

3  promotion -- the only opening they had was for me to

4  go to Belmont and Western office.  That was gang

5  crimes north.

6      Q.      So it was considered a promotion to go

7  from working the -- working in patrol to becoming a

8  gang crimes specialist.  Is that right?

9      A.      Yes.

10     Q.      And did you get that position because

11  you applied for it, someone offered it to you?  How

12  did it come about that you became --

13     A.      A test.

14     Q.      Hold on a second.

15             How did it come about that you were

16  promoted to gang crimes specialist?

17             You can answer.  Thank you.

18     A.      I took a test and then an interview.

19     Q.      Can you tell me what -- can you tell me

20  what -- what the test involved to the best of your

21  recollection?

22             Was it a written test, for instance?

23     A.      I don't know.  I'm not sure.  No.

24     Q.      Okay.  So you took a test.  I mean do

25  you remember answering questions or --

39

1          A.     No.  There was some writing to it.  I
2     believe questions, probably a few, and then after
3     you passed that, then -- if you did, then you got to
4     do the interview part.

5                I'm not sure if it was part of the
6     whole thing or it was separate or whatever the case
7     may be.  I'm not sure anymore.  Too many years ago.

8          Q.     Okay.  Do you remember what the
9     nature -- the subject matter of the written
10    component was at all?

11         A.     Street gangs.

12         Q.     Okay.  I mean was it testing your
13    existing knowledge of street gangs or something
14    else?

15         A.     I don't remember.

16         Q.     Okay.  And the interview component,
17    what was involved with interviewing to become a gang
18    crimes specialist back in the mid-'80s?

19         A.     If you faced a panel of people,
20    officers, higher rank, I don't know how many, and
21    they just asked you questions.

22         Q.     If someone wanted to become a gang
23    crimes specialist back in the mid-'80s, what was
24    your understanding of what made a good gang crime
25    specialist or what the chain of command was looking

**40**

1  for in a good gang crimes specialist?

2         MR. RAHE:  This is Austin Rahe.  I'm

3  going to object to form and foundation.

4      Q.    I'm sorry.  Did you answer?

5      A.    I don't know.  What was the question

6  again?

7      Q.    Sure.

8            What was your understanding of what

9  your chain of command or your -- the higher ranking

10  officers who were part of the interview process were

11  looking for, what they were trying to find out to

12  see if you would be an appropriate gang crime

13  specialist?

14     A.    I have no idea.  I don't remember.

15     Q.    Okay.  Do you remember anything about

16  the interview that took place?

17     A.    No.

18     Q.    Not a thing?

19     A.    Only that I went.

20     Q.    Okay.  Well, you know, did they ask you

21  what you like to eat?

22     A.    I don't know.  No.  I don't know.  I

23  have no idea.  I don't remember any of the

24  questions.

25     Q.    I understand you don't remember the

41

1    questions, but do you remember at all what sort of

2    the general tone was of what they were looking for?

3          A.      Probably your knowledge of street

4    gangs.

5          Q.      Do you know whether they reviewed your

6    internal affairs history to determine whether you

7    were -- or complaint register history whether you

8    were an appropriate or suitable person to work as a

9    gang crime specialist?

10               MR. ENQUIST:  Object to foundation,

11   calls for speculation.  Go ahead.

12         A.      No.  I have no idea.

13         Q.      Do you remember being asked any

14   questions about your complaint history, if such

15   existed, during your interview process?

16         A.      I don't remember.

17         Q.      All right.  Do you know how many people

18   were interviewing for a position with the gang -- as

19   a gang crimes specialist at the time that you were

20   applying?

21         A.      No.

22         Q.      Was it a particularly desirable

23   position?

24               Was it like a competitive position I

25   guess is a better way to put it?

42

1        A.    I don't know if it was competitive.  It

2  was an increase in salary.  Different type of work.

3        Q.    Okay.  What were the perks associated

4  with becoming a gang crimes specialist?

5        A.    Perks?

6        Q.    Yeah.  You got increased salary.  What

7  else?

8        A.    A lot of times you worked plain

9  clothes.  It was a different type of work, a

10  different challenge.

11        Q.    You did say, though, that it was

12  considered a promotion, right?

13        A.    Yes.

14        Q.    And you applied for the position with

15  gang crimes north, right?

16        A.    I applied to take the test.

17        Q.    Okay.  So am I correct then that people

18  would -- the people who are interested in applying

19  might take the test and an interview and then you

20  would begin an assignment or did you actually apply

21  for a particular unit?

22        A.    They asked you if you were going to get

23  promoted.  In my case, they just said that the only

24  openings they had were up north.

25        Q.    All right.  So -- and that was at

43

1   Belmont and Western?

2       A.      Correct.  Yes.

3       Q.      And do you remember what year it was

4   that you became a gang crimes specialist at Belmont

5   and Western?

6       A.      1986 maybe.  I'm not sure.

7       Q.      Okay.  Well, let's see if we can work

8   backwards.  Do you remember when you became a

9   detective?

10      A.      It was 1990.

11      Q.      Okay.  So did you hold any other

12  positions between 1986 and 1990 other than a gang

13  crimes specialist?

14      A.      No.

15      Q.      Okay.  So between 1986 and 1990, it

16  sounds like you worked as a gang crimes specialist,

17  right?

18      A.      Yes.

19      Q.      And during that entire period, were you

20  assigned to gang crimes north?

21      A.      Yes.

22      Q.      And between 1986 to 1990, where was

23  gang crimes north physically located?

24      A.      Belmont and Western, Western Avenue.

25      Q.      And were there any other police

44

1    district or units of any kind that worked out of

2    Belmont and Western between 1986 and 1990 other than

3    gang crime specialist or the gang crimes unit?

4          A.     Yes.

5          Q.     What were they?

6          A.     Belmont and Western was an area

7    headquarters.  So on the second floor you had all

8    your detective divisions up there.  You had -- I

9    believe at the time the 19th District was located in

10   there.  I believe youth division also in the area.

11   That's all I know.

12         Q.     What area was located at Belmont and

13   Western between 1986 and 1990?

14         A.     What do you mean what area?

15         Q.     You just said there was an area --

16   there was -- you just said that there was an area

17   detective division there.  What was it?  Which one

18   was it?

19         A.     At that time, it was I believe Area 3.

20         Q.     Area 3?

21         A.     I believe so.

22         Q.     All right.  You said the 19th District

23   worked out of Belmont and Western, and then there

24   was a youth division there and then Area 3 detective

25   division, right?

45

1    A.    Yes.

2    Q.    And then also gang crimes north.  Is

3  that right?

4    A.    Correct.  Yes.

5    Q.    What were the geographical boundaries

6  of gang crimes north meaning -- let me rephrase

7  that.

8          I assume gang crimes north was

9  responsible for doing whatever gang crimes

10 specialists did in a particular geographical area.

11 Is that right?

12   A.    Right.  Correct.

13   Q.    And what was that geographical boundary

14 that you worked in as a gang crimes specialist?

15   A.    I don't know if I can remember all the

16 boundaries, but it was basically the north third of

17 the city.  It would be from the lake to whatever

18 north side street is.  We'd cut across and then went

19 all the way west to -- through Austin neighborhood

20 and the south maybe -- I mean the streets didn't go

21 straight across.  So I don't really remember.

22   Q.    Did it encompass Humboldt Park?

23   A.    Yes.

24   Q.    The gang crimes unit at Belmont and

25 Western between 1986 and 1990 was -- sounds like it

1    was made up of gang crimes specialists, right?

2        A.    Yes.

3        Q.    Were there also gang crimes tactical

4    officers working out of Belmont and Western?

5        A.    Yes.

6        Q.    Can you explain for me what the

7    difference is between a gang crimes specialist and a

8    gang crimes tactical officer?

9        A.    I'll try.  For the most part, in

10   general, tactical officers were just assigned as we

11   were on the south side to problem areas or problem

12   districts to head off whatever shootings and things

13   like that.

14            The gang specialists' job was to

15   investigate -- not only take up patrol in a certain

16   area, but also to investigate gang-related cases.

17       Q.    Okay.  Bear with me.  I want to break

18   that down a little bit.

19            When you say investigate gang crimes

20   cases, first, I want to focus on, when you say

21   investigate, what do you mean?

22       A.    We would -- we would assist the

23   detective division in there because they had the

24   overall responsibility for the case.

25            So we would assist them with a lot of

47

1   the footwork that goes on as gang investigators,

2   talking to people, things like that.

3        Q.    Fair to say that, as a gang crimes

4   specialist, you worked pretty closely with the

5   detective divisions?

6        A.    Yes, I would say so.

7        Q.    And would that include both Area 3 and

8   then different areas since you were covering not

9   just Area 3, but it sounds like you were covering

10  other detective divisions?  Is that right?

11       A.    Right.

12       Q.    Was part of your responsibility to

13  gather intelligence on gangs as a gang crimes

14  specialist?

15       A.    Yes.

16       Q.    And, for instance, were you ever

17  qualified as a gang crimes expert in your career as

18  a Chicago police officer?

19       A.    I don't think so.  No.

20       Q.    Okay.  Did you ever testify as a gang

21  crimes expert in any criminal proceeding in which

22  you testified?

23       A.    Not that I can remember.

24       Q.    Okay.  Did you have a gang that you

25  were particularly knowledgeable about that sort of

1  was your -- your specialty, if you will?

2      A.      After the gang specialists were

3  assigned gangs, certain gangs when we were on the

4  north side, and you would have to leave reports, I

5  think they were call synoptic reports, you would

6  type these up and then they would be sent through

7  channels to downtown office, and I believe we did --

8  I'm not sure.  Maybe every six months we had to do

9  that.

10      Q.      And what type of information went into

11  a synoptic report?

12      A.      About your gang, who was in prison, who

13  came out of prison, girlfriends, cars, new members.

14      Q.      First, let me ask you this.  What was

15  your gang?

16      A.      I got the Latin Kings at Leavitt and

17  Schiller, and I had the Insane Unknowns.  They were

18  off of -- if I can remember.  I don't remember their

19  area.

20      Q.      Was it somewhere in K-Town?

21      A.      K-Town was out west.  No.

22              The Insane Unknowns were around Wicker

23  Park, in that area.  So like --

24      Q.      I'm sorry.  Go ahead.

25      A.      North of Damon maybe or something like

49

1    that.  Yeah.

2          Q.     And then you said Latin Kings from a

3    particular set, Leavitt and Schiller you said?

4          A.     Section.

5          Q.     Right.

6                 The section at Leavitt and Schiller?

7          A.     Right.  Yes.

8          Q.     Was that a particularly large section

9    of the Latin Kings?

10         A.     I don't know.  I'm not sure.

11         Q.     I mean you're not sure or you forgot,

12   because it sounds like, as a gang crimes specialist

13   who was assigned the Latin Kings section of Leavitt

14   and Schiller and had to write synoptic reports every

15   six months, that's something you would know.

16                Are you saying you forgot or you never

17   knew how large they were?

18         A.     No.  They had their boundary, their

19   section.  They went from, let's see, North Avenue to

20   Division and then on the east end maybe Damon to

21   Western Avenue.

22         Q.     How many sections of Latin Kings

23   existed within gang crimes north when you were there

24   between 1986 and 1990 roughly?  Do you know?

25         A.     I don't know.

50

1      Q.      Was it a lot, like hundreds, or was
2  it -- you know --
3      A.      I have no idea.  There were other
4  sections, but I don't know how many.
5      Q.      And, again, is that because you don't
6  remember right now or because you never knew?
7      A.      I don't remember.
8      Q.      All right.  So these synoptic reports
9  that you had to prepare every six months that were
10  sent you said through channels and eventually
11  channel -- when you say channels, what do you mean
12  by that?  Where were they sent?
13      A.      Chain of command.
14      Q.      And when -- the chain of command would
15  be your superiors up through superintendent?
16      A.      I don't know if the superintendent read
17  them, but they went to our gang office, and then
18  they were sent to the main gang office downtown.
19      Q.      Okay.  Where was the main gang office
20  located downtown?
21      A.      At that time, 11th and State.
22      Q.      All right.  Yeah.
23              I'm talking about this period of time
24  which you were a gang crimes specialist, obviously,
25  which sounds like 1986 to 1990-ish, right?

51

1          A.      Yes.

2          Q.      How did you go about obtaining the

3     information for preparation of your synoptic

4     reports?

5          A.      You talked to the members on the

6     street, get to know them, nicknames.

7          Q.      If someone was coming out of prison,

8     how would you get that information, for example?

9          A.      You'd know who was -- you had to check

10    who was in prison, for how long, things like that.

11               Sometimes we would have -- once in a

12    while, you talk to the prison guys, the guards.

13    They had a unit.  Some of these prisons that had --

14    they had -- some of them had a gang unit within

15    them, within the prison.

16               So you would stay in contact with them

17    and see what's going on, things like that.

18         Q.      Back in 1986 through 1990, how would

19    you do your communication with like -- as an

20    example, you just used like guys working in a

21    prison -- in the prisons or in a gang unit in the

22    prisons.  Was it by telephone, by email?

23               How did you actually communicate with

24    your colleagues?

25         A.      It wasn't very often.  I didn't do that

52

1  a lot of times.  It was probably by phone.

2       Q.     And did you develop sources on the

3  street?  Is that one way in which you developed

4  information?

5       A.     I tried to find out who people are

6  within the gang, how many members, things like that.

7       Q.     And, again, would that be through

8  sources within the gangs?

9       A.     Gang members?

10      Q.     I guess, yeah.

11      A.     Yeah.  We'd talk to them.

12      Q.     And you just talked to them on the

13  street and they gave you information about their

14  gangs?

15      A.     Sometimes.

16      Q.     You sometimes bring them in and talk to

17  them at the police station about their gangs?

18      A.     Usually, just on the street.

19      Q.     What about if someone was under arrest

20  and, you know, you wanted to -- for something not

21  even serious like a mob action or gang loitering?

22             Did you sometimes pop in to ask them

23  questions?

24      A.     We might, yes.

25      Q.     And was it through that topic that you

53

1    sometimes were able to develop information?

2          A.     We were, but information was as good as

3    the person giving it to you.  So you had to verify

4    it.

5          Q.     And how did you go about verifying

6    information --

7          A.     Other sources.

8          Q.     Let me finish my question.  I'm sorry.

9          A.     I'm sorry.

10          Q.     That's all right.  If you got

11    information from a gang member who was either on the

12    street or custody, how would you go about verifying

13    that information?

14          A.     Talk to other gang members.

15          Q.     So you would verify gang members' tips

16    or information from other gang members?

17          A.     Yes.

18          Q.     How did you find out when somebody

19    became a new member of a gang?

20          A.     A lot of times you would see new people

21    on the street because you basically stayed in your

22    area for the most part unless you were doing another

23    type of police function, but you would always visit

24    where you were assigned, and, you know, they were

25    hanging out on the corner.  So you'd see who's

54

1    there.

2                  After a while, you get to know each

3    other.

4        Q.    I see.

5                  So you would make a determination of

6    whether someone was a member in part because they

7    were hanging out with other members in a particular

8    geographic area, right?

9        A.    Yes.

10       Q.    What about like clothing?  Would that

11   be an indicator to you if somebody had on particular

12   colors or something like that?

13       A.    Back then, they were -- there wasn't so

14   much anymore wearing colors.

15                 Once in a while, they did, but they

16   didn't want to do that for fear of being -- well,

17   for different reasons.

18       Q.    You mean like being identified as a

19   particular gang member?

20       A.    Yeah.  If you wore black and gold and,

21   you know, then you got a problem if you leave your

22   territory.

23       Q.    Right.

24                 And how did you determine such things

25   as who a gang member's girlfriend is?

55

1      A.      Who they're with.

2      Q.      Again, would that just be observing who

3  they're hanging out with?

4      A.      Yes.

5      Q.      Did you also gather information about

6  what type of cars they drove?

7      A.      Yes.

8      Q.      So in addition to these synoptic --

9  well, strike that.

10              These synoptic reports that you said

11  were prepared every six months and then sent up the

12  chain of command, did the unit itself maintain a

13  copy of those synoptic reports within the gang

14  crimes office?

15              MR. ENQUIST:  Object to foundation.  Go

16  ahead.

17      A.      I'm not sure, but I believe so.

18      Q.      All right.

19      A.      I'm not sure, though.  I'm not sure.

20      Q.      Okay.  All right.  There were other

21  sources of information that were maintained in the

22  gang crimes unit that -- well, strike that.

23              There were other -- there were other

24  ways in which a gang crimes specialist organized

25  information about gang crime members within the

1  unit, correct?

2          MR. ENQUIST:  Object to the form,

3  vague.

4      Q.    If you understand.  If not --

5      A.    Yes.

6      Q.    Okay.  Can you tell me what those other

7  ways in which you might organize information that

8  you developed about members of the various gangs

9  within gang crimes north?

10      A.    We kept books of photos.  They were

11  basically IR arrest photos.

12      Q.    Okay.  And were they organized -- these

13  books of IR arrest photos, how were they organized?

14      A.    By gang.

15      Q.    Were they in binders?

16      A.    Yes.

17      Q.    And were they maintained at Belmont and

18  Western in the gang crimes office there?

19      A.    Our office, yes.

20      Q.    All right.  So if you wanted to find

21  out who the Latin Kings were from Leavitt and

22  Schiller, you could actually pull out a binder and

23  at least see individuals who were arrested and

24  presumed Latin King members from this section,

25  correct?

57

1      A.      Not specifically Leavitt and Schiller.
2  It was the Latin Kings.
3      Q.      I see.
4              What about -- Latin Kings was a big
5  gang, right?
6      A.      Yes.
7      Q.      Insane Unknowns smaller gang, right?
8      A.      I would say so.  At that time, yes.
9      Q.      So let's just say, if you wanted to get
10  an idea of who were the members of the Insane
11  Unknowns, you could go to the gang crimes office and
12  pull out the binders for Insane Unknowns' binders,
13  and it would contain arrest photos of individuals
14  who the department viewed as Insane Unknowns, right?
15      A.      Who the gang unit identified, yes.
16      Q.      Okay.  Who the gang unit identified as
17  Insane Unknowns that had arrest photos, right?
18      A.      Yes.
19      Q.      Was there any information apart from --
20  well, strike that.
21              Was there any other information on
22  those photographs that were assembled into these
23  binders and organized by gang names or gangs?
24      A.      What do you mean on the pictures?
25      Q.      Yeah.

58

1          On backs of pictures, was there any

2    other information other than the photographs

3    themselves that were maintained in these binders to

4    which you referred us?

5          A.    Yes.  There were what they call gang

6    cards.  So when an individual is arrested, you fill

7    out a card with the particulars.

8          Q.    And were the cards actually placed in

9    the binders or were they organized in a separate

10   location?

11         A.    Separate file.

12         Q.    Okay.  And this would be -- there was a

13   gang card, like an index card, right?

14         A.    Correct.

15         Q.    And those -- there was -- those gang

16   index cards were organized, and then they were

17   organized -- instead of me -- let me ask it this

18   way.

19              You said the particulars.  How were the

20   gang -- the gang cards organized?

21         A.    I believe they were by the name and

22   then a nickname.

23         Q.    Was this file sometimes called the

24   nickname file?

25         A.    It could have been.  Not sure.

59

1       Q.     What did you call it?

2       A.     Nickname file.  That's a good name for

3 it.

4       Q.     What did you call it back then?

5       A.     I don't remember.

6       Q.     It sounds like you called it a nickname

7 file?

8       A.     Could be.

9       Q.     All right.  So we had -- let me just

10 get some clarity, though, first, because it probably

11 was the fault of my question.

12            Going back to the binders with the

13 arrest photos, was there any handwritten information

14 anywhere on those photos or was it just the photos

15 themselves in the binders?

16            We're not talking about the nickname

17 file, but the binders.

18       A.    In the binders there were no notes

19 written on the cards other than a number.

20       Q.     Were there cards in the binders?

21       A.     No.

22       Q.     Okay.  You said cards.  So I guess I'm

23 getting confused.  You said there were no notes?

24       A.    I said there was a number by the

25 picture.  Maybe I said it wrong.  I'm sorry.

60

1      Q.    That's all right.  I'm just trying to
2  understand.
3            So there were IR photos that had a
4  number associated with them, right?
5      A.    Yes.
6      Q.    Okay.  And was that number on the back
7  of the photo or on the front of the photo?
8      A.    On the front.
9      Q.    Okay.  Are you talking about -- okay.
10           So some IR photos, at least the older
11 ones, people actually held placards.  Remember that?
12           I said, at least in some IR photos that
13 I've seen, individuals might have a placard in front
14 of them, a plaque?
15     A.    I don't understand.  A fax you said?
16     Q.    A plaque, a placard.  They're holding
17 up a --
18     A.    Oh, yes.  Yes.  I'm sorry.  Yes, a
19 placard.
20     Q.    That's what they called them, right?
21     A.    Right.  Correct.
22     Q.    Are you referring to that or was there
23 actually also a handwritten like IR number, case
24 number or something like that?
25     A.    No.  There was a little number I

1  believe on a little sticky that went in there.

2       Q.    Okay.

3       A.    And that page had four pictures in a

4  plastic, clear, and there were numbers to the side

5  of it, just one number, and you would flip these,

6  and it would be four more and four usually.  That's

7  how it is.  Basically, that's how it was done.

8       Q.    And those numbers were associated to

9  what?

10       A.    The name of the person and an index

11  within the book.

12       Q.    Got it.  Okay.

13             So the book had photographs and like a

14  number on a sticky and then that corresponded to an

15  index that will tell you the name of that person,

16  right?

17       A.    Right.

18       Q.    What other information other than the

19  name of the person could you find out from this

20  index?

21       A.    I don't remember.

22       Q.    Was the index inside the book or was it

23  held somewhere else?

24       A.    Inside the book I believe.

25       Q.    So like at the back of the book there

62

1    was some index that would correspond to the

2    photographs that were in the book, binder?

3         A.    Yes.

4         Q.    What was the purpose of the binder?

5         A.    The purpose was for investigations,

6    show people photos.

7         Q.    Is that how you used the books, to show

8    potential witnesses or other individuals pictures?

9         A.    Yes.

10        Q.    So let me just understand.  Let's say a

11   crime happens in a particular area, right, a murder.

12             In those days, just the mere location

13   of a murder would give you some information about

14   who might be responsible for it or what group of

15   people might be responsible for it, right?

16             MR. ENQUIST:  Objection, calls for

17   speculation.

18        Q.    You can answer.

19        A.    Well, it depends what the witnesses are

20   telling you.

21        Q.    Okay.  Understood.

22             I understand, if a witness says, you

23   know, the person yelled out King killer or something

24   like that, that would give you some indication about

25   whether it was gang related, right?

63

1   A.  Yes.

2   Q.  And then it might also give you some

3 information about whether the offender was part of a

4 rival gang, right?

5   A.  What was that again, information?

6   Q.  Yeah.  It would give you -- it would

7 give you some idea of whether the perpetrator was a

8 member of a rival gang, correct?

9   A.  Yes.

10   Q.  All right.  If a witness, for instance,

11 tells you, you know, I saw a light-complected

12 Hispanic shoot and say King killer, that -- and, you

13 know, wasn't able to provide a real detailed

14 description, you might be able to look -- you might

15 have them look at some gang books of people who were

16 members of rival gangs of the Kings, right?

17   A.  You could.

18   Q.  Is that one way -- that's one way you

19 could use the books, right?

20   A.  Right.  You would need more

21 information.

22   Q.  Okay.

23   A.  Because there's several gangs that are

24 rivals.

25   Q.  What if there was an ongoing war

**64**

1    between two gangs?  That would also give you an

2    idea -- that's one thing you would keep track of?

3         A.    There would be more information.  Yes.

4         Q.    Okay.  How did you decide whether

5    someone was in a gang such that their picture would

6    end up in one of these books?

7              If let's say they had not been arrested

8    or had not self-admitted, how did you make a

9    determination as to whether someone was a gang

10   member?

11        A.    You can ask them.

12        Q.    Right.

13              And, again, assuming someone is not

14   self-admitting to being a gang member, how did you

15   make a determination as to if someone was in a gang?

16              What did it require to get into one of

17   those books?

18        A.    Well, I don't know.  Arrest was the

19   basic way.

20        Q.    Okay.  But even being arrested doesn't

21   tell you whether you're a gang member.

22        A.    Tattoos, who you're hanging around

23   with.

24        Q.    Tattoos, who you're hanging around

25   with.  What else?

65

1      A.      Other people tell you that that guy
2   belongs to the gang or whatever.
3      Q.      Okay.  Anything else?
4      A.      Not that I could think of.
5      Q.      All right.  Now, you also mentioned the
6   nickname file or the index file that we started
7   talking about.
8              Was that -- how was that maintained, if
9   you understand?
10      A.      By alphabetical order.
11      Q.      Okay.  So there was -- there were index
12   cards by alphabetical order.
13              Were they like in a little plastic
14   index box or some other wood index box?  Where were
15   they actually kept physically?
16      A.      Ours were a file.  They're in
17   alphabetical order.  They were probably sized 4-by-6
18   cards maybe.  I don't know.  I'm not sure.  I don't
19   remember, and they were to be filed in there.
20      Q.      When you say they were organized in a
21   file, can you just describe the file for me a little
22   more because I just don't have a clear picture of
23   it?
24      A.      The cabinet with drawers, and, you
25   know, you pull the drawers out and in there are all

1    the cards.

2          Q.      Four-by-six, though, is pretty small

3    and a cabinet file is usually bigger.

4          A.      You're talking a card file, not a file

5    cabinet.

6          Q.      Okay.  That's what I was asking.  So it

7    was a card?

8          A.      It holds the cards.  That's all.

9          Q.      So it was an appropriate size for

10   4-by-6 index cards, right?

11         A.      Yes.

12         Q.      And then you said it was organized

13   alphabetically, right?

14         A.      Yes.

15         Q.      Okay.  And alphabetically in terms of

16   what, legal names, nicknames?

17                 What was alphabetized how?

18         A.      I believe it was by last name.

19         Q.      Last name.

20                 What other information was contained on

21   the index cards other than last name?

22         A.      If there was a picture available.

23         Q.      So it might contain a photo?

24         A.      It would be a photo.  People that this

25   person may have been arrested with.  There might

1    have been case numbers that they were brought in for

2    to go back to.  That's all I remember.

