*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 11

# In The Matter Of:

*Maysonet v.*
*Guevara*

*Roland Paulnitsky*
*September 17, 2019*
*Video Deposition*



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

---

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3   JOSE JUAN MAYSONET, JR.,   )
                                )
 4              Plaintiff,      )
                                )
 5         vs.                  )   No. 18-cv-02342
                                )
 6   REYNALDO GUEVARA, ERNEST   )
     HALVORSEN, EDWARD MINGEY,  )
 7   EPPLEN, FERNANDO MONTILLA, )
     ROLAND PAULNITSKY, FRANK   )
 8   DI FRANCO, CITY OF CHICAGO )
     and COOK COUNTY,           )
 9                              )
                Defendants.     )
10

11        The video-recorded deposition of ROLAND

12   PAULNITSKY, taken in the above-entitled case on

13   the 17th day of September, 2019, at the hour of

14   10:17 a.m. at the offices of the Sotos Law Firm,

15   141 West Jackson Boulevard, Suite 1240A, Chicago,

16   Illinois, pursuant to agreement of counsel.

17

18   Reported by: Karen P. Burns, CSR

19   License No.: 084-002615

20

21

22

23

24

25
```

Page 2

```
 1   APPEARANCES:

 2        BONJEAN LAW GROUP
          BY: MS. JENNIFER A. BONJEAN
 3
          100 Dean Street
 4        Suite 422
          Brooklyn, New York 11238
 5        (718) 875-1850
          jennifer@bonjeanlaw.com,
 6
               On behalf of the plaintiff;
 7
          STEVEN A. GREENBERG, LTD.
 8        BY: MR. KYLE JORGENSEN

 9        53 West Jackson Boulevard
          Suite 1260
10        Chicago, Illinois 60604
          (312) 879-9500
11        kyle@greenbergcd.com,

12             On behalf of the plaintiff;

13        THE SOTOS LAW FIRM
          BY: MR. JOSH ENQUIST
14
          141 West Jackson Boulevard
15        Suite 1240A
          Chicago, Illinois 60604
16        (312) 735-3300
          jenquist@jsotoslaw.com,
17
               On behalf of defendants
18        Ernest Halvorsen, Edward Mingey,
          Lee Epplen, Fernando Montilla and
19        Roland Paulnitsky;

20

21

22

23

24

25
```

Page 3

```
 1   APPEARANCES (Continued):

 2        ROCK, FUSCO & CONNELLY, LLC
          BY: MS. EILEEN E. ROSEN
 3
          321 North Clark Street
 4        Suite 2200
          Chicago, Illinois 60654
 5        (312) 494-1000
          erosen@rfclaw.com,
 6
               On behalf of defendant
 7             City of Chicago.

 8        LEINENWEBER BARONI & DAFFADA LLC, by
          MR. JUSTIN LENNON LEINENWEBER,
 9
          120 North LaSalle Street
10        Suite 2000
          Chicago, Illinois  60602
11        (847) 251-4091
          jll@ilesq.com
12
               on behalf of defendant
13             Reynaldo Guevara;

14   COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
     MS. SARA DIXON SPIVY,
15
          50 West Washington Street
16        Suite 500
          Chicago, Illinois  60602
17        (312) 603-5971
          sara.spivy@cookcountyil.gov
18
               on behalf of defendants
19             Frank DiFranco and Cook County.

20

21   ALSO PRESENT:

22        Mr. Gabriel Martin, Videographer;

23        Ms. Gabby Orozco, Legal intern
          (partial proceeding).
24

25
```

Page 4

```
 1                    I N D E X

 2   WITNESS                          EXAMINATION

 3   ROLAND PAULNITSKY

 4     By Ms. Bonjean                      6

 5

 6

 7                  E X H I B I T S

 8   EXHIBIT NAME   DESCRIPTION            PAGE

 9   Paulnitsky Exhibit

10   Exhibit 1    Document Bates numbered   69
                  CCSA0000100-101
11
     Exhibit 2    Document Bates numbered  182
12                MAYSONET 9596-9617

13   Exhibit 3    Document Bates numbered  270
                  RFC-Maysonet 000001-66
14
     Exhibit 4    Document Bates numbered  270
15                RFC-Maysonet 000067-102

16   Exhibit 5    Document Bates numbered  311
                  CCSA001145
17
     Exhibit 6    Document Bates numbered  317
18                CCSA001145, 1556 and 1557

19   Exhibit 7    Document Bates numbered  356
                  RFC-Maysonet 000378-404
20
     Exhibit 8    Document Bates numbered  358
21                CCSA0000364-371

22

23        (Exhibits attached to transcript.)

24

25
```

Page 5

1     THE VIDEOGRAPHER: We are now on the
2  record in the matter of Maysonet versus
3  Guevara, et al. in the United States District
4  Court for the Northern District of Illinois,
5  Eastern Division, case number 18 CV 02342.
6     Today's date is September 17,
7  2019, and the time is now 10:17 a.m.  This is
8  the videorecorded deposition of Ronald
9  Paulnitsky.  We are located at the Sotos Law
10  Firm, Chicago, Illinois.  My name is Gabriel
11  Martin and I am the videographer.  The court
12  reporter is Karen Burns, both with Rizman
13  Rappaport Court Reporters.
14     For the record, will Counsel
15  please introduce yourself and who do you
16  represent?
17     MS. BONJEAN: Jennifer Bonjean on
18  behalf of the plaintiff, Mr. Maysonet.
19     MR. LEINENWEBER: Justin Leinenweber on
20  behalf of defendant Officer Guevara.
21     MS. SPIVY: Sara Spivy, Assistant
22  State's Attorney, on behalf of the County
23  defendants.
24     MS. ROSEN: Eileen Rosen on behalf of
25  the City of Chicago.

Page 6

1     MR. ENQUIST: And Josh Enquist on
2  behalf of defendants Halvorsen, Mingey,
3  Epplen, Montilla and Paulnitsky.
4     THE VIDEOGRAPHER: Now the court
5  reporter is going to swear in the witness.
6     (Witness duly sworn.)
7     ROLAND PAULNITSKY,
8  having been first duly sworn, was examined and
9  testified as follows:
10     EXAMINATION
11     BY MS. BONJEAN:
12  Q.  Good morning, Mr. Paulnitsky.  My name
13  is Jennifer Bonjean.  I represent the plaintiff,
14  Jose Maysonet, in this matter in which you are a
15  named defendant.  I suspect you have some
16  familiarity with the deposition process, but I
17  would like to go over some ground rules with you
18  so that we are on the same page.
19  A.  Yes.
20  Q.  Do you understand, sir, that you are
21  under oath here today?
22  A.  Yes.
23  Q.  Do you understand that it is the same
24  oath that you would take as if you were in a court
25  of law with a judge and attorneys present

Page 7

1  litigating a case?
2  A.  Yes.
3  Q.  Have you testified under oath before?
4  A.  Yes.
5  Q.  How many times?
6  A.  Several.
7  Q.  Is "several" less than ten or more than
8  ten?
9  A.  More than ten.
10  Q.  More than 100?
11  A.  Yes.
12  Q.  Do you understand that by taking the
13  oath, that you are swearing that your testimony is
14  truthful to the best of your ability?
15  A.  Yes.
16  Q.  And you're expected to give truthful
17  answers to every single question I ask of you here
18  today?
19  A.  Yes.
20  Q.  I am looking for full and complete
21  responses to my questions.  Do you understand
22  that?
23  A.  Yes.
24  Q.  And can we agree that you will not
25  purposely omit any material facts that would be

Page 8

1  naturally responsive one of my questions?
2     MS. ROSEN: Objection to form.
3     MR. ENQUIST: Join.
4     MS. SPIVY: Same.
5     THE WITNESS: Yes.
6     BY MS. BONJEAN:
7  Q.  It's perfectly acceptable to give an
8  estimation in response to a question; a date,
9  times, things of that nature, particularly in a
10  case that is this old.  So if you do so, I would
11  just ask that you indicate that you're doing so,
12  okay?
13  A.  Yes.
14  Q.  Now, if you do not understand one of
15  the questions I ask you, will you let me know?
16  A.  Yes.
17  Q.  And I will give you the opportunity or
18  I will try to rephrase and provide a clearer
19  question so that you can answer it, okay?
20  A.  Yes.
21  Q.  And if at any point during the
22  deposition you recollect a piece of information
23  that is responsive to a prior question, will you
24  let me know that?
25  A.  Yes.

Maysonet v.
Guevara

Video Deposition

---

Page 9

1  Q.  That way I'll give you the opportunity
2  to go back and provide a more fulsome response,
3  okay?
4  A.  Yes.
5  Q.  Obviously the court reporter cannot
6  transcribe us both speaking at the same time, so I
7  will do my very best to wait for you to answer my
8  question and I would ask that you wait for me to
9  ask the question, even if you know where I'm going
10  with it, okay?
11  A.  Yes.
12  Q.  And if you need a break, certainly you
13  are at liberty to take one.  I would ask only that
14  you answer any question that may be pending prior
15  to asking for a break, okay?
16  A.  Yes.
17  Q.  And as you sit here today, is there any
18  reason why you cannot give truthful and complete
19  testimony to the best of your ability?
20  A.  There is not.
21  Q.  Okay.  How many times have you had your
22  deposition taken before?
23  A.  I don't recall.
24  Q.  Can you estimate for me?
25  A.  I would estimate more than six.

---

Page 10

1  Q.  And of those six depositions that you
2  basically recall, can you tell me what you recall
3  about each one?
4      MS. ROSEN: Object to the form,
5  compound.
6      THE WITNESS: No.
7      BY MS. BONJEAN:
8  Q.  Do you remember any single deposition
9  you've ever sat for?
10  A.  No, I do not.
11      MS. ROSEN: Object to the form.
12      BY MS. BONJEAN:
13  Q.  Have you been sued previously?
14  A.  Yes.
15  Q.  How many times have you been sued?
16  A.  I don't recall.
17  Q.  You don't recall?  Can you approximate
18  how many times you've been sued?
19  A.  I don't want to guess.
20  Q.  I'm not asking you to guess, I'm asking
21  you to approximate.  Can you approximate?
22  A.  I cannot.
23  Q.  So there has been so many times that
24  you can't approximate how many times?
25      MS. ROSEN: Objection to the form.

---

Page 11

1      MR. ENQUIST: Join.
2      MS. SPIVY: Join.
3      THE WITNESS: I don't remember.
4      BY MS. BONJEAN:
5  Q.  Is your testimony that you are unable
6  to approximate how many times you've been sued?
7      MS. ROSEN: Objection, form.
8      THE WITNESS: That's correct.
9      BY MS. BONJEAN:
10  Q.  And do you remember any suit in which
11  you have been a named defendant in your capacity
12  as a Chicago Police officer?
13  A.  I do not.
14  Q.  Not a single one?
15  A.  No.
16  Q.  Nothing sticks out in your head?
17      MS. ROSEN: Objection, form.
18      THE WITNESS: Nope.
19      BY MS. BONJEAN:
20  Q.  Not even a name?
21      MS. ROSEN: Objection, form.
22      THE WITNESS: No.
23      BY MS. BONJEAN:
24  Q.  How about an allegation; no prior
25  allegations you ever remember?

---

Page 12

1      MS. ROSEN: Objection, form.
2      THE WITNESS: I don't recall.
3      BY MS. BONJEAN:
4  Q.  Does the name Miguel Castillo mean
5  anything to you?
6  A.  No.
7  Q.  Nothing?
8      MS. ROSEN: Objection, form, harassing.
9      BY MS. BONJEAN:
10  Q.  I'm just getting clear.  You actually
11  are testifying truthfully under oath that you
12  don't know the name Miguel Castillo?
13  A.  I don't recall.
14  Q.  You don't recall the name?
15      MS. ROSEN: Objection, asked and
16  answered.
17      THE WITNESS: I don't recall.
18      BY MS. BONJEAN:
19  Q.  Do you remember being sued with a
20  colleague, Officer Jose Zuniga, in a case brought
21  by a complainant named Miguel Castillo?
22  A.  I remember the other police officer,
23  yes.
24  Q.  What do you remember about the other
25  police officer?

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

---

Page 13

1   A.  Just that there was an allegation
2   against us, several of us.
3   Q.  Okay.  And do you remember now that you
4   interrogated Mr. Castillo in connection with a
5   homicide investigation?
6   A.  I don't recall.
7   Q.  And do you remember having your
8   deposition taken in that case?
9   A.  I don't remember.  Do you have a report
10   that I can refresh my memory?
11   Q.  I'm asking you if you remember having
12   it taken.  I'm not asking you anything about what
13   you said, just do you remember sitting for a
14   deposition?
15   A.  As I said before, there was I believe
16   about six depositions I was part of.  I'm not sure
17   which names are -- what names were available at
18   that time on the allegations against me.
19   Q.  Okay.  Do you remember that
20   Mr. Castillo accused you of coercing a statement
21   from him?
22   A.  I don't recall.
23   Q.  You don't recall doing it or you don't
24   recall being alleged to -- don't recall being
25   accused of doing it?

---

Page 14

1   A.  I don't recall the facts of the
2   allegations against me, no.
3   Q.  Were you aware that Mr. Castillo's
4   convictions were later reversed and dismissed?
5       MS. ROSEN: Objection, form,
6   foundation.
7       BY MS. BONJEAN:
8   Q.  Or the charges were dismissed?
9   A.  I don't recall that case, ma'am.
10   Q.  No.  Do you know how that case
11   resolved?
12       MS. ROSEN: Objection, form.  Which
13   case, the civil case or the criminal case?
14       MS. BONJEAN: Good question.
15       BY MS. BONJEAN:
16   Q.  I've represented that the case, the
17   criminal case, was resolved by dismissal.  Do you
18   know how the civil case, in which you were a named
19   defendant, was resolved?
20   A.  I don't recall.
21   Q.  Do you remember ever receiving any
22   notice that the case had been settled?
23   A.  I don't know if I did or not.
24   Q.  Okay.  So Mr. Castillo's allegations
25   against you, you have zero recollection of,

---

Page 15

1   correct?
2   A.  I don't recall.
3   Q.  Is that a yes?
4   A.  Ma'am, it's been so many years that
5   I've been retired, I don't recall.
6   Q.  So that's a yes; you don't have any
7   recollection of the allegations that Miguel
8   Castillo made against you?
9   A.  I don't recall.
10   Q.  So that's a yes?
11   A.  I don't recall.
12   Q.  You don't recall what?
13   A.  The allegations brought forward or what
14   the outcome was.
15   Q.  Okay.  That's what I asked you.  Any
16   other depositions that you have any memory of?
17       MS. ROSEN: Object to the form.
18       THE WITNESS: No.
19       BY MS. BONJEAN:
20   Q.  Do you have any medical conditions that
21   prevent you from remembering things?
22   A.  I have diabetes.
23   Q.  Have your doctors told you that
24   diabetes impacts your memory?
25   A.  I've had conversations with my

---

Page 16

1   specialist about what diabetes is.
2   Q.  That wasn't the question that I asked
3   you.  I asked you the specific question of whether
4   you have been told by your doctor or any
5   professional that diabetes affects your memory
6   negatively?
7   A.  In general or my own being?
8   Q.  I'm sorry?
9   A.  I was told by my specialist about what
10   diabetes is, what could be some results of
11   diabetes and medicines that I'm taking.
12   Q.  Okay, so I'll ask you this.  Are you
13   under the belief or do you -- strike that.
14       Do you have the understanding that the
15   disease of diabetes impacts your ability to
16   remember things?
17   A.  I don't know.
18   Q.  You don't know whether you have the
19   belief?  Either you have the belief or you don't
20   have the belief or something in between, but --
21   A.  I could only answer for myself.  I
22   don't know exactly what the diabetes is doing to
23   my body.
24   Q.  Okay.  Have you been told by any health
25   professional that diabetes has the capacity to

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 17

1  impact your memory?
2  A.  I don't recall if I received that
3  information from my doctor or not.
4  Q.  Okay.  And do you have any reason to
5  believe that diabetes impacts your memory?
6  A.  I have no reason to believe that it may
7  affect or may not affect.
8  Q.  Well, have you found that since you
9  started suffering from diabetes, that your memory
10  has failed you?
11     MS. ROSEN: Objection, form.
12     THE WITNESS: I don't know.  I can't
13  answer that.
14     BY MS. BONJEAN:
15  Q.  And what medications are you taking
16  right now?
17  A.  Well, I'm taking 18 medicines a day.
18  Q.  Okay.  And are all those medications to
19  treat your diabetes?
20  A.  No.
21  Q.  What else are these medications
22  treating?
23  A.  High blood pressure, hypertension,
24  problems with my prostate.  There is other
25  medications that I'm taking that somewhat counter

Page 18

1  effect some of the medications that I'm taking.
2  Q.  And are you under the belief that any
3  of those medications, either individually or
4  collectively, have an impact on your ability to
5  remember events from the past?
6  A.  I don't have an opinion.  I'm not a
7  medical doctor to see what they're doing to my
8  body.  I have medicine that's prescribed to me, I
9  take them daily, twice a day, and I pray to God
10  that it helps my condition.
11  Q.  And your condition being your memory?
12  A.  Again, I have diabetes and
13  hypertension.
14  Q.  Okay.  So your condition being diabetes
15  and hypertension, but you can't identify any
16  specific communication from your doctors telling
17  you that these medicines or your condition have a
18  negative impact on your memory, right?
19  A.  I don't recall.
20  Q.  So is that a no, you cannot identify --
21     MS. ROSEN: Objection, form, harassing.
22  I don't recall is I don't recall.
23     MR. ENQUIST: Join.
24     BY MS. BONJEAN:
25  Q.  So you don't recall whether your doctor

Page 19

1  ever told you that?
2  A.  I don't recall what information he gave
3  me.  I believe that's privileged between my doctor
4  and myself.
5  Q.  Well, perhaps, but to the extent that
6  it impacts your memory, that's something that I
7  think I would have the right to ask you about, if
8  you can communicate that to me without revealing
9  communications with your doctors?
10     MS. ROSEN: I'm going to object to the
11  form of that question.
12     MR. ENQUIST: I'll join.
13     BY MS. BONJEAN:
14  Q.  Well, I asked you earlier, sir, today,
15  whether there was any reason you couldn't give
16  truthful and complete testimony here today.
17     Do you remember when I asked that
18  question?
19  A.  I do.
20  Q.  And you said you couldn't think of any
21  reason, right?
22  A.  Yes.
23  Q.  You didn't indicate to me at that time
24  that you had memory issues, right?
25     MS. ROSEN: He's not telling you he has

Page 20

1  memory issues.  We went down this road
2  because you're challenging whether or not his
3  answers about I don't recall to prior
4  depositions are truthful or not.  That's a
5  whole different thing.  He's not saying to
6  you that he can't answer your questions.  You
7  don't like the I don't recall's or you don't
8  believe the I don't recall's.
9     MS. BONJEAN: It's not that -- I don't
10  recall means that you can't remember
11  something, so I think it's a pretty logical
12  inquiry, Eileen.  If someone says they don't
13  recall, then there might be a reason they
14  don't recall, so that's what I'm exploring.
15     MS. ROSEN: Right, but now you're
16  suggesting that he has somehow been
17  untruthful.
18     MS. BONJEAN: I suggested no such
19  thing.  That is a figment of your
20  imagination.
21     BY MS. BONJEAN:
22  Q.  Mr. Paulnitsky, your memory is not
23  preventing you from providing testimony here
24  today, correct?
25  A.  It is not.

Maysonet v.
Guevara

Video Deposition

Page 21

1 Q. Okay. But you can't tell me anything
2 about the prior depositions that you've sat for,
3 correct?
4 A. I don't remember them.
5 Q. And you don't know anything -- you
6 can't tell me, for instance, how many of them
7 involved lawsuits as -- filed against you as a
8 Chicago Police officer, correct?
9 A. I don't remember.
10 Q. Okay. Do you remember ever having any
11 judgments entered against you?
12 A. I never had any judgments against me.
13 Q. Well, how do you know?
14 A. Because I never did.
15 Q. You remember that about those lawsuits,
16 though?
17 MS. ROSEN: Object to the form.
18 MR. ENQUIST: Join.
19 THE WITNESS: Yes.
20 BY MS. BONJEAN:
21 Q. All right. What did you do to prepare
22 for your deposition here today?
23 A. I met with my attorneys.
24 Q. How many times?
25 A. Pertaining to my deposition, probably

Page 22

1 three times, maybe four.
2 Q. And who are your attorneys?
3 A. Josh and his partner and his law firm.
4 Q. And did you meet with Josh and his
5 partner at this law firm all three or four times?
6 A. I believe so.
7 Q. And how long did each of those meetings
8 take?
9 A. Probably less than an hour.
10 Q. And who was present for those meetings,
11 apart from your lawyers?
12 A. One meeting there was other detectives,
13 retired detectives, retired supervisors.
14 Q. Do you mean the other defendants in
15 this case?
16 A. Yes.
17 Q. And that was only for one of those
18 meetings?
19 A. Yes.
20 Q. And the other meetings you met alone
21 with your attorneys?
22 A. Yes.
23 Q. Did you ever meet with your attorneys
24 in preparation for this deposition with anyone
25 other than the other defendants in this case?

Page 23

1 A. Met with the City attorney.
2 Q. Okay. Aside from other attorneys on
3 the defense side of the V and the defendants in
4 this case, were any other individuals present?
5 A. No.
6 Q. Apart from meeting with your attorneys,
7 did you review any documents in connection -- in
8 preparing for your deposition today?
9 A. Yes.
10 Q. What did you review?
11 A. I reviewed my grand jury statement.
12 Q. Anything else?
13 A. Police supplemental reports.
14 Q. Did you say supplemental report or
15 reports?
16 A. Reports.
17 Q. Review anything else?
18 A. No.
19 Q. So you've only seen or reviewed your
20 grand jury testimony and supplemental reports that
21 were prepared in connection with this case?
22 A. Yes.
23 Q. Have you spoken to or with any of the
24 defendants, co-defendants in this case, since the
25 complaint has been filed?

Page 24

1 MR. ENQUIST: Just you're talking about
2 outside our presence?
3 MS. BONJEAN: Correct.
4 THE WITNESS: Outside -- let me
5 understand the question.
6 MS. BONJEAN: Sure.
7 THE WITNESS: Outside of my attorneys?
8 BY MS. BONJEAN:
9 Q. Yes. I'll ask it again.
10 Putting aside your meetings with your
11 attorney and co-defendants, did you ever speak
12 with any of the co-defendants in this case outside
13 the presence of your attorneys?
14 A. Yes.
15 Q. Okay. Who have you spoken to?
16 A. I said hello to Freddie Montilla. I
17 said hello to Sergeant Mingey and Detective
18 Halvorsen.
19 Q. And how many times have you had the
20 opportunity to converse with Montilla, Mingey and
21 Halvorsen since this lawsuit was filed?
22 A. Twice.
23 Q. And when was the first time you spoke
24 to Freddie Montilla since this lawsuit was filed?
25 A. When I answered your subpoena at 26th

**Maysonet v.
Guevara**

Video Deposition

Page 25

1 and California.
2 Q. Okay. And when was the second time you
3 spoke to him?
4 A. A couple weeks ago here.
5 Q. After his deposition?
6 A. I don't know when his deposition was.
7 Q. Okay. When you spoke to him a couple
8 weeks ago, what did you say to him and what did he
9 say to you?
10 A. It was just chitchat.
11 Q. And how did the conversation come to
12 be?
13 A. Well, I haven't seen them in a long
14 time. I was wondering how they were doing and how
15 their family was.
16 Q. So you called them?
17 A. No. You asked me where I talked to
18 them and what I said. It was here. I wouldn't
19 know how to call them.
20 Q. So let me back up. This conversation
21 that you had with Mr. Montilla outside the
22 presence of your attorneys, where did the
23 conversation take place?
24 A. Right in this room.
25 Q. Okay. And was it before or after you

Page 26

1 spoke with your attorneys? Were you waiting to
2 speak to your attorneys?
3 A. Yes.
4 Q. Or were you coming and socializing with
5 Mr. Montilla on a regular basis?
6 MR. ENQUIST: Objection, form.
7 THE WITNESS: It was in this room
8 before my attorneys were present.
9 BY MS. BONJEAN:
10 Q. Okay. And how long did the
11 conversation last?
12 A. Maybe less than ten minutes.
13 Q. And did you discuss the underlying
14 case; that is, Maysonet's case?
15 A. No.
16 Q. What did you talk about?
17 A. I just told you. I haven't seen them
18 for several years. I wanted to know how their
19 families were, they asked me how mine was, just
20 idle chitchat.
21 Q. Okay, idle chitchat. And was that the
22 same circumstance under which you last spoke to
23 Sergeant Mingey?
24 A. Yes.
25 Q. Here in this conference room?

Page 27

1 A. Same place, same time.
2 Q. Same place, same time. And also
3 Halvorsen was present?
4 A. Yes.
5 Q. Was Lee Epplen present?
6 A. Yes.
7 Q. So he was here, as well? I assume Rey
8 was not here?
9 A. No.
10 Q. So correct me if I'm wrong. A couple
11 weeks ago before you met with your attorneys in
12 preparation for your deposition, you all sat in
13 this conference room and had idle chitchat, is
14 that right?
15 A. Yes.
16 Q. And did anyone raise any issues or --
17 strike that.
18 Did anybody speak about the underlying
19 civil lawsuit?
20 A. Not in my presence.
21 Q. All right. So prior to that time when
22 you were in the conference room speaking with the
23 co-defendants in the case, when was the next most
24 recent time that you spoke with any of the
25 co-defendants in this case?

Page 28

1 A. That was the last time.
2 Q. Okay. And before that date, when was
3 the next time?
4 A. The first time?
5 Q. Yeah, the first time?
6 A. When I answered your subpoena.
7 Q. Okay. So let's talk about that.
8 Prior to getting a subpoena from me on
9 behalf of Mr. Maysonet in the fall of 2017, did
10 you know that Mr. Maysonet's convictions had been
11 reversed?
12 A. I did not.
13 Q. Had anyone from the Cook County State's
14 Attorney's office contacted you to alert you that
15 Mr. Maysonet's convictions had been reversed in
16 the fall of 2016?
17 A. No one.
18 Q. No e-mails, nothing?
19 A. Nothing.
20 Q. Okay. So is it fair to say that the
21 first time that you learned that Mr. Maysonet's
22 case was back in the Circuit Court for some reason
23 was when you received a subpoena from me?
24 A. Yes.
25 Q. And upon receiving a subpoena from me,

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 29

1  what did you do with that subpoena?
2  A.  I contacted the Fraternal Order of
3  Police.
4  Q.  Now, is it your practice to contact the
5  Fraternal Order of Police when you get a subpoena
6  to come testify in a criminal prosecution in which
7  you have played an investigative role?
8      MS. ROSEN: Object to the form.
9      THE WITNESS: At that time I was no
10  longer a detective.  I was retired.
11      BY MS. BONJEAN:
12  Q.  Understood.  So I'll revise my
13  question.  Let's talk about prior to your
14  retirement.  Was it your practice to contact the
15  Fraternal Order of Police upon receipt of a
16  subpoena to give testimony in a prosecution in
17  which you played an investigative role?
18  A.  No.
19  Q.  Now, certainly after your retirement
20  you've been called on to testify from time to
21  time, correct?
22  A.  One other time that I can remember.
23  Q.  Okay.  And what was that case?
24  A.  That was a cause and origin of a fire.
25  Q.  What was the case?

Page 30

1  A.  I don't remember what the name of the
2  case was.  I do remember where it was, though, if
3  that would help you.
4  Q.  Sure.  Where was it?
5  A.  I want to say Wabash and Balbo.  It was
6  a former restaurant.
7  Q.  And was it an arson case?
8  A.  I determined it was not an arson.
9  Q.  Okay.  And after your retirement you
10  were called to testify in some matter pertaining
11  to this incident?
12  A.  Yes.
13  Q.  Was it a criminal prosecution or a
14  civil litigation?
15  A.  Civil litigation.
16  Q.  All right.  Did you contact the
17  Fraternal Order of Police when you received the
18  subpoena in that case?
19  A.  No.
20  Q.  Okay.  And your testimony is that since
21  your retirement, you have not been called upon to
22  testify in any proceedings, criminal proceedings,
23  related to work you conducted while you were still
24  a sworn police officer?
25  A.  Correct.

Page 31

1  Q.  Okay.  So upon receipt of the subpoena
2  that Mr. Maysonet issued you, you said you
3  contacted the Fraternal Order of Police.
4      Why did you contact the Fraternal Order
5  of Police?
6  A.  For legal advice.
7  Q.  And why did you believe you needed
8  legal advice?
9  A.  Because I was retired.
10  Q.  And what type of legal advice did you
11  believe you needed by virtue of the fact that you
12  were retired?
13  A.  I received a subpoena.
14  Q.  Right, and what about receiving a
15  subpoena led you to believe, ah, I need legal
16  advice?
17  A.  Because I was retired and received a
18  subpoena and I wanted the FOP's advice what to do.
19  Q.  So you wanted to know whether you had
20  to comply with the subpoena?
21      MS. ROSEN: Objection, form.
22      MR. ENQUIST: Join.
23      THE WITNESS: No.  I just wanted to
24  know what I had to do as a retired policeman.
25

Page 32

1      BY MS. BONJEAN:
2  Q.  What did you have questions about?
3  Well, what was your uncertainty about whether
4  you -- what you had to do in response to a
5  subpoena?
6  A.  It was a subpoena to appear at 26th and
7  California, and I wanted to know what the
8  procedure was for me being retired.
9  Q.  And why did you think the Fraternal
10  Order of Police was the place to go to figure out
11  whether you had to comply with the subpoena?
12  A.  I pay monthly dues for that advice.
13  Q.  Thanks for telling me that, I
14  appreciate the information, but not what I asked.
15      My question was, what makes you
16  think -- why was the Fraternal Order of Police
17  able -- why did you believe the Fraternal Order of
18  Police was who you needed to consult with to
19  determine whether you had to respond to a
20  subpoena?
21      MS. ROSEN: Objection, asked and
22  answered.
23      MR. ENQUIST: Join.
24      MS. ROSEN: He just told you why.
25      THE WITNESS: I received your subpoena

Maysonet v.
Guevara

Video Deposition

Page 33

1  to appear at 26th and California and I wanted
2  legal advice.
3      BY MS. BONJEAN:
4  Q.   You thought you needed legal advice,
5  right?
6      MS. ROSEN: Object to the form.
7      MR. ENQUIST: Join.
8      THE WITNESS: No.  I wanted to know
9  what my rights were as a retired police
10  officer.
11      BY MS. BONJEAN:
12  Q.   Because you didn't want to come
13  testify, correct?
14      MS. ROSEN: Object to the form,
15  harassing.
16      MS. SPIVY: Join.
17      THE WITNESS: I did not say that.
18      BY MS. BONJEAN:
19  Q.   What rights did you think you might
20  have?
21  A.   I wanted to --
22      MS. ROSEN: Object to the form.  You
23  can go ahead and answer.
24      MR. ENQUIST: Go ahead.
25      THE WITNESS: I wanted to know what a

Page 34

1  retired police officer, what the procedure is
2  for answering a subpoena at 26th and
3  California.
4      BY MS. BONJEAN:
5  Q.   You, sir -- again, you were a police
6  officer for how long?
7  A.   A couple weeks short of 40 years.
8  Q.   40 years.  And in your 40 years as a
9  Chicago Police officer, have you seen any
10  subpoenas in your time?
11  A.   I have.
12  Q.   And you understand that they are court
13  orders, correct?
14  A.   Yes.
15  Q.   You understand that it's summoning you
16  to appear in court to give testimony about a
17  matter that you have information about, correct?
18  A.   Yes.
19  Q.   You certainly understand that you are
20  not at liberty to ignore court subpoenas, correct?
21  A.   Yes.
22  Q.   Okay.  And that when you are issued a
23  subpoena that's served on you, that you are
24  obligated to respond to the subpoena because it's
25  a court order, right?

Page 35

1  A.   Yes.
2  Q.   Okay.  So what was confusing about that
3  to you when you received it?
4      MS. ROSEN: I'm going to object.  He
5  never said it was confusing, so I'm objecting
6  to the form.  I'm objecting that this is
7  argumentative, and I don't believe he ever
8  said that he wasn't going to comply with the
9  subpoena so I'm not even sure why you're even
10  going down this road and wasting time.
11      MS. BONJEAN: Go ahead, you can answer.
12      THE WITNESS: As a retired police
13  officer, I wanted to know what the procedure
14  was for me in particular to appear in court.
15      BY MS. BONJEAN:
16  Q.   Did you believe that maybe the rules of
17  subpoenas were different because you were a
18  retired Chicago Police officer?
19      MS. ROSEN: Objection, relevance.
20      MR. ENQUIST: Join.
21      THE WITNESS: I wanted to know what the
22  procedure was for a retired police officer,
23  in particular, me.
24      BY MS. BONJEAN:
25  Q.   I know.  You testified to that more

Page 36

1  than once and I heard you.  I have a different
2  question, okay, if you could answer the question I
3  have, which is, did you believe that subpoenas,
4  court orders, subpoenas, didn't have the same
5  effect because you were retired?
6      MS. ROSEN: Object to the form,
7  argumentative.
8      MR. ENQUIST: I'll join.
9      THE WITNESS: Again, I wanted to know
10  what the procedure was pertaining to a
11  retired police officer.
12      BY MS. BONJEAN:
13  Q.   I know.  I heard you say that, and I
14  don't doubt that you wanted to know what the
15  procedure was.
16      My question is, did you believe that
17  maybe you didn't have to respond to the subpoena
18  because you were retired?
19  A.   I have to give you the same answer.  I
20  wanted to know what the procedure was for a
21  retired police officer to --
22  Q.   Did you -- sorry.  Didn't mean to cut
23  you off.
24  A.   -- to appear in court.
25  Q.   Okay.  Did you believe that retired

Page 37

1  police officers did not have to comply with
2  subpoenas?
3  A. I did not believe that.
4  Q. Okay. So you knew you had to comply
5  with the subpoena, right?
6      MS. ROSEN: Objection, asked and
7  answered.
8      MR. ENQUIST: Join.
9      THE WITNESS: I knew that I was
10  subpoenaed to appear in court. Your
11  subpoena, I called the FOP because I wanted
12  to know what the procedure was for a retired
13  police officer.
14      BY MS. BONJEAN:
15  Q. Okay. And you knew that you had to
16  comply with the subpoena, right?
17      MR. ENQUIST: Objection, asked and
18  answered.
19      THE WITNESS: Yes.
20      BY MS. BONJEAN:
21  Q. And did you do anything else after
22  receiving the subpoena from Mr. Maysonet?
23      MR. LEINENWEBER: Objection, form,
24  vague.
25      THE WITNESS: I'm not sure I know what

Page 38

1  you mean.
2      BY MS. BONJEAN:
3  Q. Sure. Did you contact anyone else
4  after receiving the subpoena; again, not anyone
5  associated with the FOP?
6  A. Yes. I received a phone call from an
7  FOP representative.
8  Q. Who?
9  A. I don't know.
10  Q. So you don't know who called you a few
11  years ago in connection with the Maysonet case?
12      MS. ROSEN: Objection, asked and
13  answered.
14      THE WITNESS: I don't know what person
15  from the FOP called me back.
16      BY MS. BONJEAN:
17  Q. Okay. So when you called the FOP, you
18  called who? Was there a phone number, a direct
19  line, how do you call them?
20  A. I called them on the telephone number
21  that's on -- that was on my current FOP book that
22  year.
23  Q. Okay. And who did you speak to when
24  you called them?
25  A. Whoever answered the phone. I know it

Page 39

1  was a female.
2  Q. Okay. And what did you say to her?
3  A. I identified myself as a retired police
4  officer, I told them I received a subpoena, I said
5  I would like some legal advice.
6  Q. And what did she say in response?
7  A. Spell your name, what phone number
8  could you be reached at, and that was the end of
9  the conversation.
10  Q. Okay. And you then got a return phone
11  call?
12  A. Some time later.
13  Q. Okay. And you got a return phone call
14  from an FOP representative?
15  A. Yes.
16  Q. Whose name you don't recall, correct?
17  A. It was one of their officers at the
18  time. I wouldn't know if he's still an officer,
19  if that person is an officer, is back on the
20  street or retired.
21  Q. Okay. Not someone you knew previously?
22  A. I don't think I knew who that person
23  was.
24  Q. Okay. And what did he say when he
25  called you?

Page 40

1  A. He asked me how they could be of
2  service. I told them I received a subpoena. I
3  told him what the subpoena -- the name of the
4  subpoena and also your name, and they said thank
5  you, somebody will be calling you.
6  Q. All right. And did you eventually get
7  another call?
8  A. Yes.
9  Q. And who was that from?
10  A. Attorney Tim Grace.
11  Q. Now, after receiving the subpoena from
12  me, did you reach out to anybody else other than
13  the FOP?
14  A. I said I received a phone call from
15  attorney Tim Grace.
16  Q. Right. And my question is, after
17  receiving the subpoena, did you contact anyone
18  else aside from the FOP?
19  A. Well, Tim Grace is not part of the FOP,
20  he's a private attorney.
21  Q. And you testified that he contacted
22  you, right?
23  A. Yes.
24  Q. Okay. Well, I'm asking you whether you
25  contacted someone else after you received the

Maysonet v.
Guevara

Video Deposition

Page 41

1 subpoena?  Forget about Tim Grace.
2 A. I didn't contact anybody.
3 Q. Okay.  You didn't contact any other
4 officers?
5 A. No.
6 Q. You didn't contact Mingey?
7 A. No.
8 Q. Guevara?
9 A. No.
10 Q. Montilla?
11 A. No.
12 Q. Epplen?
13 A. No.
14 Q. Bill Dorsch?
15 A. He contacted me.
16 Q. When did he contact you?
17 A. Almost immediately, a couple days after
18 I received the subpoena.
19 Q. Okay.  And what did Bill Dorsch say to
20 you when he contacted you?
21 A. That he worked for you.
22 Q. He worked for me?
23 A. Yes.
24 Q. Okay.  And did he say what he did for
25 me?

Page 42

1 A. Yes.
2 Q. What did he say?
3 A. He's an investigator for you.
4 Q. Okay.  And did he suggest that he had
5 investigated the Maysonet case?
6 A. No.
7 Q. Okay.  What else did he say?
8 A. He asked that I call you in New York.
9 Q. Okay.
10 A. Then after suggesting that, he says,
11 but I don't think she's in New York, I think she's
12 in Chicago.
13 Q. Okay.  And then what did you say?
14 A. I said thanks, Bill, and I ended the
15 conversation.
16 Q. Okay.  Any further conversation with
17 Mr. Dorsch?
18 A. Several.
19 Q. You mean after receiving the subpoena?
20 A. Yes.
21 Q. Okay.  When is the next time you spoke
22 to Bill Dorsch?
23 A. When I was -- before I retired from the
24 Chicago Board of Education, he would unexpectedly
25 come into the building that I was working at.

Page 43

1 Q. Okay.  When did you retire?
2 A. A little bit over two years ago.
3 Q. And when he would come by, did you
4 speak with him?
5 A. I had no choice.
6 Q. Why didn't you have any choice?
7 A. Well, I worked with him, I wanted to
8 give him the courtesy of seeing what he wanted.
9 Q. Well, you had a choice?
10 MS. ROSEN: Object to the form and
11 argument.
12 BY MS. BONJEAN:
13 Q. It's not accurate you didn't have a
14 choice; you chose to, right?
15 MS. ROSEN: Objection, form,
16 argumentative.
17 THE WITNESS: It was my choice.
18 BY MS. BONJEAN:
19 Q. It was your choice?
20 A. Well, it was -- I had no option.  He
21 was in a school that I worked in and I wanted to
22 give him the courtesy.
23 Q. Right.  You wanted to give him the
24 courtesy to speak to him.  That was your choice,
25 correct?

Page 44

1 A. Yes.
2 Q. And what was the nature of your
3 conversations?
4 A. He would ask me things that were, in my
5 opinion, unnecessary to talk about and then he
6 would talk about you and another attorney.
7 Q. What other attorney?
8 A. I think her first name is Kathleen.
9 Zellner.
10 Q. Uh-huh.  And what did he say about me
11 and Kathleen Zellner?
12 A. That he worked for you.
13 Q. Oh, okay.  And what did he say he did,
14 he did investigative work for me?
15 A. Yes.
16 Q. Did he mention whether he did
17 investigative work for Ms. Zellner?
18 A. Yes.
19 Q. Anybody else?
20 A. Then he told me that he was also
21 working for Northwestern University wrongful
22 convictions.
23 Q. Okay.  And what did you say in response
24 to Mr. Dorsch announcing to you that he worked for
25 Northwestern University's center on wrongful

Rizman Rappaport (973)992-7650
"When every word counts"

Page 45

1 convictions and other defense attorneys?
2 A. Told him that was nice that he was
3 making money.
4 Q. Anything else?
5 A. Probably asked how he was doing. I
6 know he said he was divorced, asked him if he was
7 going out with anybody. He told me he married a
8 woman that had a chain of hotels.
9 Q. Anything else you discussed?
10 A. His toupee.
11 Q. What did you discuss about his toupee?
12 A. Well, over the years that I worked with
13 Bill, he would always have a different hairstyle.
14 I remember once we were out of the car and his
15 toupee was blown off by the wind.
16 Q. So you chuckled about this story from
17 the past, is that right?
18 A. I did.
19 Q. Okay. Did you ask him why he testified
20 that Reynaldo Guevara had motioned or indicated to
21 a witness viewing a photo array who to identify
22 from that photo array?
23 A. I know he was obsessed with a couple
24 people from Area 5. He did speak about Reynaldo.
25 To be honest with you, it went in one ear and went

Page 46

1 out the other. I'm no longer a policeman, I
2 didn't want to hear it.
3 Q. So you didn't ask him anything about
4 his prior testimony that he had witnessed Reynaldo
5 Guevara suggest to a witness who to identify from
6 a photo array?
7 A. Never said that to me.
8 Q. Were you aware that he had testified to
9 that?
10 A. Sometime after he did that, yes, I was.
11 Q. So you weren't aware of that two years
12 ago when he came and visited you at the Department
13 of Education?
14 A. Actually no, I wasn't.
15 Q. When did you first become aware that he
16 had given sworn testimony in a number of cases
17 about Guevara suggesting to a witness who to pick
18 out of a photo array?
19     MS. ROSEN: Object to the form.
20     THE WITNESS: Sometimes after -- excuse
21 me. Sometime after his visits to me.
22     BY MS. BONJEAN:
23 Q. And how did you learn that information?
24 A. Well, he would bring it up after a
25 couple contacts that I had with him when he would

Page 47

1 come in. That's when I found out about it.
2 Q. And you actually were partners with
3 Dorsch at one time?
4 A. Oh, yeah.
5 Q. How long?
6 A. Well, we were in the 20th District
7 together as patrolmen and we were on the same
8 watch on the same tactical team. And then when he
9 became a detective, I couldn't give you
10 approximately how many years. It was several
11 years on and off.
12 Q. And you both were the subject of
13 complaint registers investigations together from
14 time to time, right?
15     MS. ROSEN: Object to the form.
16     THE WITNESS: I think so.
17     BY MS. BONJEAN:
18 Q. Although you have much more extensive
19 complaint register history, right?
20     MS. ROSEN: Object to the form.
21     MR. ENQUIST: Foundation.
22     MS. SPIVY: Join.
23     THE WITNESS: I don't know that.
24     BY MS. BONJEAN:
25 Q. Do you know how many complaint

Page 48

1 registers you had lodged against you in your
2 career?
3 A. Don't know, don't care.
4 Q. Did you ever care?
5 A. I don't think so.
6 Q. Don't think so?
7 A. No.
8 Q. Okay. Did your conversations with your
9 former partner involve anything else than what you
10 have already described here?
11 A. You mean Bill?
12 Q. Yeah.
13 A. I think one conversation, it was about
14 another case that we had or that he kept telling
15 me that he had knowledge of. I didn't have any
16 part of it but --
17 Q. What was the case?
18 A. John Wayne Gacy.
19 Q. Oh, okay. Anything else?
20 A. And the Brown's Chicken case.
21 Q. And what did he ask you about the
22 Brown's Chicken case?
23 A. He didn't ask me anything. He was
24 telling me that the wrong people were in custody
25 and that he's investigating it again and it's

Maysonet v.
Guevara

Video Deposition

Page 49

1  going to be the subject of a documentary.
2  Q.  And did you have any firsthand
3  knowledge about the Brown's Chicken investigation?
4  A.  I did not have firsthand knowledge of
5  it.
6  Q.  Did you have secondhand knowledge about
7  the Brown's Chicken investigation?
8      MS. ROSEN: Object to the form,
9  relevance.
10     THE WITNESS: I was conducting an
11 investigation with Bill in Area 5 where a
12 couple people that we were talking to related
13 some kind of knowledge of Brown's Chicken.
14     BY MS. BONJEAN:
15 Q.  Were you on the task force for the
16 Brown's Chicken?
17 A.  No.
18 Q.  How was it that you were investigating
19 the Brown's Chicken?
20     MS. ROSEN: Objection, relevance.
21     THE WITNESS: We were conducting an
22 investigation and Brown's Chicken came up,
23 and with that information we went to our
24 commander and had a conversation with our
25 commander about a couple things that was

Page 50

1  brought up during an unrelated investigation.
2      BY MS. BONJEAN:
3  Q.  And what was the significance as it
4  relates to the Brown's Chicken murder?
5  A.  Well, it was all over the news media
6  about Brown's Chicken, and we wanted to tell the
7  task force there was information that was gathered
8  on an unrelated matter, maybe they would like to
9  talk to these people.
10 Q.  And do you know whether they did?
11 A.  I believe Sergeant Paul Carroll did,
12 and Dick Zuley.
13 Q.  And was this information that
14 inculpated the charged individuals or exculpated
15 the charged individuals?
16     MS. ROSEN: Objection, relevance.
17     THE WITNESS: I don't know what they
18 did with the information.
19     BY MS. BONJEAN:
20 Q.  And what was the information?
21 A.  It's so long ago, I don't recall.
22 Q.  Well, do you remember anything about
23 it?
24     MS. ROSEN: Objection, relevance.  I'm
25 going to have a standing objection to all

Page 51

1  these Brown's Chicken murder questions,
2  investigation questions.  Just because you
3  have a particular interest in it doesn't make
4  it relevant in this case.
5      MS. BONJEAN: I have just a couple more
6  questions because it's --
7      MS. ROSEN: I still have a standing
8  objection to all of them.
9      MS. BONJEAN: That's fine.
10     BY MS. BONJEAN:
11 Q.  I'm just wondering, you said you spoke
12 to some witnesses.  What was the nature --
13 A.  No, I did not say that.
14 Q.  Okay.  Do you typically investigate
15 cases that are outside your jurisdiction?
16     MS. ROSEN: Objection, form.
17     MR. ENQUIST: Join.
18     THE WITNESS: Not typically.
19     BY MS. BONJEAN:
20 Q.  And what made you do so in this case?
21     MS. ROSEN: Objection, form,
22 mischaracterizes his testimony.  I don't
23 think he said anything about he conducted an
24 investigation.
25     MS. BONJEAN: I think he did.

Page 52

1      THE WITNESS: As I said before, I was
2  conducting an unrelated investigation.  That
3  word came up, I went to my supervisor,
4  contacted the two Chicago Police officers
5  that were assigned to the task force.  That's
6  all the conversation that I had about Brown's
7  Chicken.  That's the only thing I did.
8  Whether they acted on it, I don't know.
9      BY MS. BONJEAN:
10 Q.  Okay.  Anything else between you and
11 Mr. Dorsch that was communicated about
12 Mr. Maysonet's case came back to the circuit
13 court?
14 A.  Bill would always talk about the same
15 thing.  I would listen and glad that he left when
16 he did.
17 Q.  And what did he -- you say he always
18 talked about the same thing.  What's the same
19 thing that he kept talking about?
20 A.  You.
21 Q.  What else besides the fact that -- go
22 ahead?
23 A.  Attorney Zellner, and he talked about
24 his son being fired from the police -- one of his
25 sons being fired from the police department.

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 53

1 Q.  Okay.
2 A.  He would always talk about how he did
3   not like the majority of the people in Area 5.
4 Q.  Anything else?
5 A.  That's all I remember.
6 Q.  And anything else related to
7   Mr. Maysonet's case?
8 A.  Just to call you.
9 Q.  Did he say why he wanted you to call
10  me?
11 A.  He asked if I received the subpoena.
12  My impression was he knew I received that
13  subpoena, and he wanted me to call you in
14  New York.  And then he says, I believe she's in
15  Chicago.
16 Q.  Okay.  Did you find that unusual?
17 A.  Didn't even think about it.
18 Q.  Sounds like it's one of the few things
19  you actually remember.
20     MS. ROSEN: Objection to the form,
21  argumentative.
22     MR. ENQUIST: Join.
23     MS. BONJEAN: I'll withdraw it.
24     BY MS. BONJEAN:
25 Q.  Okay.  Did you contact any of the other

Page 54

1   individuals who have been sued with you in this
2   case after receiving the subpoena?
3 A.  Never.
4 Q.  You remember coming up to me at 26th
5   Street?
6 A.  I remember you coming up to me with a
7   picture of myself and you asked if I wanted to
8   talk to you, and I told you absolutely not, I'll
9   only talk to my attorney.
10 Q.  Okay.  And I had a picture of you?
11 A.  Yes, you did.  You had a board like
12  that and there was a black and white photo of me.
13 Q.  Was it an old photo, was it a new
14  photo?
15 A.  I don't recall.
16     MS. ROSEN: Objection, relevance.
17     THE WITNESS: I know it was me.  I
18  don't know when it was taken, how it was
19  taken, where it was taken.
20     BY MS. BONJEAN:
21 Q.  So I had a photo of you.  Was it a
22  photo of you as a Chicago Police officer or like
23  recently, like -- you know, I don't know, since
24  your retirement?
25     MS. ROSEN: Objection, relevance.

Page 55

1     MR. ENQUIST: Asked and answered.
2     THE WITNESS: I don't know when it was
3   taken, where it was taken, how it was taken.
4     BY MS. BONJEAN:
5 Q.  You can't even recollect whether it was
6   you as a young man or you as an old man?
7     MS. ROSEN: Object to the tone of your
8   voice, object to this line of questioning as
9   irrelevant and if you want to make yourself a
10  witness, clearly you don't believe you showed
11  him a photograph, then we can talk about you
12  being a witness in the case and we can depose
13  you, but --
14     MS. BONJEAN: Yes, because I'm sure me
15  showing the man a picture of himself is
16  certainly material to something, somewhere,
17  somehow.
18     MS. ROSEN: Then why are you asking
19  about it?
20     MS. BONJEAN: I'm just curious.  He
21  testified to it.
22     MS. ROSEN: Okay.  Well, depositions
23  aren't about your curiosity.  We heard
24  about your curiosity over the Brown's murder
25  investigation.  Now we're hearing about your

Page 56

1   curiosity about showing him a picture that
2   you clearly disbelieve that you showed him.
3     MS. BONJEAN: Are you done yelling?
4     MS. ROSEN: I am, because you're
5   wasting time.
6     MS. BONJEAN: Well, you know what?
7     MS. ROSEN: How about relevant
8   testimony, relevant questions?
9     MS. BONJEAN: You don't get to decide
10  what's relevant.  I mean, you're not the
11  final arbiter on that.
12     MS. ROSEN: You're right.  I'm not the
13  final --
14     MS. BONJEAN: So perhaps maybe limit
15  the speaking objections so that we can move
16  ahead.
17     MS. ROSEN: I will make my objections
18  based on what they are.
19     MS. BONJEAN: Okay.  Well, I'm going to
20  ask my questions.
21     MS. ROSEN: Go ahead.  You have seven
22  hours.  Fill it how you see fit.
23     BY MS. BONJEAN:
24 Q.  So you would agree we never actually
25  saw each other before the Maysonet criminal

Page 57

1  prosecution, right?
2      MS. ROSEN: Objection, relevance.
3      THE WITNESS: I never knew who you were
4  until you came up to me as I was sitting in
5  the gallery.
6      BY MS. BONJEAN:
7  Q.  And do you have any theory about how I
8  would have known what you looked like?
9      MS. ROSEN: Objection, relevance.
10     THE WITNESS: Never thought about it.
11     BY MS. BONJEAN:
12 Q.  And so it's your testimony that I
13 approached you, not that you approached me, is
14 that right?
15     MS. ROSEN: Objection, relevance.
16     MR. LEINENWEBER: Also asked and
17 answered.
18     MR. ENQUIST: Join.
19     THE WITNESS: I didn't know who you
20 were.  You came up to me.  You introduced
21 yourself.  I did not want to talk to you at
22 all.
23     BY MS. BONJEAN:
24 Q.  And we didn't talk, did we?
25     MS. ROSEN: Objection, relevance.

Page 58

1      THE WITNESS: The only thing I said to
2  you, you asked me who I was.  I told you yes,
3  I was.  You asked me if I wanted to talk.  I
4  says absolutely not.
5      BY MS. BONJEAN:
6  Q.  Okay.  By the way, do you remember my
7  questions about you being under oath?
8      MS. ROSEN: Objection, form,
9  argumentative.
10     BY MS. BONJEAN:
11 Q.  Do you know what the oath means?
12     MS. ROSEN: Objection, argumentative.
13     MR. ENQUIST: Join.
14     THE WITNESS: Yes, I do.
15     MS. ROSEN: And as I indicated earlier,
16 if we're going to go down this road, then
17 you're risking us putting you under oath.
18     MS. BONJEAN: Please, put me under
19 oath.
20     MS. ROSEN: Fine.  Get yourself
21 disqualified out of the case.
22     MS. BONJEAN: You know what?  I wish I
23 had a dollar for every time someone tried to
24 disqualify me from a case.
25     MR. LEINENWEBER: You're getting 2

Page 59

1  bucks.
2      MS. BONJEAN: It's actually been far
3  more.
4      MS. ROSEN: What does that say?  We
5  won't go there.
6      MS. BONJEAN: No, it does say
7  something, doesn't it?
8      MS. ROSEN: Yeah, it does.
9      MS. BONJEAN: Unsuccessfully, by the
10 way.
11     MS. ROSEN: It does say a lot about
12 your tactics.  That's what it says.
13     MS. BONJEAN: Or effectiveness.
14     MS. ROSEN: We'll see about that.
15     BY MS. BONJEAN:
16 Q.  In any event, just to be clear, I
17 approached you, we never met before, right?
18     MS. ROSEN: Objection, asked and
19 answered for I think the third time.
20     MR. ENQUIST: Join.
21     BY MS. BONJEAN:
22 Q.  Where were we?
23     MS. ROSEN: 26th and California.
24     MS. BONJEAN: It's a big building if
25 you've ever been there.

Page 60

1      MR. LEINENWEBER: He already testified
2  in the gallery.
3      BY MS. BONJEAN:
4  Q.  Was it in the gallery that I approached
5  you?
6  A.  When I was seated on the bench.  That's
7  when you came up to me.  It was one of the small
8  courtrooms.
9  Q.  Okay.  And what was I wearing?
10 A.  I don't know.
11 Q.  How did you know it was me?
12 A.  You told me it was you.
13     MS. ROSEN: Objection, relevance.
14     BY MS. BONJEAN:
15 Q.  All right.  And then after you said you
16 didn't want to speak to me or whatever transpired
17 during this conversation in which I showed you a
18 picture that you have zero recollection of, what
19 did you do?
20     MR. ENQUIST: Objection, form.
21     MS. ROSEN: Object to the form, object
22 to the argumentative, object to the
23 relevance.
24     MR. LEINENWEBER: Also misstates the
25 witness' testimony.

Page 61

1      MR. ENQUIST: Join.
2      THE WITNESS: I stayed seated in the
3  gallery.
4      BY MS. BONJEAN:
5  Q.  Now, after receiving this subpoena,
6  we'll go back to that, it's your testimony that
7  you did not make contact either by telephone or
8  e-mail or in any other fashion with any of the
9  other individuals who are co-defendants in this
10  case, correct?
11      MS. ROSEN: Objection, asked and
12  answered.
13      THE WITNESS: I never called anyone.
14      BY MS. BONJEAN:
15  Q.  That's not my question.  Did you have
16  any contact whatsoever with any of the other
17  individuals in this case, whether they initiated
18  contact or you initiated contact, after you
19  received the subpoena?
20      MR. LEINENWEBER: Objection, vague.
21      THE WITNESS: I never seen them, talked
22  to them, met with hem.
23      BY MS. BONJEAN:
24  Q.  So the answer is no, you had no contact
25  with any of the other co-defendants in this case

Page 62

1  after you received the subpoena until you arrived
2  at 26th Street?
3  A.  When I received the subpoena, I went to
4  26th and California.  I was standing in the
5  hallway.  I saw Freddie first.  A couple minutes
6  later I saw Ernie and Eddie.  That's the first
7  time I ever met them, saw them, talked to them.
8  Q.  So the first time you saw them was in
9  the hallway at 26th Street after you received the
10  subpoena, correct?
11  A.  That's when I answered your subpoena.
12  Q.  Yes.  And the first time you spoke to
13  any one of them was at 26th Street after you
14  received the subpoena, correct?
15  A.  Yes, ma'am.
16  Q.  And you didn't receive a call or
17  initiate a call to Guevara?
18  A.  No.
19  Q.  Why do you say it with such adamance?
20  Do you have an issue with Guevara?
21      MS. ROSEN: Objection, form.
22      THE WITNESS: I'm answering your
23  question.
24      BY MS. BONJEAN:
25  Q.  What about Mingey?

Page 63

1  A.  No.
2  Q.  Montilla?
3  A.  No.
4  Q.  Halvorsen?
5  A.  No.
6  Q.  Did you reach out to any Cook County
7  State's Attorneys after receiving this subpoena?
8  A.  No.
9  Q.  So the only individuals you spoke to
10  after receiving the subpoena were FOP
11  representatives and then eventually Tim Grace, who
12  contacted you, is that right?
13  A.  And you at the court building.
14  Q.  Right.  I was saying before you went to
15  court, but okay.
16  A.  Oh.
17  Q.  You weren't up in the cafeteria with
18  any of the defendants when you were at 26th
19  Street?
20      MS. ROSEN: Object to the form.
21      THE WITNESS: I was not.
22      BY MS. BONJEAN:
23  Q.  And did you have any conversations
24  about anything related to the Maysonet case when
25  you were in the hallway with your fellow

Page 64

1  co-defendants?
2  A.  I had no conversation about that case.
3  Q.  Okay.  What did you guys talk about in
4  the hallway?
5  A.  Again, I hadn't seen them for years.  I
6  was inquiring how they were and how their family
7  was.
8  Q.  Anything else?
9  A.  Could have been.  I don't recall.
10  Q.  So to the best of your recollection,
11  the only thing you remember talking about in the
12  hallway at 26th Street with Montilla and Halvorsen
13  and the other co-defendants is idle talk, right?
14  A.  Sure.  I hadn't seen them for years.
15  Q.  Okay.  But that was the scope and
16  extent of your conversation, right?
17      MS. ROSEN: Objection, asked and
18  answered.
19      BY MS. BONJEAN:
20  Q.  To the best of your recollection?
21  A.  Didn't talk about this case.
22  Q.  Did you talk about any other cases?
23      MS. ROSEN: Objection, asked and
24  answered.
25      THE WITNESS: I only said to them,

Maysonet v.
Guevara

Video Deposition

Page 65

1  how's things going, stuff like that.
2      BY MS. BONJEAN:
3  Q.  Did you discuss Rey at all with any of
4  these individuals?
5  A.  Not at all.
6  Q.  All right.  So at what point did you
7  realize or learn that Mr. Maysonet's double murder
8  conviction had been vacated?
9  A.  It was sometime after I received the
10  subpoena.
11  Q.  Okay.  And how did you learn that
12  information?
13  A.  I think it was from Tim Grace.
14  Q.  Okay.  And if it calls for a
15  communication between you and your counsel, you
16  can assert your privilege.  If your answer calls
17  for a communication, that is.
18      Did you have -- how many calls did you
19  have with Mr. Grace before you appeared at 26th
20  Street?
21  A.  There was the initial conversation and
22  then I went down to his office.
23  Q.  When did you decide that you would
24  assert your Fifth Amendment right to remain silent
25  if called to testify during the Maysonet hearing

Page 66

1  and trial?
2  A.  I never decided to or not to.  I
3  listened to my attorney as he was telling me what
4  that --
5      MR. ENQUIST: Don't go into the
6  conversations you had with your attorney.
7      THE WITNESS: Okay.  I did not make a
8  decision.
9      BY MS. BONJEAN:
10  Q.  Well, you knew Mr. Grace had
11  represented that you would assert your Fifth
12  Amendment right to the Cook County State's
13  Attorneys and to actually the judge as well,
14  right?
15  A.  The only thing I'm going to say to that
16  is he informed me what the Fifth was.  I did not
17  make a decision.
18  Q.  Okay, my question is different.  You
19  were aware that Mr. Grace had represented to both
20  the Cook County State's Attorney's office and the
21  judge and in open court that you would assert your
22  Fifth Amendment right if you were called to
23  testify.
24      You were aware of that, right?
25  A.  I was not at the court proceeding and I

Page 67

1  did not make a final decision.
2  Q.  Okay.  You were aware that he made that
3  representation, correct?
4  A.  Again, I wasn't in court.  I did not
5  know what I was going to do at the final moment.
6  Q.  I didn't ask you what you were going to
7  do at the final moment.
8      MS. BONJEAN: Can you read back my
9  question and see if he'll answer it if you
10  ask it?
11      MS. ROSEN: Object to the form, object
12  to the argumentative, the editorial comments.
13      MR. ENQUIST: Join.
14      (Record read as requested.)
15      THE WITNESS: I wasn't in court.  I
16  don't know what motions he made.
17      BY MS. BONJEAN:
18  Q.  So you were not aware that he had told
19  the Cook County State's Attorney's office that you
20  would assert your Fifth Amendment right to remain
21  silent if called to testify?
22  A.  I don't know what he said.  I had
23  privileged conversation with him and my mind
24  wasn't made up what I was going to do.
25  Q.  So if Mr. Grace made that

Page 68

1  representation, he did so without your approval,
2  is that your testimony?
3  A.  That is not.
4  Q.  So you understand that the Fifth
5  Amendment privilege belonged to you, not
6  Mr. Grace, right?
7  A.  That's correct.
8  Q.  Okay.  And if he told the Cook County
9  State's Attorney or the judge that you would
10  assert your Fifth Amendment right if called to
11  testify, that that would not be accurate, is that
12  what you're saying?
13  A.  That's not what I'm saying.
14  Q.  Well, I thought you just testified,
15  correct me if I'm wrong, that you had not made a
16  decision?
17  A.  I, the day of that court hearing, was
18  still undecided what I would do.
19  Q.  Okay.  Again, if Mr. Grace represented
20  to the court that you had made a decision and you
21  would assert your Fifth Amendment right, is it
22  your testimony that he misrepresented that?
23      MS. ROSEN: Object to the form,
24  argumentative.
25

Page 69

1       BY MS. BONJEAN:
2   Q.  I'm sorry?
3   A.  It's not my testimony.
4       MS. BONJEAN: Will you mark this,
5   please?
6       (Whereupon, Paulnitsky
7       Deposition Exhibit No. 1 was
8       marked for identification.)
9       MS. BONJEAN: These were Dropbox.  Here
10  are some extra copies.
11      MR. LEINENWEBER: Do you know what the
12  file name is?
13      MS. BONJEAN: Gabby, are you able to
14  figure that out?
15      BY MS. BONJEAN:
16  Q.  I'm handing you what has been marked as
17  Exhibit 1.
18      Do you see this letter, Mr. Paulnitsky?
19  A.  Yes.
20      MS. BONJEAN: Hold on.
21      MR. LEINENWEBER: That's all right.  I
22  have this copy.
23      MS. BONJEAN: Hold on.  I'm not sure
24  what it's labeled or if it's in there, but
25  since you have it, you guys hopefully can

Page 70

1   share.
2       BY MS. BONJEAN:
3   Q.  Mr. Paulnitsky, have you seen this
4   letter before?
5   A.  Yes.
6   Q.  You have.  And you saw this letter
7   before Mr. Grace sent it because he e-mailed it to
8   you, right?
9   A.  I don't recall him e-mailing this to
10  me.  That's not to say that he didn't, I just
11  don't recall if he did or not.
12  Q.  Well, when do you remember seeing this
13  letter?
14  A.  The last time -- or last and first time
15  that I know I've ever seen this was as I was
16  talking to my attorneys.
17  Q.  Okay.  In this building, correct?
18  A.  Yes, ma'am.
19  Q.  Okay.  And you would agree it's dated
20  November 13, 2017, right?
21  A.  Yes.
22  Q.  And it's a letter from your attorney,
23  Mr. Grace, to Jim Papa, correct?
24  A.  Yes.
25  Q.  And Jim Papa was the Cook County

Page 71

1   State's Attorney who was assigned to the Maysonet
2   prosecution, right?
3   A.  I don't know that.
4   Q.  All right.  Well, can you read that it
5   says that he is the Assistant State's Attorney?
6   A.  It says that.
7   Q.  And that it's regarding Mr. Maysonet?
8   A.  Yes.
9   Q.  And in this letter, if you look about
10  two thirds down, the first paragraph, Mr. Grace
11  represents to Mr. Papa that, quote, "As such, my
12  clients intend to invoke their right to remain
13  silent afforded them under the Fifth Amendment to
14  the United States Constitution and the due process
15  clause of both the Federal and State Constitutions
16  respectively."
17      Do you see that?
18  A.  Yes.
19  Q.  "However, they are willing to testify
20  under a grant of immunity"?
21      MS. ROSEN: Is that a question?
22      BY MS. BONJEAN:
23  Q.  Are you following along?
24  A.  Yes, I'm reading.
25  Q.  So do you see that there?

Page 72

1   A.  Yes.
2   Q.  "We would be requesting full
3   transactional immunity and total blanket immunity
4   from any future prosecution which relates to or
5   arises from their testimony."
6       Do you see that?
7   A.  Yes.
8   Q.  Why was your attorney asking for
9   immunity?
10      MS. ROSEN: Objection.  To the extent
11  that it calls for attorney/client
12  communications it's an improper question.
13      MR. ENQUIST: I join.
14      MS. ROSEN: And foundation and
15  speculation regarding why Mr. Grace did
16  whatever he did.
17      MS. SPIVY: Join.
18      BY MS. BONJEAN:
19  Q.  Well, Mr. Grace's letter is a matter of
20  public record, so I'm just asking what your
21  understanding was of why he asked for
22  transactional and total blanket immunity for you
23  and Mr. Montilla?
24      MS. ROSEN: Objection, foundation,
25  calls for speculation and your statement that

Maysonet v.
Guevara

Video Deposition

Page 73

1  it's a matter of public record, whether it is
2  or isn't, is irrelevant to the objection.
3      MS. BONJEAN: I don't see anything that
4  suggests it's confidential. Go ahead.
5      MR. ENQUIST: It's confidential.
6      MS. ROSEN: It says "Confidential"
7  across the top of it. Pooh-pooh the
8  confidentiality.
9      MS. BONJEAN: It's not that. I didn't
10 see it. But in any event, it's a matter of
11 public record in this case, certainly, and
12 maybe a matter of public record outside this
13 case at some point.
14     BY MS. BONJEAN:
15 Q.  But in any event, can you answer my
16 question?
17 A.  I had a conversation with Mr. Grace.
18 That conversation is privileged between me and
19 him.
20 Q.  I'm not asking you to tell me about
21 your conversation. I'm asking you why he
22 asked -- why you wanted immunity. Why did you
23 want immunity?
24     MS. ROSEN: Object to the form of the
25 question.

Page 74

1      MR. ENQUIST: Join.
2      MS. ROSEN: And to the extent that it
3  invades the attorney/client privilege, it is
4  an improper question.
5      MR. ENQUIST: To the extent that it
6  involves conversations that you had with
7  Grace, I'm going to instruct you not to
8  answer.
9      BY MS. BONJEAN:
10 Q.  Okay. Mr. Paulnitsky, the
11 attorney/client privilege protects your
12 communications with your counsel and I am not
13 asking for any information about your
14 communications. But I am asking, why did you want
15 transactional or blanket immunity?
16     MS. ROSEN: Same objection.
17     MR. ENQUIST: Join.
18     THE WITNESS: Same answer.
19     BY MS. BONJEAN:
20 Q.  Which is what?
21 A.  I had a conversation with my attorney
22 Grace. That conversation is between me and him.
23 Q.  I'm not asking for your conversation,
24 sir.
25     MS. ROSEN: You are.

Page 75

1      MS. BONJEAN: No, I'm not.
2      MS. ROSEN: If that's his answer, then
3  yes, you are.
4      MS. BONJEAN: I'm not asking for his
5  communications. I'm asking why he wanted
6  transactional and full blanket immunity.
7      MS. ROSEN: If the -- hypothetically
8  speaking, if the reason is only because of
9  information provided to him by his lawyer,
10 then yes, you are. Yes. If I were to ask
11 your client that question, you would be
12 screaming bloody murder.
13     MS. BONJEAN: I never assert privilege,
14 not once in any litigation, so I don't know
15 where you're getting that from. We have
16 nothing to hide. So go ahead, sir.
17     MS. ROSEN: Okay. We'll remember that.
18     THE WITNESS: I had a conversation with
19 attorney Grace. That conversation is between
20 me and him and nobody else.
21     BY MS. BONJEAN:
22 Q.  Okay. Well, no one is asking about
23 your conversation. You wanted blanket immunity,
24 right?
25 A.  Again, I had a conversation with

Page 76

1  Mr. Grace. That conversation is between me and
2  him only.
3  Q.  Sir, you're not suggesting that
4  Mr. Grace misrepresented anything to Mr. Papa,
5  correct?
6      MS. ROSEN: Objection, asked and
7  answered.
8      MR. ENQUIST: Join.
9      THE WITNESS: I never said that, I
10 never suggested it.
11     BY MS. BONJEAN:
12 Q.  Okay. So Mr. Grace would not have
13 represented something to Mr. Papa that was a lie,
14 right? You have no reason to believe that,
15 correct?
16     MS. ROSEN: Objection, form.
17     THE WITNESS: Again, ma'am, my
18 conversation with my attorney is between me
19 and him and nobody else.
20     BY MS. BONJEAN:
21 Q.  Are you having a hard time
22 understanding my questions, sir?
23     MS. ROSEN: Objection, argumentative.
24 I believe your questions are improper, so
25 your question right now of him in that

Maysonet v.
Guevara

Video Deposition

Page 77

1  argumentative way is improper.
2      BY MS. BONJEAN:
3  Q.  Are you having a hard time
4  understanding my questions?
5  A.  I can only answer that question as I
6  did.
7  Q.  Okay.  Mr. Grace represented that "my
8  clients," that being you, "intend to invoke their
9  right to remain silent."
10     Do you see that in this letter?
11 A.  Yes.
12     MS. ROSEN: Objection, asked and
13 answered.
14     BY MS. BONJEAN:
15 Q.  Okay.  And you have no reason to tell
16 me here today that Mr. Grace was going rogue and
17 was not -- was indicating something that was not
18 consistent with your wishes, right?
19 A.  I never said that.
20 Q.  Okay.  So you wanted to -- you
21 indicated to the Cook County State's Attorney's
22 office that you were going to exercise your Fifth
23 Amendment rights through your counsel, right?
24     MS. ROSEN: Objection, form,
25 foundation.

Page 78

1      MR. ENQUIST: And asked and answered.
2      THE WITNESS: I had a conversation with
3  my attorney Grace.  I'm not going to get into
4  that conversation.  I never had a
5  conversation with the State's Attorney's
6  office.
7      BY MS. BONJEAN:
8  Q.  Okay.  But he represented to the
9  State's Attorney that you were going to assert
10 your Fifth Amendment right.  We can agree on that,
11 correct?
12 A.  I only agree with what's on black and
13 white.
14 Q.  Right.  And on black and white he
15 indicated that you would assert your Fifth
16 Amendment right, so we've established that.  He
17 also indicated that you would be willing to
18 testify under a grant of immunity.
19     That's in black and white here too,
20 right?
21 A.  It is.
22 Q.  Okay.  And he also represented on your
23 behalf that you would testify only if you received
24 full transactional immunity and total blanket
25 immunity.

Page 79

1      That's in black and white here as well,
2  correct?
3  A.  Yes.
4  Q.  And Mr. Grace, you don't know him to be
5  a liar, right?
6      MS. ROSEN: Objection, asked and
7  answered.
8      THE WITNESS: I thought he was a
9  fantastic, great attorney.
10     MR. ENQUIST: I just want to go back
11 and object to, you mischaracterized the
12 document when you said "only," but you can
13 answer the question.  I object to the form, I
14 just couldn't read fast enough.
15     BY MS. BONJEAN:
16 Q.  He writes on the second page that, "My
17 clients are retired and older men and to be quite
18 honest, are afraid of the climate that exists in
19 these types of post conviction proceedings."
20     Do you see that?
21 A.  Yes.
22 Q.  What climate were you afraid of in
23 these post-conviction proceedings?
24     MS. ROSEN: Objection, form,
25 argumentative

Page 80

1      THE WITNESS: I had a conversation with
2  my attorney Grace.  That conversation is
3  privileged.
4      BY MS. BONJEAN:
5  Q.  So is it your testimony that you only
6  became afraid of the climate after you spoke to
7  your attorney, Mr. Grace?
8      MS. ROSEN: Objection, form, and to the
9  extent that it requests information protected
10 by attorney/client privilege, it's
11 objectionable.
12     MR. ENQUIST: If it has to do with a
13 conversation you just had with Grace, I'll
14 instruct you not to answer.  But if it has to
15 do with somebody from the outside, you can
16 answer the question.
17     THE WITNESS: It was part of a
18 conversation that I had with Mr. Grace, but
19 to be honest with you, everything you see in
20 the newspaper today is how we hate the police
21 and derogatory against the police, and I did
22 not want to become part of the fake news.
23     BY MS. BONJEAN:
24 Q.  Okay.  What fake news did you fear
25 becoming a part of?

Maysonet v.
Guevara

Video Deposition

Page 81

1      MS. ROSEN: Objection, relevance.
2      THE WITNESS: I did not want my name to
3  be out in any news media for any reason at
4  all, other than obituary column for me.
5      BY MS. BONJEAN:
6  Q.   And why is it that you were so fearful
7  of your name being out in the public realm in
8  connection with any issue other than your death?
9  A.   No reason for it.  I'm retired.
10 Q.   But you would agree that as a Chicago
11 Police officer, you were allegedly a public
12 servant, right?
13     MS. ROSEN: Object to the form,
14 argumentative.
15     MR. ENQUIST: Join.
16     THE WITNESS: I'm not sure what I
17 mean -- what you mean by "allegedly a public
18 servant."
19     BY MS. BONJEAN:
20 Q.   Did you consider yourself a public
21 servant when you were a Chicago Police officer?
22 A.   Yes.
23 Q.   Did you understand that you -- your job
24 was to serve and protect the people of the City of
25 Chicago?

Page 82

1      MS. ROSEN: Object to the form.
2      THE WITNESS: Yes.
3      BY MS. BONJEAN:
4  Q.   And that that included all the people
5  of the City of Chicago, including my client,
6  Mr. Maysonet?
7      MS. ROSEN: Object to the form,
8  argumentative.
9      MR. ENQUIST: Join.
10     THE WITNESS: Yes.
11     BY MS. BONJEAN:
12 Q.   Now, this view that you hold that the
13 media is overwhelmingly anti-police, did you hold
14 that view before you were called to testify or
15 were subpoenaed in the Maysonet case?
16     MS. ROSEN: Objection, relevance.
17     THE WITNESS: I don't recall when I
18 felt that way.  I couldn't give you a time
19 frame.
20     BY MS. BONJEAN:
21 Q.   But so this climate that Mr. Grace
22 references in his letter, is that a climate that
23 you were concerned about only after you were
24 called as a witness in the Maysonet case or was it
25 something that you were fearful of before that?

Page 83

1      MS. ROSEN: Objection, form, relevance.
2      MR. ENQUIST: And foundation.
3      THE WITNESS: I did not like how the
4  news media was treating any policeman
5  anywhere in this country.
6      BY MS. BONJEAN:
7  Q.   And he also wrote, "They want to assist
8  in the prosecution of this case but do not want to
9  place themselves in jeopardy due to baseless
10 allegations."
11     Do you see that?
12 A.   Yes.
13 Q.   What type of jeopardy were you fearful
14 of being placed in?
15     MS. ROSEN: Objection, form,
16 foundation.
17     MR. ENQUIST: I'm also going to
18 instruct you if it has to do with
19 conversations you specifically had with your
20 attorney, if that's the only basis for it,
21 then don't answer the question.
22     MS. BONJEAN: That's not even correct.
23     MR. ENQUIST: It is.
24     MS. BONJEAN: If it has to do with?
25 That's not what the attorney/client privilege

Page 84

1  protects.
2      MR. ENQUIST: Well, if his answer to
3  that only has to do with conversations he had
4  with his attorney, discussions he had with
5  his attorney, then yeah, it is privileged.
6      MS. BONJEAN: It's not a
7  has-to-do-with.  It protects communications,
8  and nothing more.
9      MR. ENQUIST: If his basis of knowledge
10 or his basis of belief is based only on the
11 fact of his communications with his attorney,
12 yes, it is privileged.
13     BY MS. BONJEAN:
14 Q.   Did you fear that you -- I'll strike
15 that.
16     Did you fear that you were in jeopardy
17 prior to talking to Mr. Grace?
18     MS. ROSEN: Object to the form.
19     THE WITNESS: I had no opinion until I
20 talked to my attorneys.
21     BY MS. BONJEAN:
22 Q.   Okay.  But you actually, for the first
23 time in your entire career, reached out to
24 attorneys after getting the subpoena in this case,
25 right?

Page 85

1     MS. ROSEN: Object to the form and
2  mischaracterizes the record.
3     THE WITNESS: Could you --
4     BY MS. BONJEAN:
5  Q.  Sure.  The one and only time that you
6  have ever reached out to criminal defense counsel
7  in connection with a subpoena --
8     MS. ROSEN: How is an FOP attorney a
9  criminal defense counsel?
10    MS. BONJEAN: Oh, my apologies.  That's
11 what Montilla testified to.  You weren't here
12 for that, so I apologize.
13    MS. ROSEN: Okay.  I mean, an FOP
14 attorney is an FOP attorney.
15    MS. BONJEAN: Well, I have a good faith
16 basis to ask that because that's what
17 Montilla characterized him as.
18    BY MS. BONJEAN:
19 Q.  Do you see Mr. Grace as a criminal
20 defense attorney?
21 A.  Yes.
22 Q.  Okay.
23    MS. ROSEN: But he didn't say he
24 reached out to a criminal defense attorney,
25 he said he reached out to the FOP and then

Page 86

1  Tim Grace called him.  That's the problem
2  with your question.
3     MS. BONJEAN: If you say so.  Do you
4  want to just do this dep?  I feel like you
5  have done more speaking in this deposition.
6  I mean, you know, pot, kettle, that whole
7  thing.
8     I forgot what my question was.
9  I'll start over.
10    BY MS. BONJEAN:
11 Q.  Mr. Paulnitsky, did you fear that you
12 were in any jeopardy when you received the
13 subpoena prior to talking to Mr. Grace?
14    MR. ENQUIST: Objection, asked and
15 answered.
16    THE WITNESS: When I received that
17 subpoena, I wanted to talk to an attorney.  I
18 talked to an attorney, it's privileged
19 information what we talked about or what my
20 feelings were.
21    BY MS. BONJEAN:
22 Q.  Okay.  Again, sir, are you having
23 trouble?  Because you're engaging in speeches that
24 are not responsive to the questions, and I don't
25 really understand why you're doing that.  I'm just

Page 87

1  worried maybe you're struggling.
2     MS. ROSEN: Objection, argumentative.
3     BY MS. BONJEAN:
4  Q.  I know you don't want to answer the
5  questions and I can understand why, but you're
6  obligated to answer the questions because you
7  promised to tell the truth here, okay?
8     MS. ROSEN: Objection, argumentative.
9     MR. ENQUIST: Join.
10    BY MS. BONJEAN:
11 Q.  Now, the first time you ever reached
12 out to an FOP lawyer to advise you regarding a
13 subpoena in a criminal prosecution was in the Jose
14 Maysonet case, correct?
15    MS. ROSEN: Objection, asked and
16 answered.
17    MR. ENQUIST: Join.
18    THE WITNESS: I reached out for the FOP
19 attorney -- please let me finish this before
20 you're doing whatever you're doing there.
21    MS. BONJEAN: I'm not doing anything.
22    THE WITNESS: I reached out to the FOP
23 lawyer for this case.  If in my career -- and
24 I don't recall if I did, if I ever reached
25 out to the FOP for guidance or not.  I don't

Page 88

1  recall.
2     BY MS. BONJEAN:
3  Q.  So you are unable to recall any other
4  time that you reached out to the FOP upon
5  receiving a subpoena in a criminal prosecution,
6  correct?
7     MS. ROSEN: Objection, asked and
8  answered.
9     THE WITNESS: I don't recall if I did.
10 40 years is a long time to remember.
11    BY MS. BONJEAN:
12 Q.  I'm asking you, sir, this question:
13 Will you agree that you cannot recall another
14 instance in which you reached out to the FOP
15 seeking legal advice upon receipt of a subpoena in
16 a criminal prosecution?
17    MS. ROSEN: Objection, asked and
18 answered.
19    MR. ENQUIST: Join.
20    THE WITNESS: I don't recall if I did
21 or not, ma'am.
22    BY MS. BONJEAN:
23 Q.  You can't recall a single other time,
24 correct?
25    MS. ROSEN: Objection, asked and

Maysonet v.
Guevara

Video Deposition

Page 89

1 answered.
2     THE WITNESS: I'm not going to guess
3 like you want me to guess.  I don't recall.
4     BY MS. BONJEAN:
5 Q.  So I'm not asking you to guess.  You
6 can't recall a single time, correct?
7     MS. ROSEN: Objection, asked and
8 answered.
9     THE WITNESS: I don't recall.
10     BY MS. BONJEAN:
11 Q.  A single other time, correct?
12 A.  I don't recall.
13 Q.  Okay.  Well, you have not identified
14 any other case when you've done that, have you?
15     MS. ROSEN: Objection, asked and
16 answered.
17     MR. ENQUIST: Join.
18     THE WITNESS: I don't recall.
19     BY MS. BONJEAN:
20 Q.  Can you please tell me one other case
21 in which you did that?
22 A.  I don't recall.
23 Q.  Because there is no other case, right?
24     MS. ROSEN: Objection, argumentative.
25     MR. ENQUIST: Join.

Page 90

1     MS. SPIVY: Join.
2     THE WITNESS: I don't recall.
3     BY MS. BONJEAN:
4 Q.  Well, you can't recall any other time
5 that you reached out to the FOP for criminal
6 advice upon receipt of a criminal prosecution.
7 We've established that.
8     My question is, do you understand that
9 as a retired police officer, you might be called
10 upon to still give testimony in connection with
11 prosecutions in which you were an investigator or
12 played an investigative role?
13 A.  I understand that.  That's why I'm
14 here.
15 Q.  No, you're here because you're being
16 sued.
17     MS. ROSEN: Objection, argumentative.
18     BY MS. BONJEAN:
19 Q.  Do you understand the difference
20 between here, right here now and in a criminal
21 case?
22     MS. ROSEN: Objection, relevance.
23     THE WITNESS: I understand.
24     BY MS. BONJEAN:
25 Q.  Okay.  And you understand in a criminal

Page 91

1 prosecution you are a witness, typically,
2 unless -- well, that's a great question.
3     Have you ever been charged with a
4 crime?
5 A.  No.
6 Q.  Never?
7 A.  Never.
8     MS. ROSEN: Objection, asked and
9 answered.
10     BY MS. BONJEAN:
11 Q.  Even in your youth?
12     MS. ROSEN: Objection, asked and
13 answered.
14     MR. ENQUIST: Join.
15     THE WITNESS: Absolutely not.
16     BY MS. BONJEAN:
17 Q.  Ever been arrested?
18 A.  Never.
19 Q.  So you understand that in a criminal
20 prosecution, then, if you're being subpoenaed,
21 typically you're going to be subpoenaed as a
22 witness, right?
23 A.  That's fair to say.
24 Q.  Okay.  And you understand that, as a
25 Chicago Police officer who worked for 40 years in

Page 92

1 the department, that there might be an occasion
2 where, even after your retirement you would have
3 to give sworn testimony regarding some of the work
4 that you did while you were an officer, right?
5 A.  I knew there was a chance.
6 Q.  And that you're obligated to come in,
7 even though you're retired, to provide testimony
8 to assist in a prosecution, correct?
9     MR. ENQUIST: Objection, asked and
10 answered.  We've gone through this.
11     THE WITNESS: I knew as a citizen that
12 I might receive a subpoena for something.
13     BY MS. BONJEAN:
14 Q.  Not just as a citizen, but as a retired
15 police detective?
16 A.  I knew that.
17 Q.  Okay.  In fact, is there a policy about
18 this in the Chicago Police Department that you're
19 aware of?
20     MS. ROSEN: Objection, form, vague as
21 to what you are referring to as "this."
22     MR. LEINENWEBER: Also foundation.
23     BY MS. BONJEAN:
24 Q.  Does the police department have a
25 policy related to whether or not you are required

Maysonet v.
Guevara

Video Deposition

Page 93

1  to comply with prosecutions or cooperate with
2  prosecutions even after your retirement?
3      MS. ROSEN: Objection, relevance.
4      THE WITNESS: I couldn't recall if
5  there was one or not.
6      BY MS. BONJEAN:
7  Q.  All right.  So after Mr. Grace --
8  strike that.
9      Did Mr. Grace -- I think you testified
10 you weren't in the courtroom when Mr. Grace told
11 the judge that you would assert your Fifth
12 Amendment rights, correct?
13     MS. ROSEN: Objection, foundation.
14     THE WITNESS: I was not present.
15     BY MS. BONJEAN:
16 Q.  All right.  And did you later learn
17 that Mr. Maysonet's convictions -- strike that,
18 that Mr. Maysonet's charges had been tossed?
19     MS. ROSEN: Objection, asked and
20 answered.
21     THE WITNESS: At some point in time I
22 did.
23     BY MS. BONJEAN:
24 Q.  Did you read the newspaper the next
25 day?  Same day, next day?

Page 94

1  A.  I didn't read the newspaper, but I was
2  standing in front of my house when I received a
3  phone call.
4  Q.  From?
5  A.  I believe it was my attorney, Tim
6  Grace.
7  Q.  Okay.  But you didn't read the Chicago
8  Tribune the next day?
9      MS. ROSEN: Objection, asked and
10 answered.
11     THE WITNESS: I don't know if I did or
12 not.
13     BY MS. BONJEAN:
14 Q.  Did you see the Chicago Tribune report
15 that you and fellow officers had indicated that
16 you would plead the Fifth Amendment?
17 A.  I don't recall.
18     MS. ROSEN: Objection, relevance.
19     THE WITNESS: I don't recall if I did
20 or not, ma'am.
21     BY MS. BONJEAN:
22 Q.  Okay.  And how did you feel about the
23 fact that Mr. Maysonet's convictions and charges
24 had ultimately been dismissed?
25 A.  I know I did my job.  After I did my

Page 95

1  job, it was up to the court system, the State's
2  Attorney.  I had no feelings.
3  Q.  You were indifferent to his being
4  released from custody?
5  A.  I could care less.
6      MS. ROSEN: Object to the form.
7      MR. ENQUIST: You've been going for
8  about an hour and a half.  I think this is a
9  good time to give him a break.
10     MS. BONJEAN: If he needs one.
11     THE WITNESS: Yeah, could I?
12     MR. ENQUIST: Yeah.
13     THE VIDEOGRAPHER: We're going off the
14 record at 11:47 a.m.
15     (Discussion off the record.)
16     (Short recess.)
17     THE VIDEOGRAPHER: We are back on the
18 record at 11:56 a.m.
19     BY MS. BONJEAN:
20 Q.  Mr. Paulnitsky, when were you hired by
21 the Chicago Police Department?
22 A.  March 4, 1968.
23 Q.  Did you graduate from high school?
24 A.  I did.
25 Q.  What high school?

Page 96

1  A.  Senn High School.
2  Q.  Spell it?
3  A.  S-e-n-n.
4  Q.  And where is it?
5  A.  Chicago.
6  Q.  Where is it located by street?
7  A.  Oh, I want to say -- bear with me one
8  second.  5900 North Glenwood, G-l-e-n, wood, in
9  Chicago.
10 Q.  You remember the exact address of your
11 high school, huh?
12 A.  I do.
13 Q.  That's impressive.  Did you grow up in
14 Chicago?
15 A.  I did.
16 Q.  And what area did you grow up in?
17 A.  West Rogers Park.
18 Q.  What's your date of birth?
19 A.  ████████
20 Q.  And what year did you graduate from
21 high school, then?
22 A.  1966, I believe.
23 Q.  And upon graduation from high school,
24 did you work or go to the military or --
25 A.  I worked for a couple months and then I

Maysonet v.
Guevara

Video Deposition

Page 97

1  went into the U.S. Army National Guard.
2  Q.  What did you work as when you graduated
3    from high school?
4  A.  I believe I worked at Walgreen's and
5    then I worked for my father.
6  Q.  And what did your father do?
7  A.  My father was the owner of an air
8    freight and trucking company.
9  Q.  And then you enlisted or --
10 A.  Yes.
11 Q.  Okay.  You enlisted in the U.S. Army
12   and what was your assignment after you enlisted?
13   Strike that.  That was a terrible question.
14      You enlisted in the U.S. Army and I
15   assume that you went through some type of basic
16   training, correct?
17 A.  Yes.
18 Q.  All right.  And then after completion
19   of your basic training, were you deployed
20   anywhere?
21 A.  After my basic training, I then
22   proceeded to learn my MOS.
23 Q.  And what's MOS?
24 A.  Well, that would be my occupation.
25 Q.  And what does MOS stand for, if you

Page 98

1  remember?
2  A.  No, I'm sorry, I don't.
3  Q.  Okay.  And describe for me what it is
4    if you don't remember what --
5  A.  Oh, after my basic training I went to
6    Fort Sill, Oklahoma, where I learned field
7    artillery.
8  Q.  So you went to Oklahoma and studied
9    field artillery, is that correct?
10 A.  Yes.
11 Q.  How long did you do that?
12 A.  Oh, a couple months, and then I came
13   back home to a reserve unit.
14 Q.  Okay.  So you never served in Vietnam,
15   is that correct?
16 A.  Correct.
17 Q.  Did you ever -- were you ever deployed
18   anywhere?
19 A.  Yes.
20 Q.  Where is that?
21 A.  City of Chicago.
22 Q.  So you were deployed in the City of
23   Chicago as a reservist, is that right?
24 A.  As a National Guard.
25 Q.  As a National Guard?

Page 99

1  A.  Yes.
2  Q.  Reservist or National Guard?
3  A.  Well, it's a matter of terminology.
4    Some people call it Army Reserve National Guard.
5    Some people call it National Guard Army Reserve.
6  Q.  And is this -- how many times were you
7    deployed in the City of Chicago?
8  A.  I was deployed once by the Federal
9    government and we were called up several times in
10   the city for civil unrest.
11 Q.  Okay.  And this was during 1968 or '7,
12   what year?
13 A.  I believe it was in 1967, '68, so on
14   and so forth.
15 Q.  Have anything to do with the Democratic
16   National Convention that was --
17 A.  I was there.
18 Q.  Hm?
19 A.  I was there.
20 Q.  Were you deployed during those events?
21 A.  First I was a policeman and then I was
22   called up.  I was on the street when I was
23   deployed.
24 Q.  That was '68.  You were already a
25   Chicago Police officer, correct?

Page 100

1  A.  Yes.
2  Q.  So when did you get deployed by the
3    Federal government when you were in the National
4    Guard?
5  A.  I'm not sure when it was.
6  Q.  Well, why were you deployed?
7  A.  Well, the city was being damaged by
8    several different groups that were opposed to
9    political views.
10 Q.  What groups were damaging the city?
11 A.  I could only name a couple.  I'm not
12   sure if I would name them all.
13 Q.  Well, name the ones that you know?
14 A.  Well, you had the Students For a
15   Democratic Society.  You had a couple groups, the
16   Black Panthers, and anybody that thought that they
17   were in a group that could do damage.
18 Q.  All right.  And any other groups that
19   you can think of?
20 A.  No.
21 Q.  Okay.  And how many times were you
22   deployed by the National Guard or the -- strike
23   that.
24      How many times were you deployed by the
25   Federal government when you were a member of the

Page 101

1  National Guard to address civil disrest in the
2  City of Chicago?
3  A.  Once by the Federal government.
4  Q.  Okay.  And how many times were you
5  deployed to address civil disrest in the City of
6  Chicago as a National Guard member by someone
7  other than the Federal government?
8  A.  Several times.
9  Q.  And who would be responsible for
10 deploying you under those circumstances?
11 A.  Our governor.
12 Q.  Okay.  And who was the governor in
13 1967?
14 A.  I don't recall.
15 Q.  How did you avoid Vietnam?
16    MS. ROSEN: Object to the form.
17    MR. ENQUIST: Objection to form.
18    THE WITNESS: By luck.
19    BY MS. BONJEAN:
20 Q.  Just luck?
21    MS. ROSEN: Object to the form.
22    THE WITNESS: Yeah.  I was lucky.
23    BY MS. BONJEAN:
24 Q.  Did you want to go to Vietnam?
25    MS. ROSEN: Objection, relevance.

Page 102

1     THE WITNESS: If I had to, I would.
2     BY MS. BONJEAN:
3  Q.  Did you or your father take any action
4  to protect you from going to Vietnam?
5     MS. ROSEN: Objection, relevance,
6  foundation.
7     MR. ENQUIST: Join.
8     THE WITNESS: I'm not sure what you
9  mean by that.
10    BY MS. BONJEAN:
11 Q.  You don't understand my question?
12 A.  I'm not sure I understand your
13 question, yes.
14 Q.  Okay.  Did you or did any member of
15 your family take any action, such as writing a
16 letter, making a phone call, take any action
17 whatsoever, to aid in the effort to prevent you
18 from going to Vietnam?
19    MS. ROSEN: Objection, form,
20 foundation, relevance.
21    THE WITNESS: Not that I know of, no.
22    BY MS. BONJEAN:
23 Q.  So it was sheer luck that you didn't
24 get deployed?
25    MR. ENQUIST: Objection, asked and

Page 103

1  answered.
2     MS. ROSEN: Asked and answered and
3  argumentative.
4     THE WITNESS: I would think it was that
5  I was lucky.  If I would have been deployed,
6  so be it.
7     BY MS. BONJEAN:
8  Q.  Right.  But you don't have any reason
9  to believe that anyone on your behalf took efforts
10 to help so that you wouldn't get deployed?
11 A.  No.
12    MS. ROSEN: Objection, asked and
13 answered.
14    THE WITNESS: Never happened.
15    BY MS. BONJEAN:
16 Q.  Okay.  So were you honorably
17 discharged?
18 A.  Yes.
19 Q.  And then did you apply to the Chicago
20 Police Department immediately upon leaving the
21 National Guard or how did that work?
22 A.  I needed a job.  I had to make ends
23 meet for myself, so I became a policeman.  I
24 applied for the job.
25 Q.  And that was after you left the

Page 104

1  National Guard?
2  A.  While I was in the National Guard.
3  Q.  Okay.  So while you were a member of
4  the National Guard, you applied for a police
5  department position?
6  A.  Yes.
7  Q.  And how did you do that?
8  A.  I believe -- bear with me.  I believe I
9  went down, I think it was downtown and obtained a
10 application, completed that application and
11 submitted that application.
12 Q.  And you were hired?
13 A.  Eventually, after a physical and tests,
14 yes.
15 Q.  You attended the Police Academy, I
16 assume?
17 A.  Yes.
18 Q.  And when did you attend?
19 A.  4th of March, 1968.
20 Q.  How long was the Police Academy?
21 A.  Eight or nine weeks at the time.
22 Q.  And upon graduation from the Police
23 Academy, what was your first assignment with the
24 Chicago Police Department?
25 A.  Patrol.

Maysonet v.
Guevara

Video Deposition

Page 105

1  Q.  Okay.  And that was also, I assume,
2  your rank, a patrol officer?
3  A.  I was a patrolman.
4  Q.  Patrolman.  And where were you
5  assigned?
6  A.  1st District.
7  Q.  And what are the geographical locations
8  of the 1st District?
9  A.  It's probably changed since that time.
10  Q.  Sure, fair enough.  What were they back
11  then?
12  A.  I want to say Lake Michigan, Halsted
13  Street, Wacker Drive to, I want to say 18th
14  Street.  However, it took in Soldier's Field, so
15  that would be a little bit more than 18th Street,
16  I think.
17  Q.  So sort of South Loop and then even
18  south of there?
19  A.  What's considered South Loop right now.
20  Q.  How long were you there?
21  A.  I don't recall.
22  Q.  And what were your duties and
23  responsibilities during your time at the 1st
24  District?
25  A.  My duties were patrol.

Page 106

1  Q.  And what are the duties and
2  responsibilities of a patrolman, again during this
3  time period, which would have been the late '60s?
4  A.  Patrol, like I said stated.  Reports,
5  enforcing the municipal and the state codes.  That
6  would include writing tickets.  If there was an
7  arrest situation, if arrests would be warranted, I
8  would arrest people.
9  Q.  Where did you go after the 1st
10  District?
11  A.  20th District.
12  Q.  And were you still in patrol at that
13  time?
14  A.  Yes.
15  Q.  How long were you there at the 20th
16  District?
17  A.  I couldn't tell you now.  I would be
18  guessing, I'm sorry.
19  Q.  Same type of responsibilities, however?
20  A.  Yes, and I was also on a tactical unit
21  for some time there.
22  Q.  Okay.  And a tactical unit is a
23  uniformed position?
24  A.  Sometimes.
25  Q.  How long were you at the 20th District?

Page 107

1  Oh, you said you didn't know.
2  Where did you go next?
3  A.  I wanted to go to the 14th District --
4  or I'm sorry, the 19th District.
5  Q.  The 19th District.  And why did you
6  want to go to the 19th District?
7  A.  I was bored.
8  Q.  What was alluring about the 19th
9  District?
10  A.  Just different streets.
11  Q.  Why not the 18th, the 16th, the 2nd?
12  What was unique about the 19th?
13  MS. ROSEN: Objection, form.
14  THE WITNESS: It appealed to me.
15  BY MS. BONJEAN:
16  Q.  What about it appealed to you?
17  A.  Just liked it.
18  Q.  What about it made you like it?
19  A.  I don't know.
20  Q.  What is the geographical boundaries of
21  the 19th District?
22  A.  That's going to be a hard one.
23  Q.  Or what were they?
24  A.  Montrose Avenue, the lakefront to
25  Wacker -- I'm sorry.  I think it was Fullerton

Page 108

1  Avenue on the south.  Then on the west, this is
2  where it gets tricky.  It went in some places to
3  Bradley Place.  If you're not familiar with that,
4  that's where WGN was, and just for a couple sort
5  of blocks and then it would go a little bit
6  further east, and I don't remember what street
7  that was.
8  Q.  And how long were you at the 19th?
9  A.  I don't recall.
10  Q.  Were you still on patrol?
11  A.  Yes.
12  Q.  Did you meet any of the co-defendants
13  in this case when you were in either the 1st
14  District or -- what did you say, the 20th?
15  A.  Yes, ma'am.
16  Q.  And then the 19th?
17  A.  Yes.
18  Q.  Did you meet any of the co-defendants
19  in this case?
20  A.  Not that I'm aware of.
21  Q.  Just so I get this out of the way, when
22  did you first meet Rey Guevara?
23  A.  When I was a detective in Area 5.
24  Q.  Okay.  What about Lee Epplen?
25  A.  Lee, I believe I worked with in

Maysonet v.
Guevara

Video Deposition

Page 109

1   Summerdale.  20th District, I'm sorry.  20th
2   District.
3   Q.  Oh, so you do remember working with him
4   at the 20th District?
5   A.  I knew he was there.  I was there.
6   Q.  Did you work together at all?
7   A.  I don't know.
8   Q.  Okay.  So this would have been very
9   early in your career that you worked with Lee
10  Epplen, right?
11  A.  Sure.
12  Q.  What about Mingey?
13  A.  I really don't recall meeting Ed until
14  I was at Area 5.
15  Q.  What about Montilla?
16  A.  That would be at Area 5, also.
17  Q.  Halvorsen?
18  A.  I met him, I believe, when I was still
19  in patrol at the 14th District.
20  Q.  Okay.  So was the 19th District all
21  that you had hoped it would be?  Did you enjoy it
22  there?
23  A.  Never had a bad day anywhere.
24  Q.  Okay.  So is that a yes, you did enjoy
25  it there?

Page 110

1   A.  I enjoyed my career every place I've
2   been, every day I worked.
3   Q.  Okay.  And what was your favorite part
4   of working at the 19th District?
5   A.  I couldn't give you a definite answer,
6   what I enjoyed most about it.
7   Q.  What were your top three favorite
8   things?
9   A.  Good restaurants, friendlier people and
10  more people because of how the area was.
11  Q.  Friendlier than the 1st or the 20th?
12  A.  Yes.
13  Q.  What was the demographic of the 19th?
14  A.  I told you, it was --
15  Q.  Not geographic, demographics?
16     MS. ROSEN: Objection, form.
17     THE WITNESS: I would be guessing at
18  the time, because it's changed so much.
19     BY MS. BONJEAN:
20  Q.  You don't remember at the time what it
21  was?
22  A.  It was a mixture of people.
23  Q.  Would you call it a diverse area?
24  A.  Yes, I would.
25  Q.  Really?

Page 111

1   A.  Yes.
2   Q.  After the 19th, where did you go?
3   A.  I went to the 14th District.
4   Q.  You would not say the 14th District was
5   diverse, would you?
6      MS. ROSEN: Object to the form.
7      THE WITNESS: Yeah, it was.
8      BY MS. BONJEAN:
9   Q.  It's not predominantly Hispanic?
10  A.  At the time I was there?
11  Q.  Yeah.
12  A.  Gee, I would have to think about that.
13  Give me a second.  Well, the way I could answer
14  that is certain areas had different ethnic groups.
15  Q.  Certain areas within the 14th District?
16  A.  Yes.
17  Q.  Okay.  And what area in the 14th
18  District was comprised mostly of white people?
19  A.  Well, most of the 14th District was,
20  but there was a couple pockets where there would
21  be other types of people.
22  Q.  What year was this that you were in the
23  14th District?
24  A.  Oh, I don't recall.
25  Q.  No idea?

Page 112

1   A.  '70s, early '70s.
2   Q.  Early '70s.  How long were you there?
3   A.  A couple years.
4   Q.  And what did you do there?
5   A.  I was in patrol and on the tactical
6   unit.
7   Q.  Okay.  And what were your day-to-day
8   responsibilities?
9   A.  Enforcing laws.
10  Q.  And did you have the opportunity to
11  enforce laws as it relates to people who were
12  members of gangs?
13  A.  Yeah.
14  Q.  Did you make arrests when you were in
15  the 14th District?
16  A.  Yes.
17  Q.  Lots of them?
18  A.  Yes.
19  Q.  Okay.  And what type of arrests did you
20  make?
21  A.  Anywhere from disorderly conduct to
22  murders.
23  Q.  Was it a particularly violent area?
24  A.  I thought so.
25  Q.  Was it considered a place that had

Maysonet v.
Guevara

Video Deposition

Page 113

1  higher crime than other districts?
2  A.  I don't know what the official stats
3  were, but I was busy.
4  Q.  Do you know where it fell generally on
5  the roster of districts in terms of crime rates?
6  A.  No.
7  Q.  And how much -- how many of your
8  arrests were gang-related by percentage, if you
9  can estimate?
10  A.  I couldn't estimate.
11  Q.  Would you say at least some percentage
12  was gang-related crime?
13  A.  Yes.
14  Q.  50 percent?
15  A.  I would be guessing.
16  Q.  Okay.  Was it more than non
17  gang-related crime or less than non gang-related
18  crime?
19  A.  Well, there was other crimes in the
20  district.
21  Q.  So about half and half, is that what
22  you're saying?
23  A.  I would think so.
24  Q.  Okay.  And where did you go after the
25  14th?

Page 114

1  A.  I went back to the 20th District, and
2  then a short time later I became a field training
3  officer and then the district -- they redistrict
4  the whole city and then we had an option, being a
5  training officer, either to stay at the 20th
6  District, go to the 23rd District, go to the 19th
7  District or the brand new 24th District.
8     So since I was working at the time
9  where the cut-off boundary, which was Peterson
10  Avenue, I was working north of Peterson Avenue,
11  I -- you know, you put your wish list in and my
12  wish list was to stay at -- or go to the 24th
13  District from 20th as a patrol specialist.
14  Q.  Okay.  Would that have been closer to
15  your home?
16  A.  Yes.
17  Q.  And did you get your first choice?
18  A.  That was my only choice.
19  Q.  Oh.  Well, you said you put a wish list
20  together?
21  A.  That was --
22  Q.  Okay.  Well, a wish list usually
23  suggests there is a list involved.  So it was just
24  a request for one location?
25     MS. ROSEN: Object to the form.

Page 115

1     THE WITNESS: It was one request.
2     BY MS. BONJEAN:
3  Q.  Okay.  And you got it?
4  A.  Yes.
5  Q.  Okay.  And how long were you at the
6  24th?
7  A.  Until I made detective.
8  Q.  And what year did you make detective?
9  A.  I want to say 1983.
10  Q.  And how did you become detective?  Did
11  you apply for it?
12  A.  I became a meritorious detective.
13  Q.  Okay.  And what is a meritorious
14  detective?
15  A.  My supervisors thought that I would be
16  best to serve the police department and citizens
17  of Chicago as a homicide/violent crimes detective.
18  Q.  And what were you doing immediately
19  prior to being promoted to the position of
20  homicide detective?
21  A.  I told you I was a field training
22  officer.
23  Q.  Okay.  So you were doing that up until
24  that point, is that right?
25  A.  Yes.

Page 116

1  Q.  Nothing in between, okay.  And so you
2  didn't have to take a test, right?
3  A.  I did not take a test.
4  Q.  You didn't have to take a test because
5  you were meritoriously promoted, right?
6  A.  Correct.
7  Q.  Just like Rey Guevara was promoted,
8  correct?
9     MS. ROSEN: Object to the form.
10     THE WITNESS: I couldn't tell you how
11  he was promoted.
12     BY MS. BONJEAN:
13  Q.  You didn't take a test and actually
14  score well on a test and then get promoted, right?
15     MS. ROSEN: Objection, asked and
16  answered.
17     MR. ENQUIST: Join.
18     THE WITNESS: I didn't take a test.
19     BY MS. BONJEAN:
20  Q.  You know that that is one way in which
21  some detectives get promoted, is they actually
22  have to test for it and compete for it, correct?
23     MR. ENQUIST: Objection, form.
24     MS. ROSEN: Relevance.
25     THE WITNESS: With every rank in the

Page 117

1   police department, except the exempt ranks.
2       BY MS. BONJEAN:
3   Q.   Except what?
4   A.   The exempt ranks.
5   Q.   Right.  So that's a yes, except for the
6   exempt ranks?
7       MS. ROSEN: He said yes.
8       THE WITNESS: Yes.
9       BY MS. BONJEAN:
10  Q.   Okay.  And then another way you can get
11  promoted is if your supervisors like you and think
12  you do a good job, correct?
13      MS. ROSEN: Object to the form,
14  foundation.
15      MR. ENQUIST: Join.
16      THE WITNESS: I suppose.
17      BY MS. BONJEAN:
18  Q.   Well, is there something else that goes
19  into it other than your supervisors deciding they
20  like you and wanting to promote you?
21      MS. ROSEN: Objection, form,
22  foundation.
23      THE WITNESS: Well, I imagine that your
24  work productivity has something to do with
25  it.

Page 118

1       BY MS. BONJEAN:
2   Q.   But you don't know, right?
3       MS. ROSEN: Objection, foundation.
4       THE WITNESS: I don't know what formula
5   that they used.
6       BY MS. BONJEAN:
7   Q.   Is there a formula that was used?
8       MS. ROSEN: Objection, foundation.
9       THE WITNESS: I'm just saying formula.
10  I don't know what they look for.
11      BY MS. BONJEAN:
12  Q.   Okay.  But you didn't have to actually
13  do anything specific to get promoted, you were
14  just told you were going to be meritoriously
15  promoted, right?
16  A.   I was asked if I would like to get that
17  position.
18  Q.   Right, you were asked.  But apart from
19  being asked, there was nothing you had to do to
20  show that you were the best man for the job,
21  right?
22      MS. ROSEN: Objection, form, asked and
23  answered.
24      MR. ENQUIST: Join.
25      THE WITNESS: I would think that being

Page 119

1   a field training officer, my reputation was
2   enough.
3       BY MS. BONJEAN:
4   Q.   I know that's what you think, but you
5   didn't have to do anything, right?  That's all I'm
6   asking.
7       MS. ROSEN: Objection, asked and
8   answered.
9       MR. LEINENWEBER: Also vague.
10      MR. ENQUIST: Objection, foundation.
11      THE WITNESS: I did my job.
12      BY MS. BONJEAN:
13  Q.   Right.  You didn't have to take a test,
14  correct?
15      MS. ROSEN: Objection, asked and
16  answered.
17      MR. ENQUIST: Join.
18      THE WITNESS: I did not take a test.
19      BY MS. BONJEAN:
20  Q.   Right.  You didn't get interviewed,
21  correct?
22  A.   I was interviewed by a couple exempt
23  ranks.
24  Q.   So you were interviewed?
25  A.   Yes.

Page 120

1   Q.   Okay.  And in what part of the process
2   were you interviewed?
3       MS. ROSEN: Objection, form.
4       THE WITNESS: I was called in by my
5   district commander.  He asked me if I would
6   like it, and I believe that I was called in
7   by the deputy chief of the area where my
8   district fell into.
9       BY MS. BONJEAN:
10  Q.   And what did he ask you?
11  A.   Oh, I don't remember what questions.  I
12  think --
13  Q.   Go ahead.
14  A.   Mainly you're a patrol specialist now,
15  would you like to advance to detective.
16  Q.   Okay.  So apart from being asked
17  whether you wanted to be a detective, can you tell
18  me what any superior asked you during these
19  interviews?
20  A.   I couldn't tell you that, ma'am.
21  Q.   So after you were meritoriously
22  promoted, where were you assigned?
23  A.   On paper I was assigned to Area 4.
24  However, I was never there to work.  I went to the
25  Area 5 detective division.

Page 121

1  Q.  Okay.  I have a question about that,
2    but before I do, by the way, did you ever go to
3    college?
4  A.  Yes.
5  Q.  When did you go to college?
6  A.  I went to college right after I
7    graduated from Senn High School, before I went
8    into the Army.
9  Q.  Okay.  And where did you attend
10   college?
11  A.  Central YMCA College, in the Loop.  I
12   don't think they're in operation any more.
13  Q.  So it was a community college?
14  A.  Well, it was a private college.
15  Q.  Was it a four-year college or a
16   two-year?
17  A.  It was a two-year.  Imagine if you
18   wanted to go for four years, they would take your
19   money.
20  Q.  Did you actually graduate with --
21  A.  No, I did not.
22  Q.  Can I ask my question before you answer
23   it?
24  A.  Sure.
25  Q.  Okay.  Did you actually graduate with a

Page 122

1    degree from the Central -- what's it called?
2  A.  YMCA.
3  Q.  YMCA.  Did you graduate?
4  A.  No.
5  Q.  So you have no advanced degree,
6    correct?
7  A.  No.
8  Q.  Your highest level of education is a
9    high school diploma?
10  A.  Yes.
11     MS. ROSEN: I'm going to object to the
12   form of that question because it's not
13   accurate.
14     MS. BONJEAN: It's not accurate?
15     MS. ROSEN: Well, you said his highest
16   formal education.  You didn't ask him his
17   highest degree.  He said he took other
18   classes at community college.  So the
19   question you asked was highest form of
20   education, so that's inaccurate.
21     MS. BONJEAN: Okay.  So I will
22   rephrase, then.
23     BY MS. BONJEAN:
24  Q.  The highest degree that you received is
25   a high school diploma, correct?

Page 123

1  A.  Yes.
2  Q.  Okay.  So you said in 1983 you were
3    assigned Area 4 on paper but really went to
4    Area 5?
5  A.  Yes.
6  Q.  Okay.  How did that work?
7  A.  How that came about was, there was a
8    small class of detectives that I was in, I want to
9    say maybe 32, so the class was split in half.  The
10   first half went to various areas.  There were six
11   at the time.  The second half was sent back to a
12   district.  I was sent back to my district working
13   as a field training officer.  There was a
14   telephone call for other people to report to their
15   assignments.  Everybody in my group went to Area 4
16   on paper.  Don't know why, don't know how, but I
17   was called to go to Area 5.
18  Q.  So after you became detective, you said
19   you initially went back as a field training
20   officer?
21  A.  Yes, because they only took half of our
22   class.
23  Q.  Okay.  So you weren't actually doing
24   detective work initially?
25  A.  For a couple weeks, no.

Page 124

1  Q.  Okay, yeah.  How long was that period
2    of time when you went back to your old
3    responsibilities?
4  A.  It was a couple weeks.  I went back as
5    a patrol specialist.
6  Q.  For a couple of weeks, and then you
7    were assigned to Area 5 but Area 4 on paper?
8  A.  It was on paper, and then when the
9    transfer order came out I was officially Area 5.
10  Q.  And how long were you at Area 5 but on
11   paper at Area 4?
12  A.  Maybe one period.
13  Q.  What's one period?
14  A.  28 days.
15  Q.  So about a month?
16  A.  Something like that.
17  Q.  So you never actually did investigative
18   work at Area 4, is that what you're saying?
19  A.  No.
20  Q.  So you went to Area 5 as a detective
21   and this would have been in '83, right?
22  A.  Yes.
23  Q.  And you said there were six areas?
24  A.  At the time.
25  Q.  Okay.  And was Area 5 at Grand and

Maysonet v.
Guevara

Video Deposition

Page 125

1   Central at this time? It wasn't, right?
2  A.  They had just moved.
3  Q.  They had just moved?
4  A.  Yes.
5  Q.  Already in '83?
6  A.  I think it was just before 1983.
7  Q.  Okay. And was the 25th District there
8   as well, or were they --
9  A.  It was downstairs.
10  Q.  Downstairs, right?
11  A.  Yes.
12  Q.  At Grand and Central, correct?
13  A.  Yes.
14  Q.  And the 14th District was over on
15   Shakespeare?
16  A.  It was still at 2138 North California.
17  Q.  Oh, 2138 North California. And that's
18   where Area 5 had been, correct?
19  A.  Yes.
20  Q.  All right. And in 1983 when you went
21   to Area 5, were the areas organized as violent
22   crime areas and property crime areas?
23  A.  They just switched over.
24  Q.  Okay. And before that, it was
25   organized differently, is that right?

Page 126

1  A.  Yes.
2  Q.  Okay. But in 1983 there was a violent
3   crime area, correct?
4  A.  Yes.
5  Q.  Property crimes, correct?
6  A.  Yes.
7  Q.  Both housed at Grand and Central?
8  A.  Yes.
9  Q.  Same floor actually, right?
10  A.  Second floor.
11  Q.  Second floor. And you were
12   specifically assigned to Area 5 violent crimes?
13  A.  Yes.
14  Q.  How was it determined, if you know,
15   whether a detective would go to a violent crime
16   area or a property crime?
17  A.  I don't know.
18  Q.  Okay. Did you have a say in the
19   matter?
20  A.  I asked to be assigned to violent
21   crimes.
22  Q.  And why did you want to be assigned to
23   violent crimes as opposed to property crimes?
24  A.  I did not want to handle burglaries and
25   thefts. Didn't appeal to me.

Page 127

1  Q.  And was it boring?
2     MS. ROSEN: Object to the form.
3     THE WITNESS: My opinion, it would be
4   boring to me.
5     BY MS. BONJEAN:
6  Q.  So you were interested in homicides and
7   the more serious violent crimes, correct?
8  A.  I was interested in violent crimes.
9  Q.  And when you got to Area 5 as a
10   detective, who was your supervisor, do you
11   remember?
12  A.  Nick Schuler.
13  Q.  Nick Schuler?
14  A.  Yes.
15  Q.  Were any of the defendants in this case
16   already at Area 5 when you got there?
17  A.  Lee Epplen.
18  Q.  Was he a sergeant?
19  A.  Yes.
20  Q.  Anybody else that you recall?
21  A.  That's all I can remember.
22  Q.  Now, did you have to go to some type of
23   detective school prior to being a detective?
24  A.  Yes.
25  Q.  And where did that take place?

Page 128

1  A.  At the Training Academy.
2  Q.  How long was it?
3  A.  I'm not sure.
4  Q.  And can you describe for me what type
5   of training would-be detectives received?
6  A.  There was typing, general orders,
7   special orders, department directives, criminal
8   law, detective division procedures.
9  Q.  Was this classroom instruction
10   primarily?
11  A.  There was classroom, as well as other
12   places.
13  Q.  What other types of instruction?
14  A.  I went to heavy weapons school at -- I
15   believe it was Camp Zion.
16  Q.  So like firearms instruction?
17  A.  Instructions other than my service
18   revolver.
19  Q.  Okay. So different types of firearms?
20  A.  Yes.
21  Q.  Anything else, again, apart from the
22   classroom instruction?
23  A.  That's the only thing I can think of
24   that I remember.
25  Q.  All right. Now, in the classroom

Maysonet v.
Guevara

Video Deposition

Page 129

1  discussion or at the classroom instruction, did
2  you have teachers or instructors?
3  A.  Yes.
4  Q.  And were these sworn personnel of the
5  Chicago Police Department?
6  A.  Some were.
7  Q.  Some were not?
8  A.  Yes.
9  Q.  And what were they, if not --
10  A.  Some were instructors from city
11  colleges.  I believe they brought in speakers from
12  the FBI, Secret Service, State Police, other law
13  enforcement agencies.
14  Q.  Okay.  Now, you testified that you
15  studied department directives?
16  A.  Yes.
17  Q.  And this would be written policies of
18  the department?
19  A.  At that time.
20  Q.  At that time, obviously, correct?
21  A.  Yes.
22  Q.  And did you have an expectation to be
23  familiar with the policies of your department?
24  A.  I hoped to have been.
25  Q.  And you also received instruction on

Page 130

1  criminal law?
2  A.  Yes.
3  Q.  And what was the purpose of receiving
4  instruction on criminal law?
5      MR. ENQUIST: Objection, foundation.
6      MS. ROSEN: Objection, foundation.
7      THE WITNESS: To familiarize yourself
8  with certain -- I believe then it was chapter
9  38, which was mainly the criminal laws.
10  Familiarize yourself with what offenses are,
11  know what the proper charges you would ask
12  for as a detective to the State's Attorney's
13  office.
14      BY MS. BONJEAN:
15  Q.  So it was your understanding that in
16  order to charge people with crimes, you had to be
17  familiar with the criminal code, correct?
18  A.  No, I couldn't charge anybody on a
19  felony without -- when I was telling my case, I
20  would call felony review.  It was their decision.
21  Q.  Understood.  But in order to arrest
22  someone, you had to actually charge them with
23  something, right?
24  A.  If I get probable cause.
25  Q.  Right.  So as part of your

Page 131

1  responsibilities as a detective, you had to
2  understand the concept of probable cause, I
3  assume, right?
4  A.  Yes.
5  Q.  Were you instructed at the Training
6  Academy about what probable cause is and what the
7  standard is?
8  A.  All through my career I have been
9  instructed.
10  Q.  Okay.  So it wasn't a new concept to
11  you at the time you went to the Training Academy
12  as a detective, correct?
13  A.  It was more detailed.
14  Q.  Okay.  And how was it more detailed, if
15  you are able to describe that?
16  A.  Being in patrol, you were limited, you
17  know, what charges, traffic tickets, parking
18  tickets.  Anything of a serious nature, if you had
19  somebody in custody or any type of incident, you
20  would always call the detective division and they
21  would do the followup investigations.
22  Q.  So you had a greater level of
23  responsibility as a detective in terms of charging
24  people that were under arrest, right?
25  A.  There was that aspect of being a

Page 132

1  detective, yes.
2  Q.  Okay.  So anything else you learned
3  while you studied the criminal code other than the
4  actual offenses that were contained in the
5  criminal code?
6  A.  Not at that time.
7  Q.  Okay.  Did you receive instruction on
8  investigative actions such as committing -- strike
9  that -- such as conducting photo arrays?
10  A.  Yes.
11  Q.  And how about conducting lineups?
12  A.  Yes.
13  Q.  What about interrogations?
14  A.  Yes.
15  Q.  Questioning suspects, questioning
16  witnesses, is that right?
17  A.  Yes.
18  Q.  Was there a distinction made between
19  how you question a suspect versus how you question
20  a witness?
21  A.  I didn't think so, except for suspects,
22  the Miranda warnings.
23  Q.  So again, pursuant to your training,
24  was it your understanding that you approached the
25  questioning of a suspect similarly to how you

Rizman Rappaport (973)992-7650
"When every word counts"

Case: 1:18-cv-02342 Document #: 367-3 Filed: 07/17/24 Page 36 of 707 PageID #:18903

Maysonet v. Guevara                                    Video Deposition

Page 133

1  approached the questioning of a witness with the
2  exception that you would have to give Miranda
3  warnings if the person was a suspect?
4  A.  Basically, yes.
5  Q.  And did you study any case law when you
6  were there?
7  A.  I'm not sure.
8  Q.  Did you understand where Miranda
9  warnings came from?
10  A.  Yes.  We had a course in that, yes.
11  Q.  Were you instructed that if a person
12  exercised their right to counsel, you were
13  obligated to cease any type of interrogation?
14  A.  Yes.
15  Q.  So that was something you were aware
16  of, even as of 1983, correct?
17  A.  As a patrolman.
18  Q.  Even before that, right?
19  A.  Yes.
20  Q.  And in your career did you always honor
21  those requests when they were made of you?
22  A.  Yes.
23  Q.  Now, did you receive training on report
24  writing?
25  A.  Yes.

Page 134

1  Q.  And I assume you received training on
2  report writing even before you made it to the
3  Training Academy for detective school, right?
4  A.  Yes.
5  Q.  But when you went to detective school,
6  it was different types of reports, right?
7  A.  Yes.
8  Q.  Okay.  What type of reports were you
9  trained to complete, like types of reports?
10  A.  When?
11  Q.  When you were at the Training Academy
12  for detective school?
13  A.  There were stop orders, there was daily
14  bulletin requests, there was name check requests,
15  there were supplemental report checks, there was
16  inventorying property, lineup reports.  I probably
17  forgot something, but yeah.
18  Q.  What about GPR's, was that something
19  that was in existence in 1983?
20  A.  I think it just came into play.
21  Q.  And what was your understanding of the
22  purpose behind a GPR?
23  A.  There if there was any notes to be
24  taken in regards to a case, there was a form,
25  General Progress Report, you would fill that out.

Page 135

1  You would put your notes on there.  If you didn't
2  have one, a piece of paper, and then you would
3  attach it to the file.
4  Q.  Did the GPR's replace any type of memo
5  books or anything of that nature?
6  A.  I never saw those.
7  Q.  Did you ever carry a memo book as a
8  patrol officer?
9  A.  Maybe a piece of paper.  If I would
10  receive a phone -- a radio assignment, I would
11  just put the address in.
12  Q.  Okay.  And what were the guiding
13  principles on how to prepare a supplemental report
14  as you were trained at the Training Academy?
15  A.  It depends on what the supplemental
16  report was.  There was formats for different types
17  of crimes.
18  Q.  So there were certain formats that you
19  were trained to follow, depending on what crime
20  was involved, is that right?
21  A.  Yes.
22  Q.  Okay.  Were there still -- were you
23  taught on how to prepare a good report, a thorough
24  report?
25  A.  I thought every report that I ever

Page 136

1  prepared was a thorough, good report.
2  Q.  And you were trained to do that,
3  correct?
4  A.  Yes.
5  Q.  Okay.  And in your mind what makes a
6  thorough or good report?
7  A.  By writing down the facts you learned
8  about an incident.
9  Q.  And would you agree that the pertinent
10  facts should be contained in any type of report
11  that you prepare?
12  A.  Sometimes.
13  Q.  The who and the what and the where and
14  the why, to the best of your ability?
15  A.  Majority of the time.
16  Q.  Again, barring an unusual circumstance,
17  that would be the goal in preparing a police
18  report, right?
19  A.  As you said, who, what, where --
20  Q.  Yes.
21  A.  Who, what, when and where.
22  Q.  Correct?
23  A.  Yes.
24  Q.  And police reports are supposed to be
25  accurate; you're trained to do that, right?

Min-U-Script®                    Rizman Rappaport (973)992-7650              (34) Pages 133 - 136
                                         "When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 137

1 A.  They're only accurate as to the
2 information that you know and obtain.
3 Q.  Right.  Obviously you don't know
4 whether someone is telling you the truth or not,
5 but you were trained that it was important to
6 accurately report what is being communicated to
7 you in a police report, right?
8 A.  Yes.
9 Q.  And you were trained that it's
10 important to accurately report what you have seen
11 with your own eyes, correct?
12 A.  Some reports, yes.
13 Q.  Now, were you trained on whether or not
14 you could report about what another officer has
15 seen or heard?
16     MS. ROSEN: Object to the form.
17     THE WITNESS: I cannot account for what
18 they've seen or what they did.  I can only
19 account for my actions.
20     BY MS. BONJEAN:
21 Q.  So was it your understanding upon
22 completion of the Training Academy that you were
23 required to -- strike that.
24     Was it your understanding that it was
25 your obligation to prepare a report about things

Page 138

1 that you have seen or heard rather than -- that's
2 still bad.  Let me start over.
3     During your career as a detective, did
4 there ever come a time when you prepared a report
5 to memorialize what another detective did?
6 A.  There could have been.
7 Q.  So that was something that was
8 acceptable according to the Chicago Police
9 Department's policies and practices?
10 A.  I believe it was.
11 Q.  Okay.  So if a police officer said I
12 did X, will you prepare a report on this, that was
13 something that you would be willing to do?
14 A.  I could have.
15 Q.  So you could not, though, under those
16 circumstances, vouch for the accuracy of what
17 you're reporting, right?
18 A.  I'm only reporting what I know to be
19 facts.
20 Q.  Right.  But if someone tells you, I did
21 X and you didn't see it with your own eyes, you
22 have take their word for it, right?
23 A.  Yes.
24 Q.  And that's something that you did from
25 time to time as a Chicago Police officer?

Page 139

1 A.  I could have.
2 Q.  Do you remember doing that?
3 A.  I could have.
4 Q.  It's not something that you wouldn't
5 have done, right?
6 A.  I could have done it.
7 Q.  Right.  You wouldn't have objected to
8 doing something like that?
9 A.  No, no.
10 Q.  But you would agree that if you're just
11 reporting what someone else did, you can't attest
12 to its truth or accuracy, right?
13 A.  I'm just recording what I was told by
14 who I was told.
15 Q.  If you were recording what another
16 detective did, would you put that in the body of
17 your report, that detective such-and-such told me
18 this happened?
19 A.  Not always.
20 Q.  Okay.  So if you -- so you would put it
21 in there as if you saw it?
22 A.  I would only put in my report my
23 observation in that case, yes.
24 Q.  And if the observation was another
25 detective asked you to report on something, would

Page 140

1 you do that for him?
2     MR. ENQUIST: Objection, asked and
3 answered.  We've gone through this.
4     MS. BONJEAN: I'm sorry.  He said two
5 different things, so I'm going to have to get
6 some understanding.
7     MR. ENQUIST: I disagree.
8     MS. ROSEN: Object to the form.
9     MS. BONJEAN: Well, maybe I just didn't
10 understand.
11     MR. ENQUIST: You've asked him several
12 times.  We keep on objecting, but go ahead.
13     THE WITNESS: I could have.
14     BY MS. BONJEAN:
15 Q.  You could have what?
16 A.  I might have put that in one of the
17 reports that I authored.
18 Q.  You might have put what?
19 A.  What you asked me.
20 Q.  Which is what?
21 A.  Would you read back the question,
22 please?
23 Q.  So you're just agreeing, you don't even
24 know what I asked you and you're just saying I
25 could have?

Page 141

1     MS. ROSEN: Object to the form.
2     MR. ENQUIST: And argumentative.
3     BY MS. BONJEAN:
4   Q.  No, I'm serious.  Do you know what I
5   asked you even?
6     MS. ROSEN: Object to the form.  Asked
7   you when?
8     MS. BONJEAN: I don't know what he's
9   even responding to, so I'm wondering what he
10  was responding to.
11    MS. ROSEN: Object to the form.  Is
12  there a question?
13    THE WITNESS: Responding to the last
14  couple questions that were the same questions
15  that you asked me.
16    BY MS. BONJEAN:
17  Q.  Which you don't even remember?
18    MS. ROSEN: Object to the form.
19    THE WITNESS: I want to make sure.
20    BY MS. BONJEAN:
21  Q.  Okay.  So let's get on the same page so
22  that the record has some meaning.
23    MS. ROSEN: Object to the argument and
24  editorialize.
25

Page 142

1     BY MS. BONJEAN:
2   Q.  You can only report accurately what
3   you've done or heard or seen, correct?
4     MR. ENQUIST: Objection,
5   mischaracterizes previous testimony,
6   argumentative, form.
7     THE WITNESS: I would have recorded
8   what I learned.
9     BY MS. BONJEAN:
10  Q.  What you heard?
11  A.  If I found it to be something that
12  should be in a report.
13  Q.  Okay.  So if you heard a witness or a
14  suspect tell you something that you thought was
15  relevant to an investigation, you were trained to
16  prepare a report to memorialize those statements,
17  correct?
18  A.  That's fair to say.
19  Q.  Okay.  And during your career, did you
20  ever assign that responsibility to a fellow
21  detective, and when I say "assign that
22  responsibility," what I mean by that is, did you
23  ever ask another detective to memorialize
24  something that only you heard?
25  A.  I could have.

Page 143

1   Q.  And why would you ever do that?
2   A.  Because that detective was writing the
3   report pertaining to something that we were doing.
4   Q.  Okay.  So it's possible that you would
5   tell another detective what you heard so that he
6   could include it in a report, is that what you're
7   testifying to?
8   A.  That's somewhat accurate.
9   Q.  Okay.  And if you were the person
10  responsible for actually preparing, for instance,
11  a supplemental report of some type and another
12  detective came to you and said X happened, it
13  would be in keeping with your habits to actually
14  include that if it was relevant to the
15  investigation, right?
16    MR. ENQUIST: Objection, vague and
17  confusing.
18    THE WITNESS: I'm going to answer it as
19  sometimes I would, sometimes I wouldn't.
20    BY MS. BONJEAN:
21  Q.  And why would you sometimes do it and
22  sometimes not do it?
23  A.  It depends on what type of report I'm
24  writing and if it had anything to do with that
25  particular case.

Page 144

1   Q.  Okay.  If you were investigating a
2   matter with another detective and that detective
3   told you that a witness had made certain
4   statements that were relevant to the
5   investigation, can you please include that in this
6   report, you would do that from time to time,
7   right?
8   A.  I could have had him type on my report
9   what he learned.  That wasn't uncommon.
10  Q.  So that you would all be typing on the
11  same document, is that right?
12  A.  Possible.  That happened.
13  Q.  Okay.  And if you were including a
14  narrative in one of your reports that had been
15  conveyed from another detective, was it your
16  practice to make note that the information came
17  from another detective?
18  A.  Could have.
19  Q.  Is it something that you were trained
20  to do?
21  A.  I don't think I was trained in that
22  aspect.
23  Q.  So essentially, report writing could be
24  very much a collaborative enterprise, right?
25  A.  Yes.

Page 145

1 Q. And in fact, reports don't necessarily
2 even indicate who is responsible for putting the
3 words on the piece of paper, right?
4    MS. ROSEN: Objection, form,
5 foundation.
6    MR. ENQUIST: Join.
7    THE WITNESS: I'm not sure I understand
8 that question.
9    BY MS. BONJEAN:
10 Q. If -- you testified earlier to a
11 scenario where different detectives might actually
12 type into the same supplemental report, right?
13 A. I said that under the circumstances
14 that you asked me, I could have said, you can type
15 in your interview in my report so you wouldn't
16 have to go through all the formatting.
17 Q. Right. That happened from time to
18 time, right?
19 A. Yes.
20 Q. And if this was a situation where that
21 did happen, did you notate in that report that
22 that portion of the report came from another
23 detective?
24 A. I could have.
25 Q. Was it something that you were trained

Page 146

1 to do?
2 A. I don't think I was trained to do it.
3 Q. So the contents of a report -- strike
4 that.
5    To the best of your understanding, you
6 were not required by any policy or practice to
7 indicate at the end of a report everybody who may
8 have contributed to that report, correct?
9    MS. ROSEN: Objection, form,
10 foundation.
11    THE WITNESS: I can only answer for me
12 and in my supplemental reports, if there was
13 multiple detectives that were assigned to
14 that investigation, there was a category,
15 personnel assigned, and I would put their
16 name.
17    BY MS. BONJEAN:
18 Q. Right. But just because there is a
19 list of personnel assigned does not tell us who
20 wrote what, right?
21    MS. ROSEN: Objection, foundation.
22    THE WITNESS: I would have to look at
23 the report and see under what circumstances.
24    BY MS. BONJEAN:
25 Q. Okay. But my question really was

Page 147

1 different. My question was, were you trained that
2 it was acceptable to prepare a report as a group
3 effort without identifying everybody who
4 contributed to that report?
5    MR. ENQUIST: Objection, form.
6    MS. ROSEN: Form, foundation.
7    THE WITNESS: I don't know.
8    BY MS. BONJEAN:
9 Q. So you don't remember being instructed
10 that it was important to actually identify anyone
11 who was participating in the authorship of a
12 report, right?
13 A. I could only account for how I did a
14 report.
15 Q. I'm asking you training. Training.
16 That's the question.
17 A. I don't know.
18 Q. You don't remember?
19 A. I don't recall.
20 Q. Were you trained that it was important
21 to memorialize interviews in and around the time
22 that they occurred?
23 A. Yes.
24 Q. And one of the purposes of a report is
25 to refresh your recollection later on when you

Page 148

1 have to either testify or need to refer to that
2 report, right?
3 A. Well, that depends on how later, how
4 much time went by.
5 Q. Well, you were busy at Area 5, right?
6 in the '80s, '90s, right?
7 A. The whole city was. Area 5 was busy.
8 Q. So that's a yes, right?
9 A. Yes.
10 Q. You were busy. You investigated a lot
11 of cases, correct?
12 A. I did.
13 Q. And had a lot of information in your
14 head as a result of investigating lots of cases at
15 Area 5, correct?
16 A. I had information on cases that I was
17 working on.
18 Q. Right. And you would agree that it's
19 important to memorialize information that you've
20 developed in an investigation so that you don't
21 forget, right?
22 A. Well, I would memorialize the majority
23 of the times, but if something was fresh in my
24 mind and I knew that -- at the time I knew this
25 information was fresh, there was no rush for me to

Page 149

1  write it down on a piece of paper or report.
2  Q.  But eventually you would want to
3  memorialize it within -- you know, maybe not
4  immediately, but within a short period of time,
5  correct?
6  A.  I don't know what you mean by "short."
7  Q.  Well, why don't you tell me what the
8  rule was?  What was the policy?
9  A.  There wasn't a policy.
10     MS. ROSEN: Objection, form,
11  foundation.
12     BY MS. BONJEAN:
13  Q.  So there was no policy of the Chicago
14  Police Department that you had to record pertinent
15  information relative to an investigation within a
16  certain period of time?
17  A.  How your question seems to me, I don't
18  have to record something that day, a short period
19  of time.
20  Q.  How about the next day?
21     MS. ROSEN: Objection, form.
22     THE WITNESS: I don't think so.
23     BY MS. BONJEAN:
24  Q.  How about the following day?
25  A.  I don't know.

Page 150

1     MS. ROSEN: Objection, form.
2     BY MS. BONJEAN:
3  Q.  What do you mean, you don't know?
4     MS. ROSEN: Objection, form.
5     THE WITNESS: As long as the facts were
6  fresh in my memory, there was no need for me
7  to rush with a report.
8     BY MS. BONJEAN:
9  Q.  But eventually, facts become less fresh
10  over time, right?
11  A.  They could.
12  Q.  Right.  And since they could, it would
13  be important to, within some reasonable amount of
14  time, record relevant information, right?
15     MS. ROSEN: Objection, form.
16     THE WITNESS: I would say so.
17     BY MS. BONJEAN:
18  Q.  There is other benefits to recording
19  statements or information in and around the time
20  that you received it, right?
21  A.  Could be.
22  Q.  Maybe to defend against some later
23  allegation that you made it up, right?
24     MS. ROSEN: Objection, form.
25     THE WITNESS: I don't know.

Page 151

1     BY MS. BONJEAN:
2  Q.  You don't know?
3     MS. ROSEN: Objection, form,
4  argumentative.
5     BY MS. BONJEAN:
6  Q.  Does that sound logical as a detective
7  of 40 years or 20 years, however long you were a
8  detective?
9     MS. ROSEN: Objection, form,
10  argumentative.
11     THE WITNESS: I could only tell you
12  what I did.
13     BY MS. BONJEAN:
14  Q.  Right.  And I'm asking, is it your
15  understanding that in addition to it being
16  beneficial to record what actions you take in an
17  investigation so it can refresh your recollection
18  years down the line or months down the line, that
19  another reason is to corroborate your eventual
20  testimony, right?
21  A.  It's possible.
22  Q.  Right.  Otherwise defense attorneys
23  might say you're making it up, right?
24     MS. ROSEN: Objection, form, foundation
25  as to what other defense attorneys might say.

Page 152

1     MR. ENQUIST: Join.
2     THE WITNESS: I don't know what they
3  would say.
4     BY MS. BONJEAN:
5  Q.  Right.  But if a defense attorney said
6  Detective Paulnitsky, what you testified to here
7  today, you're testifying to this today but that
8  didn't really happen, if you had a report, you
9  could say no, I made a report at the time; that
10  would be a good way to refute that charge of
11  fabrication, right?
12     MS. ROSEN: Objection, form,
13  foundation, calls for speculation.
14     MR. ENQUIST: Join.
15     THE WITNESS: It's their opinion.
16     BY MS. BONJEAN:
17  Q.  Right.  I mean, it may be their
18  opinion, but did you have a job to do when you
19  were called to testify in criminal prosecutions?
20     MS. ROSEN: Objection, form.
21     THE WITNESS: I did my job.
22     BY MS. BONJEAN:
23  Q.  Okay.  So you don't know the value of a
24  police report, right?  I guess that's what you're
25  saying?

Maysonet v.
Guevara

Video Deposition

Page 153

1      MS. ROSEN: Objection, form,
2  argumentative.
3      MR. ENQUIST: Objection.
4      THE WITNESS: I know the value of a
5  police report and all reports within the
6  Chicago Police Department.
7      BY MS. BONJEAN:
8  Q.  Okay, so now we're getting somewhere.
9      MS. ROSEN: Objection to the editorial
10  commentary.
11      BY MS. BONJEAN:
12  Q.  What is the value of a police report?
13      MS. ROSEN: Objection, form.
14      MR. ENQUIST: Could you read the
15  question back, please?
16      (Record read as requested.)
17      THE WITNESS: I think it's very
18  self-explanatory.  Police report is a summary
19  of what occurred and what happened, the facts
20  pertaining to the incident.
21      BY MS. BONJEAN:
22  Q.  What is the value of it?  You said, I
23  know the value of a police report so I'm asking
24  you to explain your answer?
25      MS. ROSEN: That was in response to you

Page 154

1  saying well, I guess you don't know the value
2  of a police report, so objection, form,
3  foundation and argumentative.
4      MS. BONJEAN: Well, whatever it was in
5  response to, it came out of his mouth and I'm
6  asking him, what is the value of a police
7  report?
8      MS. ROSEN: Objection, argumentative.
9      THE WITNESS: The value of a police
10  report is to record certain facts.
11      BY MS. BONJEAN:
12  Q.  And why is that valuable?
13      MS. ROSEN: Objection, form.
14      THE WITNESS: Because there is a public
15  report that's public record of what's
16  pertaining to an incident.
17      BY MS. BONJEAN:
18  Q.  So the public has an interest in
19  knowing what steps are taken in an investigation?
20      MS. ROSEN: Objection, form,
21  foundation.
22      BY MS. BONJEAN:
23  Q.  Is that what you're saying?
24  A.  I would think so.
25  Q.  Okay.  Any other values to a police

Page 155

1  report?
2  A.  You're recording alleged allegations
3  and you're conducting an investigation.
4  Q.  Yes, and any other value to a police
5  report other than the public has an interest in
6  knowing what happens in an investigation?
7  A.  And other police officers.
8  Q.  Other police officers have an interest
9  in knowing what happened in an investigation,
10  right?
11  A.  Yes.
12  Q.  So that they can see what preceded,
13  maybe, work that they are taking up in an
14  investigation?
15  A.  Possible.
16  Q.  Like if a witness was already spoken
17  to, you might want to know what they said before
18  you speak to them, correct?
19  A.  It's possible.
20  Q.  A police report might show you whether
21  a particular witness had been spoken to or
22  interviewed, right?
23  A.  Yes.
24  Q.  I think you agreed to this, but that
25  police reports have the capacity to refresh your

Page 156

1  recollection at some later point?
2  A.  They could.
3  Q.  Particularly in a case where, for
4  instance this case, the person wasn't prosecuted
5  until five years after their arrest, right?
6  A.  I don't recall.
7  Q.  Right.  But when there is a gap in time
8  from time of arrest to prosecution, a police
9  report serves the purpose of refreshing a
10  detective's recollection about what investigative
11  actions took place, right?
12  A.  It's possible.
13  Q.  So for instance, today here, when I
14  question you about what happened in this
15  investigation, having a police report would be
16  helpful to refresh your recollection about what
17  happened, right?
18  A.  Could.
19  Q.  And also a police report could
20  corroborate what a police officer is saying
21  happened in an investigation, right?
22      MR. ENQUIST: Objection, asked and
23  answered.
24      THE WITNESS: It could.
25

Page 157

BY MS. BONJEAN:
1
2   Q.   So those are all things police reports
3   have the capacity to do, correct?
4   A.   Yes.
5   Q.   Anything else that you can think of
6   that I'm missing?
7   A.   What you're thinking and how I'm
8   thinking towards that question could be different,
9   so I will not speculate on that.  The police
10  report, as I stated, has facts in there and your
11  investigation and what you did.
12  Q.   Right.  We know what it functions as.
13  The question that we've been talking about is what
14  value does that have, and can you think of any
15  other value a police report has other than what
16  you've already testified to?
17      MS. ROSEN: Objection, form.
18      THE WITNESS: I can't think of anything
19  else.
20      (Ms. Orozco is no longer
21      in attendance.)
22      BY MS. BONJEAN:
23  Q.   All right.  Were you taught during your
24  detective training that it was acceptable to lie
25  to a suspect during an interrogation?

Page 158

1   A.   No.
2   Q.   You can't lie to a suspect?
3       MS. ROSEN: Objection, form.
4       THE WITNESS: I've never lied to
5   anybody.
6       BY MS. BONJEAN:
7   Q.   What's that?
8   A.   I've never lied to anybody.
9   Q.   Never?
10  A.   Not that I can recall.
11  Q.   Ever been disciplined for making false
12  statements in OPS investigations or anything?
13  A.   It's possible.
14  Q.   Okay.  But to the best of your
15  knowledge you've never lied?
16  A.   Never lied to a suspect.
17  Q.   Okay.  Ever lied to anybody?
18      MS. ROSEN: Objection, form,
19  foundation.
20      MS. BONJEAN: He said -- I wouldn't
21  have even asked the question except he
22  doesn't lie to anybody, so I'm just trying to
23  get clarity.
24      MS. ROSEN: Then why are you asking it
25  again if you think that's what he said?

Page 159

1       MS. BONJEAN: I'm going to give him the
2   opportunity to amend that.
3       THE WITNESS: Questions and answers
4   stay the same.
5       BY MS. BONJEAN:
6   Q.   Okay.  You've never lied to a suspect,
7   is that right?
8       MS. ROSEN: Objection, asked and
9   answered, I think for the third time.
10      THE WITNESS: There is no need to.
11      BY MS. BONJEAN:
12  Q.   Is that a yes or a no?
13  A.   My answer is there is no need to lie to
14  a suspect.  It's unethical.
15  Q.   Okay.  So your testimony is that you've
16  never lied to a suspect because it's unethical?
17  A.   That's correct.
18  Q.   And does that include white lies, big
19  lies, small lies, all types of lies?
20  A.   A lie is a lie.
21  Q.   What about to a witness; is it your
22  understanding that it's permissible under any
23  circumstances to lie to a witness who you are
24  interviewing?
25  A.   As a police officer, it's unethical and

Page 160

1   I would never do that.
2   Q.   What was the policy of the Chicago
3   Police Department when you became a detective
4   regarding memorializing lineups?
5   A.   You would make out a lineup
6   supplementary report and that would tell you what
7   the case was, where the lineup was, who was
8   conducting the lineup, the person taking a photo
9   of the lineup, if there was any witnesses and who
10  the subjects that were participating in the lineup
11  were.
12  Q.   And were you required by policy to
13  memorialize a negative ID back in the late '80s?
14  A.   I did it.
15  Q.   So you routinely --
16  A.   If I was conducting a lineup with
17  negative results, that would be the subject of my
18  report, negative results.
19  Q.   Okay.  And do you know what the policy
20  was of the department at the time?
21  A.   Yes, to record the lineups.
22  Q.   Okay.  And that was irrespective of
23  what the outcome of that lineup was?
24  A.   Yes.
25  Q.   So positives, negatives, fillers,

Maysonet v.
Guevara

Video Deposition

Page 161

1 anything, you had to record it, is that your
2 understanding?
3 A. Yes.
4 Q. You never worked in gang crimes north,
5 right?
6 A. Never.
7 Q. Did you consider yourself knowledgeable
8 about gangs when you were a detective at Area 5?
9 A. Back then, yes.
10 Q. And where did you -- how did you obtain
11 your knowledge about gangs?
12 A. From the street.
13 Q. Were you someone that had a lot of
14 sources on the street?
15 A. I had people that I could ask questions
16 to.
17 Q. Was there a particular gang that you
18 considered yourself more knowledgeable about than
19 others?
20 A. No.
21 Q. No, you said?
22 A. No.
23 Q. You would agree that in 1990 it was a
24 pretty violent time in the city, right?
25 A. I think every year is violent in the

Page 162

1 city.
2 Q. Well, not every year is equally
3 violent, correct?
4 A. Stats show some are more, some are
5 less.
6 Q. In 1990 the homicide rate was higher
7 than it had been five years earlier and higher
8 than it was five years later, right?
9 A. I don't know. I would have to look at
10 the stats.
11 Q. You don't remember 1990 being
12 particularly violent, though?
13 A. No.
14 Q. Just like any other year as far as you
15 knew?
16 A. Correct.
17 Q. Now, at Area 5 -- I want to talk now
18 about in 1990, approximately, okay? Can you tell
19 us whether you were trained on how to not only
20 prepare a report but what to do with reports after
21 you prepared them?
22 A. Yes.
23 Q. Okay. And how did you receive that
24 training, was it formal or was it informal?
25 A. At the Academy I learned what to do.

Page 163

1 When I got to Area 5 there was a procedure where
2 to submit the report to.
3 Q. Okay. So what was the procedure in
4 1990 at Area 5 on how you -- after you prepared a
5 report, what you did with it?
6 A. I gave it to my supervisor.
7 Q. Okay. Did you make copies of it before
8 you gave it to your supervisor?
9 A. It depends what type of report it was.
10 Q. So and when you prepared a report, it
11 might be a report you authored or it might have
12 been co-authored with other detectives, right?
13 A. Yes.
14 Q. And then if it was a supplemental
15 report, as an example, you had to make a copy of
16 it?
17 A. Again, it would depend on what type of
18 report.
19 Q. What did it depend on to determine
20 whether you had to make a copy or not a copy?
21 A. I would -- on shootings, homicides, I
22 would make a couple copies. Depending on the
23 severity of the shooting I would make a copy and
24 put it on the homicide board that we had so other
25 detectives would know. I would also make a copy

Page 164

1 that would go into the investigative file, again,
2 so other detectives would know what I'm doing, and
3 then I can't remember at the time if they -- I
4 know one year they wanted a couple Xerox copies
5 attached to that report that you made for office
6 distribution. I don't remember what year that
7 came about.
8 Q. Okay. So let's talk specific about
9 homicide cases in and around 1990, okay?
10 A. Uh-huh.
11 Q. If you authored a report you would
12 typically make a copy, or one or two copies of the
13 report, right?
14 A. Yes.
15 Q. What did you do with the original?
16 A. It would go -- the sergeant had a
17 basket or a bin. It would go in there.
18 Q. And after you submitted your report
19 into the sergeant bin, did you ever see it again?
20 A. That original report?
21 Q. Yes.
22 A. No.
23 Q. Were there times when the report had to
24 be modified per your sergeant's orders?
25 A. I don't recall ever getting a report

Page 165

1　back.
2　Q.　Okay.　So how long were you a detective
3　at Area 5?
4　A.　Long time.　I'm not sure how long.
5　Q.　Can you approximate for me, please?
6　A.　No.　I would be guessing.
7　Q.　Well, where did you work prior to your
8　retirement?
9　A.　At a bomb and arson unit.
10　Q.　How long were you there?
11　A.　I think about three years.
12　Q.　And when did you retire?
13　A.　2008.
14　Q.　And where were you prior to bomb and
15　arson?
16　A.　Area 1.
17　Q.　How long were you at area 1?
18　A.　A couple years.
19　Q.　And then before area 1?
20　A.　Area 5.
21　Q.　So Area 5 from 1983 to at least the
22　early 2000s, right?
23　A.　I could live with that answer.
24　Q.　Okay.　So either 20 or shy of 20 years,
25　right?

Page 166

1　A.　Okay.
2　Q.　Now, in those 20 years or less than
3　20 years, whatever it is that you were at Area 5,
4　can you remember a single time when a sergeant
5　returned a police report to you with instructions
6　to correct something or add more detail or any
7　type of directive?
8　A.　Again, I don't remember ever getting a
9　report back.
10　Q.　So in your entire career at Area 5,
11　your recollection is when you submitted one of
12　your reports into the sergeant's basket, you
13　didn't see it again, right?
14　A.　That original report?
15　Q.　Correct.
16　A.　I didn't see that original paper.
17　Q.　Do you know where it went?
18　A.　I would assume that it would go to the
19　review office and eventually downtown.
20　Q.　Where was the review office?
21　A.　That was also on the second floor.
22　Q.　And who worked the review office?
23　A.　I don't know.
24　Q.　What was the review office?
25　A.　They would review reports.

Page 167

1　Q.　So would this be after the sergeant
2　reviewed the report or are you talking about the
3　sergeant's review of the report?
4　A.　No, the sergeant or supervisor.
5　Q.　Okay.　So you put it in the basket,
6　somebody reviews it and then it makes its way
7　downtown; that's your best guess as to what
8　happened to it?
9　A.　That is the proper procedure.
10　Q.　Sometimes you seem to be an expert on
11　the proper procedure, sometimes you don't
12　remember, so I'm trying to get to --
13　　　　MS. ROSEN: Objection to the editorial
14　comments.
15　　　　MS. BONJEAN: Depending on -- I'll
16　refrain.
17　　　　BY MS. BONJEAN:
18　Q.　So if this was a homicide case in 1990,
19　you would have made a couple copies; one went on
20　the board, on the clipboard, right, of the
21　homicide, in the sergeant's office, right?
22　A.　Yes.
23　Q.　And that was so that sergeants coming
24　in and detectives could look at the report if they
25　wanted to, right?

Page 168

1　A.　Any detective.
2　Q.　And then another copy would go into the
3　investigative file, right?
4　A.　Yes.
5　Q.　What is an investigative file?
6　A.　That would be an office file that I
7　would take out if I was doing an investigation on
8　a crime, no matter what the crime was, that would
9　have information, reports in there.
10　Q.　What information, what types of reports
11　went into an investigative file?
12　A.　You could have notes, GPR's, you could
13　have a case report, supplemental reports.
14　Q.　And was there an index or a log on the
15　front of the investigative file that reflected the
16　documents that were supposed to be in the
17　investigative file?
18　A.　Yes.
19　Q.　And do you know how that got filled
20　out?
21　A.　By the detective that put it in there.
22　Q.　So when a detective completed a report,
23　he or she would put it into -- were there any
24　shes?　Were there any female detectives in 1990 at
25　Area 5?

Page 169

1  A.  I think two.
2  Q.  All right.
3  A.  No, one.
4  Q.  Okay.  So if a detective completed a
5  report, he or she would place the report in the
6  investigative file and then would log it on some
7  type of log or index, is that right?
8  A.  I would assume.
9  Q.  Is that what you did?
10  A.  That's what I did.
11  Q.  Okay.  And is that what you were
12  trained to do?
13  A.  Yes.
14  Q.  And if you wanted to go back and look
15  at reports, you could pull the investigative file,
16  I assume?
17  A.  Yes.
18  Q.  Where was the investigative file
19  maintained?
20  A.  In a file cabinet.
21  Q.  Was there a separate room for it?
22  A.  Ours was right behind where the
23  sergeant sits.
24  Q.  And did any detective have the ability
25  to go pull an investigative file?

Page 170

1  A.  Yes.
2  Q.  You didn't have to get permission or
3  anything, right?
4  A.  No.
5  Q.  Would you say the investigative file is
6  sort of the most complete file related to an
7  investigation?
8      MS. ROSEN: Objection, form,
9  foundation.
10      THE WITNESS: I don't know if it was a
11  complete file, the most complete file or not.
12      BY MS. BONJEAN:
13  Q.  Well, did Area 5 maintain any other
14  files related to the investigations it conducted?
15  A.  I would imagine after the report that I
16  made, after the sergeant approved it, after it
17  went through review, I believe that went downtown.
18  Q.  Okay.  And that would be part of some
19  permanent retention file, is that right?
20  A.  Yes.
21  Q.  Apart from the permanent retention
22  file, were there any other files maintained at
23  area -- strike that.
24      Apart from the permanent retention file
25  that was maintained downtown and the investigative

Page 171

1  file that was maintained at Area 5, can you think
2  of any other filing systems that existed at Area
3  5?
4  A.  The only one I knew of.
5  Q.  And did you keep any files, sort of
6  separate files for your own personal use at your
7  desk or anything?
8  A.  Nobody had a desk.
9  Q.  Okay.  Did you keep any personal files
10  anywhere for your own personal use?
11  A.  No.
12  Q.  So if you wanted access to all the
13  reports that were prepared in connection with an
14  investigation, you would go to the investigative
15  file, is that right?
16  A.  Yes.
17  Q.  Did you hear -- strike that.
18      What's the first thing you remember
19  about the Wiley brothers' murders on May 25, 1990?
20  A.  The first thing that I remembered?
21  Q.  Uh-huh.
22  A.  Besides where it happened, was reading
23  that board that I referred to.  So I like to keep
24  involved in any submitted reports involving the
25  crimes.  There was some talk, I'm not sure how

Page 172

1  long it was after, that there was a 9 millimeter
2  that was involved in that homicide.
3  Q.  Were you on duty when the Wiley
4  brothers were murdered?
5  A.  I don't know.
6  Q.  Do you remember there being a call
7  about the two African-American men who were shot
8  down on North Avenue in the early morning hours of
9  May 25 of 1990?
10  A.  I was working 4:00 to 12:00, so if it
11  happened after 12:30, I wasn't there.
12  Q.  Okay.  So you believe at the time, 1990
13  May, you would have been working 4:00 to 12:00?
14  A.  That's the shift that I would be
15  working.
16  Q.  Is that the -- which watch is that?
17  A.  They call it the third watch.
18  Q.  Okay.  So if the crime occurred at 1:00
19  a.m., it's your best guess you would not have been
20  on duty at that time, right?
21  A.  I would have most likely been out of
22  the building.
23  Q.  All right.  You have no recollection of
24  being at the scene, I assume, correct?
25  A.  When it happened?

Page 173

1  Q.  Yes.  My apologies.  Yes.
2  A.  No.
3  Q.  Responding to the scene at the time
4  that the bodies were laying in the street?
5  A.  No, ma'am.
6  Q.  Now, was it your practice when you came
7  in being off duty to look at the board and
8  see what cases had been updated or anything of
9  that nature?
10  A.  When I came to work?
11  Q.  Yes.
12  A.  Took my coat off, go in the sergeant's
13  office.  After saying hello to anybody that was in
14  that office, I would grab the board and go sit at
15  a desk that was available and just read all the
16  reports.
17  Q.  And that kept you apprised of what was
18  happening with any number of investigations within
19  Area 5, right?
20  A.  Yes.
21  Q.  You could see whether any investigative
22  work had been done on any cases that were already
23  being investigated plus any new cases, right?
24  A.  Right.  That board had 95 percent of,
25  you know, what happened last night and that.

Page 174

1  Sometimes there was still a detective typing so it
2  wouldn't be up there, you know, immediately,
3  because he was still typing.
4  Q.  So the board contained reports that
5  were pretty fresh, is that what you're saying?
6  A.  Yes, but you could have a detective
7  that responded to an incident, say, theoretically
8  1:00 in the morning and he was still doing their
9  investigation or his investigation and the report
10  wasn't submitted.  He was still typing it.
11  Q.  Okay.
12  A.  So that wouldn't be up there at that
13  time.
14  Q.  All right.  So do you have a
15  recollection of seeing a report prepared in
16  connection with the Wiley brothers' murders when
17  you came in after your shift and looked at that
18  board?
19  A.  I must have seen it.  It was the
20  midnight officer that handled it, the scene, and I
21  did not recall seeing him when I came to work so I
22  assumed it was there.
23  Q.  And did you take any actions in
24  connection with that murder investigation after
25  you read those scene reports?

Page 175

1  MR. ENQUIST: Objection, vague.  Are
2  you talking immediately?
3  BY MS. BONJEAN:
4  Q.  Yeah, immediately, upon reading them?
5  A.  I don't think so.
6  Q.  Were you assigned to the case?
7  A.  Eventually.
8  Q.  When were you first assigned to the
9  case, the Wiley brothers' murder investigation?
10  A.  When I did anything on it?  Assigned,
11  I'm not sure what you mean by that.
12  Q.  When did you understand that you were
13  assigned to investigate the Wiley brothers' murder
14  investigation?
15  A.  I had information that I learned over a
16  period of time, and with that information I acted
17  on that information.
18  Q.  Okay.  That's not my question.  When?
19  Do you know what "when" means?  When is a time.
20  MS. ROSEN: Objection, argumentative.
21  BY MS. BONJEAN:
22  Q.  When did you first come to know that
23  you were assigned to investigate the Wiley
24  brothers' murders?
25  A.  I don't know if I was ever officially

Page 176

1  assigned to it.
2  Q.  Okay.  That's what I was asking.  So
3  you don't have a recollection of ever being
4  assigned by a sergeant to the Wiley brothers'
5  murders investigation, correct?
6  A.  I had information that I knew and I
7  acted upon the information.
8  Q.  I heard that.  The question is
9  different.
10  Did a sergeant ever assign the case to
11  you to investigate?
12  A.  As the lead detective, no.
13  Q.  Is there something called a lead
14  detective?
15  A.  Today there is.  Back then there
16  wasn't.
17  Q.  Okay.  So then you wouldn't have been
18  assigned as a lead detective since there was no
19  such thing back then, right?
20  A.  That's correct.
21  Q.  Okay.  Were you ever assigned by a
22  sergeant to investigate the Wiley brothers'
23  murders?
24  A.  I'm not sure if I was or not.
25  Q.  Do you have a recollection of being

Maysonet v.
Guevara

Video Deposition

Page 177

1  assigned?
2      MS. ROSEN: Objection, asked and
3  answered.
4      THE WITNESS: I don't recall if I was
5  or not.
6      BY MS. BONJEAN:
7  Q.  So it's possible you were?
8  A.  It could be.
9  Q.  And it's possible you weren't?
10 A.  Could be, too.
11 Q.  But have you seen any piece of paper
12 that reflects that you were assigned to
13 investigate the Wiley brothers' murder
14 investigation?
15 A.  I did not see one.
16 Q.  So after you became familiar with the
17 underlying facts of the crime in and around
18 May 25 of 1990, what investigative actions did you
19 take in connection with the Wiley brothers'
20 murders?
21 A.  I was reading the submitted reports
22 that were submitted that was on that board.  I
23 also had a couple conversations with the other
24 detectives relative to that investigation.
25 Q.  Anything else?

Page 178

1  A.  Well, eventually.
2  Q.  I know eventually you arrested
3  Mr. Maysonet, right?
4  A.  Yes.
5  Q.  Okay.  Prior to that, any investigative
6  conduct you engaged in other than reading the
7  initial reports and then apparently talking to
8  some detectives; anything else?
9  A.  Not that I recall at this time.
10 Q.  Do you recall interviewing a person by
11 the name of Efrain Cruz?
12 A.  I don't remember if I did or not.
13 Q.  If you had interviewed someone named
14 Efrain Cruz and he had provided you with
15 information about the Wiley brothers' murders,
16 would you have recorded it in a report?
17 A.  I would have.
18 Q.  If you had placed Efrain Cruz in a
19 lineup, would you have memorialized it in that
20 lineup -- would have memorialized that lineup?
21 A.  I would have.
22 Q.  And consistent with what your practices
23 were, you would have done so even if it was a
24 negative ID, right?
25 A.  Yes.

Page 179

1  Q.  And if it was a filler ID, you would
2  have, right?
3  A.  Filler?
4  Q.  Even if the filler was identified, you
5  would have?
6  A.  The results of any lineup was always
7  recorded by me.
8  Q.  Okay.  So if Efrain Cruz was placed in
9  a lineup that you conducted, you would have
10 recorded the results of that lineup regardless of
11 the outcome, right?
12 A.  Yes.
13 Q.  Did you speak to or question an
14 individual by the name of Francisco Varas,
15 otherwise known as Cisco?
16 A.  I don't recall.
17 Q.  Okay.  Have you seen any reports that
18 reflect that you interviewed an individual by the
19 name of Francisco Varas?
20 A.  I don't recall.
21 Q.  Do you remember conducting any lineups
22 in which you placed Mr. Varas?
23 A.  I don't recall.
24 Q.  Possible though, right?
25 A.  If I did participate in that lineup, it

Page 180

1  would have been memorialized.
2  Q.  Okay.  So if there is not a report
3  memorializing it, are you testifying it didn't
4  happen?
5      MS. ROSEN: Objection, foundation, form
6  of the question.
7      THE WITNESS: Again, any lineup that I
8  conducted would be memorialized with the
9  results.
10     BY MS. BONJEAN:
11 Q.  Okay.  So it's possible, then, that you
12 did conduct a lineup with Efrain Cruz in it,
13 right?
14     MS. ROSEN: Objection, form.
15     THE WITNESS: If you show me a lineup
16 conducted by me, then I could answer yes or
17 no, but I don't know.
18     BY MS. BONJEAN:
19 Q.  But it's possible, since you don't have
20 an independent recollection one way or the other,
21 right?
22     MS. ROSEN: Objection, form.
23     MR. ENQUIST: Join.
24     THE WITNESS: I don't know if I did or
25 didn't.

Maysonet v.
Guevara

Video Deposition

Page 181

1    BY MS. BONJEAN:
2    Q.   Right.  So it's possible that you did
3    and it's possible that you didn't, right?
4    MS. ROSEN: Objection, form.
5    THE WITNESS: That's fair to say.
6    BY MS. BONJEAN:
7    Q.   And the same thing would be true for
8    Francisco Varas; it's possible that you did and
9    it's possible that you didn't, right?
10   MS. ROSEN: Objection, form.
11   MS. BONJEAN: Put him in a lineup?
12   MR. ENQUIST: Same objection.
13   THE WITNESS: Any lineup that I
14   conducted, I memorialized.
15   BY MS. BONJEAN:
16   Q.   I know.  That's a separate issue, but
17   I'm saying you don't have an independent
18   recollection of placing any of these individuals
19   in lineups, right?
20   A.   I don't recall.
21   Q.   Okay.  And again, the only thing that
22   would refresh your recollection would be a
23   lineup -- a report, right?
24   MS. ROSEN: Objection, form,
25   mischaracterizes his testimony.

Page 182

1    THE WITNESS: Yes, you would have to
2    show me a report.
3    BY MS. BONJEAN:
4    Q.   Okay.  But as you sit here today, you
5    don't have an independent recollection one way or
6    the other whether you put those individuals in
7    lineups, right?
8    MS. ROSEN: Objection, asked and
9    answered, form.
10   THE WITNESS: I don't know.
11   BY MS. BONJEAN:
12   Q.   I want to draw your attention to --
13   A.   Can I just get a glass of water?
14   Q.   Yeah.
15   MS. BONJEAN: Would you just mark this?
16   (Whereupon, Paulnitsky
17   Deposition Exhibit No. 2 was
18   marked for identification.)
19   MS. ROSEN: Is this something that you
20   shared?
21   MS. BONJEAN: I'll give you copies.
22   Yes, it was shared, but I'm not showing it to
23   him.
24   BY MS. BONJEAN:
25   Q.   I want to draw your attention to

Page 183

1    July 15, 1990.  Do you remember arresting
2    Mr. Maysonet in connection with a shooting?
3    MS. ROSEN: Objection, form.
4    THE WITNESS: I had the opportunity to
5    place him in custody for shooting three
6    people.
7    BY MS. BONJEAN:
8    Q.   Okay.  And where were you when you
9    placed him into custody for that?
10   A.   I believe in front of his house.
11   Q.   And how did you find him in front of
12   his house?
13   A.   I went there with my partner at the
14   time, Anthony Bongiorno.
15   Q.   And what brought you to his apartment?
16   A.   There was an investigation of an
17   aggravated battery.  There was a photo that was
18   given to Detective Holec and it was part of the
19   file, and Tony and I were asked to pick up the
20   investigation and to find out who a particular
21   subject in a group photo was.
22   Q.   And who asked you to pick up the
23   investigation?
24   A.   It was the watch commander.
25   Q.   So you were assigned to pick up that

Page 184

1    investigation, is that right?
2    A.   Yes.
3    Q.   And you were given a photograph that
4    depicted what?
5    A.   A group of males.
6    Q.   Okay.  And what were the males doing?
7    A.   I don't recall.
8    Q.   And what do you remember the
9    significance of the photo being?
10   A.   There was investigation by the midnight
11   detective that the individual that had done the
12   shooting was in that picture.
13   Q.   And was there a witness who had
14   identified someone from the picture, is that what
15   you're saying?
16   A.   Yes.
17   Q.   And you were assigned to arrest the
18   individual?
19   A.   To learn -- to pick up the
20   investigation, to learn who that individual was.
21   Q.   Okay.  And as of July 15, 1990, you had
22   already familiarized yourself with the Wiley
23   brothers' murders as well, right?
24   A.   You're asking me about the aggravated
25   battery that I'm talking about.

Page 185

1  Q.  What I'm asking you is as of July 15,
2  1990, you had already familiarized yourself with
3  the Wiley brothers' murders, correct?
4  A.  I'm not sure what date it was.
5  Q.  Not sure what date what was?
6  A.  The date I became familiar with it.
7  Q.  I thought you testified that shortly
8  after the murders you would have come in and
9  looked at the board and looked at the reports.
10     Is that now inaccurate?
11 A.  No.
12     MS. ROSEN: Objection, mischaracterizes
13 his testimony.
14     BY MS. BONJEAN:
15 Q.  So if I represented to you that the
16 Wiley brothers were murdered on May 25, 1990, how
17 soon after that date do you say you familiarized
18 yourself with the reports around the murder
19 investigation?
20 A.  Whenever a report was submitted on the
21 board.
22 Q.  So if the report had been submitted on
23 the board the next day, that's the time you would
24 have familiarized yourself with it?
25 A.  If I was working that day.

Page 186

1  Q.  All right.  But eventually you would
2  have, right?
3  A.  Yes.
4  Q.  And I thought that you testified that
5  one of your recollections was actually sitting
6  down and looking at the reports?
7  A.  I just said that.
8  Q.  Okay.  That's correct, right?
9  A.  Yes.
10 Q.  So by July 15, 1990, you were familiar
11 with the Wiley brothers' murder investigation,
12 correct?
13     MS. ROSEN: Objection, form.
14     THE WITNESS: That date, I imagine.
15     BY MS. BONJEAN:
16 Q.  Okay.  And had you taken any
17 investigative actions prior to July 15, 1990 in
18 connection with the Wiley brothers' murders?
19 A.  No.
20 Q.  Just read the reports?
21 A.  Read the report and had conversations
22 about that murder and other murders.
23 Q.  Okay.  And did you have conversations
24 about that murder and other murders prior to
25 July 15, 1990?

Page 187

1  A.  I'm not sure of the date, but yes,
2  those conversations.
3  Q.  And who did you have those
4  conversations with?
5  A.  With my watch commander and boss,
6  Sergeant Mingey and other detectives.
7  Q.  And what did you learn during those
8  conversations?
9  A.  There were some similarities in the
10 weapon that was used, 9 millimeter.  I also
11 learned that Sergeant Mingey and Detective
12 Montilla had a conversation with him at the County
13 Jail, with Mr. Maysonet at the County Jail.
14 Q.  So you learned that prior to your
15 arrest of Mr. Maysonet on July 15, 1990?
16     MS. ROSEN: Objection, form.
17     THE WITNESS: It was prior to my
18 arrest.
19     BY MS. BONJEAN:
20 Q.  Okay.  And in speaking to Sergeant
21 Mingey, do you recall discussing that there was a
22 9 millimeter used in the Wiley brothers' murders?
23 A.  During our conversation.
24 Q.  Okay.  And why were you discussing what
25 type of weapon was used in the Wiley brothers'

Page 188

1  murder investigation?
2  A.  The exact reason at the time I don't
3  know.  Conversation -- during that conversation it
4  was a 9 millimeter that used.  That seemed to
5  be interesting because Mr. Maysonet allegedly used
6  a 9 millimeters in those aggravated batteries.
7  Q.  Right.  But those aggravated batteries
8  didn't happen until July of 1990, right?
9  A.  You have the date.  I'm not sure what
10 date it was.
11 Q.  Okay.  But you recall talking to the
12 detectives about the weapons that were -- about
13 the weapon that may have been used in the Wiley
14 brothers' murders, right?
15 A.  Yes.
16 Q.  And what would have been the purpose to
17 be having these conversations with your supervisor
18 or the watch commander?
19 A.  Just to inform people that were on our
20 watch what was going on.
21 Q.  And at that time do you know whether
22 you were actually assigned to that case?
23     MR. ENQUIST: Which case?
24     MS. BONJEAN: The Wiley brothers'
25 murders.

Page 189

1     THE WITNESS: I don't ever remember
2   specifically being assigned to it.
3     BY MS. BONJEAN:
4   Q.  But if in your investigative work
5   something came up that might help solve that
6   murder, you would want to have background
7   information, right?
8   A.  Yes.
9   Q.  And in fact, the detectives at Area 5
10  worked pretty collaboratively together, right?
11  A.  When I was there they did.
12  Q.  Yeah.  In the 1990s they worked
13  collaboratively together, correct?
14  A.  For the most part.
15  Q.  So even if one officer or detective was
16  assigned to a murder investigation, another might
17  help out, correct?
18  A.  That's correct.
19  Q.  And we already discussed that you might
20  actually even co-author reports together, right?
21  A.  Yes.
22  Q.  And you routinely shared information
23  about investigations to help each other out,
24  right?
25  A.  Yes.

Page 190

1   Q.  And I want to get back to something.
2   So it's your recollection that prior to arresting
3   Mr. Maysonet on the triple attempt shooting case,
4   you had received information from Sergeant Mingey
5   and Montilla about statements that Maysonet had
6   made?
7   A.  That's not what I said.
8   Q.  Okay.
9   A.  I said during my investigation of that
10  triple aggravated battery, we did some
11  investigative work.  During the course of
12  investigation we were shown -- there was a
13  photograph that was given to Detective Holec and
14  we were assigned to see if we could find out who
15  that photograph was and that also we learned a 9
16  millimeter was used in that triple shooting.
17  Q.  Okay.  Well, I am going to represent
18  that Mr. Maysonet was arrested for the triple
19  aggravated battery on July 15, 1990, okay?
20  A.  Go ahead.
21  Q.  Any reason to quarrel with that?
22  A.  If that's what you're telling me is on
23  that report.
24  Q.  All right.  And prior to that date,
25  what if anything did you know about who might be

Page 191

1   responsible for the murders of Torrence and Kevin
2   Wiley?
3   A.  Before that?
4   Q.  Before that date?
5   A.  I didn't know.
6   Q.  Did you have any information that
7   Mr. Maysonet was involved in the Wiley brothers'
8   murders prior to July 15 of 1990?
9   A.  Prior to that aggravated battery, I had
10  no information.
11  Q.  And did you have any information to
12  suggest that anyone in particular might have been
13  involved in that shooting?
14  A.  The only information I had was what was
15  told to me during our conversation we had at Area
16  5 where there was a 9 millimeter that was used and
17  that Ed Mingey and Freddie Montilla, they had gone
18  to the County Jail and talked to Mr. Maysonet.
19  Q.  Okay.  So you had information prior to
20  your arrest of Mr. Maysonet on July 15, 1990 that
21  Mingey and Montilla had spoken to Mr. Maysonet at
22  the County Jail?
23  A.  Not at that time.  During my
24  investigation --
25  Q.  Which investigation?

Page 192

1   A.  Of the triple shooting.
2   Q.  Okay.
3   A.  Okay, there was facts that were
4   submitted in the reports and then sometime after
5   he was arrested by us, that the information, I
6   learned, after his arrest, that they had went to
7   the County Jail and talked to him.
8   Q.  Let's try this one more time.
9   A.  The answer is going to be the same.
10  Q.  What information did you have prior to
11  July 15, 1990 that Mr. Maysonet even had any
12  knowledge about the shooting of the Wiley
13  brothers?
14      MS. ROSEN: Objection, asked and
15  answered.
16      MR. ENQUIST: Join.
17      THE WITNESS: The only information I
18  had, after Tony and I made the arrest --
19      BY MS. BONJEAN:
20  Q.  You're going to after.  I'm talking
21  about before.  Listen to the question.
22      MS. ROSEN: He has already said before
23  he had no information.
24      MS. BONJEAN: Just stop.  He is talking
25  out of both sides of his mouth and I know you

Page 193

1    don't want him answering.
2        MS. ROSEN: I don't care. You're
3    talking out of both sides of your mouth. He
4    has answered repeatedly that he had no
5    information before.
6        MS. BONJEAN: Okay, great. Thank you
7    for lodging your objection. Duly noted. The
8    video's got it, the court reporter's got it.
9    I'm going to ask my questions and get
10   clarity, okay?
11       MS. ROSEN: Okay.
12       BY MS. BONJEAN:
13   Q.  Prior to July 15, 1990 -- do you know
14   what "prior" means? It means before, right?
15       MR. ENQUIST: Objection, form,
16   argumentative.
17       MS. ROSEN: Objection, form,
18   argumentative. Did you need a break?
19       MS. BONJEAN: I don't need a break.
20       MS. ROSEN: Is your blood pressure
21   going down or up or something? What's
22   happening?
23       MR. ENQUIST: We're going to get
24   through this question and then we're going to
25   take a break.

Page 194

1        BY MS. BONJEAN:
2    Q.  Do you need a break?
3    A.  I think maybe you do. I don't. I'm
4    fine.
5    Q.  Okay, great.
6    A.  I'm only concerned about you right now.
7        MR. LEINENWEBER: I would actually like
8    a break.
9        MS. BONJEAN: Well, we'll take a break
10   in a few minutes.
11       THE WITNESS: Again, you asked me a
12   couple times. I told you, I did not have any
13   knowledge, other than what I read, about the
14   Wileys, okay, at that time. I --
15       BY MS. BONJEAN:
16   Q.  Stop. That answers my question.
17       So prior to July 15, 1990, all you knew
18   about was what you read in those reports, right?
19   A.  That's correct.
20   Q.  Okay. And you had conversations, you
21   said, with Mingey, about the type of weapon that
22   might have been used in the Wiley brothers'
23   murders, right?
24   A.  Yes.
25   Q.  And that would have been before your

Page 195

1    arrest of Mr. Maysonet, correct?
2    A.  No, that's not correct. As I said
3    before, I didn't know about any connection or
4    possible connection until after my aggravated
5    battery was done, okay, and then I was privy to a
6    couple conversations.
7    Q.  Okay. So all of your conversations
8    with Mingey were after your arrest with
9    Mr. Maysonet -- strike that.
10       All of your conversations about the
11   Wiley brothers' murders were after your arrest of
12   Mr. Maysonet, is that right?
13   A.  I'm sure that we had conversations
14   about it because --
15   Q.  After or before?
16   A.  Probably after they were murdered.
17   Q.  Okay.
18   A.  Okay? But I'm doing this
19   investigation, I'm also listening to what's going
20   on with that homicide that we have, and then I
21   focused more on that murder investigation after he
22   was placed in custody for the shootings.
23   Q.  Okay. What do you remember about your
24   conversations with Sergeant Mingey before
25   Mr. Maysonet was arrested on the unrelated ag bat?

Page 196

1    A.  The exact conversations I don't recall,
2    but it had information pertaining to the murders,
3    a 9 millimeter was used, and then at some point in
4    time I learned that Freddie Montilla and Eddie
5    Mingey had gone to the County Jail to talk to
6    Maysonet when he was in custody.
7    Q.  Okay. So the information about the 9
8    millimeter, did you learn that before or after you
9    arrested Mr. Maysonet?
10   A.  I'm not sure.
11   Q.  Okay. And information that Mingey and
12   Montilla had spoken to Maysonet in the Cook County
13   Jail, did you learn that before or after you
14   arrested Mr. Maysonet on the ag bat?
15   A.  I believe it was after.
16   Q.  So on July 15, 1990, you received
17   information and had a photograph that somebody in
18   that photograph was identified in connection with
19   the shooting of three individuals, is that right?
20   A.  Yes.
21   Q.  And was Mr. Maysonet the individual in
22   that photograph?
23   A.  He was in that photograph.
24   Q.  Okay. And is that what led you to go
25   arrest him?

Maysonet v.
Guevara

Video Deposition

Page 197

1  A.  After we learned his name, we, Tony and
2  I, proceeded to an address that was familiar with
3  his whereabouts.
4  Q.  How did you learn his name?
5  A.  Tony Bongiorno, who was a former gang
6  investigator, learned that information.
7  Q.  Do you know how he learned it?
8  A.  By going through the gang files.
9  Q.  And what's entailed in doing that?
10 A.  I'm sorry?
11 Q.  What's entailed in that?
12 A.  By looking at files, I guess.
13 Q.  Well, if he just had a picture, did he
14 have a nickname or something?
15 A.  Yes, he did.
16 Q.  Oh, okay.  You're welcome.  And so he
17 was going through the files --
18    MS. ROSEN: Objection to the editorial
19 comment.
20    BY MS. BONJEAN:
21 Q.  -- to look for a real name of this
22 nickname that he had?
23 A.  Yes.
24 Q.  And what nickname did you learn?
25 A.  I don't recall what it was.

Page 198

1  Q.  So and after you got the name you went
2  to Mr. Maysonet's home?
3  A.  Yes.
4  Q.  And what did you do at his home?
5  A.  Identified ourselves and asked him
6  to -- well, we identified ourselves, told him we
7  were investigating three people that were shot,
8  asked him to come into Area 5.
9  Q.  And did you speak English to him?
10 A.  Yes, I did.
11 Q.  And did he speak English back to you?
12 A.  Yes, he did.
13 Q.  And did he consent to go to Area 5 with
14 you?
15 A.  Yes, he did.
16 Q.  And you took him to Area 5?
17 A.  Yes.
18 Q.  Okay.  And did you continue to speak to
19 him in English?
20 A.  Yes.
21 Q.  In the car?
22 A.  I'm not sure if I did or not.
23 Q.  All right.  So what happened when you
24 got back to Area 5 with Mr. Maysonet?
25 A.  Went up to the second floor of the

Page 199

1  office, he was placed in a room, advised of the
2  allegations against him again, also advised of his
3  Miranda rights.
4  Q.  And did you do that in English?
5  A.  I'm not sure if I or Tony, which one of
6  us did it.
7  Q.  Did one of you do it in English?
8  A.  Of course.
9  Q.  And he spoke English back to you?
10 A.  Yes, he did.
11 Q.  All right.  And then what happened
12 after you read him his Miranda warnings?
13 A.  We had a conversation about the
14 incident.
15 Q.  And what did he say?
16 A.  He had no clue what we were talking
17 about or where he was.
18 Q.  All right.  And then what happened?
19 A.  He was placed in a lineup.
20 Q.  Okay.  And after he was placed in a
21 lineup, was he identified in that lineup?
22 A.  Yes.
23 Q.  And then what happened?
24 A.  I believe that I took pictures of the
25 lineup.  I believe that Tony made out a lineup

Page 200

1  report and State's Attorney was called.  They
2  called us back on the telephone, they asked us
3  what was going on, explained to them we had a
4  triple aggravated battery.  Somebody came out from
5  the State's Attorney's office.
6  Q.  All right.  And did you have any
7  further conversations with Mr. Maysonet after you
8  called felony review?
9  A.  I'm not sure if I did or not.
10 Q.  And all of your conversations were in
11 English?
12 A.  Yes, they were.
13 Q.  And you had no problems understanding
14 him?
15 A.  I understood him perfectly.
16 Q.  And he had no problems understanding
17 you as best as you could tell?
18 A.  We were communicating.  He never said
19 that he had a problem.
20 Q.  And at no point were you using an
21 interpreter?
22 A.  I believe not, though we had one that
23 was immediately available if we needed one.
24 Q.  But you don't recall using one,
25 correct?

Maysonet v.
Guevara

Video Deposition

Page 201

1  A.  I would have to look at the report.  I
2   don't think we used one at all.
3  Q.  But you remember speaking English to
4   him without difficulty?
5  A.  Yes, I do.
6  Q.  And do you remember him having any type
7   of accent?
8  A.  I don't recall.
9  Q.  Do you remember finding it difficult to
10  understand him speaking in English?
11     MR. ENQUIST: Objection, asked and
12  answered.
13     THE WITNESS: I communicated with him.
14     BY MS. BONJEAN:
15  Q.  My question is, do you remember finding
16   it difficult to communicate with him even in
17   English?
18  A.  I did not.
19  Q.  And you did not find it difficult to
20   understand the words he was saying in the course
21   of your investigation, is that right?
22     MR. ENQUIST: Objection, asked and
23  answered.
24     THE WITNESS: Yes.
25

Page 202

1     BY MS. BONJEAN:
2  Q.  Did Mr. Maysonet exercise his right to
3   counsel at any point during your conversations
4   with him?
5  A.  Didn't want an attorney.
6  Q.  I'm sorry?
7  A.  He never asked for an attorney.
8  Q.  And if he had asked for an attorney,
9   would you have honored that request?
10  A.  All my questioning would have stopped,
11   Tony's would have stopped, we would have allowed
12   him to call anybody he wanted.
13  Q.  And again, you would have honored his
14   request that he did not want to speak to you or
15   your fellow detectives if he had exercised his
16   right to counsel, correct?
17  A.  Yes.
18     MS. ROSEN: Are you still looking for a
19  break?
20     MR. LEINENWEBER: Yeah.  Any time,
21  Jennifer, that is --
22     MS. BONJEAN: Yeah, I'm almost done
23  with my line of thought.
24     THE VIDEOGRAPHER: I also have five
25  minutes on the tape.

Page 203

1     MS. BONJEAN: Okay, that will work.
2     BY MS. BONJEAN:
3  Q.  How long was your conversation with
4   Mr. Maysonet at Area 5?
5  A.  I don't recall.
6  Q.  Did you talk to him before and after
7   the lineup or just before the lineup?
8  A.  Before and after.
9  Q.  And what was the nature of the
10  conversation after the lineup?
11  A.  After the lineup?
12  Q.  Yeah.
13  A.  I told him he was identified.
14  Q.  Okay.  Any other further conversation?
15  A.  I don't recall.
16  Q.  Just basically communicating to him
17   that he had been identified?
18  A.  He's been identified.
19  Q.  And he's going to be charged?
20  A.  I can't charge him, that I called --
21  Q.  I said, and that he was going to be
22  charged?
23     MR. ENQUIST: Objection.  He was
24  answering.
25

Page 204

1     BY MS. BONJEAN:
2  Q.  I understood that you can't.
3  A.  No.  You cut me off.  I told him I was
4   going to call felony review.  That was the end of
5   that conversation.
6  Q.  Okay.  So after you spoke to felony
7   review, did you have any further conversations
8   with Mr. Maysonet?
9  A.  Not at that time.
10  Q.  All right.  And certainly you prepared
11   a GPR in connection with your investigative work
12   on July 15, 1990, right?
13  A.  I prepared a closing supp.
14  Q.  And you prepared a GPR as well, right?
15     MS. ROSEN: Objection, form.
16     THE WITNESS: Yes.
17     BY MS. BONJEAN:
18  Q.  And why did you prepare a GPR?
19  A.  Because I had multiple people that were
20   looking at the lineup and also his placement in
21   the lineup.
22  Q.  And did you find it important to
23   memorialize that in a GPR?
24  A.  You're required to do a -- yes.  Yes,
25   I'm sorry.

Maysonet v.
Guevara

Video Deposition

Page 205

1  Q.   You're required to --
2  A.   I put it on the GPR and then that GPR
3  helped prepare a lineup supplementary report.
4  Q.   And is that consistent with the
5  policies and practices of the Chicago Police
6  Department?
7  A.   Yes.
8       MS. BONJEAN: Okay.  We can take a
9  break.
10      THE VIDEOGRAPHER: We are going off the
11 record at 1:47 p.m.
12      (Discussion off the record.)
13      (Short recess.)
14      THE VIDEOGRAPHER: We are back on the
15 record at 2:13 p.m.
16      BY MS. BONJEAN:
17 Q.   Mr. Paulnitsky, remind me again who
18 received this picture that you referenced in your
19 testimony before we broke?
20 A.   Detective Holec.
21 Q.   Holec?
22 A.   H-o-l-e-c.
23 Q.   E-c.  Okay.  So what did you know about
24 the shooting that had happened in July of 1990
25 prior to July 15 when you actually brought

Page 206

1  Mr. Maysonet into custody?
2  A.   Into custody on the homicide?
3  Q.   No.  Let me back up, okay?
4  A.   Okay.  I'm not sure about the dates of
5  the ag bat and the murder, so maybe if I look at
6  them.
7  Q.   Yeah, I'll have you -- I'm going to --
8  you can look at what's been marked as Exhibit 1,
9  okay?
10      MR. LEINENWEBER: Which one is that?
11      MS. ROSEN: Exhibit 2, you mean.
12      MS. BONJEAN: Oh, sorry, Exhibit 2.  I
13 have copies here.  They were all submitted
14 through Dropbox.  Exhibit 2, which is Bates
15 stamped Maysonet 9596 through 9617, does
16 everyone have the same -- okay, all right.
17      BY MS. BONJEAN:
18 Q.   Mr. Paulnitsky, I'm going to have you
19 look at the pages that are Bates stamped -- it's
20 kind of hard to see, but they would be Bates
21 stamped Maysonet 9614 and 9615.  It's at the
22 very -- sort of towards the end of the packet.
23 A.   I'm looking.  I'm guessing that's the
24 original case report?
25 Q.   The general offense or original case

Page 207

1  report, yes.
2  A.   Yes, ma'am.
3  Q.   Do you see that?
4  A.   Yes, ma'am.
5  Q.   Okay.  If you could take a look at
6  that, does this tell you when this incident
7  occurred?
8  A.   July 3, 1990 at 2200 hours.
9  Q.   Okay.  And did you respond to the scene
10 of this shooting?
11 A.   No.
12 Q.   All right.  You had an opportunity at
13 some point to look at this original report, right?
14 A.   Yes.
15 Q.   And you would agree that there are no
16 individuals identified as the perpetrators of this
17 shooting, correct?
18 A.   Yes.
19 Q.   You would agree with that?
20 A.   That there is nobody identified?
21 Q.   Correct.
22 A.   Yes.
23 Q.   And you would agree that it doesn't --
24 it has a description of two offenders, right?  One
25 is a little more detailed than the other, would

Page 208

1  you say that?
2  A.   Yes.  Could I just grab my
3  handkerchief, please?
4  Q.   Yes.
5  A.   Oh, I've got it.  I'm sorry.  Thank
6  you.
7  Q.   Sure.  So would you agree that there
8  appear to be two offenders that are described,
9  right?
10 A.   Yes, ma'am.
11 Q.   And one is described with more
12 particularity than the other?
13 A.   Some of this is whited out or -- do you
14 have a better copy?
15 Q.   I don't.  I don't maintain these
16 copies, so I get what I get.  But I understand
17 that the first words are a little cut off, but it
18 would appear, correct me if I'm wrong, that there
19 is a age and height and weight and hair color and
20 complexion and marks or scars description for one
21 offender and not for the other?
22 A.   Yes.
23 Q.   Is that right?
24 A.   Yes.
25 Q.   Okay.  Now, can you tell me when it was

Maysonet v.
Guevara

Video Deposition

Page 209

1   that you learned about a photograph related to
2   this incident that would help identify the
3   offenders?
4   A. May I look at the report?
5   Q. Sure, if it will help you.
6   A. Please. Am I still talking?
7   Q. If you're able to tell me when you
8   learned about a photograph?
9   A. It says at the bottom, Maysonet 9600.
10   Q. Okay.
11   A. Okay. And Robert Hernandez.
12   Q. Sure.
13   A. Do you want me to read that?
14   Q. Sure.
15   A. Okay. "Robert Hernandez related
16   essentially the same account as did Nelson.
17   Hernandez went on to say that he had provided the
18   above-mentioned photo. Hernandez obtained the
19   photo some time ago from a female friend who was a
20   girlfriend of a Latin King."
21   Q. Okay. And this, "had provided the
22   above-mentioned photo," is this a photo that was
23   mentioned by Nelson?
24   A. This is the photograph that Detective
25   Holec obtained during his investigation.

Page 210

1   Q. It says "above-referenced." Maybe I'm
2   missing it. Can you point me to where the above
3   reference -- oh, I see.
4   A. I'm lost. What page are you on?
5   Q. Yeah, let's look at page Maysonet 9599?
6   A. Yes, ma'am.
7   Q. In the middle with a William Vale, it
8   says, "Although neither Molina nor Vale could
9   provide a description of the driver, Molina went
10   on to say that a group photo of Latin Kings was
11   shown to him and Molina made a tentative
12   identification of one of the persons as the
13   shooter."
14     Do you see that?
15   A. That would be --
16   Q. Right sort of in the middle?
17   A. Page -- I'm sorry. Paragraph 4?
18   Q. Yeah.
19   A. Okay.
20   Q. Do you know where that photo was
21   obtained from?
22   A. My understanding, that when Holec was
23   doing his investigation, that during his
24   investigation somebody came up with it, with that
25   photograph, and Larry asked where that came from

Page 211

1   and he says it was given to him by a girlfriend of
2   a former friend, had a group photo of male
3   Hispanics.
4   Q. Okay. So can you point to me anything
5   in this report that was prepared or submitted on
6   July 4, 1990 that explains how it was that the
7   detective came in possession of a photo of Latin
8   Kings?
9   A. Sure. Just let me read this, please.
10   That paragraph --
11   Q. Hernandez?
12   A. William Vale.
13   Q. Right. Vale says he was shown -- I'm
14   just trying to understand it. William Vale says
15   he was shown a photograph of some Latin Kings, and
16   then later, I think you read from it earlier, page
17   9600, it says that "Hernandez went on to say that
18   he had provided the above-mentioned photo."
19     So is it your understanding that
20   Hernandez gave the photo to Detective Holec?
21   A. That's the impression I was under.
22   Q. So he gave -- and do you know why he
23   gave a photo of some Latin Kings to Holec?
24   A. Other than what was recorded here, that
25   there was a photo, the alleged offender was in

Page 212

1   that photo.
2   Q. Okay. And then, and you weren't
3   involved in this part of the investigation, is
4   that right?
5   A. No.
6   Q. You were assigned after that, correct?
7   A. Yes.
8   Q. So after these tentative
9   identifications were made from a photo that had
10   Latin Kings in it, you were assigned to go confirm
11   the identity of the person in the photo, is that
12   right?
13   A. Not to confirm. To try to identify who
14   that picture was.
15   Q. Right. Do you know where that photo
16   is?
17   A. I know where it was.
18   Q. Where was it?
19   A. I inventoried it.
20   Q. You did?
21   A. Yes.
22   Q. So it was part of the investigative
23   file?
24   A. No.
25     MS. ROSEN: Objection, form.

Page 213

1     BY MS. BONJEAN:
2 Q.  Well, where did you inventory it?
3 A.  The police department.
4 Q.  As evidence?
5 A.  Yes.
6 Q.  Okay.  And on page Maysonet 9612 --
7 A.  12?
8 Q.  Yeah.  Is that the inventory form that
9 you prepared?
10 A.  Yeah.  I see two copies of that, yeah.
11 Q.  And does this reflect the photo --
12 A.  Yes.
13 Q.  -- that you inventoried?  Okay.
14     So after you got these tentative ID's
15 for the photo, you were assigned to go figure out
16 who the person was in the photo, right?
17 A.  To try to learn the identity.
18 Q.  And how did you go about doing that?
19     MR. ENQUIST: Objection, asked and
20 answered.  Go ahead.
21     THE WITNESS: Tony Bongiorno, another
22 detective, who was familiar with gangs,
23 because he worked there before he became a
24 detective.
25

Page 214

1     BY MS. BONJEAN:
2 Q.  Right.  I don't see anywhere in here
3 where there is a reference to a nickname, though,
4 which is what I thought you testified to earlier?
5 A.  No, you asked me and I said at that
6 time I didn't know.
7 Q.  Okay.  So you don't know whether a
8 nickname was provided, right?
9 A.  Correct.
10 Q.  Certainly if a nickname was provided by
11 any of these individuals, that's something that
12 would have been included in a supplemental report,
13 right?
14     MS. ROSEN: Objection, calls for
15 speculation.
16     THE WITNESS: Could have been.
17     BY MS. BONJEAN:
18 Q.  That would be optimal, right?
19     MS. ROSEN: Objection, form.
20     THE WITNESS: Sometimes today nicknames
21 are different tomorrow.
22     BY MS. BONJEAN:
23 Q.  So is it your testimony that it wasn't
24 routine to memorialize the nicknames of people who
25 have been identified as the offenders in a

Page 215

1 shooting in a supplemental report?
2 A.  Well, on my report I did put down
3 Mr. Maysonet's nickname.
4 Q.  Okay.  Sir, I would ask that you look
5 at the document as I ask you to, or if you need to
6 refresh, so we can be on the same page.  That was
7 after you arrested him, right?
8 A.  I recorded that.  I don't know what
9 nickname Tony was given.
10 Q.  Okay.  So let's -- that's not -- you
11 testified earlier, I believe, that in addition to
12 the photo where the victims had tentatively
13 identified an individual in the photo, that he
14 went into his gang resources and was able to
15 determine who the actual person was because he had
16 a nickname that was provided to him.
17     Is that not accurate?
18     MS. ROSEN: Objection, form.
19     THE WITNESS: That's what -- the best
20 of my ability and recollection, yeah.
21     BY MS. BONJEAN:
22 Q.  Okay.  And where -- is that an
23 independent recollection?  Because it's not
24 reflected in the report that was prepared on
25 July 4 of 1990 when these witnesses allegedly made

Page 216

1 their identifications from the photo?
2     MS. ROSEN: Objection, form.
3     THE WITNESS: It's in here.
4     BY MS. BONJEAN:
5 Q.  Where?
6 A.  Page 2, 9597 on the bottom.  "Wanted:
7 King Leo."
8 Q.  Okay.  Do you know where the name King
9 Leo came from?  That's --
10 A.  No.
11 Q.  Do you know whether one of the
12 witnesses provided that nickname?
13 A.  I don't know where Larry got it, Holec
14 got it.
15 Q.  Well, what are the possibilities of
16 where you would have gotten such information?
17     MS. ROSEN: Did you say "where you"?
18     BY MS. BONJEAN:
19 Q.  Where the detective -- I meant that in
20 the royal sense, but where -- what are the
21 possibilities of where a detective could have
22 learned that information?
23     MS. ROSEN: Objection, calls for
24 speculation.
25     THE WITNESS: My opinion where he could

Maysonet v.
Guevara

Video Deposition

Page 217

1 have got it?
2     BY MS. BONJEAN:
3 Q.   Yeah.  Where did he --
4 A.  From his investigation.
5 Q.  Right.  From talking to witnesses,
6 right?
7 A.  I would assume.
8     MS. ROSEN: Objection, calls for
9 speculation.
10     BY MS. BONJEAN:
11 Q.   Any other place he might have been able
12 to learn the possible nickname of the offenders?
13 A.  From the victims.
14 Q.  Right.  And I know at the bottom of
15 Maysonet 9599, on which there is a reference to
16 one of the offenders wearing a sweatshirt that
17 says "Leo" on it, right?  It's at the bottom.
18     Do you see that?
19 A.  I'm looking for it, ma'am.  I'm sorry.
20 Q.  The last line on 9599.
21 A.  "Sweatshirt with 'Leo'."
22 Q.  Do you see that?
23 A.  Yes, ma'am.
24 Q.  Okay.  So apart from the fact that one
25 of the offenders was wearing a sweatshirt that had

Page 218

1 "Leo" written on it, do you know where the
2 information came from that one of the offenders
3 had the nickname King Leo?
4     MS. ROSEN: Objection, asked and
5 answered.
6     MR. ENQUIST: Objection,
7 mischaracterizes the document.  Go ahead.
8     THE WITNESS: I'm sorry, could you
9 please repeat that?
10     BY MS. BONJEAN:
11 Q.   Apart from what's written at the bottom
12 of 9599, what other information can you point me
13 to that would explain how the detective who
14 prepared this report got the nickname King Leo?
15     MS. ROSEN: Objection, asked and
16 answered.
17     THE WITNESS: I don't know how
18 Detective Holec got it.  I assume during his
19 investigation somebody said that.
20     BY MS. BONJEAN:
21 Q.   And you would agree that if somebody
22 gave the nickname King Leo, you would want to
23 report that in the report as he did, right?
24     MS. ROSEN: Objection, form.
25     THE WITNESS: Yes.

Page 219

1     BY MS. BONJEAN:
2 Q.   But you don't think it's important to
3 identify where he got that information, right?
4     MS. ROSEN: Objection, form.
5     MR. ENQUIST: Objection, form.
6     BY MS. BONJEAN:
7 Q.   Or do you?
8     MS. ROSEN: Objection, form.
9     THE WITNESS: I don't know where he got
10 the picture from, no.
11     BY MS. BONJEAN:
12 Q.   Would you agree that if he had written
13 in his report where he got the information about
14 the nickname, you would be able to tell me where
15 he got the information about the nickname?
16 A.   If it was recorded here, I could answer
17 that.
18 Q.   You could answer that question.  And
19 you can't answer that question because he didn't
20 record it, right?
21 A.   Correct.
22 Q.   All right.  And I think your testimony
23 was that he then somehow determined that one of
24 the offenders that had been identified or one of
25 the individuals in the photograph that had been

Page 220

1 tentatively identified was Mr. Maysonet, right?
2     MR. ENQUIST: Objection, form,
3 mischaracterizes previous testimony.  Are you
4 talking about Holec?
5     BY MS. BONJEAN:
6 Q.   Do you understand or no?
7 A.   I think I do.
8 Q.   I thought you said Bongiorno took
9 Holec's information --
10 A.   Yes.
11 Q.   -- and figured out it was Jose
12 Maysonet.  Is that wrong?
13 A.   I thought you were talking about Holec.
14 Bongiorno, he did his investigation and he came up
15 with the full name of who King Leo was.
16 Q.   Right.  Do you know where his report is
17 that details the investigative acts he took to
18 determine that Mr. Maysonet's nickname is
19 allegedly King Leo?
20     MS. ROSEN: Objection, asked and
21 answered.
22     THE WITNESS: May I look through these
23 reports?  Page 9605, there is two paragraphs
24 on that page.  May I read them?
25

Page 221

BY MS. BONJEAN:

1   BY MS. BONJEAN:
2   Q.  I can read them.  I don't need you to
3   read all of them.
4       Are you talking about where it says
5   that they just developed information that Jose
6   Maysonet was a Latin King with the street name
7   King Leo?
8   A.  Under "Investigation," that first
9   paragraph, yes, ma'am.
10  Q.  I see it.  Again, can you point me to
11  any document that explains or shows why they
12  thought his nickname was King Leo?
13  A.  Detective Holec, on his report, had
14  made reference to a King Leo.
15  Q.  Right, that the offender had possibly
16  the nickname King Leo.  I'm asking what made
17  Bongiorno or you or any of you believe that
18  Mr. Maysonet had a nickname King Leo?
19  A.  When Tony did his investigation and he
20  came up with a possible name, there was also a
21  picture that was attached to the card, and that
22  picture that was on that card at Western and
23  Belmont gang crimes office matched the picture of
24  the group of individuals, the one that was picked
25  out as the shooter.

Page 222

1   Q.  Oh, so now you know that Bongiorno
2   actually went and looked in the card index or name
3   index and was able to find an index card of
4   Mr. Maysonet in which it said his nickname was
5   King Leo?
6   A.  Yes.
7   Q.  Okay.  Did you see that card?
8   A.  Yes, I did.
9   Q.  Okay.  Did you inventory that card, as
10  well?
11  A.  I did not.
12  Q.  Did you make a photograph of it and put
13  it in the report?
14  A.  I did not.
15  Q.  Do you know how the information got on
16  the card?
17  A.  By a previous gang crime specialist
18  that had contact with him.
19  Q.  Okay.  And do you know who that person
20  would be?
21  A.  No.
22  Q.  So you don't really have any firsthand
23  knowledge that Mr. Maysonet's nickname is King
24  Leo, right?
25  A.  Just what was on the intelligence

Page 223

1   information at the police department.
2   Q.  Right.  Some unsourced card in the
3   police department that you cannot produce to us,
4   right?
5       MS. ROSEN: Objection, argumentative.
6       MR. ENQUIST: Join.
7       MR. LEINENWEBER: Also foundation.
8       THE WITNESS: It wasn't unsourced.  It
9   was a document being preserved by the police
10  department.
11      BY MS. BONJEAN:
12  Q.  Oh, it was preserved by the police
13  department?
14  A.  Yes.
15  Q.  Really?
16      MS. ROSEN: Objection, argumentative.
17      BY MS. BONJEAN:
18  Q.  Do you know where they have it right
19  now?
20      MS. ROSEN: Argumentative, foundation.
21      BY MS. BONJEAN:
22  Q.  Do you know where it is presently?
23  A.  I was never involved as an officer
24  assigned to gang crimes.  I do know that it was in
25  their office with many, many others.

Page 224

1   Q.  Okay.  So you don't know it was
2   preserved by the Chicago Police Department,
3   correct?
4   A.  I would only assume it was.
5   Q.  So you're just assuming that, right?
6   A.  Yes, ma'am.
7   Q.  You have no firsthand knowledge that it
8   was preserved?
9       MS. ROSEN: Objection, form.
10      THE WITNESS: I don't have any
11  firsthand knowledge where those photos are
12  today.
13      BY MS. BONJEAN:
14  Q.  Okay.  And you don't know the source of
15  the information on those cards that you don't know
16  whether they exist or don't exist to this day,
17  correct?
18      MR. ENQUIST: Objection, argumentative.
19      MS. ROSEN: Objection.
20      MR. LEINENWEBER: Also vague.
21      THE WITNESS: I have no idea where they
22  would be.
23      BY MS. BONJEAN:
24  Q.  You don't know the source of the
25  information that was on the card that you claim

Page 225

1  showed that Mr. Maysonet's nickname was King Leo,
2  correct?
3      MS. ROSEN: Objection, argumentative.
4      THE WITNESS: The source of the
5  information was by other police officers
6  assigned to the gang crimes unit.
7      BY MS. BONJEAN:
8  Q.  And what other police officers would
9  that be?
10 A.  I wouldn't know.
11 Q.  So you're assuming that's the source of
12  the information, correct?
13 A.  There was investigator names on that
14  card who completed that card.
15 Q.  But you don't know who they are,
16  correct?
17 A.  I do not.
18     MS. ROSEN: Objection, form.
19     BY MS. BONJEAN:
20 Q.  And you don't know where they got the
21  information, right?
22 A.  No, ma'am.
23 Q.  So that's my point.  You don't know the
24  original source of this claim that Mr. Maysonet
25  went by a nickname of King Leo, right?

Page 226

1      MS. ROSEN: Objection, argumentative.
2      MR. ENQUIST: Join.
3      THE WITNESS: The only claim that I
4  know is there is a picture with a nickname
5  that Tony was looking for.  He had a picture
6  of it.  The picture matched up to a picture
7  that we had during our investigation.
8      BY MS. BONJEAN:
9  Q.  Okay.  And you don't know the source of
10  the information on that card that Tony retrieved,
11  correct?
12 A.  I wouldn't know who issued that card or
13  who completed that card.
14 Q.  All right.  And you have an independent
15  recollection of that card as you sit here today?
16 A.  Yes.
17 Q.  Incapable of remembering all the times
18  you've been sued, but you remember all the
19  information on that card?
20     MS. ROSEN: Objection, argumentative.
21     MR. ENQUIST: Join.
22     MR. LEINENWEBER: Also misstates the
23  witness' testimony.
24     MS. SPIVY: Join.
25     THE WITNESS: Again, I remember the

Page 227

1  card.
2      BY MS. BONJEAN:
3  Q.  Okay.  What other information was on
4  the card?
5  A.  The card had his name, a description.
6  Q.  What was the description?
7  A.  I don't know.
8  Q.  Okay.  What were his other nicknames?
9  Did he have any other nicknames?
10 A.  I don't recall.
11 Q.  What else do you recall specifically
12  about the information on the card that you said
13  you remember?
14     MS. ROSEN: Objection, form,
15  argumentative.
16     THE WITNESS: I do remember it had a
17  name, an address, a birth date, a
18  description, where the individual frequents
19  and what organization that he was affiliated
20  with.
21     BY MS. BONJEAN:
22 Q.  But that's all the cards; they all have
23  that information, right?  That's the whole purpose
24  of the index card, correct?  Who they hung out
25  with, right?

Page 228

1  A.  Okay.
2  Q.  Nicknames, correct?
3  A.  Okay.
4  Q.  Cars they drove, right?
5  A.  I agree.
6  Q.  Okay.  Again, I understand that the
7  index cards contained that type of information.
8  What I'm asking is, what do you remember
9  specifically about those factors or identifiers as
10  it relates to Mr. Maysonet's card?
11 A.  Everything that you asked me about.
12  His name, his address --
13 Q.  Okay.  So what was the name on the
14  card?
15 A.  It had Jose Maysonet on it.
16 Q.  So you don't remember the actual
17  information on the card, you remember the
18  categories of information, right?
19 A.  I think you're cutting me off here,
20  ma'am.  You're not letting me explain.
21 Q.  I think I understood what you said.  I
22  would just like you to answer my question, if you
23  don't mind.  We could get out of here quicker.
24 A.  It had his name, his birth date, where
25  he lived, where he frequents, what affiliation he

Maysonet v.
Guevara

Video Deposition

Page 229

1  had.
2  Q.  Okay.  And where did he frequent?
3  A.  Well, at the time I remember --
4  Q.  Sir, I'm going to ask you, please, not
5  to look at reports.  I'm going to ask you --
6  because that's not the index card, is it?
7      MS. ROSEN: This is harassing and
8  argumentative.
9      MS. BONJEAN: It's not.
10     MR. ENQUIST: It is.
11     MS. ROSEN: It is.  You're stepping
12  over his answer, you're interrupting him --
13     MS. BONJEAN: Because I'm trying to
14  preserve the integrity of the question and
15  the answer, and I prefer him not leafing
16  through a report to try to glean information
17  that he's going to make up.
18     MS. ROSEN: I'm sorry, that was
19  incredibly offensive, incredibly offensive,
20  that you just right now are accusing a
21  witness of making things up on the record.
22  Okay?
23     MS. BONJEAN: Yeah.  Well, I'm going to
24  show some restraint, but those are some
25  reasonable inferences to make, okay?

Page 230

1      MR. LEINENWEBER: Just so we're clear,
2  the report you're worried about him reviewing
3  is the one you just handed him as Exhibit 2
4  and told him to review, right?
5      MS. BONJEAN: No, it's not.
6      MR. LEINENWEBER: It's not?
7      MS. BONJEAN: No.
8      MS. ROSEN: Isn't that what's sitting
9  in front of him?
10     MS. BONJEAN: I didn't ask him to thumb
11  through it with respect to every question
12  that I intend to ask.  I as a courtesy gave
13  it to him to alert him and ask him to look
14  through it when I asked him to look through
15  it.  He's talking about index cards.  Unless
16  the index card is in there, I don't want him
17  looking at it right now.
18     MR. LEINENWEBER: He asked you several
19  times if he could review the report.
20     MS. BONJEAN: And I said yes, several
21  times.
22     MR. LEINENWEBER: Absolutely.  So now
23  you don't get to be upset that he maybe has
24  information from the report.
25     MS. BONJEAN: I'm not upset.  I don't

Page 231

1  understand how looking at a report --
2      MR. LEINENWEBER: It seems as though
3  you are.
4      MS. BONJEAN: No, I'm not upset.  I
5  don't understand why looking at a report that
6  doesn't contain the name index is going to
7  help him remember the information on the
8  index card.
9      MR. LEINENWEBER: Okay, that's a fair
10  point, but I don't --
11     MS. BONJEAN: That's the point I was
12  making.
13     BY MS. BONJEAN:
14  Q.  We're talking about the index card that
15  Bongiorno went and got.  Do you remember the line
16  of questioning?
17  A.  I do.
18  Q.  Okay.  So I would ask that you turn
19  that report -- unless it's in there, I'm going to
20  ask you that you just put it aside for a second,
21  okay?
22  A.  It's in there.
23  Q.  The card is in there?
24  A.  The card is not in there.  The
25  information is in there.

Page 232

1  Q.  Okay.  And where is the information?
2  A.  May I look at it now?
3  Q.  Well, where is the information from the
4  card specifically?  Sure, point me to it.
5  A.  9605, last paragraph.  That's the
6  information that I obtained off -- that Tony and I
7  obtained off the contact card that was on file at
8  the gang crimes office.
9  Q.  Okay, right.  But you already had
10  Mr. Maysonet in custody at that point; you really
11  didn't need the card any more, did you?
12     MS. ROSEN: Objection, argumentative.
13     MR. ENQUIST: Join.
14     MS. ROSEN: The question was, where was
15  the information recorded in the report.  And
16  you don't like that he tells you where he
17  recorded the information off of the card, and
18  now you're like, well, that was after you
19  arrested him.
20     BY MS. BONJEAN:
21  Q.  But where does it say that you got this
22  information from the index card?
23  A.  May I read it to you?
24  Q.  Just point me to where you said you got
25  the information from the index card?

Page 233

1    MS. ROSEN: That was not your question.
2    BY MS. BONJEAN:
3  Q.  It was my original question.  Point to
4  me in the report where the information from the
5  index card can be found?
6    MS. ROSEN: And that's what he pointed
7  to.  Now you're asking him, where does it say
8  that this information comes from.  That's a
9  different question.
10    MS. BONJEAN: Okay.  Well, that's the
11  question that I would like to ask.
12    MS. ROSEN: Okay.  Well, then ask that
13  question.
14    BY MS. BONJEAN:
15  Q.  Where does it say that this information
16  came from the card?
17  A.  The information that was obtained, Tony
18  Bongiorno, my partner, gathered at the gang crimes
19  north unit at Western and Belmont.
20  Q.  Okay.  Does this information tell us
21  where his hangout spots were that you said was on
22  the index card?
23  A.  Second paragraph.
24  Q.  Go ahead.  You can read it.
25  A.  "King Leo was known to the reporting

Page 234

1  detective as Jose Maysonet, that frequents the
2  area of Spaulding Avenue and Beach Avenue, and was
3  known to reside at 3202 North Homan Avenue."
4  Q.  Okay.  And this information, you're
5  saying, came directly from the index card, is that
6  right?
7  A.  Yes.
8  Q.  And did you prepare this report?
9  A.  I did.
10  Q.  Okay.  So now you remember -- it wasn't
11  just Bongiorno, you actually remember seeing the
12  index card and putting that information into your
13  report, is that right?
14  A.  We both did, yes.
15  Q.  Did you write that paragraph or did he?
16  A.  No, I did.  I typed up this report.
17  Q.  Okay.  So you were looking at the card
18  that you said you pulled the information from to
19  put in here, right?
20  A.  Yes.
21  Q.  Yes?  And you didn't make a Xerox copy
22  of the card?
23    MS. ROSEN: Asked and answered.
24    THE WITNESS: I did not.
25

Page 235

1    BY MS. BONJEAN:
2  Q.  Okay.  You didn't do anything to
3  preserve what the card showed for the purposes of
4  this investigative file, right?
5  A.  I did not.
6  Q.  You didn't hand over this card with
7  this information to the prosecutor's office,
8  right?
9  A.  I did not.
10  Q.  You're not aware that Bongiorno did
11  either, correct?
12  A.  Not in my presence.
13  Q.  Okay.  So the information from which
14  you prepared this report, you never actually
15  produced to the Cook County State's Attorneys,
16  correct?
17    MS. ROSEN: Objection, foundation,
18  calls for speculation.
19    MR. ENQUIST: Join.
20    THE WITNESS: I did not produce it.
21    BY MS. BONJEAN:
22  Q.  And as far as you know, it was never
23  produced, right?
24    MS. ROSEN: Objection, foundation,
25  calls for speculation.

Page 236

1    MR. LEINENWEBER: Also vague.
2    THE WITNESS: I don't know if it was or
3  not ma'am.  I'm sorry.
4    BY MS. BONJEAN:
5  Q.  And if that card didn't actually
6  reflect a nickname of King Leo, would you agree
7  that that might be information that Mr. Maysonet's
8  attorney, if he had a competent attorney, would
9  want to know?
10    MS. ROSEN: Objection, calls for
11  speculation.
12    MR. ENQUIST: Join.
13    MR. LEINENWEBER: Also incomplete
14  hypothetical.
15    THE WITNESS: I can't answer that.
16    BY MS. BONJEAN:
17  Q.  But you didn't think it was important
18  to make sure that that card was made part of the
19  investigative file, right?
20  A.  That's correct.
21  Q.  All right.  Okay.  You can put that
22  aside.  Thank you.
23  A.  Okay.
24  Q.  So after you've had these conversations
25  with Mr. Maysonet at Area 5 and you have received

Page 237

1  approval from felony review to charge him, tell me
2  what happened next with respect to Mr. Maysonet?
3  A.  He was taken down to the lockup.
4  Q.  Okay.  And anything else?
5  A.  I don't know what they do in the
6  lockup.
7  Q.  And did you see Mr. Maysonet again
8  after you brought him to the lockup?
9      MS. ROSEN: Ever?
10     MS. BONJEAN: That day, before he was
11  transported to the County.
12     THE WITNESS: I did not.
13     BY MS. BONJEAN:
14  Q.  Did Sergeant Mingey or any sergeant ask
15  you whether they could speak to Mr. Maysonet?
16  A.  I don't recall if they did or not.
17  Q.  You have no recollection, though, of
18  having a conversation with Sergeant Mingey about
19  interviewing Mr. Maysonet, right?
20  A.  Sergeant Mingey is my supervisor.  All
21  the supervisors are responsible for everything and
22  everybody that's on that floor.
23  Q.  So he would not have to get your
24  permission to speak to Mr. Maysonet, right,
25  correct?

Page 238

1  A.  That's correct.
2  Q.  So to the best of your understanding,
3  after you let Mr. Maysonet know that he was being
4  charged, you sent him off to the lockup and you
5  didn't see him again, is that correct, until maybe
6  months later, a month later?
7  A.  Yes.
8  Q.  And you don't know whether or not
9  Mr. Maysonet had any conversations with any other
10  individuals, detectives, sergeants, et cetera, in
11  Area 5 on July 15, 1990, right?
12  A.  I don't recall if he did or not.
13  Q.  And as you sit here today you don't
14  know whether he did or did not, is that right?
15  A.  You're right.
16  Q.  Okay.  So what do you recall next as it
17  relates to Mr. Maysonet?
18  A.  I recall seeing him on the street at
19  26th and California.
20  Q.  You recall seeing him on the street on
21  August 22, 1990?
22  A.  I'm not sure of the dates.  If I could
23  look at my report, I could tell you.
24  Q.  So you arrested Mr. Maysonet on
25  August 22, 1990, okay?  And what were the

Page 239

1  circumstances under which you encountered
2  Mr. Maysonet on the date that you arrested him?
3  A.  I saw him on the street as I was going
4  into 26th and California, criminal courts
5  building.
6  Q.  Okay.  And what time was it?
7  A.  I'm not sure.  It was in the morning.
8  Q.  Okay.  Were you going into 26th Street
9  for a particular court appearance?
10  A.  I must have.  That's the only reason I
11  would be there.
12  Q.  Do you know where you were going?
13  A.  No.
14  Q.  Is it possible you were going to room
15  101?
16     MS. ROSEN: Objection, calls for
17  speculation.
18     THE WITNESS: I wouldn't know.  I don't
19  recall where I was going that day.
20     BY MS. BONJEAN:
21  Q.  It's possible, though, you were going
22  to room 101, right?
23  A.  No, I wouldn't be going to the chief
24  judge's chambers.
25  Q.  You wouldn't be going to branch 66?

Page 240

1  A.  I thought that was 100.  I may be
2  wrong.
3  Q.  Is it possible you were going to branch
4  66?
5     MS. ROSEN: Objection, calls for
6  speculation.
7     THE WITNESS: I don't know.
8     BY MS. BONJEAN:
9  Q.  So it is possible?
10    MS. ROSEN: Objection, form.
11    THE WITNESS: It's possible, but I
12  don't know why I was there.
13    BY MS. BONJEAN:
14  Q.  But if I, for instance, got the court
15  sheets for branch 66 that day and looked at the
16  homicide cases or the violent crime cases, it's
17  possible that one of those cases could have been
18  your case, right?
19    MS. ROSEN: And it's possible they
20  couldn't have been.  What does that mean?
21  Objection, form.
22    THE WITNESS: I don't recall why I was
23  there.
24    BY MS. BONJEAN:
25  Q.  All right.  And you would have been

Page 241

1  going there in the morning for a court appearance,
2  though, right?
3  A.  Yes.
4  Q.  And you don't know whether it was in
5  one of the courtrooms or branch 66; you have no
6  idea, right?
7      MS. ROSEN: Objection, asked and
8  answered.
9      MR. ENQUIST: Join.
10  THE WITNESS: I don't recall why I was
11  there.
12     BY MS. BONJEAN:
13  Q.  Well, you weren't on a social visit,
14  were you?
15     MS. ROSEN: Objection, asked and
16  answered.
17     THE WITNESS: I don't know why I was
18  there.
19     BY MS. BONJEAN:
20  Q.  Where did you see Mr. Maysonet when you
21  first saw him?
22  A.  On the street.
23  Q.  On what street?
24  A.  California Avenue.
25  Q.  Okay.  And what was he doing?

Page 242

1  A.  He was walking eastbound.
2  Q.  He was what?
3  A.  Walking eastbound.
4  Q.  And who was he with?
5  A.  Himself.
6  Q.  And what was he doing, just walking?
7  A.  He was walking.
8  Q.  Was he walking away from the court
9  building?
10  A.  Yes, ma'am.
11  Q.  Okay.  And what did you do when you saw
12  him walking eastbound away from 26th and
13  California?
14  A.  I was surprised to see him.
15  Q.  And why were you surprised to see him?
16  A.  Because I thought he was still
17  incarcerated for the triple aggravated battery.
18  Q.  Well, you understand the concept of
19  bond, right?  People make bond, make bail?
20  A.  I do.
21  Q.  All right.  That just seemed improbable
22  that he would have been able to make bail or why
23  was it such a surprise?
24     MS. ROSEN: Objection, form.
25     THE WITNESS: My experience, if you

Page 243

1  allegedly shoot three people, you have a high
2  bond.  Most people can't post that bond.
3      BY MS. BONJEAN:
4  Q.  Okay.  So you were surprised because
5  you thought he probably had a high bond and were
6  surprised to find that he had made the bond, is
7  that right?
8      MS. ROSEN: Objection, asked and
9  answered.
10     BY MS. BONJEAN:
11  Q.  Is that a yes?
12  A.  That's a yes.
13  Q.  Okay.  So what did you do, then, when
14  you saw him?
15  A.  At that time I approached him, told him
16  who I was, showed him my badge and asked him if he
17  would come back to Area 5 with me relative to
18  another shooting.
19  Q.  And why did you want him to come back
20  to Area 5 with you relative to another shooting?
21  A.  I was privy to conversations regarding
22  the double murder and I thought that it would
23  further the investigation.
24  Q.  So you weren't assigned to the Wiley
25  brothers' murders on August 26, 1990, right?

Page 244

1  A.  Correct.
2  Q.  And you testified that you had
3  information about the Wiley brothers' murders, is
4  that right?
5  A.  Yes.
6  Q.  And how did you get this information?
7  A.  As I just said, I was part of some
8  conversations that were taking place at Area 5
9  violent crimes.
10  Q.  Okay.  So let's talk about these
11  conversations that you heard.  What's the first
12  conversation that you heard relative to the Wiley
13  brothers' murders at Area 5?
14  A.  I'm not sure what that first
15  conversation was.
16  Q.  Who was part of the conversation?
17  A.  Sergeant Mingey, I and other detectives
18  that were there.
19  Q.  You, Sergeant Mingey, anybody else that
20  you recall?
21  A.  No.
22  Q.  Okay.  And when did this conversation
23  take place?
24  A.  At the beginning of our tour of duty.
25  Q.  Okay.  And do you know where, what time

Page 245

1   frame it was?  Was it shortly after the Wiley
2   brothers' murders or was it --
3   A.   I don't.  I can't recall.
4   Q.   Okay.  Relative to your arrest of
5   Mr. Maysonet, when was this conversation?
6   A.   I don't recall.
7   Q.   So you don't know now whether it was
8   before or after you arrested him on July 15, 1990?
9   A.   Oh, the conversation that I was part of
10  with Sergeant Mingey and other detectives took
11  place at Area 5 before I encountered him on the
12  street.
13  Q.   Right.  Okay.
14  A.   What date, I couldn't tell you when it
15  was.
16  Q.   Okay.  But this was after your arrest
17  of him on July 15, 1990?
18       MS. ROSEN: Didn't we already establish
19  this an hour ago?
20       MS. BONJEAN: No.
21       THE WITNESS: This conversation was
22  after my arrest for the three shootings, the
23  aggravated batteries.
24       BY MS. BONJEAN:
25  Q.   Okay.  So if the arrest of Mr. Maysonet

Page 246

1   was on July 15, 1990 and then you stopped him or
2   saw him on street on August 22, 1990, are you able
3   to tell us between those dates when you first
4   heard Sergeant Mingey talking about the Wiley
5   brothers' murders?
6   A.   I couldn't tell you when it was.
7   Q.   Okay.  Where were you?
8   A.   During these conversations?
9   Q.   Yeah.  This first conversation that you
10  referenced?
11  A.   On the second floor of Area 5.
12  Q.   Okay.  It was you and Sergeant Mingey,
13  you don't know who else was there.  Do you know
14  where exactly you were on the second floor?
15  A.   No.
16  Q.   All right.  And what did Sergeant
17  Mingey convey to you during this conversation?
18  A.   At that time I learned that a similar
19  weapon was used.  I also learned --
20  Q.   I'm sorry, you learned what?
21  A.   That a similar type of weapon was used,
22  9 millimeter, in the triple shooting, as well as
23  the double murder.
24  Q.   Okay.
25  A.   The 9 millimeter was used in both

Page 247

1   incidents.
2   Q.   Okay.  So you learned at that first
3   time that the 9 millimeter weapon was used both in
4   the ag bat and in the double murder, right?
5   A.   Wrong.
6   Q.   Okay.  What did you learn?
7   A.   I learned that a 9 millimeter was
8   learned in both incidents.
9   Q.   Okay.  What else did you learn?
10  A.   There was a conversation that took
11  place in the County Jail with Mingey and Montilla.
12  Q.   All right.  And what did you know about
13  the conversation that took place with Mingey
14  and Montilla and Mr. Maysonet?
15  A.   That they said -- related that he was
16  there, had knowledge and wanted a deal cut.
17  Q.   A deal cut for what?
18  A.   For his part in the double murder.
19  Q.   Okay.  Anything else that you learned
20  during your conversations with Sergeant Mingey?
21  A.   Basically there could have been more or
22  less.  I don't know.  I don't recall.
23  Q.   Okay.  So what you do recall is
24  learning that the Wiley brothers' murders involved
25  a 9 millimeter?

Page 248

1   A.   Yes.
2   Q.   And that Mr. Maysonet's attempt
3   involved a 9 millimeter, right?
4   A.   Yeah.  The three shootings involved a 9
5   millimeter.
6   Q.   Right.  So you learned that there was a
7   9 millimeter used in both offenses, right?
8   A.   Yes.
9   Q.   You had no knowledge that it was the
10  same 9 millimeter; you just knew that a 9
11  millimeter weapon had been used in both incidents,
12  correct?
13  A.   I didn't know if that was the same
14  weapon or not.
15  Q.   Okay.  And you also knew that when you
16  arrested Mr. Maysonet on August 22 or spoke to him
17  on August 22 on the street, that he had had a
18  conversation with Sergeant Mingey and Sergeant
19  Montilla at Cook County Jail, right?
20  A.   Detective Montilla.
21  Q.   Detective Montilla, correct?
22  A.   Yes.
23  Q.   And what else did you know about the
24  conversation that had taken place other than
25  Mr. Maysonet saying that he had knowledge, he was

Maysonet v.
Guevara

Video Deposition

Page 249

1  there and wanted to cut a deal?
2  A.  I don't recall what else.
3  Q.  But that's what you recall as you sit
4  here now, correct?
5  A.  Yes.
6  Q.  And was that Cook County Jail meeting
7  conveyed to you in that first time you spoke to
8  Sergeant Mingey or was it at a subsequent time
9  that you spoke to him?
10  A.  I believe it wasn't the first time that
11  we talked.
12  Q.  How many conversations in total did you
13  have with Sergeant Mingey between July 15, 1990
14  and August 22, 1990?
15     MR. ENQUIST: About this?
16     MS. BONJEAN: Yeah, about the Wiley
17  brothers' murders.
18     THE WITNESS: I don't know.
19     BY MS. BONJEAN:
20  Q.  Was it more than one?
21  A.  I don't know, ma'am.
22  Q.  So it could have been one?
23  A.  Yes.
24  Q.  I'm trying to understand everything you
25  knew, to the best of your recollection, about

Page 250

1  Maysonet's involvement in the Wiley brothers'
2  murders before you arrested him or asked him to
3  come to Area 5 on August 22, 1990, okay?
4  A.  Yes, ma'am.
5  Q.  And correct me if I'm wrong.  You
6  mentioned the weapon connection that you knew
7  about, right?
8  A.  Didn't know if it was a connection.  I
9  knew that in two incidents, a 9 millimeter was
10  used.
11  Q.  Okay.  And also just that you had heard
12  from Sergeant Mingey that Maysonet had
13  communicated to him and Montilla at Cook County
14  Jail that he was present for the Wiley brothers'
15  murders and wanted to cut a deal and was somehow
16  involved, is that right?
17  A.  Yes.
18  Q.  Anything else?
19  A.  Not that I can recall right now.
20  Q.  And based on that information, you
21  asked Mr. Maysonet to accompany you to Area 5?
22  A.  I did.
23  Q.  And he consented?
24  A.  He did.
25  Q.  He spoke to you in English?

Page 251

1  A.  He did.
2  Q.  Was not with any of his family members,
3  right?
4  A.  He was by himself.
5  Q.  And did Mr. Maysonet tell you that he
6  had to be in court in front of Judge Morgan on his
7  attempt murder case that you had actually been
8  involved in investigating?
9  A.  He did not.
10  Q.  Did he explain to you why he was at
11  26th Street if he wasn't going to court?
12  A.  Did not tell me why he was there at
13  all.
14  Q.  Did you ask him, why are you at 26th
15  Street?
16  A.  No.
17  Q.  Did you deduce that maybe he was there
18  to go to court for a case that you had been
19  involved in investigating?
20  A.  Saw him on the street, ma'am.  Did not
21  see him in the court building.
22  Q.  And did he tell you that he had already
23  been in court at branch 66?
24  A.  He did not.
25  Q.  Did you ask?

Page 252

1  A.  There was no reason to.
2  Q.  Would your prior testimony be accurate
3  about what time it was that you saw Mr. Maysonet
4  on the street?
5     MS. ROSEN: Objection, form,
6  foundation.
7     THE WITNESS: It could reflect what
8  time I saw him.
9     BY MS. BONJEAN:
10  Q.  Okay.  So you wouldn't have lied under
11  oath, right?
12  A.  No.
13  Q.  So whatever you testified to is
14  accurate and truthful, right?
15     MS. ROSEN: Objection, form,
16  foundation.  There is more than two
17  alternatives to that.  So foundation.
18     MR. ENQUIST: You can answer.
19     THE WITNESS: I would have to look at
20  my report to reflect what time I encountered
21  him.
22     BY MS. BONJEAN:
23  Q.  I'm not asking you to tell me what time
24  you encountered him right now, because I recognize
25  that that's many years ago.  But if you testified

Page 253

1  to what time you encountered him, you have no
2  reason to believe that that wouldn't have been
3  accurate?
4  A.  If I testified all those years ago, it
5  would be accurate.
6  Q.  So after he consented to go back to
7  Area 5 with you, did you take him back to Area 5?
8  A.  No.
9  Q.  Why not?
10  A.  Because I had my private car and I
11  provided transportation for him.
12  Q.  He didn't say, I can get there myself?
13  A.  No.
14  Q.  Did you ask him, do you want to meet me
15  over there?
16  A.  No.
17  Q.  Why not?
18  A.  No reason to.  He said that he would go
19  with me to Area 5 in this matter, in this
20  investigation.
21  Q.  But he wasn't going with you; he was
22  going in a marked police car not with you, right?
23  A.  Well, eventually.  He was transported.
24  Q.  He wasn't going with you to Area 5,
25  correct?

Page 254

1  A.  Not physically.
2  Q.  No.  You were driving your car there,
3  correct?
4  A.  Yes.
5  Q.  And he wasn't coming in your car with
6  you, right?
7  A.  Correct.
8  Q.  And according to you, you arranged for
9  his transportation there?
10  A.  I did.
11  Q.  And he never said, I'll just meet you
12  there, right?
13  A.  Correct.
14  Q.  Okay.  And how did you arrange for his
15  transportation?
16  A.  By telephone.
17  Q.  Did you have a cell phone?
18  A.  No.
19  Q.  Okay.  What telephone did you use?
20  A.  The one in the police room that was on
21  the third floor of that building.
22  Q.  All right.  And Mr. Maysonet
23  accompanied you there, as well?
24  A.  Yes.
25  Q.  So you both went into 26th Street,

Page 255

1  correct?
2  A.  Yes.
3  Q.  He went through the security, right?
4  A.  Security then was not as it is today.
5  Q.  Fair enough.  And up to the third
6  floor.  Again, he was not with any family members,
7  is that right?
8  A.  He was by himself, ma'am.
9  Q.  And you brought him up there and
10  arranged for a police car to come pick him up,
11  correct?
12  A.  A police vehicle.  I don't know if it
13  was a car or if it was a squadrol.
14  Q.  All right.  And again, this was all
15  just as a convenience for Mr. Maysonet so that he
16  would have transportation there?
17  A.  Yes.
18  Q.  And then did you wait with him until
19  the squadrol showed up or the police car showed
20  up?
21  A.  Yes.
22  Q.  Okay.  Why did you wait with him?
23  A.  There was nobody else that could be
24  with him.  It was the court sergeant and myself in
25  the room.  Other detectives and police officers

Page 256

1  were coming by signing the court logs and they
2  were going to do what they --
3  Q.  Why did anyone need to be with him at
4  all?
5  A.  I wanted to talk to him.
6  Q.  Okay.  So what did you talk about?
7  A.  Nothing at that time while we were
8  waiting for the squadrol.
9  Q.  You said you wanted to talk to him.
10  What did you want to talk to him about?
11  A.  I wanted to talk to him about a double
12  murder.
13  Q.  Okay.  My question was why did you wait
14  with him.  You said you wanted to talk to him.
15  A.  No.  I said I waited with him because
16  there was only a court sergeant there, other
17  people that were detectives or patrolmen in and
18  out of that room.  I asked him if he would assist
19  in coming in to Area 5.
20  Q.  Right.  I thought you asked him that on
21  the street?
22  A.  I did.
23  Q.  Okay.  So you asked him that again in
24  the third floor police office?
25  A.  No.  You asked me a question, why I was

Maysonet v.
Guevara

Video Deposition

Page 257

1   waiting with him.  I was waiting for his
2   transportation.
3   Q.  Okay.  Why were you waiting with him
4   for his transportation?
5   A.  Because I wanted to make sure that he
6   went back to Area 5.
7   Q.  Okay.  And why did you want to make
8   sure?
9   A.  Because I asked him if he would
10  voluntarily come with me.
11  Q.  And did you think there was a chance he
12  might not wait for that transportation if you
13  left?
14  A.  I thought there could have been a
15  better than average chance he would have left.
16  Q.  And why would that be?
17  A.  Just had that gut feeling.
18  Q.  And why?
19  A.  I don't know.
20  Q.  But according to you he consented, so
21  why all of a sudden do you think he's going to not
22  cooperate and just leave?
23  A.  I was there.  I wasn't going anywhere.
24  I was waiting with him for transportation.
25  Q.  So you were waiting next to him for

Page 258

1   transportation.  You didn't trust that he would
2   stick around for the transportation if you left,
3   right?
4   A.  The thought occurred to me.
5   Q.  And is it your testimony that he was
6   free to go, though, at that point?
7   A.  He was there voluntarily.
8   Q.  Not my question.  The question was, was
9   he free to go if he wanted to go?
10  A.  I don't know.  The question never came
11  up.
12  Q.  As you sit here today based on the
13  information that you have, was he free to go if he
14  said I don't want to go back to Area 5 with you?
15  A.  The question never came up, so I didn't
16  have an opinion and I still don't.
17  Q.  Well, you didn't let him get there on
18  his own, correct?
19  A.  Yes.
20  Q.  Okay.  You accompanied him to the
21  police office in 26th Street, right?
22  A.  Yes.
23  Q.  You arranged for his transportation,
24  correct?
25  A.  Yes.

Page 259

1   Q.  You stayed with him until his
2   transportation arrived, right?
3   A.  Yes.
4   Q.  You said that you wanted to make sure
5   that he went to Area 5, correct?
6   A.  Yes.
7   Q.  Okay.  But you are not willing to say
8   that he was free to leave or he was not free to
9   leave, right?
10      MS. ROSEN: Objection, form, asked and
11  answered.
12      THE WITNESS: As I told you, it never
13  crossed my mind.  It was never an issue.
14      BY MS. BONJEAN:
15  Q.  Well, it had to have crossed your mind
16  at some point, correct?
17      MS. ROSEN: Objection, argumentative.
18      THE WITNESS: It was never an issue.
19      BY MS. BONJEAN:
20  Q.  Well, it was an issue, because
21  Mr. Maysonet filed a motion to quash arrest and
22  suppress evidence.
23  Do you remember that?
24      MS. ROSEN: Objection, form.
25      THE WITNESS: It was never an issue

Page 260

1   with me.
2       BY MS. BONJEAN:
3   Q.  You testified at that hearing on the
4   motion, right?
5   A.  I remember testifying.
6   Q.  Okay.  So it was an issue for somebody,
7   would you agree with that?
8       MS. ROSEN: Objection, argumentative,
9   asked and answered.
10      MR. ENQUIST: Join.
11      THE WITNESS: I would assume.
12      BY MS. BONJEAN:
13  Q.  Okay.  And did you have probable cause
14  to arrest him at that point?  I'm talking about on
15  the street.
16  A.  Again, I asked him if he would assist
17  in the investigation voluntarily, and he said yes.
18  Q.  I know.  I understand what your
19  testimony is.  My question is different.
20  Did you have probable cause to arrest
21  him when you encountered him on the street on
22  August 22, 1990?
23  A.  I'm not sure if I did or not at that
24  time.
25  Q.  How long did you wait with Mr. Maysonet

Page 261

1  in the office on the third floor of 26th Street
2  before the transportation arrived?
3  A.  I'm not sure.
4  Q.  And did you let other Area 5 detectives
5  know that you had him with you?
6  A.  I made a phone call on the police
7  phone.
8  Q.  And who did you call?
9  A.  Telling them that I'll be in shortly
10  and, I forgot if it was a patrol car or a
11  squadrol, was bringing in somebody for me, and I
12  gave the name.
13  Q.  Okay.  And did the transportation
14  eventually arrive?
15  A.  Yes, ma'am.
16  Q.  Okay.  And then what happened?
17  A.  They drove him back to Area 5, drove
18  him to area 5.
19  Q.  And did you eventually go to Area 5,
20  then?
21  A.  Yes.
22  Q.  And what happened when you got there?
23  A.  When I got there, I wanted to know
24  where he was.  He was in a room, and then I left
25  the room.

Page 262

1  Q.  Did you see him in the room?
2  A.  Yes, I did.
3  Q.  Did you speak to him?
4  A.  Yes, I did.
5  Q.  And what did you say to him and what
6  did he say to you?
7  A.  Do you need a bathroom, do you need
8  anything at that time, do you want to make a phone
9  call, are you hungry.
10  Q.  Just pleasant chitchat?
11  A.  Basically at that time that's what I
12  said to him.
13  Q.  Okay.  Were you with anyone when you
14  said that to him?
15  A.  I don't know if I was or not.
16  Q.  And did he say anything in response?
17  A.  He said he was good.
18  Q.  He said he didn't want to talk to
19  anybody?
20  A.  Not at that time, not to me.
21  Q.  He didn't tell you he wanted to talk to
22  his sister or his girlfriend, right?
23  A.  Never.
24  Q.  And spoke to you in English, correct?
25  A.  Yes.

Page 263

1  Q.  You were able to understand him
2  perfectly, right?
3  A.  Yes.
4  Q.  He didn't speak with any type of accent
5  that prohibited you from understanding him, right?
6  A.  I understood him.
7  Q.  Never had any difficulties
8  understanding him, correct?
9  A.  Yes, ma'am.
10  Q.  And he was just cool hanging out at
11  Area 5, right?
12  A.  Seemed like he was comfortable.
13  Q.  Is that something that happens a lot,
14  people are just comfortable hanging out at Area 5
15  waiting to be questioned on double murders?
16      MS. ROSEN: Objection, foundation,
17  calls for speculation.
18      THE WITNESS: I don't know what his
19  mind frame was while he was waiting.  I asked
20  him if he needed anything or wanted to make a
21  phone call or go to the bathroom or if he was
22  hungry.  He told me in English he was good,
23  and I left the room.
24      BY MS. BONJEAN:
25  Q.  Was he free to leave at that point?

Page 264

1  That point being when you checked in on his
2  wellbeing and asked him whether he wanted to go to
3  the bathroom, something to eat, a steak dinner,
4  whatever you were asking him?
5      MS. ROSEN: Objection to the editorial
6  sarcastic commentary embedded within that
7  question.
8      THE WITNESS: He was there voluntarily
9  to assist in this investigation.
10      BY MS. BONJEAN:
11  Q.  Was he free to leave?
12  A.  I don't know if he was or not.
13  Q.  Did you have probable cause to arrest
14  him when he was in your interrogation room or
15  interview room?
16  A.  There was a lot of questions that
17  needed to be answered.
18  Q.  So is that a yes?
19  A.  I don't know.
20  Q.  All right.  So you left out of the room
21  after he said he was peachy keen and what happened
22  next?
23      MR. ENQUIST: Objection to the form,
24  argumentative.
25      THE WITNESS: That's all the

Page 265

1  conversation I had with him.
2      BY MS. BONJEAN:
3  Q.  That's the only conversation you had
4  with him?
5  A.  Until he -- until the State's Attorney
6  that was reviewing the case wanted to take him for
7  a ride of the murder scene.
8  Q.  So you did not question Mr. Maysonet
9  about the Wiley brothers' murders, is that right?
10  A.  Not that I recall.
11  Q.  And you asked him no questions about
12  his involvement in the Wiley brothers' murders, is
13  that right?
14  A.  I don't recall asking him about it.
15  Q.  And you didn't confront him with any
16  information you had about prior statements he had
17  allegedly made to Sergeant Mingey or Detective
18  Montilla about his knowledge or involvement in the
19  Wiley brothers' murders, is that right?
20  A.  That's correct.
21  Q.  Your conversation consisted of just
22  some pleasantries and nothing more, is that right?
23  A.  We had the conversation about his
24  wellbeing being in the police station.
25  Q.  Right.

Page 266

1  A.  I left the room.  That's all I did
2  until I was asked to take him for a ride.
3  Q.  Okay.  Who asked you to take him for a
4  ride?
5  A.  State's Attorney DiFranco --
6  Q.  And -- I'm sorry, go ahead.
7  A.  -- and Detective Montilla.
8  Q.  All right.  And how were you asked to
9  go for a ride?
10  A.  Verbally.
11  Q.  And did you agree?
12  A.  Yes.
13  Q.  And how many people went on this ride?
14  A.  Detective Montilla, DiFranco, me and
15  Maysonet.
16  Q.  And why was it necessary for two
17  detectives and a State's Attorney to go on the
18  ride?
19      MS. ROSEN: Objection, foundation.
20      THE WITNESS: DiFranco reviewed all
21  submitted facts that were given to him by
22  detectives and DiFranco wanted him to show
23  him what he was talking about on the street.
24      BY MS. BONJEAN:
25  Q.  And what submitted facts were provided

Page 267

1  to ASA DiFranco?
2      MS. ROSEN: Objection, foundation.
3      THE WITNESS: Any police reports that
4  were submitted at that time, conversations
5  with Mingey, with Montilla, any detectives
6  that had any conversation with him at that
7  point.
8      BY MS. BONJEAN:
9  Q.  And how was that information conveyed
10  to DiFranco?  I'm talking about the conversations
11  Mr. Maysonet purportedly had with Mingey and
12  Montilla?
13      MS. ROSEN: Objection, foundation.
14      MR. ENQUIST: Join.
15      THE WITNESS: I guess verbal
16  conversation.
17      BY MS. BONJEAN:
18  Q.  Have you ever seen any police report
19  GPR that memorializes these purported
20  conversations that occurred between Mingey,
21  Montilla and Mr. Maysonet?
22      MS. ROSEN: Object to the form of the
23  question.
24      THE WITNESS: I don't recall seeing.  I
25  don't know if --

Page 268

1      BY MS. BONJEAN:
2  Q.  I'm sorry?
3  A.  I don't recall.
4  Q.  You don't recall seeing them, correct?
5  A.  I don't recall looking at any reports.
6  Q.  Do you recall ever seeing any GPR's
7  that reflect this conversation with
8  Mr. Maysonet -- between Mr. Maysonet and Sergeant
9  Mingey and Montilla at the Cook County Jail?
10  A.  I don't recall if there were.
11  Q.  Your information you received just from
12  hearing conversations, is that right?
13  A.  Yes.
14  Q.  You didn't review any reports prior to
15  seeing Mr. Maysonet on the street on August 22,
16  correct?
17  A.  The only thing I saw, what was hanging
18  up on the board and verbal conversations.
19  Q.  Right.  And the stuff hanging on the
20  board, you don't remember ever seeing any GPR's
21  about the Cook County Jail visit, right?
22  A.  I don't think that any GPR's would have
23  been put up there, just supp reports or original
24  reports.
25  Q.  Did you see that information contained

Maysonet v.
Guevara

Video Deposition

Page 269

1  in any supp report prior to encountering
2  Mr. Maysonet on the street on August 22, 1990?
3  A.  I don't recall if there was or not.
4  Q.  Because when you testified earlier, you
5  testified about getting that information through a
6  conversation.  Is that what you remember?
7  A.  That's what I just said.
8  Q.  Okay.  Is that the only memory you have
9  of how you got that information?
10 A.  I remember hearing a conversation that
11 I was part of and I remember looking at reports.
12 Q.  What was contained in the reports about
13 the meeting at Cook County Jail?
14 A.  I don't recall.  Just other than the
15 conversation, the verbal conversation that I was
16 part of that Montilla and Mingey went there, they
17 were talking to him and he wanted a deal cut for
18 his participation in the murders.
19 Q.  And again, just to be clear, you saw a
20 report, you didn't see a report or you don't
21 remember seeing a report about that prior to
22 encountering Mr. Maysonet on the street?
23     MS. ROSEN: Objection, asked and
24 answered.
25     MR. ENQUIST: Join.

Page 270

1     THE WITNESS: Again, I'm talking about
2  a conversation that I was part of.
3     BY MS. BONJEAN:
4  Q.  And I'm talking about a report.
5  A.  And I said I don't recall if there was
6  one or not at that time.
7     MS. BONJEAN: All right.  I'm going to
8  hand you -- would you mark these two
9  exhibits, please?  This is all Dropbox.
10    (Whereupon, Paulnitsky
11    Deposition Exhibit No. 3 and 4
12    was marked for identification.)
13    BY MS. BONJEAN:
14 Q.  I'm handing you what has been marked as
15 Exhibit 3.  Can you look at the first page and
16 tell me if you recognize the first page at all?
17 A.  No.
18 Q.  No, you don't recognize it?
19 A.  This is the first time I saw this page.
20 Q.  Okay.  Do you recognize it, though?
21 A.  Well, it has an RD number, it has the
22 number 190.  It says it's Exhibit 3 and then it
23 says RFC-Maysonet 000001.
24 Q.  All right.  It also has some other
25 information on there, right?  It says "Assigned:

Page 271

1  P. Boyle."
2     Do you see that?
3  A.  I see Boyle, Tapkowski, Dickinson.
4  Q.  And does that mean anything to you?
5  A.  This looks like it could be a Xerox
6  copy of a file.
7  Q.  Investigative file?
8  A.  I don't know.
9  Q.  You've seen some investigative files in
10 your 20 years at Area 5, have you not?
11 A.  I have.
12 Q.  And do they look like this or do they
13 look different than this?
14 A.  My recollection, they look different.
15 Q.  Yeah?  How do they look different?
16 A.  They would have a tab that would have
17 some information on it.
18 Q.  Like what?
19 A.  Who the victims were and the location.
20 Q.  Okay.  Anything else?
21 A.  That's all that I can remember.
22 Q.  Where would the index log be that
23 contained all the reports that were part of the
24 investigative file?  Would that be inside the
25 investigative file?

Page 272

1  A.  Well, if this was the investigative
2  file that you're talking about, you would open it
3  up and it would be on the -- as you open it up, it
4  would be on the left side.
5  Q.  So it would be inside the file?
6  A.  Yes.
7  Q.  Okay.  So this doesn't look like an
8  investigative file to you, correct?
9  A.  No.  There would be two holes here
10 where they would have a clip that would keep the
11 inventory stuff in there.
12 Q.  Right.  So again, this doesn't look
13 like an investigative file to you, right?
14 A.  May I look at it?  From the outside it
15 does not to me.
16 Q.  I'm going to let you look at it, but I
17 first just want the record to be clear.  I'm
18 asking you about the outside of it, does it look
19 like it?
20 A.  Not that I remember it being.
21 Q.  Okay.  So yeah, I would like to go
22 through it with you, okay?
23 A.  Fine.
24 Q.  RFC-Maysonet number 2 through 6, these
25 are court attendance reports.

Page 273

1    Do you see that?
2 A.  May I take the clip off?
3 Q.  Sure.
4 A.  And how far?
5 Q.  2 through 6.
6 A.  Okay.
7 Q.  These are court attendance reports,
8  correct?
9 A.  Yes.
10 Q.  And what are court attendance reports?
11 A.  Where everybody in the department that
12  goes to court was required to fill this out that
13  you were in court.
14 Q.  Okay.  So these were all prepared after
15  Mr. Maysonet was already charged with the Wiley
16  brothers' murders, right?
17 A.  Yes.
18 Q.  Go to RFC-Maysonet 7.  Can you tell me
19  what that appears to be?
20 A.  I really don't know what it is other
21  than what it says here.
22 Q.  And what does it say?
23 A.  "Start of Felony Case.  Page," can't
24  read it, "of 047.  Defendant Name."  Is that
25  Christopher?  "Gossens," G-o-s-s-e-n-s.

Page 274

1 Q.  Do you know who Christopher Gossens is?
2 A.  No.
3 Q.  Do you know who Alfredo Gonzalez is?
4 A.  No.
5 Q.  Did you know who Alfredo Gonzalez was
6  back in August of 1990?
7    MS. ROSEN: Objection to form.
8    THE WITNESS: I don't know if I did or
9  not.
10    BY MS. BONJEAN:
11 Q.  Okay.  What about Justino Cruz?
12 A.  I don't recall.
13 Q.  What about Efrain Cruz, did you know
14  him?
15 A.  I don't recall.
16 Q.  Do you remember participating in the
17  arrests of any other of the other co-defendants in
18  the Wiley brothers' murder case?
19 A.  I don't think I did.
20 Q.  Okay.  Can we agree that this screen
21  that's on this RFC-Maysonet 7 has a date reflected
22  from 1995?
23    MR. ENQUIST: Just up in the date.
24    THE WITNESS: Yeah, I was just going to
25  say that.  08-10-95 on all three entries.

Page 275

1    BY MS. BONJEAN:
2 Q.  Okay.  So this looks like something
3  that existed after Mr. Maysonet was arrested on
4  August 22, 1990, right?
5 A.  I never saw this before.
6 Q.  All right.  The next couple of pages,
7  two pages, are more attendance reports prepared
8  from 1994, right?
9 A.  Yes.
10 Q.  And then pages 10 and 11 are letters
11  from the Cook County State's Attorney's office to
12  Area 5 detectives both prepared in '95.
13    Do you see that?
14 A.  I see one on page 10.  Am I going
15  beyond that?
16 Q.  Yeah, keep going.
17 A.  11.
18 Q.  All right.  12 is another screenshot of
19  something.  Do you know what that is?
20 A.  Looks like that first --
21 Q.  Do you recognize it as the clerk's
22  docket system?
23 A.  I wasn't familiar with their docket
24  system.
25 Q.  Okay, fair enough.  Next page,

Page 276

1  RFC-Maysonet 13 is another letter dated May 8,
2  1992, right?
3 A.  Yes.
4 Q.  Jack O'Malley's office to Officer
5  Halvorsen, right?
6 A.  Yes.
7 Q.  The next RFC 14 through 19 -- sorry,
8  through 20 are more court attendance reports, is
9  that fair, all of them dated in the year of 1992?
10 A.  Up to page 20, you said?
11 Q.  19 -- 20, 20.
12 A.  Yes.
13 Q.  Now, starting with RFC-Maysonet 21 to
14  23, this is a report of postmortem examination of
15  one of the victims, Torrence Wiley.
16    Do you see that?
17 A.  Yes.
18 Q.  Is this something that you would have
19  looked at in connection with the Wiley brothers'
20  murder investigation?
21 A.  I could have looked at it.
22 Q.  It would have been something that was
23  on that board?
24 A.  No.
25 Q.  Where would you have retrieved it to

Maysonet v.
Guevara

Video Deposition

---

Page 277

1  look at it?
2  A.  It would be in the office file.
3  Q.  The office file?
4  A.  Yes.
5  Q.  Is that the same as the investigative
6  file?
7  A.  It is not.
8  Q.  What's the office file?
9  A.  It's the original case reports on a
10  murder, stuff like that.
11  Q.  All right.  And where were those
12  maintained?
13  A.  That would be in a different file
14  cabinet.
15  Q.  Okay.  And what else is contained in
16  the office file?
17  A.  Important papers, documents.
18  Q.  I'm sorry?
19  A.  Documents, important documents and
20  papers.
21  Q.  Important documents and papers?
22  A.  Such as these.
23  Q.  What else, what other types of
24  documents?
25  A.  That's all I can recall.

---

Page 278

1  Q.  Supplemental police reports?
2  A.  I don't know if they would be in the
3  same thing.  Usually murders, ag bats would be put
4  in the office there.
5  Q.  What office?
6  A.  Violent crimes office.
7  Q.  I know, but when you say "office," what
8  do you mean specifically by that?
9  A.  Oh, behind where sergeant is.
10  Q.  The sergeant's office?
11  A.  Well, the sergeant's office was also
12  considered where files would be kept, yeah.
13  Q.  I see.  And it's also where the
14  lieutenant would also be sometimes, right?  Did
15  they share an office?
16  A.  Not really.  I mean, you had to walk
17  into sergeant's office to walk into the
18  lieutenant's office.
19  Q.  I see.  So in the sergeant's office
20  there was also an office file that would contain
21  reports including, for instance, the report of the
22  postmortem examination, right?
23  A.  Yes.
24  Q.  And the office file was separate and
25  apart from the investigative file, correct?

---

Page 279

1  A.  Yes.
2  Q.  And what other types of documents were
3  contained in the office file?
4      MS. ROSEN: Objection, foundation.
5      THE WITNESS: I don't know.
6      BY MS. BONJEAN:
7  Q.  How did documents get into the office
8  file?
9      MS. ROSEN: Objection, foundation.
10      BY MS. BONJEAN:
11  Q.  If you know?
12  A.  I don't know.
13  Q.  And how was the office file organized?
14      MS. ROSEN: Objection, foundation.
15      THE WITNESS: In numerical order by
16  year.
17      BY MS. BONJEAN:
18  Q.  And were you able to just go in and
19  grab an office file if you found it pertinent to
20  whatever work you were doing?
21  A.  If it wasn't contained in the
22  investigative file, I assume.
23  Q.  Okay.  And was it organized by RD
24  number or --
25  A.  Year and RD number.

---

Page 280

1  Q.  Year and RD number.
2  A.  Numerical.
3  Q.  So if you couldn't find something in
4  the investigative file, you might go into the
5  office file and see if you could find it in that
6  file, correct?
7  A.  Theoretically.
8  Q.  And did you do that sometimes?
9  A.  I don't know if I did or not.
10  Q.  Well, you just said you thought this
11  would have been in the office file?
12  A.  Yeah, because this is autopsy reports.
13  Q.  I'm sorry?
14  A.  Autopsy reports.
15  Q.  Okay.  So autopsy reports can sometimes
16  be important to investigations, right?
17  A.  Sure.
18  Q.  To find out if some theory is
19  consistent with the manner of death, right?
20  A.  Yes.
21  Q.  And if you wanted to look at a
22  postmortem examination report, you would
23  potentially be able to find that in the office
24  file within the sergeant's office, correct?
25  A.  Yes.

---

Page 281

1  Q.  Okay.  And as it relates to this case,
2  you don't know whether or not you looked at the
3  postmortem examination report or you do know?
4  A.  I don't recall if I did or not.
5  Q.  All right.  Could have, though?
6  A.  It's possible.
7  Q.  All right.  How about RFC-Maysonet 25,
8  do you see that?
9  A.  Not yet.  Yes.
10  Q.  Okay.  Toxicology report?
11  A.  Yes.
12  Q.  Do you know whether you saw this at any
13  point?
14  A.  I don't know if I did or not.
15  Q.  And is this something that you would
16  have been able to access if you wanted to, if you
17  were working on this case?
18  A.  It's a possibility.
19  Q.  And where would you find this
20  information?
21  A.  This would be right next to this
22  (indicating).
23  Q.  Next to the postmortem examination?
24  A.  Yeah.
25  Q.  In the office file?

Page 282

1  A.  Yes.
2  Q.  All right.  Moving on, RFC-Maysonet 26
3  through 28 and 29, it's the same information but
4  for Kevin Wiley.
5     Do you see that?
6  A.  Yes, ma'am.
7  Q.  I assume your answer is the same, that
8  you don't know whether you looked at these
9  materials at any point?
10  A.  Correct.
11  Q.  But it is something that you might have
12  had access to if you wanted to look at them,
13  right?
14  A.  Yes, ma'am.
15  Q.  All right.  Can you go to RFC-Maysonet
16  30?  What are these cards?  They're not cards, but
17  what does this reflect?
18  A.  Well, they have the name of Torrence
19  Wiley, homicide/murder, the RD number, the
20  homicide file number.  Then there is Kevin Wiley,
21  which basically has the same information.
22  Q.  What's a homicide file number?
23  A.  It would be -- if you bear with me, I'm
24  going to point to this first one, Torrence Wiley.
25  On the righthand upper hand corner there is the RD

Page 283

1  number.
2  Q.  Yeah.
3  A.  There is the date.
4  Q.  Correct.
5  A.  The homicide file number.
6  Q.  Right.
7  A.  The 90 would represent 1990.  Slash 293
8  would be the number of homicides in the area.
9     Then you go to the next card, which is
10  Kevin Wiley, RD number, the date, and that number
11  is 294.  So Torrence's would be 293 of the year
12  and Kevin would be 294 that year.
13  Q.  All right.  And what is the purpose of
14  a homicide file number?
15     MS. ROSEN: Objection, form.
16     THE WITNESS: I believe it was only the
17  stats in the office at that time.  You know,
18  besides the RD number, it would be homicide
19  293 for Area 5.
20  BY MS. BONJEAN:
21  Q.  Right.  Why does it say "Homicide
22  File," though?  It doesn't just say "Homicide
23  293."  It says "Homicide File," so what file is it
24  referencing?
25     MS. ROSEN: Objection, foundation.

Page 284

1     THE WITNESS: I would assume that it
2  was the office file number besides the RD
3  number.  I never understood that, because you
4  have an RD number.
5     MS. BONJEAN: Right.
6     THE WITNESS: So I really don't know.
7  I would just assume that's --
8     BY MS. BONJEAN:
9  Q.  If you could keep your finger there on
10  page 30 and look back at the first page of this
11  document that I've shown you, if you don't mind?
12  The very first page, this (indicating)?
13  A.  The cover sheet?
14  Q.  Yeah.
15  A.  Okay.
16  Q.  Do you see those numbers in the
17  righthand corner that say "90-50" and "90-51"?
18     Just do you see them?
19  A.  I see it.
20  Q.  Do you know what they reference?
21  A.  No.
22  Q.  So now if you could look at
23  RFC-Maysonet 31, this is a cause of death report.
24     Do you see that?
25  A.  Yes.

Page 285

1 Q. And it's dated May 25, 1990, which was
2 the same day that the Wiley brothers were shot.
3    Do you see that?
4 A. Yes, ma'am.
5 Q. Okay. Is this a report that you would
6 have potentially looked at in the office on the
7 homicide board?
8 A. Not on the board.
9 Q. Okay. Where would this be?
10 A. Could have been a copy, could have been
11 attached to an investigative file.
12 Q. Is this something that would have been
13 in the office file or just the investigative file?
14    MS. ROSEN: Objection, foundation.
15    THE WITNESS: Could have been both.
16    BY MS. BONJEAN:
17 Q. Okay. You can keep going. There is
18 another one for the other victim, Kevin Wiley.
19    Do you see that?
20 A. Yes, ma'am.
21 Q. Okay. You can keep going. There is a
22 report --
23    MS. ROSEN: What page are you on?
24    BY MS. BONJEAN:
25 Q. 35. There is a report that was

Page 286

1 submitted on May 1, 1992.
2    Do you see that?
3 A. Yes.
4 Q. Okay. That's almost two years after
5 Mr. Maysonet was arrested, right?
6 A. This is dated May 1, 1992.
7 Q. Right. So two years after the shooting
8 and almost -- whatever, at least 18 months after
9 Mr. Maysonet was arrested in August of 1990,
10 correct?
11 A. Yes, ma'am.
12 Q. So surely this report was not something
13 that you had access to prior to Mr. Maysonet's
14 arrest, right?
15 A. I never saw this report.
16 Q. And since it was submitted after
17 Mr. Maysonet's arrest, it's not something that you
18 would have looked at or had access to, correct?
19 A. I didn't look at it. I don't know if I
20 would have had access to it. I didn't look at it.
21 Q. It was prepared after Mr. Maysonet was
22 arrested.
23 A. I understand that, but you asked me
24 would I have access to this.
25 Q. Would you have had access to something

Page 287

1 that wasn't prepared prior to Mr. Maysonet's
2 arrest?
3 A. I misunderstood the question.
4 Q. Yeah. That's fine. Assuming that this
5 is not a falsified police report and that it
6 actually was actually submitted on May 1, 1992,
7 can we agree that it would not have been prepared
8 at the time that Mr. Maysonet was arrested?
9 A. We can.
10    MS. ROSEN: Objection, form.
11    BY MS. BONJEAN:
12 Q. Okay. And that is also true for the
13 next report that bears the Bates stamp
14 RFC-Maysonet 37 and 38?
15 A. Yes.
16 Q. And that is also actually true for the
17 report that bears RFC-Maysonet 39 through 41?
18 This is not a report that was either prepared or
19 reviewed by you prior to you arresting
20 Mr. Maysonet?
21 A. Yes.
22 Q. RFC-Maysonet 42 through 43 and 44 is
23 also a report that was submitted on August 24,
24 1990.
25    Do you see that?

Page 288

1 A. Yes.
2 Q. Again, assuming that this is not a
3 falsified report, this would have been a report
4 prepared at least a day after Mr. Maysonet was
5 arrested and charged with the murders, correct?
6    MR. ENQUIST: Objection, form.
7    MS. ROSEN: Objection, form.
8    THE WITNESS: Yes.
9    BY MS. BONJEAN:
10 Q. And do you remember taking any action
11 with the investigation after Mr. Maysonet was --
12 well, after you left Mr. Maysonet at Area 5 in
13 that interview room?
14    MR. ENQUIST: Objection, already asked
15 and answered. I'm not sure when you're
16 talking about leaving him in the room. We've
17 already had another testimony.
18    MS. BONJEAN: I'm sorry?
19    MR. ENQUIST: We've already had another
20 testimony after -- I'm not sure when you're
21 talking about leaving the room. There was
22 other testimony about his interactions.
23    BY MS. BONJEAN:
24 Q. Okay. I thought you testified that
25 after you asked him whether he wanted a phone

Page 289

1  call, a drink or anything like that, that he said
2  no, I'm good, and that you didn't actually
3  interact with him again, or did you?
4  A.  I did not until --
5      MR. ENQUIST: Finish your answer.
6      THE WITNESS: I did not interact with
7  him.
8      BY MS. BONJEAN:
9  Q.  Okay.  Did you ever interact with him
10  again?
11  A.  Just on that request with the State's
12  Attorney when we drove him.
13  Q.  Oh, okay.  Understood.  Later on.  I
14  had forgotten about that.  Thank you.
15      But that was still -- that was the same
16  day that he was in custody or the following day,
17  is that right?
18  A.  Yes.
19  Q.  Okay.  So now I would like you to look
20  at -- I'm going to actually have you work
21  backwards.  I'm going to first ask you to
22  disregard the last two pages of this file and --
23  A.  Disregard it?
24  Q.  Yeah.  I don't think it relates to this
25  case.  Take a look at it, tell me if you have any

Page 290

1  reason to believe this has something to do with
2  this case?
3  A.  This is a homicide of Gloria Sanchez.
4  Q.  Right.
5  A.  I have no clue why this is there.
6  Q.  It seems to have -- it has a one-off on
7  the RD number, so maybe it just got misfiled.  I
8  have no idea, either.
9      I'm going to have you look at
10  RFC-Maysonet 63 and 64, if you would.
11      Do you see it?
12  A.  63, 64?
13  Q.  Yes.
14  A.  Yes.
15  Q.  Okay.  It's a progress report of a
16  field investigation, is that right?
17  A.  Yes, ma'am.
18  Q.  Okay.  And it's prepared by Detectives
19  J. Boyle and B. Brennan?
20  A.  Yes.
21  Q.  Now, are these fellows detectives who
22  would have been assigned to this case, possible?
23  A.  It seems like they wrote a progress
24  report, so they did something with it.
25  Q.  Right.  When someone is assigned to the

Page 291

1  case, does that mean that they're forever assigned
2  to the case or is it just assigned for that shift?
3      MS. ROSEN: Objection, foundation.
4      THE WITNESS: Assigned for that
5  assignment.
6      BY MS. BONJEAN:
7  Q.  Right.  Is that assigned until it's
8  closed or assigned for just the shift that day?
9  A.  Yes.
10  Q.  Which one?
11  A.  Just the shift for that day.
12  Q.  Okay.  So you don't have any reason to
13  believe that Boyle and Brennan were assigned for
14  any other purpose than to do some investigative
15  conduct on this day?
16      MS. ROSEN: Objection, foundation.
17      THE WITNESS: I have no knowledge of
18  these reports.
19      BY MS. BONJEAN:
20  Q.  Okay.  This was a report that was
21  submitted on May 25, 1990, the same day that the
22  Wiley brothers were murdered, right?
23  A.  Yes.
24  Q.  This would be the type of report that
25  might be on the board, the homicide board, right?

Page 292

1  A.  If it was completed then, yes.
2  Q.  Right.  At some point it would end up
3  on the board potentially, correct?
4  A.  I would think so.
5  Q.  And it reflects interviews with members
6  of the victims' families.
7      Do you remember seeing this report?
8  A.  I don't remember seeing it.  I'm not
9  saying that I didn't see it.  I don't recall.
10  Q.  Have you seen it in preparation for
11  your deposition here today?
12  A.  I don't think so.
13  Q.  Did you ever see any evidence that the
14  Wiley brothers were involved in any gang activity?
15  A.  I don't recall.
16  Q.  Did you ever see any evidence that they
17  were drug dealers or even drug users?
18  A.  I don't recall if I did or not.
19  Q.  Did you ever have any information that
20  the shooting itself was gang motivated at all?
21  And I'll say this, prior to Mr. Maysonet's arrest
22  in or around August 22 of 1990?
23  A.  I don't recall or not.  I don't know.
24  Q.  As you sit here today, do you know
25  whether it was gang related?

Page 293

1 A. I don't know if it was or not.

2 Q. RFC-Maysonet 59 through 62 is another

3 supplemental report that is characterized as a

4 field investigation.

5 Do you see that?

6 A. 59 through 62?

7 Q. Yes.

8 A. May I look at it?

9 Q. Please.

10 A. I don't know if I saw this or not.

11 Q. It's a supp though, right?

12 A. It's a progress report.

13 Q. And is this the type of supplemental

14 report that would be on the board and accessible

15 to you after it was prepared if you wanted to find

16 out what was happening with this investigation?

17 MS. ROSEN: Object to the form.

18 THE WITNESS: I would think so.

19 BY MS. BONJEAN:

20 Q. Moving in the other direction, 55 and

21 56, do you see what that report is?

22 A. Not yet. This is a canvass report.

23 Q. Okay. And can you see that there are

24 individuals who have been interviewed in

25 connection with this murder investigation?

Page 294

1 A. Yes.

2 Q. And again, this report was submitted on

3 May 25, 1990, is that right?

4 A. 26th of May, 1990.

5 Q. That's when it was approved, but it was

6 submitted on May 25, correct?

7 MS. ROSEN: Objection, form,

8 foundation.

9 THE WITNESS: Yes, ma'am.

10 BY MS. BONJEAN:

11 Q. All right. Again, can you read Alma

12 Preceeo's narrative regarding what Alma Preceeo

13 told the detectives and tell me if that refreshes

14 your recollection about whether you've ever seen

15 this report or read this report?

16 A. Alma?

17 Q. It's page 55. It says Alma Preceeo, I

18 think.

19 A. Oh, I see it. I'm sorry. Yes, ma'am.

20 Q. Does that ring a bell for you at all?

21 A. It does, but I don't know if I saw it

22 way back when or recently.

23 Q. So it's something you may have seen

24 just in preparation for your deposition here

25 today?

Page 295

1 A. It's a possibility.

2 Q. But you don't remember whether you

3 looked at it back prior to arresting Mr. Maysonet?

4 A. I can't tell you if I did or not.

5 Q. But again, this might be a report --

6 this is one of those reports that might be on the

7 board in the sergeant's office?

8 A. Possibility.

9 Q. All right. And then the last report in

10 the packet starts with RFC-Maysonet 47 through 54.

11 This is a supplemental report or a cleared/open

12 report.

13 Do you see that?

14 A. Let me go to the last page.

15 Q. Sure.

16 A. You're correct.

17 Q. Okay. This report, what role did you

18 play in preparing this report in the sense of

19 putting the words on the piece of paper?

20 A. I didn't.

21 Q. Okay. So did you write -- and when I

22 say "write," I mean actually type in the

23 information on any portion of this report?

24 A. No.

25 Q. Your name is listed on the first page

Page 296

1 in the bottom row, second column.

2 Do you see that?

3 A. Yes.

4 Q. And what does it mean that your name is

5 there?

6 A. That means that I gave some type of

7 information for the author of the report.

8 Q. Okay. So you provided information to

9 the author of the report, and who is the author of

10 the report as best you can tell?

11 MS. ROSEN: Objection, foundation.

12 THE WITNESS: Detective Halvorsen.

13 BY MS. BONJEAN:

14 Q. All right. And do you recall giving

15 information to Detective Halvorsen about this case

16 prior to his preparation of this report?

17 A. I do.

18 Q. Okay. And when was it that you gave

19 information to Detective Halvorsen about whatever

20 you had to say about this case?

21 A. I'm not sure.

22 Q. Was it before he prepared the report?

23 A. Yes.

24 Q. So let's try to think back. You were

25 working third watch, right?

Maysonet v.
Guevara

Video Deposition

Page 297

1  A.  I believe I was that day, yes.
2  Q.  Okay.  So, which meant you started at
3  what time?
4  A.  I'm an early guy.  I mean, I'm always
5  early for anything I do in life.
6  Q.  Okay.
7  A.  So normal time is, I think it was at
8  4:00.  So sometimes because of the traffic
9  situation I would get there at 3:30, quarter to 4,
10  4:00.
11  Q.  And this is p.m.?
12  A.  Yes.
13  Q.  So on August 22 when you were at 26th
14  Street in the morning, were you working overtime?
15  A.  Yes.
16  Q.  So, and you would have put in for
17  overtime certainly if you were working overtime,
18  right?
19  A.  Yes.
20  Q.  And that was pretty routine, wasn't it,
21  that you would try to get your court dates on
22  shifts that you weren't actually working?
23      MR. ENQUIST: Objection.
24      MS. ROSEN: Object to the form,
25  foundation.

Page 298

1      MR. ENQUIST: Join.
2      BY MS. BONJEAN:
3  Q.  I'm not suggesting there is anything
4  wrong with that, I'm just saying that wasn't
5  unusual?
6  A.  Well, court is in the daytime.
7  Q.  Right.
8  A.  So I mean, if you had court, you're
9  always working overtime if you worked the night
10  shift or the morning shift.
11  Q.  Right.  If you worked the third watch,
12  you always had to be -- if you were going to be in
13  court you couldn't show up at 4:00, right?
14  A.  Yeah.
15  Q.  Okay.  So when you went to Area 5 after
16  bringing Mr. Maysonet there in the morning, you
17  said you put him in an interview room, asked him
18  if he needed anything and then you left, right?
19  A.  Yes.
20  Q.  Until you came back, I assume during
21  your shift, and participated in the field trip
22  that you went on, right?
23      MS. ROSEN: Object to the form.
24      THE WITNESS: I was outside on the
25  second floor all the time.  I never left the

Page 299

1  building until that request to drive to the
2  murder scene.
3      BY MS. BONJEAN:
4  Q.  Okay.  So you were essentially working
5  overtime through a lot of this, right?
6  A.  Yes.
7      MS. ROSEN: Object to the form.
8      BY MS. BONJEAN:
9  Q.  All right.  You didn't go home in
10  between, for instance, and come back?  You stayed
11  at Area 5?
12  A.  No, I was there.
13  Q.  So you were there the entire time?
14  A.  Yes.
15  Q.  And you were there when Mr. Maysonet
16  was questioned by Detective Guevara, right?
17      MS. ROSEN: Objection, form,
18  foundation.
19      THE WITNESS: I wasn't there when
20  Guevara talked to him.
21      BY MS. BONJEAN:
22  Q.  You weren't?
23  A.  I wasn't in the room.
24  Q.  No, but you were on the second floor?
25  A.  I was in the building, yes.

Page 300

1  Q.  Right.  You were in Area 5 violent
2  crimes offices, right?
3  A.  Yes.
4  Q.  And my understanding, correct me if I'm
5  wrong, is that after you got there, you never left
6  until after you took Mr. Maysonet to the scene?
7  A.  You're correct.
8  Q.  So you certainly were aware of what was
9  happening with the investigation even if you
10  weren't actively participating in it, right?
11  A.  Yes.
12  Q.  This report, take a look at it if you
13  need to, was submitted after Mr. Maysonet was
14  charged, right?
15  A.  You're talking about the cleared/open?
16  Q.  Yes.
17  A.  Yes.
18  Q.  Okay.  That's why it was cleared,
19  right; he was charged?
20  A.  Yes.
21  Q.  And that was a decision that was made
22  by an Assistant State's Attorney, correct?
23  A.  Yes.
24  Q.  So this is not a report that you would
25  have been able to review prior to bringing

Page 301

1    Mr. Maysonet into Area 5, fair?
2  A.   That's correct.
3  Q.   What role did Detective Gawrys play on
4  this case?
5      MS. ROSEN: Objection, foundation.
6      THE WITNESS: I have no idea.
7      BY MS. BONJEAN:
8  Q.   Do you know why he's listed here --
9      MS. ROSEN: Objection, foundation.
10      BY MS. BONJEAN:
11  Q.   -- as an arresting officer?
12  A.   The only thing I can think of, at the
13  time he was partners with Guevara.
14  Q.   All right.  I would like you to look at
15  RFC-Maysonet 49.
16  A.   49?
17  Q.   Yes.
18  A.   Okay.
19  Q.   I'm going to read to you the section
20  that says "Manner and Motive:  Victims who were
21  male black youths were standing on the street when
22  they were approached by the offenders who are
23  Latin and members of the Latin Kings.  Offenders
24  shot victims to death.  Motive was gang rivalry."
25      Do you see that?

Page 302

1  A.   Yes, ma'am.
2  Q.   What is your understanding of what the
3  gang rivalry was?
4  A.   What I understand it pertaining to this
5  or what I understand?
6  Q.   What was the gang rivalry that is
7  referenced here?
8      MS. ROSEN: Objection, foundation.
9      THE WITNESS: I would only be guessing.
10  I really don't know.
11      BY MS. BONJEAN:
12  Q.   Okay.  What's your guess, then?
13  A.   What I guessed is Hispanic men with
14  Afro American men.  I did not know of any black
15  men, Afro American men, being in the Latin Kings.
16  Q.   Okay.  But what was your knowledge
17  about whether -- you would agree that not all
18  black men are in gangs, right?
19      MS. ROSEN: I'm sorry, can you repeat
20  that question she just asked?
21      THE WITNESS: Yes.
22      MS. ROSEN: Wait.  I want the court
23  reporter to read it back before you answer.
24      (Record read as requested.)
25      THE WITNESS: Yes.

Page 303

1      BY MS. BONJEAN:
2  Q.   Okay.  And that was also true in 1990,
3  that not all black men were in gangs, correct?
4  A.   Yes.
5  Q.   All right.  So do you have any factual
6  basis to believe that the Wiley brothers were in
7  fact members of any gang?
8  A.   I had no information to that.
9  Q.   So you don't know what was meant by
10  "Motive was gang rivalry"?
11  A.   Correct.
12  Q.   And when you put your name on this
13  report, are you attesting to knowing everything
14  contained in the report or knowing the basis of
15  everything contained in the report?
16      MS. ROSEN: Object to the form.
17      THE WITNESS: When I put down my name
18  on a report, I sign my report that I looked
19  at it, I did it and I reviewed it.
20      BY MS. BONJEAN:
21  Q.   This is not that report, though, right?
22  A.   My signature is not on here.
23  Q.   Okay.  So what am I to assume from the
24  fact that your signature is not on this report?
25      MS. ROSEN: Object to the form.

Page 304

1      THE WITNESS: I gave the author, Ernie
2  Halvorsen, the only thing that I did was from
3  the time that I saw Mr. Maysonet on the
4  street at 26th and California until I got
5  back at the Area, and then later in the day
6  drove him at the request of the State's
7  Attorney to the crime scene.  That's all I
8  did.
9      BY MS. BONJEAN:
10  Q.   Do you know if you read this report
11  after it was prepared?
12  A.   I don't know if I did or not.
13  Q.   Okay.  Would it have been your practice
14  to read a report that you had contributed to after
15  it was prepared even if you weren't the one
16  authoring it?
17  A.   I could have reviewed it.  Probably
18  did.  Don't remember if I did.
19  Q.   Possible you did, possible you didn't,
20  is that --
21  A.   That's correct.
22  Q.   If you had reviewed it and there was
23  something in there that was inaccurate, would you
24  have alerted Detective Halvorsen to that fact?
25  A.   If he was the author, yes.

Page 305

1 Q. All right. The next paragraph reflects
2 "Vehicle Used" and it describes a vehicle?
3 A. Same page, ma'am?
4 Q. Yes.
5 A. Okay.
6 Q. "Older model Pontiac."
7    Do you see that?
8 A. Yes, ma'am.
9 Q. "This car is alleged to belong to a
10 Latin King first name Jeffery"?
11 A. Yes, ma'am.
12 Q. Did you find out who Jeffery was?
13 A. I did not.
14 Q. Okay. Did you go to the index cards
15 that contain gang members' identifiers that we
16 spent some time talking about earlier to determine
17 who Jeffery was?
18 A. I did not.
19 Q. Do you know whether any other detective
20 did?
21 A. Probably not.
22 Q. Why not?
23 A. State's Attorney didn't require that we
24 find or attempt to locate Jeffery.
25 Q. How do you know that?

Page 306

1 A. Never asked us to. Never asked me to.
2 Q. Do you know if he asked anybody to?
3 A. I would assume not.
4 Q. Do you think maybe it would have been
5 good investigative work to try to find the owner
6 of the car that was involved in a double murder?
7 A. I wasn't asked to do it.
8 Q. Right. I'm asking your professional
9 opinion about it. I understand you're not --
10 A. I don't know what the State's Attorney
11 required at that time. I would only be
12 second-guessing, but I was not asked and I did not
13 hear him ask anybody in my presence.
14 Q. Okay. Well, the Cook County State's
15 Attorney testified that he had no role in
16 investigating the case; that was all the
17 detectives' job?
18 A. That's correct, but if he would have
19 asked me to try to locate Jeffery or a car by the
20 name of Jeffery, I would have done so.
21 Q. Right. But you don't need permission
22 from the Cook County State's Attorney's office to
23 continue to investigate a crime, particularly one
24 that's still open, right?
25 A. Again, I had very limited part in this

Page 307

1 investigation.
2 Q. Right. But my question is, you do not
3 require permission from a Cook County State's
4 Attorney to conduct further investigation in an
5 open murder case, right?
6 A. That's correct.
7 Q. All right. And can we agree that if
8 not you, somebody should have talked to Jeffery,
9 whose car was allegedly involved in this double
10 murder, right?
11    MS. ROSEN: Objection, calls for
12 speculation.
13    THE WITNESS: I don't know. I would be
14 guessing.
15    BY MS. BONJEAN:
16 Q. Well, it says Jeffery's car was part of
17 a double murder, yeah?
18 A. I did not try to learn the identity of
19 Jeffery and I don't know if anybody was asked to
20 learn the identity of Jeffery.
21 Q. No one needed to be asked to learn the
22 identity of Jeffery, we've established that. I
23 know you said you didn't. Do you know why you
24 didn't try to find out who Jeffery was?
25    MS. ROSEN: Object to the form and to

Page 308

1 the argumentative, editorial comment in the
2 middle of the question.
3    THE WITNESS: As I stated before, I had
4 a very, very limited role in this report or
5 investigating this, other than information
6 that I was told verbally and Mr. Maysonet had
7 agreed to accompany me to the area and then
8 going for a ride with him and the State's
9 Attorney. That's all I did.
10    BY MS. BONJEAN:
11 Q. Right. But I'm trying to understand
12 why no one tried to talk to Jeffery, but you can't
13 elucidate that question?
14 A. I know I didn't. I can only --
15 Q. And you don't know why it wasn't
16 something that was a priority for any detective to
17 talk to the owner of the car that was involved in
18 this double murder, correct?
19 A. I do not.
20 Q. Did you see Jennifer Borowitz at Area 5
21 when you were there?
22 A. I don't recall if I did or not.
23 Q. Do you know who she is?
24 A. I don't recognize the name. That
25 doesn't mean that I didn't know that she was a

Page 309

1  State's Attorney.
2  Q.  But you don't recollect her being there
3  during the time that you were there from the
4  morning of August 22 until August 23?
5  A.  I don't know if I saw her or not.  I
6  don't even know at that time if I knew who she
7  was.
8  Q.  So you were there for over 24 hours,
9  about?
10  A.  Sure.
11  Q.  Did you sleep there?
12  A.  Well, I could have closed my eyes at
13  one point.
14  Q.  I don't completely understand why, if
15  you weren't involved in the investigation,
16  why -- were you there for some other purpose?
17  A.  I was there because I took him for a
18  ride with the State's Attorney and if the State's
19  Attorney needed anything else, I was available
20  with Montilla.
21  Q.  Yeah, there were a number of detectives
22  working this case, at least after you brought
23  Mr. Maysonet in, right?  There is about five names
24  on the back of this cleared/open report, correct?
25  A.  Sure.

Page 310

1  Q.  And according to you, you played a very
2  minimal role, right?
3  A.  That's correct.
4  Q.  Why would you have stayed over 24 hours
5  at the police station to just chauffeur
6  Mr. Maysonet and the others to the crime scene?
7      MS. ROSEN: Object to the form of the
8  question.
9      THE WITNESS: I don't know why.
10      BY MS. BONJEAN:
11  Q.  By the way, who drove to the crime
12  scene?
13  A.  I was driving, DiFranco was there,
14  Montilla was there, Maysonet was there.
15  Q.  What kind of car were you driving?
16  A.  I want to think I had an unmarked Ford.
17      MS. ROSEN: You're almost out of time.
18      MS. BONJEAN: All right, we can stop.
19      THE VIDEOGRAPHER: We are going off the
20  record at 4:07 p.m.
21      (Discussion off the record.)
22      (Short recess.)
23      THE VIDEOGRAPHER: We are back on the
24  record at 4:19 p.m.
25      MS. BONJEAN: Can you mark this,

Page 311

1  please?
2      (Whereupon, Paulnitsky
3      Deposition Exhibit No. 5 was
4      marked for identification.)
5      MS. BONJEAN: Thank you.
6      BY MS. BONJEAN:
7  Q.  Okay.  Mr. Paulnitsky, after you
8  brought Mr. Maysonet to Area 5 and then had your
9  brief conversation in which you checked for
10  his -- to see if he needed anything, see if he
11  needed to make a phone call, you had no contact
12  with him again until the next day when you brought
13  him to the scene with DiFranco and Montilla,
14  right?
15  A.  Yes.
16  Q.  Okay.  But you were still overseeing
17  the investigation during that 24-hour period that
18  you were at --
19  A.  I wasn't overseeing the investigation.
20  Q.  You were keeping up, paying attention
21  to the investigation, right?
22  A.  I was.
23  Q.  Is that a yes?
24  A.  Yes.
25  Q.  Okay.  I'm going to hand you what has

Page 312

1  been marked as Exhibit 5, have you take a look at
2  that.
3      MS. ROSEN: What is that?
4      MS. BONJEAN: Oh, sorry.
5      MR. ENQUIST: We can share one.
6      MS. BONJEAN: Yeah, it's on the
7  Dropbox.
8      MR. ENQUIST: So I know what it is.
9      MS. BONJEAN: It's the request to hold
10  over a prisoner.
11      MR. LEINENWEBER: Request to hold,
12  that's 5?
13      MS. BONJEAN: Yeah.
14      MR. LEINENWEBER: Got it.
15      BY MS. BONJEAN:
16  Q.  Do you see this exhibit before you?
17  A.  Yes.
18  Q.  Okay.  What is it?
19  A.  This is a request to hold over a person
20  that's in custody.
21  Q.  And what is the purpose of this
22  request?
23  A.  So basically additional investigation.
24  Q.  Okay, but who does the request go to?
25  A.  I typed this up.  I brought it down to

Page 313

1  the watch commander in the 25th District.
2  Q.  And that's who signed it or approved
3  it?
4  A.  Yeah.  I don't recognize the name so --
5  Q.  Why do you need to fill one of these
6  out?
7  A.  So that anybody that's being held in
8  custody, they do not go to court, the next court
9  call.
10 Q.  Okay.  Well, when do you have to fill
11 one of these out?
12 A.  If I was going to -- my case, to hold
13 the person past that, the morning court call.
14 Q.  Okay.  And who is responsible for
15 filling one of these requests to hold over
16 prisoners past regular court call?
17 A.  Could be any detective up there.
18 Q.  So any detective working on the case?
19 A.  Could be.
20 Q.  And this particular request to hold was
21 prepared and signed by you, right?
22 A.  Yes, ma'am.
23 Q.  Okay.  And why -- if you were not
24 involved in the investigative activities related
25 to Mr. Maysonet after you brought him to Area 5,

Page 314

1  why were you the one who filled this out?
2  A.  Because I could have been a detective
3  on the floor that was available while I was doing
4  other tasks, trying to catch up on some of my
5  reports that I had.
6  Q.  Okay.  So any detective who is working
7  the case can fill this out, is that right?
8  A.  Probably any detective in the violent
9  crimes unit could do that, yes.
10 Q.  Okay.  But again, you had some
11 familiarity with the case, obviously?
12 A.  Yes.
13 Q.  And you were keeping up with what was
14 going on, correct?
15 A.  Yes, ma'am.
16 Q.  You had to know that Mr. Maysonet
17 needed to be held past the court call, right?
18 A.  Yes, ma'am.
19 Q.  You got that information from, I'm
20 assuming, the investigating detectives?
21 A.  Through other detectives, yes, ma'am.
22 Q.  Yeah, through other detectives?
23 A.  Yes, ma'am.
24 Q.  And then based on the information you
25 received, you requested that he be held over.

Page 315

1      Why did he need to be held over?
2  A.  Additional investigation by the State's
3  Attorney and also investigation by some other
4  detectives.
5  Q.  Okay.
6  A.  Did you want this back?
7  Q.  No, you can -- well, yeah.  It can go
8  here.
9      Do you know where this document
10 ultimately lands after it's been submitted by you
11 and approved by someone?
12 A.  That's attached -- one copy would be
13 attached, I believe, to the arrest report if there
14 was one that was completed at that time.  One copy
15 would be given to our watch commander so he would
16 be aware of what was going on, and could have been
17 put in the file, too.  Anything that I submitted
18 would have went in the file.
19 Q.  What file?
20 A.  Pertaining to this, it would be
21 attached to the reports of this.
22 Q.  The investigative file?
23 A.  Yes.
24 Q.  And this request to hold was prepared
25 by you at 2400 hours on August 23?

Page 316

1  A.  Can I see it again?  I'm sorry if I
2  gave it to you too premature.
3      MS. ROSEN:  Did you say 2400?
4      MS. BONJEAN:  Yeah.  It says 2400.
5      MS. ROSEN:  Where?  I see 18.
6      MR. ENQUIST:  1800.
7      MS. BONJEAN:  That's a different
8  document.
9      BY MS. BONJEAN:
10 Q.  What does yours say, Mr. Paulnitsky?
11 A.  This is requesting hold over and it is
12 expected that the investigation be completed at
13 2400 hours on August 23.
14     MS. ROSEN:  Are they two different
15 Bates numbers?
16     MS. BONJEAN:  They are.
17     MR. LEINENWEBER:  Yeah, there is three
18 Bates numbers in the file.
19     MS. BONJEAN:  Okay.  I just separated
20 them.  I thought they were extra copies, but
21 they were one document.  So that's what
22 happened.
23     So I apologize, but let's do this.
24 Can you just mark this --
25     MR. LEINENWEBER:  Do you want to just

Page 317

1  add that to that?
2      MS. BONJEAN: I'm going to just mark a
3  whole new exhibit.
4      MS. ROSEN: Then can you tell us the
5  Bates number of the new exhibit?
6      MS. BONJEAN: Yeah.
7      (Whereupon, Paulnitsky
8      Deposition Exhibit No. 6 was
9      marked for identification.)
10     BY MS. BONJEAN:
11 Q.  Now I'm going to hand you what has been
12 marked as Exhibit 6 and have you look at all of
13 these.
14     MS. ROSEN: Can you just give us the
15 Bates numbers at the bottom?
16     MS. BONJEAN: Oh, yeah. It's CCSAO
17 11 -- let me make sure I've got this right.
18 1145 and then 1156 and 1157?
19     MS. ROSEN: No.
20     MS. BONJEAN: No? Let me see.
21     MS. ROSEN: The one you gave --
22     THE WITNESS: I have actually three.
23     MS. BONJEAN: Okay, let me just --
24     MR. ENQUIST: This was 1556 before.
25     MS. ROSEN: Right. I had 1556 before.

Page 318

1      MS. BONJEAN: Yeah. So there is three
2  requests to hold. One is CCSAO 1145.
3      MS. ROSEN: Okay.
4      MS. BONJEAN: One is 1556 and one is
5  1557.
6      MR. LEINENWEBER: So just to confirm,
7  1145 is Exhibit 5 and then the next two
8  pages, 56 and 57, are Exhibit 6?
9      MS. BONJEAN: I just remarked 6 with
10 all three of them.
11     MR. LEINENWEBER: Oh, I get it now.
12 Okay, sorry.
13     MS. BONJEAN: It seems to me 45 and 57
14 are the same document.
15     MR. ENQUIST: And the one that you
16 handed him before, I'm just making sure,
17 Exhibit 5, was 1145?
18     MS. BONJEAN: Yes, it was 1145.
19     MR. ENQUIST: All right. So I had it
20 different. Okay.
21     BY MS. BONJEAN:
22 Q.  All right. So look at the second page
23 of this Exhibit 6 that is Bates stamped CCSAO
24 1556?
25 A.  Yes.

Page 319

1  Q.  This one indicates that the
2  investigation will be completed at 1800 hours.
3      Do you see that?
4  A.  Yes.
5  Q.  Okay. On the 23rd. What time is that?
6  A.  6:00.
7  Q.  In the evening?
8  A.  6:00 p.m.
9  Q.  On August 23?
10 A.  Yes.
11 Q.  And then what is 2400 hours on August
12 23, what time is that?
13 A.  Midnight, 12:00 midnight.
14 Q.  So is that August 23 or August 24?
15 A.  August 23.
16 Q.  So 57 actually should come before 56,
17 right?
18     MS. ROSEN: Objection, form. You mean
19 time-wise?
20     MS. BONJEAN: Time-wise, yeah.
21     BY MS. BONJEAN:
22 Q.  Which one was prepared first?
23 A.  I believe the 1800 hours, the 6:00 one
24 was first.
25 Q.  But midnight on August 23 is before

Page 320

1      6:00 on August 23, right?
2  A.  Well, actually I could have meant 2359
3  hours and that was probably what I meant.
4  Q.  Okay. So what you think is that it was
5  23 --
6  A.  59.
7  Q.  -- 59?
8  A.  Reason being is, 6:00, there would be
9  night court at that time.
10 Q.  Okay. So I just want to make sure I
11 understand this.
12     You arrived at Area 5 on the morning of
13 August 22 with Mr. Maysonet, right?
14 A.  Is that what time is on that report?
15 Q.  Yes.
16 A.  Okay.
17 Q.  That's when you see him at 26th Street,
18 right?
19 A.  Okay.
20 Q.  And you stay at Area 5 until the
21 following morning, correct?
22 A.  Yes.
23 Q.  And you're aware that he has made a
24 court reported statement, correct?
25 A.  I'm not sure.

Maysonet v.
Guevara

Video Deposition

Page 321

1  Q.  Well, you took him on a ride, right?
2  A.  Yes.
3  Q.  That was after he made a court reported
4  statement, correct?
5  A.  I'm not sure if he made the court
6  reported before the ride or after the ride.  I
7  would have to look at the report.
8  Q.  Okay.  So let's put the court calls to
9  the side and just look at -- go back to this
10  cleared open report that we've been looking at?
11  A.  Tell me what page?
12  Q.  Sure.  How about the last page of it,
13  RFC-Maysonet 54.
14     Do you see that?
15  A.  I'm looking at this page.
16  Q.  Okay.  So we've got a timeline here on
17  August 23, at 6:30 in the morning, ASA DiFranco
18  was there interviewing Mr. Maysonet with
19  Detectives Guevara and Montilla.
20     Do you see that, first paragraph?
21  A.  Yes.
22  Q.  And then at 7:10 there is more
23  conversation in the conference room between
24  Guevara, Montilla, DiFranco.
25     Do you see that?

Page 322

1  A.  Yes.
2  Q.  Okay.  And then on August 23 at 9:28
3  a.m. a court reported statement is taken.
4     Do you see that?
5  A.  Yes.
6  Q.  Then after that, it says "ASA DiFranco
7  requested that Jose Maysonet be driven to the
8  scene of the murder to corroborate the statement
9  that he had just given."
10     Do you see that?
11  A.  Yes.
12  Q.  Okay.  And it has your name there,
13  right?
14  A.  Yes.
15  Q.  So can we agree that you drove to the
16  scene after 9:28 a.m. when he gave his court
17  reported statement?
18  A.  Yes.
19  Q.  Okay.  So back to my questions before,
20  you are there about 24 hours when you take him to
21  the scene, right, you've been at Area 5,
22  approximately?
23  A.  Give or take.
24  Q.  And then you stay on until 6:00 p.m. on
25  the 23rd?

Page 323

1  A.  Possibly.
2  Q.  I'm going to have you look at CCSAO
3  1556.
4  A.  Yes, ma'am.
5  Q.  You filled out this request to hold,
6  right?
7  A.  Yes, ma'am.
8  Q.  And you indicated that the
9  investigation would be completed by 6:00 p.m. on
10  August 23, right?
11  A.  Approximately, yes.
12  Q.  So you were there at 6:00 p.m. on
13  August 23 when you completed this, is that right?
14     MS. ROSEN: Objection.  Wait, what?
15     BY MS. BONJEAN:
16  Q.  When you completed this, do you know
17  whether you were there at 6:00 p.m.?
18     MS. ROSEN: Can I just -- I'm sorry.
19  Can I just look at what it says?  "When the
20  investigation is completed at 1800," right?
21  That's the reference?
22     MS. BONJEAN: Well yeah, but he
23  completes another one after that.
24     MS. ROSEN: Okay.  I'm just trying to
25  be clear on what you're saying.

Page 324

1     BY MS. BONJEAN:
2  Q.  And my question is, do you know when
3  you completed this?
4  A.  No.
5  Q.  Okay.  But you know that you were
6  estimating that the investigation would be done by
7  6:00 p.m., correct?
8  A.  Yes.
9  Q.  And that time came and went, I assume,
10  right, which is why you had to do another one?
11  A.  Yes.
12  Q.  Okay.  And you filled this one out just
13  before midnight, is that right?
14  A.  Sometime later.
15  Q.  Or sometime after 6:00 p.m.?
16  A.  Yes.
17  Q.  Okay, that's fair.  So sometime after
18  6:00 p.m. you filled out the holdover which is
19  CCSAO 1557, right?
20  A.  Yes.
21  Q.  And you estimated that it would be done
22  by midnight, is that correct?
23  A.  Yes.
24  Q.  But you don't know exactly when you
25  completed this?

Page 325

1  A.  I do not.
2  Q.  All right.  So really you were at Area
3  5 for at least 36 hours straight, is that right?
4  A.  Could have been.
5  Q.  Not unusual for you?
6  A.  Not at all.
7  Q.  Okay.  And do you know whether you were
8  working on any other cases while you were at Area
9  5 for approximately 36, maybe more, hours?
10 A.  Sure.  Could have been clearing up my
11 handouts, catching up on my paperwork.
12 Q.  But you are confident you were there;
13 you didn't go home?
14 A.  Correct.
15 Q.  Did you play any role in questioning
16 Mr. Maysonet about the underlying events while you
17 were there this entire time at Area 5?
18 A.  I don't recall talking to him after the
19 initial contact to make sure he was there,
20 everything was okay, and then with driving him.  I
21 don't recall any contact.
22 Q.  You don't recall conducting any
23 questioning of him about his involvement in the
24 Wiley brothers' murders, is that right?
25 A.  I don't remember.

Page 326

1  Q.  Okay.  Is it possible that you did?
2  A.  I don't recall that I did.
3  Q.  Do you think you would have prepared a
4  report or a GPR if you had questioned him about
5  the Wiley brothers' murders?
6  A.  Well, if I would have talked to him
7  about that, anything that he told me I would have
8  recorded on a GPR, perhaps.
9  Q.  Okay.  But you don't remember doing so,
10 is that right?
11 A.  I don't recall talking to him.
12 Q.  Okay.  And what was said by you or him
13 or anyone in the car during the field trip to the
14 crime scene?
15 A.  Well, I was driving and he was
16 directing me where to go, where to stop, where to
17 go.
18 Q.  So Mr. Maysonet was directing you where
19 to go, where to stop?
20 A.  Yes.
21 Q.  And the purpose of this was to have
22 Mr. Maysonet corroborate his court reported
23 confession, right?
24 A.  What he told the State's Attorney.
25 Q.  Right.  Is that what you understand the

Page 327

1  purpose of this was?
2  A.  That's the reason that I drove him.
3  Q.  Do you remember where he told you to
4  go?
5  A.  I don't remember exactly.  I know that
6  it was the scene of the incident and I was just
7  following directions.
8  Q.  You don't specifically remember where
9  he said go left, go right, this is where this
10 happened or anything like that?
11 A.  No, I do not.
12 Q.  Did you prepare a report reflecting
13 what statements Mr. Maysonet allegedly said to you
14 when you drove him to the crime scene?
15 A.  No.
16 Q.  Why not?
17 A.  The State's Attorney was with me.  He
18 asked for -- he requested that we go for a ride
19 and I would assume that he would have recorded it
20 in his felony review file.
21 Q.  Okay.  Did you prepare any additional
22 reports other than what you have had the
23 opportunity to look at in this exhibit -- I don't
24 know what number it is.
25 A.  This would be Exhibit 3.

Page 328

1  Q.  Okay.  Did you see any reports that you
2  prepared -- and when I say "prepared," I mean
3  authored in this --
4  A.  As we were going through it I saw court
5  attendances.
6  Q.  Right.  Any supplemental reports that
7  you prepared?
8  A.  I did not see any.
9  Q.  Okay.  Do you remember preparing any
10 supplemental reports in connection with this case?
11 A.  I don't think that I did.
12 Q.  Do you remember preparing any GPR's in
13 connection with this case?
14 A.  I thought I did.  I could have been
15 mistaken.  I don't see them here.
16 Q.  Have you ever seen any GPR's that you
17 prepared in connection with this case, being the
18 Wiley brothers' murders?
19 A.  I don't -- I don't know if I did.  I
20 don't recall seeing them in here, so I don't know
21 if I did or not.
22 Q.  Have you ever seen any GPR's that were
23 prepared in connection with the Wiley brothers'
24 murders?
25 A.  I don't know if I did or not.

Page 329

1  Q.  Prior to your deposition, did you have
2  an opportunity to see any GPR's?
3  A.  I don't recall seeing any GPR's.
4  Q.  Have you ever seen any GPR's that
5  reflected the statements that Mr. Maysonet
6  allegedly made to Sergeant Mingey and Detective
7  Montilla?
8  A.  I only learned the information
9  verbally.
10 Q.  Right.  Did you ever see any GPR's at
11 any point?
12 A.  I don't know if I did or not.  I don't
13 recall.
14 Q.  Okay.  So you don't know whether they
15 were prepared, right?
16 A.  Yes, ma'am.
17 Q.  We've already marked it, I'm going to
18 have you look at -- maybe I didn't give it to
19 you -- Exhibit 4.  This is a file that's marked
20 "Permanent Retention File."
21 A.  Do you want this back?
22 Q.  I'll take it back.
23 A.  Let me just clip it together, please.
24 How about the holdover papers?
25 Q.  I'll take those.  Thank you.

Page 330

1  Do you know what a permanent retention
2  file is?
3  A.  I think so.
4  Q.  Okay.  What do you think it to be?
5  A.  Permanent retention of certain files.
6  Q.  Do you know how it differs from, say,
7  the investigative file?
8  MS. ROSEN: Objection, foundation.
9  THE WITNESS: I really don't know
10 fully.
11 BY MS. BONJEAN:
12 Q.  All right.  I would ask that you look
13 through the permanent retention file and tell me
14 if you see any additional reports that were not
15 contained in the previous exhibit, Exhibit 3 that
16 we looked at?
17 MS. ROSEN: You want him to compare?
18 MS. BONJEAN: If he wants to look at
19 both, yeah, if he sees any reports that he
20 did not --
21 THE WITNESS: Let me thumb through this
22 before --
23 MS. BONJEAN: Sure, go ahead.
24 THE WITNESS: You told me to disregard
25 this one (indicating)?

Page 331

1  MS. BONJEAN: Yeah.  I don't think it
2  has something to do with it.  Maybe it's the
3  smoking gun, I don't know.  I have no -- I
4  can't connect it to this case.
5  (Pause in proceedings)
6  THE WITNESS: Sorry it took so long.
7  BY MS. BONJEAN:
8  Q.  That's okay.  Did you find anything
9  additional in the permanent retention file?
10 A.  Each file has things that the other
11 ones don't have.
12 Q.  Okay.  What did you find in the
13 permanent retention file that was not in the
14 investigative file?
15 A.  The permanent retention file has the
16 911 calls that came in to 911, person shot.  This
17 other file had court supps.
18 Q.  Right.  I understand that the other
19 exhibit has some documents that the permanent
20 retention file does not.
21 If you could just tell me whether there
22 are any reports in the permanent retention file
23 that were not in the investigative file, that's
24 all I need to know.
25 A.  I want to say the EI report, I didn't

Page 332

1  see it in this file.
2  Q.  Which one?
3  A.  Crime scene report.  I don't believe it
4  was in this file.  Neither was the crime
5  laboratory report.  Polygraph examination I didn't
6  see in this file.  9 millimeter report from the
7  crime lab, I don't believe was in there.
8  Q.  Did you find any GPR's in the permanent
9  retention file?
10 A.  I did not.
11 Q.  Did you have any knowledge that Rey
12 Guevara would engage in shakedown schemes of gang
13 members when he was either a gang crimes
14 specialist or a detective at Area 5?
15 A.  I did not --
16 MS. ROSEN: Object to foundation.
17 MR. ENQUIST: I object to the form, as
18 well.
19 MR. LEINENWEBER: I'll join.
20 BY MS. BONJEAN:
21 Q.  You did not, right?
22 A.  I had no knowledge.
23 Q.  Did you ever hear that he was involved
24 in any type of extortion schemes while you were at
25 Area 5?

Page 333

1      MS. ROSEN: Objection, foundation.
2      THE WITNESS: I did not.
3      BY MS. BONJEAN:
4  Q.  Did you ever observe him engage in any
5   behavior that could be construed as extortion?
6  A.  I did not.
7  Q.  Did you ever hear of -- hear any rumors
8   or hear any even secondhand information that Rey
9   Guevara had allowed individuals to buy their way
10  out of trouble while he was either a gang crimes
11  specialist or as a detective at Area 5?
12  A.  I did not.
13  Q.  Are you aware of any misconduct that
14  Guevara may have engaged in while he was at
15  Area 5?
16  A.  I never saw anything.
17     MR. LEINENWEBER: Objection to
18  foundation and form.
19     BY MS. BONJEAN:
20  Q.  I'm sorry?
21  A.  I never saw anything.
22  Q.  You never saw him commit any --
23  A.  I never knew of anything, any
24  allegations or saw anything.
25  Q.  In your 40 years on the department, did

Page 334

1   you ever witness with your own eyes any fellow
2   police officer engage in any conduct that was
3   either criminal or a serious constitutional
4   violation?
5  A.  I did not.
6  Q.  In 40 years, nothing, is that right?
7  A.  I don't remember any of it.
8  Q.  Did you ever witness an act of
9   excessive force by a fellow officer in your
10  40 years on the department?
11  A.  I never did.
12  Q.  Did you ever witness any police officer
13  make less than honest representations in a police
14  report while you were in the department for four
15  decades?
16  A.  I did not see it.
17  Q.  Have you ever made anything less than
18  honest representations in a police report during
19  your time?
20  A.  I did not.
21  Q.  And have you always provided completely
22  truthful testimony in connection with your work as
23  an Area 5 detective?
24  A.  Yes.
25  Q.  Now, you received discipline and had a

Page 335

1   sustained allegation against you for preparing a
2   report that contained false information, is that
3   right?
4  A.  I don't recall.
5  Q.  Do you recall in June of '97 being the
6   subject of a complaint for preparing a report with
7   false information related to Steven Hood?
8  A.  I don't recall it.
9  Q.  You don't -- do you recall there being
10  a recommendation that you be suspended for
11  60 days?
12  A.  I don't recall it.
13  Q.  You don't recall then retiring?
14  A.  Retiring? I'm sorry?
15     MS. ROSEN: Retiring?
16     BY MS. BONJEAN:
17  Q.  Retiring after that?
18     MS. ROSEN: Who retiring?
19     MS. BONJEAN: Him.
20     MS. ROSEN: Oh, "then retiring." I
21  thought you said "them."
22     BY MS. BONJEAN:
23  Q.  No.  Then retiring?
24  A.  I retired because I'm too old.
25  Q.  Okay.  But again, do you recall this

Page 336

1   complaint register lodged against you for a number
2   of things, but largely for providing false
3   information in a cleared/closed arrest report?
4  A.  I do not.
5  Q.  Do you remember getting into a
6   emotional exchange with Mr. Escalante?
7  A.  I do.
8  Q.  Okay.  What was that around?
9  A.  What day?
10  Q.  What was that about?  What do you
11  remember about that?
12  A.  My opinion, because I filed an EEOC
13  complaint against the unit that I was in.  It was
14  in retaliation for not withdrawing my complaint.
15  Q.  What was in retaliation?
16  A.  I was treated terribly.
17  Q.  What specifically did they do to
18  retaliate against you?
19  A.  Apparently they went out of their way
20  to check on my investigations and to interview
21  people that I had talked to, to see what I was
22  doing.
23  Q.  What's an ELC?
24     MS. ROSEN: EEOC.
25     THE WITNESS: EEOC.

Page 337

1      BY MS. BONJEAN:
2  Q.  Oh, EEOC.  SO what was the basis of
3  your EEOC complaint against the department?
4  A.  I signed up to take a test for a
5  certain position and they told me I was too old to
6  take the test.
7  Q.  Who told you that?
8  A.  Escalante and O'Donnell.
9  Q.  Okay.  And what position were you
10  attempting to get?
11  A.  A bomb technician.
12  Q.  And what do bomb technicians do?
13  A.  Defuse bombs.
14  Q.  And do you know whether in fact it's
15  true that there are age limitations for people
16  that are going to be working with bombs?
17  A.  There was not at that time.
18  Q.  And is there now, to the best of your
19  knowledge?
20  A.  I don't know.
21  Q.  Okay.  So you applied for a position to
22  be a bomb technician and why do you think that
23  they told you that you were too old for the
24  position, if you know?
25  A.  They told me outright I was too old.

Page 338

1  Q.  But did you ask them -- strike that.
2      Do you think that that was the real
3  reason or do you think there was another reason?
4  A.  Oh, that was the real reason.  In my
5  mind it was.
6  Q.  Okay.  So the reason was that they
7  thought you were too old for the position, right?
8  A.  Yes.
9  Q.  Okay.  You disagreed, obviously?
10  A.  I did, and so do department directives
11  to take that test.
12  Q.  Okay.  So and you filed an EEOC
13  complaint about it?
14  A.  Yes.
15  Q.  And what happened with that complaint?
16  A.  It was investigated.
17  Q.  Okay.  And what was the result of that
18  investigation?
19  A.  They found that I was not too old,
20  there was no set rules of the age, and if I wanted
21  to go forward, that I should.
22  Q.  And did you?
23  A.  No.
24  Q.  Why not?
25  A.  Why should I?  I retired.

Page 339

1  Q.  So you wanted to be bomb technician,
2  that didn't work out, so you then instead retired?
3  A.  Yes.
4  Q.  Were you just sort of disenchanted with
5  the department at that point?
6      MS. ROSEN: Object to the form.
7      THE WITNESS: No.  I was too old.
8      BY MS. BONJEAN:
9  Q.  So you would agree that you were too
10  old to be a bomb technician at that point?
11  A.  No.  Sometimes when you get up in the
12  morning you think to yourself, it's time to
13  retire.
14  Q.  Okay.  So ultimately you didn't pursue
15  the bomb technician position but according to you,
16  you were given permission or were told that you
17  could apply for that position, is that right?
18  A.  According to what I received from the
19  government, they did an investigation and if I
20  wanted to obtain an attorney, to do so.
21  Q.  And what was the exact date of your
22  retirement?
23  A.  Just shortly before my 40th year-end.
24  Q.  So that would have been --
25  A.  Maybe February.

Page 340

1  Q.  2008?
2  A.  Yeah.
3  Q.  And you actually made a complaint
4  register file against Commander Escalante, right?
5  A.  No.  He was the lieutenant.
6  Q.  Well, he was the lieutenant at the time
7  of the complaint, right?
8  A.  Yes.
9  Q.  And he subsequently became a commander,
10  though, right?
11  A.  Yeah.
12  Q.  Why do you say it that way?
13  A.  I just answered your question.
14  Q.  Well, you said it with a little
15  disdain.
16      MS. ROSEN: Is that a question?
17      BY MS. BONJEAN:
18  Q.  Yeah, my original question.  Why did
19  you say it that way?
20  A.  No reason.
21  Q.  Are you friendly with Commander
22  Escalante?
23  A.  I never saw him after I retired.
24  Q.  Okay.  But did you accuse Lieutenant
25  Escalante of threatening you?

Maysonet v.
Guevara

Video Deposition

Page 341

1  A.  I did.
2  Q.  And then you subsequently turned in
3  your retirement papers?
4  A.  Yes, I did.
5  Q.  All right.  And why was he threatening
6  you -- or strike that.
7        What was he doing to threaten you?
8  A.  Everything he said to me was in a
9  menacing, threatening manner.
10 Q.  Like what?
11 A.  Any word out of his mouth was
12 derogatory.
13 Q.  Like what?  What was he threatening you
14 about?
15 A.  Everything.
16 Q.  Was he your supervisor?
17 A.  He was.
18 Q.  Okay.  And give me one example of a
19 threat that he made toward you?
20 A.  I can't.  I forgot.  It's been years.
21 Q.  So you can't remember one example of a
22 threat?
23 A.  No.
24 Q.  Did you curse at Lieutenant Escalante?
25 A.  Could have.

Page 342

1  Q.  What did you curse at him about?
2  A.  If I cursed at him, it's probably what
3  I thought of him.
4  Q.  And did you actually record --
5  subversively record a conversation that you had
6  with him?
7  A.  No.  He thought I did.  I didn't.
8  Q.  Were you disciplined for that?
9  A.  I retired right after that incident.
10 Q.  Were you indicted for that?
11 A.  Indicted?  For what?
12 Q.  For surreptitiously recording somebody?
13 A.  No.
14 Q.  You know it's a crime, right?  Or at
15 least certainly it was in Illinois at the time.  I
16 think it still is.
17 A.  Under certain criteria.
18 Q.  Right.  Did you believe that you were
19 exempt from that rule when you recorded him or
20 you --
21 A.  I believed that my life was threatened,
22 and for my own personal wellbeing.
23 Q.  So you mean your life, you mean your
24 actual physical safety was threatened?
25 A.  Yes.

Page 343

1  Q.  Okay.  And what did he do to threaten
2  your physical safety?
3  A.  I don't remember the exact.  He came at
4  me with a menacing manner.
5  Q.  Did he touch you?
6  A.  He was about to.
7  Q.  Did he have a weapon?
8  A.  Carries a gun, doesn't he?
9  Q.  You all carry guns, but did he have his
10 weapon in his hand?
11 A.  I don't recall if he did or not.
12 Q.  So your testimony under oath is that he
13 came at you in a threatening, menacing manner as
14 if he was going to assault you?
15 A.  Yes.
16 Q.  And what did he say to you when he came
17 at you with a threatening, menacing --
18 A.  I don't recall.
19 Q.  And you don't recall what it was about?
20 A.  I don't recall.  It's been years.
21 Q.  Not that many years.  Less than ten
22 years?
23 A.  That's a long time for me.
24 Q.  Well, it must not have been too
25 threatening if it doesn't stick in your head,

Page 344

1  right?
2        MR. ENQUIST: Objection.
3        MS. ROSEN: Objection, argumentative.
4        BY MS. BONJEAN:
5  Q.  But before this incident in which you
6  claim that Lieutenant Escalante tried to attack
7  you, he had had some role in your discipline or
8  proposed discipline related to preparing a report
9  that contained false information, right?
10 A.  That was an allegation.  I differed
11 with the investigation.
12 Q.  You what?
13 A.  I differed from the investigating
14 officer that investigated the complaint.
15 Q.  You deferred?
16 A.  I differed.
17       MS. ROSEN: Differed.
18       BY MS. BONJEAN:
19 Q.  Differed?
20 A.  From internal affairs.
21 Q.  Did you cooperate with the
22 investigation?
23 A.  Yes, I did.
24 Q.  Okay.  And the internal affairs
25 sustained all the allegations against you, right?

Rizman Rappaport (973)992-7650
"When every word counts"

Page 345

1   A.  I was retired.  I don't know what they
2   did.
3   Q.  Well, did you ever get notification
4   that they had been sustained?
5   A.  I did not.
6   Q.  Okay.  But when the recommendation for
7   a suspension was made, you were not yet retired,
8   right?
9   A.  I was retired.
10  Q.  You were retired before OPS made their
11  recommendation?  IPRA?
12  A.  I was never notified.
13  Q.  You were never notified, okay.
14      Do you know how many complaint
15  registers have been lodged against you through
16  your career?
17      MS. ROSEN: Objection, asked and
18  answered probably about eight hours ago.
19      THE WITNESS: Do not.
20      BY MS. BONJEAN:
21  Q.  Do you know how many have been
22  sustained?
23  A.  Do not.
24  Q.  Okay.  Do you remember ever receiving
25  any discipline during the course of your career as

Page 346

1   a Chicago Police officer?
2   A.  I know I did.  I don't know when or
3   under what circumstances.
4   Q.  Did you receive any suspensions, major
5   suspensions?
6   A.  I think I probably did.
7   Q.  And do you recall what were the bases
8   of those major suspensions, if any?
9   A.  No.
10  Q.  Your complaint register history would
11  speak for itself, I assume?
12  A.  It's all documented.
13  Q.  Did you know Joe Miedzianowski?
14  A.  Yes.
15  Q.  How did you know him?
16  A.  He was assigned to gang crimes north.
17  Q.  And you were assigned where when he was
18  assigned to gang crimes north?
19  A.  Area 5.
20  Q.  Did you -- were you aware that he had
21  engaged in shakedown schemes when he was a officer
22  with the Chicago Police Department?
23  A.  I wasn't aware.
24  Q.  You're aware that he was ultimately
25  prosecuted for --

Page 347

1   A.  Yes.
2   Q.  -- activity of that nature, right?
3   A.  Yes.  I am now.
4   Q.  And you're aware that he's serving a
5   natural life sentence, correct?
6   A.  Yes.
7   Q.  When did you first become aware that he
8   was a police officer engaged in criminal conduct?
9   A.  I think when he was arrested.
10  Q.  Were you surprised that he was
11  arrested?
12  A.  Very much so.
13  Q.  Because you had no inkling that he was
14  engaging in any criminal behavior?
15  A.  Correct.
16  Q.  Do you know whether Rey Guevara and Joe
17  Miedzianowski were partners in crime?
18      MS. ROSEN: Object to the form.
19      MR. LEINENWEBER: Object, form, vague.
20      THE WITNESS: Could you repeat that
21  question?
22      BY MS. BONJEAN:
23  Q.  Yeah.  Do you know whether they were
24  coconspirators in criminal activity?
25      MS. ROSEN: Objection, form.

Page 348

1       MR. LEINENWEBER: Same.
2       THE WITNESS: No, I do not.
3       BY MS. BONJEAN:
4   Q.  So did you ever see them hang out
5   together?
6       MS. ROSEN: Objection, form, vague.
7       THE WITNESS: I don't remember if I did
8   or not.
9       BY MS. BONJEAN:
10  Q.  Did you ever see them work together?
11  A.  They were in the same unit.  I would
12  assume they did.  Being in the same unit, you have
13  to work with people.
14  Q.  Were you aware -- would you consider
15  yourself friends with Detective Guevara when you
16  worked with him?
17  A.  Working, while we were working we were
18  on good terms.
19  Q.  I mean, I'm assuming that some
20  detectives you like better than others, is that
21  fair to say?
22  A.  Just like some people I like better
23  than others, yeah.
24  Q.  Sure.  So was Detective Guevara someone
25  that you had a lot of regard for or was he someone

Page 349

1  that you didn't particularly care for or something
2  in between?
3  A.  He was a coworker.  I like all my
4  coworkers.
5  Q.  Including Bill Dorsch?
6  A.  My opinion changed on Bill Dorsch.
7  Q.  But when you worked with him, you liked
8  him okay?
9  A.  Went to his son's wedding.
10 Q.  So is that a yes?
11 A.  Yes.
12 Q.  When did your opinion change of Bill
13 Dorsch?
14 A.  When he started coming around for no
15 reasons at all and then he told me to call you.
16 Q.  Why would you find that so offensive,
17 if he just said call this lawyer who's just
18 subpoenaed you?
19    MS. ROSEN: Objection, form.
20    BY MS. BONJEAN:
21 Q.  Why did that bother you?
22 A.  There is no reason to talk to you.
23 Q.  Okay, but he didn't force you to call
24 me, right?
25 A.  He pestered me.

Page 350

1  Q.  He pestered you, but you're a grown
2  man, right?
3     MS. ROSEN: What is the point of these
4  questions?  Objection, relevance.
5     BY MS. BONJEAN:
6  Q.  You don't listen to Bill Dorsch, right,
7  if you don't want to, is that fair?
8  A.  That's fair.
9     MS. ROSEN: Objection, form.
10    BY MS. BONJEAN:
11 Q.  Okay.  So the mere fact that he told
12 you to call me made you conclude that he's changed
13 or you don't like him any more?
14    MS. ROSEN: What is your obsession with
15 Bill Dorsch?
16    MR. LEINENWEBER: Objection, form,
17 misstates prior testimony.
18    MS. ROSEN: Objection.
19    MS. BONJEAN: I don't have an obsession
20 with Bill Dorsch.
21    MS. ROSEN: It seems like we begin the
22 day and end the day talking about Bill
23 Dorsch, who has nothing at all to do with
24 anything in this case based on the questions
25 I've heard so far.  Is he on a report that

Page 351

1  I'm missing?
2     MS. BONJEAN: Is he on a report that
3  you're missing?
4     MS. ROSEN: Yeah.  Is he on some police
5  report where Bill Dorsch's name is on it?
6     MS. BONJEAN: He's only given sworn
7  testimony multiple times about misconduct at
8  Area 5.
9     MS. ROSEN: Yeah, I know, the whole
10 umbrella story.  I got it.
11    MS. BONJEAN: Umbrella story?
12    MS. ROSEN: Yeah.  This is all about
13 the umbrella man.
14    MS. BONJEAN: I have no idea what
15 you're talking about.
16    MS. ROSEN: Well, you should know.  If
17 you're going there, you should know.
18    MS. BONJEAN: The umbrella man.  Okay.
19    THE WITNESS: I'm sorry, your question?
20    BY MS. BONJEAN:
21 Q.  My question is, the mere fact that he
22 asked you to call me, is that the reason your
23 opinion changed of him or was there something
24 else?
25    MR. LEINENWEBER: Objection, misstates

Page 352

1  the witness' prior testimony.
2     MR. ENQUIST: Go ahead.
3     THE WITNESS: My opinion of Billy
4  changed when he started working for People's
5  Law Office, when he started working for you
6  and when he asked questions that I had
7  nothing to do with.  There is a reason for it
8  and I chose to stay my distance from him.
9     BY MS. BONJEAN:
10 Q.  So when he started working for people
11 who represent people who have been convicted of
12 crimes, that's when your opinion changed, right?
13    MS. ROSEN: Objection, form,
14 argumentative.
15    MR. ENQUIST: Objection,
16 mischaracterizes previous testimony.  Go
17 ahead.
18    THE WITNESS: Yes.
19    BY MS. BONJEAN:
20 Q.  Just a couple quick questions, I just
21 want to make sure that I -- did you play any role
22 in interviewing Rosa Bello, Mr. Maysonet's
23 girlfriend?
24 A.  I did not.
25 Q.  Did you ever see her at Area 5 when you

Page 353

1    were there for that 36 hours or however long you
2    were there?
3  A.  I don't recall seeing her.  It's not to
4    say that she wasn't there when I was there.  I
5    don't recall.
6  Q.  Did you ever see any members of
7    Mr. Maysonet's family at Area 5 when you were
8    there during the time that he was held in custody?
9  A.  I believe not.
10 Q.  And did you participate in interviewing
11   any of the individuals who were ultimately charged
12   as co-defendants in the case?
13 A.  No.
14 Q.  Do you remember taking any
15   investigative actions in the case involving the
16   Wiley brothers' murders after Mr. Maysonet was
17   charged and transported to the County?
18 A.  As I told you, the crime scene, went
19   out with the State's Attorney, Freddie Montilla
20   and him.
21 Q.  But after that, any actions in
22   connection with the case with any co-defendants,
23   anybody?
24 A.  No.
25 Q.  So the last memory you have of working

Page 354

1    on this case, apart from eventually testifying,
2    was taking Mr. Maysonet to the scene, is that
3    right?
4  A.  Yes.
5  Q.  Oh, did you know Rick Beuke?
6  A.  I knew him to be a State's Attorney.
7  Q.  Did he sometimes come to Area 5 in
8    felony review when you were there?
9  A.  I think so.  I'm not sure.  I think so.
10 Q.  Do you remember ever seeing him there?
11 A.  To be honest with you, I don't remember
12   seeing him there.
13 Q.  Did you know that Rick Beuke and Rey
14   Guevara were friends?
15 A.  I did not.
16 Q.  Did you know that Rick Beuke had
17   represented Rey Guevara on a number of personal
18   matters?
19 A.  I did not.
20 Q.  Did you know that Rick Beuke was
21   representing Rey Guevara a number of personal
22   matters at the same time he was representing
23   Mr. Maysonet in his criminal case?
24 A.  I did not.
25 Q.  Fair to say that you would have

Page 355

1    testified at the attempt murder case or the ag bat
2    case that you were involved in had you been called
3    to testify?
4  A.  Of course.
5  Q.  That case ultimately was not tried but
6    you would have testified, right?
7  A.  If I was called.
8  Q.  Right.  You wouldn't have called Tim
9    Grace, right?
10     MS. ROSEN: Object to the form.
11     MR. ENQUIST: Join.
12     THE WITNESS: No.
13   BY MS. BONJEAN:
14 Q.  Okay.  And you did testify in the
15   double murder case as well, right?
16 A.  I don't recall if I did or not.
17 Q.  Did you read your testimony prior to
18   today?
19 A.  I did, but I don't recall.
20 Q.  You remember actually testifying,
21   though, right, even if you don't remember what you
22   said?
23 A.  Again, I don't recall but I recall
24   testifying about the arrest.
25     MS. BONJEAN: Here, I have one other

Page 356

1    question.  Would you mark this whatever the
2    next number is?  It's on the Dropbox.
3      MR. ENQUIST: What is it?
4      MS. BONJEAN: It's his testimony.
5      MR. LEINENWEBER: Grand jury testimony?
6      MS. BONJEAN: There's also the trial
7    testimony.
8      MR. LEINENWEBER: And motion to quash?
9      MS. BONJEAN: Yes.  Pretrial.
10     (Whereupon, Paulnitsky
11     Deposition Exhibit No. 7 was
12     marked for identification.)
13     MR. LEINENWEBER: Is that 7?
14     MS. BONJEAN: Yes.
15     THE WITNESS: May I look at this?
16     MS. BONJEAN: Yes, please.
17   BY MS. BONJEAN:
18 Q.  Does this refresh your recollection
19   about whether you gave testimony in a pretrial
20   hearing in Mr. Maysonet's case on January 10,
21   1995?
22 A.  I would have to read the report to see
23   if I --
24 Q.  Well, let's look at page 379.  Do you
25   see your name there, "Motion to Quash Arrest"?

Page 357

1  A.  I see my name, yes.
2  Q.  Okay.  And if you go to page 382, do
3   you see that these transcripts reflect that you
4   provided testimony?
5  A.  On the bottom?
6  Q.  Yeah, where it says "Roland Paulnitsky,
7   called as a witness herein"?
8  A.  Yes.
9  Q.  Okay.  Any reason to quarrel with the
10  fact that you gave testimony at a pretrial hearing
11  on January 10, 1995?
12  A.  If it's here, then I was there.
13  Q.  Okay.  You don't have an independent
14  recollection of it?
15  A.  I don't recall, ma'am.
16  Q.  Okay.  And do you remember giving
17  testimony at the grand jury in this case?
18  A.  Isn't this from the grand jury?
19  Q.  No.  That's the pretrial hearing,
20  motion to quash arrest.
21  A.  Oh, it's the pretrial hearing?
22  Q.  Yes.  Hold on a second.  She's going to
23  mark it.
24
25

Page 358

1      (Whereupon, Paulnitsky
2   Deposition Exhibit No. 8 was
3   marked for identification.)
4   BY MS. BONJEAN:
5  Q.  And if you could look at Exhibit 8, do
6   you see on the first page it says "Before the
7   Grand Jury of Cook County," 29th of April, 1992?
8  A.  Yes.
9  Q.  And it has you listed as a witness?
10  A.  Yes.
11  Q.  Do you remember testifying at this
12  re-indictment in the Maysonet case?
13  A.  Yes.
14  Q.  You do remember that?
15  A.  Yes.  My name is here.
16  Q.  But do you remember it or you're just
17  reading off the piece of paper?
18  A.  You told me not to look at other
19  than -- I remember being there, giving testimony.
20  I'm on page 3, as you suggested.
21  Q.  Oh, yeah.
22  A.  No?
23  Q.  No, that's all right.  Hold on one
24  second.  I wanted to ask you a question.
25      If you could turn to page 4?

Page 359

1  A.  Of the same document?
2  Q.  Yeah.  At the bottom it says, "Did your
3   investigation reveal that the defendant, Jose
4   Maysonet, drove himself and other co-defendant,
5   including Christopher Gossens, to the location of
6   the shooting"?
7  A.  Yes.
8  Q.  And then your answer was "Yes."  When
9   you answered yes, do you know what you were
10  referencing in terms of your investigation?  Was
11  it the investigation or your investigation?
12  A.  It's part of the conversation that I
13  had with Mingey and Montilla.
14  Q.  What was?
15  A.  That he put himself there as the
16  driver.
17  Q.  That he drove himself and a
18  co-defendant, Christopher Gossens, to the location
19  of the shooting?
20  A.  Yes.
21  Q.  So your testimony is that Sergeant
22  Mingey told you that in a conversation with
23  Mr. Maysonet, Mr. Maysonet admitted to driving
24  himself and the co-defendant, Christopher Gossens,
25  to the location of the shooting?

Page 360

1  A.  He put himself at the shooting.  In
2   later investigation I read his statement.
3  Q.  Okay.  So you derived this from later
4   reading his statement?
5  A.  Yes.
6  Q.  You didn't actually develop that
7   information --
8  A.  No, I read it.
9  Q.  And so when you testified at the grand
10  jury in response to all of these leading questions
11  with a yes, you were primarily referencing
12  investigative work that had been conducted by
13  somebody else, right?
14  A.  Correct.
15  Q.  And was that commonplace, to do that?
16  A.  Yes.
17      MS. BONJEAN: All right.  I have
18  nothing further.
19      MR. LEINENWEBER: I have nothing.
20      MS. SPIVY: No questions.
21      MR. ENQUIST: We'll reserve.
22      THE VIDEOGRAPHER: We're going off the
23  record at 5:24 p.m. with the end of the
24  deposition of Roland Paulnitsky.
25      (FURTHER DEPONENT SAITH NOT.)

Page 361

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3  JOSE JUAN MAYSONET, JR.,     )

 4         Plaintiff,            )

 5    vs.                        )      No. 18-cv-02342
                                 )
 6  REYNALDO GUEVARA, et al.,    )

 7         Defendants.           )

 8         I, ROLAND PAULNITSKY, being first duly

 9  sworn, on oath say that I am the deponent in the

10  aforesaid deposition taken on the 17th day of

11  September, 2019; that I have read the foregoing

12  transcript of my deposition, consisting of pages 1

13  through 360 inclusive; and I do again subscribe

14  and make oath that the same is a true, correct and

15  complete transcript of my testimony so given as

16  aforesaid:

17         _____   as it now appears

18         _____   as it now appears with corrections
                    (Check one.)
19

20              ROLAND PAULNITSKY

21

22  Subscribed and sworn to
    before me this        day
23  of           , 2019

24

25  Notary Public
```

Page 362

```
 1  STATE OF ILLINOIS     )
                          )  SS:
 2  COUNTY OF D U P A G E )

 3         I, KAREN P. BURNS, a notary public within

 4  and for the County of DuPage County and State of

 5  Illinois, do hereby certify that heretofore,

 6  to-wit, on the 17th day of September, 2019, ROLAND

 7  PAULNITSKY personally appeared before me at 141

 8  West Jackson Boulevard, Suite 1240A, Chicago,

 9  Illinois.

10         I further certify that the said ROLAND

11  PAULNITSKY was first duly sworn to testify to the

12  truth, the whole truth and nothing but the truth

13  in the cause aforesaid; that the testimony then

14  given by said witness was reported

15  stenographically by me in the presence of the said

16  witness, and afterwards reduced to typewriting by

17  Computer-Aided Transcription, and the foregoing is

18  a true and correct transcript of the testimony so

19  given by said witness as aforesaid.

20         I further certify that the signature to

21  the foregoing deposition was reserved by counsel

22  for the respective parties.

23         I further certify that the taking of this

24  deposition was pursuant to notice and that there

25  were present at the deposition the attorneys
```

Page 363

```
 1  hereinbefore mentioned.

 2         I further certify that I am not counsel

 3  for nor in any way related to the parties to this

 4  suit, nor am I in any way interested in the

 5  outcome thereof.

 6         IN TESTIMONY WHEREOF:  I have hereunto

 7  set my hand and affixed my notarial seal this

 8  1st day of October, 2019.

 9

10

11

12

13         _____
           NOTARY PUBLIC, DU PAGE COUNTY, ILLINOIS
14         License number 084-002615

15

16

17

18

19

20

21

22

23

24

25
```

# A

**ability (7)**
7:14;9:19;16:15;
18:4;136:14;169:24;
215:20

**able (15)**
32:17;69:13;
131:15;209:7;215:14;
217:11;219:14;222:3;
242:22;246:2;263:1;
279:18;280:23;
281:16;300:25

**above (1)**
210:2

**above-mentioned (3)**
209:18,22;211:18

**above-referenced (1)**
210:1

**absolutely (4)**
54:8;58:4;91:15;
230:22

**Academy (11)**
104:15,20,23;
128:1;131:6,11;
134:3,11;135:14;
137:22;162:25

**accent (2)**
201:7;263:4

**acceptable (4)**
8:7;138:8;147:2;
157:24

**access (8)**
171:12;281:16;
282:12;286:13,18,20,
24,25

**accessible (1)**
293:14

**accompanied (2)**
254:23;258:20

**accompany (2)**
250:21;308:7

**according (6)**
138:8;254:8;
257:20;310:1;339:15,
18

**account (4)**
137:17,19;147:13;
209:16

**accuracy (2)**
138:16;139:12

**accurate (12)**
43:13;68:11;
122:13,14;136:25;
137:1;143:8;215:17;
252:2,14;253:3,5

**accurately (3)**
137:6,10;142:2

**accuse (1)**
340:24

**accused (2)**
13:20,25

**accusing (1)**
229:20

**across (1)**
73:7

**act (1)**
334:8

**acted (3)**
52:8;175:16;176:7

**action (4)**
102:3,15,16;288:10

**actions (9)**
132:8;137:19;
151:16;156:11;
174:23;177:18;
186:17;353:15,21

**actively (1)**
300:10

**activities (1)**
313:24

**activity (3)**
292:14;347:2,24

**acts (1)**
220:17

**actual (4)**
132:4;215:15;
228:16;342:24

**actually (45)**
12:10;46:14;47:2;
53:19;56:24;59:2;
66:13;84:22;116:13,
21;118:12;121:20,25;
123:23;124:17;126:9;
130:22;143:10,13;
145:11;147:10;186:5;
188:22;189:20;194:7;
205:25;222:2;234:11;
235:14;236:5;251:7;
287:6,6,16;289:2,20;
295:22;297:22;
317:22;319:16;320:2;
340:3;342:4;355:20;
360:6

**adamance (1)**
62:19

**add (2)**
166:6;317:1

**addition (2)**
151:15;215:11

**additional (5)**
312:23;315:2;
327:21;330:14;331:9

**address (7)**
96:10;101:1,5;
135:11;197:2;227:17;
228:12

**admitted (1)**
359:23

**advance (1)**
120:15

**advanced (1)**
122:5

**advice (11)**
31:6,8,10,16,18;

**advise (1)**
87:12

**advised (2)**
199:1,2

**affairs (2)**
344:20,24

**affect (2)**
17:7,7

**affects (1)**
16:5

**affiliated (1)**
227:19

**affiliation (1)**
228:25

**afforded (1)**
71:13

**afraid (3)**
79:18,22;80:6

**African-American (1)**
172:7

**Afro (2)**
302:14,15

**ag (6)**
195:25;196:14;
206:5;247:4;278:3;
355:1

**Again (52)**
18:12;24:9;34:5;
36:9;38:4;48:25;64:5;
67:4;68:19;75:25;
76:17;86:22;106:2;
128:21;132:23;
136:16;158:25;
163:17;164:1,19;
166:8,13;180:7;
181:21;194:11;199:2;
202:13;205:17;
221:10;226:25;228:6;
237:7;238:5;255:6,
14;256:23;260:16;
269:19;270:1;272:12;
288:2;289:3,10;
294:2,11;295:5;
306:25;311:12;
314:10;316:1;335:25;
355:23

**against (20)**
13:2,18;14:2,25;
15:8;21:7,11,12;48:1;
80:21;150:22;199:2;
335:1;336:1,13,18;
337:3;340:4;344:25;
345:15

**age (3)**
208:19;337:15;
338:20

**agencies (1)**
129:13

**aggravated (11)**
183:17;184:24;
188:6,7;190:10,19;

**191:9;195:4;200:4;**
242:17;245:23

**ago (12)**
25:4,8;27:11;38:11;
43:2;46:12;50:21;
209:19;245:19;
252:25;253:4;345:18

**agree (27)**
7:24;56:24;70:19;
78:10,12;81:10;
88:13;136:9;139:10;
148:18;161:23;
207:15,19,23;208:7;
218:21;219:12;228:5;
236:6;260:7;266:11;
274:20;287:7;302:17;
307:7;322:15;339:9

**agreed (2)**
155:24;308:7

**agreeing (1)**
140:23

**ah (1)**
31:15

**ahead (18)**
33:23,24;35:11;
52:22;56:16,21;73:4;
75:16;120:13;140:12;
190:20;213:20;218:7;
233:24;266:6;330:23;
352:2,17

**aid (1)**
102:17

**air (1)**
97:7

**al (1)**
5:3

**alert (2)**
28:14;230:13

**alerted (1)**
304:24

**Alfredo (2)**
274:3,5

**allegation (5)**
11:24;13:1;150:23;
335:1;344:10

**allegations (11)**
11:25;13:18;14:2,
24;15:7,13;83:10;
155:2;199:2;333:24;
344:25

**alleged (4)**
13:24;155:2;
211:25;305:9

**allegedly (10)**
81:11,17;188:5;
215:25;220:19;243:1;
265:17;307:9;327:13;
329:6

**allowed (2)**
202:11;333:9

**alluring (1)**
107:8

**Alma (4)**

**294:11,12,16,17**

**Almost (5)**
41:17;202:22;
286:4,8;310:17

**alone (1)**
22:20

**along (1)**
71:23

**alternatives (1)**
252:17

**Although (2)**
47:18;210:8

**always (12)**
45:13;52:14,17;
53:2;131:20;133:20;
139:19;179:6;297:4;
298:9,12;334:21

**amend (1)**
159:2

**Amendment (13)**
65:24;66:12,22;
67:20;68:5,10,21;
71:13;77:23;78:10,
16;93:12;94:16

**American (2)**
302:14,15

**amount (1)**
150:13

**announcing (1)**
44:24

**answered (63)**
12:16;24:25;28:6;
32:22;37:7,18;38:13,
25;55:1;57:17;59:19;
61:12;62:11;64:18,
24;76:7;77:13;78:1;
79:7;86:15;87:16;
88:8,18;89:1,8,16;
91:9,13;92:10;93:20;
94:10;103:1,2,13;
116:16;118:23;119:8,
16;140:3;156:23;
159:9;177:3;182:9;
192:15;193:4;201:12,
23;213:20;218:5,16;
220:21;234:23;241:8,
16;243:9;259:11;
260:9;264:17;269:24;
288:15;340:13;
345:18;359:9

**Anthony (1)**
183:14

**anti-police (1)**
82:13

**apart (11)**
22:11;23:6;118:18;
120:16;128:21;
170:21,24;217:24;
218:11;278:25;354:1

**apartment (1)**
183:15

**apologies (2)**
85:10;173:1

**apologize (2)**
85:12;316:23

**apparently (2)**
178:7;336:19

**appeal (1)**
126:25

**appealed (2)**
107:14,16

**appear (8)**
32:6;33:1;34:16;
35:14;36:24;37:10;
208:8,18

**appearance (2)**
239:9;241:1

**appeared (1)**
65:19

**appears (1)**
273:19

**application (3)**
104:10,10,11

**applied (3)**
103:24;104:4;
337:21

**apply (3)**
103:19;115:11;
339:17

**appreciate (1)**
32:14

**apprised (1)**
173:17

**approached (8)**
57:13,13;59:17;
60:4;132:24;133:1;
243:15;301:22

**approval (2)**
68:1;237:1

**approved (4)**
170:16;294:5;
313:2;315:11

**approximate (6)**
10:17,21,21,24;
11:6;165:5

**approximately (5)**
47:10;162:18;
322:22;323:11;325:9

**April (1)**
358:7

**arbiter (1)**
56:11

**Area (116)**
45:24;49:11;53:3;
96:16;108:23;109:14,
16;110:10,23;111:17;
112:23;120:7,23,25;
123:3,4,15,17;124:7,
7,9,10,11,18,20,25;
125:18,21;126:3,12,
16;127:9,16;148:5,7,
15;161:8;162:17;
163:1,4;165:3,16,17,
19,20,21;166:3,10;
168:25;170:13,23;
171:1,2;173:19;

189:9;191:15;198:8,
13,16,24;203:4;
234:2;236:25;238:11;
243:17,20;244:8,13;
245:11;246:11;250:3,
21;253:7,7,19,24;
256:19;257:6;258:14;
259:5;261:4,17,18,19;
263:11,14;271:10;
275:12;283:8,19;
288:12;298:15;
299:11;300:1;301:1;
304:5;308:7,20;
311:8;313:25;320:12,
20;322:21;325:2,8,
17;332:14,25;333:11,
15;334:23;346:19;
351:8;352:25;353:7;
354:7

**areas (7)**
111:14,15;123:10;
124:23;125:21,22,22

**argument (2)**
43:11;141:23

**argumentative (45)**
35:7;36:7;43:16;
53:21;58:9,12;60:22;
67:12;68:24;76:23;
77:1;79:25;81:14;
82:8;87:2,8;89:24;
90:17;103:3;141:2;
142:6;151:4,10;
153:2;154:3,8;
175:20;193:16,18;
223:5,16,20;224:18;
225:3;226:1,20;
227:15;229:8;232:12;
259:17;260:8;264:24;
308:1;344:3;352:14

**arises (1)**
72:5

**Army (6)**
97:1,11,14;99:4,5;
121:8

**around (9)**
147:21;150:19;
164:9;177:17;185:18;
258:2;292:22;336:8;
349:14

**arrange (1)**
254:14

**arranged (3)**
254:8;255:10;
258:23

**array (4)**
45:21,22;46:6,18

**arrays (1)**
132:9

**arrest (33)**
106:7,8;130:21;
131:24;156:5,8;
184:17;187:15,18;
191:20;192:6,18;

195:1,8,11;196:25;
245:4,16,22,25;
259:21;260:14,20;
264:13;286:14,17;
287:2;292:21;315:13;
336:3;355:24;356:25;
357:20

**arrested (22)**
91:17;178:2;
190:18;192:5;195:25;
196:9,14;215:7;
232:19;238:24;239:2;
245:8;248:16;250:2;
275:3;286:5,9,22;
287:8;288:5;347:9,11

**arresting (5)**
183:1;190:2;
287:19;295:3;301:11

**arrests (5)**
106:7;112:14,19;
113:8;274:17

**arrive (1)**
261:14

**arrived (4)**
62:1;259:2;261:2;
320:12

**arson (4)**
30:7,8;165:9,15

**artillery (2)**
98:7,9

**ASA (3)**
267:1;321:17;322:6

**Aside (5)**
23:2;24:10;40:18;
231:20;236:22

**aspect (2)**
131:25;144:22

**assault (1)**
343:14

**assert (11)**
65:16,24;66:11,21;
67:20;68:10,21;
75:13;78:9,15;93:11

**assign (3)**
142:20,21;176:10

**assigned (48)**
52:5;71:1;105:5;
120:22,23;123:3;
124:7;126:12,20,22;
146:13,15,19;175:6,8,
10,13,23;176:1,4,18,
21;177:1,12;183:25;
184:17;188:22;189:2,
16;190:14;212:6,10;
213:15;223:24;225:6;
243:24;270:25;
290:22,25;291:1,2,4,
7,8,13;346:16,17,18

**assignment (4)**
97:12;104:23;
135:10;291:5

**assignments (1)**
123:15

**assist (5)**
83:7;92:8;256:18;
260:16;264:9

**Assistant (3)**
5:21;71:5;300:22

**associated (1)**
38:5

**assume (25)**
27:7;97:15;104:16;
105:1;131:3;134:1;
166:18;169:8,16;
172:24;217:7;218:18;
224:4;260:11;279:22;
282:7;284:1,7;
298:20;303:23;306:3;
324:9;327:19;346:11;
348:12

**assumed (1)**
174:22

**assuming (6)**
224:5;225:11;
287:4;288:2;314:20;
348:19

**attach (1)**
135:3

**attached (6)**
164:5;221:21;
285:11;315:12,13,21

**attack (1)**
344:6

**attempt (5)**
190:3;248:2;251:7;
305:24;355:1

**attempting (1)**
337:10

**attend (2)**
104:18;121:9

**attendance (6)**
157:21;272:25;
273:7,10;275:7;276:8

**attendances (1)**
328:5

**attended (1)**
104:15

**attention (3)**
182:12,25;311:20

**attest (1)**
139:11

**attesting (1)**
303:13

**Attorney (66)**
5:22;23:1;24:11;
40:10,15,20;44:6,7;
52:23;54:9;66:3,6;
68:9;70:22;71:1,5;
72:8;74:21;75:19;
76:18;78:3,9;79:9;
80:2,7;83:20;84:4,5,
11;85:8,14,14,20,24;
86:17,18;87:19;94:5;
95:2;152:5;200:1;
202:5,7,8;236:8,8;
265:5;266:5,17;

289:12;300:22;304:7;
305:23;306:10,15;
307:4;308:9;309:1,
18,19;315:3;326:24;
327:17;339:20;
353:19;354:6

**attorney/client (5)**
72:11;74:3,11;
80:10;83:25

**attorneys (23)**
6:25;21:23;22:2,21,
23;23:2,6;24:7,13;
25:22;26:1,2,8;27:11;
45:1;63:7;66:13;
70:16;84:20,24;
151:22,25;235:15

**Attorney's (9)**
28:14;66:20;67:19;
77:21;78:5;130:12;
200:5;275:11;306:22

**August (33)**
238:21,25;243:25;
246:2;248:16,17;
249:14;250:3;260:22;
268:15;269:2;274:6;
275:4;286:9;287:23;
292:22;297:13;309:4,
4;315:25;316:13;
319:9,11,14,14,15,25;
320:1,13;321:17;
322:2;323:10,13

**author (5)**
296:7,9,9;304:1,25

**authored (4)**
140:17;163:11;
164:11;328:3

**authoring (1)**
304:16

**authorship (1)**
147:11

**autopsy (3)**
280:12,14,15

**available (5)**
13:17;173:15;
200:23;309:19;314:3

**Avenue (9)**
107:24;108:1;
114:10,10;172:8;
234:2,2,3;241:24

**average (1)**
257:15

**avoid (1)**
101:15

**aware (22)**
14:3;46:8,11,15;
66:19,24;67:2,18;
92:19;108:20;133:15;
235:10;300:8;315:16;
320:23;333:13;
346:20,23,24;347:4,7;
348:14

**away (2)**
242:8,12

# B

**back (57)**
9:2;25:20;28:22;
38:15;39:19;52:12;
61:6;67:8;79:10;
95:17;98:13;105:10;
114:1;123:11,12,19;
124:2,4;140:21;
153:15;160:13;161:9;
165:1;166:9;169:14;
176:15,19;190:1;
198:11,24;199:9;
200:2;205:14;206:3;
243:17,19;253:6,7;
257:6;258:14;261:17;
274:6;284:10;294:22;
295:3;296:24;298:20;
299:10;302:23;304:5;
309:24;310:23;315:6;
321:9;322:19;329:21,
22

**background (1)**
189:6

**backwards (1)**
289:21

**bad (2)**
109:23;138:2

**badge (1)**
243:16

**bail (2)**
242:19,22

**Balbo (1)**
30:5

**barring (1)**
136:16

**based (6)**
56:18;84:10;
250:20;258:12;
314:24;350:24

**baseless (1)**
83:9

**bases (1)**
346:7

**basic (4)**
97:15,19,21;98:5

**basically (7)**
10:2;133:4;203:16;
247:21;262:11;
282:21;312:23

**basis (8)**
26:5;83:20;84:9,10;
85:16;303:6,14;337:2

**basket (3)**
164:17;166:12;
167:5

**bat (5)**
195:25;196:14;
206:5;247:4;355:1

**Bates (9)**
206:14,19,20;
287:13;316:15,18;

317:5,15;318:23

**bathroom (3)**
262:7;263:21;264:3

**bats (1)**
278:3

**batteries (3)**
188:6,7;245:23

**battery (8)**
183:17;184:25;
190:10,19;191:9;
195:5;200:4;242:17

**Beach (1)**
234:2

**bear (3)**
96:7;104:8;282:23

**bears (2)**
287:13,17

**became (11)**
47:9;80:6;103:23;
114:2;115:12;123:18;
160:3;177:16;185:6;
213:23;340:9

**become (5)**
46:15;80:22;
115:10;150:9;347:7

**becoming (1)**
80:25

**begin (1)**
350:21

**beginning (1)**
244:24

**behalf (8)**
5:18,20,22,24;6:2;
28:9;78:23;103:9

**behavior (2)**
333:5;347:14

**behind (3)**
134:22;169:22;
278:9

**belief (6)**
16:13,19,19,20;
18:2;84:10

**bell (1)**
294:20

**Bello (1)**
352:22

**Belmont (2)**
221:23;233:19

**belong (1)**
305:9

**belonged (1)**
68:5

**bench (1)**
60:6

**beneficial (1)**
151:16

**benefits (1)**
150:18

**besides (4)**
52:21;171:22;
283:18;284:2

**best (18)**
7:14;9:7,19;64:10,

20;115:16;118:20;
136:14;146:5;158:14;
167:7;172:19;200:17;
215:19;238:2;249:25;
296:10;337:18

**better (4)**
208:14;257:15;
348:20,22

**Beuke (4)**
354:5,13,16,20

**beyond (1)**
275:15

**big (2)**
59:24;159:18

**Bill (16)**
41:14,19;42:14,22;
45:13;48:11;49:11;
52:14;349:5,6,12;
350:6,15,20,22;351:5

**Billy (1)**
352:3

**bin (2)**
164:17,19

**birth (3)**
96:18;227:17;
228:24

**bit (3)**
43:2;105:15;108:5

**black (10)**
54:12;78:12,14,19;
79:1;100:16;301:21;
302:14,18;303:3

**blanket (6)**
72:3,22;74:15;75:6,
23;78:24

**blocks (1)**
108:5

**blood (2)**
17:23;193:20

**bloody (1)**
75:12

**blown (1)**
45:15

**Board (24)**
42:24;54:11;
163:24;167:20;
171:23;173:7,14,24;
174:4,18;177:22;
185:9,21,23;268:18,
20;276:23;285:7,8;
291:25,25;292:3;
293:14;295:7

**bodies (1)**
173:4

**body (3)**
16:23;18:8;139:16

**bomb (8)**
165:9,14;337:11,
12,22;339:1,10,15

**bombs (2)**
337:13,16

**bond (6)**
242:19,19;243:2,2,

5,6

**Bongiorno (11)**
183:14;197:5;
213:21;220:8,14;
221:17;222:1;231:15;
233:18;234:11;
235:10

**Bonjean (455)**
5:17,17;6:11,13;
8:6;10:7,12;11:4,9,19,
23;12:3,9,18;14:7,14,
15;15:19;17:14;
18:24;19:13;20:9,18,
21;21:20;24:3,6,8;
26:9;29:11;32:1;33:3,
11,18;34:4;35:11,15,
24;36:12;37:14,20;
38:2,16;43:12,18;
46:22;47:17,24;
49:14;50:2,19;51:5,9,
10,19,25;52:9;53:23,
24;54:20;55:4,14,20;
56:3,6,9,14,19,23;
57:6,11,23;58:5,10,
18,22;59:2,6,9,13,15,
21,24;60:3,14;61:4,
14,23;62:24;63:22;
64:19;65:2;66:9;67:8,
17;69:1,4,9,13,15,20,
23;70:2;71:22;72:18;
73:3,9,14;74:9,19;
75:1,4,13,21;76:11,
20;77:2,14;78:7;
79:15;80:4,23;81:5,
19;82:3,11,20;83:6,
22,24;84:6,13,21;
85:4,10,15,18;86:3,
10,21;87:3,10,21;
88:2,11,22;89:4,10,
19;90:3,18,24;91:10,
16;92:13,23;93:6,15,
23;94:13,21;95:10,
19;101:19,23;102:2,
10,22;103:7,15;
107:15;110:19;111:8;
115:2;116:12,19;
117:2,9,17;118:1,6,
11;119:3,12,19;
120:9;122:14,21,23;
127:5;130:14;137:20;
140:4,9,14;141:3,8,
16,20;142:1,9;
143:20;145:9;146:17,
24;147:8;149:12,23;
150:2,8,17;151:1,5,
13;152:4,16,22;153:7,
11,21;154:4,11,17,22;
157:1,22;158:6,20;
159:1,5,11;167:15,17;
170:12;175:3,21;
177:6;180:10,18;
181:1,6,11,15;182:3,
11,15,21,24;183:7;

185:14;186:15;
187:19;188:24;189:3;
192:19,24;193:6,12,
19;194:1,9,15;
197:20;201:14;202:1,
22;203:1,2;204:1,17;
205:8,16;206:12,17;
213:1;214:1,17,22;
215:21;216:4,18;
217:2,10;218:10,20;
219:1,6,11;220:5;
221:1;223:11,17,21;
224:13,23;225:7,19;
226:8;227:2,21;
229:9,13,23;230:5,7,
10,20,25;231:4,11,13;
232:20;233:2,10,14;
235:1,21;236:4,16;
237:10,13;239:20;
240:8,13,24;241:12,
19;243:3,10;245:20,
24;249:16,19;252:9,
22;259:14,19;260:2,
12;263:24;264:10;
265:2;266:24;267:8,
17;268:1;270:3,7,13;
274:10;275:1;279:6,
10,17;283:20;284:5,
8;285:16,24;287:11;
288:9,18,23;289:8;
291:6,19;293:19;
294:10;296:13;298:2;
299:3,8,21;301:7,10;
302:11;303:1,20;
304:9;307:15;308:10;
310:10,18,25;311:5,6;
312:4,6,9,13,15;
316:4,7,9,16,19;
317:2,6,10,16,20,23;
318:1,4,9,13,18,21;
319:20,21;323:15,22;
324:1;330:11,18,23;
331:1,7;332:20;
333:3,19;335:16,19,
22;337:1;339:8;
340:17;344:4,18;
345:20;347:22;348:3,
9;349:20;350:5,10,
19;351:2,6,11,14,18,
20;352:9,19;355:13,
25;356:4,6,9,14,16,
17;358:4;360:17

**book (2)**
38:21;135:7

**books (1)**
135:5

**bored (1)**
107:7

**boring (2)**
127:1,4

**Borowitz (1)**
308:20

**boss (1)**

187:5
**both (18)**
5:12;9:6;47:12;
66:19;71:15;126:7;
192:25;193:3;234:14;
246:25;247:3,8;
248:7,11;254:25;
275:12;285:15;
330:19
**bother (1)**
349:21
**bottom (9)**
209:9;216:6;
217:14,17;218:11;
296:1;317:15;357:5;
359:2
**boundaries (1)**
107:20
**boundary (1)**
114:9
**Boyle (4)**
271:1,3;290:19;
291:13
**Bradley (1)**
108:3
**branch (5)**
239:25;240:3,15;
241:5;251:23
**brand (1)**
114:7
**break (11)**
9:12,15;95:9;
193:18,19,25;194:2,8,
9;202:19;205:9
**Brennan (2)**
290:19;291:13
**brief (1)**
311:9
**bring (1)**
46:24
**bringing (3)**
261:11;298:16;
300:25
**broke (1)**
205:19
**brothers (7)**
172:4;185:16;
192:13;285:2;291:22;
292:14;303:6
**brothers' (41)**
171:19;174:16;
175:9,13,24;176:4,22;
177:13,19;178:15;
184:23;185:3;186:11,
18;187:22,25;188:14,
24;191:7;194:22;
195:11;243:25;244:3,
13;245:2;246:5;
247:24;249:17;250:1,
14;265:9,12,19;
273:16;274:18;
276:19;325:24;326:5;
328:18,23;353:16

**brought (13)**
12:20;15:13;50:1;
129:11;183:15;
205:25;237:8;255:9;
309:22;311:8,12;
312:25;313:25
**Brown's (13)**
48:20,22;49:3,7,13,
16,19,22;50:4,6;51:1;
52:6;55:24
**bucks (1)**
59:1
**building (11)**
42:25;59:24;63:13;
70:17;172:22;239:5;
242:9;251:21;254:21;
299:1,25
**bulletin (1)**
134:14
**burglaries (1)**
126:24
**Burns (1)**
5:12
**busy (4)**
113:3;148:5,7,10
**buy (1)**
333:9

**C**

**cabinet (2)**
169:20;277:14
**cafeteria (1)**
63:17
**California (13)**
25:1;32:7;33:1;
34:3;59:23;62:4;
125:16,17;238:19;
239:4;241:24;242:13;
304:4
**call (40)**
25:19;38:6,19;
39:11,13;40:7,14;
42:8;53:8,9,13;62:16,
17;94:3;99:4,5;
102:16;110:23;
123:14;130:20;
131:20;172:6,17;
202:12;204:4;261:6,
8;262:9;263:21;
289:1;311:11;313:9,
13,16;314:17;349:15,
17,23;350:12;351:22
**called (37)**
25:16;29:20;30:10,
21;37:11;38:10,15,17,
18,20,24;39:25;
61:13;65:25;66:22;
67:21;68:10;82:14,
24;86:1;90:9;99:9,22;
120:4,6;122:1;
123:17;152:19;
176:13;200:1,2,8;

203:20;355:2,7,8;
357:7
**calling (1)**
40:5
**calls (18)**
65:14,16,18;72:11,
25;152:13;214:14;
216:23;217:8;235:18,
25;236:10;239:16;
240:5;263:17;307:11;
321:8;331:16
**came (40)**
46:12;49:22;52:3,
12;57:4,20;60:7;
98:12;123:7;124:9;
133:9;134:20;143:12;
144:16;145:22;154:5;
164:7;173:6,10;
174:17,21;189:5;
200:4;210:24,25;
211:7;216:9;218:2;
220:14;221:20;
233:16;234:5;258:10,
15;298:20;324:9;
331:16;343:3,13,16
**Camp (1)**
128:15
**can (94)**
7:24;8:19;9:24;
10:2,17,21;13:10;
19:8;29:22;33:23;
35:11;55:11,12;
56:15;65:16;67:8;
69:25;71:4;73:15;
77:5;78:10;79:12;
80:15;87:5;89:20;
100:19;113:9;117:10;
120:17;121:22;
127:21;128:4,23;
137:18;142:2;144:5;
145:14;146:11;
151:17;155:12;157:5,
14;158:10;162:18;
165:5;166:4;171:1;
182:13;205:8;206:8;
208:25;210:2;211:4;
215:6;218:12;221:2,
10;233:5,24;236:21;
250:19;252:18;
253:12;270:15;
271:21;273:18;
274:20;277:25;
280:15;282:15;
285:17,21;287:7,9;
293:23;294:11;
296:10;301:12;
302:19;307:7;308:14;
310:18,25;312:5;
314:7;315:7,7;316:1,
24;317:4,14;322:15;
323:18,19
**canvass (1)**
293:22

**capacity (4)**
11:11;16:25;
155:25;157:3
**car (18)**
45:14;198:21;
253:10,22;254:2,5;
255:10,13,19;261:10;
305:9;306:6,19;
307:9,16;308:17;
310:15;326:13
**card (48)**
221:21,22;222:2,3,
7,9,16;223:2;224:25;
225:14,14;226:10,12,
13,15,19;227:1,4,5,
12,24;228:10,14,17;
229:6;230:16;231:8,
14,23,24;232:4,7,11,
17,22,25;233:5,16,22;
234:5,12,17,22;235:3,
6;236:5,18;283:9
**cards (7)**
224:15;227:22;
228:7;230:15;282:16,
16;305:14
**care (5)**
48:3,4;95:5;193:2;
349:1
**career (12)**
48:2;84:23;87:23;
109:9;110:1;131:8;
133:20;138:3;142:19;
166:10;345:16,25
**Carries (1)**
343:8
**Carroll (1)**
50:11
**carry (2)**
153:7;343:9
**Cars (1)**
228:4
**case (124)**
5:5;7:1;8:10;12:20;
13:8;14:9,10,13,13,
13,16,17,18,22;22:15,
25;23:4,21,24;24:12;
26:14,14;27:23,25;
28:22;29:23,25;30:2,
7,18;38:11;42:5;
48:14,17,20,22;51:4,
20;52:12;53:7;54:2;
55:12;58:21,24;
61:10,17,25;63:24;
64:2,21;73:11,13;
82:15,24;83:8;84:24;
87:14,23;89:14,20,23;
90:21;108:13,19;
127:15;130:19;133:5;
134:24;139:23;
143:25;156:3,4;
160:7;167:18;168:13;
175:6,9;176:10;
188:22,23;190:3;

206:24,25;240:18;
251:7,18;265:6;
273:23;274:18;277:9;
281:1,17;289:25;
290:2,22;291:1,2;
296:15,20;301:4;
306:16;307:5;309:22;
313:12,18;314:7,11;
328:10,13,17;331:4;
350:24;353:12,15,22;
354:1,23;355:1,2,5,
15;356:20;357:17;
358:12
**cases (14)**
46:16;51:15;64:22;
148:11,14,16;164:9;
173:8,22,23;240:16,
16,17;325:8
**Castillo (6)**
12:4,12,21;13:4,20;
15:8
**Castillo's (2)**
14:3,24
**catch (1)**
314:4
**catching (1)**
325:11
**categories (1)**
228:18
**category (1)**
146:14
**cause (8)**
29:24;130:24;
131:2,6;260:13,20;
264:13;284:23
**CCSAO (5)**
317:16;318:2,23;
323:2;324:19
**cease (1)**
133:13
**cell (1)**
254:17
**center (1)**
44:25
**Central (5)**
121:11;122:1;
125:1,12;126:7
**certain (10)**
111:14,15;130:8;
135:18;144:3;149:16;
154:10;330:5;337:5;
342:17
**certainly (10)**
9:12;29:19;34:19;
55:16;73:11;204:10;
214:10;297:17;300:8;
342:15
**cetera (1)**
238:10
**chain (1)**
45:8
**challenging (1)**
20:2

**chambers (1)**
239:24
**chance (3)**
92:5;257:11,15
**change (1)**
349:12
**changed (7)**
105:9;110:18;
349:6;350:12;351:23;
352:4,12
**chapter (1)**
130:8
**characterized (2)**
85:17;293:3
**charge (6)**
130:16,18,22;
152:10;203:20;237:1
**charged (12)**
50:14,15;91:3;
203:19,22;238:4;
273:15;288:5;300:14,
19;353:11,17
**charges (5)**
14:8;93:18;94:23;
130:11;131:17
**charging (1)**
131:23
**chauffeur (1)**
310:5
**check (2)**
134:14;336:20
**checked (2)**
264:1;311:9
**checks (1)**
134:15
**Chicago (42)**
5:10,25;11:12;21:8;
34:9;35:18;42:12,24;
52:4;53:15;54:22;
81:10,21,25;82:5;
91:25;92:18;94:7,14;
95:21;96:5,9,14;
98:21,23;99:7,25;
101:2,6;103:19;
104:24;115:17;129:5;
138:8,25;149:13;
153:6;160:2;205:5;
224:2;346:1,22
**Chicken (12)**
48:20,22;49:3,7,13,
16,19,22;50:4,6;51:1;
52:7
**chief (2)**
120:7;239:23
**chitchat (5)**
25:10;26:20,21;
27:13;262:10
**choice (9)**
43:5,6,9,14,17,19,
24;114:17,18
**chose (2)**
43:14;352:8
**Christopher (5)**

**273:25;274:1;**
359:5,18,24
**chuckled (1)**
45:16
**Circuit (2)**
28:22;52:12
**circumstance (2)**
26:22;136:16
**circumstances (7)**
101:10;138:16;
145:13;146:23;
159:23;239:1;346:3
**Cisco (1)**
179:15
**citizen (2)**
92:11,14
**citizens (1)**
115:16
**City (17)**
5:25;23:1;81:24;
82:5;98:21,22;99:7,
10;100:7,10;101:2,5;
114:4;129:10;148:7;
161:24;162:1
**civil (8)**
14:13,18;27:19;
30:14,15;99:10;
101:1,5
**claim (4)**
224:25;225:24;
226:3;344:6
**clarity (2)**
158:23;193:10
**class (3)**
123:8,9,22
**classes (1)**
122:18
**classroom (5)**
128:9,11,22,25;
129:1
**clause (1)**
71:15
**clear (6)**
12:10;59:16;230:1;
269:19;272:17;
323:25
**cleared (2)**
300:18;321:10
**cleared/closed (1)**
336:3
**cleared/open (3)**
295:11;300:15;
309:24
**clearer (1)**
8:18
**clearing (1)**
325:10
**clearly (2)**
55:10;56:2
**clerk's (1)**
275:21
**client (2)**
75:11;82:5

**clients (3)**
71:12;77:8;79:17
**climate (5)**
79:18,22;80:6;
82:21,22
**clip (3)**
272:10;273:2;
329:23
**clipboard (1)**
167:20
**closed (2)**
291:8;309:12
**closer (1)**
114:14
**closing (1)**
204:13
**clue (2)**
199:16;290:5
**coat (1)**
173:12
**co-author (1)**
189:20
**co-authored (1)**
163:12
**coconspirators (1)**
347:24
**code (3)**
130:17;132:3,5
**co-defendant (1)**
359:4,18,24
**co-defendants (14)**
23:24;24:11,12;
27:23,25;61:9,25;
64:1,13;108:12,18;
274:17;353:12,22
**codes (1)**
106:5
**coercing (1)**
13:20
**collaborative (1)**
144:24
**collaboratively (2)**
189:10,13
**colleague (1)**
12:20
**collectively (1)**
18:4
**college (9)**
121:3,5,6,10,11,13,
14,15;122:18
**colleges (1)**
129:11
**color (1)**
208:19
**column (2)**
81:4;296:1
**comfortable (2)**
263:12,14
**coming (5)**
26:4;54:4,6;167:23;
254:5;256:1,19;
349:14
**commander (11)**

**49:24,25;120:5;**
183:24;187:5;188:18;
313:1;315:15;340:4,
9,21
**comment (2)**
197:19;308:1
**commentary (2)**
153:10;264:6
**comments (2)**
67:12;167:14
**commit (1)**
333:22
**committing (1)**
132:8
**commonplace (1)**
360:15
**communicate (2)**
19:8;201:16
**communicated (4)**
52:11;137:6;
201:13;250:13
**communicating (2)**
200:18;203:16
**communication (3)**
18:16;65:15,17
**communications (7)**
19:9;72:12;74:12,
14;75:5;84:7,11
**community (2)**
121:13;122:18
**company (1)**
97:8
**compare (1)**
330:17
**compete (1)**
116:22
**competent (1)**
236:8
**complainant (1)**
12:21
**complaint (16)**
23:25;47:13,19,25;
335:6;336:1,13,14;
337:3;338:13,15;
340:3,7;344:14;
345:14;346:10
**complete (7)**
7:20;9:18;19:16;
134:9;170:6,11,11
**completed (15)**
104:10;168:22;
169:4;225:14;226:13;
292:1;315:14;316:12;
319:2;323:9,13,16,20;
324:3,25
**completely (2)**
309:14;334:21
**completes (1)**
323:23
**completion (2)**
97:18;137:22
**complexion (1)**
208:20

**comply (7)**
31:20;32:11;35:8;
37:1,4,16;93:1
**compound (1)**
10:5
**comprised (1)**
111:18
**concept (3)**
131:2,10;242:18
**concerned (2)**
82:23;194:6
**conclude (1)**
350:12
**condition (4)**
18:10,11,14,17
**conditions (1)**
15:20
**conduct (7)**
112:21;178:6;
180:12;291:15;307:4;
334:2;347:8
**conducted (8)**
30:23;51:23;
170:14;179:9;180:8,
16;181:14;360:12
**conducting (10)**
49:10,21;52:2;
132:9,11;155:3;
160:8,16;179:21;
325:22
**conference (4)**
26:25;27:13,22;
321:23
**confession (1)**
326:23
**confident (1)**
325:12
**confidential (3)**
73:4,5,6
**confidentiality (1)**
73:8
**confirm (3)**
212:10,13;318:6
**confront (1)**
265:15
**confusing (3)**
35:2,5;143:17
**connect (1)**
331:4
**connection (27)**
13:4;23:7,21;38:11;
81:8;85:7;90:10;
171:13;174:16,24;
177:19;183:2;186:18;
195:3,4;196:18;
204:11;250:6,8;
276:19;293:25;
328:10,13,17,23;
334:22;353:22
**consent (1)**
198:13
**consented (3)**
250:23;253:6;

257:20
**consider (3)**
  81:20;161:7;348:14
**considered (4)**
  105:19;112:25;
  161:18;278:12
**consisted (1)**
  265:21
**consistent (4)**
  77:18;178:22;
  205:4;280:19
**Constitution (1)**
  71:14
**constitutional (1)**
  334:3
**Constitutions (1)**
  71:15
**construed (1)**
  333:5
**consult (1)**
  32:18
**contact (21)**
  29:4,14;30:16;31:4;
  38:3;40:17;41:2,3,6,
  16;53:25;61:7,16,18,
  18,24;222:18;232:7;
  311:11;325:19,21
**contacted (9)**
  28:14;29:2;31:3;
  40:21,25;41:15,20;
  52:4;63:12
**contacts (1)**
  46:25
**contain (3)**
  231:6;278:20;
  305:15
**contained (15)**
  132:4;136:10;
  174:4;228:7;268:25;
  269:12;271:23;
  277:15;279:3,21;
  303:14,15;330:15;
  335:2;344:9
**contents (1)**
  146:3
**continue (2)**
  198:18;306:23
**contributed (3)**
  146:8;147:4;304:14
**convenience (1)**
  255:15
**Convention (1)**
  99:16
**conversation (75)**
  25:11,20,23;26:11;
  39:9;42:15,16;48:13;
  49:24;52:6;60:17;
  64:2,16;65:21;67:23;
  73:17,18,21;74:21,22,
  23;75:18,19,23,25;
  76:1,18;78:2,4,5;80:1,
  2,13,18;187:12,23;
  188:3,3;191:15;

199:13;203:3,10,14;
204:5;237:18;244:12,
15,16,22;245:5,9,21;
246:9,17;247:10,13;
248:18,24;265:1,3,21,
23;267:6,16;268:7;
269:6,10,15,15;270:2;
311:9;321:23;342:5;
359:12,22
**conversations (39)**
  15:25;44:3;48:8;
  63:23;66:6;74:6;
  83:19;84:3;177:23;
  186:21,23;187:2,4,8;
  188:17;194:20;195:6,
  7,10,13,24;196:1;
  200:7,10;202:3;
  204:7;236:24;238:9;
  243:21;244:8,11;
  246:8;247:20;249:12;
  267:4,10,20;268:12,
  18
**converse (1)**
  24:20
**convey (1)**
  246:17
**conveyed (3)**
  144:15;249:7;267:9
**convicted (1)**
  352:11
**conviction (2)**
  65:8;79:19
**convictions (7)**
  14:4;28:10,15;
  44:22;45:1;93:17;
  94:23
**Cook (21)**
  28:13;63:6;66:12,
  20;67:19;68:8;70:25;
  77:21;196:12;235:15;
  248:19;249:6;250:13;
  268:9,21;269:13;
  275:11;306:14,22;
  307:3;358:7
**cool (1)**
  263:10
**cooperate (3)**
  93:1;257:22;344:21
**copies (11)**
  69:10;163:7,22;
  164:4,12;167:19;
  182:21;206:13;
  208:16;213:10;
  316:20
**copy (14)**
  69:22;163:15,20,
  20,23,25;164:12;
  168:2;208:14;234:21;
  271:6;285:10;315:12,
  14
**corner (2)**
  282:25;284:17
**corroborate (4)**

151:19;156:20;
322:8;326:22
**Counsel (9)**
  5:14;65:15;74:12;
  77:23;85:6,9;133:12;
  202:3,16
**counter (1)**
  17:25
**country (1)**
  83:5
**County (31)**
  5:22;28:13;63:6;
  66:12,20;67:19;68:8;
  70:25;77:21;187:12,
  13;191:18,22;192:7;
  196:5,12;235:15;
  237:11;247:11;
  248:19;249:6;250:13;
  268:9,21;269:13;
  275:11;306:14,22;
  307:3;353:17;358:7
**couple (32)**
  25:4,7;27:10;34:7;
  41:17;45:23;46:25;
  49:12,25;51:5;62:5;
  96:25;98:12;100:11,
  15;108:4;111:20;
  112:3;119:22;123:25;
  124:4,6;141:14;
  163:22;164:4;165:18;
  167:19;177:23;
  194:12;195:6;275:6;
  352:20
**course (6)**
  133:10;190:11;
  199:8;201:20;345:25;
  355:4
**Court (64)**
  5:4,11,13;6:4,24;
  9:5;28:22;34:12,16,
  20,25;35:14;36:4,24;
  37:10;52:13;63:13,
  15;66:21,25;67:4,15;
  68:17,20;95:1;193:8;
  239:9;240:14;241:1;
  242:8;251:6,11,18,21,
  23;255:24;256:1,16;
  272:25;273:7,10,12,
  13;276:8;297:21;
  298:6,8,13;302:22;
  313:8,8,13,16;314:17;
  320:9,24;321:3,5,8;
  322:3,16;326:22;
  328:4;331:17
**courtesy (4)**
  43:8,22,24;230:12
**courtroom (1)**
  93:10
**courtrooms (2)**
  60:8;241:5
**courts (1)**
  239:4
**cover (1)**

284:13
**coworker (1)**
  349:3
**coworkers (1)**
  349:4
**crime (30)**
  91:4;113:1,5,12,17,
  18;125:22,22;126:3,
  15,16;135:19;168:8,
  8;172:18;177:17;
  222:17;240:16;304:7;
  306:23;310:6,11;
  326:14;327:14;332:3,
  4,7;342:14;347:17;
  353:18
**crimes (27)**
  113:19;115:17;
  126:5,12,21,23,23;
  127:7,8;130:16;
  135:17;161:4;171:25;
  221:23;223:24;225:6;
  232:8;233:18;244:9;
  278:6;300:2;314:9;
  332:13;333:10;
  346:16,18;352:12
**criminal (32)**
  14:13,17;29:6;
  30:13,22;56:25;85:6,
  9,19,24;87:13;88:5,
  16;90:5,6,20,25;
  91:19;128:7;130:1,4,
  9,17;132:3,5;152:19;
  239:4;334:3;347:8,
  14,24;354:23
**criteria (1)**
  342:17
**crossed (2)**
  259:13,15
**Cruz (7)**
  178:11,14,18;
  179:8;180:12;274:11,
  13
**curiosity (3)**
  55:23,24;56:1
**curious (1)**
  55:20
**current (1)**
  38:21
**curse (2)**
  341:24;342:1
**cursed (1)**
  342:2
**custody (14)**
  48:24;95:4;131:19;
  183:5,9;195:22;
  196:6;206:1,2;
  232:10;289:16;
  312:20;313:8;353:8
**cut (8)**
  36:22;204:3;
  208:17;247:16,17;
  249:1;250:15;269:17
**cut-off (1)**

114:9
**cutting (1)**
  228:19
**CV (1)**
  5:5

**D**

**daily (2)**
  18:9;134:13
**damage (1)**
  100:17
**damaged (1)**
  100:7
**damaging (1)**
  100:10
**date (23)**
  5:6;8:8;28:2;96:18;
  185:4,5,6,17;186:14;
  187:1;188:9,10;
  190:24;191:4;227:17;
  228:24;239:2;245:14;
  274:21,23;283:3,10;
  339:21
**dated (5)**
  70:19;276:1,9;
  285:1;286:6
**dates (4)**
  206:4;238:22;
  246:3;297:21
**day (32)**
  17:17;18:9;68:17;
  93:25,25,25;94:8;
  109:23;110:2;149:18,
  20,24;185:23,25;
  224:16;237:10;
  239:19;240:15;285:2;
  288:4;289:16,16;
  291:8,11,15,21;297:1;
  304:5;311:12;336:9;
  350:22,22
**days (3)**
  41:17;124:14;
  335:11
**daytime (1)**
  298:6
**day-to-day (1)**
  112:7
**deal (5)**
  247:16,17;249:1;
  250:15;269:17
**dealers (1)**
  292:17
**death (4)**
  81:8;280:19;
  284:23;301:24
**decades (1)**
  334:15
**decide (2)**
  56:9;65:23
**decided (1)**
  66:2
**deciding (1)**

117:19
**decision (7)**
  66:8,17;67:1;68:16,
  20;130:20;300:21
**deduce (1)**
  251:17
**defend (1)**
  150:22
**defendant (6)**
  5:20;6:15;11:11;
  14:19;273:24;359:3
**defendants (8)**
  5:23;6:2;22:14,25;
  23:3,24;63:18;127:15
**defense (9)**
  23:3;45:1;85:6,9,
  20,24;151:22,25;
  152:5
**deferred (1)**
  344:15
**definite (1)**
  110:5
**Defuse (1)**
  337:13
**degree (4)**
  122:1,5,17,24
**Democratic (2)**
  99:15;100:15
**demographic (1)**
  110:13
**demographics (1)**
  110:15
**dep (1)**
  86:4
**Department (35)**
  46:12;52:25;92:1,
  18,24;95:21;103:20;
  104:5,24;115:16;
  117:1;128:7;129:5,
  15,18,23;149:14;
  153:6;160:3,20;
  205:6;213:3;223:1,3,
  10,13;224:2;273:11;
  333:25;334:10,14;
  337:3;338:10;339:5;
  346:22
**Department's (1)**
  138:9
**depend (2)**
  163:17,19
**depending (3)**
  135:19;163:22;
  167:15
**depends (4)**
  135:15;143:23;
  148:3;163:9
**depicted (1)**
  184:4
**deployed (15)**
  97:19;98:17,22;
  99:7,8,20,23;100:2,6,
  22,24;101:5;102:24;
  103:5,10

**deploying (1)**
  101:10
**DEPONENT (1)**
  360:25
**depose (1)**
  55:12
**deposition (26)**
  5:8;6:16,8;22:9,22;
  10:8;13:8,14;21:22,
  25;22:24;23:8;25:5,6;
  27:12;69:7;86:5;
  182:17;270:11;
  292:11;294:24;311:3;
  317:8;329:1;356:11;
  358:2;360:24
**depositions (6)**
  10:1;13:16;15:16;
  20:4;21:2;55:22
**deputy (1)**
  120:7
**derived (1)**
  360:3
**derogatory (2)**
  80:21;341:12
**describe (3)**
  98:3;128:4;131:15
**described (3)**
  48:10;208:8,11
**describes (1)**
  305:2
**description (6)**
  207:24;208:20;
  210:9;227:5,6,18
**desk (3)**
  171:7,8;173:15
**detail (1)**
  166:6
**detailed (3)**
  131:13,14;207:25
**details (1)**
  220:17
**Detective (105)**
  24:17;29:10;47:9;
  92:15;108:23;115:7,
  8,10,12,14,17,20;
  120:15,17,25;123:18,
  24;124:20;126:15;
  127:10,23,23;128:8;
  130:12;131:1,12,20,
  23;132:1;134:3,5,12;
  138:3,5;139:16,17,25;
  142:21,23;143:2,5,12;
  144:2,2,15,17;145:23;
  151:6,8;152:6;
  157:24;160:3;161:8;
  165:2;168:1,21,22;
  169:4,24;174:1,6;
  176:12,14,18;183:18;
  184:11;187:11;
  189:15;190:13;
  205:20;209:24;211:7,
  20;213:22,24;216:19,
  21;218:13,18;221:13;

234:1;248:20,21;
  265:17;266:7,14;
  296:12,15,19;299:16;
  301:3;304:24;305:19;
  308:16;313:17,18;
  314:2,6,8;329:6;
  332:14;333:11;
  334:23;348:15,24
**detectives (38)**
  22:12,13;116:21;
  123:8;128:5;145:11;
  146:13;163:12,25;
  164:2;167:24;168:24;
  177:24;178:8;187:6;
  188:12;189:9;202:15;
  238:10;244:17;
  245:10;255:25;
  256:17;261:4;266:17,
  22;267:5;275:12;
  290:18,21;294:13;
  309:21;314:20,21,22;
  315:4;321:19;348:20
**detectives' (1)**
  306:17
**detective's (1)**
  156:10
**determine (5)**
  32:19;163:19;
  215:15;220:18;
  305:16
**determined (3)**
  30:8;126:14;219:23
**develop (1)**
  360:6
**developed (2)**
  148:20;221:5
**diabetes (14)**
  15:22,24;16:1,5,10,
  11,15,22,25;17:5,9,
  19;18:12,14
**Dick (1)**
  50:12
**Dickinson (1)**
  271:3
**differed (5)**
  344:10,13,16,17,19
**difference (1)**
  90:19
**different (26)**
  20:5;35:17;36:1;
  45:13;66:18;100:8;
  107:10;111:14;
  128:19;134:6;135:16;
  140:5;145:11;147:1;
  157:8;176:9;214:21;
  233:9;260:19;271:13,
  14,15;277:13;316:7,
  14;318:20
**differently (1)**
  125:25
**differs (1)**
  330:6
**difficult (3)**

201:9,16,19
**difficulties (1)**
  263:7
**difficulty (1)**
  201:4
**DiFranco (11)**
  266:5,14,20,22;
  267:1,10;310:13;
  311:13;321:17,24;
  322:6
**dinner (1)**
  264:3
**diploma (2)**
  122:9,25
**direct (1)**
  38:18
**directing (2)**
  326:16,18
**direction (1)**
  293:20
**directions (1)**
  327:7
**directive (1)**
  166:7
**directives (3)**
  128:7;129:15;
  338:10
**directly (1)**
  234:5
**disagree (1)**
  140:7
**disagreed (1)**
  338:9
**disbelieve (1)**
  56:2
**discharged (1)**
  103:17
**discipline (4)**
  334:25;344:7,8;
  345:25
**disciplined (2)**
  158:11;342:8
**discuss (3)**
  26:13;45:11;65:3
**discussed (2)**
  45:9;189:19
**discussing (2)**
  187:21,24
**Discussion (4)**
  95:15;129:1;
  205:12;310:21
**discussions (1)**
  84:4
**disdain (1)**
  340:15
**disease (1)**
  16:15
**disenchanted (1)**
  339:4
**dismissal (1)**
  14:17
**dismissed (3)**
  14:4,8;94:24

**disorderly (1)**
  112:21
**disqualified (1)**
  58:21
**disqualify (1)**
  58:24
**disregard (3)**
  289:22,23;330:24
**disrest (2)**
  101:1,5
**distance (1)**
  352:8
**distinction (1)**
  132:18
**distribution (1)**
  164:6
**District (45)**
  5:3,4;47:6;105:6,8,
  24;106:10,11,16,25;
  107:3,4,5,6,9,21;
  108:14;109:1,2,4,19,
  20;110:4;111:3,4,15,
  18,19,23;112:15;
  113:20;114:1,3,6,6,7,
  7,13;120:5,8;123:12,
  12;125:7,14;313:1
**districts (2)**
  113:1,5
**diverse (2)**
  110:23;111:5
**Division (4)**
  5:5;120:25;128:8;
  131:20
**divorced (1)**
  45:6
**docket (2)**
  275:22,23
**doctor (5)**
  16:4;17:3;18:7,25;
  19:3
**doctors (3)**
  15:23;18:16;19:9
**document (12)**
  79:12;144:11;
  215:5;218:7;221:11;
  223:9;284:11;315:9;
  316:8,21;318:14;
  359:1
**documentary (1)**
  49:1
**documented (1)**
  346:12
**documents (10)**
  23:7;168:16;
  277:17,19,19,21,24;
  279:2,7;331:19
**dollar (1)**
  58:23
**done (14)**
  56:3;86:5;89:14;
  139:5,6;142:3;
  173:22;178:23;
  184:11;195:5;202:22;

306:20;324:6,21
**Dorsch (14)**
41:14,19;42:17,22;
44:24;47:3;52:11;
349:5,6,13;350:6,15,
20,23
**Dorsch's (1)**
351:5
**double (12)**
65:7;243:22;
246:23;247:4,18;
256:11;263:15;306:6;
307:9,17;308:18;
355:15
**doubt (1)**
36:14
**down (17)**
20:1;35:10;58:16;
65:22;71:10;104:9;
136:7;149:1;151:18,
18;172:8;186:6;
193:21;215:2;237:3;
303:17;312:25
**downstairs (2)**
125:9,10
**downtown (5)**
104:9;166:19;
167:7;170:17,25
**draw (2)**
182:12,25
**drink (1)**
289:1
**Drive (2)**
105:13;299:1
**driven (1)**
322:7
**driver (2)**
210:9;359:16
**driving (6)**
254:2;310:13,15;
325:20;326:15;
359:23
**Dropbox (5)**
69:9;206:14;270:9;
312:7;356:2
**drove (11)**
228:4;261:17,17;
289:12;304:6;310:11;
322:15;327:2,14;
359:4,17
**drug (2)**
292:17,17
**due (2)**
71:14;83:9
**dues (1)**
32:12
**duly (3)**
6:6,8;193:7
**during (35)**
8:21;50:1;60:17;
65:25;99:11,20;
105:23;106:2;120:18;
138:3;142:19;157:23,

25;187:7,23;188:3;
190:9,11;191:15,23;
202:3;209:25;210:23;
218:18;226:7;246:8,
17;247:20;298:20;
309:3;311:17;326:13;
334:18;345:25;353:8
**duties (3)**
105:22,25;106:1
**duty (4)**
172:3,20;173:7;
244:24

**E**

**ear (1)**
45:25
**earlier (9)**
19:14;58:15;
145:10;162:7;211:16;
214:4;215:11;269:4;
305:16
**early (7)**
109:9;112:1,2;
165:22;172:8;297:4,5
**east (1)**
108:6
**eastbound (3)**
242:1,3,12
**Eastern (1)**
5:5
**eat (1)**
264:3
**E-c (1)**
205:23
**Ed (2)**
109:13;191:17
**Eddie (2)**
62:6;196:4
**editorial (6)**
67:12;153:9;
167:13;197:18;264:5;
308:1
**editorialize (1)**
141:24
**Education (5)**
42:24;46:13;122:8,
16,20
**EEOC (6)**
336:12,24,25;
337:2,3;338:12
**effect (2)**
18:1;36:5
**effectiveness (1)**
59:13
**effort (2)**
102:17;147:3
**efforts (1)**
103:9
**Efrain (6)**
178:11,14,18;
179:8;180:12;274:13
**EI (1)**

331:25
**Eight (2)**
104:21;345:18
**Eileen (2)**
5:24;20:12
**Either (13)**
16:19;18:3;61:7;
108:13;114:5;148:1;
165:24;235:11;
287:18;290:8;332:13;
333:10;334:3
**ELC (1)**
336:23
**else (46)**
17:21;23:12,17;
37:21;38:3;40:12,18,
25;42:7;44:19;45:4,9;
48:9,19;52:10,21;
53:4,6;64:8;75:20;
76:19;117:18;127:20;
128:21;132:2;139:11;
157:5,19;177:25;
178:8;227:11;237:4;
244:19;246:13;247:9,
19;248:23;249:2;
250:18;255:23;
271:20;277:15,23;
309:19;351:24;
360:13
**elucidate (1)**
308:13
**e-mail (1)**
61:8
**e-mailed (1)**
70:7
**e-mailing (1)**
70:9
**e-mails (1)**
28:18
**embedded (1)**
264:6
**emotional (1)**
336:6
**encountered (6)**
239:1;245:11;
252:20,24;253:1;
260:21
**encountering (2)**
269:1,22
**end (7)**
39:8;146:7;204:4;
206:22;292:2;350:22;
360:23
**ended (1)**
42:14
**ends (1)**
103:22
**enforce (1)**
112:11
**enforcement (1)**
129:13
**enforcing (2)**
106:5;112:9

**engage (3)**
332:12;333:4;334:2
**engaged (2)**
178:6;333:14;
346:21;347:8
**engaging (2)**
86:23;347:14
**English (13)**
198:9,11,19;199:4,
7,9;200:11;201:3,10,
17;250:25;262:24;
263:22
**enjoy (2)**
109:21,24
**enjoyed (2)**
110:1,6
**enlisted (4)**
97:9,11,12,14
**enough (5)**
79:14;105:10;
119:2;255:5;275:25
**ENQUIST (126)**
6:1,1;8:3;11:1;
18:23;19:12;21:18;
24:1;26:6;31:22;
32:23;33:7,24;35:20;
36:8;37:8,17;47:21;
51:17;53:22;55:1;
57:18;58:13;59:20;
60:20;61:1;66:5;
67:13;72:13;73:5;
74:1,5,17;76:8;78:1;
79:10;80:12;81:15;
82:9;83:2,17,23;84:2,
9;86:14;87:9,17;
88:19;89:17,25;
91:14;92:9;95:7,12;
101:17;102:7,25;
116:17,23;117:15;
118:24;119:10,17;
130:5;140:2,7,11;
141:2;142:4;143:16;
145:6;147:5;152:1,
14;153:3,14;156:22;
175:1;180:23;181:12;
188:23;192:16;
193:15,23;201:11,22;
203:23;213:19;218:6;
219:5;220:2;223:6;
224:18;226:2,21;
229:10;232:13;
235:19;236:12;241:9;
249:15;252:18;
260:10;264:23;
267:14;269:25;
274:23;288:6,14,19;
289:5;297:23;298:1;
312:5,8;316:6;
317:24;318:15,19;
332:17;344:2;352:2,
15;355:11;356:3;
360:21
**entailed (2)**

197:9,11
**entered (1)**
21:11
**enterprise (1)**
144:24
**entire (4)**
84:23;166:10;
299:13;325:17
**entries (1)**
274:25
**Epplen (6)**
6:3;27:5;41:12;
108:24;109:10;
127:17
**equally (1)**
162:2
**Ernie (2)**
62:6;304:1
**Escalante (7)**
336:6;337:8;340:4,
22,25;341:24;344:6
**essentially (3)**
144:23;209:16;
299:4
**establish (1)**
245:18
**established (3)**
78:16;90:7;307:22
**estimate (4)**
9:24,25;113:9,10
**estimated (1)**
324:21
**estimating (1)**
324:6
**estimation (1)**
8:8
**et (2)**
5:3;238:10
**ethnic (1)**
111:14
**even (33)**
9:9;11:20;35:9,9;
53:17;55:5;83:22;
91:11;92:2,7;93:2;
105:17;133:16,18;
134:2;140:23;141:5,
9,17;145:2;158:21;
178:23;179:4;189:15,
20;192:11;201:16;
292:17;300:9;304:15;
309:6;333:8;355:21
**evening (1)**
319:7
**event (3)**
59:16;73:10,15
**events (3)**
18:5;99:20;325:16
**eventual (1)**
151:19
**eventually (14)**
40:6;63:11;104:13;
149:2;150:9;166:19;
175:7;178:1,2;186:1;

253:23;261:14,19;
354:1
**Everybody (5)**
123:15;146:7;
147:3;237:22;273:11
**everyone (1)**
206:16
**evidence (4)**
213:4;259:22;
292:13,16
**exact (5)**
96:10;188:2;196:1;
339:21;343:3
**exactly (4)**
16:22;246:14;
324:24;327:5
**EXAMINATION (7)**
6:10;276:14;
278:22;280:22;281:3,
23;332:5
**examined (1)**
6:8
**example (3)**
163:15;341:18,21
**except (5)**
117:1,3,5;132:21;
158:21
**exception (1)**
133:2
**excessive (1)**
334:9
**exchange (1)**
336:6
**exculpated (1)**
50:14
**excuse (1)**
46:20
**exempt (5)**
117:1,4,6;119:22;
342:19
**exercise (2)**
77:22;202:2
**exercised (2)**
133:12;202:15
**Exhibit (31)**
69:7,17;182:17;
206:8,11,12,14;230:3;
270:11,15,22;311:3;
312:1,16;317:3,5,8,
12;318:7,8,17,23;
327:23,25;329:19;
330:15,15;331:19;
356:11;358:2,5
**exhibits (1)**
270:9
**exist (2)**
224:16,16
**existed (2)**
171:2;275:3
**existence (1)**
134:19
**exists (1)**
79:18

**expectation (1)**
129:22
**expected (2)**
7:16;316:12
**experience (1)**
242:25
**expert (1)**
167:10
**explain (4)**
153:24;218:13;
228:20;251:10
**explained (1)**
200:3
**explains (2)**
211:6;221:11
**exploring (1)**
20:14
**extensive (1)**
47:18
**extent (6)**
19:5;64:16;72:10;
74:2,5;80:9
**extortion (1)**
332:24;333:5
**extra (2)**
69:10;316:20
**eyes (4)**
137:11;138:21;
309:12;334:1

### F

**fabrication (1)**
152:11
**fact (15)**
31:11;52:21;84:11;
92:17;94:23;145:1;
189:9;217:24;303:7,
24;304:24;337:14;
350:11;351:21;
357:10
**factors (1)**
228:9
**facts (14)**
7:25;14:1;136:7,10;
138:19;150:5,9;
153:19;154:10;
157:10;177:17;192:3;
266:21,25
**factual (1)**
303:5
**failed (1)**
17:10
**fair (15)**
28:20;91:23;
105:10;142:18;181:5;
231:9;255:5;275:25;
276:9;301:1;324:17;
348:21;350:7,8;
354:25
**faith (1)**
85:15
**fake (2)**

80:22,24
**fall (2)**
28:9,16
**false (5)**
158:11;335:2,7;
336:2;344:9
**falsified (2)**
287:5;288:3
**familiar (9)**
108:3;129:23;
130:17;177:16;185:6;
186:10;197:2;213:22;
275:23
**familiarity (2)**
6:16;314:11
**familiarize (2)**
130:7,10
**familiarized (4)**
184:22;185:2,17,24
**families (2)**
26:19;292:6
**family (6)**
25:15;64:6;102:15;
251:2;255:6;353:7
**fantastic (1)**
79:9
**far (5)**
59:2;162:14;
235:22;273:4;350:25
**fashion (1)**
61:8
**fast (1)**
79:14
**father (4)**
97:5,6,7;102:3
**favorite (2)**
110:3,7
**FBI (1)**
129:12
**fear (4)**
80:24;84:14,16;
86:11
**fearful (1)**
81:6;82:25;83:13
**February (1)**
339:25
**Federal (6)**
71:15;99:8;100:3,
25;101:3,7
**feel (2)**
86:4;94:22
**feeling (1)**
257:17
**feelings (2)**
86:20;95:2
**fell (2)**
113:4;120:8
**fellow (6)**
63:25;94:15;
142:20;202:15;334:1,
9
**fellows (1)**
290:21

**felony (9)**
130:19,20;200:8;
204:4,6;237:1;
273:23;327:20;354:8
**felt (1)**
82:18
**female (3)**
39:1;168:24;209:19
**few (3)**
38:10;53:18;194:10
**field (12)**
98:6,9;105:14;
114:2;115:21;119:1;
123:13,19;290:16;
293:4;298:21;326:13
**Fifth (14)**
65:24;66:11,16,22;
67:20;68:4,10,21;
71:13;77:22;78:10,
15;93:11;94:16
**figment (1)**
20:19
**figure (3)**
32:10;69:14;213:15
**figured (1)**
220:11
**file (93)**
69:12;135:3;164:1;
168:3,5,6,11,15,17;
169:6,15,18,20,25;
170:5,6,11,11,19,22,
24;171:1,15;183:19;
212:23;232:7;235:4;
236:19;271:6,7,24,25;
272:2,5,8,13;277:2,3,
6,8,13,16;278:20,24,
25;279:3,8,13,19,22;
280:4,5,6,11,24;
281:25;282:20,22;
283:5,14,22,23,23;
284:2;285:11,13,13;
289:22;315:17,18,19,
22;316:18;327:20;
329:19,20;330:2,7,13;
331:9,10,13,14,15,17,
20,22,23;332:1,4,6,9;
340:4
**filed (7)**
21:7;23:25;24:21,
24;259:21;336:12;
338:12
**files (11)**
170:14,22;171:5,6,
9;197:8,12,17;271:9;
278:12;330:5
**filing (1)**
171:2
**Fill (6)**
56:22;134:25;
273:12;313:5,10;
314:7
**filled (5)**
168:19;314:1;

323:5;324:12,18
**filler (3)**
179:1,3,4
**fillers (1)**
160:25
**filling (1)**
313:15
**final (5)**
56:11,13;67:1,5,7
**find (22)**
53:16;183:11,20;
190:14;201:19;
204:22;222:3;243:6;
280:3,5,18,23;281:19;
293:15;305:12,24;
306:5;307:24;331:8,
12;332:8;349:16
**finding (2)**
201:9,15
**fine (5)**
51:9;58:20;194:4;
272:23;287:4
**finger (1)**
284:9
**finish (2)**
87:19;289:5
**fire (1)**
29:24
**firearms (2)**
128:16,19
**fired (2)**
52:24,25
**Firm (3)**
5:10;22:3,5
**first (50)**
6:8;24:23;28:4,5,
21;44:8;46:15;62:5,6,
8,12;70:14;71:10;
84:22;87:11;99:21;
104:23;108:22;
114:17;123:10;
171:18,20;175:8,22;
208:17;221:8;241:21;
244:11,14;246:3,9;
247:2;249:7,10;
270:15,16,19;272:17;
275:20;282:24;
284:10,12;289:21;
295:25;305:10;
319:22,24;321:20;
347:7;358:6
**firsthand (5)**
49:2,4;222:22;
224:7,11
**fit (1)**
56:22
**five (5)**
156:5;162:7,8;
202:24;309:23
**floor (15)**
126:9,10,11;
166:21;198:25;
237:22;246:11,14;

254:21;255:6;256:24;
261:1;298:25;299:24;
314:3
**focused (1)**
195:21
**follow (1)**
135:19
**following (5)**
71:23;149:24;
289:16;320:21;327:7
**follows (1)**
6:9
**followup (1)**
131:21
**FOP (22)**
37:11;38:5,7,15,17,
21;39:14;40:13,18,
19;63:10;85:8,13,14,
25;87:12,18,22,25;
88:4,14;90:5
**FOP's (1)**
31:18
**force (5)**
49:15;50:7;52:5;
334:9;349:23
**Ford (1)**
310:16
**forever (1)**
291:1
**Forget (2)**
41:1;148:21
**forgot (4)**
86:8;134:17;
261:10;341:20
**forgotten (1)**
289:14
**form (168)**
8:2;10:4,11,25;
11:7,17,21;12:1,8;
14:5,12;15:17;17:11;
18:21;19:11;21:17;
26:6;29:8;31:21;33:6,
14,22;35:6;36:6;
37:23;43:10,15;
46:19;47:15,20;49:8;
51:16,21;53:20;58:8;
60:20,21;62:21;
63:20;67:11;68:23;
73:24;76:16;77:24;
79:13,24;80:8;81:13;
82:1,7;83:1,15;84:18;
85:1;92:20;95:6;
101:16,17,21;102:19;
107:13;110:16;111:6;
114:25;116:9,23;
117:13,21;118:22;
120:3;122:12,19;
127:2;134:24;137:16;
140:8;141:1,6,11,18;
142:6;145:4;146:9;
147:5,6,149:10,21;
150:1,4,15,24;151:3,
9,24;152:12,20;153:1,

13;154:2,13,20;
157:17;158:3,18;
170:8;180:5,14,22;
181:4,10,24;182:9;
183:3;186:13;187:16;
193:15,17;204:15;
212:25;213:8;214:19;
215:18;216:2;218:24;
219:4,5,8;220:2;
224:9;225:18;227:14;
240:10,21;242:24;
252:5,15;259:10,24;
264:23;267:22;274:7;
283:15;287:10;288:6,
7;293:17;294:7;
297:24;298:23;299:7,
17;303:16,25;307:25;
310:7;319:18;332:17;
333:18;339:6;347:18,
19,25;348:6;349:19;
350:9,16;352:13;
355:10
**formal (2)**
122:16;162:24
**formats (2)**
135:16,18
**formatting (1)**
145:16
**former (4)**
30:6;48:9;197:5;
211:2
**formula (3)**
118:4,7,9
**Fort (1)**
98:6
**forth (1)**
99:14
**forward (2)**
15:13;338:21
**found (6)**
17:8;47:1;142:11;
233:5;279:19;338:19
**foundation (59)**
14:6;47:21;72:14,
24;77:25;83:2,16;
92:22;93:13;102:6,
20;117:14,22;118:3,
8;119:10;130:5,6;
145:5;146:10,21;
147:6;149:11;151:24;
152:13;154:3,21;
158:19;170:9;180:5;
223:7,20;235:17,24;
252:6,16,17;263:16;
266:19;267:2,13;
279:4,9,14;283:25;
285:14;291:3,16;
294:8;296:11;297:25;
299:18;301:5,9;
302:8;330:8;332:16;
333:1,18
**four (4)**
22:1,5;121:18;

334:14
**four-year (1)**
121:15
**frame (3)**
82:19;245:1;263:19
**Francisco (3)**
179:14,19;181:8
**Fraternal (9)**
29:2,5,15;30:17;
31:3,4;32:9,16,17
**Freddie (6)**
24:16,24;62:5;
191:17;196:4;353:19
**free (7)**
258:6,9,13;259:8,8;
263:25;264:11
**freight (1)**
97:8
**frequent (1)**
229:2
**frequents (3)**
227:18;228:25;
234:1
**fresh (5)**
148:23,25;150:6,9;
174:5
**friend (2)**
209:19;211:2
**friendlier (2)**
110:9,11
**friendly (1)**
340:21
**friends (2)**
348:15;354:14
**front (6)**
94:2;168:15;
183:10,11;230:9;
251:6
**full (5)**
7:20;72:2;75:6;
78:24;220:15
**Fullerton (1)**
107:25
**fully (1)**
330:10
**fulsome (1)**
9:2
**functions (1)**
157:12
**further (9)**
42:16;108:6;200:7;
203:14;204:7;243:23;
307:4;360:18,25
**future (1)**
72:4

## G

**Gabby (1)**
69:13
**Gabriel (1)**
5:10
**Gacy (1)**

48:18
**gallery (4)**
57:5;60:2,4;61:3
**gang (25)**
161:4,17;197:5,8;
215:14;221:23;
222:17;223:24;225:6;
232:8;233:18;292:14,
20,25;301:24;302:3,
6;303:7,10;305:15;
332:12,13;333:10;
346:16,18
**gang-related (4)**
113:8,12,17,17
**gangs (6)**
112:12;161:8,11;
213:22;302:18;303:3
**gap (1)**
156:7
**gathered (2)**
50:7;233:18
**gave (17)**
19:2;163:6,8;
211:20,22,23;218:22;
230:12;261:12;296:6,
18;304:1;316:2;
317:21;322:16;
356:19;357:10
**Gawrys (1)**
301:3
**Gee (1)**
111:12
**general (4)**
16:7;128:6;134:25;
206:25
**generally (1)**
113:4
**geographic (1)**
110:15
**geographical (2)**
105:7;107:20
**gets (1)**
108:2
**girlfriend (4)**
209:20;211:1;
262:22;352:23
**given (11)**
46:16;183:18;
184:3;190:13;211:1;
215:9;266:21;315:15;
322:9;339:16;351:6
**giving (3)**
296:14;357:16;
358:19
**glad (1)**
52:15
**glass (1)**
182:13
**glean (1)**
229:16
**G-l-e-n (1)**
96:8
**Glenwood (1)**

96:8
**Gloria (1)**
290:3
**goal (1)**
136:17
**God (1)**
18:9
**goes (2)**
117:18;273:12
**Gonzalez (2)**
274:3,5
**Good (15)**
6:12;14:14;85:15;
95:9;110:9;117:12;
135:23;136:1,6;
152:10;262:17;
263:22;289:2;306:5;
348:18
**Gossens (5)**
273:25;274:1;
359:5,18,24
**G-o-s-s-e-n-s (1)**
273:25
**government (6)**
99:9;100:3,25;
101:3,7;339:19
**governor (2)**
101:11,12
**GPR (10)**
134:22;204:11,14,
18,23;205:2,2;
267:19;326:4,8
**GPR's (14)**
134:18;135:4;
168:12;268:6,20,22;
328:12,16,22;329:2,3,
4,10;332:8
**grab (3)**
173:14;208:2;
279:19
**Grace (41)**
40:10,15,19;41:1;
63:11;65:13,19;
66:10,19;67:25;68:6,
19;70:7,23;71:10;
72:15;73:17;74:7,22;
75:19;76:1,4,12;77:7,
16;78:3;79:4;80:2,7,
13,18;82:21;84:17;
85:19;86:1,13;93:7,9,
10;94:6;355:9
**Grace's (1)**
72:19
**graduate (5)**
95:23;96:20;
121:20,25;122:3
**graduated (2)**
97:2;121:7
**graduation (2)**
96:23;104:22
**grand (10)**
23:11,20;124:25;
125:12;126:7;356:5;

357:17,18;358:7;
360:9
**grant (2)**
71:20;78:18
**great (4)**
79:9;91:2;193:6;
194:5
**greater (1)**
131:22
**ground (1)**
6:17
**group (8)**
100:17;123:15;
147:2;183:21;184:5;
210:10;211:2;221:24
**groups (5)**
100:8,10,15,18;
111:14
**grow (2)**
96:13,16
**grown (1)**
350:1
**Guard (14)**
97:1;98:24,25;99:2,
4,5;100:4,22;101:1,6;
103:21;104:1,2,4
**guess (12)**
10:19,20;89:2,3,5;
152:24;154:1;167:7;
172:19;197:12;
267:15;302:12
**guessed (1)**
302:13
**guessing (7)**
106:18;110:17;
113:15;165:6;206:23;
302:9;307:14
**Guevara (24)**
5:3,20;41:8;45:20;
46:5,17;62:17,20;
108:22;116:7;299:16,
20;301:13;321:19,24;
332:12;333:9,14;
347:16;348:15,24;
354:14,17,21
**guidance (1)**
87:25
**guiding (1)**
135:12
**gun (2)**
331:3;343:8
**guns (1)**
343:9
**gut (1)**
257:17
**guy (1)**
297:4
**guys (2)**
64:3;69:25

## H

**habits (1)**

143:13
**hair (1)**
208:19
**hairstyle (1)**
45:13
**half (7)**
95:8;113:21,21;
123:9,10,11,21
**hallway (5)**
62:5,9;63:25;64:4,
12
**Halsted (1)**
105:12
**Halvorsen (13)**
6:2;24:18,21;27:3;
63:4;64:12;109:17;
276:5;296:12,15,19;
304:2,24
**hand (6)**
235:6;270:8;
282:25;311:25;
317:11;343:10
**handed (2)**
230:3;318:16
**handing (2)**
69:16;270:14
**handkerchief (1)**
208:3
**handle (1)**
126:24
**handled (1)**
174:20
**handouts (1)**
325:11
**hang (1)**
348:4
**hanging (4)**
263:10,14;268:17,
19
**hangout (1)**
233:21
**happen (4)**
145:21;152:8;
180:4;188:8
**happened (27)**
103:14;139:18;
143:12;144:12;
145:17;153:19;155:9;
156:14,17,21;167:8;
171:22;172:11,25;
173:25;198:23;
199:11,18,23;205:24;
237:2;261:16,22;
264:21;316:22;
327:10;338:15
**happening (4)**
173:18;193:22;
293:16;300:9
**happens (2)**
155:6;263:13
**harassing (4)**
12:8;18:21;33:15;
229:7

**hard (4)**
76:21;77:3;107:22;
206:20
**has-to-do-with (1)**
84:7
**hate (1)**
80:20
**head (3)**
11:16;148:14;
343:25
**health (1)**
16:24
**hear (7)**
46:2;171:17;
306:13;332:23;333:7,
7,8
**heard (16)**
36:1,13;55:23;
137:15;138:1;142:3,
10,13,24;143:5;
176:8;244:11,12;
246:4;250:11;350:25
**hearing (10)**
55:25;65:25;68:17;
260:3;268:12;269:10;
356:20;357:10,19,21
**heavy (1)**
128:14
**height (1)**
208:19
**held (5)**
313:7;314:17,25;
315:1;353:8
**hello (1)**
24:16,17;173:13
**help (8)**
30:3;103:10;189:5,
17,23;209:2,5;231:7
**helped (1)**
205:3
**helpful (1)**
156:16
**helps (1)**
18:10
**hem (1)**
61:22
**herein (1)**
357:7
**Hernandez (7)**
209:11,15,17,18;
211:11,17,20
**hide (1)**
75:16
**High (13)**
17:23;95:23,25;
96:1,11,21,23;97:3;
121:7;122:9,25;
243:1,5
**higher (3)**
113:1;162:6,7
**highest (5)**
122:8,15,17,19,24
**himself (9)**

55:15;242:5;251:4;
255:8;359:4,15,17,24;
360:1
**hired (2)**
95:20;104:12
**Hispanic (2)**
111:9;302:13
**Hispanics (1)**
211:3
**history (2)**
47:19;346:10
**Hm (1)**
99:18
**Hold (16)**
69:20,23;82:12,13;
312:9,11,19;313:12,
15,20;315:24;316:11;
318:2;323:5;357:22;
358:23
**holdover (2)**
324:18;329:24
**Holec (13)**
183:18;190:13;
205:20,21;209:25;
210:22;211:20,23;
216:13;218:18;220:4,
13;221:13
**H-o-l-e-c (1)**
205:22
**Holec's (1)**
220:9
**holes (1)**
272:9
**Homan (1)**
234:3
**home (6)**
98:13;114:15;
198:2,4;299:9;325:13
**homicide (22)**
13:5;115:20;162:6;
163:24;164:9;167:18,
21;172:2;195:20;
206:2;240:16;282:20,
22;283:5,14,18,21,22,
23;285:7;290:3;
291:25
**homicide/murder (1)**
282:19
**homicide/violent (1)**
115:17
**homicides (3)**
127:6;163:21;283:8
**honest (6)**
45:25;79:18;80:19;
334:13,18;354:11
**honor (1)**
133:20
**honorably (1)**
103:16
**honored (2)**
202:9,13
**Hood (1)**
335:7

**hoped (2)**
109:21;129:24
**hopefully (1)**
69:25
**hotels (1)**
45:8
**hour (3)**
22:9;95:8;245:19
**hours (16)**
56:22;172:8;207:8;
309:8;310:4;315:25;
316:13;319:2,11,23;
320:3;322:20;325:3,
9;345:18;353:1
**house (3)**
94:2;183:10,12
**housed (1)**
126:7
**how's (1)**
65:1
**huh (1)**
96:11
**hung (1)**
227:24
**hungry (2)**
262:9;263:22
**hypertension (3)**
17:23;18:13,15
**hypothetical (1)**
236:14
**hypothetically (1)**
75:7

## I

**ID (3)**
160:13;178:24;
179:1
**idea (6)**
111:25;224:21;
241:6;290:8;301:6;
351:14
**identification (8)**
69:8;182:18;
210:12;270:12;311:4;
317:9;356:12;358:3
**identifications (2)**
212:9;216:1
**identified (17)**
39:3;89:13;179:4;
184:14;196:18;198:5,
6;199:21;203:13,17,
18;207:16,20;214:25;
215:13;219:24;220:1
**identifiers (2)**
228:9;305:15
**identify (8)**
18:15,20;45:21;
46:5;147:10;209:2;
212:13;219:3
**identifying (1)**
147:3
**identity (5)**

212:11;213:17;
307:18,20,22
**idle (4)**
26:20,21;27:13;
64:13
**ID's (1)**
213:14
**ignore (1)**
34:20
**Illinois (3)**
5:4,10;342:15
**imagination (1)**
20:20
**imagine (4)**
117:23;121:17;
170:15;186:14
**immediately (8)**
41:17;103:20;
115:18;149:4;174:2;
175:2,4;200:23
**immunity (13)**
71:20;72:3,3,9,22;
73:22,23;74:15;75:6,
23;78:18,24,25
**impact (3)**
17:1;18:4,18
**impacts (4)**
15:24;16:15;17:5;
19:6
**important (13)**
137:5,10;147:10,
20;148:19;150:13;
204:22;219:2;236:17;
277:17,19,21;280:16
**impression (2)**
53:12;211:21
**impressive (1)**
96:13
**improbable (1)**
242:21
**improper (4)**
72:12;74:4;76:24;
77:1
**inaccurate (3)**
122:20;185:10;
304:23
**Incapable (1)**
226:17
**incarcerated (1)**
242:17
**incident (12)**
30:11;131:19;
136:8;153:20;154:16;
174:7;199:14;207:6;
209:2;327:6;342:9;
344:5
**incidents (4)**
247:1,8;248:11;
250:9
**include (5)**
106:6;143:6,14;
144:5;159:18
**included (2)**

82:4;214:12
**including (5)**
82:5;144:13;
278:21;349:5;359:5
**incomplete (1)**
236:13
**incredibly (2)**
229:19,19
**inculpated (1)**
50:14
**independent (6)**
180:20;181:17;
182:5;215:23;226:14;
357:13
**index (21)**
168:14;169:7;
222:2,3,3;227:24;
228:7;229:6;230:15,
16;231:6,8,14;232:22,
25;233:5,22;234:5,
12;271:22;305:14
**indicate (4)**
8:11;19:23;145:2;
146:7
**indicated (7)**
45:20;58:15;77:21;
78:15,17;94:15;323:8
**indicates (1)**
319:1
**indicating (4)**
77:17;281:22;
284:12;330:25
**indicted (2)**
342:10,11
**indifferent (1)**
95:3
**individual (8)**
179:14,18;184:11,
18,20;196:21;215:13;
227:18
**individually (1)**
18:3
**individuals (19)**
23:4;50:14,15;54:1;
61:9,17;63:9;65:4;
181:18;182:6;196:19;
207:16;214:11;
219:25;221:24;
238:10;293:24;333:9;
353:11
**inferences (1)**
229:25
**inform (1)**
188:19
**informal (1)**
162:24
**information (129)**
8:22;17:3;19:2;
32:14;34:17;46:23;
49:23;50:7,13,18,20;
65:12;74:13;75:9;
80:9;86:19;137:2;
144:16;148:13,16,19,

25;149:15;150:14,19;
168:9,10;175:15,16,
17;176:6,7;178:15;
189:7,22;190:4;
191:6,10,11,14,19;
192:5,10,17,23;193:5;
196:2,7,11,17;197:6;
216:16,22;218:2,12;
219:3,13,15;220:9;
221:5;222:15;223:1;
224:15,25;225:5,12,
21;226:10,19;227:3,
12,23;228:7,17,18;
229:16;230:24;231:7,
25;232:1,3,6,15,17,
22,25;233:4,8,15,17,
20;234:4,12,18;235:7,
13;236:7;244:3,6;
250:20;258:13;
265:16;267:9;268:11,
25;269:5,9;270:25;
271:17;281:20;282:3,
21;292:19;295:23;
296:7,8,15,19;303:8;
308:5;314:19,24;
329:8;333:8;335:2,7;
336:3;344:9;360:7
**informed (1)**
66:16
**initial (3)**
65:21;178:7;325:19
**initially (2)**
123:19,24
**initiate (1)**
62:17
**initiated (2)**
61:17,18
**inkling (1)**
347:13
**inquiring (1)**
64:6
**inquiry (1)**
20:12
**inside (2)**
271:24;272:5
**instance (8)**
21:6;88:14;143:10;
156:4,13;240:14;
278:21;299:10
**instead (1)**
339:2
**instruct (3)**
74:7;80:14;83:18
**instructed (4)**
131:5,9;133:11;
147:9
**instruction (8)**
128:9,13,16,22;
129:1,25;130:4;132:7
**Instructions (2)**
128:17;166:5
**instructors (2)**
129:2,10

**integrity (1)**
229:14
**intelligence (1)**
222:25
**intend (3)**
71:12;77:8;230:12
**interact (3)**
289:3,6,9
**interactions (1)**
288:22
**interest (4)**
51:3;154:18;155:5,
8
**interested (2)**
127:6,8
**interesting (1)**
188:5
**internal (2)**
344:20,24
**interpreter (1)**
200:21
**interrogated (1)**
13:4
**interrogation (3)**
133:13;157:25;
264:14
**interrogations (1)**
132:13
**interrupting (1)**
229:12
**interview (5)**
145:15;264:15;
288:13;298:17;
336:20
**interviewed (8)**
119:20,22,24;
120:2;155:22;178:13;
179:18;293:24
**interviewing (6)**
159:24;178:10;
237:19;321:18;
352:22;353:10
**interviews (3)**
120:19;147:21;
292:5
**into (30)**
42:25;66:5;78:3;
97:1;117:19;120:8;
121:8;134:20;145:12;
164:1,19;166:12;
168:2,11,23;183:9;
198:8;206:1,2;
215:14;234:12;239:4,
8;254:25;278:17,17;
279:7;280:4;301:1;
336:5
**introduce (1)**
5:15
**introduced (1)**
57:20
**invades (1)**
74:3
**inventoried (2)**

212:19;213:13
**inventory (4)**
213:2,8;222:9;
272:11
**inventorying (1)**
134:16
**investigate (7)**
51:14;175:13,23;
176:11,22;177:13;
306:23
**investigated (5)**
42:5;148:10;
173:23;338:16;
344:14
**investigating (11)**
48:25;49:18;144:1;
148:14;198:7;251:8,
19;306:16;308:5;
314:20;344:13
**investigation (97)**
13:5;49:3,7,11,22;
50:1;51:2,24;52:2;
55:25;142:15;143:15;
144:5;146:14;148:20;
149:15;151:17;
154:19;155:3,6,9,14;
156:15,21;157:11;
168:7;170:7;171:14;
174:9,9,24;175:9,14;
176:5;177:14,24;
183:16,20,23;184:1,
10,20;185:19;186:11;
188:1;189:16;190:9,
12;191:24,25;195:19,
21;201:21;209:25;
210:23,24;212:3;
217:4;218:19;220:14;
221:8,19;226:7;
243:23;253:20;
260:17;264:9;276:20;
288:11;290:16;293:4,
16,25;300:9;307:1,4;
309:15;311:17,19,21;
312:23;315:2,3;
316:12;319:2;323:9,
20;324:6;338:18;
339:19;344:11,22;
359:3,10,11,11;360:2
**investigations (8)**
47:13;131:21;
158:12;170:14;
173:18;189:23;
280:16;336:20
**investigative (54)**
29:7,17;44:14,17;
90:12;124:17;132:8;
156:10;164:1;168:3,
5,11,15,17;169:6,15,
18,25;170:5,25;
171:14;173:21;
177:18;178:5;186:17;
189:4;190:11;204:11;
212:22;220:17;235:4;

236:19;271:7,9,24,25;
272:1,8,13;277:5;
278:25;279:22;280:4;
285:11,13;291:14;
306:5;313:24;315:22;
330:7;331:14,23;
353:15;360:12
**investigator (4)**
    42:3;90:11;197:6;
    225:13
**invoke (2)**
    71:12;77:8
**involve (1)**
    48:9
**involved (23)**
    21:7;114:23;
    135:20;171:24;172:2;
    191:7,13;212:3;
    223:23;247:24;248:3,
    4;250:16;251:8,19;
    292:14;306:6;307:9;
    308:17;309:15;
    313:24;332:23;355:2
**involvement (4)**
    250:1;265:12,18;
    325:23
**involves (1)**
    74:6
**involving (2)**
    171:24;353:15
**IPRA (1)**
    345:11
**irrelevant (2)**
    55:9;73:2
**irrespective (1)**
    160:22
**issue (8)**
    62:20;81:8;181:16;
    259:13,18,20,25;
    260:6
**issued (3)**
    31:2;34:22;226:12
**issues (3)**
    19:24;20:1;27:16

## J

**Jack (1)**
    276:4
**Jail (14)**
    187:13,13;191:18,
    22;192:7;196:5,13;
    247:11;248:19;249:6;
    250:14;268:9,21;
    269:13
**January (2)**
    356:20;357:11
**Jeffery (12)**
    305:10,12,17,24;
    306:19,20;307:8,19,
    20,22,24;308:12
**Jeffery's (1)**
    307:16

**Jennifer (4)**
    5:17;6:13;202:21;
    308:20
**jeopardy (4)**
    83:9,13;84:16;
    86:12
**Jim (2)**
    70:23,25
**job (11)**
    81:23;94:25;95:1;
    103:22,24;117:12;
    118:20;119:11;
    152:18,21;306:17
**Joe (2)**
    346:13;347:16
**John (1)**
    48:18
**Join (59)**
    8:3;11:1,2;18:23;
    19:12;21:18;31:22;
    32:23;33:7,16;35:20;
    36:8;37:8;47:22;
    51:17;53:22;57:18;
    58:13;59:20;61:1;
    67:13;72:13,17;74:1,
    17;76:8;81:15;82:9;
    87:9,17;88:19;89:17,
    25;90:1;91:14;102:7;
    116:17;117:15;
    118:24;119:17;145:6;
    152:1,14;180:23;
    192:16;223:6;226:2,
    21,24;232:13;235:19;
    236:12;241:9;260:10;
    267:14;269:25;298:1;
    332:19;355:11
**Jose (9)**
    6:14;12:20;87:13;
    220:11;221:5;228:15;
    234:1;322:7;359:3
**Josh (3)**
    6:1;22:3,4
**judge (6)**
    6:25;66:13,21;68:9;
    93:11;251:6
**judge's (1)**
    239:24
**judgments (2)**
    21:11,12
**July (26)**
    183:1;184:21;
    185:1;186:10,17,25;
    187:15;188:8;190:19;
    191:8,20;192:11;
    193:13;194:17;
    196:16;204:12;
    205:24,25;207:8;
    211:6;215:25;238:11;
    245:8,17;246:1;
    249:13
**June (2)**
    96:19;335:5
**jurisdiction (1)**

    51:15
**jury (7)**
    23:11,20;356:5;
    357:17,18;358:7;
    360:10
**Justin (1)**
    5:19
**Justino (1)**
    274:11

## K

**Karen (1)**
    5:12
**Kathleen (2)**
    44:8,11
**keen (1)**
    264:21
**keep (9)**
    140:12;171:5,9,23;
    272:10;275:16;284:9;
    285:17,21
**keeping (3)**
    143:13;311:20;
    314:13
**kept (4)**
    48:14;52:19;
    173:17;278:12
**kettle (1)**
    86:6
**Kevin (6)**
    191:1;282:4,20;
    283:10,12;285:18
**kind (3)**
    49:13;206:20;
    310:15
**King (21)**
    209:20;216:7,8;
    218:3,14,22;220:15,
    19;221:6,7,12,14,16,
    18;222:5,23;225:1,
    25;233:25;236:6;
    305:10
**Kings (7)**
    210:10;211:8,15,
    23;212:10;301:23;
    302:15
**knew (26)**
    37:4,9,15;39:21,22;
    53:12;57:3;66:10;
    92:5,11,16;109:5;
    148:24,24;162:15;
    171:4;176:6;194:17;
    248:10,15;249:25;
    250:6,9;309:6;
    333:23;354:6
**knowing (5)**
    154:19;155:6,9;
    303:13,14
**knowledge (22)**
    48:15;49:3,4,6,13;
    84:9;158:15;161:11;
    192:12;194:13;

    222:23;224:7,11;
    247:16;248:9,25;
    265:18;291:17;
    302:16;332:11,22;
    337:19
**knowledgeable (2)**
    161:7,18
**known (4)**
    57:8;179:15;
    233:25;234:3

## L

**lab (1)**
    332:7
**labeled (1)**
    69:24
**laboratory (1)**
    332:5
**Lake (1)**
    105:12
**lakefront (1)**
    107:24
**lands (1)**
    315:10
**largely (1)**
    336:2
**Larry (2)**
    210:25;216:13
**last (14)**
    26:11,22;28:1;
    70:14,14;141:13;
    173:25;217:20;232:5;
    289:22;295:9,14;
    321:12;353:25
**late (2)**
    106:3;160:13
**later (18)**
    14:4;39:12;62:6;
    93:16;114:2;147:25;
    148:3;150:22;156:1;
    162:8;211:16;238:6,
    6;289:13;304:5;
    324:14;360:2,3
**Latin (11)**
    209:20;210:10;
    211:7,15,23;212:10;
    221:6;301:23,23;
    302:15;305:10
**Law (10)**
    5:9;6:25;22:3,5;
    128:8;129:12;130:1,
    4;133:5;352:5
**laws (3)**
    112:9,11;130:9
**lawsuit (3)**
    24:21,24;27:19
**lawsuits (2)**
    21:7,15
**lawyer (4)**
    75:9;87:12,23;
    349:17
**lawyers (1)**

    22:11
**laying (1)**
    173:4
**lead (3)**
    176:12,13,18
**leading (1)**
    360:10
**leafing (1)**
    229:15
**learn (19)**
    46:23;65:7,11;
    93:16;97:22;184:19,
    20;187:7;196:8,13;
    197:4,24;213:17;
    217:12;247:6,9;
    307:18,20,21
**learned (28)**
    28:21;98:6;132:2;
    136:7;142:8;144:9;
    162:25;175:15;
    187:11,14;190:15;
    192:6;196:4;197:1,6,
    7;209:1,8;216:22;
    246:18,19,20;247:2,7,
    8,19;248:6;329:8
**learning (1)**
    247:24
**least (7)**
    113:11;165:21;
    286:8;288:4;309:22;
    325:3;342:15
**leave (5)**
    257:22;259:8,9;
    263:25;264:11
**leaving (3)**
    103:20;288:16,21
**led (2)**
    31:15;196:24
**Lee (5)**
    27:5;108:24,25;
    109:9;127:17
**left (15)**
    52:15;103:25;
    257:13,15;258:2;
    261:24;263:23;
    264:20;266:1;272:4;
    288:12;298:18,25;
    300:5;327:9
**legal (8)**
    31:6,8,10,15;33:2,
    4;39:5;88:15
**LEINENWEBER (42)**
    5:19,19;37:23;
    57:16;58:25;60:1,24;
    61:20;69:11,21;
    92:22;119:9;194:7;
    202:20;206:10;223:7;
    224:20;226:22;230:1,
    6,18,22;231:2,9;
    236:1,13;312:11,14;
    316:17,25;318:6,11;
    332:19;333:17;
    347:19;348:1;350:16;

351:25;356:5,8,13;
360:19
**Leo (20)**
216:7,9;217:17;
218:1,3,14,22;220:15,
19;221:7,12,14,16,18;
222:5,24;225:1,25;
233:25;236:6
**Leo' (1)**
217:21
**less (12)**
7:7;22:9;26:12;
95:5;113:17;150:9;
162:5;166:2;247:22;
334:13,17;343:21
**letter (11)**
69:18;70:4,6,13,22;
71:9;72:19;77:10;
82:22;102:16;276:1
**letters (1)**
275:10
**letting (1)**
228:20
**level (2)**
122:8;131:22
**liar (1)**
79:5
**liberty (2)**
9:13;34:20
**lie (8)**
76:13;157:24;
158:2,22;159:13,20,
20,23
**lied (8)**
158:4,8,15,16,17;
159:6,16;252:10
**lies (4)**
159:18,19,19,19
**lieutenant (6)**
278:14;340:5,6,24;
341:24;344:6
**lieutenant's (1)**
278:18
**life (4)**
297:5;342:21,23;
347:5
**liked (2)**
107:17;349:7
**likely (1)**
172:21
**limit (1)**
56:14
**limitations (1)**
337:15
**limited (3)**
131:16;306:25;
308:4
**line (7)**
38:19;55:8;151:18,
18;202:23;217:20;
231:15
**lineup (33)**
134:16;160:5,7,8,9,

10,16,23;178:19,20,
20;179:6,9,10,25;
180:7,12,15;181:11,
13,23;199:19,21,21,
25,25;203:7,7,10,11;
204:20,21;205:3
**lineups (6)**
132:11;160:4,21;
179:21;181:19;182:7
**list (6)**
114:11,12,19,22,23;
146:19
**listed (3)**
295:25;301:8;358:9
**listen (3)**
52:15;192:21;350:6
**listened (1)**
66:3
**listening (1)**
195:19
**litigating (1)**
7:1
**litigation (3)**
30:14,15;75:14
**little (6)**
43:2;105:15;108:5;
207:25;208:17;
340:14
**live (1)**
165:23
**lived (1)**
228:25
**locate (2)**
305:24;306:19
**located (2)**
5:9;96:6
**location (5)**
114:24;271:19;
359:5,18,25
**locations (1)**
105:7
**lockup (4)**
237:3,6,8;238:4
**lodged (3)**
48:1;336:1;345:15
**lodging (1)**
193:7
**log (4)**
168:14;169:6,7;
271:22
**logical (2)**
20:11;151:6
**logs (1)**
256:1
**long (31)**
22:7;25:13;26:10;
34:6;47:5;50:21;
88:10;98:11;104:20;
105:20;106:15,25;
108:8;112:2;115:5;
124:1,10;128:2;
150:5;151:7;165:2,4,
4,10,17;172:1;203:3;

260:25;331:6;343:23;
353:1
**longer (3)**
29:10;46:1;157:20
**look (62)**
71:9;118:10;
146:22;162:9;167:24;
169:14;173:7;197:21;
201:1;206:5,8,19;
207:5,13;209:4;
210:5;215:4;220:22;
229:5;230:13,14;
232:2;238:23;252:19;
270:15;271:12,13,14,
15;272:7,12,14,16,18;
277:1;280:21;282:12;
284:10,22;286:19,20;
289:19,25;290:9;
293:8;300:12;301:14;
312:1;317:12;318:22;
321:7,9;323:2,19;
327:23;329:18;
330:12,18;356:15,24;
358:5,18
**looked (15)**
57:8;174:17;185:9,
9;222:2;240:15;
276:19,21;281:2;
282:8;285:6;286:18;
295:3;303:18;330:16
**looking (16)**
7:20;186:6;197:12;
202:18;204:20;
206:23;217:19;226:5;
230:17;231:1,5;
234:17;268:5;269:11;
321:10,15
**looks (3)**
271:5;275:2,20
**Loop (3)**
105:17,19;121:11
**lost (1)**
210:4
**lot (8)**
59:11;148:10,13;
161:13;263:13;
264:16;299:5;348:25
**Lots (2)**
112:17;148:14
**luck (3)**
101:18,20;102:23
**lucky (2)**
101:22;103:5

---

## M

**ma'am (49)**
14:9;15:4;62:15;
70:18;76:17;88:21;
94:20;108:15;120:20;
173:5;207:2,4;
208:10;210:6;217:19,
23;221:9;224:6;

225:22;228:20;236:3;
242:10;249:21;250:4;
251:20;255:8;261:15;
263:9;282:6,14;
285:4,20;286:11;
290:17;294:9,19;
302:1;305:3,8,11;
313:22;314:15,18,21,
23;323:4,7;329:16;
357:15
**Mainly (2)**
120:14;130:9
**maintain (2)**
170:13;208:15
**maintained (5)**
169:19;170:22,25;
171:1;277:12
**major (2)**
346:4,8
**majority (3)**
53:3;136:15;148:22
**makes (3)**
32:15;136:5;167:6
**making (7)**
45:3;102:16;
151:23;158:11;
229:21;231:12;
318:16
**male (2)**
211:2;301:21
**males (2)**
184:5,6
**man (7)**
55:6,6,15;118:20;
350:2;351:13,18
**manner (5)**
280:19;301:20;
341:9;343:4,13
**many (27)**
7:5;9:21;10:15,18,
23,24;11:6;15:4;21:6,
24;24:19;47:10,25;
65:18;99:6;100:21,
24;101:4;113:7;
223:25,25;249:12;
252:25;266:13;
343:21;345:14,21
**March (2)**
95:22;104:19
**mark (8)**
69:4;182:15;270:8;
310:25;316:24;317:2;
356:1;357:23
**marked (15)**
69:8;16;182:18;
206:8;253:22;270:12,
14;311:4;312:1;
317:9,12;329:17,19;
356:12;358:3
**marks (1)**
208:20
**married (1)**
45:7

**Martin (1)**
5:11
**matched (2)**
221:23;226:6
**material (2)**
7:25;55:16
**materials (1)**
282:9
**matter (14)**
5:2;6:14;30:10;
34:17;50:8;72:19;
73:1,10,12;99:3;
126:19;144:2;168:8;
253:19
**matters (2)**
354:18,22
**may (32)**
9:14;17:6,7;146:7;
152:17;171:19;172:9,
13;177:18;185:16;
188:13;209:4;220:22,
24;232:2,23;240:1;
272:14;273:2;276:1;
285:1;286:1,6;287:6;
291:21;293:8;294:3,
4,6,23;333:14;356:15
**maybe (27)**
22:1;26:12;35:16;
36:17;50:8;56:14;
73:12;87:1;123:9;
124:12;135:9;140:9;
149:3;150:22;155:13;
194:3;206:5;210:1;
230:23;238:5;251:17;
290:7;306:4;325:9;
329:18;331:2;339:25
**Maysonet (133)**
5:2,18;6:14;28:9;
31:2;37:22;38:11;
42:5;56:25;63:24;
65:25;71:1,7;82:6,15,
24;87:14;178:3;
183:2;187:13,15;
188:5;190:3,5,18;
191:7,18,20,21;
192:11;195:1,9,12,25;
196:6,9,12,14,21;
198:24;200:7;202:2;
203:4;204:8;206:1,
15,21;209:9;210:5;
213:6;217:15;220:1,
12;221:6,18;222:4;
225:24;228:15;
232:10;234:1;236:25;
237:2,7,15,19,24;
238:3,9,17,24;239:2;
241:20;245:5,25;
250:12,21;251:5;
252:3;254:22;255:15;
259:21;260:25;265:8;
266:15;267:11,21;
268:8,8,15;269:2,22;

273:15;275:3;286:5,
9,21;287:8,20;288:4,
11,12;295:3;298:16;
299:15;300:6,13;
301:1;304:3;308:6;
309:23;310:6,14;
311:8;313:25;314:16;
320:13;321:18;322:7;
325:16;326:18,22;
327:13;329:5;353:16;
354:2,23;358:12;
359:4,23,23

**Maysonet's (26)**
26:14;28:10,15,21;
52:12;53:7;65:7;
93:17,18;94:23;
198:2;215:3;220:18;
222:23;225:1;228:10;
236:7;248:2;250:1;
286:13,17;287:1;
292:21;352:22;353:7;
356:20

**mean (33)**
12:4;22:14;36:22;
38:1;42:19;48:11;
56:10;81:17,17;
85:13;86:6;102:9;
142:22;149:6;150:3;
152:17;175:11;
206:11;240:20;271:4;
278:8,16;291:1;
295:22;296:4;297:4;
298:8;308:25;319:18;
328:2;342:23,23;
348:19

**meaning (1)**
141:22

**means (6)**
20:10;58:11;
175:19;193:14,14;
296:6

**meant (5)**
216:19;297:2;
303:9;320:2,3

**media (4)**
50:5;81:3;82:13;
83:4

**medical (2)**
15:20;18:7

**medications (6)**
17:15,18,21,25;
18:1,3

**medicine (1)**
18:8

**medicines (3)**
16:11;17:17;18:17

**meet (8)**
22:4,23;103:23;
108:12,18,22;253:14;
254:11

**meeting (5)**
22:12;23:6;109:13;
249:6;269:13

**meetings (5)**
22:7,10,18,20;
24:10

**member (4)**
100:25;101:6;
102:14;104:3

**members (8)**
112:12;251:2;
255:6;292:5;301:23;
303:7;332:13;353:6

**members' (1)**
305:15

**memo (2)**
135:4,7

**memorialize (10)**
138:5;142:16,23;
147:21;148:19,22;
149:3;160:13;204:23;
214:24

**memorialized (5)**
178:19,20;180:1,8;
181:14

**memorializes (1)**
267:19

**memorializing (2)**
160:4;180:3

**memory (16)**
13:10;15:16,24;
16:5;17:1,5,9;18:11,
18;19:6,24;20:1,22;
150:6;269:8;353:25

**men (8)**
79:17;172:7;
302:13,14,15,15,18;
303:3

**menacing (4)**
341:9;343:4,13,17

**mention (1)**
44:16

**mentioned (2)**
209:23;250:6

**mere (2)**
350:11;351:21

**meritorious (2)**
115:12,13

**meritoriously (3)**
116:5;118:14;
120:21

**met (8)**
21:23;22:20;23:1;
27:11;59:17;61:22;
62:7;109:18

**Michigan (1)**
105:12

**middle (3)**
210:7,16;308:2

**midnight (7)**
174:20;184:10;
319:13,13,25;324:13,
22

**Miedzianowski (2)**
346:13;347:17

**might (28)**

20:13;33:19;90:9;
92:1,12;140:16,18;
145:11;151:23,25;
155:17,20;163:11,11;
189:5,16,19;190:25;
191:12;194:22;
217:11;236:7;257:12;
280:4;282:11;291:25;
295:5,6

**Miguel (4)**
12:4,12,21;15:7

**military (1)**
96:24

**millimeter (20)**
172:1;187:10,22;
188:4;190:16;191:16;
196:3,8;246:22,25;
247:3,7,25;248:3,5,7,
10,11;250:9;332:6

**millimeters (1)**
188:6

**mind (9)**
67:23;136:5;
148:24;228:23;
259:13,15;263:19;
284:11;338:5

**mine (1)**
26:19

**Mingey (43)**
6:2;24:17,20;26:23;
41:6;62:25;109:12;
187:6,11,21;190:4;
191:17,21;194:21;
195:8,24;196:5,11;
237:14,18,20;244:17,
19;245:10;246:4,12,
17;247:11,13,20;
248:18;249:8,13;
250:12;265:17;267:5,
11,20;268:9;269:16;
329:6;359:13,22

**minimal (1)**
310:2

**minutes (4)**
26:12;62:5;194:10;
202:25

**Miranda (5)**
132:22;133:2,8;
199:3,12

**mischaracterized (1)**
79:11

**mischaracterizes (8)**
51:22;85:2;142:5;
181:25;185:12;218:7;
220:3;352:16

**misconduct (2)**
333:13;351:7

**misfiled (1)**
290:7

**misrepresented (2)**
68:22;76:4

**missing (4)**
157:6;210:2;351:1,

3

**misstates (4)**
60:24;226:22;
350:17;351:25

**mistaken (1)**
328:15

**misunderstood (1)**
287:3

**mixture (1)**
110:22

**model (1)**
305:6

**modified (1)**
164:24

**Molina (3)**
210:8,9,11

**moment (2)**
67:5,7

**money (2)**
45:3;121:19

**month (2)**
124:15;238:6

**monthly (1)**
32:12

**months (5)**
96:25;98:12;
151:18;238:6;286:8

**Montilla (41)**
6:3;24:16,20,24;
25:21;26:5;41:10;
63:2;64:12;72:23;
85:11,17;109:15;
187:12;190:5;191:17,
21;196:4,12;247:11,
14;248:19,20,21;
250:13;265:18;266:7,
14;267:5,12,21;
268:9;269:16;309:20;
310:14;311:13;
321:19,24;329:7;
353:19;359:13

**Montrose (1)**
107:24

**more (35)**
7:7,9,10;9:2,25;
35:25;47:18;51:5;
59:3;84:8;86:5;
105:15;110:10;
113:16;121:12;127:7;
131:13,14;161:18;
162:4;166:6;192:8;
195:21;207:25;
208:11;232:11;
247:21;249:20;
252:16;265:22;275:7;
276:8;321:22;325:9;
350:13

**Morgan (1)**
251:6

**morning (14)**
6:12;172:8;174:8;
239:7;241:1;297:14;
298:10,16;309:4;

313:13;320:12,21;
321:17;339:12

**MOS (3)**
97:22,23,25

**most (8)**
27:23;110:6;
111:19;170:6,11;
172:21;189:14;243:2

**mostly (1)**
111:18

**motion (5)**
259:21;260:4;
356:8,25;357:20

**motioned (1)**
45:20

**motions (1)**
67:16

**motivated (1)**
292:20

**Motive (3)**
301:20,24;303:10

**mouth (4)**
154:5;192:25;
193:3;341:11

**move (1)**
56:15

**moved (2)**
125:2,3

**Moving (2)**
282:2;293:20

**much (6)**
47:18;110:18;
113:7;144:24;148:4;
347:12

**multiple (3)**
146:13;204:19;
351:7

**municipal (1)**
106:5

**murder (38)**
50:4;51:1;55:24;
65:7;75:12;174:24;
175:9,13;177:13;
185:18;186:11,22,24;
188:1;189:6,16;
195:21;206:5;243:22;
246:23;247:4,18;
251:7;256:12;265:7;
274:18;276:20;
277:10;293:25;299:2;
306:6;307:5,10,17;
308:18;322:8;355:1,
15

**murdered (4)**
172:4;185:16;
195:16;291:22

**murders (44)**
112:22;171:19;
174:16;175:24;176:5,
23;177:20;178:15;
184:23;185:3,8;
186:18,22,24;187:22;
188:14,25;191:1,8;

194:23;195:11;196:2;
243:25;244:3,13;
245:2;246:5;247:24;
249:17;250:2,15;
263:15;265:9,12,19;
269:18;273:16;278:3;
288:5;325:24;326:5;
328:18,24;353:16
**must (3)**
174:19;239:10;
343:24
**myself (7)**
16:21;19:4;39:3;
54:7;103:23;253:12;
255:24

## N

**name (54)**
5:10;6:12;11:20;
12:4,12,14;30:1;39:7,
16;40:3,4;44:8;69:12;
81:2,7;100:11,12,13;
134:14;146:16;
178:11;179:14,19;
197:1,4,21;198:1;
216:8;220:15;221:6,
20;222:2;227:5,17;
228:12,13,24;231:6;
261:12;273:24;
282:18;295:25;296:4;
303:12,17;305:10;
306:20;308:24;313:4;
322:12;351:5;356:25;
357:1;358:15
**named (5)**
6:15;11:11;12:21;
14:18;178:13
**names (4)**
13:17,17;225:13;
309:23
**narrative (2)**
144:14;294:12
**National (15)**
97:1;98:24;25;99:2,
4,5,16;100:3,22;
101:1,6;103:21;
104:1,2,4
**natural (1)**
347:5
**naturally (1)**
8:1
**nature (8)**
8:9;44:2;51:12;
131:18;135:5;173:9;
203:9;347:2
**necessarily (1)**
145:1
**necessary (1)**
266:16
**need (20)**
9:12;31:15;148:1;
150:6;159:10,13;

193:18,19;194:2;
215:5;221:2;232:11;
256:3;262:7,7;
300:13;306:21;313:5;
315:1;331:24
**needed (14)**
31:7,11;32:18;33:4;
103:22;200:23;
263:20;264:17;
298:18;307:21;
309:19;311:10,11;
314:17
**needs (1)**
95:10
**negative (5)**
18:18;160:13,17,
18;178:24
**negatively (1)**
16:6
**negatives (1)**
160:25
**neither (2)**
210:8;332:4
**Nelson (2)**
209:16,23
**New (9)**
42:8;11;53:14;
54:13;114:7;131:10;
173:23;317:3,5
**news (5)**
50:5;80:22,24;81:3;
83:4
**newspaper (1)**
80:20;93:24;94:1
**next (25)**
27:23;28:3;42:21;
93:24,25;94:8;107:2;
149:20;185:23;237:2;
238:16;257:25;
264:22;275:6,25;
276:7;281:21,23;
283:9;287:13;305:1;
311:12;313:8;318:7;
356:2
**nice (1)**
45:2
**Nick (2)**
127:12,13
**nickname (26)**
197:14,22,24;
214:3,8,10;215:3,9,
16;216:12;217:12;
218:3,14,22;219:14,
15;220:18;221:12,16,
18;222:4,23;225:1,
25;226:4;236:6
**nicknames (5)**
214:20,24;227:8,9;
228:2
**night (3)**
173:25;298:9;320:9
**nine (1)**
104:21

**nobody (5)**
75:20;76:19;171:8;
207:20;255:23
**non (2)**
113:16,17
**Nope (1)**
11:18
**nor (1)**
210:8
**normal (1)**
297:7
**North (10)**
96:8;114:10;
125:16,17;161:4;
172:8;233:19;234:3;
346:16,18
**Northern (1)**
5:4
**Northwestern (2)**
44:21,25
**notate (1)**
145:21
**note (1)**
144:16
**noted (1)**
193:7
**notes (3)**
134:23;135:1;
168:12
**notice (1)**
14:22
**notification (1)**
345:3
**notified (2)**
345:12,13
**November (1)**
70:20
**number (33)**
5:5;38:18,20;39:7;
46:16;173:18;270:21,
22;272:24;279:24,25;
280:1;282:19,20,22;
283:1,5,8,10,10,14,
18;284:2,3,4;290:7;
309:21;317:5;327:24;
336:1;354:17,21;
356:2
**numbers (4)**
284:16;316:15,18;
317:15
**numerical (2)**
279:15;280:2

## O

**oath (11)**
6:21,24;7:3,13;
12:11;58:7,11,17,19;
252:11;343:12
**obituary (1)**
81:4
**Object (64)**
10:4,11;15:17;

19:10;21:17;29:8;
33:6,14,22;35:4;36:6;
43:10;46:19;47:15,
20;49:8;55:7,8;60:21,
21,22;63:20;67:11,
11;68:23;73:24;
79:11,13;81:13;82:1,
7;84:18;85:1;95:6;
101:16,21;111:6;
114:25;116:9;117:13;
122:11;127:2;137:16;
140:8;141:1,6,11,18,
23;267:22;293:17;
297:24;298:23;299:7;
303:16,25;307:25;
310:7;332:16,17;
339:6;347:18,19;
355:10
**objected (1)**
139:7
**objecting (3)**
35:5,6;140:12
**Objection (250)**
8:2;10:25;11:7,17,
21;12:1,8,15;14:5,12;
17:11;18:21;26:6;
31:21;32:21;35:19;
37:6,17,23;38:12;
43:15;49:20;50:16,
24,25;51:8,16,21;
53:20;54:16,25;57:2,
9,15,25;58:8,12;
59:18;60:13,20;
61:11,20;62:21;
64:17,23;72:10,24;
73:2;74:16;76:6,16,
23;77:12,24;79:6,24;
80:8;81:1;82:16;83:1,
15;86:14;87:2,8,15;
88:7,17,25;89:7,15,
24;90:17,22;91:8,12;
92:9,20;93:3,13,19;
94:9,18;101:17,25;
102:5,19,25;103:12;
107:13;110:16;
116:15,23;117:21;
118:3,8,22;119:7,10,
15;120:3;130:5,6;
140:2;142:4;143:16;
145:4;146:9,21;
147:5;149:10,21;
150:1,4,15,24;151:3,
9,24;152:12,20;153:1,
3,9,13;154:2,8,13,20;
156:22;157:17;158:3,
18;159:8;167:13;
170:8;175:1,20;
177:2;180:5,14,22;
181:4,10,12,24;182:8;
183:3;185:12;186:13;
187:16;192:14;193:7,
15,17;197:18;201:11,
22;203:23;204:15;

212:25;213:19;
214:14,19;215:18;
216:2,23;217:8;
218:4,6,15,24;219:4,
5,8;220:2,20;223:5,
16;224:9,18,19;225:3,
18;226:1,20;227:14;
232:12;235:17,24;
236:10;239:16;240:5,
10,21;241:7,15;
242:24;243:8;252:5,
15;259:10,17,24;
260:8;263:16;264:5,
23;266:19;267:2,13;
269:23;274:7;279:4,
9,14;283:15,25;
285:14;287:10;288:6,
7,14;291:3,16;294:7;
296:11;297:23;
299:17;301:5,9;
302:8;307:11;319:18;
323:14;330:8;333:1,
17;344:2,3;345:17;
347:25;348:6;349:19;
350:4,9,16,18;351:25;
352:13,15
**objectionable (1)**
80:11
**objections (2)**
56:15,17
**obligated (4)**
34:24;87:6;92:6;
133:13
**obligation (1)**
137:25
**observation (2)**
139:23,24
**observe (1)**
333:4
**obsessed (1)**
45:23
**obsession (2)**
350:14,19
**obtain (3)**
137:2;161:10;
339:20
**obtained (7)**
104:9;209:18,25;
210:21;232:6,7;
233:17
**Obviously (5)**
9:5;129:20;137:3;
314:11;338:9
**occasion (1)**
92:1
**occupation (1)**
97:24
**occurred (6)**
147:22;153:19;
172:18;207:7;258:4;
267:20
**O'Donnell (1)**
337:8

off (21)
  36:23;45:15;47:11;
  95:13,15;173:7,12;
  204:3;205:10,12;
  208:17;228:19;232:6,
  7,17;238:4;273:2;
  310:19,21;358:17;
  360:22
offender (3)
  208:21;211:25;
  221:15
offenders (11)
  207:24;208:8;
  209:3;214:25;217:12,
  16,25;218:2;219:24;
  301:22,23
offense (1)
  206:25
offenses (3)
  130:10;132:4;248:7
offensive (3)
  229:19,19;349:16
office (59)
  28:14;65:22;66:20;
  67:19;77:22;78:6;
  130:13;164:5;166:19,
  20,22,24;167:21;
  168:6;173:13,14;
  199:1;200:5;221:23;
  223:25;232:8;235:7;
  256:24;258:21;261:1;
  275:11;276:4;277:2,
  3,8,16;278:4,5,6,7,10,
  11,15,17,18,19,20,24;
  279:3,7,13,19;280:5,
  11,23,24;281:25;
  283:17;284:2;285:6,
  13;295:7;306:22;
  352:5
Officer (52)
  5:20;11:12;12:20,
  22,25;21:8;30:24;
  33:10;34:1,6,9;35:13,
  18,22;36:11,21;
  37:13;39:4,18,19;
  54:22;81:11,21;90:9;
  91:25;92:4;99:25;
  105:2;114:3,5;
  115:22;119:1;123:13,
  20;135:8;137:14;
  138:11,25;156:20;
  159:25;174:20;
  189:15;223:23;276:4;
  301:11;334:2,9,12;
  344:14;346:1,21;
  347:8
officers (10)
  37:1;39:17;41:4;
  52:4;94:15;155:7,8;
  225:5,8;255:25
offices (1)
  300:2
official (1)

113:2
officially (2)
  124:9;175:25
Oklahoma (2)
  98:6,8
old (12)
  8:10;54:13;55:6;
  124:2;335:24;337:5,
  23,25;338:7,19;339:7,
  10
older (2)
  79:17;305:6
O'Malley's (1)
  276:4
omit (1)
  7:25
once (5)
  36:1;45:14;75:14;
  99:8;101:3
one (107)
  8:1,14;9:13;10:3;
  11:14;22:12,17;
  28:17;29:22;39:17;
  45:25;47:3;48:13;
  52:24;53:18;60:7;
  62:13;75:22;85:5;
  89:20;93:5;95:10;
  96:7;107:22;114:24;
  116:1;116:20;124:12,
  13;135:2;140:16;
  144:14;147:24;164:4,
  12;166:11;167:19;
  169:3;171:4;177:15;
  180:20;182:5;186:5;
  189:15;192:8;199:5,
  7;200:22,23,24;
  201:2;206:10;207:24;
  208:11,20;210:12;
  216:11;217:16,24;
  218:2;219:23,24;
  221:24;230:3;240:17;
  241:5;249:20,22;
  254:20;270:6;275:14;
  276:15;282:24;
  285:18;291:10;295:6;
  304:15;306:23;
  307:21;308:12;
  309:13;312:5;313:5,
  11,15;314:1;315:12,
  14,14;316:21;317:21;
  318:2,4,4,15;319:1,
  22,23;323:23;324:10,
  12;330:25;332:2;
  341:18,21;355:25;
  358:23
one-off (1)
  290:6
ones (2)
  100:13;331:11
only (57)
  9:13;16:21;22:17;
  23:19;52:7;54:9;58:1;
  63:9;64:11,25;66:15;

75:8;76:2;77:5;78:12,
  23;79:12;80:5;82:23;
  83:20;84:3,10;85:5;
  100:11;114:18;
  123:21;128:23;137:1,
  18;138:18;139:22;
  142:2,24;146:11;
  147:13;151:11;
  162:19;171:4;181:21;
  191:14;192:17;194:6;
  224:4;226:3;239:10;
  256:16;265:3;268:17;
  269:8;283:16;301:12;
  302:9;304:2;306:11;
  308:14;329:8;351:6
open (6)
  66:21;272:2,3;
  306:24;307:5;321:10
operation (1)
  121:12
opinion (15)
  18:6;44:5;84:19;
  127:3;152:15,18;
  216:25;258:16;306:9;
  336:12;349:6,12;
  351:23;352:3,12
opportunity (9)
  8:17;9:1;24:20;
  112:10;159:2;183:4;
  207:12;327:23;329:2
opposed (2)
  100:8;126:23
OPS (2)
  158:12;345:10
optimal (1)
  214:18
option (2)
  43:20;114:4
Order (14)
  29:2,5,15;30:17;
  31:3,4;32:10,16,17;
  34:25;124:9;130:16,
  21;279:15
orders (6)
  34:13;36:4;128:6,7;
  134:13;164:24
organization (1)
  227:19
organized (4)
  125:21,25;279:13,
  23
origin (1)
  29:24
original (12)
  164:15,20;166:14,
  16;206:24,25;207:13;
  225:24;233:3;268:23;
  277:9;340:18
Orozco (1)
  157:20
others (5)
  161:19;223:25;
  310:6;348:20,23

Otherwise (2)
  151:22;179:15
Ours (1)
  169:22
ourselves (2)
  198:5,6
out (69)
  11:16;32:10;40:12;
  45:7,14;46:1,18;47:1;
  58:21;63:6;69:14;
  81:3,7;84:23;85:6,24,
  25;87:12,18,22,25;
  88:4,14;90:5;108:21;
  124:9;134:25;154:5;
  160:5;168:7,20;
  172:21;183:20;
  189:17,23;190:14;
  192:25;193:3;199:25;
  200:4;208:13;213:15;
  220:11;221:25;
  227:24;228:23;
  256:18;263:10,14;
  264:20;273:12;
  280:18;293:16;
  305:12;307:24;
  310:17;313:6,11;
  314:1,7;323:5;
  324:12,18;333:10;
  336:19;339:2;341:11;
  348:4;353:19
outcome (3)
  15:14;160:23;
  179:11
outright (1)
  337:25
outside (11)
  24:2,4,7,12;25:21;
  51:15;73:12;80:15;
  272:14,18;298:24
over (22)
  6:17;43:2;45:12;
  50:5;55:24;86:9;
  125:14,23;138:2;
  150:10;175:15;
  229:12;235:6;253:15;
  309:8;310:4;312:10,
  19;313:15;314:25;
  315:1;316:11
overseeing (2)
  311:16,19
overtime (5)
  297:14,17,17;
  298:9;299:5
overwhelmingly (1)
  82:13
own (8)
  16:7;137:11;
  138:21;171:6,10;
  258:18;334:1;342:22
owner (3)
  97:7;306:5;308:17

P

packet (2)
  206:22;295:10
page (36)
  6:18;79:16;141:21;
  210:4,5,17;211:16;
  213:6;215:6;216:6;
  220:23,24;270:15,16,
  19;273:23;275:14,25;
  276:10;284:10,10,12;
  285:23;294:17;
  295:14,25;305:3;
  318:22;321:11,12,15;
  356:24;357:2;358:6,
  20,25
pages (6)
  206:19;275:6,7,10;
  289:22;318:8
Panthers (1)
  100:16
Papa (5)
  70:23,25;71:11;
  76:4,13
paper (14)
  120:23;123:3,16;
  124:7,8,11;135:2,9;
  145:3;149:1;166:16;
  177:11;295:19;
  358:17
papers (5)
  277:17,20,21;
  329:24;341:3
paperwork (1)
  325:11
paragraph (9)
  71:10;210:17;
  211:10;221:9;232:5;
  233:23;234:15;305:1;
  321:20
paragraphs (1)
  220:23
Park (1)
  96:17
parking (1)
  131:17
part (26)
  13:16;40:19;48:16;
  80:17,22,25;110:3;
  120:1;130:25;170:18;
  183:18;189:14;212:3,
  22;236:18;244:7,16;
  245:9;247:18;269:11,
  16;270:2;271:23;
  306:25;307:16;
  359:12
participate (2)
  179:25;353:10
participated (1)
  298:21
participating (4)
  147:11;160:10;

274:16;300:10
**participation (1)**
  269:18
**particular (10)**
  35:14,23;51:3;
  143:25;155:21;
  161:17;183:20;
  191:12;239:9;313:20
**particularity (1)**
  208:12
**particularly (6)**
  8:9;112:23;156:3;
  162:12;306:23;349:1
**partner (5)**
  22:3,5;48:9;183:13;
  233:18
**partners (3)**
  47:2;301:13;347:17
**past (5)**
  18:5;45:17;313:13,
  16;314:17
**Patrol (14)**
  104:25;105:2,25;
  106:4,12;108:10;
  109:19;112:5;114:13;
  120:14;124:5;131:16;
  135:8;261:10
**patrolman (4)**
  105:3,4;106:2;
  133:17
**patrolmen (2)**
  47:7;256:17
**Paul (1)**
  50:11
**Paulnitsky (24)**
  5:9;6:3,7,12;20:22;
  69:6,18;70:3;74:10;
  86:11;95:20;152:6;
  182:16;205:17;
  206:18;270:10;311:2,
  7;316:10;317:7;
  356:10;357:6;358:1;
  360:24
**Pause (1)**
  331:5
**pay (1)**
  32:12
**paying (1)**
  311:20
**peachy (1)**
  264:21
**pending (1)**
  9:14
**people (37)**
  45:24;48:24;49:12;
  50:9;53:3;81:24;82:4;
  99:4,5;106:8;110:9,
  10,22;111:18,21;
  112:11;123:14;
  130:16;131:24;
  161:15;183:6;188:19;
  198:7;204:19;214:24;
  242:19;243:1,2;

256:17;263:14;
  266:13;336:21;
  337:15;348:13,22;
  352:10,11
**People's (1)**
  352:4
**per (1)**
  164:24
**percent (2)**
  113:14;173:24
**percentage (2)**
  113:8,11
**perfectly (3)**
  8:7;200:15;263:2
**perhaps (3)**
  19:5;56:14;326:8
**period (9)**
  106:3;124:1,12,13;
  149:4,16,18;175:16;
  311:17
**permanent (13)**
  170:19,21,24;
  329:20;330:1,5,13;
  331:9,13,15,19,22;
  332:8
**permissible (1)**
  159:22
**permission (5)**
  170:2;237:24;
  306:21;307:3;339:16
**perpetrators (1)**
  207:16
**person (16)**
  38:14;39:19,22;
  133:3,11;143:9;
  156:4;160:8;178:10;
  212:11;213:16;
  215:15;222:19;
  312:19;313:13;
  331:16
**personal (6)**
  171:6,9,10;342:22;
  354:17,21
**personnel (3)**
  129:4;146:15,19
**persons (1)**
  210:12
**Pertaining (9)**
  21:25;30:10;36:10;
  143:3;153:20;154:16;
  196:2;302:4;315:20
**pertinent (3)**
  136:9;149:14;
  279:19
**pestered (2)**
  349:25;350:1
**Peterson (2)**
  114:9,10
**phone (17)**
  38:6,18,25;39:7,10,
  13;40:14;94:3;
  102:16;135:10;
  254:17;261:6,7;

262:8;263:21;288:25;
  311:11
**photo (36)**
  45:21,22;46:6,18;
  54:12,13,14,21,22;
  132:9;160:8;183:17,
  21;184:9;209:18,19,
  22,22;210:10,20;
  211:2,7,18,20,23,25;
  212:1,9,11,15;213:11,
  15,16;215:12,13;
  216:1
**photograph (15)**
  55:11;184:3;
  190:13,15;196:17,18,
  22,23;209:1,8,24;
  210:25;211:15;
  219:25;222:12
**photos (1)**
  224:11
**physical (3)**
  104:13;342:24;
  343:2
**physically (1)**
  254:1
**pick (6)**
  46:17;183:19,22,
  25;184:19;255:10
**picked (1)**
  221:24
**picture (18)**
  54:7,10;55:15;56:1;
  60:18;184:12,14;
  197:13;205:18;
  212:14;219:10;
  221:21,22,23;226:4,5,
  6,6
**pictures (1)**
  199:24
**piece (8)**
  8:22;135:2,9;145:3;
  149:1;177:11;295:19;
  358:17
**place (19)**
  25:23;27:1,2;32:10;
  83:9;108:3;110:1;
  112:25;127:25;
  156:11;169:5;183:5;
  217:11;244:8,23;
  245:11;247:11,13;
  248:24
**placed (9)**
  83:14;178:18;
  179:8,22;183:9;
  195:22;199:1,19,20
**placement (1)**
  204:20
**places (2)**
  108:2;128:12
**placing (1)**
  181:18
**plaintiff (2)**
  5:18;6:13

**play (5)**
  134:20;295:18;
  301:3;325:15;352:21
**played (4)**
  29:7,17;90:12;
  310:1
**plead (1)**
  94:16
**pleasant (1)**
  262:10
**pleasantries (1)**
  265:22
**please (19)**
  5:15;58:18;69:5;
  87:19;89:20;140:22;
  144:5;153:15;165:5;
  208:3;209:6;211:9;
  218:9;229:4;270:9;
  293:9;311:1;329:23;
  356:16
**plus (1)**
  173:23
**pm (18)**
  205:11,15;297:11;
  310:20,24;319:8;
  322:24;323:9,12,17;
  324:7,15,18;360:23
**pockets (1)**
  111:20
**point (36)**
  8:21;65:6;73:13;
  93:21;115:24;156:1;
  196:3;200:20;202:3;
  207:13;210:2;211:4;
  218:12;221:10;
  225:23;231:10,11;
  232:4,10,24;233:3;
  258:6;259:16;260:14;
  263:25;264:1;267:7;
  281:13;282:9,24;
  292:2;309:13;329:11;
  339:5,10;350:3
**pointed (1)**
  233:6
**Police (116)**
  11:12;12:22,25;
  21:8;23:13;29:3,5,15;
  30:17,24;31:3,5;
  32:10,16,18;33:9;
  34:1,5,9;35:12,18,22;
  36:11,21;37:1,13;
  39:3;52:4,24,25;
  54:22;80:20,21;
  81:11,21;90:9;91:25;
  92:15,18,24;95:21;
  99:25;103:20;104:4,
  15,20,22,24;115:16;
  117:1;129:5,12;
  136:17,24;137:7;
  138:8,11,25;149:14;
  152:24;153:5,6,12,18,
  23;154:2,6,9,25;
  155:4,7,8,20,25;

156:8,15,19,20;157:2,
  9,15;159:25;160:3;
  166:5;205:5;213:3;
  223:1,3,9,12;224:2;
  225:5,8;253:22;
  254:20;255:10,12,19,
  25;256:24;258:21;
  261:6;265:24;267:3,
  18;278:1;287:5;
  310:5;334:2,12,13,18;
  346:1,22;347:8;351:4
**policeman (5)**
  31:24;46:1;83:4;
  99:21;103:23
**policies (4)**
  129:17,23;138:9;
  205:5
**policy (9)**
  92:17,25;146:6;
  149:8,9,13;160:2,12,
  19
**political (1)**
  100:9
**Polygraph (1)**
  332:5
**Pontiac (1)**
  305:6
**Pooh-pooh (1)**
  73:7
**portion (2)**
  145:22;295:23
**position (11)**
  104:5;106:23;
  115:19;118:17;337:5,
  9,21,24;338:7;339:15,
  17
**positives (1)**
  160:25
**possession (1)**
  211:7
**possibilities (2)**
  216:15,21
**possibility (3)**
  281:18;295:1,8
**possible (31)**
  143:4;144:12;
  151:21;155:15,19;
  156:12;158:13;177:7,
  9;179:24;180:11,19;
  181:2,3,8,9;195:4;
  217:12;221:20;
  239:14,21;240:3,9,11,
  17,19;281:6;290:22;
  304:19,19;326:1
**possibly (2)**
  221:15;323:1
**post (2)**
  79:19;243:2
**post-conviction (1)**
  79:23
**postmortem (5)**
  276:14;278:22;
  280:22;281:3,23

pot (1)
  86:6
potentially (3)
  280:23;285:6;292:3
practice (6)
  29:4,14;144:16;
  146:6;173:6;304:13
practices (3)
  138:9;178:22;205:5
pray (1)
  18:9
preceded (1)
  155:12
Preceeo (2)
  294:12,17
Preceeo's (1)
  294:12
predominantly (1)
  111:9
prefer (1)
  229:15
premature (1)
  316:2
preparation (5)
  22:24;27:12;
  292:10;294:24;
  296:16
prepare (14)
  21:21;135:13,23;
  136:11;137:25;
  138:12;142:16;147:2;
  162:20;204:18;205:3;
  234:8;327:12,21
prepared (39)
  23:21;136:1;138:4;
  162:21;163:4,10;
  171:13;174:15;
  204:10,13,14;211:5;
  213:9;215:24;218:14;
  235:14;273:14;275:7,
  12;286:21;287:1,7,
  18;288:4;290:18;
  293:15;296:22;
  304:11,15;313:21;
  315:24;319:22;326:3;
  328:2,2,7,17,23;
  329:15
preparing (9)
  23:8;136:17;
  143:10;295:18;328:9,
  12;335:1,6;344:8
prescribed (1)
  18:8
presence (6)
  24:2,13;25:22;
  27:20;235:12;306:13
present (8)
  6:25;22:10;23:4;
  26:8;27:3,5;93:14;
  250:14
presently (1)
  223:22
preserve (2)

229:14;235:3
preserved (4)
  223:9,12;224:2,8
pressure (2)
  17:23;193:20
Pretrial (1)
  356:9,19;357:10,
  19,21
pretty (5)
  20:11;161:24;
  174:5;189:10;297:20
prevent (2)
  15:21;102:17
preventing (1)
  20:23
previous (5)
  142:5;220:3;
  222:17;330:15;
  352:16
previously (2)
  10:13;39:21
primarily (2)
  128:10;360:11
principles (1)
  135:13
prior (46)
  8:23;9:14;11:24;
  20:3;21:2;27:21;28:8;
  29:13;46:4;84:17;
  86:13;115:19;127:23;
  165:7,14;178:5;
  186:17,24;187:14,17;
  190:2,24;191:8,9,19;
  192:10;193:13,14;
  194:17;205:25;252:2;
  265:16;268:14;269:1,
  21;286:13;287:1,19;
  292:21;295:3;296:16;
  300:25;329:1;350:17;
  352:1;355:17
priority (1)
  308:16
prisoner (1)
  312:10
prisoners (1)
  313:16
private (3)
  40:20;121:14;
  253:10
privilege (7)
  65:16;68:5;74:3,11;
  75:13;80:10;83:25
privileged (7)
  19:3;67:23;73:18;
  80:3;84:5,12;86:18
privy (2)
  195:5;243:21
probable (6)
  130:24;131:2,6;
  260:13,20;264:13
probably (14)
  21:25;22:9;45:5;
  105:9;134:16;195:16;

243:5;304:17;305:21;
  314:8;320:3;342:2;
  345:18;346:6
problem (2)
  86:1;200:19
problems (3)
  17:24;200:13,16
procedure (12)
  32:8;34:1;35:13,22;
  36:10,15,20;37:12;
  163:1,3;167:9,11
procedures (1)
  128:8
proceeded (2)
  97:22;197:2
proceeding (1)
  66:25
proceedings (5)
  30:22,22;79:19,23;
  331:5
process (3)
  6:16;71:14;120:1
produce (2)
  223:3;235:20
produced (2)
  235:15,23
productivity (1)
  117:24
professional (3)
  16:5,25;306:8
Progress (4)
  134:25;290:15,23;
  293:12
prohibited (1)
  263:5
promised (1)
  87:7
promote (1)
  117:20
promoted (10)
  115:19;116:5,7,11,
  14,21;117:11;118:13,
  15;120:22
proper (3)
  130:11;167:9,11
property (5)
  125:22;126:5,16,
  23;134:16
proposed (1)
  344:8
prosecuted (2)
  156:4;346:25
prosecution (15)
  29:6,16;30:13;57:1;
  71:2;72:4;83:8;87:13;
  88:5,16;90:6;91:1,20;
  92:8;156:8
prosecutions (4)
  90:11;93:1,2;
  152:19
prosecutor's (1)
  235:7
prostate (1)

17:24
protect (2)
  81:24;102:4
protected (1)
  80:9
protects (3)
  74:11;84:1,7
provide (4)
  8:18;9:2;92:7;
  210:9
provided (14)
  75:9;178:14;
  209:17,21;211:18;
  214:8,10;215:16;
  216:12;253:11;
  266:25;296:8;334:21;
  357:4
providing (2)
  20:23;336:2
public (12)
  72:20;73:1,11,12;
  81:7,11,17,20;154:14,
  15,18;155:5
pull (2)
  169:15,25
pulled (1)
  234:18
purported (1)
  267:19
purportedly (1)
  267:11
purpose (11)
  130:3;134:22;
  156:9;188:16;227:23;
  283:13;291:14;
  309:16;312:21;
  326:21;327:1
purposely (1)
  7:25
purposes (2)
  147:24;235:3
pursuant (1)
  132:23
pursue (1)
  339:14
put (33)
  58:18;114:11,19;
  135:1,11;139:16,20,
  22;140:16,18;146:15;
  163:24;167:5;168:21,
  23;181:11;182:6;
  205:2;215:2;222:12;
  231:20;234:19;
  236:21;268:23;278:3;
  297:16;298:17;
  303:12,17;315:17;
  321:8;359:15;360:1
Putting (5)
  24:10;58:17;145:2;
  234:12;295:19

Q

quarrel (2)
  190:21;357:9
quarter (1)
  297:9
quash (4)
  259:21;356:8,25;
  357:20
quick (1)
  352:20
quicker (1)
  228:23
quite (1)
  79:17
quote (1)
  71:11

R

radio (1)
  135:10
raise (1)
  27:16
rank (2)
  105:2;116:25
ranks (4)
  117:1,4,6;119:23
Rappaport (1)
  5:13
rate (1)
  162:6
rates (1)
  113:5
rather (1)
  138:1
RD (11)
  270:21;279:23,25;
  280:1;282:19,25;
  283:10,18;284:2,4;
  290:7
reach (2)
  40:12;63:6
reached (12)
  39:8;84:23;85:6,24,
  25;87:11,18,22,24;
  88:4,14;90:5
read (37)
  67:8,14;71:4;79:14;
  93:24;94:1,7;140:21;
  153:14,16;173:15;
  174:25;186:20,21;
  194:13,18;199:12;
  209:13;211:9,16;
  220:24;221:2,3;
  232:23;233:24;
  273:24;294:11,15;
  301:19;302:23,24;
  304:10,14;355:17;
  356:22;360:2,8
reading (7)
  71:24;171:22;
  175:4;177:21;178:6;
  358:17;360:4
real (3)

197:21;338:2,4

**realize (1)**
  65:7
**really (15)**
  86:25;109:13;
  110:25;123:3;146:25;
  152:8;222:22;223:15;
  232:10;273:20;
  278:16;284:6;302:10;
  325:2;330:9
**realm (1)**
  81:7
**reason (33)**
  9:18;17:4,6;19:15,
  21;20:13;28:22;75:8;
  76:14;77:15;81:3,9;
  103:8;151:19;188:2;
  190:21;239:10;252:1;
  253:2,18;290:1;
  291:12;320:8;327:2;
  338:3,3,4,6;340:20;
  349:22;351:22;352:7;
  357:9
**reasonable (2)**
  150:13;229:25
**reasons (1)**
  349:15
**recall (150)**
  9:23;10:2,2,16,17;
  12:2,13,14,17;13:6,
  22,23,24,24;14:1,9,
  20;15:2,5,9,11,12;
  17:2;18:19,22,22,25;
  19:2;20:3,10,13,14;
  39:16;50:21;54:15;
  64:9;70:9,11;82:17;
  87:24;88:1,3,9,13,20,
  23;89:3,6,9,12,18,22;
  90:2,4;93:4;94:17,19;
  101:14;105:21;108:9;
  109:13;111:24;
  127:20;147:19;156:6;
  158:10;164:25;
  174:21;177:4;178:9,
  10;179:16,20,23;
  181:20;184:7;187:21;
  188:11;196:1;197:25;
  200:24;201:8;203:5,
  15;227:10,11;237:16;
  238:12,16,18,20;
  239:19;240:22;
  241:10;244:20;245:3,
  6;247:22,23;249:2,3;
  250:19;265:10,14;
  267:24;268:3,4,5,6,
  10;269:3,14;270:5;
  274:12,15;277:25;
  281:4;292:9,15,18,23;
  296:14;308:22;
  325:18,21,22;326:2,
  11;328:20;329:3,13;
  335:4,5,8,9,12,13,25;
  343:11,18,19,20;

346:7;353:3,5;
355:16,19,23,23;
357:15
**recall's (2)**
  20:7,8
**receipt (4)**
  29:15;31:1;88:15;
  90:6
**receive (7)**
  62:16;92:12;132:7;
  133:23;135:10;
  162:23;346:4
**received (38)**
  17:2;28:23;30:17;
  31:13,17;32:25;35:3;
  38:6;39:4;40:2,14,25;
  41:18;53:11,12;
  61:19;62:1,3,9,14;
  65:9;78:23;86:12,16;
  94:2;122:24;128:5;
  129:25;134:1;150:20;
  190:4;196:16;205:18;
  236:25;268:11;
  314:25;334:25;
  339:18
**receiving (15)**
  14:21;28:25;31:14;
  37:22;38:4;40:11,17;
  42:19;54:2;61:5;63:7,
  10;88:5;130:3;345:24
**recent (1)**
  27:24
**recently (2)**
  54:23;294:22
**recess (3)**
  95:16;205:13;
  310:22
**recognize (7)**
  252:24;270:16,18,
  20;275:21;308:24;
  313:4
**recollect (3)**
  8:22;55:5;309:2
**recollection (29)**
  14:25;15:7;60:18;
  64:10,20;147:25;
  151:17;156:1,10,16;
  166:11;172:23;
  174:15;176:3,25;
  180:20;181:18,22;
  182:5;190:2;215:20,
  23;226:15;237:17;
  249:25;271:14;
  294:14;356:18;
  357:14
**recollections (1)**
  186:5
**recommendation (3)**
  335:10;345:6,11
**record (34)**
  5:2,14;67:14;72:20;
  73:1,11,12;85:2;
  95:14,15,18;141:22;

149:14,18;150:14;
151:16;153:16;
154:10,15;160:21;
161:1;205:11,12,15;
219:20;229:21;
272:17;302:24;
310:20,21,24;342:4,5;
360:23
**recorded (12)**
  142:7;178:16;
  179:7,10;211:24;
  215:8;219:16;232:15,
  17;326:8;327:19;
  342:19
**recording (5)**
  139:13,15;150:18;
  155:2;342:12
**redistrict (1)**
  114:3
**refer (1)**
  148:1
**reference (6)**
  210:3;214:3;
  217:15;221:14;
  284:20;323:21
**referenced (3)**
  205:18;246:10;
  302:7
**references (1)**
  82:22
**referencing (3)**
  283:24;359:10;
  360:11
**referred (1)**
  171:23
**referring (1)**
  92:21
**reflect (8)**
  179:18;213:11;
  236:6;252:7,20;
  268:7;282:17;357:3
**reflected (4)**
  168:15;215:24;
  274:21;329:5
**reflecting (1)**
  327:12
**reflects (3)**
  177:12;292:5;305:1
**refrain (1)**
  167:16
**refresh (8)**
  13:10;147:25;
  151:17;155:25;
  156:16;181:22;215:6;
  356:18
**refreshes (1)**
  294:13
**refreshing (1)**
  156:9
**refute (1)**
  152:10
**regard (1)**
  348:25

**regarding (7)**
  71:7;72:15;87:12;
  92:3;160:4;243:21;
  294:12
**regardless (1)**
  179:10
**regards (1)**
  134:24
**register (4)**
  47:19;336:1;340:4;
  346:10
**registers (3)**
  47:13;48:1;345:15
**regular (2)**
  26:5;313:16
**re-indictment (1)**
  358:12
**related (14)**
  30:23;49:12;53:6;
  63:24;92:25;170:6,
  14;209:1,15;247:15;
  292:25;313:24;335:7;
  344:8
**relates (7)**
  50:4;72:4;112:11;
  228:10;238:17;281:1;
  289:24
**relative (6)**
  149:15;177:24;
  243:17,20;244:12;
  245:4
**released (1)**
  95:4
**relevance (24)**
  35:19;49:9,20;
  50:16,24;54:16,25;
  57:2,9,15,25;60:13,
  23;81:1;82:16;83:1;
  90:22;93:3;94:18;
  101:25;102:5,20;
  116:24;350:4
**relevant (8)**
  51:4;56:7,8,10;
  142:15;143:14;144:4;
  150:14
**remain (4)**
  65:24;67:20;71:12;
  77:9
**remarked (1)**
  318:9
**remember (119)**
  10:8;11:3,10,25;
  12:19,22,24;13:3,7,9,
  11,13,19;14:21;
  16:16;18:5;19:17;
  20:10;21:4,9,10,15;
  29:22;30:1,2;45:14;
  50:22;53:5,19;54:4,6;
  58:6;64:11;70:12;
  75:17;88:10;96:10;
  98:1,4;108:6;109:3;
  110:20;120:11;
  127:11,21;128:24;

139:2;141:17;147:9,
18;162:11;164:3,6;
166:4,8;167:12;
171:18;172:6;178:12;
179:21;183:1;184:8;
189:1;195:23;201:3,
6,9,15;226:18,25;
227:13,16;228:8,16,
17;229:3;231:7,15;
234:10,11;259:23;
260:5;268:20;269:6,
10,11,21;271:21;
272:20;274:16;
288:10;292:7,8;
295:2;304:18;325:25;
326:9;327:3,5,8;
328:9,12;334:7;
336:5,11;341:21;
343:3;345:24;348:7;
353:14;354:10,11;
355:20,21;357:16;
358:11,14,16,19
**remembered (1)**
  171:20
**remembering (2)**
  15:21;226:17
**remind (1)**
  205:17
**repeat (3)**
  218:9;302:19;
  347:20
**repeatedly (1)**
  193:4
**rephrase (2)**
  8:18;122:22
**replace (1)**
  135:4
**report (226)**
  13:9;23:14;94:14;
  123:14;133:23;134:2,
  15,25;135:13,16,23,
  24,25;136:1,6,10,18;
  137:6,7,10,14,25;
  138:4,12;139:17,22,
  25;142:2,12,16;143:3,
  6,11,23;144:6,8,23;
  145:12,15,21,22;
  146:3,7,8,23;147:2,4,
  12,14,24;148:2;
  149:1;150:7;152:8,9,
  24;153:5,12,18,23;
  154:2,7,10,15;155:1,
  5,20;156:9,15,19;
  157:10,15;160:6,18;
  162:20;163:2,5,9,10,
  11,15,18;164:5,11,13,
  18,20,23,25;166:5,9,
  14;167:2,3,24;168:13,
  22;169:5,5;170:15;
  174:9,15;178:16;
  180:2;181:23;182:2;
  185:20,22;186:21;
  190:23;200:1;201:1;

205:3;206:24;207:1,
13;209:4;211:5;
214:12;215:1,2,24;
218:14,23,23;219:13;
220:16;221:13;
222:13;229:16;230:2,
19,24;231:1,5,19;
232:15;233:4;234:8,
13,16;235:14;238:23;
252:20;267:18;269:1,
20,20,21;270:4;
276:14;278:21;
280:22;281:3,10;
284:23;285:5,22,25;
286:12,15;287:5,13,
17,18,23;288:3,3;
290:15,24;291:20,24;
292:7;293:3,12,14,21,
22;294:2,15,15;295:5,
9,11,12,17,18,23;
296:7,9,10,16,22;
300:12,24;303:13,14,
15,18,18,21,24;
304:10,14;308:4;
309:24;315:13;
320:14;321:7,10;
326:4;327:12;331:25;
332:3,5,6;334:14,18;
335:2,6;336:3;344:8;
350:25;351:2,5;
356:22
**reported (6)**
320:24;321:3,6;
322:3,17;326:22
**reporter (4)**
5:12;6:5;9:5;
302:23
**Reporters (1)**
5:13
**reporter's (1)**
193:8
**reporting (4)**
138:17,18;139:11;
233:25
**reports (72)**
23:13,15,16,20;
106:4;134:6,8,9,16;
136:24;137:12;
140:17;144:14;145:1;
146:12;153:5;155:25;
157:2;162:20;166:12,
25;168:9,10,13;
169:15;171:13,24;
173:16;174:4,25;
177:21;178:7;179:17;
185:9,18;186:6,20;
189:20;192:4;194:18;
220:23;229:5;267:3;
268:5,14,23,24;
269:11,12;271:23;
272:25;273:7,10;
275:7;276:8;277:9;
278:1,21;280:12,14,

15;291:18;295:6;
314:5;315:21;327:22;
328:1,6,10;330:14,19;
331:22
**represent (5)**
5:16;6:13;190:17;
283:7;352:11
**representation (2)**
67:3;68:1
**representations (2)**
334:13,18
**representative (2)**
38:7;39:14
**representatives (1)**
63:11
**represented (10)**
14:16;66:11,19;
68:19;76:13;77:7;
78:8,22;185:15;
354:17
**representing (2)**
354:21,22
**represents (1)**
71:11
**reputation (1)**
119:1
**request (15)**
114:24;115:1;
202:9,14;289:11;
299:1;304:6;312:9,
11,19,22,24;313:20;
315:24;323:5
**requested (6)**
67:14;153:16;
302:24;314:25;322:7;
327:18
**requesting (2)**
72:2;316:11
**requests (6)**
80:9;133:21;
134:14,14;313:15;
318:2
**require (2)**
305:23;307:3
**required (8)**
92:25;137:23;
146:6;160:12;204:24;
205:1;273:12;306:11
**reserve (4)**
98:13;99:4,5;
360:21
**reservist (2)**
98:23;99:2
**reside (1)**
234:3
**resolved (3)**
14:11,17,19
**resources (1)**
215:14
**respect (2)**
230:11;237:2
**respectively (1)**
71:16

**respond (4)**
32:19;34:24;36:17;
207:9
**responded (1)**
174:7
**responding (4)**
141:9,10,13;173:3
**response (9)**
8:8;9:2;32:4;39:6;
44:23;153:25;154:5;
262:16;360:10
**responses (1)**
7:21
**responsibilities (6)**
105:23;106:2,19;
112:8;124:3;131:1
**responsibility (3)**
131:23;142:20,22
**responsible (6)**
101:9;143:10;
145:2;191:1;237:21;
313:14
**responsive (3)**
8:1,23;86:24
**restaurant (1)**
30:6
**restaurants (1)**
110:9
**restraint (1)**
229:24
**result (2)**
148:14;338:17
**results (6)**
16:10;160:17,18;
179:6,10;180:9
**retaliate (1)**
336:18
**retaliation (2)**
336:14,15
**retention (13)**
170:19,21,24;
329:20;330:1,5,13;
331:9,13,15,20,22;
332:9
**retire (3)**
43:1;165:12;339:13
**retired (37)**
15:5;22:13,13;
29:10;31:9,12,17,24;
32:8;33:9;34:1;35:12,
18,22;36:5,11,18,21,
25;37:12;39:3,20;
42:23;79:17;81:9;
90:9;92:7,14;335:24;
338:25;339:2;340:23;
342:9;345:1,7,9,10
**retirement (10)**
29:14,19;30:9,21;
54:24;92:2;93:2;
165:8;339:22;341:3
**retiring (7)**
335:13,14,15,17,18,
20,23

**retrieved (2)**
226:10;276:25
**return (2)**
39:10,13
**returned (1)**
166:5
**reveal (1)**
359:3
**revealing (1)**
19:8
**reversed (3)**
14:4;28:11,15
**review (21)**
23:7,10,17;130:20;
166:19,20,22,24,25;
167:3;170:17;200:8;
204:4,7;230:4,19;
237:1;268:14;300:25;
327:20;354:8
**reviewed (8)**
23:11,19;167:2;
266:20;287:19;
303:19;304:17,22
**reviewing (2)**
230:2;265:6
**reviews (1)**
167:6
**revise (1)**
29:12
**revolver (1)**
128:18
**Rey (10)**
27:7;65:3;108:22;
116:7;332:11;333:8;
347:16;354:13,17,21
**Reynaldo (3)**
45:20,24;46:4
**RFC (1)**
276:7
**RFC-Maysonet (18)**
270:23;272:24;
273:18;274:21;276:1,
13;281:7;282:2,15;
284:23;287:14,17,22;
290:10;293:2;295:10;
301:15;321:13
**Rick (4)**
354:5,13,16,20
**ride (12)**
265:7;266:2,4,9,13,
18;308:8;309:18;
321:1,6,6;327:18
**right (470)**
17:16;18:18;19:7,
21,24;20:15;21:21;
25:24;27:14,21;
30:16;31:14;33:5;
34:25;37:5,16;40:6,
16,22;43:14,23;
45:17;47:14,19;
56:12;57:1,14;59:17;
60:15;63:12,14;
64:13,16;65:6,24;

66:12,14,22,24;67:20;
68:6,10,21;69:21;
70:8;20:71:2,4,12;
75:24;76:14,25;77:9,
18,23;78:10,14,16,20;
79:5;81:12;84:25;
89:23;90:20;91:22;
92:4;93:7,16;97:18;
98:23;100:18;103:8;
105:19;109:10;
115:24;116:2,5,14;
117:5;118:2,15,18,21;
119:5,13,20;121:6;
124:21;125:1,10,20,
25;126:9;128:25;
130:23,25;131:3,24;
132:16;133:12,18;
134:3,6;135:20;
136:18,25;137:3,7;
138:17,20,22;139:5,7,
12;143:15;144:7,11,
24;145:3,12,17,18;
146:18,20;147:12;
148:2,5,6,8,18,21;
149:16;150:10,12,14,
20,23;151:14,20,22,
23;152:5,11,17,24;
155:10,22;156:5,7,11,
17,21;157:12,23;
159:7;161:5,24;
162:8;163:12;164:13;
165:22,25;166:13;
167:20,21,25;168:3;
169:2,7,22;170:3,19;
171:15;172:20,23;
173:19,23,24;174:14;
176:19;178:3,24;
179:2,11,24;180:13,
21;181:2,3,9,19,23;
182:7;184:1,23;
186:1,2,8;188:7,8,14;
189:7,10,20,24;
190:24;193:14;194:6,
18,23;195:12;196:19;
198:23;199:11,18;
200:6;201:21;202:2,
16;204:10,12,14;
206:16;207:12,13,24;
208:9,23;210:16;
211:13;212:4,12,15;
213:16;214:2,8,13,18;
215:7;217:5,6,14,17;
218:23;219:3,20,22;
220:1,16;221:15;
222:24;223:2,4,18;
224:5;225:21,25;
226:14;227:23,25;
228:4,18;229:20;
230:4,17;232:9;
234:6,13,19;235:4,8,
23;236:19,21;237:19,
24;238:11,14,15;
239:22;240:18,25;

241:2,6;242:19,21;
243:7,25;244:4;
245:13;246:16;247:4,
12;248:3,6,7,19;
250:7,16,19;251:3;
252:11,14,24;253:22;
254:6,12,22;255:3,7,
14;256:20;258:3,21;
259:2,9;260:4;
262:22;263:2,5,11;
264:20;265:9,13,19,
22,25;266:8;268:12,
19,21;270:7,24,25;
272:12,13;273:16;
275:4,6,8,18;276:2,5;
277:11;278:14,22;
280:16,19;281:5,7,21;
282:2,13,15;283:6,13,
21;284:5;286:5,7,14;
289:17;290:4,16,25;
291:7,22,25;292:2;
293:11;294:3,11;
295:9;296:14,25;
297:18;298:7,11,13,
18,22;299:5,9,16;
300:1,2,10,14,19;
301:14;302:18;303:5,
21;305:1;306:8,21,
24;307:2,5,7,10;
308:11;309:23;310:2,
18;311:14,21;313:21;
314:7,17;317:17,25;
318:19,22;319:17;
320:1,13,18;321:1;
322:13,21;323:6,10,
13,20;324:10,13,19;
325:2,3,24;326:10,23,
25;327:9;328:6;
329:10,15;330:12;
331:18;332:21;334:6;
335:3;338:7;339:17;
340:4,7,10;341:5;
342:9,14,18;344:1,9,
25;345:8;347:2;
349:24;350:2,6;
352:12;354:3;355:6,
8,9,15,21;358:23;
360:13,17
**righthand (2)**
282:25;284:17
**rights (4)**
33:9,19;77:23;
93:12
**ring (1)**
294:20
**risking (1)**
58:17
**rivalry (4)**
301:24;302:3,6;
303:10
**Rizman (1)**
5:12
**road (3)**

20:1;35:10;58:16
**Robert (2)**
209:11,15
**Rogers (1)**
96:17
**rogue (1)**
77:16
**ROLAND (3)**
6:7;357:6;360:24
**role (11)**
29:7,17;90:12;
295:17;301:3;306:15;
308:4;310:2;325:15;
344:7;352:21
**Ronald (1)**
5:8
**room (26)**
25:24;26:7,25;
27:13,22;169:21;
199:1;239:14,22;
254:20;255:25;
256:18;261:24,25;
262:1;263:23;264:14,
15,20;266:1;288:13,
16,21;298:17;299:23;
321:23
**Rosa (1)**
352:22
**Rosen (350)**
5:24,24;8:2;10:4,
11,25;11:7,17,21;
12:1,8,15;14:5,12;
15:17;17:11;18:21;
19:10,25;20:15;
21:17;29:8;31:21;
32:21,24;33:6,14,22;
35:4,19;36:6;37:6;
38:12;43:10,15;
46:19;47:15,20;49:8,
20;50:16,24;51:7,16,
21;53:20;54:16,25;
55:7,18,22;56:4,7,12,
17,21;57:2,9,15,25;
58:8,12,15,20;59:4,8,
11,14,18,23;60:13,21;
61:11;62:21;63:20;
64:17,23;67:11;
68:23;71:21;72:10,
14,24;73:6,24;74:2,
16,25;75:2,7,17;76:6,
16,23;77:12,24;79:6,
24;80:8;81:1,13;82:1,
7,16;83:1,15;84:18;
85:1,8,13,23;87:2,8,
15;88:7,17,25;89:7,
15,24;90:17,22;91:8,
12;92:20;93:3,13,19;
94:9,18;95:6;101:16,
21,25;102:5,19;103:2,
12;107:13;110:16;
111:6;114:25;116:9,
15,24;117:7,13,21;
118:3,8,22;119:7,15;

120:3;122:11,15;
127:2;130:6;137:16;
140:8;141:1,6,11,18,
23;145:4;146:9,21;
147:6;149:10,21;
150:1,4,15,24;151:3,
9,24;152:12,20;153:1,
9,13,25;154:8,13,20;
157:17;158:3,18,24;
159:8;167:13;170:8;
175:20;177:2;180:5,
14,22;181:4,10,24;
182:8,19;183:3;
185:12;186:13;
187:16;192:14,22;
193:2,11,17,20;
197:18;202:18;
204:15;206:11;
212:25;214:14,19;
215:18;216:2,17,23;
217:8;218:4,15,24;
219:4,8;220:20;
223:5,16,20;224:9,19;
225:3,18;226:1,20;
227:14;229:7,11,18;
230:8;232:12,14;
233:1,6,12;234:23;
235:17,24;236:10;
237:9;239:16;240:5,
10,19;241:7,15;
242:24;243:8;245:18;
252:5,15;259:10,17,
24;260:8;263:16;
264:5;266:19;267:2,
13,22;269:23;274:7;
279:4,9,14;283:15,25;
285:14,23;287:10;
288:7;291:3,16;
293:17;294:7;296:11;
297:24;298:23;299:7,
17;301:5,9;302:8,19,
22;303:16,25;307:11,
25;310:7,17;312:3;
316:3,5,14;317:4,14,
19,21,25;318:3;
319:18;323:14,18,24;
330:8,17;332:16;
333:1;335:15,18,20;
336:24;339:6;340:16;
344:3,17;345:17;
347:18,25;348:6;
349:19;350:3,9,14,18,
21;351:4,9,12,16;
352:13;355:10
**roster (1)**
113:5
**routine (2)**
214:24;297:20
**routinely (2)**
160:15;189:22
**row (1)**
296:1
**royal (1)**

216:20
**rule (2)**
149:8;342:19
**rules (3)**
6:17;35:16;338:20
**rumors (1)**
333:7
**rush (2)**
148:25;150:7

**S**

**safety (2)**
342:24;343:2
**SAITH (1)**
360:25
**same (49)**
6:18,23;8:4;9:6;
26:22;27:1,1,2,2;36:4,
19;47:7,8;52:14,18,
18;74:16,18;93:25;
106:19;126:9;141:14,
21;144:11;145:12;
159:4;181:7,12;
192:9;206:16;209:16;
215:6;248:10,13;
277:5;278:3;282:3,7,
21;285:2;289:15;
291:21;305:3;318:14;
348:1,11,12;354:22;
359:1
**Sanchez (1)**
290:3
**Sara (1)**
5:21
**sarcastic (1)**
264:6
**sat (3)**
10:9;21:2;27:12
**saw (32)**
56:25;62:5,6,7,8;
70:6;135:6;139:21;
239:3;241:21;242:11;
243:14;246:2;251:20;
252:3,8;268:17;
269:19;270:19;275:5;
281:12;286:15;
293:10;294:21;304:3;
309:5;328:4;333:16,
21,22,24;340:23
**saying (22)**
20:5;63:14;68:12,
13;113:22;118:9;
124:18;140:24;
152:25;154:1,23;
156:20;173:13;174:5;
181:17;184:15;
201:20;234:5;248:25;
292:9;298:4;323:25
**scars (1)**
208:20
**scenario (1)**
145:11

**scene (21)**
172:24;173:3;
174:20,25;207:9;
265:7;299:2;300:6;
304:7;310:6,12;
311:13;322:8,16,21;
326:14;327:6,14;
332:3;353:18;354:2
**schemes (3)**
332:12,24;346:21
**school (16)**
43:21;95:23,25;
96:1,11,21,23;97:3;
121:7;122:9,25;
127:23;128:14;134:3,
5,12
**Schuler (2)**
127:12,13
**scope (1)**
64:15
**score (1)**
116:14
**screaming (1)**
75:12
**screen (1)**
274:20
**screenshot (1)**
275:18
**seated (2)**
60:6;61:2
**second (19)**
25:2;79:16;96:8;
111:13;123:11;
126:10,11;166:21;
198:25;231:20;
233:23;246:11,14;
296:1;298:25;299:24;
318:22;357:22;
358:24
**second-guessing (1)**
306:12
**secondhand (2)**
49:6;333:8
**Secret (1)**
129:12
**section (1)**
301:19
**security (2)**
255:3,4
**seeing (20)**
43:8;70:12;174:15,
21;234:11;238:18,20;
267:24;268:4,6,15,20;
269:21;292:7,8;
328:20;329:3;353:3;
354:10,12
**seeking (1)**
88:15
**seem (1)**
167:10
**seemed (3)**
188:4;242:21;
263:12

**seems (6)**
149:17;231:2;
290:6,23;318:13;
350:21
**sees (1)**
330:19
**self-explanatory (1)**
153:18
**Senn (2)**
96:1;121:7
**S-e-n-n (1)**
96:3
**sense (2)**
216:20;295:18
**sent (4)**
70:7;123:11,12;
238:4
**sentence (1)**
347:5
**separate (4)**
169:21;171:6;
181:16;278:24
**separated (1)**
316:19
**September (1)**
5:6
**Sergeant (42)**
24:17;26:23;50:11;
127:18;164:16,19;
166:4;167:1,4;
169:23;170:16;176:4,
10,22;187:6,11,20;
190:4;195:24;237:14,
14,18,20;244:17,19;
245:10;246:4,12,16;
247:20;248:18,18;
249:8,13;250:12;
255:24;256:16;
265:17;268:8;278:9;
329:6;359:21
**sergeants (2)**
167:23;238:10
**sergeant's (11)**
164:24;166:12;
167:3,21;173:12;
278:10,11,17,19;
280:24;295:7
**serious (4)**
127:7;131:18;
141:4;334:3
**servant (3)**
81:12,18,21
**serve (2)**
81:24;115:16
**served (2)**
34:23;98:14
**serves (1)**
156:9
**service (3)**
40:2;128:17;129:12
**serving (1)**
347:4
**set (1)**

**338:20**
**settled (1)**
14:22
**seven (1)**
56:21
**Several (12)**
7:6,7;13:2;26:18;
42:18;47:10;99:9;
100:8;101:8;140:11;
230:18,20
**severity (1)**
163:23
**shakedown (2)**
332:12;346:21
**Shakespeare (1)**
125:15
**share (3)**
70:1;278:15;312:5
**shared (3)**
182:20,22;189:22
**sheer (1)**
102:23
**sheet (1)**
284:13
**sheets (1)**
240:15
**shes (1)**
168:24
**shift (8)**
172:14;174:17;
291:2,8,11;298:10,10,
21
**shifts (1)**
297:22
**shoot (1)**
243:1
**shooter (2)**
210:13;221:25
**shooting (23)**
163:23;183:2,5;
184:12;190:3,16;
191:13;192:1,12;
196:19;205:24;
207:10,17;215:1;
243:18,20;246:22;
286:7;292:20;359:6,
19,25;360:1
**shootings (4)**
163:21;195:22;
245:22;248:4
**short (8)**
34:7;95:16;114:2;
149:4,6,18;205:13;
310:22
**shortly (4)**
185:7;245:1;261:9;
339:23
**shot (5)**
172:7;198:7;285:2;
301:24;331:16
**show (8)**
118:20;155:20;
162:4;180:15;182:2;

**229:24;266:22;**
298:13
**showed (8)**
55:10;56:2;60:17;
225:1;235:3;243:16;
255:19,19
**showing (3)**
55:15;56:1;182:22
**shown (5)**
190:12;210:11;
211:13,15;284:11
**shows (1)**
221:11
**shy (1)**
165:24
**side (3)**
23:3;272:4;321:9
**sides (2)**
192:25;193:3
**sign (1)**
303:18
**signature (2)**
303:22,24
**signed (3)**
313:2,21;337:4
**significance (2)**
50:3;184:9
**signing (1)**
256:1
**silent (4)**
65:24;67:21;71:13;
77:9
**Sill (1)**
98:6
**similar (2)**
246:18,21
**similarities (1)**
187:9
**similarly (1)**
132:25
**single (7)**
7:17;10:8;11:14;
88:23;89:6,11;166:4
**sister (1)**
262:22
**sit (8)**
9:17;173:14;182:4;
226:15;238:13;249:3;
258:12;292:24
**sits (1)**
169:23
**sitting (4)**
13:13;57:4;186:5;
230:8
**situation (3)**
106:7;145:20;297:9
**six (5)**
9:25;10:1;13:16;
123:10;124:23
**Slash (1)**
283:7
**sleep (1)**
309:11

**small (3)**
60:7;123:8;159:19
**smoking (1)**
331:3
**social (1)**
241:13
**socializing (1)**
26:4
**Society (1)**
100:15
**Soldier's (1)**
105:14
**solve (1)**
189:5
**somebody (14)**
40:5;80:15;131:19;
167:6;196:17;200:4;
210:24;218:19,21;
260:6;261:11;307:8;
342:12;360:13
**somehow (4)**
20:16;55:17;
219:23;250:15
**someone (16)**
20:12;39:21;40:25;
58:23;101:6;130:22;
137:4;138:20;139:11;
161:13;178:13;
184:14;290:25;
315:11;348:24,25
**Sometime (7)**
46:10,21;65:9;
192:4;324:14,15,17
**Sometimes (17)**
46:20;106:24;
136:12;143:19,21,21,
22;167:10,11;174:1;
214:20;278:14;280:8,
15;297:8;339:11;
354:7
**somewhat (2)**
17:25;143:8
**somewhere (2)**
55:16;153:8
**son (1)**
52:24
**sons (1)**
52:25
**son's (1)**
349:9
**soon (1)**
185:17
**sorry (36)**
16:8;36:22;69:2;
98:2;106:18;107:4,
25;109:1;140:4;
197:10;202:6;204:25;
206:12;208:5;210:17;
217:19;218:8;229:18;
236:3;246:20;266:6;
268:2;276:7;277:18;
280:13;288:18;
294:19;302:19;312:4;

**316:1;318:12;323:18;**
331:6;333:20;335:14;
351:19
**sort (7)**
105:17;108:4;
170:6;171:5;206:22;
210:16;339:4
**Sotos (1)**
5:9
**sound (1)**
151:6
**Sounds (1)**
53:18
**source (6)**
224:14,24;225:4,
11,24;226:9
**sources (1)**
161:14
**South (4)**
105:17,18,19;108:1
**Spaulding (1)**
234:2
**speak (19)**
24:11;26:2;27:18;
38:23;43:4,24;45:24;
60:16;155:18;179:13;
198:9,11,18;202:14;
237:15,24;262:3;
263:4;346:11
**speakers (1)**
129:11
**speaking (8)**
9:6;27:22;56:15;
75:8;86:5;187:20;
201:3,10
**special (1)**
128:7
**specialist (8)**
16:1,9;114:13;
120:14;124:5;222:17;
332:14;333:11
**specific (4)**
16:3;18:16;118:13;
164:8
**specifically (9)**
83:19;126:12;
189:2;227:11;228:9;
232:4;278:8;327:8;
336:17
**speculate (1)**
157:9
**speculation (13)**
72:15,25;152:13;
214:15;216:24;217:9;
235:18,25;236:11;
239:17;240:6;263:17;
307:12
**speeches (1)**
86:23
**Spell (2)**
39:7;96:2
**spent (1)**
305:16

**Spivy (10)**
5:21,21;8:4;11:2;
33:16;47:22;72:17;
90:1;226:24;360:20
**split (1)**
123:9
**spoke (18)**
24:23;25:3,7;26:1,
22;27:24;42:21;
51:11;62:12;63:9;
80:6;199:9;204:6;
248:16;249:7,9;
250:25;262:24
**spoken (6)**
23:23;24:15;
155:16,21;191:21;
196:12
**spots (1)**
233:21
**squadrol (4)**
255:13,19;256:8;
261:11
**stamp (1)**
287:13
**stamped (4)**
206:15,19,21;
318:23
**stand (1)**
97:25
**standard (1)**
131:7
**standing (5)**
50:25;51:7;62:4;
94:2;301:21
**start (3)**
86:9;138:2;273:23
**started (6)**
17:9;297:2;349:14;
352:4,5,10
**starting (1)**
276:13
**starts (1)**
295:10
**State (3)**
71:15;106:5;129:12
**stated (1)**
106:4;157:10;308:3
**statement (10)**
13:20;23:11;72:25;
320:24;321:4;322:3,
8,17;360:2,4
**statements (8)**
142:16;144:4;
150:19;158:12;190:5;
265:16;327:13;329:5
**States (2)**
5:3;71:14
**State's (38)**
5:22;28:13;63:7;
66:12,20;67:19;68:9;
71:1,5;77:21;78:5,9;
95:1;130:12;200:1,5;
235:15;265:5;266:5,

17;275:11;289:11;
300:22;304:6;305:23;
306:10,14,22;307:3;
308:8;309:1,18,18;
315:2;326:24;327:17;
353:19;354:6
**station (2)**
265:24;310:5
**stats (4)**
113:2;162:4,10;
283:17
**stay (6)**
114:5,12;159:4;
320:20;322:24;352:8
**stayed (4)**
61:2;259:1;299:10;
310:4
**steak (1)**
264:3
**stepping (1)**
229:11
**steps (1)**
154:19
**Steven (1)**
335:7
**stick (2)**
258:2;343:25
**sticks (1)**
11:16
**still (23)**
30:23;39:18;51:7;
68:18;90:10;106:12;
108:10;109:18;
125:16;135:22;138:2;
174:1,3,8,10;202:18;
209:6;242:16;258:16;
289:15;306:24;
311:16;342:16
**stop (6)**
134:13;192:24;
194:16;310:18;
326:16,19
**stopped (3)**
202:10,11;246:1
**story (3)**
45:16;351:10,11
**straight (1)**
325:3
**street (45)**
39:20;54:5;62:2,9,
13;63:19;64:12;
65:20;96:6;99:22;
105:13,14,15;108:6;
161:12,14;173:4;
221:6;238:18,20;
239:3,8;241:22,23;
245:12;246:2;248:17;
251:11,15,20;252:4;
254:25;256:21;
258:21;260:15,21;
261:1;266:23;268:15;
269:2,22;297:14;
301:21;304:4;320:17

**streets (1)**
107:10
**strike (15)**
16:13;27:17;84:14;
93:8,17;97:13;
100:22;132:8;137:23;
146:3;170:23;171:17;
195:9;338:1;341:6
**struggling (1)**
87:1
**Students (1)**
100:14
**studied (3)**
98:8;129:15;132:3
**study (1)**
133:5
**stuff (4)**
65:1;268:19;
272:11;277:10
**subject (5)**
47:12;49:1;160:17;
183:21;335:6
**subjects (1)**
160:10
**submit (1)**
163:2
**submitted (25)**
104:11;164:18;
166:11;171:24;
174:10;177:21,22;
185:20,22;192:4;
206:13;211:5;266:21,
25;267:4;286:1,16;
287:6,23;291:21;
294:2,6;300:13;
315:10,17
**subpoena (59)**
24:25;28:6,8,23,25;
29:1,5,16;30:18;31:1,
13,15,18,20;32:5,6,
11,20,25;34:2,23,24;
35:9;36:17;37:5,11,
16,22;38:4;39:4;40:2,
3,4,11,17;41:1,18;
42:19;53:11,13;54:2;
61:5,19;62:1,3,10,11,
14;63:7,10;65:10;
84:24;85:7;86:13,17;
87:13;88:5,15;92:12
**subpoenaed (5)**
37:10;82:15;91:20,
21;349:18
**subpoenas (6)**
34:10,20;35:17;
36:3,4;37:2
**subsequent (1)**
249:8
**subsequently (2)**
340:9;341:2
**subversively (1)**
342:5
**such-and-such (1)**
139:17

**sudden (1)**
257:21
**sued (8)**
10:13,15,18;11:6;
12:19;54:1;90:16;
226:18
**suffering (1)**
17:9
**suggest (3)**
42:4;46:5;191:12
**suggested (3)**
20:18;76:10;358:20
**suggesting (5)**
20:16;42:10;46:17;
76:3;298:3
**suggests (2)**
73:4;114:23
**suit (1)**
11:10
**summary (1)**
153:18
**Summerdale (1)**
109:1
**summoning (1)**
34:15
**superior (1)**
120:18
**supervisor (8)**
52:3;127:10;163:6,
8;167:4;188:17;
237:20;341:16
**supervisors (5)**
22:13;115:15;
117:11,19;237:21
**supp (4)**
204:13;268:23;
269:1;293:11
**supplemental (19)**
23:13,14,20;
134:15;135:13,15;
143:11;145:12;
146:12;163:14;
168:13;214:12;215:1;
278:1;293:3,13;
295:11;328:6,10
**supplementary (2)**
160:6;205:3
**suppose (1)**
117:16
**supposed (2)**
136:24;168:16
**suppress (1)**
259:22
**supps (1)**
331:17
**sure (71)**
13:16;24:6;30:4;
35:9;37:25;38:3;
55:14;64:14;69:23;
81:16;85:5;100:5,12;
102:8,12;105:10;
109:11;121:24;128:3;
133:7;141:19;145:7;

165:4;171:25;175:11;
176:24;185:4,5;
187:1;188:9;195:13;
196:10;198:22;199:5;
200:9;206:4;208:7;
209:5,12,14;211:9;
232:4;236:18;238:22;
239:7;244:14;257:5,
8;259:4;260:23;
261:3;273:3;280:17;
288:15,20;295:15;
296:21;309:10,25;
317:17;318:16;
320:10,25;321:5,12;
325:10,19;330:23;
348:24;352:21;354:9
**surely (1)**
286:12
**surprise (1)**
242:23
**surprised (5)**
242:14,15;243:4,6;
347:10
**surreptitiously (1)**
342:12
**suspect (11)**
6:15;132:19,25;
133:3;142:14;157:25;
158:2,16;159:6,14,16
**suspects (2)**
132:15,21
**suspended (1)**
335:10
**suspension (1)**
345:7
**suspensions (3)**
346:4,5,8
**sustained (4)**
335:1;344:25;
345:4,22
**swear (1)**
6:5
**swearing (1)**
7:13
**sweatshirt (3)**
217:16,21,25
**switched (1)**
125:23
**sworn (7)**
6:6,8;30:24;46:16;
92:3;129:4;351:6
**system (3)**
95:1;275:22,24
**systems (1)**
171:2

---

# T

**tab (1)**
271:16
**tactical (4)**
47:8;106:20,22;
112:5

**tactics (1)**
59:12
**talk (36)**
26:16;28:7;29:13;
44:5,6;50:9;52:14;
53:2;54:8,9;55:11;
57:21,24;58:3;64:3,
13,21,22;86:17;
162:17;164:8;171:25;
196:5;203:6;244:10;
256:5,6,9,10,11,14;
262:18,21;308:12,17;
349:22
**talked (15)**
25:17;52:18,23;
61:21;62:7;84:20;
86:18,19;191:18;
192:7;249:11;299:20;
307:8;326:6;336:21
**talking (40)**
24:1;49:12;52:19;
64:11;70:16;84:17;
86:13;157:13;167:2;
175:2;178:7;184:25;
188:11;192:20,24;
193:3;199:16;209:6;
217:5;220:4,13;
221:4;230:15;231:14;
246:4;260:14;266:23;
267:10;269:17;270:1,
4;272:2;288:16,21;
300:15;305:16;
325:18;326:11;
350:22;351:15
**tape (1)**
202:25
**Tapkowski (1)**
271:3
**task (3)**
49:15;50:7;52:5
**tasks (1)**
314:4
**taught (2)**
135:23;157:23
**teachers (1)**
129:2
**team (1)**
47:8
**technician (5)**
337:11,22;339:1,
10,15
**technicians (1)**
337:12
**telephone (6)**
38:20;61:7;123:14;
200:2;254:16,19
**telling (10)**
18:16;19:25;32:13;
48:14,24;66:3;
130:19;137:4;190:22;
261:9
**tells (2)**
138:20;232:16

**ten (5)**
7:7,8,9;26:12;
343:21
**tentative (3)**
210:11;212:8;
213:14
**tentatively (2)**
215:12;220:1
**terminology (1)**
99:3
**terms (4)**
113:5;131:23;
348:18;359:10
**terrible (1)**
97:13
**terribly (1)**
336:16
**test (12)**
116:2,3,4,13,14,18,
22;119:13,18;337:4,
6;338:11
**testified (31)**
6:9;7:3;35:25;
40:21;45:19;46:8;
55:21;60:1;68:14;
85:11;93:9;129:14;
145:10;152:6;157:16;
185:7;186:4;214:4;
215:11;244:2;252:13,
25;253:4;260:3;
269:4,5;288:24;
306:15;355:1,6;360:9
**testify (17)**
29:6,20;30:10,22;
33:13;65:25;66:23;
67:21;68:11;71:19;
78:18,23;82:14;
148:1;152:19;355:3,
14
**testifying (9)**
12:11;143:7;152:7;
180:3;260:5;354:1;
355:20,24;358:11
**testimony (56)**
7:13;9:19;11:5;
19:16;20:23;23:20;
29:16;30:20;34:16;
46:4,16;51:22;56:8;
57:12;60:25;61:6;
68:2,22;69:3;72:5;
80:5;90:10;92:3,7;
142:5;151:20;159:15;
181:25;185:13;
205:19;214:23;
219:22;220:3;226:23;
252:2;258:5;260:19;
288:17,20,22;334:22;
343:12;350:17;351:7;
352:1,16;355:17;
356:4,5,7,19;357:4,
10,17;358:19;359:21
**tests (1)**
104:13

**Thanks (2)**
32:13;42:14
**thefts (1)**
126:25
**theoretically (2)**
174:7;280:7
**theory (2)**
57:7;280:18
**thinking (2)**
157:7,8
**third (9)**
59:19;159:9;
172:17;254:21;255:5;
256:24;261:1;296:25;
298:11
**thirds (1)**
71:10
**thorough (3)**
135:23;136:1,6
**though (20)**
21:16;30:2;92:7;
138:15;162:12;
179:24;200:22;214:3;
231:2;237:17;239:21;
241:2;258:6;270:20;
281:5;283:22;293:11;
303:21;340:10;
355:21
**thought (31)**
33:4;57:10;68:14;
79:8;100:16;112:24;
115:15;135:25;
142:14;185:7;186:4;
202:23;214:4;220:8,
13;221:12;240:1;
242:16;243:5,22;
256:20;257:14;258:4;
280:10;288:24;
316:20;328:14;
335:21;338:7;342:3,7
**threat (2)**
341:19,22
**threaten (2)**
341:7;343:1
**threatened (2)**
342:21,24
**threatening (7)**
340:25;341:5,9,13;
343:13,17,25
**three (15)**
22:1,5;110:7;
165:11;183:5;196:19;
198:7;243:1;245:22;
248:4;274:25;316:17;
317:22;318:1,10
**thumb (2)**
230:10;330:21
**tickets (3)**
106:6;131:17,18
**Tim (9)**
40:10,15,19;41:1;
63:11;65:13;86:1;
94:5;355:8

**timeline (1)**
321:16
**times (26)**
7:5;8:9;9:21;10:15,
18,23,24;11:6;21:24;
22:1,5,24:19;99:6,9;
100:21,24;101:4,8;
140:12;148:23;
164:23;194:12;
226:17;230:19,21;
351:7
**time-wise (2)**
319:19,20
**today (25)**
6:21;7:18;9:17;
19:14,16;20:24;
21:22;23:8;77:16;
80:20;152:7,7;
156:13;176:15;182:4;
214:20;224:12;
226:15;238:13;255:4;
258:12;292:11,24;
294:25;355:18
**Today's (1)**
5:6
**together (10)**
47:7,13;109:6;
114:20;189:10,13,20;
329:23;348:5,10
**told (51)**
15:23;16:4,9,24;
19:1;26:17;32:24;
39:4;40:2,3;44:20;
45:2,7;54:8;58:2;
60:12;67:18;68:8;
93:10;110:14;115:21;
118:14;139:13,14,17;
144:3;191:15;194:12;
198:6;203:13;204:3;
230:4;243:15;259:12;
263:22;294:13;308:6;
326:7,24;327:3;
330:24;337:5,7,23,25;
339:16;349:15;
350:11;353:18;
358:18;359:22
**tomorrow (1)**
214:21
**tone (1)**
55:7
**Tony (13)**
183:19;192:18;
197:1,5;199:5,25;
213:21;215:9;221:19;
226:5,10;232:6;
233:17
**Tony's (1)**
202:11
**took (17)**
103:9;105:14;
122:17;123:21;
156:11;173:12;
198:16;199:24;220:8,

17;245:10;247:10,13;
300:6;309:17;321:1;
331:6
**top (2)**
73:7;110:7
**Torrence (4)**
191:1;276:15;
282:18,24
**Torrence's (1)**
283:11
**tossed (1)**
93:18
**total (4)**
72:3,22;78:24;
249:12
**touch (1)**
343:5
**toupee (3)**
45:10,11,15
**tour (1)**
244:24
**toward (1)**
341:19
**towards (2)**
157:8;206:22
**Toxicology (1)**
281:10
**traffic (2)**
131:17;297:8
**trained (17)**
134:9;135:14,19;
136:2,25;137:5,9,13;
142:15;144:19,21;
145:25;146:2;147:1,
20;162:19;169:12
**training (25)**
97:16,19,21;98:5;
114:2,5;115:21;
119:1;123:13,19;
128:1,5;131:5,11;
132:23;133:23;134:1,
3,11;135:14;137:22;
147:15,15;157:24;
162:24
**transactional (5)**
72:3,22;74:15;75:6;
78:24
**transcribe (1)**
9:6
**transcripts (1)**
357:3
**transfer (1)**
124:9
**transpired (1)**
60:16
**transportation (14)**
253:11;254:9,15;
255:16;257:2,4,12,24;
258:1,2,3;259:2;
261:2,13
**transported (3)**
237:11;253:23;
353:17

**treat (1)**
17:19
**treated (1)**
336:16
**treating (2)**
17:22;83:4
**trial (2)**
66:1;356:6
**Tribune (2)**
94:8,14
**tricky (1)**
108:2
**tried (4)**
58:23;308:12;
344:6;355:5
**trip (2)**
298:21;326:13
**triple (8)**
190:3,10,16,18;
192:1;200:4;242:17;
246:22
**trouble (2)**
86:23;333:10
**trucking (1)**
97:8
**true (5)**
181:7;287:12,16;
303:2;337:15
**trust (1)**
258:1
**truth (3)**
87:7;137:4;139:12
**truthful (7)**
7:14,16;9:18;19:16;
20:4;252:14;334:22
**truthfully (1)**
12:11
**try (11)**
8:18;192:8;212:13;
213:17;229:16;
296:24;297:21;306:5,
19;307:18,24
**trying (8)**
158:22;167:12;
211:14;229:13;
249:24;308:11;314:4;
323:24
**turn (2)**
231:18;358:25
**turned (1)**
341:2
**twice (2)**
18:9;24:22
**two (23)**
43:2;46:11;52:4;
71:10;140:4;164:12;
169:1;172:7;207:24;
208:8;213:10;220:23;
250:9;252:16;266:16;
270:8;272:9;275:7;
286:4,7;289:22;
316:14;318:7
**two-year (2)**

121:16,17
**type (32)**
31:10;83:13;97:15;
106:19;112:19;
127:22;128:4;131:19;
133:13;134:8;135:4;
136:10;143:11,23;
144:8;145:12,14;
163:9,17;166:7;
169:7;187:25;194:21;
201:6;228:7;246:21;
263:4;291:24;293:13;
295:22;296:6;332:24
**typed (2)**
234:16;312:25
**types (11)**
79:19;111:21;
128:13,19;134:6,9;
135:16;159:19;
168:10;277:23;279:2
**typically (5)**
51:14,18;91:1,21;
164:12
**typing (5)**
128:6;144:10;
174:1,3,10

**U**

**ultimately (6)**
94:24;315:10;
339:14;346:24;
353:11;355:5
**umbrella (1)**
351:10,11,13,18
**unable (2)**
11:5;88:3
**uncertainty (1)**
32:3
**uncommon (1)**
144:9
**undecided (1)**
68:18
**under (25)**
6:21;7:3;12:11;
16:13;18:2;26:22;
58:7,17,18;71:13,20;
78:18;101:10;131:24;
138:15;145:13;
146:23;159:22;
211:21;221:8;239:1;
252:10;342:17;
343:12;346:3
**underlying (4)**
26:13;27:18;
177:17;325:16
**Understood (8)**
29:12;130:21;
200:15;204:2;228:21;
263:6;284:3;289:13
**unethical (3)**
159:14,16,25
**unexpectedly (1)**

42:24
**uniformed (1)**
106:23
**unique (1)**
107:12
**unit (11)**
98:13;106:20,22;
112:6;165:9;225:6;
233:19;314:9;336:13;
348:11,12
**United (2)**
5:3;71:14
**University (1)**
44:21
**University's (1)**
44:25
**unless (3)**
91:2;230:15;231:19
**unmarked (1)**
310:16
**unnecessary (1)**
44:5
**unrelated (4)**
50:1,8;52:2;195:25
**unrest (1)**
99:10
**unsourced (2)**
223:2,8
**Unsuccessfully (1)**
59:9
**untruthful (1)**
20:17
**unusual (4)**
53:16;136:16;
298:5;325:5
**up (62)**
25:20;46:24;49:22;
50:1;52:3;54:4,6;
57:4,20;60:7;63:17;
67:24;95:1;96:13,16;
99:9,22;115:23;
150:23;151:23;
155:13;174:2,12;
183:19,22,25;184:19;
189:5;193:21;198:25;
206:3;210:24;220:14;
221:20;226:6;229:17,
21;234:16;255:5,9,10,
19,20;258:11,15;
268:18,23;272:3,3;
274:23;276:10;292:2;
298:13;311:20;
312:25;313:17;314:4,
13;325:10,11;337:4;
339:11
**updated (1)**
173:8
**upon (14)**
28:25;29:15;30:21;
31:1;88:4,15;90:6,10;
96:23;103:20;104:22;
137:21;175:4;176:7
**upper (1)**

282:25
**upset (3)**
230:23,25;231:4
**use (3)**
171:6,10;254:19
**used (22)**
118:5,7;187:10,22,
25;188:4,5,13;
190:16;191:16;
194:22;196:3;201:2;
246:19,21,25;247:3;
248:7,11;250:10;
305:2
**users (1)**
292:17
**using (2)**
200:20,24
**usually (2)**
114:22;278:3

**V**

**vacated (1)**
65:8
**vague (10)**
37:24;61:20;92:20;
119:9;143:16;175:1;
224:20;236:1;347:19;
348:6
**Vale (5)**
210:7,8;211:12,13,
14
**valuable (1)**
154:12
**value (11)**
152:23;153:4,12,
22,23;154:1,6,9;
155:4;157:14,15
**values (1)**
154:25
**Varas (4)**
179:14,19,22;181:8
**various (1)**
123:10
**vehicle (3)**
255:12;305:2,2
**verbal (3)**
267:15;268:18;
269:15
**Verbally (3)**
266:10;308:6;329:9
**versus (2)**
5:2;132:19
**victim (1)**
285:18
**victims (6)**
215:12;217:13;
271:19;276:15;
301:20,24
**victims' (1)**
292:6
**VIDEOGRAPHER (11)**
5:1,11;6:4;95:13,

17;202:24;205:10,14;
310:19,23;360:22
**videorecorded (1)**
5:8
**video's (1)**
193:8
**Vietnam (5)**
98:14;101:15,24;
102:4,18
**view (2)**
82:12,14
**viewing (1)**
45:21
**views (1)**
100:9
**violation (1)**
334:4
**violent (18)**
112:23;125:21;
126:2,12,15,20,23;
127:7,8;161:24,25;
162:3,12;240:16;
244:9;278:6;300:1;
314:8
**virtue (1)**
31:11
**visit (2)**
241:13;268:21
**visited (1)**
46:12
**visits (1)**
46:21
**voice (1)**
55:8
**voluntarily (4)**
257:10;258:7;
260:17;264:8
**vouch (1)**
138:16

**W**

**Wabash (1)**
30:5
**Wacker (2)**
105:13;107:25
**wait (9)**
9:7,8;255:18,22;
256:13;257:12;
260:25;302:22;
323:14
**waited (1)**
256:15
**waiting (9)**
26:1;256:8;257:1,1,
3,24,25;263:15,19
**Walgreen's (1)**
97:4
**walk (2)**
278:16,17
**walking (6)**
242:1,3,6,7,8,12
**wants (1)**

330:18
**warnings (5)**
132:22;133:3,9;
199:3,12
**warranted (1)**
106:7
**wasting (2)**
35:10;56:5
**watch (11)**
47:8;172:16,17;
183:24;187:5;188:18,
20;296:25;298:11;
313:1;315:15
**water (1)**
182:13
**way (20)**
9:1;58:6;59:10;
77:1;82:18;108:21;
111:13;116:20;
117:10;121:2;152:10;
167:6;180:20;182:5;
294:22;310:11;333:9;
336:19;340:12,19
**Wayne (1)**
48:18
**weapon (12)**
187:10,25;188:13;
194:21;246:19,21;
247:3;248:11,14;
250:6;343:7,10
**weapons (2)**
128:14;188:12
**wearing (3)**
60:9;217:16,25
**wedding (1)**
349:9
**weeks (8)**
25:4,8;27:11;34:7;
104:21;123:25;124:4,
6
**weight (1)**
208:19
**welcome (1)**
197:16
**wellbeing (3)**
264:2;265:24;
342:22
**weren't (14)**
46:11;63:17;85:11;
93:10;123:23;177:9;
212:2;241:13;243:24;
297:22;299:22;
300:10;304:15;
309:15
**West (2)**
96:17;108:1
**Western (2)**
221:22;233:19
**WGN (1)**
108:4
**What's (23)**
52:18;56:10;78:12;
96:18;97:23;105:19;

122:1;124:13;154:15;
158:7;171:18;193:21;
195:19;197:9,11;
206:8;218:11;230:8;
244:11;277:8;282:22;
302:12;336:23
**whatsoever (2)**
61:16;102:17
**Whenever (1)**
185:20
**whereabouts (1)**
197:3
**Whereupon (7)**
69:6;182:16;
270:10;311:2;317:7;
356:10;358:1
**white (7)**
54:12;78:13,14,19;
79:1;111:18;159:18
**whited (1)**
208:13
**whole (7)**
20:5;86:6;114:4;
148:7;227:23;317:3;
351:9
**who's (1)**
349:17
**Whose (2)**
39:16;307:9
**Wiley (56)**
171:19;172:3;
174:16;175:9,13,23;
176:4,22;177:13,19;
178:15;184:22;185:3,
16;186:11,18;187:22,
25;188:13,24;191:2,
7;192:12;194:22;
195:11;243:24;244:3,
12;245:1;246:4;
247:24;249:16;250:1,
14;265:9,12,19;
273:15;274:18;
276:15,19;282:4,19,
20,24;283:10;285:2,
18;291:22;292:14;
303:6;325:24;326:5;
328:18,23;353:16
**Wileys (1)**
194:14
**William (3)**
210:7;211:12,14
**willing (4)**
71:19;78:17;
138:13;259:7
**wind (1)**
45:15
**wish (5)**
58:22;114:11,12,
19,22
**wishes (1)**
77:18
**withdraw (1)**
53:23

**withdrawing (1)**
336:14
**within (9)**
111:15;149:3,4,15;
150:13;153:5;173:18;
264:6;280:24
**without (5)**
19:8;68:1;130:19;
147:3;201:4
**witness (269)**
6:5,6;8:5;10:6;11:3,
8,18,22;12:2,17;
15:18;17:12;21:19;
24:4,7;26:7;29:9;
31:23;32:25;33:8,17,
25;35:12,21;36:9;
37:9,19,25;38:14;
43:17;45:21;46:5,17,
20;47:16,23;49:10,
21;50:17;51:18;52:1;
54:17;55:2,10,12;
57:3,10,19;58:1,14;
61:2,13,21;62:22;
63:21;64:25;66:7;
67:15;74:18;75:18;
76:9,17;78:2;79:8;
80:1,17;81:2,16;82:2,
10,17,24;83:3;84:19;
85:3;86:16;87:18,22;
88:9,20;89:2,9,18;
90:2,23;91:1,15,22;
92:11;93:4,14,21;
94:11;99:15;95:11;
101:18,22;102:1,8,21;
103:4,14;107:14;
110:17;111:7;115:1;
116:10,18,25;117:8,
16,23;118:4,9,25;
119:11,18;120:4;
127:3;130:7;132:20;
133:1;137:17;140:13;
141:13,19;142:7,13;
143:18;144:3;145:7;
146:11,22;147:7;
149:22;150:5,16,25;
151:11;152:2,15,21;
153:4,17;154:9,14;
155:16,21;156:24;
157:18;158:4;159:3,
10,21,23;170:10;
177:4;180:7,15,24;
181:5,13;182:1,10;
183:4;184:13;186:14;
187:17;189:1;192:17;
194:11;201:13,24;
204:16;213:21;
214:16,20;215:19;
216:3,25;218:8,17,25;
219:9;220:22;223:8;
224:10,21;225:4;
226:3,25;227:16;
229:21;234:24;
235:20;236:2,15;

237:12;239:18;240:7,
11,22;241:10,17;
242:25;245:21;
249:18;252:7,19;
259:12,18,25;260:11;
263:18;264:8,25;
266:20;267:3,15,24;
270:1;274:8,24;
279:5,15;283:16;
284:1,6;285:15;
288:8;289:6;291:4,
17;293:18;294:9;
296:12;298:24;
299:19;301:6;302:9,
21,25;303:17;304:1;
307:13;308:3;310:9;
317:22;330:9,21,24;
331:6;333:2;334:1,8,
12;336:25;339:7;
345:19;347:20;348:2,
7;351:19;352:3,18;
355:12;356:15;357:7;
358:9
**witness' (3)**
60:25;226:23;352:1
**witnessed (1)**
46:4
**witnesses (6)**
51:12;132:16;
160:9;215:25;216:12;
217:5
**woman (1)**
45:8
**wondering (3)**
25:14;51:11;141:9
**wood (1)**
96:8
**word (3)**
52:3;138:22;341:11
**words (4)**
145:3;201:20;
208:17;295:19
**work (30)**
30:23;44:14,17;
92:3;96:24;97:2;
103:21;109:6;117:24;
120:24;123:6,24;
124:18;155:13;165:7;
173:10,22;174:21;
189:4;190:11;203:1;
204:11;279:20;
289:20;306:5;334:22;
339:2;348:10,13;
360:12
**worked (23)**
41:21,22;43:7,21;
44:12,24;45:12;
91:25;96:25;97:4,5;
108:25;109:9;110:2;
161:4;166:22;189:10,
12;213:23;298:9,11;
348:16;349:7
**working (30)**

42:25;44:21;109:3;
110:4;114:8,10;
123:12;148:17;
172:10,13,15;185:25;
281:17;296:25;
297:14,17,22;298:9;
299:4;309:22;313:18;
314:6;325:8;337:16;
348:17,17;352:4,5,10;
353:25
**worried (2)**
87:1;230:2
**would-be (1)**
128:5
**write (4)**
149:1;234:15;
295:21,22
**writes (1)**
79:16
**writing (8)**
102:15;106:6;
133:24;134:2;136:7;
143:2,24;144:23
**written (4)**
129:17;218:1,11;
219:12
**wrong (10)**
27:10;48:24;68:15;
208:18;220:12;240:2;
247:5;250:5;298:4;
300:5
**wrongful (2)**
44:21,25
**wrote (3)**
83:7;146:20;290:23

**X**

**Xerox (3)**
164:4;234:21;271:5

**Y**

**year (16)**
38:22;96:20;99:12;
111:22;115:8;161:25;
162:2,14;164:4,6;
276:9;279:16,25;
280:1;283:11,12
**year-end (1)**
339:23
**years (40)**
15:4;26:18;34:7,8,
8;38:11;43:2;45:12;
46:11;47:10,11;64:5,
14;88:10;91:25;
112:3;121:18;151:7,
7,18;156:5;162:7,8;
165:11,18,24;166:2,3;
252:25;253:4;271:10;
286:4,7;333:25;
334:6,10;341:20;
343:20,21,22

**yelling (1)**
56:3
**YMCA (3)**
121:11;122:2,3
**York (3)**
42:8,11;53:14
**young (1)**
55:6
**youth (1)**
91:11
**youths (1)**
301:21

## Z

**Zellner (4)**
44:9,11,17;52:23
**zero (2)**
14:25;60:18
**Zion (1)**
128:15
**Zuley (1)**
50:12
**Zuniga (1)**
12:20

## 0

**000001 (1)**
270:23
**02342 (1)**
5:5
**047 (1)**
273:24
**08-10-95 (1)**
274:25

## 1

**1 (9)**
69:7,17;165:16,17,
19;206:8;286:1,6;
287:6
**1:00 (2)**
172:18;174:8
**1:47 (1)**
205:11
**10 (4)**
275:10,14;356:20;
357:11
**10:17 (1)**
5:7
**100 (2)**
7:10;240:1
**101 (2)**
239:15,22
**11 (3)**
275:10,17;317:17
**11:47 (1)**
95:14
**11:56 (1)**
95:18
**1145 (5)**

317:18;318:2,7,17,
18
**1156 (1)**
317:18
**1157 (1)**
317:18
**12 (2)**
213:7;275:18
**12:00 (3)**
172:10,13;319:13
**12:30 (1)**
172:11
**13 (2)**
70:20;276:1
**14 (1)**
276:7
**14th (11)**
107:3;109:19;
111:3,4,15,17,19,23;
112:15;113:25;
125:14
**15 (21)**
183:1;184:21;
185:1;186:10,17,25;
187:15;190:19;191:8,
20;192:11;193:13;
194:17;196:16;
204:12;205:25;
238:11;245:8,17;
246:1;249:13
**1556 (5)**
317:24,25;318:4,
24;323:3
**1557 (2)**
318:5;324:19
**16th (1)**
107:11
**17 (1)**
5:6
**18 (4)**
5:5;17:17;286:8;
316:5
**1800 (4)**
316:6;319:2,23;
323:20
**18th (3)**
105:13,15;107:11
**19 (2)**
276:7,11
**190 (1)**
270:22
**1947 (1)**
96:19
**1966 (1)**
96:22
**1967 (2)**
99:13;101:13
**1968 (3)**
95:22;99:11;104:19
**1983 (8)**
115:9;123:2;125:6,
20;126:2;133:16;
134:19;165:21

**1990 (57)**
161:23;162:6,11,
18;163:4;164:9;
167:18;168:24;
171:19;172:9,12;
177:18;183:1;184:21;
185:2,16;186:10,17,
25;187:15;188:8;
190:19;191:8,20;
192:11;193:13;
194:17;196:16;
204:12;205:24;207:8;
211:6;215:25;238:11,
21,25;243:25;245:8,
17;246:1,2;249:13,
14;250:3;260:22;
269:2;274:6;275:4;
283:7;285:1;286:9;
287:24;291:21;
292:22;294:3,4;303:2
**1990s (1)**
189:12
**1992 (6)**
276:2,9;286:1,6;
287:6;358:7
**1994 (1)**
275:8
**1995 (3)**
274:22;356:21;
357:11
**19th (13)**
107:4,5,6,8,12,21;
108:8,16;109:20;
110:4,13;111:2;114:6
**1st (6)**
105:6,8,23;106:9;
108:13;110:11

## 2

**2 (9)**
58:25;182:17;
206:11,12,14;216:6;
230:3;272:24;273:5
**2:13 (1)**
205:15
**20 (10)**
151:7;165:24,24;
166:2,3;271:10;
276:8,10,11,11
**2000s (1)**
165:22
**2008 (2)**
165:13;340:1
**2016 (1)**
28:16
**2017 (2)**
28:9;70:20
**2019 (1)**
5:7
**20th (12)**
47:6;106:11,15,25;
108:14;109:1,1,4;

110:11;114:1,5,13
**21 (1)**
276:13
**2138 (2)**
125:16,17
**22 (15)**
238:21,25;246:2;
248:16,17;249:14;
250:3;260:22;268:15;
269:2;275:4;292:22;
297:13;309:4;320:13
**2200 (1)**
207:8
**23 (15)**
276:14;309:4;
315:25;316:13;319:9,
12,14,15,25;320:1,5;
321:17;322:2;323:10,
13
**2359 (1)**
320:2
**23rd (3)**
114:6;319:5;322:25
**24 (5)**
287:23;309:8;
310:4;319:14;322:20
**2400 (5)**
315:25;316:3,4,13;
319:11
**24-hour (1)**
311:17
**24th (3)**
114:7,12;115:6
**25 (9)**
171:19;172:9;
177:18;185:16;281:7;
285:1;291:21;294:3,6
**25th (2)**
125:7;313:1
**26 (2)**
243:25;282:2
**26th (26)**
24:25;32:6;33:1;
34:2;54:4;59:23;62:2,
4,9,13;63:18;64:12;
65:19;238:19;239:4,
8;242:12;251:11,14;
254:25;258:21;261:1;
294:4;297:13;304:4;
320:17
**28 (2)**
124:14;282:3
**29 (1)**
282:3
**293 (4)**
283:7,11,19,23
**294 (2)**
283:11,12
**29th (1)**
358:7
**2nd (1)**
107:11

## 3

**3 (7)**
207:8;270:11,15,
22;327:25;330:15;
358:20
**3:30 (1)**
297:9
**30 (2)**
282:16;284:10
**31 (1)**
284:23
**32 (1)**
123:9
**3202 (1)**
234:3
**35 (1)**
285:25
**36 (3)**
325:3,9;353:1
**37 (1)**
287:14
**379 (1)**
356:24
**38 (2)**
130:9;287:14
**382 (1)**
357:2
**39 (1)**
287:17

## 4

**4 (14)**
95:22;120:23;
123:3,15;124:7,11,18;
210:17;211:6;215:25;
270:11;297:9;329:19;
358:25
**4:00 (5)**
172:10,13;297:8,
10;298:13
**4:07 (1)**
310:20
**4:19 (1)**
310:24
**40 (9)**
34:7,8,8;88:10;
91:25;151:7;333:25;
334:6,10
**40th (1)**
339:23
**41 (1)**
287:17
**42 (1)**
287:22
**43 (1)**
287:22
**44 (1)**
287:22
**45 (1)**
318:13

**47 (1)**
  295:10
**49 (2)**
  301:15,16
**4th (1)**
  104:19

---

### 5

**5 (99)**
  45:24;49:11;53:3;
  108:23;109:14,16;
  120:25;123:4,17;
  124:7,9,10,20,25;
  125:18,21;126:12;
  127:9,16;148:5,7,15;
  161:8;162:17;163:1,
  4;165:3,20,21;166:3,
  10;168:25;170:13;
  171:1,3;173:19;
  189:9;191:16;198:8,
  13,16,24;203:4;
  236:25;238:11;
  243:17,20;244:8,13;
  245:11;246:11;250:3,
  21;253:7,7,19,24;
  256:19;257:6;258:14;
  259:5;261:4,17,18,19;
  263:11,14;271:10;
  275:12;283:19;
  288:12;298:15;
  299:11;300:1;301:1;
  308:20;311:3,8;
  312:1,12;313:25;
  318:7,17;320:12,20;
  322:21;325:3,9,17;
  332:14,25;333:11,15;
  334:23;346:19;351:8;
  352:25;353:7;354:7
**5:24 (1)**
  360:23
**50 (1)**
  113:14
**54 (2)**
  295:10;321:13
**55 (2)**
  293:20;294:17
**56 (3)**
  293:21;318:8;
  319:16
**57 (3)**
  318:8,13;319:16
**59 (4)**
  293:2,6;320:6,7
**5900 (1)**
  96:8

---

### 6

**6 (7)**
  272:24;273:5;
  317:8,12;318:8,9,23
**6:00 (12)**

  319:6,8,23;320:1,8;
  322:24;323:9,12,17;
  324:7,15,18
**6:30 (1)**
  321:17
**60 (1)**
  335:11
**60s (1)**
  106:3
**62 (2)**
  293:2,6
**63 (2)**
  290:10,12
**64 (2)**
  290:10,12
**66 (5)**
  239:25;240:4,15;
  241:5;251:23
**68 (2)**
  99:13,24

---

### 7

**7 (5)**
  99:11;273:18;
  274:21;356:11,13
**7:10 (1)**
  321:22
**70s (3)**
  112:1,1,2

---

### 8

**8 (4)**
  96:19;276:1;358:2,
  5
**80s (2)**
  148:6;160:13
**83 (2)**
  124:21;125:5

---

### 9

**9 (21)**
  172:1;187:10,22;
  188:4,6;190:15;
  191:16;196:3,7;
  246:22,25;247:3,7,25;
  248:3,4,7,10,10;
  250:9;332:6
**9:28 (2)**
  322:2,16
**90 (1)**
  283:7
**90-50 (1)**
  284:17
**90-51 (1)**
  284:17
**90s (1)**
  148:6
**911 (2)**
  331:16,16
**95 (2)**

  173:24;275:12
**9596 (1)**
  206:15
**9597 (1)**
  216:6
**9599 (4)**
  210:5;217:15,20;
  218:12
**9600 (2)**
  209:9;211:17
**9605 (2)**
  220:23;232:5
**9612 (1)**
  213:6
**9614 (1)**
  206:21
**9615 (1)**
  206:21
**9617 (1)**
  206:15
**97 (1)**
  335:5

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 12

# In The Matter Of:

*Maysonet v.*
*Guevara*

*Fernando Montilla*
*August 27, 2019*
*Video Deposition*



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Maysonet v.
Guevara                                          Video Deposition

---

Page 1

```
1              THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  JOSE JUAN MAYSONET, JR.,

4        Plaintiff,

5     vs.                        No. 18-cv-02342

6  REYNALDO GUEVARA, ERNEST
   HALVORSEN, EDWARD MINGEY,
7  EPPLEN; FERNANDO MONTILLA,
   ROLAND PAULNITSKY, FRANK
8  DIFRANCO, CITY OF CHICAGO, and
   COOK COUNTY,
9
        Defendants.
10                                         /

11

12            The video-recorded discovery deposition

13  of FERNANDO MONTILLA, taken in the above-entitled case,

14  on the 27th day of August, 2019, at 11:03 o'clock a.m.

15  at the offices of The Sotos Law Firm, 141 West Jackson

16  Boulevard, Suite 1240A, Chicago, Illinois, pursuant to

17  agreement of counsel.

18

19  Reported by:  Karyn H. Chalem, RPR, CSR
    License No.:  084-004167
20

21

22

23

24

25
```

Page 2

```
1  A P P E A R A N C E S

2        BONJEAN LAW GROUP
         100 Dean Street
3        Suite 422
         Brooklyn, New York  11238
4        BY:  JENNIFER A. BONJEAN
              ASHLEY B. COHEN  (partial proceeding)
5        (718) 875-1850
         jennifer@bonjeanlaw.com
6        ashley@bonjeanlaw.com
              On behalf of the Plaintiff;
7
         STEVEN A. GREENBERG, LTD.
8        53 West Jackson Boulevard
         Suite 1260
9        Chicago, Illinois  60604
         BY:  KYLE JORGENSEN
10             STEVEN A. GREENBERG  (partial proceeding)
         (312) 879-9500
11       kyle@greenbergcd.com
         steve@greenbergcd.com
12            On behalf of the Plaintiff;

13       THE SOTOS LAW FIRM
         141 West Jackson Boulevard
14       Suite 1240A
         Chicago, Illinois  60604
15       BY:  DAVID A. BRUEGGEN
         (312) 735-3300
16       dbrueggen@jsotoslaw.com
              On behalf of the Defendants
17            Ernest Halvorsen
              Edward Mingey
18            Lee Epplen
              Fernando Montilla
19            Roland Paulnitsky;

20       ROCK, FUSCO & CONNELLY
         321 North Clark Street
21       Suite 2200
         Chicago, Illinois  60654
22       BY:  THERESA B. CARNEY
         (312) 494-1000
23       tcarney@rfclaw.com
              On behalf of the Defendant
24            City of Chicago;

25
```

Page 3

```
1  A P P E A R A N C E S (cont'd)

2        LEINENWEBER BARONI & DAFFADA
         120 North LaSalle Street
3        Suite 2000
         Chicago, Illinois  60602
4        BY:  MICHAEL J. SCHALKA
         (847) 251-4091
5        mjs@ilesq.com
              On behalf of the Defendant
6             Reynaldo Guevara;

7        COOK COUNTY STATE'S ATTORNEY'S OFFICE
         50 West Washington Street
8        Suite 500
         Chicago, Illinois  60602
9        BY:  EDWARD M. BRENER
         (312) 603-5971
10       edward.brener@cookcountyil.gov
              On behalf of the Defendants
11            Frank DiFranco
              Cook County.
12

13  Also Present:

14       SAMANTHA DAMIANO, videographer

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1                      I N D E X

2  WITNESS:                             PAGE:

3  FERNANDO MONTILLA

4     Examination by Ms. Bonjean            6

5

6  EXHIBITS:

7     Exhibit 1                           180
      Exhibit 2                           205
8     Exhibit 4                           237
      Exhibit 5                           246
9     Montilla 3                          248
      Exhibit 3A                          253
10    Exhibit 6                           351
      Exhibit 7                           355
11    Exhibit 8                           356
      Exhibit 9                           357
12    Exhibit 10                          367
      Exhibit 11                          374
13    Exhibit 12                          388
14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 5

1     THE VIDEOGRAPHER: We're now on the
2 record in the matter of Jose Maysonet, Jr., versus
3 Reynaldo Guevara, et al., in the United States
4 District Court for the Northern District of
5 Illinois, Eastern Division, Case Number
6 18-cv-02342. Today's date is August 27th, 2019,
7 and the time is now 11:03 a.m.
8     This is the video-recorded deposition
9 of Fernando Montilla. We are located at Sotos Law
10 Firm, 141 West Jackson Boulevard, Suite 1240A,
11 Chicago, Illinois. My name is Samantha Damiano,
12 legal video specialist, representing Rizman
13 Rappaport. The court reporter is Karyn Chalem with
14 Rizman Rappaport.
15     For the record, would counsel please
16 introduce themselves and who they represent.
17     MS. BONJEAN: Jennifer Bonjean,
18 B-O-N-J-E-A-N, on behalf of the plaintiff, Jose
19 Maysonet. Also present will be Ashley Cohen,
20 C-O-H-E-N. We're both from the Bonjean Law Group.
21     MR. JORGENSEN: Kyle Jorgensen. It's
22 K-Y-L-E, J-O-R-G-E-N-S-E-N, with Greenberg Trial
23 Lawyers.
24     MR. BRENER: Edward Brener,
25 B-R-E-N-E-R. I represent Frank DiFranco and Cook

Page 6

1 County.
2     MR. SCHALKA: Michael Schalka,
3 S-C-H-A-L-K-A. I represent defendant Guevara in
4 this case.
5     MS. CARNEY: Theresa Carney,
6 C-A-R-N-E-Y, on behalf of the defendant City of
7 Chicago.
8     MR. BRUEGGEN: Dave Brueggen on behalf
9 of the defendant officers and the deponent, Freddie
10 Montilla.
11     THE VIDEOGRAPHER: The court reporter
12 will now swear in the witness.
13     THE REPORTER: Will you raise your
14 right hand, please.
15     (Witness sworn.)
16     FERNANDO MONTILLA,
17 called as a witness herein, having been first duly
18 sworn, was examined and testified as follows:
19     THE WITNESS: I do.
20     EXAMINATION
21     BY MS. BONJEAN:
22 Q. Good morning, Mr. Montilla.
23 A. Good morning.
24 Q. My name is Jennifer Bonjean. I represent
25   the plaintiff, Jose Maysonet, in this litigation in

Page 7

1   which you are a named defendant.
2   I understand that you are -- you go by the
3   name Montilla, or I heard your attorney say
4   Montilla. Is there one that you prefer?
5 A. Well, I pronounced it, since I've been here
6   since a little boy, Montilla, so...
7 Q. Okay. So I will call you Mr. Montilla.
8 A. That would be fine.
9 Q. And can you tell me what your first name is.
10 A. Fernando.
11 Q. Fernando, okay. And do you go by "Freddie"
12   sometimes?
13 A. Yes.
14 Q. I won't call you "Freddie," but is that what
15   you go by?
16 A. Yes. Yeah, I grew up with that as a
17   nickname, so...
18 Q. All right. Have you had your deposition
19   taken before, sir?
20 A. Not that I recall. No, ma'am.
21 Q. Okay. I'm speaking a little louder because
22   I think I got the impression that maybe you're
23   having a hard time hearing?
24 A. Yes, ma'am. My hearing aid batteries died
25   and I forgot my hearing aids at home because I don't

Page 8

1   have batteries.
2 Q. I see.
3 A. Because I had to get here early, so...
4 Q. Can you hear at the level I'm speaking at
5   right now?
6 A. Yes, ma'am. If you look at me, I can
7   probably read your lips a little too, so...
8 Q. Okay. If you have any troubles, will you
9   let me know?
10 A. Yes, ma'am, I will.
11 Q. All right. Since you have not had your
12   deposition taken before, I'm going to go through
13   some ground rules so that you understand what this
14   process is, and you can let me know if you don't
15   understand how it goes. Okay?
16 A. Okay.
17 Q. I'm here on behalf of the plaintiff. I'm
18   going to be asking you questions. I'm going to be
19   expecting answers to those questions, full and
20   complete answers to the best of your ability.
21   Do you understand that?
22 A. Yes, ma'am.
23 Q. Okay. And do you understand that you are
24   under oath here today?
25 A. Yes, ma'am.

Maysonet v.
Guevara

Video Deposition

Page 9

1   Q.   And do you understand that the oath you took
2   here today is the same oath that you would take in
3   a court of law if we were in front of a judge?
4   A.   Yes, ma'am.
5   Q.   Okay.  Have you testified under oath before?
6   A.   Yes, ma'am.
7   Q.   And do you understand that by taking the
8   oath, you are swearing to tell the truth to the
9   best of your ability?
10  A.   Yes, ma'am.
11  Q.   And do you understand that if you make
12  willful false statements, you may subject yourself
13  to perjury?
14  A.   Yes, ma'am.
15  Q.   If at any point you do not understand a
16  question that I'm asking you, will you let me know?
17  A.   Yes, ma'am.
18  Q.   And I will rephrase it as many times as I
19  need to so that you understand what I'm asking.
20  A.   Yes, ma'am.
21  Q.   Okay.  Can we also agree that if you answer
22  one of my questions, you understood my question?
23  A.   Yes, ma'am.
24  Q.   Okay.  And can we agree that you will do
25  your best to give complete answers to my questions

Page 10

1   again to the best of your ability?
2   A.   Yes, ma'am.
3   Q.   That you will not purposefully omit
4   information that might be naturally responsive to
5   my question?
6   A.   Yes, ma'am.
7   Q.   Now, during the course of this deposition, I
8   will be asking questions that may strain your
9   memory.  Okay?
10  A.   Yes, sir.
11  Q.   I know this is an old case.  If at any point
12  you believe or you want to qualify your answer
13  with, you know, it's a -- you don't have a clear
14  memory or you think something might be the case,
15  you are certainly at liberty to do that.  Just let
16  us know that you're estimating or giving us your
17  best guess of what happened at a time when it's not
18  fresh in your recollection.  Okay?
19  A.   Okay.
20  Q.   I don't want you just obviously guessing,
21  but if you remember some pieces of an incident,
22  just do your best, and let us know if you can't
23  remember more than what you've provided.  Okay?
24  A.   Yes, ma'am.
25  Q.   If at any point during the course of this

Page 11

1   deposition you remember something that might be
2   responsive to an earlier question, will you let me
3   know that?
4   A.   Yes, ma'am.
5   Q.   And then I'll give you an opportunity to go
6   back and either clarify or elaborate.  All right?
7   A.   Okay.
8   Q.   Now, the court reporter can't transcribe us
9   talking at the same time, and you're doing great
10  thus far.  I'm going to ask that even if you think
11  you know what I'm going to ask you, that you wait
12  for me to complete my question.
13  A.   Yes, ma'am.
14  Q.   And I will try not to step on any of your
15  answers.  All right?
16  A.   Okay.
17  Q.   Now, you mentioned that you did not have
18  your hearing aids in today.  Correct?
19  A.   Yes, ma'am.  The batteries died, so I don't
20  have extra.
21  Q.   Okay.
22  A.   I forgot to buy them yesterday.
23  Q.   Okay.  Do you wear hearing aids every day?
24  A.   Yes, ma'am.
25  Q.   All right.  And are you okay in a quiet

Page 12

1   setting, such as this, where there's not going to
2   be a lot of background noise?
3   A.   Yes, ma'am.
4   Q.   All right.  And like I said, at any point if
5   you are not understanding my questions, let us
6   know, because it's important that you understand my
7   questions and give answers to the best of your
8   ability.
9   A.   Yes, ma'am.
10  Q.   All right.  And apart from the hearing aid
11  issue, are there any other medical issues that you
12  can think of that might interfere with your ability
13  to give complete and truthful testimony here today?
14  A.   I suffer from osteoarthritis, so sometimes I
15  have to move around a lot.  My -- right now, my --
16  my right foot, my toes are all numb right now.  From
17  the sciatica, swollen.
18  Q.   Oh, I see.  Okay.  Well, I think that's
19  something that we can deal with.  This isn't a
20  marathon.  You should let us know that if you need
21  to take a walk or stand up.
22  A.   Yes.
23  Q.   If you need to stand, I don't see any reason
24  why we couldn't deal with that, if that's more
25  comfortable --

Maysonet v.
Guevara

Video Deposition

---

Page 13

1 A. Yes, ma'am.
2 Q. -- for you. You just let me know. Okay?
3 Now, you indicated you've never had your
4 deposition taken before. Is that right?
5 A. That's correct.
6 MR. BRUEGGEN: Misstates. He said he
7 couldn't remember.
8 THE WITNESS: I can't remember. I
9 don't know if I ever had one. I don't remember.
10 BY MS. BONJEAN:
11 Q. Well, have you ever been named as a
12 defendant in any civil litigation?
13 Have you ever been sued?
14 A. I don't -- I don't recall.
15 Q. Okay. Have you ever sued anyone?
16 A. Pardon me?
17 Q. Have you ever sued anyone?
18 A. Yes, ma'am.
19 Q. How many times?
20 A. Once.
21 Q. And what were the circumstances under which
22 you sued someone?
23 A. Wee hours of the morning. He turned around.
24 I -- I felt that I saw something in his hand. He
25 turned, and I shot, fear for my life. That's the

---

Page 14

1 only time I ever shot.
2 Q. Okay. Did you sue someone for shooting them
3 or did they sue you?
4 A. They didn't shoot me. I shot.
5 Q. Right. Did you sue the person or did the
6 person that you shot sue you? Sue.
7 A. Sue?
8 Q. Yeah.
9 A. I think so. I'm not -- I'm not sure.
10 Q. Okay. So I'm familiar with the incident in
11 which you had an on-duty police shooting. Is that
12 right?
13 A. Yes, ma'am.
14 Q. Okay. Let's put that aside for a second.
15 A. Okay.
16 Q. Have you been involved in any other
17 lawsuits, not -- and I'm talking not just related
18 to your police work. Any other lawsuits.
19 A. No, ma'am.
20 Q. Okay. And you've never sued anyone, brought
21 a lawsuit against someone?
22 A. No, ma'am.
23 Q. You've never sued someone for a -- like a
24 car accident or anything like that?
25 A. No, ma'am.

---

Page 15

1 Q. Okay. Now, when you were involved in the
2 shooting incident that you referenced --
3 A. Yes, ma'am.
4 Q. -- before, do you recall having to sit in a
5 conference room, similar to this, and have
6 questions asked of you?
7 A. No, ma'am.
8 Q. Okay. And do you know what happened with
9 the lawsuit that involved the shooting?
10 A. I have no idea, ma'am.
11 Q. Okay. And do you remember the name of the
12 person who got shot?
13 A. Vague recollection, but if I can be -- see
14 something, I might remember. It's hard.
15 Q. Sure. Does the name Thaddeus Jimenez sound
16 right to you?
17 A. I have no idea who that person is.
18 Q. Okay.
19 (Off stenographic record discussion.)
20 BY MS. BONJEAN:
21 Q. How about Jesse Martinez, does that sound
22 familiar?
23 A. Sounds familiar.
24 Q. Okay. Is that the person you shot?
25 A. I think so.

---

Page 16

1 Q. Okay. And did Jesse Martinez bring a
2 lawsuit against you?
3 A. I think he did through -- I don't know. I
4 never heard anything.
5 Q. Okay. And you don't remember having
6 questions asked of you like I'm asking you today?
7 A. No, ma'am, I don't recall.
8 Q. All right. And Thaddeus Jimenez doesn't
9 ring a bell at all?
10 A. Slightly, but I'd need to be refreshed. I
11 don't know.
12 Q. Sure.
13 A. I need to see something.
14 Q. Okay. We'll get there. I just wanted to
15 see what you remembered, if anything, about those
16 individuals.
17 Now, I know you said you don't ever remember
18 participating in a deposition. Do you ever
19 remember going to court in which you were one of
20 the parties in the lawsuit?
21 A. No, ma'am.
22 Q. Okay. I'm not talking about as a witness.
23 I know you testified as a witness many times --
24 A. Uh-huh.
25 Q. -- but I'm talking about as a party to the

---

Maysonet v.
Guevara

Video Deposition

Page 17

1  lawsuit.  Do you have any recollection of ever
2  being in a court proceeding?
3  A.  No, ma'am.
4  Q.  Okay.  Now, Mr. Montilla, in November of
5  2017, were you subpoenaed to give testimony at a
6  pretrial hearing in connection with Mr. Maysonet's
7  re-prosecution?
8  A.  Can you repeat that?
9  Q.  Sure.  In November of 2017, not so long
10  ago --
11  A.  Yes.
12  Q.  -- were you subpoenaed to come to 26th
13  Street in connection with Mr. Maysonet's criminal
14  case?
15  A.  Yes, ma'am.
16  Q.  Okay.  And did you get a subpoena for that?
17  A.  Yes, ma'am.
18  Q.  And were you aware at the time you received
19  the subpoena that Mr. Maysonet's convictions for
20  the double murder that is the underlying basis of
21  this lawsuit had been vacated?
22  A.  I heard something about it, yes.
23  Q.  Okay.  Who did you hear something about it
24  from?
25  A.  I --

Page 18

1      MR. BRUEGGEN: Just object.  If you
2  heard it from your attorney, you know, don't talk
3  about that.
4      THE WITNESS: Yeah.  Okay.
5      BY MS. BONJEAN:
6  Q.  Okay.  So, again, did you have an attorney
7  prior to receiving the subpoena for Mr. Maysonet's
8  criminal prosecution in November of 2017?
9  A.  No, ma'am.
10  Q.  Okay.  So what did you -- and -- strike
11  that.
12      Had you heard that Mr. Maysonet's
13  convictions had been vacated prior to receiving
14  that subpoena?
15  A.  No, ma'am.
16  Q.  Okay.  So when is the first time you heard
17  that Mr. Maysonet's convictions for the double
18  murders of the Wiley brothers had been vacated?
19  A.  I -- contact at FOB because I needed to find
20  out what I can do, and that's when they told me and
21  I was assigned an attorney.
22  Q.  Okay.  So when you received the subpoena to
23  come to court --
24  A.  Yes, ma'am.
25  Q.  -- did you recognize Mr. Maysonet's name?

Page 19

1  A.  Yes, ma'am.
2  Q.  Okay.  And what did you remember when you
3  saw his name on that piece of paper?
4  A.  Connection with the Wiley brothers.
5  Q.  Okay.  And what else?
6  A.  That he was brought in for questioning to
7  Area 5.
8  Q.  Okay.  And anything else you remembered?
9  A.  I was asked to interpret.
10  Q.  Okay.
11  A.  From Spanish to English, English to Spanish.
12  Q.  Right.  Now, when you received the subpoena,
13  did you -- did you remember the case?
14  A.  Very vaguely.
15  Q.  Okay.  Did you remember -- had you had any
16  information about the case when you received the
17  subpoena, that it had been back in the Circuit
18  Court or had come back or anything?
19  A.  No, ma'am.
20  Q.  Okay.  So that -- so when you got that
21  subpoena, it was sort of out of the blue, is that
22  fair to say?
23  A.  Yes, ma'am.
24  Q.  You had no -- you hadn't had any prior
25  conversations with anyone about Jose Maysonet?

Page 20

1  A.  No, ma'am.
2  Q.  Okay.  Now, prior to receiving the subpoena,
3  did you have information that Rey Guevara had been
4  sued in a number of cases?
5      MR. BRENER: Foundation.
6      MR. BRUEGGEN: Object to form.  You can
7  answer.
8      BY MS. BONJEAN:
9  Q.  You can answer.
10  A.  I heard something.  I read it on the paper,
11  newspaper.
12  Q.  Okay.  And what did you read in the
13  newspaper about Rey Guevara?
14  A.  Just that he was being charged with certain
15  things.
16  Q.  Okay.  And prior to receiving the subpoena,
17  had you had any contact with Mr. Guevara?
18  A.  No, ma'am.
19  Q.  When's the last time you spoke to Rey
20  Guevara?
21  A.  When I retired in January of 2007.
22  Q.  So it's been over --
23  A.  Almost 13 years.
24  Q.  -- 13 years?
25  A.  Yeah.

Maysonet v.
Guevara

Video Deposition

---

Page 21

1 Q. Okay. Have you had the opportunity to see
2 him at any events for Area 5 detectives or any
3 other police events?
4 A. No, ma'am.
5 Q. And did not maintain regular contact with
6 him?
7 A. Now, what, ma'am?
8 Q. You did not maintain regular contact with
9 him?
10 A. No, ma'am.
11 Q. Okay. Okay. Now, you received the
12 subpoena. You said you contacted the FOB?
13 A. Yes, ma'am.
14 Q. Okay. Why did you contact the FOB?
15 A. Because I didn't understand the subpoena, so
16 I wanted legal representation to help me out, find
17 out what this was about.
18 Q. Okay. Have you seen a subpoena before?
19 A. Yes, ma'am.
20 Q. And you've certainly seen subpoenas in your
21 career as a police officer, right?
22 A. Yes, ma'am.
23 Q. Okay. And in fact, you've given testimony
24 how many times, do you think, in your career as a
25 police officer?

Page 22

1 A. Oh, hundreds of times, ma'am.
2 Q. So why was -- why, when you received the
3 subpoena, did you feel that you needed to contact a
4 lawyer?
5 A. I didn't understand this. It didn't say
6 anything about going to 26th and California or
7 something, and I figure let me contact them, because
8 I was retired and I wanted to get some opinion from
9 an attorney from the FOB to help me out.
10 Q. Okay. And I want to be clear. I'm not
11 asking you to reveal to me any of your
12 conversations with your attorneys.
13 A. Yes, ma'am.
14 Q. But I am asking specifically about, prior to
15 contacting your attorney, what made you contact the
16 FOB. And if I could paraphrase, that you said you
17 were retired?
18 A. Yes, ma'am.
19 Q. And did you find it surprising to get a
20 subpoena?
21 A. Yes, ma'am.
22     MR. BRUEGGEN: Objection, form, asked
23 and answered.
24     THE WITNESS: Okay.
25 /////

Page 23

1     BY MS. BONJEAN:
2 Q. Now, prior to receiving the subpoena, had
3 you spoken to any Cook County State's Attorneys
4 about Mr. Maysonet's case?
5     MR. BRENER: Form.
6     MR. BRUEGGEN: Object to form, time.
7     MS. BONJEAN: Fair. Let me start over.
8     BY MS. BONJEAN:
9 Q. Prior to receiving the subpoena in November
10 of 2017, okay -- strike that. Let me start over.
11 Prior to receiving the subpoena in November
12 17th -- November of 2017, had you had any
13 conversations with Cook County State's Attorneys in
14 the last -- in the year prior to that?
15 A. No, ma'am.
16 Q. Okay. I know you talked to Cook County
17 State's Attorneys about Mr. Maysonet's case
18 probably many, many years ago, but I'm talking
19 about in the last five years, did you speak with
20 any Cook County State's Attorneys about
21 Mr. Maysonet's case?
22 A. Not that I recall.
23 Q. All right. Now, when you went -- now, you
24 contacted the FOB, and at some point you got in
25 contact with -- a lawyer assigned to you. Is that

Page 24

1 how it works?
2 A. Yes, ma'am.
3 Q. And was that Tim Grace?
4 A. Yes, ma'am.
5 Q. All right. And after you had Mr. Grace
6 represent you or he agreed to represent you, did
7 you then at a certain point come to 26th Street?
8 Do you remember that?
9 A. Yes, ma'am.
10 Q. Did you come more than once or did you come
11 just one time?
12 A. Pardon me?
13 Q. Did you come more than once or one time?
14 A. Just once.
15 Q. All right. And, again, during this period
16 of time, November of 2017, did you have the
17 opportunity to speak with any Cook County State's
18 Attorneys?
19     MR. BRENER: Form.
20     MR. BRUEGGEN: You can answer.
21     BY MS. BONJEAN:
22 Q. You can answer.
23 A. I think so. I don't recall.
24 Q. Okay. Well, when you came to 26th Street in
25 November of 2017 --

Page 25

1  A.  Yes, ma'am.
2  Q.  -- after receiving that subpoena, did you
3    speak with any Cook County State's Attorneys then?
4  A.  I think so.
5  Q.  Do you remember who you spoke to?
6  A.  No, ma'am.
7  Q.  Okay.  Did you speak to a person by the name
8    of Jim Papa?
9  A.  Yes, that sounds familiar.  Yes.
10  Q.  Okay.  And do you know how many
11    conversations you had with Mr. Papa?
12  A.  I think once or twice.
13  Q.  Okay.  Did you ever speak to Mr. Papa on the
14    phone?
15  A.  I might have.  I don't recall.
16  Q.  Do you know if it was before you came to
17    26th Street or after you came to 26th Street?
18  A.  Ma'am, I don't recall.
19  Q.  Okay.  Do you remember what the nature of
20    the conversation was with Mr. Papa?
21     MR. BRENER: Form.  Which conversation?
22     BY MS. BONJEAN:
23  Q.  You can answer.
24  A.  I think it was -- talked about the Maysonet
25    case, I think it was.

Page 26

1  Q.  Okay.  And when you had this conversation
2    with Mr. Papa in and around the time that you came
3    to 26th Street in November of 2017 --
4  A.  Yes, ma'am.
5  Q.  -- what did he say to you and what did you
6    say to him, if you can paraphrase?
7  A.  I don't recall, ma'am.
8  Q.  Okay.
9  A.  That, I don't recall.
10  Q.  Did he have you look at any police reports?
11  A.  I think he showed me something.  I'm not
12    sure.  I remember something.
13  Q.  Okay.  Did he have you look at --
14     MR. BRUEGGEN: Hold on.  Can I just
15    interject?  Was your attorney present when you met
16    with Mr. Papa?
17     THE WITNESS: No.
18     MR. BRUEGGEN: Okay.  Just to clarify.
19     MS. BONJEAN: Not that it would matter.
20    I mean, it's a third party present during --
21     BY MS. BONJEAN:
22  Q.  So when Mr. Papa was speaking to you at 26th
23    Street, did he also show you any prior testimony or
24    transcripts of testimony?
25  A.  Ma'am, that, I don't recall.

Page 27

1  Q.  Okay.  How long was your meeting with
2    Mr. Papa?
3  A.  Twice, I think.
4  Q.  Okay.  So two meetings?
5  A.  What kind of meeting, ma'am?
6  Q.  There were two meetings with Mr. Papa?
7  A.  I think so.
8  Q.  Okay.  And where did they take place?
9  A.  I think 26th and Cal.
10  Q.  Were they in his office at the Cook County
11    State's Attorneys?
12  A.  I think so, yes.
13  Q.  All right.  And was anyone else present
14    besides Mr. Papa?
15  A.  Not that I recall.
16  Q.  Okay.  Were there any other detectives
17    present?
18  A.  No, ma'am.
19  Q.  Former detectives.
20  A.  Not that I recall.
21  Q.  Or retired detectives.
22  A.  Yeah.
23  Q.  Okay.  And during this one or two
24    conversations with Mr. Papa, did he tell you that
25    you were going to have to testify in Mr. Maysonet's

Page 28

1    retrial?
2  A.  Yes, ma'am.
3  Q.  Okay.  And was he preparing you for that
4    testimony?
5     MR. BRUEGGEN: Object to foundation.
6     THE WITNESS: Huh?
7     MR. BRUEGGEN: Object to foundation.
8    You can answer.
9     BY MS. BONJEAN:
10  Q.  You can answer.
11     THE WITNESS: I can answer?
12     MR. BRUEGGEN: You can answer, yes.
13     THE WITNESS: Yes.
14     BY MS. BONJEAN:
15  Q.  Okay.  And what did he say that he wanted
16    you to do in connection with your testimony?
17  A.  What do you mean what he wanted me to do?
18  Q.  That was a bad question.  Thank you.  I will
19    rephrase it.
20    How did he prepare you for your testimony?
21  A.  Reading the reports and I think my testimony
22    on their prior conviction, I think it was.
23  Q.  Okay.  So he wanted you to look at your
24    prior reports, correct?
25  A.  Yes, ma'am.

Page 29

1  Q.   And he also wanted you to look at your prior
2  testimony, right?
3  A.   Yes, ma'am.
4  Q.   Okay.  And did he tell you he just wanted
5  you to testify consistent with what you had
6  previously testified to?
7      MR. BRENER: Objection, form.
8      THE WITNESS: To the best of my
9  ability, yes.
10     BY MS. BONJEAN:
11  Q.   Okay.  And did he -- did he tell you that
12  there had been allegations made by Mr. Maysonet
13  against a number of detectives, including Reynaldo
14  Guevara?
15  A.   I don't think he did.
16  Q.   Okay.  Did he tell you about any allegations
17  that Mr. Maysonet may have made against you?
18  A.   That, I don't recall.
19  Q.   Okay.  So did he give you any -- and I'm
20  talking about "he," Mr. Papa.
21  During your meetings with him, did he give
22  you any information about what had happened since
23  you were in court over two decades ago?
24     MR. BRENER: Form.
25     THE WITNESS: No, ma'am.

Page 30

1      BY MS. BONJEAN:
2  Q.   Okay.  So he had you look at your reports,
3  right?
4  A.   Yes, ma'am.
5  Q.   Had you look at your prior testimony?
6  A.   Yes, ma'am.
7  Q.   Told you he wanted you to testify consistent
8  with your prior testimony, right?
9  A.   Yes, ma'am.
10  Q.   Anything else?
11  A.   No, ma'am.
12  Q.   Okay.  Now, when you were in court in
13  November-ish of 2017 for Mr. Maysonet's retrial,
14  did you see any other Chicago police detectives who
15  are now retired?
16  A.   Yes, ma'am.
17  Q.   Okay.  Who did you see?
18  A.   I think on the hallway outside the court, I
19  think it was Paulnitsky.
20  Q.   Uh-huh.
21  A.   I think I saw Sergeant Mingey, Ernie
22  Halvorsen.  I think that's all I recall seeing.
23  Q.   Okay.  And did you have any conversations
24  with any one of those individuals either as a group
25  or one-on-one?

Page 31

1  A.   No, ma'am.
2  Q.   Okay.  Why not?
3  A.   Just it's a sense of not conferring with
4  people, because, you know, when you're outside a
5  court to talk about anything, I never did.
6  Q.   I see.  And these were former colleagues of
7  yours, correct?
8  A.   Yes, ma'am.
9  Q.   Did you maintain a relationship, friendship,
10  connection, with any of these detectives after you
11  retired?
12  A.   No, ma'am.
13  Q.   Not a one?
14  A.   Not one, ma'am.
15  Q.   Is there anyone in the Chicago Police
16  Department -- did you have someone -- any officers
17  you maintained connections with after you retired?
18  A.   I had a good friend, John Boyle, but I see
19  him every maybe once a year.  They invite me to
20  their house for Easter.
21  Q.   I see.  Apart from --
22  A.   Yeah, that's it.
23  Q.   -- Boyle, anybody else?
24  A.   No, that's it.
25  Q.   All right.  Okay.  Now, when you appeared in

Page 32

1  court with Mr. Grace in connection with
2  Mr. Maysonet's re-prosecution in November of 2017,
3  your attorney represented to the court that if
4  called to testify, you were going to assert your
5  Fifth Amendment rights.
6  Do you remember that?
7  A.   No, ma'am.  Never mentioned that.
8  Q.   Okay.  Well, were you in court when he
9  stated that?
10  A.   No, ma'am.
11  Q.   You didn't hear Mr. Grace say that?
12  A.   No, ma'am.
13  Q.   So he -- so at no point did you -- did
14  you -- strike that.
15  Did you ever learn that Mr. Grace had
16  asserted your Fifth Amendment rights?
17     MR. BRUEGGEN: Objection to the extent
18  it calls for conversation with an attorney.
19     THE WITNESS: I --
20     MR. BRUEGGEN: Objection to the extent
21  it calls for a conversation with an attorney.
22     Again, Freddie, don't talk about any
23  conversations --
24     THE WITNESS: Okay.
25     MR. BRUEGGEN: -- you had with me or

Page 33

1  any of your attorneys.
2      BY MS. BONJEAN:
3  Q.  Yeah, I'm not asking about conversations
4  with your attorneys.  You're telling me that at --
5  you did not know that Mr. Grace asserted your Fifth
6  Amendment right to remain silent in open court or
7  said you would assert your Fifth Amendment right to
8  remain silent if you were asked questions, is that
9  correct?
10  A.  Yes.
11      MR. BRUEGGEN: Objection, misstates his
12  testimony.
13      BY MS. BONJEAN:
14  Q.  Correct?
15      MR. BRUEGGEN: Same objection.  Go
16  ahead.
17      THE WITNESS: Yes.
18      BY MS. BONJEAN:
19  Q.  And did you at any point learn that your
20  attorney had represented in open court to a sitting
21  Circuit Court judge that you would assert your
22  Fifth Amendment rights to remain silent if
23  questions were asked of you about Mr. Maysonet's
24  case?
25  A.  Yes.

Page 34

1  Q.  When did you learn that?
2  A.  After the court was over with, met outside.
3  We met -- when we spoke outside the court.
4  Q.  Okay.
5  A.  And he advised me, he told me, you know --
6      MR. BRUEGGEN: Freddie, don't talk
7  about what you talked to your attorney about,
8  please.
9      BY MS. BONJEAN:
10  Q.  Okay.  So it's your testimony, though,
11  that -- well, strike that.
12  Did you intend to assert your Fifth
13  Amendment right to remain silent?
14  A.  No, ma'am.  I was willing to testify.
15  Q.  So you were willing to testify, but your
16  attorney went rogue, is that right?
17      MR. BRUEGGEN: Objection, form,
18  argumentative.
19      MR. BRENER: Join.
20      MR. BRUEGGEN: You can answer.
21      THE WITNESS: I'm following my -- my
22  attorney was advising, so I follow what he did,
23  ma'am.
24      BY MS. BONJEAN:
25  Q.  Okay.  So you -- well, what I'm trying to

Page 35

1  get a handle on is, you -- were you aware when he
2  represented to the Circuit Court judge that you
3  were going to assert your Fifth Amendment rights,
4  if asked -- if asked questions under oath?
5      MR. BRUEGGEN: Object to form.
6      BY MS. BONJEAN:
7  Q.  When -- when did -- when did you find out
8  that your attorney had -- as an officer of the
9  court --
10  A.  Yes.
11  Q.  -- rules of professional responsibility
12  apply to him.
13  A.  That's right.
14  Q.  When did you find out that he told the
15  Circuit Court judge that you would assert your
16  Fifth Amendment rights if called to testify?
17      MR. BRUEGGEN: Objection, asked and
18  answered.
19      MR. BRENER: Foundation and also
20  argumentative with respect to his obligations of
21  the court.
22      MS. BONJEAN: Okay.  We don't have
23  speaking objections at this table.
24      BY MS. BONJEAN:
25  Q.  Go ahead.

Page 36

1  A.  I was supposed to testify.  I was there to
2  testify.  I was willing to testify.  My attorney
3  went in, told me to stay outside.
4  Q.  Okay.
5  A.  Short while later, he came out, and he
6  says --
7  Q.  I'm not -- I'm not --
8  A.  Okay.
9  Q.  -- I'm not asking you to talk about what he
10  told you --
11  A.  Okay.
12  Q.  -- when he came out, but my question is:
13  Before he went into the courtroom, did you know
14  that you were going to be exercising your Fifth
15  Amendment right to remain silent if called to
16  testify?
17      MR. BRUEGGEN: Object to form.
18      MS. CARNEY: Asked and answered.
19      THE WITNESS: No, ma'am.
20      BY MS. BONJEAN:
21  Q.  Okay.  So according to you, you were always
22  willing to testify?
23  A.  Yes.
24      MS. CARNEY: Objection, asked and
25  answered.

Maysonet v.
Guevara

Video Deposition

Page 37

BY MS. BONJEAN:

1    BY MS. BONJEAN:
2  Q.  You can answer again.
3  A.  Yes, ma'am.
4  Q.  And Tim Grace, who was your attorney,
5  represented something that was not consistent with
6  what you wanted to this judge, is that right?
7  A.  That is -- huh?
8    MR. BRUEGGEN: Objection, form.
9    BY MS. BONJEAN:
10 Q.  Well, you understand that the Fifth
11  Amendment right to remain silent belongs to you and
12  only you, right?
13 A.  Yes, ma'am.
14 Q.  Nobody else can exercise your Fifth
15  Amendment right to remain silent, only you can?
16 A.  That's correct.
17 Q.  Okay.  And if an attorney went into court,
18  as an officer of the court, and represented to a
19  judge that you were going to assert your Fifth
20  Amendment right to remain silent, okay, if your
21  attorney did that, you're telling us that that was
22  not with your consent, correct?
23    MR. BRUEGGEN: Object to form.  It
24  misstates his testimony.  Go ahead.
25    MS. CARNEY: Asked and answered.

Page 38

1    BY MS. BONJEAN:
2  Q.  If you under -- if you --
3  A.  That's correct.
4  Q.  So he told the judge that you were going to
5  plead the Fifth, and that wasn't true?
6    MR. BRUEGGEN: Asked and answered.
7    MS. CARNEY: Objection, asked and
8  answered.
9    BY MS. BONJEAN:
10 Q.  Right?
11    MR. BRENER: Join.
12    THE WITNESS: He's representing me,
13  ma'am, so...
14    BY MS. BONJEAN:
15 Q.  Well, see, here's -- I understand he's
16  representing you, but my question is, is:  You're
17  telling us you were going to testify?
18 A.  Yes, ma'am.
19 Q.  Okay.  And he went into court and said you
20  weren't going to testify.  He said -- he went into
21  court and said you were going to exercise your
22  Fifth Amendment rights.  Okay?
23    MR. BRUEGGEN: Objection, asked and
24  answered.
25    MS. CARNEY: Is that a question?

Page 39

1    BY MS. BONJEAN:
2  Q.  And -- okay.
3    MS. BONJEAN: I know you don't like
4  this, but we're going to get clarity.  He said two
5  things.  He has said --
6    MS. CARNEY: I thought you just
7  lectured him on no speaking objections.
8    MS. BONJEAN: I'm not -- I'm not
9  objecting.
10    MS. CARNEY: You don't need to lecture
11  me.
12    MS. BONJEAN: I'm not objecting.
13    MS. CARNEY: I put my objection on the
14  record.
15    MS. BONJEAN: This isn't an objection.
16    THE REPORTER: One at a time.
17    MS. CARNEY: You do not need to lecture
18  me.  I put my objection on the record.  You can
19  continue asking your questions, but at some point
20  you're going to be badgering him.  He's asked it
21  five times.
22    MS. BONJEAN: I'm not getting clarity
23  because he said two things.
24    BY MS. BONJEAN:
25 Q.  Okay.  You've said two things.  You've

Page 40

1  said -- you've suggested that you were taking the
2  advice of counsel, right?
3  A.  That's correct.
4  Q.  Okay.  Which is different than him doing
5  something that you didn't know or give him
6  permission to do, right?
7    MR. BRUEGGEN: Object to form.
8    THE WITNESS: Ma'am, I don't know what
9  went on in court.
10    MS. BONJEAN: Okay.
11    THE WITNESS: He's representing me.
12  That's what I go by.
13    MS. BONJEAN: Okay.
14    THE WITNESS: He's my attorney.
15    MS. BONJEAN: Right.
16    BY MS. BONJEAN:
17 Q.  Now -- but you said you understood that the
18  Fifth Amendment right to remain silent and not
19  incriminate yourself belongs to you, right?
20 A.  That's correct.
21    MR. BRUEGGEN: Objection, asked and
22  answered.
23    BY MS. BONJEAN:
24 Q.  It didn't belong to Mr. Grace, correct?
25    MS. BONJEAN: You can keep doing it.  I

Maysonet v.
Guevara

Video Deposition

Page 41

1  don't care.
2      MR. BRUEGGEN: That's fine.  I was --
3      MS. BONJEAN: You can keep making your
4  objections.
5      BY MS. BONJEAN:
6  Q.  They're going to continue to object and
7  you're still going to have to answer my questions
8  till I get the clarity I need.  Okay?
9  A.  I don't understand.
10 Q.  Okay.  Well --
11 A.  I never invoked my Fifth Amendment, never.
12 Q.  Okay.  I know, but your attorney did.
13 A.  That's my attorney.
14 Q.  Okay.
15 A.  He's representing me.
16 Q.  Okay.  So you -- but -- I understand that he
17 was representing you, but did you give him consent
18 to let the Court know that you would plead the
19 Fifth Amendment if called to testify?
20 A.  No, ma'am.
21 Q.  Okay.  So he did something that you didn't
22 approve of, right?
23     MR. BRUEGGEN: Object to form.
24     BY MS. BONJEAN:
25 Q.  Right?

Page 42

1  A.  Correct, I guess.
2  Q.  He told the judge that you were going to
3  plead the Fifth, and you weren't going to plead the
4  Fifth?
5      MS. CARNEY: Objection, asked and
6  answered.
7      BY MS. BONJEAN:
8  Q.  Is that right?
9      MR. BRENER: Asked and answered.  Join.
10     BY MS. BONJEAN:
11 Q.  You can answer that.
12 A.  I keep answering the same thing, ma'am.  He's
13 representing me.
14 Q.  That's not an answer.
15     MS. BONJEAN: Please ask him back the
16 question.
17     When he answers the question, we'll
18 move on.
19     MS. CARNEY: He's answered it five
20 times.
21     MS. BONJEAN: Can you ask my question
22 back, please.
23     (Following question read back:  He told
24 the judge that you were going to plead the Fifth,
25 and you weren't going to plead the Fifth?)

Page 43

1      BY MS. BONJEAN:
2  Q.  Correct?
3      MR. BRUEGGEN: Objection, form, vague.
4      BY MS. BONJEAN:
5  Q.  Okay.  Your attorney told Judge Joyce that
6  if called to testify, you were going to exercise
7  your Fifth Amendment right, correct?
8      MR. BRUEGGEN: Objection, asked and
9  answered.  Go ahead and answer.
10     THE WITNESS: Yes, I always going to --
11 I'm not going to invoke my Fifth Amendment.  I was
12 ready to testify in every case.
13     BY MS. BONJEAN:
14 Q.  You're not answering my question.  You're
15 answering -- you're saying what you want to say
16 right now, and we'll go -- we'll be able to move on
17 when you answer my question.
18 A.  Ma'am, he went in court.
19 Q.  Let me stop.  Your attorney went in front of
20 a judge and told that judge you were going to
21 exercise your Fifth Amendment right to remain
22 silent if called to testify, correct?
23     MR. BRUEGGEN: Objection, asked and
24 answered.  You can answer again, Freddie.
25     THE WITNESS: Yes.

Page 44

1      BY MS. BONJEAN:
2  Q.  Okay.  And your testimony here today is that
3  you were not going to exercise your Fifth Amendment
4  right if called to testify, right?
5      MR. BRUEGGEN: Objection, misstates his
6  testimony.
7      BY MS. BONJEAN:
8  Q.  Were you going to testify if called?
9  A.  Yes.  Yes, ma'am.
10 Q.  Okay.  So he misrepresented something to the
11 Court, correct?
12     MR. BRUEGGEN: Objection, form.
13     BY MS. BONJEAN:
14 Q.  Correct?
15 A.  Ma'am, I don't know.  He's my attorney.  He's
16 in court.  I'm not.
17 Q.  I know.
18 A.  I don't know what --
19 Q.  If he --
20 A.  -- what I'm supposed to tell you.
21 Q.  If he told the Court that you were going to
22 plead the Fifth, that would be untrue, correct?
23     MR. BRUEGGEN: Object to form.
24     BY MS. BONJEAN:
25 Q.  Answer the question.

Page 45

1 A. Ma'am, all I can -- the best of my -- all I
2 can tell you is he's represented me in the court.
3 I'm not in the courtroom with him.
4 Q. I -- okay. So are you saying he didn't --
5 you don't know what he told the Court?
6       MR. BRUEGGEN: Objection, asked and
7 answered.
8       MS. BONJEAN: No.
9       BY MS. BONJEAN:
10 Q. Are you aware that your attorney told the
11 judge that you would plead the Fifth if called to
12 testify?
13       MR. BRUEGGEN: Objection, asked and
14 answered.
15       MS. CARNEY: Asked and answered.
16       MR. BRUEGGEN: This is -- you're going
17 over the same material. I know what you're trying
18 to get at, and you should, but you keep going back.
19       MS. BONJEAN: Because he's not
20 answering. Now he -- I mean, he's suggesting now I
21 wasn't in court, it was just my attorney.
22       BY MS. BONJEAN:
23 Q. Were you aware that your attorney exercised
24 your Fifth Amendment rights on your behalf to the
25 judge?

Page 46

1       MR. BRUEGGEN: Objection, asked and
2 answered.
3       THE WITNESS: After he came out from
4 court, yes.
5       BY MS. BONJEAN:
6 Q. Okay. So you were aware of that, correct?
7 A. Yes, after court.
8 Q. Okay. Now my question is: If called to
9 testify, you were going to testify, according to
10 you, correct?
11 A. That's correct.
12 Q. So he misrepresented that to the Court, that
13 you weren't going to testify, correct?
14       MR. BRUEGGEN: Objection, asked and
15 answered.
16       THE WITNESS: I don't understand that,
17 ma'am. He's representing me. I don't know how he
18 can misrepresent me in court if he's my attorney.
19       BY MS. BONJEAN:
20 Q. He told the judge something that wasn't
21 true, right?
22       MR. BRUEGGEN: Object to form.
23       MR. BRENER: Foundation.
24       BY MS. BONJEAN:
25 Q. If he said you weren't going to testify

Page 47

1 because you were going to exercise your Fifth
2 Amendment right, was that true?
3 A. Ma'am, he's the --
4       MR. BRUEGGEN: Object to form, asked
5 and answered. Go ahead.
6       THE WITNESS: He's the attorney. He's
7 in court for me. I'm outside.
8       BY MS. BONJEAN:
9 Q. I'm asking -- you can't have it both ways,
10 sir. You can't come into here and say I was going
11 to testify and then --
12       MS. CARNEY: Okay.
13       MR. BRUEGGEN: Ms. Bonjean --
14       MS. CARNEY: You're now badgering him.
15       MR. BRUEGGEN: Yeah.
16       MS. CARNEY: You cannot yell at him. I
17 understand.
18       MS. BONJEAN: He can't hear because he
19 doesn't have his hearing aids in.
20       MS. CARNEY: Would you like to continue
21 the dep, then?
22       MS. BONJEAN: No. He should have come
23 prepared.
24       MR. BRUEGGEN: Ms. Bonjean, just ask
25 questions.

Page 48

1       MS. CARNEY: It's not my fault he
2 doesn't have his hearing aids. You don't have to
3 scream at him and lecture him like a child. Ask
4 your questions.
5       MS. BONJEAN: Okay. Well, he's -- I am
6 not screaming at him, but we're going to get -- I'm
7 going to get an answer to my question.
8       MS. CARNEY: You've gotten it 16 times.
9       MS. BONJEAN: No, I haven't.
10       MS. CARNEY: Just because you don't
11 like it.
12       MS. BONJEAN: He hasn't answered it.
13       BY MS. BONJEAN:
14 Q. When -- when your attorney told the judge
15 that you weren't going to testify, that wasn't
16 true, was it?
17       MR. BRUEGGEN: Objection, asked and
18 answered, form.
19       THE WITNESS: Ma'am, he's representing
20 me in court. I'm not in court.
21       BY MS. BONJEAN:
22 Q. Is that an answer to my question? Is that
23 an answer to my question?
24       MS. CARNEY: It's his answer to your
25 question. If he doesn't understand what you're

Page 49

1  asking him, that's the answer to your question.
2      BY MS. BONJEAN:
3  Q.  Do you not understand what I'm asking?
4  A.  You're telling me that my lawyer lied before
5  a judge.
6  Q.  If your -- if your -- if your attorney told
7  the judge that you weren't going to testify because
8  you were going to invoke your Fifth Amendment
9  right, is that accurate?
10     MR. BRUEGGEN: Objection, asked and
11  answered and form.
12     THE WITNESS: That's my attorney.  He's
13  representing me.
14     BY MS. BONJEAN:
15  Q.  Is it accurate that you were not going to
16  testify and you were going to plead the Fifth?
17     MR. BRUEGGEN: Objection, asked and
18  answered.
19     THE WITNESS: I was never going to
20  plead the Fifth.
21     BY MS. BONJEAN:
22  Q.  So that was inaccurate when he told the
23  judge that?
24     MR. BRUEGGEN: Objection, asked and
25  answered.

Page 50

1      BY MS. BONJEAN:
2  Q.  Right?
3  A.  He's -- I don't know how I can explain it.
4  He's my attorney, so I have to --
5  Q.  I --
6  A.  I put my -- into the attorney.  He
7  represented me in the court.  I was never in the
8  court.  I don't know what happened in the court.
9  Q.  I'm not asking you whether you -- you said
10  you -- you already testified, sir, that you knew
11  that he told the judge that you were going to plead
12  the Fifth.  Did you or did you not know that?
13  A.  No, until after.
14  Q.  After the fact you knew that, right?
15  A.  That's correct.
16  Q.  And did you say to your attorney, hey, why
17  did you do that, I would have testified?
18     MR. BRUEGGEN: Objection, calls for
19  attorney-client privileged communication.
20     MS. BONJEAN: No, which I think he's
21  waived, but okay.  We'll leave it at that for the
22  moment.
23     BY MS. BONJEAN:
24  Q.  So it's your testimony that you would have
25  testified all along, right?

Page 51

1  A.  That is correct.
2  Q.  And if he told the judge that you weren't
3  going to testify, that was just, what, a mistake?
4      MR. BRUEGGEN: Objection, asked and
5  answered.
6      THE WITNESS: I don't know, ma'am.
7  He's in the -- I'm not in the courtroom with him.
8      BY MS. BONJEAN:
9  Q.  I'm not asking whether -- I'm saying if he
10  told the judge that, was that accurate that you
11  weren't going to testify?  It wasn't, right?
12     MR. BRUEGGEN: Objection, asked and
13  answered, form.
14     THE WITNESS: I don't know what
15  happened in court.
16     BY MS. BONJEAN:
17  Q.  Okay.  I'll tell you what happened in court.
18  He told the judge you were going to plead the
19  Fifth.  And you're telling me you were never going
20  to plead the Fifth, is that right?
21     MR. BRUEGGEN: Objection, form, asked
22  and answered.
23     BY MS. BONJEAN:
24  Q.  Is that correct?
25     MR. BRUEGGEN: Compound.  Same

Page 52

1  objections.
2      THE WITNESS: Yes, ma'am, that's
3  correct.
4      BY MS. BONJEAN:
5  Q.  Did you make an ARDC complaint against
6  Mr. Grace?
7  A.  No, ma'am.
8  Q.  Did you make a complaint with the Attorney
9  Registration and Disciplinary Commission because he
10  told the judge something that wasn't true on your
11  behalf?
12  A.  No, ma'am.
13  Q.  Why not?
14  A.  Ma'am, I didn't know he was doing -- I didn't
15  know he did something wrong.  He was representing
16  me.  He's my lawyer.
17  Q.  Okay.  But he told the judge something that
18  you didn't want to do, right?
19     MR. BRUEGGEN: Object to asked and
20  answered.
21     THE WITNESS: I don't know, ma'am.
22     BY MS. BONJEAN:
23  Q.  Did you read the newspaper the next day or
24  the same day?
25  A.  I don't read the newspapers all the time.

Maysonet v.
Guevara

Video Deposition

Page 53

1 Q. Okay. Did you read the newspaper the same
2 day about the case that you were involved in?
3 A. What do you mean?
4 MR. BRUEGGEN: Object to form.
5 BY MS. BONJEAN:
6 Q. Did you read the newspaper about Jose
7 Maysonet's case, the Chicago Tribune that very same
8 day, that said five officers are going to take the
9 Fifth in this double murder case? Did you read
10 that?
11 A. I don't read -- I don't read the Tribune.
12 Q. Okay. Did you read anything in any news
13 publication about Chicago police officers pleading
14 the Fifth in the Jose Maysonet's case?
15 A. Later on.
16 Q. Okay. And did you say to yourself, hey,
17 wait, I wasn't going to plead the Fifth, why are
18 they saying that? Did you ask yourself that?
19 MR. BRUEGGEN: Object to form.
20 THE WITNESS: No, ma'am.
21 BY MS. BONJEAN:
22 Q. Why not?
23 A. I don't know. I don't know why they did
24 this. They're individuals.
25 Q. I'm talking about you.

Page 54

1 A. Ma'am, I was willing to testify from day one.
2 Q. Okay. But your attorney said otherwise?
3 A. That's my attorney.
4 Q. Okay.
5 A. I have to follow what he says.
6 Q. Do you have to?
7 A. Yes, ma'am.
8 Q. Why?
9 A. He's representing me.
10 Q. Okay. Well, if he told you to jump off a
11 bridge, would you do that?
12 MR. BRUEGGEN: Object to form.
13 MR. BRENER: Argumentative.
14 MR. BRUEGGEN: Argumentative.
15 BY MS. BONJEAN:
16 Q. No, right?
17 A. Hypothetical question, ma'am.
18 Q. Okay. Well, if he told you to testify to
19 something that wasn't true, would you do that?
20 A. No, ma'am.
21 Q. Okay.
22 MR. BRUEGGEN: Objection, incomplete
23 hypothetical, form.
24 BY MS. BONJEAN:
25 Q. Okay. So are you saying that you were --

Page 55

1 you were -- are you now testifying that you were
2 okay with the fact, you were -- you were not upset
3 about the fact that your attorney told the State's
4 Attorneys and the judge in open court that you
5 would plead the Fifth? You were never upset about
6 that?
7 A. No, ma'am.
8 MR. BRUEGGEN: Objection, form,
9 compound.
10 MS. CARNEY: Objection, form,
11 argumentative.
12 MR. BRENER: Join.
13 BY MS. BONJEAN:
14 Q. Correct?
15 MR. BRUEGGEN: Same objections.
16 THE WITNESS: Yes.
17 BY MS. BONJEAN:
18 Q. It never bothered you?
19 A. No, ma'am.
20 Q. And you never said, wait a second, that's
21 not true, I would have testified, is that right?
22 MR. BRUEGGEN: Objection, asked and
23 answered.
24 BY MS. BONJEAN:
25 Q. Right?

Page 56

1 A. I would have testified. He knows that.
2 Q. Okay. So he just -- he just told the judge
3 that against your will?
4 MR. BRUEGGEN: Objection, asked and
5 answered.
6 BY MS. BONJEAN:
7 Q. Okay. Did you ever talk to any of your
8 colleagues or former colleagues about the fact that
9 you pled the Fifth after the fact?
10 MR. BRUEGGEN: Object to form,
11 colleague.
12 MS. BONJEAN: I'll rephrase.
13 BY MS. BONJEAN:
14 Q. Did you ever talk to the other detectives
15 who were called to testify in the Maysonet case
16 after that court appearance?
17 A. No, ma'am.
18 Q. And did you know that Mr. Maysonet's
19 convictions were vacated, tossed out, after that
20 court appearance?
21 A. Yes, ma'am.
22 Q. Okay. How did you learn that?
23 MR. BRUEGGEN: Objection to the extent
24 it calls for attorney-client privileged
25 communication. Go ahead, sir.

Page 57

1    THE WITNESS: From my attorney.
2    BY MS. BONJEAN:
3  Q.  Okay.  You don't -- if it's from your
4  attorney, you don't -- you don't have to answer
5  that.
6    Did you read it in the newspaper as well at
7  some point?
8  A.  I don't recall.
9  Q.  Okay.  And what were your impressions when
10  you learned that Mr. Maysonet's double murder
11  conviction had been vacated?
12    MR. BRUEGGEN: Object to form,
13  impressions.
14    BY MS. BONJEAN:
15  Q.  Your understanding.
16  A.  He was vacated.  It was vacated.  Nothing I
17  could do.  What can I say?
18  Q.  Well, you could have testified, right?
19    MS. CARNEY: Objection, argumentative.
20    MR. BRUEGGEN: Objection,
21  argumentative.
22    BY MS. BONJEAN:
23  Q.  Right?
24    MR. BRUEGGEN: Same objections.
25  /////

Page 58

1    BY MS. BONJEAN:
2  Q.  Are you -- you don't have to listen to your
3  attorney's advice, right?
4    MR. BRUEGGEN: Objection, form,
5  argumentative.
6    MS. CARNEY: Objection, argumentative.
7    BY MS. BONJEAN:
8  Q.  You understand that, right?
9    MR. BRUEGGEN: Same objections.
10    BY MS. BONJEAN:
11  Q.  You can answer, sir.
12  A.  Yes.
13  Q.  Okay.  Did you ever go to the Christmas
14  parties that are held for Chicago police detectives
15  or the Area 5 Chicago police detectives?
16  A.  Not after 2007.
17  Q.  Okay.  Now, you're a Spanish speaker, right?
18  A.  Yes, ma'am.
19  Q.  Where's your family from?
20  A.  Puerto Rico.
21  Q.  Okay.  So you -- you are Puerto Rican?
22  A.  Yes.
23  Q.  Okay.  Both parents?
24  A.  Pardon me?
25  Q.  Are both your parents Puerto Rican?

Page 59

1  A.  Yes.
2  Q.  Okay.  So did you grow up in the house
3  speaking Spanish?
4  A.  Yes.
5  Q.  Okay.  Is Spanish your first language?
6  A.  Yes.
7  Q.  Okay.  Where did you grow up?
8  A.  I was in Puerto Rico until I was 7, and then
9  the last 67 years I've been here.
10  Q.  Okay.  So you grew up speaking Spanish in
11  Puerto Rico, fair?
12  A.  Yes.
13  Q.  All right.  And do you consider yourself
14  still fluent and conversant in Spanish?
15  A.  Yes.
16  Q.  Do you speak it regularly now?
17  A.  No, ma'am.
18  Q.  All right.  Do you have children?
19  A.  Yes.
20  Q.  Did you speak Spanish to your children
21  growing up?
22  A.  No, ma'am.
23  Q.  Okay.  Now, Rey Guevara is a Spanish speaker
24  as well, correct?
25  A.  Yes, ma'am.

Page 60

1  Q.  Okay.  Also from Puerto Rico, right?
2  A.  I assume.
3  Q.  Okay.  Did you speak Spanish with one
4  another?
5  A.  No, ma'am.
6  Q.  Never?
7  A.  No, ma'am.
8  Q.  Have you ever heard Rey speak Spanish?
9  A.  Yes, ma'am.
10  Q.  And how is his Spanish?
11    MR. BRUEGGEN: Object to form,
12  foundation.
13    THE WITNESS: Speak.
14    BY MS. BONJEAN:
15  Q.  When you heard it, did you ever have any
16  troubles understanding what he was saying?
17  A.  No.
18  Q.  Okay.  Some people have said that he kind of
19  had a Spanglish or sort of a terrible type of
20  Spanish.
21  Is that something you would agree with, or
22  not really?
23    MR. BRUEGGEN: Object to form.  Go
24  ahead, sir.
25    THE WITNESS: I would agree with that.

Maysonet v.
Guevara

Video Deposition

Page 61

BY MS. BONJEAN:

1    BY MS. BONJEAN:
2    Q.  It wasn't great Spanish, right?
3    A.  No.
4    Q.  Okay.  There's been testimony in the past
5    that, for instance, Spanish speakers from Mexico
6    sometimes had a real hard time understanding him.
7    Would that track or make sense to you?
8        MR. BRENER: Objection.
9        MS. CARNEY: Objection, form.
10       MR. BRUEGGEN: Objection, form,
11   foundation.
12       MS. CARNEY: You can answer.
13       THE WITNESS: I have no idea, ma'am.
14       BY MS. BONJEAN:
15   Q.  Okay.  But you would agree that his Spanish
16   wasn't top-notch?
17       MR. BRUEGGEN: Objection, asked and
18   answered.
19       THE WITNESS: Yes.
20       BY MS. BONJEAN:
21   Q.  Okay.  Is there -- would you say that
22   there's like one dialect of Spanish from Spanish
23   speakers in Puerto Rico or even on that island
24   there are different dialects?
25       MR. BRUEGGEN: Object to form and

Page 62

1    foundation.
2        BY MS. BONJEAN:
3    Q.  If you know.
4    A.  I don't know, ma'am.
5    Q.  Okay.  Now, what did you do to prepare for
6    your deposition here today?
7    A.  I looked over documents.
8    Q.  Okay.
9    A.  Spoke with --
10   Q.  And again I'm not asking you to tell me
11   about what you spoke with your attorneys about, but
12   what did you do to prepare?
13   A.  I looked over documents that pertained to the
14   case.
15   Q.  Okay.  And I'm assuming you did speak with
16   your attorneys at some point in preparation for the
17   deposition?
18   A.  Yes.
19   Q.  Okay.  Don't tell me what was said.
20   A.  Uh-huh.
21   Q.  How many times did you meet with your
22   attorneys in preparation for your deposition today?
23   A.  Four times.
24   Q.  And where did you meet with them?
25   A.  Here.

Page 63

1    Q.  Okay.  So let's talk about the first time
2    you met with them.  How long ago was that, roughly?
3    A.  The 12th of August.
4    Q.  Okay.  Oh.
5    A.  I think it was the 12th.
6    Q.  Okay.  And apart from your attorneys and
7    yourself, was there any -- were there any other
8    people present?
9    A.  No, ma'am.
10   Q.  Okay.  And which attorney did you meet with?
11   Did you meet with anybody else?  Just by name.
12   A.  Josh.  Josh.
13   Q.  Okay.  All right.  And then you said you had
14   another meeting?
15   A.  Yes.
16   Q.  Okay.  Do you know how long -- strike that.
17   Do you know when that meeting took place?
18   A.  I think the following Monday.
19   Q.  Okay.  And how long was the first meeting?
20   A.  Just about an hour or two.
21   Q.  Okay.  And what about the second meeting?
22   A.  About the same.
23   Q.  All right.  Same people present for the
24   second meeting?
25   A.  Yes, ma'am.

Page 64

1    Q.  And what about the third meeting?
2    A.  About the same amount of time, same people.
3    Q.  Okay.  And the same for the fourth meeting?
4    A.  Yes.
5    Q.  Okay.  And as you sit here today without
6    anything in front of you, do you know what
7    documents you actually reviewed prior to your
8    deposition?
9    A.  The testimony in court.
10   Q.  Your testimony?
11   A.  Yes.
12   Q.  Okay.  So your prior testimony you reviewed?
13   A.  Yes.
14   Q.  Okay.  What else?
15   A.  Some reports.
16   Q.  Police reports?
17   A.  Yes.
18   Q.  Do you know how many police reports you
19   looked at?
20   A.  No, ma'am.
21   Q.  Okay.
22   A.  Don't recall.
23   Q.  Do you know if you looked at the
24   investigative file?
25   A.  No, ma'am.

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 65

1 Q. Okay. Just a couple of reports, is that
2 what you're saying?
3 A. Yes.
4 Q. Okay. Anything else?
5 A. No, ma'am.
6 Q. Anybody else's testimony you review?
7 A. No, ma'am.
8 Q. Okay. Mr. Montilla, how old are you
9 presently?
10 A. I'm 74-and-a-half.
11 Q. Okay. And what's your date of birth?
12     MR. BRUEGGEN: Object to form. I'm
13 sorry, let's -- does it need to be on the record?
14     MS. BONJEAN: No, it could be off the
15 record, but I'd still like to know.
16     MR. BRUEGGEN: Okay.
17     THE WITNESS: ███████████████
18     BY MS. BONJEAN:
19 Q. Okay. Now, I think you said you were born
20 in Puerto Rico. Right?
21 A. Yes, ma'am.
22 Q. What town?
23 A. Pardon me?
24 Q. What town?
25 A. I don't recall.

Page 66

1 Q. Oh, okay. Did you have a big family?
2 A. My family?
3 Q. Yeah.
4 A. No. My mother, father and two brothers.
5 Q. Okay. And at some point you came to the
6 mainland, is that right?
7 A. Yes, ma'am.
8 Q. Do you remember what year that was?
9 A. 1952.
10 Q. And when you...
11     (Off stenographic record discussion.)
12     BY MS. BONJEAN:
13 Q. Okay. When you came to the mainland, you
14 came with your family?
15 A. Yes, ma'am.
16 Q. This was parents and some siblings?
17 A. Yes.
18 Q. And where did you settle when you came over
19 here?
20 A. Chicago.
21 Q. And you were about 7, you said?
22 A. I was 7.
23 Q. Okay. Are you the oldest in your family?
24 A. No. I'm the middle.
25 Q. Middle, all right. And what part of the

Page 67

1 city did you settle in?
2 A. ███████████████
3 Q. Oh.
4 A. The west side, near west side.
5 Q. I lived there, too.
6     And this would have been in 1960, about, or
7 '59?
8 A. In what -- what respect?
9 Q. When you came to Chicago.
10     MR. BRUEGGEN: Objection, asked and
11 answered.
12     THE WITNESS: 1952, we came here.
13     MS. BONJEAN: Oh, I'm sorry. I'm
14 sorry. My apologies. You were born in '45. I
15 had -- I wrote the --
16     THE WITNESS: Yeah.
17     MS. BONJEAN: My apologies. My
18 apologies. Okay.
19     BY MS. BONJEAN:
20 Q. And was your father in law enforcement work
21 or did he do something else?
22 A. My father did something else.
23 Q. Okay. Where did you go to high school?
24 A. St. Philip's.
25 Q. Where did you go to grade school?

Page 68

1 A. Notre Dame, across the street from my house.
2 Q. I went to Notre Dame. How weird is that?
3     MS. COHEN: Do you want this on record?
4     MS. BONJEAN: Whatever. Interesting.
5     BY MS. BONJEAN:
6 Q. So you went to high school, and what year
7 did you graduate high school?
8 A. 1965.
9 Q. Okay. And upon graduating high school, what
10 did you do in terms of further education or work?
11 A. I was trying -- I was working, trying to make
12 money. My dad didn't have money to go to college
13 and I was drafted into the Vietnam War.
14 Q. Okay. What were you doing in terms of work?
15     What type of work were you doing at that time?
16 A. I think I was a driving school instructor for
17 a while.
18 Q. Uh-huh.
19 A. Sold insurance and a laborer, then I got
20 drafted.
21 Q. Okay. What year were you drafted?
22 A. December 6th, 1965.
23 Q. Okay. Army?
24 A. Yes, ma'am.
25 Q. Where did you do your basic training?

Maysonet v.
Guevara

Video Deposition

Page 69

1 A.  We learned the basics on a march, general
2   orders, fire a weapon.
3 Q.  No, no, no.  Where?  Where?
4 A.  Where?  Fort Polk, Louisiana.
5 Q.  And did you actually serve, then, in
6   Vietnam?
7 A.  Yes, ma'am.
8 Q.  Okay.  And what years were you deployed in
9   Vietnam?
10 A.  May of '65.
11 Q.  Did you do one tour?
12 A.  No, ma'am.  I did two.
13 Q.  Two, okay.
14 A.  I volunteered.
15 Q.  The second one you --
16 A.  Yes, ma'am.
17 Q.  -- stayed for.
18   And what -- what were your assignments in
19   Vietnam?
20 A.  When I first went there, I was a machine
21   gunner for the first cavalier air mobile.  They
22   mustered out.  I still had time to serve.  They sent
23   me to Saigon, and I think it was called the Koelper
24   Compound with MAC Vie, which is the Military
25   Assistance Command, Vietnam.  Then I was assigned to

Page 70

1   an advisory team and I was a radio operator.
2 Q.  Okay.  Did you do any service as a -- in
3   military police there?
4 A.  We were semi-military police there.
5 Q.  Okay.  And what were your duties as
6   semi-military police in Vietnam?
7 A.  We had to protect the compound.  We had to
8   secure it, question people coming in and everything,
9   and then we went about our other duties.
10 Q.  And what types of other duties did you have?
11 A.  Patrol and everything.
12 Q.  Okay.  Did you do any type of investigations
13   when you --
14 A.  No, ma'am.  No.
15 Q.  Okay.  Ever have an opportunity to
16   interrogate prisoners or anything of that nature?
17 A.  No, ma'am.
18 Q.  Okay.  And what rank did you leave the Army
19   with when you left in -- '67, is that right?
20 A.  Pardon me?
21 Q.  '67 you got out or --
22 A.  Yes, ma'am.  December -- September 9, 1967.
23   I was a Specialist Fourth Class.
24 Q.  Okay.  Honorably discharged, I assume?
25 A.  Yes, ma'am.

Page 71

1 Q.  Okay.  Now, after you were honorably
2   discharged from the Army, what did you do by way of
3   employment or further education?
4 A.  I went back to my old job as an assistant --
5   what was it?  I can't remember.  And they put me in
6   a little office with just a door, and I couldn't
7   stand it.  I walked out.
8 Q.  And by the way, during this time from when
9   you graduated high school to the time that you came
10   home from Vietnam, were you still single or were
11   you married or any --
12 A.  I was single.
13 Q.  Okay.  So after you walked out of the job
14   that you went back to, what did you do?
15 A.  I went in construction.
16 Q.  Okay.  And did you have any particular
17   skills in construction or were you going to learn?
18 A.  I had some skills, and I was -- basically I
19   was just a laborer and moved up to a -- I forgot
20   what they called that.  A union rep.
21   And there's another thing I did and my pay
22   went up a couple of dollars.
23 Q.  And how long did you do the construction
24   work?
25 A.  Four -- maybe four or five years.

Page 72

1 Q.  Now, during this time that you were working
2   construction, did you have thoughts of going into
3   law enforcement?
4 A.  Yes, ma'am.
5 Q.  Okay.  When did you start knowing you wanted
6   to go into law enforcement?
7 A.  1968.
8 Q.  So this was something post Vietnam,
9   right?
10 A.  Yes, ma'am.
11 Q.  It wasn't like a childhood dream or anything
12   like that?
13 A.  No, ma'am.
14 Q.  All right.  Now, in 1968, did you have to --
15   what did you have to do to apply for a position
16   with the Chicago Police Department?
17 A.  Took a test.
18   MR. BRUEGGEN: Object to foundation.
19   BY MS. BONJEAN:
20 Q.  Okay.  And did you do that?
21 A.  Yes, ma'am.
22 Q.  Did you apply to any other law enforcement
23   agencies?
24 A.  No, ma'am.
25 Q.  Just Chicago?

Rizman Rapparort (973)992-7650
"When every word counts"

Page 73

1  A.  Yeah, Chicago Fire Department.  That was it.
2  Q.  Did you take the test more than once or just
3  once?
4  A.  I took the police department three times.
5  Q.  Okay.  And how did it work back then?  Did
6  you get on some type of list after you take it, and
7  if you didn't get a job, the list might expire or
8  something?
9  A.  I was on a list.  Then I was told that I
10  cannot be a policeman because I had warrants.  Never
11  had a warrant in my life.  Never been arrested.  So
12  my investigator investigated it.  So he says take
13  the test again.  They try to do that -- they did
14  that twice to me.  The third time I made it.  They
15  gave up.  I didn't have no warrants.  So I came on
16  the job in '73.
17  Q.  Who told you you had warrants?
18  A.  The police department.
19  Q.  And it was your understanding that you did
20  not have any warrants?
21  A.  That's correct.
22  Q.  Okay.  Do you know -- did you ever find out
23  why they thought you had warrants?
24  A.  No, ma'am.
25  Q.  Did you ever have an opportunity to look at

Page 74

1  your IR history, your criminal history?
2  A.  I never had an IR.
3  Q.  Uh-huh.  So never got to the bottom of it,
4  huh?
5  A.  No, ma'am.
6  Q.  But third time's a charm and they ultimately
7  gave you a job with the department?
8  A.  Yes, ma'am.
9  Q.  And that would have been in '73?
10  A.  Well, I went in in '76.  They gave me three
11  years back because of I was trying for all that
12  time, so they put me back to 1973 instead of '68,
13  '69.
14  Q.  Gotcha.
15  A.  I didn't mind.
16  Q.  So they kind of acknowledged that they had
17  made a mistake?
18  A.  Yes, ma'am.
19  Q.  All right.  So the system had some type of
20  error, huh?
21  A.  Yes, ma'am.
22  MR. BRUEGGEN: Object to form,
23  foundation.
24  BY MS. BONJEAN:
25  Q.  Did you make any enemies in the police

Page 75

1  department?
2  A.  Pardon me?
3  Q.  I said:  Did you have some enemies in the
4  police department?
5  A.  No, ma'am.
6  MR. BRENER: Foundation.
7  MR. BRUEGGEN: Object to form.
8  THE WITNESS: Can I take a walk for a
9  minute?
10  MS. BONJEAN: Of course.  Take a break.
11  THE VIDEOGRAPHER: We're going off the
12  record at 12:01 p.m.
13  (Recess taken from 12:01 to 12:16.)
14  THE VIDEOGRAPHER: We are now back on
15  the record at 12:16 p.m.
16  BY MS. BONJEAN:
17  Q.  Mr. Montilla, why did you become a Chicago
18  police officer?
19  A.  Just out there in my mind.  That's all.
20  Q.  Nothing -- nothing else, just --
21  A.  Benefits.
22  Q.  Good job?
23  A.  The benefits was more -- that counted more.
24  I think that was it.
25  Q.  Okay.  Now, after you were hired by the

Page 76

1  Chicago Police Department, did you attend a police
2  academy?
3  A.  Yes, ma'am.
4  Q.  And were you a part of a particular class?
5  A.  Yes, ma'am.
6  Q.  What was the class?  What year or date?
7  A.  '76 something.  I don't remember.
8  Q.  Okay.  Now, did you attend the police
9  academy with any of the other defendants in this
10  case?
11  A.  No, ma'am.
12  Q.  Do you know who all the defendants are in
13  this case?
14  A.  Did I know, ma'am?
15  Q.  Do you know who all the defendants are in
16  this case?
17  A.  I think I named them all.  I'm not sure.
18  Q.  We'll go over them just so we're on the same
19  page.
20  You know, of course, that Rey Guevara is one
21  of the defendants?
22  A.  Yes, ma'am.
23  Q.  And Sergeant Mingey is one of the
24  defendants?
25  A.  Yes, ma'am.

---

Page 77

1 Q. And did you know that Roland Paulnitsky is
2 one of the defendants?
3 A. Who, ma'am?
4 Q. Paulnitsky?
5 A. Yes, ma'am.
6 Q. And Ernie Halvorsen is one of the
7 defendants?
8 A. Yes, ma'am.
9 Q. Okay. And it's your testimony that
10 you did --
11 MS. COHEN: Epplen.
12 MS. BONJEAN: Huh?
13 MS. COHEN: Lee Epplen.
14 BY MS. BONJEAN:
15 Q. oh, and Sergeant Lee Epplen is one of the
16 defendants?
17 A. I didn't know that.
18 Q. Okay. I apparently forgot, too.
19 Am I fair -- is it fair to say that you did
20 not go to the police academy with any of those
21 individuals?
22 A. That is correct.
23 Q. Okay. Do you know whether you joined the
24 department before Rey Guevara did or after?
25 A. I don't know, ma'am.

---

Page 78

1 Q. Okay. Now, do you remember any of the
2 training you received at the police academy?
3 A. Yes, ma'am.
4 Q. Tell me about it. What type of training did
5 you get?
6 A. Report writing, law. We learned about the
7 law, report writing.
8 Q. What do you remember about report writing,
9 this training you received?
10 A. The general reports, how to make a report,
11 what you have to really put in there.
12 Q. And what did they teach you about that?
13 A. Pardon me?
14 Q. What did they teach you about report
15 writing?
16 A. Just a summary, that you made a summary. You
17 didn't write word for word everything you did, just
18 a summary relating what -- what happened on the
19 street, what the person told you.
20 Q. Was it conveyed to you that it was important
21 to be accurate?
22 A. Yes, ma'am.
23 Q. Okay. And was it important to document when
24 witnesses or people told you things that were
25 relevant to an incident or a crime?

---

Page 79

1 MS. CARNEY: Objection, form.
2 THE WITNESS: That was in the detective
3 division.
4 MS. BONJEAN: Okay. We'll get there.
5 BY MS. BONJEAN:
6 Q. What else did you learn in the police
7 academy?
8 A. Well, I learned how to make reports, you
9 know, an accident report, regular reports, auto
10 theft reports. We learned how -- well, we had to do
11 calisthenics and everything.
12 Q. Physical requirements?
13 A. Yes, ma'am. We had to run and...
14 Q. Did you receive any training in the police
15 academy on how to interview witnesses?
16 A. No, ma'am.
17 Q. Okay. What about interviewing or
18 questioning suspects?
19 A. No, ma'am.
20 Q. Okay. Did you receive any training on when
21 you were supposed to memorialize your policing
22 activities?
23 A. What do you mean "memorialize"? I don't
24 understand.
25 Q. Did you receive any training on when you

---

Page 80

1 were supposed to document your policing activities
2 or your work?
3 A. In the detective division.
4 Q. Okay. Now, after you graduated from the
5 police academy, what was your first assignment in
6 the department?
7 A. I made detective in 1980.
8 Q. After you graduated from the police
9 academy --
10 A. Oh, I went Monroe Street.
11 Q. Monroe --
12 A. 12th district.
13 Q. Okay. 12th district.
14 A. Yes, ma'am.
15 Q. Patrol?
16 A. Yes, ma'am.
17 Q. What were your duties and responsibilities
18 as a patrol officer in the 12th district?
19 A. Patrol my beat.
20 Q. Was that an on-foot patrol or in-car?
21 A. Car.
22 Q. Did you have a partner?
23 A. Yes.
24 Q. Who was your partner?
25 A. I had a field training officer, Houlihan.

---

Maysonet v.
Guevara

Video Deposition

---

Page 81

1 Q. Houlihan.
2 A. Yes, ma'am.
3 Q. And could you put a time frame on this for
4 me. When did you start in the 12th district?
5 A. I think six months after I went in.
6 Q. So are we into 1974?
7 A. I -- well, '76 is when I really went in.
8 Q. Right.
9 A. So figure it was, I think, May. I don't
10 remember what time, but I know I was six -- I think
11 we went six months in the academy.
12 Q. Do you know how long you were assigned to
13 the 12th district?
14 A. I went there until I made detective in 1980.
15 Q. Okay. And from the time that you were in
16 the department to the time you made detective, were
17 you always at the 12th district?
18 A. Yes, ma'am.
19 Q. Always in patrol?
20 A. Yes, ma'am.
21 Q. And where geographically is the 12th
22 district located?
23 A. That's -- the 12th district is on Monroe and
24 Racine, and we covered an area from Fulton south to
25 almost Cermak, and from Western east to Halsted or

---

Page 82

1 Canal.
2 Q. Now, when you were at the 12th district, did
3 you have an occasion to work with any of the
4 defendants who are named in this case?
5 A. No, ma'am.
6 Q. Now, at some point you said you became a
7 detective. Right?
8 A. Yes, ma'am.
9 Q. Tell me what the -- what was the process to
10 become a detective.
11 A. I took a test, but I was promoted
12 meritoriously.
13 Q. Okay. And tell me what it means to be
14 promoted meritoriously.
15 A. You're doing a great job, you're performing,
16 everything is being done, and they -- they rate you
17 on all your activities, your report writing,
18 whatever activities you had, and then you become a
19 detective.
20 Q. Okay. Is there another way to become a
21 detective?
22 A. Yes, ma'am, by taking a test.
23 Q. Okay. And how does that process work?
24     MR. BRUEGGEN: Object to foundation, if
25 you know.

---

Page 83

1     BY MS. BONJEAN:
2 Q. If you know.
3 A. Same, I think.
4 Q. Do you have to score a certain number on the
5 test?
6 A. Yes, ma'am.
7 Q. All right. And is there, then, a list of
8 people who are ranked based on how well they did on
9 the test?
10     MR. BRUEGGEN: Object to foundation.
11 If you know.
12     THE WITNESS: I think so.
13     BY MS. BONJEAN:
14 Q. Okay. That's not how you were promoted,
15 correct?
16 A. No, ma'am, that's correct.
17 Q. And can we agree that when you went from
18 your patrol position to detective, that was a
19 promotion?
20 A. Yes, ma'am.
21 Q. Okay. And were there certain benefits that
22 went along with being promoted to detective?
23 A. No, ma'am, no benefits.
24 Q. Any raise -- any pay raise?
25 A. Oh, yeah. We got a pay raise, yeah.

---

Page 84

1 Q. Oh, okay.
2 A. Okay.
3 Q. But no -- apart from your pay raise, there
4 were no other perks?
5 A. No, ma'am.
6 Q. Okay. You didn't get your own, like, car or
7 anything like that --
8 A. No, ma'am.
9 Q. -- to drive around? Okay.
10 Now, you said you became detective in 1980?
11 A. Yes, ma'am.
12 Q. All right. After you were meritoriously
13 promoted to detective in 1980, did you have to
14 attend a detective school?
15 A. The academy.
16 Q. Okay. And how long was the detective
17 academy?
18 A. I think I was there a month.
19 Q. Now, are any of the defendants who are named
20 in this case -- strike that.
21 Were any of the defendants who are named in
22 this case in your detective academy?
23 A. No, ma'am.
24 Q. Okay. Now, what types of training did you
25 receive in the detective academy? What I mean --

---

Maysonet v.
Guevara

Video Deposition

Page 85

1  what I mean "what types," I mean how was it taught?
2  Was there classroom instruction, for instance?
3  A.  We had other detectives that were real
4  knowledgeable.  We learned from them.
5  Q.  Okay.  And did they teach you in like a
6  lecture setting?
7  A.  In a what?
8  Q.  Lecture, a lecture setting.
9  A.  Yes, we had lectures and everything.
10 Q.  Okay.  Did you have in-field simulations or
11 anything?  How did it -- how did it work?
12 A.  We went -- we went --
13     MR. BRUEGGEN: Object to form.  Go
14 ahead and answer.
15     THE WITNESS: We learned basically how
16 to make detective division reports.
17     MS. BONJEAN: Okay.
18     THE WITNESS: How to investigate, how
19 to look for evidence.
20     BY MS. BONJEAN:
21 Q.  Okay.  And was that done mostly through
22 other detectives teaching you and telling you how
23 to do that or were there other ways in which you
24 were taught that?
25 A.  They taught us and they -- how to

Page 86

1  investigate, what to look for in a crime scene.
2  Q.  Right.  I'm going to ask you about all that.
3  I'm just trying to understand, was this all in a
4  classroom setting?
5  A.  Yes, ma'am.  Just in a classroom, yeah.
6  Q.  Okay.  Okay.  Now, you said that you were
7  taught about report writing in the detective
8  division?
9  A.  Yes, ma'am.
10 Q.  Okay.  What did you -- what do you remember
11 about the report writing training that you received
12 when you attended the detective police academy?
13 A.  Basically that you make sure you get the age
14 of the person you're interviewing, if they're
15 working or not, what happened during the crime.
16 They tell you what happened.  You list that on the
17 narrative.  And if -- how to get -- if you gather
18 evidence, you make a report on the evidence.
19 Q.  And were you instructed to document in a
20 report what investigative conduct you took in a
21 particular case?
22     MS. CARNEY: Objection, form.
23     THE WITNESS: That came later on.
24     BY MS. BONJEAN:
25 Q.  When did that come?

Page 87

1  A.  I -- I don't -- I know it was years later,
2  they introduced something.
3  Q.  Okay.  Well, let's talk about -- let's first
4  focus on what you learned in the detective academy.
5  Am I calling that right?  Do you call it detective
6  academy or...
7  A.  No, just the academy.
8  Q.  Okay, just the academy, but it was specific
9  training for detectives, right?
10 A.  Yes, ma'am.
11 Q.  So when you were attending the academy for
12 your training to become a detective, you've
13 testified that you received instruction on report
14 writing.  Correct?
15 A.  Yes, ma'am.
16 Q.  And as part of that instruction, were you
17 taught to prepare reports in and around the time or
18 contemporaneous with whatever event you were
19 documenting?
20 A.  Yes, ma'am.
21     MR. BRUEGGEN: Object to form.
22     THE WITNESS: Okay.  Yes, ma'am.
23     BY MS. BONJEAN:
24 Q.  Yeah.  Was it conveyed to you the importance
25 of doing -- of reporting an event as close to the

Page 88

1  time as possible of when it happened?
2      MS. CARNEY: Object to form.
3      MR. BRUEGGEN: Object to form.
4      THE WITNESS: Yes, ma'am.
5      BY MS. BONJEAN:
6  Q.  So, for instance, if you were interviewing a
7  witness to a crime, you would want to document what
8  that witness told you in a report as soon as
9  possible so that it would be accurate, right?
10 A.  Yes, ma'am.
11     (Simultaneous objections from counsel.)
12     THE REPORTER: Wait, wait, wait.
13     MS. CARNEY: Form.
14     MR. BRENER: Incomplete hypothetical.
15     THE WITNESS: Can you repeat the
16 question, please?
17     MS. BONJEAN: Sure.
18     BY MS. BONJEAN:
19 Q.  Were you taught during the training that it
20 was important to report, for instance, what a
21 witness may have told you as soon as possible?
22     MR. BRUEGGEN: Same objections.
23     MR. BRENER: Same objection.
24     THE WITNESS: Yes, ma'am.
25 /////

Page 89

BY MS. BONJEAN:
1 
2 Q. Okay. And why is that?
3 A. Pardon me?
4 Q. And why would that be? Why is it important
5 to document an interview with a suspect, for
6 instance, or a witness in -- as close as time as
7 possible to when they gave you that information?
8     MR. BRUEGGEN: Object to form.
9     THE WITNESS: For court purposes.
10     BY MS. BONJEAN:
11 Q. What do you mean by that?
12 A. In case you have to go to court and need the
13 witness and the witness has to be interviewed by a
14 states's attorney, the -- you have everything that
15 they stated there.
16 Q. Right. My question's a little different.
17 I think you testified that one of the
18 instructions you received when you were at the
19 academy was that when you are, for instance,
20 interviewing a witness, you want to make a report
21 of what that witness told you, right?
22 A. That's correct.
23 Q. Okay. And you don't want to wait a week or
24 two weeks to make that report. You want to make
25 that report as close in time as when they gave you

Page 90

1 the information, right?
2 A. That is --
3     MR. BRUEGGEN: Object to form and
4 incomplete hypothetical. Go ahead.
5     MR. BRENER: Join.
6     THE WITNESS: That is correct.
7     BY MS. BONJEAN:
8 Q. Okay. And why is it important to prepare
9 your report in as close proximity to the time that
10 they conveyed the information to you -- why is that
11 important or what were you taught about why that
12 was important?
13     MR. BRUEGGEN: Objection, compound and
14 asked and answered.
15     THE WITNESS: Because you -- you can't
16 hold information in your brain for two months. You
17 have to write it down right away, and then you
18 document it.
19     MS. BONJEAN: Right.
20     BY MS. BONJEAN:
21 Q. So -- and what else do you remember about
22 being -- about report writing or what was taught to
23 you about report writing when you went to the
24 academy?
25 A. Just the basic information that you have to

Page 91

1 get, how to write that report and make sure you --
2 you put things chronologically, and that's what we
3 did.
4 Q. Okay. What else do you remember about the
5 training you received at the academy when you were
6 there for your detective training?
7 A. Typing, learned how to type, learned how to
8 use the computer.
9 Q. Did you learn how to investigate?
10 A. Not in the -- not for patrol, no.
11 Q. In detective school, though -- I thought we
12 were talking about detective school.
13 A. I thought you were talking about the
14 original, when I first went to the academy.
15 Detective school, you're trained different.
16 Q. Yeah. I was saying detective school --
17 A. Oh, I'm sorry. I missed it someplace.
18 Q. -- and you said -- and I asked you if that
19 was how I should refer, and you said, no, just the
20 academy, so we got off track. Okay.
21 A. Yeah.
22 Q. Let's -- I'm talking specifically in
23 1980-ish --
24 A. Yeah.
25 Q. -- when you went to the academy for your

Page 92

1 detective training. Okay?
2 A. Yes.
3 Q. Okay. You received additional training as
4 it relates to preparing reports, correct?
5 A. Yes.
6 Q. Okay. And part of that training was that
7 you wanted to document important information in an
8 investigation, right?
9 A. That is correct.
10 Q. And would you agree that if a witness tells
11 you some information, that would be important
12 information to document?
13     MR. BRUEGGEN: Objection.
14     MS. CARNEY: Objection, form.
15     MR. BRUEGGEN: Incomplete hypothetical.
16     MR. BRENER: Join.
17     MR. SCHALKA: Join.
18     THE WITNESS: Yes.
19     BY MS. BONJEAN:
20 Q. Okay. And, for instance, if a suspect told
21 you some information about the crime, that would be
22 important information to document?
23     MR. BRENER: Incomplete hypothetical.
24     MR. BRUEGGEN: Same objections.
25     THE WITNESS: Yes.

Maysonet v.
Guevara

Video Deposition

Page 93

BY MS. BONJEAN:

1 BY MS. BONJEAN:
2 Q. Okay. And certainly if a suspect admitted
3 to a crime, you would want to document that, right?
4 MR. BRUEGGEN: Same objections.
5 MR. BRENER: Join.
6 THE WITNESS: Yes, ma'am.
7 BY MS. BONJEAN:
8 Q. Okay. Or if a witness or a suspect said
9 somebody else was involved in a crime, you would
10 want to document that, right?
11 A. Yes, ma'am.
12 Q. Okay. And that's all -- that type of
13 training is training you received in the detective
14 program that you attended in the academy, right?
15 A. Yes.
16 Q. Okay. And, also, I think you testified to
17 this, but let me just clarify that as part of that
18 training, it's important to document information
19 relevant to an investigation as soon as you can?
20 MR. BRUEGGEN: Objection, asked and
21 answered.
22 MS. CARNEY: Objection, form.
23 THE WITNESS: Yes, ma'am.
24 BY MS. BONJEAN:
25 Q. Okay. Now, at the detective school or

Page 94

1 detective training that you received, did you learn
2 about conducting investigations?
3 A. Yes.
4 Q. Okay. And what do you remember about the
5 training you received as it relates to conducting
6 investigations?
7 A. I went to Area 4. I was working as a -- as a
8 burglary detective. The burglary detectives, I
9 would work with one and the other, and they would
10 show me how to make the reports, how to -- if you
11 have an arrest, officers make an arrest, how to
12 contact the State's Attorney, how to present the
13 case.
14 Q. Okay. When you were in the training
15 program, did they teach you how to interview
16 witnesses?
17 A. Yes.
18 Q. Okay. Did you learn how to conduct lineups?
19 A. Yes.
20 Q. Okay. Is that something you learned in the
21 detective training in the academy?
22 A. Yes, ma'am.
23 Q. Okay. Did -- were you taught how to
24 document lineups or create reports when you
25 conducted a lineup?

Page 95

1 A. Yes.
2 Q. What about interrogating or questioning
3 suspects, did you receive any training in -- on
4 that when you were -- went to the academy for your
5 detective school?
6 A. Yes.
7 Q. What other investigative strategies or
8 tactics did you receive training on when you were
9 at the academy, if you -- if you can come up with
10 any others?
11 MS. CARNEY: Just to clarify, we're
12 still in the detective?
13 MS. BONJEAN: Yeah, uh-huh.
14 THE WITNESS: As a detective?
15 MS. BONJEAN: Correct.
16 THE WITNESS: How to gather evidence,
17 how to view a crime scene, what to document, call
18 in -- if you need a -- an evidence technician or if
19 you needed the crime lab, you have to make all
20 these calls, and you have to document everything,
21 when you made the contact, who came out, what they
22 did, and you document everything.
23 BY MS. BONJEAN:
24 Q. Would you agree that learning how to
25 document an investigation was an important part of

Page 96

1 your training when you were at the police academy
2 in the detective training?
3 A. Oh, yes.
4 MR. BRUEGGEN: Object to form.
5 THE WITNESS: Yes.
6 BY MS. BONJEAN:
7 Q. Okay. Something that sounds like it was
8 emphasized a great deal when you were at the
9 training?
10 MR. BRUEGGEN: Object to form.
11 THE WITNESS: Yes.
12 BY MS. BONJEAN:
13 Q. Now, did you learn things like how to
14 develop a theory about the case or how to follow
15 leads or any of those things when you were in the
16 detective division, or is that something more on
17 field -- in-field training or on-the-job training?
18 MR. BRUEGGEN: Object to form,
19 compound.
20 THE WITNESS: It's probably in-field,
21 you know, when you're out there.
22 BY MS. BONJEAN:
23 Q. Okay. I mean, you know -- you know, for
24 example, what a motive is, right?
25 A. Yes.

Maysonet v.
Guevara

Video Deposition

Page 97

1 Q. And can motive evidence be important
2 evidence?
3 A. Yes.
4 Q. Okay. So -- and would you agree that it's
5 important to try to learn the motive of a crime, it
6 helps you solve the crime?
7 MR. BRUEGGEN: Objection.
8 MR. BRENER: Objection, hypothetical.
9 MS. CARNEY: Object to form.
10 THE WITNESS: Yes.
11 BY MS. BONJEAN:
12 Q. Okay. And when you were receiving your
13 training in the academy, is that -- is subject
14 matter like that discussed or was that more sort of
15 once you're on the job?
16 MR. BRUEGGEN: Object to form.
17 THE WITNESS: Once you're on the job.
18 MS. BONJEAN: Yeah.
19 BY MS. BONJEAN:
20 Q. Would you agree that the goal of an
21 investigation is to find the bad guy?
22 MR. BRUEGGEN: Object to form.
23 THE WITNESS: Yes.
24 BY MS. BONJEAN:
25 Q. To find the perpetrator of the crime?

Page 98

1 A. Yes.
2 Q. Okay. By the way, who was your supervisor
3 at the 12th district? I know I'm going backwards a
4 way.
5 A. I don't remember, ma'am.
6 Q. Okay.
7 A. That's a long time ago.
8 Q. Okay. Was -- when you were at the 12th
9 district, do you remember being supervised by
10 Sergeant Mingey at all at the 12th district?
11 A. Never met Sergeant Mingey.
12 Q. Okay. You mean until Area 5?
13 A. Until Area 5, yes.
14 Q. Okay. What about Lee Epplen, did he ever
15 supervise you prior to Area 5?
16 A. No, ma'am.
17 Q. Okay. So you were meritoriously promoted in
18 1980 to detective, you attended the training, and
19 then you were assigned somewhere, correct?
20 A. Yes.
21 Q. Okay. Where were you assigned?
22 A. Area 4, burglary, Harrison and Kedzie.
23 Q. When you were a new detective, do you
24 have -- is there like a field training process as
25 well?

Page 99

1 A. No, ma'am.
2 Q. Okay. Do you have any type of, sort of,
3 direct supervisor or someone that is looking after
4 your activities?
5 MR. BRUEGGEN: Object to form.
6 THE WITNESS: We have supervisors, yes.
7 BY MS. BONJEAN:
8 Q. Okay. But nothing specific to being a
9 rookie detective, right?
10 A. No, ma'am.
11 Q. Okay. Now, when you were assigned to Area 4
12 at Harrison and Kedzie, did you get a partner?
13 A. Once in a while.
14 Q. All right. And, again, would that be in
15 1980 that you went to Area 4?
16 A. Yes.
17 Q. And tell me again what type of crimes you
18 were investigating.
19 A. Burglary.
20 Q. Did it -- did Area 4 -- was that part of
21 property crimes?
22 A. We had -- at that time we had burglary, auto
23 theft, the rape unit, homicide, robbery. That's how
24 it was categorized at that time.
25 Q. All different units --

Page 100

1 A. Yes, ma'am.
2 Q. -- within Area 4?
3 A. Different detectives.
4 Q. Hold on one second. Let me -- just so the
5 record's clear.
6 All of those categories of crimes that you
7 just provided to us, there were different units
8 within Area 4 that investigated those separate
9 crimes?
10 A. Yes, ma'am.
11 Q. Okay. And at some point did that change?
12 A. Yes, ma'am.
13 Q. Okay. Do you remember when?
14 A. No, ma'am. In the, I think, the late '80s.
15 I'm not sure.
16 Q. It went -- it went to property crimes and
17 violent crimes, is that -- is that right?
18 A. Yes, ma'am.
19 Q. Okay. But in 1980, you were assigned to
20 Area 4 and specifically assigned to the burglary
21 unit, is that fair?
22 A. Correct.
23 Q. And do you recall who your supervisor was
24 when you first went to Area 4?
25 A. No, ma'am. I can't recall his name.

Maysonet v.
Guevara

Video Deposition

Page 101

1  Q.  Okay.  That's fine.
2    How long were you at Area 4?
3  A.  I was there a couple of years.
4  Q.  Always in burglaries?
5  A.  Yes, ma'am.
6  Q.  All right.  And then where did you go after
7    you were in Area 4, in burglaries, for a couple
8    years?
9  A.  Area 1, 51st and Wentworth.
10  Q.  What I meant to ask you is:  When you were
11    at Area 4, did you happen to work with any of the
12    detectives who are named in this case?
13  A.  No, ma'am.
14  Q.  Okay.  You went to Area 1 at 51st and
15    Wentworth.  What unit did you work in then?
16  A.  Burglary again.
17  Q.  Did you like working burglaries?
18  A.  Yes, ma'am.
19  Q.  Why?
20  A.  Because it's -- I don't know.  You're looking
21    for an unknown without -- unless you can find
22    evidence, fingerprints, motive of operandi, point of
23    entry, what they did.  You document everything.
24  Q.  Did you enjoy the process of trying to find
25    who was responsible through these different

Page 102

1    investigative --
2  A.  Yes, ma'am.
3  Q.  And how long did you work at Area 1 in
4    burglaries?
5  A.  Let me see.
6    Seven years.
7  Q.  So does that take us to close to like 1989?
8  A.  Something like that.
9  Q.  Do you remember who your supervisors were at
10    Area 1?
11  A.  Well, my only supervisor I remember the most
12    was Sergeant Carl Merritt.
13  Q.  And I assume none of the defendants in this
14    case were at Area 1 when you were there?
15  A.  That's correct.
16  Q.  Okay.  When you were at Area 4 or at Area 1,
17    did you do any gang crimes investigations or
18    anything like that?
19  A.  No, ma'am.
20  Q.  Just all burglaries, right?
21  A.  Just burglary.
22  Q.  And would it be fair to say that after
23    whatever training you received in the academy to
24    become a detective, you received on-the-job
25    training after that?

Page 103

1  A.  Some.
2  Q.  Did you have like in-service trainings?
3  A.  No, ma'am, not that much there.
4  Q.  Okay.  Learned by doing, I suppose?
5  A.  Yeah, basically on your own.
6  Q.  Okay.  And when you were working at Area 4
7    and then Area 1, you were in plain clothes, I
8    assume.  Right?
9  A.  Yes, ma'am.
10  Q.  And did you have a partner during your time
11    at Area 1 for any portion of those seven years?
12  A.  Once in a while.
13  Q.  Anyone that stands out as someone who
14    you were with for an extended period of time?
15  A.  One guy I remember, Roman.  I can't remember
16    his last name.  Most of them are all dead, so...
17  Q.  Okay.  So after Area 1, you went to Area 5,
18    is that right?
19  A.  Yes, ma'am.
20  Q.  All right.  What year was that?
21  A.  Well, from 2007, go back 20 years, so that
22    would be seven and -- '80 something, I think it was.
23    20 years I did in Area --
24  Q.  '89?
25  A.  I think so, yeah.  I did 20 years in Area 5.

Page 104

1  Q.  Okay.
2  A.  Or 27 years.  Oh, no, I was 27 years as a
3    detective, I'm sorry.  20 years in Area 5.
4  Q.  Okay.  And when you went to Area 5 in, I'm
5    approximating, 1989, what unit were you assigned
6    to?
7  A.  Property crimes.
8  Q.  Okay.  And at that point, there had been a
9    switch in how the areas were organized, is that
10    right?
11  A.  That is correct.
12  Q.  Okay.  And Area 5 had a violent crimes
13    division?
14  A.  Yes.
15  Q.  And then it had a property crimes division?
16  A.  Correct.
17  Q.  And property crimes, did that involve
18    burglaries?
19  A.  Yes, ma'am.
20  Q.  What other type of crimes constituted
21    property crimes at Area 5?
22  A.  Shoplifting theft, auto theft, a few other.
23    I don't remember all of them.
24  Q.  Okay.  And then violent crimes was -- were
25    homicides, right?

Maysonet v.
Guevara

Video Deposition

Page 105

1  A.  Homicide, robbery, and criminal sexual
2  assault, criminal sexual cases.
3  Q.  Okay.  Now, when you got to Area 5, was
4  Detective Guevara there as well already?
5  A.  No, ma'am.
6  Q.  He came after you?
7  A.  Yes, ma'am.
8  Q.  He was meritoriously promoted after you,
9  right?
10  A.  I don't know.
11     MR. BRUEGGEN: Object to foundation.
12     BY MS. BONJEAN:
13  Q.  Was Sergeant Mingey working at Area 5 when
14  you were assigned there?
15  A.  No, ma'am.
16  Q.  What about Lee Epplen?
17  A.  I think he was midnight sergeant, I think.
18  Q.  And Detective Paulnitsky, was he there?
19  A.  I don't recall.
20  Q.  What about Ernie Halvorsen?
21  A.  I think Ernie was there.  I'm not sure.
22     (Off stenographic record discussion.)
23     BY MS. BONJEAN:
24  Q.  So to the best of your recollection, maybe
25  Sergeant Epplen and Ernie Halvorsen were at Area 5

Page 106

1  when you got there?
2  A.  Yes, ma'am.
3  Q.  All right.  And you're not sure about the
4  others, right?
5  A.  No, ma'am.
6  Q.  Either at the training at the academy to
7  become a detective or in your years as a detective
8  before coming to Area 5, did you learn how to put
9  together photo arrays?
10     MS. CARNEY: Objection, form.
11     THE WITNESS: Yes.
12     BY MS. BONJEAN:
13  Q.  Okay.  And, again, if you assembled a photo
14  array for a witness to look at, were you instructed
15  to memorialize or report that you had shown a
16  witness a photo array?
17  A.  Yes, ma'am.
18  Q.  And were you required to document what the
19  outcome of showing a witness the photo array?
20  A.  Yes, ma'am.
21  Q.  Would that be true if you were showing
22  witnesses mug books?
23  A.  Yes.
24  Q.  Okay.  Were you required to document when
25  you showed an off -- strike that.

Page 107

1  Were you required to document when you
2  showed a witness a book of mug shots?
3  A.  Yes.
4     MS. CARNEY: Objection, form.
5     MR. BRUEGGEN: Objection, form.
6     THE WITNESS: Yes, ma'am.
7     BY MS. BONJEAN:
8  Q.  And were you required to document that
9  irrespective of whether they identified somebody or
10  didn't identify somebody?
11     MR. BRUEGGEN: Object to form.
12     MS. CARNEY: Join.
13     BY MS. BONJEAN:
14  Q.  You can answer.
15  A.  Yes, ma'am.
16  Q.  So even if someone looked at a photo array
17  and didn't identify somebody, you were still
18  expected to document that in a report, right?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: Yes.
21     BY MS. BONJEAN:
22  Q.  Okay.  Can I assume that's true of doing
23  live lineups as well?
24     MR. BRUEGGEN: Object to form.
25     THE WITNESS: Yes, ma'am.

Page 108

1     BY MS. BONJEAN:
2  Q.  If you assemble a lineup and have a witness
3  look at a lineup, you were expected to document
4  that lineup, right?
5     MR. BRUEGGEN: Object to form.
6     THE WITNESS: Yes, ma'am.
7     BY MS. BONJEAN:
8  Q.  And that would be true whether or not the
9  witness identified someone from the lineup or not,
10  right?
11     MR. BRUEGGEN: Object to form.  Go
12  ahead.
13     THE WITNESS: That is correct.
14     BY MS. BONJEAN:
15  Q.  And of course, if they did identify someone
16  from the lineup, you were expected to document
17  that, correct?
18  A.  That is correct.
19  Q.  And that's even if they didn't identify the
20  suspect, right?
21  A.  Correct.
22  Q.  And in your time as a detective, did you
23  follow that rule?
24  A.  Did I do it?
25  Q.  When you were a detective, did you follow

Maysonet v.
Guevara

Video Deposition

Page 109

1  the rule of documenting all of the investigative
2  procedures --
3  A.  Yes, ma'am.
4  Q.  -- that you took --
5      MR. BRUEGGEN: Object to form.
6      MS. BONJEAN: Okay.  I didn't finish my
7  question, so --
8      MR. BRUEGGEN: I know, but he was
9  answering.  I'm sorry.
10     MS. BONJEAN: Okay.
11     MR. BRUEGGEN: Why don't we try it
12  again.
13     BY MS. BONJEAN:
14  Q.  I'm talking specifically about
15  identification, investigative tools such as lineups
16  and photo arrays that we just discussed.  Okay?
17  In your time as a detective, did you always
18  document when you showed someone a photo array?
19     MR. BRUEGGEN: Object to form.
20     MS. CARNEY: Object to form.
21     THE WITNESS: That's correct.
22     BY MS. BONJEAN:
23  Q.  Okay.  And when -- when you showed a witness
24  a lineup, did you always document that?
25     MR. BRUEGGEN: Same objection.

Page 110

1      THE WITNESS: That's correct.
2      BY MS. BONJEAN:
3  Q.  I'm going to -- I want to ask you a couple
4  questions moving forward and then we're going to go
5  backwards, but you said you were at Area 5 for 20
6  years.  Right?
7  A.  Yes, ma'am.
8  Q.  Were you in property crimes the entire time
9  you were there?
10  A.  No, ma'am.
11  Q.  Well, where did you go and when did you go
12  there?
13  A.  When I was in property crimes, they moved me
14  into the violent crime.  I can't remember what year,
15  because I was doing a lot of interpreting and I was
16  handling a lot of robberies while I was working in
17  property crimes, and they wanted me to come to
18  the -- to the violent crimes.
19  Q.  Do you know when you switched to violent
20  crimes?
21  A.  No, ma'am.  Maybe, I don't know, five, six
22  years after, seven years later.  I can't remember.
23  Q.  Okay.  So into the '90s, though, right?
24  A.  That could be, yes, ma'am.
25  Q.  Okay.  It wasn't in your first two years

Page 111

1  there, is that right?
2  A.  No, ma'am.
3  Q.  Did you ever -- and part of violent crimes
4  would have also been homicide investigations,
5  right?
6  A.  I didn't do the homicide investigations at
7  first.
8  Q.  Got it.
9  When you first went to violent crimes some
10  time in the '90s, you did mostly robberies, is that
11  right?
12  A.  Yes, ma'am.
13  Q.  All right.  And did you have the opportunity
14  to work with the gang crimes units when you were at
15  Area 5?
16  A.  No, ma'am.
17  Q.  All right.  Okay.  I want to specifically
18  ask you about Area 5 a little bit in -- again, I
19  want to use the time frame around 1990, okay,
20  when -- I guess that's shortly after you were
21  assigned there.  Is that right?
22  A.  Yes.
23  Q.  Okay.  Where was Area 5 located?
24  A.  Grand and Central.  5555 West Grand Avenue.
25  Q.  And Grand and Central housed the violent

Page 112

1  crimes unit, right?
2  A.  How what, ma'am?
3  Q.  It housed, it was where Area -- violent
4  crimes was, right?
5  A.  Yes, ma'am.
6  Q.  Okay.  And property crimes, correct?
7  A.  And property crimes.
8  Q.  Was there a district there as well, like
9  police --
10  A.  Downstairs, the 25th district.
11  Q.  So it was in the same building?
12  A.  Yes, ma'am.
13  Q.  So there was a downstairs.  Can I assume
14  there was an upstairs as well?
15  A.  Yes, ma'am.
16  Q.  And what was upstairs?  Was that the
17  detective division?
18  A.  On one side, detective division.  The other
19  side, we had juveniles section and the commander's
20  office.
21  Q.  And on the ground floor was the 25th
22  district?
23  A.  25th district.  And then you had the lockup
24  and you had the court.
25  Q.  Got it.

Maysonet v.
Guevara

Video Deposition

Page 113

1  So the lockup was on the ground floor,
2  correct?
3  A.  Yes, ma'am.
4  Q.  And there was some courtrooms down there as
5  well?
6  A.  They were farther on the other side.
7  Q.  All right.  Now, violent crimes was on the
8  second floor, correct?
9  A.  Yes, ma'am.
10 Q.  And can you describe for me what the violent
11 crimes unit looked like?
12    MR. BRUEGGEN: Object to form.
13    THE WITNESS: When you come in the
14 stairs or the elevator, you make a right, you go in
15 through the doors.  On the right-hand side when you
16 walk in, it's called the special desk.  They pick
17 up all the phone calls that are coming in.
18    Straight ahead was the -- a room where
19 they kept photos and special books in there.  Then
20 you made a -- you turned left.  Desks on the
21 right-hand -- on the left-hand side, the detectives
22 did their work.  On the right-hand side were a
23 couple of interview rooms and then the room for the
24 sergeants from property -- violent crimes and the
25 lieutenant.  Then you had the bathrooms.  Then you

Page 114

1  had a couple of more interview rooms, I think it
2  was.  Then the -- the office for property crimes.
3  Then you had more interview rooms.
4    Straight in the back was the general
5  progress, guys that did general reports.  To the --
6  when you went in the room to the left was a -- the
7  lineup room.  Then straight in the back was photos
8  and everything you can get back there.
9    And you walk down from the hall in the
10 property crimes, they had -- the youth division
11 office was there after a while.
12    BY MS. BONJEAN:
13 Q.  Now, when you were doing your work preparing
14 reports, where would you do that at?
15 A.  In the property crimes section.
16 Q.  Okay.  And did you have a desk there?
17 A.  Oh, there were desks.  You just took whatever
18 desk was open.
19 Q.  And you didn't have like a private office,
20 but you had -- you were in the main area where
21 there were --
22 A.  Yes, ma'am.
23 Q.  Okay.  And then the violent crime guys had
24 their desks in a different room?
25 A.  Their section, yes.

Page 115

1  Q.  And were there interview rooms off of each
2  of the property division and the violent crimes?
3  A.  Yes, ma'am.
4  Q.  The lineup room, can you describe it for me?
5  A.  Well, there's a big room there, and they --
6  you have guys that are typing certain reports in
7  there.  I forgot what they called these guys.  They
8  just -- they did all the work on the telephone.
9  Just when you looked to the left was a big
10 window with the blind, or a shade, I mean, something
11 like that.  And then you walk around the corner and
12 you go into it, this is the lineup room.  It has a
13 bench, and that's where you put the -- the suspects
14 or whatever, the people you want them to look, and
15 that was it.
16 Q.  Now, there was a viewing room where the
17 witnesses would view the lineup, right?
18 A.  Yes.  Yes.
19 Q.  And was there glass that separated the
20 viewing room from where the suspects or the fillers
21 were seated or standing?
22 A.  Yes.
23 Q.  Were -- were the rooms connected in any way
24 or were they --
25 A.  No, ma'am.  Just split up with the wall and

Page 116

1  the glass.
2  Q.  Okay.  And if you were seated in the portion
3  of the room or the -- where the suspects or the
4  lineup participants were either seated or standing,
5  could they see into the viewing room?
6  A.  No, ma'am.
7  Q.  Why not?
8  A.  It was a one-way glass.
9  Q.  What is that?
10 A.  It means so they can't see the -- the
11 witnesses, the victims or whatever who's looking at
12 the lineup.
13 Q.  So someone could be viewing a lineup and
14 they can see into the room where the lineup
15 participants are seated or standing, but the lineup
16 participants can't see into the viewing room to see
17 the witnesses or victims or whoever may be viewing
18 the lineup, is that right?
19 A.  That is correct.
20 Q.  Okay.  Could they hear what --
21 A.  No.
22 Q.  Okay.  So just so the record's clear, if you
23 were in the area where the lineup was being
24 conducted and you were part of the lineup, you
25 wouldn't be able to hear what was going on in the

Maysonet v.
Guevara

Video Deposition

Page 117

1  viewing room, is that right?
2  A.  That is correct.
3  Q.  And vice versa?
4  A.  Vice versa, yes.
5  Q.  Sometimes the witnesses -- or strike that.
6  Sometimes people who are in lineups are
7  asked to say something in lineups, right?
8  A.  Yes.
9  Q.  And that's for the benefit of the witness,
10  correct?
11  A.  Yes.
12  Q.  And how would they be able to hear that
13  if --
14  A.  We turn on the speaker that you can only
15  hear, you know, in the room.
16  Q.  Got it.
17  So there was a way for someone in the
18  viewing room to hear what was going on in the room
19  where the lineup participants were seated or
20  standing?
21  A.  That is correct.
22  Q.  But not vice versa, right?
23  A.  No.
24  Q.  At no point could anybody who was in the
25  room that was participating in the lineup hear what

Page 118

1  was going on in the viewing room, right?
2  A.  Yes.
3  Q.  And when conducting a lineup, was it
4  customary for a police officer to be in the room
5  where the lineup participants were?
6  MR. BRUEGGEN: Object to form.
7  MS. CARNEY: Object to form.
8  THE WITNESS: It all depends.
9  BY MS. BONJEAN:
10  Q.  Okay.  It depends on what?
11  A.  If we need one in there or not.
12  Q.  Well, correct me if I'm wrong.  When
13  someone's participating in a lineup, sometimes
14  they're asked to turn to the right or turn to the
15  left, right?
16  A.  Yes.
17  Q.  Okay.  And would that direction come from
18  the viewing room or was there somebody in the room
19  where the participants were standing?
20  A.  We speak through the microphone and let them
21  know to turn left or right.
22  Q.  Okay.  In what circumstances would a police
23  officer actually be in the room where the lineup
24  participants were?
25  MR. BRUEGGEN: Object to form.

Page 119

1  BY MS. BONJEAN:
2  Q.  If you can think of one.
3  A.  Well, it depends.  I have no idea.
4  Whatever -- you know, if needed.  If you need one,
5  you need one.  If you don't, you don't.  I can't put
6  a finger on it.
7  Q.  Well, why would you ever need one in there?
8  MS. CARNEY: Object to form.
9  THE WITNESS: In the event someone
10  wanted something or someone was violent that we
11  have to keep an eye on.
12  BY MS. BONJEAN:
13  Q.  For safety reasoning?
14  A.  Yes.
15  Q.  Okay.
16  A.  Yeah.
17  Q.  And can you think of any other reasons aside
18  from safety that a police officer would be in the
19  room where the lineup --
20  A.  No.
21  Q.  -- participants are?  Okay.
22  A.  No.
23  THE REPORTER: You have to repeat that.
24  MS. BONJEAN: Yeah.
25  /////

Page 120

1  BY MS. BONJEAN:
2  Q.  Wait for me to finish the question.
3  A.  Yeah, okay.
4  Q.  I know -- I know you know where I'm going --
5  A.  I know.  I know.  Yes, ma'am.
6  Q.  -- but it's hard on her.  Okay.  I'll ask it
7  one more time just so the record's clear.
8  Apart from safety concerns, can you think of
9  any other reason why a police officer would be in
10  the room where the lineup participants were seated
11  or standing?
12  A.  No, ma'am.
13  Q.  All right.  Now, based on your testimony,
14  it's fair to say that there would be a detective in
15  the viewing room, correct?
16  A.  Correct.
17  Q.  And what's the purpose of the detective in
18  the viewing room?  What's his job when he's
19  conducting a lineup?
20  A.  He just stands there.
21  MR. BRUEGGEN: Object to form.
22  THE WITNESS: He's just waiting, that's
23  all, in case he needs instructions.
24  BY MS. BONJEAN:
25  Q.  Okay.  And does the detective have to give

Maysonet v.
Guevara

Video Deposition

Page 121

1  the witness instructions?
2  A.  No.  We do.
3  Q.  Right.  What I'm saying is:  When you're
4  conducting a lineup, is it part of the procedure to
5  tell the witness certain instructions to determine
6  whether they can make an identification?
7  A.  Yes, ma'am.
8  Q.  Okay.  And is that done in the viewing room?
9  A.  Yes, ma'am.
10  Q.  All right.  And if some instruction needs to
11  be made to the participants in the lineup, it was
12  done by a microphone or speaker?
13  A.  Yes.
14      MR. BRUEGGEN: Object to form,
15  misstates the testimony.
16      THE WITNESS: Yes, ma'am.
17      BY MS. BONJEAN:
18  Q.  All right.  And this two -- this glass,
19  which was, you said, one-way glass?  Is it one-way
20  or two-way?
21  A.  We can see them.  They can't see us.
22  Q.  Right.  Okay.  Is it -- it's a special --
23  it's treated in a special way so that people from
24  inside the lineup area can't see in, right?
25  A.  Yes.

Page 122

1      MR. BRUEGGEN: Object to foundation.
2      MR. BRENER: Objection to foundation.
3      BY MS. BONJEAN:
4  Q.  But is it just regular glass, is it extra
5  thick?
6      MR. BRUEGGEN: Object to foundation.
7      MR. BRENER: Join.
8      BY MS. BONJEAN:
9  Q.  If you know.
10  A.  It has a film on it, I think.
11  Q.  A film, okay.  But you can knock on it,
12  right?
13  A.  Yes.
14  Q.  Okay.  And people in the room could hear you
15  knocking.  That's -- is that fair?
16  A.  Yes, ma'am.
17  Q.  Okay.  In your time at Area 5, did you ever
18  witness any detectives conduct a fake lineup?
19      MR. BRUEGGEN: Object to form.
20      THE WITNESS: Pardon me?
21      MS. CARNEY: Object to form.
22      BY MS. BONJEAN:
23  Q.  Did you ever witness any detectives conduct
24  like a fake lineup?
25      MR. BRUEGGEN: Object to form.

Page 123

1      MS. CARNEY: You can answer.
2      MR. BRUEGGEN: You can answer.
3      THE WITNESS: No, ma'am.
4      BY MS. BONJEAN:
5  Q.  Do you know what I mean by "fake lineup"?
6  A.  Yes, ma'am.
7  Q.  Okay.  What do I mean by -- what do you
8  think I meant by "fake lineup"?
9  A.  Having suspects in there that aren't really
10  suspects or anything, and then you get a witness,
11  and you probably tell the witness this is the guy
12  that did it.
13  Q.  Well...
14  A.  Or something similar to that.
15  Q.  Okay.  That's one way.  Let me be more
16  clear.
17      Did you ever see a detective assemble a
18  lineup, where there was actually no -- nobody
19  actually viewing the lineup, no witness viewing the
20  lineup?
21  A.  No, ma'am.
22  Q.  Okay.  Because you could do that, right?
23      MR. BRUEGGEN: Object to form.
24      BY MS. BONJEAN:
25  Q.  The people participating in the lineup can't

Page 124

1  see who's in the viewing room, right?
2  A.  That's correct.
3  Q.  Okay.  So what I'm asking is:  Did you ever
4  witness a circumstance where a detective pretended
5  a witness was there viewing a lineup?
6      MR. BRUEGGEN: Objection, asked and
7  answered and form.
8      MS. CARNEY: You can answer.
9      THE WITNESS: No, ma'am.
10      BY MS. BONJEAN:
11  Q.  Okay.  And I'm assuming you've never done
12  that, where you put together a lineup, told the
13  suspect he was standing in a lineup and that a
14  witness was going to view the lineup, but there
15  really was no witness?
16  A.  Never.
17  Q.  And you've never witnessed that?
18  A.  That's correct.
19      MR. BRUEGGEN: Objection, asked and
20  answered.
21      BY MS. BONJEAN:
22  Q.  And if a detective did such a thing, would
23  that be a tactic that was consistent with the rules
24  and regs or policies of the Chicago Police
25  Department?

Page 125

1     MR. BRUEGGEN: Object to form.
2     MS. CARNEY: Object to form.
3     MR. BRUEGGEN: Foundation.
4     THE WITNESS: Can you rephrase that for
5 me just a little bit?
6     BY MS. BONJEAN:
7 Q. If a detective did do that, what I just
8 described, they told a suspect to stand in a lineup
9 and that there was going to be a witness looking at
10 that lineup, but that was in fact false, there was
11 no witness, would that be consistent with the
12 policies of the Chicago Police Department?
13     MR. BRUEGGEN: Object to form,
14 foundation. You can answer.
15     THE WITNESS: Yes, ma'am.
16     BY MS. BONJEAN:
17 Q. It would be?
18 A. I think so.
19 Q. You think it's --
20 A. I've never -- no.
21 Q. Is it -- is it your understanding that that
22 is an appropriate investigative practice, to tell a
23 suspect that he's standing in a lineup, he put him
24 in a lineup, and there's no actual witness viewing
25 the lineup?

Page 126

1     MR. BRENER: Form and foundation.
2     MR. BRUEGGEN: Join.
3     MR. SCHALKA: Join.
4     MS. CARNEY: And asked and answered.
5 Go ahead.
6     THE WITNESS: I've never seen that. I
7 never heard of it.
8     BY MS. BONJEAN:
9 Q. I know you've never heard of it, but I'm
10 asking would it be okay to do that. When I say
11 "okay," would it be consistent with the policies of
12 the Chicago Police Department to do that?
13     MR. BRUEGGEN: Objection, form,
14 foundation.
15     MR. BRENER: Foundation.
16     THE WITNESS: No, ma'am.
17     BY MS. BONJEAN:
18 Q. Why not?
19     MR. BRUEGGEN: Same objections.
20     MR. BRENER: Join.
21     THE WITNESS: It's not a proper thing
22 to do.
23     BY MS. BONJEAN:
24 Q. Why isn't it a proper thing to do?
25 A. It's not an investigative tool.

Page 127

1 Q. Are you allowed to lie to suspects in the
2 course of an investigation?
3 A. No, ma'am.
4     MR. BRUEGGEN: Objection, form,
5 incomplete hypothetical.
6     BY MS. BONJEAN:
7 Q. Are there any circumstances when you can lie
8 to a suspect during the course of an investigation?
9     MR. BRUEGGEN: Same objections.
10     THE WITNESS: No, ma'am.
11     BY MS. BONJEAN:
12 Q. Okay. So if a detective told a suspect,
13 "you were identified in that lineup," when in fact
14 there was no one actually even viewing the lineup,
15 you would agree that would be improper, right?
16     MR. BRUEGGEN: Object to form,
17 foundation.
18     MS. CARNEY: Join.
19     THE WITNESS: Yes, ma'am.
20     BY MS. BONJEAN:
21 Q. And have you ever falsely told a suspect
22 that he was identified in a lineup, when in fact he
23 was not identified in a lineup?
24 A. Never.
25 Q. Have you ever seen a detective that you've

Page 128

1 worked with tell a suspect that he was identified
2 in a lineup, when in fact he was not?
3 A. Never.
4 Q. Would you agree that if you witnessed that
5 type of conduct, that is, a detective falsely
6 telling someone he was identified in a lineup,
7 that's something that you would have to report to a
8 supervisor?
9     MR. BRUEGGEN: Object to form.
10     THE WITNESS: I suppose so.
11     BY MS. BONJEAN:
12 Q. Were you trained, either in the police
13 academy or in the detective bureau, detective
14 training, or in any in-service trainings, that you
15 had an obligation to report misconduct of your
16 fellow officers?
17     MS. CARNEY: Object to form.
18     MR. BRUEGGEN: Incomplete hypothetical.
19     MS. CARNEY: Go ahead.
20     BY MS. BONJEAN:
21 Q. That wasn't a hypothetical.
22 A. Yes, ma'am.
23 Q. I was asking --
24 A. Yes.
25 Q. -- if you've ever been trained on that

Maysonet v.
Guevara

Video Deposition

Page 129

1  concept.
2  A.  We've been told.
3  Q.  Yeah.  That if you see a police officer
4  doing something either illegal or in violation of
5  the policies and procedures, you had an obligation
6  to report that?
7      MR. BRUEGGEN: Object to form.
8      THE WITNESS: Yes, ma'am.
9      BY MS. BONJEAN:
10 Q.  And in your career as a Chicago police
11 officer, did you ever have the occasion to report
12 misconduct by another officer?
13     MS. CARNEY: Object to form.  Go ahead.
14     THE WITNESS: No, ma'am.
15     BY MS. BONJEAN:
16 Q.  Not once?
17 A.  Not once.
18 Q.  And can I assume that's because not once in
19 your career did you ever witness any misconduct by
20 another police officer?
21 A.  That is correct.
22     MS. CARNEY: Object to form.
23     THE WITNESS: That is correct.
24     BY MS. BONJEAN:
25 Q.  And if you had witnessed misconduct by

Page 130

1  another police officer in your two-and-a-half
2  decades on the department, you would have reported
3  that?
4      MR. BRENER: Calls for speculation.
5      MS. CARNEY: Object to form.
6      THE WITNESS: Yes, ma'am.
7      BY MS. BONJEAN:
8  Q.  Okay.  Now, I think you testified that it's
9  your understanding that there's never a situation
10 when you should be -- you're permitted to lie to a
11 suspect.  Is that right?
12     MR. BRUEGGEN: Object to form.
13     THE WITNESS: Yes, ma'am.
14     BY MS. BONJEAN:
15 Q.  Okay.  Like, for instance, can you falsely
16 tell a suspect that his fingerprints were found at
17 the scene, when that in fact is not true?
18     MR. BRUEGGEN: Object to form.
19     THE WITNESS: No, ma'am.
20     BY MS. BONJEAN:
21 Q.  Okay.  What about this:  Are you permitted
22 to tell a suspect that he's been implicated in a
23 crime by somebody else, when that in fact is not
24 true?
25     MR. BRUEGGEN: Object to form.

Page 131

1      THE WITNESS: No, ma'am.
2      BY MS. BONJEAN:
3  Q.  That would be improper, right?
4  A.  Yes, ma'am.
5      MR. BRUEGGEN: Same objection.
6      BY MS. BONJEAN:
7  Q.  What about telling a woman that if she
8  doesn't cooperate in your investigation, you're
9  going to report her to DCFS or take her kids away,
10 would that be proper?
11     MR. BRENER: Incomplete hypothetical.
12     MS. CARNEY: Object to form.
13     THE WITNESS: No, ma'am.
14     BY MS. BONJEAN:
15 Q.  Okay.  Can you think of any circumstance
16 under which it would be proper to threaten to take
17 someone's child away just to gain their cooperation
18 in an investigation?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: No, ma'am.
21     BY MS. BONJEAN:
22 Q.  Are you currently employed at all?
23 A.  No, ma'am.
24 Q.  Okay.  Retired, fully retired?
25 A.  Yes, ma'am.

Page 132

1  Q.  Can I assume also that you would agree that
2  there's never a circumstance under which you can
3  use physical force against someone, a suspect, in
4  an interrogation or questioning?
5      MR. BRUEGGEN: Object to form.
6      MR. BRENER: Form.
7      THE WITNESS: That is correct.
8  Q.  And let me -- let me -- let me put a finer
9  point on it.
10 Of course if you're defending yourself or
11 something of that nature, but -- maybe physical
12 force would be warranted, but my question is:  Is
13 there ever a circumstance under which you can use
14 physical force or physical abuse to induce someone
15 to make a statement against their interests?
16     MR. BRUEGGEN: Object to form and
17 compound.  You can answer.
18     THE WITNESS: Never.
19     BY MS. BONJEAN:
20 Q.  Okay.  What about witnesses, is there ever a
21 circumstance under which you are permitted to use
22 either force or threats of force to gain their
23 cooperation in giving a statement or cooperating in
24 an investigation?

Page 133

1       MR. BRUEGGEN: Objection, form,
2   compound.
3       THE WITNESS: No, ma'am.
4       BY MS. BONJEAN:
5   Q.  Now, when you went to Area 5 in 1989, did
6   you work with a partner?  I may have asked that,
7   but I don't think I did.
8   A.  It's on and off.  It all depends.
9   Q.  Okay.  And do you remember what shift you
10  worked when you went to Area 5?
11  A.  Third watch.
12  Q.  Kind of the midnights?
13  A.  4 to 12.
14  Q.  Oh, 4 to 12.
15      What were the different watches in 1990?
16  A.  First watch is midnights.  Second watch is
17  days.  Third watch is afternoons.
18  Q.  4 to 12?
19  A.  4 to 12.
20  Q.  How long did you work the third watch?
21  A.  On and off, almost all my 20 years.
22  Q.  Gotcha.
23      In 1990, were you working the third watch?
24  A.  Yes.
25  Q.  Now, specifically 1990 was a violent time in

Page 134

1   the city, right?
2   A.  Pardon me?
3   Q.  1990 was a violent time in the city of
4   Chicago, correct?
5       MR. BRENER: Form and foundation.
6       MR. BRUEGGEN: Object to form and
7   foundation.  Go ahead and answer.
8       THE WITNESS: I assume.
9       BY MS. BONJEAN:
10  Q.  Well, you were policing the city in 1990.
11  Would you agree it was a particularly violent time?
12      MS. CARNEY: Object to form.
13      MR. BRUEGGEN: Object to form.
14      THE WITNESS: I don't patrol the city
15  as a detective.
16      BY MS. BONJEAN:
17  Q.  As a detective, are you aware of what the
18  crime rates were --
19  A.  Yes.
20  Q.  -- in the city?  Okay.
21      And crime rates are one way to tell if a
22  city is experiencing a fair amount of violence,
23  correct?
24  A.  It depends on the area --
25  Q.  Right.

Page 135

1   A.  -- what is happening, yes.
2   Q.  Sure.
3   A.  You're kept up on that.
4   Q.  Yeah.  In fact right now, you read about it
5   a lot in the newspaper, about all the violence in
6   the city, right?
7   A.  That is correct.
8   Q.  Okay.  And would you agree that in 1990, it
9   was -- there was a lot of violence in different
10  parts of the city as well?
11      MR. BRUEGGEN: Object to form.
12      THE WITNESS: Yes.
13      BY MS. BONJEAN:
14  Q.  Some years crime rates are higher than
15  others, right?
16  A.  That is correct.
17  Q.  Okay.  And crime rates can be measured in a
18  number of different ways, right?
19  A.  That's correct.
20  Q.  Would you agree that, for instance, the
21  number of homicides in a year might be one way to
22  measure the crime rates in the city?
23  A.  I assume.
24  Q.  Okay.  And in 1990, there were approximately
25  850 homicides that year?

Page 136

1   A.  I didn't --
2       MS. CARNEY: Objection, foundation.
3       THE WITNESS: I didn't keep track.
4       BY MS. BONJEAN:
5   Q.  Okay.  Well, do you remember -- do you
6   remember being busy?
7   A.  Well, yeah, we were always busy.
8   Q.  Right.  And what were you busy doing?
9   A.  I was doing investigations in burglary and
10  robberies.
11  Q.  Right.  And are burglaries and robberies
12  crimes?
13  A.  Yes, ma'am.
14  Q.  Okay.  So were you busy investigating
15  crimes?
16  A.  Well, yes.
17  Q.  Okay.  And -- and how did Area 5 rank in
18  terms of crime compared to other areas?
19      MR. BRENER: Foundation.
20      MR. BRUEGGEN: Objection, form.
21      BY MS. BONJEAN:
22  Q.  In 1990.
23  A.  I'd have to look at reports.  I wouldn't -- I
24  couldn't say how -- you know, categorize it.
25  Q.  Well, I'm not asking you to, you know, be

Page 137

1  precise about it, but do you remember Area 5 being
2  a busy area?
3      MS. CARNEY: Object to form.
4      THE WITNESS: Certain districts in Area
5  5.
6      BY MS. BONJEAN:
7  Q.  Okay.  Right, but -- but certain districts
8  had more crime than others, correct?
9  A.  Correct.
10 Q.  Okay.  But Area 5, in total, did it have
11 among -- among all the areas a fair amount of
12 violent crimes?
13     MR. BRENER: Foundation.
14     MR. BRUEGGEN: Object to form.
15     THE WITNESS: I can't say, I mean.
16     BY MS. BONJEAN:
17 Q.  All the same from Area 1?
18 A.  No, ma'am.  Somehow -- some areas had more
19 crime than other areas.
20 Q.  That's what I'm asking.
21 A.  Okay.
22 Q.  Some crime -- some areas had more crime than
23 others, right?
24 A.  Yes.
25 Q.  And some had less crimes than others, right?

Page 138

1  A.  That's correct.
2  Q.  Okay.  Where did Area 5 rank?  And you don't
3  have to be precise, but was it at the upper end,
4  the lower end, in the middle?  What do you
5  remember?
6      MR. BRUEGGEN: Object to form.  Go
7  ahead.
8      THE WITNESS: Probably in the middle.
9      BY MS. BONJEAN:
10 Q.  It was just in the middle?
11 A.  I think so.
12 Q.  No more homicides than, say, other --
13 A.  Ma'am, I can't speculate on that.  I never
14 paid -- you know, counted or read all that stuff.
15 You know, we would be told that some crimes happened
16 here, okay, you know how many crimes happened there,
17 and that was it.
18 Q.  So as a police detective, you just didn't
19 really discuss how much crime was in the area that
20 you were policing?
21 A.  No, ma'am.
22 Q.  No.  It wasn't an important part of your
23 job?
24     MR. BRENER: Objection.
25     MS. CARNEY: Objection.

Page 139

1      MR. BRUEGGEN: Objection, form,
2  argumentative.
3      MS. BONJEAN: Just asking.
4      THE WITNESS: It's an important part of
5  your job, but...
6      BY MS. BONJEAN:
7  Q.  Didn't your supervisors want -- strike that.
8  Was part of your responsibilities as a
9  detective to try to solve crimes?
10 A.  Yes, ma'am.
11 Q.  Okay.  And would you agree that part of the
12 responsibilities of the Chicago Police Department
13 was to reduce crime?
14     MR. BRUEGGEN: Object to form.
15     BY MS. BONJEAN:
16 Q.  Yes?
17 A.  Yes, ma'am.
18 Q.  Those were -- those were the goals, right?
19 A.  Yes, ma'am.
20 Q.  Okay.  So given that those were the goals of
21 the police department, are you testifying that it
22 just wasn't discussed much, how much crime was in
23 your particular area?
24     MS. CARNEY: Objection.
25     MR. BRENER: Misstates prior testimony.

Page 140

1      MS. CARNEY: Misstates the testimony,
2  argumentative, asked and answered.
3      THE WITNESS: That's discussed at roll
4  calls.
5      BY MS. BONJEAN:
6  Q.  Right.  Right.
7  A.  Yeah.
8  Q.  It was discussed at roll calls, right, but
9  you don't have a sense, as you sit here today,
10 whether Area 5 had more crime than, say, Area 1 or
11 2?
12     MR. BRENER: Asked and answered.
13     THE WITNESS: I'd say that we're about
14 the middle.  I couldn't say.
15     BY MS. BONJEAN:
16 Q.  Okay.  Do you remember there being a fair
17 amount or a good amount of gang activity in Area
18 5 --
19     MR. BRUEGGEN: Object to form.
20     BY MS. BONJEAN:
21 Q.  -- in 1990?
22     MR. BRUEGGEN: Same objection.
23     MR. BRENER: Join.
24     THE WITNESS: I assume.
25 /////

Maysonet v.
Guevara

Video Deposition

Page 141

BY MS. BONJEAN:

1  BY MS. BONJEAN:
2  Q.  Why do you assume?
3  A.  I never investigated gangs, and so...
4  Q.  Uh-huh.  Do gang members ever commit
5  burglaries?
6  A.  Some, I think.
7  Q.  Do gang members ever commit property crimes?
8  A.  Oh, they did probably -- probably they did to
9  get money.
10  Q.  Uh-huh.  Do -- so, again, was it -- as you
11  sit here today, back in 1990, do you remember there
12  being a lot of gang violence in Area 5 in the early
13  '90s?
14  A.  Yes.
15  MS. CARNEY: Object to form.
16  BY MS. BONJEAN:
17  Q.  You can answer.
18  A.  Yes.  14th district was one heavy one.
19  Q.  Okay.  What about the 25th?
20  A.  Pardon me?
21  Q.  What about the 25th?
22  A.  Moderate, I think.
23  Q.  Humboldt Park had a lot of gang activity,
24  right?
25  A.  Yes.  That's -- yeah.  That was the 14th

Page 142

1  district.
2  Q.  Okay.  And just to be clear, you had no
3  history or experience as a gang crime specialist or
4  officer, right?
5  A.  That is correct.
6  MR. BRUEGGEN: Object to form.
7  MS. CARNEY: Object to form.
8  BY MS. BONJEAN:
9  Q.  Okay.  And according to you, you didn't --
10  you didn't actually investigate gang-related crimes
11  unless they happened to be a burglary, right?
12  A.  That's correct.
13  Q.  Okay.  Now, you have to admit, gang members
14  are often or frequently accused of robberies
15  during -- you must have come across some gang
16  activity when you were investigating robberies,
17  right?
18  MS. CARNEY: Object to form.
19  MR. BRUEGGEN: Object to form.
20  MR. SCHALKA: Object to form.
21  THE WITNESS: I never looked at it that
22  way.
23  BY MS. BONJEAN:
24  Q.  How did you look at it?
25  A.  As a -- as a crime and I'm trying to find the

Page 143

1  perpetrator.  That was how I took it.
2  Q.  But knowing whether someone was motivated
3  because of their gang affiliation might be
4  something that would feature into an investigation,
5  right?
6  MS. CARNEY: Object to form.
7  MR. BRENER: Foundation.
8  THE WITNESS: I never looked at it that
9  way, ma'am.
10  BY MS. BONJEAN:
11  Q.  Never considered whether or not their gang
12  affiliation --
13  A.  No, never, not until, you know, if you make
14  an arrest or something, then someone would say,
15  yeah, he's in a gang.
16  Q.  Uh-huh.  Okay.
17  You'd agree that there is a correlation
18  between gang activity and crime, though, right?
19  MR. BRUEGGEN: Object to foundation.
20  MS. CARNEY: Object to form,
21  foundation.
22  MR. BRENER: Join.
23  MS. CARNEY: You can answer.
24  THE WITNESS: Yes, there is.
25  /////

Page 144

1  BY MS. BONJEAN:
2  Q.  Okay.  Gang -- gangbangers commit crimes,
3  right?
4  A.  Yes, ma'am.
5  Q.  In fact, gang activity is associated with
6  drug crimes, right?
7  MR. BRUEGGEN: Object to form.
8  MS. CARNEY: And foundation.
9  BY MS. BONJEAN:
10  Q.  Gang activities can be associated with drug
11  crimes, right?
12  A.  I assume.
13  Q.  All right.  What's your understanding of who
14  runs the drug trade in Humboldt Park in the 1990s?
15  MR. BRUEGGEN: Object to form and
16  foundation.
17  MS. CARNEY: Object to form,
18  foundation.
19  MR. BRENER: Join.
20  BY MS. BONJEAN:
21  Q.  If you know.
22  A.  I didn't know, ma'am.
23  Q.  You don't have any knowledge?
24  A.  No.  I -- I wasn't in gangs.  I, like I said,
25  I didn't know, you know, what gangs were doing what,

Maysonet v.
Guevara

Video Deposition

---

Page 145

1 who was controlling drugs.
2 Q. Well, were there -- was there somebody other
3 than gang members selling drugs in Humboldt Park in
4 the 1990s or you just don't know?
5     MR. BRUEGGEN: Foundation.
6     MS. CARNEY: Object to form,
7 foundation.
8     THE WITNESS: I don't know, ma'am.
9     BY MS. BONJEAN:
10 Q. Did you know then and you don't remember now
11 or is it -- I'm confused.
12     MR. BRUEGGEN: Object to form.
13     BY MS. BONJEAN:
14 Q. Like is it something you've forgotten or you
15 just -- or you didn't even know then who was doing
16 the drug dealing?
17 A. I didn't know who was doing the drugs. There
18 were drugs, but, you know, I didn't go looking to
19 see who's doing the drugs, because they had the --
20 the gangs unit that does all that investigation.
21 Q. Is there any correlation between burglaries
22 and property crimes and drug use?
23     MR. BRUEGGEN: Object to --
24     MS. CARNEY: Object to form,
25 foundation.

Page 146

1     THE WITNESS: They need money. They do
2 whatever they did to get money.
3     BY MS. BONJEAN:
4 Q. Right. People who need drugs sometimes do
5 property crimes to --
6 A. Yes.
7 Q. -- feed their drug habit, right?
8 A. Yes.
9 Q. Okay. What about shootings, did you have an
10 opportunity to investigate shootings when you were
11 at Area 5?
12 A. Yes.
13 Q. Okay. And was that part of when you were in
14 violent crimes?
15 A. Yes.
16 Q. Okay. That would have been more in the
17 mid-'90s?
18 A. Yes.
19 Q. Now, in 1990, when you started working at
20 Area 5 and you were assigned to investigate a case,
21 can you tell me how that -- how that worked. How
22 did you get assigned to investigate a case, who
23 assigned you and what was the process?
24     MR. BRUEGGEN: Object to form. It
25 misstates his testimony.

Page 147

1     MS. BONJEAN: It's a question. I
2 didn't -- wasn't characterizing it.
3     MR. BRUEGGEN: You said when he started
4 working in 1990.
5     BY MS. BONJEAN:
6 Q. When you started working in Area 5 in the --
7 in 1989 or 1990, tell me what the process was for
8 getting assigned to investigate a case.
9     MR. BRUEGGEN: Objection, form.
10     BY MS. BONJEAN:
11 Q. You can answer.
12     MR. BRUEGGEN: Answer.
13     THE WITNESS: It's assigned by a
14 sergeant.
15     BY MS. BONJEAN:
16 Q. Okay. And how did that happen? Did he just
17 come up to you at roll call? When did it happen?
18 How did it happen?
19 A. They're handed out to you or put in your
20 mailbox, and when you get those jobs, that's what
21 you handle.
22 Q. Okay. And once you got assigned to an
23 investigation, what were you expected to do?
24     MR. BRUEGGEN: Object to form,
25 incomplete hypothetical.

Page 148

1     THE WITNESS: You have to investigate,
2 see what happened, find out what's -- if there's
3 any suspects or anything on that case.
4     BY MS. BONJEAN:
5 Q. Were there any other ways in which you would
6 get assigned to a case other than getting a slip of
7 paper in your mailbox?
8     MR. BRUEGGEN: Object to form and
9 foundation.
10     THE WITNESS: Something just happened,
11 a sergeant would assign you on the streets.
12     BY MS. BONJEAN:
13 Q. So if there was a crime that just occurred
14 and they needed someone to go out to the scene, you
15 might -- he might say go?
16 A. Yes.
17 Q. Okay. Now, as part of your investigative
18 responsibilities after being assigned to a case,
19 did you prepare reports?
20 A. Did I...
21 Q. Prepare reports.
22 A. Yes, ma'am.
23 Q. Okay. And we discussed a little bit about
24 report writing earlier.
25 What type of reports are there? What's the

Maysonet v.
Guevara

Video Deposition

Page 149

1  world of -- what type of reports are there?
2  A.  I had to make a --
3      MR. BRUEGGEN: Object to form.
4      THE WITNESS: I had to make a
5  supplementary report.
6      BY MS. BONJEAN:
7  Q.  Okay.  So -- well, let me ask it this way.
8  Is there something called a general offense case
9  report?
10  A.  They came in later, I think.  Later on
11  that -- after they changed things around in the
12  department, I think.
13  Q.  Well, there's an initiating report, right?
14  A.  That's -- that's your original report.
15  Q.  Right, the original report.
16  A.  Correct.
17  Q.  I called it a general offense case report.
18  A.  That's general offense.
19  Q.  Maybe I'm wrong, but --
20  A.  Yes, general offense.
21  Q.  -- but there's an original report, right?
22  A.  That's correct.
23  Q.  And then everything after the original
24  report is called something else, right?
25  A.  Yes.

Page 150

1  Q.  Okay.  What other types of reports are there
2  after there's an original report filed?
3  A.  Upon my investigation, I make a supplementary
4  report based on what I find out.
5  Q.  What type of information goes into a
6  supplemental report?
7  A.  Interviewing witnesses, the victim, see what
8  was -- what the person -- what was stolen or what
9  was lost in the crime; if I need to contact -- I
10  need an evidence technician, you contact an evidence
11  technician, you make your report.  And once you
12  start interviewing witnesses, I prepare a GPR,
13  general offense report.  I list --
14  Q.  Progress report?
15  A.  Yeah.  I put that there because I used that
16  for typing up my reports.  I can't remember what I'm
17  doing all day long, I write it down, and use that
18  for my investigative purposes.
19  Q.  Would you agree that the supplemental report
20  is meant to document your investigation?
21  A.  That's correct.
22  Q.  And is it important for the reports to be as
23  accurate as possible?
24  A.  Yes, ma'am.
25  Q.  And you mentioned general progress reports

Page 151

1  as well?
2  A.  That's correct.
3  Q.  Those are called GPRs?
4  A.  GPRs, yeah.
5  Q.  Okay.  What is a GPR?
6  A.  It's an investigative tool that we had.  It
7  was assigned -- came out from headquarters, and it
8  had a report and we have to make a GPR.  We have to
9  document who we -- what we found at the crime, who
10  we -- who we interview, who responded to the crime
11  when you're there.  You list all the
12  chronologically, and that goes into another -- a
13  second supplementary report and that's attached to
14  it.
15  Q.  Now, the general progress reports, that's a
16  form that you could handwrite on, right?
17  A.  That's correct.
18  Q.  Because I'm assuming back in 1990, you
19  didn't walk around with a Smartphone or a
20  typewriter or anything like that?
21  A.  That's correct.
22  Q.  And if you interviewed a witness to a crime
23  and you wanted to take notes, you had to write it
24  on a piece of paper, right?
25  A.  That's correct.

Page 152

1  Q.  And the general progress report is the form
2  that was used to document interviews, right?
3  A.  Yes, ma'am.  Everything.
4  Q.  Anything, right?
5  A.  That's correct.
6  Q.  And then you would use those GPRs later to
7  prepare your formal supplemental report, right?
8  A.  That's correct.
9  Q.  And what was your understanding of what
10  would happen to the general progress report after
11  you wrote on it?
12  A.  You attach it to your closing supplementary
13  or your -- in between supplementaries, goes in
14  there, it goes -- follows a report and it's put in
15  the file.
16  Q.  Were you allowed to just toss it or throw it
17  away?
18  A.  You never throw it away.
19  Q.  Can't throw away a GPR?
20  A.  No, ma'am.
21  Q.  That, in fact, would be a gross violation of
22  the policies of the Chicago Police Department?
23      MR. BRENER: Objection.
24      MR. BRUEGGEN: Objection, form.
25      MS. CARNEY: Objection, form.

Maysonet v.
Guevara

Video Deposition

Page 153

1    MR. BRUEGGEN: You can answer.
2    THE WITNESS: Yes, ma'am.
3    BY MS. BONJEAN:
4  Q.  Okay.  And in your career as a detective,
5  did you ever throw away a general progress report?
6  A.  Never.
7  Q.  Okay.  So if you prepared a general progress
8  report, you would attach it to the final
9  supplemental report that you had prepared, correct?
10 A.  Or in between reports.  Whatever -- any time
11 you make a general progress report, it goes with
12 your supplementary -- that you made a general
13 progress, that goes through -- that goes with the
14 file.
15 Q.  Okay.  And forgive me, because I'd never --
16 I wasn't there.  Does it actually go in -- when you
17 prepare a GPR, do you put it in a basket?  Do you
18 put it somewhere?  Where did you actually put it
19 when you were finished with it?
20 A.  You attach it to your reports.  It goes to
21 the -- to the supervisor.  He does the approval,
22 then it's handed over to another detective and where
23 he puts it in a file.
24 Q.  Okay.  Now, in the course of your
25 investigative work on a case, you might have a

Page 154

1  number of general progress reports, right?
2  A.  That's correct.
3  Q.  Now, do you hold on to them and then hand
4  them over at the close of the case, or do you
5  submit them during the course of the investigation
6  as you prepare them?
7  A.  As you -- you prepare them, and you hand them
8  in as soon as you finish them.
9  Q.  Okay.  Do they always go with the
10 supplemental report, the typewritten supplemental
11 report?
12 A.  Yes.
13     MR. BRUEGGEN: Object to form.
14     THE WITNESS: Yes.
15     BY MS. BONJEAN:
16 Q.  Okay.  So once you take the information from
17 a GPR and you incorporate it into a supplemental
18 report, when you're finished with that supplemental
19 report, the whole collection of materials goes to a
20 supervisor, is that right?
21 A.  Yes.
22 Q.  Okay.  And then the supervisor reviews the
23 materials, I assume?
24     MR. BRUEGGEN: Object to form and
25 foundation.  Go ahead.

Page 155

1    THE WITNESS: Yes.  He has to go
2  through -- there's a form that we -- they put in
3  there that's attached to the file which states a
4  GPR, what you did, who responded.  It's all
5  chronologically attached there.  The GPR,
6  everything goes with that file.
7    BY MS. BONJEAN:
8  Q.  And then after the -- the supervisor has to
9  approve it, right?
10 A.  That's correct.
11 Q.  And after a supervisor approves the
12 supplemental report with the attached GPRs, what
13 happens to that collection of documents?
14     MR. BRUEGGEN: Objection, foundation.
15     MS. CARNEY: Objection, foundation.
16     MR. BRUEGGEN: Go ahead.
17     BY MS. BONJEAN:
18 Q.  If you know.
19 A.  That goes to another detective in the -- in
20 the back room, where they file everything, and in
21 case we need to pull that report later on, it's
22 right back there.  We can find the report with
23 everything in there.
24 Q.  Okay.  And those reports -- strike that.
25 Those files that you just referenced, are

Page 156

1  you talking about the investigative files?
2    MR. BRUEGGEN: Object to form.
3    THE WITNESS: Everything, from the --
4  from the original report all the way through
5  whatever detective made the last supplementary.
6    BY MS. BONJEAN:
7  Q.  It all has to go to the same file, correct?
8  A.  That's correct.
9  Q.  And did the file have a name or was it --
10 A.  It went by an RD number.
11 Q.  Okay.
12 A.  Records division number, an RD.
13 Q.  And if you were looking for the file on a
14 case, would you just ask for the file or would you
15 say investigative file, or what would you call it?
16 A.  Just the -- the report.  That's all you want.
17 You look for the general -- the -- the number of the
18 case, and they pull it out for you and give you the
19 whole file.  It's supposed to be all together.  You
20 don't ask for an investigative file.  You ask for
21 the entire file.  It comes all together.
22 Q.  Right.  Yeah, that's what I'm asking.
23 So if you wanted to look at -- if you
24 were -- wanted to look at a case and you wanted to
25 see the investigative file or the file -- I'm

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 157

1  calling it an investigative file. You just called
2  it a file. Is that how you referenced it --
3  A.  Yes.
4  Q.  -- back then?
5  A.  Yes.
6  Q.  Okay. And you said it was organized by RD
7  number?
8  A.  Pardon me?
9  Q.  It was organized by RD number?
10  A.  Yes, ma'am.
11  Q.  And did this room where they kept these
12  files have open and closed cases?
13  A.  Yes.
14  Q.  Okay. So -- and just to be clear, there was
15  an actual room that housed or kept the files that
16  contained the reports that documented an entire
17  investigation from start to finish, right?
18  A.  Yes.
19  Q.  Do you remember something called an
20  inventory index card?
21  A.  Yes.
22  Q.  Okay. What is that?
23  A.  When you sign out a file, you put your name
24  on that you took this file out to review the file or
25  you're going to follow up on something.

Page 158

1  Q.  Okay. So was there a system in place that
2  allowed the detective who ran the file room to
3  determine who had a file at any time?
4  A.  From the sign-out sheets.
5  Q.  Right. That's that I'm asking. There were
6  sign-out sheets?
7  A.  Yes.
8  Q.  Okay. What about -- did the files have a
9  log of everything that was supposed to be in the
10  file, every report that was supposed to be in the
11  file?
12  A.  Yes. There's a sheet in there --
13  Q.  And what's that called?
14  A.  -- documenting everything. I can't remember.
15  I know there's a sheet in it. We had to fill that
16  out.
17  Q.  Yeah. And what color was that sheet, do you
18  know?
19  A.  I think it was green. I'm not sure.
20  Q.  Okay. And was it sort of a log of every
21  report that was in there?
22  A.  Yes.
23  Q.  And who fills out -- who filled out that log
24  or that sheet?
25  A.  The detective. Whenever you signed that file

Page 159

1  out, you filled that -- you have to put that in
2  there.
3  Q.  Okay. So let's say you -- you completed a
4  supplemental report and you gave it to the
5  supervisor. Right?
6  A.  That's correct.
7  Q.  And he approves it, and then it goes to this
8  detective in the file room, right?
9  A.  That's correct.
10  Q.  And then it's supposed to go into the file
11  that has the RD number associated with it, correct?
12  A.  That's correct.
13  Q.  Who would make the notation that we're
14  putting Detective Montilla's supplemental report
15  into this file right now on that green piece of
16  paper?
17  A.  I think the detective in that -- in the room
18  where the file was at.
19  Q.  Okay. It wasn't something you filled out.
20  It was the detective --
21  A.  No, he has to fill that out.
22  Q.  Okay. Got it.
23  And does it stay in the file?
24  A.  Everything has to stay with the file.
25  Q.  Now, if you wanted to go get a file on a

Page 160

1  case that, for instance, you weren't necessarily
2  investigating, but that somehow became to relevant
3  to one of your investigations, did you have the
4  ability to go get that file?
5  MR. BRUEGGEN: Object to form.
6  THE WITNESS: Yes. I had to fill out
7  that form, let the guy know I'm taking out the
8  file. I put a card in there saying I have the
9  file.
10  BY MS. BONJEAN:
11  Q.  So he knows who has the file?
12  A.  Yes.
13  Q.  And it doesn't go missing, right?
14  A.  That's correct.
15  Q.  And -- and then when you were finished with
16  the file, you just returned it?
17  A.  Yes, ma'am.
18  Q.  Now, when you returned it, do you know
19  what -- was there any process that the person who
20  was running that room did to ensure that all the
21  documents stayed in that file?
22  A.  I don't know.
23  MR. BRUEGGEN: Object to form,
24  foundation.
25  THE WITNESS: I have no idea. All I do

Maysonet v.
Guevara

Video Deposition

Page 161

1  is I put in the date and the time that I returned
2  it.
3      BY MS. BONJEAN:
4  Q.   Okay.  Are there any circumstances under
5  which it would be allowable to take a document out
6  of one of those files and then return it without
7  that document?
8      MR. BRUEGGEN: Object to form.
9      MS. CARNEY: You can answer.
10     THE WITNESS: No, ma'am.
11     BY MS. BONJEAN:
12 Q.  Why not?
13 A.  You just don't take a file out from a file
14 that's an original report.  Stays in there.
15 Q.  Yeah.  Why is that so important?
16 A.  Because it's an important investigative tool
17 that stays with that file.
18 Q.  Okay.  That would -- that wouldn't be
19 permissible under the policies of the department to
20 remove a report from a file, right?
21 A.  That's correct.
22     MR. BRENER: Foundation.
23     THE WITNESS: That is correct.
24     MR. BRUEGGEN: Jennifer, are you going
25 to move on to a new section or are you -- so we can

Page 162

1  take a break and let him stretch out.
2      MS. BONJEAN: Hold on one second.
3      BY MS. BONJEAN:
4  Q.  Just a couple more and then I'll let you
5  take a break.  Okay?
6  A.  Okay.
7  Q.  In your experience using GPRs, did you
8  utilize them to document your interviews with
9  witnesses?
10 A.  Yes.
11 Q.  Okay.  And did you write on them at the same
12 time that you were interviewing the witness?
13 A.  Yes.
14 Q.  Okay.  So it was a contemporaneous or
15 simultaneous documentation of your interview with
16 the witness.
17 A.  That's correct.
18 Q.  That's how you used it, right?
19 A.  Yes.
20 Q.  And I think you stated earlier it was an
21 important tool because you can't keep everything in
22 your head.  Right?
23 A.  That is correct.
24 Q.  You need to later refer to that GPR so that
25 you can take the information and put it into your

Page 163

1  supplemental report?
2  A.  Yes.
3  Q.  Okay.  Give me one second.
4  Once you submitted a supplemental report
5  with your GPRs to your supervisors or supervisor,
6  what would happen if new information came along
7  that you wanted to document?  Could you go back to
8  that supplemental report or you just start a new
9  one?
10 A.  Can you try to repeat that again?  I lost
11 you.
12 Q.  Sure, uh-huh.
13 After you submitted your supplemental
14 report, okay, and any attached GPRs to your
15 supervisor, what would you do if you had new
16 information related to the investigation?
17 A.  I make a supplementary report and put that RD
18 number and give it to the sergeant.  He looks at it,
19 file, and it goes with the file.
20 Q.  Okay.  But my question is, is:  You -- you
21 would start a new supplemental report, right?
22 A.  Yes.
23 Q.  You wouldn't go back and pull a supplemental
24 report and add information to it, correct?
25 A.  That's correct.

Page 164

1  Q.  Once -- once you've submitted a supplemental
2  report to your supervisor for approval, you do not
3  go back and amend that report, right?
4  A.  That is correct.
5  Q.  Okay.  You can -- you can just start a new
6  report, correct?
7  A.  Pardon me?
8  Q.  You just start a new report if you --
9  A.  You have to.  You have to start a new report.
10 Q.  Yeah.  And why are you not permitted to go
11 back to approved reports to add to them?
12     MR. BRUEGGEN: Object to form.  Go
13 ahead.
14     THE WITNESS: You cannot add to a
15 report that's been approved.
16     BY MS. BONJEAN:
17 Q.  Right.  And why is that?
18 A.  Because it's not warranted.  It's not
19 feasible.
20 Q.  And would it violate the policies and
21 practices of the department?
22 A.  Oh, yeah.
23 Q.  Okay.
24     MR. BRUEGGEN: Is this a good time for
25 a break?

Page 165

1  MS. BONJEAN: Yes, we can take a break.
2  THE VIDEOGRAPHER: We are going off the
3  record at 1:33 p.m.
4  (Recess taken from 1:33 to 1:47.)
5  THE VIDEOGRAPHER: We're now back on
6  the record at 1:47 p.m.
7  MS. BONJEAN: Mr. Montilla, I wanted to
8  introduce you to my co-counsel, Steve Greenberg,
9  who has joined us. I don't know if you met before
10  he came in here.
11  MR. GREENBERG: I think we've met in
12  the past, but...
13  MS. BONJEAN: Okay. All right.
14  BY MS. BONJEAN:
15  Q. I had a couple follow-up questions about
16  report writing.
17  When you prepare your supplemental report
18  off of your GPRs and you're getting ready to submit
19  it, what -- what date do you put in the box that
20  says "date submitted"?
21  A. Can you repeat that? I lost one little
22  portion.
23  Q. Sure. When you have prepared a supplemental
24  report --
25  A. Okay.

Page 166

1  Q. -- and you're getting ready to submit it to
2  your supervisor, okay --
3  A. Yes.
4  Q. -- or a supervisor, you have to date it,
5  right, put the date on it?
6  A. Yes.
7  Q. The date you're submitting it, correct?
8  A. That's correct.
9  Q. And do you use the date that you're actually
10  submitting it?
11  A. Yes.
12  Q. Okay. Are there any circumstances under
13  which, for instance, you could backdate a report?
14  A. No, ma'am.
15  Q. Not supposed to do that, right?
16  A. Not supposed to, no.
17  Q. What about dating it on a date in the
18  future, that's not acceptable either, right?
19  A. That's correct.
20  Q. You use the date that you're actually
21  submitting it?
22  A. The day you hand it to the sergeant, he has
23  to sign it.
24  Q. Okay. All right. Now, I asked you some
25  questions earlier about how detectives get assigned

Page 167

1  to a case.
2  A. How what?
3  Q. How detectives get assigned to a case.
4  A. Yes.
5  Q. Okay. And I think you mentioned that one
6  way is you get a notice in your box that you've
7  been assigned to an investigation. Right?
8  A. That's correct.
9  Q. And if a crime happens while you happen to
10  be in the department, that might be another way in
11  which you would get assigned to the case, right?
12  A. That's correct.
13  Q. And your -- the sergeant who is on duty
14  might say you need to go respond, correct?
15  A. Yes.
16  Q. Okay. What is a scene detective?
17  A. Pardon me?
18  Q. A scene detective.
19  A. There is no scene detective.
20  Q. No such thing?
21  A. No, ma'am.
22  Q. What about detectives --
23  MS. BONJEAN: Can you guys stop? I
24  can't concentrate.
25  /////

Page 168

1  BY MS. BONJEAN:
2  Q. When a crime occurs and people get assigned
3  to go to the scene, do you call them scene
4  detectives?
5  A. No.
6  Q. Okay.
7  A. Detectives.
8  Q. Just detectives, okay.
9  There's nothing about -- is there something
10  called a scene report?
11  A. Crime scene.
12  Q. Yeah, a crime scene report.
13  A. That's when a crime officer -- he does the
14  crime scene report.
15  Q. Okay. What about a canvass report?
16  A. That's just a canvass report. Everybody --
17  we all respond to a canvass report if we -- to help
18  out on the case.
19  Q. Okay. Would you agree that sometimes
20  investigations don't get closed or solved in a
21  24-hour period?
22  A. That's correct.
23  MS. CARNEY: Object to form. Sorry.
24  THE WITNESS: Oh, sorry.
25  /////

Maysonet v.
Guevara

Video Deposition

Page 169

1    BY MS. BONJEAN:
2  Q.  Sometimes investigations can extend weeks or
3  months, right?
4  A.  That is correct.
5  Q.  Okay.  And there are detectives who may be
6  assigned to investigate a case when it first
7  occurs, a crime first occurs, right?
8  A.  Yes.
9  Q.  And there might be a different set of
10  detectives that come in at a later point, right?
11  A.  Yes.
12  Q.  Okay.  Who ultimately is responsible for an
13  investigation?  What set of detectives is
14  ultimately responsible for an investigation?
15    MR. BRENER: Form.
16    MS. CARNEY: Object to form.
17    MR. BRUEGGEN: Object.
18    BY MS. BONJEAN:
19  Q.  If you understand.
20  A.  An investigation is a continuing file.
21  There's always a detective following up.
22  Q.  So there's no one detective on a case
23  who's -- it's not like the first detectives who are
24  assigned to the case are responsible for that case?
25  A.  That's correct.

Page 170

1  Q.  And would you agree that in any
2  investigation there could be a number of different
3  detectives who are assigned to work on that case?
4  A.  That's correct.
5  Q.  And the detective who closes the case may
6  not be the same detective who was initially
7  assigned to the case?
8  A.  That's correct.
9  Q.  Now, when you're first assigned to a case as
10  an investigator or detective, is part of your
11  responsibility or a part of what you would do be to
12  look at the victim, like find out as much as you
13  can about the victim?
14    MR. BRUEGGEN: Object to form.
15    THE WITNESS: What kind of crime?
16    BY MS. BONJEAN:
17  Q.  It depends on the crime?
18  A.  Yes, ma'am.
19  Q.  Okay.  What about in a homicide
20  investigation?
21  A.  Yes.
22  Q.  You'd want to know who the victim was,
23  right?
24  A.  That's correct, yes.
25  Q.  And what types of information do you want to

Page 171

1  know about the victims?
2  A.  Where the victim is at, where you found --
3  where they found them, if he's been shot or stabbed.
4  If there's any evidence around them, you have to
5  mark it.
6  Q.  What about the criminal history of a victim,
7  would you want to know like what his arrest history
8  looks like?
9  A.  Pardon me?
10  Q.  Would you want to know what the arrest
11  history of a victim is potentially?
12  A.  Down the line later on.  First your
13  investigation is to find out who the person is.
14  Q.  Right, but at some point you might -- do you
15  want to know whether the person is gang involved,
16  for instance?
17  A.  Once you learn the identity, yes.
18  Q.  Right, but --
19  A.  You pull everything, if he's got a record.
20  Q.  Right.  You want to find out what the
21  criminal history of his victim, because that might
22  give you some information about something like, for
23  instance, motive, right?
24  A.  Correct.
25  Q.  And in fact, it was pretty customary as part

Page 172

1  of an investigation to run the criminal histories
2  of victims, right?
3    MR. BRUEGGEN: Object to form.
4    MR. BRENER: Join.
5    THE WITNESS: Yes.
6    BY MS. BONJEAN:
7  Q.  And also suspects, of course, correct?
8  A.  Yes.
9  Q.  And even witnesses sometimes, right?
10  A.  Yes.
11  Q.  How are open investigations maintained?  The
12  files, how were they maintained?  Were they
13  maintained in a filing cabinet in that same
14  detective room we discussed earlier?
15    MR. BRUEGGEN: Object to form and
16  foundation.  Go ahead.
17    THE WITNESS: They're kept by that --
18  the detective who take care of those files.
19    BY MS. BONJEAN:
20  Q.  And that's open cases and closed cases?
21  A.  That's -- closed cases, usually once they're
22  completely closed, they're in the basement.
23  Q.  Got it, but if a case was open, it would be
24  in that detective room?
25  A.  Yes.

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 173

1  Q.  Was there any place where there -- where you
2    would know what cases were open at any given time?
3      MS. CARNEY: Object to form.
4      MR. BRUEGGEN: Go ahead.
5      THE WITNESS: I assume.
6      BY MS. BONJEAN:
7  Q.  Was there like a board somewhere?
8  A.  Those are the 24 hour that just happened.
9    There's a board just for that.
10  Q.  Just for the crimes that occurred in --
11  A.  Just occurred within 24 hours.
12  Q.  Okay.
13      MS. CARNEY: Sorry.  Do we have a time
14    frame on -- are we like '89, '90, '91, or --
15      MS. BONJEAN: We're in 1990.
16      MS. CARNEY: Okay.
17      MS. BONJEAN: Sticking to 1990.  Okay?
18      MS. CARNEY: Thank you.
19      BY MS. BONJEAN:
20  Q.  If at any point your answer is different
21    because in 1990 they did it one way and in 1995
22    they did it another way, you can let me know that,
23    but just assume I'm asking specifically about in
24    1990.  Okay?
25  A.  Okay.

Page 174

1  Q.  Okay.  Just to be clear, there was a board
2    that identified the crimes that had occurred within
3    the past 24 hours, is that right?
4  A.  I assume, yes, that's correct.
5  Q.  Okay.  What about open homicide
6    investigations, was there any type of board that
7    reflected open homicide investigations in the
8    department?
9  A.  I don't recall.
10  Q.  Now, when you went to Area 5, I think you
11    testified that you believe Ernest Halvorsen and Lee
12    Epplen were - were already there.
13    Did you have occasion to investigate any
14    cases with Ernest Halvorsen apart from Jose
15    Maysonet's case?
16  A.  No, ma'am.
17  Q.  And at some point, I think you testified,
18    that Rey Guevara came to Area 5.  Right?
19  A.  Yes.
20  Q.  Do you recall when he came to Area 5?
21  A.  No, ma'am.
22  Q.  Okay.  Did you have any occasion to
23    investigate any cases with Detective Guevara prior
24    to Jose Maysonet's case?
25  A.  No, ma'am.

Page 175

1  Q.  Did you investigate any cases with Detective
2    Guevara after Jose Maysonet's case?
3  A.  No, ma'am.
4  Q.  So Jose Maysonet's case is the only case you
5    ever worked on with Detective Guevara?
6  A.  Yes, ma'am.
7  Q.  What about Detective Paulnitsky, did you
8    have an occasion to work on any cases with
9    Detective Paulnitsky prior to Jose Maysonet's
10    arrest?
11  A.  I don't recall.
12  Q.  Possible?
13  A.  Possible.
14  Q.  Was Paulnitsky violent crimes or property?
15  A.  He was violent crime.
16  Q.  Okay.  And what about after Jose Maysonet's
17    arrest, which would have been in August of 1990,
18    did you have an occasion to work on any
19    investigations with Detective Paulnitsky?
20  A.  No, ma'am.
21  Q.  Okay.  I'm going to ask the same question as
22    it relates to...
23      (Off stenographic record discussion.)
24      BY MS. BONJEAN:
25  Q.  How about Sergeant Mingey, he was your

Page 176

1    sergeant at various points through your career,
2    right?
3  A.  Yes.
4  Q.  Okay.  When you first went to Area 5 in
5    1990, who was your sergeant?
6  A.  When I was in property crimes?
7  Q.  Yeah.
8  A.  I don't know.  I can't remember.
9  Q.  Okay.
10  A.  We had -- property crimes was different than
11    violent crimes, so...
12  Q.  Right.  Was Mingey ever a sergeant at
13    property crimes?
14  A.  No, ma'am.
15  Q.  He was a robbery guy, right?
16  A.  Violent crime guy.
17  Q.  Violent crimes.
18    And when you worked in violent crimes, was
19    he one of your supervisors?
20  A.  Yes, ma'am.
21  Q.  Okay.  But that would have been more
22    mid-'90s, right?
23  A.  Yes.
24  Q.  Okay.  All right.  Now, did you ever have an
25    occasion to see Rey Guevara commit any misconduct?

Page 177

1     MS. CARNEY: Object to form.
2     THE WITNESS: No, ma'am.
3     BY MS. BONJEAN:
4 Q. Never in your career?
5 A. Never.
6 Q. And that includes in the course of this
7  investigation?
8 A. In where?
9 Q. That includes in the course of this
10  investigation involving Jose Maysonet?
11 A. Yes, ma'am.
12 Q. And what about Ernest Halvorsen, did you
13  ever have an occasion to see Ernest Halvorsen
14  commit any misconduct?
15     MS. CARNEY: Object to form.
16     THE WITNESS: No, ma'am.
17     BY MS. BONJEAN:
18 Q. And again that also includes in the course
19  of this investigation?
20 A. Yes, ma'am.
21 Q. Same for Roland Paulnitsky, did you ever see
22  Roland Paulnitsky commit any form of misconduct?
23     MS. CARNEY: Object to form.
24     THE WITNESS: No, ma'am.
25  /////

Page 178

1     BY MS. BONJEAN:
2 Q. And, again, that's also the case for this
3  investigation, right?
4 A. That's correct.
5 Q. Okay. Did you ever see any detective at
6  Area 5 commit any misconduct?
7 A. No, ma'am.
8     MS. CARNEY: Object to form.
9     THE WITNESS: No, ma'am.
10     BY MS. BONJEAN:
11 Q. As a matter of fact, I think you testified
12  earlier that you -- how long were you a Chicago
13  police officer? How long in total were you a
14  Chicago police officer?
15 A. 34 years all total.
16 Q. Okay. And in your 34 years as a Chicago
17  police officer, you never once witnessed any
18  officer commit misconduct, right?
19 A. Yes, ma'am.
20     MR. BRUEGGEN: Object to form. Go
21  ahead.
22     THE WITNESS: Yes, ma'am, that's
23  correct.
24     MS. BONJEAN: That's correct.
25  /////

Page 179

1     BY MS. BONJEAN:
2 Q. All right. I'm going to turn now to the
3  underlying facts of this case a little bit. Okay?
4  When did you learn that two African-American
5  men had been shot on North Avenue during the early
6  morning hours of March 25th, 1990?
7 A. That same night.
8 Q. How did you learn?
9 A. I was working on the street and I heard the
10  call on the radio.
11 Q. Were you in your police vehicle?
12 A. I was in my unmarked squad car, yes.
13 Q. Okay. So you were in an unmarked car. Were
14  you working alone or with someone?
15 A. I don't -- I think I was working with
16  someone. I don't recall who.
17 Q. You don't remember who?
18 A. No, ma'am.
19 Q. And what do you recall about what you heard
20  over the radio?
21 A. That two people were shot on North Avenue, I
22  think near Kimball, I think. I'm not sure. So we
23  respond. As a detective, we have to respond to
24  assist.
25 Q. Okay. So did you actually respond to the

Page 180

1  scene?
2 A. Yes, ma'am.
3 Q. And that would have been shortly after you
4  heard the call?
5 A. Yes, ma'am.
6     MS. BONJEAN: I'm going to have you
7  mark something.
8     Forget it. Forget it.
9     I had copies of everything but this,
10  but I'll take a look at it. I just want to -- I'm
11  going to have him look at it.
12     MS. CARNEY: I'm just going to write
13  the -- could we put the Bates number on the record
14  when you --
15     MS. BONJEAN: Sure.
16     MR. BRUEGGEN: Yeah. You guys want to
17  pass it down, just look at it.
18     MS. BONJEAN: Okay. Can you mark this,
19  please.
20     (Exhibit 1 marked.)
21     BY MS. BONJEAN:
22 Q. Mr. Montilla, I'm going to hand you what
23  I've marked as Exhibit 1, if you could take a look
24  at that photograph.
25 A. Okay.

Maysonet v.
Guevara

Video Deposition

Page 181

1 Q. Do you recollect that scene?
2 A. Yes, ma'am.
3 Q. Okay. And what is that picture?
4 A. You have those -- the responding officers,
5 they have the squad car there. Just to the west of
6 the front of -- right front of the squad car is one
7 of the gentlemen -- the black young guys that was
8 shot.
9 Q. Uh-huh.
10 A. And just to the -- off from the passenger
11 side, maybe about ten feet, there was the other
12 gentleman laying in the empty lot.
13 Q. Okay. And is that the scene you responded
14 to when you were in your unmarked vehicle on the
15 early morning hours of May 25th of 1990?
16 A. Yes, ma'am.
17 Q. Okay. And you said that you automatically
18 went there when you heard the radio. Is that
19 right?
20 A. Yes, ma'am.
21 Q. Or were you dispatched there by a sergeant?
22 A. I responded on my own.
23 Q. Okay. And that was customary to respond on
24 your own?
25 A. Yes, ma'am.

Page 182

1 Q. All right. And you didn't have to wait for
2 a sergeant to tell you to go to the scene, is that
3 correct?
4 A. No, that's correct.
5 Q. You weren't assigned to investigate the case
6 at this point, correct?
7 A. That is correct.
8 Q. But you went there because you've heard this
9 serious event had happened and you went to the
10 scene just upon hearing that, right?
11 A. Yes, ma'am.
12    MR. BRUEGGEN: Object to form. It
13 misstates his testimony, but go ahead.
14    THE WITNESS: Yes, ma'am.
15    BY MS. BONJEAN:
16 Q. And what did you do once you got there?
17 A. Waited around in case the detectives asked if
18 anybody needs everything. We help protect the crime
19 scene, and if they needed us to do any type of an
20 investigation, go around, see, you know, if we could
21 find witnesses or anything, we do, do a canvass.
22 Q. So is it fair to say you responded to the
23 scene in case you were needed to help investigate
24 or start investigating the case?
25 A. Yes.

Page 183

1 Q. All right. And you don't remember who you
2 went there with, right?
3 A. No, ma'am, I can't remember.
4 Q. Do you remember who else was on scene?
5 A. No, ma'am, I can't remember all.
6 Q. Okay. Do you know how long you were at the
7 scene?
8 A. 15, 20 minutes maybe.
9 Q. Okay. Did you take any investigative
10 actions while you were on the scene?
11 A. Not that I recall.
12 Q. Okay. Did you talk to anybody about what
13 these two men that were apparently victims of
14 gunshots that were laying on the street?
15 A. I don't recall.
16 Q. Okay. Do you remember learning anything
17 while you were there for that 15 or 20 minutes at
18 the scene of the crime?
19 A. No, ma'am.
20 Q. Okay. Now, after 15 or 20 minutes, do you
21 recall where you went?
22 A. I think I went back to the area.
23 Q. And you're talking about Grand and Central?
24 A. Yes, ma'am.
25 Q. And why did you go back to Grand and

Page 184

1 Central?
2 A. I think I was going to get off of work.
3 Q. Okay. What time would you have been getting
4 off?
5 A. Midnight.
6 Q. All right. So if this crime happened around
7 1 a.m., you would have been --
8 A. I might -- I think I worked a little -- or I
9 might have been working midnight. I don't remember.
10 Q. Okay. I was going to ask that. On May 25th
11 of 1990, do you recall what shift you were working?
12 A. I think I might have been working midnights.
13 Q. Okay. You weren't working the third watch
14 at that time?
15 A. Yeah, if I was that late, I had to be working
16 midnights.
17 Q. Is it possible that you just stayed later?
18 A. No, ma'am.
19 Q. You wouldn't have stayed later?
20 A. Not past my time.
21 Q. Now, when you were working a particular
22 shift, did you work that day-to-day or did it
23 change from time to time?
24 A. I worked it for a long time, third watch.
25 Q. All right. Okay. Did you know the victims?

Maysonet v.
Guevara

Video Deposition

Page 185

1 A.  No, ma'am.
2 Q.  Had you ever seen the victims prior to May
3 25th of 1990?
4 A.  No, ma'am.
5 Q.  Are you aware of having any contacts with
6 the victims prior to May 25th, 1990?
7 A.  No, ma'am.
8 Q.  Now, prior to May 25th, 1999, when you
9 responded to this scene, had you had any contacts
10 with Jose Maysonet?
11     MR. BRENER: Form.
12     MR. BRUEGGEN: And just to clarify, you
13 said 1999.
14     MS. BONJEAN: Okay.  My apologies.  Let
15 me start over.
16     BY MS. BONJEAN:
17 Q.  Prior to responding to this scene on May
18 25th of 1990, did you have any contacts with Jose
19 Maysonet?
20 A.  No, ma'am.
21 Q.  Did you know who Jose Maysonet was?
22 A.  No, ma'am.
23 Q.  Did you have any prior contacts -- strike
24 that.
25     Did you have any contacts with an individual

Page 186

1 by the name of Alfredo Gonzalez prior to May 25th
2 of 1990?
3 A.  No, ma'am.
4 Q.  If I told you the nickname Lluvia or Lluvio,
5 does that ring a bell to you at all?
6 A.  No, ma'am.
7 Q.  Okay.  What about Justino Cruz, do you know
8 if you had any contacts with him -- and when I say
9 "contacts," I mean any conversations, any -- any
10 type of interaction -- prior to May 25th of 1990?
11 A.  No, ma'am.
12 Q.  And what about an individual by the name of
13 Christopher Goossens?
14 A.  No, ma'am.
15 Q.  Okay.  Do you recall having any contacts
16 with an individual by the name of Efrain Cruz prior
17 to May 25th of 1990?
18 A.  No, ma'am.
19 Q.  And how about Francisco Varas?
20 A.  No, ma'am.
21 Q.  Okay.  So none of those names, as you sit
22 here today, are familiar to the extent that you
23 remember having contact with them prior to May
24 25th, 1990?
25 A.  Can you repeat that again?  You lost me

Page 187

1 someplace.
2 Q.  Yeah, it wasn't a good question.  Sure.
3 You don't remember talking to any of those
4 individuals that I've just mentioned prior to May
5 25th of 1990, right?
6 A.  That's correct.
7 Q.  Do you remember hearing anything about any
8 of those individuals prior to May 25th, 1990,
9 either from other detectives or other police
10 officers?
11 A.  No, ma'am.
12 Q.  Had you ever heard the name Jose Maysonet
13 prior to May 25th of 1990?
14 A.  No, ma'am.
15 Q.  Okay.  You never heard his name mentioned
16 around Area 5 or anything like that?
17 A.  Never.
18 Q.  Okay.  Now, after you left the scene of the
19 Wiley brothers' murders on May 25th, 1990, you said
20 you went back to the -- went back to Grand and
21 Central, correct?
22 A.  That's correct.
23 Q.  What is the next time where you heard any
24 information about this -- these murders?
25 A.  No, ma'am.

Page 188

1 Q.  When did you next hear anything about the
2 Wiley brothers' murders?
3 A.  I don't understand.
4 Q.  After May 25th, 1990 --
5 A.  Yeah.
6 Q.  -- did you ever receive any additional
7 information about the murders of these men?
8 A.  No, ma'am.
9 Q.  Never?
10 A.  Never.
11 Q.  Do you know who was responsible for
12 investigating this after you left the scene on May
13 25th --
14 A.  No, ma'am.
15 Q.  -- of 1990?
16 A.  No, ma'am.
17 Q.  Okay.  Did any sergeant give you any
18 responsibilities to investigate this incident after
19 May 25th of 1990?
20 A.  No, ma'am.
21 Q.  Do you know who was assigned to investigate
22 the Wiley brothers' murders after May 25th of 1990?
23 A.  No, ma'am.
24 Q.  So when you left the scene in the early
25 morning hours of May 25th, 1990, you had no

Maysonet v.
Guevara

Video Deposition

Page 189

1 responsibilities as it relates to investigating the
2 case, correct?
3 A. That is correct.
4 Q. When's the next time that you heard anything
5 about this case?
6 A. At Area 5, when I was asked to do some
7 interpreting.
8 Q. Okay. Now, we know from the reports that
9 you purportedly was present for an interview with
10 Mr. Maysonet on July 15th of 1990.
11 Does that sound right to you?
12     MR. BRUEGGEN: Object, form. Go ahead.
13     THE WITNESS: That's about right.
14     BY MS. BONJEAN:
15 Q. Okay. So I want to focus on between May
16 25th, 1990, and July 15th, 1990, did you hear any
17 detectives at Area 5 discuss the investigation of
18 the deaths of these two individuals?
19 A. No, ma'am.
20 Q. Okay. Did you witness with your own eyes
21 any investigative conduct in the department related
22 to this investigation or this murder?
23 A. No, ma'am.
24 Q. For instance, did you see any detectives
25 doing any lineups between May 25th, 1990, and July

Page 190

1 15th, 1990, that were in connection with the Wiley
2 brothers' murders?
3 A. No, ma'am.
4 Q. Okay. So is it fair to say that between May
5 25th, 1990, and July 15th, 1990, you heard nothing
6 about the murders of Torrence and Kevin Wiley,
7 correct?
8 A. That's correct.
9 Q. And is it fair to say that you had no idea
10 who was responsible for investigating the deaths of
11 the Wiley brothers between May 25th, 1990, and July
12 15th, 1990?
13 A. That's correct.
14 Q. And do you know whether or not there were
15 any suspects in the murders of the Wiley brothers
16 that were identified between May 25th, 1990, and
17 July 15th, 1990?
18 A. That's correct.
19 Q. You did not know any?
20 A. No, ma'am.
21 Q. You knew nothing, correct?
22 A. Nothing.
23 Q. Okay. So now let's get to July 15th, 1990.
24 All right?
25 At some point you came into contact with

Page 191

1 Mr. Maysonet, is that correct?
2 A. Yes, ma'am.
3 Q. Okay. So on July 15th, 1990, do you recall
4 what shift you were working then?
5 A. I think I was working third watch.
6 Q. Okay. Which means you would have arrived to
7 Grand and Central at what time approximately?
8 A. Around 4.
9 Q. And you would have left at what time
10 approximately?
11 A. Midnight.
12 Q. Okay. So on July 15th, 1990, you had
13 occasion to have a contact with Mr. Maysonet. Tell
14 me how that came about. How did that happen?
15 A. Can you repeat that for me, please?
16 Q. Sure. On July 15th, 1990, during your
17 shift, you had an opportunity to speak with
18 Mr. Maysonet, right?
19 A. Yes.
20 Q. Okay. And how was it that you came to be in
21 a position to have a conversation with Mr. Maysonet
22 on July 15th of 1990?
23 A. Detective Paulnitsky asked me to interpret
24 for him, Spanish to English, English to Spanish. He
25 wanted to talk to a guy in the room.

Page 192

1 Q. Okay. And where were you when Detective
2 Paulnitsky asked you to interpret?
3 A. I think I was in -- I was in Area 5,
4 somewhere on the floor. I can't tell you where.
5 Q. Okay. And to the best of your knowledge,
6 was Detective Paulnitsky a Spanish speaker?
7 A. No, ma'am.
8 Q. Okay. And what did he want to question the
9 guy about to the best of your understanding at the
10 time?
11 A. About a shooting.
12 Q. Okay. And what did he say to you?
13 A. Pardon me?
14 Q. What did Detective Paulnitsky say to you?
15 A. I don't remember, ma'am, word for word or
16 anything.
17 Q. Well, not word for word, but generally what
18 did he say? How did he come up to you and --
19 A. He asked me if I want to interpret in case
20 the gentleman -- he asked a question and he wanted
21 me to interpret into Spanish in case the guy we're
22 interviewing didn't understand the questions, and I
23 would repeat it back in Spanish.
24 Q. Okay. And was it your understanding that
25 there was someone in custody who was a Spanish

Maysonet v.
Guevara

Video Deposition

Page 193

1 speaker?
2 A. Yes.
3 Q. Okay. And Detective Paulnitsky asked you to
4 interpret because he could not communicate with the
5 individual, is that fair to say?
6 A. That's what he said, yes.
7 Q. Okay. And did you oblige?
8 A. Yes.
9 Q. Okay. And where did this interview take
10 place?
11 A. In the -- on the crime section, in one of the
12 interview -- little interview rooms there.
13 Q. Okay. And who was present for the interview
14 apart from yourself?
15 A. I think it was Paulnitsky and I.
16 Q. Okay. And tell me what Detective Paulnitsky
17 asked -- well, strike that.
18 What's the first thing that you did when you
19 went into the room in terms of addressing
20 Mr. Maysonet?
21 A. We introduce ourselves.
22 Q. Okay.
23 A. And I would say if Detective Paulnitsky -- or
24 if he stated it in his English, I'd say it in
25 Spanish. If the guy didn't understand, I'd tell him

Page 194

1 I'm there to interpret from him to English to
2 Spanish and his replies back in English.
3 Q. Okay. Do you remember how long that
4 interview took with Paulnitsky, yourself and
5 Mr. Maysonet?
6 A. No, ma'am, didn't take very long.
7 Q. Okay. And you were speaking Spanish?
8 A. Yes, ma'am.
9 Q. Detective Paulnitsky was speaking English?
10 A. Yes, ma'am.
11 Q. So it went like this; correct me if I'm
12 wrong. Detective Paulnitsky would ask a question.
13 You would interpret it to Spanish --
14 A. Yes.
15 Q. -- or translate to Spanish?
16 A. Yes.
17 Q. And then Mr. Maysonet would respond in
18 Spanish, and then you would interpret it back in
19 English to Detective Paulnitsky?
20 A. Yes, ma'am.
21 Q. Okay. And you said this didn't happen very
22 long?
23 A. Yeah, it couldn't have been long.
24 Q. All right. What was the subject matter of
25 the interview?

Page 195

1 A. A shooting.
2 Q. Okay. And do you know where the shooting
3 took place?
4 A. No, ma'am.
5 Q. It wasn't this shooting?
6 A. I don't think so. It was a shooting. He
7 wanted me to talk to him about a shooting. That's
8 it.
9 Q. Okay. Do you know whether it was the
10 shooting that happened on North Avenue or a
11 different shooting?
12 A. I don't know, ma'am. I'm just doing -- just
13 asked to, you know, help out.
14 Q. Okay. But you don't remember the substance
15 of it at all?
16 A. No, ma'am.
17 Q. Okay. And did you prepare a report in
18 connection with this interview that you helped
19 conduct with Mr. Maysonet?
20 A. No, ma'am.
21 Q. Why not?
22 A. I'm an interpreter. I don't take notes
23 because when I'm interpreting, it's impossible to
24 write at the same time.
25 Q. Okay.

Page 196

1 A. It's up to the detective to do the report.
2 Q. So what do you remember about why
3 Mr. Maysonet was in custody other than there was
4 some type of shooting?
5 A. That's it.
6 Q. That's it?
7 A. Yes, ma'am.
8 Q. Anything else?
9 A. No, ma'am.
10 Q. Had you read any reports about the incident
11 that you were going to be questioning or helping
12 Paulnitsky question him about prior to entering
13 that interview room?
14 A. No, ma'am.
15 Q. Did you give Mr. Maysonet his Miranda rights
16 when you went into the interview room?
17 A. I -- I assume I did. I don't recall.
18 Q. Okay. Would you have done that in Spanish?
19 A. Yes.
20 Q. Okay. And would you have given him a form
21 to sign or would you have just spoken to him in
22 Spanish?
23 A. Just spoken to him.
24 Q. All right. And what do you remember
25 Mr. Maysonet saying in response to those questions

Maysonet v.
Guevara

Video Deposition

Page 197

1 by Detective Paulnitsky?
2 A. I don't recall, ma'am.
3 Q. Well, do you remember him confessing to a
4 crime?
5 A. Pardon me?
6 Q. Do you remember him confessing to a crime?
7 A. Ma'am, I don't remember that interview. All
8 I know is I just translated.
9 Q. Okay. You don't remember anything about the
10 interview?
11 A. Nothing about it, no.
12 Q. Do you remember whether he indicated that he
13 wanted his attorney present for the interview?
14 A. No indication.
15 Q. Okay. If he had wanted his attorney
16 present, what would you have done?
17 A. I would have stopped the questioning, walked
18 out of the room.
19 Q. Okay. And do you remember doing that?
20 A. I was -- never.
21 Q. You don't remember stopping the interview
22 because he asked for his attorney, is that right?
23 A. I don't remember the man asking for an
24 attorney.
25 Q. Okay. But you understand that if he had

Page 198

1 asked for an attorney, it would have -- that you
2 would have been obliged to stop the interview,
3 correct?
4 A. Oh, yeah.
5 Q. And would you have stopped the interview?
6 A. Yes. Let the detective know what the man
7 said and walk out of the room.
8 Q. Okay. Okay. So correct me if I'm wrong.
9 You had a short conversation and -- when you were
10 functioning primarily as an interpreter. Is that
11 right?
12 A. Yes.
13 Q. Would you say that your function in that
14 interview was solely as an interpreter?
15 A. Yes.
16 Q. You weren't doing any investigative work in
17 connection with the questions that were asked of
18 Mr. Maysonet by Detective Paulnitsky?
19 A. That's correct.
20 Q. Okay. Now, after that interview ended or at
21 least after your portion of it ended, what did you
22 do?
23 A. I probably went back to my regular
24 investigations.
25 Q. Okay. Do you have any recollection of what

Page 199

1 you did?
2 A. No, ma'am.
3 Q. Okay. And that was on July 15th, 1990?
4 A. If it's on the report, apparently, yes.
5 Q. All right. What happened next?
6 A. Next to what, ma'am?
7 Q. Anything else in connection with
8 Mr. Maysonet that day?
9 A. No, ma'am.
10 Q. That was it?
11 A. That was it.
12 Q. And do you remember Mr. Maysonet saying
13 anything of substance during that interview?
14 A. No, ma'am.
15 Q. As you sit here today, you just remembered
16 it was about a shooting?
17 A. Yes, ma'am.
18 Q. Okay. And you made no reports whatsoever,
19 correct?
20 A. That's correct.
21 Q. And did you prepare a GPR?
22 A. No, ma'am.
23 Q. Did you see Detective Paulnitsky preparing a
24 GPR?
25 A. I don't know, ma'am.

Page 200

1 Q. I mean, I'm asking if you remember.
2 A. No, I don't remember.
3 Q. And do you know whether he prepared any
4 supplemental reports?
5 A. I don't know, ma'am.
6 Q. Okay. Did you ever have an occasion to
7 speak with Mr. Maysonet after July 15th, 1990?
8 A. Yes.
9 Q. Okay. And where did that conversation take
10 place?
11 A. Sergeant Mingey asked me to go with him to 26
12 and Cal. He wanted to interview a gentleman out
13 there that was in custody.
14 Q. Uh-huh.
15 A. And that's when I responded there with him.
16 Q. Okay. What did you know about the
17 investigation of the Wiley brothers prior to August
18 1st, 1990?
19 A. Nothing.
20 Q. Okay. But you do remember Sergeant Mingey
21 saying he wanted to go interview somebody?
22 A. Yes.
23 Q. And he wanted you to interpret?
24 A. Yes.
25 Q. Was Sergeant Mingey a Spanish speaker?

Page 201

1  A.  No, ma'am.
2  Q.  All right.  And do you have a recollection
3   of going to Cook County?
4  A.  Yes, ma'am.
5  Q.  With Sergeant Mingey?
6  A.  Yes, ma'am.
7  Q.  And what did Sergeant Mingey tell you about
8   the purpose of the investigation or the interview?
9  A.  Just want to talk to him about a shooting.
10  Q.  Okay.  And what did you say in response to
11   that?
12  A.  Pardon me?
13  Q.  What did you say in response to Sergeant
14   Mingey telling you he wanted to talk to an inmate
15   at Cook County Jail?
16  A.  I'd go with him.
17  Q.  All right.  Was it customary or -- that
18   Sergeant Mingey was actively investigating cases?
19      MS. CARNEY: Object to form.
20      MR. BRUEGGEN: Foundation.  Go ahead.
21      THE WITNESS: Yes.
22      BY MS. BONJEAN:
23  Q.  Was he a hands-on type of supervisor?
24      MR. BRUEGGEN: Object to form,
25   foundation.  You can answer.

Page 202

1      THE WITNESS: Yes.
2      BY MS. BONJEAN:
3  Q.  He was someone that actually helped
4   investigate cases.  He didn't just sit at a desk
5   and approve reports, right?
6      MR. BRUEGGEN: Same objection.  Go
7   ahead.
8      THE WITNESS: I suppose so.
9      BY MS. BONJEAN:
10  Q.  I mean, he was going to interview somebody?
11  A.  Yeah.
12  Q.  Right?
13  A.  Yeah.
14  Q.  No other detective was going with him,
15   correct?
16  A.  No.
17  Q.  Just yourself?
18  A.  Well, let me, yeah.
19  Q.  But you were functioning as an interpreter,
20   right?
21  A.  That's correct.
22  Q.  Okay.  And so do you know how it was
23   arranged that you were going to meet with this
24   inmate at Cook County Jail?
25  A.  No, ma'am.

Page 203

1      MR. BRUEGGEN: Object to foundation.
2   You can go ahead.
3      THE WITNESS: No, ma'am.
4      BY MS. BONJEAN:
5  Q.  Okay.  So what happened when you got there?
6   And I'm talking about at Cook County Jail.
7  A.  Well, we had to lock our guns up.  We went
8   in.  They brought a form, I think.  The -- the
9   sheriffs brought a form to the gentleman we were
10   going to interview, and he had to sign this form
11   that he was going to talk to us.
12  Q.  Okay.  Did you see the sheriff bring the
13   form?
14  A.  They had the forms.  I brought it to him.  He
15   wasn't in the room with us.
16  Q.  Okay.  So before he got into the room, the
17   sheriff gave him a form to sign, correct?
18  A.  Yes.  Yes, ma'am.
19  Q.  Okay.  And were you present when the sheriff
20   gave the form to the inmate to sign?
21  A.  We were in the same area --
22  Q.  Okay.
23  A.  -- but I didn't see him hand it to him, but I
24   know, so...
25  Q.  Okay.  And what was the purpose of the form?

Page 204

1  A.  I think it's a waiver for -- to speak without
2   a lawyer.
3  Q.  Okay.  Did you have an understanding about
4   whether the inmate had a lawyer?
5  A.  No, ma'am.
6  Q.  I mean, is it a good assumption that --
7  A.  Well, yeah, he had a lawyer, yes, apparently.
8  Q.  I mean, if he was in Cook County Jail,
9   there's a good chance he had a lawyer, right?
10  A.  Yes.
11  Q.  It could have been the public defender's
12   office, but he probably was represented, right?
13  A.  Yes.
14  Q.  Did you later learn that this person was
15   Jose Maysonet?
16  A.  Yes.
17  Q.  Okay.  Did you know going to Cook County
18   Jail that you were going to interview Jose
19   Maysonet?
20  A.  No, ma'am.
21  Q.  You didn't even know who it was?
22  A.  That's correct.
23  Q.  Okay.  Did Sergeant Mingey tell you who the
24   individual was who you were going to interview?
25  A.  On our way there probably.

Maysonet v.
Guevara

Video Deposition

Page 205

1  Q.  Okay.  Did the name mean anything to you on
2  your way there?
3  A.  No, ma'am.
4  Q.  Didn't even remember the name?
5  A.  That's correct.
6  Q.  And did you -- do you remember that you had
7  previously served as an interpreter when you
8  interviewed him with Detective Paulnitsky?
9  A.  I think so.
10  Q.  Did you remember that when he said the name
11  or when you saw him?
12  A.  When I saw him.
13  Q.  Got it.  Okay.
14     MS. BONJEAN: I'm going to mark this.
15     (Exhibit 2 marked.)
16     BY MS. BONJEAN:
17  Q.  Okay.  Mr. Montilla, I'm going to hand you
18  what I've marked as Exhibit 2.  Do you see this
19  document?
20  A.  Pardon me?
21  Q.  Take a look at it.  Do you recognize the
22  document?
23  A.  The Cook County, yeah, Department of
24  Corrections, yeah.
25  Q.  Okay.  And is this the document you were

Page 206

1  referring to earlier that was the consent to be
2  interviewed?
3  A.  Yes.
4  Q.  Okay.  And do you see Mr. Maysonet's name at
5  the top there?
6  A.  Yes.
7  Q.  And it says, "consent to be interviewed by
8  Sergeant Mingey."  Do you see that right underneath
9  there?
10  A.  Right at there, yes.
11  Q.  Okay.  And is this the document that the
12  Cook County sheriff had Mr. Maysonet sign?
13  A.  Yes, ma'am.
14  Q.  Okay.  This wasn't a document you brought
15  with you, right?
16  A.  No.  We don't bring this, no.
17  Q.  Now, this was -- this is --
18  A.  Cook County.
19  Q.  This is a Cook County Department of
20  Corrections document?
21  A.  That is correct.
22  Q.  Can we agree that it's written in English?
23  A.  Yes.
24  Q.  Okay.  And down in the box below, it says,
25  "I, Inmate Jose Maysonet, do hereby consent to be

Page 207

1  interviewed without my attorney present.  This
2  consent is without threat or promises and on my
3  freewill."  And then it purports to have his
4  signature there.  Do you see that?
5  A.  Yes, ma'am.
6  Q.  Okay.  And then there's a date that says
7  August 1st, 1990?
8  A.  Yes.
9  Q.  Does that look right?
10  A.  It looks, yes.
11  Q.  Yeah.  And then down at the bottom, it looks
12  like someone signed off and there's -- I can't read
13  the signature, but it says star 17.  Do you see
14  that?
15  A.  Yes.
16  Q.  That's not you, right?
17  A.  No.
18  Q.  This was done by the Cook County sheriff?
19  A.  Probably Cook County, yes.
20  Q.  And were you present when the Cook County
21  sheriff explained this document to Mr. Maysonet?
22  A.  No.
23     MR. BRUEGGEN: Objection, asked and
24  answered.  Go ahead.
25     THE WITNESS: No, ma'am.

Page 208

1     BY MS. BONJEAN:
2  Q.  Okay.  So you don't know what the Cook
3  County sheriff said to Mr. Maysonet when he signed
4  this document?
5  A.  That is correct.
6  Q.  Okay.  Now, after this was signed, did
7  Mr. Maysonet accompany you into an interview room?
8  A.  He was brought into the interview room.
9  Q.  Okay.  And were you already in the interview
10  room?
11  A.  Yes.
12  Q.  So you and who else, Sergeant Mingey?
13  A.  Yes.
14  Q.  Okay.  So you and Sergeant Mingey were in an
15  interview room, correct?
16  A.  That's correct.
17  Q.  And then a Cook County sheriff brought Jose
18  Maysonet into the interview room?
19  A.  Yes.
20  Q.  Okay.  Now, tell me what you said to
21  Mr. Maysonet or what he said to you when he first
22  entered the room.
23  A.  Sergeant Mingey asked him questions.
24  Q.  Okay.
25  A.  And he needed me -- if I had to interpret, I

Page 209

1 interpreted.
2 Q. Okay. And -- and was Mr. Maysonet speaking
3 in Spanish?
4 A. I think he was speaking some English.
5 Q. Okay. He was speaking a mix?
6 A. Pardon me?
7 Q. Speaking like a mix?
8 A. Yeah.
9 Q. Like a Spanglish kind of?
10 A. On and off, yeah.
11 Q. Okay. Were you actually interpreting from
12 time to time?
13 A. Sometimes I would, yes.
14 Q. Okay. And what was Sergeant Mingey asking
15 Mr. Maysonet?
16 A. Something about a shooting, if he knew any
17 information on a shooting.
18 Q. And do you know whether it was in reference
19 to the shooting that happened on North Avenue?
20 A. No, ma'am, I can't recall.
21 Q. Okay. And what was Mr. Maysonet saying in
22 response to those questions?
23 A. That, I can't -- I think -- I can't recall.
24 Q. Okay. Well, was -- was Sergeant Mingey
25 accusing Mr. Maysonet of being involved in the

Page 210

1 shooting?
2 A. No. There was no accusations made.
3 Q. Okay. Was Sergeant Mingey questioning
4 Mr. Maysonet about his knowledge about a shooting?
5 A. Yes.
6 Q. Okay. And what did Mr. Maysonet say in
7 response to those questions?
8 MR. BRUEGGEN: Object to foundation.
9 THE WITNESS: I'd have to see reports
10 if there was anything made on that interview.
11 BY MS. BONJEAN:
12 Q. Okay. Do you have an independent
13 recollection of Mr. Maysonet making any
14 incriminating statements?
15 A. No, ma'am.
16 Q. Do you remember him saying anything about
17 having provided a gun to individuals who
18 participated in the shooting?
19 A. No, ma'am.
20 Q. Do you remember him saying anything about
21 being present for the shooting?
22 A. No, ma'am.
23 Q. Do you remember him basically denying any
24 involvement in the shooting?
25 A. I -- not that I recall, ma'am.

Page 211

1 Q. Was it a -- how long did the interview last?
2 A. It didn't last very long. A few minutes.
3 Q. Okay. Anything of substance take place
4 during --
5 A. Not that I recall.
6 MR. BRUEGGEN: Object to foundation.
7 THE WITNESS: Not that I recall, ma'am.
8 BY MS. BONJEAN:
9 Q. Okay. And, again, were you functioning as
10 an interpreter during this meeting or in an
11 investigative fashion or both?
12 A. I was an interpreter.
13 Q. Only an interpreter, right?
14 A. Only an interpreter, yes.
15 Q. During that meeting, do you recall
16 Mr. Maysonet invoking his right to counsel?
17 A. No, ma'am.
18 Q. Do you remember him saying, you know, if you
19 want to question me about this shooting, you can do
20 it through my attorney?
21 A. No, ma'am.
22 Q. Never mentioned an attorney during the
23 meeting to the best of your recollection?
24 A. No, ma'am. That's correct.
25 Q. And did you -- this form that we've marked

Page 212

1 as Exhibit 2, did you ever translate this form to
2 him in Spanish?
3 A. No, ma'am.
4 Q. Okay. You never actually discussed this
5 form after he came into the room?
6 A. No, ma'am.
7 Q. All right. And did you give him his Miranda
8 rights at that time?
9 A. No, ma'am.
10 Q. Okay. Do you recall during the interview
11 things getting heated? When I say "heated," I mean
12 contentious, where the parties were yelling at each
13 other.
14 A. No, ma'am.
15 Q. Do you remember Mr. Maysonet raising his
16 voice at any point?
17 A. No, ma'am.
18 Q. Do you remember Sergeant Mingey ever raising
19 his voice?
20 A. No, ma'am.
21 Q. Did you ever raise your voice?
22 A. No, ma'am.
23 Q. Okay. So it was just a cordial type of
24 conversation?
25 A. Yes.

Maysonet v.
Guevara

Video Deposition

Page 213

1 Q. And at some point did the Cook County
2 sheriff come in to the meeting at all?
3 A. No.
4 Q. Okay. You said it didn't last very long.
5 Can you estimate how long this meeting at Cook
6 County Jail lasted?
7 A. Few minutes. It wasn't long.
8 Q. All right. Well, would it be fair to say
9 that it lasted only a few minutes because it didn't
10 yield much information?
11 MR. BRUEGGEN: Object to foundation.
12 THE WITNESS: I can't recall, ma'am.
13 BY MS. BONJEAN:
14 Q. Okay. Do you remember if Jose Maysonet gave
15 any information valuable to whatever investigation
16 Sergeant Mingey was conducting?
17 MS. CARNEY: Object to form.
18 THE WITNESS: Not that I know of.
19 BY MS. BONJEAN:
20 Q. Okay. And you don't remember him making any
21 states incriminating -- any statements
22 incriminating himself in any shooting, right?
23 A. That's correct.
24 Q. How did the interview end?
25 MR. BRUEGGEN: Object to foundation.

Page 214

1 BY MS. BONJEAN:
2 Q. How did it --
3 A. We just said okay. We stopped the interview
4 and we walked out, and then the sheriff returns him
5 back to his cell, wherever he has to take him.
6 Q. All right. And did you prepare any reports?
7 A. No, ma'am.
8 Q. Did you take any notes during the interview?
9 A. No, ma'am.
10 Q. Why not?
11 A. I'm not the investigating detective. I'm the
12 interpreter. Whoever is doing the questioning, they
13 have to write all the -- everything down. Not up to
14 me.
15 Q. Okay.
16 A. I'm just an interpreter.
17 Q. And did you notice whether Sergeant Mingey
18 was taking any notes during the interview?
19 A. I don't think so, ma'am.
20 Q. Okay. Do you know whether he went back to
21 the department and took any notes?
22 A. No idea.
23 Q. Do you know whether he prepared a GPR from
24 the interview after he went back to the area?
25 A. I have no idea, ma'am.

Page 215

1 Q. Okay. So once you left Cook County Jail,
2 you took no actions whatsoever to document what
3 happened during that interview at Cook County Jail,
4 right?
5 A. That's correct.
6 MR. BRUEGGEN: Object to form.
7 THE WITNESS: That's correct.
8 BY MS. BONJEAN:
9 Q. Okay. And by the way, we're talking about
10 an interview that happened on August 1st, 1990.
11 Between the time of the Wiley brothers'
12 murders on May 25th, 1990, and August 1st, 1990,
13 had you learned anything about the investigation as
14 it related to the Wiley brothers' murders?
15 A. No, ma'am.
16 Q. Had you taken part in any part of the
17 investigation?
18 A. No, ma'am.
19 Q. Had you heard any conversation about the
20 investigation?
21 A. No, ma'am.
22 Q. Okay. So you were completely in the dark,
23 fair to say, about what occurred between May 25th,
24 1990, and August 1st, 1990, as it relates to the
25 Wiley brothers' murder investigation?

Page 216

1 MR. BRUEGGEN: Object to form. Go
2 ahead.
3 THE WITNESS: That is correct.
4 BY MS. BONJEAN:
5 Q. And did you have any conversations about
6 your interview with -- strike that.
7 Did you have any conversations about the
8 interview that was conducted between Detective
9 Paulnitsky and Mr. Maysonet back in July 15th,
10 1990, with any other detectives or police
11 personnel?
12 A. No, ma'am.
13 Q. Okay. And I'm going to ask the same
14 question as it relates to August 1st, 1990.
15 Did you have any conversations with any
16 detectives, sergeants or police personnel about
17 that interview in which you acted as an interpreter
18 for Sergeant Mingey and Mr. Maysonet?
19 A. No, ma'am.
20 Q. So when you left there, your work was done,
21 and you took no other actions to either write a
22 report about that interview or even speak about it,
23 right?
24 A. That's --
25 MR. BRUEGGEN: Objection, form,

Maysonet v.
Guevara

Video Deposition

Page 217

1  compound. Go ahead.
2     THE WITNESS: That's correct.
3     MS. BONJEAN: One second.
4     Let's take a five-minute break. That
5  way, you can walk and I can get my documents in
6  order.
7     THE VIDEOGRAPHER: We're going off the
8  record at 2:34 p.m.
9     (Recess taken from 2:34 to 2:51.)
10    (Exhibits 3, 4 and 5 marked.)
11    THE VIDEOGRAPHER: We're now back on
12 the record at 2:51 p.m.
13    BY MS. BONJEAN:
14 Q.  Mr. Montilla, after you left Cook County
15   Jail on August 1st of 1990, did you have any
16   interactions with Mr. Maysonet again?
17 A.  Some time, I think, later on.
18 Q.  Okay. Do you recall how much time elapsed
19   between --
20 A.  No.
21 Q.  Hold on. Let me finish my question. Okay?
22   Do you know how much time elapsed from your
23   meeting at Cook County Jail to the time that you
24   saw him again?
25 A.  No, ma'am.

Page 218

1  Q.  Okay. And what were the circumstances under
2    which you saw Mr. Maysonet after the Cook County
3    Jail interview?
4  A.  Interpreting.
5  Q.  Okay. And where was that?
6  A.  Area 5.
7  Q.  All right. And that same time frame, from
8    August 1st, 1990, to the date on which you saw
9    Mr. Maysonet again at Area 5, did you play any role
10   in the investigation of the Wiley brothers'
11   murders?
12 A.  No, ma'am.
13 Q.  Okay. Do you recall hearing any information
14   about the ongoing investigation into the Wiley
15   brothers' murders?
16 A.  No, ma'am.
17 Q.  Do you recall who was even assigned to
18   investigating the Wiley brothers' murders?
19 A.  No, ma'am.
20 Q.  So between August 1st, 1990, and later on
21   when you saw Mr. Maysonet at Area 5, you have no
22   recollection of learning any information about the
23   Wiley brothers' murders, is that right?
24 A.  That's right.
25 Q.  And do you know whether or not there had

Page 219

1  been any suspects developed between August 1st,
2  1990, and the time when you met Mr. Maysonet again
3  at Area 5?
4  A.  No, ma'am.
5  Q.  So at this occasion when you saw
6    Mr. Maysonet at Area 5, do you recall -- were you
7    working that day?
8  A.  What date?
9  Q.  That you saw Mr. Maysonet at Area 5. I
10   assume you were working, right?
11 A.  The first time or...
12 Q.  No, no, no. When you saw him -- let me lay
13   the foundation a little better. Okay?
14   After the August 1st meeting at Cook County
15   Jail, you said you saw him again at Area 5. Is
16   that right?
17 A.  Yes.
18 Q.  Okay. And as you sit here today, you don't
19   recall how much time elapsed, right?
20 A.  That's correct.
21 Q.  Okay. But you do remember seeing him again
22   at Area 5, correct?
23 A.  Yes, ma'am.
24 Q.  Okay. And I assume you were on duty that
25   day. Right?

Page 220

1  A.  Yes, ma'am.
2  Q.  Do you remember what shift you were working
3    that particular day?
4  A.  I don't recall.
5  Q.  Do you remember whether it was during the
6    day or night when you saw Mr. Maysonet?
7  A.  I think it was during the day.
8  Q.  Okay. And can you describe the
9    circumstances under which you saw Mr. Maysonet at
10   Area 5 some time after that meeting at Cook County
11   Jail?
12 A.  I was asked to interpret.
13 Q.  And who asked you to interpret?
14 A.  I think it was Paulnitsky again.
15 Q.  Okay. And did Detective Paulnitsky tell you
16   why he wanted you to interpret or for what purpose?
17 A.  Just ask some questions.
18 Q.  Okay. Now, did you -- when Detective
19   Paulnitsky came to you and asked you to interpret,
20   did you know it was for Mr. -- an interview --
21   another interview with Mr. Maysonet?
22 A.  Yes.
23 Q.  Okay. Did he say Mr. Maysonet's name to
24   you?
25 A.  Yes.

Page 221

1 Q. Oh, by the way, when you saw Mr. Maysonet in
2 Cook County Jail, is that when you recognized that
3 you had previously served as an interpreter?
4 A. I think so, yes.
5 Q. Okay. And -- okay. So I'm sorry to have
6 jumped back, but I just wanted to get some clarity
7 on that.
8 Okay. So Paulnitsky again asks you to serve
9 as an interpreter. And did he say -- did he tell
10 you why or what case he wanted to ask Mr. Maysonet
11 about?
12 A. I don't recall, ma'am.
13 Q. Okay. Did -- do you remember him saying
14 that he wanted to question Mr. Maysonet about the
15 shootings of the two black men on North Avenue?
16 A. I don't recall.
17 Q. Okay. So you just remember it being a
18 shooting that he -- or do -- I don't want to put
19 words in your mouth. Well, what do you remember
20 Detective Paulnitsky asking?
21 A. Just wanted me to interpret about a shooting.
22 That's all I remember.
23 Q. Okay. And did you?
24 A. Yes.
25 Q. Okay. Where did this interview take place?

Page 222

1 A. In Area 5.
2 Q. And to be clear, this is now your third time
3 serving as an interpreter for an interview with
4 Mr. Maysonet, right?
5 A. Yes.
6 Q. And who was present for this interview?
7 A. I can't recall. It had to be Paulnitsky
8 probably there. I can't recall who else.
9 Q. Anybody else?
10 A. I don't recall, ma'am.
11 Q. And do you remember Paulnitsky asking
12 Mr. Maysonet questions about the shooting?
13 A. If I see a report, something written down, I
14 might be able to recall. I don't remember all the
15 questions, ma'am.
16 Q. And did you give responses -- or strike
17 that.
18 Did he give responses? "He" being
19 Mr. Maysonet.
20 A. If he -- excuse me?
21 Q. Yeah. Did Mr. Maysonet answer Detective
22 Paulnitsky's questions?
23 A. I think he did. I'm not sure.
24 Q. And were you interpreting back and forth
25 again?

Page 223

1 A. Yes, ma'am.
2 Q. And do you remember whether Mr. Maysonet
3 made any incriminating statements during this
4 interview?
5 A. I don't recall, ma'am.
6 Q. Do you remember him making any statements
7 that would suggest that he was involved in a
8 shooting during the interview?
9 A. Not that I recall.
10 Q. And do you remember Detective Paulnitsky
11 getting angry at Mr. Maysonet during this
12 interview?
13 A. No, ma'am.
14 Q. Do you remember Detective Paulnitsky
15 grabbing Mr. Maysonet by the neck at any point?
16 A. No, ma'am.
17 Q. Do you remember Detective Paulnitsky yelling
18 at Mr. Maysonet?
19 A. No, ma'am.
20 Q. Do you remember Detective Paulnitsky ever
21 accusing Mr. Maysonet of being involved in a
22 shooting?
23 A. No, ma'am.
24 Q. If you had seen Detective Paulnitsky grab
25 Mr. Maysonet by the neck, what would you have done?

Page 224

1 A. Ended the interview and walk out of the room.
2 Q. Okay. Would you have made a report?
3 A. I would have told the sergeant.
4 Q. But that didn't happen, right?
5 A. That didn't happen, no, ma'am.
6 Q. Okay. How long did this interview take?
7 A. I don't know, ma'am. I'm not sure.
8 Q. Not very long. Was it --
9 A. I can't speculate. I have no idea.
10 Q. Okay. Fair enough.
11 After the interview, what did you do?
12 A. I don't know, ma'am.
13 Q. Did you leave?
14 A. I probably hung around the area there,
15 probably doing some work.
16 Q. Do you remember taking any investigative
17 actions in connection with the shooting that was
18 the subject of the interview with Mr. Maysonet?
19 A. No, ma'am.
20 Q. Okay. Do you remember preparing any GPRs in
21 connection with your interview or the interview of
22 Mr. Maysonet?
23 A. No, ma'am.
24 Q. Okay. Why not?
25 A. I don't take GPRs. It's up to the detective.

Maysonet v.
Guevara

Video Deposition

Page 225

1  I'm just interpreting.  It's hard to write as you're
2  interpreting.
3  Q.  Right.  And you didn't prepare any report
4  after you interpreted during this interview between
5  Paulnitsky and Mr. Maysonet, right?
6  A.  That's correct.
7  Q.  And if you were working the third watch,
8  what time would you have left work that day?
9  A.  Midnight.
10  Q.  Okay.  Do you recall, as you sit here today,
11  what time you left work?
12  A.  No, ma'am.
13  Q.  All right.  Are you positive you worked the
14  third watch or you just don't recall?
15  A.  I'm not sure.  I'd have to look at reports,
16  see what watch I worked, you know.
17  Q.  Okay.  Fair enough.
18  Now, prior to going to interpret this
19  interview with Paulnitsky and Mr. Maysonet, had you
20  had an opportunity to review any reports related to
21  the Wiley brothers' murders?
22  A.  No, ma'am.
23  Q.  Okay.  And it sounds to me, based on your
24  testimony, that prior to every interview with
25  Mr. Maysonet, you did not review any reports.

Page 226

1  Right?
2  A.  That is correct.
3  Q.  And you had no knowledge about what was
4  happening with the investigation of the Wiley
5  brothers' murders, correct?
6  A.  That's correct.
7  Q.  Now, did you have an occasion to come in
8  contact with Mr. Maysonet again?
9  A.  Probably.  I don't know.
10  Q.  After the interview with Paulnitsky?
11  A.  I think later on that night.  I'm not sure.
12  Q.  Okay.  And what's the next thing you
13  remember?
14  A.  Pardon me?
15  Q.  What's the next thing that you remember as
16  it relates to Mr. Maysonet?
17  A.  Ma'am, I'd have to look at reports to see
18  what went on.  I can't recall.  That's a long time
19  ago.
20  Q.  No, I understand.  I was -- I'm not looking
21  for specifics.
22  Do you remember being present with Detective
23  Guevara at some point?
24  A.  That, I don't recall, ma'am.  I have -- I
25  don't know.

Page 227

1  Q.  Okay.  Do you remember being present and
2  acting as an interpreter -- strike that.
3  Do you remember being present during any
4  interview of Mr. Maysonet by Detective Guevara?
5  A.  No, ma'am.
6  Q.  Okay.  Do you remember serving as an
7  interpreter during an interview with Detective
8  Guevara?
9  A.  No, ma'am.
10  Q.  Would you have served as an interpreter for
11  Guevara given the fact that Guevara spoke Spanish?
12  A.  If he spoke Spanish, I don't have to do an
13  interview with him.
14  Q.  Okay.  Do you ever remember serving as an
15  interpreter between Guevara and Mr. Maysonet?
16  A.  No, ma'am.
17  Q.  Okay.  And as you sit here today, you don't
18  have an independent recollection of being present
19  during an interview between Detective Guevara and
20  Mr. Maysonet, right?
21  A.  That's correct.
22  Q.  At some point do you remember being present
23  during a statement that Mr. Maysonet gave with a
24  court reporter?
25  A.  I might have.  I don't recall.  I might have

Page 228

1  been there.
2  Q.  Okay.  Well, I'm going to show you some
3  documents in a minute, okay, and we'll maybe get --
4  A.  Okay.
5  Q.  -- some clarity on this, but I first am just
6  trying to probe whatever you can remember from this
7  incident, although I know it's a long time ago.
8  After the interview with Detective
9  Paulnitsky in which you served as an interpreter,
10  do you have an independent recollection of any
11  additional interviews with Mr. Maysonet?
12  A.  I had some later, I think.
13  Q.  Okay.
14  A.  I just can't recall what times or...
15  Q.  Okay.  Well, what do you remember?  Tell me
16  what you do remember about those later interviews.
17  A.  Being with State's Attorney DiFranco.
18  Q.  Okay.  So you do remember State's Attorney
19  DiFranco?
20  A.  Yes, ma'am.
21  Q.  Okay.  Do you remember being present for any
22  interviews of Mr. Maysonet with any other Assistant
23  State's Attorney?
24  A.  I don't recall.  I might have been.  I'm not
25  sure.

Page 229

1  Q.  What about any female State's Attorneys, do
2    you remember any female State's Attorneys present
3    there?
4  A.  Might have been.  I think so --
5  Q.  Okay.
6  A.  -- but I can't -- I can't recall what time
7    or...
8  Q.  Okay.  What do you remember about the
9    interview with a female State's Attorney, if
10   anything?
11 A.  Were talking.  I think she called felony
12   review and had someone else in.  I think her shift
13   was ending, I think.
14 Q.  Uh-huh.
15 A.  And that was it.  I think that was it.
16 Q.  Do you know how long she was there at the
17   area?
18 A.  No, ma'am.  I'd have to see what, you know --
19   if -- if there was anything written down what I did
20   at that time, give me a timeline.
21 Q.  Okay.  Do you remember being present for any
22   interview by Detective Guevara of Mr. Maysonet?
23      MR. BRUEGGEN: Objection, asked and
24   answered.  Go ahead.
25      THE WITNESS: No, ma'am.

Page 230

1      BY MS. BONJEAN:
2  Q.  Okay.  But you do remember an interview
3    during which DiFranco was present, correct?
4  A.  Yes, ma'am.
5  Q.  And what was your function during that
6    interview?
7  A.  Pardon me?
8  Q.  What was your function during that
9    interview?
10 A.  In case I needed to interpret.
11 Q.  Okay.  And did you interpret?
12 A.  No, ma'am.
13 Q.  You didn't interpret?
14 A.  No, ma'am.
15 Q.  So tell me what you remember -- strike that.
16   Did Mr. DiFranco speak Spanish?
17 A.  No, ma'am.
18 Q.  Okay.  So did he interview Mr. Maysonet?
19 A.  He talked to him.
20 Q.  Okay.  And what do you remember about that?
21 A.  I think Maysonet was speaking English to him.
22 Q.  Only English?
23 A.  Yes, ma'am.
24 Q.  No Spanish whatsoever?
25 A.  No, ma'am.

Page 231

1  Q.  Okay.  And what did Mr. Maysonet say in
2    English?
3  A.  Ma'am, I have no idea, ma'am.  I'd have to
4    look at a report.
5  Q.  Well, do you have any recollection
6    generally?  Did he confess to a double murder?
7  A.  Ma'am, I'd have to say something.  I don't
8    recall the whole conversation, what went from the --
9    from the beginning to the end, I have no idea.  I
10   know --
11 Q.  Tell me one thing you remember about the
12   conversation.
13 A.  He took us for -- he wanted to take us to a
14   crime scene, where the crime happened.
15 Q.  Okay.  So you remember going to a crime
16   scene with Mr. Maysonet?
17 A.  Yes.  Paulnitsky, myself, DiFranco and
18   Mr. Maysonet.
19 Q.  Okay.  And where -- where did you go?
20 A.  We went to the -- where the Wiley brothers
21   were killed.
22 Q.  Okay.  So -- and that scene was the same
23   scene that you had gone to on the night of the
24   murders, right?
25 A.  Yes, ma'am.

Page 232

1  Q.  Okay.  And did you all go in the same car?
2  A.  Yes.
3  Q.  What type of car was it?
4  A.  Unmarked squad car.
5  Q.  So it was you, it was ASA DiFranco, correct?
6  A.  Yes.
7  Q.  It was Mr. Maysonet?
8  A.  Yes.
9  Q.  And it was Roland Paulnitsky?
10 A.  Yes, ma'am.
11 Q.  Anybody else?
12 A.  No, ma'am.
13 Q.  And what was the purpose of going to the
14   crime scene, if you remember?
15 A.  He took us there to show us how it happened.
16   I think that's what he did.  And that's what we did.
17   We followed up.  He showed us how he parked in the
18   alley, walked along the gangway or the side of the
19   building and fired.
20 Q.  Okay.  Did you get out of the car?
21 A.  I don't remember.  I don't recall.
22 Q.  Uh-huh.  And was it night out or was it
23   morning?  What was -- what time of the day was it?
24 A.  It was light.  I know it was light.  It
25   wasn't dark.

Maysonet v.
Guevara

Video Deposition

---

Page 233

1 Q. And was it before or after Mr. Maysonet made
2 a court-reported statement?
3 A. Before.
4 Q. Okay. And whose idea was it to go to the
5 crime scene?
6 A. I think it was Mr. Maysonet, I think.
7 Q. And why was he so eager to show you where he
8 had committed a double murder?
9 A. I have no idea, ma'am. He just -- they're
10 having their conversation and we go. He says I'll
11 show you where it happened. And that's what we
12 followed up on.
13 Q. Okay.
14 A. And then the questioning started after that.
15 Q. Okay. And where did the questioning take
16 place?
17 A. In Area 5.
18 Q. Okay. And who was present for that?
19 A. DiFranco, myself. I think Guevara might have
20 been in there; I'm not sure. And Paulnitsky, but
21 I'm not sure.
22 Q. Okay. Was there a court reporter there?
23 A. If -- I think so, yes.
24 Q. Okay.
25 A. Yeah.

---

Page 234

1 Q. And during this -- was it a question/answer
2 type of situation or how did the interview take
3 place, do you recall?
4 A. It was like a question and answer, I think.
5 Q. Okay. And again according to you, you were
6 just there essentially to serve as an interpreter,
7 if necessary, right?
8 A. That is correct.
9 Q. And it sounds to me like, at least according
10 to your testimony, that during the court-reported
11 statement, you didn't have to serve as an
12 interpreter?
13 A. I don't recall.
14 Q. Mr. Maysonet spoke entirely in English?
15 A. Spoke English, yes, ma'am.
16 Q. From start to finish?
17 A. I think so, yes.
18 Q. Did you serve as an interpreter between
19 DiFranco and Mr. Maysonet at any time period before
20 the court-reported statement?
21 A. I don't recall.
22 Q. Was there -- do you remember being present
23 for an interview that preceded the actual statement
24 that was taken with a court reporter present?
25 A. There was something between DiFranco,

---

Page 235

1 Maysonet and everything, yes. That's when he
2 decided to call a reporter, I think.
3 Q. Okay. And was that before or after you went
4 to the crime scene?
5 A. After.
6 Q. Okay. And how was -- and there must have
7 been some type of interview with DiFranco before
8 you went to the crime scene, too, correct?
9 A. Yes.
10 Q. Okay. Were you present for that one?
11 A. I think so, yes, ma'am.
12 Q. Okay. I'm just trying to get this all
13 straight.
14 After Mr. Maysonet was at Area 5 -- strike
15 that.
16 By the way, do you know how Mr. Maysonet got
17 to Area 5?
18 A. Pardon me?
19 Q. Do you know how Mr. Maysonet got to Area 5?
20 A. No, ma'am.
21 Q. Do you know whether he came there on his own
22 accord or had been arrested or anything?
23 A. No, ma'am.
24 Q. Okay. So you do recall serving as an
25 interpreter between Paulnitsky and Mr. Maysonet,

---

Page 236

1 right?
2 A. Yes, ma'am.
3 Q. And then at some later point you recall
4 assisting DiFranco with an interview of
5 Mr. Maysonet, right?
6 A. Yes.
7 Q. And you don't remember Guevara, right?
8 A. No, ma'am.
9 Q. Okay. And then at some point you remember
10 accompanying DiFranco, Maysonet and Paulnitsky to
11 the crime scene, right?
12 A. That's correct.
13 Q. And then you came back and there was another
14 interview with DiFranco and Maysonet?
15 A. Yes.
16 Q. And then eventually there was a
17 court-reported statement --
18 A. Yes.
19 Q. -- that was taken?
20 A. Yes.
21 Q. And do you remember the substance of any of
22 these interviews as you sit here today?
23 A. Talking about being with three guys or
24 something. He gave them a gun --
25 Q. Okay.

---

Rizman Rapport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 237

1  A.  -- from his house, and then that's -- they
2  went there.  They had hoodies, I think it was, and
3  they shot.  And then he said he fired.
4  Q.  Okay.  So you have some recollection of the
5  three guys and a gun and the hoodies and the
6  shooting, right?
7  A.  Yeah, on that day, yes.
8  Q.  Okay.  Prior to that day in which
9  Mr. Maysonet was in custody at Area 5, had you ever
10  heard Mr. Maysonet make any statements about three
11  guys?
12  A.  No, ma'am.
13  Q.  Okay.  And I'm going to put -- let's put a
14  date on this.  I'm going to have you actually --
15      MS. COHEN: I have the marked one.
16      MS. BONJEAN: Give me the marked one.
17      MS. COHEN: It's marked 4.
18      MS. BONJEAN: I know, because I have
19  another one marked 3.
20      BY MS. BONJEAN:
21  Q.  I'm going to show you what's been marked as
22  Exhibit 4.
23      MR. BRUEGGEN: Do you want him to read
24  that or are you saying --
25      MS. BONJEAN: I'm just having him look

Page 238

1  at it for now.
2      MS. COHEN: You can share one, I think.
3      MR. SCHALKA: Yeah, whatever.
4      MS. CARNEY: Yeah, we're good.
5      BY MS. BONJEAN:
6  Q.  Now, Mr. Montilla, do you recognize this
7  document?
8  A.  Yes, ma'am.
9  Q.  And what do you recognize it to be?
10  A.  It's an investigation for the shooting for --
11  with DiFranco.
12  Q.  Okay.  But what is it specifically?  Is it a
13  statement of Mr. Maysonet?
14  A.  I'm trying to read it here.  It's --
15  Q.  Well, just look at the top.  What does it --
16  what does it purport to be?
17  A.  Yeah, I think so.
18      MR. BRUEGGEN: If you need to read it,
19  read it, and then you can --
20      THE WITNESS: Yeah, I need to read it.
21      BY MS. BONJEAN:
22  Q.  Okay.  I'm asking you what does it purport
23  to be.  Just read the first three lines.  That's
24  all I'm asking you to read, and then you can take
25  your time reading anything else.  The first --

Page 239

1  right up here.
2  A.  Shooting death of Torrence and Kevin Wiley,
3  taken in an interview room on the 2nd floor, violent
4  crimes headquarters.
5  Q.  Okay.  And does it say statement of Jose
6  Maysonet right there?
7  A.  Yes, ma'am.
8  Q.  Okay.  I'm going to give you the opportunity
9  to read it as I ask questions, but I'm going to go
10  ahead and some questions for now.  Okay?
11  A.  Okay.
12  Q.  And if you need to read and refer, you are
13  certainly welcome to.
14  You would agree that it says statement of
15  Jose Maysonet up there at the top, right?
16  A.  That's correct.
17  Q.  And it also says taken in an interview room,
18  2nd floor, Area 5, violent crimes headquarters,
19  right?
20  A.  That's correct.
21  Q.  And do you remember being in the interview
22  room of the 2nd floor?
23  A.  I think so.
24  Q.  Let me finish my questions.  Okay?
25  And it indicates that the statement was

Page 240

1  taken on Thursday, August 23rd, 1990 at the hour of
2  9:28 a.m., right?
3  A.  Yes.
4  Q.  Does that sound right?
5  A.  Yes.
6  Q.  Okay.  Now -- and just to be clear now that
7  we have a date, between August 1st, 1990, when you
8  saw Mr. Maysonet at Cook County Jail, and August
9  23rd, 1990, at 9:28 a.m., okay, had you done any
10  investigative work on the Wiley brothers' murders?
11  A.  Just the interview, ma'am.
12  Q.  Okay.  Apart from what you did when
13  Mr. Maysonet came into Area 5 before that, did you
14  do any other work on the case?
15  A.  No, ma'am.
16  Q.  Okay.  Now, this statement was taken
17  Thursday, August 23rd, at 9:28 a.m.
18  You indicated that you also were present for
19  a statement with Paulnitsky, right?
20  A.  I think so.  I don't recall.
21  Q.  That's before this, though, right?
22  A.  I think so.
23  Q.  Okay.  And was that the day before or
24  earlier in the morning?
25  A.  I don't recall that time.

Rizman Rappaport (973)992-7650
"When every word counts"

Page 241

1  Q.  Okay.  All right.  But you do remember this
2  statement with the court reporter, and it also says
3  right there in the middle that Frank DiFranco was
4  present along with Detective Fred Montilla.
5  Do you see that?
6  A.  Yes, ma'am.
7  Q.  And is star number 16410 you?
8  A.  Yes.
9  Q.  And down at the bottom, there's some
10  signatures.
11  Do you see your signature down there?
12  A.  Yes.
13  Q.  And according to you, you did not serve as
14  an interpreter during this statement, right?
15  A.  I assume.  I think so.  I think he spoke
16  English.
17  Q.  Well, that's what I'm saying.  If he spoke
18  English, you didn't need to act as an interpreter,
19  right?
20  A.  Yes, if.
21  Q.  Okay.  Do you recall whether or not
22  Mr. Maysonet spoke English during this interview
23  that's reflected on Exhibit 4?
24  A.  With DiFranco, he spoke English, ma'am.  I
25  recall he spoke English.

Page 242

1  Q.  Okay.  So the entire time that he spoke to
2  DiFranco, according to you, he spoke English?
3  A.  I think I had to interpret one word or
4  something.  I don't remember all that.  I know he
5  spoke English.
6  Q.  Okay.  So why were you present for this
7  statement?
8  A.  Pardon me?
9  Q.  Why were you present for this statement if
10  he was speaking English?
11  A.  I was asked to be there in the -- by DiFranco
12  in case he needed -- I needed to interpret from
13  English to Spanish in case he didn't understand a
14  question or something.
15  Q.  Okay.  But in the prior interviews, you had
16  served as an interpreter, right?
17  A.  Yes.
18  Q.  But this one, he was able to speak in
19  English?
20  A.  Yes, ma'am.
21  Q.  And would you agree -- go ahead and look at
22  it if you need to.  It appears to be a question and
23  answer type of statement?
24  MR. BRUEGGEN: Just flip through the
25  pages.

Page 243

1  THE WITNESS: Huh?
2  MR. BRUEGGEN: Flip through the pages,
3  look at it, and then...
4  THE WITNESS: Yep.  Okay.
5  BY MS. BONJEAN:
6  Q.  Does that sound right?
7  A.  Yeah.
8  Q.  Okay.  And it's your recollection that
9  Mr. DiFranco was asking questions in English and
10  Mr. Maysonet was responding in English, right?
11  A.  Yes.
12  MR. BRENER: Asked and answered.
13  THE WITNESS: I recall that, yeah.
14  BY MS. BONJEAN:
15  Q.  And did Mr. Maysonet provide his name to the
16  court reporter as you recall?
17  MR. BRUEGGEN: Object to form.
18  THE WITNESS: Did who?
19  BY MS. BONJEAN:
20  Q.  Did he provide his name to the court
21  reporter as you recall?
22  A.  I assume he did, yes.
23  Q.  Okay.  Do you know -- it says "Jose
24  Maisonet," M-A-I-S-O-N-E-T, both at the top and
25  also in Mr. DiFranco's.

Page 244

1  Do you know who gave that spelling to the
2  court reporter?
3  A.  I have no idea, ma'am.
4  Q.  Okay.
5  One second.
6  Okay.  You can put it aside for the moment.
7  After this statement was taken, what, if
8  anything, do you remember about Mr. Maysonet?
9  A.  Nothing more that I could --
10  Q.  Do you remember if he was charged?  Do you
11  remember anything that happened?
12  A.  I think he was charged.  They charged him,
13  yeah.
14  Q.  Did you serve as an interpreter again after
15  this statement was taken?
16  A.  I don't recall, ma'am.
17  Q.  Okay.  Do you remember taking any
18  investigative actions after this statement was
19  taken?
20  A.  No, ma'am.
21  Q.  Okay.  Nothing, right?
22  A.  Nothing, yes, ma'am.
23  Q.  What about Mr. Maysonet's wife or
24  girlfriend, do you remember talking to her?
25  A.  Pardon me?

Page 245

1  Q.  Mr. Maysonet's wife or girlfriend, do you
2   remember talking to her?
3  A.  I think I did.
4  Q.  Okay.  When did you talk to her?
5  A.  Some time in that day, I think.  I'm not
6   sure.
7  Q.  In the same time period?
8  A.  I think up in the front, yes.
9  Q.  Okay.  Do you remember if it was before
10  Mr. Maysonet's statement was taken or after?
11  A.  I have no idea, ma'am.  I'd have to look at
12  reports.  It wouldn't -- I don't know when I talked
13  to her.
14  Q.  Okay.  Do you remember -- you remember
15  interviewing her, though?
16  A.  Yes.  Interview, I talked to her.
17  Q.  Okay.  Do you remember speaking to her in
18  Spanish?
19  A.  I don't recall, ma'am.
20  Q.  Do you remember speaking to her in English?
21  A.  I might have.
22  Q.  Okay.  If you were just serving as an
23  interpreter, why were you interviewing
24  Mr. Maysonet's wife?
25  A.  Ma'am, I have no idea.  I was probably asked

Page 246

1   to go up there or she probably -- you know, they
2   told -- told me to talk to her or ask her anything.
3  Q.  But you have no recollection of the
4   interview?
5  A.  No, ma'am.
6  Q.  Nothing?
7  A.  Nothing.
8  Q.  Do you remember her saying anything
9   incriminating or exculpatory, anything?
10  A.  No, ma'am.
11  Q.  I'm going to have you look at Exhibit 5.
12  A.  What's this here?
13      MR. SCHALKA: For Exhibit 3, you had --
14      MS. BONJEAN: I didn't do 3 yet.  I'm
15  going to go -- I'll go back to it.
16      BY MS. BONJEAN:
17  Q.  Okay.  I've handed you what's been marked as
18  Exhibit 5.  Do you recognize this document,
19  Mr. Montilla?
20  A.  Yeah.  It's a statement from Rosa Bello.
21  Q.  Who's Rosa Bello?
22  A.  I don't know.  It says here it's a wife.
23  Q.  Okay.  Do you remember speaking to the wife
24  or girlfriend of Mr. Maysonet?
25  A.  I apparently did it.  I'm on here.

Page 247

1  Q.  Okay.  In fact, it says your name and also
2   ASA Frank DiFranco, correct?
3  A.  Yeah.
4  Q.  And it looks like this statement was taken
5   at 2:10 p.m.?
6  A.  At what?
7  Q.  2:10 p.m., up there at the top.
8  A.  Yeah.
9  Q.  Okay.  And that would have been after the
10  court-reported statement of Mr. Maysonet, right?
11  A.  Apparently, yes.
12  Q.  Okay.  And does this -- oh, strike that.
13  Do you know who wrote this statement?
14  A.  No, ma'am.
15  Q.  Is that your handwriting?
16  A.  No, ma'am.
17  Q.  Okay.  Do you know whether it's Rosa Bello's
18  handwriting?
19      MR. BRENER: Foundation.
20      MS. BONJEAN: It's a "did you know" --
21  "do you know."
22      THE WITNESS: I don't know who wrote
23  the statement, ma'am.  I have no idea.
24      BY MS. BONJEAN:
25  Q.  Okay.  Do you know whether it's Frank

Page 248

1   DiFranco's handwriting?
2  A.  Might be.  I don't know, ma'am.
3  Q.  You just don't know?
4  A.  No, ma'am.  I don't have no idea.
5  Q.  Okay.  Can you look at the last page.
6   You see a photograph there.  Do you
7   recognize that guy?
8  A.  I don't know who that is, ma'am.
9  Q.  Okay.  What about the back --
10  A.  No, ma'am.  I have no idea.
11  Q.  Okay.  And as you sit here today, you don't
12  remember anything about the substance of Rosa
13  Bello's statements, right?
14  A.  That's correct.
15  Q.  I am going to now --
16      MR. BRUEGGEN: Are you done with Number
17  5?
18      MS. BONJEAN: For the moment.  I may go
19  back to it.
20      BY MS. BONJEAN:
21  Q.  I'm going to have you look at Montilla 3.
22  Here.
23      MS. BONJEAN: It seems like some of
24  them are double-sided.  It's the same Bates stamp.
25  Some are double-sided.  Here.

Maysonet v.
Guevara

Video Deposition

Page 249

1   Hold on to these because, at least for
2 tomorrow, because I'm not --
3     MR. GREENBERG: If you want, we can put
4 them in my office.
5     MS. BONJEAN: If you want to be the
6 secretary, go right ahead.
7     MR. BRUEGGEN: We can check them along
8 with you and you'll hang on to them and bring them
9 to each dep. Let the young guy do it.
10     MS. BONJEAN: Kyle.
11     MR. JORGENSEN: That's what I'm here
12 for.
13     BY MS. BONJEAN:
14 Q. Okay. I am going to have -- Mr. Montilla,
15 you will see in the right-hand corner of these
16 documents --
17 A. Yeah.
18 Q. -- there's something called a Bates stamp.
19 Okay. It's like a -- it's a numbering system so
20 that we can --
21 A. Okay.
22 Q. And I'm going to ask you some questions
23 about this, and if you need time to review whatever
24 I'm having you look at, take as much time as you
25 need. Okay?

Page 250

1 A. Okay.
2 Q. Have you ever seen this front page before?
3 A. No, ma'am.
4 Q. Is this what the files looked like at Area 5
5 that had investigative material in it?
6 A. No, ma'am. I never saw that.
7 Q. I'm talking about -- do you remember we had
8 that whole conversation earlier about the files
9 that were kept in the -- by the detective --
10 A. Yeah.
11 Q. -- that you could sign out?
12 A. Yeah.
13 Q. Okay.
14     MS. BONJEAN: And also, by the way,
15 there's two in there.
16     MS. CARNEY: Yeah.
17     MS. BONJEAN: Yeah, there's both.
18     BY MS. BONJEAN:
19 Q. But this -- this does not look like those
20 files?
21 A. I don't remember, ma'am. I don't recall.
22 Q. Okay. Okay. Can you turn to the first page
23 that we have there.
24 In the left-hand corner, it says court
25 attendance report. Do you see that?

Page 251

1 A. Yes, ma'am.
2 Q. What's a court attendance report? What are
3 these?
4 A. You made the report when you go to court.
5 You have to put the times when you went, the RD
6 number and everything on the -- on here, and it
7 marks the hours you spend in court.
8 Q. Who prepares these reports?
9 A. The detective that goes to the court.
10 Q. Okay. And what is the purpose of these
11 reports?
12 A. To get paid overtime, if you work overtime.
13 Q. Okay. And on this first page right in the
14 middle, you could see it says detectives in court,
15 and it says Detective R. Guevara. Do you see that?
16 A. Yes, ma'am.
17 Q. Okay. And is -- would that lead you to
18 believe that Detective Guevara filled out this
19 court attendance report?
20 A. I -- yes, ma'am.
21 Q. All right. So you can skip ahead.
22 I'm actually going to have you look at --
23 start -- give me one second.
24 Okay. I'm going to have you look starting
25 at page RFC-Maysonet 65.

Page 252

1 A. 65?
2 Q. Uh-huh.
3     MS. BONJEAN: Do you want to help him,
4 Dave, or do you want me to?
5     MR. BRUEGGEN: I can.
6     MS. BONJEAN: And, actually, you know
7 what I'm going to do? I meant to do this before
8 and you picked up on this. Hold on one second.
9     I'm going to have you mark something
10 else here. I'm going to mark the permanent
11 retention file separately.
12     MS. CARNEY: Thank you.
13     MS. BONJEAN: It was xeroxed together,
14 but it was not meant to be.
15     MR. GREENBERG: So what page is that?
16     MS. CARNEY: Do you want to call that
17 3A?
18     MS. BONJEAN: Yeah. Yeah. So for the
19 record, Exhibit 3 is going to consist of
20 RFC-Maysonet 1 through --
21     MS. CARNEY: 66?
22     MS. BONJEAN: -- through, yeah, 1
23 through 66. And then RFC-Maysonet 67 through 107
24 will be 3A, we'll call it, and that begins with a
25 document that was staffed permanent retention file.

Maysonet v.
Guevara

Video Deposition

Page 253

1   It bothered me, too.
2   MS. CARNEY: Thank you.
3   (Exhibit 3A marked.)
4   BY MS. BONJEAN:
5 Q.  So we're starting at the back, which I've
6   directed you to.  RFC-Maysonet 65 and 66, what do
7   you recognize this to be?
8 A.  Just a general offense case report.
9 Q.  Okay.  And it says Gloria Sanchez and Sheila
10  Santiago.  Do you know who these people are or what
11  this case is about?
12 A.  No, ma'am.
13 Q.  Okay.  Do you know why it's in the
14  investigative file for Mr. Maysonet?
15 A.  No idea, ma'am.
16 Q.  Okay.  Okay.  I'm going to have you, please,
17  if you would, look at the document starting at page
18  59.
19  What is this document?
20 A.  It's a supplementary report made on the
21  murder.
22 Q.  And do you see where it says "field
23  investigation" there, down there in the narrative
24  section?
25 A.  Yeah.

Page 254

1 Q.  What's a field investigation?
2 A.  That's the guys that responded to the -- to
3  the shooting and they were assigned to handle it.
4 Q.  Okay.  And you responded to the shooting,
5  but you weren't assigned to handle it, right?
6 A.  No, ma'am.
7 Q.  Okay.  And it has the victims as being
8  Torrence Wiley and Kevin Wiley, correct?
9 A.  Yes.
10 Q.  And they were male blacks, who were 26 and
11  27 years old, is that right?
12 A.  Yeah.
13 Q.  Okay.  And this incident occurred on May
14  25th, 1990, at least according to the supplemental
15  report, right?
16 A.  Yes.
17 Q.  Okay.  Do you have a recollection of ever
18  reviewing this supplemental report?
19 A.  Never reviewed it, ma'am.
20 Q.  Are you sure you never reviewed it?
21 A.  I never -- I never reviewed this.
22 Q.  Is it you don't remember reviewing it or
23  you're confident you never reviewed it?
24 A.  I'm sure I never reviewed anything on that
25  homicide.

Page 255

1 Q.  Okay.  Let's go to the next page.
2  So what type of information is contained on
3  this second page of this supplemental report?
4   MR. BRUEGGEN: Object to form, vague.
5   THE WITNESS: The injuries, what
6  hospital it was taken to or the county morgue, what
7  type of weapon was used, the location where it
8  happened, date and time.
9   BY MS. BONJEAN:
10 Q.  Is that pretty typical for a --
11 A.  Yeah.  That's --
12 Q.  -- field investigation?
13 A.  Yeah, this is typical.
14 Q.  Okay.  And what's manner and motive?  What
15  is, not -- you don't have to read it to me, but
16  what is -- what is meant by manner and motive?
17 A.  The manner, they were shot.
18 Q.  Uh-huh.
19 A.  The motive, unknown.
20 Q.  Okay.  And a motive is the reason that --
21 A.  Yeah, the reason they were shot, you know.
22 Q.  Okay.  And at least at the time that this
23  was prepared, the motive was unknown, right?
24 A.  Right.
25 Q.  Okay.  And then if you could turn to the

Page 256

1  next page, there's a section that identifies the
2  personnel who were assigned, right?
3 A.  That what, ma'am?
4 Q.  There's a section that shows the personnel
5  who were assigned?
6 A.  Yes.
7 Q.  And your name is not among them, right?
8 A.  That's correct.
9 Q.  Okay.  And that's consistent with your
10  recollection, right?
11 A.  Yes, ma'am.
12 Q.  And is this the first time you're looking at
13  this field investigation report?
14 A.  Yes, ma'am.
15 Q.  Okay.  And you'll see that, if you want to
16  take a look at it, there are some names of
17  individuals on -- starting on the bottom of that
18  page and on to the next page.
19  Do you see that?
20 A.  Ma'am, you're speaking to the table.  I can't
21  hear you.
22 Q.  Sure.
23 A.  You got to look at me because I'm going deaf.
24 Q.  No problem.
25  If you look at the bottom of that second

Maysonet v.
Guevara

Video Deposition

Page 257

1   page.
2   A.  This, okay.
3   Q.  That page is fine.  Do you see some names
4   over here?
5   A.  Yeah.  Oh, here.
6   Q.  Take a look at that and tell me what you
7   recognize those names to be, if anything.
8   A.  Nothing.
9   Q.  Okay.  And as you sit here and read this,
10  does this bring back any recollection or ring any
11  bells that you ever looked at this before?
12  A.  No, ma'am.
13  Q.  Okay.  First time you've ever seen this to
14  the best of your knowledge?
15  A.  Yes.
16      MR. BRUEGGEN: Objection, asked and
17  answered.  Go ahead.
18      BY MS. BONJEAN:
19  Q.  Okay.  Let's go -- then keep going, and
20  we're going to look at RFC-Maysonet 63 and 64.
21  Yeah.
22  A.  Okay.
23  Q.  You see this is another supplemental report,
24  correct?
25  A.  Yeah.

Page 258

1   Q.  It looks like the reporting officer was
2   Detective Boyle?
3   A.  Yes.  Boyle and Brennan.
4   Q.  Right.  And supervising -- or approving was
5   Mingey?
6   A.  Yes.
7   Q.  Do -- does this report -- take a look at it.
8   Just take as much time as you want and tell me if
9   you have any recollection of after having seen this
10  report previously.
11  A.  No, ma'am.
12  Q.  No?
13  And I'll represent, you can disagree, but --
14  or take your time reading it, if you don't take my
15  word for it, that this -- this seems to be
16  interviews with family members of the victims.  It
17  says brother of victim, brother of victim.
18  A.  Seems like it.
19  Q.  Right.  And does it ring a bell for you that
20  you ever looked at any reports --
21  A.  No, ma'am.
22  Q.  -- regarding interviews with family?
23  A.  No, ma'am.
24  Q.  All right.  Okay.  I'm going to have you
25  look at RFC-Maysonet 55.

Page 259

1   This is another supplemental report,
2   correct?
3   A.  Yes.
4   Q.  And it involves again the Wiley brothers'
5   murder on North Avenue?
6   A.  Yes.
7   Q.  And in the narrative section, it says this
8   is a canvass report, correct?  In the narrative
9   section.
10  A.  I got to look where -- I don't see where it
11  says a canvass -- oh, canvass continued, yeah, okay.
12  Canvass report, okay.
13  Q.  Right there.
14  A.  Yeah, I gotcha.
15  Q.  Okay.  What is a canvass report?
16  A.  You go out on the -- you go out on the street
17  and you knock on doors, try to find people, if they
18  saw anything or heard any shots.  And when you -- if
19  you speak with somebody, you put it on the report
20  and you type it down and it goes with the file.
21  That's all a canvass report is.
22  Q.  All right.  I meant to ask you this earlier.
23  When you spoke to Mr. Maysonet in Spanish, were you
24  able to understand him in Spanish?
25  A.  Yes.

Page 260

1   Q.  Okay.  And when he spoke in English, did he
2   have a Puerto Rican accent?
3   A.  Yes.
4   Q.  Pretty thick, right?
5   A.  Yeah.
6   Q.  Okay.  Were you able to understand him when
7   he spoke in English?
8   A.  Yeah.
9   Q.  Okay.  All right.  Now, this canvass report
10  has some names of individuals that appear to have
11  been either in the area or some type of occurrence
12  witnesses, is that fair?
13  A.  Apparently, yes.
14  Q.  Okay.
15  A.  It's written here.
16  Q.  Right.  Please take as much time as you
17  want, look at this report and tell me if you have a
18  recollection of ever having seen this report
19  previous to today.
20  A.  Ma'am, I've never seen this report.
21  Q.  You're confident of that?
22  A.  Yes, ma'am.
23  Q.  Okay.  Now, I'm going to draw your attention
24  specifically to the narrative section again, to an
25  interview with Alma -- I think it says Preceeo?

Maysonet v.
Guevara

Video Deposition

---

Page 261

1 A.  Preceeo, it looks like it.
2 Q.  Preceeo, right?
3 And I'm going to read it.  Read along with
4 me, if you would.
5 Alma -- "Preceeo, Alma, female, white
6 Hispanic," right?
7 A.  Uh-huh.
8 Q.  "3419 West North Avenue."  Do you see that?
9 A.  Yeah.
10 Q.  And that would have been on the same block
11 as 3428 West North Avenue?
12 A.  Yeah.  I assume, yeah.
13 Q.  "Related that she was awakened," it says,
14 "in an argument."  Do you see that?
15 A.  Yes.
16 Q.  I'm sorry, "awakened" --
17 MR. BRUEGGEN: You skipped a line.
18 BY MS. BONJEAN:
19 Q.  I'm sorry.  "She was awakened 24 hours"?
20 A.  2400.
21 Q.  2400, sorry.  What's that time --
22 A.  Midnight.
23 Q.  -- for civilians?  Midnight?
24 A.  Midnight.
25 Q.  Okay.  So "she was awakened at 2400 hours,"

---

Page 262

1 which is midnight, "by the sound of two male
2 English voices that were engaged in an argument."
3 Do you see that?
4 A.  Yes.
5 Q.  "Preceeo stated that she could only hear
6 bits of the conversation."  And then there's some
7 parentheticals that say "I am trying to help you.
8 I am going to kill you.  I am going to kill you
9 first.  You said that we should get the last bus."
10 Do you see those?
11 A.  Yes.
12 MS. CARNEY: Sorry.  I think it's
13 "would," "we would."
14 MS. BONJEAN: "You said that we would
15 get the last bus."
16 MS. CARNEY: Thank you.
17 MS. BONJEAN: My apologies.
18 BY MS. BONJEAN:
19 Q.  Do you see those?
20 A.  Yes.
21 Q.  Okay.  It continues.  "The total argument
22 lasted for about an hour.  After hearing four
23 shots, Preceeo called the police."
24 Do you see that?
25 A.  Yes.

---

Page 263

1 Q.  Preceeo then gave reporting detectives her
2 sister's, Carmen Macias's business telephone
3 number, who was also home when the incident
4 occurred.
5 Do you see that?
6 A.  Yeah.
7 Q.  Do you have a recollection of ever reading
8 this paragraph or receiving this information in any
9 form or fashion prior to today?
10 A.  No, ma'am.
11 Q.  Okay.  Would you agree that this information
12 would be -- would provide some leads into the
13 investigation of the Wiley brothers' murders?
14 MR. BRUEGGEN: Object to foundation,
15 form.  You can answer.
16 THE WITNESS: Maybe.
17 BY MS. BONJEAN:
18 Q.  If she was awakened at midnight and it
19 lasted an hour and the shooting was at 1:00 and she
20 heard these things, would you say that this is
21 material that's worth investigating?
22 MR. BRUEGGEN: Object to foundation.
23 Go ahead.
24 THE WITNESS: Yes.
25 /////

---

Page 264

1 BY MS. BONJEAN:
2 Q.  Now, if you go to the next page, I'm going
3 to read this.  "Carmen Macias" -- who is previously
4 referenced as the sister of Alma
5 Precis -- Preceeo -- "female, white Hispanic, 3419
6 West North Avenue, was contacted by telephone at
7 place of employment and related that she was
8 awakened around 2400 hours."  Also around midnight,
9 right?
10 A.  Yeah.
11 Q.  "By the sound of two male blacks having an
12 argument.  One had a very calm voice.  The second
13 had a loud, abrasive-type voice and sounded as if
14 he may have been drunk.  Macias was only able to
15 hear parts of the argument that lasted for at least
16 an hour.  Both subjects referred a number of times
17 to someone called Lulu Dog."
18 A.  I see that.
19 Q.  "And also had some disagreement about a bus.
20 Macias did not call the police after hearing shots
21 because she did not have her telephone in her
22 apartment, but considered going downstairs to her
23 father, Inocenci, who was also interviewed,
24 apartment and using his telephone to call the
25 police.  Macias later looked out of her window and

---

Page 265

1 saw the two victims down on the street."
2      MR. BRUEGGEN: Wait for a question.
3      MS. BONJEAN: Yes.
4      BY MS. BONJEAN:
5 Q.  Do you have a recollection of ever reading
6 this paragraph before?
7 A.  No, ma'am.
8 Q.  Do you have a recollection of ever receiving
9 this information in any form, either audibly,
10 orally or on some other report, anything?
11 A.  No, ma'am.
12 Q.  Does this at all ring a bell to you?
13 A.  No, ma'am.
14 Q.  Would you agree that this information from
15 Carmen Macias provides some leads that would be
16 worth investigating in connection with the murder
17 of the Wiley brothers?
18 A.  Yes.
19      MR. BRUEGGEN: Objection, foundation,
20 form.
21      BY MS. BONJEAN:
22 Q.  Do you think maybe it might be worth trying
23 to find out who Lulu Dog was, for instance?
24      MR. BRUEGGEN: Object to foundation,
25 incomplete hypothetical.

Page 266

1      THE WITNESS: Yes.
2      BY MS. BONJEAN:
3 Q.  Okay.  Now I would like you to take a look,
4 if you would, starting at page forty --
5 RFC-Maysonet 47.
6 Mr. Montilla, I'm going to have you look at
7 another document that starts at RFC-Maysonet 47 and
8 goes through RFC-Maysonet 54 and is a part of
9 Exhibit 3.
10 Would you agree that this is another
11 supplemental report?
12 A.  Yes, ma'am.
13 Q.  And it's a supplemental report that was
14 prepared in connection with the murders of Torrence
15 Wiley and presumably Kevin Wiley?
16 A.  I -- yes.
17 Q.  Is that right?
18 A.  Yes.
19 Q.  And who were the reporting detectives on
20 this report, if you can tell?
21 A.  Halvorsen, Ernie Halvorsen, Rey Guevara,
22 Steve Gawrys and Roland Paulnitsky.
23 Q.  Okay.  And do you, as you sit here today,
24 remember Roland Paulnitsky being one of the
25 detectives who investigated the Wiley brothers'

Page 267

1 murders?
2 A.  I don't know if he investigated or not,
3 ma'am.
4 Q.  Okay.  But his name is on this report,
5 right?
6 A.  Yes, ma'am.
7 Q.  Would that lead you to believe that he maybe
8 took part in the investigation?
9 A.  Could have been involved.  I don't know,
10 ma'am.
11 Q.  Would you put your name on a report for an
12 investigation you took no part in?
13 A.  No, ma'am.
14 Q.  Okay.  All right.  In the narrative section,
15 it has -- oh, strike that.
16 First of all, what's the date that this
17 report was submitted?
18 A.  Twenty -- it was approved by the sergeant, I
19 think, 24 August 1990 at 11:45 p.m.
20 Q.  Okay.  And do you know when it was submitted
21 to the sergeant?
22 A.  Pardon me?
23 Q.  Do you know when it was submitted to the
24 sergeant by looking at this report?
25 A.  Do I know...

Page 268

1 Q.  When the report was submitted to.
2 A.  Well, if the sergeant signed it on the 24th,
3 that's when he got it.
4 Q.  Right, okay.  And do you see there's a box
5 that says "date report submitted"?  Do you see
6 that, August 23rd, 1990?
7 A.  Yes.
8 Q.  Okay.  Did you play any role in preparing
9 this report?  And if you need to look at it, take
10 as much time as you need.
11 A.  No, ma'am.
12 Q.  You didn't play any role?
13      MR. BRUEGGEN: Make sure you look at
14 the document.
15      THE WITNESS: Okay.
16      MR. BRUEGGEN: There's eight pages
17 there.
18      THE WITNESS: Rephrase the question to
19 me.
20      BY MS. BONJEAN:
21 Q.  Did you play any role whatsoever in
22 preparing this document?
23 A.  Apparently I got -- I'm here with Paulnitsky
24 and myself on the reporting, and Gawrys below that,
25 arresting officers, right here.

Maysonet v.
Guevara

Video Deposition

Page 269

1 Q. Okay, arresting officers. Actually, I'll
2 just have you actually look at the very last page
3 of the report. We're going to go back, but just
4 look at the last page.
5 Do you see your name at the bottom there?
6 A. Yes.
7 Q. Okay. Is that you?
8 A. Yes, ma'am.
9 Q. Now, does the fact that your name is
10 represented here lead you to believe that you took
11 a role in authoring this report?
12 A. I was the -- doing the interpreting, I guess
13 they put me down because I was a -- considered an
14 arresting officer on this case.
15 Q. Okay. Listen to my question, though. Okay?
16 Does the fact that your name appears here
17 lead you to believe that you played a role in
18 authoring the report?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: Yes.
21     BY MS. BONJEAN:
22 Q. Okay. Do you think -- so you played a role
23 in writing the report?
24 A. No, ma'am.
25 Q. Okay. That's what I meant by "authoring."

Page 270

1 A. Okay. No, I didn't write the report.
2 Q. Okay. So I'll use different language.
3 A. Okay.
4 Q. Does the fact that your name appears here
5 lead you to believe that you played a role in
6 actually writing this document?
7 A. No, ma'am.
8 Q. Okay. Are you confident that you played no
9 role in actually writing the words that are on this
10 exhibit?
11 A. Yes, ma'am.
12 Q. That's correct, right?
13 A. That's correct.
14 Q. Okay. Do you have a recollection of ever
15 reviewing this supplemental report?
16 A. No, ma'am.
17 Q. Okay. Did it happen from time to time that
18 a detective's name may appear on a report as a
19 reporting detective, but the detective actually
20 didn't do the reporting?
21 A. Yes.
22 Q. Okay. And why would that happen?
23 A. They --
24     MR. BRUEGGEN: Object to form,
25 foundation.

Page 271

1     THE WITNESS: Apparently participated
2 in some part of the case.
3     BY MS. BONJEAN:
4 Q. Okay. So if someone participated in the
5 investigation, they may be listed on the report,
6 but that doesn't mean they wrote the report, right?
7 A. That's right.
8 Q. Okay. And would you say that's fair here,
9 that you did not have anything to do with writing
10 this report?
11 A. That's correct.
12 Q. Okay. And I think I asked this, but I'm
13 sorry. Indulge me if I did.
14 You don't remember ever reading this report
15 either, right?
16 A. That is correct.
17 Q. Okay. Do you remember reading this report
18 at any point prior to today?
19     MR. BRUEGGEN: Make sure you look at
20 the report.
21     THE WITNESS: Now that I looked at it,
22 I don't know, ma'am.
23     BY MS. BONJEAN:
24 Q. Okay. It's not familiar to you?
25 A. No, not familiar.

Page 272

1 Q. And do you see that Sergeant Epplen is the
2 supervisor who signed off on this?
3 A. Yeah. He was the midnight sergeant.
4 Q. Okay. So let's go to the second page. The
5 first page indicates that Jose Maysonet and Alfredo
6 Gonzalez are in custody. Do you see that?
7 A. Yes.
8 Q. Okay. Do you remember ever having any
9 conversations with Alfredo Gonzalez while he was at
10 Area 5?
11 A. Not that I recall, ma'am.
12 Q. Okay. And the next page references Tino or
13 a possible name of Chris Cruz. Do you see that?
14 A. Yes.
15 Q. And that's someone who is wanted? It says
16 "wanted" to the left, right?
17 A. Yes.
18 Q. Is that just sort of what -- sort of
19 obvious, they're looking for him or he --
20 A. Apparently they're looking for him, yeah.
21 Q. Okay. Do you remember the name Chris Cruz
22 or Tino?
23 A. Pardon me?
24 Q. Do you have any knowledge about Tino or
25 Chris Cruz?

Maysonet v.
Guevara

Video Deposition

Page 273

1  A.  No, ma'am.
2  Q.  Okay.  And Chris Fernandez?
3  A.  No, ma'am.
4  Q.  Okay.  You are listed as an arresting
5  officer of Mr. Maysonet.  Do you see that?
6  A.  Yeah.
7  Q.  Now, you didn't put your name there.
8  Somebody did?
9  A.  No.  Yes.
10 Q.  Okay.  Why were you listed as an arresting
11 officer?
12    MR. BRUEGGEN: Object to foundation,
13 form.
14    MR. BRENER: Join.
15    BY MS. BONJEAN:
16 Q.  If you know.
17    MR. BRUEGGEN: You can answer.
18    THE WITNESS: Apparently when he gave
19 up the -- made a statement or something and said he
20 did the murder, they apparently put me on there
21 because I was there.
22    BY MS. BONJEAN:
23 Q.  Okay.  Would you have called yourself an
24 arresting officer?
25 A.  No.

Page 274

1  Q.  What is an arresting officer?
2  A.  When you actually made the actual arrest.
3  Q.  Okay.  And did you actually make the arrest
4  of Mr. Maysonet?
5  A.  No, ma'am.
6  Q.  Do you remember making the arrest of
7  Mr. Maysonet?
8  A.  I didn't arrest him.  I know that.
9  Q.  Right.
10 A.  And this is put on the report -- when you
11 assist, they put you as an arresting officer.
12 Q.  Okay.  Somebody put you as an arresting?
13 A.  Yes, ma'am.
14 Q.  Do you -- can you tell by looking at this
15 document who actually put the words on these pieces
16 of paper?
17 A.  No, ma'am.  Other than, you know --
18 Q.  I mean, is -- go ahead.  I'm sorry.  I
19 didn't mean to cut you off.
20 A.  Halvorsen did the report.
21 Q.  Okay.  Is it -- is it -- is it customary
22 that whosever name is in that first upper box to
23 the left is the person who authored or wrote the
24 report?
25 A.  Yes.

Page 275

1  Q.  Okay.  So by looking at this, does it
2  suggest to you that it was Halvorsen who actually
3  wrote the report?
4  A.  Yes, ma'am.
5  Q.  Okay.  Let's go to the -- back to the next
6  page.
7  Well, let's keep going.  We're going to look
8  at page three of the report, but it says
9  RFC-Maysonet 49 at the bottom right-hand corner.
10 A.  This one here.  Where?
11 Q.  If you could look at the manner/motive, do
12 you see it says, "manner/motive.  Victims, who were
13 male black youths, were standing on the street when
14 they were approached by the offenders, who are
15 Latin and members of the Latin Kings.  Offenders
16 shot victims to death.  Motive was gang rivalry."
17 Do you see that?
18 A.  Yes.
19 Q.  Okay.  Did you have any information that the
20 Wiley brothers were in a gang?
21 A.  No, ma'am.
22 Q.  Okay.  As you sit here today, do you have
23 any idea what gang they were in?
24 A.  No, ma'am.
25 Q.  Now, it says "vehicle used" underneath that.

Page 276

1  Older model Pontiac Bonaventure, I'm assuming, two
2  door, light blue top over dark blue bottom.  Do you
3  see that?
4  A.  Yes.
5  Q.  "This car is alleged to belong to a Latin
6  King, first name Jeffery."  Do you -- do you
7  remember getting that information from anyone?
8  A.  No, ma'am.
9  Q.  Do you know who Jeffrey is?
10 A.  Pardon me?
11 Q.  Do you know who Jeffrey is?
12 A.  No, ma'am.
13 Q.  Do you remember Mr. Maysonet ever mentioning
14 a guy named Jeffrey?
15 A.  No, ma'am.
16 Q.  The next section is "notifications."  It has
17 two Assistant State's Attorneys listed there.  ASA
18 Jennifer Borowitz and ASA Frank DiFranco?
19 A.  Yes, ma'am.
20 Q.  Okay.  Do you remember both of those
21 Assistant State's Attorneys being at Area 5?
22 A.  Do I remember what, ma'am?
23 Q.  Do you remember both of those Assistant
24 State's Attorneys being at Area 5?
25 A.  Yes.

Maysonet v.
Guevara

Video Deposition

Page 277

1 Q.  And it also says interviewed Rosa Bella --
2 Bello.  Do you see that?
3 A.  Yes, ma'am.
4 Q.  Okay.  And you participated in the interview
5 of Rosa?
6 A.  Apparently I did, yes, ma'am.
7 Q.  Okay.  Okay.  Now, we're going to -- I want
8 to read through this with you and --
9 A.  Oh, down here?
10 Q.  Okay.  It says, "on July 15th, 1990,
11 Sergeant Mingey, Area 5 violent crimes, became
12 aware of an offender charged in a shooting
13 incident, in which three persons were shot on the
14 street.  This person was Jose Maysonet."
15 Keep going.
16 "This shooting incident was reported under
17 RD N-303737.  Recovered from the scene of this
18 shooting were three fired cartridge casings, with a
19 class of nine millimeters.  These casings were
20 inventoried under inventory 784562.
21 "Sergeant Mingey was aware of the fact that
22 the weapon used to kill Torrence and Kevin Wiley
23 was a nine millimeter automatic pistol.  Sergeant
24 Mingey believed that there might be a connection
25 between these two separate shooting incidents."

Page 278

1 On July 15th, 1990, Sergeant Mingey in
2 company with Detective Frank Montilla interviewed
3 Jose Maysonet.  Do you see that?
4 A.  Yes, ma'am.
5 MR. BRUEGGEN: Just F. Montilla, not
6 Frank.
7 MS. BONJEAN: Oh, sorry.  F. Montilla.
8 MR. BRUEGGEN: Let me clarify.  You're
9 not Frank, right?
10 THE WITNESS: No, I'm not Frank.  I
11 don't know why they put Frank.
12 MR. BRUEGGEN: They didn't.
13 MS. BONJEAN: They didn't.  I just made
14 it up, so --
15 THE WITNESS: Okay.
16 MS. BONJEAN: -- my apologies.
17 BY MS. BONJEAN:
18 Q.  It says, "Maysonet, while he was at Area
19 5 -- strike that, "interviewed Jose Maysonet while
20 he was at Area 5.  Detective F. Montilla speaks
21 Spanish.  Detective E." -- I think it's meant to be
22 F. -- "Montilla advised Jose Maysonet of his
23 Miranda rights."
24 Go ahead and just read that paragraph to
25 yourself.  I won't read it all to you.

Page 279

1 A.  Pardon me?
2 Q.  Read that paragraph to yourself.
3 MR. BRUEGGEN: This paragraph.
4 THE WITNESS: The whole paragraph,
5 okay.
6 MS. BONJEAN: Yeah.
7 THE WITNESS: Yeah.
8 BY MS. BONJEAN:
9 Q.  Let me know when you're finished.
10 A.  Okay.
11 Q.  Okay.  Now, you previously testified about
12 a -- serving as an interpreter for an initial
13 interview or -- the first time you met with
14 Mr. Maysonet.  Do you remember that?
15 A.  Uh-huh.
16 Q.  You testified earlier about that.
17 You testified earlier that the first time
18 you met with him was with Mr. Paulnitsky.  Right?
19 A.  I -- yes.
20 Q.  Okay.  Do you think that Mr. -- it was
21 Mr. Paulnitsky or Sergeant Mingey or you don't know
22 as you sit here today?
23 A.  Pardon me?
24 Q.  Do you know whether that first interview
25 with Mr. Maysonet was Sergeant Mingey or Paulnitsky

Page 280

1 or you don't know as you sit here today?
2 A.  I can't remember.  I don't know.
3 Q.  Okay.  But fair to say you don't remember
4 interviewing Mr. Maysonet with Sergeant Mingey on
5 July 15th, 1990, correct?
6 A.  I don't remember, but I know I interviewed
7 him with Sergeant Mingey.
8 Q.  Well, you -- where was that?
9 A.  I think this was at Area 5.  I'm not sure,
10 but it says here Area -- Area 5.
11 Q.  Okay.  But --
12 A.  Yeah.
13 Q.  I know what the document says.
14 A.  Yeah.
15 Q.  I'm asking you:  Do you remember having an
16 interview with Jose Maysonet at Area 5 with
17 Sergeant Mingey?
18 A.  Yes, ma'am.  Yeah.
19 Q.  Okay.  You didn't testify to that earlier,
20 did you?
21 A.  I know I -- no.
22 Q.  So what about this -- why do you think --
23 what about this made you remember that?
24 A.  I was in the area.  Sergeant Mingey asked me
25 if I can -- I think asked me -- he wanted to

Maysonet v.
Guevara

Video Deposition

Page 281

1 interview this guy about some kind of weapon.
2 Q. Okay. But you testified earlier that --
3 well, strike that.
4 So did you also have an interview with
5 Detective Paulnitsky and Mr. Maysonet then?
6 A. I think so. I don't recall all that, ma'am.
7 I don't recall all the dates.
8 Q. Okay. But you remember earlier, you
9 testified about the first time that you met
10 Mr. Maysonet was with Detective Paulnitsky. Right?
11 A. Yes.
12 Q. Okay. Is that correct?
13 A. Yes.
14 Q. That's your recollection?
15 A. My recollection is I spoke with Mason at Area
16 5.
17 Q. With -- you have a recollection of speaking
18 to Mr. Maysonet at Area 5 with Detective Paulnitsky
19 and Mr. Maysonet, right?
20 A. Yes.
21 Q. And this was prior to going to Cook County
22 Jail, right?
23 A. I think so.
24 Q. Does that sound right?
25 A. It sounds right. I might have the dates

Page 282

1 mixed up, ma'am. I don't know.
2 Q. Okay. So now when I asked you earlier about
3 whether you recollected having any interactions
4 with Mr. Maysonet other than the ones you had
5 testified about, you didn't mention one with
6 Sergeant Mingey at Area 5.
7 A. Ma'am, I didn't recall.
8 Q. Okay. So are you -- are you saying that
9 this refreshes your recollection about that?
10 A. Yes, ma'am. Yeah.
11 Q. Okay. So tell me about that interview.
12 A. With Sergeant Mingey?
13 Q. Yeah. What do you remember about it? I
14 don't want you to read it to me. I can read it.
15 A. No. Sergeant Mingey asked me, do you want to
16 talk to this guy. We went in there.
17 Q. Okay.
18 A. Jose Maysonet made some statement about the
19 Latin Kings. He had a -- a gun that they asked him
20 to keep in his house. Later on, they came and they
21 asked him for the gun back. He went to his house,
22 gave them -- got the gun, gave it to the Kings, and
23 they drove off. Then he stated -- I think it was at
24 that time he said he heard about some guys getting
25 shot and he assumed that the guys that got the gun

Page 283

1 shot.
2 So then we -- Sergeant Mingey asked some more
3 questions, and he refused to answer any more
4 questions then and there. I think he said he wanted
5 a -- a bargain or something.
6 Q. Okay. Now, remember when I asked you
7 questions about this earlier?
8 A. Yes, ma'am.
9 Q. You didn't mention anything about this.
10 A. Ma'am, I -- I have a report to recall my
11 memory.
12 Q. Well --
13 A. So I need reports to recall memory. I'm old.
14 Q. But, sir, I asked you if you remember
15 Mr. Maysonet saying anything even incriminating,
16 and you said no.
17 A. No, I don't remember it. If I see a report,
18 it will enlighten my mind. I'm 74 years old. This
19 is almost 30 years ago.
20 Q. Right.
21 A. I can't remember everything, you know, that
22 happened.
23 Q. Okay.
24 A. I need to see all the reports to read things.
25 Q. Okay. So does -- so this actually refreshes

Page 284

1 your recollection?
2 A. Yes, ma'am.
3 Q. Okay. So tell me where you were when that
4 interviewed happened.
5 A. Area 5.
6 Q. Where?
7 A. Upstairs in one of the small rooms.
8 Q. Okay. And who was present?
9 A. It was just Sergeant Mingey and I.
10 Q. Okay. And did this interview happen before
11 you interviewed Mr. Maysonet with Detective
12 Paulnitsky or after you interviewed Mr. Maysonet
13 with Detective Paulnitsky?
14 A. I think after or -- wait. With Sergeant
15 Mingey and I?
16 Q. Yeah.
17 A. Before Paulnitsky.
18 Q. So you interviewed Mr. Maysonet with
19 Detective Paulnitsky before you interviewed him
20 with Sergeant Mingey?
21 A. I'm not sure. I think so. I'm not sure,
22 ma'am.
23 Q. Well, what's your best recollection?
24 A. I know it was Paulnitsky and I at one time,
25 and Sergeant Mingey at another time.

Page 285

1 Q. Okay. Now, this paragraph you just read
2 that you now remember, did you serve as an
3 investigator or an interpreter during this
4 interview?
5 A. Interpreter.
6 Q. Just an interpreter?
7 A. Just an interpreter.
8 Q. Okay. You weren't responsible for reporting
9 this?
10 A. That's right.
11 Q. Okay. But you would expect Sergeant Mingey
12 to have reported about this incident, correct?
13 A. Yes.
14 MR. BRUEGGEN: Object to form.
15 BY MS. BONJEAN:
16 Q. Now, when you spoke -- now that your
17 recollection is refreshed --
18 A. Uh-huh.
19 Q. -- when you spoke to Sergeant Mingey on July
20 15th, 1990, what did Sergeant Mingey specifically
21 question Mr. Maysonet about? And if you need to
22 look at that to --
23 A. I will look at it, but I think it was
24 against -- asked him about the shooting on North
25 Avenue.

Page 286

1 Q. Okay. Do you remember Sergeant Mingey
2 asking him about the shooting on North Avenue?
3 A. I think he did.
4 Q. Okay. And do you remember why he wanted to
5 ask Mr. Maysonet questions about the shooting on
6 North Avenue?
7 MR. BRUEGGEN: Object to foundation.
8 THE WITNESS: Okay. A 45 was used, and
9 there was a 45 used prior to that on an aggravated
10 battery. People -- three people, I think, were
11 shot.
12 BY MS. BONJEAN:
13 Q. Okay. And how did you remember that?
14 A. Once I start reading, things will come back
15 to my mind.
16 Q. Okay. What did Mingey tell you about --
17 strike that.
18 Prior to sitting down with Sergeant Mingey
19 and Mr. Maysonet on July 15th, 1990, had you
20 reviewed any police reports?
21 A. No, ma'am.
22 Q. Okay. And did you prepare a GPR that
23 reflected this interview on July 15th of 1990?
24 A. No, ma'am.
25 Q. Did Sergeant Mingey prepare a GPR --

Page 287

1 A. I don't know. He might have, ma'am.
2 Q. Okay. Let me -- let me finish my question.
3 Do you know whether Sergeant Mingey prepared
4 a GPR that reflected this interview on July 15th,
5 1990?
6 A. I don't know, ma'am.
7 Q. Okay. Would you expect there to be a GPR
8 reflecting this interview with Mr. Maysonet?
9 A. Yes. Yes.
10 MS. CARNEY: Objection, foundation,
11 form.
12 BY MS. BONJEAN:
13 Q. Would you agree that Jose Maysonet has
14 provided some important information in connection
15 with the murder of the Wiley brothers here?
16 MS. CARNEY: Objection, form.
17 THE WITNESS: Yes.
18 BY MS. BONJEAN:
19 Q. Yeah, you would agree with that?
20 A. Yeah.
21 Q. Okay. And in fact, he's provided
22 information that, arguably, implicated himself in
23 the crime, correct?
24 A. Yes.
25 Q. He says he gave a gun to some Latin Kings

Page 288

1 that may have been involved in this shooting,
2 right?
3 A. Yes.
4 Q. Okay. So, again, this information should be
5 reflected in a GPR somewhere, right?
6 A. Yes.
7 MR. BRUEGGEN: Object to form.
8 THE WITNESS: Yes.
9 BY MS. BONJEAN:
10 Q. What information did you have about who
11 might be responsible for the Wiley brothers'
12 murders prior to July 15th of 1990?
13 A. Can you repeat that for me?
14 Q. Sure. Prior to July 15th of 1990 --
15 A. Yeah.
16 Q. -- what information did you have about any
17 possible suspects in the murders of the Wiley
18 brothers?
19 A. None.
20 Q. Mr. Maysonet provided the first bit of
21 information about who might be responsible for the
22 Wiley brothers, right?
23 MR. BRUEGGEN: Objection to --
24 MS. CARNEY: Objection, misstates his
25 testimony.

Maysonet v.
Guevara

Video Deposition

Page 289

BY MS. BONJEAN:
1
2  Q.  Is that correct?
3  A.  I assume right here, yes, on the 15th --
4  Q.  Okay.  Were --
5  A.  -- that I know.
6  Q.  Okay.
7       MR. BRUEGGEN: Jennifer, when you're to
8  a point of breaking.
9       MS. BONJEAN: Yeah.  Well --
10      MR. BRUEGGEN: I want to get him up,
11  stretching just a little.
12      MS. BONJEAN: Yeah.
13      BY MS. BONJEAN:
14  Q.  Okay.  Now -- hold on one second.
15  After this conversation with Mr. Maysonet in
16  which you served as an interpreter for Sergeant
17  Mingey, did you have any further discussions with
18  Sergeant Mingey about -- about this interview?
19  A.  No, ma'am.
20  Q.  Did you discuss what you were going to do
21  with this information?
22  A.  No, ma'am.
23  Q.  And why is that?
24  A.  I'm not the investigator and I'm not a
25  homicide detective.

Page 290

1  Q.  Okay.  So as far as you're concerned, your
2  only function was to serve as an interpreter on
3  July 15th of 1990?
4  A.  That is correct.
5  Q.  And do you recall whether or not
6  Mr. Maysonet told you or told Sergeant Mingey
7  through you that he had an attorney?
8  A.  Not that I recall.
9  Q.  Okay.  Do you recall whether or not
10  Mr. Maysonet exercised his right to counsel during
11  this meeting?
12  A.  No, ma'am.
13  Q.  No, you don't recall it, or you're confident
14  he did not?
15  A.  I'm confident he denied it.
16  Q.  And why are you so confident of that?
17  A.  Because he started talking to us and give us
18  information.
19  Q.  Okay.  And he didn't say he was represented
20  by anybody?
21  A.  No.
22  Q.  All right.  Now, after that interview, what,
23  if anything, did you do in connection with
24  investigating the Wiley brothers' murders?
25  A.  Another interview.

Page 291

1  Q.  Okay.  And when was that interview?
2  A.  That was in the county jail.
3  Q.  Okay.  Between the July 15th, 1990 interview
4  and the August 1st, 1990 interview in the county
5  jail, what investigative actions did you take in
6  connection with the Wiley brothers' murders?
7  A.  I took no investigative actions.
8  Q.  Nothing?
9  A.  Nothing, no.
10  Q.  You're confident of that?
11  A.  Yes, ma'am, I'm confident.
12  Q.  And anything -- any report I can give you to
13  refresh your recollection?
14  A.  If you give me a report, it will refresh my
15  memory, but I didn't do any investigative stuff on
16  this case, other than interpreting.
17  Q.  Okay.  So what happened that -- so you
18  testified about August 1st, 1990.  You remembered
19  going to the jail with Sergeant Mingey, right?
20  A.  Yes, ma'am.
21  Q.  And we talked about this earlier.
22  A.  Yes.
23  Q.  You said the interview didn't last very
24  long.  Right?
25  A.  Pardon me?

Page 292

1  Q.  You said the interview didn't last very
2  long.
3  A.  No, I don't think it lasted very long.
4  Q.  Okay.  And you don't remember Mr. Maysonet
5  saying anything incriminating during that
6  interview?
7  A.  I don't recall, ma'am.
8  Q.  Okay.  Now, you don't remember, of course,
9  writing any reports or GPRs from that interview,
10  because you were just an interpreter, right?
11  A.  Yes, ma'am.
12  Q.  Now, you said you remembered Mr. Maysonet
13  asking for a deal.  What was he asking you for a
14  deal -- related to what?
15  A.  I haven't...
16  Q.  Do you know why?
17  A.  I think Sergeant Mingey asked him if he knew
18  who the shooters were, and he wanted to make a deal.
19  Sergeant Mingey says no, no deal, and that's --
20  interview ended.
21  Q.  But what did Mr. Maysonet want in exchange
22  for giving up the names of the shooters?
23  A.  I have no idea, ma'am.
24  Q.  Okay.  And to be clear, prior to July 15th,
25  1990, you had no reason to believe that

Rizman Rapaport (973)992-7650
"When every word counts"

Page 293

1 Mr. Maysonet was involved in the shooting of the --
2 A. That's -- that's correct.
3 Q. Hold on. Let me finish.
4 A. Okay.
5 Q. Prior to July 15th, 1990, you had no reason
6 to believe that Mr. Maysonet had any role in the
7 murders of the Wiley brothers, right?
8 A. That's correct.
9 Q. Okay. And between July 15th and August 1st,
10 1990, you can't tell us of any information that you
11 developed or became aware of regarding who might be
12 responsible for the Wiley brothers' murders, right?
13 MR. BRUEGGEN: Objection, asked and
14 answered. Go ahead.
15 THE WITNESS: Correct.
16 BY MS. BONJEAN:
17 Q. And then on August 1st, 1990, it's your
18 recollection that the interview didn't last very
19 long. Right?
20 A. That's correct.
21 Q. But go ahead and read this paragraph, if you
22 would, for me.
23 MR. BRUEGGEN: This paragraph, the next
24 one.
25 THE WITNESS: Okay.

Page 294

1 BY MS. BONJEAN:
2 Q. Based on your prior testimony, you don't
3 have an independent recollection of what is written
4 here, right?
5 A. That's right.
6 Q. You're just reading this --
7 A. I'm reading this for the first time.
8 Q. Okay. And, again, you didn't write this,
9 right?
10 A. That's correct.
11 Q. And does this jibe with your recollection of
12 the meeting?
13 A. Yes.
14 Q. Okay. So when you said earlier that the
15 meeting didn't last very long, do you still stand
16 by that, or do you think it --
17 A. I still stand by it. It didn't last long.
18 Q. Okay. And during this meeting,
19 Mr. Maysonet, at least according to this, stated he
20 was -- stated that he was involved in the murders
21 of the two black youths, right?
22 A. Yeah.
23 Q. That's an incriminating statement, right?
24 A. Yes, it is.
25 Q. That's a confession really, right?

Page 295

1 A. Yeah.
2 Q. That's an admission, right?
3 A. Yeah.
4 Q. You didn't remember him making that, though?
5 A. No, I don't remember. I didn't recall,
6 unless I read it. If it's an old report, I don't
7 remember. It's hard to remember.
8 Q. But you don't remember him confessing to the
9 murders at Cook County Jail, right?
10 A. At the time that -- in my answer, no, I don't
11 recall, until I see reports, then I can -- it'll
12 refresh memories.
13 Q. Right. So when you read the report, you now
14 remember it?
15 A. Yes, ma'am. It refreshes my memory.
16 Q. Okay. So how did he say it?
17 A. In Spanish, he said he was three, he knew who
18 the guys were, and he wanted to make a deal.
19 Q. Okay. So now you remember those --
20 A. Yeah. I remember him wanting to make a deal.
21 Sergeant Mingey says we don't make deals, and that
22 was it.
23 Q. Okay. But you remember him saying that he
24 was involved?
25 A. Yes, ma'am. Yeah.

Page 296

1 Q. Okay. And he also stated that he was not
2 the shooter, but was present when the shooting
3 occurred, right?
4 A. Yes, ma'am.
5 Q. But he knows who the shooter is, right?
6 A. Yeah.
7 Q. And you remember all that?
8 A. Yes, ma'am.
9 Q. Okay. Now, you would agree, of course, that
10 this is essentially a confession, right?
11 A. Yes.
12 Q. Okay. And when somebody confesses to a
13 crime, as a detective what do you do?
14 MR. BRUEGGEN: Object to form,
15 foundation, incomplete hypothetical. Go ahead and
16 answer.
17 THE WITNESS: Place them into custody.
18 BY MS. BONJEAN:
19 Q. Okay. You place them under arrest, right?
20 A. Yes, ma'am.
21 Q. Now, he was already in custody.
22 A. Yes.
23 Q. So what would you do when someone confesses
24 to a murder, but they're already in custody?
25 A. You go back to the area. You put it on a

Maysonet v.
Guevara

Video Deposition

Page 297

1  report and you get a writ to writ them out of jail
2  and bring them into the area and formally charge
3  them.
4  Q.  Right.  And this is, of course -- this is a
5  death penalty case, right?
6  A.  Yes, ma'am.
7      MR. BRUEGGEN: Object to foundation.
8      BY MS. BONJEAN:
9  Q.  Two bodies, right?
10 A.  Yes.
11 Q.  A pretty serious crime?
12     MR. BRUEGGEN: Object to --
13     MS. CARNEY: Objection, form.
14     BY MS. BONJEAN:
15 Q.  You don't get more serious than two bodies,
16 except maybe five bodies or ten bodies, right?
17 A.  Yes.
18 Q.  Okay.  And certainly you would want to
19 prepare a report reflecting this confession, right?
20     MR. BRUEGGEN: Object to form.
21     THE WITNESS: Yes.
22     BY MS. BONJEAN:
23 Q.  Okay.  And you would want to prepare that
24 report immediately after someone confessed, right?
25 A.  Yes.

Page 298

1  Q.  Okay.  Would you do it -- how would you do
2  it, in a GPR and then in a supplemental?  How would
3  you do it?
4  A.  It all depends on --
5      MR. BRUEGGEN: Object to form,
6  incomplete hypothetical.  Go ahead and answer.
7      THE WITNESS: It all depends on the
8  detective that was there with me.  He has to make
9  this report.  Probably a GPR.
10     BY MS. BONJEAN:
11 Q.  Right.  And I know you didn't do it and I
12 know -- I'm not asking you to tell me what Sergeant
13 Mingey did.  I'm asking you to tell me what you
14 would expect Sergeant Mingey to do.
15 A.  Make a GPR.
16     MR. BRUEGGEN: Object to form.
17     BY MS. BONJEAN:
18 Q.  Go ahead.
19 A.  And then a supplementary.
20 Q.  Okay.  And would you expect him to do that
21 when he got back to Area 5 immediately?
22 A.  Yes.
23 Q.  Do you remember Sergeant Mingey asking
24 Mr. Maysonet whether he'd be willing to give a
25 handwritten statement?

Page 299

1  A.  I don't recall, ma'am, no.
2  Q.  Okay.  Do you remember Sergeant Mingey
3  asking Jose Maysonet whether he'd be willing to
4  make a statement in some other fashion, such as
5  with a court reporter or video?
6  A.  On August 1st?
7  Q.  Yeah.
8  A.  No, I don't recall that, ma'am.
9  Q.  Okay.  Now, did you ever review or see any
10 GPRs prepared by Sergeant Mingey?
11 A.  No, ma'am.
12 Q.  Okay.  And in connection in preparation for
13 your deposition here today, did you see any GPRs
14 prepared by Sergeant Mingey?
15 A.  No, ma'am.
16 Q.  And Sergeant Mingey would have been the
17 person responsible for preparing the GPR, correct?
18 A.  Yes.
19     MR. BRUEGGEN: Object to foundation.
20     BY MS. BONJEAN:
21 Q.  And that would be for the July 15th, 1990
22 interview and the August 1st, 1990 interview,
23 correct?
24     MR. BRUEGGEN: Same objection.
25     THE WITNESS: Yes.

Page 300

1      BY MS. BONJEAN:
2  Q.  Okay.  It wouldn't be you, right?
3  A.  No.
4  Q.  Was there anyone else there?
5  A.  No.  Just us.  That's it.
6  Q.  So it wouldn't have been Mr. Maysonet's
7  responsibility for preparing a GPR, would it?
8  A.  No, ma'am.
9  Q.  Okay.  And after Mr. Maysonet confessed to
10 this double murder on August 1st, 1990, what
11 investigative actions did you take in connection
12 with the Wiley brothers' murders?
13 A.  With Paulnitsky, with the State's Attorneys,
14 you making statements and charging.  That was it.
15 Q.  Okay.  But we've already established, and
16 you looked at the statement, that Mr. Maysonet did
17 not make any statements to ASA DiFranco until
18 August 23rd of 1990, right?
19 A.  I suppose so, if it's in the report.
20 Q.  Right.  So what happened between August 1st,
21 1990, and August 20 -- well, August 22nd, 1990, by
22 way of investigative actions?
23 A.  I have no --
24     MR. BRUEGGEN: Object to foundation.
25     MS. CARNEY: And form.

---

Page 301

1  THE WITNESS: I have no idea, ma'am.
2  BY MS. BONJEAN:
3  Q.  Did you take any actions to investigate the
4  case after Mr. Maysonet confessed, essentially, to
5  you on August 1st, 1990?
6  MS. CARNEY: Objection, asked and
7  answered.
8  MS. BONJEAN: I'm sorry.  Let me strike
9  that.
10  BY MS. BONJEAN:
11  Q.  Between August 1st, 1990, and August 22nd,
12  1990, did you take any actions in terms of the
13  investigation?
14  A.  No.
15  MS. CARNEY: Objection, asked and
16  answered.
17  THE WITNESS: No, ma'am.
18  BY MS. BONJEAN:
19  Q.  Okay.  What actions, if any, did Sergeant
20  Mingey take to corroborate Mr. Maysonet's
21  confession on August 1st, 1990?
22  MR. BRUEGGEN: Object to foundation.
23  MS. CARNEY: Object to foundation.
24  MR. BRENER: Join.
25  /////

---

Page 302

1  BY MS. BONJEAN:
2  Q.  If you know.
3  A.  I have no idea, ma'am.
4  Q.  We would see that in a report probably,
5  right?
6  MR. BRUEGGEN: Object to foundation.
7  MS. CARNEY: Object to foundation.
8  MR. BRUEGGEN: Speculation.
9  MR. BRENER: Join.
10  THE WITNESS: Yes.
11  BY MS. BONJEAN:
12  Q.  Did you do anything to corroborate
13  Mr. Maysonet's statements from August 1st, 1990?
14  A.  No, ma'am.
15  Q.  Okay.  Do you know whether any detective did
16  anything to corroborate Mr. Maysonet's statements
17  from August 1st, 1990?
18  MS. CARNEY: Objection, foundation.
19  THE WITNESS: I have no idea, ma'am.
20  BY MS. BONJEAN:
21  Q.  Do you know whether Mr. Maysonet's
22  statements -- well, strike that.
23  Did you -- did you -- did you ever even read
24  the reports that --
25  A.  No.

---

Page 303

1  Q.  -- had been prepared?
2  A.  Read whose report?
3  Q.  Did you read any reports that had been
4  prepared in connection with this double murder
5  prior to August 1st, 1990?
6  MS. CARNEY: Objection, asked and
7  answered.
8  THE WITNESS: No, ma'am.
9  MS. BONJEAN: Well, he remembers things
10  all of a sudden.  So I'm going to have to ask it
11  again, since you've looked at this.
12  THE WITNESS: I didn't prepare
13  anything, no, ma'am.
14  BY MS. BONJEAN:
15  Q.  Okay.  Do you remember reading any reports?
16  A.  No, ma'am.  No.
17  Q.  Okay.
18  MR. BRUEGGEN: Is this a good time for
19  a break?
20  MS. BONJEAN: One second.  Hold on.
21  BY MS. BONJEAN:
22  Q.  Did you charge Mr. Maysonet for the double
23  murder?
24  A.  Did I what?
25  Q.  Did you charge Mr. Maysonet for the double

---

Page 304

1  murder after August 1st, 1990, but before August
2  22nd, 1990?
3  A.  I didn't charge him, but I think Paulnitsky
4  charged him, put my name on there as an arresting
5  officer.
6  Q.  Okay.  But did you charge Mr. Maysonet for
7  the double murder of the Wiley brothers on August
8  2nd, 1990?
9  A.  I didn't formally charge him.
10  Q.  Okay.  Do you know if anyone charged
11  Mr. Maysonet on August 2nd, 1990, after he
12  confessed to the murders?
13  A.  I have no -- I have no idea, ma'am.
14  Q.  Do you know whether anybody charged
15  Mr. Maysonet with the double murders after he
16  confessed to them on August 1st, 1999 (sic), prior
17  to Paulnitsky bringing him into custody on August
18  22nd?
19  A.  No, ma'am.
20  Q.  Okay.  Do you have any idea why the
21  investigating detectives -- which according to you
22  is not you, right?
23  A.  That's correct.
24  Q.  Any idea why the investigating detectives
25  did not come back and charge Mr. Maysonet for the

---

Page 305

1  double murder after he confessed to you and
2  Sergeant Mingey on August 1st, 1990?
3      MR. BRUEGGEN: Objection, speculation.
4      THE WITNESS: I -- I have no idea,
5  ma'am.
6      BY MS. BONJEAN:
7  Q.  Certainly you would agree that there was
8  probable cause to arrest him for the double murders
9  after he confessed to you on August 1st?
10 A.  Yes.
11 Q.  Right?
12 A.  Yes.
13 Q.  And you don't know why he wasn't charged?
14 A.  That's correct.
15 Q.  Immediately?
16 A.  Yes.
17     MS. BONJEAN: Okay.  We can take a
18 break.
19     THE VIDEOGRAPHER: We're going off the
20 record at 4:17 p.m.
21     (Recess taken from 4:17 to 4:28.)
22     (Mr. Greenberg no longer present.)
23     THE VIDEOGRAPHER: We're now going back
24 on the record at 4:28 p.m.
25 /////

Page 306

1      BY MS. BONJEAN:
2  Q.  Mr. Montilla, you spent many years as a
3  detective, correct?
4  A.  Yes, ma'am.
5  Q.  And even though you weren't a homicide
6  detective in 1990, you have investigated homicides,
7  right?
8  A.  Just a couple.
9  Q.  Okay.  You've investigated serious felony
10 offenses, right?
11 A.  Say what?
12 Q.  You've investigated serious felony offenses?
13 A.  Yes.
14 Q.  Okay.  Robberies, right?
15 A.  Yes.
16 Q.  Any sexual assaults?
17 A.  Yes.
18 Q.  Burglaries?
19 A.  Yeah.
20 Q.  Other violent crimes?
21 A.  Yes, ma'am.
22 Q.  Okay.  Is there a difference between
23 investigating homicide cases and investigating
24 robbery cases, for instance?
25 A.  Big difference.

Page 307

1      MR. BRUEGGEN: Object to form.  Go
2  ahead.
3      THE WITNESS: Okay.  Big difference.
4  Different type of reporting you have to make.
5      BY MS. BONJEAN:
6  Q.  Well, the fundamentals of an investigation
7  are the same, though, aren't they?
8  A.  Yeah, fundamentals are basically the same,
9  but there's more meat to it for a murder or an
10 aggravated battery than it is for a robbery.
11 Q.  If it's a more complex case, there might be
12 more things you need to do, right?
13     MR. BRUEGGEN: Object to form.  Go
14 ahead.
15     THE WITNESS: Yes.
16     BY MS. BONJEAN:
17 Q.  If there's forensics involved, you might
18 have to involve different forensic teams in the
19 investigation, right?
20 A.  Yes.
21 Q.  Okay.  But the fundamentals, the way you
22 approach a crime and investigating a crime, is the
23 same from one case to the next, right?
24 A.  Up to a point.
25 Q.  Okay.  You want to get information,

Page 308

1  corroborate information, right?
2  A.  Yes.
3  Q.  You want to determine motives to crimes,
4  correct?
5  A.  Yes.
6  Q.  Okay.  Just want to figure out why somebody
7  did something, right?
8  A.  Yes.
9  Q.  All right.  Now, after you spoke with
10 Mr. Maysonet on July 15th, 1990, with Sergeant
11 Mingey at Area 5, I know you said you took no
12 investigative actions.  Right?
13 A.  That's correct.
14 Q.  Okay.  And would you agree, though, that as
15 an investigator, a detective should have attempted
16 to take the information that Mr. Maysonet provided
17 and either corroborate it or develop it?
18     MR. BRUEGGEN: Objection.
19     MS. CARNEY: Object to form.
20     THE WITNESS: I assumed it.  Everybody
21 does different ways.  I have no idea.
22     BY MS. BONJEAN:
23 Q.  Well, I'm not talking about the ways --
24 A.  Yeah.
25 Q.  -- he did it.  I'm saying if -- if

Maysonet v.
Guevara

Video Deposition

Page 309

1 Mr. Maysonet told -- if you were investigating this
2 case, rather than just the interpreter --
3 A. Yeah.
4 Q. -- and Mr. Maysonet told you about giving a
5 nine millimeter to three Latin Kings and then the
6 two African-American men were shot, you'd want to
7 follow up on that, right?
8 A. Yes.
9 MR. BRUEGGEN: Object to form.
10 BY MS. BONJEAN:
11 Q. Okay. And then after August 1st, 1990,
12 after Jose Maysonet confessed to being at the crime
13 with these three other Latin Kings, that's
14 information you'd want to corroborate, too, as an
15 investigator, right?
16 A. Yes.
17 Q. If you could, correct?
18 A. Yeah.
19 Q. All right. Now, I don't know if your
20 recollection has been refreshed or not, but I just
21 want to orient you.
22 Between August 1st, 1990, and August 22nd,
23 1990, you took no investigative actions in
24 connection with this case -- "this case," I mean
25 the Wiley brothers' murders -- and you're not aware

Page 310

1 of any other investigative actions that were taken,
2 correct?
3 A. That's correct.
4 Q. And if you wanted to confirm that there was
5 no investigative conduct that took place between
6 August 1st and August 22nd, where would you look?
7 MR. BRUEGGEN: Object to form,
8 foundation.
9 THE WITNESS: I have no idea. I'm not
10 in homicide. I wouldn't know where they keep that
11 stuff.
12 BY MS. BONJEAN:
13 Q. You don't know where they kept the homicide
14 files?
15 A. Not all -- no, ma'am. I don't know where
16 the -- I had nothing to do with this case so I don't
17 know why I would be looking for this case to find
18 out what's going on.
19 Q. Okay. Well, let's say it's not a murder
20 case. Okay? Let's say it's a burglary case or
21 some other crime that you would have investigated.
22 Right?
23 If you wanted to find out whether or not
24 some other detective did some investigating on your
25 case, would you go to the file to see if any

Page 311

1 reports were prepared?
2 A. No, ma'am. I don't go back on -- I keep new
3 crime. I don't go back to an old case, see if it
4 was solved or what detective handled it. I have --
5 I don't go looking for that.
6 Q. Okay. Maybe I'm not making myself clear.
7 We've already established earlier in this
8 deposition that sometimes investigations can last
9 over a period of time. Right?
10 A. Yeah.
11 Q. Okay. In fact, the Wiley brothers were
12 murdered on May 25th, 1990, correct?
13 A. Correct.
14 Q. And Mr. Maysonet wasn't arrested until
15 August 22nd, 1990, for this --
16 A. Okay.
17 Q. -- correct?
18 A. Correct.
19 Q. You know, several months, right?
20 A. Yeah.
21 Q. And during that period of time, would you
22 have expected to see some investigation?
23 A. If I was a supervisor, yes.
24 Q. Okay. Right. If you -- you would expect
25 there to be investigation taking place, even though

Page 312

1 I understand you're saying that that wasn't your
2 job, right?
3 A. Yes.
4 Q. And we also established that new detectives
5 come into a case sometimes, that they necessarily
6 weren't the detectives at the start of the case and
7 they're not necessarily the detectives that close
8 the case, right?
9 A. That's correct.
10 Q. But when a new detective comes into a case,
11 they want to look at the reports that have been
12 prepared, right?
13 A. Yes.
14 Q. And they want to see what's been done on the
15 case before they do their investigative work,
16 right?
17 A. Well, to see if there's anything to follow up
18 in there, yes.
19 Q. Right. And who's been interviewed, right?
20 A. If they're assigned to investigate farther,
21 that's what they have to do.
22 Q. And how would you find that information out?
23 You'd have to go look at the reports, right?
24 A. No, ma'am. Sergeant assigns you first. You
25 just don't go grab a report and start working on

Page 313

1  something.
2  Q.  Let's say you're assigned.  How would you
3  get the information you need to find out what had
4  been done to investigate the case prior to you
5  getting involved?
6  A.  Well, I read the whole file, find out what's
7  been happening.
8  Q.  Okay.
9  A.  If there's anything for me to follow up on,
10  that's what I do.
11  Q.  Okay.  And that's what an investigator would
12  do.  They would read the whole file and then figure
13  out next steps, right?
14  A.  That's correct.
15      MR. BRUEGGEN: Object to form.
16      THE WITNESS: Yeah, that's correct.
17      BY MS. BONJEAN:
18  Q.  Now, I think -- and, again, maybe you've
19  been refreshed and your recollection's different
20  now, but earlier you testified that the next thing
21  you recall was serving as an interpreter for
22  Detective Paulnitsky after Mr. Maysonet was in
23  custody at Area 5.  Right?
24  A.  I think so, yes.
25  Q.  And when I say that, I mean, this is after

Page 314

1  the Cook County Jail meeting.
2  A.  Yes.
3  Q.  Okay.  Do you remember anything else about
4  meeting with Jose Maysonet until you met with him
5  and Detective Paulnitsky at Area 5 on August 22nd,
6  1990?
7  A.  Prior to that?
8  Q.  Yeah.  In between the Cook County Jail and
9  when he was in Area 5.
10  A.  No, ma'am, I don't recall.
11  Q.  Okay.  I'm going to have you look now at the
12  report.
13  A.  Okay.  If I see the report, maybe it will
14  refresh me.
15  Q.  Sure.
16  A.  I don't know.
17  Q.  Okay.  Look at the last paragraph there.
18  A.  Right here.
19  Q.  The second to last paragraph you read,
20  right, and that discussed your meeting at Cook
21  County Jail on August 1st, 1990, right?
22  A.  Yeah.
23  Q.  And then it says August 26th, 1990.
24  A.  August where?
25      MR. BRUEGGEN: August 22nd.

Page 315

1      MS. BONJEAN: Ah, sorry.  Strike that.
2      BY MS. BONJEAN:
3  Q.  On August 22nd, 1990, it starts there.  Do
4  you see that?
5  A.  Yeah, I see that.
6  Q.  Go ahead and read that last paragraph there.
7  A.  To myself?
8  Q.  Yeah, sure.  Go ahead.
9  A.  Okay.
10  Q.  Do you see where it says Detective
11  Paulnitsky was aware of the previous admissions
12  that Jose Maysonet had made?
13  A.  Yes, I see that here.
14  Q.  Okay.  Do you know how Detective Paulnitsky
15  became aware of the previous admissions?
16  A.  I have no idea, ma'am.
17  Q.  Okay.  What are the number --- what are the
18  what in which he might have become aware of those
19  previous admissions?
20      MR. BRENER: Objection, calls for
21  speculation.
22      THE WITNESS: Being a detective in Area
23  5, at roll call, sergeant mentioned things what's
24  going on with cases to the -- to the homicide guys.
25  /////

Page 316

1      BY MS. BONJEAN:
2  Q.  Okay.  Could he have looked at some GPRs
3  that memorialized it?
4  A.  I have no idea what he did, ma'am.
5  Q.  Okay.  But you would -- would you expect
6  there to be some GPRs in the file?
7      MR. BRUEGGEN: Object to form.
8      MS. CARNEY: Object to form.
9      THE WITNESS: Yes, ma'am.
10      BY MS. BONJEAN:
11  Q.  I mean, there was a confession.  You'd
12  expect there to be a GPR in the file, right?
13      MS. CARNEY: Object to form.
14      MR. BRUEGGEN: Same objection.
15      BY MS. BONJEAN:
16  Q.  Yes?
17  A.  Yes.
18  Q.  Okay.  Now, you can go to the next page,
19  which is page five, but is Bates stamped
20  RFC-Maysonet 51.  The first paragraph, it says, "at
21  Area 5, Jose Maysonet was advised of his Miranda
22  rights by Detective F. Montilla."  Do you see that?
23  A.  Yes, ma'am.
24  Q.  Do you remember giving Mr. Maysonet his
25  Miranda rights?

Page 317

1  A.  If it's on paper, I did it.
2  Q.  Well, you didn't write this.
3  A.  Ma'am, it's written, it's written.
4  Q.  I know, but you didn't write it.
5  A.  I know that.
6  Q.  Okay.  So is it just because it's written
7  that you know it happened?
8  A.  Ma'am, when they wrote this report, they
9  write all this stuff, whatever was there from GPRs
10  and everything.  They make a closing report.  They
11  put everything in here that what detectives
12  participated in.  So apparently I participated in
13  this, if it's written in the report, even though I
14  didn't write it.
15  Q.  I understand, but you don't have a
16  recollection of giving him his Miranda rights,
17  right?  You're assuming that you did because you're
18  reading it in this report, right?
19  A.  Ma'am, if it's on the report, I gave him his
20  rights.
21  Q.  You didn't write this report, though.
22  A.  Doesn't matter.  I gave him his rights.
23  Q.  Well --
24  A.  As long as my name shows up on the report, I
25  was there.  That means I had to do everything that

Page 318

1  they're putting down on this report, because --
2  Q.  So everything --
3  A.  -- I don't keep my own copies.  I don't write
4  my own reports.
5  Q.  So you didn't write this report, right?
6  A.  That's correct.
7  Q.  You've never read this report according to
8  you?
9  A.  That's correct.
10  Q.  Okay.  But you just assumed that if
11  Halvorsen put it on the paper, it must have
12  happened, right?
13  A.  Yes, ma'am.
14  Q.  And there's no circumstance under which
15  Mr. Halvorsen would ever put anything in a report
16  that wasn't true, right?
17      MR. BRUEGGEN: Object to form,
18  speculation, foundation.
19      BY MS. BONJEAN:
20  Q.  Right?
21  A.  That is correct.
22  Q.  Okay.  And if Detective Guevara put it on a
23  piece of paper, you know it's true also, right?
24  A.  Yes.
25      MR. BRUEGGEN: Object to form,

Page 319

1  foundation, speculation.
2      BY MS. BONJEAN:
3  Q.  So you assume that if any detective puts
4  something in a report, it must be true, correct?
5  A.  Yes, ma'am.
6      MR. BRUEGGEN: Object to form.
7      BY MS. BONJEAN:
8  Q.  And why do you assume that?
9  A.  Because it's written by a detective in the
10  report.  Whatever name shows up there from the
11  investigative files and everything, my name was on
12  there means I did something.
13  Q.  Okay.  But can a -- is a detective capable
14  of putting a false statement into a report?
15  A.  Wouldn't do that.
16      MR. BRUEGGEN: Object to form,
17  argumentative.
18      BY MS. BONJEAN:
19  Q.  Have you ever even heard of a detective
20  putting a false statement in a report?
21  A.  No, ma'am.
22  Q.  So in your, again, three decades' experience
23  in the police department, never heard of a police
24  officer ever including a statement that wasn't a
25  hundred percent entirely accurate in a police

Page 320

1  report?
2  A.  That is --
3      MR. BRUEGGEN: Objection, form.  Go
4  ahead.
5      THE WITNESS: That is correct.
6      BY MS. BONJEAN:
7  Q.  And is that true for Detective Guevara also?
8  A.  I have --
9      MR. BRUEGGEN: Object to form,
10  foundation.  Go ahead.
11      THE WITNESS: I have no idea, ma'am.
12      BY MS. BONJEAN:
13  Q.  Well, if Detective Guevara wrote this
14  report, would you assume it happened?
15  A.  I'd have to assume it happened.
16  Q.  Why do you have to assume?
17  A.  Because it's on paper.  It comes from another
18  report.
19  Q.  Okay.
20  A.  Just --
21  Q.  I just wrote "I am 21 years old" on this
22  piece of paper.  Does that make it true because I
23  wrote it on a piece of paper?
24      MS. CARNEY: Objection, argumentative.
25      MR. BRUEGGEN: Objection.

Maysonet v.
Guevara

Video Deposition

Page 321

1    MR. BRENER: Join.
2    MR. SCHALKA: Join.
3    BY MS. BONJEAN:
4  Q.  Does it make it true?
5  A.  I have no idea if it's true or not.
6  Q.  Okay.  I'm not 21 years old.  We can agree
7  on that, right?
8  A.  I understand that.
9  Q.  Okay.  So if I wrote it on a piece of paper,
10  it doesn't make it true, right?
11  A.  That's correct.
12  Q.  Okay.  So my point is, just because it's on
13  the piece of paper doesn't make it true, right?
14    MR. BRUEGGEN: Object to form, asked
15  and answered.
16    THE WITNESS: This is a report made for
17  the type of division by detectives.  Whatever's in
18  that report is testified to, and it means that I
19  performed an action and that's why my name reports
20  is on there.
21    BY MS. BONJEAN:
22  Q.  Okay.  So -- and if the report said that
23  Fred -- Detective F. Montilla kissed Jose Maysonet
24  in the interview room, would that be true just
25  because it's on the report?

Page 322

1    MS. CARNEY: Objection, argumentative.
2    MR. BRUEGGEN: Argumentative and now
3  badgering.
4    MS. CARNEY: I'm not -- I'm not
5  badgering.  I'm just trying to understand where
6  he's coming from.
7    THE WITNESS: You're making up a
8  hypothetical thing there, ma'am.
9    BY MS. BONJEAN:
10  Q.  No.  That wouldn't be true, though, right?
11  You didn't kiss Mr. Maysonet, did you?
12  A.  Nobody would put anything false in a report.
13  Q.  Nobody would ever put anything false --
14  A.  I've never seen it in my life, in 34 years in
15  the police department.
16  Q.  So why have over a dozen people been
17  exonerated because of Detective Guevara's
18  misconduct?
19    MR. BRUEGGEN: Objection, form,
20  foundation.
21    MS. CARNEY: Objection, form,
22  foundation.
23    MR. BRENER: Object to form.
24    THE WITNESS: I have no idea, ma'am.
25  /////

Page 323

1    BY MS. BONJEAN:
2  Q.  What's your -- what's your -- what's your
3  theory about that?
4  A.  Pardon me?
5  Q.  Why do you -- what's -- what do you think's
6  going on, they're just letting people out of prison
7  for fun?
8    MS. CARNEY: Objection, argumentative.
9    THE WITNESS: I have no theory and I
10  don't make any type of statements on it.  It's a --
11  what happened happened.  That's it.  I'm here to
12  answer your questions.  That's why I'm here.
13  That's it.
14    BY MS. BONJEAN:
15  Q.  No, I understand, and I appreciate you
16  asking (sic) my questions, but I'm just -- I guess
17  I'm just befuddled that you would think that
18  it's -- it's inconceivable that anyone could put a
19  false statement in a report.
20    MR. BRUEGGEN: Objection,
21  argumentative.
22    BY MS. BONJEAN:
23  Q.  Is that just for Chicago police officers or
24  is that all law enforcement police officers across
25  the country?

Page 324

1    MS. CARNEY: Objection, argumentative.
2    MR. BRUEGGEN: Objection, argumentative
3  and --
4    MS. BONJEAN: No, I'm just curious.
5    MR. BRUEGGEN: -- bordering on
6  harassing.
7    BY MS. BONJEAN:
8  Q.  Is it for just Chicago police officers that
9  you would vouch for that or is that for any police
10  officer?
11    MR. BRUEGGEN: Same objections.
12    BY MS. BONJEAN:
13  Q.  That's a legitimate question.  You can
14  answer.
15  A.  I can't give you an answer on that, ma'am.
16  Q.  Why?
17  A.  Because I'm going by what was written, what
18  we did, and that's what I go by.
19  Q.  No, but you just said that it would never
20  happen that a police officer would put a false
21  statement in a report.
22  A.  In my -- in my investigative years, yes, I've
23  never seen that done.
24  Q.  Okay.
25  A.  And I don't think -- I've never seen a

Page 325

1  policeman do that.
2  Q.  Okay.  And that's -- and when you say
3  that -- and you can't imagine a police officer
4  doing that, right?  You've testified to that?
5  A.  That is correct.
6  Q.  Okay.  Are you talking about just Chicago
7  police officers are incapable of doing that or do
8  you think all police officers?
9  A.  I'm talking about the police -- policemen
10  right here in my life that I've seen.  I'm not
11  saying about the policemen in California, New York
12  or --
13  Q.  Okay.
14  A.  -- anyplace else.
15  Q.  Okay.
16  A.  I'm just describing for myself that I've
17  never seen this.
18  Q.  Okay.  And you've worked with a lot of
19  police officers in the Chicago Police Department
20  over the years, right?
21  A.  That is correct.
22  Q.  How many do you think?
23  A.  I don't know.  20, 30.
24  Q.  In thirty-some years, only 20 or 30?
25  A.  Yeah.  You only get partners only so much

Page 326

1  and --
2  Q.  I'm not talking about your partners.  There
3  were at least like seven detectives on this case.
4  A.  No, I worked with -- they worked all around
5  me.  Doesn't mean I was with them in a case.
6  Q.  I understand, but --
7  A.  Just a lot -- a lot of detectives in the
8  police department.
9  Q.  Right.
10  A.  Over 4,000 guys that were -- so many guys
11  were in the area or something.
12  Q.  Okay.  And at no point did you ever see a
13  police officer make any statement that was
14  misleading or false in a report, right?
15  A.  Not in my life.
16  MR. BRUEGGEN: Object to compound.
17  BY MS. BONJEAN:
18  Q.  Okay.  Let's -- now, do you remember earlier
19  I asked you about the conversation you had at Area
20  5 with Detective Paulnitsky after Mr. Maysonet was
21  arrested or was in custody?
22  A.  Conversation with Paulnitsky?
23  Q.  Yeah.  Remember, I asked you about the
24  choking.  Do you remember all that, sir?
25  A.  The -- pardon me?

Page 327

1  Q.  The choking, do you remember I asked you
2  about whether you saw Detective Paulnitsky choke
3  Mr. Maysonet?
4  A.  Yes, I recall.
5  Q.  Okay.  So you remember that line of
6  questioning?
7  A.  Yeah.
8  Q.  Okay.  And you -- again, this would have
9  been after Mr. Maysonet was in custody at Area 5,
10  and you said you served as an interpreter again?
11  A.  Yeah.
12  Q.  Okay.  And I think you indicated that it was
13  a quick conversation.  Right?
14  A.  The what?
15  Q.  It was a quick conversation.
16  A.  Yeah, as far as I recall.  I think it was a
17  quick conversation.
18  Q.  Okay.  And do you remember during that
19  conversation whether he confessed to the murders?
20  A.  I don't recall, ma'am, unless I --
21  Q.  Okay.  But if it's on the piece of paper --
22  A.  If it's on paper --
23  Q.  -- that it happened?
24  A.  -- it happened.
25  Q.  Okay.  Okay.  Go ahead, let's read that

Page 328

1  first paragraph.
2  A.  Huh?
3  MR. BRUEGGEN: Read that to yourself.
4  She wants you to read that paragraph to yourself,
5  then she'll have questions.
6  THE WITNESS: Okay.
7  BY MS. BONJEAN:
8  Q.  Okay.  Now, you've read that.  You don't
9  have an independent recollection of this --
10  A.  That's correct.
11  Q.  -- right, but you're reading this, and you
12  are assuming because it's on -- in this report,
13  that it happened, right?
14  A.  I assume, yes, ma'am.
15  Q.  All right.  But you don't remember it,
16  right?
17  A.  No, I don't remember.
18  Q.  Okay.  Let's keep going.  "On August 22nd,
19  1990, Detectives E. Halvorsen, R. Guevara and S.
20  Gawrys arrived at Area 5 to work the third watch.
21  This investigation was passed on to these
22  detectives."  Do you see that?
23  A.  Yeah.
24  Q.  Okay.  So if they were arriving for the
25  third watch, what time would that be?

Page 329

1 A. That's 4 -- 4:30.
2 Q. Okay. And would you have been getting off
3 work around that time?
4 A. I don't remember if I was working days or
5 afternoons. I don't remember.
6 Q. Okay. But --
7 A. If I was working days, I would be getting off
8 at that time when they're coming there.
9 Q. Okay. So let's -- let's use common sense
10 here. You allegedly were with Detective
11 Paulnitsky, interviewing Jose Maysonet on August
12 22nd, 1990, right?
13 A. Yeah.
14 Q. Okay. And according to this report in that
15 first paragraph, you were there when Mr. Maysonet
16 made these statements. And, again, you were
17 serving an interpreter and not an investigator,
18 correct?
19 A. Yeah.
20 Q. Okay. And then that same day, it says the
21 investigation was passed off to Halvorsen, Guevara
22 and Gawrys. Do you see that?
23 A. Yeah.
24 Q. Okay. So would that lead you to believe
25 that you were not working the third watch?

Page 330

1 A. It would lead me to believe. I don't know.
2 That's -- they're violent crime guys. They were
3 handling the case, so...
4 Q. Right.
5 A. And on this day, I don't know what --
6 Q. Well, you were present for interviews that
7 preceded the third watch, right?
8 A. Yeah. Right, yeah.
9 Q. At least according to this?
10 A. Yeah.
11 Q. And this is the bible, right?
12 A. I understand, yeah.
13 Q. Okay. You were present, so do you know --
14 do you have a -- does it lead you to believe that
15 maybe you would have been getting off work at that
16 time?
17 A. Yeah, I --
18 Q. Okay.
19 A. -- believe, yeah.
20 Q. And then it says, "at 2000 hours" -- what
21 time is that?
22 A. 8:00. 8 p.m.
23 Q. -- "Jose Maysonet was interviewed by
24 Detective Guevara, who speaks English. During this
25 interview" --

Page 331

1 MR. BRUEGGEN: Speaks Spanish.
2 BY MS. BONJEAN:
3 Q. -- "who speaks Spanish. During this
4 interview, Jose Maysonet agreed to tell all he
5 knew," right? Do you see that?
6 A. Yeah.
7 Q. Okay. Do you remember being present for
8 that interview?
9 A. No.
10 Q. Okay. And does the report say you were
11 present for that interview?
12 A. I don't think so.
13 Q. Okay. Now, there's a summary of what
14 Mr. Maysonet purportedly told Detective Guevara,
15 correct?
16 A. Yes.
17 Q. Okay. Now, during this interview, you
18 weren't present, so you don't know whether
19 Detective Guevara beat Mr. Maysonet, right?
20 A. That's correct.
21 Q. Okay. You did not see it, right?
22 A. Right.
23 Q. And would you agree that it would be
24 improper, in fact illegal, to beat Mr. Guevara --
25 to beat Mr. Maysonet in order to coerce him into

Page 332

1 making this statement, right?
2 A. Yes.
3 Q. Okay. We can keep going on.
4 Now...
5 (Off stenographic record discussion.)
6 BY MS. BONJEAN:
7 Q. Okay. So Mr. Maysonet's statements to
8 Detective Guevara are summarized at the top or
9 continued onto the first half of this narrative,
10 right, on this page?
11 A. Yeah.
12 Q. And then it says, "on August 2nd, 1990, at
13 2100."
14 A. Yeah.
15 Q. What time is that, 9?
16 A. 9 p.m.
17 Q. Okay. "Maysonet's wife arrived at Area 5."
18 Do you see that?
19 A. Yes.
20 Q. Okay. Were you present when she arrived?
21 A. No, ma'am, not that I know of.
22 Q. Okay. All right. Now -- but then it says,
23 "Rosa Bella in summary stated the following on
24 the" -- do you see that?
25 A. Yeah.

Maysonet v.
Guevara

Video Deposition

Page 333

1 Q. Were you present when she made these
2 statements?
3 A. I don't recall, ma'am.
4 Q. Okay. You saw earlier you identified a
5 handwritten statement that you were supposedly --
6 A. Yeah.
7 Q. -- present for --
8 A. Yeah.
9 Q. -- the following day?
10 A. Yeah, I saw that.
11 Q. But do you know whether you were present for
12 whatever is reported here?
13 A. Yeah.
14 Q. Do you know if it's the -- this summary is
15 based on your conversation with her or some other
16 conversation?
17 A. I have no idea, ma'am.
18 Q. Okay. Now, I'm going to keep going. Okay.
19 Let's go down to August 23rd at 4:30. Do you see
20 that?
21 A. Yep.
22 Q. That's the next day at 4:30 p.m., right?
23 A. Yeah.
24 Q. It says, "ASA Jennifer Borowitz, felony
25 review, was assigned to this investigation. She

Page 334

1 had been in the office at Area 5 on an unrelated
2 investigation and was familiar with this homicide
3 investigation." Do you see that?
4 A. Yes.
5 Q. "An interview was conducted with Jose
6 Maysonet. Present for this interview was ASA
7 Borowitz and Detectives Guevara and Montilla." Do
8 you remember that now?
9 A. Yes. Yes.
10 Q. You didn't have -- you don't have an
11 independent recollection of that, right?
12 A. No, not all independent, but I was there with
13 Borowitz.
14 Q. You remember seeing Borowitz, the --
15 A. Yeah. The young lady, yeah.
16 Q. Okay. And during this interview, according
17 to this report, Mr. Maysonet basically confessed
18 again, right?
19 A. Yeah.
20 Q. Okay. And, again, you don't have an
21 independent recollection of that, but you're
22 assuming that because it's in the report, it
23 happened, right?
24 A. Yes.
25 Q. Or as you sit here today, you don't remember

Page 335

1 being there, listening to Mr. Maysonet's
2 confession, right?
3 A. No.
4 MR. BRUEGGEN: Object to form.
5 BY MS. BONJEAN:
6 Q. But because it's in the report, you assume
7 it happened, right?
8 A. Yes.
9 Q. All right. "At the conclusion of this
10 interview, Jose Maysonet agreed to provide a
11 court-reported typed statement." Do you see that?
12 A. Yeah.
13 Q. But "due to the amount of time these
14 statements take, a second Assistant State's
15 Attorney was assigned to replace ASA Borowitz." Do
16 you see that?
17 A. Yeah.
18 Q. Okay. How many times has Mr. Maysonet
19 confessed by August 23rd at 4:30? It seems like a
20 lot of times, yeah?
21 A. Yeah, a few times.
22 Q. Confessed at the Cook County Jail, right?
23 A. He made a statement there, yes.
24 Q. Well, he said he was there, right --
25 A. Yeah.

Page 336

1 Q. -- and he was involved? That's a
2 confession, right?
3 A. Yeah. He made a statement.
4 Q. And then he made it again on August 22nd,
5 when Paulnitsky interviewed him with you,
6 correct --
7 A. Correct.
8 Q. -- according to the report?
9 And then he made it again to Detective
10 Guevara, right?
11 MR. BRUEGGEN: Object to foundation.
12 BY MS. BONJEAN:
13 Q. According to this, right?
14 MR. BRUEGGEN: Read the report.
15 MS. BONJEAN: Huh?
16 MR. BRUEGGEN: I told him to read the
17 report --
18 MS. BONJEAN: Oh.
19 MR. BRUEGGEN: -- because he clarified
20 that he wasn't present, so...
21 MS. BONJEAN: Right.
22 THE WITNESS: On which?
23 BY MS. BONJEAN:
24 Q. This was -- according to the report at
25 least, he made another statement to Guevara on

Page 337

1  August 22nd, right?
2  A.  Yeah.
3  Q.  And then again he confessed again to you
4  with ASA Borowitz, right?
5  A.  Yeah.
6  Q.  Correct?  Okay.
7  And now, if you turn the page, August 23rd
8  at 6:30, ASA Frank DiFranco arrived and conducted
9  his first interview with Jose Maysonet, and also
10  present was Detective Guevara and Montilla, and
11  again he -- he confessed again, right?
12  A.  Yeah.
13  Q.  Where are we at, five or six times now?
14  A.  I don't know.  I didn't count all, so...
15  Q.  Okay.  Quite a few times, though, right?
16  A.  Yeah.
17  Q.  All right.  And each time the detective
18  would be making a GPR, right?
19  MR. BRUEGGEN: Object to form,
20  foundation.
21  MS. CARNEY: Foundation.
22  MR. SCHALKA: Foundation.
23  THE WITNESS: I assume.
24  BY MS. BONJEAN:
25  Q.  I mean, you would as a detective, correct?

Page 338

1  A.  I would have as a detective, yes.
2  Q.  Right.  I mean, you have someone confessing
3  to a double homicide.  You would want to be taking
4  down what he's saying, right?
5  A.  Yes.
6  Q.  Not just because it might be evidence
7  against him or used to convict him, but to take
8  that information and follow other leads, right?
9  A.  That is correct.
10  Q.  I mean, he told you about three other
11  offenders.  You want to find them, too, right?
12  A.  That is correct.
13  Q.  Okay.  So you would expect there to be
14  reports that have documented all of this valuable
15  information that Mr. Maysonet is providing, right?
16  A.  That's --
17  MR. BRUEGGEN: Object to form.
18  THE WITNESS: That is correct.
19  BY MS. BONJEAN:
20  Q.  Okay.  Now, on August 23rd at -- August
21  23rd, 1990, at 7:10, he's now in a conference room,
22  and you're present, Reynaldo Guevara's present,
23  right?  Do you see that?
24  A.  Yeah.  Yeah.
25  Q.  It looks like that was another time.  And

Page 339

1  then we have the 9:28 a.m., which resulted in the
2  court-reported statement, correct?
3  A.  Uh-huh.
4  MR. BRUEGGEN: Is that a yes?
5  BY MS. BONJEAN:
6  Q.  Was that a yes?
7  MR. BRUEGGEN: Yes?
8  THE WITNESS: Yes.
9  BY MS. BONJEAN:
10  Q.  Okay.  Now, just to be clear, the
11  interviewing that was conducted by Guevara when
12  Mr. Maysonet confessed to him before you arrived,
13  you -- you have no knowledge about that, right?
14  A.  That is correct.
15  Q.  Do you know Mr. Maysonet alleges that he was
16  physically abused during that interrogation?
17  A.  I heard that.
18  Q.  Okay.  And you don't know one way or another
19  whether that happened, right?
20  A.  That is correct.
21  Q.  So after the court-reported statement, it
22  looks like ASA DiFranco requested that Jose
23  Maysonet be driven to the scene.  Do you see that?
24  A.  Where at?
25  Q.  The next paragraph.  It says, "Jose Maysonet

Page 340

1  thereafter read his statement, which he signed."
2  Do you see that?
3  A.  Thereafter, after they read his statement
4  here?
5  Q.  Yeah.  And then it looks like this was when
6  you-all went to the scene?
7  A.  Pardon me?
8  Q.  You-all went to the scene, then, after that?
9  A.  Yeah.
10  Q.  Okay.  But earlier you thought you went to
11  the scene before he made his court-reported
12  statement, but --
13  A.  Yeah.
14  Q.  -- this suggests that you went to the scene
15  after the court-reported --
16  A.  After.
17  Q.  Okay.  And you would rely on this?
18  A.  Yes.
19  Q.  Okay.  And then it says, "ASA DiFranco
20  deferred formal charging of Jose Maysonet pending
21  additional interviews with Alfredo Gonzales."
22  Any idea why ASA DiFranco deferred formal
23  charging after Jose Maysonet purportedly confessed
24  about eight times prior to April -- I'm sorry,
25  August 23rd in the morning?

Page 341

1  MR. BRENER: Form and foundation.
2  MR. BRUEGGEN: Object to foundation.
3  MS. CARNEY: You can answer.
4  THE WITNESS: I have no idea.
5  BY MS. BONJEAN:
6  Q.  Okay.  It wasn't your decision, right?  You
7  had no involvement in that decision, right?
8  A.  No.
9  Q.  And this report has your name typed at the
10  end, but it doesn't have your signature, correct?
11  The report has your name typed?
12  A.  No, it doesn't have my signature, no.
13  Q.  Okay.  And it's your best guess that your
14  name was included on here because you participated
15  in the investigative activity, right?
16  A.  Yes, that's correct.
17  Q.  But according to you, you just served as an
18  interpreter, right?
19  A.  Yes, ma'am.
20  Q.  Okay.  You weren't really an investigator on
21  this case?
22  A.  No, ma'am.
23  Q.  You never were assigned to investigate this
24  case?
25  A.  That's correct.

Page 342

1  Q.  Your only role was to interpret?
2  A.  Interpret.
3  Q.  Okay.  And these papers we looked at, are
4  these -- strike that.  Sorry.  Hold on one second.
5  Do you have any recollection of interpreting
6  for anybody after Mr. Maysonet made his
7  court-reported statement?
8  A.  No, ma'am.
9  Q.  Okay.  I want to draw your attention to
10  RFC-Maysonet 42 through 44.  There's another
11  supplemental report.
12  A.  Okay.
13  Q.  Okay.  This is another supplemental report,
14  right?
15  A.  Yeah.
16  Q.  And this report looks to have been submitted
17  on August 24th, 1990, and then approved on August
18  27th, 1990, by Sergeant Epplen?
19  A.  Okay.
20  Q.  All right.  Does that look right to you?
21  A.  Pardon me?
22  Q.  Does that look correct to you?
23  A.  Yes.
24  Q.  Okay.  It also has you identified as an
25  arresting officer of a Justino Cruz.  Do you see

Page 343

1  that?
2  A.  Yes.
3  Q.  Okay.  Do you remember participating in the
4  arrest of Justino Cruz?
5  A.  No, ma'am.
6  Q.  And then -- and can I assume, because you're
7  looking at this, you're going to assume that you
8  did participate in that arrest?
9  A.  I was participating in the original arrest of
10  Maysonet.  Apparently they put me in for everybody
11  else included in the case.
12  Q.  Okay.  Why would they put you in as an
13  arresting officer if you were just an interpreter?
14  A.  I have no idea, ma'am.
15  Q.  That's not accurate, right?
16  A.  No, but they give credit when you're in a --
17  if you're interpreting, because they're interpreted,
18  they're going to put you with the whole entire case.
19  Q.  Okay.  But --
20  A.  You're going to get credit for the whole
21  thing and -- because you're going to testify and
22  everything.  They're just giving -- all they do is
23  give you credit for the arrest.
24  Q.  Okay.  But --
25  A.  That's all they're doing.

Page 344

1  Q.  So reports are designed to -- or to give you
2  credit?
3  A.  Yeah, reflect all the officers that are
4  involved.
5  Q.  Okay.  But somebody could have easily
6  written Detective Montilla, or Montilla, assisted
7  with interpreting, right?
8  MR. BRUEGGEN: Object to form and
9  foundation, speculation.
10  THE WITNESS: I assume, yeah.
11  BY MS. BONJEAN:
12  Q.  Well, I mean, do you believe that Detective
13  Halvorsen knows how to spell "interpreter"?
14  A.  Yeah.
15  Q.  Okay.  Does he know how to use a typewriter?
16  A.  He's a very good -- he uses, what do you call
17  it, computers and everything.  He's very good at
18  that.
19  Q.  Yeah, so I've heard.  So we can expect him
20  to know how to write the word "interpreter" and use
21  the typewriter, right?
22  A.  Yeah, that's correct.
23  Q.  So he could have included in here, Detective
24  Montilla helped us in interpreting, right?
25  A.  For the entire case, yeah, not all of it.

Page 345

1  Q.  No, but he could have where you did, right?
2  A.  He could have, yes, but I can't say anything,
3   what he would do on this, because I don't know where
4   he got all this information to type it in.
5  Q.  Okay.  But he listed you as an arresting
6   officer.
7  A.  I understand.
8  Q.  And you, according to you, did not
9   participate --
10  A.  I did not physically arrest him.
11  Q.  Okay.
12  A.  Okay.
13  Q.  According to you, you didn't actually even
14   investigate the case?
15  A.  That's correct.
16  Q.  Okay.  One second.
17   You can put that aside.
18   Do you know the difference between a street
19   file and permanent retention file?
20     MS. CARNEY: Objection, form.
21     THE WITNESS: And a what file?
22     BY MS. BONJEAN:
23  Q.  A permanent retention file.
24  A.  Yeah.  The street file is -- it's used for
25   investigations.  The other file, it's there for

Page 346

1   permanent record --
2  Q.  Right.
3  A.  -- with everything else that's included in
4   there.
5  Q.  Okay.  So the street file were those files
6   that were kept at the area, right?
7  A.  Yeah.
8     MR. BRUEGGEN: Objection, form.
9     MS. CARNEY: Objection, form.
10     THE WITNESS: Yes.
11     BY MS. BONJEAN:
12  Q.  Okay.  Sometimes they were called area
13   files, right?
14  A.  The whole file is called the area file.
15  Q.  Yeah.  And then what do you understand a
16   permanent retention file to be?
17  A.  That's everything included.
18  Q.  Does the permanent retention file always
19   contain everything that was in the street file?
20     MR. BRUEGGEN: Object to foundation.
21     MS. CARNEY: Object to form.
22     BY MS. BONJEAN:
23  Q.  To the best of your knowledge.
24  A.  To the best of my knowledge, yes.
25  Q.  Okay.  And who maintains the permanent

Page 347

1   retention file, if you know?
2  A.  That's kept by the area.  That's all I know.
3  Q.  The permanent retention file is kept by the
4   area, too?
5  A.  I think so.  I'm not sure, ma'am.
6  Q.  Okay.  You don't know where the permanent --
7  A.  No, I don't know.
8  Q.  Okay.  I'm just going to have you look at
9   Exhibit 3A, if you would.
10  A.  Okay.
11  Q.  Do you see that?
12  A.  Yeah, permanent retention file.
13  Q.  Okay.  And how do you know that's a
14   permanent retention file?
15  A.  It's stamped on here.
16  Q.  Right.  And these other documents that we
17   were looking at in Exhibit 3 did not have a stamp
18   that said permanent retention file?
19  A.  That's correct.
20  Q.  Now, you testified earlier about how these
21   area files had a log of sorts, where all the
22   reports and information that was in the file were
23   reflected, correct?
24  A.  Yes.  It's a log that lists everything, yes.
25  Q.  Does it have a name?

Page 348

1  A.  No, I don't remember.  That, I don't
2   remember.
3  Q.  Okay.  You thought you remembered it being
4   the color green?
5  A.  I think so, yeah.
6  Q.  Okay.  Have you ever seen the log that
7   reflects all the reports contained in the area file
8   in connection with this case?
9  A.  No, ma'am.
10  Q.  And I'm talking about back in 1990, '95 or
11   2019, earlier today, have you ever seen that
12   document?
13  A.  No, ma'am.
14  Q.  Okay.  Did every area file have that
15   document?
16  A.  Pardon me?
17     MR. BRUEGGEN: Objection.
18     BY MS. BONJEAN:
19  Q.  Did every area file have a document like
20   that to the best of your recollection?
21  A.  To the best of my knowledge, yes.
22  Q.  Okay.
23     (Off stenographic record discussion.)
24     MR. BRUEGGEN: Let me know if you need
25   a break, if you need to stand or whatnot.

Maysonet v.
Guevara

Video Deposition

Page 349

1    THE WITNESS: I'm fine.
2    MR. BRUEGGEN: Okay. Good.
3    THE WITNESS: I'll relax when I get
4  home.
5    MS. BONJEAN: Can you mark this,
6  please.
7    (Exhibit 6 marked.)
8    BY MS. BONJEAN:
9  Q.  Before I ask you about this document,
10  Mr. Montilla, when you interviewed Mr. Maysonet on
11  July 15th, 1990, and August 1st, 1990, with
12  Sergeant Mingey present, okay, he spoke primarily
13  in Spanish, is that --
14  A.  Yes.
15  Q.  -- is that right?
16    MR. BRUEGGEN: Objection, misstates his
17  testimony.
18    BY MS. BONJEAN:
19  Q.  Is that correct?
20  A.  Yes.
21  Q.  Okay. And because Sergeant Mingey did not
22  speak Spanish, you were the only person who knew
23  what Mr. Maysonet was saying, right?
24  A.  Pardon me?
25  Q.  You were the only person who can tell us

Page 350

1  what Mr. Maysonet said during those interviews?
2  A.  At that time, yes.
3  Q.  Okay. And yet you didn't prepare a report
4  to reflect it, correct?
5  A.  That's correct.
6  Q.  So whatever Sergeant Mingey prepared, if he
7  did, would have been information that he got from
8  you, not directly from Mr. Maysonet, correct?
9  A.  That is --
10    MR. BRUEGGEN: Object to form,
11  misstates prior testimony.
12    MS. BONJEAN: Okay.
13    THE WITNESS: That is correct.
14    BY MS. BONJEAN:
15  Q.  Okay. And because you were the only person
16  who could understand what Mr. Maysonet was saying
17  during those meetings when he was speaking in
18  Spanish, did you think maybe you should also write
19  a report?
20  A.  No, ma'am.
21    MR. BRUEGGEN: Objection, misstates his
22  prior testimony.
23    BY MS. BONJEAN:
24  Q.  Go ahead.
25  A.  No, ma'am.

Page 351

1  Q.  Okay. And can you tell me why you didn't
2  feel --
3  A.  I'm an interpreter. I don't work with the
4  case they ask me to interpret. I become an
5  interpreter, not a detective or a policeman at that
6  time.
7  Q.  Okay. All right. I'm going to hand you
8  what's been marked as Exhibit 6, if you would.
9  A.  All right.
10    MS. BONJEAN: Is it two sided? I just
11  want to make sure.
12    MR. BRUEGGEN: No. No, it's just one
13  sided.
14    MS. CARNEY: That one is not.
15    MS. BONJEAN: Oh, okay. Here. Can I
16  have that back?
17    MS. COHEN: Look at the Bates stamp.
18    MS. BONJEAN: It's going to be a
19  two-page document --
20    MR. BRUEGGEN: Do you want to staple
21  it?
22    MS. BONJEAN: -- that has Maysonet
23  10890 and Maysonet 10891. Okay?
24    BY MS. BONJEAN:
25  Q.  Mr. Montilla, have you ever seen this

Page 352

1  document before?
2  A.  I've seen documents like this, but not this
3  here.
4  Q.  Okay. Do you know what it is?
5  A.  Yes, ma'am.
6  Q.  What is it?
7  A.  It's an arrest record.
8  Q.  Okay. And who is the -- who is the first
9  page an arrest record for?
10  A.  Wiley, Torrence.
11  Q.  Okay. And is that one of the victims on
12  North Avenue?
13  A.  Yes, ma'am.
14  Q.  And the other page, who's that an arrest
15  record for?
16  A.  Kevin Wiley, his brother.
17  Q.  The other, right?
18  And do you see the stamp that says "issued
19  on inquiry, May 25th, 1990"?
20  A.  Yes, ma'am.
21  Q.  What does that mean to you?
22  A.  It means that the detectives went and got a
23  copy of -- ran his name and see if he had an IR
24  number, and they went and got his copy.
25  Q.  And we talked about this earlier, about how

Page 353

1  it might be helpful to the investigation to pull
2  the criminal histories or arrest histories of a
3  victim, right?
4  A.  Yes.
5  Q.  And does it look like that's what the
6  detectives did?
7  A.  Apparently, yes.
8  Q.  All right.  And Mr. Wiley didn't have much
9  of an arrest history, did he?
10  A.  No, he didn't.
11  Q.  And what about Kevin Wiley, not really much
12  of an arrest history either, right?
13  A.  About the same thing.
14  Q.  And these -- those -- I know everyone calls
15  them youths, but they weren't young men, right?
16  A.  Right.
17  Q.  I mean, they weren't teenagers, correct?
18  A.  That's correct.
19  Q.  They were in their mid to late 20s?
20  A.  Yeah.  Okay.
21  Q.  Is there anything about this arrest record,
22  arrest history, that leads you to believe that
23  these two were gang members?
24  A.  No, ma'am.
25  Q.  They don't look like the rap sheets of a

Page 354

1  gang member, right?
2  A.  Pardon me?
3  Q.  They don't look like the rap sheets or the
4  arrest --
5  A.  No.
6  Q.  -- histories of gang members, correct?
7  A.  That's correct.  Misdemeanors.
8  Q.  Okay.  Mr. Montilla, despite the fact that
9  you were not doing any of the investigating in this
10  case, you testified a number of times in the case,
11  right?
12  MR. BRUEGGEN: Object to form.
13  MS. CARNEY: And argumentative.
14  MS. BONJEAN: I'm not trying to argue.
15  BY MS. BONJEAN:
16  Q.  You did -- you testified a number of times,
17  right?
18  A.  Ma'am, pardon me?
19  Q.  You testified a number of times in
20  Mr. Maysonet's prosecution, correct?
21  A.  Yes, ma'am.
22  Q.  Okay.  Three times, right?
23  A.  I don't remember.  I know I testified.
24  Q.  Okay.  A lot of times to testify as an
25  interpreter, right?

Page 355

1  A.  Pardon?
2  MS. CARNEY: Object to form.
3  BY MS. BONJEAN:
4  Q.  That's a lot of times to testify if you were
5  just acting as an interpreter, correct?
6  A.  Yes.
7  Q.  Okay.  So you testified at the hearing on
8  the motion to quash arrest and suppress evidence,
9  right?
10  A.  I assume so.
11  Q.  Okay.
12  MS. BONJEAN: Here, let me mark these,
13  if I could.
14  Can you mark these three.
15  (Exhibits 7, 8 and 9 marked.)
16  (Off stenographic record discussion.)
17  BY MS. BONJEAN:
18  Q.  Okay.  Mr. Montilla, I'm going to have you
19  look at what I marked as Exhibit 7, if you would.
20  I'm not going to go through everything, but
21  do you see your name here on this testimony?
22  A.  Yes, ma'am.
23  Q.  Okay.  And do you recall giving testimony at
24  Mr. Maysonet's pretrial motion to quash and
25  suppress evidence?

Page 356

1  A.  I'm sure I did.
2  Q.  Okay.  And if you want to take time to look
3  at this, do you have any reason to dispute that
4  this is the testimony that you provided at that
5  motion to quash?
6  A.  I don't -- I don't think so.  I don't dispute
7  anything.  It's a court-reported statement.  Okay.
8  Q.  Let me know when you've had a chance to
9  peruse it.
10  A.  How far do you want me to go on this?
11  Q.  I just want to -- I want you to see if it
12  refreshes your recollection of testifying at the
13  pretrial.
14  A.  Yeah, I remember this, yeah, with -- Ellen
15  Mandeltort, I remember --
16  Q.  What do you remember about Ellen Mandeltort?
17  A.  A good State's Attorney.
18  Q.  Uh-huh.  Why was she good?
19  A.  She was very good, a very intelligent lady.
20  Q.  Uh-huh.  Okay.
21  And I'm now going to have you look at
22  Exhibit 8.  And tell me if you want to look through
23  that.  I'm going to represent to you that that's
24  your testimony from the motion to suppress the
25  statements, the hearing on the motion to suppress

Page 357

1 the statements.
2 A. Okay. Yeah.
3 Q. So there were two pretrial hearings that you
4 testified --
5 A. Pardon me?
6 Q. Two pretrial hearings that you testified to.
7 A. Okay.
8 Q. Does that -- does that sound familiar?
9 A. Has to be. This is all court written by a
10 court reporter. I was there, so I can't deny all
11 this.
12 Q. Right. You testified to all of that,
13 correct?
14 A. Yeah, I testified.
15 Q. And you have no reason to quarrel with the
16 testimony that's reflected in these transcripts,
17 right?
18 A. That is correct.
19 Q. Okay. And then you also testified at trial
20 in front of a jury, right?
21 A. Yes.
22 Q. You remember that, correct?
23 A. Yes, I remember that.
24 Q. I'm going to show you Exhibit 9 --
25 A. Okay.

Page 358

1 Q. -- if you would.
2 I'm sorry it's light, but the original was
3 pretty light, so...
4 So you remember testifying before --
5 A. Yes, with Beuke, his lawyer, yes, ma'am.
6 Q. Did you know -- do you know Rick Beuke?
7 A. No. I only met him in court.
8 Q. Okay. Did you know he was friends with Rey
9 Guevara?
10 A. No, ma'am.
11 Q. Okay. Did you ever see Rick Beuke at Area
12 5?
13 A. No, ma'am.
14 Q. Not once?
15 A. No.
16 Q. Okay. Were you aware that Rey Guevara was
17 demanding protection payment money from Jose
18 Maysonet?
19 A. He was demanding what, ma'am?
20 Q. Protection -- money from Jose Maysonet.
21 A. No, ma'am.
22 Q. And that they had an arrangement -- again,
23 this was prior to Mr. Maysonet's arrest -- where
24 Mr. Maysonet would be able to deal or sell drugs
25 without interference from the police if he paid

Page 359

1 Guevara money?
2 A. I never heard that, ma'am.
3 Q. Okay. Were you aware that Mr. Guevara would
4 accept money to change outcomes in cases?
5 MR. SCHALKA: Objection, form.
6 THE WITNESS: Never.
7 BY MS. BONJEAN:
8 Q. Ever see -- you never worked a case with
9 Guevara other than this one, correct?
10 A. That is correct.
11 Q. Do you know who Joseph Miedzianowski?
12 A. Oh, yeah.
13 Q. Okay. Did you see him at Area 5 from time
14 to time?
15 A. Once.
16 Q. What were the circumstances under which you
17 saw him there?
18 A. There were -- came in to -- for some kind of
19 assist on making an arrest or something.
20 Q. Okay. Do you remember the case?
21 A. No, ma'am.
22 Q. Okay. Did you ever see him with Detective
23 Guevara?
24 A. No, ma'am.
25 Q. Okay. So you're not aware of any criminal

Page 360

1 activity by Guevara with -- that he carried out
2 with Joe Miedzianowski, right?
3 A. That's correct.
4 MR. BRUEGGEN: How are you feeling,
5 still good?
6 THE WITNESS: Uh-huh.
7 MR. BRUEGGEN: Again, if you need to
8 stand up, just stand up, stretch out.
9 THE WITNESS: Huh?
10 MR. BRUEGGEN: If you need to stand up,
11 just let her know, stand up, stretch out.
12 BY MS. BONJEAN:
13 Q. Mr. Montilla, you mentioned that you had an
14 on-duty police shooting while you were employed by
15 the Chicago Police Department. Right?
16 A. That's correct.
17 Q. And that was actually only a couple months
18 after you arrested Mr. -- or you were involved in
19 Mr. Maysonet's --
20 A. I think so.
21 Q. -- arrest, right?
22 A. Yeah. I think I was working midnights.
23 Q. And was there a complaint register that was
24 initiated as a result of that incident?
25 A. Yes, ma'am.

Page 361

1 Q. And were you disciplined in connection with
2 that incident?
3 A. I was suspended pending separation.
4 Q. Do you -- did you sit for a number of
5 interviews with OPS?
6 A. Yes.
7 Q. Okay. You were interviewed by OPS, right?
8 A. Yes, ma'am.
9 Q. Okay. And -- let's see.
10 And you were sustained -- well, hold on one
11 second.
12 Was there a recommendation for separation?
13 A. Yes, ma'am.
14 Q. Why were you recommended for separation?
15 A. I have no idea, no idea at all.
16 Q. You don't have any idea?
17 A. No, ma'am.
18 Q. Well, what were you told?
19 A. Pardon me?
20 Q. What were you told?
21 A. I was told FO -- OPS found that I should be
22 suspended pending separation under -- upon their
23 investigation.
24 Q. And is that because they found your shooting
25 unjustified?

Page 362

1 A. Apparently. I thought I did a good shooting.
2 Q. Okay. And somebody disagreed at some point,
3 right?
4 A. Apparently they have to. That's their job.
5 Q. It's not their job to find that it was an
6 unjustified shooting -- or find that it was an
7 unjustified shooting, right?
8 A. Pardon me?
9 Q. It wasn't their job to find that it was
10 unjustified shooting. It was just their job to
11 investigate the shooting?
12 A. Investigate, that's correct.
13 Q. Okay. And did anyone ever communicate to
14 you why they thought it was an unjustified
15 shooting?
16 A. No, ma'am.
17 Q. So as you sit here today, you don't know why
18 they found it unjustified?
19 A. That is correct.
20 Q. Do you think it was unfair that they found
21 it unjustified?
22 A. Yes. I thought I had a good shooting.
23 Q. Okay. Do you -- hold on one second.
24 So what happened? Why didn't you get
25 terminated?

Page 363

1 A. It went before the police board. I was
2 represented by counsel there.
3 Q. Who represented you?
4 A. Joe Roddy.
5 Q. And what was the outcome?
6 A. I was exonerated and I was given my job back
7 and all my backpay, that I -- according to the
8 police board, I did everything according to the
9 rules and regulations set forth by the Chicago
10 Police Department.
11 Q. OPS disagreed, but the hearing officers
12 found otherwise, right?
13 A. Yes, ma'am.
14 Q. Now, you indicated earlier that you never,
15 in your history as a police officer, did you ever
16 prepare a false report or ever even see another
17 detective prepare a false report, right?
18 A. That is correct.
19 Q. But OPS found that you made a false report,
20 didn't they?
21 A. Well, that's their -- their findings.
22 Q. Right. They found that you made a false
23 police report, correct?
24 A. No. I didn't make a false police report.
25 Q. I know that that's what you're saying, but

Page 364

1 OPS found otherwise, right?
2 A. Yes. They found otherwise, that's correct.
3 Q. Okay. Did OPS find that you had made false
4 statements to the investigating body?
5 A. Ma'am, whatever they put down, I guess so. I
6 can't testify for them. What they found, they
7 found. I did it right. I made a good report and I
8 didn't lie on anything, and I'll stand that on a
9 bible.
10 Q. Okay. And do you know why they thought
11 otherwise or why --
12 A. No, ma'am.
13    MR. BRUEGGEN: Object to foundation.
14 Go ahead.
15    BY MS. BONJEAN:
16 Q. I'm asking if you know. You don't know?
17 A. They didn't tell me much, ma'am. All they
18 did was separate me. That's all I got.
19 Q. Well, did you get a report of their
20 findings?
21 A. I don't remember.
22 Q. Okay. How long were you suspended?
23 A. Quite a while. I don't remember how long
24 exactly.
25 Q. As long as a year?

Maysonet v.
Guevara

Video Deposition

Page 365

1 A.  No, less than a year.
2 Q.  All right.  And after you were -- your
3 suspension ended and you were reinstated, did you
4 go back to work?
5 A.  I went to the academy for a refresher course
6 and then back to work.
7 Q.  Okay.  And did you go back to Area 5?
8 A.  Yes.
9 Q.  Okay.  Did you get any remedial training or
10 anything as it related to your shooting incident?
11 A.  Pardon me?
12 Q.  Did you get any discipline ultimate --
13 strike that.
14 Did you get any training -- retraining as a
15 result of the shooting incident?
16 A.  No, ma'am.  I just went to the academy for a
17 refresher and back to work.
18 Q.  That wasn't -- the refresher wasn't
19 discipline.  It was just because you had been out
20 of work for a while, right?
21 A.  Right, yeah.
22 Q.  Did you receive any training as a result of
23 the incident as a response to the incident itself?
24 A.  No, ma'am.
25 Q.  Okay.

Page 366

1 A.  Not that I recall.
2 (Off stenographic record discussion.)
3 BY MS. BONJEAN:
4 Q.  Do you remember a complaint register lodged
5 against you by a Michael Pong or Marjorie Pong?
6 A.  No, ma'am.
7 Q.  Doesn't ring a bell?
8 A.  No, ma'am.
9 Q.  Okay.  Okay.  Do you remember being the
10 subject of a complaint register with Detective
11 Kato?
12 A.  No, ma'am.
13 Q.  Did you ever work with Detective Kato?
14 A.  No, ma'am.
15 Q.  Never did?
16 A.  Never.
17 Q.  Okay.  Did you ever participate in an
18 interrogation of a suspect with Detective Kato?
19 A.  Not that I recall.
20 Q.  Do you know who Detective Kato is?
21 A.  Yes, ma'am.
22 Q.  How do you know Detective Kato?
23 A.  He came to Area 5 a few times and I met him
24 there.  I was introduced to him.
25 Q.  Okay.

Page 367

1 MS. BONJEAN: I'm going to -- can you
2 mark this for me, please.
3 (Exhibit 10 marked.)
4 BY MS. BONJEAN:
5 Q.  Detective -- or, Mr. Montilla, I'm going to
6 hand you what's been marked as Exhibit 10.
7 A.  Okay.
8 Q.  Do you recognize this complaint register
9 investigation file?
10 A.  I recognize this, yes.
11 Q.  Okay.  And I'm going to ask you to turn to
12 like the -- the page that is Bates stamped Maysonet
13 17346.
14 A.  Ma'am, you're talking that way, ma'am.  I
15 can't hear you.
16 Q.  Yeah, I'm sorry.  Maysonet 17346.
17 A.  Okay.
18 Q.  Okay.  Do you see that the victim's name is
19 Devon Daniels?
20 A.  Who?
21 Q.  Devon Daniels.
22 A.  Where is that at?  Daniels.  Okay.
23 Q.  And do you see that the name of the officers
24 who are identified, the accused officers, are
25 Kriston Kato and Fernando Montilla?  And that would

Page 368

1 be up above.
2 THE WITNESS: Where's she seeing this
3 at?
4 Okay.
5 BY MS. BONJEAN:
6 Q.  You're Fernando Montilla, right?
7 A.  Yeah.
8 Q.  And your star number was 20778?
9 A.  Yeah, that was my new star number.
10 Q.  Okay.  And as you sit here today, are you
11 telling us that you have no recollection of a
12 complaint register lodged against you for
13 activities that you allegedly undertook with
14 Detective Kato?
15 A.  Might have been Area 5.  I don't recall all
16 of it, ma'am.  I don't.
17 Q.  Did you ever investigate a case with
18 Detective Kato?
19 A.  Never.
20 Q.  Okay.  So I'm going to just read the
21 allegations here.  It says: The complainant was
22 received and registered by Investigator James
23 Montgomery on February 19th, 1996.  The
24 complainant, Paula Daniels, was not a witness to
25 the incident.  She filed this complaint of her son,

Maysonet v.
Guevara

Video Deposition

Page 369

1  Devon Daniels, the victim.  Mr. Daniels claimed
2  that some time between 17 and 18th of February,
3  1996, between 1300 to 500 hours, while in an
4  interrogation room in Area 5 headquarters,
5  Detective Kriston Kato tightened the handcuffs on
6  his wrists and jerked him around by the same,
7  knocked his hat off his head and slapped him on the
8  head, kneed him in the groin, kicked him on the
9  legs and shin, and along with Detective Fernando
10  Montilla and James Troken, beat him about the body,
11  pulled his hair and choked him until he confessed
12  to a murder.
13  Do you see that allegation?
14 A.  Yes, ma'am.
15 Q.  Okay.  Now, since it's written on a piece of
16  paper, we have to assume it's true, right?
17 A.  I hope --
18      MR. BRUEGGEN: Objection,
19  argumentative.
20      MS. CARNEY: Misstates his testimony.
21      BY MS. BONJEAN:
22 Q.  Correct?
23      MS. CARNEY: Go ahead.
24      MR. BRUEGGEN: Go ahead.
25      THE WITNESS: Correct.

Page 370

1      BY MS. BONJEAN:
2 Q.  Huh?  Correct?
3 A.  Yeah, that's what's written here.
4 Q.  So it must have happened, right?
5 A.  Not necessarily.
6 Q.  Oh, wait.  Didn't we say earlier that if
7  it's on a -- on a report, that it must have
8  happened?
9 A.  I'm being accused of something that's
10  investigated by the police department, and they're
11  saying I did this.  I didn't do that and I know
12  that.
13 Q.  Okay.  So can we agree now that just because
14  it's written in the report doesn't make it true?
15      MS. CARNEY: Objection, argumentative.
16      THE WITNESS: They're saying this here,
17  ma'am.  They're saying I'm accused of doing
18  something.
19      MS. BONJEAN: Right.
20      THE WITNESS: Okay?  This is a person
21  accusing me of doing something to them.
22      MR. BRUEGGEN: Right.
23      THE WITNESS: That's written on paper.
24      BY MS. BONJEAN:
25 Q.  It's written in a report.

Page 371

1 A.  It's investigated.  I prove they did wrong,
2  so this is how it's proven.  That's a CR number.
3 Q.  Okay.  But this is -- this is a police
4  document?
5 A.  Ma'am, it's written, yes.
6 Q.  Okay.  It's a report, correct?
7 A.  Yes, ma'am.
8 Q.  Okay.  And you're saying that what is
9  alleged against you is not true, right?
10 A.  That is correct.
11 Q.  Okay.  So -- and my only point is that just
12  because someone says it's so and it ends up in a
13  report doesn't make it true, does it?
14      MR. BRUEGGEN: Objection,
15  argumentative.
16      THE WITNESS: Not necessarily.
17      BY MS. BONJEAN:
18 Q.  Right.  It doesn't make it true, correct?
19 A.  That's right.  It's a CR investigation.
20 Q.  Right.  And we can't assume that just
21  because the OPS investigator put this information
22  in this report, that it actually happened, right?
23 A.  That's correct.
24 Q.  OPS investigators are police officers,
25  right?

Page 372

1 A.  That's correct.
2 Q.  Having read that, though, do you remember
3  being part of an interview of a Devon Daniels with
4  Detective Kato?
5 A.  No, ma'am, I don't recall that.
6 Q.  What about Troken, do you know who that is?
7 A.  Pardon me?
8 Q.  Troken?
9 A.  Yeah.  He was partnered with me for a while.
10 Q.  Okay.  Can you turn to page Maysonet 17358.
11 A.  Okay.
12 Q.  Okay.  You see it says Form 101.  It's hard
13  to read, but it says for Assistant State's Attorney
14  use only.  Do you see that?
15 A.  Pardon me?
16 Q.  It's hard --
17 A.  Felony review, yeah.  Okay.
18 Q.  Yeah.  Well, what is this document, do you
19  know?
20 A.  This is prepared by felony review.  It's a
21  statement identifying a person in a photograph or
22  doing a crime or something, and then it shows the
23  names of the officers and everybody involved, and
24  victims and witnesses on there.
25 Q.  Okay.  And your name appears there, right?

Page 373

1  A.  Pardon me?
2  Q.  Your name appears there as --
3  A.  Yes, it occurs, yes.
4  Q.  Along with Detective Kato, correct?
5  A.  Kato, yep.
6  Q.  Okay.  So does this --
7  A.  Troken, Carothers.
8  Q.  Does it lead you to believe that maybe you
9  did actually participate in an investigation
10  involving --
11  A.  I probably did.  My name is on there with
12  Carothers.  I was training Carothers.
13  Q.  Okay.  So this report, though, is correct,
14  right?
15  A.  That's correct.
16  Q.  Right.  All right.  But you earlier said you
17  never investigated a case with Detective Kato?
18  A.  Never.  Never.
19      MR. BRUEGGEN: Objection.
20      THE WITNESS: Only once here.  This
21  is -- this is old.  I don't remember what we did on
22  this.
23      BY MS. BONJEAN:
24  Q.  Okay.  I'm not asking you what you did, but
25  now you remember that you actually did

Page 374

1  investigate --
2  A.  Apparently we did something with Kato.
3  Q.  Okay.  So you were very sure earlier, so now
4  you're not sure, right?
5      MS. CARNEY: Objection, argumentative.
6      MR. BRENER: Join.
7      BY MS. BONJEAN:
8  Q.  The Assistant State's Attorney would have no
9  reason to just make your name up and put it there
10  as a witness, right?
11      MR. BRUEGGEN: Object to form,
12  argumentative.
13      THE WITNESS: Pardon me?
14      BY MS. BONJEAN:
15  Q.  You have no reason to believe that the
16  State's Attorney would just put your name there
17  just for yucks, correct?
18  A.  It's on the report.
19      MR. BRUEGGEN: Same objections.
20      MS. BONJEAN: Okay.  We are almost
21  done.
22      Can you mark this.
23      (Exhibit 11 marked.)
24      BY MS. BONJEAN:
25  Q.  Mr. Montilla, I'm going to hand you what's

Page 375

1  been marked as Exhibit 11.  Can you look at that
2  and tell me what that is.
3      MR. BRUEGGEN: Look at the whole
4  document.
5      MS. COHEN: Here's another copy for
6  you.
7      MS. CARNEY: Oh, thank you.
8      BY MS. BONJEAN:
9  Q.  Have you had a chance to look at it?
10  A.  Pardon me?
11  Q.  Have you had a chance to look at it?
12  A.  Some of it here, yes.
13  Q.  Okay.  What is it?
14  A.  I'm being accused of doing stuff to Maysonet,
15  I think.
16  Q.  Okay.  But what is specifically this
17  document?
18      MR. BRUEGGEN: Read it.
19      MS. BONJEAN: And please do not coach
20  him.
21      THE WITNESS: Huh?
22      MR. BRUEGGEN: I was telling him to
23  actually read it.
24      MS. BONJEAN: Okay.  Well...
25      THE WITNESS: Pardon me?

Page 376

1      MR. BRUEGGEN: I think he just looked
2  at the caption.
3      THE WITNESS: Yeah.
4      BY MS. BONJEAN:
5  Q.  Okay.  Well, do you recognize this document.
6  A.  I never had one before.  First time.  Okay.
7  Yeah.  I'm looking at it.
8  Q.  Okay.  Well, go to the last page.
9  A.  Pardon me?
10  Q.  Go to the last page of the document.
11  A.  Last page.  Okay.
12  Q.  What is that?
13  A.  A signature of me that I'm certifying that
14  I -- of a defendant on this case, the captioned
15  case.
16  Q.  Okay.  What are you certifying to?  It says,
17  "I hereby certify that the foregoing answers to the
18  interrogatories are true and accurate to the best
19  of my information."  Do you see that?
20  A.  Yes.
21  Q.  Okay.  Do you remember signing that?
22  A.  Yes.
23  Q.  Okay.
24  A.  That's my signature.
25  Q.  Okay.  So back to this document, do you now

Maysonet v.
Guevara

Video Deposition

Page 377

1   recognize what you were certifying to the truth of?
2   A.   Yeah.
3   Q.   What is it?
4   A.   That I was going to tell the truth on the
5   case and everything why.
6   Q.   Okay.  Sir, look at this document.  Have you
7   ever seen this document before?
8   A.   When I signed it, yes.
9   Q.   Okay.  Who showed it to you?
10  A.   Can't remember the attorney that was present
11  with me.  I can't remember.
12  Q.   Okay.  Let's look at interrogatory number
13  one.  Do you see that?
14  A.   Pardon me?
15  Q.   Do you know what an interrogatory is?
16  A.   No.  Explain it to me, please.  I can't
17  remember a lot of stuff.  I forget.
18  Q.   That's okay.
19  Do you remember reviewing this document
20  before you signed that certification?
21  A.   Yes, ma'am.  I had to review it, yes.
22  Q.   Okay.  And did you do that?
23  A.   Yes, ma'am.
24  Q.   And did you -- did you assist in answering
25  these questions?

Page 378

1   A.   Yes.
2   Q.   Okay.  Now, for instance -- hold on.
3       MR. BRUEGGEN: Jennifer?
4       MS. BONJEAN: Yeah.
5       MR. BRUEGGEN: This has highlights and
6   writing on it.  I think I probably wasn't supposed
7   to get that copy.  I wrote "Exhibit 11" on there.
8       MS. BONJEAN: Oh.  Yeah, I don't even
9   know.
10      MS. COHEN: Must have been yours.
11      MS. BONJEAN: Chances are I can't read
12  whatever I write anyway, but...
13      BY MS. BONJEAN:
14  Q.   Okay.  I'm going to have you look at
15  interrogatory number four.
16      THE WITNESS: Here?
17      MS. CARNEY: Yeah.
18      MR. BRUEGGEN: Yes.
19      BY MS. BONJEAN:
20  Q.   Okay.  It says:  Please identify every
21  communication that you had with any person,
22  including, but not limited to plaintiff, suspects,
23  persons of interest and any of the individual
24  defendants or anyone else, about any of the
25  allegations, events or circumstances described in

Page 379

1   plaintiff's complaint.  For each such
2   communication, please provide a summary of the
3   communication, identify when, with whom, and in
4   what medium, whether it was in person, phone,
5   email, text, the communication occurred, and
6   provide the dates of the communication.  If you
7   answer this interrogatory by referring to
8   documents, please identify the document and affirm
9   that the sum total of your communications
10  responsive to this interrogatory are contained in
11  the documents that you referenced.
12  Do you see that?
13  A.   Yes.
14  Q.   Okay.  What did you do to -- what actions
15  did you take or what did you review so that you
16  could answer this question?
17  A.   I don't understand the question.
18  Q.   How did you -- how did you -- this is a
19  question to you.  Do you understand that?
20  A.   Yeah.
21  Q.   Okay.  And how did you go about preparing to
22  answer this question?
23  A.   I don't -- I don't get it.  I've never
24  been -- I don't know about this.
25  Q.   Did you look at any documents when you --

Page 380

1   did you answer this question?
2   A.   Yeah, I answered these here with -- whatever
3   I was and where I did this, I don't remember.
4   Q.   Okay.  So what did you do so that you
5   could -- you understand that these are sworn --
6   sworn questions -- sworn questions that are asked
7   of you, and you are giving sworn answers to these
8   questions, right?
9   A.   Yeah, and I did the -- it was all written
10  here by my objections to everything.
11  Q.   Okay.  And I understand your attorney
12  probably wrote the objections.  That's what
13  attorneys do.
14  A.   Yeah.
15  Q.   But what I'm asking is:  What did -- apart
16  from the objections, what did you do so that you
17  could answer this question to the best of your
18  ability?
19  A.   I guess look at the case.  I'm not -- I don't
20  remember.
21  Q.   Well, what did you do?
22  A.   Ma'am, I don't remember all this, ma'am.  I
23  don't remember this.
24  Q.   You signed this certification --
25  A.   I understand I signed it, but I don't

Page 381

1  remember.  What year was this?  I don't know.
2  Q.  It was in May of 2019, it looks like.
3  A.  Okay.  I don't remember all that.
4  Q.  Just a couple months ago.
5  A.  A couple months.
6  Q.  Okay.  What did you do to determine whether
7  or not -- strike that.
8  What did you review so that you could answer
9  this question fully and completely?
10  A.  I guess all the reports.
11  Q.  Well, did you look at the reports?
12  A.  I think I did, yeah.  We went through
13  everything.  I know that.
14  Q.  Okay.  Well, for instance, you referenced an
15  interview with Mr. Maysonet and Detective
16  Paulnitsky that you said occurred prior to the
17  interview with Sergeant Mingey.
18  Do you remember that?
19  A.  Yes.
20  Q.  Okay.  Where did you get that information
21  from?
22  A.  Just reading reports.  If I would have read
23  the reports and I see everything, I was assuming
24  that these were the dates that we were together.
25  Q.  Okay.  Did you remember that interview with

Page 382

1  Paulnitsky?
2  A.  I remember at Area 5, yes.
3  Q.  Yeah.  And this was before your interview
4  with Mingey?
5  A.  I think it was after.
6  Q.  Okay.  So now that's --
7  A.  Yeah, I think it was --
8  Q.  You don't really remember, right?
9  A.  Not all of it, no.  I'm having a hard time.
10  I'm -- can't remember.  Unless I read reports, then
11  I'll remember, to refresh.
12  Q.  Okay.  And you have to rely on the reports
13  to tell you what happened, right?
14  A.  That is correct, yeah.
15  MR. BRUEGGEN: Object to form.
16  BY MS. BONJEAN:
17  Q.  Okay.  You have zero recollection by
18  yourself without those reports, right?
19  MR. BRUEGGEN: Object to form,
20  misstates the first two hours of the dep.
21  BY MS. BONJEAN:
22  Q.  Okay.  Well, you have -- I'll strike that.
23  That's not entirely fair, but you have very limited
24  information, other than what you testified to
25  during the first two hours of the deposition,

Page 383

1  right?
2  A.  That's correct.
3  Q.  And what -- so what else -- did you do
4  anything else to prepare these interrogatories,
5  other than look at reports?
6  A.  Not that I recall.
7  Q.  Okay.  Did you -- did you -- and you read
8  these before you certified to it?
9  A.  Yes.  I read everything, yeah.
10  Q.  And it's -- and it's complete and accurate
11  to the best of your ability, right?
12  A.  That is correct.
13  Q.  And as far as you know, there's no
14  additional information contained either in your
15  head or on any reports -- strike that.  That was
16  terrible.
17  You answered these interrogatories fully and
18  completely to the best of your ability, right?
19  A.  Yes, ma'am.
20  Q.  Okay.  And you did a -- and you looked at
21  all the reports, right?
22  A.  Yeah.  We have to go through everything, yes.
23  Q.  Okay.  And you looked at the investigative
24  file and all the police reports?
25  A.  Whatever we had --

Page 384

1  MR. BRUEGGEN: Object to form,
2  foundation.  Go ahead.
3  THE WITNESS: Whatever we had, that's
4  what we looked through.
5  BY MS. BONJEAN:
6  Q.  Okay.  Did you see any GPRs?
7  A.  I don't recall, ma'am.  I don't remember
8  everything that I saw in there.
9  Q.  Do you remember seeing one GPR ever?
10  MR. BRUEGGEN: Objection, asked and
11  answered.  Go ahead.
12  MS. CARNEY: And form.
13  THE WITNESS: I only got -- what
14  reports I had is what I had to read.
15  BY MS. BONJEAN:
16  Q.  I understand that you --
17  A.  I didn't get the entire file.
18  Q.  Okay.  Let me ask it this way.  Have you
19  ever, since the minute that you started
20  interpreting for Sergeant Mingey or anybody else,
21  from that date to this date, have you ever seen a
22  GPR prepared by any detective in this case?
23  MS. CARNEY: Objection, form.
24  THE WITNESS: Not during my interviews,
25  I don't recall.

Page 385

BY MS. BONJEAN:

Q. And in preparation for your deposition today, do you remember reviewing any GPRs?

MR. BRUEGGEN: Objection, asked and answered. Go ahead.

THE WITNESS: No, ma'am.

BY MS. BONJEAN:

Q. Do you know why there are no GPRs?

A. I have no idea, ma'am.

MS. CARNEY: Objection, foundation.

THE WITNESS: I have no idea.

BY MS. BONJEAN:

Q. I mean, is it because -- I mean, let me ask you it this way. You testified throughout this deposition that you would have expected a GPR to be prepared after interviews with Jose Maysonet. Right?

A. Yes, ma'am.

Q. Okay. And you said that wasn't your job, correct?

A. That's correct.

Q. Okay. If no such GPRs exist, do you have any idea where they might be?

MS. CARNEY: Objection, form, foundation.

Page 386

MR. SCHALKA: Join.

MR. BRENER: Join.

THE WITNESS: I have no idea, ma'am. That should have been with the file.

BY MS. BONJEAN:

Q. They should have been with the file, right?

A. That is correct.

Q. If they existed, correct?

A. That is correct.

Q. And you would have expected them to exist?

A. That is correct.

MR. BRUEGGEN: Object to form.

MS. BONJEAN: Okay. Let's take a five -- two-minute break, but I think I'm done.

MR. BRUEGGEN: Why don't we make it five so he can --

MS. BONJEAN: Yeah, let's take a five-minute break.

MR. BRUEGGEN: -- kind of stretch out just in case other people have questions.

THE VIDEOGRAPHER: We're going off the record at 5:46 p.m.

(Recess taken from 5:46 to 5:52.)

(Exhibit 12 marked.)

THE VIDEOGRAPHER: We are now back on

Page 387

the record at 5:52 p.m.

BY MS. BONJEAN:

Q. Mr. Montilla, you remember earlier, very early part of the day, when I asked you questions about you appearing for Mr. Maysonet's retrial?

A. I did what, ma'am?

Q. His retrial, when you came to the Cook -- to the 26th Street and California.

A. Yes, ma'am.

Q. Do you remember that --

A. Yeah.

Q. -- when you had reached out to Tim Grace to represent you?

A. Yes, ma'am.

Q. And you said you were confused by the subpoena, right?

A. Yes.

Q. By the way, had you ever -- have you ever -- have you ever called a lawyer before after getting a subpoena in a case?

MR. BRUEGGEN: Objection, asked and answered. Go ahead.

THE WITNESS: I don't recall.

BY MS. BONJEAN:

Q. Okay. This is the only time that you

Page 388

recall --

A. Yeah.

Q. -- calling a lawyer?

A. As I recall, yeah.

Q. Okay. I'm going to hand you what's been marked as Exhibit 12. Okay?

THE VIDEOGRAPHER: Counsel, will you please attach your microphone?

MS. BONJEAN: Oh, yeah.

BY MS. BONJEAN:

Q. Do you see this -- what appears to be a letter?

A. Yeah.

Q. It's written to Jim Papa, Assistant State's Attorney?

A. Yeah.

Q. It says November 13th, 2017, at the top there?

A. Okay.

Q. Right?

A. Yeah.

Q. And then it says regarding People versus Maysonet?

A. Yes.

Q. And then underneath it, it says in re

Maysonet v.
Guevara

Video Deposition

Page 389

1  retired Detectives Roland Paulnitsky and Fernando
2  Montilla?
3  A.  Yes.
4  Q.  Okay.  And at the end, it's Tim -- signed by
5  Timothy Grace?
6  A.  Yes, ma'am.
7  Q.  Okay.  And he's your attorney, right?
8  A.  Yes.
9  Q.  I'm going to read it, okay, and then I'm
10  going to stop you and ask you a question.  Okay?
11  A.  Okay.
12  Q.  It says, "Mr. Papa, as you recall, I
13  represent the interests of retired Detectives
14  Roland Paulnitsky and Fernando Montilla.  As I
15  understand and as we have spoken, your office is
16  currently prosecuting the case of People versus
17  Maysonet.  I also understand that the testimony of
18  both my clients are needed to continue on with that
19  prosecution.  My clients understand and appreciate
20  your position.  Unfortunately, the allegations made
21  in the motions filed by the defendant's attorney
22  implicate them in crimes."
23  Do you see that?
24  A.  Yes.
25  Q.  "All crimes that are complained of would be

Page 390

1  outside of any statute of limitation and thus could
2  not be subject" -- "the subject of a criminal
3  prosecution.  The only crime that could be
4  contemplated would be that of perjury.  If my
5  clients testified and if your office or the
6  Department of Justice believed that they had in
7  fact offered false testimony, they would be in
8  jeopardy."
9  Do you see that?
10  A.  Yes, ma'am.
11  Q.  Do you agree with that?
12  A.  Pardon me?
13  Q.  Do you agree with what he said there?
14  A.  Yes, ma'am.
15      MS. CARNEY: I'm just going to put an
16  objection on the record to foundation for the
17  letter, just for the record.
18      MS. BONJEAN: Okay.
19      BY MS. BONJEAN:
20  Q.  Have you ever seen this letter?
21  A.  Pardon me?
22  Q.  Have you ever seen this letter?
23  A.  I think I did, yes, ma'am.
24  Q.  Okay.  And did you see it before he sent it
25  to Mr. Papa?

Page 391

1  A.  Yes.
2  Q.  Right.
3  A.  Yeah.
4  Q.  Okay.  And I'll keep reading.  "As such, my
5  clients intend to invoke their right to remain
6  silent afforded them under the Fifth Amendment to
7  the United States Constitution and the due process
8  clause of both the federal and state constitutions
9  respectively."
10  Do you see that?
11  A.  Yes, ma'am.
12  Q.  Okay.  So you knew that Mr. Grace was going
13  to tell the Court that you were going to invoke
14  your Fifth Amendment rights before he did so,
15  correct?
16  A.  In a way, yes.
17  Q.  Well, you read the letter, you said, right?
18  A.  Right now, yes, I'm reading this letter.
19  Q.  Sir, you just testified that you saw the
20  letter prior to court, right?
21  A.  I think I did.  I don't -- I don't recall all
22  this stuff.
23  Q.  Now you don't remember, right?
24  A.  But I know that whatever's here, I guess, you
25  know, that I was talking with Tim Grace and doing

Page 392

1  all this for me.
2  Q.  Okay.  When you read this letter
3  previously --
4  A.  Yes, ma'am.
5  Q.  -- you never said to Mr. Grace, hey, I want
6  to testify, did you?
7      MR. BRUEGGEN: Objection, misstates the
8  testimony.
9      MS. BONJEAN: It's a question.
10      THE WITNESS: I always wanted to
11  testify.
12      BY MS. BONJEAN:
13  Q.  Did you tell -- when you saw this letter --
14  when Mr. Grace sent you a copy of this letter --
15  A.  Yeah.
16      MS. CARNEY: Objection, foundation.
17      BY MS. BONJEAN:
18  Q.  Okay.  Did Mr. Grace give you -- you said
19  you saw this letter.  Are you taking that back now?
20  A.  I'm not taking anything back.
21  Q.  Okay.  You're the one that is -- says that
22  you've never lied under oath, right?
23  A.  That's right.  I never lied under oath,
24  ma'am.
25  Q.  Okay.  Just about 12 seconds ago, you said

Page 393

1  that you saw this letter prior to going to court at
2  26th Street.
3       MR. BRUEGGEN: Objection, misstates his
4  testimony.
5       MS. BONJEAN: Well...
6       THE WITNESS: I don't remember the
7  court date.
8       MS. BONJEAN: Can we go back to what he
9  said about that?
10      THE WITNESS: Huh?
11      (Discussion with court reporter.)
12      BY MS. BONJEAN:
13 Q.  Do you remember being asked this question
14 not too long -- that won't work.
15      Okay.  I can assure you, because I just saw
16 it with my own eyes, that when I asked you did you
17 see this letter before you went to court, you said
18 yes.
19 A.  Yes.  Yes.  I remember this case.  I remember
20 this.
21 Q.  Okay.  And Mr. -- Mr. Grace wouldn't have
22 sent a letter like this without letting you see it
23 beforehand, right?
24 A.  Yes, ma'am, that is correct.
25 Q.  Okay.  So you saw this letter before --

Page 394

1  A.  Yeah.
2  Q.  -- you went to court, correct?
3  A.  Yes.
4  Q.  Okay.  In fact, this letter is November
5  13th, 2017, correct?
6  A.  Yeah.
7  Q.  Okay.  And that was before Mr. Maysonet was
8  released, right?
9  A.  I don't know when he was released.
10 Q.  I guess it speaks for itself.
11 A.  Yeah.  Okay.  Yeah.
12 Q.  It's public record when he was released,
13 correct?
14 A.  Okay.  Okay.
15 Q.  All right.  So you knew prior to going to
16 court that Mr. Grace was going to exercise your
17 Fifth Amendment rights on your behalf, right?
18      MR. BRUEGGEN: Object to form,
19 foundation, and I don't think -- I think you even
20 stated earlier he can't exercise rights on behalf
21 of Mr. Montilla, so...
22      BY MS. BONJEAN:
23 Q.  Well, he -- you knew prior to going to court
24 that Mr. Papa had told -- ah.
25      MR. BRUEGGEN: It's too late.  We

Page 395

1  should just call it an evening.
2       MS. BONJEAN: We're almost done.
3       BY MS. BONJEAN:
4  Q.  You knew prior to going to court that
5  Mr. Grace had told Mr. Papa that if you testified,
6  you were going to take the Fifth, right?
7  A.  If I wasn't granted immunity, that's the only
8  reason.
9  Q.  Right.
10 A.  That's how come I signed that paper.
11 Q.  Okay.  What paper?
12 A.  If I would -- this here.
13 Q.  Okay.  Okay.
14 A.  If I would be granted immunity.  If I wasn't
15 granted, that we're going to -- we were exercising
16 my rights to invoke the Fifth Amendment.  I went
17 with what was saying here with the letter of the law
18 down here.
19 Q.  So yeah.  So you -- you were aware that
20 Mr. Grace had told the State's Attorney you were
21 going to invoke the Fifth, right?
22 A.  If I wasn't granted immunity, yes.
23 Q.  Right.  And they didn't give you immunity,
24 right?
25 A.  According to my lawyer, Grace, no.

Page 396

1  Q.  Okay.  And so -- and just to be clear, you
2  read this letter, and you never told Mr. Grace, no,
3  don't send that letter, right?
4  A.  I never said anything.  He's my lawyer.
5  Q.  Right.
6  A.  I go with my lawyer.  I trust my lawyer, what
7  he's doing for me.  This is what he did for me here.
8  Q.  And you -- you were okay -- or strike that.
9  You were comfortable with Mr. Grace sending
10 this letter, right?
11 A.  Yes.
12 Q.  And this reflected what you wanted, right?
13 A.  Yes.
14 Q.  Okay.
15      MS. BONJEAN: I have nothing further.
16      MR. BRENER: I have no questions.
17      MR. SCHALKA: I have no questions.
18      MS. CARNEY: I have no questions.
19      MR. BRUEGGEN: I don't have any
20 questions.
21      THE WITNESS: I don't ask questions.
22      MR. BRUEGGEN: Signature, we'll
23 reserve.
24      MS. BONJEAN: Whatever you want.
25      THE VIDEOGRAPHER: We are now going off

Page 397

1  the record at the end of the deposition of Fernando
2  Montilla.  The time is 6:00 p.m.
3        (Deposition concluded at 6:00.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 398

1  STATE OF ILLINOIS      )
2  COUNTY OF COOK         )
3              JOSE JUAN MAYSONET, JR.
                        vs.
4              REYNALDO GUEVARA, et al.
5                  18-cv-02342
6
7
8              I hereby certify that I have read the
9  foregoing transcript of my deposition, given on
10 August 27, 2019, consisting of pages      through    ,
11 inclusive, and I do again subscribe and make oath that
12 the same is a true, correct and complete transcript of
13 my deposition so given as aforesaid, as it now appears.
14
15            Please check one:
16                 I have no corrections
17                 Number of errata sheets
                   enclosed
18
19   (signed)    FERNANDO MONTILLA
20 SUBSCRIBED AND SWORN TO
21 before me this      day
22 of        , A.D., 2019.
23   NOTARY PUBLIC
24
25

Page 399

1                    CERTIFICATE
2                        OF
3              CERTIFIED SHORTHAND REPORTER
4
5         I, KARYN H. CHALEM, a Certified Shorthand
6  Reporter of the State of Illinois, CSR License No.
7  084-004167, do hereby certify:
8         That previous to the commencement of the
9  examination of the aforesaid witness, the witness was
10 duly sworn by me to testify the whole truth concerning
11 the matters herein;
12        That the foregoing deposition transcript was
13 stenographically reported by me and was thereafter
14 reduced to typewriting under my personal direction and
15 constitutes a true and accurate record of the testimony
16 given and the proceedings had at the aforesaid
17 deposition;
18        That the said deposition was taken before me
19 at the time and place specified;
20        That I am not a relative or employee or
21 attorney or counsel for any of the parties herein, nor a
22 relative or employee of such attorney or counsel for any
23 of the parties hereto, nor am I interested directly or
24
25

Page 400

1  indirectly in the outcome of this action.
2              IN WITNESS WHEREOF, I do hereunto set my
3  hand at Chicago, Illinois, this 6th day of September,
4  2019.
5
6
7
8
9              KARYN CHALEM, CSR, RPR
               CSR No:  084-004167
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## /

**/////** **(15)**
22:25;57:25;88:25;
119:25;140:25;
143:25;167:25;
168:25;177:25;
178:25;263:25;
301:25;305:25;
315:25;322:25

## A

**ability (10)**
8:20;9:9;10:1;12:8,
12;29:9;160:4;
380:18;383:11,18
**able (9)**
43:16;116:25;
117:12;222:14;
242:18;259:24;260:6;
264:14;358:24
**above (1)**
368:1
**abrasive-type (1)**
264:13
**abuse (1)**
132:15
**abused (1)**
339:16
**academy (36)**
76:2;9;77:20;78:2;
79:7,15;80:5,9;81:11;
84:15,17,22,25;86:12;
87:4,6,7,8,11;89:19;
90:24;91:5,14,20,25;
93:14;94:21;95:4,9;
96:1;97:13;102:23;
106:6;128:13;365:5,
16
**accent (1)**
260:2
**accept (1)**
359:4
**acceptable (1)**
166:18
**accident (2)**
14:24;79:9
**accompany (1)**
208:7
**accompanying (1)**
236:10
**accord (1)**
235:22
**according (23)**
36:21;46:9;142:9;
234:5,9;241:13;
242:2;254:14;294:19;
304:21;318:7;329:14;
330:9;334:16;336:8,
13,24;341:17;345:8,
13;363:7,8;395:25

**accurate (10)**
49:9,15;51:10;
78:21;88:9;150:23;
319:25;343:15;
376:18;383:10
**accusations (1)**
210:2
**accused (5)**
142:14;367:24;
370:9,17;375:14
**accusing (3)**
209:25;223:21;
370:21
**acknowledged (1)**
74:16
**across (3)**
68:1;142:15;323:24
**act (1)**
241:18
**acted (1)**
216:17
**acting (2)**
227:2;355:5
**action (1)**
321:19
**actions (16)**
183:10;215:2;
216:21;224:17;
244:18;291:5,7;
300:11,22;301:3,12,
19;308:12;309:23;
310:1;379:14
**actively (1)**
201:18
**activities (7)**
79:22;80:1;82:17,
18;99:4;144:10;
368:13
**activity (7)**
140:17;141:23;
142:16;143:18;144:5;
341:15;360:1
**actual (4)**
125:24;157:15;
234:23;274:2
**actually (34)**
64:7;69:5;118:23;
123:18,19;127:14;
142:10;153:16,18;
166:9,20;179:25;
202:3;209:11;212:4;
237:14;251:22;252:6;
269:1,2;270:6,9,19;
274:2,3,15;275:2;
283:25;345:13;
360:17;371:22;373:9,
25;375:23
**add (3)**
163:24;164:11,14
**additional (5)**
92:3;188:6;228:11;
340:21;383:14
**addressing (1)**

193:19
**admission (1)**
295:2
**admissions (3)**
315:11,15,19
**admit (1)**
142:13
**admitted (1)**
93:2
**advice (2)**
40:2;58:3
**advised (3)**
34:5;278:22;316:21
**advising (1)**
34:22
**advisory (1)**
70:1
**affiliation (2)**
143:3,12
**affirm (1)**
379:8
**afforded (1)**
391:6
**African-American (2)**
179:4;309:6
**afternoons (2)**
133:17;329:5
**again (52)**
10:1;18:6;24:15;
32:22;37:2;43:24;
62:10;73:13;99:14,
17;101:16;106:13;
109:12;111:18;
141:10;163:10;
177:18;178:2;186:25;
211:9;217:16,24;
218:9;219:2,15,21;
220:14;221:8;222:25;
226:8;234:5;244:14;
259:4;260:24;288:4;
294:8;303:11;313:18;
319:22;327:8,10;
329:16;334:18,20;
336:4,9;337:3,3,11,
11;358:22;360:7
**against (13)**
14:21;16:2;29:13,
17;52:5;56:3;132:3,
16;285:24;338:7;
366:5;368:12;371:9
**age (1)**
86:13
**agencies (1)**
72:23
**aggravated (2)**
286:9;307:10
**ago (10)**
17:10;23:18;29:23;
63:2;98:7;226:19;
228:7;283:19;381:4;
392:25
**agree (37)**
9:21,24;60:21,25;

61:15;83:17;92:10;
95:24;97:4,20;
127:15;128:4;132:1;
134:11;135:8,20;
139:11;143:17;
150:19;168:19;170:1;
206:22;239:14;
242:21;263:11;
265:14;266:10;
287:13,19;296:9;
305:7;308:14;321:6;
331:23;370:13;
390:11,13
**agreed (3)**
24:6;331:4;335:10
**Ah (2)**
315:1;394:24
**ahead (59)**
33:16;35:25;37:24;
43:9;47:5;56:25;
60:24;85:14;90:4;
108:12;113:18;126:5;
128:19;129:13;134:7;
138:7;154:25;155:16;
164:13;172:16;173:4;
178:21;182:13;
189:12;201:20;202:7;
203:2;207:24;216:2;
217:1;229:24;239:10;
242:21;249:6;251:21;
257:17;263:23;
274:18;278:24;
293:14,21;296:15;
298:6,18;307:2,14;
315:6,8;320:4,10;
327:25;350:24;
364:14;369:23,24;
384:2,11;385:5;
387:22
**aid (2)**
7:24;12:10
**aids (5)**
7:25;11:18,23;
47:19;48:2
**air (1)**
69:21
**al (1)**
5:3
**Alfredo (4)**
186:1;272:5,9;
340:21
**allegation (1)**
369:13
**allegations (5)**
29:12,16;368:21;
378:25;389:20
**alleged (2)**
276:5;371:9
**allegedly (2)**
329:10;368:13
**alleges (1)**
339:15
**alley (1)**

232:18
**allowable (1)**
161:5
**allowed (3)**
127:1;152:16;158:2
**Alma (4)**
260:25;261:5,5;
264:4
**Almost (6)**
20:23;81:25;
133:21;283:19;
374:20;395:2
**alone (1)**
179:14
**along (9)**
50:25;83:22;163:6;
232:18;241:4;249:7;
261:3;369:9;373:4
**although (1)**
228:7
**always (12)**
36:21;43:10;81:17,
19;101:4;109:17,24;
136:7;154:9;169:21;
346:18;392:10
**amend (1)**
164:3
**Amendment (27)**
32:5,16;33:6,7,22;
34:13;35:3,16;36:15;
37:11,15,20;38:22;
40:18;41:11,19;43:7,
11,21;44:3;45:24;
47:2;49:8;391:6,14;
394:17;395:16
**among (3)**
137:11,11;256:7
**amount (6)**
64:2;134:22;
137:11;140:17,17;
335:13
**angry (1)**
223:11
**answered (54)**
22:23;35:18;36:18,
25;37:25;38:6,8,24;
40:22;42:6,9,19;43:9,
24;45:7,14,15;46:2,
15;47:5;48:12,18;
49:11,18,25;51:5,13,
22;52:20;55:23;56:5;
61:18;67:11;90:14;
93:21;124:7,20;
126:4;140:2,12;
207:24;229:24;
243:12;257:17;
293:14;301:7,16;
303:7;321:15;380:2;
383:17;384:11;385:5;
387:22
**anyplace (1)**
325:14
**apart (9)**

12:10;31:21;63:6;
84:3;120:8;174:14;
193:14;240:12;
380:15
**apartment (2)**
264:22,24
**apologies (6)**
67:14,17,18;
185:14;262:17;
278:16
**apparently (19)**
77:18;183:13;
199:4;204:7;246:25;
247:11;260:13;
268:23;271:1;272:20;
273:18,20;277:6;
317:12;343:10;353:7;
362:1,4;374:2
**appear (2)**
260:10;270:18
**appearance (2)**
56:16,20
**appeared (1)**
31:25
**appearing (1)**
387:5
**appears (6)**
242:22;269:16;
270:4;372:25;373:2;
388:11
**apply (3)**
35:12;72:15,22
**appreciate (2)**
323:15;389:19
**approach (1)**
307:22
**approached (1)**
275:14
**appropriate (1)**
125:22
**approval (2)**
153:21;164:2
**approve (3)**
41:22;155:9;202:5
**approved (4)**
164:11,15;267:18;
342:17
**approves (2)**
155:11;159:7
**approving (1)**
258:4
**approximately (3)**
135:24;191:7,10
**approximating (1)**
104:5
**April (1)**
340:24
**ARDC (1)**
52:5
**Area (148)**
19:7;21:2;58:15;
81:24;94:7;98:12,13,
15,22;99:11,15,20;

100:2,8,20,24;101:2,
7,9,11,14;102:3,10,
14,16,16;103:6,7,11,
17,17,23,25;104:3,4,
12,21;105:3,13,25;
106:8;110:5;111:15,
18,23;112:3;114:20;
116:23;121:24;
122:17;133:5,10;
134:24;136:17;137:1,
2,4,10,17;138:2,19;
139:23;140:10,10,17;
141:12;146:11,20;
147:6;174:10,18,20;
176:4;178:6;183:22;
187:16;189:6,17;
192:3;203:21;214:24;
218:6,9,21;219:3,6,9,
15,22;220:10;222:1;
224:14;229:17;
233:17;235:14,17,19;
237:9;239:18;240:13;
250:4;260:11;272:10;
276:21,24;277:11;
278:18,20;280:9,10,
10,16,24;281:15,18;
282:6;284:5;296:25;
297:2;298:21;308:11;
313:23;314:5,9;
315:22;316:21;
326:11,19;327:9;
328:20;332:17;334:1;
346:6,12,14;347:2,4,
21;348:7,14,19;
358:11;359:13;365:7;
366:23;368:15;369:4;
382:2
**areas (6)**
104:9;136:18;
137:11,18,19,22
**arguably (1)**
287:22
**argue (1)**
354:14
**argument (5)**
261:14;262:2,21;
264:12,15
**argumentative (25)**
34:18;35:20;54:13,
14;55:11;57:19,21;
58:5,6;139:2;140:2;
319:17;320:24;322:1,
2;323:8,21;324:1,2;
354:13;369:19;
370:15;371:15;374:5,
12
**Army (3)**
68:23;70:18;71:2
**around (21)**
12:15;13:23;26:2;
84:9;87:17;111:19;
115:11;149:11;
151:19;171:4;182:17,

20;184:6;187:16;
191:8;224:14;264:8,
8;326:4;329:3;369:6
**arranged (1)**
202:23
**arrangement (1)**
358:22
**array (5)**
106:14,16,19;
107:16;109:18
**arrays (2)**
106:9;109:16
**arrest (31)**
94:11,11;143:14;
171:7,10;175:10,17;
274:2,3,6,8;296:19;
305:8;343:4,8,9,23;
345:10;352:7,9,14;
353:2,9,12,21,22;
354:4;355:8;358:23;
359:19;360:21
**arrested (5)**
73:11;235:22;
311:14;326:21;
360:18
**arresting (13)**
268:25;269:1,14;
273:4,10,24;274:1,11,
12;304:4;342:25;
343:13;345:5
**arrived (6)**
191:6;328:20;
332:17,20;337:8;
339:12
**arriving (1)**
328:24
**ASA (13)**
232:5;247:2;
276:17,18;300:17;
333:24;334:6;335:15;
337:4,8;339:22;
340:19,22
**Ashley (1)**
5:19
**aside (4)**
14:14;119:17;
244:6;345:17
**assault (1)**
105:2
**assaults (1)**
306:16
**assemble (2)**
108:2;123:17
**assembled (1)**
106:13
**assert (7)**
32:4;33:7;21:34:12;
35:3,15;37:19
**asserted (2)**
32:16;33:5
**assign (1)**
148:11
**assigned (43)**

18:21;23:25;69:25;
81:12;98:19,21;
99:11;100:19,20;
104:5;105:14;111:21;
146:20,22,23;147:8,
13,22;148:6,18;
151:7;166:25;167:3,
7,11;168:2;169:6,24;
170:3,7,9;182:5;
188:21;218:17;254:3,
5;256:2,5;312:20;
313:2;333:25;335:15;
341:23
**assignment (1)**
80:5
**assignments (1)**
69:18
**assigns (1)**
312:24
**assist (4)**
179:24;274:11;
359:19;377:24
**Assistance (1)**
69:25
**assistant (9)**
71:4;228:22;
276:17,21,23;335:14;
372:13;374:8;388:14
**assisted (1)**
344:6
**assisting (1)**
236:4
**associated (3)**
144:5,10;159:11
**assume (38)**
60:2;70:24;102:13;
103:8;107:22;112:13;
129:18;132:1;134:8;
135:23;140:24;141:2;
144:12;154:23;173:5,
23;174:4;196:17;
219:10,24;241:15;
243:22;261:12;289:3;
319:3,8;320:14,15,16;
328:14;335:6;337:23;
343:6,7;344:10;
355:10;369:16;
371:20
**assumed (3)**
282:25;308:20;
318:10
**assuming (8)**
62:15;124:11;
151:18;276:1;317:17;
328:12;334:22;
381:23
**assumption (1)**
204:6
**assure (1)**
393:15
**attach (4)**
152:12;153:8,20;
388:8

18:21;23:25;69:25;
81:12;98:19,21;
99:11;100:19,20;
**attached (5)**
151:13;155:3,5,12;
163:14
**attempted (1)**
308:15
**attend (3)**
76:1,8;84:14
**attendance (3)**
250:25;251:2,19
**attended (3)**
86:12;93:14;98:18
**attending (1)**
87:11
**attention (2)**
260:23;342:9
**attorney (69)**
7:3;18:2,6,21;22:9,
15;26:15;32:3,18,21;
33:20;34:7,16,22;
35:8;36:2;37:4,17,21;
40:14;41:12,13;43:5,
19;44:15;45:10,21,
23;46:18;47:6;48:14;
49:6,12;50:4,6,16;
52:8;54:2,3;55:3;
57:1,4;63:10;89:14;
94:12;197:13,15,22,
24;198:1;207:1;
211:20,22;228:17,18,
23;229:9;290:7;
335:15;356:17;
372:13;374:8,16;
377:10;380:11;
388:15;389:7,21;
395:20
**attorney-client (2)**
50:19;56:24
**attorneys (22)**
22:12;23:3,13,17,
20;24:18;25:3;27:11;
33:1,4;55:4;62:11,16,
22;63:6;229:1,2;
276:17,21,24;300:13;
380:13
**attorney's (1)**
58:3
**audibly (1)**
265:9
**August (72)**
5:6;63:3;175:17;
200:17;207:7;215:10,
12,24;216:14;217:15;
218:8,20;219:1,14;
240:1,7,8,17;267:19;
268:6;291:4,18;
293:9,17;299:6,22;
300:10,18,20,21,21;
301:5,11,11,21;
302:13,17;303:5;
304:1,1,7,11,16,17;
305:2,9;309:11,22,22;
310:6,6;311:15;
314:5,21,23,24,25;

315:3;328:18;329:11;
332:12;333:19;
335:19;336:4;337:1,
7;338:20,20;340:25;
342:17,17;349:11
**authored (1)**
274:23
**authoring (3)**
269:11,18,25
**auto (3)**
79:9;99:22;104:22
**automatic (1)**
277:23
**automatically (1)**
181:17
**Avenue (14)**
111:24;179:5,21;
195:10;209:19;
221:15;259:5;261:8,
11;264:6;285:25;
286:2,6;352:12
**awakened (6)**
261:13,16,19,25;
263:18;264:8
**aware (18)**
17:18;35:1;45:10,
23;46:6;134:17;
185:5;277:12,21;
293:11;309:25;
315:11,15,18;358:16;
359:3,25;395:19
**away (7)**
90:17;131:9,17;
152:17,18,19;153:5

**B**

**back (70)**
11:6;19:17,18;
42:15,22,23;45:18;
71:4,14;73:5;74:11,
12;75:14;103:21;
114:4,7,8;141:11;
151:18;155:20,22;
157:4;163:7,23;
164:3,11;165:5;
183:22,25;187:20,20;
192:23;194:2,18;
198:23;214:5,20,24;
216:9;217:11;221:6;
222:24;236:13;
246:15;248:9,19;
253:5;257:10;269:3;
275:5;282:21;286:14;
296:25;298:21;
304:25;305:23;311:2,
3;348:10;351:16;
363:6;365:4,6,7,17;
376:25;386:25;
392:19,20;393:8
**backdate (1)**
166:13
**background (1)**

12:2
**backpay (1)**
363:7
**backwards (2)**
98:3;110:5
**bad (2)**
28:18;97:21
**badgering (4)**
39:20;47:14;322:3,
5
**bargain (1)**
283:5
**based (6)**
83:8;120:13;150:4;
225:23;294:2;333:15
**basement (1)**
172:22
**basic (2)**
68:25;90:25
**basically (7)**
71:18;85:15;86:13;
103:5;210:23;307:8;
334:17
**basics (1)**
69:1
**basis (1)**
17:20
**basket (1)**
153:17
**Bates (6)**
180:13;248:24;
249:18;316:19;
351:17;367:12
**bathrooms (1)**
113:25
**batteries (3)**
7:24;8:1;11:19
**battery (2)**
286:10;307:10
**beat (5)**
80:19;331:19,24,
25;369:10
**became (6)**
82:6;84:10;160:2;
277:11;293:11;
315:15
**become (9)**
75:17;82:10,18,20;
87:12;102:24;106:7;
315:18;351:4
**beforehand (1)**
393:23
**befuddled (1)**
323:17
**beginning (1)**
231:9
**begins (1)**
252:24
**behalf (8)**
5:18;6:6,8;8:17;
45:24;52:11;394:17,
20
**bell (5)**

16:9;186:5;258:19;
265:12;366:7
**Bella (2)**
277:1;332:23
**Bello (3)**
246:20,21;277:2
**Bello's (2)**
247:17;248:13
**bells (1)**
257:11
**belong (2)**
40:24;276:5
**belongs (2)**
37:11;40:19
**below (2)**
206:24;268:24
**bench (1)**
115:13
**benefit (1)**
117:9
**Benefits (4)**
75:21,23;83:21,23
**besides (1)**
27:14
**best (24)**
8:20;9:9,25;10:1,
17,22;12:7;29:8;45:1;
105:24;192:5,9;
211:23;257:14;
284:23;341:13;
346:23,24;348:20,21;
376:18;380:17;
383:11,18
**better (1)**
219:13
**Beuke (3)**
358:5,6,11
**bible (2)**
330:11;364:9
**big (5)**
66:1;115:5,9;
306:25;307:3
**birth (1)**
65:11
**bit (5)**
111:18;125:5;
148:23;179:3;288:20
**bits (1)**
262:6
**black (4)**
181:7;221:15;
275:13;294:21
**blacks (2)**
254:10;264:11
**blind (1)**
115:10
**block (1)**
261:10
**blue (3)**
19:21;276:2,2
**board (6)**
173:7,9;174:1,6;
363:1,8

**bodies (4)**
297:9,15,16,16
**body (2)**
364:4;369:10
**Bonaventure (1)**
276:1
**Bonjean (498)**
5:17,17,20;6:21,24;
13:10;15:20;18:5;
20:8;23:1,7,8;24:21;
25:22;26:19,21;28:9,
14;29:10;30:1;33:2,
13,18;34:9,24;35:6,
22,24;36:20;37:1,9;
38:1,9,14;39:1,3,8,12,
15,22,24;40:10,13,15,
16,23,25;41:3,5,24;
42:7,10,15,21;43:1,4,
13;44:1,7,13,24;45:8,
9,19,22;46:5,19,24;
47:8,13,18,22,24;
48:5,9,12,13,21;49:2,
14,21;50:1,20,23;
51:8,16,23;52:4,22;
53:5,21;54:15,24;
55:13,17,24;56:6,12,
13;57:2,14,22;58:1,7,
10;60:14;61:1,14,20;
62:2;65:14,18;66:12;
67:13,17,19;68:4,5;
72:19;74:24;75:10,
16;77:12,14;79:4,5;
83:1,13;85:17,20;
86:24;87:23;88:5,17,
18;89:1,10;90:7,19,
20;92:19;93:1,7,24;
95:13,15,23;96:6,12,
22;97:11,18,19,24;
99:7;105:12,23;
106:12;107:7,13,21;
108:1,7,14;109:6,10,
13,22;110:2;114:12;
118:9;119:1,12,24;
120:1,24;121:17;
122:3,8,22;123:4,24;
124:10,21;125:6,16;
126:8,17,23;127:6,11,
20;128:11,20;129:9,
15,24;130:7,14,20;
131:2,6,14,21;132:8,
20;133:4;134:9,16;
135:13;136:4,21;
137:6,16;138:9;
139:3,6,15;140:5,15,
20;141:1,16;142:8,
23;143:10;144:1,9,
20;145:9,13;146:3;
147:1,5,10,15;148:4,
12;149:6;153:3;
154:15;155:7,17;
156:6;160:10;161:3,
11;162:2,3;164:16;
165:1,7,13,14;167:23;

168:1;169:1,18;
170:16;172:6,19;
173:6,15,17,19;
175:24;177:3,17;
178:1,10,24;179:1;
180:6,15,18,21;
182:15;185:14,16;
189:14;201:22;202:2,
9;203:4;205:14,16;
208:1;210:11;211:8;
213:13,19;214:1;
215:8;216:4;217:3,
13;230:1;237:16,18,
20,25;238:5,21;243:5,
14,19;246:14,16;
247:20,24;248:18,20,
23;249:5,10,13;
250:14,17,18;252:3,6,
13,18,22;253:4;
255:9;257:18;261:18;
262:14,17,18;263:17;
264:1;265:3,4,21;
266:2;268:20;269:21;
271:3,23;273:15,22;
278:7,13,16,17;279:6,
8;285:15;286:12;
287:12,18;288:9;
289:1,9,12,13;293:16;
294:1;296:18;297:8,
14,22;298:10,17;
299:20;300:1;301:2,
8,10,18;302:1,11,20;
303:9,14,20,21;305:6,
17;306:1;307:5,16;
308:22;309:10;
310:12;311:17;315:1,
2;316:1,10,15;
318:19;319:2,7,18;
320:6,12;321:3,21;
322:4,9;323:1,14,22;
324:4,7,12;326:17;
328:7;331:2;332:6;
335:5;336:12,15,18,
21,23;337:24;338:19;
339:5,9;341:5;
344:11;345:22;
346:11,22;348:18;
349:5,8,18;350:12,14,
23;351:10,15,18,22,
24;354:14,15;355:3,
12,17;359:7;360:12;
364:15;366:3;367:1,
4;368:5;369:21;
370:1,19,24;371:17;
373:23;374:7,14,20,
24;375:8,19,24;
376:4;378:4,8,11,13,
19;382:16,21;384:5,
15;385:1,7,12;386:5,
13,17;387:2,24;388:9,
10;390:18,19;392:9,
12,17;393:5,8,12;
394:22;395:2,3;

396:15,24
**B-O-N-J-E-A-N (1)**
5:18
**book (1)**
107:2
**books (2)**
106:22;113:19
**bordering (1)**
324:5
**born (2)**
65:19;67:14
**Borowitz (7)**
276:18;333:24;
334:7,13,14;335:15;
337:4
**both (12)**
5:20;47:9;58:23,25;
211:11;243:24;
250:17;264:16;
276:20,23;389:18;
391:8
**bothered (2)**
55:18;253:1
**bottom (8)**
74:3;207:11;241:9;
256:17,25;269:5;
275:9;276:2
**Boulevard (1)**
5:10
**box (5)**
165:19;167:6;
206:24;268:4;274:22
**boy (1)**
7:6
**Boyle (4)**
31:18,23;258:2,3
**brain (1)**
90:16
**break (11)**
75:10;162:1,5;
164:25;165:1;217:4;
303:19;305:18;
348:25;386:14,18
**breaking (1)**
289:8
**Brener (59)**
5:24,24;20:5;23:5;
24:19;25:21;29:7,24;
34:19;35:19;38:11;
42:9;46:23;54:13;
55:12;61:8;75:6;
88:14,23;90:5;92:16,
23;93:5;97:8;122:2,7;
126:1,15,20;130:4;
131:11;132:6;134:5;
136:19;137:13;
138:24;139:25;
140:12,23;143:7,22;
144:19;152:23;
161:22;169:15;172:4;
185:11;243:12;
247:19;273:14;
301:24;302:9;315:20;

321:1;322:23;341:1;
374:6;386:2;396:16
**B-R-E-N-E-R (1)**
5:25
**Brennan (1)**
258:3
**bridge (1)**
54:11
**bring (6)**
16:1;203:12;
206:16;249:8;257:10;
297:2
**bringing (1)**
304:17
**brother (3)**
258:17,17;352:16
**brothers (15)**
18:18;19:4;66:4;
190:11,15;200:17;
231:20;265:17;
275:20;287:15;
288:18,22;293:7;
304:7;311:11
**brothers' (23)**
187:19;188:2,22;
190:2;215:11,14,25;
218:10,15,18,23;
225:21;226:5;240:10;
259:4;263:13;266:25;
288:11;290:24;291:6;
293:12;300:12;
309:25
**brought (8)**
14:20;19:6;203:8,9,
14;206:14;208:8,17
**Brueggen (342)**
6:8,8;13:6;18:1;
20:6;22:22;23:6;
24:20;26:14,18;28:5,
7,12;32:17,20,25;
33:11,15;34:6,17,20;
35:5,17;36:17;37:8,
23;38:6,23;40:7,21;
41:2,23;43:3,8,23;
44:5,12,23;45:6,13,
16;46:1,14,22;47:4,
13,15,24;48:17;49:10,
17,24;50:18;51:4,12,
21,25;52:19;53:4,19;
54:12,14,22;55:8,15,
22;56:4,10,23;57:12,
20,24;58:4,9;60:11,
23;61:10,17,25;65:12,
16;67:10;72:18;
74:22;75:7;82:24;
83:10;85:13;87:21;
88:3,22;89:8;90:3,13;
92:13,15,24;93:4,20;
96:4,10,18;97:7,16,
22;99:5;105:11;
107:5,11,19,24;108:5,
11;109:5,8,11,19,25;
113:12;118:6,25;

120:21;121:14;122:1,
6,19,25;123:2,23;
124:6,19;125:1,3,13;
126:2,13,19;127:4,9,
16;128:9,18;129:7;
130:12,18,25;131:5,
19;132:5,17;133:1;
134:6,13;135:11;
136:20;137:14;138:6;
139:1,14;140:19,22;
142:6,19;143:19;
144:7,15;145:5,12,23;
146:24;147:3,9,12,24;
148:8;149:3;152:24;
153:1;154:13,24;
155:14,16;156:2;
160:5,23;161:8,24;
164:12,24;169:17;
170:14;172:3,15;
173:4;178:20;180:16;
182:12;185:12;
189:12;201:20,24;
202:6;203:1;207:23;
210:8;211:6;213:11,
25;215:6;216:1,25;
229:23;237:23;
238:18;242:24;243:2,
17;248:16;249:7;
252:5;255:4;257:16;
261:17;263:14,22;
265:2,19,24;268:13,
16;269:19;270:24;
271:19;273:12,17;
278:5,8,12;279:3;
285:14;286:7;288:7,
23;289:7,10;293:13,
23;296:14;297:7,12,
20;298:5,16;299:19,
24;300:24;301:22;
302:6,8;303:18;
305:3;307:1,13;
308:18;309:9;310:7;
313:15;314:25;316:7,
14;318:17,25;319:6,
16;320:3,9,25;
321:14;322:2,19;
323:20;324:2,5,11;
326:16;328:3;331:1;
335:4;336:11,14,16,
19;337:19;338:17;
339:4,7;341:2;344:8;
346:8,20;348:17,24;
349:2,16;350:10,21;
351:12,20;354:12;
360:4,7,10;364:13;
369:18,24;370:22;
371:14;373:19;
374:11,19;375:3,18,
22;376:1;378:3,5,18;
382:15,19;384:1,10;
385:4;386:12,15,19;
387:21;392:7;393:3;
394:18,25;396:19,22

**building (2)**
112:11;232:19
**bureau (1)**
128:13
**burglaries (10)**
101:4,7,17;102:4,
20;104:18;136:11;
141:5;145:21;306:18
**burglary (11)**
94:8,8;98:22;99:19,
22;100:20;101:16;
102:21;136:9;142:11;
310:20
**bus (3)**
262:9,15;264:19
**business (1)**
263:2
**busy (5)**
136:6,7,8,14;137:2
**buy (1)**
11:22

## C

**cabinet (1)**
172:13
**Cal (2)**
27:9;200:12
**California (3)**
22:6;325:11;387:8
**calisthenics (1)**
79:11
**call (17)**
7:7,14;87:5;95:17;
147:17;156:15;168:3;
179:10;180:4;235:2;
252:16,24;264:20,24;
315:23;344:16;395:1
**called (32)**
6:17;32:4;35:16;
36:15;41:19;43:6,22;
44:4,8;45:11;46:8;
56:15;69:23;71:20;
113:16;115:7;149:8,
17,24;151:3;157:1,
19;158:13;168:10;
229:11;249:18;
262:23;264:17;
273:23;346:12,14;
387:19
**calling (3)**
87:5;157:1;388:3
**calls (11)**
32:18,21;50:18;
56:24;95:20;113:17;
130:4;140:4,8;
315:20;353:14
**calm (1)**
264:12
**came (36)**
24:24;25:16,17;
26:2;36:5,12;46:3;
66:5,13,14,18;67:9,

12;71:9;73:15;86:23;
95:21;105:6;149:10;
151:7;163:6;165:10;
174:18,20;190:25;
191:14,20;212:5;
220:19;235:21;
236:13;240:13;
282:20;359:18;
366:23;387:7
**can (150)**
7:9;8:4,6,14;9:21,
24;12:12,19;15:13;
17:8;18:20;20:6,9;
24:20,22;25:23;26:6,
14;28:8,10,11,12;
34:20;37:2,14,15;
39:18;40:25;41:3;
42:11,21;43:24;45:1,
2;46:18;50:3;57:17;
58:11;61:12;75:8;
83:17;88:15;93:19;
95:9;97:1;101:21;
107:14,22;112:13;
113:10;114:8;115:4;
116:14;117:14;119:2,
17;120:8;121:6,21;
122:11;123:1,2;
124:8;125:4,14;
127:7;129:18;130:15;
131:15;132:1,2,14,18;
135:17;141:17;
143:23;144:10;
146:21;147:11;153:1;
155:22;161:9,25;
162:25;163:10;164:5,
5;165:1,21;167:23;
169:2;170:13;173:22;
180:18;186:25;
191:15;201:25;203:2;
206:22;211:19;213:5;
217:5,5;220:8;228:6;
238:2,19,24;244:6;
248:5;249:3,7,20;
250:22;251:21;252:5;
258:13;263:15;
266:20;273:17;
274:14;280:25;
282:14;288:13;
291:12;295:11;
305:17;311:8;316:18;
319:13;321:16;324:13;
332:3;341:3;343:6;
344:19;345:17;349:5,
25;351:1,15;355:14;
367:1;370:13;372:10;
374:22;375:1;386:16;
393:8,15
**Canal (1)**
82:1
**canvass (11)**
168:15,16,17;
182:21;259:8,11,11,
12,15,21;260:9

**capable (1)**
319:13
**caption (1)**
376:2
**captioned (1)**
376:14
**car (12)**
14:24;80:21;84:6;
179:12,13;181:5,6;
232:1,3,4,20;276:5
**card (2)**
157:20;160:8
**care (2)**
41:1;172:18
**career (7)**
21:21,24;129:10,
19;153:4;176:1;177:4
**Carl (1)**
102:12
**Carmen (3)**
263:2;264:3;265:15
**Carney (133)**
6:5,5;36:18,24;
37:25;38:7,25;39:6,
10,13,17;42:5,19;
45:15;47:12,14,16,20;
48:1,8,10,24;55:10;
57:19;58:6;61:9,12;
79:1;86:22;88:2,13;
92:14;93:22;95:11;
97:9;106:10;107:4,
12;109:20;118:7;
119:8;122:21;123:1;
124:8;125:2;126:4;
127:18;128:17,19;
129:13,22;130:5;
131:12;134:12;136:2;
137:3;138:25;139:24;
140:1;141:15;142:7,
18;143:6,20,23;144:8,
17;145:6,24;152:25;
155:15;161:9;168:23;
169:16;173:3,13,16,
18;177:1,15,23;
178:8;180:12;201:19;
213:17;238:4;250:16;
252:12,16,21;253:2;
262:12,16;287:10,16;
288:24;297:13;
300:25;301:6,15,23;
302:7,18;303:6;
308:19;316:8,13;
320:24;322:1,21;
323:8;324:1;337:21;
341:3;345:20;346:9,
21;351:14;354:13;
355:2;369:20,23;
370:15;374:5;375:7;
378:17;384:12,23;
385:10,24;390:15;
392:16;396:18
**C-A-R-N-E-Y (1)**
6:6

**Carothers (3)**
373:7,12,12
**carried (1)**
360:1
**cartridge (1)**
277:18
**Case (130)**
5:5;6:4;10:11,14;
17:14;19:13,16;23:4,
17,21;25:25;33:24;
43:12;53:2,7,9,14;
56:15;62:14;76:10,
13,16;82:4;84:20,22;
86:21;89:12;94:13;
96:14;101:12;102:14;
120:23;146:20,22;
147:8;148:3,6,18;
149:8,17;153:25;
154:4;155:21;156:14,
18,24;160:1;167:1,3,
11;168:18;169:6,22,
24,24;170:3,5,7,9;
172:23;174:15,24;
175:2,4,4;178:2;
179:3;182:5,17,23,24;
189:2,5;192:19,21;
221:10;230:10;
240:14;242:12,13;
253:8,11;269:14;
271:2;291:16;297:5;
301:4;307:11,23;
309:2,24,24;310:16,
17,20,20,25;311:3;
312:5,6,8,10,15;
313:4;326:3,5;330:3;
341:21,24;343:11,18;
344:25;345:14;348:8;
351:4;354:10,10;
359:8,20;368:17;
373:17;376:14,15;
377:5;380:19;384:22;
386:20;387:20;
389:16;393:19
**cases (17)**
20:4;105:2;157:12;
172:20,20,21;173:2;
174:14,23;175:1,8;
201:18;202:4;306:23,
24;315:24;359:4
**casings (2)**
277:18,19
**categories (1)**
100:6
**categorize (1)**
136:24
**categorized (1)**
99:24
**cause (1)**
305:8
**cavalier (1)**
69:21
**cell (1)**
214:5

**Central (6)**
111:24,25;183:23;
184:1;187:21;191:7
**Cermak (1)**
81:25
**certain (8)**
20:14;24:7;83:4,21;
115:6;121:5;137:4,7
**certainly (6)**
10:15;21:20;93:2;
239:13;297:18;305:7
**certification (2)**
377:20;380:24
**certified (1)**
383:8
**certify (1)**
376:17
**certifying (3)**
376:13,16;377:1
**Chalem (1)**
5:13
**chance (4)**
204:9;356:8;375:9,
11
**Chances (1)**
378:11
**change (3)**
100:11;184:23;
359:4
**changed (1)**
149:11
**characterizing (1)**
147:2
**charge (7)**
297:2;303:22,25;
304:3,6,9,25
**charged (9)**
20:14;244:10,12,
12;277:12;304:4,10,
14;305:13
**charging (3)**
300:14;340:20,23
**charm (1)**
74:6
**check (1)**
249:7
**Chicago (31)**
5:11;6:7;30:14;
31:15;53:7,13;58:14,
15;66:20;67:9;72:16,
25;73:1;75:17;76:1;
124:24;125:12;
126:12;129:10;134:4;
139:12;152:22;
178:12,14,16;323:23;
324:8;325:6,19;
360:15;363:9
**child (2)**
48:3;131:17
**childhood (1)**
72:11
**children (2)**
59:18,20

**choke (1)**
327:2
**choked (1)**
369:11
**choking (2)**
326:24;327:1
**Chris (4)**
272:13,21,25;273:2
**Christmas (1)**
58:13
**Christopher (1)**
186:13
**chronologically (3)**
91:2;151:12;155:5
**Circuit (4)**
19:17;33:21;35:2,
15
**circumstance (6)**
124:4;131:15;
132:2,14,22;318:14
**circumstances (9)**
13:21;118:22;
127:7;161:4;166:12;
218:1;220:9;359:16;
378:25
**City (11)**
6:6;67:1;134:1,3,
10,14,20,22;135:6,10,
22
**civil (1)**
13:12
**civilians (1)**
261:23
**claimed (1)**
369:1
**clarified (1)**
336:19
**clarify (6)**
11:6;26:18;93:17;
95:11;185:12;278:8
**clarity (5)**
39:4,22;41:8;221:6;
228:5
**Class (4)**
70:23;76:4,6;
277:19
**classroom (3)**
85:2;86:4,5
**clause (1)**
391:8
**clear (15)**
10:13;22:10;100:5;
116:22;120:7;123:16;
142:2;157:14;174:1;
222:2;240:6;292:24;
311:6;339:10;396:1
**clients (4)**
389:18,19;390:5;
391:5
**close (7)**
87:25;89:6,25;90:9;
102:7;154:4;312:7
**closed (5)**

157:12;168:20;
172:20,21,22
**closes (1)**
170:5
**closing (2)**
152:12;317:10
**clothes (1)**
103:7
**coach (1)**
375:19
**co-counsel (1)**
165:8
**coerce (1)**
331:25
**Cohen (10)**
5:19;68:3;77:11,13;
237:15,17;238:2;
351:17;375:5;378:10
**C-O-H-E-N (1)**
5:20
**colleague (1)**
56:11
**colleagues (3)**
31:6;56:8,8
**collection (2)**
154:19;155:13
**college (1)**
68:12
**color (2)**
158:17;348:4
**comfortable (2)**
12:25;396:9
**coming (5)**
70:8;106:8;113:17;
322:6;329:8
**Command (1)**
69:25
**commander's (1)**
112:19
**Commission (1)**
52:9
**commit (8)**
141:4,7;144:2;
176:25;177:14,22;
178:6,18
**committed (1)**
233:8
**common (1)**
329:9
**communicate (2)**
193:4;362:13
**communication (7)**
50:19;56:25;
378:21;379:2,3,5,6
**communications (1)**
379:9
**company (1)**
278:2
**compared (1)**
136:18
**complainant (1)**
368:21,24
**complained (1)**

389:25
**complaint (9)**
52:5,8;360:23;
366:4,10;367:8;
368:12,25;379:1
**complete (5)**
8:20;9:25;11:12;
12:13;383:10
**completed (1)**
159:3
**completely (4)**
172:22;215:22;
381:9;383:18
**complex (1)**
307:11
**Compound (10)**
51:25;55:9;69:24;
70:7;90:13;96:19;
132:18;133:2;217:1;
326:16
**computer (1)**
91:8
**computers (1)**
344:17
**concentrate (1)**
167:24
**concept (1)**
129:1
**concerned (1)**
290:1
**concerns (1)**
120:8
**concluded (1)**
397:3
**conclusion (1)**
335:9
**conduct (8)**
86:20;94:18;
122:18,23;128:5;
189:21;195:19;310:5
**conducted (6)**
94:25;116:24;
216:8;334:5;337:8;
339:11
**conducting (6)**
94:2,5;118:3;
120:19;121:4;213:16
**conference (2)**
15:5;338:21
**conferring (1)**
31:3
**confess (1)**
231:6
**confessed (17)**
297:24;300:9;
301:4;304:12,16;
305:1,9;309:12;
327:19;334:17;
335:19,22;337:3,11;
339:12;340:23;
369:11
**confesses (2)**
296:12,23

**confessing (4)**
197:3,6;295:8;
338:2
**confession (7)**
294:25;296:10;
297:19;301:21;
316:11;335:2;336:2
**confident (8)**
254:23;260:21;
270:8;290:13,15,16;
291:10,11
**confirm (1)**
310:4
**confused (2)**
145:11;387:15
**connected (1)**
115:23
**connection (24)**
17:6,13;19:4;28:16;
31:10;32:1;190:1;
195:18;198:17;199:7;
224:17,21;265:16;
266:14;277:24;
287:14;290:23;291:6;
299:12;300:11;303:4;
309:24;348:8;361:1
**connections (1)**
31:17
**consent (6)**
37:22;41:17;206:1,
7,25;207:2
**consider (1)**
59:13
**considered (3)**
143:11;264:22;
269:13
**consist (1)**
252:19
**consistent (7)**
29:5;30:7;37:5;
124:23;125:11;
126:11;256:9
**constituted (1)**
104:20
**Constitution (1)**
391:7
**constitutions (1)**
391:8
**construction (4)**
71:15,17,23;72:2
**contact (17)**
18:19;20:17;21:5,8,
14;22:3,7,15;23:25;
94:12;95:21;150:9,
10;186:23;190:25;
191:13;226:8
**contacted (3)**
21:12;23:24;264:6
**contacting (1)**
22:15
**contacts (8)**
185:5,9,18,23,25;
186:8,9,15

**contain (1)**
346:19
**contained (5)**
157:16;255:2;
348:7;379:10;383:14
**contemplated (1)**
390:4
**contemporaneous (2)**
87:18;162:14
**contentious (1)**
212:12
**continue (4)**
39:19;41:6;47:20;
389:18
**continued (2)**
259:11;332:9
**continues (1)**
262:21
**continuing (1)**
169:20
**controlling (1)**
145:1
**conversant (1)**
59:14
**conversation (24)**
25:20,21;26:1;
32:18,21;191:21;
198:9;200:9;212:24;
215:19;231:8,12;
233:10;250:8;262:6;
289:15;326:19,22;
327:13,15,17,19;
333:15,16
**conversations (14)**
19:25;22:12;23:13;
25:11;27:24;30:23;
32:23;33:3;186:9;
216:5,7,15;272:9;
289:17
**conveyed (3)**
78:20;87:24;90:10
**convict (1)**
338:7
**conviction (2)**
28:22;57:11
**convictions (4)**
17:19;18:13,17;
56:19
**Cook (41)**
5:25;23:3,13,16,20;
24:17;25:3;27:10;
201:3,15;202:24;
203:6;204:8,17;
205:23;206:12,18,19;
207:18,19,20;208:2,
17;213:1,5;215:1,3;
217:14,23;218:2;
219:14;220:10;221:2;
240:8;281:21;295:9;
314:1,8,20;335:22;
387:7
**cooperate (1)**
131:8

**cooperating (1)**
132:24
**cooperation (2)**
131:17;132:24
**copies (2)**
180:9;318:3
**copy (5)**
352:23,24;375:5;
378:7;392:14
**cordial (1)**
212:23
**corner (4)**
115:11;249:15;
250:24;275:9
**Corrections (2)**
205:24;206:20
**correlation (2)**
143:17;145:21
**corroborate (6)**
301:20;302:12,16;
308:1,17;309:14
**counsel (7)**
5:15;40:2;88:11;
211:16;290:10;363:2;
388:7
**count (1)**
337:14
**counted (2)**
75:23;138:14
**country (1)**
323:25
**County (43)**
6:1;23:3,13,16,20;
24:17;25:3;27:10;
201:3,15;202:24;
203:6;204:8,17;
205:23;206:12,18,19;
207:18,19,20;208:3,
17;213:1,6;215:1,3;
217:14,23;218:2;
219:14;220:10;221:2;
240:8;255:6;281:21;
291:2,4;295:9;314:1,
8,21;335:22
**couple (13)**
65:1;71:22;101:3,7;
110:3;113:23;114:1;
162:4;165:15;306:8;
360:17;381:4,5
**course (18)**
10:7,25;75:10;
76:20;108:15;127:2,
8;132:11;153:24;
154:5;172:7;177:6,9,
18;292:8;296:9;
297:4;365:5
**Court (85)**
5:4,13;6:11;9:3;
11:8;16:19;17:2;
18:23;19:18;29:23;
30:12,18;31:5;32:1,3,
8;33:6,20,21;34:2,3;
35:2,9,15,21;37:17,

18;38:19,21;40:9;
41:18;43:18;44:11,
16,21;45:2,5,21;46:4,
7,12,18;47:7;48:20,
20;50:7,8,8;51:15,17;
55:4;56:16,20;64:9;
89:9,12;112:24;
227:24;233:22;
234:24;241:2;243:16,
20;244:2;250:24;
251:2,4,7,9,14,19;
299:5;357:9,10;
358:7;391:13,20;
393:1,7,11,17;394:2,
16,23;395:4
**court-reported (12)**
233:2;234:10,20;
236:17;247:10;
335:11;339:2,21;
340:11,15;342:7;
356:7
**courtroom (3)**
36:13;45:3;51:7
**courtrooms (1)**
113:4
**covered (1)**
81:24
**CR (2)**
371:2,19
**create (1)**
94:24
**credit (4)**
343:16,20,23;344:2
**crime (73)**
78:25;86:1,15;88:7;
92:21;93:3,9;95:17,
19;97:5,6,25;110:14;
114:23;130:23;
134:18,21;135:14,17,
22;136:18;137:8,19,
22,22;138:19;139:13,
22;140:10;142:3,25;
143:18;148:13;150:9;
151:9,10,22;167:9;
168:2,11,12,13,14;
169:7;170:15,17;
175:15;176:16;
182:18;183:18;184:6;
193:11;197:4,6;
231:14,14,15;232:14;
233:5;235:4,8;
236:11;287:23;
296:13;297:11;
307:22,22;309:12;
310:21;311:3;330:2;
372:22;390:3
**crimes (64)**
99:17,21;100:6,9,
16,17;102:17;104:7,
12,15,17,20,21,24;
110:8,13,17,18,20;
111:3,9,14;112:1,4,6,
7;113:7,11,24;114:2,

10,15;115:2;136:12,
15;137:12,25;138:15,
16;139:9;141:7;
142:10;144:2,6,11;
145:22;146:5,14;
173:10;174:2;175:14;
176:6,10,11,13,17,18;
239:4,18;277:11;
306:20;308:3;389:22,
25

**criminal (11)**
17:13;18:8;74:1;
105:1,2;171:6,21;
172:1;353:2;359:25;
390:2

**Cruz (7)**
186:7,16;272:13,
21,25;342:25;343:4

**curious (1)**
324:4

**currently (2)**
131:22;389:16

**custody (12)**
192:25;196:3;
200:13;237:9;272:6;
296:17,21,24;304:17;
313:23;326:21;327:9

**customary (5)**
118:4;171:25;
181:23;201:17;
274:21

**cut (1)**
274:19

## D

**dad (1)**
68:12

**Dame (2)**
68:1,2

**Damiano (1)**
5:11

**Daniels (7)**
367:19,21,22;
368:24;369:1,1;372:3

**dark (3)**
215:22;232:25;
276:2

**date (23)**
5:6;65:11;76:6;
161:1;165:19,20;
166:4,5,7,9,17,20;
207:6;218:8;219:8;
237:14;240:7;255:8;
267:16;268:5;384:21,
21;393:7

**dates (4)**
281:7,25;379:6;
381:24

**dating (1)**
166:17

**Dave (2)**
6:8;252:4

**day (25)**
11:23;52:23,24;
53:2,8;54:1;150:17;
166:22;199:8;219:7,
25;220:3,6,7;225:8;
232:23;237:7,8;
240:23;245:5;329:20;
330:5;333:9,22;387:4

**days (3)**
133:17;329:4,7

**day-to-day (1)**
184:22

**DCFS (1)**
131:9

**dead (1)**
103:16

**deaf (1)**
256:23

**deal (10)**
12:19,24;96:8;
292:13,14,18,19;
295:18,20;358:24

**dealing (1)**
145:16

**deals (1)**
295:21

**death (3)**
239:2;275:16;297:5

**deaths (2)**
189:18;190:10

**decades (2)**
29:23;130:2

**decades' (1)**
319:22

**December (2)**
68:22;70:22

**decided (1)**
235:2

**decision (2)**
341:6,7

**defendant (6)**
6:3,6,9;7:1;13:12;
376:14

**defendants (13)**
76:9,12,15,21,24;
77:2,7,16;82:4;84:19,
21;102:13;378:24

**defendant's (1)**
389:21

**defender's (1)**
204:11

**defending (1)**
132:11

**deferred (2)**
340:20,22

**demanding (2)**
358:17,19

**denied (1)**
290:15

**deny (1)**
357:10

**denying (1)**
210:23

**dep (3)**
47:21;249:9;382:20

**Department (36)**
31:16;72:16;73:1,4,
18;74:7;75:1,4;76:1;
77:24;80:6;81:16;
124:25;125:12;
126:12;130:2;139:12,
21;149:12;152:22;
161:19;164:21;
167:10;174:8;189:21;
205:23;206:19;
214:21;319:23;
322:15;325:19;326:8;
360:15;363:10;
370:10;390:6

**depends (8)**
118:8,10;119:3;
133:8;134:24;170:17;
298:4,7

**deployed (1)**
69:8

**deponent (1)**
6:9

**deposition (18)**
5:8;7:18;8:12;10:7;
11:1;13:4;16:18;62:6,
17,22;64:8;299:13;
311:8;382:25;385:2,
15;397:1,3

**describe (3)**
113:10;115:4;220:8

**described (2)**
125:8;378:25

**describing (1)**
325:16

**designed (1)**
344:1

**desk (4)**
113:16;114:16,18;
202:4

**Desks (3)**
113:20;114:17,24

**despite (1)**
354:8

**detective (208)**
79:2;80:3,7;81:14,
16;82:7,10,19,21;
83:18,22;84:10,13,14,
16,22,25;85:16;86:7,
12;87:4,5,12;91:6,11,
12,15,16;92:1;93:13,
25;94:1,8,21;95:5,12,
14;96:2,16;98:18,23;
99:9;102:24;104:3;
105:4,18;106:7,7;
108:22,25;109:17;
112:17,18;120:14,17,
25;123:17;124:4,22;
125:7;127:12,25;
128:5,13,13;134:15,
17;138:18;139:9;
153:4,22;155:19;

156:5;158:2,25;
159:8,14,17,20;
167:16,18,19;169:21,
22;170:5,6,10;172:14,
18,24;174:23;175:1,5,
7,9,19;178:5;179:23;
191:23;192:1,6,14;
193:3,16,23;194:9,12,
19;196:1;197:1;
198:6,18;199:23;
202:14;205:8;214:11;
216:8;220:15,18;
221:20;222:21;
223:10,14,17,20,24;
224:25;226:22;227:4,
7,19;228:8;229:22;
241:4;250:9;251:9,
15,18;258:2;270:19,
19;278:2,20,21;281:5,
10,18;284:11,13,19;
289:25;296:13;298:8;
302:15;306:3,6;
308:15;310:24;311:4;
312:10;313:22;314:5;
315:10,14,22;316:22;
318:22;319:3,9,13,19;
320:7,13;321:23;
322:17;326:20;327:2;
329:10;330:24;
331:14,19;332:8;
336:9;337:10,17,25;
338:1;344:6,12,23;
351:5;359:22;363:17;
366:10,13,18,20,22;
367:5;368:14,18;
369:5,9;372:4;373:4,
17;381:15;384:22

**detectives (56)**
21:2;27:16,19,21;
29:13;30:14;31:10;
56:14;58:14,15;85:3,
22;87:9;94:8;100:3;
101:12;113:21;
122:18,23;166:25;
167:3,22;168:4,7,8;
169:5,10,13,23;170:3;
182:17;187:9;189:17,
24;216:10,16;251:14;
263:1;266:19,25;
304:21,24;312:4,6,7;
317:11;321:17;326:3,
7;328:19,22;334:7;
352:22;353:6;389:1,
13

**detective's (1)**
270:18

**determine (4)**
121:5;158:3;308:3;
381:6

**develop (2)**
96:14;308:17

**developed (2)**
219:1;293:11

**Devon (4)**
367:19,21;369:1;
372:3

**dialect (1)**
61:22

**dialects (1)**
61:24

**died (2)**
7:24;11:19

**difference (4)**
306:22,25;307:3;
345:18

**different (22)**
40:4;61:24;89:16;
91:15;99:25;100:3,7;
101:25;114:24;
133:15;135:9,18;
169:9;170:2;173:20;
176:10;195:11;270:2;
307:4,18;308:21;
313:19

**DiFranco (27)**
5:25;228:17,19;
230:3,16;231:17;
232:5;233:19;234:19,
25;235:7;236:4,10,
14;238:11;241:3,24;
242:2,11;243:9;
247:2;276:18;300:17;
337:8;339:22;340:19,
22

**DiFranco's (2)**
243:25;248:1

**direct (1)**
99:3

**directed (1)**
253:6

**direction (1)**
118:17

**directly (1)**
350:8

**disagree (1)**
258:13

**disagreed (2)**
362:2;363:11

**disagreement (1)**
264:19

**discharged (2)**
70:24;71:2

**Disciplinary (1)**
52:9

**discipline (2)**
365:12,19

**disciplined (1)**
361:1

**discuss (3)**
138:19;189:17;
289:20

**discussed (9)**
97:14;109:16;
139:22;140:3,8;
148:23;172:14;212:4;
314:20

discussion (9)
15:19;66:11;
105:22;175:23;332:5;
348:23;355:16;366:2;
393:11
dispatched (1)
181:21
dispute (2)
356:3,6
District (20)
5:4,4;80:12,13,18;
81:4,13,17,22,23;
82:2;98:3,9,10;112:8,
10,22,23;141:18;
142:1
districts (2)
137:4,7
Division (14)
5:5;79:3;80:3;
85:16;86:8;96:16;
104:13,15;112:17,18;
114:10;115:2;156:12;
321:17
document (71)
78:23;80:1;86:19;
88:7;89:5;90:18;92:7,
12,22;93:3,10,18;
94:24;95:17,20,22,25;
101:23;106:18,24;
107:1,8,18;108:3,16;
109:18,24;150:20;
151:9;152:2;161:5,7;
162:8;163:7;205:19,
22,25;206:11,14,20;
207:21;208:4;215:2;
238:7;246:18;252:25;
253:17,19;266:7;
268:14,22;270:6;
274:15;280:13;
348:12,15,19;349:9;
351:19;352:1;371:4;
372:18;375:4,17;
376:5,10,25;377:6,7,
19;379:8
documentation (1)
162:15
documented (2)
157:16;338:14
documenting (3)
87:19;109:1;158:14
documents (13)
62:7,13;64:7;
155:13;160:21;217:5;
228:3;249:16;347:16;
352:2;379:8,11,25
Dog (2)
264:17;265:23
dollars (1)
71:22
done (18)
82:16;85:21;121:8,
12;124:11;196:18;
197:16;207:18;

216:20;223:25;240:9;
248:16;312:14;313:4;
324:23;374:21;
386:14;395:2
door (2)
71:6;276:2
doors (2)
113:15;259:17
double (15)
17:20;18:17;53:9;
57:10;231:6;233:8;
300:10;303:4,22,25;
304:7,15;305:1,8;
338:3
double-sided (2)
248:24,25
down (24)
90:17;113:4;114:9;
150:17;171:12;
180:17;206:24;
207:11;214:13;
222:13;229:19;241:9,
11;253:23;259:20;
265:1;269:13;277:9;
286:18;318:1;333:19;
338:4;364:5;395:18
Downstairs (3)
112:10,13;264:22
dozen (1)
322:16
drafted (3)
68:13,20,21
draw (2)
260:23;342:9
dream (1)
72:11
drive (1)
84:9
driven (1)
339:23
driving (1)
68:16
drove (1)
282:23
drug (6)
144:6,10,14;
145:16,22;146:7
drugs (7)
145:1,3,17,18,19;
146:4;358:24
drunk (1)
264:14
due (2)
335:13;391:7
duly (1)
6:17
during (57)
10:7,25;24:15;
26:20;27:23;29:21;
71:8;72:1;86:15;
88:19;103:10;127:8;
142:15;154:5;179:5;
191:16;199:13;211:4,

10,15,22;212:10;
214:8,18;215:3;
220:5,7;223:3,8,11;
225:4;227:3,7,19,23;
230:3,5,8;234:1,10;
241:14,22;285:3;
290:10;292:5;294:18;
311:21;327:18;
330:24;331:3,17;
334:16;339:16;350:1,
17;382:25;384:24
duties (4)
70:5,9,10;80:17
duty (2)
167:13;219:24

## E

eager (1)
233:7
earlier (33)
11:2;148:24;
162:20;166:25;
172:14;178:12;206:1;
240:24;250:8;259:22;
279:16,17;280:19;
281:2,8;282:2;283:7;
291:21;294:14;311:7;
313:20;326:18;333:4;
340:10;347:20;
348:11;352:25;
363:14;370:6;373:16;
374:3;387:3;394:20
early (6)
8:3;141:12;179:5;
181:15;188:24;387:4
easily (1)
344:5
east (1)
81:25
Easter (1)
31:20
Eastern (1)
5:5
education (2)
68:10;71:3
Edward (1)
5:24
Efrain (1)
186:16
eight (2)
268:16;340:24
either (16)
11:6;30:24;106:6;
116:4;128:12;129:4;
132:23;166:18;187:9;
216:21;260:11;265:9;
271:15;308:17;
353:12;383:14
elaborate (1)
11:6
elapsed (3)
217:18,22;219:19

elevator (1)
113:14
Ellen (2)
356:14,16
else (37)
19:5,8;27:13;30:10;
31:23;37:14;63:11;
64:14;65:4;67:21,22;
75:20;79:6;90:21;
91:4;93:9;130:23;
149:24;183:4;196:8;
199:7;208:12;222:8,
9;229:12;232:11;
238:25;252:10;300:4;
314:3;325:14;343:11;
346:3;378:24;383:3,
4;384:20
else's (1)
65:6
email (1)
379:5
emphasized (1)
96:8
employed (2)
131:22;360:14
employment (2)
71:3;264:7
empty (1)
181:12
end (7)
138:3,4;213:24;
231:9;341:10;389:4;
397:1
ended (5)
198:20,21;224:1;
292:20;365:3
ending (1)
229:13
ends (1)
371:12
enemies (2)
74:25;75:3
enforcement (5)
67:20;72:3,6,22;
323:24
engaged (1)
262:2
English (33)
19:11,11;191:24,
24;193:24;194:1,2,9,
19;206:22;209:4;
230:21,22;231:2;
234:14,15;241:16,18,
22,24,25;242:2,5,10,
13,19;243:9,10;
245:20;260:1,7;
262:2;330:24
enjoy (1)
101:24
enlighten (1)
283:18
enough (2)
224:10;225:17

ensure (1)
160:20
entered (1)
208:22
entering (1)
196:12
entire (7)
110:8;156:21;
157:16;242:1;343:18;
344:25;384:17
entirely (1)
234:14;319:25;
382:23
entry (1)
101:23
Epplen (9)
77:11,13,15;98:14;
105:16,25;174:12;
272:1;342:18
Ernest (4)
174:11,14;177:12,
13
Ernie (6)
30:21;77:6;105:20,
21,25;266:21
error (1)
74:20
essentially (3)
234:6;296:10;301:4
established (3)
300:15;311:7;312:4
estimate (1)
213:5
estimating (1)
10:16
et (1)
5:3
even (21)
11:10;61:23;
107:16;108:19;
127:14;145:15;172:9;
204:21;205:4;216:22;
218:17;283:15;
302:23;306:5;311:25;
317:13;319:19;
345:13;363:16;378:8;
394:19
evening (1)
395:1
event (4)
87:18,25;119:9;
182:9
events (3)
21:2,3;378:25
eventually (1)
236:16
Everybody (4)
168:16;308:20;
343:10;372:23
everyone (1)
353:14
evidence (14)
85:19;86:18,18;

95:16,18;97:1,2;
101:22;150:10,10;
171:4;338:6;355:8,25
**exactly (1)**
  364:24
**EXAMINATION (1)**
  6:20
**examined (1)**
  6:18
**example (1)**
  96:24
**except (1)**
  297:16
**exchange (1)**
  292:21
**exculpatory (1)**
  246:9
**excuse (1)**
  222:20
**exercise (8)**
  37:14;38:21;43:6,
  21;44:3;47:1;394:16,
  20
**exercised (2)**
  45:23;290:10
**exercising (2)**
  36:14;395:15
**Exhibit (28)**
  180:20,23;205:15,
  18;212:1;237:22;
  241:23;246:11,13,18;
  252:19;253:3;266:9;
  270:10;347:9,17;
  349:7;351:8;355:19;
  356:22;357:24;367:3,
  6;374:23;375:1;
  378:7;386:24;388:6
**Exhibits (2)**
  217:10;355:15
**exist (2)**
  385:22;386:10
**existed (1)**
  386:8
**exonerated (2)**
  322:17;363:6
**expect (9)**
  285:11;287:7;
  298:14,20;311:24;
  316:5,12;338:13;
  344:19
**expected (7)**
  107:18;108:3,16;
  147:23;311:22;
  385:15;386:10
**expecting (1)**
  8:19
**experience (3)**
  142:3;162:7;319:22
**experiencing (1)**
  134:22
**expire (1)**
  73:7
**explain (2)**

50:3;377:16
**explained (1)**
  207:21
**extend (1)**
  169:2
**extended (1)**
  103:14
**extent (2)**
  32:17,20;56:23;
  186:22
**extra (2)**
  11:20;122:4
**eye (1)**
  119:11
**eyes (2)**
  189:20;393:16

## F

**fact (29)**
  21:23;50:14;55:2,3;
  56:8,9;125:10;
  127:13,22;128:2;
  130:17,23;135:4;
  144:5;152:21;171:25;
  178:11;227:11;247:1;
  269:9,16;270:4;
  277:21;287:21;
  311:11;331:24;354:8;
  390:7;394:4
**facts (1)**
  179:3
**fair (24)**
  19:22;23:7;59:11;
  77:19,19;100:21;
  102:22;120:14;
  122:15;134:22;
  137:11;140:16;
  182:22;190:4,9;
  193:5;213:8;215:23;
  224:10;225:17;
  260:12;271:8;280:3;
  382:23
**fake (4)**
  122:18,24;123:5,8
**false (16)**
  9:12;125:10;
  319:14,20;322:12,13;
  323:19;324:20;
  326:14;363:16,17,19,
  22,24;364:3;390:7
**falsely (3)**
  127:21;128:5;
  130:15
**familiar (9)**
  14:10;15:22,23;
  25:9;186:22;271:24,
  25;334:2;357:8
**family (7)**
  58:19;66:1,2,14,23;
  258:16,22
**far (5)**
  11:10;290:1;

327:16;356:10;
  383:13
**farther (2)**
  113:6;312:20
**fashion (3)**
  211:11;263:9;299:4
**father (4)**
  66:4;67:20,22;
  264:23
**fault (1)**
  48:1
**fear (1)**
  13:25
**feasible (1)**
  164:19
**feature (1)**
  143:4
**February (3)**
  65:17;368:23;369:2
**federal (1)**
  391:8
**feed (1)**
  146:7
**feel (2)**
  22:3;351:2
**feeling (1)**
  360:4
**feet (1)**
  181:11
**fellow (1)**
  128:16
**felony (6)**
  229:11;306:9,12;
  333:24;372:17,20
**felt (1)**
  13:24
**female (5)**
  229:1,2,9;261:5;
  264:5
**Fernandez (1)**
  273:2
**Fernando (10)**
  5:9;6:16;7:10,11;
  367:25;368:6;369:9;
  389:1,14;397:1
**few (7)**
  104:22;211:2;
  213:7,9;335:21;
  337:15;366:23
**field (7)**
  80:25;96:17;98:24;
  253:22;254:1;255:12;
  256:13
**Fifth (46)**
  32:5,16;33:5,7,22;
  34:12;35:3,16;36:14;
  37:10,14,19;38:5,22;
  40:18;41:11,19;42:3,
  4,24,25;43:7,11,21;
  44:3,22;45:11,24;
  47:1;49:8,16,20;
  50:12;51:19,20;53:9,
  14,17;55:5;56:9;

391:6,14;394:17;
  395:6,16,21
**figure (4)**
  22:7;81:9;308:6;
  313:12
**file (82)**
  64:24;152:15;
  153:14,23;155:3,6,20;
  156:7,9,13,14,15,19,
  20,21,25,25;157:1,2,
  23,24,24;158:2,3,10,
  11,25;159:8,10,15,18,
  23,24,25;160:4,8,9,
  11,16,21;161:13,13,
  17,20;163:19,19;
  169:20;252:11,25;
  253:14;259:20;
  310:25;313:6,12;
  316:6,12;345:19,19,
  21,23,24,25;346:5,14,
  14,16,18,19;347:1,3,
  12,14,18,22;348:7,14,
  19;367:9;383:24;
  384:17;386:4,6
**filed (3)**
  150:2;368:25;
  389:21
**files (16)**
  155:25;156:1;
  157:12,15;158:8;
  161:6;172:12,18;
  250:4,8,20;310:14;
  319:11;346:5,13;
  347:21
**filing (1)**
  172:13
**fill (3)**
  158:15;159:21;
  160:6
**filled (4)**
  158:23;159:1,19;
  251:18
**fillers (1)**
  115:20
**fills (1)**
  158:23
**film (2)**
  122:10,11
**final (1)**
  153:8
**find (30)**
  18:19;21:16;22:19;
  35:7,14;73:22;97:21,
  25;101:21,24;142:25;
  148:2;150:4;155:22;
  170:12;171:13,20;
  182:21;259:17;
  265:23;310:17,23;
  312:22;313:3,6;
  338:11;362:5,6,9;
  364:3
**findings (2)**
  363:21;364:20

**fine (5)**
  7:8;41:2;101:1;
  257:3;349:1
**finer (1)**
  132:9
**finger (1)**
  119:6
**fingerprints (2)**
  101:22;130:16
**finish (9)**
  109:6;120:2;154:8;
  157:17;217:21;
  234:16;239:24;287:2;
  293:3
**finished (4)**
  153:19;154:18;
  160:15;279:9
**fire (2)**
  69:2;73:1
**fired (3)**
  232:19;237:3;
  277:18
**Firm (1)**
  5:10
**first (53)**
  6:17;7:9;18:16;
  59:5;63:1,19;69:20,
  21;80:5;87:3;91:14;
  100:24;110:25;111:7,
  9;133:16;169:6,7,23;
  170:9;171:12;176:4;
  193:18;208:21;
  219:11;228:5;238:23,
  25;250:22;251:13;
  256:12;257:13;262:9;
  267:16;272:5;274:22;
  276:6;279:13,17,24;
  281:9;288:20;294:7;
  312:24;316:20;318:1;
  329:15;332:9;337:9;
  352:8;376:6;382:20,
  25
**five (11)**
  23:19;39:21;42:19;
  53:8;71:25;110:21;
  297:16;316:19;
  337:13;386:14,16
**five-minute (2)**
  217:4;386:18
**flip (2)**
  242:24;243:2
**floor (7)**
  112:21;113:1,8;
  192:4;239:3,18,22
**fluent (1)**
  59:14
**FO (1)**
  361:21
**FOB (6)**
  18:19;21:12,14;
  22:9,16;23:24
**focus (1)**
  87:4;189:15

**follow (10)**
34:22;54:5;96:14;
108:23;25;157:25;
309:7;312:17;313:9;
338:8
**followed (2)**
232:17;233:12
**following (6)**
34:21;42:23;63:18;
169:21;332:23;333:9
**follows (2)**
6:18;152:14
**follow-up (1)**
165:15
**foot (1)**
12:16
**force (5)**
132:3,13,15,23,23
**foregoing (1)**
376:17
**forensic (1)**
307:18
**forensics (1)**
307:17
**Forget (3)**
180:8,8;377:17
**forgive (1)**
153:15
**forgot (5)**
7:25;11:22;71:19;
77:18;115:7
**forgotten (1)**
145:14
**form (242)**
20:6;22:22;23:5,6;
24:19;25:21;29:7,24;
34:17;35:5;36:17;
37:8,23;40:7;41:23;
43:3;44:12,23;46:22;
47:4;48:18;49:11;
51:13,21;53:4,19;
54:12,23;55:8,10;
56:10;57:12;58:4;
60:11,23;61:9,10,25;
65:12;74:22;75:7;
79:1;85:13;86:22;
87:21;88:2,3,13;89:8;
90:3;92:14;93:22;
96:4,10,18;97:9,16,
22;99:5;106:10;
107:4,5,11,19,24;
108:5,11;109:5,19,20;
113:12;118:6,7,25;
119:8;120:21;121:14;
122:19,21,25;123:23;
124:7;125:1,2,13;
126:1,13;127:4,16;
128:9,17;129:7,13,22;
130:5,12,18,25;
131:12,19;132:5,6,17;
133:1;134:5,6,12,13;
135:11;136:20;137:3,
14;138:6;139:1,14;

140:19;141:15;142:6,
7,18,19,20;143:6,20;
144:7,15,17;145:6,12,
24;146:24;147:9,24;
148:8;149:3;151:16;
152:1,24,25;154:13,
24;155:2;156:2;
160:5,7,23;161:8;
164:12;168:23;
169:15,16;170:14;
172:3,15;173:3;
177:1,15,22,23;178:8,
20;182:12;185:11;
189:12;196:20;
201:19,24;203:8,9,10,
13,17,20,25;211:25;
212:1,5;213:17;
215:6;216:1,25;
243:17;255:4;263:9,
15;265:9,20;269:19;
270:24;273:13;
285:14;287:11,16;
288:7;296:14;297:13,
20;298:5,16;300:25;
307:1,13;308:19;
309:9;310:7;313:15;
316:7,8,13;318:17,25;
319:6,16;320:3,9;
321:14;322:19,21,23;
335:4;337:19;338:17;
341:1;344:8;345:20;
346:8,9,21;350:10;
354:12;355:2;359:5;
372:12;374:11;
382:15,19;384:1,12,
23;385:24;386:12;
394:18
**formal (3)**
152:7;340:20,22
**formally (2)**
297:2;304:9
**Former (3)**
27:19;31:6;56:8
**forms (1)**
203:14
**Fort (1)**
69:4
**forth (2)**
222:24;363:9
**forty (1)**
266:4
**forward (1)**
110:4
**found (15)**
130:16;151:9;
171:2,3;361:21,24;
362:18,20;363:12,19,
22;364:1,2,6,7
**Foundation (91)**
20:5;28:5,7;35:19;
46:23;60:12;61:11;
62:1;72:18;74:23;
75:6;82:24;83:10;

105:11;122:1,2,6;
125:3,14;126:1,14,15;
127:17;134:5,7;
136:2,19;137:13;
143:7,19,21;144:8,16,
18;145:5,7,25;148:9;
154:25;155:14,15;
160:24;161:22;
172:16;201:20,25;
203:1;210:8;211:6;
213:11,25;219:13;
247:19;263:14,22;
265:19,24;270:25;
273:12;286:7;287:10;
296:15;297:7;299:19;
300:24;301:22,23;
302:6,7,18;310:8;
318:18;319:1;320:10;
322:20,22;336:11;
337:20,21,22;341:1,2;
344:9;346:20;364:13;
384:2;385:10,25;
390:16;392:16;
394:19
**Four (5)**
62:23;71:25,25;
262:22;378:15
**fourth (2)**
64:3;70:23
**frame (4)**
81:3;111:19;
173:14;218:7
**Francisco (1)**
186:19
**Frank (11)**
5:25;241:3;247:2,
25;276:18;278:2,6,9,
10,11;337:8
**Fred (2)**
241:4;321:23
**Freddie (6)**
6:9;7:11,14;32:22;
34:6;43:24
**freewill (1)**
207:3
**frequently (1)**
142:14
**fresh (1)**
10:18
**friend (1)**
31:18
**friends (1)**
358:8
**friendship (1)**
31:9
**front (8)**
9:3;43:19;64:6;
181:6,6;245:8;250:2;
357:20
**full (1)**
8:19
**fully (3)**
131:24;381:9;

383:17
**Fulton (1)**
81:24
**fun (1)**
323:7
**function (4)**
198:13;230:5,8;
290:2
**functioning (3)**
198:10;202:19;
211:9
**fundamentals (3)**
307:6,8,21
**further (4)**
68:10;71:3;289:17;
396:15
**future (1)**
166:18

## G

**gain (2)**
131:17;132:23
**gang (7)**
102:17;111:14;
140:17;141:4,7,12,23;
142:3,13,15;143:3,11,
15,18;144:2,5,10;
145:3;171:15;275:16,
20,23;353:23;354:1,6
**gangbangers (1)**
144:2
**gang-related (1)**
142:10
**gangs (4)**
141:3;144:24,25;
145:20
**gangway (1)**
232:18
**gather (2)**
86:17;95:16
**gave (19)**
73:15;74:7,10;89:7,
25;159:4;203:17,20;
213:14;227:23;
236:24;244:1;263:1;
273:18;282:22,22;
287:25;317:19,22
**Gawrys (4)**
266:22;268:24;
328:20;329:22
**general (20)**
69:1;78:10;114:4,5;
149:8,17,18,20;
150:13,25;151:15;
152:1,10;153:5,7,11,
12;154:1;156:17;
253:8
**generally (2)**
192:17;231:6
**gentleman (4)**
181:12;192:20;
200:12;203:9

**gentlemen (1)**
181:7
**geographically (1)**
81:21
**girlfriend (3)**
244:24;245:1;
246:24
**given (6)**
21:23;139:20;
173:2;196:20;227:11;
363:6
**giving (9)**
10:16;132:24;
292:22;309:4;316:24;
317:16;343:22;
355:23;380:7
**glass (6)**
115:19;116:1,8;
121:18,19;122:4
**Gloria (1)**
253:9
**goal (1)**
97:20
**goals (2)**
139:18,20
**goes (17)**
8:15;150:5;151:12;
152:13,14;153:11,13,
13,20;154:19;155:6,
19;159:7;163:19;
251:9;259:20;266:8
**Gonzales (1)**
340:21
**Gonzalez (3)**
186:1;272:6,9
**Good (21)**
6:22,23;31:18;
75:22;140:17;164:24;
187:2;204:6,9;238:4;
303:18;344:16,17;
349:2;356:17,18,19;
360:5;362:1,22;364:7
**Goossens (1)**
186:13
**Gotcha (3)**
74:14;133:22;
259:14
**GPR (27)**
150:12;151:5,8;
152:19;153:17;
154:17;155:4,5;
162:24;199:21,24;
214:23;286:22,25;
287:4,7;288:5;298:2,
9,15;299:17;300:7;
316:12;337:18;384:9,
22;385:15
**GPRs (20)**
151:3,4;152:6;
155:12;162:7;163:5,
14;165:18;224:20,25;
292:9;299:10,13;
316:2,6;317:9;384:6;

385:3,8,22
**grab (2)**
    223:24;312:25
**grabbing (1)**
    223:15
**Grace (23)**
    24:3,5;32:1,11,15;
    33:5;37:4;40:24;52:6;
    387:12;389:5;391:12,
    25;392:5,14,18;
    393:21;394:16;395:5,
    20,25;396:2,9
**grade (2)**
    67:25
**graduate (1)**
    68:7
**graduated (3)**
    71:9;80:4,8
**graduating (1)**
    68:9
**Grand (7)**
    111:24,24,25;
    183:23,25;187:20;
    191:7
**granted (4)**
    395:7,14,15,22
**great (4)**
    11:9;61:2;82:15;
    96:8
**green (3)**
    158:19;159:15;
    348:4
**Greenberg (6)**
    5:22;165:8,11;
    249:3;252:15;305:22
**grew (2)**
    7:16;59:10
**groin (1)**
    369:8
**gross (1)**
    152:21
**ground (3)**
    8:13;112:21;113:1
**Group (2)**
    5:20;30:24
**grow (2)**
    59:2,7
**growing (1)**
    59:21
**guess (11)**
    10:17;42:1;111:20;
    269:12;323:16;
    341:13;364:5;380:19;
    381:10;391:24;
    394:10
**guessing (1)**
    10:20
**Guevara (51)**
    5:3;6:3;20:3,13,17,
    20;29:14;59:23;
    76:20;77:24;105:4;
    174:18,23;175:2,5;
    176:25;226:23;227:4,

8,11,11,15,19;229:22;
    233:19;236:7;251:15,
    18;266:21;318:22;
    320:7,13;328:19;
    329:21;330:24;
    331:14,19,24;332:8;
    334:7;336:10,25;
    337:10;339:11;358:9,
    16;359:1,3,9,23;360:1
**Guevara's (2)**
    322:17;338:22
**gun (8)**
    210:17;236:24;
    237:5;282:19,21,22,
    25;287:25
**gunner (1)**
    69:21
**guns (1)**
    203:7
**gunshots (1)**
    183:14
**guy (15)**
    97:21;103:15;
    123:11;160:7;176:15,
    16;191:25;192:9,21;
    193:25;248:7;249:9;
    276:14;281:1;282:16
**guys (18)**
    114:5,23;115:6,7;
    167:23;180:16;181:7;
    236:23;237:5,11;
    254:2;282:24,25;
    295:18;315:24;
    326:10,10;330:2

# H

**habit (1)**
    146:7
**hair (1)**
    369:11
**half (1)**
    332:9
**hall (1)**
    114:9
**hallway (1)**
    30:18
**Halsted (1)**
    81:25
**Halvorsen (17)**
    30:22;77:6;105:20,
    25;174:11,14;177:12,
    13;266:21,21;274:20;
    275:2;318:11,15;
    328:19;329:21;
    344:13
**hand (12)**
    6:14;13:24;154:3,7;
    166:22;180:22;
    203:23;205:17;351:7;
    367:6;374:25;388:5
**handcuffs (1)**
    369:5

**handed (3)**
    147:19;153:22;
    246:17
**handle (4)**
    35:1;147:21;254:3,
    5
**handled (1)**
    311:4
**handling (2)**
    110:16;330:3
**hands-on (1)**
    201:23
**handwrite (1)**
    151:16
**handwriting (3)**
    247:15,18;248:1
**handwritten (2)**
    298:25;333:5
**hang (1)**
    249:8
**happen (15)**
    101:11;147:16,17,
    18;152:10;163:6;
    167:9;191:14;194:21;
    224:4,5;270:17,22;
    284:10;324:20
**happened (50)**
    10:17;15:8;29:22;
    50:8;51:15,17;78:18;
    86:15,16;88:1;
    138:15,16;142:11;
    148:2,10;173:8;
    182:9;184:6;195:10;
    199:5;203:5;209:19;
    215:3,10;231:14;
    232:15;233:11;
    244:11;255:8;283:22;
    284:4;291:17;300:20;
    317:7;318:12;320:14,
    15;323:11,11;327:23,
    24;328:13;334:23;
    335:7;339:19;362:24;
    370:4,8;371:22;
    382:13
**happening (3)**
    135:1;226:4;313:7
**happens (2)**
    155:13;167:9
**harassing (1)**
    324:6
**hard (9)**
    7:23;15:14;61:6;
    120:6;225:1;295:7;
    372:12,16;382:9
**Harrison (2)**
    98:22;99:12
**hat (1)**
    369:7
**head (4)**
    162:22;369:7,8;
    383:15
**headquarters (4)**
    151:7;239:4,18;

369:4
**hear (17)**
    8:4;17:23;32:11;
    47:18;116:20,25;
    117:12,15,18,25;
    122:14;188:1;189:16;
    256:21;262:5;264:15;
    367:15
**heard (31)**
    7:3;16:4;17:22;
    18:2,12,16;20:10;
    60:8,15;126:7,9;
    179:9,19;180:4;
    181:18;182:8;187:12,
    15,23;189:4;190:5;
    215:19;237:10;
    259:18;263:20;
    282:24;319:19,23;
    339:17;344:19;359:2
**hearing (17)**
    7:23,24,25;11:18,
    23;12:10;17:6;47:19;
    48:2;182:10;187:7;
    218:13;262:22;
    264:20;355:7;356:25;
    363:11
**hearings (2)**
    357:3,6
**heated (2)**
    212:11,11
**heavy (1)**
    141:18
**held (1)**
    58:14
**help (8)**
    21:16;22:9;168:17;
    182:18,23;195:13;
    252:3;262:7
**helped (3)**
    195:18;202:3;
    344:24
**helpful (1)**
    353:1
**helping (1)**
    196:11
**helps (1)**
    97:6
**hereby (2)**
    206:25;376:17
**herein (1)**
    6:17
**here's (2)**
    38:15;375:5
**hey (3)**
    50:16;53:16;392:5
**high (5)**
    67:23;68:6,7,9;71:9
**higher (1)**
    135:14
**highlights (1)**
    378:5
**himself (2)**
    213:22;287:22

**hired (1)**
    75:25
**Hispanic (2)**
    261:6;264:5
**histories (4)**
    172:1;353:2,2;
    354:6
**history (11)**
    74:1,1;142:3;171:6,
    7,11,21;353:9,12,22;
    363:15
**Hold (15)**
    26:14;90:16;100:4;
    154:3;162:2;217:21;
    249:1;252:8;289:14;
    293:3;303:20;342:4;
    361:10;362:23;378:2
**home (1)**
    7:25;71:10;263:3;
    349:4
**homicide (16)**
    99:23;105:1;111:4,
    6;170:19;174:5,7;
    254:25;289:25;306:5,
    23;310:10,13;315:24;
    334:2;338:3
**homicides (5)**
    104:25;135:21,25;
    138:12;306:6
**Honorably (2)**
    70:24;71:1
**hoodies (2)**
    237:2,5
**hope (1)**
    369:17
**hospital (1)**
    255:6
**Houlihan (2)**
    80:25;81:1
**hour (6)**
    63:20;173:8;240:1;
    262:22;263:19;
    264:16
**hours (14)**
    13:23;173:11;
    174:3;179:6;181:15;
    188:25;251:7;261:19,
    25;264:8;330:20;
    369:3;382:20,25
**house (6)**
    31:20;59:2;68:1;
    237:1;282:20,21
**housed (3)**
    111:25;112:3;
    157:15
**Huh (12)**
    28:6;37:7;74:4,20;
    77:12;243:1;328:2;
    336:15;360:9;370:2;
    375:21;393:10
**Humboldt (3)**
    141:23;144:14;
    145:3

**hundred (1)**
319:25
**hundreds (1)**
22:1
**hung (1)**
224:14
**Hypothetical (16)**
54:17,23;88:14;
90:4;92:15,23;97:8;
127:5;128:18,21;
131:11;147:25;
265:25;296:15;298:6;
322:8

**I**

**idea (47)**
15:10,17;61:13;
119:3;160:25;190:9;
214:22,25;224:9;
231:3,9;233:4,9;
244:3;245:11,25;
247:23;248:4,10;
253:15;275:23;
292:23;301:1;302:3,
19;304:13,20,24;
305:4;308:21;310:9;
315:16;316:4;320:11;
321:5;322:24;333:17;
340:22;341:4;343:14;
361:15,15,16;385:9,
11,23;386:3
**identification (2)**
109:15;121:6
**identified (12)**
107:9;108:9;
127:13,22,23;128:1,6;
174:2;190:16;333:4;
342:24;367:24
**identifies (1)**
256:1
**identify (7)**
107:10,17;108:15,
19;378:20;379:3,8
**identifying (1)**
372:21
**identity (1)**
171:17
**illegal (2)**
129:4;331:24
**Illinois (2)**
5:5,11
**imagine (1)**
325:3
**immediately (3)**
297:24;298:21;
305:15
**immunity (4)**
395:7,14,22,23
**implicate (1)**
389:22
**implicated (2)**
130:22;287:22

**importance (1)**
87:24
**important (22)**
12:6;78:20,23;
88:20;89:4;90:8,11,
12;92:7,11,22;93:18;
95:25;97:1,5;138:22;
139:4;150:22;161:15,
16;162:21;287:14
**impossible (1)**
195:23
**impression (1)**
7:22
**impressions (2)**
57:9,13
**improper (3)**
127:15;131:3;
331:24
**inaccurate (1)**
49:22
**incapable (1)**
325:7
**in-car (1)**
80:20
**incident (19)**
10:21;14:10;15:2;
78:25;188:18;196:10;
228:7;254:13;263:3;
277:13,16;285:12;
360:24;361:2;365:10,
15,23,23;368:25
**incidents (1)**
277:25
**included (5)**
341:14;343:11;
344:23;346:3,17
**includes (3)**
177:6,9,18
**including (3)**
29:13;319:24;
378:22
**incomplete (12)**
54:22;88:14;90:4;
92:15,23;127:5;
128:18;131:11;
147:25;265:25;
296:15;298:6
**inconceivable (1)**
323:18
**incorporate (1)**
154:17
**incriminate (1)**
40:19
**incriminating (8)**
210:14;213:21,22;
223:3;246:9;283:15;
292:5;294:23
**independent (8)**
210:12;227:18;
228:10;294:3;328:9;
334:11,12,21
**index (1)**
157:20

**indicated (5)**
13:3;197:12;
240:18;327:12;
363:14
**indicates (2)**
239:25;272:5
**indication (1)**
197:14
**individual (6)**
185:25;186:12,16;
193:5;204:24;378:23
**individuals (10)**
16:16;30:24;53:24;
77:21;187:4,8;
189:18;210:17;
256:17;260:10
**induce (1)**
132:15
**Indulge (1)**
271:13
**in-field (3)**
85:10;96:17,20
**information (62)**
10:4;19:16;20:3;
29:22;89:7;90:1,10,
16,25;92:7,11,12,21,
22;93:18;150:5;
154:16;162:25;163:6,
16,24;170:25;171:22;
187:24;188:7;209:17;
213:10,15;218:13,22;
255:2;263:8,11;
265:9,14;275:19;
276:7;287:14,22;
288:4,10,16,21;
289:21;290:18;
293:10;307:25;308:1,
16;309:14;312:22;
313:3;338:8,15;
345:4;347:22;350:7;
371:21;376:19;
381:20;382:24;
383:14
**initial (1)**
279:12
**initially (1)**
170:6
**initiated (1)**
360:24
**initiating (1)**
149:13
**injuries (1)**
255:5
**inmate (5)**
201:14;202:24;
203:20;204:4;206:25
**Inocenci (1)**
264:23
**inquiry (1)**
352:19
**in-service (2)**
103:2;128:14
**inside (1)**

121:24
**instance (18)**
61:5;85:2;88:6,20;
89:6,19;92:20;
130:15;135:20;160:1;
166:13;171:16,23;
189:24;265:23;
306:24;378:2;381:14
**instead (1)**
74:12
**instructed (2)**
86:19;106:14
**instruction (4)**
85:2;87:13,16;
121:10
**instructions (4)**
89:18;120:23;
121:1,5
**instructor (1)**
68:16
**insurance (1)**
68:19
**intelligent (1)**
356:19
**intend (2)**
34:12;391:5
**interaction (1)**
186:10
**interactions (2)**
217:16;282:3
**interest (1)**
378:23
**Interesting (1)**
68:4
**interests (2)**
132:16;389:13
**interfere (1)**
12:12
**interference (1)**
358:25
**interject (1)**
26:15
**interpret (25)**
19:9;191:23;192:2,
19,21;193:4;194:1,13,
18;200:23;208:25;
220:12,13,16,19;
221:21;225:18;
230:10,11,13;242:3,
12;342:1,2;351:4
**interpreted (3)**
209:1;225:4;343:17
**interpreter (49)**
195:22;198:10,14;
202:19;205:7;211:10,
12,13,14;214:12,16;
216:17;221:3,9;
222:3;227:2,7,10,15;
228:9;234:6,12,18;
235:25;241:14,18;
242:16;244:14;
245:23;279:12;285:3,
5,6,7;289:16;290:2;

292:10;309:2;313:21;
327:10;329:17;
341:18;343:13;
344:13,20;351:3,5;
354:25;355:5
**interpreting (15)**
110:15;189:7;
195:23;209:11;218:4;
222:24;225:1,2;
269:12;291:16;342:5;
343:17;344:7,24;
384:20
**interrogate (1)**
70:16
**interrogating (1)**
95:2
**interrogation (4)**
132:4;339:16;
366:18;369:4
**interrogatories (3)**
376:18;383:4,17
**interrogatory (5)**
377:12,15;378:15;
379:7,10
**interview (139)**
79:15;89:5;94:15;
113:23;114:1,3;
115:1;151:10;162:15;
189:9;193:9,12,12,13;
194:4,25;195:18;
196:13,16;197:7,10,
13,21;198:2,5,14,20;
199:13;200:12,21;
201:8;202:10;203:10;
204:18,24;208:7,8,9,
15,18;210:10;211:1;
212:10;213:24;214:3,
8,18,24;215:3,10;
216:6,8,17,22;218:3;
220:20,21;221:25;
222:3,6;223:4,8,12;
224:1,6,11,18,21,21;
225:4,19,24;226:10;
227:4,7,13,19;228:8;
229:9,22;230:2,6,9,
18;234:2,23;235:7;
236:4,14;239:3,17,21;
240:11;241:22;
245:16;246:4;260:25;
277:4;279:13,24;
280:16;281:1,4;
282:11;284:10;285:4;
286:23;287:4,8;
289:18;290:22,25;
291:1,3,4,23;292:1,6,
9,20;293:18;299:22,
22;321:24;330:25;
331:4,8,11,17;334:5,
6,16;335:10;337:9;
372:3;381:15,17,25;
382:3
**interviewed (21)**
89:13;151:22;

205:8;206:2,7;207:1;
264:23;277:1;278:2,
19;280:6;284:4,11,12,
18,19;312:19;330:23;
336:5;349:10;361:7
**interviewing (13)**
79:17;86:14;88:6;
89:20;150:7,12;
162:12;192:22;
245:15,23;280:4;
329:11;339:11
**interviews (15)**
152:2;162:8;
228:11,16,22;236:22;
242:15;258:16,22;
330:6;340:21;350:1;
361:5;384:24;385:16
**into (42)**
36:13;37:17;38:19,
20;47:10;50:6;68:13;
72:2,6;81:6;110:14,
23;115:12;116:5,14,
16;143:4;150:5;
151:12;154:17;
159:10,15;162:25;
190:25;192:21;
193:19;196:16;
203:16;208:7,8,18;
212:5;218:14;240:13;
263:12;296:17;297:2;
304:17;312:5,10;
319:14;331:25
**introduce (3)**
5:16;165:8;193:21
**introduced (2)**
87:2;366:24
**inventoried (1)**
277:20
**inventory (2)**
157:20;277:20
**investigate (27)**
85:18;86:1;91:9;
142:10;146:10,20,22;
147:8;148:1;169:6;
174:13,23;175:1;
182:5,23;188:18,21;
202:4;301:3;312:20;
313:4;341:23;345:14;
362:11,12;368:17;
374:1
**investigated (12)**
73:12;100:8;141:3;
266:25;267:2;306:6,
9,12;310:21;370:10;
371:1;373:17
**investigating (23)**
99:18;136:14;
142:16;160:2;182:24;
188:12;189:1;190:10;
201:18;214:11;
218:18;263:21;
265:16;290:24;
304:21,24;306:23,23;

307:22;309:1;310:24;
354:9;364:4
**investigation (66)**
92:8;93:19;95:25;
97:21;127:2,8;131:8,
18;132:25;143:4;
145:20;147:23;150:3,
20;154:5;157:17;
163:16;167:7;169:13,
14,20;170:2,20;
171:13;172:1;177:7,
10,19;178:3;182:20;
189:17,22;200:17;
201:8;213:15;215:13,
17,20,25;218:10,14;
226:4;238:10;253:23;
254:1;255:12;256:13;
263:13;267:8,12;
271:5;301:13;307:6,
19;311:22,25;328:21;
329:21;333:25;334:2,
3;353:1;361:23;
367:9;371:19;373:9
**investigations (17)**
70:12;94:2,6;
102:17;111:4,6;
136:9;160:3;168:20;
169:2;172:11;174:6,
7;175:19;198:24;
311:8;345:25
**investigative (41)**
64:24;86:20;95:7;
102:1;109:1,15;
125:22;126:25;
148:17;150:18;151:6;
153:25;156:1,15,20,
25;157:1;161:16;
183:9;189:21;198:16;
211:11;224:16;
240:10;244:18;250:5;
253:14;291:5,7,15;
300:11,22;308:12;
309:23;310:1,5;
312:15;319:11;
324:22;341:15;
383:23
**investigator (11)**
73:12;170:10;
285:3;289:24;308:15;
309:15;313:11;
329:17;341:20;
368:22;371:21
**investigators (1)**
371:24
**invite (1)**
31:19
**invoke (6)**
43:11;49:8;391:5,
13;395:16,21
**invoked (1)**
41:11
**invoking (1)**
211:16

**involve (2)**
104:17;307:18
**involved (20)**
14:16;15:1,9;53:2;
93:9;171:15;209:25;
223:7,21;267:9;
288:1;293:1;294:20;
295:24;307:17;313:5;
336:1;344:4;360:18;
372:23
**involvement (2)**
210:24;341:7
**involves (1)**
259:4
**involving (2)**
177:10;373:10
**IR (3)**
74:1,2;352:23
**irrespective (1)**
107:9
**island (1)**
61:23
**issue (1)**
12:11
**issued (1)**
352:18
**issues (1)**
12:11

**J**

**Jackson (1)**
5:10
**Jail (25)**
201:15;202:24;
203:6;204:8,18;
213:6;215:1,3;
217:15,23;218:3;
219:15;220:11;221:2;
240:8;281:22;291:2,
5,19;295:9;297:1;
314:1,8,21;335:22
**James (2)**
368:22;369:10
**January (1)**
20:21
**Jeffery (1)**
276:6
**Jeffrey (3)**
276:9,11,14
**Jennifer (5)**
5:17;6:24;161:24;
276:18;289:7;333:24;
378:3
**jeopardy (1)**
390:8
**jerked (1)**
369:6
**Jesse (2)**
15:21;16:1
**jibe (1)**
294:11
**Jim (2)**

25:8;388:14
**Jimenez (2)**
15:15;16:8
**job (19)**
71:4,13;73:7,16;
74:7;75:22;82:15;
97:15,17;120:18;
138:23;139:5;312:2;
362:4,5,9,10;363:6;
385:19
**jobs (1)**
147:20
**Joe (2)**
360:2;363:4
**John (1)**
31:18
**Join (26)**
34:19;38:11;42:9;
55:12;90:5;92:16,17;
93:5;107:12;122:7;
126:2,3,20;127:18;
140:23;143:22;
144:19;172:4;273:14;
301:24;302:9;321:1,
2;374:6;386:1,2
**joined (2)**
77:23;165:9
**Jorgensen (3)**
5:21,21;249:11
**J-O-R-G-E-N-S-E-N (1)**
5:22
**Jose (52)**
5:2,18;6:25;19:25;
53:6,14;714:14,24;
175:2,4,9,16;177:10;
185:10,18,21;187:12;
204:15,18;206:25;
208:17;213:14;239:5,
15;243:23;272:5;
277:14;278:3,19,22;
280:16;282:18;
287:13;299:3;309:12;
314:4;315:12;316:21;
321:23;329:11;
330:23;331:4;334:5;
335:10;337:9;339:22,
25;340:20,23;358:17,
20;385:16
**Joseph (1)**
359:11
**Josh (2)**
63:12,12
**Joyce (1)**
43:5
**Jr (1)**
5:2
**judge (27)**
9:3;33:21;35:2,15;
37:6,19;38:4;42:2,24;
43:5,20,20;45:11,25;
46:20;48:14;49:5,7,
23;50:11;51:2,10,18;
52:10,17;55:4;56:2

**July (31)**
189:10,16,25;
190:5,11,17,23;191:3,
12,16,22;199:3;
200:7;216:9;277:10;
278:1;280:5;285:19;
286:19,23;287:4;
288:12,14;290:3;
291:3;292:24;293:5,
9;299:21;308:10;
349:11
**jump (1)**
54:10
**jumped (1)**
221:6
**jury (1)**
357:20
**Justice (1)**
390:6
**Justino (3)**
186:7;342:25;343:4
**juveniles (1)**
112:19

**K**

**Karyn (1)**
5:13
**Kato (14)**
366:11,13,18,20,22;
367:25;368:14,18;
369:5;372:4;373:4,5,
17;374:2
**Kedzie (3)**
98:22;99:12
**keep (18)**
40:25;41:3;42:12;
45:18;119:11;136:3;
162:21;257:19;275:7;
277:15;282:20;
310:10;311:2;318:3;
328:18;332:3;333:18;
391:4
**kept (10)**
113:19;135:3;
157:11,15;172:17;
250:9;310:13;346:6;
347:2,3
**Kevin (7)**
190:6;239:2;254:8;
266:15;277:22;
352:16;353:11
**kicked (1)**
369:8
**kids (1)**
131:9
**kill (3)**
262:8,8;277:22
**killed (1)**
231:21
**Kimball (1)**
179:22
**kind (9)**

27:5;60:18;74:16;
133:12;170:15;209:9;
281:1;359:18;386:19
**King (1)**
276:6
**Kings (6)**
275:15;282:19,22;
287:25;309:5,13
**kiss (1)**
322:11
**kissed (1)**
321:23
**kneed (1)**
369:8
**knew (12)**
50:10,14;190:21;
209:16;292:17;
295:17;331:5;349:22;
391:12;394:15,23;
395:4
**knock (2)**
122:11;259:17
**knocked (1)**
369:7
**knocking (1)**
122:15
**knowing (2)**
72:5;143:2
**knowledge (10)**
144:23;192:5;
210:4;226:3;257:14;
272:24;339:13;
346:23,24;348:21
**knowledgeable (1)**
85:4
**knows (2)**
56:1;160:11;296:5;
344:13
**Koelper (1)**
69:23
**Kriston (2)**
367:25;369:5
**Kyle (2)**
5:21;249:10
**K-Y-L-E (1)**
5:22

**L**

**lab (1)**
95:19
**laborer (2)**
68:19;71:19
**lady (2)**
334:15;356:19
**language (2)**
59:5;270:2
**last (26)**
20:19;23:14,19;
59:9;103:16;156:5;
211:1,2;213:4;248:5;
262:9,15;269:2,4;
291:23;292:1;293:18;

294:15,17;311:8;
314:17,19;315:6;
376:8,10,11
**lasted (6)**
213:6,9;262:22;
263:19;264:15;292:3
**late (4)**
100:14;184:15;
353:19;394:25
**later (23)**
36:5;53:15;86:23;
87:1;110:22;149:10,
10;152:6;155:21;
162:24;169:10;
171:12;184:17,19;
204:14;217:17;
218:20;226:11;
228:12,16;236:3;
264:25;282:20
**Latin (7)**
275:15,15;276:5;
282:19;287:25;309:5,
13
**Law (11)**
5:9,20;9:3;67:20;
72:3,6,22;78:6,7;
323:24;395:17
**lawsuit (6)**
14:21;15:9;16:2,20;
17:1,21
**lawsuits (2)**
14:17,18
**lawyer (15)**
22:4;23:25;49:4;
52:16;204:2,4,7,9;
358:5;387:19;388:3;
395:25;396:4,6,6
**Lawyers (1)**
5:23
**lay (1)**
219:12
**laying (2)**
181:12;183:14
**lead (9)**
251:17;267:7;
269:10,17;270:5;
329:24;330:1,14;
373:8
**leads (5)**
96:15;263:12;
265:15;338:8;353:22
**learn (16)**
32:15;33:19;34:1;
56:22;71:17;79:6;
91:9;94:1,18;96:13;
97:5;106:8;171:17;
179:4,8;204:14
**learned (13)**
57:10;69:1;78:6;
79:8,10;85:4,15;87:4;
91:7;94:20;103:4;
215:13
**learning (3)**

95:24;183:16;
218:22
**least (10)**
198:21;234:9;
249:1;254:14;255:22;
264:15;294:19;326:3;
330:9;336:25
**leave (3)**
50:21;70:18;224:13
**lecture (6)**
39:10,17;48:3;85:6,
8,8
**lectured (1)**
39:7
**lectures (1)**
85:9
**Lee (5)**
77:13,15;98:14;
105:16;174:11
**left (17)**
70:19;113:20;
114:6;115:9;118:15,
21;187:18;188:12,24;
191:9;215:1;216:20;
217:14;225:8,11;
272:16;274:23
**left-hand (2)**
113:21;250:24
**legal (2)**
5:12;21:16
**legitimate (1)**
324:13
**legs (1)**
369:9
**less (2)**
137:25;365:1
**letter (20)**
388:12;390:17,20,
22;391:17,18,20;
392:2,13,14,19;393:1,
17,22,25;394:4;
395:17;396:2,3,10
**letting (2)**
323:6;393:22
**level (1)**
8:4
**liberty (1)**
10:15
**lie (4)**
127:1,7;130:10;
364:8
**lied (3)**
49:4;392:22,23
**lieutenant (1)**
113:25
**life (5)**
13:25;73:11;
322:14;325:10;
326:15
**light (5)**
232:24,24;276:2;
358:2,3
**limitation (1)**

390:1
**limited (2)**
378:22;382:23
**line (3)**
171:12;261:17;
327:5
**lines (1)**
238:23
**lineup (54)**
94:25;108:2,3,4,9,
16;109:24;114:7;
115:4,12,17;116:4,12,
13,14,15,18,23,24;
117:19,25;118:3,5,13,
23;119:19;120:10,19;
121:4,11,24;122:18,
24;123:5,8,18,19,20,
25;124:5,12,13,14;
125:8,10,23,24,25;
127:13,14,22,23;
128:2,6
**lineups (7)**
94:18,24;107:23;
109:15;117:6,7;
189:25
**lips (1)**
8:7
**list (7)**
73:6,7,9;83:7;
86:16;150:13;151:11
**listed (5)**
271:5;273:4,10;
276:17;345:5
**listen (2)**
58:2;269:15
**listening (1)**
335:1
**lists (1)**
347:24
**litigation (2)**
6:25;13:12
**little (14)**
7:6,21;8:7;71:6;
89:16;111:18;125:5;
148:23;165:21;179:3;
184:8;193:12;219:13;
289:11
**live (1)**
107:23
**lived (1)**
67:5
**Lluvia (1)**
186:4
**Lluvio (1)**
186:4
**located (3)**
5:9;81:22;111:23
**location (1)**
255:7
**lock (1)**
203:7
**lockup (2)**
112:23;113:1

**lodged (2)**
366:4;368:12
**log (6)**
158:9,20,23;
347:21,24;348:6
**long (42)**
17:9;27:1;63:2,16,
19;71:23;81:12;
84:16;98:7;101:2;
102:3;133:20;150:17;
178:12,13;183:6;
184:24;194:3,6,22,23;
211:1,2;213:4,5,7;
224:6,8;226:18;
228:7;229:16;291:24;
292:2,3;293:19;
294:15,17;317:24;
364:22,23,25;393:14
**longer (1)**
305:22
**look (88)**
8:6;26:10,13;28:23;
29:1;30:2,5;73:25;
85:19;86:1;106:14;
108:3;115:14;136:23;
142:24;156:17,23,24;
170:12;180:10,11,17,
23;205:21;207:9;
225:15;226:17;231:4;
237:25;238:15;
242:21;243:3;245:11;
246:11;248:5,21;
249:24;250:19;
251:22,24;253:17;
256:16,23,25;257:6,
20;258:7,25;259:10;
260:17;266:3,6;
268:9,13;269:2,4;
271:19;275:7,11;
285:22,23;310:6;
312:11,23;314:11,17;
342:20,22;347:8;
351:17;353:5,25;
354:3;355:19;356:2,
21,22;375:1,3,9,11;
377:6,12;378:14;
379:25;380:19;
381:11;383:5
**looked (22)**
62:7,13;64:19,23;
107:16;111:13;115:9;
142:21;143:8;250:4;
257:11;258:20;
264:25;271:21;
300:16;303:11;316:2;
342:3;376:1;383:20,
23;384:4
**looking (18)**
99:3;101:20;
116:11;125:9;145:18;
156:13;226:20;
256:12;267:24;
272:19,20;274:14;

275:1;310:17;311:5;
343:7;347:17;376:7
**looks (12)**
163:18;171:8;
207:10,11;247:4;
258:1;261:1;338:25;
339:22;340:5;342:16;
381:2
**lost (4)**
150:9;163:10;
165:21;186:25
**lot (16)**
12:2,15;110:15,16;
135:5,9;141:12,23;
181:12;325:18;326:7,
7;335:20;354:24;
355:4;377:17
**loud (1)**
264:13
**louder (1)**
7:21
**Louisiana (1)**
69:4
**lower (1)**
138:4
**Lulu (2)**
264:17;265:23

## M

**ma'am (674)**
7:20,24;8:6,10,22,
25;9:4,6,10,14,17,20,
23;10:2,6,24;11:4,13,
19,24;12:3,9;13:1,18;
14:13,19,22,25;15:3,
7,10;16:7,21;17:3,15,
17;18:9,15,24;19:1,
19,23;20:1,18;21:4,7,
10,13,19,22;22:1,13,
18,21;23:15;24:2,4,9;
25:1,6,18;26:4,7,25;
27:5,18;28:2,25;29:3,
25;30:4,6,9,11,16;
31:1,8,12,14;32:7,10,
12;34:14,23;36:19;
37:3,13;38:13,18;
40:8;41:20;42:12;
43:18;44:9,15;45:1;
46:17;47:3;48:19;
51:6;52:2,7,12,14,21;
53:20;54:1,7,17,20;
55:7,19;56:17,21;
58:18;59:17,22,25;
60:5,7,9;61:13;62:4;
63:9,25;64:20,25;
65:5,7,21;66:7,15;
68:24;69:7,12,16;
70:14,17,22,25;72:4,
10,13,21,24;73:24;
74:5,8,18,21;75:5;
76:3,5,11,14,22,25;
77:3,5,8,25;78:3,22;

79:13,16,19;80:14,16;
81:2,18,20;82:5,8,22;
83:6,16,20,23;84:5,8,
11,23;86:5,9;87:10,
15,20,22;88:4,10,24;
93:6,11,23;94:22;
98:5,16;99:1,10;
100:1,10,12,14,18,25;
101:5,13,18;102:2,19;
103:3,9,19;104:19;
105:5,7,15;106:2,5,
17,20;107:6,15,25;
108:6;109:3;110:7,
10,21,24;111:2,12,16;
112:2,5,12,15;113:3,
9;114:22;115:3,25;
116:6;120:5,12;
121:7,9,16;122:16;
123:3,6,21;124:9;
125:15;126:16;127:3,
10,19;128:22;129:8,
14;130:6,13,19;131:1,
4,13,20,23,25;133:3;
136:13;137:18;
138:13,21;139:10,17,
19;143:9;144:4,22;
145:8;148:22;150:24;
152:3,20;153:2;
157:10;160:17;
161:10;166:14;
167:21;170:18;
174:16,21,25;175:3,6,
20;176:14,20;177:2,
11,16,20,24;178:7,9,
19,22;179:18;180:2,
5;181:2,16,20,25;
182:11,14;183:3,5,19,
24;184:18;185:1,4,7,
20,22;186:3,6,11,14,
18,20;187:11,14,25;
188:8,14,16,20,23;
189:19,23;190:3,20;
191:2;192:7,15;
194:6,8,10,20;195:4,
12,16,20;196:7,9,14;
197:2,7;199:2,6,9,14,
17,22,25;200:5;201:1,
4,6;202:25;203:3,18;
204:5,20;205:3;
206:13;207:5,25;
209:20;210:15,19,22,
25;211:7,17,21,24;
212:3,6,9,14,17,20,
22;213:12;214:7,9,19,
25;215:15,18,21;
216:12,19;217:25;
218:12,16,19;219:4,
23;220:1;221:12;
222:10,15;223:1,5,13,
16,19,23;224:5,7,12,
19,23;225:12,22;
226:17,24;227:5,9,16;
228:20;229:18,25;

230:4,12,14,17,23,25;
231:3,3,7,25;232:10,
12;233:9;234:15;
235:11,20,23;236:2,8;
237:12;238:8;239:7;
240:11,15;241:6,24;
242:20;244:3,16,20,
22;245:11,19,25;
246:5,10;247:14,16,
23;248:2,4,8,10;
250:3,6,21;251:1,16,
20;253:12,15;254:6,
19;256:3,11,14,20;
257:12;258:11,21,23;
260:20,22;263:10;
265:7,11,13;266:12;
267:3,6,10,13;268:11;
269:8,24;270:7,11,16;
271:22;272:11;273:1,
3;274:5,13,17;275:4,
21,24;276:8,12,15,19,
22;277:3,6;278:4;
280:18;281:6;282:1,
7,10;283:8,10;284:2,
22;286:21,24;287:1,
6;289:19,22;290:12;
291:11,20;292:7,11,
23;295:15,25;296:4,8,
20;297:6;299:1,8,11,
15;300:8;301:1,17;
302:3,14,19;303:8,13,
16;304:13,19;305:5;
306:4,21;310:15;
311:2;312:24;314:10;
315:16;316:4,9,23;
317:3,8,19;318:13;
319:5,21;320:11;
322:8,24;324:15;
327:20;328:14;
332:21;333:3,17;
341:19,22;342:8;
343:5,14;347:5;
348:9,13;350:20,25;
352:5,13,20;353:24;
354:18,21;355:22;
358:5,10,13,19,21;
359:2,21,24;360:25;
361:8,13,17;362:16;
363:13;364:5,12,17;
365:16,24;366:6,8,12,
14,21;367:14,14;
368:16;369:14;
370:17;371:5,7;
372:5;377:21,23;
380:22,22;383:19;
384:7;385:6,9,18;
386:3;387:6,9,14;
389:6;390:10,14,23;
391:11;392:4,24;
393:24
**MAC (1)**
69:24
**machine (1)**

69:20
**Macias (5)**
264:3,14,20,25;
265:15
**Macias's (1)**
263:2
**mailbox (2)**
147:20;148:7
**main (1)**
114:20
**mainland (2)**
66:6,13
**maintain (3)**
21:5,8;31:9
**maintained (4)**
31:17;172:11,12,13
**maintains (1)**
346:25
**Maisonet (1)**
243:24
**M-A-I-S-O-N-E-T (1)**
243:24
**making (12)**
41:3;210:13;
213:20;223:6;274:6;
295:4;300:14;311:6;
322:7;332:1;337:18;
359:19
**male (4)**
254:10;262:1;
264:11;275:13
**man (2)**
197:23;198:6
**Mandeltort (2)**
356:15,16
**manner (3)**
255:14,16,17
**manner/motive (2)**
275:11,12
**many (14)**
9:18;13:19;16:23;
21:24;23:18,18;
25:10;62:21;64:18;
138:16;306:2;325:22;
326:10;335:18
**marathon (1)**
12:20
**march (2)**
69:1;179:6
**Marjorie (1)**
366:5
**mark (11)**
171:5;180:7,18;
205:14;252:9,10;
349:5;355:12,14;
367:2;374:22
**marked (23)**
180:20,23;205:15,
18;211:25;217:10;
237:15,16,17,19,21;
246:17;253:3;349:7;
351:8;355:15,19;
367:3,6;374:23;

375:1;386:24;388:6
**marks (1)**
251:7
**married (1)**
71:11
**Martinez (2)**
15:21;16:1
**Mason (1)**
281:15
**material (3)**
45:17;250:5;263:21
**materials (2)**
154:19,23
**matter (6)**
5:2;26:19;97:14;
178:11;194:24;
317:22
**may (45)**
9:12;10:8;29:17;
69:10;81:9;88:21;
116:17;133:6;169:5;
170:5;181:15;184:10;
185:2,6,8,17;186:1,
10,17,23;187:4,8,13,
19;188:4,12,19,22,25;
189:15,25;190:4,11,
16;215:12,23;248:18;
254:13;264:14;
270:18;271:5;288:1;
311:12;352:19;381:2
**maybe (20)**
7:22;31:19;71:25;
105:24;110:21;
132:12;149:19;
181:11;183:8;228:3;
263:16;265:22;267:7;
297:16;311:6;313:18;
314:13;330:15;
350:18;373:8
**Maysonet (226)**
5:2;19:6;25:19;25;
25:24;29:12,17;
56:15;177:10;185:10,
19,21;187:12;189:10;
191:1,13,18,21;
193:20;194:5,17;
195:19;196:3,15,25;
198:18;199:8,12;
200:7;204:15,19;
206:12,25;207:21;
208:3,7,18,21;209:2,
15,21,25;210:4,6,13;
211:16;212:15;
213:14;216:9,18;
217:16;218:2,9,21;
219:2,6,9;220:6,9,21;
221:1,10,14;222:4,12,
19,21;223:2,11,15,18,
21,25;224:18,22;
225:5,19,25;226:8,16;
227:4,15,20,23;
228:11,22;229:22;
230:18,21;231:1,16,

18;232:7;233:1,6;
234:14,19;235:1,14,
16,19,25;236:5,10,14;
237:9,10;238:13;
239:6,15;240:8,13;
241:22;243:10,15;
244:8;246:24;247:10;
253:14;259:23;272:5;
273:5;274:4,7;
276:13;277:14;278:3,
18,19,22;279:14,25;
280:4,16;281:5,10,18,
19;282:4,18;283:15;
284:11,12,18;285:21;
286:5,19;287:8,13;
288:20;289:15;290:6,
10;292:4,12,21;293:1,
6;294:19;298:24;
299:3;300:9,16;
301:4;303:22,25;
304:6,11,15,25;
308:10,16;309:1,4,12;
311:14;313:22;314:4;
315:12;316:21,24;
321:23;322:11;
326:20;327:3,9;
329:11,15;330:23;
331:4,14,19,25;334:6,
17;335:10,18;337:9;
338:15;339:12,15,23,
25;340:20,23;342:6;
343:10;349:10,23;
350:1,8,16;351:22,23;
358:18,20,24;367:12,
16;372:10;375:14;
381:15;385:16;
388:23;389:17;394:7

**Maysonet's (43)**
17:6,13,19;18:7,12,
17,25;23:4,17,21;
27:25;30:13;32:2;
33:23;53:7,14;56:18;
57:10;174:15,24;
175:2,4,9,16;206:4;
220:23;244:23;245:1,
10,24;300:6;301:20;
302:13,16,21;332:7,
17;335:1;354:20;
355:24;358:23;
360:19;387:5

**mean (37)**
26:20;28:17;45:20;
53:3;79:23;84:25;
85:1,1;89:11;96:23;
98:12;115:10;123:5,
7;137:15;186:9;
200:1;202:10;204:6,
8;205:1;212:11;
271:6;274:18,19;
309:24;313:25;
316:11;326:5;337:25;
338:2,10;344:12;
352:21;353:17;

385:13,13
**means (7)**
82:13;116:10;
191:6;317:25;319:12;
321:18;352:22
**meant (9)**
101:10;123:8;
150:20;252:7,14;
255:16;259:22;
269:25;278:21
**measure (1)**
135:22
**measured (1)**
135:17
**meat (1)**
307:9
**medical (1)**
12:11
**medium (1)**
379:4
**meet (5)**
62:21,24;63:10,11;
202:23
**meeting (24)**
27:1,5;63:14,17,19,
21,24;64:1,3;211:10,
15,23;213:2,5;
217:23;219:14;
220:10;290:11;
294:12,15,18;314:1,4,
20
**meetings (4)**
27:4,6;29:21;
350:17
**member (1)**
354:1
**members (8)**
141:4,7;142:13;
145:3;258:16;275:15;
353:23;354:6
**memorialize (1)**
79:21,23;106:15
**memorialized (1)**
316:3
**memories (1)**
295:12
**memory (6)**
10:9,14;283:11,13;
291:15;295:15
**men (6)**
179:5;183:13;
188:7;221:15;309:6;
353:15
**mention (2)**
282:5;283:9
**mentioned (9)**
11:17;32:7;150:25;
167:5;187:4,15;
211:22;315:23;
360:13
**mentioning (1)**
276:13
**meritoriously (5)**

82:12,14;84:12;
98:17;105:8
**Merritt (1)**
102:12
**met (14)**
26:15;34:2,3;63:2;
98:11;165:9,11;
219:2;279:13,18;
281:9;314:4;358:7;
366:23
**Mexico (1)**
61:5
**Michael (2)**
6:2;366:5
**microphone (3)**
118:20;121:12;
388:8
**mid (1)**
353:19
**mid-'90s (2)**
146:17;176:22
**middle (8)**
66:24,25;138:4,8,
10;140:14;241:3;
251:14
**midnight (12)**
105:17;184:5,9;
191:11;225:9;261:22,
23,24;262:1;263:18;
264:8;272:3
**midnights (5)**
133:12,16;184:12,
16;360:22
**Miedzianowski (2)**
359:11;360:2
**might (42)**
10:4,14;11:1;12:12;
15:14;25:15;73:7;
135:21;143:3;148:15,
15;153:25;167:10,14;
169:9;171:14,21;
184:8,9,12;222:14;
227:25,25;228:24;
229:4;233:19;245:21;
248:2;265:22;277:24;
281:25;287:1;288:11,
21;293:11;307:11,17;
315:18;338:6;353:1;
368:15;385:23
**Military (2)**
69:24;70:3
**millimeter (2)**
277:23;309:5
**millimeters (1)**
277:19
**mind (4)**
74:15;75:19;
283:18;286:15
**Mingey (76)**
30:21;76:23;98:10,
11;105:13;175:25;
176:12;200:11,20,25;
201:5,7,14,18;204:23;

206:8;208:12,14,23;
209:14,24;210:3;
212:18;213:16;
214:17;216:18;258:5;
277:11,21,24;278:1;
279:21,25;280:4,7,17,
24;282:6,12,15;
283:2;284:9,15,20,25;
285:11,19,20;286:1,
16,18,25;287:3;
289:17,18;290:6;
291:19;292:17,19;
295:21;298:13,14,23;
299:2,10,14,16;
301:20;305:2;308:11;
349:12,21;350:6;
381:17;382:4;384:20
**minute (3)**
75:9;228:3;384:19
**minutes (6)**
183:8,17,20;211:2;
213:7,9
**Miranda (6)**
196:15;212:7;
278:23;316:21,25;
317:16
**misconduct (10)**
128:15;129:12,19,
25;176:25;177:14,22;
178:6,18;322:18
**Misdemeanors (1)**
354:7
**misleading (1)**
326:14
**misrepresent (1)**
46:18
**misrepresented (2)**
44:10;46:12
**missed (1)**
91:17
**missing (1)**
160:13
**Misstates (17)**
13:6;33:11;37:24;
44:5;121:15;139:25;
140:1;146:25;182:13;
288:24;349:16;
350:11,21;369:20;
382:20;392:7;393:3
**mistake (2)**
51:3;74:17
**mix (2)**
209:5,7
**mixed (1)**
282:1
**mobile (1)**
69:21
**model (1)**
276:1
**Moderate (1)**
141:22
**moment (3)**
50:22;244:6;248:18

**Monday (1)**
63:18
**money (9)**
68:12,12;141:9;
146:1,2;358:17,20;
359:1,4
**Monroe (3)**
80:10,11;81:23
**Montgomery (1)**
368:23
**month (1)**
84:18
**months (8)**
81:5,11;90:16;
169:3;311:19;360:17;
381:4,5
**Montilla (49)**
5:9;6:10,16,22;7:3,
4,6,7;17:4;65:8;
75:17;165:7;180:22;
205:17;217:14;238:6;
241:4;246:19;248:21;
249:14;266:6;278:2,
5,7,20,22;306:2;
316:22;321:23;334:7;
337:10;344:6,6,24;
349:10;351:25;354:8;
355:18;360:13;367:5,
25;368:6;369:10;
374:25;387:3;389:2,
14;394:21;397:2
**Montilla's (1)**
159:14
**more (28)**
10:23;12:24;24:10,
13;73:2;75:23,23;
96:16;97:14;114:1,3;
120:7;123:15;137:8,
18,22;138:12;140:10;
146:16;162:4;176:21;
244:9;283:2,3;
297:15;307:9,11,12
**morgue (1)**
255:6
**morning (9)**
6:22,23;13:23;
179:6;181:15;188:25;
232:23;240:24;
340:25
**most (2)**
102:11;103:16
**mostly (2)**
85:21;111:10
**mother (1)**
66:4
**motion (5)**
355:8,24;356:5,24,
25
**motions (1)**
389:21
**motivated (1)**
143:2
**motive (11)**

96:24;97:1,5;
101:22;171:23;
255:14,16,19,20,23;
275:16
**motives (1)**
308:3
**mouth (1)**
221:19
**move (4)**
12:15;42:18;43:16;
161:25
**moved (2)**
71:19;110:13
**moving (1)**
110:4
**much (17)**
103:3;138:19;
139:22,22;170:12;
213:10;217:18,22;
219:19;249:24;258:8;
260:16;268:10;
325:25;353:8,11;
364:17
**mug (2)**
106:22;107:2
**murder (22)**
17:20;53:9;57:10;
189:22;215:25;231:6;
233:8;253:21;259:5;
265:16;273:20;
287:15;296:24;
300:10;303:4,23;
304:1,7;305:1;307:9;
310:19;369:12
**murdered (1)**
311:12
**murders (36)**
18:18;187:19,24;
188:2,7,22;190:2,6,
15;215:12,14;218:11,
15,18,23;225:21;
226:5;231:24;240:10;
263:13;266:14;267:1;
288:12,17;290:24;
291:6;293:7,12;
294:20;295:9;300:12;
304:12,15;305:8;
309:25;327:19
**must (7)**
142:15;235:6;
318:11;319:4;370:4,
7;378:10
**mustered (1)**
69:22
**myself (6)**
231:17;233:19;
268:24;311:6;315:7;
325:16

**N**

**N-303737 (1)**
277:17

**name (58)**
5:11;6:24;7:3,9;
15:11,15;18:25;19:3;
25:7;63:11;100:25;
103:16;156:9;157:23;
186:1,12,16;187:12,
15;205:1,4,10;206:4;
220:23;243:15,20;
247:1;256:7;267:4,
11;269:5,9,16;270:4,
18;272:13,21;273:7;
274:22;276:6;304:4;
317:24;319:10,11;
321:19;341:9,11,14;
347:25;352:23;
355:21;367:18,23;
372:25;373:2,11;
374:9,16
**named (8)**
7:1;13:11;76:17;
82:4;84:19,21;
101:12;276:14
**names (7)**
186:21;256:16;
257:3,7;260:10;
292:22;372:23
**narrative (7)**
86:17;253:23;
259:7,8;260:24;
267:14;332:9
**naturally (1)**
10:4
**nature (3)**
25:19;70:16;132:12
**near (2)**
67:4;179:22
**necessarily (5)**
160:1;312:5,7;
370:5;371:16
**necessary (1)**
234:7
**neck (2)**
223:15,25
**need (40)**
9:19;12:20,23;
16:10,13;39:10,17;
41:8;65:13;89:12;
95:18;118:11;119:4,
5,7;146:1,4;150:9,10;
155:21;162:24;
167:14;238:18,20;
239:12;241:18;
242:22;249:23,25;
268:9,10;283:13,24;
285:21;307:12;313:3;
348:24,25;360:7,10
**needed (12)**
18:19;22:3;95:19;
119:4;148:14;182:19,
23;208:25;230:10;
242:12,12;389:18
**needs (3)**
120:23;121:10;

182:18
**new (14)**
98:23;161:25;
163:6,8,15,21;164:5,
8,9;311:2;312:4,10;
325:11;368:9
**news (1)**
53:12
**newspaper (7)**
20:11,13;52:23;
53:1,6;57:6;135:5
**newspapers (1)**
52:25
**next (22)**
52:23;187:23;
188:1;189:4;199:5,6;
226:12,15;255:1;
256:1,18;264:2;
272:12;275:5;276:16;
293:23;307:23;
313:13,20;316:18;
333:22;339:25
**nickname (2)**
7:17;186:4
**night (5)**
179:7;220:6;
226:11;231:23;
232:22
**nine (3)**
277:19,23;309:5
**Nobody (4)**
37:14;123:18;
322:12,13
**noise (1)**
12:2
**none (3)**
102:13;186:21;
288:19
**North (13)**
179:5,21;195:10;
209:19;221:15;259:5;
261:8,11;264:6;
285:24;286:2,6;
352:12
**Northern (1)**
5:4
**notation (1)**
159:13
**notes (5)**
151:23;195:22;
214:8,18,21
**notice (2)**
167:6;214:17
**notifications (1)**
276:16
**Notre (2)**
68:1,2
**November (12)**
17:4,9;18:8;23:9,
11,12;24:16,25;26:3;
32:2;388:17;394:4
**November-ish (1)**
30:13

**numb (1)**
12:16
**Number (32)**
5:5;20:4;29:13;
83:4;135:18,21;
154:1;156:10,12,17;
157:7,9;159:11;
163:18;170:2;180:13;
241:7;248:16;251:6;
263:3;264:16;315:17;
352:24;354:10,16,19;
361:4;368:8,9;371:2;
377:12;378:15
**numbering (1)**
249:19

**O**

**oath (8)**
8:24;9:1,2,5,8;35:4;
392:22,23
**object (199)**
18:1;20:6;23:6;
28:5,7;35:5;36:17;
37:23;40:7;41:6,23;
44:23;46:22;47:4;
52:19;53:4,19;54:12;
56:10;57:12;60:11,
23;61:25;65:12;
72:18;74:22;75:7;
82:24;83:10;85:13;
87:21;88:2,3;89:8;
90:3;96:4,10,18;97:9,
16,22;99:5;105:11;
107:11,19,24;108:5,
11;109:5,19,20;
113:12;118:6,7,25;
119:8;120:21;121:14;
122:1,6,19,21,25;
123:23;125:1,2,13;
127:16;128:9,17;
129:7,13,22;130:5,12,
18,25;131:12,19;
132:5,17;134:6,12,13;
135:11;137:3,14;
138:6;139:14;140:19;
141:15;142:6,7,18,19,
20;143:6,19,20;144:7,
15,17;145:6,12,23,24;
146:24;147:24;148:8;
149:3;154:13,24;
156:2;160:5,23;
161:8;164:12;168:23;
169:16,17;170:14;
172:3,15;173:3;
177:1,15,23;178:8,20;
182:12;189:12;
201:19,24;203:1;
210:8;211:6;213:11,
17,25;215:6;216:1;
243:17;255:4;263:14,
22;265:24;269:19;
270:24;273:12;

285:14;286:7;288:7;
296:14;297:7,12,20;
298:5,16;299:19;
300:24;301:22,23;
302:6,7;307:1,13;
308:19;309:9;310:7;
313:15;316:7,8,13;
318:17,25;319:6,16;
320:9;321:14;322:23;
326:16;335:4;336:11;
337:19;338:17;341:2;
344:8;346:20,21;
350:10;354:12;355:2;
364:13;374:11;
382:15,19;384:1;
386:12;394:18
**objecting (2)**
39:9,12
**Objection (136)**
22:22;29:7;32:17,
20;33:11,15;34:17;
35:17;36:24;37:8;
38:7,23;39:13,15,18;
40:21;42:5;43:8,23;
44:5,12;45:6,13;46:1,
14;48:17;49:10,17,
24;50:18;51:4,12,21;
54:22;55:8,10,22;
56:4,23;57:19,20;
58:4,6;61:8,9,10,17;
67:10;79:1;86:22;
88:23;90:13;92:13,
14;93:20,22;97:7,8;
106:10;107:4,5;
109:25;122:2;124:6,
19;126:13;127:4;
131:5;133:1;136:2,
20;138:24,25;139:1,
24;140:22;147:9;
152:23,24,25;155:14,
15;202:6;207:23;
216:25;229:23;
257:16;265:19;
287:10,16;288:23,24;
293:13;297:13;
299:24;301:6,15;
302:18;303:6;305:3;
308:18;315:20;
316:14;320:3,24,25;
322:1,19,21;323:8,20;
324:1,2;345:20;
346:8,9;348:17;
349:16;350:21;359:5;
369:18;370:15;
371:14;373:19;374:5;
384:10,23;385:4,16,
24;387:21;390:16;
392:7,16;393:3
**objections (18)**
35:23;39:7;41:4;
52:1;55:15;57:24;
58:9;88:11,22;92:24;
93:4;126:19;127:9;

324:11;374:19;
380:10,12,16
**obligation (2)**
128:15;129:5
**obligations (1)**
35:20
**oblige (1)**
193:7
**obliged (1)**
198:2
**obvious (1)**
272:19
**obviously (1)**
10:20
**occasion (12)**
82:3;129:11;
174:13,22;175:8,18;
176:25;177:13;
191:13;200:6;219:5;
226:7
**occurred (10)**
148:13;173:10,11;
174:2;215:23;254:13;
263:4;296:3;379:5;
381:16
**occurrence (1)**
260:11
**occurs (4)**
168:2;169:7,7;
373:3
**Off (35)**
15:19;54:10;65:14;
66:11;75:11;91:20;
105:22;106:25;115:1;
133:8,21;165:2,18;
175:23;181:10;184:2,
4;207:12;209:10;
217:7;272:2;274:19;
282:23;305:19;329:2,
7,21;330:15;332:5;
348:23;355:16;366:2;
369:7;386:21;396:25
**offender (1)**
277:12
**offenders (3)**
275:14,15;338:11
**offense (6)**
149:8,17,18,20;
150:13;253:8
**offenses (2)**
306:10,12
**offered (1)**
390:7
**office (11)**
27:10;71:6;112:20;
114:2,11,19;204:12;
249:4;334:1;389:15;
390:5
**officer (39)**
21:21,25;35:8;
37:18;75:18;80:18,
25;118:4,23;119:18;
120:9;129:3,11,12,20;

130:1;142:4;168:13;
178:13,14,17,18;
258:1;269:14;273:5,
11,24;274:1,11;
304:5;319:24;324:10,
20;325:3;326:13;
342:25;343:13;345:6;
363:15
**officers (22)**
6:9;31:16;53:8,13;
94:11;128:16;181:4;
187:10;268:25;269:1;
323:23,24;324:8;
325:7,8,19;344:3;
363:11;367:23,24;
371:24;372:23
**often (1)**
142:14
**old (11)**
10:11;65:8;71:4;
254:11;283:13,18;
295:6;311:3;320:21;
321:6;373:21
**Older (1)**
276:1
**oldest (1)**
66:23
**omit (1)**
10:3
**Once (30)**
13:20;24:10,13,14;
25:12;31:19;73:2,3;
97:15,17;99:13;
103:12;129:16,17,18;
147:22;150:11;
154:16;163:4;164:1,
1;171:17;172:21;
178:17;182:16;215:1;
286:14;358:14;
359:15;373:20
**on-duty (2)**
14:11;360:14
**one (85)**
7:4;9:22;13:9;
16:19;24:11,13;
27:23;30:24;31:13,
14;39:16;54:1;60:3;
61:22;69:11,15;
76:20,23;77:2,6,15;
89:17;94:9;100:4;
103:15;112:18;
118:11;119:2,4,5,7;
120:7;123:15;127:14;
134:21;135:21;
141:18,18;160:3;
161:6;162:2;163:3,9;
165:21;167:5;169:22;
173:21;176:19;181:6;
193:11;217:3;231:11;
235:10;237:15,16,19;
238:2;242:3,18;
244:5;251:23;252:8;
264:12;266:24;

275:10;282:5;284:7,
24;289:14;293:24;
303:20;307:23;
339:18;342:4;345:16;
351:12,14;352:11;
359:9;361:10;362:23;
376:6;377:13;384:9;
392:21
**one-on-one (1)**
30:25
**ones (1)**
282:4
**one-way (3)**
116:8;121:19,19
**on-foot (1)**
80:20
**ongoing (1)**
218:14
**only (29)**
14:1;37:12,15;
102:11;117:14;175:4;
211:13,14;213:9;
230:22;262:5;264:14;
290:2;325:24,25,25;
342:1;349:22,25;
350:15;358:7;360:17;
371:11;372:14;
373:20;384:13;
387:25;390:3;395:7
**on-the-job (2)**
96:17;102:24
**onto (1)**
332:9
**open (11)**
33:6,20;55:4;
114:18;157:12;
172:11,20,23;173:2;
174:5,7
**operandi (1)**
101:22
**operator (1)**
70:1
**opinion (1)**
22:8
**opportunity (10)**
11:5;21:1;24:17;
70:15;73:25;111:13;
146:10;191:17;
225:20;239:8
**OPS (9)**
361:5,7,21;363:11,
19;364:1,3;371:21,24
**orally (1)**
265:10
**order (2)**
217:6;331:25
**orders (1)**
69:2
**organized (3)**
104:9;157:6,9
**orient (1)**
309:21
**original (10)**

91:14;149:14,15,
21,23;150:2;156:4;
161:14;343:9;358:2
**osteoarthritis (1)**
12:14
**others (6)**
95:10;106:4;
135:15;137:8,23,25
**otherwise (5)**
54:2;363:12;364:1,
2,11
**ourselves (1)**
193:21
**out (72)**
18:20;19:21;21:16,
17;22:9;35:7,14;36:5,
12;46:3;56:19;69:22;
70:21;71:7,13;73:22;
75:19;95:21;96:21;
103:13;147:19;148:2,
14;150:4;151:7;
156:18;157:23,24;
158:16,23,23;159:1,
19,21;160:6,7;161:5,
13;162:1;168:18;
170:12;171:13,20;
195:13;197:18;198:7;
200:12;214:4;224:1;
232:20,22;250:11;
251:18;259:16,16;
264:25;265:23;297:1;
308:6;310:18,23;
312:22;313:3,6,13;
323:6;360:1,8,11;
365:19;386:19;
387:12
**outcome (2)**
106:19;363:5
**outcomes (1)**
359:4
**outside (7)**
30:18;31:4;34:2,3;
36:3;47:7;390:1
**over (20)**
20:22;23:7,10;
29:23;34:2;45:17;
62:7,13;66:18;76:18;
153:22;154:4;179:20;
185:15;257:4;276:2;
311:9;322:16;325:20;
326:10
**overtime (2)**
251:12,12
**own (9)**
84:6;103:5;181:22,
24;189:20;235:21;
318:3,4;393:16

**P**

**page (35)**
76:19;248:5;250:2,
22;251:13,25;252:15;

253:17;255:1,3;
256:1,18,18;257:1,3;
264:2;266:4;269:2,4;
272:4,5,12;275:6,8;
316:18,19;332:10;
337:7;352:9,14;
367:12;372:10;376:8,
10,11
**pages (3)**
242:25;243:2;
268:16
**paid (3)**
138:14;251:12;
358:25
**Papa (17)**
25:8,11,13,20;26:2,
16,22;27:2,6,14,24;
29:20;388:14;389:12;
390:25;394:24;395:5
**paper (20)**
19:3;20:10;148:7;
151:24;159:16;
274:16;317:1;318:11,
23;320:17,22,23;
321:9,13;327:21,22;
369:16;370:23;
395:10,11
**papers (1)**
342:3
**paragraph (17)**
263:8;265:6;
278:24;279:2,3,4;
285:1;293:21,23;
314:17,19;315:6;
316:20;328:1,4;
329:15;339:25
**paraphrase (2)**
22:16;26:6
**Pardon (54)**
13:16;24:12;58:24;
65:23;70:20;75:2;
78:13;89:3;122:20;
134:2;141:20;157:8;
164:7;167:17;171:9;
192:13;197:5;201:12;
205:20;209:6;226:14;
230:7;235:18;242:8;
244:25;267:22;
272:23;276:10;279:1,
23;291:25;323:4;
326:25;340:7;342:21;
348:16;349:24;354:2,
18;355:1;357:5;
361:19;362:8;365:11;
372:7,15;373:1;
374:13;375:10,25;
376:9;377:14;390:12,
21
**parentheticals (1)**
262:7
**parents (1)**
58:23,25;66:16
**Park (3)**

141:23;144:14;
145:3
**parked (1)**
232:17
**part (27)**
66:25;76:4;87:16;
92:6;93:17;95:25;
99:20;111:3;116:24;
121:4;138:22;139:4,
8,11;146:13;148:17;
170:10,11;171:25;
215:16,16;266:8;
267:8,12;271:2;
372:3;387:4
**participants (10)**
116:4,15,16;
117:19;118:5,19,24;
119:21;120:10;
121:11
**participate (4)**
343:8;345:9;
366:17;373:9
**participated (7)**
210:18;271:1,4;
277:4;317:12,12;
341:14
**participating (6)**
16:18;117:25;
118:13;123:25;343:3,
9
**particular (6)**
71:16;76:4;86:21;
139:23;184:21;220:3
**particularly (1)**
134:11
**parties (3)**
16:20;58:14;212:12
**partner (5)**
80:22,24;99:12;
103:10;133:6
**partnered (1)**
372:9
**partners (2)**
325:25;326:2
**parts (2)**
135:10;264:15
**party (2)**
16:25;26:20
**pass (1)**
180:17
**passed (2)**
328:21;329:21
**passenger (1)**
181:10
**past (4)**
61:4;165:12;174:3;
184:20
**Patrol (9)**
70:11;80:15,18,19,
20;81:19;83:18;
91:10;134:14
**Paula (1)**
368:24

**Paulnitsky (80)**
30:19;77:1,4;
105:18;175:7,9,14,19;
177:21,22;191:23;
192:2,6,14;193:3,15,
16,23;194:4,9,12,19;
196:12;197:1;198:18;
199:23;205:8;216:9;
220:14,15,19;221:8,
20;222:7,11;223:10,
14,17,20,24;225:5,19;
226:10;228:9;231:17;
232:9;233:20;235:25;
236:10;240:19;
266:22,24;268:23;
279:18,21,25;281:5,
10,18;284:12,13,17,
19,24;300:13;304:3,
17;313:22;314:5;
315:11,14;326:20,22;
327:2;329:11;336:5;
381:16;382:1;389:1,
14
**Paulnitsky's (1)**
222:22
**pay (4)**
71:21;83:24,25;
84:3
**payment (1)**
358:17
**penalty (1)**
297:5
**pending (3)**
340:20;361:3,22
**people (25)**
31:4;60:18;63:8,23;
64:2;70:8;78:24;83:8;
115:14;117:6;121:23;
122:14;123:25;146:4;
168:2;179:21;253:10;
259:17;286:10,10;
322:16;323:6;386:20;
388:22;389:16
**percent (1)**
319:25
**performed (1)**
321:19
**performing (1)**
82:15
**period (7)**
24:15;103:14;
168:21;234:19;245:7;
311:9,21
**perjury (2)**
9:13;390:4
**perks (1)**
84:4
**permanent (13)**
252:10,25;345:19,
23;346:1,16,18,25;
347:3,6,12,14,18
**permissible (1)**
161:19

**permission (1)**
40:6
**permitted (4)**
130:10,21;132:22;
164:10
**perpetrator (2)**
97:25;143:1
**person (23)**
14:5,6;15:12,17,24;
25:7;78:19;86:14;
150:8;160:19;171:13,
15;204:14;274:23;
277:14;299:17;
349:22,25;350:15;
370:20;372:21;
378:21;379:4
**personnel (4)**
216:11,16;256:2,4
**persons (2)**
277:13;378:23
**pertained (1)**
62:13
**peruse (1)**
356:9
**Philip's (1)**
67:24
**phone (3)**
25:14;113:17;379:4
**photo (7)**
106:9,13,16,19;
107:16;109:16,18
**photograph (3)**
180:24;248:6;
372:21
**photos (2)**
113:19;114:7
**Physical (5)**
79:12;132:3,12,15,
15
**physically (2)**
339:16;345:10
**pick (1)**
113:16
**picked (1)**
252:8
**picture (1)**
181:3
**piece (10)**
19:3;151:24;
159:15;318:23;
320:22,23;321:9,13;
327:21;369:15
**pieces (2)**
10:21;274:15
**pistol (1)**
277:23
**place (16)**
27:8;63:17;158:1;
173:1;193:10;195:3;
200:10;211:3;221:25;
233:16;234:3;264:7;
296:17,19;310:5;
311:25

**plain (1)**
103:7
**plaintiff (4)**
5:18;6:25;8:17;
378:22
**plaintiff's (1)**
379:1
**play (4)**
218:9;268:8,12,21
**played (4)**
269:17,22;270:5,8
**plead (15)**
38:5;41:18;42:3,3,
24,25;44:22;45:11;
49:16,20;50:11;
51:18,20;53:17;55:5
**pleading (1)**
53:13
**please (18)**
5:15;6:14;34:8;
42:15,22;88:16;
180:19;191:15;
253:16;260:16;349:6;
367:2;375:19;377:16;
378:20;379:2,8;388:8
**pled (1)**
56:9
**pm (17)**
75:12,15;165:3,6;
217:8,12;247:5,7;
267:19;305:20,24;
330:22;332:16;
333:22;386:22;387:1;
397:2
**point (38)**
9:15;10:11,25;12:4;
23:24;24:7;32:13;
33:19;39:19;57:7;
62:16;66:5;82:6;
100:11;101:22;104:8;
117:24;132:10;
169:10;171:14;
173:20;174:17;182:6;
190:25;212:16;213:1;
223:15;226:23;
227:22;236:3,9;
271:18;289:8;307:24;
321:12;326:12;362:2;
371:11
**points (1)**
176:1
**police (91)**
14:11,18;21:3,21,
25;26:10;30:14;
31:15;53:13;58:14,
15;64:16,18;70:3,4,6;
72:16;73:4,18;74:25;
75:4,18;76:1,1,8;
77:20;78:2;79:6,14;
80:5,8;86:12;96:1;
112:9;118:4,22;
119:18;120:9;124:24;
125:12;126:12;

128:12;129:3,10,20;
130:1;138:18;139:12,
21;152:22;178:13,14,
17;179:11;187:9;
216:10,16;262:23;
264:20,25;286:20;
319:23,23,25;322:15;
323:23,24;324:8,9,20;
325:3,7,8,9,19,19;
326:8,13;358:25;
360:14,15;363:1,8,10,
15,23,24;370:10;
371:3,24;383:24
**policeman (3)**
73:10;325:1;351:5
**policemen (2)**
325:9,11
**policies (7)**
124:24;125:12;
126:11;129:5;152:22;
161:19;164:20
**policing (4)**
79:21;80:1;134:10;
138:20
**Polk (1)**
69:4
**Pong (2)**
366:5,5
**Pontiac (1)**
276:1
**portion (4)**
103:11;116:2;
165:22;198:21
**position (4)**
72:15;83:18;
191:21;389:20
**positive (1)**
225:13
**possible (10)**
88:1,9,21;89:7;
150:23;175:12,13;
184:17;272:13;
288:17
**post (1)**
72:8
**potentially (1)**
171:11
**practice (1)**
125:22
**practices (1)**
164:21
**preceded (2)**
234:23;330:7
**Preceeo (8)**
260:25;261:1,2,5;
262:5,23;263:1;264:5
**Precis (1)**
264:5
**precise (2)**
137:1;138:3
**prefer (1)**
7:4
**preparation (4)**

62:16,22;299:12;
385:2
**prepare (26)**
28:20;62:5,12;
87:17;90:8;148:19,
21;150:12;152:7;
153:17;154:6,7;
165:17;195:17;
199:21;214:6;225:3;
286:22,25;297:19,23;
303:12;350:3;363:16,
17;383:4
**prepared (19)**
47:23;153:7,9;
165:23;200:3;214:23;
255:23;266:14;287:3;
299:10,14;303:1,4;
311:1;312:12;350:6;
372:20;384:22;
385:16
**prepares (1)**
251:8
**preparing (10)**
28:3;92:4;114:13;
199:23;224:20;268:8,
22;299:17;300:7;
379:21
**present (53)**
5:19;26:15,20;
27:13,17;63:8,23;
94:12;189:9;193:13;
197:13,16;203:19;
207:1,20;210:21;
222:6;226:22;227:1,
3,18,22;228:21;229:2,
21;230:3;233:18;
234:22,24;235:10;
240:18;241:4;242:6,
9;284:8;296:2;
305:22;330:6,13;
331:7,11,18;332:20;
333:1,7,11;334:6;
336:20;337:10;
338:22,22;349:12;
377:10
**presently (1)**
65:9
**presumably (1)**
266:15
**pretended (1)**
124:4
**pretrial (5)**
17:6;355:24;
356:13;357:3,6
**pretty (5)**
171:25;255:10;
260:4;297:11;358:3
**previous (4)**
260:19;315:11,15,
19
**previously (7)**
29:6;205:7;221:3;
258:10;264:3;279:11;

392:3
**primarily (2)**
198:10;349:12
**prior (64)**
18:7,13;19:24;20:2,
16;22:14;23:2,9,11,
14;26:23;28:22,24;
29:1;30:5,8;64:7,12;
98:15;139:25;174:23;
175:9;185:2,6,8,17,
23;186:1,10,16,23;
187:4,8,13;196:12;
200:17;225:18,24;
237:8;242:15;263:9;
271:18;281:21;286:9,
18;288:12,14;292:24;
293:5;294:2;303:5;
304:16;313:4;314:7;
340:24;350:11,22;
358:23;381:16;
391:20;393:1;394:15,
23;395:4
**prison (1)**
323:6
**prisoners (1)**
70:16
**private (1)**
114:19
**privileged (2)**
50:19;56:24
**probable (1)**
305:8
**probably (22)**
8:7;23:18;96:20;
123:11;138:8;141:8,
8;198:23;204:12,25;
207:19;222:8;224:14,
15;226:9;245:25;
246:1;298:9;302:4;
373:11;378:6;380:12
**probe (1)**
228:6
**problem (1)**
256:24
**procedure (1)**
121:4
**procedures (2)**
109:2;129:5
**proceeding (1)**
17:2
**process (9)**
8:14;82:9,23;98:24;
101:24;146:23;147:7;
160:19;391:7
**professional (1)**
35:11
**program (2)**
93:14;94:15
**progress (11)**
114:5;150:14,25;
151:15;152:1,10;
153:5,7,11,13;154:1
**promises (1)**

207:2
**promoted (7)**
82:11,14;83:14,22;
84:13;98:17;105:8
**promotion (1)**
83:19
**pronounced (1)**
7:5
**proper (4)**
126:21,24;131:10,
16
**property (23)**
99:21;100:16;
104:7,15,17,21;110:8,
13,17;112:6,7;
113:24;114:2,10,15;
115:2;141:7;145:22;
146:5;175:14;176:6,
10,13
**prosecuting (1)**
389:16
**prosecution (4)**
18:8;354:20;
389:19;390:3
**protect (2)**
70:7;182:18
**protection (2)**
358:17,20
**prove (1)**
371:1
**proven (1)**
371:2
**provide (6)**
243:15,20;263:12;
335:10;379:2,6
**provided (8)**
10:23;100:7;
210:17;287:14,21;
288:20;308:16;356:4
**provides (1)**
265:15
**providing (1)**
338:15
**proximity (1)**
90:9
**public (2)**
204:11;394:12
**publication (1)**
53:13
**Puerto (9)**
58:20,21,25;59:8,
11;60:1;61:23;65:20;
260:2
**pull (5)**
155:21;156:18;
163:23;171:19;353:1
**pulled (1)**
369:11
**purport (2)**
238:16,22
**purportedly (3)**
189:9;331:14;
340:23

**purports (1)**
207:3
**purpose (6)**
120:17;201:8;
203:25;220:16;
232:13;251:10
**purposefully (1)**
10:3
**purposes (2)**
89:9;150:18
**put (66)**
14:14;39:13,18;
50:6;71:5;74:12;
78:11;81:3;91:2;
106:8;115:13;119:5;
124:12;125:23;132:9;
147:19;150:15;
152:14;153:17,18,18;
155:2;157:23;159:1;
160:8;161:1;162:25;
163:17;165:19;166:5;
180:13;221:18;
237:13,13;244:6;
249:3;251:5;259:19;
267:11;269:13;273:7,
20;274:10,11,12,15;
278:11;296:25;304:4;
317:11;318:11,15,22;
322:12,13;323:18;
324:20;343:10,12,18;
345:17;364:5;371:21;
374:9,16;390:15
**puts (2)**
153:23;319:3
**putting (4)**
159:14;318:1;
319:14,20

## Q

**qualify (1)**
10:12
**quarrel (1)**
357:15
**quash (3)**
355:8,24;356:5
**question/answer (1)**
234:1
**question's (1)**
89:16
**quick (3)**
327:13,15,17
**quiet (1)**
11:25
**Quite (2)**
337:15;364:23

## R

**Racine (1)**
81:24
**radio (4)**
70:1;179:10,20;

181:18
**raise (6)**
6:13;83:24,24,25;
84:3;212:21
**raising (2)**
212:15,18
**ran (2)**
158:2;352:23
**rank (3)**
70:18;136:17;138:2
**ranked (1)**
83:8
**rap (2)**
353:25;354:3
**rape (1)**
99:23
**Rappaport (2)**
5:13,14
**rate (1)**
82:16
**rates (5)**
134:18,21;135:14,
17,22
**rather (1)**
309:2
**RD (8)**
156:10,12;157:6,9;
159:11;163:17;251:5;
277:17
**re (1)**
388:25
**reached (1)**
387:12
**read (73)**
8:7;20:10,12;42:23;
52:23,25;53:1,6,9,11,
11,12;57:6;135:4;
138:14;196:10;
207:12;237:23;
238:14,18,19,20,23,
24;239:9,12;255:15;
257:9;261:3,3;264:3;
277:8;278:24,25;
279:2;282:14,14;
283:24;285:1;293:21;
295:6,13;302:23;
303:2,3;313:6,12;
314:19;315:6;318:7;
327:25;328:3,4,8;
336:14,16;340:1,3;
368:20;372:2,13;
375:18,23;378:11;
381:22;382:10;383:7,
9;384:14;389:9;
391:17;392:2;396:2
**Reading (18)**
28:21;238:25;
258:14;263:7;265:5;
271:14,17;286:14;
294:6,7;303:15;
317:18;328:11;
381:22;391:4,18
**ready (3)**

43:12;165:18;166:1
**real (2)**
61:6;85:3
**really (10)**
60:22;78:11;81:7;
123:9;124:15;138:19;
294:25;341:20;
353:11;382:8
**reason (11)**
12:23;120:9;
255:20,21;292:25;
293:5;356:3;357:15;
374:9,15;395:8
**reasoning (1)**
119:13
**reasons (1)**
119:17
**recall (115)**
7:20;13:14;15:4;
16:7;23:22;24:23;
25:15,18;26:7,9,25;
27:15,20;29:18;
30:22;57:8;64:22;
65:25;100:23,25;
105:19;174:9,20;
175:11;179:16,19;
183:11,15,21;184:11;
186:15;191:3;196:17;
197:2;209:20,23;
210:25;211:5,7,15;
212:10;213:12;
217:18;218:13,17;
219:6,19;220:4;
221:12,16;222:7,8,10,
14;223:5,9;225:10,
14;226:18,24;227:25;
228:14,24;229:6;
231:8;232:21;234:3,
13,21;235:24;236:3;
240:20,25;241:21,25;
243:13,16,21;244:16;
245:19;250:21;
272:11;281:6,7;
282:7;283:10,13;
290:5,8,9,13;292:7;
295:5,11;299:1,8;
313:21;314:10;327:4,
16,20;333:3;355:23;
366:1,19;368:15;
372:5;383:6;384:7,
25;387:23;388:1,4;
389:12;391:21
**receive (8)**
79:14,20,25;84:25;
95:3,8;188:6;365:22
**received (19)**
17:18;18:22;19:12,
16;21:11;22:2;78:2,9;
86:11;87:13;89:18;
91:5;92:3;93:13;94:1,
5;102:23,24;368:22
**receiving (11)**
18:7,13;20:2,16;

23:2,9,11;25:2;97:12;
263:8;265:8
**Recess (5)**
75:13;165:4;217:9;
305:21;386:23
**recognize (12)**
18:25;205:21;
238:6,9;246:18;
248:7;253:7;257:7;
367:8,10;376:5;377:1
**recognized (1)**
221:2
**recollect (1)**
181:1
**recollected (1)**
282:3
**recollection (45)**
10:18;15:13;17:1;
105:24;198:25;201:2;
210:13;211:23;
218:22;227:18;
228:10;231:5;237:4;
243:8;246:3;254:17;
256:10;257:10;258:9;
260:18;263:7;265:5,
8;270:14;281:14,15,
17;282:9;284:1,23;
285:17;291:13;
293:18;294:3,11;
309:20;317:16;328:9;
334:11,21;342:5;
348:20;356:12;
368:11;382:17
**recollection's (1)**
313:19
**recommendation (1)**
361:12
**recommended (1)**
361:14
**record (37)**
5:2,15;15:19;39:14,
18;65:13,15;66:11;
68:3;75:12,15;
105:22;165:3,6;
171:19;175:23;
180:13;217:8,12;
252:19;305:20,24;
332:5;346:1;348:23;
352:7,9,15;353:21;
355:16;366:2;386:22;
387:1;390:16,17;
394:12;397:1
**Records (1)**
156:12
**record's (3)**
100:5;116:22;120:7
**Recovered (1)**
277:17
**reduce (1)**
139:13
**refer (3)**
91:19;162:24;
239:12

**reference (1)**
209:18
**referenced (6)**
15:2;155:25;157:2;
264:4;379:11;381:14
**references (1)**
272:12
**referred (1)**
264:16
**referring (2)**
206:1;379:7
**reflect (2)**
344:3;350:4
**reflected (8)**
174:7;241:23;
286:23;287:4;288:5;
347:23;357:16;
396:12
**reflecting (2)**
287:8;297:19
**reflects (1)**
348:7
**refresh (5)**
291:13,14;295:12;
314:14;382:11
**refreshed (4)**
16:10;285:17;
309:20;313:19
**refresher (3)**
365:5,17,18
**refreshes (4)**
282:9;283:25;
295:15;356:12
**refused (1)**
283:3
**regarding (3)**
258:22;293:11;
388:22
**register (5)**
360:23;366:4,10;
367:8;368:12
**registered (1)**
368:22
**Registration (1)**
52:9
**regs (1)**
124:24
**regular (5)**
21:5,8;79:9;122:4;
198:23
**regularly (1)**
59:16
**regulations (1)**
363:9
**reinstated (1)**
365:3
**related (9)**
14:17;163:16;
189:21;215:14;
225:20;261:13;264:7;
292:14;365:10
**relates (7)**
92:4;94:5;175:22;

189:1;215:24;216:14;
226:16
**relating (1)**
78:18
**relationship (1)**
31:9
**relax (1)**
349:3
**released (3)**
394:8,9,12
**relevant (3)**
78:25;93:19;160:2
**rely (2)**
340:17;382:12
**remain (11)**
33:6,8,22;34:13;
36:15;37:11,15,20;
40:18;43:21;391:5
**remedial (1)**
365:9
**remember (256)**
10:21,23;11:1;13:7,
8,9;15:11,14;16:5,17,
19;19:2,13,15;24:8;
25:5,19;26:12;32:6;
66:8;71:5;76:7;78:1,
8;81:10;86:10;90:21;
91:4;94:4;98:5,9;
100:13;102:9,11;
103:15,15;104:23;
110:14,22;133:9;
136:5,6;137:1;138:5;
140:16;141:11;
145:10;150:16;
157:19;158:14;176:8;
179:17;183:1,3,4,5,
16;184:9;186:23;
187:3,7;192:15;
194:3;195:14;196:2,
24;197:3,6,7,9,12,19,
21,23;199:12;200:1,2,
20;205:4,6,10;210:16,
20,23;211:18;212:15,
18;213:14,20;219:21;
220:2,5;221:13,17,19,
22;222:11,14;223:2,6,
10,14,17,20;224:16,
20;226:13,15,22;
227:1,3,6,14,22;
228:6,15,16,18,21;
229:2,8,21;230:2,15,
20;231:11,15;232:14,
21;234:22;236:7,9,
21;239:21;241:1;
242:4;244:8,10,11,17,
24;245:2,9,14,14,17,
20;246:8,23;248:12;
250:7,21;254:22;
266:24;271:14,17;
272:8,21;274:6;
276:7,13,20,22,23;
279:14;280:2,3,6,15,
23;281:8;282:13;

283:6,14,17,21;285:2;
286:1,4,13;292:4,8;
295:4,5,7,7,8,14,19,
20,23;296:7;298:23;
299:2;303:15;314:3;
316:24;326:18,23,24;
327:1,5,18;328:15,17;
329:4,5;331:7;334:8,
14,25;343:3;348:1,2;
354:23;356:14,15,16;
357:22,23;358:4;
359:20;364:21,23;
366:4,9;372:2;
373:21,25;376:21;
377:10,11,17,19;
380:3,20,22,23;381:1,
3,18,25;382:2,8,10,
11;384:7,9;385:3;
387:3,10;391:23;
393:6,13,19,19
**remembered (6)**
16:15;19:8;199:15;
291:18;292:12;348:3
**remembers (1)**
303:9
**remove (1)**
161:20
**rep (1)**
71:20
**repeat (9)**
17:8;88:15;119:23;
163:10;165:21;
186:25;191:15;
192:23;288:13
**rephrase (5)**
9:18;28:19;56:12;
125:4;268:18
**replace (1)**
335:15
**replies (1)**
194:2
**Report (226)**
78:6,7,8,10,14;
79:9;82:17;86:7,11,
18,20;87:13;88:8,20;
89:20,24,25;90:9,22,
23;91:1;106:15;
107:18;128:7,15;
129:6,11;131:9;
148:24;149:5,9,13,14,
15,17,21,24;150:2,4,
6,11,13,14,19;151:8,
13;152:1,7,10,14;
153:5,8,9,11;154:10,
11,18,19;155:12,21,
22;156:4,16;158:10,
21;159:4,14;161:14,
20;163:1,4,8,14,17,
21,24;164:2,3,6,8,9,
15;165:16,17,24;
166:13;168:10,12,14,
15,16,17;195:17;
196:1;199:4;216:22;

222:13;224:2;225:3;
231:4;250:25;251:2,
4,19;253:8,20;254:15,
18;255:3;256:13;
257:23;258:7,10;
259:1,8,12,15,19,21;
260:9,17,18,20;
265:10;266:11,13,20;
267:4,11,17,24;268:1,
5,9;269:3,11,18,23;
270:1,15,18;271:5,6,
10,14,17,20;274:10,
20,24;275:3,8;283:10,
17;291:12,14;295:6,
13;297:1,19,24;
298:9;300:19;302:4;
303:2;312:25;314:12,
13;317:8,10,13,18,19,
21,24;318:1,5,7,15;
319:4,10,14,20;320:1,
14,18;321:16,18,22,
25;322:12;323:19;
324:21;326:14;
328:12;329:14;
331:10;334:17,22;
335:6;336:8,14,17,24;
341:9,11;342:11,13,
16;350:3,19;363:16,
17,19,23,24;364:7,19;
370:7,14,25;371:6,13,
22;373:13;374:18
**reported (4)**
130:2;277:16;
285:12;333:12
**reporter (18)**
5:13;6:11,13;11:8;
39:16;88:12;119:23;
227:24;233:22;
234:24;235:2;241:2;
243:16,21;244:2;
299:5;357:10;393:11
**reporting (4)**
87:25;258:1;263:1;
266:19;268:24;
270:19,20;285:8;
307:4
**reports (80)**
26:10;28:21,24;
30:2;64:15,16,18;
65:1;78:10;79:8,9,10;
85:16;87:17;92:4;
94:10,24;114:5,14;
115:6;136:23;148:19,
21,25;149:1;150:1,16,
22,25;151:15;153:10,
20;154:1;155:24;
157:16;164:11;189:8;
196:10;199:18;200:4;
202:5;210:9;214:6;
225:15,20,25;226:17;
245:12;251:8,11;
258:20;283:13,24;
286:20;292:9;295:11;

302:24;303:3,15;
311:1;312:11,23;
318:4;321:19;338:14;
344:1;347:22;348:7;
381:10,11,22,23;
382:10,12,18;383:5,
15,21,24;384:14
**represent (10)**
5:16,25;6:3,24;
24:6,6;258:13;
356:23;387:13;
389:13
**representation (1)**
21:16
**represented (12)**
32:3;33:20;35:2;
37:5,18;45:2;50:7;
204:12;269:10;
290:19;363:2,3
**representing (12)**
5:12;38:12,16;
40:11;41:15,17;
42:13;46:17;48:19;
49:13;52:15;54:9
**re-prosecution (2)**
17:7;32:2
**requested (1)**
339:22
**required (4)**
106:18,24;107:1,8
**requirements (1)**
79:12
**reserve (1)**
396:23
**respect (2)**
35:20;67:8
**respectively (1)**
391:9
**respond (7)**
167:14;168:17;
179:23,23,25;181:23;
194:17
**responded (9)**
151:10;155:4;
181:13,22;182:22;
185:9;200:15;254:2,4
**responding (3)**
181:4;185:17;
243:10
**response (6)**
196:25;201:10,13;
209:22;210:7;365:23
**responses (2)**
222:16,18
**responsibilities (6)**
80:17;139:8,12;
148:18;188:18;189:1
**responsibility (3)**
35:11;170:11;300:7
**responsible (11)**
101:25;169:12,14,
24;188:11;190:10;
285:8;288:11,21;

293:12;299:17
**responsive (3)**
10:4;11:2;379:10
**result (3)**
360:24;365:15,22
**resulted (1)**
339:1
**retention (11)**
252:11,25;345:19,
23;346:16,18;347:1,3,
12,14,18
**retired (11)**
20:21;22:8,17;
27:21;30:15;31:11,
17;131:24,24;389:1,
13
**retraining (1)**
365:14
**retrial (4)**
28:1;30:13;387:5,7
**return (1)**
161:6
**returned (3)**
160:16,18;161:1
**returns (1)**
214:4
**reveal (1)**
22:11
**review (13)**
65:6;157:24;
225:20,25;229:12;
249:23;299:9;333:25;
372:17,20;377:21;
379:15;381:8
**reviewed (8)**
64:7,12;254:19,20,
21,23,24;286:20
**reviewing (5)**
254:18,22;270:15;
377:19;385:3
**reviews (1)**
154:22
**Rey (12)**
20:3,13,19;59:23;
60:8;76:20;77:24;
174:18;176:25;
266:21;358:8,16
**Reynaldo (3)**
5:3;29:13;338:22
**RFC-Maysonet (12)**
251:25;252:20,23;
253:6;257:20;258:25;
266:5,7,8;275:9;
316:20;342:10
**Rican (3)**
58:21,25;260:2
**Rick (2)**
358:6,11
**Rico (6)**
58:20;59:8,11;60:1;
61:23;65:20
**right (577)**
6:14;7:18;8:5,11;

11:6,15,25;12:4,10,
15,16,16;13:4;14:5,
12;15:16;16:8;19:12;
21:21;23:23;24:5,15;
27:13;29:2;30:3,8;
31:25;33:6,7;34:13,
16;35:13;36:15;37:6,
11,12,15,20;38:10;
40:2,6,15,18,19;
41:22,25;42:8;43:7,
16,21;44:4,4;46:21;
47:2;49:9;50:2,14,25;
51:11,20;52:18;
54:16;55:21,25;
57:18,23;58:3,8,17;
59:13,18;60:1;61:12;
63:13,23;65:20;66:6,
25;70:19;72:9,14;
74:19;81:8;82:7;83:7;
84:12;86:2;87:5,9;
88:9;89:16,21;90:1,
17,19;92:8;93:3,10,
14;96:24;99:9,14;
100:17;101:6;102:20;
103:8,18,20;104:10,
25;105:9;106:3,4;
107:18;108:4,10,20;
110:6,23;111:1,5,11,
13,17,21;112:1,4;
113:7,14;115:17;
116:18;117:1,7,22;
118:1,14,15,21;
120:13;121:3,10,18,
22,24;122:12;123:22;
124:1;127:15;130:11;
131:3;134:1,25;
135:4,6,15,18;136:8,
11;137:7,23,25;
139:18;140:6,6,8;
141:24;142:4,11,17;
143:5,18;144:3,6,11,
13;146:4,7;149:13,15,
21,24;151:16,24;
152:2,4,7;154:1,20;
155:9,22;156:22;
157:17;158:5;159:5,
8,15;160:13;161:20;
162:18,22;163:21;
164:3,17;165:13;
166:5,15,18,24;167:7,
11;169:3,7,10;
170:23;171:14,18,20,
23;172:2,9;174:3,18;
176:2,12,15,22,24;
178:3,18;179:2;
181:6,19;182:4,6,10;
183:1,2;184:6,25;
187:5;189:11,13;
190:24;191:18;
194:24;196:24;
197:22;198:11;199:5;
201:2,17;202:5,12,20;
204:9,12;206:8,10,15;

207:9,16;211:13,16;
212:7;213:8,22;
214:6;215:4;216:23;
218:7,23,24;219:10,
16,19,25;222:4;
224:4;225:3,5,13;
226:1;227:20;231:24;
234:7;236:1,5,7,11;
237:6;239:1,6,15,19;
240:2,4,19,21;241:1,
3,14,19;242:16;243:6,
10;244:21;247:10;
248:13;249:6;251:13,
21;254:5,11,15;
255:23,24;256:2,7,10;
258:4,19,24;259:13,
22;260:4,9,16;261:2,
6;264:9;266:17;
267:5,14;268:4,25;
270:12;271:6,7,15;
272:16;274:9;278:9;
279:18;281:10,19,22,
24,25;283:20;285:10;
288:2,5,22;289:3;
290:10,22;291:19,24;
292:10;293:7,12,19;
294:4,5,9,21,23,25;
295:2,9,13;296:3,5,
10,19;297:4,5,9,16,
19,24;298:11;300:2,
18,20;302:5;304:22;
305:11;306:7,10,14;
307:12,19,23;308:1,7,
9,12;309:7,15,19;
310:22;311:9,19,24;
312:2,8,12,16,19,19,
23;313:13,23;314:18,
20,21;316:12;317:17,
18;318:5,12,16,20,23;
321:7,10,13;322:10;
325:4,10,20;326:9,14;
327:13;328:11,13,15,
16;329:12;330:4,7,8,
11;331:5,19,21,22;
332:1,10,22;333:22;
334:11,18,23;335:2,7,
9,22,24;336:2,10,13,
21;337:1,4,11,15,17,
18;338:2,4,8,11,15,
23;339:13,19;341:6,7,
15,18;342:14,20,20;
343:15;344:7,21,24;
345:1;346:2,6,13;
347:16;349:15,23;
351:7,9;352:17;
353:3,8,12,15,16;
354:1,11,17,22,25;
355:9;357:12,17,20;
360:2,15,21;361:7;
362:3,7;363:12,17,22;
364:1,7;365:2,20,21;
368:6;369:16;370:4,
19,22;371:9,18,19,20,

22,25;372:25;373:14,
16,16;374:4,10;
380:8;382:8,13,18;
383:1,11,18,21;
385:17;386:6;387:16;
388:20;389:7;391:2,
5,17,18,20,23;392:22,
23;393:23;394:8,15,
17;395:6,9,21,23,24;
396:3,5,10,12

**right-hand (5)**
113:15,21,22;
249:15;275:9

**rights (19)**
32:5,16;33:22;35:3,
16;38:22;45:24;
196:15;212:8;278:23;
316:22,25;317:16,20,
22;391:14;394:17,20;
395:16

**ring (6)**
16:9;186:5;257:10;
258:19;265:12;366:7

**rivalry (1)**
275:16

**Rizman (2)**
5:12,14

**robberies (7)**
110:16;111:10;
136:10,11;142:14,16;
306:14

**robbery (5)**
99:23;105:1;
176:15;306:24;
307:10

**Roddy (1)**
363:4

**rogue (1)**
34:16

**Roland (8)**
77:1;177:21,22;
232:9;266:22,24;
389:1,14

**role (11)**
218:9;268:8,12,21;
269:11,17,22;270:5,9;
293:6;342:1

**roll (4)**
140:3,8;147:17;
315:23

**Roman (1)**
103:15

**rookie (1)**
99:9

**room (63)**
15:5;113:18,23;
114:6,7,24;115:4,5,
12,16,20;116:3,5,14,
16;117:1,15,18,18,25;
118:1,4,18,18,23;
119:19;120:10,15,18;
121:8;122:14;124:1;
155:20;157:11,15;

158:2;159:8,17;
160:20;172:14,24;
191:25;193:19;
196:13,16;197:18;
198:7;203:15,16;
208:7,8,10,15,18,22;
212:5;224:1;239:3,
17,22;321:24;338:21;
369:4

**rooms (7)**
113:23;114:1,3;
115:1,23;193:12;
284:7

**Rosa (7)**
246:20,21;247:17;
248:12;277:1,5;
332:23

**roughly (1)**
63:2

**rule (2)**
108:23;109:1

**rules (4)**
8:13;35:11;124:23;
363:9

**run (2)**
79:13;172:1

**running (1)**
160:20

**runs (1)**
144:14

---

## S

**safety (3)**
119:13,18;120:8

**Saigon (1)**
69:23

**Samantha (1)**
5:11

**same (57)**
9:2;11:9;33:15;
42:12;45:17;51:25;
52:24;53:1,7;55:15;
57:24;58:9;63:22,23;
64:2,2,3;76:18;83:3;
88:22,23;92:24;93:4;
109:25;112:11;
126:19;127:9;131:5;
137:17;140:22;156:7;
162:11;170:6;172:13;
175:21;177:21;179:7;
195:24;202:6;203:21;
216:13;218:7;231:22;
232:1;245:7;248:24;
261:10;299:24;307:7,
8,23;316:14;324:11;
329:20;353:13;369:6;
374:19

**Sanchez (1)**
253:9

**Santiago (1)**
253:10

**saw (31)**

13:24;19:3;30:21;
205:11,12;217:24;
218:2,8,21;219:5,9,
12,15;220:6,9;221:1;
240:8;250:6;259:18;
265:1;327:2;333:4,
10;359:17;384:8;
391:19;392:13,19;
393:1,15,25

**saying (37)**
43:15;45:4;51:9;
53:18;54:25;60:16;
65:2;91:16;121:3;
160:8;196:25;199:12;
200:21;209:21;
210:16,20;211:18;
221:13;237:24;
241:17;246:8;282:8;
283:15;292:5;295:23;
308:25;312:1;325:11;
338:4;349:23;350:16;
363:25;370:11,16,17;
371:8;395:17

**scene (44)**
86:1;95:17;130:17;
148:14;167:16,18,19;
168:3,3,10,11,12,14;
180:1;181:1,13;
182:2,10,19,23;183:4,
7,10,18;185:9,17;
187:18;188:12,24;
231:14,16,22,23;
232:14;233:5;235:4,
8;236:11;277:17;
339:23;340:6,8,11,14

**Schalka (12)**
6:2,2;92:17;126:3;
142:20;238:3;246:13;
321:2;337:22;359:5;
386:1;396:17

**S-C-H-A-L-K-A (1)**
6:3

**school (14)**
67:23,25;68:6,7,9,
16;71:9;84:14;91:11,
12,15,16;93:25;95:5

**sciatica (1)**
12:17

**score (1)**
83:4

**scream (1)**
48:3

**screaming (1)**
48:6

**seated (6)**
115:21;116:2,4,15;
117:19;120:10

**second (27)**
14:14;520:20;63:21,
24;69:15;100:4;
113:8;131:16;151:13;
162:2;163:3;217:3;
244:5;251:23;252:8;

255:3;256:25;264:12;
272:4;289:14;303:20;
314:19;335:14;342:4;
345:16;361:11;
362:23

**seconds (1)**
392:25

**secretary (1)**
249:6

**section (13)**
112:19;114:15,25;
161:25;193:11;
253:24;256:1,4;
259:7,9;260:24;
267:14;276:16

**secure (1)**
70:8

**seeing (5)**
30:22;219:21;
334:14;368:2;384:9

**seems (4)**
248:23;258:15,18;
335:19

**sell (1)**
358:24

**selling (1)**
145:3

**semi-military (2)**
70:4,6

**send (1)**
396:3

**sending (1)**
396:9

**sense (4)**
31:3;61:7;140:9;
329:9

**sent (4)**
69:22;390:24;
392:14;393:22

**separate (3)**
100:8;277:25;
364:18

**separated (1)**
115:19

**separately (1)**
252:11

**separation (4)**
361:3,12,14,22

**September (1)**
70:22

**Sergeant (97)**
30:21;76:23;77:15;
98:10,11;102:12;
105:13,17,25;147:14;
148:11;163:18;
166:22;167:13;
175:25;176:1,5,12;
181:21;182:2;188:17;
200:11,20,25;201:5,7,
13,18;204:23;206:8;
208:12,14,23;209:14,
24;210:3;212:18;
213:16;214:17;

216:18;224:3;267:18,
21,24;268:2;272:1,3;
277:11,21,23;278:17;
279:21,25;280:4,7,17,
24;282:6,12,15;
283:2;284:9,14,20,25;
285:11,19,20;286:1,
18,25;287:3;289:16,
18;290:6;291:19;
292:17,19;295:21;
298:12,14,23;299:2,
10,14,16;301:19;
305:2;308:10;312:24;
315:23;342:18;
349:12,21;350:6;
381:17;384:20

**sergeants (2)**
113:24;216:16

**serious (5)**
182:9;297:11,15;
306:9,12

**serve (10)**
69:5,22;221:8;
234:6,11,18;241:13;
244:14;285:2;290:2

**served (8)**
205:7;221:3;
227:10;228:9;242:16;
289:16;327:10;
341:17

**service (1)**
70:2

**serving (8)**
222:3;227:6,14;
235:24;245:22;
279:12;313:21;
329:17

**set (3)**
169:9,13;363:9

**setting (4)**
12:1;85:6,8;86:4

**settle (2)**
66:18;67:1

**Seven (5)**
102:6;103:11,22;
110:22;326:3

**several (1)**
311:19

**sexual (3)**
105:1,2;306:16

**shade (1)**
115:10

**share (1)**
238:2

**sheet (4)**
158:12,15,17,24

**sheets (4)**
158:4,6;353:25;
354:3

**Sheila (1)**
253:9

**sheriff (10)**
203:12,17,19;

206:12;207:18,21;
208:3,17;213:2;214:4
**sheriffs (1)**
203:9
**shift (7)**
133:9;184:11,22;
191:4,17;220:2;
229:12
**shin (1)**
369:9
**shoot (1)**
14:4
**shooter (2)**
296:2,5
**shooters (2)**
292:18,22
**shooting (58)**
14:2,11;15:2,9;
192:11;195:1,2,5,6,7,
10,11;196:4;199:16;
201:9;209:16,17,19;
210:1,4,18,21,24;
211:19;213:22;
221:18,21;222:12;
223:8,22;224:17;
237:6;238:10;239:2;
254:3,4;263:19;
277:12,16,18,25;
285:24;286:2,5;
288:1;293:1;296:2;
360:14;361:24;362:1,
6,7,10,11,15,22;
365:10,15
**shootings (3)**
146:9,10;221:15
**Shoplifting (1)**
104:22
**Short (2)**
36:5;198:9
**shortly (2)**
111:20;180:3
**shot (19)**
13:25;14:1,4,6;
15:12,24;171:3;
179:5,21;181:8;
237:3;255:17,21;
275:16;277:13;
282:25;283:1;286:11;
309:6
**shots (4)**
107:2;259:18;
262:23;264:20
**show (8)**
26:23;94:10;228:2;
232:15;233:7,11;
237:21;357:24
**showed (7)**
26:11;106:25;
107:2;109:18,23;
232:17;377:9
**showing (2)**
106:19,21
**shown (1)**

106:15
**shows (4)**
256:4;317:24;
319:10;372:22
**siblings (1)**
66:16
**sic (2)**
304:16;323:16
**side (10)**
67:4,4;112:18,19;
113:6,15,21,22;
181:11;232:18
**sided (2)**
351:10,13
**sign (8)**
157:23;166:23;
196:21;203:10,17,20;
206:12;250:11
**signature (8)**
207:4,13;241:11;
341:10,12;376:13,24;
396:22
**signatures (1)**
241:10
**signed (13)**
158:25;207:12;
208:3,6;268:2;272:2;
340:1;377:8,20;
380:24,25;389:4;
395:10
**signing (1)**
376:21
**sign-out (2)**
158:4,6
**silent (11)**
33:6,8,22;34:13;
36:15;37:11,15,20;
40:18;43:22;391:6
**similar (2)**
15:5;123:14
**simulations (1)**
85:10
**Simultaneous (2)**
88:11;162:15
**single (2)**
71:10,12
**sister (1)**
264:4
**sister's (1)**
263:2
**sit (21)**
15:4;64:5;140:9;
141:11;186:21;
199:15;202:4;219:18;
225:10;227:17;
236:22;248:11;257:9;
266:23;275:22;
279:22;280:1;334:25;
361:4;362:17;368:10
**sitting (2)**
33:20;286:18
**situation (2)**
130:9;234:2

**six (5)**
81:5,10,11;110:21;
337:13
**skills (2)**
71:17,18
**skip (1)**
251:21
**skipped (1)**
261:17
**slapped (1)**
369:7
**Slightly (1)**
16:10
**slip (1)**
148:6
**small (1)**
284:7
**Smartphone (1)**
151:19
**Sold (1)**
68:19
**solely (1)**
198:14
**solve (2)**
97:6;139:9
**solved (2)**
168:20;311:4
**somebody (16)**
93:9;107:9,10,17;
118:18;130:23;145:2;
200:21;202:10;
259:19;273:8;274:12;
296:12;308:6;344:5;
362:2
**Somehow (2)**
137:18;160:2
**someone (34)**
13:22;14:2,21,23;
31:16;99:3;103:13;
107:16;108:9,15;
109:18;116:13;
117:17;119:9,10;
128:6;132:3,15;
143:2,14;148:14;
179:14,16;192:25;
202:3;207:12;229:12;
264:17;271:4;272:15;
296:23;297:24;338:2;
371:12
**someone's (2)**
118:13;131:17
**someplace (2)**
91:17;187:1
**sometimes (14)**
7:12;12:14;61:6;
117:5,6;118:13;
146:4;168:19;169:2;
172:9;209:13;311:8;
312:5;346:12
**somewhere (5)**
98:19;153:18;
173:7;192:4;288:5
**son (1)**

368:25
**soon (4)**
88:8,21;93:19;
154:8
**sorry (23)**
65:13;67:13,14;
91:17;104:3;109:9;
168:23,24;173:13;
221:5;261:16,19,21;
262:12;271:13;
274:18;278:7;301:8;
315:1;340:24;342:4;
358:2;367:16
**sort (7)**
19:21;60:19;97:14;
99:2;158:20;272:18,
18
**sorts (1)**
347:21
**Sotos (1)**
5:9
**sound (9)**
15:15,21;189:11;
240:4;243:6;262:1;
264:11;281:24;357:8
**sounded (1)**
264:13
**Sounds (6)**
15:23;25:9;96:7;
225:23;234:9;281:25
**south (1)**
81:24
**Spanglish (2)**
60:19;209:9
**Spanish (50)**
19:11,11;58:17;
59:3,5,10,14,20,23;
60:3,8,10,20;61:2,5,
15,22,22;191:24,24;
192:6,21,23,25;
193:25;194:2,7,13,15,
18;196:18,22;200:25;
209:3;212:2;227:11,
12;230:16,24;242:13;
245:18;259:23,24;
278:21;295:17;331:1,
3;349:13,22;350:18
**speak (20)**
23:19;24:17;25:3,7,
13;59:16,20;60:3,8,
13;62:15;118:20;
191:17;200:7;204:1;
216:22;230:16;
242:18;259:19;
349:22
**speaker (7)**
58:17;59:23;
117:14;121:12;192:6;
193:1;200:25
**speakers (2)**
61:5,23
**speaking (21)**
7:21;8:4;26:22;

35:23;39:7;59:3,10;
194:7,9;209:2,4,5,7;
230:21;242:10,12;
245:17,20;246:23;
256:20;281:17;
350:17
**speaks (5)**
278:20;330:24;
331:1,3;394:10
**special (4)**
113:16,19;121:22,
23
**specialist (3)**
5:12;70:23;142:3
**specific (2)**
87:8;99:8
**specifically (11)**
22:14;91:22;
100:20;109:14;
111:17;133:25;
173:23;238:12;
260:24;285:20;
375:16
**specifics (1)**
226:21
**speculate (2)**
138:13;224:9
**speculation (7)**
130:4;302:8;305:3;
315:21;318:18;319:1;
344:9
**spell (1)**
344:13
**spelling (1)**
244:1
**spend (1)**
251:7
**spent (1)**
306:2
**split (1)**
115:25
**spoke (25)**
20:19;25:5;34:3;
62:9,11;227:11,12;
234:14,15;241:15,17,
22,24,25;242:1,2,5;
259:23;260:1,7;
281:15;285:16,19;
308:9;349:12
**spoken (4)**
23:3;196:21,23;
389:15
**squad (4)**
179:12;181:5,6;
232:4
**St (1)**
67:24
**stabbed (1)**
171:3
**staffed (1)**
252:25
**stairs (1)**
113:14

Maysonet v.
Guevara

Video Deposition

Fernando Montilla

**stamp (5)**
  248:24;249:18;
  347:17;351:17;
  352:18
**stamped (3)**
  316:19;347:15;
  367:12
**stand (12)**
  12:21,23;71:7;
  125:8;294:15,17;
  348:25;360:8,8,10,11;
  364:8
**standing (9)**
  115:21;116:4,15;
  117:20;118:19;
  120:11;124:13;
  125:23;275:13
**stands (2)**
  103:13;120:20
**staple (1)**
  351:20
**star (4)**
  207:13;241:7;
  368:8,9
**start (18)**
  23:7,10;72:5;81:4;
  150:12;157:17;163:8,
  21;164:5,8,9;182:24;
  185:15;234:16;
  251:23;286:14;312:6,
  25
**started (6)**
  146:19;147:3,6;
  233:14;290:17;
  384:19
**starting (5)**
  251:24;253:5,17;
  256:17;266:4
**starts (2)**
  266:7;315:3
**state (1)**
  391:8
**stated (11)**
  32:9;89:15;162:20;
  193:24;262:5;282:23;
  294:19,20;296:1;
  332:23;394:20
**statement (54)**
  132:16,24;227:23;
  233:2;234:11,20,23;
  236:17;238:13;239:5,
  14,25;240:16,19;
  241:2,14;242:7,9,23;
  244:7,15,18;245:10;
  246:20;247:4,10,13,
  23;273:19;282:18;
  294:23;298:25;299:4;
  300:16;319:14,20,24;
  323:19;324:21;
  326:13;332:1;333:5;
  335:11,23;336:3,25;
  339:2,21;340:1,3,12;
  342:7;356:7;372:21

**statements (20)**
  9:12;210:14;
  213:21;223:3,6;
  237:10;248:13;
  300:14,17;302:13,16,
  22;323:10;329:16;
  332:7;333:2;335:14;
  356:25;357:1;364:4
**States (4)**
  5:3;155:3;213:21;
  391:7
**State's (26)**
  23:3,13,17,20;
  24:17;25:3;27:11;
  55:3;94:12;228:17,
  18,23;229:1,2,9;
  276:17,21,24;300:13;
  335:14;356:17;
  372:13;374:8,16;
  388:14;395:20
**states's (1)**
  89:14
**statute (1)**
  390:1
**stay (3)**
  36:3;159:23,24
**stayed (4)**
  69:17;160:21;
  184:17,19
**Stays (2)**
  161:14,17
**stenographic (8)**
  15:19;66:11;
  105:22;175:23;332:5;
  348:23;355:16;366:2
**step (1)**
  11:14
**steps (1)**
  313:13
**Steve (2)**
  165:8;266:22
**Sticking (1)**
  173:17
**still (10)**
  41:7;59:14;65:15;
  69:22;71:10;95:12;
  107:17;294:15,17;
  360:5
**stolen (1)**
  150:8
**stop (4)**
  43:19;167:23;
  198:2;389:10
**stopped (3)**
  197:17;198:5;214:3
**stopping (1)**
  197:21
**Straight (4)**
  113:18;114:4,7;
  235:13
**strain (1)**
  10:8
**strategies (1)**

95:7
**Street (23)**
  17:13;24:7,24;
  25:17,17;26:3,23;
  67:2;68:1;78:19;
  80:10;179:9;183:14;
  259:16;265:1;275:13;
  277:14;345:18,24;
  346:5,19;387:8;393:2
**streets (1)**
  148:11
**stretch (4)**
  162:1;360:8,11;
  386:19
**stretching (1)**
  289:11
**strike (31)**
  18:10;23:10;32:14;
  34:11;63:16;84:20;
  106:25;117:5;139:7;
  155:24;185:23;
  193:17;216:6;222:16;
  227:2;230:15;235:14;
  247:12;267:15;
  278:19;281:3;286:17;
  301:8;302:22;315:1;
  342:4;365:13;381:7;
  382:22;383:15;396:8
**stuff (7)**
  138:14;291:15;
  310:11;317:9;375:14;
  377:17;391:22
**subject (7)**
  9:12;97:13;194:24;
  224:18;366:10;390:2,
  2
**subjects (1)**
  264:16
**submit (3)**
  154:5;165:18;166:1
**submitted (10)**
  163:4,13;164:1;
  165:20;267:17,20,23;
  268:1,5;342:16
**submitting (3)**
  166:7,10,21
**subpoena (21)**
  17:16,19;18:7,14,
  22;19:12,17,21;20:2,
  16;21:12,15,18;22:3,
  20;23:2,9,11;25:2;
  387:16,20
**subpoenaed (2)**
  17:5,12
**subpoenas (1)**
  21:20
**substance (5)**
  195:14;199:13;
  211:3;236:21;248:12
**sudden (1)**
  303:10
**sue (6)**
  14:2,3,5,6,6,7

**sued (7)**
  13:13,15,17,22;
  14:20,23;20:4
**suffer (1)**
  12:14
**suggest (2)**
  223:7;275:2
**suggested (1)**
  40:1
**suggesting (1)**
  45:20
**suggests (1)**
  340:14
**Suite (1)**
  5:10
**sum (1)**
  379:9
**summarized (1)**
  332:8
**summary (7)**
  78:16,16,18;
  331:13;332:23;
  333:14;379:2
**supervise (1)**
  98:15
**supervised (1)**
  98:9
**supervising (1)**
  258:4
**supervisor (19)**
  98:2;99:3;100:23;
  102:11;128:8;153:21;
  154:20,22;155:8,11;
  159:5;163:5,15;
  164:2;166:2,4;
  201:23;272:2;311:23
**supervisors (5)**
  99:6;102:9;139:7;
  163:5;176:19
**supplemental (32)**
  150:6,19;152:7;
  153:9;154:10,10,17,
  18;155:12;159:4,14;
  163:1,4,8,13,21,23;
  164:1;165:17,23;
  200:4;254:14,18;
  255:3;257:23;259:1;
  266:11,13;270:15;
  298:2;342:11,13
**supplementaries (1)**
  152:13
**supplementary (9)**
  149:5;150:3;
  151:13;152:12;
  153:12;156:5;163:17;
  253:20;298:19
**suppose (4)**
  103:4;128:10;
  202:8;300:19
**supposed (11)**
  36:1;44:20;79:21;
  80:1;156:19;158:9,
  10;159:10;166:15,16;

378:6
**supposedly (1)**
  333:5
**suppress (4)**
  355:8,25;356:24,25
**sure (44)**
  14:9;15:15;16:12;
  17:9;26:12;76:17;
  86:13;88:17;91:1;
  100:15;105:21;106:3;
  135:2;158:19;163:12;
  165:23;179:22;
  180:15;187:2;191:16;
  222:23;224:7;225:15;
  226:11;228:25;
  233:20,21;245:6;
  254:20,24;256:22;
  268:13;271:19;280:9;
  284:21,21;288:14;
  314:15;315:8;347:5;
  351:11;356:1;374:3,4
**surprising (1)**
  22:19
**suspect (17)**
  89:5;92:20;93:2,8;
  108:20;124:13;125:8,
  23;127:8,12,21;
  128:1;130:11,16,22;
  132:3;366:18
**suspects (14)**
  79:18;95:3;115:13,
  20;116:3;123:9,10;
  127:1;148:3;172:7;
  190:15;219:1;288:17;
  378:22
**suspended (3)**
  361:3,22;364:22
**suspension (1)**
  365:3
**sustained (1)**
  361:10
**swear (1)**
  6:12
**swearing (1)**
  9:8
**switch (1)**
  104:9
**switched (1)**
  110:19
**swollen (1)**
  12:17
**sworn (6)**
  6:15,18;380:5,6,6,7
**system (3)**
  74:19;158:1;249:19

**T**

**table (2)**
  35:23;256:20
**tactic (1)**
  124:23
**tactics (1)**

95:8
**talk (18)**
  18:2;31:5;32:22;
  34:6;36:9;56:7,14;
  63:1;87:3;183:12;
  191:25;195:7;201:9,
  14;203:11;245:4;
  246:2;282:16
**talked (8)**
  23:16;25:24;34:7;
  230:19;245:12,16;
  291:21;352:25
**talking (29)**
  11:9;14:17;16:22,
  25;23:18;29:20;
  53:25;91:12,13,22;
  109:14;156:1;183:23;
  187:3;203:6;215:9;
  229:11;236:23;
  244:24;245:2;250:7;
  290:17;308:23;325:6,
  9;326:2;348:10;
  367:14;391:25
**taught (9)**
  85:1,24,25;86:7;
  87:17;88:19;90:11,
  22;94:23
**Taylor (1)**
  67:2
**teach (4)**
  78:12,14;85:5;
  94:15
**teaching (1)**
  85:22
**team (1)**
  70:1
**teams (1)**
  307:18
**technician (3)**
  95:18;150:10,11
**teenagers (1)**
  353:17
**telephone (5)**
  115:8;263:2;264:6,
  21,24
**telling (11)**
  33:4;37:21;38:17;
  49:4;51:19;85:22;
  128:6;131:7;201:14;
  368:11;375:22
**tells (1)**
  92:10
**ten (2)**
  181:11;297:16
**terminated (1)**
  362:25
**terms (5)**
  68:10,14;136:18;
  193:19;301:12
**terrible (2)**
  60:19;383:16
**test (7)**
  72:17;73:2,13;

82:11,22;83:5,9
**testified (43)**
  6:18;9:5;16:23;
  29:6;50:10,17,25;
  55:21;56:1;57:18;
  87:13;89:17;93:16;
  130:8;174:11,17;
  178:11;279:11,16,17;
  281:2,9;282:5;
  291:18;313:20;
  321:18;325:4;347:20;
  354:10,16,19,23;
  355:7;357:4,6,12,14,
  19;382:24;385:14;
  390:5;391:19;395:5
**testify (41)**
  27:25;29:5;30:7;
  32:4;34:14,15;35:16;
  36:1,2,2,16,22;38:17,
  20;41:19;43:6,12,22;
  44:4,8;45:12;46:9,9,
  13,25;47:11;48:15;
  49:7,16;51:3,11;54:1,
  18;56:15;280:19;
  343:21;354:24;355:4;
  364:6;392:6,11
**testifying (4)**
  55:1;139:21;
  356:12;358:4
**testimony (47)**
  12:13;17:5;21:23;
  26:23,24;28:4,16,20,
  21;29:2;30:5,8;33:12;
  34:10;37:24;44:2,6;
  50:24;61:4;64:9,10,
  12;65:6;77:9;120:13;
  121:15;139:25;140:1;
  146:25;182:13;
  225:24;234:10;
  288:25;294:2;349:17;
  350:11,22;355:21,23;
  356:4,24;357:16;
  369:20;389:17;390:7;
  392:8;393:4
**Thaddeus (2)**
  15:15;16:8
**theft (4)**
  79:10;99:23;
  104:22,22
**theory (3)**
  96:14;323:3,9
**thereafter (2)**
  340:1,3
**Theresa (1)**
  6:5
**thick (2)**
  122:5;260:4
**think's (1)**
  323:5
**third (18)**
  26:20;64:1;73:14;
  74:6;133:11,17,20,23;
  184:13,24;191:5;

222:2;225:7,14;
  328:20,25;329:25;
  330:7
**thirty-some (1)**
  325:24
**though (18)**
  34:10;91:11;
  110:23;143:18;
  240:21;245:15;
  269:15;295:4;306:5;
  307:7;308:14;311:25;
  317:13,21;322:10;
  337:15;372:2;373:13
**thought (10)**
  39:6;73:23;91:11,
  13;340:10;348:3;
  362:1,14,22;364:10
**thoughts (1)**
  72:2
**threat (1)**
  207:2
**threaten (1)**
  131:16
**threats (1)**
  132:23
**three (17)**
  73:4;74:10;236:23;
  237:5,10;238:23;
  275:8;277:13,18;
  286:10;295:17;309:5,
  13;319:22;338:10;
  354:22;355:14
**throughout (1)**
  385:14
**throw (4)**
  152:16,18,19;153:5
**Thursday (2)**
  240:1,17
**thus (2)**
  11:10;390:1
**tightened (1)**
  369:5
**till (1)**
  41:8
**Tim (5)**
  24:3;37:4;387:12;
  389:4;391:25
**timeline (1)**
  229:20
**times (27)**
  9:18;13:19;16:23;
  21:24;22:1;39:21;
  42:20;48:8;62:21,23;
  73:4;228:14;251:5;
  264:16;335:18,20,21;
  337:13,15;340:24;
  354:10,16,19,22,24;
  355:4;366:23
**time's (1)**
  74:6
**Timothy (1)**
  389:5
**Tino (3)**

272:12,22,24
**today (31)**
  8:24;9:2;11:18;
  12:13;16:6;44:2;62:6,
  22;64:5;140:9;
  141:11;186:22;
  199:15;219:18;
  225:10;227:17;
  236:22;248:11;
  260:19;263:9;266:23;
  271:18;275:22;
  279:22;280:1;299:13;
  334:25;348:11;
  362:17;368:10;385:3
**Today's (1)**
  5:6
**toes (1)**
  12:16
**together (6)**
  106:9;124:12;
  156:19,21;252:13;
  381:24
**told (60)**
  18:20;30:7;34:5;
  35:14;36:3,10;38:4;
  42:2,23;43:5,20;
  44:21;45:5,10;46:20;
  48:14;49:6,22;50:11;
  51:2,10,18;52:10,17;
  54:10,18;55:3;56:2;
  73:9,17;78:19,24;
  88:8,21;89:21;92:20;
  124:12;125:8;127:12,
  21;129:2;138:15;
  186:4;224:3;246:2,2;
  290:6,6;309:1,4;
  331:14;336:16;
  338:10;361:18,20,21;
  394:24;395:5,20;
  396:2
**tomorrow (1)**
  249:2
**took (24)**
  9:1;63:17;72:17;
  73:4;82:11;86:20;
  109:4;114:17;143:1;
  157:24;194:4;195:3;
  214:21;215:2;216:21;
  231:13;232:15;267:8,
  12;269:10;291:7;
  308:11;309:23;310:5
**tool (4)**
  126:25;151:6;
  161:16;162:21
**tools (1)**
  109:15
**top (8)**
  206:5;238:15;
  239:15;243:24;247:7;
  276:2;332:8;388:17
**top-notch (1)**
  61:16
**Torrence (6)**

190:6;239:2;254:8;
  266:14;277:22;
  352:10
**toss (1)**
  152:16
**tossed (1)**
  56:19
**total (5)**
  137:10;178:13,15;
  262:21;379:9
**tour (1)**
  69:11
**town (2)**
  65:22,24
**track (3)**
  61:7;91:20;136:3
**trade (1)**
  144:14
**trained (3)**
  91:15;128:12,25
**training (43)**
  68:25;78:2,4,9;
  79:14,20,25;80:25;
  84:24;86:11;87:9,12;
  88:19;91:5,6;92:1,3,
  6;93:13,13,18;94:1,5,
  14,21;95:3,8;96:1,2,9,
  17,17;97:13;98:18,
  24;102:23,25;106:6;
  128:14;365:9,14,22;
  373:12
**trainings (2)**
  103:2;128:14
**transcribe (1)**
  11:8
**transcripts (2)**
  26:24;357:16
**translate (1)**
  194:15;212:1
**translated (1)**
  197:8
**treated (1)**
  121:23
**Trial (2)**
  5:22;357:19
**Tribune (2)**
  53:7,11
**Troken (4)**
  369:10;372:6,8;
  373:7
**troubles (2)**
  8:8;60:16
**true (29)**
  38:5;46:21;47:2;
  48:16;52:10;54:19;
  55:21;106:21;107:22;
  108:8;130:17,24;
  318:16,23;319:4;
  320:7,22;321:4,5,10,
  13,24;322:10;369:16;
  370:14;371:9,13,18;
  376:18
**trust (1)**

396:6
**truth (3)**
9:8;377:1,4
**truthful (1)**
12:13
**try (7)**
11:14;73:13;97:5;
109:11;139:9;163:10;
259:17
**trying (15)**
34:25;45:17;68:11,
11;74:11;86:3;
101:24;142:25;228:6;
235:12;238:14;262:7;
265:22;322:5;354:14
**turn (10)**
117:14;118:14,14,
21;179:2;250:22;
255:25;337:7;367:11;
372:10
**turned (3)**
13:23,25;113:20
**Twenty (1)**
267:18
**twice (3)**
25:12;27:3;73:14
**two (37)**
27:4,6,23;29:23;
39:4,23,25;63:20;
66:4;69:12,13;89:24;
90:16;110:25;121:18;
179:4,21;183:13;
189:18;221:15;
250:15;262:1;264:11;
265:1;276:1,17;
277:25;294:21;297:9,
15;309:6;351:10;
353:23;357:3,6;
382:20,25
**two-and-a-half (1)**
130:1
**two-minute (1)**
386:14
**two-page (1)**
351:19
**two-way (1)**
121:20
**type (33)**
60:19;68:15;70:12;
73:6;74:19;78:4;91:7;
93:12;99:2,17;
104:20;128:5;148:25;
149:1;150:5;174:6;
182:19;186:10;196:4;
201:23;212:23;232:3;
234:2;235:7;242:23;
255:2,7;259:20;
260:11;307:4;321:17;
323:10;345:4
**typed (3)**
335:11;341:9,11
**types (5)**
70:10;84:24;85:1;

150:1;170:25
**typewriter (3)**
151:20;344:15,21
**typewritten (1)**
154:10
**typical (2)**
255:10,13
**Typing (3)**
91:7;115:6;150:16

**U**

**ultimate (1)**
365:12
**ultimately (3)**
74:6;169:12,14
**under (23)**
8:24;9:5;13:21;
35:4;38:2;131:16;
132:2,14,22;161:4,19;
166:12;218:1;220:9;
277:16,20;296:19;
318:14;359:16;
361:22;391:6;392:22,
23
**underlying (2)**
17:20;179:3
**underneath (3)**
206:8;275:25;
388:25
**understood (2)**
9:22;40:17
**undertook (1)**
368:13
**unfair (1)**
362:20
**Unfortunately (1)**
389:20
**union (1)**
71:20
**unit (7)**
99:23;100:21;
101:15;104:5;112:1;
113:11;145:20
**United (2)**
5:3;391:7
**units (3)**
99:25;100:7;111:14
**unjustified (7)**
361:25;362:6,7,10,
14,18,21
**unknown (3)**
101:21;255:19,23
**unless (5)**
101:21;142:11;
295:6;327:20;382:10
**unmarked (4)**
179:12,13;181:14;
232:4
**unrelated (1)**
334:1
**untrue (1)**
44:22

**up (49)**
7:16;12:21;59:2,7,
10,21;71:19,22;
73:15;95:9;113:17;
115:25;135:3;147:17;
150:16;157:25;
169:21;192:18;196:1;
203:7;214:13;224:25;
232:17;233:12;239:1,
15;245:8;246:1;
247:7;252:8;273:19;
278:14;282:1;289:10;
292:22;307:24;309:7;
312:17;313:9;317:24;
319:10;322:7;360:8,
8,10,11;368:1;
371:12;374:9
**upon (4)**
68:9;150:3;182:10;
361:22
**upper (2)**
138:3;274:22
**upset (2)**
55:2,5
**upstairs (3)**
112:14,16;284:7
**use (15)**
91:8;111:19;132:3,
14,22;145:22;150:17;
152:6;166:9,20;
270:2;329:9;344:15,
20;372:14
**used (10)**
150:15;152:2;
162:18;255:7;275:25;
277:22;286:8,9;
338:7;345:24
**uses (1)**
344:16
**using (2)**
162:7;264:24
**usually (1)**
172:21
**utilize (1)**
162:8

**V**

**vacated (7)**
17:21;18:13,18;
56:19;57:11,16,16
**Vague (3)**
15:13;43:3;255:4
**vaguely (1)**
19:14
**valuable (2)**
213:15;338:14
**Varas (1)**
186:19
**various (1)**
176:1
**vehicle (3)**
179:11;181:14;

275:25
**versa (3)**
117:3,4,22
**versus (3)**
5:2;388:22;389:16
**vice (3)**
117:3,4,22
**victim (12)**
150:7;170:12,13,
22;171:2,6,11,21;
258:17,17;353:3;
369:1
**victims (19)**
116:11,17;171:1;
172:2;183:13;184:25;
185:2,6;254:7;
258:16;265:1;275:12,
16;352:11;372:24
**victim's (1)**
367:18
**video (2)**
5:12;299:5
**VIDEOGRAPHER (14)**
5:1;6:11;75:11,14;
165:2,5;217:7,11;
305:19,23;386:21,25;
388:7;396:25
**video-recorded (1)**
5:8
**Vie (1)**
69:24
**Vietnam (8)**
68:13;69:6,9,19,25;
70:6;71:10;72:8
**view (3)**
95:17;115:17;
124:14
**viewing (19)**
115:16,20;116:5,
13,16,17;117:1,18;
118:1,18;120:15,18;
121:8;123:19,19;
124:1,5;125:24;
127:14
**violate (1)**
164:20
**violation (2)**
129:4;152:21
**violence (4)**
134:22;135:5,9;
141:12
**violent (32)**
100:17;104:12,24;
110:14,18,19;111:3,9,
25;112:3;113:7,10,
24;114:23;115:2;
119:10;133:25;134:3,
11;137:12;146:14;
175:14,15;176:11,16,
17,18;239:3,18;
277:11;306:20;330:2
**voice (5)**
212:16,19,21;

264:12,13
**voices (1)**
262:2
**volunteered (1)**
69:14
**vouch (1)**
324:9

**W**

**wait (12)**
11:11;53:17;55:20;
88:12,12;89:23;
120:2;182:1;265:2;
284:14;370:6
**Waited (1)**
182:17
**waiting (1)**
120:22
**waived (1)**
50:21
**waiver (1)**
204:1
**walk (9)**
12:21;75:8;113:16;
114:9;115:11;151:19;
198:7;217:5;224:1
**walked (5)**
71:7,13;197:17;
214:4;232:18
**wall (1)**
115:25
**wants (1)**
328:4
**War (1)**
68:13
**warrant (1)**
73:11
**warranted (2)**
132:13;164:18
**warrants (5)**
73:10,15,17,20,23
**watch (16)**
133:11,16,16,17,20,
23;184:13,24;191:5;
225:7,14,16;328:20,
25;329:25;330:7
**watches (1)**
133:15
**way (34)**
71:2,8;82:20;98:2,
4;115:23;117:17;
121:23;123:15;
134:21;135:21;
142:22;143:9;149:7;
156:4;167:6,10;
173:21,22;204:25;
205:2;215:9;217:5;
221:1;235:16;250:14;
300:22;307:21;
339:18;367:14;
384:18;385:14;
387:18;391:16

**ways (6)**
47:9;85:23;135:18;
148:5;308:21,23
**weapon (4)**
69:2;255:7;277:22;
281:1
**wear (1)**
11:23
**Wee (1)**
13:23
**week (1)**
89:23
**weeks (2)**
89:24;169:2
**weird (1)**
68:2
**welcome (1)**
239:13
**Wentworth (2)**
101:9,15
**weren't (21)**
38:20;42:3,25;
46:13,25;48:15;49:7;
51:2,11;160:1;182:5;
184:13;198:16;254:5;
285:8;306:5;312:6;
331:18;341:20;
353:15,17
**West (8)**
5:10;67:4,4;111:24;
181:5;261:8,11;264:6
**Western (1)**
81:25
**Whatever's (2)**
321:17;391:24
**whatnot (1)**
348:25
**what's (32)**
65:11;120:17,18;
144:13;148:2,25;
158:13;193:18;
226:12,15;237:21;
246:12,17;251:2;
254:1;255:14;261:21;
267:16;284:23;
310:18;312:14;313:6;
315:23;323:2,2,2,5;
351:8;367:6;370:3;
374:25;388:5
**whatsoever (4)**
199:18;215:2;
230:24;268:21
**Whenever (1)**
158:25
**When's (2)**
20:19;189:4
**Where's (2)**
58:19;368:2
**wherever (1)**
214:5
**white (2)**
261:5;264:5
**whole (11)**

154:19;156:19;
231:8;250:8;279:4;
313:6,12;343:18,20;
346:14;375:3
**who's (7)**
116:11;124:1;
145:19;169:23;
246:21;312:19;
352:14
**whose (2)**
233:4;303:2
**whosever (1)**
274:22
**wife (6)**
244:23;245:1,24;
246:22,23;332:17
**Wiley (48)**
18:18;19:4;187:19;
188:2,22;190:1,6,11,
15;200:17;215:11,14,
25;218:10,14,18,23;
225:21;226:4;231:20;
239:2;240:10;254:8,
8;259:4;263:13;
265:17;266:15,15,25;
275:20;277:22;
287:15;288:11,17,22;
290:24;291:6;293:7,
12;300:12;304:7;
309:25;311:11;
352:10,16;353:8,11
**willful (1)**
9:12
**willing (7)**
34:14,15;36:2,22;
54:1;298:24;299:3
**window (2)**
115:10;264:25
**within (4)**
100:2,8;173:11;
174:2
**without (9)**
64:5;101:21;161:6;
204:1;207:1,2;
358:25;382:18;
393:22
**witness (288)**
6:12,15,17,19;13:8;
16:22,23;18:4;22:24;
26:17;28:6,11,13;
29:8,25;32:19,24;
33:17;34:21;36:19;
38:12;40:8,11,14;
43:10,25;46:3,16;
47:6;48:19;49:12,19;
51:6,14;52:2,21;
53:20;55:16;57:1;
60:13,25;61:13,19;
65:17;67:12,16;75:8;
79:2;83:12;85:15,18;
86:23;87:22;88:4,7,8,
15,21,24;89:6,9,13,
13,20,21;90:6,15;

92:10,18,25;93:6,8,
23;95:14,16;96:5,11,
20;97:10,17,23;99:6;
106:11,14,16,19;
107:2,6,20,25;108:2,
6,9,13;109:21,23;
110:1;113:13;117:9;
118:8;119:9;120:22;
121:1,5,16;122:18,20,
23;123:3,10,11,19;
124:4,5,9,14,15;
125:4,9,11,15,24;
126:6,16,21;127:10,
19;128:10;129:8,14,
19,23;130:6,13,19;
131:1,13,20;132:7,19;
133:3;134:8,14;
135:12;136:3;137:4,
15;138:8;139:4;
140:3,13,24;142:21;
143:8,24;145:8;
146:1;147:13;148:1,
10;149:4;151:22;
153:2;154:14;155:1;
156:3;160:6,25;
161:10,23;162:12,16;
164:14;168:24;
170:15;172:5,17;
173:5;177:2,16,24;
178:9,22;182:14;
189:13,20;201:21;
202:1,8;203:3;
207:25;210:9;211:7;
213:12,18;215:7;
216:3;217:2;229:25;
238:20;243:1,4,13,18;
247:22;255:5;263:16,
24;266:1;268:15,18;
269:20;271:1,21;
273:18;278:10,15;
279:4,7;286:8;
287:17;288:8;293:15,
25;296:17;297:21;
298:7;299:25;301:1,
17;302:10,19;303:8,
12;305:4;307:3,15;
308:20;310:9;313:16;
315:22;316:9;320:5,
11;321:16;322:7,24;
323:9;328:6;336:22;
337:23;338:18;339:8;
341:4;344:10;345:21;
346:10;349:1,3;
350:13;359:6;360:6,
9;368:2,24;369:25;
370:16,20,23;371:16;
373:20;374:10,13;
375:21,25;376:3;
378:16;384:3,13,24;
385:6,11;386:3;
387:23;392:10;393:6,
10;396:21
**witnessed (4)**

124:17;128:4;
129:25;178:17
**witnesses (16)**
78:24;79:15;94:16;
106:22;115:17;
116:11,17;117:5;
132:21;150:7,12;
162:9;172:9;182:21;
260:12;372:24
**woman (1)**
131:7
**word (9)**
78:17,17;192:15,
15,17,17;242:3;
258:15;344:20
**words (3)**
221:19;270:9;
274:15
**work (46)**
14:18;67:20;68:10,
14,15;71:24;73:5;
80:2;82:3,23;85:11;
94:9;101:11,15;
102:3;111:14;113:22;
114:13;115:8;133:6,
20;153:25;170:3;
175:8,18;184:2,22;
198:16;216:20;
224:15;225:8,11;
240:10,14;251:12;
312:15;328:20;329:3;
330:15;351:3;365:4,
6,17,20;366:13;
393:14
**worked (13)**
128:1;133:10;
146:21;175:5;176:18;
184:8,24;225:13,16;
325:18;326:4,4;359:8
**working (32)**
68:11;72:1;86:15;
94:7;101:17;103:6;
105:13;110:16;
133:23;146:19;147:4,
6;179:9,14,15;184:9,
11,12,13,15,21;191:4,
5;219:7,10;220:2;
225:7;312:25;329:4,
7,25;360:22
**works (1)**
24:1
**world (1)**
149:1
**worth (3)**
263:21;265:16,22
**wrists (1)**
369:6
**writ (2)**
297:1,1
**write (23)**
78:17;90:17;91:1;
150:17;151:23;
162:11;180:12;

195:24;214:13;
216:21;225:1;270:1;
294:8;317:2,4,9,14,
21;318:3,5;344:20;
350:18;378:12
**writing (18)**
78:6,7,8,15;82:17;
86:7,11;87:14;90:22,
23;148:24;165:16;
269:23;270:6,9;
271:9;292:9;378:6
**written (21)**
206:22;222:13;
229:19;260:15;294:3;
317:3,3,6,13;319:9;
324:17;344:6;357:9;
369:15;370:3,14,23,
25;371:5;380:9;
388:14
**wrong (6)**
52:15;118:12;
149:19;194:12;198:8;
371:1
**wrote (14)**
67:15;152:11;
247:13,22;271:6;
274:23;275:3;317:8;
320:13,21,23;321:9;
378:7;380:12

**X**

**xeroxed (1)**
252:13

**Y**

**year (13)**
13:14;31:19;66:8;
68:6,21;76:6;103:20;
110:14;135:21,25;
364:25;365:1;381:1
**years (38)**
20:23,24;23:18,19;
59:9;69:8;71:25;
74:11;87:1;101:3,8;
102:6;103:11,21,23,
25;104:2,2,3;106:7;
110:6,22,22,25;
133:21;135:14;
178:15,16;254:11;
283:18,19;306:2;
320:21;321:6;322:14;
324:22;325:20,24
**yell (1)**
47:16
**yelling (2)**
212:12;223:17
**Yep (3)**
243:4;333:21;373:5
**yesterday (1)**
11:22
**yield (1)**

213:10

**York (1)**
325:11

**you-all (2)**
340:6,8

**young (4)**
181:7;249:9;
334:15;353:15

**youth (1)**
114:10

**youths (3)**
275:13;294:21;
353:15

**yucks (1)**
374:17

### Z

**zero (1)**
382:17

### 1

**1 (16)**
101:9,14;102:3,10,
14,16;103:7,11,17;
137:17;140:10;
180:20,23;184:7;
252:20,22

**1:00 (1)**
263:19

**1:33 (2)**
165:3,4

**1:47 (2)**
165:4,6

**10 (2)**
367:3,6

**101 (1)**
372:12

**107 (1)**
252:23

**10890 (1)**
351:23

**10891 (1)**
351:23

**11 (3)**
374:23;375:1;378:7

**11:03 (1)**
5:7

**11:45 (1)**
267:19

**12 (7)**
133:13,14,18,19;
386:24;388:6;392:25

**12:01 (2)**
75:12,13

**12:16 (2)**
75:13,15

**1240A (1)**
5:10

**12th (14)**
63:3,5;80:12,13,18;
81:4,13,17,21,23;

82:2;98:3,8,10

**13 (2)**
20:23,24

**1300 (1)**
369:3

**13th (2)**
388:17;394:5

**141 (1)**
5:10

**14th (2)**
141:18,25

**15 (4)**
65:17;183:8,17,20

**15th (32)**
189:10,16;190:1,5,
12,17,23;191:3,12,16,
22;199:3;200:7;
216:9;277:10;278:1;
280:5;285:20;286:19,
23;287:4;288:12,14;
289:3;290:3;291:3;
292:24;293:5,9;
299:21;308:10;
349:11

**16 (1)**
48:8

**16410 (1)**
241:7

**17 (2)**
207:13;369:2

**17346 (2)**
367:13,16

**17358 (1)**
372:10

**17th (1)**
23:12

**18-cv-02342 (1)**
5:6

**18th (1)**
369:2

**1945 (1)**
65:17

**1952 (2)**
66:9;67:12

**1960 (1)**
67:6

**1965 (2)**
68:8,22

**1967 (1)**
70:22

**1968 (2)**
72:7,14

**1973 (1)**
74:12

**1974 (1)**
81:6

**1980 (7)**
80:7;81:14;84:10,
13;98:18;99:15;
100:19

**1980-ish (1)**
91:23

**1989 (4)**

102:7;104:5;133:5;
147:7

**1990 (133)**
111:19;133:15,23,
25;134:3,10;135:8,
24;136:22;140:21;
141:11;146:19;147:4,
7;151:18;173:15,17,
21,24;175:17;176:5;
179:6;181:15;184:11;
185:3,6,18;186:2,10,
17,24;187:5,8,13,19;
188:4,15,19,22,25;
189:10,16,16,25;
190:1,5,5,11,12,16,17,
23;191:3,12,16,22;
199:3;200:7;18;
207:7;215:10,12,12,
24,24;216:10,14;
217:15;218:8,20;
219:2;240:1,7,9;
254:14;267:19;268:6;
277:10;278:1;280:5;
285:20;286:19,23;
287:5;288:12,14;
290:3;291:3,4,18;
292:25;293:5,10,17;
299:21,22;300:10,18,
21,21;301:5,11,12,21;
302:13,17;303:5;
304:1,2,8,11;305:2;
306:6;308:10;309:11,
22,23;311:12,15;
314:6,21,23;315:3;
328:19;329:12;
332:12;338:21;
342:17,18;348:10;
349:11,11;352:19

**1990s (2)**
144:14;145:4

**1995 (1)**
173:21

**1996 (2)**
368:23;369:3

**1999 (3)**
185:8,13;304:16

**19th (1)**
368:23

**1st (35)**
200:18;207:7;
215:10,12,24;216:14;
217:15;218:8,20;
219:1,14;240:7;
291:4,18;293:9,17;
299:6,22;300:10,20;
301:5,11,21;302:13,
17;303:5;304:1,16;
305:2,9;309:11,22;
310:6;314:21;349:11

### 2

**2 (4)**

140:11;205:15,18;
212:1

**2:10 (2)**
247:5,7

**2:34 (2)**
217:8,9

**2:51 (2)**
217:9,12

**20 (12)**
103:21,23,25;
104:3;110:5;133:21;
183:8,17,20;300:21;
325:23,24

**2000 (1)**
330:20

**2007 (3)**
20:21;58:16;103:21

**2017 (12)**
17:5,9;18:8;23:10,
12;24:16,25;26:3;
30:13;32:2;388:17;
394:5

**2019 (3)**
5:6;348:11;381:2

**20778 (1)**
368:8

**20s (1)**
353:19

**21 (2)**
320:21;321:6

**2100 (1)**
332:13

**22nd (15)**
300:21;301:11;
304:2,18;309:22;
310:6;311:15;314:5,
25;315:3;328:18;
329:12;332:12;336:4;
337:1

**23rd (11)**
240:1,9,17;268:6;
300:18;333:19;
335:19;337:7;338:20,
21;340:25

**24 (5)**
173:8,11;174:3;
261:19;267:19

**2400 (4)**
261:20,21,25;264:8

**24-hour (1)**
168:21

**24th (2)**
268:2;342:17

**25th (35)**
112:10,21,23;
141:19,21;179:6;
181:15;184:10;185:3,
6,8,18;186:1,10,17,
24;187:5,8,13,19;
188:4,13,19,22,25;
189:16,25;190:5,11,
16;215:12,23;254:14;
311:12;352:19

26 (2)
200:11;254:10

**26th (12)**
17:12;22:6;24:7,24;
25:17,17;26:3,22;
27:9;314:23;387:8;
393:2

**27 (3)**
104:2,2;254:11

**27th (2)**
5:6;342:18

**2nd (5)**
239:3,18,22;304:8,
11

### 3

**3 (8)**
217:10;237:19;
246:13,14;248:21;
252:19;266:9;347:17

**30 (3)**
283:19;325:23,24

**34 (3)**
178:15,16;322:14

**3419 (2)**
261:8;264:5

**3428 (1)**
261:11

**3A (4)**
252:17,24;253:3;
347:9

### 4

**4 (24)**
94:7;98:22;99:11,
15,20;100:2,8,20,24;
101:2,7,11;102:16;
103:6;133:13,14,18,
19;191:8;217:10;
237:17,22;241:23;
329:1

**4,000 (1)**
326:10

**4:17 (2)**
305:20,21

**4:28 (2)**
305:21,24

**4:30 (4)**
329:1;333:19,22;
335:19

**42 (1)**
342:10

**44 (1)**
342:10

**45 (3)**
67:14;286:8,9

**47 (2)**
266:5,7

**49 (1)**
275:9

257:20

**65 (4)**
  69:10;251:25;
  252:1;253:6
**66 (3)**
  252:21,23;253:6
**67 (4)**
  59:9;70:19,21;
  252:23
**68 (1)**
  74:12
**69 (1)**
  74:13
**6th (1)**
  68:22

---

## 7

**7 (5)**
  59:8;66:21,22;
  355:15,19
**7:10 (1)**
  338:21
**73 (2)**
  73:16;74:9
**74 (1)**
  283:18
**74-and-a-half (1)**
  65:10
**76 (3)**
  74:10;76:7;81:7
**784562 (1)**
  277:20

---

## 8

**8 (3)**
  330:22;355:15;
  356:22
**8:00 (1)**
  330:22
**80 (1)**
  103:22
**80s (1)**
  100:14
**850 (1)**
  135:25
**89 (2)**
  103:24;173:14

---

## 9

**9 (5)**
  70:22;332:15,16;
  355:15;357:24
**9:28 (4)**
  240:2,9,17;339:1
**90 (1)**
  173:14
**90s (3)**
  110:23;111:10;
  141:13
**91 (1)**

173:14
**95 (1)**
  348:10

---

## 5

**5 (97)**
  19:7;21:2;58:15;
  98:12,13,15;103:17,
  25;104:3,4,12,21;
  105:3,13,25;106:8;
  110:5;111:15,18,23;
  122:17;133:5,10;
  136:17;137:1,5,10;
  138:2;140:10,18;
  141:12;146:11,20;
  147:6;174:10,18,20;
  176:4;178:6;187:16;
  189:6,17;192:3;
  217:10;218:6,9,21;
  219:3,6,9,15,22;
  220:10;222:1;233:17;
  235:14,17,19;237:9;
  239:18;240:13;
  246:11,18;248:17;
  250:4;272:10;276:21,
  24;277:11;278:19,20;
  280:9,10,16;281:16,
  18;282:6;284:5;
  298:21;308:11;
  313:23;314:5,9;
  315:23;316:21;
  326:20;327:9;328:20;
  332:17;334:1;358:12;
  359:13;365:7;366:23;
  368:15;369:4;382:2
**5:46 (2)**
  386:22,23
**5:52 (2)**
  386:23;387:1
**500 (1)**
  369:3
**51 (1)**
  316:20
**51st (2)**
  101:9,14
**54 (1)**
  266:8
**55 (1)**
  258:25
**5555 (1)**
  111:24
**59 (2)**
  67:7;253:18

---

## 6

**6 (2)**
  349:7;351:8
**6:00 (2)**
  397:2,3
**6:30 (1)**
  337:8
**63 (1)**
  257:20
**64 (1)**

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Mary M. Rowland |
| | ) | |
| vs. | ) | |
| | ) | Magistrate Judge Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF DEATH UPON THE RECORD

Defendants Edward Mingey, Lee Epplen, Roland Paulnitsky, and Fernando Montilla

("Individual Defendants') by their attorneys, The Sotos Law Firm, P.C pursuant Fed. R. Civ. P.

25(a)(1), submit the following Statement of Death Upon the Record and state as follows:

Individual Defendants state upon the record, pursuant to Rule 25(a)(1), the death of

Defendant Ernest Halvorsen, during the pendency of this action. On January 27, 2020, the

undersigned counsel was informed that Defendant Ernest Halvorsen died on January 26, 2020.

Dated: January 27, 2020

Respectfully submitted,

/s/Josh M. Engquist
Josh M. Engquist, Attorney No. 6242849
*One of the Attorneys for Individual Defendants*

James G. Sotos
Jeffrey N. Given
Caroline P. Golden
Josh M. Engquist
David A. Brueggen
**THE SOTOS LAW FIRM, P.C.**
141 W. Jackson Blvd., Suite 1240A
Chicago, IL 60604
(630)735-3300
jengquist@jsotoslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on January 27, 2020, I electronically filed the foregoing **STATEMENT OF DEATH UPON THE RECORD** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed below.

***Attorneys for Plaintiff:***
Jennifer A. Bonjean
Ashley B. Cohen
100 Dean Street, Suite 422
Brooklyn, NY 11238
(718)875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

Steven A. Greenberg
Steven A. Greenberg, Ltd.
53 W. Jackson, Suite 1260
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

***Attorney for Cook County Defendants:***
Sara Spivy
Edward M. Brener
Cook County State's Attorney's Office
50 W. Washington St., Room 500
Chicago, IL 60602
(312) 603-3369
sara.spivy2@cookcountyil.gov
edward.brener@cookcountyil.gov

***Attorneys for City of Chicago:***
Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Rusco & Connelly, LLC
312 N. Clark, Suite 2200
Chicago, IL 60654
(312) 494-1000
erosen@rfclaw.com
sbenjamin@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

***Attorneys for Defendant Guevara:***
James V. Daffada
Thomas M. Leinenweber
Kevin E. Zibolski
Justin L. Leinenweber
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
jim@ilesq.com
thomas@ilesq.com
kevin@ilesq.com
justin@ilesq.com

/s/ Josh M. Engquist
JOSH M. ENGQUIST

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.2
### Eastern Division

Jose Juan Maysonet, Jr.

                        Plaintiff,

v.                                    Case No.: 1:18–cv–02342
                                      Honorable Mary M. Rowland

Reynaldo Guevara, et al.

                        Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, March 26, 2020:

     MINUTE entry before the Honorable Mary M. Rowland: Plaintiff's unopposed motion to substitute a special representative for deceased Defendant Ernest Halvorsen [120] is granted. A suggestion of death as to Defendant Halvorsen [116] has been filed and Defendants have indicated that JoAnn Halvorsen has agreed to serve as the substituted party [120 at p. 2]. JoAnn Halvorsen is appointed as Special Representative and is substituted as the defendant in this case. The Clerk of the Court is directed to remove Defendant Ernest Halvorsen as a defendant and instead substitute JoAnn Halvorsen as Special Representative for Ernest Halvorsen as a named Defendant. Plaintiff has agreed not to seek punitive damages against Halvorsen. Plaintiffs are granted leave to serve process on JoAnn Halvorsen forthwith. There is no need to appear on 4/7/20. Mailed notice. (dm, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 15



# Transcript of Ernest Halvorsen

**Date:** February 6, 2019
**Case:** Montanez & Serrano -v- Guevara, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

JGS_MAYSONET 3984

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3            EASTERN DIVISION
 4   ----------------------------x
 5   JOSE MONTANEZ,          :
 6            Plaintiff,     :
 7       v.                  :  Case No. 17 CV 4560
 8   REYNALDO GUEVARA, et al.,  :
 9            Defendants.    :
10   --------------------------  :
11   ARMANDO SERRANO,        :
12            Plaintiff,     :
13       v.                  :  Case No. 17 CV 2869
14   REYNALDO GUEVARA, et al.,  :
15            Defendants.    :
16   ----------------------------x
17      Videotaped Deposition of ERNEST HALVORSEN
18             Chicago, Illinois
19         Wednesday, February 6, 2019
20              10:06 a.m.
21
22   Job No.:  225342
23   Pages:  1 - 370
24   Reported by:  Joanne Ely, CSR, RPR
```

**Page 2**

```
 1      Videotaped deposition of ERNEST HALVORSEN, held
 2   at the location of:
 3
 4            LOEVY & LOEVY
 5            311 North Aberdeen Street
 6            3rd Floor
 7            Chicago, Illinois 60607
 8            (312) 243-5900
 9
10
11
12      Pursuant to notice before Joanne Ely, a
13   Certified Shorthand Reporter, Registered Professional
14   Reporter, and a Notary Public in and for the State
15   of Illinois.
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF JOSE MONTANEZ:
 3        RUSSELL AINSWORTH, ESQUIRE
 4        LOEVY & LOEVY
 5        311 North Aberdeen Street
 6        3rd Floor
 7        Chicago, Illinois 60607
 8        312.243-5900
 9   ON BEHALF OF PLAINTIFF ARMANDO SERRANO:
10        JENNIFER BONJEAN, ESQUIRE
11        ASHLEY COHEN, ESQUIRE
12        BONJEAN LAW GROUP, PLLC
13        1000 Dean Street
14        Suite 345
15        Brooklyn, New York 11238
16        718.875-1850
17   ON BEHALF OF DEFENDANT REYNALDO GUEVARA:
18        THOMAS MORE LEINENWEBER, ESQUIRE
19        LEINENWEBER BARONI DAFFADA LLC
20        120 North LaSalle Street
21        Suite 2000
22        Chicago, Illinois  60602
23        312.663.3003
24
```

**Page 4**

```
 1      A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF DEFENDANT MATTHEW COGHLAN:
 3        PAULA S. QUIST, ESQUIRE
 4        JONES DAY
 5        77 West Wacker Drive
 6        Chicago, Illinois 60601
 7        312.782.3939
 8   ON BEHALF OF DEFENDANTS ERNEST HALVORSEN AND
 9   EDWARD MINGEY:
10        JOSH M. ENGQUIST, ESQUIRE
11        DAVID A. BRUEGGEN, ESQUIRE
12        THE SOTOS LAW FIRM, PC
13        141 West Jackson Boulevard
14        Suite 1240A
15        Chicago, Illinois  60604
16        312.735.3300
17   ON BEHALF OF DEFENDANT CITY OF CHICAGO:
18        EILEEN E. ROSEN, ESQUIRE
19        ROCK FUSCO & CONNELLY, LLC
20        321 North Clark Street
21        Suite 2200
22        Chicago, Illinois 60654
23        (312) 494-1000
24
```

JGS_MAYSONET 3985

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

2 (5 to 8)

**Page 5**

```
 1      A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF DEFENDANTS COOK COUNTY AND JOHN DILLON
 3      JULIE NIKOLAEVSKAYA, ESQUIRE
 4      OFFICE OF THE COOK COUNTY STATE'S ATTORNEY
 5      500 Richard Daley Center
 6      Chicago, Illinois 60602
 7      (312) 603-3473
 8
 9   ALSO PRESENT:
10      ARMANDO SERRANO
11      JOSE MONTANEZ
12      RICK KOSBERG, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 6**

```
 1           C O N T E N T S
 2   EXAMINATION OF HALVORSEN          PAGE
 3      By Mr. Ainsworth                  8
 4      By Ms. Rosen                    362
 5      By Ms. Quist                    365
 6
 7           E X H I B I T S
 8      (Attached to transcript.)
 9
10   HALVORSEN DEPOSITION EXHIBITS     PAGE
11
12   Exhibit 1  Photograph             121
13   Exhibit 2  Transcript of Trial Testimony  178
14   Exhibit 3  Bates Nos. RFC-Serr/Mont  185
15              149-177
16   Exhibit 4  Sidley Austin Memorandum  190
17   Exhibit 5  Memorandum, 7/23/14    223
18   Exhibit 6  Bates Nos. RFC-Serr/Mont 1-148  225
19   Exhibit 7  Geraldo Iglesias Testimony,  290
20              12/16/94
21   Exhibit 8  6/8/1993, Supplementary Report  316
22   Exhibit 9  Armando Serrano, Complaint For  362
23              Preliminary Examination
24   Exhibit 10 Employee Training Record  362
```

**Page 7**

```
 1           P R O C E E D I N G S
 2      THE VIDEOGRAPHER:  This is the video
 3   deposition of Ernest Halvorsen taken by Loevy &
 4   Loevy in the matter of Jose Montanez v. Reynaldo
 5   Guevara, et al., Case No. 17 CV 4560; and Armando
 6   Serrano versus Reynaldo Guevara, et al., Case
 7   No. 17 CV 2869 held at Loevy and Loevy, 311 North
 8   Aberdeen Street, Chicago, Illinois.
 9      Today is February the 6th, 2019.  The time
10   is 10:06.  The court reporter is Joanne Ely.  The
11   videographer is Rick Kosberg.
12      Counsel will now introduce themselves.  Then
13   the court reporter is free administer the oath.
14      MR. AINSWORTH:  This is Russell Ainsworth
15   appearing on behalf of Plaintiff Jose Montanez.
16      MS. BONJEAN:  Jennifer Bonjean on behalf of
17   Armando Serrano, also present.
18      MS. COHEN:  Ashley Cohen on behalf of
19   Armando Serrano.
20      MR. LEINENWEBER:  Good morning.  Tom
21   Leinenweber on behalf of Reynaldo Guevara.
22      MS. QUIST:  Paula Quist on behalf of
23   Defendant Matt Coghlan.
24      MS. NIKOLAEVSKAYA:  Julie Nikolaevskaya on
```

**Page 8**

```
 1   behalf of John Dillon and Cook County.
 2      MS. ROSEN:  Eileen Rosen on behalf of
 3   Defendant City of Chicago.
 4      MR. ENGQUIST:  Josh Engquist on behalf of
 5   Defendants Halvorsen and Mingey.
 6      MR. BRUEGGEN:  Dave Brueggen on behalf of
 7   Defendants Halvorsen and Mingey.
 8      THE REPORTER:  Would you please raise your
 9   right hand.
10      (Witness duly sworn.)
11           ERNEST HALVORSEN,
12   having been duly sworn, testified as follows:
13   EXAMINATION BY COUNSEL FOR PLAINTIFF MONTANEZ
14   BY MR. AINSWORTH:
15      Q  Would you please state and spell your name
16   for the record.
17      A  Ernest Halvorsen.
18      MR. ENGQUIST:  Can we just make sure that we
19   have everyone else that's here on the record, that
20   they're here.
21      MS. BONJEAN:  I said also present.
22      MR. ENGQUIST:  I'm sorry.  I didn't hear.
23      MS. ROSEN:  Can we take it down a notch.
24   Sorry.
```

JGS_MAYSONET 3986

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

9

1     A   H -- E-r-n-e-s-t H-a-l-v-o-r-s-e-n.
2   BY MR. AINSWORTH:
3     Q   And your first name doesn't start with an H;
4 correct?
5     A   No, E.
6     Q   Okay.  Have you given a deposition before?
7     A   Yes.
8     Q   On how many occasions?
9     A   Two.
10    Q   And was one of those two in this case
11 previously?
12    A   Yes.
13    Q   And when was the other time that you gave a
14 deposition?
15    A   I believe it was April of last year.
16    Q   And in what case was that?
17    A   Say again, please.
18    Q   What was the case that you gave a deposition
19 in in April of last year?
20    A   The same case we're here today for.
21    Q   And so when you say you've given two
22 depositions, are you including today as one of those
23 two?
24    A   No.

10

1     Q   So one of the other two was in April of last
2 year in this case.
3         When was the other time that you had been
4 deposed in the past?
5     A   Early in 2000 sometime.
6     Q   And in what case was that?
7     A   Angel Rodriguez.
8     Q   Do you know who it was who deposed you?
9     A   No.
10    Q   And do you know why it was that you were
11 being deposed?
12    A   I was being sued.
13    Q   So you were a defendant in that lawsuit?
14    A   Yes.
15    Q   Because it's been quite some time since you
16 gave that deposition, I just want to go over some of
17 the ground rules; is that okay?
18    A   Go ahead.
19    Q   The first thing I'm going to ask you to do
20 is to give your answers just as you've been doing
21 thus far, that is out loud with a yes or no if the
22 question calls for it.  Okay?
23    A   Yes.
24    Q   The next thing I'll ask you to do is to wait

11

1 until I'm done asking my question before you begin
2 your answer so that we're not speaking at the same
3 time.  Okay?
4     A   Yes.
5     Q   I'll try and do the same to you, and that is
6 wait until you're done with your answer before I
7 begin my next question.  All right?
8     A   Yes.
9     Q   If you don't understand my question at any
10 time or you don't hear my question at any time,
11 would you please ask me to rephrase the question,
12 re-ask the question, or in some way indicate to me
13 that you did not either understand my question or
14 hear my question.  Okay?
15    A   Yes.
16    Q   The flip side of that is that if you answer
17 my question, we'll assume that you've understood my
18 question as I've posed it; fair?
19    A   Yes.
20    Q   If you need a break at any time, you can
21 take a break.  Just we -- you must answer any
22 question that's pending before taking a break.
23 Okay?
24    A   Yes.

12

1     Q   Do you have any medical issues or any
2 medical condition or any medication that you're
3 taking that would interfere with your ability to
4 testify truthfully and accurately here today?
5     A   No.
6     Q   You were kind enough to alert me that you
7 have some difficulty with your hearing; is that
8 correct?
9     A   Yes.
10    Q   And so if at any time you can't -- you're
11 having a problem hearing the questions that are
12 being asked, you understood that -- you understand
13 that you can simply ask me to re-ask the question or
14 speak louder so that you can hear the question;
15 right?
16    A   Yes.
17    Q   Do you have any difficulty with your memory?
18    A   Not that I'm aware of.
19    Q   All right.  So nobody, no family member and
20 no medical professional has mentioned to you that
21 there is -- they perceive something wrong with your
22 memory; is that right?
23    A   No.
24    Q   That's correct?

JGS_MAYSONET 3987

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

4 (13 to 16)

---

13

1    A  No.
2    Q  All right.  I've got a double negative
3 there.
4        It is correct that nobody has brought to
5 your attention that there might be some problem with
6 your memory; correct?
7    A  That's correct.
8    Q  You're retired; is that right?
9    A  Yes.
10    Q  Retired from the Chicago Police Department,
11 I mean; correct?
12    A  Yes.
13    Q  You retired in 2010?
14    A  Yes.
15    Q  Have you had any employment since your
16 retirement from the Chicago Police Department?
17    A  Have I had any what?
18    Q  Any employment.
19    A  No.
20    Q  Do you intend to seek employment?
21    A  No.
22    Q  Do you live in the State of Illinois?
23    A  Yes.
24    Q  Do you intend to move?

---

14

1    A  No.
2    Q  When was the last time you talked to Ray
3 Guevara?
4    A  Probably a year ago.
5    Q  And in what context?  Why was it that you
6 were talking to Ray Guevara about a year ago?
7    A  We were all sitting down in the cafeteria at
8 26th and California.
9    Q  And why were you at the cafeteria at 26th
10 and California?
11    A  In response to a subpoena from Ms. Bonjean.
12    Q  And for what case was that?
13    A  I believe it was Mr. Maysonet.
14    Q  And when you say we all were sitting down in
15 the cafeteria, who was the "we" who was sitting
16 together?
17    A  Me, Guevara, Mingey, Dan Herbert, three
18 other attorneys, I don't remember their names right
19 now.
20    Q  And was there -- did you see Ray Guevara at
21 26th and Cal on that day approximately a year ago
22 when you were not seated and talking with your
23 attorneys?
24    A  No.

---

15

1    Q  When you arrived at 26th and California that
2 day, where did you go?
3    A  The cafeteria.
4    Q  And were you intending to meet people at the
5 cafeteria?
6    A  I was going to meet my attorney, Dan
7 Herbert.
8    Q  Did you arrive first, or did Guevara arrive
9 first?
10    A  I don't remember.
11    Q  Did you go anywhere at 26th and Cal that day
12 apart from the cafeteria?
13    A  No.
14    Q  So you left immediately from the cafeteria?
15    A  I believe we left the cafeteria and went
16 into the hallway outside of one of the courtrooms.
17    Q  All right.  Who is the "we" that went to the
18 hallway outside of one of the courtrooms?
19    A  Me and my attorney, Dan Herbert.
20    Q  Did anyone else go to that hallway with you?
21    A  Not with us but other people did go to that
22 hallway.
23    Q  Were there other detectives who went to that
24 hallway?

---

16

1    A  I believe I saw retired detectives there,
2 yes.
3    Q  Which retired detectives did you see there?
4    A  Paul Nitsky and Montia.
5    Q  Were Paul Nitsky or Montia in the cafeteria
6 with you and your attorneys?
7    A  They may have been, but I don't remember.
8    Q  And while you were in that hallway outside
9 the courtroom, did you have any discussions with
10 anyone?
11    A  No.
12    Q  Why were you in the hallway outside the
13 courtroom?
14    A  The Judge ordered us to leave the courtroom.
15    Q  Did you go in the courtroom?
16    A  For a couple of minutes, then the Judge
17 ordered us out.
18    Q  And how long did you remain outside the
19 courtroom?
20    A  No more than 10 minutes.
21    Q  Pause before you answer this question.
22        Did you have any -- what did you discuss
23 while you were outside the courtroom?
24    MR. ENGQUIST:  I'm going to object.  If he's

---

JGS_MAYSONET 3988

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

**17**

1  talking about outside the -- conversations outside
2  conversations he had with his attorney, he can
3  answer the question.  Otherwise, he shouldn't be
4  answering questions having to do with
5  attorney/client privilege.
6      Q  Are you going to take your --
7      MR. AINSWORTH:  Are you instructing the
8  witness not to answer?
9      MR. ENGQUIST:  I'm instructing him not to
10 respond to anything having to do with conversations
11 with his attorney, Dan Herbert.
12     Q  Are you going to take your attorney's advice
13 and not -- not testify about that conversation?
14     **A  With my attorney, that's correct.**
15     Q  Did you have any conversations with people
16 who were not your attorney while you were outside
17 the courtroom?
18     **A  Not that I remember.**
19     Q  Did you return to the courtroom after being
20 outside the courtroom for some period of time?
21     **A  No.**
22     Q  Why not?
23     **A  Dan Herbert told us to leave the building**
24 **and go home.**

**18**

1      Q  And did you walk out with anyone?
2      **A  My attorney.**
3      Q  Who else did you walk out with?
4      **A  Just my attorney.**
5      Q  Which attorney?
6      **A  Dan Herbert.**
7      Q  Did Ray Guevara walk with you out?
8      **A  No.**
9      Q  Why didn't -- did the other detectives leave
10 at the same time you did?
11     **A  Yes.**
12     Q  Was there a reason why you didn't walk out
13 with them?
14     **A  I remember we went down the stairs, and I**
15 **don't know where the other people went.**
16     Q  Did you walk down the stairs with them?
17     **A  Not with them.  I walked down the stairs**
18 **with Dan Herbert.**
19     Q  Were the other detectives walking down the
20 stairs at the same time that you were?
21     **A  Not that I remember.**
22     Q  Where were you parked?
23     **A  Where was I parked?**
24     Q  Yeah.

**19**

1      **A  The parking garage across the street at 26th**
2  **Street.**
3      Q  Was Dan Herbert parked in that same garage?
4      **A  Yes.**
5      Q  Did you drive there with anyone?
6      **A  No.**
7      Q  Did you know that Ray Guevara was going to
8  be at court that day?
9      **A  No.**
10     Q  Do you know where Ray Guevara is living now?
11     **A  No.**
12     Q  Do you know that he's living out of state?
13     **A  No.**
14     Q  Do you know that he lives in Texas?
15     **A  No.**
16     Q  When did you start your employment with the
17 Chicago Police Department?
18     **A  As a police officer or as a police cadet?**
19     Q  Well, which did you do first, sir?
20     **A  I was a police cadet.**
21     Q  All right.  When were you a police cadet?
22     **A  I think I began in 1969.**
23     Q  What is a police cadet?
24     **A  Someone who has graduated from high school,**

**20**

1  who attends college, and works for the police
2  department in a civilian capacity.
3      Q  Did you graduate high school?
4      **A  Yes.**
5      Q  Where did you graduate high school?
6      **A  Lane Tech.**
7      Q  When did you graduate high school?
8      **A  1968.**
9      Q  Do you have any family members in the police
10 department?
11     **A  No.**
12     Q  Why did you want to become a police cadet?
13     **A  Because it allowed me to go to college.**
14     Q  Did they -- did the department pay you for
15 being a cadet?
16     **A  Yes, they did.**
17     Q  And was it a salary or was it tuition
18 credits or a combination?
19     **A  It was a salary.**
20     Q  What did you do for the department as a
21 police cadet?
22     **A  I had various jobs.**
23     Q  What were your various jobs?
24     **A  Timekeeper, tour guide, community relations**

JGS_MAYSONET 3989

**21**

1 officer.  Those are the three I remember.
2    Q  Who were you a tour guide for?
3    **A  Say that again, please.**
4    Q  Who were you a tour guide for?  Who did you
5 give tours to?
6    **A  I gave tours mainly to school groups at**
7 **police headquarters.**
8    Q  For how long were you a civilian cadet?
9    **A  A little less than four years.**
10    Q  Did you attend college?
11    **A  Yes.**
12    Q  What college did you attend?
13    **A  City College of Chicago.**
14    Q  Did you receive a degree or certificate from
15 the City College of Chicago?
16    **A  No.**
17    Q  How long did you attend the City College of
18 Chicago?
19    **A  A little less than four years.**
20    Q  Did you attend any other post high school
21 educational institution?
22    **A  No.**
23    Q  Did you ever receive either an associate's
24 degree or a bachelor's degree?

**22**

1    **A  No.**
2    Q  Why did you stop attending City Colleges?
3    **A  They eliminated the cadet program.**
4    Q  So why did that cause you to not attend
5 college anymore?
6    **A  Because I had to go find another job that**
7 **did not allow me to go to school.**
8    Q  What job did you find?
9    **A  I think after that I became a photographer**
10 **for a few months.**
11    Q  Did you have any training to become a
12 photographer?
13    **A  I worked in a camera store for a number of**
14 **years.**
15    Q  Was that while you were also a police cadet
16 or --
17    **A  No.**
18    Q  -- when was that?
19    **A  It was when I was in high school.**
20    Q  Why did you stop being a photographer?
21    **A  Because I became a police -- why did I stop**
22 **becoming a photographer?**
23    Q  Yeah.
24    **A  I was hired by the police department as a**

**23**

1    police officer.
2    Q  When was that?
3    **A  23 October 1972.**
4    Q  Did you attend the academy?
5    **A  Yes.**
6    Q  And what was your first assignment after the
7 academy?
8    **A  I was assigned to the patrol division, the**
9 **17th police district.**
10    Q  Where was the 17th district headquarters at
11 that time?
12    **A  4461 North Pulaski.**
13    Q  And for how long did you remain in patrol at
14 the 17th district?
15    **A  I was working a beat for approximately three**
16 **years, and then I went on the district tact team.**
17    Q  Staying within the 17th district?
18    **A  Yes.**
19    Q  How did you become a member of the tact
20 team?
21    **A  I was invited.**
22    Q  Who invited you?
23    **A  Lieutenant Harry Smith.**
24    Q  Did you want to be a member of the tact

**24**

1 team?
2    **A  Yes.**
3    Q  Why did you want to become a member of the
4 tact team?
5    **A  Because they were harder-working police**
6 **officers in my opinion.**
7    Q  The beat officers hard-working police
8 officers?
9    **A  Yes.**
10    Q  Why -- what -- what made you want to become
11 a tact officer, if both the tact officers and the
12 beat officers were hard-working police officers?
13    **A  The tact officers were harder-working police**
14 **officers.**
15    Q  All right.  So you thought the tact officers
16 worked harder than the beat officers.
17    **A  Yes.**
18    Q  Why did you believe that the tact officers
19 worked harder than the beat officers?
20    **A  They made more arrests.**
21    Q  And you wanted to make more arrests; is that
22 right?
23    **A  I wanted to do more police work.**
24    Q  Why did you want to do more police work?

JGS_MAYSONET 3990

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

25

1    A  That was the job I was hired to do.
2    Q  Did you think that if you did more police
3 work, you would have a better shot at advancement?
4    A  No.
5    Q  Did you want to get a promotion?
6    A  Yes.
7    Q  What did you think was a path to getting a
8 promotion?
9    A  Passing an exam.
10    Q  All right.  And did you sit for an exam to
11 receive a promotion?
12    A  I took an exam, yes.
13    Q  What exam did you take?
14    A  The sergeants promotional exam.
15    Q  When did you take the sergeants promotional
16 exam?
17    A  That I don't remember.
18    Q  Was there a list created based on the
19 results of that exam that you took?
20    A  Yes.
21    Q  Were you on that list?
22    A  I never saw it.
23    Q  And I take it you were not promoted from
24 that list?

26

1    A  That's correct.
2    Q  There is another path to be promoted to
3 sergeant; isn't that right?
4    A  In the Chicago Police Department?
5    Q  Yes, sir.
6    A  Not at that time there wasn't.
7    Q  Not when you were at the 17th district?
8    A  That's correct.
9    Q  How long did you -- so did you want to make
10 more arrests while you were on the -- while you were
11 in the 17th district beat patrol?
12    A  Could you repeat that question?
13    Q  Yeah.  Sorry.
14       When you were assigned to be a beat officer
15 in the 17th district, did you want to make more
16 arrests?
17       MR. ENGQUIST:  Objection; form, vague.
18    A  I wanted to do more meaningful police work.
19    Q  And what was meaningful police work to you?
20    A  To investigate and arrest dangerous
21 individuals.
22    Q  So one of the things you wanted to do was to
23 make more arrests; right?
24    A  Of dangerous individuals.

27

1    Q  Yeah.  And for how long did you serve on the
2 tact team?
3    A  Approximately, seven years.
4    Q  Did you serve for seven years continuously
5 with the tact team in the 17th district?
6    A  What was your question again?
7    Q  Did you serve continuously for about seven
8 years in the 17th district on the tact team?
9    A  Not continuously.
10    Q  Can you explain why it wasn't continuously?
11    A  I was taken off for a couple months and then
12 put back on.
13    Q  Why were you taken off for a couple months?
14    A  I have no idea.
15    Q  Who was it who reassigned you?
16    A  Commander Richard Rouchford.
17    Q  Did you seek an explanation for why you were
18 being moved from the tact team or off the tact team?
19    A  I never got one.
20    Q  Did you seek an explanation?
21    A  Yes.
22    Q  Who did you ask?
23    A  Commander Rouchford.
24    Q  And what did Commander Rouchford say?

28

1    A  His discretion.
2    Q  When you left the tact team, did you go
3 to -- back to the beat patrol?
4    A  Yes.
5    Q  And how did you get back on the tact team?
6    A  He put me back on.
7    Q  Who is he?
8    A  Commander Rouchford.
9    Q  Did you ask commander -- that commander why
10 you were being placed back on the tact team?
11    A  No.
12    Q  Why did you leave the tact team after
13 approximately seven years?
14    A  I was transferred to the 24th police
15 district.
16    Q  Why were you transferred?
17    A  It was a brand new police district, and they
18 needed manpower to fill the station.
19    Q  Did you volunteer to be a member of the 24th
20 district?
21    A  No.
22    Q  And do you know why it was that you were
23 selected as opposed to other officers to form the
24 24th district?

JGS_MAYSONET 3991

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

**29**

1     A  No.
2     Q  Where was the 24th district at the time?
3     A  I believe it was 6401 North Clark Street.
4  That address could be wrong, though.
5     Q  Somewhere up in Roger's Park?
6     A  It was on Clark Street north of Devon.
7     Q  And for how long did you remain in the 24th
8  district?
9     A  A little less than three years.
10    Q  What did you do -- or what was your work
11 assignment at the -- in the 24th district?
12    A  I was on the tact team.
13    Q  Did you serve in patrol at all in the 24th
14 district?
15    A  Approximately a week I was in a beat car.
16    Q  And what were your duties on the tact team
17 in the 24th district?
18    A  District law enforcement.
19    Q  Did you respond to radio calls?
20    A  Yes.
21    Q  Were you asked to focus your attention on
22 the gang activity in the 24th district?
23    A  We did focus our attention on the gang
24 activity in the 24th police district, but at that

---

**31**

1     Q  Why did you want to become a detective?
2     A  I thought that was the premiere spot of
3  being a police officer.
4     Q  Why did you think it was the premiere spot
5  of being a police officer?
6     A  I thought detectives were the cream of the
7  crop of policemen.
8     Q  Why did you think that -- why did you think
9  that detectives were the cream of the crop of the
10 policemen?
11    A  That was my opinion.
12    Q  What was your opinion based on?
13    A  Watching detectives in action.
14    Q  Did you work with detectives?
15    A  Yes.
16    Q  What was it about detectives that you
17 admired?
18    A  Their knowledge, their skill, their
19 dedication.
20    Q  Did you have knowledge and skill and
21 dedication as a tact officer in the 24th district?
22    A  To my level, yes.
23    Q  What were the skills that you wanted to
24 become better at while you were a tact officer in

---

**30**

1  time there wasn't really a large gang problem.
2     Q  What about in the 17th district?  Were you
3  asked to focus your attention on the gang activity
4  in the 17th district when you were a member of the
5  tact team?
6     A  Same thing.  We were asked to focus on gang
7  activity, but there wasn't a lot of gang activity in
8  the 17th district.
9     Q  Why did you leave the 24th district?
10    A  I was promoted to detective.
11    Q  How did you go about becoming promoted to
12 detective?
13    A  I took a competitive examination and scored
14 high.
15    Q  Was there a list created based on the
16 results of the exam that you took?
17    A  Yes.
18    Q  Were you on that list?
19    A  Yes.
20    Q  Were you promoted from that list?
21    A  Yes.
22    Q  How many times did you take that test to
23 become a detective?
24    A  Once.

---

**32**

1  the 24th district?
2     A  I imagine it would have been interviews,
3  just basically following -- as a patrol officer, as
4  a tact officer, you don't follow up on
5  investigations.  You do the initial investigation,
6  and then you're out of the case.
7        As a detective you get to see the end of the
8  case, and that's what I wanted to see.  I wanted to
9  see how the cases progressed, how they ended.
10    Q  You wanted to see how to follow up on the
11 leads; right?
12    A  Part of it, yes.
13    Q  How to try and solve the case over time;
14 right?
15    A  Correct.
16    Q  Did you go to detective school?
17    A  Yes.
18    Q  When did you go to detective school?
19    A  I believe it was in 1972, but I could be
20 wrong.
21    Q  You mean '82?
22    A  '82 but I could be wrong.
23    Q  How long was that detective school?
24    A  If I remember correctly, it was three weeks.

---

JGS_MAYSONET 3992

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

9 (33 to 36)

---

33

1    Q   Were you trained in detective school on the
2  importance of report writing?
3    **A  Yes.**
4    Q   Were you -- were you told the old saying
5  that if it's not written down, it didn't happen?
6    **A  Never heard that.**
7      MS. ROSEN:  Object to the form.
8    Q   You never heard that phrase?
9    **A  No.**
10     THE REPORTER:  Sorry?
11     MS. ROSEN:  Object to the form.
12   Q   Were you trained in detective school to
13  document the progress of your investigation?
14   **A  Yes.**
15   Q   Were you trained that you were supposed to
16  document the facts of your investigation whether
17  they were good for the prosecution or good for the
18  defense?
19   **A  Yes.**
20   Q   Were you trained that you had an obligation
21  to document the facts that might be good for the
22  criminal defendant in the case?
23   **A  Yes.**
24   Q   Were you trained that sometimes you didn't

---

34

1  know what facts -- or the importance of certain
2  facts until later in an investigation?
3      MS. ROSEN:  Object to the form.
4      MR. ENGQUIST:  Join.
5    **A  I don't remember that specifically.**
6  **BY MR. AINSWORTH:**
7    Q   Did you learn that in your experience as a
8  detective, that sometimes a witness would tell you
9  something and it didn't become really important
10  until later in your investigation?
11   **A  That's correct.**
12   Q   And so you knew that because facts might
13  become important later in your investigations, you
14  knew that it was important to document the facts
15  that you learned as you learned them; correct?
16   **A  It would have to pertain to what facts are**
17  **we talking about.**
18   Q   Facts of the criminal investigation that
19  you're working on.
20   **A  Well, again, it would have to be what facts**
21  **that would have to be documented.**
22   Q   Let's ask that to you, sir.
23     What facts would you document in an
24  investigation?

---

35

1      MS. ROSEN:  Object to the form.
2      MR. ENGQUIST:  Join.
3    **A  Interviews, evidence, statements -- that's**
4  **all I can recall right now.**
5  **BY MR. AINSWORTH:**
6    Q   So let me start with an easy one.
7      If a witness told you that another person
8  had confessed murder to him, is that the kind of
9  thing that you would write down?
10   **A  Yes.**
11   Q   And why would you write that down?
12   **A  I would cause that statement to be typed up**
13  **in a report.  I would not necessarily write that**
14  **down.**
15   Q   Why wouldn't you write down the fact that a
16  person had told you that another person had
17  confessed murder to him?
18   **A  As I have just stated, I typed many things**
19  **that persons told me rather than taking longhand**
20  **written notes.**
21   Q   I see.
22     You mean you would type it in a supp report?
23   **A  Correct.**
24   Q   Okay.  So -- so in some fashion, either in

---

36

1  handwritten notes or in a supplemental police
2  report, you would document the fact that a witness
3  had told you that another person had confessed
4  murder; correct?
5    **A  Yes.**
6    Q   And why would you document in a supplemental
7  report that another -- that a witness had told you
8  that another person had confessed murder to him?
9    **A  It was a third-party admission that could be**
10  **used for evidence.**
11   Q   And evidence in an important case; right?
12   **A  Evidence in a case --**
13     MR. ENGQUIST:  Objection; calls for
14  speculation.
15     Go ahead.
16   **A  Evidence in that particular case that I**
17  **would be involved in.**
18   Q   And all cases are important; right?
19   **A  All cases deserve to be investigated.**
20   Q   But homicide cases are some of the most
21  important cases that the Chicago Police Department
22  handles.
23     Would you agree with that?
24   **A  In my opinion, I'd have to say yes.**

---

JGS_MAYSONET 3993

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

37

1    Q  And so if a -- if a witness is telling you
2  that another person had confessed murder to him,
3  that's the kind of thing that should absolutely be
4  written down, right, in a supplemental report?
5    **A  That is the type of statement that would**
6  **have to be memorialized, yes.**
7    Q  In a supp report?
8    **A  Yes.**
9    Q  Were you trained in detective school on how
10  to conduct interviews?
11   **A  Not that I remember.**
12   Q  Did you learn how to conduct interviews
13  while you were a detective?
14   **A  Yes.**
15   Q  Did you learn that it was important to ask
16  open-ended questions to witnesses to try and learn
17  what they knew?
18   **A  I don't remember that.**
19   Q  Do you know what I mean by open-ended
20  questions?
21   **A  No.**
22   Q  I mean a question that doesn't suggest the
23  answer, something that allows the witness to explain
24  to you what they know.  As opposed to a closed-ended

38

1  question which is typically asking a witness such as
2  what color was the -- was the color of the car red?
3      MS. ROSEN:  Object to the form.
4    **A  Could you rephrase that question.**
5  **BY MR. AINSWORTH:**
6    Q  Sure.
7    **A  It's kind of confusing.**
8    Q  Yeah.  Let me ask it this way.
9        When you interviewed witnesses, you wanted
10  to make sure that the information that you're
11  obtaining from the witness was truly the witness's
12  knowledge as opposed to something that you had
13  suggested to the witness; is that right?
14   **A  Correct.**
15   Q  And so when you were interviewing a witness,
16  you would be careful not to share nonpublic
17  information with that witness when you're conducting
18  the interview; is that right?
19   **A  Sometimes we'd have to give the person we're**
20  **interviewing some basic information such as the**
21  **location of where a crime occurred, the date and**
22  **time the -- time the crime occurred.  But no, we**
23  **would not give a witness the details.**
24   Q  So you wouldn't, for example, reveal to the

39

1  witness the caliber of the gun that was used in a
2  crime, but rather try and find out if the witness
3  might know the caliber of the gun.
4      Is that the kind of thing that you would do?
5    **A  That's correct.**
6    Q  Because it was important for the integrity
7  of your investigation to be able to determine
8  whether witnesses were providing the facts as
9  opposed to parroting information that you had
10  provided to them; right?
11   **A  Yes.**
12   Q  And that's not something that you would do,
13  that is to feed witnesses nonpublic information
14  about the -- about the crime, and then attribute
15  those facts to the witness; is that right?
16   **A  That's correct.**
17   Q  Were you trained to take notes in detective
18  school?
19   **A  No.**
20   Q  Were you later trained to take notes?
21   **A  No.**
22   Q  Were you ever trained by the Chicago Police
23  Department to take notes?
24   **A  When I was a cadet.**

40

1    Q  What were you trained while you were a cadet
2  about how to -- about taking notes?
3    **A  I took an extension course called**
4  **"Interviews and Interrogations."**
5    Q  Was that a course at the department or is
6  it -- or did you have to go somewhere else for that
7  training?
8    **A  It was an extension course.  They sent me**
9  **the material in the mail.  I read books, answered**
10  **question sheets, returned it to the training**
11  **division.**
12   Q  Do you recall the name of the book?
13   **A  "Interviews and Interrogations."**
14   Q  By Reid and Inbau?
15   **A  I don't remember whose book it was.**
16   Q  And what were you trained in that extension
17  course about note taking?
18   **A  I don't remember.  This was from 45 years**
19  **ago.**
20   Q  What were you trained in that extension
21  course about conducting interviews?
22   **A  Again, this is so long ago, I don't**
23  **remember.**
24   Q  Did you become a detective before GPRs were

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

11 (41 to 44)

41

1  used by the department?
2  **A  Yes.**
3  Q  When GPRs were introduced by the department,
4  were you trained on how to use those GPRs?
5  **A  No.**
6  Q  They just gave you the GPRs?
7  **A  We were under order that you had to use them**
8  **and what to do with them.**
9  Q  Would you take notes in your investigations?
10 **A  Sometimes, yes; sometimes, no.**
11 Q  What would determine whether you would take
12 notes during your investigation?
13 **A  I would take notes of things that I couldn't**
14 **remember such as a person's name, addresses, dates**
15 **of birth, social security numbers, where they**
16 **worked, what hours they worked.**
17 **    I would generally not take notes on**
18 **statements because I could remember a statement.**
19 Q  Why wouldn't you take notes on statements?
20 **A  Because I just said I could remember them.**
21 Q  How would you know that you would remember
22 statements as well without the aid of your notes as
23 you could with the aid of your notes?
24 **A  I just could.**

42

1  Q  Was there any other reason why you wouldn't
2  take notes of statements that were being provided to
3  you?
4  **A  No.**
5  Q  How is your handwriting?
6  MS. ROSEN:  Objection to form.
7  MR. ENGQUIST:  Go ahead.
8  **A  Average.**
9  Q  Legible?
10 MS. ROSEN:  Object to form.
11 **A  To myself.**
12 Q  You didn't have a problem reading your
13 writing?
14 **A  No.**
15 Q  Would you sometimes delay documenting
16 statements because you didn't know if the statement
17 was true or not?
18 MS. ROSEN:  Object to the form.
19 **A  No.**
20 Q  And why not?  Why wouldn't you --
21 **A  Why?**
22 Q  Yeah.  Why would you not delay documenting a
23 statement even though you didn't know if the
24 statement was true or not?

43

1  MR. ENGQUIST:  Objection.
2  MS. ROSEN:  Object to the form.
3  MR. ROSEN:  Join.
4  **A  If I believed the statement that was given**
5  **to me was needed for a case, I would document it as**
6  **soon as possible in a typed written report while it**
7  **was fresh in my memory.**
8  **BY MR. AINSWORTH:**
9  Q  And would you -- you would document it so
10 you didn't forget what the statement was; correct?
11 **A  Correct.**
12 Q  And then you would continue with your
13 investigation to determine whether that documented
14 statement was, in fact, true or whether portions of
15 it were false; is that fair to say?
16 MS. ROSEN:  Object to the form.
17 **A  That would be correct.**
18 Q  And is that what you understood you were
19 supposed to do?  If you received information, you
20 would document it and then continue on with your --
21 let me just start over with that question so we've
22 got it clean.
23 And would you document whatever statements
24 you obtained in a written supp report and then

44

1  continue in your investigation to determine whether
2  the statement was true or false?
3  MR. ENGQUIST:  Objection; calls for
4  speculation.  It's an incomplete hypothetical.
5  Objection; form.
6  Go ahead.  Go ahead.
7  **A  I did not use written supp reports.**
8  Q  I mean typed, sorry.  Let me try that again.
9  Was it your understanding that what you were
10 supposed to do was if you received a statement, and
11 even if you weren't sure if the statement was true
12 or false, you would document it in a typed supp
13 report and then continue your investigation to
14 determine whether that statement was, in fact, true
15 or false?
16 MR. ENGQUIST:  Objection; calls for
17 speculation, incomplete hypothetical, and form.
18 Go ahead.
19 **A  That's correct.**
20 Q  Did you sometimes use polygraph tests?
21 **A  Yes.**
22 Q  As an investigative tool, I mean?
23 **A  Yes.**
24 Q  Why would you use a polygraph test?

JGS_MAYSONET 3995

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

45

1    A  To find out if some person was telling the
2 truth or not.
3    Q  Did you find those tests to be helpful in
4 your investigations?
5    A  Yes.
6    Q  If you had a suspect or a person of interest
7 and you wanted them to sit for a polygraph exam, how
8 would you go about doing that in 1993?
9      MR. ENGQUIST:  Objection; incomplete
10 hypothetical, form.
11      Go ahead.
12    A  I would ask if they wanted to volunteer to
13 take a polygraph examination.  If they did, I would
14 call the polygraph section, arrange an appointment,
15 and drive them down to the polygraph section.  They
16 would meet with the polygraph examiner, and the test
17 would be conducted.
18    Q  Well, would you sit in for any portion of
19 the examination at the polygraph examiner's place?
20    A  No.  It was not permitted.
21    Q  Would you document the results of that
22 polygraph examination?
23    A  Yes.
24    Q  How would you document the results of that

46

1 polygraph examination?
2    A  In one of our supp reports.
3    Q  Why would you document the results of a
4 polygraph examination in one of your supp reports?
5    A  To show the progress of the investigation.
6    Q  Would you also document the fact that you
7 had requested a person to take a polygraph exam in
8 your supp report?
9    A  Yes.
10    Q  And would you document the reason why you
11 asked the person to sit for a polygraph exam?
12    A  I would inform the person of why I requested
13 that they sit for a polygraph exam.  I don't think I
14 would explain it in my report because the report
15 would already indicate what investigation it was.
16    Q  What do you mean your report would already
17 indicate what investigation it was?
18    A  Well, if I'm working on this case, for
19 example, my reports would indicate what murder case
20 I'm working on.  I wouldn't have to type in there
21 I'm going to do a polygraph exam for this murder
22 case; but I would tell the defendant that he was a
23 suspect in this case, did he want to take a
24 polygraph exam and try to show his innocence.

47

1    Q  Would you document in a supp -- in a typed
2 supp report the reasons why you believed that person
3 to be a suspect?
4    A  Yes.
5    Q  Why would you document the reasons why you
6 believed a person to be a suspect?
7    A  To justify asking him to take a polygraph
8 exam.
9    Q  Why was that important?
10    A  To show the flow of the investigation.
11    Q  Does it sometimes happen in your
12 investigations that you would have multiple suspects
13 for the same crime?
14    A  Yes.
15    Q  And did it sometimes happen that you would
16 have multiple suspects who were not necessarily
17 alleged to be working together, but, you know,
18 different -- you know, two different people who were
19 alleged to be the perpetrator -- you're looking at
20 me quizzically, so let me stop that question,
21 withdraw it, and try it in a different way.
22    A  Please.
23    Q  Sometimes you have investigations where you
24 have multiple offenders; right?

48

1    A  Correct.
2    Q  But sometimes it's just one single offender;
3 right?
4    A  Correct.
5    Q  But even cases where there's only alleged to
6 be a single offender, you may have multiple suspects
7 who might be that single offender; correct?
8    A  Correct.
9    Q  All right.  And so it's important -- even
10 where you have a single offender but multiple
11 suspects, it's important to document the reasons why
12 you believe each of those suspects might be the
13 perpetrator; correct?
14    A  Correct.
15    Q  And later on a criminal defendant who is
16 accused of the crime, who may have access to the
17 investigation that might point to somebody else as
18 being the perpetrator; right?
19    A  Correct.
20      MS. ROSEN:  Object to the form.
21    Q  So long as you -- so long as you properly
22 documented the information about why the other
23 people were suspects; correct?
24      MS. ROSEN:  Object to the form.

JGS_MAYSONET 3996

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

13 (49 to 52)

49

1       MR. ENGQUIST:  Join.
2    A  Correct.
3  BY MR. AINSWORTH:
4    Q  What was your first assignment after
5  detective school?
6    A  Area 5 detectives.
7    Q  And for -- and did you have any choice in
8  going to Area 5 as opposed to one of the other
9  areas?
10    A  I submitted a request to go there.
11    Q  Why did you want to go to Area 5?
12    A  It was close to my house.
13    Q  Did you know any of the Area 5 detectives
14  when you joined Area 5?
15    A  Yes.
16    Q  Who did you know?
17    A  I knew Rich Schak.
18    Q  Who else?
19    A  I can only remember Schak.
20    Q  Did Rich Schak speak Spanish at all?
21    A  No.
22    Q  How did you know Rich Schak?
23    A  He was a police cadet.
24    Q  At the same time that you were?

50

1    A  Yes.
2    Q  Did you work together?
3    A  No.
4    Q  How did you know he was a police cadet?
5    A  One time I was the police -- I was the
6  police timekeeper for the cadets.
7    Q  And so you would see his name?
8    A  I'd seen his name.  I had met him.
9    Q  And how did you meet him when you were a
10  police cadet?
11    A  That I don't recall.
12    Q  Do you stay in touch with him?
13    A  No.
14    Q  How did you know he was at Area 5 -- strike
15  that.
16        Did you know he was at Area 5 when you came
17  to Area 5?
18    A  When persons were taken into custody for
19  crimes in the 17th district, say, robbery,
20  detectives had to come out to process the crime.  I
21  would see Schak in the 17th district working on
22  cases.
23    Q  And did you -- did he work on some of your
24  cases?

51

1    A  Not that I remember.
2    Q  While you were at the 17th district, did you
3  work with gang crimes officers?
4    A  I don't know if gang crimes even existed at
5  the time I was in the 17th district, but I did not.
6    Q  How about when you were on the 24th
7  district, did you work with gang crimes officers?
8    A  No.
9    Q  For how long did you remain in Area 5 as a
10  detective?
11    A  28 years.
12    Q  Did you stay -- were you assigned to violent
13  crimes when you first arrived at Area 5?
14    A  Yes.
15    Q  Did you stay for 28 years continuously on
16  violent crimes?
17    A  They changed the name of the unit, but the
18  duties were the same.
19    Q  How did the name change?
20    A  They changed the name from violent crimes to
21  homicide, gang, sex.
22        MS. ROSEN:  Let the record just reflect that
23  Mr. Montanez is now in the room.
24        MR. AINSWORTH:  Thank you.

52

1    Q  Were you assigned a partner while you were
2  at Area 5?
3    A  What year?
4    Q  At all.
5    A  When I first got to Area 5, I worked with an
6  older detective by the name of Bill Rooney.
7    Q  For how long did you work with Bill Rooney?
8    A  Probably a year.
9    Q  Why did you stop partnering with Bill
10  Rooney?
11    A  I believe he got promoted to sergeant.
12    Q  Did you have a partner after you were with
13  Bill Rooney?
14    A  Yes.
15    Q  Who was that?
16    A  Detective Eddie Dickinson.
17    Q  For how long were partnered with Dickinson?
18    A  Eight, nine years.
19    Q  Why did you stop being partnered with Eddie
20  Dickinson?
21    A  He wanted to work midnights to coach his
22  son's little league team.
23    Q  What watch were you working at the time?
24    A  I was working the third watch.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

53

1    Q  And who was your partner after Eddie
2  Dickinson?
3    **A  The next regular partner I had, which is the**
4  **'90s, would have been Ray Guevara.**
5    Q  How did you come to be partnered with Ray
6  Guevara?
7    **A  His partner had left him to go work days,**
8  **and he didn't have a partner.**
9    Q  For how long were you and Ray Guevara
10 partnered?
11   **A  Eight, nine years.**
12   Q  Why did you stop being partners?
13   **A  I developed a heart condition.  My doctor**
14 **told me to go find myself a less stressful job in**
15 **the police department. I stopped working the street**
16 **and took an inside desk job.**
17   Q  What was the inside desk job that you took?
18   **A  I answered the phones.**
19   Q  What was your assigned title?
20   **A  Desk officer.**
21   Q  How long -- and when did you become a desk
22 officer?
23   **A  September of 1999.**
24   Q  Then for how long did you remain a desk

54

1  officer in Area 5?
2    **A  Until I retired in 2010.**
3    Q  What were your duties as a desk officer?
4    **A  Answer the phone, take the requests for**
5  **detectives to come out and be assigned to cases, do**
6  **computer information for detectives, and do the**
7  **daily -- we called them the attendance and**
8  **assignment sheets.**
9    Q  What computer information would you gather
10 for the detectives?
11   **A  As an example, if they called up and they**
12 **wanted to know the registration of a car they were**
13 **looking at, I went on the computer and tell them who**
14 **the car was registered to.**
15   Q  Would you run it through LEADS?
16   **A  Yes.**
17   Q  Were there any other computer databases that
18 you would use for that kind of task apart from
19 LEADS?
20   **A  There were a number of different computer**
21 **bases I had access to.**
22   Q  What were they?
23   **A  LEADS, NCIC, SOS.  That's all I can remember**
24 **right now.**

55

1    Q  Would you run searches to try and determine
2  who potential perpetrators might be for detectives
3  while you were a desk officer?
4    **A  I don't know how I would do that.  What --**
5  **how I could determine who a potential offender is.**
6    Q  For example, if you wanted to know who the
7  sex offenders were in a, you know, three-block
8  radius of a, you know, sexual assault crime, is that
9  the kind of thing that you would search for?
10   **A  No.  That's too involved a search.**
11   Q  In 1993, how would you go about creating a
12 supplemental police report?
13   **A  We had to use a two-part system.  We had to**
14 **type the first page on a manual typewriter, and we**
15 **went to a word processor -- word processor and typed**
16 **up the rest of the report.**
17   Q  So you would manually type the first page;
18 is that right?
19   **A  Correct.**
20   Q  And then you'd type the remainder on a word
21 processor?
22   **A  Correct.**
23   Q  When you typed the remainder on a word
24 processor, were some of the fields already filled

56

1  in?
2    **A  I don't remember.**
3    Q  Could you save the supp report as you went
4  along, you know, if you were taken away from your
5  typing?
6    **A  Yes.**
7    Q  And then you could pick back up where you
8  left off?
9    **A  Yes.**
10   Q  And how would you -- what would you do once
11 you completed the supplemental report to your
12 satisfaction?
13   **A  Once the report was finished?**
14   Q  Yes.
15   **A  I'd print the whole report out and submit it**
16 **to my sergeant.**
17   Q  So you would print the reports, and you'd
18 take the typewritten first page, and you'd submit it
19 to your sergeant; correct?
20   **A  Along with the computer-generated pages.**
21   Q  And would you staple them?
22   **A  I don't remember if we stapled them or used**
23 **a paper clip.**
24   Q  Where would you submit them in order to have

JGS_MAYSONET 3998

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

15 (57 to 60)

57

1 your sergeant review them?
2    A  There was a basket in the violent crimes
3 office.
4    Q  Can you describe that violent crimes office
5 for us?
6    A  Describe the office?
7    Q  Yeah. Back in 1993.
8    A  It's a little bit smaller than the room
9 we're currently sitting in. There was a couple of
10 desks, some file cabinets, and two or three computer
11 terminals.
12    Q  What would be housed in that violent crimes
13 office?
14    A  Say it again, please.
15    Q  What would be housed in that violent crimes
16 office?
17    A  Files.
18    Q  What would you call those files in the
19 violent crimes office?
20    A  Investigative files.
21    Q  Okay. And what comprises an investigative
22 file back in 1993?
23    A  Manila folder, a 5-by-7 envelope that was
24 stapled inside of it, and a clasp that was on the

58

1 opposite page to hold reports.
2    Q  What would go in the 5-by-7 envelope?
3    A  Miscellaneous items such as photos, a dead
4 person's driver's license, things of that nature.
5    Q  And what would go in the clasp side of that
6 manila folder?
7    A  Xerox copies of information, GPRs, and typed
8 reports.
9    Q  Why would you put Xeroxed copies in the
10 manila file?
11    MS. ROSEN: Object to the form.
12 Mischaracterizes his testimony.
13    A  Just to show the progress of the
14 investigation.
15    Q  Would you keep a Xerox copy of the reports
16 for your own purposes?
17    A  Never.
18    Q  Why do you say "never"?
19    A  Because I never did.
20    Q  What would you do if you wanted to have
21 access to the reports while you were out
22 investigating?
23    A  I would take the entire investigative file
24 from the office with me.

59

1    Q  And would you indicate to anyone or in any
2 way that you had taken the file out of the office?
3    A  Initially, when I was a detective, no.
4    Later on they instituted a system of green
5 cards where you signed out the file and then signed
6 the file back in.
7    Q  And so you would have to sign the green
8 card?
9    A  I believe by the time they instituted those
10 green cards, I had already stopped working the
11 street. I was working at the desk.
12    Q  Would those investigative files have an
13 inventory sheet?
14    A  Yes.
15    Q  Did you -- back in 1993, would you fill out
16 the inventory sheet?
17    A  I would indicate what items I had put in the
18 file, yes.
19    Q  And would you be the person who put stuff in
20 that investigative file?
21    A  Some things, yes.
22    Q  And what kind of things would you put in that
23 file?
24    A  My reports.

60

1    Q  And then would you fill out from the
2 inventory sheet which reports you were adding to the
3 file?
4    A  Yes.
5    Q  Would anyone sit in the violent crimes
6 office?
7    MS. ROSEN: Object to the form.
8    Q  I mean -- I'll clarify.
9    Was anyone assigned to sit in the violent
10 crimes office as their desk or workspace?
11    A  Yes.
12    Q  Who would -- in 1993, who would be there?
13    A  It would be the on-duty violent crimes
14 sergeant.
15    Q  Anyone else?
16    A  Nope. Not specifically assigned to sit in
17 the office.
18    Q  Were there other people who would sit in
19 that office in 1993?
20    A  Detectives could go in there and sit and do
21 their work if they wanted to.
22    Q  There were workspaces for them?
23    A  There were desks, and there were computer
24 terminals.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

61

1    Q  Was there a lieutenants office?
2    **A  Yes.**
3    Q  Where was the lieutenants office?
4    **A  That was a different office adjoining the**
5    **violent crime office.**
6    Q  Was it next door, or did you have to go
7    through the sergeants office to get to the
8    lieutenants office?
9    **A  You had to go through the violent crime**
10   **office to get to the lieutenants office.**
11   Q  Where was the on-duty -- well, the violent
12   crimes office in relation to the interview rooms at
13   Area 5 in 1993?
14   **A  Right behind some of them.**
15   Q  When you say "right behind," what do you
16   mean?
17   **A  Within feet of the back wall of the**
18   **interview room.**
19   Q  Is there an open area that -- that is
20   adjacent to the violent crimes office?
21   **A  Say again, please.**
22   Q  Is there an open area that's adjacent to the
23   violent crimes office?
24   **A  There is a main floor in Area 5 detectives.**

62

1    **There's a hallway that extends from the main floor**
2    **into the violent crimes office.  On either side of**
3    **this hallway are interview rooms.**
4    Q  And in that hallway, are there spaces for
5    the detectives to work?
6    **A  No.**
7    Q  Where would detectives -- where would --
8    where would detectives work on Area -- at Area 5?
9    **A  Most of the detectives worked on the main**
10   **floor.**
11   Q  And when you say "the main floor," what do
12   you mean?
13   **A  The largest open area in the office where**
14   **detectives had desks and computer terminals where**
15   **they could sit down and do their work.**
16   Q  And where was that area in relation to the
17   violent crimes office?
18   **A  10, 15 feet away.**
19   Q  Now, Area 5 is a secure police facility;
20   right?
21   **A  A secure police facility?**
22   Q  Yeah.
23   **A  With locked doors and things of that nature?**
24   Q  Yeah.

63

1    **A  No.**
2    Q  All right.  What floor was Area 5 -- Area 5
3    violent crimes on?
4    **A  Second floor.**
5    Q  I take it that a member of the public, such
6    as myself, couldn't just walk into the middle of
7    Area 5 violent crimes back in 1993; is that right?
8    **A  Unfortunately, they could.**
9    Q  And explain what you mean.
10   **A  There was no barring them from walking up**
11   **the stairs and just walking into the office.**
12   Q  And so you would sometimes have a concern
13   that there might civilians walking around Area 5;
14   right?
15       MR. ENGQUIST:  Object to the form.
16       Go ahead.
17   **A  There was -- in the first years I was a**
18   **detective in the new Area 5, after the 911 attacks,**
19   **they built a wall as you walked into Area 5 that**
20   **anybody coming in couldn't walk into the detective**
21   **area.**
22   Q  So before that wall was built -- let's just
23   say in 1993, okay, in that time period.
24       It could pose problems for your

64

1    investigations if civilians were walking around
2    freely within Area 5 violent crimes; is that
3    correct?
4    **A  Yes.**
5    Q  For example, you might have civilian
6    witnesses to a crime who might not want to be
7    observed cooperating with the police; right?
8    **A  Yes.**
9    Q  You might also not want suspects to know who
10   it was who was implicating them if you had suspects
11   and civilian witnesses at the area at the same time;
12   right?
13   **A  Yes.**
14   Q  And so sometimes -- so those interview rooms
15   that you had at Area 5, they would have windows into
16   them; right?
17   **A  Yes.**
18   Q  Windows on the door?
19   **A  Yes.**
20   Q  Those kind of like old-style narrow windows
21   that would extend for a portion of the floor -- for
22   a portion of the door, I should say.
23   **A  Yes.**
24   Q  You would sometimes cover up those windows

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

65

1  with paper; right?
2    A  Yes.
3    Q  And one of the purposes for doing so was to
4  prevent suspects and witnesses from inadvertently
5  seeing each other when you didn't want them to;
6  right?
7    A  Yes.
8    Q  Was there any prohibition against putting
9  paper on the windows?
10   A  Could you repeat that, please.
11   Q  Was there any prohibition against putting
12 paper on the windows?
13   A  No.
14   Q  How did you meet Ray Guevara?
15   A  When he was promoted to detective and he
16 began working in Area 5.
17   Q  Did you know him before he became detective?
18   A  I had seen him up in the office working with
19 other detectives on cases, but I didn't know him
20 personally.
21   Q  How did you learn that he was promoted
22 meritoriously?
23   MS. ROSEN:  Object to the form, foundation.
24   MR. ENGQUIST:  Join.

---

66

1    A  I was told by Ray.
2  BY MR. AINSWORTH:
3    Q  Did you work with Ray Guevara before you
4  became partners?
5    A  Not that I remember.
6    Q  When was it that you became partnered
7  with him?
8    A  Sometime in the early 1990s.  I don't
9  remember the exact year.
10   Q  Do you know whether it was 1992 or 1991?
11   A  Again, I don't remember the exact year.
12   Q  How long before you began your investigation
13 into the Rodrigo Vargas homicide, did you start
14 working or being partnered with Ray Guevara?
15   A  I don't remember.
16   Q  Was it as short as a couple months, or was
17 it longer than that?
18   A  I don't remember.
19   Q  When you would print your reports and submit
20 them to be approved by a supervisor, would you
21 sometimes get feedback from the supervisor and have
22 to correct something in the report and resubmit it?
23   A  That could happen, but I do not recall it
24 happening to me.

---

67

1    Q  You were pretty good at your reports; right?
2    MS. ROSEN:  Object to the form.
3    MR. ROSEN:  Go ahead.
4    A  I thought I was.
5    Q  And no sergeant was saying -- telling you
6  that there's a problem with the -- with your reports
7  or a repeated problem; right?
8    A  Not that I recall.
9    Q  Once you submitted your supplemental report,
10 if you learned new information, would you then
11 create a new supplemental report?
12   A  Yes.
13   Q  Why would you create a new supplemental
14 report if you learned new information after
15 submitting a report to be approved?
16   A  Because you could not add on any information
17 to that previous report.  It was locked in the
18 computer.
19   Q  And how would it be locked in a computer?
20   A  Well, when I retired, the only way that they
21 could get at a report was the sergeant would have to
22 unlock the case.
23   Q  And so -- and just to be clear, I'm talking
24 about the time frame of 1993.

---

68

1    Back in 1993, why would you create a new
2  report for information you learned after you
3  submitted your supp report?
4    A  To show the flow of the investigation, to
5  refresh my memory later on for trial.
6    Q  And once you submitted a supp report in
7  1993, would the computer be locked so that you
8  couldn't add on information to the report?
9    MS. ROSEN:  Object to the form, foundation.
10   MR. ENGQUIST:  Join.
11   A  Not in 1993.
12   Q  All right.  Were you supposed to alter
13 reports after they had been submitted to a
14 supervisor for approval back in 1993?
15   MS. ROSEN:  Object to the form.
16   A  No.
17   Q  Would you add on information to a report
18 that you had submitted back in 1993 after a
19 supervisor had approved it?
20   A  No.
21   Q  And why not?
22   A  Because that report was finished.
23   Q  And once it was finished, you weren't
24 supposed to alter it or do anything to it; right?

---

JGS_MAYSONET 4001

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

69

1    A  That's correct.
2    Q  That would be altering a police report;
3 right?
4       MS. ROSEN:  Object to the form.
5    A  That's correct.
6    Q  You know that you're not supposed to do
7 that; right?
8    A  When it's finished, no.
9    Q  And the correct procedure, as I understand
10 it, is that if you learned information after you
11 completed a supplemental report would be to create a
12 new supplemental report.
13      Would you agree with that?
14    A  Yes.
15    Q  Was there ever a reason to deviate from that
16 practice?
17      MS. ROSEN:  Object to the form.
18    A  No.
19    Q  What does R/Det mean in a supplemental
20 report?
21    A  I'm sorry.  Could you say that again,
22 please?
23    Q  Yeah, sure.
24      Sometimes you use abbreviations in your

70

1 reports; right?
2    A  Yes.
3    Q  What does R/Det mean?
4    A  R/Det means reporting detective.
5    Q  And what does R/Dets mean?
6    A  That's plural.  It would be more than one
7 detective.
8    Q  So that would mean more than one detective
9 was involved in whatever activity you were
10 documenting?
11    A  Yes.
12    Q  When you interviewed witnesses, sometimes
13 you would ask them to describe either a person or a
14 suspect; right?
15    A  Yes.
16    Q  When you asked the witness to -- and let's
17 take it in terms of a suspect.  Okay.
18      When you asked a witness to describe a
19 suspect, what would you ask them to try and
20 describe?
21      MR. ENGQUIST:  Objection; vague.
22      But go ahead.
23    A  How would I do it?
24    Q  Yeah.

71

1    A  Sex, age, height, weight, skin color, any
2 distinguishing marks, clothing, facial hair, things
3 of that nature.
4    Q  With as much detail as the witness is able
5 to provide to you; right?
6    A  Yes.
7    Q  And if the witness is unable to describe the
8 witness in any fashion, would you document that
9 as well?
10      MS. ROSEN:  Object to the form.
11    A  I think you said if the witness is unable to
12 describe the witness.
13    Q  I'm sorry.
14      If the witness was unable to describe the
15 suspect in any way, would you document that fact?
16    A  Yes.
17    Q  When you first started in violent crimes in
18 1982 or thereabouts, what types of crimes would you
19 investigate?
20    A  Mostly robbery.
21    Q  And why was it that you would be mostly
22 involved in robbery cases?
23    A  Being a detective was a learning process,
24 and you started out with robbery investigations.

72

1    Q  And for how long did you primarily work on
2 robbery cases in violent crimes?
3    A  That first year I worked with Detective
4 Rooney.
5    Q  And how about after you stopped working with
6 Detective Rooney, what kind of cases did you work
7 with -- work on?
8    A  I continued to work on all cases that came
9 into violent crimes; but after that first year, I
10 was allowed to start working on homicide cases.
11    Q  And so what would all cases comprise in
12 violent crimes after you stopped working with
13 Detective Rooney?
14    A  Well, we specifically investigated
15 robberies, aggravated batteries, sex crimes,
16 kidnappings, and I'm sure there are other crimes,
17 and then homicides.
18    Q  Were you trained in how to conduct photo
19 arrays?
20    A  I don't remember.
21    Q  In 1993, how would you go about conducting a
22 photo array?
23    A  I knew the Supreme Court suggested that you
24 would use five filler photos for every suspect.  So

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

19 (73 to 76)

73

1  if you had one suspect, you would need five filler
2  photos, and that's what I did.
3      Q  And when you referred to filler, you mean
4  the people who are not suspects but whose
5  photographs are included in the array alongside the
6  suspect's photo; is that right?
7      A  Yes.
8      Q  And were you trained to try and make the
9  photo array fair to the suspect?
10      A  Yes.
11      MS. ROSEN:  Object to form.
12      Q  When you had one suspect in a photo array,
13  would you try to make the fillers similar in
14  appearance?
15      A  Yes.
16      Q  And when you had five fillers and one
17  suspect in a photo array, would you try and make the
18  fillers similar in appearance to the witness's
19  description of the suspect, or would you try to make
20  them similar in appearance to the suspect that you
21  had?
22      A  I would try to make them similar in
23  appearance to the suspect at that time.
24      Q  All right.  And so when you're looking for

74

1  similarity in appearance, what kind of things would
2  you look for?
3      A  Age, glasses, teeth, facial hair, color of
4  hair, things of that nature.
5      Q  Ethnicity?
6      A  Ethnicity, yes, sex.
7      Q  Height and weight?
8      A  Not in a filler photo, you can't see it.
9      Q  I see.  All right.
10      If you had two suspects and you wanted to
11  conduct a photo array, would you create two separate
12  arrays, one array with one suspect and five fillers
13  and then a second array with the other suspect and
14  five filler photos?
15      MR. ENGQUIST:  Just to be clear, you're
16  talking about back in '93; right?
17      MR. AINSWORTH:  Yes.
18      A  That would be the correct procedure.
19      Q  Was that because if you had two suspects in
20  one photo array, it'd be hard to have the fillers be
21  fillers for both suspects?  Do you know what I mean?
22      MS. ROSEN:  Object to the form.
23      A  If you had two suspects, you should do a
24  photo array with 10 fillers.

75

1      BY MR. AINSWORTH:
2      Q  And two separate photo arrays; right?
3      A  No.  You could do them all, but you'd need
4  10 filler photos.
5      Q  Back in 1993.
6      A  Yes.
7      Q  And so you would -- you would include five
8  fillers for each -- five fillers for each suspect
9  to -- that would be similar in appearance in the
10  ways you've described, right?
11      A  I would, yes.
12      Q  What if you had three suspects?
13      A  Again, it would either be three separate
14  photo arrays, or it would be one gigantic photo
15  array, which we never did them that big.  So I would
16  have to say we did three separate photo arrays.
17      Q  When you used a photo array back in 1993,
18  what type of photographs would you use to conduct
19  it?
20      A  We used official Chicago Police Department
21  photos.  Some were black and white.  Some were
22  color.
23      Q  Would you try and make sure the backgrounds
24  of the photos were the same between the fillers and

76

1  the suspect?
2      A  These were all Chicago Police Department
3  photos.  The backgrounds were all the same.
4      Q  So when you say "Chicago Police Department
5  photos," you mean mug shots?
6      A  Yes.
7      Q  Would you ever use Polaroids that were taken
8  at the area as part of the photo arrays?
9      A  I may have, but I don't remember.
10      Q  Back in 1993, where would you get the filler
11  photographs from?
12      A  We had boxes of photos in Area 5 of people
13  that had been taken into custody and that their
14  photos had been sent for, and we had it on file in
15  Area 5.
16      Q  So there was a place in Area 5 where you had
17  a box of filler photos, and you could just kind of
18  root through it to find photos that would be similar
19  in appearance to your suspect?
20      A  Well, it was one location.
21      Q  And when you displayed photographs to a
22  witness during a photo array, how would you do it
23  back in 1993?
24      MR. ENGQUIST:  Objection.  It's a

JGS_MAYSONET 4003

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

20 (77 to 80)

77

1 hypothetical. It's an incomplete hypothetical and
2 calls for speculation.
3     Go ahead.
4     **A  I would lay the photos out on a table such**
5 **as this. I would tell the witness to look at all**
6 **the photos and that if they identified anybody from**
7 **the crime we were investigating, tell me about it.**
8 **BY MR. AINSWORTH:**
9     Q  And so you would display all the photos
10 together; correct?
11    **A  Yes.**
12    Q  And I take it from your explanation that
13 back in 1993 you wouldn't tell the witness something
14 to the effect of even if you don't select somebody
15 from the photo, we'll still keep investigating; is
16 that right?
17    **A  Could you say that again, please.**
18    MS. ROSEN:  Object to the form.
19    Q  Sure. I take it from your explanation of
20 how you conducted photo arrays, that back in 1993
21 you would not tell a witness even if you don't
22 select somebody from the photo array, we will still
23 continue investigating?
24    MS. ROSEN:  Object to the form.

78

1     **A  Back in 1993, when I laid the filler photos**
2 **out, I would tell the person viewing the photos that**
3 **I want you to look at some pictures. I've got no**
4 **evidence at this time that these people are involved**
5 **in this investigation. If you do see somebody that**
6 **you recognize, please let me know.**
7         **I never remember telling them that if they**
8 **didn't pick anybody, we'd keep investigating, no.**
9 **BY MR. AINSWORTH:**
10    Q  And I take it that it was not your habit to
11 or it was not your practice to document the level of
12 confidence that the witness displayed when making
13 the identification at the time of the
14 identification; is that right?
15    **A  Sometimes I did document their level of**
16 **confidence.**
17    Q  And what would determine whether or not you
18 did document their level of confidence?
19    **A  Some people would look at the photo array**
20 **and say positively identified. Someone would say,**
21 **It looks like the guy, but I need to view him**
22 **personally in a lineup to be sure. I would document**
23 **that.**
24    Q  Back in 1993, would you conduct physical

79

1 lineups?
2     **A  Yes.**
3     Q  How would you conduct physical lineups back
4 in 1993?
5     **A  In 1993, Area 5 had a specific area for**
6 **viewing lineups. There was a holding room where**
7 **persons to be viewed would either sit or stand.**
8         **There was a one-way window that looked into**
9 **a separate room where the persons viewing the lineup**
10 **could stand in front of this one-way window and look**
11 **at the persons to be viewed.**
12    Q  And did you have a -- would you use fillers
13 for physical lineups?
14    **A  Say again, please.**
15    Q  Would you use fillers for physical lineups?
16    **A  Yes.**
17    Q  And why would you use fillers for physical
18 lineups?
19    **A  Keeping with Supreme Court decisions, you**
20 **were suggested to use five fillers for every suspect**
21 **in a physical lineup.**
22    Q  And what was the purpose for using fillers
23 in the lineup?
24    **A  So that the person viewing the suspect**

80

1 **didn't just get to look at one person.**
2     Q  That might be suggestive if you're just
3 showing one person? Is him? Is that what you're
4 getting at?
5     MR. ENGQUIST:  Objection; form.
6     MS. ROSEN:  Object to the form.
7     **A  Correct.**
8     Q  And so when you would select fillers for a
9 lineup, would that be you and your partner who would
10 go about selecting the fillers?
11    **A  Sometimes.**
12    Q  How else would it work?
13    **A  Sometimes we'd have other detectives go look**
14 **for fillers for us.**
15    Q  And what would you look for in the fillers
16 to try to make the -- was your purpose to make the
17 lineup a fair lineup to the suspect?
18    **A  Yes.**
19    Q  And what would you look for in fillers to
20 make the lineup a fair lineup for the suspect?
21    **A  Sex, race, age, height, weight, physical**
22 **characteristics, we tried to do clothing.**
23    Q  So you wouldn't have one man with a bunch of
24 women; right?

JGS_MAYSONET 4004

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

21 (81 to 84)

---

**81**

1    **A No.**

2    Q And you wouldn't have a lineup with A

3 5-foot-6 person, and all of the rest of the people 6

4 feet tall?

5    **A We could if they were all seated.**

6    Q Why would you have them seated?

7    **A Because that would eliminate the height**

8 **requirement. You couldn't tell a person's height if**

9 **they were sitting down.**

10    Q Why do you think people can't tell a

11 person's height if they're sitting down?

12    **A You just can't.**

13    Q Were you trained that it was okay to do a

14 lineup of a 5-foot-6 person and a bunch of

15 6-feet-tall people so long as they were all sitting

16 down?

17    MS. ROSEN: Object to the form.

18    **A This was something I learned in court from**

19 **testifying in numerous cases, that it was**

20 **permissible to do this.**

21    Q Who told you in court that you would -- that

22 it was permissible to have a 5-foot-6 person and a

23 bunch of 6-feet-tall people so long as they are

24 sitting down?

---

**82**

1    **A On numerous motions to suppress lineup**

2 **identifications.**

3    Q And so how would you learn in the numerous

4 motions to suppress lineup identifications? How did

5 you learn this fact?

6    **A We would win the motion.**

7    Q And so if you had the lineup participants

8 seated during the lineup, would you document the

9 fact that you would have them seated?

10    **A Yes.**

11    Q And if you didn't document that they were

12 seated, that meant they were standing; is that

13 right?

14    **A Say it again, please.**

15    Q Sure. If you did not document that the

16 lineup participants were seated, then that would

17 mean that the lineup participants were standing; is

18 that right?

19    **A I think I documented all of my lineups**

20 **specifically if they were standing or seated.**

21    Q Why do you say "I think"?

22    **A Say again.**

23    Q Why do you say "I think"?

24    MS. ROSEN: Object to the form.

---

**83**

1    **A I don't have in front of me every single**

2 **lineup I ever conducted. I don't remember.**

3    Q In any event, if you had a lineup where

4 there was a 5-foot-6 guy and bunch of 6-feet-tall

5 people and they were standing, that wouldn't be a

6 fair lineup; right?

7    **A I would never do a lineup like that.**

8    Q Because that would be unfair.

9    **A Yes.**

10    Q Would you sometimes pull rap sheets on

11 suspects?

12    **A Yes.**

13    Q How would you go about pulling a rap sheet

14 on a suspect?

15    MR. ENGQUIST: Objection; vague, time frame.

16    Q Back in 1993.

17    **A We would fill out a form that we would fax**

18 **down to the identification section, and they would**

19 **fax us back the arrest report, the rap sheets.**

20    Q What form would you fill out?

21    **A Request for identification records.**

22    Q Getting back to the photo arrays, would you

23 ever conduct a photo array with three suspects and

24 five fillers?

---

**84**

1    **A Would I?**

2    Q Yes.

3    **A No.**

4    Q Why not?

5    **A Because it violated the Supreme Court**

6 **suggestions for how to properly do a photo array.**

7    Q And if you had three suspects and only five

8 fillers, you'd have either only two fillers for each

9 suspect or one filler, for, you know, one of the

10 suspects; right?

11    **A Correct.**

12    Q And that's not enough fillers to make it

13 fair; right?

14    **A In my opinion, no.**

15    Q And that's based on your experience as a

16 police officer?

17    **A Yes.**

18    Q Sometimes in your career you would get

19 informants willing to provide you with information;

20 right?

21    **A Yes.**

22    Q And when you're dealing with an informant,

23 it's very important not to reveal the nonpublic

24 facts about the investigation to that informant;

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

85

1  right?
2  **A  Correct.**
3  Q  It's important in all interviews, but it's
4  critically important where the informant might be
5  trying to get something from the police in exchange
6  for their information; right?
7  **A  Correct.**
8  Q  You want to be able to corroborate the
9  information that the suspect is giving you; correct?
10  MS. ROSEN:  Object to the form.
11  MR. AINSWORTH:  Yes.  You're right.  Let me
12  withdraw that question and restate it.
13  Q  You want to be able to corroborate the
14  information that the informant is providing you;
15  right?
16  **A  Yes.**
17  Q  And one way to corroborate is to see if the
18  informant is able to provide you any of the
19  nonpublic facts about the crime that only someone
20  who committed the crime or talked to somebody who
21  committed the crime might know; right?
22  **A  Yes.**
23  Q  And so when you're talking to an informant,
24  you're paying attention to what facts they can

86

1  provide that you might be able to corroborate;
2  right?
3  **A  Yes.**
4  Q  And when you're talking to an informant, you
5  want to get as much detail as you can from that
6  person; right?
7  **A  Yes.**
8  Q  And some people are very forthcoming in
9  talking to the police about other criminal activity;
10  right?
11  **A  Yes.**
12  Q  And when you have a cooperative witness,
13  sometimes they can tell you a lot of information
14  about a number of crimes; right?
15  **A  Yes.**
16  Q  And so one of your jobs, as a police
17  detective, is if you have a cooperative witness is
18  to try and find out whatever information that person
19  might have about the crime that you're
20  investigating; right?
21  **A  Say that one again, please.**
22  Q  Sure.  When you have a cooperative
23  informant, you want to get as much information about
24  the crime that you're investigating from that

87

1  informant; right?
2  **A  Yes.**
3  Q  And if the informant is willing, you want to
4  find out what other information about other crimes
5  that informant might be willing to share; right?
6  **A  Yes.**
7  Q  And you need to be very careful not to make
8  undisclosed promises to an informant; right?
9  **A  Yes.**
10  Q  You know that it would be wrong to promise
11  something to an informant in exchange for their
12  information but not reveal that fact to either the
13  prosecution or the criminal defense; right?
14  **A  Could you rephrase that question.**
15  Q  Yeah.  I can.
16  You know that it would be improper and wrong
17  to promise something to an informant in exchange for
18  their information without revealing the fact of the
19  promise to the prosecution and to the criminal
20  defendant; right?
21  **A  That's correct.**
22  Q  That's not something you would do; correct?
23  **A  No, I would not.**
24  Q  And when you're talking about an informant

88

1  who is facing significant time in the penitentiary,
2  any kind of promise or benefit can be magnified for
3  that person; right?
4  MR. ENGQUIST:  Objection.
5  MS. ROSEN:  Object to the form.
6  MS. NIKOLAEVSKAYA:  Form.
7  MR. ENGQUIST:  And it calls for speculation.
8  **A  I don't know.**
9  Q  Well, let me put it this way.
10  If the informant is not incarcerated, then
11  offering that person the ability to make a phone
12  call isn't that much of a benefit because that
13  person could, you know, go home and use the phone
14  themselves; right?
15  **A  Yes.**
16  Q  But for an incarcerated informant, offering
17  that person the use of the phone could be a very
18  real benefit to that person; right?
19  MS. ROSEN:  Object to the form.  Calls for
20  speculation.
21  MR. ENGQUIST:  Join.
22  **A  I don't know.  I can't read a person's mind.**
23  Q  Well, you understand that incarcerated
24  people don't have their freedom, right, because

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

89
1 they're incarcerated?
2   **A  That's correct.**
3   Q  So they don't have access to buy meals from
4 a restaurant; right?
5   **A  That's correct.**
6   Q  They don't necessarily have the ability to
7 make phone calls whenever they want; right?
8       MS. ROSEN:  Object to the form, foundation.
9       MR. ENGQUIST:  Join.
10   **A  They have the ability to make phone calls.**
11   Q  You knew in 1993 that phone calls they'd
12 have to make would be collect calls; right?
13   **A  I don't know how it worked.  I know there**
14 **was a phone in lockup they could use.**
15   Q  Would people in the Cook County Jail
16 sometimes call you?
17   **A  Yes.**
18   Q  And how would you get calls from the Cook
19 County Jail?  Would they come collect or direct or
20 how would they work?
21   **A  They came collect.**
22   Q  So sometimes you would get collect calls,
23 and they would say this is so-and-so.
24     Would they say who they wanted to reach?

90
1   **A  Yes.**
2   Q  Would you accept those calls?
3   **A  Yes.**
4   Q  And would you accept those calls whether or
5 not the detective they were looking for was present?
6   **A  I only accepted calls that pertained to me.**
7   Q  So if there was a collect call that you
8 happened to pick up -- well, strike that.
9     Did you have a direct dial back in 1993?
10   **A  No.**
11   Q  Was there a pool phone, pool for the floor?
12   **A  Area 5 had a number of different phone**
13 **numbers.**
14   Q  And did you have a dedicated phone?
15   **A  No.**
16   Q  Did you share the phone with other
17 detectives?
18   **A  Did I share a phone with other detectives?**
19   Q  Did you share a phone number with other
20 detectives?
21   **A  Area 5 had general phone numbers that we all**
22 **used.**
23   Q  And so were there -- how many general phone
24 numbers did you have back in 1993?

91
1   **A  There was a basic phone number that if that**
2 **line was busy, it would skip to the next line; and**
3 **if that line was busy, it would skip to the next**
4 **line.  To the best of my knowledge, I think we had**
5 **five incoming lines.**
6   Q  And for the public, would the public -- if
7 the public wanted to call violent crimes Area 5, was
8 there just one number to call?
9   **A  Yes.**
10   Q  All right.  And so when somebody was calling
11 violent crimes Area 5, they would call one number,
12 and would it ring on all the desks of the
13 detectives?
14   **A  No.**
15   Q  Whose desk would it ring at?
16   **A  The sergeant's desk.**
17   Q  And then the sergeant would -- would they
18 transfer the call from the sergeant's desk to
19 whoever is detective -- whichever detective was
20 working that case?
21   **A  We had a public address system.  Sometimes**
22 **the sergeant would pick up the phone.  If he was**
23 **busy, other detectives would pick up the phone, and**
24 **then we'd announce on the public address system**

92
1 phone call for whoever, pick up line 8601.
2   Q  And was it -- would it only ring in the
3 sergeant's office?
4   **A  No.  It probably rang in more locations than**
5 **that.  It rang in his office, and it rang up to**
6 **special desk.**
7   Q  What's the special desk?
8   **A  That's where the desk officer sat.**
9   Q  Where did the desk officer sit in 1993?
10   **A  On the far northern end of the office.**
11   Q  Where was that in relation to the violent
12 crimes office?
13   **A  Approximately 40 feet away.**
14   Q  In which direction was the violent crimes
15 office from the sergeants -- from the special --
16 what did you call it?  Special --
17   **A  Special desk.**
18   Q  From the special desk.
19   **A  It was in the same office.  It was just an**
20 **area where the special desk officer sat.**
21   Q  Was the special desk north of the violent
22 crimes office?
23   **A  It was the same office.**
24   Q  I'm just trying to get a sense of

JGS_MAYSONET 4007

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

93

1  geographically was the violent crimes office -- was
2  the -- sorry.
3       You called it before the violent crimes
4  office where the sergeant sat.
5       Did you have a different name for that?
6    **A  Well, the sergeants office.**
7    Q  All right.  Let's call it the sergeants
8  office.  Okay.
9       Where was the special desk in relation to
10 the sergeants office?
11   **A  Approximately 40 feet north.**
12   Q  Do you know what a Serafini report is?
13   **A  Do I know what a what is?**
14   Q  Serafini report.
15   **A  No.**
16   Q  How would you indicate to the next watch of
17 detectives back in 1993 what investigative steps
18 needed to be followed up on a case?
19   **A  We were done working at 11:30 at night.  The**
20 **midnight watch would not start until 12:30.  We'd**
21 **leave instructions for the oncoming midnight**
22 **sergeant, and he'd pass them along.**
23   Q  And so would you write out those
24 instructions for the midnight sergeant to pass

94

1  along?
2    **A  No.**
3    Q  How would you communicate to the midnight
4  sergeant that there were investigative tasks that
5  needed to be followed up on?
6    **A  We'd tell them.**
7    Q  Why would you tell them and not write them
8  down?
9    **A  There wasn't a need to.**
10   Q  Why wasn't there a need to?
11   **A  There wasn't.**
12   Q  I'm asking why.
13   **A  There wasn't a need to.**
14     MS. ROSEN:  Object to the form.
15   Q  So when would the midnight sergeant arrive?
16   **A  They arrived at 11:30.**
17   Q  And so how many detectives were working
18 third watch back in 1993?
19   **A  It varied from night to night.**
20   Q  What was the range?
21   **A  Huh?**
22   Q  What was the range?
23   **A  I can't give you an accurate number.  I**
24 **would say in total anywhere from 10 to 20 guys.**

95

1    Q  And so 10 to 20 detectives would all crowd
2  around the incoming midnight sergeant to tell them
3  all the investigative steps that needed to be
4  followed up on on their case --
5      MS. ROSEN:  Object to the form.
6    Q  -- is that right?
7      MR. ENGQUIST:  Join.
8      MS. NIKOLAEVSKAYA:  Join.
9    **A  No.**
10   Q  So how would it work?
11     MS. ROSEN:  Object to the form.
12   **A  As I just said, if there was something we**
13 **specifically needed the midnight crew to follow up**
14 **on, we'd tell the sergeant go have these guys go do**
15 **this specific task, and let us know how it turned**
16 **out.**
17   Q  What would you do if you needed the day
18 shift to follow up on one of your investigations?
19   **A  We'd let the sergeants know, and they would**
20 **pass the information along.**
21   Q  When you say "the sergeants," which sergeant
22 would you tell?
23   **A  Say that again.**
24   Q  When you say "the sergeant," which sergeant

96

1  would you tell?
2    **A  I have no idea who was the sergeant in 1993.**
3    Q  Well, you would just -- you would tell your
4  third-watch sergeant or the first-watch?
5    **A  The midnight sergeant.**
6    Q  All right.  You'd tell the midnight
7  sergeant.
8    **A  Yes.**
9    Q  And so you'd tell the midnight sergeant that
10 you need these -- day watch to follow up on
11 information pertaining to one of your
12 investigations; is that right?
13   **A  Sometimes.**
14   Q  Why wouldn't you just leave a note for the
15 day-shift sergeant?
16   **A  We just didn't.  We just gave instructions**
17 **orally.**
18   Q  Were you instructed not to leave notes --
19   **A  No.**
20   Q  -- for the day-shift sergeant?
21   **A  No.**
22   Q  Did you have a problem with writing things
23 down?
24     MS. ROSEN:  Object to the form.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

25 (97 to 100)

97

1    A  No.
2    Q  Did you not want to taint your file with
3  information that might be incorrect?
4        MS. ROSEN:  Object to the form.
5        MR. ENGQUIST:  Join.
6        MS. NIKOLAEVSKAYA:  Join.
7    **A  I did not want to put incorrect information**
8  **in my file.  That is correct.**
9    Q  All right.  And so if you received
10  information about a criminal case, would you
11  withhold that information from your file until you
12  could verify that information?
13        MS. ROSEN:  Object to the form.
14        MR. ENGQUIST:  Join.
15        MS. NIKOLAEVSKAYA:  Join.
16    **A  No.**
17    Q  You would include that information; right?
18    **A  Yes.**
19    Q  And you would include it in the -- in your
20  file?
21        MS. ROSEN:  Object to the form.
22    **A  Yes.**
23    Q  What's a nickname file?
24    **A  Gang members love to have nicknames for each**

98

1  **other, as the two gentlemen seated in this room have**
2  **nicknames.**
3        MS. BONJEAN:  Objection to form.
4    **A  Many times we talk to people on the street,**
5  **they don't know their real names, but they know**
6  **their nicknames.  So if we're interviewing persons**
7  **on the street and they say, Well, we just had this**
8  **shooting and Moon Dog from the IG shot him, well,**
9  **then we'd try to find out who Moon Dog was.**
10        **And there was one sergeant in the 25th**
11  **district Bob DeGraf that took it upon himself to go**
12  **through every single arrest report and take the box**
13  **where it said nickname and match it up with their**
14  **real name.**
15        **So if we wanted to find out who Moon Dog**
16  **was, we'd get a copy of Bob DeGraf's nickname**
17  **folder, look it up, and many times we'd get the**
18  **information we were looking for.**
19  **BY MR. AINSWORTH:**
20    Q  And so where was the nickname file?
21    **A  Bob DeGraf had it down in his office in the**
22  **25th district, but then he would occasionally give**
23  **us a copy of it.  We'd have it up in the office at**
24  **Area 5.**

99

1    Q  Bob DeGraf, his office was on the first
2  floor?
3    **A  Yes.**
4    Q  And so you would go downstairs and say, Bob,
5  can I take a look at your nickname file?
6    **A  Sometimes.**
7    Q  And how was his nickname file organized?
8    **A  It was a binder with computer-printed**
9  **sheets.**
10    Q  What was on the computer-printed sheets?
11    **A  The nicknames and the real names.**
12    Q  Was it like -- had he typed them up on to
13  paper and then printed it out to be put in the
14  binder or -- I don't know what you mean by
15  computer-generated sheet.
16    **A  From what I saw is that he typed it into a**
17  **computer, and then he printed out the sheets and put**
18  **it in a binder.**
19    Q  Would each sheet have more than one nickname
20  or just one nickname and real name per sheet?
21    **A  Yes.  It was just -- well, there were more**
22  **than one nicknames on the sheets.**
23    Q  And more than one real name on the sheet?
24    **A  Yes.**

100

1    Q  Were they organized by nickname or gang or
2  in any fashion?
3    **A  It was organized by nickname.**
4    Q  Alphabetically?
5    **A  Yes.**
6    Q  So all the people named Speedy, regardless
7  of gang, would be in one area of that nickname file?
8    **A  Yes.**
9    Q  Did you have access to gang books in -- at
10  Area 5 in 1993?
11    **A  Say that again, please.**
12    Q  Did you have access to gang books in Area 5
13  in 1993?
14    **A  I don't remember Area 5 detectives having**
15  **any gang books.**
16    Q  Did you have access to them?
17    **A  We didn't have any gang books in Area 5.**
18    Q  Do you know what gang books are?
19    **A  If you're referring to gang photo books,**
20  **yes.**
21    Q  What is a gang photo book?
22    **A  Photos of known gang members.**
23    Q  Placed in binders or books?
24    **A  Chicago Police Department used to have**

JGS_MAYSONET 4009

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

101

1   official photographic binders for pictures.
2      Q   Separated by gang; is that right?
3      A   Whoever maintained the photos.  That was one
4   way they were catalogued, but we did not have gang
5   books at Area 5 detectives.
6      Q   Did you use those gang books before?
7      A   We did not have gang books at Area 5
8   detectives.
9      Q   I'm not asking you if you had them at Area 5
10  detectives, sir.  I'm asking if you used them
11  before.
12     A   I have used gang books at gang crimes north,
13  yes.
14     Q   Fine.  So how would you go about using the
15  gang books at gang crimes north?
16     A   We would take whatever person we wanted to
17  look through the books over to gang crimes north.
18  They would have some kind of a log that this person
19  was viewing whatever books on that date and time.
20  And if they made identification, we would document
21  it, and that was it.
22     Q   How would you document an identification
23  from a gang book?
24     A   Supplemental report.

102

1      Q   And how would you indicate the photograph --
2   or how would you memorialize the photograph that the
3   person had identified from the gang book?
4      A   We'd do a supp report.  I would indicate
5   they looked at a certain book, picked a certain
6   picture of a certain person.
7      Q   Would you remove the photograph that they
8   identified from the book so there would be a record
9   of what the person looked like that they identified?
10     MS. ROSEN:  Object to the form.
11     A   No.  These books were locked.  You could not
12  take photos out of them.
13     Q   And where was the log that would document
14  who was viewing the photo books or the gang books?
15     A   That was the on-duty officer that sat at the
16  front desk in gang crimes north.
17     Q   Well, would you have to indicate to that
18  person which books you were going to show to the
19  witness?
20     A   That officer would go get the books we
21  requested, and then we'd show those books that we
22  brought to us.
23     Q   Were you ever allowed to take those books
24  out of area north?

103

1      A   I did not.
2      Q   I'm sorry.  I said area north.  I mean, gang
3   crimes north at the time.
4      Did you ever remove the books from -- the
5   gang photo books from gang crimes north?
6      A   I did not.
7      Q   Do you know if you were allowed back in
8   1993, allowed to take the photo of gang crimes --
9   gang photo books out of gang crimes north?
10     A   I don't remember.
11     Q   Why would you document any identifications
12  made from those gang photo books?
13     A   It was evidence.
14     Q   Evidence of who the perpetrator might be?
15     A   Correct.
16     Q   Any reason not to document the identity of
17  any person who is identified from the gang photo
18  books?
19     A   In 1993, we were not required to document
20  negative identifications.
21     Q   So if the person looked at the gang photo
22  books and didn't identify anyone -- well, what do
23  you mean that you weren't required to document a
24  negative identification?

104

1      A   Well, we did not have to document that they
2   didn't make an identification.  We would document
3   the fact that they went to, let's just say, gang
4   crimes north, for instance, and looked at Latin King
5   photo books A, B, C, D, and E.  No identifications
6   were made.  That's it.
7      Q   So you would document to that extent.
8      A   That no identifications were made, that's
9   correct, in those specific books.
10     Q   And why was it important to document if they
11  did make an identification?
12     A   So the detectives wouldn't have to repeat
13  what we've already done.
14     Q   And so you would have evidence of who the
15  perpetrator was?
16     A   Say that again, please.
17     MS. ROSEN:  I think he got confused.  You
18  switched.
19     Q   Sure.  I'll try again.
20     And I'm -- in instances where the witness
21  does make a positive identification, why is it
22  important to document that identification?
23     A   That's inculpatory evidence.
24     Q   As to the person who is identified; right?

JGS_MAYSONET 4010

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

105

1    A  Correct.
2        MR. ENGQUIST:  We've been going for about
3  two hours.  Want to give him a break to go charge
4  his life and come back.
5        MR. AINSWORTH:  Now is a perfect time for
6  that.
7        THE VIDEOGRAPHER:  Off the record at 11:59.
8        (A recess was taken from 11:59 a.m. to
9  12:19 p.m.)
10       THE VIDEOGRAPHER:  Back on the record,
11 12:19.
12 BY MR. AINSWORTH:
13   Q  Sir, you understand that you and you alone
14 get to choose whether you assert the Fifth Amendment
15 in response to questions that are posed to you at a
16 deposition; right?
17       MS. ROSEN:  Object to the form.
18       MR. ENGQUIST:  I'm going to object to the
19 form too.
20       Go ahead and answer.
21   A  Yes.
22   Q  You gave a deposition in this case
23 previously; right?
24   A  Yes.

---

106

1    Q  And in response to every single question,
2  apart from your name, you asserted your Fifth
3  Amendment right to counsel; right?
4    A  Yes.
5        MS. ROSEN:  No.
6    Q  And so --
7        MS. ROSEN:  Your Fifth Amendment right to
8  counsel?
9    Q  Fifth Amendment right not to incriminate
10 yourself; right?
11   A  Yes.
12   Q  And you asserted your Fifth Amendment right
13 not to incriminate yourself because you feared that
14 giving truthful answers to the questions that were
15 posed to you might subject you to criminal
16 liability; right?
17       MR. ENGQUIST:  I'm going to object to the
18 form.  Also I'm going to object to the extent that
19 you're asking him to discuss things that were part
20 of attorney/client privilege which is with his
21 counsel.  I'm instructing him not to answer those
22 parts.
23       But you can answer the question, if you can.
24       THE WITNESS:  Could you repeat your

---

107

1  question?
2  BY MR. AINSWORTH:
3    Q  Yes, sir.
4        The reason that you asserted your Fifth
5  Amendment right against self-incrimination was
6  because you feared truthful responses to the
7  questions that were asked of you might subject you
8  to criminal liability; right?
9        MR. ENGQUIST:  Same objection.
10       THE WITNESS:  Huh?
11       MR. ENGQUIST:  Same objection.  Without
12 going into attorney/client privileged information,
13 you can answer the question.
14   A  I was concerned that truthful responses
15 would be turned against me, yes.
16   Q  And be used to prosecute you; right?
17   A  For truthful responses, yes.
18   Q  But if you gave truthful responses, those
19 truthful responses could be used to prosecute you;
20 correct?
21   A  Yes.
22   Q  Who did you consult with in determining
23 whether or not to assert your Fifth Amendment right
24 against self-incrimination?

---

108

1    A  Attorney Dan Herbert.
2    Q  Did you consult with anyone else?
3    A  No.  He was my -- he was my criminal
4  attorney that gave me his opinion of what I should
5  do.
6    Q  Did you consult with your civil attorneys?
7    A  Yes.
8    Q  Who did you consult with among your civil
9  attorneys when deciding whether to assert your Fifth
10 Amendment rights or not?
11   A  Mr. Sotos, Mr. Given at that time.
12   Q  Anyone else?
13   A  No.  Just those two at that time.  Oh,
14 Mr. Brueggen.
15   Q  Mr. Who?
16   A  Dan.  Dave, I should say.
17       MR. BRUEGGEN:  Dave.
18   Q  Anyone else?
19   A  Not that I remember.
20   Q  And did you consult with anyone who is not
21 an attorney about whether to assert your Fifth
22 Amendment right against self-incrimination?
23   A  No.
24   Q  What did Dan Herbert tell you in regard to

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

109

1 whether or not to assert your Fifth Amendment right?
2     MR. ENGQUIST: I'm going to object. It's
3 prohibited by attorney/client privilege, and I'm
4 instructing him not to answer.
5     Q  Are you going to follow your attorney's
6 advice and not answer the question?
7     A  That's correct.
8     Q  Was your decision to assert your Fifth
9 Amendment right against self-incrimination in part
10 based on your attorney's advice?
11     MS. ROSEN:  Same objection.
12     A  Yes.
13     Q  Then I want to know what that advice was;
14 and so I'm going to ask you, sir, what was the
15 advice that you were given by your counsel in regard
16 to whether or not to assert your Fifth Amendment
17 right to counsel?
18     MR. ENGQUIST:  Once again I'm going to
19 object.
20     Q  Right to self -- right against
21 self-incrimination.
22     MR. ENGQUIST:  Once again I'm going to
23 object.  Conversations with his attorney are
24 privileged, and I'm going to instruct him not to

---

110

1 answer the question.
2 BY MR. AINSWORTH:
3     Q  Are you going to refuse to testify about the
4 advice that was provided to you by your attorneys?
5     A  That's correct.
6     MR. ENGQUIST:  I think more accurately he's
7 taking my advice, but go ahead.
8     Q  Well, you have an independent right, you
9 understand, to either assert a privilege or waive a
10 privilege; right?
11     A  What's your question, please?
12     Q  You don't have to do what your attorneys
13 tell you; right?
14     A  That's correct.
15     Q  Did you consult with any attorneys in
16 advance of this deposition about whether to assert
17 your Fifth Amendment right or not?
18     A  Prior to this deposition, I had spoken with
19 my civil attorneys.
20     Q  Did you consult with Dan Herbert?
21     A  No.
22     Q  Why didn't you consult with Dan Herbert?
23     A  I didn't.
24     Q  Why didn't you, sir?

---

111

1     A  I didn't need his advice.
2     Q  Why didn't you need his advice?
3     A  I had made up my mind to testify.
4     Q  Why did you make up your mind to testify?
5     MR. ENGQUIST:  I'm just going to object.
6     To the extent that the question would call
7 for any kind of discussions you had with any of your
8 attorneys, I'm going to instruct you not to answer,
9 but otherwise, you can answer the question.
10     A  Would you repeat your last question.
11     MR. AINSWORTH:  Would you please read it
12 back.
13     (Pending question read.)
14     A  I saw the shameful way that Detective
15 Guevara was being portrayed in the media as some
16 kind of monster, which he is not.  He did not have a
17 chance to rebut any claims that were made against
18 him.
19     I did not like the fact that I had to sit
20 through Mrs. Bonjean's deposition where I had to sit
21 there and not respond to her questions.  I wanted to
22 take the opportunity to accurately say what I had
23 done that did not violate any laws, did not violate
24 any department regulations.  It was all -- all the

---

112

1 police work I had done was lawful and honorable, and
2 I wanted the chance to say my -- my story.
3     Q  Do you fear that truthful responses here
4 will subject you to criminal liability?
5     A  Yes.
6     Q  Guevara did get to testify before Judge
7 Orbish; right?
8     MR. ENGQUIST:  Objection; calls for
9 speculation, foundation.
10     A  I don't know who Guevara testified in front
11 of.
12     Q  Did you read the reports of Judge Orbish
13 saying that Ray Guevara had told bold-faced lies in
14 his courtroom?
15     A  I've never seen those.
16     Q  Who paid for Dan Herbert to be your
17 attorney?
18     A  The Fraternal Order of Police.
19     Q  So did you reach out to Ray to tell him that
20 you, you know, thought it was shameful how he was
21 being portrayed in the media and to lend your
22 support to him?
23     A  Could you say that again, please.
24     Q  Sure.  Did you reach out to Ray Guevara and

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

29 (113 to 116)

113

1  tell him that it was shameful the way he was being
2  portrayed in the media and show some support for
3  him?
4     A  No.
5     Q  Why not?
6     A  I have not talked to him.
7     Q  Why haven't you talked to him?
8     A  I was instructed not to.
9     Q  When was the last time you talked to Ray
10 Guevara outside the presence of your counsel?
11    A  Haven't.  Oh, the last time?
12    Q  Yeah.
13    A  Probably when I was still working, 19 --
14 when did I retire? -- 2016.
15    Q  You retired in 2016?
16    A  Yes.  No.  I didn't retire -- 2010, I'm
17 sorry.
18    Q  Did you have a retirement party?
19    A  Just a few guys met after work in a bar for
20 some drinks.
21    Q  Did Ray Guevara appear?
22    A  I don't believe so.
23    Q  Why don't you believe so?
24    A  I don't remember him being there.

114

1     Q  When did you first learn that Ray Guevara
2  was taking the Fifth?
3        MS. ROSEN:  Objection; foundation.
4        MR. ENGQUIST:  I'm going to object to the
5  extent --
6        MS. ROSEN:  Form.
7        MR. ENGQUIST:  To the extent that would
8  require him to talk about conversations he had with
9  his counsel, I'm going to instruct him not to
10 answer, but other than that he can talk about -- you
11 can answer the question.
12    A  The first time I learned was when I got sued
13 in this case.
14    Q  So before you were sued in this case, you
15 had no idea that Ray Guevara was pleading the fifth?
16    A  No.
17    Q  That's correct?
18    A  Yes.
19    Q  When you talked to the lawyers from Sidley
20 Austin back in 2014, did they tell you that Ray was
21 not testifying?
22    A  I don't remember.
23    Q  In the -- during the post-conviction phase
24 of this case, so since Jose and Armando were

115

1  convicted, did you talk to the state's attorney's
2  office about your investigation?
3     A  In this case?
4     Q  Yeah.
5     A  They never contacted me.
6     Q  Did you talk to any investigators in the
7  state's attorney's office?
8     A  No.
9     Q  Did you ever talk to a Celeste Stack or a
10 Kurt Smitko?
11    A  Who?
12    Q  Celeste Stack or Kurt Smitko?
13    A  No.
14    Q  Or Enrique Abraham?
15    A  No.
16    Q  Or Jim Papa?
17    A  Nope.
18    Q  Were you provided training from the Chicago
19 Police Department in how to interact with
20 confidential informants?
21    A  No.
22    Q  Were you given any training or guidelines on
23 how to keep confidential informants confidential?
24    A  No.

116

1     Q  Were you given any training or guidelines
2  from the department about how to document your
3  contacts with confidential informants?
4     A  No.
5     Q  Did you work with confidential informants
6  during your career?
7     A  A few.
8     Q  Was Francisco Vicente one of them?
9     A  Yes.
10    Q  In what kind of circumstances did you work
11 with the other confidential informants?
12    A  Many years ago I remember I was involved in
13 a murder-for-hire case that came out of Cook County
14 Jail.
15    Q  And there was a -- was the confidential
16 informant in that case incarcerated?
17    A  Yes.
18    Q  Were you provided with any training as to
19 how you were supposed to -- well, strike that.
20        At Area 5, were you supposed to create a
21 separate file for a confidential informant outside
22 of the file for the case that you were working on?
23    A  There were --
24        MS. ROSEN:  Objection; form.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

30 (117 to 120)

---

117

1     MR. ENGQUIST:  Go ahead.
2   **A  There were no confidential informant files**
3 **in Area 5 that I ever saw.**
4 **BY MR. AINSWORTH:**
5     Q  Well, part of a confidential informant is
6 the confidential nature of hiding their identity;
7 right?
8   **A  Yes.**
9     Q  And if you wrote down their name in the
10 investigative file, that would destroy their
11 confidentiality; right?
12   **A  If the name was there, yes.**
13     Q  So how would you document the name of the
14 confidential informant?
15   **A  As I did in my report, I kept the identity**
16 **of Francisco Vicente off my reports until I had the**
17 **opportunity to ensure his safety in Cook County**
18 **Jail.**
19     Q  So you just wouldn't write it down anywhere,
20 write down the name of the informant anyplace and
21 anywhere?
22   **A  Not of a confidential informant.  I would**
23 **not put their name in my report initially, no.**
24     Q  Well, then how would anyone know years later

---

118

1 who the informant was if it wasn't documented?
2   **A  They'd have to come ask me.**
3     Q  What if something happened to you?
4   **A  Say again.**
5     Q  What if something happened to you?
6     MS. ROSEN:  Object to the form.
7   **A  I don't know.**
8     MS. ROSEN:  Calls for speculation.
9   **A  They'd have to ask Detective Guevara.**
10     Q  What did you review in preparation for this
11 deposition?
12   **A  I read the investigative file for this case.**
13     Q  How long ago did you read it?
14   **A  Yesterday.**
15     Q  And before that, when was the last time you
16 read it?
17   **A  I had been reading it off and on for weeks.**
18     Q  And would you read some portions of it more
19 than once?
20   **A  Yes.**
21     Q  What else did you do to prepare for this
22 deposition?
23   **A  Talked to my attorneys.**
24     Q  And which attorneys did you speak to?

---

119

1   **A  Mr. Josh Engquist, Mr. Dan Brueggen,**
2 **Mr. Jeff Kivetz.**
3     Q  And when did you speak to them?
4   **A  Yesterday.**
5     Q  And did you speak to them before yesterday?
6   **A  Yes.**
7     Q  When did you speak to them before yesterday?
8   **A  We've had meetings over a period of weeks.**
9     Q  How long did you meet for yesterday?
10   **A  Probably three weeks ago.**
11     Q  I mean how long was your meeting yesterday?
12   **A  Well, from 10:00 in the morning until**
13 **5:00 in the afternoon.**
14     Q  And did you have a similarly long meeting at
15 some point before yesterday?
16   **A  Not that long, no.**
17     Q  When was the last time you met with them
18 before yesterday?
19   **A  As I mentioned, probably three weeks ago.**
20     Q  And how long was your meeting about three
21 weeks ago?
22   **A  From 10:00 to 2:00.**
23     Q  And when else did you meet with your
24 attorneys in preparation for this deposition?

---

120

1   **A  Again, I don't remember the exact dates, but**
2 **we've had two or three meetings.**
3     Q  Was there a third meeting?
4   **A  Was there a third meeting?**
5     Q  Yes.
6   **A  Probably.**
7     Q  How long was that third meeting?
8   **A  Most of our meetings lasted from 10:00 to**
9 **2:00.**
10     Q  And so would it be fair to say you've met
11 with your attorneys at least three times, the last
12 one being a seven-hour meeting, and the first two
13 being about four hours apiece?
14   **A  That would be roughly correct.**
15     Q  Did you review any other documents apart
16 from the investigative file?
17   **A  I may have, but I don't remember.**
18     Q  Did you review any photographs?
19   **A  Not that I can recall.**
20     Q  Did you review any memos?
21   **A  Any what?**
22     Q  Memos?
23   **A  Not that I can recall.**
24     Q  Did you review any transcripts?

JGS_MAYSONET 4014

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

31 (121 to 124)

---

121

1    A  Just the ones that were in the investigative
2  file.
3    Q  And what transcripts were in the
4  investigative file?
5    A  I'm confusing the transcript with a
6  handwritten statement.  I don't think there were any
7  transcripts in the investigative file.
8    Q  Did you review any transcripts at all?
9    A  Not that I remember.
10   Q  You reviewed the handwrittens that were in
11  the file; is that right?
12   A  Yes.
13      MR. AINSWORTH:  Let's mark this as Exhibit
14  No. 1, please.
15      (Halvorsen Deposition Exhibit 1 marked
16  for identification and attached to the transcript.)
17      MR. AINSWORTH:  Counsel, I just have the one
18  color photo.  I'm going to give you each a
19  black-and-white copy.
20   Q  Showing you what we've marked as Exhibit
21  No. 1 to your deposition, can you identify the
22  people in that photograph?
23   A  I see Ray Guevara.
24   Q  Can you describe who Ray Guevara is in that

---

122

1  photo?
2    A  He's the gentleman wearing a suit and the
3  tan latex gloves.
4    Q  Pointing down towards the ground?
5    A  Yes.
6    Q  And who else do you recognize in that
7  photograph?
8    A  That may be me behind Guevara, but I can't
9  be sure.
10   Q  I guess that's why I'm asking.
11      How did you wear your hair back in 1993?
12   A  On my head.
13   Q  What style hair did you have?
14   A  Regular hair cut.  Nothing special.
15   Q  Did you have long hair?
16   A  No.
17   Q  Short hair?  Medium hair?
18      MS. ROSEN:  Object to the form.
19   A  I would probably consider it medium hair
20  back in '93.
21   Q  All right.  Were you and Ray about the same
22  height?
23   A  I think he was a little taller than me.
24   Q  How tall are you?

---

123

1    A  5-7.
2    Q  How much did you weigh back in 1993?
3    A  About 170.
4    Q  Do you recognize the third gentleman in the
5  photograph standing by the pole?
6    A  No.
7    Q  Do you know what this photograph is --
8  depicts?
9    A  I think this is the kid that was shot out in
10  front of Roosevelt High School.
11   Q  Salvador Ruvalcaba?
12   A  If that's the name of the guy.
13   Q  How did you first learn about that murder
14  outside of Roosevelt High School?
15   A  I was assigned to the case when I walked in
16  the door at Area 5 at 3:00 o'clock on the day of the
17  murder.
18   Q  What was your typical shift start?
19   A  3:00 o'clock.
20   Q  And when you worked the 3:00 o'clock shift,
21  what time would you arrive at work?
22   A  3:00 o'clock.
23   Q  What was the -- did you have a roll call?
24   A  No.

---

124

1    Q  Would you arrive in your -- dressed for
2  work?
3    A  Yes.
4    Q  Would you carpool with anyone else to get to
5  work in '93?
6    A  No.
7    Q  Where would you go when you first arrived
8  for work in 1993?
9    A  Go up in the violent crimes office.
10   Q  And what would you typically do in 1993 when
11  you arrived at work at the violent crimes office?
12   A  Check in with the sergeant and see what's
13  going on.
14   Q  And on May 14th, 1993, what were you told --
15  and that was the day of the Salvador Ruvalcaba
16  murder?
17   A  I don't remember the exact date; but if
18  you're saying that's the date, then it would be
19  correct.
20   Q  And what were you told on that date when you
21  went in and checked with the sergeant?
22   A  Shortly after I arrived, me and Detective
23  Guevara were assigned to a murder that had just
24  occurred outside of Roosevelt High School.

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

125

1    Q  And were you -- when you were assigned a
2  murder, what does that mean?
3    A  We were going to be the -- what we call the
4  scene detectives, which would be the first
5  detectives assigned to an investigation.
6    Q  And so what did you do after you learned
7  that you were going to be the scene detectives for
8  the murder outside of Roosevelt High School?
9    A  We went to Roosevelt High School.
10    Q  And what did you do when you got to
11 Roosevelt High School?
12    A  Observed the body on the street.
13    Q  Then what did you do?
14    A  We learned from the officer of the 17th
15 district that there were a number of eyewitnesses,
16 the eyewitnesses had given them a very good
17 description of the person who had shot
18 Mr. Ruvalcaba, and that there was a search underway
19 at that time to find the suspect.
20    Q  Do you recall what that description was?
21    A  No.
22    Q  But it was the 17th district officers who
23 obtained that description?
24    A  Yes.

---

126

1    Q  What area of the city did you grow up in?
2    A  Two different areas.
3    Q  Which two?
4    A  Humboldt Park and Logan Square.
5    Q  Which part of Humboldt Park?
6    A  Kedzie and Evergreen.
7    Q  And which part of Logan Square?
8    A  Central Park and Wrightwood.
9    Q  Did you spend your teenage years in either
10 one of those or both?
11    A  Teenager would have been Central Park and
12 Wrightwood.
13    Q  When did you move to that area?  How old
14 were you?
15    A  After I graduated grammar school, we left
16 Humboldt Park and we moved to Logan Square.  So I
17 would have been about 13 years old.
18    Q  What did you do at the scene of the
19 Ruvalcaba murder after you learned that there was a
20 description of the offender?
21    A  We did our initial work at the scene, and
22 then me and Detective Guevara, we both went out
23 looking for the suspect too.
24    Q  Do you recall the description of the

---

127

1  offender?
2    A  No.
3    Q  And what happened after you and Guevara went
4  out looking for the suspect?
5    A  I heard on the radio that the tactical team
6  from the 17th district had located the possible
7  offender and they were taking him to the 17th
8  district.
9      I then got on the radio and told them make
10 sure you take them all to Area 5.  Then me and
11 Guevara went back to Area 5.
12    Q  What do you mean "all"?
13    A  The suspect and the witnesses.
14    Q  Did you see the suspect at the scene of the
15 murder?
16    A  No.
17    Q  Do you know if a show-up was conducted at
18 the scene of the murder?
19    A  I have no knowledge of it.
20    Q  Do you know who any of the witnesses were to
21 that murder?
22    A  I don't remember.
23    Q  Do you know what gangs were involved in that
24 crime?

---

128

1    A  I don't remember.
2    Q  Do you remember there being a conflict
3  between the Cobras and the PR Stones?
4    A  I don't remember.
5    Q  What happened after you went to Area 5 after
6  directing the witnesses and the suspect to go there?
7    A  We conducted a series of lineups.
8    Q  And when you say "a series of lineups," was
9  it more than one offender in the lineups?
10    A  One offender.
11    Q  One offender?
12    A  Yes.
13    Q  And a number of witnesses?
14      MS. ROSEN:  In the lineup?
15      MR. AINSWORTH:  Viewing the lineup.
16      MS. ROSEN:  Oh.
17      MR. AINSWORTH:  Number of witnesses.
18    A  There were if I -- I remember there were
19 more than one lineup.
20    Q  When you have multiple witnesses and one
21 lineup, do you have the witnesses view the lineup at
22 the same time or separately?
23    A  Separately.
24    Q  Why do you have them view it separately?

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

33 (129 to 132)

---

129

1    A  So they don't influence each other's
2    identification.
3    Q  When you were conducting a lineup back in
4    1993, would you typically be on one side of the
5    lineup than the other?
6    A  Could you say that again, please.
7        MS. ROSEN:  Object to form.
8    Q  Sure.  When you conducted lineups back in
9    1993, you would have one detective on the side with
10   the suspects and one detective on the side with the
11   witnesses; right?
12   A  Yes.
13   Q  In 1993, would you more typically be on the
14   side with the suspects or the side with the
15   witnesses -- or the side with the witnesses?
16   A  It depends --
17       MR. ENGQUIST:  Objection.
18       Go ahead.  Go ahead.
19   A  It depends.  Every case is different.
20   Q  What would it depend on?
21   A  Mainly language.
22   Q  And what do you mean by language?
23   A  I don't speak Spanish.
24   Q  So what if the person, the witness was a

---

130

1    non-Spanish speaker?
2    A  Then I could possibly be on either side of
3    the glass.
4    Q  If the witness was a Spanish speaker, which
5    side would you be on?
6    A  If the witness only spoke English, she would
7    be on the side with Detective Guevara who spoke
8    Spanish.
9    Q  You mean, if the witness spoke Spanish, then
10   they would be on the side with Detective Guevara; is
11   that right?
12   A  Correct.
13   Q  Do you speak Spanish at all?
14   A  No.
15   Q  Do you understand Spanish when it's spoken?
16   A  No.
17   Q  What happened after you had a series of
18   lineups?
19   A  I don't really recall this investigation.
20   I'd have to sit down and go through the entire
21   investigative file to refresh my memory.  If you'd
22   like to give me the file, I'll read it here now and
23   attempt to do so.
24   Q  Well, I'm just asking what do you recall

---

131

1    happening next?
2    A  Lineups and then after that I don't recall
3    what we did then.
4    Q  Have you reviewed any reports regarding that
5    Ruvalcaba murder in preparation for today's
6    deposition?
7    A  No.
8    Q  Was anyone charged in that crime?
9    A  Yes.
10   Q  Do you know who was charged in that crime?
11   A  A guy named Robert Bouto.
12   Q  Do you know what happened to his case?
13   A  He was convicted.
14   Q  Do you know what happened subsequently in
15   his case?
16   A  No.
17   Q  Do you know his conviction was overturned?
18   A  I don't know anything about that.
19   Q  Do you recall that occurred in that
20   investigation after there was a series of lineups?
21   A  No.
22   Q  Do you recall having any contact with
23   Francisco Vicente in regard to that investigation?
24   A  Now that you've just refreshed my memory,

---

132

1    yes.
2    Q  What do you recall, sir?
3    A  Specifically with Francisco Vicente?
4    Q  Yes.
5    A  He was a person that was taken into custody
6    in the 25th district for a series of armed
7    robberies.  There was a Detective Rick Maher who
8    processed him for those armed robberies.
9        At some point during Detective Maher's
10   interviews with Francisco Vicente, he told Maher
11   that he had been in the lockup having a conversation
12   with a guy that was talking about shooting a kid in
13   front of Roosevelt High School.
14       When I came to work at 3:00 o'clock in the
15   afternoon, either Detective Maher or one of the
16   sergeants told me about this information, and then I
17   proceeded to have an interview with Francisco
18   Vicente.
19   Q  Were you alone or with your partner?
20   A  I was with Detective Guevara.
21   Q  All right.  So you and Detective Guevara
22   both questioned Francisco Vicente; right?
23   A  Yes.
24   Q  Where did you question him?

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

133

1    A  Up in Area 5 detectives.
2    Q  And was this during your normal shift of
3  3:00 o'clock on?
4    A  Yes.
5    Q  And where in Area 5 detectives did you
6  question Francisco Vicente?
7    A  In one of the interview rooms.
8    Q  Which one?
9    A  I don't remember.
10   Q  How did Vicente appear when you talked to
11 him?
12   A  Fine.
13   Q  Was he sweating at all?
14   A  No.
15   Q  Did he appear to be suffering the effects of
16 withdrawal symptoms?
17   A  No.
18   Q  Was he cheerful?
19   A  Was he what?
20   Q  Cheerful.
21     MS. ROSEN:  Object to the form.
22   Q  Cheerful.
23   A  Cheerful or tearful?
24   Q  Cheerful, full of joy.

134

1    A  He seemed fine.
2    Q  And what did you say to Francisco Vicente,
3  and what did he say to you?
4    A  I asked him to tell me what he had told
5  Detective Maher.
6    Q  What did Vicente tell you?
7    A  He gave me a long statement about the
8  conversation that he was having with someone in the
9  lockup downstairs.
10   Q  What did he tell you?
11   A  I'd have to go back and look at the file to
12 refresh my memory as to everything that Francisco
13 Vicente told me 26 years ago.
14   Q  What do you remember him saying?
15   A  That he had been with a guy in the lockup
16 that was talking about doing a shooting in front of
17 Roosevelt High School.
18   Q  Well, what did he say about doing the
19 shooting?  What do you mean?
20   A  Again, I'd have to look at his statement to
21 refresh my memory from 26 years ago.
22   Q  Was Francisco Vicente forthcoming?
23     MS. ROSEN:  Object to the form.  Calls for
24 speculation.

135

1      MR. ENGQUIST:  Join.
2    A  Yes.
3  BY MR. AINSWORTH:
4    Q  And did he -- did you have to ask a lot of
5  questions to get him to give you information, or was
6  he just, you know, running with it when you just
7  asked him, you know, what happened?
8    A  No.  He just related everything that was --
9  he spoke about with this other person in the lockup.
10   Q  Which lockup?
11   A  The lockup at the 25th police district.
12   Q  And did you believe him when he was telling
13 you this?
14   A  Yes.
15   Q  Had you met Vicente before?
16   A  No.
17   Q  What gang was Vicente with?
18   A  He told me he was an Imperial Gangster.
19   Q  And what gang was Bouto with?
20   A  I don't remember.
21   Q  Was Bouto an opposing gang member?
22   A  I don't remember.
23   Q  Were the Stones opposing or allied gang
24 members with the IGs back in 1993?

136

1    A  I don't know.
2    Q  Did you know at the time?
3    A  I may have back then, but I don't now.  I
4  don't know now.
5    Q  Well, back then you would pay attention to
6  whether a person who was giving you information was
7  giving you information about a fellow gang member or
8  an opposing gang member; right?
9      MR. ENGQUIST:  Objection; calls for
10 speculation, form.
11     Go ahead.
12   A  If I knew, yes.
13   Q  Well, you would make it your business to
14 know whether they were providing information about a
15 fellow gang member or an opposing gang member;
16 right?
17   A  I did not have that much knowledge about who
18 was a friendly gang as opposed to an opposing gang.
19   Q  That was more of Ray's territory; right?
20   A  Correct.
21     MS. ROSEN:  Objection to the form.
22   Q  So you would try and find out is what I'm
23 saying.  You would try and find out whether somebody
24 who was giving you information about gang activity

JGS_MAYSONET 4018

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

35 (137 to 140)

---

137

1 was informing about a fellow gang member or an
2 opposing gang member; correct?
3     MR. ENGQUIST: Objection; form and asked and
4 answered.
5     **A Yes.**
6     Q Because that would be relevant to that's
7 person's bias; right?
8     **A Yes.**
9     Q And the credibility of what -- the
10 information that they were giving you; right?
11     **A Yes.**
12     Q It was less likely, for example, that an
13 opposing gang member would confess murder to -- or
14 strike that.
15         It's less likely that a gang member would
16 confess murder to an opposing gang member than to a
17 fellow gang member; correct?
18     MS. ROSEN: Objection; form, calls for
19 speculation.
20     MR. ENGQUIST: Join.
21     MS. NIKOLAEVSKAYA: Join.
22     **A Could you say that question again. It was a**
23 **little confusing.**
24

---

138

1 BY MR. AINSWORTH:
2     Q Sure. A gang member who -- strike that.
3         It's less likely that a gang member would
4 confess to an opposing gang member than to a member
5 of their own gang; is that right?
6     **A That's backwards.**
7     MS. ROSEN: Object to the form.
8     Q It would be more likely that they would
9 confess on an opposing gang than their own gang.
10         Why do you say that?
11     **A Because I would suggest -- I would think**
12 **they would want to protect members of their own**
13 **gang.**
14     Q So they're less likely to share their
15 misdeeds with a member of the opposing gang; right?
16     **A No. They're less likely to share their**
17 **misdeeds with members of their own gang.**
18     Q You think that somebody would say I
19 committed murder more freely to an opposing gang
20 member in the lockup than to a member of their own
21 gang?
22     MS. ROSEN: Object to the form.
23     MR. ENGQUIST: I object to the form too, and
24 I think we're talking past each other here but --

---

139

1     **A If I was a gang member, I would be less**
2 **likely to tell somebody from a rival gang any**
3 **misdeeds that I did as opposed to telling members of**
4 **my own gang of any misdeeds that I did.**
5 **BY MR. AINSWORTH:**
6     Q Okay. Did you want to know from Francisco
7 Vicente who else may have witnessed his conversation
8 with Robert Bouto?
9     **A If there was somebody else in the lockup,**
10 **yes.**
11     Q Did you want to know whether somebody else
12 had witnessed the conversation?
13     **A Yes.**
14     Q Because that's one way to corroborate the
15 information that Vicente is providing you; right?
16     **A Correct.**
17     Q Did you want to know what other information
18 Vicente might have about other crimes?
19     **A Not at that time.**
20     Q Why wouldn't you want to know if Vicente had
21 information about other crimes?
22     **A I didn't think -- I didn't think to press**
23 **him on anything else other than what he was telling**
24 **me about the Ruvalcaba murder.**

---

140

1     Q Remember earlier today you said that if you
2 had an informant who is providing information about
3 a crime, they were forthcoming, you would ask them
4 about what other criminal activity they knew about.
5 Remember that?
6     **A Yeah.**
7     Q So why wouldn't you ask Vicente about other
8 crimes that he had knowledge of?
9     **A He wasn't my informant.**
10     MS. ROSEN: Objection to form.
11     Q Whose informant was he?
12     **A Nobody's.**
13     Q So he was informing on criminal activity by
14 another person; right?
15     MS. ROSEN: Object to the form.
16     **A When we spoke to Francisco Vicente, he was**
17 **any other witness giving us information. We**
18 **portrayed him as being a confidential informant so**
19 **that when he went to Cook County Jail, he wouldn't**
20 **get killed.**
21     Q Why wouldn't you want to know if Vicente
22 could provide information about other crimes in
23 addition to the Ruvalcaba murder?
24     MS. ROSEN: Object to the form.

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

141

1     MS. NIKOLAEVSKAYA:  Join.
2     MR. ENGQUIST:  Join.  Asked and answered
3 also.
4     **A  He was not my informant.  We did not**
5 **question him about any other crimes.**
6 **BY MR. AINSWORTH:**
7     Q  I understand you're saying you didn't
8 question him about other crimes.  I'm asking you the
9 why part.
10     Why didn't you --
11     **A  It didn't occur to me.**
12     Q  Let me just ask the whole question.
13     Why didn't you want to know from Francisco
14 Vicente, who was forthcoming to you about the
15 Ruvalcaba murder, if he knew about other criminal
16 activity that he might be similarly willing to be
17 forthcoming about?
18     MR. ENGQUIST:  Objection; form.  Objection;
19 asked and answered.
20     **A  I just didn't.**
21     Q  I understand you didn't, sir.
22     Why didn't you?
23     **A  I didn't see the necessary -- I didn't think**
24 **it was necessary.**

142

1     Q  I thought that you wanted to become a
2 detective so that you could investigate crimes and
3 arrest dangerous criminals; right?
4     **A  Yes.**
5     MS. ROSEN:  Object to the form.
6     MS. NIKOLAEVSKAYA:  Join.
7     Q  So why didn't you think it was helpful to
8 see if this forthcoming witness would provide
9 criminal -- information about other crimes that
10 would help you to arrest dangerous people?
11     MR. ENGQUIST:  Objection; form.  Objection;
12 asked and answered.  He has already answered the
13 question several times.
14     Go ahead.  You can answer it again.
15     **A  I just didn't see a need.**
16     Q  You didn't see a need to find out
17 information about other crimes that the witness
18 might possess; right?  That's what you're saying?
19     **A  I had no linkage with Francisco Vicente to**
20 **any other crime other than what he was discussing**
21 **with me regarding the Ruvalcaba murder.**
22     Q  So you're saying you didn't even ask him if
23 he knew about any other -- any other crimes?
24     **A  As I've said like four times now, no, I did**

143

1 **not.**
2     Q  Did Ray Guevara ask Vicente whether he had
3 information about other crimes?
4     **A  Not in my presence.**
5     Q  Did you talk to Ray Guevara about asking
6 Vicente about other crimes?
7     MR. ENGQUIST:  Objection; vague.  Are you
8 talking about that time?
9     Q  Yeah.  May 15 -- May 14, May 15 of 1993.
10     **A  I don't remember.**
11     Q  You knew John Dillon; right?
12     **A  Say that again, please.**
13     Q  You knew John Dillon; right?
14     MR. ENGQUIST:  Objection; vague as to time
15 frame.
16     MS. NIKOLAEVSKAYA:  Join.
17     **A  I knew John Dillon when?**
18     Q  When did you first meet John Dillon?
19     **A  Many, many years ago.**
20     Q  In what context?
21     **A  He's an assistant state's attorney.**
22     Q  So how did you meet him?
23     **A  He was one of the prosecutors up in the**
24 **state's attorney's office.**

144

1     Q  So how did you meet him?
2     **A  I don't remember specifically how I met him.**
3     Q  Was he the prosecutor on some cases that you
4 had investigated?
5     **A  He might have been, but I don't remember.**
6     Q  How do you know Jose Montanez?
7     MS. ROSEN:  Objection; form.
8     **A  From this case or other cases?**
9     Q  That's what I'm trying to find out, sir.
10     MS. ROSEN:  Objection; form.
11     **A  I don't know him personally.  He first came**
12 **up in a murder investigation in 1990 in Area 5 where**
13 **he was arrested and charged.  I don't remember**
14 **working on that case with him.**
15     **The next thing I knew about Jose Montanez**
16 **was when -- was the statement from Francisco Vicente.**
17     Q  How do you know that Jose Montanez was
18 arrested and charged in a 1990 case?
19     **A  It's on his rap sheet.**
20     Q  And your name is on that rap sheet; right?
21     **A  I don't remember.**
22     Q  Did you arrest Jose Montanez ever?
23     **A  I don't remember.**
24     Q  Well, why did you say that -- or why is the

JGS_MAYSONET 4020

Transcript of Ernest Halvorsen

Conducted on February 6, 2019

---

145

1  fact that Jose's rap sheet reveals he was arrested
2  in 1990 -- what does that have to do with your
3  response to whether you know Jose Montanez?
4      **A  At some point in 1990, he was brought up to**
5  **Area 5 for a murder investigation, and I saw him.**
6      Q  And did you work that murder investigation?
7      **A  I don't believe so.  I think I assisted**
8  **Detective Paul Nitsky in making an arrest, and that**
9  **was it.**
10     Q  How did it come up that you assisted
11  Detective Paul Nitsky in making an arrest in that
12  case?
13        MS. ROSEN:  Object to form.  What does that
14  mean how did it come up?
15     **A  I don't remember.**
16     Q  Why were you assisting Detective Paul
17  Nitsky?
18     **A  I'd have to look at that investigative file**
19  **to refresh my memory.  I don't remember.**
20     Q  Did you talk to Jose Montanez in 1990?
21     **A  Not that I remember.**
22     Q  After Vicente provided you information about
23  Robert Bouto, what did you do with that information?
24     **A  We eventually called felony review, and the**

---

146

1  **assistant state's attorney came out and interviewed**
2  **Robert -- Francisco Vicente and took a handwritten**
3  **signed statement from him.**
4      Q  And did you try to corroborate Vicente's
5  statement?
6      **A  Later that afternoon, yes, we did.**
7      Q  How did you go about trying to corroborate
8  his information?
9      **A  Detective Guevara contacted Wilda -- Wilda,**
10  **the victim's wife on the phone.  They had a**
11  **conversation, after which we went over to Wilda's**
12  **house.  I sat out in the car.  Guevara went in the**
13  **house and had an interview with Wilda.  He showed**
14  **her some photos.**
15        **Wilda identified two photos of some**
16  **individuals that she had seen in a gas station at**
17  **North Avenue and Central Park that had followed her**
18  **home on the 4th of February, 1993.**
19        MR. ENGQUIST:  I think the question might
20  have been vague.  You got a different time-frame
21  answer.
22        MR. AINSWORTH:  I understand.
23     Q  So after Vicente provided the information
24  about Robert Bouto, what did you do?

---

147

1      **A  The next thing was we went and talked to**
2  **Wilda.**
3      Q  And why did -- you sat in the car while
4  Guevara went inside; right?
5      **A  Yes.**
6      Q  So you weren't present when Guevara showed
7  Wilda the photographs; right?
8      **A  Correct.**
9      Q  So you have no idea what was said to Wilda
10  by Ray Guevara; right?
11     **A  Correct.**
12     Q  Or what she said to him; right?
13     **A  Correct.**
14     Q  Or whether she actually identified anybody
15  from that photo array; right?
16        MS. ROSEN:  Objection to form.
17     **A  I'm going by what Ray Guevara told me.**
18     Q  And you helped create the photo array that
19  was showed to Wilda Vargas; right?
20     **A  Not that I remember.**
21     Q  Who created that photo array that was showed
22  to Wilda Vargas?
23     **A  Guevara.**
24     Q  So it was all Guevara's doing; right?

---

148

1        MS. ROSEN:  Object to the form.
2      **A  Guevara showed her the photo array.**
3  **BY MR. AINSWORTH:**
4      Q  And he created the photo array; right?
5      **A  Yes.**
6      Q  Did you tell him, I don't know.  That photo
7  array doesn't really look to be a fair one?
8      **A  We didn't discuss the composition of the**
9  **photo array.**
10     Q  My question is a little bit different.
11        Did you alert Guevara to the fact that you
12  didn't think the photo array was a fair one?
13     **A  No.**
14     Q  Did you think the photo array was fair?
15     **A  Back in 1993, yes.**
16     Q  Why did you think it was fair?
17     **A  It looked fair to me.**
18     Q  So you viewed the photo array before it was
19  shown to Wilda; right?
20     **A  Before or after, I don't remember.  It was**
21  **inventoried.**
22     Q  In any event, whenever it was that you saw
23  the photo array, it didn't raise any issues in your
24  mind about being unfair; correct?

---

JGS_MAYSONET 4021

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

149

1    A  No.
2    Q  That's correct?
3    A  That's correct.
4    Q  And I'm referring to the photo array that
5  was shown to Wilda Vargas; right?
6    A  Yes.
7    Q  And so why didn't you go inside Wilda's
8  house to observe her, you know, making an
9  identification, if she could, from the photo array?
10   A  There might have been a parking problem out
11 in front that I had to sit in the car.
12   Q  As a detective, you had M class plates;
13 right?
14   A  Say again.
15   Q  You had M -- you had plates with a -- that
16 indicated it was a municipal car?
17   A  I don't remember what we had in 1993.
18   Q  Do you know what I mean by M plates?
19   A  Yes.
20   Q  All right.  You drove a department-issued
21 car back in 1993, right, when you were on duty?
22   A  An unmarked car, yes.
23   Q  All right.  An unmarked car with municipal
24 plates?

150

1    A  I don't believe we had municipal plates on
2  the car.  Those were on the marked cars.
3    Q  Wilda lived on a residential street; right?
4    A  Yes.
5    Q  Are you saying that you didn't go inside
6  because you had to keep from getting a ticket?
7  That's what you're saying?
8    MS. ROSEN:  Object to the form.
9  Mischaracterizes his testimony.
10   MR. ENGQUIST:  Join.
11   A  What I'm saying is that I don't remember why
12 I sat in the car.  I'm just giving you a plausible
13 reason.  I don't really remember why I sat in the
14 car.
15   Q  There's no police reason for you to be
16 sitting in the car; right?
17   MS. ROSEN:  Object to the form.
18   MR. ENGQUIST:  Vague.
19   A  There had to be a reason.  I just don't
20 remember.
21   Q  What I mean is there was -- it wasn't
22 helpful for the investigation for you to be sitting
23 out in the car; right?
24   MS. ROSEN:  Object to the form.  Calls for

151

1  speculation.
2    MS. NIKOLAEVSKAYA:  Join.
3    A  No.
4    BY MR. AINSWORTH:
5    Q  You didn't sit out in the car to give the
6  investigation a tactical advantage to allow Guevara
7  to go in alone; is that right?
8    MS. ROSEN:  Object to the form.
9    MS. NIKOLAEVSKAYA:  Join.
10   MR. ENGQUIST:  Join.
11   A  No.
12   Q  How did you -- did you come into contact
13 with Vicente again after he provided information
14 about Robert Bouto?
15   A  Yes.
16   Q  How did you come in contact with him again?
17   A  On the 31st, I can't remember what month it
18 was.
19   Q  May?
20   A  I just remember it was on the 31st.  It
21 might have been May.  He called me up at Area 5 on
22 the pay phone from Cook County Jail, collect, that I
23 accepted charges, to let me know that an attorney
24 had showed up at Cook County Jail and tried to bribe

152

1  him not to testify against Robert Bouto.
2    Q  So did you answer that call when he was
3  calling collect?
4    A  I don't know if I answered the phone or if
5  the phone was given to me, and then I accepted the
6  charges.
7    Q  What did you say to Francisco Vicente when
8  he told you that an attorney had tried to bribe him?
9    A  I told him I was going to arrange for him to
10 come over to the Cook County State's Attorney's
11 Office as soon as possible so he could tell his
12 story to someone in the gang prosecution office.
13   Q  Did you talk to anyone in the gang
14 prosecution office about what Francisco Vicente told
15 you?
16   A  Yes.
17   Q  Why did you contact somebody in the gang
18 crimes -- or in the gang prosecution unit?
19   A  I believe they were prosecuting the case.
20   Q  How do you know that?
21   A  I don't recall at this time.
22   Q  Who did you contact within the gang
23 prosecution unit?
24   A  John Dillon.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

**153**

1    Q  Why did you contact John Dillon as opposed
2  to some other prosecutor?
3    **A  I believe he was a supervisor.**
4    Q  So you contacted the supervisor of the gang
5  prosecution unit?
6    **A  Yes.**
7    Q  Why did you contact the supervisor of the
8  gang prosecution unit?
9    **A  Because I wanted Francisco Vicente brought**
10  **over to their office to let them know about this**
11  **bribe attempt.**
12    Q  And so why the supervisor as opposed to any
13  of the other assistants there?
14    **A  I thought it was an important matter to go**
15  **right to the supervisor.**
16    Q  So at the time you didn't know that John
17  Dillon was assigned to the case in any way?
18    **A  John Dillon?**
19    Q  Yeah.
20    **A  I think he was a supervisor.  I don't think**
21  **he was assigned to the case.**
22    Q  And what did the -- what did John Dillon say
23  to you when you contacted him about Vicente?
24    **A  That he would arrange to bring him over as**

---

**154**

1  **soon as possible, and we'd talk to him.**
2    Q  All right.  Did you set a time for that to
3  happen?
4    **A  Huh?**
5    Q  Did you set a time for that to happen?
6    **A  No.**
7    Q  What was your understanding of how Vicente
8  was going to get from Cook County Jail to the gang
9  prosecution unit?
10    **A  Dillon would arrange it.**
11    Q  So you didn't think that you would be
12  bringing Vicente up; is that right?
13    **A  That's correct.**
14    Q  So that was for Dillon to arrange and -- for
15  Dillon to arrange for Vicente to get from the Cook
16  County Jail to the gang crime -- gang prosecution
17  unit; right?
18    **A  Correct.**
19    Q  Did you intend to be present for that
20  conversation with John Dillon?
21    **A  Yes.**
22    Q  Why?
23    **A  I wanted to hear what was going on.**
24    Q  Why did you want to hear what was going on?

---

**155**

1    **A  Because I didn't like the fact that some**
2  **attorney was trying to bribe a witness in my murder**
3  **case.**
4    Q  Did you learn that Vicente was actually
5  going to be at the gang prosecution unit?
6    **A  Yes.**
7    Q  How did you learn that?
8    **A  I don't remember who called me, but it was**
9  **determined that Vicente will be brought over on the**
10  **2nd of June.  The 2nd of June, I went down there,**
11  **and he was there.**
12    Q  Did you go with anyone else to the gang
13  prosecution unit?
14    **A  No.**
15    Q  Did you go at your scheduled work time,
16  3:00 o'clock?
17    **A  No.**
18    Q  Why not?
19    **A  Because he was -- Francisco Vicente was**
20  **brought over earlier in the day.  So I changed my**
21  **work hours so that I could be there when he was**
22  **there.**
23    Q  And how did you go about changing your work
24  hours?

---

**156**

1    **A  Tell the sergeant what I had to do, and they**
2  **change the work hours.**
3    Q  What were your work hours on that day,
4  June 2nd?
5    **A  I don't remember.**
6    Q  Well, do you know what -- did you meet with
7  Vicente in the morning?  In the afternoon?  At
8  night?
9    **A  It was sometime afternoon.**
10    Q  And can you tell us what -- so when you went
11  to the gang prosecution unit, was Vicente already
12  there?
13    **A  Yes.**
14    Q  And where did you meet with Vicente?
15    **A  One of the offices up in gang prosecution on**
16  **the 13th floor at 2600 South California.**
17    Q  And who was present for that meeting?
18    **A  Myself, John Dillon, and Francisco Vicente.**
19    Q  And so why didn't Ray Guevara come with you?
20    **A  He wasn't working.**
21    Q  You weren't working either; right?
22    **A  But I changed my hours.**
23    Q  Why didn't Ray Guevara change his hours?
24    MS. ROSEN:  Objection; foundation.

---

JGS_MAYSONET 4023

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

157

1    MS. NIKOLAEVSKAYA: Join.
2    MS. ROSEN: Go ahead.
3    **A  I don't remember what Ray was doing back on**
4 **the 2nd of June of 1993.**
5    Q  And so did Dillon do most of the questioning
6 of Vicente in that meeting?
7    **A  Yes.**
8    Q  And you were there to take notes?
9    **A  No.**
10    Q  Did you take notes?
11    **A  No.**
12    Q  Why didn't you take notes?
13    **A  I didn't bring my notepad with me.**
14    Q  Did you ask for some paper?
15    **A  No.**
16    Q  You keep a notepad in your car; right?
17    **A  In my police car, yes.**
18    Q  All right.  Did you drive there in your
19 personal car?
20    **A  I don't believe so.**
21    Q  So why didn't you bring your notepad from
22 your car to a meeting with a witness who has made a
23 pretty serious allegation that he has been attempted
24 to be bribed by an attorney?

158

1    **A  He had told me all the details on the phone**
2 **when I first talked to him.  I just didn't bring a**
3 **notepad.**
4    Q  So when he told you all of the details on
5 the phone, did you then document that in a
6 supplementary report?
7    **A  Eventually.**
8    Q  Well, I mean, before June 2nd, did you make
9 a supplementary report to document those details
10 that he provided you on the phone?
11    **A  I can't remember the dates.  I do know that**
12 **everything that Francisco Vicente told me about the**
13 **attempt to bribe with the attorney I documented on a**
14 **supplementary report.**
15    Q  Did you take any notes when Vicente called
16 you on the phone?
17    **A  That I don't remember.**
18    Q  Was there anything preventing you from
19 taking notes when Vicente called you on the phone
20 while you were at a desk in Area 5?
21    **A  I don't remember taking any notes.**
22    Q  You had no paper available; right?
23    **A  Yes.**
24    Q  All right.  So then Vicente tells John

159

1 Dillon about the -- about the attempted bribery;
2 right?
3    **A  Yes.**
4    Q  And then Dillon starts talking about the
5 Vargas homicide; is that correct?
6    **A  No.  I don't remember that conversation.**
7    Q  Well, how did Dillon get the conversation
8 from the bribery to the Vargas -- to the Vargas
9 homicide?
10    MR. ENGQUIST: Objection; form.
11    MS. NIKOLAEVSKAYA: Join.
12    **A  We never talked to him about the Vargas**
13 **homicide, to my knowledge.**
14    Q  Well, tell us what conversation was had
15 between John Dillon and Francisco Vicente in that
16 room in the gang prosecution unit.
17    MS. ROSEN: Objection to form.
18    MS. NIKOLAEVSKAYA: Join.
19    **A  Dillon -- Dillon questioned Francisco**
20 **Vicente about the bribery attempt in Cook County**
21 **Jail.  That's it.  When Francisco Vicente started**
22 **talking to me about the Vargas murder, Dillon wasn't**
23 **in the room.**
24

160

1 BY MR. AINSWORTH:
2    Q  Well, where was Vicente when he started
3 talking about the Vargas homicide?
4    **A  In one of the offices at gang prosecution.**
5    Q  And who was present?
6    **A  When he started talking about the Vargas**
7 **homicide, it was just me and Francisco Vicente.**
8    Q  Well, where was John Dillon?
9    **A  He had left.**
10    Q  Why did he leave?
11    MS. NIKOLAEVSKAYA: Objection.
12    MS. ROSEN: Form.
13    MS. NIKOLAEVSKAYA: Form.
14    **A  He was a supervisor.  He had other tasks and**
15 **duties he had to attend to.**
16    Q  All right.  And so tell us, you talk about
17 the -- the bribery attempt, and Vicente doesn't say
18 anything about the Vargas homicide; is that what
19 you're saying?
20    **A  Not at that time.**
21    Q  And so how does it come up that Vicente
22 starts talking about the Vargas homicide?
23    MS. ROSEN: Object to the form.
24    MR. ENGQUIST: Join.

JGS_MAYSONET 4024

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

41 (161 to 164)

161

1     MS. NIKOLAEVSKAYA: Join.
2     A  We had information that some guy named
3  Pistol Pete was a possible suspect in the Vargas
4  murder.  I had been told by Officer Lupe Pina that
5  Francisco Vicente knew somebody named Pistol Pete.
6        When I was with Francisco Vicente, I asked
7  him do you know somebody named Pistol Pete?
8        And he goes, Well, Little Pistol Pete or Big
9  Pistol Pete?
10       I said, I don't know.  I says, I'm
11 investigating a Pistol Pete that did a shooting on
12 Springfield last February.
13       He goes, Oh, that's Big Pistol Pete.
14       I said, Well, how do you know that?
15       He then gave me a lengthy statement about
16 his knowledge of that case.
17 BY MR. AINSWORTH:
18    Q  And did he -- did you document all the
19 information that he provided you in a supplementary
20 report?
21    A  Yes.
22    Q  And did you document how he described Pistol
23 Pete in that supplementary report?
24    A  I'd have to review that report to give you

162

1  an accurate accounting of what everything he said.
2     Q  Is there any reason why you wouldn't
3  document Vicente's description of Pistol Pete, Big
4  Pistol Pete?
5     A  There would not be any reason I would not
6  document it, but again I would have to review that
7  report to refresh my memory.
8     Q  You said you'd received some information
9  that there is a Pistol Pete involved in the
10 homicide; is that right?
11    A  Yes.
12    Q  Where did that information come from?
13    A  Ray Guevara.
14    Q  What did Ray Guevara tell you?
15    A  He had a street source that was telling him
16 that three guys were involved in that murder over on
17 Springfield.
18    Q  So a street source said three guys were
19 involved in the murder on Springfield?
20    A  Yes.
21    Q  Did Ray Guevara tell you anything else about
22 the three guys who were involved in the murder on
23 Springfield?
24    A  I think he initially gave me their

163

1  nicknames.
2     Q  What were the nicknames that he --
3     A  Pistol Pete, Joker, and Mondo.
4        THE REPORTER:  Pardon?
5        THE WITNESS:  Pistol Pete, Joker, and Mondo.
6     Q  Okay.  So Ray Guevara told you Pistol Pete,
7  Joker, and Mondo were involved in this crime; right?
8     A  Ray told me that someone had given him
9  information that these three guys were involved in
10 that incident.
11    Q  So when Ray Guevara told you that he had
12 information that these three guys were involved in
13 the murder, you then documented that information so
14 it would be preserved in the file for you to then
15 conduct your follow-up investigation.
16    A  No, I did not.
17    Q  Why didn't you document in the file when Ray
18 Guevara told you that there's a street source saying
19 that there were three guys -- Pistol Pete, Joker,
20 and Mondo -- who were involved in this murder?
21    A  It was an ongoing investigation.  It was
22 going to be documented eventually.
23    Q  What do you mean "it was going to be
24 documented eventually"?

164

1     A  We were working the information to see if it
2  was factual or not.
3     Q  So you withheld the information from the
4  file to see if it could be corroborated?
5        MS. ROSEN:  Objection to form.
6        MR. ENGQUIST:  Join.
7        MS. NIKOLAEVSKAYA:  Join.
8     A  No.  We were proceeding with the
9  investigation.  Ray Guevara got some loose
10 information that guys with three nicknames may have
11 been involved in this incident.
12    I wanted to proceed and do a further
13 investigation before I started typing supplemental
14 reports.
15    Q  So you looked in your nickname file to try
16 and find out who Pistol Pete was; right?
17    A  At one point I did, but there were just too
18 many Pistol Petes.
19    Q  And so you couldn't tell from the nickname
20 file who Pistol Pete was; right?
21    A  Not the one that Guevara was referring to.
22    Q  Okay.  So how long before June 2nd did Ray
23 Guevara tell you that he heard from a source that
24 three guys named Pistol Pete, Joker, and Mondo were

JGS_MAYSONET 4025

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

165

1 involved in this murder?
2 **A I think he told me that information sometime**
3 **around the end of May. That was before June 2nd.**
4 Q So at the end of May, he provided this
5 information; right?
6 **A Huh?**
7 Q End of May he provided you this information;
8 right?
9 **A I believe it was sometime around that. Some**
10 **time in that last week of May. It was before**
11 **June 2nd.**
12 Q So right before Francisco Vicente ends up in
13 John Dillon's office, you learn about Pistol Pete
14 and Joker and Mondo being involved in this murder
15 via Ray Guevara; right?
16 MR. ENGQUIST: Objection to form.
17 Go ahead.
18 **A I learned from Ray Guevara the information**
19 **he had.**
20 Q Who did Ray Guevara get it from?
21 **A I don't know.**
22 Q Did you ever ask him?
23 **A Yes.**
24 Q What did he say?

166

1 **A Couldn't tell me.**
2 Q Well, what did he say?
3 **A Street source.**
4 Q He refused to tell you?
5 **A That I don't remember, but he didn't tell**
6 **me.**
7 Q Did he do something other than refuse to
8 tell you what the name of the person was?
9 MS. ROSEN: Objection to form. Asked and
10 answered.
11 MS. NIKOLAEVSKAYA: Join.
12 **A Did Ray Guevara do something else?**
13 Q Yeah.
14 **A I imagine that he tried to identify who the**
15 **nicknames belonged to.**
16 Q Sorry. I need to -- when you asked Ray
17 Guevara who the source was, what did Ray say in
18 response?
19 **A I don't remember the conversation**
20 **specifically.**
21 Q Well, what did Ray say generally when you
22 asked him who his source was for this information?
23 **A He never told me.**
24 Q So he just refused to tell you?

167

1 **A He never told me. It's just as simple as**
2 **that.**
3 Q Did you want to know?
4 **A Yes.**
5 Q Why did you want to know?
6 **A Reliability of the informant.**
7 Q You wanted to know if this was somebody who
8 provided accurate information on other occasions;
9 right?
10 **A Yes.**
11 MS. ROSEN: Object to the form.
12 Q Did Ray Guevara tell you anything about the
13 informant as to his or her reliability?
14 **A No.**
15 Q Did you ask him whether this was a witness
16 who had provided credible information on other
17 occasions?
18 **A No.**
19 Q Why didn't you ask Ray, you know, the
20 foundational question? Just, Hey, is this person
21 legit or something to that effect?
22 **A I didn't ask him that question.**
23 Q Did you ask him something to that effect?
24 **A No.**

168

1 Q Why not?
2 **A I didn't.**
3 Q But you wanted to know whether the person
4 was legit or not; right?
5 **A Ray said he got it from a street source, and**
6 **that was it.**
7 Q All right. But you wanted to know if the
8 person was legit; correct?
9 **A Yes.**
10 Q But you didn't ask Ray if the person was
11 legitimate or had provided credible information on
12 other occasions; right?
13 **A He wouldn't tell me who the person was.**
14 Q Were there other occasions when Ray had
15 obtained information from street sources but refused
16 to tell you it was who provided the information?
17 **A Not that I recall.**
18 Q So this was the only time that Ray refused
19 to tell you who his source was for information as
20 far as you can remember; right?
21 MS. ROSEN: Object to the form.
22 **A As far as I can recall, this is the only**
23 **time. There may have been other times. I don't**
24 **recall them.**

JGS_MAYSONET 4026

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

43 (169 to 172)

169

1  BY MR. AINSWORTH:
2      Q  There were other occasions when Ray told you
3  who his sources were; right?
4      A  Yes.
5      Q  Did it raise a red flag in your mind?  You
6  know, why isn't Ray sharing with me the name of the
7  person who is providing this information?
8      A  I thought it was someone that Ray was trying
9  to protect.
10     Q  Did you think that Ray didn't trust you?
11     A  Could have been.
12     Q  Did you think at the time that Ray didn't
13 trust you?
14     A  No.  I don't know what I thought at the
15 time.
16     Q  Did you trust Ray?
17     A  Yes.  As a police officer, yes.
18     Q  How about as a person?
19     A  Yeah.  I'd say yes.
20     Q  Why do you hesitate?
21     A  I have trusted him as a police officer and
22 as a person.
23     Q  You took a long pause there.
24        What were you considering?

170

1      A  Well --
2         MS. ROSEN:  Object to the form.
3      A  -- I would trust him as a police officer and
4  a person.
5  BY MR. AINSWORTH:
6      Q  What's some of the crazy ass stuff that
7  you've heard about Ray doing off duty?
8         MR. ENGQUIST:  Objection to form.
9         MS. ROSEN:  I object to form.
10        MS. NIKOLAEVSKAYA:  Join.
11     A  When you mention "crazy ass stuff," such as
12 what?
13     Q  That's what I'm trying to find out from
14 you, sir.
15        MS. ROSEN:  Object to foundation as to crazy
16 ass.
17     A  The only crazy ass thing I know Ray ever did
18 is he went into the 14th district police station one
19 time, got into a verbal argument with the officers
20 there over a parking ticket and he -- I think he
21 took a suspension.  That's the only crazy ass thing
22 I can remember.
23     Q  Did you ever tell anyone that Ray Guevara
24 used to do crazy ass shit while off duty?

171

1      A  Did I what?
2      Q  Did you ever tell anyone that Ray Guevara
3  did crazy ass stuff while off duty?
4         MS. ROSEN:  Objection; form, foundation,
5  once again --
6      A  Not that I remember.
7         MS. ROSEN:  -- to the phrase crazy ass.
8         MR. ENGQUIST:  Join.
9         MS. NIKOLAEVSKAYA:  Join.
10     Q  All right.  So you would have wanted to know
11 who Vicente was referring to when he mentioned
12 Pistol Pete and these other people; right?
13     A  Yes.
14     Q  Because you needed to know, like, which
15 Pistol Pete he's talking about; right?
16     A  Yes.
17     Q  Because you already knew that there were too
18 many Pistol Petes in the nickname file for you to be
19 able to identify who it was based solely on the
20 nickname Pistol Pete; right?
21     A  Correct.
22     Q  So you would have asked Vicente for a
23 description of the Pistol Pete he was referring to;
24 right?

172

1      A  I don't specifically remember what I asked
2  him.
3      Q  But you would have wanted to obtain a
4  description from Vicente that would allow you to
5  narrow down which Pistol Pete we're talking about
6  here; right?
7      A  He just told me the Big Pistol Pete.
8      Q  I understand what he told you, but I'm
9  asking a different question.
10        My question here is you wanted to know a
11 description of the Pistol Pete that Vicente was
12 referring to so you could narrow down who that
13 Pistol Pete was; right?
14     A  I don't remember.
15     Q  Well, how about now?  As an experienced
16 homicide detective, if you knew that there were too
17 many Pistol Petes in the nickname file to allow you
18 to identify the person simply by the nickname, you
19 would have wanted to know either the person's given
20 name or a description of the person that would allow
21 you to identify which of the Pistol Petes it was;
22 right?
23     A  I think what happened here is after I talked
24 to Francisco Vicente, I called the office.  I don't

JGS_MAYSONET 4027

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

173

1 remember who I talked to in the office, but someone
2 was able to give me the names of Montanez, Pacheco,
3 and Serrano.
4      I then went and got Chicago Police
5 Department black-and-white photos. I can't remember
6 if I went back to Area 5 and got them or if I went
7 down to 11th and State and got them. But I got the
8 black-and-white photos of the three individuals.
9      I took them back up to gang prosecution,
10 showed them to Francisco Vicente, and he identified
11 Pacheco, Serrano, and Montanez as being the three
12 persons he was referring to in the statement he had
13 given me.
14   Q Who did you call at the office?
15   A I just said I don't remember.
16   Q Was it a detective or a supervisor?
17   A I don't remember.
18   Q What was your purpose for calling the
19 office?
20   A To have someone look up those three
21 nicknames.
22   Q All right. So you asked somebody to look up
23 the three nicknames, and the three nicknames were
24 what?

---

174

1   A That Francisco Vicente had given me.
2   Q Which nicknames were they?
3   A Pistol Pete, Mondo, Joker.
4   Q All right. So you called somebody on the
5 phone at Area 5?
6   A Yeah.
7   Q And you gave them the nickname Mondo; right?
8   A Yes.
9   Q And we're talking about the City of Chicago;
10 right?
11   A Yes.
12   Q And all you said to them was I need to know
13 who Mondo is; right? And the other nicknames;
14 right?
15      MS. ROSEN: Object to the form.
16   A Someone at Area 5 was able to give those
17 three nicknames I gave them on the phone and give me
18 three possible real names to go with those
19 nicknames.
20   Q One for each nickname; right?
21   A Yes.
22   Q So you said, for example, I need some -- the
23 names for these people. One of them is named Mondo,
24 and the person on the other end of the phone said,

---

175

1   Oh, you're looking for Mondo? That's Armando
2 Serrano, or something to that effect.
3      Is that what you're saying, sir?
4   A I'm saying --
5      MS. ROSEN: Object to the form.
6      MR. ENGQUIST: Join.
7      MS. NIKOLAEVSKAYA: Join.
8   A I'm saying someone in the office was able to
9 look up those three nicknames and give me possible
10 names. I don't remember who it was.
11   Q Okay. So, sir, you testified at Armando
12 Serrano and Jose Montanez's trial; right?
13   A Yes.
14   Q And at that trial, were you asked the
15 following question, and did you give the following
16 answer, sir?
17      MR. ENGQUIST: Can you tell us what you're
18 reading off of.
19      MR. AINSWORTH: Sure. Page 83,
20 Bates-numbered JR-L 05066.
21      MR. ENGQUIST: 05066?
22      MR. AINSWORTH: Yes.
23      MR. ENGQUIST: All right.
24   Q And I'll start lines 7 through 17.

---

176

1      "QUESTION: What else did he tell you?
2      "ANSWER: He then gave me a lengthy
3 statement of what he knew about the murder of
4 Rodrigo Vargas.
5      "QUESTION: After he did that, what did you
6 do?
7      "ANSWER: He supplied me the three nicknames
8 of Pistol Pete, Mondo and Jordan."
9   A Oh, Jordan. Okay.
10   Q "I checked my nickname files in my office,
11 and I saw that Pistol Pete was, in fact, Jose
12 Montanez, Mondo was Armando Serrano, and Jordan was
13 Jorge Pacheco. I had dealt with all three of these
14 persons in the past in investigations."
15      Were you asked those questions, and did you
16 give those answers, sir?
17   A Yes.
18   Q So, sir, did you call some unknown person on
19 the phone to check the nicknames, or did you check
20 it yourself, sir?
21   A After I talked to the person -- let me
22 correct something. I said Joker before. The
23 nickname was Jordan.
24      After I talked to the person in Area 5 and

---

JGS_MAYSONET 4028

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

45 (177 to 180)

---

177

1 saw their pictures, once I got them, I remembered
2 these guys.
3    Q  Okay.  But how did you connect Mondo to
4 being Armando Serrano?
5    A  From the nickname files.
6    Q  What about the nickname files indicated
7 that -- was there only one Mondo in the nickname
8 files?
9    A  As I said, when I called Area 5, whoever I
10 spoke to gave me three names that could possibly be
11 the persons associated with these nicknames.
12    Q  So it was just the first person off the list
13 of all the Mondos in the City of Chicago?
14       MS. ROSEN:  Objection to form.
15       MS. NIKOLAEVSKAYA:  Join.
16       MR. ENGQUIST:  Join.
17    A  This list was not a list in the City of
18 Chicago.  This is Bob DeGraf's nickname file.
19    Q  Right.  So of all the Mondos in the nickname
20 file, he gave you -- just picked one at random, or
21 how did that happen?
22       MS. ROSEN:  Object to the form, foundation.
23       MR. ENGQUIST:  Join.
24       MS. NIKOLAEVSKAYA:  Join.

---

178

1    A  I was given three names.  I went and got
2 their pictures to see if these were the right
3 persons.  Francisco Vicente identified them as being
4 the persons he was referring to.
5 BY MR. AINSWORTH:
6    Q  All right.  Sir, so at that -- so when you
7 testified at trial, you said that you checked your
8 nickname files at the office, and you saw that
9 Pistol Pete was, in fact, Jose Montanez, Mondo was
10 Armando Serrano, and Jordan was Jorge Pacheco;
11 right?  Do you want to read your testimony?
12    A  No.  If you're saying that's what I said,
13 that's probably true.
14    Q  Well, let's avoid probably.
15       MR. AINSWORTH:  Let's mark this as Exhibit
16 No. 2.  Everybody can take this.
17       (Halvorsen Deposition Exhibit 2 marked
18 for identification and attached to the transcript.)
19    Q  Flip to page 83 of Exhibit No. 2.
20       MS. ROSEN:  The regular page or the Bates
21 page?
22       MR. AINSWORTH:  Regular page.
23    Q  So back when you testified, you said, "I
24 checked my nickname files at my office, and I saw

---

179

1 that Pistol Pete was, in fact, Jose Montanez, Mondo
2 was Armando Serrano, and Jordan was Jorge Pacheco;
3 right?  That's what you testified to?
4    A  Yes.
5    Q  All right.  Were you truthful in -- when you
6 testified under oath at a murder trial?
7    A  These weren't my nickname files.  These were
8 the Area's nickname files.  I misspoke.
9    Q  So you were using my nickname files.  You
10 meant Bob's nickname files; right?
11    A  Yes.
12    Q  Okay.  But you said "I checked"; right?
13    A  Did what?
14    Q  You said that I checked my nickname files at
15 my office, and I saw that Pistol Pete was, in fact,
16 Jose Montanez, Mondo was Armando Serrano, and Jordan
17 was Jorge Pacheco; right?  That was your testimony;
18 correct?
19    A  Yeah.
20    Q  That you were the one who checked; right?
21    A  Yeah.
22    Q  And you were the one that saw that those
23 were the people identified for each of those people;
24 right?

---

180

1    A  As I explained today, I called my office.
2 Someone in Area 5 checked these nicknames against
3 Bob DeGraf's master nickname list of gang members.
4 He gave me three possible names to match up the
5 nicknames I was given.
6    Q  And you knew that there were too many Pistol
7 Petes in the nickname file to be able to identify
8 any one Pistol Pete; right?
9    A  Yes.  Initially, yes.
10    Q  Well, at any point in time?
11    A  Initially, yes.
12    Q  Well, when you talked to the person on the
13 phone, did you say, Gee, how were you able to
14 identify which Pistol Pete we're looking for from
15 the nickname file?  When I looked, there were too
16 many for me to tell who it was.
17       MR. ENGQUIST:  Objection; form.
18       MS. ROSEN:  Object to the form.
19       MS. NIKOLAEVSKAYA:  Join.
20    A  I think at that time, I told them to look
21 for Imperial Gangsters.
22    Q  You told them to look for Imperial
23 Gangsters.
24    A  Yeah.  Now that I'm thinking about it.

---

JGS_MAYSONET 4029

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

181

1    Q  Okay.  So you said, Look for Imperial
2  Gangsters because Ray Guevara's informant on the
3  street didn't know that these people were Imperial
4  Gangsters; is that right?
5    **A I don't know.**
6      MR. ENGQUIST:  Objection; form,
7  argumentative.
8      MS. NIKOLAEVSKAYA:  Join.
9    Q  And you're saying that Jordan -- looking for
10 the nickname Jordan led you to Jorge Pacheco.
11  That's what you're saying?
12      MS. ROSEN:  Object to the form.
13   **A Okay.  For about the fifth time now, I**
14 **called my office.  Someone I spoke to looked up**
15 **these three nicknames, gave me three possible real**
16 **names of members of the Imperial Gangsters who had**
17 **these nicknames.**
18   Q  All right.  So sir --
19      MR. ENGQUIST:  Are we going on to another
20 exhibit?
21      MR. AINSWORTH:  Not yet.
22      MR. ENGQUIST:  Okay.  Because if now would
23 be a good time for a break, now would be a good time
24 for a break.

182

1      MR. AINSWORTH:  Let me just finish this one
2  point, and we can take a break.
3  BY MR. AINSWORTH:
4    Q  So did you have to go and get the photos of
5  Pistol Pete, Jordan, and Mondo?
6      MR. ENGQUIST:  Objection; asked and
7  answered.
8    **A Yes.**
9    Q  All right.  Sir, in your supplemental report
10 dated June 2nd, 1993, in this case, did you write,
11 "The reporting detectives were familiar with the
12 Imperial Gangster street gang and had photos of
13 Pistol Pete, Jordan, and Mondo"?
14   **A Yes.**
15   Q  You didn't say we had to go and get photos
16 of the three of them.
17      You said we had photos because we are
18 familiar with them; right?
19      MR. ENGQUIST:  Objection.
20      MS. ROSEN:  Object to the form.
21      MR. ENGQUIST:  Join.
22      MS. NIKOLAEVSKAYA:  Join.
23   **A As I testified before, I don't remember**
24 **where I got the photos from, either from the office**

183

1  or from the graphic arts.  Their photos were
2  probably on their arrest cards at Area 5.
3  BY MR. AINSWORTH:
4    Q  Well, when you learned that these three
5  people were wanted for this murder, you wanted to
6  get photos of them; right?
7      MS. ROSEN:  Object to the form.
8      MR. ENGQUIST:  Join.
9      MS. ROSEN:  They were wanted by who?  Object
10 to the form.
11   **A I wanted to show Francisco Vicente pictures**
12 **of three individuals that might be the Pistol Pete,**
13 **the Jordan, and the Mondo that he was referring to.**
14 **I did not know when I showed him the pictures if**
15 **these were the three guys he was talking about.**
16   Q  So
17 you wanted to bring Vicente from gang prosecution to
18 Area 5; right?
19   **A No.**
20   Q  You wanted to show him the photos; right?
21   **A Yes.**
22   Q  So you had to go get the photos; right?
23   **A Yes.**
24   Q  So where did you -- so you didn't know where

184

1  to go to get the photos; right?
2      MS. ROSEN:  Objection; form, foundation, and
3  vague as to time.
4    **A As I have now mentioned the fourth time,**
5  **that I don't recall where I went and got the photos,**
6  **either Area 5 or 11th and State.**
7    Q  But in 1993 you said you had the photos of
8  these three; right?
9      MS. ROSEN:  Object to the form.
10      MR. ENGQUIST:  Join.  Asked and answered.
11   **A Yes.  But I don't remember on that date**
12 **where I went and got them.**
13   Q  You didn't say you had to go anywhere to get
14 them; right?
15      MS. ROSEN:  Objection; form, argumentative.
16      MS. NIKOLAEVSKAYA:  Join.
17      MR. ENGQUIST:  Join.
18   **A I think I did.**
19   Q  It says, "The reporting detectives were
20 familiar with the Imperial Gangster street gang and
21 had photos of Pistol Pete, Jordan, and Mondo."
22   **A Can I read my report?**
23   Q  Sure.
24      MR. AINSWORTH:  Let's mark this as Exhibit

JGS_MAYSONET 4030

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

185

1  No. 3, please.
2        (Halvorsen Deposition Exhibit 3 marked
3  for identification and attached to the transcript.)
4        MS. ROSEN:  Do you want to direct us to the
5  page that you're looking at?
6        MR. AINSWORTH:  Sure.  173 is the Bates in
7  the bottom right-hand corner.
8  BY MR. AINSWORTH:
9     Q  Are you there, sir?
10    **A  Okay.  I've read it.**
11       **It's not indicated in the -- it's not**
12 **indicated in this report that I went and got the**
13 **photos, but I did not have the photos with me.  I**
14 **had to go get them.**
15    Q  Okay.  Even though your report says you had
16 the photos; right?
17       MS. ROSEN:  Objection; asked and answered.
18    **A  Not with me.**
19    Q  All right.  If you look on the preceding
20 page 172.
21    **A  Which page?**
22    Q  172.
23       Second paragraph from the top, you say, "On
24 June 2nd, 1993, the reporting detectives had a

---

186

1  meeting with a circumstantial witness."
2        Who was that circumstantial witness?
3     **A  That was a typo.**
4     Q  The circumstantial witness was a typo?
5     **A  No, the detectives.  There's a typographical**
6  **error.**
7     Q  I see.  So the circumstantial witness is
8  Vicente; right?
9     **A  Huh?**
10    Q  The circumstantial witness is Vicente;
11 right?
12    **A  Yes.  Is there a question?**
13    Q  And you're now saying that it was a typo
14 that -- where you wrote, "The reporting detectives
15 had a meeting with a circumstantial witness"?
16    **A  Yeah.  I type up dozens of reports every**
17 **week, and usually I'm with Detective Guevara.  So I**
18 **always used the phrase R/Dets.  On the June 2nd**
19 **interview, it was just me and John Dillon in the**
20 **office.**
21    Q  On the next page, where it indicates the
22 interview of Wilda Vargas, you just say Detective
23 Guevara interviewed Wilda Vargas.  You don't say
24 R/Dets; right?  You don't say plural detectives;

---

187

1  right?
2     **A  Which are you --**
3     Q  Sorry.  On page 173.  Right?
4     **A  I think in my trial testimony, I stated that**
5  **after I completed the interview with Francisco**
6  **Vicente, showed him the photos, I went back to**
7  **Area 5 and told Guevara about the new developments.**
8        **He then contacted Wilda on the phone.  He**
9  **alone talked to Wilda because only he could talk to**
10 **Wilda because they both spoke Spanish.**
11    Q  My point, sir, is simply just to establish
12 that when it was just Ray Guevara talking to Wilda,
13 you specified that it was just Ray Guevara talking
14 to Wilda; right?
15    **A  Yes.**
16    Q  And you also -- you said -- you referred to
17 detectives plural meeting with Vicente in your
18 report; correct?
19    **A  As I have explained to you, that was a**
20 **typographical error.**
21    Q  And then you made --
22    **A  Ray Guevara was not there.**
23    Q  And you made the same typographical error on
24 page 173, sir; is that correct, where you said the

---

188

1  reporting detectives were familiar with the Imperial
2  Gangster street gang and had photos of Pistol Pete,
3  Jordan, and Mondo?  Was that also a typographical
4  error?
5     **A  No.  I think that me and Guevara were**
6  **familiar with these guys.**
7     Q  So how were you familiar with -- so you both
8  had photos of Pistol Pete, Jordan, and Mondo; is
9  that what you're saying, sir?
10       MS. ROSEN:  Object to the form.
11 Mischaracterizes the witness's testimony.
12    **A  Yeah.  Is there a question?**
13    Q  Yes, there is.
14    **A  All right.**
15    Q  Are you saying that both you and Guevara had
16 photos of Pistol Pete, Jordan, and Mondo?
17    **A  No.**
18       MS. ROSEN:  Object to the form.
19 Mischaracterizes his prior testimony.
20       MR. ENGQUIST:  Join.
21    Q  Sir --
22       MR. ENGQUIST:  Before you keep on going to
23 different points, we need to take break.
24       MR. AINSWORTH:  I know.  I know.

JGS_MAYSONET 4031

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

48 (189 to 192)

---

**189**

1    MR. ENGQUIST: Well, you said you just had
2 the one point, and you kept on going. So that's --
3    MR. AINSWORTH: I'm with you.
4    MR. ENGQUIST: Okay. So we're taking a
5 break.
6    MR. AINSWORTH: Just one second.
7    MR. ENGQUIST: One second or --
8    MS. ROSEN: Well, wait. We're asking for a
9 break. There's no question pending. We're asking
10 for a break.
11    MR. AINSWORTH: All right. Let's take a
12 break.
13    MS. ROSEN: Are you denying a break?
14    MR. ENGQUIST: Okay.
15    THE VIDEOGRAPHER: Off the record, 1:59.
16    (A recess was taken from 1:59 p.m. to
17 2:42 p.m.)
18    THE VIDEOGRAPHER: Back on the record, 2:42.
19 BY MR. AINSWORTH:
20    Q So if you get tired at any point during this
21 deposition, would you let us know?
22    **A Sure.**
23    Q And I'm going to assume that you're okay
24 unless you tell us. All right. So I'm checking in

---

**190**

1 with you now just to make sure that if you are
2 fatigued or feeling in any way encumbered, please do
3 let us know.
4    **A Yes. Thank you.**
5    Q You met with lawyers from Sydney and Austin;
6 right?
7    **A Yes.**
8    Q In 2013. I think I said 2014 earlier, but
9 it was in 2013.
10    Does that sound right?
11    **A Yes.**
12    MR. AINSWORTH: Let's mark this as Exhibit
13 No. 4, please.
14    (Halvorsen Deposition Exhibit 4 marked
15 for identification and attached to the
16 transcript.)
17    Q All right. Have you seen this document
18 before, sir?
19    **A I don't remember seeing this specific**
20 **document, no.**
21    Q All right. Let's turn to the second page of
22 Exhibit 4. You told the -- so you had a meeting
23 with lawyers from Sidley Austin who were
24 investigating some cases on behalf of the City of

---

**191**

1 Chicago.
2    Was that your understanding of the meeting?
3    **A No. But -- I thought they were an outside**
4 **law firm who had been hired to defend Detective**
5 **Guevara, but it didn't turn out that way.**
6    Q What do you mean "didn't turn out that way"?
7    **A They were there to investigate -- they**
8 **weren't there to defend Guevara. They were there**
9 **investigating Guevara.**
10    Q But you understood from your communications
11 with them that they were defending Guevara; is that
12 right?
13    **A I thought they were hired by the corporation**
14 **counsel to defend Guevara.**
15    Q You told the lawyers from Sidley Austin that
16 Detective Guevara's nephew had died in a
17 gang-related incident; is that right?
18    MR. ENGQUIST: Objection. Before we go on,
19 I have an objection. On page 1 of this document you
20 put in front of him, it talks about how this was not
21 a verbatim or substantially verbatim transcript or
22 interview.
23    MR. AINSWORTH: Why the speaking objection?
24    MR. ENGQUIST: Well, I'm just --

---

**192**

1    MR. AINSWORTH: Stop.
2    MR. ENGQUIST: No. I'm putting on the
3 record what it says it is. If you're going to be
4 using it --
5    MR. AINSWORTH: Counsel --
6    MR. ENGQUIST: No. If you're going to be
7 using this document to try to go through the --
8    MR. AINSWORTH: Stop. We'll let the witness
9 step out of the room if you want to make a speaking
10 objection. But I do not -- you're not allowed to
11 characterize documents.
12    MR. ENGQUIST: The document characterizes
13 itself.
14    MR. AINSWORTH: Then it doesn't need you to
15 do anything.
16    MR. ENGQUIST: Well, it does if you're going
17 to try to imply it doesn't. If it's something other
18 than what it is.
19    MR. AINSWORTH: Josh, you can't do that in a
20 deposition. You wouldn't do that at trial. You
21 wouldn't stand up and say, Judge, the document says
22 in front of the jury. This deposition is supposed
23 to be conducted as if we were at trial. So you
24 don't do that.

---

JGS_MAYSONET 4032

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

193

1    And if there's something that needs to be
2  clarified, you will have an opportunity to clarify
3  at the end of the deposition.
4      MS. ROSEN:  But it's a little bit different
5  than it is at a trial because there's no Judge here
6  to referee if, in fact, you're making
7  misrepresentations that lead the witness astray.
8      MR. AINSWORTH:  So --
9      MS. ROSEN:  So if we need to send the
10 witness out of the room to clarify things like that,
11 we're happy to accommodate you.
12     MR. AINSWORTH:  Great.
13     MS. ROSEN:  Okay.
14     MR. AINSWORTH:  All right.
15     THE WITNESS:  Do you want me to leave?
16     MR. AINSWORTH:  No.
17     MS. ROSEN:  No.  We're good.
18 BY MR. AINSWORTH:
19   Q  Did you tell Sidley Austin -- the lawyers
20 from Sidley Austin in that meeting in October of
21 2013 that Detective Guevara's nephew had died in a
22 gang-related incident?
23   A  I told them that his wife's nephew had been
24 murdered.

---

194

1    Q  How did you learn that?
2    A  It was an Area 5 murder case.
3    Q  How did you learn that, sir?
4    A  I work in Area 5.
5    Q  Did you investigate it?
6    A  Initially, I did with Guevara until I
7  learned that it was -- it was his wife's nephew.
8  Then I said, No, we're not going to investigate this
9  anymore, and I backed off.
10   Q  Did Ray Guevara back off?
11   A  I don't know.
12   Q  Why did you back off?
13   A  Because I thought it was an obvious
14 conflict.
15   Q  When was this that Detective Guevara's
16 nephew died?
17   A  I don't remember.
18   Q  It was while you and Ray were partners?
19   A  Yes, we were.
20   Q  And here you -- do you know what his
21 nephew's name was -- or his wife's nephew's name
22 was?
23   A  No.
24   Q  Do you know whether the killer was brought

---

195

1  to justice?
2      MS. ROSEN:  Object to the form.
3    A  No.
4  BY MR. AINSWORTH:
5    Q  Do you know who worked the case?
6    A  No.
7    Q  According to Sidley Austin, you told them
8  that those of Mexican descent struggle to understand
9  Detective Guevara's Spanish.
10     MR. ENGQUIST:  Objection to form.
11   Q  Is that something you told the lawyers at
12 Sidley Austin?
13   A  That's not what I said.
14   Q  What did you say about Mexican -- people of
15 Mexican descent being able to understand Detective
16 Guevara's Spanish?
17   A  We were discussing another case.
18   Q  Solache and Reyes?
19   A  Solache and Reyes.
20     And in my presence, Guevara was having an
21 argument with another detective named Danny Trevino.
22     And I -- what are you guys arguing about?
23     And Trevino told me that the Mexican
24 suspects we had in custody weren't understanding

---

196

1  Guevara's Humboldt Park Puerto Rican, and they got
2  into a heated argument about who was the better
3  interpreter, and that's what I told Sidley Austin.
4    Q  Who got in a heated argument?
5    A  Trevino and Guevara.
6    Q  And Guevara was saying that he was a better
7  interpreter?
8    A  Yes.
9    Q  And Trevino was saying that Solache and
10 Reyes were saying they couldn't understand Guevara.
11   A  Trevino was saying that they were having a
12 hard time understanding Guevara, yes.
13   Q  If you go down to the forth paragraph down,
14 it states -- the memo states, "Despite their lengthy
15 partnership, Detective Halvorsen reported and that
16 he and Detective Guevara did not socialize together.
17 He was aware, however, that Detective Guevara 'had a
18 temper' and 'used to do crazy ass stuff' when off
19 duty."
20     Do you see that, sir?
21   A  I know for a fact he had a temper because we
22 argued.
23   Q  Okay.  How did you know that Guevara had a

---

JGS_MAYSONET 4033

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

50 (197 to 200)

197

1    A  He yelled at me.
2    Q  What did he yell at you about?
3    A  Minor points in cases.  We'd argue about
4  different things.
5    Q  So you told the lawyers at Sidley Austin
6  that Guevara had a temper; right?
7    A  Based on his interrelations with me.
8    Q  All right.  And did you tell the lawyers at
9  Sidley Austin that Guevara used to do crazy ass
10 stuff when off duty?
11   A  Yes.
12   Q  What did you tell them -- why did you tell
13 them that Guevara used to do crazy ass stuff when
14 off duty?
15   A  Because I gave a specific example to them,
16 and I gave a specific example here earlier today
17 about him going into the 14th district and causing a
18 commotion over a parking ticket.
19   Q  So what did you tell Sidley Austin about
20 Guevara doing crazy ass stuff when off duty?
21     MR. ENGQUIST:  Objection; asked and
22 answered.
23   A  That specific incident at the 14th district.
24 I don't remember anything else.

198

1  BY MR. AINSWORTH:
2    Q  So why did you say that Guevara used to do
3  crazy ass stuff when off duty?  Simply because of
4  that one incident?  Is that what you're saying?
5    A  That I can recall, yes.  That was something
6  to me that was crazy.
7    Q  Were there other things that Guevara was
8  doing while off duty that you can't recall now but
9  gave you the impression that he would do crazy ass
10 stuff?
11   A  No.
12   Q  And you told Sidley about -- the lawyers at
13 Sidley Austin about the one instance of going into
14 the 14th district; right?
15   A  Yes.
16   Q  Why did you characterize the one instant as
17 Guevara used to do -- you know, doing crazy ass
18 stuff when off duty?
19     MR. ENGQUIST:  Objection; asked and
20 answered, form.
21     Go ahead.
22   A  My opinion.
23   Q  Why did you have that opinion based on one
24 incident?

199

1    A  Because what he got involved with that day
2  to me was crazy ass.
3    Q  So he was somebody who you said would --
4  used to do crazy ass stuff because on one occasion
5  he argued about a parking ticket.
6    A  I used that as one example that I could
7  remember.  I couldn't remember anything else.
8    Q  You see in that first footnote at the bottom
9  of that second page, it says, "Detective Halvorsen
10 explained that although it had 'always bothered' him
11 that they sometimes memorialized in English
12 statements taken from and approved by Spanish-only
13 speakers, the office of the state's attorney had
14 knowledge of and seemed 'comfortable' with the
15 practice."
16     Do you see that, sir?
17   A  Yes.  I remember that distinctly.
18   Q  And you told the lawyers at Sidley Austin
19 that it always bothered you that Chicago police
20 officers sometimes memorialized in English
21 statements taken from and approved by Spanish-only
22 speakers?
23   A  I told Sidley Austin what bothered me in the
24 Solache and Reyes case specifically is that we had

200

1  two guys who couldn't speak English.  They couldn't
2  read and write English, but yet they were having
3  state's attorneys come in there and taking
4  handwritten statements from them interpreted by
5  Chicago police officers in English.
6     And I walked in, and I says, How in the
7  world are they supposed to read these statements?
8  So why are we doing this?  This was not my call.
9  This was the State's Attorney's decision.
10     And they just answered me, Well, this is the
11 way we always did it.
12     Then I finally got an answer from the
13 state's attorney's office.  They wanted it written
14 in English so that when a handwritten statement went
15 to the jury, they could read it.
16     I never liked their -- this wasn't our
17 practice.  This was the state's attorney's office
18 practice.
19   Q  I would like you to take a look at the last
20 paragraph on page 3 here.
21     It says, "According to Detective Halvorsen,
22 the investigation began to progress in earnest when
23 Vicente was arrested for armed robbery on May 14,
24 1993.  At that time, according to Detective

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

51 (201 to 204)

---

201

1  Halvorsen, Vicente informed Detective Bongiorno,
2  Sergeant Mingey, and his arresting officers that"
3  they -- "that he had been with the 'guys who killed
4  Vargas,' i.e., Serrano, Montanez, and Pacheco
5  shortly after the murder was committed.
6      "Detective Halvorsen and Detective Guevara
7  met with Vicente in connection with the Vargas
8  murder the following day. According to Detective
9  Halvorsen, this sequence of events rendered Serrano
10 and Montanez's argument that they were wrongfully
11 convicted through Detective Guevara's fabrication of
12 the evidence provided by Vicente 'the easiest claim
13 in the world to destroy.'"
14     Do you see that, sir?
15 **A  I see the paragraph, yes.**
16     Q  And is that in sum and substance what you
17 told Sidley Austin when you met with them on
18 October 21st, 199 -- 2013?
19 **A  I don't remember specifically what I told**
20 **them, but there's glaring errors in this.  I**
21 **probably provided the errors because when I went to**
22 **Sidley Austin, as I mentioned before, I thought they**
23 **were hired by the City to represent Guevara.**
24     **They did not let me review any reports**

---

202

1  **before I talked to them.  I walked in there**
2  **completely cold and ignorant as to what's going on.**
3  **I had completely forgotten that we had used Vicente**
4  **on multiple homicide investigations, and I am**
5  **factually wrong here in a lot of the stuff I told**
6  **them.**
7      Q  All right.  So you're saying that you did
8  tell Sidley Austin the substance that's attributed
9  to you in this paragraph, but that you were mistaken
10 when you said it; Is that what you're saying?
11     MR. ENGQUIST:  Objection; mischaracterizing
12 his testimony.  Also I'm objecting because I think
13 you're mischaracterizing the document itself.
14 **A  What was your question again?**
15     Q  You're saying that you did provide the
16 information attributed to you in this -- the
17 paragraph that I just read to you, the last
18 paragraph on page 3, but you're saying it's
19 erroneous; right?
20 **A  I don't remember what I told these guys back**
21 **then, but I'm looking at this now and parts of this**
22 **are wrong.  I may have told them the wrong**
23 **information, but I know now it's wrong.  It wasn't**
24 **Detective Bongiorno, it was Detective Maher who**

---

203

1  **first interviewed Francisco Vicente.**
2      Q  Let's go on to the next page.
3      Do you see the top paragraph there.
4      It says, "We pointed out to Detective
5  Halvorsen that we were not aware of any
6  documentation confirming that Vicente had provided
7  information in the Vargas matter prior to meeting
8  with Detective Halvorsen and Detective Guevara on
9  June 2nd, 1993.
10     "In response, Detective Halvorsen explained
11 that the information obtained during the May 15,
12 1993, meeting with Vicente was not officially
13 memorialized until the June 2nd, 1993, supplementary
14 report was drafted because he wanted to verify
15 several facts before putting it on paper and
16 muddying up the case.
17     "Detective Halvorsen did insist, however,
18 that if we were to locate the original investigative
19 file, aka the RD or street file, we would find
20 handwritten notes confirming this sequence.
21     "As Detective Halvorsen explained, they were
22 reluctant to file an official report prior to
23 verifying portions of Vicente's story because
24 bullshit stays that way and forever taints the file.

---

204

1  Detective Halvorsen emphasized that he initially
2  suspected that Vicente was a big bullshit artist."
3      Do you see that, sir?
4  **A  Yes.**
5      Q  And did you provide that information to the
6  lawyers at Sidley Austin?
7  **A  I don't remember this at all.**
8      Q  All right.  Are you saying that you didn't
9  tell them that you wanted to verify several facts
10 from Vicente "before putting it on paper and
11 muddying up the case"?
12 **A  I'm not saying that they're wrong.  I'm just**
13 **saying that I don't remember this.**
14     Q  All right.  So you're not disputing that you
15 said this.  You just don't remember.
16     That's what you're saying?
17 **A  That's correct.**
18     MS. ROSEN:  Object to the form.
19     Q  Going to the next paragraph, it says,
20 "Specifically Detective Halvorsen wanted to verify
21 information regarding damage Montanez's car
22 sustained during the murder, both from ricocheting
23 or pass-through bullets and from a collision during
24 the getaway."

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

52 (205 to 208)

205

1      Do you see that, sir?
2      **A   Yes.**
3      Q   All right.  So did you tell the lawyers from
4  Sidley Austin that you wanted to verify information
5  regarding damage Montanez's car sustained during the
6  murder, both from ricocheting or pass-through
7  bullets and from a collision during the getaway?
8      **A   I don't really remember what I told Sidley.**
9      Q   Did you want to --
10      MR. ENGQUIST:  Are you done answering
11 or not?
12      THE WITNESS:  Huh?
13      MR. ENGQUIST:  Were you done answering?
14      **A   What was the question again?**
15      Q   Let me ask it.
16      Did you want to verify information regarding
17 damage to Montanez's car from ricocheting bullets or
18 pass-through bullets?
19      **A   Did I?   Yes.**
20      Q   Why did you want to verify information about
21 damage to Montanez's car both from ricocheting or
22 pass-through bullets -- pass-through bullets?
23      **A   That would give weight to the statement**
24 **provided to me by Francisco Vicente.**

206

1      Q   So you wanted to see if the ballistic
2  evidence from Montanez's car would match Vicente's
3  statement?
4      **A   I wanted to see if there were bullet holes**
5  **in the car.  I wanted to see if there was damage to**
6  **the car where Francisco Vicente had told me.**
7      Q   Do you think that the bullet holes in
8  Montanez's car was caused as a result of the murder?
9      **A   Francisco Vicente told me that the car had**
10 **been shot by one of the defendants at the time that**
11 **the murder took place.**
12      Q   And you -- and that's what you believed,
13 that the bullet holes in the car was a result of the
14 murder; right?
15      **A   You're using the word "holes."  I think**
16 **Francisco Vicente only told me one bullet hole.**
17      Q   Sorry.  Let me phrase then.
18      So your belief was that the bullet hole in
19 Mr. Montanez's car was a result of the murder;
20 right?
21      **A   It took place during the murder, yes.**
22      Q   And that's based on what Vicente told you;
23 correct?
24      **A   Yes.**

207

1      Q   All right.  It says, "Detective Halvorsen
2  also wanted to verify information regarding a store
3  called Gold Busters, to which Vicente accompanied
4  Montanez, Serrano, and Pacheco after the murder for
5  purposes of fencing gold.
6      "Detective Halvorsen informed us that
7  thereafter he confirmed that Montanez's car had
8  sustained the described damage.  However, Detective
9  Halvorsen and Detective Guevara went looking for but
10 couldn't find a store called Gold Busters.
11 Ultimately, they determined that Vicente's story
12 about Gold Busters was bullshit."
13      Did you tell the lawyers from Sidley Austin
14 the information that's attributed to you here?
15      **A   Again, I don't remember what I told Sidley**
16 **Austin.  As far as the investigation, we did try to**
17 **find a store called Gold Busters.  We were unable to**
18 **locate the store.**
19      Q   And the damage to Montanez's car?
20      **A   And we did confirm on Montanez's car that**
21 **there was vehicle damage and a bullet hole as told**
22 **to us by Francisco Vicente.**
23      Q   And so you went looking for Gold Busters
24 because that would help corroborate Vicente's

208

1  information to you; right?
2      **A   Yes.**
3      Q   And conversely, if Gold Busters didn't
4  exist, that would cast some doubt on Vicente's
5  statement; right?
6      **A   I don't know if Gold Busters ever existed,**
7  **but we could not find it.**
8      Q   And you did that as part of your
9  investigation to the Vargas homicide, to look for
10 Gold Busters?
11      **A   Yes.**
12      Q   And so when you couldn't find any indication
13 that Gold Busters actually existed -- well, strike
14 that.
15      What did you do to try and find Gold
16 Busters?
17      **A   We went to the location where Francisco**
18 **Vicente said it was located.  I think it was at the**
19 **corner of Diversey and Harding in an apartment**
20 **building on the first floor.  When we got there it**
21 **was a vacant -- vacant storefront.  There was**
22 **nothing there.  We talked to people in the building,**
23 **and they couldn't give us any information about who**
24 **had been there.**

JGS_MAYSONET 4036

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

53 (209 to 212)

---

**209**

1    Q  And did you do this after Vicente had told
2  you about it on June 2nd?
3    **A  It was sometime after Vicente had given us**
4  **the June 2nd statement.**
5    Q  Sometime in the month of June of 1993?
6    **A  Yes.**
7    Q  Did you ask Vicente when you saw him again,
8  Hey, Francisco, you know, we went to Gold Busters,
9  and it wasn't where you said it was; you know,
10 what's going on?
11     MR. ENGQUIST:  Objection to form.
12     Go ahead.
13   **A  I don't remember asking him that.**
14   Q  Why didn't you try and find out from
15 Francisco Vicente why he had given you incorrect
16 information about Gold Busters?
17   **A  I didn't know it was incorrect.**
18   Q  Well, it wasn't where he said it was; right?
19   **A  Well, it might have been there, but it was**
20 **gone.**
21   Q  You went there just a few days after he told
22 you about it; right?
23   **A  No.  I just said at some time after the**
24 **statement.  I didn't say it was a few days after he**

---

**210**

1  gave us the statement.
2    Q  Sorry.  I misspoke.  Let me ask it this way.
3    Did you ask Francisco, you know, did Gold
4  Busters close or, you know, what happened here?
5    **A  No, I did not.**
6    Q  Were you curious as to why you were unable
7  to corroborate his story about Gold Busters?
8    **A  No.**
9    Q  Why weren't you curious?
10   **A  Francisco Vicente portrayed it as a**
11 **fly-by-night outfit that was buying stolen**
12 **merchandise off the street.  So the fact that they**
13 **set up shop for a short time and disappeared did not**
14 **seem strange to me.**
15   Q  So then you documented in your supplementary
16 report that you tried to confirm the existence of
17 Gold Busters but were unable to because the location
18 where Vicente said it was was a vacant lot.
19   **A  It was a vacant storefront.  That's correct.**
20   Q  Vacant storefront.
21     And you documented that in a typed
22 supplementary report; is that right?
23   **A  I'd have to see the report, but I believe**
24 **so.**

---

**211**

1    Q  Is there any reason why you wouldn't
2  document that fact?
3    **A  No.**
4    Q  You wouldn't try and hide that or anything,
5  would you?
6    **A  No.**
7      MS. ROSEN:  Object to the form.
8    Q  Because that would be wrong if you tried to
9  hide the fact that you investigated Gold Busters but
10 were unable to find any sign of its existence?
11   **A  It would be wrong if we tried to conceal a**
12 **material fact, but I think I did document that we**
13 **went and looked for the place and couldn't find it.**
14   Q  And I'm just saying, thus, it would be wrong
15 if you had withheld the information about trying to
16 corroborate Vicente's story about Gold Busters but
17 were unable to do so; right?
18   **A  It would be wrong if we tried to, but we**
19 **didn't.**
20   Q  But you didn't hide that information, you're
21 saying?
22   **A  We didn't hide that information.**
23   Q  And it would be wrong if you did; right?
24   **A  Yes.**

---

**212**

1      MS. NIKOLAEVSKAYA:  Form.
2      THE REPORTER:  Pardon?
3      MS. NIKOLAEVSKAYA:  Withdrawn.
4  BY MR. AINSWORTH:
5    Q  Okay.  All right.  Let's go to the very last
6  sentence actually on that same page, page 4.  Just
7  the very last beginning of a paragraph at the bottom
8  of the page where it says, "Detective Halvorsen also
9  explained that," and then it goes on to the next
10 page.  So it's the very end of that page, sir.
11   **A  On page 4?**
12   Q  Yeah.  If you don't -- can I point to it?
13 Would that help you?
14   **A  No.  Just tell me.**
15   Q  It's says, "Detective Halvorsen also
16 explained that," and it's just a fragment of the
17 last sentence at the bottom of the page and perhaps
18 I can --
19   **A  The bottom on my page, it says something**
20 **about Vicente.**
21   Q  Right.  Yeah.  That's a footnote, sir.  So
22 if you just go up to above the -- where it starts
23 there.
24   **A  Okay.  And your question?**

---

JGS_MAYSONET 4037

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

54 (213 to 216)

213

1    Q  Just if you would just read along with me
2 for right now.  "Detective Halvorsen also explained
3 that there was a significant risk that Vicente's
4 name would leak if it were included in the police
5 report because Joe Miedzianowski, John" Woodall "and
6 other CPD personnel routinely photo --"
7       MS. ROSEN:  The word is Woodard.
8       MR. ENGQUIST:  Woodard.
9    Q  Sorry.  "And other CPD personnel routinely
10 photocopied reports and gave them to shit heads."
11   A  Okay.
12   Q  "For this reason Detective Halvorsen and
13 Detective Guevara did not trust other detectives to
14 maintain source confidentiality."
15      Do you see that?
16   A  That's not at the bottom of page 4.  This is
17 the top of page 5.
18   Q  Right.  Starting at the bottom of page 4.
19   A  Oh, going to the top of page 5.  And your
20 question?
21   Q  Did you tell that information to the lawyers
22 at Sidley Austin?
23   A  Again, I don't remember what I told those
24 guys over at Sidley Austin.

214

1    Q  But you don't dispute that you told them
2 that.
3    A  No.
4    Q  And that it's true that you knew that Joe
5 Miedzianowski and John Woodall --
6       MR. ENGQUIST:  Not Woodall, Woodard.  It's a
7 different person.
8       MR. AINSWORTH:  I'm saying Woodall.
9       MR. ENGQUIST:  I know.  But that's not what
10 it says.
11      MR. AINSWORTH:  I am aware of what it says.
12      MR. ENGQUIST:  So you're -- well, then I'm
13 objecting if it's characterizing what it says in the
14 report.
15      MR. AINSWORTH:  I'm not --
16      MR. ENGQUIST:  Yes, you are.  You're trying
17 to trick the client -- trick my client.  That's not
18 what it says.  You read it wrong, and now you're
19 changing it again.
20   Q  Sir, were you referring to John Woodall when
21 you were talking to Sidley Austin?
22   A  I don't remember what I was -- I don't
23 remember what I said to Sidley Austin.
24   Q  Right.  So in terms of the shit heads who

215

1 would photocopy -- or the guys who would photocopy
2 files and give them to shit heads, was John Woodall
3 one of those people who you considered?
4    A  Someone who photocopied reports?
5    Q  Yeah.
6    A  I never considered him.  I considered Joe
7 Miedzianowski.
8    Q  All right.  And the guy's name was John
9 Woodall; right?
10   A  Yes.
11      MS. ROSEN:  Object to the form.
12   Q  John Woodard is just a --
13   A  A typo.
14   Q  A typo.  Okay.
15      So Joe Miedzianowski was somebody who you
16 knew to photocopy reports and give them to shit
17 heads; right?
18   A  Yes.
19   Q  How did you know that?
20   A  I had a murder case.  I had a good witness
21 in this murder case.  He identified the shooter,
22 came forward and gave us statements, agreed to
23 testify.  We were going to take him down to the
24 grand jury to have him locked in, and he

216

1 disappeared.
2       It took us days to find him again
3 eventually, and then I said, What are you doing?  I
4 said, Why are you hiding?
5       He said, My father came to me with my
6 statement and showed it to me.  His statement that
7 he had given us.
8       And his father, you know, got into him.
9       And my witness asked his father, Well, where
10 the hell did you get this from?
11      And he said Joe Miedzianowski.
12      It's as simple as that.  Then I went back.
13 We told Commander Cline about this.  He instituted a
14 CR investigation.  Where it went from there, I got
15 no idea.
16   Q  Well, did anyone from OPS or IAD ever
17 question you about that incident?
18   A  No.
19   Q  How did you know a CR was obtained?
20   A  Because Cline told me he did it.
21   Q  And who was the victim in that case?
22   A  I don't remember the name of the victim.
23   Q  Who was the suspect?
24   A  I just remember his nickname was Baby Bum.

JGS_MAYSONET 4038

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

217

1    Q  Who was the witness?
2    **A  I don't remember that.**
3    Q  Did you talk to Joe Miedzianowski about
4  this?
5    **A  Did I?  No.**
6    Q  Why not?
7    **A  I went to Cline and told him about the**
8  **allegation.  I'm not going to confront Joe**
9  **Miedzianowski about giving our paperwork to gang**
10 **bangers.**
11   Q  Was this Phil Cline?
12   **A  Yes.**
13   Q  And what year was this?
14   **A  Probably someplace in the '90s.**
15   Q  Was Guevara your partner?
16   **A  He probably was because he always warned me**
17 **to stay away from Joe Miedzianowski.**
18   Q  Did you and Ray talk about Miedzianowski?
19   **A  We really didn't have dealings with him.  I**
20 **never understood what the problem was, but more than**
21 **twice Guevara told me don't have anything to do with**
22 **Joe Miedzianowski.**
23   Q  Did he tell you why?
24   **A  No.**

218

1    Q  Did you ask him?
2    **A  I assumed it was something from their gang**
3  **crime days together, but I don't know.**
4    Q  Did you ask him why?
5    **A  No.**
6    Q  Why --
7    **A  I asked him, but he never told me.**
8    Q  He just refused to say?
9    **A  Yeah.**
10   Q  Let's go back on this page 5 of Exhibit 4,
11 the first full paragraph where it says, "Detective
12 Halvorsen informed us that on June 2nd, 1993, as he
13 was preparing the supplementary report in the Vargas
14 matter, 'Ray came into the office and told' him, 'By
15 the way,' at some point prior to June 2nd, 1993,
16 Wilda informed him that she 'remembered something
17 happened the night before the murder at a gas
18 station.'
19      "Detective Halvorsen does not know precisely
20 when Wilda shared this information with Detective
21 Guevara but explained that she must have done so
22 'prior to June 2nd, 1993.'  Detective Halvorsen
23 recalls being surprised that Detective Guevara had
24 not shared the information with him earlier and

219

1  recalls exclaiming at the time, 'You're just telling
2  me about this now?'
3      "When we asked Detective Halvorsen whether
4  Vicente instead might have introduced the gas
5  station into the case, as the State had argued at
6  trial, and during the meeting with us in this
7  matter, Detective Halvorsen stated that Vicente
8  'didn't tell us about the gas station.  He had no
9  knowledge of that.'"
10      MR. ENGQUIST:  I'm going to object as to
11 completeness on what you're reading to him and
12 misrepresentation of what it is.
13   Q  All right.  So, sir, did you tell the
14 lawyers at Sidley Austin the information attributed
15 to you in that paragraph?
16   **A  I don't recall my conversations with the**
17 **lawyers at Sidley Austin.**
18   Q  But you don't dispute that you said the --
19 said the substance of what's attributed to you in
20 that paragraph to the lawyers at Sidley Austin;
21 right?
22   **A  I can't say they're lying if I don't**
23 **remember it.**
24   Q  All right.  And specifically -- well, did

220

1  Ray come into the office and tell you, By the way,
2  at some point before June 2nd, 1993, Wilda informed
3  him that she remembered something happened the night
4  before the murder at the gas station?
5    **A  No.**
6    Q  Did he say anything like that to you?
7    **A  The first that I heard from Guevara about**
8  **what Wilda said was after 3:00 o'clock in the**
9  **afternoon on June 2nd, 1993, when Guevara called her**
10 **on the phone and asked her about what Francisco**
11 **Vicente had told me at the state's attorney's office**
12 **earlier that day.**
13   Q  Do you know why the lawyers at Sidley Austin
14 would attribute to you a statement that -- that
15 Wilda had provided this information about the gas
16 station to Ray prior to June 2nd?
17      MR. ENGQUIST:  I'm going to object again.
18      MS. ROSEN:  Object to the form, calls for
19 speculation, foundation.
20      MR. ENGQUIST:  I join, and I'm also going to
21 object you're also misrepresenting the validity of
22 the document by not showing the complete document to
23 the witness.
24   **A  Again, I don't remember exactly what I told**

JGS_MAYSONET 4039

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

56 (221 to 224)

---

221

1 these guys, what they told me. I can't dispute what
2 they typed up if I don't remember.
3 BY MR. AINSWORTH:
4    Q Well, you say you don't recall exactly.
5    I'm just saying do you recall saying
6 anything close to telling them that, in quotes, "Ray
7 came into the office and told him, by the way," end
8 quotes, at some point prior to June 2nd, 1993, Wilda
9 informed Ray that she remembered something happened
10 the night before the murder at a gas station?
11    MS. ROSEN: Object to the form.
12    MR. ENGQUIST: Join. Once again I'm
13 objecting because you're misrepresenting the
14 validity of the document, and you're not showing the
15 completeness of the document.
16    Go ahead.
17    A Again, I don't remember the conversations I
18 had with Sidley.
19    Q You don't remember any of it?
20    A No.
21    Q Do you think that this paragraph I just read
22 to you on page 5 about Ray saying, By the way, Wilda
23 had previously told him about the gas station
24 encounter, do you think that was fabricated by the

---

222

1 lawyers at Sidley Austin?
2    MR. ENGQUIST: I'm going to object to form.
3 I'm also objecting that you're misrepresenting the
4 validity of this document, and I object for the
5 completeness of what you're showing him right now.
6    MS. QUIST: Join.
7    MS. BONJEAN: No. I don't join.
8    THE REPORTER: You joined? Thank you.
9    A What was your question again?
10 BY MR. AINSWORTH:
11    Q Do you believe that the lawyers at Sidley
12 Austin fabricated the statements in this paragraph
13 on page 5 talking about Ray coming to the office and
14 telling you, by the way, Wilda had previously told
15 him about a gas station encounter?
16    MR. ENGQUIST: Once again I'm objecting that
17 you're misrepresenting the validity of this
18 document, and also I'm objecting that you're not
19 showing the complete document and misrepresenting
20 what it means.
21    Go ahead.
22    A Again, I don't remember this conversation at
23 all, and I'm not going to sit here and call them
24 liars if I don't remember it.

---

223

1 BY MR. AINSWORTH:
2    Q You thought that Rankins was giving you
3 false information; is that right?
4    A What was your question? You had your head
5 turned away.
6    Q Sorry. You thought that Timothy Rankins was
7 giving you false information; right?
8    A No.
9    Q All right. You thought he was nuts and not
10 all the way there; right?
11    A I thought there was something wrong with
12 him.
13    Q All right. Let's mark this as Exhibit No. 5
14 please.
15    (Halvorsen Deposition Exhibit 5 marked
16 for identification and attached to the
17 transcript.)
18    Q So this is a memo regarding an interview
19 with Ed Mingey, but I wanted to turn your attention
20 to -- it's page 4, although the page number is hard
21 to read under the Bates number. It says -- 510 is
22 the Bates number. That might be easier to see.
23    A What's the page?
24    Q Where it says 510.

---

224

1    MS. ROSEN: JR-L. Look at those numbers,
2 the JR-L numbers.
3    A Okay.
4    Q All right. If you look at footnote 7 of
5 this document, it says, "In two separate interviews
6 with us, Detective Halvorsen stated that Rankins
7 provided detectives with false evidence. He stated
8 regarding Rankins, 'He was just making up stories'
9 and 'didn't have any of the facts of the case.'
10 Halvorsen continued 'He had no information.
11 Everything he had was goofy.'"
12    Do you see that sir?
13    A Yes, I see it.
14    Q Did you provide that information to the
15 lawyers at Sidley Austin?
16    MR. ENGQUIST: I'm going to object as to
17 foundation. Also object that you're
18 mischaracterizing this exhibit -- document that's
19 labeled down here No. 5.
20    Go ahead.
21    A I don't remember the conversations I had
22 with the attorneys at Sidley Austin.
23    Q Are you disputing that you told the lawyers
24 at Sidley Austin that Rankins provided you with

---

JGS_MAYSONET 4040

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

57 (225 to 228)

---

225

1  false evidence and that Rankins was just making up
2  stories, didn't have any of the facts of the case
3  and that he had no information, everything he had
4  was goofy?
5      MR. ENGQUIST:  Same objection.
6      **A  Without being able to remember this**
7  **conversation, I cannot dispute what they typed.**
8      Q  All right.  All right.  Let's mark this as
9  Exhibit No. 6, please.
10      (Halvorsen Deposition Exhibit 6 marked
11  for identification and attached to the
12  transcript.)
13      MR. AINSWORTH:  Okay.  Are we missing one?
14  Sorry.
15      Q  All right.  Would you turn to No. 4 in the
16  bottom right-hand corner.
17      Do you see where it says "Investigative File
18  Inventory"?
19      **A  Uh-huh.**
20      Q  Is that a yes?
21      **A  Yes, I have it.**
22      Q  All right.  And is page 4 -- is this the
23  investigative file inventory for the Vargas
24  homicide?

---

226

1      **A  That's correct.**
2      Q  When you told Guevara that you had, you
3  know, obtained this information from Vicente and you
4  were able to link the crime to Jose Montanez and
5  Armando Serrano and Jorge Pacheco, I take it
6  that Guevara didn't say, Oh, I knew it.  I knew it
7  was those three or anything like that.  Right?
8      **A  No.**
9      Q  That's correct?
10      **A  He didn't say that.**
11      Q  And he didn't say anything indicating that
12  he had any knowledge of Montanez, Serrano, or
13  Pacheco having anything to do with this crime before
14  June 2nd of 1993; right?
15      **A  He told me prior to June 2nd that he was**
16  **working with three nicknames for persons who may**
17  **possibly be involved in the crime.  That's it.**
18      Q  And before June 2nd, 1993 -- well, strike
19  that.
20      And he never indicated that he had any hint
21  that those three nicknames were Montanez, Serrano,
22  or Pacheco before June 2nd, 1993, is that correct?
23      **A  Not that I remember.**
24      MR. ENGQUIST:  Object to the form.

---

227

1      Go ahead.
2      **A  Not that I remember.**
3  BY MR. AINSWORTH:
4      Q  All right.  So does your handwriting appear
5  on this page, page 4 of Exhibit 6?
6      **A  On the inventory?**
7      Q  Yeah.
8      **A  Yeah, it does.**
9      Q  Where is your handwriting?
10      **A  The whole page.**
11      Q  The whole page is yours.
12      **A  Uh-huh.**
13      Q  So on February 6th, you put Jack and Schak's
14  15 pages of GPRs and their progress supp and the
15  canvas supp into the other file with the other stuff
16  that you included?
17      **A  What happened here is that the original**
18  **investigative file, I spilled coffee on.  So I had**
19  **to redo it.**
20      Q  I see.  When did you spill coffee on the
21  original?
22      **A  When I was working on the file.**
23      Q  All right.  Was this -- at what point in the
24  investigation did you spill coffee on the file?

---

228

1      **A  When it was completed.  What date would that**
2  **have been?  It looks like 3 July.**
3      Q  So on July 3rd, you spilled coffee and just
4  mucked it all up, and so then you just had to redo
5  it?
6      **A  Yes.**
7      Q  So did you create a report to memorialize
8  that you had spilled coffee on the inventory file
9  and you had to recreate it?
10      **A  No.**
11      MS. ROSEN:  Object to the form.
12      **A  Because it was just a copy of what was**
13  **already done.**
14      Q  Did you tell anyone that you had spilled
15  coffee on the inventory file and needed to recreate
16  it?
17      **A  No.**
18      MS. ROSEN:  I'm going to object to the form.
19  You mean inventory -- investigative file inventory?
20      MR. AINSWORTH:  I do mean the investigative
21  file inventory.
22      MS. ROSEN:  Okay.  Because it gets
23  confusing.
24

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

58 (229 to 232)

229

1  BY MR. AINSWORTH:
2     Q  Did you tell anyone that you had spilled
3  coffee on the investigative file inventory and
4  needed to destroy it and then recreate it?
5        MS. ROSEN:  Object to the form.
6        MR. ENGQUIST:  Join.
7     A  Not that I recall.
8     Q  What did you do with the coffee spilled
9  investigative file inventory?
10    A  Threw it away.
11    Q  All right.  So did you alter anything when
12  you created the new investigative file inventory?
13    A  What was your question?
14    Q  Did you alter anything from the original
15  investigative file inventory when you created this
16  new investigative file inventory?
17    A  No.  It was copied verbatim.
18    Q  Were you careful when you created the
19  investigative file inventory?
20    A  Yes.
21    Q  You understand that this is the document
22  that tracks all of the documents that are contained
23  within the investigative file; right?
24    A  Yes.

230

1     Q  And it's the way to make sure that important
2  information isn't being removed from the file;
3  right?
4        MS. ROSEN:  Object to the form, foundation.
5        MR. ENGQUIST:  Join.
6     A  The investigative index tracks the reports
7  that are put into the file.
8     Q  You started working on the Vargas homicide
9  on the day after it happened; right?
10    A  On the 6th of February 1993.
11    Q  What were you assigned to do on the 6th of
12  February of 1993?
13    A  Go work the homicide.
14    Q  And what did you do to work the homicide?
15    A  Me and Guevara went and talked to the murder
16  victim's wife, Wilda Vargas.
17    Q  Did you understand anything that she said?
18    A  No.
19    Q  Did you understand anything that Guevara
20  said to her?  Could you understand anything that
21  Guevara said to her?
22    A  No.
23    Q  Do you know what she told Guevara?
24    A  Only what Guevara related to me.

231

1     Q  What did he relate to you?
2     A  She was at home in bed sleeping, and some
3  neighbor told her that her husband was out in the
4  car and was injured or something.
5     Q  Did you want to know what she was doing the
6  day before the murder?
7     A  Not at that time.
8     Q  Did you want to know what her husband was
9  doing the night before he was killed?
10    A  Not at that time.
11    Q  Hang on.  So the shots were heard at 5:30 in
12  the morning; right?
13    A  I believe so.
14    Q  At this point, you've got 11 years
15  experience as a homicide detective; right?
16    A  In '93?
17    Q  Yeah.
18    A  That would have been 11 years.
19    Q  Yeah.  And 20 years as a cop?
20    A  If you say so.
21    Q  I'm asking you, sir.
22    A  Well, I have to get my calculator out and do
23  the math.
24    Q  All right.  21 years as a cop.

232

1     A  All right.
2     Q  Right?
3     A  21 years, yes.
4     Q  All right.  A guy is killed at 5:30 in the
5  morning; right?
6        MS. ROSEN:  Objection to the form.
7     A  Yes.
8        MS. ROSEN:  Asked and answered.
9     Q  So you want to know what was that guy doing
10  the night before; right?
11       MR. ENGQUIST:  Objection.
12       MS. ROSEN:  Object to the form.  Object to
13  your tone.
14       MR. ENGQUIST:  Objection; it calls for
15  speculation, incomplete hypothetical.
16       MS. QUIST:  Join.
17    A  I had no reason to be curious at that time
18  what was he was doing the night before.
19    Q  You wanted to know who committed the murder;
20  right?
21    A  Yes.
22    Q  You wanted to know what leads there might be
23  as to who committed the murder; right?
24    A  Yes.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

59 (233 to 236)

233

1    Q  And one of the leads might be, Gee, what was
2  the decedent doing the night before he was killed at
3  5:30 in the morning; right?
4        MS. ROSEN:  Object to the form.
5    A  What was he doing at 5:30 in the morning?
6  He was going to work.
7    Q  No.  What he was doing the night before he
8  was killed at 5:30 in the morning; right?
9        MS. ROSEN:  Object to the form.
10   A  It didn't seem relevant at that time.
11   Q  Okay.  So it didn't seem relevant on
12  February 6th to find out what the guy who was killed
13  at 5:30 in the morning had been doing the night
14  before; right?
15       MS. ROSEN:  Objection; asked and answered
16  and now argumentative.
17       MR. ENGQUIST:  Join.
18       MS. QUIST:  Join.
19   A  It did not seem relevant at that time.
20   Q  Did it seem relevant on February 13th, a
21  week later when you had no other document or leads
22  in the case?
23       MS. ROSEN:  Object to the form.
24       MR. ENGQUIST:  Join.

234

1    A  I don't believe I worked on this case on
2  February 13th.
3  BY MR. AINSWORTH:
4    Q  Well, sir, what did you do to try and find
5  out who killed Rodrigo Vargas?
6    A  We interviewed his wife, Wilda Vargas, and
7  that's it.  I didn't work on that case again until
8  June the 2nd.
9    Q  So you asked her -- and according to Ray, he
10  told you just that she woke up and her husband was
11  dead, and that's all she had to offer; right?
12   A  I think the neighbor came and woke her up.
13  She had actually very little to offer.  That's
14  correct.  Her husband was going to work, and that's
15  about it.
16   Q  So -- all right.  Well, we'll come back to
17  that, sir.
18       In terms of this investigative file
19  inventory, if you look at Item No. 7, it says CB and
20  a bunch of numbers.
21   A  Uh-huh.
22   Q  What does that refer to?
23   A  It's the central booking number.
24   Q  Why did you write a central booking number

235

1  on the investigative file inventory?
2    A  Because a copy of that CB number was put
3  into the file.
4    Q  When you say "a copy of that CB number,"
5  what are you referring to?
6    A  Somebody's arrest report.
7    Q  Okay.  And then after that, it says
8  IR 863500.
9        What does that refer to?
10   A  Somebody's arrest history.
11   Q  You mean like a rap sheet?
12   A  We don't call them rap sheets.  They're
13  called arrest histories.
14   Q  Okay.  Somebody's arrest history.
15   A  Rap sheet is from television.
16   Q  All right.  Sorry.
17       So Item No. 7 is a -- is an arrest report;
18  right?
19   A  Yes.
20   Q  And that was entered into the file on
21  June 2nd, 1993; correct?
22   A  Correct.
23   Q  And the arrest history -- oh, and then
24  there's another arrest history and then another

236

1  arrest report and another arrest history on lines --
2  you know, comprising lines 7 through 11; is that
3  right?
4    A  Yes.
5    Q  And all of those were entered into the file
6  on June 2nd, 1993?
7    A  Yes.
8    Q  And those were all obtained on June 2nd,
9  1993?
10   A  I don't know when they were obtained.  I can
11  only tell you when they were put in this file.
12   Q  All right.  Well, if I told you that the CB
13  No. 9106-315 was Pacheco's CB number, that IR 863500
14  is Pacheco's IR number, and IR 736499, that's
15  Montanez's IR number, and CB -- and the subject of
16  the arrest is CB 9579443 was Armando Serrano, and
17  Armando Serrano's IR number is 874175, for those
18  three people, you didn't have their rap sheets
19  before June 2nd; is that right?
20   A  No.  I believe Detective Guevara obtained
21  all these reports sometime at the end of May.
22   Q  Detective Guevara obtained these reports at
23  the end of May.
24       Why do you believe that Detective Guevara

JGS_MAYSONET 4043

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

60 (237 to 240)

237

1  obtained these reports at the end of May?
2     A  Because I've seen the inventory from
3  identification where he requested them on the 24th
4  of May.
5     Q  You saw the documents.
6     A  I saw the request for the documents, yes.
7     Q  Within the last month.
8     A  Right.  At the end of May, yeah.
9     Q  Sorry.  Within the last month in 2019, you
10 saw those documents.
11    A  In the last month?
12    Q  Yes.
13       MS. ROSEN:  He's confused.
14       MR. ENGQUIST:  This last month.
15       THE WITNESS:  Oh.
16       MS. ROSEN:  When did you --
17    Q  In January or February of 2019.
18    A  No.  I saw that inventory when I was first
19 brought down to Sotos office after I was sued.
20    Q  Yeah.  Okay.  So can you tell us when you
21 first learned that Ray Guevara had requested those
22 documents near the end of May of 1993?
23    A  I can only go by the identification
24 section's log that he requested them on the 24th of

238

1  May.
2     Q  All right.  And you learned that after you
3  had been sued in this case.
4     A  Yes.
5     Q  In 2017; right?
6     A  Yes.
7     Q  Before 2017, you had no idea that Guevara
8  had requested those documents in May of 1993; is
9  that what you're saying?
10    A  I did not.
11    Q  Now, can you tell us do you know why Guevara
12 requested those documents in May of 1993?
13       And when I say "those documents," I mean the
14 arrest history for Pacheco, for Montanez, and
15 Serrano and the arrest reports for Serrano and
16 Pacheco.
17    A  He did not tell me back then that he had
18 requested these documents.
19       Today, I can speculate as to why he did, but
20 that's just my speculation.
21    Q  Well, first tell us do you know why Ray
22 Guevara requested those documents?
23    A  Back on the 24th of May, no.
24    Q  All right.  What is your speculation as to

239

1  why Ray Guevara requested those documents?
2     A  He had those three nicknames of Mondo,
3  Pistol Pete, and Jordan, and he was trying to find
4  out everything he could about them, specifically, if
5  they were even alive.
6     Q  Why -- for example, why that particular
7  Pistol Pete?
8     A  I don't know.
9     Q  You tried to find out who that Pistol Pete
10 was.
11    A  And I couldn't.
12    Q  And you failed.  Yeah.
13       Did Ray have some secret special nickname
14 file?
15       MR. ENGQUIST:  Objection to the form.
16       MS. ROSEN:  Object to the form.
17       MS. QUIST:  Join.
18    A  He had an informant that he was dealing
19 with, that I don't know what information the
20 informant gave him.
21    Q  Did you know Ray to have his own nickname
22 file?
23    A  No, he did not.
24    Q  You knew him to consult the sergeant's --

240

1  the 25th district sergeant's nickname file if he
2  needed to look up a nickname; right?
3     A  That was the primary nickname file we all
4  used.
5     Q  Were there any other nickname files?
6     A  Were there any what?
7     Q  Were there any other nickname files apart
8  from Sergeant --
9     A  In the Chicago Police Department, there
10 might have been, but that's the one we used.
11    Q  Did you have any others that you could
12 access?
13    A  No.
14    Q  All right.  So then in line 12 you have an
15 evidence report that was added to the file on
16 June 2nd, 1993; is that right?
17    A  Correct.
18    Q  And then you've got offender photos was
19 added to the file on June 13th; right?
20    A  Correct.
21    Q  And you've got an inventory number.
22       What does that refer to?
23    A  I'd have to go through the file and look
24 for it.

JGS_MAYSONET 4044

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

61 (241 to 244)

---

241

1    Q  All right.  But it's a property inventory
2  sheet?  Is that what they were?
3    **A  I don't know.  I'd have to go through the**
4  **file and look at the inventory.**
5    Q  All right.  And then line 15, you have the
6  word "supp." --
7    **A  Uh-huh.**
8    Q  -- referring to a supp report?
9    **A  That refers to a supp report.**
10   Q  All right.  And then you have line 16.
11 There's -- line 16 and 17, two CB numbers.
12   **A  Uh-huh.**
13   Q  Is that a yes?
14   **A  Those are two CB numbers, yes.**
15   Q  Two arrest reports were added to the file on
16 June 14th?
17   **A  Correct.**
18   Q  An IR number, a criminal history report was
19 added on June 14th; right?
20   **A  What was added when?**
21   Q  An IR number of a criminal history report
22 was added on June 14th, line 18?
23   **A  Yes.**
24   Q  And then you've got an evidence report that

---

242

1  was added on line -- on June 14th; right?
2    **A  Yes.**
3    Q  Statement from Rankins was added on
4  June 14th; right?
5    **A  Yes.**
6    Q  Then you've got one lineup supp, line 21;
7  right?
8    **A  Yes.**
9    Q  And one clearing supp that was line 22, also
10 added on June 14th; right?
11   **A  Yes.**
12   Q  And then you've got two more inventory
13 sheets added on line 23; right?
14   **A  Yes.**
15   Q  That was on July 3rd; correct?
16   **A  Yes.**
17   Q  And then a statement from Vicente was added
18 on July 3rd.
19   **A  Yes.**
20   Q  And then one final supp was added on
21 July 3rd; right?
22   **A  That's correct.**
23   Q  Then it says, "Copy sent to case report unit
24 records processing; date, July 3rd, 1993."

---

243

1        And is that your signature?
2    **A  Yes.**
3    Q  Why did you sign that line?
4    **A  It's required.**
5    Q  Well, why was it required?
6    **A  By department order.**
7    Q  All right.  What were you signifying when
8  you signed that line?
9    **A  That this was an accurate accounting for the**
10 **reports that were in the file.**
11   Q  What does it mean that copy sent to case
12 report unit records processing?
13   **A  That's where all the police department's**
14 **permanent records are maintained.**
15   Q  Did you send the report -- send a copy of
16 the -- did you send a copy of just this one page to
17 the case report unit?
18   **A  Yes.**
19   Q  When I say "this one page," meaning
20 investigative file inventory?
21   **A  Yes.**
22   Q  Did you send a copy of the remainder of the
23 file?
24   **A  No.**

---

244

1    Q  Why did you send a copy of the investigative
2  file inventory to the case report unit at that time?
3    **A  I think this is the third time I've answered**
4  **that.  It's required by department order.**
5    Q  But why on June 3rd -- July 3rd?
6    **A  Because I was finished.**
7    Q  You were finished with the case?
8    **A  Yeah.**
9    Q  Let's turn back to Exhibit No. 3, please.
10       All right.  Would you turn to the page that
11 says 155 on the bottom.
12   **A  Which stack of papers are we in?**
13   Q  Exhibit No. 3.  It's the RD file.
14   **A  Where are you going to look at?**
15   Q  It's Exhibit 3, page 155.
16   **A  Okay.**
17   Q  All right.  This is Schak and Jack's supp
18 report; right?
19   **A  Yes.**
20   Q  Okay.  If you turn to the page 157, where it
21 says "Manner/Motive."  Here it says, "The victim was
22 shot several times as he sat in his vehicle
23 preparing to go to his place of employment"; right?
24   **A  Yes.**

---

JGS_MAYSONET 4045

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

245

1    Q  Do you see that?
2        And when you started working this case, you
3  had access to Schak and Jack's scene supp; right?
4    A  Yes.  I read this.
5    Q  All right.  And you read this, meaning Schak
6  and Jack's supplementary report, to understand the
7  circumstances of the murder; right?
8    A  Yes.  Well, I read this -- read their
9  initial investigation.
10   Q  Okay.  If you turn to page 8 of that same
11 supp report.
12   MS. ROSEN:  158?
13   MR. AINSWORTH:  162, I'm sorry.  I switched
14 to -- I thought it would help him more.
15   Q  So I'm on 162.  I think you're on 163.  I
16 think you're on the wrong page, sir.  If you go back
17 one.
18   A  Page 7?
19   Q  Page 8.
20   A  Okay.
21   Q  Okay.  See where it has a statement
22 attributed to Anna Velez; and if you go down a
23 couple lines, it talks about at approximately
24 5:30 a.m. she looked out of her window and observed

---

246

1  the victim's van running as usual.  She stated that
2  the victim would start the van and sit for a few
3  minutes warming it up before driving away.  A few
4  moments later, she stated she heard several gunshots
5  and again looked out.
6        Do you see that sir?
7    A  Yes.
8    Q  All right.  So you knew, based on your
9  review of this report, that the victim would
10 typically sit in his car, warming it up before he
11 drove away in the morning; right?
12   A  Yes.
13   Q  And on a cold February morning in Chicago,
14 that's not so unusual; right?
15   MS. ROSEN:  Objection to form.
16   A  What was your question?
17   Q  On a cold February morning in Chicago,
18 that's not so unusual; right?
19   MS. ROSEN:  Object.
20   A  No, it wouldn't be.
21   Q  And you knew that Anna Velez said that on
22 this morning, February 5th, 1993, she had observed
23 the victim sitting in his car, warming it up as
24 usual; right?

---

247

1    MS. QUIST:  Object to form.
2    A  That's what Detective Schak and Jack put in
3  their report.
4  BY MR. AINSWORTH:
5    Q  All right.  And then if you go to page 164
6  or page 10 of the report -- actually, I'm going to
7  direct your attention to the next page, page 11.  In
8  the middle of the page there's a paragraph that
9  begins with the words "During a check of robbery
10 incidents."  So it's right in the middle of the
11 page.
12   A  All right.  What's your question?
13   Q  Do you see the paragraph that says, "During
14 a check of robbery incidents," the paragraph that
15 begins with those words?  Underneath --
16   A  During a check of robbery incidents?
17   Q  Yes.
18   A  All right.  Go ahead.
19   Q  The last sentence of that paragraph says, "A
20 copy of that report and the subsequent investigation
21 has been included in this file."
22        Do you see that, sir?
23   A  I see it.
24   Q  Where is the copy of RD No. X018247,

---

248

1  aggravated battery and attempted armed robbery?
2  Where is that file?
3    A  If it's not listed in the inventory, it
4  wasn't put in the file.
5    Q  Well, you were investigating this case;
6  right?
7    MS. ROSEN:  Objection; asked and answered.
8    A  Not at this time.
9    Q  Well, you were investigating it on
10 February 6th when this supp report was submitted;
11 right?
12   A  Yes.
13   Q  And so wouldn't you want to know what
14 follow-up investigation you could do based on Schak
15 and Jack's suggestion that there may be a link
16 between this murder and the aggravated battery that
17 occurred as described in RD No. X018247?
18   MS. ROSEN:  Object to the form, foundation.
19   A  This doesn't give anything to follow up.
20   Q  See at the bottom of the page, page 11?
21   A  Uh-huh.
22   Q  It says, "Efforts will be made to interview
23 this subject as soon as possible in an effort to
24 determine if there's any possible connection between

---

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

249

1  these incidents.  The appropriate reports will be
2  submitted for both investigative files."
3      Do you see that, sir?
4      A  Yeah.  This is not my report.
5      Q  Right.  I'm just saying that Schak and Jack
6  gave some suggestions for what needed to be followed
7  up on; right?
8      A  Yeah.  And they should have done it.
9      Q  So it's their fault.
10     A  It's their case.
11         MS. ROSEN:  Object to the form of the
12  question.
13     Q  It's their case?
14     A  Yes.
15     Q  And Schak and Jack were the scene
16  detectives; right?
17     A  Yes.
18     Q  And you were the follow-up detectives;
19  right?
20     A  For one day.
21     Q  For one day.
22     A  Yes.
23     Q  And on that day you talked to one witness;
24  right?

250

1      A  Yes.
2      Q  Who had already been questioned before;
3  right?
4      A  To my knowledge, yes.
5      Q  Why did you talk to Wilda on February 6th?
6      A  Seemed like a logical person to talk to.
7      Q  Why did you want to talk to her?
8      A  Again, she seemed like a logical person to
9  talk to.
10     Q  Sorry.
11     A  She was the wife of the guy who had just
12  been murdered.  We were hoping she could provide us
13  a direction to go and investigate.  Ex-boyfriend,
14  jealous lover, money dispute, gang affiliation, we
15  didn't know.
16     Q  What he had been doing recently?
17     A  Uh-huh.
18         MR. ENGQUIST:  Objection; asked and
19  answered.
20     Q  Right?
21         MR. ENGQUIST:  Argumentative.
22     Q  She might know what he had been doing
23  recently; right?
24         MR. ENGQUIST:  Same objection.

251

1      A  We were hoping that Wilda would give us a
2  direction to proceed in the investigation.
3  BY MR. AINSWORTH:
4      Q  A direction that Jack and Schak had failed
5  to uncover in their interview with her the day
6  before?
7      A  There was no direction to uncover the day
8  before.  This was a brand new homicide that all
9  possibilities were available.  It could have been a
10  robbery attempt.  It could have been a domestic.
11  Wilda could have shot him.  We didn't know.
12     Q  So did you consider that Wilda might have
13  been the perpetrator?
14     A  Possibility at that time.
15     Q  So did you investigate, for example, her
16  whereabouts the day before?
17     A  Not the day before, no.
18     Q  Did you investigate her whereabouts at any
19  time?
20     A  Investigate her whereabouts when?
21     Q  Sorry.  Did you investigate, for example,
22  her employment history?
23     A  Did I?  No.
24     Q  Did you ask anyone else to?

252

1      A  No.
2      Q  Do you know why Wilda would say that
3  detectives were going to her work to verify that she
4  was actually at work the day before?
5      A  No idea.  It wasn't me and Ray.
6      Q  Would you turn to page 8 of that same
7  report?  You've got to flip back a few pages.
8      A  Which page again?
9      Q  Page 8, 162 again.
10         See right above Anna Velez's paragraph, it
11  says "Gang crimes records," and it refers to an auto
12  theft under RD No. T-153841.
13     A  Uh-huh.
14     Q  And a copy of that report has been requested
15  and will be included in the file pertaining to this
16  incident?
17     A  Uh-huh.
18     Q  Whose responsibility was it to ensure that
19  that file --
20     A  Whoever wrote this report, Schak and Jack.
21     Q  Whose responsibility was it to ensure that
22  report was included in this file?
23     A  Schak and Jack.
24     Q  And it was their responsibility because they

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

253

1  were the scene --
2      A  It was their -- it was their investigative
3  lead they were going to follow up on.
4      Q  So it wasn't your responsibility.
5      A  No.
6      Q  Were they the lead detectives on this case?
7      A  Uh-huh.
8      Q  Is that a yes?
9      A  Uh-huh.  That's a yes.  They were the scene
10 detectives.  They were the lead detectives.
11     Q  Schak and Jack were the lead detectives on
12 this case.
13     A  Yes.
14     Q  Okay.  Why did you have Anna Velez give a
15 polygraph?
16     A  That one I don't remember, why she was
17 polygraphed.
18     Q  Where would I look to find out why she was
19 polygraphed?
20     A  Probably in the polygraph section.
21     Q  Well, where in the supplemental reports
22 created by the detectives would I look?
23     A  I didn't polygraph her.
24     Q  You're not a polygraph operator.

254

1      A  I didn't take her to the polygraph.  I
2  didn't request she go take a polygraph.  Who took
3  her and why, I don't know.
4      Q  So your partner requested that she be given
5  a polygraph.
6         You're aware of that; right?
7      A  No, I'm not aware of that.
8      Q  All right.  So a detective supp report
9  should have been created documenting why Anna Velez
10 was taken for a polygraph; right?
11     A  Correct.
12     Q  Let's skip to Exhibit 6.
13        All right.  I'll have to go back to Ms. Anna
14 Velez and her polygraph test.
15        Do you know why she was suspected of
16 committing this murder?
17        MR. ENGQUIST:  Objection -- well, just the
18 form, calls for speculation.
19     A  Why she was suspected of what?
20     Q  Of having some involvement in the Vargas
21 homicide.
22        MS. QUIST:  Object.
23        MS. ROSEN:  Foundation.
24     A  I do not.

255

1  BY MR. AINSWORTH:
2      Q  Was there any other reason to polygraph her
3  apart from her having some suspected involvement in
4  the Rodrigo Vargas homicide?
5      A  Not to my knowledge.
6      Q  All right.  Sir, so then why didn't you
7  conduct any follow-up investigation after you talked
8  to Wilda and she said, "I was sleeping and then
9  somebody woke me up and told me my husband was
10 dead."
11        MS. ROSEN:  I'm sorry.  Could you read that
12 back.
13        (Pending question read.)
14        MR. ENGQUIST:  I'm going to object to form.
15        Go ahead.
16     A  The question about Wilda is that after
17 Guevara talked to her, she added no new information.
18 We had no investigation direction to go in, and we
19 were buried in other murder cases we were working
20 on.
21     Q  So just so I get it right, your sergeant
22 said investigate this murder.
23     A  For a day.
24     Q  For that day.  You went and talked to Wilda.

256

1  She told you what she told you.
2         You didn't ask her any follow-up questions;
3  right?
4      A  I never spoke to Wilda.  She speaks Spanish.
5      Q  Okay.  And then despite having access to
6  Schak and Jack's report suggesting follow-up
7  information on -- following up an investigation on
8  the aggravated battery, you and your partner -- what
9  did you do after you talked to Wilda?
10     A  Nothing as far as this case went, not until
11 June 2nd.
12     Q  Did you go back to your sergeant and say,
13 You know, we gave it our best shot, but we couldn't
14 crack this one?
15        MR. ENGQUIST:  Objection; argumentative,
16 form.
17        MS. NIKOLAEVSKAYA:  Join.
18     A  I don't remember what conversations we had
19 with our sergeant in Area 5.
20     Q  Did you tell anyone that you were not going
21 to investigate this murder anymore after June --
22 after February 6th?
23        MS. ROSEN:  Object to the form.
24        MR. ENGQUIST:  Join.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

65 (257 to 260)

257

1      A  I don't remember.
2  BY MR. AINSWORTH:
3      Q  Your partner was keeping in contact with
4  Wilda Vargas; right?
5      A  That I don't know about.
6      Q  Well, you testified at the same trial,
7  right, with Montanez and Serrano?
8      A  What was your question?
9      Q  You testified at the trial of Mr. Montanez
10 and Mr. Serrano; right?
11     A  Yes.
12     Q  Sorry.  My apologies.  This is actually
13 Exhibit No. 4, the Sidley interview, if you turn to
14 page 3.  Do you see that second paragraph on page 3?
15 The last sentence of that paragraph, "Detective
16 Halvorsen noted that throughout the next several
17 months, Detective Guevara 'kept in touch' with Wilda
18 by phone," kept in touch being in quotes.
19     A  Again, I don't remember the conversations I
20 had with Sidley.
21     Q  All right.
22     A  I can't dispute what they typed because I
23 don't remember it.
24     Q  Do you dispute that you told the lawyers at

258

1  Sidley Austin that Detective Guevara kept in touch
2  with Wilda by phone over the next several months?
3      A  I'm not disputing that.
4      Q  Why didn't you create a report regarding
5  your interview of Wilda Vargas on February 6th?
6      A  On February 6th because no new information
7  was learned.  It's pointless to turn a report in
8  that says we learned nothing.
9      Q  So then let's go back to Exhibit No. 3.
10 Here we are, page 169.  We have a polygraph --
11     MR. ENGQUIST:  One second.  The staple you
12 gave me didn't hold.  It kind of fell apart.  I'm
13 sorry.  You have bad staples.
14     MR. AINSWORTH:  It's stress turning.
15     Q  All right.  Page 169, this is a -- appears
16 to be a polygraph report; is that right?
17     A  Yes.
18     Q  Requested by Detective, it says, Geurrera of
19 Area 5 violent crimes.
20     Is that supposed to be Guevara?
21     A  That's what it says.
22     Q  Did you have a Geurrera in Area 5 at the
23 time?
24     A  Yeah.  Ricky Geurrera, Area 5 youth.

259

1      Q  Ricky Geurrera --
2      A  Uh-huh.
3      Q  -- Area 5 youth.
4      A  Uh-huh.
5      Q  What does youth mean?  What is Area 5 youth?
6      A  Where was it?
7      Q  What is it?
8      A  Youth division.
9      Q  Youth division.
10     They investigate crimes against children;
11 right?
12     A  Mainly.
13     Q  And crimes committed by children?
14     A  Investigate crimes involving minors.
15     Q  Minors.
16     And the Vargas homicide was not a crime
17 involving minors; right?
18     A  No.
19     Q  And this was for the murder of Rodrigo
20 Vargas?  That's what the polygraph was in relation
21 to; right?
22     A  It doesn't say that.
23     Q  Top left corner and it also has the RD
24 number.

260

1      Do you see where it says victim's name?
2      A  I'm looking at the RD number.
3      Q  All right.
4      A  This would have been relating to the Rodrigo
5  Vargas murder.
6      Q  Yeah.  All right.  And it was requested on
7  March 11th, 1993, and that leads you to believe that
8  that should be Detective Guevara rather than
9  Geurrera.
10     A  I see this report, but I have no knowledge
11 of this thing.
12     Q  All right.  Does the fact that it was
13 requested in the Vargas homicide lead you to believe
14 that it's actually a typo, and it was supposed to be
15 Detective Guevara rather than Detective Geurrera who
16 requested this?
17     A  I don't know.  I've got no idea why this was
18 requested in October 3rd of 1993, way, way, way
19 after this case was closed.
20     Q  Well, I take this as police writing where it
21 says 11-3-93.
22     A  Okay.  You're saying it's March the 11th.
23     Q  Yes.
24     A  All right.  Again, I don't know anything

JGS_MAYSONET 4049

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

261

1  about this.
2     Q  All right.  What was the result of Anna
3  Velez's polygraph?
4     A  It doesn't say.
5     Q  Why wasn't a copy of this report included in
6  the set of documents that you submitted with the
7  inventory file -- oh, strike that.  You didn't send
8  any documents.
9        Why wasn't this report listed on the
10  inventory file or file inventory that you completed?
11     A  I don't know.  I don't know anything about
12  this report.  I have no idea why Anna Velez was
13  taken to the polygraph.
14     Q  All right.  Let's then turn to page 171.
15  You're listed as the first detective on this supp
16  report.
17        Do you see that?
18     A  Yes.
19     Q  And Detective Guevara, he's listed as the
20  second reporting detective; right?
21     A  Yes.
22     Q  That's your signature below your name on the
23  first page?
24     A  Say that again, please.

262

1     Q  That's your signature there?
2     A  Yes.
3     Q  You signed it once you completed this
4  report; right?
5     A  Yes.
6     Q  But before you turned it in; right?
7     A  Correct.
8     Q  And you signed it to affirm that it was
9  truthful and accurate; right?
10     A  I signed the report to say that I typed it.
11     Q  You were not saying that it was truthful and
12  accurate?
13     A  I'm saying that I typed the report.
14     Q  All right.  Are your police reports truthful
15  and accurate?
16     A  Yes.
17     Q  Is this report truthful and accurate, the
18  supp report dated June 2nd, 1993?
19        MS. ROSEN:  Object to the form.
20     A  As far as I know, this report is truthful
21  and accurate.
22     Q  Okay.  And you submitted this report on June
23  2nd, 1993, at 11:00 p.m.; is that right?
24     A  On what day?

263

1     Q  June 2nd.
2     A  No, I don't believe so.  That's the day I
3  typed this first page.
4     Q  Okay.  So where it says date this report
5  submitted --
6     A  I know.
7     Q  -- day -- let me just finish the question.
8     A  Go ahead.
9     Q  The date this report submitted:  Day,
10  June 2nd, 1993; time, 2300.
11        You're supposed to put the date that this is
12  submitted; right?
13     A  Yes.
14     Q  Okay.  And your -- and when you submitted
15  this report dated June 2nd, 1993, you put it into
16  the same basket where you're supposed to put
17  reports; right?
18     A  This report was not submitted on June 2nd,
19  1993.
20     Q  I didn't -- I'm not there yet.
21     A  Okay.  Go ahead.
22     Q  I'm just saying this report dated June 2nd,
23  1993.
24     A  The first page is dated that.

264

1     Q  This report, it's only dated by you in one
2  place; right?
3     A  No.  It's dated on the back page too,
4  June 6th.
5     Q  Is that where it says the date of the
6  report?
7     A  No.  But it's also dated on the back,
8  June 6th.
9     Q  So you consider that to be a date of the
10  report.
11     A  The front page is the day that I started
12  typing.  Yes, I know the box down here says the day
13  it's submitted.  That's wrong.  I should have
14  changed this box to June 6th.
15     Q  Okay.  In any event, this report which we'll
16  call -- it's at least dated June 2nd, 1993; right?
17     A  The front page is, yes.
18     Q  Okay.  Was submitted by you in the same box
19  where you typically submit your reports; right?
20     A  Yes.
21     Q  When you're seeking approval for them;
22  right?
23     A  Yes.
24     Q  And then it was approved by Sergeant Biebel

JGS_MAYSONET 4050

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

67 (265 to 268)

265

1  on June 3rd, 1993, at 11:45 a.m.; correct?
2      **A  That's what it shows, correct.**
3      Q  Do you have any doubt that Sergeant Biebel
4  approved this report on June 3rd, 1993, at
5  11:45 p.m. -- a.m.?
6      **A  I think the date it was approved is wrong.**
7      Q  You think that both the date that it was
8  submitted and the date that it was approved --
9  approved, both of those dates are wrong?
10     **A  You're mixing up things here.  I have**
11 **already told you that this was the first page that I**
12 **started typing the report.  I should have changed**
13 **this date to the 6th.  I didn't.**
14     Q  Right.  You got that wrong.
15     **A  It's an error on my behalf.**
16     Q  Okay.
17     **A  There is a notation here this report was**
18 **still in progress on June the 6th.**
19     Q  Okay.  So you're saying that you erred in
20 the date --
21     **A  Yes.**
22     Q  -- on the first page?
23     **A  Yes.**
24     Q  And your supervisor, Sergeant Biebel, also

266

1  erred as to the date that he approved the report;
2  right?
3      **A  I'm not saying he intentionally erred.  I'm**
4  **saying that he had a stamp that he used.  The wheel**
5  **might have been turned to the wrong date.**
6      Q  And so it was one of those stamps that you
7  set it at the beginning of the day to allow you to
8  stamp --
9      **A  Yes.**
10     Q  -- everything that day?
11     **A  Yes.**
12     Q  All right.  And do you know why he would
13 have turned his wheel on that stamp back three days
14 just for this particular report, which you also
15 erred on the date on the first page?
16     MS. ROSEN:  Object to the form.
17     MS. QUIST:  Join.
18     **A  I'm not saying that he did.  I'm saying that**
19 **the wheel was turned back, and he may not have**
20 **noticed.**
21     Q  Did you spill coffee on this report, sir?
22     **A  No.**
23     MS. QUIST:  Object to form.
24     Q  All right.  So when do you think you

267

1  submitted this report, sir?
2      **A  Sometime after June 6th.**
3      Q  Do you have any idea when?
4      **A  Probably June 6th or June 7th.**
5      Q  Why did you say that this report was added
6  to the file on June 2nd?  In the inventory file --
7      **A  Yeah, I know.  I know.  My error.**
8      Q  So --
9      **A  It should have said June 6th.**
10     Q  I'm sorry.  I'm just trying to get this
11 straight.
12         So you're saying that you not only got the
13 date wrong on the report, but you also got the date
14 wrong on the investigative file inventory, and your
15 sergeant got the date wrong when he approved it.
16         Is that what you're saying, sir?
17     **A  Can I look at the investigative file**
18 **inventory and make sure that we're comparing this**
19 **report to that?**
20     Q  Sure.
21     **A  Can we do that?**
22     Q  Yeah.  Exhibit 6.
23         So on June 2nd, you include a number of
24 documents but only one supp report; right?

268

1      **A  None of this stuff is chronological.  I**
2  **would need to have the chronological file as to what**
3  **was before this supp and what was after this supp so**
4  **I can compare it to make sure I'm referring to this**
5  **supp on June the 2nd and not on June the 14th.**
6      Q  All right.  Well, you've got a -- on
7  February 2nd, you've got a canvas supp and the
8  progress supp.  Those are the only other two supp
9  reports submitted as of June 2nd.
10         The canvas supp, the progress supp, and then
11 the supp that you introduced; right?
12     **A  Again, this is not chronological, and it's**
13 **very confusing.**
14     Q  All right.  So let's just --
15     **A  I will admit that I put the wrong date on**
16 **the front of this report.  I would admit that this**
17 **report should have been logged in the file as of**
18 **June 6th.**
19         **Why Bob Biebel had the wrong date on this I**
20 **don't know.  I can only assume that someone, I don't**
21 **think it was him, probably was playing with his time**
22 **stamp and changed the date, and he didn't notice.**
23     Q  But you agree that you logged the supp
24 reports on June 2nd --

JGS_MAYSONET 4051

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

68 (269 to 272)

269

1    A  Apparently.
2    Q  -- in the investigative file inventory;
3  correct?
4    A  Yes.
5    Q  And so you got the date wrong on the
6  investigative file inventory on the first page of
7  the supp report, and your sergeant also got the date
8  wrong that he approved the report.
9      That's what you're saying?
10    A  Yes.
11    Q  All right.  Did you include the location --
12  sorry -- did you include in this report --
13      MR. ENGQUIST:  Which report are you speaking
14  of?
15      MR. AINSWORTH:  The report that the first
16  page is dated June 2nd, 1993.
17    Q  Did you include in that report the fact that
18  you tried to verify that Gold Busters didn't exist,
19  but you found it to be an empty storefront?
20    A  Which report are you referring to?
21    Q  The one that's dated on the first page,
22  June 2nd, 1993.
23    A  I can't find it.  Can you find it for me.
24    Q  Yeah.  I'm sorry.  I'm on Exhibit 3, and

270

1  here's the first page of it just for your reference.
2    A  All right.
3    Q  You can turn to the second and third page,
4  if you'd like.
5    A  Which page would you like me to turn to?
6    Q  Well, I will represent to you that there's
7  nowhere in this report or in this file anything
8  about you determining that Gold Busters was actually
9  a vacant storefront.
10      And I'm asking you --
11    A  You would be correct.  There's nothing in
12  this report.
13    Q  All right.  And there's nothing in this
14  report about Vicente telling you that Jose
15  Montanez's car was damaged by a bullet during the
16  murder; correct?
17    A  Say your question again, please.
18    Q  Sure.  There's nothing in this report about
19  Jose Montanez's car being damaged by a bullet as you
20  claimed that Vicente had said to you.
21    A  No.  That was a different report.
22    Q  Okay.
23    A  Let me correct that.
24    Q  Yes.

271

1    A  Let me correct that.
2    Q  Yes, sir.
3    A  The same report --
4    Q  Yes.
5    A  -- that we talked about this one --
6    Q  Yes.
7    A  -- the front page says 2nd of June.
8    Q  Yes.
9    A  On page 3 --
10    Q  Yes.
11    A  -- Francisco Vicente clearly stated that two
12  days later, Pistol Pete drove up.  He noticed new
13  damage to the left-front fender.  Pistol Pete told
14  him he smashed the car after he popped the victim.
15    Q  Okay.
16    A  Bullet hole.  Bullet hole.
17      You were correct.  There's nothing in here
18  that -- about Francisco Vicente telling me that
19  Pistol Pete -- the car had accidentally been shot
20  during the murder.
21    Q  But you told Wilda Vargas that Montanez's
22  car had sustained a bullet hole as part of the
23  murder; correct?
24      MS. ROSEN:  Object to the form, foundation.

272

1      MR. ENGQUIST:  Mischaracterizes his previous
2  testimony.
3    A  I never told Wilda Vargas anything.
4  BY MR. AINSWORTH:
5    Q  Sorry.  Your partner, Ray Guevara, told
6  Wilda Vargas that Montanez's car had sustained a
7  bullet hole as part of the murder; right?
8    A  That I'm unaware of.  I don't know what Ray
9  told Wilda.
10    Q  You can't admit that's true or deny it's
11  false; right?
12    A  What's that?
13    Q  You can't -- you can't say one way or the
14  other whether Ray told Wilda that the bullet hole in
15  Montanez's car came from the murder; right?
16    A  Correct.
17      MR. ENGQUIST:  I think we're going to take
18  another break.  Just a few minutes.
19      MR. AINSWORTH:  Okay.
20      THE VIDEOGRAPHER:  Off the record, 4:20.
21      (A recess was taken from 4:20 p.m. to
22  4:31 p.m.)
23      THE VIDEOGRAPHER:  Back on the record, 4:31.
24

JGS_MAYSONET 4052

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

69 (273 to 276)

273

1  BY MR. AINSWORTH:
2    Q  Okay.  If you turn back to Exhibit No. 3,
3  that's the RD file, and if you turn to page 174.
4      It says, "On June 2nd, 1993, Detective R.
5  Guevara showed Wilda Vargas a photo array that
6  consisted of CPD black-and-white identification
7  photos.  Wilda Vargas identified Jose Montanez,
8  Pistol Pete, as the person who followed her husband
9  into the gas station."
10     "She also identified Armando Serrano, Mondo,
11 as the person she saw seated in the front
12 passenger's seat of the tan" can -- tan "car that
13 followed them.  These photos were inventoried for
14 evidence."
15     Do you see that, sir?
16   A  Yes.
17   Q  So the photo array consisted of three
18 defendants; right?
19   A  Yes.
20   Q  Or three suspects.
21   A  Three suspects at that time.
22   Q  All right.  Montanez, Serrano, and Pacheco;
23 right?
24   A  Yes.

274

1    Q  And then five filler photos; right?
2    A  Yes.
3    Q  Do you know why Ray Guevara showed Wilda
4  Vargas a photo array that contained three suspects
5  and five fillers?
6    A  No.
7    Q  That was improper to do; right?
8    A  Every case is different.  You have to use
9  what's available to you.  It appears to be wrong.
10 There should have been more filler photos.
11   Q  And was there a shortage of filler photos on
12 June 2nd, 1993?
13   A  I do not know what filler photos Guevara had
14 with him.
15   Q  Well, I mean at the station, were there --
16 was there a shortage of filler photos on June 2nd,
17 1993?
18   A  Not to my knowledge.
19   Q  Did you ever have a situation where there
20 weren't enough filler photos for a photo array?
21   A  Yes.
22   Q  All right.  And tell us the circumstances
23 when that happened.
24   A  We didn't have them.  We didn't have enough

275

1  pictures of a certain person we were trying to do a
2  photo array with.
3    Q  All right.
4    A  If the guy is missing his eye, we'd need
5  filler photos with the guys missing their eyes.
6    Q  I see.  There were situations where somebody
7  has a very prominent distinguishing factor; right?
8    A  Yes.
9      MS. ROSEN:  Object to the form.
10   Q  But how about people who did not have such a
11 prominent distinguishing factor?  Did you ever have
12 not enough filler photos?
13   A  Ordinarily, we would have filler photos in
14 the office.
15   Q  All right.  Then it says that the reporting
16 detectives -- well, according to this report, you
17 then identified a car belonging to Jose Montanez;
18 right?
19   A  Yes.
20   Q  And then it says detective --
21   A  Let me correct that.  We found a car that
22 was registered to Jose Montanez.
23   Q  Okay.  And then in the last -- the next
24 paragraph there, second from the end, it says,

276

1  "Detective R. Guevara drove Wilda Vargas around the
2  neighborhood of the 3900 block of West Dickens."
3      Do you see that, sir?
4    A  Yes.
5    Q  And so was it only Ray Guevara who was
6  driving Wilda around?
7    A  Yes.
8    Q  So you did not accompany him on that
9  driving?
10   A  No.
11   Q  And so then -- and when did that take place?
12   A  I imagine it was June 2nd.  No, it couldn't
13 have been June 2nd.  I'm sorry.  It had to be the
14 same day we took the photographs of the car, which
15 would have been June 6th.
16   Q  And you took those photographs; right?
17   A  Yes.
18   Q  Okay.  So you were not present when Wilda
19 identified Jose Montanez's car; right?
20   A  My report says no.
21   Q  All right.  And you don't know if Ray
22 Guevara first drove her to a number of vehicles that
23 looked nothing like the suspect vehicle from the gas
24 station; right?

JGS_MAYSONET 4053

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

277

1    A  That's correct.
2    Q  You don't know where Ray Guevara took her;
3  right?
4    A  That's correct.
5    Q  You don't know if Ray Guevara told Wilda
6  Vargas that the bullet damage to Jose Montanez's car
7  matched the ballistics evidence from the crime scene
8  when she was asked to identify Jose Montanez's car;
9  right?
10    A  That's correct.
11    Q  And if you did type stuff on here, on this
12  report after June -- after submitting and having the
13  report approved, that would have been totally wrong;
14  right?
15    A  Correct.
16    MS. ROSEN:  Object to the form.
17    Q  All right.  Then I want to direct your
18  attention to page 193.
19    This is a lineup report; correct?
20    A  Correct.
21    Q  You prepared this report?
22    A  I did.
23    Q  That's your signature under your name on the
24  first page?

278

1    A  That's correct.
2    Q  Did you sign your partner's name on this?
3    A  Yes.
4    Q  Did you give him a chance to review it for
5  accuracy before signing in his stead?
6    A  No.
7    Q  Why did you sign his name to your report?
8    A  It's a common thing we did.
9    Q  And this report was approved by Sergeant
10  Mingey?
11    A  Yes.
12    Q  No way to forge that signature.
13    A  That's Ed's signature.
14    MS. NIKOLAEVSKAYA:  Objection to form.
15    Q  So then going to the second page, you have a
16  lineup, and you tried to make this a fair lineup to
17  Armando Serrano; right?
18    A  Yes.
19    Q  Trying to find people who would appear
20  similar to him; right?
21    A  Yes.
22    Q  And so when you were creating this lineup,
23  you were looking for people who would appear similar
24  to the 5-foot-6, 150 pound Armando Serrano; right?

279

1    A  Yes.
2    Q  And so you went out, and you found other
3  Latino men; right?
4    A  Yes.
5    Q  And you found the tallest, skinniest Latino
6  men you could to place next to Armando Serrano in
7  the lineup; is that right?
8    A  What was your question?
9    MS. ROSEN:  Object to the form.  Object to
10  the argumentative.
11    MR. ENGQUIST:  Join.
12    Q  You went out and you found the tallest,
13  skinniest Latino men that you could to place next to
14  Armando Serrano in the lineup; right?
15    A  Wrong.
16    Q  All right.  Well, let's just take a look
17  here.
18    Did you have trouble finding shorter Latino
19  men in the City of Chicago on June 11th, 1993?
20    A  This report indicates that all the fellows
21  in the lineup were prisoners.
22    Q  Okay.  So you went to the lockup and you
23  found -- and you couldn't find any shorter Latinos
24  in the lockup; is that what you're saying?

280

1    A  We use what's available to us.
2    Q  Did you --
3    A  That's all we can do.
4    Q  Did they just arrest a basketball team or
5  something?
6    MS. QUIST:  Objection.
7    MS. ROSEN:  Object to the argumentative
8  nature of the question.
9    MS. NIKOLAEVSKAYA:  Join.
10    Q  Why did you create a lineup that has people
11  who are all either 5-11 or 6-1 or 6-foot tall next
12  to the 5-foot-6 Armando Serrano?
13    A  We used what filler are available to us.
14    Can I see the lineup photo?
15    Q  I don't have it in front of me, sir.
16    A  I want to see if he's sitting down or not.
17    Q  Well, sir, let's take a look at the --
18    A  The persons are seated.
19    Q  In the report, you would indicate if the
20  participants in the lineup were seated, correct, if
21  they were, in fact, seated?
22    A  Well, that's why I want to look at the
23  lineup photo.
24    Q  I'm just asking you, sir, in your report you

JGS_MAYSONET 4054

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

281

1  would indicate if the participants were seated, if
2  they were, in fact, seated; right?
3      **A  I normally would, yes.**
4      Q  All right.  And your report does not
5  indicate that the participants were seated; right?
6      **A  That's correct.**
7      Q  All right.  And so -- and not only did you
8  find really tall people, but proportionally they
9  were really skinny people; right?
10     MS. ROSEN:  Object to the form of your
11 question.
12     MS. NIKOLAEVSKAYA:  Join.
13     MR. ENGQUIST:  Join.
14     Q  You've got a guy who is 6-foot-1 and only
15 150 pounds.
16     MS. ROSEN:  Object to the form.
17     MS. QUIST:  Join.
18     MS. NIKOLAEVSKAYA:  Join.
19     **A  What's your question, please?**
20     Q  Well, just that you were -- you've got a guy
21 who is 5-foot-6, 150 pounds, which would be about a
22 medium build; right?
23     MS. ROSEN:  Object to the form.
24     **A  I can save you some trouble here.**

---

282

1      **Wilda Vargas never saw Armando Serrano out**
2  **of the car.  She had no idea how tall he is, how**
3  **much he weighed.  She saw him sitting in the car.**
4  **So I don't see your questions about height.**
5  **BY MR. AINSWORTH:**
6      Q  Well, would the -- as part of what you're
7  trying to do in a lineup when you're creating the
8  fillers is make sure that the suspect doesn't stand
9  out in some significant way from the other people in
10 the lineup.
11     **A  That's correct.  That's why I'd like to see**
12 **the lineup photo.**
13     Q  Okay.  Let's turn to page 183 of Exhibit 3.
14     **A  183?**
15     Q  Yes.
16     All right.  So this is a report documenting
17 the questioning of Armando Serrano and Jorge Pacheco
18 on June 8th and June 9th of 1993.
19     Do you see that?
20     **A  Yes.**
21     Q  Why didn't you have Wilda come and view a
22 lineup of Armando Serrano on June 8, 1993?
23     **A  He wasn't under arrest.**
24     Q  And so why -- why does that matter?

---

283

1      **A  You're not supposed to put persons in**
2  **lineups who aren't under arrest.**
3      Q  Well, isn't it an investigative tool to try
4  and find out who the perpetrator is?
5      **A  No.  It's a charging tool.**
6      Q  It's a charging tool.
7      **A  Yeah.  To identify who an offender is and**
8  **charge him.**
9      Q  So you're saying that you can only do a
10 lineup after somebody has already been arrested.
11     **A  Arrested.  That's the proper procedure.**
12     Q  All right.  So you can't ask somebody if
13 they would voluntarily appear in a lineup.
14     **A  We can ask, yes.**
15     Q  All right.  So why didn't you ask Armando
16 Serrano if he would -- you know, because he was
17 cooperative and came down for a polygraph test;
18 right?
19     **A  Yes.**
20     Q  He came down voluntarily; is that what
21 you're saying?
22     **A  Yes.**
23     Q  And so why didn't you just say, Hey,
24 Armando, we'd really like to clear this up.  Could

---

284

1  we just have you stand in a lineup.  We'll make it
2  fair for you.
3      MS. ROSEN:  Object to the form of the
4  question.
5      **A  We didn't.**
6      MR. ENGQUIST:  Join.
7      MS. NIKOLAEVSKAYA:  Join.
8      Q  Well, why didn't you, sir?
9      **A  We weren't at that point in the**
10 **investigation yet.**
11 **BY MR. AINSWORTH:**
12     Q  Why weren't you at that point in the
13 investigation?
14     **A  To have them stand in a lineup?**
15     Q  Yeah.
16     **A  Because I wanted to talk to all three**
17 **potential suspects before I took that step.**
18     Q  Why?
19     **A  I wanted to.**
20     Q  Why?
21     **A  Because that was my investigative steps.**
22     Q  All right.  But why were those your
23 investigative steps?
24     **A  That's the way I did my job.**

JGS_MAYSONET 4055

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

285

1    Q  And what was the thinking behind it?
2    **A  That I was building a case.**
3    Q  And how was talking to everybody before you
4  had a lineup --
5    **A  Well, I might have got some -- one of the**
6  **three persons to come in and give me a statement.**
7    Q  And neither Armando Serrano or Jorge Pacheco
8  claimed any responsibility for this crime
9  whatsoever; right?
10   **A  That's correct.**
11   Q  They both denied it wholeheartedly?
12   **A  Correct.**
13   Q  And you submitted this report on June 14,
14 1993?
15   **A  It's not my report.  It's Detective**
16 **Guevara's report.**
17   Q  Oh, I see.
18      Does that mean he typed this report?
19   **A  No.**
20   Q  So you typed it?
21   **A  Guevara typed it.**
22   Q  Guevara typed it.  Okay.
23      So Guevara typed it, and he submitted it on
24 June 14th, 1993, at 8:30 p.m.; right?

---

286

1       MS. ROSEN:  Objection; foundation.
2    **A  That's what the report indicates.**
3  **BY MR. AINSWORTH:**
4    Q  Do you have any reason to doubt that?
5    **A  What's that?**
6    Q  Do you have any reason to doubt that?
7    **A  No.**
8       MS. ROSEN:  Object to the foundation.
9    Q  Sergeant Biebel approved it on June 15th at
10 noon; correct?
11      MS. ROSEN:  Object to the foundation.
12      MR. ENGQUIST:  Join.
13   **A  That's what the report indicates.**
14   Q  Okay.  So let's go back a few pages to 177.
15      This is a report typed by you; correct?
16   **A  Correct.**
17   Q  And this is submitted on June 14th, 1993, at
18 6:00 p.m.; is that right?
19   **A  Correct.**
20   Q  And approved by Sergeant Biebel on
21 June 15th, 1993, at 12:45?
22   **A  That's what's indicated.**
23   Q  All right.  And this demonstrates or
24 documents your interview with Timothy Rankins; is

---

287

1  that right?
2    **A  That's correct.**
3    Q  All right.  How did you come in contact with
4  Timothy Rankins?
5    **A  I was at home.  I was called at home by**
6  **Sergeant Mingey.  He told me he had a witness to the**
7  **shooting of Rodrigo Vargas in the office, and he**
8  **wanted me to come in and take a statement from him.**
9    Q  All right.  And how did Sergeant Mingey come
10 in contact with Timothy Rankins?
11   **A  I believe Rankins was in custody for some**
12 **other crime.**
13   Q  And why did that lead Timothy -- why did
14 that lead Mingey to be in contact with Timothy
15 Rankins?
16   **A  I don't know.**
17   Q  Would reviewing your report help refresh
18 your recollection?
19   **A  Yeah.**
20   Q  Take a look at the bottom of page 2 of your
21 June 14, 1993, report relating to Timothy Rankins.
22   **A  Yes.  My recollection has been -- has**
23 **been --**
24   Q  Refreshed?

---

288

1    **A  Well, apparently, Ed Mingey knew this guy**
2  **from another murder case.**
3    Q  And what was that murder case?
4    **A  Monica Roman.**
5    Q  You investigated the Monica Roman murder
6  as well; right?
7    **A  I don't remember off the top of my head.**
8    Q  You don't remember a guy named Geraldo
9  Iglesias who was prosecuted for that murder?
10   **A  No.**
11   Q  Did Vicente tell you that yet another person
12 confessed to him in a murder that you were
13 investigating?
14   **A  Did Vicente tell me what?**
15   Q  That yet another person confessed to him in
16 a murder that you were investigating?
17   **A  I don't really remember.**
18   Q  How many murders did Vicente tell you people
19 had confessed to him about?
20   **A  Sidley told me it was three, but I only**
21 **remember two.**
22   Q  All right.  Could it be because the third
23 one never happened?
24   **A  The third murder never happened?**

JGS_MAYSONET 4056

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

289

1    MS. ROSEN:  Object to the form.

2    MS. NIKOLAEVSKAYA:  Objection to form.

3    MR. AINSWORTH:  Sorry.  You're right.

4 That's a poor question.

5 BY MR. AINSWORTH:

6   Q  So Vicente testified that he told you --

7 well, strike that.

8    If Vicente told you that Geraldo Iglesias

9 had murdered Monica Roman, you should have written

10 that in a report; right?

11    MS. QUIST:  Object to form.

**12  A  That's correct.**

13   Q  There's no reason not to document the fact

14 that Vicente is telling you that Geraldo Iglesias

15 has confessed to murdering Monica Roman?

**16  A  If he did, that would be correct.**

17   Q  Do you have any explanation for why in the

18 Monica Roman homicide investigation there's no

19 report documenting the fact that Vicente claims

20 Geraldo Iglesias confessed the murder to him?

**21  A  Who did he tell this to?**

22    MS. ROSEN:  Object to the form, foundation.

23    MS. NIKOLAEVSKAYA:  Join.

24    MR. ENGQUIST:  Join.

---

290

1 BY MR. AINSWORTH:

2   Q  Well, okay.  So let's mark this -- well, let

3 me just read this to you.  This is Geraldo

4 Iglesias's testimony on December 16, 1994.

5    MS. ROSEN:  Do you have a copy of that for

6 everyone?

7    MR. ENGQUIST:  Yeah.  So we can follow

8 along.

9    MS. ROSEN:  It's a completely different

10 case.

11    MR. AINSWORTH:  Well, it's this case.

12    MS. ROSEN:  Well, no, it's not.

13    MR. AINSWORTH:  It is.  All right.

14    MS. ROSEN:  So what number is this now?

15    MR. AINSWORTH:  Oh, I didn't --

16    MS. ROSEN:  7?

17    THE REPORTER:  7.

18    MS. ROSEN:  Is that right?

19    THE REPORTER:  Yes.

20    (Halvorsen Deposition Exhibit 7 marked

21 for identification and attached to the

22 transcript.)

23 BY MR. AINSWORTH:

24   Q  Page V-62, Iglesias is being examined by the

---

291

1 prosecutor in the case.

2    MS. NIKOLAEVSKAYA:  62 or 52?

3    MR. AINSWORTH:  62.  It says -- and so

4 line 2 on that page.

5    "QUESTION:  And by the way, Chino, when you

6 went on July 1st, to talk about the other case, you

7 did tell the detectives about what he told you on

8 the way over; is that correct?

9    "ANSWER:  Yes, sir.

10    "QUESTION:  And you brought that up to the

11 detectives, didn't you?

12    "ANSWER:  Yes.

13    "QUESTION:  What did the detectives tell you

14 when you brought that up to them?

15    "ANSWER:  They told me let's take care of

16 this in front of the grand jury, the case that we

17 are speaking on now, forget about that.

18    "QUESTION:  In other words, we will take one

19 case at a time?

20    "ANSWER:  Yes, sir."

21    Were you asked -- do you see that testimony,

22 sir?

**23  A  No.  Where is it at?**

24   Q  Oh, geez, V-62.

---

292

**1  A  Which one?**

2   Q  V-62.  62.

**3  A  Section 2?**

4   Q  Yeah.

5    MS. ROSEN:  Is there a problem?

6    MS. BONJEAN:  No.  Do you have a problem?

7    MS. ROSEN:  Well, you're huffing over there.

8 So I'm just asking --

9    MR. BONJEAN:  I exhaled.  I exhaled.  I

10 really don't need you policing every little move I

11 make.  It's really -- (Overtalk.)

12    MS. ROSEN:  I've been with you all day

13 today.

14    MS. BONJEAN:  You're really focusing a

15 little too much.  I exhaled.  Okay.  Relax.

16    MS. ROSEN:  I have not said a word to you

17 all day, and the record will reflect that.

18    MS. BONJEAN:  Yes.  The record will also

19 reflect that I exhaled, and you have some arbitrary

20 comment to make about my exhale.

21 BY MR. AINSWORTH:

22   Q  All right.  Are you on V-62, sir, line 2?

**23  A  Yeah.  I'm reading this thing, and it**

**24 doesn't show that Francisco Vicente told any**

---

JGS_MAYSONET 4057

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

293

1  detective.  It says he told David Studenroth.
2     Q  He told the detectives who brought him to
3  the grand jury.
4        Do you see that, sir?
5        MS. ROSEN:  Object to the form.
6     A  What line is that on?
7     Q  Line 2.  "And by the way, Chino, when you
8  went on July 1st to the talk about the other case,
9  you did tell the detectives about what he told you
10 on the way over; is that correct?
11       "ANSWER:  Yes."
12       Do you see that, sir?
13    A  Yeah.  I see it but --
14    Q  Okay.
15    A  But it doesn't say that he -- you know, who
16 he talked to.
17    Q  Right.  Okay.  So you -- if you turn to
18 page 187 of Exhibit 3, and I guess, I should before
19 we leave because we've got -- I don't know whether
20 to flip back, which one to go to first, but on that
21 page V-62.
22       MS. ROSEN:  This is back to the other
23 exhibit.
24       MR. AINSWORTH:  Yeah.  I know.

294

1  BY MR. AINSWORTH:
2     Q  All right.  We'll stick on Exhibit 3.
3        So you see where it says, the third
4  paragraph down, On July 1, 1993, the reporting
5  detectives, that's you and your partner, Ray
6  Guevara; right?
7     A  Uh-huh.
8     Q  Yes?
9     A  Yep.
10    Q  Yes?
11    A  I see it.
12    Q  Brought Francisco Vicente to the Cook County
13 grand jury.
14    A  Correct.
15    Q  Do you see that, sir?
16    A  Right.
17    Q  Do you agree that you and Ray Guevara were
18 the detectives who brought Francisco Vicente to the
19 grand jury on July 1st, 1993?
20    A  That's correct.
21    Q  And in his testimony, Geraldo Iglesias is
22 telling the prosecutor that he told the
23 detectives --
24       MS. ROSEN:  Geraldo Iglesias is telling the

295

1  prosecutor?
2     A  Geraldo Iglesias.
3        MR. AINSWORTH:  Geraldo Iglesias is
4  testifying.
5     A  Okay.
6        MS. ROSEN:  Okay.
7  BY MR. AINSWORTH:
8     Q  Yes.  Geraldo Iglesias is testifying that he
9  told the detectives who brought --
10       MS. ROSEN:  That Iglesias told the
11 detectives?
12    A  Geraldo is the defendant.
13       MR. AINSWORTH:  I'm so sorry, everyone.  I
14 caused the utmost confusion.
15    Q  Vicente's testimony -- Vicente testified
16 that he told the detectives who brought him to the
17 grand jury on July 1st about Geraldo Iglesias
18 confessing to him.
19       MS. ROSEN:  Well, are you now representing
20 that this testimony on V-62 is Vicente's testimony,
21 not Iglesias's testimony?
22       MR. AINSWORTH:  I'm sorry.
23       MS. ROSEN:  Okay.
24       MR. AINSWORTH:  In the Iglesias case.

296

1        MS. ROSEN:  Got it.
2        MR. AINSWORTH:  I got it wrong.
3        MS. ROSEN:  Okay.
4  BY MR. AINSWORTH:
5     Q  And so if you want to look at that again, by
6  all means.
7     A  I don't remember him telling me about a
8  third case.
9     Q  Okay.
10       MS. ROSEN:  Is there some -- oh, I see what
11 you're saying.  Okay.
12    Q  And so you -- and you don't dispute that you
13 brought Vicente to the grand jury on July 1st;
14 right?
15    A  No.
16    Q  Okay.  And you don't dispute that you should
17 have -- if Vicente told you about a confession he
18 received from Iglesias, you should have documented
19 that in a supp report; right?
20    A  I don't remember him giving me a confession
21 ever.
22    Q  But you accept that you should have included
23 Vicente's statement about Iglesias confession if, in
24 fact, he told you about it on July 1st, 1993?

JGS_MAYSONET 4058

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

297

1    A  If he had told me that information, I would
2  have documented it.
3    Q  All right.  So let's turn back to
4  Mr. Rankins.
5       MS. ROSEN:  We're in Exhibit 3?
6       MR. AINSWORTH:  We're in Exhibit 3.
7       MS. ROSEN:  Okay.
8    A  Where are you at?
9    Q  Page 178.
10   A  On what exhibit?
11   Q  Exhibit 3.
12   A  2?
13   Q  3, 178.
14      So it just so happens that Vicente got a
15 confession in another case that you and Guevara were
16 investigating that's referenced in this file, the
17 Monica Roman homicide.
18      That's just a coincidence?
19      MS. ROSEN:  Object to the form.
20   A  I have to read this Monica Roman file
21 because it doesn't ring any bells with me at all.
22   Q  All right.  A girl who was shot in a car
23 when she was driving by with some other Latin Kings,
24 I believe, in a car, and somebody came up and shot

298

1  at the car and killed this young woman.
2    A  Again, I'd have to read the investigative
3  file --
4    Q  All right.
5    A  -- to refresh my memory.
6    Q  How long was your interview with Timothy
7  Rankins?
8    A  It's been 26 years since this interview.
9  I'd say no more than an hour.
10   Q  All right.  And you started interviewing him
11 at 2:00 p.m.; is that right?
12   A  That's what my report indicates.
13   Q  So did you come in early for that?
14   A  As I previously informed you, Sergeant
15 Mingey called me at home and told me to come on in,
16 he had this guy in the office that he wanted me to
17 interview as a witness in the Rodrigo Vargas murder.
18   Q  All right.  So then he gave you some
19 nicknames for the suspects.  He said that Jose
20 Montanez was Moses or Barrel Belly?
21   A  Uh-huh.
22   Q  Is that a yes?
23   A  Correct.
24   Q  Did you look in the nickname file to see if

299

1  Jose Montanez was ever known by Moses or Barrel
2  Belly?
3    A  No.
4    Q  Have you ever received any kind of
5  corroboration that Montanez is known as Moses or
6  Barrel Belly?
7    A  No.
8    Q  And Rankins referred to Armando Serrano as
9  Joker.
10      Do you know of any other reference to
11 Armando Serrano going by the nickname of Joker?
12   A  No.
13   Q  Did you look in the nickname file to see if
14 you could find any reference to Armando Serrano
15 being known as Joker?
16   A  No.
17   Q  And how about Jorge Pacheco being known as
18 Stripes?  Do you know of any other instance where
19 Jorge Pacheco was ever referenced as Stripes?
20   A  No.
21   Q  Did you look in your nickname file to see if
22 Jorge Pacheco was also referred to as Stripes?
23   A  No.
24   Q  So Rankins tells you that he goes with

300

1  Shorty Folks to the scene of the crime; right?
2    A  I'd have to sit here and read this whole
3  thing.
4    Q  Well, let me and -- let me direct you to the
5  last four lines of page 179.  Here it says, "He,
6  Shorty Folks, and Stripes got into a red van with
7  white stripes on the bottom.  Stripes drove this
8  van.  He did not know who owned the van, only that
9  it was borrowed from another Imperial Gangster.
10 They drove down to North Avenue to Springfield.
11 They drove north on Springfield about two blocks.
12     "The tan Buick pulled over and parked a few
13 car lengths away from a van that was parked on
14 Springfield," and then Rankins relates that he
15 witnessed the murder from that vantage point.
16     Do you see that, sir?
17   A  He gives a detailed description of the
18 murder, and he says he sees Joker shoot and kill
19 this guy.
20   Q  Right.  So -- and next to Timothy Rankins
21 while this is going on is Shorty Folks; right?
22   A  Say that again, please.
23   Q  Next to Timothy Rankins while this is going
24 on is Shorty Folks, right, according to your report?

JGS_MAYSONET 4059

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

301

1    A  That's what Rankins told us.
2    Q  So did you then, as an experienced homicide
3 detective, ask Timothy Rankins the question who is
4 Shorty Folks?
5       Spoiler alert, it's not reflected in the
6 report that you did, if you're looking for that.
7       MR. ENGQUIST:  Objection.
8       MS. ROSEN:  Objection just to the form.
9       MR. ENGQUIST:  Yeah.  Give him time to read
10 the report.
11   Q  Certainly.
12   A  It doesn't say so in this report, but I'm
13 sure we asked Rankins who Shorty Folks was.
14   Q  And did Rankins tell you he is the guy I was
15 arrested with the day before?
16   A  Where does it say that at?
17   Q  Well, it doesn't in your report, but do you
18 know?
19   A  It doesn't?
20   Q  It does not, not in your report.
21   A  Well, then he didn't tell me then.
22   Q  All right.  Well, do you know that Shorty --
23 that Timothy Rankins was arrested with a person
24 named Shorty Folks on June 10th, 1993?

302

1    A  No, I do not.
2    Q  What efforts did you take to try and find
3 out who Shorty Folks was?
4    A  I don't remember at this time.
5    Q  Did you want to know who Shorty Folks was?
6    A  Yes.
7    Q  He was a witness to a murder; right?
8    A  Yes.
9    Q  He would be able to corroborate what Timothy
10 Rankins was telling you; right?
11   A  Yes.
12   Q  So you wanted to find him; right?
13   A  Yes.
14   Q  Did you say, Mr. Rankins, would you mind
15 telling us who Shorty Folks is or how we could talk
16 to him?
17   A  I don't remember that conversation.
18   Q  All right.  Did Timothy Rankins refuse to
19 tell you who Shorty Folks was?
20   A  I don't remember that conversation.  Timothy
21 Rankins was very cooperative.
22   Q  If Timothy Rankins had refused to provide
23 the information about this crime, such as who Shorty
24 Folks was, that's something you would have

303

1 documented; right?
2    A  What was your question again?
3    Q  If Timothy Rankins had refused to tell you
4 who Shorty Folks was, you would have documented that
5 fact; right?
6    A  Yes, probably.
7    Q  Because that would be withholding pertinent
8 information to a murder investigation; right?
9    A  I don't remember the conversation with
10 Timothy Rankins really.  I don't remember any
11 conversation about Shorty Folks.
12   Q  That's --
13   A  I documented everything he told me.
14   Q  That's why you have to rely on your reports
15 to aid your memory; right?
16   A  Correct.
17   Q  So that's why you know, as an experienced
18 homicide detective, that it was important to include
19 all pertinent information in your reports so it
20 would assist your memory recall later; right?
21   A  Correct.
22   Q  Rankins also refers to his girlfriend
23 Sabrina being at the park?
24   A  Say that again, please.

304

1    Q  Rankins refers to his girlfriend Sabrina
2 being at the park, page 179.  Let's go about -- in
3 that last paragraph about -- the big one about
4 Timothy Rankins, about a third from the bottom,
5 "There was also a guy he knows as Shorty Folks.
6 Rankins' girlfriend Sabrina was also at the park."
7       Do you see that?
8    A  I see where it says Sabrina is at the park,
9 yes.
10   Q  All right.  Did you want to know how to
11 contact Sabrina?
12   A  What park were they referring to?  I don't
13 know.
14   Q  Well, did you want to be able to contact
15 Sabrina?  And just to fill you in, Sabrina was at
16 the park when all --
17   A  Which park?
18   Q  Monticello Park when all three defendants or
19 all three suspects were supposedly making a plan
20 with Rankins to come back at -- sorry -- he arrived
21 at Monticello Park with his girlfriend to meet up
22 with all three suspects and Shorty Folks to go on
23 this mission.
24       MS. ROSEN:  Object to the form.

JGS_MAYSONET 4060

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

305

1       MR. ENGQUIST:  Join.
2    **A  I have no idea where Monticello Park is at.**
3  **BY MR. AINSWORTH:**
4    Q  I don't see the relevance, sir, because I'm
5  just trying to find out --
6    **A  Well, if she's not there at the murder, what**
7  **relevance does she have?**
8    Q  Well, she's -- he's saying that when I met
9  up with the three suspects, immediately before we
10 went over to commit the murder, my girlfriend was
11 there, and she would be able to see that I was with
12 the three defendants, Montanez, Serrano and Pacheco,
13 as well as Shorty Folks all meeting up to commit
14 this crime.
15   **A  Which crime are they meeting up to commit?**
16   Q  The murder.
17   **A  No.  I thought they were meeting up to go**
18 **get guns or something.**
19   Q  And then they'd go to the murder -- scene of
20 the murder.
21   **A  So they didn't meet up to commit a murder.**
22   Q  All right.  Well, we can play semantics, but
23 I'm just trying to find out did you or did you
24 not --

306

1    **A  No, I didn't find Sabrina.**
2    Q  Did you want to --
3    **A  Yeah.  I'm sure I did.**
4    Q  Let me just ask the questions.
5       Did you want to speak to Sabrina?
6    **A  Yes, I would have liked to talk to Sabrina.**
7    Q  Did you make any effort to find out who she
8  was?
9    **A  I don't remember.**
10   Q  Did you ask Timothy Rankins who was your --
11   **A  I don't know.**
12   Q  -- girlfriend?
13      Did you ask Timothy Rankins for her last
14 name?
15   **A  I don't remember.**
16   Q  Is there any reason why you wouldn't have
17 asked Timothy Rankins for the last name of his
18 girlfriend?
19   **A  No.**
20   Q  When you were typing this up, did it occur
21 to you, Gee, I don't know who Sabrina's -- what
22 Sabrina's last name is or have any way to contact
23 her?
24      MR. ENGQUIST:  Object to the form,

307

1  argumentative.
2    **A  What was your question?**
3    Q  When you were typing up this report as part
4  of Exhibit 3, did it occur to you that I don't know
5  who Sabrina's last name is -- or what Sabrina's
6  latest name is or how to contact her?
7       MS. ROSEN:  Object to the form,
8  argumentative.
9    **A  I don't remember what I thought 26 years**
10 **ago.**
11   Q  All right.  So then on the next page,
12 page 4, the very bottom, this is page 180 of
13 Exhibit 3.  The last paragraph says, The reporting
14 detectives, so that's both you and Detective
15 Guevara; right?
16   **A  That's correct.**
17   Q  Showed Timothy Rankins a photo array
18 consisting of eight Polaroid color photos.  Timothy
19 Rankins identified the photo of Armando Serrano as
20 the person known to him as Joker.
21      Do you see that?
22   **A  Yes.**
23   Q  And then the next page says, "Timothy
24 Rankins identified the photo of Jorge Pacheco as the

308

1  person known to him as Stripes.  Lastly, Timothy
2  Rankins identified the photo of Jose Montanez as the
3  person known to him as Moses."
4       Do you see that?
5    **A  Yes.**
6    Q  And so you were creating a photo array to be
7  fair to Jose Montanez and Armando Serrano; right?
8    **A  Yes.**
9    Q  And you showed Polaroid photos; right?
10   **A  Yes.**
11   Q  And those -- and Polaroid photos are not
12 what TV calls mug shots and what the Chicago Police
13 Department calls -- what do you call them?
14   **A  Arrest photos.**
15   Q  Arrest photos.  All right.
16      They're not arrest photos; right?
17   **A  Correct.**
18   Q  So you didn't get the Polaroid photos from
19 the identification section; right?
20   **A  No.**
21   Q  No.  The only way that you could have
22 Polaroid photos of the defendants or of the suspects
23 is if they were at the area; right?
24   **A  Correct.**

JGS_MAYSONET 4061

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

**309**

1    Q  And so when you learned from Francisco
2  Vicente that the perpetrators were Pistol Pete,
3  Mondo, and Jordan, you went back to the Area; right?
4    **A  I don't remember if I went back to the area**
5  **to get the pictures or identification to get the**
6  **pictures.**
7    Q  Well, take a look at Exhibit No. 6.  It's
8  the thick one, page 114.
9    **A  Okay.**
10    Q  These are the photographs that you showed to
11  Timothy Rankins; right?
12    **A  My report says we showed him a photo array.**
13    Q  Sorry.  These are the photos of the three
14  suspects that you showed him along with five
15  fillers; right?
16    **A  I'd have to see the inventory photos.**
17    Q  All right.
18    **A  If we inventoried the photos, obviously,**
19  **these can't be the photos.**
20    Q  Then if you turn back to the same page that
21  you're on Exhibit 3, page 181.
22    **A  Okay.**
23    Q  You then state that Serrano was arrested at
24  3:00 p.m.?

---

**310**

1    **A  Correct.**
2    Q  You started talking to Rankins at 2:00
3  o'clock and by 3:00 o'clock, you had already
4  arrested Armando Serrano?
5    **A  Apparently.**
6    Q  And then at 6:45 that evening, Timothy
7  Rankins identified Armando Serrano in the lineup.
8    Do you see that?
9    **A  That's what the report indicates.**
10    Q  All right.  You don't indicate that Wilda
11  Vargas viewed a lineup, right, in the supp report?
12    **A  Not on the 11th of June at 1845 hours.**
13    Q  But in the separate lineup supp, you do say
14  that she viewed a lineup.
15    **A  Say again, please.**
16    Q  In the separate lineup supp that you
17  created, you said that Wilda Vargas did view a
18  lineup on June 11th at 1845 hours.
19    **A  Not in this report.**
20    Q  Right.  Not in this report.
21    Why didn't you include the fact that Wilda
22  also viewed the lineup and identified Serrano?
23    **A  I'd have to see the lineup reports.  Are**
24  **they in this packet here?**

---

**311**

1    Q  Yeah.  We looked at one of them already.  We
2  looked at the Wilda Vargas one, and then I'll show
3  you the other one.  It's on page 175.
4    **A  I'm looking on 175.  That's the lineup that**
5  **was viewed by --**
6    Q  Rankins.
7    **A  -- Timothy Rankins.**
8    Q  Yep.
9    **A  But I don't see a lineup that was viewed by**
10  **Wilda.**
11    Q  Well, we'll get to it in a second, but
12  before you leave 175, you see that this report is
13  submitted on June 11th, 1993, at 2300 hours?
14    **A  Yes.**
15    Q  And it's approved by Biebel --
16    **A  Yes.**
17    Q  -- on June 15 at 1208?
18    **A  Yes.**
19    Q  It's approved by Biebel at about the same
20  time that he approves the other report at noon on
21  June 15th and the other report that he reviewed
22  at -- he approved at 12:45 on June 15th.
23    **A  That appears to be correct.**
24    Q  All right.  But then page 193 is --

---

**312**

1    **A  Page which?**
2    Q  Page 193 is the Wilda.
3    **A  This is obviously my mistake.  I should have**
4  **put that Wilda also viewed a lineup on that same**
5  **date and at that same time.**
6    Q  All right.  Sir, moving forward, we've got
7  a -- then if you go to 185.
8    **A  All right.**
9    Q  This is a report dated July 3rd, 1993;
10  right?
11    **A  Correct.**
12    Q  If you go to the second page -- and you
13  typed this report; right?
14    MR. ENGQUIST:  I'm sorry.  Which Bates
15  number are we on?
16    MR. AINSWORTH:  185 and now turning to 186.
17    Q  You see in the upper right-hand corner --
18    **A  On which page?**
19    Q  186.
20    **A  Okay.**
21    Q  -- you've got a date, July 3rd, 1993?
22    **A  Uh-huh.**
23    Q  Is that a yes?
24    **A  Correct.**

---

JGS_MAYSONET 4062

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

313

1    Q  That's the date that you would submit the
2  report; right?
3    **A  The date that's on the other pages of the**
4  **report.  As I previously explained to you, we typed**
5  **up the first page first when we began it, and it may**
6  **not necessarily match the dates on the other pages.**
7    Q  Because the dates on the other pages of the
8  report reflect when you're writing those --
9    **A  When I'm actually typing it, yes.**
10   Q  When you're actually typing it.
11      So the fact on page 2 it says July 3rd,
12 1993, in the upper right-hand corner reflects that
13 that page was typed on July 3rd; right?
14   **A  Yes.**
15   Q  And the same for page 187.  In the upper
16 right-hand corner where it says July 3rd, 1993, that
17 reflects that it's typed on July 3rd, 1993.
18   **A  Yes.**
19   Q  All right.  So then, sir, if you go back to
20 page 172 of Exhibit 3.  This is the famous June 2nd,
21 1993, report, and in the upper right-hand corner we
22 have June 2nd of 1993 reflecting that that page was
23 typed on June 2nd, 1993; correct?
24      MS. ROSEN:  Object to the form.

314

1    **A  What's the question?**
2    Q  The June 2nd, 1993, in the upper right-hand
3  corner of page 172 of Exhibit --
4    **A  All right.**
5    Q  -- 3 reflects that that page was typed on
6  June 2nd; right?
7    **A  Yes.**
8    Q  And the same going on to the next page,
9  page 173.  In the upper right-hand corner, we have
10 June 2nd, 1993.
11      That means that page was typed on June 2nd,
12 1993; right?
13   **A  Yes.**
14   Q  And then going on to the next page, page 174
15 of Exhibit 3, the date of June 2nd in the -- 1993 in
16 the upper right-hand corner reflects that that
17 page was typed on June 2nd, 1993; correct?
18   **A  No.  As I've explained before, this report**
19 **was not completed until June 6th.**
20   Q  So --
21   **A  So the final -- this typing took place**
22 **between the period of June the 2nd and June the 6th.**
23 **It all may not have been on the same day.**
24   Q  So are you saying that the date on the upper

315

1  right-hand corner of page 174 where it says
2  June 2nd, 1993, that date is also wrong?
3    **A  I'm saying that this report was not finished**
4  **until June the 6th.  June the 2nd might have been**
5  **the day I was typing this report, the majority of**
6  **this report, but it was not finished until June**
7  **the 6th.**
8    Q  That's not my question, sir.
9       My question is are you saying that where it
10 says June 2nd, 1993, in the upper right-hand corner
11 of page 174, that's also an error in the date?
12      MR. ENGQUIST:  Objection; mischaracterizing
13 his previous testimony, asked and answered.
14      You can answer it again.
15   **A  From June the 2nd to June the 6th, I was**
16 **typing this report.  Not all this was typed up on**
17 **June the 2nd.  The report was finished on June**
18 **the 6th and submitted at that time.**
19   Q  What date should have been written in the
20 upper right-hand corner of page 174 of Exhibit 3?
21   **A  The day I started typing this report, June**
22 **2nd.**
23   Q  So you're saying it should be June 2nd.
24   **A  Yeah.**

316

1    Q  Even though the report was not submitted --
2    **A  This box does not indicate the day the**
3  **report is turned in.**
4    Q  Okay.
5    **A  I already indicated I made a mistake.  I**
6  **should have changed that first page to June the 6th.**
7    Q  All right.  Sir, let me show you what we'll
8  mark as Exhibit No. 8, please.
9       (Halvorsen Deposition Exhibit 8 marked
10 for identification and attached to the
11 transcript.)
12   Q  All right.  So this is your report; correct?
13   **A  This is my report, my first -- well, not my**
14 **first.  This is the interview with Francisco Vicente**
15 **when he was attempted to be bribed.**
16   Q  All right.  This documents your conversation
17 with Vicente and John Dillon at the gang prosecution
18 unit; right?
19   **A  Yes.**
20   Q  All right.  And then one second, sir.
21 Let's -- let me come back to this.
22      Going back to Exhibit 3, let's turn now to
23 page 185.  So this report documents that Rankins was
24 brought to the Cook County grand jury.

JGS_MAYSONET 4063

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

317

1        Do you see that on the bottom of the second
2   page?
3      **A  Which page are you on now?**
4      Q  186.
5      **A  Okay.  Go ahead.**
6      Q  The second-to-the-last paragraph says,
7   Detectives brought Rankins to the grand jury; right?
8      **A  I must be on the wrong page here.  You're**
9   **talking about page 186?**
10     Q  Yeah.
11     **A  What's your question?**
12     Q  Just the second-to-the-last paragraph says
13  Rankins was brought to the grand jury.  You brought
14  him to the grand jury.
15     **A  It doesn't say the grand jury.  It says Cook**
16  **County State's Attorney gang prosecution unit.**
17     Q  Sorry.
18        If you go up one, I think one before it,
19  where it's talking about Rankins, not Vicente.
20        Next to Investigation, the reporting
21  detectives brought Timothy Rankins to the Cook
22  County grand jury.
23     **A  Rankins to the grand jury, not Vicente.**
24     Q  Yeah.

---

318

1      **A  Okay.  All right.  That's correct.**
2      Q  And then the next paragraph says, "On June
3   28, 1993, the detectives had Francisco Vicente
4   brought from the Cook County Jail to the Cook County
5   State's Attorney's gang prosecution unit.
6         Why did you have Francisco Vicente brought
7   from the Cook County Jail to the Cook County State's
8   Attorney's gang prosecution unit?
9      **A  I think they wanted to take a handwritten**
10  **statement from him.**
11     Q  So why did -- why were you involved in that
12  process?
13     **A  Well, from what I can read here, we were**
14  **seeking arrest warrants for Jorge Pacheco and Jose**
15  **Montanez.  The state's attorney wanted to take a**
16  **handwritten statement from Francisco Vicente before**
17  **she approved the murder warrants.**
18     Q  Okay.  So why did you have to be present for
19  Vicente talking to the prosecution?
20     **A  Why did I have to be what?**
21     Q  Present or involved in the state's attorney
22  getting a statement from Vicente?
23     **A  I always witnessed statements.  It's**
24  **required.  The state's attorney does not take**

---

319

1   **statements without a police officer or detective**
2   **witnessing them?**
3      Q  Did you ask to be present?
4      **A  This was my investigation.  I was requesting**
5   **the murder warrants.  She was responding to my**
6   **request for murder warrants.  Before she would issue**
7   **them, she wanted to take a handwritten statement**
8   **from Francisco Vicente where I was present when she**
9   **took the statement.**
10     Q  I thought that Schak and Jack were the lead
11  detectives.
12     **A  They were not at this point.**
13     Q  When did they stop being the lead
14  detectives?
15     **A  When we had all the information that we were**
16  **working with.**
17     Q  When was that?
18     **A  Probably after the 2nd of June.**
19     Q  So as of the 2nd of June, you and Guevara
20  were the lead detectives on this case.
21     **A  I would say we took it over, yes.**
22     Q  Would you say you're the lead detectives?
23     **A  We don't use that term in the police**
24  **department, "lead detectives."  We took over the**

---

320

1   investigation.
2      Q  You called Jack and Schak the lead
3   detectives.  Why are you reluctant to --
4      **A  I called them the scene detectives.**
5      Q  I mean, that's why we have a court reporter.
6      **A  All right.  Maybe I did.**
7      Q  All right.  So --
8      **A  It's the scene detectives.**
9      Q  All right.  So are you now saying that Jack
10  and Schak were not the lead detectives?
11     **A  At this point in the investigation, no.**
12     Q  But they were on February 6th, 1993; right?
13     **A  Yes.**
14     Q  And you and Guevara were the lead detectives
15  as of June 2nd, 1993; is that correct?
16     **A  If you want to use that phrase "lead**
17  **detectives," yes.**
18     Q  I'm asking you, sir.  I'm not the one
19  testifying here.
20     **A  All right.  We were -- we took over the**
21  **investigation.**
22     Q  What does that mean to take over the
23  investigation?
24     **A  Well, we were doing all the work.**

---

JGS_MAYSONET 4064

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

321

1    Q  Is there anybody else responsible -- well,
2  strike that.
3        You signed the criminal complaints against
4  each of Jose Montanez and Armando Serrano for
5  murder; right?
6    A  I'd have to see the complaints to verify
7  that.
8    Q  If you'd stay on the same page 187 of that
9  report, is this a clearing supp?
10   A  Yes, it was.
11   Q  Why was it a clearing supp?
12   A  One of the three offenders was in custody,
13 and the case was cleared and open by arrest.
14   Q  The other two suspects weren't arrested
15 until after this point; is that right?
16   A  The other two suspects were not arrested
17 until after this report was submitted.
18   Q  And so I'm wondering what was it about the
19 June 3rd -- July 3rd supp report that caused you to
20 send the inventory -- the investigative file
21 inventory to that location where you sent it to?
22   A  Because the case was cleared.
23   Q  Even though only one person had been
24 arrested?

322

1    A  Correct.
2    Q  So why didn't you send the inventory file or
3  the investigative file inventory to the place where
4  you were supposed on to June 14th when you arrested
5  and charged Serrano?
6    A  Obviously, I didn't.
7    Q  I know that you didn't.  I'm wondering why.
8  What was it about July 3rd that caused you to send
9  it in as opposed to an earlier date?
10   A  Well, the case was cleared.
11   Q  Why isn't there an inventory for documents
12 that were added after July 3rd, 1993?
13   A  I don't know.
14   Q  Should there have been?
15   A  There should have been.
16   Q  Whose responsibility was that, to make sure
17 that the documents that you added to this file after
18 July 3rd were properly inventoried?
19   A  Whatever the person --
20   MS. ROSEN:  Object to form.
21   A  Whatever person in the office puts the
22 file -- puts the reports in the file.
23   Q  And who was the person who put the reports
24 in this file?

323

1    A  I don't know.
2    Q  Whose responsibility is it?
3    A  I don't know.
4    Q  Is it anybody's responsibility?
5    A  Say again, please.
6    Q  Is it anybody's responsibility?
7    A  The job got done, so someone had to be doing
8  it.
9    Q  I'm going to ask you to turn back to Exhibit
10 No. 6, this thick one.
11   A  Which page?
12   Q  Just for now Exhibit 6 and page 49.
13   A  Okay.
14   Q  All right.  This is a complaint that you
15 filed against Jose Montanez for murder; right?
16   A  Yes.
17   Q  That's your signature; correct?
18   A  Yes.
19   Q  Who clerked it?
20   A  I can't make out that signature.
21   Q  Is that Mingey?
22   A  I can't make it out.
23   Q  You also signed the complaint against Jorge
24 Pacheco on page 51?

324

1        Sorry.  52 actually, that's the arrest
2  warrant.
3    A  Yes.
4    Q  And that's your signatures on that page?
5    A  Yes.
6    MR. AINSWORTH:  Let's go off the record.
7    THE VIDEOGRAPHER:  Off the record, 5:39.
8    (A recess was taken from 5:39 p.m. to
9  5:54 p.m.)
10   THE VIDEOGRAPHER:  Back on the record, 5:54.
11 BY MR. AINSWORTH:
12   Q  Sir, have you ever been disciplined by the
13 department?
14   A  No.
15   Q  Have you ever witnessed another police
16 officer commit misconduct?
17   A  Yes.
18   Q  On how many occasions?
19   A  One I remember specifically.
20   Q  Which one was that?
21   A  It was a murder in the early 1990s involving
22 Officer Johnny Rodriguez.
23   Q  And what happened in that investi- -- or
24 regarding that murder that you deemed to be officer

JGS_MAYSONET 4065

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

325

1 misconduct?

2　A He contacted the common law wife of one of
3 the two people that were murdered and told her not
4 to cooperate with the police, keep her mouth shut if
5 she knew what was good for her.

6　Q Who did this?

7　A Johnny Rodriguez.

8　Q Sorry. I thought he was the victim.

9　A No. He was the police officer.

10　Q All right. And so he was investigating a
11 murder?

12　A No. You asked me if I witnessed any
13 misconduct.

14　Q Yes.

15　A And then you said who, and I said Johnny
16 Rodriguez. I witnessed him commit misconduct.

17　Q Was he a detective?

18　A No. He was a patrolman.

19　Q Patrolman.

20　　And it was in one of your murder
21 investigations?

22　A Yes.

23　Q And he told a witness to not get involved in
24 that murder?

326

1　A He told a common law wife of one of the
2 murder victims she was not to cooperate with the
3 police or something very bad was going to happen to
4 her.

5　Q How did you know that he said this to her?

6　A She came and told me.

7　Q And so what did you do?

8　A I can't remember who the commander of Area 5
9 was at that time, but he got a CR number, and a
10 confidential investigation was launched where
11 internal affairs followed Johnny Rodriguez around.

12　Q And what was the result of that
13 investigation?

14　A They caught him one night taking his car,
15 setting it on fire, and filing an insurance claim.
16 He was then prosecuted for insurance fraud and fired
17 from the police department.

18　Q Was he fired for interfering in the
19 investigation?

20　A No. He was fired for being a criminal.

21　Q I see. So --

22　A Your question was if I had ever witnessed
23 any misconduct.

24　Q I understand.

327

1　A This was gross misconduct.

2　Q Yeah. But the Chicago Police Department
3 didn't discipline or fire him for interfering in a
4 murder investigation. They got him for insurance
5 fraud.

6　A No. That was the trigger that got the
7 investigation started.

8　Q Any other misconducts you've ever witnessed
9 in your career?

10　A No, just that one.

11　Q Did you ever lend --

12　A And Joe Miedzianowski I told you about
13 taking our reports and Xeroxing them and giving them
14 to gang members.

15　Q Did you ever loan Ray Guevara money?

16　A No, never.

17　Q Why do you say "never"?

18　A I'd never get it back. The guy is broke.

19　Q And so did you know about his financial
20 condition back in the '90s?

21　A I knew that he never had any money. He
22 could never go out to dinner with us because he
23 couldn't afford to buy dinner.

24　Q Would you guys talk about his money

328

1 troubles?

2　A No.

3　Q Was it something you avoided talking about?

4　A It wasn't -- I didn't really talk to Ray
5 about his personal life. We weren't that buddy
6 buddy. We worked together, but we weren't big
7 buddies.

8　Q Do you know how many kids he had?

9　A A lot.

10　Q What's a lot?

11　A More than 10.

12　Q Did he talk to you about how much he
13 appreciated overtime?

14　A No.

15　Q Did you try and get cases that would involve
16 overtime?

17　A Did we what?

18　Q Did you try to get cases that would involve
19 overtime?

20　A No.

21　　MS. ROSEN: Object to form.

22　Q How was overtime doled out in Area 5 at that
23 time, 1993?

24　　MS. ROSEN: Objection; form.

JGS_MAYSONET 4066

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

329

1    **A  If you had something to do and your**
2  **supervisor deemed that you had to stay there and do**
3  **it, overtime was approved.  If I had people in**
4  **custody for murder that I had to do lineups and get**
5  **statements and get state's attorneys in, overtime**
6  **was approved.**
7  **BY MR. AINSWORTH:**
8     Q  And so if you had a lot of cases going on,
9  you would be more likely to be able to get overtime;
10 is that right?
11     MR. ENGQUIST:  Objection; form, foundation.
12    **A  People who did more police work tended to**
13 **have more overtime, yes.**
14    Q  Vicente, he told you that a large frame
15 pistol -- let me get his exact words.
16     MR. ENGQUIST:  Which exhibit?
17     MR. AINSWORTH:  This is 3.
18     MR. ENGQUIST:  That's the -- oh, 3.  Okay.
19    Q  If you want to look at page 172 alongside
20 me.  About a third of the way down that big ole
21 paragraph, the sentence that reads, "The witness saw
22 Pistol Pete take a large frame, 9-millimeter
23 semiautomatic pistol from under the dashboard of the
24 car and put the gun in one of the heating ducts in

---

330

1  the dashboard."
2     Do you see that?
3     MR. ENGQUIST:  You said a third of the way
4  down?
5     MR. AINSWORTH:  To a quarter.  The sentence
6  starts in the middle of the page, "The witness saw
7  Pistol Pete take a large frame, 9-millimeter
8  semiautomatic pistol --
9    **A  It's in the bottom third of the paragraph.**
10    MR. ENGQUIST:  Okay.
11   **A  Yes, I see it.**
12 **BY MR. AINSWORTH:**
13    Q  Okay.  And what's a large frame,
14 9-millimeter semiautomatic pistol?
15   **A  A gun.**
16    Q  Do you know guns?
17   **A  Yes.**
18    Q  What's the difference between a large frame
19 and some other kind of 9-millimeter semiautomatic
20 pistol?
21   **A  The size of the gun.**
22    Q  Is a large frame bigger than a -- than some
23 other type of 9-millimeter gun?
24   **A  A large frame would be bigger than a**

---

331

1  medium-sized frame and a small frame.
2     Q  And does large frame refer to the grip?
3  What does it refer to?
4    **A  Large frame usually pertain to a 4-inch**
5  **barrel.**
6     Q  Have you ever seen a heating duct on a
7  dashboard that could fit a large frame, 9-millimeter
8  pistol?
9    **A  Not off the top of my head, no.**
10    Q  Doesn't that seem odd to you that Francisco
11 Vicente was telling you that he could fit a -- or
12 that he saw Pistol Pete fit a large frame,
13 9-millimeter semiautomatic Pistol into the heating
14 duct of his car?
15   **A  Did that seem odd?**
16    Q  Yeah.
17   **A  No.**
18    Q  Why didn't it seem odd to you?
19   **A  I've seen cars with guns hidden in many**
20 **different locations.**
21    Q  But placed through the heating duct?
22   **A  It's a possibility.  It didn't strike me as**
23 **odd at all.**
24    Q  So it completely did not strike you as odd

---

332

1  at all.
2     MS. ROSEN:  Objection; asked and answered.
3     MR. ENGQUIST:  Go ahead.
4    **A  No.  Because I know that guns are hidden in**
5  **cars.**
6  **BY MR. AINSWORTH:**
7     Q  When you looked at Jose Montanez's car, did
8  you look to see if the heating vents were large
9  enough to fit a large frame, 9-millimeter gun?
10   **A  No.**
11    Q  How did you come to learn that Armando
12 Serrano was at Area 5 on June 8th, 1993?
13   **A  I'd have to see that report.**
14    Q  All right.  Take a look at the report that
15 appears at page 184 of Exhibit 3.
16   **A  I see it.**
17    Q  How did you learn that Armando Serrano was
18 at Area 5?
19   **A  I don't specifically remember, but I would**
20 **assume that it was me and Guevara brought him in.**
21    Q  Did he come voluntarily?
22   **A  Yes.**
23    Q  How do you know he came voluntarily?
24   **A  Because he agreed to take a polygraph test.**

---

JGS_MAYSONET 4067

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

84 (333 to 336)

333

1    Q  Well, sometimes you have suspects under
2  arrest who agree to take polygraph tests; right?
3    **A  Yes.**
4    Q  So -- and those people are not there
5  voluntarily; correct?
6    **A  They are under arrest, yes.**
7    Q  So just because he agreed to take a
8  polygraph test doesn't mean he's voluntarily at the
9  police station; right?
10   **A  That's correct.**
11   Q  So how do you know that Armando Serrano came
12  to the police station voluntarily?
13   **A  Because if he wasn't under arrest, he would**
14 **have had to volunteer to come in.  We don't just**
15 **grab people off the street and bring them in.**
16   Q  Why don't you grab people off the street and
17  bring them in?
18   **A  It's improper.**
19   Q  It violates their constitutional rights;
20  right?
21   **A  I would say so.**
22     MS. ROSEN:  Object to the form.
23     MS. QUIST:  Join.
24   Q  How long was Armando Serrano at Area 5 on

334

1  June 8th, 1993, or June 9th, 1993?
2    **A  I'd have to look at the polygraph report.**
3    Q  Well, the polygraph test, according to your
4  report, ended at 10:30 p.m.
5    **A  Then after 10:30 p.m., he was returned to**
6  **Area 5, and he was allowed to leave.**
7    Q  Did you interrogate Armando Serrano?
8    **A  I can't remember.  No.  It was Guevara.**
9  **This is his report.  Guevara talked to him.**
10   Q  All right.  How do you know it was only
11  Guevara and not you?
12   **A  Because I don't remember talking to him.**
13   Q  So whatever happened between Armando Serrano
14  and Ray Guevara you have no knowledge of; is that
15  what you're saying?
16   **A  I don't remember, no.**
17   Q  So you can't tell us if Ray Guevara was --
18  used force against Armando Serrano; right?
19   **A  When he was up in the office, I didn't see**
20 **Ray Guevara put a hand on him.**
21   Q  Well, were you present while Armando Serrano
22  was being interrogated?
23   **A  I was in the office when Guevara was talking**
24 **with him.**

335

1    Q  How do you know that?
2    **A  I had to be.**
3    Q  Why?
4    **A  Because me and Guevara took him down to the**
5  **polygraph.**
6    Q  All right.  Which interrogation room was
7  Armando Serrano in?
8    **A  Say that again, please.**
9    Q  Which interrogation room was Armando Serrano
10 in?
11   **A  I don't remember.**
12   Q  There are six at Area 5, right, six
13  interrogation rooms?
14   **A  I don't remember.**
15   Q  Can you describe the interior of those
16  interrogation rooms at Area 5 back in 1993?
17   **A  They were plain-walled rooms, approximately,**
18 **I don't know, 10 feet wide, 20 feet deep with a**
19 **metal bench and a handcuff ring on the wall.**
20   Q  So a hook on the wall --
21   **A  Yes.**
22   Q  -- where you could handcuff somebody?
23   **A  Yes.**
24   Q  The light switch, is it inside or outside

336

1  those rooms?
2    **A  That I don't remember.**
3    Q  The walls are concrete walls?
4    **A  Cinder block.**
5    Q  Cinder block walls.
6       What kind of -- fluorescent lighting?
7    **A  Yes.**
8    Q  Tile floor?
9    **A  Yes.**
10   Q  Anything on the walls?
11   **A  No.**
12   Q  No windows on the walls?
13   **A  There might have been some kind of sign on**
14 **the walls.**
15   Q  What kind of sign?
16   **A  I think it was, like, prisoner's rights.**
17   Q  Like what kind of prisoner rights?
18   **A  I can't remember what was on the sign, but**
19 **it was something about prisoners.**
20   Q  No windows in those walls; right?
21   **A  No.  There was no windows in the walls.**
22   Q  The only window in the room was the narrow
23  window in the door; correct?
24   **A  Yes.**

JGS_MAYSONET 4068

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

85 (337 to 340)

337

1    Q  And that could be covered with paper; right?
2       MS. ROSEN:  Objection; asked and answered
3  about seven hours ago.
4    **A  Yes.**
5    Q  When a person is in one of those
6  interrogation rooms, the only way they can use the
7  bathroom is by leave of the detectives who are
8  working on that case; right?
9    **A  No.  If the detectives that were assigned to**
10 **the case had gone out to do something else, they**
11 **could knock on the door, they could call out, and**
12 **another detective would take them to the bathroom.**
13   Q  So whoever is in the interrogation room
14 needs a detective to assist them to be able to use
15 the bathroom; right?
16   **A  Yes.**
17   Q  Same to get water; correct?
18   **A  Yes.**
19   Q  Same to get food; right?
20   **A  No, not so much food as is bathroom and**
21 **water.**
22   Q  Well, how would a person who is in one of
23 those interrogation rooms get fed?
24   **A  The detectives that put them in the room**

338

1  **would be responsible for that.**
2    Q  I see.  So they were reliant upon the
3  detectives who were working that case to feed that
4  person; right?
5    **A  I'd say so, yes.**
6    Q  And in order to feed that person in the
7  interrogation room, the detectives would have to use
8  their own money to go out and buy food for that
9  person; right?
10   **A  No.**
11   Q  You'd get a sandwich from the lockup?
12   **A  That's one way.**
13   Q  Is there another way?
14   **A  To go drive and buy food.**
15   Q  And because, as we talked about seven hours
16 ago, the Area 5 is a secure -- is supposed to be a
17 secure facility, you don't want to let the people
18 who are in the interrogation rooms just wander
19 around the place freely; right?
20   **A  The doors in the interrogation rooms had**
21 **exterior locks that you could lock the door.**
22   Q  And if you had somebody on Area 5, you would
23 lock that door to ensure that they didn't walk into
24 something that they weren't supposed to be walking

339

1  into; right?
2    **A  Correct.**
3    Q  Would you -- well, strike that.
4       Is there any reason why Armando Serrano
5  would still be at Area 5 during the day on June 9th,
6  1993?
7    **A  Nope, not to my knowledge.**
8    Q  There's no telephones in the interrogation
9  rooms; right?
10   **A  No.**
11   Q  So if somebody in the interrogation room
12 needs to make a phone call, they're wholly reliant
13 upon a detective allowing them to do so; correct?
14   **A  Yes.**
15   Q  Especially in 1993 when there were no
16 ubiquitous cell phones being lugged around; right?
17   **A  There were no cell phones in 1993.**
18   Q  And just to be clear, sir, you have no
19 record of when Armando Serrano was released from
20 Area 5; right?
21      MR. ENGQUIST:  Objection; vague as to time
22 frame.  Are we talking about this case?
23      MR. AINSWORTH:  Yeah.
24   Q  For his stay at Area 5 beginning on

340

1  June 8th.
2    **A  Just my best guess that after the polygraph**
3  **exam was finished, he was returned to Area 5, and he**
4  **left.**
5    Q  And that's your guess at this point; right?
6    **A  Yes.**
7    Q  And that's what should have happened; right?
8  He should have been released after he took the
9  polygraph test; right?
10   **A  He was released and left the area.**
11   Q  All right.  But it doesn't say when he left.
12   **A  No.**
13   Q  All right.  And it doesn't say when he was
14 brought to the area; right?
15   **A  No.  Just the date.**
16   Q  And you have no record anywhere of when
17 Armando Serrano was brought to Area 5; correct?
18   **A  No.**
19   Q  That's correct?
20   **A  What was your question?**
21   Q  That's correct?
22   **A  Yes.**
23   Q  If you'd flip to just a couple pages forward
24 to 186.  We've looked at this report before.

JGS_MAYSONET 4069

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

341

1      You include all of the nick -- all of the
2  nicknames for Jose Montanez and for Pacheco and
3  Montanez?
4      **A  Yes.**
5      Q  Did you find it odd that Timothy Rankins
6  didn't know Jose Montanez's nickname of Pistol Pete
7  despite knowing Jose for seven years?
8      **A  I don't specifically remember what Timothy**
9  **Rankins said as far as remembering all the different**
10 **nicknames these guys had.**
11     Q  I'm asking a different question.
12        Do you find it odd that Timothy Rankins
13 didn't know any of the three men's nicknames despite
14 knowing them supposedly for seven years?
15     MS. QUIST:  Object to the form.
16     MS. NIKOLAEVSKAYA:  Join.
17     **A  Timothy Rankins did know --**
18     MS. ROSEN:  Object to the form.
19     **A  -- all three of them by certain nicknames.**
20     Q  Got it.
21        So -- but Timothy Rankins didn't know the
22 nicknames that they're known by according to the
23 nickname file and according to Francisco Vicente and
24 according to their own admission, that is, Pistol

---

342

1  Pete, Jordan, or Mondo; right?
2      **A  I don't know.**
3      MS. ROSEN:  Object to the form.
4      MS. NIKOLAEVSKAYA:  Join.
5      **A  I don't know if he knew them or not by those**
6  **names.**
7  **BY MR. AINSWORTH:**
8      Q  Or the street source that provided the
9  nicknames for Pistol Pete, Mondo, and Jordan to Ray
10 Guevara; right?
11     **A  What was the question?**
12     MS. ROSEN:  Objection to form.
13     MR. AINSWORTH:  That was a poor question.
14     Q  And the street source who provided the
15 nicknames Pistol Pete, Mondo, and Jordan to Ray
16 Guevara at some point before June 2nd, 1993,
17 according to that person, didn't refer to any of
18 those three men as Moses or Barrel Belly or Joker or
19 stripes; right?
20     **A  I never talked to that person.  I have no**
21 **idea.**
22     Q  Well, Ray Guevara never told you that that
23 person said any of those other names; right?
24     **A  Nope.**

---

343

1      Q  So I guess, you know, my question to you is
2  if you've got the nickname file, the street source,
3  Francisco Vicente, and all three of Jose Montanez,
4  Armando Serrano, and Jorge Pacheco admitting that
5  their nicknames were Pistol Pete, Mondo, and Jordan
6  respectively, did it strike you as odd that Rankins
7  didn't know those nicknames at all?
8      MS. ROSEN:  Object to form.
9      MS. NIKOLAEVSKAYA:  Join.
10     **A  I don't know.**
11     Q  Did you ask him?
12     **A  Hell, yes.**
13     Q  Did you ask him if he knew that the three
14 men had these other nicknames -- Pistol Pete, Mondo,
15 and Jordan?
16     **A  When he looked at the photos of these three**
17 **individuals, I told him, I says, You're giving me**
18 **all the wrong nicknames.  And I told him, I says,**
19 **those aren't the names I know these guys by.  Then**
20 **he corrected himself.**
21        **And that's when I said, You know what, I**
22 **want you to prove to me something in addition to**
23 **what you're saying as to what happened regarding**
24 **this murder.**

---

344

1      **We then put him in a car.  I says, I want**
2  **you to take me to the scene of this murder and point**
3  **it out to me.  We drove to the corner of North**
4  **Avenue and Springfield.  I said, Direct me where you**
5  **want us to go.**
6         **He said, Go north on Springfield.  He**
7  **stopped right in front of the Vargas house at 1838**
8  **North Springfield.  He said, The guy came out of**
9  **that house.**
10        **I says, Where was the van parked?**
11        **He goes, Right there.**
12        **He knew exactly where the van was parked.**
13 **He knew exactly where Rodrigo Vargas lived.**
14        **At that point in time, I became a believer**
15 **in Timothy Rankins.  There is no way in the world he**
16 **would know that unless he was there.**
17     Q  Or if somebody provided the information to
18 him; right?
19     **A  Someone would have had to take him there and**
20 **actually show him.**
21     Q  Right.  Somebody with a car; right?
22     **A  Somebody what?**
23     Q  Somebody who could take him there in a car;
24 right?

---

JGS_MAYSONET 4070

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

87 (345 to 348)

---

345

1    MS. QUIST:  Object to form.
2    A  He would have had to have been taken there
3  the night of the murder to know where the van was
4  parked.
5  BY MR. AINSWORTH:
6    Q  Or somebody who knew where the van was
7  parked could tell him; right?
8    A  That's a possibility.
9    Q  How did Timothy Rankins correct himself?
10    A  Regarding the photos?
11    Q  Regarding the nicknames.
12    A  That's the photos, the nicknames.  I told
13  him, I says, You're giving me the wrong nicknames
14  for these guys.
15    Then he corrected himself.  Well, I also
16  know this guy as Pistol Pete, this is Mondo, and
17  this is Jordan.
18    I said, Did these guys have multiple names?
19    And he goes, Yeah.
20    That's why we put all their nicknames on the
21  photos after that.
22    Q  All right.  So you said you're giving me all
23  the nicknames, and did you tell him that actually
24  Jose Montanez is known as Pistol Pete and Serrano is

---

346

1  known as Mondo --
2    A  No, he told me.
3    Q  He told you.
4    A  Yeah.
5    Q  So he told you that Jose Montanez is
6  actually also known as Pistol Pete?
7    A  After I told him I didn't know them by the
8  names he was giving me.  I says, Do you say you have
9  any other nicknames, and he goes -- these other
10  nicknames.
11    Q  What nicknames?
12    A  Regarding Jose Montanez?
13    Q  Or any of them.
14    A  Well, he also said that he knew Jose
15  Montanez as Pistol Pete.  I'd have to find his
16  statement again and read it.
17    Q  All right.  Well, your report doesn't
18  reflect that Timothy Rankins knew any of these
19  suspects by names other than the ones he provided,
20  which was Moses or Barrel Belly or Joker or Stripes;
21  right?
22    A  I'd have to read his report.
23    Q  Well, it's at 178.
24    A  No, he does not use the nicknames of --

---

347

1  initially, he does not use the nicknames of Pistol
2  Pete, Mondo, and Jordan; but when we questioned him
3  on this, he corrected himself.  He said, Yeah, I
4  also know them by other names, and then he come up
5  with the other names.
6    Q  Where did you document that --
7    A  It's not documented.
8    Q  All right.  But that's a pertinent fact.  If
9  he's able to corroborate the nicknames of these
10  people that he is identifying, that's an important
11  fact; right?
12    A  No, the fact is these guys had multiple --
13    MS. ROSEN:  Object to the form.
14    A  -- nicknames, and he knew them more by one
15  than another.
16    Q  How do you know that they had multiple
17  nicknames?
18    A  Well, to begin with he says that Moses
19  pulled up.  They called him Moses and Barrel Belly.
20  So that's two nicknames right there.
21    Q  That's just from Timothy Rankins.
22    A  Yeah.
23    Q  From no other source --
24    A  No.

---

348

1    Q  -- Right?
2    And you even thought it was weird because --
3    A  Huh?
4    Q  You even thought it was weird that he was --
5  that Rankins was referring to these guys by these
6  names you had never heard before; right?
7    A  Yes.  I thought it was odd that I had not
8  heard these names before.
9    Q  And so you wanted to confront Timothy
10  Rankins about that fact.
11    A  Yes.
12    Q  And so you wanted to know what he would say
13  when you confronted him; right?
14    A  What was the question again?
15    Q  You wanted to know what he would say when
16  you confronted him; right?
17    A  I wanted to know that if he knew them by any
18  other nicknames than these ones he was giving us
19  because they were not the ones that we had been
20  given by other people.
21    Q  And you're saying that 26 years later, you
22  remember from memory that Timothy Rankins said, Oh,
23  I also know them by Pistol Pete, Mondo, and Jordan?
24    A  Yes.  Because I remember I didn't believe

---

JGS_MAYSONET 4071

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

349

1  him initially until he started telling things that
2  fit, such as the nicknames, such as where the murder
3  happened, such as where the van was parked.
4      Q  So then why didn't you write down the fact
5  that he was now providing you information that fit
6  such as the suspects' nicknames that were known to
7  other people?
8      A  Because he knew them by different nicknames.
9  He also heard -- be called by these other names, but
10 he knew them personally by the names he gave me.
11     Q  Why on the first page -- well, here.
12        Who is the -- when is the first time that
13 you've ever told somebody that Timothy Rankins
14 identified Jose Montanez, Armando Serrano, and Jorge
15 Pacheco as Pistol Pete, Mondo, and Jordan?
16     A  I don't remember.
17     Q  Can you tell us any person that you have
18 ever in your life told that Timothy Rankins
19 identified the three men by those three nicknames?
20     A  No.
21     Q  Why doesn't it appear in his handwritten
22 statement that he knew Jose Montanez, Armando
23 Serrano, and Timothy Rankins [sic] by their
24 nicknames Pistol Pete, Mondo, and Jordan as well as

350

1  the other names he knew them by?
2      MS. NIKOLAEVSKAYA:  Objection; form.
3      A  He knew that they had multiple nicknames,
4  but he referred to them by the names he knew them
5  best as.
6  BY MR. AINSWORTH:
7      Q  I know, but why didn't -- why didn't you
8  talk with the assistant state's attorney about
9  documenting the fact that not only did Timothy
10 Rankins know them by these other nicknames that
11 nobody else seemed to use, but he also knew them by
12 their traditional nicknames that were used by other
13 people and by themselves?
14     MS. ROSEN:  Objection; form.
15     MS. NIKOLAEVSKAYA:  Join.
16     MR. ENGQUIST:  Join.
17     A  It wasn't done.
18     Q  Did you tell Assistant State's Attorney John
19 King at the time that he memorialized Timothy
20 Rankins' statement that Timothy Rankins knew
21 Montanez, Serrano, and Pacheco by their nicknames
22 Pistol Pete, Mondo, and Jordan?
23     A  No.
24     Q  Why didn't you tell John King that, Hey, you

351

1  know, I thought it was weird that he was using these
2  other nicknames, but it turns out he also knows
3  Montanez, Serrano, and Pacheco by their nicknames
4  that they go by?
5      A  He preferred to refer to them by the names
6  that he knew them best as, but he had also heard
7  them called these other nicknames by other people.
8      MR. ENGQUIST:  Where are we on time?
9      MS. ROSEN:  Seven minutes.
10     THE VIDEOGRAPHER:  6:54.
11 BY MR. AINSWORTH:
12     Q  Did you ever use -- did you make any attempt
13 to corroborate Rankins' statement with these
14 nicknames -- Moses, Barrel Belly, Joker, or
15 Stripes -- was ever used by any person to refer to
16 those three men?
17     A  No.
18     Q  You documented in your report of which the
19 first page is dated June 2nd, 1993, whatever
20 description that Tim -- that Vicente provided to you
21 of the three; right?
22     A  What was the question again?
23     Q  Actually, let me skip that one, and first
24 I'll go to -- when you talked to -- when Guevara

352

1  talked to Wilda Vargas and learned about the gas
2  station incident, she described that there were
3  three men in the car, right, at the gas station?
4      A  She said one man walked in with her husband,
5  and two guys were sitting in the car.
6      Q  And --
7      A  That's what Ray told me.
8      Q  Yeah.  And whatever description that Wilda
9  had for those three men you included in your report;
10 right?
11     A  I'd have to see the report.
12     Q  Is there any reason why you would not
13 include the description that Wilda provided of those
14 three men in your report?
15     A  I don't know what she told Ray.
16     Q  Take a look -- well, I'm just saying any
17 description that he told you she had provided, you
18 would include in your report; right?
19     A  If Guevara would have shared that
20 information with me, I would have put it in my
21 report.
22     Q  And if she provided no description for any
23 of the three people at the gas station -- well,
24 strike that.

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

353

1    The fact that there's no description of any
2 of those three men at the gas station, that
3 indicates that she didn't provide any descriptive
4 information for those three men; right?
5        MS. NIKOLAEVSKAYA:  Objection; form.
6        MS. ROSEN:  Objection; form, foundation.
7        MR. ENGQUIST:  Join.
8    **A  I'd have to look at the report.**
9    Q  Look at page 173 of Exhibit 3, please.
10   **A  She didn't need to provide a description of**
11 **the person she saw.  She immediately identified a**
12 **photo array on June 2nd that was shown to her by**
13 **Detective Guevara.**
14   Q  We talked earlier today that if you have a
15 witness to a crime, you would want to know how they
16 could describe that person; right?
17   **A  Yeah.  But she wasn't a witness to a crime.**
18   Q  She was a witness to the perpetrators;
19 right?
20   **A  She was a witness to an incident that**
21 **happened at a gas station at Central Park and North**
22 **Avenue that I had no idea that had any connection to**
23 **this murder.**
24   Q  And you thought that those people were the

---

354

1 perpetrators of the murder; right?
2    **A  When did I think this?**
3        MS. ROSEN:  Objection; form.
4 BY MR. AINSWORTH:
5    Q  After you talked -- after Vicente talked to
6 you; right?
7    **A  Yeah.  And that's the same day we showed**
8 **Wilda the photos, and she identified it -- two of**
9 **them.**
10   Q  So you wanted to know whatever identifying
11 information Wilda might have for these three
12 individuals; correct?
13   **A  No.  Because the day we learned this**
14 **information was the day she identified them.**
15   Q  Don't you want to know how she would
16 describe them before you show her the photo array?
17   **A  No.**
18   Q  Don't you want to test her ability to
19 identify the perpetrators to see if she is
20 describing people who match the description of your
21 suspects?
22   **A  No.**
23   Q  You didn't want to know that?
24   **A  She was -- it's a simple as this.  She was**

---

355

1    **shown photos.  Either she identifies people or she**
2    **doesn't.  I wasn't testing her mental abilities.**
3    Q  So you didn't want to know what her
4    description was of the offenders; right?
5    **A  She didn't see the offenders.  She saw guys**
6    **in a gas station on the 4th that turned out to be**
7    **the offenders, but she never witnessed her husband**
8    **being murdered.**
9    Q  Right.  So did you want -- so you didn't
10 want her to describe the three men that she had seen
11 in the car at the gas station; is that right?
12       MS. QUIST:  Object to form.
13   **A  You're getting this all convoluted.**
14   **We didn't know about the guys in the car**
15 **until June 2nd.  Guevara did not go talk to her and**
16 **demand a description before he showed her a photo**
17 **array.  He just showed her a photo array.**
18   Q  And I'm saying that on June 2nd, you didn't
19 want her to -- Wilda Vargas to describe the three
20 men she had seen at the gas station before she was
21 shown a photo array; correct?
22   **A  I did not.  I did not talk to Wilda.**
23   Q  And you didn't -- you weren't interested in
24 what her description was of the men she had seen at

---

356

1 the gas station; right?
2        MS. QUIST:  Object to form.
3        MR. ENGQUIST:  Join.
4    **A  On June 2nd, no.**
5        MS. ROSEN:  You have one minute.
6 BY MR. AINSWORTH:
7    Q  That's correct?
8    **A  Uh-huh.**
9    Q  That's correct?
10   **A  Yeah.**
11       MS. ROSEN:  Also you have one minute.
12   Q  And whatever description Vicente provided
13 you of the three people he knew as Pistol Pete,
14 Mondo, and Pacheco is in your report; right?
15   **A  Probably not.**
16   Q  Why wouldn't you include whatever
17 description Vicente had of those three people in
18 your report?
19   **A  I didn't need Vicente to give me their**
20 **description.  We had plenty of information on Pistol**
21 **Pete, Mondo, and Jordan in Area 5; and after he**
22 **identified their three photos, I had their heights,**
23 **weights, descriptions, where they lived, what they**
24 **had been previously arrested for, what they have**

---

JGS_MAYSONET 4073

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

90 (357 to 360)

357

1 been previously convicted of. I didn't need
2 Francisco to give me any information.
3    Q But did you know which Pistol Pete it was?
4    A After I showed Francisco Vicente the three
5 photographs, he identified Pistol Pete, Mondo, and
6 Jordan. We had ample information about all these
7 guys in Area 5.
8    Q How did you get the photo for Pistol Pete?
9    A As I said, I either went back to the office
10 and got it, or I went down to 1121 South State
11 Street and got it.
12    Q But you knew --
13    A I don't remember.
14    Q You knew when you were asking Francisco
15 Vicente that you had a problem identifying Pistol
16 Pete.
17       So why wouldn't you want whatever
18 description he could provide of Pistol Pete to you?
19    MR. ENGQUIST: Objection; asked and
20 answered, and literally over seven hours ago. We're
21 past seven.
22    THE WITNESS: Asked and answered.
23    MR. ENGQUIST: You can answer one more time.
24 Go ahead.

358

1    A One more time. After Francisco Vicente gave
2 his information, I went and got pictures of what I
3 believed to be the right three people he was
4 referring to. That's why I showed him pictures, to
5 establish that I was looking at the right three
6 people he was referring to. He identified their
7 pictures. It's as simple as that.
8    MS. ROSEN: You're at seven hours.
9    MR. ENGQUIST: Yeah, you are.
10 BY MR. AINSWORTH:
11    Q Did you look for any other --
12    MS. ROSEN: Can you just acknowledge the
13 fact of I just said?
14    MR. ENGQUIST: -- acknowledge --
15    MR. AINSWORTH: Okay. Two minutes.
16    MS. ROSEN: Okay. One-and-a-half minutes.
17    MR. ENGQUIST: I'll take one and a half.
18 BY MR. AINSWORTH:
19    Q Did you look to see how many more Mondos
20 there were in the nickname file?
21    MR. ENGQUIST: Objection; asked and
22 answered.
23    MS. BONJEAN: No.
24    MS. QUIST: Yes.

359

1    MR. AINSWORTH: Oh, I can't tell. It's been
2 so long.
3    THE WITNESS: I think you did ask if I
4 looked up --
5    MS. ROSEN: No.
6    THE WITNESS: You maybe missed one of these
7 guys.
8    MS. ROSEN: I might have. Yep.
9    THE WITNESS: Yes, you did, I think a couple
10 of times.
11 BY MR. AINSWORTH:
12    Q And what did you say?
13    MS. BONJEAN: What did you say?
14    A I said we never looked.
15    Q Did you look for Jordan?
16    A We never looked for Mondo. We never looked
17 for Jordan, other than the guys that were
18 identified.
19    Q But when the street source said it was three
20 guys named Pistol Pete, Mondo, and Jordan, why
21 didn't you look in the nickname file to see if you
22 could identify who Mondo and Jordan were?
23    A You'd have to ask Detective Guevara that
24 because I wasn't aware of that information at that

360

1 time.
2    Q But I thought he -- so later on he told you
3 that it was -- that he knew there was other
4 nicknames too?
5    A Sometime between the 24th of May and the 2nd
6 of June Ray told me he had this other information.
7    Q All right. That's what I mean. In that
8 time frame, May 24th to June 2nd, why didn't you
9 look in the nickname file to see if you could
10 identify Mondo or Jordan?
11    A I don't know if Guevara did or not.
12    Q Well, why didn't you, sir?
13    A He didn't pass that information on to me.
14    Q I thought you just said he did pass that
15 information on to you between --
16    A Eventually, but I don't remember when.
17    Q Between May 24th and June 2nd, in that time
18 frame when he passed that information on to you, why
19 didn't you look in the nickname file to see if you
20 could identify Jordan and Mondo?
21    A On June 2nd, as I previously told you, I
22 called the office and had someone look up those
23 names.
24    Q I mean, between -- before June 2nd and after

JGS_MAYSONET 4074

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

361

1  May 24th, whenever Guevara told you that those are
2  the nicknames you're looking for, why didn't you
3  look for Mondo and Jordan?
4      **A  I don't think Ray passed that information on**
5  **to me until June 2nd.**
6          MR. AINSWORTH:  I don't have any other
7  questions.
8          MS. ROSEN:  I have some questions.  I need
9  to print a document.  Can you do that?
10         MR. AINSWORTH:  What document do you need?
11         MS. ROSEN:  It was just produced Monday
12 night, and it states RFC 1282 to 1296.
13         MR. AINSWORTH:  Hang on.
14         MS. ROSEN:  1282 to 1296.  It's a training
15 record.
16         MR. AINSWORTH:  1296.
17         MS. ROSEN:  Yeah.
18         MR. ENGQUIST:  Let's go off the record.
19         MS. ROSEN:  Let's go off the record.
20         THE VIDEOGRAPHER:  Off the record at 6:37.
21         (A recess was taken from 6:37 p.m. to
22 6:45 p.m.)
23         THE VIDEOGRAPHER:  Back on the record, 6:45.
24

362

1          (Halvorsen Deposition Exhibit 9 marked
2  for identification and attached to the
3  transcript.)
4  BY MR. AINSWORTH:
5      Q Showing you what we've marked as Exhibit
6  No. 9, is that your signature, sir, where it says
7  "Complainant's Signature"?
8      **A  Yes.**
9      Q This is the complaint against Armando
10 Serrano for murder; correct?
11     **A  Yes.**
12         MR. AINSWORTH:  Okay.  I have no further
13 questions.
14         MS. ROSEN:  This will be 10.
15         (Halvorsen Deposition Exhibit 10 marked
16 for identification and attached to the
17 transcript.)
18 EXAMINATION BY COUNSEL FOR DEFENDANT CITY OF CHICAGO
19 BY MS. ROSEN:
20     Q Okay.  Mr. Halvorsen, I introduced myself to
21 you earlier today, but my name is Eileen Rosen, and
22 I represent the City of Chicago.  I just have a
23 couple questions.
24     **A  Yes.**

363

1      Q  We've put in front of you what we've marked
2  as Exhibit No. 10, and I'll represent to you that
3  that's your employee training record that's kept by
4  the Chicago Police Department.
5          Have you ever seen that document before?
6      **A  No.**
7      Q  Okay.  I'm going to direct your attention to
8  page 14 of the training record, which is also Bates
9  stamped RFC Serrano Montanez 1295.
10         You've got the page?
11     **A  You're on page 14 of 15?**
12     Q  Correct.
13     **A  Yes, I have it.**
14     Q  Okay.  If you look at the bottom of the
15 page there and you see the last entry, it says "010,
16 Pre-service detective training program," and the
17 date is 14 September 1981.
18         Do you see that there?
19     **A  Yes.**
20     Q  And does that generally correspond with your
21 recollection of when you went to training once you
22 were promoted to detective?
23     **A  That's correct.**
24     Q  Okay.  And then if you look up a couple

364

1  lines to the Item 104, four lines up from the
2  bottom, do you see there some training that's
3  labeled "In-service detective division reporting
4  procedures," and the date of that is 5 July 1983?
5  Do you see that there?
6      **A  Yes.**
7      Q  And as you sit here today, do you have a
8  specific recollection of what that training was?
9      **A  No.**
10     Q  Okay.  And as you look at the entries around
11 that time period, the in-service 1st Amendment
12 training, the investigative files training, any of
13 those trainings that are listed there.
14         As you sit here today, do you have a
15 specific recollection of any of that training that
16 you received?
17     **A  No.**
18     Q  If I were to tell you that the inservice
19 detective division reporting procedure training,
20 this Item 104 was, in fact, the training that was
21 provided by the Chicago Police Department after the
22 institution of special orders that initiated the use
23 of general progress reports, would you have any
24 reason to doubt that you got that training?

JGS_MAYSONET 4075

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

---

365

1    A  I'm sure I did.
2    Q  Okay.
3       MS. ROSEN:  I have no further questions.
4    EXAMINATION BY COUNSEL FOR DEFENDANT MATT COGHLAN
5    BY MS. QUIST:
6       Q  I have just a few questions, Mr. Halvorsen.
7    My name is Paula Quist.  I represent Matthew
8    Coghlan.  I introduced myself to you earlier.
9       Do you know Matthew Coghlan?
10   A  I have met him a couple of times.
11      Q  And in what circumstances did you meet
12   Mr. Coghlan?
13   A  He was a state's attorney up in the gang
14   prosecution unit.
15      Q  Do you know Mr. Coghlan in any capacity
16   other than his former role as state's attorney?
17   A  No.
18      Q  You were asked questions about a meeting you
19   had with Francisco Vicente on June 2nd, 1993.
20      Do you remember those questions?
21   A  Do I remember the questions?
22      Q  The subject matter of the questions.
23   A  Not all of them but --
24      Q  Was Matthew Coghlan at any meeting that you

---

366

1    had with Francisco Vicente on June 2nd of 1993?
2    A  No.  It was Matt -- it was John Dillon.
3       Q  Did you have any communication with
4    Mr. Coghlan about the Vargas murder investigation on
5    or before June 2nd of 1993?
6    A  No.
7       Q  Did you have any communication with
8    Mr. Coghlan about Francisco Vicente on or before
9    June 2nd of 1993?
10   A  No.
11      Q  Are you aware of whether Mr. Coghlan had any
12   contact with Francisco Vicente on or before June 2nd
13   of 1993?
14   A  No.
15      Q  To your knowledge, did Mr. Coghlan have
16   anything to do with Mr. Vicente's June 2nd, 1993,
17   interview at the Cook County State's Attorney's
18   Office?
19   A  No.
20      Q  Do you have any reason to believe that
21   Mr. Coghlan was involved in any way in requesting
22   Mr. Vicente's presence at the Cook County State's
23   Attorney's Office on June 2nd of 1993?
24   A  No.

---

367

1       Q  Did Mr. Vicente ever tell you that he had
2    any contact with Matthew Coghlan on or before
3    June 2nd of 1993?
4    A  No.
5       Q  Was Matthew Coghlan present for any meeting
6    that you had with anyone regarding the Vargas murder
7    before Mr. Montanez, Mr. Serrano, and Mr. Pacheco
8    were indicted for the Vargas murder?
9    A  Not to my knowledge.
10      Q  Was Matthew Coghlan present for any
11   conversations you had with anyone regarding the
12   Vargas murder before Mr. Montanez, Mr. Serrano, and
13   Mr. Pacheco were indicted for the Vargas murder?
14   A  Not to my knowledge.
15      Q  You had conversations with Timothy Rankins
16   about the Vargas murder as well; is that right?
17   A  Yes.
18      Q  Was Mr. Coghlan present for any of those
19   conversations?
20   A  No.
21      Q  When you put Mr. Rankins in a car to
22   determine whether he was familiar with the scene of
23   the murder, was Mr. Coghlan present for that ride?
24   A  No.

---

368

1       MS. QUIST:  I don't have any other
2    questions.  Thank you.
3       MR. ENGQUIST:  Julie.
4       MS. NIKOLAEVSKAYA:  None from me.
5       MR. ENGQUIST:  We'll reserve.
6       THE VIDEOGRAPHER:  This concludes the video
7    deposition of Mr. Halvorsen at 6:53.
8       (Off the video record.)
9       THE REPORTER:  Do you want to order the
10   transcript?
11      MR. AINSWORTH:  Yes.
12      THE REPORTER:  Does anyone need a copy?
13      MS. QUIST:  I'll order one, Etran.
14      MR. ENGQUIST:  The City will take a copy.
15      (Off the record at 6:54 p.m.)
16
17
18
19
20
21
22
23
24

---

JGS_MAYSONET 4076

369

1         ACKNOWLEDGMENT OF DEPONENT

2

3     I, ERNEST HALVORSEN, do hereby acknowledge

4  that I have read and examined the foregoing

5  testimony, and the same is a true, correct, and

6  complete transcription of the testimony given by me

7  and any corrections appear on the attached errata

8  sheet signed by me.

9

10

11

12 _____    _____

13  (DATE)        (SIGNATURE)

14

15

16

17

18

19

20

21

22

23

24

370

1   CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2

3     I, Joanne Ely, Certified Shorthand Reporter

4  No. 84-4169, CSR, RPR, and a Notary Public in and

5  for the County of Kane, State of Illinois, the

6  officer before whom the foregoing deposition was

7  taken, do hereby certify that the foregoing

8  transcript is a true and correct record of the

9  testimony given; that said testimony was taken by me

10  stenographically and thereafter reduced to

11  typewriting under my direction; that review was

12  requested; and that I am neither counsel for,

13  related to, nor employed by any of the parties to

14  this case and have no interest, financial or

15  otherwise, in its outcome.

16     IN WITNESS WHEREOF I have hereunto set my

17  hand and affixed my notarial seal this 18th day of

18  February, 2019.

19

20  My commission expires:  May 16, 2020

21  *Joanne E. Ely*

22  _____

23  Notary Public in and for the

24  State of Illinois

JGS_MAYSONET 4077

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

94

**A**

**abbreviations**
69:24
**aberdeen**
2:5, 3:5, 7:8
**abilities**
355:2
**ability**
12:3, 88:11,
89:6, 89:10,
354:18
**able**
39:7, 71:4,
85:8, 85:13,
85:18, 86:1,
171:19, 173:2,
174:16, 175:8,
180:7, 180:13,
195:15, 225:6,
226:4, 302:9,
304:14, 305:11,
329:9, 337:14,
347:9
**above**
212:22, 252:10
**abraham**
115:14
**absolutely**
37:3
**academy**
23:4, 23:7
**accept**
90:2, 90:4,
296:22
**accepted**
90:6, 151:23,
152:5
**access**
48:16, 54:21,
58:21, 89:3,
100:9, 100:12,
100:16, 240:12,
245:3, 256:5
**accidentally**
271:19
**accommodate**
193:11

**accompanied**
207:3
**accompany**
276:8
**according**
195:7, 200:21,
200:24, 201:8,
234:9, 275:16,
300:24, 334:3,
341:22, 341:23,
341:24, 342:17
**accounting**
162:1, 243:9
**accuracy**
278:5
**accurate**
94:23, 162:1,
167:8, 243:9,
262:9, 262:12,
262:15, 262:17,
262:21
**accurately**
12:4, 110:6,
111:22
**accused**
48:16
**acknowledge**
358:12, 358:14,
369:3
**acknowledgment**
369:1
**across**
19:1
**action**
31:13
**activity**
29:22, 29:24,
30:3, 30:7,
70:9, 86:9,
136:24, 140:4,
140:13, 141:16
**actually**
147:14, 155:4,
208:13, 212:6,
234:13, 247:6,
252:4, 257:12,
260:14, 270:8,
313:9, 313:10,

324:1, 344:20,
345:23, 346:6,
351:23
**add**
67:16, 68:8,
68:17
**added**
240:15, 240:19,
241:15, 241:19,
241:20, 241:22,
242:1, 242:3,
242:10, 242:13,
242:17, 242:20,
255:17, 267:5,
322:12, 322:17
**adding**
60:2
**addition**
140:23, 343:22
**address**
29:4, 91:21,
91:24
**addresses**
41:14
**adjacent**
61:20, 61:22
**adjoining**
61:4
**administer**
7:13
**admired**
31:17
**admission**
36:9, 341:24
**admit**
268:15, 268:16,
272:10
**admitting**
343:4
**advance**
110:16
**advancement**
25:3
**advantage**
151:6
**advice**
17:12, 109:6,
109:10, 109:13,

109:15, 110:4,
110:7, 111:1,
111:2
**affairs**
326:11
**affiliation**
250:14
**affirm**
262:8
**affixed**
370:17
**afford**
327:23
**after**
17:19, 22:9,
23:6, 28:12,
49:4, 52:12,
53:1, 63:18,
67:14, 68:2,
68:13, 68:18,
69:10, 72:5,
72:9, 72:12,
113:19, 124:22,
125:6, 126:15,
126:19, 127:3,
128:5, 130:17,
131:2, 131:20,
145:22, 146:11,
146:23, 148:20,
151:13, 172:23,
176:5, 176:21,
176:24, 187:5,
201:5, 207:4,
209:1, 209:3,
209:21, 209:23,
209:24, 220:8,
230:9, 235:7,
237:19, 238:2,
255:7, 255:16,
256:9, 256:21,
256:22, 260:19,
267:2, 268:3,
271:14, 277:12,
283:10, 319:18,
321:15, 321:17,
322:12, 322:17,
334:5, 340:2,
340:8, 345:21,

JGS_MAYSONET 4078

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

95

346:7, 354:5,
356:21, 357:4,
358:1, 360:24,
364:21
**afternoon**
119:13, 132:15,
146:6, 156:7,
156:9, 220:9
**again**
9:17, 21:3,
27:6, 34:20,
40:22, 44:8,
57:14, 61:21,
66:11, 69:21,
75:13, 77:17,
79:14, 82:14,
82:22, 86:21,
95:23, 100:11,
104:16, 104:19,
109:18, 109:22,
112:23, 118:4,
120:1, 129:6,
134:20, 137:22,
142:14, 143:12,
149:14, 151:13,
151:16, 162:6,
171:5, 202:14,
205:14, 207:15,
209:7, 213:23,
214:19, 216:2,
220:17, 220:24,
221:12, 221:17,
222:9, 222:16,
222:22, 234:7,
246:5, 250:8,
252:8, 252:9,
257:19, 260:24,
261:24, 268:12,
270:17, 296:5,
298:2, 300:22,
303:2, 303:24,
310:15, 315:14,
323:5, 335:8,
346:16, 348:14,
351:22
**against**
65:8, 65:11,
107:5, 107:15,

107:24, 108:22,
109:9, 109:20,
111:17, 152:1,
180:2, 259:10,
321:3, 323:15,
323:23, 334:18,
362:9
**age**
71:1, 74:3,
80:21
**aggravated**
72:15, 248:1,
248:16, 256:8
**ago**
14:4, 14:6,
14:21, 40:19,
40:22, 116:12,
118:13, 119:10,
119:19, 119:21,
134:13, 134:21,
143:19, 307:10,
337:3, 338:16,
357:20
**agree**
36:23, 69:13,
268:23, 294:17,
333:2
**agreed**
215:22, 332:24,
333:7
**ahead**
10:18, 36:15,
42:7, 44:6,
44:18, 45:11,
63:16, 67:3,
70:22, 77:3,
105:20, 110:7,
117:1, 129:18,
136:11, 142:14,
157:2, 165:17,
198:21, 209:12,
221:16, 222:21,
224:20, 227:1,
247:18, 255:15,
263:8, 263:21,
317:5, 332:3,
357:24
**aid**
41:22, 41:23,

303:15
**aka**
203:19
**al**
1:8, 1:14, 7:5,
7:6
**alert**
12:6, 148:11,
301:5
**alive**
239:5
**allegation**
157:23, 217:8
**alleged**
47:17, 47:19,
48:5
**allied**
135:23
**allow**
22:7, 151:6,
172:4, 172:17,
172:20, 266:7
**allowed**
20:13, 72:10,
102:23, 103:7,
103:8, 192:10,
334:6
**allowing**
339:13
**allows**
37:23
**alone**
105:13, 132:19,
151:7, 187:9
**along**
56:4, 56:20,
93:22, 94:1,
95:20, 213:1,
290:8, 309:14
**alongside**
73:5, 329:19
**alphabetically**
100:4
**already**
46:15, 46:16,
55:24, 59:10,
104:13, 142:12,
156:11, 171:17,

228:13, 250:2,
265:11, 283:10,
310:3, 311:1,
316:5
**also**
5:9, 7:17,
8:21, 22:15,
46:6, 64:9,
106:18, 141:3,
187:16, 188:3,
202:12, 207:2,
212:8, 212:15,
213:2, 220:20,
220:21, 222:3,
222:18, 224:17,
242:9, 259:23,
264:7, 265:24,
266:14, 267:13,
269:7, 273:10,
292:18, 299:22,
303:22, 304:5,
304:6, 310:22,
312:4, 315:2,
315:11, 323:23,
345:15, 346:6,
346:14, 347:4,
348:23, 349:9,
350:11, 351:2,
351:6, 356:11,
363:8
**alter**
68:12, 68:24,
229:11, 229:14
**altering**
69:2
**although**
199:10, 223:20
**always**
186:18, 199:10,
199:19, 200:11,
217:16, 318:23
**amendment**
105:14, 106:3,
106:7, 106:9,
106:12, 107:5,
107:23, 108:10,
108:22, 109:1,
109:9, 109:16,

JGS_MAYSONET 4079

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

96

110:17, 364:11
**among**
108:8
**ample**
357:6
**angel**
10:7
**anna**
245:22, 246:21,
252:10, 253:14,
254:9, 254:13,
261:2, 261:12
**announce**
91:24
**another**
22:6, 26:2,
35:7, 35:16,
36:3, 36:7,
36:8, 37:2,
140:14, 181:19,
195:17, 195:21,
235:24, 236:1,
272:18, 288:2,
288:11, 288:15,
297:15, 300:9,
324:15, 337:12,
338:13, 347:15
**answer**
11:2, 11:6,
11:16, 11:21,
16:21, 17:3,
17:8, 37:23,
54:4, 105:20,
106:21, 106:23,
107:13, 109:4,
109:6, 110:1,
111:8, 111:9,
114:10, 114:11,
142:14, 146:21,
152:2, 175:16,
176:2, 176:7,
200:12, 291:9,
291:12, 291:15,
291:20, 293:11,
315:14, 357:23
**answered**
40:9, 53:18,
137:4, 141:2,

141:19, 142:12,
152:4, 166:10,
182:7, 184:10,
185:17, 197:22,
198:20, 200:10,
232:8, 233:15,
244:3, 248:7,
250:19, 315:13,
332:2, 337:2,
357:20, 357:22,
358:22
**answering**
17:4, 205:10,
205:13
**answers**
10:20, 106:14,
176:16
**anybody**
63:20, 77:6,
78:8, 147:14,
321:1
**anybody's**
323:4, 323:6
**anymore**
22:5, 194:9,
256:21
**anyone**
15:20, 16:10,
18:1, 19:5,
59:1, 60:5,
60:9, 60:15,
103:22, 108:2,
108:12, 108:18,
108:20, 117:24,
124:4, 131:8,
152:13, 155:12,
170:23, 171:2,
216:16, 228:14,
229:2, 251:24,
256:20, 367:6,
367:11, 368:12
**anyplace**
117:20
**anything**
17:10, 68:24,
131:18, 131:19,
139:23, 158:18,
160:18, 162:21,

167:12, 192:15,
197:24, 199:7,
211:4, 217:21,
220:6, 221:6,
226:7, 226:11,
226:13, 229:11,
229:14, 230:17,
230:19, 230:20,
248:19, 260:24,
261:11, 270:7,
272:3, 336:10,
366:16
**anywhere**
15:11, 94:24,
117:19, 117:21,
184:13, 340:16
**apart**
15:12, 54:18,
106:2, 120:15,
240:7, 255:3,
258:12
**apartment**
208:19
**apiece**
120:13
**apologies**
257:12
**apparently**
269:1, 288:1,
310:5
**appear**
113:21, 133:10,
133:15, 227:4,
278:19, 278:23,
283:13, 349:21,
369:7
**appearance**
73:14, 73:18,
73:20, 73:23,
74:1, 75:9,
76:19
**appearing**
7:15
**appears**
258:15, 274:9,
311:23, 332:15
**appointment**
45:14

**appreciated**
328:13
**appropriate**
249:1
**approval**
68:14, 264:21
**approved**
66:20, 67:15,
68:19, 199:12,
199:21, 264:24,
265:4, 265:6,
265:8, 265:9,
266:1, 267:15,
269:8, 277:13,
278:9, 286:9,
286:20, 311:15,
311:19, 311:22,
318:17, 329:3,
329:6
**approves**
311:20
**approximately**
14:21, 23:15,
27:3, 28:13,
29:15, 92:13,
93:11, 245:23,
335:17
**april**
9:15, 9:19,
10:1
**arbitrary**
292:19
**area's**
179:8
**areas**
49:9, 126:2
**aren't**
283:2, 343:19
**argue**
197:3
**argued**
196:22, 199:5,
219:5
**arguing**
195:22
**argument**
170:19, 195:21,
196:2, 196:4,

JGS_MAYSONET 4080

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

97

201:10
**argumentative**
181:7, 184:15,
233:16, 250:21,
256:15, 279:10,
280:7, 307:1,
307:8
**armando**
1:11, 3:9,
5:10, 6:22, 7:5,
7:17, 7:19,
114:24, 175:1,
175:11, 176:12,
177:4, 178:10,
179:2, 179:16,
226:5, 236:16,
236:17, 273:10,
278:17, 278:24,
279:6, 279:14,
280:12, 282:1,
282:17, 282:22,
283:15, 283:24,
285:7, 299:8,
299:11, 299:14,
307:19, 308:7,
310:4, 310:7,
321:4, 332:11,
332:17, 333:11,
333:24, 334:7,
334:13, 334:18,
334:21, 335:7,
335:9, 339:4,
339:19, 340:17,
343:4, 349:14,
349:22, 362:9
**armed**
132:6, 132:8,
200:23, 248:1
**around**
63:13, 64:1,
95:2, 165:3,
165:9, 276:1,
276:6, 326:11,
338:19, 339:16,
364:10
**arrange**
45:14, 152:9,
153:24, 154:10,

154:14, 154:15
**array**
72:22, 73:5,
73:9, 73:12,
73:17, 74:11,
74:12, 74:13,
74:20, 74:24,
75:15, 75:17,
76:22, 77:22,
78:19, 83:23,
84:6, 147:15,
147:18, 147:21,
148:2, 148:4,
148:7, 148:9,
148:12, 148:14,
148:18, 148:23,
149:4, 149:9,
273:5, 273:17,
274:4, 274:20,
275:2, 307:17,
308:6, 309:12,
353:12, 354:16,
355:17, 355:21
**arrays**
72:19, 74:12,
75:2, 75:14,
75:16, 76:8,
77:20, 83:22
**arrest**
26:20, 83:19,
98:12, 142:3,
142:10, 144:22,
145:8, 145:11,
183:2, 235:6,
235:10, 235:13,
235:14, 235:17,
235:23, 235:24,
236:1, 236:16,
238:14, 238:15,
241:15, 280:4,
282:23, 283:2,
308:14, 308:15,
308:16, 318:14,
321:13, 324:1,
333:2, 333:6,
333:13
**arrested**
144:13, 144:18,

145:1, 200:23,
283:10, 283:11,
301:15, 301:23,
309:23, 310:4,
321:14, 321:16,
321:24, 322:4,
356:24
**arresting**
201:2
**arrests**
24:20, 24:21,
26:10, 26:16,
26:23
**arrive**
15:8, 94:15,
123:21, 124:1
**arrived**
15:1, 51:13,
94:16, 124:7,
124:11, 124:22,
304:20
**artist**
204:2
**arts**
183:1
**ashley**
3:11, 7:18
**ask**
10:19, 10:24,
11:11, 12:13,
27:22, 28:9,
34:22, 37:15,
38:8, 45:12,
70:13, 70:19,
109:14, 118:2,
118:9, 135:4,
140:3, 140:7,
141:12, 142:22,
143:2, 157:14,
165:22, 167:15,
167:19, 167:22,
167:23, 168:10,
205:15, 209:7,
210:2, 210:3,
218:1, 218:4,
251:24, 256:2,
283:12, 283:14,
283:15, 301:3,

306:4, 306:10,
306:13, 319:3,
323:9, 343:11,
343:13, 359:3,
359:23
**asked**
12:12, 29:21,
30:3, 30:6,
46:11, 70:16,
70:18, 107:7,
134:4, 135:7,
137:3, 141:2,
141:19, 142:12,
161:6, 166:9,
166:16, 166:22,
171:22, 172:1,
173:22, 175:14,
176:15, 182:6,
184:10, 185:17,
197:21, 198:19,
216:9, 218:7,
219:3, 220:10,
232:8, 233:15,
234:9, 248:7,
250:18, 277:8,
291:21, 301:13,
306:17, 315:13,
325:12, 332:2,
337:2, 357:19,
357:22, 358:21,
365:18
**asking**
11:1, 38:1,
47:7, 94:12,
101:9, 101:10,
106:19, 122:10,
130:24, 141:8,
143:5, 172:9,
189:8, 189:9,
209:13, 231:21,
270:10, 280:24,
292:8, 320:18,
341:11, 357:14
**ass**
170:6, 170:11,
170:16, 170:17,
170:21, 170:24,
171:3, 171:7,

JGS_MAYSONET 4081

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

98

196:18, 197:9,
197:13, 197:20,
198:3, 198:9,
198:17, 199:2,
199:4
**assault**
55:8
**assert**
105:14, 107:23,
108:9, 108:21,
109:1, 109:8,
109:16, 110:9,
110:16
**asserted**
106:2, 106:12,
107:4
**assigned**
23:8, 26:14,
51:12, 52:1,
53:19, 54:5,
60:9, 60:16,
123:15, 124:23,
125:1, 125:5,
153:17, 153:21,
230:11, 337:9
**assignment**
23:6, 29:11,
49:4, 54:8
**assist**
303:20, 337:14
**assistant**
143:21, 146:1,
350:8, 350:18
**assistants**
153:13
**assisted**
145:7, 145:10
**assisting**
145:16
**associate's**
21:23
**associated**
177:11
**assume**
11:17, 189:23,
268:20, 332:20
**assumed**
218:2

**astray**
193:7
**attached**
6:8, 121:16,
178:18, 185:3,
190:15, 223:16,
225:11, 290:21,
316:10, 362:2,
362:16, 369:7
**attacks**
63:18
**attempt**
130:23, 153:11,
158:13, 159:20,
160:17, 251:10,
351:12
**attempted**
157:23, 159:1,
248:1, 316:15
**attend**
21:10, 21:12,
21:17, 21:20,
22:4, 23:4,
160:15
**attendance**
54:7
**attending**
22:2
**attends**
20:1
**attention**
13:5, 29:21,
29:23, 30:3,
85:24, 136:5,
223:19, 247:7,
277:18, 363:7
**attorney**
5:4, 15:6,
15:19, 17:2,
17:5, 17:11,
17:14, 17:16,
18:2, 18:4,
18:5, 106:20,
107:12, 108:1,
108:4, 108:21,
109:3, 109:23,
112:17, 143:21,
146:1, 151:23,

152:8, 155:2,
157:24, 158:13,
199:13, 317:16,
318:15, 318:21,
318:24, 350:8,
350:18, 365:13,
365:16
**attorney's**
17:12, 109:5,
109:10, 115:1,
115:7, 143:24,
152:10, 200:9,
200:13, 200:17,
220:11, 318:5,
318:8, 366:17,
366:23
**attorneys**
14:18, 14:23,
16:6, 108:6,
108:9, 110:4,
110:12, 110:15,
110:19, 111:8,
118:23, 118:24,
119:24, 120:11,
200:3, 224:22,
329:5
**attribute**
39:14, 220:14
**attributed**
202:8, 202:16,
207:14, 219:14,
219:19, 245:22
**austin**
6:16, 114:20,
190:5, 190:23,
191:15, 193:19,
193:20, 195:7,
195:12, 196:3,
197:5, 197:9,
197:19, 198:13,
199:18, 199:23,
201:17, 201:22,
202:8, 204:6,
205:4, 207:13,
207:16, 213:22,
213:24, 214:21,
214:23, 219:14,
219:17, 219:20,

220:13, 222:1,
222:12, 224:15,
224:22, 224:24,
258:1
**auto**
252:11
**available**
158:22, 251:9,
274:9, 280:1,
280:13
**avenue**
146:17, 300:10,
344:4, 353:22
**average**
42:8
**avoid**
178:14
**avoided**
328:3
**aware**
12:18, 196:17,
203:5, 214:11,
254:6, 254:7,
359:24, 366:11
**away**
56:4, 62:18,
92:13, 217:17,
223:5, 229:10,
246:3, 246:11,
300:13

**B**

**baby**
216:24
**bachelor's**
21:24
**back**
27:12, 28:3,
28:5, 28:6,
28:10, 56:7,
57:7, 57:22,
59:6, 59:15,
61:17, 63:7,
68:1, 68:14,
68:18, 74:16,
75:5, 75:17,
76:10, 76:23,
77:13, 77:20,

JGS_MAYSONET 4082

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

99

78:1, 78:24,
79:3, 83:16,
83:19, 83:22,
90:9, 90:24,
93:17, 94:18,
103:7, 105:4,
105:10, 111:12,
114:20, 122:11,
122:20, 123:2,
127:11, 129:3,
129:8, 134:11,
135:24, 136:3,
136:5, 148:15,
149:21, 157:3,
173:6, 173:9,
178:23, 187:6,
189:18, 194:10,
194:12, 202:20,
216:12, 218:10,
234:16, 238:17,
238:23, 244:9,
245:16, 252:7,
254:13, 255:12,
256:12, 258:9,
264:3, 264:7,
266:13, 266:19,
272:23, 273:2,
286:14, 293:20,
293:22, 297:3,
304:20, 309:3,
309:4, 309:20,
313:19, 316:21,
316:22, 323:9,
324:10, 327:18,
327:20, 335:16,
357:9, 361:23
**backed**
194:9
**backgrounds**
75:23, 76:3
**backwards**
138:6
**bad**
258:13, 326:3
**ballistic**
206:1
**ballistics**
277:7

**bangers**
217:10
**bar**
113:19
**baroni**
3:19
**barrel**
298:20, 299:1,
299:6, 331:5,
342:18, 346:20,
347:19, 351:14
**barring**
63:10
**based**
25:18, 30:15,
31:12, 84:15,
109:10, 171:19,
197:7, 198:23,
206:22, 246:8,
248:14
**bases**
54:21
**basic**
38:20, 91:1
**basically**
32:3
**basket**
57:2, 263:16
**basketball**
280:4
**bates**
6:14, 6:18,
178:20, 185:6,
223:21, 223:22,
312:14, 363:8
**bates-numbered**
175:20
**bathroom**
337:7, 337:12,
337:15, 337:20
**batteries**
72:15
**battery**
248:1, 248:16,
256:8
**beat**
23:15, 24:7,
24:12, 24:16,

24:19, 26:11,
26:14, 28:3,
29:15
**became**
22:9, 22:21,
65:17, 66:4,
66:6, 344:14
**because**
10:15, 20:13,
22:6, 22:21,
24:5, 34:12,
39:6, 41:18,
41:20, 42:16,
46:14, 58:19,
67:16, 68:22,
74:19, 81:7,
83:8, 84:5,
88:12, 88:24,
106:13, 107:6,
137:6, 138:11,
139:14, 150:6,
153:9, 155:1,
155:19, 171:14,
171:17, 181:2,
181:22, 182:17,
187:9, 187:10,
193:5, 194:13,
196:21, 197:15,
198:3, 199:1,
199:4, 201:21,
202:12, 203:14,
203:23, 207:24,
210:17, 211:8,
213:5, 216:20,
217:16, 221:13,
228:12, 228:22,
235:2, 237:2,
244:6, 252:24,
257:22, 258:6,
283:16, 284:16,
284:21, 288:22,
293:19, 297:21,
303:7, 305:4,
313:7, 321:22,
327:22, 332:4,
332:24, 333:7,
333:13, 334:12,
335:4, 338:15,

348:2, 348:19,
348:24, 349:8,
354:13, 359:24
**become**
20:12, 22:11,
23:19, 24:3,
24:10, 30:23,
31:1, 31:24,
34:9, 34:13,
40:24, 53:21,
142:1
**becoming**
22:22, 30:11
**bed**
231:2
**been**
8:12, 10:3,
10:15, 10:20,
16:7, 32:2,
53:4, 68:13,
76:13, 76:14,
105:2, 118:17,
126:11, 126:17,
132:11, 134:15,
144:5, 146:20,
149:10, 151:21,
157:23, 161:4,
164:11, 168:23,
169:11, 191:4,
193:23, 201:3,
206:10, 208:24,
209:19, 228:2,
231:18, 233:13,
238:3, 240:10,
247:21, 250:2,
250:12, 250:16,
250:22, 251:9,
251:10, 251:13,
252:14, 254:9,
260:4, 266:5,
268:17, 271:19,
274:10, 276:13,
276:15, 277:13,
283:10, 287:22,
287:23, 292:12,
298:8, 314:23,
315:4, 315:19,
321:23, 322:14,

JGS_MAYSONET 4083

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

100

322:15, 324:12,
336:13, 340:8,
345:2, 348:19,
356:24, 357:1,
359:1
**before**
2:12, 9:6,
11:1, 11:6,
11:22, 16:21,
40:24, 63:22,
65:17, 66:3,
66:12, 93:3,
101:6, 101:11,
112:6, 114:14,
118:15, 119:5,
119:7, 119:15,
119:18, 135:15,
148:18, 148:20,
158:8, 164:13,
164:22, 165:3,
165:10, 165:12,
176:22, 182:23,
188:22, 190:18,
191:18, 201:22,
202:1, 203:15,
204:10, 218:17,
220:2, 220:4,
221:10, 226:13,
226:18, 226:22,
231:6, 231:9,
232:10, 232:18,
233:2, 233:7,
233:14, 236:19,
238:7, 246:3,
246:10, 250:2,
251:6, 251:8,
251:16, 251:17,
252:4, 262:6,
268:3, 278:5,
284:17, 285:3,
293:18, 301:15,
305:9, 311:12,
314:18, 317:18,
318:16, 319:6,
340:24, 342:16,
348:6, 348:8,
354:16, 355:16,
355:20, 360:24,

363:5, 366:5,
366:8, 366:12,
367:2, 367:7,
367:12, 370:6
**began**
19:22, 65:16,
66:12, 200:22,
313:5
**begin**
11:1, 11:7,
347:18
**beginning**
212:7, 266:7,
339:24
**begins**
247:9, 247:15
**behalf**
3:2, 3:9, 3:17,
4:2, 4:8, 4:17,
5:2, 7:15, 7:16,
7:18, 7:21,
7:22, 8:1, 8:2,
8:4, 8:6,
190:24, 265:15
**behind**
61:14, 61:15,
122:8, 285:1
**being**
10:11, 10:12,
12:12, 17:19,
20:15, 22:20,
27:18, 28:10,
31:3, 31:5,
42:2, 48:18,
52:19, 53:12,
66:14, 71:23,
111:15, 112:21,
113:1, 113:24,
120:12, 120:13,
128:2, 140:18,
148:24, 165:14,
173:11, 177:4,
178:3, 195:15,
218:23, 225:6,
230:2, 257:18,
270:19, 290:24,
299:15, 299:17,
303:23, 304:2,

319:13, 326:20,
334:22, 339:16,
355:8
**belief**
206:18
**believe**
9:15, 14:13,
15:15, 16:1,
24:18, 29:3,
32:19, 48:12,
52:11, 59:9,
113:22, 113:23,
135:12, 145:7,
150:1, 152:19,
153:3, 157:20,
165:9, 210:23,
222:11, 231:13,
234:1, 236:20,
236:24, 260:7,
260:13, 263:2,
287:11, 297:24,
348:24, 366:20
**believed**
43:4, 47:2,
47:6, 206:12,
358:3
**believer**
344:14
**bells**
297:21
**belly**
298:20, 299:2,
299:6, 342:18,
346:20, 347:19,
351:14
**belonged**
166:15
**belonging**
275:17
**below**
261:22
**bench**
335:19
**benefit**
88:2, 88:12,
88:18
**best**
91:4, 256:13,

340:2, 350:5,
351:6
**better**
25:3, 31:24,
196:2, 196:6
**between**
75:24, 128:3,
159:15, 248:16,
248:24, 314:22,
330:18, 334:13,
360:5, 360:15,
360:17, 360:24
**bias**
137:7
**biebel**
264:24, 265:3,
265:24, 268:19,
286:9, 286:20,
311:15, 311:19
**big**
75:15, 161:8,
161:13, 162:3,
172:7, 204:2,
304:3, 328:6,
329:20
**bigger**
330:22, 330:24
**bill**
52:6, 52:7,
52:9, 52:13
**binder**
99:8, 99:14,
99:18
**binders**
100:23, 101:1
**birth**
41:15
**bit**
57:8, 148:10,
193:4
**black**
75:21
**black-and-white**
121:19, 173:5,
173:8, 273:6
**block**
276:2, 336:4,
336:5

JGS_MAYSONET 4084

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

101

**blocks**
300:11
**bob**
98:11, 98:16,
98:21, 99:1,
99:4, 177:18,
180:3, 268:19
**bob's**
179:10
**body**
125:12
**bold-faced**
112:13
**bongiorno**
201:1, 202:24
**bonjean**
3:10, 3:12,
7:16, 8:21,
14:11, 98:3,
222:7, 292:6,
292:9, 292:14,
292:18, 358:23,
359:13
**bonjean's**
111:20
**book**
40:12, 40:15,
100:21, 101:23,
102:3, 102:5,
102:8
**booking**
234:23, 234:24
**books**
40:9, 100:9,
100:12, 100:15,
100:17, 100:18,
100:19, 100:23,
101:5, 101:6,
101:7, 101:12,
101:15, 101:17,
101:19, 102:11,
102:14, 102:18,
102:20, 102:21,
102:23, 103:4,
103:5, 103:9,
103:12, 103:18,
103:22, 104:5,
104:9

**borrowed**
300:9
**both**
24:11, 74:21,
126:10, 126:22,
132:22, 187:10,
188:7, 188:15,
204:22, 205:6,
205:21, 249:2,
265:7, 265:9,
285:11, 307:14
**bothered**
199:10, 199:19,
199:23
**bottom**
185:7, 199:8,
212:7, 212:17,
212:19, 213:16,
213:18, 225:16,
244:11, 248:20,
287:20, 300:7,
304:4, 307:12,
317:1, 330:9,
363:14, 364:2
**boulevard**
4:13
**bouto**
131:11, 135:19,
135:21, 139:8,
145:23, 146:24,
151:14, 152:1
**box**
76:17, 98:12,
264:12, 264:14,
264:18, 316:2
**boxes**
76:12
**brand**
28:17, 251:8
**break**
11:20, 11:21,
11:22, 105:3,
181:23, 181:24,
182:2, 188:23,
189:5, 189:9,
189:10, 189:12,
189:13, 272:18
**bribe**
151:24, 152:8,

153:11, 155:2,
158:13
**bribed**
157:24, 316:15
**bribery**
159:1, 159:8,
159:20, 160:17
**bring**
153:24, 157:13,
157:21, 158:2,
183:17, 333:15,
333:17
**bringing**
154:12
**broke**
327:18
**brooklyn**
3:15
**brought**
13:4, 102:22,
145:4, 153:9,
155:9, 155:20,
194:24, 237:19,
291:10, 291:14,
293:2, 294:12,
294:18, 295:9,
295:16, 296:13,
316:24, 317:7,
317:13, 317:21,
318:4, 318:6,
332:20, 340:14,
340:17
**brueggen**
4:11, 8:6,
108:14, 108:17,
119:1
**buddies**
328:7
**buddy**
328:5, 328:6
**buick**
300:12
**build**
281:22
**building**
17:23, 208:20,
208:22, 285:2
**built**
63:19, 63:22

**bullet**
206:4, 206:7,
206:13, 206:16,
206:18, 207:21,
270:15, 270:19,
271:16, 271:22,
272:7, 272:14,
277:6
**bullets**
204:23, 205:7,
205:17, 205:18,
205:22
**bullshit**
203:24, 204:2,
207:12
**bum**
216:24
**bunch**
80:23, 81:14,
81:23, 83:4,
234:20
**buried**
255:19
**business**
136:13
**busters**
207:3, 207:10,
207:12, 207:17,
207:23, 208:3,
208:6, 208:10,
208:13, 208:16,
209:8, 209:16,
210:4, 210:7,
210:17, 211:9,
211:16, 269:18,
270:8
**busy**
91:2, 91:3,
91:23
**buy**
89:3, 327:23,
338:8, 338:14
**buying**
210:11

C

**cabinets**
57:10

JGS_MAYSONET 4085

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

102

cadet
19:18, 19:20,
19:21, 19:23,
20:12, 20:15,
20:21, 21:8,
22:3, 22:15,
39:24, 40:1,
49:23, 50:4,
50:10
cadets
50:6
cafeteria
14:7, 14:9,
14:15, 15:3,
15:5, 15:12,
15:14, 15:15,
16:5
cal
14:21, 15:11
calculator
231:22
caliber
39:1, 39:3
california
14:8, 14:10,
15:1, 156:16
call
45:14, 57:18,
88:12, 89:16,
90:7, 91:7,
91:8, 91:11,
91:18, 92:1,
92:16, 93:7,
111:6, 123:23,
125:3, 152:2,
173:14, 176:18,
200:8, 222:23,
235:12, 264:16,
308:13, 337:11,
339:12
called
40:3, 54:7,
54:11, 93:3,
145:24, 151:21,
155:8, 158:15,
158:19, 172:24,
174:4, 177:9,
180:1, 181:14,

207:3, 207:10,
207:17, 220:9,
235:13, 287:5,
298:15, 320:2,
320:4, 347:19,
349:9, 351:7,
360:22
calling
91:10, 152:3,
173:18
calls
10:22, 29:19,
36:13, 44:3,
44:16, 77:2,
88:7, 88:19,
89:7, 89:10,
89:11, 89:12,
89:18, 89:22,
90:2, 90:4,
90:6, 112:8,
118:8, 134:23,
136:9, 137:18,
150:24, 220:18,
232:14, 254:18,
308:12, 308:13
came
50:16, 72:8,
89:21, 116:13,
132:14, 144:11,
146:1, 215:22,
216:5, 218:14,
221:7, 234:12,
272:15, 283:17,
283:20, 297:24,
326:6, 332:23,
333:11, 344:8
camera
22:13
can
8:18, 8:23,
11:20, 12:13,
12:14, 17:2,
27:10, 35:4,
49:19, 54:23,
57:4, 85:24,
86:5, 86:13,
87:15, 88:2,
99:5, 106:23,

107:13, 111:9,
114:10, 114:11,
120:19, 120:23,
121:21, 121:24,
142:14, 156:10,
168:20, 168:22,
170:22, 175:17,
178:16, 182:2,
184:22, 198:5,
212:12, 212:18,
236:10, 237:20,
237:23, 238:11,
238:19, 267:17,
267:21, 268:4,
268:20, 269:23,
270:3, 273:12,
280:3, 280:14,
281:24, 283:9,
283:14, 290:7,
305:22, 315:14,
318:13, 335:15,
337:6, 349:17,
357:23, 358:12,
361:9
can't
12:10, 74:8,
81:10, 81:12,
88:22, 94:23,
122:8, 151:17,
158:11, 173:5,
192:19, 198:8,
219:22, 221:1,
257:22, 269:23,
272:10, 272:13,
283:12, 309:19,
323:20, 323:22,
326:8, 334:8,
334:17, 336:18,
359:1
cannot
225:7
canvas
227:15, 268:7,
268:10
capacity
20:2, 365:15
car
29:15, 38:2,

54:12, 54:14,
146:12, 147:3,
149:11, 149:16,
149:21, 149:22,
149:23, 150:2,
150:12, 150:14,
150:16, 150:23,
151:5, 157:16,
157:17, 157:19,
157:22, 204:21,
205:5, 205:17,
205:21, 206:2,
206:5, 206:6,
206:8, 206:9,
206:13, 206:19,
207:7, 207:19,
207:20, 231:4,
246:10, 246:23,
270:15, 270:19,
271:14, 271:19,
271:22, 272:6,
272:15, 273:12,
275:17, 275:21,
276:14, 276:19,
277:6, 277:8,
282:2, 282:3,
297:22, 297:24,
298:1, 300:13,
326:14, 329:24,
331:14, 332:7,
344:1, 344:21,
344:23, 352:3,
352:5, 355:11,
355:14, 367:21
card
59:8
cards
59:5, 59:10,
183:2
care
291:15
career
84:18, 116:6,
327:9
careful
38:16, 87:7,
229:18
carpool
124:4

JGS_MAYSONET 4086

cars
150:2, 331:19,
332:5
cases
32:9, 36:18,
36:19, 36:20,
36:21, 48:5,
50:22, 50:24,
54:5, 65:19,
71:22, 72:2,
72:6, 72:8,
72:10, 72:11,
81:19, 144:3,
144:8, 190:24,
197:3, 255:19,
328:15, 328:18,
329:8
cast
208:4
catalogued
101:4
caught
326:14
cause
22:4, 35:12
caused
206:8, 295:14,
321:19, 322:8
causing
197:17
cb
234:19, 235:2,
235:4, 236:12,
236:13, 236:15,
236:16, 241:11,
241:14
celeste
115:9, 115:12
cell
339:16, 339:17
center
5:5
central
126:8, 126:11,
146:17, 234:23,
234:24, 353:21
certain
34:1, 102:5,

102:6, 275:1,
341:19
certainly
301:11
certificate
21:14, 370:1
certified
2:13, 370:3
certify
370:7
chance
111:17, 112:2,
278:4
change
51:19, 156:2,
156:23
changed
51:17, 51:20,
155:20, 156:22,
264:14, 265:12,
268:22, 316:6
changing
155:23, 214:19
characteristics
80:22
characterize
192:11, 198:16
characterizes
192:12
characterizing
214:13
charge
105:3, 283:8
charged
131:8, 131:10,
144:13, 144:18,
322:5
charges
151:23, 152:6
charging
283:5, 283:6
check
124:12, 176:19,
247:9, 247:14,
247:16
checked
124:21, 176:10,
178:7, 178:24,

179:14, 179:20,
180:2
checked"
179:12
checking
189:24
cheerful
133:18, 133:20,
133:22, 133:23,
133:24
chicago
1:18, 2:7, 3:7,
3:22, 4:6, 4:15,
4:17, 4:22, 5:6,
7:8, 8:3, 13:10,
13:16, 19:17,
21:13, 21:15,
21:18, 26:4,
36:21, 39:22,
75:20, 76:2,
76:4, 100:24,
115:18, 173:4,
174:9, 177:13,
177:18, 191:1,
199:19, 200:5,
240:9, 246:13,
246:17, 279:19,
308:12, 327:2,
362:18, 362:22,
363:4, 364:21
children
259:10, 259:13
chino
291:5, 293:7
choice
49:7
choose
105:14
chronological
268:1, 268:2,
268:12
cinder
336:4, 336:5
circumstances
116:10, 245:7,
274:22, 365:11
circumstantial
186:1, 186:2,

186:4, 186:7,
186:10, 186:15
city
4:17, 8:3,
21:13, 21:15,
21:17, 22:2,
126:1, 174:9,
177:13, 177:17,
190:24, 201:23,
279:19, 362:18,
362:22, 368:14
civil
108:6, 108:8,
110:19
civilian
20:2, 21:8,
64:5, 64:11
civilians
63:13, 64:1
claim
201:12, 326:15
claimed
270:20, 285:8
claims
111:17, 289:19
clarified
193:2
clarify
60:8, 193:2,
193:10
clark
4:20, 29:3,
29:6
clasp
57:24, 58:5
class
149:12
clean
43:22
clear
67:23, 74:15,
283:24, 339:18
cleared
321:13, 321:22,
322:10
clearing
242:9, 321:9,
321:11

JGS_MAYSONET 4087

clearly
271:11
clerked
323:19
client
17:5, 106:20,
107:12, 109:3,
214:17
cline
216:13, 216:20,
217:7, 217:11
clip
56:23
close
49:12, 210:4,
221:6
closed
260:19
closed-ended
37:24
clothing
71:2, 80:22
coach
52:21
cobras
128:3
coffee
227:18, 227:20,
227:24, 228:3,
228:8, 228:15,
229:3, 229:8,
266:21
coghlan
4:2, 7:23,
365:4, 365:8,
365:9, 365:12,
365:15, 365:24,
366:4, 366:8,
366:11, 366:15,
366:21, 367:2,
367:5, 367:10,
367:18, 367:23
cohen
3:11, 7:18
coincidence
297:18
cold
202:2, 246:13,

246:17
collect
89:12, 89:19,
89:21, 89:22,
90:7, 151:22,
152:3
college
20:1, 20:13,
21:10, 21:12,
21:13, 21:15,
21:17, 22:5
colleges
22:2
collision
204:23, 205:7
color
38:2, 71:1,
74:3, 75:22,
121:18, 307:18
combination
20:18
come
50:20, 53:5,
54:5, 89:19,
105:4, 118:2,
145:10, 145:14,
151:12, 151:16,
152:10, 156:19,
160:21, 162:12,
200:3, 220:1,
234:16, 282:21,
285:6, 287:3,
287:8, 287:9,
298:13, 298:15,
304:20, 316:21,
332:11, 332:21,
333:14, 347:4
comfortable
199:14
coming
63:20, 222:13
commander
27:16, 27:23,
27:24, 28:8,
28:9, 216:13,
326:8
comment
292:20

commission
370:20
commit
305:10, 305:13,
305:15, 305:21,
324:16, 325:16
committed
85:20, 85:21,
138:19, 201:5,
232:19, 232:23,
259:13
committing
254:16
common
278:8, 325:2,
326:1
commotion
197:18
communicate
94:3
communication
366:3, 366:7
communications
191:10
community
20:24
compare
268:4
comparing
267:18
competitive
30:13
complainant's
362:7
complaint
6:22, 323:14,
323:23, 362:9
complaints
321:3, 321:6
complete
220:22, 222:19,
369:6
completed
56:11, 69:11,
187:5, 228:1,
261:10, 262:3,
314:19
completely
202:2, 202:3,

290:9, 331:24
completeness
219:11, 221:15,
222:5
composition
148:8
comprise
72:11
comprises
57:21
comprising
236:2
computer
54:6, 54:9,
54:13, 54:17,
54:20, 57:10,
60:23, 62:14,
67:18, 67:19,
68:7, 99:17
computer-generat-
ed
56:20, 99:15
computer-printed
99:8, 99:10
conceal
211:11
concern
63:12
concerned
107:14
concludes
368:6
concrete
336:3
condition
12:2, 53:13,
327:20
conduct
37:10, 37:12,
72:18, 74:11,
75:18, 78:24,
79:3, 83:23,
163:15, 255:7
conducted
45:17, 77:20,
83:2, 127:17,
128:7, 129:8,
192:23

JGS_MAYSONET 4088

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

105

conducting
38:17, 40:21,
72:21, 129:3
confess
137:13, 137:16,
138:4, 138:9
confessed
35:8, 35:17,
36:3, 36:8,
37:2, 288:12,
288:15, 288:19,
289:15, 289:20
confessing
295:18
confession
296:17, 296:20,
296:23, 297:15
confidence
78:12, 78:16,
78:18
confidential
115:20, 115:23,
116:3, 116:5,
116:11, 116:15,
116:21, 117:2,
117:5, 117:6,
117:14, 117:22,
140:18, 326:10
confidentiality
117:11, 213:14
confirm
207:20, 210:16
confirmed
207:7
confirming
203:6, 203:20
conflict
128:2, 194:14
confront
217:8, 348:9
confronted
348:13, 348:16
confused
104:17, 237:13
confusing
38:7, 121:5,
137:23, 228:23,
268:13

confusion
295:14
connect
177:3
connection
201:7, 248:24,
353:22
connelly
4:19
consider
122:19, 251:12,
264:9
considered
215:3, 215:6
considering
169:24
consisted
273:6, 273:17
consisting
307:18
constitutional
333:19
consult
107:22, 108:2,
108:6, 108:8,
108:20, 110:15,
110:20, 110:22,
239:24
contact
131:22, 151:12,
151:16, 152:17,
152:22, 153:1,
153:7, 257:3,
287:3, 287:10,
287:14, 304:11,
304:14, 306:22,
307:6, 366:12,
367:2
contacted
115:5, 146:9,
153:4, 153:23,
187:8, 325:2
contacts
116:3
contained
229:22, 274:4
context
14:5, 143:20

continue
43:12, 43:20,
44:1, 44:13,
77:23
continued
72:8, 224:10
continuously
27:4, 27:7,
27:9, 27:10,
51:15
conversation
17:13, 132:11,
134:8, 139:7,
139:12, 146:11,
154:20, 159:6,
159:7, 159:14,
166:19, 222:22,
225:7, 302:17,
302:20, 303:9,
303:11, 316:16
conversations
17:1, 17:2,
17:10, 17:15,
109:23, 114:8,
219:16, 221:17,
224:21, 256:18,
257:19, 367:11,
367:15, 367:19
conversely
208:3
convicted
115:1, 131:13,
201:11, 357:1
conviction
131:17
convoluted
355:13
cook
5:2, 5:4, 8:1,
89:15, 89:18,
116:13, 117:17,
140:19, 151:22,
151:24, 152:10,
154:8, 154:15,
159:20, 294:12,
316:24, 317:15,
317:21, 318:4,
318:7, 366:17,

366:22
cooperate
325:4, 326:2
cooperating
64:7
cooperative
86:12, 86:17,
86:22, 283:17,
302:21
cop
231:19, 231:24
copied
229:17
copies
58:7, 58:9
copy
58:15, 98:16,
98:23, 121:19,
228:12, 235:2,
235:4, 242:23,
243:11, 243:15,
243:16, 243:22,
244:1, 247:20,
247:24, 252:14,
261:5, 290:5,
368:12, 368:14
corner
185:7, 208:19,
225:16, 259:23,
312:17, 313:12,
313:16, 313:21,
314:3, 314:9,
314:16, 315:1,
315:10, 315:20,
344:3
corporation
191:13
corrected
343:20, 345:15,
347:3
corrections
369:7
correctly
32:24
correspond
363:20
corroborate
85:8, 85:13,

JGS_MAYSONET 4089

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

106

85:17, 86:1,
139:14, 146:4,
146:7, 207:24,
210:7, 211:16,
302:9, 347:9,
351:13
**corroborated**
164:4
**corroboration**
299:5
**could**
26:12, 29:4,
32:19, 32:22,
36:9, 38:4,
41:18, 41:20,
41:23, 41:24,
55:5, 56:3,
56:7, 60:20,
62:15, 63:8,
63:24, 65:10,
66:23, 67:16,
67:21, 69:21,
75:3, 76:17,
77:17, 79:10,
81:5, 87:14,
88:13, 88:17,
89:14, 97:12,
102:11, 106:24,
107:19, 112:23,
129:6, 130:2,
137:22, 140:22,
142:2, 149:9,
152:11, 155:21,
164:4, 169:11,
172:12, 177:10,
187:9, 199:6,
200:15, 208:7,
230:20, 239:4,
240:11, 248:14,
250:12, 251:9,
251:10, 251:11,
255:11, 279:6,
279:13, 283:24,
288:22, 299:14,
302:15, 308:21,
327:22, 331:7,
331:11, 335:22,
337:1, 337:11,

338:21, 344:23,
345:7, 353:16,
357:18, 359:22,
360:9, 360:20
**couldn't**
41:13, 63:6,
63:20, 68:8,
81:8, 164:19,
166:1, 196:10,
199:7, 200:1,
207:10, 208:12,
208:23, 211:13,
239:11, 256:13,
276:12, 279:23,
327:23
**counsel**
7:12, 8:13,
106:3, 106:8,
106:21, 109:15,
109:17, 113:10,
114:9, 121:17,
191:14, 192:5,
362:18, 365:4,
370:12
**county**
5:2, 5:4, 8:1,
89:15, 89:19,
116:13, 117:17,
140:19, 151:22,
151:24, 152:10,
154:8, 154:16,
159:20, 294:12,
316:24, 317:16,
317:22, 318:4,
318:7, 366:17,
366:22, 370:5
**couple**
16:16, 27:11,
27:13, 57:9,
66:16, 245:23,
340:23, 359:9,
362:23, 363:24,
365:10
**course**
40:3, 40:5,
40:8, 40:17,
40:21
**court**
1:1, 7:10,

7:13, 19:8,
72:23, 79:19,
81:18, 81:21,
84:5, 320:5,
370:1
**courtroom**
16:9, 16:13,
16:14, 16:15,
16:19, 16:23,
17:17, 17:19,
17:20, 112:14
**courtrooms**
15:16, 15:18
**cover**
64:24
**covered**
337:1
**cpd**
213:6, 213:9,
273:6
**cr**
216:14, 216:19,
326:9
**crack**
256:14
**crazy**
170:6, 170:11,
170:15, 170:17,
170:21, 170:24,
171:3, 171:7,
196:18, 197:9,
197:13, 197:20,
198:3, 198:6,
198:9, 198:17,
199:2, 199:4
**cream**
31:6, 31:9
**create**
67:11, 67:13,
68:1, 69:11,
74:11, 116:20,
147:18, 228:7,
258:4, 280:10
**created**
25:18, 30:15,
147:21, 148:4,
229:12, 229:15,
229:18, 253:22,

254:9, 310:17
**creating**
55:11, 278:22,
282:7, 308:6
**credibility**
137:9
**credible**
167:16, 168:11
**credits**
20:18
**crew**
95:13
**crime**
38:21, 38:22,
39:2, 39:14,
47:13, 48:16,
50:20, 55:8,
61:5, 61:9,
64:6, 77:7,
85:19, 85:20,
85:21, 86:19,
86:24, 127:24,
131:8, 131:10,
140:3, 142:20,
154:16, 163:7,
218:3, 226:4,
226:13, 226:17,
259:16, 277:7,
285:8, 287:12,
300:1, 302:23,
305:14, 305:15,
353:15, 353:17
**crimes**
50:19, 51:3,
51:4, 51:7,
51:13, 51:16,
51:20, 57:2,
57:4, 57:12,
57:15, 57:19,
60:5, 60:10,
60:13, 61:12,
61:20, 61:23,
62:2, 62:17,
63:3, 63:7,
64:2, 71:17,
71:18, 72:2,
72:9, 72:12,
72:15, 72:16,

JGS_MAYSONET 4090

86:14, 87:4,
91:7, 91:11,
92:12, 92:14,
92:22, 93:1,
93:3, 101:12,
101:15, 101:17,
102:16, 103:3,
103:5, 103:8,
103:9, 104:4,
124:9, 124:11,
139:18, 139:21,
140:8, 140:22,
141:5, 141:8,
142:2, 142:9,
142:17, 142:23,
143:3, 143:6,
152:18, 252:11,
258:19, 259:10,
259:13, 259:14
**criminal**
33:22, 34:18,
48:15, 86:9,
87:13, 87:19,
97:10, 106:15,
107:8, 108:3,
112:4, 140:4,
140:13, 141:15,
142:9, 241:18,
241:21, 321:3,
326:20
**criminals**
142:3
**critically**
85:4
**crop**
31:7, 31:9
**crowd**
95:1
**csr**
1:24, 370:4
**curious**
210:6, 210:9,
232:17
**currently**
57:9
**custody**
50:18, 76:13,
132:5, 195:24,

287:11, 321:12,
329:4
**cut**
122:14
**cv**
1:7, 1:13, 7:5,
7:7

---

### D

**daffada**
3:19
**daily**
54:7
**daley**
5:5
**damage**
204:21, 205:5,
205:17, 205:21,
206:5, 207:8,
207:19, 207:21,
271:13, 277:6
**damaged**
270:15, 270:19
**dan**
14:17, 15:6,
15:19, 17:11,
17:23, 18:6,
18:18, 19:3,
108:1, 108:16,
108:24, 110:20,
110:22, 112:16,
119:1
**dangerous**
26:20, 26:24,
142:3, 142:10
**danny**
195:21
**dashboard**
329:23, 330:1,
331:7
**databases**
54:17
**date**
38:21, 101:19,
124:17, 124:18,
124:20, 184:11,
228:1, 242:24,
263:4, 263:9,

263:11, 264:5,
264:9, 265:6,
265:7, 265:8,
265:13, 265:20,
266:1, 266:5,
266:15, 267:13,
267:15, 268:15,
268:19, 268:22,
269:5, 269:7,
312:5, 312:21,
313:1, 313:3,
314:15, 314:24,
315:2, 315:11,
315:19, 322:9,
340:15, 363:17,
364:4, 369:13
**dated**
182:10, 262:18,
263:15, 263:22,
263:24, 264:1,
264:3, 264:7,
264:16, 264:19,
269:21, 312:9,
351:19
**dates**
41:14, 120:1,
158:11, 265:9,
313:6, 313:7
**dave**
8:6, 108:16,
108:17
**david**
4:11, 293:1
**day**
4:4, 14:21,
15:2, 15:11,
19:8, 95:17,
96:10, 123:16,
124:15, 155:20,
156:3, 199:1,
201:8, 220:12,
230:9, 231:6,
249:20, 249:21,
249:23, 251:5,
251:7, 251:16,
251:17, 252:4,
255:23, 255:24,
262:24, 263:2,

263:7, 263:9,
264:11, 264:12,
266:7, 266:10,
276:14, 292:12,
292:17, 301:15,
314:23, 315:5,
315:21, 316:2,
339:5, 354:7,
354:13, 354:14,
370:17
**day-shift**
96:15, 96:20
**days**
53:7, 209:21,
209:24, 216:2,
218:3, 266:13,
271:12
**dead**
58:3, 234:11,
255:10
**dealing**
84:22, 239:18
**dealings**
217:19
**dealt**
176:13
**dean**
3:13
**decedent**
233:2
**december**
290:4
**deciding**
108:9
**decision**
109:8, 200:9
**decisions**
79:19
**dedicated**
90:14
**dedication**
31:19, 31:21
**deemed**
324:24, 329:2
**deep**
335:18
**defend**
191:4, 191:8,

JGS_MAYSONET 4091

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                              108

191:14
**defendant**
3:17, 4:2,
4:17, 7:23, 8:3,
10:13, 33:22,
46:22, 48:15,
87:20, 295:12,
362:18, 365:4
**defendants**
1:9, 1:15, 4:8,
5:2, 8:5, 8:7,
206:10, 273:18,
304:18, 305:12,
308:22
**defending**
191:11
**defense**
33:18, 87:13
**degraf**
98:11, 98:21,
99:1
**degraf's**
98:16, 177:18,
180:3
**degree**
21:14, 21:24
**delay**
42:15, 42:22
**demand**
355:16
**demonstrates**
286:23
**denied**
285:11
**deny**
272:10
**denying**
189:13
**department**
13:10, 13:16,
19:17, 20:2,
20:10, 20:14,
20:20, 22:24,
26:4, 36:21,
39:23, 40:5,
41:1, 41:3,
53:15, 75:20,
76:2, 76:4,

100:24, 111:24,
115:19, 116:2,
173:5, 240:9,
243:6, 244:4,
308:13, 319:24,
324:13, 326:17,
327:2, 363:4,
364:21
**department's**
243:13
**department-issued**
149:20
**depend**
129:20
**depends**
129:16, 129:19
**depicts**
123:8
**deponent**
369:1
**deposed**
10:4, 10:8,
10:11
**deposition**
1:17, 2:1,
6:10, 7:3, 9:6,
9:14, 9:18,
10:16, 105:16,
105:22, 110:16,
110:18, 111:20,
118:11, 118:22,
119:24, 121:15,
121:21, 131:6,
178:17, 185:2,
189:21, 190:14,
192:20, 192:22,
193:3, 223:15,
225:10, 290:20,
316:9, 362:1,
362:15, 368:7,
370:6
**depositions**
9:22
**descent**
195:8, 195:15
**describe**
57:4, 57:6,
70:13, 70:18,

70:20, 71:7,
71:12, 71:14,
121:24, 335:15,
353:16, 354:16,
355:10, 355:19
**described**
75:10, 161:22,
207:8, 248:17,
352:2
**describing**
354:20
**description**
73:19, 125:17,
125:20, 125:23,
126:20, 126:24,
162:3, 171:23,
172:4, 172:11,
172:20, 300:17,
351:20, 352:8,
352:13, 352:17,
352:22, 353:1,
353:10, 354:20,
355:4, 355:16,
355:24, 356:12,
356:17, 356:20,
357:18
**descriptions**
356:23
**descriptive**
353:3
**deserve**
36:19
**desk**
53:16, 53:17,
53:20, 53:21,
53:24, 54:3,
55:3, 59:11,
60:10, 91:15,
91:16, 91:18,
92:6, 92:7,
92:8, 92:9,
92:17, 92:18,
92:20, 92:21,
93:9, 102:16,
158:20
**desks**
57:10, 60:23,
62:14, 91:12

**despite**
196:14, 256:5,
341:7, 341:13
**destroy**
117:10, 201:13,
229:4
**det**
69:19, 70:3,
70:4
**detail**
71:4, 86:5
**detailed**
300:17
**details**
38:23, 158:1,
158:4, 158:9
**detectives**
15:23, 16:1,
16:3, 18:9,
18:19, 31:6,
31:9, 31:13,
31:14, 31:16,
49:6, 49:13,
50:20, 54:5,
54:6, 54:10,
55:2, 60:20,
61:24, 62:5,
62:7, 62:8,
62:9, 62:14,
65:19, 80:13,
90:17, 90:18,
90:20, 91:13,
91:23, 93:17,
94:17, 95:1,
100:14, 101:5,
101:8, 101:10,
104:12, 125:4,
125:5, 125:7,
133:1, 133:5,
182:11, 184:19,
185:24, 186:5,
186:14, 186:24,
187:17, 188:1,
213:13, 224:7,
249:16, 249:18,
252:3, 253:2,
253:10, 253:11,
253:22, 275:16,

JGS_MAYSONET 4092

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

109

291:7, 291:11,
291:13, 293:2,
293:9, 294:5,
294:18, 294:23,
295:9, 295:11,
295:16, 307:14,
317:7, 317:21,
318:3, 319:11,
319:14, 319:20,
319:22, 319:24,
320:3, 320:4,
320:8, 320:10,
320:14, 320:17,
337:7, 337:9,
337:24, 338:3,
338:7
**determine**
39:7, 41:11,
43:13, 44:1,
44:14, 55:1,
55:5, 78:17,
248:24, 367:22
**determined**
155:9, 207:11
**determining**
107:22, 270:8
**dets**
70:5, 186:18,
186:24
**developed**
53:13
**developments**
187:7
**deviate**
69:15
**devon**
29:6
**dial**
90:9
**dickens**
276:2
**dickinson**
52:16, 52:17,
52:20, 53:2
**died**
191:16, 193:21,
194:16
**difference**
330:18

**different**
47:18, 47:21,
54:20, 61:4,
90:12, 93:5,
126:2, 129:19,
146:20, 148:10,
172:9, 188:23,
193:4, 197:4,
214:7, 270:21,
274:8, 290:9,
331:20, 341:9,
341:11, 349:8
**difficulty**
12:7, 12:17
**dillon**
5:2, 8:1,
143:11, 143:13,
143:17, 143:18,
152:24, 153:1,
153:17, 153:18,
153:22, 154:10,
154:14, 154:15,
154:20, 156:18,
157:5, 159:1,
159:4, 159:7,
159:15, 159:19,
159:22, 160:8,
186:19, 316:17,
366:2
**dillon's**
165:13
**dinner**
327:22, 327:23
**direct**
89:19, 90:9,
185:4, 247:7,
277:17, 300:4,
344:4, 363:7
**directing**
128:6
**direction**
92:14, 250:13,
251:2, 251:4,
251:7, 255:18,
370:11
**disappeared**
210:13, 216:1
**discipline**
327:3

**disciplined**
324:12
**discretion**
28:1
**discuss**
16:22, 106:19,
148:8
**discussing**
142:20, 195:17
**discussions**
16:9, 111:7
**display**
77:9
**displayed**
76:21, 78:12
**dispute**
214:1, 219:18,
221:1, 225:7,
250:14, 257:22,
257:24, 296:12,
296:16
**disputing**
204:14, 224:23,
258:3
**distinctly**
199:17
**distinguishing**
71:2, 275:7,
275:11
**district**
1:1, 1:2, 23:9,
23:10, 23:14,
23:16, 23:17,
26:7, 26:11,
26:15, 27:5,
27:8, 28:15,
28:17, 28:20,
28:24, 29:2,
29:8, 29:11,
29:14, 29:17,
29:18, 29:22,
29:24, 30:2,
30:4, 30:8,
30:9, 31:21,
32:1, 50:19,
50:21, 51:2,
51:5, 51:7,
98:11, 98:22,

125:15, 125:22,
127:6, 127:8,
132:6, 135:11,
170:18, 197:17,
197:23, 198:14,
240:1
**diversey**
208:19
**division**
1:3, 23:8,
40:11, 259:8,
259:9, 364:3,
364:19
**doctor**
53:13
**document**
33:13, 33:16,
33:21, 34:14,
34:23, 36:2,
36:6, 43:5,
43:9, 43:20,
43:23, 44:12,
45:21, 45:24,
46:3, 46:6,
46:10, 47:1,
47:5, 48:11,
71:8, 71:15,
78:11, 78:15,
78:18, 78:22,
82:8, 82:11,
82:15, 101:20,
101:22, 102:13,
103:11, 103:16,
103:19, 103:23,
104:1, 104:2,
104:7, 104:10,
104:22, 116:2,
117:13, 158:5,
158:9, 161:18,
161:22, 162:3,
162:6, 163:17,
190:17, 190:20,
191:19, 192:7,
192:12, 192:21,
202:13, 211:2,
211:12, 220:22,
221:14, 221:15,
222:4, 222:18,

JGS_MAYSONET 4093

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

110

222:19, 224:5,
224:18, 229:21,
233:21, 289:13,
347:6, 361:9,
361:10, 363:5
**documentation**
203:6
**documented**
34:21, 43:13,
48:22, 82:19,
118:1, 158:13,
163:13, 163:22,
163:24, 210:15,
210:21, 296:18,
297:2, 303:1,
303:4, 303:13,
347:7, 351:18
**documenting**
42:15, 42:22,
70:10, 254:9,
282:16, 289:19,
350:9
**documents**
120:15, 192:11,
229:22, 237:5,
237:6, 237:10,
237:22, 238:8,
238:12, 238:13,
238:18, 238:22,
239:1, 261:6,
261:8, 267:24,
286:24, 316:16,
316:23, 322:11,
322:17
**does**
47:11, 69:19,
70:3, 70:5,
104:21, 125:2,
145:2, 145:13,
160:21, 190:10,
192:16, 218:19,
227:4, 227:8,
234:22, 235:9,
240:22, 243:11,
259:5, 260:12,
281:4, 282:24,
285:18, 301:16,
301:20, 305:7,

316:2, 318:24,
320:22, 331:2,
331:3, 346:24,
347:1, 363:20,
368:12
**doesn't**
9:3, 37:22,
148:7, 160:17,
192:14, 192:17,
248:19, 259:22,
261:4, 282:8,
292:24, 293:15,
297:21, 301:12,
301:17, 301:19,
317:15, 331:10,
333:8, 340:11,
340:13, 346:17,
349:21, 355:2
**dog**
98:8, 98:9,
98:15
**doing**
10:20, 45:8,
65:3, 134:16,
134:18, 147:24,
157:3, 170:7,
197:20, 198:8,
198:17, 200:8,
216:3, 231:5,
231:9, 232:9,
232:18, 233:2,
233:5, 233:7,
233:13, 250:16,
250:22, 320:24,
323:7
**doled**
328:22
**domestic**
251:10
**done**
11:1, 11:6,
93:19, 104:13,
111:23, 112:1,
205:10, 205:13,
218:21, 228:13,
249:8, 323:7,
350:17
**door**
61:6, 64:18,

64:22, 123:16,
336:23, 337:11,
338:21, 338:23
**doors**
62:23, 338:20
**double**
13:2
**doubt**
208:4, 265:3,
286:4, 286:6,
364:24
**down**
8:23, 14:7,
14:14, 18:14,
18:16, 18:17,
18:19, 33:5,
35:9, 35:11,
35:14, 35:15,
37:4, 45:15,
62:15, 81:9,
81:11, 81:16,
81:24, 83:18,
94:8, 96:23,
98:21, 117:9,
117:19, 117:20,
122:4, 130:20,
155:10, 172:5,
172:12, 173:7,
196:13, 215:23,
224:19, 237:19,
245:22, 264:12,
280:16, 283:17,
283:20, 294:4,
300:10, 329:20,
330:4, 335:4,
349:4, 357:10
**downstairs**
99:4, 134:9
**dozens**
186:16
**drafted**
203:14
**dressed**
124:1
**drinks**
113:20
**drive**
4:5, 19:5,

45:15, 157:18,
338:14
**driver's**
58:4
**driving**
246:3, 276:6,
276:9, 297:23
**drove**
149:20, 246:11,
271:12, 276:1,
276:22, 300:7,
300:10, 300:11,
344:3
**duct**
331:6, 331:14,
331:21
**ducts**
329:24
**duly**
8:10, 8:12
**during**
41:12, 76:22,
82:8, 114:23,
116:6, 132:9,
133:2, 189:20,
203:11, 204:22,
204:23, 205:5,
205:7, 206:21,
219:6, 247:9,
247:13, 247:16,
270:15, 271:20,
339:5
**duties**
29:16, 51:18,
54:3, 160:15
**duty**
149:21, 170:7,
170:24, 171:3,
196:19, 197:10,
197:14, 197:20,
198:3, 198:8,
198:18

| E |
|---|

**e-r-n-e-s-t**
9:1
**each**
48:12, 65:5,

JGS_MAYSONET 4094

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    111

75:8, 84:8,
97:24, 99:19,
121:18, 129:1,
138:24, 174:20,
179:23, 321:4
**earlier**
140:1, 155:20,
190:8, 197:16,
218:24, 220:12,
322:9, 353:14,
362:21, 365:8
**early**
10:5, 66:8,
298:13, 324:21
**earnest**
200:22
**easier**
223:22
**easiest**
201:12
**eastern**
1:3
**easy**
35:6
**ed**
223:19, 288:1
**ed's**
278:13
**eddie**
52:16, 52:19,
53:1
**educational**
21:21
**edward**
4:9
**effect**
77:14, 167:21,
167:23, 175:2
**effects**
133:15
**effort**
248:23, 306:7
**efforts**
248:22, 302:2
**eight**
52:18, 53:11,
307:18
**eileen**
4:18, 8:2,

362:21
**either**
11:13, 21:23,
35:24, 62:2,
70:13, 75:13,
79:7, 84:8,
87:12, 110:9,
126:9, 130:2,
132:15, 156:21,
172:19, 182:24,
184:6, 280:11,
355:1, 357:9
**eliminate**
81:7
**eliminated**
22:3
**else**
8:19, 15:20,
18:3, 40:6,
48:17, 49:18,
60:15, 80:12,
108:2, 108:12,
108:18, 118:21,
119:23, 122:6,
124:4, 139:7,
139:9, 139:11,
139:23, 155:12,
162:21, 166:12,
176:1, 197:24,
199:7, 251:24,
321:1, 337:10,
350:11
**ely**
1:24, 2:12,
7:10, 370:3
**emphasized**
204:1
**employed**
370:13
**employee**
6:24, 363:3
**employment**
13:15, 13:18,
13:20, 19:16,
251:22
**employment"**
244:23
**empty**
269:19

**encounter**
221:24, 222:15
**encumbered**
190:2
**end**
32:7, 92:10,
165:3, 165:4,
165:7, 174:24,
193:3, 212:10,
221:7, 236:21,
236:23, 237:1,
237:8, 237:22,
275:24
**ended**
32:9, 334:4
**ends**
165:12
**enforcement**
29:18
**english**
130:6, 199:11,
199:20, 200:1,
200:2, 200:5,
200:14
**enough**
12:6, 84:12,
274:20, 274:24,
275:12, 332:9
**enrique**
115:14
**ensure**
117:17, 252:18,
252:21, 338:23
**entered**
235:20, 236:5
**entire**
58:23, 130:20
**entries**
364:10
**entry**
363:15
**envelope**
57:23, 58:2
**ernest**
1:17, 2:1, 4:8,
7:3, 8:11, 8:17,
369:3
**errata**
369:7

**erred**
265:19, 266:1,
266:3, 266:15
**erroneous**
202:19
**error**
186:6, 187:20,
187:23, 188:4,
265:15, 267:7,
315:11
**errors**
201:20, 201:21
**especially**
339:15
**esquire**
3:3, 3:10,
3:11, 3:18, 4:3,
4:10, 4:11,
4:18, 5:3
**establish**
187:11, 358:5
**et**
1:8, 1:14, 7:5,
7:6
**ethnicity**
74:5, 74:6
**etran**
368:13
**even**
42:23, 44:11,
48:5, 48:9,
51:4, 77:14,
77:21, 142:22,
185:15, 239:5,
316:1, 321:23,
348:2, 348:4
**evening**
310:6
**event**
83:3, 148:22,
264:15
**events**
201:9
**eventually**
145:24, 158:7,
163:22, 163:24,
216:3, 360:16
**ever**
21:23, 39:22,

JGS_MAYSONET 4095

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

112

69:15, 76:7,
83:2, 83:23,
102:23, 103:4,
115:9, 117:3,
144:22, 165:22,
170:17, 170:23,
171:2, 208:6,
216:16, 274:19,
275:11, 296:21,
299:1, 299:4,
299:19, 324:12,
324:15, 326:22,
327:8, 327:11,
327:15, 331:6,
349:13, 349:18,
351:12, 351:15,
363:5, 367:1
**evergreen**
126:6
**every**
72:24, 79:20,
83:1, 98:12,
106:1, 129:19,
186:16, 274:8,
292:10
**everybody**
178:16, 285:3
**everyone**
8:19, 290:6,
295:13
**everything**
134:12, 135:8,
158:12, 162:1,
224:11, 225:3,
239:4, 266:10,
303:13
**evidence**
35:3, 36:10,
36:11, 36:12,
36:16, 78:4,
103:13, 103:14,
104:14, 104:23,
201:12, 206:2,
224:7, 225:1,
240:15, 241:24,
273:14, 277:7
**ex-boyfriend**
250:13

**exact**
66:9, 66:11,
120:1, 124:17,
329:15
**exactly**
220:24, 221:4,
344:12, 344:13
**exam**
25:9, 25:10,
25:12, 25:13,
25:14, 25:16,
25:19, 30:16,
45:7, 46:7,
46:11, 46:13,
46:21, 46:24,
47:8, 340:3
**examination**
6:2, 6:23,
8:13, 30:13,
45:13, 45:19,
45:22, 46:1,
46:4, 362:18,
365:4
**examined**
290:24, 369:4
**examiner**
45:16
**examiner's**
45:19
**example**
38:24, 46:19,
54:11, 55:6,
64:5, 137:12,
174:22, 197:15,
197:16, 199:6,
239:6, 251:15,
251:21
**exchange**
85:5, 87:11,
87:17
**exclaiming**
219:1
**exhale**
292:20
**exhaled**
292:9, 292:15,
292:19
**exhibit**
6:12, 6:13,

6:14, 6:16,
6:17, 6:18,
6:19, 6:21,
6:22, 6:24,
121:13, 121:15,
121:20, 178:15,
178:17, 178:19,
181:20, 184:24,
185:2, 190:12,
190:14, 190:22,
218:10, 223:13,
223:15, 224:18,
225:9, 225:10,
227:5, 244:9,
244:13, 244:15,
254:12, 257:13,
258:9, 267:22,
269:24, 273:2,
282:13, 290:20,
293:18, 293:23,
294:2, 297:5,
297:6, 297:10,
297:11, 307:4,
307:13, 309:7,
309:21, 313:20,
314:3, 314:15,
315:20, 316:8,
316:9, 316:22,
323:9, 323:12,
329:16, 332:15,
353:9, 362:1,
362:5, 362:15,
363:2
**exhibits**
6:10
**exist**
208:4, 269:18
**existed**
51:4, 208:6,
208:13
**existence**
210:16, 211:10
**experience**
34:7, 84:15,
231:15
**experienced**
172:15, 301:2,
303:17

**expires**
370:20
**explain**
27:10, 37:23,
46:14, 63:9
**explained**
180:1, 187:19,
199:10, 203:10,
203:21, 212:9,
212:16, 213:2,
218:21, 313:4,
314:18
**explanation**
27:17, 27:20,
77:12, 77:19,
289:17
**extend**
64:21
**extends**
62:1
**extension**
40:3, 40:8,
40:16, 40:20
**extent**
104:7, 106:18,
111:6, 114:5,
114:7
**exterior**
338:21
**eye**
275:4
**eyes**
275:5
**eyewitnesses**
125:15, 125:16

**F**

**fabricated**
221:24, 222:12
**fabrication**
201:11
**facial**
71:2, 74:3
**facility**
62:19, 62:21,
338:17
**facing**
88:1

JGS_MAYSONET 4096

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

113

**fact**
35:15, 36:2,
43:14, 44:14,
46:6, 71:15,
82:5, 82:9,
87:12, 87:18,
104:3, 111:19,
145:1, 148:11,
155:1, 176:11,
178:9, 179:1,
179:15, 193:6,
196:21, 210:12,
211:2, 211:9,
211:12, 260:12,
269:17, 280:21,
281:2, 289:13,
289:19, 296:24,
303:5, 310:21,
313:11, 347:8,
347:11, 347:12,
348:10, 349:4,
350:9, 353:1,
358:13, 364:20
**factor**
275:7, 275:11
**facts**
33:16, 33:21,
34:1, 34:2,
34:12, 34:14,
34:16, 34:18,
34:20, 34:23,
39:8, 39:15,
84:24, 85:19,
85:24, 203:15,
204:9, 224:9,
225:2
**factual**
164:2
**factually**
202:5
**failed**
239:12, 251:4
**fair**
11:18, 43:15,
73:9, 80:17,
80:20, 83:6,
84:13, 120:10,
148:7, 148:12,

148:14, 148:16,
148:17, 278:16,
284:2, 308:7
**false**
43:15, 44:2,
44:12, 44:15,
223:3, 223:7,
224:7, 225:1,
272:11
**familiar**
182:11, 182:18,
184:20, 188:1,
188:6, 188:7,
367:22
**family**
12:19, 20:9
**famous**
313:20
**far**
10:21, 92:10,
168:20, 168:22,
207:16, 256:10,
262:20, 341:9
**fashion**
35:24, 71:8,
100:2
**father**
216:5, 216:8,
216:9
**fatigued**
190:2
**fault**
249:9
**fax**
83:17, 83:19
**fear**
112:3
**feared**
106:13, 107:6
**february**
1:19, 7:9,
146:18, 161:12,
227:13, 230:10,
230:12, 233:12,
233:20, 234:2,
237:17, 246:13,
246:17, 246:22,
248:10, 250:5,

256:22, 258:5,
258:6, 268:7,
320:12, 370:18
**fed**
337:23
**feed**
39:13, 338:3,
338:6
**feedback**
66:21
**feeling**
190:2
**feet**
61:17, 62:18,
81:4, 92:13,
93:11, 335:18
**fell**
258:12
**fellow**
136:7, 136:15,
137:1, 137:17
**fellows**
279:20
**felony**
145:24
**fencing**
207:5
**fender**
271:13
**few**
22:10, 113:19,
116:7, 209:21,
209:24, 246:2,
246:3, 252:7,
272:18, 286:14,
300:12, 365:6
**fields**
55:24
**fifth**
105:14, 106:2,
106:7, 106:9,
106:12, 107:4,
107:23, 108:9,
108:21, 109:1,
109:8, 109:16,
110:17, 114:2,
114:15, 181:13
**filed**
323:15

**files**
57:17, 57:18,
57:20, 59:12,
117:2, 176:10,
177:5, 177:6,
177:8, 178:8,
178:24, 179:7,
179:8, 179:9,
179:10, 179:14,
215:2, 240:5,
240:7, 249:2,
364:12
**filing**
326:15
**fill**
28:18, 59:15,
60:1, 83:17,
83:20, 304:15
**filled**
55:24
**filler**
72:24, 73:1,
73:3, 74:8,
74:14, 75:4,
76:10, 76:17,
78:1, 84:9,
274:1, 274:10,
274:11, 274:13,
274:16, 274:20,
275:5, 275:12,
275:13, 280:13
**fillers**
73:13, 73:16,
73:18, 74:12,
74:20, 74:21,
74:24, 75:8,
75:24, 79:12,
79:15, 79:17,
79:20, 79:22,
80:8, 80:10,
80:14, 80:15,
80:19, 83:24,
84:8, 84:12,
274:5, 282:8,
309:15
**final**
242:20, 314:21
**finally**
200:12

JGS_MAYSONET 4097

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

114

**financial**
327:19, 370:14
**find**
22:6, 22:8,
39:2, 45:1,
45:3, 53:14,
76:18, 86:18,
87:4, 98:9,
98:15, 125:19,
136:22, 136:23,
142:16, 144:9,
164:16, 170:13,
203:19, 207:10,
207:17, 208:7,
208:12, 208:15,
209:14, 211:10,
211:13, 216:2,
233:12, 234:4,
239:3, 239:9,
253:18, 269:23,
278:19, 279:23,
281:8, 283:4,
299:14, 302:2,
302:12, 305:5,
305:23, 306:1,
306:7, 341:5,
341:12, 346:15
**finding**
279:18
**fine**
101:14, 133:12,
134:1
**finish**
182:1, 263:7
**finished**
56:13, 68:22,
68:23, 69:8,
244:6, 244:7,
315:3, 315:6,
315:17, 340:3
**fire**
326:15, 327:3
**fired**
326:16, 326:18,
326:20
**firm**
4:12, 191:4
**first**
9:3, 10:19,

15:8, 15:9,
19:19, 23:6,
49:4, 51:13,
52:5, 55:14,
55:17, 56:18,
63:17, 71:17,
72:3, 72:9,
99:1, 114:1,
114:12, 120:12,
123:13, 124:7,
125:4, 143:18,
144:11, 158:2,
177:12, 199:8,
203:1, 208:20,
218:11, 220:7,
237:18, 237:21,
238:21, 261:15,
261:23, 263:3,
263:24, 265:11,
265:22, 266:15,
269:6, 269:15,
269:21, 270:1,
276:22, 277:24,
293:20, 313:5,
316:6, 316:13,
316:14, 349:11,
349:12, 351:19,
351:23
**first-watch**
96:4
**fit**
331:7, 331:11,
331:12, 332:9,
349:2, 349:5
**five**
72:24, 73:1,
73:16, 74:12,
74:14, 75:7,
75:8, 79:20,
83:24, 84:7,
91:5, 274:1,
274:5, 309:14
**flag**
169:5
**flip**
11:16, 178:19,
252:7, 293:20,
340:23

**floor**
2:6, 3:6,
61:24, 62:1,
62:10, 62:11,
63:2, 63:4,
64:21, 90:11,
99:2, 156:16,
208:20, 336:8
**flow**
47:10, 68:4
**fluorescent**
336:6
**fly-by-night**
210:11
**focus**
29:21, 29:23,
30:3, 30:6
**focusing**
292:14
**folder**
57:23, 58:6,
98:17
**folks**
300:1, 300:6,
300:21, 300:24,
301:4, 301:13,
301:24, 302:3,
302:5, 302:15,
302:19, 302:24,
303:4, 303:11,
304:5, 304:22,
305:13
**follow**
32:4, 32:10,
95:13, 95:18,
96:10, 109:5,
248:19, 253:3,
290:7
**follow-up**
163:15, 248:14,
249:18, 255:7,
256:2, 256:6
**followed**
93:18, 94:5,
95:4, 146:17,
249:6, 273:8,
273:13, 326:11
**following**
32:3, 175:15,

201:8, 256:7
**follows**
8:12
**food**
337:19, 337:20,
338:8, 338:14
**footnote**
199:8, 212:21,
224:4
**force**
334:18
**foregoing**
369:4, 370:6,
370:7
**forever**
203:24
**forge**
278:12
**forget**
43:10, 291:17
**forgotten**
202:3
**former**
365:16
**forth**
196:13
**forthcoming**
86:8, 134:22,
140:3, 141:14,
141:17, 142:8
**forward**
215:22, 312:6,
340:23
**found**
269:19, 275:21,
279:2, 279:5,
279:12, 279:23
**foundation**
65:23, 68:9,
89:8, 112:9,
114:3, 156:24,
170:15, 171:4,
177:22, 184:2,
220:19, 224:17,
230:4, 248:18,
254:23, 271:24,
286:1, 286:8,
286:11, 289:22,

JGS_MAYSONET 4098

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    115

329:11, 353:6
**foundational**
167:20
**four**
21:9, 21:19,
120:13, 142:24,
300:5, 364:1
**fourth**
184:4
**fragment**
212:16
**frame**
67:24, 83:15,
143:15, 329:14,
329:22, 330:7,
330:13, 330:18,
330:22, 330:24,
331:1, 331:2,
331:4, 331:7,
331:12, 332:9,
339:22, 360:8,
360:18
**francisco**
116:8, 117:16,
131:23, 132:3,
132:10, 132:17,
132:22, 133:6,
134:2, 134:12,
134:22, 139:6,
140:16, 141:13,
142:19, 144:16,
146:2, 152:7,
152:14, 153:9,
155:19, 156:18,
158:12, 159:15,
159:19, 159:21,
160:7, 161:5,
161:6, 165:12,
172:24, 173:10,
174:1, 178:3,
183:11, 187:5,
203:1, 205:24,
206:6, 206:9,
206:16, 207:22,
208:17, 209:8,
209:15, 210:3,
210:10, 220:10,
271:11, 271:18,

292:24, 294:12,
294:18, 309:1,
316:14, 318:3,
318:6, 318:16,
319:8, 331:10,
341:23, 343:3,
357:2, 357:4,
357:14, 358:1,
365:19, 366:1,
366:8, 366:12
**fraternal**
112:18
**fraud**
326:16, 327:5
**free**
7:13
**freedom**
88:24
**freely**
64:2, 138:19,
338:19
**fresh**
43:7
**friendly**
136:18
**front**
79:10, 83:1,
102:16, 112:10,
123:10, 132:13,
134:16, 149:11,
191:20, 192:22,
264:11, 264:17,
268:16, 271:7,
273:11, 280:15,
291:16, 344:7,
363:1
**full**
133:24, 218:11
**further**
164:12, 362:12,
365:3
**fusco**
4:19

---
**G**
---

**gang**
29:22, 29:23,
30:1, 30:3,

30:6, 30:7,
51:3, 51:4,
51:7, 51:21,
97:24, 100:1,
100:7, 100:9,
100:12, 100:15,
100:17, 100:18,
100:19, 100:21,
100:22, 101:2,
101:4, 101:6,
101:7, 101:12,
101:15, 101:17,
101:23, 102:3,
102:14, 102:16,
103:2, 103:5,
103:8, 103:9,
103:12, 103:17,
103:21, 104:3,
135:17, 135:19,
135:21, 135:23,
136:7, 136:8,
136:15, 136:18,
136:24, 137:1,
137:2, 137:13,
137:15, 137:16,
137:17, 138:2,
138:3, 138:4,
138:5, 138:9,
138:13, 138:15,
138:17, 138:19,
138:21, 139:1,
139:2, 139:4,
152:12, 152:13,
152:17, 152:18,
152:22, 153:4,
153:8, 154:8,
154:16, 155:5,
155:12, 156:11,
156:15, 159:16,
160:4, 173:9,
180:3, 182:12,
183:17, 184:20,
188:2, 217:9,
218:2, 250:14,
252:11, 316:17,
317:16, 318:5,
318:8, 327:14,
365:13

**gang-related**
191:17, 193:22
**gangs**
127:23
**gangster**
135:18, 182:12,
184:20, 188:2,
300:9
**gangsters**
180:21, 180:23,
181:2, 181:4,
181:16
**garage**
19:1, 19:3
**gas**
146:16, 218:17,
219:4, 219:8,
220:4, 220:15,
221:10, 221:23,
222:15, 273:9,
276:23, 352:1,
352:3, 352:23,
353:2, 353:21,
355:6, 355:11,
355:20, 356:1
**gather**
54:9
**gave**
9:13, 9:18,
10:16, 21:6,
41:6, 96:16,
105:22, 107:18,
108:4, 134:7,
161:15, 162:24,
174:7, 174:17,
176:2, 177:10,
177:20, 180:4,
181:15, 197:15,
197:16, 198:9,
210:1, 213:10,
215:22, 239:20,
249:6, 256:13,
258:12, 298:18,
349:10, 358:1
**gee**
180:13, 233:1,
306:21
**geez**
291:24

JGS_MAYSONET 4099

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    116

**general**
90:21, 90:23,
364:23
**generally**
41:17, 166:21,
363:20
**gentleman**
122:2, 123:4
**gentlemen**
98:1
**geographically**
93:1
**geraldo**
6:19, 288:8,
289:8, 289:14,
289:20, 290:3,
294:21, 294:24,
295:2, 295:3,
295:8, 295:12,
295:17
**get**
25:5, 28:5,
32:7, 61:7,
61:10, 66:21,
67:21, 76:10,
80:1, 84:18,
85:5, 86:5,
86:23, 89:18,
89:22, 92:24,
98:16, 98:17,
102:20, 105:14,
112:6, 124:4,
135:5, 140:20,
154:8, 154:15,
159:7, 165:20,
182:4, 182:15,
183:6, 183:22,
184:1, 184:13,
185:14, 189:20,
216:10, 231:22,
255:21, 267:10,
305:18, 308:18,
309:5, 311:11,
325:23, 327:18,
328:15, 328:18,
329:4, 329:5,
329:9, 329:15,
337:17, 337:19,

337:23, 338:11,
357:8
**getaway**
204:24, 205:7
**gets**
228:22
**getting**
25:7, 80:4,
83:22, 150:6,
318:22, 355:13
**geurrera**
258:18, 258:22,
258:24, 259:1,
260:9, 260:15
**gigantic**
75:14
**girl**
297:22
**girlfriend**
303:22, 304:1,
304:6, 304:21,
305:10, 306:12,
306:18
**give**
10:20, 21:5,
38:19, 38:23,
94:23, 98:22,
105:3, 121:18,
130:22, 135:5,
151:5, 161:24,
173:2, 174:16,
174:17, 175:9,
175:15, 176:16,
205:23, 208:23,
215:2, 215:16,
248:19, 251:1,
253:14, 278:4,
285:6, 301:9,
356:19, 357:2
**given**
9:6, 9:21,
43:4, 108:11,
109:15, 115:22,
116:1, 125:16,
152:5, 163:8,
172:19, 173:13,
174:1, 178:1,
180:5, 209:3,

209:15, 216:7,
254:4, 348:20,
369:6, 370:9
**gives**
300:17
**giving**
85:9, 106:14,
136:6, 136:7,
136:24, 137:10,
140:17, 150:12,
217:9, 223:2,
223:7, 296:20,
327:13, 343:17,
345:13, 345:22,
346:8, 348:18
**glaring**
201:20
**glass**
130:3
**glasses**
74:3
**gloves**
122:3
**goes**
161:8, 161:13,
212:9, 299:24,
344:11, 345:19,
346:9
**going**
10:19, 15:6,
16:24, 17:6,
17:12, 19:7,
46:21, 49:8,
102:18, 105:2,
105:18, 106:17,
106:18, 107:12,
109:2, 109:5,
109:14, 109:18,
109:22, 109:24,
110:3, 111:5,
111:8, 114:4,
114:9, 121:18,
124:13, 125:3,
125:7, 147:17,
152:9, 154:8,
154:23, 154:24,
155:5, 163:22,
163:23, 181:19,

188:22, 189:2,
189:23, 192:3,
192:6, 192:16,
194:8, 197:17,
198:13, 202:2,
204:19, 209:10,
213:19, 215:23,
217:8, 219:10,
220:17, 220:20,
222:2, 222:23,
224:16, 228:18,
233:6, 234:14,
244:14, 247:6,
252:3, 253:3,
255:14, 256:20,
272:17, 278:15,
299:11, 300:21,
300:23, 314:8,
314:14, 316:22,
323:9, 326:3,
329:8, 363:7
**gold**
207:3, 207:5,
207:10, 207:12,
207:17, 207:23,
208:3, 208:6,
208:10, 208:13,
208:15, 209:8,
209:16, 210:3,
210:7, 210:17,
211:9, 211:16,
269:18, 270:8
**gone**
209:20, 337:10
**good**
7:20, 33:17,
33:21, 67:1,
125:16, 181:23,
193:17, 215:20,
325:5
**goofy**
224:11, 225:4
**got**
13:2, 27:19,
43:22, 52:5,
52:11, 78:3,
104:17, 114:12,
125:10, 127:9,

JGS_MAYSONET 4100

146:20, 164:9,
168:5, 170:19,
173:4, 173:6,
173:7, 177:1,
178:1, 182:24,
184:5, 184:12,
185:12, 196:1,
196:4, 199:1,
200:12, 208:20,
216:8, 216:14,
231:14, 240:18,
240:21, 241:24,
242:6, 242:12,
252:7, 260:17,
265:14, 267:12,
267:13, 267:15,
268:6, 268:7,
269:5, 269:7,
281:14, 281:20,
285:5, 293:19,
296:1, 296:2,
297:14, 300:6,
312:6, 312:21,
323:7, 326:9,
327:4, 327:6,
341:20, 343:2,
357:10, 357:11,
358:2, 363:10,
364:24

**gprs**
40:24, 41:3,
41:4, 41:6,
58:7, 227:14

**grab**
333:15, 333:16

**graduate**
20:3, 20:5,
20:7

**graduated**
19:24, 126:15

**grammar**
126:15

**grand**
215:24, 291:16,
293:3, 294:13,
294:19, 295:17,
296:13, 316:24,
317:7, 317:13,

317:14, 317:15,
317:22, 317:23

**graphic**
183:1

**great**
193:12

**green**
59:4, 59:7,
59:10

**grip**
331:2

**gross**
327:1

**ground**
10:17, 122:4

**group**
3:12

**groups**
21:6

**grow**
126:1

**guess**
122:10, 293:18,
340:2, 340:5,
343:1

**guevara's**
147:24, 181:2,
191:16, 193:21,
194:15, 195:9,
195:16, 196:1,
201:11, 285:16

**guide**
20:24, 21:2,
21:4

**guidelines**
115:22, 116:1

**gun**
39:1, 39:3,
329:24, 330:15,
330:21, 330:23,
332:9

**guns**
305:18, 330:16,
331:19, 332:4

**gunshots**
246:4

**guy**
78:21, 83:4,

123:12, 131:11,
132:12, 134:15,
161:2, 232:4,
232:9, 233:12,
250:11, 275:4,
281:14, 281:20,
288:1, 288:8,
298:16, 300:19,
301:14, 304:5,
327:18, 344:8,
345:16

**guy's**
215:8

**guys**
94:24, 95:14,
113:19, 162:16,
162:18, 162:22,
163:9, 163:12,
163:19, 164:10,
164:24, 177:2,
183:15, 188:6,
195:22, 200:1,
201:3, 202:20,
213:24, 215:1,
221:1, 275:5,
327:24, 341:10,
343:19, 345:14,
345:18, 347:12,
348:5, 352:5,
355:5, 355:14,
357:7, 359:7,
359:17, 359:20

---
**H**
---

**h**
9:3

**h-a-l-v-o-r-s-e-n**
9:1

**habit**
78:10

**hair**
71:2, 74:3,
74:4, 122:11,
122:13, 122:14,
122:15, 122:17,
122:19

**half**
358:17

**hallway**
15:16, 15:18,
15:20, 15:22,
15:24, 16:8,
16:12, 62:1,
62:3, 62:4

**halvorsen**
1:17, 2:1, 4:8,
6:2, 6:10, 7:3,
8:5, 8:7, 8:11,
8:17, 121:15,
178:17, 185:2,
190:14, 196:15,
199:9, 200:21,
201:1, 201:6,
201:9, 203:5,
203:8, 203:10,
203:17, 203:21,
204:1, 204:20,
207:1, 207:6,
207:9, 212:8,
212:15, 213:2,
213:12, 218:12,
218:19, 218:22,
219:3, 219:7,
223:15, 224:6,
224:10, 225:10,
257:16, 290:20,
316:9, 362:1,
362:15, 362:20,
365:6, 368:7,
369:3

**hand**
8:9, 334:20,
370:17

**handcuff**
335:19, 335:22

**handles**
36:22

**handwriting**
42:5, 227:4,
227:9

**handwritten**
36:1, 121:6,
146:2, 200:4,
200:14, 203:20,
318:9, 318:16,
319:7, 349:21

JGS_MAYSONET 4101

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

118

handwrittens
121:10
hang
231:11, 361:13
happen
33:5, 47:11,
47:15, 66:23,
154:3, 154:5,
177:21, 326:3
happened
90:8, 118:3,
118:5, 127:3,
128:5, 130:17,
131:12, 131:14,
135:7, 172:23,
210:4, 218:17,
220:3, 221:9,
227:17, 230:9,
274:23, 288:23,
288:24, 324:23,
334:13, 340:7,
343:23, 349:3,
353:21
happening
66:24, 131:1
happens
297:14
happy
193:11
hard
74:12, 196:12,
223:20
hard-working
24:7, 24:12
harder
24:16, 24:19
harder-working
24:5, 24:13
harding
208:19
harry
23:23
has
12:20, 13:4,
19:24, 142:12,
157:22, 157:23,
245:21, 247:21,
252:14, 259:23,

275:7, 280:10,
283:10, 287:22,
289:15
haven't
113:7, 113:11
having
8:12, 12:11,
17:4, 17:10,
100:14, 131:22,
132:11, 134:8,
195:20, 196:11,
200:2, 226:13,
254:20, 255:3,
256:5, 277:12
he'd
93:22
he's
16:24, 19:12,
110:6, 122:2,
143:21, 171:15,
237:13, 261:19,
280:16, 305:8,
333:8, 347:9
head
122:12, 223:4,
288:7, 331:9
headquarters
21:7, 23:10
heads
213:10, 214:24,
215:2, 215:17
hear
8:22, 11:10,
11:14, 12:14,
154:23, 154:24
heard
33:6, 33:8,
127:5, 164:23,
170:7, 220:7,
231:11, 246:4,
348:6, 348:8,
349:9, 351:6
hearing
12:7, 12:11
heart
53:13
heated
196:2, 196:4

heating
329:24, 331:6,
331:13, 331:21,
332:8
height
71:1, 74:7,
80:21, 81:7,
81:8, 81:11,
122:22, 282:4
heights
356:22
held
2:1, 7:7
hell
216:10, 343:12
help
142:10, 207:24,
212:13, 245:14,
287:17
helped
147:18
helpful
45:3, 142:7,
150:22
her
111:21, 146:14,
146:17, 148:2,
149:8, 167:13,
220:9, 220:10,
230:20, 230:21,
231:3, 231:8,
234:9, 234:10,
234:12, 234:14,
245:24, 250:7,
251:5, 251:15,
251:18, 251:20,
251:22, 252:3,
253:23, 254:1,
254:3, 254:14,
255:2, 255:3,
255:17, 256:2,
273:8, 276:22,
277:2, 306:13,
306:23, 307:6,
325:3, 325:4,
325:5, 326:4,
326:5, 352:4,
353:12, 354:16,

354:18, 355:2,
355:3, 355:7,
355:10, 355:15,
355:16, 355:17,
355:19, 355:24
herbert
14:17, 15:7,
15:19, 17:11,
17:23, 18:6,
18:18, 19:3,
108:1, 108:24,
110:20, 110:22,
112:16
here
8:19, 8:20,
9:20, 12:4,
112:3, 130:22,
138:24, 172:6,
172:10, 172:23,
193:5, 194:20,
197:16, 200:20,
202:5, 207:14,
210:4, 222:23,
224:19, 227:17,
244:21, 258:10,
264:12, 265:10,
265:17, 271:17,
277:11, 279:17,
281:24, 300:2,
300:5, 310:24,
317:8, 318:13,
320:19, 349:11,
364:7, 364:14
here's
270:1
hereby
369:3, 370:7
hereunto
370:16
hesitate
169:20
hey
167:20, 209:8,
283:23, 350:24
hidden
331:19, 332:4
hide
211:4, 211:9,

JGS_MAYSONET 4102

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

119

211:20, 211:22
**hiding**
117:6, 216:4
**high**
19:24, 20:3,
20:5, 20:7,
21:20, 22:19,
30:14, 123:10,
123:14, 124:24,
125:8, 125:9,
125:11, 132:13,
134:17
**himself**
98:11, 343:20,
345:9, 345:15,
347:3
**hint**
226:20
**hired**
22:24, 25:1,
191:4, 191:13,
201:23
**his**
17:2, 17:11,
28:1, 46:24,
50:7, 50:8,
52:21, 53:7,
58:12, 92:5,
98:21, 99:1,
99:7, 105:4,
106:20, 108:4,
109:23, 111:1,
111:2, 112:14,
114:9, 117:17,
131:12, 131:15,
131:17, 134:20,
139:7, 144:19,
146:8, 150:9,
152:11, 156:23,
161:16, 166:22,
167:13, 168:19,
169:3, 188:19,
193:23, 194:7,
194:20, 194:21,
197:7, 201:2,
202:12, 210:7,
216:6, 216:8,
216:9, 216:24,

234:6, 239:21,
244:22, 244:23,
246:10, 246:23,
266:13, 268:21,
272:1, 275:4,
278:5, 278:7,
294:21, 303:22,
304:1, 304:21,
306:17, 315:13,
326:14, 327:19,
327:24, 328:5,
329:15, 331:14,
334:9, 339:24,
346:15, 346:22,
349:21, 358:2,
365:16
**histories**
235:13
**history**
235:10, 235:14,
235:23, 235:24,
236:1, 238:14,
241:18, 241:21,
251:22
**hold**
58:1, 258:12
**holding**
79:6
**hole**
206:16, 206:18,
207:21, 271:16,
271:22, 272:7,
272:14
**holes**
206:4, 206:7,
206:13, 206:15
**home**
17:24, 88:13,
146:18, 231:2,
287:5, 298:15
**homicide**
36:20, 51:21,
66:13, 72:10,
159:5, 159:9,
159:13, 160:3,
160:7, 160:18,
160:22, 162:10,
172:16, 202:4,

208:9, 225:24,
230:8, 230:13,
230:14, 231:15,
251:8, 254:21,
255:4, 259:16,
260:13, 289:18,
297:17, 301:2,
303:18
**homicides**
72:17
**honorable**
112:1
**hook**
335:20
**hoping**
250:12, 251:1
**hour**
298:9
**hours**
41:16, 105:3,
120:13, 155:21,
155:24, 156:2,
156:3, 156:22,
156:23, 310:12,
310:18, 311:13,
337:3, 338:15,
357:20, 358:8
**house**
49:12, 146:12,
146:13, 149:8,
344:7, 344:9
**housed**
57:12, 57:15
**however**
196:17, 203:17,
207:8
**huffing**
292:7
**huh**
94:21, 107:10,
154:4, 165:6,
186:9, 205:12,
348:3
**humboldt**
126:4, 126:5,
126:16, 196:1
**husband**
231:3, 231:8,

234:10, 234:14,
255:9, 273:8,
352:4, 355:7
**hypothetical**
44:4, 44:17,
45:10, 77:1,
232:15

**I**

**i'll**
10:24, 11:5,
60:8, 104:19,
130:22, 175:24,
254:13, 311:2,
351:24, 358:17,
363:2, 368:13
**i've**
11:18, 13:2,
78:3, 112:15,
142:24, 185:10,
237:2, 244:3,
260:17, 292:12,
314:18, 331:19
**iad**
216:16
**idea**
27:14, 96:2,
114:15, 147:9,
216:15, 238:7,
252:5, 260:17,
261:12, 267:3,
282:2, 305:2,
342:21, 353:22
**identification**
78:13, 78:14,
83:18, 83:21,
101:20, 101:22,
103:24, 104:2,
104:11, 104:21,
104:22, 121:16,
129:2, 149:9,
178:18, 185:3,
190:15, 223:16,
225:11, 237:3,
237:23, 273:6,
290:21, 308:19,
309:5, 316:10,
362:2, 362:16

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

120

identifications
82:2, 82:4,
103:11, 103:20,
104:5, 104:8
identified
77:6, 78:20,
102:3, 102:8,
102:9, 103:17,
104:24, 146:15,
147:14, 173:10,
178:3, 179:23,
215:21, 273:7,
273:10, 275:17,
276:19, 307:19,
307:24, 308:2,
310:7, 310:22,
349:14, 349:19,
353:11, 354:8,
354:14, 356:22,
357:5, 358:6,
359:18
identifies
355:1
identify
103:22, 121:21,
166:14, 171:19,
172:18, 172:21,
180:7, 180:14,
277:8, 283:7,
354:19, 359:22,
360:10, 360:20
identifying
347:10, 354:10,
357:15
identity
103:16, 117:6,
117:15
ig
98:8
iglesias
6:19, 288:9,
289:8, 289:14,
289:20, 290:24,
294:21, 294:24,
295:2, 295:3,
295:8, 295:10,
295:17, 295:24,
296:18, 296:23

iglesias's
290:4, 295:21
ignorant
202:2
igs
135:24
illinois
1:2, 1:18, 2:7,
2:15, 3:7, 3:22,
4:6, 4:15, 4:22,
5:6, 7:8, 13:22,
370:5, 370:24
imagine
32:2, 166:14,
276:12
immediately
15:14, 305:9,
353:11
imperial
135:18, 180:21,
180:22, 181:1,
181:3, 181:16,
182:12, 184:20,
188:1, 300:9
implicating
64:10
imply
192:17
importance
33:2, 34:1
important
34:9, 34:13,
34:14, 36:11,
36:18, 36:21,
37:15, 39:6,
47:9, 48:9,
48:11, 84:23,
85:3, 85:4,
104:10, 104:22,
153:14, 230:1,
303:18, 347:10
impression
198:9
improper
87:16, 274:7,
333:18
in-service
364:3, 364:11

inadvertently
65:4
inbau
40:14
incarcerated
88:10, 88:16,
88:23, 89:1,
116:16
incident
163:10, 164:11,
191:17, 193:22,
197:23, 198:4,
198:24, 216:17,
252:16, 352:2,
353:20
incidents
247:10, 247:14,
247:16, 249:1
include
75:7, 97:17,
97:19, 267:23,
269:11, 269:12,
269:17, 303:18,
310:21, 341:1,
352:13, 352:18,
356:16
included
73:5, 213:4,
227:16, 247:21,
252:15, 252:22,
261:5, 296:22,
352:9
including
9:22
incoming
91:5, 95:2
incomplete
44:4, 44:17,
45:9, 77:1,
232:15
incorrect
97:3, 97:7,
209:15, 209:17
incriminate
106:9, 106:13
inculpatory
104:23
independent
110:8

index
230:6
indicate
11:12, 46:15,
46:17, 46:19,
59:1, 59:17,
93:16, 102:1,
102:4, 102:17,
280:19, 281:1,
281:5, 310:10,
316:2
indicated
149:16, 177:6,
185:11, 185:12,
226:20, 286:22,
316:5
indicates
186:21, 279:20,
286:2, 286:13,
298:12, 310:9,
353:3
indicating
226:11
indication
208:12
indicted
367:8, 367:13
individuals
26:21, 26:24,
146:16, 173:8,
183:12, 343:17,
354:12
influence
129:1
inform
46:12
informant
84:22, 84:24,
85:4, 85:14,
85:18, 85:23,
86:4, 86:23,
87:1, 87:3,
87:5, 87:8,
87:11, 87:17,
87:24, 88:10,
88:16, 116:16,
116:21, 117:2,
117:5, 117:14,

JGS_MAYSONET 4104

117:20, 117:22,
118:1, 140:2,
140:9, 140:11,
140:18, 141:4,
167:6, 167:13,
181:2, 239:18,
239:20
**informants**
84:19, 115:20,
115:23, 116:3,
116:5, 116:11
**informed**
201:1, 207:6,
218:12, 218:16,
220:2, 221:9,
298:14
**informing**
137:1, 140:13
**initial**
32:5, 126:21,
245:9
**initially**
59:3, 117:23,
162:24, 180:9,
180:11, 194:6,
204:1, 347:1,
349:1
**initiated**
364:22
**injured**
231:4
**innocence**
46:24
**inservice**
364:18
**inside**
53:16, 53:17,
57:24, 147:4,
149:7, 150:5,
335:24
**insist**
203:17
**instance**
104:4, 198:13,
299:18
**instances**
104:20
**instant**
198:16

**instead**
219:4
**instituted**
59:4, 59:9,
216:13
**institution**
21:21, 364:22
**instruct**
109:24, 111:8,
114:9
**instructed**
96:18, 113:8
**instructing**
17:7, 17:9,
106:21, 109:4
**instructions**
93:21, 93:24,
96:16
**insurance**
326:15, 326:16,
327:4
**integrity**
39:6
**intend**
13:20, 13:24,
154:19
**intending**
15:4
**intentionally**
266:3
**interact**
115:19
**interest**
45:6, 370:14
**interested**
355:23
**interfere**
12:3
**interfering**
326:18, 327:3
**interior**
335:15
**internal**
326:11
**interpreted**
200:4
**interpreter**
196:3, 196:7

**interrelations**
197:7
**interrogate**
334:7
**interrogated**
334:22
**interrogation**
335:6, 335:9,
335:13, 335:16,
337:6, 337:13,
337:23, 338:7,
338:18, 338:20,
339:8, 339:11
**interrogations**
40:4, 40:13
**interview**
38:18, 61:12,
61:18, 62:3,
64:14, 132:17,
133:7, 146:13,
186:19, 186:22,
187:5, 191:22,
223:18, 248:22,
251:5, 257:13,
258:5, 286:24,
298:6, 298:8,
298:17, 316:14,
366:17
**interviewed**
38:9, 70:12,
146:1, 186:23,
203:1, 234:6
**interviewing**
38:15, 38:20,
98:6, 298:10
**interviews**
32:2, 35:3,
37:10, 37:12,
40:4, 40:13,
40:21, 85:3,
132:10, 224:5
**into**
15:16, 50:18,
62:2, 63:6,
63:11, 63:19,
63:20, 64:15,
66:13, 72:9,
76:13, 79:8,

99:16, 107:12,
132:5, 151:12,
170:18, 170:19,
196:2, 197:17,
198:13, 216:8,
218:14, 219:5,
220:1, 221:7,
227:15, 230:7,
235:3, 235:20,
236:5, 263:15,
273:9, 300:6,
331:13, 338:23,
339:1
**introduce**
7:12
**introduced**
41:3, 219:4,
268:11, 362:20,
365:8
**inventoried**
148:21, 273:13,
309:18, 322:18
**inventory**
59:13, 59:16,
60:2, 225:18,
225:23, 227:6,
228:8, 228:15,
228:19, 228:21,
229:3, 229:9,
229:12, 229:15,
229:16, 229:19,
234:19, 235:1,
237:2, 237:18,
240:21, 241:1,
241:4, 242:12,
243:20, 244:2,
248:3, 261:7,
261:10, 267:6,
267:14, 267:18,
269:2, 269:6,
309:16, 321:20,
321:21, 322:2,
322:3, 322:11
**investi**
324:23
**investigate**
26:20, 71:19,
142:2, 191:7,

JGS_MAYSONET 4105

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

122

194:5, 194:8,
250:13, 251:15,
251:18, 251:20,
251:21, 255:22,
256:21, 259:10,
259:14
**investigated**
36:19, 72:14,
144:4, 211:9,
288:5
**investigating**
58:22, 77:7,
77:15, 77:23,
78:8, 86:20,
86:24, 161:11,
190:24, 191:9,
248:5, 248:9,
288:13, 288:16,
297:16, 325:10
**investigation**
32:5, 33:13,
33:16, 34:2,
34:10, 34:18,
34:24, 39:7,
41:12, 43:13,
44:1, 44:13,
46:5, 46:15,
46:17, 47:10,
48:17, 58:14,
66:12, 68:4,
78:5, 84:24,
115:2, 125:5,
130:19, 131:20,
131:23, 144:12,
145:5, 145:6,
150:22, 151:6,
163:15, 163:21,
164:9, 164:13,
200:22, 207:16,
208:9, 216:14,
227:24, 245:9,
247:20, 248:14,
251:2, 255:7,
255:18, 256:7,
284:10, 284:13,
289:18, 303:8,
317:20, 319:4,
320:1, 320:11,

320:21, 320:23,
326:10, 326:13,
326:19, 327:4,
327:7, 366:4
**investigations**
32:5, 34:13,
41:9, 45:4,
47:12, 47:23,
64:1, 71:24,
95:18, 96:12,
176:14, 202:4,
325:21
**investigative**
44:22, 57:20,
57:21, 58:23,
59:12, 59:20,
93:17, 94:4,
95:3, 117:10,
118:12, 120:16,
121:1, 121:4,
121:7, 130:21,
145:18, 203:18,
225:17, 225:23,
227:18, 228:19,
228:20, 229:3,
229:9, 229:12,
229:15, 229:16,
229:19, 229:23,
230:6, 234:18,
235:1, 243:20,
244:1, 249:2,
253:2, 267:14,
267:17, 269:2,
269:6, 283:3,
284:21, 284:23,
298:2, 321:20,
322:3, 364:12
**investigators**
115:6
**invited**
23:21, 23:22
**involve**
328:15, 328:18
**involved**
36:17, 55:10,
70:9, 71:22,
78:4, 116:12,
127:23, 162:9,

162:16, 162:19,
162:22, 163:7,
163:9, 163:12,
163:20, 164:11,
165:1, 165:14,
199:1, 226:17,
318:11, 318:21,
325:23, 366:21
**involvement**
254:20, 255:3
**involving**
259:14, 259:17,
324:21
**ir**
235:8, 236:13,
236:14, 236:15,
236:17, 241:18,
241:21
**isn't**
26:3, 88:12,
169:6, 230:2,
283:3, 322:11
**issue**
319:6
**issues**
12:1, 148:23
**it'd**
74:20
**it's**
10:15, 33:5,
38:7, 44:4,
48:2, 48:9,
48:11, 57:8,
69:8, 76:24,
77:1, 84:23,
85:3, 109:2,
130:15, 137:15,
138:3, 144:19,
167:1, 185:11,
192:17, 193:4,
202:18, 202:23,
212:10, 212:15,
212:16, 214:4,
214:6, 214:13,
216:12, 223:20,
230:1, 234:23,
241:1, 243:4,
244:4, 244:13,

244:15, 247:10,
248:3, 249:9,
249:10, 249:13,
258:7, 258:14,
260:14, 260:22,
264:1, 264:3,
264:7, 264:13,
264:16, 265:15,
268:12, 272:10,
278:8, 283:5,
283:6, 285:15,
290:9, 290:11,
290:12, 292:11,
298:8, 301:5,
309:7, 311:3,
311:15, 311:19,
313:17, 317:19,
318:23, 320:8,
330:9, 331:22,
333:18, 346:23,
347:7, 354:24,
358:7, 359:1,
361:14
**item**
234:19, 235:17,
364:1, 364:20
**items**
58:3, 59:17
**its**
211:10, 370:15
**itself**
192:13, 202:13

---
**J**
---

**jack**
227:13, 247:2,
249:5, 249:15,
251:4, 252:20,
252:23, 253:11,
319:10, 320:2,
320:9
**jack's**
244:17, 245:3,
245:6, 248:15,
256:6
**jackson**
4:13
**jail**
89:15, 89:19,

JGS_MAYSONET 4106

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

123

116:14, 117:18,
140:19, 151:22,
151:24, 154:8,
154:16, 159:21,
318:4, 318:7
**january**
237:17
**jealous**
250:14
**jeff**
119:2
**jennifer**
3:10, 7:16
**jim**
115:16
**joanne**
1:24, 2:12,
7:10, 370:3
**job**
1:22, 22:6,
22:8, 25:1,
53:14, 53:16,
53:17, 284:24,
323:7
**jobs**
20:22, 20:23,
86:16
**joe**
213:5, 214:4,
215:6, 215:15,
216:11, 217:3,
217:8, 217:17,
217:22, 327:12
**john**
5:2, 8:1,
143:11, 143:13,
143:17, 143:18,
152:24, 153:1,
153:16, 153:18,
153:22, 154:20,
156:18, 158:24,
159:15, 160:8,
165:13, 186:19,
213:5, 214:5,
214:20, 215:2,
215:8, 215:12,
316:17, 350:18,
350:24, 366:2

**johnny**
324:22, 325:7,
325:15, 326:11
**join**
34:4, 35:2,
43:3, 49:1,
65:24, 68:10,
88:21, 89:9,
95:7, 95:8,
97:5, 97:6,
97:14, 97:15,
135:1, 137:20,
137:21, 141:1,
141:2, 142:6,
143:16, 150:10,
151:2, 151:9,
151:10, 157:1,
159:11, 159:18,
160:24, 161:1,
164:6, 164:7,
166:11, 170:10,
171:8, 171:9,
175:6, 175:7,
177:15, 177:16,
177:23, 177:24,
180:19, 181:8,
182:21, 182:22,
183:8, 184:10,
184:16, 184:17,
188:20, 220:20,
221:12, 222:6,
222:7, 229:6,
230:5, 232:16,
233:17, 233:18,
233:24, 239:17,
256:17, 256:24,
266:17, 279:11,
280:9, 281:12,
281:13, 281:17,
281:18, 284:6,
284:7, 286:12,
289:23, 289:24,
305:1, 333:23,
341:16, 342:4,
343:9, 350:15,
350:16, 353:7,
356:3
**joined**
49:14, 222:8

**joker**
163:3, 163:5,
163:7, 163:19,
164:24, 165:14,
174:3, 176:22,
299:9, 299:11,
299:15, 300:18,
307:20, 342:18,
346:20, 351:14
**jones**
4:4
**jordan**
176:8, 176:9,
176:12, 176:23,
178:10, 179:2,
179:16, 181:9,
181:10, 182:5,
182:13, 183:13,
184:21, 188:3,
188:8, 188:16,
239:3, 309:3,
342:1, 342:9,
342:15, 343:5,
343:15, 345:17,
347:2, 348:23,
349:15, 349:24,
350:22, 356:21,
357:6, 359:15,
359:17, 359:20,
359:22, 360:10,
360:20, 361:3
**jorge**
176:13, 178:10,
179:2, 179:17,
181:10, 226:5,
282:17, 285:7,
299:17, 299:19,
299:22, 307:24,
318:14, 323:23,
343:4, 349:14
**jose**
1:5, 3:2, 5:11,
7:4, 7:15,
114:24, 144:6,
144:15, 144:17,
144:22, 145:3,
145:20, 175:12,
176:11, 178:9,

**joker**
179:1, 179:16,
226:4, 270:14,
270:19, 273:7,
275:17, 275:22,
276:19, 277:6,
277:8, 298:19,
299:1, 308:2,
308:7, 318:14,
321:4, 323:15,
332:7, 341:2,
341:6, 341:7,
343:3, 345:24,
346:5, 346:12,
346:14, 349:14,
349:22
**jose's**
145:1
**josh**
4:10, 8:4,
119:1, 192:19
**joy**
133:24
**jr-1**
175:20, 224:1,
224:2
**judge**
16:14, 16:16,
112:6, 112:12,
192:21, 193:5
**julie**
5:3, 7:24,
368:3
**july**
228:2, 228:3,
242:15, 242:18,
242:21, 242:24,
244:5, 291:6,
293:8, 294:4,
294:19, 295:17,
296:13, 296:24,
312:9, 312:21,
313:11, 313:13,
313:16, 313:17,
321:19, 322:8,
322:12, 322:18,
364:4
**jury**
192:22, 200:15,

JGS_MAYSONET 4107

215:24, 291:16,
293:3, 294:13,
294:19, 295:17,
296:13, 316:24,
317:7, 317:13,
317:14, 317:15,
317:22, 317:23
**justice**
195:1
**justify**
47:7

### K

**kane**
370:5
**kedzie**
126:6
**keep**
58:15, 77:15,
78:8, 115:23,
150:6, 157:16,
188:22, 325:4
**keeping**
79:19, 257:3
**kept**
117:15, 189:2,
257:17, 257:18,
258:1, 363:3
**kid**
123:9, 132:12
**kidnappings**
72:16
**kids**
328:8
**kill**
300:18
**killed**
140:20, 201:3,
231:9, 232:4,
233:2, 233:8,
233:12, 234:5,
298:1
**killer**
194:24
**kind**
12:6, 35:8,
37:3, 38:7,
39:4, 54:18,

55:9, 59:22,
64:20, 72:6,
74:1, 76:17,
88:2, 101:18,
111:7, 111:16,
116:10, 258:12,
299:4, 330:19,
336:6, 336:13,
336:15, 336:17
**king**
104:4, 350:19,
350:24
**kings**
297:23
**kivetz**
119:2
**knew**
34:12, 34:14,
37:17, 49:17,
72:23, 89:11,
136:12, 140:4,
141:15, 142:23,
143:11, 143:13,
143:17, 144:15,
161:5, 171:17,
172:16, 176:3,
180:6, 214:4,
215:16, 226:6,
239:24, 246:8,
246:21, 288:1,
325:5, 327:21,
342:5, 343:13,
344:12, 344:13,
345:6, 346:14,
346:18, 347:14,
348:17, 349:8,
349:10, 349:22,
350:1, 350:3,
350:4, 350:11,
350:20, 351:6,
356:13, 357:12,
357:14, 360:3
**knock**
337:11
**knowing**
341:7, 341:14
**knowledge**
31:18, 31:20,

38:12, 91:4,
127:19, 136:17,
140:8, 159:13,
161:16, 199:14,
219:9, 226:12,
250:4, 255:5,
260:10, 274:18,
334:14, 339:7,
366:15, 367:9,
367:14
**known**
100:22, 299:1,
299:5, 299:15,
299:17, 307:20,
308:1, 308:3,
341:22, 345:24,
346:1, 346:6,
349:6
**knows**
304:5, 351:2
**kosberg**
5:12, 7:11
**kurt**
115:10, 115:12

### L

**labeled**
224:19, 364:3
**laid**
78:1
**lane**
20:6
**language**
129:21, 129:22
**large**
30:1, 329:14,
329:22, 330:7,
330:13, 330:18,
330:22, 330:24,
331:2, 331:4,
331:7, 331:12,
332:8, 332:9
**largest**
62:13
**lasalle**
3:20
**last**
9:15, 9:19,

10:1, 14:2,
111:10, 113:9,
113:11, 118:15,
119:17, 120:11,
161:12, 165:10,
200:19, 202:17,
212:5, 212:7,
212:17, 237:7,
237:9, 237:11,
237:14, 247:19,
257:15, 275:23,
300:5, 304:3,
306:13, 306:17,
306:22, 307:5,
307:13, 363:15
**lasted**
120:8
**lastly**
308:1
**later**
34:2, 34:10,
34:13, 39:20,
48:15, 59:4,
68:5, 117:24,
146:6, 233:21,
246:4, 271:12,
303:20, 348:21,
360:2
**latest**
307:6
**latex**
122:3
**latin**
104:4, 297:23
**latino**
279:3, 279:5,
279:13, 279:18
**latinos**
279:23
**launched**
326:10
**law**
3:12, 4:12,
29:18, 191:4,
325:2, 326:1
**lawful**
112:1
**laws**
111:23

JGS_MAYSONET 4108

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

125

**lawsuit**
10:13
**lawyers**
114:19, 190:5,
190:23, 191:15,
193:19, 195:11,
197:5, 197:8,
198:12, 199:18,
204:6, 205:3,
207:13, 213:21,
219:14, 219:17,
219:20, 220:13,
222:1, 222:11,
224:15, 224:23,
257:24
**lay**
77:4
**lead**
193:7, 253:3,
253:6, 253:10,
253:11, 260:13,
287:13, 287:14,
319:10, 319:13,
319:20, 319:22,
319:24, 320:2,
320:10, 320:14,
320:16
**leads**
32:11, 54:15,
54:19, 54:23,
232:22, 233:1,
233:21, 260:7
**league**
52:22
**leak**
213:4
**learn**
34:7, 37:12,
37:15, 37:16,
65:21, 82:3,
82:5, 114:1,
123:13, 155:4,
155:7, 165:13,
194:1, 194:3,
332:11, 332:17
**learned**
34:15, 67:10,
67:14, 68:2,

69:10, 81:18,
114:12, 125:6,
125:14, 126:19,
165:18, 183:4,
194:7, 237:21,
238:2, 258:7,
258:8, 309:1,
352:1, 354:13
**learning**
71:23
**least**
120:11, 264:16
**leave**
16:14, 17:23,
18:9, 28:12,
30:9, 93:21,
96:14, 96:18,
160:10, 193:15,
293:19, 311:12,
334:6, 337:7
**led**
181:10
**left**
15:14, 15:15,
28:2, 53:7,
56:8, 126:15,
160:9, 259:23,
340:4, 340:10,
340:11
**left-front**
271:13
**legible**
42:9
**legit**
167:21, 168:4,
168:8
**legitimate**
168:11
**leinenweber**
3:18, 3:19,
7:20, 7:21
**lend**
112:21, 327:11
**lengths**
300:13
**lengthy**
161:15, 176:2,
196:14

**less**
21:9, 21:19,
29:9, 53:14,
137:12, 137:15,
138:3, 138:14,
138:16, 139:1
**let**
35:6, 38:8,
43:21, 44:8,
47:20, 51:22,
78:6, 85:11,
88:9, 95:15,
95:19, 141:12,
151:23, 153:10,
176:21, 182:1,
189:21, 190:3,
192:8, 201:24,
205:15, 206:17,
210:2, 263:7,
270:23, 271:1,
275:21, 290:2,
300:4, 306:4,
316:7, 316:21,
329:15, 338:17,
351:23
**let's**
34:22, 63:22,
70:16, 93:7,
104:3, 121:13,
178:14, 178:15,
184:24, 189:11,
190:12, 190:21,
203:2, 212:5,
218:10, 223:13,
225:8, 244:9,
254:12, 258:9,
261:14, 268:14,
279:16, 280:17,
282:13, 286:14,
290:2, 291:15,
297:3, 304:2,
316:21, 316:22,
324:6, 361:18,
361:19
**level**
31:22, 78:11,
78:15, 78:18
**liability**
106:16, 107:8,

112:4
**liars**
222:24
**license**
58:4
**lies**
112:13
**lieutenant**
23:23
**lieutenants**
61:1, 61:3,
61:8, 61:10
**life**
105:4, 328:5,
349:18
**light**
335:24
**lighting**
336:6
**like**
64:20, 78:21,
83:7, 99:12,
102:9, 111:19,
130:22, 142:24,
155:1, 171:14,
193:10, 200:19,
220:6, 226:7,
228:2, 235:11,
250:6, 250:8,
270:4, 270:5,
276:23, 282:11,
283:24, 336:16,
336:17
**liked**
200:16, 306:6
**likely**
137:12, 137:15,
138:3, 138:8,
138:14, 138:16,
139:2, 329:9
**line**
91:2, 91:3,
91:4, 92:1,
240:14, 241:5,
241:10, 241:11,
241:22, 242:1,
242:6, 242:9,
242:13, 243:3,

JGS_MAYSONET 4109

243:8, 291:4,
292:22, 293:6,
293:7
**lines**
91:5, 175:24,
236:1, 236:2,
245:23, 300:5,
364:1
**lineup**
78:22, 79:9,
79:21, 79:23,
80:9, 80:17,
80:20, 81:2,
81:14, 82:1,
82:4, 82:7,
82:8, 82:16,
82:17, 83:2,
83:3, 83:6,
83:7, 128:14,
128:15, 128:19,
128:21, 129:3,
129:5, 242:6,
277:19, 278:16,
278:22, 279:7,
279:14, 279:21,
280:10, 280:14,
280:20, 280:23,
282:7, 282:10,
282:12, 282:22,
283:10, 283:13,
284:1, 284:14,
285:4, 310:7,
310:11, 310:13,
310:14, 310:16,
310:18, 310:22,
310:23, 311:4,
311:9, 312:4
**lineups**
79:1, 79:3,
79:6, 79:13,
79:15, 79:18,
82:19, 128:7,
128:8, 128:9,
129:8, 130:18,
131:2, 131:20,
283:2, 329:4
**link**
226:4, 248:15

**linkage**
142:19
**list**
25:18, 25:21,
25:24, 30:15,
30:18, 30:20,
177:12, 177:17,
180:3
**listed**
248:3, 261:9,
261:15, 261:19,
364:13
**literally**
357:20
**little**
21:9, 21:19,
29:9, 52:22,
57:8, 122:23,
137:23, 148:10,
161:8, 193:4,
234:13, 292:10,
292:15
**live**
13:22
**lived**
150:3, 344:13,
356:23
**lives**
19:14
**living**
19:10, 19:12
**llc**
3:19, 4:19
**loan**
327:15
**locate**
203:18, 207:18
**located**
127:6, 208:18
**location**
2:2, 38:21,
76:20, 208:17,
210:17, 269:11,
321:21
**locations**
92:4, 331:20
**lock**
338:21, 338:23

**locked**
62:23, 67:17,
67:19, 68:7,
102:11, 215:24
**locks**
338:21
**lockup**
89:14, 132:11,
134:9, 134:15,
135:9, 135:10,
135:11, 138:20,
139:9, 279:22,
279:24, 338:11
**loevy**
2:4, 3:4, 7:3,
7:4, 7:7
**log**
101:12, 102:13,
237:24
**logan**
126:4, 126:7,
126:16
**logged**
268:17, 268:23
**logical**
250:6, 250:8
**long**
16:18, 21:8,
21:17, 23:13,
26:9, 27:1,
29:7, 32:23,
40:22, 48:21,
51:9, 52:7,
52:17, 53:9,
53:21, 53:24,
66:12, 72:1,
81:15, 81:23,
118:13, 119:9,
119:11, 119:14,
119:16, 119:20,
120:7, 122:15,
134:7, 164:22,
169:23, 298:6,
333:24, 359:2
**longer**
66:17
**longhand**
35:19

**look**
74:2, 77:5,
78:3, 78:19,
79:10, 80:1,
80:13, 80:15,
80:19, 98:17,
99:5, 101:17,
134:11, 134:20,
145:18, 148:7,
173:20, 173:22,
175:9, 180:20,
180:22, 181:1,
185:19, 200:19,
208:9, 224:1,
224:4, 234:19,
240:2, 240:23,
241:4, 244:14,
253:18, 253:22,
267:17, 279:16,
280:17, 280:22,
287:20, 296:5,
298:24, 299:13,
299:21, 309:7,
329:19, 332:8,
332:14, 334:2,
352:16, 353:8,
353:9, 358:11,
358:19, 359:15,
359:21, 360:9,
360:19, 360:22,
361:3, 363:14,
363:24, 364:10
**looked**
79:8, 102:5,
102:9, 103:21,
104:4, 148:17,
164:15, 180:15,
181:14, 211:13,
245:24, 246:5,
276:23, 311:1,
311:2, 332:7,
340:24, 343:16,
359:4, 359:14,
359:16
**looking**
47:19, 54:13,
73:24, 90:5,
98:18, 126:23,

JGS_MAYSONET 4110

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

127

127:4, 175:1,
180:14, 181:9,
185:5, 202:21,
207:9, 207:23,
260:2, 278:23,
301:6, 311:4,
358:5, 361:2
**looks**
78:21, 228:2
**loose**
164:9
**lot**
30:7, 86:13,
135:4, 202:5,
210:18, 328:9,
328:10, 329:8
**loud**
10:21
**louder**
12:14
**love**
97:24
**lover**
250:14
**lugged**
339:16
**lupe**
161:4
**lying**
219:22

**M**

**made**
24:10, 24:20,
101:20, 103:12,
104:6, 104:8,
111:3, 111:17,
157:22, 187:21,
187:23, 248:22,
316:5
**magnified**
88:2
**maher**
132:7, 132:10,
132:15, 134:5,
202:24
**maher's**
132:9

**mail**
40:9
**main**
61:24, 62:1,
62:9, 62:11
**mainly**
21:6, 129:21,
259:12
**maintain**
213:14
**maintained**
101:3, 243:14
**majority**
315:5
**make**
8:18, 24:21,
26:9, 26:15,
26:23, 38:10,
73:8, 73:13,
73:17, 73:19,
73:22, 75:23,
80:16, 80:20,
84:12, 87:7,
88:11, 89:7,
89:10, 89:12,
104:2, 104:11,
104:21, 111:4,
127:9, 136:13,
158:8, 190:1,
192:9, 230:1,
267:18, 268:4,
278:16, 282:8,
284:1, 292:11,
292:20, 306:7,
322:16, 323:20,
323:22, 339:12,
351:12
**making**
78:12, 145:8,
145:11, 149:8,
193:6, 224:8,
225:1, 304:19
**man**
80:23, 352:4
**manila**
57:23, 58:6,
58:10
**manner**
244:21

**manpower**
28:18
**manual**
55:14
**manually**
55:17
**many**
9:8, 30:22,
35:18, 90:23,
94:17, 98:4,
98:17, 116:12,
143:19, 164:18,
171:18, 172:17,
180:6, 180:16,
288:18, 324:18,
328:8, 331:19,
358:19
**march**
260:7, 260:22
**mark**
121:13, 178:15,
184:24, 190:12,
223:13, 225:8,
290:2, 316:8
**marked**
121:15, 121:20,
150:2, 178:17,
185:2, 190:14,
223:15, 225:10,
290:20, 316:9,
362:1, 362:5,
362:15, 363:1
**marks**
71:2
**master**
180:3
**match**
98:13, 180:4,
206:2, 313:6,
354:20
**matched**
277:7
**material**
40:9, 211:12
**math**
231:23
**matt**
7:23, 365:4,

366:2
**matter**
7:4, 153:14,
203:7, 218:14,
219:7, 282:24,
365:22
**matthew**
4:2, 365:7,
365:9, 365:24,
367:2, 367:5,
367:10
**may**
16:7, 48:6,
76:9, 120:17,
122:8, 124:14,
136:3, 139:7,
143:9, 151:19,
151:21, 164:10,
165:3, 165:4,
165:7, 165:10,
168:23, 200:23,
202:22, 203:11,
226:16, 236:21,
236:23, 237:1,
237:4, 237:8,
237:22, 238:1,
238:8, 238:12,
238:23, 248:15,
266:19, 313:5,
314:23, 360:5,
360:8, 360:17,
361:1, 370:20
**maybe**
320:6, 359:6
**maysonet**
14:13
**meals**
89:3
**mean**
13:11, 32:21,
35:22, 37:19,
37:22, 44:8,
44:22, 46:16,
60:8, 61:16,
62:12, 63:9,
69:19, 70:3,
70:5, 70:8,
73:3, 74:21,

JGS_MAYSONET 4111

76:5, 82:17,
99:14, 103:2,
103:23, 119:11,
125:2, 127:12,
129:22, 130:9,
134:19, 145:14,
149:18, 150:21,
158:8, 163:23,
191:6, 228:19,
228:20, 235:11,
238:13, 243:11,
259:5, 274:15,
285:18, 320:5,
320:22, 333:8,
360:7, 360:24
**meaning**
243:19, 245:5
**meaningful**
26:18, 26:19
**means**
70:4, 222:20,
296:6, 314:11
**meant**
82:12, 179:10
**media**
111:15, 112:21,
113:2
**medical**
12:1, 12:2,
12:20
**medication**
12:2
**medium**
122:17, 122:19,
281:22
**medium-sized**
331:1
**meet**
15:4, 15:6,
45:16, 50:9,
65:14, 119:9,
119:23, 143:18,
143:22, 144:1,
156:6, 156:14,
304:21, 305:21,
365:11
**meeting**
119:11, 119:14,

119:20, 120:3,
120:4, 120:7,
120:12, 156:17,
157:6, 157:22,
186:1, 186:15,
187:17, 190:22,
191:2, 193:10,
203:7, 203:12,
219:6, 305:13,
305:15, 305:17,
365:18, 365:24,
367:5
**meetings**
119:8, 120:2,
120:8
**member**
12:19, 23:19,
23:24, 24:3,
28:19, 30:4,
63:5, 135:21,
136:7, 136:8,
136:15, 137:1,
137:2, 137:13,
137:15, 137:16,
137:17, 138:2,
138:3, 138:4,
138:15, 138:20,
139:1
**members**
20:9, 97:24,
100:22, 135:24,
138:12, 138:17,
139:3, 180:3,
181:16, 327:14
**memo**
196:14, 223:18
**memorandum**
6:16, 6:17
**memorialize**
102:2, 228:7
**memorialized**
37:6, 199:11,
199:20, 203:13,
350:19
**memory**
12:17, 12:22,
13:6, 43:7,
68:5, 130:21,

131:24, 134:12,
134:21, 145:19,
162:7, 298:5,
303:15, 303:20,
348:22
**memos**
120:20, 120:22
**men**
279:3, 279:6,
279:13, 279:19,
342:18, 343:14,
349:19, 351:16,
352:3, 352:9,
352:14, 353:2,
353:4, 355:10,
355:20, 355:24
**men's**
341:13
**mental**
355:2
**mention**
170:11
**mentioned**
12:20, 119:19,
171:11, 184:4,
201:22
**merchandise**
210:12
**meritoriously**
65:22
**met**
50:8, 113:19,
119:17, 120:10,
135:15, 144:2,
190:5, 201:7,
201:17, 305:8,
365:10
**metal**
335:19
**mexican**
195:8, 195:14,
195:15, 195:23
**middle**
63:6, 247:8,
247:10, 330:6
**midnight**
93:20, 93:21,
93:24, 94:3,

94:15, 95:2,
95:13, 96:5,
96:6, 96:9
**midnights**
52:21
**miedzianowski**
213:5, 214:5,
215:7, 215:15,
216:11, 217:3,
217:9, 217:17,
217:18, 217:22,
327:12
**might**
13:5, 33:21,
34:12, 39:3,
48:7, 48:12,
48:17, 55:2,
63:13, 64:5,
64:6, 64:9,
80:2, 85:4,
85:21, 86:1,
86:19, 87:5,
97:3, 103:14,
106:15, 107:7,
139:18, 141:16,
142:18, 144:5,
146:19, 149:10,
151:21, 183:12,
209:19, 219:4,
223:22, 232:22,
233:1, 240:10,
250:22, 251:12,
266:5, 285:5,
315:4, 336:13,
354:11, 359:8
**mind**
88:22, 111:3,
111:4, 148:24,
169:5, 302:14
**mingey**
4:9, 8:5, 8:7,
14:17, 201:2,
223:19, 278:10,
287:6, 287:9,
287:14, 288:1,
298:15, 323:21
**minor**
197:3

JGS_MAYSONET 4112

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

129

minors
259:14, 259:15,
259:17
minute
356:5, 356:11
minutes
16:16, 16:20,
246:3, 272:18,
351:9, 358:15,
358:16
miscellaneous
58:3
mischaracterizes
58:12, 150:9,
188:11, 188:19,
272:1
mischaracterizing
202:11, 202:13,
224:18, 315:12
misconduct
324:16, 325:1,
325:13, 325:16,
326:23, 327:1
misconducts
327:8
misdeeds
138:15, 138:17,
139:3, 139:4
misrepresentation
219:12
misrepresentatio-
ns
193:7
misrepresenting
220:21, 221:13,
222:3, 222:17,
222:19
missed
359:6
missing
225:13, 275:4,
275:5
mission
304:23
misspoke
179:8, 210:2
mistake
312:3, 316:5

mistaken
202:9
mixing
265:10
moments
246:4
monday
361:11
mondo
163:3, 163:5,
163:7, 163:20,
164:24, 165:14,
174:3, 174:7,
174:13, 174:23,
175:1, 176:8,
176:12, 177:3,
177:7, 178:9,
179:1, 179:16,
182:5, 182:13,
183:13, 184:21,
188:3, 188:8,
188:16, 239:2,
273:10, 309:3,
342:1, 342:9,
342:15, 343:5,
343:14, 345:16,
346:1, 347:2,
348:23, 349:15,
349:24, 350:22,
356:14, 356:21,
357:5, 359:16,
359:20, 359:22,
360:10, 360:20,
361:3
mondos
177:13, 177:19,
358:19
money
250:14, 327:15,
327:21, 327:24,
338:8
monica
288:4, 288:5,
289:9, 289:15,
289:18, 297:17,
297:20
monster
111:16

mont
6:14, 6:18
montanez
1:5, 3:2, 5:11,
7:4, 7:15, 8:13,
51:23, 144:6,
144:15, 144:17,
144:22, 145:3,
145:20, 173:2,
173:11, 176:12,
178:9, 179:1,
179:16, 201:4,
207:4, 226:4,
226:12, 226:21,
238:14, 257:7,
257:9, 273:7,
273:22, 275:17,
275:22, 298:20,
299:1, 299:5,
305:12, 308:2,
308:7, 318:15,
321:4, 323:15,
341:2, 341:3,
343:3, 345:24,
346:5, 346:12,
346:15, 349:14,
349:22, 350:21,
351:3, 363:9,
367:7, 367:12
montanez's
175:12, 201:10,
204:21, 205:5,
205:17, 205:21,
206:2, 206:8,
206:19, 207:7,
207:19, 207:20,
236:15, 270:15,
270:19, 271:21,
272:6, 272:15,
276:19, 277:6,
277:8, 332:7,
341:6
month
151:17, 209:5,
237:7, 237:9,
237:11, 237:14
months
22:10, 27:11,

27:13, 66:16,
257:17, 258:2
montia
16:4, 16:5
monticello
304:18, 304:21,
305:2
moon
98:8, 98:9,
98:15
more
3:18, 16:20,
24:20, 24:21,
24:23, 24:24,
25:2, 26:10,
26:15, 26:18,
26:23, 70:6,
70:8, 92:4,
99:19, 99:21,
99:23, 110:6,
118:18, 128:9,
128:19, 129:13,
136:19, 138:8,
138:19, 217:20,
242:12, 245:14,
274:10, 298:9,
328:11, 329:9,
329:12, 329:13,
347:14, 357:23,
358:1, 358:19
morning
7:20, 119:12,
156:7, 231:12,
232:5, 233:3,
233:5, 233:8,
233:13, 246:11,
246:13, 246:17,
246:22
moses
298:20, 299:1,
299:5, 308:3,
342:18, 346:20,
347:18, 347:19,
351:14
most
36:20, 62:9,
120:8, 157:5
mostly
71:20, 71:21

JGS_MAYSONET 4113

**motion**
82:6
**motions**
82:1, 82:4
**motive**
244:21
**mouth**
325:4
**move**
13:24, 126:13,
292:10
**moved**
27:18, 126:16
**moving**
312:6
**mrs**
111:20
**much**
71:4, 86:5,
86:23, 88:12,
123:2, 136:17,
282:3, 292:15,
328:12, 337:20
**mucked**
228:4
**muddying**
203:16, 204:11
**mug**
76:5, 308:12
**multiple**
47:12, 47:16,
47:24, 48:6,
48:10, 128:20,
202:4, 345:18,
347:12, 347:16,
350:3
**municipal**
149:16, 149:23,
150:1
**murder-for-hire**
116:13
**murdered**
193:24, 250:12,
289:9, 325:3,
355:8
**murdering**
289:15
**murders**
288:18

**must**
11:21, 218:21,
317:8
**myself**
42:11, 53:14,
63:6, 156:18,
362:20, 365:8

---
### N
**name**
8:15, 9:3,
40:12, 41:14,
50:7, 50:8,
51:17, 51:19,
51:20, 52:6,
93:5, 98:14,
99:20, 99:23,
106:2, 117:9,
117:12, 117:13,
117:20, 117:23,
123:12, 144:20,
166:8, 169:6,
172:20, 194:21,
213:4, 215:8,
216:22, 260:1,
261:22, 277:23,
278:2, 278:7,
306:14, 306:17,
306:22, 307:5,
307:6, 362:21,
365:7
**named**
100:6, 131:11,
161:2, 161:5,
161:7, 164:24,
174:23, 195:21,
288:8, 301:24,
359:20
**names**
14:18, 98:5,
99:11, 173:2,
174:18, 174:23,
175:10, 177:10,
178:1, 180:4,
181:16, 342:6,
342:23, 343:19,
345:18, 346:8,
346:19, 347:4,

347:5, 348:6,
348:8, 349:9,
349:10, 350:1,
350:4, 351:5,
360:23
**narrow**
64:20, 172:5,
172:12, 336:22
**nature**
58:4, 62:23,
71:3, 74:4,
117:6, 280:8
**ncic**
54:23
**near**
237:22
**necessarily**
35:13, 47:16,
89:6, 313:6
**necessary**
141:23, 141:24
**need**
11:20, 73:1,
75:3, 78:21,
87:7, 94:9,
94:10, 94:13,
96:10, 111:1,
111:2, 142:15,
142:16, 166:16,
174:12, 174:22,
188:23, 192:14,
193:9, 268:2,
275:4, 292:10,
353:10, 356:19,
357:1, 361:8,
361:10, 368:12
**needed**
28:18, 43:5,
93:18, 94:5,
95:3, 95:13,
95:17, 171:14,
228:15, 229:4,
240:2, 249:6
**needs**
193:1, 337:14,
339:12
**negative**
13:2, 103:20,

103:24
**neighbor**
231:3, 234:12
**neighborhood**
276:2
**neither**
285:7, 370:12
**nephew**
191:16, 193:21,
193:23, 194:7,
194:16
**nephew's**
194:21
**never**
25:22, 27:19,
33:6, 33:8,
58:17, 58:18,
58:19, 75:15,
78:7, 83:7,
112:15, 115:5,
159:12, 166:23,
167:1, 200:16,
215:6, 217:20,
218:7, 226:20,
256:4, 272:3,
282:1, 288:23,
288:24, 327:16,
327:17, 327:18,
327:21, 327:22,
342:20, 342:22,
348:6, 355:7,
359:14, 359:16
**new**
3:15, 28:17,
63:18, 67:10,
67:11, 67:13,
67:14, 68:1,
69:12, 187:7,
229:12, 229:16,
251:8, 255:17,
258:6, 271:12
**next**
10:24, 11:7,
53:3, 61:6,
91:2, 91:3,
93:16, 131:1,
144:15, 147:1,
186:21, 203:2,

JGS_MAYSONET 4114

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

131

204:19, 212:9,
247:7, 257:16,
258:2, 275:23,
279:6, 279:13,
280:11, 300:20,
300:23, 307:11,
307:23, 314:8,
314:14, 317:20,
318:2

**nick**
341:1

**nickname**
97:23, 98:13,
98:16, 98:20,
99:5, 99:7,
99:19, 99:20,
100:1, 100:3,
100:7, 164:15,
164:19, 171:18,
171:20, 172:17,
172:18, 174:7,
174:20, 176:10,
176:23, 177:5,
177:6, 177:7,
177:18, 177:19,
178:8, 178:24,
179:7, 179:8,
179:9, 179:10,
179:14, 180:3,
180:7, 180:15,
181:10, 216:24,
239:13, 239:21,
240:1, 240:2,
240:3, 240:5,
240:7, 298:24,
299:11, 299:13,
299:21, 341:6,
341:23, 343:2,
358:20, 359:21,
360:9, 360:19

**nicknames**
97:24, 98:2,
98:6, 99:11,
99:22, 163:1,
163:2, 164:10,
166:15, 173:21,
173:23, 174:2,
174:13, 174:17,

174:19, 175:9,
176:7, 176:19,
177:11, 180:2,
180:5, 181:15,
181:17, 226:16,
226:21, 239:2,
298:19, 341:2,
341:10, 341:13,
341:19, 341:22,
342:9, 342:15,
343:5, 343:7,
343:14, 343:18,
345:11, 345:12,
345:13, 345:20,
345:23, 346:9,
346:10, 346:11,
346:24, 347:1,
347:9, 347:14,
347:17, 347:20,
348:18, 349:2,
349:6, 349:8,
349:19, 349:24,
350:3, 350:10,
350:12, 350:21,
351:2, 351:3,
351:7, 351:14,
360:4, 361:2

**night**
93:19, 94:19,
156:8, 218:17,
220:3, 221:10,
231:9, 232:10,
232:18, 233:2,
233:7, 233:13,
326:14, 345:3,
361:12

**nikolaevskaya**
5:3, 7:24,
88:6, 95:8,
97:6, 97:15,
137:21, 141:1,
142:6, 143:16,
151:2, 151:9,
157:1, 159:11,
159:18, 160:11,
160:13, 161:1,
164:7, 166:11,
170:10, 171:9,

175:7, 177:15,
177:24, 180:19,
181:8, 182:22,
184:16, 212:1,
212:3, 256:17,
278:14, 280:9,
281:12, 281:18,
284:7, 289:2,
289:23, 291:2,
341:16, 342:4,
343:9, 350:2,
350:15, 353:5,
368:4

**nine**
52:18, 53:11

**nitsky**
16:4, 16:5,
145:8, 145:11,
145:17

**nobody**
12:19, 13:4,
350:11

**nobody's**
140:12

**non-spanish**
130:1

**none**
268:1, 368:4

**nonpublic**
38:16, 39:13,
84:23, 85:19

**noon**
286:10, 311:20

**nope**
60:16, 115:17,
339:7, 342:24

**nor**
370:13

**normal**
133:2

**normally**
281:3

**north**
2:5, 3:5, 3:20,
4:20, 7:7,
23:12, 29:3,
29:6, 92:21,
93:11, 101:12,

101:15, 101:17,
102:16, 102:24,
103:2, 103:3,
103:5, 103:9,
104:4, 146:17,
300:10, 300:11,
344:3, 344:6,
344:8, 353:21

**northern**
1:2, 92:10

**nos**
6:14, 6:18

**notarial**
370:17

**notary**
2:14, 370:1,
370:4, 370:23

**notation**
265:17

**notch**
8:23

**note**
40:17, 96:14

**noted**
257:16

**notepad**
157:13, 157:16,
157:21, 158:3

**notes**
35:20, 36:1,
39:17, 39:20,
39:23, 40:2,
41:9, 41:12,
41:13, 41:17,
41:19, 41:22,
41:23, 42:2,
96:18, 157:8,
157:10, 157:12,
158:15, 158:19,
158:21, 203:20

**nothing**
122:14, 208:22,
256:10, 258:8,
270:11, 270:13,
270:18, 271:17,
276:23

**notice**
2:12, 268:22

JGS_MAYSONET 4115

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

132

noticed
266:20, 271:12
now
7:12, 14:19,
19:10, 35:4,
51:23, 54:24,
62:19, 105:5,
130:22, 131:24,
136:3, 136:4,
142:24, 172:15,
180:24, 181:13,
181:22, 181:23,
184:4, 186:13,
190:1, 198:8,
202:21, 202:23,
213:2, 214:18,
219:2, 222:5,
233:16, 238:11,
290:14, 291:17,
295:19, 312:16,
316:22, 317:3,
320:9, 323:12,
349:5
nowhere
270:7
number
22:13, 54:20,
86:14, 90:12,
90:19, 91:1,
91:8, 91:11,
94:23, 125:15,
128:13, 128:17,
223:20, 223:21,
223:22, 234:23,
234:24, 235:2,
235:4, 236:13,
236:14, 236:15,
236:17, 240:21,
241:18, 241:21,
259:24, 260:2,
267:23, 276:22,
290:14, 312:15,
326:9
numbers
41:15, 90:13,
90:21, 90:24,
224:1, 224:2,
234:20, 241:11,

241:14
numerous
81:19, 82:1,
82:3
nuts
223:9

---

## O

o'clock
123:16, 123:19,
123:20, 123:22,
132:14, 133:3,
155:16, 220:8,
310:3
oath
7:13, 179:6
objecting
202:12, 214:13,
221:13, 222:3,
222:16, 222:18
objection
26:17, 36:13,
42:6, 43:1,
44:3, 44:5,
44:16, 45:9,
70:21, 76:24,
80:5, 83:15,
88:4, 98:3,
107:9, 107:11,
109:11, 112:8,
114:3, 116:24,
129:17, 136:9,
136:21, 137:3,
137:18, 140:10,
141:18, 142:11,
143:7, 143:14,
144:7, 144:10,
147:16, 156:24,
159:10, 159:17,
160:11, 164:5,
165:16, 166:9,
170:8, 171:4,
177:14, 180:17,
181:6, 182:6,
182:19, 184:2,
184:15, 185:17,
191:18, 191:19,
191:23, 192:10,

195:10, 197:21,
198:19, 202:11,
209:11, 225:5,
232:6, 232:11,
232:14, 233:15,
239:15, 246:15,
248:7, 250:18,
250:24, 254:17,
256:15, 278:14,
280:6, 286:1,
289:2, 301:7,
301:8, 315:12,
328:24, 329:11,
332:2, 337:2,
339:21, 342:12,
350:2, 350:14,
353:5, 353:6,
354:3, 357:19,
358:21
obligation
33:20
observe
149:8
observed
64:7, 125:12,
245:24, 246:22
obtain
172:3
obtained
43:24, 125:23,
168:15, 203:11,
216:19, 226:3,
236:8, 236:10,
236:20, 236:22,
237:1
obtaining
38:11
obvious
194:13
obviously
309:18, 312:3,
322:6
occasion
199:4
occasionally
98:22
occasions
9:8, 167:8,

167:17, 168:12,
168:14, 169:2,
324:18
occur
141:11, 306:20,
307:4
occurred
38:21, 38:22,
124:24, 131:19,
248:17
october
23:3, 193:20,
201:18, 260:18
odd
331:10, 331:15,
331:18, 331:23,
331:24, 341:5,
341:12, 343:6,
348:7
off
27:11, 27:13,
27:18, 56:8,
105:7, 117:16,
118:17, 170:7,
170:24, 171:3,
175:18, 177:12,
189:15, 194:9,
194:10, 194:12,
196:18, 197:10,
197:14, 197:20,
198:3, 198:8,
198:18, 210:12,
272:20, 288:7,
324:6, 324:7,
331:9, 333:15,
333:16, 361:18,
361:19, 361:20,
368:8, 368:15
offender
48:2, 48:6,
48:7, 48:10,
55:5, 126:20,
127:1, 127:7,
128:9, 128:10,
128:11, 240:18,
283:7
offenders
47:24, 55:7,

JGS_MAYSONET 4116

321:12, 355:4,
355:5, 355:7
**offer**
234:11, 234:13
**offering**
88:11, 88:16
**office**
5:4, 57:3,
57:4, 57:6,
57:13, 57:16,
57:19, 58:24,
59:2, 60:6,
60:10, 60:17,
60:19, 61:1,
61:3, 61:4,
61:5, 61:7,
61:8, 61:10,
61:12, 61:20,
61:23, 62:2,
62:13, 62:17,
63:11, 65:18,
92:3, 92:5,
92:10, 92:12,
92:15, 92:19,
92:22, 92:23,
93:1, 93:4,
93:6, 93:8,
93:10, 98:21,
98:23, 99:1,
115:2, 115:7,
124:9, 124:11,
143:24, 152:11,
152:12, 152:14,
153:10, 165:13,
172:24, 173:1,
173:14, 173:19,
175:8, 176:10,
178:8, 178:24,
179:15, 180:1,
181:14, 182:24,
186:20, 199:13,
200:13, 200:17,
218:14, 220:1,
220:11, 221:7,
222:13, 237:19,
275:14, 287:7,
298:16, 322:21,
334:19, 334:23,

357:9, 360:22,
366:18, 366:23
**officer**
19:18, 21:1,
23:1, 24:11,
26:14, 31:3,
31:5, 31:21,
31:24, 32:3,
32:4, 53:20,
53:22, 54:1,
54:3, 55:3,
84:16, 92:8,
92:9, 92:20,
102:15, 102:20,
125:14, 161:4,
169:17, 169:21,
170:3, 319:1,
324:16, 324:22,
324:24, 325:9,
370:6
**officers**
24:6, 24:7,
24:8, 24:11,
24:12, 24:13,
24:14, 24:15,
24:16, 24:18,
24:19, 28:23,
51:3, 51:7,
125:22, 170:19,
199:20, 200:5,
201:2
**offices**
156:15, 160:4
**official**
75:20, 101:1,
203:22
**officially**
203:12
**oh**
108:13, 113:11,
128:16, 161:13,
175:1, 176:9,
213:19, 226:6,
235:23, 237:15,
261:7, 285:17,
290:15, 291:24,
296:10, 329:18,
348:22, 359:1

**okay**
9:6, 10:17,
10:22, 11:3,
11:14, 11:23,
35:24, 57:21,
63:23, 70:17,
81:13, 93:8,
139:6, 163:6,
164:22, 175:11,
176:9, 177:3,
179:12, 181:1,
181:13, 181:22,
185:10, 185:15,
189:4, 189:14,
189:23, 193:13,
196:23, 212:5,
212:24, 213:11,
215:14, 224:3,
225:13, 228:22,
233:11, 235:7,
235:14, 237:20,
244:16, 244:20,
245:10, 245:20,
245:21, 253:14,
256:5, 260:22,
262:22, 263:4,
263:14, 263:21,
264:15, 264:18,
265:16, 265:19,
270:22, 271:15,
272:19, 273:2,
275:23, 276:18,
279:22, 282:13,
285:22, 286:14,
290:2, 292:15,
293:14, 293:17,
295:5, 295:6,
295:23, 296:3,
296:9, 296:11,
296:16, 297:7,
309:9, 309:22,
312:20, 316:4,
317:5, 318:1,
318:18, 323:13,
329:18, 330:10,
330:13, 358:15,
358:16, 362:12,
362:20, 363:7,

363:14, 363:24,
364:10, 365:2
**old**
33:4, 126:13,
126:17
**old-style**
64:20
**older**
52:6
**ole**
329:20
**on-duty**
60:13, 61:11,
102:15
**once**
30:24, 56:10,
56:13, 67:9,
68:6, 68:23,
109:18, 109:22,
118:19, 171:5,
177:1, 221:12,
222:16, 262:3,
363:21
**oncoming**
93:21
**one-and-a-half**
358:16
**one-way**
79:8, 79:10
**ones**
121:1, 346:19,
348:18, 348:19
**ongoing**
163:21
**only**
48:5, 49:19,
67:20, 84:7,
84:8, 85:19,
90:6, 92:2,
130:6, 168:18,
168:22, 170:17,
170:21, 177:7,
187:9, 206:16,
230:24, 236:11,
237:23, 264:1,
267:12, 267:24,
268:8, 268:20,
276:5, 281:7,

JGS_MAYSONET 4117

281:14, 283:9,
288:20, 300:8,
308:21, 321:23,
334:10, 336:22,
337:6, 350:9
**open**
61:19, 61:22,
62:13, 321:13
**open-ended**
37:16, 37:19
**operator**
253:24
**opinion**
24:6, 31:11,
31:12, 36:24,
84:14, 108:4,
198:22, 198:23
**opportunity**
111:22, 117:17,
193:2
**opposed**
28:23, 37:24,
38:12, 39:9,
49:8, 136:18,
139:3, 153:1,
153:12, 322:9
**opposing**
135:21, 135:23,
136:8, 136:15,
136:18, 137:2,
137:13, 137:16,
138:4, 138:9,
138:15, 138:19
**opposite**
58:1
**ops**
216:16
**orally**
96:17
**orbish**
112:7, 112:12
**order**
41:7, 56:24,
112:18, 243:6,
244:4, 338:6,
368:9, 368:13
**ordered**
16:14, 16:17

**orders**
364:22
**ordinarily**
275:13
**organized**
99:7, 100:1,
100:3
**original**
203:17, 227:17,
227:21, 229:14
**other's**
129:1
**others**
240:11
**otherwise**
17:3, 111:9,
370:15
**our**
29:23, 46:2,
120:8, 126:21,
200:16, 217:9,
256:13, 256:19,
327:13
**out**
10:21, 16:17,
18:1, 18:3,
18:7, 18:12,
19:12, 32:6,
39:2, 45:1,
50:20, 54:5,
56:15, 58:21,
59:2, 59:5,
59:15, 60:1,
71:24, 77:4,
78:2, 83:17,
83:20, 86:18,
87:4, 93:23,
95:16, 98:9,
98:15, 99:13,
99:17, 102:12,
102:24, 103:9,
112:19, 112:24,
116:13, 123:9,
126:22, 127:4,
136:22, 136:23,
142:16, 144:9,
146:1, 146:12,
149:10, 150:23,

151:5, 164:16,
170:13, 191:5,
191:6, 192:9,
193:10, 203:4,
209:14, 231:3,
231:22, 233:12,
234:5, 239:4,
239:9, 245:24,
246:5, 253:18,
279:2, 279:12,
282:1, 282:9,
283:4, 302:3,
305:5, 305:23,
306:7, 323:20,
323:22, 327:22,
328:22, 337:10,
337:11, 338:8,
344:3, 344:8,
351:2, 355:6
**outcome**
370:15
**outfit**
210:11
**outside**
15:16, 15:18,
16:8, 16:12,
16:18, 16:23,
17:1, 17:16,
17:20, 113:10,
116:21, 123:14,
124:24, 125:8,
191:3, 335:24
**over**
10:16, 32:13,
43:21, 101:17,
119:8, 146:11,
152:10, 153:10,
153:24, 155:9,
155:20, 162:16,
170:20, 197:18,
213:24, 258:2,
291:8, 292:7,
293:10, 300:12,
305:10, 319:21,
319:24, 320:20,
320:22, 357:20
**overtalk**
292:11

**overtime**
328:13, 328:16,
328:19, 328:22,
329:3, 329:5,
329:9, 329:13
**overturned**
131:17
**own**
58:16, 138:5,
138:9, 138:12,
138:17, 138:20,
139:4, 339:21,
338:8, 341:24
**owned**
300:8

---
**P**
---
**pacheco**
173:2, 173:11,
176:13, 178:10,
179:2, 179:17,
181:10, 201:4,
207:4, 226:5,
226:13, 226:22,
238:14, 238:16,
273:22, 282:17,
285:7, 299:17,
299:19, 299:22,
305:12, 307:24,
318:14, 323:24,
341:2, 343:4,
349:15, 350:21,
351:3, 356:14,
367:7, 367:13
**pacheco's**
236:13, 236:14
**packet**
310:24
**pages**
1:23, 56:20,
227:14, 252:7,
286:14, 313:3,
313:6, 313:7,
340:23
**paid**
112:16
**papa**
115:16

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                                135

paper
56:23, 65:1,
65:9, 65:12,
99:13, 157:14,
158:22, 203:15,
204:10, 337:1
papers
244:12
paperwork
217:9
paragraph
185:23, 196:13,
200:20, 201:15,
202:9, 202:17,
202:18, 203:3,
204:19, 212:7,
218:11, 219:15,
219:20, 221:21,
222:12, 247:8,
247:13, 247:14,
247:19, 252:10,
257:14, 257:15,
275:24, 294:4,
304:3, 307:13,
317:6, 317:12,
318:2, 329:21,
330:9
pardon
163:4, 212:2
park
29:5, 126:4,
126:5, 126:8,
126:11, 126:16,
146:17, 196:1,
303:23, 304:2,
304:6, 304:8,
304:12, 304:16,
304:17, 304:18,
304:21, 305:2,
353:21
parked
18:22, 18:23,
19:3, 300:12,
300:13, 344:10,
344:12, 345:4,
345:7, 349:3
parking
19:1, 149:10,

170:20, 197:18,
199:5
parroting
39:9
part
32:12, 76:8,
106:19, 109:9,
117:5, 126:5,
126:7, 141:9,
208:8, 271:22,
272:7, 282:6,
307:3
participants
82:7, 82:16,
82:17, 280:20,
281:1, 281:5
particular
36:16, 239:6,
266:14
parties
370:13
partner
52:1, 52:12,
53:1, 53:3,
53:7, 53:8,
80:9, 132:19,
217:15, 254:4,
256:8, 257:3,
272:5, 294:5
partner's
278:2
partnered
52:17, 52:19,
53:5, 53:10,
66:6, 66:14
partnering
52:9
partners
53:12, 66:4,
194:18
partnership
196:15
parts
106:22, 202:21
party
113:18
pass
93:22, 93:24,

95:20, 360:13,
360:14
pass-through
204:23, 205:6,
205:18, 205:22
passed
360:18, 361:4
passenger's
273:12
passing
25:9
past
10:4, 138:24,
176:14, 357:21
path
25:7, 26:2
patrol
23:8, 23:13,
26:11, 28:3,
29:13, 32:3
patrolman
325:18, 325:19
paul
16:4, 16:5,
145:8, 145:11,
145:16
paula
4:3, 7:22,
365:7
pause
16:21, 169:23
pay
20:14, 136:5,
151:22
paying
85:24
pc
4:12
pending
11:22, 111:13,
189:9, 255:13
penitentiary
88:1
people
15:4, 15:21,
17:15, 18:15,
47:18, 48:23,
60:18, 73:4,

76:12, 78:4,
78:19, 81:3,
81:10, 81:15,
81:23, 83:5,
86:8, 88:24,
89:15, 98:4,
100:6, 121:22,
142:10, 171:12,
174:23, 179:23,
181:3, 183:5,
195:14, 208:22,
215:3, 236:18,
275:10, 278:19,
278:23, 280:10,
281:8, 281:9,
282:9, 288:18,
325:3, 329:3,
329:12, 333:4,
333:15, 333:16,
338:17, 347:10,
348:20, 349:7,
350:13, 351:7,
352:23, 353:24,
354:20, 355:1,
356:13, 356:17,
358:3, 358:6
per
99:20
perceive
12:21
perfect
105:5
perhaps
212:17
period
17:20, 63:23,
119:8, 314:22,
364:11
permanent
243:14
permissible
81:20, 81:22
permitted
45:20
perpetrator
47:19, 48:13,
48:18, 103:14,
104:15, 251:13,

JGS_MAYSONET 4119

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

136

283:4
**perpetrators**
55:2, 309:2,
353:18, 354:1,
354:19
**person**
35:7, 35:16,
36:3, 36:8,
37:2, 38:19,
45:1, 45:6,
46:7, 46:11,
46:12, 47:2,
47:6, 59:19,
70:13, 78:2,
79:24, 80:1,
80:3, 81:3,
81:14, 81:22,
86:6, 86:18,
88:3, 88:11,
88:13, 88:17,
88:18, 101:16,
101:18, 102:3,
102:6, 102:9,
102:18, 103:17,
103:21, 104:24,
125:17, 129:24,
132:5, 135:9,
136:6, 140:14,
166:8, 167:20,
168:3, 168:8,
168:10, 168:13,
169:7, 169:18,
169:22, 170:4,
172:18, 172:20,
174:24, 176:18,
176:21, 176:24,
177:12, 180:12,
214:7, 250:6,
250:8, 273:8,
273:11, 275:1,
288:11, 288:15,
301:23, 307:20,
308:1, 308:3,
321:23, 322:19,
322:21, 322:23,
337:5, 337:22,
338:4, 338:6,
338:9, 342:17,

342:20, 342:23,
349:17, 351:15,
353:11, 353:16
**person's**
41:14, 58:4,
81:8, 81:11,
88:22, 137:7,
172:19
**personal**
157:19, 328:5
**personally**
65:20, 78:22,
144:11, 349:10
**personnel**
213:6, 213:9
**persons**
35:19, 50:18,
79:7, 79:9,
79:11, 98:6,
173:12, 176:14,
177:11, 178:3,
178:4, 226:16,
280:18, 283:1,
285:6
**pertain**
34:16, 331:4
**pertained**
90:6
**pertaining**
96:11, 252:15
**pertinent**
303:7, 303:19,
347:8
**pete**
161:3, 161:5,
161:7, 161:8,
161:9, 161:11,
161:13, 161:23,
162:3, 162:4,
162:9, 163:3,
163:5, 163:6,
163:19, 164:16,
164:20, 164:24,
165:13, 171:12,
171:15, 171:20,
171:23, 172:5,
172:7, 172:11,
172:13, 174:3,

176:8, 176:11,
178:9, 179:1,
179:15, 180:8,
180:14, 182:5,
182:13, 183:12,
184:21, 188:2,
188:8, 188:16,
239:3, 239:7,
239:9, 271:12,
271:13, 271:19,
273:8, 309:2,
329:22, 330:7,
331:12, 341:6,
342:1, 342:9,
342:15, 343:5,
343:14, 345:16,
345:24, 346:6,
346:15, 347:2,
348:23, 349:15,
349:24, 350:22,
356:13, 356:21,
357:3, 357:5,
357:8, 357:16,
357:18, 359:20
**petes**
164:18, 171:18,
172:17, 172:21,
180:7
**phase**
114:23
**phil**
217:11
**phone**
54:4, 88:11,
88:13, 88:17,
89:7, 89:10,
89:11, 89:14,
90:11, 90:12,
90:14, 90:16,
90:18, 90:19,
90:21, 90:23,
91:1, 91:22,
91:23, 92:1,
146:10, 151:22,
152:4, 152:5,
158:1, 158:5,
158:10, 158:16,
158:19, 174:5,

174:17, 174:24,
176:19, 180:13,
187:8, 220:10,
257:18, 258:2,
339:12
**phones**
53:18, 339:16,
339:17
**photo**
72:18, 72:22,
73:6, 73:9,
73:12, 73:17,
74:8, 74:11,
74:20, 74:24,
75:2, 75:14,
75:16, 75:17,
76:8, 76:22,
77:15, 77:20,
77:22, 78:19,
83:22, 83:23,
84:6, 100:19,
100:21, 102:14,
103:5, 103:8,
103:9, 103:12,
103:17, 103:21,
104:5, 121:18,
122:1, 147:15,
147:18, 147:21,
148:2, 148:4,
148:6, 148:9,
148:12, 148:14,
148:18, 148:23,
149:4, 149:9,
213:6, 273:5,
273:17, 274:4,
274:20, 275:2,
280:14, 280:23,
282:12, 307:17,
307:19, 307:24,
308:2, 308:6,
309:12, 353:12,
354:16, 355:16,
355:17, 355:21,
357:8
**photocopied**
213:10, 215:4
**photocopy**
215:1, 215:16

JGS_MAYSONET 4120

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                           137

**photograph**
6:12, 102:1,
102:2, 102:7,
121:22, 122:7,
123:5, 123:7
**photographer**
22:9, 22:12,
22:20, 22:22
**photographic**
101:1
**photographs**
73:5, 75:18,
76:11, 76:21,
120:18, 147:7,
276:14, 276:16,
309:10, 357:5
**photos**
58:3, 72:24,
73:2, 74:14,
75:4, 75:21,
75:24, 76:3,
76:5, 76:12,
76:14, 76:17,
76:18, 77:4,
77:6, 77:9,
78:1, 78:2,
100:22, 101:3,
102:12, 146:14,
146:15, 173:5,
173:8, 182:4,
182:12, 182:15,
182:17, 182:24,
183:1, 183:6,
183:20, 183:22,
184:1, 184:5,
184:7, 184:21,
185:13, 185:16,
187:6, 188:2,
188:8, 188:16,
240:18, 273:7,
273:13, 274:1,
274:10, 274:11,
274:13, 274:16,
274:20, 275:5,
275:12, 275:13,
307:18, 308:9,
308:11, 308:14,
308:15, 308:16,

308:18, 308:22,
309:13, 309:16,
309:18, 309:19,
343:16, 345:10,
345:12, 345:21,
354:8, 355:1,
356:22
**phrase**
33:8, 171:7,
186:18, 206:17,
320:16
**physical**
78:24, 79:3,
79:13, 79:15,
79:17, 79:21,
80:21
**pick**
56:7, 78:8,
90:8, 91:22,
91:23, 92:1
**picked**
102:5, 177:20
**picture**
102:6
**pictures**
78:3, 101:1,
177:1, 178:2,
183:11, 183:14,
275:1, 309:5,
309:6, 358:2,
358:4, 358:7
**pina**
161:4
**pistol**
161:3, 161:5,
161:7, 161:8,
161:9, 161:11,
161:13, 161:22,
162:3, 162:4,
162:9, 163:3,
163:5, 163:6,
163:19, 164:16,
164:18, 164:20,
164:24, 165:13,
171:12, 171:15,
171:18, 171:20,
171:23, 172:5,
172:7, 172:11,

172:13, 172:17,
172:21, 174:3,
176:8, 176:11,
178:9, 179:1,
179:15, 180:6,
180:8, 180:14,
182:5, 182:13,
183:12, 184:21,
188:2, 188:8,
188:16, 239:3,
239:7, 239:9,
271:12, 271:13,
271:19, 273:8,
309:2, 329:15,
329:22, 329:23,
330:7, 330:8,
330:14, 330:20,
331:8, 331:12,
331:13, 341:6,
341:24, 342:9,
342:15, 343:5,
343:14, 345:16,
345:24, 346:6,
346:15, 347:1,
348:23, 349:15,
349:24, 350:22,
356:13, 356:20,
357:3, 357:5,
357:8, 357:15,
357:18, 359:20
**place**
45:19, 76:16,
206:11, 206:21,
211:13, 244:23,
264:2, 276:11,
279:6, 279:13,
314:21, 322:3,
338:19
**placed**
28:10, 100:23,
331:21
**plain-walled**
335:17
**plaintiff**
1:6, 1:12, 3:2,
3:9, 7:15, 8:13
**plan**
304:19

**plates**
149:12, 149:15,
149:18, 149:24,
150:1
**plausible**
150:12
**play**
305:22
**playing**
268:21
**pleading**
114:15
**please**
8:8, 8:15,
9:17, 11:11,
21:3, 47:22,
57:14, 61:21,
65:10, 69:22,
77:17, 78:6,
79:14, 82:14,
86:21, 100:11,
104:16, 110:11,
111:11, 112:23,
121:14, 129:6,
143:12, 185:1,
190:2, 190:13,
223:14, 225:9,
244:9, 261:24,
270:17, 281:19,
300:22, 303:24,
310:15, 316:8,
323:5, 335:8,
353:9
**plenty**
356:20
**pllc**
3:12
**plural**
70:6, 186:24,
187:17
**point**
48:17, 119:15,
132:9, 145:4,
164:17, 180:10,
182:2, 187:11,
189:2, 189:20,
212:12, 218:15,
220:2, 221:8,

JGS_MAYSONET 4121

227:23, 231:14,
284:9, 284:12,
300:15, 319:12,
320:11, 321:15,
340:5, 342:16,
344:2, 344:14
**pointed**
203:4
**pointing**
122:4
**pointless**
258:7
**points**
188:23, 197:3
**polaroid**
307:18, 308:9,
308:11, 308:18,
308:22
**polaroids**
76:7
**pole**
123:5
**police**
13:10, 13:16,
19:17, 19:18,
19:20, 19:21,
19:23, 20:1,
20:9, 20:12,
20:21, 21:7,
22:15, 22:21,
22:24, 23:1,
23:9, 24:5,
24:7, 24:12,
24:13, 24:23,
24:24, 25:2,
26:4, 26:18,
26:19, 28:14,
28:17, 29:24,
31:3, 31:5,
36:1, 36:21,
39:22, 49:23,
50:4, 50:5,
50:6, 50:10,
53:15, 55:12,
62:19, 62:21,
64:7, 69:2,
75:20, 76:2,
76:4, 84:16,

85:5, 86:9,
86:16, 100:24,
112:1, 112:18,
115:19, 135:11,
150:15, 157:17,
169:17, 169:21,
170:3, 170:18,
173:4, 199:19,
200:5, 213:4,
240:9, 243:13,
260:20, 262:14,
308:12, 319:1,
319:23, 324:15,
325:4, 325:9,
326:3, 326:17,
327:2, 329:12,
333:9, 333:12,
363:4, 364:21
**policemen**
31:7, 31:10
**policing**
292:10
**polygraph**
44:20, 44:24,
45:7, 45:13,
45:14, 45:15,
45:16, 45:19,
45:22, 46:1,
46:4, 46:7,
46:11, 46:13,
46:21, 46:24,
47:7, 253:15,
253:20, 253:23,
253:24, 254:1,
254:2, 254:5,
254:10, 254:14,
255:2, 258:10,
258:16, 259:20,
261:3, 261:13,
283:17, 332:24,
333:2, 333:8,
334:2, 334:3,
335:5, 340:2,
340:9
**polygraphed**
253:17, 253:19
**pool**
90:11

**poor**
289:4, 342:13
**popped**
271:14
**portion**
45:18, 64:21,
64:22
**portions**
43:11, 118:18,
203:23
**portrayed**
111:15, 112:21,
113:2, 140:18,
210:10
**pose**
63:24
**posed**
11:18, 105:15,
106:15
**positive**
104:21
**positively**
78:20
**possess**
142:18
**possibilities**
251:9
**possibility**
251:14, 331:22,
345:8
**possible**
43:6, 127:6,
152:11, 154:1,
161:3, 174:18,
175:9, 180:4,
181:15, 248:23,
248:24
**possibly**
130:2, 177:10,
226:17
**post**
21:20
**post-conviction**
114:23
**potential**
55:2, 55:5,
284:17
**pound**
278:24

**pounds**
281:15, 281:21
**pr**
128:3
**practice**
69:16, 78:11,
199:15, 200:17,
200:18
**pre-service**
363:16
**preceding**
185:19
**precisely**
218:19
**preferred**
351:5
**preliminary**
6:23
**premiere**
31:2, 31:4
**preparation**
118:10, 119:24,
131:5
**prepare**
118:21
**prepared**
277:21
**preparing**
218:13, 244:23
**presence**
113:10, 143:4,
195:20, 366:22
**present**
5:9, 7:17,
8:21, 90:5,
147:6, 154:19,
156:17, 160:5,
276:18, 318:18,
318:21, 319:3,
319:8, 334:21,
367:5, 367:10,
367:18, 367:23
**preserved**
163:14
**press**
139:22
**pretty**
67:1, 157:23

JGS_MAYSONET 4122

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                                    139

prevent
65:4
preventing
158:18
previous
67:17, 272:1,
315:13
previously
9:11, 105:23,
221:23, 222:14,
298:14, 313:4,
356:24, 357:1,
360:21
primarily
72:1
primary
240:3
print
56:15, 56:17,
66:19, 361:9
printed
99:13, 99:17
prior
110:18, 188:19,
203:7, 203:22,
218:15, 218:22,
220:16, 221:8,
226:15
prisoner
336:17
prisoner's
336:16
prisoners
279:21, 336:19
privilege
17:5, 106:20,
109:3, 110:9,
110:10
privileged
107:12, 109:24
probably
14:4, 52:8,
92:4, 113:13,
119:10, 119:19,
120:6, 122:19,
178:13, 178:14,
183:2, 201:21,
217:14, 217:16,

253:20, 267:4,
268:21, 303:6,
319:18, 356:15
problem
12:11, 13:5,
30:1, 42:12,
67:6, 67:7,
96:22, 149:10,
217:20, 292:5,
292:6, 357:15
problems
63:24
procedure
69:9, 74:18,
283:11, 364:19
procedures
364:4
proceed
164:12, 251:2
proceeded
132:17
proceeding
164:8
process
50:20, 71:23,
318:12
processed
132:8
processing
242:24, 243:12
processor
55:15, 55:21,
55:24
produced
361:11
professional
2:13, 12:20
program
22:3, 363:16
progress
33:13, 46:5,
58:13, 200:22,
227:14, 265:18,
268:8, 268:10,
364:23
progressed
32:9
prohibited
109:3

prohibition
65:8, 65:11
prominent
275:7, 275:11
promise
87:10, 87:17,
87:19, 88:2
promises
87:8
promoted
25:23, 26:2,
30:10, 30:11,
30:20, 52:11,
65:15, 65:21,
363:22
promotion
25:5, 25:8,
25:11
promotional
25:14, 25:15
proper
283:11
properly
48:21, 84:6,
322:18
property
241:1
proportionally
281:8
prosecute
107:16, 107:19
prosecuted
288:9, 326:16
prosecuting
152:19
prosecution
33:17, 87:13,
87:19, 152:12,
152:14, 152:18,
152:23, 153:5,
153:8, 154:9,
154:16, 155:5,
155:13, 156:11,
156:15, 159:16,
160:4, 173:9,
183:17, 316:17,
317:16, 318:5,
318:8, 318:19,

365:14
prosecutor
144:3, 153:2,
291:1, 294:22,
295:1
prosecutors
143:23
protect
138:12, 169:9
prove
343:22
provide
71:5, 84:19,
85:18, 86:1,
140:22, 142:8,
202:15, 204:5,
224:14, 250:12,
302:22, 353:3,
353:10, 357:18
provided
39:10, 42:2,
110:4, 115:18,
116:18, 145:22,
146:23, 151:13,
158:10, 161:19,
165:4, 165:7,
167:8, 167:16,
168:11, 168:16,
201:12, 201:21,
203:6, 205:24,
220:15, 224:7,
224:24, 342:8,
342:14, 344:17,
346:19, 351:20,
352:13, 352:17,
352:22, 356:12,
364:21
providing
39:8, 85:14,
136:14, 139:15,
140:2, 169:7,
349:5
public
2:14, 63:5,
91:6, 91:7,
91:21, 91:24,
370:1, 370:4,
370:23

JGS_MAYSONET 4123

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

140

puerto
196:1
pulaski
23:12
pull
83:10
pulled
300:12, 347:19
pulling
83:13
purpose
79:22, 80:16,
173:18
purposes
58:16, 65:3,
207:5
pursuant
2:12
put
27:12, 28:6,
58:9, 59:17,
59:19, 59:22,
88:9, 97:7,
99:13, 99:17,
117:23, 191:20,
227:13, 230:7,
235:2, 236:11,
247:2, 248:4,
263:11, 263:15,
263:16, 268:15,
283:1, 312:4,
322:23, 329:24,
334:20, 337:24,
344:1, 345:20,
352:20, 363:1,
367:21
puts
322:21, 322:22
putting
65:8, 65:11,
192:2, 203:15,
204:10

**Q**

quarter
330:5
question
10:22, 11:1,

11:7, 11:9,
11:10, 11:11,
11:12, 11:13,
11:14, 11:17,
11:18, 11:22,
12:13, 12:14,
16:21, 17:3,
26:12, 27:6,
37:22, 38:1,
38:4, 40:10,
43:21, 47:20,
85:12, 87:14,
106:1, 106:23,
107:1, 107:13,
109:6, 110:1,
110:11, 111:6,
111:9, 111:10,
111:13, 114:11,
132:24, 133:6,
137:22, 141:5,
141:8, 141:12,
142:13, 146:19,
148:10, 167:20,
167:22, 172:9,
172:10, 175:15,
176:1, 176:5,
188:12, 189:9,
202:14, 205:14,
212:24, 213:20,
216:17, 222:9,
223:4, 229:13,
246:16, 247:12,
249:12, 255:13,
255:16, 257:8,
263:7, 270:17,
279:8, 280:8,
281:11, 281:19,
284:4, 289:4,
291:5, 291:10,
291:13, 291:18,
301:3, 303:2,
307:2, 314:1,
315:8, 315:9,
317:11, 326:22,
340:20, 341:11,
342:11, 342:13,
343:1, 348:14,
351:22

questioned
132:22, 159:19,
250:2, 347:2
questioning
157:5, 282:17
questions
12:11, 17:4,
37:16, 37:20,
105:15, 106:14,
107:7, 111:21,
135:5, 176:15,
256:2, 282:4,
306:4, 361:7,
361:8, 362:13,
362:23, 365:3,
365:6, 365:18,
365:20, 365:21,
365:22, 368:2
quist
4:3, 6:5, 7:22,
222:6, 232:16,
233:18, 239:17,
247:1, 254:22,
266:17, 266:23,
280:6, 281:17,
289:11, 333:23,
341:15, 345:1,
355:12, 356:2,
358:24, 365:5,
365:7, 368:1,
368:13
quite
10:15
quizzically
47:20
quotes
221:6, 221:8,
257:18

**R**

race
80:21
radio
29:19, 127:5,
127:9
radius
55:8
raise
8:8, 148:23,

169:5
random
177:20
rang
92:4, 92:5
range
94:20, 94:22
rankins
223:2, 223:6,
224:6, 224:8,
224:24, 225:1,
242:3, 286:24,
287:4, 287:10,
287:11, 287:15,
287:21, 297:4,
298:7, 299:8,
299:24, 300:14,
300:20, 300:23,
301:1, 301:3,
301:13, 301:14,
301:23, 302:10,
302:14, 302:18,
302:21, 302:22,
303:3, 303:10,
303:22, 304:1,
304:4, 304:6,
304:20, 306:10,
306:13, 306:17,
307:17, 307:19,
307:24, 308:2,
309:11, 310:2,
310:7, 311:6,
311:7, 316:23,
317:7, 317:13,
317:19, 317:21,
317:23, 341:5,
341:9, 341:12,
341:17, 341:21,
343:6, 344:15,
345:9, 346:18,
347:21, 348:5,
348:10, 348:22,
349:13, 349:18,
349:23, 350:10,
350:20, 351:13,
367:15, 367:21
rap
83:10, 83:13,

JGS_MAYSONET 4124

83:19, 144:19,
144:20, 145:1,
235:11, 235:12,
235:15, 236:18
**rather**
35:19, 39:2,
260:8, 260:15
**ray's**
136:19
**rd**
203:19, 244:13,
247:24, 248:17,
252:12, 259:23,
260:2, 273:3
**re-ask**
11:12, 12:13
**reach**
89:24, 112:19,
112:24
**read**
40:9, 88:22,
111:11, 111:13,
112:12, 118:12,
118:13, 118:16,
118:18, 130:22,
178:11, 184:22,
185:10, 200:2,
200:7, 200:15,
202:17, 213:1,
214:18, 221:21,
223:21, 245:4,
245:5, 245:8,
255:11, 255:13,
290:3, 297:20,
298:2, 300:2,
301:9, 318:13,
346:16, 346:22,
369:4
**reading**
42:12, 118:17,
175:18, 219:11,
292:23
**reads**
329:21
**real**
88:18, 98:5,
98:14, 99:11,
99:20, 99:23,

174:18, 181:15
**really**
30:1, 34:9,
130:19, 148:7,
150:13, 205:8,
217:19, 281:8,
281:9, 283:24,
288:17, 292:10,
292:11, 292:14,
303:10, 328:4
**reason**
18:12, 42:1,
46:10, 69:15,
103:16, 107:4,
150:13, 150:15,
150:19, 162:2,
162:5, 211:1,
213:12, 232:17,
255:2, 286:4,
286:6, 289:13,
306:16, 339:4,
352:12, 364:24,
366:20
**reasons**
47:2, 47:5,
48:11
**reassigned**
27:15
**rebut**
111:17
**recall**
35:4, 40:12,
50:11, 66:23,
67:8, 120:19,
120:23, 125:20,
126:24, 130:19,
130:24, 131:2,
131:19, 131:22,
132:2, 152:21,
168:17, 168:22,
168:24, 184:5,
198:5, 198:8,
219:16, 221:4,
221:5, 229:7,
303:20
**recalls**
218:23, 219:1
**receive**
21:14, 21:23,

25:11
**received**
43:19, 44:10,
97:9, 162:8,
296:18, 299:4,
364:16
**recently**
250:16, 250:23
**recess**
105:8, 189:16,
272:21, 324:8,
361:21
**recognize**
78:6, 122:6,
123:4
**recollection**
287:18, 287:22,
363:21, 364:8,
364:15
**record**
6:24, 8:16,
8:19, 51:22,
102:8, 105:7,
105:10, 189:15,
189:18, 192:3,
272:20, 272:23,
292:17, 292:18,
324:6, 324:7,
324:10, 339:19,
340:16, 361:15,
361:18, 361:19,
361:20, 361:23,
363:3, 363:8,
368:8, 368:15,
370:8
**records**
83:21, 242:24,
243:12, 243:14,
252:11
**recreate**
228:9, 228:15,
229:4
**red**
38:2, 169:5,
300:6
**redo**
227:19, 228:4
**reduced**
370:10

**refer**
234:22, 235:9,
240:22, 331:2,
331:3, 342:17,
351:5, 351:15
**referee**
193:6
**reference**
270:1, 299:10,
299:14
**referenced**
297:16, 299:19
**referred**
73:3, 187:16,
299:8, 299:22,
350:4
**referring**
100:19, 149:4,
164:21, 171:11,
171:23, 172:12,
173:12, 178:4,
183:13, 214:20,
235:5, 241:8,
268:4, 269:20,
304:12, 348:5,
358:4, 358:6
**refers**
241:9, 252:11,
303:22, 304:1
**reflect**
51:22, 292:17,
292:19, 313:8,
346:18
**reflected**
301:5
**reflecting**
313:22
**reflects**
313:12, 313:17,
314:5, 314:16
**refresh**
68:5, 130:21,
134:12, 134:21,
145:19, 162:7,
287:17, 298:5
**refreshed**
131:24, 287:24
**refuse**
110:3, 166:7,

JGS_MAYSONET 4125

302:18
**refused**
166:4, 166:24,
168:15, 168:18,
218:8, 302:22,
303:3
**regard**
108:24, 109:15,
131:23
**regarding**
131:4, 142:21,
204:21, 205:5,
205:16, 207:2,
223:18, 224:8,
258:4, 324:24,
343:23, 345:10,
345:11, 346:12,
367:6, 367:11
**regardless**
100:6
**registered**
2:13, 54:14,
275:22
**registration**
54:12
**regular**
53:3, 122:14,
178:20, 178:22
**regulations**
111:24
**reid**
40:14
**relate**
231:1
**related**
135:8, 230:24,
370:13
**relates**
300:14
**relating**
260:4, 287:21
**relation**
61:12, 62:16,
92:11, 93:9,
259:20
**relations**
20:24
**relax**
292:15

**released**
339:19, 340:8,
340:10
**relevance**
305:4, 305:7
**relevant**
137:6, 233:10,
233:11, 233:19,
233:20
**reliability**
167:6, 167:13
**reliant**
338:2, 339:12
**reluctant**
203:22, 320:3
**rely**
303:14
**remain**
16:18, 23:13,
29:7, 51:9,
53:24
**remainder**
55:20, 55:23,
243:22
**remembered**
177:1, 218:16,
220:3, 221:9
**remembering**
341:9
**remove**
102:7, 103:4
**removed**
230:2
**rendered**
201:9
**repeat**
26:12, 65:10,
104:12, 106:24,
111:10
**repeated**
67:7
**rephrase**
11:11, 38:4,
87:14
**reported**
1:24, 196:15
**reporter**
2:13, 2:14,

7:10, 7:13, 8:8,
33:10, 163:4,
212:2, 222:8,
290:17, 290:19,
320:5, 368:9,
368:12, 370:1,
370:3
**reporting**
70:4, 182:11,
184:19, 185:24,
186:14, 188:1,
261:20, 275:15,
294:4, 307:13,
317:20, 364:3,
364:19
**reports**
44:7, 46:2,
46:4, 46:19,
56:17, 58:1,
58:8, 58:15,
58:21, 59:24,
60:2, 66:19,
67:1, 67:6,
68:13, 70:1,
112:12, 117:16,
131:4, 164:14,
186:16, 201:24,
213:10, 215:4,
215:16, 230:6,
236:21, 236:22,
237:1, 238:15,
241:15, 243:10,
249:1, 253:21,
262:14, 263:17,
264:19, 268:9,
268:24, 303:14,
303:19, 310:23,
322:22, 322:23,
327:13, 364:23
**represent**
201:23, 270:6,
362:22, 363:2,
365:7
**representing**
295:19
**request**
49:10, 83:21,
237:6, 254:2,

319:6
**requested**
46:7, 46:12,
102:21, 237:3,
237:21, 237:24,
238:8, 238:12,
238:18, 238:22,
239:1, 252:14,
254:4, 258:18,
260:6, 260:13,
260:16, 260:18,
370:12
**requesting**
319:4, 366:21
**requests**
54:4
**require**
114:8
**required**
103:19, 103:23,
243:4, 243:5,
244:4, 318:24
**requirement**
81:8
**reserve**
368:5
**residential**
150:3
**respectively**
343:6
**respond**
17:10, 29:19,
111:21
**responding**
319:5
**response**
14:11, 105:15,
106:1, 145:3,
166:18, 203:10
**responses**
107:6, 107:14,
107:17, 107:18,
107:19, 112:3
**responsibility**
252:18, 252:21,
252:24, 253:4,
285:8, 322:16,
323:2, 323:4,

**323:6**
**responsible**
321:1, 338:1
**rest**
55:16, 81:3
**restate**
85:12
**restaurant**
89:4
**resubmit**
66:22
**result**
206:8, 206:13,
206:19, 261:2,
326:12
**results**
25:19, 30:16,
45:21, 45:24,
46:3
**retire**
113:14, 113:16
**retired**
13:8, 13:10,
13:13, 16:1,
16:3, 54:2,
67:20, 113:15
**retirement**
13:16, 113:18
**return**
17:19
**returned**
40:10, 334:5,
340:3
**reveal**
38:24, 84:23,
87:12
**revealing**
87:18
**reveals**
145:1
**review**
57:1, 118:10,
120:15, 120:18,
120:20, 120:24,
121:8, 145:24,
161:24, 162:6,
201:24, 246:9,
278:4, 370:11

**reviewed**
121:10, 131:4,
311:21
**reviewing**
287:17
**reyes**
195:18, 195:19,
196:10, 199:24
**reynaldo**
1:8, 1:14,
3:17, 7:4, 7:6,
7:21
**rfc**
361:12, 363:9
**rfc-serr**
6:14, 6:18
**rican**
196:1
**rich**
49:17, 49:20,
49:22
**richard**
5:5, 27:16
**rick**
5:12, 7:11,
132:7
**ricky**
258:24, 259:1
**ricocheting**
204:22, 205:6,
205:17, 205:21
**ride**
367:23
**right-hand**
185:7, 225:16,
312:17, 313:12,
313:16, 313:21,
314:2, 314:9,
314:16, 315:1,
315:10, 315:20
**rights**
108:10, 333:19,
336:16, 336:17
**ring**
91:12, 91:15,
92:2, 297:21,
335:19
**risk**
213:3

**rival**
139:2
**robberies**
72:15, 132:7,
132:8
**robbery**
50:19, 71:20,
71:22, 71:24,
72:2, 200:23,
247:9, 247:14,
247:16, 248:1,
251:10
**robert**
131:11, 139:8,
145:23, 146:2,
146:24, 151:14,
152:1
**rock**
4:19
**rodrigo**
66:13, 176:4,
234:5, 255:4,
259:19, 260:4,
287:7, 298:17,
344:13
**rodriguez**
10:7, 324:22,
325:7, 325:16,
326:11
**roger's**
29:5
**role**
365:16
**roll**
123:23
**roman**
288:4, 288:5,
289:9, 289:15,
289:18, 297:17,
297:20
**room**
51:23, 57:8,
61:18, 79:6,
79:9, 98:1,
159:16, 159:23,
192:9, 193:10,
335:6, 335:9,
336:22, 337:13,

337:24, 338:7,
339:11
**rooms**
61:12, 62:3,
64:14, 133:7,
335:13, 335:16,
335:17, 336:1,
337:6, 337:23,
338:18, 338:20,
339:9
**rooney**
52:6, 52:7,
52:10, 52:13,
72:4, 72:6,
72:13
**roosevelt**
123:10, 123:14,
124:24, 125:8,
125:9, 125:11,
132:13, 134:17
**root**
76:18
**rouchford**
27:16, 27:23,
27:24, 28:8
**roughly**
120:14
**routinely**
213:6, 213:9
**rpr**
1:24, 370:4
**rules**
10:17
**run**
54:15, 55:1
**running**
135:6, 246:1
**russell**
3:3, 7:14
**ruvalcaba**
123:11, 124:15,
125:18, 126:19,
131:5, 139:24,
140:23, 141:15,
142:21

| S |
|---|

**s**
53:4, 217:14,

JGS_MAYSONET 4127

327:20
**sabrina**
303:23, 304:1,
304:6, 304:8,
304:11, 304:15,
306:1, 306:5,
306:6
**sabrina's**
306:21, 306:22,
307:5
**safety**
117:17
**said**
8:21, 41:20,
71:11, 95:12,
98:13, 103:2,
140:1, 142:24,
147:9, 147:12,
161:10, 161:14,
162:1, 162:8,
162:18, 168:5,
173:15, 174:12,
174:22, 174:24,
176:22, 177:9,
178:7, 178:12,
178:23, 179:12,
179:14, 181:1,
182:17, 184:7,
187:16, 187:24,
189:1, 190:8,
194:8, 195:13,
199:3, 202:10,
204:15, 208:18,
209:9, 209:18,
209:23, 210:18,
214:23, 216:3,
216:4, 216:5,
216:11, 219:18,
219:19, 220:8,
230:17, 230:20,
230:21, 246:21,
255:8, 255:22,
267:9, 270:20,
292:16, 298:19,
310:17, 325:15,
326:5, 330:3,
341:9, 342:23,
343:21, 344:4,

344:6, 344:8,
345:18, 345:22,
346:14, 347:3,
348:22, 352:4,
357:9, 358:13,
359:14, 359:19,
360:14, 370:9
**salary**
20:17, 20:19
**salvador**
123:11, 124:15
**same**
9:20, 11:2,
11:5, 18:10,
18:20, 19:3,
30:6, 47:13,
49:24, 51:18,
64:11, 75:24,
76:3, 92:19,
92:23, 107:9,
107:11, 109:11,
122:21, 128:22,
187:23, 212:6,
225:5, 245:10,
250:24, 252:6,
257:6, 263:16,
264:18, 271:3,
276:14, 309:20,
311:19, 312:4,
312:5, 313:15,
314:8, 314:23,
321:8, 337:17,
337:19, 354:7,
369:5
**sandwich**
338:11
**sat**
92:8, 92:20,
93:4, 102:15,
146:12, 147:3,
150:12, 150:13,
244:22
**satisfaction**
56:12
**save**
56:3, 281:24
**saw**
16:1, 25:22,

99:16, 111:14,
117:3, 145:5,
148:22, 176:11,
177:1, 178:8,
178:24, 179:15,
179:22, 209:7,
237:5, 237:6,
237:10, 237:18,
273:11, 282:1,
282:3, 329:21,
330:6, 331:12,
353:11, 355:5
**saying**
33:4, 67:5,
112:13, 124:18,
134:14, 136:23,
141:7, 142:18,
142:22, 150:5,
150:7, 150:11,
160:19, 163:18,
175:3, 175:4,
175:8, 178:12,
181:9, 181:11,
186:13, 188:9,
188:15, 196:6,
196:9, 196:10,
196:11, 198:4,
202:7, 202:10,
202:15, 202:18,
204:8, 204:12,
204:13, 204:16,
211:14, 211:21,
214:8, 221:5,
221:22, 238:9,
249:5, 260:22,
262:11, 262:13,
263:22, 265:19,
266:3, 266:4,
266:18, 267:12,
267:16, 269:9,
279:24, 283:9,
283:21, 296:11,
305:8, 314:24,
315:3, 315:9,
315:23, 320:9,
334:15, 343:23,
348:21, 352:16,
355:18

**says**
161:10, 184:19,
185:15, 192:3,
192:21, 199:9,
200:6, 200:21,
203:4, 204:19,
207:1, 212:8,
212:15, 212:19,
214:10, 214:11,
214:13, 214:18,
218:11, 223:21,
223:24, 224:5,
225:17, 234:19,
235:7, 242:23,
244:11, 244:21,
247:13, 247:19,
248:22, 252:11,
258:8, 258:18,
258:21, 260:1,
260:21, 263:4,
264:5, 264:12,
271:7, 273:4,
275:15, 275:20,
275:24, 276:20,
291:3, 293:1,
294:3, 300:5,
300:18, 304:8,
307:13, 307:23,
309:12, 313:11,
313:16, 315:1,
315:10, 317:6,
317:12, 317:15,
318:2, 343:17,
343:18, 344:1,
344:10, 345:13,
346:8, 347:18,
362:6, 363:15
**scene**
125:4, 125:7,
126:18, 126:21,
127:14, 127:18,
245:3, 249:15,
253:1, 253:9,
277:7, 300:1,
305:19, 320:4,
320:8, 344:2,
367:22
**schak**
49:17, 49:19,

JGS_MAYSONET 4128

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

145

49:20, 49:22,
50:21, 244:17,
245:3, 245:5,
247:2, 248:14,
249:5, 249:15,
251:4, 252:20,
252:23, 253:11,
256:6, 319:10,
320:2, 320:10
**schak's**
227:13
**scheduled**
155:15
**school**
19:24, 20:3,
20:5, 20:7,
21:6, 21:20,
22:7, 22:19,
32:16, 32:18,
32:23, 33:1,
33:12, 37:9,
39:18, 49:5,
123:10, 123:14,
124:24, 125:8,
125:9, 125:11,
126:15, 132:13,
134:17
**scored**
30:13
**seal**
370:17
**search**
55:9, 55:10,
125:18
**searches**
55:1
**seat**
273:12
**seated**
14:22, 81:5,
81:6, 82:8,
82:9, 82:12,
82:16, 82:20,
98:1, 273:11,
280:18, 280:20,
280:21, 281:1,
281:2, 281:5
**second**
63:4, 74:13,

185:23, 189:6,
189:7, 190:21,
199:9, 257:14,
258:11, 261:20,
270:3, 275:24,
278:15, 311:11,
312:12, 316:20,
317:1
**second-to-the-la-
st**
317:6, 317:12
**secret**
239:13
**section**
45:14, 45:15,
83:18, 253:20,
292:3, 308:19
**section's**
237:24
**secure**
62:19, 62:21,
338:16, 338:17
**security**
41:15
**seeing**
65:5, 190:19
**seek**
13:20, 27:17,
27:20
**seeking**
264:21, 318:14
**seem**
210:14, 233:10,
233:11, 233:19,
233:20, 331:10,
331:15, 331:18
**seemed**
134:1, 199:14,
250:6, 250:8,
350:11
**seen**
50:8, 65:18,
112:15, 146:16,
190:17, 237:2,
331:6, 331:19,
355:10, 355:20,
355:24, 363:5
**sees**
300:18

**select**
77:14, 77:22,
80:8
**selected**
28:23
**selecting**
80:10
**self**
109:20
**self-incriminati-
on**
107:5, 107:24,
108:22, 109:9,
109:21
**semantics**
305:22
**semiautomatic**
329:23, 330:8,
330:14, 330:19,
331:13
**send**
193:9, 243:15,
243:16, 243:22,
244:1, 261:7,
321:20, 322:2,
322:8
**sense**
92:24
**sent**
40:8, 76:14,
242:23, 243:11,
321:21
**sentence**
212:6, 212:17,
247:19, 257:15,
329:21, 330:5
**separate**
74:11, 75:2,
75:13, 75:16,
79:9, 116:21,
224:5, 310:13,
310:16
**separated**
101:2
**separately**
128:22, 128:23,
128:24
**september**
53:23, 363:17

**sequence**
201:9, 203:20
**serafini**
93:12, 93:14
**sergeant**
26:3, 52:11,
56:16, 56:19,
57:1, 60:14,
67:5, 67:21,
91:17, 91:22,
93:4, 93:22,
93:24, 94:4,
94:15, 95:2,
95:14, 95:21,
95:24, 96:2,
96:4, 96:5,
96:7, 96:9,
96:15, 96:20,
98:10, 124:12,
124:21, 156:1,
201:2, 240:8,
255:21, 256:12,
256:19, 264:24,
265:3, 265:24,
267:15, 269:7,
278:9, 286:9,
286:20, 287:6,
287:9, 298:14
**sergeant's**
91:16, 91:18,
92:3, 239:24,
240:1
**sergeants**
25:14, 25:15,
61:7, 92:15,
93:6, 93:7,
93:10, 95:19,
95:21, 132:16
**series**
128:7, 128:8,
130:17, 131:20,
132:6
**serious**
157:23
**serrano**
1:11, 3:9,
5:10, 6:22, 7:6,
7:17, 7:19,

JGS_MAYSONET 4129

173:3, 173:11,
175:2, 175:12,
176:12, 177:4,
178:10, 179:2,
179:16, 201:4,
201:9, 207:4,
226:5, 226:12,
226:21, 236:16,
238:15, 257:7,
257:10, 273:10,
273:22, 278:17,
278:24, 279:6,
279:14, 280:12,
282:1, 282:17,
282:22, 283:16,
285:7, 299:8,
299:11, 299:14,
305:12, 307:19,
308:7, 309:23,
310:4, 310:7,
310:22, 321:4,
322:5, 332:12,
332:17, 333:11,
333:24, 334:7,
334:13, 334:18,
334:21, 335:7,
335:9, 339:4,
339:19, 340:17,
343:4, 345:24,
349:14, 349:23,
350:21, 351:3,
362:10, 363:9,
367:7, 367:12
**serrano's**
236:17
**serve**
27:1, 27:4,
27:7, 29:13
**set**
154:2, 154:5,
210:13, 261:6,
266:7, 370:16
**setting**
326:15
**seven**
27:3, 27:4,
27:7, 28:13,
337:3, 338:15,

341:7, 341:14,
351:9, 357:20,
357:21, 358:8
**seven-hour**
120:12
**several**
142:13, 203:15,
204:9, 244:22,
246:4, 257:16,
258:2
**sex**
51:21, 55:7,
71:1, 72:15,
74:6, 80:21
**sexual**
55:8
**shameful**
111:14, 112:20,
113:1
**share**
38:16, 87:5,
90:16, 90:18,
90:19, 138:14,
138:16
**shared**
218:20, 218:24,
352:19
**sharing**
169:6
**she**
130:6, 146:16,
147:12, 147:14,
149:9, 218:16,
218:21, 220:3,
221:9, 230:17,
230:23, 231:2,
231:5, 234:10,
234:11, 234:13,
245:24, 246:1,
246:4, 246:22,
250:8, 250:11,
250:12, 250:22,
252:3, 253:16,
253:18, 254:2,
254:4, 254:15,
254:19, 255:8,
255:17, 256:1,
256:4, 273:10,

273:11, 277:8,
282:2, 282:3,
297:23, 305:7,
305:11, 306:7,
310:14, 318:17,
319:5, 319:6,
319:7, 319:8,
325:5, 326:2,
326:6, 352:2,
352:4, 352:15,
352:17, 352:22,
353:3, 353:10,
353:11, 353:17,
353:18, 353:20,
354:8, 354:14,
354:15, 354:19,
354:24, 355:1,
355:5, 355:7,
355:10, 355:20,
355:24
**she's**
305:6, 305:8
**sheet**
59:13, 59:16,
60:2, 83:13,
99:15, 99:19,
99:20, 99:23,
144:19, 144:20,
145:1, 235:11,
235:15, 241:2,
369:8
**sheets**
40:10, 54:8,
83:10, 83:19,
99:9, 99:10,
99:17, 99:22,
235:12, 236:18,
242:13
**shift**
95:18, 123:18,
123:20, 133:2
**shit**
170:24, 213:10,
214:24, 215:2,
215:16
**shoot**
300:18
**shooter**
215:21

**shooting**
98:8, 132:12,
134:16, 134:19,
161:11, 287:7
**shop**
210:13
**short**
66:16, 122:17,
210:13
**shortage**
274:11, 274:16
**shorter**
279:18, 279:23
**shorthand**
2:13, 370:3
**shortly**
124:22, 201:5
**shorty**
300:1, 300:6,
300:21, 300:24,
301:4, 301:13,
301:22, 301:24,
302:3, 302:5,
302:15, 302:19,
302:23, 303:4,
303:11, 304:5,
304:22, 305:13
**shot**
25:3, 98:8,
123:9, 125:17,
206:10, 244:22,
251:11, 256:13,
271:19, 297:22,
297:24
**shots**
76:5, 231:11,
308:12
**should**
37:3, 64:22,
74:23, 108:4,
108:16, 249:8,
254:9, 260:8,
264:13, 265:12,
267:9, 268:17,
274:10, 289:9,
293:18, 296:16,
296:18, 296:22,
312:3, 315:19,

JGS_MAYSONET 4130

315:23, 316:6,
322:14, 322:15,
340:7, 340:8
**shouldn't**
17:3
**show**
46:5, 46:24,
47:10, 58:13,
68:4, 102:18,
102:21, 113:2,
183:11, 183:20,
292:24, 311:2,
316:7, 344:20,
354:16
**show-up**
127:17
**showed**
146:13, 147:6,
147:19, 147:21,
148:2, 151:24,
173:10, 183:14,
187:6, 216:6,
273:5, 274:3,
307:17, 308:9,
309:10, 309:12,
309:14, 354:7,
355:16, 355:17,
357:4, 358:4
**showing**
80:3, 121:20,
220:22, 221:14,
222:5, 222:19,
362:5
**shown**
148:19, 149:5,
353:12, 355:1,
355:21
**shows**
265:2
**shut**
325:4
**sic**
349:23
**side**
11:16, 58:5,
62:2, 129:4,
129:9, 129:10,
129:14, 129:15,

130:2, 130:5,
130:7, 130:10
**sidley**
6:16, 114:19,
190:23, 191:15,
193:19, 193:20,
195:7, 195:12,
196:3, 197:5,
197:9, 197:19,
198:12, 198:13,
199:18, 199:23,
201:17, 201:22,
202:8, 204:6,
205:4, 205:8,
207:13, 207:15,
213:22, 213:24,
214:21, 214:23,
219:14, 219:17,
219:20, 220:13,
221:18, 222:1,
222:11, 224:15,
224:22, 224:24,
257:13, 257:20,
258:1, 288:20
**sign**
59:7, 211:10,
243:3, 278:2,
278:7, 336:13,
336:15, 336:18
**signature**
243:1, 261:22,
262:1, 277:23,
278:12, 278:13,
323:17, 323:20,
362:6, 362:7,
369:13
**signature-sc3**
370:21
**signatures**
324:4
**signed**
59:5, 146:3,
243:8, 262:3,
262:8, 262:10,
321:3, 323:23,
369:8
**significant**
88:1, 213:3,

282:9
**signifying**
243:7
**signing**
278:5
**similar**
73:13, 73:18,
73:20, 73:22,
75:9, 76:18,
278:20, 278:23
**similarity**
74:1
**similarly**
119:14, 141:16
**simple**
167:1, 216:12,
354:24, 358:7
**simply**
12:13, 172:18,
187:11, 198:3
**since**
10:15, 13:15,
114:24, 298:8
**single**
48:2, 48:6,
48:7, 48:10,
83:1, 98:12,
106:1
**sir**
19:19, 26:5,
34:22, 101:10,
105:13, 107:3,
109:14, 110:24,
132:2, 141:21,
144:9, 170:14,
175:3, 175:11,
175:16, 176:16,
176:18, 176:20,
178:6, 181:18,
182:9, 185:9,
187:11, 187:24,
188:9, 188:21,
190:18, 194:3,
196:20, 199:16,
201:14, 204:3,
205:1, 212:10,
212:21, 214:20,
219:13, 224:12,

231:21, 234:4,
234:17, 245:16,
246:6, 247:22,
249:3, 255:6,
266:21, 267:1,
267:16, 271:2,
273:15, 276:3,
280:15, 280:17,
280:24, 284:8,
291:9, 291:20,
291:22, 292:22,
293:4, 293:12,
294:15, 300:16,
305:4, 312:6,
313:19, 315:8,
316:7, 316:20,
320:18, 324:12,
339:18, 360:12,
362:6
**sit**
25:10, 45:7,
45:18, 46:11,
46:13, 60:5,
60:9, 60:16,
60:18, 60:20,
62:15, 79:7,
92:9, 111:19,
111:20, 130:20,
149:11, 151:5,
222:23, 246:2,
246:10, 300:2,
364:7, 364:14
**sitting**
14:7, 14:14,
14:15, 57:9,
81:9, 81:11,
81:15, 81:24,
150:16, 150:22,
246:23, 280:16,
282:3, 352:5
**situation**
274:19
**situations**
275:6
**six**
335:12
**size**
330:21

JGS_MAYSONET 4131

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

148

**skill**
31:18, 31:20
**skills**
31:23
**skin**
71:1
**skinniest**
279:5, 279:13
**skinny**
281:9
**skip**
91:2, 91:3,
254:12, 351:23
**sleeping**
231:2, 255:8
**small**
331:1
**smaller**
57:8
**smashed**
271:14
**smith**
23:23
**smitko**
115:10, 115:12
**so-and-so**
89:23
**social**
41:15
**socialize**
196:16
**solache**
195:18, 195:19,
196:9, 199:24
**solely**
171:19
**solve**
32:13
**some**
10:15, 10:16,
11:12, 12:7,
13:5, 17:20,
35:24, 36:20,
38:20, 45:1,
50:23, 55:24,
57:10, 59:21,
61:14, 75:21,
78:3, 78:19,

86:8, 101:18,
111:15, 113:2,
113:20, 118:18,
119:15, 132:9,
144:3, 145:4,
146:14, 146:15,
153:2, 155:1,
157:14, 161:2,
162:8, 164:9,
165:9, 170:6,
174:22, 176:18,
190:24, 208:4,
209:23, 218:15,
220:2, 221:8,
231:2, 239:13,
249:6, 254:20,
255:3, 281:24,
282:9, 285:5,
287:11, 292:19,
296:10, 297:23,
298:18, 330:19,
330:22, 336:13,
342:16, 361:8,
364:2
**somebody**
48:17, 77:14,
77:22, 78:5,
85:20, 91:10,
136:23, 138:18,
139:2, 139:9,
139:11, 152:17,
161:5, 161:7,
167:7, 173:22,
174:4, 199:3,
215:15, 255:9,
275:6, 283:10,
283:12, 297:24,
335:22, 338:22,
339:11, 344:17,
344:21, 344:22,
344:23, 345:6,
349:13
**somebody's**
235:6, 235:10,
235:14
**someone**
19:24, 78:20,
85:19, 134:8,

152:12, 163:8,
169:8, 173:1,
173:20, 174:16,
175:8, 180:2,
181:14, 215:4,
268:20, 323:7,
344:19, 360:22
**someplace**
217:14
**something**
12:21, 34:9,
37:23, 38:12,
39:12, 66:22,
77:13, 81:18,
85:5, 87:11,
87:17, 87:22,
95:12, 118:3,
118:5, 166:7,
166:12, 167:21,
167:23, 175:2,
176:22, 192:17,
193:1, 195:11,
198:5, 212:19,
218:2, 218:16,
220:3, 221:9,
223:11, 231:4,
280:5, 302:24,
305:18, 326:3,
328:3, 329:1,
336:19, 337:10,
338:24, 343:22
**sometime**
10:5, 66:8,
156:9, 165:2,
165:9, 209:3,
209:5, 236:21,
267:2, 360:5
**sometimes**
33:24, 34:8,
38:19, 41:10,
42:15, 44:20,
47:11, 47:15,
47:23, 48:2,
63:12, 64:14,
64:24, 66:21,
69:24, 70:12,
78:15, 80:11,
80:13, 83:10,

84:18, 86:13,
89:16, 89:22,
91:21, 96:13,
99:6, 199:11,
199:20, 333:1
**somewhere**
29:5, 40:6
**son's**
52:22
**soon**
43:6, 152:11,
154:1, 248:23
**sorry**
8:22, 8:24,
26:13, 33:10,
44:8, 69:21,
71:13, 93:2,
103:2, 113:17,
166:16, 187:3,
206:17, 210:2,
213:9, 223:6,
225:14, 235:16,
237:9, 245:13,
250:10, 251:21,
255:11, 257:12,
258:13, 267:10,
269:12, 269:24,
272:5, 276:13,
289:3, 295:13,
295:22, 304:20,
309:13, 312:14,
317:17, 324:1,
325:8
**sos**
54:23
**sotos**
4:12, 108:11,
237:19
**sound**
190:10
**source**
162:15, 162:18,
163:18, 164:23,
166:3, 166:17,
166:22, 168:5,
168:19, 213:14,
342:8, 342:14,
343:2, 347:23,

JGS_MAYSONET 4132

359:19
**sources**
168:15, 169:3
**south**
156:16, 357:10
**spaces**
62:4
**spanish**
49:20, 129:23,
130:4, 130:8,
130:9, 130:13,
130:15, 187:10,
195:9, 195:16,
256:4
**spanish-only**
199:12, 199:21
**speak**
12:14, 49:20,
118:24, 119:3,
119:5, 119:7,
129:23, 130:13,
200:1, 306:5
**speaker**
130:1, 130:4
**speakers**
199:13, 199:22
**speaking**
11:2, 191:23,
192:9, 269:13,
291:17
**speaks**
256:4
**special**
92:6, 92:7,
92:15, 92:16,
92:17, 92:18,
92:20, 92:21,
93:9, 122:14,
239:13, 364:22
**specific**
79:5, 95:15,
104:9, 190:19,
197:15, 197:16,
197:23, 364:8,
364:15
**specifically**
34:5, 60:16,
72:14, 82:20,

95:13, 132:3,
144:2, 166:20,
172:1, 199:24,
201:19, 204:20,
219:24, 239:4,
324:19, 332:19,
341:8
**specified**
187:13
**speculate**
238:19
**speculation**
36:14, 44:4,
44:17, 77:2,
88:7, 88:20,
112:9, 118:8,
134:24, 136:10,
137:19, 151:1,
220:19, 232:15,
238:20, 238:24,
254:18
**speedy**
100:6
**spell**
8:15
**spend**
126:9
**spill**
227:20, 227:24,
266:21
**spilled**
227:18, 228:3,
228:8, 228:14,
229:2, 229:8
**spoiler**
301:5
**spoke**
130:6, 130:7,
130:9, 135:9,
140:16, 177:10,
181:14, 187:10,
256:4
**spoken**
110:18, 130:15
**spot**
31:2, 31:4
**springfield**
161:12, 162:17,

162:19, 162:23,
300:10, 300:11,
300:14, 344:4,
344:6, 344:8
**square**
126:4, 126:7,
126:16
**st**
151:17, 151:20,
201:18
**stack**
115:9, 115:12,
244:12
**stairs**
18:14, 18:16,
18:17, 18:20,
63:11
**stamp**
266:4, 266:8,
266:13, 268:22
**stamped**
363:9
**stamps**
266:6
**stand**
79:7, 79:10,
192:21, 282:8,
284:1, 284:14
**standing**
82:12, 82:17,
82:20, 83:5,
123:5
**staple**
56:21, 258:11
**stapled**
56:22, 57:24
**staples**
258:13
**start**
9:3, 19:16,
35:6, 43:21,
66:13, 72:10,
93:20, 123:18,
175:24, 246:2
**started**
71:17, 71:24,
159:21, 160:2,
160:6, 164:13,

230:8, 245:2,
264:11, 265:12,
298:10, 310:2,
315:21, 327:7,
349:1
**starting**
213:18
**starts**
159:4, 160:22,
212:22, 330:6
**state**
2:14, 8:15,
13:22, 19:12,
173:7, 184:6,
219:5, 309:23,
357:10, 370:5,
370:24
**state's**
5:4, 115:1,
115:7, 143:21,
143:24, 146:1,
152:10, 199:13,
200:3, 200:9,
200:13, 200:17,
220:11, 317:16,
318:5, 318:7,
318:15, 318:21,
318:24, 329:5,
350:8, 350:18,
365:13, 365:16,
366:17, 366:22
**stated**
35:18, 187:4,
219:7, 224:6,
224:7, 246:1,
246:4, 271:11
**statement**
35:12, 37:5,
41:18, 42:16,
42:23, 42:24,
43:4, 43:10,
43:14, 44:2,
44:10, 44:11,
44:14, 121:6,
134:7, 134:20,
144:16, 146:3,
146:5, 161:15,
173:12, 176:3,

JGS_MAYSONET 4133

200:14, 205:23,
206:3, 208:5,
209:4, 209:24,
210:1, 216:6,
220:14, 242:3,
242:17, 245:21,
285:6, 287:8,
296:23, 318:10,
318:16, 318:22,
319:7, 319:9,
346:16, 349:22,
350:20, 351:13
**statements**
35:3, 41:18,
41:19, 41:22,
42:2, 42:16,
43:23, 199:12,
199:21, 200:4,
200:7, 215:22,
222:12, 318:23,
319:1, 329:5
**states**
1:1, 196:14,
361:12
**station**
28:18, 146:16,
170:18, 218:18,
219:5, 219:8,
220:4, 220:16,
221:10, 221:23,
222:15, 273:9,
274:15, 276:24,
333:9, 333:12,
352:2, 352:3,
352:23, 353:2,
353:21, 355:6,
355:11, 355:20,
356:1
**stay**
50:12, 51:12,
51:15, 217:17,
321:8, 329:2,
339:24
**staying**
23:17
**stays**
203:24
**stead**
278:5

**stenographically**
370:10
**step**
192:9, 284:17
**steps**
93:17, 95:3,
284:21, 284:23
**stick**
294:2
**still**
77:15, 77:22,
113:13, 265:18,
339:5
**stolen**
210:11
**stones**
128:3, 135:23
**stop**
22:2, 22:20,
22:21, 47:20,
52:9, 52:19,
53:12, 192:1,
192:8, 319:13
**stopped**
53:15, 59:10,
72:5, 72:12,
344:7
**store**
22:13, 207:2,
207:10, 207:17,
207:18
**storefront**
208:21, 210:19,
210:20, 269:19,
270:9
**stories**
224:8, 225:2
**story**
112:2, 152:12,
203:23, 207:11,
210:7, 211:16
**straight**
267:11
**strange**
210:14
**street**
2:5, 3:5, 3:13,
3:20, 4:20, 7:8,

19:1, 19:2,
29:3, 29:6,
53:15, 59:11,
98:4, 98:7,
125:12, 150:3,
162:15, 162:18,
163:18, 166:3,
168:5, 168:15,
181:3, 182:12,
184:20, 188:2,
203:19, 210:12,
333:15, 333:16,
342:8, 342:14,
343:2, 357:11,
359:19
**stress**
258:14
**stressful**
53:14
**strike**
50:14, 90:8,
116:19, 137:14,
138:2, 208:13,
226:18, 261:7,
289:7, 321:2,
331:22, 331:24,
339:3, 343:6,
352:24
**stripes**
299:18, 299:19,
299:22, 300:6,
300:7, 308:1,
342:19, 346:20,
351:15
**struggle**
195:8
**studenroth**
293:1
**stuff**
59:19, 170:6,
170:11, 171:3,
196:18, 197:10,
197:13, 197:20,
198:3, 198:10,
198:18, 199:4,
202:5, 227:15,
268:1, 277:11
**style**
122:13

**subject**
106:15, 107:7,
112:4, 236:15,
248:23, 365:22
**submit**
56:15, 56:18,
56:24, 66:19,
264:19, 313:1
**submitted**
49:10, 67:9,
68:3, 68:6,
68:13, 68:18,
248:10, 249:2,
261:6, 262:22,
263:5, 263:9,
263:12, 263:14,
263:18, 264:13,
264:18, 265:8,
267:1, 268:9,
285:13, 285:23,
286:17, 311:13,
315:18, 316:1,
321:17
**submitting**
67:15, 277:12
**subpoena**
14:11
**subsequent**
247:20
**subsequently**
131:14
**substance**
201:16, 202:8,
219:19
**substantially**
191:21
**such**
38:1, 38:20,
41:14, 58:3,
63:5, 77:4,
170:11, 275:10,
302:23, 349:2,
349:3, 349:6
**sued**
10:12, 114:12,
114:14, 237:19,
238:3
**suffering**
133:15

JGS_MAYSONET 4134

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

151

**suggest**
37:22, 138:11
**suggested**
38:13, 72:23,
79:20
**suggesting**
256:6
**suggestion**
248:15
**suggestions**
84:6, 249:6
**suggestive**
80:2
**suit**
122:2
**suite**
3:14, 3:21,
4:14, 4:21
**sum**
201:16
**supervisor**
66:20, 66:21,
68:14, 68:19,
153:3, 153:4,
153:7, 153:12,
153:15, 153:20,
160:14, 173:16,
265:24, 329:2
**supp**
35:22, 37:7,
43:24, 44:7,
44:12, 46:2,
46:4, 46:8,
47:1, 47:2,
56:3, 68:3,
68:6, 102:4,
227:14, 227:15,
241:6, 241:8,
241:9, 242:6,
242:9, 242:20,
244:17, 245:3,
245:11, 248:10,
254:8, 261:15,
262:18, 267:24,
268:3, 268:5,
268:7, 268:8,
268:10, 268:11,
268:23, 269:7,

296:19, 310:11,
310:13, 310:16,
321:9, 321:11,
321:19
**supplemental**
36:1, 36:6,
37:4, 55:12,
56:11, 67:9,
67:11, 67:13,
69:11, 69:12,
69:19, 101:24,
164:13, 182:9,
253:21
**supplementary**
6:21, 158:6,
158:9, 158:14,
161:19, 161:23,
203:13, 210:15,
210:22, 218:13,
245:6
**supplied**
176:7
**support**
112:22, 113:2
**supposed**
33:15, 43:19,
44:10, 68:12,
68:24, 69:6,
116:19, 116:20,
192:22, 200:7,
258:20, 260:14,
263:11, 263:16,
283:1, 322:4,
338:16, 338:24
**supposedly**
304:19, 341:14
**suppress**
82:1, 82:4
**supreme**
72:23, 79:19,
84:5
**sure**
8:18, 38:6,
38:10, 44:11,
69:23, 72:16,
75:23, 77:19,
78:22, 82:15,
86:22, 104:19,

112:24, 122:9,
127:10, 129:8,
138:2, 175:19,
184:23, 185:6,
189:22, 190:1,
230:1, 267:18,
267:20, 268:4,
270:18, 282:8,
301:13, 306:3,
322:16, 365:1
**surprised**
218:23
**suspect**
45:6, 46:23,
47:3, 47:6,
70:14, 70:17,
70:19, 71:15,
72:24, 73:1,
73:9, 73:12,
73:17, 73:19,
73:20, 73:23,
74:12, 74:13,
75:8, 76:1,
76:19, 79:20,
79:24, 80:17,
80:20, 83:14,
84:9, 85:9,
125:19, 126:23,
127:4, 127:13,
127:14, 128:6,
161:3, 216:23,
276:23, 282:8
**suspect's**
73:6
**suspected**
204:2, 254:15,
254:19, 255:3
**suspects**
47:12, 47:16,
48:6, 48:11,
48:12, 48:23,
64:9, 64:10,
65:4, 73:4,
74:10, 74:19,
74:21, 74:23,
75:12, 83:11,
83:23, 84:7,
84:10, 129:10,

129:14, 195:24,
273:20, 273:21,
274:4, 284:17,
298:19, 304:19,
304:22, 305:9,
308:22, 309:14,
321:14, 321:16,
333:1, 346:19,
349:6, 354:21
**suspension**
170:21
**sustained**
204:22, 205:5,
207:8, 271:22,
272:6
**sweating**
133:13
**switch**
335:24
**switched**
104:18, 245:13
**sworn**
8:10, 8:12
**sydney**
190:5
**symptoms**
133:16
**system**
55:13, 59:4,
91:21, 91:24

---

**T**

**t**
252:12
**table**
77:4
**tact**
23:16, 23:19,
23:24, 24:4,
24:11, 24:13,
24:15, 24:18,
27:2, 27:5,
27:8, 27:18,
28:2, 28:5,
28:10, 28:12,
29:12, 29:16,
30:5, 31:21,
31:24, 32:4

JGS_MAYSONET 4135

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

152

**tactical**
127:5, 151:6
**taint**
97:2
**taints**
203:24
**take**
8:23, 11:21,
17:6, 17:12,
25:13, 25:15,
25:23, 30:22,
39:17, 39:20,
39:23, 41:9,
41:11, 41:13,
41:17, 41:19,
42:2, 45:13,
46:7, 46:23,
47:7, 54:4,
56:18, 58:23,
63:5, 70:17,
77:12, 77:19,
78:10, 98:12,
99:5, 101:16,
102:12, 102:23,
103:8, 111:22,
127:10, 157:8,
157:10, 157:12,
158:15, 178:16,
182:2, 188:23,
189:11, 200:19,
215:23, 226:5,
254:1, 254:2,
260:20, 272:17,
276:11, 279:16,
280:17, 287:8,
287:20, 291:15,
291:18, 302:2,
309:7, 318:9,
318:15, 318:24,
319:7, 320:22,
329:22, 330:7,
332:14, 332:24,
333:2, 333:7,
337:12, 344:2,
344:19, 344:23,
352:16, 358:17,
368:14
**taken**
7:3, 27:11,

27:13, 50:18,
56:4, 59:2,
76:7, 76:13,
105:8, 132:5,
189:16, 199:12,
199:21, 254:10,
261:13, 272:21,
324:8, 345:2,
361:21, 370:7,
370:9
**taking**
11:22, 12:3,
35:19, 40:2,
40:17, 110:7,
114:2, 127:7,
158:19, 158:21,
189:4, 200:3,
326:14, 327:13
**talk**
98:4, 114:8,
114:10, 115:1,
115:6, 115:9,
143:5, 145:20,
152:13, 154:1,
160:16, 187:9,
217:3, 217:18,
250:5, 250:6,
250:7, 250:9,
284:16, 291:6,
293:8, 302:15,
306:6, 327:24,
328:4, 328:12,
350:8, 355:15,
355:22
**talked**
14:2, 85:20,
113:6, 113:7,
113:9, 114:19,
118:23, 133:10,
147:1, 158:2,
159:12, 172:23,
173:1, 176:21,
176:24, 180:12,
187:9, 202:1,
208:22, 230:15,
249:23, 255:7,
255:17, 255:24,
256:9, 271:5,

293:16, 334:9,
338:15, 342:20,
351:24, 352:1,
353:14, 354:5
**talking**
14:6, 14:22,
17:1, 34:17,
67:23, 74:16,
85:23, 86:4,
86:9, 87:24,
132:12, 134:16,
138:24, 143:8,
159:4, 159:22,
160:3, 160:6,
160:22, 171:15,
172:5, 174:9,
183:15, 187:12,
187:13, 214:21,
222:13, 285:3,
310:2, 317:9,
317:19, 318:19,
328:3, 334:12,
334:23, 339:22
**talks**
191:20, 245:23
**tall**
81:4, 122:24,
280:11, 281:8,
282:2
**taller**
122:23
**tallest**
279:5, 279:12
**tan**
122:3, 273:12,
300:12
**task**
54:18, 95:15
**tasks**
94:4, 160:14
**team**
23:16, 23:20,
24:1, 24:4,
27:2, 27:5,
27:8, 27:18,
28:2, 28:5,
28:10, 28:12,
29:12, 29:16,

30:5, 52:22,
127:5, 280:4
**tearful**
133:23
**tech**
20:6
**teenage**
126:9
**teenager**
126:11
**teeth**
74:3
**telephones**
339:8
**television**
235:15
**tell**
34:8, 46:22,
54:13, 77:5,
77:7, 77:13,
77:21, 78:2,
81:8, 81:10,
86:13, 94:6,
94:7, 95:2,
95:14, 95:22,
96:1, 96:3,
96:6, 96:9,
108:24, 110:13,
112:19, 113:1,
114:20, 134:4,
134:6, 134:10,
139:2, 148:6,
152:11, 156:1,
156:10, 159:14,
160:16, 162:14,
162:21, 164:19,
164:23, 166:1,
166:4, 166:5,
166:8, 166:24,
167:12, 168:13,
168:16, 168:19,
170:23, 171:2,
175:17, 176:1,
180:16, 189:24,
193:19, 197:8,
197:12, 197:19,
202:8, 204:9,
205:3, 207:13,

JGS_MAYSONET 4136

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

153

212:14, 213:21,
217:23, 219:8,
219:13, 220:1,
228:14, 229:2,
236:11, 237:20,
238:11, 238:17,
238:21, 256:20,
274:22, 288:11,
288:14, 288:18,
289:21, 291:7,
291:13, 293:9,
301:14, 301:21,
302:19, 303:3,
334:17, 345:7,
345:23, 349:17,
350:18, 350:24,
359:1, 364:18,
367:1
**telling**
37:1, 45:1,
67:5, 78:7,
135:12, 139:3,
139:23, 162:15,
219:1, 221:6,
222:14, 270:14,
271:18, 289:14,
294:22, 294:24,
296:7, 302:10,
302:15, 331:11,
349:1
**tells**
158:24, 299:24
**temper**
196:18, 196:21,
196:24, 197:6
**tended**
329:12
**term**
319:23
**terminals**
57:11, 60:24,
62:14
**terms**
70:17, 214:24,
234:18
**territory**
136:19
**test**
30:22, 44:24,

45:16, 254:14,
283:17, 332:24,
333:8, 334:3,
340:9, 354:18
**testified**
8:12, 112:10,
175:11, 178:7,
178:23, 179:3,
179:6, 182:23,
257:6, 257:9,
289:6, 295:15
**testify**
12:4, 17:13,
110:3, 111:3,
111:4, 112:6,
152:1, 215:23
**testifying**
81:19, 114:21,
295:4, 295:8,
320:19
**testimony**
6:13, 6:19,
58:12, 150:9,
178:11, 179:17,
187:4, 188:11,
188:19, 202:12,
272:2, 290:4,
291:21, 294:21,
295:15, 295:20,
295:21, 315:13,
369:5, 369:6,
370:9
**testing**
355:2
**tests**
44:20, 45:3,
333:2
**texas**
19:14
**th**
14:8, 14:9,
14:21, 15:1,
15:11, 19:1,
23:9, 23:10,
23:14, 23:17,
26:7, 26:11,
26:15, 27:5,
27:8, 28:14,

28:19, 28:24,
29:2, 29:7,
29:11, 29:13,
29:17, 29:22,
29:24, 30:2,
30:4, 30:8,
30:9, 31:21,
32:1, 50:19,
50:21, 51:2,
51:5, 51:6,
98:10, 98:22,
124:14, 125:14,
125:22, 127:6,
127:7, 132:6,
135:11, 156:16,
170:18, 173:7,
184:6, 197:17,
197:23, 198:14,
233:20, 234:2,
237:3, 237:24,
238:23, 240:1,
240:19, 241:16,
241:19, 241:22,
242:1, 242:4,
242:10, 260:7,
260:22, 268:5,
279:19, 285:24,
286:9, 286:17,
286:21, 301:24,
310:12, 310:18,
311:13, 311:21,
311:22, 322:4,
360:5, 360:8,
360:17, 361:1,
370:17
**than**
16:20, 21:9,
21:19, 24:16,
24:19, 29:9,
35:19, 57:8,
66:17, 70:6,
70:8, 92:4,
99:19, 99:22,
99:23, 114:10,
118:19, 122:23,
128:9, 128:19,
129:5, 137:16,
138:4, 138:9,

138:20, 139:23,
142:20, 166:7,
192:18, 193:5,
217:20, 260:8,
260:15, 298:9,
328:11, 330:22,
330:24, 346:19,
347:15, 348:18,
359:17, 365:16
**thank**
51:24, 190:4,
222:8, 368:2
**theft**
252:12
**their**
14:18, 31:18,
60:10, 60:21,
62:15, 76:13,
78:15, 78:18,
85:6, 87:11,
87:18, 88:24,
95:4, 98:5,
98:6, 98:13,
117:6, 117:9,
117:10, 117:23,
138:5, 138:9,
138:12, 138:14,
138:16, 138:17,
138:20, 153:10,
162:24, 177:1,
178:2, 183:1,
183:2, 196:14,
200:16, 218:2,
227:14, 236:18,
245:8, 247:3,
249:9, 249:10,
249:13, 251:5,
252:24, 253:2,
275:5, 333:19,
338:8, 341:24,
343:5, 345:20,
349:23, 350:12,
350:21, 351:3,
356:19, 356:22,
358:6
**themselves**
7:12, 88:14,
350:13

JGS_MAYSONET 4137

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

154

**there's**
48:5, 62:1,
67:6, 150:15,
163:18, 186:5,
189:9, 193:1,
193:5, 201:20,
235:24, 241:11,
247:8, 248:24,
270:6, 270:11,
270:13, 270:18,
271:17, 289:13,
289:18, 339:8,
353:1
**thereabouts**
71:18
**thereafter**
207:7, 370:10
**these**
76:2, 78:4,
95:14, 96:10,
102:11, 163:9,
163:12, 171:12,
174:23, 176:13,
177:2, 177:11,
178:2, 179:7,
180:2, 181:3,
181:15, 181:17,
183:4, 183:15,
184:8, 188:6,
200:7, 202:20,
221:1, 236:21,
236:22, 237:1,
238:18, 249:1,
273:13, 309:10,
309:13, 309:19,
341:10, 343:14,
343:16, 343:19,
345:14, 345:18,
346:9, 346:18,
347:9, 347:12,
348:5, 348:8,
348:18, 349:9,
350:10, 351:1,
351:7, 351:13,
354:11, 357:6,
359:6
**they'd**
89:11, 118:2,

118:9, 305:19
**they're**
8:20, 81:11,
89:1, 138:14,
138:16, 204:12,
219:22, 235:12,
308:16, 339:12,
341:22
**thick**
309:8, 323:10
**thing**
10:19, 10:24,
30:6, 35:9,
37:3, 39:4,
55:9, 144:15,
147:1, 170:17,
170:21, 260:11,
278:8, 292:23,
300:3
**things**
26:22, 35:18,
41:13, 58:4,
59:21, 59:22,
62:23, 71:2,
74:1, 74:4,
96:22, 106:19,
193:10, 197:4,
198:7, 265:10,
349:1
**think**
19:22, 22:9,
25:2, 25:7,
31:4, 31:8,
46:13, 71:11,
81:10, 82:19,
82:21, 82:23,
91:4, 104:17,
110:6, 121:6,
122:23, 123:9,
138:11, 138:18,
138:24, 139:22,
141:23, 142:7,
145:7, 146:19,
148:12, 148:14,
148:16, 153:20,
154:11, 162:24,
165:2, 169:10,
169:12, 170:20,

172:23, 180:20,
184:18, 187:4,
188:5, 190:8,
202:12, 206:7,
206:15, 208:18,
211:12, 221:21,
221:24, 234:12,
244:3, 245:15,
245:16, 265:6,
265:7, 266:24,
268:21, 272:17,
317:18, 318:9,
336:16, 354:2,
359:3, 359:9,
361:4
**thinking**
180:24, 285:1
**third**
52:24, 94:18,
120:3, 120:4,
120:7, 123:4,
244:3, 270:3,
288:22, 288:24,
294:3, 296:8,
304:4, 329:20,
330:3, 330:9
**third-party**
36:9
**third-watch**
96:4
**thomas**
3:18
**those**
9:10, 9:22,
21:1, 39:15,
41:4, 45:3,
48:12, 57:18,
59:9, 59:12,
64:14, 64:20,
64:24, 90:2,
90:4, 93:23,
101:6, 102:21,
102:23, 103:12,
104:9, 106:21,
107:18, 108:13,
112:15, 126:10,
132:8, 150:2,
158:9, 173:20,

174:16, 174:18,
175:9, 176:15,
176:16, 179:22,
179:23, 195:8,
213:23, 215:3,
224:1, 226:7,
226:21, 236:5,
236:8, 236:17,
237:10, 237:21,
238:8, 238:12,
238:13, 238:22,
239:1, 239:2,
241:14, 247:15,
265:9, 266:6,
268:8, 276:16,
284:22, 308:11,
313:8, 333:4,
335:15, 336:1,
336:20, 337:5,
337:23, 342:5,
342:18, 342:23,
343:7, 343:19,
349:19, 351:16,
352:9, 352:13,
353:2, 353:4,
353:24, 356:17,
360:22, 361:1,
364:13, 365:20,
367:18
**though**
29:4, 42:23,
185:15, 316:1,
321:23
**thought**
24:15, 31:2,
31:6, 67:4,
112:20, 142:1,
153:14, 169:8,
169:14, 191:3,
191:13, 194:13,
201:22, 223:2,
223:6, 223:9,
223:11, 245:14,
305:17, 307:9,
319:10, 325:8,
348:2, 348:4,
348:7, 351:1,
353:24, 360:2,

JGS_MAYSONET 4138

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

155

360:14
**three**
14:17, 21:1,
23:15, 29:9,
32:24, 57:10,
75:12, 75:13,
75:16, 83:23,
84:7, 119:10,
119:19, 119:20,
120:2, 120:11,
162:16, 162:18,
162:22, 163:9,
163:12, 163:19,
164:10, 164:24,
173:8, 173:11,
173:20, 173:23,
174:17, 174:18,
175:9, 176:7,
176:13, 177:10,
178:1, 180:4,
181:15, 182:16,
183:4, 183:12,
183:15, 184:8,
226:7, 226:16,
226:21, 236:18,
239:2, 266:13,
273:17, 273:20,
273:21, 274:4,
284:16, 285:6,
288:20, 304:18,
304:19, 304:22,
305:9, 305:12,
309:13, 321:12,
341:13, 341:19,
342:18, 343:3,
343:13, 343:16,
349:19, 351:16,
351:21, 352:3,
352:9, 352:14,
352:23, 353:2,
353:4, 354:11,
355:10, 355:19,
356:13, 356:17,
356:22, 357:4,
358:3, 358:5,
359:19
**three-block**
55:7

**threw**
229:10
**through**
54:15, 61:7,
61:9, 76:18,
98:12, 101:17,
111:20, 130:20,
175:24, 192:7,
201:11, 236:2,
240:23, 241:3,
331:21
**throughout**
257:16
**thus**
10:21, 211:14
**ticket**
150:6, 170:20,
197:18, 199:5
**tile**
336:8
**tim**
351:20
**time-frame**
146:20
**timekeeper**
20:24, 50:6
**times**
30:22, 98:4,
98:17, 120:11,
142:13, 142:24,
168:23, 244:22,
359:10, 365:10
**timothy**
223:6, 286:24,
287:4, 287:10,
287:13, 287:14,
287:21, 298:6,
300:20, 300:23,
301:3, 301:23,
302:9, 302:18,
302:20, 302:22,
303:3, 303:10,
304:4, 306:10,
306:13, 306:17,
307:17, 307:18,
307:23, 308:1,
309:11, 310:6,
311:7, 317:21,

341:5, 341:8,
341:12, 341:17,
341:21, 344:15,
345:9, 346:18,
347:21, 348:9,
348:22, 349:13,
349:18, 349:23,
350:9, 350:19,
350:20, 367:15
**tired**
189:20
**title**
53:19
**today**
7:9, 9:20,
9:22, 12:4,
140:1, 180:1,
197:16, 238:19,
292:13, 353:14,
362:21, 364:7,
364:14
**today's**
131:5
**together**
14:16, 47:17,
50:2, 77:10,
196:16, 218:3,
328:6
**tom**
7:20
**tone**
232:13
**too**
55:10, 105:19,
126:23, 138:23,
164:17, 171:17,
172:16, 180:6,
180:15, 264:3,
292:15, 360:4
**took**
25:12, 25:19,
30:13, 30:16,
40:3, 53:16,
53:17, 98:11,
146:2, 169:23,
170:21, 173:9,
206:11, 206:21,
216:2, 254:2,

276:14, 276:16,
277:2, 284:17,
314:21, 319:9,
319:21, 319:24,
320:20, 335:4,
340:8
**tool**
44:22, 283:3,
283:5, 283:6
**top**
185:23, 203:3,
213:17, 213:19,
259:23, 288:7,
331:9
**total**
94:24
**totally**
277:13
**touch**
50:12, 257:17,
257:18, 258:1
**tour**
20:24, 21:2,
21:4
**tours**
21:5, 21:6
**towards**
122:4
**tracks**
229:22, 230:6
**traditional**
350:12
**trained**
33:1, 33:12,
33:15, 33:20,
33:24, 37:9,
39:17, 39:20,
39:22, 40:1,
40:16, 40:20,
41:4, 72:18,
73:8, 81:13
**training**
6:24, 22:11,
40:7, 40:10,
115:18, 115:22,
116:1, 116:18,
361:14, 363:3,
363:8, 363:16,

JGS_MAYSONET 4139

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

156

363:21, 364:2,
364:8, 364:12,
364:15, 364:19,
364:20, 364:24
**trainings**
364:13
**transcript**
6:8, 6:13,
121:5, 121:16,
178:18, 185:3,
190:16, 191:21,
223:17, 225:12,
290:22, 316:11,
362:3, 362:17,
368:10, 370:8
**transcription**
369:6
**transcripts**
120:24, 121:3,
121:7, 121:8
**transfer**
91:18
**transferred**
28:14, 28:16
**trevino**
195:21, 195:23,
196:5, 196:9,
196:11
**trial**
6:13, 68:5,
175:12, 175:14,
178:7, 179:6,
187:4, 192:20,
192:23, 193:5,
219:6, 257:6,
257:9
**trick**
214:17
**tried**
80:22, 151:24,
152:8, 166:14,
210:16, 211:8,
211:11, 211:18,
239:9, 269:18,
278:16
**trigger**
327:6
**trouble**
279:18, 281:24

**troubles**
328:1
**true**
42:17, 42:24,
43:14, 44:2,
44:11, 44:14,
178:13, 214:4,
272:10, 369:5,
370:8
**truly**
38:11
**trust**
169:10, 169:13,
169:16, 170:3,
213:13
**trusted**
169:21
**truth**
45:2
**truthful**
106:14, 107:6,
107:14, 107:17,
107:18, 107:19,
112:3, 179:5,
262:9, 262:11,
262:14, 262:17,
262:20
**truthfully**
12:4
**try**
11:5, 32:13,
37:16, 39:2,
44:8, 46:24,
47:21, 55:1,
70:19, 73:8,
73:13, 73:17,
73:19, 73:22,
75:23, 80:16,
86:18, 98:9,
104:19, 136:22,
136:23, 146:4,
164:15, 192:7,
192:17, 207:16,
208:15, 209:14,
211:4, 234:4,
283:3, 302:2,
328:15, 328:18
**trying**
85:5, 92:24,

144:9, 146:7,
155:2, 169:8,
170:13, 211:15,
214:16, 239:3,
267:10, 275:1,
278:19, 282:7,
305:5, 305:23
**tuition**
20:17
**turn**
190:21, 191:5,
191:6, 223:19,
225:15, 244:9,
244:10, 244:20,
245:10, 252:6,
257:13, 258:7,
261:14, 270:3,
270:5, 273:2,
273:3, 282:13,
293:17, 297:3,
309:20, 316:22,
323:9
**turned**
95:15, 107:15,
223:5, 262:6,
266:5, 266:13,
266:19, 316:3,
355:6
**turning**
258:14, 312:16
**turns**
351:2
**tv**
308:12
**twice**
217:21
**two**
9:9, 9:10,
9:21, 9:23,
10:1, 47:18,
57:10, 74:10,
74:11, 74:19,
74:23, 75:2,
84:8, 98:1,
105:3, 108:13,
120:2, 120:12,
126:2, 126:3,
146:15, 200:1,

224:5, 241:11,
241:14, 241:15,
242:12, 268:8,
271:11, 288:21,
300:11, 321:14,
321:16, 325:3,
347:20, 352:5,
354:8, 358:15
**two-part**
55:13
**type**
35:22, 37:5,
46:20, 55:14,
55:17, 55:20,
75:18, 186:16,
277:11, 330:23
**typed**
35:12, 35:18,
43:6, 44:8,
44:12, 47:1,
55:15, 55:23,
58:7, 99:12,
99:16, 210:21,
221:2, 225:7,
257:22, 262:10,
262:13, 263:3,
285:18, 285:20,
285:21, 285:22,
285:23, 286:15,
312:13, 313:4,
313:13, 313:17,
313:23, 314:5,
314:11, 314:17,
315:16
**types**
71:18
**typewriter**
55:14
**typewriting**
370:11
**typewritten**
56:18
**typical**
123:18
**typically**
38:1, 124:10,
129:4, 129:13,
246:10, 264:19

JGS_MAYSONET 4140

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

157

**typing**
56:5, 164:13,
264:12, 265:12,
306:20, 307:3,
313:9, 313:10,
314:21, 315:5,
315:16, 315:21
**typo**
186:3, 186:4,
186:13, 215:13,
215:14, 260:14
**typographical**
186:5, 187:20,
187:23, 188:3

**U**

**ubiquitous**
339:16
**uh-huh**
225:19, 227:12,
234:21, 241:7,
241:12, 248:21,
250:17, 252:13,
252:17, 253:7,
253:9, 259:2,
259:4, 294:7,
298:21, 312:22,
356:8
**ultimately**
207:11
**unable**
71:7, 71:11,
71:14, 207:17,
210:6, 210:17,
211:10, 211:17
**unaware**
272:8
**uncover**
251:5, 251:7
**under**
41:7, 179:6,
223:21, 252:12,
277:23, 282:23,
283:2, 329:23,
333:1, 333:6,
333:13, 370:11
**underneath**
247:15

**understand**
11:9, 11:13,
12:12, 69:9,
88:23, 105:13,
110:9, 130:15,
141:7, 141:21,
146:22, 172:8,
195:8, 195:15,
196:10, 229:21,
230:17, 230:19,
230:20, 245:6,
326:24
**understanding**
44:9, 154:7,
191:2, 195:24,
196:12
**understood**
11:17, 12:12,
43:18, 191:10,
217:20
**underway**
125:18
**undisclosed**
87:8
**unfair**
83:8, 148:24
**unfortunately**
63:8
**unit**
51:17, 152:18,
152:23, 153:5,
153:8, 154:9,
154:17, 155:5,
155:13, 156:11,
159:16, 242:23,
243:12, 243:17,
244:2, 316:18,
317:16, 318:5,
318:8, 365:14
**united**
1:1
**unknown**
176:18
**unless**
189:24, 344:16
**unlock**
67:22
**unmarked**
149:22, 149:23

**until**
11:1, 11:6,
34:2, 34:10,
54:2, 93:20,
97:11, 117:16,
119:12, 194:6,
203:13, 234:7,
256:10, 314:19,
315:4, 315:6,
321:15, 321:17,
349:1, 355:15,
361:5
**unusual**
246:14, 246:18
**upon**
98:11, 338:2,
339:13
**upper**
312:17, 313:12,
313:15, 313:21,
314:2, 314:9,
314:16, 314:24,
315:10, 315:20
**use**
41:4, 41:7,
44:7, 44:20,
44:24, 54:18,
55:13, 69:24,
72:24, 75:18,
76:7, 79:12,
79:15, 79:17,
79:20, 88:13,
88:17, 89:14,
101:6, 274:8,
280:1, 319:23,
320:16, 337:6,
337:14, 338:7,
346:24, 347:1,
350:11, 351:12,
364:22
**used**
36:10, 39:1,
41:1, 56:22,
75:17, 75:20,
90:22, 100:24,
101:10, 101:12,
107:16, 107:19,
170:24, 186:18,

196:18, 197:9,
197:13, 198:2,
198:17, 199:4,
199:6, 202:3,
240:4, 240:10,
266:4, 280:13,
334:18, 350:12,
351:15
**using**
79:22, 101:14,
179:9, 192:4,
192:7, 206:15,
351:1
**usual**
246:1, 246:24
**usually**
186:17, 331:4
**utmost**
295:14

**V**

**v**
290:24, 291:24,
292:2, 292:22,
293:21, 295:20
**vacant**
208:21, 210:18,
210:19, 210:20,
270:9
**vague**
26:17, 70:21,
83:15, 143:7,
143:14, 146:20,
150:18, 184:3,
339:21
**validity**
220:21, 221:14,
222:4, 222:17
**van**
246:1, 246:2,
300:6, 300:8,
300:13, 344:10,
344:12, 345:3,
345:6, 349:3
**vantage**
300:15
**vargas**
66:13, 147:19,

JGS_MAYSONET 4141

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                          158

147:22, 149:5,
159:5, 159:8,
159:12, 159:22,
160:3, 160:6,
160:18, 160:22,
161:3, 176:4,
186:22, 186:23,
201:4, 201:7,
203:7, 208:9,
218:13, 225:23,
230:8, 230:16,
234:5, 234:6,
254:20, 255:4,
257:4, 258:5,
259:16, 259:20,
260:5, 260:13,
271:21, 272:3,
272:6, 273:5,
273:7, 274:4,
276:1, 277:6,
282:1, 287:7,
298:17, 310:11,
310:17, 311:2,
344:7, 344:13,
352:1, 355:19,
366:4, 367:6,
367:8, 367:12,
367:13, 367:16
**varied**
94:19
**various**
20:22, 20:23
**vehicle**
207:21, 244:22,
276:23
**vehicles**
276:22
**velez**
245:22, 246:21,
253:14, 254:9,
254:14, 261:12
**velez's**
252:10, 261:3
**vents**
332:8
**verbal**
170:19
**verbatim**
191:21, 229:17

**verify**
97:12, 203:14,
204:9, 204:20,
205:4, 205:16,
205:20, 207:2,
252:3, 269:18,
321:6
**verifying**
203:23
**versus**
7:6
**very**
84:23, 86:8,
87:7, 88:17,
125:16, 212:5,
212:7, 212:10,
234:13, 268:13,
275:7, 302:21,
307:12, 326:3
**via**
165:15
**vicente's**
146:4, 162:3,
203:23, 206:2,
207:11, 207:24,
208:4, 211:16,
213:3, 295:15,
295:20, 296:23,
366:16, 366:22
**victim**
216:21, 216:22,
244:21, 246:2,
246:9, 246:23,
271:14, 325:8
**victim's**
146:10, 230:16,
246:1, 260:1
**victims**
326:2
**video**
7:2, 368:6,
368:8
**videographer**
5:12, 7:2,
7:11, 105:7,
105:10, 189:15,
189:18, 272:20,
272:23, 324:7,

324:10, 351:10,
361:20, 361:23,
368:6
**videotaped**
1:17, 2:1
**view**
78:21, 128:21,
128:24, 282:21,
310:17
**viewed**
79:7, 79:11,
148:18, 310:11,
310:14, 310:22,
311:5, 311:9,
312:4
**viewing**
78:2, 79:6,
79:9, 79:24,
101:19, 102:14,
128:15
**violate**
111:23
**violated**
84:5
**violates**
333:19
**violent**
51:12, 51:16,
51:20, 57:2,
57:4, 57:12,
57:15, 57:19,
60:5, 60:9,
60:13, 61:5,
61:9, 61:11,
61:20, 61:23,
62:2, 62:17,
63:3, 63:7,
64:2, 71:17,
72:2, 72:9,
72:12, 91:7,
91:11, 92:11,
92:14, 92:21,
93:1, 93:3,
124:9, 124:11,
258:19
**voluntarily**
283:13, 283:20,
332:21, 332:23,

333:5, 333:8,
333:12
**volunteer**
28:19, 45:12,
333:14

---
### W
**wacker**
4:5
**wait**
10:24, 11:6,
189:8
**waive**
110:9
**walk**
18:1, 18:3,
18:7, 18:12,
18:16, 63:6,
63:20, 338:23
**walked**
18:17, 63:19,
123:15, 200:6,
202:1, 352:4
**walking**
18:19, 63:10,
63:11, 63:13,
64:1, 338:24
**wall**
61:17, 63:19,
63:22, 335:19,
335:20
**walls**
336:3, 336:5,
336:10, 336:12,
336:14, 336:20,
336:21
**wander**
338:18
**want**
10:16, 20:12,
23:24, 24:3,
24:10, 24:24,
25:5, 26:9,
26:15, 31:1,
46:23, 49:11,
64:6, 64:9,
65:5, 78:3,
85:8, 85:13,

JGS_MAYSONET 4142

86:5, 86:23,
87:3, 89:7,
97:2, 97:7,
105:3, 109:13,
138:12, 139:6,
139:11, 139:17,
139:20, 140:21,
141:13, 154:24,
167:3, 167:5,
178:11, 185:4,
192:9, 193:15,
205:9, 205:16,
205:20, 231:5,
231:8, 232:9,
248:13, 250:7,
277:17, 280:16,
280:22, 296:5,
302:5, 304:10,
304:14, 306:2,
306:5, 320:16,
329:19, 338:17,
343:22, 344:1,
344:5, 353:15,
354:15, 354:18,
354:23, 355:3,
355:9, 355:10,
355:19, 357:17,
368:9
**wanted**
24:21, 24:23,
26:18, 26:22,
31:23, 32:8,
32:10, 38:9,
45:7, 45:12,
52:21, 54:12,
55:6, 58:20,
60:21, 74:10,
89:24, 91:7,
98:15, 101:16,
111:21, 112:2,
142:1, 153:9,
154:23, 164:12,
167:7, 168:3,
168:7, 171:10,
172:3, 172:10,
172:19, 183:5,
183:9, 183:11,
183:17, 183:20,

200:13, 203:14,
204:9, 204:20,
205:4, 206:1,
206:4, 206:5,
207:2, 223:19,
232:19, 232:22,
284:16, 284:19,
287:8, 298:16,
302:12, 318:9,
318:15, 319:7,
348:9, 348:12,
348:15, 348:17,
354:10
**warming**
246:3, 246:10,
246:23
**warned**
217:16
**warrant**
324:2
**warrants**
318:14, 318:17,
319:5, 319:6
**wasn't**
26:6, 27:10,
30:1, 30:7,
94:9, 94:10,
94:11, 94:13,
118:1, 140:9,
150:21, 156:20,
159:22, 200:16,
202:23, 209:9,
209:18, 248:4,
252:5, 253:4,
261:5, 261:9,
282:23, 328:4,
333:13, 350:17,
353:17, 355:2,
359:24
**watch**
52:23, 52:24,
93:16, 93:20,
94:18, 96:10
**watching**
31:13
**water**
337:17, 337:21
**way**
11:12, 38:8,

47:21, 59:2,
67:20, 71:15,
85:17, 88:9,
101:4, 111:14,
113:1, 139:14,
153:17, 190:2,
191:5, 191:6,
200:11, 203:24,
210:2, 218:15,
220:1, 221:7,
221:22, 222:14,
223:10, 230:1,
260:18, 272:13,
278:12, 282:9,
284:24, 291:5,
291:8, 293:7,
293:10, 306:22,
308:21, 329:20,
330:3, 337:6,
338:12, 338:13,
344:15, 366:21
**ways**
75:10
**we'd**
38:19, 78:8,
80:13, 91:24,
93:20, 94:6,
95:14, 95:19,
98:9, 98:16,
98:17, 98:23,
102:4, 102:21,
154:1, 197:3,
275:4, 283:24
**we'll**
11:17, 77:15,
192:8, 234:16,
264:15, 284:1,
294:2, 311:11,
316:7, 368:5
**we're**
9:20, 11:2,
38:19, 57:9,
98:6, 138:24,
172:5, 174:9,
180:14, 189:4,
189:8, 189:9,
193:11, 193:17,
194:8, 267:18,

272:17, 297:5,
297:6, 357:20
**we've**
43:21, 104:13,
105:2, 119:8,
120:2, 121:20,
293:19, 312:6,
340:24, 362:5,
363:1
**wear**
122:11
**wearing**
122:2
**wednesday**
1:19
**week**
29:15, 165:10,
186:17, 233:21
**weeks**
32:24, 118:17,
119:8, 119:10,
119:19, 119:21
**weigh**
123:2
**weighed**
282:3
**weight**
71:1, 74:7,
80:21, 205:23
**weights**
356:23
**weird**
348:2, 348:4,
351:1
**went**
15:15, 15:17,
15:23, 18:14,
18:15, 23:16,
54:13, 55:15,
56:3, 104:3,
124:21, 125:9,
126:22, 127:3,
127:11, 128:5,
140:19, 146:11,
146:12, 147:1,
147:4, 155:10,
156:10, 170:18,
173:4, 173:6,

JGS_MAYSONET 4143

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

160

178:1, 184:5,
184:12, 185:12,
187:6, 200:14,
201:21, 207:9,
207:23, 208:17,
209:8, 209:21,
211:13, 216:12,
216:14, 217:7,
230:15, 255:24,
256:10, 279:2,
279:12, 279:22,
291:6, 293:8,
305:10, 309:3,
309:4, 357:9,
357:10, 358:2,
363:21

**weren't**
44:11, 68:23,
103:23, 147:6,
156:21, 179:7,
191:8, 195:24,
210:9, 274:20,
284:9, 284:12,
321:14, 328:5,
328:6, 338:24,
355:23

**west**
4:5, 4:13,
276:2

**what's**
92:7, 97:23,
110:11, 124:12,
170:6, 202:2,
209:10, 219:19,
223:23, 247:12,
272:12, 274:9,
280:1, 281:19,
286:5, 286:22,
314:1, 317:11,
328:10, 330:13,
330:18

**whatever**
43:23, 70:9,
86:18, 101:16,
101:19, 322:19,
322:21, 334:13,
351:19, 352:8,
354:10, 356:12,

356:16, 357:17

**whatsoever**
285:9

**wheel**
266:4, 266:13,
266:19

**whenever**
89:7, 148:22,
361:1

**whereabouts**
251:16, 251:18,
251:20

**whereof**
370:16

**whether**
33:16, 39:8,
41:11, 43:13,
43:14, 44:1,
44:14, 66:10,
78:17, 90:4,
105:14, 107:23,
108:9, 108:21,
109:1, 109:16,
110:16, 136:6,
136:14, 136:23,
139:11, 143:2,
145:3, 147:14,
167:15, 168:3,
194:24, 219:3,
272:14, 293:19,
366:11, 367:22

**which**
16:3, 18:5,
19:19, 38:1,
53:3, 60:2,
75:15, 92:14,
95:21, 95:24,
102:18, 106:20,
111:16, 118:24,
125:4, 126:3,
126:5, 126:7,
130:4, 133:8,
135:10, 146:11,
171:14, 172:5,
172:21, 174:2,
180:14, 185:21,
187:2, 207:3,
244:12, 252:8,

264:15, 266:14,
269:13, 269:20,
270:5, 276:14,
281:21, 292:1,
293:20, 304:17,
305:15, 312:1,
312:14, 312:18,
317:3, 323:11,
324:20, 329:16,
335:6, 335:9,
346:20, 351:18,
357:3, 363:8

**whichever**
91:19

**while**
16:8, 16:23,
17:16, 22:15,
26:10, 31:24,
37:13, 40:1,
43:6, 51:2,
52:1, 55:3,
58:21, 147:3,
158:20, 170:24,
171:3, 194:18,
198:8, 300:21,
300:23, 334:21

**white**
75:21, 300:7

**whoever**
91:19, 92:1,
101:3, 177:9,
252:20, 337:13

**whole**
56:15, 141:12,
227:10, 227:11,
300:2

**wholeheartedly**
285:11

**wholly**
339:12

**whom**
370:6

**whose**
40:15, 73:4,
91:15, 140:11,
252:18, 252:21,
322:16, 323:2

**wide**
335:18

**wife**
146:10, 230:16,
234:6, 250:11,
325:2, 326:1

**wife's**
193:23, 194:7,
194:21

**wilda**
146:9, 146:13,
146:15, 147:2,
147:7, 147:9,
147:19, 147:22,
148:19, 149:5,
150:3, 186:22,
186:23, 187:8,
187:9, 187:10,
187:12, 187:14,
218:16, 218:20,
220:2, 220:8,
220:15, 221:8,
221:22, 222:14,
230:16, 234:6,
250:5, 251:1,
251:11, 251:12,
252:2, 255:8,
255:16, 255:24,
256:4, 256:9,
257:4, 257:17,
258:2, 258:5,
271:21, 272:3,
272:6, 272:9,
272:14, 273:5,
273:7, 274:3,
276:1, 276:6,
276:18, 277:5,
282:1, 282:21,
310:10, 310:17,
310:21, 311:2,
311:10, 312:2,
312:4, 352:1,
352:8, 352:13,
354:8, 354:11,
355:19, 355:22

**wilda's**
146:11, 149:7

**will**
7:12, 77:22,
112:4, 155:9,

JGS_MAYSONET 4144

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

161

193:2, 248:22,
249:1, 252:15,
268:15, 270:6,
291:18, 292:17,
292:18, 362:14,
368:14
**willing**
84:19, 87:3,
87:5, 141:16
**win**
82:6
**window**
79:8, 79:10,
245:24, 336:22,
336:23
**windows**
64:15, 64:18,
64:20, 64:24,
65:9, 65:12,
336:12, 336:20,
336:21
**withdraw**
47:21, 85:12
**withdrawal**
133:16
**withdrawn**
212:3
**withheld**
164:3, 211:15
**withhold**
97:11
**withholding**
303:7
**within**
23:17, 61:17,
64:2, 152:22,
229:23, 237:7,
237:9
**without**
41:22, 87:18,
107:11, 225:6,
319:1
**witness**
8:10, 17:8,
34:8, 35:7,
36:2, 36:7,
37:1, 37:23,
38:1, 38:11,

38:13, 38:15,
38:17, 38:23,
39:1, 39:2,
39:15, 70:16,
70:18, 71:4,
71:7, 71:8,
71:11, 71:12,
71:14, 76:22,
77:5, 77:13,
77:21, 78:12,
86:12, 86:17,
102:19, 104:20,
106:24, 107:10,
129:24, 130:4,
130:6, 130:9,
140:17, 142:8,
142:17, 155:2,
157:22, 163:5,
167:15, 186:1,
186:2, 186:4,
186:7, 186:10,
186:15, 192:8,
193:7, 193:10,
193:15, 205:12,
215:20, 216:9,
217:1, 220:23,
237:15, 249:23,
287:6, 298:17,
302:7, 325:23,
329:21, 330:6,
353:15, 353:17,
353:18, 353:20,
357:22, 359:3,
359:6, 359:9,
370:16
**witness's**
38:11, 73:18,
188:11
**witnessed**
139:7, 139:12,
300:15, 318:23,
324:15, 325:12,
325:16, 326:22,
327:8, 355:7
**witnesses**
37:16, 38:9,
39:8, 39:13,
64:6, 64:11,

65:4, 70:12,
127:13, 127:20,
128:6, 128:13,
128:17, 128:20,
128:21, 129:11,
129:15
**witnessing**
319:2
**woke**
234:10, 234:12,
255:9
**woman**
298:1
**women**
80:24
**wondering**
321:18, 322:7
**woodall**
213:5, 214:5,
214:6, 214:8,
214:20, 215:2,
215:9
**woodard**
213:7, 213:8,
214:6, 215:12
**word**
55:15, 55:20,
55:23, 206:15,
213:7, 241:6,
292:16
**words**
247:9, 247:15,
291:18, 329:15
**work**
24:23, 24:24,
25:3, 26:18,
26:19, 29:10,
31:14, 50:2,
50:23, 51:3,
51:7, 52:7,
52:21, 53:7,
60:21, 62:5,
62:8, 62:15,
66:3, 72:1,
72:6, 72:7,
72:8, 80:12,
89:20, 95:10,
112:1, 113:19,

116:5, 116:10,
123:21, 124:2,
124:5, 124:8,
124:11, 126:21,
132:14, 145:6,
155:15, 155:21,
155:23, 156:2,
156:3, 194:4,
230:13, 230:14,
233:6, 234:7,
234:14, 252:3,
252:4, 320:24,
329:12
**worked**
22:13, 24:16,
24:19, 41:16,
52:5, 62:9,
72:3, 89:13,
123:20, 195:5,
234:1, 328:6
**working**
23:15, 34:19,
46:18, 46:20,
47:17, 50:21,
52:23, 52:24,
53:15, 59:10,
59:11, 65:16,
65:18, 66:14,
72:5, 72:10,
72:12, 91:20,
93:19, 94:17,
113:13, 116:22,
144:14, 156:20,
156:21, 164:1,
226:16, 227:22,
230:8, 245:2,
255:19, 319:16,
337:8, 338:3
**works**
20:1
**workspace**
60:10
**workspaces**
60:22
**world**
200:7, 201:13,
344:15
**wouldn't**
35:15, 38:24,

JGS_MAYSONET 4145

41:19, 42:1, 42:20, 46:20, 77:13, 80:23, 81:2, 83:5, 96:14, 104:12, 117:19, 139:20, 140:7, 140:19, 140:21, 162:2, 168:13, 192:20, 192:21, 211:1, 211:4, 246:20, 248:13, 306:16, 356:16, 357:17

**wrightwood**
126:8, 126:12

**write**
35:9, 35:11, 35:13, 35:15, 93:23, 94:7, 117:19, 117:20, 182:10, 200:2, 234:24, 349:4

**writing**
33:2, 42:13, 96:22, 260:20, 313:8

**written**
33:5, 35:20, 37:4, 43:6, 43:24, 44:7, 200:13, 289:9, 315:19

**wrong**
12:21, 29:4, 32:20, 32:22, 87:10, 87:16, 202:5, 202:22, 202:23, 204:12, 211:8, 211:11, 211:14, 211:18, 211:23, 214:18, 223:11, 245:16, 264:13, 265:6, 265:9, 265:14, 266:5, 267:13, 267:14, 267:15, 268:15, 268:19, 269:5, 269:8,

274:9, 277:13, 279:15, 296:2, 315:2, 317:8, 343:18, 345:13

**wrongfully**
201:10

**wrote**
117:9, 186:14, 252:20

---
**X**
---

**xerox**
58:7, 58:15

**xeroxed**
58:9

**xeroxing**
327:13

---
**Y**
---

**yeah**
18:24, 22:23, 26:13, 27:1, 38:8, 42:22, 57:7, 62:22, 62:24, 69:23, 70:24, 87:15, 113:12, 115:4, 140:6, 143:9, 153:19, 166:13, 169:19, 174:6, 179:19, 179:21, 180:24, 186:16, 188:12, 212:12, 212:21, 215:5, 218:9, 227:7, 227:8, 231:17, 231:19, 237:8, 237:20, 239:12, 244:8, 249:4, 249:8, 258:24, 260:6, 267:7, 267:22, 269:24, 283:7, 284:15, 287:19, 290:7, 292:4, 292:23, 293:13, 293:24, 301:9, 306:3, 311:1, 315:24,

317:10, 317:24, 327:2, 331:16, 339:23, 345:19, 346:4, 347:3, 347:22, 352:8, 353:17, 354:7, 356:10, 358:9, 361:17

**year**
9:15, 9:19, 10:2, 14:4, 14:6, 14:21, 52:3, 52:8, 66:9, 66:11, 72:3, 72:9, 217:13

**years**
21:9, 21:19, 22:14, 23:16, 27:3, 27:4, 27:8, 28:13, 29:9, 40:18, 51:11, 51:15, 52:18, 53:11, 63:17, 116:12, 117:24, 126:9, 126:17, 134:13, 134:21, 143:19, 231:14, 231:18, 231:19, 231:24, 232:3, 298:8, 307:9, 341:7, 341:14, 348:21

**yell**
197:2

**yelled**
197:1

**yep**
294:9, 311:8, 359:8

**yesterday**
118:14, 119:4, 119:5, 119:7, 119:9, 119:11, 119:15, 119:18

**yet**
181:21, 200:2, 263:20, 284:10,

288:11, 288:15

**york**
3:15

**you'd**
55:20, 56:17, 56:18, 75:3, 84:8, 96:6, 96:9, 130:21, 162:8, 270:4, 321:8, 338:11, 340:23, 359:23

**you've**
9:21, 10:20, 11:17, 75:10, 120:10, 131:24, 170:7, 231:14, 240:18, 240:21, 241:24, 242:6, 242:12, 252:7, 268:6, 268:7, 281:14, 281:20, 312:21, 327:8, 343:2, 349:13, 363:10

**young**
298:1

**yours**
227:11

**yourself**
106:10, 106:13, 176:20

**youth**
258:24, 259:3, 259:5, 259:8, 259:9

---
**.**
---

**.3003**
3:23

**.3300**
4:16

**.3939**
4:7

---
**0**
---

**00**
119:12, 119:13, 119:22, 120:8,

JGS_MAYSONET 4146

120:9, 123:16,
123:19, 123:20,
123:22, 132:14,
133:3, 155:16,
220:8, 262:23,
286:18, 298:11,
309:24, 310:2,
310:3
**010**
363:15
**018247**
247:24, 248:17
**05066**
175:20, 175:21
**06**
1:20, 7:10

**1**

**1**
6:18, 189:15,
189:16
**10**
1:20, 6:24,
7:10, 16:20,
62:18, 74:24,
75:4, 94:24,
95:1, 119:12,
119:22, 120:8,
247:6, 301:24,
328:11, 334:4,
334:5, 335:18,
362:14, 362:15,
363:2
**1000**
3:13, 4:23
**104**
364:1, 364:20
**11**
93:19, 94:16,
105:7, 105:8,
173:7, 184:6,
231:14, 231:18,
236:2, 247:7,
248:20, 260:7,
260:21, 260:22,
262:23, 265:1,
265:5, 279:19,
280:11, 310:12,

310:18, 311:13
**1121**
357:10
**11238**
3:15
**114**
309:8
**12**
6:20, 93:20,
105:9, 105:11,
240:14, 286:21,
311:22
**120**
3:20
**1208**
311:17
**121**
6:12
**1240**
4:14
**1282**
361:12, 361:14
**1295**
363:9
**1296**
361:12, 361:14,
361:16
**13**
126:17, 156:16,
233:20, 234:2,
240:19
**14**
6:17, 124:14,
143:9, 170:18,
197:17, 197:23,
198:14, 200:23,
241:16, 241:19,
241:22, 242:1,
242:4, 242:10,
268:5, 285:13,
285:24, 286:17,
287:21, 322:4,
363:8, 363:11,
363:17
**141**
4:13
**148**
6:18

**149**
6:15
**15**
62:18, 143:9,
203:11, 227:14,
241:5, 286:9,
286:21, 311:17,
311:21, 311:22,
363:11
**150**
278:24, 281:15,
281:21
**153841**
252:12
**155**
244:11, 244:15
**157**
244:20
**158**
245:12
**16**
6:20, 241:10,
241:11, 290:4,
370:20
**162**
245:13, 245:15,
252:9
**163**
245:15
**164**
247:5
**169**
258:10, 258:15
**17**
1:7, 1:13, 7:5,
7:7, 23:9,
23:10, 23:14,
23:17, 26:7,
26:11, 26:15,
27:5, 27:8,
30:2, 30:4,
30:8, 50:19,
50:21, 51:2,
51:5, 125:14,
125:22, 127:6,
127:7, 175:24,
241:11
**170**
123:3

**171**
261:14
**172**
185:20, 185:22,
313:20, 314:3,
329:19
**173**
185:6, 187:3,
187:24, 314:9,
353:9
**174**
273:3, 314:14,
315:1, 315:11,
315:20
**175**
311:3, 311:4,
311:12
**177**
6:15, 286:14
**178**
6:13, 297:9,
297:13, 346:23
**179**
300:5, 304:2
**18**
241:22, 370:17
**180**
307:12
**181**
309:21
**183**
282:13, 282:14
**1838**
344:7
**184**
332:15
**1845**
310:12, 310:18
**185**
6:14, 312:7,
312:16, 316:23
**1850**
3:16
**186**
312:16, 312:19,
317:4, 317:9,
340:24
**187**
293:18, 313:15,

JGS_MAYSONET 4147

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

164

321:8
**19**
105:9, 105:11,
113:13
**190**
6:16
**193**
277:18, 311:24,
312:2
**1968**
20:8
**1969**
19:22
**1972**
23:3, 32:19
**1981**
363:17
**1982**
71:18
**1983**
364:4
**199**
201:18
**1990**
66:8, 144:12,
144:18, 145:2,
145:4, 145:20,
324:21
**1991**
66:10
**1992**
66:10
**1994**
290:4
**1999**
53:23
**1st**
291:6, 293:8,
294:19, 295:17,
296:13, 296:24,
364:11

———— 2 ————

**2**
119:22, 120:9,
189:17, 189:18,
298:11, 310:2
**20**
94:24, 95:1,

231:19, 272:20,
272:21, 335:18
**2000**
3:21, 10:5
**2010**
13:13, 54:2,
113:16
**2013**
190:8, 190:9,
193:21, 201:18
**2014**
114:20, 190:8
**2016**
113:14, 113:15
**2017**
238:5, 238:7
**2019**
1:19, 7:9,
237:9, 237:17,
370:18
**2020**
370:20
**21**
201:18, 231:24,
232:3, 242:6
**22**
242:9
**2200**
4:21
**223**
6:17
**225**
6:18
**225342**
1:22
**23**
6:17, 23:3,
242:13
**2300**
263:10, 311:13
**24**
28:14, 28:19,
28:24, 29:2,
29:7, 29:11,
29:13, 29:17,
29:22, 29:24,
30:9, 31:21,
32:1, 51:6,

237:3, 237:24,
238:23, 360:5,
360:8, 360:17,
361:1
**243**
2:8
**25**
98:10, 98:22,
132:6, 135:11,
240:1
**26**
14:8, 14:9,
14:21, 15:1,
15:11, 19:1,
134:13, 134:21,
298:8, 307:9,
348:21
**2600**
156:16
**28**
51:11, 51:15,
318:3
**2869**
1:13, 7:7
**290**
6:19
**2nd**
155:10, 156:4,
157:4, 158:8,
164:22, 165:3,
165:11, 182:10,
185:24, 186:18,
203:9, 203:13,
209:2, 209:4,
218:12, 218:15,
218:22, 220:2,
220:9, 220:16,
221:8, 226:14,
226:15, 226:18,
226:22, 234:8,
235:21, 236:6,
236:8, 236:19,
240:16, 256:11,
262:18, 262:23,
263:1, 263:10,
263:15, 263:18,
263:22, 264:16,
267:6, 267:23,

268:5, 268:7,
268:9, 268:24,
269:16, 269:22,
271:7, 273:4,
274:12, 274:16,
276:12, 276:13,
313:20, 313:22,
313:23, 314:2,
314:6, 314:10,
314:11, 314:15,
314:17, 314:22,
315:2, 315:4,
315:10, 315:15,
315:17, 315:22,
315:23, 319:18,
319:19, 320:15,
342:16, 351:19,
353:12, 355:15,
355:18, 356:4,
360:5, 360:8,
360:17, 360:21,
360:24, 361:5,
365:19, 366:1,
366:5, 366:9,
366:12, 366:16,
366:23, 367:3

———— 3 ————

**3**
123:16, 123:19,
123:20, 123:22,
132:14, 133:3,
155:16, 220:8,
260:21, 309:24,
310:3
**30**
93:19, 93:20,
94:16, 231:11,
232:4, 233:3,
233:5, 233:8,
233:13, 245:24,
285:24, 334:4,
334:5
**31**
151:17, 151:20,
272:22, 272:23
**311**
2:5, 3:5, 7:7

JGS_MAYSONET 4148

Transcript of Ernest Halvorsen
Conducted on February 6, 2019

165

**312**
2:8, 4:23, 5:7
**312.243**
3:8
**312.663**
3:23
**312.735**
4:16
**312.782**
4:7
**315**
236:13
**316**
6:21
**321**
4:20
**345**
3:14
**3473**
5:7
**362**
6:4, 6:22, 6:24
**365**
6:5
**37**
361:20, 361:21
**370**
1:23
**39**
324:7, 324:8
**3900**
276:2
**3rd**
2:6, 3:6,
228:3, 242:15,
242:18, 242:21,
242:24, 244:5,
260:18, 265:1,
265:4, 312:9,
312:21, 313:11,
313:13, 313:16,
313:17, 321:19,
322:8, 322:12,
322:18

---
**4**
---
**4**
272:20, 272:21,

272:22, 272:23
**4-inch**
331:4
**40**
92:13, 93:11
**4169**
370:4
**42**
189:17, 189:18
**4461**
23:12
**45**
40:18, 265:1,
265:5, 286:21,
310:6, 311:22,
361:22, 361:23
**4560**
1:7, 7:5
**49**
323:12
**494**
4:23
**4th**
146:18, 355:6

---
**5**
---
**5**
63:13, 119:13,
183:18, 231:11,
232:4, 233:3,
233:5, 233:8,
233:13, 245:24,
280:11, 324:7,
324:8, 324:9,
324:10, 339:20,
340:17, 356:21
**5-7**
123:1
**5-by-7**
57:23, 58:2
**5-foot-6**
81:3, 81:14,
81:22, 83:4,
278:24, 280:12,
281:21
**500**
5:5
**51**
323:24

**510**
223:21, 223:24
**52**
291:2, 324:1
**53**
368:7
**54**
324:9, 324:10,
351:10, 368:15
**59**
105:7, 105:8,
189:15, 189:16
**5900**
2:8, 3:8
**5th**
246:22

---
**6**
---
**6**
286:18, 310:6,
351:10, 361:20,
361:21, 361:22,
361:23, 368:7,
368:15
**6-1**
280:11
**6-feet-tall**
81:15, 81:23,
83:4
**6-foot**
280:11
**6-foot-1**
281:14
**6/8/1993**
6:21
**603**
5:7
**60601**
4:6
**60602**
3:22, 5:6
**60604**
4:15
**60607**
2:7, 3:7
**60654**
4:22
**62**
290:24, 291:2,

**291:3, 291:24,
292:2, 292:22,
293:21, 295:20
**6401**
29:3
**6th**
7:9, 227:13,
230:10, 230:11,
233:12, 248:10,
250:5, 256:22,
258:5, 258:6,
264:4, 264:8,
264:14, 265:13,
265:18, 267:2,
267:4, 267:9,
268:18, 276:15,
314:19, 314:22,
315:4, 315:7,
315:15, 315:18,
316:6, 320:12

---
**7**
---
**718.875**
3:16
**736499**
236:14
**77**
4:5
**7th**
267:4

---
**8**
---
**8**
285:24
**82**
32:21, 32:22
**83**
175:19, 178:19
**84**
370:4
**8601**
92:1
**863500**
235:8, 236:13
**874175**
236:17
**8th**
282:18, 332:12,

JGS_MAYSONET 4149

Transcript of Ernest Halvorsen
Conducted on February 6, 2019                    166

334:1, 340:1

## 9

**9-millimeter**
329:22, 330:7,
330:14, 330:19,
330:23, 331:7,
331:13, 332:9
**90**
53:4, 217:14,
327:20
**9106**
236:13
**911**
63:18
**92**
370:21
**93**
74:16, 122:20,
124:5, 231:16,
260:21
**94**
6:20
**9579443**
236:16
**9th**
282:18, 334:1,
339:5

JGS_MAYSONET 4150

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 16

# In The Matter Of:

*Maysonet v.*
*Guevara*

---

*Edward Mingey*
*September 11, 2019*
*Video Deposition*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

---

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3
      JOSE JUAN MAYSONET, JR.,        )
 4                                    )
                                      )
 5            Plaintiff,              )
                                      )
 6       vs.                          ) No. 18-cv-02342
                                      )
 7    REYNALDO GUEVARA, ERNEST        )
      HALVORSEN, EDWARD MINGEY,       )
 8    EPPLEN; FERNANDO MONTILLA,      )
      ROLAND PAULNITSKY, FRANK        )
 9    DIFRANCO, CITY OF CHICAGO,      )
      COOK COUNTY,                    )
10                                    )
                                      )
11            Defendants.            )

12

13         The deposition of EDWARD MINGEY, called

14    by the Plaintiff for examination, taken pursuant

15    to notice and pursuant to the Federal Rules of

16    Civil Procedure for the United States District

17    Courts pertaining to the taking of depositions,

18    taken before Alyssa N. Kuipers, Certified

19    Shorthand Reporter, Registered Professional

20    Reporter, at 141 West Jackson Boulevard,

21    Suite 1240A, Chicago, Illinois, commencing at

22    10:14 a.m. on the 11th day of September, 2019.

23

24

25
```

---

**Page 2**

```
 1   APPEARANCES:

 2        BONJEAN LAW GROUP
          MS. JENNIFER A. BONJEAN
 3        MS. ASHLEY COHEN
          100 Dean Street
 4        Suite 422
          Brooklyn, New York 11238
 5        Phone:  (718) 875-1850
          E-mail:  jennifer@bonjeanlaw.com
 6
              On behalf of the Plaintiff;
 7
          STEVEN A. GREENBERG, LTD.
 8        MR. KYLE JORGENSEN
          53 West Jackson Boulevard
 9        Suite 1260
          Chicago, Illinois 60604
10        Phone:  (312) 879-9500
          E-mail:  kyle@greenbergcd.com
11
              On behalf of the Plaintiff;
12
          THE SOTOS LAW FIRM
13        MR. JOSH ENGQUIST
          141 West Jackson Boulevard
14        Suite 1240A
          Chicago, Illinois 60604
15        Phone:  (312) 735-3300
          E-mail:  jengquist@jsotoslaw.com
16
              On behalf of the Defendants Ernest
17        Halvorsen, Edward Mingey, Lee Epplen,
          Fernando Montilla, and Roland Paulnitsky;
18
          ROCK, FUSCO & CONNELLY
19        MR. AUSTIN G. RAHE
          321 North Clark Street
20        Suite 2200
          Chicago, Illinois 60654
21        Phone:  (312) 494-1000
          E-mail:  arahe@rfclaw.com
22
              On behalf of the Defendant City of
23        Chicago;

24

25
```

---

**Page 3**

```
 1   APPEARANCE:  (continued)

 2        LEINENWEBER BARONI & DAFFADA
          MR. JUSTIN LEINENWEBER
 3        120 North LaSalle Street
          Suite 2000
 4        Chicago, Illinois 60602
          Phone:  (847) 251-4091
 5        E-mail:  justin@ilesq.com

 6            On behalf of the Defendant Reynaldo
          Guevara;
 7
          COOK COUNTY STATE'S ATTORNEY'S OFFICE
 8        MR. EDWARD M. BRENER
          50 West Washington Street
 9        Suite 500
          Chicago, Illinois 60602
10        Phone:  (312) 603-5971
          E-mail:  edward.brener@cookcountyil.gov
11
              On behalf of the Defendants Frank
12        DiFranco and Cook County.

13

14

15   ALSO PRESENT:  Gabriel Martin, videographer

16

17            *    *    *    *    *    *

18

19

20

21

22

23

24

25
```

---

**Page 4**

```
 1                 I N D E X

 2   WITNESS:                              PAGE

 3   Direct Examination by Ms. Bonjean       6

 4

 5

 6             E X H I B I T S

 7   MINGEY DEPOSITION EXHIBIT             PAGE

 8   Exhibit 1    criminal reports         152

 9   Exhibit 2    photographs              247

10   Exhibit 3    RFC Maysonet 1-66        249

11   Exhibit 4    permanent retention file 249

12   Exhibit 5    GPRs                     302

13   Exhibit 6    consent to be interviewed 328

14   Exhibit 7    statement                351

15

16

17

18

19

20

21

22

23

24

25
```

Maysonet v.
Guevara

Video Deposition

---

Page 5

1 THE VIDEOGRAPHER: We are now on the
2 record in the matter of Maysonet vs.
3 Guevara, et al., in the United States
4 District Court for the Northern District of
5 Illinois, Eastern Division,
6 Case No. 18-cv-02342.
7 Today is September 11, 2019, and
8 the time is now 10:14 a.m. This is the
9 video-recorded deposition of Edward Mingey.
10 We are located at The Sotos Law Firm,
11 Chicago, Illinois.
12 My name is Gabriel Martin, and
13 I'm the videographer; the court reporter is
14 Alyssa Kuipers, both with Chimniak Court
15 Reporting & Video.
16 For the record, will counsel
17 please introduce yourself and who you
18 represent.
19 MS. BONJEAN: Jennifer Bonjean on
20 behalf of the plaintiff, Jose Maysonet.
21 MS. COHEN: Ashley Cohen on behalf
22 of the plaintiff, Jose Maysonet.
23 MR. BRENER: Edward Brener on behalf
24 of Frank DiFranco and Cook County.
25 MR. LEINENWEBER: Justin Leinenweber

---

Page 6

1 on behalf of Defendant Guevara.
2 MR. RAHE: Austin Rahe on behalf of
3 the City of Chicago.
4 MR. ENGQUIST: Josh Engquist on
5 behalf of the other individual defendants,
6 including the deponent.
7 THE VIDEOGRAPHER: Now the court
8 reporter is going to swear in the witness.
9 (Witness sworn.)
10 WHEREUPON:
11 EDWARD MINGEY,
12 called as a witness herein, having been first duly
13 sworn, was examined and testified as follows:
14 DIRECT EXAMINATION
15 BY MS. BONJEAN:
16 Q. Good morning --
17 A. How are you?
18 Q. -- Mr. Mingey. Hello. We've had
19 the opportunity to meet in the past, but I will
20 remind you that my name is Jennifer Bonjean. I
21 represent the plaintiff, Jose Maysonet, in this
22 litigation in which you are a named defendant.
23 I know you've had your deposition
24 taken before because I have personally taken
25 your deposition, but can you estimate for me

---

Page 7

1 how many times you've had your deposition taken
2 now, as of today?
3 A. Overall?
4 Q. Yeah, overall.
5 A. In what cases now? You mean all
6 these --
7 Q. Your whole -- Your whole life, how
8 many depositions have you sat for?
9 A. Four or five.
10 Q. Okay. So you understand how the
11 process goes, correct?
12 A. Yes, ma'am.
13 Q. You understand you're under oath
14 today?
15 A. Yes, ma'am, I do.
16 Q. And if at any point you don't
17 understand one of my questions, will you let me
18 know, and I will rephrase it until we can get
19 on the same page?
20 A. Sure.
21 Q. Can we agree that, if you answer one
22 of my questions, I can assume that you
23 understood the question?
24 A. Yes.
25 Q. And can we agree that you will not

---

Page 8

1 purposely -- purposely omit any material facts or
2 information that would be naturally responsive to
3 one of my questions?
4 MR. ENGQUIST: Objection, form.
5 BY THE WITNESS:
6 A. I'll be as truthful as I can.
7 Q. And that you will not purposely omit
8 material facts that would be naturally
9 responsive to my question to the best of your
10 ability?
11 A. Yes.
12 Q. Okay. And obviously we've been
13 through this; the court reporter is taking down
14 my questions and your answers. I will try not
15 to talk over you and I'd ask that, even if you
16 know where my question is going, that you wait
17 for me to complete it, okay?
18 A. Yes, ma'am.
19 Q. You are a named defendant in a
20 number of civil rights litigations; isn't that
21 right?
22 A. That's true.
23 Q. Do you know how many cases you are
24 named as a defendant in, presently?
25 A. No, not offhand.

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 9

1  Q.  Um.
2  A.  11, 10 something like that.
3  Q.  Okay.  Have you sat for depositions
4  in any other case other than the
5  Serrano/Montanez case that's currently pending?
6      MR. ENGQUIST: You mean having to do
7  with this round of cases that you're
8  talking about here, or are we talking about
9  overall?
10     BY MS. BONJEAN:
11  Q.  I'll -- I'll rephrase it.
12     You have approximately ten cases
13  pending against you right now, correct?
14  A.  Could be.
15  Q.  Could be?  Any reason you don't know
16  the precise number?
17  A.  No, I don't recall.
18  Q.  Don't care to know how many, right?
19     MR. ENGQUIST: Objection, form.
20     BY THE WITNESS:
21  A.  I don't recall -- 9, 10 I don't
22  know.
23  Q.  Again.  Would you agree that most
24  people know when they're named defendant in a
25  -- in a lawsuit?

Page 10

1      MR. ENGQUIST: Objection, form,
2  argumentative, calls for speculation.
3      BY THE WITNESS:
4  A.  I would say so.
5  Q.  Okay.  But you don't know how many
6  you are a named defendant in right now; you can
7  just estimate for me.
8  A.  I'd say, 9, 10, 11.
9  Q.  Okay.  And of those 9, 10, or 11
10  cases in which you are a named defendant, how
11  many have you sat for a deposition in?
12  A.  Rivera; Maysonet, of course; and
13  Montanez/Serrano.
14  Q.  Okay.  Well, this is Maysonet.
15     Yeah, we're sitting --
16  A.  Well, we're sitting.
17  Q.  -- now for that.
18  A.  Yes.
19  Q.  Okay.  But aside from the case that
20  you're currently being deposed in right this
21  very moment, you were deposed in Rivera and you
22  were deposed in Montanez and Serrano; is that
23  correct?
24  A.  Yes.
25  Q.  Any other cases, of those 9, 10, or

Page 11

1  11 cases pending against you, in which you've
2  sat for a deposition?
3  A.  Not that I can recall, no.
4  Q.  All right.  What is the status of
5  the judgment against you in the Rivera case?
6  Or what's your understanding?
7  A.  The status, it's in post-motion
8  phase, I guess you'd call it, post-trial
9  motions.
10  Q.  Do you know if it's pending in the
11  7th Circuit?
12  A.  No idea.
13  Q.  All right.  So when was the last
14  time you spoke to Reynaldo Guevara?
15  A.  I spoke to him, I think -- well,
16  shortly after the -- the judgment in the Rivera
17  case.
18  Q.  And how did that communication take
19  place?
20  A.  He called.
21  Q.  By telephone?
22  A.  Telephone.
23  Q.  What was the nature of the
24  conversation?
25  A.  Not much.  He wanted to know if I

Page 12

1  heard anything; I said no.  And it was very
2  short.
3  Q.  And since that conversation, have
4  you had any conversations with him?
5  A.  No, no.  I think there was three
6  calls in kind of rapid succession.  He left a
7  -- called me --  I think he got ahold of me
8  twice and I -- He left a message for me to call
9  him, and I called him.  And it was -- just
10  wanted to know the status, if I heard anything.
11  I said no.  That was it.
12  Q.  And that's -- was focused on the
13  Rivera case, the Jacques Rivera case?
14  A.  Yes, ma'am.
15  Q.  Okay.
16  A.  Right.
17  Q.  But since you made contact with him
18  during that telephone conversation that
19  centered on the Jacques Rivera case, have you
20  had any communications with him?
21  A.  None.
22  Q.  What about Ernest Halvorsen?  When
23  is the last time you spoke to Ernie Halvorsen?
24  A.  In the lawyer's office.
25  Q.  This office right here?

Maysonet v.
Guevara

Video Deposition

**Page 13**

1 A. Yes.
2 Q. And how long ago was that?
3 A. That's been a while, a month -- Oh,
4 wait a minute. Recently, maybe a couple, three
5 weeks.
6 Q. What did you do to prepare for your
7 deposition here today?
8 A. Looked over the reports, talked to
9 the lawyers.
10 Q. You met with your lawyers; is that
11 right?
12 A. Yes.
13 Q. Okay. How many times did you meet
14 with your lawyers in preparation for this
15 deposition?
16 A. This -- at the most three times --
17 two or three times.
18 Q. And were those face-to-face
19 meetings?
20 A. Yes.
21 Q. And did they occur in this office or
22 anywhere else?
23 A. This office.
24 Q. And can you approximate for me how
25 long each of those meetings were?

**Page 14**

1 A. Couple of hours.
2 Q. And during each of those two to
3 three meetings, were you alone or were you with
4 anyone else while you were meeting with your
5 attorneys?
6 A. Well, who else was here?
7 Q. Yeah.
8 A. Halvorsen, Montilla. Let's see.
9 Lee Epplen. There might have been somebody
10 else; I'm not sure right now.
11 Q. Paulnitsky?
12 A. Rola was here. Sorry about that.
13 Yes, he was.
14 Q. So in each of these meetings, is it
15 fair to say that you participated in the
16 meeting with the other co-defendants in the
17 case or some of the other co-defendants in the
18 case?
19 A. Yes, I did.
20 Q. And who did you meet with
21 specifically from this office in preparation
22 for your deposition?
23 A. Josh.
24 Q. Anyone else?
25 A. Dave.

**Page 15**

1 Q. Anyone else?
2 A. Jeff.
3 Q. Anyone else?
4 A. I think that's it.
5 Q. Now you said you reviewed documents,
6 right?
7 A. Yes.
8 Q. Okay. What documents did you review
9 in connection with your deposition here today?
10 A. I would say the case file.
11 Q. And when you say "the case file,"
12 what do you mean by the case file?
13 A. The RD file. All this -- the RD
14 file.
15 Q. Okay. When you call it the "RD
16 file," what is in an RD file?
17 A. Well, there's two. There's the
18 investigative file, which you'd have all the
19 case reports plus the GPRs and you'd have the
20 permanent retention file, which would just be
21 the case reports.
22 Q. And did you look at both the
23 investigative file and the permanent retention
24 file?
25 A. I looked at -- I'm sorry.

**Page 16**

1 Q. Let me --
2 A. I'm sorry.
3 Q. Let me finish my question, please.
4 A. Sure.
5 Q. Did you look at both the
6 investigative file and the permanent retention
7 file in connection with your deposition here
8 today?
9 A. I think it was a permanent retention
10 file. I don't know if I -- There might have
11 been a GPR, too, that I looked at, but I'm
12 really not sure of that. But it was the entire
13 file.
14 Q. And how do you know it was the
15 entire file?
16 A. Well, I assumed it was.
17 Q. Do -- How do you distinguish between
18 a permanent retention file and an investigative
19 file?
20 A. Investigative file, you have GPRs
21 and everything that transpired on that case
22 including the case reports.
23 Q. Okay.
24 A. And the permanent retention file,
25 you'd have just case reports. And you wouldn't

Rizman Rappaport (973)992-7650
"When every word counts"

Page 17

1  have GPRs and notes.
2  Q.  Right.  But what I'm saying is, all
3  these years later, if someone hands you a file
4  to look at, how are you able to determine
5  whether you're looking at the investigative
6  file or the permanent retention file --
7  or -- or are you?
8  A.  You know, I'm really not sure.  I
9  think on the investigative file, you'd have an
10  index; the permanent retention file, I have
11  -- I can't recall seeing an index on this case.
12  Q.  Is it your understanding that
13  permanent retention file documents are stamped
14  with "permanent retention file"?
15  A.  I have no idea.
16  Q.  Okay.  So you don't know what you
17  looked at in connection with this case, and
18  when I say "you don't know what you looked at"
19  -- Strike that.  Let me start over.
20      You looked at documents in this
21  case, but you don't know whether you were
22  looking at a permanent retention file or an
23  investigative file.
24      Is that fair to say?
25  A.  I thought it was the investigative

Page 18

1  file -- permanent retention file.
2  Q.  Okay.  In preparation for your
3  deposition, would you agree that you want to
4  look at the -- as many documents as you could
5  in connection with the investigation?
6  A.  Absolutely.
7  Q.  So you would want -- And since the
8  investigative file has more documents, would
9  you agree you probably want to look at the
10  investigative file?
11  A.  Yes.
12  Q.  Okay.  Do you know whether you
13  looked at the investigative file in connection
14  with your deposition here today?
15  A.  I -- I can't recall either way.  I
16  can't recall looking at GPRs.  There might have
17  been -- might have been a few, but I can't
18  really recall any GPRs.  I -- I could have.
19  Can't recall.
20  Q.  And so are you suggesting that
21  because you don't have a recollection of
22  reviewing GPRs or many GPRs in this case, that
23  leads you to believe that you were looking at a
24  permanent retention file rather than the
25  investigative file?

Page 19

1  A.  Yes.  Although, I could be wrong.
2  Q.  Okay.  All right.  And anything else
3  you looked at in connection with your
4  preparation for your dep here today?
5  A.  Another -- Let's see.
6  Interrogatories, I believe; the actual
7  complaint against us from your client.  That's
8  about it.
9  Q.  Did you happen to look at any
10  depositions of other witnesses or defendants in
11  this case?
12  A.  No, not that I can recall.
13  Q.  Okay.  Now, I think I was asking you
14  about when the last time you spoke to Ernest
15  Halvorsen was.  And you, I think, indicated it
16  was in The Sotos Law Firm.
17  A.  Yes, ma'am.
18  Q.  Okay.
19  A.  Right.
20  Q.  Possibly, I'm assuming, it was when
21  you were here preparing for your deposition,
22  and he was here as well; is that right?
23  A.  Yes, ma'am, right.
24  Q.  What about outside of preparation
25  for depositions?  When's the last time you

Page 20

1  spoke with Mr. Halvorsen?
2  A.  Outside of this office?
3  Q.  Yes.
4  A.  In court on the Maysonet rehearing.
5  Q.  Okay.  Have you had any
6  conversations with Ernest Halvorsen, since the
7  Maysonet retrial hearing that was taking place
8  at 26th Street, which I'm going to get to.  But
9  between that time and today, have you had any
10  conversations with Ernest Halvorsen that were
11  not with your attorney?
12  A.  Can't recall any.
13  Q.  What about Roland Paulnitsky?  Any
14  conversations with him between the time that
15  you all appeared at 26th Street for the
16  Maysonet hearing and today?  Again, not
17  including conversations in which your attorneys
18  were present.
19  A.  None.
20  Q.  Same question as to Montilla.
21  A.  Same answer.
22  Q.  Okay.  And what about Lee Epplen?
23  What -- have you had any conversations with
24  Mr. Epplen apart from meeting here at the
25  offices?

Maysonet v.
Guevara

Video Deposition

Page 21

1  A.  No, ma'am, no.
2  Q.  Are any of these individuals people
3  who you remained in regular or somewhat regular
4  contact since your retirement with the Chicago
5  Police Department?  And I'm talking the other
6  co-defendants in this case.
7  A.  Not really, no.
8  Q.  If you had to pick one of the
9  co-defendants that you were closest with, who
10  would it be?
11  A.  The one I saw more than the others?
12  Probably Halvorsen, Ernie.
13  Q.  I know you testified previously that
14  sometimes you would run into each other at
15  these holiday gatherings.
16  A.  Yes.
17  Q.  Is that fair?
18  A.  That's fair.
19  Q.  But I think you also testified that
20  the holiday gatherings hadn't necessarily
21  happened as of late?
22  A.  No.  It's been a long time.
23  Q.  Do you know why it was, the last
24  time you saw Ernest Halvorsen in any sort of
25  social capacity?

Page 22

1  A.  You know, I can't recall.  It could
2  have been one of those Christmas parties, but
3  I'm not sure if he was there or not.  I don't
4  know.
5  Q.  Sure.
6  A.  It's been a long time.
7  Q.  I think you testified previously
8  that there was a Christmas party -- I think I
9  know this -- in January of 2014?
10  A.  Could be.
11  Q.  Does that sound right?
12  A.  Could be.
13  Q.  Do you know whether there's any --
14  been any get-togethers of Chicago Police
15  detectives since January of 2014 that you --
16  that you've attended?
17  A.  I don't believe I've attended any
18  since the last one, whatever date the last one
19  was.  I couldn't tell you.
20  Q.  Okay.  Fair enough.
21  A.  That sounds pretty good 2- -- -14,
22  but I'm not sure.
23  Q.  All right.  I want to ask you some
24  questions about the Maysonet hearing that you
25  showed up for, if you will indulge me; and I

Page 23

1  know I asked you some questions about this
2  during the Serrano/Montanez, so I'll try not to
3  be too repetitive.  But I -- I need to -- It's
4  for the purposes of this record -- ask you some
5  questions about that.
6  When is the first time that you
7  heard that Mr. Maysonet's conviction for the
8  murders of the Wiley brothers had -- had been
9  vacated?
10  A.  A friend of mine told me that Jim
11  Papa, State's Attorney Office, was trying to
12  get ahold of me.  And I finally got ahold of
13  Jim Papa, and -- and he explained that the case
14  was going to be -- There was going to be a
15  rehearing in the case.
16  Q.  Who's the friend that told you Papa
17  was trying to get ahold of you?
18  A.  Lieutenant -- It was a police
19  lieutenant I worked for; last name escapes me,
20  but -- Tom Keane.
21  Q.  Is he still a police lieutenant?
22  A.  No.  He's been retired.
23  Q.  And do you know why Jim Papa would
24  have been reaching out to Lieutenant Keane to
25  get in touch with you?

Page 24

1  A.  I don't know.  I think just because
2  I worked for Tom for a while, and I'm sure he,
3  for some reason, couldn't get in touch with me.
4  I don't know why.  But --
5  Q.  Do you know why Jim Papa would know
6  or how Jim Papa would know to talk to
7  Lieutenant Keane to get to you?
8  A.  No idea.  I guess they're friends.
9  Q.  You think they're friends?
10  A.  I assume.
11  Q.  Okay.  So maybe it was just sort of:
12  Hey, do you know how to get ahold of Ed Mingey?
13  A.  I would say so.
14  Q.  Okay.  And -- And was that the very
15  first time that you heard anything about
16  Mr. Maysonet's case being back in the Circuit
17  Court of Cook County for some reason?
18  A.  I believe so.  After I talked to
19  Jim, he explained it.
20  Q.  Okay.  So you had a -- you had a
21  conversation with Jim Papa.  Was that by
22  telephone?
23  A.  Initially, I'm sure.
24  Q.  And what did Jim say to you when you
25  had that first time conversation with him about

Page 25

1  the Maysonet matter?
2  A.  He asked me about the case and I --
3  And he wanted me to testify.  And I didn't have
4  any problem with that.
5  Q.  What did he ask you about the case?
6  A.  I don't recall.
7  Q.  Did you remember the case when he
8  brought it up to you?
9  A.  I don't know if I did or not;
10  probably not.
11  Q.  And you said you had no problem
12  testifying.  Why -- Why were you so, I guess,
13  accepting of having to testify if you knew
14  nothing about the case?
15  A.  He wanted my testimony in the case
16  if I was part of it; I didn't have any problem
17  with that.
18  Q.  All right.  How long did the
19  conversation last?
20  A.  Oh, minutes; not very long.
21  Q.  And did he say he was going to get
22  you some reports or anything of that nature?
23  A.  Yeah, in fact, I think he did.  He
24  sent me some reports and I reviewed them; and
25  then it turned out I had some cancer issues,

Page 26

1  and I told him that I'd be out of pocket for a
2  while.  And I never heard back from him.  He
3  probably felt sorry for me.
4  Q.  How did he send you those reports?
5  A.  Mail, e-mail; I -- I really don't
6  know.
7  Q.  You communicated with him through
8  e-mail, though, right?
9  A.  E-mail, texts.  However he sent it
10  to me in the mail, I'm not sure.  But he sent
11  them to me; I got them and reviewed some
12  reports.
13  Q.  But he did communicate with you at
14  some point via e-mail and you communicated with
15  him at some point via e-mail, right?
16  A.  I would say so, probably.
17  Q.  You did say so previously, so if
18  that -- that refreshes your recollection.
19  A.  At my age it's -- It's difficult.
20  But yeah, I'd say that's probably accurate.
21  Q.  Do you remember what reports you
22  looked at?
23  A.  No.  I would imagine -- Well, I
24  don't want to guess.  I -- I -- the closing
25  report, dick's sup, I would say; but again, I'm

Page 27

1  just -- I would say that the dick's sup would
2  be the one I looked at.
3  Q.  Did you have any subsequent
4  conversations with Mr. Papa or any state's
5  attorney related to the Maysonet prosecution
6  after your initial conversation that you just
7  testified about?
8  A.  I told him I would be out of pocket
9  for a while and I assumed he was gonna call me
10  back.
11  Q.  And did he call you back?
12  A.  I really never heard from him since,
13  that I can recall.  Never did.
14  Q.  And during that conversation, did
15  you get into any details about the case?  Did
16  he have any specific questions for you?
17  A.  Not that I can recall, no.
18  Q.  Do you remember talking about the
19  substance of the case at all during that
20  initial telephone conversation?
21  A.  What do you mean?
22  Q.  When I say the "substance of the
23  case," I mean the actual evidence that was
24  recovered, the investigation, the steps that
25  were taken during the investigation, anything

Page 28

1  related to the actual underlying case rather
2  than scheduling or things like that.
3  A.  Probably not; but I could be wrong.
4  Q.  You don't remember any?
5  A.  Not really, no.
6  Q.  All right.  So what's the next thing
7  that you recall happening with the Maysonet
8  case after you lost touch with Jim Papa?
9  A.  I was subpoenaed by you.
10  Q.  And how did you receive that
11  subpoena?
12  A.  Lawyers' office.  Lawyers gave it to
13  me.  I'm not sure about that either, but I
14  assume it came from our lawyers here or in the
15  mail.  I don't know.
16  Q.  You don't remember being served?
17  A.  No.
18  Q.  You don't remember being served at
19  your house?
20  A.  Could be; could have been.
21  Q.  All right.  Okay.  So after you
22  received the subpoena, you -- You recognize the
23  caption, right?
24  A.  What do you mean "caption"?
25  Q.  People versus Maysonet?

Maysonet v.
Guevara

Video Deposition

Page 29

1  A.  Yes.
2  Q.  You -- You recognize the defendant's
3  name?
4  A.  Yes.
5  Q.  Okay.  And once -- and once having
6  received the subpoena, what did you do next?
7  A.  I think I probably talked to lawyers
8  from Sotos Law Office.
9  Q.  Okay.  You ended up with a different
10  lawyer at 26th Street.
11  A.  FOP lawyer, right.
12  Q.  Right.  When -- At some point you
13  made contact with an FOP lawyer?
14  A.  Yes.
15  Q.  How did you do that?
16  A.  I just inquired to see who was
17  available from the FOP that could look at the
18  entire situation and give me some advice.
19  Q.  Why did you feel that you needed to
20  contact the FOP in connection with the subpoena
21  in a criminal prosecution?
22  A.  Actually, I didn't feel I needed to
23  contact anybody; it was just advice from --
24  MR. ENGQUIST: Without going -- I'm
25  going to instruct you not to go into advice

Page 30

1  you got from your attorneys.
2  THE WITNESS: Okay.
3  BY MS. BONJEAN:
4  Q.  So would the answer to the question
5  I posed require you to reveal attorney-client
6  communications?
7  A.  Yes.
8  Q.  Okay.  So you did, however,
9  proactively reach out and seek assistance from
10  the FOP in retaining or getting advice from a
11  criminal attorney, right?
12  A.  Yes.
13  Q.  Okay.  Dan Herbert's a criminal
14  attorney, right?
15  A.  Yes, he is.
16  Q.  Did you meet with Mr. Herbert prior
17  to the hearing date?
18  A.  I met with him a couple times in his
19  office.  I assume I met with him prior to the
20  hearing date, yes.
21  Q.  Okay.  Did you talk to him by phone?
22  A.  Probably.
23  Q.  So you -- You had a couple meetings
24  with him at least prior to the hearing date,
25  correct?

Page 31

1  A.  I believe so.
2  Q.  Talked to him by phone, correct?
3  A.  Yes.
4  Q.  Do you know how long those meetings
5  were that you had with Mr. Herbert?
6  A.  Not really.  Not very long.  By "not
7  very long," maybe a half hour, an hour.  I
8  don't even know if that -- that long.
9  Q.  And was anyone else present during
10  those meetings that you had with Dan Herbert,
11  either one or however many there were?
12  A.  Halvorsen.
13  Q.  Okay.  Anybody else?
14  A.  I think that's it.  I don't think
15  there's anybody else.
16  Q.  Did you have any conversations with
17  Jim Papa after you received the subpoena issued
18  by me on behalf of Mr. Maysonet?
19  A.  I don't know; not sure.
20  Q.  Well, prior to showing up for the
21  hearing date that you were subpoenaed on, how
22  many conversations in total did you have with
23  Jim Papa, if you -- If you know?
24  A.  I don't think I had anything after
25  -- When I told him I'd be out of pocket with

Page 32

1  the radiation treatments, I can't recall
2  hearing from him again.  Now, I could be wrong;
3  but I can't recall.  I think I might have sent
4  him an e-mail saying that I'm back, so let me
5  know if you need me or if you need me.
6  Q.  All right.  So you appeared pursuant
7  to the subpoena, correct?
8  A.  Yes.
9  Q.  Okay.  And that was at 26th and
10  California, in Judge Joyce's courtroom; is that
11  right?
12  A.  I believe so.
13  Q.  And when you got there that day for
14  the hearing, where did you go?
15  A.  Lunchroom.
16  Q.  And who did you arrive with, if
17  anyone?
18  A.  Myself, I believe.
19  Q.  And when you went to the lunchroom,
20  did you see any of the other officers who were
21  involved in the Maysonet investigation there?
22  A.  Yes.  Halvorsen, Guevara, and I
23  think that was it.  And Guevara's attorneys and
24  Herbert, me, and Halvorsen.
25  Q.  Okay.  I want to put a time on it.

Page 33

1     I was -- I was missing the date.  But does --
2     Does October 12, 2017, sound right in terms of
3     when you responded to the Defendant Maysonet's
4     subpoena in -- to appear at 26th Street for a
5     hearing in front of --
6     A.  No idea.
7     Q.  -- Judge Joyce -- in 2017 sound
8     right?
9     A.  It could be.  I have no idea.
10    Q.  All right.  So when you got to the
11    lunchroom and saw Mr. Halvorsen and
12    Mr. Guevara, did you have any conversation with
13    the two of them?
14    A.  We were -- Ernie and I were waiting
15    for Herbert, and I think Rey was waiting for
16    his lawyer or -- or he was there with his
17    lawyer.  I -- I'm really not sure.  But if we
18    had, it was small talk: Hi, how are you,
19    what's going on, that kind of stuff.
20    Q.  And did you talk about the Maysonet
21    case at all while you were there in the
22    lunchroom with these guys?
23    A.  Absolutely not.
24    Q.  And why is that?
25    A.  We didn't talk about any of these

Page 34

1     cases.  There's nothing to talk about.
2     Q.  There's nothing to talk about?
3     A.  Nope.
4     Q.  Why not?  Seems like there would be
5     a lot to talk about.
6     A.  No, nothing, as far as I was
7     concerned.
8     Q.  Weren't interested in finding out
9     what your fellow colleagues remembered about
10    the case?
11    A.  No.
12    Q.  And why is that?
13    A.  It's no interest to me.
14    Q.  It's not -- You're not interested in
15    probing their recollections of a case that is
16    going to be retried?
17    A.  No.  The way I look at that, I
18    prefer to rely on my own memory, not somebody
19    else's; because I know mine is accurate.  If
20    somebody says something, it might stick in my
21    head, and I won't know what my actual
22    recollection is; so I prefer not to talk about
23    any case.
24    Q.  And has that been a practice of
25    yours throughout your career, or is that new

Page 35

1     since you've been retired?
2     A.  The older I get, the more I kind of
3     look at things that way.
4     Q.  Certainly back when you were a
5     working detective --
6     A.  I was never a detective.
7     Q.  Right.  You had the opportunity to
8     testify during criminal prosecutions, though,
9     from time to time, right?
10    A.  Yes, ma'am.
11    Q.  Do you know how many you testified
12    in during the --
13    A.  No idea.
14    Q.  Okay.  But it's not an insignificant
15    number, is it?
16    A.  Probably not.
17    Q.  Okay.  And during the days when you
18    were testifying, did you hold the same view
19    that you didn't want to talk about a case in
20    the presence with other detectives who had
21    worked the case?
22    A.  That's -- That's really kind of hard
23    to say.
24    Q.  It's al -- It also would be
25    completely untrue if you said that, right?

Page 36

1         MR. ENGQUIST: Objection, form.
2         BY MS. BONJEAN:
3     Q.  You definitely spoke with other
4     detectives in -- with state's attorneys when
5     you were --
6     A.  Oh.  Sure, sure.  Absolutely, sure.
7     Q.  You didn't --
8     A.  No.  Of course.
9     Q.  I mean --
10    A.  I thought you meant just --
11    Q.  No, no.  I -- I --
12    A.  -- discussions.
13    Q.  I understand what you're saying now.
14    I'm saying, when you were working for the
15    Chicago Police Department at whatever rank you
16    were working at and you found yourself in a
17    position where you had to testify in a criminal
18    prosecution, there were plenty of times that
19    you prepped for the case with other detectives
20    who had worked the case, correct?
21    A.  Sure.  State's attorney, absolutely.
22    Q.  Okay.  And so this approach that
23    you've adopted that you just don't want anyone
24    tainting your memory or influencing your memory
25    in any way, that's something that's more

Maysonet v.
Guevara

Video Deposition

Page 37

1  recent. Fair to say?
2  A.  More recent, yes, probably;
3  especially after I retired.
4  Q.  Right. Okay. So after you met in
5  the lunchroom at 26th Street -- And, again,
6  this is October of 2017, for the hearing in the
7  Maysonet case, did you ever appear in the
8  courtroom?
9  A.  Yes, I did.
10  Q.  And was that -- And again, were --
11  Did you go to the courtroom immediately after
12  the lunchroom or did you go to the state's
13  attorney's office? At any point were you in
14  the state's attorney's office?
15  A.  I don't believe so.
16       Bless you.
17  Q.  Did you wait for your attorney and
18  then go to the courtroom?
19  A.  Yeah, right.
20  Q.  Okay. And did you -- Did you have
21  an understanding about whether you were going
22  to testify that day?
23  A.  Yes.
24  Q.  And what was your understanding
25  about whether you were going to be called to

Page 38

1  testify?
2  A.  That I wasn't going to testify.
3  Q.  Okay. Were you in the courtroom
4  when Judge Joyce was on the bench?
5  A.  Yes.
6  Q.  And what did you hear Judge Joyce
7  say while you were on the -- while you were in
8  the courtroom?
9  A.  I can't recall what he said. I was
10  sitting with the -- everybody else. I wasn't
11  in the "courtroom" courtroom; you could see the
12  proceedings but --
13  Q.  You were in the gallery.
14  A.  Gallery.
15  Q.  Let me ask you this: Were you --
16  did -- Did you go to 26th Street more than once
17  or just once for this -- for this Maysonet
18  situation?
19  A.  I can't recall.
20  Q.  When you do recall being there in
21  the gallery when Judge Joyce was on the bench,
22  how did that proceeding end?
23  A.  You know, I'm not sure; it ended,
24  but nobody testifying.
25  Q.  Do you remember whether that was the

Page 39

1  day that Mr. Maysonet's convictions were
2  dismissed?
3  A.  I have no idea.
4  Q.  Strike that.
5       The day Mr. Maysonet's charges were
6  dismissed?
7  A.  No idea. Could have been; I don't
8  know.
9  Q.  Okay. You were there -- Were you
10  there when your attorney indicated that you
11  would exercise your Fifth Amendment privilege
12  in response to any questions posed to him if --
13  posed to you if you were called to testify?
14  A.  Yes.
15  Q.  And you didn't object to that
16  representation that he made to the Court at
17  that time, correct?
18  A.  Correct.
19  Q.  Why did you want to exercise your
20  Fifth Amendment right?
21  A.  After discussions with Mr. Herbert,
22  his advice was that was his advice, and I took
23  his advice.
24  Q.  Okay. Had you ever indicated an
25  intent to assert your Fifth Amendment right to

Page 40

1  remain silent in any other case in which you
2  participated in the investigation?
3  A.  At the criminal trial.
4  Q.  Let me start over. You bring a good
5  point up. Thank you.
6       Can you recall any case in which you
7  were called to testify in a criminal
8  prosecution in which you indicated or did, in
9  fact, exercise your Fifth Amendment right to
10  remain silent?
11  A.  This was the only one.
12  Q.  So in your -- How long were you --
13  have you been a --
14  A.  37 years.
15  Q.  37 years. Okay. So in your
16  37 years as a Chicago police officer, sworn
17  officer, you can remember a single time when
18  you indicated that you would exercise your
19  Fifth Amendment right to remain silent in the
20  context of a criminal prosecution, correct?
21  A.  Could you say that again, please.
22  I'm sorry.
23  Q.  Sure. In your 37-year career, there
24  was only a single time in which you were called
25  as a witness in a criminal prosecution and

Maysonet v.
Guevara

Video Deposition

Page 41

1  indicated that you would exercise your Fifth
2  Amendment right to remain silent, correct?
3  A.   Correct.
4  Q.   And that was the People v. Maysonet
5  matter?
6  A.   Yes, ma'am.
7  Q.   And you understand, of course, that
8  an exercise of the Fifth Amendment right is a
9  constitutional right afforded to people who
10  fear prosecution, correct?
11  A.   Yes.
12  Q.   Did you fear prosecution if you gave
13  testimony in the Maysonet case?
14  A.   When subpoenaed to go to that by
15  you, I was -- I was scared.
16  Q.   Why were you scared by receiving a
17  subpoena for a criminal prosecution?
18  A.   I thought that in the climate at the
19  time and now, I thought that I could have
20  further problems by testifying.
21  Q.   And what climate made you fearful
22  that, by testifying in Maysonet's criminal
23  prosecution, you could have problems?
24  A.   Just kind of like the antipolice
25  climate.

Page 42

1  Q.   Do you feel like --
2  A.   The way I -- my perception of the
3  way things were, yeah.
4  Q.   Do you feel like we're in an
5  antipolice climate presently?
6  A.   In this room?
7  Q.   No.  I mean, I assume -- I assume,
8  when you say "antipolice climate," you're
9  talking about more of a climate, at least, in
10  the City of Chicago.
11  Right?
12  A.   City of Chicago, Cook County.
13  Q.   Cook County?  Do you think there's
14  an antipolice climate nationally right now?
15  A.   At -- At the time, that's the way I
16  felt.  I was concerned.  I was scared.
17  Q.   Okay.  So I'm going to ask you to
18  differentiate for me:  Is it a feeling you have
19  then and don't have now, or is it the same --
20  Do you hold the same feelings today, as you sit
21  here for this deposition?
22  A.   More so then than now; because,
23  then, I was actually involved in that case.
24  And that's what -- That's why I chose to go in
25  that direction.

Page 43

1  Q.   You're also involved in -- as a
2  defendant in about ten cases right now, too.
3  A.   Right, right.
4  Q.   So let -- Let me talk -- let --
5  Let's focus in on back in late 2017, when you
6  were subpoenaed by me in the Maysonet case.
7  You said you were scared, fearful, right?
8  A.   Sure.
9  Q.   And what were you fearful of?
10  A.   Having my testimony misconstrued and
11  me have further problems.
12  Q.   What further problems did you fear?
13  A.   Anything.
14  Q.   Did you --
15  A.   Anything more than what I had then.
16  Q.   Did you fear prosecution by the Cook
17  County State's Attorney's office as led by Kim
18  Foxx?
19  A.   If something was misconstrued, yeah,
20  that could be a possibility.
21  Q.   Do you think you would have had that
22  same fear if Anita Alvarez was running the
23  office?
24      MR. ENGQUIST: Foundation.
25      BY THE WITNESS:

Page 44

1  A.   I have no idea.  You have to be in
2  that position to -- I made that decision
3  because I was very concerned.
4  Q.   So you -- One of your concerns was a
5  prosecution by perhaps the Cook County State's
6  Attorney's office, right?
7  A.   Could have been really anything
8  after -- when deciding not to testify.
9  Q.   What other -- What else would you
10  possibly be afraid of, if not what you already
11  identified?
12  A.   No, that's about it:  general fear.
13  Q.   If the Cook County State's
14  Attorney's office had subpoenaed you, rather
15  than Mr. Maysonet's attorney, would have had
16  held -- Would you have had the same fear?
17      MR. ENGQUIST: Objection, calls for
18  speculation.
19      MR. BRENER: Join.
20      BY MS. BONJEAN:
21  Q.   Speculate.
22  A.   I was -- I had planned to testify.
23  Q.   Right.  When - When Mr. Papa reached
24  out to you, you told him you had no problem --
25  A.   Sure.

Maysonet v.
Guevara

Video Deposition

Page 45

1  Q.  -- testifying, right?
2  A.  Right.
3  Q.  And that couldn't have been too
4  much; it's definitely less than a year before I
5  subpoenaed you, correct?
6  A.  I -- I don't -- I couldn't tell you
7  the time frame, but yes.
8  Q.  Okay.  So when Mr. Papa subpoenaed
9  you -- Strike that.
10     Certainly, Mr. Papa didn't reach out
11 to you until after he -- he himself knew that
12 the case was going to be retried, right?
13 A.  Could you run that by me again.  I'm
14 sorry.
15 Q.  Sure.  Certainly, Mr. Papa didn't
16 reach out to you until after he -- he himself
17 knew the case was going to be retried, right?
18     MR. ENGQUIST: Objection, calls for
19 speculation.  Objection, foundation.
20     BY THE WITNESS:
21 A.  He reached out for me when he found
22 out the case was going to be retried, yes.
23 Right.
24 Q.  He didn't reach out to you before
25 that and said:  Hey, I think someday the case

Page 46

1  will get retried?
2  A.  No.
3  Q.  So he reaches out to you and says
4  the case is going to get retried, and you told
5  him you didn't have any problem testifying.
6  Right?
7  A.  None.
8  Q.  Okay.  Was the climate different
9  when he reached out to you?
10 A.  I think the climate was the same.
11 Q.  Okay.  But it was a prosecutor
12 reaching out to you rather than me reaching out
13 to you by subpoena, correct?
14 A.  Correct.
15 Q.  That's fair.  And what was it about
16 the fact that Mr. Maysonet's attorney was
17 subpoenaing you that made you fearful of some
18 negative consequence to you if you testified?
19 A.  Well, I'll tell you, your -- One of
20 your witnesses on -- On another case, Serrano,
21 in particular, is Timothy Rankins.  Rankins
22 lied about my contact with him.  He couldn't
23 have been more cooperative.  It was your -- It
24 was your witness.  He was lying about my
25 actions, and that made me fearful of

Page 47

1  testifying, to be honest with you.
2  Q.  Why is he my witness?  Why do you
3  call him my witness?
4  A.  I thought he was.
5  Q.  Witness where?
6  A.  On the Serrano -- the other case.
7  Q.  He was your witness, the State's
8  witness, right?
9     MR. ENGQUIST: Objection -- you're
10 just -- form.  You're just arguing with the
11 witness.
12     BY MS. BONJEAN:
13 Q.  No.  I mean, I'm asking you:  Who --
14 Whose witness was he during the criminal
15 prosecution?
16 A.  Initially, the state.
17 Q.  Okay.  And he didn't testify for the
18 defense at Mr. Serrano's criminal prosecution
19 or the state.  So why -- Why do you call him my
20 witness?
21     MR. ENGQUIST: Objection, asked and
22 answered.
23     BY THE WITNESS:
24 A.  I assume he's your witness.
25 Q.  Why did you assume he's my witness?

Page 48

1  A.  Well, because he testified in -- for
2  your clients.
3  Q.  Where did he testify for my clients?
4  A.  In paperwork I saw; in the documents
5  I looked at on those case -- on that case.  So
6  that made me fearful of getting involved in the
7  retrial of Montanez.
8  Q.  But let me ask you this:  Again,
9  during your courses -- career as a police
10 officer, you're accustomed to witnesses and
11 defendants and gangbangers lying, right?
12 A.  I guess so.
13 Q.  I mean, don't gangbangers lie all
14 the time according to -- to police officers?
15     MR. ENGQUIST: Objection, form,
16 foundation.
17     BY THE WITNESS:
18 A.  I don't know about that.
19 Q.  Well, how -- Would you agree that,
20 for instance, many defendants who give
21 statements often contend that their statements
22 are a product of coercion?
23 A.  Certainly some do.
24 Q.  Right.  And can we agree that -- And
25 strike that.

Page 49

1     And can -- can you identify a case
2  where you believe that the -- an allegation of
3  coercion was truthful?
4     MR. RAHE: Foundation.
5     BY THE WITNESS:
6  A.  No.
7  Q.  Okay.  So in all the cases that at
8  least you're familiar with in your 37 years as
9  a police officer, a defendant who has alleged
10 coercion is not being truthful, right?
11 A.  No idea.
12 Q.  Well, I'm -- Let's talk about cases
13 that you've investigated -- either supervised
14 or investigated yourself, worked on in any
15 capacity, correct?  Can we agree that, in a
16 number of those cases, whatever the number is,
17 defendants or witnesses recant their statements
18 prior to trial?
19 A.  In some cases they do, sure.
20 Q.  In fact, in gang cases, that happens
21 a lot right?
22    MR. RAHE: Foundation.
23    BY THE WITNESS:
24 A.  It happens.
25 Q.  It's the whole reason you drag them

Page 50

1  before the grand jury right away, correct; want
2  to get them on paper, sworn?
3     MR. ENGQUIST: Objection, form,
4  foundation, calls for speculation.  Asking
5  about him dragging people to the grand
6  jury, that's --
7     BY MS. BONJEAN:
8  Q.  Yeah, I am.  I mean, I'm asking
9  about -- I'm asking about the practice; and,
10 you know, we can pretend and be outraged and
11 pretend this is like:  Oh, what are you talking
12 about?
13    So -- But Sergeant Mingey knows, and
14 I think he'll be honest that it was a goal of
15 officers to commit witnesses, particularly gang
16 members, to their statements as soon as
17 possible because there was always a risk that
18 they were going to recant?
19    Can we agree on that?
20    MR. ENGQUIST: Objection,
21 foundation.
22    BY MS. BONJEAN:
23 Q.  Once they're outside of police
24 custody, they're going to flip.
25 A.  They certainly -- it's certainly a

Page 51

1  problem.
2  Q.  It was a problem, right?
3  A.  Sure.
4  Q.  Okay.  So my point is:  Is that you
5  are suggesting that one of the reasons you
6  exercised your Fifth Amendment right in the
7  Maysonet case was because Tim Rankins lied on
8  you, right?
9  A.  Yeah, right.
10 Q.  But defendants and witnesses lie on
11 police officers all the time, at least
12 according to the State, don't they?
13    MR. RAHE: Objection, form and
14 foundation.
15    MR. ENGQUIST: Join.
16    BY MS. BONJEAN:
17 Q.  That was nothing new.
18 A.  Well, it's new because it was
19 directed at me.
20 Q.  So you were never the subject of
21 false allegations in the course of your career
22 as a Chicago police officer?
23 A.  I -- I'm sure I was.
24 Q.  Did you exercise your Fifth
25 Amendment right when you were the target of

Page 52

1  false allegations by defendants or witnesses
2  previously?
3  A.  No.
4  Q.  Okay.  So what was the -- what --
5  And can we agree Timothy Rankins was -- is --
6  has a long rap sheet, right?
7  A.  I'm sure he does.
8  Q.  Okay.  And made a lot of different
9  statements, right?
10 A.  Yes.
11 Q.  I guess some people might say -- I'm
12 not saying it's me, but some people might say
13 he's not the world's most credible witness,
14 right?
15 A.  Possibly.
16 Q.  What was it about Rankins, directing
17 his allegations at you, what was so unique
18 about those allegations that made you fearful
19 in the Maysonet case --
20    MR. ENGQUIST: I'm just going to
21 object.
22    BY MS. BONJEAN:
23 Q.  -- to testify?
24    MR. ENGQUIST: Object again that
25 it's asked and answered.

Maysonet v.
Guevara

Video Deposition

Page 53

1  But go ahead again.
2    BY THE WITNESS:
3  A.  Well, first of all, he couldn't have
4  been treated better; and for him to come up
5  with those statements that he made against me
6  that I physically abused him, a witness on
7  another case to get him to testify against
8  other people is ridiculous to begin with.  But
9  the fact that he just came up with those
10  statements out of the blue gave me a reason to
11  be concerned about testifying in Maysonet.  I
12  was scared.  I didn't know where it was going
13  to go, and I certainly didn't want more
14  problems than I had already.
15  Q.  Were you scared that people were
16  taking Mr. Rankins seriously?  Is that what you
17  were scared about?
18  A.  Possibly.
19  Q.  All right.  So you made the decision
20  at that point to exercise your Fifth Amendment
21  if called to testify.  And did you discuss that
22  decision with anyone other than your attorney?
23  A.  No.
24  Q.  Do you know why the other detectives
25  in the case decided to exercise their Fifth

Page 54

1  Amendment right as well?
2  A.  No, not really.  I knew why
3  Halvorsen and I did; because we talked to the
4  same lawyer.  But the other guys, I had no idea
5  what caused them to do that.  I just found out
6  they did it after -- I saw them in the hallway
7  after the -- after the case, I believe.  No
8  idea why.
9  Q.  Now today, though, you are not
10  exercising your Fifth Amendment right, right?
11  A.  No, ma'am.
12  Q.  Okay.  What's changed?
13  A.  You know what's changed?  The
14  embarrassment -- embarrassment to me and my
15  family for not testifying at the -- at the
16  Rivera case; the embarrassment to us,
17  especially my family; and the fact that I had
18  to sit there and not say something about lies
19  told against me.  I want to be able to defend
20  myself, not sit back and not defend myself;
21  that's what changed.
22  Q.  And you don't fear prosecution, as
23  you sit here today, then?
24  A.  No.
25  Q.  And what is it about today that's

Page 55

1  different than back in late 2017?  Why do you
2  fear pros -- why did -- Why don't you fear
3  prosecution today?
4  A.  That -- The issue is why am I test
5  -- Why do I want to testify now?  Because I
6  want to be able to -- I don't want the
7  embarrassment heaped on myself, my family
8  especially.  And I want to be able to defend
9  myself.  And that's why I'm testifying now.
10  The same issues -- Who knows whether they're
11  here or there or whatever; but that's what I
12  want to do now is defend myself.
13  Q.  So if I'm understanding you, what
14  you're saying is that it's -- it's not so much
15  about fearing or not fearing prosecution; you
16  want to defend yourself and the chips fall
17  where they do?
18  A.  Now, yes.  Yes.
19  Q.  That's what I'm talking about --
20  A.  Yeah.
21  Q.  -- as you sit here today.
22  A.  Yes, ma'am.
23  Q.  And if it means prosecution, you'll
24  deal with it.
25  A.  I'll deal with it.

Page 56

1  Q.  Do you have any reason to believe
2  that you could be prosecuted in connection with
3  your testimony here today?
4  A.  None.
5  Q.  All right.  When I took your
6  deposition in the Serrano case, I did go
7  through your employment history pretty
8  extensively.  I do not want to spend that
9  amount of time here today doing that, but I do
10  want to get an overview of it.
11  A.  Okay.
12  Q.  So if you don't mind.  Okay.  Hold
13  on one second.  What is your date of birth?
14  A.  ███████████
15  Q.  And you're from Chicago, right?
16  A.  Yes, ma'am, right.
17  Q.  What -- What area did you grow up
18  in?
19  A.  Palmer Park, Saint Sylvester's
20  Parish.
21  Q.  You attended high school, right?
22  A.  Saint Patrick's.
23  Q.  And what year did you graduate from
24  high school?
25  A.  '61.

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 57

1 Q. Went to the military after that?
2 A. Yes.
3 Q. Okay. And did you serve in Vietnam?
4 I can't remember.
5 A. Yes.
6 Q. What type of assignment did you hold
7 when you were --
8 A. Military police, '65 and '66.
9 Q. How long were you in the military?
10 A. Close to two years.
11 Q. What years were they?
12 A. '64 through '66.
13 Q. Okay. So what did you do between
14 graduation from high school until you went to
15 the military?
16 A. I went to junior college for a
17 while.
18 Q. What did you study?
19 A. Just general courses, liberal arts.
20 Q. Now, while you were in the military
21 police. Were you Army -- Strike that.
22 A. Yes.
23 Q. And you served as a military -- in
24 the military police unit in Vietnam?
25 A. Yes.

Page 58

1 Q. What part of Vietnam?
2 A. Cam Ranh Bay Area.
3 Q. And what were your duties as a
4 military police officer in Vietnam?
5 A. Convoy escorts, town patrol, ship
6 guards. We did a lot of ship guarding. Ships
7 used to come into port. There was a deepwater
8 port, and we used to -- We used to work 12 on
9 and 12 off, basically seven days a week, making
10 sure that the surrounding area of the ship was
11 secure.
12 Q. Did you investigate crimes?
13 A. No, no.
14 Q. Did you ever have to deal with
15 witnesses or suspects?
16 A. No, not offhand. Not that I can
17 recall. Anything that we got involved in was
18 on-view kind of stuff, no investigative.
19 Q. You didn't interrogate prisoners of
20 war?
21 A. No, no.
22 Q. Okay. So after the military, you
23 joined the police department. Right?
24 A. Yes, ma'am, right.
25 Q. And that was right out of the

Page 59

1 military or did you --
2 A. Pretty much.
3 Q. And what police academy did you
4 attend? What year?
5 A. Oh, let's see -- '66 -- that would
6 be on O'Brien Street, I believe.
7 Q. And what was your first assignment
8 out of the academy?
9 A. 12th District.
10 Q. Patrol?
11 A. Yes.
12 Q. Did you attend the police academy
13 with any of the co-defendants in this case?
14 A. Not to my knowledge, no. I don't
15 recall attending it with anybody.
16 Q. And how long were you at the
17 12th District in patrol?
18 A. A year or two. Then I went to Area
19 4 Task Force.
20 Q. And what did you do at Area 4 Task
21 Force?
22 A. Street patrol, high crime areas, and
23 so forth.
24 Q. What were the geographical
25 boundaries of Area 4?

Page 60

1 A. Area 4 encompassed -- Let's see --
2 11, 12, 13, 10 -- 10, 11, 12 and 13.
3 Q. How long were you assigned to Area 4
4 Task Force?
5 A. A few years.
6 Q. And then you were reassigned or --
7 or assigned elsewhere, right?
8 A. Youth Division.
9 Q. What year was that?
10 A. I couldn't really tell you anymore.
11 I don't know.
12 Q. Early '70s, around '72?
13 A. Sure, could be.
14 Q. How did you get the job as a youth
15 officer?
16 A. It was an appointment -- appointed
17 to that position. No test.
18 Q. When did you become sergeant?
19 A. '77.
20 Q. So when you were a youth officer,
21 you were still at the rank of patrolman, right?
22 A. Yeah, technically. It's like a
23 dick's rating, but it's not. It's -- You get
24 dick's pay, but you're really a patrolman.
25 Q. Okay. How long were you a youth

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 61

1  officer?
2  A.  Not long because from there -- from
3  the youth division, Area 4 Youth, I went to
4  Gang Crimes North.
5  Q.  All right.  And what year did you go
6  to Gang Crimes North?  Do you know?
7  A.  Early -- early, '70s.
8  Q.  Where was Gang Crimes North
9  physically located?
10  A.  14th District, 2138 North
11  California, I believe.
12  Q.  And the 14th District encompassed
13  what geographical area, if you know?
14  A.  North Avenue South -- North to
15  probably Diversey; west to Cicero; east -- east
16  to -- I'm really not sure -- River, maybe?  But
17  I could be wrong.
18  Q.  What gang -- What gangs operated in
19  the Gang Crimes North Area, lots?
20  A.  All of them.
21      MR. ENGQUIST: I'm just -- ask him
22  time frame.
23      MS. BONJEAN: Oh, that's a good
24  question -- good point.
25      BY MS. BONJEAN:

Page 62

1  Q.  When you were there in the early
2  '70s, there were a number of gangs that
3  operated within the Gang Crimes North
4  boundaries?
5  A.  Sure.
6  Q.  Was there a Gang Crime South?
7  A.  There was.
8  Q.  Okay.  And there was not a Gang
9  Crimes East and West, though, right?
10  A.  There was west.
11  Q.  Oh, there was?
12  A.  Yeah.  Oh.  I'm sorry.
13  Q.  So what was -- what -- What did the
14  Gang Crimes Units -- north, south, west -- What
15  did they do?
16  A.  Narcotics.  Just develop information
17  on gangs, you know, who the leaders are, the
18  locations, the cars they drive, where they
19  live, what they're into.
20  Q.  Were they --
21  A.  That kind of stuff.
22  Q.  Were they made up of patrol
23  officers, primarily?
24  A.  There were dicks youth officers and
25  patrolmen.

Page 63

1  Q.  When you say "dicks," you mean
2  detectives?
3  A.  Right.
4  Q.  So were there actually detectives
5  assigned to Gang Crimes North?
6  A.  There were.  But there were actual
7  detectives assigned to Gangs North, but they
8  didn't -- They were real detectives, but they
9  couldn't really do detective-type work -- not
10  that they couldn't.  That would have to go to
11  the specific detective area where whatever they
12  were investigating occurred.  And the actual
13  detectives that were from the area would handle
14  the jobs.  But there were a number of
15  detectives that worked in Gangs North.
16  Q.  I see.  But if there was a serious
17  crime that was being investigated that happened
18  to involve gang -- gang members and was going
19  to be charged and eventually prosecuted, that
20  was something that was typically handled by the
21  area.  Correct?
22  A.  Yes, right.
23  Q.  Now, was there an intelligence
24  division of the Gang Crimes North, South?
25  A.  There was before the -- Before the

Page 64

1  gang units, there was one at 1121 South State
2  before the gang units were organized in the
3  field.  There was one.  It was strictly
4  intelligence.  I think they probably did
5  narcotics and stuff, too, related to gangs.
6      But when -- When they reorganized
7  the gang units, they put them in the field; and
8  our jobs were not only identifying gang
9  members, but working on gang-related cases,
10  narcotics, whatever.
11  Q.  Okay.  So when you were working for
12  Gang Crimes North, one of your responsibilities
13  was to develop information about gang members,
14  correct?
15  A.  Yes.
16  Q.  And also to investigate gang-related
17  crime, right?
18  A.  Right, right.  And by investigating,
19  I would mean we'd -- especially on a serious
20  crime, we would work hand in hand with the
21  dicks.  We couldn't do that on our own.  We'd
22  notify them that we're doing such and such on,
23  you know, a serious case -- a shooting or a
24  murder or something like that.  We definitely
25  have to talk to them first before we did really

Maysonet v.
Guevara

Video Deposition

Page 65

1 anything.
2 Q. I see. So you collaborated with the
3 detectives from the area that --
4 A. Yes.
5 Q. -- was in charge of wherever this
6 activity was happening, right?
7 A. Right.
8 Q. Did you execute search warrants?
9 A. All the time.
10 Q. Make drug busts?
11 A. Yes, right.
12 Q. Now, was it important to share
13 information about gang members amongst officers
14 in the gang crimes unit and even in the area,
15 the detectives in the area?
16 MR. ENGQUIST: Objection to
17 compound.
18 But go ahead.
19 BY THE WITNESS:
20 A. I would say that, generally
21 speaking, yes, the gang crime specialists --
22 That's what we were called -- would share
23 information with everybody in the unit pretty
24 much. You'd always have exceptions in the rule
25 book. For the most part, they would share

Page 66

1 information with other gang crime specialists,
2 sure.
3 Q. Did you maintain data about gang
4 members as a gang crime specialist at Gangs
5 North?
6 A. Sure.
7 Q. And how did you do that?
8 A. It was card files of nickname files,
9 card files, photos, photo books.
10 Q. Anything else?
11 A. That's all I can think of right now.
12 Q. What sort of information went into
13 the card file?
14 A. Say, for example, you arrest a
15 certain person for whatever. He would -- you
16 would make out a card; it was like an arrest
17 card. You'd make out the card. You'd also --
18 If he had a nickname, you'd make out a smaller
19 nickname card that would be filed in the
20 alphabetical nickname card file.
21 And you might note everything about
22 where he lived, height, weight, the usual stuff
23 you would have on maybe on an arrest report,
24 plus maybe where his girlfriend stayed or
25 description of his vehicle, that kind of stuff,

Page 67

1 gang, of course.
2 Q. How was it organized, by name?
3 A. Sure. The arrest cards, I believe,
4 would be organized by name, last name; and
5 nickname cards would be alphabetized.
6 Q. By nickname?
7 A. Yeah.
8 Q. Or by?
9 A. Nickname. Two different sets.
10 Q. So if you had a nickname and you
11 wanted to find out a real name, you could go
12 maybe to your nickname file?
13 A. If I had a nickname, I could go to
14 the nickname cards and find out --
15 Q. What --
16 A. There's usually a lot of individuals
17 with the same nickname, but they could --
18 There'd be a corresponding arrest card on that
19 person.
20 Q. Right. You could narrow the pool of
21 potential people you're looking for by
22 nicknames, certainly, even if there were like
23 15 "Jokers" --
24 A. Sure.
25 Q. -- you could go and find out the

Page 68

1 possible -- the world of Jokers.
2 A. Sure, you could.
3 Q. Okay. Do you -- how did -- How did
4 a gang crime specialist and, I guess, how did
5 you -- We'll talk specifically about you. How
6 did you determine whether someone was actually
7 in a gang?
8 A. Could be self-admitted, could be
9 tattoos, could be photographs representing a
10 certain gang. There's a million different ways
11 where you could identify a person -- not a
12 million, but there's a number of ways you could
13 identify a specific person as a gangbanger:
14 Where they hang out at, who they hang out with,
15 clothes they wear, do they wear the colors of
16 the gangs, what corners do they hang out with,
17 who represents -- who hangs -- Who runs that
18 corner, that kind of stuff.
19 Q. Would you agree that -- Let's look
20 at -- well, strike this.
21 Was Humboldt Park in Gang Crimes
22 North?
23 A. It -- it -- Part of it is, yes. And
24 I think the -- we started -- 13th District
25 split up from 14 and they changed the

Page 69

1 boundaries; but most of -- big part of Humboldt
2 Park is in 14, in Gang Crimes North, right.
3 Q. Okay. So for you to determine
4 whether someone was a gang member, did it
5 require more than just they lived on a
6 particular block?
7 A. Sure.
8 Q. Would you agree that there were kids
9 that actually lived in Humboldt Park who were
10 not associated with gangs?
11 A. Sure there were.
12 Q. Okay. So in order to make your way
13 into the -- into the arrest card box, it would
14 require more than just being a kid growing up
15 in Humboldt Park, right?
16 A. Of course.
17 Q. And you said there are certain
18 indicia of what a gang member might wear, do or
19 --
20 A. Certain --
21 Q. I said "indicia." But that's all
22 right. I'll use a different word. But there's
23 certain features that gang members would have
24 or carry that would identify to you that
25 they're in a gang, right?

Page 70

1 A. Pretty much.
2 Q. And I think the obvious is like a
3 tattoo, right? If you see them throwing up
4 gang signs, that would tell you that they're
5 probably in a gang, correct?
6 A. Correct.
7 Q. Now, just hanging out on a
8 particular block does not necessarily mean
9 you're a gang member, does it?
10 A. Of course not.
11 Q. I mean, people have -- You know,
12 people live in this community. If there're
13 gangs all over the community, it's kind of hard
14 to avoid them to some degree, right?
15 A. Right.
16 Q. So just the mere hanging out in a
17 particular area, in and of itself, does not
18 mean someone's in a gang, does it?
19 A. Of course.
20 Q. Would you agree that you would need
21 more than just seeing someone on a particular
22 block or at a particular corner to know that
23 they're in a gang?
24 A. You'd need something more.
25 Q. And at that -- Did you hold that

Page 71

1 attitude when you were policing in Gang Crimes
2 North back in the '70s?
3 A. Yes, yes. I work strictly, kind of,
4 in 15, which was part of Gangs North at the
5 time; so our issues were different, but I know
6 what you're saying.
7 Q. What were -- How were they
8 different?
9 A. Well, you know, you had all
10 different sections of Vice Lords, and it would
11 be the same thing. But -- But it's a different
12 environment out there.
13 Q. I see. Different than like the
14 Latin gangs in Humboldt Park?
15 A. Yes, right.
16 Q. Where the Vice Lords -- How would
17 you care -- How would you compare and contrast
18 the issues of policing, for instance, the Vice
19 Lords in the 15th District versus the Latin
20 gangs in the 14th?
21 A. Usually the way I look at it is just
22 a -- Like Latin gangs and 14, there's a lot of
23 -- there's -- there's people selling dope;
24 there's gang members, you know, hanging out in
25 the area to protect their dope spots, so to

Page 72

1 speak. There's -- There's other issues with --
2 In 15, it's just a totally different
3 environment when it comes to that. Spanish
4 gangs, you know, if you're a rival gang member
5 -- Since 15 was mostly all Vice Lords, you'd
6 have insane Vice Lords and all kinds of
7 different Cicero Vice Lords, and so you
8 wouldn't have gang members, per se, shooting at
9 each other; because one guy would be a rival
10 faction of the Vice Lords.
11 But in -- in 14, you'd have a lot of
12 Disciples Cobra shooting Kings, gangsters, you
13 could have anything. It was more -- It was
14 different.
15 Q. More chaotic?
16 A. Well, you could say that. Sure.
17 Q. More unpredictable?
18 A. Yeah, sure. Well, actually not so
19 much unpredictable. You could predict it, but
20 -- But these kind of issues could jump out at
21 you in an unpredictable fashion, so to speak.
22 Q. And Vice Lords were sort of your
23 specialty; is that right?
24 A. Yeah, right.
25 Q. Okay. Did you meet with Rey Guevara

Page 73

1  in Gang Crimes North?
2  A.  Gang Crimes North.
3  Q.  What year?
4  A.  I have no idea.  Now, I would say --
5  I want to say after I made sergeant, but he
6  might have been there before.  I don't know.
7  Q.  What year did you make sergeant?
8  A.  '77.
9  Q.  Were you still in Gang Crimes North
10  when you made sergeant?
11  A.  Yeah, right.
12  Q.  Did you have to go to some type of
13  sergeant school?
14  A.  Yes, we did.
15  Q.  Let me get back to that in a minute.
16  I just want to get some clarity.  So you made
17  sergeant in '77; you were part of Gang Crimes
18  North.  How long did you stay in Gang Crimes
19  North as a sergeant, after you made sergeant?
20  A.  I went to -- Let's see, after making
21  sergeant I went to the 20th District; then from
22  -- I was there a short period of time; then I
23  went to 14, worked a tag team in 14; and then
24  went back to gangs, all in a matter of year,
25  year and a half, something like that.  I was

Page 74

1  back in gangs -- gangs again.
2  Q.  And where are we at time-wise?  What
3  year would that be?
4  A.  I'd say '78-ish.
5  Q.  Okay.  And what did you do -- How
6  long were you back -- How long did you stay
7  back in gang crimes after you went back in '78?
8  A.  To '89.
9  Q.  To '89.  So, for instance -- So you
10  were there a while then from '70 -- What did
11  you say, '78?
12  A.  '78-ish.
13  Q.  '78.  So late '70s to late 80s --
14  A.  Yes.
15  Q.  -- you were in Gang Crimes North --
16  A.  Right.
17  Q.  -- as a sergeant, correct?
18  A.  Right.
19  Q.  And can you tell me in that time
20  span, which sounds like about ten years, what
21  your duties and responsibilities were as a
22  sergeant in Gang Crimes North?
23  A.  Search warrants -- You'd have to be
24  there on search warrants.  We'd get involved in
25  really everything, everything gang related.

Page 75

1  The rule of thumb was it had to be a
2  gang-related issue before we'd get involved.
3  Q.  But you, personally, as a sergeant,
4  you were still pretty hands-on, right?
5  A.  So I feel -- street guy, yeah.
6  Q.  You were in the street?
7  A.  Yes.
8  Q.  Still doing sort of gang specialists
9  work but supervising other gang specialists in
10  the field?
11  A.  Yes, right.  But in the field
12  primarily.
13  Q.  Okay.  And did you supervise Rey
14  Guevara during that time?
15  A.  I'm sure I probably did.
16  Q.  Right.  Were any of the other
17  defendants in this case -- Halvorsen,
18  Paulnitsky, Montilla, any of them gang people?
19  A.  No, not to my knowledge.
20  Q.  None that you supervised as far as
21  you recall?
22  A.  Right.
23  Q.  And then you, at some point, got
24  transferred to Area 5, right?
25  A.  I did.

Page 76

1  Q.  And what year was that?
2  A.  '89, I think.
3  Q.  That was Area 9, Violent Crimes,
4  correct?
5  A.  Area 5.
6  Q.  Strike that.  I'm sorry.
7  Area 5, Violent Crimes, correct?
8  A.  Yes, right.  Correct.
9  Q.  And the 14th District was part of
10  Area 5, correct?
11  A.  Correct.
12  Q.  And was the 14th District, in 1989,
13  physically located in the same building as Area
14  5?
15  A.  Yes.
16  Q.  Which was at Grand and Central?
17  A.  No.
18  Q.  Okay.
19  A.  2138 North California, 14.
20  Q.  Okay.  So 2138 North California was
21  the 14th District, right?
22  A.  Right.
23  Q.  And we're talking 1989.
24  A.  Okay.  Around that time they moved
25  to Grand and Central; but I think it was a

Maysonet v.
Guevara

Video Deposition

Page 77

1    couple years later.  I'm not too sure about the
2    dates.  But when I left Gangs in '89, they were
3    still at Shakespeare; and I believe the dicks
4    were still at Shakespeare too.
5    Q.  And then eventually everyone went
6    over to Grand and Central?  Or did the 14th
7    District stay at Shakespeare?
8    A.  No.  14 stayed there.  The dicks
9    went to Grand and Central, Area 5 out of Grand
10   and Central; and Gangs went to Area 6.
11   Q.  Okay.  What district was at Area 5,
12   then, in post-1990?
13   A.  Let's see.  Okay.  When they went to
14   Grand and Central?
15   Q.  Yeah.
16   A.  When was that?  Got to think about
17   that -- 25.
18   Q.  Okay.  And then, in '89-ish, 1990,
19   the -- Or '89, the 14th District was at
20   Shakespeare?
21   A.  Yes.  No, I might have made a
22   mistake there.  I think when I got promoted, I
23   went -- Before I went to area, the area, that
24   was in '89; but I think Gangs had moved
25   previously.  We were in Area 6.

Page 78

1    Q.  Okay.
2    A.  I think that's what happened.  Sorry
3    about that.
4    Q.  That's all right.  Where's Area 6
5    located, or where was Area 6 located?
6    A.  Western and Belmont.  But I might
7    have the times and dates a little screwed up
8    there, but ...
9    Q.  Well, let me just put some context
10   on it.  This case that we're here on,
11   Mr. Maysonet's case, was 1990; and I believe
12   Area 5 was already at Grand and Central in
13   1990.
14   A.  Sure.
15   Q.  Does that sound right to you?
16   A.  Sounds right.
17   Q.  Okay.  So before 1990, to summarize,
18   Gangs North went to Western and Belmont, Area
19   6.  Correct?
20   A.  Yes.
21   Q.  And the 14th District stayed at
22   Shakespeare, correct?
23   A.  It did.
24   Q.  And then, at some point, Area 5
25   Violent Crimes, the dicks went over to Grand

Page 79

1    and Central in and around, again, this time
2    period.  Right?
3    A.  In and around that time, yeah.
4    Q.  And then also the 25th District was
5    at Grand and Central in and around this time
6    period?
7    A.  Yes, right.
8    Q.  And do you know what the
9    geographical boundaries were of the
10   25th District?
11   A.  Offhand, couldn't even tell you now.
12   I'd say west, it would be -- couldn't really
13   tell you how north to Diversey, south to
14   -- really not sure.
15   Q.  That's okay.
16   A.  I'm really not sure --
17   Q.  That -- That's fine.
18   A.  -- anymore.  Sorry about that.
19   Q.  That's okay.  Humboldt Park, though,
20   we can say was 14th District, right?
21   A.  Yeah.  Part of it was in 13.
22   Q.  Part of it was in 13, but also --
23   A.  Mostly --
24   Q.  Mostly 14?
25   A.  Right.

Page 80

1    Q.  What neighborhood was mostly 25th?
2    Do you know?
3    A.  Kind of like -- Well, on the east
4    side you had -- west side was, I would say --
5    I'm just trying to think now.  But that, what
6    do you mean?  What kind of neighborhood?  Who
7    was there?  Who lived there?
8    Q.  No, no.  What would you call the
9    neighborhood?  And like Humboldt Park --
10   A.  Cragin.
11   Q.  Okay.
12   A.  Maybe.
13   Q.  All right.  More activity -- More
14   gang activity in the 14th District certainly,
15   right?
16   A.  Without a -- without a doubt, sure.
17   Q.  Okay.  25th District wasn't a big
18   gangbanging district?
19   A.  It was on the east end, sure.
20   Q.  Oh, it was.  Okay.
21   A.  Yeah.
22   Q.  All right.  Okay.  So now let's -- I
23   want to focus in on this time period when you
24   get promoted or assigned to Area 5 Violent
25   Crimes, okay?

Page 81

1  A.  Uh-huh.
2  Q.  And this is going to be 1980, 1990
3  time period, all right?
4     MR. ENGQUIST: Before we move on to
5  there, can we take a break.
6     MS. BONJEAN: Sure.
7     MR. ENGQUIST: We've been going an
8  hour and a half.
9     MS. BONJEAN: Sure.
10     THE VIDEOGRAPHER: We are going off
11  the record at 11:32 a.m.
12     (A short break was had.)
13     THE VIDEOGRAPHER: We are back on
14  the record at 11:43 a.m.
15     BY MS. BONJEAN:
16  Q.  Mr. Mingey, as a sergeant, both in
17  Gang Crimes North and then later at Area 4 --
18  Strike that.
19     Area 5 Violent Crimes, one of your
20  duties was to approve police reports that were
21  prepared by officers, correct?
22  A.  Correct.
23  Q.  And did you receive formal training
24  on how to review a police report?
25  A.  I'm sure at some point I did.

Page 82

1  Q.  I'm sure, in your career, you had an
2  opportunity to prepare police reports yourself,
3  right?
4  A.  Right.
5  Q.  And then, when you were promoted to
6  sergeant, you had the responsibility of
7  reviewing police reports and approving them,
8  correct?
9  A.  Correct.
10  Q.  And you probably received some
11  formal training along the way on both preparing
12  police reports and reviewing them, correct?
13  A.  I'm sure I did, plus on the job and
14  that kind of stuff.
15  Q.  Okay.  So as of 1990, when you were
16  a sergeant at Area 5, you certainly had a fair
17  amount of experience both authorizing police
18  reports as well as reviewing them, correct?
19  A.  Correct.
20  Q.  So as a sergeant, were you obligated
21  to be familiar with the policies of the Chicago
22  Police Department as it related to report
23  writing?
24  A.  Yes.
25  Q.  And were there written policies

Page 83

1  related to report writing back in 1990?
2  A.  No idea.
3  Q.  If there were, would you have been
4  familiar with them?
5  A.  I'm sure I probably would have.
6  Q.  And again, in the time frame of
7  1990, what were the fundamentals of writing a
8  good police report?
9     MR. ENGQUIST: Objection,
10  foundation, vague.
11     Go ahead.
12     BY THE WITNESS:
13  A.  Well, first of all, you'd have to
14  follow the format, whatever format, whether it
15  was a gang format from gang crimes or a
16  detective format.  You'd have to follow the
17  format, make sure all the questions were
18  answered, make sure it read well and made
19  sense, make sure the boxes were checked; and
20  the report was signed off by the detectives or
21  gang crime specialist or whoever.
22  Q.  You mentioned it had to follow a
23  format.  What do you mean by that?
24  A.  It's a format from the different --
25  For example, detective division format would be

Page 84

1  who, what, when, where, why and how.  When did
2  it occur?  Who's the victim?  Who's the
3  offender?  You know, all that kind of stuff.
4  And it's got a special format, and it would
5  have to follow in the way the format was laid
6  out:  Victim first, date and time, the location
7  of incident, the -- all that stuff.
8  Q.  And how did the format get
9  established or settled?
10  A.  No idea.
11  Q.  When you became a sergeant, the
12  format for instance -- Strike that.
13     So let's talk specifically about the
14  detective format, okay?
15  A.  Uh-huh.
16  Q.  When you became a sergeant at Area
17  5, was that a format that you implemented, or
18  was it already a format that was being used by
19  detectives at Area 5?
20  A.  Being used when I got there.
21  Q.  And when a police officer was
22  promoted to detective, was that part of their
23  training, to learn how to write these reports
24  following the detective format?
25     MR. RAHE: Objection, foundation.

Page 85

1      BY THE WITNESS:
2  A.  I'm sure it was.
3  Q.  All right.  And when you say
4  "format," I assume you mean that there was sort
5  of a way information should be organized in a
6  police report pursuant to, again, either a
7  written policy or an established practice of
8  the department, right?
9  A.  Right.
10  Q.  And as a general proposition, police
11  reports should contain the who, the what, the
12  where, the why as best as it can.  Correct?
13  A.  Correct.
14  Q.  Was there a policy in place, either
15  formal or informal, in 1990, in the detective
16  division or at Area 5 Detective Division that
17  dictated when police reports should be
18  prepared?
19  A.  I have no idea.
20  Q.  You would agree that it is important
21  to memorialize an important fact related to an
22  investigation as soon as you can, right?
23  A.  Absolutely.
24      MR. RAHE: Objection, form to the
25  last question.

Page 86

1      BY MS. BONJEAN:
2  Q.  And optimally you want to
3  memorialize an important fact about an
4  investigation, contemporaneous or near
5  contemporaneously, when you receive the
6  information, right?
7  A.  Right.
8  Q.  And what's the reason why that is a
9  sound practice?
10  A.  Make sure you get it straight; you
11  don't forget anything that was told or you
12  found out.
13  Q.  Do detectives typically investigate
14  more than one case at a time?
15  A.  Yes.
16  Q.  Do you know how many, back in 1990
17  in Area 5, a violent crime detective might be
18  investigating at any given time?
19  A.  When it comes to robberies and
20  aggravated batteries?  Multiple.
21  Q.  Right.  So that is one reason why it
22  would be important to document information as
23  you receive it, or as close in time as you
24  receive it, to make sure that you don't forget
25  it, right?

Page 87

1  A.  Sure.
2  Q.  Particularly if you're working on a
3  number of cases, it's a lot of information to
4  hold in your head; is that right?
5  A.  That's right.
6  Q.  And would you agree that, if you
7  document information in and around the time
8  that you receive it, there's a greater
9  likelihood that it will be an accurate
10  documentation rather than if you waited, for
11  instance, a month or two months to document it?
12  A.  Sure.
13  Q.  Now in 1990, can you tell me what
14  different types of police reports existed that
15  were utilized by Area 5 Violent Crime
16  personnel?
17  A.  I don't -- could you run that by me
18  again.
19  Q.  Sure.  Let me -- let me put a finer
20  point on it.  Let's talk about Area 5
21  detectives in 1990.  What are the different
22  types of police reports that might be prepared
23  in connection with an investigation?
24  A.  Sups to -- to a robbery, homicide,
25  aggravated battery, rapes, bank robberies,

Page 88

1  could be anything.
2  Q.  Okay.  Let me ask a little better
3  question.  Putting aside what type of crime is
4  involved, if there's an incident, would you
5  agree that most incidences would have a General
6  Offense Case Report associated with an incident
7  or a crime of some type, right?
8  A.  Sure.
9  Q.  Okay.  Is that what the -- Is that
10  the initiating report that you would see in any
11  type of violent crime, for instance?
12  A.  I'm sure it probably was.
13  Q.  Do you call it something?  I've
14  always called it a General Offense Case Report
15  as a criminal defense attorney; that's what
16  I've known it to be.
17      Is there another name for it?
18  A.  I have no idea.  At this point I
19  have no idea.  There could be.
20  Q.  Well, we'll look at them and maybe
21  it will prompt your memory when --
22  A.  Okay.
23  Q.  -- we do that.  And apart from the
24  -- the original case report, there would be
25  supplemental reports, right?

Maysonet v.
Guevara

Video Deposition

Page 89

1  A. Yes.
2  Q. And would you agree that General
3  Offense Case Reports tend to be prepared by
4  people -- by an officer who is sort of the
5  first responder to any incident?
6  A. That, I believe, would be the
7  initial report.
8  Q. Yeah.
9  A. From the field?
10  Q. Yeah.
11  A. Sure.
12  Q. Not necessarily a detective; in
13  fact, usually not a detective, right?
14  A. Usually not.
15  Q. And then the supplemental reports
16  tend to be prepared by the detectives who are
17  assigned to investigate a case, right?
18  A. Yes.
19  Q. And I'm talking about more serious
20  violent crime cases; I'm not talking about, you
21  know, just a misdemeanor or anything like that.
22  I'm talking robberies, murders, that type of
23  thing.
24  A. Yes.
25  Q. And another type of report that you

Page 90

1  might see in an investigative file is a General
2  Progress Report?
3  A. Yes.
4  Q. What is a General Progress Report?
5  A. It's a GPR.
6  Q. And for a lay person, what is that?
7  A. Well, it's a -- It's a report where
8  you take notes on interviews, so forth --
9  Q. And --
10  A. -- before it would go to a regular
11  sup -- supplementary report.
12  Q. Do general progress reports supplant
13  or replace like -- just like a memo book?
14  A. I don't know what a memo book is;
15  but apparently, it may have replaced something.
16  I don't know what it replaced.
17  Q. As of 1990, were there General
18  Progress Reports that were used in the course
19  of investigations?
20  A. I believe so.
21  Q. Do you know whether there was a time
22  when there were not General Progress Reports
23  where detectives might just write notes from an
24  interview in a memo pad or something of that
25  nature?

Page 91

1  A. I'm sure at some point. I have no
2  idea.
3  Q. Okay. But in 1990, the document
4  that was used to memorialize an interview with
5  a witness or a suspect or something of that
6  nature would be a General Progress Report?
7  A. I would -- I would --
8  MR. ENGQUIST: Objection, form,
9  mischaracterizes previous testimony,
10  foundation.
11  Go ahead.
12  BY THE WITNESS:
13  A. Yes.
14  Q. Now, was the practice at the time
15  that every interview had to -- was memorialized
16  by a GPR?
17  A. Every one? Usually it'd be
18  memorialized that way; but it also could be
19  passed on orally to somebody else who would do
20  the report, another dick or --
21  Q. Well, what would -- How would a
22  detective, who was not present to hear an
23  interview, memorialize the substance of an
24  interview in a GPR?
25  A. Well, I think the person that was

Page 92

1  conducting the interview could orally talk to
2  maybe a detective assigned and tell him this is
3  what occurred, make a report, put it on paper.
4  Q. Was that a practice that was used in
5  1990 on a regular basis?
6  A. No, I don't think so.
7  Q. Wouldn't it make more sense for the
8  person who actually conducted the interview to
9  write the GPR?
10  A. It would make more sense, yes.
11  Q. Okay. What would --
12  A. Sometimes it can't -- It can't be
13  done.
14  Q. Oh, why is that?
15  A. Well, for example, if you conduct an
16  interview with somebody and you're not the
17  detective assigned to the case, you would talk
18  to the assigned detective, if he's there, and
19  just tell him what occurred and for him to make
20  the report.
21  Q. But --
22  A. Or if the assigned detective wasn't
23  present, you'd make it yourself. Speaking as a
24  supervisor gathering information, that's where
25  I'm coming from.

Page 93

1 Q. Right. But I -- I'm having a hard
2 time envisioning a scenario where the person --
3 whether it's a detective, a sergeant, whoever
4 it may be -- who actually interviews a witness
5 or a suspect or whomever, would not just go
6 ahead and memorialize it him or herself since
7 that was the person receiving the information?
8 A. Certainly it would be a better
9 practice doing it that way, but it does --
10 Sometimes you can't do it.
11 Q. And what would be the circumstance
12 where you can't do it.
13 A. Multiple things going on at the same
14 time. You conduct an interview, you tell an
15 assigned detective: Listen, this is what he
16 said. Put it down on paper.
17 Or you put it down on paper yourself
18 if the dick isn't there that's assigned to the
19 case.
20 Q. Yeah. Eventually, you would have
21 time to put it down on a piece of paper at some
22 point, no?
23 A. Maybe.
24 Q. I mean, you don't -- Isn't there a
25 risk of like a game of "Telephone" happening,

Page 94

1 where he told me this, you tell the detective
2 this, the detective writes it down, and then
3 the detective has never even heard what was
4 said?
5 Something can go wrong, no?
6 A. The best practice is put it on paper
7 right away.
8 Q. By the person who actually heard it,
9 correct?
10 A. Yes.
11 Q. Any other circumstances that you
12 could think of where the interview with a
13 suspect or a witness would not be memorialized
14 in a General Progress Report?
15 A. I have no idea.
16 Q. Nothing comes to mind, though,
17 right?
18 A. Not really, no.
19 Q. I mean, as a practice, what you want
20 to see is interviews being memorialized in and
21 around the time those interviews have been
22 conducted, correct?
23 A. Yes.
24 Q. And that they should be memorialized
25 in writing on a General Progress Report or on

Page 95

1 some type of report, right.
2 A. Yes. But they can be passed orally
3 to other detectives assigned to the case for
4 them to do it.
5 Q. Right. You said that. And we've
6 agreed, though, that that's not a good
7 practice, right?
8 A. Well, sometimes it's a necessary
9 practice.
10 Q. Well, barring an emergency or
11 something of that nature, it generally would be
12 a poor practice because information can get
13 distorted in the passing along, correct?
14 A. I agree. Yeah, sure.
15 Q. And in fact, a detective who is
16 writing down what another detective tells him
17 about what another person said is really --
18 It's hearsay, correct?
19 MR. RAHE: Objection, form and
20 foundation, speculation.
21 MR. ENGQUIST: Join.
22 BY THE WITNESS:
23 A. I think if a detective -- somebody's
24 talking to a witness, he gets certain
25 information and he goes to the other detective

Page 96

1 assigned and gives that detective and tells
2 him: Listen, this is what occurred, this is
3 what he told me.
4 If he puts that down on paper, I
5 don't think -- It's not the best way to do it,
6 but sometimes it's the only thing you can do
7 sometimes.
8 Q. Well, you keep saying it's the only
9 thing you can do. Give me one example of why
10 that is going to be the only thing you can do.
11 A. Well, if you've got multiple things,
12 multiple cases going on at the same time,
13 multiple incidents that occur out in the
14 street, you have detectives all over the place,
15 sometimes you have to do it that way.
16 Q. So again, you're suggesting that you
17 might be really busy and you can't write down
18 -- You can't write it down right away, so you
19 just pass it on orally?
20 A. No. If a dick is there that's
21 responsible for that particular case, you talk
22 to him right away, give him the information,
23 move on to whatever you're doing. The best
24 practice would be to do it yourself if you have
25 the time and the detective assigned to the case

Maysonet v.
Guevara

Video Deposition

Page 97

1 isn't there.
2 Q. Right.
3 A. That's what I would do.
4 Q. And if you are someone who's
5 actually working the case, whether you're
6 responsible for the case, it would be your
7 responsibility to write it down. Right?
8 A. Not necessarily. What you'd want to
9 do is give it to the assigned detectives or do
10 it yourself.
11 Q. Right. But many times there's more
12 than one detective who is working a case,
13 correct?
14 A. Sure.
15 Q. And in fact, this is one of those
16 cases. There were a number of detectives on
17 this case, correct?
18 A. There was.
19 Q. And a number of different detectives
20 and people who were doing investigative work on
21 this case, the Maysonet case, correct?
22 A. Yes.
23 Q. What other types of reports might
24 there be in an investigative file that are
25 prepared by the area detectives?

Page 98

1 A. Outside of originals, sups, GPRs,
2 lineup reports, and so forth.
3 Q. Can you think of anything else?
4 A. I can't think of anything right now.
5 Q. I know there are other reports that
6 relate to the collecting of evidence and
7 inventory --
8 A. Sure.
9 Q. -- and stuff like that.
10 A. Yes, right. Good point.
11 Q. Back in 1990, was it a policy of the
12 Chicago Police Department to memorialize
13 lineups?
14 A. Certain types of lineups, I would
15 say; but I'm not familiar with the policy --
16 lineup policy in the '90s. If you could
17 refresh my memory with policy on that, I, you
18 know, but I don't know exactly. At a certain
19 point, lineup procedure changed somewhere in
20 the '90s. I have no idea when.
21 Q. And how did it change? What did it
22 go from to what?
23 A. You know, I'm really not sure; but I
24 think negative lineups had to be documented
25 after a certain point. I think anything that

Page 99

1 occurred on a case had to be documented, I
2 would say. That's how it changed.
3 Q. So --
4 A. Filler ID and all that kind of
5 stuff, that changed in the '90s, where you
6 would have to submit a negative lineup report.
7 Q. Okay. So you -- Your testimony is
8 at some point it was not required by policy or
9 practice to document a negative lineup; is that
10 right?
11 A. I have no idea when it changed. And
12 if you're talking about prior to me going to
13 Area 5, I don't have any idea what the policy
14 was.
15 Q. Okay.
16 MS. BONJEAN: Can you read back my
17 question, and he'll be able to answer when
18 you read it to me.
19 (Record read as
20 requested.)
21 BY THE WITNESS:
22 A. I don't know how to answer that.
23 Could be; maybe not. I'm not sure. I know it
24 changed eventually, where you had to document
25 all those lineups. Most any time you did a

Page 100

1 lineup, I think you had to document everything.
2 Q. Okay. So at -- some -- You have
3 a recollection that at some point it was -- You
4 were required to document --
5 A. Everything.
6 Q. -- anything that happens during a
7 lineup, whether it's a negative lineup, a
8 filler is ID'd, whatever happens during the
9 lineup has to be memorialized. Right?
10 A. I believe so.
11 Q. And my question is: You recall that
12 change, which leads me to believe, at some
13 point, that was not required; is that right?
14 A. At some point it may not have been
15 required, but I probably wasn't in the
16 detective division at the time where I would be
17 familiar with that procedure because I only got
18 there in '89, '90 -- or '89.
19 Q. Okay. So in 1990, what is your
20 recollection about what was required to be
21 documented?
22 A. At this point, I have no idea.
23 Q. Okay. So it's possible that you
24 didn't document a negative lineup in connection
25 with this particular -- Strike that.

Maysonet v.
Guevara

Video Deposition

Page 101

1     So it is possible that you or a
2  detective that you were supervising did not
3  document a negative lineup in connection with
4  this investigation.
5     MR. RAHE: Objection to form,
6  foundation and speculation.
7     BY THE WITNESS:
8  A.  Again, not knowing what the specific
9  policy was, anything's possible.
10  Q.  So is it possible that there was a
11  lineup conducted in this case that had a
12  negative -- negative lineup that never got
13  documented.  It's possible.
14  A.  Possible, sure.
15  Q.  And it's also possible in this case,
16  by your testimony, that a lineup could have
17  been conducted where a -- filler was
18  identified and there was no documentation of
19  the lineup, right?
20     MR. RAHE: Objection to speculation.
21     BY THE WITNESS:
22  A.  Possible.
23  Q.  Did you ever in your career, let's
24  just say entire career, witness detectives or
25  participate in preparing a lineup procedure

Page 102

1  that was bogus, where there was no witness
2  actually viewing the lineup?
3     MR. RAHE: Objection to form.
4     BY THE WITNESS:
5  A.  I know.  What's preparing lineup
6  procedure?  I don't know what you mean.
7  Q.  Okay.  Did you ever put a target or
8  a suspect in a lineup with fillers, go through
9  the whole lineup process, but never actually
10  have a witness view the lineup?
11  A.  I've never heard of that.
12  Q.  Okay.  So that's never happened as
13  far as you know?
14  A.  As far as I know.
15  Q.  So in all your years supervising
16  detectives at Area 5, did you ever witness any
17  detective put a suspect or a target into a
18  lineup with fillers and pretend that a witness
19  was actually viewing that lineup?
20  A.  I've only -- Off the top of my head,
21  I've only -- I can only recall being at one
22  lineup, and that was a police-related incident.
23  I've never heard of what you're talking about.
24  Q.  Okay.  So --
25  A.  Was it ever done?  I hope not.  I

Page 103

1  have no idea.
2  Q.  Okay.
3  A.  Because I only witnessed one lineup
4  that I can recall.
5  Q.  In your career?
6  A.  Yeah.
7  Q.  Only one --
8  A.  Or two.
9  Q.  -- lineups?
10  A.  Sure.  I never conducted lineups;
11  that's a dick's job.
12  Q.  You did a lot of things that were
13  dick's jobs; let's be honest.
14  A.  I was an information guy and a
15  street guy.  But I never -- That's a dick's
16  job.
17  Q.  Okay.
18  A.  Lineups, that kind of stuff, is a
19  detective's job.
20  Q.  All right.  Well, that may be the
21  case.
22     Let's talk about what you heard
23  then.  Have you ever heard of a detective
24  conducting a lineup in which there was no
25  actual witness viewing the lineup, for the

Page 104

1  purpose of later telling a suspect that he or
2  she was identified, falsely telling the person?
3  A.  No.  I find that hard to believe
4  that that would happen because you would have
5  to get all the fillers.  You have to send
6  people out, get fillers from the street, or see
7  if the lockup had fillers that looked pretty
8  much the same, same characteristics.  I don't
9  know why anybody would go through that to play
10  that kind of a silly game.
11  Q.  Well, one reason -- And I'm not
12  saying it happened.  I'm asking you if it
13  happened.  But one possible reason is to try to
14  get a suspect to either implicate somebody else
15  or confess if you falsely told them that they
16  were identified in a lineup.  Right?
17  A.  I have no idea.  I don't know why
18  any -- Why wouldn't somebody just say: Hey,
19  listen, you were ID'd.
20  Q.  Okay.
21  A.  You know?  That just makes no sense
22  to me at all.
23  Q.  So your experience is that, if a
24  lineup was being conducted at Area 5, it was a
25  legitimate lineup, and there was actually a

Maysonet v.
Guevara

Video Deposition

Page 105

1 witness who was viewing it, right?
2 A. I would say so, yes.
3 Q. And you're not aware of any
4 detective under your command or really under,
5 at all, that's ever put together a lineup for
6 the -- as a ruse, right?
7 A. Not that I can recall, no.
8 Q. In 1990, would you agree that it was
9 permissible as a law enforcement practice to
10 lie to a suspect during an interrogation?
11 A. You know, I'm -- that's -- That's
12 another hard one because, you know, basically
13 the rule of thumb, to me, anyways, is not to
14 lie to any of these people.
15    So but, were you permitted to lie?
16 I guess on certain things, you could do that.
17 But you certainly couldn't say: Listen, your
18 fingerprints came back on the gun -- that kind
19 of stuff, substant -- substantive issues. I
20 don't know if you -- I don't think you can on
21 that stuff. At -- At a certain point. When
22 that point changed or could you do it
23 previously, I don't know what the policy was
24 regarding that.
25 Q. Well, let's talk -- Putting aside

Page 106

1 what the written policy was about such a thing,
2 to the best that you can recollect the
3 practices of 1990, was it a permissible law
4 enforcement tool to tell a suspect he was
5 implicated in a crime by somebody else,
6 falsely?
7 A. I don't even know how to answer
8 that. I wouldn't do it.
9 Q. Okay. So your practice would never
10 be, say, like: Hey, whatever your name is --
11 Joker -- we'll use that again -- Ace said you
12 did this when you had no information that Ace
13 said he did it.
14    That's not a tool you would ever use
15 when you were dealing with individuals?
16 A. I personally wouldn't do that, no.
17 Q. Okay. Do you know detectives who
18 did do that?
19 A. I'm sure it probably was done, but I
20 wouldn't be involved in something like that.
21 Q. Wouldn't be involved in something
22 like that?
23 A. No, no.
24 Q. And why not?
25 A. I wouldn't lie to people. I try not

Page 107

1 to.
2 Q. Even -- Even to suspects?
3 A. Not me. Do guys -- Have guys done
4 that, detectives or policemen? I'm sure they
5 probably have, but I wouldn't have done it.
6 Q. So to the best of your recollection,
7 you can't tell me a time when you ever lied to
8 a suspect in the course of an interrogation?
9 A. You know, I probably have, but I'm
10 reluctant to do that because I -- There's
11 always a "down the road." I like to be kind of
12 straight with people because I think people can
13 tell if you're being straight with them or not.
14 Q. But would you agree that by telling
15 someone that they've been implicated in a
16 crime, you might get information out of them?
17 A. I'm sure that probably works; it's a
18 tactic that might work.
19 Q. But it's not a tactic that you used?
20 A. No.
21 Q. What about telling someone, for
22 instance, that they were caught on video when,
23 in fact, they weren't?
24 A. I wouldn't say that. Has somebody
25 said that? Has a policeman told a suspect

Page 108

1 that? Possibly.
2 Q. And as far as you know, that's -- at
3 least back in 1990, that that -- it's -- that
4 type of lie was not necessarily impermissible
5 as a law enforcement tool?
6 A. It depends on what type it is, what
7 kind of lie it is. And I couldn't even explain
8 a good lie and a bad lie, at this point.
9 Q. Okay.
10 A. I can just tell you what I would do.
11 Q. Well, would you agree that it would
12 be improper to falsely tell someone that if
13 they didn't cooperate with your investigation,
14 they'd have their kids taken away from DCFS?
15    MR. RAHE: Objection to foundation.
16    BY THE WITNESS:
17 A. Might be a tactic somebody would
18 use; I wouldn't use it.
19 Q. And do you think it's a tactic that
20 would be permissible -- a permissible tactic by
21 either law enforcement standards or by the
22 Constitution?
23    MR. RAHE: Objection to foundation.
24    BY THE WITNESS:
25 A. To a certain extent, that may be

---

Page 109

1 true.
2 Q. So threatening to take someone's
3 kids away is a -- is a tool that could be used
4 by a detective?
5     MR. RAHE: Objection to foundation.
6     BY THE WITNESS:
7 A. You know, it's a -- to a certain
8 extent, it might be. Because if -- to me, if
9 that's down the road, somebody doesn't
10 cooperate, gets charged, they take their kids
11 away? Probably part of that would be true.
12 Has anybody I know said that? I wouldn't say
13 it. I haven't heard of that, somebody saying
14 that, but I'm sure it's probably -- somebody
15 probably has. I don't know whether they did or
16 not.
17 Q. But you -- You don't think
18 necessarily that telling, for instance, a woman
19 that, if she does not cooperate with an
20 investigation against her boyfriend, that her
21 kids could be taken away is a tool that could
22 be used, permissibly.
23     MR. RAHE: Objection to form and
24 foundation.
25     BY THE WITNESS:

---

Page 110

1 A. I don't know if it's -- that kind of
2 a lie is permissible because it might not be a
3 lie.
4 Q. Well, what if -- What if, in fact,
5 it's true? Is it permissible, then, that they
6 might have their kids taken away?
7 A. That person who told that lady that
8 isn't lying then.
9 Q. Okay. So let's -- Putting aside
10 whether it's a lie or not, even if it's
11 possible, is it -- Is it permissible to use
12 that threat, however real it may be, to get
13 someone to cooperate with an investigation?
14     MR. RAHE: Objection to foundation.
15     BY MS. BONJEAN:
16 Q. And the threat I'm talking about is
17 the threat of taking someone's kids away or
18 DCFS coming to get your kids if you don't talk
19 to us.
20     MR. RAHE: Same objection.
21     BY THE WITNESS:
22 A. Again, I can only tell you what I
23 would do; and I wouldn't do that.
24 Q. Okay. But is it a practice that you
25 have seen done?

---

Page 111

1 A. Not that I can recall.
2 Q. And -- But putting aside the fact
3 that it's not something you would personally
4 do, would you agree that it's impermissible to
5 do that?
6     MR. RAHE: Objection to foundation,
7 asked and answered.
8     BY THE WITNESS:
9 A. I wouldn't -- I wouldn't necessarily
10 agree with that or not.
11 Q. So you --
12 A. It might be approve -- it might be
13 -- It might be the truth that this person is
14 telling the lady or not.
15 Q. Again, I'm -- I'm off the truth
16 part, okay?
17 A. Okay.
18 Q. Let's say it is true. Let's say
19 it's true that a woman might -- Well, strike
20 that.
21     Let me ask you this: In what world
22 would it be true that if someone -- If a
23 witness doesn't talk to you, they could have
24 their kids taken away?
25     MR. RAHE: Objection to form.

---

Page 112

1     BY THE WITNESS:
2 A. I have --
3     MR. LEINENWEBER: Also calls for
4 speculation.
5     MR. ENGQUIST: Join.
6     BY THE WITNESS:
7 A. I have no idea. I have no idea. If
8 a person is going to ultimately be charged,
9 then it wouldn't necessarily be a lie to tell
10 that person that.
11 Q. No, I'm not talking about a suspect;
12 I'm talking about a witness. Obviously if
13 someone gets charged and they go to prison,
14 they can't be a parent and they might get their
15 kids taken away.
16     But I'm talking about to gain the
17 cooperation of a witness, who is not the
18 subject of the investigation, is it permissible
19 and -- to tell them that if they don't
20 cooperate, you might have your kids taken away?
21     MR. RAHE: Objection to foundation,
22 asked and answered.
23     BY THE WITNESS:
24 A. Certainly possible. Are we talking
25 about a specific person here?

---

Maysonet v.
Guevara

Video Deposition

Page 113

1  Q.  I mean --
2  A.  Or just in general.
3  Q.  I'm using this as -- I'm trying to
4  figure out what the -- what the contours or
5  what can be done in an investigation to get
6  cooperation from a witness.  And would you --
7  Would you agree that telling somebody that
8  their kids might be taken away, if they don't
9  cooperate with the investigation, might induce
10  someone to cooperate with the investigation?
11      MR. RAHE: Objection to speculation
12  and foundation.
13      BY THE WITNESS:
14  A.  Sure.
15  Q.  And that if the consequences of not
16  cooperating in the investigation are you lose
17  your kids, that might be a very strong
18  inducement, correct?
19      MR. RAHE: Objection to foundation
20  and speculation.
21      BY THE WITNESS:
22  A.  Could be.
23  Q.  And whether it's true or not that
24  they could have their kids taken away, would
25  you agree that that could procure bad

Page 114

1  information if someone is scared about getting
2  their kids taken away?
3      MR. RAHE: Objection to foundation
4  and speculation.
5      BY THE WITNESS:
6  A.  That's certainly possible.
7  Q.  And then my other question was --
8  is: I'm having a hard time wrapping my head
9  around the circumstance under which, if someone
10  didn't cooperate, they might get their kids
11  taken away.  You thought that might be a
12  possibility, that might, you know, be a
13  truthful thing that someone had -- a police
14  officer has conveyed.
15      Have you ever seen that?
16  A.  No.  But it's certainly possible, if
17  the witness was kind of a suspect --
18  Q.  Okay.
19  A.  -- and kind of maybe borderline
20  involved in a serious incident, that's
21  certainly probably not a lie saying that.  Kind
22  of rough to put her in that spot, but if she
23  could be charged, her kids would be taken away.
24  Q.  Okay.  So as long as there was some
25  theoretical possibility that someone could get

Page 115

1  charged and you don't feel it's completely a
2  falsehood, in your mind it's not an
3  impermissible representation to make.
4      MR. RAHE: Objection to foundation.
5      BY THE WITNESS:
6  A.  I have no idea whoever said that to
7  somebody.  I wouldn't personally do it.  I know
8  a lot of -- probably -- a lot of people
9  probably wouldn't.  But if you're talking to
10  somebody that could ultimately be charged in
11  the case, I think that's an honest -- It
12  certainly wouldn't be dishonest by talking to
13  somebody like that.
14  Q.  And if the person couldn't be
15  charged in the case, there's really no scenario
16  under which they could be charged, can we
17  agree, then, it would not be a proper
18  representation to make?
19      MR. RAHE: Objection, foundation.
20      BY THE WITNESS:
21  A.  You know, it depends.  Would it be
22  proper?  Would it be improper?  I wouldn't do
23  it.  I'm sure there's a lot of guys that
24  wouldn't do it, but is it done?  Could be.  I'm
25  sure it's been done in the past.

Page 116

1  Q.  You agree women tend to like to
2  protect their children, right?
3      MR. RAHE: Objection to foundation.
4      BY THE WITNESS:
5  A.  Absolutely.
6  Q.  You agree women don't want their
7  kids to be taken into DCFS, right?
8      MR. RAHE: Objection to foundation.
9      BY THE WITNESS:
10  A.  Exactly.
11  Q.  And that, again, being the strong
12  motivator that it is, it might produce
13  information that's not so reliable; because a
14  woman might be more concerned about protecting
15  her kids than protecting her boyfriend, right?
16      MR. RAHE: Objection to foundation.
17      BY THE WITNESS:
18  A.  Well, certainly you could -- If you
19  could verify, if she did that and came up with
20  -- You could verify everything she said, most
21  probably, to see if it was good information or
22  not.
23  Q.  But you should verify it, right?
24  A.  I would say so, sure.
25  Q.  In fact, you should always try to

Maysonet v.
Guevara

Video Deposition

Page 117

1  find corroboration to a statement; that's a
2  good investigative procedure, correct?
3  A.  If you can, sure.
4  Q.  You should try.  I'm not saying
5  whether you can.  You should try, right?
6  A.  If you can, yes.
7  Q.  If, for instance, a witness says I
8  was at the murder and this person was there and
9  person A was there, person B was there, person
10  C was there, a good investigator would try to
11  confirm that with person A, person B, and
12  person C.
13      Right?
14  A.  Yes.
15  Q.  Okay.  Are you still working right
16  now?
17  A.  I am.
18  Q.  You're working for the racetrack
19  people?
20  A.  Racing board.
21  Q.  Doing investigative work?
22  A.  Pretty much, security.
23  Q.  Okay.  I want to talk a little bit
24  about Area 5 in 1990, the -- the physical
25  structure, first of all.

Page 118

1  A.  Uh-huh.
2  Q.  And we're talking about Grand and
3  Central, okay?
4  A.  Right.
5  Q.  Area 2 Detective Division -- Strike
6  that.
7      Area 2 Violent Crimes Detective
8  Division was on the second floor, correct?
9  A.  Area 5.
10  Q.  I don't know.  My apologies.  Let me
11  start over, and let me ask the question rather
12  than lead you through it.
13      Area 5 was located at Grand and
14  Central, right?
15  A.  It was.
16  Q.  Describe the building for me.
17  A.  Two-story.  Detectives, youth
18  officers on the second floor; patrol, on the
19  first, lockup on the first.
20  Q.  So on the first floor, 25th District
21  and lockup, correct?
22  A.  Yes, right.
23  Q.  And second floor was --
24  A.  Detectives, youth officers and so
25  forth.  I think that's about it.

Page 119

1  Q.  And in 1990, there was the Violent
2  Crimes and Property, right?
3  A.  Right.
4  Q.  There were detectives as part of
5  Property, detectives as part of Violent Crimes,
6  correct?
7  A.  Right.
8  Q.  And were they both located -- both
9  units on the second floor?
10  A.  They were.
11  Q.  Were they in the same general -- Did
12  they share the same space?
13  A.  Pretty much.  Detective -- Violent
14  Crime detectives would -- There'd be desks --
15  would usually use the desks closest to the
16  front.  Property Crime guys would use the desks
17  closer to the back because it was where their
18  office was.
19  Q.  And were there a number of desks in
20  a big open area?
21  A.  Yes, there was.
22  Q.  How many detectives would be on duty
23  at any given time?
24  A.  I have no idea.
25  Q.  Were there still three shifts back

Page 120

1  in 1990?
2  A.  Yes.
3  Q.  First watch, second watch, third
4  watch?
5  A.  Uh-huh.
6  Q.  What -- Did you have a watch that
7  you worked primarily?
8  A.  I worked the third watch and the
9  second watch a lot; it would depend.  But a lot
10  of third watch, a lot of second watch.
11  Q.  Okay.  So if you came into Area 5 on
12  the first floor, you would take a set of stairs
13  up to the second floor?
14  A.  Yes, ma'am.  Right.
15  Q.  And when you came up those flight of
16  stairs --
17  A.  Are you talking the front or the
18  back.
19  Q.  Okay.  Well, let's talk about the
20  front, first of all.
21  A.  Okay.
22  Q.  You came in through the front doors
23  of Area 5 Grand and Central, and you wanted to
24  go up to the detective division.  You could go
25  up the stairs, right?

Maysonet v.
Guevara

Video Deposition

Page 121

1  A.  You'd have to talk to the desk guy
2  and he would kind of let you go up there.
3  Q.  Right.  But-- But personnel could go
4  up to the second floor?
5  A.  Sure.
6  Q.  I'm not talking about --
7  A.  Civilians.
8  Q.  -- civilians.
9  A.  Okay.
10  Q.  Okay.  And when arrestees were
11  brought into Area 5, were they typically
12  brought in through the front or the back?
13  A.  Back.
14  Q.  And tell me how the back was
15  situated.  How did you get up to the second
16  floor?
17      MR. ENGQUIST: Could you straighten
18  out a little bit.  You're hitting the back
19  of the screen.
20      THE WITNESS: Sorry.
21      MR. ENGQUIST: Wait a second.  We're
22  hooked here.  Let's go off.  Sorry about
23  this.  Looks normal.  Okay.  Or is the
24  chair going to hit the back -- Leave that
25  there.  Okay?

Page 122

1      THE WITNESS: Okay.
2      THE VIDEOGRAPHER: Try to stay straight.
3  I'm sorry.
4      THE WITNESS: I'll try.
5      BY MS. BONJEAN:
6  Q.  So we were talking about if a
7  detainee was coming in through the back.  How
8  -- How did that work?
9  A.  They'd come in through the back and
10  up the stairs.  Same similar type stairs as in
11  the front; go up the stairs and onto the floor.
12  Q.  So there are two sets of stairs that
13  went up to the second floor?
14  A.  Two.
15  Q.  A back set and a front set?
16  A.  Yes, ma'am.
17  Q.  And typically -- I know it's
18  probably not 100 percent, but most of the time
19  if a detective was bringing in a suspect, he
20  would come up the back set?
21      Right?
22  A.  Pretty much, yes.
23  Q.  Okay.  And if you're coming up that
24  back set of stairs, where do you find yourself
25  when you get to the top of the staircase?

Page 123

1  A.  A locker room is to your rear when
2  you open the door onto the floor, detective
3  floor; the Property Crime guys would be to the
4  right and directly in front of you; and the
5  Violent Crime guys would be further towards the
6  front of the building.
7  Q.  And did this open space that you
8  walked into have offices that worked around the
9  perimeter of it?
10  A.  Yes, right.  One side.
11  Q.  And -- One side?  How many offices
12  approximately?
13  A.  Violent Property -- I think there
14  were six interview rooms, a bathroom in the
15  center, Homicide Bureau are to the front of the
16  building and to the left.  Multiple offices.
17  Q.  And did the sergeant and lieutenants
18  have an office for --
19  A.  They did, yeah.
20  Q.  That's where you would be,
21  potentially, if you were inside and not in the
22  field?
23  A.  Yes, right.
24  Q.  Detectives didn't have their own
25  offices; they just sort of worked in this

Page 124

1  general open space.
2      Right?
3  A.  Right.
4  Q.  There were interviews rooms, there
5  was a bathroom, there was an office for the
6  Property Crimes sergeant, lieutenant?
7  A.  Uh-huh.
8  Q.  Is that a yes?
9  A.  Yes, ma'am.
10  Q.  Okay.  Now, in that open area, was
11  there a board that identified open homicides?
12  A.  Yes.  But I -- You're talking 1990?
13  Q.  Uh-huh.
14  A.  It would be in the Homicide office
15  and it didn't -- It would be in the Homicide
16  office.  A civilian walking on the floor --
17  offender, parent of the offender, or a witness
18  -- couldn't see the board.  It'd be in the
19  Violent Crime, the Homicide squads, the cold
20  case squads, so to speak.  It would be in their
21  office.
22  Q.  Okay.  So there was a separate
23  office for Homicide; is that right?
24  A.  No.  There -- cold case.  It would
25  be the cold case guys.  Homicide guys were cold

Page 125

1  case homicides.
2  Q.  But there are -- There could be open
3  homicide investigations that weren't
4  necessarily cold; they were just active.
5  A.  I know, right.  Exactly.  But you're
6  talking about the board now, right?
7  Q.  Yeah.  I'm talking --
8  A.  Okay.
9  Q.  -- about the board.
10  A.  Right.
11  Q.  So if -- If a detective came in to
12  the office and wanted to know which cases were
13  active -- or a sergeant -- where would they get
14  that information?
15  A.  They'd have to pull the file.  At a
16  certain point, the -- They develop the board, a
17  dry erase board; and they put all the
18  homicides, who is assigned, location, victim's
19  name, and so forth.  Whether the color-coded
20  open and closed.  I don't know which color was
21  which.  But anyways, it would be in the cold
22  case squad office, and the Homicide coordinator
23  -- I don't know if we had one in 90 -- But
24  somebody would take care of that board.  The
25  board was about the size of the dark spot, in

Page 126

1  fact, almost exactly.
2  Q.  Of all three panels?
3  A.  Yeah.
4  Q.  So would say it was approximately,
5  let's say, I don't know.  10-by-4, 9-by-4?
6  A.  Could be.  It was big.
7  Q.  Does that look about right?
8  A.  And it developed --
9  Q.  Am I estimating okay?
10  A.  I have no idea.
11  Q.  I'd like the record to reflect --
12  What do we think this is?  If your counsel
13  wants to --
14  MR. LEINENWEBER:  Yeah.  9-by-4 is
15  about right.  9-by-4, 9-by-5 maybe.
16  MS. BONJEAN:  Okay.
17  BY THE WITNESS:
18  A.  Something like that.  But that
19  didn't come into effect until, I think, Jack
20  Kazarwitz (phonetic) that was our Violent
21  Crimes lieutenant, at a certain point,
22  developed that, I believe.
23  Q.  And do you know what year that was
24  approximately?
25  A.  I got there in '89, and I would say

Page 127

1  early, early '90s.
2  Q.  Okay.
3  A.  He was there, and that's when that
4  system developed; it was a pretty good system
5  too.
6  Q.  All right.  Now, for an active
7  investigation -- and let's talk specifically about
8  homicide investigations.
9  A.  Uh-huh.
10  Q.  An active homicide investigation --
11  A homicide happens, there's investigating going
12  on, and detectives are preparing reports in
13  connection with their investigation.
14  What was the protocol or the
15  practice for what a detective did with his
16  report after he prepared one, again, 1990-ish?
17  A.  Okay.  You'd probably put it in the
18  sergeant's inbox, and the sergeant would sign
19  off on it.
20  Q.  Was it one copy?  Did he have to
21  make multiple copies of his report, or was it
22  just the original and he put it in the
23  sergeant's basket?
24  A.  I would say he put the original in
25  the basket and put a copy of that report on the

Page 128

1  board, if you're talking a major incident.
2  Q.  Major incident, homicide?
3  A.  Bank robberies, murders, God knows
4  what.
5  Q.  Yeah.  I'm talking murders.
6  A.  Yeah.
7  Q.  You put it on -- Where did you say
8  the copy would go?
9  A.  A copy would probably go on the
10  homicide board.
11  Q.  Okay.  And the homicide board is not
12  the same board we're talking about --
13  A.  No.
14  Q.  -- before, right?
15  A.  Yeah.
16  Q.  The homicide board would have been
17  in your office, right?
18  A.  Right.
19  Q.  Had clipboards to it?
20  A.  Right.
21  Q.  It would get attached to the
22  clipboard?
23  A.  Actually it would be in a -- the
24  binder with the binder-type clipboards, where
25  you could put multiple reports on it.

Page 129

```
1   Q.  And what was the purpose of -- Well,
2   strike that.  Let me -- Let me try to get a
3   visual of this.
4       So in the sergeants office there
5   were binders that had police reports?
6   A.  I don't know what you mean by
7   binders.  You're talking about clipboard-type
8   things?
9   Q.  Yeah, yeah.  What I'm --
10  A.  Yeah.
11  Q.  -- trying to understand what you're
12  talking about.
13  A.  I'm talking about a clipboard with
14  two rings that come out, metal rings that come
15  out, that hold a lot more reports than a
16  clipboard.  Look the same, except the mouth is
17  bigger; you can attach more reports to it.
18  Q.  Okay.  So when I think of a
19  clipboard, I think of the old fashioned.  It's
20  got like a little clip at the top?
21  A.  No.  This -- this is a little bit
22  different.
23  Q.  Okay.  So it had a hard back, right?
24  A.  Sure.
25  Q.  And then it had some rings that you
```

Page 130

```
1   -- that allowed you to you put more documents,
2   correct?
3   A.  Right.
4   Q.  So when a homicide investigation was
5   ongoing and a detective prepared a supplemental
6   report, they would put the original in a basket
7   for approval; is that right?
8   A.  Right.
9   Q.  They might make a copy and then put
10  it onto this clipboard we're calling it, right?
11  A.  I would say they would do it.
12  Q.  Was a clipboard organized in any
13  way, or was it just chronologically next one,
14  next one?
15  A.  Chronologically.
16  Q.  Okay.  By date, right?
17  A.  Yes.
18  Q.  With the most recent date being on
19  top and oldest date being at the bottom, right?
20  A.  Yes, right.
21  Q.  And then did that clipboard -- How
22  -- How do reports come out of that clipboard,
23  if that makes sense?
24  A.  They could.  But usually the
25  clipboard would be there for review.  Somebody
```

Page 131

```
1   wants to review what the current status of the
2   case is, that's where they find it.
3   Q.  So it stayed there until the case
4   was cleared/closed, right?
5   A.  I would say it would stay there for
6   a while.
7   Q.  Okay.  And who had access to this
8   clipboard that had the reports for --
9   A.  Really everybody on the floor, I
10  think.
11  Q.  And this -- Correct me if I'm wrong
12  -- this allowed someone to know what was going
13  on in an investigation without having to go
14  pull the investigative file, right?
15  A.  Yes.  Usually, yeah.
16  Q.  And importantly, it would allow the
17  sergeant to see what preceded in the
18  investigation, right?
19  A.  Pretty much, sure.
20  Q.  So if you got a report that you had
21  to look at for approval and you wanted to see
22  what had been done prior to this report, you
23  could go to that board and see, right?
24  A.  Most probably would be there, but
25  may not be.
```

Page 132

```
1   Q.  I understand.  But as part of your
2   practice in reviewing police reports, that was
3   one tool that you had.  You could look at that
4   clipboard to see --
5   A.  Sure.
6   Q.  -- well, what did these guys do
7   before --
8   A.  Uh-huh.
9   Q.  -- this report was prepared, right?
10  A.  Right.
11  Q.  And in fact -- Well, strike that.
12      Tell me what -- what did you look --
13  When you reviewed a report, whatever type of
14  report it was, what did you -- What was your
15  process for deciding whether you were going to
16  approve it or not approve it?
17  A.  Make sure it's told the story; make
18  sure the format was checked, followed; make
19  sure all the boxes were checked; the reports
20  were signed; the report itself made sense.
21  Q.  Okay.  And in order to make sure a
22  report makes sense, you might have to know what
23  happened before this report was authored,
24  right?
25  A.  I don't know what you mean.
```

Page 133

1 Q. Well, supplemental reports might
2 memorialize some aspect of the investigation,
3 but not necessarily the whole investigation,
4 correct?
5 A. Correct.
6 Q. And if there was information in a
7 report that made you question or had looked
8 peculiar, raised a red flag for you, might you
9 look at the reports that preceded this report
10 to see whether it all made sense?
11 A. Possibly. Probably be aware of the
12 previous reports, sure.
13 Q. As a sergeant in Area 5 Violent
14 Crimes, did you make it your business to be
15 aware of the open murder investigations?
16 A. I tried to.
17 Q. Okay. And how did you go about
18 keeping yourself informed about the open murder
19 investigations?
20 A. Review the board to see what's
21 there, and if it looks like it's -- there might
22 be more involved, you'd pull the file.
23 Q. Okay. But if you came in on your
24 shift and wanted to know what happened, you
25 know, on your shift -- Or strike that.

Page 134

1 Let's say -- Let's say you had a --
2 I assume you had days off from time to time?
3 A. Yes.
4 Q. And you might come into an office --
5 come into the office and some investigative
6 activities happened on your day off. How would
7 you find out about what happened?
8 A. You'd pull the -- You'd pull the
9 file, investigative file or you look at the
10 board or both.
11 Q. So there are a number of ways you
12 can get your information, correct?
13 A. Sure.
14 Q. Could you actually go to the
15 detectives and ask them?
16 A. Absolutely. Sure.
17 Q. Is that something you did?
18 A. Sure.
19 Q. How did -- how did -- Strike that.
20 What happened after a report is
21 approved? What would happen to that report?
22 MR. ENGQUIST: Objection,
23 foundation.
24 BY THE WITNESS:
25 A. You had to go to the front office.

Page 135

1 I have no idea what they did with it.
2 Q. Okay. My understanding is there was
3 a place in Area 2 where investigative files
4 were housed; is that right?
5 A. Area 5.
6 Q. Oh, God. Accept my apologies.
7 A. Yes, right. You're right.
8 Q. Where -- Where was the Area 5 filing
9 room?
10 A. I would say it was in -- It was
11 probably in the watch -- the commander's office
12 general area.
13 Q. And do you know how it was
14 organized?
15 A. No idea.
16 Q. If you wanted to go pull an
17 investigative file from there, you could,
18 though, correct?
19 A. Correct.
20 Q. And does this sound right, that it
21 was by RD number maybe?
22 A. Yes, right. I would say that year.
23 Q. Right. And were the files that were
24 in the watch commander's office typically
25 housed there until they were closed and then

Page 136

1 moved somewhere or --
2 A. I would assume so.
3 Q. I'll represent that Sergeant Epplen
4 testified -- Tell me if this is consistent with
5 your recollection that investigative files --
6 Cases that were closed, the files would go into
7 the basement and then eventually go to some other
8 location.
9 A. If Lee said it, that's how it goes,
10 I'm sure.
11 Q. Doesn't sound wrong to you, correct?
12 A. No, not at all.
13 Q. All right. So -- And once a
14 supplemental report or any report is approved
15 by a sergeant, the detective does not have
16 access to it to change it, right?
17 A. I've never heard of that happening.
18 Maybe somebody would tell a detective to do it
19 over that it wasn't -- wasn't proper, a lot of
20 mistakes.
21 Is that what you mean.
22 Q. You wouldn't approve a report that
23 had a lot of mistakes and wasn't proper, right?
24 A. If you knew they were mistakes, you
25 wouldn't approve. If you didn't -- if you knew

Maysonet v.
Guevara

Video Deposition

Page 137

1 they -- If you knew they were -- they weren't
2 mistakes, you'd approve it.  You'd have to --
3 you'd have to assume that a report that you
4 get, the detective does and signs off on it,
5 that it's -- that it's accurate.
6    Now if at some point you find out
7 that it's not accurate, you talk to the
8 detective.  He would have to come up with maybe
9 another report to straighten that out.  I don't
10 know of that happening, but I'm sure it
11 probably could have.
12 Q.  Well, right.  If there's something
13 that turns out to be inaccurate in a report
14 that's already approved, the practice or
15 protocol would be prepare another report to
16 explain that.  Right?
17 A.  I would say so.
18 Q.  Let's not go back and destroy the
19 report that's there.
20 A.  Absolutely not, no.
21 Q.  Okay.  You're not suggesting that it
22 would be proper to destroy a report that you
23 later found out had some inaccuracies in it.
24 Correct?
25 A.  No, of course not.

Page 138

1 Q.  Okay.  And again, back to my
2 question:  It would be impermissible to change
3 the substance of a report that has already gone
4 through a process of being approved, right?
5    MR. RAHE: Objection, foundation.
6    BY THE WITNESS:
7 A.  I don't really -- If somebody
8 submits a report, get it signed, and then he
9 wants to make changes?
10 Q.  Yeah.
11 A.  I would say to submit another --
12 submit a sup.
13 Q.  Right.  The proper protocol would be
14 prepare a supplemental report; we don't go back
15 and cross off a -- what's in -- what's already
16 been --
17 A.  No, if mistakes are made.  It would
18 -- It would depend.  They might get the
19 victim's name wrong, they might have the
20 offender's name wrong, they might have -- God
21 knows what they could have wrong.  Wrong RD
22 number would screw things up; they'd have to
23 straighten it out with a -- with a fresh
24 report, I would say.
25 Q.  Okay.  And -- And you're talking

Page 139

1 mostly about typographical errors right here,
2 the one you -- these examples you just used?
3 A.  Yes, right.
4 Q.  Certainly if, for instance, you come
5 to find out that a witness' account of
6 something -- A witness says Oh, you know, it's
7 not -- I said X, but I meant Y. A police
8 officer can't go back and change a report for
9 substance.  He'd absolutely have to prepare a
10 supplemental report, right?
11 A.  I would say so, sure.
12 Q.  Okay.  Because once it's approved,
13 it should be --
14 A.  And you're saying once it's
15 approved.  Not on the same day.
16 Q.  No, not --
17 A.  You're talking about a week, a
18 month.
19 Q.  Correct.  I'm talking about after
20 it's been submitted for approval and then
21 approved?
22 A.  Gone on to where it's supposed to
23 go, left the area?
24 Q.  Left the area?  I mean, it stays in
25 the area for a while from what I understand.

Page 140

1 A.  An original?
2 Q.  Yeah.
3 A.  I don't know how long an --
4 Q.  Doesn't it go into the investigative
5 file?
6 A.  The original?
7 Q.  Yeah.
8 A.  I think the original would be sent
9 to Records.
10 Q.  Oh, okay.  So --
11 A.  I'm -- I'm assuming.
12 Q.  So --
13 A.  You wouldn't keep an original in the
14 file -- in a file, I don't believe.
15 Q.  Okay.  So -- then let's back up a
16 second.
17 A.  You should ask Lee about that.
18 Q.  I did.
19 A.  He'd know.
20 Q.  I asked Lee about it.  And you may
21 be right.  This may be consistent with what he
22 said.  But it sounds to me that, when a police
23 officer prepares a supplemental report, he
24 might make more than one copy then.
25 A.  I'm sure -- Well, I'm sure he

Maysonet v.
Guevara

Video Deposition

Page 141

1  probably would.
2  Q.  Okay.  So because one would go on
3  the clipboard, right?
4  A.  And assuming that the dick would put
5  it on the clipboard.
6  Q.  Okay.
7  A.  Maybe the -- We had a file guy in
8  the back room in the Homicide office that did a
9  lot of those things.  Now whether he was the
10  one that made copies and put it on the
11  sergeant's board in the Violent Crimes office
12  or the actual dick that submitted the report
13  made a copy, at this point, it's too long ago
14  for me.
15  Q.  All right.  Fair enough.
16  It's your recollection, though, that
17  the original did not go into what we now know
18  to be the investigative file that was
19  maintained in the commander's office, right?
20  A.  No, no.
21  Q.  So a copy?
22  A.  It's gone.  A copy.
23  Q.  So the original would go to records
24  immediately?
25  A.  Sure.

Page 142

1  Q.  And -- And it's those originals that
2  become part of the permanent retention file, to
3  the best of your understanding?
4  A.  Sure, yeah.  A copy of the original,
5  yeah.
6  Q.  Okay.  Where do the original
7  originals go then?
8  A.  Records.  All the originals go there
9  unless --
10  Q.  Is that true for GPRs as well?
11  A.  No, no.  The GPRs would stay with
12  the investigative file.
13  Q.  Okay.  And GPRs, did they go on the
14  clipboard?
15  A.  Good question.  Don't know.  I would
16  say no, but I -- I could be wrong.
17  Q.  But definitely copies of the GPRs
18  went into the investigative file?
19  A.  Oh, yeah, yeah.
20  Q.  And did you have to approve GPRs as
21  a sergeant?
22  A.  I'm sure there might be a box down
23  there to sign.  Whether they were all signed
24  off on, I don't know; it's been such a long
25  time.

Page 143

1  Q.  But do you remember, as part of your
2  duties, seeing GPRs and signing off on them?
3  A.  I can't recall signing off on GPRs,
4  but I may have.
5  THE WITNESS: That's not good.
6  MS. BONJEAN: I know.  I take them
7  on and off.  So, anyway, you'll forgive me.
8  I look a little goofy.
9  THE WITNESS: You look fine.
10  MR. ENGQUIST: Put you on camera.
11  We can get some duct tape or something
12  later on.
13  THE WITNESS: There you go.
14  MR. RAHE: You need the old lady,
15  like, strings, just keep them around your
16  head.
17  BY MS. BONJEAN:
18  Q.  Anyway, as part of reviewing
19  supplemental reports, did you make it your
20  practice to compare the contents of a
21  supplemental report with what is contained in a
22  GPR?
23  A.  Possibly.  I would just read
24  actually the sup, and if it -- If it sounded
25  good, if all the boxes were checked, it was

Page 144

1  signed off on, and the format was followed,
2  would I compare it with the GPR?  Unless
3  something hit me that wasn't right, but I can't
4  recall that really ever happening.  Maybe it
5  did.  I don't know.
6  Q.  You were mostly looking to see
7  within the confines of the supplemental report
8  whether -- whether it made sense --
9  A.  Yes.
10  Q.  -- in an isolated way, right?
11  A.  Yeah.  You're not signing off to
12  accuracy, just that it's done properly; because
13  you wouldn't know if it's accurate or not.  You
14  assume it is, but you really don't know.
15  MR. ENGQUIST: I don't want to cut
16  you off in the middle of something, but
17  we've been at it another hour; so I want to
18  give him a break sometime soon.  So if you
19  want to -- I don't know if you want to
20  finish on this section before you go on.
21  The reason I'm asking you is there's a
22  pause, so I didn't know if you're --
23  MS. BONJEAN: Yeah, I -- I mean, do
24  you want to break now for five minutes?
25  MR. ENGQUIST: How long do you need

Maysonet v.
Guevara

Video Deposition

Page 145

1   a break for?
2       THE WITNESS: No.  It's up to you
3   guys.
4       MR. ENGQUIST: Probably ten minutes.
5       MS. BONJEAN: Okay.
6       THE VIDEOGRAPHER: We are going off
7   the record at 12:44 p.m.
8       (A short break was had.)
9       THE VIDEOGRAPHER: We are back on
10  the record at 12:58 p.m.
11      BY MS. BONJEAN:
12  Q.  Mr. Mingey, I want to start drawing
13  your attention to this particular case.  Prior
14  to May 25th --
15      THE VIDEOGRAPHER: Just put on.
16      MS. BONJEAN: Oh, I'm sorry.
17      BY MS. BONJEAN:
18  Q.  Prior to May 25th, 1990, did you
19  have any contacts in any form or fashion with
20  Jose Maysonet?
21  A.  What was the 25th?
22  Q.  The Wiley brothers' murders.
23  A.  Okay.  Not to my knowledge, no.
24  Q.  Okay.  Prior to the Wiley brothers'
25  murders on May 25, 1990, did you have any

Page 146

1   contact with Alfredo Gonzalez, also known as
2   Lluiva?
3   A.  Not to my knowledge.  I may have
4   seen him on the street.  I don't recall.
5   Q.  Nothing stands out right now?
6   A.  No, ma'am, no.
7   Q.  Prior to May 25th of 1990, on the
8   day that the Wiley brothers were murdered, did
9   you have any contact with an individual by the
10  name of Justino Cruz, or otherwise known as
11  Tino?
12  A.  Not to my knowledge.
13  Q.  Same question as it relates to an
14  individual by the name of Christopher Goossens?
15  A.  Not to my knowledge, no.
16  Q.  What about an individual by the name
17  of Efrain Cruz?
18  A.  The name is vaguely familiar, but
19  can you be more specific?
20  Q.  What -- What comes to mind when I
21  ask you about the name of Efrain Cruz?
22  A.  Just the name.  Sounds like I've
23  heard it before; that's all.
24  Q.  And how about a person by the name
25  of Francisco or Cisco Varas?  Is that a name

Page 147

1   that's familiar to you?
2   A.  No.
3   Q.  Are you familiar with the Latin
4   Kings street gang prior to May 25th, 1990?
5   A.  Some of them; the older guys kind
6   of.  But the young guys, not all that much.  It
7   would depend on who you run into.  I probably
8   -- I'd probably forget their names more than I
9   would remember them.
10  Q.  What do you consider the young guys
11  versus the old guys by age, like --
12  A.  I don't know if you heard of King
13  Kong.  King Kong and Prince Kong and all those
14  guys.  I know those guys.  But the younger
15  guys, I knew the older guys better.
16  Q.  And King Kong and Prince Kong, were
17  they Latin Kings who were a little older in
18  1990; is that right?
19  A.  Yes.
20  Q.  And when you say "older," I mean, I
21  know gang --
22  A.  You know --
23  Q.  -- age is different than --
24  A.  That's a good point.  They were kind
25  of like the older guys in the gang, I think.

Page 148

1   Q.  And would that be late 20s or 30s
2   or --
3   A.  I would say late 20s, could be 30s.
4   Q.  They weren't teenagers, right?
5   A.  Right.
6   Q.  Weren't early 20s probably either;
7   is that right?
8   A.  I don't think so.
9   Q.  Okay.  But these names that I have
10  just asked you about that were involved in the
11  Maysonet case -- Jose Maysonet, Alfredo Cruz --
12  These were not names that you have a distinct
13  memory of.
14  A.  No.
15  Q.  Okay.  Who was the Latin King
16  specialist in 1990?
17  A.  That depends really on what section,
18  but let me think.  I can't -- I don't know '90.
19  That's after I left.  So I don't know what
20  gangs, who the Latin Kings' specialist was.
21  Q.  Uh-huh.  If you had a Latin King
22  question back in the early '90s, who would you
23  go to?
24  A.  Anybody that worked in the
25  14th District, worked 14th District gangs; but

Page 149

1  we did have, you know, Tony Martinez. Could be
2  anybody.
3  Q. Right. Guevara too, right?
4  A. Could be, sure.
5  Q. I mean, he was at Gang Crimes North
6  and then came to Area 5; so you kind of had a
7  gangs specialist even within Area 5, right?
8  A. Same with Steve Gawrys; and there
9  were a few of them, sure.
10 Q. What other detectives at Area 5 were
11 former gang crime specialists? I know you
12 mentioned Guevara, Gawrys; anybody else come to
13 mind?
14 A. Tony Riccio maybe. And I don't know
15 if Tony was -- I think Tony was a gang -- I'm
16 not -- I think he was in gangs. I don't know
17 which side he was on, but he made dick, went to
18 Area 5; great guy.
19    And there might be a handful of
20 others. At this point I couldn't tell you. I
21 don't know.
22 Q. All right.
23 A. Roman Tedkowsky worked third watch.
24 Roman was a Gangs West guy, but there were gang
25 guys there.

Page 150

1  Q. All right. Now, as you sit here
2  today, you, of course, now know that you
3  recollect the Wiley brothers were two African
4  American men who were murdered on North Avenue,
5  right?
6  A. Yes, right.
7  Q. What is your first memory of the
8  Wiley brothers' murders?
9  A. Probably reading it on the board.
10 It's kind of one of those murders that you kind
11 of don't forget.
12 Q. You don't forget?
13 A. No.
14 Q. Why is it one of those murders you
15 kind of don't forget?
16 A. Two guys not from the neighborhood
17 in that neighborhood for no particular reason,
18 and you get gunned down on the street.
19 Q. And there's two of them, right?
20 A. Two of them.
21 Q. Double murder?
22 A. Sure.
23 Q. And do you have a recollection that
24 they didn't seem to be gang affiliated?
25 A. It's really hard to know at the

Page 151

1  time. You never know whether it's a gang
2  thing, dope thing or what it is. It could be
3  anything, a robbery, you just don't know.
4  Q. Right. But as you sit here today
5  with everything you know now, is it your belief
6  that these fellows were probably not associated
7  with a gang?
8  A. Victims or the offenders?
9  Q. Victims.
10 A. Probably not.
11 Q. They -- they weren't -- they weren't
12 -- They weren't particularly young, right?
13 A. No.
14 Q. They were in their -- 26, 27 years
15 old, right? Is that correct?
16 A. It could be.
17 Q. Yeah. Do you have a recollection of
18 seeing their rap sheets recently?
19 A. No. The Wileys'?
20 Q. Yeah.
21 A. No.
22    MS. BONJEAN: I'm going to mark
23 this.
24    You should have it.
25    THE WITNESS: Thank you.

Page 152

1     MS. BONJEAN: Did you mark it
2  Exhibit 1?
3     THE COURT REPORTER: Yes.
4     (Mingey Deposition Exhibit
5     No. 1 marked as requested.)
6  BY MS. BONJEAN:
7  Q. Okay. I'm handing you what's been
8  marked as Exhibit 1. It's a two-sided sheet.
9  A. Okay.
10 Q. And it's Bates stamped on one side
11 Maysonet 80 -- 1080890 and on the other side
12 10891. These are criminal histories -- reports
13 for Torrence L. Wiley and Kevin G. Wiley. Do
14 you see that?
15 A. Uh-huh. I do.
16 Q. Okay. And if they were murdered on
17 May 25th of 1990, can we agree that they were
18 in their mid to almost late 20s, both of them?
19 A. Yes.
20 Q. All right. And in looking, at least
21 looking at this rap sheet, they're not --
22 they're not -- this is not a -- it's not a
23 particularly significant rap sheet, right, for
24 either one of them?
25 A. No, it's not.

Maysonet v.
Guevara

Video Deposition

Page 153

1 Q. And I suppose that doesn't mean
2 they're not in a gang, but there's nothing
3 about their rap sheets that would suggest that
4 they were active gang members, correct?
5 A. Mob action on one; but no, not
6 really.
7 Q. And mob action really wasn't, I
8 mean, mob action is a pretty -- in fact, it was
9 struck down as unconstitutional, wasn't it?
10 A. No idea.
11 Q. Didn't have to do much to get a mob
12 action case, right?
13 A. Probably not, but he's got one.
14 Q. Right. But that doesn't mean he's
15 in a gang, right?
16 A. No, not necessarily. It could mean
17 that, but who knows?
18 Q. You would agree, though, that
19 pulling the rap sheets of a victim is something
20 you would want to do in the course of an
21 investigation, right?
22 A. It's something one could do.
23 Q. Particularly if you didn't know what
24 the motive was, it might give you some
25 information about the motive of a crime, right?

Page 154

1 A. Not necessarily.
2 Q. It could?
3 A. It would help. It could help.
4 Q. Right. I'm not saying necessarily
5 it does or doesn't; I'm saying if investigators
6 they don't know -- They don't know what they
7 don't know until they look for it, right?
8 A. True.
9 Q. And in fact, these rap sheets were
10 actually pulled on May 25th of 1990, because
11 they're stamped that right at the bottom.
12 Right?
13 A. Okay.
14 Q. Do you see that?
15 A. Uh-huh.
16 Q. So some detective thought it was
17 important to pull the victims' rap sheets on
18 the day they were murdered, right?
19 A. It would kind of be standard, but --
20 Q. Right.
21 A. -- you know.
22 Q. That's what I'm saying.
23 A. But the bottom line is there's two
24 dead kids out there. So, you know, that's --
25 You know, it's something you should do, but you

Page 155

1 know.
2 Go ahead. I'm sorry.
3 Q. No. You tell me what -- Why are you
4 hesitating?
5 A. No. I'm saying it's certainly a
6 piece of the puzzle; it's something you should
7 do. Whether or not this tells the dick, you
8 know, what the motive was of the murder --
9 Q. No, no. Of course not. But if they
10 had long rap sheets that showed that they were
11 both associated with lots of crime,
12 particularly gang-related crime, it would give
13 you a piece of the puzzle about perhaps their
14 gang association might be one of the reasons
15 they're now dead. Right?
16 A. Possibly.
17 Q. Right. And these rap sheets don't
18 depict an image of gangbangers, right?
19 A. It's hard to tell.
20 Q. It's hard to tell what they actually
21 are, but there's nothing about these rap sheets
22 that leads you to believe that these two
23 individuals were gang members, right?
24 A. Right. Except for the mob action.
25 Q. Right. Which why does the mob

Page 156

1 action suggest that Torrence might have been in
2 a gang?
3 A. Well, you know, it's a possibility;
4 so it's something that, you know, makes it
5 possible that he was in a gang.
6 Q. Okay. But a 27-year-old with one --
7 I don't know even what that first charge is --
8 and one mob action. He's not a very -- He's
9 not a very active gang member at 27 years old.
10 A. You're right.
11 Q. If that's all he has. Come on.
12 A. Right.
13 Q. Okay. Let's -- Let's be honest
14 here. In your experience --
15 MR. ENGQUIST: Objection, form.
16 BY MS. BONJEAN:
17 Q. In your experience a 27-year-old who
18 has been a gang member for his teenage and
19 adult life is probably going to have more of a
20 rap sheet than this, right?
21 A. Possibly, sure.
22 Q. I mean, if you're a detective
23 investigating a case, this does -- these rap
24 sheets don't jump out at you and like: Aha,
25 that -- you know, gang -- these guys are

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 157

1  definitely involved in a gang, right?
2      MR. ENGQUIST: Objection, asked and
3  answered, form.
4      BY THE WITNESS:
5  A.  I have no idea.  Doesn't look like
6  it.
7  Q.  Right.
8  A.  But he could be.
9  Q.  I'm not asking -- He could be a lot
10  of things.  He could be a priest too, right?
11  A.  Could be.
12  Q.  He could be a scientist too, right?
13  A.  Certainly possible.
14  Q.  He could be anything.
15  A.  Could be anything.
16  Q.  I'm guessing, if you were a betting
17  person, you wouldn't bet he was a priest,
18  though, right?
19  A.  Right.
20  Q.  Okay.  So with limited information
21  can we say that this does not look like the rap
22  sheet of a gangbanger?
23  A.  No, it doesn't look like it.
24  Q.  That's all I'm asking.
25      Now you said that these two young

Page 158

1  men -- men, though, not teenagers -- are gunned
2  down on North Avenue.  They do not seem to be,
3  at least by their rap sheets, you know,
4  obviously gang associated.  Could be, but not
5  obviously.  So it sticks out in your head --
6  right? -- the murders of these two -- two men?
7  A.  Yes.
8  Q.  And what else do you remember about
9  the murders of these two men?
10  A.  When I read it, I thought that it
11  could be a gangbang; it could be a robbery; it
12  could be a dope deal gone wrong; could be
13  really anything.
14  Q.  Any number of things, right?
15  A.  Yes.  Right.
16  Q.  Do you remember hearing about these
17  two men being gunned down on North Avenue
18  shortly after it occurred?
19  A.  Shortly after what occurred.
20  Q.  The murder occurred.
21  A.  Could you run that by me again.
22  Q.  Sure.  Do you remember receiving
23  information that these two black men had been
24  gunned down on North Avenue shortly after it
25  actually happened after May 25th, 1990?

Page 159

1  A.  I have no idea when I received the
2  information.
3  Q.  Do you remember being on the scene?
4  A.  No, I wasn't on the scene.
5  Q.  Okay.  What -- What do you recollect
6  about the first time you heard about these men
7  being gunned down?
8  A.  Just that I read it.
9  Q.  Okay.  Read it in a report or
10  something?
11  A.  In a report.
12  Q.  And do you have some impressions
13  that come to mind that -- I think you mentioned
14  -- anything else came to --
15  A.  No.
16  Q.  What -- what's -- What investigative
17  activity do you recall taking place after May
18  25th of 1990, in connection with these fellows
19  being killed?
20  A.  I have no idea.  I don't recall what
21  took place.  I'm sure something did, but I
22  don't recall.
23  Q.  Do you have any memory whatsoever?
24  A.  No.
25  Q.  What's your -- What's your first --

Page 160

1  what's -- What do you recollect, again, without
2  looking at paper, as you sit here right now,
3  what do you recollect about the --
4  A.  Wiley brothers?
5  Q.  -- investigation.  Yeah.
6  A.  I would have been aware of it and
7  read the reports.  Wouldn't memorize them, but
8  I would have read roughly what happened.  And
9  my first recollection was, when I talked to
10  Paulnitsky at Area 5, he had -- He had Maysonet
11  in custody.  And I asked Paulnitsky or his
12  partner, Bongiorno -- I really don't know which
13  one it was -- if he wouldn't mind me debriefing
14  their in-custody offender.
15  Q.  Okay.  Is that -- As you sit here
16  today, that's really the first time you
17  remember about the investigation as it relates
18  to Mr. Maysonet's involvement in the Wiley
19  brothers' murder?
20  A.  Today, yes.
21  Q.  Okay.  Do you have reason to believe
22  that there was investigative conduct between
23  May 25th, 1990, and the date on which you, as
24  you say, debriefed Mr. Maysonet?
25  A.  I'm sure there was interview of

Page 161

1  witnesses, the suit guys would, you know,
2  canvass a scene, talk to everybody, and so
3  forth. I'm sure there's a lot of work done.
4  Q.  And do you -- Do you remember seeing
5  any reporting -- reports related to --
6  A.  Sure.
7  Q.  -- investigative work?
8  A.  Yes.
9  Q.  And where did you see those reports?
10  A.  In the file.
11  Q.  And that -- Are those part of the
12  documents that you reviewed in preparation for
13  your deposition here today?
14  A.  Yes.
15  Q.  All right.  Before we look at those
16  reports, you said you remember talking to
17  Paulnitsky about --
18  A.  Or Bongiorno.  I'm not sure.
19  Q.  So -- So tell me how this happens.
20  You hear that Paulnitsky has someone in
21  custody?
22  A.  Yes, he has -- he had somebody in
23  custody.  We knew that a 9 millimeter was used
24  on the -- on the Wiley brothers.
25  Q.  Right.

Page 162

1  A.  So Paulnitsky and Bongiorno were
2  processing Maysonet, probably others, on a -- I
3  think, a triple shooting that occurred in the
4  same general area of the victims who were Wild
5  ODs (phonetic) and the offenders probably were
6  Latin Kings; and it turned out they were.
7  So since the 9 millimeter was used
8  in one case and another 9 millimeter was used
9  by Latin Kings in another case, it -- you know,
10  I was kind of -- it would be somebody you would
11  want to debrief and talk to and see if he had
12  any information on who may have been involved.
13  Q.  Would you agree that in 1990,
14  Humboldt Park was a pretty violent area?
15  A.  Yes.
16  Q.  There was a lot of crime going on in
17  the '90s, gang crime, right?
18  A.  There was.
19  Q.  And every day there were shootings
20  in Humboldt Park, right?
21  A.  There was a lot of shootings every
22  day.  I couldn't tell you, but that'd be a good
23  bet.
24  Q.  And they don't all result in murder,
25  of course, but there was a fair amount of

Page 163

1  violent crime that was occurring in Humboldt
2  Park --
3  A.  Right.
4  Q.  -- in the '90s?
5  And as a sergeant, you certainly
6  were kept abreast of the crime statistics of
7  the area that you were working, right?
8  A.  I would read the reports of major
9  incidents that occurred in Area 5.
10  Q.  In fact, the Chicago Police
11  Department kept that type of data, right?
12  A.  You mean about specific stats for a
13  district?
14  Q.  Yeah, for each district.
15  A.  Sure they did.
16  Q.  Okay.  Number -- Number of murders,
17  right?
18  A.  Right.
19  Q.  Different types of crime, correct?
20  A.  Correct.
21  Q.  And as a sergeant in a particular
22  area, you would at least have some passing
23  familiarity with what the crime rates were for
24  the area that you were policing and
25  supervising, right?

Page 164

1  A.  Some.  Yeah, pretty much.
2  Q.  Was Area 5 sort at the upper end of
3  homicide cases?
4  A.  It was a upper end of gang cases,
5  I'd say.
6  Q.  Okay.  And gang cases involve
7  murders, right?  Fair enough?
8  A.  Yeah.
9  Q.  But other types of crimes as well,
10  right?
11  A.  Sure.
12  Q.  Drug crimes?
13  A.  Right.  Dope, robberies.
14  Q.  Robberies.  Really --
15  A.  Just regular shootings; could be
16  anything.
17  Q.  Right.  And 9 millimeter guns were
18  not uncommon for gang users, right?
19  A.  Not uncommon.
20  Q.  In fact, pretty common gun you would
21  see on the streets, right?
22  A.  Not uncommon.
23  Q.  So you come to find out that
24  Mr. Maysonet's been arrested in connection with
25  another shooting that involved a 9 millimeter,

Maysonet v.
Guevara

Video Deposition

Page 165

1  right?
2  A.  Yes.
3  Q.  And you know that the Wiley brothers
4  were victims of gun violence involving a 9
5  millimeter, right?  Is that correct?
6  A.  That's correct.
7  Q.  So is it your testimony that the
8  mere fact that both cases involve 9 millimeters
9  prompted you to interview Mr. Maysonet?
10  A.  No.
11       MR. ENGQUIST: Objection.
12       Go ahead.
13       BY THE WITNESS:
14  A.  Well --
15  Q.  What were other factors that
16  prompted you to interview Mr. Maysonet?
17  A.  The Wiley brothers were killed on
18  Latin King turf.
19  Q.  Okay.
20  A.  So that would be -- That and the
21  fact they used a 9 millimeter.  I would -- I
22  would debrief any of those in-custody guys
23  anyways.  But in this case, that's a guy that
24  you really want to talk to.
25  Q.  So is part of your practice to talk

Page 166

1  to gang members who were in custody just to see
2  if they had any information that could help you
3  out?
4  A.  When at all possible, sure.
5  Q.  Let me finish the question, all
6  right?
7  A.  I'm sorry.
8  Q.  It's all right.  It wasn't uncommon;
9  in fact, it was rather routine for you to try
10  to talk to gang members who were in custody for
11  whatever they may be in custody for to see if
12  they might give you some information about
13  unsolved cases in -- in the community, right?
14  A.  It wasn't routine, but I did it --
15  Q.  All right.
16  A.  -- whenever I could.
17  Q.  And did you find that to be helpful
18  in solving cases?
19  A.  Yes.
20  Q.  Did -- Did gangbangers give up
21  information pretty easily just by being asked?
22  A.  You know, most of the time, no; but
23  on occasion, yes.
24  Q.  It was worth a shot.
25  A.  Absolutely.  Part of our job.

Page 167

1  Q.  Part of your job.  And why is it
2  part of your job?
3  A.  Debriefing in-custody people
4  whenever possible.
5  Q.  To get information, correct?
6  A.  Sure.  On other cases, yes.
7  Q.  And could help you solve -- solve a
8  crime, right?
9  A.  Yes.
10  Q.  Corroborate information as part of
11  an investigate -- corroborate information that
12  is collected in investigations?
13  A.  Uh-huh.
14  Q.  Is that right, yes?
15  A.  Yeah.
16  Q.  So you find out that Mr. Maysonet is
17  a Latin King who has allegedly been involved in
18  a shooting with a 9 millimeter, right?  Excuse
19  me.
20       And you know that the Wiley brothers
21  -- sorry.  And you know that the Wiley brothers
22  were gunned down in Latin King territory,
23  correct?
24  A.  Correct.
25  Q.  With a 9 millimeter, correct?

Page 168

1  A.  Correct.
2  Q.  And you believe it would be useful
3  to debrief him, right?
4  A.  Yes.
5  Q.  Why didn't you decide -- Why didn't
6  you just have a detective who was assigned to
7  the case debrief Mr. Maysonet?
8  A.  That's something that I'm supposed
9  to do as a supervisor up there is debriefings.
10  Now detectives, are they supposed to do it too?
11  Absolutely.
12  Q.  Why not have Paulnitsky do it?
13  A.  He was already involved in another
14  case.
15  Q.  He was --
16  A.  But, yeah -- But he's working on one
17  case, you know, talking to -- It depends on
18  what kind of rapport he had with this guy and
19  that kind of stuff.  The key thing is you want
20  to try to get people to cooperate and tell you
21  stuff that you could use down the road to clear
22  a case.
23  Q.  Yeah.  But Paulnitsky was already
24  involved in the investigation of the Wiley
25  brothers, right?

Maysonet v.
Guevara

Video Deposition

---

Page 169

1  A.  I have no idea if he was.
2  Q.  Well, if he was, wouldn't it make
3  sense that he would debrief Mr. Maysonet?
4  A.  If he was already involved in the
5  murder of the Wiley brothers?
6  Q.  The investigation of the Wiley
7  brothers.
8  A.  That certainly wouldn't hurt.  But
9  if he's involved in processing Maysonet and
10  others on another case, I don't know why that
11  -- he would be concerned about clearing that
12  place -- case and getting charges approved.
13  It's really a supervisor's job to de- --
14  debrief; although anybody could do it.
15  Q.  Well, debriefing can lead to invest
16  -- Debriefing is investigative conduct, right?
17  A.  Yeah.
18  Q.  All right.  And not every
19  supervising sergeant engages directly in
20  investigating cases, right?
21  A.  Not everyone.
22  Q.  I mean, I've never seen a report
23  where Biebel is interviewing a witness.
24  A.  Well, Bob was kind of an inside guy,
25  and I was kind of the outside guy.

---

Page 170

1  Q.  Right.  But witnesses sometimes come
2  inside the police department.
3  A.  Sometimes, sure.
4  Q.  Mr. Maysonet was inside the police
5  department?
6  A.  Right.
7  Q.  Okay.  So even if Paulnitsky wasn't
8  already working on the Wiley brothers' murder
9  investigation, there were detectives who were
10  working that investigation, right?
11  A.  You know, I really -- There
12  certainly were, but I don't know if they were
13  there at the time when I talked to Maysonet.  I
14  don't know.
15  Q.  So it occurs to you there might be a
16  connection between these two crimes, correct?
17  A.  Yes.
18  Q.  How did you know there might be a
19  connection?
20  A.  9 millimeter, Latin Kings.
21  Q.  No.  I know.  But how did you -- how
22  did you -- how did you remem -- How did you
23  know that the Wiley brothers were murdered in
24  Latin King territory and with a 9 millimeter?
25  A.  I read it on the report, I'm sure.

---

Page 171

1  Q.  You weren't a detective assigned to
2  the case.
3  A.  No.
4  Q.  So just through reviewing reports
5  you had remembered that?
6  A.  Yes.
7  Q.  And you didn't have a detective talk
8  to Mr. Maysonet; you decided you were going to
9  debrief him yourself?
10  A.  No.  I decided to have Freddie with
11  me because he spoke Spanish to me.  So I
12  thought he couldn't speak English.
13  Q.  Right.  But Freddie was working as
14  an interpreter, right?
15  A.  Yeah, right.
16  Q.  He wasn't even assigned to Violent
17  Crimes.
18  A.  No, he wasn't.
19  Q.  -- Crimes?
20  A.  Right.
21  Q.  So you really used him as an
22  interpreter, correct?
23  A.  Yes, right.
24  Q.  And you were the one that was going
25  to interview Mr. Maysonet to see what he knew

---

Page 172

1  about the Wiley brothers' murders?
2  A.  And anything else out there, other
3  cases.
4  Q.  Okay.  So you were going to
5  interview someone you knew to be associated
6  with the Latin Kings, who had just been
7  arrested in connection with another shooting,
8  to find out what he knew about other
9  investigations that were ongoing by Area 5,
10  right?
11  A.  Right.
12  Q.  That is investigative conduct,
13  right?
14  A.  It is.  But it's debriefing conduct.
15  Everybody should do it, but not everybody does
16  it.
17  Q.  You could put whatever -- whatever
18  word you want to put onto it.  But the reality
19  is, is you're interviewing someone to find out
20  whether they have firsthand knowledge about
21  crimes that are committed in Area 5, right?
22  A.  Part of the job.
23  Q.  Right.  And -- In specific, you were
24  interested in knowing what information he had
25  about the Wiley brothers' murders because you,

---

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 173

1  as a sergeant who had been reviewing the
2  investigation, had made a connection or saw a
3  possibility of a connection between the two
4  crimes, correct?
5  A.  Correct.
6  Q.  All right.  And how did you know
7  Mr. Maysonet was in custody?
8  A.  I was probably -- I was obviously
9  working that day, and I just was -- want to
10  make sure you knew what was happening on the
11  floor.
12  Q.  And is that something you would
13  typically be aware of -- Who was in custody,
14  what was going on on the floor during the shift
15  that you were working?
16  A.  If I was inside, it would be my job
17  to be aware of who's in there.
18  Q.  Right.  So it would be your job to
19  know who was in custody, why they were in
20  custody, and what was going on with that person
21  in custody?
22  A.  Me or some other sergeant up there.
23  Q.  Okay.  And so what did Paulnitsky
24  say to you when you asked him whether or not
25  you could talk to his arrestee in connection

Page 174

1  with any other cases he might be aware of and,
2  specifically, the Wiley brothers' murder?
3      MR. ENGQUIST: Objection, form,
4  compound, and also mischaracterizing his
5  previous testimony.
6      BY THE WITNESS:
7  A.  I don't know whether I talked to
8  Paulnitsky or Bongiorno.  I'm not sure.
9  Q.  Okay.
10  A.  But whoever I talked to, I asked
11  them or him if I could debrief their in-custody
12  guy.
13  Q.  And do you recall what that person
14  said in response to your question?
15  A.  I have no recollection at all --
16  Q.  Okay.
17  A.  -- outside of I'm sure they said:
18  Yeah, go ahead.
19  Q.  So where did this -- And did you, in
20  fact, go ahead and interview Mr. Maysonet?
21  A.  I did.
22  Q.  And where -- Where did that
23  interview take place?
24  A.  One of the interview rooms.
25  Q.  On the second floor at Area 5?

Page 175

1  A.  Yes, ma'am.
2  Q.  How did you engage Mr. Montilla in
3  this -- in this interview?
4  A.  I walked in to introduce myself and
5  Maysonet spoke Spanish to me.  I assumed he
6  couldn't speak English, so I got ahold of
7  Freddie to interpret.
8  Q.  All right.  And where was Freddie
9  when you grabbed him?
10  A.  No idea.
11  Q.  He was in Area 2 though, right?
12  A.  Area 5.
13  Q.  Strike that.
14      You -- You had a quick conversation
15  with Mr. Maysonet in an interview room where he
16  spoke Spanish to you, right?
17  A.  He did.
18  Q.  And then did Paulnitsky tell you
19  that he spoke Spanish?
20  A.  I had no idea what he said or didn't
21  say.
22  Q.  Okay.  But you grabbed Detective
23  Montilla from the floor?
24  A.  Right.
25  Q.  And why did you grab Detective

Page 176

1  Montilla?
2  A.  Freddie is a fluent Spanish speaker.
3  Q.  Were there any other Area 5 Violent
4  Crime detectives who spoke Spanish available to
5  you?
6  A.  Apparently not.  I -- I knew
7  Freddie.  I've known Freddie for quite some
8  time.  He's a good detective, and I would -- He
9  spoke Spanish fluent.  He's a fluent Spanish
10  speaker.
11  Q.  But had there been a Spanish
12  speaking detective who was part of Violent
13  Crimes, would that have been your preference or
14  you were indifferent?
15  A.  Probably, I would probably take
16  somebody from Violent Crimes, a Spanish
17  speaker; but apparently, Freddie was the only
18  one available.
19  Q.  All right.  So you grabbed Freddie.
20  And what did you say to Freddie?
21  A.  I said: Fred, I want to debrief
22  this guy and he doesn't speak -- As far as he
23  speaks Spanish to me -- so I assume he can't
24  speak English.  Would you interpret for me?
25      He agreed.  We went into the room,

Rizman Rappaport (973)992-7650
"When every word counts"

Page 177

1  identified ourself, asked Freddie to read him
2  his rights, and then asked him a few questions.
3  Q.  Okay.  So you read Mr. --
4  A.  I didn't.
5  Q.  Maysonet -- Strike that.
6      You asked Detective Montilla to read
7  Mr. Maysonet his rights?
8  A.  Yes, right.
9  Q.  Did he do so?
10  A.  It was in Spanish.  I really don't
11  know.  I didn't pay attention.
12  Q.  You assume that Montilla did what
13  you asked him to do?
14  A.  Yes, right.
15  Q.  And after Mr. Montilla read
16  Mr. Maysonet his rights in Spanish, presumably,
17  what happened next?
18  A.  I asked Freddie to talk to him and
19  see if he knew anything about the two black
20  guys that were killed on North Avenue.  And I
21  probably asked about other cases that were
22  open.  What those cases were -- You wouldn't
23  want to ask about one thing.  You know, you
24  want to try to get as much in there as you can.
25  And he was cooperative; so you want to try to

Page 178

1  see if -- Well, he gave you information on one,
2  maybe he can help out with another.
3  Q.  Okay.  But you did specifically ask
4  him about the Wiley brothers' murders?
5  A.  Yes.
6  Q.  And what, if anything, did he say in
7  response?
8  A.  To the best of my recollection, he
9  said that he was home with -- with whoever,
10  wife, girlfriend.  The night of the murder,
11  before the murder occurred, three Latin Kings,
12  apparently, that he knew went up to his house,
13  borrowed the gang -- borrowed a 9 millimeter
14  that he was holding -- or I'm sorry -- borrowed
15  a gun that he was holding.  I think he said it
16  was a nine and they left.  And he found out the
17  next day that two black guys were killed on
18  North Avenue.  He assumed these guys did it.
19  Q.  Okay.  And he just gave you this
20  information?
21  A.  Yeah.
22  Q.  How did he know that the night that
23  Mr. -- that the Wiley brothers were murdered?
24  Did you -- Did you tell him what night?
25  A.  No.  I -- I make it a point not to

Page 179

1  say too much about these cases.  I just
2  mentioned the two black guys that were killed
3  on North Avenue, nothing else.  Because I
4  really didn't know anything else, except that
5  somebody used a 9 on 'em.  So this guy that's
6  -- No doubt in my mind that he knew what he was
7  talking about.
8  Q.  Uh-huh.  And Mr. Maysonet said this
9  in Spanish to Mr. Montillo, who, then,
10  translated to you; is that right?
11  A.  Yes, ma'am.  Right.
12  Q.  And so you asked an open-ended
13  question about whether he knew something about
14  the murders that occurred on North Avenue, and
15  he told you that --
16  A.  About the two black guys that were
17  killed on North Avenue.
18  Q.  Right.  The two black guys that were
19  killed on North Avenue.  And he offered up to
20  you that he provided the murder weapon that was
21  probably used to kill them, right?
22  A.  That's what -- Yeah, yeah, sure.
23  That's what he said.  He didn't know for sure,
24  I'm sure; but --
25  Q.  But he assumed it, right?

Page 180

1  A.  I guess he assumed it.
2  Q.  That's why he told you that in
3  response to that question?
4  A.  Right.
5  Q.  And you assumed as well, then,
6  right?
7  A.  Yes.
8  Q.  You had no reason to believe he was
9  lying to you about that.
10  A.  No.  Actually, I thought he was --
11  He was cooperative.  I thought he was truthful.
12  But it's hard when you're not hearing it in
13  English, and you're going through Freddie; but
14  Freddie, I think, had the same impression.
15  Q.  Right.  And you -- You remember that
16  this interview that took place, took place a
17  few months after the murders, right?
18  A.  You know, right now, I couldn't tell
19  you July, August -- I, you know --
20  Q.  Well --
21  A.  -- but after the -- certainly, well
22  after the murder.
23  Q.  Well, I will represent to you that
24  Mr. Maysonet was arrested by Paulnitsky in
25  connection with this other shooting on -- on

Maysonet v.
Guevara

Video Deposition

Page 181

1  July 15th of 1990, okay?
2  A.  (Nodding.)
3  Q.  Any reason to quarrel with my
4  representation?
5  A.  No.
6  Q.  All right.  And I will also
7  represent to you that the Wiley bothers were
8  murdered on May 25th of 1990, correct?  Does
9  that sound right?
10  A.  Could be.
11  Q.  All right.  Any reason to quarrel
12  with that?
13  A.  I'm not going to quarrel with you.
14  Q.  All right.  So if, in fact, I'm
15  telling you the truth about this and I am not
16  lying to your face --
17  A.  Uh-huh.
18  Q.  -- would we -- Can we agree that
19  your interview with Mr. Maysonet happened just
20  shy of two months after the Wiley brothers'
21  murders?
22  A.  Could be.
23  Q.  Sound right?
24  A.  Could be.
25  Q.  Okay.  So -- And your testimony is

Page 182

1  -- Strike that.
2      And you don't remember -- Strike
3  that.
4      What information did you have about
5  the Wiley brothers' murders prior to
6  interviewing Mr. Maysonet?
7  A.  Location, weapon used.
8  Q.  Okay.  You had no suspects, right?
9  A.  No.
10  Q.  Had no real leads either, right?
11  A.  None.  None that I was aware of.
12  Q.  None that you were aware of.  But
13  it's your job to be aware of these
14  investigations, right?
15  A.  Yes, generally speaking, sure.
16  Q.  Try to be aware of the
17  investigations?
18  A.  Try to be.
19  Q.  And if there had been some reports
20  written, you would have looked at those
21  reports, right?
22  A.  Hopefully.
23  Q.  It would be on that board we talked
24  about earlier, most likely, correct?
25  A.  Presumably, sure.

Page 183

1  Q.  So -- And by your own testimony, you
2  were just going in there to sort of just see if
3  he had any information about this, correct?
4  A.  That and probably a few other cases
5  that were open at the time.
6  Q.  Right.  And lo and behold, you get a
7  very cooperative Mr. Maysonet, right?
8  A.  Lo and behold.
9  Q.  Didn't exercise his right to
10  counsel, correct?
11  A.  Freddie gave him his rights.
12  Q.  Have any recollection of him saying:
13  I want my lawyer here?
14  A.  He only spoke Spanish.  I --
15  Freddie's telling me what he said.  But there's
16  no reason for me to believe that he wanted to
17  see a lawyer.  He seemed cooperative.
18  Q.  Mr. Montilla didn't tell you that he
19  said: Hey, he says he wants his lawyer?
20  A.  No, of course not.
21  Q.  Mr. Montilla never communicated to
22  you that Mr. Maysonet wanted his lawyer, right?
23  A.  If he said that and told Freddie
24  that, Freddie would have told me that.
25  Q.  Okay.  So again, I -- I know you

Page 184

1  don't speak Spanish, right?
2  A.  Right.
3  Q.  Okay.  But putting aside the fact
4  that you don't speak Spanish, you have no
5  reason to believe that Mr. Maysonet exercised
6  his right to counsel?
7  A.  I don't speak Spanish.  I trusted
8  Freddie to, you know, give him his rights and
9  talk to him, ask him what I wanted Freddie to
10  ask him.
11  Q.  Right.
12  A.  Freddie's a good guy and an honest
13  guy.
14  Q.  So being a great guy, honest guy --
15  A.  Uh-huh.
16  Q.  -- he would have told you if
17  Mr. Maysonet wanted his attorney, right?
18  A.  Yes, he would.
19  Q.  Okay.  And therefore, you have no
20  reason to believe that Mr. Maysonet wanted his
21  attorney, right?
22  A.  Freddie never said he wanted an
23  attorney.
24  Q.  Right.  And Freddie is a great guy
25  and an honest guy so?

Page 185

1  A.  Plus he's a Puerto Rican.  Why would
2  he say that?  Seriously.
3  Q.  Why would he say what?
4  A.  Why would he say -- Why would he try
5  to trick bag one of his own people?  He
6  wouldn't do that.
7  Q.  Like Guevara hasn't done that?
8  A.  I don't know if he -- I don't know
9  if he's done it or not.  But I've known Freddie
10  for a long time.  Freddie's a honorable, good
11  guy.  And he's not going to tell me something
12  that didn't happen.
13  Q.  Okay.  Well, let's go back to this
14  -- this point, this notion that a Puerto Rican
15  wouldn't trick bag his own people?
16  A.  Well, you know.
17  Q.  I mean --
18  A.  That's why it's good to have Spanish
19  guys working on these cases; because I think
20  that they would give a person the benefit of
21  the doubt.
22  Q.  Guevara didn't give people the
23  benefit of the doubt, right?
24      MR. LEINENWEBER: Objection.
25      BY THE WITNESS:

Page 186

1  A.  I don't know whether he did or
2  didn't.
3      MR. ENGQUIST: Objection,
4  argumentative.
5      But go ahead.
6      BY MS. BONJEAN:
7  Q.  Do you find it ironic that Guevara
8  is Puerto Rican, and all the people he's framed
9  are Puerto Rican?
10      MR. LEINENWEBER: Objection to form,
11  also argumentative.
12      MR. ENGQUIST: Join.
13      BY MS. BONJEAN:
14  Q.  Do you find that ironic?
15  A.  Did he frame anybody?
16  Q.  I don't know.  Does he answer your
17  questions when you ask him whether he framed
18  people?  Because he doesn't answer our
19  questions when we ask him whether he frames
20  people.
21  A.  I haven't talked to him.
22  Q.  All right.  Does -- If you can let
23  us in on whatever information you might have.
24  But when I asked him whether he frames people,
25  do you know what he tells me?  He says:  I

Page 187

1  exercise my Fifth Amendment right.  I'm not
2  going to answer your questions.
3      So has he said anything to you of
4  saying that he didn't frame anyone?
5  A.  I haven't talked to Rey.
6  Q.  Okay.  So he hasn't even told you he
7  hasn't framed anyone, has he?
8  A.  Freddie didn't either.  Freddie's an
9  honest guy, and he would have told me the
10  truth.
11  Q.  Okay.  So you interviewed
12  Mr. Maysonet.  You have no leads really, other
13  than, you know, it's a 9 millimeter.  And with
14  just your charming presence, he tells you that
15  he thinks he may have provided the gun that
16  shot these guys down in the street, right?
17      MR. ENGQUIST: Objection, form,
18  argumentative.
19      BY THE WITNESS:
20  A.  That's what Freddie said he said.
21  Q.  Okay.  You have no reason to doubt
22  Freddie, right?
23  A.  Not at all, no.
24  Q.  And did you find it curious that
25  this individual would offer up incriminating

Page 188

1  information about his involvement in a double
2  murder?
3  A.  Well, he kind of really didn't
4  incriminate himself.  He just said these guys
5  came over to his house, fellow gangbangers, and
6  they wanted the gun.  He gave them the gun and
7  they left.
8  Q.  Right.  And this gun -- It's
9  assuming that this -- assuming Mr. Maysonet is
10  telling the truth, there's a good chance that
11  this gun was used in the murder of the Wiley
12  brothers.  Right?
13  A.  Could be.
14  Q.  That's -- I mean, that's what you're
15  thinking as a detective, right?
16  A.  I'm not a detective, but that's what
17  I was thinking.
18  Q.  No.  You were acting as a detective;
19  you were investigating the case.
20  A.  Information -- Yeah, you could say
21  that.
22  Q.  Certainly if it turns out that the
23  gun that was used to kill the Wiley brothers is
24  the same gun that Mr. Maysonet used -- gave to
25  these other gangbangers, that is incriminating

Maysonet v.
Guevara

Video Deposition

Page 189

1   information, right?
2   A.   It would be, sure.
3   Q.   It doesn't necessarily mean he's
4   accountable for the murder; but he could be
5   accountable for the murder, right?
6   A.   Could be.
7   Q.   Depends on what his knowledge is,
8   right?
9   A.   Yeah.
10  Q.   Okay.  So but the act, the conduct
11  to help the murder is there if he -- if he gave
12  the gun, right?
13  A.   Pretty much, yeah.
14  Q.   So you have to agree this is
15  incriminating information that he's just
16  provided you?
17  A.   Sure is.
18  Q.   So after you receive this
19  incriminating information from Mr. Maysonet, in
20  which he says I may have provided the gun that
21  was used to kill the Wiley brothers, what did
22  you do next?
23  A.   Probably I either ran it by the
24  detectives assigned, or I made a GPR.  I have
25  no idea what I did, but it would be one of

Page 190

1   those two things.
2   Q.   All right.  One thing is important
3   here.  Would you agree that that information
4   that he just provided you has to be
5   memorialized somewhere, right?
6   A.   It should be documented if at all
7   possible, sure.
8   Q.   And it was possible, right?
9   A.   Well, if I didn't document it, that
10  means I told the assigned detectives what
11  occurred; and they would have to document it or
12  whatever.
13  Q.   Somebody -- Somebody had to document
14  this information, correct?
15  A.   Yes, right.  It's important
16  information.
17  Q.   There's no scenario under which we
18  don't document a statement saying --
19  A.   No.  You're right.
20  Q.   Let me finish, please.
21  A.   Sorry.
22  Q.   There's no scenario under which it
23  would be acceptable to just fail to document a
24  statement by an individual who has disclosed
25  that he may have provided the murder weapon for

Page 191

1   a double homicide to those who are responsible
2   for the murder, right?
3   A.   It would have to be disclosed.
4   Q.   I'm sorry?
5   A.   It would have to be disclosed.
6   Q.   Forget disclosed.  It'd have to be
7   documented.
8   A.   That's what I mean.
9   Q.   Right?
10  A.   Yes.
11  Q.   As soon as possible, correct?
12  A.   Well, I don't know about that.
13  You'd have to tell -- If I gave it to the
14  assigned detectives, they do -- they would put
15  it on paper when they had a chance.
16  Q.   Okay.  So who did you tell to
17  document it?
18  A.   I have no idea.  None.  I don't know
19  if I documented it.  I don't know if I told
20  somebody to document it.  I don't even know who
21  the detective -- the assigned detectives are on
22  the case.
23  Q.   So, in your mind, it was acceptable
24  just to tell the assigned detective that:  Hey,
25  this guy I had in custody just told me that he

Page 192

1   may have provided the murder weapon to the
2   individuals, and he -- he knows who may have
3   been responsible for these murders, right?
4   A.   Yes.
5   Q.   After talking to Mr. Maysonet, you
6   got a very strong lead on who is responsible
7   for the murders of --
8   A.   Right.
9   Q.   Right?
10  A.   Well, when that he knew or think --
11  thought he knew.
12  Q.   And even knowing that he know --
13  Even knowing that he knew gives you some idea
14  of who did it, right?
15  A.   Not who did it, but that he knew who
16  did it.
17  Q.   Well, you know now that it's
18  probably Latin Kings, right?
19  A.   Yes.
20  Q.   As opposed to some --
21  A.   Sure.
22  Q.   -- some -- I don't know, some jilted
23  lover of the Wiley brothers, right?
24  A.   Right.
25  Q.   Okay.  So you -- You now know that

Rizman Rappaport (973)992-7650
"When every word counts"

Page 193

1    it looks like it could be a Latin King that
2    committed these murders, right?
3  A.  Yes.
4  Q.  Well, you know that Mr. Maysonet
5    knows who these Latin Kings are.
6  A.  Yes.
7  Q.  You know that -- that Mr. Maysonet
8    or these other fellows might have the murder
9    weapon that was used, correct?
10 A.  Correct.
11 Q.  And this is more information than
12   you had prior to talking to Mr. Maysonet,
13   right?
14 A.  Right.
15 Q.  Before talking to Mr. Maysonet, you
16   had no idea who was involved other than it just
17   happened in Latin King territory, right?
18 A.  Right.
19 Q.  So these are very important
20   developments in the context --
21 A.  Sure they are.
22 Q.  -- of this investigation, right?
23 A.  Right.
24 Q.  And this is an investigation that,
25   up to this point, hadn't really yielded any

Page 194

1    fruitful leads, correct?
2  A.  Correct.
3  Q.  So now you get your first big lead
4    in the murders of two men, and you would agree
5    it's very important that we report, make a
6    report about this lead, right?
7      MR. ENGQUIST: Objection, asked and
8    answered, argumentative.
9      BY THE WITNESS:
10 A.  Yes.  I'm saying I don't know if the
11   dicks I told about that made it or if I made
12   it.
13 Q.  I'm not asking who made it at this
14   point.  I'm asking you --
15 A.  Okay.
16 Q.  -- to agree that, in your mind, you
17   would agree it was important --
18 A.  Sure.
19 Q.  -- to make a report about it?
20 A.  Yes.
21 Q.  This isn't information we just blow
22   off, right?
23 A.  You don't blow off this kind of
24   stuff, no.
25 Q.  No.  Particularly when you have --

Page 195

1    You have no other leads going.  This is -- This
2    is going to possibly lead to solving and
3    clearing a double murder, right?
4      MR. ENGQUIST: Objection, form.
5      BY THE WITNESS:
6  A.  Right.
7  Q.  Okay.  So you agree that this
8    information needed to be reported, and you also
9    agree that it should be memorialized or
10   documented within -- within at least a few days
11   of when you received it, right?
12 A.  Should be documented at some point,
13   sure.
14 Q.  Not just at some point, within,
15   let's say, 48 hours.
16 A.  Sure.
17 Q.  Because this is information that
18   could turn out to be evidence itself, right?
19 A.  Certainly could.
20 Q.  It could turn out to be a statement
21   by Mr. Maysonet against his own interests,
22   right?
23      MR. ENGQUIST: Objection,
24   foundation, calls for legal conclusion.
25      BY THE WITNESS:

Page 196

1  A.  Certainly possible.
2  Q.  In fact, if you later find out that
3    he had knowledge about this, it's really,
4    really important evidence, right?
5  A.  Right.
6  Q.  So it would be important to document
7    it, not just so you don't forget about it, but
8    also because it might be used in a prosecution
9    at some point, right?
10 A.  That's why I'm sure it was
11   documented.
12 Q.  Okay.  So you're positive --
13 A.  One way or the other.
14 Q.  It's positive -- You're positive it
15   was documented one way or the other?
16 A.  If I didn't do it, the dicks
17   assigned -- I would have told them the
18   information and had them do it.
19 Q.  And you would make sure that they do
20   it, right?
21 A.  If I didn't do it, I'd make sure
22   they did it.
23 Q.  Right.  Because your -- That's your
24   job as a sergeant, right?
25 A.  Sure.

Maysonet v.
Guevara

Video Deposition

Page 197

1  Q.  And you would have the opportunity,
2  if not yourself to approve such a report, to
3  see the report that ultimately ends up on a
4  board, right?
5  A.  I don't know if it would wind up on
6  the board, but ...
7  Q.  Well, on -- on the clipboard?
8  A.  I would -- It would be docu- --
9  Somebody would have to document, sure.
10  Q.  And again, if it wasn't you, it
11  would have been -- you would have made sure it
12  got done, right?
13  A.  I would have told the assigned
14  detectives, and I would hopefully make sure it
15  got done.
16  Q.  You'll have to forgive me, but
17  doesn't it seem like a better practice that you
18  would document it yourself since you're the one
19  who heard it, or maybe Montilla would document
20  it?
21  A.  You know, looking back on it, sure,
22  it would be probably smarter for me to have
23  done it; but I may have done it.  I don't know.
24  I have no idea whether I told the assigned
25  detectives to do it or I documented it myself.

Page 198

1  Q.  Right.  Do you remember ever writing
2  a GPR memorializing it?
3  A.  Back on that case?
4  Q.  Uh-huh.
5  A.  No.
6  Q.  Would you have had Montilla do it?
7  A.  No.  I'd probably have the assigned
8  detectives do it, or I would do it.
9  Q.  And if you have the assigned
10  detectives do it, the assigned detective is
11  reporting it.  Would they have to say:
12  Sergeant Mingey told me this is what happened?
13  A.  Yes.
14  Q.  They can't say they heard it, right?
15  A.  Right.
16  Q.  Because that would be a lie, right?
17  A.  Right.  Exactly, exactly.
18  Q.  They would have to write somewhere
19  in a GPR:  Sergeant Mingey told me that
20  Maysonet said X, Y, Z.
21  MR. ENGQUIST: Objection, calls for
22  speculation.
23  BY MS. BONJEAN: Is that how it would work?
24  MR. ENGQUIST: Objection, calls for
25  speculation, foundation, form.

Page 199

1  BY MS. BONJEAN:
2  Q.  All we got here is speculation.  So
3  let's go for it.
4  A.  I would, yeah.  He would have to say
5  that he got it from me, who got it from
6  Freddie.  We're not talking directly to
7  Maysonet; it's through Freddie.  So yeah -- But
8  yeah, it would have to be documented one way or
9  the other.
10  Q.  All right.
11  A.  I'm sure it was one way or the
12  other.
13  Q.  Why are you so sure?
14  A.  Something like that's important,
15  valuable information; it has to be documented.
16  Somebody's got to document it.  Somebody's got
17  to put it down.  Again, whether I did it or
18  somebody else did it, I really don't remember.
19  Q.  All right.  What else do you
20  remember about your conversation with
21  Mr. Maysonet?
22  A.  That's it.
23  Q.  Did you ask him who these Latin
24  Kings were?
25  A.  I'm sure Freddie did and he wouldn't

Page 200

1  say -- or something.  I'd have to read the
2  report again; but he never came up with the
3  people that he claimed got the gun.
4  Q.  Are you recollecting this from your
5  reports or from your independent recollection?
6  A.  I got a vague recollection of what
7  occurred at Area 5.
8  Q.  How do you distinguish in your mind
9  your independent, vague recollection from what
10  you're reading off of the reports that you have
11  seen?
12  A.  Reports are just to trigger your
13  memory, you know, get an idea of what occurred;
14  and that's what I remember.  It's a little
15  vague, but that's what I remember.
16  Q.  All right.  If you hadn't read your
17  reports, what would you remember?
18  MR. ENGQUIST: Objection, calls for
19  speculation.
20  BY MS. BONJEAN:
21  Q.  What do you think you might have
22  remembered if you hadn't read your reports?
23  If I had asked you this when you
24  didn't have the benefit of reviewing your
25  reports, what -- What would you remember?

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 201

1     MR. ENGQUIST: Same objection.
2     BY THE WITNESS:
3  A.  That he gave the -- he got the -- he
4  gave the three guys, Latin King members, a gun;
5  and later on, he found out two -- two guys were
6  shot and killed on wherever.  That's what I
7  would remember.
8  Q.  Okay.
9  A.  Whey he didn't come with up with the
10  names of those people, I have no idea.  I'm
11  sure Freddie asked, but ...
12  Q.  So anything else you remember about
13  the conversation?
14  A.  No, that's it.
15  Q.  So what -- After that conversation,
16  you said you may have prepared a GPR
17  memorializing that conversation, but you may
18  have also told the assigned detectives about
19  the conversation?
20  A.  Yes.
21  Q.  You think you might have done both,
22  maybe?
23  A.  Well, I'm sure I probably -- I could
24  have.
25  Q.  If you -- If you did do a GPR, what

Page 202

1  would you have done with the GPR?
2  A.  Give a copy to the assigned
3  detectives.
4  Q.  So one way or another, you were
5  going to let the assigned detectives know,
6  right?
7  A.  Sure.
8  Q.  I mean, it's the first big break in
9  a double-murder case.
10  A.  Exactly.
11  Q.  You're not taking over the
12  investigation yourself, right?
13  A.  No, I'm not.
14  Q.  But you want to make sure that the
15  investigation keeps going, right?
16  A.  Right.
17  Q.  So one way or another, whether it's
18  through preparing a GPR or communicating, you
19  would have let the assigned detective know,
20  right?
21  A.  I'm sure I did.
22  Q.  And you would have let them know
23  quickly, I'm guessing, right?
24  A.  If they were working, yes.
25  Q.  Okay.  But when I say "quickly," I

Page 203

1  mean -- I don't mean like immediately; but you
2  would have let them know within the next
3  48 hours about this big break on a double
4  murder, right?
5  A.  Yeah, I'm sure I would.  Whenever I
6  could see him again, sure.
7  Q.  Right.  I mean, I assume you took
8  double murders seriously.
9  A.  Absolutely.
10  Q.  Okay.  You wouldn't have waited a
11  month, right?
12  A.  No.
13  Q.  Now what do you remember next
14  happening?
15  A.  I don't.
16  Q.  No recollection of what happened
17  next?
18  A.  No.  I went to the jail at some
19  point with Freddie, again, and spoke to him
20  again.  I just can't recall going to the jail.
21  Q.  Right.
22  A.  I know I did, but I can't recall.
23  Q.  You know because you read the report
24  that you went to the jail, right?
25  A.  I signed off on the waiver.  Right.

Page 204

1  My name is on the waiver.
2  Q.  Is it?
3  A.  Yes.  So I did go to the jail.
4  Q.  Yeah, you remember going to the jail
5  because you read it in a report, right?
6  A.  Yup.  I don't remember going to the
7  jail, but I read it in the report that I did
8  and saw the waiver signed -- or with my name on
9  it.  So -- But do I remember going to the jail
10  and talking to him?  No.
11  Q.  Okay.  Now you're going to the jail
12  to talk to someone who you know has information
13  about a double murder because he's already told
14  he has information about a double murder,
15  right?
16  A.  Well, he has information that leads
17  you to believe that the guys that got the gun
18  were the offenders, yes.
19  Q.  Yeah.  Again, you had reason to
20  believe that he knew who the murderers were and
21  gun used; and you wanted to go investigate
22  further, right?
23  A.  Well, he indicated -- I don't think
24  he indicated initially that he knew who the
25  murderers were, only the people that got the

Maysonet v.
Guevara

Video Deposition

Page 205

1  gun that could be the murderers because there
2  was two guys shot the next day.
3  Q.  Right.
4  A.  Yup.
5  Q.  And that gave you the strong
6  impression that he very well might know who was
7  responsible for the murders, right?
8  A.  Right.
9  Q.  Which is the whole reason you went
10  there in the first place, right?
11  A.  Right.
12  Q.  You weren't going there to have tea,
13  correct?
14  A.  No.
15  Q.  You weren't going there to just, you
16  know, talk about the Bears game, right?
17  A.  Right.
18  Q.  Why did you go rather than send a
19  detective who actually is assigned to the case?
20  A.  I would go because we had -- He was
21  cooperative.  Freddie was a Spanish speaker.
22  Seemed to get -- Everything was very smooth in
23  the interview.  You don't want to change horses
24  in mid stream; you'd want the same guys to go
25  back there if you could poss -- If there was a

Page 206

1  chance of getting more information out of
2  Maysonet, you want the same guys that talked to
3  him initially.  You wouldn't want to send two
4  unknown guys to talk to him; because the odds
5  are he'd clam up.
6  Q.  So you're now actively involved in
7  the investigation yourself, right?
8  A.  Developing information.
9  Q.  You're the only show in town.  What
10  other information was being developed?
11  A.  None, to my knowledge.
12  Q.  Okay.  So you were actively involved
13  in the investigation at this point; in fact,
14  you're the only thing -- you're the only person
15  that's developing information in this case --
16  as -- in this time period, right?
17  A.  I'm sure there was other detectives
18  working on it, but nothing concrete except for
19  Maysonet.
20  Q.  Can you tell me one bit of
21  information another detective developed between
22  May 25, 1990, and August 1st, 1990?
23  A.  No.  There might have been.  I don't
24  know.
25  Q.  But you can't -- You can't point me

Page 207

1  to anything, right?
2  A.  No.
3  Q.  So you decide you had such great
4  luck getting your first real lead in this
5  double murder from Mr. Maysonet on July 25,
6  1990, that you want to go talk to him again on
7  August 1st, 1990.  Right?
8      MR. ENGQUIST: Objection, form,
9  argumentative, misstates his previous
10  testimony.
11      Go ahead.
12      BY THE WITNESS:
13  A.  I would want to talk to him again to
14  see if he could give us more information about
15  who those three guys were.
16  Q.  And you didn't assign it to the
17  detective actually assigned to the case,
18  correct?
19  A.  No.
20  Q.  You decided that, because you had
21  had success with Montilla, and whatever --
22  whatever synergy was going on was working.  You
23  wanted to keep with that program, right?
24  A.  No.  What I -- He was cooperative
25  when he talked to us.  We didn't want to -- We

Page 208

1  didn't want to screw it up by sending two guys
2  that he didn't know and maybe be reluctant to
3  talk to them.
4  Q.  Right.  So whatever combination was
5  going on, you, Montilla, it had been
6  successful; and you didn't want to jeopardize
7  his cooperativeness by sending new people,
8  right?
9  A.  Exactly.
10  Q.  So you decided to go.  And tell me
11  what happened.
12  A.  I have no idea.
13  Q.  No independent recollection?
14  A.  None.
15  Q.  Do you remember, generally, whether
16  he spoke to you?
17  A.  No.
18  Q.  Do you remember what he said?
19  A.  No.  Outside of what the report
20  says.
21  Q.  Uh-huh.
22  A.  But I just don't.  For some reason,
23  I can't remember.  Maybe because I'm old, but I
24  can't remember.
25  Q.  All right.  Having read the report,

Maysonet v.
Guevara

Video Deposition

Page 209

1    you know he made more incriminating statements
2    --
3  A.  Right, exactly.
4  Q.  -- that amounted to almost a
5  confession, right?
6  A.  Pretty close to it.  At least he
7  puts himself with guys that did the murder.
8  Q.  Right.  And having provided the gun,
9  right?
10 A.  Yes.
11 Q.  That's -- that's pretty -- that's --
12    That's accountability right there.
13 A.  It is.
14 Q.  We can agree on that.
15 A.  It is.
16 Q.  Okay.  And accountability would make
17    him accountable and guilty of the murder if he
18    is prosecuted and it turns out that that
19    information -- a jury believes that
20    information --
21 A.  Uh-huh.
22 Q.  -- right?
23    MR. ENGQUIST: Objection, calls for
24    speculation, also legal conclusion.
25    BY MS. BONJEAN:

Page 210

1  Q.  Right?
2  A.  Yeah, could be.
3  Q.  Certainly as a detective who's
4  there, that gives you probable cause to arrest
5  him for the murder, right?
6  A.  You're talk- -- Now, you're talking
7  about the information after we talked to him
8  and he came up:  Yeah, I was with the guys that
9  actually did it?
10 Q.  Yeah.
11 A.  So you're talking about he should
12    have been arrested at that time?
13 Q.  I'm not saying he should have been.
14    I'm saying as of August 1st, 1990, when he's
15    told you that he provided the gun and was
16    present for the murders, that that's probable
17    cause to arrest him.
18 A.  He wanted a deal.  He wanted a deal.
19    You don't know what the circumstances were.  We
20    really didn't fully become aware of what the
21    circumstances were.  So if you would try to get
22    him charged, then writ him out, and talk to the
23    state's attorney, he might say:  No, you don't
24    have enough.
25    But he said that he would -- He'd be

Page 211

1    willing to make a deal for the names of the
2    offenders if we could, you know, if we can get
3    a deal for him.
4  Q.  I understand.  But I'm asking a
5  slightly different question.  Whether or not
6  you should have, could have writted him out and
7  charged him, is -- is the question I'm probably
8  going to ask you in a little bit.
9    But the question I want to know is:
10    You would agree that if someone tells you that
11    they provided the murder weapon and were
12    present for the murders, that that provides you
13    with a probable cause if you wanted to arrest
14    him for this offense.
15 A.  Probably could.
16 Q.  And at a minimum, you would agree
17    that this highly inculpatory communication
18    that's been made to you should be reported in
19    some type of written report.
20    MR. ENGQUIST: Object to form.
21    Go ahead.
22    BY THE WITNESS:
23 A.  Yes.
24 Q.  Did you prepare a report after
25    interviewing Mr. Maysonet at the Cook County

Page 212

1    Jail?
2  A.  I have no idea whether I did or not.
3  Q.  Okay.
4  A.  I have no -- I'm sure if I didn't
5  write a report, I passed it on to the assigned
6  detectives, whoever they were.
7  Q.  So it's possible that someone comes
8  as close to confessing to a crime as one can
9  come to, and that crime being a double murder;
10    and you didn't write it down.  That's possible.
11    Is that what you're saying?
12    MR. ENGQUIST: Objection,
13    argumentative, form.
14    BY THE WITNESS:
15 A.  I would say it's not possible.
16 Q.  Okay.  So you believe you wrote it
17    --
18 A.  Not that I wrote it down.  I passed
19    it on or wrote it down.
20 Q.  Okay.  My question is:  Then it is
21    possible that Mr. Maysonet essentially
22    confessed or came as close to confessing as one
23    can probably come to a double murder, and you
24    personally did not write it down?
25 A.  I -- I may have written it down.  I

Page 213

1  don't know.
2  Q.  It's also possible you did not write
3  it down, right?
4  A.  If I didn't write it down, I passed
5  it on to the assigned detectives and they wrote
6  it down.
7  Q.  So is it possible you did not write
8  down the words that Mr. Maysonet said to you on
9  --
10  A.  Possible.
11  Q.  -- August 1st?
12  A.  It's possible.
13  Q.  It's possible.  And according to
14  you, if you did not write it down you would
15  have passed it along to the assigned detective,
16  right?
17  A.  Absolutely, sure.
18  Q.  But you don't know who that assigned
19  detective was.
20  A.  I have no idea.
21  Q.  Have you been able to look at these
22  reports and tell me who you would have passed
23  that information along to?
24  A.  No idea, for sure.
25  Q.  And in fact, even if you had written

Page 214

1  it down, you would still want to have passed it
2  along to the assigned detective, right?
3  A.  Absolutely.
4  Q.  I mean, again, you don't -- You
5  don't get really more critical information than
6  someone saying, not only did I provide the
7  murder weapon, but I was present; so therefore,
8  I know who is responsible for the shooting.
9  And I myself may have been involved in this
10  crime.
11      That's -- That's as valuable
12  information as you can get in a double murder,
13  isn't it?
14  A.  Yes, right.
15  Q.  Okay.  So even if you didn't write
16  it down and even if you did write it down, you
17  certainly would have gotten on the blower
18  almost immediately to let the investigating
19  detective know, right?
20  A.  Absolutely.
21  Q.  But you can't tell us who that
22  detective was?
23  A.  I really don't know.  I don't
24  recall.
25  Q.  And having --

Page 215

1  A.  I have no idea.
2  Q.  And having prepared for this
3  investigation -- Strike that.
4      And having prepared for this
5  deposition in reviewing all the documents
6  reviewed, after reviewing all that, you can't
7  tell us --
8  A.  No.
9  Q.  -- whether you did that or who did
10  -- who you contacted?
11  A.  I have no idea who the assigned
12  detectives were.
13  Q.  Shouldn't the reports tell us who
14  the assigned detectives were on August 1st,
15  1990?
16  A.  I can't figure out who they were.
17  There's a number of detectives that were put on
18  that report; so I don't know which ones were
19  the assigned -- were assigned to that case.
20  Q.  And again, my question is:
21  Shouldn't we be able to -- you, me, and
22  everyone in this room -- look at the reports
23  and figure out who was the assigned detective
24  on August 1st, 1990?
25  A.  I couldn't.

Page 216

1  Q.  I know.  I couldn't either.  I'm
2  asking:  Shouldn't we be able to?
3  A.  We should be able to, yes.
4  Q.  So after this conversation on
5  August 1st, 1990, what happened next?
6  A.  I would have talked to the assigned
7  detectives and, since this guy wanted upfront
8  deal and asked the detectives to talk to the
9  State's Attorney's office and see if they could
10  go over the case and see if it would be
11  valuable enough or it would be good enough for
12  them to give this guy a deal.  And then testify
13  against -- give the names of the actual
14  offenders.
15  Q.  Did you do that?
16  A.  Did I what?
17  Q.  Did you talk to the assigned
18  detective and instruct him to contact the Cook
19  County State's Attorney and find out whether or
20  not a deal could be made to learn who the other
21  offenders were in the Wiley brothers' murders?
22  A.  I would have had to.
23  Q.  Okay.  I know you said you would
24  have.
25      Did you?

Maysonet v.
Guevara

Video Deposition

Page 217

1 A.  I'm sure I did.
2 Q.  Okay.  And do you have an
3 independent recollection of doing so?
4 A.  I would have because, when
5 Paulnitsky called the office to say that he had
6 Mays -- he was bringing Maysonet in, my first
7 concern was wait a minute, I thought somebody,
8 whoever they were -- I'm sure I knew at the
9 time -- was going to talk to the state's
10 attorney for a deal upfront, that bringing this
11 guy in would be premature.
12 Q.  My question is:  Did -- Do you have
13 an independent recollection of telling the
14 assigned detective to reach out and contact the
15 Cook County State's Attorney to determine
16 whether a deal could be made?
17 A.  I must have.
18 Q.  I know you're saying you must have.
19 But I'm asking you --
20 A.  To be honest with you, I don't know
21 who I talked to; but I would have had to talk
22 to them and pass that information on.
23 Q.  Do you have a recollection of doing
24 so?
25 A.  No.

Page 218

1 Q.  And have you seen any report or any
2 piece of paper that reflects that you contacted
3 the assigned detective and instructed him to
4 reach out to the Cook County State's Attorney
5 or any pieces of paper that shows that a
6 detective did, in fact, reach out to the Cook
7 County State's Attorney?
8 A.  Nothing.
9 Q.  So when you say you must have, this
10 is you assuming that you did this because
11 that's the only thing that's logical to you; is
12 that right?
13 A.  Yes.
14     MR. ENGQUIST: We've been going a
15 little over an hour.  Give him another
16 break?
17     MS. BONJEAN: If he needs one.
18     THE WITNESS: Yeah, sure.
19     THE VIDEOGRAPHER: We are going off
20 the record at 2:04 p.m.
21     (A short break was had.)
22     THE VIDEOGRAPHER: We are back at
23 the record at 2:41 p.m.
24     BY MS. BONJEAN:
25 Q.  Mr. Mingey, I believe that we were

Page 219

1 discussing, before we broke, the -- what
2 transpired after you met with Mr. Maysonet at
3 the Cook County Jail.  I wanted to go back to
4 one question, though, that I overlooked.
5     When you met with Mr. Maysonet the
6 first time at Area 5 after he was arrested by
7 detective Paulnitsky and he gave you this lead
8 about the Wiley brothers' murders, did he ask
9 for a deal during that meeting?
10 A.  According to Freddie, no.
11 Q.  Okay.  And when you say "according
12 to Freddie," you mean based on what Freddie
13 communicated to you in the room.
14 A.  Yes.
15 Q.  At no point did Freddie say to you
16 he's asking about a deal, right?
17 A.  No. The first time.
18 Q.  Right.  I'm talking about.
19 A.  Yeah, no.
20 Q.  You specifically remember him asking
21 about it the second time and, according to you,
22 you deduced or you -- You assumed that you went
23 back and, not only told the assigned detective,
24 but instructed the assigned detective to
25 contact the Cook County State's Attorney's

Page 220

1 office, right?
2 A.  Yes.
3 Q.  But you've not been able to find any
4 paperwork that would corroborate what you're
5 saying here today, have you?
6 A.  No.
7 Q.  Between your first meeting with
8 Mr. Maysonet and your second meeting with
9 Mr. Maysonet, you can't tell us any
10 investigative conduct or actions that were
11 taken by you or any of the detectives at Area
12 5, can you?
13 A.  None that I know of.
14 Q.  Okay.  And -- And you've not seen
15 any paper that would reflect what investigative
16 actions were taken between July 15th and
17 August 1, 1990, right?
18 A.  Not that I know of, no.
19 Q.  After this meeting on August 1st,
20 1990, at Cook County Jail, when Mr. Maysonet
21 essentially confessed or certainly made highly
22 incriminating statements about the Wiley
23 brothers' murders, apart from letting the
24 detective know, what did you do?
25     MR. ENGQUIST: Object to the form.

Maysonet v.
Guevara

Video Deposition

Page 221

1 　But go ahead.
2 　　BY THE WITNESS:
3 A. 　Outside of communicating what I --
4 　what I thought should be done to the detectives
5 　to go to the State's Attorney's office -- This
6 　guy wants to talk, but he won't until there's a
7 　deal hatched that would help him out. So and
8 　as far as I know, nothing occurred that I was
9 　aware of until Roland brought Maysonet in.
10 Q. 　But you were supervising --
11 A. 　Uh-huh.
12 Q. 　-- during this period of time,
13 　right?
14 A. 　I was.
15 Q. 　Yeah. And between August -- Strike
16 　-- Well, strike that.
17 　　Just for context, Mr. Maysonet was
18 　arrested on -- I believe it was August 22,
19 　1990. Does that sound right?
20 A. 　I'd have to look.
21 Q. 　All right.
22 A. 　I'm not good with dates anymore.
23 Q. 　So I will represent to you that he
24 　was arrested on August 22nd, 1990, okay? I'll
25 　show you reports shortly. But between

Page 222

1 　August 1st, 1990, when you spoke to him at Cook
2 　County Jail and over three weeks later on
3 　August 22nd, 1990, isn't it true that you were
4 　keeping up with the investigation?
5 A. 　I probably could have been. I'm
6 　sure I probably was. But I can't recall what,
7 　if anything, I did in the case at all
8 　afterwards.
9 Q. 　But you were, not only a supervisor,
10 　generally speaking, but this was a case that
11 　you had some more direct involvement in, right?
12 A. 　Yes.
13 Q. 　And you would have wanted to make
14 　sure that this near confession, if not full on
15 　confession was followed up on, right?
16 A. 　Absolutely.
17 Q. 　And what are the ways in which you
18 　would have made sure that the investigation was
19 　moving forward given the progress that you had
20 　made?
21 A. 　Talked to the assigned detectives
22 　and see what progress they made, see if they
23 　talked to the State's Attorney's office and
24 　what, if anything, they planned to do on that.
25 Q. 　And did you follow up and make sure

Page 223

1 　that they were --
2 A. 　You know --
3 Q. 　-- taking the necessary --
4 A. 　Sorry.
5 Q. 　-- steps to, again, talk to the Cook
6 　County State's Attorney, make sure that the
7 　case was moving forward?
8 A. 　I'm sure I probably did, or other
9 　supervisors did; but I can't specif -- I can't
10 　recall exactly what I did between that time. I
11 　don't remember.
12 Q. 　You have a vague recollection of
13 　speaking to any assigned detective about this
14 　issue?
15 A. 　Well, I'm sure initially after the
16 　admission in Cook County, I would have had to
17 　have talked to the assigned detectives and/or
18 　did a GPR.
19 Q. 　I know. And I know you said that.
20 　My question is: What recollection do you have
21 　of speaking with any detective between
22 　August 1st, 1990, and August 22nd, 1990?
23 　　MR. ENGQUIST: Objection asked and
24 　answered.
25 　　BY THE WITNESS:

Page 224

1 A. 　None.
2 Q. 　What recollection do you have of
3 　speaking to any person on the planet about
4 　Mr. Maysonet's case between August 1st, 1990,
5 　and August 22nd, 1990?
6 A. 　I can't recall any.
7 Q. 　And as you sit here today, you've
8 　not seen any piece of paper, report that tells
9 　you or refreshes your recollection about what
10 　might have been done in the investigation
11 　between August 1st, 1990, and August 22nd,
12 　1990, right?
13 　　MR. ENGQUIST: Objection, asked and
14 　answered.
15 　　BY THE WITNESS:
16 A. 　Between the jail and Maysonet being
17 　brought in by Paulnitsky?
18 Q. 　Correct?
19 A. 　No.
20 Q. 　But you -- You do remember
21 　Mr. Maysonet being brought in by
22 　Mr. Paulnitsky?
23 A. 　I remember him being brought in,
24 　right. Roland called the office and indicated
25 　that he was coming in to some -- I don't know

Page 225

1  if I talked to him or somebody else in the
2  office talked to him.  But Roland said to
3  either me or somebody in the office:  I'm
4  coming with Maysonet.
5      And I thought to myself -- Or he's
6  on the way in with Maysonet, and I thought to
7  myself:  This is way premature.
8      Because of my understanding that the
9  dicks were going to talk to the state's
10  attorney's office, I thought it was premature.
11  Q.  Did you ask -- Did you ask
12  Paulnitsky how it was that he came to be
13  bringing Mr. Maysonet in?
14  A.  No, no.  I don't know if I talked to
15  him on the phone or if somebody either talked
16  to him on the phone gave me that information.
17  I really don't know.
18  Q.  Why did Paulnitsky bring him in?
19      MR. ENGQUIST: Objection,
20  foundation.
21      BY THE WITNESS:
22  A.  Talked to him about the -- talked to
23  him about the case, apparently.
24  Q.  What's your understanding of why he
25  was bringing him in to Area 5?

Page 226

1  A.  Not sure.  Because, again, I thought
2  it was premature.
3  Q.  So -- And Paulnitsky wasn't assigned
4  -- the assigned detective on the case according
5  to you, right?
6  A.  I don't think so; but I could be
7  wrong.  But I don't think so.
8  Q.  Well, you previously testified that
9  one of the reasons that you chose to question
10  Mr. Maysonet on July 15th, 1990, rather than
11  just tell Paulnitsky to do it was because
12  Paulnitsky was investigating this unrelated
13  triple murder?
14  A.  Triple shooting.
15  Q.  I'm sorry.  Triple shooting.  And
16  you thought it best that a different person be
17  speaking to him or debriefing him on other
18  unsolved crimes, right?
19  A.  Right.  But that didn't mean he's
20  not the assigned detective.  I don't think so,
21  but ...
22  Q.  Well, if he was the assigned
23  detective, wouldn't -- it would make zero
24  sense, then, that you would just swoop in to
25  interview Maysonet, right?

Page 227

1  A.  Not necessarily, no.  If he's tied
2  up, he's -- he's trying to get this guy charged
3  with three counts of aggravated battery.  Would
4  the guy cooperate with him or a fresh face that
5  wants to talk to him about maybe he thinks he
6  could get a deal down the road.  Who knows?
7  Apparently, he did.
8  Q.  Well --
9  A.  So I'm just saying I don't know who
10  the assigned detective was.  I'm not saying
11  Roland was or wasn't.  I don't think he was,
12  but I don't know.  I really don't know.
13  Q.  Don't you think it is kind of
14  appalling that we're all sitting here wondering
15  who the assigned detective was?
16      MR. ENGQUIST: Objection, form,
17  argumentative.
18      BY THE WITNESS:
19  A.  Sure.
20  Q.  I mean --
21  A.  Maybe it will turn up.  I don't
22  know.
23  Q.  Where would that information be, in
24  your basement?
25  A.  Not in my basement, no.  It'd be in

Page 228

1  the investigative file, wherever that's at.
2  Q.  Well, we have the investigative
3  file, at least according to the City.
4  A.  You might have.  I don't know.
5  Q.  And as best I can tell, I haven't
6  found the information in the investigative
7  file, and you've indicated you've looked at
8  everything that's been --
9  A.  Yeah.
10  Q.  -- provided to you.
11  A.  Nothing.
12  Q.  And you can't find it, right?
13  A.  No.
14  Q.  So what's your best explanation for
15  why we can't find out this information?
16  A.  I have no idea.
17  Q.  You think it's just poor
18  recordkeeping on the part of the City?
19      MR. RAHE: Objection, form,
20  foundation.
21      BY THE WITNESS:
22  A.  No idea.
23  Q.  Well -- Okay.  So if you have no
24  idea, then it's possible that it's poor
25  recordkeeping on the part of the City, right?

Page 229

1 MR. RAHE: Objection, form,
2 foundation.
3 BY THE WITNESS:
4 A. Anything's possible.
5 Q. Including the fact that one of your
6 detectives destroyed information, right?
7 That's possible. You said anything's possible.
8 A. That's --
9 MR. LEINENWEBER: Objection, form,
10 foundation as well.
11 BY THE WITNESS:
12 A. -- very unlikely. Why would they do
13 that? Why would they do that?
14 Q. I get to ask the questions. I'd be
15 -- I would actually love to --
16 A. Okay. I'm sorry about that.
17 Q. No. I would love to answer the
18 question, but I don't think it would be a good
19 use of our time. I have my own theories.
20 But you're not -- You're unwilling
21 to say it's poor recordkeeping, right? You're
22 saying you have no idea, anything's possible,
23 right?
24 A. I have no idea where -- if they
25 exist, where they are.

Page 230

1 Q. Right. And therefore, it is
2 possible that one or more detectives destroyed
3 or concealed reports then?
4 A. Anything's possible.
5 Q. Okay. Now, you said you have an
6 independent recollection of Paulnitsky
7 informing you or someone at Area 5 that he had
8 Maysonet in custody and was bringing him to --
9 back to Area 5, right?
10 A. My understanding that he wasn't in
11 custody and that he was voluntarily coming in
12 with Paulnitsky to Area 5.
13 Q. Okay. So he was voluntarily
14 accompanying Paulnitsky at Area 5?
15 A. That was my understanding.
16 Q. What is your understanding of how
17 this -- how this happened?
18 A. No idea. Never talked to Roland
19 about this at all, that part of it.
20 Q. Never talked to Roland at all?
21 A. As far as I can recall, I'm sure I
22 talked to him on the day he brought him in; but
23 I -- I don't recall what, if anything, he said
24 or -- I'm sure I did talk to him.
25 Q. You don't have any recollection of

Page 231

1 speaking to Roland Paulnitsky about this case
2 prior to August 22nd, 1990, right?
3 A. When he was brought in to -- when he
4 was taken in by Paulnitsky from --
5 Q. Right. So August 22nd, 1990, is
6 when Roland Paulnitsky brought, either by
7 consent or not, depending on who you believe,
8 but regardless, August 22nd, 1990, is the date
9 on which Paulnitsky escorted Mr. Maysonet --
10 A. Uh-huh.
11 Q. -- to Area 5?
12 A. Okay.
13 Q. Okay? And am I correct that you
14 don't have any recollection of communicating
15 with Roland Paulnitsky about the Wiley
16 brothers' murders prior to that date?
17 A. No. Except -- You mean after the
18 jail? I would have talked to him because it
19 was his prisoner, and I asked him or Bongiorno,
20 his partner, if I could talk to the guy, I
21 would have told them what he said.
22 Q. So you -- So it's your testimony
23 that you remember specifically telling --
24 A. No. That's what I would have done.
25 I don't remember what I did.

Page 232

1 Q. Okay. I don't -- I -- I know you
2 think you may have done certain things; but
3 absent a recollection of doing that -- Well, I
4 appreciate you saying you think you would have
5 done that. Let me -- Let me drill down.
6 Do you have a recollection of
7 speaking to Paulnitsky about any aspect of the
8 Wiley brothers' murder investigation after
9 August 1st, 1990, and --
10 A. That was the jail --
11 Q. Right.
12 A. -- when I talked to him in the jail.
13 I probably -- Now, I don't have an independent
14 recollection for that, but I probably would
15 have told him what transpired.
16 Q. Okay. But you don't recall doing
17 so?
18 A. No. But I probably would have.
19 Q. I know you said that.
20 A. But no, I don't recall.
21 Q. I mean, but you can't tell us you
22 did because you don't remember it, right?
23 A. I don't remember talking to anybody
24 about this --
25 Q. Right.

Maysonet v.
Guevara

Video Deposition

Page 233

1  A.  -- that part.
2  Q.  You can't point us to any piece of
3  paper that would corroborate your hunch, right?
4  A.  I wish I could.
5  Q.  Right.  But you can't, right?
6  A.  No.
7  Q.  So you can't tell us that you spoke
8  to Paulnitsky after August 1st, 1990, before --
9  between August 1st, 1990, and August 22nd,
10 1990, right?
11 A.  I don't have a recollection of
12 talking to him.
13 Q.  Right.  And you can't tell us, as
14 you sit here today, why it was that Paulnitsky
15 came into contact with Mr. Maysonet on
16 August 22nd, 1990, right?
17 A.  No.
18 Q.  Or how it was that the two of them
19 ended up back at Area 5, correct?
20 A.  I don't have any recollection of
21 that at all.
22 Q.  They weren't friends, were they, as
23 far as you know?
24 A.  Not to my knowledge.
25 Q.  And what information do you recall

Page 234

1  about once Mr. Maysonet was back at Area 5 on
2  August 22, 1990?
3  A.  Nothing.
4  Q.  Zero?
5  A.  Zero.
6  Q.  Do you recollect that he was
7  eventually charged?
8  A.  Yes.
9  Q.  All right.  And do you have an
10 understanding of how he came to be charged?
11 A.  He -- apparently he gave information
12 to the detectives who -- that he was with a few
13 guys -- three other guys and they -- Somebody
14 within that group did the shooting, but it
15 wasn't him.
16 Q.  Okay.  And do you have a
17 recollection of this happening, or are you just
18 gleaning that from reports you've read --
19 reports you've read since?
20 A.  It's been so long ago.  I have a
21 recollection, a vague recollection; but I --
22 No.  I have kind of a vague recollection of
23 what occurred and supported by the -- by the
24 reports.  But do I have independent
25 recollection of what I talked to them about and

Page 235

1  what they said to me -- who I -- I guess I --
2  what did I -- arrest Gonzalez or one of the
3  other wanted offenders with Gawrys?  I don't
4  even recall that; although, I'm sure I did.
5  Q.  Okay.  Now, you must have -- It must
6  have occurred to you, once you heard
7  Mr. Maysonet was charged, that you were now a
8  witness in this murder prosecution, right?
9  A.  Sure.
10 Q.  I mean, you were there when he made
11 his first two alleged admissions to the crime,
12 correct?
13 A.  Correct.
14 Q.  And even if you told another
15 detective, that other detective wouldn't be
16 able to testify to that; only the person who
17 heard him say that would be able to testify to
18 that, right?
19 A.  Didn't Montilla testify?
20 Q.  Yeah, he did.  So one of two people
21 who heard these statements would be -- would be
22 able to testify, right?
23 A.  The one that could understand what
24 the -- what Maysonet was saying, yes.
25 Q.  The interpreter?

Page 236

1  A.  Yeah.
2  Q.  So the interpreter testified?
3  A.  I believe so.
4  Q.  Now if the interpreter is the only
5  person that would be able to give competent
6  testimony, why didn't the interpreter write a
7  report?
8      MR. ENGQUIST: Objection, asked and
9  answered.
10     BY THE WITNESS:
11 A.  I don't know.  I don't believe he
12 did write a report.  I would have told the
13 assigned detectives, whoever they were, to
14 write one or I would write one.
15 Q.  Okay.
16 A.  One of the two.
17 Q.  I understand you're not a lawyer,
18 but you've been in this business, or were in
19 this business long enough to know that, if a
20 defendant confesses or makes inculpatory
21 statements, it's only a detective who heard
22 those statements who would be able to testify
23 before a jury about the defendant making those
24 statements, right?
25 A.  Right.

Maysonet v.
Guevara

Video Deposition

Page 237

1 Q. Okay. So you knew, at least after
2 Mr. Maysonet was arrested, that only you or
3 Montilla would be able to give testimony about
4 what Mr. Maysonet told you on July 15th, 1990,
5 and August 1st, 1990, right?
6 A. Wrong. Just Montilla.
7 Q. Well, you could have testified.
8 A. I had no idea what he was saying.
9 Q. I've seen detectives testify all the
10 time about what was said to them through an
11 interpreter. That certainly happened, right?
12 A. I -- I don't know. If you have a
13 detective being the interpreter, he would -- He
14 did, I think, eventually go to court and
15 testify on this.
16 Q. Right. But you could have testified
17 by saying this is what was communicated to me,
18 right?
19 A. I would have, had they called me.
20 Q. Right. Okay. So having this
21 information that so -- Strike that.
22 So according to you, really there's
23 only one person on the planet that would be
24 able to testify to these statements if called
25 to testify, right?

Page 238

1 A. That was there at the time, yes.
2 Q. Montilla, right?
3 A. Montilla.
4 Q. Well, who was there at the time,
5 he's it. He's the only person that could
6 understand it, and he's the only person that
7 witnessed it, right?
8 A. Right.
9 Q. So according to you, there is one
10 person on the planet who would be able to
11 testify to what Mr. Maysonet told him during
12 these meetings on July 15th, 1990, and
13 August 1st, 1990. Right?
14 A. Right.
15 Q. So why, knowing that, why wouldn't
16 you tell that person to write a report about
17 what was said?
18 A. Like I said, I either wrote a report
19 myself or I gave it to the assigned detectives.
20 Q. Again, and my question is -- And I'm
21 not a detective, although I'm beginning to
22 think maybe I should have been. Why wouldn't
23 you have asked Montilla, knowing that he's the
24 only guy that can understand Maysonet if this
25 turns out that Mr. Maysonet gets charged --

Page 239

1 which had to be in your mind that it's a
2 possibility -- You're the one that's going to
3 have to hit the stand, you should be the one to
4 write the report.
5 MR. ENGQUIST: Objection, form.
6 BY THE WITNESS:
7 A. Didn't occur to me to have him do
8 it. He wasn't a Violent Crime guy.
9 Q. But yet you brought him in as the
10 only person who would be able to testify about
11 a confession to a double murder or statements,
12 inculpatory statements, about a double murder?
13 A. He's the only Spanish speaker on the
14 floor that I -- that I had confidence in.
15 Q. Didn't you have confidence in
16 Guevara?
17 A. He wasn't there.
18 Q. Okay. He could have come on August
19 1st, 1990; you could have worked around his
20 schedule, right?
21 A. Freddie Montilla's an excellent guy;
22 that's why I chose him.
23 Q. I understand that's why you chose
24 him. And he's an excellent guy and -- It just
25 brings me back to my original question was:

Page 240

1 Being an excellent guy, a Spanish speaker, the
2 only person who could understand what
3 Mr. Maysonet was saying, why wouldn't you have
4 told Montilla to prepare at least a GPR or
5 write some report about what this guy was
6 saying?
7 MR. ENGQUIST: Objection, ask and
8 answered, form.
9 BY THE WITNESS:
10 A. Either I did it, or I told somebody
11 -- I told somebody what occurred, and they
12 would have done it.
13 Q. Okay. You're really trying to have
14 it both ways. On one hand --
15 A. I'm just telling you what I think
16 occurred.
17 Q. But I'm not asking. One thing we
18 know didn't occur, and that is Montilla didn't
19 prepare a report and you never told Montilla to
20 prepare a report.
21 A. I don't believe I did.
22 Q. Okay. You testified that you
23 wouldn't have told Montilla to prepare a
24 report.
25 A. Right.

Maysonet v.
Guevara

Video Deposition

Page 241

1 Q. And you don't think you did tell him
2 to prepare a report, right?
3 A. Right.
4 Q. And we have Montilla himself saying
5 he didn't prepare a report; he was just the
6 interpreter, right?
7 A. Right.
8 Q. Okay. So we know one thing didn't
9 happen: Montilla did not prepare a report.
10 Right?
11 A. Right.
12 Q. Question is: Why? Knowing that
13 he's the only guy that could verify what was
14 being said, why not have him write a report?
15 A. Well, first of all, I may have
16 written a report; and secondly, I may have told
17 the assigned detectives to write a report.
18 Q. I know. You've said both those
19 things. I have a different question: Why
20 didn't you tell Montilla to write a report?
21 A. I thought the other way would be the
22 best way to go.
23 Q. Why did you think it was best way to
24 go?
25 A. Because he's not a homicide detect

Page 242

1 -- He's not a Violent Crime detective. He's
2 doing us a favor by actually doing what he did
3 by interpreting.
4 Q. Right. But he's not just an
5 interpreter. One minute you're saying he's an
6 interpreter; next minute you're saying he's the
7 only guy on the planet who knows what this --
8 what this -- what this suspect is confessing
9 to.
10 A. But he was.
11 Q. Okay. So he's not just an
12 interpreter. He was -- He's a detective who
13 was literally the only person that could hit
14 the stand, according to you, and say what
15 Mr. Maysonet was saying.
16 A. Right.
17 Q. In fact, Montilla testified up to
18 three or four times in the prosecution, right?
19 Pretty important?
20 MR. ENGQUIST: Objection,
21 argumentative.
22 BY MS. BONJEAN:
23 Q. Well, he's the only person that had
24 the ability to tell a jury and a judge what
25 Maysonet told him, right?

Page 243

1 A. Yes.
2 Q. Okay. Again, you're -- You're not a
3 dumb guy. You've had to have known that that
4 was -- that was going to happen.
5 A. Sure.
6 Q. At the time it was happening.
7 Here's a guy speaking in Spanish to another guy
8 who speaks Spanish. I can't understand what
9 the heck they're saying. I later come to find
10 out that he's basically confessing or coming
11 close to confessing. You had to have known
12 that that was potentially going to be evidence
13 in a double-murder prosecution, right?
14 MR. ENGQUIST: Objection, form and
15 argumentative.
16 BY THE WITNESS:
17 A. Right.
18 Q. So I don't understand why any
19 sergeant, someone who is supposed to be
20 overseeing investigations, wouldn't tell that
21 detective -- I don't care if he's Homicide,
22 Property Crime, it doesn't matter. He -- He's
23 the guy that's hearing the information, what --
24 And he's a great guy according to you.
25 A. He is.

Page 244

1 Q. So why wouldn't you just tell him:
2 Hey, prepare a GPR, prepare a sup?
3 MR. ENGQUIST: Objection --
4 Objection, argumentative, form, and it's
5 been asked and answered.
6 BY THE WITNESS:
7 A. Because I either did it or told the
8 assigned detectives to do it.
9 Q. But you -- you didn't -- You didn't
10 think it would be important to tell him to do
11 it?
12 A. No. It's important to be part of
13 the case; but I either did it myself or had the
14 assigned detectives do it.
15 Q. Okay. So you think it's logical to
16 have someone who didn't hear the statement and
17 who's never going to be able to testify to this
18 statement to be the one to document the
19 statement?
20 A. I don't think there's any problem
21 with me or another detective documenting the
22 case after talking to Freddie and putting it on
23 paper. I don't see a problem with that.
24 Q. In fact, that is by design, isn't
25 it?

Maysonet v.
Guevara

Video Deposition

Page 245

1  A.  How so?
2  Q.  Well, it's -- it's better.  Freddie
3  can't eat the paper of another officer, right?
4  He can't -- he can't -- he can't be impeached
5  with a state- -- a report of another officer,
6  right?
7      MR. ENGQUIST: Objection,
8  argumentative, calls for legal conclusion.
9      MR. RAHE: Foundation.
10      BY THE WITNESS:
11  A.  No idea what you mean.
12  Q.  Well, it was a practice of the
13  Chicago Police Department to have officers --
14  officers who reported, report events that were
15  witnessed by other officers, right?
16      MR. ENGQUIST: Objection, vague,
17  form.
18      BY THE WITNESS:
19  A.  Could you repeat that, please.
20  Q.  Yeah.  It was a practice of the
21  police department to -- to avoid having an
22  officer who actually witnessed a statement to
23  actually report the statement, it was better to
24  have somebody else report it?
25      MR. ENGQUIST: Objection, form,

Page 246

1  foundation.
2      BY THE WITNESS:
3  A.  Not to my knowledge.
4  Q.  Just doesn't matter which one?
5  A.  I don't think it does.
6  Q.  As long as it gets done, right?
7  A.  True.
8  Q.  And as you sit here today, you
9  cannot -- You cannot assure us that
10  Mr. Maysonet's statement from August 1st or his
11  statement from July 15th was ever memorialized
12  anywhere, can you?
13      MR. ENGQUIST: Objection, asked and
14  answered.
15      BY THE WITNESS:
16  A.  Either I did it or I told detectives
17  assigned to the case to do it.
18  Q.  I know.  You're -- you're -- But
19  that's speculation on your part.
20  A.  I would have done that.
21  Q.  I know you want to say --
22  A.  That's all I can tell you.
23  Q.  Well, no, it's not all you can say.
24  You are speculating.  You've already suggested
25  that you believe it's one of these two things,

Page 247

1  but you have no idea which one it is.  But you
2  can't tell us it was done because you don't
3  have an independent recollection of it, and you
4  can't point us to it.
5  A.  Right.
6  Q.  So you cannot tell us that
7  Mr. Maysonet's statement from July 15th was
8  memorialized in and around the time he made the
9  statement; and you can't tell us that
10  Mr. Maysonet's statement from August 1st was
11  memorialized in and around the time he made the
12  statement.
13  A.  No, but I'm sure that's what I did.
14  I would have done that, but ...
15  Q.  I know.  But you -- you can't -- you
16  can't -- you can't assure us of that because
17  you --
18  A.  No, I can't.
19  Q.  Okay.  I'm going to hand you --
20      MS. BONJEAN: First of all, can you
21  mark this, please?
22      (Mingey Deposition Exhibit
23      No. 2 marked as requested.)
24      BY MS. BONJEAN:
25  Q.  Handing you what's been marked as

Page 248

1  Exhibit 2.
2      Who are these people?
3      MR. ENGQUIST: I'm sorry.  What is
4  this?
5      MS. BONJEAN: Exhibit 2.
6      MR. ENGQUIST: No.  But what is this
7  Bates stamp?  I don't know what this is.
8      MR. LEINENWEBER: We just have them
9  in Dropbox with file names.  What -- Which
10  file?
11      MS. COHEN: Photos of men.
12      MR. LEINENWEBER: Photos of males?
13      MS. COHEN: Males.
14      MR. LEINENWEBER: And what are we
15  calling it?
16      MR. ENGQUIST: CCSAO 403.
17      MR. LEINENWEBER: What are we
18  calling it?
19      MS. BONJEAN: I'm waiting to find
20  out what it is.
21      MR. LEINENWEBER: No.  I mean which
22  exhibit number?
23      MS. BONJEAN: Oh, 2.
24      MR. ENGQUIST: This has been
25  produced in this case?

Page 249

1  MS. BONJEAN: Yes.
2  MR. ENGQUIST: I -- I don't know.
3  It says CCS. That's been used on different
4  cases. I have no idea who that is.
5  BY THE WITNESS:
6  A.  I have no idea who it is.
7  Q.  All right. You don't recognize
8  either of these guys?
9  A.  No, not really. No.
10 Q.  Okay. It's a mystery.
11 I'm going to hand you -- I'm going
12 to mark as 3 and 4.
13 (Mingey Deposition Exhibit
14 No. 3 marked as requested.)
15 (Mingey Deposition Exhibit
16 No. 4 marked as requested.)
17 MS. BONJEAN: RFC Maysonet 1
18 through 66. Does everyone have that?
19 MR. LEINENWEBER: Say that again.
20 MS. BONJEAN: RFC Maysonet 1
21 through 66. Everyone have it?
22 BY THE WITNESS:
23 A.  58?
24 Q.  Oh, maybe -- I'm sorry. You got an
25 incomplete -- Ash, make sure -- I don't think

Page 250

1  so.
2  So just hold on. A couple got out
3  of order. This is a mess.
4  MS. COHEN: Probably because it was
5  your copy.
6  MS. BONJEAN: Let me put that in --
7  Give me one second.
8  I don't want to give him
9  double-sided copies. Hold on. I'm sorry.
10 I think it goes through 40 and it's
11 missing. Do we have another set?
12 MS. COHEN: Hold on. Hold on.
13 MS. BONJEAN: Pull it up on the
14 computer for me?
15 MS. COHEN: Yeah.
16 MS. BONJEAN: All right. I'm going
17 to switch this. Okay. All right. Let's
18 do it this way. Can you pull it up on the
19 computer.
20 BY MS. BONJEAN:
21 Q.  Now I'm handing you Exhibit 3. I
22 believe it's RFC Maysonet 1 through 66.
23 A.  Okay.
24 Q.  If you could confirm that for me,
25 sir, I would appreciate it.

Page 251

1  A.  It is.
2  Q.  Okay. That copy is double-sided. I
3  hope that's not too annoying for you.
4  A.  No.
5  Q.  Okay. I'm going to represent to you
6  that it has been represented to us that this is
7  the investigative file of the case.
8  And does the first page there, which
9  is RFC Maysonet 1, look like the cover of an
10 investigative file?
11 A.  I can't tell. I really don't know.
12 Q.  I'm not saying of this investigative
13 file, but does it look like what the
14 investigative files for murder cases or any
15 case at Area 5 look like?
16 A.  Not to me, no.
17 Q.  How did they usually look? What's
18 -- What's different about that?
19 A.  Case report's first.
20 Q.  I'm talking about the outside of the
21 file.
22 A.  You're talking about the envelope
23 it's in.
24 Q.  Yeah. Does that look --
25 A.  Could be. Could be.

Page 252

1  Q.  I know it could be. Anything could
2  be. Does that look like -- What does that look
3  like to you? It says -- It looks like it's a
4  manila sort of file, right? It has in the
5  right-hand corner 90-50 and 90-51.
6  Do you see that?
7  A.  I do.
8  Q.  And it has some names there:
9  Assigned P. Boyle, Tapkowski, Dickinson. Do
10 you see that?
11 A.  I do.
12 Q.  Okay. What does it look like to
13 you, if not the outside of an investigative
14 file?
15 A.  It could be. I don't know.
16 Q.  What else could it be, if not an
17 investigative file?
18 A.  No idea.
19 Q.  Okay.
20 A.  It could be.
21 Q.  It could be, but what else could it
22 be?
23 A.  I don't know.
24 Q.  Well, it sounds like, then, the only
25 hypothesis you have is that it's an

Maysonet v.
Guevara

Video Deposition

Page 253

1  investigative file.
2      MR. ENGQUIST: Objection,
3  argumentative and harassing now. He's
4  given you an answer. You just don't like
5  it.
6      MS. BONJEAN: It's not that I'm not
7  liking it; it's just a dishonest answer.
8      MR. ENGQUIST: No. The dishonest
9  answer would be him saying that he -- He
10  knows something that's not true. He
11  doesn't know something, and he just said he
12  didn't know it.
13      BY MS. BONJEAN:
14  Q.  I understand what else could it be?
15  You said it could be an investigative file,
16  which suggests to me that you think it could be
17  something else?
18  A.  Could be anything.
19  Q.  Okay. So it could be -- it could --
20  it could be -- What are the other
21  possibilities? It could be a -- I mean, I
22  don't want to put words in your mouth, but what
23  are the other possibilities? Give me one other
24  possibility of what it could be.
25  A.  No idea.

Page 254

1  Q.  Does it seem consistent with what an
2  investigative file --
3  A.  It could be.
4  Q.  Not my question. Does it seem
5  consistent with what an investigative file
6  looks like?
7  A.  These numbers on the investigative
8  file -- the dicks are Area 5 dicks. Certainly
9  could be the cover of an investigative file. I
10  don't know. No idea. Could be.
11  Q.  Okay. Well, if --
12  A.  I'm not trying to be a wise guy
13  here, but it could be. I don't know for sure
14  what it is.
15  Q.  Okay. So it could be, for instance,
16  a file that was fabricated by Detective
17  Guevara, right?
18      MR. LEINENWEBER: Objection,
19  foundation, argumentative.
20      BY THE WITNESS:
21  A.  I don't know what it is.
22  Q.  It could be a file that was
23  fabricated by Detective Guevara, right?
24      MR. LEINENWEBER: Same objections.
25      BY THE WITNESS:

Page 255

1  A.  I doubt that.
2  Q.  Okay. But you said it -- all of a
3  sudden -- I'm giving you some other "could
4  be's," and you're sure it's not a file
5  fabricated by Detective Guevara?
6      MR. LEINENWEBER: Same objections,
7  also asked and answered several times now.
8      MR. ENGQUIST: Join.
9      BY MS. BONJEAN:
10  Q.  Could be though, right?
11  A.  I have no idea what it is. Could be
12  an investigative file. Don't know.
13  Q.  It could be a bogus file fabricated
14  by a detective at Area 5. It could be, right?
15      MR. LEINENWEBER: Same objections.
16      BY THE WITNESS:
17  A.  Why would a detectives at Area 5
18  bogus up a file folder?
19  Q.  I don't know. There's a lot of men
20  in prison that have some theories about that.
21  But I'm -- I'm asking you, since you're the one
22  that has taken a position that you don't know
23  what it is; it could be anything.
24      I'm asking you to agree, then, if it
25  could be anything -- You have no clue what it

Page 256

1  is -- that it could be, then, a file fabricated
2  by a detective at Area 5.
3      MR. LEINENWEBER: Same objections,
4  also asked and answered several times.
5      BY THE WITNESS:
6  A.  Could be an investigative file. I
7  really don't know. I don't know what it is.
8  Q.  And it could be a bogus file that
9  was just, again, pieced together by some
10  detective at Area 5 to pretend that, you know,
11  there was a proper investigation done. Right?
12      MR. LEINENWEBER: Same objections.
13  This is about the fifth time.
14      BY THE WITNESS:
15  A.  I can't see that happening.
16      MR. ENGQUIST: Join.
17      BY MS. BONJEAN:
18  Q.  I know you can't. But since
19  anything is possible, according to you, it
20  could be anything. That's one possibility,
21  isn't it?
22      MR. LEINENWEBER: Same objections.
23      BY THE WITNESS:
24  A.  Not the way I look at it. I don't
25  know what this is. Could be an investigative

Page 257

1  file. I really don't know what it is.
2  Q. And it could -- it could be -- It
3  could be anything, right?
4  A. Could be anything.
5  Q. And if the City was representing
6  that this was the investigative file, they
7  could be lying. Right?
8      MR. RAHE: Objection, form,
9  foundation, argumentative.
10     BY THE WITNESS:
11 A. I can't even answer that question.
12 Q. Well, it could -- you're Mr. "It
13 could be anything," so that's one possibility,
14 isn't it?
15 A. I don't have any recollection. It
16 doesn't -- This doesn't look like anything to
17 me.
18 Q. Okay. Well, now we're getting
19 somewhere. It does -- You say it doesn't look
20 like anything to you.
21     When you say that, what do you mean
22 by that?
23 A. It could be an investigative file or
24 it couldn't be. I have no idea. How can I --
25 What do you want me to say?

Page 258

1  Q. I don't want -- I want you to tell
2  me.
3  A. I don't know what it is.
4  Q. Okay.
5  A. Could be an investigative file. I
6  don't know.
7  Q. I have just let you know that the
8  City of Chicago, your former employer, has
9  represented to me that this is an investigative
10 file for this case. And you are telling me:
11 Hey, it doesn't really look like an
12 investigative file.
13    So as -- As an attorney on this case
14 who wants to do her job, don't you think I
15 might want to ask you: Well, what do you think
16 it could be, if not the investigative file?
17 A. No idea.
18    MR. ENGQUIST: Objection, form,
19 argumentative.
20    MR. RAHE: Asked and answered. He
21 doesn't know.
22    BY MS. BONJEAN:
23 Q. So the City has represented that
24 this is an investigative file; but you're
25 telling me it doesn't look like an

Page 259

1  investigative file, right?
2  A. I'm saying I don't know what it is.
3  It could be an investigative file. How can I
4  say this is an investigative file folder just
5  by looking at this? It certainly could be.
6  Q. Well --
7  A. I don't know.
8  Q. -- doesn't the City of Chicago have
9  an obligation to maintain records?
10 A. They do.
11    MR. RAHE: Objection, foundation.
12    BY MS. BONJEAN:
13 Q. And when they represent that these
14 are the records that are responsive to requests
15 for the investigative file, should I take them
16 at their word, or should I not?
17 A. Why not? Take them at their word.
18 Q. Okay. So now they have represented
19 to me that this is the investigative file.
20    Do you have any reason to doubt
21 them?
22 A. No.
23 Q. Okay. So the fact that you think
24 maybe it doesn't look quite like an
25 investigative file is just --

Page 260

1  A. It looks like a kind of yellow piece
2  of paper with numbers on it and dicks' names on
3  it. I don't know what it is.
4  Q. Okay.
5  A. If they -- the City said it's an
6  investigative file, I'm sure it was.
7  Q. Okay. Great. They say it's the
8  investigative file.
9     MR. RAHE: I'm just going to object
10 to whatever the City has said to her.
11    MS. BONJEAN: The City certified
12 that this was the investigative file.
13    MR. RAHE: This will get in on the
14 record.
15    MS. BONJEAN: But since you brought
16 it up, I would ask that the City confirm
17 that it is, in fact, the investigative
18 file, since now, you know, we have doubt
19 about it. We'll follow up with a letter.
20    MR. RAHE: Great.
21    BY MS. BONJEAN:
22 Q. Okay. So I want to go to the very
23 last page. We're going to work backwards.
24 A. Okay.
25 Q. And if you could turn that page

Maysonet v.
Guevara

Video Deposition

Page 261

1  over, and it says RFC Maysonet 65; and then on
2  the back page is 66.
3      Do you see that?
4  A.  Yes, I do.
5  Q.  Okay.  I would call this a General
6  Offense Case Report.  What would you call it?
7  A.  General Offense Case Report.
8  Q.  Okay.  Now it seems to me this says
9  Gloria Sanchez.  I don't -- are you -- Do you
10  have any reason to believe there's a Gloria
11  Sanchez that's involved in this case?
12  A.  Not to my knowledge, no.
13  Q.  Okay.  You can put that aside.
14  A.  Okay.
15  Q.  I'm going to have you now look at
16  RFC Maysonet 64.  Do you see that?
17  A.  I do.
18  Q.  And the page on the other side is
19  RFC 63.
20      Do you see that?
21  A.  I do.
22  Q.  Okay.  And then -- And what do you
23  recognize this to be?
24  A.  Progress report.  Supplementary
25  progress reports.

Page 262

1  Q.  Okay.  And whose name -- who is --
2  Whose name is on it?
3  A.  Boyle and Brennan.  Detectives?
4  Q.  Uh-huh.
5  A.  Yeah.
6  Q.  And can you tell us when this report
7  was submitted?
8  A.  They've got the 25th; I signed it on
9  the 26th.
10  Q.  So -- And if you just put that right
11  there for a second, I'm going to have you look
12  at this next report here --
13  A.  Okay.
14  Q.  -- that goes from RFC 59 to 62.
15  A.  Okay.
16  Q.  Do you see that?
17  A.  Uh-huh.
18  Q.  Okay.  So what do you recognize this
19  report to be?
20  A.  Progress.
21  Q.  A supplemental report?
22  A.  Yeah.  Progress -- progress
23  supplemental report.
24  Q.  Where do you see "progress" on this?
25  A.  Middle right.

Page 263

1  Q.  Got it.  Progress report.  And what
2  does it mean that it says field investigation?
3  A.  I'm sorry.  Where does it say --
4      Okay.  That would be probably part of the
5  format they're using.
6  Q.  And who are the detectives that were
7  assigned to this?
8  A.  Tapkowski and Boyle.
9  Q.  All right.  Now, this appears to be
10  a report that was submitted on May 25th of
11  1990, at 8:00 a.m., right?
12  A.  Right.
13  Q.  Which was not long after the murder,
14  the occurrence, right?
15  A.  Apparently so, right.
16  Q.  According to the report, the
17  occurrence or the murders happened on May 25th,
18  1990, at 1:00 in the morning, right?
19  A.  Right.
20  Q.  Now, the fact that Tapkowski and
21  Boyle have prepared this report shortly after
22  the murders have occurred, does that mean that
23  they were the assigned detectives?
24  A.  No.  They were midnight guys.  They
25  wouldn't really be assigned to this job.  They

Page 264

1  would -- The job would be reassigned to
2  somebody on the second and third -- or third
3  watch.
4  Q.  Why is that?
5  A.  Because the midnight guys, their
6  main focus is on current things that happen on
7  midnights.  So they -- You would want a team
8  that could give this a lot more work than just
9  a midnight guy.  Because he'd be tied up
10  working midnights, be tied up on current stuff
11  that happens on the watch, and also it'd be
12  difficult to locate witnesses and so forth on
13  the midnights.  You wouldn't want to disturb
14  people.
15  Q.  So are you of the view that these
16  guys were just assigned to go do an initial
17  field investigation?
18  A.  They would probably be canvass guys,
19  I would say.
20  Q.  Okay.  And is that because they
21  happen to be on duty at the time that the
22  murders occurred, the shooting occurred?
23  A.  Sure, yeah.
24  Q.  So when we talked about trying to
25  figure out who the assigned detectives were --

Maysonet v.
Guevara

Video Deposition

Page 265

1  And when I say the "assigned detectives," I
2  mean the detectives assigned to investigate the
3  Wiley brothers' murders.
4      You're fairly confident that
5  Tapkowski and Boyle are not the assigned
6  detectives?
7  A.  Yeah, I'm pretty confident that they
8  weren't.
9  Q.  Excuse me.  Okay.
10      Would you think that they probably
11  went to the scene, though?
12  A.  Pardon.
13  Q.  Would you think they probably went
14  to the scene?
15  A.  I would say so.
16  Q.  Okay.  So let's look at the next
17  page, which is RFC Maysonet 60, which is page 2
18  of this report.
19  A.  Okay.
20  Q.  Do you see how there's these wanted,
21  injuries, taken to, weapon --
22  A.  Right.
23  Q.  -- location?
24      Is that the format of the report
25  that we were talking about?

Page 266

1  A.  That would be a format, yes.
2  Q.  And is that a format for like a
3  canvass report or an initial field
4  investigation?
5  A.  Initial field investigation.  Yeah,
6  it could be.
7  Q.  Okay.
8  A.  It certainly could be, but -- It
9  could be.
10  Q.  All right.  So it -- It indicates
11  that the possible weapon used -- right, which
12  is the 9 millimeter?
13  A.  Right.
14  Q.  And is this information, I'm
15  guessing, you would have reviewed since your
16  name is the approving sergeant, right?
17  A.  Right.
18  Q.  Is this maybe where you got the 9
19  millimeter information?
20  A.  I don't know.  Could be.
21  Q.  Okay.  One place you could have
22  gotten it from, right?
23  A.  Uh-huh, right.
24  Q.  Any other possibilities, maybe just
25  talking to somebody?

Page 267

1  A.  Certainly could be.
2  Q.  All right.  And it says the motive
3  is unknown at this time, right?
4  A.  Yeah.
5  Q.  Nothing about the crime scene or any
6  investigative work that had been done prior to
7  whenever this report was submitted that gave
8  the officers an idea of what the motive was,
9  correct?
10  A.  Correct.
11  Q.  And it looks as if there was some
12  canvassing of the neighborhood based on this
13  report, right?
14  A.  Yes.
15  Q.  There's actually a narrative written
16  here; describes the scene, describes the
17  location, right?
18  A.  Yes.
19  Q.  And some people were interviewed in
20  connection with what they heard or observed on
21  the early morning hours of May 25th, 1990?
22  A.  Right.
23  Q.  Doesn't appear to be any
24  eyewitnesss; is that right?
25  A.  Not to my knowledge, no.

Page 268

1  Q.  Pretty busy street, though, correct?
2  A.  Pretty busy.
3  Q.  As a detective, would you expect
4  that somebody would have heard or seen
5  something?
6  A.  I'm sure somebody probably did and
7  just maybe didn't want to come forward, or
8  maybe nobody saw it.  It's hard to say.
9  Q.  But again, you have to work on
10  plausibilities when you're investigating a
11  case.  I know anything's possible; but
12  certainly you have to work with theories.  And
13  one theory is that probably somebody saw
14  something, right?
15  A.  That's why you canvass.
16  Q.  Right.  I mean, if someone's
17  murdered in the middle of the woods, there's
18  less of a likelihood it's witnessed than on
19  North Avenue.
20  A.  Right.
21  Q.  Can we agree on that, at least?
22  A.  Sure.
23  Q.  Okay.  Great.  And we can see by
24  this, there were a lot of addresses that had
25  people living in them that were places that

Maysonet v.
Guevara

Video Deposition

Page 269

1    detectives might want to inquire --
2    A.  Right.
3    Q.  -- of whether they saw anything,
4    correct?
5    A.  Correct.
6    Q.  And it looks like from this report,
7    unless you can point me to anything else, not
8    much was yielded from this, correct?
9    A.  No.  Due to the lateness of the
10   hour, that's probably why.
11   Q.  Well, I mean, there's one -- I mean,
12   I could argue alternatively that the lateness
13   of the hour means people were probably home and
14   not at work, right?
15   A.  Could be.  Most probably.
16   Q.  And that means that they would be
17   more available to respond to an inquiry by
18   investigating detectives.
19   A.  Or not want to get involved and not
20   answer the door.  It's hard to say.
21   Q.  Hard to say, right?  But whatever --
22   Whatever the reasoning is -- people were
23   sleeping, they were uncooperative -- I mean,
24   some people did talk to the police, right?
25   A.  Yes.

Page 270

1    Q.  And is it a good idea to go back and
2    canvass maybe a second time in case you miss
3    people who were not there or --
4    A.  Absolutely.
5    Q.  Do you know whether that was done in
6    this case?
7    A.  I don't know offhand.
8    Q.  All right.  But this report was
9    submitted on May 25th, 1990, at 8:00 a.m.
10   Correct?
11   A.  Right.
12   Q.  Signed off by you?
13   A.  Right.
14   Q.  Anything about this report that
15   stands out to you that looks problematic, or
16   does it look like it's in order?
17   A.  Looks like it should look, a canvass
18   report, went to the ME's office apparently, and
19   -- but no, that's kind of standard.
20   Q.  And it's still pretty much a mystery
21   about who did this, right?
22   A.  Yes, right.
23   Q.  Now I'm going to have you look back
24   at that report that was Bates stamped 63 and
25   64.

Page 271

1    A.  Okay.
2    Q.  And this one is submitted on May
3    25th, 1990, at 1630 hundred, which is what,
4    like 4:30 p.m.?
5    A.  Right.
6    Q.  So same day as the murders but later
7    in the afternoon, correct?
8    A.  Uh-huh.  Correct.
9    Q.  You also signed off on this report,
10   right?
11   A.  Right.
12   Q.  In fact, you signed off -- You
13   approved this report literally 20 minutes after
14   you approved the other report, right?
15   A.  Right.
16   Q.  So you probably looked at both these
17   reports around the same time.
18   A.  Probably.
19   Q.  And this report says Progress Report
20   and involves interviewing members of the
21   victims' family and/or girlfriend, correct?
22   A.  Yes.
23   Q.  Why would you want to interview
24   members of the family or a girlfriend?
25   A.  Want to interview everybody you

Page 272

1    could, find out where these guys were going,
2    who they were going to see, if they have that
3    kind of information.  That's what you'd want to
4    find out.
5    Q.  Right.  You would also want to find
6    out whether or not they were -- They might be
7    involved in criminal activity, right?
8    A.  You're trying to find out really
9    where the victims were.  You're talking about
10   the victims' family?
11   Q.  Yeah.  You want to know if they got
12   -- I mean, you want to know what they're up to,
13   why they got murdered, right?
14   A.  What they're up to -- Yeah.
15   Primarily why were they were there and who were
16   they going to meet.
17   Q.  Why are they on North Avenue at
18   1:00 a.m.?
19   Right?
20   A.  Right.
21   Q.  Are they doing a drug deal, or are
22   they just catching the bus to, you know --
23   A.  Right.
24   Q.  -- go to catch them -- their --
25   their work shift at 5:00 a.m., right?  I mean,

Maysonet v.
Guevara

Video Deposition

Page 273

1  I don't know. Anything's possible, right?
2  A.  Uh-huh.
3  Q.  But that's why you talk to the
4  family members, correct?
5  A.  Right.
6  Q.  And having talked to the family
7  members, there was nothing to indicate that
8  these -- these individuals were up to criminal
9  activity when they were shot, correct?
10 A.  Not to my knowledge, no.
11 Q.  I mean, nothing that the family gave
12 you or the girlfriend gave to the detectives?
13 A.  I'd have to reread this, but I don't
14 think so.
15 Q.  Okay.  You can take your time, if
16 you want.
17 A.  Okay.  Okay.
18 Q.  All right?
19 A.  Uh-huh.
20 Q.  Anything in there that gave you an
21 inkling that Torrence and Kevin Wiley were
22 murdered in the course of some criminal
23 activity?
24 A.  No.
25 Q.  I'm going to, now, have you look at

Page 274

1  RFC Maysonet 55 and 56; again, we're moving
2  backwards.
3  A.  Okay.
4  Q.  And another report submitted on May
5  25th, 1990, correct?
6  A.  Correct.
7  Q.  Now, I see these detectives are
8  Detective Willie Ware and Joseph Kondal.
9  A.  Right.
10 Q.  Were they the assigned detectives to
11 the case?
12 A.  No, they wouldn't be.
13 Q.  And why do you know that?
14 A.  I think Kondal, at the time, was a
15 Robbery guy; and Willie Ware, I'm not sure what
16 he was.  I'm not sure what shift he was on
17 either.
18 Q.  Well, this report doesn't indicate
19 what time it was submitted, but it appears to
20 be approved by you at 1750, which is -- can we
21 agree at the same time you're looking at the
22 other reports?
23 A.  Pretty close.
24 Q.  Within five minutes of the last
25 report, right?

Page 275

1  A.  Right.
2  Q.  So all three of these reports were
3  approved by you, the three that we've looked
4  at, between -- within a matter of 25 minutes?
5  A.  Right.
6  Q.  All submitted on May 25th, 1990; all
7  approved by you the following day; all within a
8  25-minute period.
9  Right?
10 A.  Right.
11 Q.  Now this report says it's a canvass
12 report.  What does that mean?
13 A.  It's a canvass report seeing if they
14 could talk to people in the neighborhood that
15 might have an eyeshot or earshot of the
16 incident, the murder, and see if they could
17 give evidence information.
18 Q.  And, in fact, they found someone who
19 sort of was a -- an occurrence, at least
20 through earshot, right?
21 A.  Right.
22 Q.  This Alma Preceeo and her sister
23 Carmen Macias, right?
24 A.  Uh-huh.
25 Q.  Go ahead and take a look at that.

Page 276

1  A.  Okay.
2  Q.  And then I have some questions for
3  you.
4  A.  Uh-huh.
5  Q.  Let me know when you've had a chance
6  to look at it.
7  A.  Okay.
8  Q.  All right.  So Ms. Preceeo was able
9  to provide that around midnight she heard two
10 -- two male English voices arguing with each
11 other over the course of an hour outside of
12 North Avenue, correct?
13 A.  Right.
14 Q.  She heard bits of the conversation
15 such as I'm trying to help you, I'm going to
16 kill you, I'm going to kill you first, you said
17 that we would get the last bus.
18 You see that?
19 A.  I do.
20 Q.  Okay.  Again, doesn't sound like a
21 gang-related type of incident -- right? --
22 based on what she's reporting?
23 A.  Not so far, no.
24 Q.  Okay.  I mean -- And then we have
25 also her sister, Carmen Macias, who said she

Maysonet v.
Guevara

Video Deposition

Page 277

1 heard the sound of two male blacks having an
2 argument.
3     Do you see that?
4 A. Right.
5 Q. One sounded kind of drunk and loud,
6 and the other one was more calm, she reports.
7 And, again, she heard parts of the argument; it
8 lasted for about an hour.
9     Do you hear [sic] that?
10 A. Uh-huh.
11 Q. She heard the name Lulu Dog
12 referenced.
13 A. Right.
14 Q. Disagreement about a bus, and then
15 she heard shots.
16     Do you see that?
17 A. I do.
18 Q. Again, nothing about what Carmen
19 Macias is reporting that sounds like this is a
20 gang-related shooting, correct?
21 A. Hard to know what it is at this
22 point.
23 Q. Right. But gangbangers don't
24 usually hang out for an hour arguing back and
25 forth before they shoot each other, right?

Page 278

1     MR. RAHE: Objection, foundation.
2     BY THE WITNESS:
3 A. The Wiley brothers? You're saying
4 the Wiley brothers shot each other?
5 Q. No. I'm saying the information we
6 have here are male black voices arguing and
7 then it -- eventually leading to shots fired by
8 somebody.
9 A. Yes.
10 Q. Okay? Again, nothing about what's
11 been communicated by these women, who seem to
12 have at least heard what preceded the shooting,
13 that suggests that this was a, for instance, a
14 drive-by shooting, correct?
15 A. Correct.
16 Q. Nothing about hearing Latino voices
17 or Hispanic or people with Spanish-speaking
18 accents or anything of that nature, correct?
19 A. Correct.
20 Q. Again, if you're a detective who's
21 investigating this case, so far, the
22 information you've developed is yes, it
23 happened in Latin Kings' territory, but nothing
24 thus far is pointing at Latin Kings. Correct?
25 A. Outside of the location --

Page 279

1 Q. Right.
2 A. -- correct.
3 Q. A crime could happen in Latin King
4 territory and not be the result of a Latin King
5 committing it, right?
6 A. Right.
7 Q. There are law-abiding people who
8 live in Latin King territory, correct?
9 A. There sure are.
10 Q. And there are non law-abiding people
11 living in Latin King territory who aren't Latin
12 Kings, correct?
13 A. Right.
14 Q. I mean there could be a pedophile
15 living in the area who is not a Latin King,
16 right?
17 A. Sure could be.
18 Q. There could be, you know, all types
19 of different types of people; just because it's
20 a Latin King territory doesn't mean Latin Kings
21 committed every crime in that area, right?
22 A. No. But it kind of gives you a
23 direction.
24 Q. Right. But -- And you started with
25 that direction, but now you would admit,

Page 280

1 looking at the rap sheets and the canvass
2 reports, it's not taking you in that direction;
3 it's taking you in a different direction,
4 correct?
5     MR. ENGQUIST: Objection,
6 argumentative.
7     BY THE WITNESS:
8 A. I have no idea what direction it's
9 taking us.
10 Q. Well, if you have tunnel vision as a
11 police officer and assume that it has to be a
12 Latin King, then that's the direction you would
13 go in, right?
14 A. It would be one direction to
15 explore, sure.
16 Q. Right. But what I'm saying is:
17 After 24 hours of investigating -- and we have
18 three reports to look at and we have a rap
19 sheet of the victims -- an open-minded
20 detective would maybe still consider the
21 possibility of it being a gang-related
22 shooting, but also would say, you know: This
23 looks like it's going in a different direction.
24     Right?
25     MR. ENGQUIST: Objection,

Maysonet v.
Guevara

Video Deposition

Page 281

1 argumentative.
2    BY THE WITNESS:
3 A.  No idea what direction it's going
4 to.
5 Q.  You don't draw any inferences from
6 what these witnesses reported?
7 A.  Could be anything.  Could be a
8 robbery, could be two guys walking in a
9 neighborhood they shouldn't be in, thinking
10 that they were offenders, thinking they were
11 rival gangbangers, could be a dope deal; it's
12 hard to say what it is.
13 Q.  Okay.  Well, what facts lead you to
14 believe it could have been a dope deal?
15 A.  It's just the same as any other
16 fact.
17 Q.  Okay.  But would it make it more
18 likely if it was a dope deal if the victims
19 were drug users or drug sellers?
20 A.  Yeah, sure.
21 Q.  Okay.  And they weren't, as far as
22 we can tell from their rap sheets at least,
23 right?
24 A.  Doesn't look like it.
25 Q.  Okay.  So again, anything's

Page 282

1 possible, but as a detective, you have to
2 follow leads.  Isn't that your job?
3 A.  Sure.
4 Q.  Okay.  And can we agree that the
5 little bit of information that's been developed
6 this far is not leading us in the direction of
7 a -- a gang-related shooting?
8    MR. ENGQUIST: Objection,
9 argumentative, asked and answered.
10    BY THE WITNESS:
11 A.  Not leading us in really any
12 direction at this point.
13 Q.  I think -- I mean, it's not leading
14 you in any direction?
15 A.  No.
16 Q.  You have two victims, African
17 Americans, who aren't from the community,
18 arguing potentially or being part of an
19 argument potentially on a street for an hour
20 that have pretty minimal backgrounds that don't
21 suggest that they're gangbangers or drug
22 dealers or even drug users, for that matter,
23 that get shot down, executed on North Avenue on
24 a busy street.
25    That doesn't give you some leads,

Page 283

1 some ideas that you want to follow?
2    MR. ENGQUIST: Objection, form,
3 argumentative, asked and answered.
4 BY THE WITNESS;
5 A.  Gang bang, drug deal, robbery, could
6 be anything.
7 Q.  Okay.  Well, at least according to
8 Carmen Macias, the only voices she heard were
9 male black voices, right?
10 A.  Right.
11 Q.  She didn't hear anyone with a thick
12 Puerto Rican accent, did she?
13    MR. ENGQUIST: Objection, asked and
14 answered.
15    BY THE WITNESS:
16 A.  No.
17 Q.  And you had the privilege of
18 speaking to Mr. Maysonet, allegedly; and you
19 heard how -- what his manner of speak is,
20 right?
21 A.  I did.
22 Q.  And he was speaking Spanish
23 according to you, correct?
24 A.  Correct.
25 Q.  Pretty thick accent, right?

Page 284

1 A.  Very much so.
2 Q.  Didn't sound like a male black, did
3 he?
4 A.  No.
5 Q.  All right.  Now you can put that to
6 the side.
7    And that report was submitted on May
8 25th, 1990, approved May 26th, 1990, okay?
9 A.  Uh-huh.
10 Q.  I would like you to take the rest of
11 the investigative file, as it has been
12 represented by the City of Chicago, and tell me
13 -- and pull out for me any report prepared by
14 any detective that was prepared after May 25th,
15 1990, but before Mr. Maysonet's arrest on
16 August 22nd, 1990?
17 A.  That was submitted be -- What are
18 the dates?
19 Q.  Okay.  The reports we've looked at
20 were all prepared and submitted on the date of
21 the murders, May 25th, 1990.
22 A.  Uh-huh.
23 Q.  Okay?  And Mr. Maysonet was arrested
24 on August 22nd, 1990.
25 A.  Any reports submitted within that

Page 285

1  date?
2  Q.  Yeah.  And I don't --  And I don't
3  mean for -- I'm not talking about forensics,
4  necessarily.  I'm talking about any reports by
5  an investigating detective.
6  A.  I know what you mean.
7  Q.  If you can find me one, let me know.
8  A.  No.  That's it.  Nothing.
9  Q.  Okay.  So in what's been represented
10  to be the investigative file, there's not a
11  single report that reflects any investigative
12  work between May 25th, 1990, and August 22nd,
13  1990, right?
14  A.  No.
15  Q.  Now I'm going to hand you what's
16  been marked as Exhibit 4.
17  A.  Can I put this aside?
18  Q.  For a second.  We'll probably get
19  back to it.  Maybe I'll put it in order for
20  you.
21  A.  Okay.  Thank you.
22  Q.  And I'm going to represent that this
23  is allegedly the permanent retention file for
24  the Maysonet case.  It has Bates stamp RFC
25  Maysonet 67 through 107.

Page 286

1     Do you see that?
2  A.  Yes.
3  Q.  Okay?
4     MR. LEINENWEBER: Mine only goes to
5  102.  Doesn't appear to be out of order
6  either.
7     MS. BONJEAN: Yeah.  Hold on a
8  second.  I think maybe there was something
9  added to it.
10     THE WITNESS: Do you want it?
11     MS. BONJEAN: Yeah.  Let me take off
12  the last pages.  I want to --
13     THE WITNESS: Okay.
14     BY MS. BONJEAN:
15  Q.  All right.  So I'm going to have --
16  A.  Back to front or ...
17  Q.  What's that?
18  A.  Back to front?
19  Q.  No.  Actually, this one moves in the
20  other direction.
21  A.  Okay.
22  Q.  So look at page 69.
23  A.  Okay.
24  Q.  And that's, again, the General
25  Offense Case Report.  Do you see that?

Page 287

1  A.  Yes.
2  Q.  May 25th, 1990.  Who is Montalbo?
3  Is that a --
4  A.  Beat guy, probably.
5  Q.  Okay.  He's not a detective -- He's
6  not the investigating or assigned detective, is
7  he?
8  A.  No.
9  Q.  Okay.  The next report is page 70.
10  We looked at it already --
11  A.  Uh-huh.
12  Q.  -- because we saw it in the
13  investigative file.
14  A.  Right.
15  Q.  And it's the one that says Progress
16  Report Field Investigation.  That's the
17  Tapkowski and Boyle report?
18  A.  Right.
19  Q.  Discussed that.  If you want to keep
20  moving ahead, there is a Cause of Death Report
21  on page 73, right?
22  A.  Right.
23  Q.  Who's Wasmund, Robert Wasmund?
24  A.  He would be down at the ME's office.
25  Q.  Okay.  So he's part of the Forensic

Page 288

1  --
2  A.  Yes.
3  Q.  -- detective, squad, right?
4  A.  Right.
5  Q.  He's not an Area 5 Violent Crimes
6  guy, correct?
7  A.  No.
8  Q.  And his goal -- his job would be to
9  document the crime scene, perhaps, right?
10  A.  Yeah.  You know, cause of death,
11  gunshot, location of gunshot wounds, and so
12  forth.
13  Q.  Right.  And then the next report
14  which starts on page 75, we looked at.  This is
15  the report that memorializes interviews with
16  family members.
17  A.  Uh-huh.
18  Q.  Begins at 75, right?
19  A.  Right.
20  Q.  Keep going.  Page 77 and 78 is this
21  report that has these occurrence witnesses, at
22  least in the sense of what they heard.  77, 78
23  we looked at this report; is that right?
24  A.  Yep.
25  Q.  Page 79, it looks like a repeat -- I

Maysonet v.
Guevara

Video Deposition

Page 289

1  could be wrong -- but a repeat of the Cause of
2  Death Report?
3  A.  Right.
4  Q.  And then the next report is
5  submitted on August 23rd, 1990, correct?
6  A.  Correct.
7  Q.  If you could look through, again,
8  this exhibit, which is marked as Exhibit 4, and
9  tell me if you see any reports prepared by
10  anybody, any detective at Area 5 Violent
11  Crimes, between -- And, again, I'm putting
12  aside any forensic reports.  But any
13  investigative reports that were prepared
14  between May 25th, 1990, and August 20- -- use
15  August 22nd, 1990, just ...
16  A.  Okay.  No, nothing.
17  Q.  Okay.  So the permanent retention
18  file does not have any reports that you can see
19  that memorialize any investigative conduct
20  between May 25th, 1990, and August 22nd, 1990,
21  right?
22  A.  Right.
23  Q.  And the investigative file that you
24  looked at, which was Exhibit 3, contained no
25  GPRs, correct?

Page 290

1  A.  Not that I -- Not that I observed,
2  no.
3  Q.  And did you see any log, index log,
4  for reports that are supposed to be in the
5  investigative file?
6  A.  No.
7  Q.  And in fact, that's something you
8  would expect to see in an investigative file,
9  correct?
10  A.  Yes.
11  Q.  When a report is placed into the
12  investigative file, whoever places it into the
13  investigative file is supposed to log it on an
14  index card -- right? -- or an index form,
15  right?
16  A.  I don't know how that works, but he
17  would definitely log it in the log index.
18  Q.  Right.  So log index -- Is that what
19  you call it?
20  A.  You know, there's a million names
21  for it; but I know what you're talking about.
22  Q.  Okay.  So there is some form that --
23  You can put it right here for now.  There is
24  some form -- There's some form that is --
25  should be contained somewhere either on top of

Page 291

1  or in an investigative file that indexes or
2  logs all of the reports that are in that file.
3  A.  Yes.
4  Q.  Correct?
5  A.  Right, correct.
6  Q.  So that's one way to know what has
7  been placed in the investigative file, correct?
8  A.  Correct.
9  Q.  And if you have that log -- If I had
10  that log, I could be able to look at the log --
11  We could look at it together and see what was
12  placed into the investigative file during the
13  course of the investigation, right?
14  A.  Right.
15  Q.  And the fact that we don't have that
16  log is an impediment to us knowing what was
17  placed in the investigative file; is that
18  correct?
19      MR. RAHE:  Objection, foundation.
20      BY THE WITNESS:
21  A.  It certainly would make it a lot
22  easier to have it.
23  Q.  Now when a case is prosecuted by the
24  Cook County State's Attorney's office that a
25  detective at Area 5 or detectives at Area 5 had

Page 292

1  investigated, who is responsible for providing
2  all of the investigative material to the Cook
3  County State's Attorney for use in the
4  investigation?
5  A.  A detective -- either the one in the
6  back room or the detective subpoenaed to court
7  on a trial.  I really don't know.
8  Q.  In your -- all your years'
9  experience, you don't have an understanding of
10  how that happened?
11  A.  No.
12  Q.  Well, you would agree that the
13  permanent retention file itself is not what
14  goes to the Cook County State's Attorney's
15  office, or it's not only -- the only file that
16  goes to the Cook County State's Attorney's
17  office, correct?
18  A.  It would be the investigative file.
19  Q.  Right.  Because the investigative
20  file has the GPRs.
21  A.  Correct.
22  Q.  You don't withhold GPRs from the
23  Cook County State's Attorney's office, do you?
24  Or do you?
25  A.  No.

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 293

1 Q. Was it a practice to withhold GPRs
2 from the Cook County State's Attorney?
3 A. No, not to my knowledge.
4 Q. So if a GPR existed, you would give
5 it to the Cook County State's Attorney's office
6 --
7 A. Absolutely, sure.
8 Q. -- if they were prosecuting the
9 case?
10 A. Uh-huh.
11 Q. Let me -- Let me start again. Let
12 me finish so that the record's clear.
13     It was a practice of the Chicago
14 Police Department and specifically Area 5
15 detectives under your supervision to provide
16 the entire investigative file to the Cook
17 County State's Attorney's office including
18 GPRs, correct?
19     MR. RAHE: Objection to form and
20 foundation.
21     BY THE WITNESS:
22 A. Correct.
23 Q. You wouldn't withhold GPRs from the
24 Cook County State's Attorney's office?
25 A. Absolutely not.

Page 294

1 Q. All right. And -- But you don't
2 know the mechanism and process by which it got
3 to the Cook County State's Attorney's?
4 A. Not really, no.
5 Q. If -- Would they call up or would
6 they send a subpoena to the Area?
7 A. You know, the record could have been
8 subpoenaed. I really don't know how that area
9 works. It's not part of what I do.
10 Q. Okay. You weren't responsible for
11 getting it to the Cook County State's
12 Attorney's?
13 A. No.
14 Q. And you don't know who was
15 responsible?
16 A. I assume the dicks would bring it
17 over there.
18 Q. Okay.
19 A. But I -- just a guess.
20 Q. And they would just go into the file
21 room and get it and bring it?
22 A. I would imagine so.
23 Q. Or would they make a copy of it and
24 bring it?
25 A. I don't know.

Page 295

1 Q. Well, in all your years, I find it
2 really hard to believe. So you'll excuse that
3 I'm a little incredulous about it; but you're a
4 supervisor of detectives at Area 5. You don't
5 know how the investigative files made their way
6 to the Cook County --
7 A. No.
8 Q. -- State's Attorney office?
9 A. No. I assume the dicks. I don't
10 handle that end of it.
11 Q. Just because you don't handle it
12 doesn't mean you don't know how something
13 works.
14 A. At my age I forget a lot about how
15 things work.
16 Q. All right. So you've looked now at
17 the investigative file or at least what's
18 purported to be the investigative file and a
19 permanent retention file, correct?
20 A. Correct.
21 Q. And we can agree that there are no
22 GPRs in either of those files, right?
23 A. Not that I saw.
24 Q. And we can agree that there are
25 actually no reports whatsoever that reports or

Page 296

1 documents any investigative work between May
2 25th and August 22, 1990, correct?
3 A. Correct.
4 Q. All right. And according to you, as
5 best as I can tell, you're suggesting that --
6 Well, strike that.
7     Do you think those files are missing
8 materials?
9     MR. RAHE: Objection to foundation.
10     BY THE WITNESS:
11 A. No idea.
12 Q. Well --
13 A. I hope if they're missing, they turn
14 up.
15 Q. Well, previously, you testified that
16 you met with Mr. Maysonet on July 15th, 1990,
17 and August 1st, 1990, right?
18 A. I'd have to check the dates, but
19 that sounds right.
20 Q. Okay. And I think we've established
21 that there are no reports whatsoever in and
22 around the time of July 15th, 1990, or
23 August 1st, 1990?
24 A. Not that I found, no.
25 Q. Okay. And according to you in your

Maysonet v.
Guevara

Video Deposition

Page 297

1 prior testimony today, that either you wrote a
2 GPR or you had somebody write a GPR, correct?
3 A. Correct.
4 Q. So -- And we can agree that, at
5 least according to these files, there's nothing
6 there. I don't find a GPR by you or by any
7 detective.
8 A. Right.
9 Q. So what's your explanation for that?
10 A. Don't have one.
11 Q. Do you think it -- it existed one
12 time and it's just missing or it was never
13 prepared?
14 A. If it's missing, I hope it's found.
15 Never prepared? That's hard to
16 believe.
17 Q. Okay. So you do not subscribe to
18 the view that it was never prepared; so you
19 must subscribe to the view that somehow it went
20 missing?
21 A. Sure.
22 Q. And do you also believe that there
23 should be some investigative report, apart from
24 those two meetings that you had with Mr.
25 Maysonet, there should be other investigative

Page 298

1 reports that document investigation between May
2 25th, 1990, and August 22nd, 1990?
3 A. Possibly.
4 Q. I mean, were detectives
5 investigating the case?
6 A. I assume so.
7 Q. I mean, would you expect them to do
8 -- to do something other than, you know, just
9 talk to some people on the day of the murder
10 and that's it, bye-bye, we're done?
11 A. Right.
12 Q. They didn't solve the case, correct?
13 A. Right.
14 Q. I mean, after the first day --
15 There's all the activity on the first day,
16 right? Saw three reports -- canvassing,
17 talking to family members, talking to some
18 occurrence witnesses -- right?
19 A. Right.
20 Q. And then, after that, nothing, until
21 Mr. Maysonet is arrested on August 23rd, 1990.
22 Correct?
23 A. Correct.
24 Q. And is it possible that there was
25 just nothing done in between, apart from your

Page 299

1 unreported meetings?
2 A. I would hope not. I would hope that
3 something was done, but I -- I have no
4 knowledge of it.
5 Q. But if there was something done, it
6 would be memorialized, most likely, at least in
7 the GPR, correct?
8 A. Correct.
9 Q. And so either those are missing from
10 the file -- But if they existed, they should be
11 in the Cook County State's Attorney's file,
12 right?
13 A. I assume so.
14 MR. RAHE: Objection, speculation,
15 foundation.
16 BY MS. BONJEAN:
17 Q. Well, you wouldn't -- Again, we've
18 established you don't believe anyone --
19 yourself or anyone under your command would
20 have withheld GPRs from the Cook County State's
21 Attorney's office, correct?
22 A. No, of course not.
23 Q. All right. So that is an
24 impossibility. So it would have to be in the
25 Cook County State's Attorney's file if it

Page 300

1 existed, right?
2 MR. ENGQUIST: Objection, form and
3 argumentative.
4 BY THE WITNESS:
5 A. Or mislaid.
6 Q. So mis -- mislaid -- you mean lost?
7 A. Mislaid.
8 Q. What does "mislaid" mean?
9 A. Somewhere, but nobody knows where
10 it's at. In a drawer somewhere? I don't know.
11 No idea.
12 Q. Right. But we would expect to see
13 it in the investigative file; we don't find it
14 there, correct?
15 A. Correct.
16 Q. And we would expect to see some
17 reports, maybe not GPRs, but some reports in
18 the permanent retention file. Not there,
19 right?
20 A. Right.
21 Q. And we would expect to see it in the
22 Cook County State's Attorney's file, correct?
23 A. Correct.
24 Q. And what are the odds that they
25 would be missing from all three places?

Page 301

1     MR. ENGQUIST: Objection,
2  foundation, calls for speculation.
3     BY THE WITNESS:
4  A.  I have no idea.
5  Q.  You would admit that that would be
6  pretty suspicious if all three files maintained
7  by different -- well, at least two files -- two
8  different agencies' reports would be missing,
9  correct?
10     MR. LEINENWEBER: Same objections.
11     BY THE WITNESS:
12  A.  It would be odd.
13  Q.  All right.  Now, I'm going to --
14     MS. BONJEAN: What do you have these
15  marked as?
16     MS COHEN: GPRs.
17     MS. BONJEAN: GPRs?
18     MS. COHEN: Uh-huh.
19     MS. BONJEAN: Okay.  I don't know.
20  I don't want the full pack.  Because that's
21  not a GPR.
22     BY MS. BONJEAN:
23  Q.  Okay.  I'm going to have you --  Oh.
24  There we go.  Okay.
25     MS. GOLDEN: I didn't get a copy.

Page 302

1  What number?
2     MS. BONJEAN: It's Cook County
3  State's Attorney's Office 874 to 881.  And
4  it's going to be Exhibit 5.
5     (Mingey Deposition Exhibit
6     No. 5 marked as requested.)
7     MS. COHEN: Just disregard that
8  first page.
9     MR. LEINENWEBER: Not 873.
10     MS. BONJEAN: Yeah, disregard that.
11     MS. COHEN: Disregard 873.
12     MR. ENGQUIST: 874 through 881, did
13  you say?
14     MS. BONJEAN: 881, yes.
15     THE WITNESS: Thank you.
16     BY MS. BONJEAN:
17  Q.  What are these?
18  A.  GPRs.
19  Q.  GPRs.  And I'm going to represent
20  and you can tell from the Bates stamp, these
21  GPRs came out of a Cook County State's
22  Attorney's office file.  Right?
23     Any reason to doubt me on that?
24  A.  No.
25  Q.  Okay.  Can we agree that these GPRs

Page 303

1  do not appear in the investigative file that
2  was, at least, represented to you to be the
3  investigative file?
4  A.  They don't appear there, no.
5  Q.  Do you have any idea why they were
6  not in the investigative file or what is
7  allegedly the investigative file?
8  A.  No idea.
9  Q.  Would you expect them to be in the
10  investigative file?
11  A.  Yes.
12  Q.  Any theories about how they got
13  removed from the investigative file?
14  A.  None.
15     MR. LEINENWEBER: Objection, form.
16     MR. BRENER: Calls for speculation.
17     BY THE WITNESS:
18  A.  None.
19  Q.  Now let's look at these GPRs,
20  though.  This GPR appears to have the same
21  handwriting as the officer on 874 and 875.  I
22  think it's Brennan.  Is that his name?
23  A.  Boyle.
24  Q.  Boyle.  I'm sorry.  My apologies.
25  Boyle.

Page 304

1     And this information seems to be the
2  information that went into those initial
3  supplemental reports, right?
4  A.  It certainly could be.
5  Q.  You have on the first page
6  information about the victim and then
7  information about the family members and the
8  girlfriend, Sandra Montoya, right?
9  A.  Right.
10  Q.  The fiance of Torrence, right?
11  A.  Uh-huh, yes.
12  Q.  And this information actually went
13  into a supplemental report or is also reflected
14  in the supplemental report that we looked at.
15  You can look back if you want to see.
16     Would you agree with that?
17  A.  I would agree.
18  Q.  And you can see in the right-hand
19  corner that this GPR in the top right-hand
20  corner is dated May 25th, 1990; and it says
21  second.  Is that second shift or second watch?
22  Second watch.
23  A.  What is that again?
24  Q.  This was prepared also on May 25th,
25  1990, the date of the murders and was prepared

Video Deposition

Page 305

1  on the second watch, at least --
2  A.  Okay.
3  Q.  -- is the date of this report.
4  A.  Right, uh-huh, yes.
5  Q.  And it appears to be signed by
6  Boyle, and he was one of the first detectives
7  who were -- who was working on the case; but is
8  not what you would call the assigned detective,
9  correct?
10 A.  No.  There's two different Boyles,
11 you know.  There's a midnight Boyle and a day
12 Boyle.
13    It's the day Boyle.
14 Q.  Okay.  You think, well -- Let's look
15 at the star numbers then.  That will help us,
16 right?
17 A.  Boyle and Tapkowski, I think that's
18 Phil Boyle.  They're midnight guys.
19 Q.  Well, the Boyle -- Okay.  Look at --
20 look at a -- Look at Exhibit 3.  I'm going to
21 have you look at RFC Maysonet 63, that sup.
22 A.  That's John.
23 Q.  Okay.  Same guy that did these GPRs?
24 A.  Yeah, looks like it.
25 Q.  Okay.  So we're not -- You're

Page 306

1  introducing a whole new Boyle, but he's not the
2  Boyle on this.
3  A.  But he's one of the Boyles that was
4  on this case.
5  Q.  Where -- where -- Where do we find
6  that?
7  A.  Midnights.  Boyle and Tapkowski.
8  Q.  Oh, P. Boyle?
9  A.  P. Boyle, Phil.
10 Q.  Got it.  Okay.
11    So these GPRs were conducted by J.
12 Boyle, who prepared this supplemental report
13 also on May 25th, 1990, regarding the family
14 members' interviews, right?
15 A.  Yes.
16 Q.  Okay.  Now, also from the Cook
17 County State's Attorney's file is Bates stamp
18 876.
19    Do you see this?  This handwritten
20 thing?
21 A.  Okay.  Yes.
22 Q.  What -- What do you make of this?
23 A.  I see it.  I don't know what to make
24 of it.
25 Q.  Well, do you see Kondal and Ware

Page 307

1  over here?
2  A.  Okay.  Yeah, right.
3  Q.  We saw a report that they were doing
4  some canvassing?
5  A.  They were.
6  Q.  And we see Kevin -- voter
7  registration.  Maybe that's an ID for Kevin
8  Wiley.  I don't know.
9  A.  Could be.
10 Q.  Okay.
11 A.  Could be part of a GPR or I don't
12 know.
13 Q.  Okay.  By the way -- I'm sorry.  I
14 meant to ask you this:  On that first page that
15 we looked at, 874, do you see up at the top it
16 says Lulu?
17 A.  Lulu.  Yes.
18 Q.  Do you remember one of the
19 occurrence witnesses mention something about a
20 Lulu Dog?
21 A.  Sure.
22 Q.  Does this suggest to you that maybe
23 there was some effort to find Lulu?
24 A.  Certainly possible.
25 Q.  All right.  Do you know if anything

Page 308

1  came of that?
2  A.  Nothing to my knowledge.
3  Q.  All right.  Let's keep going.  And
4  then we have another GPR that's at 877.
5  A.  Okay.
6  Q.  And this GPR appears to me --
7  correct me if I'm wrong -- to be documenting
8  the bodies.  Tell me if you see something
9  different -- and describing what the victims
10 are wearing?
11 A.  Uh-huh.
12 Q.  Is that right?
13 A.  Right.
14 Q.  Would this be what somebody who was
15 going to do the --
16 A.  Scene.
17 Q.  -- the scene report?
18 A.  Right.
19 Q.  Okay.  So -- Okay.  It looks like a
20 Milwaukee Best -- I know that there -- that was
21 recovered from the scene.  So this looks like a
22 scene GPR?
23 A.  It certainly could be.
24 Q.  Uh-huh.  All right.  And then I want
25 you to look at page 878 and 879.  Look at both

Maysonet v.
Guevara

Video Deposition

Page 309

1    of those.
2        And this appears to be from
3    Dickinson, at least 878 does, right?  It says
4    his name there.
5    A.  Uh-huh.
6    Q.  And Dickinson was -- do you know why
7    -- what Dickinson's role was?
8    A.  Surprised to see his name.  That's
9    the first time his name has come up in this
10   case that I'm -- that I'm aware of.
11   Q.  Well, his name is on -- If you look
12   at the field -- first actual supplemental
13   report that -- No, wait, hold on -- Page 59
14   here.
15   A.  Okay.  Boyle and Tapkowski?
16   Q.  Yeah, that's that first -- the first
17   --
18   A.  Got it?
19   Q.  He's not on the report itself, but
20   he's listed here.
21   A.  Okay.
22   Q.  Do you see that?
23   A.  All right.
24   Q.  And then, if you look at these two
25   pages of GPRs, these are individuals who, at

Page 310

1    least according to the supplemental report --
2    A.  Uh-huh.
3    Q.  -- were interviewed in that initial
4    sort of canvassing.  Right here.  See these
5    individuals?
6    A.  Right.
7    Q.  Nelson Winston, he's on that sup,
8    right?
9    A.  Uh-huh.
10   Q.  Isabella Negron, Jenny Gonzalez,
11   Aurelio Felaaciano, and then these addresses
12   where --
13   A.  Yeah.
14   Q.  No one was here.  So you'd agree
15   that the information that's on GPR 878, 879 is
16   information that seems to have made its way
17   into that supplemental report that is RFC
18   Maysonet --
19   A.  Right.
20   Q.  -- 61, 62?
21   A.  Uh-huh.
22   Q.  Correct?
23   A.  Yeah.
24   Q.  Okay.  So these GPRs that we're
25   looking at all seem to correspond to those

Page 311

1    initial police reports that we've looked at
2    already, right?
3    A.  Yes, they do.
4    Q.  All right.  And then, if you can go
5    to the last two pages -- the 80 and 81 --
6    A.  I got it.
7    Q.  You got it?
8    A.  Uh-huh.
9    Q.  This is a GPR that's actually dated
10   November of -- 23rd, 1990, right?
11   A.  Yeah, yeah.
12   Q.  All right.  And this involves --
13   A.  It's kind of hard to tell the date,
14   but yes.
15   Q.  This involves Christopher Goossens,
16   who we know was arrested much later, right?
17   A.  Right.
18   Q.  And then 81 is a duplicate of what
19   appears to be the scene report, right?
20   A.  Right.  Excuse me.
21   Q.  Correct?
22   A.  Yeah.
23   Q.  Okay.  Now, you've now had the
24   opportunity to look at all the GPRs that were
25   in the Cook County State's Attorney's file.  I

Page 312

1    know you have to take my word for it; but at
2    least based on what you've seen, any GPRs that
3    memorialize your interview with Mr. Maysonet on
4    July 15th, 1990?
5    A.  Nothing.
6    Q.  What about August 1st, 1990?
7    A.  No.
8    Q.  Any GPRs that memorialize any
9    investigative conduct between May 25th, 1990,
10   and August 22nd, 1990?
11   A.  Not that I can find.
12   Q.  All right.  So now, even the Cook
13   County State's Attorney's office provides no
14   GPRs or supplemental reports that document any
15   work that was done by the detectives between
16   May 25th, 1990, and August 22nd, 1990, correct?
17       MR. ENGQUIST: Objection,
18   argumentative, form.
19       BY THE WITNESS:
20   A.  Correct.
21   Q.  So if I want to know what was done,
22   I have to rely on you're not-so-great memory
23   and any other memories of the detectives --
24   right? -- that have worked on the case?
25   A.  I -- the way it looks so far, yes.

Maysonet v.
Guevara

Video Deposition

Page 313

1  Q.  Any other ideas where we might be
2  able to get answers to our questions?
3  A.  I wish I had an idea.  I have no
4  idea.
5  Q.  Okay.  So --
6      MR. ENGQUIST: Before you go to
7  another exhibit, we've been going for over
8  an hour and a half.  I want to give him a
9  chance to stretch his legs.
10     MS. BONJEAN: All right.  Fine.
11     THE VIDEOGRAPHER: We are going off
12  the record at 4:19 p.m.
13     (A short break was had.)
14     THE VIDEOGRAPHER: We are back on
15  the record at 4:29 p.m.
16     BY MS. BONJEAN:
17  Q.  Okay.  Mr. Mingey, I'm going to,
18  now, have you look at the supplemental report
19  that is included in Exhibit 3 at RFC Maysonet
20  47 through 56, okay?
21  A.  Uh-huh.
22  Q.  You can take a look at that.  You
23  don't have to read the whole thing right now;
24  but if you could, tell me what you recognize
25  that report to be.

Page 314

1  A.  Closing sup.
2  Q.  So "closing sup," what does that
3  mean?
4  A.  Or a progress -- I would say a --
5  Let's see.  Yeah, closing sup.
6  Q.  So we go from reports prepared on
7  the date of the murder to a closing sup, right?
8  A.  Right.
9  Q.  Nothing in between, correct?
10  A.  It doesn't look like there's any.
11  Q.  And this is a report that is dated
12  August 23rd, 1990, right?
13  A.  Right.
14  Q.  And approved the following day on
15  August 24th, 1990, by Sergeant Epplen?
16  A.  Right.
17  Q.  You did not -- You were not the
18  sergeant who approved this report, am I --
19  A.  No.
20  Q.  Who authored this report?
21  A.  I would say Halvorsen typed it.
22  Q.  Okay.
23  A.  And I guess the other detectives had
24  the information they supplied to Halvorsen to
25  finish the report.

Page 315

1  Q.  All right.  But your best guess,
2  from looking at this, because it's the first
3  box, as I understand it, is that Halvorsen is
4  the detective who actually --
5  A.  I would say so.
6  Q.  -- authored it?
7  A.  Yeah, I would say so.
8  Q.  And what is a closing sup?  What
9  does that mean to you?
10  A.  Well, it's a supplementary,
11  especially like in the case, the case was
12  cleared open with the arrest of one person;
13  still wanted offenders out there.  So it would
14  be clear, open, closing sup -- closing out the
15  --
16  Q.  It's solved, but there's people you
17  still got to get?
18  A.  Yes, right.
19  Q.  You have one person in custody as an
20  offender and that happens to be Jose Maysonet,
21  right?
22  A.  Right.
23  Q.  Okay.  Now looking at this document,
24  does this tell you who the assigned detectives
25  were to this case?

Page 316

1  A.  Not really.  No, not really.
2  Q.  So this document doesn't shed any
3  additional light on who the detective was who
4  was actually assigned the Wiley brothers'
5  murders?
6  A.  My -- If I had a guess, I would say
7  Gawrys, Halvorsen, Guevara or Brennan and
8  Boyle.
9  Q.  Well, I thought you didn't think
10  Brennan and Boyle was?
11  A.  I didn't think Tapkowski and Boyle,
12  the other Boyle.
13  Q.  Oh, okay.  And why?
14  A.  Because they would be midnight guys.
15  Q.  Okay.  And what about Brennan and
16  P. Boyle?
17     Is it P. Boyle?
18  A.  No.  J. Boyle.
19  Q.  Okay.  J. Boyle.
20  A.  Could be.  It could be.  I don't --
21  I have no idea.  But it could be.
22  Q.  Who assigns cases?
23  A.  They would be assigned by the
24  coordinator, if we had one at the time.
25  Because the incident occurred on midnights, so

Maysonet v.
Guevara

Video Deposition

Page 317

1 they would assign it to a team not on
2 midnights.
3 Q. All right. And when would that
4 assignment take place?
5 A. As soon as the coordinator would
6 have a chance to look at it, see who's
7 available, see maybe who has a -- who could
8 handle a case like this and has the time to
9 handle it too. Could be really -- All kinds of
10 factors would factor into it.
11 Q. That assignment would be made within
12 a day or two?
13 A. Yes, I would say so. Pretty close
14 to it. But sometimes with these cases the
15 assigned detective doesn't have to stay with
16 the case. He could be on another shift.
17 Somebody else could run into like Guevara,
18 Halvorsen, Gawrys, come in and get the -- get
19 the job and all of sudden they're kind of stuck
20 with it.
21 Q. All right. But that doesn't
22 necessarily mean that they're -- Because they
23 ended up closing the case, it doesn't
24 necessarily mean they were the assigned
25 detectives, right?

Page 318

1 A. Right.
2 Q. I mean that happened with Guevara a
3 lot, right?
4 A. It happens.
5 Q. He closed a lot of cases he wasn't
6 assigned to.
7 MR. LEINENWEBER: Objection,
8 foundation.
9 BY MS. BONJEAN:
10 Q. Is that your recollection?
11 A. He closed a lot of cases. I'm sure
12 he was assigned to some of them.
13 Q. Assigned to some of them; and he had
14 a knack for closing cases that he wasn't even
15 assigned to, didn't he?
16 MR. ENGQUIST: Objection,
17 argumentative --
18 MR. LEINENWEBER: Same objection.
19 MR. ENGQUIST: -- form.
20 BY THE WITNESS:
21 A. It's not unusual.
22 Q. He did it at a higher rate than
23 most, though, you agree?
24 MR. ENGQUIST: Objection,
25 foundation, argumentative.

Page 319

1 BY THE WITNESS:
2 A. Did the job well.
3 Q. Which means he closed more cases
4 than the average bird, even those that he
5 wasn't assigned to.
6 A. Some of which I assume he wasn't
7 assigned to. That happens, though. When you
8 run into information, you run with it. There's
9 plenty of murders to go around at that time.
10 So nobody is really going to lose any sleep
11 over one of your cases getting solved by
12 somebody else.
13 Q. Uh-huh. Okay. I'd like you to look
14 at -- Continuing on with this report, bottom of
15 page 4 of the report or actually just page 4 of
16 the report --
17 A. Page 4?
18 Q. Well, it's RFC Maysonet 49.
19 A. Oh, okay. I got it.
20 Q. Do you see it?
21 A. Yeah.
22 Q. Now here we have the manner and
23 motive that the victims, who were male, black
24 youths, weren't really youths, were they?
25 A. Not really.

Page 320

1 Q. Okay. Were standing on the street
2 when they were approached by the offenders who
3 were Latin and members of the Latin Kings.
4 Offenders shot victims to death. Motive was --
5 Motive was gang rivalry.
6 What's the evidence that it was gang
7 rivalry?
8 A. I don't know. Apparently maybe the
9 statements from the in-custody offenders?
10 Q. Uh-huh. But even based on
11 statements from in-custody offenders, don't put
12 the Wiley brothers in any particular gang,
13 right?
14 A. No, not -- Could be gang rivalry or
15 they thought they were a member of a gang and
16 that's why they shot them.
17 Q. Okay.
18 A. Could be anything.
19 Q. Anything that you remember seeing in
20 those reports?
21 A. No. I would imagine that Maysonet
22 would have -- He did a court reported
23 statement. Wouldn't it be in there, the reason
24 why they shot these guys?
25 Q. Yeah. Did you -- Did you see

Maysonet v.
Guevara

Video Deposition

Page 321

1  anything -- Do you remember looking at the
2  court reported statement and drawing any
3  conclusions?
4  A.  You know, I may have.  Recently?
5  No.
6  Q.  Okay.  So as you sit here today, you
7  don't know what there was for evidence of gang
8  rivalry, right?
9  A.  No, no.
10 Q.  Okay.
11 A.  Other than the statements of the
12 offenders.
13 Q.  Right.  But you can't point to
14 anything in the statements themselves that
15 suggests --
16 A.  I have to reread them.
17 Q.  Give me a second, please, to --
18 A.  Sure.  Sorry.
19 Q.  Without rereading them, and as you
20 sit here today, you don't know what the
21 evidence of gang rivalry was?
22 A.  No.
23 Q.  You think it's maybe in the
24 statements, but you don't know, correct?
25 A.  Correct.

Page 322

1  Q.  Now also, it says vehicle used --
2  older model Pontiac Bonaventure, two-door,
3  light blue top over dark blue bottom.  This car
4  is alleged to belong to a Latin King, first
5  name Jeffrey, right?
6  A.  Right.
7  Q.  And that information came presumably
8  from Mr. Maysonet or somebody, right?
9  A.  Somebody, right.
10 Q.  Now can we agree that a competent
11 detective would attempt to go find Jeffrey,
12 right?
13 A.  Who's to say they didn't try to find
14 him?
15 Q.  Who's to say -- I don't know.  No
16 one's saying that.  I'm asking you a different
17 question.  I'm saying a competent detective
18 would attempt to find Jeffrey?
19 A.  Jeffrey should be a person who could
20 be talked to -- should be talked to, yes.
21 Q.  You should talk to the person whose
22 car was used in a double murder, right?
23 A.  Absolutely.
24 Q.  They could either be a suspect and
25 involved, or they could be a witness for the

Page 323

1  State, right?
2  A.  Right.
3  Q.  They could provide information that
4  would help prosecute the case, right?
5  A.  Right.
6  Q.  What efforts were made to find
7  Jeffrey?
8  A.  No idea.
9  Q.  Have you seen any report that would
10 indicate any efforts were made to find Jeffrey?
11 A.  Not to my knowledge, no.
12 Q.  And as you sit here today, you
13 cannot tell us with that -- You can't assure us
14 that anyone went to find Jeffrey, right?
15 A.  No, I don't recall.  I don't have a
16 memory of somebody going out and trying to
17 locate him.  But I'm sure that was done.
18 Q.  Well, you don't have a memory and
19 you don't have a single piece of paper that
20 suggests it either, do you?
21 A.  No, I don't.
22 Q.  So apart from your assumptions, you
23 don't have any reason to believe that anybody
24 had spoke to Jeffrey?
25 A.  I'm sure they tried to locate

Page 324

1  Jeffrey.
2  Q.  You say you're sure, but you don't
3  know, right?
4  A.  I don't know for sure, no.
5  Q.  Okay.  I'm not -- Right now I'm not
6  really asking for, you know, what you think may
7  have happened theoretically.  I'm asking you
8  what you have knowledge of, okay?
9  A.  Okay.
10 Q.  And you have no factual basis to
11 believe that anyone spoke to Jeffrey, right?
12 A.  No knowledge, no.
13 Q.  And you have no factual basis to
14 believe anyone even attempted to speak to
15 Jeffrey, right?
16 A.  No.  As I sit here, no.
17 Q.  And you have not found any piece of
18 paper in our looking at the investigative file,
19 permanent retention file, or any papers you
20 looked at in preparation for your deposition
21 here today that would reflect an effort to find
22 Jeffrey and speak to him, right?
23 A.  Right.
24 Q.  All right.  Moving on.  At the
25 bottom it starts a narrative about the

Page 325

1  so-called investigation that went on.
2  A.  Uh-huh.
3  Q.  And it says on July 15th, 1990,
4  Sergeant E. Mingey -- That's right you, right?
5  A.  Yes, ma'am.
6  Q.  Area 5 Violent Crimes became aware
7  of an offender charged in a shooting incident
8  in which three persons were shot on the street.
9  This person was Jose Maysonet.  And then it
10  proceeds -- I'll let you read it -- to
11  memorialize a meeting that you allegedly had
12  with Mr. Maysonet on July 15th, 1990.
13     Do you see that?
14  A.  Yes, I do.
15  Q.  We discussed that earlier in this
16  deposition, correct?
17  A.  Correct.
18  Q.  Which Montilla was present for,
19  right?
20  A.  Right.
21  Q.  And apart from this narrative that's
22  contained in a closing supplemental report
23  about five weeks after this meeting, we have no
24  corresponding GPRs anywhere that we can find,
25  correct?

Page 326

1  A.  Correct.
2  Q.  And you don't know how Halvorsen got
3  this information, do you?
4  A.  No.
5  Q.  Halvorsen wasn't there when you
6  interviewed Mr. Maysonet, right?
7  A.  No idea who was there.
8  Q.  I thought it was just you and
9  Montilla?
10  A.  Oh, yeah, in the room, right.  But I
11  don't know if he was on the floor.
12  Q.  No, no.  I'm saying he wasn't
13  present during this interview.
14  A.  No.  No, he wasn't.
15  Q.  He also doesn't speak Spanish,
16  correct?
17  A.  He doesn't speak Spanish, no.
18  Q.  Okay.  So you don't know how -- Did
19  you give Halvorsen this information?
20  A.  Probably not.
21  Q.  Do you know where he derived it?
22  A.  No idea.
23  Q.  All right.  Moving on.  August 1st
24  is the Cook County Jail meeting in which you
25  and Montilla headed over to Cook County Jail to

Page 327

1  speak to Mr. Maysonet, in which he stated he
2  was involved in the murders.  You know it was
3  his gun that he provided and essentially he's
4  here making himself accountable for the murders
5  of the Wiley brothers, right?
6  A.  Right.
7  Q.  And again, we have no report, GPR,
8  any piece of paper that was prepared in and
9  around the time that this August 1st meeting
10  took place, correct?
11     MR. ENGQUIST: Objection, asked and
12  answered.
13     BY THE WITNESS:
14  A.  Correct.
15  Q.  Do you know how Ernie Halvorsen got
16  this information to put into this report?
17  A.  No.
18  Q.  You don't think it was you though,
19  right?
20  A.  I don't believe so.  I don't recall
21  talking with him about the -- when he was doing
22  the report sup.
23  Q.  Speaking of the August 1st
24  interview, I'm going to hand you -- Leave that
25  there.  We're going to come back to it.

Page 328

1     (Mingey Deposition Exhibit
2     No. 6 marked as requested.)
3     BY MS. BONJEAN:
4  Q.  I handed you what's been marked as
5  Exhibit 6, Maysonet 10864.  This is Cook County
6  Department of Corrections.
7     Do you see that?
8  A.  Yes, I do.
9  Q.  Okay.  And it purports to be some
10  type of consent to be interviewed.
11     Do you see that?
12  A.  Right.
13  Q.  Did you fill any portion of this
14  out?
15  A.  I have no idea whether I did or not.
16  Q.  Well, you don't recognize your
17  handwriting here?
18  A.  I don't know if it is or not.
19  Q.  Who doesn't recognize their own
20  handwriting?
21  A.  Printing?  You know, I don't know.
22  Q.  Didn't you say earlier that you did
23  fill it out?
24  A.  I'm sure I did.
25  Q.  That's what I'm saying?

Maysonet v.
Guevara

Video Deposition

Page 329

1  A.  I'm sure I filled it out, but I
2  don't recognize that as my handwriting.  I'm
3  not sure.  That's what you asked me, I thought.
4  Q.  I -- I guess I'm confused.  You're
5  sure you filled it out --
6  A.  Yes.
7  Q.  -- but you don't recognize your own
8  handwriting?
9  A.  Right.  I'm not sure if I printed
10  that.  I'm sure I probably did, but I don't
11  recognize it as being my --
12  Q.  Okay.  Well, there's -- See the box
13  down at the bottom?
14  A.  Right.
15  Q.  That's not your signature down
16  there?
17  A.  No.
18  Q.  You're not Star 17, right?
19  A.  No, I'm not.
20  Q.  And you're not Jose Maysonet, are
21  you?
22  A.  No.
23  Q.  Okay.  And you can tell that whoever
24  filled out the ID numbers had -- You know, it's
25  the same person that filled out the ID numbers,

Page 330

1  right?  It looks to be.
2  A.  Could be.
3  Q.  9034835 looks like the same
4  handwriting.  I mean, I know we're not
5  handwriting experts here; but it appears to be.
6  Correct?
7  A.  I don't know.  Could be.
8  Q.  And up where it says Sergeant
9  Mingey, Department CPD.  You don't recognize
10  that?
11  A.  It could be.  It could be my
12  writing.  I'm not sure.
13  Q.  You can't look at it and see whether
14  any of those letters is how you make -- how you
15  do your printed letters?
16  A.  Not really.
17  Q.  Really?  I'm sorry.  That just seems
18  impossible to me.  So if that's your
19  testimony --
20  MR. ENGQUIST: Objection,
21  argumentative.
22  BY MS. BONJEAN:
23  Q.  You don't recognize your handwriting
24  on here?
25  MR. ENGQUIST: Objection, asked and

Page 331

1  answered, argumentative.
2  BY THE WITNESS:
3  A.  I'm not sure.  I'm sure I was there
4  when this was filled out.  I'm sure.  It could
5  be I filled this out.  I don't have any
6  recollection at all.  And I'm not sure that
7  that's my handwriting.  It probably is; but I'm
8  not sure.
9  Q.  Okay.  So you don't have a
10  recollection of filling it out.
11  A.  No.
12  Q.  And you cannot tell us this is your
13  handwriting, right?
14  A.  It could be.
15  Q.  You can't tell us it is?
16  A.  No.  Probably is; but I'm not sure.
17  Q.  I understand.  But you can't assure
18  us that it is your handwriting.
19  A.  I can't assure you.
20  Q.  And you -- You didn't explain this
21  form to Mr. Maysonet, right?
22  A.  I don't recall the interview at all.
23  Q.  Well, you don't speak Spanish
24  anyways, right?
25  A.  Right.

Page 332

1  Q.  So you did not personally explain
2  this form to Mr. Maysonet.
3  A.  No.
4  Q.  And you don't remember whether
5  Montilla did or did not?
6  A.  I don't remember being at the jail
7  at all.
8  Q.  All right.  And you -- So entirely
9  possible that the Cook County sheriff who
10  signed it is the person who provided this to
11  Mr. Maysonet?
12  A.  I have no idea.
13  Q.  All right.  All right.  Back to our
14  closing sup.  Even accord -- Even according to
15  this closing sup, there's no reporting of any
16  investigative activity between August 1st and
17  August 22nd, is there?
18  A.  No.
19  Q.  So we have zero idea what anyone did
20  between August 1st and August 22nd, correct?
21  A.  August 1st?
22  Q.  Yeah.  We know you saw Mr. Maysonet
23  on August 1st, and then we know he's arrested
24  on August 22nd; but we don't have any
25  information about what happened in between,

Maysonet v.
Guevara

Video Deposition

Page 333

1   correct?
2   A.  Correct.  You want some water?
3   Q.  No.  I'm sorry.
4       Do you remember getting any calls
5   from the Cook County State's Attorney's office
6   about:  We're confused.  We feel like we're
7   missing some GPRs.  Do you know where any GPRs
8   -- where the GPRs are?
9   A.  I didn't get any calls that I can
10  recall from them.
11  Q.  Do you remember hearing through the
12  grapevine or from any other detectives, the
13  Cook County State's Attorney's office were
14  looking for any missing GPRs?
15  A.  No.  Not that I recall.
16  Q.  Okay.  And moving on to page -- It's
17  Bates stamped RFC Maysonet 51 -- at the top of
18  the page?
19  A.  Got it.
20  Q.  Read that first paragraph to
21  yourself, please.  We have another -- It
22  appears that on August 22nd, after he's taken
23  into custody, he confesses again.  Right?
24  A.  It appears so.
25  Q.  Provides the same information he

Page 334

1   provided on August 1st to you and Montilla,
2   right?
3   A.  Pretty much.
4   Q.  Provides it again, correct?
5   A.  Correct.
6   Q.  This time he's placed into custody
7   and charged with murder, though, right?
8       MR. ENGQUIST:  Objection,
9   mischaracterizing the document.
10      BY MS. BONJEAN:
11  Q.  Well, it says at the bottom:  Jose
12  Maysonet was informed that he was being placed
13  into custody for these murders.  At the bottom
14  of the first paragraph.
15  A.  Yeah, okay.
16  Q.  Okay.  So what was different on
17  August 22nd, when he provided this information,
18  than what he provided on August 1st?
19  A.  Again, when I thought it was
20  premature to bring him in because I thought the
21  state's attorney was trying to work a deal out
22  with this guy.  That's all I knew until he came
23  in the station and he was charged.
24  Q.  Okay.  But -- But nothing really
25  changed from August 1st to August 22nd?

Page 335

1   A.  Not really, no.
2   Q.  Just different detectives now, all
3   of a sudden, decided to charge --
4   A.  Except -- Let me just --
5       MR. ENGQUIST:  I'll object to the
6   form of the question.
7       BY THE WITNESS:
8   A.  A little bit changed.  Well, he puts
9   himself with the offenders when the shooting
10  goes down, I believe, right?
11  Q.  He did that August 1st too.  He said
12  he was involved and he was there.  He told you
13  that on August 1st, according to this report.
14  A.  What was the date we went to the
15  jail.
16  Q.  August 1st.
17  A.  Okay.  That's it.
18  Q.  Now you're -- You say your
19  recollection is that, after that August 1st
20  meeting at Cook County Jail, you instructed the
21  detective to talk to the Cook County State's
22  Attorney about a possible deal, right?
23  A.  I believe so, yes.
24  Q.  Okay.  But according to this report,
25  Jose Maysonet was informed by Sergeant Mingey

Page 336

1   that no deal would be made even if possible.
2   A.  Well, apparently he asked for one.
3   But we can't promise these guys anything.
4   You'd have to go through the State's Attorney's
5   office.  So I would respond probably like that
6   -- We can't cut a deal; gotta talk to the
7   state's attorney.
8   Q.  But that's not what you told.  You
9   said no deal would be made even if possible.
10  A.  I have no idea what I said.  I don't
11  recall being there.
12  Q.  Okay.  But Halvorsen says you said
13  that?
14  A.  He might have got it from Montilla.
15  Q.  Okay.  Montilla, the good guy that's
16  a good detective?
17  A.  Excellent guy.
18  Q.  Okay.  So he would not have conveyed
19  inaccurate information, right?
20  A.  No.
21  Q.  So it says here Jose Maysonet was
22  informed by Sergeant Mingey that no deal would
23  be made even if possible.
24  A.  Okay.
25  Q.  So did you not -- Did you or did you

Maysonet v.
Guevara

Video Deposition

Page 337

1 not tell Mr. Maysonet that through Montilla?
2 A.  I have no idea.  I don't recall even
3 being there.  I have no idea what I said to him
4 --
5 Q.  Okay.
6 A.  -- other than what's in Freddie's
7 recollection of the -- that day we were in the
8 jail.
9 Q.  Freddie's recollection?  Well, where
10 do we find Freddie's recollection?
11 A.  Documented in the report.
12 Q.  Well, how -- Freddie didn't write
13 this report.
14 A.  I'm sure he supplied information to
15 Halvorsen.
16 Q.  Okay.  Well, the back of the report,
17 there's about five detectives' names.
18 A.  Right.
19 Q.  How do we know where this
20 information came from?
21 A.  Talk to Halvorsen.
22 Q.  I intend to.  But shouldn't a report
23 be able to tell us -- shouldn't it speak for
24 itself about where information comes from?
25 A.  Well, you got to read the re -- the

Page 338

1 total report --
2 Q.  Okay.
3 A.  -- not just pick out a paragraph.
4 Q.  I'm -- I'm reading the entire
5 report.  You read the entire report and tell me
6 where this information came from?
7 A.  What information?
8 Q.  Where -- It says here Jose Maysonet
9 was informed by Sergeant Mingey that no deal
10 would be made if possible.
11 A.  That's according to Freddie's --
12 during his conversation with Maysonet.
13 Q.  How do you know that's according to
14 Freddie?
15 A.  That's what Freddie said.
16 Q.  Who -- where -- Where did Freddie
17 say that?
18 A.  It's documented in the report.
19 Q.  Where -- What report?
20 A.  This report.
21 Q.  This report?
22 A.  Doesn't it say that?
23 Q.  I don't see anything that attributes
24 this statement to Freddie.  We know Halvorsen
25 probably authored it.

Page 339

1 A.  Right.
2 Q.  I can tell you I deposed Montilla.
3 He certainly did not author, according to him.
4 A.  He didn't assist in helping
5 Halvorsen write that?
6 Q.  I don't believe his testimony was
7 remembering assisting writing it, no.  So
8 again, without you making assumptions, which I
9 know you're inclined to do --
10 MR. ENGQUIST: Objection to the
11 form, argumentative.
12 BY MS. BONJEAN:
13 Q.  You have us -- You've told us that,
14 after this meeting with August -- on
15 August 1st, you delegated to a detective to go
16 talk to the Cook County State's Attorney about
17 making a deal, right?
18 A.  Yes.
19 Q.  Or whether they would be open to a
20 deal, right?
21 A.  Right.
22 Q.  And according to this report, you
23 told Maysonet no deal was happening regardless.
24 A.  Well, I probably would have -- If I
25 made that statement, I probably would have said

Page 340

1 I can't promise you anything.
2 Q.  Which is it?
3 A.  I have to talk to the State's
4 Attorney's office.
5 Q.  Which is different than saying no
6 deal would be made even if possible, right?
7 A.  I don't know what to tell you.
8 Q.  It doesn't say Sergeant Mingey said
9 I'll talk to the Cook County State's Attorney
10 and see if they're open to a deal; but I don't
11 think they will be -- or anything like that.
12 What this reflects is that you told
13 Maysonet no deal, not even if it was possible
14 would we be making a deal with you.
15 A.  I can't recall what I said there.
16 So I don't know.
17 Q.  Well, you recalled earlier tonight
18 that you -- today -- that you remember telling
19 a detective to talk to a Cook County State's
20 Attorney.
21 That's not really --
22 A.  Sure.
23 Q.  That does not -- It's not really
24 consistent with what we see in this report, is
25 it?

Page 341

1  A.  Well, it's what I -- It's what I
2  recall.
3  Q.  And yet you can't point us to any
4  GPR you prepared or that any detective prepared
5  that might accurately tell us what happened
6  next during this meeting?
7  A.  No, I can't.
8  Q.  So we're all left to speculate who's
9  telling the truth, aren't we?
10  A.  I guess.
11      MR. ENGQUIST: Objection,
12  argumentative.
13      BY MS. BONJEAN:
14  Q.  Okay.  But back to August 22nd, we
15  have Maysonet in custody, and according to this
16  report, he basically repeats the same thing
17  that he told you and Montilla on August 1st;
18  but this time he's charged, arrested and
19  charged for these murders.  And you don't know
20  why, right?
21      MR. ENGQUIST: Objection,
22  mischaracterizing the document.
23      BY MS. BONJEAN:
24  Q.  It says Jose Maysonet again repeated
25  his previous statements about supplying the gun

Page 342

1  used in the murders and the fact that he knew
2  who the offenders were.  Jose Maysonet stated
3  that he could not provide any further
4  information because he had been threatened by
5  Latin King gang members of the death of
6  himself, his wife and child if he informed to
7  the police.  He was informed he was being
8  placed in custody for these murders.
9      In fact, on August 22nd, he provided
10  less information than August 1st, right?
11  A.  Could be.
12  Q.  And yet he was charged on that day
13  or taken into custody for these murders, right?
14  A.  After those admissions, sure.
15  Q.  Same admissions he made on
16  August 1st.
17  A.  Right.  I still say it was
18  premature; but that's my feeling.
19  Q.  Okay.
20  A.  That's all I can tell you.
21  Q.  And can you tell from looking at
22  this report who Mr. Maysonet made these
23  admissions to on August 22nd, these -- when he
24  first came in to Area 5?  We see he was advised
25  of his Miranda rights by Montilla.  Says he

Page 343

1  acknowledged understanding them and agreed to
2  talk with the detectives.
3  A.  No idea.
4  Q.  Do you think it would be better
5  practices to say who he spoke to?
6  A.  Could have put his name in there and
7  make it clearer.
8  Q.  I mean, maybe the state's attorney
9  might want to know which detectives they have
10  to call to the witness stand, right?
11  A.  I'm sure the state's attorney knew
12  who to call.
13  Q.  How would the state's attorney know
14  without having to actually speak to them
15  directly?
16  A.  During the course of -- the way --
17  When they reviewed the case, they'd be talking
18  to the detective that talked to Maysonet.
19  Q.  Huh?  They would be talking to the
20  detectives?  Is that what you're saying?
21  A.  Sure.
22  Q.  Okay.  But it's all -- It's often
23  useful to have a report to corroborate what a
24  detective is going to say -- right? -- if
25  necessary?

Page 344

1  A.  Yes.
2  Q.  To -- For instance, to rebut maybe
3  an inference or a suggestion on the part of us
4  weasely defense attorneys who might say you're
5  just making it up from the witness stand?
6  Right?
7  A.  Right.
8  Q.  And you might want to say:  Ha.  I'm
9  not making it up because look it; I prepared a
10  report in and around the same time you made
11  this to me.  Here it is.  This corroborates my
12  testimony.
13      Right?
14  A.  Right.
15  Q.  And yet wouldn't that be a good
16  reason to identify what detectives he allegedly
17  made these statements to?
18  A.  Certainly would be a reason to do
19  that.
20  Q.  Did you see any GPRs that reflected
21  Mr. Maysonet making these admissions on
22  August 22, 1990?
23  A.  No.  Not when I reviewed the file.
24  Q.  All right.  All right.  Moving on.
25      The next paragraph says:  On

Maysonet v.
Guevara

Video Deposition

Page 345

1　August 22nd, Halvorsen, Guevara, and Gawrys
2　arrived at Area 5 to work the third watch, and
3　this investigation was passed on to these
4　detectives.
5　　Do you see that?
6　A.　I do.
7　Q.　By the powers of deductive
8　reasoning, since they're arriving for their
9　shift on the third watch, and that seems to be
10　happening after these admissions, can -- it
11　would be fair to say that it seems like
12　Maysonet did not make these admissions to
13　Halvorsen, Guevara or Gawrys?
14　A.　I have no idea who he made them to.
15　Q.　Right.  But it looks as if it wasn't
16　Halvorsen, Guevara, or Gawrys because they
17　arrived after he made the admissions according
18　to this report.
19　　Right?
20　A.　It appears that way.
21　Q.　So Halvorsen got this information
22　from somebody else; and we don't know who,
23　right?
24　A.　I was -- Montilla was still there.
25　Q.　Montilla.  He was probably acting as

Page 346

1　the interpreter; but we don't know who else he
2　made -- who else was there, right?
3　A.　Montilla would be enough.
4　Q.　I'm not saying he wouldn't be.  But
5　this says Maysonet was advised of his Miranda
6　Warning by Detective Montilla.  Jose Maysonet
7　acknowledged understanding each of his rights
8　and agreed to talk with the detectives, plural.
9　A.　Okay.
10　Q.　And I guess Detective Montilla is
11　one of the detectives, but this certainly
12　suggests there was another person he was
13　confessing to and we can't tell who that is
14　from this report, can we?
15　　MR. ENGQUIST: Objection,
16　argumentative, asked and answered, form.
17　　BY THE WITNESS:
18　A.　From this report, no, but I'm sure,
19　in the statements, you -- he would spell out
20　exactly who he talked to and who he confessed
21　to.
22　Q.　This is an oral statement that
23　preceded any court-reported statement.
24　A.　I can't answer it.  I wasn't
25　involved in this part of the process.

Page 347

1　Q.　All right.  And if you don't know,
2　do you think I would possibly have any idea of
3　knowing or anybody else looking at this case
4　file?
5　　MR. RAHE: Objection --
6　　BY THE WITNESS: You would have to look at the
7　case -- I'm sorry.
8　　MR. RAHE: -- foundation.
9　　BY THE WITNESS:
10　A.　You would have to look at the entire
11　case file.
12　Q.　Yeah, you do.
13　A.　And you'd know exactly who talked to
14　who and when.
15　Q.　Please.  You have everything I have.
16　Tell -- Tell me -- Take as much time as you
17　want.  Look through every piece of paper I
18　provided you and tell me who Mr. Maysonet
19　confessed to when he first got to Area 5.
20　　I mean, how can you-- How do you say
21　that, when we've just -- We've spent the last
22　three hours meticulously going through these
23　documents, and you have agreed there's not a
24　single report --
25　A.　Right.

Page 348

1　Q.　-- that memorializes the conduct of
2　the officers between August 1st or actually --
3　Strike that.
4　　Between May 25th, 1990, and this
5　report.  So you're saying you gotta look at the
6　whole case file.  We just did that.
7　A.　Yes.
8　Q.　We spent three hours doing that.
9　A.　Yes.  Did we look at the -- his --
10　Did he do a handwritten?
11　Q.　He did.
12　A.　Did he -- In the handwritten, were
13　detectives in the room at the time?  Did he
14　spell out who talked to him?
15　Q.　He did a handwritten -- which we'll
16　get to in this report -- is after this oral
17　statement.  I'll give you -- I'll show it to
18　you.  It's after -- so go -- Go to the next
19　paragraph.  On August 22nd, 1990, at
20　2000 hours, Jose Maysonet was interviewed by
21　Guevara, who speaks Spanish.  During this
22　interview, Jose Maysonet agreed to tell all he
23　knew.  Guevara came in and got Mr. Maysonet to
24　spill all the beans.
25　　Right?

Maysonet v.
Guevara

Video Deposition

Page 349

1 A.   That's what it says.
2 Q.   Right.  And he -- He wouldn't do it
3   on July 15th, when you and Montilla were
4   talking to him, right?
5 A.   Right.
6 Q.   And he wouldn't do it on August 1st,
7   when you and Montilla were talking to him,
8   correct?
9 A.   Correct.
10 Q.   And he didn't do it when he first
11   came into Area 5, according to this, when
12   Montilla and some unknown detective was talking
13   to him, correct?
14 A.   I guess.  Correct.
15 Q.   Well, isn't that what it says here?
16 A.   Did you ask Montilla who he was
17   talking -- what he was talking about in here?
18   He would know, I assume.
19 Q.   First of all, he doesn't; and I
20   shouldn't have to ask a detective 30 years
21   later.  It should be in a report.  Can we agree
22   on that.
23 A.   We can agree.
24 Q.   All right.  Montilla might be dead.
25   I mean, he's not; but he could have been,

Page 350

1   right?
2 A.   Sure.
3 Q.   Any of us could be dead.  So I mean,
4   you shouldn't rely on -- And we've already
5   talked about how age can impact your memory,
6   right?
7 A.   Uh-huh.
8 Q.   Okay.  So back to my point.  We know
9   that Guevara gets Maysonet to tell all he knows
10   on August 22nd at 2000.
11      MR. LEINENWEBER: Objection,
12   mischaracterizes the document.
13      BY MS. BONJEAN:
14 Q.   Do you see that?
15 A.   Yeah, I do.
16 Q.   Okay.  And again, he didn't -- On
17   those meetings he had with you on July 15th and
18   August 1st; and he did it earlier in the day
19   when he was represent- -- when he was
20   interviewed by Montilla and some unknown
21   detective, correct?
22 A.   Correct.
23 Q.   All right.  And we've spent three
24   hours looking through the investigative file
25   and the permanent retention file, and I have

Page 351

1   the very, I think, reasonable question of who
2   was the other detective that Mr. Maysonet
3   confessed to?  And you said:  Oh, you got to
4   look at the whole case file.
5      Well, I haven't seen it.  Have you
6   seen it, who he spoke to?
7 A.   I would have to look at the
8   handwritten.  I assume it's there; but I could
9   be wrong.
10 Q.   Okay.
11      MS. BONJEAN: Could you grab me that
12   handwritten.
13      BY MS. BONJEAN:
14 Q.   It's not a handwritten; it's court
15   reported.
16 A.   Okay?
17      (Mingey Deposition Exhibit
18   No. 7 marked as requested.)
19      BY MS. BONJEAN:
20 Q.   I'm handing you what's been marked
21   as Exhibit 7, which purports to be a statement
22   of Jose Maysonet.  Do you see that?
23 A.   Yes.
24 Q.   And it's -- present is Frank
25   DiFranco and Fred Montilla, Yeah?

Page 352

1 A.   Right.
2 Q.   And it's taken on August 23rd, 1990,
3   at 9:28 a.m.
4      Do you see that?
5 A.   Right.
6 Q.   Go ahead and look at it.
7      MR. RAHE: Can you give me the Bates
8   number.
9      MS. BONJEAN: Yes.  This is Cook
10   County State's Attorney's office 287 to
11   293, okay?
12      BY MS. BONJEAN:
13 Q.   Go ahead and take your time and look
14   at it; and then tell me, if you can, who
15   Maysonet confessed to on August 22nd, 1990,
16   before Guevara spoke to him.
17 A.   No, I can't tell either.
18 Q.   So that the court-reported doesn't
19   tell us who Mr. Maysonet confessed to when he
20   first arrived at Area 5 on August 22nd, 1990,
21   does it?
22 A.   Not that I can recall in reading
23   this.
24 Q.   Okay.  So we're still left wondering
25   who the other detective was to whom he

Maysonet v.
Guevara

Video Deposition

Page 353

1   confessed, right?
2   A.   Or it's just a typo.
3   Q.   Would Montilla be interviewing Jose
4   Maysonet by himself?  Didn't you say earlier
5   he's not even a Homicide guy?
6   A.   No, he's not a Homicide guy.
7   Q.   That doesn't make sense, does it?
8   A.   Well, the problem is, is they have a
9   rapport, maybe?
10  Q.   Yeah, but --
11  A.   He would definitely be in the room.
12  Q.   Right.  But he wouldn't be alone.
13  He certainly wouldn't -- He certainly would
14  deny vehemently that he was ever alone
15  interviewing Mr. Maysonet.
16  A.   I wasn't there, so I really don't
17  know.
18  Q.   Okay.  But he's a good guy.  He
19  doesn't lie.
20  A.   He is a good guy.  No, he doesn't
21  lie.
22  Q.   Okay.  So probably not a typo,
23  right?
24  A.   Maybe, maybe not.  I really don't
25  know.

Page 354

1   Q.   Well, he says no.  Do you have any
2   reason to doubt him?
3   A.   No.
4   Q.   Okay.  So it's not a typo, according
5   to him.
6   A.   Who'd he say was in there?
7   Q.   I don't think he has any
8   recollection of who was present.  Much like
9   you, his memory seems to be failing as well.
10  Which, I guess is why we should have good
11  reports; so we don't have to rely on --
12  A.   Yes.
13  Q.   -- men.
14       MR. ENGQUIST: I'm just going to
15  object to the soliloquy on this.
16       BY MS. BONJEAN:
17  Q.   But anyway, so you'd expect there to
18  be some report somewhere, a GPR or something
19  that would reflect this important communication
20  from Mr. Maysonet when he arrives at Area 5,
21  right?
22  A.   Yes.
23  Q.   Because -- Can we agree that, if
24  Mr. Maysonet has confessed to Guevara, and
25  Guevara somehow is shockingly -- His

Page 355

1   credibility is somehow questioned, it would be
2   useful to be able to put on another detective
3   who would say:  No, no, no, he confessed to me
4   too.
5       Right?
6   A.   Yeah.  It seems like Montilla was
7   there, though.
8   Q.   Right.  But that's -- I understand
9   that; but we still want to know who was present
10  when --
11  A.   Sure.
12  Q.   -- someone confesses, correct?
13  A.   Absolutely, yeah.
14  Q.   All right.  August 22nd, 1990, he
15  agrees to tell Guevara all he knows, right?
16  And we have a narrative here.  Now, Halvorsen
17  does not speak Spanish, right?
18  A.   No, he doesn't.
19  Q.   And it does not indicate that anyone
20  is present when Guevara interviews Maysonet in
21  Spanish, correct?
22  A.   Correct.
23  Q.   Would it be customary for Guevara to
24  interview a suspect by himself?
25  A.   Certainly could.  There's no reason

Page 356

1   he shouldn't.
2   Q.   Okay.  And this does not indicate
3   that there's -- anyone else was present, right?
4   A.   I don't know.  Doesn't appear so.
5   Q.   I'm not asking you to say whether
6   anyone else was present.  I'm asking you to
7   agree that there's nothing in this report that
8   reflects anyone else was present?
9   A.   Right.
10  Q.   And yet there's some statements that
11  are in quotation marks.  Do you see that?  What
12  does that mean to you?
13  A.   Like Lluiva or whatever that name
14  is?
15  Q.   Yeah.  Yeah, for instance, three
16  Latin Kings came to his apartment.  One of the
17  Kings was quote, Lluiva.  The other two guys
18  were Fro and Tino.
19  A.   Uh-huh.
20  Q.   Do you see that?
21  A.   You're on 51, right?
22  Q.   Right.
23  A.   Okay.  Yeah, that wouldn't be
24  unusual.
25  Q.   And what does it mean?

Page 357

1  A.  Draw your attention to one of the
2  offenders' nickname.
3  Q.  Right.  But does that mean that
4  that's a quotation from the person saying it?
5  A.  Yes.
6  Q.  Or is it -- Okay.  And do you know
7  how this information was conveyed to Halvorsen
8  such that it went into the report?
9  A.  No idea.
10  Q.  If he wasn't there, it had to come
11  from somebody who was there, right?
12  A.  Right.
13  Q.  Or could it come -- Or could it have
14  been Guevara told one person, and then it was
15  passed along to three other people before it
16  made its way to Halvorsen?
17  A.  I don't know.
18  Q.  All right.  Now, again, we see
19  Jeffrey here.  And I think we discussed
20  Jeffrey, and we couldn't find any paperwork
21  that suggested that that is an individual that
22  was interviewed, right?
23  A.  Right.
24  Q.  Also, if you look on the next page,
25  which is RFC 52, the first paragraph, which is

Page 358

1  a continuation of Jose Maysonet's statement
2  allegedly to Guevara, I guess.  And at the
3  bottom of that it says:  Maysonet stayed in the
4  Cook County Jail until he was able to make bond
5  on Thursday, August 16th.  That same day, about
6  2200 hours, he was at home.  Lluvia, Fro, Tino,
7  Cisco, and King all came to his house.  Tino
8  and King are brothers.
9  A.  We're still on the first paragraph.
10  Okay.
11  Q.  Yeah, at the very bottom --
12  A.  Gotcha.
13  Q.  -- of the paragraph.
14  A.  Right.
15  Q.  Okay.  We see some names, and these
16  guys threatened him, right?  King actually put
17  a gun to Maysonet's head and told him that if
18  he ever talked about the two murders, he would
19  be 6 feet under.
20  Do you see that?
21  A.  Uh-huh.
22  Q.  Again, a competent detective would
23  want to go try and find King and Cisco,
24  correct?
25  MR. ENGQUIST: Argumentative.

Page 359

1  BY THE WITNESS;
2  A.  Yes.
3  Q.  And find out who these people are,
4  right?
5  A.  Right.
6  Q.  Probably a few Kings out there, I'm
7  guessing, as nicknames go.
8  A.  Yes.
9  Q.  And a couple Ciscos too, yeah?
10  A.  There's got to be a lot of those
11  too.
12  Q.  All right.  King and Cisco are
13  pretty common names?
14  A.  Not King so much; Cisco is, though.
15  Q.  Okay.  In any event, did you see any
16  reports that we looked at in the course of our
17  hours here together that reflected any
18  investigative conduct by detectives trying to
19  find King and Cisco?
20  A.  No.
21  Q.  Any interviews of King and Cisco?
22  A.  Nothing that I see.
23  Q.  Anything even reflecting the legal
24  names of King and Cisco?
25  A.  No.

Page 360

1  Q.  Again, this next paragraph we have,
2  it says:  On August 22nd, 1990, at 2100,
3  Maysonet's wife, Rosa Bella, arrived to Area 5.
4  She was allowed to talk with Maysonet in the
5  presence of detectives.
6  Doesn't say which detectives, does
7  it?
8  A.  No.
9  Q.  And Maysonet told her to tell the
10  truth about the night the blacks were killed.
11  She agreed to do so.
12  Do you see that?
13  A.  Yes.
14  Q.  And again, we have Maysonet
15  essentially making an admission, right?
16  A.  Right.
17  Q.  Telling his girl:  Just tell him the
18  truth about -- Go ahead.  You can tell him what
19  happened.
20  Right?
21  A.  Right.
22  Q.  And we don't know who was present
23  when he makes this damning admission, do we?
24  A.  No.
25  Q.  Okay.  Now go to the next page,

Page 361

1  please.  We have Jose Maysonet making more
2  statements in this first paragraph; but again,
3  we don't know who he's making these statements
4  to, do we?
5  A.  No, it doesn't say.
6  Q.  Would you agree that it would be
7  helpful to know who these detectives are that
8  he's making these additional statements to?
9  A.  Yes, it would.
10  Q.  Then, in the next paragraph it says:
11  The reporting detectives and Sergeant Mingey
12  spent the next hour searching the neighborhood
13  for all three officers [sic].
14      Do you remember searching the
15  neighborhood for three offenders?  I'm sorry.
16  A.  I don't recall it, but I'm sure
17  that's what I did.
18  Q.  Zero recollection of searching for
19  the offenders?
20  A.  Not really, no.
21  Q.  You don't have a recollection?
22  A.  No.
23  Q.  It says:  Lluiva was seen on the
24  street by Gawrys and Mingey.
25      Do you remember seeing Lluiva on the

Page 362

1  street?
2  A.  No really, no.  But I'm sure I did.
3  I'm sure this is accurate.
4  Q.  Any of your own reports you've been
5  able to find that would reflect that you were
6  on the streets looking for an offender by the
7  name of Lluiva or Alfredo Gonzalez?
8  A.  It's right here.
9  Q.  Reports that you prepared?
10  A.  No.
11  Q.  Any GPRs prepared by you or even
12  anyone you were with reflecting this search
13  for --
14  A.  Not that I've seen.
15  Q.  Okay.  Do you remember J -- ASA
16  Jennifer Borowitz being at Area 5?
17  A.  No.
18  Q.  Do you know who that is?
19  A.  Outside of her name coming up in
20  this file, no.
21  Q.  Now it says on August 23rd, 4:30,
22  ASA Borowitz, who is from Felony Review, was
23  assigned to the investigation.  She had been in
24  the office at Area 5 on an unrelated
25  investigation and was familiar with this

Page 363

1  homicide investigation.
2      Do you see that?
3  A.  Yes.
4  Q.  An interview was conducted with Jose
5  Maysonet.  Present for this interview were ASA
6  Borowitz and Detectives Guevara and Montilla.
7  Jose repeated his previous statement.
8      Right?
9  A.  Right.
10  Q.  So now we have Guevara -- he's now
11  confessing again.  This guy just wants to
12  confess nonstop to anybody and everybody.  He's
13  confessing to ASA Borowitz and Guevara and
14  Montilla, according to this, right?
15  A.  Yes.
16  Q.  Have you seen any reports anywhere
17  prepared by any of these individuals, whether
18  it's ASA Borowitz, Guevara, or Montilla that
19  reflect a confession at 4:30 in the morning on
20  August 23rd?
21  A.  Outside of this, no.
22  Q.  No?  Do you think there is a report
23  somewhere and we're just missing it, or do you
24  think this --
25  A.  No.

Page 364

1  Q.  No, what?
2  A.  No.  I wouldn't make out a report of
3  this.
4  Q.  No?
5  A.  No.
6  Q.  Even though he confessed to three --
7  these three people, you would just --
8  A.  I'm talking about taking Gonzalez
9  into custody.
10  Q.  No, no, no.  I'm talking about the
11  confession again of Mr. Maysonet to -- at
12  4:30 in the morning.
13  A.  It was documented.  Something else?
14  Q.  Yeah, apart from this paragraph,
15  would you have expected either Borowitz or
16  Guevara or Montilla, themselves, who actually
17  heard the confession, to make some type of
18  memorialization of it?
19  A.  I don't think so.  It's right here.
20  Q.  Well, what's right there?
21  A.  The fact that they were there when
22  he made that statement.
23  Q.  Well, we don't know what he said
24  here, right?  This is a repeat of his previous
25  statement.  Which statement, right?  You tell

Page 365

1  me what he said.
2  A.  Which paragraph are you referring to
3  now?
4  Q.  It says August 23rd at 4:30 hours.
5      Do you see that?  Second to the last
6  paragraph.
7  A.  53?
8  Q.  Yeah, second to last paragraph.
9  A.  Yeah.  Okay.
10 Q.  I want you to look at that paragraph
11 and tell me what Jose Maysonet said during that
12 interview or that time period?
13 A.  Could have made it a little bit more
14 clear, but it's -- it's apparent what happened,
15 I think.  He repeated his admission.
16 Q.  The whole thing?  You don't know,
17 though.
18 A.  No, no.  It could be -- could be
19 part, whole of it; but it's clear to me what
20 happened, but --
21 Q.  Right.  But certainly ASA Borowitz
22 was new to this equation.  Confessing to a
23 state's attorney is different than confessing
24 to a cop, right?
25 A.  I'm sure she got notes and so forth.

Page 366

1  Q.  Okay.  You would expect her to,
2  right?
3  A.  I would imagine so.  I'm sure she
4  would have to document it.  I would imagine.  I
5  think she might have been new, though,
6  possibly.
7  Q.  So you think it's possible that a
8  new state's attorney would maybe think:  Huh,
9  somebody just confessed to double murder to me.
10 I need not write that down.
11 A.  It is.  I'm sure she would.
12     MR. BRENER: Objection, form, calls
13 for speculation.
14     BY MS. BONJEAN:
15 Q.  You would expect her -- even being
16 new, a new attorney -- She did go to law
17 school, right?
18     MR. RAHE: Objection, foundation.
19 BY THE WITNESS;
20 A.  I assume so.
21 Q.  I mean, I think even a six-year-old
22 would probably know if someone confesses
23 murder, you probably should document it, right?
24 A.  Right.
25     MR. ENGQUIST: Objection,

Page 367

1  argumentative.
2      BY MS. BONJEAN:
3  Q.  Okay.  And then we have Jose
4  Maysonet at 6:30 making a court reported
5  statement.
6  A.  What page?
7  Q.  Yeah, it's the end of the page going
8  into 54.
9  A.  Okay.
10 Q.  Do you see that?
11     And that -- He makes a
12 court-reported statement, which we looked at
13 earlier, which I believe is marked as
14 Exhibit 7, maybe?  The court-reported?
15 A.  Yeah, 7.
16 Q.  Okay.
17 A.  Right.
18 Q.  All right.  Now it indicates, here,
19 in the middle of the page on the last page of
20 this closing sup that DiFranco requested that
21 Maysonet be driven to the scene of the murder.
22     Did you participate in driving
23 Mr. Maysonet to the scene of the murder?
24 A.  No.
25 Q.  It says was accompanied by

Page 368

1  Paulnitsky, Montilla; but you don't have any
2  recollection of being present there, do you?
3  A.  No.  I'm sure I wasn't.
4  Q.  Okay.
5  A.  Where are you at now?
6  Q.  Yeah.  I'm in the middle -- in the
7  middle of the last page, page 54.
8  A.  Oh, okay.
9  Q.  It's probably on the back of
10 something you have in your hand.
11 A.  It is.  Okay.
12 Q.  And it's sort of in the middle of --
13 It looks like kind of the fifth paragraph
14 or fourth or fifth, I guess.
15 A.  Uh-huh.
16 Q.  Do you see that?
17 A.  Yeah.
18 Q.  Okay.  But you don't -- You weren't
19 present for that, right?
20 A.  No, I was not.
21 Q.  Now, Mr. Maysonet is charged.  And
22 did you have any further conversations with
23 Mr. Maysonet after he makes his court reported
24 statement, as far as you know?
25 A.  I don't know if I -- I don't think I

Maysonet v.
Guevara

Video Deposition

Page 369

1  had a conversation with him when he came into
2  the station. I'm sure I didn't talk to him. I
3  doubt it. I can't recall it.
4  Q. All right. Do you remember any
5  other investigative conduct you may have taken
6  or actions you may have taken in connection
7  with the Wiley brothers' murders after
8  Mr. Maysonet was charged?
9  A. Outside of arresting Gonzalez with
10  Steve Gawrys, no.
11  Q. You do remember arresting him?
12  A. No.
13  Q. You're just assuming it happened
14  from looking at the report?
15  A. Right.
16  Q. What about any other investigative
17  work?
18  A. That I can recall, nothing.
19  Q. What about as it relates to any of
20  the other codefendants?
21  A. I have no idea.
22  Q. Have you seen any reports that show
23  you were approving sergeant on any other sups
24  related to the investigation into this case,
25  other than what we've looked at?

Page 370

1  A. I can't recall anything.
2  Q. Nothing about Justino Cruz or Gosins
3  (phonetic) or Goossens?
4  A. No.
5  Q. Alfredo Gonzalez, nothing?
6  A. Nothing --
7  Q. Um.
8  A. -- that I can recall.
9  Q. And you don't remember there being
10  any inquiry by the Cook County State's
11  Attorney's office about why there are no
12  reports reflecting the July 15th or the August
13  1st statements of Mr. Maysonet?
14  MR. ENGQUIST: Objection, asked and
15  answered.
16  BY THE WITNESS:
17  A. I can't recall any conversation with
18  the State's Attorney's office about that.
19  Q. Okay. Are you aware that those
20  reports are not really missing, but they never
21  were made available to defense counsel even at
22  the time Mr. Maysonet was tried?
23  MR. ENGQUIST: Objection,
24  foundation, calls for speculation.
25  BY THE WITNESS:

Page 371

1  A. I have no idea.
2  Q. You never heard that?
3  A. No.
4  Q. Were you under the assumption that
5  those reports are sort of missing because of
6  the age of the case all these years later?
7  A. They're missing, but I'm sure
8  they're somewhere.
9  Q. Right. I know.
10  A. I would hope.
11  Q. Well, is it -- Is it surprising to
12  you that they were not in the Cook County
13  State's Attorney's office file?
14  A. Yes, it is.
15  Q. Okay. And is it surprising to learn
16  that, according to the transcripts of the
17  proceedings in this case, those were -- No GPRs
18  were tendered to the State or the defense
19  counsel as it relates to that July 15th and
20  August 1st meeting?
21  A. Surprising.
22  Q. And why is it surprising?
23  A. Because this is rather unusual,
24  missing GPRs, especially important ones; if
25  they exist at all, which I'm sure they do.

Page 372

1  Q. You've said that, but it would be
2  strange for GPRs to be missing from the
3  investigative file and the Cook County State's
4  Attorney's file, even -- even -- I mean, we're
5  not talking about 30 years later; we're talking
6  about within months, within weeks, they were
7  never tendered.
8  MR. LEINENWEBER: Objection,
9  foundation, vague.
10  BY THE WITNESS:
11  A. What's the question?
12  MR. ENGQUIST: Object.
13  BY MS. BONJEAN:
14  Q. What I'm saying is, according to the
15  record, the transcripts of the proceedings,
16  there were no GPRs ever given to any party to
17  the criminal prosecution that reflected those
18  statements.
19  What's your explanation for that?
20  A. I have none.
21  Q. So if they were lost, they were lost
22  immediately, not 20 years later or 30 years
23  later.
24  A. I -- I can't answer that. Don't
25  know.

Maysonet v.
Guevara

Video Deposition

Page 373

1  Q.  It's not possible that the
2   statements were made up on August 23rd, 1990?
3     MR. RAHE: Objection, speculation.
4     BY THE WITNESS:
5  A.  What do you -- Repeat that.
6  Q.  It's not possible that the
7   statements were just made up on August 23rd,
8   1990?
9  A.  No.
10    MR. RAHE: Same objection.
11    BY MS. BONJEAN:
12 Q.  Why isn't that possible?
13 A.  Who would do that?
14 Q.  You.
15 A.  No.  I would not do it.  In the
16  conversations with --
17 Q.  Yeah.
18 A.  Absolutely not.
19 Q.  Certainly odd that there were never
20  any reports made of it.
21    MR. LEINENWEBER: Objection,
22 foundation.
23    MR. ENGQUIST: Objection, this is
24 argumentative.
25    MR. RAHE: No question pending.

Page 374

1     BY THE WITNESS:
2  A.  Either I made or I passed it on for
3   somebody else to be made.
4  Q.  Nobody made them.
5     MR. LEINENWEBER: Same objection.
6     MR. ENGQUIST: There's no question.
7     BY MS. BONJEAN:
8  Q.  But if you find them, let me know.
9  A.  Will do.
10    MR. LEINENWEBER: Same objection, to
11 this continued commentary.
12    BY MS. BONJEAN:
13 Q.  Give me a minute.
14    THE VIDEOGRAPHER: Should we go off
15 the record?
16    MS. BONJEAN: Let's go off for a
17 minute, okay?  A couple minutes and then --
18    MR. ENGQUIST: Yeah.  Well, a couple
19 minutes because if we're going to get off,
20 we're going to walk around a little bit.
21 So, yeah, we'll be back.
22    MS. BONJEAN: Yeah.  I mean, I don't
23 -- I want to get out of here too, so --
24    MR. ENGQUIST: Okay.
25    MS. BONJEAN: -- I think --

Page 375

1     THE VIDEOGRAPHER: We are going off
2   the record at 5:28 p.m.
3     (A short break was had.)
4     THE VIDEOGRAPHER: We are back on
5   the record at 5:34 p.m.
6     BY MS. BONJEAN:
7  Q.  Mr. Mingey, do you remember what
8   Mr. Maysonet went to trial for?
9  A.  No.
10 Q.  Were you contacted about your
11  knowledge of his exculpatory statements when
12  he --
13 A.  The original trial?
14 Q.  Yeah?
15 A.  No, not that I recall.
16 Q.  Do you remember talking with
17  Montilla about your meetings with Mr. Maysonet
18  --
19 A.  No.
20 Q.  -- prior to trial?  Nothing?
21 A.  No, nothing.  Nothing that I recall.
22 Q.  Nobody contacted you to get your
23  recollection of those meetings?
24 A.  To my knowledge, no.
25 Q.  So after Mr. Maysonet was taken

Page 376

1   away, charged with two counts of first-degree
2   murder on August 23rd, 1990, the next time this
3   case came into your consciousness was when Jim
4   Papa reached out to you --
5  A.  Yes.
6  Q.  27 years later?
7  A.  Right.
8  Q.  What was your relationship with Joe
9   Miedzianowski?
10 A.  He worked in Gangs.  He was on --
11  there was -- When gang crimes went to Area 6,
12  they joined SOG and Gangs merged.  Joe was a
13  uniform guy on the SOG side.
14 Q.  Okay.
15 A.  And eventually became a gang crime
16  specialist at some point.
17 Q.  What's SOG?
18 A.  Specialist Operations Group.  The
19  uniform guys that go to high crime areas; like
20  the old task force.  But they merged both units
21  and he was on the uniform side.  Him and his
22  partner for a while -- I don't know when they
23  became Gang Crime Specialists, probably after I
24  left, possibly.
25 Q.  What year would that be, '89?

Page 377

1 A. Yeah. They probably got promoted, I
2 would imagine, somewhere in the '90s. He got
3 arrested what, '99, '98? Something like that.
4 Q. Yeah. Well, he went to -- I think
5 he went to trial in '99, maybe.
6 A. Okay.
7 Q. He was arrested in '98.
8 A. Okay. No, that's no relationship,
9 pretty much.
10 Q. You're aware that my client contends
11 that his home was searched by Miedzianowski and
12 Guevara late '80s at some point?
13 A. I didn't think -- To be honest with
14 you, I didn't think Rey had much to do with Joe
15 Miedz- -- as far as I'm concerned.
16 Q. I've heard that.
17 A. In fact, I didn't think they really
18 got along together.
19 Q. What's your basis of understanding?
20 A. Pretty much that you can kind of
21 tell when guys like or dislike each other. We
22 didn't have much contact with Miedzianowski
23 when we were there; because Joe, again, was on
24 the uniform side. And although he did work in
25 plain clothes with his sergeant, whoever he

Page 378

1 was, you could just tell. A lot of guys didn't
2 like Joe.
3 Q. Were you aware that he was working
4 both sides of the --
5 A. Miedzianowski?
6 Q. Yeah.
7 A. Not until he got arrested. And we
8 started getting people that would filter in,
9 gangbangers that would tell us stories about
10 Joe.
11 Q. Uh-huh.
12 A. And one that I think I told you the
13 last time.
14 Q. Which is -- Remind me?
15 A. Benny Marzullo, rape case, Florida.
16 Q. Okay.
17 A. They writted him in, and I guess he
18 had a tale to tell about Joe. I didn't know
19 anything about it. We were gone -- I was gone
20 for a long time. But I don't think anybody
21 knew the extent of what that guy was doing.
22 Q. Uh-huh. And have you ever received
23 any information that Rey Guevara was up to the
24 same sort of tactics?
25 A. Absolutely not.

Page 379

1 Q. Well, you know, there have been
2 allegations, including by my client, that he
3 was shaking down gangbangers for protection
4 money?
5 A. I can't see that.
6 Q. Why not?
7 A. He's not that kind of a guy. I've
8 never seen that. I've known him for years. I
9 can't see him doing that.
10 Q. Well, you knew he was hard out on
11 his luck; he needed money from time to time,
12 correct?
13 A. That he did.
14 Q. Borrowed money from other
15 detectives?
16 A. Sure. Borrowed money from me. Paid
17 me back. But no, he was -- But he never had
18 any money. I mean, it's not like one day he
19 was a buck busted and next day he was buying
20 everybody lunch at the office, no. He never
21 had money -- never, never. His broken-down
22 cars and all kinds of weird stuff like that.
23 No. I would be shocked if that was true. I
24 don't believe it. I'll never believe it that
25 he would do something like that.

Page 380

1 Q. And so you -- It would surprise you
2 to learn that Miedzianowski and Guevara had
3 collaborated in essentially shaking down drug
4 dealers?
5 A. Absolutely.
6 MR. LEINENWEBER: Objection to
7 foundation.
8 BY MS. BONJEAN:
9 Q. And if -- And if people other than
10 my client were to have -- say that, you would
11 find that to be hard to believe?
12 MR. LEINENWEBER: Same objection.
13 BY THE WITNESS:
14 A. Very hard to believe.
15 Q. What if I told you I've spoken to
16 Joe Miedzianowski and he told me that?
17 MR. LEINENWEBER: Same objection.
18 BY THE WITNESS:
19 A. Extremely hard to believe.
20 Q. So you think Joe Miedzianowski would
21 lie to you?
22 A. Well, I can't believe that Guevara
23 and Miedzianowski would be involved in a scheme
24 like that. I can't believe that.
25 Q. Well, you would believe that

Page 381

1  Miedzianowski would be involved in a scheme
2  like that?
3  A.  Only after he was arrested.  Joe was
4  a good policeman.  Before he was arrested, I
5  don't think anybody knew what was going on.  I
6  certainly didn't because I was gone.
7  Q.  But he wasn't a good policeman.  He
8  was a bad policeman.  You just didn't know
9  about it.
10  A.  I just didn't know about it.
11  Q.  Right?
12  A.  But as far as informants and
13  narcotics and stuff like that, he was good.  He
14  cleared a couple cases for us.
15  Q.  Right.  But you didn't know -- It's
16  easy to clear cases when you're working both
17  sides of the --
18  A.  Absolutely.
19  Q.  And Guevara was someone who cleared
20  a lot of cases, right?
21  A.  Yeah.  He lived in that
22  neighborhood, had informants all over the
23  place, a lot of Xs with information he had.  He
24  was good.
25  Q.  Right.  And one way to get

Page 382

1  information is sometimes to pay for it, isn't
2  it?
3      MR. LEINENWEBER: Objection,
4  foundation, calls for speculation.
5      BY THE WITNESS:
6  A.  Pay for it?
7  Q.  Well, you know, give a benefit for
8  it.
9      MR. LEINENWEBER: Same.
10      BY MS. BONJEAN:
11  Q.  Give protection for it?
12  A.  No way, not Guevara.  Never had any
13  money, never.
14  Q.  Right.  But I'm saying that giving
15  protection to someone with information is one
16  form of currency, correct?
17  A.  Yeah.
18      MR. LEINENWEBER: Objection, vague.
19      BY THE WITNESS:
20  A.  Could be considered that.
21  Q.  And just like you didn't know what
22  Miedzianowski was up to, you also don't
23  necessarily know what Guevara was up to?
24      MR. LEINENWEBER: Objection,
25  foundation, calls for speculation.

Page 383

1      MR. ENGQUIST: Objection,
2  argumentative.
3      BY THE WITNESS:
4  A.  No, I didn't know what Joe was up
5  to, whether any of the people that were left --
6  Don't forget, I left in '89.  Joe was locked up
7  ten years later.
8      However, it would be shocking to me
9  -- It was shocking when Joe got locked up.  It
10  would be even more shocking if any dirt came
11  out about Guevara doing that.  I can't believe
12  he'd do that.  Because that would be hard to
13  cov -- that would be hard to hide.  I don't
14  think he'd do it to begin with anyways.
15  Q.  Are you aware that, when the FBI was
16  prosecute -- Strike that.
17      When the U.S. Attorney's
18  office was prosecuting Miedzianowski, they
19  interviewed a number of people who -- or
20  interviewed one person who was a codefendant of
21  Miedzianowski named Muhammad Omar.
22      Do you know who that is?
23  A.  I heard the name, sure.
24  Q.  Okay.  And that Muhammad Omar told
25  AUSA agents, including -- and also apparently a

Page 384

1  sergeant from IAD -- Chicago Police sergeant
2  assigned to IAD that Guevara did allow
3  gangbangers to buy their way out of trouble?
4  A.  Never heard that.  But I think at
5  the time I -- I heard rumblings about that,
6  that he was dirtied up on one -- on one -- from
7  one of Joe's guys, Omar, in fact, right?
8  Q.  Right.  Who was dirtied up, Guevara?
9  A.  Yeah.
10  Q.  And you heard that at the time?
11  A.  I believe I heard something about
12  that.  I don't know if it was at the time or
13  later on.  But when that came out, I think we
14  heard something about that.
15  Q.  That one of Joe's guys had dirtied
16  up Guevara?
17  A.  Something like that; but I don't buy
18  any of it.
19  Q.  Okay.  And were you aware that -- Do
20  you know who Rick Beuke is?
21  A.  Sure.
22  Q.  Do you know Rick Beuke's
23  relationship with Miedzianowski?
24  A.  I didn't think he had any.
25  Q.  Did he represent Miedzianowski?

Maysonet v.
Guevara

Video Deposition

Page 385

1  A.  I have no idea.  I don't know who
2  his lawyers were when he got jammed up.  Was it
3  Beuke?
4  Q.  He had a few, including Beuke.
5     Were you aware of Beuke's
6  relationship with Guevara?
7  A.  I was aware that Beuke handled maybe
8  a divorce case or some kind of a case with his
9  ex-wife or ex-girlfriend or something like that
10  over a kid or maybe some child support issues.
11  I think many years ago I heard that.
12  Q.  Apart from representing him on a
13  case, were you aware that they had a
14  friendship?
15  A.  Well, they certainly weren't
16  enemies, but if they had a -- like a
17  friendship/friendship --
18  Q.  Friendship.
19  A.  -- or just -- no, not really.  But
20  he was a friend of Rick's.  And Rick, I
21  thought, was a friend of his too.
22  Q.  Right.  You were aware that they had
23  a friendship?
24  A.  Not away from the police department,
25  though.  I didn't know about that, if that's

Page 386

1  what you're referring to.
2  Q.  I'm just --
3  A.  Just like work friends, like a
4  lawyer comes in to represent people.
5     Hey, Rey, how you doing?  Let's go
6  out for a beer afterwards.
7     That kind of stuff?
8  Q.  I guess, you know, we can
9  characterize it different ways.  I will
10  represent that Rick Beuke himself has called it
11  a friendship.  And that I think Rick Beuke
12  represented him in about eight or nine cases.
13  A.  Probably all that domestic stuff, I
14  would assume.  But I don't know.  I don't know
15  how many cases.  I know I heard that Rick was
16  representing him on some kind of a child
17  support issue.  I don't even know where I got
18  that information from or anything more about
19  it.
20  Q.  And were you aware that Rick has
21  been accused of being sort of a conduit for
22  drug dealers and gangbangers buying their way
23  out of trouble?
24  A.  Nonsense.  Good guy.
25  Q.  Beuke?

Page 387

1  A.  Yeah.
2  Q.  You don't think that's the case?
3  A.  No, no.  He's a class act.  Always
4  was.  I've been wrong about people before, but
5  about him, I don't think so.  He's a good guy.
6  Q.  And what -- What's your basis of
7  opinion?
8  A.  Just the little I knew of him.  I
9  thought he was a class act.
10  Q.  What makes someone a "class act"?
11  A.  Go along with everybody, taking care
12  of Guevara and his -- all his problems.  No, he
13  was a good guy, I thought.
14  Q.  Even though he represented Maysonet?
15  A.  Rick?  That doesn't bother me.
16  That's his job.  Not a problem.
17  Q.  And so he represented Miedzianowski,
18  and -- you didn't know that, though, right?
19  A.  No.  I couldn't recall who his
20  lawyers were.  Maybe at the time, I did.  But
21  when you brought it, it was kind of a surprise
22  to me that he did actually, but --
23  Q.  And you've never heard that Rick
24  Beuke was sort of in on helping gangbangers buy
25  their way out of trouble?

Page 388

1  A.  Never.
2     MR. LEINENWEBER:  Objection, asked
3  and answered.
4     BY MS. BONJEAN:
5  Q.  First person you've heard that from
6  is me?
7  A.  Yeah.  Never heard that.
8  Q.  And you're not aware that Muhammad
9  Omar provided that information to the FBI?
10  A.  No.  Again, Omar's name came up as
11  providing information, I think; but there's so
12  many stories that started coming out when Joe
13  was arrested.  I think that's when these
14  stories really started coming out, and we heard
15  a few of them, but about that and Omar, I
16  didn't know Rey even knew him.
17  Q.  Did you know Woodall was dirty?
18  A.  Yeah.  But again, Woodall was a good
19  policeman, smart guy, college guy.  Got
20  involved in a deal with Miedzianowski over some
21  recovered dope, and apparently the government
22  was on his phone line when he called
23  Miedzianowski to see if he could get rid of
24  whatever he -- whatever Woodall still -- And
25  Woodall, I'll tell ya, did a bad thing, but

Page 389

1  before he did that, he was a hardworking, good
2  guy.
3  Q.  Yeah?  You think that was an
4  isolated incident?
5  A.  I would hope it was.  I think he's
6  out of jail now and hopefully he turned his
7  life around.
8  Q.  What about Danny Engle?  Hear he was
9  dirtied up?
10  A.  No.  Danny's a good guy too.
11  Hardworking guy.
12    You're talking about Danny or Jeff?
13  Q.  Danny.
14  A.  The Gang's Area 5 guy?
15  Q.  Yeah?
16  A.  Hardworking, good guy.
17  Q.  Have you ever heard the wiretaps
18  where Miedzianowski threatens Chad Johnson that
19  if he doesn't turn himself in, Engle or Guevara
20  is going to come get him?
21  A.  No.
22  Q.  If you heard the wiretaps, would you
23  doubt me?
24    MR. RAHE: Objection to speculation
25  and foundation.

Page 390

1    BY THE WITNESS:
2  A.  You know, I worked with these guys
3  for years.  I can't say a bad word about a lot
4  of them.
5  Q.  Any of them, really, except the ones
6  that are in prison?
7  A.  True.
8    MR. LEINENWEBER: Mischaracterizes
9  the witness's testimony.
10    BY THE WITNESS:
11  A.  But at the time they always -- they
12  were just good guys, hardworking, solid guys.
13  Q.  What about Jon Burge?
14  A.  I know of him; don't know him.
15  Q.  Is he a solid guy?  Was a solid guy?
16  A.  Vietnam guy.  And he was at one
17  time.
18  Q.  In your 37 years in the department,
19  did you ever see any misconduct committed by
20  any fellow officer?
21  A.  By that, what do you mean?
22  Q.  Any misconduct that would --
23  A.  Criminal-type stuff?
24  Q.  Well, I would say any criminal-type
25  stuff or excessive force, violations of policy

Page 391

1  that were violating constitutional rights of
2  civilians?
3  A.  Not that I can recall.
4  Q.  I'm not talking about not wearing a
5  hat or something or having your uniform clean.
6  A.  I know what you mean now.
7  Q.  In your 37 -- 37 years; is that
8  right?
9  A.  Yeah.
10  Q.  37 years on the force, did you ever
11  witness a fellow officer either commit a crime
12  or commit any violation of the policies of the
13  Department that resulted in a constitutional
14  violation of an individual?
15    MR. RAHE: Objection, foundation.
16    MR. LEINENWEBER: Also, just asked
17  and answered.
18    MR. ENGQUIST: Join.
19    BY THE WITNESS:
20  A.  Not that I can recall.  I really
21  don't know what you're trying to get at,
22  though.  What do you mean like --  What do you
23  mean?
24  Q.  Okay.  Did you ever witness a police
25  officer commit an act of excessive force?

Page 392

1    MR. RAHE: Objection, foundation.
2    BY THE WITNESS;
3  A.  No.
4  Q.  Did you ever witness a police
5  officer prepare a police report that contained
6  a false statement?
7  A.  Not that I can recall, no.
8  Q.  Did you ever witness a police report
9  lie under oath -- police officer?
10  A.  Did I --
11  Q.  Have you ever witnessed or become
12  aware of a police officer lying under oath?
13  A.  Not that I can recall.
14  Q.  Have you ever witnessed a police
15  officer or have firsthand knowledge of a police
16  officer using some level of abuse during an
17  interrogation?
18  A.  No, no.
19  Q.  Have you ever witnessed a police
20  officer make false promises to a -- Strike
21  that.
22    Have you ever witnessed a police
23  officer threaten either force or -- Yeah, we'll
24  just say keep it at force -- any level of
25  physical force?

Maysonet v.
Guevara

Video Deposition

Page 393

1 A.  You're talking about offenders and
2 witnesses and so forth?  It could be anybody?
3 Q.  In the course of investigating a
4 case, have you ever witnessed a fellow police
5 officer threaten force against a witness or a
6 suspect or would be defendant?
7 A.  Out in the street?  In the station?
8 Q.  Anywhere.
9 A.  No.  I've seen police officers get
10 in physical altercations with people, but they
11 were justified in what occurred.
12 Q.  Yeah.  I'm not talking about
13 justified defending yourself.  I'm talking
14 about using force as a means of --
15 A.  Getting a confession out of
16 somebody?
17 Q.  Yeah.
18 A.  That kind of stuff?  No.
19 Q.  Never, right?
20 A.  No.
21 Q.  All right.
22 A.  Not that I can recall.
23     MS. BONJEAN: I have nothing
24 further.
25     MR. BRENER: No questions.

Page 394

1     MR. LEINENWEBER: No questions.
2     MR. RAHE: No questions.
3     MR. ENGQUIST: We'll reserve.
4     MS. BONJEAN: All right.
5     THE WITNESS: Thank you.
6     THE VIDEOGRAPHER: We are going off
7 the record at --
8     THE WITNESS: Are you flying --
9     THE VIDEOGRAPHER: -- 5:51 p.m. --
10     THE WITNESS: -- home?
11     THE VIDEOGRAPHER: --  with the
12 end --
13     MS. BONJEAN: Nope.  I have more
14 tomorrow.
15     THE VIDEOGRAPHER: -- of the
16 deposition of Edward Mingey.
17     (Deposition concluded at 5:51.)
18
19
20
21
22
23
24
25

Page 395

1       IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION
3 JOSE JUAN MAYSONET, JR.,        )
4                                 )
         Plaintiff,               )
5                                 )
         vs.                      ) No. 18-cv-02342
6                                 )
  REYNALDO GUEVARA, ERNEST        )
7 HALVORSEN, EDWARD MINGEY,       )
  EPPLEN; FERNANDO MONTILLA,      )
8 ROLAND PAULNITSKY, FRANK        )
  DIFRANCO, CITY OF CHICAGO,      )
9 and COOK COUNTY,                )
                                  )
10         Defendants.            )
11     I, EDWARD MINGEY, state that I have
12 read the foregoing transcript of the testimony
   given by me at my deposition on the 11th day of
   September, 2019, and that said transcript
13 constitutes a true and correct record of the
   testimony given by me at the said deposition
14 except as I have so indicated on the errata sheets
   provided herein.
15
16
17
18
19                    _____
                              EDWARD MINGEY
20
21 SUBSCRIBED AND SWORN to
   before me this _____ day
22 of _____, 2019.
23
24 _____
          NOTARY PUBLIC
25

Page 396

1  UNITED STATES OF AMERICA    )
2  NORTHERN DISTRICT OF ILLINOIS )
   EASTERN DIVISION            )  SS.
3  STATE OF ILLINOIS           )
   COUNTY OF COOK              )
4
5     I, Alyssa N. Kuipers, Certified Shorthand
6 Reporter, Registered Professional Reporter, do
7 hereby certify that EDWARD MINGEY was first duly
8 sworn by me to testify to the whole truth and that
9 the above deposition was reported stenographically
10 by me and reduced to typewriting under my personal
11 direction.
12     I further certify that the said
13 deposition was taken at the time and place
14 specified and that the taking of said deposition
15 commenced on the 11th day of September, 2019, at
16 10:14 a.m.
17     I further certify that I am not a
18 relative or employee or attorney or counsel of any
19 of the parties, nor a relative or employee of such
20 attorney or counsel, nor financially interested
21 directly or indirectly in this action.
22
23
24
25

Maysonet v.
Guevara

Video Deposition

Page 397

```
 1        Witness my official signature on this
 2  30th day of September, A.D., 2019.
 3
 4
 5
 6
 7        _____
 8            ALYSSA N. KUIPERS, CSR, RPR
 9
10
11  CSR No. 084-004857
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**[**

**[sic] (2)**
277:9;361:13

**A**

**ability (2)**
8:10;242:24
**able (27)**
17:4;54:19;55:6,8;
99:17;213:21;215:21;
216:2,3;220:3;
235:16,17,22;236:5,
22;237:3,24;238:10;
239:10;244:17;276:8;
291:10;313:2;337:23;
355:2;358:4;362:5
**abreast (1)**
163:6
**absent (1)**
232:3
**Absolutely (25)**
18:6;33:23;36:6,21;
85:23;116:5;134:16;
137:20;139:9;166:25;
168:11;203:9;213:17;
214:3,20;222:16;
270:4;293:7,25;
322:23;355:13;
373:18;378:25;380:5;
381:18
**abuse (1)**
392:16
**abused (1)**
53:6
**academy (3)**
59:3,8,12
**accent (2)**
283:12,25
**accents (1)**
278:18
**Accept (1)**
135:6
**acceptable (2)**
190:23;191:23
**accepting (1)**
25:13
**access (2)**
131:7;136:16
**accompanied (1)**
367:25
**accompanying (1)**
230:14
**accord (1)**
332:14
**according (34)**
48:14;51:12;
213:13;219:10,11,21;
226:4;228:3;237:22;
238:9;242:14;243:24;
256:19;263:16;283:7,

23;296:4,25;297:5;
310:1;332:14;335:13,
24;338:11,13;339:3,
22;341:15;345:17;
349:11;354:4;363:14;
371:16;372:14
**account (1)**
139:5
**accountability (2)**
209:12,16
**accountable (4)**
189:4,5;209:17;
327:4
**accuracy (1)**
144:12
**accurate (7)**
26:20;34:19;87:9;
137:5,7;144:13;362:3
**accurately (1)**
341:5
**accused (1)**
386:21
**accustomed (1)**
48:10
**Ace (2)**
106:11,12
**acknowledged (2)**
343:1;346:7
**act (5)**
189:10;387:3,9,10;
391:25
**acting (2)**
188:18;345:25
**action (7)**
153:5,7,8,12;
155:24;156:1,8
**actions (4)**
46:25;220:10,16;
369:6
**active (6)**
125:4,13;127:6,10;
153:4;156:9
**actively (2)**
206:6,12
**activities (1)**
134:6
**activity (9)**
65:6;80:13,14;
159:17;272:7;273:9,
23;298:15;332:16
**actual (10)**
19:6;27:23;28:1;
34:21;63:6,12;
103:25;141:12;
216:13;309:12
**Actually (41)**
29:22;42:23;63:4;
68:6;69:9;72:18;92:8;
93:4;94:8;97:5;102:2,
9,19;104:25;128:23;
134:14;143:24;
154:10;155:20;
158:25;180:10;

205:19;207:17;210:9;
229:15;242:2;245:22,
23;267:15;286:19;
295:25;304:12;311:9;
315:4;316:4;319:15;
343:14;348:2;358:16;
364:16;387:22
**added (1)**
286:9
**additional (2)**
316:3;361:8
**addresses (2)**
268:24;310:11
**admission (4)**
223:16;360:15,23;
365:15
**admissions (8)**
235:11;342:14,15,
23;344:21;345:10,12,
17
**admit (2)**
279:25;301:5
**adopted (1)**
36:23
**adult (1)**
156:19
**advice (7)**
29:18,23,25;30:10;
39:22,22,23
**advised (2)**
342:24;346:5
**affiliated (1)**
150:24
**afforded (1)**
41:9
**afraid (1)**
44:10
**African (2)**
150:3;282:16
**afternoon (1)**
271:7
**afterwards (2)**
222:8;386:6
**Again (75)**
9:23;20:16;26:25;
32:2;37:5,10;40:21;
45:13;48:8;52:24;
53:1;74:1;79:1;83:6;
85:6;87:18;96:16;
101:8;106:11;110:22;
111:15;116:11;
127:16;138:1;158:21;
160:1;183:25;197:10;
199:17;200:2;203:6,
19,20;204:19;207:6,
13;214:4;215:20;
223:5;226:1;238:20;
243:2;249:19;256:9;
268:9;274:1;276:20;
277:7,18;278:10,20;
281:25;286:24;289:7,
11;293:11;299:17;
304:23;327:7;333:23;

334:4,19;339:8;
341:24;350:16;
357:18;358:22;360:1,
14;361:2;363:11;
364:11;377:23;
388:10,18
**against (11)**
9:13;11:1,5;19:7;
53:5,7;54:19;109:20;
195:21;216:13;393:5
**age (6)**
26:19;147:11,23;
295:14;350:5;371:6
**agencies' (1)**
301:8
**agents (1)**
383:25
**aggravated (3)**
86:20;87:25;227:3
**ago (4)**
13:2;141:13;
234:20;385:11
**agree (61)**
7:21,25;9:23;18:3,
9;48:19,24;49:15;
50:19;52:5;68:19;
69:8;70:20;85:20;
87:6;88:5;89:2;95:14;
105:8;107:14;108:11;
111:4,10;113:7,25;
115:17;116:1,6;
152:17;153:18;
162:13;181:18;
189:14;190:3;194:4,
16,17;195:7,9;
209:14;211:10,16;
255:24;268:21;
274:21;282:4;292:12;
295:21,24;297:4;
302:25;304:16,17;
310:14;318:23;
322:10;349:21,23;
354:23;356:7;361:6
**agreed (7)**
95:6;176:25;343:1;
346:8;347:23;348:22;
360:11
**agrees (1)**
355:15
**Aha (1)**
156:24
**ahead (18)**
53:1;65:18;83:11;
91:11;93:6;155:2;
165:12;174:18,20;
186:5;207:11;211:21;
221:1;275:25;287:20;
352:6,13;360:18
**ahold (6)**
12:7;23:12,12,17;
24:12;175:6
**al (2)**
5:3;35:24

**Alfredo (4)**
146:1;148:11;
362:7;370:5
**allegation (1)**
49:2
**allegations (5)**
51:21;52:1,17,18;
**alleged (3)**
49:9;235:11;322:4
**allegedly (5)**
167:17;283:18;
285:23;303:7;325:11;
344:16;358:2
**allow (2)**
131:16;384:2
**allowed (3)**
130:1;131:12;360:4
**Alma (1)**
275:22
**almost (4)**
126:1;152:18;
209:4;214:18
**alone (3)**
14:3;353:12,14
**along (8)**
82:11;95:13;
213:15,23;214:2;
357:15;377:18;
387:11
**alphabetical (1)**
66:20
**alphabetized (1)**
67:5
**altercations (1)**
393:10
**alternatively (1)**
269:12
**Although (5)**
19:1;169:14;235:4;
238:21;377:24
**Alvarez (1)**
43:22
**always (7)**
50:17;65:24;88:14;
107:11;116:25;387:3;
390:11
**Alyssa (1)**
5:14
**Amendment (13)**
39:11,20,25;40:9,
19;41:2,8;51:6,25;
53:20;54:1,10;187:1
**American (1)**
150:4
**Americans (1)**
282:17
**amongst (1)**
65:13
**amount (3)**
56:9;82:17;162:25
**amounted (1)**
209:4

**and/or (2)**
223:17;271:21
**Anita (1)**
43:22
**annoying (1)**
251:3
**answered (25)**
47:22;52:25;83:18;
111:7;112:22;157:3;
194:8;223:24;224:14;
236:9;240:8;244:5;
246:14;255:7;256:4;
258:20;282:9;283:3,
14;327:12;331:1;
346:16;370:15;388:3;
391:17
**antipolice (4)**
41:24;42:5,8,14
**anymore (3)**
60:10;79:18;221:22
**anything's (8)**
101:9;229:4,7,22;
230:4;268:11;273:1;
281:25
**anyways (5)**
105:13;125:21;
165:23;331:24;
383:14
**apart (9)**
20:24;88:23;
220:23;297:23;
298:25;323:22;
325:21;364:14;
385:12
**apartment (1)**
356:16
**apologies (3)**
118:10;135:6;
303:24
**appalling (1)**
227:14
**apparent (1)**
365:14
**apparently (13)**
90:15;176:6,17;
178:12;225:23;227:7;
234:11;263:15;
270:18;320:8;336:2;
383:25;388:21
**appear (7)**
33:4;37:7;267:23;
286:5;303:1,4;356:4
**appeared (2)**
20:15;32:6
**appears (11)**
263:9;274:19;
303:20;305:5;308:6;
309:2;311:19;330:5;
333:22,24;345:20
**appointed (1)**
60:16
**appointment (1)**
60:16

**appreciate (2)**
232:4;250:25
**approach (1)**
36:22
**approached (1)**
320:2
**approval (3)**
130:7;131:21;
139:20
**approve (9)**
81:20;111:12;
132:16,16;136:22,25;
137:2;142:20;197:2
**approved (16)**
134:21;136:14;
137:14;138:4;139:12,
15,21;169:12;271:13,
14;274:20;275:3,7;
284:8;314:14,18
**approving (3)**
82:7;266:16;369:23
**approximate (1)**
13:24
**approximately (4)**
9:12;123:12;126:4,
24
**area (125)**
56:17;58:2,10;
59:18,20,25;60:1,3;
61:3,13,19;63:11,13,
21;65:3,14,15;70:17;
71:25;75:24;76:3,5,7,
10,13;77:9,10,11,23,
23,25;78:4,5,12,18,
24;80:24;81:17,19;
82:16;84:16,19;
85:16;86:17;87:15,
20;97:25;99:13;
102:16;104:24;
117:24;118:5,7,9,13;
119:20;120:11,23;
121:11;124:10;
133:13;135:3,5,8,12;
139:23,24,25;149:6,7,
10,18;160:10;162:4,
14;163:7,9,22,24;
164:2;172:9,21;
174:25;175:11,12;
176:3;200:7;219:6;
220:11;225:25;230:7,
9,12,14;231:11;
233:19;234:1;251:15;
254:8;255:14,17;
256:2,10;279:15,21;
288:5;289:10;291:25,
25;293:14;294:6,8;
295:4;325:6;342:24;
345:2;347:19;349:11;
352:20;354:20;360:3;
362:16,24;376:11;
389:14
**areas (2)**
59:22;376:19

**argue (1)**
269:12
**arguing (5)**
47:10;276:10;
277:24;278:6;282:18
**argument (3)**
277:2,7;282:19
**argumentative (33)**
10:2;186:4,11;
187:18;194:8;207:9;
212:13;227:17;
242:21;243:15;244:4;
245:8;253:3;254:19;
257:9;258:19;280:6;
281:1;282:9;283:3;
300:3;312:18;318:17,
25;330:21;331:1;
339:11;341:12;
346:16;358:25;367:1;
373:24;383:2
**Army (1)**
57:21
**around (21)**
60:12;76:24;79:1,3,
5;87:7;94:21;114:9;
123:8;143:15;239:19;
247:8,11;271:17;
276:9;296:22;319:9;
327:9;344:10;374:20;
389:7
**arrest (12)**
66:14,16,23;67:3,
18;69:13;210:4,17;
211:13;235:2;284:15;
315:12
**arrested (19)**
164:24;172:7;
180:24;210:12;219:6;
221:18,24;237:2;
284:23;298:21;
311:16;332:23;
341:18;377:3,7;
378:7;381:3,4;388:13
**arrestee (1)**
173:25
**arrestees (1)**
121:10
**arresting (2)**
369:9,11
**arrive (1)**
32:16
**arrived (4)**
345:2,17;352:20;
360:3
**arrives (1)**
354:20
**arriving (1)**
345:8
**arts (1)**
57:19
**ASA (6)**
362:15,22;363:5,
13,18;365:21

**Ash (1)**
249:25
**Ashley (1)**
5:21
**aside (9)**
10:19;88:3;105:25;
110:9;111:2;184:3;
261:13;285:17;
289:12
**aspect (2)**
133:2;232:7
**assert (1)**
39:25
**assign (2)**
207:16;317:1
**assigned (93)**
60:3,7;63:5,7;
80:24;89:17;92:2,17,
18,22;93:15,18;95:3;
96:1,25;97:9;125:18;
168:6;171:1,16;
189:24;190:10;
191:14,21,24;196:17;
197:13,24;198:7,9,10;
201:18;202:2,5,19;
205:19;207:17;212:5;
213:5,15,18;214:2;
215:11,14,19,19,23;
216:6,17;217:14;
218:3;219:23,24;
222:21;223:13,17;
226:3,4,20,22;227:10,
15;236:13;238:19;
241:17;244:8,14;
246:17;252:9;263:7,
23,25;264:16,25;
265:1,2,5;274:10;
287:6;305:8;315:24;
316:4,23;317:15,24;
318:6,12,13,15;319:5,
7;362:23;384:2
**assignment (4)**
57:6;59:7;317:4,11
**assigns (1)**
316:22
**assist (1)**
339:4
**assistance (1)**
30:9
**assisting (1)**
339:7
**associated (6)**
69:10;88:6;151:6;
155:11;158:4;172:5
**association (1)**
155:14
**assume (26)**
7:22;24:10;28:14;
30:19;42:7,7;47:24,
25;85:4;134:2;136:2;
137:3;144:14;176:23;
177:12;203:7;280:11;
294:16;295:9;298:6;

**299:13;319:6;349:18;
351:8;366:20;386:14
assumed (8)**
16:16;27:9;175:5;
178:18;179:25;180:1,
5;219:22
**assuming (7)**
19:20;140:11;
141:4;188:9,9;
218:10;369:13
**assumption (1)**
371:4
**assumptions (2)**
323:22;339:8
**assure (5)**
246:9;247:16;
323:13;331:17,19
**attach (1)**
129:17
**attached (1)**
128:21
**attempt (2)**
322:11,18
**attempted (1)**
324:14
**attend (2)**
59:4,12
**attended (3)**
22:16,17;56:21
**attending (1)**
59:15
**attention (3)**
145:13;177:11;
357:1
**attitude (1)**
71:1
**attorney (38)**
20:11;23:11;27:5;
30:11,14;36:21;
37:17;39:10;44:15;
46:16;53:22;88:15;
184:17,21,23;210:23;
216:19;217:10,15;
218:4,7;223:6;
258:13;292:3;293:2;
295:8;334:21;335:22;
336:7;339:16;340:9,
20;343:8,11,13;
365:23;366:8,16
**attorney-client (1)**
30:5
**attorneys (6)**
14:5;20:17;30:1;
32:23;36:4;344:4
**attorney's (38)**
37:13,14;43:17;
44:6,14;216:9;
219:25;221:5;222:23;
225:10;291:24;
292:14,16,23;293:5,
17,24;294:3,12;
299:11,21,25;300:22;
302:3,22;306:17;

311:25;312:13;333:5,
13;336:4;340:4;
352:10;370:11,18;
371:13;372:4;383:17
**attributes (1)**
338:23
**August (101)**
180:19;206:22;
207:7;210:14;213:11;
215:14,24;216:5;
220:17,19;221:15,18,
24;222:1,3;223:22,
22;224:4,5,11,11;
231:2,5,8;232:9;
233:8,9,9,16;234:2;
237:5;238:13;239:18;
246:10;247:10;
284:16,24;285:12;
289:5,14,15,20;296:2,
17,23;298:2,21;312:6,
10,16;314:12,15;
326:23;327:9,23;
332:16,17,20,20,21,
23,24;333:22;334:1,
17,18,25,25;335:11,
13,16,19;339:14,15;
341:14,17;342:9,10,
16,23;344:22;345:1;
348:2,19;349:6;
350:10,18;352:2,15,
20;355:14;358:5;
360:2;362:21;363:20;
365:4;370:12;371:20;
373:2,7;376:2
**Aurelio (1)**
310:11
**AUSA (1)**
383:25
**author (1)**
339:3
**authored (4)**
132:23;314:20;
315:6;338:25
**authorizing (1)**
82:17
**available (6)**
29:17;176:4,18;
269:17;317:7;370:21
**Avenue (15)**
61:14;150:4;158:2,
17,24;177:20;178:18;
179:3,14,17,19;
268:19;272:17;
276:12;282:23
**average (1)**
319:4
**avoid (2)**
70:14;245:21
**aware (27)**
105:3;133:11,15;
160:6;173:13,17;
174:1;182:11,12,13,
16;210:20;221:9;

309:10;325:6;370:19;
377:10;378:3;383:15;
384:19;385:5,7,13,22;
386:20;388:8;392:12
**away (20)**
50:1;94:7;96:18,22;
108:14;109:3,11,21;
110:6,17;111:24;
112:15,20;113:8,24;
114:2,11,23;376:1;
385:24

## B

**back (75)**
24:16;26:2;27:10,
11;32:4;35:4;43:5;
54:20;55:1;71:2;
73:15,24;74:1,6,7,7;
81:13;83:1;86:16;
98:11;99:16;105:18;
108:3;119:17,25;
120:18;121:12,13,14,
18,24;122:7,9,15,20,
24;129:23;137:18;
138:1,14;139:8;
140:15;141:8;145:9;
148:22;185:13;
197:21;198:3;205:25;
218:22;219:3,23;
230:9;233:19;234:1;
239:25;261:2;270:1,
23;277:24;285:19;
286:16,18;292:6;
304:15;313:14;
327:25;332:13;
337:16;341:14;350:8;
368:9;374:21;375:4;
379:17
**backgrounds (1)**
282:20
**backwards (2)**
260:23;274:2
**bad (5)**
108:8;113:25;
381:8;388:25;390:3
**bag (2)**
185:5,15
**bang (1)**
283:5
**bank (2)**
87:25;128:3
**barring (1)**
95:10
**based (5)**
219:12;267:12;
276:22;312:2;320:10
**basement (3)**
136:7;227:24,25
**basically (4)**
58:9;105:12;
243:10;341:16
**basis (5)**

92:5;324:10,13;
377:19;387:6
**basket (3)**
127:23,25;130:6
**Bates (8)**
152:10;248:7;
270:24;285:24;
302:20;306:17;
333:17;352:7
**bathroom (2)**
123:14;124:5
**batteries (1)**
86:20
**battery (2)**
87:25;227:3
**Bay (1)**
58:2
**beans (1)**
348:24
**Bears (1)**
205:16
**Beat (1)**
287:4
**became (5)**
84:11,16;325:6;
376:15,23
**become (4)**
60:18;142:2;
210:20;392:11
**beer (1)**
386:6
**begin (2)**
53:8;383:14
**beginning (1)**
238:21
**Begins (1)**
288:18
**behalf (4)**
5:20,21,23;31:18
**behold (2)**
183:6,8
**belief (1)**
151:5
**believes (1)**
209:19
**Bella (1)**
360:3
**Belmont (2)**
78:6,18
**belong (1)**
322:4
**bench (2)**
38:4,21
**benefit (4)**
185:20,23;200:24;
382:7
**Benny (1)**
378:15
**be's (1)**
255:4
**best (17)**
8:9;85:12;94:6;
96:5,23;106:2;107:6;

142:3;178:8;226:16;
228:5,14;241:22,23;
296:5;308:20;315:1
**bet (2)**
157:17;162:23
**better (8)**
53:4;88:2;93:8;
147:15;197:17;245:2,
23;343:4
**betting (1)**
157:16
**Beuke (8)**
384:20;385:3,4,7;
386:10,11,25;387:24
**Beuke's (2)**
384:22;385:5
**Biebel (1)**
169:23
**big (7)**
69:1;80:17;119:20;
126:6;194:3;202:8;
203:3
**bigger (1)**
129:17
**binder (1)**
128:24
**binders (2)**
129:5,7
**binder-type (1)**
128:24
**bird (1)**
319:4
**birth (1)**
56:13
**bit (9)**
117:23;121:18;
129:21;206:20;211:8;
282:5;335:8;365:13;
374:20
**bits (1)**
276:14
**black (10)**
158:23;177:19;
178:17;179:2,16,18;
278:6;283:9;284:2;
319:23
**blacks (2)**
277:1;360:10
**Bless (1)**
37:16
**block (3)**
69:6;70:8,22
**blow (2)**
194:21,23
**blower (1)**
214:17
**blue (3)**
53:10;322:3,3
**board (22)**
117:20;124:11,18;
125:6,9,16,17,24,25;
128:1,10,11,12,16;
131:23;133:20;

134:10;141:11;150:9;
182:23;197:4,6
**Bob (1)**
169:24
**bodies (1)**
308:8
**bogus (4)**
102:1;255:13,18;
256:8
**Bonaventure (1)**
322:2
**bond (1)**
358:4
**Bongiorno (5)**
160:12;161:18;
162:1;174:8;231:19
**BONJEAN (106)**
5:19,19;9:10;30:3;
36:2;44:20;47:12;
50:7;22;51:16;52:22;
61:23,25;81:6,9,15;
86:1;99:16;110:15;
122:5;126:16;143:6,
17;144:23;145:5,11,
16,17;151:22;152:1,
6;156:16;186:6,13;
198:23;199:1;200:20;
209:25;218:17,24;
242:22;247:20,24;
248:5,19,23;249:1,17,
20;250:6,13,16,20;
253:6,13;255:9;
256:17;258:22;
259:12;260:11,15,21;
286:7,11,14;299:16;
301:14,17,19,22;
302:2,10,14,16;
313:10,16;318:9;
339:12;341:13,23;
350:13;351:11,13,19;
352:9,12;354:16;
366:14;367:2;372:13;
373:11;374:7,12,16,
22,25;375:6;380:8;
382:10;388:4;393:23;
394:4,13
**book (3)**
65:25;90:13,14
**books (1)**
66:9
**borderline (1)**
114:19
**Borowitz (7)**
362:16,22;363:6,
13,18;364:15;365:21
**borrowed (2)**
178:13,13,14;
379:14,16
**both (20)**
5:14;15:22;16:5;
81:16;82:11,17;
119:8,8;134:10;

152:18;155:11;165:8;
201:21;240:14;
241:18;271:16;
308:25;376:20;378:4;
381:16
**bother (1)**
387:15
**bothers (1)**
181:7
**bottom (11)**
130:19;154:11,23;
319:14;322:3;324:25;
329:13;334:11,13;
358:3,11
**boundaries (4)**
59:25;62:4;69:1;
79:9
**box (4)**
69:13;142:22;
315:3;329:12
**boxes (3)**
83:19;132:19;
143:25
**boyfriend (2)**
109:20;116:15
**Boyle (31)**
252:9;262:3;263:8,
21;265:5;287:17;
303:23,24,25;305:6,
11,12,13,17,18,19;
306:1,2,7,8,9,12;
309:15;316:8,10,11,
12,16,17,18,19
**Boyles (2)**
305:10;306:3
**break (12)**
81:5,12;144:18,24;
145:1,8;202:8;203:3;
218:16,21;313:13;
375:3
**BRENER (6)**
5:23,23;44:19;
303:16;366:12;
393:25
**Brennan (5)**
262:3;303:22;
316:7,10,15
**bring (6)**
40:4;225:18;
294:16,21,24;334:20
**bringing (6)**
122:19;217:6,10;
225:13,25;230:8
**brings (1)**
239:25
**broke (1)**
219:1
**broken-down (1)**
379:21
**brothers (23)**
23:8;146:8;150:3;
160:4;161:24;165:3,
17;167:20,21;168:25;

169:5,7;170:23;
178:23;188:12,23;
189:21;192:23;278:3,
4;320:12;327:5;358:8
**brothers' (19)**
145:22,24;150:8;
160:19;170:8;172:1,
25;174:2;178:4;
181:20;182:5;216:21;
219:8;220:23;231:16;
232:8;265:3;316:4;
369:7
**brought (13)**
25:8;121:11,12;
221:9;224:17,21,23;
230:22;231:3,6;
239:9;260:15;387:21
**buck (1)**
379:19
**building (4)**
76:13;118:16;
123:6,16
**Bureau (1)**
123:15
**Burge (1)**
390:13
**bus (3)**
272:22;276:17;
277:14
**business (3)**
133:14;236:18,19
**busted (1)**
379:19
**busts (1)**
65:10
**busy (4)**
96:17;268:1,2;
282:24
**But- (1)**
121:3
**buy (3)**
384:3,17;387:24
**buying (2)**
379:19;386:22
**bye-bye (1)**
298:10

## C

**California (4)**
32:10;61:11;76:19,
20
**call (16)**
11:8;12:8;15:15;
27:9,11;47:3,19;80:8;
88:13;261:5,6;
290:19;294:5;305:8;
343:10,12
**called (16)**
11:20;12:7,9;37:25;
39:13;40:7,24;53:21;
65:22;88:14;217:5;
224:24;237:19,24;

386:10;388:22
**calling (3)**
130:10;248:15,18
**calls (20)**
10:2;12:6;44:17;
45:18;50:4;112:3;
195:24;198:21,24;
200:18;209:23;245:8;
301:2;303:16;333:4,
9;366:12;370:24;
382:4,25
**calm (1)**
277:6
**Cam (1)**
58:2
**came (34)**
28:14;53:9;105:18;
116:19;120:11,15,22;
125:11;133:23;149:6;
159:14;188:5;200:2;
210:8;212:22;225:12;
233:15;234:10;
302:21;308:1;322:7;
334:22;337:20;338:6;
342:24;348:23;
349:11;356:16;358:7;
369:1;376:3;383:10;
384:13;388:10
**camera (1)**
143:10
**can (130)**
7:18,21,22,25;8:6;
10:6;11:3;13:24;
19:12;27:13,17;40:6,
17;48:24;49:1,1,15;
50:10,19;52:5;58:16;
66:11;74:19;79:20;
81:5;85:12,22;87:13;
94:5;95:2,12;96:6,9,
10;98:3;99:16;
102:21;103:4;105:7,
20;106:2;107:12;
108:10;110:22;111:1;
113:5;115:16;117:3,
5,6;129:17;134:12;
143:11;146:19;
152:17;157:21;
169:15;177:24;178:2;
181:18;186:22;
206:20;209:14;211:2;
212:8,23;214:12;
220:12;228:5;230:21;
238:24;246:12,22,23;
247:20;250:18;
257:24;259:3;261:13;
262:6;268:21,23;
269:7;273:15;274:20;
281:22;282:4;284:5;
285:7,17;289:18;
290:23;295:21,24;
296:5;297:4;302:20,
25;304:15,18;311:4;
312:11;313:22;

322:10;325:24;
329:23;333:9;339:2;
342:20,21;345:10;
346:14;347:20;
349:21,23;350:5;
352:7,14,22;354:23;
360:18;369:18;370:8;
377:20;386:8;391:3,
20;392:7,13;393:22
**cancer (1)**
25:25
**canvass (9)**
161:2;264:18;
266:3;268:15;270:2,
17;275:11,13;280:1
**canvassing (4)**
267:12;298:16;
307:4;310:4
**capacity (2)**
21:25;49:15
**caption (2)**
28:23,24
**car (2)**
322:3,22
**card (11)**
66:8,9,13,16,17,17,
19,20;67:18;69:13;
290:14
**cards (3)**
67:3,5,14
**care (5)**
9:18;71:17;125:24;
243:21;387:11
**career (8)**
34:25;40:23;48:9;
51:21;82:1;101:23,
24;103:5
**Carmen (4)**
275:23;276:25;
277:18;283:8
**carry (1)**
69:24
**cars (2)**
62:18;379:22
**Case (184)**
5:6;9:4,5;10:19;
11:5,17;12:13,13,19;
14:17,18;15:10,11,12,
19,21;16:21,22,25;
17:11,17,21;18:22;
19:11;21:6;23:13,15;
24:16;25:2,5,7,14,15;
27:15,19,23;28:1,8;
33:21;34:10,15,23;
35:19,21;36:19,20;
37:7;40:1,6;41:13;
42:23;43:6;45:12,17,
22,25;46:4,20;47:6;
48:5,5;49:1;51:7;
52:19;53:7,25;54:7,
16;56:6;59:13;64:23;
75:17;78:10,11;
86:14;88:6,14,24;

89:3,17;92:17;93:19;
95:3;96:21,25;97:5,6,
12,17,21,21;99:1;
101:11,15;103:21;
115:11,15;124:20,24,
25;125:1,22;131:2,3;
145:13;148:11;
153:12;156:23;162:8,
9;165:23;168:7,14,17,
22;169:10,12;171:2;
188:19;191:22;198:3;
202:9;205:19;206:15;
207:17;215:19;
216:10;222:7,10;
223:7;224:4;225:23;
226:4;231:1;244:13,
22;246:17;248:25;
251:7,15,19;258:10,
13;261:6,7,11;
268:11;270:2,6;
274:11;278:21;
285:24;286:25;
291:23;293:9;298:5,
12;305:7;306:4;
309:10;312:24;
315:11,11,25;317:8,
16,23;323:4;343:17;
347:3,7,11;348:6;
351:4;369:24;371:6,
17;376:3;378:15;
385:8,8,13;387:2;
393:4
**cases (50)**
7:5;8:23;9:7,12;
10:10,25;11:1;34:1;
43:2;49:7,12,16,19,
20;64:9;87:3;89:20;
96:12;97:16;125:12;
136:6;164:3,4,6;
165:8;166:13,18;
167:6;169:20;172:3;
174:1;177:21,22;
179:1;183:4;185:19;
249:4;251:14;316:22;
317:14;318:5,11,14;
319:3,11;381:14,16,
20;386:12,15
**catch (1)**
272:24
**catching (1)**
272:22
**caught (1)**
107:22
**cause (6)**
210:4,17;211:13;
287:20;288:10;289:1
**caused (1)**
54:5
**CCS (1)**
249:3
**CCSAO (1)**
248:16
**center (1)**

123:15
**centered (1)**
  12:19
**Central (12)**
  76:16,25;77:6,9,10,
  14;78:12;79:1,5;
  118:3,14;120:23
**certain (16)**
  66:15;68:10;69:17,
  20,23;95:24;98:14,18,
  25;105:16,21;108:25;
  109:7;125:16;126:21;
  232:2
**Certainly (51)**
  35:4;45:10,15;
  48:23;50:25,25;
  53:13;67:22;80:14;
  82:16;93:8;105:17;
  112:24;114:6,16,21;
  115:12;116:18;139:4;
  155:5;157:13;163:5;
  169:8;170:12;180:21;
  188:22;195:19;196:1;
  210:3;214:17;220:21;
  237:11;254:8;259:5;
  266:8;267:1;268:12;
  291:21;304:4;307:24;
  308:23;339:3;344:18;
  346:11;353:13,13;
  355:25;365:21;
  373:19;381:6;385:15
**certified (1)**
  260:11
**Chad (1)**
  389:18
**chair (1)**
  121:24
**chance (6)**
  188:10;191:15;
  206:1;276:5;313:9;
  317:6
**change (6)**
  98:21;100:12;
  136:16;138:2;139:8;
  205:23
**changed (12)**
  54:12,13,21;68:25;
  98:19;99:2,5,11,24;
  105:22;334:25;335:8
**changes (1)**
  138:9
**chaotic (1)**
  72:15
**characteristics (1)**
  104:8
**characterize (1)**
  386:9
**charge (3)**
  65:5;156:7;335:3
**charged (25)**
  63:19;109:10;
  112:8,13;114:23;
  115:1,10,15,16;

210:22;211:7;227:2;
234:7,10;235:7;
238:25;325:7;334:7,
23;341:18,19;342:12;
368:21;369:8;376:1
**charges (2)**
  39:5;169:12
**charming (1)**
  187:14
**check (1)**
  296:18
**checked (4)**
  83:19;132:18,19;
  143:25
**Chicago (18)**
  5:11;21:4;22:14;
  36:15;40:16;42:10,
  12;51:22;56:15;
  82:21;98:12;163:10;
  245:13;258:8;259:8;
  284:12;293:13;384:1
**child (3)**
  342:6;385:10;
  386:16
**children (1)**
  116:2
**Chimniak (1)**
  5:14
**chips (1)**
  55:16
**chose (4)**
  42:24;226:9;
  239:22,23
**Christmas (2)**
  22:2,8
**Christopher (2)**
  146:14;311:15
**chronologically (2)**
  130:13,15
**Cicero (2)**
  61:15;72:7
**Circuit (2)**
  11:11;24:16
**circumstance (2)**
  93:11;114:9
**circumstances (3)**
  94:11;210:19,21
**Cisco (8)**
  146:25;358:7,23;
  359:12,14,19,21,24
**Ciscos (1)**
  359:9
**City (14)**
  42:10,12;228:3,18,
  25;257:5;258:8,23;
  259:8;260:5,10,11,16;
  284:12
**civil (1)**
  8:20
**civilian (1)**
  124:16
**Civilians (3)**
  121:7,8;391:2

**claimed (1)**
  200:3
**clam (1)**
  206:5
**clarity (1)**
  73:16
**class (3)**
  387:3,9,10
**clean (1)**
  391:5
**clear (6)**
  168:21;293:12;
  315:14;365:14,19;
  381:16
**cleared (3)**
  315:12;381:14,19
**cleared/closed (1)**
  131:4
**clearer (1)**
  343:7
**clearing (2)**
  169:11;195:3
**client (4)**
  19:7;377:10;379:2;
  380:10
**clients (2)**
  48:2,3
**climate (9)**
  41:18,21,25;42:5,8,
  9,14;46:8,10
**clip (1)**
  129:20
**clipboard (15)**
  128:22;129:13,16,
  19;130:10,12,21,22,
  25;131:8;132:4;
  141:3,5;142:14;197:7
**clipboards (2)**
  128:19,24
**clipboard-type (1)**
  129:7
**Close (8)**
  57:10;86:23;209:6;
  212:8,22;243:11;
  274:23;317:13
**closed (6)**
  125:20;135:25;
  136:6;318:5,11;319:3
**closer (1)**
  119:17
**closest (2)**
  21:9;119:15
**closing (14)**
  26:24;314:1,2,5,7;
  315:8,14,14;317:23;
  318:14;325:22;
  332:14,15;367:20
**clothes (2)**
  68:15;377:25
**clue (1)**
  255:25
**Cobra (1)**
  72:12

**codefendant (1)**
  383:20
**codefendants (1)**
  369:20
**co-defendants (5)**
  14:16,17;21:6,9;
  59:13
**coercion (3)**
  48:22;49:3,10
**COHEN (11)**
  5:21,21;248:11,13;
  250:4,12,15;301:16,
  18;302:7,11
**cold (6)**
  124:19,24,25,25;
  125:4,21
**collaborated (2)**
  65:2;380:3
**colleagues (1)**
  34:9
**collected (1)**
  167:12
**collecting (1)**
  98:6
**college (2)**
  57:16;388:19
**color (1)**
  125:20
**color-coded (1)**
  125:19
**colors (1)**
  68:15
**combination (1)**
  208:4
**coming (11)**
  92:25;110:18;
  122:7,23;224:25;
  225:4;230:11;243:10;
  362:19;388:12,14
**command (2)**
  105:4;299:19
**commander's (3)**
  135:11,24;141:19
**commentary (1)**
  374:11
**commit (4)**
  50:15;391:11,12,25
**committed (4)**
  172:21;193:2;
  279:21;390:19
**committing (1)**
  279:5
**common (2)**
  164:20;359:13
**communicate (1)**
  26:13
**communicated (6)**
  26:7,14;183:21;
  219:13;237:17;
  278:11
**communicating (3)**
  202:18;221:3;
  231:14

**communication (3)**
  11:18;211:17;
  354:19
**communications (2)**
  12:20;30:6
**community (4)**
  70:12,13;166:13;
  282:17
**compare (3)**
  71:17;143:20;144:2
**competent (4)**
  236:5;322:10,17;
  358:22
**complaint (1)**
  19:7
**complete (1)**
  8:17
**completely (2)**
  35:25;115:1
**compound (2)**
  65:17;174:4
**computer (2)**
  250:14,19
**concealed (1)**
  230:3
**concern (1)**
  217:7
**concerned (7)**
  34:7;42:16;44:3;
  53:11;116:14;169:11;
  377:15
**concerns (1)**
  44:4
**concluded (1)**
  394:17
**conclusion (3)**
  195:24;209:24;
  245:8
**conclusions (1)**
  321:3
**concrete (1)**
  206:18
**conduct (13)**
  92:15;93:14;
  160:22;169:16;
  172:12,14;189:10;
  220:10;289:19;312:9;
  348:1;359:18;369:5
**conducted (8)**
  92:8;94:22;101:11,
  17;103:10;104:24;
  306:11;363:4
**conducting (2)**
  92:1;103:24
**conduit (1)**
  386:21
**confess (2)**
  104:15;363:12
**confessed (12)**
  212:22;220:21;
  346:20;347:19;351:3;
  352:15,19;353:1;
  354:24;355:3;364:6;

366:9

**confesses (4)**
236:20;333:23;
355:12;366:22

**confessing (10)**
212:8,22;242:8;
243:10,11;346:13;
363:11,13;365:22,23

**confession (8)**
209:5;222:14,15;
239:11;363:19;
364:11,17;393:15

**confidence (2)**
239:14,15

**confident (2)**
265:4,7

**confines (1)**
144:7

**confirm (2)**
117:11;250:24;
260:16

**confused (2)**
329:4;333:6

**connection (23)**
15:9;16:7;17:17;
18:5,13;19:3;29:20;
56:2;87:23;100:24;
101:3;127:13;159:18;
164:24;170:16,19;
172:7;173:2,3,25;
180:25;267:20;369:6

**consciousness (1)**
376:3

**consent (2)**
231:7;328:10

**consequence (1)**
46:18

**consequences (1)**
113:15

**consider (2)**
147:10;280:20

**considered (1)**
382:20

**consistent (5)**
136:4;140:21;
254:1,5;340:24

**Constitution (1)**
108:22

**constitutional (3)**
41:9;391:1,13

**contact (13)**
12:17;21:4;29:13,
20,23;46:22;146:1,9;
216:18;217:14;
219:25;233:15;
377:22

**contacted (4)**
215:10;218:2;
375:10,22

**contacts (1)**
145:19

**contain (1)**
85:11

**contained (5)**
143:21;289:24;
290:25;325:22;392:5

**contemporaneous (1)**
86:4

**contemporaneously (1)**
86:5

**contend (1)**
48:21

**contends (1)**
377:10

**contents (1)**
143:20

**context (4)**
40:20;78:9;193:20;
221:17

**continuation (1)**
358:1

**continued (1)**
374:11

**Continuing (1)**
319:14

**contours (1)**
113:4

**contrast (1)**
71:17

**conversation (21)**
11:24;12:3,18;
24:21,25;25:19;27:6,
14,20;33:12;175:14;
199:20;201:13,15,17,
19;216:4;276:14;
338:12;369:1;370:17

**conversations (11)**
12:4;20:6,10,14,17,
23;27:4;31:16,22;
368:22;373:16

**conveyed (3)**
114:14;336:18;
357:7

**conviction (1)**
23:7

**convictions (1)**
39:1

**Convoy (1)**
58:5

**Cook (55)**
5:24;24:17;42:12,
13;43:16;44:5,13;
211:25;216:18;
217:15;218:4,6;
219:3,25;220:20;
222:1;223:5,16;
291:24;292:2,14,16,
23;293:2,5,16,24;
294:3,11;295:6;
299:11,20,25;300:22;
302:2,21;306:16;
311:25;312:12;
326:24,25;328:5;
332:9;333:5,13;
335:20,21;339:16;
340:9,19;352:9;

358:4;370:10;371:12;
372:3

**cooperate (10)**
108:13;109:10,19;
110:13;112:20;113:9,
10;114:10;168:20;
227:4

**cooperating (1)**
113:16

**cooperation (2)**
112:17;113:6

**cooperative (7)**
46:23;177:25;
180:11;183:7,17;
205:21;207:24

**cooperativeness (1)**
208:7

**coordinator (3)**
125:22;316:24;
317:5

**cop (1)**
365:24

**copies (4)**
127:21;141:10;
142:17;250:9

**copy (15)**
127:20,25;128:8,9;
130:9;140:24;141:13,
21,22;142:4;202:2;
250:5;251:2;294:23;
301:25

**corner (5)**
68:18;70:22;252:5;
304:19,20

**corners (1)**
68:16

**Corrections (1)**
328:6

**correspond (1)**
310:25

**corresponding (2)**
67:18;325:24

**Corroborate (5)**
167:10,11;220:4;
233:3;343:23

**corroborates (1)**
344:11

**corroboration (1)**
171:1

**counsel (6)**
5:16;126:12;
183:10;184:6;370:21;
371:19

**counts (2)**
227:3;376:1

**County (55)**
5:24;24:17;42:12,
13;43:17;44:5,13;
211:25;216:19;
217:15;218:4,7;
219:3,25;220:20;
222:2;223:6,16;
291:24;292:3,14,16,

23;293:2,5,17,24;
294:3,11;295:6;
299:11,20,25;300:22;
302:2,21;306:17;
311:25;312:13;
326:24,25;328:5;
332:9;333:5,13;
335:20,21;339:16;
340:9,19;352:10;
358:4;370:10;371:12;
372:3

**couple (10)**
13:4;14:1;30:18,23;
77:1;250:2;359:9;
374:17,18;381:14

**course (23)**
10:12;36:8;41:7;
51:21;67:1;69:16;
70:10;19;90:18;
107:8;137:25;150:2;
153:20;155:9;162:25;
183:20;273:22;
276:11;291:13;
299:22;343:16;
359:16;393:3

**courses (2)**
48:9;57:19

**Court (15)**
5:4,13,14;8:13;
20:4;24:17;39:16;
152:3;237:14;292:6;
320:22;321:2;351:14;
367:4;368:23

**court-reported (4)**
346:23;352:18;
367:12,14

**courtroom (8)**
32:10;37:8,11,18;
38:3,8,11,11

**cov (1)**
383:13

**cover (2)**
251:9;254:9

**CPD (1)**
330:9

**Cragin (1)**
80:10

**credibility (1)**
355:1

**credible (1)**
52:13

**crime (50)**
59:22;62:6;63:17;
64:17,20;65:21;66:1,
4;68:4;83:21;86:17;
87:15;88:3,7,11;
89:20;106:5;107:16;
119:14,16;123:3,5;
124:19;149:11;
153:25;155:11,12;
162:16,17;163:1,6,19,
23;167:8;176:4;
212:8,9;214:10;

23;293:2,5,17,24;
294:3,11;295:6;
299:11,20,25;300:22;
302:2,21;306:17;
311:25;312:13;
326:24,25;328:5;
332:9;333:5,13;
335:20,21;339:16;
340:9,19;352:9;
358:4;370:10;371:12;
372:3

235:11;239:8;242:1;
243:22;267:5;279:3,
21;288:9;376:15,19,
23;391:11

**crimes (52)**
58:12;61:4,6,8,19;
62:3,9,14;63:5,24;
64:12;65:14;68:21;
69:2;71:1;73:1,2,9,17,
18;74:7,15,22;76:3,7;
78:25;80:25;81:17,
19;83:15;118:7;
119:2,5;124:6;
126:21;133:14;
141:11;149:5;164:9,
12;170:16;171:17,19;
172:21;173:4;176:13,
16;226:18;288:5;
289:11;325:6;376:11

**criminal (19)**
29:21;30:11,13;
35:8;36:17;40:3,7,20,
25;41:17,22;47:14,
18;88:15;152:12;
272:7;273:8,22;
372:17

**Criminal-type (2)**
390:23,24

**critical (1)**
214:5

**cross (1)**
138:15

**Cruz (5)**
146:10,17,21;
148:11;370:2

**curious (1)**
187:24

**currency (1)**
382:16

**current (3)**
131:1;264:6,10

**currently (2)**
9:5;10:20

**custody (23)**
50:24;160:11;
161:21,23;166:1,10,
11;173:7,13,19,20,21;
191:25;230:8,11;
315:19;333:23;334:6,
13;341:15;342:8,13;
364:9

**customary (1)**
355:23

**cut (2)**
144:15;336:6

---

**D**

**damning (1)**
360:23

**Dan (2)**
30:13;31:10

**Danny (3)**

389:8,12,13
**Danny's (1)**
  389:10
**dark (2)**
  125:25;322:3
**data (2)**
  66:3;163:11
**date (21)**
  22:18;30:17,20,24;
  31:21;33:1;56:13;
  84:6;130:16,18,19;
  160:23;231:8,16;
  284:20;285:1;304:25;
  305:3;311:13;314:7;
  335:14
**dated (3)**
  304:20;311:9;
  314:11
**dates (5)**
  77:2;78:7;221:22;
  284:18;296:18
**Dave (1)**
  14:25
**day (29)**
  32:13;37:22;39:1,5;
  134:6;139:15;146:8;
  154:18;162:19,22;
  173:9;178:17;205:2;
  230:22;271:6;275:7;
  298:9,14,15;305:11,
  13;314:14;317:12;
  337:7;342:12;350:18;
  358:5;379:18,19
**days (4)**
  35:17;58:9;134:2;
  195:10
**DCFS (3)**
  108:14;110:18;
  116:7
**de- (1)**
  169:13
**dead (4)**
  154:24;155:15;
  349:24;350:3
**deal (37)**
  55:24,25;58:14;
  158:12;210:18,18;
  211:1,3;216:8,12,20;
  217:10,16;219:9,16;
  221:7;227:6;272:21;
  281:11,14,18;283:5;
  334:21;335:22;336:1,
  6,9,22;338:9;339:17,
  20,23;340:6,10,13,14;
  388:20
**dealers (3)**
  282:22;380:4;
  386:22
**dealing (1)**
  106:15
**Death (5)**
  287:20;288:10;
  289:2;320:4;342:5

**debrief (9)**
  162:11;165:22;
  168:3,7;169:3,14;
  171:9;174:11;176:21
**debriefed (1)**
  160:24
**debriefing (6)**
  160:13;167:3;
  169:15,16;172:14;
  226:17
**debriefings (1)**
  168:9
**decide (2)**
  168:5;207:3
**decided (6)**
  53:25;171:8,10;
  207:20;208:10;335:3
**deciding (2)**
  44:8;132:15
**decision (3)**
  44:2;53:19,22
**deduced (1)**
  219:22
**deductive (1)**
  345:7
**deepwater (1)**
  58:7
**defend (5)**
  54:19,20;55:8,12,
  16
**defendant (11)**
  8:19,24;9:24;10:6,
  10;33:3;43:2;49:9;
  236:20,23;393:6
**defendants (7)**
  19:10;48:11,20;
  49:17;51:10;52:1;
  75:17
**defendant's (1)**
  29:2
**defending (1)**
  393:13
**defense (5)**
  47:18;88:15;344:4;
  370:21;371:18
**definitely (7)**
  36:3;45:4;64:24;
  142:17;157:1;290:17;
  353:11
**degree (1)**
  70:14
**delegated (1)**
  339:15
**deny (1)**
  353:14
**dep (1)**
  19:4
**Department (17)**
  21:5;36:15;58:23;
  82:22;85:8;98:12;
  163:11;170:2,5;
  245:13,21;293:14;
  328:6;330:9;385:24;

390:18;391:13
**depend (3)**
  120:9;138:18;147:7
**depending (1)**
  231:7
**depends (5)**
  108:6;115:21;
  148:17;168:17;189:7
**depict (1)**
  155:18
**deposed (4)**
  10:20,21,22;339:2
**deposition (27)**
  5:9;7:1;10:11;11:2;
  13:7,15;14:22;15:9;
  16:7;18:3,14;19:21;
  42:21;56:6;152:4;
  161:13;215:5;247:22;
  249:13,15;302:5;
  324:20;325:16;328:1;
  351:17;394:16,17
**depositions (1)**
  7:8;9:3;19:10,25
**derived (1)**
  326:21
**Describe (1)**
  118:16
**describes (2)**
  267:16,16
**describing (1)**
  308:9
**description (1)**
  66:25
**design (1)**
  244:24
**desk (1)**
  121:1
**desks (4)**
  119:14,15,16,19
**destroy (2)**
  137:18,22
**destroyed (2)**
  229:6;230:2
**details (1)**
  27:15
**detainee (1)**
  122:7
**detect (1)**
  241:25
**detective (143)**
  35:5,6;63:11;83:16,
  25;84:14,22,24;85:15,
  16;86:17;89:12,13;
  91:22;92:2,17,18,22;
  93:3,15;94:1,2,3;
  95:15,16,23,25;96:1,
  25;97:12;100:16;
  101:2;102:17;103:23;
  105:4;109:4;118:5,7;
  119:13;120:24;
  122:19;123:2;125:11;
  127:15;130:5;136:15,
  18;137:4,8;154:16;

156:22;168:6;171:1,
  7;175:22,25;176:8,
  12;177:6;188:15,16,
  18;191:21,24;198:10;
  202:19;205:19;
  206:21;207:17;210:3;
  213:15,19;214:2,19,
  22;215:23;216:18;
  217:14;218:3,6;
  219:7,23,24;220:24;
  223:13,21;226:4,20,
  23;227:10,15;235:15,
  15;236:21;237:13;
  238:21;242:1,12;
  243:21;244:21;
  254:16,23;255:5,14;
  256:2,10;268:3;
  274:8;278:20;280:20;
  282:1;284:14;285:5;
  287:5,6;288:3;
  289:10;291:25;292:5,
  6;297:7;305:8;315:4;
  316:3;317:15;322:11,
  17;335:21;336:16;
  339:15;340:19;341:4;
  343:18,24;346:6,10;
  349:12,20;350:21;
  351:2;352:25;355:2;
  358:22
**detectives (115)**
  22:15;35:20;36:4,
  19;53:24;63:2,4,7,8,
  13,15;65:3,15;83:20;
  84:19;86:13;87:21;
  89:16;90:23;95:3;
  96:14;97:9,16,19,25;
  101:24;102:16;
  106:17;107:4;118:17,
  24;119:4,5,14,22;
  123:24;127:12;
  134:15;149:10;
  168:10;170:9;176:4;
  189:24;190:10;
  191:14,21;197:14,25;
  198:8,10;201:18;
  202:3,5;206:17;
  212:6;213:5;215:12,
  14,17;216:7,8;
  220:11;221:4;222:21;
  223:17;229:6;230:2;
  234:12;236:13;237:9;
  238:19;241:17;244:8,
  14;246:16;255:17;
  262:3;263:6,23;
  264:25;265:1,2,6;
  269:1,18;273:12;
  274:7,10;291:25;
  293:15;295:4;298:4;
  305:6;312:15,23;
  314:23;315:24;
  317:25;333:12;335:2;
  343:2,9,20;344:16;
  345:4;346:8,11;

348:13;359:18;360:5,
  6;361:7,11;363:6;
  379:15
**detectives' (1)**
  337:17
**detective's (1)**
  103:19
**detective-type (1)**
  63:9
**determine (4)**
  17:4;68:6;69:3;
  217:15
**develop (3)**
  62:16;64:13;125:16
**developed (7)**
  126:8,22;127:4;
  206:10,21;278:22;
  282:5
**Developing (2)**
  206:8,15
**developments (1)**
  193:20
**dick (7)**
  91:20;93:18;96:20;
  141:4,12;149:17;
  155:7
**Dickinson (3)**
  252:9;309:3,6
**Dickinson's (1)**
  309:7
**dicks (13)**
  62:24;63:1;64:21;
  77:3,8;78:25;194:11;
  196:16;225:9;254:8,
  8;294:16;295:9
**dicks' (1)**
  260:2
**dick's (7)**
  26:25;27:1;60:23,
  24;103:11,13,15
**dictated (1)**
  85:17
**different (40)**
  29:9;46:8;52:8;
  55:1;67:9;68:10;
  69:22;71:5,8,10,11,
  13;72:2,7,14;83:24;
  87:14,21;97:19;
  129:22;147:23;
  163:19;211:5;226:16;
  241:19;249:3;251:18;
  279:19;280:3,23;
  301:7,8;305:10;
  308:9;322:16;334:16;
  335:2;340:5;365:23;
  386:9
**differentiate (1)**
  42:18
**difficult (2)**
  26:19;264:12
**DiFranco (3)**
  5:24;351:25;367:20
**direct (1)**

222:11
**directed (1)**
  51:19
**directing (1)**
  52:16
**direction (14)**
  42:25;279:23,25;
  280:2,3,8,12,14,23;
  281:3;282:6,12,14;
  286:20
**directly (4)**
  123:4;169:19;
  199:6;343:15
**dirt (1)**
  383:10
**dirtied (4)**
  384:6,8,15;389:9
**dirty (1)**
  388:17
**Disagreement (1)**
  277:14
**Disciples (1)**
  72:12
**disclosed (4)**
  190:24;191:3,5,6
**discuss (1)**
  53:21
**Discussed (3)**
  287:19;325:15;
  357:19
**discussing (1)**
  219:1
**discussions (2)**
  36:12;39:21
**dishonest (3)**
  115:12;253:7,8
**dislike (1)**
  377:21
**dismissed (2)**
  39:2,6
**disregard (3)**
  302:7,10,11
**distinct (1)**
  148:12
**distinguish (2)**
  16:17;200:8
**distorted (1)**
  95:13
**District (27)**
  5:4,4;59:9,17;
  61:10,12;68:24;
  71:19;73:21;76:9,12,
  21;77:7,11,19;78:21;
  79:4,10,20;80:14,17,
  18;110:20;148:25,25;
  163:13,14
**disturb (1)**
  264:13
**Diversey (2)**
  61:15;79:13
**Division (11)**
  5:5;60:8;61:3;
  63:24;83:25;85:16,

16;100:16;118:5,8;
120:24
**divorce (1)**
  385:8
**docu- (1)**
  197:8
**document (33)**
  86:22;87:7,11;91:3;
  99:9,24;100:1,4,24;
  101:3;190:9,11,13,18,
  23;191:17,20;196:6;
  197:9,18,19;199:16;
  244:18;288:9;298:1;
  312:14;315:23;316:2;
  334:9;341:22;350:12;
  366:4,23
**documentation (2)**
  87:10;101:18
**documented (17)**
  98:24;99:1;100:21;
  101:13;190:6;191:7,
  19;195:10,12;196:11,
  15;197:25;199:8,15;
  337:11;338:18;
  364:13
**documenting (2)**
  244:21;308:7
**documents (12)**
  15:5,8;17:13,20;
  18:4,8;48:4;130:1;
  161:12;215:5;296:1;
  347:23
**Dog (2)**
  277:11;307:20
**domestic (1)**
  386:13
**done (40)**
  92:13;102:25;
  106:19;107:3,5;
  110:25;113:5;115:24,
  25;131:22;144:12;
  161:3;185:7,9;
  197:12,15,23,23;
  201:21;202:1;221:4;
  224:10;231:24;232:2,
  5;240:12;246:6,20;
  247:2,14;256:11;
  267:6;270:5;298:10,
  25;299:3,5;312:15,
  21;323:17
**door (2)**
  123:2;269:20
**doors (1)**
  120:22
**dope (9)**
  71:23,25;151:2;
  158:12;164:13;
  281:11,14,18;388:21
**Double (16)**
  150:21;188:1;
  191:1;195:3;203:3,8;
  204:13,14;207:5;
  212:9,23;214:12;

239:11,12;322:22;
366:9
**double-murder (2)**
  202:9;243:13
**double-sided (2)**
  250:9;251:2
**doubt (12)**
  80:16;179:6;
  185:21,23;187:21;
  255:1;259:20;260:18;
  302:23;354:2;369:3;
  389:23
**down (46)**
  8:13;93:16,17,21;
  94:2;95:16;96:4,17,
  18;97:7;107:11;
  109:9;142:22;150:18;
  153:9;158:2,17,24;
  159:7;167:22;168:21;
  187:16;199:17;
  212:10,18,19,24,25;
  213:3,4,6,8,14;214:1,
  16,16;227:6;232:5;
  282:23;287:24;
  329:13,15;335:10;
  366:10;379:3;380:3
**drag (1)**
  49:25
**dragging (1)**
  50:5
**draw (2)**
  281:5;357:1
**drawer (1)**
  300:10
**drawing (2)**
  145:12;321:2
**drill (1)**
  232:5
**drive (1)**
  62:18
**drive-by (1)**
  278:14
**driven (1)**
  367:21
**driving (1)**
  367:22
**Dropbox (1)**
  248:9
**drug (10)**
  65:10;164:12;
  272:21;281:19,19;
  282:21,22;283:5;
  380:3;386:22
**drunk (1)**
  277:5
**dry (1)**
  125:17
**duct (1)**
  143:11
**Due (1)**
  269:9
**dumb (1)**
  243:3

**duplicate (1)**
  311:18
**during (28)**
  12:18;14:2;23:2;
  27:14,19,25;31:9;
  35:8,12,17;47:14;
  48:9;75:14;100:6,8;
  105:10;173:14;219:9;
  221:12;238:11;
  291:12;326:13;
  338:12;341:6;343:16;
  348:21;365:11;
  392:16
**duties (4)**
  58:3;74:21;81:20;
  143:2
**duty (2)**
  119:22;264:21

**E**

**earlier (7)**
  182:24;325:15;
  328:22;340:17;
  350:18;353:4;367:13
**Early (9)**
  60:12;61:7,7;62:1;
  127:1,1;148:6,22;
  267:21
**earshot (2)**
  275:15,20
**easier (1)**
  291:22
**easily (1)**
  166:21
**east (5)**
  61:15,15;62:9;80:3,
  19
**Eastern (1)**
  5:5
**easy (1)**
  381:16
**eat (1)**
  245:3
**Ed (1)**
  24:12
**Edward (3)**
  5:9,23;394:16
**effect (1)**
  126:19
**effort (2)**
  307:23;324:21
**efforts (2)**
  323:6,10
**Efrain (2)**
  146:17,21
**eight (1)**
  386:12
**either (37)**
  18:15;28:13;31:11;
  49:13;85:6,14;
  104:14;108:21;148:6;
  152:24;182:10;187:8;

189:23;216:1;225:3,
15;231:6;238:18;
240:10;244:7,13;
246:16;249:8;274:17;
286:6;290:25;292:5;
295:22;297:1;299:9;
322:24;323:20;
352:17;364:15;374:2;
391:11;392:23
**else (45)**
  13:22;14:4,6,10,24;
  15:1,3;19:2;31:9,13,
  15;38:10;44:9;66:10;
  91:19;98:3;104:14;
  106:5;149:12;158:8;
  159:14;172:2;179:3,
  4;199:18,19;201:12;
  225:1;245:24;252:16,
  21;253:14,17;269:7;
  317:17;319:12;
  345:22;346:1,2;
  347:3;356:3,6,8;
  364:13;374:3
**else's (1)**
  34:19
**elsewhere (1)**
  60:7
**em (1)**
  179:5
**e-mail (6)**
  26:5,8,9,14,15;32:4
**embarrassment (4)**
  54:14,14,16;55:7
**emergency (1)**
  95:10
**employer (1)**
  258:8
**employment (1)**
  56:7
**encompassed (2)**
  60:1;61:12
**end (7)**
  38:22;80:19;164:2,
  4;295:10;367:7;
  394:12
**ended (4)**
  29:9;38:23;233:19;
  317:23
**ends (1)**
  197:3
**enemies (1)**
  385:16
**enforcement (4)**
  105:9;106:4;108:5,
  21
**engage (1)**
  175:2
**engages (1)**
  169:19
**Engle (2)**
  389:8,19
**English (5)**
  171:12;175:6;

176:24;180:13;
276:10
**ENGQUIST (111)**
8:4;9:6,19;10:1;
29:24;36:1;43:24;
44:17;45:18;47:9,21;
48:15;50:3,20;51:15;
52:20,24;61:21;
65:16;81:4,7;83:9;
91:8;95:21;112:5;
121:17,21;134:22;
143:10;144:15,25;
145:4;156:15;157:2;
165:11;174:3;186:3,
12;187:17;194:7;
195:4,23;198:21,24;
200:18;201:1;207:8;
209:23;211:20;
212:12;218:14;
220:25;223:23;
224:13;225:19;
227:16;236:8;239:5;
240:7;242:20;243:14;
244:3;245:7,16,25;
246:13;248:3,6,16,24;
249:2;253:2,8;255:8;
256:16;258:18;280:5,
25;282:8;283:2,13;
300:2;301:1;302:12;
312:17;313:6;318:16,
19,24;327:11;330:20,
25;334:8;335:5;
339:10;341:11,21;
346:15;354:14;
358:25;366:25;
370:14,23;372:12;
373:23;374:6,18,24;
383:1;391:18;394:3
**enough (8)**
22:20;141:15;
164:7;210:24;216:11,
11;236:19;346:3
**entire (8)**
16:12,15;29:18;
101:24;293:16;338:4,
5;347:10
**entirely (1)**
332:8
**envelope (1)**
251:22
**environment (2)**
71:12;72:3
**envisioning (1)**
93:2
**Epplen (5)**
14:9;20:22,24;
136:3;314:15
**equation (1)**
365:22
**erase (1)**
125:17
**Ernest (5)**
12:22;19:14;20:6,

10;21:24
**Ernie (4)**
12:23;21:12;33:14;
327:15
**errors (1)**
139:1
**escapes (1)**
23:19
**escorted (1)**
231:9
**escorts (1)**
58:5
**especially (6)**
37:3;54:17;55:8;
64:19;315:11;371:24
**essentially (5)**
212:21;220:21;
327:3;360:15;380:3
**established (4)**
84:9;85:7;296:20;
299:18
**estimate (1)**
10:7
**estimating (1)**
126:9
**et (1)**
5:3
**even (52)**
8:15;31:8;65:14;
67:22;79:11;94:3;
106:7;107:2,2;108:7;
110:10;149:7;156:7;
170:7;171:16;187:6;
191:20;192:12,13;
213:25;214:15,16;
235:4,14;257:11;
282:22;312:12;
318:14;319:4;320:10;
324:14;332:14,14;
336:1,9,23;337:2;
340:6,13;353:5;
359:23;362:11;364:6;
366:15,21;370:21;
372:4,4;383:10;
386:17;387:14;
388:16
**event (1)**
359:15
**events (1)**
245:14
**eventually (9)**
63:19;77:5;93:20;
99:24;136:7;234:7;
237:14;278:7;376:15
**everybody (10)**
38:10;65:23;131:9;
161:2;172:15,15;
271:25;363:12;
379:20;387:11
**everyone (5)**
77:5;169:21;
215:22;249:18,21
**evidence (9)**

27:23;98:6;195:18;
196:4;243:12;275:17;
320:6;321:7,21
**exactly (12)**
98:18;116:10;
125:5;126:1;198:17,
17;202:10;208:9;
209:3;223:10;346:20;
347:13
**example (4)**
66:14;83:25;92:15;
96:9
**examples (1)**
139:2
**excellent (4)**
239:21,24;240:1;
336:17
**except (7)**
129:16;155:24;
179:4;206:18;231:17;
335:4;390:5
**exceptions (1)**
65:24
**excessive (2)**
390:25;391:25
**exculpatory (1)**
375:11
**Excuse (4)**
167:18;265:9;
295:2;311:20
**execute (1)**
65:8
**executed (1)**
282:23
**exercise (11)**
39:11,19;40:9,18;
41:1,8;51:24;53:20,
25;183:9;187:1
**exercised (2)**
51:6;184:5
**exercising (1)**
54:10
**ex-girlfriend (1)**
385:9
**Exhibit (24)**
152:2,4,8;247:22;
248:1,5,22;249:13,15;
250:21;285:16;289:8,
8,24;302:4,5;305:20;
313:7,19;328:1,5;
351:17,21;367:14
**exist (2)**
229:25;371:25
**existed (5)**
87:14;293:4;
297:11;299:10;300:1
**expect (10)**
268:3;290:8;298:7;
300:12,16,21;303:9;
354:17;366:1,15
**expected (1)**
364:15
**experience (5)**

82:17;104:23;
156:14,17;292:9
**experts (1)**
330:5
**explain (4)**
108:7;137:16;
331:20;332:1
**explained (2)**
23:13;24:19
**explanation (3)**
228:14;297:9;
372:19
**explore (1)**
280:15
**extensively (1)**
56:8
**extent (3)**
108:25;109:8;
378:21
**Extremely (1)**
380:19
**ex-wife (1)**
385:9
**eyeshot (1)**
275:15
**eyewitnesss (1)**
267:24

**F**

**fabricated (5)**
254:16,23;255:5,
13;256:1
**face (2)**
181:16;227:4
**face-to-face (1)**
13:18
**fact (47)**
25:23;40:9;46:16;
49:20;53:9;54:17;
85:21;86:3;89:13;
95:15;97:15;107:23;
110:4;111:2;116:25;
126:1;132:11;153:8;
154:9;163:10;164:20;
165:8,21;166:9;
174:20;181:14;184:3;
196:2;206:13;213:25;
218:6;229:5;242:17;
244:24;259:23;
260:17;263:20;
271:12;275:18;
281:16;290:7;291:15;
342:1,9;364:21;
377:17;384:7
**faction (1)**
72:10
**factor (1)**
317:10
**factors (2)**
165:15;317:10
**facts (3)**
8:1,8;281:13

**factual (2)**
324:10,13
**fail (1)**
190:23
**failing (1)**
354:9
**fair (12)**
14:15;17:24;21:17,
18;22:20;37:1;46:15;
82:16;141:15;162:25;
164:7;345:11
**fairly (1)**
265:4
**fall (1)**
55:16
**false (4)**
51:21;52:1;392:6,
20
**falsehood (1)**
115:2
**falsely (4)**
104:2,15;106:6;
108:12
**familiar (9)**
49:8;82:21;83:4;
98:15;100:17;146:18;
147:1,3;362:25
**familiarity (1)**
163:23
**family (13)**
54:15;17;55:7;
271:21,24;272:10;
273:4,6,11;288:16;
298:17;304:7;306:13
**far (18)**
34:6;75:20;102:13,
14;108:2;176:22;
221:8;230:21;233:23;
276:23;278:21,24;
281:21;282:6;312:25;
368:24;377:15;
381:12
**fashion (2)**
72:21;145:19
**fashioned (1)**
129:19
**favor (1)**
242:2
**FBI (2)**
383:15;388:9
**fear (10)**
41:10,12;43:12,16,
22;44:12,16;54:22;
55:2,2
**fearful (7)**
41:21;43:7,9;46:17,
25;48:6;52:18
**fearing (2)**
55:15,15
**features (1)**
69:23
**February (1)**
56:14

**feel (7)**
29:19,22;42:1,4;
75:5;115:1;333:6
**feeling (2)**
42:18;342:18
**feelings (1)**
42:20
**feet (1)**
358:19
**Felaaciano (1)**
310:11
**fellow (5)**
34:9;188:5;390:20;
391:11;393:4
**fellows (3)**
151:6;159:18;193:8
**Felony (1)**
362:22
**felt (2)**
26:3;42:16
**few (11)**
18:17;60:5;149:9;
177:2;180:17;183:4;
195:10;234:12;359:6;
385:4;388:15
**fiance (1)**
304:10
**field (12)**
64:3,7;75:10,11;
89:9;123:22;263:2;
264:17;266:3,5;
287:16;309:12
**Fifth (16)**
39:11,20,25;40:9,
19;41:1,8;51:6,24;
53:20,25;54:10;
187:1;256:13;368:13,
14
**figure (4)**
113:4;215:16,23;
264:25
**file (153)**
15:10,11,12,13,14,
16,16,18,20,23,24;
16:6,7,10,13,15,18,19,
20,24;17:3,6,6,9,10,
13,14,22,23;18:1,1,8,
10,13,24,25;66:13,20;
67:12;90:1;97:24;
125:15;131:14;
133:22;134:9,9;
135:17;140:5,14,14;
141:7,18;142:2,12,18;
161:10;228:1,3,7;
248:9,10;251:7,10,13,
21;252:4,14,17;253:1,
15;254:2,5,8,9,16,22;
255:4,12,13,18;256:1,
6,8;257:1,6,23;258:5,
10,12,16,24;259:1,3,
4,15,19,25;260:6,8,
12,18;284:11;285:10,
23;287:13;289:18,23;

290:5,8,12,13;291:1,
2,7,12,17;292:13,15,
18,20;293:16;294:20;
295:17,18,19;299:10,
11,25;300:13,18,22;
302:22;303:1,3,6,7,
10,13;306:17;311:25;
324:18,19;344:23;
347:4,11;348:6;
350:24,25;351:4;
362:20;371:13;372:3,
4
**filed (1)**
66:19
**files (14)**
66:8,8,9;135:3,23;
136:5,6;251:14;
295:5,22;296:7;
297:5;301:6,7
**filing (1)**
135:8
**fill (2)**
328:13,23
**filled (6)**
329:1,5,24,25;
331:4,5
**Filler (3)**
99:4;100:8;101:17
**fillers (5)**
102:8,18;104:5,6,7
**filling (1)**
331:10
**filter (1)**
378:8
**finally (1)**
23:12
**find (52)**
67:11,14,25;104:3;
117:1;122:24;131:2;
134:7;137:6;139:5;
164:23;166:17;
167:16;172:8,19;
186:7,14;187:24;
196:2;216:19;220:3;
228:12,15;243:9;
248:19;272:1,4,5,8;
285:7;295:1;297:6;
300:13;306:5;307:23;
312:11;322:11,13,18;
323:6,10,14;324:21;
325:24;337:10;
357:20;358:23;359:3,
19;362:5;374:8;
380:11
**finding (1)**
34:8
**fine (3)**
79:17;143:9;313:10
**finer (1)**
87:19
**fingerprints (1)**
105:18
**finish (6)**

16:3;144:20;166:5;
190:20;293:12;
314:25
**fired (1)**
278:7
**Firm (2)**
5:10;19:16
**first (59)**
23:6;24:15,25;53:3;
59:7;64:25;83:13;
84:6;89:5;117:25;
118:19,19,20;120:3,
12,20;150:7;156:7;
159:6,25;160:9,16;
194:3;202:8;205:10;
207:4;217:6;219:6,
17;220:7;235:11;
241:15;247:20;251:8,
19;276:16;298:14,15;
302:8;304:5;305:6;
307:14;309:9,12,16,
16;315:2;322:4;
333:20;334:14;
342:24;347:19;
349:10,19;352:20;
357:25;358:9;361:2;
388:5
**first-degree (1)**
376:1
**firsthand (2)**
172:20;392:15
**five (5)**
7:9;144:24;274:24;
325:23;337:17
**flag (1)**
133:8
**flight (1)**
120:15
**flip (1)**
50:24
**floor (21)**
118:8,18,20,23;
119:9;120:12,13;
121:4,16;122:11,13;
123:2,3;124:16;
131:9;173:11,14;
174:25;175:23;
239:14;326:11
**Florida (1)**
378:15
**fluent (3)**
176:2,9,9
**flying (1)**
394:8
**focus (3)**
43:5;80:23;264:6
**focused (1)**
12:12
**folder (2)**
255:18;259:4
**follow (8)**
83:14,16,22;84:5;
222:25;260:19;282:2;

283:1
**followed (3)**
132:18;144:1;
222:15
**following (3)**
84:24;275:7;314:14
**FOP (5)**
29:11,13,17,20;
30:10
**Force (12)**
59:19,21;60:4;
376:20;390:25;
391:10,25;392:23,24,
25;393:5,14
**Forensic (2)**
287:25;289:12
**forensics (1)**
285:3
**forget (10)**
86:11,24;147:8;
150:11,12,15;191:6;
196:7;295:14;383:6
**forgive (2)**
143:7;197:16
**form (56)**
8:4;9:19;10:1;36:1;
47:10;48:15;50:3;
51:13;85:24;91:8;
95:19;101:5;102:3;
109:23;111:25;
145:19;156:15;157:3;
174:3;186:10;187:17;
195:4;198:25;207:8;
211:20;212:13;
220:25;227:16;
228:19;229:1,9;
239:5;240:8;243:14;
244:4;245:17,25;
257:8;258:18;283:2;
290:14,22,24,24;
293:19;300:2;303:15;
312:18;318:19;
331:21;332:2;335:6;
339:11;346:16;
366:12;382:16
**formal (3)**
81:23;82:11;85:15
**format (23)**
83:14,14,15,16,17,
23,24,25;84:4,5,8,12,
14,17,18,24;85:4;
132:18;144:1;263:5;
265:24;266:1,2
**former (2)**
149:11;258:8
**forth (11)**
59:23;90:8;98:2;
118:25;125:19;161:3;
264:12;277:25;
288:12;365:25;393:2
**forward (3)**
222:19;223:7;268:7
**found (12)**

36:16;45:21;54:5;
86:12;137:23;178:16;
201:5;228:6;275:18;
296:24;297:14;
324:17
**Foundation (60)**
43:24;45:19;48:16;
49:4,22;50:4,21;
51:14;83:10;84:25;
91:10;95:20;101:6;
108:15,23;109:5,24;
110:14;111:6;112:21;
113:12,19;114:3;
115:4,19;116:3,8,16;
134:23;138:5;195:24;
198:25;225:20;
228:20;229:2,10;
245:9;246:1;254:19;
257:9;259:11;278:1;
291:19;293:20;296:9;
299:15;301:2;318:8,
25;347:8;366:18;
370:24;372:9;373:22;
380:7;382:4,25;
389:25;391:15;392:1
**Four (2)**
7:9;242:18
**fourth (1)**
368:14
**Foxx (1)**
43:18
**frame (5)**
45:7;61:22;83:6;
186:15;187:4
**framed (3)**
186:8,17;187:7
**frames (2)**
186:19,24
**Francisco (1)**
146:25
**Frank (2)**
5:24;351:24
**Fred (2)**
176:21;351:25
**Freddie (43)**
171:10,13;175:7,8;
176:2,7,7,17,19,20;
177:1,18;180:13,14;
183:11,23,24;184:8,9,
22,24;185:9;187:8,20,
22;199:6,7,25;
201:11;203:19;
205:21;219:10,12,12,
15;239:21;244:22;
245:2;337:12;338:14,
15,16,24
**Freddie's (8)**
183:15;184:12;
185:10;187:8;337:6,
9,10;338:11
**fresh (2)**
138:23;227:4
**friend (4)**

23:10,16;385:20,21
**friends (4)**
    24:8,9;233:22;
    386:3
**friendship (4)**
    385:14,18,23;
    386:11
**friendship/friendship (1)**
    385:17
**Fro (2)**
    356:18;358:6
**front (14)**
    33:5;119:16;
    120:17,20,22;121:12;
    122:11,15;123:4,6,15;
    134:25;286:16,18
**fruitful (1)**
    194:1
**full (2)**
    222:14;301:20
**fully (1)**
    210:20
**fundamentals (1)**
    83:7
**further (8)**
    41:20;43:11,12;
    123:5;204:22;342:3;
    368:22;393:24

**G**

**Gabriel (1)**
    5:12
**gain (1)**
    112:16
**gallery (3)**
    38:13,14,21
**game (3)**
    93:25;104:10;
    205:16
**gang (104)**
    49:20;50:15;61:4,6,
    8,18,19;62:3,6,8,14;
    63:5,18,18,24;64:1,2,
    7,8,12,13;65:13,14,
    21;66:1,3,4;67:1;
    68:4,7,10,21;69:2,4,
    18,23,25;70:4,5,9,18,
    23;71:1,24;72:4,8;
    73:1,2,9,17,18;74:7,
    15,22,25;75:8,9,18;
    80:14;81:17;83:15,
    15,21;147:4,21,25;
    149:5,11,15,24;
    150:24;151:1,7;
    153:2,4,15;155:14,23;
    156:2,5,9,18,25;
    157:1;158:4;162:17;
    164:4,6,18;166:1,10;
    178:13;283:5;320:5,
    6,12,14,15;321:7,21;
    342:5;376:11,15,23
**gangbang (1)**

158:11
**gangbanger (2)**
    68:13;157:22
**gangbangers (14)**
    48:11,13;155:18;
    160:20;188:5,25;
    277:23;281:11;
    282:21;378:9;379:3;
    384:3;386:22;387:24
**gangbanging (1)**
    80:18
**gang-related (8)**
    64:9,16;75:2;
    155:12;276:21;
    277:20;280:21;282:7
**gangs (29)**
    61:18;62:2,17;63:7,
    15;64:5;66:4;68:16;
    69:10;70:13;71:4,14,
    20,22;72:4;73:24;
    74:1,1;77:2,10,24;
    78:18;148:20,25;
    149:7,16,24;376:10,
    12
**Gang's (1)**
    389:14
**gangsters (1)**
    72:12
**gathering (1)**
    92:24
**gatherings (2)**
    21:15,20
**gave (21)**
    28:12;41:12;53:10;
    178:1,19;183:11;
    188:6,24;189:11;
    191:13;201:3,4;
    205:5;219:7;225:16;
    234:11;238:19;267:7;
    273:11,12,20
**Gawrys (10)**
    149:8,12;235:3;
    316:7;317:18;345:1,
    13,16;361:24;369:10
**general (22)**
    44:12;57:19;85:10;
    88:5,14;89:2;90:1,4,
    12,17,22;91:6;94:14,
    25;113:2;119:11;
    124:1;135:12;162:4;
    261:5,7;286:24
**generally (5)**
    65:20;95:11;
    182:15;208:15;
    222:10
**geographical (3)**
    59:24;61:13;79:9
**gets (6)**
    95:24;109:10;
    112:13;238:25;246:6;
    350:9
**get-togethers (1)**
    22:14

**girl (1)**
    360:17
**girlfriend (6)**
    66:24;178:10;
    271:21,24;273:12;
    304:8
**given (5)**
    86:18;119:23;
    222:19;253:4;372:16
**gives (4)**
    96:1;192:13;210:4;
    279:22
**giving (2)**
    255:3;382:14
**gleaning (1)**
    234:18
**Gloria (2)**
    261:9,10
**goal (2)**
    50:14;288:8
**God (3)**
    128:3;135:6;138:20
**goes (9)**
    7:11;95:25;136:9;
    250:10;262:14;286:4;
    292:14,16;335:10
**GOLDEN (1)**
    301:25
**gonna (1)**
    27:9
**Gonzalez (7)**
    146:1;235:2;
    310:10;362:7;364:8;
    369:9;370:5
**good (44)**
    22:21;40:4;61:23,
    24;83:8;95:6;98:10;
    108:8;116:21;117:2,
    10;127:4;142:15;
    143:5,25;147:24;
    162:22;176:8;184:12;
    185:10,18;188:10;
    216:11;221:22;
    229:18;270:1;336:15,
    16;344:15;353:18,20;
    354:10;381:4,7,13,24;
    386:24;387:5,13;
    388:18;389:1,10,16;
    390:12
**goofy (1)**
    143:8
**Goossens (3)**
    146:14;311:15;
    370:3
**Gosins (1)**
    370:2
**Gotcha (1)**
    358:12
**gotta (2)**
    336:6;348:5
**government (1)**
    388:21
**GPR (34)**

16:11;90:5;91:16,
24;92:9;143:22;
144:2;189:24;198:2,
19;201:16,25;202:1,
18;223:18;240:4;
244:2;293:4;297:2,2,
6;299:7;301:21;
303:20;304:19;
307:11;308:4,6,22;
310:15;311:9;327:7;
341:4;354:18
**GPRs (50)**
    15:19;16:20;17:1;
    18:16,18,22,22;98:1;
    142:10,11,13,17,20;
    143:2,3;289:25;
    292:20,22;293:1,18,
    23;295:22;299:20;
    300:17;301:16,17;
    302:18,19,21,25;
    303:19;305:23;
    306:11;309:25;
    310:24;311:24;312:2,
    8,14;325:24;333:7,7,
    8,14;344:20;362:11;
    371:17,24;372:2,16
**grab (2)**
    175:25;351:11
**grabbed (3)**
    175:9,22;176:19
**graduate (1)**
    56:23
**graduation (1)**
    57:14
**grand (14)**
    50:1,5;76:16,25;
    77:6,9,9,14;78:12,25;
    79:5;118:2,13;120:23
**grapevine (1)**
    333:12
**great (8)**
    149:18;184:14,24;
    207:3;243:24;260:7,
    20;268:23
**greater (1)**
    87:8
**group (2)**
    234:14;376:18
**grow (1)**
    56:17
**growing (1)**
    69:14
**guarding (1)**
    58:6
**guards (1)**
    58:6
**guess (23)**
    11:8;24:8;25:12;
    26:24;48:12;52:11;
    68:4;105:16;180:1;
    235:1;294:19;314:23;
    315:1;316:6;329:4;
    341:10;346:10;

349:14;354:10;358:2;
368:14;378:17;386:8
**guessing (4)**
    157:16;202:23;
    266:15;359:7
**Guevara (51)**
    5:3;11:14;32:22;
    33:12;72:25;75:14;
    149:3,12;185:7,22;
    186:7;239:16;254:17,
    23;255:5;316:7;
    317:17;318:2;345:1,
    13,16;348:21,23;
    350:9;352:16;354:24,
    25;355:15,20,23;
    357:14;358:2;363:6,
    10,13,18;364:16;
    377:12;378:23;380:2,
    22;381:19;382:12,23;
    383:11;384:2,8,16;
    385:6;387:12;389:19
**Guevara's (1)**
    32:23
**guilty (1)**
    209:17
**gun (23)**
    105:18;164:20;
    165:4;178:15;187:15;
    188:6,6,8,11,23,24;
    189:12,20;200:3;
    201:4;204:17,21;
    205:1;209:8;210:15;
    327:3;341:25;358:17
**gunned (6)**
    150:18;158:1,17,
    24;159:7;167:22
**guns (1)**
    164:17
**gunshot (2)**
    288:11,11
**guy (74)**
    72:9;75:5;103:14,
    15;121:1;141:7;
    149:18,24;165:23;
    168:18;169:24,25;
    174:12;176:22;179:5;
    184:12,13,14,14,24,
    25;185:11;187:9;
    191:25;216:7,12;
    217:11;221:6;227:2,
    4;231:20;238:24;
    239:8,21,24;240:1,5;
    241:13;242:7;243:3,
    7,7,23,24;254:12;
    264:9;274:15;287:4;
    288:6;305:23;334:22;
    336:15,17;353:5,6,18,
    20;363:11;376:13;
    378:21;379:7;386:24;
    387:5,13;388:19,19;
    389:2,10,11,14,16;
    390:15,15,16
**guys (69)**

33:22;54:4;107:3,3;
115:23;119:16;123:3,
5;124:25,25;132:6;
145:3;147:5,6,10,11,
14,14,15,15,25;
149:25;150:16;
156:25;161:1;165:22;
177:20;178:17,18;
179:2,16,18;185:19;
187:16;188:4;201:4,
5;204:17;205:2,24;
206:2,4;207:15;
208:1;209:7;210:8;
234:13,13;249:8;
263:24;264:5,16,18;
272:1;281:8;305:18;
316:14;320:24;336:3;
356:17;358:16;
376:19;377:21;378:1;
384:7,15;390:2,12,12

**H**

**Ha (1)**
344:8
**half (4)**
31:7;73:25;81:8;
313:8
**hallway (1)**
54:6
**Halvorsen (36)**
12:22,23;14:8;
19:15;20:1,6,10;
21:12,24;31:12;
32:22,24;33:11;54:3;
75:17;314:21,24;
315:3;316:7;317:18;
326:2,5,19;327:15;
336:12;337:15,21;
338:24;339:5;345:1,
13,16,21;355:16;
357:7,16
**hand (8)**
64:20,20;240:14;
247:19;249:11;
285:15;327:24;
368:10
**handed (1)**
328:4
**handful (1)**
149:19
**handing (4)**
152:7;247:25;
250:21;351:20
**handle (5)**
63:13;295:10,11;
317:8,9
**handled (2)**
63:20;385:7
**hands (1)**
17:3
**hands-on (1)**
75:4

**handwriting (11)**
303:21;328:17,20;
329:2,8;330:4,5,23;
331:7,13,18
**handwritten (7)**
306:19;348:10,12,
15;351:8,12,14
**hang (4)**
68:14,14,16;277:24
**hanging (3)**
70:7,16;71:24
**hangs (1)**
68:17
**happen (9)**
19:9;104:4;134:21;
185:12;241:9;243:4;
264:6,21;279:3
**happened (33)**
21:21;63:17;78:2;
102:12;104:12,13;
132:23;133:24;134:6,
7,20;158:25;160:8;
177:17;181:19;
193:17;198:12;
203:16;208:11;216:5;
230:17;237:11;
263:17;278:23;
292:10;318:2;324:7;
332:25;341:5;360:19;
365:14,20;369:13
**happening (13)**
28:7;65:6;93:25;
136:17;137:10;144:4;
173:10;203:14;
234:17;243:6;256:15;
339:23;345:10
**happens (10)**
49:20,24;100:6,8;
127:11;161:19;
264:11;315:20;318:4;
319:7
**harassing (1)**
253:3
**hard (25)**
35:22;70:13;93:1;
104:3;105:12;114:8;
129:23;150:25;
155:19,20;180:12;
268:8;269:20,21;
277:21;281:12;295:2;
297:15;311:13;
379:10;380:11,14,19;
383:12,13
**hardworking (4)**
389:1,11,16;390:12
**hat (1)**
391:5
**hatched (1)**
221:7
**head (7)**
34:21;87:4;102:20;
114:8;143:16;158:5;
358:17

**headed (1)**
326:25
**heaped (1)**
55:7
**hear (7)**
38:6;91:22;161:20;
244:16;277:9;283:11;
389:8
**heard (52)**
12:1,10;23:7;24:15;
26:2;27:12;94:3,8;
102:11,23;103:22,23;
109:13;136:17;
146:23;147:12;159:6;
197:19;198:14;235:6,
17,21;236:21;267:20;
268:4;276:9,14;
277:1,7,11,15;278:12;
283:8,19;288:22;
364:17;371:2;377:16;
383:23;384:4,5,10,11,
14;385:11;386:15;
387:23;388:5,7,14;
389:17,22
**hearing (16)**
20:7,16;22:24;
30:17,20,24;31:21;
32:2,14;33:5;37:6;
158:16;180:12;
243:23;278:16;
333:11
**hearsay (1)**
95:18
**heck (1)**
243:9
**height (1)**
66:22
**held (1)**
44:16
**help (10)**
154:3,3;166:2;
167:7;178:2;189:11;
221:7;276:15;305:15;
323:4
**helpful (2)**
166:17;361:7
**helping (2)**
339:4;387:24
**Herbert (6)**
30:16;31:5,10;
32:24;33:15;39:21
**Herbert's (1)**
30:13
**Here's (1)**
243:7
**herself (1)**
93:6
**hesitating (1)**
155:4
**Hey (9)**
24:12;45:25;
104:18;106:10;
183:19;191:24;244:2;

258:11;386:5
**Hi (1)**
33:18
**hide (1)**
383:13
**high (5)**
56:21,24;57:14;
59:22;376:19
**higher (1)**
318:22
**highly (2)**
211:17;220:21
**himself (12)**
45:11,16;188:4;
209:7;241:4;327:4;
335:9;342:6;353:4;
355:24;386:10;
389:19
**Hispanic (1)**
278:17
**histories (1)**
152:12
**history (1)**
56:7
**hit (4)**
121:24;144:3;
239:3;242:13
**hitting (1)**
121:18
**hold (13)**
35:18;42:20;56:12;
57:6;70:25;87:4;
129:15;250:2,9,12,12;
286:7;309:13
**holding (2)**
178:14,15
**holiday (2)**
21:15,20
**home (5)**
178:9;269:13;
358:6;377:11;394:10
**homicide (25)**
87:24;123:15;
124:14,15,19,23,25;
125:3,22;127:8,10,11;
128:2,10,11,16;130:4;
141:8;164:3;191:1;
241:25;243:21;353:5,
6;363:1
**homicides (3)**
124:11;125:1,18
**honest (11)**
47:1;50:14;103:13;
115:11;156:13;
184:12,14,25;187:9;
217:20;377:13
**honorable (1)**
185:10
**hooked (1)**
121:22
**hope (8)**
102:25;251:3;
296:13;297:14;299:2,

2;371:10;389:5
**Hopefully (3)**
182:22;197:14;
389:6
**horses (1)**
205:23
**hour (13)**
31:7;81:8;144:17;
218:15;269:10,13;
276:11;277:8,24;
282:19;313:8;361:12
**hours (12)**
14:1;195:15;203:3;
267:21;280:17;
347:22;348:8,20;
350:24;358:6;359:17;
365:4
**house (9)**
28:19;178:12;
188:5;358:7
**housed (2)**
135:4,25
**Huh (2)**
343:19;366:8
**Humboldt (10)**
68:21;69:1,9,15;
71:14;79:19;80:9;
162:14,20;163:1
**hunch (1)**
233:3
**hundred (1)**
271:3
**hurt (1)**
169:8
**hypothesis (1)**
252:25

**I**

**IAD (2)**
384:1,2
**ID (4)**
99:4;307:7;329:24,
25
**ID'd (2)**
100:8;104:19
**idea (98)**
11:12;17:15;24:8;
33:6,9;35:13;39:3,7;
44:1;49:11;54:4,8;
73:4;83:2;84:10;
85:19;88:18,19;91:2;
94:15;98:20;99:11,
13;100:22;103:1;
104:17;112:7,7;
115:6;119:24;126:10;
135:1,15;153:10;
157:5;159:1,20;
169:1;175:10,20;
189:25;191:18;
192:13;193:16;
197:24;200:13;
201:10;208:12;212:2;

213:20,24;215:1,11;
228:16,22,24;229:22,
24;230:18;237:8;
245:11;247:1;249:4,
6;252:18;253:25;
254:10;255:11;
257:24;258:17;267:8;
270:1;280:8;281:3;
296:11;300:11;301:4;
303:5,8;313:3,4;
316:21;323:8;326:7,
22;328:15;332:12,19;
336:10;337:2,3;
343:3;345:14;347:2;
357:9;369:21;371:1;
385:1
**ideas (2)**
  283:1;313:1
**identified (6)**
  44:11;101:18;
  104:2,16;124:11;
  177:1
**identify (5)**
  49:1;68:11,13;
  69:24;344:16
**identifying (1)**
  64:8
**Illinois (2)**
  5:5,11
**image (1)**
  155:18
**imagine (6)**
  26:23;294:22;
  320:21;366:3,4;377:2
**immediately (5)**
  37:11;141:24;
  203:1;214:18;372:22
**impact (1)**
  350:5
**impeached (1)**
  245:4
**impediment (1)**
  291:16
**impermissible (4)**
  108:4;111:4;115:3;
  138:2
**implemented (1)**
  84:17
**implicate (1)**
  104:14
**implicated (2)**
  106:5;107:15
**important (19)**
  65:12;85:20,21;
  86:3,22;154:17;
  190:2,15;193:19;
  194:5,17;196:4,6;
  199:14;242:19;
  244:10,12;354:19;
  371:24
**importantly (1)**
  131:16
**impossibility (1)**

299:24
**impossible (1)**
  330:18
**impression (2)**
  180:14;205:6
**impressions (1)**
  159:12
**improper (2)**
  108:12;115:22
**inaccuracies (1)**
  137:23
**inaccurate (2)**
  137:13;336:19
**inbox (1)**
  127:18
**incidences (1)**
  88:5
**incident (13)**
  84:7;88:4,6;89:5;
  102:22;114:20;128:1,
  2;275:16;276:21;
  316:25;325:7;389:4
**incidents (2)**
  96:13;163:9
**inclined (1)**
  339:9
**included (1)**
  313:19
**including (7)**
  16:22;20:17;229:5;
  293:17;379:2;383:25;
  385:4
**incomplete (1)**
  249:25
**incredulous (1)**
  295:3
**incriminate (1)**
  188:4
**incriminating (6)**
  187:25;188:25;
  189:15,19;209:1;
  220:22
**inculpatory (3)**
  211:17;236:20;
  239:12
**in-custody (6)**
  160:14;165:22;
  167:3;174:11;320:9,
  11
**independent (9)**
  200:5,9;208:13;
  217:3,13;230:6;
  232:13;234:24;247:3
**index (7)**
  17:10,11;290:3,14,
  14,17,18
**indexes (1)**
  291:1
**indicate (5)**
  273:7;274:18;
  323:10;355:19;356:2
**indicated (10)**
  19:15;39:10,24;

40:8,18;41:1;204:23,
24;224:24;228:7
**indicates (2)**
  266:10;367:18
**indicia (2)**
  69:18,21
**indifferent (1)**
  176:14
**individual (7)**
  146:9,14,16;
  187:25;190:24;
  357:21;391:14
**individuals (9)**
  21:2;67:16;106:15;
  155:23;192:2;273:8;
  309:25;310:5;363:17
**induce (1)**
  113:9
**inducement (1)**
  113:18
**indulge (1)**
  22:25
**inference (1)**
  344:3
**inferences (1)**
  281:5
**influencing (1)**
  36:24
**informal (1)**
  85:15
**informants (2)**
  381:12,22
**information (123)**
  8:2;62:16;64:13;
  65:13,23;66:1,12;
  85:5;86:6,22;87:3,7;
  92:24;93:7;95:12,25;
  96:22;103:14;106:12;
  107:16;114:1;116:13,
  21;125:14;133:6;
  134:12;153:25;
  157:20;158:23;159:2;
  162:12;166:2,12,21;
  167:5,10,11;172:24;
  178:1,20;182:4;
  183:3;186:23;188:1,
  20;189:1,15,19;190:3,
  14,16;193:11;194:21;
  195:8,17;196:18;
  199:15;204:12,14,16;
  206:1,8,10,15,21;
  207:14;209:19,20;
  210:7;213:23;214:5,
  12;217:22;225:16;
  227:23;228:6,15;
  229:6;233:25;234:11;
  237:21;243:23;
  266:14,19;272:3;
  275:17;278:5,22;
  282:5;304:1,2,6,7,12;
  310:15,16;314:24;
  319:8;322:7;323:3;
  326:3,19;327:16;

332:25;333:25;
334:17;336:19;
337:14,20,24;338:6,7;
342:4,10;345:21;
357:7;378:23;381:23;
382:1,15;386:18;
388:9,11
**informed (7)**
  133:18;334:12;
  335:25;336:22;338:9;
  342:6,7
**informing (1)**
  230:7
**initial (9)**
  27:6,20;89:7;
  264:16;266:3,5;
  304:2;310:3;311:1
**Initially (5)**
  24:23;47:16;
  204:24;206:3;223:15
**initiating (1)**
  88:10
**injuries (1)**
  265:21
**inkling (1)**
  273:21
**inquire (1)**
  269:1
**inquired (1)**
  29:16
**inquiry (2)**
  269:17;370:10
**insane (1)**
  72:6
**inside (5)**
  123:21;169:24;
  170:2,4;173:16
**insignificant (1)**
  35:14
**instance (14)**
  48:20;71:18;74:9;
  84:12;87:11;88:11;
  107:22;109:18;117:7;
  139:4;254:15;278:13;
  344:2;356:15
**instruct (2)**
  29:25;216:18
**instructed (3)**
  218:3;219:24;
  335:20
**intelligence (2)**
  63:23;64:4
**intend (1)**
  337:22
**intent (1)**
  39:25
**interest (1)**
  34:13
**interested (3)**
  34:8;14;172:24
**interests (1)**
  195:21
**interpret (2)**

175:7;176:24
**interpreter (13)**
  171:14,22;235:25;
  236:2,4,6;237:11,13;
  241:6;242:5,6,12;
  346:1
**interpreting (1)**
  242:3
**interrogate (1)**
  58:19
**interrogation (3)**
  105:10;107:8;
  392:17
**Interrogatories (1)**
  19:6
**interview (36)**
  90:24;91:4,15,23,
  24;92:1,8,16;93:14;
  94:12;123:14;160:25;
  165:9,16;171:25;
  172:5;174:20,23,24;
  175:3,15;180:16;
  181:19;205:23;
  226:25;271:23,25;
  312:3;326:13;327:24;
  331:22;348:22;
  355:24;363:4,5;
  365:12
**interviewed (10)**
  187:11;267:19;
  310:3;326:6;328:10;
  348:20;350:20;
  357:22;383:19,20
**interviewing (7)**
  169:23;172:19;
  182:6;211:25;271:20;
  353:3,15
**interviews (9)**
  90:8;93:4;94:20,21;
  124:4;288:15;306:14;
  355:20;359:21
**into (45)**
  21:14;27:15;29:25;
  58:7;62:19;66:12;
  69:13,13;102:17;
  116:7;120:11;121:11;
  123:8;126:19;134:4,
  5;136:6;140:4;
  141:17;142:18;147:7;
  176:25;233:15;
  290:11,12;291:12;
  294:20;304:2,13;
  310:17;317:10,17;
  319:8;327:16;333:23;
  334:6,13;342:13;
  349:11;357:8;364:9;
  367:8;369:1,24;376:3
**introduce (2)**
  5:17;175:4
**introducing (1)**
  306:1
**inventory (1)**
  98:7

**invest (1)**
169:15
**investigate (7)**
58:12;64:16;86:13;
89:17;167:11;204:21;
265:2
**investigated (4)**
49:13,14;63:17;
292:1
**investigating (17)**
63:12;64:18;86:18;
127:11;156:23;
169:20;188:19;
214:18;226:12;
268:10;269:18;
278:21;280:17;285:5;
287:6;298:5;393:3
**investigation (59)**
18:5;27:24,25;
32:21;40:2;85:22;
86:4;87:23;101:4;
108:13;109:20;
110:13;112:18;113:5,
9,10,16;127:7,10,13;
130:4;131:13,18;
133:2,3;153:21;
160:5,17;168:24;
169:6;170:9,10;
173:2;193:22,24;
202:12,15;206:7,13;
215:3;222:4,18;
224:10;232:8;256:11;
263:2;264:17;266:4,
5;287:16;291:13;
292:4;298:1;325:1;
345:3;362:23,25;
363:1;369:24
**investigations (10)**
90:19;125:3;127:8;
133:15,19;167:12;
172:9;182:14,17;
243:20
**investigative (112)**
15:18,23;16:6,18,
20;17:5,9,23,25;18:8,
10,13,25;58:18;90:1;
97:20,24;117:2,21;
131:14;134:5,9;
135:3,17;136:5;
140:4;141:18;142:12,
18;159:16;160:22;
161:7;169:16;172:12;
220:10,15;228:1,2,6;
251:7,10,12,14;
252:13,17;253:1,15;
254:2,5,7,9;255:12;
256:6,25;257:6,23;
258:5,9,12,16,24;
259:1,3,4,15,19,25;
260:6,8,12,17;267:6;
284:11;285:10,11;
287:13;289:13,19,23;
290:5,8,12,13;291:1,

7,12,17;292:2,18,19;
293:16;295:5,17,18;
296:1;297:23,25;
300:13;303:1,3,6,7,
10,13;312:9;324:18;
332:16;350:24;
359:18;369:5,16;
372:3
**investigator (1)**
117:10
**investigators (1)**
154:5
**involve (3)**
63:18;164:6;165:8
**involved (35)**
32:21;42:23;43:1;
48:6;58:17;74:24;
75:2;88:4;106:20,21;
114:20;133:22;
148:10;157:1;162:12;
164:25;167:17;
168:13,24;169:4,9;
193:16;206:6,12;
214:9;261:11;269:19;
272:7;322:25;327:2;
335:12;346:25;
380:23;381:1;388:20
**involvement (3)**
160:18;188:1;
222:11
**involves (3)**
271:20;311:12,15
**involving (1)**
165:4
**ironic (2)**
186:7,14
**Isabella (1)**
310:10
**isolated (2)**
144:10;389:4
**issue (4)**
55:4;75:2;223:14;
386:17
**issued (1)**
31:17
**issues (8)**
25:25;55:10;71:5,
18;72:1,20;105:19;
385:10

**J**

**Jack (1)**
126:19
**Jacques (2)**
12:13,19
**jail (24)**
203:18,20,24;
204:3,4,7,9,11;212:1;
219:3;220:20;222:2;
224:16;231:18;
232:10,12;326:24,25;
332:6;335:15,20;

337:8;358:4;389:6
**jammed (1)**
385:2
**January (2)**
22:9,15
**Jeff (2)**
15:2;389:12
**Jeffrey (14)**
322:5,11,18,19;
323:7,10,14,24;324:1,
11,15,22;357:19,20
**Jennifer (2)**
5:19;362:16
**Jenny (1)**
310:10
**jeopardize (1)**
208:6
**jilted (1)**
192:22
**Jim (12)**
23:10,13,23;24:5,6,
19,21,24;28:8;31:17,
23;376:3
**job (22)**
60:14;82:13;
103:11,16,19;166:25;
167:1,2;169:13;
172:22;173:16,18;
182:13;196:24;
258:14;263:25;264:1;
282:2;288:8;317:19;
319:2;387:16
**jobs (3)**
63:14;64:8;103:13
**Joe (14)**
376:8,12;377:14,
23;378:2,10,18;
380:16,20;381:3;
383:4,6,9;388:12
**Joe's (2)**
384:7,15
**John (1)**
305:22
**Johnson (1)**
389:18
**Join (8)**
44:19;51:15;95:21;
112:5;186:12;255:8;
256:16;391:18
**joined (2)**
58:23;376:12
**Joker (1)**
106:11
**Jokers (2)**
67:23;68:1
**Jon (1)**
390:13
**Jose (24)**
5:20,22;145:20;
148:11;315:20;325:9;
329:20;334:11;
335:25;336:21;338:8;
341:24;342:2;346:6;

348:20,22;351:22;
353:3;358:1;361:1;
363:4,7;365:11;367:3
**Joseph (1)**
274:8
**Josh (1)**
14:23
**Joyce (4)**
33:7;38:4,6,21
**Joyce's (1)**
32:10
**Judge (6)**
32:10;33:7;38:4,6,
21;242:24
**judgment (2)**
11:5,16
**July (18)**
180:19;181:1;
207:5;220:16;226:10;
237:4;238:12;246:11;
247:7;296:16,22;
312:4;325:3,12;
349:3;350:17;370:12;
371:19
**jump (2)**
72:20;156:24
**junior (1)**
57:16
**jury (5)**
50:1,6;209:19;
236:23;242:24
**justified (2)**
393:11,13
**Justin (1)**
5:25
**Justino (2)**
146:10;370:2

**K**

**Kazarwitz (1)**
126:20
**Keane (3)**
23:20,24;24:7
**keep (8)**
96:8;140:13;
143:15;207:23;
287:19;288:20;308:3;
392:24
**keeping (2)**
133:18;222:4
**keeps (1)**
202:15
**kept (2)**
163:6,11
**Kevin (4)**
152:13;273:21;
307:6,7
**key (1)**
168:19
**kid (2)**
69:14;385:10
**kids (20)**

69:8;108:14;109:3,
10,21;110:6,17,18;
111:24;112:15,20;
113:8,17,24;114:2,10,
23;116:7,15;154:24
**kill (5)**
179:21;188:23;
189:21;276:16,16
**killed (9)**
159:19;165:17;
177:20;178:17;179:2,
17,19;201:6;360:10
**Kim (1)**
43:17
**kind (58)**
12:6;33:19;35:2,22;
41:24;58:18;62:21;
66:25;68:18;70:13;
71:3;72:20;80:3,6;
82:14;84:3;99:4;
103:18;104:10;
105:18;107:11;108:7;
110:1;114:17,19,21;
121:2;147:5,24;
149:6;150:10,10,15;
154:19;162:10;
168:18,19;169:24,25;
188:3;194:23;227:13;
234:22;260:1;270:19;
272:3;277:5;279:22;
311:13;317:19;
368:13;377:20;379:7;
385:8;386:7,16;
387:21;393:18
**kinds (3)**
72:6;317:9;379:22
**King (30)**
147:12,13,16;
148:15,21;165:18;
167:17,22;170:24;
193:1,17;201:4;
279:3,4,8,11,15,20;
280:12;322:4;342:5;
358:7,8,16,23;359:12,
14,19,21,24
**Kings (8)**
72:12;147:4,17;
162:6,9;170:20;
172:6;178:11;192:18;
193:5;199:24;278:24;
279:12,20;320:3;
356:16,17;359:6
**Kings' (2)**
148:20;278:23
**knack (1)**
318:14
**knew (35)**
25:13;45:11,17;
54:2;136:24,25;
137:1;147:15;161:23;
171:25;172:5,8;
173:10;176:6;177:19;
178:12;179:6,13;

192:10,11,13,15;
204:20,24;217:8;
237:1;334:22;342:1;
343:11;348:23;
378:21;379:10;381:5;
387:8;388:16
**knowing (9)**
101:8;172:24;
192:12,13;238:15,23;
241:12;291:16;347:3
**knowledge (24)**
59:14;75:19;
145:23;146:3,12,15;
172:20;189:7;196:3;
206:11;233:24;246:3;
261:12;267:25;
273:10;293:3;299:4;
308:2;323:11;324:8,
12;375:11,24;392:15
**known (8)**
88:16;146:1,10;
176:7;185:9;243:3,
11;379:8
**knows (13)**
50:13;55:10;128:3;
138:21;153:17;192:2;
193:5;227:6;242:7;
253:10;300:9;350:9;
355:15
**Kondal (3)**
274:8,14;306:25
**Kong (5)**
147:13,13,13,16,16
**Kuipers (1)**
5:14

# L

**lady (3)**
110:7;111:14;
143:14
**laid (1)**
84:5
**last (22)**
11:13;12:23;19:14,
25;21:23;22:18,18;
23:19;25:19;67:4;
85:25;260:23;274:24;
276:17;286:12;311:5;
347:21;365:5,8;
367:19;368:7;378:13
**lasted (1)**
277:8
**late (9)**
21:21;43:5;55:1;
74:13,13;148:1,3;
152:18;377:12
**lateness (2)**
269:9,12
**later (20)**
17:3;77:1;81:17;
104:1;137:23;143:12;
196:2;201:5;222:2;

243:9;271:6;311:16;
349:21;371:6;372:5,
22,23;376:6;383:7;
384:13
**Latin (39)**
71:14,19,22;147:3,
17;148:15,20,21;
162:6,9;165:18;
167:17,22;170:20,24;
172:6;178:11;192:18;
193:1,5,17;199:23;
201:4;278:23,24;
279:3,4,8,11,11,15,20,
20;280:12;320:3,3;
322:4;342:5;356:16
**Latino (1)**
278:16
**Law (8)**
5:10;19:16;29:8;
105:9;106:3;108:5,
21;366:16
**law-abiding (2)**
279:7,10
**lawsuit (1)**
9:25
**lawyer (12)**
29:10,11,13;33:16,
17;54:4;183:13,17,19,
22;236:17;386:4
**lawyers (8)**
13:9,10,14;28:12,
14;29:7;385:2;387:20
**Lawyers' (1)**
28:12
**lawyer's (1)**
12:24
**lay (1)**
90:6
**lead (9)**
118:12;169:15;
192:6;194:3,6;195:2;
207:4;219:7;281:13
**leaders (1)**
62:17
**leading (4)**
278:7;282:6,11,13
**leads (10)**
18:23;100:12;
155:22;182:10;
187:12;194:1;195:1;
204:16;282:2,25
**learn (4)**
84:23;216:20;
371:15;380:2
**least (28)**
30:24;42:9;49:8;
51:11;108:3;152:20;
158:3;163:22;195:10;
209:6;228:3;237:1;
240:4;268:21;275:19;
278:12;281:22;283:7;
288:22;295:17;297:5;
299:6;301:7;303:2;

305:1;309:3;310:1;
312:2
**Leave (2)**
121:24;327:24
**led (1)**
43:17
**Lee (5)**
14:9;20:22;136:9;
140:17,20
**left (14)**
12:6,8;77:2;123:16;
139:23,24;148:19;
178:16;188:7;341:8;
352:24;376:24;383:5,
6
**legal (4)**
195:24;209:24;
245:8;359:23
**legitimate (1)**
104:25
**legs (1)**
313:9
**Leinenweber (42)**
5:25,25;112:3;
126:14;185:24;
186:10;229:9;248:8,
12,14,17,21;249:19;
254:18,24;255:6,15;
256:3,12,22;286:4;
301:10;302:9;303:15;
318:7,18;350:11;
372:8;373:21;374:5,
10;380:6,12,17;382:3,
9,18,24;388:2;390:8;
391:16;394:1
**less (3)**
45:4;268:18;342:10
**letter (1)**
260:19
**letters (2)**
330:14,15
**letting (1)**
220:23
**level (2)**
392:16,24
**liberal (1)**
57:19
**lie (20)**
48:13;51:10;
105:10,14,15;106:25;
108:4,7,8,8;110:2,3,
10;112:9;114:21;
198:16;353:19,21;
380:21;392:9
**lied (3)**
46:22;51:7;107:7
**lies (1)**
54:18
**Lieutenant (7)**
23:18,19,21,24;
24:7;124:6;126:21
**lieutenants (1)**
123:17

**life (3)**
7:7;156:19;389:7
**light (2)**
316:3;322:3
**likelihood (2)**
87:9;268:18
**likely (3)**
182:24;281:18;
299:6
**liking (1)**
253:7
**limited (1)**
157:20
**line (2)**
154:23;388:22
**lineup (31)**
98:2,16,19;99:6,9;
100:1,7,7,9,24;101:3,
11,12,16,19,25;102:2,
5,8,9,10,18,19,22;
103:3,24,25;104:16,
24,25;105:5
**lineups (7)**
98:13,14,24;99:25;
103:9,10,18
**listed (1)**
309:20
**Listen (4)**
93:15;96:2;104:19;
105:17
**literally (2)**
242:13;271:13
**litigations (1)**
8:20
**little (17)**
78:7;88:2;117:23;
121:18;129:20,21;
143:8;147:17;200:14;
211:8;218:15;282:5;
295:3;335:8;365:13;
374:20;387:8
**live (3)**
62:19;70:12;279:8
**lived (5)**
66:22;69:5,9;80:7;
381:21
**living (3)**
268:25;279:11,15
**Lluiva (7)**
146:2;356:13,17;
358:6;361:23,25;
362:7
**lo (2)**
183:6,8
**locate (3)**
264:12;323:17,25
**located (7)**
5:10;61:9;76:13;
78:5,5;118:13;119:8
**location (8)**
84:6;125:18;136:8;
182:7;265:23;267:17;
278:25;288:11

**locations (1)**
62:18
**locked (2)**
383:6,9
**locker (1)**
123:1
**lockup (3)**
104:7;118:19,21
**log (10)**
290:3,3,13,17,17,
18;291:9,10,10,16
**logical (2)**
218:11;244:15
**logs (1)**
291:2
**long (32)**
13:2,25;21:22;22:6;
25:18,20;31:4,6,7,8;
40:12;52:6;57:9;
59:16;60:3,25;61:2;
73:18;74:6,6;114:24;
140:3;141:13;142:24;
144:25;155:10;
185:10;234:20;
236:19;246:6;263:13;
378:20
**look (88)**
15:22;16:5;17:4;
18:4,9;19:9;29:17;
34:17;35:3;68:19;
71:21;88:20;126:7;
129:16;131:21;132:3,
12;133:9;134:9;
143:8,9;154:7;157:5,
21,23;161:15;213:21;
215:22;221:20;251:9,
13,15,17,24;252:2,2,
12;256:24;257:16,19;
258:11,25;259:24;
261:15;262:11;
265:16;270:16,17,23;
273:25;275:25;276:6;
280:18;281:24;
286:22;289:7;291:10,
11;303:19;304:15;
305:14,19,20,20,21;
308:25,25;309:11,24;
311:24;313:18,22;
314:10;317:6;319:13;
330:13;344:9;347:6,
10,17;348:5,9;351:4,
7;352:6,13;357:24;
365:10
**Looked (30)**
13:8;15:25;16:11;
17:17,18,20;18:13;
19:3;26:22;27:2;48:5;
104:7;133:7;182:20;
228:7;271:16;275:3;
284:19;287:10;
288:14,23;289:24;
295:16;304:14;
307:15;311:1;324:20;

359:16;367:12;
369:25
**looking (24)**
17:5,22;18:16,23;
67:21;144:6;152:20,
21;160:2;197:21;
259:5;274:21;280:1;
310:25;315:2,23;
321:1;324:18;333:14;
342:21;347:3;350:24;
362:6;369:14
**Looks (20)**
121:23;133:21;
193:1;252:3;254:6;
260:1;267:11;269:6;
270:15,17;280:23;
288:25;305:24;
308:19,21;312:25;
330:1,3;345:15;
368:13
**Lords (8)**
71:10,16,19;72:5,6,
7,10,22
**lose (2)**
113:16;319:10
**lost (4)**
28:8;300:6;372:21,
21
**lot (36)**
34:5;49:21;52:8;
58:6;67:16;71:22;
72:11;87:3;103:12;
115:8,8,23;120:9,9,
10;129:15;136:19,23;
141:9;157:9;161:3;
162:16,21;255:19;
264:8;268:24;291:21;
295:14;318:3,5,11;
359:10;378:1;381:20,
23;390:3
**lots (2)**
61:19;155:11
**loud (1)**
277:5
**love (2)**
229:15,17
**lover (1)**
192:23
**luck (2)**
207:4;379:11
**Lulu (5)**
277:11;307:16,17,
20,23
**lunch (1)**
379:20
**Lunchroom (6)**
32:15,19;33:11,22;
37:5,12
**lying (7)**
46:24;48:11;110:8;
180:9;181:16;257:7;
392:12

## M

**ma'am (20)**
7:12,15;8:18;12:14;
19:17,23;21:1;35:10;
41:6;54:11;55:22;
56:16;58:24;120:14;
122:16;124:9;146:6;
175:1;179:11;325:5
**Macias (4)**
275:23;276:25;
277:19;283:8
**Mail (3)**
26:5,10;28:15
**main (1)**
264:6
**maintain (2)**
66:3;259:9
**maintained (2)**
141:19;301:6
**major (3)**
128:1,2;163:8
**makes (9)**
104:21;130:23;
132:22;156:4;236:20;
360:23;367:11;
368:23;387:10
**making (15)**
58:9;73:20;236:23;
327:4;339:8,17;
340:14;344:5,9,21;
360:15;361:1,3,8;
367:4
**male (6)**
276:10;277:1;
278:6;283:9;284:2;
319:23
**males (2)**
248:12,13
**manila (1)**
252:4
**manner (2)**
283:19;319:22
**many (20)**
7:1,8;8:23;9:18;
10:5,11;13:13;18:4,
22;31:11,22;35:11;
48:20;86:16;97:11;
119:22;123:11;
385:11;386:15;
388:12
**mark (4)**
151:22;152:1;
247:21;249:12
**marked (15)**
152:5,8;247:23,25;
249:14,16;285:16;
289:8;301:15;302:6;
328:2,4;351:18,20;
367:13
**marks (1)**
356:11

**Martin (1)**
5:12
**Martinez (1)**
149:1
**Marzullo (1)**
378:15
**material (3)**
8:1,8;292:2
**materials (1)**
296:8
**matter (8)**
5:2;25:1;41:5;
73:24;243:22;246:4;
275:4;282:22
**may (65)**
90:15;93:4;100:14;
103:20;108:25;
110:12;131:25;
140:20,21;143:4;
145:14,18,25;146:3,7;
147:4;152:17;154:10;
158:25;159:17;
160:23;162:12;
166:11;181:8;187:15;
189:20;190:25;192:1,
2;197:23;201:16,17;
206:22;212:25;214:9;
232:2;241:15,16;
263:10,17;267:21;
270:9;271:2;274:4;
275:6;284:7,8,14,21;
285:12;287:2;289:14,
20;296:1;298:1;
304:20,24;306:13;
312:9,16;321:4;
324:6;348:4;369:5,6
**maybe (56)**
13:4;24:11;31:7;
61:16;66:23,24;
67:12;79:13;80:12;
88:20;92:2;93:23;
99:23;114:19;126:15;
135:21;136:18;137:8;
141:7;144:4;149:14;
178:2;197:19;201:22;
208:2,23;227:5,21;
238:22;249:24;
259:24;266:18,24;
268:7,8;270:2;
280:20;285:19;286:8;
300:17;307:7,22;
317:7;320:8;321:23;
343:8;344:2;353:9,
24,24;366:8;367:14;
377:5;385:7,10;
387:20
**Mays (1)**
217:6
**Maysonet (191)**
5:2,20,22;10:12,14;
20:4,7,16;22:24;25:1;
27:5;28:7,25;31:18;
32:21;33:20;37:7;

38:17;41:4,13;43:6;
51:7;52:19;53:11;
97:21;145:20;148:11,
11;152:11;160:10,24;
162:2;165:9,16;
167:16;168:7;169:3,
9;170:4,13;171:8,25;
173:7;174:20;175:5,
15;177:5,7,16;179:8;
180:24;181:19;182:6;
183:7,22;184:5,17,20;
187:12;188:9,24;
189:19;192:5;193:4,
7,12,15;195:21;
198:20;199:7,21;
206:2,19;207:5;
211:25;212:21;213:8;
217:6;219:2,5;220:8,
9,20;221:9,17;224:16,
21;225:4,6,13;226:10,
25;230:8;231:9;
233:15;234:1;235:7,
24;237:2,4;238:11,24,
25;240:3;242:15,25;
249:17,20;250:22;
251:9;261:1,16;
265:17;274:1;283:18;
284:23;285:24,25;
296:16;297:25;
298:21;305:21;
310:18;312:3;313:19;
315:20;319:18;
320:21;322:8;325:9,
12;326:6;327:1;
328:5;329:20;331:21;
332:2,11,22;333:17;
334:12;335:25;
336:21;337:1;338:8,
12;339:23;340:13;
341:15,24;342:2,22;
343:18;344:21;
345:12;346:5,6;
347:18;348:20,22,23;
350:9;351:2,22;
352:15,19;353:4,15;
354:20,24;355:20;
358:3;360:4,9,14;
361:1;363:5;364:11;
365:11;367:4,21,23;
368:21,23;369:8;
370:13,22;375:8,17,
25;387:14
**Maysonet's (19)**
23:7;24:16;33:3;
39:1,5;41:22;44:15;
46:16;78:11;160:18;
164:24;224:4;246:10;
247:7,10;284:15;
358:1,17;360:3
**mean (100)**
7:5;9:6;15:12;
27:21,23;28:24;36:9;
42:7;47:13;48:13;

50:8;63:1;64:19;70:8,
11,18;80:6;83:23;
85:4;93:24;94:19;
102:6;113:1;129:6;
132:25;136:21;
139:24;144:23;
147:20;149:5;153:1,
8,14,16;156:22;
163:12;169:22;
185:17;188:14;189:3;
191:8;202:8;203:1,1,
7;214:4;219:12;
226:19;227:20;
231:17;232:21;
235:10;245:11;
248:21;253:21;
257:21;263:2,22;
265:2;268:16;269:11,
11,23;272:12,25;
273:11;275:12;
276:24;279:14,20;
282:13;285:3,6;
295:12;298:4,7,14;
300:6,8;314:3;315:9;
317:22,24;318:2;
330:4;343:8;347:20;
349:25;350:3;356:12,
25;357:3;366:21;
372:4;374:22;379:18;
390:21;391:6,22,23
**means (60)**
55:23;190:10;
269:13,16;319:3;
393:14
**meant (3)**
36:10;139:7;307:14
**mechanism (1)**
294:2
**meet (5)**
13:13;14:20;30:16;
72:25;272:16
**meeting (15)**
14:4,16;20:24;
219:9;220:7,8,19;
325:11,23;326:24;
327:9;335:20;339:14;
341:6;371:20
**meetings (13)**
13:19,25;14:3,14;
30:23;31:4,10;
238:12;297:24;299:1;
350:17;375:17,23
**member (7)**
69:4,18;70:9;72:4;
156:9,18;320:15
**members (23)**
50:16;63:18;64:9,
13;65:13;66:4;69:23;
71:24;72:8;153:4;
155:23;166:1,10;
201:4;271:20,24;
273:4,7;288:16;
298:17;304:7;320:3;

342:5
members' (1)
306:14
memo (3)
90:13,14,24
memorialization (1)
364:18
memorialize (11)
85:21;86:3;91:4,23;
93:6;98:12;133:2;
289:19;312:3,8;
325:11
memorialized (12)
91:15,18;94:13,20,
24;100:9;190:5;
195:9;246:11;247:8,
11;299:6
memorializes (2)
288:15;348:1
memorializing (2)
198:2;201:17
memories (1)
312:23
memorize (1)
160:7
memory (14)
34:18;36:24,24;
88:21;98:17;148:13;
150:7;159:23;200:13;
312:22;323:16,18;
350:5;354:9
men (12)
150:4;158:1,1,6,9,
17,23;159:6;194:4;
248:11;255:19;
354:13
mention (1)
307:19
mentioned (4)
83:22;149:12;
159:13;179:2
mere (2)
70:16;165:8
merged (2)
376:12,20
ME's (2)
270:18;287:24
mess (1)
250:3
message (1)
12:8
met (7)
13:10;30:18,19;
37:4;219:2,5;296:16
metal (1)
129:14
meticulously (1)
347:22
mid (2)
152:18;205:24
middle (7)
144:16;262:25;
268:17;367:19;368:6,

7,12
midnight (7)
263:24;264:5,9;
276:9;305:11,18;
316:14
midnights (6)
264:7,10,13;306:7;
316:25;317:2
Miedz- (1)
377:15
Miedzianowski (18)
376:9;377:11,22;
378:5;380:2,16,20,23;
381:1;382:22;383:18,
21;384:23,25;387:17;
388:20,23;389:18
might (80)
14:9;16:10;18:16,
17;32:3;34:20;52:11,
12;66:21;69:18;73:6;
77:21;78:6;86:17;
87:22;90:1,23;96:17;
97:23;107:16,18;
108:17;109:8;110:2,
6;111:12,12,13,19;
112:14,20;113:8,9,17;
114:10,11,12;116:12,
14;130:9;132:22;
133:1,8,21;134:4;
138:18,19,20;140:24;
142:22;149:19;
153:24;155:14;156:1;
166:12;170:15,18;
174:1;186:23;193:8;
196:8;200:21;201:21;
205:6;206:23;210:23;
224:10;228:4;258:15;
269:1;272:6;275:15;
313:1;336:14;341:5;
343:9;344:4,8;
349:24;366:5
military (10)
57:1,8,9,15,20,23,
24;58:4,22;59:1
millimeter (15)
161:23;162:7,8;
164:17,25;165:5,21;
167:18,25;170:20,24;
178:13;187:13;
266:12,19
millimeters (1)
165:8
million (3)
68:10,12;290:20
Milwaukee (1)
308:20
mind (12)
56:12;94:16;115:2;
146:20;149:13;
159:13;160:13;179:6;
191:23;194:16;200:8;
239:1
mine (3)

23:10;34:19;286:4
Mingey (26)
5:9;24:12;50:13;
81:16;145:12;152:4;
198:12,19;218:25;
247:22;249:13,15;
302:5;313:17;325:4;
328:1;330:9;335:25;
336:22;338:9;340:8;
351:17;361:11,24;
375:7;394:16
minimal (1)
282:20
minimum (1)
211:16
minute (7)
13:4;73:15;217:7;
242:5,6;374:13,17
minutes (8)
25:20;144:24;
145:4;271:13;274:24;
275:4;374:17,19
Miranda (2)
342:25;346:5
mis (1)
300:6
mischaracterizes (3)
91:9;350:12;390:8
mischaracterizing (3)
174:4;334:9;341:22
misconduct (2)
390:19,22
misconstrued (2)
43:10,19
misdemeanor (1)
89:21
mislaid (4)
300:5,6,7,8
miss (1)
270:2
missing (18)
33:1;250:11;296:7,
13;297:12,14,20;
299:9;300:25;301:8;
333:7,14;363:23;
370:20;371:5,7,24;
372:2
misstates (1)
207:9
mistake (1)
77:22
mistakes (5)
136:20,23,24;
137:2;138:17
Mob (7)
153:5,7,8,11;
155:24,25;156:8
model (1)
322:2
moment (1)
10:21
money (7)
379:4,11,14,16,18,

21;382:13
Montalbo (1)
287:2
Montanez (2)
10:22;48:7
Montanez/Serrano (1)
10:13
month (4)
13:3;87:11;139:18;
203:11
months (4)
87:11;180:17;
181:20;372:6
Montilla (61)
14:8;20:20;75:18;
175:2,23;176:1;
177:6,12,15;179:9;
183:18,21;197:19;
198:6;207:21;208:5;
235:19;237:3,6;
238:2,3,23;240:4,18,
19,23;241:4,9,20;
242:17;325:18;326:9,
25;332:5;334:1;
336:14,15;337:1;
339:2;341:17;342:25;
345:24,25;346:3,6,10;
349:3,7,12,16,24;
350:20;351:25;353:3;
355:6;363:6,14,18;
364:16;368:1;375:17
Montilla's (1)
239:21
Montoya (1)
304:8
more (65)
18:8;21:11;35:2;
36:25;37:2;38:16;
42:9,22;43:15;46:23;
53:13;69:5,14;70:21,
24;72:13,15,17;80:13,
13;86:14;89:19;92:7,
10;97:11;116:14;
129:15,17;130:1;
133:22;140:24;
146:19;147:8;156:19;
193:11;206:1;207:14;
209:1;214:5;222:11;
230:2;264:8;269:17;
277:6;281:17;319:3;
361:1;365:13;383:10;
386:18;394:13
morning (4)
263:18;267:21;
363:19;364:12
most (16)
9:23;13:16;52:13;
65:25;69:1;88:5;
99:25;116:20;122:18;
130:18;131:24;
166:22;182:24;
269:15;299:6;318:23
mostly (6)

72:5;79:23,24;80:1;
139:1;144:6
motions (1)
11:9
motivator (1)
116:12
motive (8)
153:24,25;155:8;
267:2,8;319:23;
320:4,5
mouth (2)
129:16;253:22
move (2)
81:4;96:23
moved (3)
76:24;77:24;136:1
moves (1)
286:19
moving (8)
222:19;223:7;
274:1;287:20;324:24;
326:23;333:16;
344:24
much (30)
11:25;45:4;55:14;
59:2;65:24;70:1;
72:19;104:8;117:22;
119:13;122:22;
131:19;147:6;153:11;
164:1;177:24;179:1;
189:13;269:8;270:20;
284:1;311:16;334:3;
347:16;354:8;359:14;
377:9,14,20,22
Muhammad (3)
383:21,24;388:8
Multiple (8)
86:20;93:13;96:11,
12,13;123:16;127:21;
128:25
murder (55)
64:24;117:8;
133:15,18;150:21;
155:8;158:20;160:19;
162:24;169:5;170:8;
174:2;178:10,11;
179:20;180:22;188:2,
11;189:4,5,11;
190:25;191:2;192:1;
193:8;195:3;203:4;
204:13,14;207:5;
209:7,17;210:5;
211:11;212:9,23;
214:7;12;226:13;
232:8;235:8;239:11,
12;251:14;263:13;
275:16;298:9;314:7;
322:22;334:7;366:9,
23;367:21,23;376:2
murdered (10)
146:8;150:4;
152:16;154:18;
170:23;178:23;181:8;

268:17;272:13;
273:22
**murderers (3)**
204:20,25;205:1
**murders (50)**
23:8;89:22;128:3,5;
145:22,25;150:8,10,
14;158:6,9;163:16;
164:7;172:1,25;
178:4;179:14;180:17;
181:21;182:5;192:3,
7;193:2;194:4;203:8;
205:7;210:16;211:12;
216:21;219:8;220:23;
231:16;263:17,22;
264:22;265:3;271:6;
284:21;304:25;316:5;
319:9;327:2,4;
334:13;341:19;342:1,
8,13;358:18;369:7
**must (6)**
217:17,18;218:9;
235:5,5;297:19
**Myself (13)**
32:18;54:20,20;
55:7,9,12;175:4;
197:25;214:9;225:5,
7;238:19;244:13
**mystery (2)**
249:10;270:20

## N

**name (38)**
5:12;23:19;29:3;
67:2,4,4,11;88:17;
106:10;125:19;
138:19,20;146:10,14,
16,18,21,22,24,25;
204:1,8;262:1,2;
266:16;277:11;
303:22;309:4,8,9,11;
322:5;343:6;356:13;
362:7,19;383:23;
388:10
**named (4)**
8:19,24;9:24;10:6,
10;383:21
**names (14)**
147:8;148:9,12;
201:10;211:1;216:13;
248:9;252:8;260:2;
290:20;337:17;
358:15;359:13,24
**Narcotics (4)**
62:16;64:5,10;
381:13
**narrative (4)**
267:15;324:25;
325:21;355:16
**narrow (1)**
67:20
**nationally (1)**

42:14
**naturally (2)**
8:2,8
**nature (6)**
11:23;25:22;90:25;
91:6;95:11;278:18
**near (2)**
86:4;222:14
**necessarily (19)**
21:20;70:8;89:12;
97:8;108:4;109:18;
111:9;112:9;125:4;
133:3;153:16;154:1,
4;189:3;227:1;285:4;
317:22,24;382:23
**necessary (3)**
95:8;223:3;343:25
**need (8)**
23:3;32:5,5;70:20,
24;143:14;144:25;
366:10
**needed (4)**
29:19,22;195:8;
379:11
**needs (1)**
218:17
**negative (9)**
46:18;98:24;99:6,9;
100:7,24;101:3,12,12
**Negron (1)**
310:10
**neighborhood (11)**
80:1,6,9;150:16,17;
267:12;275:14;281:9;
361:12,15;381:22
**Nelson (1)**
310:7
**new (10)**
34:25;51:17,18;
208:7;306:1;365:22;
366:5,8,16,16
**next (28)**
28:6;29:6;130:13,
14;177:17;178:17;
189:22;203:2,13,17;
205:2;216:5;242:6;
262:12;265:16;287:9;
288:13;289:4;341:6;
344:25;348:18;
357:24;360:1,25;
361:10,12;376:2;
379:19
**nickname (13)**
66:8,18,19,20;67:5,
6,9,10,12,13,14,17;
357:2
**nicknames (2)**
67:22;359:7
**night (4)**
178:10,22,24;
360:10
**nine (2)**
178:16;386:12

**nobody (6)**
38:24;268:8;300:9;
319:10;374:4;375:22
**Nodding (1)**
181:2
**non (1)**
279:10
**None (16)**
12:21;20:19;46:7;
56:4;75:20;182:11,
11,12;191:18;206:11;
208:14;220:13;224:1;
303:14,18;372:20
**Nonsense (1)**
386:24
**nonstop (1)**
363:12
**Nope (2)**
34:3;394:13
**normal (1)**
121:23
**North (46)**
61:4,6,8,10,14,14,
19;62:3,14;63:5,7,15,
24;64:12;66:5;68:22;
69:2;71:2,4;73:1,2,9,
18,19;74:15,22;76:19,
20;78:18;79:13;
81:17;149:5;150:4;
158:2,17,24;177:20;
178:18;179:3,14,17,
19;268:19;272:17;
276:12;282:23
**Northern (1)**
5:4
**note (1)**
66:21
**notes (4)**
17:1;90:8,23;
365:25
**notify (1)**
64:22
**notion (1)**
185:14
**not-so-great (1)**
312:22
**November (1)**
311:10
**number (23)**
8:20;9:16;35:15;
49:16,16;62:2;63:14;
68:12;87:3;97:16,19;
119:19;134:11;
135:21;138:22;
158:14;163:16,16;
215:17;248:22;302:1;
352:8;383:19
**numbers (5)**
254:7;260:2;
305:15;329:24,25

## O

**oath (3)**
7:13;392:9,12
**object (9)**
39:15;52:21,24;
211:20;220:25;260:9;
335:5;354:15;372:12
**Objection (133)**
8:4;9:19;10:1;36:1;
44:17;45:18,19;47:9,
21;48:15;50:3,20;
51:13;65:16;83:9;
84:25;85:24;91:8;
95:19;101:5,20;
102:3;108:15,23;
109:5,23;110:14,20;
111:6,25;112:21;
113:11,19;114:3;
115:4,19;116:3,8,16;
134:22;138:5;156:15;
157:2;165:11;174:3;
185:24;186:3,10;
187:17;194:7;195:4,
23;198:21,24;200:18;
201:1;207:8;209:23;
212:12;223:23;
224:13;225:19;
227:16;228:19;229:1,
9;236:8;239:5;240:7;
242:20;243:14;244:3,
4;245:7,16,25;
246:13;253:2;254:18;
257:8;258:18;259:11;
278:1;280:5,25;
282:8;283:2,13;
291:19;293:19;296:9;
299:14;300:2;301:1;
303:15;312:17;318:7,
16,18,24;327:11;
330:20,25;334:8;
339:10;341:11,21;
346:15;347:5;350:11;
366:12,18,25;370:14,
23;372:8;373:3,10,21,
23;374:5,10;380:6,12,
17;382:3,18,24;
383:1;388:2;389:24;
391:15;392:1
**objections (7)**
254:24;255:6,15;
256:3,12,22;301:10
**obligated (1)**
82:20
**obligation (1)**
259:9
**O'Brien (1)**
59:6
**observed (2)**
267:20;290:1
**obvious (1)**
70:2
**obviously (5)**
8:12;112:12;158:4,
5;173:8

**occasion (1)**
166:23
**occur (5)**
13:21;84:2;96:13;
239:7;240:18
**occurred (25)**
63:12;92:3,19;96:2;
99:1;158:18,19,20;
162:3;163:9;178:11;
179:14;190:11;200:7,
13;221:8;234:23;
235:6;240:11,16;
263:22;264:22,22;
316:25;393:11
**occurrence (6)**
263:14,17;275:19;
288:21;298:18;
307:19
**occurring (1)**
163:1
**occurs (1)**
170:15
**October (2)**
33:2;37:6
**odd (2)**
301:12;373:19
**odds (2)**
206:4;300:24
**ODs (1)**
162:5
**off (34)**
58:9;81:10;83:20;
102:20;111:15;
121:22;127:19;134:2,
6;137:4;138:15;
142:24;143:2,3,7;
144:1,11,16;145:6;
194:22,23;200:10;
203:25;218:19;
270:12;271:9,12;
286:11;313:11;
374:14,16,19;375:1;
394:6
**offender (7)**
84:3;124:17,17;
160:14;315:20;325:7;
362:6
**offenders (19)**
151:8;162:5;
204:18;211:2;216:14,
21;235:3;281:10;
315:13;320:2,4,9,11;
321:12;335:9;342:2;
361:15,19;393:1
**offenders' (1)**
357:2
**offender's (1)**
138:20
**Offense (7)**
88:6,14;89:3;
211:14;261:6,7;
286:25
**offer (1)**

Maysonet v.
Guevara

Video Deposition

Edward Mingey

187:25
**offered (1)**
179:19
**offhand (4)**
8:25;58:16;79:11;
270:7
**office (69)**
12:24,25;13:21,23;
14:21;20:2;23:11;
28:12;29:8;30:19;
37:13,14;43:17,23;
44:6,14;119:18;
123:18;124:5,14,16,
21,23;125:12,22;
128:17;129:4;134:4,
5,25;135:11,24;141:8,
11,19;216:9;217:5;
220:1;221:5;222:23;
224:24;225:2,3,10;
270:18;287:24;
291:24;292:15,17,23;
293:5,17,24;295:8;
299:21;302:3,22;
312:13;333:5,13;
336:5;340:4;352:10;
362:24;370:11,18;
371:13;379:20;
383:18
**officer (30)**
40:16,17;48:10;
49:9;51:22;58:4;
60:15,20;61:1;84:21;
89:4;114:14;139:8;
140:23;245:3,5,22;
280:11;303:21;
390:20;391:11,25;
392:5,9,12,15,16,20,
23;393:5
**officers (17)**
32:20;48:14;50:15;
51:11;62:23,24;
65:13;81:21;118:18,
24;245:13,14,15;
267:8;348:2;361:13;
393:9
**offices (5)**
20:25;123:8,11,16,
25
**often (2)**
48:21;343:22
**old (7)**
129:19;143:14;
147:11;151:15;156:9;
208:23;376:20
**older (7)**
35:2;147:5,15,17,
20,25;322:2
**oldest (1)**
130:19
**Omar (5)**
383:21,24;384:7;
388:9,15
**Omar's (1)**

388:10
**omit (2)**
8:1,7
**once (10)**
29:5,5;38:16,17;
50:23;136:13;139:12,
14;234:1;235:6
**one (140)**
7:17,21;8:3;21:8,
11;22:2,18,18;27:2;
31:11;40:11;44:4;
46:19;51:5;56:13;
64:1,3,12;72:9;81:19;
86:14,21;91:17;96:9;
97:12,15;102:21;
103:3,7;104:11,13;
105:12;123:10,11;
125:23;127:16,20;
130:13,14;132:3;
139:2;140:24;141:2,
9;150:10,14;152:10,
24;153:5,13,22;
155:14;156:6,8;
160:13;162:8;168:16;
171:24;174:24;
176:18;177:23;178:1;
185:5;189:25;190:2;
196:13,15;197:18;
199:8,11;202:4,17;
206:20;212:8,22;
218:17;219:4;226:9;
229:5;230:2;235:2,
20,23;236:14,14,16;
237:23;238:9;239:2,
3;240:14,17;241:8;
242:5;244:18;246:4,
25;247:1;250:7;
253:23;255:21;
256:20;257:13;
266:21;268:13;
269:11;271:2;277:5,
6;280:14;285:7;
286:19;287:15;291:6;
292:5;297:10,11;
305:6;306:3;307:18;
310:14;315:12,19;
316:24;319:11;336:2;
346:11;356:16;357:1,
14;378:12;379:18;
381:25;382:15;
383:20;384:6,6,7,15;
390:16
**ones (3)**
215:18;371:24;
390:5
**one's (1)**
322:16
**ongoing (2)**
130:5;172:9
**only (44)**
40:11,24;64:8;96:6,
8,10;100:17;102:20,
21,21;103:3,7;

110:22;176:17;
183:14;204:25;206:9,
14,14;214:6;218:11;
219:23;222:9;235:16;
236:4,21;237:2,23;
238:5,6,24;239:10,13;
240:2;241:13;242:7,
13,23;252:24;283:8;
286:4;292:15,15;
381:3
**onto (4)**
122:11;123:2;
130:10;172:18
**on-view (1)**
58:18
**open (16)**
119:20;123:2,7;
124:1,10,11;125:2,20;
133:15,18;177:22;
183:5;315:12,14;
339:19;340:10
**open-ended (1)**
179:12
**open-minded (1)**
280:19
**operated (2)**
61:18;62:3
**Operations (1)**
376:18
**opinion (1)**
387:7
**opportunity (4)**
35:7;82:2;197:1;
311:24
**opposed (1)**
192:20
**optimally (1)**
86:2
**oral (2)**
346:22;348:16
**orally (4)**
91:19;92:1;95:2;
96:19
**order (6)**
69:12;132:21;
250:3;270:16;285:19;
286:5
**organized (6)**
64:2;67:2,4;85:5;
130:12;135:14
**original (14)**
88:24;127:22,24;
130:6;140:1,6,8,13;
141:17,23;142:4,6;
239:25;375:13
**originals (4)**
98:1;142:1,7,8
**others (4)**
21:11;149:20;
162:2;169:10
**otherwise (1)**
146:10
**ourself (1)**

177:1
**out (130)**
23:24;25:25;26:1;
27:8;30:9;31:25;34:8;
44:24;45:10,16,21,22,
24;46:3,9,12,12;
53:10;54:5;58:25;
59:8;66:16,17,18;
67:11,14,25;68:14,14,
16;70:7,16;71:12,24;
72:20;77:9;84:6;
86:12;96:13;104:6;
107:16;113:4;121:18;
129:14,15;130:22;
134:7;137:6,9,13,23;
138:23;139:5;146:5;
154:24;156:24;158:5;
162:6;164:23;166:3;
167:16;172:2,8,19;
178:2,16;188:22;
195:18,20;196:2;
201:5;206:1;209:18;
210:22;211:6;215:16,
23;216:19;217:14;
218:4,6;221:7;
228:15;238:25;
243:10;248:20;250:2;
264:25;270:15;272:1,
4,6,8;277:24;284:13;
286:5;302:21;315:13,
14;323:16;328:14,23;
329:1,5,24,25;331:4,
5,10;334:21;338:3;
346:19;348:14;359:3,
6;364:2;374:23;
376:4;379:10;383:11;
384:3,13;386:6,23;
387:25;388:12,14;
389:6;393:7,15
**outraged (1)**
50:10
**outside (15)**
19:24;20:2;50:23;
98:1;169:25;174:17;
208:19;221:3;251:20;
252:13;276:11;
278:25;362:19;
363:21;369:9
**over (26)**
8:15;13:8;17:19;
40:4;70:13;77:6;
78:25;96:14;118:11;
136:19;188:5;202:11;
216:10;218:15;222:2;
261:1;276:11;294:17;
307:1;313:7;319:11;
322:3;326:25;381:22;
385:10;388:20
**Overall (1)**
7:3,4;9:9
**overlooked (1)**
219:4
**overseeing (1)**

243:20
**overview (1)**
56:10
**own (11)**
34:18;64:21;
123:24;183:1;185:5,
15;195:21;229:19;
328:19;329:7;362:4

---

## P

**pack (1)**
301:20
**pad (1)**
90:24
**page (32)**
7:19;251:8;260:23,
25;261:2,18;265:17,
17;286:22;287:9,21;
288:14,20,25;302:8;
304:5;307:14;308:25;
309:13;319:15,15,17;
333:16,18;357:24;
360:25;367:6,7,19,19;
368:7,7
**pages (3)**
286:12;309:25;
311:5
**Paid (1)**
379:16
**Palmer (1)**
56:19
**panels (1)**
126:2
**Papa (16)**
23:11,13,16,23;
24:5,6,21;27:4;28:8;
31:17,23;44:23;45:8,
10,15;376:4
**paper (21)**
50:2;92:3;93:16,17,
21;94:6;96:4;160:2;
191:15;218:2,5;
220:15;224:8;233:3;
244:23;245:3;260:2;
323:19;324:18;327:8;
347:17
**papers (1)**
324:19
**paperwork (3)**
48:4;220:4;357:20
**paragraph (17)**
333:20;334:14;
338:3;344:25;348:19;
357:25;358:9,13;
360:1;361:2,10;
364:14;365:2,6,8,10;
368:13
**Pardon (1)**
265:12
**parent (2)**
112:14;124:17
**Parish (1)**

Rizman Rappaport (973)992-7650
"When every word counts"

56:20
**Park (11)**
  56:19;68:21;69:2,9,
  15;71:14;79:19;80:9;
  162:14,20;163:2
**part (41)**
  25:16;58:1;65:25;
  68:23;69:1;71:4;
  73:17;76:9;79:21,22;
  84:22;109:11;111:16;
  119:4,5;132:1;142:2;
  143:1,18;161:11;
  165:25;166:25;167:1,
  2,10;172:22;176:12;
  228:18,25;230:19;
  233:1;244:12;246:19;
  263:4;282:18;287:25;
  294:9;307:11;344:3;
  346:25;365:19
**participate (2)**
  101:25;367:22
**participated (2)**
  14:15;40:2
**particular (12)**
  46:21;69:6;70:8,17,
  21,22;96:21;100:25;
  145:13;150:17;
  163:21;320:12
**particularly (7)**
  50:15;87:2;151:12;
  152:23;153:23;
  155:12;194:25
**parties (1)**
  22:2
**partner (3)**
  160:12;231:20;
  376:22
**parts (1)**
  277:7
**party (2)**
  22:8;372:16
**pass (2)**
  96:19;217:22
**passed (11)**
  91:19;95:2;212:5,
  18;213:4,15,22;
  214:1;345:3;357:15;
  374:2
**passing (2)**
  95:13;163:22
**past (1)**
  115:25
**Patrick's (1)**
  56:22
**patrol (6)**
  58:5;59:10,17,22;
  62:22;118:18
**patrolman (2)**
  60:21,24
**patrolmen (1)**
  62:25
**Paulnitsky (36)**
  14:11;20:13;75:18;

160:10,11;161:17,20;
162:1;168:12,23;
170:7;173:23;174:8;
175:18;180:24;217:5;
219:7;224:17,22;
225:12,18;226:3,11,
12;230:6,12,14;231:1,
4,6,9,15;232:7;233:8,
14;368:1
**pause (1)**
  144:22
**pay (4)**
  60:24;177:11;
  382:1,6
**peculiar (1)**
  133:8
**pedophile (1)**
  279:14
**pending (5)**
  9:5,13;11:1,10;
  373:25
**people (63)**
  9:24;21:2;28:25;
  41:4,9;50:5;52:11,12;
  53:8,15;67:21;70:11,
  12;71:23;75:18;89:4;
  97:20;104:6;105:14;
  106:25;107:12,12;
  115:8;117:19;167:3;
  168:20;185:5,15,22;
  186:8,18,20,24;200:3;
  201:10;204:25;208:7;
  235:20;248:2;264:14;
  267:19;268:25;
  269:13,22,24;270:3;
  275:14;278:17;279:7,
  10,19;298:9;315:16;
  357:15;359:3;364:7;
  378:8;380:9;383:5,
  19;386:4;387:4;
  393:10
**per (1)**
  72:8
**percent (1)**
  122:18
**perception (1)**
  42:2
**perhaps (1)**
  44:5;155:13;288:9
**perimeter (1)**
  123:9
**period (9)**
  73:22;79:2,6;80:23;
  81:3;206:16;221:12;
  275:8;365:12
**permanent (21)**
  15:20,23;16:6,9,18,
  24;17:6,10,13,14,22;
  18:1,24;142:2;
  285:23;289:17;
  292:13;295:19;
  300:18;324:19;
  350:25

**permissible (8)**
  105:9;106:3;
  108:20,20;110:2,5,11;
  112:18
**permissibly (1)**
  109:22
**permitted (1)**
  105:15
**person (56)**
  66:15;67:19;68:11,
  13;90:6;91:25;92:8;
  93:2,7;94:8;95:17;
  104:2;110:7;111:13;
  112:8,10,25;115:14;
  117:8,9,9,9,11,11,12;
  146:24;157:17;
  173:20;174:13;
  185:20;206:14;224:3;
  226:16;235:16;236:5;
  237:23;238:5,6,10,16;
  239:10;240:2;242:13,
  23;315:12,19;322:19,
  21;325:9;329:25;
  332:10;346:12;357:4,
  14;383:20;388:5
**personally (6)**
  75:3;106:16;111:3;
  115:7;212:24;332:1
**personnel (2)**
  87:16;121:3
**persons (1)**
  325:8
**phase (1)**
  11:8
**Phil (2)**
  305:18;306:9
**phone (5)**
  30:21;31:2;225:15,
  16;388:22
**phonetic (3)**
  126:20;162:5;370:3
**photo (1)**
  66:9
**photographs (1)**
  68:9
**photos (3)**
  66:9;248:11,12
**physical (3)**
  117:24;392:25;
  393:10
**physically (3)**
  53:6;61:9;76:13
**pick (2)**
  21:8;338:3
**piece (11)**
  93:21;155:6,13;
  218:2;224:8;233:2;
  260:1;323:19;324:17;
  327:8;347:17
**pieced (1)**
  256:9
**pieces (1)**
  218:5

**place (16)**
  11:19;20:7;85:14;
  96:14;135:3;159:17,
  21;169:12;174:23;
  180:16,16;205:10;
  266:21;317:4;327:10;
  381:23
**placed (7)**
  290:11;291:7,12,
  17;334:6,12;342:8
**places (3)**
  268:25;290:12;
  300:25
**plain (1)**
  377:25
**plaintiff (2)**
  5:20,22
**planet (4)**
  224:3;237:23;
  238:10;242:7
**planned (2)**
  44:22;222:24
**plausibilities (1)**
  268:10
**play (1)**
  104:9
**please (10)**
  5:17;16:3;40:21;
  190:20;245:19;
  247:21;321:17;
  333:21;347:15;361:1
**plenty (2)**
  36:18;319:9
**plural (1)**
  346:8
**plus (4)**
  15:19;66:24;82:13;
  185:1
**pm (10)**
  145:7,10;218:20,
  23;271:4;313:12,15;
  375:2,5;394:9
**pocket (3)**
  26:1;27:8;31:25
**point (54)**
  7:16;26:14,15;
  29:12;37:13;40:5;
  51:4;53:20;61:24;
  75:23;78:24;81:25;
  87:20;88:18;91:1;
  93:22;98:10,19,25;
  99:8;100:3,13,14,22;
  105:21,22;108:8;
  125:16;126:21;137:6;
  141:13;147:24;
  149:20;178:25;
  185:14;193:25;
  194:14;195:12,14;
  196:9;203:19;206:13,
  25;219:15;233:2;
  247:4;269:7;277:22;
  282:12;321:13;341:3;
  350:8;376:16;377:12

**pointing (1)**
  278:24
**Police (63)**
  21:5;22:14;23:18,
  21;36:15;40:16;48:9,
  14;49:9;50:23;51:11,
  22;57:8,21,24;58:4,
  23;59:3,12;81:20,24;
  82:2,7,12,17,22;83:8;
  84:21;85:6,10,17;
  87:14,22;98:12;
  114:13;129:5;132:2;
  139:7;140:22;163:10;
  170:2,4;245:13,21;
  269:24;280:11;
  293:14;311:1;342:7;
  384:1;385:24;391:24;
  392:4,5,8,9,12,14,15,
  19,22;393:4,9
**policeman (5)**
  107:25;381:4,7,8;
  388:19
**policemen (1)**
  107:4
**police-related (1)**
  102:22
**policies (3)**
  82:21,25;391:12
**policing (3)**
  71:1,18;163:24
**policy (12)**
  85:7,14;98:11,15,
  16,17;99:8,13;101:9;
  105:23;106:1;390:25
**Pontiac (1)**
  322:2
**pool (1)**
  67:20
**poor (4)**
  95:12;228:17,24;
  229:21
**port (2)**
  58:7,8
**portion (1)**
  328:13
**posed (3)**
  30:5;39:12,13
**position (4)**
  36:17;44:2;60:17;
  255:22
**positive (3)**
  196:12,14,14
**poss (1)**
  205:25
**possibilities (3)**
  253:21,23;266:24
**possibility (10)**
  43:20;114:12,25;
  156:3;173:3;239:2;
  253:24;256:20;
  257:13;280:21
**possible (58)**
  50:17;68:1;100:23;

101:1,9,10,13,14,15,
22;104:13;110:11;
112:24;114:6,16;
156:5;157:13;166:4;
167:4;190:7,8;
191:11;196:1;212:7,
10,15,21;213:2,7,10,
12,13;228:24;229:4,7,
7,22;230:2,4;256:19;
266:11;268:11;273:1;
282:1;298:24;307:24;
332:9;335:22;336:1,
9,23;338:10;340:6,
13;366:7;373:1,6,12
**Possibly (14)**
19:20;44:10;52:15;
53:18;108:1;133:11;
143:23;155:16;
156:21;195:2;298:3;
347:2;366:6;376:24
**post-1990 (1)**
77:12
**post-motion (1)**
11:7
**post-trial (1)**
11:8
**potential (1)**
67:21
**potentially (4)**
123:21;243:12;
282:18,19
**powers (1)**
345:7
**practice (27)**
34:24;50:9;85:7;
86:9;91:14;92:4;93:9;
94:6,19;95:7,9,12;
96:24;99:9;105:9;
106:9;110:24;127:15;
132:2;137:14;143:20;
165:25;197:17;
245:12,20;293:1,13
**practices (2)**
106:3;343:5
**preceded (4)**
131:17;133:9;
278:12;346:23
**Preceeo (2)**
275:22;276:8
**precise (1)**
9:16
**predict (1)**
72:19
**prefer (2)**
34:18,22
**preference (1)**
176:13
**premature (6)**
217:11;225:7,10;
226:2;334:20;342:18
**preparation (7)**
13:14;14:21;18:2;
19:4,24;161:12;

324:20
**prepare (16)**
13:6;82:2;137:15;
138:14;139:9;211:24;
240:4,19,20,23;241:2,
5,9;244:2,2;392:5
**prepared (32)**
81:21;85:18;87:22;
89:3,16;97:25;
127:16;130:5;132:9;
201:16;215:2,4;
263:21;284:13,14,20;
289:9,13;297:13,15,
18;304:24,25;306:12;
314:6;327:8;341:4,4;
344:9;362:9,11;
363:17
**prepares (1)**
140:23
**preparing (6)**
19:21;82:11;
101:25;102:5;127:12;
202:18
**prepped (1)**
36:19
**presence (3)**
35:20;187:14;360:5
**present (20)**
20:18;31:9;91:22;
92:23;210:16;211:12;
214:7;325:18;326:13;
351:24;354:8;355:9,
20;356:3,6,8;360:22;
363:5;368:2,19
**presently (2)**
8:24;42:5
**presumably (3)**
177:16;182:25;
322:7
**pretend (4)**
50:10,11;102:18;
256:10
**pretty (34)**
22:21;56:7;59:2;
65:23;70:1;75:4;
104:7;117:22;119:13;
122:22;127:4;131:19;
153:8;162:14;164:1,
20;166:21;189:13;
209:6,11;242:19;
265:7;268:1,2;
270:20;274:23;
282:20;283:25;301:6;
317:13;334:3;359:13;
377:9,20
**previous (7)**
91:9;133:12;174:5;
207:9;341:25;363:7;
364:24
**previously (8)**
21:13;22:7;26:17;
52:2;77:25;105:23;
226:8;296:15

**priest (2)**
157:10,17
**primarily (4)**
62:23;75:12;120:7;
272:15
**Prince (2)**
147:13,16
**printed (2)**
329:9;330:15
**Printing (1)**
328:21
**prior (19)**
30:16,19,24;31:20;
49:18;99:12;131:22;
145:13,18,24;146:7;
147:4;182:5;193:12;
231:2,16;267:6;
297:1;375:20
**prison (3)**
112:13;255:20;
390:6
**prisoner (1)**
231:19
**prisoners (1)**
58:19
**privilege (2)**
39:11;283:17
**proactively (1)**
30:9
**probable (3)**
210:4,16;211:13
**probably (100)**
18:9;21:12;25:10;
26:3,16,20;28:3;29:7;
30:22;35:16;37:2;
61:15;64:4;70:5;
75:15;82:10;83:5;
88:12;100:15;106:19;
107:5,9,17;109:11,14,
15;114:21;115:8,9;
116:21;122:18;
127:17;128:9;131:24;
133:11;135:11;
137:11;141:1;145:4;
147:7,8;148:6;150:9;
151:6,10;153:13;
156:19;162:2,5;
173:8;176:15,15;
177:21;179:21;183:4;
189:23;192:18;
197:22;198:7;201:23;
211:7,15;212:23;
222:5,6;223:8;
232:13,14,18;250:4;
263:4;264:18;265:10,
13;268:6,13;269:10,
13,15;271:16,18;
285:18;287:4;326:20;
329:10;331:7,16;
336:5;338:25;339:24,
25;345:25;353:22;
359:6;366:22,23;
368:9;376:23;377:1;

386:13
**probing (1)**
34:15
**problem (11)**
25:4,11,16;44:24;
46:5;51:1,2;244:20,
23;353:8;387:16
**problematic (1)**
270:15
**problems (6)**
41:20,23;43:11,12;
53:14;387:12
**procedure (5)**
98:19;100:17;
101:25;102:6;117:2
**proceeding (1)**
38:22
**proceedings (3)**
38:12;371:17;
372:15
**proceeds (1)**
325:10
**process (6)**
7:11;102:9;132:15;
138:4;294:2;346:25
**processing (2)**
162:2;169:9
**procure (1)**
113:25
**produce (1)**
116:12
**produced (1)**
248:25
**product (1)**
48:22
**program (1)**
207:23
**Progress (20)**
90:2,4,12,18,22;
91:6;94:14,25;
222:19,22;261:24,25;
262:20,22,22,24;
263:1;271:19;287:15;
314:4
**promise (2)**
336:3;340:1
**promises (1)**
392:20
**promoted (5)**
77:22;80:24;82:5;
84:22;377:1
**prompt (1)**
88:21
**prompted (2)**
165:9,16
**proper (7)**
115:17,22;136:19,
23;137:22;138:13;
256:11
**properly (1)**
144:12
**Property (7)**
119:2,5,16;123:3,

13;124:6;243:22
**proposition (1)**
85:10
**pros (1)**
55:2
**prosecute (2)**
323:4;383:16
**prosecuted (4)**
56:2;63:19;209:18;
291:23
**prosecuting (2)**
293:8;383:18
**prosecution (23)**
27:5;29:21;36:18;
40:8,20,25;41:10,12,
17,23;43:16;44:5;
47:15,18;54:22;55:3,
15,23;196:8;235:8;
242:18;243:13;
372:17
**prosecutions (1)**
35:8
**prosecutor (1)**
46:11
**protect (2)**
71:25;116:2
**protecting (2)**
116:14,15
**protection (3)**
379:3;382:11,15
**protocol (3)**
127:14;137:15;
138:13
**provide (5)**
214:6;276:9;
293:15;323:3;342:3
**provided (19)**
179:20;187:15;
189:16,20;190:4,25;
192:1;209:8;210:15;
211:11;228:10;327:3;
332:10;334:1,17,18;
342:9;347:18;388:9
**provides (4)**
211:12;312:13;
333:25;334:4
**providing (1)**
292:1;388:11
**Puerto (5)**
185:1,14;186:8,9;
283:12
**pull (10)**
125:15;131:14;
133:22;134:8,8;
135:16;154:17;
250:13,18;284:13
**pulled (1)**
154:10
**pulling (1)**
153:19
**purported (1)**
295:18
**purports (2)**

Maysonet v.
Guevara

Video Deposition

Edward Mingey

328:9;351:21
**purpose (2)**
104:1;129:1
**purposely (3)**
8:1,1,7
**purposes (1)**
23:4
**pursuant (2)**
32:6;85:6
**put (45)**
32:25;64:7;78:9;
87:19;92:3;93:16,17,
21;94:6;102:7,17;
105:5;114:22;125:17;
127:17,22,24,25;
128:7,25;130:1,6,9;
141:4,10;143:10;
145:15;172:17,18;
191:14;199:17;
215:17;250:6;253:22;
261:13;262:10;284:5;
285:17,19;290:23;
320:11;327:16;343:6;
355:2;358:16
**puts (3)**
96:4;209:7;335:8
**Putting (7)**
88:3;105:25;110:9;
111:2;184:3;244:22;
289:11
**puzzle (2)**
155:6,13

**Q**

**quarrel (3)**
181:3,11,13
**quick (1)**
175:14
**quickly (2)**
202:23,25
**quite (2)**
176:7;259:24
**quotation (2)**
356:11;357:4
**quote (1)**
356:17

**R**

**racetrack (1)**
117:18
**Racing (1)**
117:20
**radiation (1)**
32:1
**RAHE (53)**
49:4,22;51:13;
84:25;85:24;95:19;
101:5,20;102:3;
108:15,23;109:5,23;
110:14,20;111:6,25;
112:21;113:11,19;

114:3;115:4,19;
116:3,8,16;138:5;
143:14;228:19;229:1;
245:9;257:8;258:20;
259:11;260:9,13,20;
278:1;291:19;293:19;
296:9;299:14;347:5,
8;352:7;366:18;
373:3,10,25;389:24;
391:15;392:1;394:2
**raised (1)**
133:8
**ran (1)**
189:23
**Ranh (1)**
58:2
**rank (2)**
36:15;60:21
**Rankins (6)**
46:21,21;51:7;52:5,
16;53:16
**rap (18)**
52:6;151:18;
152:21,23;153:3,19;
154:9,17;155:10,17,
21;156:20,23;157:21;
158:3;280:1,18;
281:22
**rape (1)**
378:15
**rapes (1)**
87:25
**rapid (1)**
12:6
**rapport (2)**
168:18;353:9
**rate (1)**
318:22
**rates (1)**
163:23
**rather (10)**
18:24;28:1;44:14;
46:12;87:10;118:11;
166:9;205:18;226:10;
371:23
**rating (1)**
60:23
**RD (6)**
15:13,13,15,16;
135:21;138:21
**re (1)**
337:25
**reach (7)**
30:9;45:10,16,24;
217:14;218:4,6
**reached (4)**
44:23;45:21;46:9;
376:4
**reaches (1)**
46:3
**reaching (3)**
23:24;46:12,12
**read (30)**

83:18;99:16,18,19;
143:23;158:10;159:8,
9;160:7,8;163:8;
170:25;177:1,3,6,15;
200:1,16,22;203:23;
204:5,7;208:25;
234:18,19;313:23;
325:10;333:20;
337:25;338:5
**reading (4)**
150:9;200:10;
338:4;352:22
**real (5)**
63:8;67:11;110:12;
182:10;207:4
**reality (1)**
172:18
**really (93)**
16:12;17:8;18:18;
21:7;26:5;27:12;28:5;
31:6;33:17;35:22;
44:7;54:2;60:10,24;
61:16;63:9;64:25;
74:25;79:12,14,16;
94:18;95:17;96:17;
98:23;105:4;115:15;
131:9;138:7;144:4,
14;148:17;150:25;
153:6,7;158:13;
160:12,16;164:14;
165:24;169:13;
170:11;171:21;
177:10;179:4;187:12;
188:3;193:25;196:3,
4;199:18;210:20;
214:5,23;225:17;
227:12;237:22;
240:13;249:9;251:11;
256:7;257:1;258:11;
263:25;272:8;282:11;
292:7;294:4,8;295:2;
316:1,1;317:9;
319:10,24,25;324:6;
330:16,17;334:24;
335:1;340:21,23;
353:16,24;361:20;
362:2;370:20;377:17;
385:19;388:14;390:5;
391:20
**rear (1)**
123:1
**reason (32)**
9:15;24:3,17;49:25;
53:10;56:1;86:8,21;
104:11,13;144:21;
150:17;160:21;180:8;
181:3,11;183:16;
184:5,20;187:21;
204:19;205:9;208:22;
259:20;261:10;
302:23;320:23;
323:23;344:16,18;
354:2;355:25

**reasonable (1)**
351:1
**reasoning (2)**
269:22;345:8
**reasons (3)**
51:5;155:14;226:9
**reassigned (2)**
60:6;264:1
**rebut (1)**
344:2
**recall (72)**
9:17,21;11:3;17:11;
18:15,16,18,19;19:12;
20:12;22:1;25:6;
27:13,17;28:7;32:1,3;
38:9,19,20;40:6;
58:17;59:15;75:21;
100:11;102:21;103:4;
105:7;111:1;143:3;
144:4;146:4;159:17,
20,22;174:13;203:20,
22;214:24;222:6;
223:10;224:6;230:21,
23;232:16,20;233:25;
235:4;323:15;327:20;
331:22;333:10,15;
336:11;337:2;340:15;
341:2;352:22;361:16;
369:3,18;370:1,8,17;
375:15,21;387:19;
391:3,20;392:7,13;
393:22
**recalled (1)**
340:17
**recant (2)**
49:17;50:18
**receive (7)**
28:10;81:23;86:5,
23,24;87:8;189:18
**received (7)**
28:22;29:6;31:17;
82:10;159:1;195:11;
378:22
**receiving (3)**
41:16;93:7;158:22
**recent (3)**
37:1,2;130:18
**Recently (3)**
13:4;151:18;321:4
**recognize (13)**
28:22;29:2;249:7;
261:23;262:18;
313:24;328:16,19;
329:2,7,11;330:9,23
**recollect (6)**
106:2;150:3;159:5;
160:1,3;234:6
**recollecting (1)**
200:4
**recollection (53)**
18:21;26:18;34:2;
100:3,20;107:6;
136:5;141:16;150:23;

151:17;160:9;174:15;
178:8;183:12;200:5,
6,9;203:16;208:13;
217:3,13,23;223:12,
20;224:2,9;230:6,25;
231:14;232:3,6,14;
233:11,20;234:17,21,
21,22,25;247:3;
257:15;318:10;331:6,
10;335:19;337:7,9,
10;354:8;361:18,21;
368:2;375:23
**recollections (1)**
34:15
**record (20)**
5:2,16;23:4;81:11,
14;99:19;126:11;
145:7,10;218:20,23;
260:14;294:7;313:12,
15;372:15;374:15;
375:2,5;394:7
**recordkeeping (3)**
228:18,25;229:21
**Records (5)**
140:9;141:23;
142:8;259:9,14
**record's (1)**
293:12
**recovered (3)**
27:24;308:21;
388:21
**red (1)**
133:8
**referenced (1)**
277:12
**referring (2)**
365:2;386:1
**reflect (6)**
126:11;220:15;
324:21;354:19;362:5;
363:19
**reflected (4)**
304:13;344:20;
359:17;372:17
**reflecting (3)**
359:23;362:12;
370:12
**reflects (4)**
218:2;285:11;
340:12;356:8
**refresh (1)**
98:17
**refreshes (2)**
26:18;224:9
**regarding (2)**
105:24;306:13
**regardless (1)**
231:8;339:23
**registration (1)**
307:7
**regular (5)**
21:3,3;90:10;92:5;
164:15

**rehearing (2)**
20:4;23:15
**relate (1)**
98:6
**related (9)**
27:5;28:1;64:5;
74:25;82:22;83:1;
85:21;161:5;369:24
**relates (4)**
146:13;160:17;
369:19;371:19
**relationship (4)**
376:8;377:8;
384:23;385:6
**reliable (1)**
116:13
**reluctant (2)**
107:10;208:2
**rely (4)**
34:18;312:22;
350:4;354:11
**remain (4)**
40:1,10,19;41:2
**remained (1)**
21:3
**remem (1)**
170:22
**remember (61)**
25:7;26:21;27:18;
28:4,16,18;38:25;
40:17;57:4;143:1;
147:9;158:8,16,22;
159:3;160:17;161:4,
16;180:15;182:2;
198:1;199:18,20;
200:14,15,17,25;
201:7,12;203:13;
204:4,6,9;208:15,18,
23,24;219:20;223:11;
224:20,23;231:23,25;
232:22,23;307:18;
320:19;321:1;332:4,
6;333:4,11;340:18;
361:14,25;362:15;
369:4,11;370:9;
375:7,16
**remembered (3)**
34:9;171:5;200:22
**remembering (1)**
339:7
**Remind (1)**
378:14
**removed (1)**
303:13
**reorganized (1)**
64:6
**repeat (5)**
245:19;288:25;
289:1;364:24;373:5
**repeated (3)**
341:24;363:7;
365:15
**repeats (1)**

341:16
**repetitive (1)**
23:3
**rephrase (2)**
7:18;9:11
**replace (1)**
90:13
**replaced (2)**
90:15,16
**report (210)**
26:25;66:23;81:24;
82:22;83:1,8,20;85:6;
88:6,10,14,24;89:7,
25;90:2,4,7,11;91:6,
20;92:3,20;94:14,25;
95:1;99:6;127:16,21,
25;130:6;131:20,22;
132:9,13,14,20,22,23;
133:7,9;134:20,21;
136:14,14,22;137:3,9,
13,15,19,22;138:3,8,
14,24;139:8,10;
140:23;141:12;
143:21;144:7;159:9,
11;169:22;170:25;
194:5,6,19;197:2,3;
200:2;203:23;204:5,
7;208:19,25;211:19,
24;212:5;215:18;
218:1;224:8;236:7,
12;238:16,18;239:4;
240:5,19,20,24;241:2,
5,9,14,16,17,20;
245:5,14,23,24;261:6,
7,24;262:6,12,19,21,
23;263:1,10,16,21;
265:18,24;266:3;
267:7,13;269:6;
270:8,14,18,24;271:9,
13,14,19,19;274:4,18,
25;275:11,12,13;
284:7,13;285:11;
286:25;287:9,16,17,
20;288:13,15,21,23;
289:2,4;290:11;
297:23;304:13,14;
305:3;306:12;307:3;
308:17;309:13,19;
310:1,17;311:19;
313:18,25;314:11,18,
20,25;319:14,15,16;
323:9;325:22;327:7,
16,22;335:13,24;
337:11,13,16,22;
338:1,5,5,18,19,20,
21;339:22;340:24;
341:16;342:22;
343:23;344:10;
345:18;346:14,18;
347:24;348:5,16;
349:21;354:18;356:7;
357:8;363:22;364:2;
369:14;392:5,8

**reported (9)**
195:8;211:18;
245:14;281:6;320:22;
321:2;351:15;367:4;
368:23
**reporter (3)**
5:13;8:13;152:3
**Reporting (7)**
5:15;161:5;198:11;
276:22;277:19;
332:15;361:11
**reports (104)**
13:8;15:19,21;
16:22,25;25:22,24;
26:4,12,21;81:20;
82:2,7,12,18;84:23;
85:11,17;87:14,22;
88:25;89:3,15;90:12,
18,22;97:23;98:2,5;
127:12;128:25;129:5,
15,17;130:22;131:8;
132:2,19;133:1,9,12;
143:19;152:12;160:7;
161:5,9,16;163:8;
171:4;182:19,21;
200:5,10,12,17,22,25;
213:22;215:13,22;
221:25;230:3;234:18,
19,24;261:25;271:17;
274:22;275:2;277:6;
280:2,18;284:19,25;
285:4;289:9,12,13,18;
290:4;291:2;295:25,
25;296:21;298:1,16;
300:17,17;301:8;
304:3;311:1;312:14;
314:6;320:20;354:11;
359:16;362:4,9;
363:16;369:22;
370:12,20;371:5;
373:20
**report's (1)**
251:19
**represent (12)**
5:18;136:3;180:23;
181:7;221:23;251:5;
259:13;285:22;
302:19;384:25;386:4,
10
**represent- (1)**
350:19
**representation (4)**
39:16;115:3,18;
181:4
**represented (10)**
251:6;258:9,23;
259:18;284:12;285:9;
303:2;386:12;387:14,
17
**representing (4)**
68:9;257:5;385:12;
386:16
**represents (1)**

68:17
**requested (9)**
99:20;152:5;
247:23;249:14,16;
302:6;328:2;351:18;
367:20
**requests (1)**
259:14
**require (3)**
30:5;69:5,14
**required (5)**
99:8;100:4,13,15,
20
**reread (2)**
273:13;321:16
**rereading (1)**
321:19
**reserve (1)**
394:3
**respond (2)**
269:17;336:5
**responded (1)**
33:3
**responder (1)**
89:5
**response (4)**
39:12;174:14;
178:7;180:3
**responsibilities (2)**
64:12;74:21
**responsibility (2)**
82:6;97:7
**responsible (10)**
96:21;97:6;191:1;
192:3,6;205:7;214:8;
292:1;294:10,15
**responsive (3)**
8:2,9;259:14
**rest (1)**
284:10
**result (2)**
162:24;279:4
**resulted (1)**
391:13
**retaining (1)**
30:10
**retention (21)**
15:20,23;16:6,9,18,
24;17:6,10,13,14,22;
18:1,24;142:2;
285:23;289:17;
292:13;295:19;
300:18;324:19;
350:25
**retired (3)**
23:22;35:1;37:3
**retirement (1)**
21:4
**retrial (2)**
20:7;48:7
**retried (6)**
34:16;45:12,17,22;
46:1,4

**reveal (1)**
30:5
**review (6)**
15:8;81:24;130:25;
131:1;133:20;362:22
**reviewed (9)**
15:5;25:24;26:11;
132:13;161:12;215:6;
266:15;343:17;
344:23
**reviewing (11)**
18:22;82:7,12,18;
132:2;143:18;171:4;
173:1;200:24;215:5,6
**Rey (8)**
33:15;72:25;75:13;
187:5;377:14;378:23;
386:5;388:16
**Reynaldo (1)**
11:14
**RFC (17)**
249:17,20;250:22;
251:9;261:1,16,19;
262:14;265:17;274:1;
285:24;305:21;
310:17;313:19;
319:18;333:17;
357:25
**Rican (5)**
185:1,14;186:8,9;
283:12
**Riccio (1)**
149:14
**Rick (9)**
384:20,22;385:20;
386:10,11,15,20;
387:15,23
**Rick's (1)**
385:20
**rid (1)**
388:23
**ridiculous (1)**
53:8
**right (866)**
8:21;9:13,18;10:6,
20;11:4,13;12:16,25;
13:11;14:10;15:6;
17:2;19:2,19,22,23;
22:11,23;25:18;26:8,
15;28:6,21,23;29:11,
12;30:11,14;32:6,11;
33:2,8,10;35:7,9,25;
37:4,19;39:20,25;
40:9,19;41:2,8,9;
42:11,14;43:2,3,3,7;
44:6,23;45:1,2,12,17,
23;46:6;47:8;48:11,
24;49:10,21;50:1;
51:2,6,8,9,25;52:6,9,
14;53:19;54:1,10,10;
56:5,15,16,21;58:23,
24,25;60:7,21;61:5;
62:9;63:3,22;64:17,

18,18;65:6,7,11;
66:11;67:20;69:2,15,
22,25;70:3,14,15;
71:15;72:23,24;
73:11;74:16,18;75:4,
11,16,22,24;76:8,21,
22;78:4,15,16;79:2,7,
20,25;80:13,15,22;
81:3;82:3,4;85:3,8,9,
22;86:6,7,21,25;87:4,
5;88:7,25;89:13,17;
93:1;94:7,17;95:1,5,
7;96:18,22;97:2,7,11;
98:4,10;99:10;100:9,
13;101:19;103:20;
104:16;105:1,6;
116:2,7,15,23;117:5,
13,15;118:4,14,22;
119:2,3,7;120:14,25;
121:3;122:21;123:4,
10,23;124:2,3,23;
125:5,6,10;126:7,15;
127:6;128:14,17,18,
20;129:23;130:3,7,8,
10,16,19,20;131:4,14,
18,23;132:9,10,24;
135:4,7,7,20,22,23;
136:13,16,23;137:12,
16;138:4,13;139:1,3,
10;140:21;141:3,15,
19;144:3,10;146:5;
147:18;148:4,5,7;
149:3,3,7,22;150:1,5,
6,19;151:4,12,15;
152:20,23;153:12,14,
15,21,25;154:4,7,11,
12,18,20;155:15,17,
18,23,24,25;156:10,
12,20;157:1,7,10,12,
18,19;158:6,14,15;
160:2;161:15,25;
162:17,20;163:3,7,11,
17,18,25;164:7,10,13,
17,18,21;165:1,5;
166:6,8,13,15;167:8,
14,18;168:3,25;
169:16,18,20;170:1,6,
10;171:13,14,15,20,
23;172:10,11,13,21,
23;173:6,18;175:8,11,
16,24;176:19;177:8,
14;179:10,11,18,21,
25;180:4,6,15,17,18;
181:6,9,11,14,23;
182:8,10,14,21;183:6,
7,9,22;184:1,2,6,11,
17,21,24;185:23;
186:22;187:1,16,22;
188:8,12,15;189:1,5,
8,12;190:2,5,8,15,19;
191:2,9;192:3,8,9,14,
18,23,24;193:2,13,14,
17,18,22,23;194:6,22;

195:3,6,11,18,22;
196:4,5,9,20,23,24;
197:4,12;198:1,14,15,
16,17;199:10,19;
200:16;202:6,12,15,
16,20,23;203:4,7,11,
21,24,25;204:5,15,22;
205:3,7,8,10,11,16,
17;206:7,16;207:1,7,
23;208:4,8,25;209:3,
5,8,9,12,22;210:1,5;
213:3,16;214:2,14,19;
218:12;219:16,18;
220:1,17;221:13,19,
21;222:11,15;224:12,
24;226:5,18,19,25;
228:12,25;229:6,21,
23;230:1,9;231:2,5;
232:11,22,25;233:3,5,
5,10,13,16;234:9;
235:8,18,22;236:24,
25;237:5,11,16,18,20,
25;238:2,7,8,13,14;
239:20;240:25;241:2,
3,6,7,10,11;242:4,16,
18,25;243:13,17;
245:3,6,15;246:6;
247:5;249:7;250:16,
17;252:4;254:17,23;
255:10,14;256:11;
257:3,7;259:1;
262:10,25;263:9,11,
12,14,15,18,19;
265:22;266:10,11,13,
16,17,22,23;267:2,3,
13,17,22,24;268:14,
16,20;269:2,14,21,24;
270:8,11,13,21,22;
271:5,10,11,14,15;
272:5,7,13,19,20,23,
25;273:1,5,18;274:9,
25;275:1,5,9,10,20,
21,23;276:8,13,21;
277:4,13,23,25;279:1,
5,6,13,16,21,24;
280:13,16,24;281:23;
283:9,10,20,25;284:5;
285:13;286:15;
287:14,18,21,22;
288:3,4,9,13,18,19,
23;289:3,21,22;
290:14,15,18,23;
291:5,13,14;292:19;
294:1;295:16,22;
296:4,17,19;297:8;
298:11,13,16,18,19;
299:12,23;300:1,12,
19,20;301:13;302:22;
304:3,8,9,10;305:4,
16;306:14;307:2,25;
308:3,12,13,18,24;
309:3,23;310:4,6,8,
19;311:2,4,10,12,16,

17,19,20;312:12,24;
313:10,23;314:7,8,12,
13,16;315:1,18,21,22;
317:3,21,25;318:1,3;
320:13;321:8,13;
322:5,6,8,9,12,22;
323:1,2,4,5,14;324:3,
5,11,15,22,23,24;
325:4,4,19,20;326:6,
10,23;327:5,6,19;
328:12;329:9,14,18;
330:1;331:13,21,24,
25;332:8,13,13;
333:23;334:2,7;
335:10,22;336:19;
337:18;339:1,17,20,
21;340:6;341:20;
342:10,13,17;343:10,
24;344:6,7,13,14,24,
24;345:15,19,23;
346:2;347:1,25;
348:25;349:2,4,5,24;
350:1,6,23;352:1,5;
353:1,12,23;354:21;
355:5,8,14,15,17;
356:3,9,21,22;357:3,
11,12,18,22,23;
358:14,16;359:4,5,12;
360:15,16,20,21;
362:8;363:8,9,14;
364:19,20,24,25;
365:21,24;366:2,17,
23,24;367:17,18;
368:19;369:4,15;
371:9;376:7;381:11,
15,20,25;382:14;
384:7,8;385:22;
387:18;391:8;393:19,
21;394:4

**right-hand (3)**
252:5;304:18,19
**rights (9)**
8:20;177:2,7,16;
183:11;184:8;342:25;
346:7;391:1
**rings (3)**
129:14,14,25
**risk (2)**
50:17;93:25
**rival (3)**
72:4,9;281:11
**rivalry (5)**
320:5,7,14;321:8,
21
**River (1)**
61:16
**Rivera (8)**
10:12,21;11:5,16;
12:13,13,19;54:16
**road (4)**
107:11;109:9;
168:21;227:6
**robberies (6)**

86:19;87:25;89:22;
128:3;164:13,14
**robbery (6)**
87:24;151:3;
158:11;274:15;281:8;
283:5
**Robert (1)**
287:23
**Rola (1)**
14:12
**Roland (10)**
20:13;221:9;
224:24;225:2;227:11;
230:18;231:1,6,15
**role (1)**
309:7
**Roman (2)**
149:23,24
**room (13)**
42:6;123:1;135:9;
141:8;175:15;176:25;
215:22;219:13;292:6;
294:21;326:10;
348:13;353:11
**rooms (3)**
123:14;124:4;
174:24
**Rosa (1)**
360:3
**rough (1)**
114:22
**roughly (1)**
160:8
**round (1)**
9:7
**routine (2)**
166:9,14
**rule (3)**
65:24;75:1;105:13
**rumblings (1)**
384:5
**run (8)**
21:14;45:13;87:17;
147:7;158:21;317:17;
319:8,8
**running (1)**
43:22
**runs (1)**
68:17
**ruse (1)**
105:6

---

## S

**Saint (2)**
56:19,22
**same (61)**
7:19;20:20,21;
35:18;42:19,20;
43:22;44:16;46:10;
54:4;55:10;67:17;
71:11;76:13;93:13;
96:12;104:8,8;

110:20;119:11,12;
122:10;128:12;
129:16;139:15;
146:13;149:8;162:4;
180:14;188:24;201:1;
205:24;206:2;254:24;
255:6,15;256:3,12,22;
271:6,17;274:21;
281:15;301:10;
303:20;305:23;
318:18;329:25;330:3;
333:25;341:16;
342:15;344:10;358:5;
373:10;374:5,10;
378:24;380:12,17;
382:9
**Sanchez (2)**
261:9,11
**Sandra (1)**
304:8
**sat (4)**
7:8;9:3;10:11;11:2
**saw (15)**
21:11,24;33:11;
48:4;54:6;173:2;
204:8;268:8,13;
269:3;287:12;295:23;
298:16;307:3;332:22
**saying (58)**
17:2;32:4;36:13,14;
52:12;55:14;71:6;
96:8;104:12;109:13;
114:21;117:4;139:14;
154:4,5,22;155:5;
183:12;187:4;190:18;
194:10;210:13,14;
212:11;214:6;217:18;
220:5;227:9,10;
229:22;232:4;235:24;
237:8,17;240:3,6;
241:4;242:5,6,15;
243:9;251:12;253:9;
259:2;278:3,5;
280:16;322:16,17;
326:12;328:25;340:5;
343:20;346:4;348:5;
357:4;372:14;382:14
**scared (8)**
41:15,16;42:16;
43:7;53:12,15,17;
114:1
**scenario (4)**
93:2;115:15;
190:17,22
**scene (15)**
159:3,4;161:2;
265:11,14;267:5,16;
288:9;308:16,17,21,
22;311:19;367:21,23
**schedule (1)**
239:20
**scheduling (1)**
28:2

scheme (2)
380:23;381:1
school (5)
56:21,24;57:14;
73:13;366:17
scientist (1)
157:12
screen (1)
121:19
screw (2)
138:22;208:1
screwed (1)
78:7
se (1)
72:8
search (4)
65:8;74:23,24;
362:12
searched (1)
377:11
searching (3)
361:12,14,18
second (31)
56:13;118:8,18,23;
119:9;120:3,9,10,13;
121:4,15,21;122:13;
140:16;174:25;
219:21;220:8;250:7;
262:11;264:2;270:2;
285:18;286:8;304:21,
21,21,22;305:1;
321:17;365:5,8
secondly (1)
241:16
section (2)
144:20;148:17
sections (1)
71:10
secure (1)
58:11
security (1)
117:22
seeing (8)
17:11;70:21;143:2;
151:18;161:4;275:13;
320:19;361:25
seek (1)
30:9
seem (7)
150:24;158:2;
197:17;254:1,4;
278:11;310:25
seemed (2)
183:17;205:22
Seems (9)
34:4;261:8;304:1;
310:16;330:17;345:9,
11;354:9;355:6
self-admitted (1)
68:8
sellers (1)
281:19
selling (1)

71:23
send (5)
26:4;104:5;205:18;
206:3;294:6
sending (2)
208:1,7
sense (13)
83:19;92:7,10;
104:21;130:23;
132:20,22;133:10;
144:8;169:3;226:24;
288:22;353:7
sent (5)
25:24;26:9,10;32:3;
140:8
separate (1)
124:22
September (1)
5:7
Sergeant (52)
50:13;60:18;73:5,7,
10,13,17,19,19,21;
74:17,22;75:3;81:16;
82:6,16,20;84:11,16;
93:3;123:17;124:6;
125:13;127:18;
131:17;133:13;136:3,
15;142:21;163:5,21;
169:19;173:1,22;
196:24;198:12,19;
243:19;266:16;
314:15,18;325:4;
330:8;335:25;336:22;
338:9;340:8;361:11;
369:23;377:25;384:1,
1
sergeants (1)
129:4
sergeant's (3)
127:18,23;141:11
serious (5)
63:16;64:19,23;
89:19;114:20
seriously (3)
53:16;185:2;203:8
Serrano (4)
10:22;46:20;47:6;
56:6
Serrano/Montanez (2)
9:5;23:2
Serrano's (1)
47:18
serve (1)
57:3
served (3)
28:16,18;57:23
set (6)
120:12;122:15,15,
20,24;250:11
sets (2)
67:9;122:12
settled (1)
84:9

seven (1)
58:9
several (2)
255:7;256:4
Shakespeare (5)
77:3,4,7,20;78:22
shaking (2)
379:3;380:3
share (4)
65:12,22,25;119:12
shed (1)
316:2
sheet (7)
52:6;152:8,21,23;
156:20;157:22;
280:19
sheets (12)
151:18;153:3,19;
154:9,17;155:10,17,
21;156:24;158:3;
280:1;281:22
sheriff (1)
332:9
shift (8)
133:24,25;173:14;
272:25;274:16;
304:21;317:16;345:9
shifts (1)
119:25
ship (3)
58:5,6,10
Ships (1)
58:6
shocked (1)
379:23
shocking (3)
383:8,9,10
shockingly (1)
354:25
shoot (1)
277:25
shooting (20)
64:23;72:8,12;
162:3;164:25;167:18;
172:7;180:25;214:8;
226:14,15;234:14;
264:22;277:20;
278:12,14;280:22;
282:7;325:7;335:9
shootings (3)
162:19,21;164:15
short (7)
12:2;73:22;81:12;
145:8;218:21;313:13;
375:3
shortly (6)
11:16;158:18,19,
24;221:25;263:21
shot (11)
166:24;187:16;
201:6;205:2;273:9;
278:4;282:23;320:4,
16,24;325:8

shots (2)
277:15;278:7
show (4)
206:9;221:25;
348:17;369:22
showed (2)
22:25;155:10
showing (1)
31:20
shows (1)
218:5
shy (1)
181:20
side (12)
80:4,4;123:10,11;
149:17;152:10,11;
261:18;284:6;376:13,
21;377:24
sides (2)
378:4;381:17
sign (2)
127:18;142:23
signature (1)
329:15
signed (13)
83:20;132:20;
138:8;142:23;144:1;
203:25;204:8;262:8;
270:12;271:9,12;
305:5;332:10
significant (1)
152:23
signing (3)
143:2,3;144:11
signs (2)
70:4;137:4
silent (4)
40:1,10,19;41:2
silly (1)
104:10
similar (1)
122:10
single (5)
40:17,24;285:11;
323:19;347:24
sister (2)
275:22;276:25
sit (16)
42:20;54:18,20,23;
55:21;150:1;151:4;
160:2,15;224:7;
233:14;246:8;321:6,
20;323:12;324:16
sitting (4)
10:15,16;38:10;
227:14
situated (1)
121:15
situation (2)
29:18;38:18
six (2)
123:14
six-year-old (1)

366:21
size (1)
125:25
sleep (1)
319:10
sleeping (1)
269:23
slightly (1)
211:5
small (1)
33:18
smaller (1)
66:18
smart (1)
388:19
smarter (1)
197:22
smooth (1)
205:22
so-called (1)
325:1
social (1)
21:25
SOG (3)
376:12,13,17
solid (5)
390:12,15,15
soliloquy (1)
354:15
solve (3)
167:7,7;298:12
solved (2)
315:16;319:11
solving (2)
166:18;195:2
somebody (56)
14:9;34:18,20;
91:19;92:16;104:14,
18;106:5;107:24;
108:17;109:9,13,14;
113:7;115:7,10,13;
125:24;130:25;
136:18;138:7;161:22;
162:10;176:16;179:5;
190:13,13;191:20;
197:9;199:18;217:7;
225:1,3,15;234:13;
240:10,11;245:24;
264:2;266:25;268:4,
6,13;278:8;297:2;
308:14;317:17;
319:12;322:8,9;
323:16;345:22;
357:11;366:9;374:3;
393:16
somebody's (3)
95:23;199:16,16
someday (1)
45:25
somehow (3)
297:19;354:25;
355:1
someone (33)

17:3;68:6;69:4;
70:21;97:4;107:15,
21;108:12;110:13;
111:22;112:13;
113:10;114:1,9,13,25;
131:12;161:20;172:5,
19;204:12;211:10;
212:7;214:6;230:7;
243:19;244:16;
275:18;355:12;
366:22;381:19;
382:15;387:10
**someone's (4)**
70:18;109:2;
110:17;268:16
**sometime (1)**
144:18
**sometimes (11)**
21:14;92:12;93:10;
95:8;96:6,7,15;170:1,
3;317:14;382:1
**somewhat (1)**
21:3
**somewhere (12)**
98:19;136:1;190:5;
198:18;257:19;
290:25;300:9,10;
354:18;363:23;371:8;
377:2
**soon (5)**
50:16;85:22;
144:18;191:11;317:5
**Sorry (33)**
14:12;15:25;16:2;
26:3;40:22;45:14;
62:12;76:6;78:2;
79:18;121:20,22;
122:3;145:16;155:2;
166:7;167:21;178:14;
190:21;191:4;223:4;
226:15;229:16;248:3;
249:24;250:9;263:3;
303:24;307:13;
321:18;330:17;347:7;
361:15
**sort (18)**
21:24;24:11;66:12;
72:22;75:8;85:4;89:4;
123:25;164:2;183:2;
252:4;275:19;310:4;
368:12;371:5;378:24;
386:21;387:24
**Sotos (3)**
5:10;19:16;29:8
**sound (13)**
22:11;33:2,7;78:15;
86:9;135:20;136:11;
181:9,23;221:19;
276:20;277:1;284:2
**sounded (2)**
143:24;277:5
**sounds (8)**
22:21;74:20;78:16;

140:22;146:22;
252:24;277:19;
296:19
**South (6)**
61:14;62:6,14;
63:24;64:1;79:13
**space (3)**
119:12;123:7;124:1
**span (1)**
74:20
**Spanish (32)**
72:3;171:11;175:5,
16,19;176:2,4,9,9,11,
16,23;177:10,16;
179:9;183:14;184:1,
4,7;185:18;205:21;
239:13;240:1;243:7,
8;283:22;326:15,17;
331:23;348:21;
355:17,21
**Spanish-speaking (1)**
278:17
**speak (20)**
72:1,21;124:20;
171:12;175:6;176:22,
24;184:1,4,7;283:19;
324:14,22;326:15,17;
327:1;331:23;337:23;
343:14;355:17
**speaker (6)**
176:2,10,17;
205:21;239:13;240:1
**speaking (15)**
65:21;92:23;
176:12;182:15;
222:10;223:13,21;
224:3;226:17;231:1;
232:7;243:7;283:18,
22;327:23
**speaks (3)**
176:23;243:8;
348:21
**special (1)**
84:4
**specialist (8)**
66:4;68:4;83:21;
148:16,20;149:7;
376:16,18
**specialists (6)**
65:21;66:1;75:8,9;
149:11;376:23
**specialty (1)**
72:23
**specif (1)**
223:9
**specific (8)**
27:16;63:11;68:13;
101:8;112:25;146:19;
163:12;172:23
**specifically (9)**
14:21;68:5;84:13;
127:7;174:2;178:3;
219:20;231:23;

293:14
**Speculate (2)**
44:21;341:8
**speculating (1)**
246:24
**speculation (26)**
10:2;44:18;45:19;
50:4;95:20;101:6,20;
112:4;113:11,20;
114:4;198:22,25;
199:2;200:19;209:24;
246:19;299:14;301:2;
303:16;366:13;
370:24;373:3;382:4,
25;389:24
**spell (2)**
346:19;348:14
**spend (1)**
56:8
**spent (4)**
347:21;348:8;
350:23;361:12
**spill (1)**
348:24
**split (1)**
68:25
**spoke (22)**
11:14,15;12:23;
19:14;20:1;36:3;
171:11;175:5,16,19;
176:4,9;183:14;
203:19;208:16;222:1;
233:7;323:24;324:11;
343:5;351:6;352:16
**spoken (1)**
380:15
**spot (2)**
114:22;125:25
**spots (1)**
71:25
**squad (2)**
125:22;288:3
**squads (2)**
124:19,20
**staircase (1)**
122:25
**stairs (8)**
120:12,16,25;
122:10,10,11,12,24
**stamp (4)**
248:7;285:24;
302:20;306:17
**stamped (5)**
17:13;152:10;
154:11;270:24;
333:17
**stand (4)**
239:3;242:14;
343:10;344:5
**standard (2)**
154:19;270:19
**standards (1)**
108:21

**standing (1)**
320:1
**stands (2)**
146:5;270:15
**star (2)**
305:15;329:18
**start (5)**
17:19;40:4;118:11;
145:12;293:11
**started (5)**
68:24;279:24;
378:8;388:12,14
**starts (2)**
288:14;324:25
**state (6)**
47:16,19;51:12;
64:1;323:1;371:18
**state- (1)**
245:5
**stated (2)**
327:1;342:2
**statement (32)**
117:1;190:18,24;
195:20;244:16,18,19;
245:22,23;246:10,11;
247:7,9,10,12;320:23;
321:2;338:24;339:25;
346:22,23;348:17;
351:21;358:1;363:7;
364:22,25,25;367:5,
12;368:24;392:6
**statements (33)**
48:21,21;49:17;
50:16;52:9;53:5,10;
209:1;220:22;235:21;
236:21,22,24;237:24;
239:11,12;320:9,11;
321:11,14,24;341:25;
344:17;346:19;
356:10;361:2,3,8;
370:13;372:18;373:2,
7;375:11
**States (1)**
5:3
**State's (63)**
23:11;27:4;36:4,21;
37:12,14;43:17;44:5,
13;47:7;210:23;
216:9,19;217:9,15;
218:4,7;219:25;
221:5;222:23;223:6;
225:9;291:24;292:3,
14,16,23;293:2,5,17,
24;294:3,11;295:8;
299:11,20,25;300:22;
302:3,21;306:17;
311:25;312:13;333:5,
13;334:21;335:21;
336:4,7;339:16;
340:3,9,19;343:8,11,
13;352:10;365:23;
366:8;370:10,18;
371:13;372:3

**station (3)**
334:23;369:2;393:7
**statistics (1)**
163:6
**stats (1)**
163:12
**status (4)**
11:4,7;12:10;131:1
**stay (7)**
73:18;74:6;77:7;
122:2;131:5;142:11;
317:15
**stayed (5)**
66:24;77:8;78:21;
131:3;358:3
**stays (1)**
139:24
**steps (2)**
27:24;223:5
**Steve (2)**
149:8;369:10
**stick (1)**
34:20
**sticks (1)**
158:5
**still (20)**
23:21;60:21;73:9;
75:4,8;77:3,4;117:15;
119:25;214:1;270:20;
280:20;315:13,17;
342:17;345:24;
352:24;355:9;358:9;
388:24
**stories (3)**
378:9;388:12,14
**story (1)**
132:17
**straight (4)**
86:10;107:12,13;
122:2
**straighten (3)**
121:17;137:9;
138:23
**strange (1)**
372:2
**stream (1)**
205:24
**Street (25)**
20:8,15;29:10;33:4;
37:5;38:16;59:6,22;
75:5,6;96:14;103:15;
104:6;146:4;147:4;
150:18;187:16;268:1;
282:19,24;320:1;
325:8;361:24;362:1;
393:7
**streets (2)**
164:21;362:6
**stretch (1)**
313:9
**strictly (2)**
64:3;71:3
**Strike (28)**

17:19;39:4;45:9;
48:25;57:21;68:20;
76:6;81:18;84:12;
100:25;111:19;118:5;
129:2;132:11;133:25;
134:19;175:13;177:5;
182:1,2;215:3;
221:15,16;237:21;
296:6;348:3;383:16;
392:20

**strings (1)**
143:15

**strong (4)**
113:17;116:11;
192:6;205:5

**struck (1)**
153:9

**structure (1)**
117:25

**stuck (1)**
317:19

**study (1)**
57:18

**stuff (26)**
33:19;58:18;62:21;
64:5;66:22,25;68:18;
82:14;84:3,7;98:9;
99:5;103:18;105:19,
21;168:19,21;194:24;
264:10;379:22;
381:13;386:7,13;
390:23,25;393:18

**subject (2)**
51:20;112:18

**submit (3)**
99:6;138:11,12

**submits (1)**
138:8

**submitted (15)**
139:20;141:12;
262:7;263:10;267:7;
270:9;271:2;274:4,
19;275:6;284:7,17,20,
25;289:5

**subpoena (10)**
28:11,22;29:6,20;
31:17;32:7;33:4;
41:17;46:13;294:6

**subpoenaed (9)**
28:9;31:21;41:14;
43:6;44:14;45:5,8;
292:6;294:8

**subpoenaing (1)**
46:17

**subscribe (2)**
297:17,19

**subsequent (1)**
27:3

**substance (5)**
27:19,22;91:23;
138:3;139:9

**substant (1)**
105:19

**substantive (1)**
105:19

**success (1)**
207:21

**successful (1)**
208:6

**succession (1)**
12:6

**sudden (3)**
255:3;317:19;335:3

**suggest (4)**
153:3;156:1;
282:21;307:22

**suggested (2)**
246:24;357:21

**suggesting (5)**
18:20;51:5;96:16;
137:21;296:5

**suggestion (1)**
344:3

**suggests (5)**
253:16;278:13;
321:15;323:20;
346:12

**suit (1)**
161:1

**summarize (1)**
78:17

**sup (18)**
26:25;27:1;90:11;
138:12;143:24;244:2;
305:21;310:7;314:1,
2,5,7;315:8,14;
327:22;332:14,15;
367:20

**supervise (1)**
75:13

**supervised (2)**
49:13;75:20

**supervising (6)**
75:9;101:2;102:15;
163:25;169:19;
221:10

**supervision (1)**
293:15

**supervisor (4)**
92:24;168:9;222:9;
295:4

**supervisors (1)**
223:9

**supervisor's (1)**
169:13

**supplant (1)**
90:12

**supplemental (23)**
88:25;89:15;130:5;
133:1;136:14;138:14;
139:10;140:23;
143:19,21;144:7;
262:21,23;304:3,13,
14;306:12;309:12;
310:1,17;312:14;
313:18;325:22

**supplementary (3)**
90:11;261:24;
315:10

**supplied (2)**
314:24;337:14

**supplying (1)**
341:25

**support (2)**
385:10;386:17

**supported (1)**
234:23

**suppose (1)**
153:1

**supposed (6)**
139:22;168:8,10;
243:19;290:4,13

**Sups (3)**
87:24;98:1;369:23

**Sure (231)**
7:20;14:10;16:4,12;
17:8;22:3,5,22;24:2,
23;26:10;28:13;
31:19;33:17;36:6,6,6,
21;38:23;40:23;43:8;
44:25;45:15;49:19;
51:3,23;52:7;58:10;
60:13;61:16;62:5;
66:2,6;67:3,24;68:2;
69:7,11;72:16,18;
75:15;77:1;78:14;
79:14,16;80:16,19;
81:6,9,25;82:1,13;
83:5,17,18,19;85:2;
86:10,24;87:1,12,19;
88:8,12;89:11;91:1;
95:14;97:14;98:8,23;
99:23;101:14;103:10;
106:19;107:4,17;
109:14;113:14;
115:23,25;116:24;
117:3;121:5;129:24;
131:19;132:5,17,18,
19,21;133:12;134:13,
16,18;136:10;137:10;
139:11;140:25,25;
141:25;142:4,22;
149:4,9;150:22;
156:21;158:22;
159:21;160:25;161:3,
6,18;163:15;164:11;
166:4;167:6;170:3,
25;173:10;174:8,17;
179:22,23,24;182:15,
25;189:2,17;190:7;
192:21;193:21;
194:18;195:13,16;
196:10,19,21,25;
197:9,11,14,21;
199:11,13,25;201:11,
23;202:7,14,21;203:5,
6;206:17;212:4;
213:17,24;217:1,8;
218:18;222:6,14,18,

25;223:6,8,15;226:1;
227:19;230:21,24;
235:4,9;243:5;
247:13;249:25;
254:13;255:4;260:6;
264:23;268:6,22;
274:15,16;279:9,17;
280:15;281:20;282:3;
293:7;297:21;307:21;
318:11;321:18;
323:17,25;324:2,4;
328:24;329:1,3,5,9,
10;330:12;331:3,3,4,
6,8,16;337:14;
340:22;342:14;
343:11,21;346:18;
350:2;355:11;361:16;
362:2,3;365:25;
366:3,11;368:3;
369:2;371:7,25;
379:16;383:23;
384:21

**surprise (2)**
380:1;387:21

**Surprised (1)**
309:8

**surprising (4)**
371:11,15,21,22

**surrounding (1)**
58:10

**suspect (18)**
91:5;93:5;94:13;
102:8,17;104:1,14;
105:10;106:4;107:8,
25;112:11;114:17;
122:19;242:8;322:24;
355:24;393:6

**suspects (2)**
58:15;107:2;182:8

**suspicious (1)**
301:6

**switch (1)**
250:17

**swoop (1)**
226:24

**sworn (2)**
40:16;50:2

**Sylvester's (1)**
56:19

**synergy (1)**
207:22

**system (2)**
127:4,4

---

**T**

**tactic (5)**
107:18,19;108:17,
19,20

**tactics (1)**
378:24

**tag (1)**
73:23

**tainting (1)**
36:24

**tale (1)**
378:18

**talk (71)**
8:15;24:6;30:21;
33:18,20,25;34:1,2,5,
22;35:19;43:4;49:12;
64:25;68:5;84:13;
87:20;92:1,17;96:21;
103:22;105:25;
110:18;111:23;
117:23;120:19;121:1;
127:7;137:7;161:2;
162:11;165:24,25;
166:10;171:7;173:25;
177:18;184:9;204:12;
205:16;206:4;207:6,
13;208:3;210:22;
216:8,17;217:9,21;
221:6;223:5;225:9;
227:5;230:24;231:20;
269:24;273:3;275:14;
298:9;322:21;335:21;
336:6;337:21;339:16;
340:3,9,19;343:2;
346:8;360:4;369:2

**talk- (1)**
210:6

**talked (42)**
13:8;24:18;29:7;
31:2;54:3;160:9;
170:13;174:7,10;
182:23;186:21;187:5;
206:2;207:25;210:7;
216:6;217:21;222:21,
23;223:17;225:1,2,14,
15,22,22;230:18,20,
22;231:18;232:12;
234:25;264:24;273:6;
322:20,20;343:18;
346:20;347:13;
348:14;350:5;358:18

**talking (79)**
9:8,8;21:5;27:18;
42:9;50:11;55:19;
76:23;89:19,20,22;
95:24;99:12;102:23;
110:16;112:11,12,16,
24;115:9,12;118:2;
120:17;121:6;122:6;
124:12;125:6,7;
128:1,5,12;129:7,12,
13;138:25;139:17,19;
161:16;168:17;179:7;
192:5;193:12,15;
199:6;204:10;210:6,
11;219:18;232:23;
233:12;244:22;
251:20,22;265:25;
266:25;272:9;285:3,
4;290:21;298:17,17;
327:21;343:17,19;

349:4,7,12,17,17;
364:8,10;372:5,5;
375:16;389:12;391:4;
393:1,12,13
**tape (1)**
143:11
**Tapkowski (9)**
252:9;263:8,20;
265:5;287:17;305:17;
306:7;309:15;316:11
**target (3)**
51:25;102:7,17
**Task (4)**
59:19,20;60:4;
376:20
**tattoo (1)**
70:3
**tattoos (1)**
68:9
**tea (1)**
205:12
**team (3)**
73:23;264:7;317:1
**technically (1)**
60:22
**Tedkowsky (1)**
149:23
**teenage (1)**
156:18
**teenagers (2)**
148:4;158:1
**telephone (6)**
11:21,22;12:18;
24:22;27:20;93:25
**telling (18)**
104:1,2;107:14,21;
109:18;111:14;113:7;
181:15;183:15;
188:10;217:13;
231:23;240:15;
258:10,25;340:18;
341:9;360:17
**tells (7)**
95:16;96:1;155:7;
186:25;187:14;
211:10;224:8
**ten (5)**
9:12;43:2;74:20;
145:4;383:7
**tend (3)**
89:3,16;116:1
**tendered (2)**
371:18;372:7
**terms (1)**
33:2
**territory (8)**
167:22;170:24;
193:17;278:23;279:4,
8,11,20
**test (2)**
55:4;60:17
**testified (15)**
21:13,19;22:7;27:7;

35:11;46:18;48:1;
136:4;226:8;236:2;
237:7,16;240:22;
242:17;296:15
**testify (30)**
25:3,13;35:8;36:17;
37:22;38:1,2;39:13;
40:7;44:8,22;47:17;
48:3;52:23;53:7,21;
55:5;216:12;235:16,
17,19,22;236:22;
237:9,15,24,25;
238:11;239:10;
244:17
**testifying (11)**
25:12;35:18;38:24;
41:20,22;45:1;46:5;
47:1;53:11;54:15;
55:9
**testimony (20)**
25:15;41:13;43:10;
56:3;91:9;99:7;
101:16;165:7;174:5;
181:25;183:1;207:10;
231:22;236:6;237:3;
297:1;330:19;339:6;
344:12;390:9
**texts (1)**
26:9
**that'd (1)**
162:22
**theoretical (1)**
114:25
**theoretically (1)**
324:7
**theories (4)**
229:19;255:20;
268:12;303:12
**theory (1)**
268:13
**There'd (2)**
67:18;119:14
**therefore (3)**
184:19;214:7;230:1
**there're (1)**
70:12
**thick (2)**
283:11,25
**thinking (4)**
188:15,17;281:9,10
**third (8)**
120:3,8,10;149:23;
264:2,2;345:2,9
**though (31)**
26:8;35:8;54:9;
62:9;79:19;94:16;
95:6;135:18;141:16;
153:18;157:18;158:1;
175:11;219:4;255:10;
265:11;268:1;303:20;
318:23;319:7;327:18;
334:7;355:7;359:14;
364:6;365:17;366:5;

385:25;387:14,18;
391:22
**thought (29)**
17:25;36:10;41:18,
19;47:4;114:11;
154:16;158:10;
171:12;180:10,11;
192:11;217:7;221:4;
225:5,6,10;226:1,16;
241:21;316:9;320:15;
326:8;329:3;334:19,
20;385:21;387:9,13
**threat (3)**
110:12,16,17
**threaten (2)**
392:23;393:5
**threatened (2)**
342:4;358:16
**threatening (1)**
109:2
**threatens (1)**
389:18
**three (30)**
12:5;13:4,16,17;
14:3;119:25;126:2;
178:11;201:4;207:15;
222:2;227:3;234:13;
242:18;275:2,3;
280:18;298:16;
300:25;301:6;325:8;
347:22;348:8;350:23;
356:15;357:15;
361:13,15;364:6,7
**throughout (1)**
34:25
**throwing (1)**
70:3
**thumb (2)**
75:1;105:13
**Thursday (1)**
358:5
**thus (1)**
278:24
**tied (3)**
227:1;264:9,10
**Tim (1)**
51:7
**times (11)**
7:1;13:13,16,17;
30:18;36:18;78:7;
97:11;242:18;255:7;
256:4
**time-wise (1)**
74:2
**Timothy (2)**
46:21;52:5
**Tino (4)**
146:11;356:18;
358:6,7
**Today (33)**
5:7;7:2,14;13:7;
15:9;16:8;18:14;19:4;
20:9,16;42:20;54:9,

23,25;55:3,21;56:3,9;
150:2;151:4;160:16,
20;161:13;220:5;
224:7;233:14;246:8;
297:1;321:6,20;
323:12;324:21;
340:18
**together (5)**
105:5;256:9;
291:11;359:17;
377:18
**told (63)**
23:10,16;26:1;27:8;
31:25;44:24;46:4;
54:19;86:11;94:1;
96:3;104:15;107:25;
110:7;132:17;179:15;
180:2;183:23,24;
184:16;187:6,9;
190:10;191:19,25;
194:11;196:17;
197:13,24;198:12,19;
201:18;204:13;
210:15;219:23;
231:21;232:15;
235:14;236:12;237:4;
238:11;240:4,10,11,
19,23;241:16;242:25;
244:7;246:16;335:12;
336:8;339:13,23;
340:12;341:17;
357:14;358:17;360:9;
378:12;380:15,16;
383:24
**Tom (2)**
23:20;24:2
**tomorrow (1)**
394:14
**tonight (1)**
340:17
**Tony (4)**
149:1,14,15,15
**took (7)**
39:22;56:5;159:21;
180:16,16;203:7;
327:10
**tool (6)**
106:4,14;108:5;
109:3,21;132:3
**top (9)**
102:20;122:25;
129:20;130:19;
290:25;304:19;
307:15;322:3;333:17
**Torrence (4)**
152:13;156:1;
273:21;304:10
**total (2)**
31:22;338:1
**totally (1)**
72:2
**touch (3)**
23:25;24:3;28:8

**towards (1)**
123:5
**town (2)**
58:5;206:9
**training (3)**
81:23;82:11;84:23
**transcripts (2)**
371:16;372:15
**transferred (1)**
75:24
**translated (1)**
179:10
**transpired (3)**
16:21;219:2;232:15
**treated (1)**
53:4
**treatments (1)**
32:1
**trial (7)**
40:3;49:18;292:7;
375:8,13,20;377:5
**trick (2)**
185:5,15
**tried (3)**
133:16;323:25;
370:22
**trigger (1)**
200:12
**triple (4)**
162:3;226:13,14,15
**trouble (3)**
384:3;386:23;
387:25
**true (15)**
8:22;109:1,11;
110:5;111:18,19,22;
113:23;142:10;154:8;
222:3;246:7;253:10;
379:23;390:7
**trusted (1)**
184:7
**truth (8)**
111:13,15;181:15;
187:10;188:10;341:9;
360:10,18
**truthful (5)**
8:6;49:3,10;114:13;
180:11
**try (21)**
8:14;23:2;104:13;
106:25;116:25;117:4,
5,10;122:2,4;129:2;
166:9;168:20;177:24,
25;182:16,18;185:4;
210:21;322:13;
358:23
**trying (15)**
23:11,17;80:5;
113:3;129:11;227:2;
240:13;254:12;
264:24;272:8;276:15;
323:16;334:21;
359:18;391:21

**tunnel (1)**
280:10
**turf (1)**
165:18
**turn (6)**
195:18,20;227:21;
260:25;296:13;
389:19
**turned (3)**
25:25;162:6;389:6
**turns (4)**
137:13;188:22;
209:18;238:25
**twice (1)**
12:8
**two (59)**
13:17;14:2;15:17;
33:13;57:10;59:18;
67:9;87:11;103:8;
122:12,14;129:14;
150:3,16,19,20;
154:23;155:22;
157:25;158:6,6,9,17,
23;170:16;173:3;
177:19;178:17;179:2,
16,18;181:20;190:1;
194:4;201:5,5;205:2;
206:3;208:1;233:18;
235:11,20;236:16;
246:25;276:9,10;
277:1;281:8;282:16;
297:24;301:7,7;
305:10;309:24;311:5;
317:12;356:17;
358:18;376:1
**two-door (1)**
322:2
**two-sided (1)**
152:8
**Two-story (1)**
118:17
**type (17)**
57:6;73:12;88:3,7,
11;89:22,25;95:1;
108:4,6;122:10;
132:13;163:11;
211:19;276:21;
328:10;364:17
**typed (1)**
314:21
**types (8)**
87:14,22;97:23;
98:14;163:19;164:9;
279:18,19
**typically (6)**
63:20;86:13;
121:11;122:17;
135:24;173:13
**typo (3)**
353:2,22;354:4
**typographical (1)**
139:1

## U

**ultimately (3)**
112:8;115:10;197:3
**Um (2)**
9:1;370:7
**uncommon (4)**
164:18,19,22;166:8
**unconstitutional (1)**
153:9
**uncooperative (1)**
269:23
**under (13)**
7:13;105:4,4;114:9;
115:16;190:17,22;
293:15;299:19;
358:19;371:4;392:9,
12
**underlying (1)**
28:1
**understood (1)**
7:23
**uniform (5)**
376:13,19,21;
377:24;391:5
**unique (1)**
52:17
**unit (3)**
57:24;65:14,23
**United (1)**
5:3
**Units (6)**
62:14;64:1,2,7;
119:9;376:20
**unknown (4)**
206:4;267:3;
349:12;350:20
**unless (3)**
142:9;144:2;269:7
**unlikely (1)**
229:12
**unpredictable (3)**
72:17,19,21
**unrelated (2)**
226:12;362:24
**unreported (1)**
299:1
**unsolved (2)**
166:13;226:18
**untrue (1)**
35:25
**unusual (3)**
318:21;356:24;
371:23
**unwilling (1)**
229:20
**up (84)**
22:25;25:8;29:9;
31:20;40:5;53:4,9;
56:17;62:22;68:25;
69:14;70:3;78:7;
116:19;120:13,15,24,

25;121:2,4,15;122:10,
11,13,20,23;137:8;
138:22;140:15;145:2;
166:20;168:9;173:22;
178:12;179:19;
187:25;193:25;197:3,
5;200:2;201:9;206:5;
208:1;210:8;222:4,
15,25;227:2,21;
233:19;242:17;
250:13,18;255:18;
260:16,19;264:9,10;
272:12,14;273:8;
294:5;296:14;307:15;
309:9;317:23;330:8;
344:5,9;362:19;
373:2,7;378:23;
382:22,23;383:4,6,9;
384:6,8,16;385:2;
388:10;389:9
**upfront (1)**
216:7;217:10
**upper (2)**
164:2,4
**use (12)**
69:22;106:11,14;
108:18,18;110:11;
119:15,16;168:21;
229:19;289:14;292:3
**used (32)**
58:7,8,8;84:18,20;
90:18;91:4;92:4;
107:19;109:3,22;
139:2;161:23;162:7,
8;165:21;171:21;
179:5,21;182:7;
188:11,23,24;189:21;
193:9;196:8;204:21;
249:3;266:11;322:1,
22;342:1
**useful (3)**
168:2;343:23;355:2
**users (3)**
164:18;281:19;
282:22
**using (4)**
113:3;263:5;
392:16;393:14
**usual (1)**
66:22
**usually (10)**
67:16;71:21;89:13,
14;91:17;119:15;
130:24;131:15;
251:17;277:24
**utilized (1)**
87:15

## V

**vacated (1)**
23:9
**vague (10)**

83:10;200:6,9,15;
223:12;234:21,22;
245:16;372:9;382:18
**vaguely (1)**
146:18
**valuable (3)**
199:15;214:11;
216:11
**Varas (1)**
146:25
**vehemently (1)**
353:14
**vehicle (2)**
66:25;322:1
**verify (4)**
116:19,20,23;
241:13
**versus (3)**
28:25;71:19;147:11
**via (2)**
26:14,15
**Vice (8)**
71:10,16,18;72:5,6,
7,10,22
**victim (4)**
84:2,6;153:19;
304:6
**Victims (11)**
151:8,9;162:4;
165:4;272:9;280:19;
281:18;282:16;308:9;
319:23;320:4
**victims' (3)**
154:17;271:21;
272:10
**victim's (2)**
125:18;138:19
**Video (2)**
5:15;107:22
**VIDEOGRAPHER (19)**
5:1,13;81:10,13;
122:2;145:6,9,15;
218:19,22;313:11,14;
374:14;375:1,4;
394:6,9,11,15
**video-recorded (1)**
5:9
**Vietnam (5)**
57:3,24;58:1,4;
390:16
**view (5)**
35:18;102:10;
264:15;297:18,19
**viewing (4)**
102:2,19;103:25;
105:1
**violating (1)**
391:1
**violation (2)**
391:12,14
**violations (1)**
390:25
**violence (1)**

165:4
**Violent (30)**
76:3,7;78:25;80:24;
81:19;86:17;87:15;
88:11;89:20;118:7;
119:1,5,13;123:5,13;
124:19;126:20;
133:13;141:11;
162:14;163:1;171:16;
176:3,12,16;239:8;
242:1;288:5;289:10;
325:6
**vision (1)**
280:10
**visual (1)**
129:3
**voices (5)**
276:10;278:6,16;
283:8,9
**voluntarily (2)**
230:11,13
**voter (1)**
307:6
**vs (1)**
5:2

## W

**wait (6)**
8:16;13:4;37:17;
121:21;217:7;309:13
**waited (2)**
87:10;203:10
**waiting (3)**
33:14,15;248:19
**waiver (3)**
203:25;204:1,8
**walk (1)**
374:20
**walked (2)**
123:8;175:4
**walking (2)**
124:16;281:8
**wants (8)**
126:13;131:1;
138:9;183:19;221:6;
227:5;258:14;363:11
**war (1)**
58:20
**Ware (3)**
274:8,15;306:25
**Warning (1)**
346:6
**warrants (3)**
65:8;74:23,24
**Wasmund (2)**
287:23,23
**watch (18)**
120:3,3,4,6,8,9,10,
10;135:11,24;149:23;
264:3,11;304:21,22;
305:1;345:2,9
**water (1)**

333:2

**way (44)**
18:15;34:17;35:3;
36:25;42:2,3,15;
69:12;71:21;82:11;
84:5;85:5;91:18;93:9;
96:5,15;130:13;
144:10;196:13,15;
199:8,11;202:4,17;
225:6,7;241:21,22,23;
250:18;256:24;291:6;
295:5;307:13;310:16;
312:25;343:16;
345:20;357:16;
381:25;382:12;384:3;
386:22;387:25

**ways (6)**
68:10,12;134:11;
222:17;240:14;386:9

**weapon (9)**
179:20;182:7;
190:25;192:1;193:9;
211:11;214:7;265:21;
266:11

**wear (3)**
68:15,15;69:18

**wearing (2)**
308:10;391:4

**weasely (1)**
344:4

**week (2)**
58:9;139:17

**weeks (4)**
13:5;222:2;325:23;
372:6

**weight (1)**
66:22

**weird (1)**
379:22

**Weren't (19)**
34:8;107:23;125:3;
137:1;148:4,6;
151:11,11,12;171:1;
205:12,15;233:22;
265:8;281:21;294:10;
319:24;368:18;
385:15

**west (7)**
61:15;62:9,10,14;
79:12;80:4;149:24

**Western (2)**
78:6,18

**what's (36)**
11:6;28:6;33:19;
54:12,13;86:8;102:5;
133:20;138:15,15;
152:7;159:16,25,25;
160:1;225:24;228:14;
247:25;251:17,18;
278:10;285:9,15;
286:17;295:17;297:9;
320:6;328:4;337:6;
351:20;364:20;

372:11,19;376:17;
377:19;387:6

**whatsoever (3)**
159:23;295:25;
296:21

**whenever (4)**
166:16;167:4;
203:5;267:7

**When's (1)**
19:25

**Where's (1)**
78:4

**wherever (1)**
65:5;201:6;228:1

**Whey (1)**
201:9

**Who'd (1)**
354:6

**whole (12)**
7:7,7;49:25;102:9;
133:3;205:9;306:1;
313:23;348:6;351:4;
365:16,19

**whomever (1)**
93:5

**Who's (13)**
23:16;84:2,2;97:4;
173:17;210:3;244:17;
278:20;287:23;317:6;
322:13,15;341:8

**Whose (4)**
47:14;262:1,2;
322:21

**wife (3)**
178:10;342:6;360:3

**Wild (1)**
162:4

**Wiley (46)**
23:8;145:22,24;
146:8;150:3,8;
152:13,13;160:4,18;
161:24;165:3,17;
167:20,21;168:24;
169:5,6;170:8,23;
172:1,25;174:2;
178:4,23;181:7,20;
182:5;188:11,23;
189:21;192:23;
216:21;219:8;220:22;
231:15;232:8;265:3;
273:21;278:3,4;
307:8;316:4;320:12;
327:5;369:7

**Wileys' (1)**
151:19

**Willie (2)**
274:8,15

**willing (1)**
211:1

**wind (1)**
197:5

**Winston (1)**
310:7

**wiretaps (2)**
389:17,22

**wise (1)**
254:12

**wish (2)**
233:4;313:3

**withheld (1)**
299:20

**withhold (3)**
292:22;293:1,23

**within (15)**
62:3;144:7;149:7;
195:10,10,14;203:2;
234:14;274:24;275:4,
7;284:25;317:11;
372:6,6

**Without (8)**
29:24;80:16,16;
131:13;160:1;321:19;
339:8;343:14

**WITNESS (174)**
8:5;9:20;10:3;30:2;
40:25;43:25;45:20;
46:24;47:2,3,5,7,8,11,
14,20,23,24,25;48:17;
49:5,23;52:13;53:2,6;
65:19;83:12;85:1;
91:5,12;93:4;94:13;
95:22,24;99:21;
101:7,21,24;102:1,4,
10,16,18;103:25;
105:1;108:16,24;
109:6,25;110:21;
111:8,23;112:1,6,12,
17,23;113:6,13,21;
114:5,17;115:5,20;
116:4,9,17;117:7;
121:20;122:1,4;
124:17;126:17;
134:24;138:6;139:6;
143:5,9,13;145:2;
151:25;157:4;165:13;
169:23;174:6;185:25;
187:19;194:9;195:5,
25;201:2;207:12;
211:22;212:14;
218:18;221:2;223:25;
224:15;225:21;
227:18;228:21;229:3,
11;235:8;236:10;
239:6;240:9;243:16;
244:6;245:10,18;
246:2,15;249:5,22;
254:20,25;255:16;
256:5,14,23;257:10;
278:2;280:7;281:2;
282:10;283:4,15;
286:10,13;291:20;
293:21;296:10;300:4;
301:3,11;302:15;
303:17;312:19;
318:20;319:1;322:25;
327:13;331:2;335:7;

343:10;344:5;346:17;
347:6,9;359:1;
366:19;370:16,25;
372:10;373:4;374:1;
380:13,18;382:5,19;
383:3;390:1,10;
391:11,19,24;392:2,4,
8;393:5;394:5,8,10

**witness' (1)**
139:5

**witnessed (10)**
103:3;238:7;
245:15,22;268:18;
392:11,14,19,22;
393:4

**witnesses (16)**
19:10;46:20;48:10;
49:17;50:15;51:10;
52:1;58:15;161:1;
170:1;264:12;281:6;
288:21;298:18;
307:19;393:2

**witness's (1)**
390:9

**woman (3)**
109:18;111:19;
116:14

**women (3)**
116:1,6;278:11

**wondering (2)**
227:14;352:24

**Woodall (4)**
388:17,18,24,25

**woods (1)**
268:17

**word (6)**
69:22;172:18;
259:16,17;312:1;
390:3

**words (2)**
213:8;253:22

**work (28)**
58:8;63:9;64:20;
71:3;75:9;97:20;
107:18;117:21;122:8;
161:3,7;198:23;
260:23;264:8;267:6;
268:9,12;269:14;
272:25;285:12;
295:15;296:1;312:15;
334:21;345:2;369:17;
377:24;386:3

**worked (18)**
23:19;24:2;35:21;
36:20;49:14;63:15;
73:23;120:7,8;123:8,
25;148:24,25;149:23;
239:19;312:24;
376:10;390:2

**working (25)**
35:5;36:14,16;64:9,
11;87:2;97:5,12;
117:15,18;163:7;

168:16;170:8,10;
171:13;173:9,15;
185:19;202:24;
206:18;207:22;
264:10;305:7;378:3;
381:16

**works (4)**
107:17;290:16;
294:9;295:13

**world (2)**
68:1;111:21

**world's (1)**
52:13

**worth (1)**
166:24

**wounds (1)**
288:11

**wrapping (1)**
114:8

**writ (1)**
210:22

**write (30)**
84:23;90:23;92:9;
96:17,18;97:7;
198:18;212:5,10,24;
213:2,4,7,14;214:15,
16;236:6,12,14,14;
238:16;239:4;240:5;
241:14,17,20;297:2;
337:12;339:5;366:10

**writes (1)**
94:2

**writing (8)**
82:23;83:1,7;94:25;
95:16;198:1;330:12;
339:7

**writted (2)**
211:6;378:17

**written (9)**
82:25;85:7;106:1;
182:20;211:19;
212:25;213:25;
241:16;267:15

**wrong (19)**
19:1;28:3;32:2;
61:17;94:5;131:11;
136:11;138:19,20,21,
21;142:16;158:12;
226:7;237:6;289:1;
308:7;351:9;387:4

**wrote (6)**
212:16,18,19;
213:5;238:18;297:1

---

**X**

---

**Xs (1)**
381:23

---

**Y**

---

**ya (1)**
388:25

**year (15)**
45:4;56:23;59:4,18;
60:9;61:5;73:3,7,24,
25;74:3;76:1;126:23;
135:22;376:25
**years (27)**
17:3;40:14,15,16;
49:8;57:10,11;60:5;
74:20;77:1;102:15;
151:14;156:9;295:1;
349:20;371:6;372:5,
22,22;376:6;379:8;
383:7;385:11;390:3,
18;391:7,10
**years' (1)**
292:8
**yellow (1)**
260:1
**Yep (1)**
288:24
**yielded (2)**
193:25;269:8
**you- (1)**
347:20
**young (4)**
147:6,10;151:12;
157:25
**younger (1)**
147:14
**Youth (9)**
60:8,14,20,25;61:3,
3;62:14;118:17,24
**youths (2)**
319:24,24
**Yup (2)**
204:6;205:4

**Z**

**zero (5)**
226:23;234:4,5;
332:19;361:18

**1**

**1 (8)**
152:2,5,8;220:17;
249:17,20;250:22;
251:9
**1:00 (2)**
263:18;272:18
**10 (7)**
9:2,21;10:8,9,25;
60:2,2
**10:14 (1)**
5:8
**100 (1)**
122:18
**102 (1)**
286:5
**107 (1)**
285:25
**1080890 (1)**

152:11
**10864 (1)**
328:5
**10891 (1)**
152:12
**10-by-4 (1)**
126:5
**11 (7)**
5:7;9:2;10:8,9;
11:1;60:2,2
**11:32 (1)**
81:11
**11:43 (1)**
81:14
**1121 (1)**
64:1
**12 (5)**
33:2;58:8,9;60:2,2
**12:44 (1)**
145:7
**12:58 (1)**
145:10
**12th (2)**
59:9,17
**13 (4)**
60:2,2;79:21,22
**13th (1)**
68:24
**14 (10)**
22:21;68:25;69:2;
71:22;72:11;73:23,
23;76:19;77:8;79:24
**14th (13)**
61:10,12;71:20;
76:9,12,21;77:6,19;
78:21;79:20;80:14;
148:25,25
**15 (4)**
67:23;71:4;72:2,5
**15th (17)**
71:19;181:1;
220:16;226:10;237:4;
238:12;246:11;247:7;
296:16,22;312:4;
325:3,12;349:3;
350:17;370:12;
371:19
**1630 (1)**
271:3
**16th (1)**
358:5
**17 (1)**
329:18
**1750 (1)**
274:20
**18-cv-02342 (1)**
5:6
**1980 (1)**
81:2
**1989 (2)**
76:12,23
**1990 (127)**
77:18;78:11,13,17;

81:2;82:15;83:1,7;
85:15;86:16;87:13,
21;90:17;91:3;92:5;
98:11;100:19;105:8;
106:3;108:3;117:24;
119:1;120:1;124:12;
145:18,25;146:7;
147:4,18;148:16;
152:17;154:10;
158:25;159:18;
160:23;162:13;181:1,
8;206:22,22;207:6,7;
210:14;215:15,24;
216:5;220:17,20;
221:19,24;222:1,3;
223:22,22;224:4,5,11,
12;226:10;231:2,5,8;
232:9;233:8,9,10,16;
234:2;237:4,5;
238:12,13;239:19;
263:11,18;267:21;
270:9;271:3;274:5;
275:6;284:8,8,15,16,
21,24;285:12,13;
287:2;289:5,14,15,20,
20;296:2,16,17,22,23;
298:2,2,21;304:20,25;
306:13;311:10;312:4,
6,9,10,16,16;314:12,
15;325:3,12;344:22;
348:4,19;352:2,15,20;
355:14;360:2;373:2,
8;376:2
**1990-ish (1)**
127:16
**1st (46)**
206:22;207:7;
210:14;213:11;
215:14,24;216:5;
220:19;222:1;223:22;
224:4,11;232:9;
233:8,9;237:5;
238:13;239:19;
246:10;247:10;
296:17,23;312:6;
326:23;327:9,23;
332:16,20,21,23;
334:1,18,25;335:11,
13,16,19;339:15;
341:17;342:10,16;
348:2;349:6;350:18;
370:13;371:20

**2**

**2 (9)**
118:5,7;135:3;
175:11;247:23;248:1,
5,23;265:17
**2- (1)**
22:21
**2:04 (1)**
218:20

**2:41 (1)**
218:23
**20 (2)**
271:13;372:22
**20- (1)**
289:14
**2000 (2)**
348:20;350:10
**2014 (2)**
22:9,15
**2017 (5)**
33:2,7;37:6;43:5;
55:1
**2019 (1)**
5:7
**20s (4)**
148:1,3,6;152:18
**20th (1)**
73:21
**2100 (1)**
360:2
**2138 (3)**
61:10;76:19,20
**22 (4)**
221:18;234:2;
296:2;344:22
**2200 (1)**
358:6
**22nd (34)**
221:24;222:3;
223:22;224:5,11;
231:2,5,8;233:9,16;
284:16,24;285:12;
289:15,20;298:2;
312:10,16;332:17,20,
24;333:22;334:17,25;
341:14;342:9,23;
345:1;348:19;350:10;
352:15,20;355:14;
360:2
**23rd (11)**
289:5;298:21;
311:10;314:12;352:2;
362:21;363:20;365:4;
373:2,7;376:2
**24 (1)**
280:17
**24th (1)**
314:15
**25 (5)**
77:17;145:25;
206:22;207:5;275:4
**25-minute (1)**
275:8
**25th (39)**
79:4,10;80:1,17;
118:20;145:14,18,21;
146:7;147:4;152:17;
154:10;158:25;
159:18;160:23;181:8;
262:8;263:10,17;
267:21;270:9;271:3;
274:5;275:6;284:8,

14,21;285:12;287:2;
289:14,20;296:2;
298:2;304:20,24;
306:13;312:9,16;
348:4
**26 (2)**
56:14;151:14
**26th (9)**
20:8,15;29:10;32:9;
33:4;37:5;38:16;
262:9;284:8
**27 (3)**
151:14;156:9;376:6
**27-year-old (2)**
156:6,17
**287 (1)**
352:10
**293 (1)**
352:11

**3**

**3 (6)**
249:12,14;250:21;
289:24;305:20;
313:19
**30 (3)**
349:20;372:5,22
**30s (2)**
148:1,3
**37 (8)**
40:14,15,16;49:8;
390:18;391:7,7,10
**37-year (1)**
40:23

**4**

**4 (14)**
59:19,20,25;60:1,3;
61:3;81:17;249:12,
16;285:16;289:8;
319:15,15,17
**4:19 (1)**
313:12
**4:29 (1)**
313:15
**4:30 (5)**
271:4;362:21;
363:19;364:12;365:4
**40 (1)**
250:10
**403 (1)**
248:16
**43 (1)**
56:14
**47 (1)**
313:20
**48 (2)**
195:15;203:3
**49 (1)**
319:18

## 5

**5 (78)**
75:24;76:5,7,10,14;
77:9,11;78:12,24;
80:24;81:19;82:16;
84:17,19;85:16;
86:17;87:15,20;
99:13;102:16;104:24;
117:24;118:9,13;
120:11,23;121:11;
133:13;135:5,8;
149:6,7,10,18;160:10;
163:9;164:2;172:9,
21;174:25;175:12;
176:3;200:7;219:6;
220:12;225:25;230:7,
9,12,14;231:11;
233:19;234:1;251:15;
254:8;255:14,17;
256:2,10;288:5;
289:10;291:25,25;
293:14;295:4;302:4,
6;325:6;342:24;
345:2;347:19;349:11;
352:20;354:20;360:3;
362:16,24;389:14
**5:00 (1)**
272:25
**5:28 (1)**
375:2
**5:34 (1)**
375:5
**5:51 (2)**
394:9,17
**51 (2)**
333:17;356:21
**52 (1)**
357:25
**53 (1)**
365:7
**54 (2)**
367:8;368:7
**55 (1)**
274:1
**56 (2)**
274:1;313:20
**58 (1)**
249:23
**59 (2)**
262:14;309:13

## 6

**6 (9)**
77:10,25;78:4,5,19;
328:2,5;358:19;
376:11
**6:30 (1)**
367:4
**60 (1)**
265:17

**61 (2)**
56:25;310:20
**62 (2)**
262:14;310:20
**63 (3)**
261:19;270:24;
305:21
**64 (3)**
57:12;261:16;
270:25
**65 (2)**
57:8;261:1
**66 (7)**
57:8,12;59:5;
249:18,21;250:22;
261:2
**67 (1)**
285:25
**69 (1)**
286:22

## 7

**7 (4)**
351:18,21;367:14,
15
**70 (2)**
74:10;287:9
**70s (5)**
60:12;61:7;62:2;
71:2;74:13
**72 (1)**
60:12
**73 (1)**
287:21
**75 (2)**
288:14,18
**77 (5)**
60:19;73:8,17;
288:20,22
**78 (5)**
74:7,11,13;288:20,
22
**78-ish (2)**
74:4,12
**79 (1)**
288:25
**7th (1)**
11:11

## 8

**8:00 (2)**
263:11;270:9
**80 (2)**
152:11;311:5
**80s (2)**
74:13;377:12
**81 (2)**
311:5,18
**873 (2)**
302:9,11
**874 (4)**

302:3,12;303:21;
307:15
**875 (1)**
303:21
**876 (1)**
306:18
**877 (1)**
308:4
**878 (3)**
308:25;309:3;
310:15
**879 (2)**
308:25;310:15
**881 (3)**
302:3,12,14
**89 (11)**
74:8,9;76:2;77:2,
19,24;100:18,18;
126:25;376:25;383:6
**89-ish (1)**
77:18

## 9

**9 (22)**
9:21;10:8,9,25;
76:3;161:23;162:7,8;
164:17,25;165:4,8,21;
167:18,25;170:20,24;
178:13;179:5;187:13;
266:12,18
**9:28 (1)**
352:3
**90 (3)**
100:18;125:23;
148:18
**9034835 (1)**
330:3
**90-50 (1)**
252:5
**90-51 (1)**
252:5
**90s (8)**
98:16,20;99:5;
127:1;148:22;162:17;
163:4;377:2
**98 (2)**
377:3,7
**99 (2)**
377:3,5
**9-by-4 (3)**
126:5,14,15
**9-by-5 (1)**
126:15

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 17

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   JOSE JUAN MAYSONET,            )
                                    )
 4                Plaintiff,        )
                                    )
 5           vs.                    )    No. 18 CV 2342
                                    )
 6   REYNALDO GUEVARA, et al.,      )
                                    )
 7                Defendants.       )

 8

 9           The video-recorded videoconference

10   deposition of JOSE JUAN MAYSONET, JR., taken

11   pursuant to the Federal Rules of Civil Procedure,

12   before Kathleen A. Hillgard, Certified Shorthand

13   Reporter No. 084-004093, via Zoom, on Friday,

14   April 16, 2021, commencing at 10:06 a.m. pursuant

15   to notice.

16

17

18

19

20

21

22

23

24
```

JOSE JUAN MAYSONET JR., 04/16/2021                              Page 2..5

---

**Page 2**

```
 1   APPEARANCES:
 2       BONJEAN LAW GROUP, by
         MS. JENNIFER BONJEAN
 3       MS. ASHLEY COHEN
         (750 Lexington Avenue, 9th Floor
 4       New York, New York 10022
         718.875.1850
 5       Jennifer@bonjeanlaw.com
         Ashley@bonjeanlaw.com)
 6            -and-
         STEVEN A. GREENBERG, LTD., by
 7       MR. STEVEN A. GREENBERG
         (53 West Jackson Boulevard, Suite 1260
 8       Chicago, Illinois  60604
         312.879.9500
 9       Steve@greenbergcd.com)
            appeared on behalf of the plaintiff;
10
         THE SOTOS LAW FIRM, by
11       MR. DAVID A. BRUEGGEN
         (141 West Jackson Boulevard, Suite 1240A
12       Chicago, Illinois  60604
         312.494.1000
13       Dbrueggen@jsotoslaw.com)
            appeared on behalf of the City of
14       Chicago police officer defendants;
15   ROCK FUSCO & CONNELLY, LLC, by
         MR. AUSTIN G. RAHE
16       MS. EILEEN ROSEN
         MS. JESS ZEHNER
17       (321 North Clark Street, Suite 2200
         Chicago, Illinois  60604
18       312.494.1000
         Arahe@rfclaw.com
19       Erosen@rfclaw.com
         Jzehner@rfclaw.com)
20          appeared on behalf of the defendant
         City of Chicago;
21
22
23
24
```

**Page 4**

```
 1              I N D E X
 2
     Witness:                            Page
 3
         JOSE JUAN MAYSONET, JR.
 4
         Examination by:
 5
         Mr. Brueggen.................     6
 6       Mr. Shannon..................   398
 7
 8
 9
10
11
12
13
14
15            E X H I B I T S
16
     No.  Description          Marked/Referenced
17
      1  Photos, Santiago Sanchez Funeral....... 191
18    2  Cook County Jail Authorization......... 249
      3  Statement of Jose Maysonet 8/23/90..... 320
19    4  Polaroid Photo, Front and Back......... 324
      6  Petition for Postconviction Relief..... 358
20
21        (Exhibits attached/scanned.)
22
23
                       - - -
24
```

**Page 3**

```
 1   ALSO PRESENT:  (Cont'd)
 2       LEINENWEBER BARONI & DAFFADA, LLC, by
         MS. MEGAN K. McGRATH
 3       (120 North LaSalle Street, Suite 2000
         Chicago, Illinois  60602
 4       312.380.6635
         Megan@ilesq.com)
 5          appeared on behalf of the defendant
         Reynaldo Guevara;
 6
         HINSHAW, by
 7       MR. ROBERT T. SHANNON
         MR. VINCENT M. RIZZO
 8       MS. ESTHER C. CHOI
         (151 North Franklin Street, Suite 2500
 9       Chicago, Illinois  60606
         312.704.3000
10       Rshannon@hinshawlaw.com
         Vrizzo@hinshawlaw.com
11       Echoi@hinshawlaw.com)
            appeared on behalf of the defendant
12       Frank DiFranco.
13   ALSO PRESENT:
14       Ms. Haley Coolbaugh,
         Bonjean Law, Paralegal
15
         Ms. Brett Schatzle
16       Urlaub Bowen & Associates, Videographer
17             * * * * * * * *
18
19
20
21
22
23
24
```

**Page 5**

```
 1       THE VIDEOGRAPHER:  This is the beginning of
 2  Media Unit 1 and we are now on the video record at
 3  10:06 a.m.
 4       This is the videotaped video
 5  conference deposition of Jose Juan Maysonet, Jr.,
 6  being taken on April 16, 2021.
 7       This deposition is being taken on
 8  behalf of the defendant in the matter of Jose Juan
 9  Maysonet, Jr. versus Reynaldo Guevara et al.  The
10  case number is 18 CV 2342, filed in the United
11  States for the Northern District of Illinois,
12  Eastern Division.
13       My name is Bret Schatzle, legal
14  videographer representing Urlaub Bowen & Associates
15  with offices at 20 North Clark Street, Suite 600,
16  Chicago, Illinois.
17       The court reporter today is Kathy
18  Hillgard, also of Urlaub Bowen & Associates.
19       Counsel, please identify yourselves
20  for the video record and the parties which you
21  represent.
22       MS. BONJEAN:  Good morning.  Jennifer Bonjean
23  on behalf of the plaintiff Jose Juan Maysonet, Jr.
24       MR. BRUEGGEN:  Good morning.  Dave Brueggen
```

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 6..9

Page 6

1 on behalf of defendants Montilla, Paulnitsky,
2 Epplen, Mingey, and Halvorsen.
3       MR. RAHE:  Good morning.  This is Austin
4 Rahe.  I'm here with Eileen Rosen and Jess Zehner
5 for defendant City of Chicago.
6       MS. McGRATH:  Megan McGrath on behalf of the
7 defendant Guevara.
8       MR. SHANNON:  Bob Shannon on behalf of
9 defendant DiFranco.  Also with me is Vincent Rizzo
10 and on occasion Esther Choi will also be on.
11       THE VIDEOGRAPHER:  Will the court reporter
12 please swear in the witness.
13             (Witness sworn.)
14       JOSE JUAN MAYSONET, JR.
15 called as a witness herein, having been first duly
16 sworn, was examined and testified as follows:
17             EXAMINATION
18 BY MR. BRUEGGEN:
19     Q.   Good morning, Mr. Maysonet.  How are
20 you today?
21     A.   Good.  How you doing?
22     Q.   Good.
23          Let's start.  Can you please state
24 your full name for the record?

Page 7

1     A.   Jose Juan Maysonet, Jr.
2     Q.   Mr. Maysonet, have you ever given a
3 deposition before?
4     A.   No.
5     Q.   Okay.  As you can see, we're doing it
6 via Zoom, and I don't know if you're familiar
7 already with Zoom.  I'm sure you talked to your
8 attorney about the rules for a deposition.
9          But we need to take turns speaking.
10 So I ask if I'm asking a question, you wait until
11 I'm done with my question before giving me an
12 answer, and likewise I will wait until you're done
13 with your answer before I pose a new question.
14 Okay?
15     A.   Okay.
16     Q.   We also need your answers to be out
17 loud if you could use yes and no instead of uhn-uhn
18 or uh-huh or nod or shake your head.  Okay?
19     A.   Okay.
20     Q.   And if you nod or shake your head, you
21 might forget, I may follow up with, Is that a yes
22 or is that a no, just to clear the record.  Okay?
23     A.   Okay.
24     Q.   I'll be asking a lot of questions

Page 8

1 today.  If at any time you don't understand my
2 question or you don't hear me, just let me know and
3 I can rephrase it.  Okay?
4     A.   Okay.
5     Q.   If you answer a question, we'll assume
6 you understood it; is that fair?
7     A.   Good.
8     Q.   Also, since it's going to be -- you
9 know, take some time today, if you need a break at
10 any time, that's not a problem.  Just let me know.
11 I just ask if there's a question pending, you give
12 us an answer to that question and then we can take
13 a break.  Okay?
14     A.   Okay.
15     Q.   And to start, can you tell me who's
16 present in the room with you?
17     A.   I got my attorney right here sitting
18 next to me on my right, and I also got another
19 attorney sitting right on my left in front of me.
20       MS. BONJEAN:  I'm going to, just for the
21 record to clarify, we have my paralegal, Haley --
22       THE WITNESS:  Paralegal.
23       MS. BONJEAN:  She's like an attorney.  That's
24 fair.

Page 9

1             -- (continuing)  who's present.  And
2 also Ashley will be joining us, but she's not here
3 right now.  And -- and Greenberg will be joining us
4 at some point.
5       MR. BRUEGGEN:  And just to clarify, Jennifer,
6 will they be joining on their own computers or will
7 they be in the room with you?
8       MS. BONJEAN:  Ashley will be on her own
9 computer.
10             And, Haley, are you on Zoom right
11 now?
12             She's going to be joining on Zoom
13 shortly, but she's doing something right this
14 second.
15 BY MR. BRUEGGEN:
16     Q.   And, Mr. Maysonet, since we're not in
17 the same room, you may have some documents that
18 were printed out that we use as exhibits or other
19 documents, and I just ask that if you refer to a
20 document or look at a document to provide an
21 answer, you let me know that you're looking at a
22 document since I can't see that you're doing that.
23 Okay?
24     A.   Okay.

JOSE JUAN MAYSONET JR., 04/16/2021         Page 10..13

Page 10

1     Q.   Mr. Maysonet, did you speak with your
2 attorney to prepare for this deposition? And I'm
3 not looking for what you talked about, just whether
4 you spoke to her, yes or no.
5     A.   Yes, yeah. We talked.
6     Q.   How many times did you speak with her
7 to prepare for your deposition?
8     A.   We -- I guess we talk a number of time.
9 I'm not remember how -- how many times we, but
10 yeah, a number of time.
11     Q.   And that number of times specifically
12 to talk about your deposition today?
13     A.   Not really. I mean ...
14     Q.   And do you recall specifically meeting
15 with your attorneys just to talk about your
16 deposition and prepare for your deposition today?
17     A.   Well, we'll be preparing for a long
18 time.
19     Q.   Did you meet with your attorney in
20 person to talk about your deposition today?
21     A.   I just got here right now, yeah.
22     Q.   Prior to this morning, did you meet
23 with your attorney in person to talk about your
24 deposition?

Page 11

1     A.   Sure. Yeah.
2     Q.   And when was that?
3     A.   Just probably about 15 minutes ago.
4     MS. BONJEAN: Yesterday.
5     THE WITNESS: Oh, and yesterday. Yeah.
6 BY MR. BRUEGGEN:
7     Q.   You met with your attorney yesterday to
8 talk about the deposition?
9     A.   Yeah.
10     Q.   Was that in person or via
11 videoconference or via --
12     A.   No, no, no. In person, in person.
13     Q.   How long was that meeting with your
14 attorney yesterday?
15     A.   Few minutes, I guess.
16     MS. BONJEAN: No. Longer than that.
17     THE WITNESS: I mean, probably about an hour.
18 BY MR. BRUEGGEN:
19     Q.   You met with your attorney for about an
20 hour yesterday?
21     A.   Yes.
22     Q.   And when you met with your attorney,
23 did you review any documents?
24     A.   No.

Page 12

1     Q.   And prior to yesterday meeting with
2 your attorney, had you met with your attorney to
3 talk specifically about your deposition, the fact
4 that you had would come here and testify today?
5     A.   Yesterday, yeah.
6     Q.   Other than your attorney or anybody who
7 works with your attorney, did you talk to anybody
8 else about your deposition?
9     A.   No.
10     Q.   Have you looked at or reviewed any
11 documents in preparation for your deposition?
12     A.   Not really.
13     Q.   When you say "not really," it makes me
14 think that you did look at some documents; is that
15 accurate?
16     A.   Some of them, but not -- you know, not
17 anything, you know, basically important to me,
18 though, you know. I know what I'm -- I'm here for,
19 what the procedure that I've already been
20 explained, though. So ...
21     Q.   Can you tell me what documents you
22 looked at?
23     A.   Just old papers and stuff. Yeah.
24     Q.   And --

Page 13

1     A.   Stuff -- stuff they didn't even -- I
2 didn't even -- I didn't even thought they were
3 around, though.
4     Q.   Okay. Did you look at any police
5 reports in preparation for your deposition today?
6     A.   No, no police reports.
7     Q.   Did you look at any affidavits you
8 completed in preparation for your deposition today?
9     A.   No.
10     Q.   Did you look at any motions you filed
11 in preparation for your deposition today?
12     A.   No, no. No motion.
13     Q.   Can you tell me what the documents were
14 that you looked at?
15     A.   No.
16     Q.   Did you look at any photographs in
17 preparation for today?
18     A.   Yes.
19     Q.   What photographs did you look at?
20     A.   I saw photograph of -- I think it was a
21 photograph of -- from the -- I think it was from
22 the -- from the funeral or something like that.
23        I want to know the name of the card.
24 The -- I forgot the name. It come from the

Page 14

1 funeral, one of those things when you go -- I don't
2 understand.  Sorry.  My English not all that good,
3 though, but some thing, you know, I can ...
4    Q.  No.  Understandable.
5        Are you saying it was like a
6 memorial card from a funeral that you saw?
7    A.  Like memorial card, right, yeah.
8    Q.  Did you see any other photos?
9    MS. BONJEAN:  Pontiac.
10   THE WITNESS:  Pontiac photo, yeah.  So photo
11 from prison.
12 BY MR. BRUEGGEN:
13   Q.  And, Mr. Maysonet, just to let you
14 know, I know your attorney's sitting next to you
15 and it seems at times you're trying to ask her to
16 help you, but, again, she's not supposed to tell
17 you any answers or anything.
18       Just do the best you can.  Whatever
19 you remember.  Okay, sir?
20   MS. BONJEAN:  Yeah.  And if you don't
21 remember or you don't know, tell him you don't
22 remember and you don't know.
23   THE WITNESS:  The name, or the name, I
24 don't --

Page 15

1    MS. BONJEAN:  Yeah.
2    THE WITNESS:  -- remember some name, yeah.
3 And, you know, like this -- you know, what is the
4 name of this or that.  I mean ...
5 BY MR. BRUEGGEN:
6    Q.  Mr. Maysonet, can you tell us where you
7 currently live?
8    A.  I live with -- I live with my mom.
9 ███████████████.
10   Q.  And is that a house or an apartment?
11   A.  It is an apartment.
12   Q.  Does your mom live in the same
13 apartment as you?
14   A.  Yes.  She -- she ...
15   Q.  Are there other apartments in the
16 building?
17   A.  Just the second floor.
18   Q.  Do you live on the second floor with
19 your mom?
20   A.  No.  I live in the first floor with my
21 mom.
22   Q.  Who lives on the second floor?
23   A.  My sister.
24   Q.  And does anybody live in the basement

Page 16

1 of that apartment?
2    A.  Only thing in the basement, I'm a DJ.
3 I be, you know, playing music and stuff, just like
4 a caveman.  Sorry.
5    Q.  No.  I appreciate that.
6        So is your bedroom in the basement?
7    A.  It's -- it's like a small studio, you
8 know, like a small recording studio.  I make music.
9    Q.  Okay.
10   A.  Just a hobby; just a hobby.
11   Q.  Understandable.
12       So you said you're a DJ.  So you
13 have DJ equipment in the basement?
14   A.  Yes, I do.
15   Q.  And you said you have a small studio in
16 there.
17   A.  Yes.
18   Q.  Is that soundproofed or anything?
19   A.  It's a cheap one, not, you know, for --
20 it is a good one, though, but it's cheap, though,
21 yes.  Maybe one day I get a nice one.
22   Q.  How long have you been doing DJ stuff?
23   A.  I've been doing DJ, actually, since
24 I've been a kid, though, for now since -- well, I

Page 17

1 know you know that I've been out of prison not long
2 ago, so I kind of pick up where I left, you know,
3 when I was young when I went to prison, though.
4        So basically I learning a lot about
5 the technology.  That's what amazing me about the
6 technologies of everything, you know, that they
7 talk about like 20-something years ago, it is true
8 now, you know.  So that's basically -- you know.
9 Music is my thing, make it possible you make your
10 own music now.  You don't have to go to one of
11 those big, expensive studios stuff.  You can create
12 stuff, basically, though.  I love it.
13   Q.  So do you have a computer you use as a
14 DJ to make music?
15   A.  I got two computer, you know.  It's --
16 I mean, I'm sorry I get so excited about something
17 that, you know, for year I want, you know, touch
18 and feel.  But yeah, I do.  I do got two computer.
19   Q.  Do you also have any musical
20 instruments?
21   A.  I do got a keyboard.
22   Q.  So where is your bedroom in the
23 apartment building that you're in?
24   A.  The bedroom in my house is next to my

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 18..21

Page 18

1  mom, next -- in between the shower and my mother's
2  bedroom.
3      Q.   So it's on the first floor of the --
4      A.   Yes, sir.
5      Q.   You said your sister lives on the
6  second floor of the apartment building, right?
7      A.   Correct.
8      Q.   Who does your sister live with?
9      A.   My sister live with two of her kid, her
10  daughter and her baby boy.
11      Q.   How long have you lived in the
12  apartment with your mother.
13      A.   Since I been out of prison.
14      Q.   Does anybody else live in that building
15  other than your sister and her children and you and
16  your mother?
17      A.   My dog, if you want.
18      Q.   Is it your dog, sir?
19      A.   Yeah.
20      Q.   What kind of dog?
21      A.   It just -- it's a mix, half pit bull
22  and half Shih Tzu.
23      Q.   What about a gentleman by the name of
24  Rafael, does he live in that building?

Page 19

1      A.   Yes. That's my stepdad.
2      Q.   And your stepdad Rafael, where does he
3  live in the apartment building?
4      A.   He live -- he live with my mom too. We
5  live in the first floor.
6      Q.   Does he have his own bedroom on the
7  first floor?
8      A.   No. He -- he got -- he got his own
9  bedroom with my mom.
10      Q.   Okay. I understand.
11           Are you currently employed,
12  Mr. Maysonet?
13      A.   I work now.
14      Q.   Where do you work?
15      A.   I work with the Voyant Company.
16      Q.   I'm sorry. Can you say that name
17  again?
18      A.   Voyant Company. I'll show you the name
19  right now, if you give me a moment. Let me just
20  look for it.
21      Q.   Yeah. And why don't you hand it to
22  your attorney and perhaps she can maybe spell it
23  for the record.
24      MS. BONJEAN: Oh, it's that one?

Page 20

1      THE WITNESS: No. That is my other one. No
2  that's -- that's my key.
3      MS. BONJEAN: That's your key?
4      THE WITNESS: Yeah. It doesn't have the
5  name, Voyant.
6      MS. BONJEAN: Okay. It just has -- just so
7  you know, on the card it just says Ceridian
8  Dayforce. I don't know what he's saying in
9  terms -- why don't -- can you spell it?
10      THE WITNESS: It is Ceridian,
11  C-e-r-i-d-i-a-n, Dayforce.
12      MS. BONJEAN: Yeah.
13      THE WITNESS: But it is a key. This just --
14  this just for the -- my -- to punch my -- my
15  punching card. I left my ID in the house. I'm
16  sorry, though. I just ...
17  BY MR. BRUEGGEN:
18      Q.   Not a problem, Mr. Maysonet.
19           Can you spell the name of your
20  company?
21      A.   The Voyant is with a V-o-y-a-n-t, I
22  believe. Basically it's Johnson & Johnson, though,
23  you know, just one of -- I work with the Johnson &
24  Johnson, but the name of the company is Voyant,

Page 21

1  though.
2      Q.   And what does the company Voyant do for
3  Johnson & Johnson?
4      THE WITNESS: I can talk about that?
5      MS. BONJEAN: Yeah.
6      THE WITNESS: No, but I don't want no problem
7  with the company.
8           It's just -- they make like some
9  lotions, hand sanitizer. They make a number of
10  cosmetics. Let's put it like that, you know.
11  BY MR. BRUEGGEN:
12      Q.   So are you working at a manufacturing
13  facility?
14      A.   Yes. It's just like a plant, yeah.
15      Q.   What is your position with Voyant?
16      A.   My position in Voyant is sanitizer.
17  I'm -- I'm the type of person that I, you know,
18  take thing apart and put them back together again
19  and make sure they, you know, got their seal.
20  Anything broke, I make sure they, you know, get
21  change, and maintenance, though, you know.
22  Basically, though, got to be sanitized, though, you
23  know. They don't want no product mix with another
24  one when they get -- go through the process of

Urlaub Bowen & Associates, Inc.   312-781-9586

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 22..25

Page 22

1 bagging it up or whatever.

2    **Q.    So you sanitize the equipment after**
3 **it's been used to manufacture?**

4    A.   Yes.  That's what I do.

5    **Q.    So do you have mechanical skills where**
6 **you have to take the equipment part to sanitize it?**

7    A.   Well, it's -- everything so basic.  I
8 mean, I'm pretty sure probably a 15-year-old kid
9 could take the machine apart and put it back
10 together again.  It's just working with chemical is
11 the difficult part.  It's a -- it's a long process,
12 though.

13          So like, for instance, like
14 yesterday when I was working yesterday, we had
15 these machines, they -- they need a critical.  So
16 they got two step.  You got number one critical and
17 you got number two critical.  The number two is
18 super critical, meaning you got to take things
19 apart.  And it take about eight hours, the whole
20 process take the whole eight hour and -- and you
21 got someone there, you know, with -- supervising.
22 Every step that you do, you do it by the book.  If
23 not, you know, you be in trouble.

24    **Q.    How long have you been working for**

Page 23

1 **Voyant?**

2    A.   Not -- I been working for Voyant for
3 like almost a month now or five weeks.

4    **Q.    What are your usual hours of work for**
5 **Voyant?**

6    A.   From 5:00 o'clock in the morning to
7 3:30 in the afternoon.

8    **Q.    Do you work with other people who are**
9 **sanitizers who are doing the same stuff as you?**

10    A.   Yes, I do.

11    **Q.    When you sanitize the equipment, do you**
12 **work as a team, like with someone else who's also**
13 **helping take the machine apart and sanitize it?**

14    A.   It depend.  If -- if we pretty much
15 busy, you know, you be pretty much by your own,
16 though.  Just the paperwork, you need verification,
17 so that's basically when you need someone to sign
18 the paper and make sure that everything you do,
19 step by step, is what you do.

20          Other than that, you know, you
21 pretty much -- you're on your own, though.  Unless
22 there's not too many work to do, someone might give
23 you a hand.  So yeah.

24    **Q.    And can you tell us what your hourly**

Page 24

1 **wage is there?**

2    A.   I get paid out $18.50.

3    MS. BONJEAN:  An hour.

4    THE WITNESS:  Yeah, an hour.

5 BY MR. BRUEGGEN:

6    **Q.    Do you receive any benefits?**

7    A.   Yeah.  We get, you know, like vacation.
8 We get like insurance, stuff like that.

9    **Q.    You have health insurance through**
10 **Voyant?**

11    A.   Yes.  Through Voyant, yes.  Well, I
12 ain't got mine yet, though, but yeah, they do give
13 you that, though, you know.  They give you bonuses
14 too every month.  Depend how you do.  Depending on
15 the company doing great, you know, you get what --
16 what they give you, though, you know.  They very
17 kind and generous people.

18    **Q.    And so you have the opportunity to get**
19 **health insurance after you've been there a certain**
20 **time.  Is that your understanding?**

21    A.   Well, I haven't got my insurance to
22 done yet, though, but I'm getting ready to -- to
23 have it, though.  I just -- I've been new in there,
24 you know.  It's a lot of things that I haven't done

Page 25

1 yet, though, you know.  Kind of far for me, you
2 know.  I don't travel that far distance.
3 Everything that I do, you know, is on my own and
4 sometimes I get lost.

5    **Q.    Where is your -- where is Voyant**
6 **located where you work?**

7    A.   Voyant located on 53 -- I got -- can I
8 see my phone so I can him the show address?  I can
9 check my address and --

10    **Q.    And, Mr. Maysonet, you can just give me**
11 **a general idea.  You can tell me cross streets.**
12 **You don't have to give me the exact address.**

13    A.   It's in -- It's in County, County Side,
14 Illinois.

15    **Q.    How do you get to work at Voyant?**

16    A.   I got -- I got my vehicle, though.  I
17 got -- I got a car.

18    **Q.    You drive to work?**

19    A.   Yes, I do.

20    **Q.    And going back to the -- the building**
21 **where you currently live, do you know who owns that**
22 **building?**

23    A.   My parents.

24    **Q.    So your mother and your stepfather own**

Page 26

1 the building?

2    A.   Actually, yeah.  My -- my mom and my

3 dad, yeah.

4    **Q.   Does your mom make you pay rent?**

5    A.   Not yet.  Kind of glad, though,

6 but -- you know, I guess have to start learning how

7 to be responsible.  I thought I'm going to get away

8 for it forever, though, but I don't know.

9    **Q.   Mr. Maysonet, do you have a girlfriend**

10 **or a significant other at the present time?**

11   A.   Not now.

12   **Q.   Have you had a girlfriend -- since**

13 **you've been released from prison, did you have a**

14 **girlfriend?**

15   A.   Yes, I did.

16   **Q.   More than one?**

17   A.   Plenty.

18   **Q.   Did you say 20 or plenty?**

19   A.   Plenty, plenty.

20   **Q.   Plenty.**

21        **So --**

22   A.   Enough -- enough -- enough, you know,

23 to make me forget a lot of things from the past.

24 Let's put it like that.

Page 27

1    **Q.   So you've had -- when you say "plenty,"**

2 **is it more than ten girlfriends you've had since**

3 **being out or --**

4    A.   I don't -- I don't want to excited

5 myself, but I did have plenty, though, you know,

6 just ...

7    **Q.   And, Mr. Maysonet, what I'm looking for**

8 **is, you know, a girlfriend relationship where**

9 **you're, you know, kind of in a relationship as**

10 **opposed to just someone that maybe you spend time**

11 **with.**

12   A.   Someone seriously?

13   **Q.   Yes, yes.**

14   A.   Yes, I did.  I did have someone

15 serious, though.

16   **Q.   And was it just one serious**

17 **relationship or --**

18   A.   Yes.

19   **Q.   -- multiple?**

20   A.   No, no, no, no.  One.

21   **Q.   So one serious relationship and then**

22 **plenty of other relationships?**

23   A.   Exactly.  How you -- yeah.  How you ...

24   **Q.   Mr. Maysonet, can you tell me who your**

Page 28

1 closest friends are now?

2    A.   My closest friend right now is my own

3 shadow.

4    **Q.   You say your shadow?**

5    A.   My shadow, yes.

6    **Q.   Do you have any friends?**

7    A.   No, I don't.

8    **Q.   Do you spend time with anybody outside**

9 **of work?**

10   A.   Yeah.  I spend time with my dog most of

11 the times, the only one who can listen to me,

12 though.

13   **Q.   What types of things do you do with**

14 **your dog outside of work?**

15   A.   Well, we walk.  We walk around, you

16 know.  I -- I spend -- I think I spend more time

17 with him than what I spend, you know, actually with

18 anybody.  You know, the dog is so very obedient,

19 though, that everything that I taught him he do.

20        So I don't know if you want to,

21 don't believe me.  If you say something bad to me

22 and I tell somebody, Hey, don't talk to me, you

23 know.  I don't know if these people believe me,

24 though, but yeah, it's just -- it's a wonderful

Page 29

1 relationship that I got with him.

2    **Q.   Are there any people that -- you know,**

3 **setting aside your girlfriends or, you know, those**

4 **types of relationships, are there any people that**

5 **you spend time with where you go have dinner with**

6 **them or go grab a drink with them or go to the park**

7 **with them?**

8    A.   No.  I really don't -- I really don't

9 go nowhere with nowhere.  I don't even -- I don't

10 even go to restaurant.  I don't -- I don't even

11 drink.  I mean ...

12   **Q.   Can you tell me what you do with your**

13 **free time, what hobbies you have?  You've mentioned**

14 **DJing and you've mentioned your dog.  Can you tell**

15 **us some other stuff?**

16   A.   I fixing stuff around the house, you

17 know.  If anything basically that I can put my

18 hands on, I will fix, though.  If I can save some

19 money for the family, I will.

20        But other than DJ, making music, you

21 know.  That's it.

22   **Q.   What about do you like going on bike**

23 **rides.**

24   A.   Sometime I do.  I haven't been on bike

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 30..33

Page 30

1 since -- that I bought my car, though, but yeah.
2 Sometime I do, yeah.
3      Q.   And what kind of bike was that?  Was
4 that a bike like that you would ride on trails or
5 was it like a bike for on the roads?
6      A.   No.  It's -- it just -- it just a -- I
7 had a -- I had a bike.  I had a big bike,
8 supersport bike.  Basically I just sold it, though
9 not long ago.  Big bike, you know what I mean,
10 Suzuki.
11      Q.   Did you say Suzuki?
12      A.   Suzuki, yeah.
13      Q.   And so was that a bike like a
14 motorcycle?
15      A.   Yeah.  It's a motorcycle.  Right,
16 motorcycle?  Yeah.
17      Q.   How long did you have your motorcycle?
18      A.   Oh, I have that motorcycle since --
19 wow, since '88, I believe.
20      Q.   So after you recently acquired a car,
21 you got rid of the motorcycle?
22      A.   Well, I get rid of the motorcycle
23 before I fall for it.  It -- it'll be long time
24 that I haven't drove motorcycle and after that

Page 31

1 couldn't and I fall, so I decide to sell it and get
2 something more safe for me.  I'm old.  I'm an old
3 guy.  I'm not young like I used to be.  Even though
4 I seem like I'm young, though, but I'm not, you
5 know.
6      Q.   And any other hobbies, like gardening
7 or cooking?
8      A.   Gardening, pretty much.
9      Q.   Do you have a garden in your backyard?
10      A.   Yeah.  We got two.  We -- we got two of
11 them.  We got a vegetable garden and then a garden
12 with flowers and stuff, roses.  Nothing now yet
13 because just -- winter just went by a couple --
14 getting prepped.
15      Q.   Any other things you do with your free
16 time other than the DJing, playing with your dog,
17 or gardening?
18      A.   No.  That's about it.  That's about it.
19      Q.   Do you play any sports or any
20 activities?
21      A.   No.
22      Q.   Mr. Maysonet, are you receiving any
23 medical treatment at this time?
24      A.   No.

Page 32

1      Q.   Are you receiving any mental health
2 treatment on an ongoing basis at this time?
3      A.   No.
4      Q.   And, Mr. Maysonet, to move things
5 along, I'm just going to tell you, our
6 understanding is that you were born in the United
7 States and then moved to Puerto Rico for part of
8 your childhood; is that right?
9      A.   Yeah.
10      Q.   How old were you when you moved to
11 Puerto Rico?
12      A.   I was -- I was very young.  Been a long
13 time and I was very young.
14      Q.   In Puerto Rico, who did you live with?
15      A.   With my mom.  I live with my mom next
16 to my grandma.  My mother's mother, that is.
17      Q.   Did you live with your siblings?
18      A.   Yes, I did.  With my brother and my
19 sister.
20      Q.   Your brother is Jose Antonio?
21      A.   Antonio.
22      Q.   And your sister Rose?
23      A.   Rose.  Take the R and put a J, what it
24 sound like?  We all got the same name, basically.

Page 33

1      Q.   Fair enough.
2           Your brother, Jose Antonio, what is
3 his age relation to you?
4      A.   We -- we -- we're close brothers, yeah.
5      Q.   He is about a year younger than you?
6      A.   A year younger than me.
7      Q.   What about Rose?  What's her age in
8 relation to yours?
9      A.   I really -- I know she probably --
10 well, I don't remember her age exactly.  I don't --
11 really don't want to say an age, though.  If you
12 see her, she look real young, but she's probably
13 her late 40s, though, I believe.
14      Q.   Is she about four years younger than
15 you?
16      A.   I don't want to lie, though, but it
17 could be.
18      Q.   You said you lived at a house next to
19 your grandmother's house in Puerto Rico?
20      A.   Yes.
21      Q.   What was your grandmother like?
22      A.   Oh, she was real tough.  She was -- she
23 was a librarian, as I remember, and a walking
24 library.  Anything that you want to know, you ask

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 34..37

Page 34

1  her, she will tell you the answer.  You can go and
2  look in a dictionary, an encyclopedia and she --
3  you know, she was right.  Very good woman, though.
4  She still alive, though.  She almost a hundred
5  years old.
6      Q.  So your grandmother's still alive,
7  living in Puerto Rico?
8      A.  No.  She -- she -- she -- actually she
9  just visit in Connecticut.  Yeah.  She just -- she
10 in United States right now.  She just came and
11 visit.
12     Q.  Mr. Maysonet, do you remember how long
13 you lived in Puerto Rico?
14     A.  For -- I live for quite a while.  It
15 was going back and forth, back and forth, you know.
16 We -- when I was young, you know, we
17 just -- summer, when school vacation come, I go --
18 we go back -- I go back to Puerto Rico and come
19 back, you know, just for a little bit, and travel
20 back and forth.
21     Q.  So after moving to Puerto Rico when you
22 were very young, did you and your family come back
23 to the United States?
24     A.  Yeah.

Page 35

1      Q.  Do you remember what age you were when
2  your family and you moved back to the United
3  States?
4      A.  No, I don't.  I don't remember.  I was
5  just young.  We were young.
6      Q.  While you were in Puerto Rico, did you
7  go to school?
8      A.  I went to school Puerto Rico when --
9  when I first came over there, though, yeah.
10     Q.  When you came back from Puerto Rico to
11 the United States, did you go to school in the
12 United States?
13     A.  I also did, yeah.
14     Q.  Do you remember what grade you were in
15 or what school you were at when you came back to
16 the United States to live here from Puerto Rico?
17     A.  I was elementary school.  I say it
18 right, elementary school?  Elementary school.
19     Q.  "Eleventary" or secondary?
20     A.  No, no.  What they call that?
21 Elementary.  I was just in --
22     MS. BONJEAN:  Elementary.
23     THE WITNESS:  Elementary.  Yeah.  Sorry,
24 sorry, sorry, though.

Page 36

1  BY MR. BRUEGGEN:
2      Q.  Not a problem, sir.  You're doing
3  great.
4      A.  I'm not perfect.
5      Q.  Not a problem.  None of us are.  But
6  you're doing great, so ...
7          You came back when you were in
8  elementary school in the United States?
9      A.  Yes, that correct.
10     Q.  Where did you guys move when you came
11 back to the United States?
12     A.  We were living on Kedzie and North
13 Avenue, 1530 North Kedzie.
14     Q.  Did you complete elementary school in
15 the United States?
16     A.  No.
17     Q.  What happened -- or strike that.
18          Did you drop out of elementary
19 school?
20     A.  No, not really.  I quit.
21     Q.  How old were you when you quit school?
22     A.  I was young.  I was very young.
23     Q.  Were you under 12?
24     A.  Somewhere around there maybe.

Page 37

1      Q.  When you came back to the United States
2  to live here, do you recall if you were older than
3  16 or younger than 16?
4      A.  I was young.  I was very young.
5      Q.  Do you know why you came back to the
6  United States from Puerto Rico?
7      A.  Well, we went -- everywhere that mom
8  go, we got to go, you know.  Just a psychological
9  thing though, you know.  If she said we going here,
10 that's where we go, there.  Whether you don't like
11 it, you -- she going to drag you and take you there
12 with you.
13     Q.  Understandable.
14          Do you recall --
15     A.  Didn't have a choice.
16     Q.  I'm sorry, sir.
17     A.  I didn't have no choice.  I'm sorry.
18     Q.  Understandable.  You know, your parents
19 tell you where to go, you go.  So ...
20          So do you recall going to a junior
21 high school in the Chicagoland area?
22     A.  Yeah.  I did -- I did went back to
23 school when I was young, and basically I -- somehow
24 I made it to high school and quit again.  I was a

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 38

1 dropout.

2    Q.   So you went back and you did junior
3 high school at some point?

4    A.   At some point.

5    Q.   Do you remember when that was?

6    A.   That was long time ago, long time ago.

7    Q.   And when I say "when," you can tell me
8 how old you were or what year it was, if you have a
9 recollection.

10    A.   Probably early '80s.  Yeah.  '80s.
11 MTV, all that stuff coming out.  Earlier '80s,
12 yeah.

13    Q.   In junior high were your classes in
14 English?

15    A.   Bilingual.  Spanish, English.  I only
16 had two English class, though, you know.  Most of
17 them, they were all Spanish.

18    Q.   So you had mostly Spanish classes, but
19 you also had English classes?

20    A.   Yeah.  Two -- two period.

21    Q.   And were you learning to speak English
22 in those English classes?

23    A.   I was hardheaded.  I -- I won't lie to
24 you.  School was never -- it was never my type, my

Page 39

1 cup of -- my cup of coffee, though.

2    Q.   Ultimately you graduated from junior
3 high and made it to high school?

4    A.   No.  I did -- I graduate from junior
5 high.  I went to high school, but then I drop --
6 drop out.

7    Q.   Do you know how many years you were in
8 high school before you dropped out?

9    A.   It was second year of high school that
10 I was a dropout.

11    Q.   While you were in high school, did you
12 take any classes in English?

13    A.   Only -- the only classes that I had in
14 English, it was two classes of English, first
15 period and second period.  That's about it.

16    Q.   How old were you when you dropped out
17 of high school?

18    A.   Oh, I was in my teens.  Yeah, I was
19 young.

20    Q.   Can you give us a general idea?  Before
21 you were arrested for the case we're going to talk
22 about today, do you remember how many years prior
23 to that you had dropped out of high school?

24    A.   I -- I cannot even remember, but it was

Page 40

1 long time ago.  That's -- that's what I can say,
2 though, long time ago.

3    Q.   While you were in high school, did you
4 participate in any extracurricular activities or
5 any activities through the school?

6    A.   Yeah.  When I was in high school, I
7 was -- I joined the band, the high school band.

8    Q.   Was there a particular instrument that
9 you played?

10    A.   The trombone.

11    Q.   When did you start playing the
12 trombone?

13    A.   Oh, as soon as -- as soon as one come
14 get into my hand, that's when I -- that nice
15 instrument.  I remember back in the day when -- you
16 know, when music used to be music.  There was this
17 guy name Willie Colón, very good trombonist,
18 though, you know, and everybody would love one day
19 to play music just like him.

20       So it happened that I had one in my
21 hands, so I grabbed the chance.  I just started
22 playing.  So the teacher said, Man, you like -- you
23 natural.  So the rest was history.

24    Q.   So did you take band class in high

Page 41

1 school or --

2    A.   Yes, I did, band class.

3    Q.   And you learned the notes and how to
4 play the trombone?

5    A.   Little bit.  That's what good about the
6 technology now.  You don't need to know that --
7 none of that, though.  I mean, the computer do most
8 of the work for you.  The only thing you have to do
9 is just add a rhythm.  That's it.

10    Q.   Mr. Maysonet, can you tell us why you
11 dropped out of high school?

12    A.   I guess, you know, doing the easy life.
13 I took the route, the easy life.

14    Q.   What do you mean by you "took the easy
15 life"?

16    A.   Just, you know, back in the day, it was
17 hard to work.  It was hard to -- you know, to go
18 and sell the newspaper.  I did sell the newspaper
19 one point, but there were all those -- all those
20 stuff that was more interesting, though, you know.
21 They attract me more, though.

22    Q.   So did you drop out of high school to
23 get a job?

24    A.   Yeah, basically.

Page 42

1    Q.   What job did you get when you dropped
2  out of high school?
3    A.   I was selling the newspaper and buffing
4  shoes.
5    Q.   When you say selling newspaper, were
6  you selling it on the street or were you delivering
7  papers?
8    A.   No.  Selling in the street.
9    Q.   You said you also shined shoes?
10   A.   Yes, I did.
11   Q.   Where did you -- where did you shine
12 shoes?
13   A.   Right there on the -- on right corner
14 of Federal Building on Randolph.
15   Q.   When you were selling the newspaper,
16 did you work for a company or were you working for
17 yourself?
18   A.   I was just working for myself.
19   Q.   Do you remember how old you were when
20 you were selling the newspaper?
21   A.   I was young, really young.
22   Q.   Under 18?
23   A.   That was right probably after - right
24 after I drop off from high school.

Page 43

1    Q.   Where would you sell newspapers?
2    A.   Right on -- on Randolph and -- right in
3  front of the Federal Building.  Or the Daley Plaza.
4    Q.   Were you also shining shoes at the same
5  time you were selling newspapers?
6    A.   Yes, I did.  Yeah.
7    Q.   And for shining shoes, did you have
8  like a shoeshine kit?
9    A.   I had a wooden box.  Yes, I did.
10   Q.   Did you have a chair or something that
11 the customers could sit in?
12   A.   Yeah.  I had a little chair, yeah.
13   Q.   So would you travel from your house in
14 Humboldt Park downtown to then set up to shine
15 shoes?
16   A.   Yes.  In the morning, yeah.
17   Q.   How long did you sell newspapers over
18 there by the federal building?
19   A.   Just in the morning.  Basically that's
20 when you do most of your, you know, newspaper
21 sales, though, you know.
22   Q.   And how many years were you selling
23 newspapers?  Did you do that for many years?
24   A.   Not for long I didn't.  I mean, after

Page 44

1  so long, you get tired doing it and you move on to
2  go do other -- other stuff.
3    Q.   What about with shining shoes, was that
4  at the same time as selling newspapers?
5    A.   Yeah, same.  The -- the newspaper and
6  shining shoes are the same time.
7    Q.   So after you stopped selling newspapers
8  and shining shoes, did you find a new job?
9    A.   No, no.
10   Q.   While you were in high school, what did
11 you do with your free time when you weren't in
12 school?
13   A.   Sell drugs.
14   Q.   Did you -- did you say sell drugs?
15   A.   Yes, I did.
16   Q.   When did you start selling drugs?
17   A.   Once that I stopped selling shoes -- I
18 mean, buffing shoes and selling newspaper.
19   Q.   Did you do anything else in your free
20 time and -- and now let's go back to when you were
21 in high school.
22   A.   No.
23   Q.   You -- obviously you said you were in
24 the band, right?

Page 45

1    A.   Yeah.
2    Q.   Any other activities you would do in
3  your free time?  Did you play any sports, go play
4  soccer or basketball in the parks?
5    A.   Most of the time back in the day, just
6  the music, the music.  That's basically what I --
7  what I liked, you know.  I come from a musician
8  family background.  My grandpa, he was a musician
9  himself, though.  And when I was in Puerto Rico, I
10 learned a lot from him.  He used to play guitar.
11   Q.   While you were in high school, going to
12 high school, did you hang out with your brother?
13   A.   With my -- with my real brother, yes.
14 Yes, I did.
15   Q.   What would you and your brother do
16 while you were in high school?
17   A.   Just hanging around and talking, you
18 know.  See what happen in the day, you know,
19 talking about girl.  You know, just normal -- what
20 normal brothers do, you know, when they go to high
21 school.
22   Q.   After you dropped out of high school,
23 did you continue to hang out with your brother?
24   A.   No.  My -- my mom got to the point that

Page 46

1  she kind of -- you know, she kind of thought, you
2  know, that I was the black sheep and, you know, he
3  didn't want him -- you know, me influencing him and
4  stuff, you know, how are you to do and, you know,
5  obeying her and stuff like that.  I mean, I'm not
6  going to say -- I was not an angel, though, you
7  know, I mean, you know, growing up, though.  So,
8  yes.  Took the easy route, I guess.
9      Q.   So did you say your mom saw that you
10  were the -- the black sheep; is that what you said?
11     A.   Yeah.  I mean, what --
12     Q.   You were --
13     A.   -- parent don't know -- what parent
14  don't know his kid, though, you know.  So ...
15     Q.   So did your -- is it your understanding
16  that your mom believed you were a bad influence on
17  your brother?
18     A.   She didn't want me to, you know.
19  She -- she kind of knew that I started turning out,
20  you know, bad, though, you know.  And that's how I
21  be in Puerto Rico so many times away from
22  everybody, though, you know.  So, I mean, that was
23  the punishment.
24     Q.   What was the punishment, sir?

Page 47

1      A.   Sending back to Puerto Rico with --
2  with grandma.
3      Q.   So your -- your mom would send you back
4  to Puerto Rico for how long of a time?
5      A.   Just to they know that I -- I was okay
6  to come back again, come back again.  And once I
7  start acting bad again, she just send me back to
8  Puerto Rico again.
9      Q.   What types of things were you doing
10  that resulted in you being sent back to Puerto
11  Rico?
12     A.   Doing bad stuff, just doing bad stuff.
13     Q.   Can you tell me what the bad stuff is?
14     A.   Sure.  Selling drug.  When I got caught
15  selling drug one day, my mom, she just beat the
16  crap out of me.
17          Oh, I'm not supposed to say stuff
18  like that.
19          Anyway, I'm sorry about my language.
20     Q.   It's okay, sir.
21     A.   Yeah.  And she told me -- you know, she
22  told me -- tell me that you found this.  And I told
23  the truth.  I said, No, mom, I'm -- I'm selling
24  this just to make a living for me, though.  And she

Page 48

1  just, Why, you know, I didn't -- I didn't raise you
2  for you to be coming to do this and that or
3  nothing.
4          I really -- I really got it real bad
5  that day.  I be in Puerto Rico almost -- almost a
6  year.  And being with grandma, even though a very
7  lovely grandma, you know -- I'm being realistic,
8  you know.  Being with grandma, grandma give you the
9  punishment, though, you know.  Remember, back in
10  those days not like now.
11          If they all throw rice in the floor
12  and you got to knee down in the floor for an hour,
13  that was a lot, you know, that type of punishment.
14          Just to go to the -- just to go to
15  the -- to the mailbox, she used to spit in the
16  floor.  She used to say, If by the time you go and
17  come back, if that spit right there is dry, you
18  going to get it.  So you have to go.  And then when
19  you start running, No, no run, you just go and walk
20  and come back the same way, make sure that you
21  cross the street the right way, though, you know.
22  But you always seen the -- you know, every time she
23  turn around, poom, then we just run, hurry up
24  before the saliva dry.

Page 49

1      Q.   Okay.  So on one occasion, your mom
2  caught you selling drugs and sent you to go live
3  with your grandmother for a period of time?
4      A.   Yeah.
5      Q.   Do you remember when that was?
6      A.   I was young.  I was -- I was very
7  young.
8      Q.   Was that after you had stopped going to
9  high school?
10     A.   Yeah, yeah.
11     Q.   How long were you in Puerto Rico with
12  your grandmother when your mom sent you there?
13     A.   Like almost a year, something like
14  that.  I can hardly remember, but I know it was for
15  a while, though.
16     Q.   When you went to Puerto Rico to live
17  with your grandmother at that time, what were you
18  doing down in Puerto Rico?
19     A.   They have me -- they have me cleaning
20  the pig, whatever, the cow, whatever, the chicken.
21  I was doing -- you know, I was doing stuff that
22  nobody ever want to do, you know, being a city boy.
23  So I had to be, you know, on the farm with grandpa
24  helping him doing -- just doing the dirty work.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 50..53

Page 50

1    Q.   So that's one time that your mom caught
2 you.
3         Can you tell me what were the other
4 bad things that you were doing that you got
5 punished for by your mom and sent to Puerto Rico?
6    A.   That was it, though, I guess.  I mean,
7 just hanging around and doing, you know, the stuff
8 that I do, you know.  Just anything -- anything
9 that get her mad, though, you know, it just --
10 that's how I get punished.
11   Q.   When did your mother meet Rafael, your
12 stepfather?
13   A.   I was young.  I was real, real young.
14 I was just like right -- right when my mom, I
15 believe, separated from my -- from my real dad.  I
16 know my sister, she was a baby.  She was just like
17 a little tiny thing like that.  It was long, long
18 time ago, yeah.
19   Q.   Did you meet Rafael while you were
20 lived in Puerto Rico with your mom next to your
21 grandmother?
22   A.   Yeah, yeah.
23   Q.   So after you came back to the United
24 States, did Rafael live with you and your mom and

Page 51

1 your brother and sister?
2    A.   Yeah.
3    Q.   Now, you said he's your stepfather, or
4 that's what -- how you refer to him, right?
5    A.   Well, he my stepfather, but, you know,
6 he raised me since he was a kid, so -- but normally
7 most of the people, I say he's my dad, though, just
8 not -- not to give them the whole story.  Oh, yeah,
9 you know, that not my real dad, you know, my --
10 but, you know, I just tell, yeah, he's my dad, yes.
11   Q.   And did he act like your dad and
12 discipline you for stuff?
13   A.   Yes.  Yes, he do.  Yeah.  But he
14 different, though, you know.  He just sit with me
15 and we -- you know, especially now that I'm older,
16 though, you know, we sit and talk, you know, just
17 like two grown men.  Very good man.  He's a good,
18 good man, though, you know, like a father.
19   Q.   When you first dropped out of high
20 school and were selling the newspapers and the --
21 doing shoe shines, did you contribute financially
22 to your household?
23   A.   I was just a kid.  I do what I -- you
24 know, what I could, you know.  I mean, I didn't

Page 52

1 make -- I didn't make much like people do now,
2 though, but I helped whenever I can help, though,
3 basically.
4    Q.   What about when you were selling drugs?
5 Did you contribute some of the money you would earn
6 from selling drugs and give that to your mom to
7 help pay bills?
8    A.   She didn't want to, said dirty money,
9 no good.
10   Q.   Before you dropped out of high school,
11 did you have any close friends while in high
12 school?
13   A.   Just people that you met, you know, in
14 high school, though, you know.  I don't even
15 remember they names of -- you know.  Yeah, they --
16 as a kid, though, you know, you always met people,
17 you know.  I don't go see no like friend or --
18 yeah.  I mean, normal people, school stuff.
19   Q.   So no best friend in high school?
20   A.   No.
21   Q.   Back in the late 1980s, did you have
22 any other family that lived in the Chicagoland
23 area?
24   A.   No, not really.

Page 53

1    Q.   And when you say "not really," what do
2 you mean by not really?
3    A.   Well, we was only -- we just a small
4 family, you know, just my mom, my -- my stepfather,
5 my brother, and sister, though.  So, you know, now
6 everybody got kids now, so the family growing now.
7 So ...
8    Q.   But at the time it was just you, your
9 mother, stepfather, brother, and sister?
10   A.   Yes, yeah.
11   Q.   No aunts or uncles in the Chicagoland
12 area?
13   A.   No.
14   Q.   Back in the late 1980s, did you own a
15 car?
16   A.   Yes, I did.
17   Q.   When did you get your car?
18   A.   It was -- it was -- it was in the '80s
19 when I -- my first car, when I first bought my
20 first car, it was just when I start probably
21 selling the newspaper I bought a car.  I bought a
22 Toyota.  That was my first car, a Toyota.
23   Q.   Do you remember what model it was?
24   A.   It was a Toyota Corolla.

Urlaub Bowen & Associates, Inc.   312-781-9586

JOSE JUAN MAYSONET JR., 04/16/2021      Page 54..57

Page 54

1    Q.   Do you recall how hold you were when

2 you bought that Toyota Corolla?

3    A.   I was -- I was real young. I got --

4 matter of fact, I got myself in trouble for that

5 when my mom -- that I had a car.

6    Q.   How did you get yourself in trouble for

7 that?

8    A.   I was not old enough to drive.

9    Q.   So you bought a car before you were old

10 enough to drive?

11    A.   Yes, I did.

12    Q.   How did you have money to buy a Toyota

13 Corolla?

14    A.   Just selling drugs. So easy to make

15 money back in the day, though, selling drugs.

16    Q.   What drugs were you selling?

17    A.   I was -- I was selling -- I was selling

18 marijuana, though.

19    Q.   Any other drugs that you sold?

20    MS. BONJEAN: Hold on.

21        Objection to the foundation of that

22 question.

23 BY MR. BRUEGGEN:

24    Q.   So, Mr. Maysonet, let me clarify, back

Page 55

1 before -- before you dropped out of high school,

2 were you selling drugs?

3    A.   That's what -- that's basically when --

4 when I started, though, but, you know, I took the

5 newspaper job first and I saw somebody else doing

6 more money than I was making. That's when I said,

7 I'm in the wrong business. I decided to sell drugs

8 after that.

9    Q.   So you did not sell drugs while you

10 were in high school?

11    A.   When I was in high school, I probably

12 did so. I probably did so. That's what started it

13 all.

14    Q.   What color was your Toyota Corolla?

15    A.   It was blue. My favorite color, blue.

16    Q.   Did you have any other cars prior to

17 your arrest in this case?

18    MS. BONJEAN: Wait -- okay. Go ahead. You

19 can answer.

20    THE WITNESS: I had a '75 Super Sport

21 Oldsmobile. I did have a '77 Cadillac Seville.

22 And also I had a motorcycle too; it was a Yamaha.

23 BY MR. BRUEGGEN:

24    Q.   And the '75 Super Sport Oldsmobile,

Page 56

1 what color was that?

2    A.   Green, candy apple green.

3    Q.   Did you own that at the same time as

4 the Toyota Corolla?

5    A.   Yes, I did.

6    Q.   What about the -- you said a '77, was

7 it a Cadillac Seville?

8    A.   A Cadillac Seville.

9    Q.   What color was that?

10    A.   That was red.

11    Q.   Did you own the Cadillac Seville at the

12 same time you owned the Corolla or the Oldsmobile?

13    A.   Yes, I did.

14    Q.   So did you own all three cars at the

15 same time?

16    A.   At the same time.

17    Q.   How did you afford to buy those three

18 cars?

19    A.   Like I said, the drug money back in the

20 day, it was so good. I'm not gonna sit in here and

21 lie to you.

22        It legal now, right, selling drug

23 now?

24    MS. BONJEAN: Marijuana?

Page 57

1    THE WITNESS: Marijuana, yeah. They got

2 store for it.

3 BY MR. BRUEGGEN:

4    Q.   Mr. Maysonet, prior to your arrest in

5 this case, were you a member of any gang?

6    A.   Yes, I did.

7    Q.   What gang were you a member of?

8    A.   Latin King.

9    Q.   How old were you when you joined the

10 Latin Kings?

11    A.   I was very young when I joined the

12 Latin King.

13    Q.   When you say "very young," was it

14 before you started high school?

15    A.   Before I started high school.

16    Q.   Did you have a nickname when you were

17 in the Latin Kings?

18    THE WITNESS: Can I say that?

19    MS. BONJEAN: Yeah, you can tell him.

20    THE WITNESS: Yes.

21 BY MR. BRUEGGEN:

22    Q.   What was your nickname, sir?

23    A.   Double J.

24    Q.   Did you have any other nicknames or

Page 58

1 street names while you were with the Latin Kings?

2    A.   No.

3    **Q.   Did -- how long after you came back to**

4 **the United States from Puerto Rico did you join the**

5 **Latin Kings?**

6    A.   I was real young.  I was -- I probably

7 was still elementary school when I started to join

8 the gang.

9    **Q.   You were in elementary school when you**

10 **joined the gang?**

11    A.   Yeah.  I was real young.

12    **Q.   And the Latin Kings, are they part of**

13 **People or the Folk Nation?**

14    MS. BONJEAN:  You can answer.

15    THE WITNESS:  People.

16 BY MR. BRUEGGEN:

17    **Q.   When you were with the Latin Kings, did**

18 **any -- strike that.**

19        **The Latin Kings had rival gangs; is**

20 **that right?**

21    A.   Um-hmm.

22    **Q.   Yes?**

23    A.   Yes, yes.

24    **Q.   And would you know the nicknames of**

Page 59

1 people in the rival gangs?

2    A.   Knew quite a few, yeah.

3    **Q.   Do you know if any rival gangs had a**

4 **nickname for you?**

5    A.   No.  They -- everybody know me --

6 everybody know me by that name, Double J.

7    **Q.   Were you ever called King Leo?**

8    A.   No.

9    **Q.   Do you know if any other gang referred**

10 **to you as King Leo?**

11    A.   No.

12    **Q.   Now, with the Latin Kings, were there**

13 **multiple sets of Latin Kings in the Chicagoland**

14 **area?**

15    A.   Yes.

16    **Q.   And can you tell us what a set is?**

17    THE WITNESS:  Can I say that?

18    MS. BONJEAN:  Yeah, go ahead.  You can answer

19 that.

20    THE WITNESS:  I don't want to get myself in

21 trouble, though.

22        A set, a set is where a body or

23 number of people will take control.  And if you

24 want to hang out by some corner in the street, and

Page 60

1 depending how long and the number of people that

2 you got, the -- if you selling drugs or whatever,

3 you just can -- you claim that as your corner,

4 nobody else can mess with it, though, you know.  We

5 all follow the Latin King Nation, you know.  We all

6 can say something, though, you know.  It's always,

7 you know, when you sell drugs, you know, you always

8 got to -- that's how we are fearful for the gang,

9 you know.  We call it a -- you know, the bank, the

10 financial bank, so.  We could sell anywhere,

11 you know, as long as you a Latin King in the

12 neighborhood, yeah.

13 BY MR. BRUEGGEN:

14    **Q.   So were -- were sets known kind of**

15 **geographically either by a street corner or by**

16 **cross streets?**

17    A.   Street corner, yeah.

18    **Q.   In the Chicagoland area, was there any**

19 **type of leadership in the Latin Kings above all the**

20 **sets?**

21    THE WITNESS:  Answer that?

22    MS. BONJEAN:  Yeah.

23    THE WITNESS:  Yeah.

24

Page 61

1 BY MR. BRUEGGEN:

2    **Q.   And do you know how that leadership was**

3 **structured in the Latin Kings in the late 1980s?**

4    A.   Yeah.  I guess from the chief, from --

5 from the right-hand man for the chief, enforcer, to

6 the treasurer -- the treasurer person.

7    THE COURT REPORTER:  I'm sorry.  The what

8 person?

9    THE WITNESS:  The treasurer.

10    THE COURT REPORTER:  Thank you.

11 BY MR. BRUEGGEN:

12    **Q.   The treasurer like person who handles**

13 **the money?**

14    A.   Yes.

15    **Q.   And so was the -- the chief and the**

16 **enforcer and the treasurer, were they above all the**

17 **sets in the Humboldt Park neighborhood?**

18    A.   Yes.

19    **Q.   Were you in a specific set of Latin**

20 **Kings?**

21    A.   I was.  I was.

22    **Q.   And what was your set or how would you**

23 **identify that set?**

24    A.   Kimball and Wabansia.

JOSE JUAN MAYSONET JR., 04/16/2021                          Page 62..65

Page 62

1     Q.   Wabansia and Kimball?
2     A.   Yeah.  Or Kimball and Wabansia we
3 prefer it back then, KW.
4     Q.   And were you in the same set when you
5 were in the Latin Kings the entire time you were in
6 there?
7     A.   Say that question again.  Sorry.
8     Q.   And so maybe I should start back with
9 did Latin Kings, would they change sets?
10     MS. BONJEAN:  Objection.  I'm sorry.
11 Objection to form, foundation of that question.
12         If you understand the question, you
13 can answer.  If you don't, tell him you don't
14 understand it.
15     THE WITNESS:  Can you be more specific,
16 though, so I can ...
17 BY MR. BRUEGGEN:
18     Q.   Yeah.  And what I'm asking is, you
19 know, you said you were in the set at Kimball and
20 Wabansia.  Could you switch and be at a set at a
21 different, you know, corner if you wanted to go
22 hang out with different guys?
23     A.   Oh, yeah, you could.  Yeah, you could.
24     Q.   So did you ever --

Page 63

1     A.   If you have approval, only if you have
2 approval.
3     Q.   Okay.  Did you ever switch sets or were
4 you always with Kimball and Wabansia?
5     A.   Never.
6     Q.   You never switched sets?
7     A.   Never.
8     Q.   And I think you explained when you were
9 explaining a set, they would control a certain
10 corner?
11     A.   Yeah.
12     Q.   And was there a corner that they could
13 sell drugs from?
14     A.   Yes.
15     Q.   Did they control a larger area, you
16 know, that people weren't supposed to sell drugs
17 anywhere close to that?
18     MS. BONJEAN:  Objection; form, foundation.
19         Go ahead.  If you understand, go
20 ahead.
21     THE WITNESS:  Once -- once you got that
22 corner, I mean, nobody else from another set from
23 Latin King that can come in there and -- and deal.
24 No, you can't.  You got to respect it, though, you

Page 64

1 know, if you do so.
2 BY MR. BRUEGGEN:
3     Q.   And what I'm trying to understand is
4 did you have like a territory beyond that corner
5 that was kind of your territory that you would look
6 out for and protect that nobody could come to that
7 territory to sell drugs?
8     A.   At Kimball and Wabansia, that's
9 basically where we do everything, yeah.  I mean, on
10 that corner there, like I said, nobody could come
11 from nobody -- from all the set and sell drug
12 unless, you know, we give them the okay.
13     Q.   And could somebody sell drugs a block
14 away on another corner?  Was that okay?
15     A.   No.
16     Q.   Why not?
17     A.   Taking our customers away.
18     Q.   So if you're on Kimball and Wabansia,
19 you didn't want other people selling drugs, you
20 know, just a block away on another corner because
21 it'd take your customers away?
22     A.   Yeah.
23     Q.   So how far did your -- you know, and I
24 don't know if you like the word turf or territory,

Page 65

1 expand where if you've got Kimball and Wabansia,
2 how far -- how many blocks away would it go where
3 no one could sell drugs in that area without your
4 permission?
5     A.   It's -- you know, you got to be pretty
6 much, you know, far away where nobody -- where
7 nobody would know.  Basically, though, you know, we
8 didn't -- we didn't want no competition within the
9 same organization, though, basically.  You know,
10 if -- if -- my set, we move Kimball, Wabansia, our
11 territory basically, even from -- from -- I will
12 say from -- from Sawyer all the way to -- all the
13 way to Spaulding, all the way to Wabansia, all the
14 way -- you know.  It's a bigger territory.  As long
15 as nobody can be doing in that geographical area,
16 though, everything was okay.  I mean, it's all
17 about money.
18     Q.   So you -- you had a general area that
19 you controlled and you would sell the drugs on
20 Kimball and Wabansia.  Am I understanding --
21     A.   Yes.
22     Q.   -- you correct?
23         And nobody could come into that
24 general area without your permission, right?

Page 66

1     A.   Well, not with my permission.  With
2 somebody else permission, yeah.
3     Q.   I'm sorry.  Without the -- the set's
4 permission.
5     A.   Exactly.
6     Q.   And did various Latin King sets, you
7 know, kind of have an understanding amongst
8 themselves that that's your territory, this is our
9 territory?
10     A.   That's how it was, you know.  It would
11 be like that.
12     Q.   Was there a leadership structure in
13 your set?
14     A.   Yes.  Yeah, there was.
15     Q.   And what was the leadership structure
16 in there?  What were the leadership roles?
17     A.   Just make sure everything was -- you
18 know, our quality, though, you know, no problem
19 with other -- other Latin King and, you know,
20 everything -- everything had to be cool and, you
21 know, peacefully.  You know, you -- when you deal
22 with -- when people deal with a number of -- of
23 people like that, you know, they solve their
24 problem, you know, they solve with, you know,

Page 67

1 confrontation, you know, especially with money, you
2 know.  But that was then.  I don't know how they do
3 it now.
4     Q.   No.  I understand that, sir.  I'm
5 asking just about your knowledge from back in --
6 and we'll constrain it just to the 1980s, the late
7 1980s.  Okay?
8     A.   Uh-huh.
9     Q.   So at that time -- at the time you
10 joined, do you know who the leader of your set was
11 at Wabansia and Kimball?
12     MS. BONJEAN:  I'm sorry.  At the time he
13 joined in middle school?
14     MR. BRUEGGEN:  Yes.
15     MS. BONJEAN:  Or whenever.  I don't -- I
16 don't want to mischaracterize his testimony.
17     MR. BRUEGGEN:  Yeah.
18     MS. BONJEAN:  So when he was younger.
19     MR. BRUEGGEN:  Yes.  When he first joined,
20 who the leader of the set was.
21     MS. BONJEAN:  Okay.  Object -- I'm going to
22 object to the form of that question.
23          But if you -- if you recall.
24     THE WITNESS:  No.  I don't -- I don't

Page 68

1 remember back then, though, no.
2 BY MR. BRUEGGEN:
3     Q.   Do you remember any of the leaders of
4 the set that you were in in the 1980s?
5     A.   In the 1980s, Macho.
6     Q.   And do you know Macho's real name?
7     THE WITNESS:  Can I say his name?
8     MS. BONJEAN:  Yeah, you can say it.
9     THE WITNESS:  Santiago Sanchez.
10 BY MR. BRUEGGEN:
11     Q.   Do you remember when Santiago Sanchez
12 was the -- the leader of your set?
13     A.   No.
14     MS. BONJEAN:  When you say when he became the
15 leader or like -- I guess I'll object to the form
16 of that question.
17 BY MR. BRUEGGEN:
18     Q.   When he was the leader, any years he
19 was the leader.
20     A.   I say I guess when we opened that set,
21 though, in the '80s, late '80s, yeah.
22     Q.   Can you tell me what you mean when you
23 said we opened that set in the late '80s?
24     A.   Yeah.  That was his -- that was his

Page 69

1 part of his neighborhood he would never touch
2 because the danger that occurring there, though.
3 You got to remember, a block away there was a rival
4 gang and --
5     Q.   Who was the -- sorry.  Go on with your
6 answer, sir.
7     A.   It was a rival gang, you know, the next
8 block.  So -- and back in the day, you know, if you
9 didn't have curfew, somebody from the other side,
10 you know, it was so close, they opposite the
11 borderline, and you could get shot.  So you had a
12 curfew back then.
13     Q.   Who was the rival gang?
14     A.   Insane Gangster, or IG how they know.
15     Q.   Do you know where they were located or
16 what their area was that they controlled?
17     A.   They were controlling on Kimball and
18 Cortland.
19     Q.   So when you say you started the set at
20 Wabansia or where -- when it opened, were you with
21 a group of guys who basically made that corner
22 yours.
23     A.   Yep, um-hmm.
24     Q.   Was that at the time you joined or was

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 70..73

Page 70

1 that after you had been a member for some time?

2    A.   After.

3    Q.   Where was your set when you first

4 joined?

5    A.   Right on Kimball and Wabansia.  That's

6 where -- when -- when I started being a Latin King,

7 I would just a peewee, just -- when you -- when you

8 a shorty, you know, you don't be on no set.  You

9 just everywhere.  You know, you just like being

10 approved by everybody gang, though, you know, or

11 set, should I say, though, you know.

12           Once you reach -- you know, reach

13 certain age, it's up to you where you want to go or

14 where you want to join, though, you know, with

15 somebody approval, though.  So it happened that we

16 open the Kimball and Wabansia.  It was a corner,

17 kind of quiet, though, you know, had perfect for

18 what we wanted it for.

19    Q.   So who else was involved in opening up

20 the corner for your set at Kimball and Wabansia?

21    A.   It was me and 11 other guy.

22    Q.   And was Santiago Sanchez one of those

23 11 other guys?

24    A.   Yes.

Page 71

1    Q.   Who was the leader of the set when that

2 was opened up with and the 11 other guys?

3    A.   Santiago Sanchez.

4    Q.   Do you remember the names of the other

5 guys who opened up that set with you?

6    A.   I don't remember their real name, but I

7 remember, you know, like the street name.

8    Q.   Yeah, if you -- if you can give me the

9 street name and if you remember the real name, tell

10 me both.  I would appreciate that, sir.

11    A.   I do remember some -- some of the

12 nickname.  Like Tank, Peewee, Little D, Baby D,

13 Tino, Ivan.  What did I forgot?  Me, Macho.  I

14 don't know if that got everybody in there, though,

15 but some of them I can remember now.

16    Q.   I understand that.  I'm just asking

17 whatever you can recall.

18    A.   Yeah.

19    MS. BONJEAN:  He answered it.  Go ahead.

20 BY MR. BRUEGGEN:

21    Q.   So Santiago Sanchez was the leader of

22 the set at Wabansia and Kimball?

23    A.   Yes.

24    MS. BONJEAN:  Objection, asked and answered.

Page 72

1 BY MR. BRUEGGEN:

2    Q.   And so what I'm trying to figure out is

3 did the leader of the set have a name?  You would

4 use the word chief earlier for the leader of all

5 Latin Kings.  Was there a name for the leader of

6 this set?

7    A.   You mean the set from Kimball and

8 Wabansia?

9    Q.   Yes.

10    A.   Macho.

11    Q.   Yeah.  Did he have a title?  Was he

12 called like a chief or something like that?

13    A.   We don't call him the chief, though.

14 Everybody know who he is, though, you know, so why

15 refer him to a title, though, you know?

16    Q.   Understand.

17         Was there any other type of

18 leadership structure, like did Santiago have guys

19 that were below him that were above all the other

20 members?

21    A.   Yes.

22    Q.   And who were those guys?

23    A.   Tank is one of them.  And --

24    MS. BONJEAN:  I'm going to object, asked --

Page 73

1 you asked this question, he answered it, but go

2 ahead.  You can ask -- ask it again.

3    THE WITNESS:  The treasurer was Peewee.  The

4 enforcer was Macho.  Macho, you know, he -- that's

5 what I love about him.  He was just very talent

6 person, though, you know.  He -- he didn't need

7 much.  Tough guy.  You know, it was mostly enough

8 to take over anywhere we want.

9         It's how it was back then, though,

10 you know.  I mean, we were cool guys.  We were not

11 bad people, though.  I mean, I don't care what

12 people used to say about us, though.  We never did

13 bad other than sell drugs, that's about it.

14 BY MR. BRUEGGEN:

15    Q.   And so underneath Macho, the next

16 leaders in your set would have been Tank and

17 Peewee?

18    MS. BONJEAN:  I'm going to object to

19 mischaracterization of his testimony.  That --

20    MR. BRUEGGEN:  And that's what I -- I'm not

21 trying to mischaracterize.  I'm just trying to

22 understand.

23 BY MR. BRUEGGEN:

24    Q.   Macho was leader of your set.  We've

Page 74

1 established that. I'm wondering was there somebody
2 who was below him who also had -- was a leadership
3 role other than Macho?
4    A.   No.
5        Q.   Okay. So Macho and then the other
6 ten guys would be below Macho?
7    A.   Yeah.
8        Q.   Did all the guys sell drugs at -- in
9 your set at Wabansia and Kimball?
10    A.   No, not -- not too -- you know, not
11 everybody, not everybody sold drugs, though. Some
12 of them they had jobs. Some of them had real job,
13 though. Believe it or not.
14        Q.   So some guys had real jobs and other
15 guys sold drugs?
16    A.   Yes, yeah. Some of them they went to
17 school too, when we was, you know, hanging around,
18 though, you know. We were not -- we were not bad
19 people, though. I said, though, you know, we were
20 just a bunch of kids and, you know, we just -- we
21 just -- I guess we have -- have the future, though,
22 you know, should we say, though, right? I mean, we
23 were trying to survive.
24        Q.   From the time that you opened up that

Page 75

1 set at Wabansia and Kimball, did you ever have an
2 increase in number of members or did it remain
3 those 11 guys?
4    A.   Yes. We were only 12. That's it. We
5 don't need no more -- we don't need more added,
6 though.
7        Q.   What set -- or what drugs did your set
8 sell?
9    A.   We were selling pretty much, you know,
10 weed and -- and some cocaine too, though, you know.
11        Q.   And was that sold at the corner of
12 Wabansia and Kimball?
13    A.   Yes.
14        Q.   Did you sell at any other corners in
15 the general area?
16    A.   No. Maybe driving around and
17 somebody -- you know, you see somebody, somebody,
18 you know, wanted you to sell something. You have
19 something? Yeah, you like that? Yeah, cool. You
20 know, just not on nobody corner is what matter,
21 though.
22        Q.   So from your corner at Kimball and
23 Wabansia, how far did your territory go where no
24 one could come in that territory without your

Page 76

1 permission?
2    A.   I would say probably like five blocks,
3 five square blocks, though, I'll probably say.
4        Q.   Okay. So like two to three blocks in
5 any direction from that corner?
6    A.   Exactly, yeah.
7        Q.   When you were with that set, where were
8 you living?
9    A.   I was living on -- I was living on
10 Homan and Potomac.
11        Q.   Was that -- would that have been south
12 of where you were -- your set met?
13    A.   I don't understand that question.
14        Q.   Homan and Potomac, how far away is that
15 from Kimball and Wabansia?
16    A.   Oh, how far. Wow. Probably --
17 probably like nine blocks away.
18        Q.   And were there other gangs or other
19 sets of gangs between your home and your set at
20 Kimball and Wabansia?
21    A.   Yes.
22        Q.   And were they Latin Kings or --
23    A.   Yeah Latin King, Latin King. Humboldt
24 Park's a big area, though, you know. Humboldt

Page 77

1 Park's a real, real big area, though, you know,
2 just bunch of sets.
3        Q.   And what was the set closest to your
4 home at Homan and Potomac?
5    A.   Probably -- Homan and Potomac, a block
6 away.
7        Q.   And because you were a Latin King, you
8 could walk through their territory without any
9 problems if you needed to get up to your area?
10    A.   Yeah. I -- as long as it's my -- if
11 it's the same territory, yeah, we shouldn't have no
12 problem.
13        MR. BRUEGGEN: So, Mr. Maysonet, we've been
14 going for about an hour or so, little over an hour.
15 I'm going to take just a quick break so you can
16 stand up, stretch, you know, get some more coffee,
17 get a drink, use the facilities. And we'll be back
18 in like two to three minutes. That okay?
19        MS. BONJEAN: Can we get five?
20        MR. BRUEGGEN: Yeah. Five minutes is fine.
21 I was just --
22        MS. BONJEAN: Okay. See you in five.
23        THE VIDEOGRAPHER: We're off the video record
24 at 11:19 at the end of Media Unit 1.

JOSE JUAN MAYSONET JR., 04/16/2021                          Page 78..81

Page 78

1        (Recess taken.)
2     THE VIDEOGRAPHER: We're back on the video
3 record at 11:28 at the beginning of Media Unit 2.
4 BY MR. BRUEGGEN:
5     Q.   Mr. Maysonet, you ready to begin again?
6     A.   Yes.
7     Q.   All right. So when we -- we left we
8 were talking about Latin Kings and various sets and
9 specifically your set at Wabansia and Kimball.
10 Okay?
11    A.   Yeah.
12    Q.   And so moving on from that, did you
13 your set at Wabansia and Kimball, did you have
14 specific rules for your set that the gang members
15 had to follow?
16    THE WITNESS: Can I say?
17    MS. BONJEAN: Yeah. You can answer.
18    THE WITNESS: Yeah, we -- we did. You know,
19 just like any -- any normal -- I'll say any normal
20 organization, you know, you got to have the rules
21 set in place, though, so everybody be in, you know,
22 check.
23 BY MR. BRUEGGEN:
24    Q.   Can you tell us what some of those

Page 79

1 rules were for your -- strike that. Let me step
2 back.
3        Were the rules specific just to your
4 set or for all Latin Kings?
5     MS. BONJEAN: Objection to the form of that
6 question.
7        If you know, you can answer.
8     THE WITNESS: Well, we have -- there's two
9 rules. You got the rule from the whole gang and
10 then you got rule -- I'm going to say it like this
11 so you can understand it better, you know, my best
12 of my knowledge. We have what we call
13 constitutional rules. So constitutional rule, you
14 can make any rule as long as it is above the rule
15 from the Nation, though, which, that's all the
16 Latin King. So yeah, we do have our own rules, you
17 know.
18        Like for instance, one of the rule
19 in our set, if he -- if you do cocaine, you snort
20 cocaine, you got to do them like in the weekend,
21 you know, starting like Friday at 6:00 o'clock, and
22 you can snort your life off for all the way to
23 Sunday at midnight. If you get caught after
24 midnight doing drug, you get discipline.

Page 80

1 BY MR. BRUEGGEN:
2     Q.   And what would discipline entail?
3     A.   First you get a warning. And the
4 second maybe you get a fine. And the third rule
5 whatever, you know, maybe clean somebody's car or
6 maybe take somebody wife to do grocery. Something
7 that you won't like, though, to do. I will say
8 that to you.
9     Q.   Would it ever lead up to a -- have you
10 heard the term violation?
11    A.   Yes.
12    Q.   Do you know what a violation is in gang
13 terminology?
14    A.   A violation -- should I ...
15    MS. BONJEAN: Yeah, you can answer.
16    THE WITNESS: A violation --
17 BY MR. BRUEGGEN:
18    Q.   And, Mr. Maysonet --
19    A.   I -- I'm going to be honest, though. I
20 just -- I just -- you know, I just -- you know, you
21 got to understand, though, you know, they -- you
22 got to understand, I don't -- I don't want to say
23 something, though, you know, that -- I don't want
24 to get myself in trouble, not in here, outside,

Page 81

1 though, you know.
2     MS. BONJEAN: Yeah. And I'm going to object.
3 You have to understand like the -- there are
4 concerns -- you're asking him sensitive questions
5 --
6     THE WITNESS: Yeah.
7     MS. BONJEAN: -- that he's willing to answer,
8 but there are safety issues. It's not like the
9 Latin Kings don't exist anymore. And he's -- he's
10 answering all your questions. I'm advising him,
11 but there's nothing wrong with him, you know,
12 checking in. Because there may be a point at which
13 I would object and -- because of safety issues.
14 And so that's all he's doing. He's just checking
15 in. And he's answer -- I have not instructed him
16 not to answer and he's not refused to answer.
17 BY MR. BRUEGGEN:
18    Q.   And, Mr. Maysonet, I understand that
19 some of these are sensitive things, and I'm not
20 going into this just because I'm trying to cause
21 problems. I -- it's stuff that is relevant.
22        So, you know, if you --
23    A.   I understand. It's just -- I want for
24 you to understand, though. You know, the -- you

Page 82

1  know, there are gangs out there that still -- you
2  know, Latin King are still very active gang,
3  though.  You know that, though.  You're a lawyer,
4  so, you know, you should know, you know.  You watch
5  the news everyday, what's going on out there.  I
6  don't want to be part of that life no more.
7      Q.   Understood.  And, again, I'm not trying
8  to create any problems.  I'm just asking the
9  questions for the information I need.
10          So going back to the question, can
11  you tell us what a violation is?
12     A.   A violation.  A violation is when --
13  when you really, really, really do something very
14  dramatic, though, I should say, though, you know,
15  really causing a lot of problem within -- in the
16  gang, though, and then you get violation, though.
17  It all depends if it call for it, though.  You got
18  to remember, you treat the people from your set
19  just like brother, you know, and you always going
20  to take their side.  You're not going to go against
21  your own brother just because somebody else say
22  something, though.  So you always just in line.
23  You always got to, you know, follow, though.
24     Q.   So what happens with a violation when

Page 83

1  someone does something that's really bad or
2  disrespecting their brothers from the set?
3      A.   You get beat up.  That's what a
4  violation is.  Depend what you do, that's how many
5  minute.  You know, we don't go hour, you know, just
6  minutes, second, whatever, you know.
7      Q.   And that was the way that your set
8  would, if you will, keep the discipline was to, if
9  somebody did something really bad, they could be
10  violated?
11     A.   Yeah.
12     Q.   And obviously people wouldn't want to
13  be violated because they wouldn't want to get beat
14  up, so they follow the rules?
15     A.   So believe it or not, you know, again,
16  you know, going back to what I said earlier, we not
17  perfect, though.  So it's always someone we end up
18  doing something bad, though, you know, and you need
19  to discipline him in the way that the other will
20  follow, though, you know, seeing, you know, what
21  you do to so somebody else, though.  You know,
22  you're not going to beat somebody up to put them in
23  the hospital in coma, but you're doing -- you know,
24  beating him up enough for him to know that he did,

Page 84

1  what he did was bad, though, you know, for him not
2  to do it again.  Yeah.
3      Q.   So you told us about a rule about not
4  to do cocaine during the week when you're working,
5  only on the weekends.
6          Can you tell us some of the other
7  rules from your set specifically?
8      A.   Other rule if -- if you were young, you
9  got to stay in school.  That's one thing,
10  education.
11          Other thing, you cannot steal in the
12  neighborhood.  You know, you can't -- you cannot
13  commit no crime in the neighborhood other than, you
14  know, sell drug, though, you know, or -- you know,
15  there a number of things, you know, that -- that
16  you cannot do, though.
17          But other than that, though, you got
18  to, you know, respect your neighborhood, all the
19  graffiti and stuff, you know, writing in wall and
20  stuff, we really didn't want it.  And that's it.
21  You know, I cannot speak about all of somebody else
22  said, though, you know.  The majority of us, you
23  know, we were just -- the people we want to, you
24  know, do better, do something, you know, good for

Page 85

1  our life, though, you know.
2          We knew the gang, it was not going
3  to be for us forever, you know.  It was not a war
4  that we were going to have, you know, forever.  It
5  was just something -- you know, just kids being
6  kids, you know.  It's just I guess a way to survive
7  back in the day making little money here and there,
8  though.
9      Q.   So one of the rules was not to commit
10  crimes in the neighborhood and --
11     A.   Right.
12     Q.   Right?
13          And that would be like don't rob
14  houses in your neighborhood?
15     A.   You cannot rob, you cannot steal nobody
16  car or property.  If you do sell drugs, you --
17  somebody else got to be approval on that, though.
18  If you're not approval and you get caught, it can
19  be within our own set, you know.  If you open
20  another set and you start selling drug in another
21  set that we don't know, you can get yourself in
22  trouble for that.  You know, it's number of things
23  that you got to follow, though, you know.
24          Or, for instance, like if you drink

Page 86

1 and you get drunk, you know how -- you know how
2 some people get, you know, stupid, act stupid?  We
3 don't want that.  You know, you drink, you act
4 normal.  If you can't handle the alcohol, you go
5 home.  If you can go home, we going to make sure
6 you go home in one way or the other, though, you
7 know, so you don't get yourself in trouble.
8         We want to -- we want to represent
9 the opposite things that were other -- other sets
10 represent, though.  If anybody got problem with
11 anybody in the neighborhood and anybody who come to
12 the right person, we talk about it, and we'll
13 find -- we will investigate, though, you know, like
14 anybody else, though, you know.  And if we know
15 that person be right, we talk to our own guy,
16 though, you know, and we let them know, go and talk
17 to that person and apologize, though, you know.
18         So we don't want to look bad,
19 though, you know.  People know what we were doing,
20 selling drug, though.  So really, you know, we want
21 to keep everybody calm.  Yeah, we know what we're
22 doing -- what we doing is wrong, but we not here
23 doing, you know, horrible either, though, you know.
24 We try to do things, you know, the more quiet but

Page 87

1 different way that we could, you know.  Again, that
2 was us.  I don't know about nobody else set,
3 though, you know.  Trying to keep it organized.
4     Q.    And so you wanted to keep a good
5 relationship with all the -- the people that lived,
6 if you will, in your territory area, which would be
7 the -- I think you said about five square blocks
8 around Wabansia and Kimball?
9     A.    Correct, yeah.
10     Q.    And so if somebody was committing
11 crimes in that area, you'd want to make sure that
12 that stopped because you didn't want the people to
13 have problems?
14     A.    Anybody.  Yeah.
15     Q.    What would happen if another gang, you
16 know, other than a Latin King came into your
17 territory and disrespected you?
18     A.    Then they're going to go, you know, in
19 a whole bad way, though.  You know, depend.  You
20 know, it's -- I tell you a block away there was a
21 rival gang and how often -- you know, being young,
22 strong, how many time we got into fight because
23 somebody else want to come from the other set over
24 here, though, you know, to prove a point, so we end

Page 88

1 up fighting and stuff, yeah, you know.
2         So it was a lot of violence went on
3 back in the day, but not like it would be for you
4 today, though, you know.
5     Q.    And with that type of fighting, if --
6 you know, you said that other gang was up by you
7 guys at Kimball and Wabansia -- if they
8 disrespected you, was it just your set that was
9 fighting or would other Latin King sets join you
10 guys in fighting if necessary?
11     A.    It depend who's around.  If -- if you
12 happen to be from another set and you talking to
13 me, then something happen, because you being Latin
14 King, though, you know, you -- you got to do
15 something too.  You know, you're not going to let
16 me be in there by myself and deal with the problem,
17 though, if I got to get physical with somebody, you
18 there, you got to -- you got to get involved in it
19 too, though.  That's how part of the brotherhood
20 is, though, you know.
21     Q.    Okay.  So you basically had to take
22 your brothers' back; if they were getting in a
23 fight, you had to look out for them and help them
24 out?

Page 89

1     A.    Yeah.  We -- we'll help ourself out,
2 though, you know.  Not -- not with everybody,
3 though, but, you know, it depend too.  You
4 know what I mean?  You -- you -- because we Latin
5 King, doesn't mean that, you know, you like the
6 other Latin King from the other side, though, you
7 know.  I mean, there was a competition.  You got to
8 remember, it's a big competition with money.
9         And being young back then, though,
10 whoever had the better car, whoever had better
11 girl, though, you know, however you dress, though,
12 you know, is how you get treated, though.  You
13 know, if -- if they see you doing bad, though, they
14 don't -- they don't treat you bad either, though,
15 you know, but if they see you doing drug that
16 you're not supposed to do and acting like a young
17 kid, stuff like that, they will discard you, you
18 know.  They don't want you around.  You know, you
19 don't -- you don't belong around, you know.
20     Q.    So back in the late 1980s, were -- was
21 the Latin Kings, was that a violent gang?
22     MS. BONJEAN:  Objection to the -- objection
23 to the form and foundation of that question.
24         You can answer.

Page 90

1    THE WITNESS: What kind of violent, though?
2  BY MR. BRUEGGEN:
3      Q.  So they were a violent gang?
4      MS. BONJEAN: Objection to the form and
5  foundation of that question.
6          You can answer if you understand
7  what he's saying.
8      THE WITNESS: I guess everybody was violent.
9  I mean, what gang not violent?
10 BY MR. BRUEGGEN:
11     Q.  So back in the late 1980s, all the
12 gangs, and we're talking about general Humboldt
13 Park neighborhood area that you would have
14 information or knowledge about because you lived
15 there, were violent?
16     A.  Everybody. Oh, yeah.
17         I mean, if -- I'm the type -- I'm
18 just a social person. I like to get to know
19 everybody. I don't care what gang you are. We are
20 human, you know. But that's my mentality, you
21 know. If I get along with a opp- -- somebody the
22 opposite side, you know, cool, whatever business we
23 do, gang sometime, it be put to the side. Anything
24 after that, you know, hands off, you know. You go

Page 91

1  back to what you are. Yeah. I'm Latin King. You
2  what you are. You stay in your corner; I stay in
3  my corner, though, you know.
4          It happen that I go by and one of
5  his homie see me and they know me, might start
6  shooting on actually know me. That's how -- you
7  know, that's how gang they are. And if you cool
8  with everybody, you know, you might not have that
9  problem. I never had that problem, though.
10     Q.  So as long as other gangs stayed in
11 their territory and didn't come in your territory,
12 there wouldn't be any problem, right?
13     MS. BONJEAN: Objection to the form of the
14 question in mischaracterizing his testimony.
15     THE WITNESS: Business always come first.
16 BY MR. BRUEGGEN:
17     Q.  And so, again, if I'm misunderstanding
18 you, let me know. It just -- it sounded like that
19 you said that you could be friends with people from
20 other gangs and that as long as they stayed, you
21 know, where they were supposed to be and you were
22 where you were supposed to be, there wouldn't be
23 any issues.
24     MS. BONJEAN: I'm going to object to the

Page 92

1  form. He -- he was talking about -- are you
2  talking about the gang, as -- as you people tend to
3  talk about these things, or are you talking about
4  him specifically? Because --
5      MR. BRUEGGEN: I'm talking about him
6  specifically, because that's what he was talking
7  about, interacting --
8      MS. BONJEAN: Yeah. He's talking --
9      MR. BRUEGGEN: -- with someone from another
10 gang.
11     MS. BONJEAN: He was talking about his
12 experience and who he was. And, you know, you --
13 you people talk about the gang as if there's some
14 like, you know, one person that's defined by the
15 gang. So I'm ask -- I guess that's a form and
16 foundation objection.
17 BY MR. BRUEGGEN:
18     Q.  Mr. Maysonet, did you understand what I
19 was asking?
20     A.  Kind of.
21     Q.  And so I'm asking about -- about, you
22 know, you as a person, you know.
23         If you stayed in your territory and
24 you know, other rival gangs stayed in their

Page 93

1  territories, there wouldn't be a problem, right?
2      A.  Well, how can I say it? Back in the
3  day, if -- if you out walking somebody else
4  neighborhood and I happen to have a sweater with a
5  Latin King and my emblems and stuff, though, you
6  know, I got to take my sweater off and put it in my
7  arm as a tone of respect, and just walk through
8  that neighborhood, you know, it would not worry
9  about being violent and stuff. Now, if I want to
10 walk around there representing who I am, but, you
11 know -- I mean, I don't think nobody would allow
12 that, you know, even if you go somebody house, you
13 know, nobody would allow that, though, you know.
14         But other than that, you know me, I
15 didn't have no problem with nobody, though,
16 basically. I was just -- I was just a friendly
17 person, social person. I get along with everybody.
18 If you happen to don't like me, too bad. You the
19 one miss out, not me.
20     Q.  In your set, was there any significance
21 when a Latin King would wear a dark-colored hoodie
22 sweatshirt?
23     A.  Everybody dressed dark. I mean, I'm
24 not afraid of colors.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 94..97

Page 94

1    Q.   So wearing a dark-colored hoodie didn't
2    necessarily mean anything in your set?
3    A.   Not really.
4    Q.   Did you know guys in other sets of
5    Latin Kings?
6    A.   If I knew people?
7    Q.   Yes.  Other -- other Latin Kings in
8    different sets than yours at Wabansia and Kimball.
9    A.   Again, I talk to everybody, you know.
10   I don't know no nobody by name.  I prefer -- I
11   prefer it like that, though.  You know, if I know
12   you, we might engage in a conversation, doesn't
13   mean, you know, that I want to know your name, you
14   going to know my name, you know.  If it's something
15   about business or something, you know, we make
16   whatever business and good-bye, you know, no hard
17   feelings.
18   Q.   Did you have any friends who were Latin
19   Kings in other sets?
20   A.   I knew people.  I wouldn't say friend
21   though, you know.  I knew people, but not -- again,
22   you know, nothing for me to be, you know, very
23   close to them.
24   Q.   And earlier you were -- you were

Page 95

1    talking about, you know, the respect you guys have
2    kind of with the neighbors in your territory.
3            And so your set at Wabansia and
4    Kimball, would you guys try to keep your fingers on
5    the pules of what was going on in your territory?
6    MS. BONJEAN:  Objection to the form.
7            You can answer.
8    THE WITNESS:  Everybody -- everybody -- we
9    all knew what going on in the neighborhood, though.
10   We had eyes everywhere.
11   BY MR. BRUEGGEN:
12   Q.   Did you know somebody by the name of
13   Alfredo Gonzalez?
14   A.   Yes, I do.
15   Q.   Was -- Mr. Gonzalez, do you know what
16   his street name was?
17   A.   Lluvia.
18   Q.   Was he in your set at Wabansia and
19   Kimball?
20   A.   Yes.
21   Q.   When did you meet Lluvia?
22   A.   Basically, I knew Lluvia from since we
23   were -- we were kids, yeah.  We grew up in the same
24   block.

Page 96

1    Q.   Did Mr. Gonzalez have a car?
2    A.   No.  I don't think he knew how to
3    drive.
4    Q.   So was Mr. Gonzalez one of those
5    original, I think you said 12, founding members of
6    the set of Wabansia and Kimball?
7    A.   Yes.  Yeah, he was.  Yeah.
8    Q.   What about Justino Cruz?
9    A.   Justino Cruz, we wasn't nobody, though,
10   you know.  He -- he came in one point to join and
11   then, you know, we kick him out, you know.  Too
12   weak.
13   Q.   You kicked him out, did you say because
14   he was too weak?
15   A.   Too weak, yeah.
16   Q.   But Justino Cruz joined your set at
17   Wabansia and Kimball?
18   A.   At one point, yeah.
19   Q.   Do you know what Justino Cruz's street
20   name was?
21   A.   They used to call him Tino.
22   Q.   And earlier when I asked about the
23   people who kind of founded your set over there at
24   Wabansia and Kimball, you said the name Tino.

Page 97

1    A.   Tino.
2    Q.   Were you referring to Justino Cruz?
3    A.   Yes.
4    Q.   How did you know Justino Cruz?
5    A.   Again, we all grew up in the same
6    block, though, you know, literally in the same
7    block.  We probably went to school together at the
8    same time too.
9    Q.   Did you ever hang out socially with
10   Mr. Gonzalez?
11   MS. BONJEAN:  Objection to the form of the
12   question.
13           Go ahead.
14   THE WITNESS:  Well, I don't know, but I'm
15   going to explain to you to be more specific answer
16   to you, though, you know.  You seem to be a good
17   guy anyway.
18           Justino Cruz and Alfredo Cruz,
19   they -- they related to my brother's wife.  You
20   know, we like their family.  So yeah.  You know,
21   I said we grew up in the same -- in the same
22   neighborhood, literally, in the same building, we
23   might say.
24

Page 98

1 BY MR. BRUEGGEN:
2    Q.   So how long was Justino Cruz affiliated
3 with your set?
4    A.   I can't remember, be such a long time,
5 though, but it was not for -- for long, though.  I
6 think one point he left to college, though.
7    Q.   Justino Cruz left to go to college?
8    A.   I think so, yeah.
9    Q.   Did Justino have a car?
10    A.   Justino Cruz had a car.
11    Q.   What kind of car did Justino have?
12    A.   I think it was a GM.  I don't know what
13 kind of brand, but I think it was GM.
14    Q.   Was it anything flashy or just a basic
15 GM?
16    A.   Just a regular car.
17    Q.   Do you know what -- do you know where
18 he got the money to buy that car?
19    A.   I believe he just -- he was working,
20 though.  I believe he had a job, though.  Like I
21 said, you know, most of all we had good -- you
22 know, we had real jobs, though.
23    Q.   What about somebody by the name of
24 Chris Gossens -- or Goosens?

Page 99

1    A.   Christopher Goosens.  You mean Fro?
2    Q.   Yeah, Fro.
3    A.   I --
4    Q.   Did you --
5    A.   Yeah, I know Fro.
6    Q.   Back in the 1980s?
7    A.   Yeah.  We -- again, you know, that's
8 another guy that we -- we grow up together, though,
9 even though that he -- he not from the same set
10 that I'm from, but we went to school together,
11 though.  We -- we really went to school together.
12 We grew up in the same neighborhood.
13    Q.   And it sounds like a lot of the -- the
14 guys grew up in the same neighborhoods, but then
15 would join different sets.
16    A.   Yes.
17    Q.   That kind of how it worked?
18        And what set was Fro a member of?
19    THE WITNESS:  Should I answer that question?
20    MS. BONJEAN:  If you know.
21    MR. BRUEGGEN:  Yeah.
22    MS. BONJEAN:  If you don't know --
23 BY MR. BRUEGGEN:
24    Q.   And, again, Mr. Maysonet, just to

Page 100

1 remind you, I'm just asking what you know.  If you
2 don't know, you can tell me, I -- I don't know
3 or -- that's fine.  So I'm just asking what you
4 know.
5    A.   Yeah.  I'm going to say I don't know,
6 though.
7    Q.   Okay.  Was he from a set around by your
8 set or was he, you know, other side of Chicago?
9    A.   Same neighborhood, same neighborhood.
10    Q.   Do you know did Mr. Goosens, Fro, live
11 in the neighborhood that you lived in generally?
12    A.   He was living, yeah, kind of -- I don't
13 know the street name because been a long time,
14 haven't been around there, you know, almost 30
15 years.  But yeah, he was living in the Humboldt
16 Park area.
17    Q.   Did Fro have a car?
18    A.   Yes.  Fro had a car, yeah.
19    Q.   What kind of car did Fro have?
20    A.   I believe he had a number of car, you
21 know.  He -- I think he had a number of car.
22    Q.   Do you remember any?
23    A.   I would wire it for him too.
24    Q.   I'm sorry.  What did you say?

Page 101

1    A.   He had a nice car back then, though.
2 He had a -- I think it was '69 convertible Buick
3 Electra.
4    Q.   So a flashy car?
5    A.   It was not -- it was just regular,
6 basic car, though, but, you know, I'm pretty sure
7 say if he -- you have money back then, you can hook
8 that car up.  Man, that car would have looked so
9 nice.
10    Q.   Did you know whether Fro was selling
11 drugs back in the 1980s?
12    A.   I don't -- I don't remember that,
13 though.
14    Q.   Did you know a person by the name of
15 Efrain Cruz?
16    A.   Efrain Cruz, yes.
17    Q.   Do you know what his street name was?
18    A.   King.
19    Q.   Was Efrain Cruz a member of the Latin
20 Kings?
21    A.   Yes.
22    Q.   Was he in your set?
23    A.   Yes.  He was in set too.
24    Q.   And you grew up with Efrain Cruz?

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 102..105

Page 102

1    A.   Yes.  I said, we all grew up in the
2  same -- in the same block, though, in the same
3  neighborhood.
4    Q.   Did Efrain Cruz have a car?
5    A.   No.  He -- I don't -- he don't know how
6  to drive.  He blind.
7    Q.   Did you say he's blind?
8    A.   Yeah.  He -- I think he blind from one
9  eye, yeah.  He can see.
10   Q.   And was that back in 1980 he was blind
11 in one eye?
12   A.   Yeah, yeah.  He -- something happened.
13 I think he -- he hit -- he hit hisself with a pole.
14 Something with the eye, though, he -- something
15 went inside his eye, though, you know, and mess up
16 his eyesight, though, you know.  But it was one
17 eye, though, you know.  I should say both eyes
18 because every time he look, he's like, you know,
19 looking weird.
20   Q.   What about somebody by the name of
21 Francisco Veras, do you know --
22   A.   I know Francisco Veras, yes.
23   Q.   Is it the same thing?  Did he grow up
24 in the neighborhood with you guys?

Page 103

1    A.   Yes.  In the same block, but he not
2  from the same -- he not from the same set that I'm
3  from.  He's from another set.
4    Q.   And it was another set of Latin Kings?
5    A.   In Humboldt Park there's number of set,
6  though, yeah.
7    Q.   Yeah.  And you're saying Mr. Veras was
8  a Latin King, but he hung out in a different set
9  than you, right?
10   A.   Well, I -- how can I say this?  We had
11 cliques.  You know what cliques is, though?  You
12 know, like -- say like if you from another set and
13 let's say Jennifer, she's from another set and --
14 and whatever, though, you know, this girl from
15 another set, though, you know, and we happen to --
16 to be cool with them, you know, you can hang with
17 them.  They can come to my set.  I can go to their
18 set, though.  It doesn't mean I'm going to talk to
19 everybody.  I might talk to him, though, you know.
20        You know, again, though, you know, I
21 didn't have too many friends like that, though, you
22 know, just people who really want to do business
23 with us, though, you know.
24   Q.   So am I understanding you correctly

Page 104

1  that Francisco Veras was from a different set --
2    A.   Yeah.
3    Q.   -- but he hung out in your clique?
4    A.   Yeah.  We -- we hang out sometime,
5  yeah.
6    Q.   And who else was in that clique with
7  you?
8    THE WITNESS:  Can I answer that?
9    MS. BONJEAN:  Yeah.
10   THE WITNESS:  We had Jeffrey.  Jeffrey was
11 from my set too.  It was number of guys, though,
12 you know.  I don't remember quite they name,
13 though, but -- Jeffrey was from another set, you
14 know, and we used to hang too.  We grew up in the
15 same block, like I said, though, you know.
16        It just that most -- most of the guy
17 from Kimball and Wabansia, how can I say it, we
18 were living basically in the same -- almost in the
19 same area, same building.  And it happened that one
20 day we just came up with an idea, say, how come we
21 don't -- we don't take over one of these -- this
22 corner, though, you know, like everybody else do,
23 though, and do money and do better than everybody
24 else do?

Page 105

1        And that's how we became to do
2  things, though, you know, very organized, clean,
3  though, you know, without getting ourself in
4  trouble.  But, you know, when you got a number of
5  guys, you always trouble gonna be, right in the
6  corner.  So ...
7  BY MR. BRUEGGEN:
8    Q.   So when you guys decided to do that,
9  you would have gotten permission from, you know,
10 the powers that be in the Latin Kings to open up
11 your own set on Wabansia and Kimball?
12   A.   To -- to do that, we have to -- we have
13 to get approved for the whole -- all the other set,
14 you know.  So every -- whoever in charge every set,
15 you know, they all get together, and if he -- they
16 say okay to do it, we'll do it.  If not, we don't
17 got no choice, though, you know.  We're going to
18 have to join somebody else set, though.  You know,
19 it happened, you know.  Again, you know, I'm a very
20 social person and people happen to get along with
21 me real good.  And they give us -- they give
22 everybody the approval, though, you know, so that's
23 how we became to be Wabansia and Kimball, or KW.
24   Q.   So the -- the Jeffrey you just told us

Page 106

1 about who was from another set who hung out in your
2 clique --
3    A.   Yeah.
4    Q.   -- did he have a -- did you know his
5 name?
6    A.   No, I don't know his name.  I just know
7 him by -- by street name, Jeffrey.  They used to
8 call him Jeff.  A Black guy, by the way.  He joined
9 the Latin King, Latin -- you know, Latin gang.
10   Q.   Did Jeffrey grow up with you in the
11 neighborhood?
12   A.   Yeah, he did.  He -- he lived in the
13 same -- in the same area too.
14   Q.   And he was from a different set than
15 Kimball and Wabansia?
16   A.   Yes, yeah.
17   Q.   Did Jeffrey have a car?
18   A.   Jeffrey had a car, yeah.
19   Q.   What kind of car did Jeffrey have?
20   A.   I believe he had a -- I believe he had
21 a GM too.  I don't know if it was a Pontiac or a --
22 or a Chevy Monte Carlo, but I know it was -- it was
23 just a mid-size car, yeah.
24   Q.   Do you remember what color it was?

Page 107

1    A.   Oh, color I believe was blue.
2    Q.   Was it a flashy car or --
3    A.   Oh, yeah.  It was flashy car.  Yeah,
4 yeah.  He had a nice sound too.
5    Q.   Nice sound system?
6    A.   Wow, hell of a sound system, though.
7    Q.   And you told us that Santiago Sanchez
8 was -- he was the leader of your set at Wabansia
9 and Kimball, right?
10   A.   Yes.
11   Q.   Had Santiago grown up with you --
12   A.   Yes.
13   Q.   -- in the neighborhood?
14   A.   Yeah.  We grew up together too.
15   Q.   Did Santiago have a car?
16   A.   Santiago had a car, yeah.
17   Q.   What kind of car did he have?
18   A.   Well, Santiago had a number of car, you
19 know.  I mean, the last -- I can just tell you the
20 last one that he had.  It was a Chevy Impala.  It
21 was -- I believe it was a '78 four-door Chevy
22 Impala, though.
23   Q.   What about did you know someone by the
24 name of a Yanerez (phonetic) Maldonado?

Page 108

1    A.   Jimenez Maldonado, no, I really don't.
2    Q.   Was a gentleman who --
3    A.   Any nickname -- does he got any
4 nickname?
5    Q.   I do not.  It was a gentleman who
6 visited you while you were incarcerated.
7    A.   Jimenez?
8    MS. BONJEAN:  If you don't -- if you --
9    THE WITNESS:  No.  I don't -- I really don't.
10 I really don't.  I tried to put a picture of that
11 name, but I really don't ...
12 BY MR. BRUEGGEN:
13   Q.   And so back in the 1980s, did you
14 pretty much know people by their street names or
15 their nicknames?
16   A.   Just by street name.
17   Q.   And the people who you knew their real
18 names, were those the people you'd grown up with?
19   A.   Some of them I did; some of them I
20 don't, you know.
21   Q.   Mr. Maysonet, why did you join the
22 Latin Kings?
23   A.   Why join the Latin Kings?  Money.  You
24 know, you -- you got to belong to a gang just in

Page 109

1 order to make money from the street.
2    Q.   Was your brother, Jose Antonio, was he
3 a member of the Latin Kings?
4    A.   No.
5    Q.   Was he affiliated with the Latin Kings?
6    A.   No.
7    Q.   I'm sorry.  Go ahead.
8    A.   Like I said, I'm just the black sheep
9 in the house, though.
10   Q.   What about your -- your sister, was --
11 and I got to ask the whole question just to make
12 sure it's clear on the record.
13        Was your sister a member of the
14 Latin Kings, or Latin Queens?
15   A.   Latin Queens, yeah.
16   MS. BONJEAN:  No.
17   THE WITNESS:  Oh, no.
18 BY MR. BRUEGGEN:
19   Q.   Was your sister a member?
20   A.   No, no, no.
21   MS. BONJEAN:  He's just correcting you that
22 if she was, it would be a Latin Queen, not a Latin
23 King.
24   MR. BRUEGGEN:  Yes, yes.  And I think he told

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 110..113

Page 110

1  us that she was neither a Latin King or a Queen,
2  regardless of how she's characterized, right?
3      MS. BONJEAN:  Exactly.
4      THE WITNESS:  Latin Queen, Latin Queen, Latin
5  King, Latin King.  Two different world.
6      MS. BONJEAN:  Although, Ashley may be a Latin
7  Queen.
8      THE WITNESS:  Yeah.  I'm probably Latin Queen
9  too.  If I just wear long blonde hair -- no, no.
10 Just kidding.
11 BY MR. BRUEGGEN:
12     Q.   So now -- and I wanted to ask you about
13 the Latin Queens, were they affiliated with the
14 Latin Kings?
15     A.   Yeah, they are.  It's another branch of
16 the Latin Kings, yeah.
17     Q.   Were the Latin Queens, would they be
18 tied to a set of Latin Kings, or did they have
19 their own territory?
20     A.   Actually, Queens, they can be anywhere,
21 you know, as long as they, you know -- how can I
22 say?  In order for you to have a set, again, you
23 got to be approval.  You have to have a number of
24 people in order for be, you know, a set, though,

Page 111

1  you know.  You cannot -- you're not going to hang
2  out with two or three people in there.  You got to
3  have at least a number of people, you know, that
4  they can, you know, back off the corner that you --
5  that you have, though, you know, claim in, you
6  know.
7          But female, that was different,
8  though, you know, basically, though, you know.
9  Don't get me wrong, you know, they -- they fight
10 like men too, so -- they're very rough gals,
11 though, you know.
12     Q.   So were there any Latin Queens that
13 hung out with your set?
14     A.   There were quite a few females, yeah,
15 quite a few.  I mean --
16     Q.   Do you remember any of their names?
17     A.   Well, I had a girlfriend by the name
18 Olga Quinones, otherwise known by Crazy.  She did
19 time in jail and everything.
20     Q.   Was she a Latin Queen?
21     A.   She was.
22     Q.   And did she hang out in your set
23 because you guys were dating?
24     A.   She hang out in the set because me.

Page 112

1  She was my girlfriend back then.  She was --
2      Q.   Do you remember -- sorry.  Go ahead,
3  sir.
4      A.   No.  I said she was a good girl too.
5      Q.   Do you remember when she was your
6  girlfriend, either time or an age?
7      A.   We were young.  You know, it was just
8  long time ago, you know.  We were, you know,
9  teenagers, again.  I mean ...
10     Q.   As a Latin King at the Wabansia and
11 Kimball set, were you involved in any gang fights?
12     A.   I got involved to fights, you know.
13 I'm going to sit in here and lie to you.  Any -- I
14 don't think -- I don't think anybody in the gang --
15 you know, you had to have some kind of
16 confrontation one point or the another, no?
17 Whether you maybe messing around with somebody's
18 woman, you don't know, though, you know, maybe you
19 doing something you're not supposed to do, though,
20 you know, and somebody got offend.  You know, you
21 always going to get a confrontation, not all the
22 time for it, sometimes you do.
23     Q.   Did you ever cause a gang fight by
24 something that you did that either disrespected

Page 113

1  another gang or selling drugs in another gang's
2  territory?
3      A.   No, no.
4      Q.   When you were a Latin King, were you
5  ever shot at by rival gang members?
6      A.   If I ever got shot?
7      Q.   Shot at.  Not necessarily shot, but
8  shot at.
9      A.   Yeah.  I been -- I been shot in my car,
10 yeah, once before, though, but they never cause me
11 no -- no harm to me, though, you know, just the
12 car, yeah.
13     Q.   And can you tell --
14     A.   Come up to me and put a gun in my face
15 and I was sitting in the car.  I was rolling a
16 joint.  And when I start -- when I was finish
17 rolling the joint, I saw this guy come, he was
18 coming towards me.  It was -- it was dark.  It was
19 probably like around probably 9:00 o'clock at
20 night.
21          And I remember when this guy came,
22 you know, I just finish rolling the joint.  I'm
23 thinking that, Oh, can I smoke some of that -- some
24 of that weed with you?  And soon as I put the joint

Page 114

1 in my mouth and lit it, this guy pull out the gun,
2 the joint fall off of my mouth.  But the window, it
3 was closed.  And when he shot the gun, he hit the
4 window and the bullet just went basically through
5 my ear.  And then when he kept shooting, the gun
6 jammed.
7            And only thing he did, turn around,
8 he start running, so we went after him.  I know I
9 was so nervous that I couldn't run so fast, though.
10 Only thing I was thinking then when I got shot,
11 though, I was just -- because that thing, it happen
12 so close to me, though, you know, everybody thought
13 that I had -- that I got shot, though, you know,
14 that -- that night, though.  So yeah, you know, I
15 did got shot before, yeah.
16      Q.   Where were you parked when that
17 happened?
18      A.   I probably park in another set.  I was
19 park on Wabansia and Whipple.  That's another Latin
20 King set.
21      Q.   And did you know the person that shot
22 at you, whether he was affiliated with a different
23 gang?
24      A.   Yeah.  He was affiliated with another

Page 115

1 gang.  I didn't know him.  I really didn't know
2 him.  They know my car; they didn't know me.
3      Q.   Did you know what gang he was
4 affiliated with?
5      A.   I believe it was Spanish Cobra.
6      Q.   And do you have any idea why he shot at
7 you, whether you had done something or --
8      A.   No.  Just part of the gang, you know.
9 Just they -- they know who probably you -- who you
10 are, though, you know, so they got to get -- they
11 want to make their name for themselves.  They want
12 to go and shot somebody they know, everybody knows.
13 So, you know, yeah, that's how you get -- you be
14 famous around.
15      Q.   And you just mentioned that the other
16 gangs knew your car?
17      A.   Yeah.
18      Q.   Right?
19      A.   Oh, yeah.
20      Q.   And they knew your name?
21      A.   They know my street name.
22      Q.   Yeah.  That's what I mean.
23            They -- they knew your street name
24 and associated with the car?

Page 116

1      A.   Yeah.  Oh, here, goes Double J.  You
2 know, when they see you, you know, they see I'm
3 like boom, boom, the sound.  Basically the sound.
4 That's what attract the other people, though, you
5 know.  They see -- they'll hear the sounds from the
6 car.  They want to know who they are and if they
7 know who car it is, it be like, Oh, that's
8 Double J, Double J.  So if he -- some of those
9 guys, you know, happen not to like you, things
10 going to go bad.  But some of them, if that happen,
11 you know, they okay.  Even though they know that
12 you a Latin King, they might give you a pass,
13 though, you know, like, We not going to mess with
14 his car, though, you know, but they -- they'll give
15 you a warning, like, yeah, you know, maybe next
16 time, you know, we might get you, though, you know.
17 Yeah.
18      Q.   And did you have your -- your
19 carburetor wide open on your car to make it nice
20 and loud?
21      A.   I had like a $10,000 sound back then.
22      Q.   Oh, so it was -- it was music.
23      A.   You can put a six-pack in top of the
24 woofer and you will keep it up.  That's how loud it

Page 117

1 sound.
2      Q.   I gotcha.
3            So it wasn't your car was loud, like
4 strong.  It was you had a sound system in there
5 that was very loud?
6      A.   Man, that sound, you can feel the base
7 in the ground when you standing next to it, though.
8 It was -- I mean, you know, being young, though,
9 you know, and being young and naive.  You know what
10 I mean?
11            Maybe now people, see you now with a
12 better car like that, they might think different.
13 Back then, people say used to say, Oh, yeah, he
14 must be a drug dealer, he must be a gang, though.
15 You know, people just judge -- judge you, though.
16 You know how you have to basically -- we were not
17 like that, though, you know.
18      Q.   At the time, I -- I think you kind of
19 touched upon it, your priorities were a little
20 different, as having a really cool car was a good
21 thing at that time?
22      A.   I'm not going to say good thing,
23 though, because you attract too much attention,
24 especially the police, though.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 118..121

Page 118

1    Q.  Gotcha.

2        So ...

3    A.   The police the one who always keep the
4  eye on you.  They'll see your car, always want to
5  stop you.  They what to know what your wheres
6  about.  I guess you -- you know, you met a good cop
7  or something, someone that he can, you know, have a
8  nice conversation with you and do good things
9  maybe.

10   Q.   In your set, did you ever achieve any
11 type of a leadership role?

12   A.   No.  Sorry.  No.

13   Q.   So you were basically just a member,
14 the same as the other 11 guys?

15   A.   You need to -- you don't need to join
16 no rank, though, you know, especially when you
17 making money.  You just looking for a piece of
18 action.  You're not looking to, you know, spend
19 your whole life doing something that, you know, is
20 not going to take you nowhere anyway.

21   Q.   So in your set, when you guys were
22 selling drugs, would you have to give some of the
23 money to Santiago since he was the head of your
24 set?

Page 119

1    A.   Basically, it's not -- it's not the way
2  it is, though, you know.  It just we had a group of
3  people, and if the money basically -- I'm going
4  to -- I'm going to say this, without offending
5  nobody, though, you know, but some of the money, it
6  go to lawyers, you know.  Some of the money goes to
7  other people that, you know, that may make business
8  with you, though, you know.  Maybe give you some
9  kind of protection or maybe keep an eye on thing,
10 you know, that you really want to, you know, pay
11 attention to.

12       But the money go to a bank, you
13 know, what we call -- you know, it's just like a
14 bank, like an account basically, you know.  And
15 whatever we need, we get.  You know, you have your
16 own money.  You making your own money, though.  You
17 know, just like a -- you know, basically like a big
18 credit card thing, though, you know, what we call
19 now, though.

20       But if we needed money to bond
21 somebody out from jail, we don't need to go and
22 borrow money from nobody.  We got the money right
23 there, though, so why not?  Go and take it out, use
24 it, and we sell drugs, we put it back together

Page 120

1  again, you know.  Just that simple.

2    Q.   So would it be that you'd sell drugs,
3  you'd take a cut of your sales, and the rest would
4  go into this kind of community fund for everybody
5  else?

6        MS. BONJEAN:  Objection, mischaracterizes his
7  testimony.

8        Go ahead, if he got it right.

9        THE WITNESS:  You want me to answer that?

10       MS. BONJEAN:  Yeah, go ahead.

11 BY MR. BRUEGGEN:

12   Q.   Yeah.  If you can, sir?

13   A.   We -- we -- you know, out of every --
14 probably say out of every $100, you probably give
15 five percent, you know, not much.  If you're not in
16 the gang and you selling drugs for us, maybe the
17 percentage probably be a little bit higher, though,
18 because you're not part of us, but we using you to
19 sell the drugs.  It doesn't mean that, you know,
20 we're going to treat you bad though, no.

21       Some people might -- they might use
22 it for the wrong reason, though, you know.  Not us.
23 If we know you in need for money, you know, we help
24 you, though.  And if you want to cut out later,

Page 121

1  then, you know, we violating you, even though if
2  you're not a gang -- a part of the gang or not, you
3  know.

4    Q.   Okay.  I got it.

5        So you -- you kept what you sold,
6  but then you had to kickback a certain percent or a
7  certain amount?

8    A.   Yes.

9    Q.   Is that -- okay.

10   A.   Yeah.

11   Q.   And so the more you sold as a person,
12 the more money you'd make?

13   A.   But if you sell it by yourself, yeah,
14 of course you're going to make money, yeah.

15   Q.   And what I'm trying to do is versus,
16 you know, different gang members.  If you're out
17 there selling all the time, you're selling a ton,
18 you're going to make more money than somebody who's
19 only out there maybe selling one or two days?

20   A.   Well, that's if you want to go around
21 there and be drag about it, though, you know.  But
22 you don't want to do that, though, you know,
23 because that's how problems start.  And basically,
24 you know, that's where most of the gang start from

Page 122

1 the -- within the gang: Money, money power, you
2 know. Nobody want to make no more money than what
3 the gang made. Remember that, so ...
4 　　　　If you do make more money than the
5 gang, you going to be in trouble. They're going to
6 be -- try to steal you. Maybe they going to wait
7 for you to run the wrong things so they can use
8 that excuse so you can be cursed out, though, you
9 know, or violated so they can get the money. Okay,
10 I give you money so you don't beat me up, though,
11 you know. Not on me. Beat me up, I ain't did
12 nothing wrong.
13 　　**Q. And so the money that came into the**
14 **set, did that stay in the set or did that go to a**
15 **larger pool with other Latin Kings sets?**
16 　　A. No. That stay in that set.
17 　　　　As a matter of fact, if other set,
18 they get financially in trouble, you know, that's
19 how we making good business with other set in our
20 gang, you know. Because once you borrow money to
21 another gang, then you can ask for a higher
22 percentage back. Basically, it's taxes, though,
23 what they're paying back, though, you know. And
24 you make a little more money, or the set made a

Page 123

1 little bit more money from the other -- from the
2 other set, though, you know.
3 　　　　And they can never be accused of
4 say, Oh, no, we don't got the money to pay you.
5 They always going to pay, you know, because that's
6 the help they going to get. If they happen to mess
7 up that, you know, they ain't going to have nobody
8 to help them.
9 　　　　But you got to remember this, that's
10 how set become to be famous in that -- in the
11 neighborhood too. Because if you borrow or you
12 lend somebody, say, a big amount of money to
13 another set, though, you know, and they got to pay
14 you back maybe double that, they going to know, Oh,
15 yeah, those guy over there, they making good money,
16 they -- you know, and you don't have to show off.
17 They will know for any -- any type of reason, you
18 know, that you making money over there, though.
19 　　**Q. Sir, now your complaint, you've seen**
20 **your complaint in this case, right?**
21 　　A. Yes, I did.
22 　　**Q. And your complaint alleges that you ran**
23 **a small crew of people that sold drugs?**
24 　　MS. BONJEAN: Objection, mis --

Page 124

1 mischaracterizes the complaint.
2 　　I need the complaint.
3 BY MR. BRUEGGEN:
4 　　**Q. Mr. Maysonet, your complaint says that**
5 **you worked with a small crew who sold drugs?**
6 　　A. We -- we always be in group, though.
7 When we sell drugs, though, you know, we always
8 watch ourselves back, though, you know. So yeah,
9 you know. If we in the corner and, you know,
10 happen to be 12 guys in there, though, you know,
11 and most of them, they're not doing nothing, just
12 kicking back and smoking weed, though, you know,
13 why not -- why not go in that corner over there and
14 watch our back, you know. We -- we selling drugs
15 and basically -- basically we making money for my
16 own set, whether you selling it or not, you know.
17 Yeah. We got to watch our back. We got to be
18 together, put it to you like that, though, you
19 know.
20 　　**Q. So I -- and my question is, you know,**
21 **when you reference this crew in your complaint, is**
22 **that your whole set was the small crew that you're**
23 **referencing in your complaint or was it a smaller**
24 **set of your --**

Page 125

1 　　A. No, no, no. That's -- that's Kimball
2 and Wabansia. Again, you cannot -- you can't
3 belong to two sets, though, you know. You're
4 always going to make someone happy, someone going
5 to get mad.
6 　　**Q. I think earlier you said that you sold**
7 **marijuana and also cocaine was sold.**
8 　　　　**And were they both sold on that**
9 **corner of Wabansia and Kimball?**
10 　　A. Pretty much, yeah.
11 　　**Q. Did you sell both marijuana and**
12 **cocaine?**
13 　　A. I'll say I did sell more coke than
14 marijuana, though. I love smoking weed, though,
15 you know, so ...
16 　　**Q. Did you say you sold more cocaine than**
17 **marijuana?**
18 　　A. Yes. I don't do coke. I mean, I did
19 it once. I didn't like it, though, you know. I
20 rather do marijuana, be happy.
21 　　**Q. And did all the guys sell either**
22 **marijuana or cocaine or was there certain guys**
23 **could only sell cocaine and certain guys could only**
24 **sell marijuana?**

Page 126

1    A.   Yeah.  Some of those guys just sell
2 marijuana, some of them, you know, they sold the
3 coke, though.  Yeah, yeah.  More dangerous to sell
4 coke then than marijuana anyway.
5    **Q.   Was selling one more profitable or did**
6 **you make more money selling marijuana or cocaine?**
7    A.   Cocaine was more profitable, yes.  Yes.
8 That's -- that's life, though, you know.
9    **Q.   You talked about other members of your**
10 **set would be out there when selling, kind of**
11 **keeping eyes out?**
12    A.   Yeah.  Hanging out, yeah, keeping an
13 eye, you know, on what going on.  Basically
14 watching the back.
15    **Q.   And when you say "watching the back,"**
16 **what are they watching your back for?**
17    A.   Anybody can sneak on you and try to,
18 you know, rob you, you know.  Somebody can come
19 from somewhere, you know, maybe another gang can
20 come with a gang and try to shoot you from behind.
21 And you got to keep an eye on what's going on,
22 especially when you -- especially when you belong
23 in the corner, you know, that everybody knows,
24 though.  Kimball and Wabansia, everybody know about

Page 127

1 us making the money.
2    **Q.   And at that time, selling drugs was, to**
3 **some extent, completely cash business?**
4    A.   Cash business.
5    **Q.   So that would be a lot of -- go ahead,**
6 **sir.**
7    A.   I never heard nobody come and buy drug
8 with a check or with food stamp.
9    **Q.   And, again, it's -- you know, I'm sure**
10 **times things were traded.  Somebody might give you**
11 **something of value, whether it be CDs or equipment**
12 **or something like that, but predominantly cash,**
13 **right?**
14    A.   Well, again, you know, that stealing
15 stuff is no good for business, though, you know.
16 You really don't want to get caught up in something
17 that -- you know, that is not worthful, you know.
18 You -- you rather buy stuff.  But, yeah, I did saw
19 a lot of people coming around with stuff, try to --
20 to trade for drugs or -- yeah.  I did saw that, but
21 I never -- I never -- I never did trade like that,
22 though, you know.  I rather have the money.  Money
23 better.
24    **Q.   So when you would be on the corner**

Page 128

1 **selling drugs and other people would be looking out**
2 **for you, did anybody in your set have a gun?**
3    A.   There's guns everywhere.  Why not?
4    **Q.   So if somebody -- did you ever have a**
5 **gun when you were hanging on the corner of Wabansia**
6 **and Kimball?**
7    MS. BONJEAN:  Objection to the form of that
8 question.
9    Go ahead.
10    THE WITNESS:  If I ever had a gun?
11 BY MR. BRUEGGEN:
12    **Q.   And let me clarify the question, sir.**
13       **Did you ever have a gun on your**
14 **person when you were on the corner of Wabansia and**
15 **Kimball?**
16    A.   I always have my personal gun.
17    **Q.   And what would -- what caliber was your**
18 **personal gun?**
19    A.   .45, 1911.
20    **Q.   Did other guys in the set also carry**
21 **their personal guns on them?**
22    A.   Not -- not everybody, though.
23    **Q.   Why did you always have your personal**
24 **gun on you?**

Page 129

1    A.   Well, you know, I always carry enough,
2 you know, money on me, so you have to have a little
3 protection, though.  Doesn't mean that make you a
4 bad person, right?  You know, I never -- I never --
5 I never had that type of confrontation with nobody,
6 thank God, though.  But yeah, I did have my gun for
7 protection, though.
8    MR. BRUEGGEN:  Mr. Maysonet, I'm about to go
9 into another area of questioning.  I just wanted to
10 see if you wanted to take a break now or if you
11 want to stop for lunch.  And you can ask Jennifer.
12       Jennifer, I'm open to whatever you
13 guys want to do.  If you want to do a lunch break
14 now.  I'm just switching topics, so it's a good
15 time for a break, whether five minutes or if you
16 want to do something longer.
17    MS. BONJEAN:  I don't -- you don't -- do you
18 want food?
19    THE WITNESS:  I'm not hungry, though.
20    MS. BONJEAN:  Okay.
21    THE WITNESS:  I just want to smoke.
22    MS. BONJEAN:  Yeah, okay.
23       So, you know what, he needs to go
24 out and have a smoke break.

JOSE JUAN MAYSONET JR., 04/16/2021          Page 130..133

Page 130

1     MR. BRUEGGEN: Sure.

2     MS. BONJEAN: So ten minutes so he can go

3 down and have a good smoke break.

4     MR. BRUEGGEN: All right. Not a problem. So

5 we're back right about 12:30.

6     MS. BONJEAN: Okay.

7     MR. BRUEGGEN: That sound good?

8     MS. BONJEAN: Yep.

9     MR. BRUEGGEN: All right. Great. Thank you.

10     THE VIDEOGRAPHER: We're off the video record

11 at 12:19 at the end of Media Units 2.

12          (Recess taken.)

13     THE VIDEOGRAPHER: We're back on the video

14 record at 12:33 at the beginning of Media Unit 3.

15 BY MR. BRUEGGEN:

16     **Q.   Mr. Maysonet, I just want to follow-up**

17 **what we'd just been talking about.**

18          **You told us that selling cocaine was**

19 **much more profitable then selling marijuana, right?**

20     A.   Yes, that's correct.

21     **Q.   And can you give us a general idea of**

22 **how much money you were making on a weekly or daily**

23 **or monthly basis back in the late 1980s from**

24 **selling drugs?**

Page 131

1     MS. BONJEAN: Objection; form, foundation.

2          You can answer to the extent you're

3 able to.

4     THE WITNESS: Well, it all depend how you --

5 you know, you prep, you sell -- to sell it, you

6 know. I mean, just like anything else, though. If

7 you go with small quantity, the more profit you're

8 going to make. If you go with big quantity, you

9 going to make still money, though, but not like you

10 really want to, though.

11          Say like -- I give you, say, you

12 know, an example. Like if you buy a house for a

13 thousand dollars, it says that, right, for -- this

14 is just an example, right? And you happen to buy

15 it off, you might -- out of that thousand dollars,

16 you probably come out with 50 grand. Depends.

17 Small quantity, $10 bag, you know, might -- how can

18 you make out an ounce, you know. So yeah, you --

19 you very profitable.

20 BY MR. BRUEGGEN:

21     **Q.   And, sir, maybe my question was a**

22 **little confusing. I'm -- I was looking for like a**

23 **dollar amount, like you were making like $20,000 a**

24 **week or $5,000 a week. You personally. Because**

Page 132

1 **you said it was very profitable. I'm just looking**

2 **your best recollection in the late 1980s?**

3     MS. BONJEAN: Okay. I'm going to object to

4 the foundation of that question.

5          If you can estimate or give a range

6 maybe.

7     THE WITNESS: Again, you know, it just

8 depend, you know, how -- how many people they in

9 the corner. That's one thing, you know. If you

10 finally come out with five, six, seven, maybe a

11 $1,000 a day, that would be -- that would be good.

12 That would be a good day, matter of fact.

13          But the more people -- you know, the

14 more people in the same corner that you sharing the

15 corner with, the same gang from your home -- your

16 home set, though, you know, again, you know, you --

17 you make money, but not like the way you want to,

18 though.

19 BY MR. BRUEGGEN:

20     **Q.   Thank you, sir.**

21          **When did you first interact with**

22 **Mr. Guevara?**

23     A.   I was in my -- in my teen years,

24 though. I was very young.

Page 133

1     **Q.   Were you still in high school at that**

2 **time?**

3     A.   Probably I was in elementary school. I

4 was young.

5     **Q.   And can you tell me about your**

6 **interaction with Mr. Guevara?**

7     A.   Well, we didn't -- we didn't really get

8 to be friend when -- you know, after he raided my

9 house, though.

10     **Q.   And, sir, I -- I'm asking about the**

11 **first time you interacted with him back in**

12 **elementary school.**

13          **Was -- is that what you're telling**

14 **me about?**

15     A.   Well, we -- we -- he was -- he was a

16 detective in the neighborhood. So yeah, we always

17 see him around, yeah.

18     **Q.   And you would see him around.**

19          **When was the first time you**

20 **interacted with him, either he spoke to you, you**

21 **spoke to him?**

22     A.   I was young when I was -- when I was --

23 when we first got stopped by him, basically, yeah.

24     **Q.   What were you doing when you got**

Page 134

1 stopped by him?

2    A.    We was -- we was just gangbanging, you

3 know.

4    Q.    What do you mean by "gangbanging"?

5    A.    We was just in the car having fun, you

6 know, goofing around, selling drug, though.  You

7 know, just doing what normal kid do.

8    Q.    And while doing that, what happened

9 with Officer Guevara?

10    A.    He really -- he really came around and

11 he really stopped everybody, you know, like

12 searching the whole area, you know, watching

13 everybody down, see if there were any illegal stuff

14 around.

15    Q.    Did he find -- sorry.  Go ahead.

16    A.    He just sneaking around, you know.

17    Q.    Did he find anything illegal on you or

18 any of the people you were with?

19    A.    No.

20    Q.    And then what happened?

21    A.    Just we go back to do our normal stuff,

22 you know.  Hang around and just do what kids do.

23    Q.    Did you have any other interactions

24 with him after that?

Page 135

1    A.    It that's when he raid -- raided my

2 house.

3    Q.    How many years after that interaction

4 with him when you were in elementary school did he

5 raid your house?

6    A.    Probably years later, though.

7    Q.    Did you say a year later or years?

8    A.    Years later, yeah.

9    Q.    And do you have an estimate?  Was it

10 two years later; was it four years later?

11    A.    I'll say probably I was a little bit

12 more -- I was probably -- I understand a little bit

13 more about, you know, what I was doing.  You know,

14 I was just a little more older, yeah.

15    Q.    When Guevara raided your house, were

16 you still in high school at that time or had you

17 dropped out?

18    A.    I was dropped out, yeah.

19    Q.    Were you a member of the Latin Kings

20 with the set at Wabansia and Kimball when he raided

21 your house?

22    A.    Yes.

23    Q.    Tell me about him raiding your house.

24    A.    It was one of those -- it was one of

Page 136

1 those surprise things, though, you know.  We was --

2 I was having a guy coming in and out of the house,

3 and the door was open.  And little did what

4 everybody know, the police was across the street,

5 across the park behind the National Guard.  And

6 they were just watching, you know, the movement

7 going in and out and cars stopping and stuff,

8 though, you know.

9         All happened by my house, though,

10 you know.  It was a big mistake that I did, you

11 know.  Never sell drug from your house, though, but

12 that day, you know, happen the people, they know

13 me.  So they was ready for me to do what I was

14 doing there, though, before I get to my set,

15 though, you know.  And beside, you know, make a

16 little money extra quietly, nobody will know, you

17 know.  That was bad -- that was a bad way to do it,

18 though, you know.  So you got to be smart what you

19 do.

20         It happened that he was across --

21 across the park watching what was going on, though.

22 That's how he then raided my house.

23    Q.    And when he raided your house, did he

24 find any drugs?

Page 137

1    A.    No, no.  He didn't find no drugs.

2    Q.    And you say "my house," was it your

3 mother's house that you were living there or --

4    A.    Yeah, yes.

5    Q.    Do you remember the address?

6    A.    1530 North Kedzie.

7    Q.    How many officers raided your house

8 with Guevara?

9    A.    There was a number of officer, but

10 there was one in particular that he walked in with

11 him, though.

12    Q.    There was one officer in particular

13 that was what?

14    A.    With -- with Guevara.

15    Q.    Okay.  And do you know who that officer

16 was?

17    A.    Joe Miedzianowski.

18    Q.    Had you ever interacted with a Joe

19 Miedzianowski before he raided your house with

20 Guevara?

21    A.    No.  He was -- he was always a quiet

22 guy, never talked to him.

23    Q.    When you say "he was always a quiet

24 guy," were you aware of who he was?

JOSE JUAN MAYSONET JR., 04/16/2021      Page 138..141

Page 138

1    A.   Well, it's just that I -- I didn't
2 speak -- I didn't speak English, you know, fully
3 English, though, by then, though.  So basically,
4 you know, I didn't know if the guy talk Spanish or
5 what, though, you know.  I never -- I never -- I
6 never talked to him.  I never -- he was always
7 quiet, though.
8    Q.   You never talked to Joe Miedzianowski?
9    A.   No, never.
10   Q.   When Guevara raided your house, what
11 did you know about Guevara?
12   A.   What did I know about Guevara?  That
13 he --
14   MS. BONJEAN:  Yeah.  I'm sorry.
15       I'm going to object to the form of
16 that question.
17       Go ahead.
18   THE WITNESS:  He was a detective.  That's
19 what we know.  A cop.
20 BY MR. BRUEGGEN:
21   Q.   He was just -- you knew he was a cop
22 and he worked in the Humboldt Park neighborhood?
23   A.   Yeah.
24   Q.   Anything else you knew about him?

Page 139

1    A.   Not -- not nothing to the -- up to that
2 moment that he raided my house.
3    Q.   And so you said there was Guevara and
4 Miedzianowski was around Guevara.  And how many
5 other officers?
6    A.   I cannot tell you the number of the
7 cars there was that day, the number, but there were
8 quite enough officers, though, you know, to go and
9 raid my house and look for whatever they were
10 looking for.
11   Q.   And I think you mentioned earlier that
12 the door was open.
13       Did they just come into your house?
14   A.   Yes.  They just walk in like they were
15 living in there.
16   Q.   Did they give you a warrant or anything
17 or did they just come in?
18   A.   They came in and they did give me
19 warrant to my mom, not to me.
20   Q.   And who did you speak -- did you speak
21 to any of the officers when they came in?
22   A.   Guevara, yeah.  I did speak to him.
23   Q.   Did Guevara say something to you when
24 he came in?

Page 140

1    A.   We were just talking in Spanish,
2 though.  He was just -- tried to explain himself,
3 the reason why he -- you know, he came in, though,
4 in the house, though, or why they raided the house,
5 though.
6    Q.   What did Guevara say to you?
7    A.   That he want to know if there's any
8 drugs coming or selling from -- from the house,
9 from the basement, basically.  We were living in
10 the basement back then.
11   Q.   You said "we."  Who was living in the
12 basement?
13   A.   My family.  My mom, my stepfather, my
14 brother, and my sister.
15   Q.   What did you tell Guevara when he asked
16 you if there were any drugs in the house?
17   A.   When he asked me if there's any -- any
18 drugs in the house, I told him no.  Or anything.
19 They said anything.  Guns, drugs, anything, he
20 wanted to know.
21   Q.   Did you have your -- you told us about
22 you had a personal gun, told us about that earlier.
23 Was that in the house at the time?
24   A.   No.  Didn't have the gun.  I left it

Page 141

1 somewhere.
2    Q.   So what happened after you talked to
3 Guevara?  Did the officers search your house?  What
4 happened?
5    A.   When they were searching the house,
6 they couldn't -- basically, they didn't found
7 nothing.  And Guevara, he walk in the basement
8 where the laundry, where they had the washing
9 machine.  And it happened that -- you know, that I
10 was walking with him because he wanted me, he
11 didn't want nobody of my family, though.
12       So we happened to -- then we walk
13 through the basement.  And he found bunch of
14 baggies.  You know, that's what we were --
15 basically what we were doing, you know, our --
16 our -- you know, our bagging, putting stuff -- you
17 know, prepping stuff for sale, though, you know.
18       And he walk in there and he saw all
19 the -- you know, all the elements.  And he said
20 that -- that he know what's going on in there and
21 if he ever found out, we -- I was going to be in
22 trouble.
23       But he always said that there's a
24 small price to pay if you don't want to get

Page 142

1 yourself in trouble, though. I didn't know what he
2 mean with that, though, back then, though, you
3 know.
4     Q.   So when you spoke to Guevara when he
5 first came in the house, did he give any indication
6 why they thought you had drugs in the house?
7     A.   Yeah. He -- he keep watching people
8 going in and out of the house, though. That's
9 basically what prompt him, you know, to go in,
10 though, him and the other officers.
11     Q.   And then once they got in, they didn't
12 find any actual drugs in the house, right?
13     A.   No drugs. No gun.
14     Q.   But you said he found baggies and other
15 stuff that you used for breaking up the drugs?
16     A.   Big scale, you know. You know, it's
17 tough that, you know, you going to think, you know,
18 yeah, there's something going on in here, though,
19 you know, but they never found basically what they
20 were looking for: money, drug, gun, you know, none
21 of that. My mother house, you know. I mean, you
22 can't have that in there.
23     Q.   So but did you say that you had had
24 drugs in your house to break them up in your

Page 143

1 mother's house?
2     A.   No. In the basement by the laundry,
3 yeah. Not in the house.
4     Q.   Sorry.
5         In the basement area, you -- is that
6 where you'd break up the drugs?
7     A.   That's where we break up, yeah. That's
8 safe place for us to do what we were doing in the
9 basement. This is the laundry room, basement.
10 Yeah. Laundry room, basement, same.
11     Q.   So can you describe what Guevara looked
12 like?
13     A.   Back then he was a big guy with a
14 mustache, kind of curly hair. He always wear
15 glasses, though. A little bit of white complexion,
16 though, you know, him being Puerto Rican.
17 Light-skinned, yeah. They call it light-skinned.
18     Q.   And you mentioned he spoke to you in
19 Spanish?
20     A.   Guevara, he always spoke to me in
21 Spanish.
22     Q.   What about the other officer that you
23 said was Joe Miedzianowski? Can you tell me what
24 he looked like?

Page 144

1     A.   He was tall Caucasian guy, kind of --
2 you know, kind of husky guy, though, you know. He
3 always had a pushed back, you know, haircut,
4 though, you know. Clean haircut, that's should I
5 say, though, you know. Had big -- big old blue
6 eyes, though, you know. He always quiet, though,
7 you know, like a peaceful guy. He looked mean,
8 though, but he being mean peacefully, though, you
9 know.
10     Q.   During that raid, did you talk to any
11 other officer besides Guevara?
12     A.   Just Guevara.
13     Q.   You said you and Guevara went
14 downstairs to the laundry room area, basement,
15 laundry room?
16     A.   In the -- in the laundry room, yeah.
17 That's -- they went -- he went and search in there.
18 He took me. Miedzianowski, he walk with him too,
19 so -- but he was a quiet one.
20     Q.   So when you were down in that laundry
21 room, who was present when Guevara talked about
22 that you can get in trouble for selling drugs?
23     A.   Miedzianowski, he was there.
24     Q.   Was anybody else present?

Page 145

1     A.   No. Guevara.
2     Q.   So you, Guevara, and Miedzianowski?
3     A.   Yeah.
4     Q.   Did Guevara say anything else?
5     A.   He -- he just told me he want to make
6 sure that I'm aware that he know what's going on,
7 you know. So basically, you know, don't be playing
8 dumb with me. Basically that's what he was doing.
9     Q.   And to be fair, he was right in
10 assessing that?
11     A.   Sure.
12     Q.   Did he say anything else to you?
13     A.   Not -- not at that moment, though.
14 Just he keep -- he keeping an eye on me. That's
15 what he say.
16     Q.   Did he -- sorry. Go ahead?
17     A.   Well, you know, the conversation, you
18 know, when -- when we were -- when he was talking
19 regarding -- you know, I tried to be play -- play
20 dumb with him, though, you know, that's -- and he
21 found the baggie. I mean, it was quite a lot, you
22 know. I mean, he always say, you know, if -- if
23 you get yourself in trouble, you know, there's a
24 small price to be paid for. I didn't quite

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 146..149

Page 146

1  understand what he said with that, though.  Maybe
2  he talk about me getting myself in trouble, though,
3  you know, and how I'm going to pay, you know, the
4  price, though, you know.  I really don't know what
5  he mean with that, though.
6      Q.  Anything else that you said to him?
7      A.  I kept my mouth quiet.  I -- you know.
8  I got scared.
9      Q.  And what happened next?  Did the police
10 then leave when they couldn't find anything?
11     A.  Yeah.  They -- they left after you,
12 know, they destroyed everything, you know.  So when
13 they left, that's -- that basically was my worry,
14 you know, about getting myself in trouble started,
15 though, you know.
16     Q.  And did you get in trouble with your
17 mom for having the police raid your house?
18     A.  Big time.  I really did.
19     Q.  And what did she do?
20     A.  Tell me what she didn't did.
21     Q.  Did she send you back to Puerto Rico or
22 anything?
23     A.  Yeah.  After I got my ass beat up.  I
24 got whooped real bad that day.

Page 147

1      Q.  When was the next time you interacted
2  with Guevara?
3      A.  Same -- probably somewhere around the
4  same year.  I met him in -- I met him through -- I
5  kind of met him real good through a friend of mine.
6  I got introduced to him through a friend of mine.
7      Q.  Who was that friend?
8      A.  His name was Juma.  That's street name.
9      Q.  And do you know his real name?
10     A.  No.
11     Q.  Do you know anything about Juma?
12     MS. BONJEAN:  Objection to the form.
13 Anything about?
14 BY MR. BRUEGGEN:
15     Q.  Mr. Maysonet, what can you tell us
16 about Juma, who you said was a friend?  Can you
17 tell us where he lived, where he worked?
18     A.  No.  I don't -- I really don't know --
19 I really didn't know where he lived, though.  I
20 knew where he -- where he worked.  He had a
21 restaurant -- well, kind of restaurant, though, you
22 know.  Like -- like I don't know how do you say it,
23 though, but he didn't have no name, the restaurant
24 had no name.

Page 148

1      Q.  Where was the restaurant located?
2      A.  Right on Sawyer, North Avenue.
3      Q.  What type of restaurant was it?
4      A.  It was just kind of like a -- like a
5  restaurant, whole thing, you know, when you really
6  want to eat, you can buy food and eat there.  Or if
7  you really want to throw like some kind of party or
8  stuff, you can rent the hall and whatever come in
9  packet with it, though.
10     Q.  Did you say Juma owned that restaurant?
11     A.  He did, yeah.
12     Q.  And how did you meet Juma?
13     A.  I met him -- I was walking with -- I
14 was walking with the -- the mother of my son -- or,
15 actually, the future mother of my son.  And we were
16 walking down the street and somebody, he was
17 running down the street.  And I saw Juma behind the
18 guy chasing him, but I also saw the guy had
19 something in his hand.  What he was holding was
20 Juma's jewelry.  He snatch them and he just started
21 running.  I didn't saw that, but that's what he
22 said to me.
23     All the sudden, the guy come and
24 touch me.  And the guy, he keep looking back

Page 149

1  because he just want to see how far he was from
2  him, which he was not far from him.  And I am
3  tripping him.  I put my leg -- and me being Latin
4  King from the neighborhood, again, going back to
5  the rule, though, you're not supposed to steal in
6  the neighborhood.  So I decide to trip the guy and
7  he fall.  And I went and jump in top of him and --
8  just to hold him down, really.  You know, I really
9  didn't know, you know, what really he did, though,
10 only other than he had some jewelry in his hand and
11 I saw Juma chasing him.  So Juma jump in top of
12 him.  Again, he probably, you know, punch the guy a
13 couple times, took his jewelry.  And to everybody
14 surprise, he let him go.  He told him, get out of
15 here, you don't belong around here, though, you
16 know, we don't like you type of people around here
17 like that, though, you know.  So he left.
18     So then he -- he changed his focus
19 to me.  So I'm like, the only thing I try to do,
20 you know, just, you know, do the best that I can,
21 though, you know.  He say, no, no, you did good,
22 kid, you did good.  You know, I'm like, whoa, you
23 know.  So he surprised me.
24     I met him.  He took him me to the

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 150..153

Page 150

1 restaurant.  We ate.  We -- you know, we had a
2 chance to talk, whatever, though, you know.  And he
3 invited me to the restaurant and to -- one day I
4 went over there, though, you know, and little did
5 that I didn't know, Guevara and Miedzianowski, they
6 were there at the restaurant.  And that's how I met
7 him, you know, Guevara.
8      Q.   When did that incident occur where Juma
9 had his jewelry snatched and you tripped the guy
10 for him in relation to the raid on your house by
11 Guevara?
12      MS. BONJEAN:  I'm going to object to the form
13 of that question.
14           If you understand what he's asking.
15      THE WITNESS:  No, I don't.  I don't
16 understand.
17 BY MR. BRUEGGEN:
18      Q.   And, sir, what I'm looking at is did
19 the raid on your house with Guevara happen first or
20 did you meet Juma first?
21      A.   You know what, I'm -- no.  I'm -- I
22 meet Juma in -- I meet Juma from the neighborhood,
23 though, you know, just by eye and stuff, though.
24 But when I really -- when I really became to meet

Page 151

1 Juma it was that day that I tripped that guy,
2 though, you know, but yeah, after -- after Guevara
3 raid my house.
4      Q.   Okay.  So -- and that's when you became
5 friends with Juma?
6      A.   With Juma, yeah.
7      Q.   After --
8      A.   Yeah.  We were good friend.
9      Q.   And were you good friends just because
10 you had helped him recover his stolen jewelry?
11      A.   We became to be friend more than that.
12 I mean, he -- basically, he teach me a lot though,
13 you know, of the street, though.  Selling drugs is
14 one thing, you know.  I mean, being quiet, not
15 being flashy, that was another thing.  I learned a
16 lot from him.  He was a good guy.  Remember, I was
17 young.
18      Q.   What did he teach you about selling
19 drugs?
20      A.   Don't be bragging around what you do,
21 always keep focus what you do, though, you know,
22 don't trust nobody.
23      Q.   Did Juma sell drugs?
24      A.   Juma, yeah, he did.

Page 152

1      Q.   Was he affiliated with any gang?
2      A.   No, no.
3      Q.   Were the Latin Kings aware that he was
4 selling drugs?
5      A.   Yes.
6      Q.   And they were okay with that?
7      A.   As long as you pay the price, yeah.
8      Q.   Was he selling drugs out of his
9 restaurant?
10      A.   The restaurant, pretty much it was just
11 a front of, though.
12      Q.   When you say "just a front of," are you
13 saying it was a front for his drug business?
14      A.   Yes.
15      Q.   So the restaurant did serve food, but
16 it was predominantly a front for his drug business?
17      A.   Yeah.  A lot of things going on in
18 there.
19      Q.   And has the restaurant would have been,
20 if you will, a couple blocks east of your territory
21 at Kimball and Wabansia?
22      A.   Yeah, yeah.
23      Q.   So tell me about this day that you went
24 in to eat at Juma's restaurant and you saw Guevara

Page 153

1 and Miedzianowski.
2           How long after the raid on your
3 house did you see Guevara and Miedzianowski in the
4 restaurant?
5      A.   I don't understand what you're saying,
6 though.  Can you say more specifically, though?  I
7 can't understand you.
8      Q.   No, no problem.
9           I'm looking for how much time passed
10 from the time that Guevara raided your house.  Was
11 it a year later that you saw him in the restaurant?
12 Was it a month later; was it a week later?
13      A.   Like months later, weeks later, though,
14 I'll say.  Probably, yeah.
15      Q.   So what happened when you saw Guevara
16 in the restaurant?
17      A.   Oh, I was -- I was surprised to see
18 somebody that he raided my house, though, you know,
19 in the restaurant, but more shocking to me that he
20 was drinking and doing drugs, though, you know.
21 Really didn't know what kind of man he was until
22 that day that I met him in there.
23      Q.   Do you know what Guevara and
24 Miedzianowski were doing at Juma's place?

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 154

1    A.   I think they went over there to have a
2 good time, you know, just to kick back and talk.
3    **Q.   Were they eating?**
4    A.   Little drink.
5    **Q.   And they were eating and drinking at**
6 **Juma's restaurant?**
7    MS. BONJEAN: That's not what he said.
8      Repeat what you said.
9    THE WITNESS: You go there just to have --
10 just to have a good time.
11    MS. BONJEAN: Well, what were they doing?
12    THE WITNESS: Business, like usual, you know.
13 They talk, you know.
14 BY MR. BRUEGGEN:
15    **Q.   So were they drinking?**
16    A.   Oh, they -- there was a lot of
17 drinking, a lot of drug going on in there, yeah.
18    **Q.   And did they -- were they eating there**
19 **and drinking or --**
20    A.   Everything. You go eat. You go do
21 drug. You go have fun with girl. You go do
22 whatever you want to do, as long as stay in there.
23 That's like Las Vegas, though. Whatever happen in
24 there, stay in there.

Page 155

1    **Q.   So where did you see Guevara and**
2 **Miedzianowski in the restaurant?**
3    A.   When did I saw --
4    MS. BONJEAN: No. Where.
5 BY MR. BRUEGGEN:
6    **Q.   No. Where, where in the restaurant?**
7    A.   In the back in the kitchen.
8    **Q.   What were they doing when you saw them?**
9    A.   Actually, they were, you know, talking
10 with Juma and doing little -- you know, little
11 coke, snorting, drinking. I don't know what they
12 were talking about, though. Only thing that I know
13 when I got introduced to Guevara, though, you know,
14 what we talk about.
15    **Q.   Okay.**
16    A.   I don't pay attention, you know,
17 what -- what Juma do there, though.
18    **Q.   How did you end up in the -- in the**
19 **back kitchen area?**
20    A.   Taking, you know, stuff to the back,
21 though, like dirty dishes and stuff, though, you
22 know. Give him a hand, though, you know. Keeping
23 the place nice and organized, though, you know,
24 before anybody come.

Page 156

1    **Q.   So what happened when you walked in the**
2 **back and you saw Guevara and Miedzianowski?**
3    A.   I got shock. Like I say, I was
4 surprised see somebody that -- you know, that he
5 raided my house with earlier, though, you know, or
6 month earlier, though, you know. He -- he was
7 shocked too hisself, though. He opened his eyes,
8 though, you know. And when I got introduced to
9 him, he said, oh, I -- he's from around -- he's one
10 of the kids from around the neighborhood, I already
11 met him. And Juma basically, you know, he always
12 tried to put me under his wing. So Guevara told
13 him that he raided my house for the reason that he
14 raided my house for, though, you know. And Juma,
15 right there he just told him, you know, He's --
16 he's my buddy, he's my friend, he need to be
17 protected, though you know. So that's when we
18 engage in the same conversation again about, you
19 know, for everything there's a price to be paid
20 for.
21      So the thing that Juma teach me,
22 that's basically what -- what I did, though, you
23 know. I started making better business because
24 Guevara, though, basically. Everything that I

Page 157

1 always wanted to do, though, you know. I needed
2 to -- I got what I always wanted, someone who can
3 keep the eye in what going on in the neighborhood,
4 though, you know. Quietly, though, you know,
5 without nobody knowing, though.
6    **Q.   So at that day that you saw Guevara and**
7 **Miedzianowski there, Juma knew that you were**
8 **selling drugs?**
9    A.   Yeah.
10    **Q.   And you had talked to him about that**
11 **and he was kind of like a mentor for you?**
12    A.   He was my supplier.
13    **Q.   Oh, Juma was your supplier?**
14    A.   Yeah.
15    **Q.   And what did he supply?**
16    A.   Anything that I wanted and any -- if
17 you had the money, you working today. If not, go
18 somewhere else.
19    **Q.   So Juma told Guevara that you were**
20 **selling drugs and you needed protection?**
21    A.   No. It was -- basically what he --
22 what he -- what Juma told Guevara, you know, that
23 I'm his buddy, you know. I'm -- he's my little
24 buddy right here, though, you know. He didn't want

Page 158

1 nothing to happen to me. Once he heard what
2 Guevara did, though, you know, he stop him,
3 basically, though, you know. And he told him, No,
4 keep an eye on him, protect him, though, you know.
5 He work for us, basically.
6     Q.   Okay. I gotcha.
7           So Juma basically, after he heard
8 that Guevara had raided your house, he vouched for
9 you and said he's a good --
10    A.   Yeah.
11    Q.   -- meaning you, was a good guy?
12    A.   He with me.
13    Q.   What happened after that? Did Guevara
14 say anything?
15    A.   Yeah. We -- we engaged again in a
16 conversation about the price, about what he said
17 that for everything there's a price for it. So I
18 kind of put one and one together, so now I figure
19 out, you know, what's -- what was the deal about
20 it, about that, though, you know. So we end up
21 having a conversation, though. You know, we --
22 like I say, we became to be, you know, real good
23 buddies. We -- we came to be real good buddies,
24 though, you know. We -- I was doing good. What I

Page 159

1 was doing, it was -- I was doing way better than
2 what I was doing before, you know. I don't have to
3 worry about the police no more.
4     Q.   So and you said we got to be good
5 buddies, who is the "we"? You and who were good
6 buddies?
7     A.   Meaning -- you mean me and Macho?
8     MS. BONJEAN: No, no. He said who, when you
9 said we became good buddies --
10    THE WITNESS: Oh, me and Guevara, yeah. Me
11 and -- and Reynaldo.
12 BY MR. BRUEGGEN:
13    Q.   So you just told me that you talked to
14 Rey about price. Was that at the restaurant when
15 Juma was there?
16    A.   In the restaurant, yeah.
17    Q.   And what did Rey say to you, and Rey --
18 Rey Guevara say to you?
19    A.   We'll talk. We would talk.
20    Q.   And I'm wondering what do you recall
21 that Guevara said to you there at the restaurant?
22    MS. BONJEAN: He just answered that question.
23    THE WITNESS: Yeah. He -- he said we talk.
24

Page 160

1 BY MR. BRUEGGEN:
2     Q.   Okay. Guevara told you you would talk.
3     A.   We would talk, you know. Like, you
4 know --
5     Q.   You --
6     A.   That we going to -- we going to sit and
7 talk again, though, you know. Basically that's
8 what he mean with that.
9     Q.   So did you talk to Guevara about prices
10 or anything at the restaurant at that time that you
11 met him?
12    A.   Not in that moment, though, but when
13 time went by, we really did sit and we talk about,
14 you know, what should I do, you know, for me to,
15 you know, make thing more better. So again, there
16 were rules, you know, that we got to follow,
17 though, you know, because we -- we didn't want
18 him -- we really didn't want him -- we don't want
19 throw him off and we really -- I didn't want to
20 throw myself off either, though, you know.
21           You got to remember, I'm a Latin
22 King, though, you know, and doing what I was doing,
23 though, you know, it's a very thin line that I was
24 walking on, you know. I'm playing both sides of

Page 161

1 the fence. So, you know, in the gang, that's a
2 no-no.
3     Q.   And what were the two sides of the
4 fence you were playing?
5     A.   I was being good buddy with a cop and
6 being good buddy with the Latin King. So you
7 better be one side or the other, though, you know.
8     Q.   So when Guevara told you at the
9 restaurant that we'll talk, did he say when?
10    A.   No. We -- he didn't -- we didn't
11 specifically say the day, you know, and stuff like
12 that, though, you know. It just happen out of --
13 out of the blue like that, you know, when -- when
14 he came around. And I was in the park, we were --
15 I was in the park when we really got -- when I
16 really got stopped, and I thought I was getting
17 stopped because my -- my sound from my car, but I
18 had a big ass -- big ass, you know, joint, big, you
19 know, Cheech & Chong joint, like I said back then,
20 though, you know.
21           And I remember when Guevara stopped
22 the car, you know, I was just like in the middle of
23 the street in the park, and everybody saw what
24 happened. So we decide to throw the joint away and

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 162..165

Page 162

1  stuff, you know.  And he went and pick it up and --
2  because he saw that I was with Santiago, he -- he
3  pull me to the side.  He want to give me the joint.
4  And he go and say, I don't care, you go and smoke
5  it, though, you know, you guys aren't doing nothing
6  bad, you know.  Tried, though, you know, I mean,
7  now we can have a chance to talk about, though, you
8  know.
9             So that's how Macho, he -- you know,
10 me and him, we were real close, you know, and I
11 talked -- I talked to Macho about it.  I told him,
12 you know, we -- I got good feeling about this guy,
13 though, you know.  I mean, should we -- you know,
14 should we get him to do something for us, though,
15 you know, and keep it quiet, though, you know, and
16 do things better, though, you know.
17            Remember, it was about competition.
18 We're doing good, though, but quietly, though, you
19 know.
20            And that's when he said, you know,
21 you know what we're getting into if they all found
22 out, you know, we -- we might get smoked, you know.
23 So I'm like, well, might him too, you know.  He
24 might get himself in trouble with the gang, though,

Page 163

1  you know, but we figured out that he -- you know,
2  he a cop, you know.  How the hell he going to get
3  in trouble with the gang, though, you know?
4             So that was our reputation that we
5  had to protect, though, you know, and be quiet
6  about it.
7      Q.   So how long after your interaction with
8  Guevara at Juma's restaurant did you see Guevara in
9  the park when you were with Santiago smoking the
10 big joint?
11     A.   Probably like few days later, though,
12 I'll say.
13     Q.   And when you say "the park," is that
14 Humboldt Park?
15     A.   Yeah, Humboldt Park.
16     Q.   And you and Santiago were just sitting
17 out on a park bench or something?
18     A.   No.  We just cruising, and I was just
19 smoking a joint, you know.  He don't smoke.  He
20 really -- the guy, he don't do drugs, though, you
21 know.  That's what amazing me, though, you know.
22 And very intelligent person, though, you know.  It
23 just happened to meet him, you know.  But how we
24 started selling drugs, we were with him, you know,

Page 164

1  basically, though, you know, and -- and once the
2  chance came and have someone, you know, like
3  Guevara, though, you know, I mean, that was just
4  like a dream come true, though, basically.  But at
5  the same time, you know, it was -- we were walking
6  on thin line, though, you know.  But we accomplish
7  what we wanted, though.
8      Q.   Okay.  And --
9      A.   And, you know, had that protection that
10 we were looking for from the other cop, not from
11 the gang, just from the cops, though, you know.  We
12 don't want the police to mess with us, though, you
13 know.  Especially us, me and him.
14     Q.   So let me make sure I understand.
15          You were driving around in a car.
16 Did Guevara pull you guys over --
17     A.   Yeah.
18     Q.   -- in a police car?
19     A.   In a -- it was an unmarked car.
20     Q.   But he pulled you over like with a
21 siren or just --
22     A.   No.  Just -- he just turn the lights
23 on, so you know that -- what time it was, though,
24 you know.

Page 165

1      Q.   And what did Guevara say to you then?
2      A.   After he give me the joint, you know,
3  and basically he want to know the guy who was with
4  me, so I told him he was my right-hand man.  I
5  don't want to front the guy say, oh, yeah, he's the
6  chief or the Kimball-Wabansia, you know, guy,
7  though, you know, no.  You know, just -- just he's
8  my right-hand man, though, you know.
9             So he like whatever, you know, you
10 decide to do, you know, this is my price.  So we
11 started with small amount of money.  We -- we want
12 to know how we want to deliver the money to him
13 without, you know, causing too much attention,
14 though, you know.
15            And -- and to my surprise, you know,
16 we were doing -- we were doing things right, you
17 know, in the street, though, just, you know,
18 quietly, though.  He come stop me, maybe he'll put
19 me in -- put the hands in the wall.  I might have
20 some money in the pocket with him.  People, they
21 don't know that he might take the money thinking --
22 he going to make everybody think that drug money,
23 I'm going to take it from him.  But what the other
24 people, they don't know you're paying him in front

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 166..169

Page 166

1 of everybody.  Nobody didn't know.  So you guys
2 found way to do things, you know, without causing
3 too much attention, though.
**4     Q.   So when Guevara pulled you over, you**
**5 told Guevara that Santiago was your right-hand guy?**
6     A.   Yes.
**7     Q.   So did you imply to Guevara that you**
**8 were in charge, not Santiago?**
9     A.   Well, in -- in selling drug, though,
10 you know, I don't want to get the chief involved in
11 nothing, though, you know.  You always have to
12 protect him, you know.  You take the bullet for
13 him.
**14     Q.   Was Santiago the chief?**
15     MS. BONJEAN:  Objection to the form.  This
16 has been asked and answered.  And I'm -- I'm
17 getting tired of those questions.  Ask him once
18 and -- and be done with it.
19 BY MR. BRUEGGEN:
**20     Q.   Sir, you can answer the question.**
21     A.   Yeah.  He was the chief.
**22     Q.   And so you said you had to talk to --**
**23 did you -- I thought when you were answering**
**24 earlier you said you talked to Santiago about what**

Page 167

**1 Guevara was talking to you about?**
2     A.   Actually, when we were -- when I was --
3 when I was -- when I was driving the car, you know,
4 I was just -- we were just talking about that
5 fantasy that I have whereabouts we can have some of
6 these cop, you know, paying them off and, you know,
7 keep an eye on what we do, you know.
8          We got enemies out there, though,
9 you know.  I mean, you -- you can get it from your
10 own gang too and you -- you don't know nothing,
11 though, you know.  Right now, why not have someone
12 like him, though, you know.  He had the eye too for
13 it.  And besides, you know, he was Puerto Rican.
14 We can communicate.
**15     Q.   And so for -- when Guevara told you the**
**16 price, did you agree to it or did you need to talk**
**17 to Santiago to get his permission as the head of**
**18 your set?**
19     A.   I agreed.  I knew what I was doing.
**20     Q.   And I think you -- you said you started**
**21 off small.  Can you tell me what that means?**
22     A.   Started small like selling drugs, you
23 mean?
**24     Q.   Yeah.  I think you said, you know, with**

Page 168

**1 Guevara, we started off small, and I'm just trying**
**2 to figure out what that means.**
3     A.   Well, when we started small, we -- I
4 believe we were paying like $2,000.  And we see,
5 you know, if what he was promised to us, though,
6 you know, he do good, though, you know, which he
7 did, though, you know.  I mean, he did good.
**8     Q.   What was the $2,000 for?**
9     A.   For having other officer not to come
10 and mess with us though.
**11     Q.   Was that for a certain period of time**
**12 or was that a one-time thing?**
13     A.   No, no.  It was just for period of
14 time, yeah.
**15     Q.   When Guevara stopped you when you guys**
**16 were cruising through the park, who was with him?**
17     A.   Miedzianowski.
**18     Q.   When Guevara pulled you over, did he**
**19 walk up to the car to talk to you guys, when he**
**20 brought the joint?**
21     A.   Well, I throw the joint out of the
22 window when I was driving.  Then I stop probably
23 like -- I don't know, probably a few feet away from
24 the joint.  And he got out of the car.  We got

Page 169

1 ordered to get out of the car.  He knew it was me,
2 though.  So I just stood right there near the car
3 with my hands in -- in top of the hood of the car.
4 And then he went and got the joint.
5          And after he search me and stuff,
6 he -- he give me the joint back.  And I turn
7 around.  We start talking.  And that's how, you
8 know, we refresh our mind about, you know, what we
9 talk in the restaurant and stuff, though, you know,
10 and we agree.
11          I talked to Macho.  He agree.  He
12 was the chief, though.  As long as we keep it
13 quiet, though, you know, nobody -- they don't know
14 about it, though.  And we pursue what we wanted to
15 do, though, you know.  It was just simple.
**16     Q.   So keeping it quiet, was it kept quiet**
**17 from other sets of Latin Kings?**
18     A.   All the gang, yeah.
**19     Q.   What about other -- go ahead.**
**20          Did you guys keep it quiet from**
**21 other members in your set?**
22     A.   Everybody.
**23     Q.   So the only people that talked to**
**24 Guevara or knew about this agreement with Guevara**

Page 170

1  was you and Santiago?

2     A.   I do most of the talk, not Santiago.

3     **Q.   Yeah, but Santiago was aware of the**

4  **talk?**

5     A.   He was my mentor.

6     **Q.   And Santiago knew that you were talking**

7  **to Guevara?**

8        MS. BONJEAN:  I'm going to object to the --

9  to the form of that question.

10       But go ahead.

11       THE WITNESS:  Yeah, he knew.  We -- you know,

12  he knew what Guevara was going on.

13  BY MR. BRUEGGEN:

14    **Q.   And so you started off small paying**

15  **$2,000, right?**

16    A.   Um-hmm.

17    **Q.   Is that a yes?**

18    A.   Yes.  Sorry.

19    **Q.   And then where did things go from**

20  **there, sir?**

21    A.   It got better.  You know, more money,

22  more the pay, right?  So it was doing good.  We

23  were doing good.

24          There was one time I got stopped;

Page 171

1  there was one time I got stopped.  I went out with

2  Macho.  And Guevara, right, they stop everybody,

3  right.  There were a bunch of cops that day, man.

4  And it happened that I was just going right to

5  where they were having everybody against the wall.

6  And me, like an idiot, I just drive through it with

7  my sound loud, and he put pulled me to the side.

8  And my guy that he was with me, you know, he didn't

9  know what going on between me and him.  He kept my

10  guy and he let me go.

11          And everybody like what happened?

12  What did he did that for, though?  You know, I

13  thought he was going to arrest -- arrest us,

14  like -- now, remember, I don't got no record,

15  though.  I'm a good kid, though, you know.  So I

16  don't represent like you guys represent, though,

17  you know.  So he let me go, though, you know.

18          You know, it was a lot of times lot

19  of people ask question, though, you know.  You

20  always have to have some kind of lie just to cover

21  things up, though, you know.  You got to play it

22  all off.

23    **Q.   And that example you just gave, was**

24  **that Guevara that pulled you over or another police**

Page 172

1  officer?

2     A.   Oh, no, it was Guevara.  Guevara, he

3  was there.  He was -- there was bunch of officers,

4  but Guevara, he was like the one who basically

5  pulled me to the side, though.

6     **Q.   So in that example you just told us,**

7  **Guevara pulled you and another friend over; the**

8  **friend got arrested, but you were let go?**

9     A.   No.  He -- he didn't got arrested.  He

10  just, they kept him there, you know.  He just let

11  me go, you know.  Whether he got arrested or not, I

12  don't know.  I just -- I left.  I was lucky too.  I

13  had a gun in any car.

14    **Q.   Why did you need to keep this agreement**

15  **with Guevara quiet from the other sets of Kings?**

16       MS. BONJEAN:  I'm going to object.  This has

17  been asked and answered.

18       But you can -- you can -- I think he

19  really actually went into a fair amount of detail

20  about why.

21       But go ahead.  You can answer again.

22       THE WITNESS:  Keeping things quiet,

23  especially with cop, you know.  It not going to

24  look very appetizing for the rest of the gang.  It

Page 173

1  just -- you can't play both side of the fence.

2  Remember, that's a no-no.  They going to think you

3  a snitch.

4          Someone can get locked up or he can

5  get someone looked up, and they can see that our

6  friendship, they going to think, you know, that I

7  might have something to do with that, or I'm

8  snitching.  Anything they can say that not true,

9  though.  You can get yourself in trouble once

10  everybody see what going on, though, you know.

11  Whether you in the right or not, you know, if

12  people get mad, you're going to get it, you know.

13  BY MR. BRUEGGEN:

14    **Q.   And so in this agreement you had with**

15  **Guevara, what was he supposed to do for that**

16  **$2,000?  You told us that he was supposed to make**

17  **sure you guys didn't get arrested by the police.**

18  **Was there anything else he was supposed to do?**

19    A.   Only thing he might just keep all the

20  cops away from our business, though.  That's all.

21  Just simple.  We don't want him to do bad, just

22  keep everybody away from us, let us make some

23  money.  We're going to look out for you no matter

24  what, though, you know.

Page 174

1    Q.   Do you remember how old you were when
2 you had this agreement with Guevara?
3    A.   I was just young.  I was just a
4 teenager.  Again, though, you know, just -- I was
5 not even 20 years old.  I was young.
6    Q.   You said you initially paid him $2,000.
7        Did you pay him any other amounts?
8    A.   When the time went by, yeah, I mean, we
9 started giving him more -- more money, though.
10    Q.   And was the money tied to any time
11 period?  Did you have to pay on a certain schedule
12 or was it you just gave him money when you wanted?
13    A.   You know, it's just a weekly thing that
14 we do for him, though, you know.  Just basically
15 like another regular job, though.
16        I know he mention a lot of time that
17 he never -- he don't get paid enough doing what he
18 was doing, though.  So I guess what we were doing
19 for him, you know, it was hurtful for him.  Again,
20 you know, he just -- he gets money.
21    Q.   How long did you have that agreement
22 with Guevara?
23    A.   Until I got arrested.
24    Q.   Until you got arrested which time, sir?

Page 175

1    A.   1990.
2    Q.   Was that for the attempted murder?
3    A.   Yeah.
4    Q.   Okay.  Did you have any other
5 interactions with Guevara other than the ones you
6 told me about?
7    A.   When he tried to hook my friend Macho.
8    Q.   Can you tell me about that, sir?
9    A.   He came -- it was in 1990 when -- it
10 was -- it was in 1990 when he -- when he came and
11 accuse my friend about something, that he shot
12 somebody.  And I had to mention him about deal.
13 We -- we wanted to be protected, though.  And
14 things went bad.  We -- he disagree and we got into
15 a big argument in the corner.  He left because
16 basically we were -- we got so loud, and he went
17 and arrest my friend.  And ever since, you know, I
18 didn't pay him no more.
19    Q.   So when you had that agreement with
20 Guevara, Guevara -- you had told Guevara that Macho
21 was your right-hand man, right?  That's what you
22 told us earlier?
23        And despite that, you said --
24    THE COURT REPORTER:  I'm sorry.  I didn't get

Page 176

1 an answer.
2    THE WITNESS:  I don't -- what happened?
3 BY MR. BRUEGGEN:
4    Q.   You had -- let's just do it over.
5        You had told Guevara that Macho was
6 your right-hand man, right?
7    A.   Yeah.  He -- he -- he kind of knew, you
8 know, more than -- more the time go by, you know, I
9 kind of -- we kind of let him know what going on,
10 though, you know, and who all in -- who was the
11 chief and that, though, you know.  So he -- he kind
12 of knew, though, what business, what going on,
13 though, you know.  But I'm the one that I do the
14 talk and do the business with him, though, you
15 know.  Even though Macho, he was there too, he was
16 my protection, though, my right-hand man.  Like I
17 said, though, you know, everything I do, I would
18 have him with me.  That I can tell you, though.
19    Q.   So Guevara knew that Macho was involved
20 in the agreement you guys had with him?
21    A.   Macho knew, yeah.
22    Q.   No.  I -- I'm saying Guevara knew that
23 it was you and Macho for the agreement with
24 Guevara?

Page 177

1    MS. BONJEAN:  Objection to the form of that
2 question, what Guevara knew.
3        Go ahead.
4    THE WITNESS:  I always pay him, whether get
5 money from Macho and me.  We always pay him, you
6 know.  Guevara might think money only come from me,
7 though, but really not.  It comes from Macho too,
8 though.  He just -- he didn't -- he was not aware
9 about it.
10 BY MR. BRUEGGEN:
11    Q.   And what I'm getting at, Mr. Maysonet,
12 is even though you had that deal with Guevara, he
13 still came and tried to arrest Macho?
14    A.   Yeah.
15    Q.   Is that what you said?
16    A.   Yeah.
17    Q.   And you said that you and Guevara then
18 got into an argument about it?
19    A.   Well, we did got into the argument
20 because how can you pay someone and he give you a
21 word of protection, and then suddenly you're going
22 to come and take one of your guy, especially
23 someone who real close to you?  You know, it just
24 don't make no sense, you know.  He's -- actually,

JOSE JUAN MAYSONET JR., 04/16/2021          Page 178..181

Page 178

1 he -- he's an innocent man, though, you know. For
2 whatever the reason, though, you know, he just --
3 he want to hook him in, you know.
4 BY MR. BRUEGGEN:
5    Q.   Other than your agreement with Guevara,
6 did you have any other interactions with Guevara?
7    A.   If I had any other action after he
8 arrest my friend?
9    Q.   No.
10        Other than the agreement you just
11 told us about where you had this alleged agreement
12 where you gave Guevara money, did you have any
13 other interactions with Guevara?
14   A.   Yeah, yeah. He -- like I say, he was a
15 good guy, though, you know. He went to my house
16 when I was living with the mother of my son. How
17 many time he went to my house, you know, and eat,
18 you know. Eat good Puerto Rican food, though, you
19 know. How many time, you know, I'm -- you know, I
20 mean, I brung girls for him to met too, though, you
21 know. I did treat him like -- like a good person
22 though, you know. I really did, though, you know.
23 He was comfortable around me and I was comfortable
24 around him.

Page 179

1    Q.   So you had Guevara over for dinner with
2 you and your girlfriend?
3    A.   Yeah, yeah.
4    Q.   Was that when you were living with your
5 mom or were you living somewhere else?
6    A.   I was living with the mother of my son,
7 like I said, you know, yeah.
8    Q.   And you said -- also said something
9 about girls. What did you say?
10   A.   I had girls. We -- you know, there
11 were times that we had some females around, though,
12 you know, and still have good times, you know.
13 Have good quality time, should I say, though, you
14 know.
15   Q.   And can you tell me what you mean by
16 that?
17   A.   Have a good time. You know, like maybe
18 have sex, you know. Maybe have some weed, some
19 drugs. You know, whatever make you feel
20 comfortable.
21        You do good, you get reward good,
22 right?
23   Q.   Were these girls underage girls or
24 of-age girls?

Page 180

1    A.   No. Just -- I'll say they were legal,
2 you know. No, no, no minors, no.
3    Q.   And were these girls --
4    A.   Excuse me. Let me -- let me just say
5 one thing, right.
6        If there would be one thing about
7 Latin King, they don't like prostitution, though.
8 Prostitution, that's a no-no. You can meet girls,
9 you know, just no money involved.
10   Q.   So these were girls that you knew
11 from -- were they Latin Queens?
12   A.   Some of them, they were, yeah. Some of
13 them, they were, yeah.
14   Q.   But they weren't prostitutes?
15   A.   No, they're not. They're not. No
16 prostitutes, no, no prostitutes.
17 BY MR. BRUEGGEN:
18   Q.   Was Sanchez ultimately arrested by
19 Guevara?
20   A.   Yes, he did.
21   Q.   Do you know what the crime was that
22 Guevara alleged Sanchez had committed?
23   A.   I believe it was attempt murder.
24   Q.   Do you have any details about that

Page 181

1 attempt murder?
2    A.   No. I really -- I really -- you know,
3 I really don't want to talk about that, though.
4    Q.   And what happened with that case
5 against Santiago?
6    A.   The case, before it even went to trial,
7 they found Santiago dead.
8    Q.   Where did they find Santiago dead?
9    A.   In his car.
10   Q.   Was it -- what -- where was the car
11 located?
12   A.   In the neighborhood right on Crystal
13 and Kedzie.
14   Q.   So over near the neighborhood near your
15 corner?
16   A.   Yeah. It was in the neighborhood,
17 basically, yeah.
18   Q.   And had -- how had Santiago died?
19   A.   He shot himself.
20   Q.   Had you ever talked to Santiago about
21 what was going on before that he shot himself?
22   A.   I was that day -- the night that he
23 shot himself.
24   Q.   I'm sorry. What did you say, sir?

Page 182

1    A.   I was with him the night -- the day
2  that he shot himself.
3    **Q.   Okay.  You had been with him that day**
4  **and then he shot himself later that night?**
5    A.   Yeah.  We was supposed to go to
6  theater.  He was going to take his girlfriend.  I
7  was going to take my girlfriend.  And we were going
8  to have a good time and relax.
9    **Q.   Were you with him when he shot himself?**
10    A.   No.  I was in the theater.  He never --
11  hen ever made it to the theater, though.
12    **Q.   So you had been hanging out with him**
13  **earlier in the day?**
14    A.   Yeah.  Earlier in the day we were
15  hanging out and -- and you got to remember, he
16  was -- he was kind of brokenhearted.  He lost his
17  mom years earlier though, you know.  And then he
18  got charged with what he got charged for.  You
19  know, I mean, things got bad for him.
20    **Q.   And it sounds like he didn't reach out**
21  **to you for support or anything?**
22    MS. BONJEAN:  Objection to the form of that
23  question.  I don't even know what that means.
24

Page 183

1  BY MR. BRUEGGEN:
2    **Q.   If you understand, Mr. Maysonet.**
3    A.   What are you talking about?
4    **Q.   You know, you said that you had been**
5  **with him earlier that day and it sounded like**
6  **everything was fine, you had planned to go to the**
7  **theater that night, right?**
8    MS. BONJEAN:  Objection to the form and the
9  ridiculousness of that question.  That's not --
10  that's not how suicide works.
11    But go ahead.
12    THE WITNESS:  Macho, he -- he was always
13  depressed, though, you know.  And he loved his mom.
14  He never had a chance to see his mom for the time
15  she was in the hospital dying.  She had tumor,
16  cancer in the brain, and she got operated number of
17  time.  And he never -- every time that he -- she
18  was in the hospital, he never want and saw her
19  because he know that he was not a good kid either,
20  though, you know, even though his mom love him more
21  than the other siblings, though, you know.
22  Because, again, you know, black sheep in the house
23  too, though, you know.  She always wanted to make
24  sure he don't get himself in trouble, though, you

Page 184

1  know.  Little that he didn't know what we was
2  doing.  He didn't want her to find out, though, you
3  know.
4    When she died, though, you know
5  that's when things really came back for him,
6  though, you know.  Real bad.  I mean, how many
7  times we have to, you know, spend the night with
8  him just because, you know, the pain that he was
9  going through, though, you know.  It was amazing,
10  though, you know.  Losing your mom, you know,
11  someone real close to you, though, you know.  It
12  was bad.
13  BY MR. BRUEGGEN:
14    **Q.   Mr. Maysonet, do you recall a general**
15  **time or date when Santiago Sanchez committed**
16  **suicide?**
17    A.   When Macho committed suicide, it was
18  somewhere -- I know it was right after our
19  birthday.  My birthday's in ▮▮▮▮  I believe his
20  birthday, it was in -- I don't know if it was in
21  April or May, but I know we celebrate our birthday
22  ever since we met, you know.
23    And I remember that day.  We -- I
24  was in my house with -- with the mother of my son.

Page 185

1  And we had a bunch of girl too, though, you know,
2  because him being the playboy that he was, though,
3  you know.  We was having a good time, though, you
4  know.  My wife, she knew Macho too, you know, for a
5  long time, you know, and we tried to make his life
6  better, though, you know, tried to make things --
7  get things off his head, though, you know.
8    He did mention couple times that he
9  feel like, you know, killing hisself, though,
10  because he dream a lot about his mom.  His mom
11  calling him in his dream.
12    But our responsibility was make sure
13  that he -- you know, that he don't do nothing
14  stupid, though, you know.
15    **Q.   After Macho committed suicide, did your**
16  **set help pay for the funeral and visitation and**
17  **things?**
18    A.   (Nodding.)
19    **Q.   Is that a yes, sir?**
20    A.   Yes.
21    **Q.   Do you recall when Macho's visitation**
22  **was?**
23    A.   It was -- I think it was the second
24  week of may.  I think it was -- it was in May.  I'm

Page 186

1 going to say it was in May.

2    Q.   Did you go to his visitation?

3    A.   Yes.  Yes, I did.

4    Q.   And do you recall what the time of his

5 visitation was?  Was it afternoon, evening,

6 morning?

7    A.   Early in the morning, all day, until

8 they close the funeral.  That's how we wanted it.

9    Q.   Do you remember what time the

10 visitation closed?

11    MS. BONJEAN:  Objection -- oh, sorry.

12       You can answer that if you know.

13    THE WITNESS:  What time they close the

14 funeral?  Probably like late at night, right?

15    MS. BONJEAN:  Don't guess.  If you know, then

16 you just give him an answer.  If you don't know,

17 don't guess.

18    THE WITNESS:  Late.  They closed up late.

19 BY MR. BRUEGGEN:

20    Q.   Were you there throughout the whole

21 visitation, the whole day from morning till they

22 closed?

23    A.   Yeah.  He was my friend.  I'm not going

24 to let him down like that.

Page 187

1    Q.   Do you recall when the funeral was in

2 relation to the visitation?  Was it the following

3 day, a couple days later?

4    A.   Funeral was like couple days later, two

5 days later.  Something like that.

6    Q.   Did you go to the funeral?

7    A.   Yes, I did.

8    Q.   And then after the funeral, was he

9 buried in a cemetery?

10    A.   Um-hmm, yeah.

11    Q.   Is that a yes?

12    A.   Yes.

13    Q.   Did you go to the burial?

14    A.   I did went to the burial, yes.

15    Q.   After Santiago died, did somebody take

16 over as the chief of your set at Wabansia and

17 Kimball?

18    A.   No.  Not allowed to do that.

19    Q.   Why aren't you allowed to do that?

20    A.   You're not.

21    Q.   Yeah.  And I'm asking was there a rule

22 or something or how did it work?

23    A.   Yes, it's a rule.  If you don't qualify

24 for it, they're not going to put no one to hold

Page 188

1 somebody, you know, corner, you know, without

2 knowing or having the knowledge of what you're

3 doing.

4       I don't really know who -- who the

5 next in line because I got arrested after that got,

6 got put away, and I lost contact with everybody

7 after, after that.

8    Q.   And I think you were arrested in July

9 and I think you said Santiago's funeral was in May.

10       Do you know if anybody was in charge

11 of your set between May and July of 1990?

12    A.   No.  It was just -- it was just like a

13 snake, running around without no head.

14    Q.   Did your set continue to sell drugs

15 at --

16    A.   Yeah.

17    Q.   Sorry.

18    A.   Say that question again, though.  I'm

19 sorry to interrupt you.

20    Q.   Yeah.

21       Did your set continue to sell drugs

22 after Santiago passed away?

23    A.   Yeah, we did.  Yeah.

24    Q.   So everything continued, but there

Page 189

1 wasn't -- you just didn't have your chief?

2    A.   Didn't have no head.  We didn't have no

3 direction.

4    MR. BRUEGGEN:  Mr. Maysonet, I was hoping to

5 show you some photos now.

6       And Jennifer, did you guys get an

7 opportunity to print out those exhibits?

8    MS. BONJEAN:  Some of -- some of them.

9    MR. BRUEGGEN:  And I don't know if you have

10 the photos from Santiago's service.  If you have

11 those available, I'm going to pull them up on the

12 screen.

13    MS. BONJEAN:  You can pull them up on the

14 screen.  Because my experience is is that we have

15 black and white and the -- you can see them better

16 in color.  So if you pull them up on the screen,

17 it'll be better for -- at least for the

18 photographs.  Everything else we have, but I

19 didn't -- we did this yesterday, and it's just

20 hard with the -- huh?

21       (Interruption.)

22    MS. BONJEAN:  So we -- I do have everything,

23 actually.  I'm just saying we don't have the

24 photographs.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 190..193

Page 190

1    THE WITNESS: In color.
2    MS. BONJEAN: In -- yeah. I don't have the
3 photographs because they're --
4    MR. BRUEGGEN: All right.
5    MS. BONJEAN: Yeah.
6        And also, you just sent this stuff
7 to us this morning, but we -- we did get the
8 papers, for the most part. The photos we did not
9 print out in black and white. It's useless.
10    MR. BRUEGGEN: Not a problem. I was just --
11 I was going to put them on the screen anyway. I
12 just wanted to make sure whether he'd be looking at
13 the screen or he had copies.
14 BY MR. BRUEGGEN:
15    Q.   So, Mr. Maysonet, I'm going to show you
16 some photos on the screen now.
17    A.   Yes.
18    Q.   Mr. Maysonet, can you see my screen?
19 Is it -- oh, nope. Here, let me try that.
20    MS. BONJEAN: Yeah, there we go.
21 BY MR. BRUEGGEN:
22    Q.   Can you see it right now?
23    A.   Um-hmm.
24    Q.   Do you see the photo there, sir?

Page 191

1    A.   Yeah.
2    Q.   And you can see -- written in red right
3 down here, you can see my cursor, it says
4 JGS_MAYSONET 002553. You see that, sir?
5    A.   Yes.
6    Q.   Okay. And we call these Bates stamped
7 numbers and we use them to identify pages so that
8 we know what we're talking about. Okay?
9    A.   Okay. Yeah.
10    Q.   And so I'm just going to go through the
11 pictures real quick so you can see them.
12        So this is the first page of Exhibit
13 Number 1, the second page, third page, fourth page,
14 fifth page, six page, seventh page.
15    A.   Um-hmm.
16    Q.   All right. Sir, did you have an
17 opportunity to look at all those pages?
18    A.   Yeah.
19    Q.   And those are photographs, right?
20    A.   Yeah.
21    Q.   And do you know --
22    A.   That's a --
23    Q.   I'm sorry?
24    A.   That's a photograph from his burial.

Page 192

1    Q.   And do you know what burial this is?
2    A.   Macho, Santiago Sanchez.
3    Q.   And looking at this first page, which
4 is JGS_MAYSONET 2553, are you in that photograph,
5 sir?
6    A.   Yes, I am. I'm right there.
7    Q.   Which one are you, sir?
8    A.   Right here.
9    Q.   And I can't see where you're pointing
10 to. Can you --
11    MS. BONJEAN: Right there or behind there?
12    THE WITNESS: Behind there.
13    MS. BONJEAN: Okay. So I'm going to indicate
14 that if you look in the -- the right -- upper
15 corner of this photograph, there is a gentleman
16 that has a jacket sleeve that I think has some
17 writing on his left. Right? Do you see that?
18    MR. BRUEGGEN: Yes.
19    MS. BONJEAN: And then there's someone right
20 over his shoulder in what appears to be like a
21 white hoodie.
22    THE WITNESS: Um-hmm, hoodie.
23    MS. BONJEAN: Do you see that person?
24    MR. BRUEGGEN: I do.

Page 193

1    MS. BONJEAN: And that's who he's identifying
2 as himself.
3    MR. BRUEGGEN: Oh, okay. So --
4    MS. ROSEN: Do you see the pointer on the --
5    MR. BRUEGGEN: Yeah. Is it this person?
6    MS. ROSEN: Is that him?
7    THE WITNESS: Yeah, that's me.
8    MS. ROSEN: Okay.
9    THE WITNESS: I had hair.
10 BY MR. BRUEGGEN:
11    Q.   And can you identify who this gentleman
12 is that is standing right in front of you with the
13 blue and white jacket?
14    A.   I cannot see that good.
15    MS. BONJEAN: He said he can't see it that
16 good. He can't see the face.
17    THE WITNESS: Yeah. I can't see the face
18 that good.
19 BY MR. BRUEGGEN:
20    Q.   And I -- I can try to Zoom it, but I
21 don't know what that will do for the quality of the
22 picture.
23        I don't know if that helps at all,
24 Mr. Maysonet.

Page 194

1    A.   That look like Fro.

2       MS. BONJEAN:  All right.  Don't guess.  If

3 you don't know --

4       THE WITNESS:  No.  No, I don't know.

5 BY MR. BRUEGGEN:

6    Q.   Don't know.  Okay.

7          How about the person to the left in

8 the photo that the cursor's over right now in the

9 all black shirt?

10   A.   That's Efrain Cruz.

11   Q.   Who's that, sir?

12   A.   Efrain Cruz.

13      MS. BONJEAN:  Efrain Cruz.

14      MR. BRUEGGEN:  Efrain Cruz.  Okay.

15 BY MR. BRUEGGEN:

16   Q.   Okay.  And how about the person to

17 Efrain Cruz's right or our left in this photo, this

18 gentleman that I have the cursor over who's also in

19 all black?

20   A.   Yeah, no.  I don't know him.

21   Q.   What about the gentleman right here the

22 cursor's over in the red shirt with a -- looks like

23 a white coat over it?

24   A.   No.  I don't know him either.

Page 195

1    Q.   How about this gentleman here with the

2 black coat with the red lapels?

3    A.   No.  I know the guy next to him.

4    Q.   This gentleman up here?  The guy

5 standing up or the guy bent over?

6          Which one?  The one bent over, this

7 one?

8    A.   The one bent over, that's Macho's

9 brother.

10   Q.   Macho's brother.

11          And what was Macho's brother's name?

12   A.   I don't know -- I don't know his -- his

13 real name, though, but he had a -- he had a street

14 nickname, though.  What was his name again?  I

15 don't talk to him.  It's been a while, long time

16 ago.  But yeah, that was Macho's brother, though.

17   Q.   Was Macho's brother involved in your

18 set?

19   A.   No, no.

20   Q.   Do you know was Macho's brother, was he

21 a King?

22   A.   No, no.

23   Q.   How about this gentleman who's standing

24 up with the -- the black coat with just a little

Page 196

1 bit of red on it, do you know who that gentleman

2 is?

3    A.   His name is -- his street name is Jojo.

4 I don't know his real name.  He was just a big,

5 tall kid.  He was a real cool guy.

6    Q.   And do you recognize anyone else in the

7 photo?

8    A.   That's Macho brother right there with

9 the shovel.

10      MS. BONJEAN:  Oh, with the shovel.

11      THE WITNESS:  Yeah.

12 BY MR. BRUEGGEN:

13   Q.   Do you recognize anybody else in the

14 photo, sir?

15   A.   No.

16   Q.   And I know it's hard.  It's -- they're

17 old photos and copies of originals.

18          How about the next photo, which is

19 page JGS_MAYSONET 2255, do you recognize anybody in

20 this photo?

21   A.   That's Lluvia right here, the one who's

22 bending over right here.

23   Q.   In the blue coat?

24   A.   No.

Page 197

1       MS. BONJEAN:  No.  In the left-hand corner,

2 you see the face of someone bending over.

3 BY MR. BRUEGGEN:

4    Q.   This gentleman the cursor's over?

5    A.   Yeah.

6    Q.   Okay.  That's Alfredo Gonzales?

7    A.   Alfredo Gonzalez, yeah.  He always wear

8 glasses, though.

9    Q.   And do you know where this photo was

10 taken?

11   A.   That was right where Macho committed

12 suicide.

13   Q.   So this was the location where the body

14 was found in the car?

15   A.   Yeah.

16   Q.   And looks like there was a little

17 memorial that was done there?

18   A.   Yeah.  I believe that was the next day,

19 though, in -- in the -- probably in the evening

20 when we got together.  We -- well, basically, we --

21 we ain't got together.  We just happen to be -- we

22 going by just to show him -- to show a friend where

23 Macho, you know, committed suicide the night

24 before.

Page 198

1        And when we went by, we saw the guys
2 like putting flowers and doing little prayers and
3 stuff, though, you know.  And we decide to stop and
4 check who the guy is, though, you know.  We didn't
5 want nobody to disrespect where he got killed, so
6 we know there were a bunch of Latin Kings from the
7 neighborhood that really we don't want to associate
8 with them, you know.
9        When I say "associate," we don't
10 really -- we don't really talk to them, you know.
11 I mean, we might say hi and good-bye.  That's it,
12 though, you know.
13     **Q.   And, sir, is there anything else in**
14 **this photo that you can identify?**
15     A.   All I know is the building where --
16     **Q.   The people, do you know --**
17     A.   Yeah.  This guy name is -- his name is
18 Papo.
19     MS. BONJEAN:  So he's pointing to the guy
20 in -- to the right, looks to be like a black and
21 white -- or I'm sorry, black -- either black or --
22 yeah.  That guy.
23 BY MR. BRUEGGEN:
24     **Q.   This guy with the -- the white pants.**

Page 199

1     A.   Yeah.
2     **Q.   What was his name, sir?**
3     A.   Papo, P -- P-a-p-o, Papo.
4     **Q.   And do you recognize anybody else in**
5 **this photograph?**
6     A.   Not -- not really.
7     **Q.   What about this gentleman in the white**
8 **shirt and white hat?**
9     A.   No, I don't.
10     **Q.   Okay.  And was Papo, we he part of your**
11 **set?**
12     A.   No, no.  He was from another set from
13 far away from us, though, but he happened that
14 he -- he was living around the neighborhood,
15 though.
16        That's me right there.
17     MS. BONJEAN:  Yeah.
18     MR. BRUEGGEN:  And let me zoom out.
19 BY MR. BRUEGGEN:
20     **Q.   Mr. Maysonet, I'm showing you what's**
21 **the fifth page of Exhibit 1, that's Bate stamped**
22 **JGS_MAYSONET 2558.  Can you identify what this is a**
23 **photo of?**
24     A.   This a photo of -- in the funeral with

Page 200

1 Macho.  I was just -- that's me right there, matter
2 of fact.  I was just -- just bending over and, you
3 know, spending some time with him.
4     **Q.   And then, sir, looking at page 6 of**
5 **Exhibit 1, it appears to be a text message chain or**
6 **part of a text message chain.**
7        **Do you know -- is this your writing?**
8 **Freddy is standing next to the guy with the black**
9 **and blue jacket.  Did you write that, sir?**
10     A.   What you talking about, this right
11 here?
12     **Q.   The actual writing right here.**
13     MS. BONJEAN:  Okay.  First of all, show him
14 the phone number and ask him if that's his phone
15 number.
16 BY MR. BRUEGGEN:
17     **Q.   Sir, do you know the**
18 **number** ███████████
19     A.   Yeah.  That's my phone number.
20     **Q.   So are these text messages that were**
21 **sent to you?**
22     A.   No.  That's just -- just those text
23 message there, they're mine.
24     **Q.   Okay.  So these are text messages you**

Page 201

1 sent.
2        **So did you write, Freddy is standing**
3 **next to the guy with the black and blue jacket?**
4     A.   Yeah.
5     **Q.   And who is Freddy?**
6     A.   Freddy, that's Alfredo Gonzalez.
7     **Q.   And so looking at this picture, I'm**
8 **going to go back.  There's a better picture,**
9 **bigger.**
10        **You see this, the same picture from**
11 **the text message?**
12     A.   Um-hmm.
13     **Q.   And so is Freddy, this gentleman that's**
14 **in the black, next to the person in the blue Adidas**
15 **jacket?**
16     A.   No.  Freddy's all the way in -- all the
17 way in the back.  Right there.
18     **Q.   In the back up over here?**
19     A.   Right there, yeah, right there.
20     **Q.   Okay.  With --**
21     A.   Right there.  That's the one.
22     **Q.   Okay.  With the sunglasses and it looks**
23 **like he's wearing a blue colored shirt or jacket of**
24 **sorts?**

Page 202

1    A.   Jacket.  That's Freddy.
2       MR. BRUEGGEN:  All right.  Back to looking at
3  me.  Sorry.
4          Do you need a break now or you want
5  to keep moving?  It's up to you, sir.
6       MS. BONJEAN:  It's up to you.  You want to
7  take little break?
8       THE WITNESS:  Yeah.  We take a little break
9  now.
10      MR. BRUEGGEN:  All right.  Why don't we take
11  like five.  Do you want -- do you want to go have
12  another cigarette?  10 minutes.  I don't --
13  whatever you want to do, sir.
14      MS. BONJEAN:  You want to go take another
15  cigarette?  Oh, you want to eat something?
16      THE WITNESS:  Yeah.  I want to eat.  I'm
17  going to eat -- I'm going eat real quick, real
18  quick, come back.  We'll get going on it.
19      MS. BONJEAN:  Give us -- give us 10 minutes.
20      MR. BRUEGGEN:  Do you want just 10 minutes or
21  do you want to do 15?  We can do 2:00.
22      MS. BONJEAN:  Yeah.
23      MR. BRUEGGEN:  Okay.  That way he can grab
24  something to eat and have a cigarette, and -- you

Page 203

1  know.
2          All right.  Thank you very much.
3  We'll see you shortly.
4       THE VIDEOGRAPHER:  We are off the video
5  record at 1:45 at the end of Media Unit 3.
6          (Recess taken.)
7       THE VIDEOGRAPHER:  We are back on the video
8  record at 2:09 at the beginning of Media
9  Unit 4.
10  BY MR. BRUEGGEN:
11    Q.   Mr. Maysonet, when we left off we had
12  been talking about some photos.
13          Do you remember that?
14    A.   Yes.
15    Q.   Of the funeral, funeral of Santiago
16  Sanchez?
17    A.   Yes.
18    Q.   Was Rosa Bella in any of those photos?
19    A.   Well, he was there, but I don't -- I
20  don't recall if she was in one of those picture,
21  though.
22    Q.   But she was present at the funeral?
23    A.   Yes.
24    Q.   And earlier you had talked about Joe

Page 204

1  Miedzianowski.
2       Q.   Do you remember talking about him?
3    A.   Yes.
4    Q.   Did you ever give Joe Miedzianowski any
5  money?
6    A.   No.
7    Q.   Are you aware of Joe Miedzianowski --
8    A.   Excuse me.
9    Q.   Bless you, sir.
10    A.   Thank you.
11    Q.   Are you aware of Joe Miedzianowski
12  having any ties to any other gangs?
13    A.   Not in my -- not in my knowledge.
14    Q.   If Joe Miedzianowski was doing business
15  or had a relationship with a gang that was a member
16  of Folk Nation, would that have caused you concern?
17      MS. BONJEAN:  The Folk Nation?
18      MR. BRUEGGEN:  Folk Nation.
19      THE WITNESS:  Folk.  We really don't care
20  who -- who made business with.  We just care about
21  our own interest, though.  Miedzianowski never
22  made -- well, I never give him no money.  Whether
23  he was involved with other people, like you said,
24  Folks, I really don't know.

Page 205

1  BY MR. BRUEGGEN:
2    Q.   Other than what you told us about
3  Miedzianowski just being present, do you have any
4  other information about Officer Miedzianowski?
5    A.   He was always present.  That's the only
6  thing I can say.  Never talked to the guy.
7    Q.   When did you start dating Rosa Bella?
8    A.   I was young.  I was real young.
9    Q.   And when you say "young," was this
10  after you had dated the woman you told us about
11  earlier that's nickname was Crazy?
12    A.   Yeah.  As a matter of fact, I met Rosa
13  Bella through her.  She was her friend.
14    Q.   And Rosa Bella is the woman you
15  referred to throughout this deposition as the
16  mother of your children?
17    A.   Yeah.  The mother of my son.  You say
18  children like if I had more than one.
19    Q.   I'm sorry.  I misspoke.  You're
20  correct.  I think you said mother of my child.
21    A.   Yeah, mother of my son.  I only got
22  one, that I know.
23    Q.   When you started dating Rosa Bella, did
24  she have any children?

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 206..209

Page 206

1    A.   Yes.  She did.
2    Q.   How many children -- I'm sorry?
3    A.   Two girls, two girls.
4    Q.   And how old were those girls when you
5  started dating her; do you remember?
6    A.   They were babies.  They were very,
7  very, very -- I mean, the little one, she was still
8  in Pamper.
9    Q.   At some point prior to your arrest, did
10  you live with Rosa Bella in the same residence?
11   A.   Say that again.
12   Q.   Before your arrest that we're going to
13  talk about today, did you live with Rosa Bella in
14  the same house?
15   A.   Yeah, yeah.
16   Q.   And where did you first live with Rosa
17  Bella?
18   A.   On Kedzie and North Avenue.
19   Q.   Was that in your mother's --
20   A.   No.  It was in the same -- in the
21  same -- you know, I'll say it was a big-ass tall
22  building, probably like 40-apartment-unit building.
23  So I was living all the way in the back with her
24  when I met her.

Page 207

1    Q.   And did your mother live in a different
2  apartment in the same building?
3    A.   In the same building, yes.
4    Q.   Did Rosa Bella's daughters live with
5  you in that apartment at Kedzie and North?
6    A.   Yeah, yeah.
7    Q.   Did Rosa Bella have a job?
8    A.   No.
9    Q.   Did Rosa Bella speak Spanish?
10   A.   She speak just a little bit, not much,
11  but yeah, she did speak a little bit Spanish.
12   Q.   Did she primarily communicate in
13  English?
14   A.   Well, we always communicate in Spanish,
15  you know.  She -- I understand what she always
16  said, even though Spanish was a little messed up,
17  though, but yeah, she -- it was understandable.
18   Q.   How long did you -- strike that.
19        How long were you in a relationship
20  with Rosa Bella?
21   A.   Probably -- probably six year, till I
22  got put away in jail.
23   Q.   And during that time, her primary
24  language was English?

Page 208

1    A.   Well, he speak Spanish.  We would speak
2  in Spanish to me, though.  She speak English to the
3  girls, though.
4    Q.   Did her daughters speak any Spanish?
5    A.   Her older one, she knew how to speak
6  Spanish, though.
7    Q.   And during that six year relationship,
8  how did you and Rosa communicate?
9    A.   In Spanish.
10   Q.   So Rosa spoke Spanish enough to be able
11  to communicate?
12   A.   We always speak Spanish.
13   Q.   During your relationship with Rosa
14  Bella, did she use any drugs?
15   A.   Not really.  Maybe smoke weed with me,
16  though, you know.  That's about it, though, for now
17  other than -- you know.
18   Q.   Mr. Maysonet, prior to your arrest
19  that -- the arrest that we're going to talk about
20  in this case, had you been arrested by the police?
21   A.   Before?
22   Q.   Yes.
23   A.   Just for minor stuff, like, you know,
24  be in the corner, you know, disorderly conduct and

Page 209

1  stuff like that, though, you know.  I mean, no --
2  nothing -- nothing, you know, major, though.  Petty
3  stuff.
4    Q.   Were you convicted of anything prior
5  to --
6    A.   No.
7    Q.   -- this case?
8    A.   Never.
9    Q.   Did you get convicted of possession of
10  a controlled substance?
11   A.   For a bag or two.  I mean, misdemeanor
12  stuff, yeah, you know, I mean, but not nothing, you
13  know, big, though.
14   Q.   When did you first learn that two
15  African-Americans had been shot on North Avenue
16  just west of Kimball on May 25th of 1990?
17   A.   I remember when walking to -- to the
18  restaurant, everybody in the neighborhood, they
19  were actually talking about it, though, you know,
20  what happened, you know.  They never said about two
21  Black African-American.  Only thing they were --
22  the rumor was that there was two guys that got
23  killed somewhere in the vicinity of North Avenue
24  and Kimball.

Page 210

1    Q.    Where did you hear that rumor?
2    A.    When I went -- when I went to the
3  restaurant to eat, to buy some breakfast and stuff
4  early that morning.
5    Q.    And your territory was just northwest
6  of there on Wabansia and Kimball?
7    A.    On Wabansia and Kimball, yeah.
8    Q.    So was the area of that shooting, which
9  was between Kimball and North St. Louis on North
10 Avenue, was that part of your territory?
11   A.    Our territory start right on St. Louis
12 and Wabansia, all the way to -- all the way to
13 North Avenue, North Avenue all the way to Kedzie
14 and Kedzie all the way to Wabansia.  That was
15 our -- our -- basically our set, though.
16   Q.    And other than what you just told me
17 about you heard two guys were killed by North
18 Avenue, did any of the eyes and ears you had on the
19 street give any other information about that crime?
20   A.    No, not really.
21   Q.    You ever hear anything about why the
22 two gentlemen were out there at North Avenue when
23 they were shot?
24   A.    No.  We really -- it was not -- it

Page 211

1  really was not a concern anyway.  We really
2  didn't -- we really didn't care, though, you know.
3  Crime happen everywhere.  It's just that our -- our
4  rule from -- from Kings is not to commit crime in
5  the neighborhood, not to make no -- that's --
6  people think the opposite thing, though, you know.
7  It not -- it not a way people think, though, you
8  know.
9    Q.    And can you explain what you just said,
10 people think the opposite?  I didn't quite
11 understand, sir.
12   A.    You know, if any crime happen, you
13 know, in -- they say like in a neighborhood, you
14 know, the first thing people want to know, you
15 know, who did it, right?  In our neighborhood,
16 though, you know, everybody always talk about
17 thing, though, but people know that we not -- we
18 were not like that, though.
19        We -- we -- we can commit crime like
20 that in the neighborhood, though, you know.
21 Sometime if the opposite gang come in the
22 neighborhood, yeah, we might get shot, we might get
23 killed, though, you know.  Other than that, though,
24 all committed crime like that in the neighborhood,

Page 212

1  no, you can't.  You can't even rob, do stealing and
2  stuff like that in the neighborhood, though, you
3  know.
4        We never had no knowledge of what
5  happened that day.
6    Q.    Do you recall being picked up by
7  detectives on July 15th, 1990, to assist in a case?
8    A.    I got arrested I believe in July 15 for
9  the attempt murder.
10   Q.    And do you recall who arrested you?
11   A.    The detective name, it was Paulnitsky.
12   MS. BONJEAN:  And, Dave, I'm going to place
13 on the record that in connection with that
14 incident, since there is a pending post-conviction
15 petition that is likely to result in a retrial, at
16 this juncture, as to the substance of that event,
17 Mr. Maysonet's going to be invoking his Fifth
18 Amendment right as to the substance of that
19 incident at the present time.
20        We certainly will produce him at a
21 later time if you want to ask him questions about
22 it, but at this time, we're going to be invoking
23 his Fifth as to anything that occurred on -- may or
24 may not have occurred on July 3rd, I think is the

Page 213

1  date of that incident.
2        You can ask him about, you know,
3  the -- obviously, he was arrested, brought here,
4  brought there, but I'm just giving you a head's up.
5  But we can take it question by question.
6    MR. BRUEGGEN:  I was going --
7    MS. ROSEN:  Can I just --
8    MR. BRUEGGEN:  Go ahead, Eileen.
9    MS. ROSEN:  Just can I get a clarification on
10 what's the basis?  What -- just I missed what you
11 said in the beginning.
12   MS. BONJEAN:  He has a pending post-
13 conviction petition in that matter that is likely
14 to result in vacating the conviction in that case
15 and retrial.  I mean, he's likely to face trial on
16 that case again.
17   MS. ROSEN:  Okay.
18 BY MR. BRUEGGEN:
19   Q.    So, Mr. Maysonet, with what your
20 attorney just said, I just ask that you pause after
21 my questions to allow your attorney to object, if
22 she wants.  Okay?
23   A.    All right.
24   Q.    So you told me you were arrested by

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 214..217

Page 214

1 Detective Paulnitsky, right?
2    A.   That's correct.
3       Q.   Do you remember was there any other
4 detective with Paulnitsky when you were arrested?
5    A.   Yeah, there was, there was.  Actually,
6 there were probably about like three, four other
7 car with detective, though, you know.  Number of
8 detective, I know there were quite a few, though,
9 but I cannot tell you exactly right from my back
10 how many detective it was, though.
11      Q.   No problem.
12         Do you recall anybody's name other
13 than Paulnitsky?
14    A.   No.  Paulnitsky.
15      Q.   And what happened after they picked you
16 up?  Where did you go?
17    A.   Went to the police station for a
18 lineup.
19      Q.   And after -- strike that.
20         Regarding Detective Paulnitsky, had
21 you ever seen him before?
22    A.   Not -- no, not really, though, not
23 really.
24      Q.   What did the detectives tell you when

Page 215

1 they picked you up to take you to Area 5?
2    A.   Basically, I was just coming out of the
3 store with a -- with a box of beer, and I know
4 there was -- the detective, they were -- they saw
5 me going in.  And I guess they were looking for
6 someone with the name of King Leo.  That's what
7 they were looking for, someone who happened to call
8 King Leo.
9         I had a sweater with a big-ass lion
10 and a big-ass crown and bottom said Leo.  And that
11 basically how they created the name King Leo.
12 When -- when Paulnitsky came, he got out of the
13 car, was just walking, and he called me.  He said,
14 Can you come over her?
15         I don't understood English, though,
16 you know.  I just kept walking like, you know, none
17 of my business, though, you know.  So I kept
18 walking, going home.
19         And all sudden I saw -- not saw.  I
20 felt somebody kick -- kicking me in the back and
21 throwing me in the floor, thinking that I had a gun
22 on me.  So when I got turned around in the floor
23 after they caught me and stuff, I had a few weapon,
24 you know, drawn in my face, though, telling me,

Page 216

1 Where the gun, where the gun?  So I'm like, What
2 gun, you know?  I mean ...
3         There's some guy that was talking in
4 Spanish, though, you know, Danos la pistola, danos
5 la pistola, esta la pistola.  You know, I'm like,
6 man, I don't -- I really don't know what I'm --
7 what you guys talking about.  So confused, though,
8 you know.  They -- probably I don't know nothing.
9      Q.   So you were leaving the store with --
10 you said some beer, and someone kicked you in the
11 back?
12    A.   Yeah.  Well, someone called me, but I
13 kept walking, you know.  And few second later, I
14 just -- somebody kick me in the back and put be
15 down on the ground and they handcuff me in the
16 back.  And when they turn me around, I had guns in
17 my face.  They were thinking that I had a gun
18 because they keep looking and because, obviously, I
19 understood what they were saying to me, somebody in
20 Spanish come and say:  We looking for the weapon.
21 Where's the weapon?  We don't -- you don't want to
22 get shot, in Spanish.  And I'm -- I don't even
23 know.  I didn't even say nothing.  I was just --
24 just letting myself do whatever they want to do,

Page 217

1 though, you know.
2      Q.   After you were handcuffed, were you put
3 into a car and taken to Area 5?
4    A.   Yeah.
5      Q.   And when you got to Area 5, where were
6 you placed?
7    A.   In the room.  I was placed in the -- in
8 the -- what, interview room, that's they call it?
9    MR. GREENBERG:  Interrogation.
10    THE WITNESS:  Interrogation room, yeah.
11 BY MR. BRUEGGEN:
12      Q.   And did you speak to anybody in that
13 interview room when you initially got there?
14    A.   No.  I didn't -- I didn't speak -- I
15 didn't speak to nobody until somebody speaking
16 Spanish came to me, and I asked for my lawyer.
17      Q.   Do you recall standing in a lineup at
18 Area 5?
19    A.   Not -- not the minute I got there.  I
20 think we probably waited like -- I don't know, like
21 probably -- we waited for a while.  And then I got
22 placed in the lineup with three other guys, though.
23      Q.   And did you understand why you were put
24 in a lineup?

Page 218

1    A.   No.  It was first for me.

2    Q.   I'm sorry.  What did you say?

3    A.   First time for me.

4    Q.   First time you were in a lineup?

5    A.   Yeah.

6    Q.   You said you were in a lineup with
7 three other men?

8    A.   Three other guys, yeah.

9    Q.   After the lineup, were you returned to
10 that interview room?

11    A.   After the -- after the -- the lineup,
12 they placed me another room, yeah.

13    Q.   Did you speak to any police or
14 detectives when you were in that other room after
15 the lineup?

16    A.   Some officer came to me -- I said I
17 don't speak no English.  Somebody came to me
18 letting me know the reason why I was there for.

19    Q.   And what were you told the reason you
20 were there?

21    A.   Well, they told me I was there because
22 three guys got shot somewhere around the
23 neighborhood of Wabansia and Keystone, and they
24 want to know if you had anything to do with it.

Page 219

1    Q.   Did they ask where you were on July 3rd
2 of 1990?

3    A.   They did.  They did ask me.

4    Q.   And did you tell them where you were on
5 July 3rd of 1990?

6    A.   At that time I was at home with Rosa
7 Bella.

8    Q.   And do you know what time the shooting
9 was on July 3rd, 1990?

10    A.   I really don't know.

11    Q.   Do you know were you with -- strike
12 that.

13         Were you with Rosa Bella the whole
14 day on July 3rd, 1990?

15    MS. BONJEAN:  I'm just going to ask -- at
16 this point I -- I'm going to invoke his -- he's
17 going to invoke his Fifth Amendment right as to
18 anything about July 3rd.  Okay?

19 BY MR. BRUEGGEN:

20    Q.   Mr. Maysonet, are you going to follow
21 your attorney's advice and invoke -- for any
22 questions about July 3rd of 1990, invoke your right
23 to remain silent?

24    A.   Sure.  You might found out some of

Page 220

1 the -- some stuff about that some other day after
2 we done with this case, if you want to know.

3    Q.   And again, sir, I'm just making sure
4 that I understand I should not ask you any
5 questions about July 3rd, 1990, because you're
6 going to invoke your right to remain silent and
7 anything you say could incriminate you; is that
8 correct?

9    A.   The case still pending, right?  So best
10 to stop right there, though.

11    Q.   Yes.  But, again, I want to make sure
12 that you are invoking --

13    MS. BONJEAN:  He's -- yes.

14    THE WITNESS:  I understand.  I understand
15 what -- what you're saying, though.  Yes, I do.

16    MS. ROSEN:  Dave, you need a clean answer to
17 that.

18    MR. BRUEGGEN:  Yes.

19    MR. GREENBERG:  Can we go off the record for
20 a second?

21    MS. BONJEAN:  Hold on one second.  Hold on
22 one second.  I'm going to consult with my client
23 and ask -- advise him to answer your question.
24 Hold on.

Page 221

1    MR. BRUEGGEN:  Okay.

2    THE VIDEOGRAPHER:  Do we need to go
3 completely off or just wait a second?

4    MS. BONJEAN:  No, no, no.  It's going to take
5 45 seconds, not even.

6    THE VIDEOGRAPHER:  Okay.  No problem.

7         (Brief pause.)

8    MS. BONJEAN:  Okay.  Go ahead.

9 BY MR. BRUEGGEN:

10    Q.   Mr. Maysonet, did you participate in a
11 drive-by shooting on July 3rd, 1990?

12    MS. BONJEAN:  On the advice of counsel --

13    THE WITNESS:  On the -- under my -- advice of
14 my counsel, I will plead the Fifth on that.

15    MR. BRUEGGEN:  And, Jennifer, I'm going to
16 continue to ask questions and, you know, advise him
17 as you need.  I just want to ask what I can and get
18 what I can now.  Okay?

19    MS. BONJEAN:  Okay.  I -- that's fine, but I
20 am -- I am indicating for the record that he has a
21 pending case and he is going to invoke his Fifth
22 Amendment right as to those matters on advice of
23 counsel, but he will be happy to answer those
24 questions at a later date.  Okay?

Page 222

1    MR. BRUEGGEN:  No, I understand that.  I
2  just, you know, if I ask questions about various
3  gangs and stuff that impact upon that, you know,
4  it's one of those where he may want to object or
5  not.
6    MS. BONJEAN:  He has been answering questions
7  with as much detail as any of you have ever gotten
8  from anybody.  So ask your questions, but we're
9  not -- we're not -- July 3rd has nothing to do with
10  this.  And he has a pending case.
11    MS. ROSEN:  Dave, can we go off the record
12  for a second?
13    MR. BRUEGGEN:  Let's go off the record.
14    THE VIDEOGRAPHER:  We're off the video record
15  at 2:31.
16             (Recess taken.)
17    THE VIDEOGRAPHER:  We are back on the video
18  record at 2:34.
19  BY MR. BRUEGGEN:
20    **Q.   Mr. Maysonet, you invoked your right**
21  **under the Fifth Amendment because a truthful answer**
22  **would incriminate you?**
23    A.   On the advice of my counsel I invoke my
24  Fifth Amendment right at this time.

Page 223

1    **Q.   Yes.**
2        **And the reason you're invoking your**
3  **right is because answering truthfully would**
4  **incriminate you in a crime?**
5    A.   On -- under the advice --
6    MR. BRUEGGEN:  Hold on, hold on, hold on.
7        Jennifer, are you whispering things
8  to him?
9    MS. BONJEAN:  No.  I have written out how
10  he's going to invoke his Fifth Amendment right.
11  Would you like to see it?  He's going to say this
12  every time you ask that question.  So get used to
13  it.
14    MR. BRUEGGEN:  That's fine.
15    MR. GREENBERG:  Dave, you can't -- you can't
16  get into -- like you're asking stuff, first of all,
17  that's privileged also.  You're asking him the
18  reasoning behind it and that's privileged.  That
19  goes to -- our discussions with him.  So he's
20  saying, On the advice of counsel, I'm invoking.
21  You can't ask him, Why did you make that decision?
22  Get a judge to say you can, but I -- he's not going
23  to answer that.
24    MR. BRUEGGEN:  Steve, I just -- I think I can

Page 224

1  ask that and he doesn't have to tell me anything he
2  talked to his attorneys about.  I think that's
3  fair.
4    MS. BONJEAN:  Keep asking your questions
5  and -- and we'll just keep going.
6  BY MR. BRUEGGEN:
7    **Q.   Mr. Maysonet, when you were arrested on**
8  **July 15th of 1990, did you understand that you**
9  **were being questioned in relation to a shooting,**
10  **drive-by shooting that occurred against some YLOD**
11  **gang members?**
12    MS. BONJEAN:  Invoke.
13    THE WITNESS:  On the -- on the advice of my
14  counsel, I invoke my Fifth Amendment right at this
15  time.
16  BY MR. BRUEGGEN:
17    **Q.   Do you know what gang the YLOD is?**
18    MS. BONJEAN:  Do you know that?
19    THE WITNESS:  No.
20        Under the advice of my counsel, I
21  invoke my Fifth Amendment right at this time.
22  BY MR. BRUEGGEN:
23    **Q.   Were the Latin Kings at war with any**
24  **YLO Disciple gang in 1990?**

Page 225

1    MS. BONJEAN:  In the -- in 1990?
2    MR. BRUEGGEN:  Yes.  That was the question.
3    THE WITNESS:  Under the advice of my counsel,
4  I invoke my Fifth Amendment at this time.
5  BY MR. BRUEGGEN:
6    **Q.   We talked about you were involved in a**
7  **lineup earlier, sir?**
8    A.   Yes.
9    **Q.   And then after that, you spoke to some**
10  **detectives, right?**
11    A.   It was an officer, Spanish-speaking
12  officer.
13    **Q.   Was there also a detective in the room?**
14    A.   Yeah, it was.
15    **Q.   And do you know who that detective was?**
16    A.   Paulnitsky.
17    **Q.   And what did Detective Paulnitsky ask**
18  **you through the Spanish interpreter?**
19    A.   He was just letting me know the reason
20  why I was there for.  That's all.
21    **Q.   What did he say -- I'm sorry.  Go**
22  **ahead.**
23    A.   And my name too.
24    **Q.   And what did the detective tell you as**

Page 226

1 to why you were there?

2     A.   They were going to ask me questions.
3 They were waiting for somebody.  I really don't
4 know how long I waited, though, but I know they --
5 they just waited for somebody to come to the police
6 station, though, you know, to talk to me.

7     Q.   And at some point, did they ask you
8 questions?

9     A.   No.  Just --

10     Q.   They never asked you any questions
11 about the shooting?

12     A.   They told me what -- what I was -- the
13 reason why I was there for at -- at that moment,
14 you know.  They never asked me nothing about the
15 shooting, no murder, nothing.

16     Q.   Who were the detectives that you
17 interacted with?  Can you tell me all the people
18 you knew who you interacted with on July 15th
19 regarding the shooting that you were brought in
20 for?

21     MS. BONJEAN:  Okay.  I'm going to object to
22 the foundation of that question.

23         But you can answer that question.
24 If you want him to repeat it, ask him to repeat it.

Page 227

1     THE WITNESS:  Yeah.  Repeat the question
2 again.

3 BY MR. BRUEGGEN:

4     Q.   And what I'm getting at, sir, is you've
5 identified that Detective Paulnitsky was there
6 asking you questions through a Spanish interpreter.
7 I am wondering if you know the names of any of the
8 other detectives that were there asking you about
9 this shooting that happened on July 3rd.

10     A.   No.  I didn't -- I didn't know nobody's
11 name.

12     Q.   While you were at the police station,
13 do you recall speaking to an assistant state's
14 attorney regarding a July 3rd shooting?

15     A.   An assistant state attorney?  Someone
16 came in the room who happened to work with the --
17 with the state, but I -- I didn't understood what
18 she was saying anyway, so she left.

19     Q.   So a woman, you say, came in the room?

20     A.   Some woman, yeah.

21     Q.   Was she -- do you know was she a police
22 officer, was she an attorney?  Do you know what her
23 role was?

24     A.   According to the -- to the interpreter,

Page 228

1 she was -- she was a DA, a district attorney.

2     Q.   Do you recall what her name was?

3     A.   Her name, it start with a B.  I know it
4 was a female, but I don't -- I really don't know
5 the name.

6     Q.   Who was present with that female?  Was
7 Detective Paulnitsky still there?

8     A.   She -- when she came in, she came in
9 with -- with a Spanish-speaking officer.
10 Paulnitsky was there too.  They were just want to
11 hear what she had to say, I guess.

12     Q.   And this was on July 15th of 1990?

13     A.   That was the day that I got -- that I
14 got arrested for the -- for the attempt murder.

15     Q.   Did you speak to anybody else who was
16 from the DA's office or the state's attorney's
17 office?

18     A.   No, not at all.

19     Q.   Earlier when you said you were
20 arrested, you said you were kicked in the back,
21 right?

22     A.   Yes.

23     Q.   Do you know who kicked you in the back?

24     A.   No.  I really -- I really didn't saw

Page 229

1 who.  You know, they kicked me from behind.  So by
2 the time I turn around, there was a bunch of guns
3 drawn in my face.

4     Q.   And while you were in the interview
5 room on July 15th, 1990, did any police officer lay
6 hands on you?

7     A.   No, no.  They didn't -- they didn't lay
8 they hands on me that day.

9     Q.   They just asked you questions?

10     A.   They did ask me questions, yeah.

11     Q.   Were you charged with the attempted
12 murder on that day?

13     A.   Yes, I did.

14     Q.   Were you taken down to the lockup at
15 Area 5?

16     A.   Yes.

17     Q.   And then subsequently sent to Cook
18 County Jail?

19     A.   Yes.

20     Q.   Did you retain an attorney regarding
21 those charges?

22     A.   I hired attorney.

23     Q.   Who was that?

24     A.   Martin Abraham.  I think I said it

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 230..233

Page 230

1 right. Martin Abraham.
2    Q.   And how did you know Mr. Abraham?
3    A.   Oh, he was basically the lawyer of --
4 of some of the guys, you know, from the
5 neighborhood. Other -- I met him through other
6 people. I met him through other people.
7    Q.   When did you first contact Mr. Abraham
8 after July 15th, 1990?
9    A.   Actually, my family contacted him as
10 soon as I got arrested.
11   Q.   How long were you in Cook County Jail
12 after you were transferred there on July 15th,
13 1990?
14   A.   30 days.
15   Q.   Were you able to bond out?
16   A.   Yes. I did bond out.
17   Q.   Prior to being transferred, when you
18 were in the interview room prior to being
19 transferred down to lockup, did you speak to a
20 Sergeant Mingey and a Detective Montilla?
21   A.   Montilla, yes.
22   Q.   Montilla?
23   A.   Frank Montilla, yes.
24   Q.   Was this after you had talked to

Page 231

1 Paulnitsky and the female attorney?
2    A.   Yeah.
3    Q.   What did you talk to Mingey and
4 Montilla about?
5    A.   They -- the same day that I got
6 arrested.
7    Q.   Not when. What did they -- did they
8 ask you questions?
9    A.   They did ask me questions.
10   Q.   And what did they ask you?
11   A.   Where was I on July 3rd, 1990.
12   Q.   So Mingey and Montilla were asking you
13 questions about July 3rd of 1990?
14   A.   Well, they were -- first they were
15 question me about the attempt murder, and then they
16 changed the focus of -- of double murder.
17   Q.   And was that the double murder that we
18 talked about earlier that happened on North Avenue?
19   A.   Yeah.
20   MS. BONJEAN: Hold on one second. There's
21 someone that entered the room for a second. Just
22 hold on a second. Okay? I think she's ...
23   MR. BRUEGGEN: Entered your room or --
24   MS. BONJEAN: Yeah. The housekeeper just

Page 232

1 came in. Hold on a second.
2    MR. BRUEGGEN: You're like looking around.
3 You're scaring me.
4    MS. BONJEAN: Hold on. I just figure it's
5 distracting, so hold on.
6    MR. BRUEGGEN: Do you want to go off the
7 record until she's done or --
8    MS. BONJEAN: No. I think she's just --
9 we're -- Ashley, can you please -- it's
10 distracting. Ask her to leave.
11       Okay. Yeah, that's -- that's fine.
12 You can go now. It's just -- she dropped off some
13 towels. Go ahead.
14 BY MR. BRUEGGEN:
15   Q.   Mr. Maysonet, so Mingey and Montilla
16 were asking you about the double murder we talked
17 about earlier that happened on North Avenue?
18   A.   Yeah.
19   Q.   And what did they ask you?
20   A.   They want to know my wheres about
21 that -- that day that the crime happened and what I
22 was doing and stuff like that, though.
23   Q.   And did you tell them where you were
24 when that crime happened?

Page 233

1    A.   I was in my house.
2    Q.   And do you remember how you could
3 recall where you were when that crime happened in
4 May and we're talking about July?
5    A.   Double -- double murder?
6    Q.   Yeah, the double murder.
7    A.   Yeah. I -- I was in my house. I don't
8 -- I don't -- I don't -- Rosa Bella have two girls.
9 They need to take care of her, and she -- older
10 one, she -- she's epileptic, though, you know, and
11 sometimes she get those seizures attack and we need
12 -- we need to take them to the hospital, though.
13   Q.   So Rosa Bella was an epileptic?
14   A.   No. Her daughter, her oldest.
15   Q.   And so do you have a recollection then
16 of -- on the earlier morning hours of May 25th,
17 1990 being at home?
18   A.   Yeah, I was at home. Yes, I was.
19   Q.   And did you tell police that?
20   A.   I did tell them that.
21   Q.   Did they ask anything else?
22   A.   All they want -- they wanted to know
23 if -- you know, if I got lawyers, if -- you know,
24 stuff like that, though, you know. Who were I

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 234..237

Page 234

1 living with, though.  You know, just basic
2 questions and stuff, though.
3           I told them I got a lawyer.  I told
4 them, you know, I don't know why, you know, they
5 wanted to talk to me about that, though, you know,
6 when -- when I didn't have nothing to do with
7 nothing, you know.
8           So again, they just brung -- they
9 saying that the -- the other case, the weapon is
10 supposed to have something to do with this case.
11 Whether it true or not, I don't know.  I just --
12 like I said, I didn't -- I didn't have no -- I
13 didn't have much to say to them only other than I
14 wanted my lawyer present.  I was getting scared,
15 though, you know, and -- and disoriented, you know.
16 I never -- I never been through stuff like that in
17 my life before, though.
18     Q.   And, sir, switching back to your time
19 at Cook County Jail after you were arrested on the
20 attempt murder on July 15th, were you visited by
21 any of your fellow Latin Kings while you were in
22 jail?
23     A.   No.
24     Q.   Did you plead guilty to the attempt

Page 235

1 murder case?
2     MS. BONJEAN:  You can answer that --
3     THE WITNESS:  Yeah.
4     MS. BONJEAN:  -- that question.
5     THE WITNESS:  Yeah.
6 BY MR. BRUEGGEN:
7     Q.   You were sentenced to 15 years in the
8 IDOC based on that plea of guilty to the attempt
9 murder?
10     A.   Yeah.
11     Q.   Did you commit that murder?
12     A.   Under my -- advice --
13     MS. BONJEAN:  Wait.  Hold on.  The murder?
14     MR. BRUEGGEN:  I'm sorry.
15 BY MR. BRUEGGEN:
16     Q.   Did you -- strike that.  Let me
17 rephrase it.
18           Did you commit that attempt --
19           (Crosstalk.)
20     MS. BONJEAN:  -- questions about the double
21 murder, but because the -- the attempt murder is
22 pending, he -- he is not going to at my advice.  So
23 if you want to ask about the attempt, I got to be
24 clear on what you're asking about.

Page 236

1     MR. BRUEGGEN:  And, Jennifer, I think I
2 misspoke.  That's why I was going to strike that,
3 withdraw the question and I'll rephrase.
4     MS. BONJEAN:  Okay.
5 BY MR. BRUEGGEN:
6     Q.   We were just talking about your
7 pleading to the attempt murder, right, sir?
8     A.   Yes.
9     Q.   Did you commit the attempt murder on
10 July 3rd of 1990?
11     A.   Under the advice of my counsel, I
12 invoke my Fifth right at this time.
13     MS. BONJEAN:  But we will be happy to produce
14 him at a later date to answer questions about that.
15     MS. ROSEN:  And -- and when do you propose
16 that's going to be?
17     MS. BONJEAN:  Well, we have a hearing in his
18 case that was supposed to be set, but thanks to the
19 state continually delaying it, we haven't been able
20 to have that hearing.  But it's supposed to be set
21 in front of Judge Reddick.  And I suspect we will
22 be able to do that in very short course.
23     MS. ROSEN:  So once -- I'm not -- I guess I
24 should be clearer.  Do you mean you're going to

Page 237

1 wait until the case -- the conviction gets
2 overturned, as you suspect, and then you're going
3 to bring him back or are you going to wait until
4 the entire proceeding gets resolved?
5     MS. BONJEAN:  We're going to wait until the
6 case is overturned and then we're going to demand
7 trial, and I suspect the state will have to bring
8 him to trial pretty quickly.
9           And we have plenty of Monell
10 discovery to do, as you said, what, you -- you
11 predicted like two years, Eileen.
12     MS. ROSEN:  Jennifer, I'm not trying to get
13 sarcastic with you here.  I am just trying to get
14 an understanding of what your plan is.
15     MS. BONJEAN:  When -- when the state says,
16 Motion to stay, nolle pros, we'll produce him.
17 We'll produce him that afternoon if you'd like.
18     MS. ROSEN:  Thanks.  It wasn't really
19 supposed to be a trick question or to get a debate
20 about.  It was simply an idea of what your plan
21 was.  Thank you.
22     MS. BONJEAN:  You're welcome.
23 BY MR. BRUEGGEN:
24     Q.   Mr. Maysonet?

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 238..241

Page 238

1    A.   Yes, sir.
2    Q.   Why did you plead guilty to the attempt
3 murder case?
4         MS. BONJEAN:  Hold on.  We're going to --
5         MR. GREENBERG:  Well, no.  That -- that gets
6 into -- I'm going to object.  That gets into
7 attorney/client privilege matters.
8         MS. BONJEAN:  Yeah.  We're going to object at
9 that point, not so much on Fifth Amendment grounds,
10 but he does at this point have an attorney/client
11 privilege with his then attorneys as it relates to
12 that matter.  So ...
13        MS. ROSEN:  And I'm going to object to Steve
14 objecting from across the room.  There's one lawyer
15 involved in defending the case.  So he should get
16 closer to you and whisper in your ear, if that's
17 what he needs to do.
18        MR. GREENBERG:  We're in a hotel room,
19 Eileen, and that would just make me a little bit
20 uncomfortable.
21        MS. BONJEAN:  Okay.  I will -- don't worry.
22 I will object from this -- this point.
23        MR. GREENBERG:  I'll throw something at her,
24 if that's okay.

Page 239

1         MS. ROSEN:  I just don't want to hear you.
2         MS. BONJEAN:  Well, you're not the only one.
3         MR. GREENBERG:  Would you rather hear her?
4 That's really -- I -- that hurts.
5         MS. BONJEAN:  Okay.  Go ahead.
6 BY MR. BRUEGGEN:
7    Q.   Mr. Maysonet, let me rephrase the
8 question, and I think -- you know, to clarify
9 everything.
10        Why did you plead guilty to the
11 attempt murder?
12        MS. BONJEAN:  Okay.  I'm going to object on
13 attorney/client privilege grounds.  He's not going
14 to answer that question.
15 BY MR. BRUEGGEN:
16   Q.   Mr. Maysonet, are you going to listen
17 to your attorney and not answer that question?
18   A.   Yes, sir.
19   Q.   Okay.  How long was Martin Abrams your
20 attorney on the attempt murder case?
21   A.   Just for a brief moment.
22   Q.   When you say "a brief moment," can you
23 put that in days, weeks, or court hearing?
24   A.   I'm going to put it like in -- I'm

Page 240

1 going to put it like in court hearing.  Because
2 after him, I went and hired another lawyer.
3    Q.   Did Martin Abrams speak Spanish?
4    A.   No, he don't.  Just -- maybe just few
5 word here and there, though, but other than that,
6 though, no.
7    Q.   And how long after retaining Mr. Abrams
8 did you hire another attorney?
9    A.   Well, let's see.  I got arrested in
10 July.  I'll probably say before -- before I even
11 get out -- out of jail, though, or bond myself out,
12 I got the second attorney, though.
13   Q.   Who was the attorney that you got, the
14 second attorney?
15   A.   William Swano.
16   Q.   Why did you switch attorneys?
17        MS. BONJEAN:  I'm going to object on
18 attorney/client privilege grounds and instruct him
19 not to answer.
20 BY MR. BRUEGGEN:
21   Q.   And, Mr. Maysonet, I will rephrase the
22 question -- or strike that.
23        Are you able to answer my question
24 without revealing anything you talked to your

Page 241

1 attorneys about?
2         MS. BONJEAN:  All right.  Can you answer --
3 hold on.
4         Can I consult with him?
5         MR. BRUEGGEN:  Yes.  On this privilege, yes.
6         MS. BONJEAN:  Yeah.
7         (Recess taken.)
8         MR. BRUEGGEN:  Jennifer, are you guys ready
9 to go?
10        MS. BONJEAN:  Yes.  Go.
11 BY MR. BRUEGGEN:
12   Q.   Okay.  Mr. Maysonet, my last question
13 was, Why did you switch attorneys?  And when I ask
14 that, I don't want to know anything you spoke to
15 your attorneys about in switching, but if you had
16 reasons for -- had reasons you discussed with your
17 family.  Can you tell me, sir?
18   A.   My family was the one who got lawyer,
19 so I really didn't have nothing to tell -- nothing
20 to decide on that, though, you know.  That was they
21 money, not mine.
22   Q.   So did your family retain Mr. Abrams?
23        MS. BONJEAN:  Mr. Abrams or Mr. Swano?
24

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 242..245

Page 242

1 BY MR. BRUEGGEN:
2     Q.   Mr. -- Mr. Abrams, starting with the
3 first attorney.
4     A.   Abraham, he been know by -- with the
5 family, but then later we got Swano through my
6 family, basically.  You know, they the one who
7 really made the decision to get Swano.
8 BY MR. BRUEGGEN:
9     Q.   Did your family retain Mr. Swano on
10 your behalf?
11     A.   Yes.
12     Q.   And did you tell your family you wanted
13 to switch attorneys before they were -- they
14 retained Mr. Swano?
15     A.   No.
16     Q.   Did you have any concern with them
17 switching attorneys even though you'd been
18 represented by Mr. Abraham?
19     A.   No, not really.
20     Q.   And do you know how your family came to
21 retain Mr. Swano?
22     A.   I believe Swano, he was my
23 brother-in-law attorney.
24     Q.   And who was your brother-in-law?

Page 243

1     A.   Wilfredo Rivera.
2     Q.   Wilfredo Rivera?
3     A.   Yeah.
4     Q.   Was Wilfredo Rivera a member of the
5 Latin Kings?
6     A.   Yes.
7     Q.   Was he from your set?
8     A.   No.
9     Q.   What set was Wilfredo Rivera from?
10     A.   Basically, he was from Whipple and
11 Wabansia.
12     Q.   Did you pay Mr. Swano to represent you?
13     A.   My family did.
14     Q.   Do you know where your family got the
15 money to pay Mr. Swano?
16     A.   They work, so ...
17     Q.   Did you retain Mr. Swano before or
18 after you bonded out of prison on the attempt
19 murder charge?
20     A.   I was -- I was still incarcerated when
21 I got Swano, though.
22     Q.   You were still incarcerated when you
23 got Swano?
24     A.   Yeah.

Page 244

1     Q.   Okay.  Thank you, sir.
2     A.   He went and visit me and stuff.
3     Q.   Did Mr. Swano speak Spanish?
4     A.   No, he didn't speak Spanish.
5     Q.   How did you communicate with Mr. Swano?
6     A.   Through the translator.
7     Q.   Every time you spoke to Mr. Swano, was
8 there a translator?
9     A.   Yes.
10     Q.   Who posted your pail or bond to get out
11 of prison on the attempt murder charge?
12     A.   My family.
13     Q.   And do you know where your family got
14 the money to do that?
15     A.   Again, they work, so ...
16     Q.   Mr. Maysonet, earlier you talked about
17 a community fund from your set of the Latin Kings
18 and that was to be used for attorneys and bonding
19 people out.  Do you recall talking about that?
20     A.   Yes.
21     Q.   Do you know if your family got any
22 money from your set of the Latin Kings to help pay
23 for your attorney?
24     A.   No, they don't.

Page 245

1     Q.   What about to pay your bond?
2     A.   They paid the bond, not -- not on the
3 money from -- from the gang.
4     Q.   While you were incarcerated at the Cook
5 County Jail on the attempt murder charge, do you
6 recall speaking to Sergeant Mingey and Detective
7 Montilla?
8     A.   Yeah.  They went and visit me.
9     Q.   Do you recall when they visited you?
10     A.   Probably few week after I got locked
11 up.
12     Q.   Do you recall prior to speaking to them
13 that a Cook County guard gave you a form to sign?
14     A.   A Cook County -- Cook County guard, he
15 give me a form to sign, yes.
16     Q.   Did you sign that form?
17     A.   I did.
18     Q.   And was that form explained to you?
19     A.   Nobody explain what I was signing.
20 Just -- they just told me to sign in order for me
21 to get put in the room with the detective, though,
22 Montilla and Mingey.
23     Q.   I'm sorry.  Did you say it got put in a
24 room with -- or they put you in the room.  Could

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 246..249

Page 246

1 you -- I'm sorry.  Could you just repeat your
2 answer, sir?
3      A.  Right.  I will explain to you.
4           After I sign the paper, I got put in
5 the room with Mingey and Montilla, though.  I
6 didn't know they were there, though.
7      Q.  And did you look at the form before you
8 signed it?
9      A.  I did look at the form, but I couldn't
10 understood what it said, though.
11     Q.  And what did Sergeant Mingey and
12 Montilla ask you about while you were in that room?
13     A.  They want to -- they want to know if I
14 ha anything to do with -- with the double murder.
15     Q.  The double murder that happened on
16 North Avenue just west of Kimball?
17     A.  Yes.
18     Q.  And if I refer to that as the Wiley
19 brothers murder, do you understand that the Wiley
20 brothers were killed in that murder?
21     A.  Yeah.  Just the -- the two guys that
22 got killed in there, they are the two -- were
23 actually two brothers, yeah.
24     Q.  And I'm just trying to make it simple.

Page 247

1 If we refer to that again, I don't want to keep
2 saying the murder what was west off Kimball on
3 North Avenue.  Okay, sir?  So I'll just call it the
4 Wiley brothers murder.
5      A.  Okay.  All right.
6      Q.  Did you ask Mingey or Montilla if there
7 was a chance you could get a deal on your attempted
8 murder case if you had information about the Wiley
9 brothers murder?
10     A.  No.  They -- I never -- I never asked
11 for no deal.
12     Q.  How long were you with Mingey and
13 Montilla in the room at Cook County Jail?
14     A.  Few minutes, very, very, very short few
15 minutes.  Not long.
16     Q.  Less -- was it less than five minutes?
17     A.  I'll probably say so.
18     Q.  What else did Mingey and Montilla ask
19 you?
20     A.  They just want to know, you know, my
21 wheres about that day.  I kept telling them where I
22 was, you know.  Suddenly they got mad because they
23 thought that I was not being truly honest with
24 them.  So I got mad at myself too.  So we got into

Page 248

1 a heated argument in the room.  And Montilla
2 started raising his voice on me and I raise his
3 voice on him.  I got off of the chair.  He ordered
4 me for me to sit down.
5           And I told him:  No, I'm leaving.
6 I'm -- I don't -- I don't have nothing to talk to
7 you.  You guys come to me.  I didn't ask for you --
8 to see you guys, though, you know.  I'm leaving.
9           That's when somebody came.  The --
10 some old man that give me the paper, he came in the
11 room.  He was screaming real loud.  I don't know
12 what they were talking about.  Only thing I saw,
13 that everybody focus on the old man where he was
14 screaming.
15           And that was my chance for me to
16 leave the room.  I just leave the room.  They said
17 I could leave the room anytime I want.  I left the
18 room.
19           So the guard or the -- the old man,
20 he grabbed me.  He was in civilian clothes, matter
21 of fact.  He grabbed me and he took me.  That was
22 it.
23     Q.  And that old man in civilian clothes,
24 he worked for Cook County Jail?

Page 249

1      A.  Yes.
2      Q.  Did either Mingey or Montilla lay any
3 hands on you in that interaction?
4      A.  No, no.  But he got -- it was a
5 heating -- a heating argument.  I mean, it was
6 about to, you know, get real, real, real, real bad.
7      MR. BRUEGGEN:  Mr. Maysonet, I would like
8 to show you what we'll mark as Maysonet Exhibit
9 Number 2.
10          And, Jennifer, this is the Cook
11 County Jail authorization.
12     MS. BONJEAN:  Okay.  Hold on.  I have the
13 paper.  Let me grab it.
14     MR. BRUEGGEN:  And I'll also put it up on the
15 screen just to make sure we're on the same page,
16 sir.
17     MS. BONJEAN:  Okay.
18     MR. BRUEGGEN:  So -- and for the court
19 reporter.
20 BY MR. BRUEGGEN:
21     Q.  Mr. Maysonet, I put up what we're going
22 to call Maysonet Exhibit Number 2 on the screen.
23 Can you look at that?
24     A.  Yeah.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 250..253

Page 250

1    Q.   You see that document?

2    A.   Um-hmm.

3    Q.   And I believe you have a paper copy
4  there of the same document?

5    A.   Yeah.

6    Q.   And would it be easier for you to use
7  the paper copy or the screen copy?

8    A.   I think the copy would be better.  I
9  can hardly see the numbers in that one.

10   Q.   Okay.  So why don't we use the paper
11 copy you have there.  And just if you could for me
12 confirm that's the same document you see on the
13 screen.

14   A.   Yeah.  It is the same document.

15   Q.   Okay.  Mr. Maysonet, have you seen
16 Maysonet Exhibit Number 2 prior to today?

17   A.   Don't believe it.

18   MS. BONJEAN:  He's asking if you saw this
19 before today.

20   THE WITNESS:  Yes.  Yes, I did.

21 BY MR. BRUEGGEN:

22   Q.   And can you tell us what Maysonet
23 Exhibit Number 2 is?

24   A.   The Cook County Department of

Page 251

1  Correction paper.

2    Q.   And is this the -- the paper that the
3  Cook County guard handed to you before you met
4  Mingey and Montilla on August 1st, 1990?

5    A.   Yeah.

6    Q.   And see some typed writing and then
7  there's also some handwriting on the page, right,
8  sir?

9    A.   Right.

10   Q.   In August of 1990, you could recognize
11 your name when it was written on a piece of paper,
12 right?

13   A.   Yes, sir.

14   Q.   Again, the spelling of your name is the
15 same whether it's in Spanish or English?

16   A.   My name in Spanish or English?  My
17 name, it's there.

18   Q.   Yeah.  And what I'm asking is whether
19 it's -- you know, your name is the same whether you
20 speak Spanish or English, right?

21   A.   Right.  Yeah, yeah.

22   Q.   And so when you were handed this form,
23 did you see your name on there?

24   A.   Yes, I do.

Page 252

1    MS. BONJEAN:  No.  What -- not --

2    THE WITNESS:  Oh, talking about --

3    MS. BONJEAN:  When -- can you lay some
4  foundation?  Handed this form now or handed it at a
5  different point?

6  BY MR. BRUEGGEN:

7    Q.   Mr. Maysonet, when you were handed this
8  form by Cook County correctional officer, you said
9  you looked at the form, right?

10   A.   Yeah.

11   Q.   And did you see your name on the form
12 when looked at it back in August 1st of 1990?

13   A.   I saw that -- I saw my name in -- in
14 the -- in the page in the top.

15   Q.   And did you see right below your name
16 there's some other writing and it says -- hard to
17 read, but it looks like Sergeant Mingey.  Did you
18 see that?

19   A.   Yes, I do.

20   MS. BONJEAN:  No.  He's talking in present
21 tense.  Can you please --

22   MR. BRUEGGEN:  I'm going to clarify,
23 Jennifer.  Calm down.

24

Page 253

1  BY MR. BRUEGGEN:

2    Q.   Did you see that it says Sergeant
3  Mingey on this form when you were handed the form
4  back in August of 1990?

5    A.   No.

6    Q.   And then down below it there's some
7  additional handwriting.  Again, do -- did you see
8  your name that's written there when you were handed
9  this form in August of 1990?

10   A.   No.  My name was not there.  I signed
11 the paper where it got the signature, though.  All
12 that maybe come later, though.  I know the paper, I
13 had to sign the name right there.  And this right
14 here, it was only my name.  They didn't have no
15 Sergeant Mingey or whatever the stuff on the
16 bottom, though.

17   MS. BONJEAN:  I'm going to -- I'm going to
18 represent that he -- he said he saw his name up at
19 the top, but they didn't have no -- no Sergeant
20 Mingey or anything else.

21   MS. ROSEN:  I think he -- he can speak.  Why
22 are you representing?  He said what he said.  Why
23 are you rephrasing what he said?

24   MS. BONJEAN:  I'm not rephrasing.  I am

Urlaub Bowen & Associates, Inc.   312-781-9586

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 254..257

Page 254

1 clarifying what he's pointing to on the paper.
2      Fine. You don't want --
3      MS. ROSEN: Well --
4      MS. BONJEAN: You don't -- you guys figure it
5 out, but I'm not going to let you misrepresent what
6 he's saying. So go ahead. You figure out what
7 he's pointing at without being able to see it.
8      MS. ROSEN: Can you stop yelling?
9      MS. BONJEAN: I'm --
10     MS. ROSEN: You --
11     MS. BONJEAN: You can hear --
12     MS. ROSEN: You can point -- stop yelling.
13     MR. BRUEGGEN: All right.
14     MS. ROSEN: Just point to if you want to
15 identify on the page, but you -- you just simply
16 were repeating. You started with, He said. We can
17 hear him.
18     MS. BONJEAN: I said, He pointed.
19     MS. ROSEN: No, you didn't. You said, He
20 said.
21     MS. BONJEAN: Okay. Go ahead. Go ahead. I
22 will not -- I was trying to make it easier. I'm
23 not misrepresenting what he's -- what he's pointing
24 at, so --

Page 255

1      MS. ROSEN: I'm not asking -- I'm not
2 suggesting that, Jennifer. I am simply saying if
3 you -- if you would like to tell us what he's
4 pointing to, that would be great, but that's not
5 what you just did. You said, He said.
6      MS. BONJEAN: Okay. Go ahead, go ahead.
7 BY MR. BRUEGGEN:
8      Q.  And, Mr. Maysonet, I'm going to share
9 my screen again that has that same document, just
10 to make sure that I fully understand what you're
11 saying, because obviously the document's in front
12 of you and I'm not there with you.
13          So let me pull it up on the screen
14 for you right now. Okay? And you can look at
15 either your document or this document, but I'm
16 going to show you some things on this document that
17 I'm going to want you to look at. Okay?
18     A.  Yeah.
19     MS. BONJEAN: You can enlarge or --
20 BY MR. BRUEGGEN:
21     Q.  Does it need to be larger, sir, or can
22 you read it?
23     A.  You could put little bit larger.
24          Yeah, that's good right there.

Page 256

1      Q.  That's good?
2      A.  Yeah.
3      Q.  Okay. And so up at the top where the
4 cursor is, it says, I, Inmate Jose Maysonet. Do
5 you see what I'm indicating, sir?
6      A.  Yes.
7      Q.  Was that Jose Maysonet written on this
8 form when it was handed to you by the Cook County
9 guard?
10     A.  That was only thing was there, my name
11 and the ID number that I had when I was
12 incarcerated. That's about it.
13     Q.  Okay. So this part right below your
14 name and ID number where it says, Sergeant Mingey,
15 and then typed DEPT and written CPD was not on
16 there when you signed this form?
17     A.  No, it was not there.
18     Q.  Right what below where it says again,
19 I, Inmate, handwritten Jose Maysonet and your ID
20 number, was that on this form when you signed it?
21     A.  No. It was not there either.
22     Q.  And then down below that it says,
23 Signature, and it appears to say, Jose Juan
24 Maysonet. Do you see that, sir?

Page 257

1      A.  Yes.
2      Q.  Is that your signature?
3      A.  It is.
4      Q.  And you signed this form on August 1st,
5 1990?
6      A.  Yeah.
7      Q.  And you signed it before you met with
8 Mingey and Montilla?
9      A.  Yeah, I did.
10     Q.  Did you write your ID number?
11     A.  No.
12     Q.  Did you write the date?
13     A.  No.
14     MR. BRUEGGEN: And, Mr. Maysonet, this is
15 another good point to take just a quick break to
16 use the bathroom or grab more coffee or a drink or
17 something, and we can get back on the record
18 shortly. I only need about like two to three
19 minutes, if that's all right.
20     THE WITNESS: Okay.
21     MR. BRUEGGEN: Does that work?
22          All right. Thank you.
23     THE COURT REPORTER: Can I get five?
24     MR. BRUEGGEN: Yes, we can do five.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 258..261

Page 258

1    THE COURT REPORTER:  Thank you.
2    THE VIDEOGRAPHER:  We're off the video record
3 at 3:10 at the end of Media Unit 4.
4         (Recess taken.)
5    THE VIDEOGRAPHER:  We are back on the video
6 record at 3:17 at the beginning of Media Unit 5.
7 BY MR. BRUEGGEN:
8    Q.   Mr. Maysonet, do you recall going to
9 court on the morning of August 22nd, 1990?
10   A.   August 22nd, 1990, yes.
11   Q.   What time was court that day?
12   A.   I believe it was probably like around
13 9:00, 9:00 o'clock in the morning.
14   Q.   Was that court for your attempt murder
15 charge?
16   A.   Yes.
17   Q.   What had you done that morning prior to
18 going to court?
19   A.   Say that again.
20   Q.   What did you do prior to going to court
21 that morning?
22   MR. GREENBERG:  And don't leave out shit.
23   THE WITNESS:  What did I did?  Just eat my
24 breakfast and go -- go to court before I get myself

Page 259

1 in trouble.
2 BY MR. BRUEGGEN:
3    Q.   Do you know what time you arrived at
4 the Cook County courthouse?
5    A.   Not probably before 9:00.
6    Q.   Who did you go to the Cook County
7 Courthouse with on August 22nd, 1990?
8    A.   Rosa Bella.  My sister, Rose Maysonet.
9 And a friend of mine, though, that I know by his
10 street name, Pantoja, though.  He was my driver.
11   Q.   You said "street name, Pantoja."
12 Is that P-a-n-t-o-j-a?
13   A.   Yeah, Pantoja.  Not J -- J, yeah, J.
14 Yeah.  I'm sorry.  J.
15   Q.   And was Pantoja, was he a Latin King?
16   A.   No, no.
17   Q.   Do you know what his real name was?
18   A.   No.  I -- I didn't.  He was just -- he
19 was just one of the kids from the neighborhood,
20 though, you know.  Good kid, though.
21   Q.   And you said he was your driver?
22   A.   Yeah.  He was my driver that day.
23   Q.   So he gave you a ride to the
24 courthouse?

Page 260

1    A.   Yes, he did.
2    Q.   Did he stick around?
3    A.   He -- he stuck around for a brief
4 moment and then he went outside.  And by the time
5 he came -- he came in, I guess, you know, I was
6 already -- I was already on my way to the police
7 station.
8    Q.   So he came in initially.  Was he there
9 in court in Room 101?
10   A.   Um-hmm.
11   Q.   Yes?
12   A.   Yes.  Sorry, sorry.  Yes.
13   Q.   No problem, sir.  You've done great so
14 far.
15   A.   Okay.  Thank you.
16   Q.   And then when did he leave?
17   A.   He -- he left, I want to say five
18 minute before -- before we got there.  He went
19 outside.  And by the time, you know, he came back,
20 that's when I was on my way to the police station,
21 though.  He probably didn't even know what happened
22 to me until somebody else probably told him.
23   Q.   And do you know where Pantoja lived?
24   A.   By the time, yeah.

Page 261

1    Q.   Yeah, at the time.
2         Can you tell me what his address
3 was?
4    A.   No.  I don't know the address, but I
5 know where he was living, though.
6    Q.   And can you describe where he was
7 living, whether cross streets or --
8    A.   He was living right on Potomac and
9 Kedzie, though, right, the first building.  I
10 really don't know the address around there, though.
11   Q.   Was your attorney present with you in
12 court in Room 101?
13   A.   My -- my lawyer, can you -- the name?
14   Q.   Your -- your lawyer, was he present
15 with you in Courtroom 101 when you first appeared
16 at Cook County on August 22nd, 1990?
17   A.   No.
18   Q.   Your lawyer at that time was Mr. Swano?
19   A.   Yes.
20   Q.   And what happened in Courtroom 101?
21   A.   The judge, he -- the judge give me --
22 when they call my name, the judge, she give me like
23 some kind of pass, a piece of paper.  And by the
24 time I understood what she was being -- what she

JOSE JUAN MAYSONET JR., 04/16/2021                 Page 262..265

Page 262

1 was saying and to -- I mean, I keep thinking Judge
2 Morgan.
3        The judge, he was present that day,
4 I don't know the name, he give me a piece of paper,
5 and he said something.  I came to find out what he
6 was telling me when -- when my sister, she told me
7 that I got to go to the courtroom in 302 and make
8 sure the name of the judge and I got to stay there
9 until they call my name.  If I weren't -- if I
10 don't go there, I will get myself in trouble with
11 the judge.
12    **Q.  Was your attorney, Mr. Swano, supposed**
13 **to meet you in Courtroom 101 that morning?**
14     A.  He was supposed to meet me in --
15 when -- when the judge -- he assign me to a trial
16 judge.  He said he'll be -- he will be there as
17 soon as, you know, the judge, we found out who the
18 judge is, though.
19    **Q.  Had you talked to your attorney,**
20 **Mr. Swano, that morning of August 22nd, 1990?**
21     A.  No.
22    **Q.  What happened after you left**
23 **Courtroom 101?**
24     A.  When -- when -- when I was walking out

Page 263

1 of the courtroom going to the -- to the courtroom
2 that I was assigned for, I open the door and let my
3 sister go, go out of the courtroom.  And Rosa
4 Bella, she followed my sister.  And then somebody
5 grabbed my hand and got me out of the courtroom.
6 I'm thinking it was somebody playing.  And when I
7 turn around and look, it was Paulnitsky holding my
8 hand and pushing me towards the wall.
9    **Q.  And did Paulnitsky say anything as he**
10 **was holding your hand and pushing me towards the**
11 **wall?**
12     A.  Yeah.  He did say -- he did say
13 something, but I didn't understood what he was
14 saying.
15    **Q.  Did he say your name?**
16     A.  Did he say my name?  Yeah.  He did say
17 my name.
18    **Q.  And what else did Mr. Paulnitsky do?**
19     A.  He just handcuff me in the back and he
20 turned around.  He was saying something.  I asked
21 my sister what he was trying to say, though, and
22 she say, Oh, they say you got to go to the police
23 station with him.
24    **Q.  Got to go to what with him?**

Page 264

1     A.  The police station.
2    **Q.  And where did -- where did you and**
3 **Detective Paulnitsky go?**
4     A.  We went -- when he put the cuff on me,
5 we walk to the opposite way from 101.  I'll
6 probably say southeast of that -- of the
7 Courtroom 101, and got put in the elevator with my
8 head looking toward the wall.  And the further I
9 went up, I look, when the -- when the -- when the
10 elevator stop and I look and I saw it was like the
11 10th floor in the Cook County building.
12    **Q.  Was anybody else with Detective**
13 **Paulnitsky?**
14     A.  No.  He was by himself.
15    **Q.  When you were put in the elevator with**
16 **Detective Paulnitsky, was there anybody else in the**
17 **elevator with you?**
18     A.  No.
19    **Q.  You say you went to the 10th floor?**
20     A.  10th floor, yeah.
21    **Q.  And where did you go on the 10th floor?**
22     A.  They put me in some -- like some
23 little -- some little room.  And he went to make a
24 phone call.  I saw him when he went to make a phone

Page 265

1 call.  And he came and he -- he stood there.  He
2 didn't say nothing else.
3        And like five, ten minute later, I
4 guess, though, he -- he got a call and -- in the
5 phone that he made the phone call.  And he just
6 took me all the way down to the basement.  From the
7 basement, he took me out of the -- back of the Cook
8 County building, of the court building.
9    **Q.  And on the -- you say he took you down**
10 **to the basement?**
11     A.  Yeah.  All the way down to the
12 basement, yeah, or all the way down to the -- to
13 the first floor, I guess.  I know it was -- it look
14 like a basement to me.
15    **Q.  My question is:  On the first floor,**
16 **were there cars there?  In the basement, sorry.**
17     A.  No, there were no cars.  There was just
18 like -- like stuff, like sheets and mops and stuff
19 like that, though.
20    **Q.  It was a different floor than where you**
21 **had gotten on the elevator?**
22     A.  Yeah.
23    **Q.  And what did you do once you got down**
24 **to that floor?**

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 266..269

Page 266

1    A.   He pushed me toward -- towards a
2 detective car and they put me in the car, and from
3 there we went straight to the police station.
4    Q.   Did you know -- or strike that.
5         Were there officers with the
6 detective car?
7    A.   There were two detective in the car.
8    Q.   Did you know either of the detectives?
9    A.   No.
10   Q.   And those detectives, you said, drove
11 you to the police station?
12   A.   They did.
13   Q.   Was Paulnitsky in the car with you?
14   A.   No.
15   Q.   What happened once you arrived back at
16 the police station?
17   A.   They just put me in the room and I just
18 stood there by myself for quite a while until
19 Paulnitsky came.  I guess he want to make sure that
20 I was there.  He close the door.  He didn't never
21 say nothing.  And -- then came Montilla and Mingey.
22   Q.   And so the room they put you in at
23 Area 5, was that similar to the room you had been
24 in when you were arrested for the attempt murder?

Page 267

1    A.   Yes.
2    Q.   And the two detectives who drove you
3 there put you in that room and then closed the
4 door?
5    A.   Yeah.  But they put me in there and
6 they cuff me to the ring of the wall.  There's a
7 ring in the wall, so they place like another
8 handcuff in between the one that I had on and cuff
9 me to the wall so I don't go nowhere.
10   Q.   And you said you waited a while until
11 Detective Paulnitsky put his head in?
12   A.   I waited a while until they -- until he
13 arrived, and Mingey.
14   Q.   How long did you wait?
15   A.   I waited a long time.
16   Q.   Was it more than an hour?
17   A.   More than an hour.
18   Q.   Was it more than three hours?
19   A.   More than three hours.
20   Q.   Was it more than five hours?
21   A.   No.
22   Q.   Was it somewhere between three and five
23 hours that you waited before you saw --
24   A.   I was -- basically, we were -- they

Page 268

1 were waiting for the shift change so -- so when the
2 Detective Montilla and Mingey come, they were going
3 to come as soon as the shift change.  I guess
4 that's what they were waiting for.
5    MS. BONJEAN:  Don't guess.
6 BY MR. BRUEGGEN:
7    Q.   And going back to the courthouse, do
8 you know how long you were in Courtroom 101?
9    A.   As soon as I got there, my name, it got
10 called like -- probably like 20 minutes later.
11   Q.   And after your name was called and you
12 got the slip, did you then immediately exit
13 Courtroom 101?
14   A.   Well, I wanted to go home.  I'm
15 thinking that I want to go home, but they told me
16 no, that I got to go to 302, when my sister put the
17 brakes on me.  So I had to go.  But I was on my way
18 to the Court 302 when right in between it happened,
19 I got arrested.
20   Q.   And how long were you with Paulnitsky
21 before you were -- at the courthouse before you
22 were put in the car with the two detectives to go
23 back to the station?
24   A.   I'll say probably like ten minute or

Page 269

1 more.
2    Q.   And so you get to the station.  The two
3 detectives put you in the interview room.  They
4 cuffed you to the call.  And then you wait
5 somewhere between three and five hours.  Right?
6    A.   Yeah.  Something like that, yeah.
7    Q.   And did anybody check on you during
8 that time?
9    A.   Yeah, Paulnitsky.  He kept coming and
10 checking on me, see if I was -- I guess all right
11 or -- or I was still there, though.
12   Q.   And then how many times did Paulnitsky
13 check on you while you were in there?
14   A.   It was a number of time.
15   Q.   And how would he check on you?  Did he
16 open the door and pop his head in or did he just
17 look through a window?
18   A.   Yeah.  It's got this like -- like a
19 window like this, though, you know, with some kind
20 of fans in between.  So yeah.  There were time they
21 put a paper in.  They put like a big, big paper.
22 And the only thing he do, he just -- just lift the
23 paper like this and look to see if I was there and
24 just close it down again.

Page 270

1    Q.   So when you were first put in the room,
2 there was paper on the window?
3    A.   The window, yeah.
4    Q.   And you would see Paulnitsky lift that
5 paper and check to see if you were in there?
6    A.   Yeah.
7    Q.   Did he say anything to you?
8    A.   No.
9    Q.   And then what happened next?
10    A.   When Montilla and Mingey came, they --
11 they asked me some questions and stuff.  And then
12 they put me down in the lockup room in nine to -- I
13 cannot say specifically the time, but then later it
14 happened that Officer Guevara went down to the
15 lockup room and got me and he took me back to the
16 floor that I was at first.
17    Q.   And, sir, were you saying the -- the
18 lockup room?
19    A.   (Nodding.)
20    Q.   Okay.
21    A.   Lockup room.
22    Q.   Sorry.
23    A.   Yeah, the jail, you know, where they
24 got --

Page 271

1    Q.   Yeah.  No, no.  I -- I understand, sir.
2 I just wanted to clarify.
3         So you were in the interview room,
4 Paulnitsky checked on you several times, and then
5 Mingey and Montilla came and talked to you?
6    A.   Yeah.  They came and talked to me real
7 briefly and -- and then they took me all the way
8 down to the lockup room.
9    Q.   How long did Mingey and Montilla talk
10 to you?
11    A.   Not -- not for long.
12    Q.   What did they say to you?
13    A.   Montilla, when Montilla came, he asked
14 me, Who brung you in?  Who -- who -- who got you
15 here?  So -- because I had the handcuff, I started
16 pointing, Oh, the white guy, the white guy.  So I
17 guess he got offended.
18         And I was saying that in Spanish to
19 him.  And Mingey -- Paulnitsky, he -- he started
20 walking towards us and he grabbed me by -- by the
21 shirt.  And he told me if I would say anything bad
22 about -- about him or call him a white -- a white
23 guy, that he was going to bust my face.  So he went
24 and slapped me right in my face and knocked me down

Page 272

1 the floor.
2         And I look at Montilla, look at
3 Montilla, Hey, why you let him do that, though?
4 And he -- Montilla, he just turned around.  He go
5 and say -- I'm just going to say exactly how he
6 said, though.  He told Paulnitsky:  Oh, what the
7 fuck, man, why do you got to hit him, though?  You
8 know, don't -- don't do that to him.  You know, he
9 a good guy, though, he know me.  You know, he
10 willing to cooperate, though.  You know, you don't
11 have to do that to him.  Don't be a jerk, though,
12 you know.
13         So he -- Paulnitsky, he was saying
14 something to him.  The reason that I know what he
15 said to him because I told -- I told Montilla, you
16 know, What did you tell him, though, you know?  And
17 he said, I told him, you know, the why he did that
18 to you, you know, you -- you seem to be a good guy,
19 though, you know.
20         And I'm like, Man, I'm -- I'm
21 scared.  I don't know -- I don't know what going to
22 happened to me.  He like, Ain't nothing going to
23 happen to you, don't worry about it, though, you
24 know.  So he told me, Come on, I'm going to put you

Page 273

1 down there and we'll talk later, though, you know.
2         So he put me in the lockup room.  I
3 didn't saw him until Guevara went down there an
4 pick me up, or brought me up.
5    Q.   Was Mingey in the interview room when
6 you pointed at Paulnitsky?
7    A.   Mingey was doing something.  The one
8 who was in the room, it was Montilla.  And the door
9 was open, so they could hear, you know, what we
10 were talking.
11    Q.   So when Mingey and Montilla were in
12 there, the door to the interview room was open?
13    A.   The door was open when Montilla --
14 Mingey came.  Mingey left.  I guess he went to look
15 for something or make a call or something.  I
16 really don't know.  It's just that when Montilla,
17 he was there, he asked me, Who brung you, who brung
18 you in, in Spanish.  So I pointed to Paulnitsky
19 with my finger with my -- with my hands in the
20 back, though.  And that's when he got mad and he --
21 I believe Montilla mentioned his name.  That's --
22 that's how he know that we were talking about him.
23    Q.   Was Paulnitsky in the room at that
24 time?

Page 274

1   A.  He -- he was out -- outside, but he can
2 see everything clear what's going on in the room.
3    **Q.  And what did Mingey and Montilla say to**
4 **you prior to Montilla asking you who brought you**
5 **in?**
6   A.  Nothing.  They just -- they just told
7 me, Who brung you in, though, and they say, We're
8 going to talk to you, don't worry about it.
9          I would say, though, he -- after I
10 got hit and all that stuff, he put me down there in
11 the -- in the lockup room waiting until Officer
12 Guevara came down there and pick me up and put me
13 back in the same room that I was, though, you know.
14 And then that's when Mingey and Montilla, they went
15 and check on me, they left.  And most of the talk,
16 it was with Guevara after that.
17    **Q.  So after you pointed to Paulnitsky, you**
18 **say he came in the room.  And did he grab you?**
19   A.  Paulnitsky, he grabbed my --
20   **Q.  Yeah.**
21   A.  -- shirt, yeah.  He grab it through
22 here, through the shirt, yeah.
23   **Q.  Grabbed your shirt?**
24   A.  Yeah.  Right here, yeah.

Page 275

1   **Q.  And what did he do after he grabbed**
2 **your shirt?**
3   A.  He just got real close to my face and
4 he was screaming on me, telling me if I would say
5 anything about him for far as white boy -- not
6 white boy, white guy, that he was going to bust my
7 face.  He hit me in the face.  He -- basically he
8 slapped me in the face and shoved me in the floor.
9         So I just looking on Montilla,
10 telling Montilla, Why you let him do that, though?
11 He like --
12   **Q.  So -- I'm sorry.  Go ahead.**
13   A.  Montilla, he turn around.  He -- you
14 know, he was just talking loud to him.  I'm asking
15 him, What -- what were you saying to him, though,
16 you know?  So he told me what he was saying to him.
17 Whether he was saying the truth or not, I don't
18 know.
19   **Q.  So Paulnitsky grabbed your shirt and**
20 **yelled at you?**
21   A.  Yeah.  Yelled at me, yeah.
22   **Q.  And then he slapped you?**
23   A.  He slapped me after he finished saying
24 what he was saying, yeah.

Page 276

1   **Q.  And did he slap you or did he punch**
2 **you?**
3   A.  He -- well, it felt like a punch, you
4 know.  I mean, I was just, you know, a young guy,
5 though.  Yeah, he hit me in the face.
6   **Q.  And did he have a closed fist or an**
7 **open fist?**
8   MS. BONJEAN:  Objection, form.
9        Go ahead.
10   THE WITNESS:  It happened so fast, though,
11 really -- you know.  I didn't even pay attention.
12 Surprised that he hit me, though.
13 BY MR. BRUEGGEN:
14   **Q.  And when he hit you, did he still have**
15 **a hand holding your shirt?**
16   A.  No.  I was already on the floor.  He
17 pushed me.
18   **Q.  So at the -- did he hit you when you**
19 **were on the floor?**
20   A.  No, no.  When he grabbed me and he said
21 what he said, he put -- he slapped me and he pushed
22 me in the floor.
23   **Q.  Was he still holding you when he**
24 **slapped you?**

Page 277

1   A.  Oh, yeah.  When he slapped me, yeah, he
2 was holding me.
3   **Q.  And after he slapped you is when he**
4 **pushed you down to the floor?**
5   A.  Yeah.
6   **Q.  How many times did he hit you?**
7   A.  Only one.
8   **Q.  And after he pushed you down to the**
9 **floor, did he say anything?**
10   A.  Yeah.
11   **Q.  What did he say?**
12   A.  I don't know what he said, but I know
13 what he was saying, though, you know, it was -- he
14 was screaming on me.
15   **Q.  And after that, did he leave?**
16   A.  Montilla told him to leave, told him to
17 get out of the room.
18   **Q.  After that interaction with Paulnitsky,**
19 **is that when Montilla took you down to the lockup?**
20   A.  Montilla took me down to the lockup
21 room.
22   **Q.  How long were you in the lockup?**
23   A.  I was there for a while.
24   **Q.  More than two hours?**

JOSE JUAN MAYSONET JR., 04/16/2021                     Page 278..281

Page 278

1    A.   I fall asleep on there.

2    **Q.   You slept in the lockup room?**

3    A.   Yeah.  I did fall asleep.

4    **Q.   And so you don't know how long you were**

5 **in there?**

6    A.   No.

7    **Q.   What happened next?**

8    A.   Guevara came.  He ordered the officer

9 to open the door, so they -- yeah, the door.  And

10 he got me off the cell, check me down, cuff me in

11 back again.  And he put me back in the same room

12 that I was when I came in the police station.

13    **Q.   And what happened after he put you in**

14 **that room?**

15    A.   Well, he just sat me in there and he

16 told me, Do you know what you're here for?  So I

17 told him, No, not really, I want to know, you know

18 what, going on.  And he said he'll be back in a

19 moment.

20         He left and he came back.  And he

21 told me what I was there for.  And then he wanted

22 -- wanted me to talk to him.  And I told him I

23 don't have no knowledge whatever the stuff that he

24 wanted to talk to me.  So me and him, we was

Page 279

1 already, you know, mad and stuff.

2         And I tried to offer him some money

3 and stuff, and he -- he don't want to -- he don't

4 want to take it.  He just want to know what

5 happened to those guys, though, you know.  I told

6 him I don't -- I don't have no clue.  I'm being the

7 most honest than I can, though.  So he like, Okay,

8 I'll be back.  So he left.

9         He came back again.  And this time

10 he came back with a -- with a flashlight.  He came

11 back with a -- with a Yellow Book and a pair of

12 glove, one pair of black glove, and he put them in

13 the table.  And then he keep telling me if I'm

14 ready to talk.

15         So I'm like, I don't have anything

16 to talk about; I want to have my lawyer present,

17 though.  And that's when things got a little bit,

18 you know, out of hand and stuff.  He -- he left, I

19 guess mad, telling me, You going to talk, one way

20 or the other, you're going to talk.  I don't know

21 what he wanted to talk about.

22         When he came back, that's when, you

23 know, things got real bad, though, you know.  He

24 started physically slapping me, hitting me in the

Page 280

1 head with book, you know, asking me questions,

2 leaving the room, doing the same thing all over

3 again, come back, asking the question again.

4         I keep telling him:  I don't know

5 nothing, you know.  I want my lawyer.  I want my

6 lawyer.

7         He keep getting more mad when I keep

8 mentioning the lawyer name, and hitting me,

9 leaving, coming back, repeating the same thing over

10 and over again.

11    **Q.   When Guevara got you out of the lockup,**

12 **was that the first time you saw Guevara on that**

13 **day?**

14    A.   Yes.

15    **Q.   And when Guevara was in the interview**

16 **room with you when he first put you in there, was**

17 **that the first time you talked to Guevara about the**

18 **double homicide on North Avenue, the Wiley brothers**

19 **murder?**

20    A.   He -- he talked to me about it, though.

21 But again, I didn't -- I didn't have no clue, you

22 know, what -- what he trying to do or say to me,

23 though.

24    **Q.   And again, sir, my question:  Was that**

Page 281

1 **the first time that Guevara talked to you about the**

2 **Wiley brothers homicide in that interview room?**

3    A.   Yes, sir.

4    **Q.   And you said initially Guevara just**

5 **asked you questions about it?**

6    A.   Guevara, he did, yeah.

7    **Q.   And then he left?**

8    A.   He asked questions for a brief moment

9 and then he leave and then come back again, asking

10 the same question again.

11    **Q.   How many times did he ask you questions**

12 **and then leave, where all he did was ask questions**

13 **and then leave?**

14    A.   It was bunch of times that he did that,

15 though.

16    **Q.   And at some point you said he brought**

17 **in a Yellow Pages book and a flashlight and gloves?**

18    A.   Yeah.  He brought -- he brought a

19 Yellow -- a Yellow Book, it was a directory book,

20 and a flashlight and a pair of black glove.

21    **Q.   Did he bring those in after -- strike**

22 **that.**

23         **After he brought you into the**

24 **interview room, did he then go get the flashlight,**

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 282..285

Page 282

1 gloves, and Yellow Pages book, or bring it in?
2      MS. BONJEAN: Objection. He already answered
3 this question.
4 BY MR. BRUEGGEN:
5      Q.   And, Mr. Maysonet, what I'm trying to
6 get at is when did Mr. Guevara bring in the Yellow
7 Pages, a flashlight, and the gloves? Had he talked
8 to you several times and asked you what happened
9 first or did he bring those in initially before he
10 asked you questions?
11      A.   He talked to me first and then he -- he
12 got up. He left. And that's when he came back the
13 second time he placed the book, the flashlight, and
14 the glove in the table. We talked. He got up. He
15 left. He turned around. He told me, I'm just
16 giving you a chance for you to be -- to come clean.
17 He left. He came back.
18      And that's when he -- you know, like
19 I said, that's when he started getting mad. He
20 started yelling on me. I was getting mad too. And
21 that's when they -- when he start slap me in the
22 face and then hit me in the head with the book,
23 like -- in other word, like for me to be, you know,
24 like intimidated, though, you know, and scared so I

Page 283

1 can just talk. But I don't -- I don't have
2 anything to stay; I don't have nothing to talk
3 about.
4      Q.   So, Mr. Maysonet, am I understanding
5 you correctly, it was on the third occasion that
6 Guevara had left and come back in that he started
7 to hit you?
8      A.   Yes.
9      Q.   And how many times did he slap you?
10      A.   He slap me a number of time, though,
11 you know.
12      Q.   More than ten?
13      A.   Huh?
14      Q.   Let's talk about the third time that
15 Guevara came in when he first started hitting you.
16 How many times did he slap you?
17      A.   He -- he slapped me once. And then
18 he -- he got up and grabbed the book, and that's
19 when he started hitting me in the -- in the head,
20 you know. I was just sitting.
21      MS. BONJEAN: The book?
22      THE WITNESS: Yeah, the book. He just hit
23 the book in the head. And after he hit me few time
24 with the book, and then he went and grabbed the

Page 284

1 flashlight and he start hitting the flashlight in
2 the book in top of my head, though, you know, and
3 putting it somewhere in my body, though, and
4 hitting -- hitting the book with the flashlight,
5 though, you know. Touch my body, though.
6 BY MR. BRUEGGEN:
7      Q.   So how many time did he hit you with
8 the book on top of the head?
9      A.   I really -- I don't know. He just -- I
10 was just getting -- you know, getting beat up by
11 him, though. That's much as I can say, though, you
12 know.
13      Q.   Did he ever hit you --
14      A.   I --
15      Q.   Did he ever hit you in the --
16      A.   Go ahead. Sorry.
17      Q.   Did he ever hit you in the side of the
18 head with the book?
19      A.   He hit me in the head. He hit me in my
20 ribs. He place the book in the back. There's a
21 number of -- you know, where it hurt the most
22 basically, though.
23      Q.   And so he - I think you were
24 indicating, correct me if I'm wrong, but he hit you

Page 285

1 on top of the head with the book several times,
2 right?
3      A.   Yes.
4      Q.   Did he ever hit you in the side of the
5 head or the face with the book?
6      A.   He -- he hit me in the head, not in the
7 side, you know, but he really did -- he did slap me
8 in the face, though, you know.
9      Q.   Yes.
10      You said he slapped you once and
11 then he hit you with the book on top of the head
12 several times?
13      A.   Um-hmm.
14      Q.   And then did -- then what did he do
15 with the book?
16      A.   He grabbed the flashlight and put it in
17 my head and -- and hitting the book with the
18 flashlight, though.
19      Q.   So he put the book on top of your head
20 and hit the book with the flashlight?
21      A.   Yeah.
22      Q.   How many times did he hit the book with
23 the flashlight on top your head?
24      A.   A lot of time, a lot of time. I didn't

JOSE JUAN MAYSONET JR., 04/16/2021          Page 286..289

Page 286

1 count how many time.  I know, you know, it was

2 just ...

3     Q.    What were you doing while he was

4 hitting you?

5     A.    What was -- what I was doing?  Begging

6 him not to hit me.

7     Q.    Were you screaming?

8     A.    I did scream.

9     Q.    And after he put the book on your head

10 and hit you a lot of times with the flashlight on

11 the book on the head, where -- I think you said he

12 put the book somewhere else on your body?  Where

13 did he put the book then?

14     A.    He hit me in the ribs.  He hit me in

15 the back.  He hit me my groin.  He just -- he was

16 just hitting me anywhere that he can.

17          Remember, I'm cuffed against the

18 wall, so it was not too much movement for me, you

19 know, to move around.  So ...

20     Q.    And I understand that, sir.

21          I'm just trying to clarify that when

22 he hit you in the side, how did he hit you in the

23 side?  Did he hit with the flashlight in the side?

24     A.    No.  Hit me with the hand in my face.

Page 287

1     Q.    No.  In the side of your body, sir?

2     A.    Oh, in the side?  He put the book, the

3 Yellow Page in my side, and then with the

4 flashlight he kept hitting the book.

5     Q.    And how many times did he hit the book

6 when it was on your side of your body?

7     A.    It happened a lot.

8     Q.    And then you said where else did he hit

9 you?  You said --

10     A.    My head.

11     Q.    -- the back?

12     A.    In my back, my groin.

13     Q.    And when he hit you on the back, did he

14 just hit you with a flashlight on the back or did

15 he use the book?

16     A.    The book and the flashlight.

17     Q.    So he put the book up against your body

18 and then hit the book with the flashlight?

19     A.    Yes.

20     Q.    And how many times did he hit you on

21 the back like that?

22     A.    I -- to be honest with you, I didn't

23 even count how many time.  I know it was a lot of

24 time that he hit me, though, you know.

Page 288

1     Q.    And then what about in the groin?  How

2 many times did he hit you in the groin?

3     A.    He hit me a number of time in the groin

4 too.

5     Q.    And how did he hit you in the groin?

6 Did he put the book up against your groin and hit

7 it with the flashlight or did he just --

8     A.    No.  He just got the flashlight, he

9 just -- he just hit me in the groin.

10     Q.    So he swung the flashlight and hit

11 you --

12     A.    Yeah.

13     Q.    -- in the crouch?

14     A.    In my crouch, yes.

15     Q.    How many times did he hit you in the

16 crouch?

17     A.    He hit me number of time.

18     Q.    After that, did he hit you anywhere

19 else on this occasion that he's in the room with

20 you?

21     A.    He stop for a moment.  He leave.  He

22 come back.  And he repeat the same thing all over

23 again, hitting me in the same spots that he can hit

24 me with.

Page 289

1          Remember, I'm cuffed in the back,

2 though, so there's not much me for me, you know, to

3 protect myself.  So whatever place that he put the

4 book, he hit the book with the flashlight.

5     Q.    Did you say you were cuffed in the

6 back?

7     A.    Yeah.

8     Q.    Or cuffed in the front?

9     A.    No.  I was cuffed in the back.

10     Q.    And were the handcuffs attached to the

11 ring on the wall?

12     A.    Yeah.  They had another cuff in between

13 the cuff that I already have, hook up with a -- a

14 ring in the wall, a metal ring.  It was like a

15 hook, like a big hook in -- in the wall of the

16 police station.

17     Q.    And so how long was Guevara in -- the

18 third time he came in when we just talked about all

19 the times he hit you, how long was he in there with

20 you?

21     A.    I don't know.

22     Q.    Was it more than an hour?

23     A.    I can't -- I can't remember.  Only

24 thing, he just come real briefly, ask the question,

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 290..293

Page 290

1 beat me, and leave.

2     Q.   And so after he beat you, you say he
3 left.  How long was he gone?

4     A.   I don't know.  I don't know for how
5 long he be -- only thing, like I say, he leave for
6 a moment, come back, ask the question, do what he
7 did, beat me up and stuff, leave to give me the --
8 the time for me to think about what I'm going to
9 say to him.

10     Q.   Between the third time he was in there
11 when he hit you, did anybody else come in after
12 Guevara left?

13     A.   No.  Not at that moment, no.

14     Q.   And then Guevara came back, and that
15 would be the fourth time that he was in there with
16 you?

17     MS. BONJEAN:  Objection.  That's -- that
18 misstates his testimony, but -- are you asking
19 about the fourth time or are you putting words --
20 or trying to characterize his testimony?

21     MR. BRUEGGEN:  I'm -- and, Jennifer, I think
22 we clarified that it was the third time that
23 Guevara went in there that all of that hitting took
24 place.

Page 291

1     MS. BONJEAN:  No, no.  That -- we haven't
2 clarified that.  He -- he's testified differently
3 than that.  He said something different.  I'm not
4 going to repeat his testimony.

5        But I'm going to object to the
6 mischaracterization of what he said about --
7 about this.

8 BY MR. BRUEGGEN:

9     Q.   So we just went through a bunch of your
10 testimony about Guevara hitting you and I was
11 asking you how many times.

12        Do you remember that, sir?

13     A.   Yes, I did.

14     Q.   And then --

15     A.   Yeah.

16     Q.   And then you said Guevara left and he
17 came back in, right?

18     A.   Um-hmm.

19     Q.   And when he came back in, what
20 happened?

21     MS. BONJEAN:  Objection, asked and answered.

22        Go ahead.  Answer again.

23     THE WITNESS:  Repeat the same thing all over
24 again, though, you know.  He do the questioning.

Page 292

1 He see that he don't get no answer from me.  He go
2 back to the beating again.

3 BY MR. BRUEGGEN:

4     Q.   And on this second time that he was in
5 there beating you, where did he hit you?

6     A.   The second time?

7     MS. BONJEAN:  Yeah.  I'm just --

8 BY MR. BRUEGGEN:

9     Q.   Yeah.

10        After he left -- you said he beat
11 you and then he left the room.  Now when he comes
12 back in the room, I'm calling that the second time
13 he's in the room with you, sir.

14     MS. BONJEAN:  But that misstates his
15 testimony.  It's not the second time he was in
16 the room with him.  So, I mean, that's a
17 mischaracterization of his testimony.  And it's
18 confusing, frankly.

19 BY MR. BRUEGGEN:

20     Q.   And, sir, I think -- I thought we had
21 the times down, but maybe I'm mistaken.

22        So the first time when you talked
23 about Mr. Guevara hitting you, he left the room and
24 then he came back in, right?

Page 293

1     A.   Yes.

2     Q.   Okay.  And now after that first time of
3 him hitting you, he's in the room for a second
4 time, right?

5     A.   Yes.

6     Q.   And he hits you again?

7     A.   He kept hitting me until the third
8 time.  That's what I just said to you.

9        He came the second time.  He ask me
10 the question again.  That's when he brang the book
11 and the -- the flashlight and glove in the table.
12 We talk about for a brief moment and then he left.

13        The third time when he came in, he
14 ask the question and he see the -- the same answer
15 that I was telling him on previous time, I was
16 saying to him.  That's when he really got mad and
17 he slap me in the face.  He went and grab the book
18 and he start hitting me on top of the head with the
19 book.  He might thought that I was not -- you know,
20 putting no face like, Oh, yeah, you -- you hurting
21 me and stuff like that, though, you know.

22        Only thing I keep saying, you know,
23 Why you doing this, though, you know?  Why you
24 doing this?  I thought you were my friend.  I

Page 294

1 thought you were my buddy, though, you know.
2         He keep putting the book in my ribs
3 and hitting me.  He really didn't -- he really
4 didn't want -- he really didn't want to listen to
5 anything that I wanted to beg to him about for him
6 to stop, though, you know.  Only thing he wanted me
7 to say whatever that he want to hear, though, you
8 know.
9         So he keep hitting me with the book
10 and the flashlight, leave, come back, and do the
11 same thing all over again.
12    Q.    How many times did Guevara hit you with
13 the book and the flashlight and then leave and come
14 back in and hit you again?
15    MS. BONJEAN:  Objection to the compound
16 nature of that question.
17        You can answer if you understand it.
18    THE WITNESS:  He just -- he keep repeat -- he
19 keep -- he keep doing the same thing over and over
20 and over again, though.
21    Q.    How long did that cycle of him hitting
22 you continue for?
23    MS. BONJEAN:  Objection to the form of that
24 question.

Page 295

1    THE WITNESS:  Again, until I got -- until
2 they charge me with it, until they -- you know,
3 they made me say what they want to hear.
4 BY MR. BRUEGGEN:
5    Q.    And do you know how long, timewise,
6 that took?  Did --
7    A.    No.  I can't remember.
8    Q.    Was it more than two hours?
9    A.    It might -- I got there early in the
10 morning.  I was in court.  So yeah, all day, all --
11 all that day until I got to the police station.
12    Q.    At some point you said you told them --
13 you told Guevara what he wanted?
14    MS. BONJEAN:  No.  Objection, that's --
15 mischaracterizes his testimony.
16 BY MR. BRUEGGEN:
17    Q.    Sir, when did the -- when did Guevara
18 allegedly stop beating you?
19    A.    When -- Guevara stop hitting me when --
20 when he really got me by my groin and he really,
21 you know, made me give up, and I -- I told him, you
22 know, whatever -- whatever stuff that he want me to
23 say, I'll -- I will say it to him, though, you
24 know, just for him to stop hitting me.

Page 296

1    Q.    And after you told him that you'd say
2 whatever he wanted you to say, what did he say
3 then?
4    A.    He agree.
5    Q.    And what was the next thing Guevara
6 said to you?
7    A.    I mean, we just -- he left the room.  I
8 believe Montilla came and he said something real
9 quick, but I was -- I was off my stuff already,
10 though, you know, that I didn't really care no
11 more, you know.  Just I guess I want him to stop
12 beating me, though.
13    Q.    Did Montilla come after Guevara had
14 stopped beating you?
15    A.    Yeah.
16    Q.    And what did Montilla say to you?
17    MS. BONJEAN:  Objection, asked and answered.
18 BY MR. BRUEGGEN:
19    Q.    Go ahead, sir.
20        What did Montilla say to you after
21 he came in after Guevara stopped being you?
22    A.    For me to cooperate, though, you know.
23 That he know that Guevara, he's a mean guy, though,
24 you know.  If I don't cooperate, though, you know,

Page 297

1 he going to continue beating me up, just for me to
2 cooperate, though, you know.  That I'm -- I'm
3 basically the one that I can stop him, though, you
4 know, if I cooperate with him.
5    Q.    How did you respond to Montilla saying
6 that?
7    A.    I told him I -- I'll do whatever he
8 want me to do, though, you know, so -- so he can
9 stop beating me up.
10    Q.    At some point did you ask Montilla or
11 Guevara for medication for a nerves issue you had?
12    A.    Yeah.  I was shaking.  I was -- I was
13 having a nervous breakdown, you know.  And I used
14 to take medicine for it, but then I started taking
15 my mom medicine.
16        And I have one of the officer
17 call -- I think it was Montilla who called my house
18 to ask someone to bring some -- some medicine, some
19 medication, so I can calm myself down.  And
20 somebody from my -- from my relative, they came to
21 the police station and gave me some medicine.
22    Q.    So you had a nerve issue that you had a
23 prescription medication for?
24    A.    Yeah.  A long time ago I had a

Page 298

1 prescription, but then after I stopped getting the
2 prescription for -- you know.  No -- I had no -- I
3 didn't have no -- no formal Medicaid, though, you
4 know, so I stopped taking the medication.  But my
5 mom, she was sharing her medication with me.
6    Q.   So prior to going to the police station
7 on August 22nd, 1990, you had at times taken your
8 mom's medication for this nervous issue that you
9 had?
10   A.   Sometime when I get nervous, yeah.
11   Q.   And so you asked Montilla to contact
12 your family about getting you this medication?
13   A.   Um-hmm.  Yes, sir.
14   Q.   And what happened then?
15   A.   My sister came to the police station to
16 give me the medication.  I took it; I drunk it.
17 And after that, though, you know, it was helping.
18   Q.   After you had taken your mom's
19 medication before, right?
20   A.   Yes, sir.
21   Q.   Did you take the same amount that you
22 had taken before?
23   A.   Yes, yeah.
24   Q.   Did you get a chance to talk to your

Page 299

1 sister when she brought you your medication?
2    A.   For a brief moment.
3    Q.   How long is a brief moment?
4    A.   About five minute.
5    Q.   Was there a police officer present when
6 you were talking to your sister?
7    A.   Montilla.
8    Q.   And was he standing next to you guys or
9 was he away from you?
10   A.   He was -- he was standing the door of
11 the room.  He want to make sure that I drink my
12 medicine -- the medicine too, though.
13   Q.   And do you know how long your sister --
14 strike that.
15        After -- what did you say to your
16 sister?
17   A.   I told my sister to leave, I was
18 getting -- I was getting beat up by the police.
19        Back then it was common for people
20 to get beat up and nobody care about it.  I told
21 her what they were doing to me.
22        And she asked Montilla where is the
23 phone.  And Montilla asked, For what?
24        I'm calling a lawyer.  You're not

Page 300

1 supposed to touch him.  You're not supposed to
2 touch my brother.  He just told me that you guys
3 hitting him.
4        And he ordered her to leave the
5 police station.  He said, When we done with him, we
6 let him go or take him back to your house, though,
7 which they never did.
8    Q.   So after you spoke to your sister, what
9 happened then?
10   A.   Rosa Bella came.
11   Q.   Did Rosa Bella come with your sister?
12   MS. BONJEAN:  Objection, form.
13        If you know.
14   THE WITNESS:  She came -- she came by herself
15 in the room, though.  I'm pretty sure with my --
16 she came with my sister to the police station, but
17 only one people at a time that can go inside and
18 see me, though.  She was the second one that went
19 in the room and seen me, though.
20 BY MR. BRUEGGEN:
21   Q.   Were you able to speak to Rosa Bella?
22   A.   Yeah.  She -- she speak to me.
23   Q.   And how long did you speak to her?
24   A.   Oh, probably about ten minute.

Page 301

1    Q.   And what did she say to you?
2    A.   She said that Montilla told her that
3 for me to cooperate, that if I do cooperate with
4 her -- I mean with him, with -- with the officer,
5 though, you know, they will let me go home.
6    Q.   And what did you say to Rosa Bella?
7    A.   I told Rosa Bella that they telling me
8 they don't believe that -- they talking about
9 taking her kid if I don't cooperate, though, you
10 know.
11   Q.   Who said that they were going to take
12 Rosa Bella's kids if you didn't collaborate?
13   A.   Guevara.
14   Q.   How did Guevara know about Rosa Bella?
15   MS. BONJEAN:  Objection to the form of that
16 question.
17 BY MR. BRUEGGEN:
18   Q.   You can answer, sir, if you know.
19   MS. BONJEAN:  How would he -- okay.
20        Go ahead, if you know.
21   THE WITNESS:  I take -- I used to take Rey to
22 the house to -- to eat when I was with Rosa Bella,
23 so he know who -- who my girl is, though, by the
24 time.

Page 302

1 BY MR. BRUEGGEN:

2     Q.   **So when you spoke to Rosa Bella, you**
3 **told Rosa Bella that the police were threatening to**
4 **take her children away?**

5     A.   Yeah, if I don't cooperate.

6     Q.   **And how did she respond to that?**

7     A.   She got mad.  But at the same time, she
8 told me cooperate with them if you know anything.
9 And I keep telling her I don't know nothing.

10    Q.   **At some point did you provide the names**
11 **Lluvia, Tino, and Fro to the police?**

12    A.   Yes, I did.

13    Q.   **When did you provide those names to the**
14 **police?**

15    A.   When -- when we was -- when Guevara,
16 he -- he was just -- when Guevara, we was try to
17 make up story about, you know, how, you know, he
18 think how thing happen, he wanted me to involve
19 some other people.  I involve -- they not the first
20 name that I involve, though.

21          The first name that I involve, it
22 was Cisco, Jeffrey, and Efrain.  When they went and
23 look for them, they found out, Oh, we don't want
24 those guys.

Page 303

1          I said, Well, why they don't want
2 those guys, though, you know?  You wanted me to
3 mention some name, so I give you some name, though.
4 You know, whether they do -- happen to do with that
5 or not, I don't know; it's for you to find out.

6          They found out they -- they were
7 arrested or locked up the day that the crime
8 happened.  So they told me that I got to come up
9 with some other name.

10    Q.   **When did you provide the names Cisco,**
11 **Jeffrey, and Efrain in the chronology of events**
12 **that we've talked about?**

13    A.   The day that Guevara wanted me to
14 cooperate.

15    Q.   **Was it before or after you talked to**
16 **your sister?**

17    A.   That was after.

18    Q.   **Was it before or after you talked to**
19 **Rosa Bella?**

20    A.   After.

21    Q.   **And when you told Guevara those names,**
22 **what did he say to you?**

23    A.   They went and looked for them.

24    Q.   **And how long before Guevara came back**

Page 304

1 and asked you for different names?

2     A.   Right there, I -- I cannot tell you
3 exactly the same time, but it was quite a while,
4 though, when they found the guys and -- and went
5 and shake them, though, but I -- I'm pretty sure it
6 was -- it was -- it took a while, though, you know.

7     Q.   **And at some point you then gave them**
8 **the names Lluvia, Tino, and Fro, right?**

9     A.   When he came in, he said that the name
10 that I gave him first, those guys that were
11 arrested.  That's when, you know, he want me to
12 give him somebody else name, and the name that came
13 up in my head was Lluvia, Tino, and Fro.

14    Q.   **And why did you include three people's**
15 **names as opposed to just one other person's name?**

16    A.   It's just Guevara idea, though.

17    Q.   **I'm sorry.  What did you say, sir?**

18    A.   Guevara, Reynaldo.  It was Reynaldo
19 idea though.

20    Q.   **So Guevara said --**

21    A.   Yeah.

22    Q.   **Guevara said give me three names?**

23    A.   He wanted me to throw people out there,
24 though, you know, to him.

Page 305

1     Q.   **After providing him those names, did**
2 **you then go for a drive with Guevara around the**
3 **neighborhood to identify where Lluvia, Tino, or Fro**
4 **lived?**

5     A.   No, not at all.

6     Q.   **Did you speak to a female assistant**
7 **state's attorney later on that evening?**

8     A.   Yes, I did.

9     Q.   **And what did you say to her?**

10    A.   Well, she ask me if I had any knowledge
11 of what I was there for, if she wanted -- you know,
12 she wanted me to come out clean to her.

13          So I said:  No.  I don't have
14 anything to do with it.  These people, they beating
15 me up.

16          She turned around and she said, Oh,
17 if you not cooperate, Officer Guevara, or Detective
18 Guevara, he -- he not a -- you know, he's a very
19 mean man, though.

20          So again, if I don't cooperate, you
21 know, I was going to get my ass beat up, basically
22 is what she was trying to say.

23    Q.   **So but you told her that Detective**
24 **Guevara had been beating you?**

Page 306

1    A.   I told to Montilla, yeah, that I was
2 getting beat up by Guevara.  But the state
3 attorney, she really didn't want to listen to that.
4 She just wanted me to cooperate.
5    **Q.   Did you tell the female state's**
6 **attorney that Guevara had been beating you up?**
7    MS. BONJEAN:  Objection.  You're -- he just
8 answered that question.
9    MR. BRUEGGEN:  I didn't understand his
10 answer.  I'm -- if he did -- I thought he said he
11 told Montilla.
12    MS. BONJEAN:  Well --
13    THE WITNESS:  Montilla is the translator,
14 though.  The lady, she know how to speak English.
15 She don't know how to speak Spanish, though, you
16 know, so I had to get it translated just to know
17 what she's saying.
18 BY MR. BRUEGGEN:
19    **Q.   Okay.  So you told her through Montilla**
20 **that Guevara had beaten you up?**
21    A.   Yes.
22    **Q.   And what happened then?**
23    A.   She didn't believe me.  She just wanted
24 me to -- you know, to cooperate and tell them what

Page 307

1 I know, which I didn't know nothing.  I really
2 don't.
3    **Q.   Did you say anything else to her?**
4    A.   I want my lawyer present.
5    **Q.   And what happened after you asked to**
6 **have your lawyer present?**
7    A.   She just told me if you not cooperate,
8 you're going to have to talk to Guevara again, and
9 you really don't want him in your hair.  She turn
10 around and she left.  I didn't want to cooperate.
11    **Q.   After she left, then what happened?**
12    A.   Guevara came in the room.  And again
13 the same -- the same that he did the first, second,
14 and third, then he start doing it again.  Beating
15 me up, asking question and leaving the room, coming
16 back.  At one point, he really run out of breath so
17 much as he was beating me up.
18    **Q.   So after you spoke to the female**
19 **state's attorney, Guevara came back in the room and**
20 **continued to beat on you?**
21    A.   Yeah.
22    **Q.   And how many times -- how long was he**
23 **beating on you at that time?**
24    A.   For a long time.  He keep coming back

Page 308

1 and forth.  All that day, all that night,
2 basically, he would just coming in and out and
3 beating me up, not letting me use the toilet.  I
4 didn't even ate that day.  I even had to pee on
5 myself.  I even, you know, poop on myself.  I
6 screamed.  I did anything possible that I can just
7 to get away from this man, but I couldn't done
8 nothing.
9    **Q.   So from the time that Guevara started**
10 **betting you up, did he basically continue to beat you**
11 **off and on through the rest of the night, including**
12 **after you talked to the female state's attorney?**
13    A.   Yes.
14    **Q.   And what happened -- at some point did**
15 **you talk to a male state's attorney?**
16    A.   I believe yes, I did.
17    **Q.   And who was that male state's attorney?**
18    A.   I didn't know no name by the -- by the
19 time that I was at the police station, but I know
20 it was a young Caucasian guy who happened to work
21 with the DA.  He told me -- well, he told me
22 through the translator, I am a lawyer, but I'm not
23 your lawyer; I represent the police.
24    **Q.   And when you spoke to that assistant**

Page 309

1 **state's attorney, you said you had urinated on**
2 **yourself?**
3    A.   I was already -- I already used the
4 toilet on myself.
5    **Q.   And you said you had also defecated or**
6 **pooped in your pants?**
7    A.   Yes.  I did poop in my pants, yes.
8    **Q.   And so when you spoke to him, you were**
9 **sitting there in poop and urine?**
10    A.   He didn't care.
11    **Q.   What did he stay to you, the state's**
12 **attorney?**
13    MS. BONJEAN:  Objection, form -- or that's
14 fine.
15    Go ahead.
16    THE WITNESS:  He just, again, the same
17 questioning.  What I was doing that day.  He want
18 to know about my wheres about.
19    At that point, we -- you know, we
20 haven't made no deal yet, but then later on that
21 night when Guevara, he really, really, really
22 brought me down and I agree with him to cooperate
23 with him, though, you know, that's when I saw
24 the -- the state attorney again, the same young

Page 310

1 guy, in another room.  They didn't -- he didn't
2 want to come in the room because it was kind of
3 bad, though, you know, smelling bad, though, you
4 know.  So he put me in another room and talked to
5 me through Montilla, and asked me if I was ready to
6 cooperate, though, you know.
7          And when Guevara came, basically he
8 just came out with idea what I'm supposed to say as
9 to these guys -- you know, when everybody that I
10 did name and everybody got -- I guess they chained
11 in police station, that's when he really -- he got
12 happy.  He like, Oh, yeah, these guy right here,
13 you know, they don't -- they never got arrested
14 that day, you know.  It's a possibility they
15 probably don't have nothing to do with it,
16 whatever, whatever, you know.  This, this, and
17 that, you know.
18          But I keep telling him, though, you
19 know, just involving these people, man, these
20 people didn't have nothing to do with it.  You just
21 wanted me to lie, though, you know.
22          So he's like, You did good, you did
23 good, though.  If -- if you don't cooperate, you
24 don't do what supposed to do, you know what's going

Page 311

1 to happen again, though, you know.  So I -- know, I
2 just -- I do what you want me to do.
3 BY MR. BRUEGGEN:
4     Q.    And, sir, you had given Guevara the
5 names Lluvia, Tino, and Fro prior to the time that
6 you sat down with the female state's attorney?
7     A.    That was after, after.  She -- I was
8 keep beating up.  Guevara keep coming back and
9 beating me up and stuff.
10          And at one point when he got my --
11 my groin and he brought me down, I was actually in
12 tears, though, you know.  He -- that's when I
13 agreed with him.  I told him, Yeah, I'll do
14 whatever you want me to say.
15     Q.    And this is after you had met with the
16 female state's attorney?
17     A.    Yeah.  After, yeah.
18     Q.    Was it before you met with the male
19 state's attorney?
20     A.    It was after.
21     Q.    So you sit down with the male state's
22 attorney, and what did you say to him?
23     A.    I told him the same thing too, you
24 know.  I'm getting beat up by this guy, though, you

Page 312

1 know.  I don't know nothing what he wanted to know
2 about, though.  I just want him to stop.  I want
3 him to stop beating me up.  I want my lawyer
4 present, you know.  I -- I wanted them to help me,
5 though, but nobody seemed to help me, though.
6     Q.    So you told them --
7     A.    They let him keep beating me up.
8     Q.    So you told the male state's attorney
9 that Guevara was beating you and that you wanted
10 your lawyer?
11     A.    Yes, I did.
12     Q.    And after that, did the male state's
13 attorney leave the room?
14     A.    Yes.
15     Q.    And Guevara continued to beat you up?
16     A.    Guevara came back and he started same
17 thing all over again.
18     Q.    Is that the point where you provided
19 the names Lluvia, Tino, and Fro?
20     A.    When he grabbed me -- well, it was not
21 in the moment, but I know it got to the point where
22 he grabbed my by the groin and brought me down, so
23 I didn't have no choice, just to cooperate with
24 him.

Page 313

1     Q.    So did you collaborate with him while
2 he was holding onto your -- was he grabbing your
3 penis and your testicles or just your testicles?
4     A.    Just grab all everything.
5     Q.    Everything?
6     A.    Yeah.
7     Q.    And was that when you agreed?
8     A.    Yes, I did.
9     Q.    And is that when you provided --
10     A.    To cooperate with him.  I agreed to
11 cooperate with him, whatever stuff that he want me
12 to do or say.
13     Q.    And that's when you gave him the name
14 Tino, Fro, and Lluvia?
15     A.    No.  I give up the name of -- of Jeff,
16 Jeffrey, Cisco, and Efrain.
17     Q.    Okay.  So you gave those names after
18 you had met with the female state's attorney and
19 after you met with the male state's attorney,
20 that's when Guevara grabbed you by the groin and
21 you provided the name Cisco, Jeffrey, and Efrain?
22     A.    Yeah.
23     Q.    And then you said some time passed
24 before Guevara checked those out and he came back

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 314..317

Page 314

1  to you and asked you for different names?

2     A.   He told me those guys, they was
3  arrested that day when the crime happened.  They
4  spend the night in jail.  That's what he said.  So
5  he wanted me to provide him with some other name,
6  someone that he think -- that I think who can
7  committed a crime like that.  So I just mention
8  Lluvia name, Tino, and Fro.

9     Q.   At some point later that morning, did
10 you give a court-reported statement with the male
11 state's attorney?

12    MS. BONJEAN:  Objection to the form of that
13 question.

14    THE WITNESS:  When -- when I agree and they
15 got these three guys and they came back that they
16 were arrested or locked up all that night when the
17 crime happened, and I provide some other name and
18 they came back with those guys, they were like,
19 okay, cool.  They stop -- the beating stopped.

20         And that's when -- that's when
21 the -- the DA, they put me in the room, and
22 Montilla ask me if I ever met a court reporter
23 before.  So I said no, I don't even know what's
24 that, you know.  So he said, Well, you're going to

Page 315

1  have a court reporter to see what the stuff that
2  Guevara wanted you for you to say, though, you
3  know.  I got it written down.

4         At first they tried me in English,
5  but I couldn't -- I couldn't read, you know,
6  whatever stuff on the paper.  And they decide to --
7  to ask me the question through Montilla in English,
8  he say it in Spanish, so the answer it was in the
9  paper already written, though, you know, in
10 Spanish, so he can translate it back in English,
11 though, you know, to the court reporter.

12 BY MR. BRUEGGEN:

13    Q.   So you recall sitting down with a court
14 reporter with the male state's attorney and
15 Detective Montilla?

16    A.   And Guevara.  I believe Mingey was in
17 the room too.  And some other officer too, though.
18 I really don't know they name.

19    Q.   So in addition to the male state's
20 attorney, there were four policemen in the room,
21 you said?

22    A.   Off and on, off and on.

23    Q.   And that was when you were -- the court
24 reporter was typing everything you said?

Page 316

1     A.   Yeah.

2     Q.   And after you gave that statement, do
3  you remember you were provided a typed-up copy of
4  that statement to sign?

5     A.   They -- they did produce some papers to
6  sign and I refused.  I didn't want to sign nothing.
7  So they say -- when Rosa Bella came the next day in
8  the morning to check with me, see if I was leaving
9  home, I haven't signed the statement yet.  So Rose
10 said, Sign it because that probably mean they're
11 going to let you go home.  Now, this is the time
12 that she pregnant with my son too.

13    Q.   So you spoke to Rosa Bella before you
14 signed the statement?

15    A.   Yes.

16    Q.   When did you speak to her?

17    A.   It was early morning the next day.

18    Q.   So early morning the next day, the
19 police came back with the statement and you refused
20 to sign?

21    A.   I reviewed to sign.

22    Q.   And then you were able to speak with
23 Rosa Bella?

24    A.   Well, they -- they threaten me they

Page 317

1  were going to call Guevara to come in the police
2  station to talk to me.  And it happened that Rosa
3  Bella, she just arrived in the police station.  So
4  she went -- they let her see me all because she was
5  pregnant.  And I don't know what the police told
6  her.

7         Only thing, though, she came and
8  told me that, Baby, sign the papers so they can let
9  you go home.  They say if you sign and cooperate,
10 they were going to let you go home.

11         I told her, They not going to let me
12 go home; they acting like they not.  So I told her,
13 you know, I'm -- as soon as I go home, we going to
14 have to move because I'm going to be in trouble
15 with -- with the guys, though.

16         So only thing she wanted me to worry
17 about me getting up out of there and go home, which
18 I never did.

19    Q.   And ultimately you did sign a statement
20 that you had given?

21    A.   Yes, I did.

22    Q.   Do you recall after you gave the
23 statement that a photograph was taken of you?

24    A.   That was after.

Page 318

1    Q.   After you gave the statement a
2 photograph was taken?
3    A.   Yeah.  When I got -- when I came to the
4 police station that morning.
5    Q.   Which morning?
6    A.   That morning that I got arrested for
7 the double murder.
8    Q.   A photograph was taken of you when you
9 immediately got to the police station after
10 Paulnitsky had you transferred from Cook County
11 Jail?
12   A.   Yeah.  When I got to the police
13 station, that's when they took a -- a Polaroid
14 picture.  That's what it was.
15   Q.   And did they take any other pictures of
16 you?  Photographs of you?
17   A.   Yeah.  They take a picture when you go
18 down there and get your fingerprints and stuff
19 like that, but other than that, though, yeah, that
20 was -- that was it.
21   Q.   So the only Polaroid picture that was
22 taken of you was when you immediately got to the
23 police station on August 22nd?
24   A.   Um-hmm.  Yes, sir.

Page 319

1    MS. BONJEAN:  Can -- when you have a second,
2 whenever you're ready, I just want to take a
3 two-minute bathroom break, but if you want to --
4    MR. BRUEGGEN:  Let's do that right now,
5 because I'm going to get into some exhibits, so ...
6    MS. BONJEAN:  All right.
7    MR. GREENBERG:  Six hours and 40 minutes.
8    MS. BONJEAN:  What -- how much time do you we
9 have on the record here?
10   THE VIDEOGRAPHER:  Five hours, 16 minutes and
11 counting till we go off.
12   MS. BONJEAN:  Okay.
13   MR. BRUEGGEN:  Let's go off now.
14   THE VIDEOGRAPHER:  We're off the video record
15 at 4:18 at the end of Media Unit 5.
16         (Recess taken.)
17   THE VIDEOGRAPHER:  We are back on the video
18 record at 4:28 and the beginning of Media Unit 6.
19   MR. BRUEGGEN:  Mr. Maysonet, I'm going to
20 show you what we will mark as Exhibit Number 3.  I
21 will share it on the screen.
22         And, Jennifer, maybe you can pull
23 it.  It's his statement that we just talked about,
24 if you can pull the hard copy.

Page 320

1    MS. BONJEAN:  One second, I will grab it.
2    MR. BRUEGGEN:  And, Mr. Maysonet, while your
3 attorney's grabbing that, can you look at the
4 screen?  I put a document up, and we're going to
5 try to get you a hard copy of that document as
6 well.
7    THE WITNESS:  Okay.
8    MS. BONJEAN:  Yeah, we have it.
9    MR. BRUEGGEN:  Okay, great.
10 BY MR. BRUEGGEN:
11   Q.   Mr. Maysonet, you can use the hard
12 copy, if you'd like.
13        Can you identify what we've marked
14 as Maysonet Exhibit Number 3?
15   THE WITNESS:  He's talking about this one
16 here, right?
17   MS. BONJEAN:  Yeah.
18 BY MR. BRUEGGEN:
19   Q.   Yeah.  The one up here, and you should
20 have a hard copy in front of you as well that you
21 can flip through more easily than I can scroll.
22   A.   Okay.  It say, Investigation, shooting
23 deaths of Torrence and Kevin Wi- -- Wiley.
24   Q.   And do you recognize -- sorry, sir.

Page 321

1 Did you say something else?
2    A.   Statement of Jose Maysonet.
3    Q.   Do you recognize this to be the -- the
4 statement that was recorded from you on the morning
5 of August 23rd, 1990?
6    MS. BONJEAN:  Objection to the form and
7 foundation of that question.
8    THE WITNESS:  Yes, I remember this.
9 BY MR. BRUEGGEN:
10   Q.   If we go to the bottom of the first
11 page, which for the record is JGS_MAYSONET 1697, do
12 you see it says -- looks like it says Jose Juan
13 Maysonet, Jr.; do you see that, sir?
14   A.   Yes, sir.
15   Q.   And I'm showing it on the screen where
16 there's a signature.
17   A.   Yes, sir.
18   Q.   Is that your signature?
19   A.   Yes, sir.
20   Q.   Did you sign this page?
21   A.   I did.
22   Q.   And you told us you signed it after you
23 had already talked to Rosa Bella, correct?
24   A.   Yeah.

Page 322

1    Q.   And then moving on to the very end, the
2 last page of it, there's a signature line with an X
3 in front of it, which is page 7 of Exhibit 3.  You
4 see that, sir?  And I have it up on the screen.
5    A.   I got it.
6    Q.   And is that your signature?
7    A.   Yes, sir.
8    Q.   And you signed that page?
9    A.   I did sign it.
10   Q.   And have you had a chance to read your
11 statement that's Exhibit 3?
12   A.   No.
13   Q.   You've never read that?
14   A.   No.
15   Q.   So you can't tell me what in that
16 statement is true and what's false?
17   A.   The whole statement is false.
18   Q.   Everything in the statement is false?
19   A.   Everything.
20   Q.   Okay.  And, sir, when you talked to --
21 after the statement was typed up, did you talk to a
22 State's Attorney DiFranco about the statement
23 before you signed it?
24        Is that a no?

Page 323

1    A.   No.  I said no.
2    Q.   Okay.  Sorry, I did not hear you.  I
3 saw you shaking your head.
4        Did you make any corrections to the
5 statement or did you see the state's attorney make
6 any corrections to the statement in your presence?
7    A.   He -- only thing he -- he said that --
8 that he not my lawyer, he --he represent the
9 police, not me.
10   Q.   And, sir, I'm going to show you -- if
11 you could look at the third page of the statement,
12 JGS_MAYSONET 1699.  Take a look at that, sir.  You
13 can see that there's a typed thing and it appears
14 it's crossed out and then something -- the word
15 "something" is written.
16       Do you see that on -- my cursor's
17 right by it.  You see that, sir?
18   A.   I see it.
19   Q.   Do you -- were you present when that
20 correction was made?
21   A.   Not that I remember.
22   Q.   And next to the word "something" are
23 the initials JJM.  Do you see those, sir?
24   A.   Yeah.

Page 324

1    Q.   And those are your initials?
2    A.   That's my initials, though.
3    Q.   Did you put your initials here?
4    A.   I really don't know.
5    Q.   You don't recall putting your initials
6 here?
7    A.   I don't remember.
8    Q.   Now, sir, I want to show you what we'll
9 mark as Maysonet Exhibit Number 4, and this is the
10 Polaroid photo and backsides.
11       You see that, sir?
12   A.   Yes.
13   Q.   What's been marked as Exhibit Number 4?
14   A.   Yes, sir.
15   Q.   Polaroid photo and then the back of the
16 Polaroid photo.
17   A.   I see.
18   Q.   And do you have a copy of this that you
19 can work off of a hard copy, or do you want me to
20 show you on the screen?
21   MS. BONJEAN:  We don't have a copy of the
22 photos.
23   MR. BRUEGGEN:  Okay.  No problem.
24

Page 325

1 BY MR. BRUEGGEN:
2    Q.   And so, sir, can you identify what
3 Exhibit Maysonet Number 4 shows?
4    A.   It shows picture of me.
5    Q.   And do you know when that picture was
6 taken?
7    A.   Right as soon as I got arrested.
8    Q.   So this is the photograph you said that
9 was taken shortly after you were brought to Area 5
10 after leaving Cook County court?
11   A.   Yes, sir.
12   Q.   And looking at the backside of the
13 photograph, which is CCSAO 1474.
14       And, sir, just to show you, I'm
15 reading these Bates numbers down here, so you know
16 where I'm at.
17   A.   Okay.
18   Q.   Do you see some writing that was on the
19 back of that Polaroid?
20   A.   Um-hmm.  I see.
21   Q.   And do you see an X with a signature
22 after it?
23   A.   I see.
24   Q.   And is that your signature after that

Page 326

1 X?

2    A.   It is my signature.

3    Q.   Do you remember signing this -- the
4 back of this Polaroid photo?

5    A.   I don't remember signing the back of
6 the photo, but I -- I do recognize my signature,
7 though.

8    Q.   And looking at this page, do you recall
9 signing a document, a photo, or anything that had
10 the writing on there that you see?

11   A.   Actually, I don't -- I don't remember
12 writing that, writing my name in behind the
13 picture, though.

14   Q.   Okay.  But that is your signature, sir?

15   A.   It is my signature.  I'm not going to
16 deny that it -- that it not my signature.  It is my
17 signature, but I don't remember signing the picture
18 there.

19   Q.   And up above your signature it says --

20   A.   At Area 5.  I believe it say something
21 about HP, Thursday, August 23rd, 1990, at 10:55 a.m.,
22 and some -- I don't know, some kind of initial,
23 though, CSR.

24   Q.   And, sir, do you recall your statement

Page 327

1 was given on Thursday, August 23, 1999 -- or strike
2 that.

3        Do you recall that your statement
4 was given on Thursday, August 23rd, 1990, around
5 10:00 in the morning?

6    A.   No.

7    Q.   After you gave your statement that we
8 just looked at, do you -- sorry.

9        Sir, after you gave your statement
10 that we just looked at, do you recall leaving the
11 police station to go for a ride with Detective
12 Paulnitsky, Detective Montilla, and the state's
13 attorney that you had given your statement to?

14   A.   If ride -- if I leave the police
15 station with them, you mean?

16   Q.   Yes.  In a car, sir.

17   A.   No.  I -- I never leave the police
18 station.

19   Q.   So from the time that you were brought
20 to the police station on the morning of August 22nd,
21 1990, until you were transferred to Cook County
22 Jail, you never left the police station?

23   A.   Never left the police station.  I
24 didn't even left the room.

Page 328

1    Q.   And, sir, after you gave that
2 statement, do you recall you were charged with the
3 double murder, the Wiley brothers murder?

4    A.   Yes, sir.

5    Q.   And you were brought down to the lockup
6 at Area 5?

7    A.   Area 5.

8    Q.   And then subsequently transferred to
9 Cook County Jail?

10   A.   Yeah.  They did transfer me.  I don't
11 know when, though, but I know they did transfer me.
12 They got me up out of there.

13   Q.   And who represented you initially for
14 your -- for the murder charges against you?

15   A.   For the -- for the murder charges, the
16 one who represent me, it was Rick Beuke.

17   Q.   And when did you retain Rick Beuke?

18   A.   I'll say probably it was -- it was just
19 right -- I believe it was right after -- after
20 Swano.  He -- he got charged with something in
21 court, I believe.

22   Q.   Did Swano represent you on your -- on
23 the murder charges?

24   A.   He started to, but something happened

Page 329

1 to him.

2    Q.   Were you also represented by an
3 attorney named Neil Spector?

4    A.   He was my lawyer, yeah, after Swano.

5    Q.   So after Swano was your attorney, and
6 you said Swano got in trouble, did you retain Neil
7 Spector?

8    A.   Well, I didn't have no choice.  Yeah.

9    Q.   Did Neil Spector speak Spanish?

10   A.   He always -- he always brings -- you
11 know, I always get translator, though.  Neil, he
12 don't know how to speak Spanish.

13   Q.   So do you recall meeting with your
14 attorney Neil Spector to talk about a motion to
15 suppress the statements you made?

16   A.   No, never talk about it.

17   Q.   Do you know if Neil Spector filed a
18 motion on your behalf seeking to suppress
19 statements?

20   A.   I was not aware about it.

21   Q.   Did you want the statements that you
22 had given on August 22nd, 1990 to be suppressed?

23   MS. BONJEAN:  Objection to the form.

24       But go ahead.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 330..333

Page 330

1     THE WITNESS: I don't think Neil never -- I
2 don't think Neil never did nothing to represent --
3 to represent me in the double murder. The one who
4 represent me in the double murder was Rick Beuke.
5 As matter of fact, he was the one who go to court
6 most of the time because it got to a point that
7 Neil Spector, he -- he -- basically he -- he didn't
8 talk no more for -- for my behalf. Rick Beuke was
9 doing everything at one point.
10    **Q.    Did Neil Spector represent you at the**
11 **same time as Rick Beuke?**
12    A.    He was supposed to.
13    **Q.    And, sir, I'm going to show you what**
14 **we'll mark as Exhibit 5. And this is the motion to**
15 **suppress, file-stamped August 4th of 1992, and**
16 **Bates stamped CCSAO 722.**
17    MS. BONJEAN: Okay. Hold on one second.
18       All right. We have the paper copy.
19 BY MR. BRUEGGEN:
20    **Q.    And, Mr. Maysonet, I put up Exhibit**
21 **Number 5 to your deposition up on the screen, but I**
22 **believe you also have a paper copy. Feel free to**
23 **use the paper copy.**
24    A.    Okay.

Page 331

1     **Q.    But can you just confirm that you do**
2 **have the same document that I have on the screen**
3 **you have in front of you?**
4     MS. BONJEAN: Well, hold --
5     THE WITNESS: Yes, sir.
6     MS. BONJEAN: Well, hold on. Let's look at
7 the Bates stamp, please.
8     MR. BRUEGGEN: I have CCSAO 722 to 726.
9     THE WITNESS: There they are.
10    MS. BONJEAN: Okay.
11 BY MR. BRUEGGEN:
12    **Q.    Mr. Maysonet, have you seen this**
13 **document before that's been marked as Maysonet**
14 **Exhibit 5?**
15    A.    No, never. Never saw this till --
16 until now.
17    **Q.    And do you see the caption on this**
18 **document that says People of the State of Illinois**
19 **v. Jose Maysonet; do you see that?**
20    A.    I see it.
21    **Q.    Do you recall talking to your attorney**
22 **about trying to suppress statements you made?**
23    MS. BONJEAN: Okay. Hold on a second. I'm
24 going to -- give me one second.

Page 332

1         Which attorney are you talking
2 about?
3     MR. BRUEGGEN: Start with Neil Spector.
4     MS. BONJEAN: Hold on. I don't know -- I
5 need -- give me one second to consult with my
6 client. We may be asserting an attorney/client
7 privilege as to Neil Spector.
8     MR. BRUEGGEN: Okay. We can go off the
9 record and you can talk to Mr. Maysonet and let us
10 know when you're ready.
11    MS. BONJEAN: Okay.
12    THE VIDEOGRAPHER: We're off the video record
13 at 4:42.
14        (Recess taken.)
15    THE VIDEOGRAPHER: We are back on the video
16 record at 4:44.
17    MR. BRUEGGEN: Kathy, can you please read
18 back the last question.
19
        (The record was read as follows:
20        Q. Do you recall talking to
           your attorney about trying to
21        suppress statements you made?)
22    MS. BONJEAN: Okay. At this time I'm going
23 to advise my client not to answer that question
24 on -- on the basis of the attorney/client

Page 333

1 privilege.
2 BY MR. BRUEGGEN:
3     **Q.    Okay. Sir, are you going follow your**
4 **attorney's advice and not talk about any**
5 **conversations you had with Mr. Spector?**
6     A.    Yes, I am.
7     **Q.    And, sir, I want to show you what we've**
8 **marked as Exhibit 5 that was just up on the screen.**
9 **I will show you that. And I will represent to you**
10 **that this is a document that was filed in your**
11 **case, your -- the criminal case for the double**
12 **homicide, sir. And I'd like you to look at the**
13 **page I have up there, which is the top of page 3.**
14    MS. BONJEAN: Well, hold on. He's going to --
15 he's going to read the whole document since he's
16 not seen it. So just hang on for a second.
17        Go ahead. Start here and take your
18 time. Read it to yourself; read it to
19 yourself.
20    MR. BRUEGGEN: I'm going to withdraw the
21 question and I will withdraw the exhibit, and we
22 can just talk about it. Okay?
23    MS. BONJEAN: Sure.
24    MR. BRUEGGEN: I'm not going to make

Page 334

1 Mr. Maysonet read today.
2      MS. BONJEAN:  Okay.
3      MR. BRUEGGEN:  Or read -- read that much.
4      THE WITNESS:  All right.  Good.
5 BY MR. BRUEGGEN:
6      Q.   Mr. Maysonet, prior to your arrest on
7 August 22nd, 1990, had you inhaled substantial
8 quantifies of cocaine for a sustained period of
9 time?
10     A.   I don't do drugs.
11     Q.   You don't do drugs; is that what you
12 said?
13     A.   I don't do drugs.
14     Q.   So you did not use any cocaine --
15     A.   No, no --
16     Q.   -- back in 1990?
17     A.   I did smoke weed, though, but I don't
18 call marijuana a drug no more because that's legal,
19 so ...
20     Q.   And back in -- on August 22nd, 1990,
21 did you ingest an unknown quantity of a
22 prescription drug lorazepam while in custody?
23     A.   No, I didn't.
24     Q.   You took the medication that -- your

Page 335

1 mom's medication that you had taken in the past,
2 right?
3      A.   Yes, took it.
4      Q.   Do you remember what medication that
5 was?
6      A.   I remember it was two small white
7 pills.  I don't know the name.
8      Q.   And do you recall what that medication
9 was for?
10     A.   Supposed to -- to calm me down.
11     Q.   So it was the medication that you had
12 taken at other times when you were getting nervous
13 or had a nervous episode?
14     A.   When I get mad, I get nervous, though,
15 you know, when I get mad, I get angry.  They wanted
16 me to calm down.
17     Q.   And, sir, you told us that after Neil
18 Spector, you had Rick Beuke as your attorney; is
19 that right?
20     A.   Correct.
21     Q.   Did Rick Beuke speak Spanish?
22     A.   No, he don't.
23     Q.   Did you communicate with Rick Beuke in
24 English in some conversations you had with him at

Page 336

1 the jail?
2      A.   Yeah.
3      Q.   So you did speak to Rick Beuke in
4 English?
5      A.   A little bit.
6      Q.   Little bit?
7      A.   Yeah.
8      Q.   Simple things?
9      A.   Basic stuff.
10     Q.   And did you tell Rick Beuke about your
11 interactions on August 22nd, 1990, with Detective
12 Guevara?
13     MS. BONJEAN:  All right.  I'm going to --
14     MR. BRUEGGEN:  Privilege has been waived,
15 Jennifer, if that's where you were going.
16     MS. BONJEAN:  Yeah, hold on.  Let me think
17 for a second.  I want to -- these are big -- these
18 are important things.  I -- I don't necessarily
19 disagree.  Give me two seconds.
20          (Brief pause.)
21     MS. BONJEAN:  Okay.  He can answer.
22     THE WITNESS:  Can you repeat the question
23 again?
24     MR. BRUEGGEN:  Yes.  We'll have it read back.

Page 337

1          Kathy, can you read that question
2 back, please?
3          (The record was read as follows:
4              Q. And did you tell Rick Beuke
                about your interactions on
5              August 22nd, 1990, with
                Detective Guevara?)
6      THE WITNESS:  Yes, I did.
7 BY MR. BRUEGGEN:
8      Q.   And did you tell him that Detective
9 Guevara beat you --
10     A.   Yes.
11     Q.   -- the whole time you were there until
12 you admitted to other people that were involved?
13     A.   I did tell Beuke what happen to me that
14 day in the police station.
15     Q.   Did you tell Beuke about your previous
16 relationship with Guevara and the agreement we
17 talked about earlier on in the dep?
18     MS. BONJEAN:  You can answer.
19     THE WITNESS:  Yes, I did.
20 BY MR. BRUEGGEN:
21     Q.   And what did you tell Beuke about that
22 relationship?
23     A.   I told him everything that I know.
24     Q.   Did you tell Beuke that you had been

JOSE JUAN MAYSONET JR., 04/16/2021          Page 338..341

Page 338

1  paying Rey Guevara?
2      A.   Yeah.  I told him everything.
3      Q.   Did you tell Beuke that you had Rey
4  Guevara over for dinner?
5      A.   I did tell him that, yeah.
6      Q.   And did you tell Beuke that you
7  acquired girls for Rey Guevara?
8      A.   Everything.
9      Q.   And when you told him all that, did you
10 expect Beuke to use that information to help
11 support your case that Guevara had beat you?
12     A.   I'm just letting him know what kind of
13 person that we're dealing with.  I mean, whether he
14 can use that in court to defend me or not, that was
15 up to him.  Only thing that I did, everything that
16 he -- you know, that he already advised me to.
17 That's about it.
18     Q.   Did Rick Beuke ever tell you that he
19 had represented Guevara?
20     A.   He never did.
21     Q.   Did he tell you that he knew Detective
22 Guevara?
23     A.   He familiar with him.
24     Q.   And how did you get Rick Beuke's name

Page 339

1  to represent you?
2      A.   I was in -- I was in the Cook County
3  in -- in the dayroom when he came in the dayroom
4  one morning.  And he -- he basically -- they --
5  they look for me, for my name.  And we have a talk
6  after he came.
7           And basically, he -- he was sent to
8  somebody else, though, you know, for a friend of
9  mine.  He -- he talked to him and he really came
10 and chat with me for a little bit, though, you
11 know.  Then my friend, he knew that I needed a
12 lawyer bad, though, so he sent him, see for what he
13 can do.
14           And it happened it -- what we talk
15 about, you know, I told him I got to talk to my
16 family, I don't have no -- no income like that.
17 After, you know, we talk and my family talk to him,
18 and that's how he became to be my lawyer in the
19 case.
20     Q.   So Beuke was referred to you by a
21 friend that you were incarcerated with?
22     A.   Yeah.  Referred by somebody, yeah.
23     Q.   Who was what friend that you were
24 incarcerated with what referred Beuke to you?

Page 340

1      A.   It was a -- it was another inmate,
2  yeah.
3      Q.   What was his name, sir?
4      A.   I don't remember the name.
5      Q.   Was this a friend that had been a Latin
6  King with you?
7      A.   No, no.  No, no.  No Latin King.
8      Q.   And how did you know this gentleman?
9      A.   We was doing time in the same -- in the
10 same part of the jail in Cook County.
11     Q.   Did you know him prior to your
12 incarceration at Cook County?
13     A.   Yeah.  I met him in -- when I was in
14 there, though.
15     Q.   And while Rick Beuke was representing
16 you, do you remember talking to a psychiatrist,
17 Dr. Thampy?
18     A.   No.  I don't remember.
19     Q.   Do you remember ever going and speaking
20 to a doctor relating to your defense in the
21 homicide case?
22     A.   I did talk to the doctor on some part
23 in the Cook County.  I think it was -- I thought it
24 was in the hospital in the Cook County.  They took

Page 341

1  me to some floor to see some psychiatrist, though.
2  Yes, I remember.
3      Q.   And what did you talk to that
4  psychiatrist about?
5      A.   He just wanted me to know if I know how
6  to speak English and stuff like what.
7      Q.   And do you know what that
8  psychiatrist's findings were?
9      A.   He was talking to me in Spanish,
10 though.
11     Q.   Yeah.
12           Sir, and I -- I'm asking, you know,
13 do you know what he said his findings were as far
14 as your ability to speak English or anything like
15 that?
16     A.   No, not really.
17     Q.   Do you remember testifying for a motion
18 to suppress statements and quash your arrest in the
19 criminal court?
20     A.   I remember.
21     Q.   And you testified on examination by
22 Reuck- -- by Attorney Reuckert?
23     A.   Reuckert.
24     Q.   Did you retain Reuckert as your

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 342..345

Page 342

1 attorney?

2    A.   He work with Beuke, I believe.

3    Q.   So Reuckert was helping Beuke out and

4 presented you for the motion to suppress?

5    MS. BONJEAN:  Objection to the form,

6 foundation of that questions.

7 BY MR. BRUEGGEN:

8    Q.   If you know, sir.

9    A.   I think Beuke was in the hospital.  He

10 was getting some kind of surgery.  He was getting

11 his leg operated.

12    Q.   Prior to testifying, did you talk to

13 Attorney Reuckert about what testimony you were to

14 give?

15    A.   We -- we talk.  We did our prep.

16    Q.   Did you talk to your Attorney Reuckert

17 about all the -- the beatings that happened on

18 August 22nd, 1990 through August 23rd, 1990 by

19 Detective Guevara?

20    A.   No, not Reuckert.

21    Q.   Did you talk to Reuckert about your

22 prior relationship with Guevara and the agreement

23 you had to pay him money?

24    A.   No, not Reuckert.

Page 343

1    Q.   What did you and Reuckert talk about in

2 preparation for your testimony on the motion to

3 suppress statements?

4    A.   Just he gave me prep just like any --

5 any lawyer do with their client, though, so he

6 just -- I don't -- I don't hardly remember what we

7 talk about, but I know he was just -- you know,

8 about the case and stuff, I believe.  But other

9 than that, you know, I don't remember any -- any

10 serious, hardcore conversation I had with him.

11    Q.   And, sir, when you testified for your

12 motion to suppress, did you provide all of the

13 information you had about your interactions with --

14    MS. BONJEAN:  Objection.

15    MR. BRUEGGEN:  -- Detective Guevara?

16    MS. BONJEAN:  Objection to the form of that

17 question.  You know he can only answer questions

18 that are posed to him, so that's -- it's not like

19 he can go in and give a narrative.

20 BY MR. BRUEGGEN:

21    Q.   Sir, you can answer the question.

22    MS. BONJEAN:  Answer -- ask the question

23 again so -- please.

24

Page 344

1 BY MR. BRUEGGEN:

2    Q.   Sir, when you testified on the motion

3 to suppress, did you provide all the information

4 and your -- you knowledge about the alleged abuse

5 that you were asked about?

6    A.   I don't remember.  I don't remember.

7    MS. BONJEAN:  Do you want him to look at --

8 look at the testimony?

9    THE WITNESS:  Yeah.

10 BY MR. BRUEGGEN:

11    Q.   Sir, would there be any reason why you

12 wouldn't testify fully in response to questions

13 about the abuse that allegedly happened to you on

14 August 22nd, 1990?

15    MS. BONJEAN:  Objection to the form of that

16 question, foundation of that question.  If you want

17 him to talk about the testimony he gave, I'm going

18 to ask that you provide it to him so he can have

19 some basis.

20    MR. BRUEGGEN:  This is a different question,

21 Jennifer.

22 BY MR. BRUEGGEN:

23    Q.   Sir, do you understand my question --

24    MS. BONJEAN:  It's not a fair question.

Page 345

1    But go ahead if you understand the

2 question.

3    THE WITNESS:  Say the question again.

4    MR. BRUEGGEN:  Why don't we have it read

5 back?  Kathy, can you please read it back.

6    (The record was read as follows:

      Q. Sir, would there be any

7      reason why you didn't testify

       fully in response to questions

8      about the abuse that allegedly

       happened to you on August 22nd,

9      1990?)

10    MS. BONJEAN:  If you understand.

11    THE WITNESS:  I really don't understand the

12 question, though.

13 BY MR. BRUEGGEN:

14    Q.   And, sir, you understood that you

15 testified at a motion to suppress trying to have

16 your statement thrown out?  Do you understand that,

17 sir?

18    A.   I remember testifying.

19    Q.   And in doing that, you would want to

20 provide all the support for having your statement

21 thrown out, right?

22    MS. BONJEAN:  Objection to form of that

23 question.

24    THE WITNESS:  No.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 346..349

Page 346

1 BY MR. BRUEGGEN:
2    Q.   You didn't want to provide all the
3 support?
4    MS. BONJEAN:  Objection to the form of the
5 question.
6        Do you understand the question?
7    THE WITNESS:  No, I don't.  That's what I was
8 going to say.  No, I don't understand.
9 BY MR. BRUEGGEN:
10   Q.   Sir, when you were testifying, they
11 were asking you about the alleged abuse that
12 happened on August 22nd, 1990 to August 23rd, 1990,
13 did you provide -- did you want to provide all the
14 information in your knowledge that was responsive
15 to the questions that were posed to you?
16   A.   I was trying to answer the question the
17 best possible that I can.
18   Q.   And did you intentionally hold back any
19 information about the alleged abuse that happened
20 to you on August 22nd and August 23rd, 1990 when
21 you were asked about that abuse?
22   A.   I did talk about the abuse in the
23 motion.  I told the judge what the -- what the
24 police did to me.

Page 347

1    Q.   Yes, sir.
2        And -- and I'm asking did you tell
3 the judge everything the police did to you?
4    MS. BONJEAN:  Objection to the form of that
5 question.  Objection to the form of that question.
6        Give him his testimony if you want
7 him to answer that question.  You're asking him to
8 remember testimony that was given over 30 years
9 ago.
10   THE WITNESS:  I can't remember.
11   MS. ROSEN:  I'm going to object to the
12 speaking objections that are designed to coach him.
13   MS. BONJEAN:  They're not designed to coach
14 him.  I -- you're -- you remember what you were
15 doing 30 years ago in great detail?
16   MS. ROSEN:  He was asked a direct question
17 that he can answer.
18   MS. BONJEAN:  No.  He can't answer whether or
19 not he provided every detail from testimony he gave
20 30 years ago.  Nobody could.  It's unrealistic.
21       If you want to show him testimony,
22 then I'm sure he could answer those questions a
23 little better.
24   MR. BRUEGGEN:  Jennifer, I'm just going to

Page 348

1 move on.
2 BY MR. BRUEGGEN:
3    Q.   So, Mr. Maysonet, were you aware that
4 your criminal codefendants gave statements that put
5 you at the scene of the double homicide?
6    A.   Yeah, I remember.
7    Q.   And were you aware that both Gonzalez
8 and Justino Cruz had said that they had gone to
9 your house the night of the shooting to obtain a
10 gun?
11   A.   Yeah.
12   Q.   And then Justino Cruz said that you
13 drove him and Gonzalez and Fro over near the scene
14 of the crime and waited in the car while Lluvia
15 Gonzalez shot the two men on North Avenue?
16   MS. BONJEAN:  Wait.  Objection.  Who testi- --
17 who stated that?
18   MR. BRUEGGEN:  Justino Cruz.
19   THE WITNESS:  Tino.
20       I remember he was -- he said that in
21 the statement.
22 BY MR. BRUEGGEN:
23   Q.   And do you remember that Gonzalez'
24 statement was different than Justino Cruz, and he

Page 349

1 said that he was walking home when you, Tino, and
2 Fro picked up Gonzalez to give him a ride home?  Do
3 you recall that?
4    A.   I believe everybody statement was
5 different.  Everybody had different story to say.
6 We all didn't say the same story.
7    Q.   And, sir, do you recall Gonzalez said
8 that you were the one who did the actual shooting?
9    A.   He was saying that I was the one.  I
10 was saying that he was the one, and the other guy,
11 he was saying it was me and him.  So, you know, it
12 was so confusing, the -- the whole statement.
13   Q.   So the three of you were consistently
14 present in all three statements, it was just a
15 different matter of who was shooting who?
16   MS. BONJEAN:  Objection to the form of -- of
17 that testimony.
18   THE WITNESS:  I was like, you're good.
19   MR. BRUEGGEN:  And, sir, let me rephrase.
20 BY MR. BRUEGGEN:
21   Q.   So it was basically you had the three
22 statements from you, Tino, and Gonzalez that had
23 all three of you at the scene of the crime and
24 there was a difference of who actually pulled the

JOSE JUAN MAYSONET JR., 04/16/2021       Page 350..353

Page 350

1 trigger on the gun. Is that your recollection?

2    A. What -- what the statement say, he say

3 all -- every statement, they were all saying

4 different story, though. So, I mean, there were no

5 consistent in -- in either of the statement,

6 though.

7    Q. So your recollection is there was no

8 consistency through the statements?

9    A. They were all lies. They were not --

10 you know, that's -- that's not the truth. That was

11 all what the police coach us to say.

12    Q. When did you first learn that Rosa

13 Bella had given a statement about the night of

14 the -- or the night before the murder happened in

15 the early morning hours?

16    A. I found out about that when the

17 discovery, the motion for discovery, it went

18 through. And -- and Beuke, he was just telling me,

19 you know, Oh, Rosa Bella, he -- he meant she talked

20 to the police. He didn't say nothing about the

21 statement. He did -- she did talk to the police.

22 What did she talk about, he -- he didn't want to --

23 basically he didn't want to say too much because

24 everything was under investigation, though.

Page 351

1       But yeah, I found out later what --

2 you know, what the statement said, though, you

3 know, when the trial went on.

4    Q. Did Rosa Bella visit you when you were

5 first incarcerated in Cook County for the double

6 homicide?

7    A. Yes. She would -- she would go in and

8 visit me.

9    Q. Did she ever tell you that she gave the

10 police a handwritten statement?

11    A. She never said that.

12    Q. Sir, you were aware that Gonzalez went

13 to trial on the double homicide several years

14 before you did?

15    A. He did. He did went to trial first,

16 then me.

17    Q. And at trial, were you aware that

18 Mr. Gonzalez testified that you, he, and Tino Cruz

19 were all present on the night of the murder?

20    A. That's -- that's what Beuke told me.

21    Q. So Beuke told you about Gonz- -- what

22 Gonzalez testified to?

23    A. Yeah. He -- he did tell me that he

24 bury me alive with his testimony. That was just

Page 352

1 exactly what he said.

2    Q. And do you know why Gonzalez did not

3 testify in your criminal trial?

4    MR. GREENBERG: Perjury.

5    THE WITNESS: I really don't know. I

6 really -- I really don't know why he didn't

7 testify, though.

8 BY MR. BRUEGGEN:

9    Q. Do you know why Tino, Justino Cruz, did

10 not testify in your criminal trial?

11    A. No, I did not.

12    Q. And do you know why Rosa Bella did not

13 testify in your criminal trial?

14    A. Everybody, that were lying, you know,

15 they didn't have nothing to say, though, so they

16 probably decide not to say nothing bad about me,

17 after everybody ...

18    Q. And, sir, for Mr. Gonzalez's trial,

19 were you aware that Tino had pled guilty to a

20 murder in exchange for testifying against Alfredo

21 Gonzalez?

22    A. Yeah. My lawyer -- my lawyer did -- he

23 did told me that. He made a deal, something like

24 that.

Page 353

1    Q. And Justino Cruz testified at Alfredo

2 Gonzalez trial about Alfredo Gonzalez shooting the

3 two gentlemen while you were driving the car?

4    A. That's what they later told me, yeah.

5    Q. When you went to trial, you went to

6 trial at the same time as Chris Goosens, right?

7    A. We both went to trial the same -- the

8 same time.

9    Q. You elected to have a jury trial?

10    A. I'm hungry.

11       Huh?

12    Q. You elected to have a jury trial?

13    A. It was elect by, yeah, jury trial.

14    Q. And Chris Goosens took a bench trial

15 where the judge would decide, right.

16    A. Yeah. The -- the judge decide his

17 fate, yeah.

18    Q. Why did you decide to take a jury

19 trial?

20    MS. BONJEAN: Objection. That -- that -- I

21 mean, that -- I don't know why that isn't covered

22 by the attorney/client privilege, potentially.

23       You're saying we -- it's waived

24 there as well?

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 354..357

Page 354

1     MR. BRUEGGEN: With Beuke I think it was
2 waived completely when you sued him. So that would
3 be my position. If you have a different position,
4 please feel free to say.
5     MS. BONJEAN: No. He can answer that.
6         Go ahead.
7     THE WITNESS: Repeat the question again.
8     MR. BRUEGGEN: Yeah.
9 BY MR. BRUEGGEN:
10    Q.   Sir, can you tell me why you decided to
11 take a jury trial?
12    A.   Everything that I was doing it was
13 under the judge -- the lawyer advice.
14    Q.   So you just did whatever Beuke told you
15 to do?
16    A.   Whatever he advise me to do, that's
17 what I do. He's the lawyer.
18    Q.   Did you want to call any alibi
19 witnesses at trial?
20    A.   I didn't have no -- I didn't have no
21 alibi witness only other than my family.
22    Q.   And, sir, did -- wasn't this murder --
23 didn't it happen the night of visitation for
24 Santiago Sanchez?

Page 355

1     MS. BONJEAN: Objection to the form of that
2 question. That's -- also mischaracterizing. He
3 has said repeatedly, and you know what he said, the
4 answer to the question was, where he was at the
5 time of the murder.
6 BY MR. BRUEGGEN:
7     Q.   Okay. Sir, can you answer the
8 question?
9         And let me -- let me rephrase the
10 question because I want to make sure I'm specific.
11       That the murder happened the early
12 morning hours after the day that Santiago Sanchez's
13 visitation was?
14    MS. BONJEAN: Objection to the form of that
15 question.
16    THE WITNESS: I don't -- I don't remember.
17 BY MR. BRUEGGEN:
18    Q.   And, sir, I think you told us before
19 that you were at home or you believe you were at
20 home at the time of this murder?
21    A.   I was at home at the time of the
22 murder.
23    Q.   And do you recall who you were at home
24 with?

Page 356

1     A.   I was at home with the kids and Rosa.
2     Q.   So was there any reason you didn't call
3 Rosa as an alibi witness to say you were home the
4 night -- or the early morning hours that the double
5 murder happened?
6     A.   I was acting under the lawyer advice,
7 though. Whatever the lawyer decide to do, you
8 know, that's what we do.
9     Q.   Sir, did you participate in your
10 defense at all with Mr. Beuke?
11    MS. BONJEAN: Objection to the form of that
12 question.
13       What do you mean "participate"?
14 BY MR. BRUEGGEN:
15    Q.   You provided Beuke information about
16 your interrogation and where you were when the
17 murder happened?
18    A.   I did tell him, yeah.
19    Q.   And you understand what an alibi is,
20 right?
21    A.   Alibi is a witness who happen to go
22 there on your behalf to talk to -- to the judge,
23 right? That's what an alibi, right? Witness?
24    Q.   And so, sir, with that understanding,

Page 357

1 would you have wanted Rosa Bella to come testify
2 that you were at home with her when the double
3 murder happened?
4     A.   If Beuke didn't want her in the -- in
5 the case, you know, I don't know what to do. It
6 was his decision to do what he supposed to do. He
7 the one who defending me.
8         Remember, by the time that I had
9 lawyers and stuff, you know, I didn't -- I really
10 didn't know what to tell them, you know, how to
11 fight the case. I mean, only thing I do is give
12 him information for him to, you know, see what he
13 can do.
14    Q.   Ultimately you were convicted of the
15 homicides of the Wiley brothers; is that right?
16    A.   Yeah. I did got found guilty.
17    Q.   And you were sentenced to natural life?
18    A.   I got sentenced to natural life, yeah.
19 That's correct.
20    Q.   You appealed your conviction?
21    A.   I did.
22    Q.   And that appeal was ultimately denied?
23    A.   Several times.
24    Q.   Do you recall that in about 1998 after

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 358..361

Page 358

1 your appeal was denied, you filed a pro se petition
2 for post-conviction relief?
3     A.   Yes, I did.
4     Q.   And you filed that from at the prison?
5     A.   Yes, I did.
6     Q.   And, sir, I'm going to mark this as
7 Exhibit 6 -- or, I'm sorry, 5.  Because I think I
8 withdrew the last exhibit, right?
9          Kathy, do you know where we're at?
10 I'm sorry.
11     MS. BONJEAN:  I don't, but ...
12     MR. BRUEGGEN:  Well, let's mark it as
13 Exhibit 6.  Either way.
14     And, Jennifer, this is the pro se
15 petition that was file-stamped May 3rd, 2006, and
16 it's Bates stamped MAYSONET 9048.
17     MS. BONJEAN:  Okay.  Let me see.
18     MR. BRUEGGEN:  If you want to pull that out.
19 And I'm going to be very brief with it, so ...
20     MS. BONJEAN:  Well, okay, we'll see.
21 BY MR. BRUEGGEN:
22     Q.   Sir, let me share my screen with you
23 and show you what we'll mark as Exhibit 6.
24          You see a document up on the screen?

Page 359

1     A.   Yes.
2     Q.   And do you see the caption there, it
3 says, People of the State of Illinois v. Jose
4 Maysonet?
5     A.   AKA Juan Maysonet.
6     Q.   Yeah.
7          You see that, sir?
8     A.   Yes, I do.
9     Q.   And I just want to take you to the
10 bottom of page six, which is Maysonet 9053.
11 There's a signature there.
12     A.   Okay.
13     Q.   You see that signature, sir?
14     A.   Yes, sir.
15     Q.   Is that your signature?
16     A.   It is.
17     Q.   And if you go down to the next page,
18 top of page 7, there's Affidavit.  You see that?
19     A.   Um-hmm.  I see it.
20     Q.   And can you read that to yourself
21 underneath Affidavit?
22     A.   It says --
23     MS. BONJEAN:  Read it to yourself; read it to
24 yourself.

Page 360

1 BY MR. BRUEGGEN:
2     Q.   Read it to yourself, sir.  I just want
3 to make sure that you've seen it.
4     A.   Okay.
5          Okay.
6     Q.   And is that your signature below that
7 paragraph?
8     A.   It is.
9     Q.   And that paragraph says that, The
10 foregoing Petition For Postconviction Relief and
11 the facts contained therein are true to the best of
12 your knowledge, information, and belief?
13     A.   Yes.
14     Q.   When you filed that post-conviction
15 petition, did you set forth all the information and
16 arguments that you believed that were relevant to
17 your case and overturning your conviction?
18     MS. BONJEAN:  Okay.  Hold on.
19          Objection to the question; form,
20 foundation.
21          You can answer.
22     THE WITNESS:  I didn't understood the form of
23 the question.
24     MR. BRUEGGEN:  No -- no problem, sir.

Page 361

1 BY MR. BRUEGGEN:
2     Q.   So after your appeal was denied, you
3 filed a post-conviction petition for relief from
4 the judgment, right?
5     A.   Yes.
6     Q.   And in that you wanted to argue why you
7 thought you should be --
8     A.   Relieved.
9     Q.   -- out from underneath the judgment of
10 the homicide, right?
11     A.   Yes.
12     Q.   Did you make all the arguments you knew
13 about?
14     MS. BONJEAN:  Okay.  He -- he's going to have
15 to read this in order to answer that question.
16 Okay?  So would you like him to read it.
17     MR. BRUEGGEN:  No.  I'll -- I'll just go to
18 the next ...
19 BY MR. BRUEGGEN:
20     Q.   Sir, would there be any reason why you
21 wouldn't make all arguments you had after you had
22 been convicted of murder to try to get your murder
23 conviction tossed out?
24     MS. BONJEAN:  Objection.  He's not a lawyer,

Page 362

1 but I don't -- I don't understand the question. I
2 mean, it calls for a legal -- a legal conclusion
3 that he cannot answer.
4          But answer to the best of your
5 ability.
6      THE WITNESS: Really I don't understand the
7 question, though. And I want to answer the
8 question, but I really don't understand the
9 question.
10 BY MR. BRUEGGEN:
11     Q. Sir, what I'm saying is --
12     A. Ask another way that I can understand.
13     Q. Okay. You filed, I think, several
14 post-conviction petitions?
15     A. Yes.
16     Q. And in those petitions, you were asking
17 the court to reverse your conviction for homicide?
18     A. Right.
19     Q. And so can you think of a reason why
20 you wouldn't make all arguments that you were aware
21 of in asking the court to throw out your homicide
22 conviction?
23     A. I'm not a lawyer, first. And I really
24 don't understand that language you guys talk. So I

Page 363

1 don't know nothing about court, though, you know.
2 The only thing that I can just get somebody's help
3 and help me. You know, we -- you know, we got
4 people in jail that they call legal para, legal --
5 paralegal, whatever they call that. So ...
6     Q. And, sir, my question isn't necessarily
7 a fully legal one. It's if someone's -- if you
8 were convicted of something, wouldn't you want to
9 make any argument you could possibly think of to
10 try to reverse that conviction?
11     MS. BONJEAN: I'm going to object. It calls
12 for a legal conclusion about what would reverse a
13 conviction and what might not reverse a conviction.
14 So I think it's an inappropriate question. He's
15 answered it. He -- and it calls for speculation.
16     THE WITNESS: Well, I'm not a lawyer, so it
17 just -- I'm -- I'm trying to be truly honest with
18 the judge in a motion, so ...
19 BY MR. BRUEGGEN:
20     Q. No, sir, I understand that. I'm just
21 trying to figure out if there would be any reason
22 why you would not tell the court all the
23 information that you knew to try to get your
24 information in front of the court so that your

Page 364

1 conviction could potentially be reversed.
2     MS. BONJEAN: Okay. Objection. Because
3 you're framing it in terms of getting a conviction
4 reversed. He's not a lawyer and he's answered
5 that's the reason why he might not do that. So I
6 don't know why you keep asking him that question.
7     MR. BRUEGGEN: I understand. I -- I will
8 move on.
9 BY MR. BRUEGGEN:
10     Q. Sir, was -- why you did you file
11 your -- what we've marked as Exhibit Number 6, the
12 pro se post-conviction petition? What was the
13 purpose of filing that?
14     MS. BONJEAN: Well, he's going to have to
15 look at it. Okay? Because there were multiple --
16 there were multiple petitions.
17 BY MR. BRUEGGEN:
18     Q. So, sir, let me start with the first
19 question: Do you remember filing your post-
20 conviction petition?
21     A. I remember filing it.
22     Q. And can you tell me without having to
23 review the whole petition why you filed it?
24     MS. BONJEAN: Hold on a second. You keep

Page 365

1 saying 1998, though, right?
2     MR. BRUEGGEN: Yes. That's the -- it was
3 filed in 2006, but if you look at the dates, it's
4 dated 1998 for his affidavit and his sister's
5 affidavit.
6     MS. BONJEAN: Okay. So it's not filed until
7 May 3rd, 2006. I just want to make sure we're
8 talking about the same document.
9     MR. BRUEGGEN: Yes.
10     MS. BONJEAN: Okay. Did you ask why he filed
11 it?
12     MR. BRUEGGEN: I first asked if he recalls,
13 and I think he said yes. And then I asked if he
14 can recall why he filed it, without having to
15 review the entire postconviction petition.
16     THE WITNESS: I wanted to keep the case open.
17 I -- I really wanted -- I wanted to have someone to
18 have the chance and -- and fight it, though. I
19 really didn't want -- I didn't want to lose the --
20 you know, there's a period of time that you -- that
21 you got a put in some kind of petition in court,
22 though, so they don't -- I guess, you know, you
23 continue fighting it, though.
24          Only thing I'm trying to do is keep

Page 366

1 the door open for the case so maybe, you know, one
2 day I'll get someone to fight the case.  Basically
3 that's what I was trying to do.
4        MR. BRUEGGEN:  And, sir, I'm going to switch
5 topics.  Do you want to take a quick break?  I'm
6 getting close to the --
7        MS. BONJEAN:  How much time do we have on the
8 record?
9            We can take a two-minute break.
10 That'd be great because we just got coffee.
11        MR. BRUEGGEN:  Okay.
12        THE VIDEOGRAPHER:  We are at six hours and
13 four minutes.
14        MS. BONJEAN:  Six hours and four minutes?
15        THE VIDEOGRAPHER:  Yeah.
16        MS. BONJEAN:  Okay.  Thank you.
17        THE COURT REPORTER:  All right.  I need --
18 I'm taking five minutes.
19        MS. BONJEAN:  Five minutes?
20        THE COURT REPORTER:  Yeah.
21        MS. BONJEAN:  Okay.  No problem.
22        MS. ROSEN:  Go for it.
23        THE VIDEOGRAPHER:  We're off the video record
24 at 5:18.

Page 367

1            (Recess taken.)
2        THE VIDEOGRAPHER:  We're back on the video
3 record at 5:28.
4 BY MR. BRUEGGEN:
5     Q.   Mr. Maysonet, while you were
6 incarcerated in the Cook County Jail, were you
7 aware that someone threw a Molotov cocktail into
8 your mother's apartment?
9     A.   Yes.
10     Q.   And what did you know about that
11 incident?
12     A.   That -- what my mother told me, though,
13 somebody tried to burn the building down.
14     Q.   And do you know if that was any type of
15 gang retaliation?
16        MS. BONJEAN:  Objection to the form.
17        THE WITNESS:  Yeah.
18 BY MR. BRUEGGEN:
19     Q.   And who was the gang retaliation by?
20     A.   My own people.
21     Q.   You said your own people?
22     A.   Yeah.
23     Q.   The Latin Kings threw a Molotov
24 cocktail in your mother's apartment?

Page 368

1     A.   Yes.
2     Q.   And was that because you were -- you
3 had given up other Latin Kings?
4        MS. BONJEAN:  Objection to the form of that
5 question.
6            If you know.
7        THE WITNESS:  That's because I was messing
8 with Guevara.
9 BY MR. BRUEGGEN:
10     Q.   So you believe that the Latin Kings
11 retaliated against your mom because you were
12 messing with Guevara?
13     A.   Yes.
14     Q.   And, sir, you told us earlier Rosa
15 Bella visited you while you were in jail, right?
16     A.   Yes.
17     Q.   Did Rosa Bella talk to you about when
18 she was almost run over by a gang member when she
19 was out with her children?
20     A.   She did tell me that.
21     Q.   And do you know what that was for?
22     A.   The same.
23     Q.   More retaliation by Latin Kings because
24 you were messing with Guevara?

Page 369

1     A.   Exactly.
2     Q.   Sir, after your conviction, you were
3 incarcerated at the Joliet prison in Illinois for a
4 short period of time, right?
5     A.   Yes, sir.
6     Q.   And then you were transferred to
7 Stateville for several years?
8     A.   Yes, sir.
9     Q.   And then the rest of your incarceration
10 was at Pontiac or the Cook County Jail?
11     A.   Pontiac and County Jail.
12     Q.   While you were incarcerated, were you
13 ever subject to any discipline?
14        MS. BONJEAN:  Objection to the form.  By who?
15 BY MR. BRUEGGEN:
16     Q.   Sir, let me withdraw that question and
17 rephrase.
18            While you were incarcerated, were
19 you ever subjected to any discipline by the
20 correctional officers?
21     A.   I'll say whoever -- whoever never got
22 in trouble in there, though, with the police, it's
23 probably going to be angel.  Because everybody get
24 at one point or other trouble with the police.

Page 370

1    Q.   And, sir, I don't know if you're
2 answering my question, but I was asking while you
3 were incarcerated in the Illinois Department of
4 Corrections, were you ever disciplined by the
5 Illinois Department of Corrections for violating
6 the rules of the Illinois Department of
7 Corrections?
8    A.   Yes.
9    Q.   For what things were you disciplined?
10   A.   Just normal stuff, you know.  Fighting,
11 weapon.  No drug.  That was --
12   Q.   While -- I'm sorry.  Go ahead.
13   A.   No.  That's -- that's about it.
14   Q.   While in the Illinois Department of
15 Corrections, were you ever placed in segregation?
16   A.   I did.
17   Q.   And what -- why were you placed in
18 segregation?
19   A.   For a violation of weapon.
20   Q.   Did you possess a weapon?
21   A.   I did.
22   Q.   What kind of weapon did you possess?
23   A.   A knife, sharpened knife.
24   Q.   And so you were put into disciplinary

Page 371

1 segregation?
2    A.   They put you in the -- in disciplinary
3 segregation.  That's if you lucky stuff, because
4 they'll give you a case, but it was just seg.
5    Q.   How long were you in disciplinary
6 segregation for having a knife?
7    A.   For a whole year.
8    Q.   And when was what?
9    A.   I don't remember exactly the year,
10 though, but it happened when I was in Pontiac.
11   Q.   Do you remember if it was closer to the
12 beginning of your time at Pontiac or closer to the
13 end?
14   A.   No.  It was just -- it was just way
15 before I even thought about me I was going to come
16 out and stuff.
17   Q.   Sir, while you were in the Illinois
18 Department of Corrections, were you ever placed in
19 protective custody?
20   A.   Yes, I was.
21   Q.   When were you placed in protective
22 custody?
23   A.   Once -- once that there was a chance
24 for me to fight the case, decide meditation and

Page 372

1 leave population and go -- go to PC so I can -- I
2 can do the rest of the time or whatever time that I
3 was going to be there, you know, without no trouble
4 and see if I can get the blessing and go home.
5    Q.   Did you request to be put in protective
6 custody?
7    A.   Yes, I did.
8    Q.   And what was the reason for you to be
9 put in protective custody that you provided to the
10 Illinois Department of Corrections?
11   A.   I -- I told them that I wanted to leave
12 the gang, so there was no place for me to be out
13 here, though.  So I needed to go into the -- to the
14 police protection custody so I can be protected by
15 the -- by my own gang.
16   Q.   Okay.  So you said you were leaving the
17 gang so that they would put you in protective
18 custody so your own gang wouldn't retaliate against
19 you; did I understand you correct?
20   A.   Yes, sir.
21   Q.   Did you, in fact, leave your gang at
22 that time?
23   A.   I did.
24   Q.   And was there any type of retaliation

Page 373

1 that you were aware of?
2    A.   Yeah, what happened to my mom, to my
3 family.  That was more than the reason for me to,
4 you know, walk away from the gang.
5    Q.   And, sir, the Molotov cocktail incident
6 was while you were at Cook County Jail, right?
7    A.   Say that again.
8    Q.   Let me strike that question.
9         Do you know of any other retaliation
10 against your mom or your sister or Rosa Bella other
11 than the Molotov cocktail or Rosa Bella almost
12 being run over?
13   A.   Watch my back in jail, though, before
14 they put the hands on me.  I knew they were going
15 to retaliate, though, but I never give them the
16 chance.
17   Q.   While you were in Illinois Department
18 of Corrections, were you -- did you ever suffer an
19 injury that required medical care?
20   A.   Yes.
21   Q.   What kind of injuries did you suffer?
22   A.   I got stabbed a number of time.
23   Q.   Who stabbed you?
24   A.   The opposite gang.

Page 374

1    Q.   And what gang was what?

2    A.   I don't know what was the gang, but I

3 remember it was the opposite gang.

4    Q.   So it was a rival of the Latin Kings?

5    A.   It was a rival of Latin Kings.

6    Q.   When did that stabbing occur?

7    A.   It happened when I was in Cook County

8 fighting the case.

9    Q.   So that was before your conviction?

10   A.   Before I even went to trial.

11   Q.   How about after trial after you were

12 convicted, any injuries in prison that required

13 medical care?

14   A.   Yes. I was in the hospital for -- for

15 a little bit. I got stabbed real bad in my head.

16   Q.   You got what real bad in your head?

17   A.   I got a knife stuck in my head.

18   Q.   You got stabbed in the back of the head

19 while you were in IDOC?

20   A.   Yes.

21   Q.   When did that occur, which facility

22 were you at?

23   A.   That was in County Jail.

24   Q.   Oh, that was -- that was in County Jail

Page 375

1 as well. Okay.

2         What about after you got out of Cook

3 County Jail? I want to talk about the Illinois

4 Department of Corrections, either Joliet,

5 Stateville, or Pontiac. Any issues at those

6 places?

7    A.   I got myself in trouble, though. I

8 went to PC just for the protection, though, you

9 know. I didn't -- really didn't want to have no

10 confrontation with the -- with my own gang.

11   Q.   Once you were in protective custody,

12 did you not have any other issues with inmates?

13   A.   No, I didn't. Well, you know, you

14 always going to -- you always going to find few

15 guys that they're not going to like you for

16 whatever the reason.

17        I mean, I look at them dumb because

18 they don't know me. So if you don't know me, you

19 happen to don't like me, though, you know, I mean,

20 does that make you smart?

21   Q.   When you were in protective custody at

22 Illinois Department of Corrections, were you in a

23 cellblock with other inmates who were in protective

24 custody?

Page 376

1    A.   Yes.

2    Q.   And you would interact with those

3 inmates, but not the general population?

4    A.   I talk to everybody, whether you PC or

5 not.

6    Q.   But in PC you're kept --

7    A.   Not everybody in jail belong to gang,

8 though, so ...

9    Q.   And, sir, it's my understanding that

10 when you're in protective custody, you're kept

11 separate from the general population; is that

12 right?

13   A.   No.

14   Q.   So when you were in protective custody,

15 you still interacted with the general population?

16   A.   Yeah. You can talk to them. You can

17 see them.

18   Q.   Prior to your arrest in this case, did

19 you suffer from any serious medical conditions?

20   A.   No.

21   Q.   And you told us about that prior to

22 this incarceration you had a nerve issue for which

23 you would take medication from time to time, right?

24   A.   Yes.

Page 377

1    Q.   And that was just you would get anxious

2 or nervous and you would have to take a pill and

3 that would take care of it?

4    A.   Yeah. I get excited. I get excited at

5 times.

6    Q.   How long did you have that condition

7 prior to your arrest?

8    A.   Since I was a kid, though.

9    Q.   I think you told us at one time you

10 were prescribed medication for that condition?

11   A.   Yes, I was.

12   Q.   But then you lost your medical card and

13 you were no longer filling that prescription?

14   A.   I just decide not to take it no more.

15   Q.   How many medications did you take for

16 that?

17   A.   How many medication did I take? I

18 only -- my medication, it was just one pill.

19   Q.   Did you ever talk to a psychiatrist or

20 a psychologist about your nervous condition that

21 you had prior to your incarceration?

22   A.   I did talk to them. I did talk to --

23 to the psych, though, you know, just to get some

24 medicine and stuff, though.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 378..381

Page 378

1     Q.   Did you see the psychiatrist on a
2  regular basis to continue to prescribe the
3  medication for you?
4     A.   No, no.
5     Q.   What was the name of the psychiatrist
6  you spoke to?
7     MS. BONJEAN:  Objection to the form.
8     THE WITNESS:  That was long time ago.  I
9  cannot even remember the name.
10 BY MR. BRUEGGEN:
11    Q.   But prior to your incarceration at
12 issue here, you spoke to a psychiatrist about
13 getting medication for your anxious condition?
14    A.   In the Cook County?
15    Q.   No, no.  Prior to your incarceration.
16    A.   No.  I didn't -- I did talk to the
17 psych, but not for medication, though.
18    MS. BONJEAN:  He's saying before you were
19 arrested.
20    THE WITNESS:  Oh, before I was arrested.
21 Yes, I did saw the psych.  I did saw the psych.
22 BY MR. BRUEGGEN:
23    Q.   You saw the psych and he prescribed the
24 medications for your nerves?

Page 379

1     A.   Yeah.  When I was in the street, yes.
2     Q.   Yeah.
3          Did you ever talk to a psychologist
4  about that condition?
5     A.   In the street -- when I was in the
6  street, I was going to see one like once a month.
7     Q.   Do you remember the name of that doctor
8  that you were seeing once a month?
9     A.   Again, that was long time ago.  I don't
10 remember -- I don't remember the name.
11    Q.   Do you remember the period of time that
12 you were seeing a psychiatrist or psychologist once
13 a month, how long that lasted?
14    A.   It probably lasted for a year, couple
15 years, something like that.
16    Q.   And that was related to your nerves?
17    A.   Yeah.  My nerve condition, yeah.
18    Q.   After you were arrested and
19 incarcerated in Cook County Jail, did you receive
20 any mental health treatment in Cook County Jail
21 after you were arrested for this incident?
22    A.   No.
23    Q.   While you were in the Illinois
24 Department of Corrections, did you receive any

Page 380

1  mental health treatment for --
2     A.   I did -- I didn't receive no mental
3  health treatment, but I did -- I did talk to the
4  psychiatrist, though, you know.  Just to talk to
5  somebody, though, you know, just to make you feel
6  good.
7     Q.   Did you take any medications as result
8  of talking to that person?
9     A.   No, I didn't.
10    Q.   Did you receive any type of mental
11 health medications while you were in jail or
12 prison?
13    A.   No.
14    Q.   Since you were released from prison,
15 have you sought any medical care for injuries that
16 you believe were related to being incarcerated?
17    A.   When I got out of jail, I went to see
18 the doctor, though, basically, you know, for
19 physical check and stuff.  But during that period
20 of time that I was going to see the doctor, she
21 started to notice something.  And she ask me
22 question and I told, you know, how I was feeling,
23 and she basically diagnosed me with PTSD and I
24 started seeing the psych.

Page 381

1     Q.   Did she diagnose you with any medical
2  conditions, not mental health, but medical
3  conditions?
4     MS. BONJEAN:  Objection to the form of that
5  question.  Medical and mental health are the same.
6  Physical maybe, maybe that's the word you're
7  looking for.
8     MR. BRUEGGEN:  I can use physical if that
9  would make it easier.
10 BY MR. BRUEGGEN:
11    Q.   Sir, were you diagnosed with any
12 physical conditions as opposed to mental health
13 conditions?
14    A.   No.
15    Q.   And do you have any physical conditions
16 now?
17    A.   Yeah.  I'm old.  My bone hurting, my
18 back, everything.
19    Q.   Other than just getting older and,
20 you know, some wear, do you have any medical
21 conditions, and physical medical conditions, for
22 which you're seeking treatments?
23    A.   You know, I be lying to you if I told
24 you yes or no, so I'm going to be honest with you.

Page 382

1 I haven't seen the doctor for past few years. I
2 don't got insurance. I don't got nothing. So I
3 really don't -- I don't got no answer for that
4 question, though. I might be -- I might got
5 something that I don't know and that I might be
6 sitting here dying and I don't know. I lost a lot
7 of weight. I weighed 270 pounds. Look how much I
8 weigh now, 170 pounds.
9        Q.   When was the last time you saw a
10 doctor, sir?
11       MS. BONJEAN: You mean a medical doctor -- I
12 mean a physical medical doctor or a mental health
13 doctor?
14       MR. BRUEGGEN: I'm just saying -- he said he
15 hasn't seen a doctor in years. I'm just clarifying
16 what he meant by that.
17 BY MR. BRUEGGEN:
18       Q.   When was the last time you saw a
19 doctor, whether medical or mental health?
20       A.   Both be probably couple years now.
21       Q.   Like 2019?
22       A.   Yes. About 2019.
23       Q.   Are you taking any medications now?
24       A.   The only medication that I take is --

Page 383

1 is what I smoke. Weed, that's my medication. I
2 don't take no medication.
3        Q.   Do you have a --
4        A.   Bad, do you bad. Medication going to
5 make me puke, to hurt myself.
6        Q.   Do you have a medical marijuana card?
7        A.   No. I will soon.
8        Q.   You're in the process of trying to get
9 your medical marijuana card?
10       A.   I'm not in a hurry, so ...
11       Q.   I'm sorry, sir. I didn't understand
12 you.
13       A.   No, I'm not in a hurry to get one, but
14 yes, I will be in the process pretty soon to get
15 one.
16       Q.   And what is the basis for you wanting
17 to get your medical marijuana card?
18       A.   PTSD. I don't eat. I don't -- I don't
19 sleep sometime. I get angry. I be always watching
20 through the window late at night or walking down --
21 walking down the street by myself in the middle of
22 the night, wandering everywhere.
23       Q.   Did any mental health physician or
24 psychologist tell you that you should get your

Page 384

1 medical marijuana card to treat PTSD?
2        A.   I talk about it, but only thing they
3 do, they refer me to somebody. But if -- like the
4 doctor said, though, you know, they got -- they not
5 advising me to change medicine for cannabis, but
6 if -- if it work for me, they say it's okay, you go
7 ahead and do it, though, you know.
8            They agree with the scientific
9 community that I should -- I should do the same
10 what other people do. Because they were afraid --
11 I think they were afraid that, you know, I might
12 hurt myself, so -- the medicine was bad. It -- no
13 medicine for me.
14       Q.   Sir, after you got out of prison, did
15 you suffer from nightmares?
16       A.   Yes.
17       Q.   How long did you suffer from
18 nightmares?
19       A.   I still suffer from nightmares.
20       Q.   How often do you have nightmares?
21       A.   When my mom, she said that I'll be
22 screaming down in my room, she will tell me, you
23 know, What were you dreaming about? So basically
24 every -- every other -- every other night, you

Page 385

1 know. When I feel relax and I sleep good, I sleep
2 good, though, you know, but when I go to bed
3 thinking especially nonsense stuff, though, you
4 know. It's how PTSD work, though. You know, you
5 get sad, depressed, you know, maybe you find
6 yourself in the room crying --
7        Q.   Were you --
8        A.   -- for no reason.
9        Q.   Were you taking medications for a
10 diagnosis of PTSD at one point?
11       A.   Yes.
12       Q.   And did those medications help with the
13 symptoms you had?
14       A.   No. They got worse.
15       Q.   Does smoking marijuana help with your
16 symptoms of PTSD?
17       A.   Yeah, they do.
18       Q.   But you still have symptoms?
19       A.   I still have symptoms, but it -- you
20 know, PTSD will never going to go away, you know.
21 That's not cured disease, though. So only thing
22 you can do is just, you know, find a way to relax.
23       Q.   And, sir, has your mental health
24 condition, do you think it's improved since you got

Page 386

1  out of prison to the present?
2      MS. BONJEAN:  I'm going to object to the form
3  to the extent that -- improved from when, I guess.
4  You mean since he was in prison?
5  BY MR. BRUEGGEN:
6      Q.   And, sir, I'm talking about from the
7  time you were released from prison until the
8  present, has your mental health, your outlook on
9  life, has is gotten better?
10     A.   Not -- not really.
11     Q.   Has it gotten worse?
12     A.   You see how thin I am?
13     Q.   Being thin is not a bad thing.
14     A.   Well, for some people I look good,
15 though.  It's just I don't eat.  I don't sleep.  It
16 just -- I just think what happened, you know.  You
17 just -- it's just like a switch that I got to learn
18 how to turn off in my head.  It got worse, yeah.
19     Q.   After you were released from prison,
20 did you start taking GED classes?
21     A.   Yes.
22     Q.   Did you get your GED?
23     A.   No.
24     Q.   What happened with those classes?

Page 387

1      A.   Whether I continue school or get a job
2  or go back to the streets and sell drugs again just
3  to survive myself, I rather go and work and forget
4  about everything else, though, you know, and do
5  better, try to do better.
6      Q.   Have you seen Rosa Bella since you've
7  been released from prison?
8      A.   No.
9      Q.   Have you spoken to her?
10     A.   No.
11     Q.   Have you mentioned her on any social
12 media?
13     A.   No.
14     Q.   Have you seen your son since you were
15 released from prison?
16     A.   I saw him on -- you know, on the phone
17 when we talk on video chat.  Other than that,
18 though, I haven't -- I haven't touch him
19 physically.  I haven't been with him physically,
20 though, not yet.
21     Q.   When was the last time you had a video
22 chat with your son?
23     A.   The 13, ▮▮▮▮▮
24     Q.   Oh, so just several days ago.

Page 388

1      A.   Yeah.  His birthday.
2      Q.   How often do you video chat with him?
3      A.   On and off when there's a chance.  Most
4  of the time I go to sleep early, so when people
5  call me, you know, the phone off.  So when I go and
6  call them, their phone is off.  So whenever, you
7  know, we have the chance to chat, we -- we just
8  take advantage of it and enjoy ourselves.
9      Q.   Sir, earlier you told us about you were
10 in a serious relationship with a girl since you've
11 been released from prison?
12     A.   Yes, I was.
13     Q.   How long were you in that relationship?
14     A.   I'd probably say almost a year.
15     Q.   What was the name of that woman you
16 were in a relationship with?
17     A.   Sara Caceres.
18     Q.   How did you meet Sara?
19     A.   I met her through -- you know, through
20 meetings and stuff like that in church.
21     Q.   When did you break up with Sara?
22     A.   I'll say couple years ago.
23     Q.   Why did you and Sara break up?
24     A.   I guess, you know, too rough.  I'm not

Page 389

1  a man to be in a relationship anyway.  Too rough,
2  too rough.  She was too -- too jealous.
3      Q.   She was too jealous, did you say?
4      A.   Yeah.  She argued too much.
5      Q.   She argued too much?  Is that -- I'm
6  sorry.
7      A.   Yes.
8      Q.   So she would argue with you too much?
9      A.   Yes.
10     Q.   Is that why you broke up with her?
11     A.   Yes.
12     MS. BONJEAN:  Objection to the form.
13         But go ahead.
14     THE WITNESS:  Yes.  We broke up, you know.
15 We just -- I rather be friend with her than, you
16 know, be serious with her.  I think it didn't work,
17 our relationship is not going to work out.
18 BY MR. BRUEGGEN:
19     Q.   Are you still friends with her today?
20     A.   No.
21     Q.   Why aren't you friends with her?
22     MS. BONJEAN:  Objection to the form.
23     THE WITNESS:  She -- she doesn't want to be
24 friend, so I'm not going to force it, though, you

Page 390

1 know.  I mean, if you don't want to be with
2 someone, not going to be with someone.
3 BY MR. BRUEGGEN:
4    Q.    Did she accuse you of domestic
5 violence?
6    A.    Yes, she did.
7    Q.    What did she allege you did?
8    MS. BONJEAN:  Objection to the form.
9         If you know.
10 BY MR. BRUEGGEN:
11    Q.    If you know, sir.
12    A.    She accused me of me I believe slapping
13 her, pushing her.  I never did that, though.  She
14 just -- that was just a lie, you know, just -- just
15 to -- how can I say?  To go back to -- to make me
16 go back with her, basically.  That's what she
17 wanted to do, though, you know.  If I don't go back
18 with her, she was going to -- she was going to
19 start messing with me.
20    MS. BONJEAN:  Just answer the question.
21 BY MR. BRUEGGEN:
22    Q.    Okay.  So you had broken up with her
23 prior to her accusing you of domestic violence?
24    A.    Yes.

Page 391

1    Q.    And you believe that she accused you of
2 domestic violence so that you would come back to
3 her in a relationship?
4    A.    Yeah.  It was just a form to give me
5 to, you know, try to bring me back.  You know, for
6 me to say, Oh, okay, I'm sorry, though, you know,
7 I'll go back with you, I won't leave you, though.
8 But it didn't work out like that anyway.
9    Q.    Did you get into a verbal altercation
10 with her on the day she alleged you committed
11 domestic violence?
12    A.    We got into -- well, she got into a
13 verbal argument with me all because Facebook.
14    Q.    And what was her concern about
15 Facebook?
16    A.    A female, you know.
17    Q.    What do you mean "a female"?
18    A.    Well, it's just that, you know, I'm a
19 DJ and sometime, you know, I get some of the --
20 some of the female friend, you know, on -- on
21 Facebook and just start making, you know, like good
22 comments and stuff, though, and talking a little
23 bit more, you know, attracted to me.  She get
24 jealous, but I keep telling her, you know, I

Page 392

1 don't -- I don't have no -- I don't have no feeling
2 with -- no relation with some -- with nobody.  Just
3 I'm entertaining myself, though.  But she think
4 otherwise, that I was just messing around and doing
5 this or -- she get mad all the time.
6         And besides, though, you know, me --
7 she -- I think she -- she was crazy.  I'm going to
8 say that.  Because she -- there's something sick
9 about her that up here not right, though.  She --
10 she got a disease, though.  I think she had cancer
11 too.
12    Q.    But you had been in a relationship with
13 her for about a year prior to this?
14    A.    Almost a year, yeah.
15    Q.    And as a result of her accusing you of
16 domestic violence, were you incarcerated?
17    A.    That's when she got me arrested.
18    MS. BONJEAN:  Okay.  Wait.  Object -- I'm
19 sorry.  Objection to the form of that question.  As
20 a result of this arrest, was he incarcerated?
21    MR. BRUEGGEN:  As a result of her accusing
22 him of domestic violence, was he arrested and
23 incarcerated.
24    MS. BONJEAN:  Okay.  Those are two different

Page 393

1 questions.  It's a compound question.  I'm going to
2 object to the form.
3 BY MR. BRUEGGEN:
4    Q.    Start with the first one.
5         Sir, as a result of her accusing you
6 of domestic violence, were you arrested?
7    A.    I was arrested.
8    Q.    And as a result of that arrest, were
9 you incarcerated?
10    A.    No.
11    Q.    No, you were not incarcerated?
12    MS. BONJEAN:  Well, I'm going to object to
13 the extent that incarceration means that he served
14 a sentence as a result of a conviction of that.
15 BY MR. BRUEGGEN:
16    Q.    Sir, as a result of your arrest, were
17 you sent to Cook County Jail?
18    A.    Of course, yeah.  If you get arrested,
19 you're going to go to County Jail, yeah.
20    Q.    And after that arrest, were you also
21 then sent to the Illinois Department of
22 Corrections?
23    A.    Yes, I was.
24    Q.    How long were you in custody -- strike

JOSE JUAN MAYSONET JR., 04/16/2021      Page 394..397

Page 394

1 that.

2      How long were you incarcerated after
3 that arrest?

4    A. I'll say probably about a month, about
5 a month.

6    Q. And that time was spent both at Cook
7 County Jail and in the Illinois Department of
8 Corrections?

9    A. When I got -- when I got at Cook County
10 Jail because I was in parole, I was in house
11 arrest, I believe, the Department of Correction,
12 they -- they send me to state, back to state prison
13 due to the parole hearing. So basically I was -- I
14 was a parole violator.

15    Q. Okay. So as a result of being accused
16 of domestic violence, they thought you had violated
17 your parole and sent you back to prison?

18    A. Yeah.

19    Q. And eventually you got out of prison?

20    A. I did got out of prison.

21    Q. And were you subsequently arrested on
22 another occasion in relation to your former
23 girlfriend?

24    A. I got arrested a second time.

Page 395

1    Q. Was that for violating an order of
2 protection she had taken out against you?

3    A. Yeah. It was just violating protection
4 order.

5    Q. How long were you incarcerated on that
6 time?

7    A. Not long.

8    Q. Couple days?

9    A. Not even 24 hours.

10    Q. What happened with your domestic
11 violence charge and the violation of the order of
12 protection?

13    A. It got thrown away.

14    MR. GREENBERG: Your lawyer beat that.

15    THE WITNESS: My lawyer beat it.

16    MR. BRUEGGEN: Sir, those are all the
17 questions I have, but there's some other attorneys
18 that may have some questions. I'll look at my
19 notes.

20      Thank you very much for your time.
21 I appreciate your patience.

22      And maybe we can take just a very
23 quick break so that the other attorneys can get
24 organized.

Page 396

1    MS. BONJEAN: Yeah. Can we get -- can we get
2 time? Where we at?

3    THE VIDEOGRAPHER: We're at 6 hours,
4 33 minutes.

5      And we are off the video record at
6 5:57.

7      (Recess taken.)

8    THE VIDEOGRAPHER: We're back on the video
9 record at 6:08.

10    MS. BONJEAN: Whoever's trying to talk is on
11 mute.

12    MR. BRUEGGEN: Bob, are you trying to talk?
13 I can't hear you.

14    MR. SHANNON: Can you hear me now?

15    MR. BRUEGGEN: Yeah, I can hear you now,
16 barely.

17    MR. SHANNON: Jennifer, did you -- did you
18 hear my comments before we went on the record about
19 how much time I have?

20    MS. BONJEAN: I heard nothing. You were
21 talking into the abyss.

22    MR. SHANNON: Okay. I'm sorry. Can we go
23 off the record for a minute, please?

24    MS. BONJEAN: No. Put -- you can put it on

Page 397

1 the record.

2    MR. SHANNON: Well, why -- let's go off the
3 record real quick and then we can put it on the
4 record.

5    MS. BONJEAN: Okay.

6    MR. SHANNON: I have about one hour.

7    THE VIDEOGRAPHER: Hang on. I have to
8 announce it.

9      We are off the video record at 6:09.

10      (Discussion off the record.)

11    THE VIDEOGRAPHER: Okay. We are back on the
12 video record at 6:12 at the beginning of Media
13 Unit 7.

14    MR. SHANNON: For the record, Bob Shannon,
15 counsel for DiFranco. And plaintiff's counsel and
16 I had a discussion off the record. I've indicated
17 that I have at least an hour of questioning that I
18 believe that I'm entitled to. And, if necessary,
19 she and I can place more information on the record
20 if it becomes necessary or relevant.

21      In the meantime, I'm going to start
22 my questioning. Okay, Jennifer?

23    MS. BONJEAN: Yes. Go right ahead.

24

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 398..401

Page 398

1          EXAMINATION
2 BY MR. SHANNON:
3     Q.   Okay.  Mr. Maysonet, hello.
4          Drawing your attention to
5 August 23rd, I'm going to be asking you some
6 questions about ASA DiFranco.  I believe that you
7 referred to him in your answers as the male state's
8 attorney or the -- male ASA; is that right?
9     A.   Right.
10    Q.   Okay.  So when I -- when I ask you
11 questions about the male state's attorney, you'll
12 understand that we're talking about Mr. DiFranco;
13 is that fair?
14    A.   That's fair.
15    Q.   Okay.  On August 23rd of 1990, was that
16 the first time that you had ever met the male ASA?
17    A.   Yes, I did.
18    Q.   And do you know whether or not the male
19 state's attorney spoke with any detectives on
20 August 23rd?
21         MS. BONJEAN:  Objection to the form.
22         MR. SHANNON:  I'll rephrase.  Strike --
23 strike it.
24

Page 399

1 BY MR. SHANNON:
2     Q.   Do you know if before speaking to you
3 on August 23rd, the male ASA had any conversations
4 with any of the Area 5 detectives?
5         MS. BONJEAN:  Objection to the form,
6 foundation.
7         You can answer.
8         THE WITNESS:  I was in the room all the time.
9 I really don't know what other conversation
10 happened on the other side of the wall.
11 BY MR. SHANNON:
12    Q.   Do you know whether the male ASA spoke
13 with the female ASA on August 23rd?
14    A.   No.
15         MS. BONJEAN:  Hold on.
16         Objection; form, foundation.
17         Go ahead.
18         THE WITNESS:  No.
19 By MR. SHANNON:
20    Q.   You testified that you had given the
21 names Lluvia, Tina, and Fro to the detectives,
22 correct?
23    A.   Lluvia and Tino, not Tina.
24    Q.   I'm sorry.  Tino.

Page 400

1     A.   And Lluvia.
2     Q.   You provided those names to the
3 detectives; is that correct?
4     A.   Yes.
5         MS. BONJEAN:  Objection to form,
6 mischaracterizes his testimony.
7         Go ahead.
8         THE WITNESS:  Yes, I did.
9 BY MR. SHANNON:
10    Q.   Which detective did you say that you
11 provided those names to?
12    A.   Guevara.
13    Q.   Okay.  You did not provide those names
14 to the male ASA, correct?
15    A.   No.
16    Q.   And according to your testimony, you
17 agreed to provide the false story to the detectives
18 before you ever met with male ASA on August 23rd,
19 correct?
20    A.   Correct.
21    Q.   Okay.  And the male ASA never laid
22 hands on you, correct?
23    A.   Correct.
24    Q.   And the male ASA never saw anyone else

Page 401

1 beating or laying hands on you, correct?
2         MS. BONJEAN:  Objection to the form of
3 question, speculative.
4         Also, if you intend to lead him
5 through this entire examination, I will -- I'm
6 not -- if for some reason you want to use it at
7 some later point, I will object.  I'm just letting
8 you know.
9         MR. SHANNON:  He's -- he's not my witness.
10        MS. BONJEAN:  Exactly.  He's not your -- I
11 understand that, but you are leading him through
12 it.  If you're -- you're going to try to use his
13 testimony if -- for any reason other than for --
14 and it sounds like you're trying to make him your
15 witness a little bit.  Sorry.
16        MR. SHANNON:  Jennifer, now you're trying to
17 waste my time and I'm trying to be quick here.
18 Okay?
19        MS. BONJEAN:  Okay.  You're trying -- you are
20 trying to make my client your witness.  Letting you
21 know that, but go ahead.
22 BY MR. SHANNON:
23    Q.   My question was:  Do you have any
24 information that the male ASA ever observed you

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 402..405

Page 402

1 being physically beaten by any of the detectives?
2      MS. BONJEAN:  Objection to form and
3 foundation.
4      THE WITNESS:  No.
5 BY MR. SHANNON:
6      Q.   It's your testimony that you told the
7 male ASA that you had been beaten?
8      A.   Yes, I did.
9      Q.   All right.  What exactly did you say?
10     A.   I told him the officer, he -- he beated
11 me up.  He -- he wanted -- he wanted me -- he was
12 forcing me to talk about something that I don't
13 have no knowledge to.
14     Q.   Okay.  And who was present for that
15 conversation besides you and the male ASA?
16     A.   When I talk to the male ASA, Guevara,
17 he was there, Montilla, Mingey, and some other
18 officer too.
19     Q.   So when you told the male ASA that you
20 had been beaten by the detective, all four of those
21 Area 5 detectives were present?
22     A.   When I told the DA, Mr. DiFranco, yes.
23 Yes, they were present.
24     Q.   Okay.  And how did you -- how did you

Page 403

1 communicate that to DiFranco, in Spanish or
2 English?
3      A.   Through Montilla.  He's -- he served me
4 as interpreter to communicate with DiFranco.
5      Q.   Okay.  So let me make sure I'm clear
6 how this worked.
7           You in Spanish told Montilla that
8 you had been beaten by the detective and then you
9 had Montilla interpret that to DiFranco in English?
10     MS. BONJEAN:  I'm going to object to the
11 form.  He had Montilla?  I'm objecting to the form
12 of that question.  He --
13     MR. SHANNON:  I'll strike.  I'll rephrase.
14 BY MR. SHANNON:
15     Q.   Is it your testimony that during that
16 conversation you told Montilla in Spanish that you
17 had been beaten by the detective and then observed
18 Montilla translate that to DiFranco in English?
19     A.   To be frankly honest, what I was
20 telling him, I don't know if that quite the same
21 story that he was telling back to DiFranco, but I
22 did told -- I'm telling you what I told Montilla.
23 Anything that he told him that I don't understand,
24 I cannot tell you.

Page 404

1      Q.   So you don't know -- you don't know
2 exactly what was said to DiFranco in English,
3 correct?
4      A.   Correct.
5      Q.   Okay.  And besides -- besides -- strike
6 that.
7           And besides what you told Montilla,
8 you have no other information as to whether
9 DiFranco was made aware of the fact that you had
10 been physically beaten, correct?
11     A.   Correct.
12     Q.   When was the first time, if at all,
13 that you reported that you had -- strike that.
14 I'll move on.
15           How many times, sir, did you speak
16 with the male ASA on August 23rd?  How many
17 separate interviews or meetings did you have with
18 the male ASA?
19     MS. BONJEAN:  Objection to the form of that
20 question.
21           Go ahead.
22     THE WITNESS:  Only -- I probably -- he only
23 came and saw me twice when I was in the -- in
24 the -- in the interview room or interrogation room.

Page 405

1 I didn't saw him no more after, you know, I agreed
2 with Guevara to say, you know, what he want me to
3 say.  That's when a few minutes later I got
4 transferred from that room to another bigger room
5 where DiFranco was sitting right there in the
6 middle of the table and the court reporter was
7 sitting next to him.
8 BY MR. SHANNON:
9      Q.   Okay.  And -- and the male ASA was
10 there, as far as you understood, to take a
11 statement as a lawyer, correct?
12     A.   Correct.
13     Q.   The male ASA wasn't present for the
14 conversation that you just testified about that you
15 had with Guevara, correct?
16     MS. BONJEAN:  Objection to the form of that
17 question, foundation of that question.  He -- and
18 it mischaracterizes his testimony already.
19           But go ahead.
20 BY MR. SHANNON:
21     Q.   You can answer if you can, please.
22     A.   No, I don't -- I don't -- I don't -- I
23 don't think he was there witness Guevara putting
24 hands on me, no.  Talking to Guevara about, you

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 406..409

Page 406

1 know, what Guevara want me to say, though, no, he
2 was not there.
3     **Q.   Okay.  And of the two meetings that you**
4 **had with the male ASA, focusing on the first one,**
5 **how long did it last?**
6     A.   You talking about the female now?  Are
7 you talking about the female now or are you just
8 talking about the male?
9     **Q.   I'm sorry, sir.  Could -- well, why**
10 **don't I ask the question and then see if you can**
11 **answer that.  Okay?**
12        **If there's a question pending, I'll**
13 **strike it and I will -- I'll withdraw that.  I'll**
14 **ask a new question.**
15        **You testified that there were two**
16 **meetings that you had with the male ASA.  On -- on**
17 **the first meeting that you had with the male ASA,**
18 **who was present?**
19     A.   Everybody was present.
20     **Q.   And what did you say during that**
21 **meeting?**
22     MS. BONJEAN:  Objection to the form of that
23 question.
24     THE WITNESS:  They just wanted me to speak in

Page 407

1 English.  They thought that I know how to speak
2 fluent English, though.  And when they try, we --
3 then everybody, obviously, they changed their mind.
4        So that's when Montilla say, Ah, we
5 going to do this in Spanish, though.  I will be the
6 one that I'm going to be translating everything
7 that you say to them to the court reporter.
8        And he just ask the question,
9 though.  You know, everything was written down on
10 the paper, so it was easy for them, you know,
11 course me through it.
12 BY MR. SHANNON:
13     **Q.   So was the first meeting, sir, the**
14 **meeting where the court reporter was present?**
15     A.   The first meeting was there when
16 they --
17     **Q.   I should be clearer.**
18        **The first meeting with the male ASA**
19 **was the meeting when the court reporter was**
20 **present; is that right?**
21     MS. BONJEAN:  Objection.  That
22 mischaracterizes his testimony.  He --
23     MR. SHANNON:  I'm asking a question.
24        Did you get the answer, Madame Court

Page 408

1 Reporter?
2     THE COURT REPORTER:  I didn't.  I did not get
3 an answer.
4     THE WITNESS:  I say everybody was there.
5 BY MR. BRUEGGEN:
6     **Q.   Including the court reporter?**
7     A.   For the first time.
8     MS. BONJEAN:  The first time with the male --
9     MR. SHANNON:  No, no.  Jennifer, you cannot
10 coach the witness.
11     MS. BONJEAN:  I'm not coaching.
12     THE WITNESS:  All right.  Say the question
13 again.
14     MS. BONJEAN:  You're not going to take
15 advantage and -- you're not going to take
16 advantage.
17     MR. SHANNON:  Then why did he turn and look
18 at you?
19     MS. BONJEAN:  Why?  Because you are asking
20 terrible questions.  It's like you've never taken a
21 deposition before.  So -- and he -- he is miss --
22 you need to not try to trick him.  So ask -- ask an
23 appropriate question.  He's -- and don't keep
24 asking the same question to get a different answer,

Page 409

1 which is what you're trying to do.
2 BY MR. SHANNON:
3     **Q.   Mr. Maysonet, you testified that the**
4 **first meeting that you had with everyone and the**
5 **ASA was the meeting where the court reporter was**
6 **present, correct?**
7     MS. BONJEAN:  Objection.  No, he never
8 testified to that and I'm not going to allow you to
9 mischaracterize.
10     MR. SHANNON:  You have to let him answer the
11 questions.
12     MS. BONJEAN:  No.  That is -- you can't --
13 no.  I will -- I will pull him right now if you are
14 going to tell him things he has said that he never
15 said, or you ask that court reporter to read it
16 back and prove me wrong.
17        So start playing fair and I will let
18 you answer your -- ask your questions.
19     MR. SHANNON:  Your objection is noted.
20 BY MR. SHANNON:
21     **Q.   Can you answer the question?**
22     A.   I don't -- I don't remember.
23     **Q.   Was the court reporter present during**
24 **the meeting that you had with ASA DiFranco and**

Page 410

1 everyone?

2　　MS. BONJEAN: Objection to the foundation and

3 form of that question.

4 BY MR. SHANNON:

5　　Q.　Can you answer that?

6　　A.　I don't -- I don't remember if the

7 court reporter was in the -- in the room. I do

8 remember the police that were there, the -- the

9 detectives and DiFranco.

10　　Q.　And during the second meeting that you

11 had with the male ASA, who was present for that

12 meeting?

13　　A.　DiFranco was there; Guevara; Montilla;

14 Mingey; the court reporter, it was a fat guy,

15 Caucasian guy; and some other officer there too

16 that I don't know they names.

17　　Q.　Okay. And, sir, let me clear up for

18 the record. I'm jumping back to the first meeting.

19　　　　When you said everyone was there,

20 can you tell -- tell us who is "everyone"? Who do

21 you mean by "everyone"?

22　　A.　Guevara, DiFranco, Montilla, Mingey,

23 and some other officer too. You know, I don't know

24 the name.

Page 411

1　　Q.　How many officers in total?

2　　A.　There were quite a few officers in

3 there. I'm not going to tell you no numbers

4 because I can't remember. I don't want to lie to

5 you, but I'll -- I will tell you this, there were

6 quite a few officers in there.

7　　Q.　Okay. You don't have to like me,

8 that's fine.

9　　　　Were there more than --

10　　A.　No, no. I didn't say like you. I said

11 I don't want to lie to you.

12　　Q.　Oh, I see.

13　　A.　You misunderstood me. Sorry.

14　　Q.　Were there more than four officers?

15　　A.　There were -- there were few -- quite a

16 few officers there, though, that I didn't know

17 their name, though.

18　　　　But I know Mingey was there,

19 Montilla was there, Guevara was there. The ones

20 that I know by name, they were there. DiFranco was

21 there. The court reporter was there; I don't know

22 his name. And some other officer, though, but I

23 don't know their name.

24　　Q.　Okay. Sir, in total, if you can,

Page 412

1 how -- how many minutes did you spend talking to

2 the male ASA on -- on August 23rd?

3　　A.　Don't recall how many minute.

4　　Q.　And how much time was there between the

5 first meeting with the male ASA and the second

6 meeting with the male ASA?

7　　A.　Don't -- don't -- don't remember how

8 long we -- it took.

9　　Q.　Did the male ASA read you your rights

10 during one of those meetings?

11　　A.　I guess he did.

12　　Q.　I'm sorry?

13　　A.　I said I guess he did.

14　　Q.　Well, do you remember that?

15　　A.　Well, I don't understand what he was

16 saying. I don't -- I didn't speak English that

17 well.

18　　Q.　Do you remember him advising you of

19 your rights?

20　　A.　I remember Montilla saying something

21 about -- and I can even say that now in English

22 because I can speak it even better, though. But I

23 remember saying that I got the right to remain

24 silent, anything that I say it could be used in a

Page 413

1 court of law against me, and all that kind of

2 stuff, in Spanish.

3　　Q.　Sir, can -- can I refer you to

4 Exhibit -- I think it's been marked as Maysonet

5 Deposition Exhibit 3. It's your -- it's your

6 typed -- or written statement with the court

7 reporter.

8　　　　And I believe you testified that

9 this statement is false?

10　　A.　Yes.

11　　Q.　All right. And did -- are you in a

12 position to indicate whether there's any part in

13 this statement that is true?

14　　A.　There's nothing true in there.

15　　MS. BONJEAN: All right. You're going to

16 have to let him read the statement if you're going

17 to ask specific questions about that.

18　　MR. SHANNON: Okay. And did you get the

19 answer, Madame Court Reporter?

20　　THE COURT REPORTER: (Nodding.)

21　　MS. BONJEAN: He's going to look at it. He's

22 going to look through the statement, so just hang

23 tight.

24　　　　Read it.

Page 414

1     MR. SHANNON:  Well, I don't -- I don't want
2 to use my time with him reading it.  I'll ask it
3 differently.
4     MS. BONJEAN:  Well, then you -- you can't
5 just ask him is there anything in here without
6 letting him read it.
7     MR. SHANNON:  I'm going to -- I'm going to
8 move on with a different question, Jennifer.
9     MS. BONJEAN:  Okay.  Put this away, put that
10 away.
11 BY MR. SHANNON:
12     **Q.   Without reading the statement, sir, my**
13 **question is:  Do you know whether the interpreter**
14 **that you said was present during the statement**
15 **accurately interpreted the questions that are asked**
16 **and the answers that were given?**
17     A.   Again, I was just saying in Spanish
18 what it was wrote on the paper.  Whether they were
19 saying that to the court reporter in English, I
20 don't have no clue.
21     **Q.   Okay.**
22     A.   I didn't understand, you know.
23     **Q.   Okay.  Thank you.**
24         **Were you given a choice to do either**

Page 415

1 **a handwritten statement or a court-reported**
2 **statement?**
3     A.   No.  They never -- they never gave me
4 no chance or none of that.
5     **Q.   Did --**
6     A.   You mean writing the statement myself?
7     **Q.   Yes.  Were you given the choice?**
8     A.   No.  They never give me no choice.
9     **Q.   Okay.  And was it your -- was it your**
10 **decision to do a court-reported statement?**
11     A.   No, it was not.
12     **Q.   Do you know who called the dispatcher**
13 **who called the court reporter?**
14     A.   No clue.
15     **Q.   I'm going to -- I'm going to follow-up**
16 **on some of the questions that you were asked quite**
17 **some time ago, sir.**
18         **Is it true that you were taught**
19 **English in your elementary schools in the United**
20 **States?**
21     MS. BONJEAN:  Objection to the -- to the form
22 of that question.
23     THE WITNESS:  In elementary school, it was
24 just almost Spanish, though.  You're always going

Page 416

1 to get your English.  I had too, you know.  I mean,
2 that's how they work in school, right?  You got
3 math, social studies, science, English class, art,
4 whatever stuff they add to it.
5 BY MR. SHANNON:
6     **Q.   And you were in -- and you were taught**
7 **English, correct?**
8     MS. BONJEAN:  Objection to the form,
9 mischaracterizes his testimony.
10         You can answer.
11     THE WITNESS:  I didn't -- my English, it was
12 so bad, though, you know, that -- it was real bad.
13 BY MR. SHANNON:
14     **Q.   I -- let me ask a better question.**
15     A.   Okay.
16     **Q.   You were in classes where the teachers**
17 **spoke in English, correct?**
18     MS. BONJEAN:  Objection to the form, asked
19 and answered.
20         If you want to use your time asking
21 questions that have already been asked, go ahead,
22 but I'm going to keep objecting.  That was asked
23 and answered.
24         Go ahead.  Answer it again.

Page 417

1     THE WITNESS:  My classes, they were all
2 bilingual, everybody speak Spanish and English.
3 BY MR. SHANNON:
4     **Q.   Okay.  I'm going to ask you some**
5 **specific ones that I don't think were asked, sir.**
6         **In 1990, so I'm -- I'm focusing on**
7 **that, back then in 1990, could you understand**
8 **English?**
9     A.   No.
10     **Q.   At all?**
11     A.   Just a little bit, you know, anything
12 easy that I could understand.
13     **Q.   In 1990, could you speak English?**
14     A.   No, I didn't -- I didn't -- I didn't
15 speak English just like I speak now, though.  It
16 was worse.
17     **Q.   In 1990, could you -- strike that.**
18         **In 1990, did you ever communicate**
19 **with anyone in English without an interpreter?**
20     A.   Just a little bit.
21     **Q.   Give me an example, please.**
22     A.   It's like going to the store and buy
23 something, though, you know, that I don't
24 understand, though, you know.  I'm afraid to find

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 418..421

Page 418

1 some way, you know, to communicate and understand
2 the other party, though.  But other than that,
3 though, you know, I mean, I didn't -- I didn't
4 carry no interpreter everywhere that I go, if
5 that's what you're trying to say, though, you know.
6 But somehow you got to defend yourself any way that
7 you can, right?
8      Q.   Mr. Maysonet, do you have any
9 information that at any time the male state's
10 attorney lied about what you had said during your
11 interviews with the detectives on July the 15th or
12 on August the 1st?
13          Do you understand that question?
14      MS. BONJEAN:  Objection to -- to that
15 question.
16      MR. SHANNON:  Basis?
17      MS. BONJEAN:  It's incomprehensible.
18 BY MR. SHANNON:
19      Q.   All right.  Can you -- can you answer
20 the question, please?
21      A.   I don't -- I don't remember.  I don't --
22      MS. BONJEAN:  Did you understand the
23 question?
24      THE WITNESS:  No.  That's --

Page 419

1      MS. BONJEAN:  Okay.  Don't answer a question
2 you don't -- you don't understand.
3      THE WITNESS:  I don't remember what he's
4 saying.
5      MS. BONJEAN:  Okay.  So ask him to repeat it.
6 BY MR. SHANNON:
7      Q.   Do you have any infor- -- I'll repeat
8 it.
9          Do you have any information that the
10 male ASA at any time lied about what you had said
11 in your interviews on July the 15th or on August
12 the 1st, 1990?
13      MS. BONJEAN:  Objection to the form of that
14 question.  It's compound.  It's -- to the extent
15 that there were multiple interviews.
16          But go ahead.  If you understand it,
17 answer it.
18      THE WITNESS:  No, I don't -- I don't --  I
19 don't remember.
20 BY MR. SHANNON:
21      Q.   And the -- the male state's attorney,
22 he was not present for your interviews on July the
23 15th or on August the 1st, correct?
24      A.   I don't -- I don't remember.

Page 420

1      MS. BONJEAN:  No.  Listen to the question.
2      THE WITNESS:  I don't -- I don't -- I don't
3 remember talking to him.
4 BY MR. SHANNON:
5      Q.   So as you sit here today, you're not
6 sure whether State's Attorney DiFranco was present
7 for your interview on July the 15th; is that right?
8      MS. BONJEAN:  Listen to the date.
9      THE WITNESS:  July 15?
10      MS. BONJEAN:  Yes.
11      THE WITNESS:  No, he wasn't.
12 BY MR. SHANNON:
13      Q.   Okay.  And how about on August the 1st?
14      A.   No.  He was wasn't.  I was in jail.
15      Q.   Do you remember whose decision it
16 was to take the Polaroid photo of you on August
17 the 23rd?
18      MS. BONJEAN:  I'm going to object to the form
19 of that question.
20          Go ahead.
21      THE WITNESS:  I don't remember.
22 BY MR. SHANNON:
23      Q.   Do you remember who -- who worked the
24 camera and actually took the photo?

Page 421

1      A.   I don't -- I think it was an officer,
2 but I don't remember no name.  I mean, it was
3 not -- was nobody that I did know.
4      Q.   Okay.  On these questions, sir, I don't
5 want to know what you talked about with your
6 lawyers.  Okay?  My questions are different and
7 they're very specific.
8          In 1990, did you ever communicate
9 with Attorney Beuke in English?
10      A.   Yes.
11      Q.   Okay.  And how did that -- how -- how
12 would you communicate with him in English?
13      A.   How did I communicate in English?
14 Basically, you know, just the way that I could
15 understood, though, you know.  He -- I -- you know,
16 you got to remember, you know, the two years that I
17 was already in jail, you know, I learned how to
18 speak a little bit better, though, you know.  I was
19 around English speaking people, so I didn't have no
20 choice, though, you know.  So I have to learn how
21 to -- how to get my English a little bit better so
22 people, they can understand me, though, and have a
23 conversation.  Especially with other inmates in
24 there, though, you know, so don't get -- don't go

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 422..425

Page 422

1 boring.

2    Q.   And again in 1990, did you ever
3 communicate with Attorney -- is it Swano or
4 "Swaino" in English?

5    A.   Swano.

6    Q.   Swano.

7    A.   When I communicate with him it was
8 through my sister, though.  My sister the one who
9 always -- you know, when -- when I had to talk to
10 somebody, she always be my interpreter, someone
11 that I can trust.

12    Q.   Was -- was -- I'm sorry.  Strike that.

13         Did Attorney Swano speak Spanish?

14    MR. GREENBERG:  Swano.

15    MS. BONJEAN:  It's Swano.

16    MR. SHANNON:  Sorry, Swano.

17 BY MR. SHANNON:

18    Q.   Did Attorney Swano speak Spanish, sir?

19    A.   No, he didn't.

20    Q.   All right.  And so I just want to be
21 clear, did you ever speak to Attorney Swano without
22 your sister present?

23    A.   I don't remember.

24    Q.   So it's possible that you did?

Page 423

1    MS. BONJEAN:  Objection.  He answered your
2 question.  He doesn't remember.  We're not playing
3 those games.

4    MR. SHANNON:  I'll move on.

5 BY MR. SHANNON:

6    Q.   Martin Abrams.

7    A.   Yes.

8    Q.   Did Mr. Abrams speak Spanish -- strike
9 that.

10         Did Mr. Abrams speak Spanish in
11 1990?

12    A.   No, he didn't speak Spanish.  Maybe
13 just hola, cómo estás, or -- you know, basic stuff.
14 You know, maybe like -- maybe like what you know,
15 you know.

16    Q.   Did you ever on any occasion
17 communicate with Mr. Abrams in 1990 in English?

18    A.   I always communicate with people
19 through somebody.  And with Mr. Abraham, every time
20 that he come and see us, though, you know, he don't
21 come and see me, he come and see the other guys
22 too.  They know how to speak English and Spanish.
23 So we always get interpreter just to -- you know,
24 to communicate with the lawyer to make sure that

Page 424

1 when we talk, you know, it is what it is.

2    Q.   So the answer to my question, sir, is
3 that your testimony is that you never communicated
4 with Attorney Abrams in English; is that true?

5    MS. BONJEAN:  You mean without an
6 interpreter?

7    MR. SHANNON:  Well, he wouldn't need an
8 interpreter if it was in English.  I'm asking about
9 in English.

10    MS. BONJEAN:  Okay.

11    THE WITNESS:  No.

12 BY MR. SHANNON:

13    Q.   Never?

14    A.   Well, I never said never, you know, be
15 caught lying, but just a little bit, yes, we
16 talked.

17    Q.   You would talk to Attorney Abrams in
18 English, correct?

19    MS. BONJEAN:  Objection to the form.  He --
20 objection to the form of that question.  Snakes.

21         Go ahead.

22    THE WITNESS:  Just a little bit.

23 BY MR. SHANNON:

24    Q.   Were you provided -- strike that.

Page 425

1         According to you, were you provided
2 with a new set of pants on August 23rd while you
3 were in custody?

4    MS. BONJEAN:  Object to the foundation and
5 the form of that question.

6    THE WITNESS:  I don't understand.  Can you
7 say the question in easy way that I can understand,
8 please?

9    MR. SHANNON:  Yes.

10 BY MR. SHANNON:

11    Q.   Were you provided a new set of pants?

12    A.   Pants.

13    Q.   Pants.

14    A.   Right.

15    Q.   Right.  While you were -- while you
16 were in custody on the 23rd?

17    A.   They brought me some -- some pants to
18 me because I shit and peed on myself.

19    Q.   Okay.  And were those pants brought to
20 you before you met with the male state's attorney?

21    A.   After.

22    Q.   After?

23    A.   Yes.

24    Q.   Who brought them to you?

Urlaub Bowen & Associates, Inc.    312-781-9586

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 426..429

Page 426

1     A.   My sister.
2     Q.   Those pants weren't provided by a
3 detective?
4     A.   Well, actually, my sister had to bring
5 them to give them to him so him to give them to me.
6 She cannot come walking in the police station and
7 open the door and give them to me because she would
8 get herself in trouble.  Do you think?
9     Q.   The -- the medication, the nerve
10 medication that you took, sir, does that -- would
11 that affect your memory?
12    A.   It's just nerve pills.  How could it
13 affect my memory?  It's just nerve pills.  That's
14 what it is.  Not for my -- my head.
15    Q.   It would have no impact or affect on
16 your memory or your -- your brain ability?
17    MS. BONJEAN:  Objection to the form.
18         Go ahead.
19    THE WITNESS:  They make you go to sleep.
20 They make you drowsy, though.
21 BY MR. SHANNON:
22    Q.   That's it?
23    A.   Yeah.  It make you drowsy.  They make
24 you go to sleep.  You can focus and stuff, though,

Page 427

1 you know.  I mean, it's a psycho-medication,
2 though.
3         He's muted.
4    MR. SHANNON:  Jennifer, can I take a quick
5 break?  I might be done or close to it.
6    MS. BONJEAN:  Okay, sure.
7    THE VIDEOGRAPHER:  We're off the video record
8 at 6:42.
9         (Recess taken.)
10    THE VIDEOGRAPHER:  We are back on the video
11 record at 6:47.
12 BY MR. SHANNON:
13    Q.   Sir, the first -- I'm going back to
14 August 23rd.  Okay?
15         The first meeting that you had with
16 the male state's attorney, you came into that
17 meeting with an idea of the false story that you
18 were going to tell at that meeting, correct?
19    MS. BONJEAN:  Objection to the form of that
20 question.
21 BY MR. SHANNON:
22    Q.   Do you understand?
23    A.   No, I don't understand.
24    MR. SHANNON:  Can you read it back, please.

Page 428

1         (The record was read as follows:
2         Q. Sir, first I'm going back to
          August 23rd.  Okay?
          The first meeting that you had
          with the male state's attorney,
          you came into that meeting with
          an idea of the false story that
          you were going to tell at that
          meeting, correct?)
6    THE WITNESS:  When I first met DiFranco, that
7 was -- we were going to start making the statement,
8 but because my -- you know, my communication, it
9 was not all that good, though, they decide to send
10 me back to the bullpen and see what they can come
11 up with, though.
12         Montilla told me everything going to
13 be in Spanish and he would be the one who would be
14 translating to me and speak up to the story that
15 Guevara already cause me to -- to say, though.  And
16 that was it.  Yeah, that was the first time we --
17 when we met, you know, after Guevara finished
18 beating me up.
19 BY MR. SHANNON:
20    Q.   Okay.  And -- and my question was:  The
21 male state's attorney, he wasn't present when you
22 were coached by Guevara, as you claim, correct?
23    MS. BONJEAN:  Objection to the form of that
24 question.

Page 429

1    THE WITNESS:  He was in the room, in the
2 interview room.  Whether he was aware or not, I
3 don't know when they were speaking in Spanish --
4 in English, I mean.
5 BY MR. SHANNON:
6    Q.   That conversation you had with Guevara
7 was in Spanish?
8    A.   All the conversation that I had with
9 him was in -- in Spanish.
10    MR. SHANNON:  Okay.  All right.
11         All right.  Nothing further.
12    MS. BONJEAN:  Okay.  Who's next?  Anybody got
13 45 seconds they want to use?
14    MS. ROSEN:  I don't have any questions at
15 this time, but the City defendants are reserving
16 their ability to call him back once you let us know
17 that he's willing to waive the Fifth Amendment.
18         I know you probably have a different
19 position, but I just want to put that on the
20 record, and we can deal with that when and if it
21 ever becomes a reality.
22    MS. BONJEAN:  Okay, yeah.  We'll be objecting
23 to that, but we'll reconsider it at another point.
24 Thank you.

JOSE JUAN MAYSONET JR., 04/16/2021                    Page 430..433

Page 430

```
1           Anybody else?
2      MS. MCGRATH:  Defendant Guevara has nothing
3 at this present time.
4      MR. SHANNON:  Defendant DiFranco joins with
5 Ms. Rosen's request.
6      MS. BONJEAN:  Okay.  All right.  Great.
7      MS. ROSEN:  Reserve, are you reserving?
8      MR. BRUEGGEN:  Yeah.  Jennifer, are you going
9 to reserve?
10          You're on mute.  I can't hear you.
11     MS. BONJEAN:  Yeah.  I want to reserve
12 because of the -- the language issue.
13     MR. BRUEGGEN:  Okay.
14     THE VIDEOGRAPHER:  This concludes today's
15 proceedings.  We are off the video record at
16 6:50 at the end of Media Unit 7.
17          (The proceedings adjourned at
18               6:50 p.m.)
19
20
21
22
23
24
```

Page 432

```
1             REPORTER'S CERTIFICATE
2      I, Kathleen A. Hillgard, do hereby certify
  that JOSE JUAN MAYSONET, JR. was duly sworn by me
3 to testify the whole truth, that the foregoing
  deposition was recorded stenographically by me and
4 was reduced to computerized transcript under my
  direction, and that said deposition constitutes a
5 true record of the testimony given by said witness.
6      I further certify that the reading and
  signing of the deposition was not waived, and the
7 deposition was submitted to Ms. Jennifer Bonjean,
  plaintiff's counsel, for signature.  Pursuant to
8 Rule 30(e) of the Federal Rules of Civil Procedure,
  if deponent does not appear or read and sign the
9 deposition within 30 days, the deposition may be
  used as fully as though signed, and this
10 certificate will then evidence such failure to
  appear as the reason for signature not being
11 obtained.
12     I further certify that I am not a relative
  or employee or attorney or counsel of any of the
13 parties, or a relative or employee of such attorney
  or counsel, or financially interested directly or
14 indirectly in this action.
15     IN WITNESS WHEREOF, I have hereunto set my
  hand of office at Chicago, Illinois, this 26th day
16 of April 2021.
17
18
              _____
19            Illinois CSR No. 084-004093
20
21
22
23
24
```

Page 431

```
1         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION
3 JOSE JUAN MAYSONET,          )
                               )
4          Plaintiff,          )
                               )
5      vs.                     )  No. 18 CV 2342
                               )
6 REYNALDO GUEVARA, et al.,    )
                               )
7          Defendants.         )
8
9         This is to certify that I have read my
10 deposition taken on Friday, April 16, 2021, in the
11 foregoing cause and that the foregoing transcript
12 accurately states the questions asked and the
13 answers given by me, with the changes or
14 corrections, if any, made on the Errata Sheet
15 attached hereto.
16
             _____
17                   JOSE JUAN MAYSONET, JR.
18
  No errata sheets submitted (Please initial)
19 Number of errata sheets submitted _____ pages
20 Subscribed and sworn to
  before me this _____ day
21 of _____2021.
22
23   _____
     Notary Public
24
```

Page 433

```
1 Errata Sheet
2
3 NAME OF CASE: JOSE JUAN MAYSONET vs REYNALDO GUEVARA, et al.
4 DATE OF DEPOSITION: 04/16/2021
5 NAME OF WITNESS: Jose Juan Maysonet Jr.
6 Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25          _____
```

JOSE JUAN MAYSONET JR., 04/16/2021

**Exhibits**

**1 Maysonet 041621-1** 191:12,13 199:21 200:5

**2 Maysonet 041621-2** 249:8,9,22 250:16,23

**3 Maysonet 041621-3** 319:20 320:14 322:3,11 413:5

**4 Maysonet 041621-4** 324:9,13

**6 Maysonet 041621-6** 358:7,13, 23 364:11

**$**

**$1,000** 132:11

**$10** 131:17

**$10,000** 116:21

**$100** 120:14

**$18.50** 24:2

**$2,000** 168:4,8 170:15 173:16 174:6

**$20,000** 131:23

**$5,000** 131:24

**-**

**--he** 323:8

**0**

**002553** 191:4

**1**

**1** 5:2 77:24 191:13 199:21 200:5

**10** 202:12,19,20

**101** 260:9 261:12,15,20 262:13,23 264:5,7 268:8,13

**10:00** 327:5

**10:06** 5:3

**10:55** 326:21

**10th** 264:11,19,20,21

**11** 70:21,23 71:2 75:3 118:14

**11:19** 77:24

**11:28** 78:3

**12** 36:23 75:4 96:5 124:10

**12:19** 130:11

**12:30** 130:5

**12:33** 130:14

**13** 387:23

**1474** 325:13

**15** 11:3 202:21 212:8 235:7 420:9

**15-year-old** 22:8

**1530** 36:13 137:6

**15th** 212:7 224:8 226:18 228:12 229:5 230:8,12 234:20 418:11 419:11,23 420:7

**16** 5:6 37:3 319:10

**1697** 321:11

**1699** 323:12

**170** 382:8

**18** 5:10 42:22

**1911** 128:19

**1980** 102:10

**1980s** 52:21 53:14 61:3 67:6,7 68:4,5 89:20 90:11 99:6 101:11 108:13 130:23 132:2

**1990** 175:1,9,10 188:11 209:16 212:7 219:2,5,9,14,22 220:5 221:11 224:8,24 225:1 228:12 229:5 230:8,13 231:11,13 233:17 236:10 251:4,10 252:12 253:4,9 257:5 258:9,10 259:7 261:16 262:20 298:7 321:5 326:21 327:4, 21 329:22 334:7,16,20 336:11 337:4 342:18 344:14 345:9 346:12, 20 398:15 417:6,7,13,17,18 419:12 421:8 422:2 423:11,17

**1992** 330:15

**1998** 357:24 365:1,4

**1999** 327:1

**1:45** 203:5

**1st** 251:4 252:12 257:4 418:12 419:12,23 420:13

**2**

**2** 78:3 130:11 249:9,22 250:16,23

**20** 5:15 26:18 174:5 268:10

**20-something** 17:7

**2006** 358:15 365:3,7

**2019** 382:21,22

**2021** 5:6

**2255** 196:19

**22nd** 258:9,10 259:7 261:16 262:20 298:7 318:23 327:20 329:22 334:7,20 336:11 337:4 342:18 344:14 345:8 346:12,20

**23** 327:1

**2342** 5:10

**23rd** 321:5 326:21 327:4 342:18 346:12,20 398:5,15,20 399:3,13 400:18 404:16 412:2 420:17 425:2, 16 427:14 428:2

**24** 395:9

**2454** 15:9

**2553** 192:4

**2558** 199:22

**25th** 209:16 233:16

**270** 382:7

**2:00** 202:21

**2:09** 203:8

**2:31** 222:15

**2:34** 222:18

**3**

**3** 130:14 203:5 319:20 320:14 322:3,11 333:13 413:5

**30** 100:14 230:14 347:8,15,20

**302** 262:7 268:16,18

**33** 396:4

**3:10** 258:3

**3:17** 258:6

**3:30** 23:7

**3rd** 212:24 219:1,5,9,14,18,22 220:5 221:11 222:9 227:9,14

JOSE JUAN MAYSONET JR., 04/16/2021

231:11,13 236:10 358:15 365:7

**4**

**4** 203:9 258:3 324:9,13 325:3

**40** 319:7

**40-apartment-unit** 206:22

**40s** 33:13

**45** 128:19 221:5 429:13

**4:18** 319:15

**4:28** 319:18

**4:42** 332:13

**4:44** 332:16

**4th** 330:15

**5**

**5** 215:1 217:3,5,18 229:15 258:6 266:23 319:15 325:9 326:20 328:6, 7 330:14,21 331:14 333:8 358:7 399:4 402:21

**50** 131:16

**53** 25:7

**5:00** 23:6

**5:18** 366:24

**5:28** 367:3

**5:57** 396:6

**6**

**6** 200:4 319:18 358:7,13,23 364:11 396:3

**600** 5:15

**69** 101:2

**6:00** 79:21

**6:08** 396:9

**6:09** 397:9

**6:12** 397:12

**6:42** 427:8

**6:47** 427:11

**6:50** 430:16,18

**7**

**7** 322:3 359:18 397:13 430:16

**722** 330:16 331:8

**726** 331:8

**75** 55:20,24

**77** 55:21 56:6

**773.663.5391** 200:18

**78** 107:21

**7th** 184:19

**8**

**80s** 38:10,11 53:18 68:21,23

**88** 30:19

**9**

**9048** 358:16

**9053** 359:10

**9:00** 113:19 258:13 259:5

**A**

**a.m.** 5:3 326:21

**ability** 341:14 362:5 426:16 429:16

**Abraham** 229:24 230:1,2,7 242:4, 18 423:19

**Abrams** 239:19 240:3,7 241:22,23 242:2 423:6,8,10,17 424:4,17

**abuse** 344:4,13 345:8 346:11,19, 21,22

**abyss** 396:21

**accomplish** 164:6

**account** 119:14

**accurate** 12:15

**accurately** 414:15

**accuse** 175:11 390:4

**accused** 123:3 390:12 391:1 394:15

**accusing** 390:23 392:15,21 393:5

**achieve** 118:10

**acquired** 30:20 338:7

**act** 51:11 86:2,3

**acting** 47:7 89:16 317:12 356:6

**action** 118:18 178:7

**active** 82:2

**activities** 31:20 40:4,5 45:2

**actual** 142:12 200:12 349:8

**add** 41:9 416:4

**added** 75:5

**addition** 315:19

**additional** 253:7

**address** 25:8,9,12 137:5 261:2,4, 10

**Adidas** 201:14

**adjourned** 430:17

**admitted** 337:12

**advantage** 388:8 408:15,16

**advice** 219:21 221:12,13,22 222:23 223:5,20 224:13,20 225:3 235:12,22 236:11 333:4 354:13 356:6

**advise** 220:23 221:16 332:23 354:16

**advised** 338:16

**advising** 81:10 384:5 412:18

**affect** 426:11,13,15

**affidavit** 359:18,21 365:4,5

**affidavits** 13:7

**affiliated** 98:2 109:5 110:13 114:22,24 115:4 152:1

**afford** 56:17

**afraid** 93:24 384:10,11 417:24

**African-american** 209:21

**African-americans** 209:15

**afternoon** 23:7 186:5 237:17

**age** 33:3,7,10,11 35:1 70:13 112:6

**agree** 167:16 169:10,11 296:4 309:22 314:14 384:8

**agreed** 167:19 311:13 313:7,10 400:17 405:1

**agreement** 169:24 172:14 173:14

Index: ahead-attorneys

JOSE JUAN MAYSONET JR., 04/16/2021

174:2,21 175:19 176:20,23 178:5, 10,11 337:16 342:22

**ahead** 55:18 59:18 63:19,20 71:19 73:2 97:1 109:7 112:2 120:8,10 127:5 128:9 134:15 138:17 145:16 169:19 170:10 172:21 177:3 183:11 213:8 221:8 225:22 232:13 239:5 254:6,21 255:6 275:12 276:9 284:16 291:22 296:19 301:20 309:15 329:24 333:17 345:1 354:6 370:12 384:7 389:13 397:23 399:17 400:7 401:21 404:21 405:19 416:21,24 419:16 420:20 424:21 426:18

**AKA** 359:5

**alcohol** 86:4

**Alfredo** 95:13 97:18 197:6,7 201:6 352:20 353:1,2

**alibi** 354:18,21 356:3,19,21,23

**alive** 34:4,6 351:24

**allege** 390:7

**alleged** 178:11 180:22 344:4 346:11,19 391:10

**allegedly** 295:18 344:13 345:8

**alleges** 123:22

**allowed** 187:18,19

**altercation** 391:9

**amazing** 17:5 163:21 184:9

**Amendment** 212:18 219:17 221:22 222:21,24 223:10 224:14, 21 225:4 238:9 429:17

**amount** 121:7 123:12 131:23 165:11 172:19 298:21

**amounts** 174:7

**angel** 46:6 369:23

**angry** 335:15 383:19

**announce** 397:8

**answering** 81:10 166:23 222:6 223:3 370:2

**answers** 7:16 14:17 398:7 414:16

**Antonio** 32:20,21 33:2 109:2

**anxious** 377:1 378:13

**anybody's** 214:12

**anymore** 81:9

**anytime** 248:17

**apartment** 15:10,11,13 16:1 17:23 18:6,12 19:3 207:2,5 367:8,24

**apartments** 15:15

**apologize** 86:17

**appeal** 357:22 358:1 361:2

**appealed** 357:20

**appeared** 261:15

**appears** 192:20 200:5 256:23 323:13

**appetizing** 172:24

**apple** 56:2

**approval** 63:1,2 70:15 85:17,18 105:22 110:23

**approved** 70:10 105:13

**April** 5:6 184:21 387:23

**area** 37:21 52:23 53:12 59:14 60:18 63:15 65:3,15,18,24 69:16 75:15 76:24 77:1,9 87:6,11 90:13 100:16 104:19 106:13 129:9 134:12 143:5 144:14 155:19 210:8 215:1 217:3,5,18 229:15 266:23 325:9 326:20 328:6,7 399:4 402:21

**argue** 361:6 389:8

**argued** 389:4,5

**argument** 175:15 177:18,19 248:1 249:5 363:9 391:13

**arguments** 360:16 361:12,21 362:20

**arm** 93:7

**arrest** 55:17 57:4 171:13 175:17 177:13 178:8 206:9,12 208:18,19 334:6 341:18 376:18 377:7 392:20 393:8,16,20 394:3,11

**arrested** 39:21 172:8,9,11 173:17 174:23,24 180:18 188:5,8 208:20 212:8,10 213:3,24 214:4 224:7 228:14,20 230:10 231:6 234:19 240:9 266:24 268:19 303:7 304:11 310:13 314:3,16 318:6 325:7 378:19,20 379:18,21 392:17,22 393:6,7,18 394:21,24

**arrived** 259:3 266:15 267:13 317:3

**art** 416:3

**ASA** 398:6,8,16 399:3,12,13 400:14,18,21,24 401:24 402:7,15,

16,19 404:16,18 405:9,13 406:4, 16,17 407:18 409:5,24 410:11 412:2,5,6,9 419:10

**Ashley** 9:2,8 110:6 232:9

**asleep** 278:1,3

**ass** 146:23 161:18 305:21

**asserting** 332:6

**assessing** 145:10

**assign** 262:15

**assigned** 263:2

**assist** 212:7

**assistant** 227:13,15 305:6 308:24

**associate** 198:7,9

**Associates** 5:14,18

**assume** 8:5

**ate** 150:1 308:4

**attached** 289:10

**attack** 233:11

**attempt** 180:23 181:1 212:9 228:14 231:15 234:20,24 235:8,18, 21,23 236:7,9 238:2 239:11,20 243:18 244:11 245:5 258:14 266:24

**attempted** 175:2 229:11 247:7

**attention** 117:23 119:11 155:16 165:13 166:3 276:11 398:4

**attorney** 7:8 8:17,19,23 10:2,19,23 11:7,14,19,22 12:2,6,7 19:22 213:20,21 227:14,15,22 228:1 229:20,22 231:1 239:17,20 240:8, 12,13,14 242:3,23 244:23 261:11 262:12,19 305:7 306:3,6 307:19 308:12,15,17 309:1,12,24 311:6, 16,19,22 312:8,13 313:18,19 314:11 315:14,20 322:22 323:5 327:13 329:3,5,14 331:21 332:1,20 335:18 341:22 342:1,13,16 398:8, 11,19 418:10 419:21 420:6 421:9 422:3,13,18,21 424:4,17 425:20 427:16 428:3,21

**attorney's** 14:14 219:21 228:16 320:3 333:4

**attorney/client** 238:7,10 239:13 240:18 332:6,24 353:22

**attorneys** 10:15 224:2 238:11 240:16 241:1,13,15 242:13,17

Index: attract-Bella

JOSE JUAN MAYSONET JR., 04/16/2021

244:18 395:17,23

**attract** 41:21 116:4 117:23

**attracted** 391:23

**August** 251:4,10 252:12 253:4,9
257:4 258:9,10 259:7 261:16
262:20 298:7 318:23 321:5 326:21
327:1,4,20 329:22 330:15 334:7,20
336:11 337:4 342:18 344:14 345:8
346:12,20 398:5,15,20 399:3,13
400:18 404:16 412:2 418:12
419:11,23 420:13,16 425:2 427:14
428:2

**aunts** 53:11

**Austin** 6:3 15:9

**authorization** 249:11

**Avenue** 15:9 36:13 148:2 206:18
209:15,23 210:10,13,18,22 231:18
232:17 246:16 247:3 280:18
348:15

**aware** 137:24 145:6 152:3 170:3
177:8 204:7,11 329:20 348:3,7
351:12,17 352:19 362:20 367:7
373:1 404:9 429:2

---

**B**

**babies** 206:6

**baby** 18:10 50:16 71:12 317:8

**back** 21:18 22:9 25:20 34:15,18,
19,20,22 35:2,10,15 36:7,11 37:1,
5,22 38:2 40:15 41:16 44:20 45:5
47:1,3,6,7,10 48:9,17,20 50:23
52:21 53:14 54:15,24 56:19 58:3
62:3,8 67:5 68:1 69:8,12 73:9
77:17 78:2 79:2 82:10 83:16 85:7
88:3,22 89:9,20 90:11 91:1 93:2
99:6 101:1,7,11 102:10 108:13
111:4 112:1 116:21 117:13 119:24
122:22,23 123:14 124:8,12,14,17
126:14,15,16 130:5,13,23 133:11
134:21 140:10 142:2 143:13 144:3
146:21 148:24 149:4 154:2 155:7,
19,20 156:2 161:19 169:6 184:5
201:8,17,18 202:2,18 203:7 206:23
214:9 215:20 216:11,14,16 222:17
228:20,23 234:18 237:3 252:12
253:4 257:17 258:5 260:19 263:19
265:7 266:15 268:7,23 270:15
273:20 274:13 278:11,18,20 279:8,
9,10,11,22 280:3,9 281:9 282:12,
17 283:6 284:20 286:15 287:11,12,
13,14,21 288:22 289:1,6,9 290:6,

14 291:17,19 292:2,12,24 294:10,
14 299:19 300:6 303:24 307:16,19,
24 311:8 312:16 313:24 314:15,18
315:10 316:19 319:17 324:15
325:19 326:4,5 332:15,18 334:16,
20 336:24 337:2 345:5 346:18
367:2 373:13 374:18 381:18 387:2
390:15,16,17 391:2,5,7 394:12,17
396:8 397:11 403:21 409:16
410:18 417:7 427:10,13,24 428:1,
10 429:16

**background** 45:8

**backside** 325:12

**backsides** 324:10

**backyard** 31:9

**bad** 28:21 46:16,20 47:7,12,13
48:4 50:4 73:11,13 74:18 83:1,9,18
84:1 86:18 87:19 89:13,14 93:18
116:10 120:20 129:4 136:17
146:24 162:6 173:21 175:14
182:19 184:6,12 249:6 271:21
279:23 310:3 339:12 352:16
374:15,16 383:4 384:12 386:13
416:12

**bag** 131:17 209:11

**baggie** 145:21

**baggies** 141:14 142:14

**bagging** 22:1 141:16

**band** 40:7,24 41:2 44:24

**bank** 60:9,10 119:12,14

**barely** 396:16

**base** 117:6

**based** 235:8

**basement** 15:24 16:2,6,13 140:9,
10,12 141:7,13 143:2,5,9,10
144:14 265:6,7,10,12,14,16

**basic** 22:7 98:14 101:6 234:1
336:9 423:13

**basically** 12:17 17:4,8,12 20:22
21:22 23:17 29:17 30:8 32:24
37:23 41:24 43:19 45:6 52:3 55:3
64:9 65:7,9,11 69:21 88:21 93:16
95:22 104:18 111:8 114:4 116:3
117:16 118:13 119:1,3,14,17
121:23 122:22 124:15 126:13
133:23 138:3 140:9 141:6,15
142:9,19 145:7,8 146:13 151:12
156:11,22,24 157:21 158:3,5,7
160:7 164:1,4 165:3 172:4 174:14

175:16 181:17 197:20 210:15
215:2,11 230:3 242:6 243:10
267:24 275:7 284:22 297:3 305:21
308:2,10 310:7 330:7 339:4,7
349:21 350:23 366:2 380:18,23
384:23 390:16 394:13 421:14

**basis** 32:2 130:23 213:10 332:24
344:19 378:2 383:16 418:16

**basketball** 45:4

**Bate** 199:21

**Bates** 191:6 325:15 330:16 331:7
358:16

**bathroom** 257:16 319:3

**beat** 47:15 83:3,13,22 122:10,11
146:23 284:10 290:1,2,7 292:10
299:18,20 305:21 306:2 307:20
308:10 311:24 312:15 337:9
338:11 395:14,15

**beated** 402:10

**beaten** 306:20 402:1,7,20 403:8,17
404:10

**beating** 83:24 292:2,5 295:18
296:12,14 297:1,9 305:14,24 306:6
307:14,17,23 308:3 311:8,9 312:3,
7,9 314:19 401:1 428:18

**beatings** 342:17

**bed** 385:2

**bedroom** 16:6 17:22,24 18:2 19:6,
9

**beer** 215:3 216:10

**beg** 294:5

**Begging** 286:5

**begin** 78:5

**beginning** 5:1 78:3 130:14 203:8
213:11 258:6 319:18 371:12
397:12

**behalf** 5:8,23 6:1,6,8 242:10
329:18 330:8 356:22

**belief** 360:12

**believed** 46:16 360:16

**Bella** 203:18 205:7,13,14,23
206:10,13,17 207:7,9,20 208:14
219:7,13 233:8,13 259:8 263:4
300:10,11,21 301:6,7,14,22 302:2,
3 303:19 316:7,13,23 317:3 321:23
350:13,19 351:4 352:12 357:1
368:15,17 373:10,11 387:6

JOSE JUAN MAYSONET JR., 04/16/2021

**Bella's** 207:4 301:12

**belong** 89:19 108:24 125:3 126:22 149:15 376:7

**bench** 163:17 353:14

**bending** 196:22 197:2 200:2

**benefits** 24:6

**bent** 195:5,6,8

**betting** 308:10

**Beuke** 328:16,17 330:4,8,11 335:18,21,23 336:3,10 337:3,13, 15,21,24 338:3,6,10,18 339:20,24 340:15 342:2,3,9 350:18 351:20,21 354:1,14 356:10,15 357:4 421:9

**Beuke's** 338:24

**big** 17:11 30:7,9 76:24 77:1 89:8 119:17 123:12 131:8 136:10 142:16 143:13 144:5 146:18 161:18 163:10 175:15 196:4 209:13 269:21 289:15 336:17

**big-ass** 206:21 215:9,10

**bigger** 65:14 201:9 405:4

**bike** 29:22,24 30:3,4,5,7,8,9,13

**bilingual** 38:15 417:2

**bills** 52:7

**birthday** 184:19,20,21 388:1

**birthday's** 184:19

**bit** 34:19 41:5 120:17 123:1 135:11,12 143:15 196:1 207:10,11 238:19 255:23 279:17 336:5,6 339:10 374:15 391:23 401:15 417:11,20 421:18,21 424:15,22

**black** 46:2,10 106:8 109:8 183:22 189:15 190:9 194:9,19 195:2,24 198:20,21 200:8 201:3,14 209:21 279:12 281:20

**Bless** 204:9

**blessing** 372:4

**blind** 102:6,7,8,10

**block** 64:13,20 69:3,8 77:5 87:20 95:24 97:6,7 102:2 103:1 104:15

**blocks** 65:2 76:2,3,4,17 87:7 152:20

**blonde** 110:9

**blue** 55:15 107:1 144:5 161:13 193:16 196:23 200:9 201:3,14,23

**Bob** 6:8 396:12 397:14

**body** 59:22 197:13 284:3,5 286:12 287:1,6,17

**bond** 119:20 230:15,16 240:11 244:10 245:1,2

**bonded** 243:18

**bonding** 244:18

**bone** 381:17

**Bonjean** 5:22 8:20,23 9:8 11:4,16 14:9,20 15:1 19:24 20:3,6,12 21:5 24:3 35:22 54:20 55:18 56:24 57:19 58:14 59:18 60:22 62:10 63:18 67:12,15,18,21 68:8,14 71:19,24 72:24 73:18 77:19,22 78:17 79:5 80:15 81:2,7 89:22 90:4 91:13,24 92:8,11 95:6 97:11 99:20, 22 104:9 108:8 109:16,21 110:3,6 120:6,10 123:24 128:7 129:17,20, 22 130:2,6,8 131:1 132:3 138:14 147:12 150:12 154:7,11 155:4 159:8,22 166:15 170:8 172:16 177:1 182:22 183:8 186:11,15 189:8,13,22 190:2,5,20 192:11,13, 19,23 193:1,15 194:2,13 196:10 197:1 198:19 199:17 200:13 202:6, 14,19,22 204:17 212:12 213:12 219:15 220:13,21 221:4,8,12,19 222:6 223:9 224:4,12,18 225:1 226:21 231:20,24 232:4,8 235:2,4, 13,20 236:4,13,17 237:5,15,22 238:4,8,21 239:2,5,12 240:17 241:2,6,10,23 249:12,17 250:18 252:1,3,20 253:17,24 254:4,9,11, 18,21 255:6,19 268:5 276:8 282:2 283:21 290:17 291:1,21 292:7,14 294:15,23 295:14 296:17 300:12 301:15,19 306:7,12 309:13 314:12 319:1,6,8,12 320:1,8,17 321:6 324:21 329:23 330:17 331:4,6,10, 23 332:4,11,22 333:14,23 334:2 336:13,16,21 337:18 342:5 343:14, 16,22 344:7,15,24 345:10,22 346:4 347:4,13,18 348:16 349:16 353:20 354:5 355:1,14 356:11 358:11,17, 20 359:23 360:18 361:14,24 363:11 364:2,14,24 365:6,10 366:7,14,16,19,21 367:16 368:4 369:14 378:7,18 381:4 382:11 386:2 389:12,22 390:8,20 392:18, 24 393:12 396:1,10,20,24 397:5,23 398:21 399:5,15 400:5 401:2,10,19 402:2 403:10 404:19 405:16 406:22 407:21 408:8,11,14,19 409:7,12 410:2 413:15,21 414:4,9 415:21 416:8,18 418:14,17,22

419:1,5,13 420:1,8,10,18 422:15 423:1 424:5,10,19 425:4 426:17 427:6,19 428:23 429:12,22 430:6, 11

**bonuses** 24:13

**book** 22:22 279:11 280:1 281:17, 19 282:1,13,22 283:18,21,22,23,24 284:2,4,8,18,20 285:1,5,11,15,17, 19,20,22 286:9,11,12,13 287:2,4,5, 15,16,17,18 288:6 289:4 293:10, 17,19 294:2,9,13

**boom** 116:3

**borderline** 69:11

**boring** 422:1

**born** 32:6

**borrow** 119:22 122:20 123:11

**bottom** 215:10 253:16 321:10 359:10

**bought** 30:1 53:19,21 54:2,9

**Bowen** 5:14,18

**box** 43:9 215:3

**boy** 18:10 49:22 275:5,6

**bragging** 151:20

**brain** 183:16 426:16

**brakes** 268:17

**branch** 110:15

**brand** 98:13

**brang** 293:10

**break** 8:9,13 77:15 129:10,13,15, 24 130:3 142:24 143:6,7 202:4,7,8 257:15 319:3 366:5,9 388:21,23 395:23 427:5

**breakdown** 297:13

**breakfast** 210:3 258:24

**breaking** 142:15

**breath** 307:16

**Bret** 5:13

**briefly** 271:7 289:24

**bring** 237:3,7 281:21 282:1,6,9 297:18 391:5 426:4

**brings** 329:10

**broke** 21:20 389:10,14

Index: broken–Caucasian

JOSE JUAN MAYSONET JR., 04/16/2021

**broken** 390:22

**brokenhearted** 182:16

**brother** 32:18,20 33:2 45:12,13, 15,23 46:17 51:1 53:5,9 82:19,21 109:2 140:14 195:9,10,16,17,20 196:8 300:2

**brother's** 97:19 195:11

**brother-in-law** 242:23,24

**brotherhood** 88:19

**brothers** 33:4 45:20 83:2 246:19, 20,23 247:4,9 280:18 281:2 328:3 357:15

**brothers'** 88:22

**brought** 168:20 213:3,4 226:19 273:4 274:4 281:16,18,23 299:1 309:22 311:11 312:22 325:9 327:19 328:5 425:17,19,24

**Brueggen** 5:24 6:18 9:5,15 11:6, 18 14:12 15:5 20:17 21:11 24:5 36:1 54:23 55:23 57:3,21 58:16 60:13 61:1,11 62:17 64:2 67:14,17, 19 68:2,10,17 71:20 72:1 73:14,20, 23 77:13,20 78:4,23 80:1,17 81:17 90:2,10 91:16 92:5,9,17 95:11 98:1 99:21,23 105:7 108:12 109:18,24 110:11 120:11 124:3 128:11 129:8 130:1,4,7,9,15 131:20 132:19 138:20 147:14 150:17 154:14 155:5 159:12 160:1 166:19 170:13 173:13 176:3 177:10 178:4 180:17 183:1 184:13 186:19 189:4,9 190:4,10,14,21 192:18,24 193:3,5, 10,19 194:5,14,15 196:12 197:3 198:23 199:18,19 200:16 202:2,10, 20,23 203:10 204:18 205:1 213:6, 8,18 217:11 219:19 220:18 221:1, 9,15 222:1,13,19 223:6,14,24 224:6,16,22 225:2,5 227:3 231:23 232:2,6,14 235:6,14,15 236:1,5 237:23 239:6,15 240:20 241:5,8,11 242:1,8 249:7,14,18,20 250:21 252:6,22 253:1 254:13 255:7,20 257:14,21,24 258:7 259:2 268:6 276:13 282:4 284:6 290:21 291:8 292:3,8,19 295:4,16 296:18 300:20 301:17 302:1 306:9,18 311:3 315:12 319:4,13,19 320:2,9,10,18 321:9 324:23 325:1 330:19 331:8, 11 332:3,8,17 333:2,20,24 334:3,5 336:14,24 337:7,20 342:7 343:15, 20 344:1,10,20,22 345:4,13 346:1, 9 347:24 348:2,18,22 349:19,20 352:8 354:1,8,9 355:6,17 356:14

358:12,18,21 360:1,24 361:1,17,19 362:10 363:19 364:7,9,17 365:2,9, 12 366:4,11 367:4,18 368:9 369:15 378:10,22 381:8,10 382:14,17 386:5 389:18 390:3,10,21 392:21 393:3,15 395:16 396:12,15 408:5 430:8,13

**brung** 178:20 234:8 271:14 273:17 274:7

**buddies** 158:23 159:5,6,9

**buddy** 156:16 157:23,24 161:5,6 294:1

**buffing** 42:3 44:18

**Buick** 101:2

**building** 15:16 17:23 18:6,14,24 19:3 25:20,22 26:1 42:14 43:3,18 97:22 104:19 198:15 206:22 207:2, 3 261:9 264:11 265:8 367:13

**bull** 18:21

**bullet** 114:4 166:12

**bullpen** 428:10

**bunch** 74:20 77:2 141:13 171:3 172:3 185:1 198:6 229:2 281:14 291:9

**burial** 187:13,14 191:24 192:1

**buried** 187:9

**burn** 367:13

**bury** 351:24

**business** 55:7 90:22 91:15 94:15, 16 103:22 119:7 122:19 127:3,4,15 152:13,16 154:12 156:23 173:20 176:12,14 204:14,20 215:17

**bust** 271:23 275:6

**busy** 23:15

**buy** 54:12 56:17 98:18 127:7,18 131:12,14 148:6 210:3 417:22

---

## C

**C-E-R-I-D-I-A-N** 20:11

**Caceres** 388:17

**Cadillac** 55:21 56:7,8,11

**caliber** 128:17

**call** 35:20 60:9 72:13 79:12 82:17 96:21 106:8 119:13,18 143:17 191:6 215:7 217:8 247:3 249:22

261:22 262:9 264:24 265:1,4,5 269:4 271:22 273:15 297:17 317:1 334:18 354:18 356:2 363:4,5 388:5,6 429:16

**called** 6:15 59:7 72:12 215:13 216:12 268:10,11 297:17 415:12, 13

**calling** 185:11 292:12 299:24

**calls** 362:2 363:11,15

**calm** 86:21 252:23 297:19 335:10, 16

**camera** 420:24

**cancer** 183:16 392:10

**candy** 56:2

**cannabis** 384:5

**caption** 331:17 359:2

**car** 25:17 30:1,20 53:15,17,19,20, 21,22 54:5,9 80:5 85:16 89:10 96:1 98:9,10,11,16,18 100:17,18,19,20, 21 101:1,4,6,8 102:4 106:17,18,19, 23 107:2,3,15,16,17,18 113:9,12, 15 115:2,16,24 116:6,7,14,19 117:3,12,20 118:4 134:5 161:17,22 164:15,18,19 167:3 168:19,24 169:1,2,3 172:13 181:9,10 197:14 214:7 215:13 217:3 266:2,6,7,13 268:22 327:16 348:14 353:3

**carburetor** 116:19

**card** 13:23 14:6,7 20:7,15 119:18 377:12 383:6,9,17 384:1

**care** 73:11 90:19 162:4 204:19,20 211:2 233:9 296:10 299:20 309:10 373:19 374:13 377:3 380:15

**Carlo** 106:22

**carry** 128:20 129:1 418:4

**cars** 55:16 56:14,18 136:7 139:7 265:16,17

**case** 5:10 39:21 55:17 57:5 123:20 181:4,6 208:20 209:7 212:7 213:14,16 220:2,9 221:21 222:10 234:9,10 235:1 236:18 237:1,6 238:3,15 239:20 247:8 333:11 338:11 339:19 340:21 343:8 357:5, 11 360:17 365:16 366:1,2 371:4,24 374:8 376:18

**cash** 127:3,4,12

**Caucasian** 144:1 308:20 410:15

Index: caught–communicate

JOSE JUAN MAYSONET JR., 04/16/2021

**caught** 47:14 49:2 50:1 79:23
85:18 127:16 215:23 424:15

**caused** 204:16

**causing** 82:15 165:13 166:2

**caveman** 16:4

**CCSAO** 325:13 330:16 331:8

**CDS** 127:11

**celebrate** 184:21

**cell** 278:10

**cellblock** 375:23

**cemetery** 187:9

**Ceridian** 20:7,10

**chain** 200:5,6

**chained** 310:10

**chair** 43:10,12 248:3

**chance** 40:21 150:2 162:7 164:2
183:14 247:7 248:15 282:16
298:24 322:10 365:18 371:23
373:16 388:3,7 415:4

**change** 21:21 62:9 268:1,3 384:5

**changed** 149:18 231:16 407:3

**characterize** 290:20

**characterized** 110:2

**charge** 105:14 166:8 188:10
243:19 244:11 245:5 258:15 295:2
395:11

**charged** 182:18 229:11 328:2,20

**charges** 229:21 328:14,15,23

**chasing** 148:18 149:11

**chat** 339:10 387:17,22 388:2,7

**cheap** 16:19,20

**check** 25:9 78:22 127:8 198:4
269:7,13,15 270:5 274:15 278:10
316:8 380:19

**checked** 271:4 313:24

**checking** 81:12,14 269:10

**Cheech** 161:19

**chemical** 22:10

**Chevy** 106:22 107:20,21

**Chicago** 5:16 6:5 100:8

**Chicagoland** 37:21 52:22 53:11

59:13 60:18

**chicken** 49:20

**chief** 61:4,5,15 72:4,12,13 165:6
166:10,14,21 169:12 176:11
187:16 189:1

**child** 205:20

**childhood** 32:8

**children** 18:15 205:16,18,24 206:2
302:4 368:19

**Choi** 6:10

**choice** 37:15,17 105:17 312:23
329:8 414:24 415:7,8 421:20

**Chong** 161:19

**Chris** 98:24 353:6,14

**Christopher** 99:1

**chronology** 303:11

**church** 388:20

**cigarette** 202:12,15,24

**Cisco** 302:22 303:10 313:16,21

**city** 6:5 49:22 429:15

**civilian** 248:20,23

**claim** 60:3 111:5 428:22

**clarification** 213:9

**clarified** 290:22 291:2

**clarify** 8:21 9:5 54:24 128:12 239:8
252:22 271:2 286:21

**clarifying** 254:1 382:15

**Clark** 5:15

**class** 38:16 40:24 41:2 416:3

**classes** 38:13,18,19,22 39:12,13,
14 386:20,24 416:16 417:1

**clean** 80:5 105:2 144:4 220:16
282:16 305:12

**cleaning** 49:19

**clear** 7:22 109:12 235:24 274:2
403:5 410:17 422:21

**clearer** 236:24 407:17

**client** 220:22 332:6,23 343:5
401:20

**clique** 104:3,6 106:2

**cliques** 103:11

**close** 33:4 52:11 63:17 69:10
94:23 114:12 162:10 177:23
184:11 186:8,13 266:20 269:24
275:3 366:6 427:5

**closed** 114:3 186:10,18,22 267:3
276:6

**closer** 238:16 371:11,12

**closest** 28:1,2 77:3

**clothes** 248:20,23

**clue** 279:6 280:21 414:20 415:14

**coach** 347:12,13 350:11 408:10

**coached** 428:22

**coaching** 408:11

**coat** 194:23 195:2,24 196:23

**Cobra** 115:5

**cocaine** 75:10 79:19,20 84:4
125:7,12,16,22,23 126:6,7 130:18
334:8,14

**cocktail** 367:7,24 373:5,11

**codefendants** 348:4

**coffee** 39:1 77:16 257:16 366:10

**coke** 125:13,18 126:3,4 155:11

**collaborate** 301:12 313:1

**college** 98:6,7

**color** 55:14,15 56:1,9 106:24 107:1
189:16 190:1

**colored** 201:23

**colors** 93:24

**Colón** 40:17

**coma** 83:23

**comfortable** 178:23 179:20

**comments** 391:22 396:18

**commit** 84:13 85:9 211:4,19
235:11,18 236:9

**committed** 180:22 184:15,17
185:15 197:11,23 211:24 314:7
391:10

**committing** 87:10

**common** 299:19

**communicate** 167:14 207:12,14
208:8,11 244:5 335:23 403:1,4
417:18 418:1 421:8,12,13 422:3,7
423:17,18,24

**communicated** 424:3

**communication** 428:8

**community** 120:4 244:17 384:9

**company** 19:15,18 20:20,24 21:2, 7 24:15 42:16

**competition** 65:8 89:7,8 162:17

**complaint** 123:19,20,22 124:1,2,4, 21,23

**complete** 36:14

**completed** 13:8

**completely** 127:3 221:3 354:2

**complexion** 143:15

**compound** 294:15 393:1 419:14

**computer** 9:9 17:13,15,18 41:7

**computers** 9:6

**concern** 204:16 211:1 242:16 391:14

**concerns** 81:4

**concludes** 430:14

**conclusion** 362:2 363:12

**condition** 377:6,10,20 378:13 379:4,17 385:24

**conditions** 376:19 381:2,3,12,13, 15,21

**conduct** 208:24

**conference** 5:5

**confirm** 250:12 331:1

**confrontation** 67:1 112:16,21 129:5 375:10

**confused** 216:7

**confusing** 131:22 292:18 349:12

**Connecticut** 34:9

**connection** 212:13

**consistency** 350:8

**consistent** 350:5

**consistently** 349:13

**constitutional** 79:13

**constrain** 67:6

**consult** 220:22 241:4 332:5

**contact** 188:6 230:7 298:11

**contacted** 230:9

**contained** 360:11

**continually** 236:19

**continue** 45:23 188:14,21 221:16 294:22 297:1 308:10 365:23 378:2 387:1

**continued** 188:24 307:20 312:15

**continuing** 9:1

**contribute** 51:21 52:5

**control** 59:23 63:9,15

**controlled** 65:19 69:16 209:10

**controlling** 69:17

**conversation** 94:12 118:8 145:17 156:18 158:16,21 343:10 399:9 402:15 403:16 405:14 421:23 429:6,8

**conversations** 333:5 335:24 399:3

**convertible** 101:2

**convicted** 209:4,9 357:14 361:22 363:8 374:12

**conviction** 213:13,14 237:1 357:20 360:17 361:23 362:17,22 363:10,13 364:1,3,20 369:2 374:9 393:14

**Cook** 229:17 230:11 234:19 245:4, 13,14 247:13 248:24 249:10 250:24 251:3 252:8 256:8 259:4,6 261:16 264:11 265:7 318:10 325:10 327:21 328:9 339:2 340:10, 12,23,24 351:5 367:6 369:10 373:6 374:7 375:2 378:14 379:19,20 393:17 394:6,9

**cooking** 31:7

**cool** 66:20 73:10 75:19 90:22 91:7 103:16 117:20 196:5 314:19

**cooperate** 272:10 296:22,24 297:2,4 301:3,9 302:5,8 303:14 305:17,20 306:4,24 307:7,10 309:22 310:6,23 312:23 313:10,11 317:9

**cop** 118:6 138:19,21 161:5 163:2 164:10 167:6 172:23

**copies** 190:13 196:17

**cops** 164:11 171:3 173:20

**copy** 250:3,7,8,11 316:3 319:24

320:5,12,20 324:18,19,21 330:18, 22,23

**corner** 42:13 59:24 60:3,15,17 62:21 63:10,12,22 64:4,10,14,20 69:21 70:16,20 75:11,20,22 76:5 91:2,3 104:22 105:6 111:4 124:9, 13 125:9 126:23 127:24 128:5,14 132:9,14,15 175:15 181:15 188:1 192:15 197:1 208:24

**corners** 75:14

**Corolla** 53:24 54:2,13 55:14 56:4, 12

**correct** 18:7 36:9 65:22 87:9 130:20 205:20 214:2 220:8 284:24 321:23 335:20 357:19 372:19 399:22 400:3,14,19,20,22,23 401:1 404:3,4,10,11 405:11,12,15 409:6 416:7,17 419:23 424:18 427:18 428:5,22

**correcting** 109:21

**correction** 251:1 323:20 394:11

**correctional** 252:8 369:20

**corrections** 323:4,6 370:4,5,7,15 371:18 372:10 373:18 375:4,22 379:24 393:22 394:8

**correctly** 103:24 283:5

**Cortland** 69:18

**cosmetics** 21:10

**counsel** 5:19 221:12,14,23 222:23 223:20 224:14,20 225:3 236:11 397:15

**count** 286:1 287:23

**counting** 319:11

**County** 25:13 229:18 230:11 234:19 245:5,13,14 247:13 248:24 249:11 250:24 251:3 252:8 256:8 259:4,6 261:16 264:11 265:8 318:10 325:10 327:21 328:9 339:2 340:10,12,23,24 351:5 367:6 369:10,11 373:6 374:7,23,24 375:3 378:14 379:19,20 393:17,19 394:7, 9

**couple** 31:13 149:13 152:20 185:8 187:3,4 379:14 382:20 388:22 395:8

**court** 5:17 6:11 61:7,10 175:24 239:23 240:1 249:18 257:23 258:1, 9,11,14,18,20,24 260:9 261:12 265:8 268:18 295:10 314:22 315:1,

11,13,23 325:10 328:21 330:5 338:14 341:19 362:17,21 363:1,22, 24 365:21 366:17,20 405:6 407:7, 14,19,24 408:2,6 409:5,15,23 410:7,14 411:21 413:1,6,19,20 414:19 415:13

**court-reported** 314:10 415:1,10

**courthouse** 259:4,7,24 268:7,21

**courtroom** 261:15,20 262:7,13,23 263:1,3,5 264:7 268:8,13

**cover** 171:20

**covered** 353:21

**cow** 49:20

**CPD** 256:15

**crap** 47:16

**crazy** 111:18 205:11 392:7

**create** 17:11 82:8

**created** 215:11

**credit** 119:18

**crew** 123:23 124:5,21,22

**crime** 84:13 180:21 210:19 211:3, 4,12,19,24 223:4 232:21,24 233:3 303:7 314:3,7,17 348:14 349:23

**crimes** 85:10 87:11

**criminal** 333:11 341:19 348:4 352:3,10,13

**critical** 22:15,16,17,18

**cross** 25:11 48:21 60:16 261:7

**crossed** 323:14

**Crosstalk** 235:19

**crouch** 288:13,14,16

**crown** 215:10

**cruising** 163:18 168:16

**Cruz** 96:8,9,16 97:2,4,18 98:2,7,10 101:15,16,19,24 102:4 194:10,12, 13,14 348:8,12,18,24 351:18 352:9 353:1

**Cruz's** 96:19 194:17

**crying** 385:6

**Crystal** 181:12

**CSR** 326:23

**cuff** 264:4 267:6,8 278:10 289:12, 13

**cuffed** 269:4 286:17 289:1,5,8,9

**cup** 39:1

**cured** 385:21

**curfew** 69:9,12

**curly** 143:14

**cursed** 122:8

**cursor** 191:3 194:18 256:4

**cursor's** 194:8,22 197:4 323:16

**custody** 334:22 371:19,22 372:6, 9,14,18 375:11,21,24 376:10,14 393:24 425:3,16

**customers** 43:11 64:17,21

**cut** 120:3,24

**CV** 5:10

**cycle** 294:21

**cómo** 423:13

**D**

**DA** 228:1 308:21 314:21 402:22

**DA's** 228:16

**dad** 26:3 50:15 51:7,9,10,11

**daily** 130:22

**Daley** 43:3

**danger** 69:2

**dangerous** 126:3

**danos** 216:4

**dark** 93:23 113:18

**dark-colored** 93:21 94:1

**date** 184:15 213:1 221:24 236:14 257:12 420:8

**dated** 205:10 365:4

**dates** 365:3

**dating** 111:23 205:7,23 206:5

**daughter** 18:10 233:14

**daughters** 207:4 208:4

**Dave** 5:24 212:12 220:16 222:11 223:15

**day** 16:21 40:15,18 41:16 45:5,18 47:15 48:5 54:15 56:20 69:8 85:7 88:3 93:3 104:20 132:11,12 136:12 139:7 146:24 150:3 151:1 152:23 153:22 157:6 161:11 171:3 181:22 182:1,3,13,14 183:5 184:23 186:7, 21 187:3 197:18 212:5 219:14 220:1 228:13 229:8,12 231:5 232:21 247:21 258:11 259:22 262:3 280:13 295:10,11 303:7,13 308:1,4 309:17 310:14 314:3 316:7,17,18 337:14 355:12 366:2 391:10

**Dayforce** 20:8,11

**dayroom** 339:3

**days** 48:10 121:19 163:11 187:3,4, 5 230:14 239:23 387:24 395:8

**dead** 181:7,8

**deal** 63:23 66:21,22 88:16 158:19 175:12 177:12 247:7,11 309:20 352:23 429:20

**dealer** 117:14

**dealing** 338:13

**deaths** 320:23

**debate** 237:19

**decide** 31:1 149:6 161:24 165:10 198:3 241:20 315:6 352:16 353:15, 16,18 356:7 371:24 377:14 428:9

**decided** 55:7 105:8 354:10

**decision** 223:21 242:7 357:6 415:10 420:15

**defecated** 309:5

**defend** 338:14 418:6

**defendant** 5:8 6:5,7,9 430:2,4

**defendants** 6:1 429:15

**defending** 238:15 357:7

**defense** 340:20 356:10

**defined** 92:14

**delaying** 236:19

**deliver** 165:12

**delivering** 42:6

**demand** 237:6

**denied** 357:22 358:1 361:2

**deny** 326:16

**dep** 337:17

**Department** 250:24 370:3,5,6,14 371:18 372:10 373:17 375:4,22

JOSE JUAN MAYSONET JR., 04/16/2021

379:24 393:21 394:7,11

**depend** 23:14 24:14 83:4 87:19 88:11 89:3 131:4 132:8

**depending** 24:14 60:1

**depends** 82:17 131:16

**deposition** 5:5,7 7:3,8 10:2,7,12, 16,20,24 11:8 12:3,8,11 13:5,8,11 205:15 330:21 408:21 413:5

**depressed** 183:13 385:5

**DEPT** 256:15

**describe** 143:11 261:6

**designed** 347:12,13

**destroyed** 146:12

**detail** 172:19 222:7 347:15,19

**details** 180:24

**detective** 133:16 138:18 212:11 214:1,4,7,8,10,20 215:4 225:13,15, 17,24 227:5 228:7 230:20 245:6,21 264:3,12,16 266:2,6,7 267:11 268:2 305:17,23 315:15 327:11,12 336:11 337:5,8 338:21 342:19 343:15 400:10 402:20 403:8,17 426:3

**detectives** 212:7 214:24 218:14 225:10 226:16 227:8 266:8,10 267:2 268:22 269:3 398:19 399:4, 21 400:3,17 402:1,21 410:9 418:11

**diagnose** 381:1

**diagnosed** 380:23 381:11

**diagnosis** 385:10

**dictionary** 34:2

**died** 181:18 184:4 187:15

**difference** 349:24

**differently** 291:2 414:3

**difficult** 22:11

**Difranco** 6:9 322:22 397:15 398:6, 12 402:22 403:1,4,9,18,21 404:2,9 405:5 409:24 410:9,13,22 411:20 420:6 428:6 430:4

**dinner** 29:5 179:1 338:4

**direct** 347:16

**direction** 76:5 189:3

**directory** 281:19

**dirty** 49:24 52:8 155:21

**disagree** 175:14 336:19

**discard** 89:17

**Disciple** 224:24

**disciplinary** 370:24 371:2,5

**discipline** 51:12 79:24 80:2 83:8, 19 369:13,19

**disciplined** 370:4,9

**discovery** 237:10 350:17

**discussed** 241:16

**discussion** 397:10,16

**discussions** 223:19

**disease** 385:21 392:10

**dishes** 155:21

**disorderly** 208:24

**disoriented** 234:15

**dispatcher** 415:12

**disrespect** 198:5

**disrespected** 87:17 88:8 112:24

**disrespecting** 83:2

**distance** 25:2

**distracting** 232:5,10

**district** 5:11 228:1

**Division** 5:12

**DJ** 16:2,12,13,22,23 17:14 29:20 391:19

**DJING** 29:14 31:16

**doctor** 340:20,22 379:7 380:18,20 382:1,10,11,12,13,15,19 384:4

**document** 9:20,22 250:1,4,12,14 255:9,15,16 320:4,5 326:9 331:2, 13,18 333:10,15 358:24 365:8

**document's** 255:11

**documents** 9:17,19 11:23 12:11, 14,21 13:13

**dog** 18:17,18,20 28:10,14,18 29:14 31:16

**dollar** 131:23

**dollars** 131:13,15

**domestic** 390:4,23 391:2,11 392:16,22 393:6 394:16 395:10

**door** 136:3 139:12 263:2 266:20 267:4 269:16 273:8,12,13 278:9 299:10 366:1 426:7

**double** 57:23 59:6 116:1,8 123:14 231:16,17 232:16 233:5,6 235:20 246:14,15 280:18 318:7 328:3 330:3,4 333:11 348:5 351:5,13 356:4 357:2

**downstairs** 144:14

**downtown** 43:14

**drag** 37:11 121:21

**dramatic** 82:14

**Drawing** 398:4

**drawn** 215:24 229:3

**dream** 164:4 185:10,11

**dreaming** 384:23

**dress** 89:11

**dressed** 93:23

**drink** 29:6,11 77:17 85:24 86:3 154:4 257:16 299:11

**drinking** 153:20 154:5,15,17,19 155:11

**drive** 25:18 54:8,10 96:3 102:6 171:6 305:2

**drive-by** 221:11 224:10

**driver** 259:10,21,22

**driving** 75:16 164:15 167:3 168:22 353:3

**drop** 36:18 39:5,6 41:22 42:24

**dropout** 38:1 39:10

**dropped** 39:8,16,23 41:11 42:1 45:22 51:19 52:10 55:1 135:17,18 232:12

**drove** 30:24 266:10 267:2 348:13

**drowsy** 426:20,23

**drug** 47:14,15 56:19,22 64:11 79:24 84:14 85:20 86:20 89:15 117:14 127:7 134:6 136:11 142:20 152:13,16 154:17,21 165:22 166:9 334:18,22 370:11

**drugs** 44:13,14,16 49:2 52:4,6 54:14,15,16,19 55:2,7,9 60:2,7 63:13,16 64:7,13,19 65:3,19 73:13 74:8,11,15 75:7 85:16 101:11 113:1 118:22 119:24 120:2,16,19

123:23 124:5,7,14 127:2,20 128:1
130:24 136:24 137:1 140:8,16,18,
19 142:6,12,13,15,24 143:6 144:22
151:13,19,23 152:4,8 153:20
157:8,20 163:20,24 167:22 179:19
188:14,21 208:14 334:10,11,13
387:2

**drunk** 86:1 298:16

**dry** 48:17,24

**due** 394:13

**duly** 6:15

**dumb** 145:8,20 375:17

**dying** 183:15 382:6

---

**E**

**ear** 114:5 238:16

**earlier** 38:11 72:4 83:16 94:24
96:22 125:6 139:11 140:22 156:5,6
166:24 175:22 182:13,14,17 183:5
203:24 205:11 225:7 228:19
231:18 232:17 233:16 244:16
337:17 368:14 388:9

**early** 38:10 186:7 210:4 295:9
316:17,18 350:15 355:11 356:4
388:4

**earn** 52:5

**ears** 210:18

**easier** 250:6 254:22 381:9

**easily** 320:21

**east** 152:20

**Eastern** 5:12

**easy** 41:12,13,14 46:8 54:14
407:10 417:12 425:7

**eat** 148:6 152:24 154:20 178:17,18
202:15,16,17,24 210:3 258:23
301:22 383:18 386:15

**eating** 154:3,5,18

**education** 84:10

**Efrain** 101:15,16,19,24 102:4
194:10,12,13,14,17 302:22 303:11
313:16,21

**Eileen** 6:4 213:8 237:11 238:19

**elect** 353:13

**elected** 353:9,12

**Electra** 101:3

**elementary** 35:17,18,21,22,23
36:8,14,18 58:7,9 133:3,12 135:4
415:19,23

**elements** 141:19

**elevator** 264:7,10,15,17 265:21

**Eleventary** 35:19

**emblems** 93:5

**employed** 19:11

**encyclopedia** 34:2

**end** 77:24 83:17 87:24 130:11
155:18 158:20 203:5 258:3 319:15
322:1 371:13 430:16

**enemies** 167:8

**enforcer** 61:5,16 73:4

**engage** 94:12 156:18

**engaged** 158:15

**English** 14:2 38:14,15,16,19,21,22
39:12,14 138:2,3 207:13,24 208:2
215:15 218:17 251:15,16,20
306:14 315:4,7,10 335:24 336:4
341:6,14 403:2,9,18 404:2 407:1,2
412:16,21 414:19 415:19 416:1,3,
7,11,17 417:2,8,13,15,19 421:9,12,
13,19,21 422:4 423:17,22 424:4,8,
9,18 429:4

**enjoy** 388:8

**enlarge** 255:19

**entail** 80:2

**entered** 231:21,23

**entertaining** 392:3

**entire** 62:5 237:4 365:15 401:5

**entitled** 397:18

**epileptic** 233:10,13

**episode** 335:13

**Epplen** 6:2

**equipment** 16:13 22:2,6 23:11
127:11

**esta** 216:5

**established** 74:1

**Esther** 6:10

**estimate** 132:5 135:9

**estás** 423:13

**et al** 5:9

**evening** 186:5 197:19 305:7

**event** 212:16

**events** 303:11

**eventually** 394:19

**everyday** 82:5

**exact** 25:12

**examination** 6:17 341:21 398:1
401:5

**examined** 6:16

**exchange** 352:20

**excited** 17:16 27:4 377:4

**excuse** 122:8 180:4 204:8

**exhibit** 191:12 199:21 200:5
249:8,22 250:16,23 319:20 320:14
322:3,11 324:9,13 325:3 330:14,20
331:14 333:8,21 358:7,8,13,23
364:11 413:4,5

**exhibits** 9:18 189:7 319:5

**exist** 81:9

**exit** 268:12

**expand** 65:1

**expect** 338:10

**expensive** 17:11

**experience** 92:12 189:14

**explain** 97:15 140:2 211:9 245:19
246:3

**explained** 12:20 63:8 245:18

**explaining** 63:9

**extent** 127:3 131:2 386:3 393:13
419:14

**extra** 136:16

**extracurricular** 40:4

**eye** 102:9,11,14,15,17 118:4 119:9
126:13,21 145:14 150:23 157:3
158:4 167:7,12

**eyes** 95:10 102:17 126:11 144:6
156:7 210:18

**eyesight** 102:16

JOSE JUAN MAYSONET JR., 04/16/2021

## F

**face** 113:14 193:16,17 197:2 213:15 215:24 216:17 229:3 271:23,24 275:3,7,8 276:5 282:22 285:5,8 286:24 293:17,20

**Facebook** 391:13,15,21

**facilities** 77:17

**facility** 21:13 374:21

**fact** 12:3 54:4 122:17 132:12 200:2 205:12 248:21 330:5 372:21 404:9

**facts** 360:11

**fair** 8:6,24 33:1 145:9 172:19 224:3 344:24 398:13,14 409:17

**fall** 30:23 31:1 114:2 149:7 278:1,3

**false** 322:16,17,18 400:17 413:9 427:17 428:4

**familiar** 7:6 338:23

**family** 29:19 34:22 35:2 45:8 52:22 53:4,6 97:20 140:13 141:11 230:9 241:17,18,22 242:5,6,9,12,20 243:13,14 244:12,13,21 298:12 339:16,17 354:21 373:3

**famous** 115:14 123:10

**fans** 269:20

**fantasy** 167:5

**farm** 49:23

**fast** 114:9 276:10

**fat** 410:14

**fate** 353:17

**father** 51:18

**favorite** 55:15

**fearful** 60:8

**federal** 42:14 43:3,18

**feel** 17:18 117:6 179:19 185:9 330:22 354:4 380:5 385:1

**feeling** 162:12 380:22 392:1

**feelings** 94:17

**feet** 168:23

**fellow** 234:21

**felt** 215:20 276:3

**female** 111:7 228:4,6 231:1 305:6 306:5 307:18 308:12 311:6,16 313:18 391:16,17,20 399:13 406:6, 7

**females** 111:14 179:11

**fence** 161:1,4 173:1

**fight** 87:22 88:23 111:9 112:23 357:11 365:18 366:2 371:24

**fighting** 88:1,5,9,10 365:23 370:10 374:8

**fights** 112:11,12

**figure** 72:2 158:18 168:2 232:4 254:4,6 363:21

**figured** 163:1

**file** 364:10

**file-stamped** 330:15 358:15

**filed** 5:10 13:10 329:17 333:10 358:1,4 360:14 361:3 362:13 364:23 365:3,6,10,14

**filing** 364:13,19,21

**filling** 377:13

**finally** 132:10

**financial** 60:10

**financially** 51:21 122:18

**find** 44:8 86:13 134:15,17 136:24 137:1 142:12 146:10 181:8 184:2 262:5 303:5 375:14 385:5,22 417:24

**findings** 341:8,13

**fine** 77:20 80:4 100:3 183:6 221:19 223:14 232:11 254:2 309:14 411:8

**finger** 273:19

**fingerprints** 318:18

**fingers** 95:4

**finish** 113:16,22

**finished** 275:23 428:17

**fist** 276:6,7

**fix** 29:18

**fixing** 29:16

**flashlight** 279:10 281:17,20,24 282:7,13 284:1,4 285:16,18,20,23 286:10,23 287:4,14,16,18 288:7,8, 10 289:4 293:11 294:10,13

**flashy** 98:14 101:4 107:2,3 151:15

**flip** 320:21

**floor** 15:17,18,20,22 18:3,6 19:5,7 48:11,12,16 215:21,22 264:11,19, 20,21 265:13,15,20,24 270:16 272:1 275:8 276:16,19,22 277:4,9 341:1

**flowers** 31:12 198:2

**fluent** 407:2

**focus** 149:18 151:21 231:16 248:13 426:24

**focusing** 406:4 417:6

**Folk** 58:13 204:16,17,18,19

**Folks** 204:24

**follow** 7:21 60:5 78:15 82:23 83:14,20 85:23 160:16 219:20 333:3

**follow-up** 130:16 415:15

**food** 127:8 129:18 148:6 152:15 178:18

**force** 389:24

**forcing** 402:12

**foregoing** 360:10

**forever** 26:8 85:3,4

**forget** 7:21 26:23 387:3

**forgot** 13:24 71:13

**form** 62:11 63:18 67:22 68:15 79:5 89:23 90:4 91:13 92:1,15 95:6 97:11 128:7 131:1 138:15 147:12 150:12 166:15 170:9 177:1 182:22 183:8 245:13,15,16,18 246:7,9 251:22 252:4,8,9,11 253:3,9 256:8, 16,20 257:4 276:8 294:23 300:12 301:15 309:13 314:12 321:6 329:23 342:5 343:16 344:15 345:22 346:4 347:4,5 349:16 355:1,14 356:11 360:19,22 367:16 368:4 369:14 378:7 381:4 386:2 389:12,22 390:8 391:4 392:19 393:2 398:21 399:5,16 400:5 401:2 402:2 403:11 404:19 405:16 406:22 410:3 415:21 416:8,18 419:13 420:18 424:19,20 425:5 426:17 427:19 428:23

**formal** 298:3

**found** 47:22 141:6,13,21 142:14, 19 145:21 162:21 166:2 181:7

JOSE JUAN MAYSONET JR., 04/16/2021

197:14 219:24 262:17 302:23
303:6 304:4 350:16 351:1 357:16

**foundation** 54:21 62:11 63:18
89:23 90:5 92:16 131:1 132:4
226:22 252:4 321:7 342:6 344:16
360:20 399:6,16 402:3 405:17
410:2 425:4

**founded** 96:23

**founding** 96:5

**four-door** 107:21

**fourth** 191:13 290:15,19

**framing** 364:3

**Francisco** 102:21,22 104:1

**Frank** 230:23

**frankly** 292:18 403:19

**Freddy** 200:8 201:2,5,6,13 202:1

**Freddy's** 201:16

**free** 29:13 31:15 44:11,19 45:3
330:22 354:4

**Friday** 79:21

**friend** 28:2 52:17,19 94:20 133:8
147:5,6,7,16 151:8,11 156:16
172:7,8 175:7,11,17 178:8 186:23
197:22 205:13 259:9 293:24 339:8,
11,21,23 340:5 389:15,24 391:20

**friendly** 93:16

**friends** 28:1,6 52:11 91:19 94:18
103:21 151:5,9 389:19,21

**friendship** 173:6

**Fro** 99:1,2,5,18 100:10,17,18,19
101:10 194:1 302:11 304:8,13
305:3 311:5 312:19 313:14 314:8
348:13 349:2 399:21

**front** 8:19 43:3 152:11,12,13,16
165:5,24 193:12 236:21 255:11
289:8 320:20 322:3 331:3 363:24

**fuck** 272:7

**full** 6:24

**fully** 138:2 255:10 344:12 345:7
363:7

**fun** 134:5 154:21

**fund** 120:4 244:17

**funeral** 13:22 14:1,6 185:16 186:8,
14 187:1,4,6,8 188:9 199:24
203:15,22

**future** 74:21 148:15

**G**

**gals** 111:10

**games** 423:3

**gang** 57:5,7 58:8,10 59:9 60:8
69:4,7,13 70:10 78:14 79:9 80:12
82:2,16 85:2 87:15,21 88:6 89:21
90:3,9,19,23 91:7 92:2,10,13,15
106:9 108:24 112:11,14,23 113:1,5
114:23 115:1,3,8 117:14 120:16
121:2,16,24 122:1,3,5,20,21
126:19,20 132:15 152:1 161:1
162:24 163:3 164:11 167:10
169:18 172:24 204:15 211:21
224:11,17,24 245:3 367:15,19
368:18 372:12,15,17,18,21 373:4,
24 374:1,2,3 375:10 376:7

**gang's** 113:1

**gangbanging** 134:2,4

**gangs** 58:19 59:1,3 76:18,19 82:1
90:12 91:10,20 92:24 115:16
204:12 222:3

**Gangster** 69:14

**garden** 31:9,11

**gardening** 31:6,8,17

**gave** 171:23 174:12 178:12 245:13
259:23 297:21 304:7,10 313:13,17
316:2 317:22 318:1 327:7,9 328:1
343:4 344:17 347:19 348:4 351:9
415:3

**GED** 386:20,22

**general** 25:11 39:20 65:18,24
75:15 90:12 130:21 184:14 376:3,
11,15

**generally** 100:11

**generous** 24:17

**gentleman** 18:23 108:2,5 192:15
193:11 194:18,21 195:1,4,23 196:1
197:4 199:7 201:13 340:8

**gentlemen** 210:22 353:3

**geographical** 65:15

**geographically** 60:15

**get along** 90:21 93:17 105:20

**girl** 45:19 89:11 103:14 112:4
154:21 185:1 301:23 388:10

**girlfriend** 26:9,12,14 27:8 111:17
112:1,6 179:2 182:6,7 394:23

**girlfriends** 27:2 29:3

**girls** 178:20 179:9,10,23,24 180:3,
8,10 206:3,4 208:3 233:8 338:7

**give** 8:11 19:19 23:22 24:12,13,16
25:10,12 39:20 48:8 51:8 52:6
64:12 71:8 105:21 116:12,14
118:22 119:8 120:14 122:10
127:10 130:21 131:11 132:5
139:16,18 142:5 155:22 162:3
165:2 169:6 177:20 186:16 202:19
204:4,22 210:19 245:15 248:10
261:21,22 262:4 290:7 295:21
298:16 303:3 304:12,22 313:15
314:10 331:24 332:5 336:19
342:14 343:19 347:6 349:2 357:11
371:4 373:15 391:4 415:8 417:21
426:5,7

**giving** 7:11 174:9 213:4 282:16

**glad** 26:5

**glasses** 143:15 197:8

**glove** 279:12 281:20 282:14
293:11

**gloves** 281:17 282:1,7

**GM** 98:12,13,15 106:21

**God** 129:6

**Gonz-** 351:21

**Gonzales** 197:6

**Gonzalez** 95:13,15 96:1,4 97:10
197:7 201:6 348:7,13,15 349:2,7,
22 351:12,18,22 352:2,21 353:2

**Gonzalez'** 348:23

**Gonzalez's** 352:18

**good** 5:22,24 6:3,19,21,22 8:7 14:2
16:20 34:3 40:17 41:5 51:17,18
52:9 56:20 84:24 87:4 97:16 98:21
105:21 112:4 117:20,22 118:6,8
122:19 123:15 127:15 129:14
130:3,7 132:11,12 147:5 149:21,22
151:8,9,16 154:2,10 158:9,11,22,
23,24 159:4,5,9 161:5,6 162:12,18
168:6,7 170:22,23 171:15 178:15,
18,21 179:12,13,17,21 182:8
183:19 185:3 193:14,16,18 255:24
256:1 257:15 259:20 272:9,18
310:22,23 334:4 349:18 380:6
385:1,2 386:14 391:21 428:9

JOSE JUAN MAYSONET JR., 04/16/2021

**good-bye** 94:16 198:11

**goofing** 134:6

**Goosens** 98:24 99:1 100:10 353:6,14

**Gossens** 98:24

**gotcha** 117:2 118:1 158:6

**grab** 29:6 202:23 249:13 257:16 274:18,21 293:17 313:4 320:1

**grabbed** 40:21 248:20,21 263:5 271:20 274:19,23 275:1,19 276:20 283:18,24 285:16 312:20,22 313:20

**grabbing** 313:2 320:3

**grade** 35:14

**graduate** 39:4

**graduated** 39:2

**graffiti** 84:19

**grand** 131:16

**grandma** 32:16 47:2 48:6,7,8

**grandmother** 33:21 49:3,12,17 50:21

**grandmother's** 33:19 34:6

**grandpa** 45:8 49:23

**great** 24:15 36:3,6 130:9 255:4 260:13 320:9 347:15 366:10 430:6

**green** 56:2

**Greenberg** 9:3 217:9 220:19 223:15 238:5,18,23 239:3 258:22 319:7 352:4 395:14 422:14

**grew** 95:23 97:5,21 99:12,14 101:24 102:1 104:14 107:14

**grocery** 80:6

**groin** 286:15 287:12 288:1,2,3,5,6, 9 295:20 311:11 312:22 313:20

**ground** 117:7 216:15

**grounds** 238:9 239:13 240:18

**group** 69:21 119:2 124:6

**grow** 99:8 102:23 106:10

**growing** 46:7 53:6

**grown** 51:17 107:11 108:18

**guard** 136:5 245:13,14 248:19 251:3 256:9

**guess** 10:8 11:15 26:6 41:12 46:8 50:6 61:4 68:15,20 74:21 85:6 90:8 92:15 118:6 174:18 186:15,17 194:2 215:5 228:11 236:23 260:5 265:4,13 266:19 268:3,5 269:10 271:17 273:14 279:19 296:11 310:10 365:22 386:3 388:24 412:11,13

**Guevara** 5:9 6:7 132:22 133:6 134:9 135:15 137:8,14,20 138:10, 11,12 139:3,4,22,23 140:6,15 141:3,7 142:4 143:11,20 144:11, 12,13,21 145:1,2,4 147:2 150:5,7, 11,19 151:2 152:24 153:3,10,15,23 155:1,13 156:2,12,24 157:6,19,22 158:2,8,13 159:10,18,21 160:2,9 161:8,21 163:8 164:3,16 165:1 166:4,5,7 167:1,15 168:1,15,18 169:24 170:7,12 171:2,24 172:2,4, 7,15 173:15 174:2,22 175:5,20 176:5,19,22,24 177:2,6,12,17 178:5,6,12,13 179:1 180:19,22 270:14 273:3 274:12,16 278:8 280:11,12,15,17 281:1,4,6 282:6 283:6,15 289:17 290:12,14,23 291:10,16 292:23 294:12 295:13, 17,19 296:5,13,21,23 297:11 301:13,14 302:15,16 303:13,21,24 304:16,18,20,22 305:2,17,18,24 306:2,6,20 307:8,12,19 308:9 309:21 310:7 311:4,8 312:9,15,16 313:20,24 315:2,16 317:1 336:12 337:5,9,16 338:1,4,7,11,19,22 342:19,22 343:15 368:8,12,24 400:12 402:16 405:2,15,23,24 406:1 410:13,22 411:19 428:15,17, 22 429:6 430:2

**guilty** 234:24 235:8 238:2 239:10 352:19 357:16

**guitar** 45:10

**gun** 113:14 114:1,3,5 128:2,5,10, 13,16,18,24 129:6 140:22,24 142:13,20 172:13 215:21 216:1,2, 17 348:10 350:1

**guns** 128:3,21 140:19 216:16 229:2

**guy** 31:3 40:17 70:21 73:7 86:15 97:17 99:8 104:16 106:8 113:17,21 114:1 123:15 136:2 137:22,24 138:4 143:13 144:1,2,7 148:18,23, 24 149:6,12 150:9 151:1,16 158:11 162:12 163:20 165:3,5,6 166:5 171:8,10 177:22 178:15 195:3,4,5 196:5 198:4,17,19,22,24 200:8 201:3 205:6 216:3 271:16,23

272:9,18 275:6 276:4 296:23 308:20 310:1,12 311:24 349:10 410:14,15

**guys** 36:10 62:22 69:21 70:23 71:2,5 72:18,22 73:10 74:6,8,14,15 75:3 88:7,10 94:4 95:1,4 99:14 102:24 104:11 105:5,8 111:23 116:9 118:14,21 124:10 125:21,22, 23 126:1 128:20 129:13 162:5 164:16 166:1 168:6,9 169:20 171:16 173:17 176:20 189:6 198:1 209:22 210:17 216:7 217:22 218:8, 22 230:4 241:8 246:21 248:7,8 254:4 279:5 299:8 300:2 302:24 303:2 304:4,10 310:9 314:2,15,18 317:15 362:24 375:15 423:21

---

**H**

**ha** 246:14

**hair** 110:9 143:14 193:9 307:9

**haircut** 144:3,4

**Haley** 8:21 9:10

**half** 18:21,22

**hall** 148:8

**Halvorsen** 6:2

**hand** 19:21 21:9 23:23 40:14 148:19 149:10 155:22 263:5,8,10 276:15 279:18 286:24

**handcuff** 216:15 263:19 267:8 271:15

**handcuffed** 217:2

**handcuffs** 289:10

**handed** 251:3,22 252:4,7 253:3,8 256:8

**handle** 86:4

**handles** 61:12

**hands** 29:18 40:21 90:24 165:19 169:3 229:6,8 249:3 273:19 373:14 400:22 401:1 405:24

**handwriting** 251:7 253:7

**handwritten** 256:19 351:10 415:1

**hang** 45:12,23 59:24 62:22 97:9 103:16 104:4,14 111:1,22,24 134:22 333:16 397:7 413:22

**hanging** 45:17 50:7 74:17 126:12 128:5 182:12,15

JOSE JUAN MAYSONET JR., 04/16/2021

**happen** 45:18 87:15 88:12,13 91:4 93:4,18 103:15 105:20 114:11 116:9,10 123:6 124:10 131:14 136:12 150:19 154:23 158:1 161:12 197:21 211:3,12 272:23 302:18 303:4 311:1 337:13 354:23 356:21 375:19

**happened** 36:17 40:20 70:15 102:12 104:19 105:19 114:17 134:8,20 136:9,20 141:2,4,9,12 146:9 153:15 156:1 158:13 161:24 163:23 171:4,11 176:2 181:4 199:13 209:20 212:5 214:15 215:7 227:9,16 231:18 232:17,21,24 233:3 246:15 260:21 261:20 262:22 266:15 268:18 270:9,14 272:22 276:10 278:7,13 279:5 282:8 287:7 291:20 298:14 300:9 303:8 306:22 307:5,11 308:14,20 314:3,17 317:2 328:24 339:14 342:17 344:13 345:8 346:12,19 350:14 355:11 356:5,17 357:3 371:10 373:2 374:7 386:16,24 395:10 399:10

**happy** 125:4,20 221:23 236:13 310:12

**hard** 41:17 94:16 189:20 196:16 252:16 319:24 320:5,11,20 324:19

**hardcore** 343:10

**hardheaded** 38:23

**harm** 113:11

**hat** 199:8

**he'll** 165:18 262:16 278:18

**head** 7:18,20 118:23 167:17 185:7 188:13 189:2 264:8 267:11 269:16 280:1 282:22 283:19,23 284:2,8, 18,19 285:1,5,6,11,17,19,23 286:9, 11 287:10 293:18 304:13 323:3 374:15,16,17,18 386:18 426:14

**head's** 213:4

**health** 24:9,19 32:1 379:20 380:1, 3,11 381:2,5,12 382:12,19 383:23 385:23 386:8

**hear** 8:2 116:5 210:1,21 228:11 239:1,3 254:11,17 273:9 294:7 295:3 323:2 396:13,14,15,18 430:10

**heard** 80:10 127:7 158:1,7 210:17 396:20

**hearing** 236:17,20 239:23 240:1 394:13

**heated** 248:1

**heating** 249:5

**hell** 107:6 163:2

**helped** 52:2 151:10

**helping** 23:13 49:24 298:17 342:3

**helps** 193:23

**hen** 182:11

**Hey** 28:22 272:3

**high** 37:21,24 38:3,13 39:3,5,8,9, 11,17,23 40:3,6,7,24 41:11,22 42:2,24 44:10,21 45:11,12,16,20, 22 49:9 51:19 52:10,11,14,19 55:1, 10,11 57:14,15 133:1 135:16

**higher** 120:17 122:21

**Hillgard** 5:18

**hire** 240:8

**hired** 229:22 240:2

**hisself** 102:13 156:7 185:9

**history** 40:23

**hit** 102:13 114:3 272:7 274:10 275:7 276:5,12,14,18 277:6 282:22 283:7,22,23 284:7,13,15,17,19,24 285:4,6,11,20,22 286:6,10,14,15, 22,23,24 287:5,8,13,14,18,20,24 288:2,3,5,6,9,10,15,17,18,23 289:4,19 290:11 292:5 294:12,14

**hits** 293:6

**hitting** 279:24 280:8 283:15,19 284:1,4 285:17 286:4,16 287:4 288:23 290:23 291:10 292:23 293:3,7,18 294:3,9,21 295:19,24 300:3

**hobbies** 29:13 31:6

**hobby** 16:10

**hola** 423:13

**hold** 54:1,20 149:8 187:24 220:21, 24 223:6 231:20,22 232:1,4,5 235:13 238:4 241:3 249:12 330:17 331:4,6,23 332:4 333:14 336:16 346:18 360:18 364:24 399:15

**holding** 148:19 263:7,10 276:15, 23 277:2 313:2

**Homan** 76:10,14 77:4,5

**home** 76:19 77:4 86:5,6 132:15,16 215:18 219:6 233:17,18 268:14,15

301:5 316:9,11 317:9,10,12,13,17 349:1,2 355:19,20,21,23 356:1,3 357:2 372:4

**homicide** 280:18 281:2 333:12 340:21 348:5 351:6,13 361:10 362:17,21

**homicides** 357:15

**homie** 91:5

**honest** 80:19 247:23 279:7 287:22 363:17 381:24 403:19

**hood** 169:3

**hoodie** 93:21 94:1 192:21,22

**hook** 101:7 175:7 178:3 289:13,15

**hoping** 189:4

**horrible** 86:23

**hospital** 83:23 183:15,18 233:12 340:24 342:9 374:14

**hotel** 238:18

**hour** 11:17,20 22:20 24:3,4 48:12 77:14 83:5 267:16,17 289:22 397:6,17

**hourly** 23:24

**hours** 22:19 23:4 233:16 267:18, 19,20,23 269:5 277:24 295:8 319:7,10 350:15 355:12 356:4 366:12,14 395:9 396:3

**house** 15:10 17:24 20:15 29:16 33:18,19 43:13 93:12 109:9 131:12 133:9 135:2,5,15,21,23 136:2,9,11, 22,23 137:2,3,7,19 138:10 139:2,9, 13 140:4,8,16,18,23 141:3,5 142:5, 6,8,12,21,24 143:1,3 146:17 150:10,19 151:3 153:3,10,18 156:5,13,14 158:8 178:15,17 183:22 184:24 206:14 233:1,7 297:17 300:6 301:22 348:9 394:10

**household** 51:22

**housekeeper** 231:24

**houses** 85:14

**HP** 326:21

**human** 90:20

**Humboldt** 43:14 61:17 76:23,24 90:12 100:15 103:5 138:22 163:14, 15

**hundred** 34:4

JOSE JUAN MAYSONET JR., 04/16/2021

**hung** 103:8 104:3 106:1 111:13

**hungry** 129:19 353:10

**hurry** 48:23 383:10,13

**hurt** 284:21 383:5 384:12

**hurtful** 174:19

**hurting** 293:20 381:17

**hurts** 239:4

**husky** 144:2

——————————

**I**

**ID** 20:15 256:11,14,19 257:10

**idea** 25:11 39:20 104:20 115:6 130:21 237:20 304:16,19 310:8 427:17 428:4

**identified** 227:5

**identify** 5:19 61:23 191:7 193:11 198:14 199:22 254:15 305:3 320:13 325:2

**identifying** 193:1

**idiot** 171:6

**IDOC** 235:8 374:19

**IG** 69:14

**illegal** 134:13,17

**Illinois** 5:11,16 25:14 331:18 359:3 369:3 370:3,5,6,14 371:17 372:10 373:17 375:3,22 379:23 393:21 394:7

**immediately** 268:12 318:9,22

**impact** 222:3 426:15

**Impala** 107:20,22

**imply** 166:7

**important** 12:17 336:18

**improved** 385:24 386:3

**inappropriate** 363:14

**incarcerated** 108:6 243:20,22 245:4 256:12 339:21,24 351:5 367:6 369:3,12,18 370:3 379:19 380:16 392:16,20,23 393:9,11 394:2 395:5

**incarceration** 340:12 369:9 376:22 377:21 378:11,15 393:13

**incident** 150:8 212:14,19 213:1

367:11 373:5 379:21

**include** 304:14

**including** 308:11 408:6

**income** 339:16

**incomprehensible** 418:17

**increase** 75:2

**incriminate** 220:7 222:22 223:4

**indicating** 221:20 256:5 284:24

**indication** 142:5

**influence** 46:16

**influencing** 46:3

**infor-** 419:7

**information** 82:9 90:14 205:4 210:19 247:8 338:10 343:13 344:3 346:14,19 356:15 357:12 360:12, 15 363:23,24 397:19 401:24 404:8 418:9 419:9

**ingest** 334:21

**inhaled** 334:7

**initial** 326:22

**initially** 174:6 217:13 260:8 281:4 282:9 328:13

**initials** 323:23 324:1,2,3,5

**injuries** 373:21 374:12 380:15

**injury** 373:19

**inmate** 256:4,19 340:1

**inmates** 375:12,23 376:3 421:23

**innocent** 178:1

**Insane** 69:14

**inside** 102:15 300:17

**instance** 22:13 79:18 85:24

**instruct** 240:18

**instructed** 81:15

**instrument** 40:8,15

**instruments** 17:20

**insurance** 24:8,9,19,21 382:2

**intelligent** 163:22

**intend** 401:4

**intentionally** 346:18

**interact** 132:21 376:2

**interacted** 133:11,20 137:18 147:1 226:17,18 376:15

**interacting** 92:7

**interaction** 133:6 135:3 163:7 249:3 277:18

**interactions** 134:23 175:5 178:6, 13 336:11 337:4 343:13

**interest** 204:21

**interesting** 41:20

**interpret** 403:9

**interpreted** 414:15

**interpreter** 225:18 227:6,24 403:4 414:13 417:19 418:4 422:10 423:23 424:6,8

**interrogation** 217:9,10 356:16 404:24

**interrupt** 188:19

**Interruption** 189:21

**interview** 217:8,13 218:10 229:4 230:18 269:3 271:3 273:5,12 280:15 281:2,24 404:24 420:7 429:2

**interviews** 404:17 418:11 419:11, 15,22

**intimidated** 282:24

**introduced** 147:6 155:13 156:8

**investigate** 86:13

**investigation** 320:22 350:24

**invited** 150:3

**invoke** 219:16,17,21,22 220:6 221:21 222:23 223:10 224:12,14, 21 225:4 236:12

**invoked** 222:20

**invoking** 212:17,22 220:12 223:2, 20

**involve** 302:18,19,20,21

**involved** 70:19 88:18 112:11,12 166:10 176:19 180:9 195:17 204:23 225:6 238:15 337:12

**involving** 310:19

**issue** 297:11,22 298:8 376:22 378:12 430:12

**issues** 81:8,13 91:23 375:5,12

**Ivan** 71:13

---

**J**

**jacket** 192:16 193:13 200:9 201:3, 15,23 202:1

**jail** 111:19 119:21 207:22 229:18 230:11 234:19,22 240:11 245:5 247:13 248:24 249:11 270:23 314:4 318:11 327:22 328:9 336:1 340:10 363:4 367:6 368:15 369:10, 11 373:6,13 374:23,24 375:3 376:7 379:19,20 380:11,17 393:17,19 394:7,10 420:14 421:17

**jammed** 114:6

**jealous** 389:2,3 391:24

**Jeff** 106:8 313:15

**Jeffrey** 104:10,13 105:24 106:7, 10,17,18,19 302:22 303:11 313:16, 21

**Jennifer** 5:22 9:5 103:13 129:11, 12 189:6 221:15 223:7 236:1 237:12 241:8 249:10 252:23 255:2 290:21 319:22 336:15 344:21 347:24 358:14 396:17 397:22 401:16 408:9 414:8 427:4 430:8

**jerk** 272:11

**Jess** 6:4

**jewelry** 148:20 149:10,13 150:9 151:10

**JGS_MAYSONET** 191:4 192:4 196:19 199:22 321:11 323:12

**Jimenez** 108:1,7

**JJM** 323:23

**job** 41:23 42:1 44:8 55:5 74:12 98:20 174:15 207:7 387:1

**jobs** 74:12,14 98:22

**Joe** 137:17,18 138:8 143:23 203:24 204:4,7,11,14

**Johnson** 20:22,23,24 21:3

**join** 58:4,7 70:14 88:9 96:10 99:15 105:18 108:21,23 118:15

**joined** 40:7 57:9,11 58:10 67:10, 13,19 69:24 70:4 96:16 106:8

**joining** 9:2,3,6,12

**joins** 430:4

**joint** 113:16,17,22,24 114:2 161:18,19,24 162:3 163:10,19 165:2 168:20,21,24 169:4,6

**Jojo** 196:3

**Joliet** 369:3 375:4

**Jose** 5:5,8,23 6:14 7:1 32:20 33:2 109:2 256:4,7,19,23 321:2,12 331:19 359:3

**Jr** 5:5,9,23 6:14 7:1 321:13

**Juan** 5:5,8,23 6:14 7:1 256:23 321:12 359:5

**judge** 117:15 223:22 236:21 261:21,22 262:1,3,8,11,15,16,17, 18 346:23 347:3 353:15,16 354:13 356:22 363:18

**judgment** 361:4,9

**July** 188:8,11 212:7,8,24 219:1,5, 9,14,18,22 220:5 221:11 222:9 224:8 226:18 227:9,14 228:12 229:5 230:8,12 231:11,13 233:4 234:20 236:10 240:10 418:11 419:11,22 420:7,9

**Juma** 147:8,11,16 148:10,12,17 149:11 150:8,20,22 151:1,5,6,23, 24 155:10,17 156:11,14,21 157:7, 13,19,22 158:7 159:15

**Juma's** 148:20 152:24 153:24 154:6 163:8

**jump** 149:7,11

**jumping** 410:18

**juncture** 212:16

**junior** 37:20 38:2,13 39:2,4

**jury** 353:9,12,13,18 354:11

**Justino** 96:8,9,16,19 97:2,4,18 98:2,7,9,10,11 348:8,12,18,24 352:9 353:1

---

**K**

**Kathy** 5:17 332:17 337:1 345:5 358:9

**Kedzie** 36:12,13 137:6 181:13 206:18 207:5 210:13,14 261:9

**keeping** 126:11,12 145:14 155:22 169:16 172:22

**Kevin** 320:23

**key** 20:2,3,13

**keyboard** 17:21

**Keystone** 218:23

**kick** 96:11 154:2 215:20 216:14

**kickback** 121:6

**kicked** 96:13 216:10 228:20,23 229:1

**kicking** 124:12 215:20

**kid** 16:24 18:9 22:8 46:14 51:6,23 52:16 89:17 134:7 149:22 171:15 183:19 196:5 259:20 301:9 377:8

**kidding** 110:10

**kids** 53:6 74:20 85:5,6 95:23 134:22 156:10 259:19 301:12 356:1

**killed** 198:5 209:23 210:17 211:23 246:20,22

**killing** 185:9

**Kimball** 61:24 62:1,2,19 63:4 64:8, 18 65:1,10,20 67:11 69:17 70:5,16, 20 71:22 72:7 74:9 75:1,12,22 76:15,20 78:9,13 87:8 88:7 94:8 95:4,19 96:6,17,24 104:17 105:11, 23 106:15 107:9 112:11 125:1,9 126:24 128:6,15 135:20 152:21 187:17 209:16,24 210:6,7,9 246:16 247:2

**Kimball-wabansia** 165:6

**kind** 17:2 18:20 24:17 25:1 26:5 27:9 30:3 46:1,19 60:14 64:5 66:7 70:17 90:1 92:20 95:2 96:23 98:11, 13 99:17 100:12,19 106:19 107:17 112:15 117:18 119:19 120:4 126:10 143:14 144:1,2 147:5,21 148:4,7 153:21 157:11 158:18 171:20 176:7,9,11 182:16 261:23 269:19 310:2 326:22 338:12 342:10 365:21 370:22 373:21 413:1

**King** 57:8,12 59:7,10 60:5,11 63:23 66:6,19 70:6 76:23 77:7 79:16 82:2 87:16 88:9,14 89:5,6 91:1 93:5,21 101:18 103:8 106:9 109:23 110:1,5 112:10 113:4 114:20 116:12 149:4 160:22 161:6 180:7 195:21 215:6, 8,11 259:15 340:6,7

**Kings** 57:10,17 58:1,5,12,17,19 59:12,13 60:19 61:3,20 62:5,9 72:5 76:22 78:8 79:4 81:9 89:21 94:5,7, 19 101:20 103:4 105:10 108:22,23

JOSE JUAN MAYSONET JR., 04/16/2021

109:3,5,14 110:14,16,18 122:15
135:19 152:3 169:17 172:15 198:6
211:4 224:23 234:21 243:5 244:17,
22 367:23 368:3,10,23 374:4,5

**kit** 43:8

**kitchen** 155:7,19

**knee** 48:12

**knew** 46:19 59:2 85:2 94:6,20,21
95:9,22 96:2 108:17 115:16,20,23
138:21,24 147:20 157:7 167:19
169:1,24 170:6,11,12 176:7,12,19,
21,22 177:2 180:10 185:4 208:5
226:18 338:21 339:11 361:12
363:23 373:14

**knife** 370:23 371:6 374:17

**knocked** 271:24

**knowing** 157:5 188:2

**knowledge** 67:5 79:12 90:14
188:2 204:13 212:4 278:23 305:10
344:4 346:14 360:12 402:13

**KW** 62:3 105:23

----

**L**

**la** 216:4,5

**lady** 306:14

**laid** 400:21

**language** 47:19 207:24 362:24
430:12

**lapels** 195:2

**larger** 63:15 122:15 255:21,23

**Las** 154:23

**lasted** 379:13,14

**late** 33:13 52:21 53:14 61:3 67:6
68:21,23 89:20 90:11 130:23 132:2
186:14,18 383:20

**Latin** 57:8,10,12,17 58:1,5,12,17,
19 59:12,13 60:5,11,19 61:3,19
62:5,9 63:23 66:6,19 70:6 72:5
76:22,23 77:7 78:8 79:4,16 81:9
82:2 87:16 88:9,13 89:4,6,21 91:1
93:5,21 94:5,7,18 101:19 103:4,8
105:10 106:9 108:22,23 109:3,5,
14,15,22 110:1,4,5,6,8,13,14,16,
17,18 111:12,20 112:10 113:4
114:19 116:12 122:15 135:19
149:3 152:3 160:21 161:6 169:17
180:7,11 198:6 224:23 234:21

243:5 244:17,22 259:15 340:5,7
367:23 368:3,10,23 374:4,5

**laundry** 141:8 143:2,9,10 144:14,
15,16,20

**law** 413:1

**lawyer** 82:3 217:16 230:3 234:3,14
238:14 240:2 241:18 261:13,14,18
279:16 280:5,6,8 299:24 307:4,6
308:22,23 312:3,10 323:8 329:4
339:12,18 343:5 352:22 354:13,17
356:6,7 361:24 362:23 363:16
364:4 395:14,15 405:11 423:24

**lawyers** 119:6 233:23 357:9 421:6

**lay** 229:5,7 249:2 252:3

**laying** 401:1

**lead** 80:9 401:4

**leader** 67:10,20 68:12,15,18,19
71:1,21 72:3,4,5 73:24 107:8

**leaders** 68:3 73:16

**leadership** 60:19 61:2 66:12,15,
16 72:18 74:2 118:11

**leading** 401:11

**learn** 209:14 350:12 386:17 421:20

**learned** 41:3 45:10 151:15 421:17

**learning** 17:4 26:6 38:21

**leave** 146:10 232:10 248:16,17
258:22 260:16 277:15,16 281:9,12,
13 288:21 290:1,5,7 294:10,13
299:17 300:4 312:13 327:14,17
372:1,11,21 391:7

**leaving** 216:9 248:5,8 280:2,9
307:15 316:8 325:10 327:10
372:16

**left** 8:19 17:2 20:15 78:7 98:6,7
140:24 146:11,13 149:17 172:12
175:15 192:17 194:7,17 203:11
227:18 248:17 260:17 262:22
273:14 274:15 278:20 279:8,18
281:7 282:12,15,17 283:6 290:3,12
291:16 292:10,11,23 293:12 296:7
307:10,11 327:22,23,24

**left-hand** 197:1

**leg** 149:3 342:11

**legal** 5:13 56:22 180:1 334:18
362:2 363:4,7,12

**lend** 123:12

**Leo** 59:7,10 215:6,8,10,11

**letting** 216:24 218:18 225:19
308:3 338:12 401:7,20 414:6

**librarian** 33:23

**library** 33:24

**lie** 33:16 38:23 56:21 112:13
171:20 310:21 390:14 411:4,11

**lied** 418:10 419:10

**lies** 350:9

**life** 41:12,13,15 79:22 82:6 85:1
118:19 126:8 185:5 234:17 357:17,
18 386:9

**lift** 269:22 270:4

**light-skinned** 143:17

**lights** 164:22

**likewise** 7:12

**lineup** 214:18 217:17,22,24 218:4,
6,9,11,15 225:7

**lion** 215:9

**listen** 28:11 239:16 294:4 306:3
420:1,8

**lit** 114:1

**literally** 97:6,22

**live** 15:7,8,12,18,20,24 18:8,9,14,
24 19:3,4,5 25:21 32:14,15,17
34:14 35:16 37:2 49:2,16 50:24
100:10 206:10,13,16 207:1,4

**lived** 18:11 33:18 34:13 50:20
52:22 87:5 90:14 100:11 106:12
147:17,19 260:23 305:4

**lives** 15:22 18:5

**living** 34:7 36:12 47:24 76:8,9
100:12,15 104:18 137:3 139:15
140:9,11 178:16 179:4,5,6 199:14
206:23 234:1 261:5,7,8

**Lluvia** 95:17,21,22 196:21 302:11
304:8,13 305:3 311:5 312:19
313:14 314:8 348:14 399:21,23
400:1

**located** 25:6,7 69:15 148:1 181:11

**location** 197:13

**locked** 173:4 245:10 303:7 314:16

**lockup** 229:14 230:19 270:12,15,
18,21 271:8 273:2 274:11 277:19,
20,22 278:2 280:11 328:5

**long** 10:17 11:13 16:22 17:1 18:11 22:11,24 30:9,17,23 32:12 34:12 38:6 40:1,2 43:17,24 44:1 47:4 49:11 50:17 58:3 60:1,11 65:14 77:10 79:14 91:10,20 98:2,4,5 100:13 110:9,21 112:8 152:7 153:2 154:22 163:7 169:12 174:21 185:5 195:15 207:18,19 226:4 230:11 239:19 240:7 247:12,15 267:14,15 268:8,20 271:9,11 277:22 278:4 289:17,19 290:3,5 294:21 295:5 297:24 299:3,13 300:23 303:24 307:22,24 371:5 377:6 378:8 379:9,13 384:17 388:13 393:24 394:2 395:5,7 406:5 412:8

**longer** 11:16 129:16 377:13

**looked** 12:10,22 13:14 101:8 143:11,24 144:7 173:5 252:9,12 303:23 327:8,10

**lorazepam** 334:22

**lose** 365:19

**Losing** 184:10

**lost** 25:4 182:16 188:6 377:12 382:6

**lot** 7:24 17:4 24:24 26:23 45:10 48:13 82:15 88:2 99:13 127:5,19 145:21 151:12,16 152:17 154:16, 17 171:18 174:16 185:10 285:24 286:10 287:7,23 382:6

**lotions** 21:9

**loud** 7:17 116:20,24 117:3,5 171:7 175:16 248:11 275:14

**Louis** 210:9,11

**love** 17:12 40:18 73:5 125:14 183:20

**loved** 183:13

**lovely** 48:7

**lucky** 172:12 371:3

**lunch** 129:11,13

**lying** 352:14 381:23 424:15

M

**machine** 22:9 23:13 141:9

**machines** 22:15

**Macho** 68:5 71:13 72:10 73:4,15, 24 74:3,5,6 159:7 162:9,11 169:11 171:2 175:7,20 176:5,15,19,21,23 177:5,7,13 183:12 184:17 185:4,15 192:2 196:8 197:11,23 200:1

**Macho's** 68:6 185:21 195:8,10,11, 16,17,20

**mad** 50:9 125:5 173:12 247:22,24 273:20 279:1,19 280:7 282:19,20 293:16 302:7 335:14,15 392:5

**Madame** 407:24 413:19

**made** 37:24 39:3 69:21 122:3,24 182:11 204:20,22 242:7 265:5 295:3,21 309:20 323:20 329:15 331:22 332:21 352:23 404:9

**mailbox** 48:15

**maintenance** 21:21

**major** 209:2

**majority** 84:22

**make** 16:8 17:9,14 21:8,9,19,20 23:18 26:4,23 47:24 48:20 52:1 54:14 66:17 79:14 86:5 87:11 94:15 109:1,11 115:11 116:19 119:7 121:12,14,18 122:2,4,24 125:4 126:6 129:3 131:8,9,18 132:17 136:15 145:5 160:15 164:14 165:22 173:16,22 177:24 179:19 183:23 185:5,6,12 190:12 211:5 220:11 223:21 238:19 246:24 249:15 254:22 255:10 262:7 264:23,24 266:19 273:15 299:11 302:17 323:4,5 333:24 355:10 360:3 361:12,21 362:20 363:9 365:7 375:20 380:5 381:9 383:5 390:15 401:14,20 403:5 423:24 426:19,20,23

**makes** 12:13

**making** 29:20 55:6 85:7 118:17 119:16 122:19 123:15,18 124:15 127:1 130:22 131:23 156:23 220:3 391:21 428:7

**Maldonado** 107:24 108:1

**male** 308:15,17 311:18,21 312:8, 12 313:19 314:10 315:14,19 398:7, 8,11,16,18 399:3,12 400:14,18,21, 24 401:24 402:7,15,16,19 404:16, 18 405:9,13 406:4,8,16,17 407:18 408:8 410:11 412:2,5,6,9 418:9 419:10,21 425:20 427:16 428:3,21

**man** 40:22 51:17,18 61:5 101:8 117:6 153:21 165:4,8 171:3 175:21 176:6,16 178:1 216:6 248:10,13, 19,23 272:7,20 305:19 308:7 310:19 389:1

**manufacture** 22:3

**manufacturing** 21:12

**marijuana** 54:18 56:24 57:1 125:7, 11,14,17,20,22,24 126:2,4,6 130:19 334:18 383:6,9,17 384:1 385:15

**mark** 249:8 319:20 324:9 330:14 358:6,12,23

**marked** 320:13 324:13 331:13 333:8 364:11 413:4

**Martin** 229:24 230:1 239:19 240:3 423:6

**math** 416:3

**matter** 5:8 54:4 75:20 122:17 132:12 173:23 200:1 205:12 213:13 238:12 248:20 330:5 349:15

**matters** 221:22 238:7

**Maysonet** 5:5,9,23 6:14,19 7:1,2 9:16 10:1 14:13 15:6 19:12 20:18 25:10 26:9 27:7,24 31:22 32:4 34:12 41:10 54:24 57:4 77:13 78:5 80:18 81:18 92:18 99:24 108:21 124:4 129:8 130:16 147:15 177:11 183:2 184:14 189:4 190:15,18 193:24 199:20 203:11 208:18 213:19 219:20 221:10 222:20 224:7 232:15 237:24 239:7,16 240:21 241:12 244:16 249:7,8,21, 22 250:15,16,22 252:7 255:8 256:4,7,19,24 257:14 258:8 259:8 282:5 283:4 319:19 320:2,11,14 321:2,13 324:9 325:3 330:20 331:12,13,19 332:9 334:1,6 348:3 358:16 359:4,5,10 367:5 398:3 409:3 413:4 418:8

**Maysonet's** 212:17

**Mcgrath** 6:6 430:2

**meaning** 22:18 158:11 159:7

**means** 167:21 168:2 182:23 393:13

**meant** 350:19 382:16

**meantime** 397:21

**mechanical** 22:5

**media** 5:2 77:24 78:3 130:11,14 203:5,8 258:3,6 319:15,18 387:12 397:12 430:16

**Medicaid** 298:3

JOSE JUAN MAYSONET JR., 04/16/2021

**medical** 31:23 373:19 374:13 376:19 377:12 380:15 381:1,2,5, 20,21 382:11,12,19 383:6,9,17 384:1

**medication** 297:11,19,23 298:4,5, 8,12,16,19 299:1 334:24 335:1,4,8, 11 376:23 377:10,17,18 378:3,13, 17 382:24 383:1,2,4 426:9,10

**medications** 377:15 378:24 380:7,11 382:23 385:9,12

**medicine** 297:14,15,18,21 299:12 377:24 384:5,12,13

**meditation** 371:24

**meet** 10:19,22 50:11,19 95:21 148:12 150:20,22,24 163:23 180:8 262:13,14 388:18

**meeting** 10:14 11:13 12:1 329:13 406:17,21 407:13,14,15,18,19 409:4,5,24 410:10,12,18 412:5,6 427:15,17,18 428:2,3,5

**meetings** 388:20 404:17 406:3,16 412:10

**Megan** 6:6

**member** 57:5,7 70:1 99:18 101:19 109:3,13,19 118:13 135:19 204:15 243:4 368:18

**members** 72:20 75:2 78:14 96:5 113:5 121:16 126:9 169:21 224:11

**memorial** 14:6,7 197:17

**memory** 426:11,13,16

**men** 51:17 111:10 218:7 348:15

**mental** 32:1 379:20 380:1,2,10 381:2,5,12 382:12,19 383:23 385:23 386:8

**mentality** 90:20

**mention** 174:16 175:12 185:8 303:3 314:7

**mentioned** 29:13,14 115:15 139:11 143:18 273:21 387:11

**mentioning** 280:8

**mentor** 157:11 170:5

**mess** 60:4 102:15 116:13 123:6 164:12 168:10

**message** 200:5,6,23 201:11

**messages** 200:20,24

**messed** 207:16

**messing** 112:17 368:7,12,24 390:19 392:4

**met** 11:7,19,22 12:2 52:13,16 76:12 118:6 147:4,5 148:13 149:24 150:6 153:22 156:11 160:11 178:20 184:22 205:12 206:24 230:5,6 251:3 257:7 311:15,18 313:18,19 314:22 340:13 388:19 398:16 400:18 425:20 428:6,17

**metal** 289:14

**mid-size** 106:23

**middle** 67:13 161:22 383:21 405:6

**midnight** 79:23,24

**Miedzianowski** 137:17,19 138:8 139:4 143:23 144:18,23 145:2 150:5 153:1,3,24 155:2 156:2 157:7 168:17 204:1,4,7,11,14,21 205:3,4

**mind** 169:8 407:3

**mine** 24:12 147:5,6 200:23 241:21 259:9 339:9

**Mingey** 6:2 230:20 231:3,12 232:15 245:6,22 246:5,11 247:6, 12,18 249:2 251:4 252:17 253:3, 15,20 256:14 257:8 266:21 267:13 268:2 270:10 271:5,9,19 273:5,7, 11,14 274:3,14 315:16 402:17 410:14,22 411:18

**minor** 208:23

**minors** 180:2

**minute** 83:5 217:19 260:18 265:3 268:24 299:4 300:24 396:23 412:3

**minutes** 11:3,15 77:18,20 83:6 129:15 130:2 202:12,19,20 247:14, 15,16 257:19 268:10 319:7,10 366:13,14,18,19 396:4 405:3 412:1

**mis** 123:24

**mischaracterization** 73:19 291:6 292:17

**mischaracterize** 67:16 73:21 409:9

**mischaracterizes** 120:6 124:1 295:15 400:6 405:18 407:22 416:9

**mischaracterizing** 91:14 355:2

**misdemeanor** 209:11

**misrepresent** 254:5

**misrepresenting** 254:23

**missed** 213:10

**misspoke** 205:19 236:2

**misstates** 290:18 292:14

**mistake** 136:10

**mistaken** 292:21

**misunderstanding** 91:17

**misunderstood** 411:13

**mix** 18:21 21:23

**model** 53:23

**Molotov** 367:7,23 373:5,11

**mom** 15:8,12,19,21 18:1 19:4,9 26:2,4 32:15 37:7 45:24 46:9,16 47:3,15,23 49:1,12 50:1,5,14,20,24 52:6 53:4 54:5 139:19 140:13 146:17 179:5 182:17 183:13,14,20 184:10 185:10 297:15 298:5 368:11 373:2,10 384:21

**mom's** 298:8,18 335:1

**moment** 19:19 139:2 145:13 160:12 226:13 239:21,22 260:4 278:19 281:8 288:21 290:6,13 293:12 299:2,3 312:21

**Monell** 237:9

**money** 29:19 52:5,8 54:12,15 55:6 56:19 61:13 65:17 67:1 85:7 89:8 98:18 101:7 104:23 108:23 109:1 118:17,23 119:3,5,6,12,16,20,22 120:23 121:12,14,18 122:1,2,4,9, 10,13,20,24 123:1,4,12,15,18 124:15 126:6 127:1,22 129:2 130:22 131:9 132:17 136:16 142:20 157:17 165:11,12,20,21,22 170:21 173:23 174:9,10,12,20 177:5,6 178:12 180:9 204:5,22 241:21 243:15 244:14,22 245:3 279:2 342:23

**Monte** 106:22

**month** 23:3 24:14 153:12 156:6 379:6,8,13 394:4,5

**monthly** 130:23

**months** 153:13

**Montilla** 6:1 230:20,21,22,23 231:4,12 232:15 245:7,22 246:5,12 247:6,13,18 248:1 249:2 251:4 257:8 266:21 268:2 270:10 271:5,

JOSE JUAN MAYSONET JR., 04/16/2021

9,13 272:2,3,4,15 273:8,11,13,16, 21 274:3,4,14 275:9,10,13 277:16, 19,20 296:8,13,16,20 297:5,10,17 298:11 299:7,22,23 301:2 306:1, 11,13,19 310:5 314:22 315:7,15 327:12 402:17 403:3,7,9,11,16,18, 22 404:7 407:4 410:13,22 411:19 412:20 428:12

**mops** 265:18

**Morgan** 262:2

**morning** 5:22,24 6:3,19 10:22 23:6 43:16,19 186:6,7,21 190:7 210:4 233:16 258:9,13,17,21 262:13,20 295:10 314:9 316:8,17, 18 318:4,5,6 321:4 327:5,20 339:4 350:15 355:12 356:4

**mother** 18:12,16 25:24 32:16 50:11 53:9 142:21 148:14,15 178:16 179:6 184:24 205:16,17,20, 21 207:1 367:12

**mother's** 18:1 32:16 137:3 143:1 206:19 367:8,24

**motion** 13:12 237:16 329:14,18 330:14 341:17 342:4 343:2,12 344:2 345:15 346:23 350:17 363:18

**motions** 13:10

**motorcycle** 30:14,15,16,17,18,21, 22,24 55:22

**mouth** 114:1,2 146:7

**move** 32:4 36:10 44:1 65:10 286:19 317:14 348:1 364:8 404:14 414:8 423:4

**moved** 32:7,10 35:2

**movement** 136:6 286:18

**moving** 34:21 78:12 202:5 322:1

**MTV** 38:11

**multiple** 27:19 59:13 364:15,16 419:15

**murder** 175:2 180:23 181:1 212:9 226:15 228:14 229:12 231:15,16, 17 232:16 233:5,6 234:20 235:1,9, 11,13,21 236:7,9 238:3 239:11,20 243:19 244:11 245:5 246:14,15,19, 20 247:2,4,8,9 258:14 266:24 280:19 318:7 328:3,14,15,23 330:3,4 350:14 351:19 352:20 354:22 355:5,11,20,22 356:5,17 357:3 361:22

**music** 16:3,8 17:9,10,14 29:20 40:16,19 45:6 116:22

**musical** 17:19

**musician** 45:7,8

**mustache** 143:14

**mute** 396:11 430:10

**muted** 427:3

---

**N**

**naive** 117:9

**named** 329:3

**names** 52:15 58:1 71:4 108:14,18 111:16 227:7 302:10,13 303:10,21 304:1,8,15,22 305:1 311:5 312:19 313:17 314:1 399:21 400:2,11,13 410:16

**narrative** 343:19

**Nation** 58:13 60:5 79:15 204:16, 17,18

**National** 136:5

**natural** 40:23 357:17,18

**nature** 294:16

**necessarily** 94:2 113:7 336:18 363:6

**needed** 77:9 119:20 157:1,20 339:11 372:13

**neighborhood** 60:12 61:17 69:1 84:12,13,18 85:10,14 86:11 90:13 93:4,8 95:9 97:22 99:12 100:9,11 102:3,24 106:11 107:13 123:11 133:16 138:22 149:4,6 150:22 156:10 157:3 181:12,14,16 198:7 199:14 209:18 211:5,13,15,20,22, 24 212:2 218:23 230:5 259:19 305:3

**neighborhoods** 99:14

**neighbors** 95:2

**Neil** 329:3,6,9,11,14,17 330:1,2,7, 10 332:3,7 335:17

**nerve** 297:22 376:22 379:17 426:9, 12,13

**nerves** 297:11 378:24 379:16

**nervous** 114:9 297:13 298:8,10 335:12,13,14 377:2,20

**news** 82:5

**newspaper** 41:18 42:3,5,15,20 43:20 44:5,18 53:21 55:5

**newspapers** 43:1,5,17,23 44:4,7 51:20

**nice** 16:21 40:14 101:1,9 107:4,5 116:19 118:8 155:23

**nickname** 57:16,22 59:4 71:12 108:3,4 195:14 205:11

**nicknames** 57:24 58:24 108:15

**night** 113:20 114:14 181:22 182:1, 4 183:7 184:7 186:14 197:23 308:1,11 309:21 314:4,16 348:9 350:13,14 351:19 354:23 356:7 383:20,22 384:24

**nightmares** 384:15,18,19,20

**no-no** 161:2 173:2 180:8

**nobody's** 227:10

**nod** 7:18,20

**Nodding** 185:18 270:19 413:20

**nolle** 237:16

**nonsense** 385:3

**normal** 45:19,20 52:18 78:19 86:4 134:7,21 370:10

**North** 5:15 15:9 36:12,13 137:6 148:2 206:18 207:5 209:15,23 210:9,13,17,22 231:18 232:17 246:16 247:3 280:18 348:15

**Northern** 5:11

**northwest** 210:5

**noted** 409:19

**notes** 41:3 395:19

**notice** 380:21

**number** 5:10 10:8,10,11 21:9 22:16,17 59:23 60:1 66:22 75:2 84:15 85:22 100:20,21 103:5 104:11 105:4 107:18 110:23 111:3 137:9 139:6,7 183:16 191:13 200:14,15,18,19 214:7 249:9,22 250:16,23 256:11,14,20 257:10 269:14 283:10 284:21 288:3,17 319:20 320:14 324:9,13 325:3 330:21 364:11 373:22

**numbers** 191:7 250:9 325:15 411:3

JOSE JUAN MAYSONET JR., 04/16/2021

## O

**obedient** 28:18

**obeying** 46:5

**object** 67:21,22 68:15 72:24 73:18 81:2,13 91:24 132:3 138:15 150:12 170:8 172:16 213:21 222:4 226:21 238:6,8,13,22 239:12 240:17 291:5 347:11 363:11 386:2 392:18 393:2, 12 401:7 403:10 420:18 425:4

**objecting** 238:14 403:11 416:22 429:22

**objection** 54:21 62:10,11 63:18 71:24 79:5 89:22 90:4 91:13 92:16 95:6 97:11 120:6 123:24 128:7 131:1 147:12 166:15 177:1 182:22 183:8 186:11 276:8 282:2 290:17 291:21 294:15,23 295:14 296:17 300:12 301:15 306:7 309:13 314:12 321:6 329:23 342:5 343:14, 16 344:15 345:22 346:4 347:4,5 348:16 349:16 353:20 355:1,14 356:11 360:19 361:24 364:2 367:16 368:4 369:14 378:7 381:4 389:12,22 390:8 392:19 398:21 399:5,16 400:5 401:2 402:2 404:19 405:16 406:22 407:21 409:7,19 410:2 415:21 416:8,18 418:14 419:13 421:1 424:19,20 426:17 427:19 428:23

**objections** 347:12

**observed** 401:24 403:17

**obtain** 348:9

**occasion** 6:10 49:1 283:5 288:19 394:22 423:16

**occur** 150:8 374:6,21

**occurred** 212:23,24 224:10

**occurring** 69:2

**of-age** 179:24

**offend** 112:20

**offended** 271:17

**offending** 119:4

**offer** 279:2

**office** 228:16,17

**officer** 134:9 137:9,12,15 143:22 144:11 168:9 172:1 205:4 218:16 225:11,12 227:22 228:9 229:5

252:8 270:14 274:11 278:8 297:16 299:5 301:4 305:17 315:17 402:10, 18 410:15,23 411:22 421:1

**officers** 137:7 139:5,8,21 141:3 142:10 172:3 266:5 369:20 411:1, 2,6,14,16

**offices** 5:15

**older** 37:2 51:15 135:14 208:5 233:9 381:19

**oldest** 233:14

**Oldsmobile** 55:21,24 56:12

**Olga** 111:18

**one-time** 168:12

**ongoing** 32:2

**open** 70:16 85:19 105:10 116:19 129:12 136:3 139:12 263:2 269:16 273:9,12,13 276:7 278:9 365:16 366:1 426:7

**opened** 68:20,23 69:20 71:2,5 74:24 156:7

**opening** 70:19

**operated** 183:16 342:11

**opp-** 90:21

**opportunity** 24:18 189:7 191:17

**opposed** 27:10 304:15 381:12

**opposite** 69:10 86:9 90:22 211:6, 10,21 264:5 373:24 374:3

**order** 109:1 110:22,24 245:20 361:15 395:1,4,11

**ordered** 169:1 248:3 278:8 300:4

**organization** 65:9 78:20

**organized** 87:3 105:2 155:23 395:24

**original** 96:5

**originals** 196:17

**ounce** 131:18

**ourself** 89:1 105:3

**outlook** 386:8

**overturned** 237:2,6

**overturning** 360:17

**owned** 56:12 148:10

**owns** 25:21

## P

**P-A-N-T-O-J-A** 259:12

**P-A-P-O** 199:3

**p.m.** 430:18

**packet** 148:9

**pages** 191:7,17 281:17 282:1,7

**paid** 24:2 145:24 156:19 174:6,17 245:2

**pail** 244:10

**pain** 184:8

**pair** 279:11,12 281:20

**Pamper** 206:8

**Pantoja** 259:10,11,13,15 260:23

**pants** 198:24 309:6,7 425:2,11,12, 13,17,19 426:2

**paper** 23:18 246:4 248:10 249:13 250:3,7,10 251:1,2,11 253:11,12 254:1 261:23 262:4 269:21,23 270:2,5 315:6,9 330:18,22,23 407:10 414:18

**papers** 12:23 42:7 190:8 316:5 317:8

**paperwork** 23:16

**Papo** 198:18 199:3,10

**para** 363:4

**paragraph** 360:7,9

**paralegal** 8:21,22 363:5

**parent** 46:13

**parents** 25:23 37:18

**park** 29:6 43:14 61:17 90:13 100:16 103:5 114:18,19 136:5,21 138:22 161:14,15,23 163:9,13,14, 15,17 168:16

**Park's** 76:24 77:1

**parked** 114:16

**parks** 45:4

**parole** 394:10,13,14,17

**part** 22:6,11 32:7 58:12 69:1 82:6 88:19 115:8 120:18 121:2 190:8 199:10 200:6 210:10 256:13 340:10,22 413:12

JOSE JUAN MAYSONET JR., 04/16/2021

**participate** 40:4 221:10 356:9,13

**parties** 5:20

**party** 148:7 418:2

**pass** 116:12 261:23

**passed** 153:9 188:22 313:23

**past** 26:23 335:1 382:1

**patience** 395:21

**Paulnitsky** 6:1 212:11 214:1,4,13, 14,20 215:12 225:16,17 227:5 228:7,10 231:1 263:7,9,18 264:3, 13,16 266:13,19 267:11 268:20 269:9,12 270:4 271:4,19 272:6,13 273:6,18,23 274:17,19 275:19 277:18 318:10 327:12

**pause** 213:20 221:7 336:20

**pay** 26:4 52:7 119:10 123:4,5,13 141:24 146:3 152:7 155:16 170:22 174:7,11 175:18 177:4,5,20 185:16 243:12,15 244:22 245:1 276:11 342:23

**paying** 122:23 165:24 167:6 168:4 170:14 338:1

**PC** 372:1 375:8 376:4,6

**peaceful** 144:7

**peacefully** 66:21 144:8

**pee** 308:4

**peed** 425:18

**peewee** 70:7 71:12 73:3,17

**pending** 8:11 212:14 213:12 220:9 221:21 222:10 235:22 406:12

**penis** 313:3

**people** 23:8 24:17 28:23 29:2,4 51:7 52:1,13,16,18 58:13,15 59:1, 23 60:1 63:16 64:19 66:22,23 73:11,12 74:19 82:18 83:12 84:23 86:2,19 87:5,12 91:19 92:2,13 94:6,20,21 96:23 103:22 105:20 108:14,17,18 110:24 111:2,3 116:4 117:11,13,15 119:3,7 120:21 123:23 127:19 128:1 132:8,13,14 134:18 136:12 142:7 149:16 165:20,24 169:23 171:19 173:12 198:16 204:23 211:6,7,10,14,17 226:17 230:6 244:19 299:19 300:17 302:19 304:23 305:14 310:19,20 331:18 337:12 359:3 363:4 367:20,21 384:10 386:14 388:4 421:19,22 423:18

**people's** 304:14

**percent** 120:15 121:6

**percentage** 120:17 122:22

**perfect** 36:4 70:17 83:17

**period** 38:20 39:15 49:3 168:11,13 174:11 334:8 365:20 369:4 379:11 380:19

**Perjury** 352:4

**permission** 65:4,24 66:1,2,4 76:1 105:9 167:17

**person** 10:20,23 11:10,12 21:17 61:6,8,12 73:6 86:12,15,17 90:18 92:14,22 93:17 101:14 105:20 114:21 121:11 128:14 129:4 163:22 178:21 192:23 193:5 194:7, 16 201:14 338:13 380:8

**person's** 304:15

**personal** 128:16,18,21,23 140:22

**personally** 131:24

**petition** 212:15 213:13 358:1,15 360:10,15 361:3 364:12,20,23 365:15,21

**petitions** 362:14,16 364:16

**Petty** 209:2

**phone** 25:8 200:14,19 264:24 265:5 299:23 387:16 388:5,6

**phonetic** 107:24

**photo** 14:10 190:24 194:8,17 196:7,14,18,20 197:9 198:14 199:23,24 324:10,15,16 326:4,6,9 420:16,24

**photograph** 13:20,21 191:24 192:4,15 199:5 317:23 318:2,8 325:8,13

**photographs** 13:16,19 189:18,24 190:3 191:19 318:16

**photos** 14:8 189:5,10 190:8,16 196:17 203:12,18 324:22

**physical** 88:17 380:19 381:6,8,12, 15,21 382:12

**physically** 279:24 387:19 402:1 404:10

**physician** 383:23

**pick** 17:2 162:1 273:4 274:12

**picked** 212:6 214:15 215:1 349:2

**picture** 108:10 193:22 201:7,8,10 203:20 318:14,17,21 325:4,5 326:13,17

**pictures** 191:11 318:15

**piece** 118:17 251:11 261:23 262:4

**pig** 49:20

**pill** 377:2,18

**pills** 335:7 426:12,13

**pistola** 216:4,5

**pit** 18:21

**place** 78:21 143:8 153:24 155:23 212:12 267:7 284:20 289:3 290:24 372:12 397:19

**places** 375:6

**plaintiff** 5:23

**plaintiff's** 397:15

**plan** 237:14,20

**planned** 183:6

**plant** 21:14

**play** 31:19 40:19 41:4 45:3,10 145:19 171:21 173:1

**playboy** 185:2

**played** 40:9

**playing** 16:3 31:16 40:11,22 145:7 160:24 161:4 263:6 409:17 423:2

**Plaza** 43:3

**plea** 235:8

**plead** 221:14 234:24 238:2 239:10

**pleading** 236:7

**pled** 352:19

**plenty** 26:17,18,19,20 27:1,5,22 237:9

**pocket** 165:20

**point** 9:4 38:3,4 41:19 45:24 81:12 87:24 96:10,18 98:6 112:16 206:9 219:16 226:7 238:9,10,22 252:5 254:12,14 257:15 281:16 295:12 297:10 302:10 304:7 307:16 308:14 309:19 311:10 312:18,21 314:9 330:6,9 369:24 385:10 401:7 429:23

**pointed** 254:18 273:6,18 274:17

**pointer** 193:4

**pointing** 192:9 198:19 254:1,7,23 255:4 271:16

**Polaroid** 318:13,21 324:10,15,16 325:19 326:4 420:16

**pole** 102:13

**police** 13:4,6 117:24 118:3 136:4 146:9,17 159:3 164:12,18 171:24 173:17 208:20 214:17 218:13 226:5 227:12,21 229:5 233:19 260:6,20 263:22 264:1 266:3,11,16 278:12 289:16 295:11 297:21 298:6,15 299:5,18 300:5,16 302:3, 11,14 308:19,23 310:11 316:19 317:1,3,5 318:4,9,12,23 323:9 327:11,14,17,20,22,23 337:14 346:24 347:3 350:11,20,21 351:10 369:22,24 372:14 410:8 426:6

**policemen** 315:20

**Pontiac** 14:9,10 106:21 369:10,11 371:10,12 375:5

**pool** 122:15

**poom** 48:23

**poop** 308:5 309:7,9

**pooped** 309:6

**pop** 269:16

**population** 372:1 376:3,11,15

**pose** 7:13

**posed** 343:18 346:15

**position** 21:15,16 354:3 413:12 429:19

**possess** 370:20,22

**possession** 209:9

**possibility** 310:14

**possibly** 363:9

**post-** 213:12 364:19

**post-conviction** 212:14 358:2 360:14 361:3 362:14 364:12

**postconviction** 360:10 365:15

**posted** 244:10

**potentially** 353:22 364:1

**Potomac** 76:10,14 77:4,5 261:8

**pounds** 382:7,8

**power** 122:1

**powers** 105:10

**prayers** 198:2

**predicted** 237:11

**predominantly** 127:12 152:16

**prefer** 62:3 94:10,11

**pregnant** 316:12 317:5

**prep** 131:5 342:15 343:4

**preparation** 12:11 13:5,8,11,17 343:2

**prepare** 10:2,7,16

**preparing** 10:17

**prepped** 31:14

**prepping** 141:17

**prescribe** 378:2

**prescribed** 377:10 378:23

**prescription** 297:23 298:1,2 334:22 377:13

**presence** 323:6

**present** 8:16 9:1 26:10 144:21,24 203:22 205:3,5 212:19 228:6 234:14 252:20 261:11,14 262:3 279:16 299:5 307:4,6 312:4 323:19 349:14 351:19 386:1,8 402:14,21, 23 405:13 406:18,19 407:14,20 409:6,23 410:11 414:14 419:22 420:6 422:22 428:21 430:3

**presented** 342:4

**pretty** 22:8 23:14,15,21 31:8 65:5 75:9 101:6 108:14 125:10 152:10 237:8 300:15 304:5 383:14

**previous** 293:15 337:15

**price** 141:24 145:24 146:4 152:7 156:19 158:16,17 159:14 165:10 167:16

**prices** 160:9

**primarily** 207:12

**primary** 207:23

**print** 189:7 190:9

**printed** 9:18

**prior** 10:22 12:1 39:22 55:16 57:4 206:9 208:18 209:4 230:17,18 245:12 250:16 258:17,20 274:4 298:6 311:5 334:6 340:11 342:12, 22 376:18,21 377:7,21 378:11,15

390:23 392:13

**priorities** 117:19

**prison** 14:11 17:1,3 18:13 26:13 243:18 244:11 358:4 369:3 374:12 380:12,14 384:14 386:1,4,7,19 387:7,15 388:11 394:12,17,19,20

**privilege** 238:7,11 239:13 240:18 241:5 332:7 333:1 336:14 353:22

**privileged** 223:17,18

**pro** 358:1,14 364:12

**problem** 8:10 20:18 21:6 36:2,5 66:18,24 77:12 82:15 86:10 88:16 91:9,12 93:1,15 130:4 153:8 190:10 214:11 221:6 260:13 324:23 360:24 366:21

**problems** 77:9 81:21 82:8 87:13 121:23

**procedure** 12:19

**proceeding** 237:4

**proceedings** 430:15,17

**process** 21:24 22:11,20 383:8,14

**produce** 212:20 236:13 237:16,17 316:5

**product** 21:23

**profit** 131:7

**profitable** 126:5,7 130:19 131:19 132:1

**promised** 168:5

**prompt** 142:9

**property** 85:16

**propose** 236:15

**pros** 237:16

**prostitutes** 180:14,16

**prostitution** 180:7,8

**protect** 64:6 158:4 163:5 166:12 289:3

**protected** 156:17 175:13 372:14

**protection** 119:9 129:3,7 157:20 164:9 176:16 177:21 372:14 375:8 395:2,3,12

**protective** 371:19,21 372:5,9,17 375:11,21,23 376:10,14

**prove** 87:24 409:16

JOSE JUAN MAYSONET JR., 04/16/2021

**provide** 9:20 302:10,13 303:10 314:5,17 343:12 344:3,18 345:20 346:2,13 400:13,17

**provided** 312:18 313:9,21 316:3 347:19 356:15 372:9 400:2,11 424:24 425:1,11 426:2

**providing** 305:1

**psych** 377:23 378:17,21,23 380:24

**psychiatrist** 340:16 341:1,4 377:19 378:1,5,12 379:12 380:4

**psychiatrist's** 341:8

**psycho-medication** 427:1

**psychological** 37:8

**psychologist** 377:20 379:3,12 383:24

**PTSD** 380:23 383:18 384:1 385:4, 10,16,20

**Puerto** 32:7,11,14 33:19 34:7,13, 18,21 35:6,8,10,16 37:6 45:9 46:21 47:1,4,8,10 48:5 49:11,16,18 50:5, 20 58:4 143:16 146:21 167:13 178:18

**puke** 383:5

**pules** 95:5

**pull** 114:1 162:3 164:16 189:11,13, 16 255:13 319:22,24 358:18 409:13

**pulled** 164:20 166:4 168:18 171:7, 24 172:5,7 349:24

**punch** 20:14 149:12 276:1,3

**punching** 20:15

**punished** 50:5,10

**punishment** 46:23,24 48:9,13

**purpose** 364:13

**pursue** 169:14

**pushed** 144:3 266:1 276:17,21 277:4,8

**pushing** 263:8,10 390:13

**put** 21:10,18 22:9 26:24 29:17 32:23 83:22 90:23 93:6 108:10 113:14,24 116:23 119:24 124:18 149:3 156:12 158:18 165:18,19 171:7 187:24 188:6 190:11 207:22 216:14 217:2,23 239:23,24 240:1 245:21,23,24 246:4 249:14,21 255:23 264:4,7,15,22 266:2,17,22

267:3,5,11 268:16,22 269:3,21 270:1,12 272:24 273:2 274:10,12 276:21 278:11,13 279:12 280:16 285:16,19 286:9,12,13 287:2,17 288:6 289:3 310:4 314:21 320:4 324:3 330:20 348:4 365:21 370:24 371:2 372:5,9,17 373:14 396:24 397:3 414:9 429:19

**putting** 141:16 198:2 284:3 290:19 293:20 294:2 324:5 405:23

---

## Q

**qualify** 187:23

**quality** 66:18 179:13 193:21

**quantifies** 334:8

**quantity** 131:7,8,17 334:21

**quash** 341:18

**Queen** 109:22 110:1,4,7,8 111:20

**Queens** 109:14,15 110:13,17,20 111:12 180:11

**question** 7:10,11,13 8:2,5,11,12 54:22 62:7,11,12 67:22 68:16 73:1 76:13 79:6 82:10 89:23 90:5 91:14 97:12 99:19 109:11 124:20 128:8, 12 131:21 132:4 138:16 150:13 159:22 166:20 170:9 171:19 177:2 182:23 183:9 188:18 213:5 220:23 223:12 225:2 226:22,23 227:1 231:15 235:4 236:3 237:19 239:8, 14,17 240:22,23 241:12 265:15 280:3,24 281:10 282:3 289:24 290:6 293:10,14 294:16,24 301:16 306:8 307:15 314:13 315:7 321:7 332:18,23 333:21 336:22 337:1 343:17,21,22 344:16,20,23,24 345:2,3,12,23 346:5,6,16 347:5,7, 16 354:7 355:2,4,8,10,15 356:12 360:19,23 361:15 362:1,7,8,9 363:6,14 364:6,19 368:5 369:16 370:2 373:8 380:22 381:5 382:4 390:20 392:19 393:1 401:3,23 403:12 404:20 405:17 406:10,12, 14,23 407:8,23 408:12,23,24 409:21 410:3 414:8,13 415:22 416:14 418:13,15,20,23 419:1,14 420:1,19 423:2 424:2,20 425:5,7 427:20 428:20,24

**questioned** 224:9

**questioning** 129:9 291:24 309:17 397:17,22

**questions** 7:24 81:4,10 82:9 166:17 212:21 213:21 219:22 220:5 221:16,24 222:2,6,8 224:4 226:2,8,10 227:6 229:9,10 231:8,9, 13 234:2 235:20 236:14 270:11 280:1 281:5,8,11,12 282:10 342:6 343:17 344:12 345:7 346:15 347:22 393:1 395:17,18 398:6,11 408:20 409:11,18 413:17 414:15 415:16 416:21 421:4,6 429:14

**quick** 77:15 191:11 202:17,18 257:15 296:9 366:5 395:23 397:3 401:17 427:4

**quickly** 237:8

**quiet** 70:17 86:24 137:21,23 138:7 144:6,19 146:7 151:14 162:15 163:5 169:13,16,20 172:15,22

**quietly** 136:16 157:4 162:18 165:18

**Quinones** 111:18

**quit** 36:20,21 37:24

---

## R

**Rafael** 18:24 19:2 50:11,19,24

**Rahe** 6:3,4

**raid** 135:1,5 139:9 144:10 146:17 150:10,19 151:3 153:2

**raided** 133:8 135:1,15,20 136:22, 23 137:7,19 138:10 139:2 140:4 153:10,18 156:5,13,14 158:8

**raiding** 135:23

**raise** 48:1 248:2

**raised** 51:6

**raising** 248:2

**ran** 123:22

**Randolph** 42:14 43:2

**range** 132:5

**rank** 118:16

**reach** 70:12 182:20

**read** 252:17 255:22 315:5 322:10, 13 332:17,19 333:15,18 334:1,3 336:24 337:1,3 345:4,5,6 359:20, 23 360:2 361:15,16 409:15 412:9 413:16,24 414:6 427:24 428:1

**reading** 325:15 414:2,12

Index: ready–respond

JOSE JUAN MAYSONET JR., 04/16/2021

**ready** 24:22 78:5 136:13 241:8 279:14 310:5 319:2 332:10

**real** 33:12,22 45:13 48:4 50:13,15 51:9 54:3 58:6,11 68:6 71:6,9 74:12,14 77:1 98:22 105:21 108:17 146:24 147:5,9 158:22,23 162:10 177:23 184:6,11 191:11 195:13 196:4,5 202:17 205:8 248:11 249:6 259:17 271:6 275:3 279:23 289:24 296:8 374:15,16 397:3 416:12

**realistic** 48:7

**reality** 429:21

**reason** 120:22 123:17 140:3 156:13 178:2 218:18,19 223:2 225:19 226:13 272:14 344:11 345:7 356:2 361:20 362:19 363:21 364:5 372:8 373:3 375:16 385:8 401:6,13

**reasoning** 223:18

**reasons** 241:16

**recall** 10:14 37:2,14,20 54:1 67:23 71:17 159:20 184:14 185:21 186:4 187:1 203:20 212:6,10 214:12 217:17 227:13 228:2 233:3 244:19 245:6,9,12 258:8 315:13 317:22 324:5 326:8,24 327:3,10 328:2 329:13 331:21 332:20 335:8 349:3,7 355:23 357:24 365:14 412:3

**recalls** 365:12

**receive** 24:6 379:19,24 380:2,10

**receiving** 31:22 32:1

**recently** 30:20

**recess** 78:1 130:12 203:6 222:16 241:7 258:4 319:16 332:14 367:1 396:7 427:9

**recognize** 196:6,13,19 199:4 251:10 320:24 321:3 326:6

**recollection** 38:9 132:2 233:15 350:1,7

**reconsider** 429:23

**record** 5:2,20 6:24 7:22 8:21 19:23 77:23 78:3 109:12 130:10,14 171:14 203:5,8 212:13 220:19 221:20 222:11,13,14,18 232:7 257:17 258:2,6 319:9,14,18 321:11 332:9,12,16,19 337:3 345:6 366:8, 23 367:3 396:5,9,18,23 397:1,3,4, 9,10,12,14,16,19 410:18 427:7,11 428:1 429:20 430:15

**recorded** 321:4

**recording** 16:8

**recover** 151:10

**red** 56:10 191:2 194:22 195:2 196:1

**Reddick** 236:21

**refer** 9:19 51:4 72:15 246:18 247:1 384:3 413:3

**reference** 124:21

**referencing** 124:23

**referred** 59:9 205:15 339:20,22,24 398:7

**referring** 97:2

**refresh** 169:8

**refused** 81:16 316:6,19

**regular** 98:16 101:5 174:15 378:2

**related** 97:19 379:16 380:16

**relates** 238:11

**relating** 340:20

**relation** 33:3,8 150:10 187:2 224:9 392:2 394:22

**relationship** 27:8,9,17,21 29:1 87:5 204:15 207:19 208:7,13 337:16,22 342:22 388:10,13,16 389:1,17 391:3 392:12

**relationships** 27:22 29:4

**relative** 297:20

**relax** 182:8 385:1,22

**released** 26:13 380:14 386:7,19 387:7,15 388:11

**relevant** 81:21 360:16 397:20

**relief** 358:2 360:10 361:3

**Relieved** 361:8

**remain** 75:2 219:23 220:6 412:23

**remember** 10:9 14:19,21,22 15:2 33:10,23 34:12 35:1,4,14 38:5 39:22,24 40:15 42:19 48:9 49:5,14 52:15 53:23 68:1,3,11 69:3 71:4,6, 7,9,11,15 82:18 89:8 98:4 100:22 101:12 104:12 106:24 111:16 112:2,5 113:21 122:3 123:9 137:5 151:16 160:21 161:21 162:17 171:14 173:2 174:1 182:15 184:23 186:9 203:13 204:2 206:5 209:17

214:3 233:2 286:17 289:1,23 291:12 295:7 316:3 321:8 323:21 324:7 326:3,5,11,17 335:4,6 340:4, 16,18,19 341:2,17,20 343:6,9 344:6 345:18 347:8,10,14 348:6, 20,23 355:16 357:8 364:19,21 371:9,11 374:3 378:9 379:7,10,11 409:22 410:6,8 411:4 412:7,14,18, 20,23 418:21 419:3,19,24 420:3, 15,21,23 421:2,16 422:23 423:2

**remind** 100:1

**rent** 26:4 148:8

**repeat** 154:8 226:24 227:1 246:1 288:22 291:4,23 294:18 336:22 354:7 419:5,7

**repeatedly** 355:3

**repeating** 254:16 280:9

**rephrase** 8:3 235:17 236:3 239:7 240:21 349:19 355:9 369:17 398:22 403:13

**rephrasing** 253:23,24

**reported** 404:13

**reporter** 5:17 6:11 61:7,10 175:24 249:19 257:23 258:1 314:22 315:1, 11,14,24 366:17,20 405:6 407:7, 14,19 408:1,2,6 409:5,15,23 410:7, 14 411:21 413:7,19,20 414:19 415:13

**reports** 13:5,6

**represent** 5:21 86:8,10 171:16 243:12 253:18 308:23 323:8 328:16,22 330:2,3,4,10 333:9 339:1

**represented** 242:18 328:13 329:2 338:19

**representing** 5:14 93:10 253:22 340:15

**reputation** 163:4

**request** 372:5 430:5

**required** 373:19 374:12

**reserve** 430:7,9,11

**reserving** 429:15 430:7

**residence** 206:10

**resolved** 237:4

**respect** 63:24 84:18 93:7 95:1

**respond** 297:5 302:6

JOSE JUAN MAYSONET JR., 04/16/2021

**response** 344:12 345:7

**responsibility** 185:12

**responsible** 26:7

**responsive** 346:14

**rest** 40:23 120:3 172:24 308:11 369:9 372:2

**restaurant** 29:10 147:21,23 148:1, 3,5,10 150:1,3,6 152:9,10,15,19,24 153:4,11,16,19 154:6 155:2,6 159:14,16,21 160:10 161:9 163:8 169:9 209:18 210:3

**result** 212:15 213:14 380:7 392:15,20,21 393:5,8,14,16 394:15

**resulted** 47:10

**retain** 229:20 241:22 242:9,21 243:17 328:17 329:6 341:24

**retained** 242:14

**retaining** 240:7

**retaliate** 372:18 373:15

**retaliated** 368:11

**retaliation** 367:15,19 368:23 372:24 373:9

**retrial** 212:15 213:15

**returned** 218:9

**Reuck-** 341:22

**Reuckert** 341:22,23,24 342:3,13, 16,20,21,24 343:1

**revealing** 240:24

**reverse** 362:17 363:10,12,13

**reversed** 364:1,4

**review** 11:23 364:23 365:15

**reviewed** 12:10 316:21

**reward** 179:21

**Rey** 159:14,17,18 301:21 338:1,3,7

**Reynaldo** 5:9 159:11 304:18

**rhythm** 41:9

**ribs** 284:20 286:14 294:2

**Rican** 143:16 167:13 178:18

**rice** 48:11

**Rick** 328:16,17 330:4,8,11 335:18, 21,23 336:3,10 337:3 338:18,24 340:15

**Rico** 32:7,11,14 33:19 34:7,13,18, 21 35:6,8,10,16 37:6 45:9 46:21 47:1,4,8,11 48:5 49:11,16,18 50:5, 20 58:4 146:21

**rid** 30:21,22

**ride** 30:4 259:23 327:11,14 349:2

**rides** 29:23

**ridiculousness** 183:9

**right-hand** 61:5 165:4,8 166:5 175:21 176:6,16

**rights** 412:9,19

**ring** 267:6,7 289:11,14

**rival** 58:19 59:1,3 69:3,7,13 87:21 92:24 113:5 374:4,5

**Rivera** 243:1,2,4,9

**Rizzo** 6:9

**roads** 30:5

**rob** 85:13,15 126:18 212:1

**role** 74:3 118:11 227:23

**roles** 66:16

**rolling** 113:15,17,22

**room** 8:16 9:7,17 143:9,10 144:14, 15,16,21 217:7,8,10,13 218:10,12, 14 225:13 227:16,19 229:5 230:18 231:21,23 238:14,18 245:21,24 246:5,12 247:13 248:1,11,16,17,18 260:9 261:12 264:23 266:17,22,23 267:3 269:3 270:1,12,15,18,21 271:3,8 273:2,5,8,12,23 274:2,11, 13,18 277:17,21 278:2,11,14 280:2,16 281:2,24 288:19 292:11, 12,13,16,23 293:3 296:7 299:11 300:15,19 307:12,15,19 310:1,2,4 312:13 314:21 315:17,20 327:24 384:22 385:6 399:8 404:24 405:4 410:7 429:1,2

**Rosa** 203:18 205:7,12,14,23 206:10,13,16 207:4,7,9,20 208:8, 10,13 219:6,13 233:8,13 259:8 263:3 300:10,11,21 301:6,7,12,14, 22 302:2,3 303:19 316:7,13,23 317:2 321:23 350:12,19 351:4 352:12 356:1,3 357:1 368:14,17 373:10,11 387:6

**Rose** 32:22,23 33:7 259:8 316:9

**Rosen** 6:4 193:4,6,8 213:7,9,17 220:16 222:11 236:15,23 237:12, 18 238:13 239:1 253:21 254:3,8,

10,12,14,19 255:1 347:11,16 366:22 429:14 430:7

**Rosen's** 430:5

**roses** 31:12

**rough** 111:10 388:24 389:1,2

**route** 41:13 46:8

**rule** 79:9,10,13,14,18 80:4 84:3,8 149:5 187:21,23 211:4

**rules** 7:8 78:14,20 79:1,3,9,13,16 83:14 84:7 85:9 160:16 370:6

**rumor** 209:22 210:1

**run** 48:19,23 114:9 122:7 307:16 368:18 373:12

**running** 48:19 114:8 148:17,21 188:13

---

**S**

**sad** 385:5

**safe** 31:2 143:8

**safety** 81:8,13

**sale** 141:17

**sales** 43:21 120:3

**saliva** 48:24

**Sanchez** 68:9,11 70:22 71:3,21 107:7 180:18,22 184:15 192:2 203:16 354:24

**Sanchez's** 355:12

**sanitize** 22:2,6 23:11,13

**sanitized** 21:22

**sanitizer** 21:9,16

**sanitizers** 23:9

**Santiago** 68:9,11 70:22 71:3,21 72:18 107:7,11,15,16,18 118:23 162:2 163:9,16 166:5,8,14,24 167:17 170:1,2,3,6 181:5,7,8,18,20 184:15 187:15 188:22 192:2 203:15 354:24 355:12

**Santiago's** 188:9 189:10

**Sara** 388:17,18,21,23

**sarcastic** 237:13

**sat** 278:15 311:6

**save** 29:18

Index: Sawyer-shooting

JOSE JUAN MAYSONET JR., 04/16/2021

**Sawyer** 65:12 148:2

**scale** 142:16

**scared** 146:8 234:14 272:21 282:24

**scaring** 232:3

**scene** 348:5,13 349:23

**Schatzle** 5:13

**schedule** 174:11

**school** 34:17 35:7,8,11,15,17,18 36:8,14,19,21 37:21,23,24 38:3,24 39:3,5,8,9,11,17,23 40:3,5,6,7 41:1,11,22 42:2,24 44:10,12,21 45:11,12,16,21,22 49:9 51:20 52:10,12,14,18,19 55:1,10,11 57:14,15 58:7,9 67:13 74:17 84:9 97:7 99:10,11 133:1,3,12 135:4,16 387:1 415:23 416:2

**schools** 415:19

**science** 416:3

**scientific** 384:8

**scream** 286:8

**screamed** 308:6

**screaming** 248:11,14 275:4 277:14 286:7 384:22

**screen** 189:12,14,16 190:11,13, 16,18 249:15,22 250:7,13 255:9,13 319:21 320:4 321:15 322:4 324:20 330:21 331:2 333:8 358:22,24

**scroll** 320:21

**seal** 21:19

**search** 141:3 144:17 169:5

**searching** 134:12 141:5

**secondary** 35:19

**seconds** 221:5 336:19 429:13

**seeking** 329:18 381:22

**seg** 371:4

**segregation** 370:15,18 371:1,3,6

**seizures** 233:11

**sell** 31:1 41:18 43:1,17 44:13,14 55:7,9 60:7,10 63:13,16 64:7,11,13 65:3,19 73:13 74:8 75:8,14,18 84:14 85:16 119:24 120:2,19 121:13 124:7 125:11,13,21,23,24 126:1,3 131:5 136:11 151:23 188:14,21 387:2

**selling** 42:3,5,6,8,15,20 43:5,22 44:4,7,16,17,18 47:14,15,23 49:2 51:20 52:4,6 53:21 54:14,15,16,17 55:2 56:22 60:2 64:19 75:9 85:20 86:20 101:10 113:1 118:22 120:16 121:17,19 124:14,16 126:5,6,10 127:2 128:1 130:18,19,24 134:6 140:8 144:22 151:13,18 152:4,8 157:8,20 163:24 166:9 167:22

**send** 47:3,7 146:21 394:12 428:9

**Sending** 47:1

**sense** 177:24

**sensitive** 81:4,19

**sentence** 393:14

**sentenced** 235:7 357:17,18

**separate** 376:11 404:17

**separated** 50:15

**Sergeant** 230:20 245:6 246:11 252:17 253:2,15,19 256:14

**serve** 152:15

**served** 393:13 403:3

**service** 189:10

**set** 43:14 59:16,22 61:19,22,23 62:4,19,20 63:9,22 64:11 65:10 66:13 67:10,20 68:4,12,20,23 69:19 70:3,8,11,20 71:1,5,22 72:3, 6,7 73:16,24 74:9 75:1,7 76:7,12, 19 77:3 78:9,13,14,21 79:4,19 82:18 83:2,7 84:7 85:19,20,21 87:2,23 88:8,12 93:20 94:2 95:3,18 96:6,16,23 98:3 99:9,18 100:7,8 101:22,23 103:2,3,4,5,8,12,13,15, 17,18 104:1,11,13 105:11,13,14,18 106:1,14 107:8 110:18,22,24 111:13,22,24 112:11 114:18,20 118:10,21,24 122:14,16,17,19,24 123:2,10,13 124:16,22,24 126:10 128:2 132:16 135:20 136:14 167:18 169:21 185:16 187:16 188:11,14,21 195:18 199:11,12 210:15 236:18,20 243:7,9 244:17, 22 360:15 425:2,11

**set also** 128:20

**set's** 66:3

**sets** 59:13 60:14,20 61:17 62:9 63:3,6 66:6 76:19 77:2 78:8 86:9 88:9 94:4,8,19 99:15 122:15 125:3 169:17 172:15

**setting** 29:3

**seventh** 191:14

**Seville** 55:21 56:7,8,11

**sex** 179:18

**shadow** 28:3,4,5

**shake** 7:18,20 304:5

**shaking** 297:12 323:3

**Shannon** 6:8 396:14,17,22 397:2, 6,14 398:2,22 399:1,11,19 400:9 401:9,16,22 402:5 403:13,14 405:8,20 407:12,23 408:9,17 409:2,10,19,20 410:4 413:18 414:1,7,11 416:5,13 417:3 418:16, 18 419:6,20 420:4,12,22 422:16,17 423:4,5 424:7,12,23 425:9,10 426:21 427:4,12,21,24 428:19 429:5,10 430:4

**share** 255:8 319:21 358:22

**sharing** 132:14 298:5

**sharpened** 370:23

**sheep** 46:2,10 109:8 183:22

**sheets** 265:18

**shift** 268:1,3

**Shih** 18:22

**shine** 42:11 43:14

**shined** 42:9

**shines** 51:21

**shining** 43:4,7 44:3,6,8

**shirt** 194:9,22 199:8 201:23 271:21 274:21,22,23 275:2,19 276:15

**shit** 258:22 425:18

**shock** 156:3

**shocked** 156:7

**shocking** 153:19

**shoe** 51:21

**shoes** 42:4,9,12 43:4,7,15 44:3,6, 8,17,18

**shoeshine** 43:8

**shoot** 126:20

**shooting** 91:6 114:5 210:8 219:8 221:11 224:9,10 226:11,15,19 227:9,14 320:22 348:9 349:8,15 353:2

JOSE JUAN MAYSONET JR., 04/16/2021

**short** 236:22 247:14 369:4

**shortly** 9:13 203:3 257:18 325:9

**shorty** 70:8

**shot** 69:11 113:5,6,7,8,9 114:3,10, 13,15,21 115:6,12 175:11 181:19, 21,23 182:2,4,9 209:15 210:23 211:22 216:22 218:22 348:15

**shoulder** 192:20

**shoved** 275:8

**shovel** 196:9,10

**show** 19:18 25:8 123:16 189:5 190:15 197:22 200:13 249:8 255:16 319:20 323:10 324:8,20 325:14 330:13 333:7,9 347:21 358:23

**shower** 18:1

**showing** 199:20 321:15

**shows** 325:3,4

**siblings** 32:17 183:21

**sick** 392:8

**side** 25:13 69:9 82:20 89:6 90:22, 23 100:8 161:7 162:3 171:7 172:5 173:1 284:17 285:4,7 286:22,23 287:1,2,3,6 399:10

**sides** 160:24 161:3

**sign** 23:17 245:13,15,16,20 246:4 253:13 316:4,6,10,20,21 317:8,9, 19 321:20 322:9

**signature** 253:11 256:23 257:2 321:16,18 322:2,6 325:21,24 326:2,6,14,15,16,17,19 359:11,13, 15 360:6

**signed** 246:8 253:10 256:16,20 257:4,7 316:9,14 321:22 322:8,23

**significance** 93:20

**significant** 26:10

**signing** 245:19 326:3,5,9,17

**silent** 219:23 220:6 412:24

**similar** 266:23

**simple** 120:1 169:15 173:21 246:24 336:8

**simply** 237:20 254:15 255:2

**sir** 14:19 18:4,18 36:2 37:16 46:24 47:20 57:22 67:4 69:6 71:10 112:3 120:12 123:19 127:6 128:12

131:21 132:20 133:10 150:18 166:20 170:20 174:24 175:8 181:24 185:19 190:24 191:4,16 192:5,7 194:11 196:14 198:13 199:2 200:4,9,17 202:5,13 204:9 211:11 220:3 225:7 227:4 234:18 236:7 238:1 239:18 241:17 244:1 246:2 247:3 249:16 251:8,13 255:21 256:5,24 260:13 270:17 271:1 280:24 281:3 286:20 287:1 291:12 292:13,20 295:17 296:19 298:13,20 301:18 304:17 311:4 318:24 320:24 321:13,14,17,19 322:4,7,20 323:10,12,17,23 324:8, 11,14 325:2,11,14 326:14,24 327:9,16 328:1,4 330:13 331:5 333:3,7,12 335:17 340:3 341:12 342:8 343:11,21 344:2,11,23 345:6,14,17 346:10 347:1 349:7,19 351:12 352:18 354:10,22 355:7,18 356:9,24 358:6,22 359:7,13,14 360:2,24 361:20 362:11 363:6,20 364:10,18 366:4 368:14 369:2,5,8, 16 370:1 371:17 372:20 373:5 376:9 381:11 382:10 383:11 384:14 385:23 386:6 388:9 390:11 393:5,16 395:16 404:15 406:9 407:13 410:17 411:24 413:3 414:12 415:17 417:5 421:4 422:18 424:2 426:10 427:13 428:1

**siren** 164:21

**sister** 15:23 18:5,8,9,15 32:19,22 50:16 51:1 53:5,9 109:10,13,19 140:14 259:8 262:6 263:3,4,21 268:16 298:15 299:1,6,13,16,17 300:8,11,16 303:16 373:10 422:8, 22 426:1,4

**sister's** 365:4

**sit** 43:11 51:14,16 56:20 112:13 160:6,13 248:4 311:21 420:5

**sitting** 8:17,19 14:14 113:15 163:16 283:20 309:9 315:13 382:6 405:5,7

**six-pack** 116:23

**skills** 22:5

**slap** 276:1 282:21 283:9,10,16 285:7 293:17

**slapped** 271:24 275:8,22,23 276:21,24 277:1,3 283:17 285:10

**slapping** 279:24 390:12

**sleep** 383:19 385:1 386:15 388:4 426:19,24

**sleeve** 192:16

**slept** 278:2

**slip** 268:12

**small** 16:7,8,15 53:3 123:23 124:5, 22 131:7,17 141:24 145:24 165:11 167:21,22 168:1,3 170:14 335:6

**smaller** 124:23

**smart** 136:18 375:20

**smelling** 310:3

**smoke** 113:23 129:21,24 130:3 162:4 163:19 208:15 334:17 383:1

**smoked** 162:22

**smoking** 124:12 125:14 163:9,19 385:15

**snake** 188:13

**Snakes** 424:20

**snatch** 148:20

**snatched** 150:9

**sneak** 126:17

**sneaking** 134:16

**snitch** 173:3

**snitching** 173:8

**snort** 79:19,22

**snorting** 155:11

**soccer** 45:4

**social** 90:18 93:17 105:20 387:11 416:3

**socially** 97:9

**sold** 30:8 54:19 74:11,15 75:11 121:5,11 123:23 124:5 125:6,7,8, 16 126:2

**solve** 66:23,24

**somebody's** 80:5 112:17 363:2

**someone's** 363:7

**son** 148:14,15 178:16 179:6 184:24 205:17,21 316:12 387:14, 22

**sorts** 201:24

**sought** 380:15

**sound** 32:24 107:4,5,6 116:3,21 117:1,4,6 130:7 161:17 171:7

JOSE JUAN MAYSONET JR., 04/16/2021

**sounded** 91:18 183:5

**soundproofed** 16:18

**sounds** 99:13 116:5 182:20 401:14

**south** 76:11

**southeast** 264:6

**Spanish** 38:15,17,18 115:5 138:4 140:1 143:19,21 207:9,11,14,16 208:1,2,4,6,9,10,12 216:4,20,22 217:16 225:18 227:6 240:3 244:3,4 251:15,16,20 271:18 273:18 306:15 315:8,10 329:9,12 335:21 341:9 403:1,7,16 407:5 413:2 414:17 415:24 417:2 422:13,18 423:8,10,12,22 428:13 429:3,7,9

**Spanish-speaking** 225:11 228:9

**Spaulding** 65:13

**speak** 10:1,6 38:21 84:21 138:2 139:20,22 207:9,10,11 208:1,2,4,5, 12 217:12,14,15 218:13,17 228:15 230:19 240:3 244:3,4 251:20 253:21 300:21,22,23 305:6 306:14, 15 316:16,22 329:9,12 335:21 336:3 341:6,14 404:15 406:24 407:1 412:16,22 417:2,13,15 421:18 422:13,18,21 423:8,10,12, 22 428:14

**speaking** 7:9 217:15 227:13 245:6,12 340:19 347:12 399:2 421:19 429:3

**specific** 61:19 62:15 78:14 79:3 97:15 355:10 413:17 417:5 421:7

**specifically** 10:11,14 12:3 78:9 84:7 92:4,6 153:6 161:11 270:13

**Spector** 329:3,7,9,14,17 330:7,10 332:3,7 333:5 335:18

**speculation** 363:15

**speculative** 401:3

**spell** 19:22 20:9,19

**spelling** 251:14

**spend** 27:10 28:8,10,16,17 29:5 118:18 184:7 314:4 412:1

**spending** 200:3

**spent** 394:6

**spit** 48:15,17

**spoke** 10:4 133:20,21 142:4 143:18,20 208:10 225:9 241:14

244:7 300:8 302:2 307:18 308:24 309:8 316:13 378:6,12 398:19 399:12 416:17

**spoken** 387:9

**Sport** 55:20,24

**sports** 31:19 45:3

**spots** 288:23

**square** 76:3 87:7

**St** 210:9,11

**stabbed** 373:22,23 374:15,18

**stabbing** 374:6

**stamp** 127:8 331:7

**stamped** 191:6 199:21 330:16 358:16

**stand** 77:16

**standing** 117:7 193:12 195:5,23 200:8 201:2 217:17 299:8,10

**start** 6:23 8:15 26:6 40:11 44:16 47:7 48:19 53:20 62:8 85:20 91:5 113:16 114:8 121:23,24 169:7 205:7 210:11 228:3 282:21 284:1 293:18 307:14 332:3 333:17 364:18 386:20 390:19 391:21 393:4 397:21 409:17 428:7

**started** 40:21 46:19 55:4,12 57:14, 15 58:7 69:19 70:6 146:14 148:20 156:23 163:24 165:11 167:20,22 168:1,3 170:14 174:9 205:23 206:5 248:2 254:16 271:15,19 279:24 282:19,20 283:6,15,19 297:14 308:9 312:16 328:24 380:21,24

**starting** 79:21 242:2

**state** 6:23 227:15,17 236:19 237:7, 15 306:2 309:24 331:18 359:3 394:12

**state's** 227:13 228:16 305:7 306:5 307:19 308:12,15,17 309:1,11 311:6,16,19,21 312:8,12 313:18,19 314:11 315:14,19 322:22 323:5 327:12 398:7,11,19 418:9 419:21 420:6 425:20 427:16 428:3,21

**stated** 348:17

**statement** 314:10 316:2,4,9,14,19 317:19,23 318:1 319:23 321:2,4 322:11,16,17,18,21,22 323:5,6,11 326:24 327:3,7,9,13 328:2 345:16, 20 348:21,24 349:4,12 350:2,3,5, 13,21 351:2,10 405:11 413:6,9,13,

16,22 414:12,14 415:1,2,6,10 428:7

**statements** 329:15,19,21 331:22 332:21 341:18 343:3 348:4 349:14, 22 350:8

**States** 5:11 32:7 34:10,23 35:3,11, 12,16 36:8,11,15 37:1,6 50:24 58:4 415:20

**Stateville** 369:7 375:5

**station** 214:17 226:6 227:12 260:7,20 263:23 264:1 266:3,11,16 268:23 269:2 278:12 289:16 295:11 297:21 298:6,15 300:5,16 308:19 310:11 317:2,3 318:4,9,13, 23 327:11,15,18,20,22,23 337:14 426:6

**stay** 84:9 91:2 122:14,16 154:22, 24 237:16 262:8 283:2 309:11

**stayed** 91:10,20 92:23,24

**steal** 84:11 85:15 122:6 149:5

**stealing** 127:14 212:1

**step** 22:16,22 23:19 79:1

**stepdad** 19:1,2

**stepfather** 25:24 50:12 51:3,5 53:4,9 140:13

**Steve** 223:24 238:13

**stick** 260:2

**stolen** 151:10

**stood** 169:2 265:1 266:18

**stop** 118:5 129:11 158:2 165:18 168:22 171:2 198:3 220:10 254:8, 12 264:10 288:21 294:6 295:18,19, 24 296:11 297:3,9 312:2,3 314:19

**stopped** 44:7,17 49:8 87:12 133:23 134:1,11 161:16,17,21 168:15 170:24 171:1 296:14,21 298:1,4 314:19

**stopping** 136:7

**store** 57:2 215:3 216:9 417:22

**story** 51:8 302:17 349:5,6 350:4 400:17 403:21 427:17 428:4,14

**straight** 266:3

**street** 5:15 42:6,8 48:21 58:1 59:24 60:15,17 71:7,9 95:16 96:19 100:13 101:17 106:7 108:14,16 109:1 115:21,23 136:4 147:8

JOSE JUAN MAYSONET JR., 04/16/2021

148:16,17 151:13 161:23 165:17 195:13 196:3 210:19 259:10,11 379:1,5,6 383:21

**streets** 25:11 60:16 261:7 387:2

**stretch** 77:16

**strike** 36:17 58:18 79:1 207:18 214:19 219:11 235:16 236:2 240:22 266:4 281:21 299:14 327:1 373:8 393:24 398:22,23 403:13 404:5,13 406:13 417:17 422:12 423:8 424:24

**strong** 87:22 117:4

**structure** 66:12,15 72:18

**structured** 61:3

**stuck** 260:3 374:17

**studies** 416:3

**studio** 16:7,8,15

**studios** 17:11

**stuff** 12:23 13:1 16:3,22 17:11,12 23:9 24:8 29:15,16 31:12 38:11 41:20 44:2 46:4,5 47:12,13,17 49:21 50:7 51:12 52:18 81:21 84:19,20 88:1 89:17 93:5,9 127:15, 18,19 134:13,21 136:7 141:16,17 142:15 148:8 150:23 155:20,21 161:11 162:1 169:5,9 190:6 198:3 208:23 209:1,3,12 210:3 212:2 215:23 220:1 222:3 223:16 232:22 233:24 234:2,16 244:2 253:15 265:18 270:11 274:10 278:23 279:1,3,18 290:7 293:21 295:22 296:9 311:9 313:11 315:1,6 318:18 336:9 341:6 343:8 357:9 370:10 371:16 377:24 380:19 385:3 388:20 391:22 413:2 416:4 423:13 426:24

**stupid** 86:2 185:14

**subject** 369:13

**subjected** 369:19

**subsequently** 229:17 328:8 394:21

**substance** 209:10 212:16,18

**substantial** 334:7

**sudden** 148:23 215:19

**suddenly** 177:21 247:22

**sued** 354:2

**suffer** 373:18,21 376:19 384:15, 17,19

**suggesting** 255:2

**suicide** 183:10 184:16,17 185:15 197:12,23

**Suite** 5:15

**summer** 34:17

**Sunday** 79:23

**sunglasses** 201:22

**super** 22:18 55:20,24

**supersport** 30:8

**supervising** 22:21

**supplier** 157:12,13

**supply** 157:15

**support** 182:21 338:11 345:20 346:3

**supposed** 14:16 47:17 63:16 89:16 91:21,22 112:19 149:5 173:15,16,18 182:5 234:10 236:18, 20 237:19 262:12,14 300:1 310:8, 24 330:12 335:10 357:6

**suppress** 329:15,18 330:15 331:22 332:21 341:18 342:4 343:3, 12 344:3 345:15

**suppressed** 329:22

**surgery** 342:10

**surprise** 136:1 149:14 165:15

**surprised** 149:23 153:17 156:4 276:12

**survive** 74:23 85:6 387:3

**suspect** 236:21 237:2,7

**sustained** 334:8

**Suzuki** 30:10,11,12

**Swaino** 422:4

**Swano** 240:15 241:23 242:5,7,9, 14,21,22 243:12,15,17,21,23 244:3,5,7 261:18 262:12,20 328:20,22 329:4,5,6 422:3,5,6,13, 14,15,16,18,21

**swear** 6:12

**sweater** 93:4,6 215:9

**sweatshirt** 93:22

**switch** 62:20 63:3 240:16 241:13

242:13 366:4 386:17

**switched** 63:6

**switching** 129:14 234:18 241:15 242:17

**sworn** 6:13,16

**swung** 288:10

**symptoms** 385:13,16,18,19

**system** 107:5,6 117:4

———————————————

**T**

**table** 279:13 282:14 293:11 405:6

**taking** 64:17 155:20 297:14 298:4 301:9 366:18 382:23 385:9 386:20

**talent** 73:5

**talk** 10:8,12,15,20,23 11:8 12:3,7 17:7 21:4 28:22 39:21 51:16 86:12, 15,16 92:3,13 94:9 103:18,19 138:4 144:10 146:2 150:2 154:2,13 155:14 159:19,23 160:2,3,7,9,13 161:9 162:7 166:22 167:16 168:19 169:9 170:2,4 176:14 181:3 195:15 198:10 206:13 208:19 211:16 226:6 231:3 234:5 248:6 271:9 273:1 274:8,15 278:22,24 279:14, 16,19,20,21 283:1,2,14 293:12 298:24 307:8 308:15 317:2 322:21 329:14,16 330:8 332:9 333:4,22 339:5,14,15,17 340:22 341:3 342:12,15,16,21 343:1,7 344:17 346:22 350:21,22 356:22 362:24 368:17 375:3 376:4,16 377:19,22 378:16 379:3 380:3,4 384:2 387:17 396:10,12 402:12,16 422:9 424:1, 17

**talked** 7:7 10:3,5 126:9 137:22 138:6,8 141:2 144:21 157:10 159:13 162:11 166:24 169:11,23 181:20 203:24 205:6 224:2 225:6 230:24 231:18 232:16 240:24 244:16 262:19 271:5,6 280:17,20 281:1 282:7,11,14 289:18 292:22 303:12,15,18 308:12 310:4 319:23 321:23 322:20 337:17 339:9 350:19 421:5 424:16

**talking** 45:17,19 78:8 88:12 90:12 92:1,2,3,5,6,8,11 95:1 130:17 140:1 145:18 155:9,12 167:1,4 169:7 170:6 183:3 191:8 200:10 203:12 204:2 209:19 216:3,7 233:4 236:6 244:19 248:12 252:2,20

JOSE JUAN MAYSONET JR., 04/16/2021

273:10,22 275:14 299:6 301:8 320:15 331:21 332:1,20 340:16 341:9 365:8 380:8 386:6 391:22 396:21 398:12 405:24 406:6,7,8 412:1 420:3

**tall** 144:1 196:5 206:21

**Tank** 71:12 72:23 73:16

**taught** 28:19 415:18 416:6

**taxes** 122:22

**teach** 151:12,18 156:21

**teacher** 40:22

**teachers** 416:16

**team** 23:12

**tears** 311:12

**technologies** 17:6

**technology** 17:5 41:6

**teen** 132:23

**teenager** 174:4

**teenagers** 112:9

**teens** 39:18

**telling** 133:13 215:24 247:21 262:6 275:4,10 279:13,19 280:4 293:15 301:7 302:9 310:18 350:18 391:24 403:20,21,22

**ten** 27:2 74:6 130:2 265:3 268:24 283:12 300:24

**tend** 92:2

**tense** 252:21

**term** 80:10

**terminology** 80:13

**terms** 20:9 364:3

**terrible** 408:20

**territories** 93:1

**territory** 64:4,5,7,24 65:11,14 66:8,9 75:23,24 77:8,11 87:6,17 91:11 92:23 95:2,5 110:19 113:2 152:20 210:5,10,11

**testi-** 348:16

**testicles** 313:3

**testified** 6:16 291:2 341:21 343:11 344:2 345:15 351:18,22 353:1 399:20 405:14 406:15 409:3,8 413:8

**testify** 12:4 344:12 345:7 352:3,7, 10,13 357:1

**testifying** 341:17 342:12 345:18 346:10 352:20

**testimony** 67:16 73:19 91:14 120:7 290:18,20 291:4,10 292:15, 17 295:15 342:13 343:2 344:8,17 347:6,8,19,21 349:17 351:24 400:6,16 401:13 402:6 403:15 405:18 407:22 416:9 424:3

**text** 200:5,6,20,22,24 201:11

**Thampy** 340:17

**That'd** 366:10

**theater** 182:6,10,11 183:7

**thin** 160:23 164:6 386:12,13

**thing** 14:3 16:2 17:9 21:18 37:9 41:8 50:17 84:9,11 102:23 114:7, 10,11 117:21,22 119:9,18 132:9 148:5 149:19 151:14,15 155:12 156:21 160:15 168:12 173:19 174:13 180:5,6 205:6 209:21 211:6,14,17 248:12 256:10 269:22 280:2,9 288:22 289:24 290:5 291:23 293:22 294:6,11,19 296:5 302:18 311:23 312:17 317:7,16 323:7,13 338:15 357:11 363:2 365:24 384:2 385:21 386:13

**things** 14:1 22:18 24:24 26:23 28:13 31:15 32:4 47:9 50:4 81:19 84:15 85:22 86:9,24 92:3 105:2 116:9 118:8 122:7 127:10 136:1 152:17 162:16 165:16 166:2 170:19 171:21 172:22 175:14 182:19 184:5 185:6,7,17 223:7 255:16 279:17,23 336:8,18 370:9 409:14

**thinking** 113:23 114:10 165:21 215:21 216:17 262:1 263:6 268:15 385:3

**thought** 13:2 26:7 46:1 114:12 142:6 161:16 166:23 171:13 247:23 292:20 293:19,24 294:1 306:10 340:23 361:7 371:15 394:16 407:1

**thousand** 131:13,15

**threaten** 316:24

**threatening** 302:3

**threw** 367:7,23

**throw** 48:11 148:7 160:19,20

161:24 168:21 238:23 304:23 362:21

**throwing** 215:21

**thrown** 345:16,21 395:13

**Thursday** 326:21 327:1,4

**tied** 110:18 174:10

**ties** 204:12

**tight** 413:23

**till** 186:21 207:21 319:11 331:15

**time** 8:1,9,10 10:8,10,18 24:20 26:10 27:10 28:8,10,16 29:5,13 30:23 31:16,23 32:2,13 38:6 40:1,2 43:5 44:4,6,11,20 45:3,5 47:4 48:16,22 49:3,17 50:1,18 53:8 56:3,12,15,16 62:5 67:9,12 69:24 70:1 74:24 87:22 97:8 98:4 100:13 102:18 111:19 112:6,8,22 116:16 117:18,21 121:17 127:2 129:15 133:2,11,19 135:16 140:23 146:18 147:1 153:9,10 154:2,10 160:10,13 164:5,23 168:11,14 170:24 171:1 174:8,10,16,24 176:8 178:17,19 179:13,17 182:8 183:14,17 184:15 185:3,5 186:4,9,13 195:15 200:3 207:23 212:19,21,22 218:3,4 219:6,8 222:24 223:12 224:15,21 225:4 229:2 234:18 236:12 244:7 258:11 259:3 260:4,19,24 261:1, 18,24 267:15 269:8,14,20 270:13 273:24 279:9 280:12,17 281:1 282:13 283:10,14,23 284:7 285:24 286:1 287:23,24 288:3,17 289:18 290:8,10,15,19,22 292:4,6,12,15, 22 293:2,4,8,9,13,15 297:24 300:17 301:24 302:7 304:3 307:23, 24 308:9,19 311:5 313:23 316:11 319:8 327:19 330:6,11 332:22 333:18 334:9 337:11 340:9 353:6,8 355:5,20,21 357:8 365:20 366:7 369:4 371:12 372:2,22 373:22 376:23 377:9 378:8 379:9,11 380:20 382:9,18 386:7 387:21 388:4 392:5 394:6,24 395:6,20 396:2,19 398:16 399:8 401:17 404:12 408:7,8 412:4 414:2 415:17 416:20 418:9 419:10 423:19 428:16 429:15 430:3

**times** 10:6,9,11 14:15 28:11 46:21 127:10 149:13 171:18 179:11,12 184:7 185:8 269:12 271:4 277:6 281:11,14 282:8 283:9,16 285:1, 12,22 286:10 287:5,20 288:2,15 289:19 291:11 292:21 294:12

Urlaub Bowen & Associates, Inc.   312-781-9586

JOSE JUAN MAYSONET JR., 04/16/2021

298:7 307:22 335:12 357:23 377:5
404:15

**timewise** 295:5

**Tina** 399:21,23

**Tino** 71:13 96:21,24 97:1 302:11
304:8,13 305:3 311:5 312:19
313:14 314:8 348:19 349:1,22
351:18 352:9,19 399:23,24

**tiny** 50:17

**tired** 44:1 166:17

**title** 72:11,15

**today** 5:17 6:20 8:1,9 10:12,16,20
12:4 13:5,8,11,17 39:22 88:4
157:17 206:13 250:16,19 334:1
389:19 420:5

**today's** 430:14

**toilet** 308:3 309:4

**told** 47:21,22 84:3 105:24 107:7
109:24 130:18 140:18,21,22 145:5
149:14 156:12,15 157:19,22 158:3
159:13 160:2 161:8 162:11 165:4
166:5 167:15 172:6 173:16 175:6,
20,22 176:5 178:11 205:2,10
210:16 213:24 218:19,21 226:12
234:3 245:20 248:5 260:22 262:6
268:15 271:21 272:6,15,17,24
274:6 275:16 277:16 278:16,17,21,
22 279:5 282:15 295:12,13,21
296:1 297:7 299:17,20 300:2
301:2,7 302:3,8 303:8,21 305:23
306:1,11,19 307:7 308:21 311:13,
23 312:6,8 314:2 317:5,8,11,12
321:22 335:17 337:23 338:2,9
339:15 346:23 351:20,21 352:23
353:4 354:14 355:18 367:12
368:14 372:11 376:21 377:9
380:22 381:23 388:9 402:6,10,19,
22 403:7,16,22,23 404:7 428:12

**ton** 121:17

**tone** 93:7

**top** 116:23 149:7,11 169:3 252:14
253:19 256:3 284:2,8 285:1,11,19,
23 293:18 333:13 359:18

**topics** 129:14 366:5

**Torrence** 320:23

**tossed** 361:23

**total** 411:1,24

**touch** 17:17 69:1 148:24 284:5

**300**:1,2 387:18

**touched** 117:19

**tough** 33:22 73:7 142:17

**towels** 232:13

**Toyota** 53:22,24 54:2,12 55:14
56:4

**trade** 127:20,21

**traded** 127:10

**trails** 30:4

**transfer** 328:10,11

**transferred** 230:12,17,19 318:10
327:21 328:8 369:6 405:4

**translate** 315:10 403:18

**translated** 306:16

**translating** 407:6 428:14

**translator** 244:6,8 306:13 308:22
329:11

**travel** 25:2 34:19 43:13

**treasurer** 61:6,9,12,16 73:3

**treat** 82:18 89:14 120:20 178:21
384:1

**treated** 89:12

**treatment** 31:23 32:2 379:20
380:1,3

**treatments** 381:22

**trial** 181:6 213:15 237:7,8 262:15
351:3,13,15,17 352:3,10,13,18
353:2,5,6,7,9,12,13,14,19 354:1,
19 374:10,11

**trick** 237:19 408:22

**trigger** 350:1

**trip** 149:6

**tripped** 150:9 151:1

**tripping** 149:3

**trombone** 40:10,12 41:4

**trombonist** 40:17

**trouble** 22:23 54:4,6 59:21 80:24
85:22 86:7 105:4,5 122:5,18
141:22 142:1 144:22 145:23 146:2,
14,16 162:24 163:3 173:9 183:24
259:1 262:10 317:14 329:6 369:22,
24 372:3 375:7 426:8

**true** 17:7 164:4 173:8 234:11
322:16 360:11 413:13,14 415:18
424:4

**trust** 151:22 422:11

**truth** 47:23 275:17 350:10

**truthful** 222:21

**truthfully** 223:3

**tumor** 183:15

**turf** 64:24

**turn** 48:23 114:7 164:22 169:6
216:16 229:2 263:7 275:13 307:9
386:18 408:17

**turned** 215:22 263:20 272:4
282:15 305:16

**turning** 46:19

**turns** 7:9

**two-minute** 319:3 366:9

**type** 21:17 38:24 48:13 60:19
72:17 88:5 90:17 118:11 123:17
129:5 148:3 149:16 367:14 372:24
380:10

**typed** 251:6 256:15 322:21 323:13
413:6

**typed-up** 316:3

**types** 28:13 29:4 47:9

**typing** 315:24

**Tzu** 18:22

---

## U

**uh-huh** 7:18 67:8

**uhn-uhn** 7:17

**ultimately** 39:2 180:18 317:19
357:14,22

**um-hmm** 58:21 69:23 170:16
187:10 190:23 191:15 192:22
201:12 250:2 260:10 285:13
291:18 298:13 318:24 325:20
359:19

**uncles** 53:11

**uncomfortable** 238:20

**underage** 179:23

**underneath** 73:15 359:21 361:9

Index: understand-week

JOSE JUAN MAYSONET JR., 04/16/2021

**understand** 8:1 14:2 19:10 62:12, 14 63:19 64:3 67:4 71:16 72:16 73:22 76:13 79:11 80:21,22 81:3, 18,23,24 90:6 92:18 135:12 146:1 150:14,16 153:5,7 164:14 183:2 207:15 211:11 217:23 220:4,14 222:1 224:8 246:19 255:10 271:1 286:20 294:17 306:9 344:23 345:1, 10,11,16 346:6,8 356:19 362:1,6,8, 12,24 363:20 364:7 372:19 383:11 398:12 401:11 403:23 412:15 414:22 417:7,12,24 418:1,13,22 419:2,16 421:22 425:6,7 427:22,23

**understandable** 14:4 16:11 37:13,18 207:17

**understanding** 24:20 32:6 46:15 65:20 66:7 103:24 237:14 283:4 356:24 376:9

**understood** 8:6 82:7 215:15 216:19 227:17 246:10 261:24 263:13 345:14 360:22 405:10 421:15

**Unit** 5:2 77:24 78:3 130:14 203:5,9 258:3,6 319:15,18 397:13 430:16

**United** 5:10 32:6 34:10,23 35:2,11, 12,16 36:8,11,15 37:1,6 50:23 58:4 415:19

**Units** 130:11

**unknown** 334:21

**unmarked** 164:19

**unrealistic** 347:20

**upper** 192:14

**urinated** 309:1

**urine** 309:9

**Urlaub** 5:14,18

**useless** 190:9

**usual** 23:4 154:12

---

**V**

**V-O-Y-A-N-T** 20:21

**vacating** 213:14

**vacation** 24:7 34:17

**Vegas** 154:23

**vegetable** 31:11

**vehicle** 25:16

**Veras** 102:21,22 103:7 104:1

**verbal** 391:9,13

**verification** 23:16

**versus** 5:9 121:15

**vicinity** 209:23

**video** 5:2,4,20 77:23 78:2 130:10, 13 203:4,7 222:14,17 258:2,5 319:14,17 332:12,15 366:23 367:2 387:17,21 388:2 396:5,8 397:9,12 427:7,10 430:15

**videoconference** 11:11

**Vincent** 6:9

**violated** 83:10,13 122:9 394:16

**violating** 121:4 370:5 395:1,3

**violation** 80:10,12,14,16 82:11,12, 16,24 83:4 370:19 395:11

**violator** 394:14

**violence** 88:2 390:5,23 391:2,11 392:16,22 393:6 394:16 395:11

**violent** 89:21 90:1,3,8,9,15 93:9

**visit** 34:9,11 244:2 245:8 351:4,8

**visitation** 185:16,21 186:2,5,10,21 187:2 354:23 355:13

**visited** 108:6 234:20 245:9 368:15

**voice** 248:2,3

**vouched** 158:8

**Voyant** 19:15,18 20:5,21,24 21:2, 15,16 23:1,2,5 24:10,11 25:5,7,15

---

**W**

**Wabansia** 61:24 62:1,2,20 63:4 64:8,18 65:1,10,13,20 67:11 69:20 70:5,16,20 71:22 72:8 74:9 75:1, 12,23 76:15,20 78:9,13 87:8 88:7 94:8 95:3,18 96:6,17,24 104:17 105:11,23 106:15 107:8 112:10 114:19 125:2,9 126:24 128:5,14 135:20 152:21 187:16 210:6,7,12, 14 218:23 243:11

**wage** 24:1

**wait** 7:10,12 55:18 122:6 221:3 235:13 237:1,3,5 267:14 269:4 348:16 392:18

**waited** 217:20,21 226:4,5 267:10, 12,15,23 348:14

**waiting** 226:3 268:1,4 274:11

**waive** 429:17

**waived** 336:14 353:23 354:2

**walk** 28:15 48:19 77:8 93:7,10 139:14 141:7,12,18 144:18 168:19 264:5 373:4

**walked** 137:10 156:1

**walking** 33:23 93:3 141:10 148:13, 14,16 160:24 164:5 209:17 215:13, 16,18 216:13 262:24 271:20 349:1 383:20,21 426:6

**wall** 84:19 165:19 171:5 263:8,11 264:8 267:6,7,9 286:18 289:11,14, 15 399:10

**wandering** 383:22

**wanted** 62:21 70:18 75:18 87:4 110:12 129:9,10 140:20 141:10 157:1,2,16 164:7 169:14 174:12 175:13 183:23 186:8 190:12 233:22 234:5,14 242:12 268:14 271:2 278:21,22,24 279:21 294:5,6 295:13 296:2 302:18 303:2,13 304:23 305:11,12 306:4,23 310:21 312:1,4,9 314:5 315:2 317:16 335:15 341:5 357:1 361:6 365:16, 17 372:11 390:17 402:11 406:24

**wanting** 383:16

**war** 85:3 224:23

**warning** 80:3 116:15

**warrant** 139:16,19

**washing** 141:8

**waste** 401:17

**watch** 82:4 124:8,14,17 373:13

**watching** 126:14,15,16 134:12 136:6,21 142:7 383:19

**weak** 96:12,14,15

**weapon** 215:23 216:20,21 234:9 370:11,19,20,22

**wear** 93:21 110:9 143:14 197:7 381:20

**wearing** 94:1 201:23

**weed** 75:10 113:24 124:12 125:14 179:18 208:15 334:17 383:1

**week** 84:4 131:24 153:12 185:24 245:10

JOSE JUAN MAYSONET JR., 04/16/2021

**weekend** 79:20

**weekends** 84:5

**weekly** 130:22 174:13

**weeks** 23:3 153:13 239:23

**weigh** 382:8

**weighed** 382:7

**weight** 382:7

**weird** 102:19

**west** 209:16 246:16 247:2

**whereabouts** 167:5

**wheres** 118:5 232:20 247:21 309:18

**Whipple** 114:19 243:10

**whisper** 238:16

**whispering** 223:7

**white** 143:15 189:15 190:9 192:21 193:13 194:23 198:21,24 199:7,8 271:16,22 275:5,6 335:6

**whoa** 149:22

**Whoever's** 396:10

**whooped** 146:24

**Wi-** 320:23

**wide** 116:19

**wife** 80:6 97:19 185:4

**Wiley** 246:18,19 247:4,8 280:18 281:2 320:23 328:3 357:15

**Wilfredo** 243:1,2,4,9

**William** 240:15

**Willie** 40:17

**window** 114:2,4 168:22 269:17,19 270:2,3 383:20

**wing** 156:12

**winter** 31:13

**wire** 100:23

**withdraw** 236:3 333:20,21 369:16 406:13

**withdrew** 358:8

**witnesses** 354:19

**woman** 34:3 112:18 205:10,14 227:19,20 388:15

**wonderful** 28:24

**wondering** 74:1 159:20 227:7

**wooden** 43:9

**woofer** 116:24

**word** 64:24 72:4 177:21 240:5 282:23 323:14,22 381:6

**words** 290:19

**work** 19:13,14,15 20:23 23:4,8,12, 22 25:6,15,18 28:9,14 41:8,17 42:16 49:24 158:5 187:22 227:16 243:16 244:15 257:21 308:20 324:19 342:2 384:6 385:4 387:3 389:16,17 391:8 416:2

**worked** 99:17 124:5 138:22 147:17,20 248:24 403:6 420:23

**working** 21:12 22:10,14,24 23:2 42:16,18 84:4 98:19 157:17

**works** 12:7 183:10

**world** 110:5

**worry** 93:8 146:13 159:3 238:21 272:23 274:8 317:16

**worse** 385:14 386:11,18 417:16

**worthful** 127:17

**wow** 30:19 76:16 107:6

**write** 200:9 201:2 257:10,12

**writing** 84:19 192:17 200:7,12 251:6 252:16 325:18 326:10,12 415:6

**written** 191:2 223:9 251:11 253:8 256:7,15 315:3,9 323:15 407:9 413:6

**wrong** 55:7 81:11 86:22 111:9 120:22 122:7,12 284:24 409:16

**wrote** 414:18

---

**Y**

**Yamaha** 55:22

**Yanerez** 107:24

**year** 17:17 33:5,6 38:8 39:9 48:6 49:13 135:7 147:4 153:11 207:21 208:7 371:7,9 379:14 388:14 392:13,14

**years** 17:7 33:14 34:5 39:7,22 43:22,23 68:18 100:15 132:23 135:3,6,7,8,10 174:5 182:17 235:7

237:11 347:8,15,20 351:13 369:7 379:15 382:1,15,20 388:22 421:16

**yelled** 275:20,21

**yelling** 254:8,12 282:20

**Yellow** 279:11 281:17,19 282:1,6 287:3

**yesterday** 11:4,5,7,14,20 12:1,5 22:14 189:19

**YLO** 224:24

**YLOD** 224:10,17

**young** 17:3 31:3,4 32:12,13 33:12 34:16,22 35:5 36:22 37:4,23 39:19 42:21 49:6,7 50:13 54:3 57:11,13 58:6,11 84:8 87:21 89:9,16 112:7 117:8,9 132:24 133:4,22 151:17 174:3,5 205:8,9 276:4 308:20 309:24

**younger** 33:5,6,14 37:3 67:18

---

**Z**

**Zehner** 6:4

**zoom** 7:6,7 9:10,12 193:20 199:18