3          Q.    I think we froze up again.

4          A.    I froze up.  Looks good on this end.

5          Q.    Yeah, I think so.

6                Just to recap, you didn't say this, but

7    I'm assuming there were nicknames on the index

8    cards, right?

9          A.    Yes.

10          Q.    You said people who the person may

11    associate with or who have been charged in the past.

12    Is that right?

13          A.    Yes.

14          Q.    Case numbers that they may have been

15    prosecuted under, right?

16          A.    Numbers?  Case numbers, right.  RD

17    numbers, CB numbers, things like that.

18          Q.    An RD number is a number that initiates

19    a general offense case report, correct?

20          A.    Records division number, yes.

21          Q.    And a CB number, what's a CB number?

22          A.    I don't know what it stands for

23    anymore, but it's individual for each person

24    arrested at that time.

25          Q.    So an RD number is a number associated

1   with an actual case, and CB references a person.  Is

2   that right?

3          A.     Yes.

4          Q.     What about where they hang out?  Like

5   locations where they hang out?

6                 Would that be something that would be

7   on the index card?

8          A.     Yeah, I would think so.

9          Q.     I'm assuming what gang they're

10  allegedly associated with would be on the index

11  card?

12         A.     Yeah.  Sure.

13         Q.     What about girlfriend, that type of

14  thing?

15         A.     Probably not.

16         Q.     What about cars that they drove or --

17         A.     I don't remember doing that.  No.

18         Q.     What else?  Anything else that you

19  haven't told me?

20         A.     That's about it.

21                MR. ENQUIST:  Can we take a quick

22  break?  We've been going for an hour and a half.

23                MS. BONJEAN:  No problem.

24                MR. ENQUIST:  Five minutes or so.

25                MS. BONJEAN:  Yeah.  No problem.

1          (Whereupon, a recess was taken.)

2      Q.     So when we left off we were talking

3   about the nickname files.  I think you provided sort

4   of a list of the text of information that you recall

5   being part of the index cards.

6          Anything else that comes to mind other

7   than what you already mentioned?

8      A.     No.

9      Q.     All right.  Now, you said it was

10  organized by last name, these index cards.

11         Was there also a way to find what you

12  were looking for by nickname?  Like was it organized

13  in some way versus nickname or cross-reference?

14         Was there an index card -- I'm sorry,

15  like an index that you could look at to determine

16  what someone's real name would be if you had only a

17  nickname?

18     A.     Yes.

19     Q.     Okay.  And how did that work?

20     A.     That was the nickname file we talked

21  about earlier.  There would be cards.  I don't know

22  what size, but there would be all these nicknames on

23  it, and then these cards would cross-reference to a

24  name, and then you would use it that way, but, you

25  know, there's a lot of nicknames out there with the

70

1  same nickname.

2       Q.    No.  I understand.

3             But it sounds like there were actually

4  two index card files?

5       A.    I believe so.  Yes.  Yes.

6       Q.    Okay.  So you had one that was

7  organized by legal last name that contained a lot of

8  this information we just talked about before we took

9  a break, right?

10            Is that a yes?

11      A.    Yes.

12      Q.    Okay.  And then it sounds like you also

13  had an index file that was organized alphabetically

14  by nickname, right?

15      A.    I believe so.  Yes.

16      Q.    Okay.  And so if you had -- you had

17  information that somebody named Cisco was involved

18  in a crime but you didn't know who the possible

19  Ciscos were, you could go to the index for

20  nicknames, look up Cisco and there would be legal

21  names that were associated with that nickname,

22  right?

23      A.    Yes.

24      Q.    Okay.  And then from there you could go

25  to the other index file which is organized by last

1    name and see, you know, who the possible Ciscos are

2    that were out there and what their legal names were,

3    right?

4            A.    Yes.

5            Q.    Okay.  In the actual nickname index

6    card file which was organized by nickname, was there

7    any other information contained in that file other

8    than legal names?

9            A.    I don't remember.

10           Q.    Okay.  So you have one file that was

11   organized alphabetically by legal name and one file

12   that was organized alphabetically by nicknames,

13   right?

14           A.    Yes.

15           Q.    And they cross-referenced each other

16   essentially.  Is that fair?

17           A.    That's fair.

18           Q.    Do you recall that some of the same

19   information that was on the index cards that was

20   organized alphabetically by last name was

21   information that was -- same type of information

22   that was included on the index cards that was

23   organized by nickname?

24           A.    I don't remember what was on the

25   nickname cards.

72

1          Q.     Okay.

2          A.     But there was -- it would make sense

3   that they would cross-reference each other.

4          Q.     All right.  Okay.  Any other tools

5   that -- well, strike that.

6                 Let me phrase it this way.  Any other

7   sources of information that were compiled by gang

8   crime specialists at gang crimes north other than

9   the binders we talked about and then these two index

10  card files that cross-referenced each other?

11         A.     No.  That's about it.

12         Q.     Were there any electronic databases

13  that were used back between --

14         A.     Not back then.

15         Q.     Let me finish my question.  So I kind

16  of figured that would be the answer, but let me ask

17  it again just so the record is clear.

18         A.     Okay.  I'm sorry.  I cut you off.

19         Q.     That's all right.

20                Between 1986 and 1990, was there any

21  type of electronic database no matter how crude it

22  might be that organized information about street

23  gangs and street gang members?

24         A.     No, there was not.

25         Q.     Now, if a detective from Area 5 or Area

1   3 was working a case, okay, that they believed was a

2   gang motivated let's say shooting, okay, and they

3   wanted to get intelligence about a particular gang

4   member, could they access those -- those filing

5   systems that you referenced earlier, binders or

6   index cards, for purposes of their investigations?

7         A.    Yes, with the permission of the watch

8   commander.

9         Q.    Okay.  And when you say the watch

10   commander, are you talking about the watch commander

11   at Belmont and Western?

12         A.    Any watch commander working those

13   shifts.  Yes.

14         Q.    But at Belmont and Western?

15         A.    Yes.  Well, that's where our office

16   was, and that's where all these cards were kept.

17         Q.    So if a detective came in and said,

18   listen, I'd like to look at your nickname file,

19   we're working a case, we have a nickname, we need a

20   real name, can we look at that, and with permission

21   from whoever was the watch commander, they could go

22   in and look at those nickname files, right?

23         A.    Yes.

24         Q.    I suppose it's also possible that they

25   could call up a gang crimes specialist saying this

74

1   is what we're doing over here, would you mind

2   looking and seeing if you have any legal names for

3   this nickname, right?

4          A.      They could.

5          Q.      And that's a way in which you

6   collaborated as gang crime specialists with

7   detectives which I think you testified to earlier,

8   right?

9          A.      Yes.

10         Q.      Now, between 1986 and 1990, you worked

11  with Rey Guevara at Belmont and Western, right?

12         A.      Yes.

13         Q.      You were both gang crimes specialists

14  in gang crimes north.  Is that fair?

15         A.      Yes.

16         Q.      In fact, it seems as if you were both

17  promoted to detective at around the same time.  Do

18  you remember that?

19         A.      Yes.

20         Q.      Now, were you meritoriously promoted or

21  were you promoted in some other way?

22         A.      Meritoriously.

23         Q.      And what does it mean to be

24  meritoriously promoted?

25         A.      You were promoted.  You were put in by

75

1   your supervisors sort of -- I guess you would call

2   it nomination.  I don't know what the word would be,

3   and then that was -- and the reasons why would be

4   typed up by a supervisor, and that would be sent

5   down to the main office for recommendation.

6           Q.      And main office being the main office

7   where?

8           A.      Of the gang office.

9           Q.      At 11th and State?

10          A.      Yes, and what happened there, I have no

11  idea.

12          Q.      All right.  And what's the other way in

13  which someone could be promoted to detective?

14          A.      You pass the exam.

15          Q.      Okay.  Did you ever take the exam to be

16  detective?

17          A.      Yes, twice I believe.

18          Q.      Okay.  And you were not promoted off

19  the exam.  Is that fair?

20          A.      Yes.

21          Q.      All right.  And what years did you take

22  the exam?

23          A.      I don't know.

24          Q.      Okay.  Were you ever -- did you ever

25  get an understanding of where -- why you were not

76

1    promoted off the exam?

2              Do you get your results from the exam

3    that you take?

4         A.    Yes.

5         Q.    Okay.  Fair to say you weren't --

6    sorry.  My cat.

7         A.    That's all right.

8         Q.    Fair to say you didn't pass the

9    detective's exam?

10        A.    What was that?  I didn't hear that.

11        Q.    You didn't pass the exam.  Is that

12   right?

13        A.    I didn't place high enough in the

14   scores in the numbers, in the rankings.

15        Q.    Okay.  I understand you would take the

16   exam and there would be a ranking system, right?

17        A.    Right.

18        Q.    Do you know what other information went

19   into the ranking system other than exam score or was

20   it just exam score?

21        A.    I believe there was an interview

22   process, but I'm not sure.  I don't remember.

23        Q.    So if someone was applying to be a

24   detective and they took the exam and then there was

25   an interview process, would they get some type of

77

1    ranking and be on a list?  Is that fair?

2          A.    Yes.

3          Q.    All right.  And then, depending on how

4    many detective spots were available, it sounds like,

5    generally speaking, the top whatever it is, top five

6    people, three people, whatever how many spots were

7    available, would be hired off the list.  Is that

8    correct?

9          A.    Yes.

10          Q.    And then there was this other avenue to

11    become a detective which is this meritorious

12    promotion which you previously referenced, right?

13          A.    Yes.

14          Q.    Okay.  So it wasn't really like a

15    pass/fail type of thing.  It had just to do with how

16    high you scored on the test which played into where

17    you ended up on the list, right?

18          A.    I believe so.

19          Q.    Okay.  Also, Rey Guevara was

20    meritoriously promoted as well, right?

21          A.    Yes.

22          Q.    What about Ed Mingey?  Was he one of

23    your supervisors at gang crimes north?

24          A.    Yes, he was.

25          Q.    For what period of time was Ed Mingey

78

1   one of your supervisors?

2          A.      Well, the time was at gang crimes

3   north.

4          Q.      The whole time, 1986 to 1990?

5          A.      Yes.

6          Q.      So did he go over to Area 5 at about

7   the same time you did?

8          A.      I don't remember.  I think he went

9   there previous, before us.

10         Q.      Okay.

11         A.      I'm not sure, though.

12         Q.      And do you know who Ernest Halvorsen

13  is?

14         A.      Yes.

15         Q.      He -- was he at gang crimes north with

16  you at any point?

17         A.      No.

18         Q.      All right.  What about Roland

19  Paulnitsky?  Was he at gang crimes north with you?

20         A.      No.

21         Q.      What about Freddie Montilla or

22  Montilla?  Was he ever at gang crimes north with

23  you?

24         A.      No.

25         Q.      What about Joe Miedzianowski?  Was he

79

1  ever working at Belmont and Western when you were

2  there between 1986 and 1990?

3          A.      Yes.

4          Q.      And what did Joe Miedzianowski -- he

5  wasn't a gang crimes specialist, was he?

6          A.      I'm not sure what his rank was.

7          Q.      Okay.  What did you -- what did you

8  understand him -- what did you understand him to be

9  or do while assigned to Belmont and Western in the

10  gang crimes unit?

11               MR. ENQUIST:  You're still talking

12  about the same time frame when he was there?

13               MS. BONJEAN:  Yeah.

14          Q.      Between 1986 and 1990 when you were

15  personally there.

16          A.      What's the question?

17          Q.      Yeah.

18               What do you recollect about what Joe

19  Miedzianowski was doing at gang crimes north between

20  1986 and 1990?

21          A.      I don't know.  I don't remember.

22          Q.      So maybe I shouldn't have phrased it

23  that way.

24               Do you know whether he was a gang

25  crimes specialist?

1          A.      No, I do not.

2          Q.      And you said there was a tactical unit

3    there as well, gang crimes tactical unit, correct?

4          A.      Correct.

5          Q.      Do you know whether he was part of the

6    tactical unit there?

7          A.      I don't remember.

8          Q.      Do you remember ever, for instance,

9    executing any search warrants with Joseph

10   Miedzianowski?

11         A.      Yes.

12         Q.      Okay.  Do you know how many times you

13   executed search warrants with Joseph Miedzianowski?

14         A.      One time.

15         Q.      And where did that take place?

16         A.      I don't know.  Somewhere on the

17   northwest side.

18         Q.      Okay.  And what happened during that --

19   during that execution of a search warrant?

20         A.      I'm not sure.

21         Q.      Okay.  Do you remember anything that

22   stands out about it?

23         A.      No.

24         Q.      How do you remember it was only one

25   time that you executed a search warrant with him?

81

1      A.     I think that was my only time dealing

2  with him.

3      Q.     So in the history of your time there

4  at -- at Belmont and Western, you only had one

5  interaction with Joe Miedzianowski?

6      A.     Correct.  Yes.

7      Q.     Did you ever make any arrests with Joe

8  Miedzianowski?

9      A.     No, I don't think so.

10     Q.     Were you friends with him?

11     A.     No.

12     Q.     Did you respect him?

13     A.     Pardon me?

14     Q.     Did you respect him as a police

15  officer?

16     A.     He seemed to be good at what he did.

17  He was -- he had a lot of information.  That's what

18  I remember about him.

19     Q.     Do you remember how he -- well, did you

20  have any information about how he obtained his

21  information?

22     A.     No.

23     Q.     Did you have any information that he

24  was involved in extortion plots and other criminal

25  activities on the street?

82

1       A.      No.

2       Q.      Okay.  You made a face like that's a

3  ridiculous idea that he was involved in extorting

4  people.

5               Do you think that's a ridiculous idea?

6       A.      That's what he --

7               MR. ENQUIST:  Objection, argumentative.

8  Go ahead.

9       A.      No.  I don't know anything about what

10  he was doing.

11      Q.      Well, you know he's serving a life

12  sentence.  You know that?

13      A.      Yeah, that I know because he --

14  whatever he did, I don't know, you know, but I never

15  dealt with him or dealt with any of his dealings.  I

16  didn't know what he was into.

17      Q.      You know he was prosecuted for

18  conspiracy and other RICO activities, right?

19      A.      Yes.

20      Q.      Okay.  And are you saying you had no

21  knowledge whatsoever about the factual underpinnings

22  of those criminal charges?

23      A.      No, no knowledge at all.

24      Q.      Never even heard any rumors that he was

25  there on the street committing criminal activity?

83

1      A.     No.

2      Q.     Not even a breath, a rumor that Joe

3  Miedzianowski was a corrupted police officer?

4      A.     No.

5      Q.     Did you ever see him take money in

6  exchange for some type of benefit to a gang member?

7      A.     No, him or anybody.

8      Q.     Okay.  Did you ever witness any

9  misconduct by any Chicago police officer in your

10 career?

11     A.     I don't know what you're talking about.

12 What do you mean?

13     Q.     What didn't you understand about that

14 question?

15     A.     Criminal activity?  Is that what you're

16 referencing?

17     Q.     Well, let's start with that.

18            Did you ever witness any criminal

19 behavior whatsoever by any police officer at the

20 Chicago Police Department when you were employed

21 there?

22     A.     No.

23     Q.     Did you ever witness any violations of

24 the policies and general orders of the Chicago

25 Police Department by other police officers when you

84

1    were there?

2           A.      Not that I remember.

3           Q.      How long were you a Chicago police

4    officer?

5           A.      Thirty years.

6           Q.      What about Rey Guevara?  Did you work

7    with Rey Guevara when you were a gang crimes

8    specialist?

9           A.      Yes.

10          Q.      Okay.  What was Rey Guevara's gang that

11   he was a specialist about?

12          A.      One of them was the Latin Lovers.  I

13   don't remember the other one.

14          Q.      And did gang crimes specialists work in

15   teams or partners or how did you work with one

16   another?

17          A.      For the most part, you worked with a

18   regular partner.

19          Q.      Okay.  And when you were a gang crimes

20   specialist between '86 and '90, who was your

21   partner?

22          A.      Mostly Rey Guevara.

23          Q.      And what were the day-to-day activities

24   that you and Rey would do as gang crimes specialist?

25                  Like what did it -- what did an average

85

1   day look like?

2          A.      Well, you'd start by seeing what was

3   happening on the previous watch, any reports.

4   Sometimes there were reports left in the command

5   book that there may be gang activity here or

6   whatever.  You look at that.

7                  If the detective division needed some

8   type of assistance or ask a question, if you heard

9   anything, whatever cases they were working on.

10  Basically, it was a lot of patrol in your area of

11  responsibility, but you would come out of that, too,

12  area, and that was about it.  Answer calls.

13         Q.      You did answer calls?

14         A.      Oh, yeah.  Over the radio that came

15  out, yes.

16         Q.      Did you work in plain clothes?

17         A.      Yes.

18         Q.      Excuse me?

19         A.      Sure.

20         Q.      Did you work in unmarked cars?

21         A.      Yes.

22         Q.      Did you and Rey use the same car for

23  that entire four years?  Did you switch up cars?

24         A.      Yeah.  We switched them.  It's whatever

25  was assigned to us.

86

1      Q.      So did you have a roll call when you

2  came to your shift as a gang crimes specialist?

3      A.      Yes.

4      Q.      And would you get assigned a car?

5      A.      Oh, you'd look on the sheet.  The sheet

6  was made the previous day of the lineup.  They call

7  it the lineup, who's going to be working that day,

8  and you would just check the sheet and see what's

9  your car, which car number it is, and that was it.

10      Q.      Did you conduct arrests as gang crime

11  specialists?

12      A.      Arrests?

13      Q.      Did you conduct arrests?

14      A.      Sure.  Yes.

15      Q.      Did you -- did you effectuate

16  identification procedures like photo arrays,

17  lineups, that type of thing?

18      A.      We did photo arrays.

19      Q.      Okay.  If there was going to be a live

20  lineup, is that something that you would be involved

21  in or would you have the detectives do it or how

22  did -- what was -- what was the normal course of

23  action?

24      A.      The detective division responsibility.

25      Q.      Did sometimes gang crime specialists be

87

1    present for those lineups?

2         A.    Could be.

3         Q.    Did you write reports as gang crime

4    specialists?

5         A.    What kind of reports?

6         Q.    Well, did you do GPRs?

7         A.    No.

8         Q.    Was that more just a function of the

9    detectives mostly?

10        A.    Yes.  They had a specific form to fill

11   out for notes.

12        Q.    Okay.  Did you take -- did you take

13   notes anywhere as a gang crimes specialist?

14        A.    Yes.

15        Q.    And where did you take your notes, like

16   on what?

17        A.    A piece of paper.

18        Q.    So like a notepad, just average piece

19   of paper?

20        A.    Could be.  Sometimes a napkin.

21        Q.    And if you took a piece of information

22   down on a notepad or a napkin, did you maintain

23   those notes anywhere?

24        A.    Sometimes we transfer them to a report.

25        Q.    And then what would you do with the

1    original notes?

2           A.      Destroy them.

3           Q.      And what type of report -- what was the

4    name of the report that you would use?  Like do they

5    have a name, supplemental report, GPR?

6                   Those sound like the types of reports.

7    Was there some type of report that the specialists

8    use?

9           A.      There was a patrol division

10   supplementary report.

11          Q.      Okay.  And if you prepared a patrol

12   division supplementary report in connection with

13   some work you were doing, where did that report go

14   after you completed it?

15          A.      It would go through police channels.

16   If it was something that the detective division

17   needed, you could make a copy and give them one just

18   to expedite what's going on.

19          Q.      If a specialist was working with the

20   detective division on a investigation, did the gang

21   crimes specialist maintain a separate file or did

22   you just basically prepare reports that went into

23   the detective division's file?

24          A.      Separate file.

25          Q.      I'm sorry?

1      A.      Like what do you mean by separate file?

2      Q.      Okay.  So as a gang crime specialist,

3  if you were helping detectives in some

4  investigation, did you have your own file or was

5  it -- or did you just prepare reports that were

6  submitted to the detectives for inclusion in the

7  investigative file?

8      A.      No.  We didn't keep separate files.  We

9  would just pass that information on to them and then

10  they could put it in their supplementary report.

11      Q.      When you say pass information on to

12  them, you mean just verbally pass it on?

13      A.      Yes, you could do.  That's one of the

14  ways, right.

15      Q.      You also mentioned that you sometimes

16  did patrol division supplementary reports, right?

17      A.      Right.

18      Q.      Okay.  Would you say that doing -- as a

19  gang crimes specialist, you didn't do a ton of

20  report writing?  Is that fair?

21      A.      That's fair.

22      Q.      What percentage of your job was devoted

23  to assisting the detective division?

24      A.      It depended on the case.  A lot of

25  times you would assist them, or if you made arrests,

1    you would bring them into the -- obviously, they

2    have the responsibility of closing the case when it

3    was warranted.  It was their type of case.

4              Otherwise, you would assist them just

5    by keep gathering information.

6         Q.    What type of arrests did gang crimes

7    specialists make?

8         A.    We made all kind of arrests.

9         Q.    And I'm talking about arrests that

10   would not have involved the detective division.

11        A.    Sex crimes.

12        Q.    I'm sorry.  Say that again.

13        A.    Sex crimes.

14        Q.    Okay.

15        A.    Narcotics, auto theft.

16        Q.    Got it.

17              And would you do like your run of the

18   mill gang loitering or mob action arrests as well?

19        A.    I don't remember that.  I know at one

20   point in the department they wanted that a lot to

21   clear the streets for whatever reason.

22        Q.    Right.

23              But was that something that specialists

24   would be responsible for or took a big role in or

25   was that more like the tactical units or patrol

91

1    division or --

2         A.    I really don't remember.

3         Q.    Okay.  If it was a homicide, obviously,

4    that was something that was handled more by the

5    violent crimes division or detective homicide

6    division.  Is that right?

7         A.    Yes.

8         Q.    Now, were you -- did you respect Rey

9    Guevara as a fellow officer?

10        A.    Yes.

11        Q.    Did you ever witness him engage in any

12   investigative misconduct?

13        A.    No.

14        Q.    For instance, did you ever see him

15   provide information to a witness about who he

16   believed was the perpetrator of a crime?

17        A.    No.

18        Q.    Did you ever see him use any type of

19   tactic where he either pointed out who the

20   perpetrator was or communicated to a witness who he

21   wanted that witness to identify?

22        A.    No.

23        Q.    Did you ever see him engage in any type

24   of excessive force against anyone?

25        A.    No.

1    Q.    Did you ever see him or hear him use a

2  derogatory term based on someone's race or gender?

3    A.    No.

4    Q.    Never heard him use the word bitch

5  before?

6    A.    Not openly.

7          What do you mean by using it?  I don't

8  understand.

9    Q.    Did you ever hear him call a woman a

10  bitch openly or not openly?

11    A.    No.  No.

12    Q.    Did you ever hear him call a black

13  person the N word?

14    A.    No.

15    Q.    Did you ever hear any officer in your

16  entire career call a black person the N word?

17    A.    Not that I could remember.

18    Q.    Okay.  All right.  Did you ever

19  socialize with Rey Guevara outside of work?

20    A.    Once in a while.

21    Q.    What sort of things would you two do?

22    A.    Pardon me?  Say that again.

23    Q.    What sort of things would you do --

24  would you do with Rey?

25    A.    Once in a blue moon I'd have a beer

93

1    with him at a bar.  Sometimes he would come to my

2    house.  I would go to his house, but not frequently.

3          Q.    And when you said sometimes he'd come

4    to your house or you'd go to his house, would this

5    be for like social gatherings like barbecues, that

6    type of thing?

7          A.    Yeah sitting in the yard.  That's all.

8          Q.    Did you ever attend any of his

9    children's birthdays, weddings, anything like that?

10         A.    No.

11         Q.    Did he ever attend any of your family

12   members' events such as a wedding, birthday, a

13   milestone event?

14         A.    No.

15         Q.    By the way, are you married?

16         A.    Yes, I am.

17         Q.    How long have you been married?

18         A.    Forty-one years.

19         Q.    Okay.  So you were married back before

20   you even I guess started working for the Chicago

21   Police Department?

22         A.    August 23, 1980.

23         Q.    So sometime after beginning to work

24   there.  Is that right?

25         A.    Yes.

94

1      Q.     Do you have any children?

2      A.     Yes.

3      Q.     I assume they're grown children at this

4  point.  How many of them are there?

5      A.     Two, one of each.

6      Q.     Okay.  And are either one of them

7  Chicago police officers?

8      A.     No.

9      Q.     Do you still live in the City of

10 Chicago?

11            You don't have to tell me exactly where

12 but --

13     A.     Yes, I do.

14     Q.     When's the last time you spoke to Rey

15 Guevara?

16     A.     Oh, boy.  I'm not sure.  Probably four

17 months ago maybe.

18     Q.     And what were the circumstances under

19 which you spoke to him roughly four months ago?

20     A.     I was going to visit my sister who

21 lives in Corpus Christi, Texas, and I called Rey or

22 he called me.  I'm not sure.  I don't know which

23 way.  Just to say that maybe I would come and visit

24 him, drive and visit him.

25     Q.     And what did he say to that?

95

1        A.      What was that?

2        Q.      What did he say to that when he

3    suggested you --

4        A.      Yeah.  Sure.  Come on over, but I never

5    made it.

6        Q.      And prior to that conversation of

7    roughly four months ago, do you remember the time --

8    the last time you had spoken to him before that?

9        A.      I do not.

10        Q.      Okay.  Obviously, I assume you spoke

11    during Jacques Rivera's trial?

12        A.      Oh, yeah.  Yeah.

13        Q.      Were you in court together pretty

14    regularly?

15        A.      What do you mean?

16        Q.      Did you attend court to --

17        A.      Oh, yes.

18        Q.      Did you talk to each other at

19    lunchtime, for example?

20        A.      Yes.

21        Q.      And did you talk about the case?

22        A.      No.

23        Q.      Never?

24        A.      Never.  Not that I remember, no.

25        Q.      Did you ever talk to Rey Guevara about

96

1    your testimony before you took the stand in Jacques

2    Rivera's case?

3         A.    No.

4         Q.    Did you ever ask Rey Guevara why he was

5    taking the Fifth Amendment in connection with

6    Jacques Rivera's case or any other case?

7         A.    No.

8         Q.    Why not?

9         A.    Well, I don't -- it wasn't really my

10   business, and we didn't discuss the case for obvious

11   reasons, you know.  We stayed away from it.  All our

12   conversations, we didn't want to bring it up.

13        Q.    And when you say for obvious reasons,

14   maybe it's obvious to you.  I'm not sure it's

15   obvious to me.

16             Why did you stay away from that subject

17   matter when you spoke to one another?

18        A.    Because people -- other attorneys have

19   said you can't talk about this or whatever.  So we

20   just stayed away from it, all of us.

21        Q.    Now, did you socialize with Ed Mingey

22   when you were a gang crimes specialist?

23        A.    As far as that went was once a year.

24   We used to get together at Christmastime.

25        Q.    Right.

97

1                You had a big Christmas party?

2        A.      Yeah.  Be in a bar.  Just all the

3   regular guys were there, and we'd get together once

4   a year, and that would be the end of it.

5        Q.      And when you say the regular guys, who

6   would you consider the regular guys?

7        A.      The guys from gang crimes, from the

8   detective division.

9        Q.      Which detective division?

10       A.      Area 5.

11       Q.      Why not Area 3?

12               Since you worked at Belmont and

13  Western, it seemed like you were closer with the

14  Area 5 detectives.

15       A.      That's where we mainly worked usually

16  were Area 5 cases because each of the areas are

17  divided up by districts, their responsibility.

18       Q.      I see.

19               So you worked more closely with Area 5

20  detectives than the other areas.  Is that correct?

21       A.      Yes.

22       Q.      I want to ask you some questions about

23  Jacques Rivera's case.  Do you acknowledge that

24  Jacques Rivera was wrongfully convicted?

25               He was innocent for the crimes for

98

1    which he was convicted?

2         A.    That's what they said.  That's what the

3    jury said.

4         Q.    Again, I'm asking do you accept that

5    that is, in fact, the case?

6         A.    I don't understand what you're asking

7    me.

8         Q.    Do you believe he was factually

9    innocent of the crimes for which he was prosecuted

10   and convicted?

11        A.    No.

12        Q.    You believe he was guilty?

13        A.    Yes.

14        Q.    All right.  So did it bother you that

15   your own attorney conceded his innocence at the

16   civil trial?

17        A.    Bother me, I don't know.  It's -- I

18   didn't like it.  That's all I could tell you.

19        Q.    And as you sit here today, what do you

20   believe is the evidence that demonstrates to you

21   that he was guilty rather than innocent of those

22   charges?

23        A.    Just the investigation conducted.

24        Q.    You mean the investigation that a jury

25   decided was a terrible investigation?

99

1              MR. ENQUIST:  Objection, argumentative.

2    Also completely irrelevant.

3              We're over two hours into this for a

4    witness that was involved in a small portion of this

5    case.  We haven't even gotten to the '90s yet.

6              MS. BONJEAN:  I have no idea what

7    portion he was involved with.  Frankly, nobody ever

8    does because we all know how these reports get

9    written.  So relax.  I will get there.

10        Q.    Now, you admitted at Mr. Rivera's trial

11   that you and Rey Guevara prepared your reports from

12   your memory.  Do you remember that?

13        A.    Yes.

14        Q.    Okay.  Was this a common practice that

15   you engaged in as a gang crimes specialist or as a

16   detective I guess?

17        A.    No.

18        Q.    It was a unique situation where you

19   prepared a report from memory.  Is that what you're

20   saying?

21        A.    Yes.

22        Q.    Okay.  Was it consistent with the

23   policies of the Chicago Police Department to prepare

24   reports from your memory that recorded events that

25   occurred some period of time before the preparation

1  of that report?

2          A.      No, it's not the policy.

3          Q.      Okay.  And do you have an understanding

4  of why that was not the policy of the Chicago Police

5  Department?

6          A.      Say that again.

7          Q.      Why wasn't it -- why did the Chicago

8  Police Department not condone that policy of

9  preparing police reports from memory after some

10  period of time after alleged investigative actions

11  took place?

12                 MR. ENQUIST:  Object to the foundation,

13  calls for speculation, but go ahead.

14         A.      Because information can get lost or

15  forgotten or misrepresented.

16         Q.      All right.  So was it your practice to

17  prepare reports within -- I don't want to say

18  necessarily contemporaneously, but within a short

19  period of time of when investigative evidence was

20  developed?

21         A.      Did we prepare reports when we got any

22  kind of information?

23         Q.      Well, how did you decide if and when

24  you should prepare a report in the course of an

25  investigation?

1          MR. ENQUIST:  Object to the form,

2   vague.

3          A.    As what, for gang specialist or

4   detective?

5          Q.    So let's back up a second.

6                In Jacques Rivera's case you were a

7   gang crimes specialist.  You weren't a detective,

8   correct?

9          A.    Correct.

10         Q.    Okay.  But you, in fact, did prepare a

11  report with Rey Guevara that memorialized -- that

12  memorialized information or investigative work that

13  you had done prior to preparing the report like

14  significantly prior, right?

15         A.    Yes.

16         Q.    Okay.  Do you know how much time

17  elapsed from the time that you actually carried out

18  the investigative work to the time that you

19  memorialized it in the report?

20         A.    No, I do not.

21         Q.    Okay.  But you admit that there was a

22  significant passage of time that was not consistent

23  with the policies of the Chicago Police Department,

24  right?

25         A.    I don't know what you're specifically

1    talking about.

2          Q.    Well, you said earlier that you

3    remembered that you prepared a report from memory,

4    right?

5          A.    Well, a portion, yes.

6          Q.    Okay.  And what portion was that?

7          A.    Are you referencing the hospital ID?

8          Q.    Yes, I am.

9          A.    That part was -- didn't have a note on

10   it.

11         Q.    What do you mean it didn't have a note

12   on it?

13         A.    I didn't have notes written on it or I

14   misplaced them or whatever.

15         Q.    And you didn't prepare a report

16   contemporaneous with the hospital ID either, right?

17         A.    No, I did not.

18         Q.    Okay.  So you prepared a report about

19   something as important as an ID sometime after that

20   ID allegedly happened, right?

21         A.    Correct.

22         Q.    Okay.  And I think you have admitted --

23   at least under oath you admitted that you and Rey

24   prepared that report from memory rather than from

25   prior notes or from, you know -- or at the same time

1   that the incident or the ID happened, right?

2        A.    Say that again please.

3        Q.    You admitted under oath that you

4   prepared that hospital ID report from your memory

5   rather than any prior notes, right?

6        A.    Yes.

7        Q.    Okay.  And you also admit that you

8   didn't prepare that hospital ID report

9   contemporaneous with the ID itself, right?

10       A.    You mean immediately after we received

11  it?

12       Q.    I don't know.  Within -- within some

13  reasonable period of time.  Maybe not immediately,

14  but within 24, 48 hours.

15       A.    No.  We didn't prepare the report then.

16       Q.    Right.

17             You prepared it how long after roughly?

18       A.    I'm not sure.  It was a few days after.

19       Q.    Enough time to make someone suspicious

20  that maybe it didn't actually happen, right?

21             MR. ENQUIST:  Objection, calls for

22  speculation, foundation.  Go ahead.

23       A.    It could have been.

24       Q.    And according to you, that's not

25  something that was typically done.  Is that right?

104

1       A.      Yes.

2       Q.      Okay.  And as you sit here today, are

3   you testifying under oath that that ID actually did

4   happen, that hospital ID?

5       A.      Yes.

6       Q.      Okay.  And that you and Rey were

7   present for this hospital ID?

8       A.      Yes.

9       Q.      And it's your testimony that the

10  witness who allegedly made the ID was in a condition

11  to actually make it, correct?

12      A.      Correct.

13      Q.      And do you think his doctor who

14  suggested otherwise at the trial is a liar?

15              MR. ENQUIST:  Objection, argumentative.

16  Go ahead.

17      A.      No.

18      Q.      How do you -- how do you reconcile the

19  doctor's testimony and your testimony that the ID

20  actually happened?

21      A.      Because I know what I did.

22      Q.      And we have to take your word for it,

23  right?

24      A.      Yes.

25      Q.      The jury didn't take your word for it,

1    though, did they?

2              MR. ENQUIST:  Objection, argumentative.

3              All you're doing is fighting with him,

4    and I'm not even sure why because the case is done.

5    You're not even asking about this case.

6              MS. BONJEAN:  I'm not going to connect

7    the dots for you, Josh.  I'm sorry.  That's not my

8    job.

9              MR. ENQUIST:  Your job is not to badger

10   a witness or harass the witness and ask the

11   questions.

12             MS. BONJEAN:  I'm not badgering him.

13             MR. ENQUIST:  You're harassing him.

14             MS. BONJEAN:  No, I'm not.  Give me a

15   break.  I mean, seriously, you'd think they'd have a

16   little thicker skin if you think that's harassing,

17   but all right.

18             Let's move on.  I will move on.

19        Q.    So do you remember what month you

20   became a detective?

21        A.    No, I do not.

22        Q.    Okay.  Do you know if it was early part

23   of 1990, middle, later?

24        A.    I don't remember.

25        Q.    Were you meritoriously promoted with

106

1 Rey?

2      A.      Yes.

3      Q.      So you would have become detectives

4 around the same time.  Is that fair?

5      A.      Yes.

6      Q.      Did you go to detective school before

7 you began working as a detective?

8      A.      Yes.

9      Q.      Tell me what is -- what was involved in

10 detective school.

11      A.      I don't remember specifically.  We

12 covered probably classes on witnesses, taking

13 statements, processing, different types of reports

14 that were needed in the detective division that we

15 used because they're different from patrol division.

16 Use of state's attorneys.  I'm just guessing now.

17      Q.      Okay.  Do you know how long the

18 detective training lasted for?

19      A.      You know, I don't remember because

20 there was -- no.  That wasn't it.  Detective

21 division -- I don't know.  I don't remember.

22      Q.      Would you know if it was weeks or

23 months?  Do you have a sense of that?

24      A.      I'm guessing.

25      Q.      Okay.  Did you go through, again, the

1    policies and general orders that would be applicable

2    to the work you would be doing as a detective during

3    the detective training?

4         A.     I don't remember doing it, but I know

5    they use different ones than the patrol division.

6         Q.     Okay.  And what about report writing?

7                Did you get a refresher on report

8    writing and get familiar with the different types of

9    reports you would be expected to complete as a

10   detective?

11        A.     Report writing.  Specifically, I don't

12   remember.  I know one of then was lineup reports.

13        Q.     What about conducting lineups, live

14   lineups?

15               Did you get trained on how to conduct a

16   lineup that would be consistent with the

17   constitution and the policies of the Chicago Police

18   Department?

19               MR. ENQUIST:  I'm going to object as to

20   form.

21               MS. BONJEAN:  We can't hear you.

22               MR. ENQUIST:  Object to the form as

23   vague and foundation.

24        Q.     You can answer.

25        A.     Could you ask -- repeat that question.

1      Q.     My question is did you receive training

2  on how to administer lineups in a manner that would

3  be consistent with the laws of the State of Illinois

4  and the laws of the United States of America and the

5  policies and procedures of the Chicago Police

6  Department?

7      A.     I don't remember specifically, but I'm

8  assuming, yes, we did since it's a big part of the

9  job of detective.

10     Q.     What about questioning witnesses?  Is

11  that something that you covered in your detective

12  training?

13     A.     I'm sure we did.

14     Q.     What about interrogating suspects?  Was

15  that something you covered?

16     A.     Yes.  I'm sure it was.

17     Q.     Do you have any independent

18  recollection of whether that training was in the

19  form of like classroom training or, I don't know,

20  watching videos, scenarios?

21            I don't know.  Do you remember how the

22  training was actually administered?

23     A.     No, I do not.

24     Q.     If I told you that Mr. Maysonet, my

25  client, was arrested for a double murder that

109

1    occurred -- well, strike that.

2                    If I told you that the murders for

3    which my client was arrested and subsequently

4    prosecuted occurred in May of 1990, would that

5    refresh your recollection about whether or not you

6    were a detective in May of 1990?

7         A.    I think we were detectives in that

8    time.

9         Q.    Okay.  So you became a detective in

10   shall we say the first quarter of 1990 at some

11   point?

12        A.    I guess it would be safe to say.

13        Q.    Give or take?

14        A.    Exactly.

15        Q.    Okay.  So in reviewing the materials

16   that you reviewed in connection with this homicide

17   investigation, did you learn or have your

18   recollection refreshed that there was the shooting

19   deaths of two African American men that occurred on

20   I believe May -- let me get this right, May, I

21   guess, 25th of 1990?

22        A.    I don't know specifically, but if it's

23   on the report, then that's what it is.

24        Q.    Okay.  Do you recall receiving a call

25   or learning about this shooting on the day that it

110

1    happened?

2         A.      No.

3         Q.      Do you know whether you responded to

4    the scene of this shooting death when the Wiley

5    brothers bodies were still there?

6         A.      No.

7         Q.      What is the first thing you recall

8    about this murder investigation?

9         A.      Reviewing the reports.  I was in the

10   area, and I -- Ernie Halvorsen and Rey Guevara

11   working on this case, and they had an identification

12   of somebody and then I was asked to go look for a

13   second suspect.

14        Q.      Okay.  So let's back up a second.  You

15   said -- and, again, I'm going to ask you to try to,

16   if you can, differentiate for me what you learned

17   from reading the reports versus what you actually

18   remember doing.

19             So the first thing I guess I'd ask is

20   do you have any independent recollection of doing

21   any investigative work on this case?

22        A.      No.

23        Q.      So if you had never looked at the

24   reports and someone came up to you and said, hey, do

25   you remember anything about the Wiley brothers

111

1    murders, would the name have even rung a bell to

2    you?

3         A.    Probably not, no.

4         Q.    Okay.  If someone came up to you prior

5    to you reviewing your reports and said, hey, do you

6    remember working on the Jose Maysonet case, would

7    that have ever rung a bell to you?

8         A.    The name did because it's been brought

9    up so many times in the past.

10        Q.    Okay.  When you say in the past, are

11   you talking about after he was convicted?

12        A.    Oh, yeah.  Yes.

13        Q.    So I guess -- well, let me ask you

14   about that.

15             At some point in the last few years,

16   did you learn that Mr. Maysonet's convictions had

17   been reversed and he was released from custody?

18        A.    Yes.

19        Q.    How did you get that information?

20        A.    From attorneys.

21        Q.    Okay.  Your attorneys or other

22   attorneys?

23        A.    My attorneys.

24        Q.    And did you see any news coverage about

25   Mr. Maysonet's release from prison?

112

1   A.  No.

2   Q.  Did the Cook County State's Attorney's

3 Office, and by that, I mean any member of the Cook

4 County State's Attorney's Office, reach out to you

5 to discuss the re-prosecution of Mr. Maysonet for

6 these murders?

7   A.  No.

8   Q.  Did any of your fellow detectives,

9 whether it be Rey Guevara, Roland Paulnitsky, Ernest

10 Halvorsen, Freddie Montilla or Sergeant Mingey reach

11 out to you when there was some subpoenas issued for

12 their testimony in criminal court?

13   A.  No.

14   Q.  Did you ever know that any of those

15 individuals had been subpoenaed to testify in

16 criminal proceedings back in 2017?

17   A.  No.

18   Q.  Okay.  So are you saying that the first

19 time you have heard the name Jose Maysonet was after

20 this lawsuit was filed -- or strike that.

21     Let me ask it this way.

22     Until this lawsuit was filed, did you

23 have any independent recollection of the name Jose

24 Maysonet?

25   A.  No.

113

1      Q.      Okay.  So fair to say that there was

2  nothing about the investigation itself, the names of

3  the victims, the circumstances of the shooting or

4  even the name of Mr. Maysonet that stuck out in your

5  head prior to you becoming aware that there was a

6  lawsuit and reviewing these police reports?  Is that

7  right?

8      A.      That's right.

9      Q.      So all your testimony here today really

10  is either your refreshed memory or what you were

11  deriving from the police reports.  Is that correct?

12      A.      From the police reports, yes.

13      Q.      Okay.  All right.  So let's go back to

14  that.  You said at some point you received some

15  information about this investigation.  Is that

16  right?

17      A.      Say that again.

18      Q.      You said you looked at some police

19  reports that indicated to you that you had played

20  some role in this investigation.  Is that right?

21      A.      Yes.  That's correct.

22      Q.      After reviewing the police reports,

23  tell me what you understood your role to be.

24      A.      It was a very small role.  Went out

25  with Sergeant Mingey to look for an individual that

114

1  was identified or mentioned, and we went to look for

2  that subject, and we found him, and he was brought

3  into Area 5.

4       Q.    And who was that person that you went

5  out to look for?

6       A.    What was his name?  I don't remember.

7  I don't remember right offhand.

8       Q.    Do you remember when this occurred?

9       A.    When it occurred, yeah, from the

10  reports.

11       Q.    Do you have the reports in front of

12  you?

13       A.    Yes.

14            MR. ENQUIST:  Which one do you want him

15  to see?

16            MS. BONJEAN:  Do you have -- do you

17  have the full investigative file there?

18            MR. ENQUIST:  I do not.  I believe I

19  have like one sup, his testimony, and that's pretty

20  much it.  I didn't bring the whole thing down.

21            MS. BONJEAN:  Can you tell me what

22  sup -- I am assuming it begins with 46.  Is that

23  right?

24            MR. ENQUIST:  That's right.

25  Forty-seven through 54.

115

1          MS. BONJEAN:  Okay.  And that's the
2    cleared open report?
3          MR. ENQUIST:  That would be on the last
4    page or in there somewhere.  Do you want me to put
5    that in front of him?
6          MS. BONJEAN:  Sure.  I'm going to --
7    we'll mark -- I guess I'm going to mark the whole
8    investigative file as an exhibit, but I'm going to
9    specifically draw the deponent's attention to a
10   supplemental report that is Bates stamped Maysonet
11   47 or RFC-Maysonet 47.
12      Q.     Do you have that in front of you, Mr.
13   Gawrys?
14      A.     Yes, 47 to 54.
15             (Exhibit Gawrys-1, Investigative file,
16   is marked for Identification.)
17      Q.     Is this the report you had an
18   opportunity to review prior to your deposition here
19   today?
20      A.     Yes.
21      Q.     And would you agree that this
22   supplemental report is a cleared open report?
23      A.     Yes.  That's how it's characterized,
24   classified.
25      Q.     As a cleared open report?

116

1      A.      Pardon me?

2      Q.      What is a cleared open report?  What

3  does that mean?

4      A.      That means that there was an arrest,

5  but there's still other offenders possibly.

6      Q.      Does it mean there's an arrest or is it

7  more than an arrest?

8      A.      It says cleared by arrest.  Open for

9  additional investigation.

10      Q.      Okay.  What's a cleared closed report?

11      A.      What's a clear closed?  Is that what

12  you're asking?

13      Q.      Yeah, that's what I said.  Yeah.

14      A.      Clear closed means there's no other

15  investigation needed.  The case is closed.  The

16  arrest has been made or some determination

17  otherwise.

18      Q.      Okay.  And is it fair to say, until you

19  looked at the supplemental report, you didn't have

20  any independent recollection of your work on this

21  case which involves the murders of Torrence and

22  Kevin Wiley?

23      A.      Correct.  Yes.

24      Q.      Okay.  And after looking at this

25  report, what did you understand your role to be in

117

1    the investigation of the Wiley brothers' murders?

2         A.    Just as an assist.

3         Q.    And when you say an assist, what do you

4    mean by that?

5         A.    I just helped out to look for an

6    individual.

7         Q.    And who did you go -- who did you help

8    look for?

9         A.    Last name Gonzalez.

10        Q.    Okay.

11        A.    He had a nickname, Lluvia.

12        Q.    Okay.  I don't want you to read off the

13   reports.

14              I don't mind you refreshing your

15   recollection to see names and stuff, but I do want

16   to ask you some follow-up questions without you just

17   reading the report to me if you don't mind.

18        A.    Okay.

19        Q.    Okay.  So as far as you know, your only

20   involvement in this case was to go look for Alfredo

21   Gonzalez.  Is that right?

22        A.    Correct.

23        Q.    And after having read the report, do

24   you remember going to look for Alfredo Gonzalez?

25        A.    No.

1      Q.      Was it unusual to be asked to assist in

2  going to find a suspect or a witness as a detective

3  at Area 5?

4      A.      No.

5      Q.      Okay.  Do you remember, again, without

6  looking at the report, who was with you when you

7  went to go try to find Alfredo Gonzalez?

8      A.      Ed Mingey.

9      Q.      And do you get that from the report or

10 do you remember that?

11     A.      It's from the report.

12     Q.      All right.  Anybody else who was with

13 you when you went to look for Alfredo Gonzalez?

14     A.      Not with us, no.

15     Q.      Okay.  And do you recall where you

16 ultimately found Alfredo Gonzalez?

17     A.      I don't remember.  I know it's in the

18 report, but I forgot.

19     Q.      Okay.  Do you remember why it was you

20 were going to look for Alfredo Gonzalez?

21     A.      I don't remember, but it would be for

22 the Wiley brother murders.

23     Q.      Okay.  And do you remember how it was

24 that you came to believe that -- well, strike that.

25              Do you remember what information or

1  evidence led you and Sergeant Mingey to try to go

2  find Lluvia or Alfredo Gonzalez?

3       A.    No, not until I read the report.

4       Q.    I want to draw your attention to page

5  53 of the report.  It's actually page 8 of the

6  report but Bates stamped RFC-Maysonet 53.  Let me

7  know when you get there please.

8       A.    I'm on page 53.

9       Q.    Okay.  The second paragraph, if you

10 look at it, it says, The reporting detectives and Ed

11 Mingey spent the next hour searching the

12 neighborhood for all three offenders during the

13 early morning hours of August 3, 1990.  Lluvia or

14 Lluvia, I think, was seen on the street by detective

15 S. Gawrys and Sergeant E. Mingey.

16            Do you see that?

17       A.    Yes.

18       Q.    And that Lluvia was identified as being

19 Alfredo Gonzalez?

20       A.    Correct.

21       Q.    And he was informed of the allegations

22 made against him by Jose Maysonet.  Gonzalez was

23 asked to come to Area 5 and be interviewed.

24 Gonzalez stated that he would and was driven to Area

25 5.

1          Do you see that?

2     A.     Yes.

3     Q.     And is that the paragraph to which you

4   are referencing the reference -- is that the

5   paragraph that informs you that you -- it was you

6   and Ed Mingey that went to find Alfredo Gonzalez?

7     A.     Yes.

8     Q.     Anything else about this report that

9   gave you some information about what you were doing

10  in connection with this investigation other than

11  what we just read here?

12    A.     No.

13    Q.     Okay.  Now, given this role in finding

14  Alfredo Gonzalez, is this something that you would

15  have independently memorialized in either a report,

16  a GPR or just on a napkin or a notepad?

17    A.     What's the first part of your question?

18  That I would write it?

19    Q.     What I'm saying is, after having read

20  what you purportedly did, what your role was in this

21  investigation, would you have independently

22  memorialized or reported this information in one of

23  your own reports like a GPR?

24    A.     No.

25    Q.     And why not?

121

1          A.     It wasn't needed because it could be

2   Ernie already was taking notes on the case.  They

3   were assigned to it.

4          Q.     I'm sorry.  Who?  What did you say?

5          A.     Ernie Halvorsen and Rey Guevara were

6   assigned to this case I'm assuming.  So they would

7   take the notes of what happened.

8          Q.     But if they weren't there, how would

9   they be able to take the notes?

10         A.     Well, if he wasn't there, then we got a

11  whole different situation.

12         Q.     Well, you're not all working on top of

13  each other at all times.  One of you is doing one

14  thing.  Somebody else is doing another.

15                So how did they get the information?

16         A.     I don't know.  I don't remember.  I'm

17  just reading the report.  That's all.  They got it

18  from Maysonet.

19         Q.     Let me clarify my question.  I'm not

20  talking about that.

21                I'm saying Guevara and Halvorsen

22  weren't with you when you -- when you and Mingey

23  went out to find Alfredo Gonzalez and then located

24  him and asked him some questions, right?

25         A.     Right.

1          Q.     Okay.  At least according to this

2     report it gives us no indication that anybody but

3     you and Mingey were involved in locating him and

4     that you and Gawrys -- I'm sorry, you and Mingey

5     found him, Alfredo Gonzalez; that is, right?

6          A.     Yes.

7          Q.     Okay.  So what I'm saying is, if

8     Halvorsen and Guevara were in charge of the

9     investigation, how would they get this paragraph of

10    information?

11         A.     From me or Eddie Mingey.

12         Q.     Yeah.  That's what I'm asking.

13                You just verbally told them that?

14         A.     I'm assuming so.  Yes.

15         Q.     So it wasn't your practice to say, you

16    know, write this out and this is what we did and

17    here's a GPR and you can prepare your cleared open

18    or cleared closed report based on this?

19                That wasn't a practice of yours?

20         A.     Not in this case, no.

21         Q.     Why is that?

22         A.     Because it's a small part.  I mean they

23    were right there.  They were working that night too.

24    I think we met up with them.  So you just tell them.

25    They made the note, whatever they did, you know, and

1    that's it.

2         Q.    Okay.  So it's your belief that this

3    investigative role you played in finding Alfredo

4    Gonzalez and bringing him in is not something that

5    you would have memorialized in any type of GPR or

6    any other type of report or even in a notepad.  Is

7    that right?

8         A.    Not in this case.

9         Q.    Okay.  Yeah.  I'm talking about this

10   case.

11              It's not your belief that you would

12   have done that in this case?

13        A.    No.

14        Q.    Is that right?

15              And you believe you probably would have

16   just informally communicated this information to

17   whoever was preparing this report?

18        A.    Correct.

19        Q.    And at least in looking at the first

20   page of the report, it appears as if Halvorsen was

21   the person who authored the report, correct?

22        A.    I don't remember, but you can assume

23   that.

24        Q.    Based on the fact that his name is in

25   that first box, right?

124

1        A.     You could say that.

2        Q.     Right.

3              And on the last page there's a list of

4  detectives.  Do you see that?

5        A.     Yes.

6        Q.     And Detective Halvorsen is at the top

7  of that list, correct?

8        A.     Correct.

9        Q.     You're listed there too.  Do you see

10  that?

11        A.     Yes, I do.

12        Q.     And why are you listed there, because

13  of this small role you played?

14        A.     Correct.

15        Q.     Was your signature affixed to this

16  report at all?

17        A.     Pardon me?

18        Q.     Was your signature affixed to this

19  report at all?

20        A.     I don't see a signature.  No.

21        Q.     Okay.  And you see that the report was

22  submitted on August 23, 1990.  The time we don't

23  know, but do you see that?

24        A.     Yes.  Okay.  On the front page, right.

25        Q.     Right.

1          Would it have been your practice to

2    read this cleared open report prior to its

3    submission to the supervisor who was Sergeant

4    Epplen?

5          A.    No.  I didn't read it.  No.  I did not.

6    I don't remember reading it prior.

7          Q.    Was it your practice to read a report

8    that bore your name prior to its submission to the

9    supervisor?

10         A.    It depends what capacity I'm in.  If

11   I'm just assisting, I might look at it later.

12         Q.    You mean later as in after it was

13   already submitted?

14         A.    Yes.

15         Q.    Why?  Why would you look at it after it

16   was submitted?

17         A.    Just to read to see what the whole case

18   was.  I had a very small part in this.  So it's

19   really minor.

20         Q.    Is it your belief that when you were

21   asked to go find Alfredo Gonzalez that you didn't

22   have any working knowledge of the evidence that had

23   been developed prior to that request being made of

24   you?

25         A.    I don't remember.

126

1      Q.     Were you familiar with the

2  circumstances of how Jose Maysonet came into

3  custody?

4      A.     I don't remember at what point.

5      Q.     Do you remember that Rey Guevara

6  interrogated Jose Maysonet at Area 5 prior to you

7  being dispatched with Sergeant Mingey to find

8  Alfredo Gonzalez?

9      A.     Only from the report.

10     Q.     Okay.  And I know you don't have an

11  independent recollection mostly.  After reading the

12  report, did you feel -- or strike that.

13           After reading this report in

14  preparation for your deposition, did any of it ring

15  a bell other than, you know, just maybe a name.

16     A.     No.

17     Q.     Okay.  We talked a little bit about

18  this earlier.  I want to draw your attention to,

19  let's see, page 50 of this report if you don't mind.

20     A.     Okay.  I got page 50.

21     Q.     Okay.  I think we established that this

22  report was submitted on August 23, 1990.  Do you

23  remember me saying that?

24     A.     Yes.

25     Q.     Okay.  And it says it in the right-hand

127

1    corner when that report was submitted, right?

2         A.    Yes.

3         Q.    Now, in this third paragraph of this

4    report it says on July 15, 1990.  Do you see that?

5         A.    Yes.

6         Q.    Okay.  And that would have been about

7    five weeks prior to the submission of this report,

8    right?

9         A.    Approximately, yes.

10        Q.    It says, Sergeant Mingey and company

11   with Detective F. Montilla, Area 5 property crimes,

12   interviewed Jose Maysonet while he was at Area 5.

13   Detective F. Montilla speaks Spanish.  Detective E.

14   Montilla, I think it meant F. Montilla, advised Jose

15   Maysonet of his Miranda rights in Spanish.  Jose

16   Maysonet acknowledged understanding these rights and

17   agreed to speak with these detectives.  Jose

18   Maysonet indicated that he did have some knowledge

19   of the murders of the two black youths on North

20   Avenue.  He stated that, on the night the blacks

21   were shot, three Latin Kings came by his house and

22   wanted to get a 9-millimeter automatic pistol that

23   he had been given by the gang to hold.  He gave the

24   gun to these guys and they left.  The next day he

25   learned about the shooting of the two blacks on

128

1   North Avenue and assumed that the Kings he gave the

2   gun to must have done the shooting.  Jose Maysonet

3   declined to provide the names of the individuals who

4   had the gun.

5            Do you see that information?

6      A.    Yes.

7      Q.    Okay.  And this is information that was

8   deemed important enough to include in this report,

9   right?

10      A.    Correct.

11      Q.    Okay.  And this is the type of

12   information that would have been the subject of some

13   other report closer in time to July 15th of 1990,

14   right?

15            MR. ENQUIST:  Objection, calls for

16   speculation, foundation.  Go ahead.

17      A.    What are you asking?  I'm sorry.  I

18   missed that.

19      Q.    This information we agree is that an

20   individual has provided statements about giving a

21   9-millimeter to some Latin Kings and that his belief

22   is that the Kings he gave the gun to did the

23   shooting, right?

24      A.    Yes.

25      Q.    You call this a lead in detective work,

129

1 right?

2      A.      Yes.

3      Q.      Okay.  We call it potentially -- it

4 could be potentially inculpatory.  It could be he

5 did give the gun to the people he believed did the

6 shooting, right?

7      A.      Correct.

8      Q.      Okay.  So what I'm saying is this is

9 the type of information that a detective would want

10 to make sure was memorialized or reported shortly

11 after receiving the information, right?

12     A.      Yes.

13     Q.      Okay.  You wouldn't wait five weeks to

14 report on this information, would you?

15     A.      Not normally, no.  I don't think so.

16     Q.      Yeah.  It's kind of the stuff we talked

17 about earlier when you waited to report an ID.  You

18 admitted that that wasn't consistent with the

19 policies of the Chicago Police Department, right?

20     A.      Yes.

21     Q.      You would expect that, if Jose Maysonet

22 made these statements to Sergeant Mingey and

23 Montilla, there should have been at least some type

24 of GPR or report that would reflect these statements

25 were made in and around the time they were made,

130

1   right?

2           A.      Fair to say.  Yes.

3           Q.      All right.  Let's keep going.

4                   The next sentence says, Jose Maysonet

5   was thereafter locked up in the Cook County Jail.

6   On August 1, 1990, Sergeant Mingey and Detective

7   Montilla went to interview Jose Maysonet at the Cook

8   County Jail.  Jose Maysonet signed the required

9   attorney waiver form and agreed to be interviewed.

10  Jose Maysonet stated that he was involved in the

11  murders of the two black youths.  He stated that he

12  was not the shooter but was present when the

13  shooting occurred.  He stated that he knew who the

14  shooter was and the other persons with him.  He

15  stated that he would not cooperate in this

16  investigation unless a deal was cut to get him out

17  of jail.  Jose Maysonet was informed by Sergeant

18  Mingey that no deal would be made even if possible.

19                  Do you see that?

20          A.      Yes.

21          Q.      So we have on August 1, 1990, Jose

22  Maysonet admits to being involved in the murders,

23  right?

24          A.      Sure.

25          Q.      And it says he's trying to work out a

131

1    deal on another case according to this, right?

2         A.     It looks like it.  Yes.

3         Q.     And it looks like he has information

4    about the other individuals who are responsible for

5    the shooting, correct?

6         A.     Correct.

7         Q.     All right.  And this information we can

8    agree is inculpatory statements of Mr. Maysonet,

9    right?

10        A.     Yes.

11        Q.     And this information also would be

12   information that could lead to additional offenders

13   if pursued, right?

14        A.     Yes.

15        Q.     Potentially, and, again, this is the

16   type of information that a good detective would want

17   to memorialize in and around the time the statement

18   is made, right?

19        A.     You could say so.

20        Q.     This isn't something you would just put

21   on the back burner and try to, you know, come back

22   to a few weeks later, right?

23             MR. ENQUIST:  Objection, argumentative.

24   Go ahead.

25        A.     No.

132

1      Q.    Okay. I mean, typically, when people

2 confess to murders, it's something you like to write

3 down, right?

4      A.    Correct.

5      Q.    All right. Did you ever see any GPRs

6 or reports that were prepared prior to August 23,

7 1990, that memorialized Mr. Maysonet's alleged oral

8 statements on July 15 and August 1?

9      A.    No.

10      Q.    Do you know who ASA De Franco is?

11      A.    No, I do not.

12      Q.    Do you remember seeing him at Area 5 on

13 August -- I don't know. When you went to go --

14 well, let's see. Let's find out what the date was.

15 Give me a second.

16           When you went to go look for Alfredo

17 Gonzalez with Sergeant Mingey I guess on August

18 20 -- I think it's 23, but I could be wrong. Let's

19 see. August -- let's say, just to be careful, I

20 guess August 22 or August 23, when you went to do

21 that search for Alfredo Gonzalez, do you recall

22 speaking with ASA De Franco?

23      A.    No.

24      Q.    Do you recall speaking with a female

25 state's attorney by the name of ASA Jennifer

133

1   Borowitz?

2        A.      No.

3        Q.      Do you recall being -- did you

4   participate in any way in the questioning or

5   interrogation of Alfredo Gonzalez?

6        A.      No.

7        Q.      And is that because this was not an

8   investigation that you were assigned to at least in

9   any lead capacity?

10       A.      Yes.  I was assisting.

11       Q.      Did you testify in Alfredo Gonzalez's

12  or Jose Maysonet's case?

13       A.      Yes.

14       Q.      What was the substance of your

15  testimony?

16       A.      Pretty much what's in this report.  I

17  don't have it in front of me yet.

18       Q.      All right.  Did you review your

19  testimony?

20       A.      Yes, I did.

21       Q.      All right.  When's the last time you

22  talked to Sergeant Mingey or Ed Mingey?

23       A.      Probably around the time of the Rivera

24  case.

25       Q.      All right.  Have you spoken to him

134

1    about this case at all?

2         A.    No.

3         Q.    Have you talked to Rey about this case

4    at all?

5         A.    No.

6         Q.    Are you aware that Rey's being sued in

7    about, I don't know, a dozen cases right now?

8         A.    Yes.

9         Q.    And how did you become aware of that?

10             MR. ENQUIST:  I'm going to object to

11   the extent that it calls for conversations he had

12   with his attorney, but go ahead.

13             If you can answer without that, then go

14   ahead.

15        A.    Newspapers.  It's been in the

16   newspapers a lot, talking with attorneys, my

17   attorneys.

18        Q.    Well, you don't have to tell me about

19   that, but apart from information you received from

20   your attorneys, you testified that you have read the

21   papers and it's referenced cases in which Rey

22   Guevara's being sued, right?

23        A.    Yes.

24        Q.    Okay.  And were you aware that Ernest

25   Halvorsen, who I know is deceased, and Sergeant

135

1   Mingey are also being sued in a number of these Area

2   5 cases?

3         A.      Yes.

4         Q.      And when was the last time you talked

5   to Ernie Halvorsen before he died?

6         A.      I never really talked to him.

7         Q.      Were you friends with him?

8         A.      Just work, working relationship.

9   That's all.

10        Q.      Did you ever see Rey Guevara ever use

11  physical force against a detainee in the context of

12  his work?

13        A.      No.

14        Q.      Did you ever see him use any physical

15  force in the course of an interrogation of a

16  suspect?

17        A.      No.

18        Q.      Did you ever see threats in course of

19  an interrogation of a suspect?

20        A.      No.

21        Q.      Did you ever watch him make promises of

22  release if someone cooperated and stated -- and made

23  certain statements in the course of an

24  interrogation?

25        A.      No.

136

1        Q.    Did you ever see Rey Guevara accept

2  cash or monies from a gang member?

3        A.    No.

4        Q.    Did you ever participate in any

5  extortion conduct as a police officer?

6        A.    Did I?

7        Q.    Yeah.

8        A.    No.  No, never.  Never would.

9        Q.    Did you ever allow people to buy their

10  way out of trial to put it differently?

11        A.    No.  That's ridiculous.

12        Q.    Well, ridiculous that you would have

13  done it or ridiculous that anybody would have done

14  it?

15        A.    Ridiculous that I would do it.

16        Q.    Okay.  Were you aware that Rey Guevara

17  has been accused for allowing gang bangers to buy

18  their way out of trouble?

19        A.    Not really, no.

20            MS. BONJEAN:  Let's take a 10-minute

21  break.

22            (Whereupon, a recess was taken.)

23        Q.    Mr. Gawrys, were you familiar with Rey

24  Guevara having financial issues?

25        A.    Not financial issues.  I know he had --

137

1  Rey had a lot of kids.  Don't ask me how many.  I'm
2  not sure.
3          Q.    He's not sure either.
4          A.    Pardon me?
5          Q.    I don't think he's sure either, but go
6  ahead.
7          A.    Oh, boy.  But, you know, he used to
8  send -- give them money.  I know that.
9          Q.    Did he ever ask to borrow money from
10 you?
11         A.    No.
12         Q.    Did you ever loan him money?
13         A.    No.  I don't think so.  I think I
14 bought him lunch every once in a while while we were
15 working.
16         Q.    Okay.  So was your understanding he had
17 a number of child support payments that he was
18 responsible for?
19         A.    What payments?
20         Q.    Child support payments.
21         A.    Yes.  Yes.  Yes.
22         Q.    When you worked with Rey, do you know
23 who his romantic partner was or romantic partners
24 were?
25         A.    I never really formally met them, but

138

1   I'd see him -- once in a while he'd get out of the

2   car, talk to some female and come back.  Who's that?

3   Oh, that's just a lady I had an affair with or

4   something, had a baby with.

5        Q.    All right.

6        A.    I mean I really didn't care.

7        Q.    That's fine.

8        I was just wondering if you -- I was

9   more interested in knowing whether or not you had

10   any firsthand knowledge of him having financial

11   struggles?

12        A.    No.  I know he was tight with the

13   money, but I don't know how much the struggle was.

14        Q.    And was there a particular reason why

15   you did not continue being a partner with Rey

16   Guevara once you went to Area 5 since you had been

17   partners as gang crimes specialist?

18        A.    Yeah.  I wanted to work different

19   shifts.  I mean we were required -- you had to take

20   your turn on midnight which I did.  I mean it was

21   fair that every once in a while, several months

22   they'd say, hey, you got to work midnights.  Okay.

23   Fine.  That's not a problem.  I did it before on

24   patrol.  I can do it here.

25        My life was different.  I'm not a bar

139

1  guy even though I told you once in a while I'd stop

2  for a beer just to be social with the guys, but this

3  was not a regular thing for me.  I just didn't get

4  into it.  I didn't like it really.

5          I had a life at home.  I didn't want to

6  screw that up.  I had kids.  I took care of the

7  kids, and they were -- I had kids who were involved

8  in sports and activities, and that's what I did.  I

9  tried to support them in those activities, my son

10 playing hockey and my daughter playing volleyball

11 and club ball and all that.

12          For me, it was easier to go to these

13 games working the day shift, and I just wanted to

14 work with somebody else, because everybody you work

15 with in a detective division, they all have a

16 different style, and you can learn from them.

17          I mean I was new back in 1990.  We were

18 all new.  You don't know anything, you know.  So

19 that's basically it in a nutshell, you know.

20      Q.     So it was nothing specific to having

21 any type of fallout or issues with Rey.  It was more

22 just you wanted to have an experience with a new

23 partner, maybe a more experienced partner and also

24 definitely wanted to try to work more of the day

25 shifts than the night shifts?

140

1     A.     Right.  Yes.

2     Q.     And did Rey work more night shifts than

3  day shift?

4     A.     He was night, yeah, because he worked a

5  lot of overtime.  He went to court a lot.  You know,

6  cases we might have had together, he would go to

7  court on them because I really didn't want to go.  I

8  didn't care about it unless I had to.

9          That was the way we were set up, our

10  partnership, and then it just worked out, and I just

11  wanted to go a different direction with somebody

12  else, and that's all.

13     Q.     And who was your partner at Area 5?

14     A.     It happened in different places.

15  William Johnston maybe.  I worked with him.  Riccio,

16  Tony Riccio, Anthony Riccio, I worked with him.

17     Q.     And were you aware --

18     A.     That's all I can remember.

19     Q.     Okay.  And you were aware that Rey

20  Guevara and Ernie Halvorsen worked as partners for a

21  pretty extended period of time, right?

22     A.     Yes.

23     Q.     By the way, when you were at Area 5

24  when you did your assisting in this investigation,

25  did you ever speak to Jose Maysonet?

141

1      A.     No.

2      Q.     Okay.  Would you be able to recognize

3  Jose Maysonet if I showed you a picture of him back

4  then?

5      A.     I couldn't pick him out right now.  I

6  don't know what he looks like.  Even back then I

7  don't think I could, you know, unless you told me.

8      Q.     Right.

9             How long were you at Area 5 before you

10  moved on from there?

11      A.     I got promoted to sergeant 1996 I

12  believe.

13      Q.     And did you stay at Area 5 or did you

14  get assigned elsewhere?

15      A.     No.  I got assigned elsewhere to the

16  patrol division.

17      Q.     Which district?

18      A.     Pardon me?  Which district?

19      Q.     Yeah.

20      A.     I went first to the 22nd District on

21  the south side.  Okay.

22      Q.     How long were you there?

23      A.     Not very long.  I don't remember how

24  long I was there.  It was a short period, and then I

25  went on to the police academy.

142

1    Q.    And what did you do at the police

2  academy?

3    A.    I was a sergeant in instructional

4  design and quality control.  That was the official

5  title, and I worked with curriculum for recruits,

6  our recruits and for suburban police.  We had both

7  those classes in there.

8    Q.    And how long did you hold that

9  position?

10    A.    Six years.

11    Q.    What year did you retire?

12    A.    Officially, January of 2008.

13    Q.    Okay.  So six years you are now in

14  whatever, like 2002.  Is that right?

15    A.    Yeah, and then I was asked to -- I

16  moved to another unit, internal affairs, and that's

17  where I finished up my career.

18    Q.    You were a sergeant in internal

19  affairs?

20    A.    Yes.

21    Q.    And did that involve reviewing

22  investigations or conducting investigations or both?

23    A.    Both.

24    Q.    Did you review investigations of your

25  former colleagues at Area 5 ever?

143

1       A.      Never.

2       Q.      Was there a policy about that?

3       A.      I don't know.  I don't think so.  No.

4    I didn't know of a policy.

5       Q.      So if an internal affairs complaint or

6    complaint came in regarding Rey Guevara, even though

7    you were a former partner of his, you would be

8    acceptable to conduct that investigation?

9       A.      Oh, I would never do that.  That would

10   have to get passed along.

11      Q.      What I'm asking, even if you personally

12   wouldn't do that because you don't think that that

13   would be a great scenario, do you know of any policy

14   or order from the department that prohibited it?

15      A.      No, I do not.

16      Q.      And when you were at the police

17   academy, you said you were involved in creating

18   curriculum.

19              Was that kind of all the areas you

20   discussed earlier in your deposition here today,

21   firearms, physical ed, law, policies and procedures

22   I think you said as well as rules and regulations,

23   all of that?

24      A.      Yes.  I had police officers of that

25   rank that were -- that did the lesson plans, created

144

1   the lesson plans for the class for the recruits,

2   and, of course, I had to review them, and I also

3   wrote classes too.

4        Q.      And was there any particular area of

5   the curriculum that was I guess a specialty of yours

6   or that you were more interested in or it was kind

7   of just the whole curriculum that you had a command

8   of?

9        A.      I wrote the class on domestic violence

10   when it started.  That was just going to Ed in the

11   State of Illinois.  I did that class.  I did vehicle

12   stops and a couple other little cases.

13            I didn't have much time to do that

14   because I'm -- you know, it was a -- I think at that

15   time an 1100-hour program.

16        Q.      Did you decide you didn't want to be a

17   homicide detective anymore or were you moved out of

18   that role over your desires?

19        A.      No.  I just -- you know, you have to

20   move on.  You can't -- I mean some people, if they

21   have the political juice, will move on, you know,

22   but they might get back to that same unit

23   eventually, but I didn't.  I just moved on.

24        Q.      Okay.  Were you disappointed when you

25   were promoted to sergeant and then moved out of Area

1   5?

2          A.      No, not at all.

3          Q.      But you stayed in contact with your

4   Area 5 detectives -- colleagues?

5          A.      Yeah.  It was -- it was far between

6   because it was different shifts and things like

7   that.  So you lose contact with people.

8          Q.      Okay.  And then since your retirement,

9   I assume you continued to do some work.  I think you

10  mentioned that you're currently working -- or maybe

11  you didn't say you were currently working.

12                 Are you currently working?  I don't

13  think I asked you that.

14         A.      Yeah.  I'm working now.  I was working

15  prior to this, before the assessor's office job.  I

16  started there in 2014.

17         Q.      Where did you work before the

18  assessor's office?

19         A.      I was working as an independent

20  contractor overseas.

21         Q.      Doing independent contracting as it

22  related to law enforcement?

23         A.      Yes.

24         Q.      And what agencies were hiring you to do

25  that?

1        A.        Originally, I did it -- I worked for

2    the Department of Justice from around 1997, and I

3    taught these classes in other countries, gang class.

4                When I left the department, I went to

5    Trinidad with -- got hired by George Mason

6    University as an adjunct professor for research on

7    gangs on the islands, in the Caribbean, specifically

8    Trinidad, and I spent two and a half years there,

9    and then I had to get out.

10       Q.        How did you become familiar with the

11   gangs that operated on the island of Trinidad?

12       A.        I learned when I got there.

13       Q.        And did your wife go with you to

14   Trinidad?

15       A.        No.  She was -- she came down to fly.

16   She actually took very good care of us.  She'd come

17   down every few weeks.  They'd fly her down.  She'd

18   stay for a couple weeks and then fly back, back and

19   forth, and then I would meet her at certain places

20   like a little vacation to get out of there and -- I

21   didn't want to -- for tax purposes, you couldn't

22   come to the country, you know.  You were restricted.

23       Q.        As an independent contractor, I mean

24   did you live there for two and a half years or just

25   kind of bounce back and forth?  How does that work?

147

1    A.    No.  I lived there.

2    Q.    Okay.  And what gangs do operate in

3  Trinidad?

4    A.    Oh, there's many.  They go by their

5  areas, you know, Beekman Gardens gang.  This is an

6  area like you'd call Englewood.  It would be the

7  Englewood gang, but these were Beekman Gardens, and

8  it would be different areas.  Now, I forget what

9  they're called.

10    Q.    Okay.  So you did that two and a half

11  years after the Department of Justice gig?

12    A.    Yeah.  That ended.  I did that when I

13  left the police department.

14    Q.    Okay.  And then after working in

15  Trinidad, you said you had to get out.  What do you

16  mean by that?

17    A.    It was political.  It was getting

18  politically unrest.  The governments were changing,

19  and I just felt it wasn't safe anymore to be there.

20    Q.    Oh, like physically safe for you?

21    A.    Pardon me?

22    Q.    Physically safe is what you're saying?

23    A.    Yes.  Yes.

24    Q.    And then what did you do once you came

25  back, I assume, to the United States?

148

1       A.      I didn't do much for a while until

2   2014, and that's when this job came up, and I

3   interviewed and got hired through Jackman, the

4   federal agency, interviews with them, process, you

5   know, and then I got hired to run to be the chief

6   investigator for the assessor's office and the tax

7   stuff, exemptions.

8       Q.      Got it.

9               Okay.  Apart from the Geraldo Iglesias

10  case, do you know if you're being sued in any other

11  Area 5 wrongful conviction cases?

12      A.      Not at this time, no.

13      Q.      Do you anticipate you could be?

14      A.      I hope not.

15              MS. BONJEAN:  All right.  I have

16  nothing further for you, Mr. Gawrys.

17              THE WITNESS:  Okay.

18              MR. ENQUIST:  Anybody else?

19              MS. MC GRATH:  We don't have anything

20  right now.

21              MR. RAHE:  Nothing from me.

22              MS. CHOI:  Nothing from Defendant Di

23  Franco.

24              MS. BONJEAN:  Thank you.

25              (Deposition concludes at 2:40 p.m.)

149

1

2

3          I, STEPHEN GAWRYS, have read the

4    foregoing transcript and hereby certify that it is a

5    true and accurate transcript of my testimony.

6

7

8                      STEPHEN GAWRYS

9

10

11   Sworn and subscribed to before me

12   this     day of              , 2021.

13

14

15   _____

16   Notary Public of the State of

17   My Commission Expires:

18

19

20

21

22

23

24

25

150

1                    CERTIFICATE OF OFFICER

2

3

4              I CERTIFY that the foregoing is a true

5   and accurate transcript of the testimony and

6   proceedings as reported stenographically by me at

7   the time, place and on the date as hereinbefore set

8   forth.

9              I DO FURTHER CERTIFY that I am neither

10  a relative nor employee nor attorney or counsel of

11  any of the parties to this action, and that I am

12  neither a relative nor employee of such attorney or

13  counsel, and that I am not financially interested in

14  the action.

15                    *Diane M Holmes*

16

17          DIANE M. HOLMES, C.C.R.
            Certificate No. XI01660

18

19

20

21

22

23

24

25

## A

**able (6)**
11:23;53:1;63:13,
14;121:9;141:2
**academy (11)**
24:16,18,23;25:1;
26:23;27:9,12,18;
141:25;142:2;143:17
**accept (2)**
98:4;136:1
**acceptable (2)**
26:4;143:8
**access (1)**
73:4
**according (3)**
103:24;122:1;131:1
**accurate (1)**
149:5
**accused (1)**
136:17
**acknowledge (1)**
97:23
**acknowledged (1)**
127:16
**across (4)**
11:22;32:15;45:18,
21
**action (4)**
5:10;52:21;86:23;
90:18
**actions (1)**
100:10
**activities (5)**
81:25;82:18;84:23;
139:8,9
**activity (5)**
29:21;36:7;82:25;
83:15;85:5
**actual (2)**
68:1;71:5
**actually (18)**
36:17;42:20;51:23;
56:22;58:8;60:11,23;
65:15;70:3;101:17;
103:20;104:3,11,20;
108:22;110:17;119:5;
146:16
**addition (1)**
55:8
**additional (2)**
116:9;131:12
**address (2)**
5:1;34:1
**adjunct (1)**
146:6
**administer (1)**
108:2
**administered (1)**
108:22
**admit (2)**
101:21;103:7

**admits (1)**
130:22
**admitted (5)**
99:10;102:22,23;
103:3;129:18
**advised (1)**
127:14
**affair (1)**
138:3
**affairs (4)**
41:6;142:16,19;
143:5
**affixed (2)**
124:15,18
**African (1)**
109:19
**again (26)**
14:1,17;15:11;16:7;
17:20;18:25;26:21;
34:18;40:6;50:5;52:7;
55:2;63:5;64:13;67:3;
72:17;90:12;92:22;
98:4;100:6;103:2;
106:25;110:15;
113:17;118:5;131:15
**against (7)**
9:25;16:5,9,13;
91:24;119:22;135:11
**agencies (1)**
145:24
**agency (1)**
148:4
**ago (4)**
39:7;94:17,19;95:7
**agree (3)**
115:21;128:19;
131:8
**agreed (2)**
127:17;130:9
**ahead (15)**
8:8;17:19;26:18;
41:11;48:24;55:16;
82:8;100:13;103:22;
104:16;128:16;
131:24;134:12,14;
137:6
**Alfredo (19)**
117:20,24;118:7,
13,16,20;119:2,19;
120:6,14;121:23;
122:5;123:3;125:21;
126:8;132:16,21;
133:5,11
**allegations (2)**
15:23;119:21
**alleged (2)**
100:10;132:7
**allegedly (3)**
68:10;102:20;
104:10
**allow (1)**
136:9
**allowing (1)**

**136:17**
**along (4)**
14:7;19:18;36:9;
143:10
**alphabetical (3)**
65:10,12,17
**alphabetically (6)**
66:13,15;70:13;
71:11,12,20
**alphabetized (1)**
66:17
**altogether (1)**
24:8
**always (3)**
7:16;33:8;53:23
**Amendment (3)**
16:17,24;96:5
**America (1)**
108:4
**American (1)**
109:19
**amount (1)**
16:12
**Anthony (1)**
140:16
**anticipate (1)**
148:13
**anticipating (1)**
7:7
**anymore (8)**
29:8;30:24;35:11;
39:7;54:14;67:23;
144:17;147:19
**apart (3)**
57:19;134:19;148:9
**appearances (1)**
5:19
**appears (1)**
123:20
**applicable (1)**
107:1
**applied (4)**
23:10;38:11;42:14,
16
**apply (1)**
42:20
**applying (3)**
41:20;42:18;76:23
**appropriate (4)**
36:10;40:12;41:8;
66:9
**Approximately (1)**
127:9
**April (1)**
19:25
**Area (54)**
28:5;30:20;32:25;
34:6;36:8;44:6,10,12,
14,15,16,19,20,24;
45:10;46:16;47:7,9;
48:19,23;53:22;54:8;
62:11;72:25,25;78:6;
85:10,12;97:10,11,14,

**16,19;110:10;114:3;**
**118:3;119:23,24;**
**126:6;127:11,12;**
**132:12;135:1;138:16;**
**140:13,23;141:9,13;**
**142:25;144:4,25;**
**145:4;147:6;148:11**
**areas (12)**
28:6;32:16,20;34:1;
37:10;46:11;47:8;
97:16,20;143:19;
147:5,8
**argumentative (5)**
82:7;99:1;104:15;
105:2;131:23
**arose (1)**
32:19
**around (10)**
19:22;48:22;64:22,
24;74:17;106:4;
129:25;131:17;
133:23;146:2
**arrays (2)**
86:16,18
**arrest (15)**
27:1;29:18;30:3;
52:19;56:11,13;
57:13,17;59:13;
64:18;116:4,6,7,8,16
**arrested (8)**
56:23;58:6;64:7,20;
66:25;67:24;108:25;
109:3
**arrests (9)**
81:7;86:10,12,13;
89:25;90:6,8,9,18
**ASA (3)**
132:10,22,25
**Ashley (2)**
5:14,15
**assaults (1)**
33:1
**assembled (1)**
57:22
**Assessor's (4)**
12:14;145:15,18;
148:6
**assigned (22)**
27:19;28:14,17;
29:9;30:9;31:22;
32:17;33:13;34:14;
43:20;46:10;48:3;
49:13;53:24;79:9;
85:25;86:4;121:3,6;
133:8;141:14,15
**assignment (3)**
27:12,18;42:20
**assist (7)**
46:22,25;89:25;
90:4;117:2,3;118:1
**assistance (1)**
85:8
**assisting (4)**

**89:23;125:11;**
**133:10;140:24**
**associate (1)**
67:11
**associated (6)**
42:3;60:4;61:8;
67:25;68:10;70:21
**assume (9)**
7:25;28:13;29:17;
45:8;94:3;95:10;
123:22;145:9;147:25
**assumed (1)**
128:1
**assuming (9)**
24:11;30:6;64:13;
67:7;68:9;108:8;
114:22;121:6;122:14
**attend (3)**
93:8,11;95:16
**attention (3)**
115:9;119:4;126:18
**attorney (5)**
5:16;98:15;130:9;
132:25;134:12
**attorneys (16)**
5:18;15:12,15,16,
24;18:24;19:3;96:18;
106:16;111:20,21,22,
23;134:16,17,20
**Attorney's (2)**
112:2,4
**August (13)**
93:22;119:13;
124:22;126:22;130:6,
21;132:6,8,13,17,19,
20,20
**Austin (3)**
5:20;40:2;45:19
**authored (1)**
123:21
**auto (2)**
32:25;90:15
**Automatic (4)**
22:18;23:4,5;
127:22
**available (3)**
66:22;77:4,7
**Avenue (6)**
43:24;49:19,21;
77:10;127:20;128:1
**average (2)**
84:25;87:18
**awards (3)**
16:4,5,10
**aware (7)**
113:5;134:6,9,24;
136:16;140:17,19
**away (3)**
96:11,16,20

## B

**baby (1)**

138:4

**back (30)**
24:20;28:25;30:9;
39:18,23;51:18;
54:13;59:4,12;60:6;
61:25;67:2;72:13,14;
93:19;101:5;110:14;
112:16;113:13;
131:21,21;138:2;
139:17;141:3,6;
144:22;146:18,18,25;
147:25

**background (2)**
19:11,17

**backs (1)**
58:1

**backwards (1)**
43:8

**badger (1)**
105:9

**badgering (1)**
105:12

**ball (1)**
139:11

**bangers (1)**
136:17

**bar (3)**
93:1;97:2;138:25

**barbecues (1)**
93:5

**based (3)**
92:2;122:18;123:24

**basic (1)**
64:19

**basically (9)**
22:7;37:9;45:16;
53:21;56:11;61:7;
85:10;88:22;139:19

**Bates (2)**
115:10;119:6

**Bear (1)**
46:17

**beat (1)**
28:19

**beats (1)**
29:9

**became (9)**
24:4,8;36:11;38:12;
43:4,8;53:19;105:20;
109:9

**become (8)**
20:4;35:13;39:17,
22;77:11;106:3;
134:9;146:10

**becoming (3)**
38:7;42:4;113:5

**Beekman (2)**
147:5,7

**beer (2)**
92:25;139:2

**began (1)**
106:7

**begin (2)**

7:8;42:20

**beginning (5)**
6:12;11:10,15;31:1;
93:23

**begins (1)**
114:22

**behalf (3)**
5:23,25;6:3

**behavior (1)**
83:19

**belief (4)**
123:2,11;125:20;
128:21

**bell (3)**
111:1,7;126:15

**Belmont (18)**
38:4;43:1,4,24;
44:2,6,12,23;45:24;
46:4;56:17;73:11,14;
74:11;79:1,9;81:4;
97:12

**belongs (1)**
65:2

**benefit (1)**
83:6

**best (1)**
38:20

**better (1)**
41:25

**big (5)**
37:1;57:4;90:24;
97:1;108:8

**bigger (1)**
66:3

**binder (3)**
56:22;62:2,4

**binders (13)**
56:15;57:12,12,23;
58:3,9;59:12,15,17,
18,20;72:9;73:5

**birth (1)**
19:24

**birthday (1)**
93:12

**birthdays (1)**
93:9

**bit (6)**
19:11;23:6;26:8;
37:4;46:18;126:17

**bitch (2)**
92:4,10

**black (5)**
54:20;92:12,16;
127:19;130:11

**blacks (2)**
127:20,25

**blue (1)**
92:25

**blueprints (1)**
22:22

**bodies (1)**
110:5

**body (1)**

22:9

**BONJEAN (20)**
5:5,8,17;11:7,13;
68:23,25;79:13;99:6;
105:6,12,14;107:21;
114:16,21;115:1,6;
136:20;148:15,24

**B-O-N-J-E-A-N (1)**
5:9

**book (7)**
61:11,13,22,24,25;
62:2;85:5

**books (7)**
56:10,13;62:7;
63:15,19;64:6,17

**bore (1)**
125:8

**Borowitz (1)**
133:1

**borrow (1)**
137:9

**boss (2)**
12:18,19

**both (9)**
9:1;10:21;11:2;
47:7;74:13,16;142:6,
22,23

**bother (2)**
98:14,17

**bought (1)**
137:14

**bounce (1)**
146:25

**boundaries (2)**
45:5,16

**boundary (2)**
45:13;49:18

**box (3)**
65:14,14;123:25

**boy (2)**
94:16;137:7

**boys (1)**
20:12

**break (10)**
6:23;8:3,4,6,9;
46:17;68:22;70:9;
105:15;136:21

**breath (1)**
83:2

**briefly (1)**
12:23

**bring (4)**
52:16;90:1;96:12;
114:20

**bringing (1)**
123:4

**brother (1)**
118:22

**brothers (3)**
17:17;110:5,25

**brothers' (1)**
117:1

**brought (5)**

9:22;10:8;67:1;
111:8;114:2

**building (4)**
28:24;29:1;30:18;
31:24

**buildings (3)**
22:21;28:20;30:1

**burglaries (1)**
32:24

**burglary (1)**
32:23

**burner (1)**
131:21

**business (1)**
96:10

**buy (2)**
136:9,17

**Byrne (1)**
36:25

## C

**cabinet (3)**
65:24;66:3,5

**call (24)**
22:3;23:25;28:10,
10,11;31:7;33:21;
34:3;35:7;48:5;58:5;
59:1,4;73:25;75:1;
86:1,6;92:9,12,16;
109:24;128:25;129:3;
147:6

**called (11)**
22:18;23:2;25:12;
31:25;35:18;58:23;
59:6;60:20;94:21,22;
147:9

**calls (10)**
28:21;35:24;41:11;
62:16;85:12,13;
100:13;103:21;
128:15;134:11

**came (14)**
37:18;48:13;73:17;
85:14;86:2;110:24;
111:4;118:24;126:2;
127:21;143:6;146:15;
147:24;148:2

**can (38)**
8:5;11:14,20,25;
12:5;13:4,14;14:2;
17:4;19:2,17;24:25;
26:19;38:17,19,19;
43:7;45:15;46:6;
47:23;48:18;56:6;
62:18;64:11;65:21;
68:21;73:20;100:14;
107:24;110:16;
114:21;122:17;
123:22;131:7;134:13;
138:24;139:16;
140:18

**capacity (2)**

125:10;133:9

**car (6)**
28:19;85:22;86:4,9,
9;138:2

**card (11)**
58:7,13,13;66:4,7;
68:7,11;69:14;70:4;
71:6;72:10

**cards (23)**
58:6,8,16,20;59:19,
20,22;65:12,18;66:1,
8,10,21;67:8;69:5,10,
21,23;71:19,22,25;
73:6,16

**care (4)**
138:6;139:6;140:8;
146:16

**career (3)**
31:18;47:17;83:10;
92:16;142:17

**careful (1)**
132:19

**Caribbean (1)**
146:7

**carried (1)**
101:17

**carrying (1)**
26:4

**cars (6)**
33:12;48:13;55:6;
68:16;85:20,23

**case (79)**
8:24;9:9,13;10:12,
15,19;13:10,14,16,20,
23;14:9,10,13,16,19,
21;15:16,18,19;16:3,
6,8,15,21,22;17:22,
23;18:9,12,17,18;
19:7,12;35:25;39:6;
42:23;46:24;60:23;
67:1,14,16,19;68:1;
73:1,19;89:24;90:2,3;
95:21;96:2,6,6,10;
97:23;98:5;99:5;
101:6;105:4,5;
110:11,21;111:6;
116:15,21;117:20;
121:2,6;122:20;
123:8,10,12;125:17;
131:1;133:12,24;
134:1,3;148:10

**cases (24)**
8:24,25;9:4,6,7;
11:3;13:4,9,9,13;17:2,
6,23;36:18;46:16,20;
85:9;97:16;134:7,21;
135:2;140:6;144:12;
148:11

**cash (1)**
136:2

**cat (1)**
76:6

**CB (4)**

67:17,21,21;68:1
**certain (5)**
37:9;46:15;48:3;
135:23;146:19
**certify (1)**
149:4
**chain (5)**
39:25;40:9;50:13,
14;55:12
**challenge (2)**
20:7;42:10
**change (4)**
31:4,6,11,12
**changed (7)**
28:9;31:5,5;36:12,
15;37:3,3
**changing (1)**
147:18
**channel (1)**
50:11
**channels (4)**
48:7;50:10,11;
88:15
**characterized (1)**
115:23
**charge (1)**
122:8
**charged (1)**
67:11
**charges (2)**
82:22;98:22
**check (2)**
51:9;86:8
**Chicago (31)**
5:21;19:13,20;
23:10,13,18;24:8,15;
25:7,11,15,25;26:3;
28:3,4;34:5;47:18;
83:9,20,24;84:3;
93:20;94:7,10;99:23;
100:4,7;101:23;
107:17;108:5;129:19
**chief (2)**
12:14;148:5
**child (2)**
137:17,20
**children (2)**
94:1,3
**children's (1)**
93:9
**CHOI (3)**
6:3,3;148:22
**Christi (1)**
94:21
**Christmas (1)**
97:1
**Christmastime (1)**
96:24
**Cicero (1)**
19:22
**circumstances (3)**
94:18;113:3;126:2
**Cisco (2)**

70:17,20
**Ciscos (2)**
70:19;71:1
**City (8)**
5:21;15:9;20:11;
21:3;32:15;37:19;
45:17;94:9
**citywide (3)**
33:25,25;34:3
**civil (8)**
5:10;8:24,25;9:1,4,
22;13:23;98:16
**claims (1)**
12:17
**clarify (1)**
121:19
**clarity (1)**
59:10
**class (4)**
144:1,9,11;146:3
**classes (5)**
25:2;106:12;142:7;
144:3;146:3
**classified (1)**
115:24
**classroom (1)**
108:19
**clean (1)**
7:19
**clear (6)**
61:4;65:22;72:17;
90:21;116:11,14
**cleared (9)**
115:2,22,25;116:2,
8,10;122:17,18;125:2
**client (2)**
108:25;109:3
**closed (5)**
116:10,11,14,15;
122:18
**closely (2)**
47:4;97:19
**closer (3)**
6:15;97:13;128:13
**closing (1)**
90:2
**clothes (3)**
33:18;42:9;85:16
**clothing (1)**
54:10
**club (1)**
139:11
**co-defendants (1)**
10:22
**Cohen (2)**
5:14,15
**collaborated (1)**
74:6
**colleagues (3)**
51:24;142:25;145:4
**college (1)**
20:24;21:2,3,3
**colors (2)**

54:12,14
**coming (3)**
11:22;15:19;51:7
**command (7)**
39:25;40:9;50:13,
14;55:12;85:4;144:7
**commander (5)**
73:8;10,10,12,21
**Commission (1)**
149:17
**committing (2)**
29:18;82:25
**common (1)**
99:14
**communicate (1)**
51:23
**communicated (2)**
91:20;123:16
**communication (1)**
51:19
**communications (2)**
15:12;19:1
**company (2)**
22:18;127:10
**competitive (2)**
41:24;42:1
**compiled (1)**
72:7
**complaint (10)**
14:13,16,19,23;
15:2,9;41:7,14;143:5,
6
**complete (2)**
24:16;107:9
**completed (3)**
23:18;27:11;88:14
**completely (1)**
99:2
**completing (1)**
7:13
**component (2)**
39:10,16
**conceded (1)**
98:15
**concerned (1)**
15:3
**concludes (1)**
148:25
**condition (1)**
104:10
**condone (1)**
100:8
**conduct (6)**
25:25;86:10,13;
107:15;136:5;143:8
**conducted (1)**
98:23
**conducting (2)**
107:13;142:22
**confess (1)**
132:2
**confused (1)**
59:23

confusing (1)
26:18
**connect (1)**
105:6
**connection (7)**
9:25;17:16;19:3;
88:12;96:5;109:16;
120:10
**consider (1)**
97:6
**considered (2)**
38:6;42:12
**consistent (5)**
99:22;101:22;
107:16;108:3;129:18
**conspiracy (1)**
82:18
**constitution (1)**
107:17
**constitutional (2)**
26:15,25
**constructing (1)**
22:19
**contact (4)**
31:18;51:16;145:3,
7
**contain (2)**
57:13;66:23
**contained (3)**
66:20;70:7;71:7
**contemporaneous (2)**
102:16;103:9
**contemporaneously (1)**
100:18
**context (3)**
7:5,17;135:11
**continue (1)**
138:15
**continued (1)**
145:9
**contracting (1)**
145:21
**contractor (2)**
145:20;146:23
**control (1)**
142:4
**conversation (1)**
95:6
**conversations (2)**
96:12;134:11
**converted (1)**
36:21
**convicted (4)**
97:24;98:1,10;
111:11
**conviction (1)**
148:11
**convictions (1)**
111:16
**Cook (5)**
12:14;112:2,3;
130:5,7
**Coolbaugh (1)**

5:13
**cooperate (1)**
130:15
**cooperated (1)**
135:22
**copy (4)**
14:22;15:8;55:13;
88:17
**corner (2)**
53:25;127:1
**Corpus (1)**
94:21
**correspond (1)**
62:1
**corresponded (1)**
61:14
**corresponding (1)**
20:14
**corrupted (1)**
83:3
**counsel (2)**
19:2,7
**countries (1)**
146:3
**country (1)**
146:22
**County (5)**
12:14;112:2,4;
130:5,8
**couple (6)**
10:8;15:6;22:15;
34:5;144:12;146:18
**course (8)**
7:12;31:18;86:22;
100:24;135:15,18,23;
144:2
**courses (2)**
21:5,6
**court (9)**
7:19;8:15,15;12:7;
95:13,16;112:12;
140:5,7
**courts (1)**
26:24
**cover (1)**
26:23
**coverage (1)**
111:24
**covered (4)**
27:8;106:12;
108:11,15
**covering (2)**
47:8,9
**create (1)**
37:2
**created (2)**
37:1;143:25
**creating (1)**
143:17
**crime (18)**
30:8,17;34:1,13;
39:24;40:12;41:9;
44:3;55:25;62:11;

70:18;72:8;74:6;
86:10,25;87:3;89:2;
91:16
**crimes (81)**
28:1,4,10;29:19;
36:13,22;37:15;38:1,
5,8,16;39:18,23;40:1;
41:19;42:4,15;43:4,
13,16,20,23;44:3;
45:2,6,8,9,14,24;46:1,
3,7,8,19;47:3,13,17,
21;49:12,23;50:24;
55:14,22,24;56:9,18;
57:11;72:8;73:25;
74:13,14;77:23;78:2,
15,19,22;79:5,10,19,
25;80:3;84:7,14,19,
24;86:2;87:13;88:21;
89:19;90:6,11,13;
91:5;96:22;97:7,25;
98:9;99:15;101:7;
127:11;138:17
**criminal (9)**
26:15;47:21;81:24;
82:22,25;83:15,18;
112:12,16
**cross-reference (3)**
69:13,23;72:3
**cross-referenced (2)**
71:15;72:10
**crude (1)**
72:21
**currently (4)**
14:2;145:10,11,12
**curriculum (6)**
26:10,11;142:5;
143:18;144:5,7
**custody (3)**
53:12;111:17;126:3
**cut (6)**
6:12;7:9;31:1;
45:18;72:18;130:16
**cutting (1)**
11:10

## D

**Daley (1)**
21:3
**Damon (2)**
48:25;49:20
**database (1)**
72:21
**databases (1)**
72:12
**date (2)**
19:23;132:14
**daughter (1)**
139:10
**day (11)**
24:22;31:7;85:1;
86:6,7;109:25;
127:24;139:13,24;

140:3;149:12
**days (6)**
31:15,15;37:12,13;
62:12;103:18
**day-to-day (1)**
84:23
**De (2)**
132:10,22
**deal (4)**
12:20;130:16,18;
131:1
**dealing (1)**
81:1
**dealings (1)**
82:15
**dealt (2)**
82:15,15
**death (1)**
110:4
**deaths (1)**
109:19
**deceased (1)**
134:25
**decide (3)**
64:4;100:23;144:16
**decided (1)**
98:25
**declined (1)**
128:3
**deemed (1)**
128:8
**Defendant (11)**
5:24;6:4;9:15,18;
13:23;14:3,4,10;
16:21;17:4;148:22
**defendants (1)**
6:2
**definitely (1)**
139:24
**degree (2)**
22:1,2
**delay (2)**
11:8,11
**demonstrates (1)**
98:20
**department (27)**
23:8,13,18;24:15;
25:4,8,11,18;28:3,5;
57:14;83:20,25;
90:20;93:21;99:23;
100:5,8;101:23;
107:18;108:6;129:19;
143:14;146:2,4;
147:11,13
**depended (1)**
89:24
**depending (1)**
77:3
**depends (2)**
62:19;125:10
**deponent's (1)**
115:9
**deposed (6)**

6:9;8:23;9:11,12;
12:11;13:5
**deposition (12)**
6:6;7:1;8:19;12:23;
17:9;18:6,23;19:4;
115:18;126:14;
143:20;148:25
**deriving (1)**
113:11
**derogatory (1)**
92:2
**describe (2)**
25:15;65:21
**description (1)**
63:14
**design (1)**
142:4
**desirable (1)**
41:22
**desires (1)**
144:18
**Destroy (1)**
88:2
**detailed (1)**
63:13
**detainee (1)**
135:11
**detective (58)**
19:14;28:7;30:13,
19;43:9;44:8,17,24;
46:23;47:5,10;72:25;
73:17;74:17;75:13,
16;76:24;77:4,11;
85:7;86:24;88:16,20,
23;89:23;90:10;91:5;
97:8,9;99:16;101:4,7;
105:20;106:6,7,10,14,
18,20;107:2,3,10;
108:9,11;109:6,9;
118:2;119:14;124:6;
127:11,13,13;128:25;
129:9;130:6;131:16;
139:15;144:17
**detectives (14)**
74:7;86:21;87:9;
89:3,6;97:14,20;
106:3;109:7;112:8;
119:10;124:4;127:17;
145:4
**detective's (1)**
76:9
**determination (4)**
54:5;64:9,15;
116:16
**determine (3)**
41:6;54:24;69:15
**develop (2)**
52:2;53:1
**developed (4)**
52:3;56:8;100:20;
125:23
**developments (1)**
26:14

**devoted (1)**
89:22
**DeVry (3)**
20:25;21:11,17
**Di (2)**
6:4;148:22
**Diane (1)**
11:14
**dictated (1)**
25:24
**died (1)**
135:5
**difference (2)**
25:22;46:7
**different (23)**
23:23;29:9,10,10;
31:7;34:1;42:2,9,10;
47:8;54:17;106:13,
15;107:5,8;121:11;
138:18,25;139:16;
140:11,14;145:6;
147:8
**differentiate (1)**
110:16
**differently (1)**
136:10
**difficulties (1)**
6:20
**dig (1)**
15:22
**DIRECT (1)**
5:5
**direction (1)**
140:11
**disappointed (1)**
144:24
**Disciples (3)**
34:25;35:3,9
**discuss (2)**
96:10;112:5
**discussed (1)**
143:20
**discussion (1)**
27:15
**dispatched (1)**
126:7
**District (22)**
27:19,21;28:13,18;
30:8,10,18,22;31:15,
21;34:8,8,10,12;
35:18,23;44:1,9,22;
141:17,18,20
**districts (3)**
32:18;46:12;97:17
**divided (2)**
28:7;97:17
**division (31)**
28:4,8;30:13,19;
44:10,17,24,25;46:23;
49:20;67:20;85:7;
86:24;88:9,12,16,20;
89:16,23;90:10;91:1,
5,6;97:8,9;106:14,15,

21;107:5;139:15;
141:16
**divisions (4)**
28:1;44:8;47:5,10
**division's (1)**
88:23
**doctor (1)**
104:13
**doctor's (1)**
104:19
**domestic (1)**
144:9
**done (8)**
61:7;101:13;
103:25;105:4;123:12;
128:2;136:13,13
**dots (1)**
105:7
**double (2)**
17:16;108:25
**down (9)**
28:25;46:18;75:5;
87:22;114:20;132:3;
146:15,17,17
**downtown (3)**
48:7;50:18,20
**dozen (1)**
134:7
**draw (3)**
115:9;119:4;126:18
**drawers (2)**
65:24,25
**drive (1)**
94:24
**driven (1)**
119:24
**drove (2)**
55:6;68:16
**drug (1)**
29:21
**duly (1)**
5:2
**during (8)**
35:5;41:15;43:19;
80:18,19;95:11;
107:2;119:12
**duties (2)**
28:16;37:4

## E

**earlier (7)**
69:21;73:5;74:7;
102:2;126:18;129:17;
143:20
**early (4)**
31:15;32:11;
105:22;119:13
**easier (1)**
139:12
**east (1)**
49:20
**eat (1)**

40:21
**ed (10)**
25:2;77:22,25;
96:21;118:8;119:10;
120:6;133:22;143:21;
144:10
**Eddie (1)**
122:11
**education (1)**
20:22
**Edward (1)**
16:20
**effectuate (1)**
86:15
**either (9)**
14:2;53:11;91:19;
94:6;102:16;113:10;
120:15;137:3,5
**El (2)**
35:7,9
**elapsed (1)**
101:17
**Electric (3)**
22:19;23:4,5
**electrical (1)**
23:20
**electrician (2)**
23:21,22
**electronic (9)**
20:24;21:16;22:2,7,
11;24:1,4;72:12,21
**Electronics (6)**
21:13,14;22:1,6,21;
23:4
**else (18)**
10:25;18:22;31:13;
37:12;39:14;42:7;
61:23;64:25;65:3;
68:18,18;69:6;
118:12;120:8;121:14;
139:14;140:12;
148:18
**elsewhere (2)**
141:14,15
**email (1)**
51:22
**employed (2)**
12:13;83:20
**encompass (1)**
45:22
**end (7)**
7:6;11:12;22:1;
49:20;64:6;67:4;97:4
**ended (2)**
77:17;147:12
**enforcement (2)**
26:5;145:22
**engage (2)**
91:11,23
**engaged (1)**
99:15
**Englewood (4)**
34:11;37:11;147:6,

7
**English (1)**
21:5
**enough (4)**
21:24;76:13;
103:19;128:8
**Enquist (32)**
5:25,25;11:11,21;
17:18;26:17;41:10;
55:15;56:2;62:16;
68:21,24;79:11;82:7;
99:1;100:12;101:1;
103:21;104:15;105:2,
9,13;107:19,22;
114:14,18,24;115:3;
128:15;131:23;
134:10;148:18
**entered (3)**
16:5,9,13
**entire (4)**
31:4;43:19;85:23;
92:16
**Epplen (1)**
125:4
**Ernest (3)**
78:12;112:9;134:24
**Ernie (5)**
110:10;121:2,5;
135:5;140:20
**especially (2)**
29:11;35:2
**essentially (1)**
71:16
**established (1)**
126:21
**Esther (1)**
6:3
**estimate (2)**
21:23;34:18
**even (17)**
15:8;52:21;64:20;
82:24;83:2;93:20;
99:5;105:4,5;111:1;
113:4;123:6;130:18;
139:1;141:6;143:6,11
**evening (1)**
33:11
**event (1)**
93:13
**events (2)**
93:12;99:24
**eventually (2)**
50:10;144:23
**everybody (1)**
139:14
**evidence (4)**
98:20;100:19;
119:1;125:22
**exactly (2)**
94:11;109:14
**exam (12)**
75:14,15,19,22;
76:1,2,9,11,16,19,20,

24
**EXAMINATION (1)**
5:5
**example (5)**
27:7;29:25;51:8,20;
95:19
**excessive (1)**
91:24
**exchange (1)**
83:6
**Excuse (1)**
85:18
**executed (2)**
80:13,25
**executing (1)**
80:9
**execution (1)**
80:19
**exemptions (2)**
12:17;148:7
**exhibit (2)**
115:8,15
**existed (2)**
41:15;49:23
**existing (1)**
39:13
**expect (1)**
129:21
**expected (1)**
107:9
**expedite (1)**
88:18
**experience (3)**
15:4,5;139:22
**experienced (1)**
139:23
**expert (2)**
47:17,21
**Expires (1)**
149:17
**explain (3)**
22:20;25:13;46:6
**extended (2)**
31:8;140:21
**extent (1)**
134:11
**extorting (1)**
82:3
**extortion (2)**
81:24;136:5

## F

**face (1)**
82:2
**faced (1)**
39:19
**fact (5)**
9:21;74:16;98:5;
101:10;123:24
**factual (1)**
82:21
**factually (1)**

98:8
**fair (22)**
8:1,2;16:18;21:24;
23:15;29:24;36:4;
47:3;71:16,17;74:14;
75:19;76:5,8;77:1;
89:20,21;106:4;
113:1;116:18;130:2;
138:21
**fallout (1)**
139:21
**familiar (5)**
35:13;107:8;126:1;
136:23;146:10
**family (2)**
20:2;93:11
**far (4)**
12:24;96:23;
117:19;145:5
**fault (1)**
59:11
**fax (1)**
60:15
**fear (1)**
54:16
**federal (4)**
5:10;10:9;13:23;
148:4
**feel (1)**
126:12
**fellow (2)**
91:9;112:8
**felt (1)**
147:19
**female (2)**
132:24;138:2
**few (7)**
22:13;37:12;39:2;
103:18;111:15;
131:22;146:17
**field (2)**
23:23;24:5
**Fifth (3)**
16:17,24;96:5
**fighting (1)**
105:3
**figure (2)**
11:25;15:22
**figured (1)**
72:16
**file (33)**
17:12,21;58:11,23,
24;59:2,7,17;65:6,6,
16,21,21;66:3,4,4;
69:20;70:13,25;71:6,
7,10,11;73:18;88:21,
23,24;89:1,4,7;
114:17;115:8,15
**filed (3)**
65:19;112:20,22
**files (2)**
69:3;70:4;72:10;
73:22;89:8

**filing (1)**
73:4
**fill (2)**
58:6;87:10
**financial (3)**
136:24,25;138:10
**find (14)**
40:11;52:5;53:18;
56:20;61:19;69:11;
118:2,7;119:2;120:6;
121:23;125:21;126:7;
132:14
**finding (2)**
120:13;123:3
**fine (3)**
33:17;138:7,23
**finish (3)**
7:11;53:8;72:15
**finished (2)**
7:13;142:17
**firearms (2)**
25:3;143:21
**fired (1)**
35:24
**firm (1)**
5:21
**first (15)**
7:3;10:4;27:12,18;
46:20;48:14;59:10;
109:10;110:7,19;
112:18;120:17;
123:19,25;141:20
**firsthand (1)**
138:10
**Five (4)**
68:24;77:5;127:7;
129:13
**flip (1)**
61:5
**flood (1)**
32:20
**floor (1)**
44:7
**fly (3)**
146:15,17,18
**focus (1)**
46:20
**foes (1)**
35:10
**folded (1)**
36:22
**follows (1)**
5:4
**follow-up (2)**
19:18;117:16
**footwork (1)**
47:1
**force (3)**
91:24;135:11,15
**foregoing (1)**
149:4
**forget (1)**
147:8

**forgot (3)**
49:11,16;118:18
**forgotten (1)**
100:15
**form (10)**
17:18;26:17;40:3;
56:2;87:10;101:1;
107:20,22;108:19;
130:9
**formally (1)**
137:25
**former (2)**
142:25;143:7
**fort (1)**
35:8
**forth (2)**
146:19,25
**Forty-one (1)**
93:18
**Forty-seven (1)**
114:25
**found (3)**
114:2;118:16;122:5
**foundation (7)**
40:3;41:10;55:15;
100:12;103:22;
107:23;128:16
**four (9)**
22:13;31:2;61:3,6,
6;85:23;94:16,19;
95:7
**Four-by-six (1)**
66:2
**frame (1)**
79:12
**Franco (4)**
6:4;132:10,22;
148:23
**Frankly (1)**
99:7
**Freddie (2)**
78:21;112:10
**frequently (1)**
93:2
**friends (3)**
35:10;81:10;135:7
**front (8)**
60:7,8,13;114:11;
115:5,12;124:24;
133:17
**froze (2)**
67:3,4
**frozen (2)**
27:13,14
**full (1)**
114:17
**function (2)**
53:23;87:8
**further (1)**
148:16

**G**

**games (1)**
139:13
**gang (155)**
34:7,22,24;35:3,21;
36:7,11,13,14,17,17,
22;37:1,2,6,15,19;
38:1,4,8,16;39:17,22,
24;40:1,12;41:9,18,
19;42:4,15;43:4,12,
16,20,23;44:3,3;45:2,
6,8,9,14,24;46:1,3,7,8,
14,19;47:1,3,13,17,
20,24;48:2,12,15;
49:12,23;50:17,18,19,
24;51:14,21;52:6,9,
21;53:11,14,15,16,19;
54:19,25;55:13,22,24,
25;56:9,14,18;57:5,7,
11,15,16,23;58:5,13,
15,20,20;62:25;63:4,
8,15;64:5,9,14,15,21;
65:2;68:9;72:7,8,23;
73:2,3,25;74:6,13,14;
75:8;77:23;78:2,15,
19,22;79:5,10,19,24;
80:3;83:6;84:7,10,14,
19,24;85:5;86:2,10,
25;87:3,13;88:20;
89:2,19;90:6,18;
96:22;97:7;99:15;
101:3,7;127:23;
136:2,17;138:17;
146:3;147:5,7
**gang-related (1)**
46:16
**gangs (7)**
34:24;35:1,4,14,19;
39:11,13;41:4;47:13;
48:3,3;52:8,14,17;
56:8;57:23;63:16,23;
64:1;72:23;146:7,11;
147:2
**Gardens (4)**
29:4,7;147:5,7
**gate (1)**
18:1
**gather (4)**
36:4,6;47:13;55:5
**gathering (1)**
90:5
**gatherings (1)**
93:5
**gave (5)**
52:13;120:9;
127:23;128:1,22
**Gawrys (9)**
5:6;6:5;115:13;
119:15;122:4;136:23;
148:16;149:3,8
**Gawrys-1 (1)**
115:15
**Gawyrs (1)**
6:2

**gears (2)**
21:8;24:8
**gender (1)**
92:2
**general (9)**
21:5;25:12,16,17;
41:2;46:10;67:19;
83:24;107:1
**generally (4)**
15:13;33:6,24;77:5
**geographic (1)**
54:8
**geographical (3)**
45:5,10,13
**George (1)**
146:5
**Geraldo (2)**
13:15;148:9
**gets (1)**
6:18
**gig (1)**
147:11
**girlfriend (2)**
54:25;68:13
**girlfriends (1)**
48:13
**girls (1)**
20:14
**given (3)**
5:1;120:13;127:23
**gives (1)**
122:2
**giving (2)**
53:3;128:20
**glitchy (2)**
6:19;11:22
**goal (1)**
21:15
**goes (1)**
47:1
**gold (1)**
54:20
**Gonzalez (21)**
117:9,21,24;118:7,
13,16,20;119:2,19,22,
24;120:6,14;121:23;
122:5;123:4;125:21;
126:8;132:17,21;
133:5
**Gonzalez's (1)**
133:11
**Good (11)**
5:6,7;11:18;39:24;
40:1;53:2;59:2;67:4;
81:16;131:16;146:16
**governments (1)**
147:18
**GPR (6)**
88:5;120:16,23;
122:17;123:5;129:24
**GPRs (2)**
87:6;132:5
**graduate (4)**

20:8,17;21:17,19
**graduated (2)**
21:1,25
**graduation (2)**
20:21;23:16
**Grath (3)**
5:23,23;148:19
**great (2)**
17:14;143:13
**group (7)**
31:25;32:4,9;33:2,
22;34:15;62:14
**grow (1)**
19:19
**grown (1)**
94:3
**guards (1)**
51:12
**guess (17)**
23:19;30:12;37:23;
41:25;52:10;59:22;
75:1;93:20;99:16;
109:12,21;110:19;
111:13;115:7;132:17,
20;144:5
**guessing (6)**
23:11;24:24;32:10;
33:15;106:16,24
**Guevara (29)**
5:24;10:22;11:2;
14:10;74:11;77:19;
84:6,7,22;91:9;92:19;
94:15;95:25;96:4;
99:11;101:11;110:10;
112:9;121:5,21;
122:8;126:5;135:10;
136:1,16,24;138:16;
140:20;143:6
**Guevara's (2)**
84:10;134:22
**guidance (1)**
26:3
**guilty (2)**
98:12,21
**gun (5)**
127:24;128:2,4,22;
129:5
**guy (2)**
65:1;139:1
**guys (8)**
51:12,20;97:3,5,6,
7;127:24;139:2

**H**

**Haley (1)**
5:13
**half (4)**
68:22;146:8,24;
147:10
**Halvorsen (11)**
78:12;110:10;
112:10;121:5,21;

122:8;123:20;124:6;
134:25;135:5;140:20
**handful (1)**
33:7
**handle (2)**
15:24;32:15
**handled (1)**
91:4
**hand-to-hand (1)**
29:25
**handwritten (1)**
59:13;60:23
**hang (2)**
68:4,5
**hanging (5)**
53:25;54:7;55:3;
64:22,24
**happen (3)**
36:6;103:20;104:4
**happened (9)**
6:16;75:10;80:18;
102:20;103:1;104:20;
110:1;121:7;140:14
**happening (1)**
85:3
**happens (4)**
6:21;15:5,7;62:11
**harass (1)**
105:10
**harassing (2)**
105:13,16
**hard (2)**
7:18;22:20
**head (2)**
46:12;113:5
**headquarters (1)**
44:7
**hear (7)**
11:9;76:10;92:1,9,
12,15;107:21
**heard (4)**
82:24;85:8;92:4;
112:19
**held (3)**
27:15;60:11;61:23
**help (2)**
37:7;117:7
**helped (1)**
117:5
**helping (1)**
89:3
**hereby (1)**
149:4
**here's (1)**
122:17
**hey (3)**
110:24;111:5;
138:22
**high (7)**
20:8,18,21;23:16;
34:13;76:13;77:16
**higher (2)**
39:20;40:9

**hired (5)**
  23:12;77:7;146:5;
  148:3,5
**hiring (3)**
  23:17;24:14;145:24
**Hispanic (1)**
  63:12
**history (4)**
  41:6,7,14;81:3
**hockey (1)**
  139:10
**Hold (4)**
  38:14;43:11;
  127:23;142:8
**holding (1)**
  60:16
**holds (1)**
  66:8
**home (1)**
  139:5
**homes (2)**
  29:5,6
**homicide (7)**
  17:16;28:11,11;
  91:3,5;109:16;144:17
**hope (1)**
  148:14
**hospital (6)**
  102:7,16;103:4,8;
  104:4,7
**hour (2)**
  68:22;119:11
**hours (6)**
  19:7;26:10,12;99:3;
  103:14;119:13
**house (5)**
  93:2,2,4,4;127:21
**housing (5)**
  28:20;29:1,22;30:1,
  18
**Humboldt (3)**
  34:6;35:20;45:22
**hundreds (1)**
  50:1

**I**

**ID (14)**
  102:7,16,19,20;
  103:1,4,8,9;104:3,4,7,
  10,19;129:17
**idea (13)**
  20:16;26:12;40:14,
  23;41:12;50:3;57:10;
  63:7;64:2;75:11;82:3,
  5;99:6
**identification (3)**
  86:16;110:11;
  115:16
**identified (7)**
  13:6,10;54:18;
  57:15,16;114:1;
  119:18

**identify (1)**
  91:21
**Iglesias (2)**
  15:19;148:9
**Iglesias's (2)**
  13:16;14:9
**Illinois (2)**
  108:3;144:11
**immediate (1)**
  12:19
**immediately (2)**
  103:10,13
**important (6)**
  7:5,10,16,17;
  102:19;128:8
**inadvertently (1)**
  7:9
**incident (1)**
  103:1
**include (2)**
  47:7;128:8
**included (1)**
  71:22
**including (1)**
  10:22
**inclusion (1)**
  89:6
**increase (1)**
  42:2
**increased (1)**
  42:6
**inculpatory (2)**
  129:4;131:8
**independent (10)**
  18:2,12;108:17;
  110:20;112:23;
  116:20;126:11;
  145:19,21;146:23
**independently (2)**
  120:15,21
**index (29)**
  58:13,16;61:10,15,
  20,22;62:1;65:6,11,
  14,14;66:10,21;67:7;
  68:7,10;69:5,10,14,
  15;70:4,13,19,25;
  71:5,19,22;72:9;73:6
**indicated (2)**
  113:19;127:18
**indication (2)**
  62:24;122:2
**indicator (1)**
  54:11
**individual (8)**
  6:1;12:19;31:12;
  58:6;67:23;113:25;
  117:6;128:20
**individuals (7)**
  56:23;57:13;60:13;
  62:8;112:15;128:3;
  131:4
**informally (1)**
  123:16

**information (70)**
  36:9;48:10;51:3,8;
  52:4,13;53:1,2,6,11,
  13,16;55:5,21,25;
  56:7;57:19,21;58:2;
  59:13;61:18;62:13;
  63:3,5,21;64:3;66:20;
  69:4;70:8,17;71:7,19,
  21,21;72:7,22;76:18;
  81:17,20,21,23;87:21;
  89:9,11;90:5;91:15;
  100:14,22;101:12;
  111:19;113:15;
  118:25;120:9,22;
  121:15;122:10;
  123:16;128:5,7,12,19;
  129:9,11,14;131:3,7,
  11,12,16;134:19
**informed (2)**
  119:21;130:17
**informs (1)**
  120:5
**initiates (1)**
  67:18
**inner (1)**
  35:13
**innocence (1)**
  98:15
**innocent (3)**
  97:25;98:9,21
**Insane (7)**
  48:17,22;57:7,10,
  12,14,17
**inside (2)**
  61:22,24
**instance (9)**
  11:17;27:6;35:17;
  36:3;38:22;47:16;
  63:10;80:8;91:14
**instances (1)**
  34:5
**instead (1)**
  58:17
**instructional (1)**
  142:3
**instrument (2)**
  22:9,10
**intelligence (4)**
  36:4,7;47:13;73:3
**interaction (1)**
  81:5
**interested (3)**
  42:18;138:9;144:6
**internal (4)**
  41:6;142:16,18;
  143:5
**interrogated (1)**
  126:6
**interrogating (1)**
  108:14
**interrogation (4)**
  133:5;135:15,19,24
**interrupt (1)**

  7:12
**interview (10)**
  38:18;39:4,16;
  40:10,16;41:15;
  42:19;76:21,25;130:7
**interviewed (4)**
  119:23;127:12;
  130:9;148:3
**interviewing (2)**
  39:17;41:18
**interviews (1)**
  148:4
**into (15)**
  32:10;36:22;37:9;
  48:10;57:22;64:16;
  76:19;77:16;82:16;
  88:22;90:1;99:3;
  114:3;126:2;139:4
**investigate (7)**
  12:16;30:2,8;46:15,
  16,19,21
**investigated (1)**
  36:17
**investigation (24)**
  18:3,4;30:11;88:20;
  89:4;98:23,24,25;
  100:25;109:17;110:8;
  113:2,15,20;116:9,15;
  117:1;120:10,21;
  122:9;130:16;133:8;
  140:24;143:8
**investigations (6)**
  12:15;62:5;73:6;
  142:22,22,24
**investigative (12)**
  17:21;89:7;91:12;
  100:10,19;101:12,18;
  110:21;114:17;115:8,
  15;123:3
**investigator (1)**
  148:6
**investigators (1)**
  47:1
**invoke (2)**
  16:17,24
**involve (1)**
  142:21
**involved (16)**
  25:1;38:20;39:17;
  70:17;81:24;82:3;
  86:20;90:10;99:4,7;
  106:9;122:3;130:10,
  22;139:7;143:17
**involvement (1)**
  117:20
**involves (1)**
  116:21
**IR (6)**
  56:11,13;60:3,10,
  12,23
**irrelevant (1)**
  99:2
**island (1)**

  146:11
**islands (1)**
  146:7
**issue (2)**
  12:3;35:19
**issued (1)**
  112:11
**issues (2)**
  11:23;136:24,25;
  139:21

**J**

**Jack (1)**
  13:13
**Jackman (1)**
  148:3
**Jacques (10)**
  9:13;13:10;16:8,21;
  95:11;96:1,6;97:23,
  24;101:6
**Jail (3)**
  130:5,8,17
**Jane (1)**
  36:25
**January (1)**
  142:12
**Jennifer (2)**
  5:8;132:25
**Jersey (1)**
  5:3
**Jess (1)**
  5:21
**job (11)**
  9:2,5;25:25;36:3;
  46:14;89:22;105:8,9;
  108:9;145:15;148:2
**Joe (6)**
  78:25;79:4,18;81:5,
  7;83:2
**Johnson (6)**
  9:9;10:3,3,5,6;11:4
**Johnsons (1)**
  10:8
**Johnson's (1)**
  10:12
**Johnston (1)**
  140:15
**Jose (22)**
  5:10;111:6;112:19,
  23;119:22;126:2,6;
  127:12,14,15,17;
  128:2;129:21;130:4,
  7,8,10,17,21;133:12;
  140:25;141:3
**Joseph (2)**
  80:9,13
**Josh (3)**
  5:25;11:8;105:7
**Juan (4)**
  10:5,5,11;11:4
**judgment (4)**
  9:25;16:4,5,9

**juice (1)**
144:21

**July (3)**
127:4;128:13;132:8

**jumping (1)**
7:6

**junior (2)**
20:24;21:2

**jury (4)**
9:24;98:3,24;
104:25

**Justice (2)**
146:2;147:11

## K

**keep (8)**
11:20;12:8;19:9;
26:14;64:2;89:8;90:5;
130:3

**kept (3)**
56:10;65:15;73:16

**Kevin (1)**
116:22

**kids (4)**
137:1;139:6,7,7

**killer (2)**
62:23;63:12

**kind (15)**
12:6,18,20;22:20;
36:1;37:3;44:1;72:15;
87:5;90:8;100:22;
129:16;143:19;144:6;
146:25

**King (3)**
56:24;62:23;63:12

**Kings (13)**
48:16;49:2,9,13,22;
56:21;57:2,4;63:16;
127:21;128:1,21,22

**knew (3)**
49:17;50:6;130:13

**knowing (1)**
138:9

**knowledge (10)**
18:8;21:15;25:14;
39:13;41:3;82:21,23;
125:22;127:18;
138:10

**knowledgeable (1)**
47:25

**K-Town (2)**
48:20,21

## L

**lady (1)**
138:3

**lake (1)**
45:17

**large (3)**
35:6;49:8,17

**largely (1)**

23:19

**larger (1)**
35:4

**last (15)**
66:18,19,21;69:10;
70:7,25;71:20;94:14;
95:8;111:15;115:3;
117:9;124:3;133:21;
135:4

**lasted (1)**
106:18

**later (5)**
31:10;105:23;
125:11,12;131:22

**Latin (12)**
48:16;49:2,9,13,22;
56:21,24;57:2,4;
84:12;127:21;128:21

**law (11)**
8:15,15;25:3;26:5,
7,11,15,15,22;143:21;
145:22

**laws (3)**
27:1;108:3,4

**lawsuit (5)**
13:8;14:13;112:20,
22;113:6

**lawsuits (1)**
14:1

**lead (3)**
128:25;131:12;
133:9

**learn (3)**
109:17;111:16;
139:16

**learned (3)**
110:16;127:25;
146:12

**learning (1)**
109:25

**leases (1)**
12:17

**least (9)**
11:2;56:23;60:10,
12;102:23;122:1;
123:19;129:23;133:8

**leave (2)**
48:4;54:21

**Leavitt (6)**
48:16;49:3,6,13;
56:21;57:1

**led (1)**
119:1

**ledger (1)**
5:14

**left (5)**
69:2;85:4;127:24;
146:4;147:13

**legal (7)**
66:16;70:7,20;71:2,
8,11;74:2

**lesson (2)**
143:25;144:1

**lets (1)**
15:9

**letters (1)**
12:21

**liar (1)**
104:14

**life (3)**
82:11;138:25;139:5

**light-complected (1)**
63:11

**lineup (5)**
86:6,7,20;107:12,
16

**lineups (5)**
86:17;87:1;107:13,
14;108:2

**list (6)**
69:4;77:1,7,17;
124:3,7

**listed (2)**
124:9,12

**listen (2)**
11:14;73:18

**litigation (2)**
9:16,19

**little (16)**
6:18;12:6;19:11;
23:6;26:8;35:1;37:4;
46:18;60:25;61:1;
65:13,21;105:16;
126:17;144:12;
146:20

**live (4)**
86:19;94:9;107:13;
146:24

**lived (1)**
147:1

**lives (1)**
94:21

**Lluvia (5)**
117:11;119:2,13,
14,18

**loan (1)**
137:12

**located (5)**
43:23;44:9,12;
50:20;121:23

**locating (1)**
122:3

**location (2)**
58:10;62:12

**locations (1)**
68:5

**locked (1)**
130:5

**loitering (2)**
52:21;90:18

**long (17)**
22:12,23,25;24:18;
27:4;30:21;34:14;
51:10;84:3;93:17;
103:17;106:17;141:9,
22,23,24;142:8

**look (25)**
15:3;63:14,15;
69:15;70:20;73:18,
20,22;85:1,6;86:5;
110:12;113:25;114:1,
5;117:5,8,20,24;
118:13,20;119:10;
125:11,15;132:16

**looked (4)**
25:10;110:23;
113:18;116:19

**looking (10)**
15:11;18:25;39:25;
40:11;41:2;69:12;
74:2;116:24;118:6;
123:19

**Looks (4)**
67:4;131:2,3;141:6

**lose (1)**
145:7

**lost (1)**
100:14

**lot (21)**
12:7;15:4;25:2;
29:21;33:11;35:1;
42:8;46:25;50:1;52:1;
53:20;69:25;70:7;
81:17;85:10;89:24;
90:20;134:16;137:1;
140:5,5

**louder (1)**
6:17

**Lovers (1)**
84:12

**Lowry (2)**
22:6;23:4

**lunch (1)**
137:14

**lunchtime (1)**
95:19

## M

**main (5)**
50:18,19;75:5,6,6

**Mainly (2)**
28:19;97:15

**maintain (3)**
55:12;87:22;88:21

**maintained (4)**
55:21;56:17;58:3;
65:8

**making (1)**
10:7

**manner (1)**
108:2

**many (20)**
6:9;19:2,6;26:10,
12;33:3,16;39:7,20;
41:17;49:22;50:4;
52:6;77:4,6;80:12;
94:4;111:9;137:1;
147:4

**mark (2)**
115:7,7

**marked (1)**
115:16

**married (3)**
93:15,17,19

**Mason (1)**
146:5

**materials (1)**
109:15

**matter (9)**
9:11;10:1,13;12:10,
12;13:22;39:9;72:21;
96:17

**matters (3)**
8:22;10:21;26:24

**Maxwell (1)**
37:18

**may (14)**
19:17;32:24,25;
35:25;37:11;39:7;
66:25;67:10,14;85:5;
109:4,6,20,20

**Maybe (27)**
6:10;12:1,2;19:5;
31:2,9;34:16,19;
35:24;37:11;43:6;
45:20;48:8,25;49:20;
50:5;58:6;18;79:22;
94:17,23;96:14;
103:13,20;126:15;
139:23;140:15;
145:10

**mayor (1)**
36:25

**Maysonet (28)**
5:10;17:13;108:24;
111:6;112:5,19,24;
113:4;115:10;119:22;
121:18;126:2,6;
127:12,15,16,18;
128:2;129:21;130:4,
7,8,10,17,22;131:8;
140:25;141:3

**M-A-Y-S-O-N-E-T (1)**
5:11

**Maysonet's (6)**
17:12;18:5;111:16,
25;132:7;133:12

**Mc (3)**
5:23,23;148:19

**mean (39)**
10:16;17:14;26:13;
28:23;32:22;33:6;
38:24;39:12;44:14;
45:20;46:21;49:11;
50:11;54:18;57:24;
74:23;83:12;89:1,12;
92:7;95:15;98:24;
102:11;103:10;
105:15;112:3;116:3,
6;117:4;122:22;
125:12;132:1;138:6,

19,20;139:17;144:20;
146:23;147:16
**meaning (1)**
45:6
**means (2)**
116:4,14
**meant (3)**
11:18;27:4;127:14
**meat (1)**
19:12
**meet (1)**
146:19
**Megan (1)**
5:23
**member (12)**
53:11,19;54:6,19;
63:8;64:10,14,21;
73:4;83:6;112:3;
136:2
**members (14)**
20:1;48:13;51:5;
52:6,9;53:14,16;54:7;
55:25;56:8,24;57:10;
63:16;72:23
**members' (2)**
53:15;93:12
**member's (1)**
54:25
**memorialize (1)**
131:17
**memorialized (8)**
101:11,12,19;
120:15,22;123:5;
129:10;132:7
**memory (8)**
99:12,19,24;100:9;
102:3,24;103:4;
113:10
**men (1)**
109:19
**mentioned (5)**
65:5;69:7;89:15;
114:1;145:10
**mere (1)**
62:12
**meritorious (1)**
77:11
**meritoriously (5)**
74:20,22,24;77:20;
105:25
**met (2)**
122:24;137:25
**mid-'80s (2)**
39:18,23
**middle (1)**
105:23
**midnight (1)**
138:20
**midnights (1)**
138:22
**Miedzianowski (8)**
78:25;79:4,19;
80:10,13;81:5,8;83:3

**might (23)**
6:22;19:1;31:9;
32:23;33:12,12;34:6;
35:18;42:19;52:24;
56:7;60:13;62:14,15;
63:2,14,14;66:23,25;
72:22;125:11;140:6;
144:22
**milestone (1)**
93:13
**military (2)**
20:21;24:12
**mill (1)**
90:18
**mind (7)**
14:6;19:12;69:6;
74:1;117:14,17;
126:19
**Mingey (24)**
16:21;77:22,25;
96:21;112:10;113:25;
118:8;119:1,11,15;
120:6;121:22;122:3,
4,11;126:7;127:10;
129:22;130:6,18;
132:17;133:22,22;
135:1
**minor (1)**
125:19
**minutes (1)**
68:24
**Miranda (1)**
127:15
**misconduct (2)**
83:9;91:12
**misplaced (1)**
102:14
**misrepresented (1)**
100:15
**missed (1)**
128:18
**mission (1)**
32:23
**misstating (1)**
36:23
**mistaken (2)**
9:24;11:17
**mob (2)**
52:21;90:18
**mobile (3)**
32:15;37:15,23
**money (5)**
83:5;137:8,9,12;
138:13
**monies (1)**
136:2
**monitor (1)**
35:23
**month (1)**
105:19
**months (11)**
24:22,22;48:8;
49:15;50:9;55:11;

94:17,19;95:7;
106:23;138:21
**Montilla (9)**
78:21,22;112:10;
127:11,13,14,14;
129:23;130:7
**moon (1)**
92:25
**more (18)**
7:5;11:22;30:5;
61:6;63:20;64:3;
65:22;87:8;90:25;
91:4;97:19;116:7;
138:9;139:21,23,24;
140:2;144:6
**morning (3)**
5:6,7;119:13
**most (5)**
29:15;34:10;46:9;
53:22;84:17
**Mostly (4)**
37:5;84:22;87:9;
126:11
**motivated (1)**
73:2
**move (7)**
6:15;17:3;19:16;
105:18,18;144:20,21
**moved (5)**
141:10;142:16;
144:17,23,25
**Moving (1)**
27:17
**much (11)**
16:2;25:19;33:9;
36:24;54:14;101:16;
114:20;133:16;
138:13;144:13;148:1
**murder (5)**
30:6;62:11,13;
108:25;110:8
**murders (10)**
109:2;111:1;112:6;
116:21;117:1;118:22;
127:19;130:11,22;
132:2
**must (1)**
128:2

## N

**name (34)**
5:8;10:4;36:12,15;
37:3;58:21;59:2;
61:10,15,19;66:18,19,
21;69:10,16,24;70:7;
71:1,11,20;73:20;
88:4,5;111:1,8;
112:19,23;113:4;
114:6;117:9;123:24;
125:8;126:15;132:25
**named (7)**
9:15,18;13:1;14:3,

3;17:4;70:17
**names (11)**
9:6;28:9;57:23;
66:16;70:21;71:2,8;
74:2;113:2;117:15;
128:3
**napkin (3)**
87:20,22;120:16
**Narcotics (1)**
90:15
**natural (1)**
7:6
**nature (2)**
6:23;39:9
**necessarily (2)**
15:21;100:18
**necessary (1)**
30:3
**need (6)**
8:3,4;15:24,25;
63:20;73:19
**needed (6)**
21:6;85:7;88:17;
106:14;116:15;121:1
**needs (1)**
32:18
**neighborhood (3)**
19:21;45:19;119:12
**neighborhoods (1)**
32:19
**New (9)**
5:3;29:11,11;48:13;
53:19,20;139:17,18,
22
**news (1)**
11:24
**Newspapers (2)**
134:15,16
**next (3)**
119:11;127:24;
130:4
**nickname (23)**
58:22,24;59:2,6,16;
65:6;69:3,12,13,17,
20;70:1,14,21;71:5,6,
23,25;73:18,19,22;
74:3;117:11
**nicknames (7)**
51:6;66:16;67:7;
69:22,25;70:20;71:12
**night (5)**
122:23;127:20;
139:25;140:2,4
**nobody (1)**
99:7
**nomination (1)**
75:2
**normal (1)**
86:22
**normally (1)**
129:15
**north (26)**
34:4;38:5;42:15,24;

3;17:4;70:17
43:20,23;45:2,6,8,16,
18;48:4,25;49:19,23;
56:9;72:8;74:14;
77:23;78:3,15,19,22;
79:19;127:19;128:1
**northwest (1)**
80:17
**Notary (2)**
5:2;149:16
**note (3)**
102:9,11;122:25
**notepad (4)**
87:18,22;120:16;
123:6
**notes (13)**
59:18,23;87:11,13,
15,23;88:1;102:13,
25;103:5;121:2,7,9
**notices (1)**
11:8
**notified (2)**
15:15;30:13
**November (2)**
23:14,17;24:7,15
**number (19)**
59:19,24;60:4,6,23,
24,25;61:5,14;67:18,
18,20,21,21,25,25;
86:9;135:1;137:17
**numbers (9)**
61:4,8;67:1,14,16,
16,17,17;76:14
**nutshell (1)**
139:19

## O

**Oakwood (1)**
35:8
**oath (6)**
5:4;8:12,14;102:23;
103:3;104:3
**Object (10)**
26:17;40:3;41:10;
55:15;56:2;100:12;
101:1;107:19,22;
134:10
**Objection (9)**
17:18;62:16;82:7;
99:1;103:21;104:15;
105:2;128:15;131:23
**observing (1)**
55:2
**obtained (1)**
81:20
**obtaining (1)**
51:2
**obvious (4)**
96:10,13,14,15
**obviously (4)**
50:24;90:1;91:3;
95:10
**occurred (9)**

30:6,17;99:25;
109:1,4,19;114:8,9;
130:13

**off (11)**
7:9;11:10;27:15;
46:12;48:18;69:2;
72:18;75:18;76:1;
77:7;117:12

**offender (1)**
63:3

**offenders (3)**
116:5;119:12;
131:12

**offense (1)**
67:19

**offered (1)**
38:11

**offhand (1)**
114:7

**office (22)**
5:16;12:14;37:19;
38:4;48:7;50:17,18,
19;55:14;56:18,19;
57:11;73:15;75:5,6,6,
8;112:3,4;145:15,18;
148:6

**officer (26)**
6:1;20:5;23:10;
24:9;25:15,25;26:3,5;
28:14,17;29:15;30:7,
22;31:21;32:5,8;46:8;
47:18;81:15;83:3,9,
19;84:4;91:9;92:15;
136:5

**officers (9)**
20:2;36:14;39:20;
40:10;46:4,10;83:25;
94:7;143:24

**official (1)**
142:4

**Officially (1)**
142:12

**offshoot (1)**
35:1

**often (1)**
51:25

**older (1)**
60:10

**Once (13)**
34:4;51:11;54:15;
92:20,25;96:23;97:3;
137:14;138:1,16,21;
139:1;147:24

**One (51)**
7:5,22,24;8:24,25;
9:1,8,9,10;15:16,18,
20;26:1;29:4,19;30:1;
31:10,12;32:25;35:4;
44:17;52:3;61:5;
63:18,18;64:2,6,16;
70:6;71:10,11;77:22;
78:1;80:14,24;81:4;
84:12,13,15;88:17;

89:13;90:19;94:5,6;
96:17;107:12;114:14,
19;120:22;121:13,13

**ones (2)**
60:11;107:5

**ongoing (1)**
63:25

**only (12)**
13:14;34:5;38:3;
40:19;42:23;46:15;
69:16;80:24;81:1,4;
117:19;126:9

**on-scene (1)**
29:18

**open (7)**
115:2,22,25;116:2,
8;122:17;125:2

**opening (1)**
38:3

**openings (1)**
42:24

**openly (3)**
92:6,10,10

**operate (1)**
147:2

**operated (1)**
146:11

**operating (1)**
35:4

**operations (4)**
31:25;32:4,9;34:15

**opportunity (1)**
115:18

**oral (1)**
132:7

**order (5)**
25:16;65:10,12,17;
143:14

**orders (5)**
25:12,21,24;83:24;
107:1

**organ (1)**
22:11

**organize (1)**
56:7

**organized (21)**
55:24;56:12,13;
57:23;58:9,16,17,20;
65:20;66:12;69:10,
12;70:7,13,25;71:6,
11,12,20,23;72:22

**organs (1)**
22:7

**original (1)**
88:1

**Originally (1)**
146:1

**other's (1)**
7:7

**Otherwise (3)**
90:4;104:14;116:17

**ours (2)**
35:16;65:16

**out (62)**
6:12;10:8;12:1,8;
15:22;17:25;26:4;
31:1;32:25;33:12;
35:18;37:18;40:11;
44:1,23;46:4;48:13,
21;51:7;52:5;53:18,
25;54:7;55:3;56:21,
22;57:12;58:7;61:19;
62:23;65:25;68:4,5;
69:25;71:2;80:22;
85:11,15;87:11;
91:19;101:17;112:4,
11;113:4,24;114:5;
117:5;121:23;122:16;
130:16,25;132:14;
136:10,18;138:1;
140:10;141:5;144:17,
25;146:9,20;147:15

**outside (1)**
92:19

**Over (8)**
28:9;31:18;74:1;
78:6;85:14;95:4;99:3;
144:18

**overall (1)**
46:24

**overseas (1)**
145:20

**overtime (1)**
140:5

**overwhelming (1)**
34:7

**own (3)**
89:4;98:15;120:23

## P

**page (10)**
61:3;115:4;119:4,5,
8;123:20;124:3,24;
126:19,20

**panel (1)**
39:19

**paper (2)**
87:17,19

**papers (1)**
134:21

**paragraph (5)**
119:9;120:3,5;
122:9;127:3

**paralegal (1)**
5:13

**Pardon (8)**
9:17;81:13;92:22;
116:1;124:17;137:4;
141:18;147:21

**Park (4)**
34:6;35:20;45:22;
48:23

**part (20)**
26:10,23;36:11;
39:4,5;40:10;46:9;

47:12;53:22;54:6;
63:3;69:5;80:5;84:17;
102:9;105:22;108:8;
120:17;122:22;
125:18

**participate (2)**
133:4;136:4

**particular (12)**
18:3;19:21;42:21;
45:10;49:3;54:7,11,
19;62:11;73:3;
138:14;144:4

**particularly (4)**
7:17;41:22;47:25;
49:8

**particulars (2)**
58:7,19

**parties (2)**
9:7,7

**partner (13)**
29:13,15;31:4,8;
33:9;84:18,21;
137:23;138:15;
139:23,23;140:13;
143:7

**partners (7)**
31:5,8,14;84:15;
137:23;138:17;
140:20

**partnership (1)**
140:10

**party (4)**
10:11;13:1,8;97:1

**pass (7)**
36:9;75:14;76:8,11;
89:9,11,12

**pass/fail (1)**
77:15

**passage (1)**
101:22

**passed (2)**
39:3;143:10

**past (3)**
67:11;111:9,10

**patrol (22)**
28:14,17,21,21,23;
30:7,22;31:21;32:5,8;
37:9;38:7;46:15;
85:10;88:9,11;89:16;
90:25;106:15;107:5;
138:24;141:16

**Paulnitsky (2)**
78:19;112:9

**payments (2)**
137:17,19,20

**pending (2)**
8:8;13:22

**people (28)**
29:10;31:17;33:3,
16;36:10;39:19;
41:17;42:17,18;47:2;
52:5;53:20;60:11;
62:6,15;63:15;65:1;

66:24;67:10;77:6,6;
82:4;96:18;129:5;
132:1;136:9;144:20;
145:7

**people's (1)**
15:4

**percentage (1)**
89:22

**period (11)**
24:20;35:5;43:19;
50:23;77:25;99:25;
100:10,19;103:13;
140:21;141:24

**periods (1)**
31:9

**perks (1)**
42:3,5

**permission (2)**
73:7,20

**perpetrator (3)**
63:7;91:16,20

**person (16)**
15:23;33:10;41:8;
53:3;61:10,15,19;
62:23;66:25;67:10,
23;68:1;92:13,16;
114:4;123:21

**personally (2)**
79:15;143:11

**persons (1)**
130:14

**phone (1)**
52:1

**photo (6)**
60:7;66:23,24;
86:16,18

**photographs (4)**
57:22;58:2;61:13;
62:2

**photos (12)**
56:10,11,13;57:13,
17;59:13,14,14;60:3,
10,12;62:6

**phrase (1)**
72:6

**phrased (2)**
27:3;79:22

**physical (4)**
25:2;135:11,14;
143:21

**physically (4)**
43:23;65:15;
147:20,22

**pick (1)**
141:5

**picture (5)**
59:25;64:5;65:22;
66:22;141:3

**pictures (4)**
57:24;58:1;61:3;
62:8

**piece (4)**
12:5;87:17,18,21

**pistol (1)**
127:22
**placard (3)**
60:13,16,19
**placards (1)**
60:11
**place (5)**
5:18;40:16;76:13;
80:15;100:11
**placed (1)**
58:8
**places (3)**
34:12;140:14;
146:19
**plain (3)**
33:18;42:8;85:16
**plaintiff (1)**
5:9
**plans (2)**
143:25;144:1
**plaque (2)**
60:14,16
**plastic (2)**
61:4;65:13
**play (1)**
22:10
**played (4)**
77:16;113:19;
123:3;124:13
**playing (2)**
139:10,10
**please (4)**
7:22;14:7;103:2;
119:7
**plots (1)**
81:24
**pm (1)**
148:25
**point (12)**
6:21,25;7:21;24:12;
36:21;78:16;90:20;
94:4;109:11;111:15;
113:14;126:4
**pointed (1)**
91:19
**police (62)**
6:1;17:10,11,15;
19:14;20:2,4;23:7,10,
13,18;24:8,15,16,18;
25:7,11,15,17,25;
26:3,23;27:8,12,18;
28:3,5;43:25;47:18;
52:17;53:23;81:14;
83:3,9,19,20,25,25;
84:3;88:15;93:21;
94:7;99:23;100:4,8,9;
101:23;107:17;108:5;
113:6,11,12,18,22;
129:19;136:5;141:25;
142:1,6;143:16,24;
147:13
**policies (9)**
25:10;83:24;99:23;

101:23;107:1,17;
108:5;129:19;143:21
**policy (8)**
25:3,17;100:2,4,8;
143:2,4,13
**political (3)**
12:20;144:21;
147:17
**politically (1)**
147:18
**politics (1)**
36:16
**pop (1)**
52:22
**portion (5)**
26:11;99:4,7;102:5,
6
**position (6)**
38:10;41:18,23,24;
42:14;142:9
**positions (1)**
43:12
**possible (4)**
70:18;71:1;73:24;
130:18
**possibly (2)**
5:14;116:5
**potatoes (1)**
19:12
**potential (1)**
62:8
**potentially (3)**
129:3,4;131:15
**practice (7)**
26:15;99:14;
100:16;122:15,19;
125:1,7
**practices (1)**
26:4
**predominant (1)**
34:22
**preliminary (1)**
30:11
**preparation (4)**
18:6;51:3;99:25;
126:14
**prepare (14)**
17:8;18:22;50:9;
88:22;89:5;99:23;
100:17,21,24;101:10;
102:15;103:8,15;
122:17
**prepared (11)**
17:16;55:11;88:11;
99:11,19;102:3,18,24;
103:4,17;132:6
**preparing (3)**
100:9;101:13;
123:17
**present (4)**
5:12;87:1;104:7;
130:12
**presently (3)**

12:13;13:16;19:13
**press (1)**
17:23
**presumed (1)**
56:24
**Pretty (9)**
16:2;33:9;36:24;
47:4;66:2;95:13;
114:19;133:16;
140:21
**previous (4)**
18:8;78:9;85:3;
86:6
**previously (5)**
8:20,21,23;14:3;
77:12
**primarily (3)**
29:2,3;34:23
**prior (17)**
18:5;95:6;101:13,
14;102:25;103:5;
111:4;113:5;115:18;
125:2,6,8,23;126:6;
127:7;132:6;145:15
**prison (8)**
48:12,13;51:7,10,
12,15,21;111:25
**prisons (3)**
51:13,21,22
**private (3)**
9:10;12:10,11
**Probably (13)**
6:14;34:11;39:2;
41:3;52:1;59:10;
65:17;68:15;94:16;
106:12;111:3;123:15;
133:23
**probation (1)**
24:21
**problem (11)**
8:5;32:24;34:7;
35:21;37:1;46:11,11;
54:21;68:23,25;
138:23
**problems (2)**
32:19,21
**procedure (1)**
26:25
**procedures (6)**
25:3,11,18;86:16;
108:5;143:21
**proceeding (1)**
47:21
**proceedings (1)**
112:16
**process (6)**
15:13;40:10;41:15;
76:22,25;148:4
**processing (1)**
106:13
**professor (1)**
146:6
**program (1)**

144:15
**prohibited (1)**
143:14
**projects (2)**
29:22;35:2
**promises (1)**
135:21
**promoted (15)**
38:1,16;42:23;
74:17,20,21,24,25;
75:13,18;76:1;77:20;
105:25;141:11;
144:25
**promotion (4)**
38:3,6;42:12;77:12
**property (2)**
12:16;127:11
**prosecuted (4)**
67:15;82:17;98:9;
109:4
**prosecution (1)**
18:5
**provide (3)**
63:13;91:15;128:3
**provided (2)**
69:3;128:20
**Public (6)**
5:2;28:20;29:1;
30:1,17;149:16
**pull (3)**
56:22;57:12;65:25
**punitive (5)**
16:4,4,5,9,9
**purportedly (1)**
120:20
**purpose (2)**
62:4,5
**purposes (2)**
73:6;146:21
**pursued (1)**
131:13
**put (3)**
41:25;74:25;89:10;
115:4;131:20;136:10

**Q**

**qualified (1)**
47:17
**quality (1)**
142:4
**quarter (1)**
109:10
**quick (1)**
68:21
**quickly (1)**
19:17
**quite (1)**
11:21
**quote/unquote (1)**
35:21

**R**

**race (1)**
92:2
**radio (2)**
35:24;85:14
**Rahe (5)**
5:20,20;40:2,2;
148:21
**rank (4)**
32:5;39:20;79:6;
143:25
**ranking (2)**
40:9;76:16,19;77:1
**rankings (1)**
76:14
**rate (1)**
34:13
**rather (3)**
98:21;102:24;103:5
**RD (3)**
67:16,18,25
**reach (2)**
112:4,10
**read (9)**
14:12,12,15,19;
15:3;17:10,11,15,21,
23;23:2;50:16;
117:12,23;119:3;
120:11,19;125:2,5,7,
17;134:20;149:3
**reading (9)**
18:5;12,17;110:17;
117:17;121:17;125:6;
126:11,13
**real (5)**
35:15,19;63:13;
69:16;73:20
**really (15)**
7:10;11:18;22:8;
45:21;77:14;91:2;
96:9;113:9;125:19;
135:6;136:19;137:25;
138:6;139:4;140:7
**reason (5)**
14:15,18;36:16;
90:21;138:14
**reasonable (1)**
103:13
**reasons (4)**
54:17;75:3;96:11,
13
**recall (9)**
31:14;69:4;71:18;
109:24;110:7;118:15;
132:21,24;133:3
**recap (1)**
67:6
**receive (1)**
108:1
**received (3)**
103:10;113:14;

134:19
**receiving (2)**
109:24;129:11
**recess (2)**
69:1;136:22
**recognize (1)**
141:2
**recollect (1)**
79:18
**recollection (12)**
18:3,12,18;38:21;
108:18;109:5,18;
110:20;112:23;
116:20;117:15;
126:11
**recommendation (1)**
75:5
**reconcile (1)**
104:18
**record (4)**
5:19;7:19;27:16;
72:17
**recorded (1)**
99:24
**Records (1)**
67:20
**recruits (3)**
142:5,6;144:1
**reference (1)**
120:4
**referenced (4)**
9:4;73:5;77:12;
134:21
**references (1)**
68:1
**referencing (3)**
83:16;102:7;120:4
**referred (1)**
58:4
**referring (1)**
60:22
**reflect (1)**
129:24
**refresh (2)**
18:18;109:5
**refreshed (2)**
109:18;113:10
**refresher (1)**
107:7
**refreshing (1)**
117:14
**regarding (1)**
143:6
**register (1)**
41:7
**regs (3)**
25:4,6,7
**regular (5)**
84:18;97:3,5,6;
139:3
**regularly (1)**
95:14
**Regulations (2)**

25:4;143:22
**related (3)**
9:1;62:25;145:22
**relates (1)**
27:1
**relationship (1)**
135:8
**relax (1)**
99:9
**release (2)**
111:25;135:22
**released (1)**
111:17
**remain (1)**
16:18
**remaining (1)**
6:1
**remember (89)**
17:1;18:9;22:14;
24:19;25:18,23;
26:12;30:19;33:5;
34:5;35:21;38:25;
39:8,15;40:14,15,23,
25;41:1,13,16;43:3,8;
45:15,21;47:23;
48:18,18;50:6,7;59:5;
60:11;61:21;65:19;
67:2;68:17;71:9,24;
74:18;76:22;78:8;
79:21;80:7,8,21,24;
81:18,19;84:2,13;
90:19;91:2;92:17;
95:7,24;99:12;
105:19,24;106:11,19,
21;107:4,12;108:7,
21;110:18,25;111:6;
114:6,7,8;117:24;
118:5,10,17,19,21,23,
25;121:16;123:22;
125:6,25;126:4,5,23;
132:12;140:18;
141:23
**remembered (1)**
102:3
**remind (1)**
19:23
**repeat (2)**
6:22;107:25
**rephrase (2)**
26:19;45:6
**report (78)**
17:23;27:7;48:11;
67:19;87:24;88:3,4,5,
7,10,12,13;89:10,20;
99:19;100:1,24;
101:11,13,19;102:3,
15,18,24;103:4,8,15;
107:6,7,11;109:23;
115:2,10,17,22,22,25;
116:2,10,19,25;
117:17,23;118:6,9,11,
18;119:3,5,6;120:8,
15;121:17;122:2,18;

123:6,17,20,21;
124:16,19,21;125:2,7;
126:9,12,13,19,22;
127:1,4,7;128:8,13;
129:14,17,24;133:16
**reported (2)**
120:22;129:10
**reporter (2)**
7:19;12:7
**reporting (1)**
119:10
**reports (45)**
17:10,11,15;18:5,
13,17;28:22;48:4,5;
49:14;50:8;51:4;
55:10,13;85:3,4;87:3,
5;88:6,22;89:5,16;
99:8,11,24;100:9,17,
21;106:13;107:9,12;
110:9,17,24;111:5;
113:6,11,12,19,22;
114:10,11;117:13;
120:23;132:6
**represent (1)**
5:9
**representing (1)**
6:2
**re-prosecution (1)**
112:5
**request (1)**
125:23
**require (1)**
64:16
**required (4)**
26:9,14;130:8;
138:19
**requiring (1)**
26:25
**requisites (1)**
21:7
**research (1)**
146:6
**respect (3)**
81:12,14;91:8
**respond (2)**
30:19;35:24
**responded (1)**
110:3
**responsibilities (3)**
26:5;28:17;29:19
**responsibility (7)**
35:16;46:24;47:12;
85:11;86:24;90:2;
97:17
**responsible (7)**
30:7;45:9;62:14,15;
90:24;131:4;137:18
**restricted (1)**
146:22
**resulted (1)**
18:4
**results (1)**
76:2

**retire (1)**
142:11
**retirement (1)**
145:8
**returned (1)**
9:25
**reveal (1)**
19:1
**reversed (1)**
111:17
**review (4)**
115:18;133:18;
142:24;144:2
**reviewed (2)**
41:5;109:16
**reviewing (6)**
109:15;110:9;
111:5;113:6,22;
142:21
**Rey (41)**
10:22,24;11:2;
14:10;74:11;77:19;
84:6,7,10,22,24;
85:22;91:8;92:19,24;
94:14,21;95:25;96:4;
99:11;101:11;102:23;
104:6;106:1;110:10;
112:9;121:5;126:5;
134:3,21;135:10;
136:1,16,23;137:1,22;
138:15;139:21;140:2,
19;143:6
**Rey's (1)**
134:6
**RFC-Maysonet (2)**
115:11;119:6
**Riccio (3)**
140:15,16,16
**RICO (1)**
82:18
**ridiculous (7)**
22:8;82:3,5;136:11,
12,13,15
**right (207)**
7:19;8:11,12,13,17,
18,20;9:3,13,16;10:1,
2,7,17,23;11:1,13;
13:24,24,25;14:6;
16:1,3,15,18,25,25;
17:2,25;18:21;19:14;
21:9;23:21,24;24:5,
12;27:11,17,25;
28:14;30:10,14;31:1,
18;32:11;34:2,19,20;
35:5;36:23,24;38:8;
41:17;42:12,15,25;
43:17;44:22,25;45:3,
11,12;46:1;47:10,11;
49:5,7;50:6,8,22,25;
53:10;54:8,23;55:18,
20;56:20;57:5,7,14,
17;58:13;59:9;60:1,4,
20,21;61:16,17;62:11,

15,25;63:4,10,16,19,
20;64:12;65:5;66:10,
13;67:8,12,15,16;
68:2;69:9;70:9,14,22;
71:3,13;72:4,19;
73:22;74:3,8,11;
75:12,21;76:7,12,16,
17;77:3,12,17,20;
78:18;82:18;89:14,
16,17;90:22;91:6;
92:18;93:24;96:25;
98:14;100:16;101:14,
24;102:4,16,20;103:1,
5,9,16,20,25;104:23;
105:17;109:20;113:7,
8,13,16,20;114:7,23,
24;117:21;118:12;
121:24,25;122:5,23;
123:7,14,25;124:2,24,
25;127:1,8;128:9,14,
23;129:1,6,11,19;
130:1,3,23;131:1,7,9,
13,18,22;132:3,5;
133:18,21,25;134:7,
22;138:5;140:1,21;
141:5,8;142:14;
148:15,20
**right-hand (1)**
126:25
**rights (4)**
5:10;13:23;127:15,
16
**ring (1)**
126:14
**Rita (1)**
20:10
**rival (3)**
63:4,8,16
**rivals (1)**
63:24
**Rivera (8)**
9:8,13,22;11:4;
13:13;16:3;97:24;
133:23
**Rivera's (9)**
13:10;16:8,22;
95:11;96:2,6;97:23;
99:10;101:6
**robberies (1)**
33:1
**Robert (2)**
29:5,6
**Roland (2)**
78:18;112:9
**role (11)**
35:20;90:24;
113:20,23,24;116:25;
120:13,20;123:3;
124:13;144:18
**roll (2)**
31:7;86:1
**romantic (1)**
137:23,23

**room (1)**
7:18
**roughly (5)**
22:24;49:24;94:19;
95:7;103:17
**Rukns (2)**
35:7,9
**rules (5)**
7:4;25:4,6,7;143:22
**rumor (1)**
83:2
**rumors (1)**
82:24
**run (2)**
90:17;148:5
**rung (2)**
111:1,7

## S

**safe (4)**
109:12;147:19,20,
22
**salary (2)**
42:2,6
**same (9)**
7:4,18;8:14;31:3,
23;32:16;33:10;70:1;
71:18,21;74:17;78:7;
79:12;85:22;102:25;
106:4;144:22
**saw (3)**
29:18,25;63:11
**saying (15)**
11:14,24;12:6;
36:21;49:16;73:25;
82:20;99:20;112:18;
120:19;121:21;122:7;
126:23;129:8;147:22
**scenario (1)**
143:13
**scenarios (1)**
108:20
**scene (2)**
30:3;110:4
**Schiller (5)**
48:17;49:3,6,14;
56:22;57:1
**school (15)**
20:9,12,15,18,21,
23,25,25;21:9,10,12;
23:16;24:4;106:6,10
**schooling (1)**
23:19
**score (2)**
76:19,20
**scored (1)**
77:16
**scores (1)**
76:14
**screw (1)**
139:6
**search (5)**

**80:9,13,19,25;**
132:21
**searching (1)**
119:11
**Second (18)**
27:19,21;28:13,18;
30:8,9,18,22;31:15,
20;34:12;38:14;44:7;
101:5;110:13,14;
119:9;132:15
**Section (6)**
49:4,6,8,13,19;
56:24
**sections (2)**
49:22;50:4
**seeing (4)**
5:15;74:2;85:2;
132:12
**seemed (2)**
81:16;97:13
**seems (1)**
74:16
**self-admitted (1)**
64:8
**self-admitting (1)**
64:14
**send (3)**
33:2;34:9;137:8
**sense (2)**
72:2;106:23
**sent (7)**
34:4;48:6;50:10,12,
18;55:11;75:4
**sentence (2)**
82:12;130:4
**separate (8)**
37:15;39:6;58:9,11;
88:21,24;89:1,8
**Sergeant (17)**
112:10;113:25;
119:1,15;125:3;
126:7;127:10;129:22;
130:6,17;132:17;
133:22;134:25;
141:11;142:3,18;
144:25
**serious (1)**
52:21
**seriously (1)**
105:15
**serve (1)**
24:11
**service (1)**
20:22
**serving (1)**
82:11
**set (2)**
49:3;140:9
**several (2)**
63:23;138:21
**sex (4)**
28:11,12;90:11,13
**sexual (1)**

**33:1**
**shakes (1)**
12:8
**shall (1)**
109:10
**sheet (3)**
86:5,5,8
**shift (3)**
86:2;139:13;140:3
**shifted (1)**
24:8
**shifts (6)**
73:13;138:19;
139:25,25;140:2;
145:6
**shoot (1)**
63:12
**shooter (2)**
130:12,14
**shooting (11)**
73:2;109:18,25;
110:4;113:3;127:25;
128:2,23;129:6;
130:13;131:5
**shootings (1)**
46:12
**short (2)**
100:18;141:24
**shortly (1)**
129:10
**shot (1)**
127:21
**shots (1)**
35:24
**show (2)**
62:6,7
**showed (1)**
141:3
**side (17)**
5:12;11:25;19:22;
20:10;32:17;33:4;
34:4,11,23;35:4;36:8;
45:18;46:11;48:4;
61:4;80:17;141:21
**signature (3)**
124:15,18,20
**signed (1)**
130:8
**significant (1)**
101:22
**significantly (1)**
101:14
**silent (1)**
16:18
**sister (1)**
94:20
**sit (3)**
10:18;98:19;104:2
**sitting (1)**
93:7
**situation (2)**
99:18;121:11
**six (6)**

**48:8;49:15;50:9;**
55:11;142:10,13
**size (1)**
66:9;69:22
**sized (1)**
65:17
**skin (1)**
105:16
**slander (1)**
12:20
**slower (1)**
12:2
**small (6)**
66:2;99:4;113:24;
122:22;124:13;
125:18
**smaller (1)**
57:7
**social (2)**
93:5;139:2
**socialize (2)**
92:19;96:21
**SOG (9)**
32:2,3,4;33:4;
35:22;36:11,21;
37:14,23
**solution (1)**
11:19
**somebody (9)**
25:14;31:13;53:18;
54:11;70:17;110:12;
121:14;139:14;
140:11
**somehow (1)**
30:12
**someone (18)**
23:20;29:18,25;
38:11;39:22;51:7;
52:19;54:6;64:5,9,13,
15;75:13;76:23;
103:19;110:24;111:4;
135:22
**someone's (2)**
69:16;92:2
**sometime (2)**
93:23;102:19
**Sometimes (19)**
6:18,19;7:8;11:15;
29:17;37:5;51:11;
52:15,16,22;53:1;
58:23;85:4;86:25;
87:20,24;89:15;93:1,
3
**Somewhere (6)**
30:23;37:12;48:20;
61:23;80:16;115:4
**son (1)**
139:9
**SOP (1)**
32:1
**sorry (7)**
13:18;30:25;40:4;
48:24;53:8,9;59:25;

**60:18;69:14;72:18;**
76:6;88:25;90:12;
105:7;121:4;122:4;
128:17
**sort (10)**
15:22,23;26:14;
33:21;41:1;47:25;
69:3;75:1;92:21,23
**sound (2)**
12:5;88:6
**sounds (11)**
22:8;37:24;43:16;
45:25;47:9;49:12;
50:25;59:6;70:3,12;
77:4
**sources (5)**
52:2,8;53:7;55:21;
72:7
**South (11)**
19:22;20:10;32:17;
33:4;34:11,23;35:4;
36:8;45:20;46:11;
141:21
**Spanish (2)**
127:13,15
**speak (3)**
6:17;127:17;140:25
**speaking (4)**
15:13;77:5;132:22,
24
**speaks (1)**
127:13
**special (7)**
25:20,21;31:25;
32:4,9,18,19,21;
33:21;34:15
**specialist (40)**
38:2,8,16;39:18,23,
25;40:1,13;41:9,19;
42:4;43:4,13,16;44:3;
44:6;46:7;47:4,14;
49:12;50:24;55:24;
73:25;79:5,25;84:8,
11,20,24;86:2;87:13;
88:19,21;89:2,19;
96:22;99:15;101:3,7;
138:17
**specialists (16)**
36:12,17;37:6;
45:10;46:1;48:2;72:8;
74:6,13;84:14;86:11,
25;87:4;88:7;90:7,23
**specialists' (1)**
46:14
**specialty (2)**
48:1;144:5
**specific (3)**
34:1;87:10;139:20
**specifically (10)**
32:14;35:20;57:1;
101:25;106:11;
107:11;108:7;109:22;
115:9;146:7

**speculation (5)**
41:11;62:17;
100:13;103:22;
128:16
**spent (4)**
19:7;34:11;119:11;
146:8
**spoke (5)**
19:3;94:14,19;
95:10;96:17
**spoken (2)**
95:8;133:25
**sports (1)**
139:8
**spots (2)**
77:4,6
**St (1)**
20:10
**stamped (2)**
115:10;119:6
**stand (1)**
96:1
**stands (2)**
67:22;80:22
**start (5)**
7:11;9:3;12:4;
83:17;85:2
**started (7)**
5:17;20:23;24:22;
65:6;93:20;144:10;
145:16
**starts (2)**
11:9,15
**State (8)**
5:3;17:20;26:9;
50:21;75:9;108:3;
144:11;149:16
**stated (7)**
119:24;127:20;
130:10,11,13,15;
135:22
**statement (1)**
131:17
**statements (7)**
106:13;128:20;
129:22,24;131:8;
132:8;135:23
**States (2)**
108:4;147:25
**state's (4)**
106:16;112:2,4;
132:25
**Stateway (2)**
29:4,7
**station (1)**
52:17
**stay (4)**
51:16;96:16;
141:13;146:18
**stayed (6)**
31:17,23;53:21;
96:11,20;145:3
**steady (1)**

20:6
**STEPHEN (2)**
149:3,8
**sticky (2)**
61:1,14
**still (7)**
20:13;27:3;37:8;
79:11;94:9;110:5;
116:5
**stint (1)**
31:20
**stop (2)**
19:17;139:1
**stops (1)**
144:12
**story (1)**
28:25
**straight (1)**
45:21
**street (17)**
29:6;37:18;39:11,
13;41:3;45:18;51:6;
52:3,13,18;53:12,21;
72:22,23;81:25;
82:25;119:14
**streets (2)**
45:20;90:21
**strike (9)**
36:19;55:9,22;
57:20;72:5;109:1;
112:20;118:24;
126:12
**struggle (1)**
138:13
**struggles (1)**
138:11
**stuck (1)**
113:4
**studied (2)**
21:14;26:7
**study (2)**
21:4,11
**studying (1)**
26:22
**stuff (3)**
117:15;129:16;
148:7
**style (1)**
139:16
**subject (4)**
39:9;96:16;114:2;
128:12
**submission (3)**
125:3,8;127:7
**submitted (6)**
89:6;124:22;
125:13,16;126:22;
127:1
**subpoenaed (1)**
112:15
**subpoenas (1)**
112:11
**subscribed (1)**

149:11
**subsequently (1)**
109:3
**substance (1)**
133:14
**suburban (1)**
142:6
**sued (16)**
10:11;13:12,15,20;
14:16,20;15:2,3,6,10,
14;17:6;134:6,22;
135:1;148:10
**suggested (2)**
95:3;104:14
**suing (1)**
12:19
**suitable (1)**
41:8
**suits (1)**
10:9
**summarize (1)**
24:25
**sup (2)**
114:19,22
**superintendent (2)**
50:15,16
**superiors (1)**
50:15
**supervisor (3)**
75:4;125:3,9
**supervisors (3)**
75:1;77:23;78:1
**supplemental (4)**
88:5;115:10,22;
116:19
**supplementary (4)**
88:10,12;89:10,16
**support (4)**
37:5;137:17,20;
139:9
**suppose (1)**
73:24
**sure (47)**
10:7,15;11:22,24;
14:8;24:20;29:7;
30:24;34:21;35:11;
36:20;37:17,20;
38:23;39:5,7;40:7;
43:6;48:8;49:10,11;
55:17,19,19;58:25;
65:18;68:12;76:22;
78:11;79:6;80:20;
85:19;86:14;94:16,
22;95:4;96:14;
103:18;105:4;108:13,
16;115:6;129:10;
130:24;137:2,3,5
**suspect (4)**
110:13;118:2;
135:16,19
**suspects (1)**
108:14
**suspicious (2)**

35:25;103:19
**switch (1)**
85:23
**switched (3)**
20:24;21:8;85:24
**Sworn (1)**
149:11
**sworn/affirmed (1)**
5:2
**synoptic (8)**
48:5,11;49:14;50:8;
51:3;55:8,10,13
**system (2)**
76:16,19
**systems (1)**
73:5

**T**

**tactic (1)**
91:19
**tactical (9)**
33:22;36:14;46:3,8,
10;80:2,3,6;90:25
**talk (9)**
51:12;52:11,16;
53:14;95:18,21,25;
96:19;138:2
**talked (13)**
8:4;18:24;51:5;
52:12;69:20;70:8;
72:9;126:17;129:16;
133:22;134:3;135:4,6
**talking (19)**
19:7;22:9;25:7;
47:2;50:23;59:16;
60:9;65:7;66:4;69:2;
73:10;79:11;83:11;
90:9;102:1;111:11;
121:20;123:9;134:16
**Tattoos (2)**
64:22,24
**taught (1)**
146:3
**tax (2)**
146:21;148:6
**Taylor (2)**
29:5,6
**teams (1)**
84:15
**tech (1)**
11:25
**technical (4)**
6:19;21:10,11;22:2
**technician (4)**
20:25;21:16;24:1,4
**telephone (1)**
51:22
**telephones (1)**
22:21
**telling (1)**
62:20
**tells (1)**

63:11
**term (1)**
92:2
**terms (4)**
25:1;26:22,25;
66:15
**terrible (1)**
98:25
**territory (1)**
54:22
**test (8)**
38:13,18,20,22,24;
42:16,19;77:16
**testified (7)**
8:15;9:21;16:15;
36:23;47:22;74:7;
134:20
**testifies (1)**
5:4
**testify (5)**
10:15;12:24;47:20;
112:15;133:11
**testifying (2)**
19:8;104:3
**testimony (11)**
17:24;96:1;104:9,
19,19;112:12;113:9;
114:19;133:15,19;
149:5
**testing (1)**
39:12
**Texas (1)**
94:21
**theft (1)**
90:15
**thefts (1)**
32:25
**thereafter (1)**
130:5
**thicker (1)**
105:16
**third (2)**
45:16;127:3
**third-party (1)**
10:12
**Thirty (1)**
84:5
**though (9)**
32:6;42:11;55:19;
59:10;66:2;78:11;
105:1;139:1;143:6
**thought (1)**
16:14
**threats (1)**
135:18
**three (15)**
6:10,11,14;8:19;
13:5;19:5;22:13;
30:23,25;31:2;32:16;
34:16;77:6;119:12;
127:21
**tight (1)**
138:12

**times (16)**
6:9,10,11,14;8:19;
15:6;19:2,5;29:10;
42:8;52:1;53:20;
80:12;89:25;111:9;
121:13

**tips (1)**
53:15

**title (1)**
142:5

**today (14)**
5:18;8:12;17:9;
18:7,19,23;19:4,8;
20:13;98:19;104:2;
113:9;115:19;143:20

**together (6)**
12:5;95:13;96:24;
97:3;140:6

**told (6)**
68:19;108:24;
109:2;122:13;139:1;
141:7

**ton (1)**
89:19

**tone (1)**
41:2

**Tony (1)**
140:16

**took (11)**
38:18,24;40:16;
70:8;76:24;87:21;
90:24;96:1;100:11;
139:6;146:16

**tools (1)**
72:4

**top (4)**
77:5,5;121:12;
124:6

**topic (1)**
52:25

**Torrence (1)**
116:21

**total (1)**
19:6

**Tough (1)**
21:20

**track (2)**
19:9;64:2

**trained (1)**
107:15

**training (10)**
25:1,3;29:15;
106:18;107:3;108:1,
12,18,19,22

**transaction (1)**
30:1

**transcript (2)**
149:4,5

**transfer (1)**
87:24

**trends (1)**
34:1

**trial (9)**

9:22;10:16,18;
12:24;95:11;98:16;
99:10;104:14;136:10

**tried (2)**
52:5;139:9

**Trinidad (6)**
146:5,8,11,14;
147:3,15

**trouble (1)**
136:18

**true (1)**
149:5

**try (10)**
7:12;11:25;19:16;
20:7;46:9;110:15;
118:7;119:1;131:21;
139:24

**trying (3)**
40:11;60:1;130:25

**turn (1)**
138:20

**twice (1)**
75:17

**two (20)**
6:10,14;8:19,25;
9:3;22:13;37:12;64:1;
70:4;72:9;92:21;94:5;
99:3;109:19;127:19,
25;130:11;146:8,24;
147:10

**type (32)**
12:11;26:16;30:8;
34:12;42:2,9;48:6,10;
53:23;55:6;68:13;
71:21;72:21;76:25;
77:15;83:6;85:8;
86:17;88:3,7;90:3,6;
91:18,23;93:6;123:5,
6;128:11;129:9,23;
131:16;139:21

**typed (1)**
75:4

**types (4)**
27:1;88:6;106:13;
107:8

**typically (2)**
103:25;132:1

---

**U**

**ultimately (1)**
118:16

**under (8)**
5:4;8:12;52:19;
67:15;94:18;102:23;
103:3;104:3

**underpinnings (1)**
82:21

**understood (5)**
7:25;26:19;27:4;
62:21;113:23

**uniform (2)**
33:19,20

**unique (1)**
99:18

**unit (31)**
28:11;31:24;32:14;
33:4,16;36:11,13,14,
22;37:2,9,15,15,23;
42:21;44:3;45:24;
51:13,14,21;55:12,22;
56:1;57:15,16;79:10;
80:2,3,6;142:16;
144:22

**United (2)**
108:4;147:25

**units (3)**
33:25;44:1;90:25

**University (1)**
146:6

**Unknowns (6)**
48:17,22;57:7,11,
14,17

**Unknowns' (1)**
57:12

**unless (4)**
53:22;130:16;
140:8;141:7

**unmarked (1)**
85:20

**unrelated (1)**
9:4

**unrest (1)**
147:18

**unusual (1)**
118:1

**up (45)**
7:6;13:17,19;15:19;
19:19;22:1;26:14;
28:7,24;31:4,13;33:3;
34:6,7;35:19;36:8;
42:24;44:8;46:1,15;
48:6;50:15;55:11;
60:17;64:6;67:3,4;
70:20;73:25;75:4;
77:17;85:23;96:12;
97:17;101:5;110:14,
24;111:4,9;122:24;
130:5;139:6;140:9;
142:17;148:2

**upon (1)**
15:21

**use (13)**
22:22;63:19;69:24;
85:22;88:4,8;91:18;
92:1,4;106:16;107:5;
135:10,14

**used (7)**
25:21;51:20;62:7;
72:13;96:24;106:15;
137:7

**using (2)**
22:1;92:7

**Usually (4)**
52:18;61:6;66:3;
97:15

**V**

**vacation (1)**
146:20

**vague (4)**
26:18;56:3;101:2;
107:23

**various (1)**
56:8

**vary (1)**
33:7

**vehicle (1)**
144:11

**vehicles (1)**
35:25

**verbally (2)**
89:12;122:13

**verify (2)**
53:3,15

**verifying (2)**
53:5,12

**versus (2)**
69:13;110:17

**vertical (2)**
28:21,23

**victims (1)**
113:3

**videos (1)**
108:20

**viewed (1)**
57:14

**violations (1)**
83:23

**violence (1)**
144:9

**violent (6)**
27:25;28:4,10;30:6,
17;91:5

**visit (4)**
53:23;94:20,23,24

**vocational (1)**
21:9

**volleyball (1)**
139:10

**W**

**wait (1)**
129:13

**waited (1)**
129:17

**waiver (1)**
130:9

**Walking (1)**
28:24

**war (1)**
63:25

**warrant (2)**
80:19,25

**warranted (1)**
90:3

**warrants (2)**

80:9,13

**watch (7)**
73:7,9,10,12,21;
85:3;135:21

**watching (1)**
108:20

**way (26)**
7:1;14:7;19:18;
41:25;45:19;52:3;
58:18;63:18,18;
64:19;69:11,13,24;
72:6;74:5,21;75:12;
79:23;93:15;94:23;
112:21;133:4;136:10,
18;140:9,23

**ways (3)**
55:24;56:7;89:14

**wearing (1)**
54:14

**wedding (1)**
93:12

**weddings (1)**
93:9

**weeks (6)**
106:22;127:7;
129:13;131:22;
146:17,18

**Wentworth (4)**
27:20,22;28:18;
31:24

**weren't (5)**
13:1;76:5;101:7;
121:8,22

**west (2)**
45:19;48:21

**Western (20)**
38:4;43:1,5,24,24;
44:2,6,13,23;45:25;
46:4;49:21;56:18;
73:11,14;74:11;79:1,
9;81:4;97:13

**What's (13)**
10:4;16:7;28:23;
51:17;67:21;75:12;
79:16;86:8;88:18;
116:10,11;120:17;
133:16

**whatsoever (2)**
82:21;83:19

**When's (2)**
94:14;133:21

**Whereupon (3)**
27:15;69:1;136:22

**wherever (1)**
32:18

**whole (9)**
23:23;24:20;39:6;
78:4;114:20;115:7;
121:11;125:17;144:7

**who's (3)**
53:25;86:7;138:2

**Wicker (1)**
48:22

**wife (1)**
146:13
**Wiley (6)**
17:17;110:4,25;
116:22;117:1;118:22
**William (1)**
140:15
**wiring (1)**
22:20
**within (17)**
28:4;30:18;36:13;
49:23;51:14,15;52:6,
8;55:13,25;56:9;
61:11;100:17,18;
103:12,12,14
**without (3)**
117:16;118:5;
134:13
**witness (18)**
10:12;13:2,3;62:22;
63:10;83:8,18,23;
91:11,15,20,21;99:4;
104:10;105:10,10;
118:2;148:17
**witnesses (4)**
62:8,19;106:12;
108:10
**woman (1)**
92:9
**wondering (1)**
138:8
**wood (1)**
65:14
**word (6)**
75:2;92:4,13,16;
104:22,25
**wore (1)**
54:20
**work (52)**
9:2,11;12:7,13,24;
15:1,13;20:6,22;22:2,
5,6;29:10,13;30:21;
31:3,11;33:14,18;
34:9;37:11;41:8;42:2,
9;43:7;69:19;84:6,14,
15;85:16,20;88:13;
92:19;93:23;101:12,
18;107:2;110:21;
116:20;128:25;
130:25;135:8,12;
138:18,22;139:14,14,
24;140:2;145:9,17;
146:25
**worked (27)**
23:5,19;24:5;28:19;
33:8,9;37:20,22;42:8;
43:16;44:1,23;45:14;
47:4;74:10;84:17;
97:12,15,19;137:22;
140:4,10,15,16,20;
142:5;146:1
**working (32)**
23:1;29:2;34:23;

37:14;38:7,7;46:4;
51:20;73:1,12,19;
79:1;85:9;86:7;88:19;
93:20;106:7;110:11;
111:6;121:12;122:23;
125:22;135:8;137:15;
139:13;145:10,11,12,
14,14,19;147:14
**workings (1)**
35:13
**write (5)**
49:14;87:3;120:18;
122:16;132:2
**writing (7)**
23:3;27:7;39:1;
89:20;107:6,8,11
**written (6)**
12:21;38:22;39:9;
59:19;99:9;102:13
**wrong (2)**
59:25;132:18
**wrongful (1)**
148:11
**wrongfully (1)**
97:24
**wrote (2)**
144:3,9

## Y

**yard (1)**
93:7
**year (12)**
20:17;21:19;23:9;
27:22,22;31:10;
36:13;38:2;43:3;
96:23;97:4;142:11
**years (17)**
22:13,15;28:9;
30:23;31:2;34:16;
39:7;75:21;84:5;
85:23;93:18;111:15;
142:10,13;146:8,24;
147:11
**yelled (1)**
62:23
**youth (2)**
44:10,24
**youths (2)**
127:19;130:11

## Z

**Zehner (1)**
5:22
**Zoom (3)**
5:14;7:1,17

## 1

**1 (5)**
28:5;30:20;130:6,
21;132:8

**10 (3)**
19:25;33:6,12
**10-minute (1)**
136:20
**1100-hour (1)**
144:15
**11th (2)**
50:21;75:9
**14th (3)**
34:8,10;35:18
**15 (2)**
127:4;132:8
**15th (1)**
128:13
**18 (2)**
24:21,22
**18th (1)**
28:24
**1953 (1)**
19:25
**1971 (3)**
20:19;23:16;24:3
**1973 (2)**
21:22,25
**1977 (5)**
23:14,17;24:3,7,15
**1978 (6)**
27:24,25;28:18;
29:22;30:9,16
**1980 (1)**
93:22
**1980s (1)**
32:11
**1981 (1)**
34:24
**1984 (1)**
34:24
**1986 (16)**
43:6,12,15,22;44:2,
13;45:25;49:24;
50:25;51:18;72:20;
74:10;78:4;79:2,14,
20
**1990 (29)**
43:10,12,15,22;
44:2,13;45:25;49:24;
51:18;72:20;74:10;
78:4;79:2,14,20;
105:23;109:4,6,10,21;
119:13;124:22;
126:22;127:4;128:13;
130:6,21;132:7;
139:17
**1990-ish (1)**
50:25
**1996 (1)**
141:11
**1997 (1)**
146:2
**19th (2)**
44:9,22

## 2

**2 (1)**
28:5
**2:40 (1)**
148:25
**20 (1)**
132:18
**20,000 (1)**
16:14
**2002 (1)**
142:14
**2008 (1)**
142:12
**2014 (2)**
145:16;148:2
**2017 (1)**
112:16
**2021 (1)**
149:12
**22 (1)**
132:20
**22nd (1)**
141:20
**23 (6)**
93:22;124:22;
126:22;132:6,18,20
**24 (1)**
103:14
**25th (1)**
109:21

## 3

**3 (8)**
44:19,20,24;47:7,9;
73:1;97:11;119:13
**39th (1)**
35:8

## 4

**46 (1)**
114:22
**47 (3)**
115:11,11,14
**47th (1)**
19:22
**48 (1)**
103:14
**48th (1)**
29:6
**4-by-6 (2)**
65:17;66:10

## 5

**5 (24)**
72:25;78:6;97:10,
14,16,19;114:3;
118:3;119:23,25;
126:6;127:11,12;

132:12;135:2;138:16;
140:13,23;141:9,13;
142:25;145:1,4;
148:11
**50 (2)**
126:19,20
**51st (4)**
27:20,21;28:18;
31:24
**53 (3)**
119:5,6,8
**54 (2)**
114:25;115:14

## 8

**8 (1)**
119:5
**81 (1)**
34:19
**84 (1)**
34:19
**84-ish (1)**
37:24
**86 (1)**
84:20

## 9

**90 (1)**
84:20
**90s (1)**
99:5
**9-millimeter (2)**
127:22;128:21