*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 18

# In The Matter Of:

*Maysonet v.*
*Guevara*

*Francisco Veras*
*October 28, 2021*



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

1

1                    IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
                     NO. 18-CV 02342
3

4

5
   JOSE JUAN MAYSONET JR.,         )
6                                  )        VIDEOTAPED
            Plaintiff,             )
7                                  )      DEPOSITION UPON
      v.                           )      ORAL EXAMINATION
8                                  )           OF
   REYNALDO GUEVARA, ERNEST        )      FRANCISCO VERAS
9  HALVORSEN, EDWARD               )
   MINGEY, LEE EPPLEN,             ) VIA VIDEOCONFERENCE
10 FERNANDO MONTILLA,              )
   ROLAND PAULNITSKY, FRANK        )
11 DIFRANCO, CITY OF               )
   CHICAGO, and COOK               )
12 COUNTY,                         )
                                   )
13          Defendants.            )

14

15

16          T R A N S C R I P T  of the stenographic

17  notes of AUDREY ZABAWA, a Certified Court Reporter

18  of the State of New Jersey, Certificate No.

19  XI01410, taken via videoconference, on Thursday,

20  October 28, 2021, commencing at 11:14 a.m.

21

22

23

24

25

2

1    A P P E A R A N C E S:

2    BONJEAN LAW GROUP, PLLC
     750 Lexington Avenue, 9th Floor
3    New York, New York 10022
     718.875.1850
4    jennifer@bonjeanlaw.com
     ashley@bonjeanlaw.com
5    BY:   JENNIFER BONJEAN, ESQ.
           ASHLEY COHEN, ESQ.
6    Counsel for Plaintiff

7    GREENBERG TRIAL LAWYERS
     53 West Jackson Boulevard, Suite 1260
8    Chicago, Illinois 60604
     312.399.2711
9    steve@greenbergcd.com
     BY:   STEVEN GREENBERG, ESQ.
10   Counsel for Plaintiff

11   LEINENWEBER, BARONI & DAFFADA, LLC
     120 North LaSalle Street, Suite 200
12   Chicago, Illinois 60602
     312.380.6635
13   kevin@ilesq.com
     BY:   KEVIN ZIBOLSKI, ESQ.
14   Counsel for Defendant Reynaldo Guevara

15   THE SOTOS LAW FIRM, P.C.
     141 West Jackson Boulevard, Suite 1240A
16   Chicago, Illinois 60604
     312.735.3303
17   dbrueggen@jsotoslaw.com
     BY:   DAVID BRUEGGEN, ESQ.
18   Counsel for Defendants Ernest Halvorsen, Edward
     Mingey, Lee Epplen, Fernando Montilla, and Roland
19   Paulnitsky

20   ROCK, FUSCO & CONNELLY, LLC
     312 North Clark Street
21   Chicago, Illinois 60654
     312.494.1000
22   tcarney@rfclaw.com
     BY:   THERESA CARNEY,, ESQ.
23   Counsel for Defendant City of Chicago

24

25

3

1    A P P E A R A N C E S:  (CONTINUED)

2    HINSHAW & CULBERTSON LLP
     151 North Franklin Street, Suite 2500
3    Chicago, Illinois 60606
     312.704.3127
4    echoi@hinshawlaw.com
     BY:  C. ESTHER CHOI, ESQ.
5    Counsel for Defendant Frank DiFranco

6    Also Present:

7    Haley Coolbaugh, Paralegal
     Bonjean Law Group
8
     John Edmunds IV, Videographer
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2   WITNESS          DIRECT   CROSS    REDIRECT    RECROSS

3   FRANCISCO VERAS

4    Ms. Bonjean      6                 123

5    Mr. Breuggen          88

6

7

8   NOTE:  Exhibits marked digitally.
          (Attached herewith.)
9

10                   E X H I B I T S

11  NUMBER    DESCRIPTION                FOR IDENT.

12   Veras-1, Bates JGS_Maysonet 02552        17

13   Veras-2, Bates JGS_Maysonet 02561        21

14   Veras-3, Bates JGS_Maysonet 002553       24
     through 002560
15
     Veras-4, Bates JGS_Maysonet 01722        38
16   through 01724

17

18

19

20

21

22

23

24

25

5

1            THE VIDEOGRAPHER:  We are now on the

2    record.  Today is Thursday, October 28, 2021, and

3    the time is 11:14 a.m.  This is Francisco Veras's

4    videotaped deposition regarding Maysonet Junior

5    versus Guevara, et al., and this is filed in the

6    United States District Court with the Northern

7    Eastern District of Illinois, Eastern Division,

8    Case Number 18-CV-02342.  This deposition is being

9    held via Zoom, and counsel has agreed that all

10   parties, including the court reporter and

11   videographer, may appear remotely.

12            My name is John Edmunds IV, for

13   Rizman Rappaport, and I will be the videographer.

14            At this point, would all counsel

15   please state their appearances and whom they

16   represent?

17            MS. BONJEAN:  Good morning,

18   Mr. Veras, my name Jennifer Bonjean,

19   B-O-N-J-E-A-N, and I represent the plaintiff in

20   this matter.  With me is my paralegal, Haley

21   Coolbaugh, C-O-O-L-B-A-U-G-H, who will be

22   assisting in some documents that we may present to

23   you, as well as my partner Ashley Cohen,

24   C-O-H-E-N.

25            MR. BRUEGGEN:  Good morning,

Veras - Direct/Bonjean

6

1   Mr. Veras.  My name is Dave Brueggen.  I represent

2   several of the defendant officers from the City of

3   Chicago.

4                MS. CARNEY:  Good morning.  Theresa

5   Carney, on behalf of the City of Chicago.

6                MR. ZIBOLSKI:  Good morning.  Kevin

7   Zibolski, on behalf of the Defendant Guevara.

8                MS. CHOI:  Good morning.  Esther

9   Choi, on behalf of Defendant DiFranco.

10                THE VIDEOGRAPHER:  The certified

11   court reporter, Audrey Zabawa, may now swear in

12   the witness, and all counsel may then proceed.

13   F R A N C I S C O  V E R A S, called as a

14      witness, having been first duly sworn,

15      testified as follows:

16   DIRECT EXAMINATION BY MS. BONJEAN:

17        Q.    Good morning, Mr. Veras.  Thank you

18   for joining us this morning.

19   A.    Good morning.

20        Q.    Have you ever had your deposition

21   taken before, sir?

22   A.    I have.

23        Q.    Okay.  Well, since you have some

24   familiarity, I won't belabor the rules, but I want

25   to go through a few things just so we are on the

Veras - Direct/Bonjean

7

1    same page.  Is that okay?

2    A.    Yes.

3         Q.    Okay.  We are doing this deposition

4    via Zoom, which makes it a little difficult at

5    times, perhaps if there are some glitches with WiFi

6    or anything like that.  If that happens, don't

7    worry, we will regroup, and we'll get it together.

8    We are getting kind of good at these things.  So

9    don't let that worry you.  But at the same time,

10   some of the same rules that would apply in a

11   face-to-face deposition will apply here.  If

12   there's any question I ask that you don't

13   understand, I'd ask that you let me know so that I

14   can rephrase.  Okay?

15   A.    Okay.

16        Q.    And it's very natural to sometimes

17   answer by shaking heads yes or no in normal

18   conversation, but I'm going to ask that you answer

19   verbally and out loud so that the court reporter

20   can take down your answer and we have a clear

21   record here.  Okay?

22   A.    Yes, ma'am.

23        Q.    All right.  As you can see, there are

24   a number of attorneys on this Zoom deposition.  At

25   certain points, they may lodge an objection to one

Veras - Direct/Bonjean

8

1    of my questions.  If that happens, just let them

2    make their objection, and then in most scenarios,

3    you'll go ahead and answer the question, and we

4    will proceed with the deposition.  Do you

5    understand that?

6    A.      I do.

7            Q.    Okay.  And that's just because we

8    don't have a judge here to rule, but the other

9    parties have the right to make a record of any

10   objection they have.  Okay?

11   A.      Okay.

12           Q.    I may show you a document or two, and

13   the way I would do that is by putting it on the

14   screen for you to see.  Hopefully, we won't have

15   any problems, but if we do, we will deal with that

16   as well.  All right?

17   A.      Okay.

18           Q.    I don't expect the deposition to take

19   very long, but if at any point you need a break,

20   don't hesitate to let us know, and we'll make sure

21   you get a break.  Okay?

22   A.      All right.

23           Q.    So let's get started.  Sir, can you

24   please again state your full name for the record?

25   A.      Francisco Veras, V-E-R-A-S.

Veras - Direct/Bonjean

9

```
 1          Q.    Mr. Veras, do you go by any nicknames
 2   or any other names?
 3   A.    Yeah, I do.  I'm known by the name of
 4   Cisco.
 5          Q.    And is that C-I-S-C-O?
 6   A.    It is.
 7          Q.    And, sir, how old are you?
 8   A.    55.
 9          Q.    Am I correct that you were born on
10   ███████████████████████████
11   A.    Correct.
12          Q.    In what city do you currently reside?
13   A.    Chicago.
14          Q.    Do you work, sir?
15   A.    I do.
16          Q.    What type of work do you do?
17   A.    I'm a general manager for a sewer company.
18          Q.    And how long have you held that
19   position?
20   A.    13 years.
21          Q.    What do you do as the GM for this
22   company?
23   A.    I facilitate everything that goes on with
24   the company, scheduling, biddings, everything.
25          Q.    Okay.  Did you grow up in Chicago,
```

Veras - Direct/Bonjean

10

```
 1   Illinois, Mr. Veras?
 2   A.     I did.
 3          Q.    And did you grow up in any particular
 4   neighborhood in Chicago?
 5   A.     I did.  Humboldt Park.
 6          Q.    Can you tell us generally what you
 7   consider to be Humboldt Park, what boundaries?
 8   A.     Humboldt Park goes from Western Avenue to
 9   Grand, Chicago Avenue to Armitage, and those
10   areas.  Pretty big area.
11          Q.    I'm sorry. I didn't mean to interrupt
12   you, and that's another rule.  If you know where my
13   question is going, let me finish it.  And by the
14   same token, I will definitely let you finish your
15   answer, so I apologize for that.
16                Okay.  What was the last part of your
17   answer, sir?
18   A.     It's a pretty big area.
19          Q.    Did you live at a particular corner
20   or section of Humboldt Park?
21   A.     Yes, on the west side of Humboldt Park.
22          Q.    Okay.  Did you live in different
23   homes in the area, in Humboldt Park, or were you
24   primarily in one home or apartment for the time
25   that you were living there?
```

Veras - Direct/Bonjean

1   A.     One building.

2          Q.    And where was that building located?

3   A.     3356 West Division.

4          Q.    Were you born in Chicago, Mr. Veras?

5   A.     Yes.

6          Q.    Now, I want to take you back to the

7   early 1990s, if I could.  Okay?

8   A.     Okay.

9          Q.    Did you live in Humboldt Park in the

10  early 1990s?

11  A.     Yes.

12         Q.    And that would have been at the same

13  address that you just mentioned at 3356 West

14  Division?

15  A.     Yes.

16         Q.    And who did you live with say in,

17  we'll call it, the summer of 1990?

18  A.     I had my own apartment in the basement.

19         Q.    Was this a family building?

20  A.     It is.

21         Q.    And how old were you then?  I guess

22  in 1990, were you like 23 years old?

23  A.     Something like that, yeah.

24         Q.    Did you know an individual by the

25  name of Alfredo Gonzalez back in the summer of

Veras - Direct/Bonjean

12

1   1990?

2   A.      I did.

3           Q.      Was he a friend of yours?

4   A.      Yes.

5           Q.      And did you know an individual by the

6   name of Jose Maysonet?

7   A.      I did.

8           Q.      And what would you consider Jose

9   Maysonet; was he a friend back in the summer of

10  1990?

11  A.      He was.

12          Q.      Okay.  How about Justino Cruz, did

13  you know Mr. Cruz?

14  A.      I did.

15          Q.      And again, would you consider him a

16  friend?  Again, I'm talking about back in the

17  summer of 1990.

18  A.      Yes.

19          Q.      And would that also be true for

20  Efrain Cruz?

21  A.      Yes.

22          Q.      Do you know whether Efrain Cruz and

23  Justino Cruz are related?

24  A.      They're brothers.

25          Q.      Did you know an individual by the

Veras - Direct/Bonjean

13

1   name of Christopher Goossens, or Goossens?

2   A.      I've not -- I've known of him, but not knew

3   him.

4           Q.    Okay.

5   A.      If that makes sense.

6           Q.    Yeah, sure.  Was he someone that you

7   hung out with back in the summer --

8   A.      No.

9           Q.    -- of 1990?  I'm sorry.

10  A.      No.

11          Q.    In August of 1990, would you know him

12  to recognize him?  Like if you saw him, you're

13  like, I know who that guy is?

14  A.      Yes.

15          Q.    And did you know whether or not he

16  had a nickname?

17  A.      Yes.

18          Q.    Okay.  What was his name nickname as

19  you recall?

20  A.      Fro.

21          Q.    Okay.  So were you and Mr. Gonzalez

22  and Mr. Cruz and the other Mr. Cruz and Jose

23  members of a street gang back in the summer of

24  1990?

25  A.      Yes.

Veras - Direct/Bonjean

14

1           Q.    And what street gang was that?

2    A.    The Latin Kings.

3           Q.    All right.  Now, I know that

4    sometimes street gangs have different sections.

5    Was Fro, or Christopher Goossens, a member of the

6    set that you and Mr. Gonzalez and these other

7    individuals were part of?

8    A.    No.

9           Q.    So fair to say that he was not

10   someone that you socialized with regularly?

11   A.    No.

12          Q.    All right.  Did you know an

13   individual by the name of Santiago Sanchez?

14   A.    Yes.

15          Q.    And was his nickname Macho?

16   A.    Yes, it was.

17          Q.    And would you consider him one of

18   your friends in this group that we discussed

19   including Mr. Gonzalez, Justino Cruz, Efrain Cruz,

20   and Mr. Maysonet?

21   A.    Yes.

22          Q.    And was he a good friend of yours?

23   A.    He was.

24          Q.    All right.  So I want to take you

25   back specifically to May of 1990, if I could.

Veras - Direct/Bonjean

15

1    Okay.  And I'm going to specifically ask you about

2    mid-May of 1990.  Did something happen in

3    connection with Macho, or Santiago Sanchez?

4    A.     Yes, he committed suicide.

5            Q.    Was that something that was

6    unexpected amongst your friends and the other

7    members of your gang?

8    A.     It was.

9            Q.    Okay.  And by the way, I assume Macho

10   was a member of the Latin Kings street gang as

11   well; correct?

12   A.     Correct.

13           Q.    And he was part of your group that

14   you hung out with; right?

15   A.     Correct.

16           Q.    All right.  Okay.  Can you just

17   describe for me, you know, how his suicide impacted

18   you at the time?

19   A.     Just sad that it happened.  He did it, I

20   believe it was on the anniversary of his mom's

21   passing, because his mom got runned over by a car

22   on a busy street in Humboldt Park, so I believe it

23   was close to the year anniversary of her death, so

24   it was kind of sad that, you know, that that

25   family had to deal with that.

**Veras - Direct/Bonjean**

16

1       Q.    Sure.  Did you attend any services in
2   connection with Mr. Sanchez's funeral or burial?
3   A.    I did.
4       Q.    All right.  And do you recall when
5   you attended any of those funerals -- strike that.
6           Let me ask you this.  Was there a
7   visitation for --  I'm sorry.  Mr. Veras, can you
8   just move that?
9   A.    Yes, I see it.  Sorry.
10      Q.    Okay.  After Mr. Sanchez took his own
11  life, do you know whether or not there were
12  services or visitations arranged so people could
13  pay their respects?
14  A.    Yes.
15      Q.    Okay.  And can you tell me whether or
16  not there was, in fact, a visitation at the funeral
17  home?
18  A.    Yes, there was at Andersen Funeral Home.
19      Q.    You said Andersen Funeral Home?
20  A.    Yes.  North Avenue and Sawyer.  That's in
21  the neighborhood.
22      Q.    Right.  And do you remember the date
23  on which that visitation took place?
24  A.    No, I don't.
25      Q.    Okay.  Okay.  I'm going to show what

Veras - Direct/Bonjean

17

1   I'm going to mark as Veras-1.

2              (Veras-1, Bates JGS_Maysonet 02552,

3   marked for identification.)

4              MS. BONJEAN:  Haley, can you pull up

5   the visitation card?

6              MS. COOLBAUGH:  Yes, I can.

7       Q.    I am going to have you look at

8   something and see if it refreshes your

9   recollection.  Okay?

10  A.    Okay.

11             MS. BONJEAN:  That's not what I am

12  talking about.  The palm card.  Do you know what I

13  am talking about, or no?

14             MS. COOLBAUGH:  I do not have that in

15  this folder, so just give me one second.

16             MS. BONJEAN:  While we're waiting for

17  you to find that palm card, can you pull up the

18  document you just pulled up, and we'll have him

19  look at that.

20       Q.    Okay.  Mr. Veras, do you see this

21  document right here?

22  A.    I do.

23       Q.    And do you see that it says, Record

24  of Funeral?

25  A.    Record of Funeral, yeah, I do.

Veras - Direct/Bonjean

18

1        Q.    And to the right of that, it
2    indicates the funeral home that you mentioned
3    earlier, Edward Andersen Funeral Home.  Do you see
4    that?
5    A.    I'm reading -- oh, okay.  I didn't know I
6    could zoom in.
7        Q.    Yeah.  Can you see it?  Did you see
8    that, that it says Edward Andersen Funeral Home,
9    Mr. Veras?
10   A.    On the left?
11       Q.    No, on the right, on the right?
12   A.    Yeah, yeah, yeah, I see, the visitation,
13   the visitation times and whatnot, yes.
14       Q.    And do you see that --
15            MR. BRUEGGEN:  Jennifer, before we go
16   on, do you have a Bates stamp on this?  I just
17   can't see it on the page.  There we go.  Thank
18   you.
19            MS. BONJEAN:  Uh-huh.
20       Q.    Sir, do you see that it says the
21   deceased, the individual is Santiago E. Sanchez?
22   A.    Yes.
23       Q.    All right.  And I want to also ask do
24   you see that there were visitation services, it
25   says, on Wednesday from 5 to 9 p.m. and Thursday 5

Veras - Direct/Bonjean

19

1  to 9 p.m.?

2  A.     Yes.

3         Q.    Do you remember attending either or

4  both of those visitation services, or visitations?

5  A.     I believe I went to both of them.

6         Q.    And, sir, what is a visitation by --

7  I know people think of visitations in different

8  ways, so I just want to know what this visitation

9  was like?

10 A.     Viewing the body of the deceased.

11        Q.    Okay.  And is that when the body is

12 at the funeral home and you have an opportunity to

13 spend a minute or so with the body and then other

14 people who are mourning his death?

15 A.     Yes.

16        Q.    And was that inside the funeral home

17 there at Edward Andersen?

18 A.     Yes.

19        Q.    Okay.  And then it indicates that the

20 funeral itself was on Friday at 9:30 a.m. at St.

21 Sylvester Church; is that right?

22 A.     I believe so.

23        Q.    And did you attend the funeral as

24 well?

25 A.     I did.

20

1        Q.    Now, did your close group of friends

2   together go to the visitations of Mr. Sanchez?

3                MR. BRUEGGEN:  Object to the form.

4   A.    Yes.

5        Q.    Is that a yes?

6   A.    Yes.

7                MR. BRUEGGEN:  Same objection.

8        Q.    Okay.  And just so we make it clear,

9   I asked you earlier about a number of individuals,

10  including Mr. Gonzalez, Mr. Cruz, Efrain Cruz, Jose

11  Maysonet, yourself.  Would you consider yourself at

12  the time in May of 1990 a close group of friends?

13  A.    Yes.

14       Q.    Okay.  And did you all as a group

15  mourn the loss of Santiago Sanchez?

16  A.    Yes.

17       Q.    And were you all pretty broken up

18  about it?

19  A.    Yes.

20       Q.    And as a result, did you all attend

21  his visitation on that Wednesday and Thursday

22  preceding his funeral on, I believe, May 25th of

23  1990?

24                MR. BRUEGGEN:  Object to form and

25  foundation.  Go ahead, sir.

Veras - Direct/Bonjean

21

1          Q.     You can answer.

2     A.     Yes, I believe so.  We were all there.

3          Q.    Okay.   In fact, I'm going to -- hold

4     on a second.  All right.

5               MS. BONJEAN:  Haley, can you please

6     pull up now the palm card that I referenced

7     earlier?   I'm going to mark this exhibit as

8     Veras-2.

9               (Veras-2, Bates JGS_Maysonet 02561,

10    marked for identification.)

11         Q.    Mr. Veras, I'm going to have you look

12    at this real quick.  This is the front and back of

13    a card.  Do you recognize it?

14    A.     I'm familiar with these cards.

15         Q.    Okay.  Do you see that it reflects

16    that it appears or purports to be a palm card for

17    Santiago E. Sanchez?

18    A.     Hold.  On, I lost the video.

19         Q.    Okay.  Oh, okay.  Did you click

20    your -- oh, there we go.

21    A.     It's in a screen with four pictures in it.

22         Q.     I'm sorry?

23    A.     It's in a screen with four pictures in it.

24    How can I get back to where --

25         Q.    What are you seeing right now, sir?

Veras - Direct/Bonjean

22

1  A.      It's says 14 participants.

2          Q.    Okay.  Let's try again.  Can you see

3  the document now?

4  A.      I see it.

5          Q.    Okay.  Can you confirm for me that

6  you're seeing a document that purports to be some

7  type of card, what I would call a palm card?

8  A.      Um-hum.

9          Q.    Is that what you recognize it to be?

10 A.      Yes.

11         Q.    Okay.  And for those people who are

12 not from the Catholic faith, can you explain what a

13 palm card is?

14 A.       It's the cards that you get at the funeral

15 home, and it's got the saint on one side, or Jesus

16 Christ, and the description on the following side

17 with the individual's name, where they're going to

18 bury them, and they have a prayer in it.

19         Q.    And is this something that the people

20 who attend the funeral can get and bring home as, I

21 don't want to call it as a memento, but some type

22 of memoriam?

23 A.      Yes.

24         Q.    Now, this palm card, do you see that

25 it reflects that it was prepared in connection with

Veras - Direct/Bonjean

23

1    the death of Santiago E. Sanchez?

2    A.    Yes.

3         Q.    And it also indicates that the

4    funeral mass was on Friday, May 25th, 1990, at

5    9:30 a.m.?

6    A.    Yes.

7         Q.    And does that refresh your

8    recollection about when Mr. Sanchez's funeral was?

9    A.    Yes.

10        Q.    And it also indicates that, at the

11   bottom, that it took place at the Edward Andersen

12   Funeral Home or was -- that was the funeral home

13   handling the burial of Mr. Sanchez.  Do you see

14   that?

15   A.    Yes.

16        Q.    Would you agree that the visitations

17   took place then on the Wednesday, Thursday,

18   preceding May 25th, 1990?

19   A.    Yes.

20        Q.    So that would mean that there was a

21   visitation on May 23rd, 1990, and May 24th, 1990;

22   is that right?

23   A.    Sounds correct.

24        Q.    Okay.  And it's your recollection

25   that you went to both of those visitation; right?

24

1  A.    Correct.

2        Q.    Do you recall what time visitation on

3  Thursday, May 24th, 1990, ended?

4  A.    9 o'clock.  They always close at 9:00.

5        Q.    Okay.  And on Thursday, May 24th, in

6  1990, after visitation of Mr. Sanchez concluded, do

7  you recall what you and your friends did?

8  A.    No, not really.  Just walked around our

9  area.

10        Q.    Okay.  Did you go out and commit a

11  double murder, for example?

12  A.    No.

13              MR. BRUEGGEN:  Object to form.

14        Q.    And then you were all prepared to get

15  up in the morning and go to this funeral; right?

16  A.    Correct.

17        Q.    And did you go to the funeral for

18  Mr. Sanchez?

19  A.    Yes, I was.

20        Q.    I want to show you some pictures, if

21  I could, and see if you can identify for me a few

22  things.  We'll call this group exhibit Veras-3.

23              (Veras-3, Bates JGS_Maysonet 002553

24  through 002560, marked for identification.)

25        Q.    Are you okay, Mr. Veras?  Do you need

Veras - Direct/Bonjean

25

1    a break or anything?

2    A.    No, I'm fine.

3         Q.    Okay.  Sir, do you recognize this

4    photograph right here?

5              MS. BONJEAN:  If you can scroll it up

6    a little bit, please, Haley, so he can see the

7    whole thing.  Okay.  And then go back down.

8         Q.    Do you recognize this photo,

9    Mr. Veras?

10   A.    I do.

11        Q.    And what do you recognize it to be?

12   A.    Macho's funeral.

13        Q.    And do you know where this photograph

14   was taken?

15   A.    At the cemetery.

16        Q.    All right.  And this would have been

17   when he was being buried; right?

18   A.    Yes.

19        Q.    Do you recognize any of the

20   individuals in the photo?  I know it's not great

21   quality, but are you able to recognize any of

22   individuals?

23   A.    Yes, I see Efrain Cruz is in the picture.

24        Q.    Can you tell us what Efrain is

25   wearing in this photograph?

**Veras - Direct/Bonjean**

1  A.     He's standing by the guy with the

2  white-sleeved jacket, Adidas jacket.  That guy

3  name, I believe that was Woody.

4          Q.    So the guy in the white Adidas jacket

5  is a fellow named Woody; is that right?

6  A.     I believe so.  I can't really tell by his

7  face, but I know that's Efrain next to him.

8          Q.    And if we're looking at the picture,

9  Efrain is to his left; right?

10 A.     Yes.

11         Q.    And do you see who is standing

12 directly behind the guy in the white Adidas jacket;

13 can you tell?  With the white --

14 A.     Yes, I believe that looks like Juan.

15         Q.    And when you say Juan, you're talking

16 about Juan Jose Maysonet, Junior; right?

17 A.     Yes, Double J.

18         Q.    I'm sorry.  Double J?

19 A.     Yes.

20         Q.    By the way, did Juan go by any other

21 nicknames that you know of other Juan or Jose or

22 Double J?

23 A.     No.

24         Q.    Mr. Veras, do you see yourself in

25 this photograph, by the way?

Veras - Direct/Bonjean

27

1    A.     No, I don't think I'm in...

2          Q.    I know it's just one shot, but I'm

3    just wondering if you see yourself in here

4    anywhere?

5    A.     No, no, I don't.

6              MS. BONJEAN:  Okay.  Let's go to the

7    next picture, Haley.

8          Q.    Okay.  Mr. Veras, do you recognize

9    this photograph at all?

10             MS. BONJEAN:  And go down all the

11   way, Haley, so he can see the whole thing, please.

12         Q.    Do you recognize this photo?

13   A.     No, I never seen it before.

14         Q.    Okay.  Do you know what it depicts?

15   A.     I believe this is where he committed

16   suicide at.

17         Q.    And do you see that there's a bouquet

18   of flowers there that's on the floor there, or on

19   the ground?

20   A.     I do.

21         Q.    Do you recognize anyone in this

22   photograph?

23   A.     Well, yeah.  Again, the guy, one of the

24   guys on the left side, again, that's Woody.

25         Q.    Okay.

Veras - Direct/Bonjean

28

1   A.      And Justino Cruz is in this picture.

2           Q.    Which one is Justino in this picture?

3   A.      I believe it's the guy on the right

4   standing up with his hands in his pocket.

5           Q.    With the gray, it looks like grayish

6   sweat pants, or white pants?

7   A.      Yes.

8           Q.    There's someone who appears to be a

9   darker complected, I don't know what his background

10  is, but he's got a white cap on.  Do you know who

11  that is?

12  A.      No.

13          MS. BONJEAN:  All right.  Next

14  picture, please.

15          Q.    Okay.  Do you see this photograph,

16  Mr. Veras?  Do you recognize what's depicted here?

17  A.      I believe this was at the cemetery.

18          Q.    Okay.  I know this is sort of from

19  the back side.  Anyone here you recognize?  I know

20  it's not a great quality.

21  A.      Just that I can make out a couple guys,

22  yeah.

23          Q.    Can you tell me who you can make out,

24  and describe by what they're wearing, if you don't

25  mind?

Veras - Direct/Bonjean

29

1   A.      Straight back with the blue jean jacket.

2           Q.     Yeah.

3   A.      That's a guy we used to call Chicky.

4           Q.     Okay.

5   A.      And then on the left side, some guy that

6   his name was Tank, but I'm not too sure if it's

7   him.

8           Q.     Okay.  Fair enough.

9                  MS. BONJEAN:  Okay.  Haley, just

10  scroll up.  I don't know if there's anything else

11  that I need to show at this moment.  Oh, there we

12  go.  Let's show this one.

13          Q.     Mr. Veras, do you recognize the image

14  that's depicted in this photograph?

15  A.      Not really.

16          Q.     Okay.  Do you see that there's a

17  hearse with flowers on top of it in the picture?

18  A.      Yes.

19          Q.     Was there some type of processional

20  that went to the cemetery after Mr. Sanchez's

21  funeral?

22  A.      Yes.

23                 MS. BONJEAN:  Okay.  And just for the

24  record, Haley, let me put the Bates stamp on the

25  record.  That is JGS_Maysonet 02557.

Veras - Direct/Bonjean

30

1           Let's go to the next photograph,
2    please.  Okay.  And keep going down, please.  No,
3    no, I just want to get the Bates stamp.
4    JGS_ Maysonet 02558.  Can you scroll out a little
5    bit so he can see the whole thing.  Okay.  Yes.
6           Q.    Do you recognize what is depicted in
7    this photograph, Mr. Veras?
8    A.      It's the body of Santiago Sanchez with
9    somebody praying over it.
10          Q.    And so do you recognize the
11   individual with the goatee as the body of
12   Mr. Sanchez?
13   A.      Yes.
14          Q.    And are you able to make out who the
15   person is who's praying over him?
16   A.      No, not really.
17          Q.    Okay.  Do you know from looking at
18   this photograph whether this was a photograph that
19   was taken at the visitation of Mr. Sanchez?
20   A.      Yes.
21          Q.    Okay.  Because the casket isn't open
22   at the funeral; right?
23   A.      Right.
24          Q.    Where is the casket open in a funeral
25   that's being held in the Catholic faith?

Veras - Direct/Bonjean

31

1   A.      At the funeral home.

2           Q.     I'm sorry?

3   A.      At the funeral home.

4           Q.     Okay.  And this would have been at

5   the visitation time when you had the opportunity to

6   pray over the casket; right?

7   A.      Yes.

8           Q.     Okay.

9                  MS. BONJEAN:  You can take that down,

10  Haley.

11          Q.     Thank you, Mr. Veras.

12                 Now, people dying in Humboldt Park in

13  the 1990s was an all-too-frequent occurrence; would

14  you agree with that?

15  A.      I agree.

16          Q.     Was it common for someone to actually

17  take their own life, though?

18  A.      No.

19          Q.     Is that something that was an unusual

20  occurrence that would stick out in your mind?

21  A.      Yes.

22          Q.     So now I want to ask you specifically

23  about the early morning hours of, let's see,

24  May 25th, 1990, at around midnight, I'm going to go

25  draw your attention to, okay, midnight or one in

Veras - Direct/Bonjean

32

1    the morning.  Okay?

2    A.    Okay.

3         Q.    This would have been about, just to

4    put it in context, this would have been the day of

5    Mr. Sanchez's funeral but at about 12 or 1 o'clock

6    in the morning.  Okay?

7    A.    Okay.

8         Q.    Okay.  Did you hear or learn in that

9    time that there had been two black men that had

10   been shot on North Avenue at around 12 or -- about

11   one in the morning on May 25th of 1990?

12   A.    Yes, I recall that.

13        Q.    Okay.  When do you recall learning

14   that these men had been shot and killed on North

15   Avenue on the morning hours of May 25th, 1990, at

16   about 1 a.m.?

17   A.    Where you're asking?

18        Q.    No, no.  When did you first hear

19   about that shooting?

20   A.    I was told by a police officer.

21        Q.    So prior to being told by a police

22   officer that two black men were shot on North

23   Avenue, did you hear any information on the streets

24   about those men being shot?

25   A.    No.

Veras - Direct/Bonjean

```
 1          Q.    All right.  So where were you when
 2    you first learned that there had been two black men
 3    shot on North Avenue on May 25th in the early
 4    morning hours?
 5    A.     In custody at the 14th District Police
 6    Station.
 7          Q.    Do you have a recollection as you sit
 8    here today when it was that you were in the 14th
 9    District Police Station and learned of this
10    shooting that occurred on May 25th?
11    A.     What was your question?
12          Q.    Yeah, sure.  Do you have a date -- do
13    you have a recollection of what date it was when
14    you were in the 14th District when you heard all
15    this?
16    A.     Not really, but it was during the time of
17    the funeral, of Macho's funeral.
18          Q.    So it was shortly after the funeral,
19    would you say?
20    A.     Yes.
21          Q.    So how did you get into the 14th
22    District, as you recall?
23    A.     We were at a fast food restaurant called
24    Spunkey's, and the police did a neighborhood
25    sweep, and we got arrested, Efrain Cruz and I.
```

34

1      Q.    Would this have been after one of the
2  visitations?
3  A.    Yes.
4      Q.    So you remember it was like very much
5  around the time of Sanchez's death and funeral;
6  right?
7  A.    Yes.
8      Q.    Okay.  And was the 14th District
9  located on Shakespeare?
10  A.    Yes, it was.
11      Q.    Okay.  Were there any other members
12  of the Latin Kings present at the 14th District
13  when you were arrested and taken there?
14  A.    Yes, there was.  There was a bunch of
15  people arrested that day.
16      Q.    Okay.  Do you know who arrested you?
17  A.    Yeah.  Yeah, when I got arrested, I do know
18  the officer that arrested me was the same one that
19  told me about the two black guys that got shot on
20  North Avenue.
21      Q.    Got it.  Would you consider this sort
22  of a sweep that the police were doing?
23  A.    Yes.
24          MR. BRUEGGEN:  Object to form and
25  foundation.

Veras - Direct/Bonjean

35

```
 1          Q.    What is a sweep in your mind?
 2   A.     A sweep they used to call that when they
 3   come, when they come in the area and start
 4   arresting people that were hanging out to get them
 5   off the street.
 6          Q.    Okay.  And were those people charged
 7   with minor offenses like mob action or disorderly?
 8   A.     Disorderly conduct, yes.
 9          Q.    Is that what you were arrested for
10   after you and Efrain went to the visitation of
11   Mr. Sanchez?
12   A.     I believe so.
13          Q.    Okay.  So when you got to the 14th
14   District, you said there were a number of other
15   people there.  Do you remember what time of day it
16   was when you got there?
17   A.     No, it was night.  It was already in the
18   evening.
19          Q.    And your presence in the 14th
20   District on the evening prior to Mr. Sanchez's
21   funeral ended up being an important fact in your
22   life; didn't it?
23              MR. BRUEGGEN:  Object to the form.
24          Q.    I'm sorry?
25   A.     Yes.
```

Veras - Direct/Bonjean

36

```
 1        Q.    Okay.  And we'll get to that in a
 2   minute.  So let's talk about after you were
 3   arrested and brought to the 14th District.  You
 4   said you were with Efrain Cruz; right?
 5   A.    Yes.
 6        Q.    Did you get the impression that the
 7   sweep was in any way related to Macho's death?
 8             MR. BRUEGGEN:  Object to form and
 9   foundation.
10   A.    Yes.
11        Q.    And explain that to us, if you would?
12   A.    They just didn't want nobody out.  The
13   police didn't want nobody out because they were
14   probably in fear of retaliation, but there wasn't
15   going to be any retaliation if Macho took his own
16   life.  Who are they going to retaliate against?
17   They just wanted to get people off the street.
18        Q.    Was Macho's death something that had
19   inspired the emotions of the community, if that
20   makes sense?
21             MR. BRUEGGEN:  Object to form.  Go
22   ahead, sir.
23        Q.    If you understand?  I'll rephrase if
24   you don't.
25   A.    Yes, please rephrase.
```

1      Q.     Were people upset that Macho had
2  died, and were emotions high?
3  A.     Well, yeah, they were upset that he took
4  his own life.
5      Q.     Right.  But this was an emotion in
6  the form of sadness; right?
7  A.     Correct.
8      Q.     Were there people -- were there Latin
9  Kings who were talking about, you know, retaliating
10  because, or shooting people because Macho had taken
11  his own life?
12  A.     No.
13              MR. BRUEGGEN:  Object to form.
14  Compound.
15      Q.     I'll break it up for you.  Did you
16  ever hear any Latin King members talk about
17  shooting any rival gang members or anyone because
18  Macho had committed suicide?
19  A.     No.
20      Q.     I'm going to take a break right here
21  and have you take a look at a document we sent you
22  earlier.  We'll call it Veras --
23              MS. BONJEAN:  I guess we're on
24  Veras-4?
25              MS. COOLBAUGH:  Yes, Veras-4.

Veras - Direct/Bonjean

38

1          MS. BONJEAN:  Okay.  Can you show him

2     the affidavit?  I just want to have him look at it

3     real quick.

4               (Veras-4, Bates JGS_Maysonet 01722

5     through 01724, marked for identification.)

6          Q.    Mr. Veras, do you recognize what

7     appears to be an affidavit with the caption, People

8     of the State of Illinois versus Alfredo Gonzalez?

9     A.     I do.

10          Q.    All right.  And it says, Affidavit of

11     Francisco Veras right there.  Do you see that?

12     A.     Yes, I do.

13          Q.    And I'm going to go to the last page

14     and just see if you can recognize your signature.

15     Do you see your signature there, sir, with a date

16     of 1/21/18 next to it?

17     A.     I do.

18          Q.    Now, I know it's not notarized, but

19     do you recognize that as your signature?

20     A.     I do.

21          Q.    Let's go back to the first page, if

22     we can.  We have been talking about it, but we'll

23     just continue from here.

24               At number 10, you indicate in your

25     affidavit that after you were processed at the

Veras - Direct/Bonjean

39

1   lockup in the 14th District, a Hispanic police

2   officer who you knew as Red told you that two

3   people had been killed at St. Louis and North

4   Avenue.  And you testified that to that earlier; is

5   that right?

6   A.     Yes.  We thought they -- we both assumed

7   they were Kings that got killed.  That's why he

8   came and told me about it.

9          Q.     Had you heard about any Kings being

10  killed before this officer told you?

11  A.     No.

12         Q.     Is it usually something that you

13  would hear if a Latin king was killed, you'd hear

14  that on the street?

15  A.     Well, yeah, pretty much.

16         Q.     Okay.  And I know at the time you

17  didn't know the government name for Red.  As you

18  sit here today, has that come -- do you know who

19  that is, or were you ever able to determine what

20  his real name was?

21  A.     No.  Just I know his first name was Tom or

22  Thomas, but he went by the nickname Red because he

23  had rust-colored hair.

24         Q.     Was he white?

25  A.     He was light complexion, yes.

Veras - Direct/Bonjean

40

1      Q.    Oh, you said Hispanic, but he was a
2  light-complected Hispanic; is that right?
3  A.    Correct.
4      Q.    He was a 14th District patrol
5  officer?
6  A.    Correct.
7          MR. BRUEGGEN:  Object to form and
8  foundation.
9      Q.    Was he an officer who worked in
10 uniform?
11 A.    Yes.
12         MS. BONJEAN:  Okay.  Go to the next
13 page, Haley.
14     Q.    Now, it says here at paragraph 11
15 that, it looks as if you were in the lockup for a
16 period of time.  Do you remember how long you were
17 in there?
18 A.    A few hours.
19     Q.    And according to your affidavit, you
20 said that you did communicate to other people on --
21 or strike that.  I'm sorry.  You were there for a
22 few hours and that Red came back and told everyone
23 that the guys that were killed were black and not
24 Latin Kings.  Do you remember that?
25 A.    Yes.

41

```
1        Q.    Did he provide any other information
2   about the men that were killed?
3   A.    No.
4        Q.    Okay.  And then at paragraph 12, it
5   says that you got out early in the morning and that
6   you took a nap and then went to Macho's burial,
7   which was at 9:30 in the morning; is that right?
8   A.    Yes.  We got out probably like around three
9   in the morning.  Two, three in the morning.
10        Q.    So you went home for a little bit,
11   slept, showered, and then went to the burial, or
12   funeral; right?
13   A.    Correct.
14        Q.    In paragraph 13, you indicated that
15   something happened a few weeks after you were
16   arrested at Spunky's.  Do you see that?
17   A.    Yes.
18        Q.    Okay.  It indicates that you and
19   Efrain Cruz were arrested by Detective Guevara and
20   his partner in the area of Lemoyne and Spaulding.
21   Do you remember that?
22            MR. BRUEGGEN:  Object to form.
23   A.    Correct.  Yes, it was close to Lemoyne and
24   Spaulding.
25        Q.    Okay.  Can you tell us what happened
```

Veras - Direct/Bonjean

42

```
 1   a few weeks after you were arrested at Spunkey's

 2   when Detective Guevara and his partner arrested

 3   you?

 4   A.     What was the question again?

 5          Q.    Yeah.  First of all, let me start

 6   here.  Did you know who Detective Ray Guevara was

 7   back on May 25th, 1990?

 8   A.     I did.

 9          Q.    Okay.  And how did you know him?

10   A.     He was known as locking people up for

11   murder.

12          Q.    I didn't mean to cut you off.  Did

13   you say he was a detective?  I'm sorry.  Did you

14   hear my question?

15   A.     No.  Sorry.  My phone had just rung.

16          Q.    No problem.  Did you say Detective

17   Guevara was a detective?

18   A.     Yes.

19          Q.    And do you know what area he was

20   associated with?

21   A.     Area Five, I believe it was.

22          Q.    Was that at Grand and Central?

23   A.     It was.

24          Q.    Do you know who Detective Guevara's

25   partner was back in May of 1990?
```

Veras - Direct/Bonjean

43

```
 1   A.     No, not really.
 2          Q.    Could you describe him?
 3   A.     White.  I believe it was a white man,
 4   probably late forties maybe.
 5          Q.    Does the name Earnest Halvorsen ring
 6   a bell to you?
 7   A.     No.
 8          Q.    Okay.  Now, you said you knew Guevara
 9   from the neighborhood because he was known for
10   locking up people for murders.  Did you say that?
11   A.     Yes, I did.
12          Q.    And when you say locking up people
13   for murders, what do you mean by that?
14   A.     By getting people to either point them out
15   in lineups or getting witnesses to point them out
16   in lineups, even though the individuals were
17   innocent.
18          Q.    So when you say locking up, do you
19   mean he was known in the neighborhood for framing
20   people?
21   A.     Correct.
22                MR. BRUEGGEN:  Object to form.
23          Q.    What was his reputation in the
24   neighborhood in terms of -- did people in the
25   neighborhood have an understanding of how he would
```

Veras - Direct/Bonjean

44

1  go about framing members of gangs?

2              MR. BRUEGGEN:  Object to foundation.

3        Q.    I'm sorry.  Your answer?

4  A.      Yes.

5        Q.    What did you understand his tactics

6  to be?

7  A.      Having people point individuals out in

8  lineups, or he'll use tactics to have your own

9  friends signing statements on you, on an

10  individual.

11       Q.    And was he someone that was feared in

12  the neighborhood?

13  A.      Yes, definitely.

14       Q.    And why was he someone who was feared

15  by the young people in the neighborhood back in the

16  May of 1990?

17              MR. BRUEGGEN:  Object to foundation.

18       Q.    You can answer.

19  A.      He had a reputation of putting people in

20  jail for a long time, so when he was in the

21  neighborhood, everyone knew disappear, you know,

22  go somewhere and get off the streets.

23       Q.    When you heard that Ray Guevara was

24  in the neighborhood, did you try to avoid contact

25  with him?

Veras - Direct/Bonjean

45

1    A.    Well, on that -- on the day he grabbed me,

2    I wasn't aware he was in the neighborhood, but if

3    I would have known he was in the neighborhood,

4    there was no way I would have been around there.

5         Q.    And why is that?

6    A.    Because of his reputation.

7         Q.    And that's his reputation for framing

8    people?

9    A.    Yeah.  I have a few friends that were

10   arrested by Guevara, and I know -- I knew the

11   outcome.

12        Q.    All right.  So on this day, a few

13   weeks after May 25th of 1990, when you were

14   arrested at Spunkey's, you ran into Detective

15   Guevara and his partner near the area of Lemoyne

16   and Spaulding; is that right?

17   A.    Yes, sounds about right.

18        Q.    Okay.  And explain what happened when

19   you encountered Detective Guevara and his partner,

20   along with Efrain Cruz, during this period shortly

21   after your arrest at Spunkey's?

22             MR. BRUEGGEN:  Object to foundation.

23   Assumes facts not in evidence.

24        Q.    You can answer.

25   A.    What was your question again?  You're

Veras - Direct/Bonjean

46

1    comparing Spunkey's with the time that Guevara

2    arrested me?

3          Q.    No, no.  And my question probably

4    wasn't clear.  I was just trying to put a timeline

5    on it because I'm assuming that you don't remember

6    the exact date that Detective Guevara arrested you;

7    right?

8    A.    No, no, I don't.

9          Q.    But it was a few weeks after you were

10   arrested at Spunkey's; right?

11   A.    Yes.

12         Q.    So having said that, you indicated in

13   your affidavit that you were also arrested with

14   Efrain Cruz; is that correct?

15               MR. BRUEGGEN:  Object to foundation.

16   A.    What was the question again?

17         Q.    Yeah.  So you indicated in your

18   affidavit that you were arrested by Detective

19   Guevara along with Efrain Cruz, who was also

20   arrested; right?

21               MR. BRUEGGEN:  Object to foundation.

22   Leading.

23         Q.    I'm sorry.  You can answer.

24   A.    Correct.

25         Q.    Okay.  Now, where were you and Efrain

Veras - Direct/Bonjean

47

1  Cruz when Detective Guevara and his partner

2  arrested you?

3  A.    Um, I believe we were walking, we were

4  walking north on Spaulding Avenue with, it was

5  Efrain Cruz, his son, and myself.

6        Q.    Do you recall where you were going?

7  A.    I think we were going to Foremost.  It's a

8  liquor store.

9        Q.    Do you recall what time of day it

10 was?

11 A.    No.

12       Q.    Okay.

13 A.    Probably like early evening, I want to say.

14       Q.    It wasn't in the morning, though;

15 right?

16 A.    No.

17       Q.    Did Detective Guevara say anything to

18 you -- strike that.

19              Did Detective Guevara say anything to

20 you when he encountered you and Efrain Cruz as you

21 were walking to the liquor store?

22 A.    I believe he told us that he wanted us to

23 come on in to fill in for a lineup.

24       Q.    And did he say what type of lineup he

25 wanted to have you fill in for?

Veras - Direct/Bonjean

48

1    A.    No.

2          Q.    When Detective Guevara asked people

3    on the streets to come fill in for a lineup, does

4    that get your heart pounding?

5                MR. BRUEGGEN:  I'll object to form.

6    A.    Yes.

7          Q.    You said it does; right?

8    A.    Yes.

9          Q.    Let me put it in more precise terms.

10   Were you terrified when Detective Guevara told you

11   he wanted you to come and stand in a lineup?

12   A.    Yes.

13         Q.    And what was your fear?

14   A.    Well, I was scared that he was going to

15   have somebody point me out and frame me.

16         Q.    And did you have any idea what he

17   might have you framed for?

18   A.    No.

19         Q.    Did it matter?

20   A.    No, it didn't, because I know -- and like I

21   said earlier, he already had some of my friends

22   locked up.

23         Q.    What would have happened if you just

24   told Detective Guevara that you weren't going to go

25   with him?

Veras - Direct/Bonjean

49

1   A.      It wasn't --

2               MR. BRUEGGEN:  Objection.

3   Speculation.

4           Q.    You can answer.

5   A.      It wasn't an option.  I couldn't tell him

6   no, I wasn't going fill in a lineup.  It's like,

7   You're coming to fill in for a lineup.  It wasn't

8   voluntarily.

9           Q.    So you didn't go voluntarily to go

10  sit in a lineup for Detective Guevara; is that

11  right?

12  A.      No, he just said it, that he needed people

13  to fill in for a lineup, but when they tell you

14  that, you can't tell them no.

15          Q.    What happened -- what did you fear if

16  you just said, No, I'm not going?

17  A.      Oh, well, he was just gonna lock us up

18  anyways.  He was still going to take us.

19          Q.    Right.  So it's not like you were

20  free to say no; is that right?

21  A.      Correct.

22              MR. BRUEGGEN:  Object to form.

23          Q.    In your experience, if you had just

24  said, I'm not going to go to a lineup, would he

25  have just arrested you?

Veras - Direct/Bonjean

50

1              MR. BRUEGGEN:  Object to form and
2    foundation.
3    A.     Yes.
4              Q.    Okay.  And did you see this happen
5    with other people in your neighborhood on a regular
6    basis?
7    A.     Yes.
8              Q.    So I'm assuming that you then, and
9    Efrain Cruz, accompanied Detective Guevara and his
10   partner back to Area Five; is that right?
11   A.     Yes.
12             Q.    Okay.  And did you go in the police
13   car with them?
14   A.     Yes.
15             Q.    All right.  Was it the four of you in
16   the squad car, or the detective car?
17   A.     Yes.  Well, he took us to drop off -- we
18   dropped off Efrain Cruz's son at Efrain's house,
19   and then we went to the police station.
20             Q.    So everyone piled in Detective
21   Guevara's car, and you drove first to drop off
22   Efrain Cruz's son; is that right?
23   A.     Yes.
24             Q.    How old was Efrain Cruz's son?
25   A.     Oh, probably like around five.

51

1      Q.    Was his son scared that Detective
2   Guevara was scooping you all up?
3           MR. BRUEGGEN:  Objection to
4   foundation.
5   A.    I would think, yeah, he was probably
6   scared.
7      Q.    Okay.  Did Detective Guevara say
8   anything to you or Efrain Cruz in the car prior to
9   -- hold on.  Let me finish my question, sir.  I'm
10  sorry.
11          Did Detective Guevara or his partner
12  say anything to you while you were in the car?
13  A.    No, not a word.
14     Q.    All right.  Now, after Efrain Cruz's
15  son was dropped off, where did Detective Guevara
16  take you and Efrain Cruz?
17  A.    Grand and Central police station.
18     Q.    And after he brought you in to Grand
19  and Central, can you tell us to the best of your
20  recollection exactly where you went?
21  A.    We went to the second floor of the police
22  station, and they put me in one interrogation room
23  and Efrain in another.
24     Q.    Prior to being placed in that
25  interrogation room at Area Five at Grand and

Veras - Direct/Bonjean

1    Central, did you have any idea why you had been

2    brought to Grand and Central other than Detective

3    Guevara saying he wanted you to serve as a filler

4    in a lineup?

5    A.     No.

6           Q.    Did it frighten you that you were

7    sitting in an interrogation room at Grand and

8    Central without knowing why you had been brought

9    there?

10   A.     Yes.

11          Q.    And again, why did that frighten you?

12   A.     Because of Guevara's reputation.

13          Q.    Did you fear that you might be framed

14   for a crime that you did not commit?

15   A.     Yes.

16              MR. BRUEGGEN:  Object to form.

17          Q.    Now, and you said in your affidavit

18   that you waited in that interrogation room for

19   several hours; is that right?

20   A.     Yes.

21          Q.    After -- well, strike that.

22              During the time that you were sitting

23   in an interrogation room, did you feel like you

24   were free to leave?

25   A.     No.

**Veras - Direct/Bonjean**

53

1        Q.    Do you know whether or not the door
2    was locked or open?
3    A.     It was locked.
4        Q.    Okay.  Even if it was open, would you
5    be free to leave?
6    A.     No.
7        Q.    So after you sat there for several
8    hours, what's the next thing that happened?
9    A.     Went to the lineups.
10       Q.    Were you questioned at all while you
11   were in the interrogation room prior to going to a
12   lineup?
13   A.    No, I believe we weren't, or I wasn't at
14   least.
15       Q.    You were not; you don't recall that?
16   A.    Right, no, I don't recall that.  I know we
17   were waiting for a little while, and then we went
18   to the lineups.
19       Q.    You don't know if Efrain Cruz was
20   questioned; do you?
21   A.    No, I don't.
22       Q.    Okay.  So you were brought to a
23   lineup.  And who brought you to the lineup?
24   A.    From the interrogation room?
25       Q.    Yes, sir.

Veras - Direct/Bonjean

54

1   A.      Some other officers.  It wasn't Guevara or

2   his partner.

3           Q.    Okay.  And when you got to the lineup

4   room, did you see anyone else there that you

5   recognized?

6   A.      Efrain Cruz.

7           Q.    Were there any other men there in the

8   lineup?

9   A.      There were.

10          Q.    Okay.  Did you recognize any of them?

11  A.      No.

12          Q.    All right.  All right.  So you stood

13  in the lineup.  Explain to us what happens when you

14  stand in a lineup?

15  A.      You're in a row with like about probably

16  five or six people, and they assign you a number,

17  and then they tell you they'll call your number

18  and they say step forward, step to the side, turn

19  to the side, and then go back in line.

20          Q.    And is that what happened when you

21  stood in this lineup along with Efrain Cruz after

22  you were arrested by Detective Guevara?

23  A.      Yes.

24          Q.    Okay.  Now, as you were standing in

25  this lineup with Efrain Cruz, did you hear

**Veras - Direct/Bonjean**

55

1   anything?

2   A.      When it was my turn to step forward, there

3   was a knock on the window.

4           Q.    Okay.  So you were asked to step

5   forward; is that right?

6   A.      Yes.

7           Q.    And then you heard a knock on the

8   window?

9   A.      Yes.

10          Q.    What did you understand that knock on

11  the window to mean?

12  A.      That I was --

13              MR. BRUEGGEN:  Objection to form.

14          Q.    I'm sorry.  Could you repeat that?

15  A.      That I was confirmed as the individual,

16  that I was pointed out in the lineup.

17          Q.    And how did you draw the inference or

18  conclusion that you had been identified, or you

19  thought you had been identified -- well, strike

20  that.

21              Why did you think the knock meant

22  that you were identified?

23  A.      Because they didn't knock for nobody else

24  until they got to Efrain.

25          Q.    And had you ever been in a lineup

Veras - Direct/Bonjean

56

1  before, Mr. Veras?

2  A.     Yes, one time prior.

3        Q.    Okay.  And was it your understanding

4  that when someone is identified in a lineup, it

5  wasn't uncommon for there to be a knock that would

6  indicate as such?

7             MR. BRUEGGEN:  Object to form.

8  A.     Yes.

9        Q.    All right.  So when there was that

10  knock on the window, it was your belief that you

11  had been identified for something; right?

12  A.     Yes.

13        Q.    Did you have any idea what you had

14  been identified for or thought you were identified

15  for?

16  A.     No.

17        Q.    Okay.  Now, as you were standing in

18  that lineup room, did you hear that knock again?

19  A.     Yes.

20        Q.    And how -- when -- in what -- when

21  did you hear the knock again?  What preceded it?

22  A.     For Efrain.

23        Q.    Did Efrain stand up and come forward

24  during the lineup?

25  A.     Yes.

Veras - Direct/Bonjean

57

1    Q.    And did you hear the knock again?

2    A.    Yes.

3    Q.    And what did you take that knock to

4    mean when that happened?

5    A.    That he was also identified.

6    Q.    Okay.  Now, you said in your

7    affidavit that you believe that you were in one or

8    two lineups.  Is that your recollection today, that

9    it was one or two?

10    A.    I think it was two because they had us do

11    it again.

12    Q.    And did they have you do it again

13    right after the first one, or was there some time

14    that elapsed?

15    A.    No, right after, right after the first

16    knock, then we had to do the whole process over

17    again.

18    Q.    And during the second lineup process,

19    were there knocks again when you stood forward in

20    the lineup?

21    A.    Yes.

22    Q.    And then it happened again with

23    Efrain Cruz?

24    A.    Yes.

25    Q.    So did you take that to mean that you

58

1  had been identified in two different lineups

2  presumably by two different people?

3  A.    Yes.

4        Q.    Okay.  And, again, after the second

5  lineup, did you even know what you had purportedly

6  or possibly been identified for or what you did?

7              MR. BRUEGGEN:  Objection to form.

8  A.    I had no idea.

9        Q.    So just to be clear, at no point

10  prior to Detective Guevara having you stand in

11  these lineups were you informed of the basis for

12  being placed in these lineups; correct?

13  A.    Correct.

14              MR. BRUEGGEN:  Object to form.

15  Foundation.

16        Q.    All right.  Now, in your affidavit,

17  you said after the lineups, you were then

18  interrogated by two or three detectives; is that

19  right?

20              MR. BRUEGGEN:  Objection.  Leading.

21  A.    Correct.

22        Q.    Okay.  Well, let's talk about it.

23  After the lineups, were you taken back to an

24  interrogation room?

25  A.    I was.

Veras - Direct/Bonjean

59

1        Q.    Were you placed in that room alone or
2    with someone else?
3    A.    Alone.
4        Q.    And tell us what happened after you
5    were returned to the interrogation room?
6    A.    I was told that I was pointed out of a
7    lineup for a double murder.
8        Q.    And who told you you had been pointed
9    out of a lineup for this double murder?
10   A.    One of the detectives.
11       Q.    And do you remember the name of that
12   detective?
13   A.    No.
14       Q.    Okay.  Do you know if it was a white
15   detective or a Hispanic detective?
16   A.    I would think it was a white detective.
17       Q.    Okay.  It wasn't Detective Guevara
18   who first told you that you had been pointed out in
19   the lineup?
20   A.    No.
21       Q.    All right.  So after this detective
22   told you that you had been identified in this
23   lineup, did he tell you what crime you had been
24   identified in connection with?
25   A.    No.  At first he was just saying it was a

Veras - Direct/Bonjean

60

1    double murder.

2          Q.    Did you later learn that it was the

3    double murder of the two black man that had been

4    referenced by Red?

5    A.    Yes.

6          Q.    After this detective told you that

7    you had been identified in a lineup, did you say

8    anything in response to him?

9    A.    Yeah, I told him I didn't kill nobody.

10         Q.    And what did he say in response to

11   your statement that you hadn't killed anybody?

12   A.    They didn't believe it.

13         Q.    Okay.  Do you know how long you were

14   interrogated?

15   A.    A few hours.

16         Q.    And do you know how many detectives

17   were involved in that interrogation?

18   A.    I would say like five or six.

19         Q.    Okay.  Now, at paragraph 19 of your

20   affidavit, it says, "Detective Guevara showed me

21   pictures of two dead black men and told me that I

22   had killed them.  His partner mentioned that the

23   murders happened near the Donald Duk's."  Do you

24   remember that?

25                MR. BRUEGGEN:  Object to form.

Veras - Direct/Bonjean

61

1    Leading.

2    A.     Yes.

3           Q.    So at some point did Detective

4    Guevara come into the interrogation room to

5    question you?

6    A.     Yes.

7           Q.    Okay.  And tell us what he said to

8    you and what you said back to him?

9    A.     First he said that I should make a

10   statement that they knew that I was the shooter

11   and that Efrain Cruz was the lookout and that an

12   individual by the name of Jeffrey Watts, which he

13   wasn't in custody, was the driver, that they knew

14   that, and for me to make a statement before Efrain

15   Cruz made a statement, because if he made a

16   statement that he was going to put me down as a

17   shooter, but if I made a statement saying that

18   Efrain was the shooter that they'll charge him

19   with the shooting.

20          Q.    And did Detective Guevara also show

21   you pictures of the two dead black men?

22   A.     At the end of that conversation, yes.

23          Q.    Okay.  I'm sorry.  I didn't mean to

24   cut you off.

25               MS. BONJEAN:  Did you get that,

Veras - Direct/Bonjean

62

1   Audrey?

2               COURT REPORTER:  No.  What did you

3   say?

4   A.     He got frustrated.

5               Q.   He got frustrated.  Okay.  Now,

6   Detective Guevara suggested to you that you should

7   make a statement against Efrain Cruz because the

8   first person who made a statement wouldn't get hit

9   with the shooting; is that right?

10              MR. BRUEGGEN:   Objection to form.

11  A.     Yes.

12              Q.   Is that one of the tactics that you

13  had heard from the street that Detective Guevara

14  would use to frame people?

15              MR. BRUEGGEN:   Objection.  Leading.

16              Q.   You can answer.

17  A.     Yes.

18              Q.   And when Detective Guevara told you

19  that -- well, strike that.

20              Did Detective Guevara also tell you

21  that he already had an ID on you so you may as well

22  go and make a statement?

23              MR. BRUEGGEN:   Objection.  Leading.

24  A.     Yes.

25              Q.   Did you get the impression that he

Veras - Direct/Bonjean

63

1    was trying to get you to implicate Mr. Cruz --

2    well, I'm going to strike that.  I'm going to start

3    over.

4                    After Detective Guevara told you that

5    you should just go ahead and make a statement

6    because he already knew you were responsible, did

7    you say anything in response to him?

8    A.      Nothing that I could remember.

9            Q.    Okay.  Did you tell him you would

10   make a statement?

11   A.      No.

12           Q.    Okay.  Did you tell him you were

13   innocent?

14   A.      I did.

15           Q.    Did you tell him you were innocent of

16   any murders more than once?

17   A.      Yes.

18           Q.    Did he tell you that Efrain Cruz was

19   going to make a statement against you?

20                 MR. BRUEGGEN:  Objection.  Leading.

21   A.      Yes.

22           Q.    What did Detective Guevara say about

23   what Efrain Cruz was going to do?

24   A.      Well, he was saying that if he made -- if

25   he did his statement first that I was going to be

Veras - Direct/Bonjean

64

1    arrested as the shooter, and that I didn't have a

2    chance, and that if -- he was getting, he was

3    getting riled up, and he said that if the two

4    black guys' grandmother passes away that they were

5    going to charge me with that murder as well,

6    because allegedly she was in the hospital.

7         Q.    Oh, so he said that the victims'

8    grandmother was in the hospital?

9    A.    Yes.

10        Q.    And he threatened to put that murder

11   on you as well if she passed away?

12             MR. BRUEGGEN:  Object to form.

13   A.    Yes.

14        Q.    Okay.  How long did the interrogation

15   with Detective Guevara go on?

16   A.    I don't know.  Probably half hour to an

17   hour maybe.

18        Q.    Now, he also told you something about

19   Jeffrey Watts, you said?

20             MR. BRUEGGEN:  Objection.  Leading.

21   A.    Yes.

22        Q.    Okay.  Who is Jeffrey Watts?

23   A.    Jeffry Watts is one of our friends.

24        Q.    Did he go by a name other than

25   Jeffrey Watts?

**Veras - Direct/Bonjean**

1    A.      Yes.

2            Q.    What did they call him?

3    A.      Slick.

4            Q.    Okay.  Did anybody ever call him

5    Black Jeffrey?

6    A.      Yes, he was known to be called Black

7    Jeffrey.

8            Q.    And was he darker complected?

9    A.      He was.

10           Q.    Is Jeffrey Watts alive to the best of

11   your understanding?

12   A.      No, he passed away.

13           Q.    Okay.  All right.  Tell me what was

14   going through your mind when Detective Guevara was

15   telling you that he wanted you to implicate Efrain

16   Cruz and that he was -- and that if Efrain Cruz

17   implicated you first, you would be the person that

18   would be charged with the shooting?

19                 MR. BRUEGGEN:  Object to form.

20   A.      I knew I wasn't going to -- I wasn't going

21   to sign any statements because I know I didn't

22   kill nobody.

23           Q.    And did you have any information that

24   Efrain Cruz had killed anybody?

25   A.      No.

Veras - Direct/Bonjean

66

1       Q.   All right.  Did he tell you at any

2  point when this murder allegedly happened?

3  A.     He did.

4       Q.   Okay.  And after you learned when the

5  murder happened, did anything occur to you?

6  A.     Could you rephrase that?

7       Q.   Yeah.  At some point did you make a

8  connection between what you heard from Red and what

9  Detective Guevara was telling you?

10  A.     Yes.

11       Q.   Okay.  Tell me how that happened?

12  A.     He came -- he came in the room, in the

13  interrogation room again, Guevara did, and he was

14  mad, I take it as being mad or ramped up.

15           MR. BRUEGGEN:  He's on mute.  Mr.

16  Veras, you're on mute.

17       Q.   Mr. Veras, if you could repeat your

18  answer because you were on mute for a second.

19  A.     Okay.

20       Q.   Okay.  So you said Detective Guevara

21  came into the room, and go ahead, if you can start

22  over?

23  A.     Yeah, he came in the room, like more, for

24  me, I take it as not mad, but he was like amped up

25  like almost yelling saying that I know I killed

Veras - Direct/Bonjean

1   those guys, that they have witnesses, and that,

2   again, if the guys, if their grandmother died that

3   I was going to be charged with that, and to be a

4   man and sign the statement, and then he slapped

5   the pictures of the two dead guys on the table,

6   and then he said, "You know you killed these guys

7   by the Donald Duk's on North Avenue," and then

8   that's when it clicked in what he was talking

9   about.

10        Q.   When you say it clicked in, what

11   clicked for you?

12   A.   That I was arrested at the time of their

13   murders.

14        Q.   Okay.  And did you say anything to

15   Detective Guevara after this clicked for you?

16   A.   I sure did.

17        Q.   What did you tell him?

18   A.   I told him that I didn't kill them, and I

19   believe I was cursing at him, and I told him where

20   I was the day of the murders, the night those

21   murders happened, and he walked out the room.

22        Q.   Did Detective Guevara ever tell you

23   who identified you as having committed the murders?

24   A.   He didn't, but the other officers --

25   another detective that was there did.

Veras - Direct/Bonjean

68

1      Q.    And what did the other detective say?

2  A.    Because I had a -- I had told the detective

3  when they were releasing us, I had made a comment

4  like, The person that pointed us out in the lineup

5  must know a lot about this case, that that's who

6  they needed to arrest.

7      Q.    And --

8  A.    And in the conversation, then he told me

9  who was the ones that were pointing me out in the

10  lineup.

11      Q.    Who did they say pointed you out of

12  the lineup?

13  A.    Double J, Juan; and his girlfriend Rosy.

14      Q.    Okay.  So a detective told that you

15  Juan Maysonet and his girlfriend Rosy were the

16  people who identified you from the lineup; is that

17  right?

18  A.    Correct.

19      Q.    Were you ever -- did you ever receive

20  any information that showed that they were --

21  strike that.

22          Did you ever see Juan or Rosy at the

23  police station a few weeks later?

24          MR. BRUEGGEN:  Object to form.  A few

25  weeks later?

69

1          MS. BONJEAN:  Yeah, let me -- that

2   was bad.  Okay.

3          Q.    When you were in custody at Grand and

4   Central, did you ever see Jose Maysonet or his

5   girlfriend Rosy?

6   A.    No.

7          Q.    Are you aware that there is not any

8   police report or any indication anywhere that they

9   viewed a lineup several weeks after your arrest?

10          MR. BRUEGGEN:  Object to form and

11   leading.

12   A.    What was the question again?

13          Q.    Yeah.  Were you aware that there is

14   not a single police report or note that Juan

15   Maysonet or Rosa Bella ever viewed a lineup at all?

16          MR. BRUEGGEN:  Same objection.

17   A.    I think they probably wouldn't because they

18   were probably scared I was going to sue them.

19          Q.    Who?  The police?

20   A.    The police.

21          Q.    Are you aware that no police officer

22   has ever testified that Juan or Rosy had viewed a

23   lineup?

24          MR. BRUEGGEN:  Object to form.

25   Leading.

Veras - Direct/Bonjean

70

1   A.      No.

2           Q.      Okay.  Were you aware that Rosa Bella

3   has testified that she never viewed this lineup?

4                   MR. BRUEGGEN:  Object to form and

5   leading.

6   A.      No.

7           Q.      Okay.  So I guess my point is do you

8   have any idea whether anyone was actually viewing

9   that lineup from firsthand knowledge?

10  A.      No.

11          Q.      Okay.  So that was information that

12  you got from a detective; right?

13  A.      Correct.

14          Q.      And you don't know which detective it

15  was; right?

16  A.      No.

17          Q.      Okay.  Did an officer ever apologize

18  to you?

19  A.      Yes.

20          Q.      Who apologized to you; do you

21  remember?

22  A.      I believe he was -- I believe he was

23  probably the lead detective.  He had a Polish last

24  name.  Tall.  It was a tall individual, white.  He

25  came in and apologized for everything after they

Veras - Direct/Bonjean

1    confirmed that I was in Shakespeare that night.

2         Q.    Was that -- I'm sorry.  Go ahead.

3    A.    No, no.  He just came in and apologized.

4         Q.    What did he say to you, if you can

5    just summarize?

6    A.    He just apologized, that they were sorry of

7    what was going on, and it was actually him and

8    another detective came in and that we were going

9    to be given a ride back home, if we needed

10   anything, if we were hungry, if we wanted

11   cigarettes.

12        Q.    Did they tell you whether or not --

13   well, strike that.

14              Did any detective tell you whether

15   they had, in fact, confirmed that you were in

16   custody at the time of the murders?

17   A.    Yes.

18        Q.    Which detective, if you know, told

19   you that?

20   A.    The lead detective that I was talking

21   about.

22        Q.    Okay.  And you said he was a white

23   man with a Polish last name?

24   A.    Yes.

25        Q.    Was his name Detective Paulnitsky?

Veras - Direct/Bonjean

72

1  A.     You know, it could be.  I can't really tell

2  you.

3       Q.   Did his last name end with a "sky"?

4  A.     It did, yes.

5       Q.   Now, did anything happen prior to

6  your release other than what you testified here

7  today that stands out in your mind?

8  A.     No.  Afterwards, shortly after that,

9  Alfredo Gonzalez got arrested.  Justino Cruz got

10 arrested.  And that was it.  They were all

11 charged.

12      Q.   And Jose Maysonet got arrested;

13 correct?

14 A.     Correct.  From my understanding, they made

15 statements on each other, and they all got

16 arrested and got a lot of time, except for

17 Justino.  I guess Justino was the first one to

18 sign because I believe he only got nine years for

19 the case and --

20      Q.   Go ahead.

21 A.     And Freddy, Alfredo Gonzalez got natural

22 life without parole.  And Jose, I don't recall

23 what he got.

24      Q.   He got natural life, too.

25           But prior to you going to Area Five

73

```
 1   after Detective Guevara arrested you, had you heard
 2   about any of your crew being involved of the
 3   murders of these two black men?
 4               MR. BRUEGGEN:  Objection to form.
 5   Misstates the testimony.
 6   A.    No.
 7               MR. BRUEGGEN:  Go ahead, sir.
 8   A.    No.
 9        Q.    Was there any word on the street,
10   apart from what we've talked about, about who might
11   have been responsible for the murders of these two
12   African American men?
13   A.    No.
14        Q.    Do you have any reason to believe
15   that the murders of the Wiley brothers, the two
16   black men, was gang motivated in any way?
17               MR. BRUEGGEN:  Objection to
18   foundation.  Speculation.
19   A.    No.
20        Q.    The two men that -- well, let me put
21   it this way.  Do you have any reason to believe
22   based on your experiences at that time on the
23   streets that the Latin Kings were responsible for
24   the murders of those two black men?
25               MR. BRUEGGEN:  Object to foundation.
```

Veras - Direct/Bonjean

74

1   Speculation.  Go ahead, sir.

2   A.     No, I wouldn't think -- in my opinion, I

3   don't think it was.

4          Q.    Did you ever hear that any Latin

5   Kings killed those men?

6   A.     No.

7          Q.    Were you aware that the two men had

8   no gang affiliation?

9                MR. BRUEGGEN:  Object to foundation.

10  A.     No.

11         Q.    Is it very common for Latin Kings to

12  be killing people who have no gang affiliations?

13               MR. BRUEGGEN:  Object.  Speculation.

14  A.     No.

15         Q.    Now, when you left Grand and Central,

16  did you leave with Efrain Cruz?

17  A.     Yes.

18         Q.    And did you guys talk about what had

19  happened there at Area Five?

20  A.     Yes.

21         Q.    Did he explain to you whether or not

22  he had a similar experience to you while you were

23  both locked up there at Area five for those hours?

24               MR. BRUEGGEN:  Object to leading.

25  A.     Yeah.

Veras - Direct/Bonjean

75

1      Q.     I'm sorry?

2    A.     Yeah, we were both talking about their

3    tactics and what they were saying for us, for one

4    of us to sign before the other one, and he said

5    that they did the same thing to him.  They were

6    telling him to sign a statement on me before I

7    signed a statement on him.

8      Q.     Do you know whether or not any of the

9    detectives arrested or took Jeffrey Watts into

10   custody?

11          MR. BRUEGGEN:  Object to foundation.

12   A.     He was never in custody.

13     Q.     Did you ever talk to Jeffrey Watts

14   about this incident?

15   A.     At the time of the incident, he was

16   arrested in the Cook County Jail.

17     Q.     Oh.  When you say the incident, you

18   said Jeffrey Watts was in custody at the Cook

19   County Jail at the time that you were brought into

20   Area Five by Detective Guevara?

21   A.     Yes, I believe so.

22     Q.     Do you know whether Jeffrey Watts was

23   in custody at the Cook County Jail at the time of

24   Santiago Sanchez's funeral?

25   A.     You know, it's a possibility because I

Veras - Direct/Bonjean

76

1   don't recall him being at the funeral.

2           Q.    Fair to say that if he was in custody

3   on May 25th, 1990, he could not have taken any role

4   in the murders of these two men; right?

5   A.    No.  I get that they wanted two Hispanics

6   and one dark-complected or black individual

7   because that's the pattern they were going for

8   with myself, Efrain, and Jeffrey being black, and

9   then got Alfredo Gonzalez and Justino being

10  light-complected and Jose being dark, so I think

11  that was the pattern they were going for.

12          Q.    And also did you know Christopher

13  Goossens was ultimately charged with the double

14  murder of the black men?

15  A.    I did not know he was charged.

16              MR. BRUEGGEN:  Objection to

17  foundation.

18              MS. BONJEAN:  Are we disputing that

19  Christopher Goossens was charged with the murders,

20  Dave?

21              MR. BRUEGGEN:  No, I'm objecting

22  whether he knows.

23              MS. BONJEAN:  Well, I'm asking him

24  whether he knows.

25  A.    No, I don't know.

Veras - Direct/Bonjean

1        Q.    Was Christopher Goossens a
2    darker-complected person?
3    A.    He's probably the same complexion as Jose
4    Maysonet.
5        Q.    Okay.  Now, do you have any idea why
6    the detectives were trying to frame two lighter
7    Hispanics and a darker-complected Hispanic, or
8    black person, what the motivation was?
9            MR. BRUEGGEN:  Objection to
10   speculation.  Foundation.  Go ahead, sir.
11   A.    My opinion is that, I believe since they
12   were going with Efrain and I as being the shooters
13   and Jeffrey as the driver, by Jeffrey being black
14   that they needed a dark individual in the case
15   because that's what they were going for from the
16   beginning.
17       Q.    Okay.  I see, and was it -- is it
18   your understanding that they had some information
19   that there was a driver who was black who was
20   involved in the shooting?
21   A.    I believe when I was implicated, implicated
22   Efrain, that they implicated Jeffrey, so by them
23   doing that, that that's why they came up with the
24   black individual as the driver.
25       Q.    Did Detective Guevara tell you

Veras - Direct/Bonjean

78

1   that -- strike that.

2              You testified that Detective Guevara

3   told you that you had been identified by witnesses;

4   right?

5   A.    Correct.

6         Q.    Did he tell you what other evidence

7   he had linking you to these murders when he was

8   trying to get you to make a statement?

9              MR. BRUEGGEN:  Object to foundation.

10  A.    No.

11        Q.    Did he tell you what other physical

12  evidence he had at all in connection to these

13  murders?

14             MR. BRUEGGEN:  Same objection.

15  A.    No.

16        Q.    Did he tell you whether he had any

17  other statements from witnesses?

18             MR. BRUEGGEN:  Same objection.

19  A.    No.  He was saying I was pointed out in the

20  lineup, and for me to sign the statements and to

21  do what's right before Efrain signs statements.

22        Q.    Got it.  All right.  I don't have

23  much more, Mr. Veras.  Bear with me, if you would.

24  Do you want to take a bathroom break?

25  A.    No.

Veras - Direct/Bonjean

79

1      Q.    Okay.  You said that after this

2  incident where you were taken to Grand and Central

3  by Detective Guevara, there were arrests made

4  sometime thereafter; is that right?

5  A.    Yes.

6      Q.    Do you recall how much time elapsed

7  from when you were released from custody at Grand

8  and Central to the time that other individuals were

9  arrested?

10  A.    Probably within days.

11      Q.    If you had not been in custody at the

12  14th District on the early morning hours of May

13  25th, of 1990, what do you think would have

14  happened?

15          MR. BRUEGGEN:  Objection to form.

16  A.    I would have been in Stateville with a

17  natural life.

18      Q.    I'm sorry.  Say that again, sir.

19  A.    I would have been sitting in Stateville

20  Correctional with natural life like Alfredo

21  Gonzalez is.

22      Q.    Okay.  Just a couple more questions

23  for you.

24          Now, I want to take us back real

25  quickly to May 25th of 1990, but before I -- I'm

80

1   going to say, or the evening of May 24th into May

2   25th, but before I do that, had you ever been to

3   Mr. Maysonet's house back in the 1990s?

4   A.    Yes.

5        Q.    Okay.  Did he live with Rosa Bella?

6   A.    Yes.

7        Q.    Do you know who Rosa Bella is?

8   A.    His girlfriend.

9        Q.    Did you know Juan's sister Rose?

10  A.    Rosy, yeah.

11       Q.    Now I want to draw you specifically

12  to, I'm going to go -- the date that I'm asking you

13  to think about, which you may or may not recall

14  specifically, would have been about five days

15  before Santiago Sanchez's funeral, May 20th of

16  1990, in the afternoon hours.  Okay?

17  A.    Okay.

18       Q.    And so this would have been a few

19  days before you were actually picked up and brought

20  to the 14th District, or about five days before.

21  All right.  And that's the time frame that I'm

22  looking at.

23         Do you recall going to Mr. Maysonet's

24  house at any time during that period with Alfredo

25  Gonzalez, Christopher Goossens, and Justino Cruz?

Veras - Direct/Bonjean

81

1              MR. BRUEGGEN:  Objection.  Leading.

2    A.     That never happened.

3              Q.    Have you ever been to Mr. Maysonet's

4    house with Christopher Goossens?

5    A.     Never.  That's why I know it didn't happen

6    because I never -- I didn't hang out with

7    Christopher like that.

8              (Off the record.)

9              MR. BRUEGGEN:  Let's go off the

10   record for a moment.

11             THE VIDEOGRAPHER:   The time is

12   12:42 p.m.  Going off the record.

13             (Off the record.)

14             THE VIDEOGRAPHER:  The time is 12:44

15   p.m.  Back on the record.

16        Q.    Mr. Veras, picking up where we left

17   off, I want to now draw your attention real

18   quickly, if you could, to August, mid-August of

19   1990.  This would be a few months later; right?

20   A.     Okay.

21        Q.    And specifically August 16th of 1990

22   at about 10 p.m.  Did you ever go to Mr. Maysonet's

23   home with Alfredo Gonzalez, Christopher Goossens,

24   Justino Cruz, and Efrain Cruz?

25   A.     No.

Veras - Direct/Bonjean

```
 1                    MR. BRUEGGEN:  Objection to
 2    foundation.  Leading.
 3           Q.    By the way, what was Alfredo's
 4    Gonzales's nickname?
 5    A.     Juvia (phonetic), Freddy.
 6           Q.    Did they call Justino Cruz Tino?
 7    A.     Yes.
 8           Q.    You said your nickname was Cisco.
 9    Did some people call Efrain Cruz King?
10    A.     Yes.
11           Q.    All right.  And you mentioned earlier
12    that you knew Christopher Goossens to go by the
13    nickname Fro; right?
14    A.     Right.
15           Q.    But he was not someone who was part
16    of your group of friends that we've identified
17    earlier; right?
18    A.     Right.
19           Q.    And you said you'd never been to
20    Mr. Maysonet's home with Christopher Goossens at
21    all; correct?
22    A.     Yes.
23           Q.    Now, on August 16, 1990, did you ever
24    go to Mr. Maysonet's house with the individuals
25    that I just identified and put a nine millimeter
```

Veras - Direct/Bonjean

83

1   gun to his head?

2                MR. BRUEGGEN:  Objection.  Leading.

3   A.     You said August of 1990.  I believe he was

4   already gone by then.

5           Q.    But whether he was or wasn't, were

6   you ever -- did you ever put a gun to

7   Mr. Maysonet's head?

8   A.     No.

9           Q.    Did you ever see Efrain Cruz put a

10  gun to Mr. Maysonet's head?

11  A.     No.

12          Q.    Did you ever see Alfredo Gonzalez put

13  a gun to Mr. Maysonet's head?

14  A.     No.

15          Q.    Did you ever see Christopher Goossens

16  put a gun to Mr. Maysonet's head?

17  A.     No.

18          Q.    Did you ever see Justino Cruz put a

19  gun to Mr. Maysonet's head?

20  A.     No.

21          Q.    Did you ever threaten Mr. Maysonet

22  that you would kill him if he talked about the

23  murders of these two black men?

24  A.     No.

25          Q.    Did you ever hear Efrain Cruz

Veras - Direct/Bonjean

84

1    threaten Mr. Maysonet to kill him if he talked

2    about the murders?

3    A.      No.

4            Q.    Did you ever hear anybody threaten

5    Mr. Maysonet that they would kill him if he talked

6    about the murders?

7    A.      No.

8            Q.    All right.  Were you ever at

9    Mr. Maysonet's -- well, strike that.

10                 Do you know if Jeffrey Watts had a

11   car?

12   A.      Yes, he had -- he always had a car.

13           Q.    He always had a car, you say?

14   A.      Yes.

15           Q.    Do you know what kind of car he had?

16   A.      At the time, no.

17           Q.    Okay.  All right.  Are you still in

18   contact with Justino Cruz?

19   A.      No.

20           Q.    What about with Freddy?

21   A.      No.

22           Q.    And I know the answer to this.  Are

23   you in contact with Mr. Maysonet at all?

24   A.      No.

25           Q.    And what about Christopher Goossens,

Veras - Direct/Bonjean

85

1    have you had any contact with Christopher Goossens?

2    A.    No.

3            Q.    If you give me one second, I may be

4    finished.  I just want to -- did you ever hear

5    that -- strike that.

6                    You said you didn't know what kind of

7    car Jeffrey Watts drove; right?

8    A.    Right.

9            Q.    Did you ever speak to Jeffrey Watts

10   about what happened to you at Area Five after you

11   were arrested by Detective Guevara?

12   A.    Yes.

13           Q.    And what did you tell him?

14   A.    I told him what happened and that they

15   pointed us out in the lineup and that they were

16   saying he was the driver.

17           Q.    And what did he say in response to

18   that?

19   A.    He just -- he really didn't say anything.

20   He just kind of like laughed it off, like what the

21   hell, why the hell they got my name involved with

22   that.

23           Q.    Okay.  Did you have any other

24   conversations with Jeffrey Watts about what the

25   detective was saying about his involvement in these

**Veras - Direct/Bonjean**

1    murders?

2    A.    No.

3          Q.    Did the detective say to you -- did

4    any of the detectives, including Detective Guevara,

5    ever tell you why they believed Jeffrey Watts was

6    involved in this murder?

7    A.    No.

8          Q.    Did you have any other conversations

9    with any law enforcement detectives or prosecutors

10   or anyone from the state apart from what you've

11   already testified here to today?

12   A.    No.

13         Q.    All right.  And, sir, you haven't

14   been involved in any gang activity for a very long

15   time; is that right?

16   A.    Correct.

17         Q.    When did you, I guess for lack of a

18   better word, leave the gang?

19   A.    '93.

20         Q.    And --

21   A.    After I got out of prison.

22         Q.    I'm sorry.  Say that again?

23   A.    After I got out of prison.

24         Q.    What did you end up going to prison

25   for?

**Veras - Direct/Bonjean**

1    A.      Possession of a controlled substance.

2            Q.    And how much time did you do for that

3    drug case?

4    A.      I was sentenced to four and a half years,

5    and I did 18 months, with six months on house

6    arrest.

7            Q.    And after you got out, did you leave

8    gang life behind you?

9    A.      I did.

10           Q.    And did you eventually leave Humboldt

11   Park?

12   A.      No, I actually still live in the same

13   building I grew up in in Humboldt, and I've been

14   here.

15           Q.    Ever since.  Okay.

16                 MS. BONJEAN:  Well, I appreciate your

17   time.  I have no further questions for you, but

18   some of the other attorneys may have some

19   questions for you.  Okay.

20                 THE WITNESS:  Okay.

21                 MS. BONJEAN:  Thank you.

22                 MR. BRUEGGEN:  Mr. Veras, again, I

23   introduced myself earlier.  My name is Dave

24   Brueggen.  I represent some of the defendant

25   officers.  I was hoping we could take like a

Veras - Cross/Brueggen

88

1    five-minute break to get up, stretch, get water,

2    use the facilities.  Is that okay?

3                    THE WITNESS:  You need a five-minute

4    break because I'm --

5                    MR. BRUEGGEN:  Yes, sir, if I could

6    have a five-minute break, too.  Get up, stretch,

7    get some water.  Is that okay?

8                    THE WITNESS:  Yeah.

9                    MS. BONJEAN:  Mr. Veras, we're taking

10   five minutes.  If you want to walk around or put

11   yourself on mute, or whatever you want to do,

12   we're going to go off the record now.  Okay?

13                   THE WITNESS:  Okay.

14                   (Break taken.)

15                   THE VIDEOGRAPHER:  The time is 1:04

16   p.m.  We are back on the record.

17   CROSS-EXAMINATION BY MR. BRUEGGEN:

18        Q.    All right.  Mr. Veras, thank you for

19   indulging me with a break.  I was also able to kind

20   of streamline my questioning to hopefully move

21   things along and get you out of here as quick as I

22   can.

23                   If at any time you don't understand

24   what I'm asking about because I may direct you to

25   some previous testimony, just get my attention, let

Veras - Cross/Brueggen

89

1   me know, and I'll make sure you understand what I'm

2   asking.  Okay?

3   A.      Okay.

4           Q.    Mr. Veras, you've told us that you've

5   given a deposition before; right?

6   A.      Yes.

7           Q.    How many depositions have you given?

8   A.      For this case?

9           Q.    No, no, just in general.  Before this

10  case, how many depositions have you given?

11  A.      Probably three, with this one.

12          Q.    Okay.  So two prior to this one; am I

13  understanding you correct?

14  A.      Correct.

15          Q.    Can you tell me the first dep you

16  ever gave what type of case was that?

17  A.      I was in a car accident in a company

18  vehicle, and I had to go to a deposition for the

19  individual that I had that car accident with.  He

20  was suing our company.

21          Q.    And do you recall how long ago that

22  was?

23  A.      Probably ten years ago maybe.

24          Q.    How about the deposition after that,

25  can you tell us what type of case?

Veras - Cross/Brueggen

1    A.      That was my mistake.  That was the only one

2    that I did, that I believe I did.  Yeah, I think

3    that was the only one.  I don't think the other

4    one was a deposition.

5           Q.    What is the other thing you were

6    thinking about that's like a deposition?

7    A.      I believe it was like a testimony for --

8    no, that was before the car accident.  This was

9    like in the '90s, probably in the 2000s, early

10   2000s.  It was a testimony for -- I really can't

11   recall.  I don't know.  It's coming up blank, but

12   I know I did a testimony in downtown Chicago.

13          Q.    I'm sorry.  Was that testimony?  Was

14   it in like a courtroom?

15   A.      No, no.

16          Q.    Was it with attorneys?

17   A.      It was, yes, yes, there was some attorneys

18   there.  We were all sitting in a room.  Oh, I

19   remember what it was.  It was a deposition for

20   also my -- the company I worked for, one of our

21   employees had a -- had a lawsuit going on for

22   unfair wages that he was -- that he wasn't paid,

23   so we did a deposition with the union and the

24   lawyers and stuff like that.

25          Q.    Thank you.  Have you ever filed a

Veras - Cross/Brueggen

91

1    lawsuit against a person or company?

2    A.    No, I believe I never did.

3          Q.    Sir, prior to this deposition today,

4    have you ever spoken to Ms. Bonjean on the phone

5    about the facts of this case?

6    A.    No.

7          Q.    Did you ever meet Ms. Bonjean in

8    person?

9    A.    No.

10          Q.    What about her partner, Ms. Cohen,

11   Ashley Cohen, did you ever speak to Ms. Cohen?

12   A.    No.

13          Q.    No?

14   A.    No.

15          Q.    Did you speak to anybody about the

16   substance of your testimony after receiving the

17   deposition subpoena prior to sitting down with us?

18   A.    What was the question again?

19          Q.    Again, it's from the time you were

20   first alerted that you were being requested to give

21   a deposition, did you speak to anybody about what

22   you were planning to say in this deposition?

23   A.    No.

24          Q.    Did anybody speak to you about the

25   facts or what this deposition entailed as far as

Veras - Cross/Brueggen

1   the facts of the case?

2   A.      No.

3          Q.     And then I think we established that

4   Ms. Bonjean sent you a copy of your affidavit that

5   you gave?  You're on mute now, sir.

6   A.      Yes.

7          Q.     Did you look at any other documents

8   regarding Mr. Maysonet's lawsuit other than that

9   affidavit?

10  A.      No.

11         Q.     Did you do any internet research

12  about Mr. Maysonet's lawsuit or what was going on?

13  A.      No.

14         Q.     Are you aware that Mr. Maysonet is

15  out of prison now?

16  A.      Yes.

17         Q.     When did you learn Mr. Maysonet was

18  out of prison?

19  A.      I seen it on the news.

20         Q.     And can you tell us what you saw on

21  the news as far as Mr. Maysonet being released from

22  prison, what you learned?

23  A.      Well, just seen him coming out and hugging

24  his family and being released for wrongfully

25  convicted.

Veras - Cross/Brueggen

93

1        Q.    And, sir, can you tell us what's the

2   highest level of education that you've completed?

3   A.     Junior, high school.

4        Q.    When you say junior high school, is

5   that graduating eighth grade?

6   A.     Junior in high school.

7        Q.    You were a junior in high school.

8   You completed your junior year of high school?

9   A.     Right, yes.

10       Q.    Did you obtain your GED?

11  A.     No.

12       Q.    Any other education or professional

13  training where you received a certificate?

14  A.     No.

15       Q.    In 1990, were you employed?

16  A.     1990, I believe I was.

17       Q.    Can you tell us where you were

18  employed?

19  A.     I used to work for Visual Handicapped

20  Managers of Illinois.  It was a vending company.

21       Q.    What did you do for that company,

22  just generally?

23  A.     I stacked up the vending machines, pulled

24  the daily cash out the vending machines, did the

25  cash sheets.

Veras - Cross/Brueggen

94

1    Q.    Was there a certain area that you
2  worked in the city for that company?
3  A.    Yes, Cook County Hospital.
4    Q.    Sir, when did you join the Latin
5  Kings?
6    MS. BONJEAN:  Objection.  Form,
7  foundation.
8  A.    Probably '83, '84.  1983 or 1984.
9    Q.    How old were you at that time?
10  A.    17 or 18, I believe.
11    Q.    And then you told us you stayed a
12  Latin King until about 1993.  Did I understand you
13  correctly?
14  A.    Correct.
15    Q.    And I think you addressed this
16  earlier, but there were different sets or locations
17  for Latin Kings in the Humboldt Park neighborhood;
18  right?
19  A.    Correct.
20    Q.    Were you in the same set as Mr.
21  Maysonet?
22  A.    Basically, yes.
23    Q.    Why do you say basically?  Can you
24  explain what you mean?
25  A.    I was from a section called Pierce and

Veras - Cross/Brueggen

95

1    Spaulding, and he was from one called Kimball and
2    Wabansia, but we were together, if that makes any
3    sense.  We were like combined as one, but we were
4    from different areas.
5            Q.    So the sets were in different areas,
6    but you guys hung out or spent time together?
7                  MS. BONJEAN:  Objection.  Misstates
8    his testimony.  You can answer.
9    A.      Correct.
10           Q.    Did you say Mr. Cruz, was he in your
11   set down at --
12   A.      Yes.
13           Q.    So Mr. Cruz was from -- I'm sorry.  I
14   didn't catch what you said?
15   A.      Pierce and Spaulding, yes.
16           Q.    And that's Efrain Cruz was from
17   Pierce and Spaulding?
18   A.      I didn't hear the last thing.  I was muted
19   for a second.
20           Q.    No problem.  Was Efrain Cruz in your
21   set at Pierce and Spaulding?
22   A.      Correct.
23           Q.    What about his brother Justino Cruz?
24   A.      I believe he was from Kimball and Wabansia.
25           Q.    What about Macho, Santiago?

1  A.      Kimball/Wabansia.

2          Q.    How about Alfredo Gonzalez, what set

3  was he from?

4  A.      Pierce and Spaulding.

5          Q.    And how about Jeffrey Watts, who we

6  talked about earlier, do you remember what set he

7  was from?

8  A.      Hold on.  Give me a second.  My phone got 5

9  percent power.  I got to get the charger.  Hold

10  on.

11              (Discussion off the record.)

12          Q.    So I think I had just asked you when

13  your phone was low on battery about Jeffrey Watts,

14  otherwise known as Slick.  Do you recall what set

15  he was from of the Latin Kings?

16  A.      Pierce and Spaulding.

17          Q.    And Pierce and Spaulding, was there a

18  general area that your Latin Kings at Pierce and

19  Spaulding controlled, around the corners of Pierce

20  and Spaulding?

21  A.      No, that was just where we were from.

22          Q.    Okay.  And as far as your territory

23  or your turf, how far did that extend from that

24  corner?

25              MS. BONJEAN:  I'm going to object to

Veras - Cross/Brueggen

97

1    the foundation of that question.

2         Q.    If you know, sir?

3    A.    The whole -- in Chicago, from the west side

4    of Humboldt Park is all Latin Kings, so you got a

5    big area of different sections of Latin Kings, but

6    it's all Latin Kings, so the area covers a lot of

7    ground.

8         Q.    And again, I'm specifically trying to

9    understand.  Maybe I'm not understanding.  But did

10   your set have a specific area that it controlled

11   that if other Latin Kings wanted to come into that

12   area, they had to make sure they got your

13   permission?

14              MS. BONJEAN:  Objection.  Form and

15   foundation.

16   A.    Don't get it.  We're all the same thing.

17   It's not just because we're from a different

18   street.

19        Q.    Sir, you're on mute again.   I'm

20   sorry.  I missed your answer.  Can you please

21   repeat it?

22   A.    I said if you're a Latin king, you don't

23   got to ask permission to go into another Latin

24   King's area.

25        Q.    Okay.  I understand.  So the Latin

98

1 Kings basically, I think you said, controlled from
2 West Humboldt Park to where?
3 A.    West side of Humboldt Park to probably
4 Grand Avenue, which is I believe Garfield Park
5 after that.
6        Q.    And just so I understand, when you
7 say the west side of Humboldt Park, do you mean the
8 actual park or the neighborhood referred to as
9 Humboldt Park?
10 A.    The neighborhood itself referred to as
11 Humboldt Park.  Well, actually both, because we're
12 on the west side of the park, but it's the west
13 side of Humboldt Park.
14        Q.    And what did your set of Latin Kings
15 do to make money?
16              MS. BONJEAN:  Objection.  Form,
17 foundation.
18 A.    I don't know.
19        Q.    Were there guys in your set who sold
20 drugs?
21 A.    Probably.
22        Q.    Did you sell drugs as a Latin King?
23 A.    I did.
24        Q.    What drugs did you sell, sir?
25              MS. BONJEAN:  Objection.  What does

Veras - Cross/Brueggen

99

1    it matter what drugs he sold?

2              THE WITNESS:  Thank you.

3         Q.    And, again, sir, if I could have your

4    answer?

5              MR. BRUEGGEN:  I appreciate the

6    objection but...

7    A.    Marijuana, cocaine.  I went to jail for

8    selling controlled substance.

9         Q.    Was there a general location where

10   you sold drugs?

11   A.    No.

12        Q.    Are you aware whether other Latin

13   Kings from different sets also sold drugs?

14   A.    Probably.

15             MS. BONJEAN:  Objection.

16        Q.    And, sir, basically what I'm trying

17   to get to is I'm trying to understand how would it

18   break up as to who could sell drugs in what

19   location within the Latin Kings?

20             MS. BONJEAN:  Objection to the form

21   and foundation of the question.  If you

22   understand.

23   A.    On top -- I don't understand what selling

24   drugs has to do with the murder case.  The Latin

25   Kings, if they want to sell drugs, they can sell

Veras - Cross/Brueggen

100

1  it wherever they want to sell it.  They don't have

2  to ask anybody.  They don't have to go tell

3  somebody they going to go sell it.  They just go

4  and do it.

5          Q.   I understand that, sir.  And what I'm

6  getting as if you have a Latin King from your set

7  at Pierce and Spaulding, could he go sell drugs at

8  Wabansia and Kimball that was near Mr. Maysonet's

9  and Mr. Justino Cruz's set?

10  A.      Hold on.  I was muted.  I was getting a

11  phone call.  What was the question?

12          Q.   Yeah.  What I'm trying to understand

13  if you had a Latin King from your set at Pierce and

14  Spaulding, could he go sell drugs at Wabansia and

15  Kimball where Mr. Maysonet and Mr. Justino Cruz's

16  set was?

17  A.      Yeah, I don't see why not.

18          Q.   Would he need permission of

19  Mr. Maysonet and Justino Cruz and whoever was the

20  head of that set to sell drugs?

21  A.      No, no.

22          Q.   We've talked about Latin Kings, and

23  you said could sell drugs anywhere in the Latin

24  King territory?

25  A.      Hold on.  What was the question again?

Veras - Cross/Brueggen

101

1        Q.    I think you told us that Latin Kings
2    could sell drugs anywhere in the Latin King
3    territory; right?
4    A.    Yeah, if they want.
5        Q.    What if another gang came into Latin
6    King territory and tried to sell drugs, was that
7    acceptable?
8    A.    No.
9        Q.    And what would the Latin Kings do if
10   some other gang tried to come into their territory
11   and try to sell drugs?
12           MS. BONJEAN:  I'm going to object to
13   the form of the question.  It's all hypothetical.
14   It's speculative.  It has no connection to the
15   case whatsoever, but you can answer to the extent
16   you understand the question.
17   A.    I don't know what they are capable of
18   doing.  I haven't been involved in the Kings since
19   '93.  I don't know what they would do now.  Back
20   then, they would just tell them to leave.
21       Q.    And what if the people from another
22   gang who were trying to sell drugs in Latin King
23   territory back in 1990 wouldn't leave?
24           MS. BONJEAN:  Objection.  Form,
25   foundation.

Veras - Cross/Brueggen

102

1   A.     I don't know.  Then there might be

2   problems.  I guess they'll start fighting or --

3   they won't -- they wouldn't be able to sell there.

4          Q.    Were the Latin Kings protective of

5   their territory and other people from other gangs

6   coming into their territory?

7               MS. BONJEAN:  Objection to the form

8   and foundation of that question.

9   A.     Um, I think so.

10         Q.    When you were a member of the Latin

11  Kings in 1990, would you consider the Latin Kings

12  to be a violent gang?

13              MS. BONJEAN:  Objection to the form

14  and foundation of that question.

15  A.     Some of it was violent, yes.

16         Q.    And, sir, could you move your spoon

17  just out of picture.  It's blocking your face a

18  little bit.  Thank you very much.

19               What types of violence did you

20  witness or were you aware of as a Latin King in

21  1990?

22              MS. BONJEAN:  Objection to the form

23  and foundation of that question.

24  A.     Well, just myself, I've been shot.

25         Q.    Were you -- strike that.

Veras - Cross/Brueggen

103

```
 1                    Do you know why you were shot?
 2                    MS. BONJEAN:  Objection.  Form,
 3   foundation.
 4   A.     No.
 5          Q.     Were you shot by a rival gang?
 6   A.     Yes.
 7          Q.     When did that happen, sir?
 8   A.     '87 or '89.  '89.
 9          Q.     While you were a Latin King, we'll
10   use from '87 to '91, were you aware of any Latin
11   Kings shooting other gangs?
12                    MS. BONJEAN:  Objection to form.
13   Foundation.
14   A.     No.
15          Q.     I'm sorry.  I didn't get your answer,
16   sir.  Can you say it again, please?
17   A.     No.
18          Q.     Earlier you told us you were friends
19   with Alfredo Gonzalez.  Am I remembering that
20   correctly?
21   A.     Hello?
22          Q.     Did you miss my question, sir?
23   A.     Yes, I did.  My phone is -- they're calling
24   me from work.  What was the question?
25          Q.     Yeah.  I believe earlier you told us
```

1  you were -- ready, sir?

2  A.      The question again?

3          Q.     No problem.   Earlier, I think you

4  told us you were friends with Alfredo Gonzalez;

5  right?

6  A.      Yes.

7          Q.     Were you guys good friends?

8  A.      Yes.

9          Q.     Had you grown up together?

10  A.      No.

11          Q.     How did you and Mr. Alfredo Gonzalez

12  become good friends?

13  A.      We were from the same section.

14          Q.     That's the same section of Latin

15  Kings?

16  A.      Yes.

17          Q.     And did I understand you correctly

18  that you and Mr. Gonzalez would hang out with Latin

19  Kings from the section up at Wabansia and Kimball?

20  A.      Yes.

21          Q.     Including you'd hang out with

22  Mr. Maysonet?

23  A.      Yes.

24          Q.     Did you hang out with Justino Cruz?

25  A.      Yes.

1    Q.    And I think you said Efrain Cruz was
2    from your section at Pierce and Spaulding; right?
3    A.    Yes.
4    Q.    And Efrain Cruz's little brother,
5    Justino Cruz, was from Wabansia and --
6    MS. BONJEAN:  My god, you already
7    went through all this.  We're really going to go
8    through it all again?
9    MR. BRUEGGEN:  Jennifer, I'm asking
10   my question to try to make sure it's clear.  I
11   want to make sure I have a clear record.  I'm
12   sorry if it's bothering you.
13   MS. BONJEAN:  It's not bothering me.
14   It's just like let's not waste his time with
15   asking repeating questions.  Go ahead.
16   Q.    Sir, did you get my question, or do
17   you need me to rephrase it?
18   A.    Uh, rephrase it.
19   Q.    So we've clarified that you,
20   Mr. Gonzalez, and Mr. Cruz were from the Spaulding
21   and Pierce set; right?
22   A.    Correct.
23   Q.    And that Mr. Maysonet, Macho, and
24   Tino Cruz were from the set at Wabansia and
25   Kimball; right?

Veras - Cross/Brueggen

106

1    A.      Correct.

2            Q.    And did those three groups of guys

3    from each set, did you guys hang out together?

4    A.      Yes.

5            Q.    And where would you hang out?

6                  MS. BONJEAN:  Objection.

7    A.      Pierce and Kedzie, Kimball, North Avenue,

8    we hung out all around the area.

9            Q.    Sir, I wanted to talk to you about

10   your affidavit that you signed.

11                 Do you remember it was put up on the

12   screen for you to look at?

13   A.      Go ahead.

14           Q.    I wanted to ask you about your

15   affidavit.  Do you remember that was put up on the

16   screen?

17   A.      Yes.

18           Q.    Sir, I wanted to ask you who were you

19   talking to when you signed that affidavit?  Or

20   strike that.  Let me ask a better question.

21                 Who asked you to sign that affidavit?

22                 MS. BONJEAN:  Objection to form.

23   A.      I believe they were interns for Wrongfully

24   Conviction in Chicago.

25           Q.    Do you know who the interns were

Veras - Cross/Brueggen

107

1 working for?

2 A.     Excuse me?

3      Q.   Do you know who the interns were

4 working on behalf of?

5 A.     I think the Center for the Wrongfully

6 Convicted.

7      Q.   And that was a poor question.  I'm

8 sorry.  Do you know the person that they were

9 investigating who was allegedly wrongfully

10 convicted?

11 A.     Alfredo Gonzalez.

12      Q.   Sir, at the time when Mr. Gonzalez

13 and Mr. Maysonet and Justino Cruz were -- strike

14 that.

15           You were aware that Mr. Gonzalez and

16 Mr. Maysonet and Justino Cruz were arrested for the

17 crime of the double homicide for the two black

18 youths on North Avenue?

19           MS. BONJEAN:  I'm going to object to

20 the form of the question.  I'm going to object to

21 the use of the word youths, seeing as how they

22 were grown men, but they weren't teenagers.  That

23 misstates the evidence so...

24      Q.   Let me rephrase the question.  You

25 were aware that Mr. Maysonet, Mr. Gonzalez, and

Veras - Cross/Brueggen

108

```
 1   Justino Cruz had been arrested for the murders of
 2   two black men on North Avenue; right?
 3   A.    Yes.
 4         Q.    And you were aware that they were
 5   arrested at -- around the time that they were
 6   arrested; right?
 7               MS. BONJEAN:  Objection to the form.
 8   A.    What was your question?  I was aware about
 9   the time of what?
10         Q.    When did you learn that they were
11   arrested?  Was it months later, or was it around
12   the time that they were actually arrested?
13   A.    I don't recall.  I think it was shortly
14   after, shortly after I was -- I had my incident at
15   the police.
16         Q.    I'm sorry.  Sir, you cut out.  Can
17   you finish your answer, please?
18   A.    Yeah, I think it was within a couple months
19   after I had my incident at Grand and Central.
20         Q.    And, sir, did you learn of their
21   arrests within a couple of days of when they were
22   arrested?
23               MS. BONJEAN:  Objection.
24   A.    Did I learn what?  What was that?
25               MR. BRUEGGEN:  I'm sorry.  I didn't
```

109

1   hear either the objection or --

2   A.    I didn't hear what you were saying.

3        Q.    I was asking if you learned of the

4   arrest of Mr. Maysonet, Mr. Gonzalez, and Mr. Cruz

5   within a couple of days of when they were arrested

6   for the double homicide?

7   A.    Yes.

8        Q.    After your incident with the police

9   when you were arrested that you told us about and

10  put in the lineups, okay, are you following me so

11  far, sir?

12  A.    Um-hum.

13       Q.    Yes.  Did you talk to Mr. Maysonet,

14  Mr. Gonzalez, or Justino Cruz about what happened

15  to you?

16  A.    No.

17            MS. BONJEAN:  Object to form.

18       Q.    After Mr. Maysonet, Mr. Gonzalez, and

19  Mr. Justino Cruz were arrested, did you ever speak

20  to their attorneys about what had happened to you?

21            MR. BRUEGGEN:  Objection to the form,

22  foundation.

23  A.    No.

24       Q.    Why not, sir?

25            MS. BONJEAN:  Objection to the form,

Veras - Cross/Brueggen

110

1    foundation of that question.

2    A.    I was never asked.

3         Q.    Did you think that information might

4    be beneficial to their defense of the double

5    murder?

6              MS. BONJEAN:  Objection to the form.

7    Foundation.

8    A.    No, not to my knowledge.  Probably if I

9    would have been asked to testify, I probably would

10   have.  But, again, Efrain Cruz, Efrain and Justino

11   are the nephews of Alfredo Gonzalez, so I don't

12   know why they never asked Efrain Cruz to testify.

13        Q.    Mr. Veras, how many times did you

14   meet with the interns before you signed your

15   affidavit?  Did we lose him?

16             MS. BONJEAN:  He looks frozen.

17             (Connectivity issues.)

18             MS. BONJEAN:  There we go.

19        Q.    You just froze.  So let me repeat the

20   question.  How many times did you meet with the

21   interns before you signed the affidavit that we

22   marked as Exhibit 4?

23             (Connectivity issues.)

24             MR. BRUEGGEN:  I think he's doing

25   this on purpose.  I'm taking a little offense.

Veras - Cross/Brueggen

1          MS. BONJEAN:  Can you hear us,

2    Mr. Veras?

3          MS. CARNEY:  Maybe we lost him this

4    time.

5          MR. BRUEGGEN:  Jennifer, do you know

6    if he's using a cell signal or WiFi?

7          MS. BONJEAN:  He's gone completely

8    now.  He said he would come back on, so I would

9    just wait.  Believe it or not, I have no

10   information.  This is the first time I've spoken

11   to the man really, other than to confirm the dep.

12   I don't know what provider he uses.  I don't know.

13   I don't know anything.

14         MR. BRUEGGEN:  We can go off the

15   record right now until we get Mr. Veras back on.

16         THE VIDEOGRAPHER:  The time is 1:33

17   p.m.  Off the record.

18              (Off the record.)

19         THE VIDEOGRAPHER:  The time is 2:03

20   p.m.  Back on the record.

21   BY MR. BRUEGGEN:

22      Q.    Mr. Veras, are you ready to go?

23   A.    Sure, I am.

24      Q.    Again, I will try to move quickly.

25   So when we had that break, I had asked you about

Veras - Cross/Brueggen

112

1  the affidavit that was marked as Exhibit 4.  Do you

2  remember that, sir?

3  A.     Yes.

4          Q.    And I was asking you specifically,

5  you told us it was created meeting with interns?

6  A.     I believe that's what they told me that

7  they were, interns for the Wrongfully -- Center

8  for the Wrongfully Conviction.

9          Q.    How many times did you meet with the

10 interns before you executed your affidavit?

11 A.     Before?  I just met with them twice.

12         Q.    Do you remember when you met with

13 them the first time?

14 A.     No.

15         Q.    Do you remember how many months or

16 years before you signed your affidavit that you met

17 with them the first time?

18 A.     It was within weeks of the first meeting to

19 the second meeting.

20         Q.    Did you sign the affidavit at that

21 second meeting?

22 A.     I did.  The first meeting I wrote it up, or

23 they took my statement, and then the second

24 meeting is when I signed it.

25         Q.    Did the interns reach out to you, or

113

1    did you reach out to them about giving a statement?

2    A.     They reached out to me.

3           Q.    And what did they tell you when they

4    reached out to you?

5    A.     That they wanted to give -- they asked me

6    about a Alfredo and what happened, was I arrested

7    for that --

8           (Reporter requested clarification.)

9    A.     Alfredo Gonzalez, and if I was arrested and

10   behind his case, and I said yes, and then they set

11   up a time to meet with me.

12          Q.    When you met with them that first

13   time, did they show you any documents?

14   A.     No.

15          Q.    When you met with them the second

16   time, did they show you any documents?

17   A.     My affidavit.

18          Q.    And the affidavit that you signed,

19   did you see any other previous versions of your

20   affidavit that you made changes to?

21   A.     Well, the first one that I gave them, they

22   were writing it up, and I did tell them because

23   they had -- they had Spunkey's restaurant as a

24   Chinese restaurant, and I told them that that

25   wasn't correct, that it wasn't a Chinese

Veras - Cross/Brueggen

114

1    restaurant, and they might have changed it to the

2    affidavit as a Chinese restaurant.

3        Q.    Were there any other changes or edits

4    that you needed to make to the first affidavit that

5    you saw?

6    A.    Not that I'm aware of, no.

7        Q.    Sir, did they tell you why they

8    wanted an affidavit from you?

9    A.    For --

10              (Reporter requested clarification.)

11              (Question read back as follows:

12              (QUESTION:  Sir, did they tell you

13   why they wanted an affidavit from you?

14   A.    Yes, for Alfredo Gonzalez, because he was

15   wrongfully convicted, and they were helping him.

16       Q.    Did they tell you why they believed

17   Mr. Gonzalez was wrongfully convicted?

18   A.    No, not at the time.  I guess they had

19   found out that I was pointed out of the lineup.

20       Q.    Did they ever tell you how they got

21   your name?

22   A.    No.

23       Q.    Sir, after executing the affidavit

24   that was Exhibit 4, did you ever meet with an

25   attorney by the name of Brendan Shiller?

Veras - Cross/Brueggen

115

1  A.     No.

2           Q.    Do you know who Mr. Gonzalez's

3  attorney was at the time?

4  A.     No.

5           Q.    Sir, I have a couple questions to

6  make sure I fully understand some of the things

7  from your affidavit, and if you need to see it, let

8  me know, but I think you told us earlier that the

9  officer you called Red was one of the officers who

10 arrested you.  Did I understand you correctly?

11               MS. BONJEAN:  Objection to the

12 form -- I mean the foundation.

13 A.     Correct.

14          Q.    Sir, in the affidavit, you state that

15 it was weeks after the night you were arrested at

16 Spunkey's that you were brought back in, and I

17 wanted to ask --

18 A.     Yes, I believe so.

19          Q.    And by weeks, would that have been in

20 June of 1990 when you were brought back in and

21 questioned and put in the lineups?

22 A.     Yeah, I would believe so.  That sounds

23 about accurate.

24          Q.    And then just going to the timeline

25 after the visitation for Macho on the 24th, I think

Veras - Cross/Brueggen

1    you told us that that visitation ended at

2    9 o'clock; right?

3    A.      Correct.

4           Q.    And then after that, did you guys go

5    to Spunkey's?

6    A.      Yes.

7           Q.    And Spunkey's, is it a restaurant?

8    A.      It is.  It's a fast food restaurant.

9           Q.    Do you have -- strike that.

10               Can you tell us how long after you

11   left the visitation that you were arrested by the

12   police?

13   A.      Probably within an hour, I would guess.

14          Q.    Were you arrested inside Spunkey's --

15   strike that.  Let me ask a better question.

16               Does Spunky's have like an indoor

17   seating area?

18   A.     No.  It's a standup restaurant with a

19   counter, and I was arrested inside Spunkey's.

20          Q.     Where is Spunkey's located?

21   A.      It was located on North Avenue and Kimball.

22   It's no longer there.

23          Q.     Sir, I think you told us before that

24   getting arrested at Spunkey's was important because

25   you were in custody at the time of the double

Veras - Cross/Brueggen

117

1    murder; right?

2    A.    Correct.

3         Q.    So since you were in custody, is it

4    fair to say that you have no firsthand knowledge

5    about who committed the double homicide on North

6    Avenue?

7    A.    Correct.

8         Q.    And so you have no firsthand

9    knowledge about what Mr. Maysonet was doing at the

10   time of the double homicide on North Avenue?

11   A.    Correct.

12        Q.    And you have no knowledge about what

13   Mr. Gonzalez was doing at the time of the double

14   homicide on North Avenue?

15   A.    Correct.

16        Q.    And no knowledge about what

17   Mr. Justino Cruz was doing at the time of the

18   double homicide on North Avenue?

19   A.    Correct.

20        Q.    Sir, in the summer of 1990, was there

21   a gang beef or a dispute between the Latin Kings

22   and the YLODs?

23             MS. BONJEAN:  Objection.  Foundation.

24   A.    Well, they're oppositions, so I would guess

25   it was going on.  I guess there was.

Veras - Cross/Brueggen

118

1          Q.    Do you recall if the YLO Disciples

2    were trying to move west into the Latin King

3    territory in the summer of 1990?

4                MS. BONJEAN:  I'm going to object to

5    the form of this question.  What could this

6    possibly have to do with anything?

7          Q.    Sir, if you know?

8    A.    No.

9          Q.    Sir, did anything else happen when

10   you were at the police station for the lineups

11   that's not set forth in your affidavit or that you

12   told us about today?

13   A.    Not that I'm aware of, not that I remember.

14   Nothing out of the ordinary happened.  You just

15   sit there and wait.

16         Q.    And, sir, the Latin Kings, were Latin

17   Kings allowed to snitch on other Latin Kings to the

18   police?

19                MS. BONJEAN:  Objection to the form

20   of that question, the foundation of that question.

21   Allowed, snitch, all those words.

22         Q.    Sir, did you understand my question,

23   or would you like me to rephrase it?

24   A.    No, I understand it, and the answer is no.

25         Q.    What would happen if a Latin King

Veras - Cross/Brueggen

119

1    snitched on another Latin King?

2    A.    It depends who he snitched on and what the

3    person he snitched on does to him.

4          Q.    Sir, were you aware whether Justino

5    Cruz became a witness for the state against his

6    uncle Alfredo Gonzalez?

7    A.    Yes.

8          Q.    You were aware of that?

9    A.    Yes.

10         Q.    And, sir, do you recall the names of

11   any other police officers or detectives that you

12   interacted with other than who you've told us about

13   tonight -- strike that.  Let me start over.

14               Do you recall the names of any other

15   police detectives or police officers who you

16   interacted with either on the night of your arrest

17   on the 24th into the 25th or on your subsequent

18   arrest where you sat in the lineups?

19   A.    No, just the ones that were mentioned.

20         Q.    Sir, prior to 1990, you had been

21   arrested on several occasions for various crimes;

22   is that right?

23   A.    Yes.

24         Q.    And you had, in fact, pled guilty to

25   at least one UUW; is that right?

Veras - Cross/Brueggen

120

1   A.     Yes.

2          Q.    Did you possess a gun prior to 1990?

3              MS. BONJEAN:  Objection, foundation

4   and form.  Wait, hold on a second.  Stop.  Give me

5   one second.  I'm going to --  I'm sorry.  Can you

6   repeat that question back again?

7              (Question read back as follows:

8              (QUESTION:  Did you possess a gun

9   prior to 1990?)

10             MS. BONJEAN:  I'm going to continue

11  to object to the form and foundation of that

12  question, and I'm not sure if that implicates any

13  Fifth Amendment rights.  It probably doesn't, but

14  I'm just going to object.

15             Mr. Veras, you can answer that

16  question, you know, if you feel comfortable doing

17  so, or if you do not, you have the right to

18  consult with counsel about those types of

19  questions.

20  A.     Yeah, I'll go with that.

21         Q.    Go with what, sir?

22  A.     Not answering the question.

23         Q.    Are you refusing to answer my

24  question about whether you possessed a gun prior to

25  1990?

Veras - Cross/Brueggen

121

1    A.     I was arrested for a gun, but I don't

2    recall being in possession of a gun, if that makes

3    sense.

4            Q.     Yes and no.  So let me ask was there

5    a reason -- strike that.

6                   You were arrested for possession of a

7    gun, and you actually pled guilty to that; right?

8    A.     Correct.

9            Q.     And can you tell me the circumstances

10   of that arrest?

11   A.     I don't understand the question.  What do

12   you mean the circumstances to that arrest?

13           Q.     I'm asking you, you pled guilty to

14   possession of a gun, but you're also telling me

15   that it wasn't your gun, so were you arrested when

16   you were in a car, and there was a gun in the car?

17   What was the situation, sir?

18   A.     I don't recall.  I think we were hanging

19   out, and they found a gun.

20           Q.     Who were you hanging out with; do you

21   recall?

22   A.     No, that was many years ago.

23           Q.     Was the gun one of the other people

24   you were hanging out with, was it their gun?

25   A.     I don't know.

Veras - Cross/Brueggen

122

1    MS. BONJEAN:  I'm going to object to

2    all this line of questioning about a gun case from

3    the '80s.  And, you know, if you're suggesting it

4    had some connection to this, I just don't get it.

5    It's just harassing.

6    MR. BRUEGGEN:  I understand,

7    Jennifer.

8    Q.    Sir, when you were a member of the

9    Latin Kings, were you aware of whether any Latin

10   Kings carried firearms?

11   MS. BONJEAN:  Objection.  Form,

12   foundation.

13   Q.    I'm sorry.  I didn't get your answer?

14   A.    I said no.

15   MR. BRUEGGEN:  Mr. Veras, those are

16   all the questions I have for you.  Thank you very

17   much for your time and for being patient with our

18   technological issues.

19   THE WITNESS:  Thank you.

20   MS. CARNEY:  This is Theresa from the

21   city.  I don't have any questions.  Thank you,

22   Mr. Veras.

23   MR. ZIBOLSKI:  This is Kevin.  I

24   don't have any questions either.

25   MS. CHOI:  This is Esther for

123

1   Defendant DiFranco, and no questions at this time.

2   REDIRECT EXAMINATION BY MS. BONJEAN:

3       Q.    I just have one question.  Mr. Veras,

4   have you spoken to Efrain Cruz recently?

5   A.    No, not for a few years.

6       Q.    Okay.  Do you happen to know where

7   he's living these days?  Is he in Chicago still?

8   A.    Um, I think he's in Chicago, but I really

9   don't know where he lives at, or I haven't seen or

10  heard of him.

11      Q.    Okay.

12  A.    I had him as a Facebook friend, but he's

13  never on.

14          MS. BONJEAN:  Okay.  Very good.

15  Thank you, Mr. Veras.  I have no further

16  questions.  And unless anyone --

17          MR. BRUEGGEN:  I don't have any

18  follow-up.  Signature?  Jennifer, you want to

19  explain it.

20          MS. BONJEAN:  Oh, sure.  Mr. Veras,

21  you have the right to review your deposition

22  prior -- you have the right to review your

23  deposition and sign it to make sure that they got

24  all of your answers, the court reporter got all

25  your answers down correctly.  You can't change

124

1    your answers, but if, for instance, the court

2    reporter got something, she heard something wrong

3    or something like that, you can check it for

4    accuracy like that, that is your right, or you can

5    waive that, if you're not concerned and you don't

6    have a worry about it.  It's up to you.

7                    THE WITNESS:  Would I still get a

8    copy of it?

9                    MS. BONJEAN:  You can get a copy of

10   your deposition, yes.  We're going to get a copy

11   of your deposition either way, so we'll be happy

12   to provide you with one.

13                   THE WITNESS:  Okay.

14                   MS. BONJEAN:  Okay.  So waive

15   signature, and we will take a copy, Audrey.

16                   MR. BRUEGGEN:  And, Audrey, I'll take

17   an electronic copy, PDF, eTran, whatever you

18   normally send, and the exhibits as attachments,

19   PDF attachments.

20                   MS. CHOI:  No copy for Hinshaw at

21   this time.

22                   MS. BONJEAN:  Okay.  I think we're

23   finished here today.

24                   THE VIDEOGRAPHER:  The time is 2:21

25   p.m.  This concludes the deposition.  Off the

125

1    record.

2              (Concluded at 2:21 p.m.)

126

1                    CERTIFICATE OF OFFICER

2

3          I CERTIFY that the foregoing is a true and

4     accurate transcript of the testimony and

5     proceedings as reported stenographically by me at

6     the time, place and on the date as hereinbefore

7     set forth.

8

9          I DO FURTHER CERTIFY that I am neither a

10    relative nor employee nor attorney or counsel of

11    any of the parties to this action, and that I am

12    neither a relative nor employee of such attorney

13    or counsel, and that I am not financially

14    interested in the action.

15

16

17

18              AUDREY ZABAWA, C.C.R.
                Certificate No. XI01410
19

20

21

22

23

24

25

| A | 110:10;111:24;120:6 | 10:24;11:18 | 42:20 | background (1) |
|---|---|---|---|---|

**A**

**able (5)**
25:21;30:14;39:19;
88:19;102:3
**acceptable (1)**
101:7
**accident (3)**
89:17,19;90:8
**accompanied (1)**
50:9
**according (1)**
40:19
**accuracy (1)**
124:4
**accurate (1)**
115:23
**action (1)**
35:7
**activity (1)**
86:14
**actual (1)**
98:8
**actually (8)**
31:16;70:8;71:7;
80:19;87:12;98:11;
108:12;121:7
**address (1)**
11:13
**addressed (1)**
94:15
**Adidas (3)**
26:2,4,12
**affidavit (34)**
38:2,7,10,25;40:19;
46:13,18;52:17;57:7;
58:16;60:20;92:4,9;
106:10,15,19,21;
110:15,21;112:1,10,
16,20;113:17,18,20;
114:2,4,8,13,23;
115:7,14;118:11
**affiliation (1)**
74:8
**affiliations (1)**
74:12
**African (1)**
73:12
**afternoon (1)**
80:16
**Afterwards (1)**
72:8
**again (37)**
8:24;12:15,16;22:2;
27:23,24;42:4;45:25;
46:16;52:11;56:18,
21;57:1,11,12,17,19,
22;58:4;66:13;67:2;
69:12;79:18;86:22;
87:22;91:18,19;97:8,
19;99:3;100:25;
103:16;104:2;105:8;

**against (5)**
36:16;62:7;63:19;
91:1;119:5
**ago (3)**
89:21,23;121:22
**agree (3)**
23:16;31:14,15
**agreed (1)**
5:9
**ahead (12)**
8:3;20:25;36:22;
63:5;66:21;71:2;
72:20;73:7;74:1;
77:10;105:15;106:13
**al (1)**
5:5
**alerted (1)**
91:20
**Alfredo (19)**
11:25;38:8;72:9,21;
76:9;79:20;80:24;
81:23;83:12;96:2;
103:19;104:4,11;
107:11;110:11;113:6,
9;114:14;119:6
**Alfredo's (1)**
82:3
**alive (1)**
65:10
**allegedly (3)**
64:6;66:2;107:9
**allowed (2)**
118:17,21
**all-too-frequent (1)**
31:13
**almost (1)**
66:25
**alone (2)**
59:1,3
**along (4)**
45:20;46:19;54:21;
88:21
**always (3)**
24:4;84:12,13
**Amendment (1)**
120:13
**American (1)**
73:12
**amongst (1)**
15:6
**amped (1)**
66:24
**Andersen (6)**
16:18,19;18:3,8;
19:17;23:11
**anniversary (2)**
15:20,23
**anyways (1)**
49:18
**apart (2)**
73:10;86:10
**apartment (2)**

**apologize (2)**
10:15;70:17
**apologized (4)**
70:20,25;71:3,6
**appear (1)**
5:11
**appearances (1)**
5:15
**appears (3)**
21:16;28:8;38:7
**apply (2)**
7:10,11
**appreciate (2)**
87:16;99:5
**area (25)**
10:10,18,23;24:9;
35:3;41:20;42:19,21;
45:15;50:10;51:25;
72:25;74:19,23;
75:20;85:10;94:1;
96:18;97:5,6,10,12,
24;106:8;116:17
**areas (3)**
10:10;95:4,5
**Armitage (1)**
10:9
**around (12)**
24:8;31:24;32:10;
34:5;41:8;45:4;50:25;
88:10;96:19;106:8;
108:5,11
**arranged (1)**
16:12
**arrest (9)**
45:21;68:6;69:9;
87:6;109:4;119:16,
18;121:10,12
**arrested (56)**
33:25;34:13,15,16,
17,18;35:9;36:3;
41:16,19;42:1,2;
45:10,14;46:2,6,10,
13,18,20;47:2;49:25;
54:22;64:1;67:12;
72:9,10,12,16;73:1;
75:9,16;79:9;85:11;
107:16;108:1,5,6,11,
12,22;109:5,9,19;
113:6,9;115:10,15;
116:11,14,19,24;
119:21;121:1,6,15
**arresting (1)**
35:4
**arrests (2)**
79:3;108:21
**Ashley (2)**
5:23;91:11
**assign (1)**
54:16
**assisting (1)**
5:22
**associated (1)**

**assume (1)**
15:9
**assumed (1)**
39:6
**Assumes (1)**
45:23
**assuming (2)**
46:5;50:8
**attachments (2)**
124:18,19
**attend (4)**
16:1;19:23;20:20;
22:20
**attended (1)**
16:5
**attending (1)**
19:3
**attention (3)**
31:25;81:17;88:25
**attorney (2)**
114:25;115:3
**attorneys (5)**
7:24;87:18;90:16,
17;109:20
**Audrey (4)**
6:11;62:1;124:15,
16
**August (5)**
13:11;81:18,21;
82:23;83:3
**Avenue (20)**
10:8,9;16:20;32:10,
15,23;33:3;34:20;
39:4;47:4;67:7;98:4;
106:7;107:18;108:2;
116:21;117:6,10,14,
18
**avoid (1)**
44:24
**aware (19)**
45:2;69:7,13,21;
70:2;74:7;92:14;
99:12;102:20;103:10;
107:15,25;108:4,8;
114:6;118:13;119:4,
8;122:9
**away (3)**
64:4,11;65:12

**B**

**back (36)**
11:6,25;12:9,16;
13:7,23;14:25;21:12,
24;25:7;28:19;29:1;
38:21;40:22;42:7,25;
44:15;50:10;54:19;
58:23;61:8;71:9;
79:24;80:3;81:15;
88:16;101:19,23;
111:8,15,20;114:11;
115:16,20;120:6,7

**background (1)**
28:9
**bad (1)**
69:2
**based (1)**
73:22
**basement (1)**
11:18
**Basically (4)**
94:22,23;98:1;
99:16
**basis (2)**
50:6;58:11
**Bates (7)**
17:2;18:16;21:9;
24:23;29:24;30:3;
38:4
**bathroom (1)**
78:24
**battery (1)**
96:13
**Bear (1)**
78:23
**became (1)**
119:5
**become (1)**
104:12
**beef (1)**
117:21
**beginning (1)**
77:16
**behalf (4)**
6:5,7,9;107:4
**behind (3)**
26:12;87:8;113:10
**belabor (1)**
6:24
**belief (1)**
56:10
**bell (1)**
43:6
**Bella (4)**
69:15;70:2;80:5,7
**beneficial (1)**
110:4
**best (2)**
51:19;65:10
**better (3)**
86:18;106:20;
116:15
**biddings (1)**
9:24
**big (3)**
10:10,18;97:5
**bit (4)**
25:6;30:5;41:10;
102:18
**black (24)**
32:9,22;33:2;34:19;
40:23;60:3,21;61:21;
44:4;65:5,6;73:3,16,
24;76:6,8,14;77:8,13,
19,24;83:23;107:17;

108:2
**blank (1)**
90:11
**blocking (1)**
102:17
**blue (1)**
29:1
**body (5)**
19:10,11,13;30:8,
11
**BONJEAN (71)**
5:17,18;6:16;17:4,
11,16;18:19;21:5;
25:5;27:6,10;28:13;
29:9,23;31:9;37:23;
38:1;40:12;61:25;
69:1;76:18,23;87:16,
21;88:9;91:4,7;92:4;
94:6;95:7;96:25;
97:14;98:16,25;
99:15,20;101:12,24;
102:7,13,22;103:2,12;
105:6,13;106:6,22;
107:19;108:7,23;
109:17,25;110:6,16,
18;111:1,7;115:11;
117:23;118:4,19;
120:3,10;122:1,11;
123:2,14,20;124:9,14,
22
**B-O-N-J-E-A-N (1)**
5:19
**born (2)**
9:9;11:4
**both (7)**
19:4,5;23:25;39:6;
74:23;75:2;98:11
**bothering (2)**
105:12,13
**bottom (1)**
23:11
**boundaries (1)**
10:7
**bouquet (1)**
27:17
**break (13)**
8:19,21;25:1;37:15,
20;78:24;88:1,4,6,14,
19;99:18;111:25
**Brendan (1)**
114:25
**bring (1)**
22:20
**broken (1)**
20:17
**brother (2)**
95:23;105:4
**brothers (2)**
12:24;73:15
**brought (10)**
36:3;51:18;52:2,8;
53:22,23;75:19;
80:19;115:16,20

**BRUEGGEN (80)**
5:25;6:1;18:15;
20:3,7,24;24:13;
34:24;35:23;36:8,21;
37:13;40:7;41:22;
43:22;44:2,17;45:22;
46:15,21;48:5;49:2,
22;50:1;51:3;52:16;
55:13;56:7;58:7,14,
20;60:25;62:10,15,
23;63:20;64:12,20;
65:19;66:15;68:24;
69:10,16,24;70:4;
73:4,7,17,25;74:9,13,
24;75:11;76:16,21;
77:9;78:9,14,18;
79:15;81:1,9;82:1;
83:2;87:22,24;88:5,
17;99:5;105:9;
108:25;109:21;
110:24;111:5,14,21;
112:6,15;123:17;
124:16
**building (4)**
11:1,2,19;87:13
**bunch (1)**
34:14
**burial (4)**
16:2;23:13;41:6,11
**buried (1)**
25:17
**bury (1)**
22:18
**busy (1)**
15:22

**C**

**call (13)**
11:17;22:7,21;
24:22;29:3;35:2;
37:22;54:17;65:2,4;
82:6;9;100:11
**called (6)**
6:13;33:23;65:6;
94:25;95:1;115:9
**calling (1)**
103:23
**came (11)**
39:8;40:22;66:12,
12,21,23;70:25;71:3,
8;77:23;101:5
**can (65)**
7:14,20,23;8:23;
10:6;15:16;16:7,15;
17:4,6,17;18:7;21:1,5,
24;22:2,5,12,20;
24:21;25:5,6,24;
26:13;27:11;28:21,
23,23;30:4,5;31:9;
38:1,14,22;41:25;
44:18;45:24;46:23;
49:4;51:19;62:16;

66:21;71:4;88:22;
89:15,25;92:20;93:1,
17;94:23;95:8;97:20;
99:25;101:15;103:16;
108:16;111:1,14;
116:10;120:5,15;
121:9;124:3,4,9
**cap (1)**
28:10
**capable (1)**
101:17
**caption (1)**
38:7
**car (17)**
15:21;50:13,16,16,
21;51:8,12;84:11,12,
13,15;85:7;89:17,19;
90:8;121:16,16
**card (10)**
17:5,12,17;21:6,13,
16;22:7,7,13,24
**cards (2)**
21:14;22:14
**CARNEY (4)**
6:4,5;111:3;122:20
**carried (1)**
122:10
**Case (15)**
5:8;68:5;72:19;
77:14;87:3;89:8,10,
16,25;91:5;92:1;
99:24;101:15;113:10;
122:2
**cash (2)**
93:24,25
**casket (3)**
30:21,24;31:6
**catch (1)**
95:14
**Catholic (2)**
22:12;30:25
**cell (1)**
111:6
**cemetery (3)**
25:15;28:17;29:20
**Center (2)**
107:5;112:7
**Central (11)**
42:22;51:17,19;
52:1,2,8;69:4;74:15;
79:2,8;108:19
**certain (2)**
7:25;94:1
**certificate (1)**
93:13
**certified (1)**
6:10
**chance (1)**
64:2
**change (1)**
123:25
**changed (1)**
114:1

**changes (2)**
113:20;114:3
**charge (2)**
61:18;64:5
**charged (7)**
35:6;65:18;67:3;
72:11;76:13,15,19
**charger (1)**
96:9
**check (1)**
124:3
**Chicago (12)**
6:3,5;9:13,25;10:4,
9;11:4;90:12;97:3;
106:24;123:7,8
**Chicky (1)**
29:3
**Chinese (2)**
113:24,25;114:2
**CHOI (4)**
6:8,9;122:25;
124:20
**Christ (1)**
22:16
**Christopher (14)**
13:1;14:5;76:12,19;
77:1;80:25;81:4,7,23;
82:12,20;83:15;
84:25;85:1
**Church (1)**
19:21
**cigarettes (1)**
71:11
**circumstances (2)**
121:9,12
**Cisco (2)**
9:4;82:8
**C-I-S-C-O (1)**
9:5
**City (5)**
6:2,5;9:12;94:2;
122:21
**clarification (2)**
113:8;114:10
**clarified (1)**
105:19
**clear (6)**
7:20;20:8;46:4;
58:9;105:10,11
**click (1)**
21:19
**clicked (4)**
67:8,10,11,15
**close (5)**
15:23;20:1,12;24:4;
41:23
**cocaine (1)**
99:7
**Cohen (4)**
5:23;91:10,11,11
**C-O-H-E-N (1)**
5:24
**combined (1)**

95:3
**comfortable (1)**
120:16
**coming (4)**
49:7;90:11;92:23;
102:6
**comment (1)**
68:3
**commit (1)**
24:10;52:14
**committed (5)**
15:4;27:15;37:18;
67:23;117:5
**common (2)**
31:16;74:11
**communicate (1)**
40:20
**community (1)**
36:19
**company (10)**
9:17,22,24;89:17,
20;90:20;91:1;93:20,
21;94:2
**comparing (1)**
46:1
**complected (2)**
28:9;65:8
**completed (2)**
93:2,8
**completely (1)**
111:7
**complexion (2)**
39:25;77:3
**Compound (1)**
37:14
**concerned (1)**
124:5
**concluded (2)**
24:6;125:2
**concludes (1)**
124:25
**conclusion (1)**
55:18
**conduct (1)**
35:8
**confirm (2)**
22:5;111:11
**confirmed (3)**
55:15;71:1,15
**connection (8)**
15:3;16:2;22:25;
59:24;66:8;78:12;
101:14;122:4
**Connectivity (2)**
110:17,23
**consider (7)**
10:7;12:8,15;14:17;
20:11;34:21;102:11
**consult (1)**
120:18
**contact (4)**
44:24;84:18,23;
85:1

**context (1)**
  32:4
**continue (2)**
  38:23;120:10
**controlled (5)**
  87:1;96:19;97:10;
  98:1;99:8
**conversation (3)**
  7:18;61:22;68:8
**conversations (2)**
  85:24;86:8
**convicted (5)**
  92:25;107:6,10;
  114:15,17
**Conviction (2)**
  106:24;112:8
**Cook (4)**
  75:16,18,23;94:3
**Coolbaugh (4)**
  5:21;17:6,14;37:25
**C-O-O-L-B-A-U-G-H (1)**
  5:21
**copy (7)**
  92:4;124:8,9,10,15,
  17,20
**corner (2)**
  10:19;96:24
**corners (1)**
  96:19
**Correctional (1)**
  79:20
**correctly (5)**
  94:13;103:20;
  104:17;115:10;
  123:25
**counsel (4)**
  5:9,14;6:12;120:18
**counter (1)**
  116:19
**County (4)**
  75:16,19,23;94:3
**couple (6)**
  28:21;79:22;
  108:18,21;109:5;
  115:5
**Court (7)**
  5:6,10;6:11;7:19;
  62:2;123:24;124:1
**courtroom (1)**
  90:14
**covers (1)**
  97:6
**created (1)**
  112:5
**crew (1)**
  73:2
**crime (3)**
  52:14;59:23;107:17
**crimes (1)**
  119:21
**CROSS-EXAMINATION (1)**
  88:17
**Cruz (72)**

**12:12,13,20,22,23;**
**13:22,22;14:19,19;**
**20:10,10;25:23;28:1;**
**33:25;36:4;41:19;**
**45:20;46:14,19;47:1,**
**5,20;50:9;51:8,16;**
**53:19;54:6,21,25;**
**57:23;61:11,15;62:7;**
**63:1,18,23;65:16,16,**
**24;72:9;74:16;80:25;**
**81:24,24;82:6,9;83:9,**
**18,25;84:18;95:10,13,**
**16,20,23;100:19;**
**104:24;105:1,5,20,24;**
**107:13,16;108:1;**
**109:4,14,19;110:10,**
**12;117:17;119:5;**
**123:4**
**Cruz's (7)**
  50:18,22,24;51:14;
  100:9,15;105:4
**currently (1)**
  9:12
**cursing (1)**
  67:19
**custody (13)**
  33:5;61:13;69:3;
  71:16;75:10,12,18,23;
  76:2;79:7,11;116:25;
  117:3
**cut (3)**
  42:12;61:24;108:16

**D**

**daily (1)**
  93:24
**dark (2)**
  76:10;77:14
**dark-complected (1)**
  76:6
**darker (2)**
  28:9;65:8
**darker-complected (2)**
  77:2,7
**date (6)**
  16:22;33:12,13;
  38:15;46:6;80:12
**Dave (3)**
  6:1;76:20;87:23
**day (7)**
  32:4;34:15;35:15;
  45:1,12;47:9;67:20
**days (7)**
  79:10;80:14,19,20;
  108:21;109:5;123:7
**dead (3)**
  60:21;61:21;67:5
**deal (2)**
  8:15;15:25
**death (6)**
  15:23;19:14;23:1;
  34:5;36:7,18

**deceased (2)**
  18:21;19:10
**defendant (5)**
  6:2,7,9;87:24;123:1
**defense (1)**
  110:4
**definitely (2)**
  10:14;44:13
**dep (2)**
  89:15;111:11
**depends (1)**
  119:2
**depicted (3)**
  28:16;29:14;30:6
**depicts (1)**
  27:14
**deposition (25)**
  5:4,8;6:20;7:3,11,
  24;8:4,18;89:5,18,24;
  90:4,6,19,23;91:3,17,
  21,22,25;123:21,23;
  124:10,11,25
**depositions (2)**
  89:7,10
**describe (3)**
  15:17;28:24;43:2
**description (1)**
  22:16
**Detective (71)**
  41:19;42:2,6,13,16,
  17,24;45:14,19;46:6,
  18;47:1,17,19;48:2,
  10,24;49:10;50:9,16,
  20;51:1,7,11,15;52:2;
  54:22;58:10;59:12,
  15,15,16,17,21;60:6,
  20;61:3,20;62:6,13,
  18,20;63:4,22;64:15;
  65:14;66:9,20;67:15,
  22,25;68:1,2,14;
  70:12,14,23;71:8,14,
  18,20,25;73:1;75:20;
  77:25;78:2;79:3;
  85:11,25;86:3,4
**detectives (9)**
  58:18;59:10;60:16;
  75:9;77:6;86:4,9;
  119:11,15
**determine (1)**
  39:19
**died (2)**
  37:2;67:2
**different (11)**
  10:22;14:4;19:7;
  58:1,2;94:16;95:4,5;
  97:5,17;99:13
**difficult (1)**
  7:4
**DiFranco (2)**
  6:9;123:1
**DIRECT (2)**
  6:16;88:24
**directly (1)**

**26:12**
**disappear (1)**
  44:21
**Disciples (1)**
  118:1
**discussed (1)**
  14:18
**Discussion (1)**
  96:11
**disorderly (2)**
  35:7,8
**dispute (1)**
  117:21
**disputing (1)**
  76:18
**District (15)**
  5:6,7;33:5,9,14,22;
  34:8,12;35:14,20;
  36:3;39:1;40:4;79:12;
  80:20
**Division (3)**
  5:7;11:3,14
**document (6)**
  8:12;17:18,21;22:3,
  6;37:21
**documents (4)**
  5:22;92:7;113:13,
  16
**Donald (2)**
  60:23;67:7
**door (1)**
  53:1
**double (18)**
  24:11;26:17,18,22;
  59:7,9;60:1,3;68:13;
  76:13;107:17;109:6;
  110:4;116:25;117:5,
  10,13,18
**down (9)**
  7:20;25:7;27:10;
  30:2;31:9;61:16;
  91:17;95:11;123:25
**downtown (1)**
  90:12
**draw (4)**
  31:25;55:17;80:11;
  81:17
**driver (5)**
  61:13;77:13,19,24;
  85:16
**drop (2)**
  50:17,21
**dropped (2)**
  50:18;51:15
**drove (2)**
  50:21;85:7
**drug (1)**
  87:3
**drugs (17)**
  98:20,22,24;99:1,
  10,13,18,24,25;100:7,
  14,20,23;101:2,6,11,
  22

**Duk's (2)**
  60:23;67:7
**duly (1)**
  6:14
**during (6)**
  33:16;45:20;52:22;
  56:24;57:18;80:24
**dying (1)**
  31:12

**E**

**earlier (15)**
  18:3;20:9;21:7;
  37:22;39:4;48:21;
  82:11,17;87:23;
  94:16;96:6;103:18,
  25;104:3;115:8
**early (8)**
  11:7,10;31:23;33:3;
  41:5;47:13;79:12;
  90:9
**Earnest (1)**
  43:5
**Eastern (2)**
  5:7,7
**edits (1)**
  114:3
**Edmunds (1)**
  5:12
**education (2)**
  93:2,12
**Edward (4)**
  18:3,8;19:17;23:11
**Efrain (60)**
  12:20,22;14:19;
  20:10;25:23,24;26:7,
  9;33:25;35:10;36:4;
  41:19;45:20;46:14,
  19,25;47:5,20;50:9,
  18,22,24;51:8,14,16,
  23;53:19;54:6,21,25;
  55:24;56:22,23;
  57:23;61:11,14,18;
  62:7;63:18,23;65:15,
  16,24;74:16;76:8;
  77:12,22;78:21;
  81:24;82:9;83:9,25;
  95:16,20;105:1,4;
  110:10,10,12;123:4
**Efrain's (1)**
  50:18
**eighth (1)**
  93:5
**either (6)**
  19:3;43:14;109:1;
  119:16;122:24;
  124:11
**elapsed (2)**
  57:14;79:6
**electronic (1)**
  124:17
**else (5)**

29:10;54:4;55:23;
59:2;118:9
**emotion (1)**
37:5
**emotions (2)**
36:19;37:2
**employed (2)**
93:15,18
**employees (1)**
90:21
**encountered (2)**
45:19;47:20
**end (3)**
61:22;72:3;86:24
**ended (3)**
24:3;35:21;116:1
**enforcement (1)**
86:9
**enough (1)**
29:8
**entailed (1)**
91:25
**established (1)**
92:3
**Esther (2)**
6:8;122:25
**et (1)**
5:5
**eTran (1)**
124:17
**even (3)**
43:16;53:4;58:5
**evening (4)**
35:18,20;47:13;
80:1
**eventually (1)**
87:10
**everyone (3)**
40:22;44:21;50:20
**evidence (4)**
45:23;78:6,12;
107:23
**exact (1)**
46:6
**exactly (1)**
51:20
**EXAMINATION (2)**
6:16;123:2
**example (1)**
24:11
**except (1)**
72:16
**Excuse (1)**
107:2
**executed (1)**
112:10
**executing (1)**
114:23
**exhibit (5)**
21:7;24:22;110:22;
112:1;114:24
**exhibits (1)**
124:18

**expect (1)**
8:18
**experience (2)**
49:23;74:22
**experiences (1)**
73:22
**explain (7)**
22:12;36:11;45:18;
54:13;74:21;94:24;
123:19
**extend (1)**
96:23
**extent (1)**
101:15

## F

**face (2)**
26:7;102:17
**Facebook (1)**
123:12
**face-to-face (1)**
7:11
**facilitate (1)**
9:23
**facilities (1)**
88:2
**fact (5)**
16:16;21:3;35:21;
71:15;119:24
**facts (4)**
45:23;91:5,25;92:1
**fair (4)**
14:9;29:8;76:2;
117:4
**faith (2)**
22:12;30:25
**familiar (1)**
21:14
**familiarity (1)**
6:24
**family (3)**
11:19;15:25;92:24
**far (5)**
91:25;92:21;96:22,
23;109:11
**fast (2)**
33:23;116:8
**fear (4)**
36:14;48:13;49:15;
52:13
**feared (2)**
44:11,14
**feel (2)**
52:23;120:16
**fellow (1)**
26:5
**few (15)**
6:25;24:21;40:18,
22;41:15;42:1;45:9,
12;46:9;60:15;68:23,
24;80:18;81:19;123:5
**Fifth (1)**

120:13
**fighting (1)**
102:2
**filed (2)**
5:5;90:25
**fill (6)**
47:23,25;48:3;49:6,
7,13
**filler (1)**
52:3
**find (1)**
17:17
**fine (1)**
25:2
**finish (4)**
10:13,14;51:9;
108:17
**finished (2)**
85:4;124:23
**firearms (1)**
122:10
**first (26)**
6:14;32:18;33:2;
38:21;39:21;42:5;
50:21;57:13,15;
59:18,25;61:9;62:8;
63:25;65:17;72:17;
89:15;91:20;111:10;
112:13,17,18,22;
113:12,21;114:4
**firsthand (3)**
70:9;117:4,8
**Five (14)**
42:21;50:10,25;
51:25;54:16;60:18;
72:25;74:19,23;
75:20;80:14,20;
85:10;88:10
**five-minute (3)**
88:1,3,6
**floor (2)**
27:18;51:21
**flowers (2)**
27:18;29:17
**folder (1)**
17:15
**following (2)**
22:16;109:10
**follows (3)**
6:15;114:11;120:7
**follow-up (1)**
123:18
**food (2)**
33:23;116:8
**Foremost (1)**
47:7
**form (54)**
20:3,24;24:13;
34:24;35:23;36:8,21;
37:6,13;40:7;41:22;
43:22;48:5;49:22;
50:1;52:16;55:13;
56:7;58:7,14;60:25;

62:10;64:12;65:19;
68:24;69:10,24;70:4;
73:4;79:15;94:6;
97:14;98:16;99:20;
101:13,24;102:7,13,
22;103:2,12;106:22;
107:20;108:7;109:17,
21,25;110:6;115:12;
118:5,19;120:4,11;
122:11
**forth (1)**
118:11
**forties (1)**
43:4
**forward (5)**
54:18;55:2,5;56:23;
57:19
**found (2)**
114:19;121:19
**foundation (40)**
20:25;34:25;36:9;
40:8;44:2,17;45:22;
46:15,21;50:2;51:4;
58:15;73:18,25;74:9;
75:11;76:17;77:10;
78:9;82:2;94:7;97:1,
15;98:17;99:21;
101:25;102:8,14,23;
103:3,13;109:22;
110:1,7;115:12;
117:23;118:20;120:3,
11;122:12
**four (4)**
21:21,23;50:15;
87:4
**frame (4)**
48:15;62:14;77:6;
80:21
**framed (2)**
48:17;52:13
**framing (3)**
43:19;44:1;45:7
**Francisco (3)**
5:3;8:25;38:11
**Freddy (3)**
72:21;82:5;84:20
**free (3)**
49:20;52:24;53:5
**Friday (2)**
19:20;23:4
**friend (5)**
12:3,9,16;14:22;
123:12
**friends (14)**
14:18;15:6;20:1,12;
24:7;44:9;45:9;48:21;
64:23;82:16;103:18;
104:4,7,12
**frighten (2)**
52:6,11
**Fro (2)**
13:20;14:5;82:13
**front (1)**

21:12
**froze (1)**
110:19
**frozen (1)**
110:16
**frustrated (2)**
62:4,5
**full (1)**
8:24
**fully (1)**
115:6
**funeral (38)**
16:2,16,18,19;
17:24,25;18:2,3,8;
19:12,16,20,23;20:22;
22:14,20,23:4,8,12,
12;24:15,17;25:12;
29:21;30:22,24;31:1,
3;32:5;33:17,17,18;
34:5;35:21;41:12;
75:24;76:1;80:15
**funerals (1)**
16:5
**further (2)**
87:17;123:15

## G

**gang (17)**
13:23;14:1;15:7,10;
37:17;73:16;74:8,12;
86:14,18;87:8;101:5,
10,22;102:12;103:5;
117:21
**gangs (4)**
14:4;44:1;102:5;
103:11
**Garfield (1)**
98:4
**gave (3)**
89:16;92:5;113:21
**GED (1)**
93:10
**general (4)**
9:17;89:9;96:18;
99:9
**generally (2)**
10:6;93:22
**girlfriend (4)**
68:13,15;69:5;80:8
**given (4)**
71:9;89:5,7,10
**giving (1)**
113:1
**glitches (1)**
7:5
**GM (1)**
9:21
**goatee (1)**
30:11
**god (1)**
105:6
**goes (2)**

9:23;10:8
**gonna (1)**
  49:17
**Gonzales's (1)**
  82:4
**Gonzalez (32)**
  11:25;13:21;14:6,
  19;20;10;38:8;72:9,
  21;76:9;79:21;80:25;
  81:23;83:12;96:2;
  103:19;104:4,11,18;
  105:20;107:11,12,15,
  25;109:4,14,18;
  110:11;113:9;114:14,
  17;117:13;119:6
**Gonzalez's (1)**
  115:2
**Good (12)**
  5:17,25;6:4,6,8,17,
  19;7:8;14:22;104:7,
  12;123:14
**Goossens (14)**
  13:1,1;14:5;76:13,
  19;77:1;80:25;81:4,
  23;82:12,20;83:15;
  84:25;85:1
**government (1)**
  39:17
**grabbed (1)**
  45:1
**grade (1)**
  93:5
**graduating (1)**
  93:5
**Grand (13)**
  10:9;42:22;51:17,
  18,25;52:2,7;69:3;
  74:15;79:2,7;98:4;
  108:19
**grandmother (3)**
  64:4,8;67:2
**gray (1)**
  28:5
**grayish (1)**
  28:5
**great (2)**
  25:20;28:20
**grew (1)**
  87:13
**ground (2)**
  27:19;97:7
**group (7)**
  14:18;15:13;20:1,
  12,14;24:22;82:16
**groups (1)**
  106:2
**grow (2)**
  9:25;10:3
**grown (2)**
  104:9;107:22
**guess (10)**
  11:21;37:23;70:7;
  72:17;86:17;102:2;

114:18;116:13;
117:24,25
**Guevara (54)**
  5:5;6:7;41:19;42:2,
  6,17;43:8;44:23;
  45:10,15;19;46:1,6,
  19;47:1,17,19;48:2,
  10,24;49:10;50:9;
  51:2,7,11,15;52:3;
  54:1,22;58:10;59:17;
  60:20;61:4,20;62:6,
  13,18,20;63:4,22;
  64:15;65:14;66:9,13,
  20;67:15,22;73:1;
  75:20;77:25;78:2;
  79:3;85:11;86:4
**Guevara's (3)**
  42:24;50:21;52:12
**guilty (3)**
  119:24;121:7,13
**gun (19)**
  83:1,6,10,13,16,19;
  120:2,8,24;121:1,2,7,
  14,15,16,19,23,24;
  122:2
**guy (9)**
  13:13;26:1,2,4,12;
  27:23;28:3;29:3,5
**guys (15)**
  27:24;28:21;34:19;
  40:23;67:1,2,5,6;
  74:18;95:6;98:19;
  104:7;106:2,3;116:4
**guys' (1)**
  64:4

## H

**hair (1)**
  39:23
**Haley (10)**
  5:20;17:4;21:5;
  25:6;27:7,11;29:9,24;
  31:10;40:13
**half (2)**
  64:16;87:4
**Halvorsen (1)**
  43:5
**Handicapped (1)**
  93:19
**handling (1)**
  23:13
**hands (1)**
  28:4
**hang (6)**
  81:6;104:18,21,24;
  106:3,5
**hanging (4)**
  35:4;121:18,20,24
**happen (8)**
  15:2;50:4;72:5;
  81:5;103:7;118:9,25;
  123:6

**happened (25)**
  15:19;41:15,25;
  45:18;48:23;49:15;
  53:8;54:20;57:4,22;
  59:4;60:23;66:2,5,11;
  67:21;74:19;79:14;
  81:2;85:10,14;
  109:14,20;113:6;
  118:14
**happens (3)**
  7:6;8:1;54:13
**happy (1)**
  124:11
**harassing (1)**
  122:5
**head (7)**
  83:1,7,10,13,16,19;
  100:20
**heads (1)**
  7:17
**hear (19)**
  32:8,18,23;37:16;
  39:13,13;42:14;
  54:25;56:18,21;57:1;
  74:4;83:25;84:4;85:4;
  95:18;109:1,2;111:1
**heard (9)**
  33:14;39:9;44:23;
  55:7;62:13;66:8;73:1;
  123:10;124:2
**hearse (1)**
  29:17
**heart (1)**
  48:4
**held (3)**
  5:9;9:18;30:25
**hell (2)**
  85:21,21
**Hello (1)**
  103:21
**helping (1)**
  114:15
**hesitate (1)**
  8:20
**high (6)**
  37:2;93:3,4,6,7,8
**highest (1)**
  93:2
**Hinshaw (1)**
  124:20
**Hispanic (5)**
  39:1;40:1,2;59:15;
  77:7
**Hispanics (2)**
  76:5;77:7
**hit (1)**
  62:8
**hold (8)**
  21:3,18;51:9;96:8,
  9;100:10,25;120:4
**home (19)**
  10:24;16:17,18,19;
  18:2,3,8;19:12,16;

22:15,20;23:12,12;
31:1,3;41:10;71:9;
81:23;82:20
**homes (1)**
  10:23
**homicide (6)**
  107:17;109:6;
  117:5,10,14,18
**Hopefully (2)**
  8:14;88:20
**hoping (1)**
  87:25
**hospital (3)**
  64:6,8;94:3
**hour (3)**
  64:16,17;116:13
**hours (11)**
  31:23;32:15;33:4;
  40:18,22;52:19;53:8;
  60:15;74:23;79:12;
  80:16
**house (6)**
  50:18;80:3,24;81:4;
  82:24;87:5
**hugging (1)**
  92:23
**Humboldt (19)**
  10:5,7,8,20,21,23;
  11:9;15:22;31:12;
  87:10,13;94:17;97:4;
  98:2,3,7,9,11,13
**hung (4)**
  13:7;15:14;95:6;
  106:8
**hungry (1)**
  71:10
**hypothetical (1)**
  101:13

## I

**ID (1)**
  62:21
**idea (6)**
  48:16;52:1;56:13;
  58:8;70:8;77:5
**identification (4)**
  17:3;21:10;24:24;
  38:5
**identified (18)**
  55:18,19,22;56:4,
  11,14,14;57:5;58:1,6;
  59:22,24;60:7;67:23;
  68:16;78:3;82:16,25
**identify (1)**
  24:21
**Illinois (4)**
  5:7;10:1;38:8;
  93:20
**image (1)**
  29:13
**impacted (1)**
  15:17

**implicate (2)**
  63:1;65:15
**implicated (4)**
  65:17;77:21,21,22
**implicates (1)**
  120:12
**important (2)**
  35:21;116:24
**impression (2)**
  36:6;62:25
**incident (7)**
  75:14,15,17;79:2;
  108:14,19;109:8
**including (5)**
  5:10;14:19;20:10;
  86:4;104:21
**indicate (2)**
  38:24;56:6
**indicated (3)**
  41:14;46:12,17
**indicates (5)**
  18:2;19:19;23:3,10;
  41:18
**indication (1)**
  69:8
**individual (14)**
  11:24;12:5,25;
  14:13;18:21;30:11;
  65:1;15;61:12;
  70:24;76:6;77:14,24;
  89:19
**individuals (8)**
  14:7;20:9;25:20,22;
  43:16;44:7;79:8;
  82:24
**individual's (1)**
  22:17
**indoor (1)**
  116:16
**indulging (1)**
  88:19
**inference (1)**
  55:17
**information (8)**
  32:23;41:1;65:23;
  68:20;70:11;77:18;
  110:3;111:10
**informed (1)**
  58:11
**innocent (3)**
  43:17;63:13,15
**inside (3)**
  19:16;116:14,19
**inspired (1)**
  36:19
**instance (1)**
  124:1
**interacted (2)**
  119:12,16
**internet (1)**
  92:11
**interns (9)**
  106:23,25;107:3;

110:14,21;112:5,7,10,
25
**interrogated (2)**
58:18;60:14
**interrogation (13)**
51:22,25;52:7,18,
23;53:11,24;58:24;
59:5;60:17;61:4;
64:14;66:13
**interrupt (1)**
10:11
**into (14)**
33:21;45:14;61:4;
66:21;75:9,19;80:1;
97:11,23;101:5,10;
102:6;118:2;119:17
**introduced (1)**
87:23
**investigating (1)**
107:9
**involved (7)**
60:17;73:2;77:20;
85:21;86:6,14;101:18
**involvement (1)**
85:25
**issues (3)**
110:17,23;122:18
**IV (1)**
5:12

---

**J**

**jacket (5)**
26:2,2,4,12;29:1
**jail (5)**
44:20;75:16,19,23;
99:7
**jean (1)**
29:1
**Jeffrey (22)**
61:12;64:19,22,25;
65:5,7,10;75:9,13,18,
22;76:8;77:13,13,22;
84:10;85:7,9,24;86:5;
96:5,13
**Jeffry (1)**
64:23
**Jennifer (6)**
5:18;18:15;105:9;
111:5;122:7;123:18
**Jesus (1)**
22:15
**JGS_ (1)**
30:4
**JGS_Maysonet (5)**
17:2;21:9;24:23;
29:25;38:4
**John (1)**
5:12
**join (1)**
94:4
**joining (1)**
6:18

**Jose (11)**
12:6,8;13:22;20:10;
26:16,21;69:4;72:12,
22;76:10;77:3
**Juan (10)**
26:14,15,16,20,21;
68:13,15,22;69:14,22
**Juan's (1)**
80:9
**judge (1)**
8:8
**July (1)**
9:10
**June (1)**
115:20
**Junior (7)**
5:4;26:16;93:3,4,6,
7,8
**Justino (28)**
12:12,23;14:19;
28:1,2;72:9,17,17;
76:9;80:25;81:24;
82:6;83:18;84:18;
95:23;100:9,15,19;
104:24;105:5;107:13,
16;108:1;109:14,19;
110:10;117:17;119:4
**Juvia (1)**
82:5

---

**K**

**Kedzie (1)**
106:7
**keep (1)**
30:2
**Kevin (2)**
6:6;122:23
**kill (6)**
60:9;65:22;67:18;
83:22;84:1,5
**killed (13)**
32:14;39:3,7,10,13;
40:23;41:2;60:11,22;
65:24;66:25;67:6;
74:5
**killing (1)**
74:12
**Kimball (8)**
95:1,24;100:8,15;
104:19;105:25;106:7;
116:21
**Kimball/Wabansia (1)**
96:1
**kind (6)**
7:8;15:24;84:15;
85:6,20;88:19
**King (17)**
37:16;39:13;82:9;
94:12;97:22;98:22;
100:6,13,24;101:2,6,
22;102:20;103:9;
118:2,25;119:1

**Kings (39)**
14:2;15:10;34:12;
37:9;39:7,9;40:24;
73:23;74:5,11;94:5,
17;96:15,18;97:4,5,6,
11;98:1,14;99:13,19,
25;100:22;101:1,9,
18;102:4,11,11;
103:11;104:15,19;
117:21;118:16,17,17;
122:9,10
**King's (1)**
97:24
**knew (10)**
13:2;39:2;43:8;
44:21;45:10;61:10,
13;63:6;65:20;82:12
**knock (12)**
55:3,7,10,21,23;
56:5,10,18,21;57:1,3,
16
**knocks (1)**
57:19
**knowing (1)**
52:8
**knowledge (6)**
70:9;110:8;117:4,9,
12,16
**known (8)**
9:3;13:2;42:10;
43:9,19;45:3;65:6;
96:14
**knows (2)**
76:22,24

---

**L**

**lack (1)**
86:17
**last (6)**
10:16;38:13;70:23;
71:23;72:3;95:18
**late (1)**
43:4
**later (5)**
60:2;68:23,25;
81:19;108:11
**Latin (53)**
14:2;15:10;34:12;
37:8,16;39:13;40:24;
73:23;74:4,11;94:4,
12,17;96:15,18;97:4,
5,6,11,22,23,25;
98:14,22;99:12,19,24;
100:6,13,22,23;101:1,
2,5,9,22;102:4,10,11,
20;103:9,10;104:14,
18;117:21;118:2,16,
16,17,25;119:1;122:9,
9
**laughed (1)**
85:20
**law (1)**

86:9
**lawsuit (4)**
90:21;91:1;92:8,12
**lawyers (1)**
90:24
**lead (2)**
70:23;71:20
**Leading (14)**
46:22;58:20;61:1;
62:15,23;63:20;
64:20;69:11,25;70:5;
74:24;81:1;82:2;83:2
**learn (6)**
32:8;60:2;92:17;
108:10,20,24
**learned (5)**
33:2,9;66:4;92:22;
109:3
**learning (1)**
32:13
**least (2)**
53:14;119:25
**leave (8)**
52:24;53:5;74:16;
86:18;87:7,10;
101:20,23
**left (7)**
18:10;26:9;27:24;
29:5;74:15;81:16;
116:11
**Lemoyne (3)**
41:20,23;45:15
**level (1)**
93:2
**life (11)**
16:11;31:17;35:22;
36:16;37:4,11;72:22,
24;79:17,20;87:8
**light (1)**
39:25
**light-complected (2)**
40:2;76:10
**lighter (1)**
77:6
**line (2)**
54:19;122:2
**lineup (44)**
47:23,24;48:3,11;
49:6,7,10,13,24;52:4;
53:12,23,23;54:3,8,
13,14,21,25;55:16,25;
56:4,18,24;57:18,20;
58:5;59:7,9,19,23;
60:7;68:4,10,12,16;
69:9,15,23;70:3,9;
78:20;85:15;114:19
**lineups (15)**
43:15,16;44:8;53:9,
18;57:8;58:1,11,12,
17,23;109:10;115:21;
118:10;119:18
**linking (1)**
78:7

**liquor (2)**
47:8,21
**little (8)**
7:4;25:6;30:4;
41:10;53:17;102:18;
105:4;110:25
**live (6)**
10:19,22;11:9,16;
80:5;87:12
**lives (1)**
123:9
**living (2)**
10:25;123:7
**located (4)**
11:2;34:9;116:20,
21
**location (2)**
99:9,19
**locations (1)**
94:16
**lock (1)**
49:17
**locked (4)**
48:22;53:2,3;74:23
**locking (4)**
42:10;43:10,12,18
**lockup (2)**
39:1;40:15
**lodge (1)**
7:25
**long (9)**
8:19;9:18;40:16;
44:20;60:13;64:14;
86:14;89:21;116:10
**longer (1)**
116:22
**look (7)**
17:7,19;21:11;
37:21;38:2;92:7;
106:12
**looking (3)**
26:8;30:17;80:22
**lookout (1)**
61:11
**looks (4)**
26:14;28:5;40:15;
110:16
**lose (1)**
110:15
**loss (1)**
20:15
**lost (2)**
21:18;111:3
**lot (3)**
68:7;72:16;97:6
**loud (1)**
7:19
**Louis (1)**
39:3
**low (1)**
96:13

Maysonet v. Guevara                                                    Francisco Veras

## M

**ma'am (1)**
7:22
**machines (2)**
93:23,24
**Macho (10)**
14:15;15:3,9;36:15;
37:1,10,18;95:25;
105:23;115:25
**Macho's (5)**
25:12;33:17;36:7,
18;41:6
**mad (3)**
66:14,14,24
**makes (5)**
7:4;13:5;36:20;
95:2;121:2
**man (5)**
43:3;60:3;67:4;
71:23;111:11
**manager (1)**
9:17
**Managers (1)**
93:20
**many (8)**
60:16;89:7,10;
110:13,20;112:9,15;
121:22
**Marijuana (1)**
99:7
**mark (2)**
17:1;21:7
**marked (6)**
17:3;21:10;24:24;
38:5;110:22;112:1
**mass (1)**
23:4
**matter (3)**
5:20;48:19;99:1
**may (36)**
5:11,22;6:11,12;
7:25;8:12;14:25;
20:12,22;23:4,18,21,
21;24:3,5;31:24;
32:11,15;33:3,10;
42:7,25;44:16;45:13;
62:21;76:3;79:12,25;
80:1,1,13,13,15;85:3;
87:18;88:24
**maybe (5)**
43:4;64:17;89:23;
97:9;111:3
**Maysonet (31)**
5:4;12:6,9;14:20;
20:11;26:16;30:4;
68:15;69:4,15;72:12;
77:4;83:21;84:1,5,23;
92:14,17,21;94:21;
100:15,19;104:22;
105:23;107:13,16,25;
109:4,13,18;117:9

**Maysonet's (15)**
80:3,23;81:3,22;
82:20,24;83:7,10,13,
16,19;84:9;92:8,12;
100:8
**mean (13)**
10:11;23:20;42:12;
43:13,19;55:11;57:4,
25;61:23;94:24;98:7;
115:12;121:12
**meant (1)**
55:21
**meet (6)**
91:7;110:14,20;
112:9;113:11;114:24
**meeting (6)**
112:5,18,19,21,22,
24
**member (4)**
14:5;15:10;102:10;
122:8
**members (6)**
13:23;15:7;34:11;
37:16,17;44:1
**memento (1)**
22:21
**memoriam (1)**
22:22
**men (21)**
32:9,14,22,24;33:2;
41:2;54:7;60:21;
61:21;73:3,12,16,20,
24;74:5,7;76:4,14;
83:23;107:22;108:2
**mentioned (5)**
11:13;18:2;60:22;
82:11;119:19
**met (5)**
112:11,12,16;
113:12,15
**mid-August (1)**
81:18
**mid-May (1)**
15:2
**midnight (2)**
31:24,25
**might (6)**
48:17;52:13;73:10;
102:1;110:3;114:1
**millimeter (1)**
82:25
**mind (5)**
28:25;31:20;35:1;
65:14;72:7
**minor (1)**
35:7
**minute (2)**
19:13;36:2
**minutes (1)**
88:10
**miss (1)**
103:22
**missed (1)**

97:20
**Misstates (3)**
73:5;95:7;107:23
**mistake (1)**
90:1
**mob (1)**
35:7
**mom (1)**
15:21
**moment (2)**
29:11;81:10
**mom's (1)**
15:20
**money (1)**
98:15
**months (6)**
81:19;87:5,5;
108:11,18;112:15
**more (5)**
48:9;63:16;66:23;
78:23;79:22
**morning (21)**
5:17,25;6:4,6,8,17,
18,19;24:15;31:23;
32:1,6,11,15;33:4;
41:5,7,9,9;47:14;
79:12
**most (1)**
8:2
**motivated (1)**
73:16
**motivation (1)**
77:8
**mourn (1)**
20:15
**mourning (1)**
19:14
**move (5)**
16:8;88:20;102:16;
111:24;118:2
**much (7)**
34:4;39:15;78:23;
79:6;87:2;102:18;
122:17
**murder (15)**
24:11;42:11;59:7,9;
60:1,3;64:5,10;66:2,
5;76:14;86:6;99:24;
110:5;117:1
**murders (22)**
43:10,13;60:23;
63:16;67:13,20,21,23;
71:16;73:3,11,15,24;
74:6,19;78:7,13;
83:23;84:2,6;86:1;
108:1
**must (1)**
68:5
**mute (6)**
66:15,16,18;88:11;
92:5;97:19
**muted (2)**
95:18;100:10

**myself (4)**
47:5;76:8;87:23;
102:24

## N

**name (28)**
5:12,18;6:1;8:24;
9:3;11:25;12:6;13:1,
18;14:13;22:17;26:3;
29:6;39:17,20,21;
43:5;59:11;61:12;
64:24;70:24;71:23,
25;72:3;85:21;87:23;
114:21,25
**named (1)**
26:5
**names (3)**
9:2;119:10,14
**nap (1)**
41:6
**natural (5)**
7:16;72:21,24;
79:17,20
**near (3)**
45:15;60:23;100:8
**need (7)**
8:19;24:25;29:11;
88:3;100:18;105:17;
115:7
**needed (5)**
49:12;68:6;71:9;
77:14;114:4
**neighborhood (17)**
10:4;16:21;33:24;
43:9,19,24,25;44:12,
15,21,24;45:2,3;50:5;
94:17;98:8,10
**nephews (1)**
110:11
**news (2)**
92:19,21
**next (7)**
26:7;27:7;28:13;
30:1;38:16;40:12;
53:8
**nickname (7)**
13:16,18;14:15;
39:22;82:4,8,13
**nicknames (2)**
9:1;26:21
**night (5)**
35:17;67:20;71:1;
115:15;119:16
**nine (2)**
72:18;82:25
**nobody (5)**
36:12,13;55:23;
60:9;65:22
**normal (1)**
7:17
**normally (1)**
124:18

**North (17)**
16:20;32:10,14,22;
33:3;34:20;39:3;47:4;
67:7;106:7;107:18;
108:2;116:21;117:5,
10,14,18
**Northern (1)**
5:6
**notarized (1)**
38:18
**note (1)**
69:14
**Number (7)**
5:8;7:24;20:9;
35:14;38:24;54:16,17

## O

**Object (44)**
20:3,24;24:13;
34:24;35:23;36:8,21;
37:13;40:7;41:22;
43:22;44:2,17;45:22;
46:15,21;48:5;49:22;
50:1;52:16;56:7;
58:14;60:25;64:12;
65:19;68:24;69:10,
24;70:4;73:25;74:9,
13,24;75:11;78:9;
96:25;101:12;107:19,
20;109:17;118:4;
120:11,14;122:1
**objecting (1)**
76:21
**objection (52)**
7:25;8:2,10;20:7;
49:2;51:3;55:13;58:7,
20;62:10,15,23;
63:20;64:20;69:16;
73:4,17;76:16;77:9;
78:14,18;79:15;81:1;
82:1;83:2;94:6;95:7;
97:14;98:16,25;99:6,
15,20;101:24;102:7,
13,22;103:2,12;106:6,
22;108:7,23;109:1,21,
25;110:6;115:11;
117:23;118:19;120:3;
122:11
**obtain (1)**
93:10
**occasions (1)**
119:21
**occur (1)**
66:5
**occurred (1)**
33:10
**occurrence (2)**
31:13,20
**o'clock (3)**
24:4;32:5;116:2
**October (1)**
5:2

**off (21)**
35:5;36:17;42:12;
44:22;50:17,18,21;
51:15;61:24;81:8,9,
12,13,17;85:20;
88:12;96:11;111:14,
17,18;124:25
**offense (1)**
110:25
**offenses (1)**
35:7
**officer (10)**
32:20,22;34:18;
39:2,10;40:5,9;69:21;
70:17;115:9
**officers (7)**
6:2;54:1;67:24;
87:25;115:9;119:11,
15
**old (5)**
9:7;11:21,22;50:24;
94:9
**once (1)**
63:16
**one (42)**
7:25;10:24;11:1;
14:17;17:15;22:15;
27:2,23;28:2;29:12;
31:25;32:11;34:1,18;
51:22;56:2;57:7,9,13;
59:10;62:12;64:23;
72:17;75:3,4;76:6;
85:3;89:11,12;90:1,3,
4,20;95:1,3;113:21;
115:9;119:25;120:5;
121:23;123:3;124:12
**ones (2)**
68:9;119:19
**only (3)**
72:18;90:1,3
**open (4)**
30:21,24;53:2,4
**opinion (2)**
74:2;77:11
**opportunity (2)**
19:12;31:5
**oppositions (1)**
117:24
**option (1)**
49:5
**ordinary (1)**
118:14
**otherwise (1)**
96:14
**out (57)**
7:19;13:7;15:14;
24:10;28:21,23;30:4,
14;31:20;35:4;36:12,
13;41:5,8;43:14,15;
44:7;48:15;55:16;
59:6,9,18;67:21;68:4,
9,11;72:7;78:19;81:6;
85:15;86:21,23;87:7;

88:21;92:15,18,23;
93:24;95:6;102:17;
104:18,21,24;106:3,5,
8;108:16;112:25;
113:1,2,4;114:19,19;
118:14;121:19,20,24
**outcome (1)**
45:11
**over (8)**
15:21;30:9,15;31:6;
57:16;63:3;66:22;
119:13
**own (1)**
11:18;16:10;31:17;
36:15;37:4,11;44:8

## P

**page (5)**
7:1;18:17;38:13,21;
40:13
**paid (1)**
90:22
**palm (7)**
17:12,17;21:6,16;
22:7,13,24
**pants (2)**
28:6,6
**paragraph (4)**
40:14;41:4,14;
60:19
**paralegal (1)**
5:20
**Park (21)**
10:5,7,8,20,21,23;
11:9;15:22;31:12;
87:11;94:17;97:4;
98:2,3,4,7,8,9,11,12,
13
**parole (1)**
72:22
**part (4)**
10:16;14:7;15:13;
82:15
**participants (1)**
22:1
**particular (2)**
10:3,19
**parties (2)**
5:10;8:9
**partner (12)**
5:23;41:20;42:2,25;
45:15,19;47:1;50:10;
51:11;54:2;60:22;
91:10
**passed (2)**
64:11;65:12
**passes (1)**
64:4
**passing (1)**
15:21
**patient (1)**
122:17

**patrol (1)**
40:4
**pattern (2)**
76:7,11
**Paulnitsky (1)**
71:25
**pay (1)**
16:13
**PDF (2)**
124:17,19
**people (39)**
16:12;19:7,14;
22:11,19;31:12;
34:15;35:4,6,15;
36:17;37:1,8,10;38:7;
39:3;40:20;42:10;
43:10,12,14,20,24;
44:7,15,19;45:8;48:2;
49:12;50:5;54:16;
58:2;62:14;68:16;
74:12;82:9;101:21;
102:5;121:23
**percent (1)**
96:9
**perhaps (1)**
7:5
**period (3)**
40:16;45:20;80:24
**permission (3)**
97:13,23;100:18
**person (10)**
30:15;62:8;65:17;
68:4;77:2,8;91:1,8;
107:8;119:3
**phone (6)**
42:15;91:4;96:8,13;
100:11;103:23
**phonetic (1)**
82:5
**photo (3)**
25:8,20;27:12
**photograph (12)**
25:4,13,25;26:25;
27:9,22;28:15;29:14;
30:1,7,18,18
**physical (1)**
78:11
**picked (1)**
80:19
**picking (1)**
81:16
**picture (8)**
25:23;26:8;27:7;
28:1,2,14;29:17;
102:17
**pictures (6)**
21:21,23;24:20;
60:21;61:21;67:5
**Pierce (14)**
94:25;95:15,17,21;
96:4,16,17,18,19;
100:7,13;105:2,21;
106:7

**piled (1)**
50:20
**place (3)**
16:23;23:11,17
**placed (3)**
51:24;58:12;59:1
**plaintiff (1)**
5:19
**planning (1)**
91:22
**please (12)**
5:15;8:24;21:5;
25:6;27:11;28:14;
30:2,2;36:25;97:20;
103:16;108:17
**pled (3)**
119:24;121:7,13
**pm (10)**
18:25;19:1;81:12,
15,22;88:16;111:17,
20;124:25;125:2
**pocket (1)**
28:4
**point (11)**
5:14;8:19;43:14,15;
44:7;48:15;58:9;61:3;
66:2,7;70:7
**pointed (9)**
55:16;59:6,8,18;
68:4,11;78:19;85:15;
114:19
**pointing (1)**
68:9
**points (1)**
7:25
**police (26)**
32:20,21;33:5,9,24;
34:22;36:13;39:1;
50:12,19;51:17,21;
68:23;69:8,14,19,20,
21;108:15;109:8;
116:12;118:10,18;
119:11,15,15
**Polish (2)**
70:23;71:23
**poor (1)**
107:7
**position (1)**
9:19
**possess (2)**
120:2,8
**possessed (1)**
120:24
**Possession (4)**
87:1;121:2,6,14
**possibility (1)**
75:25
**possibly (2)**
58:6;118:6
**pounding (1)**
48:4
**power (1)**
96:9

**pray (1)**
31:6
**prayer (1)**
22:18
**praying (2)**
30:9,15
**preceded (1)**
56:21
**preceding (2)**
20:22;23:18
**precise (1)**
48:9
**prepared (2)**
22:25;24:14
**presence (1)**
35:19
**present (2)**
5:22;34:12
**presumably (1)**
58:2
**Pretty (4)**
10:10,18;20:17;
39:15
**previous (2)**
88:25;113:19
**primarily (1)**
10:24
**prior (17)**
32:21;35:20;51:8,
24;53:11;56:2;58:10;
72:5,25;89:12;91:3,
17;119:20;120:2,9,
24;123:22
**prison (6)**
86:21,23,24;92:15,
18,22
**probably (25)**
36:14;41:8;43:4;
46:3;47:13;50:25;
51:5;54:15;64:16;
69:17,18;70:23;77:3;
79:10;89:11,23;90:9;
94:8;98:3,21;99:14;
110:8,9;116:13;
120:13
**problem (3)**
42:16;95:20;104:3
**problems (2)**
8:15;102:2
**proceed (2)**
6:12;8:4
**process (2)**
57:16,18
**processed (1)**
38:25
**processional (1)**
29:19
**professional (1)**
93:12
**prosecutors (1)**
86:9
**protective (1)**
102:4

**provide (2)**
41:1;124:12
**provider (1)**
111:12
**pull (3)**
17:4,17;21:6
**pulled (2)**
17:18;93:23
**purportedly (1)**
58:5
**purports (2)**
21:16;22:6
**purpose (1)**
110:25
**put (19)**
29:24;32:4;46:4;
48:9;51:22;61:16;
64:10;73:20;82:25;
83:6,9,12,16,18;
88:10;106:11,15;
109:10;115:21
**putting (2)**
8:13;44:19

## Q

**quality (2)**
25:21;28:20
**quick (3)**
21:12;38:3;88:21
**quickly (3)**
79:25;81:18;111:24

## R

**ramped (1)**
66:14
**ran (1)**
45:14
**Rappaport (1)**
5:13
**Ray (2)**
42:6;44:23
**reach (2)**
112:25;113:1
**reached (2)**
113:2,4
**read (2)**
114:11;120:7
**reading (1)**
18:5
**ready (2)**
104:1;111:22
**real (5)**
21:12;38:3;39:20;
79:24;81:17
**really (12)**
24:8;26:6;29:15;
30:16;33:16;43:1;
72:1;85:19;90:10;
105:7;111:11;123:8
**reason (3)**
73:14,21;121:5

**recall (26)**
13:19;16:4;24:2,7;
32:12,13;33:22;47:6,
9;53:15,16;72:22;
76:1;79:6;80:13,23;
89:21;90:11;96:14;
108:13;118:1;119:10,
14;121:2,18,21
**receive (1)**
68:19
**received (1)**
93:13
**receiving (1)**
91:16
**recently (1)**
123:4
**recognize (20)**
13:12;21:13;22:9;
25:3,8,11,19,21;27:8,
12,21;28:16,19;
29:13;30:6,10;38:6,
14,19;54:10
**recognized (1)**
54:5
**recollection (7)**
17:9;23:8,24;33:7,
13;51:20;57:8
**record (22)**
5:2;7:21;8:9,24;
17:23,25;29:24,25;
81:8,10,12,13,15;
88:12,16;96:11;
105:11;111:15,17,18,
20;125:1
**Red (7)**
39:2,17,22;40:22;
60:4;66:8;115:9
**REDIRECT (1)**
123:2
**referenced (2)**
21:6;60:4
**referred (2)**
98:8,10
**reflects (2)**
21:15;22:25
**refresh (1)**
23:7
**refreshes (1)**
17:8
**refusing (1)**
120:23
**regarding (2)**
5:4;92:8
**regroup (1)**
7:7
**regular (1)**
50:5
**regularly (1)**
14:10
**related (2)**
12:23;36:7
**release (1)**
72:6

**released (3)**
79:7;92:21,24
**releasing (1)**
68:3
**remember (20)**
16:22;19:3;34:4;
35:15;40:16,24;
41:21;46:5;59:11;
60:24;63:8;70:21;
90:19;96:6;106:11,
15;112:2,12,15;
118:13
**remembering (1)**
103:19
**remotely (1)**
5:11
**repeat (5)**
55:14;66:17;97:21;
110:19;120:6
**repeating (1)**
105:15
**rephrase (8)**
7:14;36:23,25;66:6;
105:17,18;107:24;
118:23
**report (2)**
69:8,14
**reporter (8)**
5:10;6:11;7:19;
62:2;113:8;114:10;
123:24;124:2
**represent (4)**
5:16,19;6:1;87:24
**reputation (5)**
43:23;44:19;45:6,7;
52:12
**requested (3)**
91:20;113:8;114:10
**research (1)**
92:11
**reside (1)**
9:12
**respects (1)**
16:13
**response (4)**
60:8,10;63:7;85:17
**responsible (3)**
63:6;73:11,23
**restaurant (8)**
33:23;113:23,24;
114:1,2;116:7,8,18
**result (1)**
20:20
**retaliate (1)**
36:16
**retaliating (1)**
37:9
**retaliation (2)**
36:14,15
**returned (1)**
59:5
**review (2)**
123:21,22

**ride (1)**
71:9
**right (118)**
7:23;8:9,16,22;
14:3,12,24;15:14,16;
16:4,22;17:21;18:1,
11,11,23;19:21;21:4,
25;23:22,25;24:15;
25:4,16,17;26:5,9,16;
28:3,13;30:22,23;
31:6;33:1;34:6;36:4;
37:5,6,20;38:10,11;
39:5;40:2;41:7,12;
45:12,16,17;46:7,10,
20;47:15;48:7;49:11,
19,20;50:10,15,22;
51:14;52:19;53:16;
54:12,12;55:5;56:9,
11;57:13,15,15;58:16,
19;59:21;62:9;65:13;
66:1;68:17;70:12,15;
76:4;78:4,21,22;79:4;
80:21;81:19;82:11,
13,14,17,18;84:8,17;
85:7,8;86:13,15;
88:18;89:5;93:9;
94:18;101:3;104:5;
105:2,21,25;108:2,6;
111:15;116:2;117:1;
119:22,25;120:17;
121:7;123:21,22;
124:4
**rights (1)**
120:13
**riled (1)**
64:3
**ring (1)**
43:5
**rival (2)**
37:17;103:5
**Rizman (1)**
5:13
**role (1)**
76:3
**room (19)**
51:22,25;52:7,18,
23;53:11,24;54:4;
56:18;58:24;59:1,5;
61:4;66:12,13,21,23;
67:21;90:18
**Rosa (4)**
69:15;70:2;80:5,7
**Rose (1)**
80:9
**Rosy (6)**
68:13,15,22;69:5,
22;80:10
**row (1)**
54:15
**rule (2)**
8:8;10:12
**rules (2)**
6:24;7:10

**rung (1)**
42:15
**runned (1)**
15:21
**rust-colored (1)**
39:23

## S

**sad (2)**
15:19,24
**sadness (1)**
37:6
**saint (1)**
22:15
**same (17)**
7:1,9,10;10:14;
11:12;20:7;34:18;
69:16;75:5;77:3;
78:14,18;87:12;
94:20;97:16;104:13,
14
**Sanchez (15)**
14:13;15:3;16:10;
18:21;20:2,15;21:17;
23:1,13;24:6,18;30:8,
12,19;35:11
**Sanchez's (8)**
16:2;23:8;29:20;
32:5;34:5;35:20;
75:24;80:15
**Santiago (10)**
14:13;15:3;18:21;
20:15;21:17;23:1;
30:8;75:24;80:15;
95:25
**sat (2)**
53:7;119:18
**saw (3)**
13:12;92:20;114:2
**Sawyer (1)**
16:20
**saying (10)**
52:3;59:25;61:17;
63:24;66:25;75:3;
78:19;85:16,25;109:2
**scared (4)**
48:14;51:1,6;69:18
**scenarios (1)**
8:2
**scheduling (1)**
9:24
**school (5)**
93:3,4,6,7,8
**scooping (1)**
51:2
**screen (5)**
8:14;21:21,23;
106:12,16
**scroll (3)**
25:5;29:10;30:4
**seating (1)**
116:17

second (15)
   17:15;21:4;51:21;
   57:18;58:4;66:18;
   85:3;95:19;96:8;
   112:19,21,23;113:15;
   120:4,5
section (6)
   10:20;94:25;
   104:13,14,19;105:2
sections (2)
   14:4;97:5
seeing (3)
   21:25;22:6;107:21
sell (16)
   98:22,24;99:18,25,
   25;100:1,3,7,14,20,
   23;101:2,6,11,22;
   102:3
selling (2)
   99:8,23
send (1)
   124:18
sense (4)
   13:5;36:20;95:3;
   121:3
sent (2)
   37:21;92:4
sentenced (1)
   87:4
serve (1)
   52:3
services (4)
   16:1,12;18:24;19:4
set (20)
   14:6;94:20;95:11,
   21;96:2,6,14;97:10;
   98:14,19;100:6,9,13,
   16,20;105:21,24;
   106:3;113:10;118:11
sets (3)
   94:16;95:5;99:13
several (5)
   6:2;52:19;53:7;
   69:9;119:21
sewer (1)
   9:17
Shakespeare (2)
   34:9;71:1
shaking (1)
   7:17
sheets (1)
   93:25
Shiller (1)
   114:25
shooter (4)
   61:10,17,18;64:1
shooters (1)
   77:12
shooting (9)
   32:19;33:10;37:10,
   17;61:19;62:9;65:18;
   77:20;103:11
shortly (5)

33:18;45:20;72:8;
   108:13,14
shot (10)
   27:2;32:10,14,22,
   24;33:3;34:19;
   102:24;103:1,5
show (9)
   8:12;16:25;24:20;
   29:11,12;38:1;61:20;
   113:13,16
showed (2)
   60:20;68:20
showered (1)
   41:11
side (13)
   10:21;22:15,16;
   27:24;28:19;29:5;
   54:18,19;97:3;98:3,7,
   12,13
sign (9)
   65:21;67:4;72:18;
   75:4,6;78:20;106:21;
   112:20;123:23
signal (1)
   111:6
signature (5)
   38:14,15,19;
   123:18;124:15
signed (8)
   75:7;106:10,19;
   110:14,21;112:16,24;
   113:18
signing (1)
   44:9
signs (1)
   78:21
similar (1)
   74:22
single (1)
   69:14
sister (1)
   80:9
sit (4)
   33:7;39:18;49:10;
   118:15
sitting (5)
   52:7,22;79:19;
   90:18;91:17
situation (1)
   121:17
six (3)
   54:16;60:18;87:5
sky (1)
   72:3
slapped (1)
   67:4
slept (1)
   41:11
Slick (2)
   65:3;96:14
snitch (2)
   118:17,21
snitched (3)

119:1,2,3
socialized (1)
   14:10
sold (4)
   98:19;99:1,10,13
somebody (3)
   30:9;48:15;100:3
someone (9)
   13:6;14:10;28:8;
   31:16;44:11,14;56:4;
   59:2;82:15
sometime (1)
   79:4
sometimes (2)
   7:16;14:4
somewhere (1)
   44:22
son (6)
   47:5;50:18,22,24;
   51:1,15
sorry (31)
   10:11;13:9;16:7,9;
   21:22;26:18;31:2;
   35:24;40:21;42:13,
   15;44:3;46:23;51:10;
   55:14;61:23;71:2,6;
   75:1;79:18;86:22;
   90:13;95:13;97:20;
   103:15;105:12;107:8;
   108:16,25;120:5;
   122:13
sort (2)
   28:18;34:21
Sounds (3)
   23:23;45:17;115:22
Spaulding (17)
   41:20,24;45:16;
   47:4;95:1,15,17,21;
   96:4,16,17,19,20;
   100:7,14;105:2,20
speak (6)
   85:9;91:11,15,21,
   24;109:19
specific (1)
   97:10
specifically (8)
   14:25;15:1;31:22;
   80:11,14;81:21;97:8;
   112:4
Speculation (5)
   49:3;73:18;74:1,13;
   77:10
speculative (1)
   101:14
spend (1)
   19:13
spent (1)
   95:6
spoken (3)
   91:4;111:10;123:4
spoon (1)
   102:16
Spunkey's (14)

33:24;42:1;45:14,
   21;46:1,10;113:23;
   115:16;116:5,7,14,19,
   20,24
Spunky's (2)
   41:16;116:16
squad (1)
   50:16
St (2)
   19:20;39:3
stacked (1)
   93:23
stamp (3)
   18:16;29:24;30:3
stand (4)
   48:11;54:14;56:23;
   58:10
standing (5)
   26:1,11;28:4;54:24;
   56:17
stands (1)
   72:7
standup (1)
   116:18
start (6)
   35:3;42:5;63:2;
   66:21;102:2;119:13
started (1)
   8:23
state (6)
   5:15;8:24;38:8;
   86:10;115:14;119:5
statement (19)
   60:11;61:10,14,15,
   16,17;62:7,8,22;63:5,
   10,19,25;67:4;75:6,7;
   78:8;112:23;113:1
statements (6)
   44:9;65:21;72:15;
   78:17,20,21
States (1)
   5:6
Stateville (2)
   79:16,19
Station (7)
   33:6,9;50:19;51:17,
   22;68:23;118:10
stayed (1)
   94:11
step (4)
   54:18,18;55:2,4
stick (1)
   31:20
still (5)
   49:18;84:17;87:12;
   123:7;124:7
stood (3)
   54:12,21;57:19
Stop (1)
   120:4
store (2)
   47:8,21
Straight (1)

29:1
streamline (1)
   88:20
street (11)
   13:23;14:1,4;15:10,
   22;35:5;36:17;39:14;
   62:13;73:9;97:18
streets (4)
   32:23;44:22;48:3;
   73:23
stretch (2)
   88:1,6
strike (19)
   16:5;40:21;47:18;
   52:21;55:19;62:19;
   63:2;68:21;71:13;
   78:1;84:9;85:5;
   102:25;106:20;
   107:13;116:9,15;
   119:13;121:5
stuff (1)
   90:24
subpoena (1)
   91:17
subsequent (1)
   119:17
substance (3)
   87:1;91:16;99:8
sue (1)
   69:18
suggested (1)
   62:6
suggesting (1)
   122:3
suicide (4)
   15:4,17;27:16;
   37:18
suing (1)
   89:20
summarize (1)
   71:5
summer (8)
   11:17,25;12:9,17;
   13:7,23;117:20;118:3
sure (15)
   8:20;13:6;16:1;
   29:6;33:12;67:16;
   89:1;97:12;105:10,
   11;111:23;115:6;
   120:12;123:20,23
swear (1)
   6:11
sweat (1)
   28:6
sweep (5)
   33:25;34:22;35:1,2;
   36:7
sworn (1)
   6:14
Sylvester (1)
   19:21

**T**

**table (1)**
67:5
**tactics (4)**
44:5,8;62:12;75:3
**talk (7)**
36:2;37:16;58:22;
74:18;75:13;106:9;
109:13
**talked (6)**
73:10;83:22;84:1,5;
96:6;100:22
**talking (10)**
12:16;17:12,13;
26:15;37:9;38:22;
67:8;71:20;75:2;
106:19
**Tall (2)**
70:24,24
**Tank (1)**
29:6
**technological (1)**
122:18
**teenagers (1)**
107:22
**telling (4)**
65:15;66:9;75:6;
121:14
**ten (1)**
89:23
**terms (2)**
43:24;48:9
**terrified (1)**
48:10
**territory (9)**
96:22;100:24;
101:3,6,10,23;102:5,
6;118:3
**testified (7)**
6:15;39:4;69:22;
70:3;72:6;78:2;86:11
**testify (2)**
110:9,12
**testimony (8)**
73:5;88:25;90:7,10,
12,13;91:16;95:8
**thereafter (1)**
79:4
**Theresa (2)**
6:4;122:20
**thinking (1)**
90:6
**Thomas (1)**
39:22
**though (3)**
31:17;43:16;47:14
**thought (3)**
39:6;55:19;56:14
**threaten (3)**
83:21;84:1,4
**threatened (1)**

64:10
**three (5)**
41:8,9;58:18;89:11;
106:2
**Thursday (6)**
5:2;18:25;20:21;
23:17;24:3,5
**timeline (2)**
46:4;115:24
**times (5)**
7:5;18:13;110:13,
20;112:9
**Tino (2)**
82:6;105:24
**Today (9)**
5:2;33:8;39:18;
57:8;72:7;86:11;91:3;
118:12;124:23
**together (6)**
7:7;20:2;95:2,6;
104:9;106:3
**token (1)**
10:14
**told (43)**
32:20,21;34:19;
39:2,8,10;40:22;
47:22;48:10,24;59:6,
8,18,22;60:6,9,21;
62:18;63:4;64:18;
67:18,19;68:2,8,14;
71:18;78:3;85:14;
89:4;94:11;101:1;
103:18,25;104:4;
109:9;112:5,6;
113:24;115:8;116:1,
23;118:12;119:12
**Tom (1)**
39:21
**tonight (1)**
119:13
**took (10)**
16:10,23;23:11,17;
36:15;37:3;41:6;
50:17;75:9;112:23
**top (2)**
29:17;99:23
**training (1)**
93:13
**tried (2)**
101:6,10
**true (1)**
12:19
**try (5)**
22:2;44:24;101:11;
105:10;111:24
**trying (10)**
46:4;63:1;77:6;
78:8;97:8;99:16,17;
100:12;101:22;118:2
**turf (1)**
96:23
**turn (2)**
54:18;55:2

**twice (1)**
112:11
**two (31)**
8:12;32:9,22;33:2;
34:19;39:2;41:9;57:8,
9,10;58:1,2,18;60:3,
21;61:21;64:3;67:5;
73:3,11,15,20,24;
74:7;76:4,5;77:6;
83:23;89:12;107:17;
108:2
**type (7)**
9:16;22:7,21;29:19;
47:24;89:16,25
**types (2)**
102:19;120:18

**U**

**Uh (1)**
105:18
**ultimately (1)**
76:13
**Um (3)**
47:3;102:9;123:8
**Um-hum (1)**
22:8;109:12
**uncle (1)**
119:6
**uncommon (1)**
56:5
**unexpected (1)**
15:6
**unfair (1)**
90:22
**uniform (1)**
40:10
**union (1)**
90:23
**United (1)**
5:6
**unless (1)**
123:16
**unusual (1)**
31:19
**up (43)**
9:25;10:3;17:4,17,
18;20:17;21:6;24:15;
25:5;28:4;29:10;
35:21;37:15;42:10;
43:10,12,18;48:22;
49:17;51:2;56:23;
64:3;66:14,24;74:23;
77:23;80:19;81:16;
86:24;87:13;88:1,6;
90:11;93:23;99:18;
104:9,19;106:11,15;
112:22;113:11,22;
124:6
**upset (2)**
37:1,3
**use (5)**
44:8;62:14;88:2;

103:10;107:21
**used (3)**
29:3;35:2;93:19
**uses (1)**
111:12
**using (1)**
111:6
**usually (1)**
39:12
**UUW (1)**
119:25

**V**

**various (1)**
119:21
**vehicle (1)**
89:18
**vending (3)**
93:20,23,24
**Veras (41)**
5:18;6:1,17;8:25;
9:1;10:1;11:4;16:7;
17:20;18:9;21:11;
24:25;25:9;26:24;
27:8;28:16;29:13;
30:7;31:11;37:22;
38:6,11;56:1;66:16,
17;78:23;81:16;
87:22;88:9,18;89:4;
110:13;111:2,15,22;
120:15;122:15,22;
123:3,15,20
**V-E-R-A-S (1)**
8:25
**Veras-1 (2)**
17:1,2
**Veras-2 (2)**
21:8,9
**Veras-3 (2)**
24:22,23
**Veras-4 (3)**
37:24,25;38:4
**Veras's (1)**
5:3
**verbally (1)**
7:19
**versions (1)**
113:19
**versus (2)**
5:5;38:8
**via (1)**
5:9;7:4
**victims' (1)**
64:7
**video (1)**
21:18
**VIDEOGRAPHER (10)**
5:1,11,13;6:10;
81:11,14;88:15;
111:16,19;124:24
**videotaped (1)**
5:4

**viewed (4)**
69:9,15,22;70:3
**Viewing (1)**
19:10;70:8
**violence (1)**
102:19
**violent (2)**
102:12,15
**visitation (21)**
16:7,16,23;17:5;
18:12,13,24;19:4,6,8;
20:21;23:21,25;24:2,
6;30:19;31:5;35:10;
115:25;116:1,11
**visitations (6)**
16:12;19:4,7;20:2;
23:16;34:2
**Visual (1)**
93:19
**voluntarily (2)**
49:8,9

**W**

**Wabansia (7)**
95:2,24;100:8,14;
104:19;105:5,24
**wages (1)**
90:22
**wait (3)**
111:9;118:15;120:4
**waited (1)**
52:18
**waiting (2)**
17:16;53:17
**waive (2)**
124:5,14
**walk (1)**
88:10
**walked (2)**
24:8;67:21
**walking (3)**
47:3,4,21
**waste (1)**
105:14
**water (2)**
88:1,7
**Watts (17)**
61:12;64:19,22,23,
25;65:10;75:9,13,18,
22;84:10;85:7,9,24;
86:5;96:5,13
**way (11)**
8:13;15:9;26:20,25;
27:11;36:7;45:4;
73:16,21;82:3;124:11
**ways (1)**
19:8
**wearing (2)**
25:25;28:24
**Wednesday (3)**
18:25;20:21;23:17
**weeks (10)**

41:15;42:1;45:13;
46:9;68:23,25;69:9;
112:18;115:15,19
**weren't (3)**
48:24;53:13;107:22
**west (10)**
10:21;11:3,13;97:3;
98:2,3,7,12,12;118:2
**Western (1)**
10:8
**whatnot (1)**
18:13
**what's (4)**
28:16;53:8;78:21;
93:1
**whatsoever (1)**
101:15
**wherever (1)**
100:1
**white (12)**
26:4,12,13;28:6,10;
39:24;43:3,3;59:14,
16;70:24;71:22
**white-sleeved (1)**
26:2
**whole (5)**
25:7;27:11;30:5;
57:16;97:3
**who's (1)**
30:15
**WiFi (2)**
7:5;111:6
**Wiley (1)**
73:15
**window (4)**
55:3,8,11;56:10
**within (7)**
79:10;99:19;
108:18,21;109:5;
112:18;116:13
**without (2)**
52:8;72:22
**witness (12)**
6:12,14;87:20;88:3,
8,13;99:2;102:20;
119:5;122:19;124:7,
13
**witnesses (4)**
43:15;67:1;78:3,17
**wondering (1)**
27:3
**Woody (3)**
26:3,5;27:24
**word (4)**
51:13;73:9;86:18;
107:21
**words (1)**
118:21
**work (4)**
9:14,16;93:19;
103:24
**worked (3)**
40:9;90:20;94:2

**working (2)**
107:1,4
**worry (3)**
7:7,9;124:6
**writing (1)**
113:22
**wrong (1)**
124:2
**wrongfully (8)**
92:24;106:23;
107:5,9;112:7,8;
114:15,17
**wrote (1)**
112:22

## Y

**year (2)**
15:23;93:8
**years (8)**
9:20;11:22;72:18;
87:4;89:23;112:16;
121:22;123:5
**yelling (1)**
66:25
**YLO (1)**
118:1
**YLODs (1)**
117:22
**young (1)**
44:15
**youths (2)**
107:18,21

## Z

**Zabawa (1)**
6:11
**ZIBOLSKI (3)**
6:6,7;122:23
**Zoom (4)**
5:9;7:4,24;18:6

## 0

**002553 (1)**
24:23
**002560 (1)**
24:24
**01722 (1)**
38:4
**01724 (1)**
38:5
**02552 (1)**
17:2
**02557 (1)**
29:25
**02558 (1)**
30:4
**02561 (1)**
21:9

## 1

**1 (2)**
32:5,16
**1/21/18 (1)**
38:16
**1:04 (1)**
88:15
**1:33 (1)**
111:16
**10 (2)**
38:24;81:22
**11 (1)**
40:14
**11:14 (1)**
5:3
**12 (3)**
32:5,10;41:4
**12:42 (1)**
81:12
**12:44 (1)**
81:14
**12th (1)**
9:10
**13 (2)**
9:20;41:14
**14 (1)**
22:1
**14th (13)**
33:5,8,14,21;34:8,
12;35:13,19;36:3;
39:1;40:4;79:12;
80:20
**16 (1)**
82:23
**16th (1)**
81:21
**17 (1)**
94:10
**18 (2)**
87:5;94:10
**18-CV-02342 (1)**
5:8
**19 (1)**
60:19
**1966 (1)**
9:10
**1983 (1)**
94:8
**1984 (1)**
94:8
**1990 (45)**
11:17,22;12:1,10,
17;13:9,11,24;14:25;
15:2;20:12,23;23:4,
18,21,21;24:3,6;
31:24;32:11,15;42:7,
25;44:16;45:13;76:3;
79:13,25;80:16;
81:19,21;82:23;83:3;
93:15,16;101:23;
102:11,21;115:20;

117:20;118:3;119:20;
120:2,9,25
**1990s (4)**
11:7,10;31:13;80:3
**1993 (1)**
94:12

## 2

**2:03 (1)**
111:19
**2:21 (2)**
124:24;125:2
**2000s (2)**
90:9,10
**2021 (1)**
5:2
**20th (1)**
80:15
**23 (1)**
11:22
**23rd (1)**
23:21
**24th (6)**
23:21;24:3,5;80:1;
115:25;119:17
**25th (15)**
20:22;23:4,18;
31:24;32:11,15;33:3,
10;42:7;45:13;76:3;
79:13,25;80:2;119:17
**28 (1)**
5:2

## 3

**3356 (2)**
11:3,13

## 4

**4 (3)**
110:22;112:1;
114:24

## 5

**5 (3)**
18:25,25;96:8
**55 (1)**
9:8

## 8

**80s (1)**
122:3
**83 (1)**
94:8
**84 (1)**
94:8
**87 (2)**
103:8,10
**89 (2)**

103:8,8

## 9

**9 (4)**
18:25;19:1;24:4;
116:2
**9:00 (1)**
24:4
**9:30 (3)**
19:20;23:5;41:7
**90s (1)**
90:9
**91 (1)**
103:10
**93 (2)**
86:19;101:19

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 19

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   JOSE JUAN MAYSONET,          )
                                  )
 4              Plaintiff,        )
                                  )
 5         vs.                    )    No. 18 CV 2342
                                  )
 6   REYNALDO GUEVARA, et al.,    )
                                  )
 7              Defendants.       )

 8

 9            The videotaped deposition of ALFREDO

10   GONZALEZ, taken pursuant to the Federal Rules of

11   Civil Procedure, before Kathleen A. Hillgard,

12   Certified Shorthand Reporter, No.  084-004093, at

13   141 West Jackson Boulevard, Suite 1240A, Chicago,

14   Illinois, on Tuesday, February 7, 2023, commencing

15   at 10:06 a.m., pursuant to court order.

16

17

18

19

20

21

22

23

24
```

ALFREDO GONZALEZ, 02/07/2023                                    Page 2..5

---

Page 2

```
 1   APPEARANCES:
 2       BONJEAN LAW GROUP, by
         MS. JENNIFER BONJEAN, via Zoom
 3       MS. ASHLEY COHEN, viz Zoom
         (750 Lexington Avenue, 9th Floor
 4       New York, New York 10022
         718.875.1850
 5       Jennifer@bonjeanlaw.com
         Ashley@bonjeanlaw.com)
 6           -and-
         STEVEN A. GREENBERG, LTD., by
 7       MR. STEVEN A. GREENBERG, via Zoom
         (53 West Jackson Boulevard, Suite 1260
 8       Chicago, Illinois  60604
         312.879.9500
 9       Steve@greenbergcd.com)
             appeared on behalf of the plaintiff;
10
         THE SOTOS LAW FIRM, by
11       MR. JOSH M. ENGQUIST
         (141 West Jackson Boulevard, Suite 1240A
12       Chicago, Illinois  60604
         630.735.3300
13       Jengquist@jsotoslaw.com)
             appeared on behalf of the City of
14           Chicago police officer defendants;
15       ROCK FUSCO & CONNELLY, LLC, by
         MR. AUSTIN G. RAHE
16       (333 West Wacker Drive, 19th Floor
         Chicago, Illinois  60606
17       312.494.1000
         Arahe@rfclaw.com)
18           appeared on behalf of the defendant
             City of Chicago;
19
         LEINENWEBER BARONI & DAFFADA, LLC, by
20       MS. MEGAN K. McGRATH, via Zoom
         (120 North LaSalle Street, Suite 2000
21       Chicago, Illinois  60602
         312.380.6635
22       Mkm@ilesq.com)
             appeared on behalf of the defendant
23           Reynaldo Guevara;
24
```

Page 3

```
 1   ALSO PRESENT:  (Cont'd)
 2       HINSHAW, by
         MR. MICHAEL F. IASPARRO
 3       (100 Park Avenue
         Rockford, Illinois  61101
 4       815.490.4900
         Miasparro@hinshawlaw.com)
 5           appeared on behalf of the defendant
             Frank DiFranco;
 6
         LOEVY & LOEVY, by
 7       MR. SEAN C. STARR
         (311 North Aberdeen Street, 3rd Floor
 8       Chicago, Illinois  60607
         312.243.5900
 9       Sean@loevy.com)
             appeared on behalf of the deponent.
10
     ALSO PRESENT:
11
         Mr. Scot Ziarko, Videographer
12
             *  *  *  *  *  *  *
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                    I N D E X
 2
     Witness:                                  Page
 3
         ALFREDO GONZALEZ
 4
         Examination by:
 5
         Mr. Engquist.................    8
 6       Mr. Rahe....................  232
         Mr. Iasparro................  244
 7
 8
 9
10
11
12
13
14
15               E X H I B I T S
16
     No.   Description              Marked/Referenced
17
         Court-Reported Statement
     1   CCSAO 727-736......................... 168
18
     2   Investigative Report CCSAO 706-714..... 208
19   3   Motion for New Trial CCSAO 469-471..... 217
20
             (Exhibits attached/scanned.)
21
22                  - - -
23
24
```

Page 5

```
 1       THE VIDEOGRAPHER:  Good morning.  This is
 2   the start of Media Number 1 of the videotaped
 3   deposition of Alfredo Gonzalez in the matter of
 4   Jose Juan Maysonet v. Reynaldo Guevara et al.,
 5   Case Number 18 CV 2342.
 6           This deposition's being held at
 7   141 West Jackson Boulevard, Chicago, Illinois, as
 8   well as via Zoom meetings.
 9           Today is February 7th, 2023.  The
10   time is now approximately 10:09 a.m.
11           My name is Scot Ziarko.  I'm the
12   videographer for Urlaub Bowen & Associates, located
13   at 20 North Clark Street, Chicago, Illinois.
14           The court reporter today is Kathy
15   Hillgard.
16           Will counsel please identify
17   themselves for the record and the court reporter
18   please swear in the witness.
19       MR. STARR:  Sean Starr.  I'm here
20   representing the witness, Alfredo Gonzalez.  I'm
21   from the law firm of Loevy & Loevy.
22       MR. ENGQUIST:  Josh Engquist on behalf of the
23   defendant officers, with the exception of Reynaldo
24   Guevara.
```

ALFREDO GONZALEZ, 02/07/2023

Page 6

1      MR. RAHE:  Austin Rahe, R-a-h-e, on behalf of
2  Defendant City of Chicago.
3      MR. IASPARRO:  Michael Iasparro with Hinshaw
4  Culbertson on behalf of Defendant Frank DiFranco.
5      MS. BONJEAN:  Good morning.  Jennifer
6  Bonjean, B-o-n-j-e-a-n, of the Bonjean Law Group.
7  Good morning, Mr. Gonzalez, and everyone else.  I
8  represent Jose Maysonet.
9      MS. COHEN:  Good morning.  Ashley Cohen, also
10  on behalf Jose Maysonet.
11      MR. GREENBERG:  Steve Greenberg, also on
12  behalf of Mr. Maysonet.
13      MS. McGRATH:  Megan McGrath on behalf of
14  Defendant Guevara.
15      MS. BONJEAN:  Before we get started, I think
16  I would like to place on the record that I don't
17  want to interrupt unnecessary this deposition.  So
18  if -- with the consent of all parties, if we can
19  agree that whenever Mr. Gonzalez's counsel makes an
20  objection, Mr. Maysonet's attorneys will join that
21  objection on behalf of Mr. Maysonet.
22      MR. ENGQUIST:  That's fine.  If you want to
23  join his objections, that's fine.  I have no
24  problem with that.

Page 7

1      MR. STARR:  That's fine with me.  I do --
2      MS. BONJEAN:  Okay.
3      MR. STARR:  I do have one objection you may
4  not want to join, so I'll make it at this point.
5          I want to object to this deposition
6  in general.  Mr. Gonzalez has a pending civil case,
7  Gonzalez v. Guevara, et al., 22 CV 6496.  And as
8  you all know, we have previously objected to this
9  deposition.  And so as a general principle, we
10  object to Mr. Gonzalez testifying today.  To the --
11  you know, we've agreed to do it, obviously, under a
12  court order.
13          And I will -- I will note that --
14  for the record, that in Mr. Gonzalez's case, we
15  intend to pursue a protocol order limiting, you
16  know, his availability at a future deposition
17  beyond -- you know, limiting it to the questions
18  that go beyond what are asked to today.
19          And so I wanted to make that a
20  general objection on the record.
21      MS. BONJEAN:  Okay.
22      MR. ENGQUIST:  Okay.
23      MS. BONJEAN:  And we would join that
24  objection to the extent that we agree Mr. Gonzalez

Page 8

1  should only sit for one deposition.  We do agree
2  with that and that this is it.  I'm not sure we
3  have standing, but we agree to that extent.
4      MR. ENGQUIST:  Anything else before we swear
5  him in?
6          (Witness sworn.)
7          ALFREDO GONZALEZ
8  called as a witness herein, having been first duly
9  sworn, was examined and testified as follows:
10          EXAMINATION
11  BY MR. ENGQUIST:
12      Q.   Okay.  Sir, can you please state your
13  name and spell your last name for the record.
14      A.   Alfredo Gonzalez, G-o-n-z-a-l-e-z.
15      MR. ENGQUIST:  Okay.  Let the record reflect
16  this is the deposition of Alfredo Gonzalez, taken
17  pursuant to court order.
18  BY MR. ENGQUIST:
19      Q.   Mr. Gonzalez, have you ever given a
20  deposition before?
21      A.   No.
22      Q.   Okay.  Couple ground rules to go
23  through just to make sure we're all on the same
24  page.  Okay?

Page 9

1      A.   (Nodding.)
2      Q.   First, I want to make sure that you
3  keep you voice up.  Because right now I know you're
4  masked, but we also need to make sure that your
5  voice reaches everybody in the room, including the
6  telephone, so everybody that's on Zoom can hear
7  you.  All right?
8      A.   All right.
9      Q.   All right.  Also, your answers have to
10  he oral.  They have to be out loud.  Okay?
11      A.   Okay.
12      Q.   Nodding of the head and shrugging of
13  the shoulders, things like that don't come across
14  really clear on the record, so if you do that
15  someone will probably prompt you, Is that a yes or
16  a no.  All right?
17      A.   All right.
18      Q.   Okay.  It's not that -- it's probably
19  going to happen during the deposition at some
20  point, but just so you know, that's what's probably
21  going to happen.  All right?
22      A.   All right.
23      Q.   Okay.  Also, I don't expect this to go
24  all day long, but it's not necessarily going to be

ALFREDO GONZALEZ, 02/07/2023                                   Page 10..13

Page 10

1 very short. So if you need to take a break at any
2 time, just let us know and we'll take a break. All
3 right?
4    A.   All right.
5    Q.   The only thing I ask, that if there's a
6 question pending by any of the counsel, that you
7 answer the question before you take a break. Does
8 that seem fair?
9    A.   Okay.
10   Q.   All right. Also, you're entitled to
11 questions you understand. So if you don't
12 understand a question being asked by anybody, just
13 let us know. We'll rephrase it, we'll repeat it,
14 we'll slow down, or whatever we need to do so you
15 can answer the question. Okay?
16   A.   Okay.
17   Q.   If you answer the question, we're going
18 to assume you understood it; is that fair?
19   A.   Fair.
20   Q.   Okay. Before we start, I also -- I
21 just want to get a little background thing. Have
22 you had anything alcoholic to drink today?
23   A.   No.
24   Q.   Any medications you're on that would

Page 11

1 affect your ability to give a deposition today?
2    A.   A sinus pill.
3    Q.   A sinus full.
4    A.   And anxiety.
5    Q.   What? I'm sorry.
6    A.   Anxiety.
7    Q.   Anxiety pill.
8         And what anxiety pill did you take
9 today?
10   A.   I don't know the name.
11   Q.   Okay. And how long have you been on
12 this medication?
13   A.   About two or three years.
14   Q.   And do you know the dose -- you don't
15 know the name of the drug, correct?
16   A.   No.
17   Q.   Do you know the dosage of the drug?
18   A.   About 1-something, 150 I think, 130.
19 Somewhere around there.
20      MR. STARR: And I'm just going to tell --
21 inform my client.
22         He's not asking you to speculate.
23 If you don't know the answer, don't -- don't guess.
24      THE WITNESS: Okay.

Page 12

1 BY MR. ENGQUIST:
2    Q.   But you did just now. If you're giving
3 me an estimate, just let me know it's an estimate.
4 That's fine. Okay?
5         All right. So since you've been
6 taking this anxiety pill, does that affect your
7 memory at all?
8    A.   Sometimes.
9    Q.   And how - how have you seen it
10 affecting your memory?
11   A.   Because I tend to forget things.
12   Q.   And have you noticed that -- that
13 forgetting things, tending to forget things, is
14 more -- happens more often now that you've been
15 taking this anxiety pill?
16   A.   Sort of a way.
17   Q.   And how so?
18   A.   Because sometimes family tell me one
19 thing and I don't remember, so I guess because of
20 the pills.
21   Q.   Any other medication you're on besides
22 the anxiety pill that you think may affect your
23 memory?
24   A.   No.

Page 13

1    Q.   Okay. Have you made this complaint to
2 any of your medical professionals about this memory
3 affect of this pill?
4    A.   Yeah.
5    Q.   Okay. And what have you been told
6 about that?
7    A.   That I got to keep taking it
8 constantly. It'll go away.
9    Q.   I'm sorry. Did you say take it
10 constantly and it will go away?
11   A.   Yeah.
12   Q.   The memory loss or the --
13   A.   No, no, no, no.
14   Q.   -- the memory issues?
15   A.   Just by taking the pills every day,
16 twice a day, it might help.
17   Q.   Help the memory issue -- the problem
18 with memory or the anxiety issues?
19   A.   I guess the anxiety issue.
20   Q.   In your everyday life, what kind of
21 things have you noticed that you for -- that you
22 had trouble remembering because of the taking of
23 this medication?
24   A.   Family calling, I forget to call back.

ALFREDO GONZALEZ, 02/07/2023                                    Page 14..17

Page 14

1   Q.   Anything else?

2   A.   No.

3   Q.   Okay.  Prior to coming in today, did

4  you prepare at all for your deposition?

5   A.   Yeah.

6   Q.   Okay.  And how did you prepare?

7   A.   My lawyer.

8   Q.   Okay.  And how many times did you meet

9  with your lawyer?

10   A.   A lot of times.

11   Q.   Do you remember the first time you met

12  with your lawyer to prepare for this deposition?

13   A.   Like over a year, something like that.

14  Maybe less.  Don't recall how long.

15   Q.   And how many times -- when you say "a

16  lot of times," approximately how many times would

17  that be?

18   A.   Two or three times a month.

19   Q.   When you say "two or three times a

20  month," is that since your release from prison

21  you've met your -- met your counsel two or three

22  times a month to prepare for your dep?

23   A.   No.  Before I came out.

24   Q.   Before you came out.  Okay.

Page 15

1            And you said that would have

2  started --

3   A.   And -- and after I came out.

4   Q.   Okay.  And the first time was about a

5  year ago, year and a half, is that -- roughly ago?

6   A.   Something like that.

7   Q.   Okay.

8   A.   Maybe longer.  I can't recall right

9  now.

10   Q.   Okay.  And when you meet these -- for

11  these two or three times a month for the past year

12  or so, how long are those meetings?

13   A.   Hour, two hours.

14   Q.   And during these hour to two hours

15  meetings that you had two to three times a month

16  for the past year or so have you reviewed any

17  documentation in preparation for your deposition?

18   A.   Repeat that again.

19   Q.   Have you reviewed any documents?

20   A.   Yeah.

21   Q.   Okay.  What documents have you reviewed

22  for preparation of this deposition?

23   A.   The statement, the trial court, and I

24  can't recall what else.

Page 16

1   Q.   Okay.  You said your statement.  That

2  would be your court-reported statement that you

3  gave in this case?

4   A.   Yeah.

5   Q.   Okay.  And you say trial court.  What

6  do you mean by trial court?

7   A.   The trial court, the trial.

8   Q.   The trial?

9   A.   (Nodding.)

10   Q.   Is that yes?

11   A.   Yeah.

12   Q.   Okay.  So you -- you've looked at the

13  trial transcript; is that correct?

14   A.   Yes.

15   Q.   Okay.  And did you just look at your

16  testimony or did you look at everyone's testimony?

17   A.   Just mine.

18   Q.   Just yours.

19            Have you reviewed anybody else's

20  testimony that's been given either in an underlying

21  criminal case or in a different criminal case or in

22  this civil case --

23   A.   No.

24   Q.   -- that we're here for today?

Page 17

1   MR. STARR:  Objection to form.

2   THE WITNESS:  No.

3  BY MR. ENGQUIST:

4   Q.   And the other documents that you

5  reviewed, did you review police reports?

6   A.   Yeah.

7   Q.   Okay.  Do you remember what police

8  reports you reviewed?

9   A.   That was back in the '90s.

10   Q.   Okay.  Were they -- were they having to

11  do with this murder case?

12   A.   Yeah.

13   Q.   Did you review any photographs?

14   A.   No.

15   Q.   Any other documents that you can recall

16  that reviewed in preparation for your deposition?

17   A.   No.

18   Q.   Did you watch any videos in preparation

19  for your deposition?

20   A.   No.

21   Q.   Okay.  Other than meeting your lawyer

22  in preparation for the deposition, did you meet

23  with any other attorneys?

24   A.   Yeah, I did.

ALFREDO GONZALEZ, 02/07/2023                                Page 18..21

Page 18

1    Q.   And what other attorneys?
2    A.   Brendan Shiller, I think it was.
3    Q.   And when did you meet with Brendan
4  Shiller?
5    A.   About over two years ago.
6    Q.   Was that while he was still your
7  attorney?
8    A.   2017, I recall I think it was.
9    Q.   Okay.
10    MR. STARR:  And just for the record, I'm
11  going to remind my client that he should not
12  divulge any conversations he had with -- with his
13  current counsel, being me, or anybody else from my
14  firm or his previous counsel, regarding --
15  regarding anything.  Okay?
16  BY MR. ENGQUIST:
17    Q.   Right now we haven't gotten to the
18  conversations.  I'm just making sure you talked to
19  them.
20         So when's the last the you spoke
21  with Brendan Schiller about your case?
22    A.   2018, somewhere around there.
23    Q.   Okay.  Any other attorneys that you met
24  with in preparation for your deposition?

Page 19

1    A.   Besides Sean, my lawyer, that's it.
2    Q.   Okay.  Was it just Sean when you met
3  with him or was anybody else present during these
4  meetings?
5    A.   No.  Just him.
6    Q.   Okay.  Have you discussed today's
7  deposition or discussed this case with any of your
8  codefendants from the criminal case?
9    A.   No.
10    Q.   Okay.  What's your date of birth?
11    A.   ████████
12    Q.   And where were you born, sir?
13    A.   Puerto Rico.
14    Q.   Okay.  When did you move to Chicago?
15    A.   In '71, '72.
16    Q.   And how old were then?
17    A.   64.
18    Q.   I mean -- okay.  So you were born in
19  1964?
20    A.   No.  '58.
21    Q.   Okay.  So I'm sorry.  Let me back up.
22         How old were you in 1971 when you
23  moved to the city of Chicago?
24    A.   Oh, 15.

Page 20

1    Q.   And did you live any other place other
2  than the city of Chicago up until the time you were
3  convicted in 1990 -- I'm sorry, 1992?
4    A.   What was what?
5    Q.   Did you live any other place other than
6  the city of Chicago and Puerto Rico before you were
7  convicted of this -- of this murder in 1992?
8    A.   Just Chicago.
9    Q.   I'm sorry?
10    A.   In Chicago only.
11    Q.   Okay.  Did you go to school in Chicago?
12    A.   Who?
13    Q.   Did you go to school in Chicago?
14    A.   Yeah.
15    Q.   Okay.  And where did you attend school?
16    A.   Lowell School, Hirsch and -- I can't
17  recall.
18    Q.   I'm sorry.  What was the first ne?
19    A.   Lowells.
20    Q.   Can you spell that, please?
21    A.   Okay.  L-o-w-e-l [sic], Lowells.
22    Q.   Okay.  Lowells.  Is that a grammar
23  school?
24    A.   Grammar.

Page 21

1    Q.   And what was the other high school --
2  school you mentioned?
3    A.   I don't remember the name.
4    Q.   Okay.  And how far did you go in
5  school?
6    A.   Junior high.
7    Q.   So 8th grade, 7th grade?
8    A.   No.  I was in high school.
9    Q.   You were in high school?
10    A.   (Nodding.)
11    Q.   Okay.  So what year in high school did
12  you stop attending school?
13    A.   '75, I believe.  Can't recall the year.
14    Q.   Are you saying you left school in 1975?
15    A.   I dropped out.
16    Q.   Okay.  Do you know what grade you were
17  in when you dropped out?
18    A.   Junior high.
19    Q.   You were a junior?
20    A.   (Nodding.)
21    Q.   Okay.
22    THE COURT REPORTER:  You have to answer out
23  loud, please.
24    THE WITNESS:  Okay.

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                    Page 22..25

Page 22

1 BY MR. ENGQUIST:
2    **Q.   So that's a yes, you were a junior in**
3 **high school when you dropped out?**
4    A.   Yeah.
5    **Q.   Okay.  And why did you drop out?**
6    A.   Because I had failed.  I didn't pass.
7 I didn't want to repeat it.
8    **Q.   Okay.  And how old were you when you**
9 **dropped out?**
10   A.   I can't recall.  18, 19.
11   **Q.   Okay.  After you dropped out of school,**
12 **did you work at all?**
13   A.   Yeah.
14   **Q.   Where did you work?**
15   A.   Grocery store.
16   **Q.   Anyplace else?**
17   A.   Factory.
18   **Q.   Anyplace else?**
19   A.   That's it.
20   **Q.   Okay.  And what was the name of the**
21 **grocery store you worked at?**
22   A.   What was that?
23   **Q.   The name of the grocery store?**
24   A.   Used to call it full -- used to call it

Page 23

1 grocery.
2    **Q.   Do you know the name of the store at**
3 **all?**
4    A.   No.
5    **Q.   Okay.  Do you know --**
6    A.   Can't recall.
7    **Q.   Do you know where it was located?**
8    A.   On Drake and North Avenue.
9         They went.
10   MR. STARR:  Oh, the meeting -- can we go off
11 the record?
12   MR. ENGQUIST:  Yeah.
13   THE VIDEOGRAPHER:  Time is 10:27 a.m.  This
14 is the end of Media 1.  We are off the record.
15        (Recess taken.)
16   THE VIDEOGRAPHER:  The time is 10:28 a.m.
17 This is the beginning of Media 2.  We're back on
18 the record.
19 BY MR. ENGQUIST:
20   **Q.   Okay.  So we -- when we left off --**
21 **and I'm sorry about that.  One of the things we**
22 **probably should explain, since we're doing this via**
23 **Zoom partially, it creates some kind of technical**
24 **issues.  So if something pops up, we might need to**

Page 24

1 stop.
2        If you notice something weird on the
3 computer screen because you have a good view of it,
4 let us know.  Okay?
5    A.   (Nodding.) Yeah.
6    **Q.   All right.  Once again, back to you**
7 **have to be out loud.  All right?**
8    A.   Okay, okay.
9    **Q.   All right.  So this grocery you worked**
10 **at at Drake and North Ave., what years was that**
11 **that you worked there?**
12   A.   '76, somewhere around there.  Can't
13 recall exact year.
14   **Q.   Just for one year or longer?**
15   A.   Like a year.
16   **Q.   Okay.  And what was your --**
17   A.   Two years, something like --
18   **Q.   I'm sorry?**
19   A.   A year, two years.
20   **Q.   And what was your -- what was your jobs**
21 **duties there at the grocery store?**
22   A.   Stock up food, cashier.
23   **Q.   Okay.  And then you also said you had**
24 **employment at a factory; is that right?**

Page 25

1    A.   Yeah.
2    **Q.   Okay.  Did you leave your job at the**
3 **grocery store to go work at the factory or -- or is**
4 **there some reason why you left other tan just going**
5 **to a different job?**
6    A.   No.  I wanted a different job.
7    **Q.   Okay.  And then you went right to the**
8 **factory?**
9    A.   Yeah.
10   **Q.   So you went to the factory in '77-ish?**
11   A.   Somewhere around there.
12   **Q.   Okay.  And how long were you at this**
13 **factory?**
14   A.   11 years.
15   **Q.   And what was the name of this factory?**
16   A.   Power Label.
17   **Q.   Power Label?**
18   A.   Yeah.  I think it was Power Label,
19 something like that.
20   **Q.   And did Power Label make?**
21   MR. STARR:  Objection to foundation.
22   THE WITNESS:  It was just like a printing
23 factory.
24

ALFREDO GONZALEZ, 02/07/2023                                    Page 26..29

---

Page 26

1 BY MR. ENGQUIST:
2   Q.   I'm sorry?
3   A.   Printing factory.
4   Q.   Printing.  Okay.
5        And what did you do at this printing
6 factory?
7   A.   I threw a slitter.
8   Q.   Slitter?
9   A.   Yes.
10  Q.   And what's a slitter?
11  A.   Make the small rolls had to be cut.
12  Q.   So you would just cut the paper?
13  A.   Yeah, through the machine.
14  Q.   Okay.  And you -- that was the same job
15 you had for those 11 years at the of course tree?
16  A.   Sometime I would work on the printing,
17 the same place.
18  Q.   Any other job?
19  A.   No.
20  Q.   And why did you leave Power Label?
21  A.   Why what?
22  Q.   Did you leave Power Label.
23  A.   No.  They close -- they close it down.
24  Q.   And do you remember when they closed

---

Page 27

1 down?
2   A.   '89, I believe.  Not for sure what
3 year.
4   Q.   And what did you do after the factory
5 closed down in approximately 1989?
6   A.   I was, what do they call it, collecting
7 unemployment.  That's what they call it.
8        THE COURT REPORTER:  Collecting what?  I'm
9 sorry.
10 BY MR. ENGQUIST:
11  Q.   Unemployment, did you say?
12  A.   Unemployment, yeah.
13  Q.   Okay.  And you were collecting
14 unemployment up until the time of your arrest; is
15 that right?
16  A.   Yeah.
17  Q.   Okay.  And just focusing at the time of
18 your arrest in 1990, in August of 1990, where were
19 you living?
20  A.   My mother.
21  Q.   And where did you -- where did you and
22 your mother live?
23  A.   Drake and Moffat.
24  Q.   Drake, what was the other street?

---

Page 28

1   A.   I think that's what they call it,
2 Moffat.
3   Q.   Can you spell it?
4   A.   I don't know how to spell that.
5 Moffat.
6   Q.   Okay.  Is that a house or an apartment?
7   A.   Building.
8   Q.   So you lived in an apartment building?
9   A.   (Nodding.)
10  Q.   Is that yes?
11  A.   Yeah.
12  Q.   And who else besides your mother and
13 yourself lived in this apartment?
14  A.   My younger sister -- I have two sisters
15 and me.
16  Q.   Okay.  And what are the two sisters
17 names that you lived with?
18  A.   Yolanda and Carmen.
19  Q.   Carmen?
20  A.   Yeah.
21  Q.   Okay.  And what is Yolanda's last name?
22 Is it Gonzalez or a different names?
23  A.   No.  Veles.
24  Q.   V-e-l-e-s?

---

Page 29

1   A.   Yes.
2   Q.   And what's Carmen's last name?
3   A.   Rosario, I think it was.
4   Q.   Do you have any other siblings other
5 than your two sisters?
6   A.   What?
7   Q.   Do you have any other siblings besides
8 those two sisters?
9   A.   Yeah.
10  Q.   How many?
11  A.   I think it was five and five.
12  Q.   Five brothers and five sisters?
13  A.   Yeah.
14  Q.   In addition to the two sisters --
15  A.   Yeah.
16  Q.   -- or including them?
17  A.   Including them.
18  Q.   Okay.  And can you just give me your
19 brothers' names?
20  A.   Ernest Sanchez; Carmelo Sanchez; me,
21 Alfredo Gonzalez, Pedro DeJesus.
22  Q.   You said Beto?
23  A.   Pedro.
24  Q.   Oh, Pedro.  And what was the last name?

---

ALFREDO GONZALEZ, 02/07/2023                    Page 30..33

Page 30

1    A.    DeJesus, DeJesus.  And Henry Torres.
2    Q.    I'm sorry.  Herberto?
3    A.    Henry.
4    Q.    Oh, I'm sorry.  Henry.  Sorry.
5          What was the last -- Henry's last
6 name?
7    A.    Torres.
8    Q.    Torres.
9          Okay.  Is that all of them, all the?
10   A.    Brothers, yes.
11   Q.    Okay.  So it's you and four brothers?
12   A.    Yes.
13   Q.    Okay.  And when you gave me the names,
14 did you kind of give them to me in age order?
15   A.    Yeah, tried to.
16   Q.    That's why I assumed you put your name
17 in the middle there.
18         Okay.  And your sisters, can you
19 give e me their names and kind of what you believe
20 their age order is?
21   A.    Lucy Sanchez, Carmen Sanchez, Migdalia
22 Dieppa.
23   Q.    I'm sorry.  What was that again?
24   A.    Migdalia Dieppa.

Page 31

1    Q.    Can you spell the last name?
2    A.    D-i-e-p-p-a, I think it is.
3    Q.    Okay.  And the next sister?
4    A.    Yolanda Veles, Carmen Rosario -- Mag --
5 yeah, Carmen Rosario.  I can't forgot my own
6 sister's name.
7    Q.    Okay.  When you were growing up in the
8 city of Chicago, did you belong to a street gang?
9    A.    Yeah.
10   Q.    Okay and.  What gang did you belong to?
11   A.    Latin Kings.
12   Q.    And when did you become a member of the
13 Latin Kings?
14   A.    Back in the '80s.
15   Q.    Do you remember --
16   A.    I can't recall -- I can't recall what
17 year.
18   Q.    Do you remember approximately how old
19 you were when you joined the Latin Kings?
20   A.    No.
21   Q.    Okay.  Did any of your family members
22 also belong to the Latin Kings?
23   MR. STARR:  Objection, foundation.
24   THE WITNESS:  No.

Page 32

1 BY MR. ENGQUIST:
2    Q.    Okay.  What about nephews, do you have
3 any nephews that are also members of the Latin
4 Kings?
5    A.    Yeah.
6    Q.    And who were they?
7    A.    Efrain Cruz, Justino Cruz.  That's it.
8    Q.    And they were both Latin Kings; is that
9 correct?
10   A.    Yeah.
11   Q.    What's the age difference between you
12 and Efrain?
13   A.    About 14.
14   Q.    And Justino is younger than Efrain,
15 correct?
16   A.    Yes.
17   Q.    Do you know the age difference between
18 you and Justino is?
19   A.    I don't know, maybe 20.  Can't recall.
20   Q.    Okay.  When's the last time you spoke
21 to Efrain Cruz?
22   A.    I can't recall what day, what year.
23   Q.    Have you spoken to him since your
24 release from prison?

Page 33

1    A.    Yeah.
2    Q.    Okay.  Well, why don't we do that.
3 When did you get released from prison?
4    A.    August 9th, 2022.
5    Q.    Okay.  How many times since your
6 release from prison have you spoken with Efrain
7 Cruz?
8    A.    Just once.
9    Q.    And where was that?
10   A.    The same day I came out.
11   Q.    Have you spoken to Justino Cruz since
12 your release from prison?
13   A.    No, never.
14   Q.    When you spoke to Efrain, was this at
15 some kind of family function the day you were
16 released or was it -- was it someplace else?
17   A.    Yeah, family reunion.
18   Q.    And where was this family reunion held?
19   A.    Talking about the place?
20   Q.    Yeah.
21   A.    Potomac and Homan.
22   Q.    Restaurant or something?
23   A.    No, no.  His daughter's place.
24   Q.    Efrain's daughter's place?

ALFREDO GONZALEZ, 02/07/2023                                    Page 34..37

Page 34

1    A.   Yeah.
2    Q.   And just so I know, what's the
3 daughter's name?
4    A.   Jennifer Cruz.
5    Q.   Okay.  I know you were unsure about
6 when you exactly joined the Latin Kings, but back
7 in the '80s.
8         Did you ever stop being a member of
9 Latin Kings?
10   A.   Yeah, I try.
11   Q.   I'm sorry, yeah, I try?
12   A.   Yeah.
13   Q.   Okay.  When did you try to stop being a
14 member of the Latin Kings?
15   A.   In the '80s.
16   Q.   When in the '80s -- did you actually
17 stop being a member in the 1980s?
18   A.   Yeah.
19   Q.   Okay.  When was that?
20   A.   I can't recall what year.
21   Q.   How old were you when you are saying
22 you stopped being a member of the Latin Kings?
23   A.   I can't recall how old I was.
24   Q.   Do you know why you stopped being a

Page 35

1 member of the Latin Kings?
2    A.   I have family to take care of.
3    Q.   Any other reason?
4    A.   When Santiago Sanchez killed himself.
5    Q.   I'm sorry.  What?
6    A.   Santiago Sanchez shot himself.
7    Q.   Santiago Sanchez, did he have a
8 nickname?
9    A.   Yeah.
10   Q.   What was his nickname?
11   A.   Macho.
12   Q.   So are you saying you decided to leave
13 the Latin Kings after Macho killed himself?
14   A.   Before and after.
15   Q.   So were you still a member up until the
16 time Santiago Sanchez killed himself?
17   A.   Yeah.
18   Q.   Okay.  And you left after he died?
19   A.   I tried.
20   Q.   You tried.
21        Okay.  How did you try to leave the
22 Latin Kings after Macho shot himself?
23   A.   Tried to concentrate on my kids.
24   Q.   I'm sorry.  One more time.

Page 36

1    A.   Tried to focus on my kids.  It was
2 painful.
3    Q.   Okay.  I'm not sure.  How -- how does
4 one leave the Latin Kings?
5    MR. STARR:  Objection; form, foundation.
6    MR. ENGQUIST:  Let me just go back.
7 BY MR. ENGQUIST:
8    Q.   Let me ask how -- what was your
9 understanding of how you would have to -- how you
10 would leave the Latin Kings when you -- back in the
11 late '80s, '90s.
12   MR. STARR:  Objection to form and foundation.
13   THE WITNESS:  Do I have to answer that?
14   MR. STARR:  Yeah.  You can answer, if
15 you're -- if you can.
16   THE WITNESS:  Because I wanted to leave it
17 alone.
18 BY MR. ENGQUIST:
19   Q.   Okay.  Was there anything you had to do
20 in order to leave the Latin Kings?
21   A.   No.
22   Q.   Was there anybody you had to tell that
23 you were leaving the Latin Kings?
24   A.   Not really.

Page 37

1    Q.   Okay.  Did you tell any of your other
2 gang -- any other associates in the gang that you
3 were leaving the Latin Kings?
4    A.   I can't recall if I did.
5    Q.   At what point did you consider yourself
6 no longer a member of the Latin Kings?  If you
7 can't give me a date, you can always tell me like
8 what was happening in your life at the time.
9    A.   Santiago Sanchez committing suicide.
10   Q.   Okay.  So at that point, you decided
11 that you -- you didn't consider yourself a Latin
12 King, correct?
13   A.   Yeah.
14   Q.   Now, when you were a member of the
15 Latin Kings, did you belong to a specific set?
16   A.   Yeah.
17   Q.   Okay.  And was that set run by Macho?
18   A.   Yeah.
19   Q.   And where was that set located?
20   A.   I believe Kimball somewhere.  I can't
21 recall the other street.
22   Q.   I'm sorry.  What was that?
23   A.   Kimball.
24   Q.   Kimball.  Okay.  But I didn't catch

ALFREDO GONZALEZ, 02/07/2023                    Page 38..41

Page 38

1  what you said after that.
2      A.   I can't recall the other street.
3      Q.   The other street.  Okay.
4           Now, the set was initially founded
5  by 11 people, including Macho; is that correct?
6      A.   Yeah.
7      Q.   Okay.  And you were one of those
8  founding people, correct?
9      A.   Yeah.
10     Q.   Okay.  Along with Jose Maysonet?
11     A.   Yeah.
12     Q.   Justino Cruz?
13     A.   I can't recall.
14     Q.   Okay.  Efrain Cruz?
15     A.   Efrain Cruz.
16     Q.   What about Veras, was he also a
17 founding member?
18     A.   Yeah.
19     Q.   Any other founding member that you
20 recall of the initial 11 who started this set of
21 Latin Kings?
22     A.   I can't recall names.
23     Q.   Do you remember nicknames?
24     A.   Yeah.

Page 39

1      Q.   Okay.  What nicknames?
2      A.   Ivan, ET.
3      Q.   ET?
4      A.   Yeah.  I can't remember other names.
5          THE COURT REPORTER:  I'm sorry.  What was the
6  first one?
7  BY MR. ENGQUIST:
8      Q.   Ivan, is that right?
9      A.   Yeah.
10     Q.   Okay.  So the nicknames you remember
11 are Ivan, Macho, and ET, correct?
12     A.   Yes.
13     Q.   Did you have a nickname in the gang?
14     A.   Yeah.
15     Q.   What was that?
16     A.   LLuvia.
17     Q.   Can you spell it, please.
18     A.   L-L-u-v-i-a.
19     Q.   And does LLuvia stand for something or
20 mean something?
21     A.   Just raining, raining.
22     Q.   Raining.
23          And how did you get that nickname?
24     A.   A record that I used to listen to.

Page 40

1      Q.   So it's a song?
2      A.   Yeah.
3      Q.   Okay.  What song was that?
4      A.   LLuvia.
5      Q.   I'm sorry.  What?
6      A.   LLuvia.
7      Q.   LLuvia.  Okay.
8           Did Veras have a nickname?
9      A.   Who?
10     Q.   Veras.
11     A.   Yeah, believe so yeah.
12     Q.   What was it?
13     A.   Cisco, I think.
14     Q.   Did Efrain have a nickname?
15     A.   Yeah.
16     Q.   What was his nickname?
17     A.   King.
18     Q.   Did Jose Maysonet have a nickname?
19     A.   I didn't know about Jose Maysonet.
20     Q.   You didn't know what about, his
21 nickname?
22     A.   I know his nickname, but I didn't know
23 him by the name.  I'd -- we'd all him Juan.
24     Q.   You'd call him Juan.  Okay.

Page 41

1          Okay.  Now, Justino Cruz was also a
2  member of the Latin Kings, correct?
3      A.   Yeah.
4      Q.   Okay.  Did he have a nickname?
5      A.   Tino.
6      Q.   And he was also from the same set to
7  over there on Kimball, correct?
8      A.   No.  I can't recall that.
9      Q.   Okay.  So you're not sure if he was
10 from the same set?
11     A.   I wasn't there like every day.  Maybe
12 he was for a few days.  I don't know.
13     Q.   Okay.  And you said you were not there
14 every day.  When you were with the other members of
15 your set, what kinds of things would you do?
16         MR. STARR:  Objection to form, foundation.
17         You can answer.
18         THE WITNESS:  Dealing drugs.
19 BY MR. ENGQUIST:
20     Q.   Okay.  And how long were you dealing
21 drugs?
22         MR. STARR:  Objection to foundation, form.
23         Go ahead.
24         THE WITNESS:  After I lost my job.

ALFREDO GONZALEZ, 02/07/2023                        Page 42..45

Page 42

1 BY MR. ENGQUIST:
2    Q.   So when you were on unemployment,
3 that's when you were dealing drugs?
4    A.   Yes.
5    Q.   Okay.  Did you deal drugs before then?
6    A.   No.
7    Q.   So it'd be fair to say you were dealing
8 drugs at the time of the murder of the Wiley
9 brothers; is that correct?
10   A.   Yeah, I suppose.
11   Q.   Okay.  And what kind of drugs were you
12 dealing then?
13   A.   Weed.
14   Q.   Anything else?
15   A.   Cocaine once in a while.
16   Q.   Anything else?
17   A.   No.
18   Q.   And when you would deal drugs for your
19 set, was that in the area of Kimball or somewhere
20 around there where your set -- where your set was?
21   A.   Yeah.
22   Q.   Okay.  Did you ever deal at any other
23 place that wasn't controlled by your set?
24   A.   Yeah.

Page 43

1    MR. STARR:  Objection; form, foundation.
2 BY MR. ENGQUIST:
3    Q.   You did?
4         Okay.  Where else did you deal drugs
5 that wasn't controlled by your set?
6    THE WITNESS:  Can I answer?
7    MR. STARR:  Yeah.  But just make sure you let
8 me get my objections in before you answer so we
9 don't talk over each other.
10   THE WITNESS:  On Pierce.
11 BY MR. ENGQUIST:
12   Q.   On Pierce, Pierce and what?
13   A.   Kedzie.
14   Q.   And whose territory was that at Pierce
15 and Kedzie?
16   MR. STARR:  Objection to foundation.
17   THE WITNESS:  It was ours.
18 BY MR. ENGQUIST:
19   Q.   It was your sets?
20   A.   No.  We used to hang there.
21   Q.   Okay.  So it was still controlled by
22 the Latin Kings?
23   A.   (Nodding.)
24   Q.   Is that a yes?

Page 44

1    A.   Yes.
2    Q.   Did you ever deal drugs in a location
3 that wasn't either controlled by your set or the
4 Latin Kings?
5    MR. STARR:  Objection; form, foundation,
6 calls for speculation.
7    THE WITNESS:  No.
8 BY MR. ENGQUIST:
9    Q.   Why not?
10   A.   Because it wasn't allowed.
11   Q.   Okay.  What do you mean by not allowed?
12 Allowed by who?
13   A.   The other people.
14   Q.   The other gangs?
15   A.   Yeah.
16   Q.   Okay.  If you -- would it be dangerous
17 for you to deal drugs in an area that you didn't
18 control, your gang didn't control?
19   A.   Yes.
20   Q.   Okay.  When you were talking about it
21 being dangerous, is that something where someone
22 could be shot for?
23   A.   No.
24   MR. STARR:  Objection; form, foundation,

Page 45

1 speculation.
2    THE WITNESS:  No.
3 BY MR. ENGQUIST:
4    Q.   Okay.  So then how would it be
5 dangerous.
6    MR. STARR:  Same objections.
7    THE WITNESS:  Just talking.
8 BY MR. ENGQUIST:
9    Q.   Talking?
10   A.   (Nodding.)
11   Q.   So the gangs would talk about it if you
12 were violating their space and selling drugs there?
13   A.   Yeah.
14   Q.   Okay.  Was there ever any kind of
15 violence between the gangs if another gang
16 encroached on their area to sell drugs?
17   MR. STARR:  Same objections.
18   THE WITNESS:  No.
19   MR. ENGQUIST:  Okay.
20   MS. BONJEAN:  Join those objections.
21 BY MR. ENGQUIST:
22   Q.   Did you have any rank within your set?
23   A.   No.
24   Q.   Okay.  So you already said Macho was

ALFREDO GONZALEZ, 02/07/2023                    Page 46..49

Page 46

1  the leader of the set up until the time he -- he
2  died, correct?
3     A.   Correct.
4     Q.   Who was the leader after Macho died?
5     MR. STARR:  Form, foundation, speculation.
6     THE WITNESS:  Can't recall.
7  BY MR. ENGQUIST:
8     Q.   Okay.  Was there any -- was there any
9  other positions within your set that you remember
10  anyone holding?
11    A.   No.
12    Q.   During the time you were with your set
13  in the Latin Kings, do you know if your set ever
14  paid any kind of protection money?
15    MR. STARR:  Objection; form, foundation,
16  speculation.
17    THE WITNESS:  I couldn't tell.  I don't know.
18  BY MR. ENGQUIST:
19    Q.   So no one ever told you about paying
20  protection money to anyone; is that correct?
21    MR. STARR:  Form, foundation, speculation,
22  asked and answered.
23    THE WITNESS:  No.
24

Page 47

1  BY MR. ENGQUIST:
2     Q.   That's not correct or that is correct?
3     A.   No one -- no one told me.
4     Q.   Okay.  The members of your set that you
5  could recall so far, Ivan and ET, Cisco, Juan, do
6  you consider them -- did you consider them friends
7  at the time?
8     A.   Yeah.
9     Q.   Okay.  Was there anybody in your set
10  you did not consider a friend?
11    A.   Not too close, Juan.
12    Q.   I'm sorry.  What was that?
13    A.   Juan was not close.
14    Q.   Juan wasn't that close?
15    A.   (Shaking.)
16    Q.   And what do you mean by Juan was not
17  that close?
18    A.   Because we didn't get along.
19    Q.   Okay.  Did you guys fight?
20    A.   No.
21    Q.   And when you say you did not get
22  along, can you describe what -- what about your
23  relationship with -- how you did not get along with
24  Juan?

Page 48

1     A.   I don't know.  He was just weird.
2     Q.   And how so?  Can you describe?
3     A.   He didn't want to hang out with us most
4  of the time.
5     Q.   You said "hang out with us," who's the
6  "us" he would not want to hang out with most of the
7  time?
8     A.   Cisco, King.  The same people I say.
9     THE COURT REPORTER:  Can you repeat that?
10    THE WITNESS:  The same people I mentioned
11  earlier.
12  BY MR. ENGQUIST:
13    Q.   So ET, Cisco, King, he didn't hang out
14  with them?
15    MR. STARR:  Objection; form, foundation,
16  mischaracterizes his testimony.
17       You can answer.
18    THE WITNESS:  Sometime.
19  BY MR. ENGQUIST:
20    Q.   Okay.  What about was Juan close to
21  Macho?
22    MR. STARR:  Form, foundation.
23    THE WITNESS:  I guess.  Not sure.
24

Page 49

1  BY MR. ENGQUIST:
2     Q.   Okay.  Were you close to Macho?
3     A.   Yeah.
4     Q.   And I know we said it before, but just
5  to be clear, when you're talking about Juan, you're
6  talking about Jose Maysonet, correct?
7     A.   I guess.
8     Q.   Okay.  All right.  Did you still
9  associate or affiliate at all with the Latin Kings
10  when you were in prison?
11    A.   Sometimes.
12    Q.   When you mean "sometimes," what do you
13  mean by that?
14    A.   If I want to be there, I go.  If I
15  didn't want to be there, I wouldn't.
16    Q.   Okay.  So was that throughout your
17  entire time when you were in IDOC?
18    A.   Yeah.
19    Q.   Okay.  And why at certain times would
20  you want to hang out with the Latin Kings when you
21  were in prison?
22    A.   Because I didn't want to get in
23  trouble.
24    Q.   So affiliated with the Latin Kings, you

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                          Page 50..53

Page 50

1 were there for protection; is that fair to say?
2    A.  Yeah.
3       Q.  Did you consider yourself a Latin King
4 while you were in prison?
5    A.  Yeah.
6       Q.  While you were in prison as a Latin
7 King, was there anything you had -- that you had to
8 do while you were a Latin King in prison --
9    MR. STARR:  Objection.
10    MR. ENGQUIST:  -- for the Latin Kings?
11    MR. STARR:  Objection; form, foundation.
12    THE WITNESS:  Yeah.
13 BY MR. ENGQUIST:
14       Q.  What?
15    A.  Security.
16       Q.  Security?
17    A.  Yeah.
18       Q.  What do you mean by that?
19    A.  Lookout.
20       Q.  When you say "lookout," did you have to
21 act as a lookout or did you have to look out for
22 the other members of Latin Kings while you were in
23 prison?  I'm not sure what you're --
24    A.  No.  Look out police, look out the

Page 51

1 other gangs.
2       Q.  Okay.  When you're talking about the
3 police, you're talking about the prison guards?
4    A.  Yeah.
5       Q.  Okay.  When you were in prison, did you
6 have any rank within the Latin Kings?
7    A.  No.
8       Q.  Have you ever had any rank with the
9 Latin Kings?
10    A.  No.
11    MR. STARR:  Asked and answered.
12 BY MR. ENGQUIST:
13       Q.  You testified earlier about there not
14 being violence between the gangs on the streets.
15       Was there violence between the gangs
16 while you were in prison?
17    MR. STARR:  Form, foundation, speculation.
18    THE WITNESS:  No.
19 BY MR. ENGQUIST:
20       Q.  Then what were you a lookout for when
21 you were looking out for the other gangs when you
22 were in prison?
23    MR. STARR:  Form, foundation, calls for
24 speculation.

Page 52

1    THE WITNESS:  Can answer?
2    MR. STARR:  If you understand the question.
3    THE WITNESS:  Not really.
4    MR. STARR:  Then tell him that.
5    THE WITNESS:  Can you repeat that again?
6    MR. ENGQUIST:  Sure.
7 BY MR. ENGQUIST:
8       Q.  Earlier you testified that you were a
9 lookout and one of the things you were a lookout
10 for were the other gangs when you were in prison.
11       If there wasn't violence between the
12 gangs when you were in prison, what were you a
13 lookout for?
14    MR. STARR:  Same objection.
15    THE WITNESS:  Difference gangs.
16 BY MR. ENGQUIST:
17       Q.  And what would you be looking for?
18    MR. STARR:  Same objections.
19    THE WITNESS:  They don't come looking for
20 trouble.
21 BY MR. ENGQUIST:
22       Q.  Okay.  And what kind of trouble would
23 someone come looking for?
24    MR. STARR:  Calls for speculation,

Page 53

1 foundation.
2    THE WITNESS:  Different gangs, different
3 things.
4 BY MR. ENGQUIST:
5       Q.  But not violence?
6    A.  No.
7       Q.  Since your release from prison, have
8 you been still in contact with the Latin Kings?
9    A.  No.
10       Q.  Okay.  So that ended when you left
11 prison?
12    A.  Yeah.
13       Q.  I know I'll get more information later
14 on, so I'm not going to go into much detail, but
15 what are you doing now your since release from
16 prison?
17    MR. STARR:  Objection to form.
18    THE WITNESS:  Like if I have a job or
19 something?
20 BY MR. ENGQUIST:
21       Q.  Yeah.
22    A.  No.
23       Q.  Have you looked for a job since you
24 were released?

ALFREDO GONZALEZ, 02/07/2023                    Page 54..57

Page 54

1    A.   Yeah, I try.
2    Q.   And what kind of jobs have you been
3 looking for since you were released?
4    A.   I file applications.
5    Q.   Okay.  Where?
6    A.   Dollar Store.
7    Q.   Anything else?
8    A.   Pig -- Piggly store.
9    Q.   I'm sorry.  What was that?
10   A.   Piggly.
11   Q.   Piggly.
12        Anything else?
13   A.   No, I can't recall right now.
14   Q.   Okay.  And you haven't heard back or
15 you just didn't get hired, which one was it?
16   A.   I haven't heard back.
17   Q.   Okay.  When did you first become aware
18 of the murder of the Wiley brothers?
19   A.   When I got arrested.
20   Q.   So the first time you heard about the
21 Wiley brothers, two African-American young men shot
22 and killed in your neighborhood, was when you were
23 arrested for the murders; is --
24   A.   Yeah.

Page 55

1    Q.   -- that correct?
2    A.   Correct.
3    MR. STARR:  Objection; form, foundation,
4 asked and answered.
5    THE WITNESS:  That's correct.
6 BY MR. ENGQUIST:
7    Q.   And who told you about the Wiley
8 brothers murders?
9    A.   Detective Guevara.
10   Q.   Okay.  Prior to the date of your
11 arrest, did you know who Detective Guevara was?
12   A.   Yeah.
13   Q.   Okay.  When did you first know or get
14 to know or learn of Detective Guevara either way?
15   MR. STARR:  Objection to form.
16   THE WITNESS:  In the '80s.
17 BY MR. ENGQUIST:
18   Q.   And how did you know him from the '80s?
19   A.   From the neighborhood.
20   Q.   What about it from the neighborhood?
21   MR. STARR:  Form.
22   THE WITNESS:  People talk.
23 BY MR. ENGQUIST:
24   Q.   And did you have any dealings with

Page 56

1 Detective Guevara before you were arrested by
2 Detective Guevara for the murder of the Wiley
3 brothers?
4    A.   Yeah.
5    Q.   Okay.  When's the first time you had
6 any kind of dealings with Detective Guevara?
7    MR. STARR:  Objection to the term "dealings."
8    THE WITNESS:  I don't remember the year, but
9 I did.
10 BY MR. ENGQUIST:
11   Q.   Okay.  And what was it?
12   A.   In a gym.
13   Q.   What gym?
14   A.   Kedzie, North Avenue.
15   Q.   One more time, please?
16   A.   Kedzie, North Avenue.
17   Q.   Kedzie and North Avenue?
18   A.   Yeah.
19   Q.   Was that like a YMCA?  Was it a park
20 district?
21   A.   Just something that -- that we got
22 together.  We opened it.
23   Q.   When you say "we opened it," who's the
24 "we"?

Page 57

1    A.   Us, Latin Kings.
2    Q.   And what kind of gym was this?  Was it
3 like weightlifting, basketball?  What kind of gym
4 was this?
5    A.   Weightlifting.
6    Q.   Okay.  Anything else besides
7 weightlifting?
8    A.   I can't recall.
9    Q.   And was this gym specifically opened by
10 the Kings for the Kings or was it for the
11 community?  What was it for?
12   MR. STARR:  Objection, foundation.
13   THE WITNESS:  For the Kings.
14 BY MR. ENGQUIST:
15   Q.   Okay.  And how did you have -- come
16 across Detective Guevara at the gym in the '80s?
17   A.   When he walked in, I seen him and I
18 walked out.
19   Q.   So you just saw him enter the gym?
20   A.   Yeah.
21   Q.   Did you talk with him?
22   A.   No.
23   Q.   Did you walk out because Officer
24 Guevara walked in or was there some other reason?

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                    Page 58..61

Page 58

1     A.   Because I know his reputation.
2     Q.   Okay.  So you knew his reputation
3 before you saw him walk in?
4     A.   Yeah.
5     Q.   Okay.  And what about his reputation
6 caused you to walk out of the gym?
7     A.   I didn't want to -- him to talk to me
8 or ...
9     Q.   Okay.  What was his reputation?  What
10 had you heard from the street?
11    A.   Taking Kings, drop them off to the
12 other side.
13    Q.   I'm sorry.  One more time, please.
14    A.   Taking Kings and dropping them off the
15 other side.
16    Q.   Anything else?
17    A.   He was just a dirty cop.
18    Q.   Okay.  Besides taking Latin Kings and
19 dropping them off in the different terri- -- I'm
20 assuming different gang territory?
21    A.   Yes.
22    Q.   Okay.  Besides that, what else have you
23 heard about Detective Guevara?
24    A.   Dirty cop.

Page 59

1     Q.   Dirty cop.
2     MR. STARR:  You got to let me --
3 BY MR. ENGQUIST:
4     Q.   What about --
5     MR. STARR:  You got to let me make my
6 objections.  Okay?  So that she can do her job
7 without having us --
8     THE WITNESS:  Okay.
9     MR. STARR:  -- talk over one another.  Okay?
10        Thanks.
11 BY MR. ENGQUIST:
12    Q.   Other than dropping Kings off into
13 different territory, what else do you attribute to
14 him for being a, quote-unquote, dirty cop?
15    THE WITNESS:  Can I answer that?
16    MR. STARR:  Yeah.  You got to answer all the
17 comes.
18    THE WITNESS:  He was just a dirty cop.
19 BY MR. ENGQUIST:
20    Q.   Okay.  Other than dropping Kings off
21 into rival gang territory, is there anything else
22 that you attributed to him that -- why you call him
23 a dirty cop?
24    MR. STARR:  Objection, asked and answered.

Page 60

1     THE WITNESS:  Rumors that I heard.
2 BY MR. ENGQUIST:
3     Q.   What other rumors had you heard?
4     A.   He would -- he would pin people drugs.
5     Q.   You said pin.  Do you mean plant drugs?
6     A.   Yeah.
7     Q.   Okay.  Anything else?
8     A.   I can't recall right now.
9     Q.   Do you think there's something else
10 that you heard about him back then in the '80s?
11    A.   Maybe.  I can't recall right now.
12    Q.   When you said he would plant -- you
13 heard he would plant drugs on people, anybody that
14 you know?
15    A.   No.  Different Kings.
16    Q.   Different Kings?
17        Did these -- these Kings tell you or
18 is it just that you heard --
19    A.   Just talk in the neighborhood.
20    Q.   Okay.
21    A.   Communicating.
22    Q.   So is it fair to say you already knew
23 what Detective Guevara or Officer Guevara looked
24 like when he walked into the King gym before he

Page 61

1 walked in, since you walked out?
2     MR. STARR:  Objection to form.
3 BY MR. ENGQUIST:
4     Q.   You were already aware what he looked
5 like.
6     MR. STARR:  Objection to form.
7     THE WITNESS:  Yeah.
8 BY MR. ENGQUIST:
9     Q.   Other than your interaction with him by
10 seeing him walk into the gym and then you walked
11 out, did you have any other contact with Detective
12 Guevara or Officer Guevara before you were arrested
13 in 1990?
14    A.   Yeah.
15    Q.   Okay.  What other occasions?
16    A.   In the alley.
17    Q.   When was this interaction with him in
18 an alley?
19    A.   After I came out of work.
20    Q.   Do you remember what year?
21    A.   Could be '88.  Not exactly what year.
22    Q.   Okay.  So you said you came out of work
23 and you met -- and you saw Detective Guevara in an
24 alley, correct?

ALFREDO GONZALEZ, 02/07/2023                                    Page 62..65

Page 62

1     A.   I didn't met.
2     **Q.   What?**
3     A.   When I left the gym.
4     **Q.   Um-hmm.**
5     A.   I walked away.
6     **Q.   Yes.  But you met -- you mentioned**
7  **something about in the alley.  What's the other --**
8     A.   I was going to the store.
9     MR. STARR:  Let me take a break -- or there's
10  a pending question.  So ...
11  BY MR. ENGQUIST:
12    **Q.   Go ahead.**
13    A.   I go to the store.  He stopped me.
14    **Q.   Yes.**
15    A.   He pat me down.
16    **Q.   Anything else?**
17    A.   Yeah.  He found money.
18    **Q.   And?**
19    A.   And he say if I was dealing.  I said,
20  No.
21    **Q.   Okay.  And what happened after you told**
22  **him you were not dealing?**
23    A.   He wanted to take the money.  And I
24  said, No, I just got paid.

Page 63

1     **Q.   Okay.  And what happened after that?**
2     A.   He asked for the copy of the money --
3  money thing.  I don't know what they call it.
4     **Q.   The -- like the pay stub or paycheck?**
5     A.   Yeah.
6     **Q.   Okay.  And what happened after that?**
7     A.   He gave it back.  He said that I owe
8  him. -
9     **Q.   I'm sorry?**
10    A.   He said that I owe him.
11    **Q.   That you owe him.  Okay.**
12       **So you showed him your pay stub,**
13  **he -- so he gave your money back because it wasn't**
14  **from dealing?**
15    A.   Correct.
16    **Q.   -- and he said, You owe me one, and**
17  **that was it?**
18    A.   Yeah.
19    MR. STARR:  Okay.  Whenever's a good time for
20  you, Josh, I need to use the restroom.
21    MR. ENGQUIST:  That's fine.  We can take a
22  break right now.
23    MR. STARR:  Okay.
24    MR. ENGQUIST:  Let's go off the record.

Page 64

1     THE VIDEOGRAPHER:  The time is 11:15 a.m.
2  This is the end of Media Unit 2.  We are off the
3  record.
4        (Recess taken.)
5     THE VIDEOGRAPHER:  The time is now 11:24 a.m.
6  This is the beginning of Media 3.  We're back on
7  the record.
8     MR. ENGQUIST:  Okay.  Before we start asking
9  questions again, sir, I know you -- you heard it,
10  there was some concern that your voice has been
11  muffled.  So if you can do us a favor, make sure
12  you keep your voice a little louder than normal
13  just so everybody can hear you that's on Zoom.
14  Okay?
15    THE WITNESS:  Okay.
16    MR. ENGQUIST:  All right.  A little bit --
17  little bit louder.
18    THE WITNESS:  Okay.
19    MR. ENGQUIST:  Excellent.
20       Is that better?
21    MS. BONJEAN:  Yeah, that's better.  Thank
22  you.
23    MR. ENGQUIST:  Sure, no problem.  And if you
24  have problems, let us know.  Okay?

Page 65

1     MS. BONJEAN:  Will do.
2  BY MR. ENGQUIST:
3     **Q.   All right.  So for prior dealings with**
4  **Officer Guevara, we have him coming into the King**
5  **gym, the weightlifting area; we have him stopping**
6  **you when you were going to the store and you were**
7  **in an alley and you showing the pay stub to show**
8  **that it was your money and it wasn't drug money.**
9        **Did you have any other contact with**
10  **Officer Guevara prior to your arrest in 1990 for**
11  **the murder of the Wiley brothers?**
12    A.   The second --
13    MR. STARR:  Objection to form, foundation.
14       Go ahead.
15    THE WITNESS:  The second time I was on the
16  LeMoyne and Spaulding.
17  BY MR. ENGQUIST:
18    **Q.   You were where?**
19    A.   LeMoyne and Spaulding.
20    **Q.   LeMoyne and Spaulding.  Okay.**
21    A.   In the nighttime.
22    **Q.   Okay.  And what happened?**
23    A.   He pulled me over.  He say if I have
24  the money for him.

ALFREDO GONZALEZ, 02/07/2023                    Page 66..69

Page 66

1   Q.   Okay.  And what happened after he asked
2 for money?
3   A.   I told him no.
4   Q.   Okay.  And then what happened after you
5 told him no?
6   A.   He punched me in the face.  I fell
7 down.  I got up.  He said that I needed to pay him
8 for protection.  I said, No.
9   Q.   Okay.  And happened after you said no
10 the second time?
11   A.   He said that he was going to get me
12 later on.
13   Q.   Okay.  Anything else happen during this
14 contact you had with Officer Guevara?
15   A.   He wanted me to pay for security,
16 protection.
17   Q.   I understand that.
18        Anything else after he said he was
19 going to get you later on?
20   A.   No.  Can't recall right now.
21   Q.   Okay.  Now, this -- the second incident
22 you're talking about here at LeMoyne and Spaulding
23 at night, do you remember what year it was?
24   A.   Not exactly, but it was the '80s.

Page 67

1   Q.   When you say "the '80s," mid '80s,
2 early '80s, the end of '80s?
3   MR. STARR:  Objection, asked and answered.
4   THE WITNESS:  Could be '88, '89.
5 BY MR. ENGQUIST:
6   Q.   Okay.  Was anybody with you in the car
7 when you were pulled over?
8   MR. STARR:  Objection, mischaracterizes
9 testimony.
10 BY MR. ENGQUIST:
11   Q.   I'm sorry.  You said you were pulled
12 over, correct?
13   A.   Yeah, no.  I was walking.
14   Q.   Oh, you were walking.  Okay.
15        Was Officer Guevara driving?
16   A.   Yeah.
17   Q.   Okay.  Was he with anybody?
18   A.   Yeah.
19   Q.   Who was he with?
20   A.   Some detectives.  I didn't know his
21 name back then.
22   Q.   When you say "some detectives," do you
23 mean -- do you remember how they were dressed?
24   A.   Street clothes.

Page 68

1   Q.   Okay.  Street clothes and like a
2 bulletproof vest?
3   MR. STARR:  Objection; form, foundation,
4 mischaracterizes his testimony.
5   MR. ENGQUIST:  I'm asking a question.  I
6 wasn't mischaracterizing.
7 BY MR. ENGQUIST:
8   Q.   Again, and a bulletproof vest, is that
9 what he was -- they were wearing?
10   A.   They all wear that.
11   Q.   Okay.  And how many other officers were
12 with Officer Guevara when you were pulled over in
13 '88 or '89 or?
14   A.   Just him and his partner.
15   Q.   I'm sorry.  What?
16   A.   Him and his partner.
17   Q.   Can you describe the partner?
18   A.   No.
19   Q.   Did the partner ever speak with you?
20   A.   No.
21   Q.   Okay.  When you were punched in the
22 face, were you injured at all?
23   A.   I felt pain.
24   Q.   Okay.  Were you bleeding?

Page 69

1   A.   No.
2   Q.   Was anything broken?
3   A.   No.
4   Q.   Did you seek any medical attention for
5 it?
6   A.   No.
7   Q.   Okay.  Did you make any complaints with
8 anybody, either the police department or back then
9 it was the Office of Professional Standards,
10 regarding this event where you said that Officer
11 Guevara punched you in the face?
12   A.   No.  Just the guys.
13   Q.   Just the guys.  What guys?
14   A.   The rest of the group, the rest of my
15 friends.
16   Q.   Your set of the Latin Kings?
17   A.   Yeah.
18   Q.   Okay.  So you would have told Cisco,
19 King, Juan, Macho, and Ivan about that?
20   A.   Yeah.
21   MR. STARR:  Objection; form, foundation,
22 mischaracterizes testimony.
23 BY MR. ENGQUIST:
24   Q.   Would you also have told Tino?

ALFREDO GONZALEZ, 02/07/2023                                    Page 70..73

Page 70

1    A.   I can't recall.
2    Q.   Okay.  And when you told them about
3  this interaction at LeMoyne and Spaulding that
4  night in 1988 or 1989, do you remember what they
5  told you or what any of them told you?
6    A.   Yeah.  They said that he a dirty cop.
7    Q.   Besides telling you that they agree
8  that he was a dirty cop, anything else?
9    A.   Can't recall right now.
10   Q.   Is there some reason you might recall
11 later?
12   A.   Maybe.
13   Q.   Okay.  Is there something that would
14 refresh your recollection as to what else they told
15 you?
16   A.   Stay away from him.
17   Q.   Okay.  Anything else?
18   A.   Can't recall.
19   Q.   Have you talked to anybody about this
20 incident that you said happened back in 1988 -- '88
21 or '89 since 1988 or '89 when you talked to your
22 set of Latin Kings?
23     MR. STARR:  I'm just going to again remind my
24 client not to reveal any attorney/client

Page 71

1 conversations.
2      THE WITNESS:  What was the question?
3      MR. ENGQUIST:  Could you read it back,
4  please?
5          (Record read.)
6      THE WITNESS:  I can't recall.
7 BY MR. ENGQUIST:
8    Q.   Okay.  And then would if be fair to say
9  the next time you had any interaction with Officer
10 Guevara was the night you were arrested in 1990 in
11 August; is that correct?
12     MR. STARR:  Objection to form.
13     THE WITNESS:  Correct.
14 BY MR. ENGQUIST:
15   Q.   Okay.  If I can just get them in order.
16 The being stopped going to the grocery store you
17 said was in 1988 or so.  That was your first time
18 having interactions with -- with Officer Guevara,
19 correct?
20   A.   Correct.
21   Q.   Is the second time LeMoyne and
22 Spaulding or is the second time seeing him walk
23 into the -- the weightlifting place?
24     MR. STARR:  Asked and answered.

Page 72

1      THE WITNESS:  Second time it was in the gym.
2  I left.
3  BY MR. ENGQUIST:
4    Q.   Okay.  And so the third time is LeMoyne
5  and Spaulding being stopped?
6    A.   Could be.
7    Q.   Okay.  Are you not sure about the
8  order?
9    A.   No.
10   Q.   That's correct, you're not sure, right?
11   A.   But he did hit me, though.
12   Q.   I know, but the order of events?
13   A.   Right.
14   Q.   Okay.  Do you recall the day you were
15 arrested on this murder?
16   A.   Yeah.
17   Q.   Okay.  Where were you?
18   A.   Talking about the place?
19   Q.   Yeah.  Where were you when you were
20 arrest?
21   A.   Kedzie and Hirsch.
22   Q.   Kedzie and Hirsch, did you say?
23   A.   Yeah.
24   Q.   And what were you doing -- or what were

Page 73

1  you doing at Kedzie and Hirsch?
2    A.   I was walking to my girlfriend's house.
3    Q.   And who was you girlfriend back then?
4    A.   Maria.
5    Q.   You remember Maria's last name?
6    A.   Perez.
7    Q.   Okay.  And that was from -- you were
8  walking to her house from when you lived on Drake,
9  correct?
10   A.   Yeah.
11   Q.   Okay.  All right.  And do you remember
12 who was there when you were arrested, what
13 officers?
14   A.   No.
15   Q.   Do you remember how many officers?
16   A.   Two.
17   Q.   Do you recall who any of the officers
18 were?
19   A.   I can't recall the name, but it was a
20 Latino and a white dude.
21   Q.   Okay.  And do you recall ever having to
22 deal with this Latino or white officer before?
23   A.   I can't recall.
24   Q.   Okay.  So let me get this right.

ALFREDO GONZALEZ, 02/07/2023                    Page 74..77

Page 74

1 You're walking to your girlfriend's house, Maria
2 Perez, and you're stopped, correct?
3    A.   Correct.
4    Q.   Okay.  How were you stopped?
5    A.   They told me to stop.
6    Q.   Okay.  And did you?
7    A.   Yeah.
8    Q.   Okay.  And were you put in handcuffs?
9    A.   Yeah.
10   Q.   Okay.  Were you told why you were being
11 put in handcuffs?
12   A.   I asked why.  They didn't say nothing.
13   Q.   Okay.
14   THE COURT REPORTER:  I'm sorry?
15   THE WITNESS:  I asked what's going on.  They
16 didn't say nothing.
17 BY MR. ENGQUIST:
18   Q.   Okay.  And after you were placed in
19 handcuffs, what happened next?
20   A.   He call Mr. Guevara.
21   Q.   When you say he called, who called?
22   A.   The officer.
23   Q.   Okay.  And how did he call him?
24   A.   Call him on the -- on the -- through

Page 75

1 the -- through the car thing.  I don't know.
2    Q.   A radio?
3    A.   Yeah.
4    Q.   Was the radio in the car or on the
5 officer?
6    A.   On the officer.
7    Q.   And what did you hear him say to
8 Guevara?
9    A.   We got suspect.  We meet you on Grand
10 close to Central Park.
11   Q.   Okay.  Did you hear anything else
12 over -- said over the radio?
13   A.   No.
14   Q.   Did you hear anything said back to them
15 on the radio?
16   A.   Don't remember.
17   Q.   Okay.  Did you have any conversations
18 with either this Latino or white officer while you
19 were in the car being transported to Grand and
20 Central?
21   A.   I asked them, What's going on?  They
22 didn't say nothing.
23   Q.   Okay.  Anything else?
24   A.   I can't recall.

Page 76

1    Q.   Okay.  Was this the first time you were
2 arrested by the Chicago Police Department?
3    A.   No.
4    Q.   Okay.  How many times before this do
5 you think you'd been arrested by the Chicago Police
6 Department?
7    A.   Don't remember.
8    Q.   Do you remember being convicted for any
9 crimes prior to this murder case?
10   A.   No.
11   Q.   Do you remember getting supervision on
12 a gun charge back in the early '80s?
13   A.   Yeah.
14   Q.   Okay.  And at that -- at that time in
15 the early '80s, did you have a gun when -- when you
16 were arrested?
17   A.   Yeah.
18   Q.   Do you remember what kind of gun it
19 was?
20   A.   I believe it was a 32.
21   Q.   And why did you have a gun on you when
22 you were arrested in the early '80s?
23   A.   Protection.
24   Q.   Protection from who?

Page 77

1    A.   Other gangs.
2    MR. STARR:  Objection; form, foundation.
3    THE WITNESS:  Other gangs.
4 BY MR. ENGQUIST:
5    Q.   Was this your gun or did it belong to
6 somebody else?
7    A.   My gun.
8    Q.   Other than that 32 caliber that you
9 were arrested with back in the early '80s, did you
10 own any other weapons, other -- other handguns?
11   A.   No.
12   Q.   Any other arrests or convictions you
13 can recall right now?
14   MR. STARR:  Asked and answered.
15   THE WITNESS:  I got others arrest.  I don't
16 remember what for.
17 BY MR. ENGQUIST:
18   Q.   Okay.  Do you remember what they were
19 for?
20   A.   I don't remember what for.
21   Q.   Oh, what for.  Okay.
22        All right.  Let's go back to your
23 arrest in this case.
24        After you were taken to Grand and

Page 78

1 Central, what happened next?
2     A.   We waited.
3     Q.   Where did you wait?
4     A.   For the other detective.
5     Q.   Where did you wait in -- did you wait
6 downstairs in the building?  Did you wait in the
7 car?  Did you wait --
8     A.   In the car.
9     Q.   In the car.
10         And do you remember -- so you were
11 in the car in the parking lot at Grand and Central?
12    A.   Just on the Grand Avenue parked.
13    Q.   On Grand Avenue?
14    A.   Yeah.
15    Q.   Okay.  So you weren't in the parking
16 lot for the police station?
17    A.   No.
18    Q.   Okay.  And how long did you wait there
19 in the car on Grand Avenue?
20    A.   That I recall, few minutes, maybe 10.
21    Q.   And what happened after that?
22    A.   Guevara came.
23    Q.   Okay.  And then what happened after
24 Officer Guevara arrived?

Page 79

1     A.   I got out the car.  Put his handcuffs.
2 Before I went in, he punched me in the back and he
3 said, I finally got you.  I said, I don't know what
4 you're talking about.
5     Q.   Okay.  So did he switch handcuffs with
6 the other officer's handcuffs?
7     A.   Yeah.
8     Q.   Okay.  And then was he in front of the
9 other officers when he punched you, I believe you
10 said, in the back of the head?
11    A.   Yeah.
12    Q.   Okay.  And how many times did he hit
13 you in the back of the head?
14    A.   Once.
15    Q.   Okay.  Do you know if what was with a
16 closed fist or an open hand?
17    A.   Closed.
18    Q.   Okay.  And so after you say that he
19 punched you in the back of the head and said I got
20 you, what's the next thing that happened?
21    A.   I went inside the car.
22    Q.   Detective Guevara's car?
23    A.   Yes.
24    Q.   Was Detective Guevara with anybody or

Page 80

1 was he by himself?
2     A.   His partner.
3     Q.   With his partner.
4         And who is his partner?
5     A.   Halvorsen.
6     Q.   Okay.  When you say "Halvorsen," did
7 you know who Detective Halvorsen was or are you
8 just using the name?
9     A.   No, I didn't know who he was.
10    Q.   Okay.  Can you describe him?
11    A.   White dude.
12    Q.   Besides being a white dude, anything
13 else?
14    A.   No, can't -- can't recall right now.
15    Q.   Do you remember if he was older or
16 younger than Guevara?
17        MR. STARR:  Objection to foundation, calls
18 for speculation.
19        THE WITNESS:  He looked younger.
20 BY MR. ENGQUIST:
21    Q.   Okay.  Do you remember how tall he was
22 compared to you?
23        MR. STARR:  Asked and answered.
24        THE WITNESS:  No.

Page 81

1 BY MR. ENGQUIST:
2     Q.   Okay.  Do you remember if he was
3 smaller than you or larger than you in any way?
4     A.   No.
5         MR. STARR:  Same objections.
6         THE WITNESS:  No.
7 BY MR. ENGQUIST:
8     Q.   Do you remember what color his hair
9 was?
10        MR. STARR:  Same objections.
11        THE WITNESS:  Blond hair.
12 BY MR. ENGQUIST:
13    Q.   And how was this -- how was he dressed,
14 this blond hair detective?
15    A.   Street clothes, regular clothes.
16    Q.   Okay.  Was he also wearing a
17 bulletproof vest or just --
18    A.   Yeah.
19    Q.   Okay.  Did the -- this white detective
20 with blond hair and the bulletproof vest, did he
21 ever speak with you?
22    A.   Not in the car.
23    Q.   Okay.  Later on did he speak with you?
24    A.   Yeah.

Page 82

1     Q.   In the police station?
2     A.   Yeah.
3     Q.   Okay.  So after Detective Guevara put
4  you in his car, what's the next thing that
5  happened?
6     A.   We went to the police station.  We went
7  to the interrogation room.
8     Q.   When you say "interrogation room," do
9  you remember where that was?  Was it upstairs,
10  downstairs?
11    A.   Upstairs.
12    Q.   And can you describe the room?
13    A.   Small room.
14    Q.   Okay.  Was that room off another room
15  of like a large room with desks and chairs where a
16  bunch of detectives were?
17    A.   No.
18    Q.   Okay.  Was it off by itself someplace?
19    A.   Yeah.
20    Q.   Okay.  What -- what was near it?  Do
21  you know what was near it?
22    A.   Can't remember.
23    Q.   Okay.  So it didn't open up onto a
24  larger room, like -

Page 83

1     A.   No.
2     Q.   -- it was in a hallway someplace?
3     A.   It was a small room.
4     Q.   Okay.  And I'm sorry if I asked, was it
5  first or second floor of the building; do you
6  recall?
7     MR. STARR:  Asked and answered.
8     THE WITNESS:  Second floor.
9  BY MR. ENGQUIST:
10    Q.   Okay.  And when you were put in that
11  room, were you still handcuffed?
12    A.   Yeah.
13    Q.   Okay.  Were your hands behind you or in
14  front of you?
15    A.   Behind.
16    Q.   Okay.  What was in the room?
17    A.   Little table, two seats, that I
18  remember.
19    Q.   And what did you do when you went to
20  the room?
21    A.   Halvorsen left.  He grabbed me by the
22  neck.
23    Q.   Okay.  You said the -- the white
24  officer left, correct?

Page 84

1     A.   Yeah.
2     Q.   Okay.  And were you sitting down?
3     A.   No.
4     Q.   You were standing?
5     A.   (Nodding.)
6     Q.   Okay.  And did you say that Detective
7  Guevara grabbed you by the neck?
8     A.   Yeah.
9     Q.   Okay.  One hand or two hands?
10    A.   Huh?
11    Q.   Did he grab you by the neck with one
12  hand or two hands?
13    A.   I don't remember.
14    Q.   Okay.  After he grabbed you by the
15  neck, what did he do?
16    A.   He said that I was going to pay for a
17  double murder that I committed.
18    THE COURT REPORTER:  I'm sorry.  A double
19  murder that?
20    THE WITNESS:  That supposedly I committed.
21  BY MR. ENGQUIST:
22    Q.   Okay.  When he grabbed you by the neck,
23  did he squeeze or did he just grab you by the neck?
24    A.   He just pin me up.

Page 85

1     Q.   He picked you up?
2     A.   No.  He pin my up, pin in the neck.
3     Q.   Okay.  Did he push you against the
4  wall?
5     A.   Yeah.
6     Q.   Okay.  And how long did he hold you
7  there against the wall?
8     A.   Few seconds, maybe.
9     Q.   And what happened after the few second?
10    A.   I told him I didn't know what he was
11  talking about.
12    Q.   Okay.  And how did he respond?
13    A.   He said I was going down.
14    Q.   Okay.  What happened next?
15    A.   I sat down.  He handcuffed to the -- to
16  the -- to the wall, then he said, I'll be back.
17    Q.   All right.  And how long were you alone
18  in the room before someone came into the room?
19    A.   A few minutes his partner came in.
20    Q.   This would be the same person you said
21  before, the --
22    A.   Yeah.
23    Q.   The white guy with blond hair?
24    A.   Yeah.

ALFREDO GONZALEZ, 02/07/2023                                    Page 86..89

Page 86

1    Q.   And what did the white officer with
2 blond hair say?
3    A.   He said that -- he told me that Guevara
4 was never going to let me go until I confess to
5 the -- until I admitted that I committed that
6 murder.
7    Q.   Did you get the impression that the
8 white officer with blond hair was kind of
9 subservient or answering -- answering to Guevara?
10       MR. STARR:  Objection to form, foundation,
11 calls for speculation, assumes fact not in
12 evidence.
13       THE WITNESS:  I don't know.
14 BY MR. ENGQUIST:
15   Q.   Who -- who seemed to be in charge?
16   A.   Guevara was.
17   Q.   Okay.  So after this white officer with
18 blond hair comes in and tells you that Guevara
19 wasn't going to let you go unless you admitted to
20 the murder -- until you admitted to the murder,
21 what happened next?
22   A.   I can't recall exactly, but he came in
23 saying that -- that he had witnesses saying that I
24 committed the murder.

Page 87

1    Q.   Okay.  When you say "he came in," is
2 there Detective Guevara again?
3    A.   Detective Guevara.
4    Q.   Okay.  When came in, was he by
5 himself?
6    A.   Yeah.
7    Q.   Okay.  And he told you that he had
8 witnesses saying that you committed the murder?
9    A.   I committed the double murder.
10   Q.   Okay.  Did he tell you who the
11 witnesses were?
12   A.   No, not at that -- at that moment.
13   Q.   Okay.  And after he told you there were
14 witnesses saying that you committed the murder,
15 what happened next?
16   A.   I told him that I had nothing to do
17 with it, whatever he's talking about.
18   Q.   And then what happened after your
19 denial?
20   A.   He slapped me a few times.  After the
21 last slap, my lip was bleeding.
22   Q.   Okay.  How many times did he slap you?
23   A.   Several times.
24   Q.   Okay.  Was it with one hand or was

Page 88

1 it --
2    A.   One hand.
3    Q.   Okay.  Was it back and forth or was it
4 --
5    A.   Yeah.
6    Q.   -- just once --
7    A.   Back and forth.
8    Q.   Back and forth.  So both sides of your
9 face?
10   A.   Yeah.
11   Q.   Okay.  And you said your lip was bloody
12 afterwards?
13   A.   Yes.
14   Q.   Okay.  Was it bleeding on the inside or
15 outside?
16   A.   The inside.
17   Q.   Okay.  Was it bleeding a lot, like you
18 were spitting -- spitting the --
19   A.   No.
20   Q.   -- blood out or were you just tasting
21 the blood?
22   A.   Just tasting the blood.
23   Q.   Okay.  So after he slapped you back and
24 forth across the face a few times, what happened

Page 89

1 next?
2    A.   I told him I want to talk to my lawyer.
3    Q.   And did you have a lawyer in mind?
4    A.   Yeah.
5    Q.   What lawyer?
6    A.   His name?
7    Q.   Yeah.
8    A.   Marty Abrams.
9    Q.   Marty Abrams?
10   A.   Yes.
11   Q.   And how did you know attorney Marty
12 Abrams?
13   A.   He helped on some of my friends' cases.
14   Q.   Was he your attorney before or was he
15 just attorney for other Latin Kings you knew?
16   A.   Latin Kings.
17   Q.   But not specifically you, correct?
18   A.   No.
19   Q.   I'm sorry.  Is --
20   A.   No.
21   Q.   Is that correct, though; you had not
22 used him before?
23   A.   No.  I know him.
24   Q.   Okay.  And what happened when you asked

ALFREDO GONZALEZ, 02/07/2023                     Page 90..93

Page 90

1 for Marty Abrams?

2      A.  He said I will never get an attorney,

3 attorney cannot help me, and I was going down no

4 matter what.

5      Q.   Okay.  And after you were told that,

6 what happened next?

7      A.   They left -- he left.

8      Q.   Okay.  And how long were you alone

9 before someone else came into the room?

10     MR. STARR:  Objection; foundation, calls for

11 speculation.

12     THE WITNESS:  Like a while later.

13 BY MR. ENGQUIST:

14     Q.   Okay.  Did it seem like half a day

15 passed, did it seem a few minutes, like right away

16 or like a long time?

17     A.   A few minutes later.

18     MR. STARR:  Belated objection to speculation,

19 foundation, form.

20 BY MR. ENGQUIST:

21     Q.   Okay.  After a few minutes, what

22 happened next?

23     A.   The detective would come in, making

24 sure I wasn't sleeping.  They would go away.

Page 91

1      Q.   You said "the detective," which

2 detective would come in to make sure you --

3      A.   Different detectives.

4      Q.   Okay.  So different people would come

5 in periodically, check on you --

6      A.   Yeah.

7      Q.   -- and then leave?

8      A.   Making sure I wasn't sleeping.

9      Q.   How do you know they were making sure

10 you weren't sleeping?

11     A.   Because that's what they told me.

12     Q.   Okay.  They would -- they came in

13 saying, Want to make sure you're not sleeping, then

14 they would leave?

15     A.   Something like that.

16     Q.   Okay.  Can you describe any of the

17 people that would come in there and told you

18 not to -- and told you that they were coming to

19 make sur you weren't sleeping?

20     A.   I don't remember the face, but there

21 was a Latino.

22     Q.   Besides the Latino, anybody else that

23 you recall?

24     A.   Other white detectives.

Page 92

1      Q.   Okay.  And how long did this go on

2 where either the Latino or the white officers would

3 come into the room and -- and make sure -- and say,

4 you know, don't sleep or make sure you weren't

5 sleeping?

6      MR. STARR:  Objection to form, foundation,

7 calls for speculation.

8      THE WITNESS:  Hours later, Guevara came back.

9 BY MR. ENGQUIST:

10     Q.   When you say "hours later," was it the

11 next day?  Do you have any idea how long it was?

12     A.   No.

13     MR. STARR:  Objection; form, foundation

14 speculation.

15 BY MR. ENGQUIST:

16     Q.   When you were arrested, what time of

17 day was it?

18     A.   It was nighttime.

19     Q.   Had the sun already gone down?

20     A.   Yeah.

21     Q.   Okay.  So you said at some point, you

22 think maybe hours later, Guevara came back to see

23 you?

24     A.   Yeah.

Page 93

1      Q.   Okay.  When he came back to see you,

2 was he by himself?

3      A.   Yeah.

4      Q.   Okay.  Had he changed his clothes?

5      A.   I couldn't tell.  Don't remember.

6      Q.   Okay.  And what happened when Guevara

7 came back to your room?

8      A.   He said that he had witnesses saying

9 that -- that I had committed double murder.

10     Q.   Okay.  So he told you again there was

11 witnesses saying you committed a double murder?

12     A.   Yeah.  He had statements.

13     Q.   Okay.  He told you he specifically had

14 statements?

15     A.   Yeah.

16     Q.   Okay.  Did he tell you anything else?

17     A.   Yeah.

18     Q.   What did he tell you?

19     A.   He gave me the names Jose Maysonet and

20 Rosa Bella.

21     Q.   I'm sorry?

22     A.   Rosa Bella.

23     Q.   And Rosa Bella?

24     A.   Yeah.

ALFREDO GONZALEZ, 02/07/2023                    Page 94..97

Page 94

1    Q.   Did he tell you anybody else had given
2 a statement saying you committed a double murder?
3    A.   No, not at that point.
4    Q.   Okay.  Did you know who Rosa Bella was?
5    A.   No.
6    Q.   Okay.  Did you know Juan's girlfriend?
7    A.   Yeah, Juan, yeah.
8    Q.   Okay.  You remember Juan's girlfriend's
9 name?
10   A.   Yeah.  We used to call her Rosie.
11   Q.   You called her Rosie.  Okay.
12        Did you come to know that this Rosie
13 was Rosa Bella?
14   A.   No.
15   Q.   Did you ever come to understand her --
16 understand that?
17   A.   No.
18   Q.   Do you remember Rosie, Juan's
19 girlfriend, testifying against you in criminal
20 court?
21   A.   Yeah.
22   Q.   Okay.  But you don't know Rosie's real
23 name, is that right, or full name?
24   A.   No.

Page 95

1    Q.   Okay.  How long had you known Rosie?
2    MR. STARR:  Objection; form, foundation.
3        At that point in time when he was in
4 custody?
5    MR. ENGQUIST:  Sure.
6    THE WITNESS:  Since I was in custody or
7 before?
8 BY MR. ENGQUIST:
9    Q.   How long had you known her, Rosie, at
10 the time of your arrest?
11   A.   Two years, maybe less.
12   Q.   And how did you come to know her?  How
13 did you get introduced to Rosie?
14   A.   By Juan.
15   Q.   Did you meet her -- where did you meet
16 her, at a party?  Did you meet her on the street?
17 Did you meet her at her house?  What?
18   A.   No.  Right there on Pierce.
19   Q.   I'm sorry, what?
20   A.   On Pierce.
21   Q.   On Pierce?
22   A.   Yeah.
23   Q.   When you say "on Pierce," would that be
24 on the street or at an address on Pierce?

Page 96

1    A.   They used to live right there on Pierce
2 and Kedzie.
3    Q.   And how many times had you been to
4 their apartment on Pierce and Kedzie?
5    A.   Maybe once.
6    Q.   So had you only met her one time
7 previously or you had met her over -- met her
8 several times during the approximately two years
9 that you had known her?
10   A.   No.  I seen her -- I seen her a few
11 times.
12   Q.   Okay.  And what other places had you
13 seen Rosie?
14   A.   Right there in the neighborhood.
15   Q.   And when you'd see her, would you
16 acknowledge her and say hi?
17   A.   Yeah.  I would show respect.
18   Q.   Okay.  Were there any animosity between
19 you and Rosie?
20   A.   No.
21   Q.   All right.  So after Detective Guevara
22 came in and told you there were statements from
23 Jose Maysonet and Rosa Bella -- or Bello, about you
24 being involved in the murders, what's the next

Page 97

1 thing that happened?
2    A.   I told him that I didn't know who Jose
3 Maysonet was and I didn't know Rosa Bello.
4    Q.   Did he explain who they were?
5    A.   No.
6    Q.   Okay.  But after going through your
7 criminal trial, is it your understanding that both
8 Jose or Juan and his girlfriend had given
9 statements about you?
10   A.   What?
11   MR. STARR:  Objection to form.
12 BY MR. ENGQUIST:
13   Q.   After going through your criminal
14 trial, was it then your understanding that both
15 Juan and Rosie had given statements about you being
16 involved in the murder?
17   A.   Yeah.  After, yeah.
18   Q.   Okay.  So after you denied knowing
19 who -- what and who he was talking about, what's
20 the next thing that happened?
21   A.   I asked for my lawyer.
22   Q.   Okay.  Was that Marty Abrams again?
23   A.   Marty Abrams.
24   Q.   Okay.  And what happened after that?

ALFREDO GONZALEZ, 02/07/2023                    Page 98..101

Page 98

1   A.  He said I'm never -- I'm never going to
2 talk to a lawyer.
3       Q.   Okay.  And then what happened?
4   A.  He punched me in my testicle.
5       Q.   Okay.  How many times did he punch you
6 in the testicles?
7   A.  In the period of time, several times,
8 multiple times.
9       Q.   Okay.  And when he was punching you in
10 the testicles, what were you doing?
11      A.  Ask for my lawyer.  I scream.  Nobody
12 came back.
13      Q.   Okay.  About how long was this that he
14 was punching you in the testicles?
15      MR. STARR:  Speculation.
16      THE WITNESS:  He wanted me to admit that I
17 committed a crime.  I said, No.
18 BY MR. ENGQUIST:
19      Q.   How long was he punching you in the
20 testicles and asking you to admit to the crime?
21      MR. STARR:  Speculation.
22      THE WITNESS:  Minutes later.
23 BY MR. ENGQUIST:
24      Q.   So after this minutes of him punching

Page 99

1 you in the testicles and asking you to admit to the
2 crime, what happened next?
3   A.  Then he said that he have more
4 witnesses.
5       Q.   Did he you describe who the more
6 witness were?
7   A.  He said Justino Cruz signed a statement
8 against me.  And I said, Who's Justino Cruz?  He
9 said, Your nephew.  And I told him, No, I don't
10 believe he lied on me.
11      Q.   Okay.  So after he told you that
12 Justino Cruz had signed a statement and you told
13 him you didn't believe that, what was the next
14 thing that happened?
15      A.  Then he said Fro also signed a
16 statement.
17      THE COURT REPORTER:  Then he said what?  I'm
18 sorry.
19      THE WITNESS:  Fro.
20 BY MR. ENGQUIST:
21      Q.   Okay.  And who's Fro.
22      A.  Fro, I -- I said, There's a lot of Fros
23 in the neighborhood.
24      Q.   Was there a Fro that was in your set?

Page 100

1   A.  No.
2       Q.   Okay.  Did you know a Fro that was a
3 Latin King?
4   A.  Yeah, several.
5       Q.   Several of them.
6       Did you know a Mr. Goosens who's
7 also known as Fro?
8   A.  No.
9       Q.   You don't know any of the Fros real
10 names?
11      A.  No.
12      Q.   Okay.  So after you were told there was
13 a Fro that had given a statement about you, what's
14 the next thing that happened?
15      A.  I tell him there's a lot of Fro in the
16 neighborhood, I don't know what he's talking about,
17 and I said I -- I said, I'm innocent; I want to
18 talk to my lawyer.  He said I will never talk to
19 the lawyer, not even lawyer can help me out.
20      Q.   Okay.  So after you asked for a lawyer
21 again and once again you were told a lawyer
22 couldn't help you, what's the next thing that
23 happened?
24      A.  He basically beat me up.  He wanted me

Page 101

1 to confess to something I didn't have nothing to do
2 with.
3       Q.   Okay.  You said then -- this is after
4 you've been punched for minutes in the testicles,
5 you said then he basically beat you up, correct?
6   A.  Yeah.
7       Q.   Can you describe what you mean by beat
8 you up?
9   A.  Hit my stomach.
10      Q.   Any other place?
11      A.  The face.
12      Q.   The face?
13      A.  (Nodding.)
14      Q.   Any other place?
15      A.  Then he left.
16      Q.   Okay.  And how long was this beating
17 up?  Being hit in the stomach and face, how long
18 did this go on for?
19      MR. STARR:  Objection, calls for speculation.
20      THE WITNESS:  Several minutes, I believe.
21 BY MR. ENGQUIST:
22      Q.   Okay.  And during the several minutes,
23 how many times were you punched in the stomach?
24      MR. STARR:  Objection, calls for speculation.

Page 102

1    THE WITNESS:  I can't recall.
2 BY MR. ENGQUIST:
3    Q.  Was it a lot?
4    A.  It's a few.
5    Q.  Okay.  And how many times were you
6 punched in the face?
7    MR. STARR:  Objection, calls for speculation.
8    THE WITNESS:  A few.
9 BY MR. ENGQUIST:
10    Q.  Okay.  And what part of your face was
11 hit, or parts of your face were hit, either way?
12    A.  Slap.
13    Q.  What?
14    A.  Slap.
15    Q.  He was slapping you in the face.
16       Okay.  Was this more the back and
17 forth with one hand across your face?
18    A.  Yeah.
19    Q.  Okay.  So that was just in your mouth
20 area on both sides, and cheeks?
21    A.  Face.
22    Q.  What?
23    A.  Face.
24    Q.  Face.

Page 103

1       Did he hit you anywhere other than
2 around your cheeks and your mouth back and forth in
3 the slapping?
4    A.  No.  Then he left.
5    Q.  I just want to be clear, though.  Did
6 he hit you in any other place in your face other
7 than you cheeks with the back -- in the mouth area
8 with the back and the forth slapping?
9    A.  My testicle.
10    Q.  And the testicles.  Did he hit you in
11 the testicles again or is it --
12    A.  Yeah, again.
13    Q.  Again.
14       Okay.  So when -- when the police
15 officer basically beat you up after this
16 conversation, he once again hit you in the
17 testicles, he hit you in the stomach, and he
18 slapped you across the face back and forth?
19    A.  Yeah.
20    Q.  Okay.  Anything else during this beat
21 up that you described?
22    A.  No.  He left.
23    Q.  Okay.  After he left, were you alone
24 for a period of time?

Page 104

1    A.  Yeah.
2    Q.  Okay.  How long were you alone?
3    MR. STARR:  Objection, calls for speculation.
4    THE WITNESS:  I don't know.  Few hours.
5 BY MR. ENGQUIST:
6    Q.  And during these hours that you were
7 alone for a few -- during these few hours you were
8 alone, did anyone come and check on you or were you
9 just by yourself the whole time?
10    A.  Yeah.  A detective would check in.
11    Q.  I'm sorry, what?
12    A.  Detective would check in.
13    Q.  Which detective, or was it just a
14 whoever -- like a round robin of detectives again?
15    A.  At one time there was three of them.
16    Q.  At the time there were three of them,
17 can you describe the three?
18    A.  Yeah.  One Latino, two white.
19    Q.  Besides just Latino, can you describe
20 this Latino officer in any other way?
21    A.  No.  I know he looked Latino to me.
22    Q.  Okay.  You can't -- you know nothing
23 about his height, correct?
24    A.  No.

Page 105

1    Q.  Can you give me an idea of his weight?
2    A.  No.
3    Q.  Whether or not he was a big man or a
4 small man?
5    MR. STARR:  Objection, asked and answered.
6    THE WITNESS:  He could be my -- about my
7 height.
8 BY MR. ENGQUIST:
9    Q.  Okay.  And how tall are you?
10    A.  Five nine.
11    Q.  Okay.  And was he -- was he a wide man,
12 a strong man?  Did he seem to be around your build?
13 Anything you can describe besides that?
14    MR. STARR:  Asked and answered.
15    THE WITNESS:  No.
16 BY MR. ENGQUIST:
17    Q.  Did he have hair?
18    A.  Yeah.
19    Q.  Can you describe his hair at all?
20    A.  Black hair.
21    Q.  Okay.  Anything else you can describe
22 him as besides Latino, maybe five nine-ish, and
23 black hair?
24    A.  No.

ALFREDO GONZALEZ, 02/07/2023                    Page 106..109

Page 106

1     Q.   And the two white officers that you
2  said came in also, can you describe them at all
3  other than white?
4     A.   No.
5     Q.   Anything about height, weight, build,
6  anything?
7     A.   They all looked to me the same, the
8  same height.
9     Q.   They all looked around five nine?
10    A.   Maybe, yeah.
11    Q.   Okay.  Can you -- do you know hair
12 color for either of these white guys?
13    A.   Blond hair.
14    Q.   What?
15    A.   Blond hair.
16    Q.   Okay.
17       MR. STARR:  Counsel, I need another break
18 whenever you get to a good point.
19       MR. ENGQUIST:  Yeah, just give me a second.
20 BY MR. ENGQUIST:
21    Q.   Okay.  Anything else besides both white
22 guys and with blond hair?
23    A.   No.
24    Q.   Okay.  Did -- besides coming in and

Page 107

1  checking on you, did they say anything else to you?
2     A.   Not at that time.
3     Q.   Okay.  Sometime later they did?
4     A.   Yeah.
5     Q.   Okay.  But not at this time?
6     A.   Yeah.
7        MR. ENGQUIST:  And we'll get to that.
8           Counsel, you need your break, let's
9  take a break.
10       MR. STARR:  Thanks.
11       THE VIDEOGRAPHER:  The time is 12:11.  This
12 is the end of Media 3.  We're off the record.
13          (Recess taken.)
14       THE VIDEOGRAPHER:  The time is now 12:19 p.m.
15 This is the beginning of Media 4.  We're back on
16 the record.
17 BY MR. ENGQUIST:
18    Q.   Okay.  So where we left off before the
19 break, you were -- you were alone for a few hours,
20 but detectives would check on you and you
21 specifically went through the one Latino and two
22 white guys that would come to your -- come and
23 check on you.
24          After those few hours, what's the

Page 108

1  next thing you recall happening?
2     A.   Well, a detective would come in.  I
3  don't remember the exact order, but he was asking
4  me if I ready to confess.  I said, No, I cannot
5  confess about it.  Then he said -- he kept talking
6  about what Donald Duk's.
7     Q.   I'm sorry, what?
8     A.   He was talking about Donald Duk's.
9     Q.   Donald Duk.  Okay.
10    A.   I said, I don't know where it happened
11 at.
12    Q.   All right.  So this detective who came
13 in and you said was talking to you, asking you if
14 you were ready to confess, was this Guevara again
15 or somebody else?
16    A.   Guevara.
17    Q.   It was Guevara.  Okay.
18    A.   Yeah.  I don't remember exactly how the
19 order was, but he came in a lot of times.
20    Q.   Okay.  Is this -- is this point you
21 think after the hours of you being by yourself and
22 the other detectives just checking on you?
23    A.   Yeah.
24    Q.   Okay.  And you -- and when he came in

Page 109

1  this time and asked you about confessing, did he
2  hit you at all this time too?
3     A.   I can't recall.  I know it -- I know
4  he -- I know he was hitting me a few times here and
5  there.
6     Q.   Here and there.
7           Did he basically hit you every time
8  he came into the room?
9     A.   I could say basically, yeah.
10    Q.   Okay.  And when he would hit you when
11 he could come into the room, was he always by
12 himself when he hit you?
13    A.   Sometime.
14    Q.   Okay.  Was he ever with somebody else
15 when he hit you?
16    A.   Sometimes he'll come in with -- with
17 Halvorsen.  With Halvorsen, he wouldn't -- he
18 wouldn't hit me, but he would ask me if I was ready
19 to confess.  I said, Confess to what, I ain't got
20 nothing to do with it.
21    Q.   Okay.
22    A.   He wanted me to admit I knew Jose
23 Maysonet, which I didn't know who he was.
24    Q.   Okay.  So you said when he came in with

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                                    Page 110..113

Page 110

1 Halvorsen.  And you've already described who you
2 knew as Halvorsen from when you were -- when you
3 got arrested and that he was at Grand Avenue.  You
4 said white dude, younger than Ray, blond hair, and
5 wearing a bulletproof vest, correct?
6     A.  Yes.
7     Q.  All right.  So you said at times
8 Detective Guevara would come in with a person you
9 know as Halvorsen, this -- this blond guy, and
10 would ask you to confess and you would say no.  But
11 did he ever hit you in front of the man you know as
12 Halvorsen?
13     A.  I can't recall.
14     Q.  Okay.  Okay.  So I'm just trying to
15 get -- and I understand you're not sure of the
16 exact order, but the last time we left off, there
17 would have been a break for a few hours where you
18 were just being checked on by the Latino and the
19 two white officers, and then you talked about
20 Guevara coming back and asking -- and then asking
21 about confessing and then said something about --
22 I'm sorry, you said Donald Duk?
23     A.  Yes.
24     Q.  What about Donald Duk?

Page 111

1     A.  He just said Donald Duk's.  He keep
2 repeated about Donald Duk's, the murder happened by
3 Donald Duk's.
4     Q.  The murder happened by Donald Duk's?
5     A.  Yeah.
6     Q.  Did you have any idea what that meant?
7     A.  No.
8     Q.  Do you know now what that mean --
9 means?
10     A.  Yeah.
11     Q.  What does it mean now?
12     A.  It happened right there in Donald
13 Duk's.
14     Q.  Okay.  And what is Donald Duk's?
15     A.  It's a restaurant.
16     Q.  And do you know that restaurant, Donald
17 Duk's?
18     A.  Yeah.
19     Q.  Okay.  And where is that -- where was
20 that located?
21     A.  North Avenue and Kimball on the corner.
22     Q.  And that was the territory for your set
23 of Latin Kings, correct?
24     A.  Yeah.

Page 112

1     Q.  Okay.  So after Guevara told you that
2 the murder happened near Donald Duk's, what's the
3 next thing that happened that you recall?
4     A.  That I recall, he told took me to
5 Donald Duk's, me and the state attorney, Halvorsen.
6     Q.  He took you to Donald Duk's?
7     A.  Yeah.
8     Q.  Okay.  I'm sorry.  So he took you to
9 Donald Duk's?
10     A.  That was hours later.
11     Q.  Hours later.
12     A.  I can't recall more or less the time
13 or -- I didn't have no watch, none of that.
14     Q.  All right.  So when he took you to
15 Donald Duk's, had you given a statement yet?
16     A.  No.
17     Q.  Okay.  So you hadn't given a statement
18 confessing to the crime, correct?
19     A.  Right.
20     Q.  When he took you to Donald Duk's, how
21 many times do you think he'd come into the room and
22 beaten you?
23     A.  Several times, multiple times.
24     Q.  Multiple times.

Page 113

1         And each time he came in to -- and
2 beat you, did he slap you across the face each
3 time?
4     A.  No.
5     Q.  Okay.  Did he punch you in the stomach
6 every time?
7     A.  Sometime.
8     Q.  Sometimes.
9         Did he punch you in the testicles
10 every time?
11     A.  Not all the time.
12     Q.  Okay.  Did he do anything else to you
13 other than punching you in the testicles, punching
14 you in the stomach, and slapping you across the
15 face back and forth?
16     A.  I kept repeating myself I want to see a
17 lawyer.
18     Q.  I understand that.
19         Did he do anything else physically
20 to you during these multiple times that you said
21 that he beat you, other than slapping you across
22 the face back and forth, punching the testicles,
23 and punching you in the stomach?
24     MR. STARR:  Objection; form, foundation,

ALFREDO GONZALEZ, 02/07/2023                    Page 114..117

Page 114

1 mischaracterizes his prior testimony.  He testified
2 earlier about other abuse.
3      THE WITNESS:  But I don't remember the exact
4 order, but I felt like I was a punching bag.
5 BY MR. ENGQUIST:
6      Q.   Okay.  And this was over several times,
7 correct?
8      A.   Yeah.
9      Q.   Okay.  Did you have any injuries from
10 any of these -- any of this?
11      A.   Yeah.
12      Q.   Okay.  What were your injuries?
13      A.   My left shoulder, my back, my private
14 parts.
15      Q.   Okay.  And what injury did you have to
16 your left shoulder.
17      A.   It just -- I mean, I guess being
18 handcuffed on the wall for hours and days.
19      Q.   Was there like a bruise or was it just
20 sore?
21      A.   It -- it been sore all those years.
22 Still hurts.
23          And my right eye, I got white
24 lights.

Page 115

1      Q.   All right.  Let's -- can I just stick
2 right now with just the left shoulder?  You said
3 that your left shoulder was store and still hurts.
4          Other than being handcuffed --
5      A.   On the wall.
6      Q.   Was it your left arm was the one
7 handcuffed to the wall?
8      A.   Both.
9      Q.   Both.  So both arms were handcuffed to
10 the wall?
11      A.   Sometimes, sometime -- sometime he take
12 one out, sometimes put it back on.
13      Q.   And which side were you handcuffed to,
14 your left or your right side?
15      A.   This side.
16      Q.   Your right side?
17      A.   (Nodding.)
18      Q.   Is that correct?
19      A.   Yes.
20      Q.   Okay.  Did Detective Guevara or another
21 officer do anything specific to your left shoulder
22 or was it just because you were handcuffed to the
23 wall that you -- you believe your shoulder hurts?
24      MR. STARR:  Objection; calls for speculation,

Page 116

1 foundation.
2      THE WITNESS:  Maybe he punched me there a few
3 time.  I don't remember.
4 BY MR. ENGQUIST:
5      Q.   You don't remember, but you think you
6 could have been punched in the shoulder?
7      A.   Yes.
8      Q.   Other than possibly being punched in
9 the shoulder, anything else happen to your left
10 shoulder other than being handcuffed?
11      A.   It never -- never heal.
12      Q.   It never healed.  Okay.
13          And I know we don't have any medical
14 records, but have you ever sought medical treatment
15 for your left shoulder?
16      A.   When I was at Stateville, I guess it
17 was, Menard.
18      Q.   Okay.  And what treatment do you recall
19 getting while you were in prison --
20      A.   While I was in Stateville --
21      Q.   -- for your left shoulder?
22      A.   -- physical therapy.
23      Q.   Anything else?
24      A.   I complain about the pain that I have

Page 117

1 right here on the -- on the bottom.
2      Q.   I'm sorry, the pain you had where?
3      A.   Right on my testicles.
4      Q.   Okay.  Again, I'm going to try to do
5 everything in kind of one spot.
6          Okay.  The left shoulder.  Anything
7 else that you had besides physical therapy in
8 prison for your left shoulder?
9      A.   Yeah.
10      Q.   Anything else besides -- to your left
11 shoulder?
12      A.   That's it.
13      Q.   Okay.
14      A.   And a cream.
15      Q.   Did you have any -- any -- did you have
16 any medical treatment for your left shoulder while
17 you were in Cook County Jail?
18      A.   No.
19      Q.   Okay.  You also mentioned your back --
20      MR. STARR:  Josh, I think he was saying
21 something else and you interrupted him, about his
22 left shoulder.  I don't want the record to be
23 incomplete.
24

ALFREDO GONZALEZ, 02/07/2023                    Page 118..121

Page 118

1 BY MR. ENGQUIST:
2    Q.   Is there something else about your left
3 shoulder that your attorney thought you were going
4 to say?
5    A.   Yeah.  I mean, it still hurts.  It
6 still bother.
7    Q.   Anything else?
8    MR. STARR:  Maybe I misheard him.  I
9 apologize.
10    MR. ENGQUIST:  Okay.
11 BY MR. ENGQUIST:
12    Q.   Then let's move on to when you said
13 your back.  Okay?  Were you ever struck in your
14 back by Officer Guevara?
15    A.   Yeah, on the side.
16    Q.   On the side.  And you pointed to your
17 right side near your kidney; is that right?
18    A.   Yeah.
19    Q.   Okay.  And how many times were you
20 struck on -- in your -- on your right -- was it
21 your right side or your back?
22    A.   I didn't say right side.  You said
23 right side.
24    Q.   Well, that's where you pointed.

Page 119

1    A.   Well, yeah, but it could be left side
2 since I was handcuffed like this.
3    Q.   Okay.  Do you recall where you were
4 struck on your sides or your back?
5    A.   On the left.
6    Q.   On the left side.  Okay.  So not your
7 right side.
8         When you were -- okay.
9         So do you remember how many times
10 you were struck on your left side?
11    A.   No.  I don't recall.
12    Q.   Okay.  Now, when you pointed to your
13 kidney area, are you trying to indicate that you
14 were actually punched in your left kidney area?
15    MR. STARR:  Objection to form, foundation.
16    THE WITNESS:  Well, it didn't have to be in
17 the kidney.  Could be upper.
18 BY MR. ENGQUIST:
19    Q.   Okay.  Do you know where you were
20 struck on the left-hand side?
21    A.   Yeah, here.
22    Q.   Okay.  You pointed to -- you motioned
23 underneath your arm and on the side?
24    A.   Yeah.

Page 120

1    Q.   So would it be all down your left side
2 from underneath your armpit down --
3    A.   Yeah.
4    Q.   -- to your waist; is that fair to say?
5    A.   Yeah, that could be.
6    Q.   Okay.  And how many times were you
7 struck on your left-hand side underneath your
8 armpit down --
9    A.   Yeah.
10    Q.   -- to your waist; is that fair to say?
11    A.   Yeah.  That could be.
12    Q.   Okay.  And how many times were you
13 struck on your left-hand side underneath your
14 armpit down to your waist?
15    A.   It could have been several time.
16    Q.   Okay.  Did you have any --
17    A.   Multiple -- multiple times.  I don't
18 remember.
19    Q.   Okay.  And did you have any bruising
20 from that?
21    A.   Yeah.
22    Q.   Okay.  And did you seek any medical
23 treatment when you were at Cook Count Jail for this
24 injury to your left-hand side?

Page 121

1    A.   I don't remember.  They would give us
2 Tylenols anyway.
3    Q.   I'm sorry, what was that?
4    A.   Tylenols.
5    Q.   Did you receive any treatment for this
6 left -- being punched in the left side while you
7 were in IDOC?
8    A.   No.  Can't recall.
9    Q.   Okay.  And you mentioned -- I'm going
10 to go to the next one, which was your private
11 parts.
12    A.   Yeah.
13    Q.   Okay.  Did you have any kind of
14 bruising or visible injuries to your private parts
15 from being struck multiple times in the -- in your
16 scrotum?
17    A.   No, I didn't have no bruise.  Just
18 hurt.
19    Q.   I'm sorry.  One more time?
20    A.   Hurts, it hurts.
21    Q.   Okay.
22    A.   I still experiencing the pain.
23    Q.   Do you still have pain in your -- in
24 your scrotum from that?

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 122

1    A.   Yes.
2    Q.   Did you receive treatment for this pain
3  in your scrotum when you were in Cook County Jail?
4    A.   I don't recall.
5    Q.   Did you ever receive treatment for this
6  pain in your scrotum when you were in IDOC?
7    A.   Yeah.
8    Q.   Okay.  And when did you first receive --
9  that you recall receive treatment for this pain in
10  your scrotum from being punched by Detective
11  Guevara back in August of 1990?
12    A.   Well, after years of suffering with
13  pain, when I was at Menard I decided to -- to talk
14  about it.
15    Q.   Okay.  You -- you said "after years."
16  Do you approximately know when that was, how many
17  years after 1990 that you went to see a doctor
18  about it in Menard?
19    A.   After suffering with pain, I would ask
20  the guys, Hey, do you ever get pain down there?
21  Say, no.  They say, Go and check.  I never did.  I
22  just suffer with pain.  When I was at Menard, then
23  I went.
24    Q.   I understand.  How many years later

Page 123

1  after -- after you were punched in the scrotum?
2    A.   Like six, five.  I can't recall how
3  many years later.
4    Q.   Okay.  And after like five or so --
5  five or six years and you saw -- you went to the
6  doctor at Menards, did you ever receive any
7  treatment for you said the pain you had in your
8  scrotum?
9    A.   They gave me some Tylenols.  They did
10  check.
11    Q.   They did check?
12    A.   Yeah.  You know, they check.  You know,
13  I mean, I don't want to --
14        MR. STARR:  You've got to give verbal
15  answers, Freddy.
16  BY MR. ENGQUIST:
17    Q.   So they -- they checked your scrotum?
18    A.   Yeah.
19    Q.   Okay.  Did they remark to you about
20  any -- any kind of change in your physiology that
21  was causing the pain?
22    A.   Any what?
23    Q.   Any injury.  Did they see any injury?
24  Did they tell -- did they remark on something that

Page 124

1  was causing you pain?
2    A.   No.  They just said that they look all
3  right, not to worry about it.  I say, Yeah, but it
4  hurts.
5    Q.   And does it still hurt today?
6    A.   Yeah, still do.
7    Q.   Okay.  How do you -- have you received
8  any treatment other than getting Tylenol when you
9  said you had pain in your scrotum when you were at
10  Menards since then?
11    A.   Yeah.
12    Q.   Where?
13    A.   At Stateville.
14    Q.   Okay.  Still in IDOC, correct?
15    A.   (Nodding.)
16    Q.   In Stateville, did they -- did they
17  remark about finding anything wrong with your
18  scrotum?
19    A.   No.
20    Q.   Did you receive Tylenol when you told
21  them you had pain?
22    A.   Ibuprofen.
23    Q.   Okay.  Did you receive treatment any
24  other place?  How about outside of IDOC, have you

Page 125

1  received any treatment for your scrotum?
2    A.   Yeah.
3    Q.   Okay.  Where?
4    A.   Outside hospital.
5    Q.   And obviously we don't have those
6  records yet, but this outside hospital that you
7  went to, when was this?
8    A.   A few months ago.  I don't remember
9  talking about it.  Maybe I should have talked about
10  it.
11    Q.   I'm sorry.  When you went to the
12  hospital a few months ago, did you go there for
13  pain in your scrotum or did you go there for
14  something else?
15    A.   Something else.  For physical.
16    Q.   For a physical.  Okay.
17        And you're not sure whether or not
18  you told them about the pain in your scrotum which
19  has been going on for years?
20    A.   Yeah.  I'm not remember.
21    Q.   Okay.  Besides there's a possibility
22  that you brought it up but you don't know if you
23  did a few months ago, any other -- anything else
24  for treatment for your scrotum?

Page 126

1    A.   My right eye.
2    Q.   I'm going to get there.  I just want to
3  finish up the one part.
4         For your scrotum, anything else
5  treatment wise?
6    A.   No.
7    Q.   Okay?
8    A.   Not that I recall.
9    Q.   All right.  Now, your -- your right
10  eye.  What's wrong with your right eye?
11    A.   I see white, flight lights, something
12  like that.
13    Q.   Okay.  And when did you first start
14  seeing like white lights or floaters or whatever
15  from your right eye?
16    A.   When I was at Stateville.  The same
17  time I was in the room, it happened too, when
18  Guevara slapped me around.
19    Q.   Okay.  So when he was slapping you
20  across the face, you saw white lights and then --
21    A.   Yeah.
22    Q.   -- you saw them again when you were in
23  Stateville; is that fair to say?
24    A.   It happened at -- it happened in the

Page 127

1  police station, everywhere -- it happened
2  occasionally.
3    Q.   Occasionally.
4    A.   Still happens.
5    Q.   Okay.  Did you receive treatment or
6  make a complaint about seeing these white lights in
7  your right eye when you were in Cook County Jail?
8    A.   Well, they would check, like with eye
9  doctor, they would put some kind of liquid in
10  there.
11    Q.   In Cook County Jail?
12    A.   I don't recall in Cook County Jail, but
13  Stateville, Menard.
14    Q.   So when you were in IDOC, you got
15  eyedrops?
16    A.   Yeah.
17    Q.   Did you ever -- were you ever told that
18  there was something wrong with your eye?
19    A.   When I went to the eye -- to get new
20  glasses, that's what I would tell them, I be
21  experiencing some white lights.  He said, Don't
22  worry about, it's nothing.  So they would -- they
23  would look inside it.  I still experience it, the
24  white lights.

Page 128

1    Q.   Okay.  But so far you've never got a
2  diagnosis of something being wrong with your right
3  eye, correct?
4    A.   No, right.
5    Q.   Okay.  Any other injuries that you --
6  that you associated with what you allege for the
7  beatings by Detective Guevara off and on for hours?
8    A.   Yeah.
9    Q.   What else?
10    A.   My right toe.
11    Q.   Your right toe.  Okay.  When was that
12  injured?
13    A.   In the police station.
14    Q.   Okay.  When?
15    A.   By Detective Halvorsen.
16    Q.   Okay.  By the -- the guy you mentioned
17  before, the blond one with -- wearing the vest,
18  correct?
19    A.   Yeah.
20    Q.   Okay.  And when did he injure your toe,
21  your right toe?
22    A.   I don't remember specific the way it
23  happened, but he came in.  He said, You got to
24  listen to him, he not going to let you go.  And I

Page 129

1  said, I got nothing to do with it.  So he stomp my
2  toe.  He slapped me a few time.
3    Q.   So this man you know as Halvorsen, this
4  blond guy wearing the vest came in, stomped your
5  toe and slapped you as well?
6    A.   Yeah.
7    Q.   Okay.  Was there anybody else in the
8  room when you were -- had your toe stomped and your
9  face was slapped?
10    A.   No.
11    Q.   Okay.  And how many times were you
12  slapped in the face by him at this time?
13    A.   Maybe three times.
14    Q.   Okay.  Was it also this back and forth?
15    A.   Yes.
16    Q.   Both sides of your face with one hand?
17    A.   Yeah.
18    Q.   Okay.  And how many times did he stomp
19  on your toe?
20    A.   Several time.
21    Q.   Okay.  Now, which toe was injured?
22    A.   My right toe.
23    Q.   Your big toe, your little toe?
24    A.   Big toe.

Page 130

1    Q.   Big toe.  Okay.
2         And what injury was inflicted to
3  your big toe?
4    A.   Years later, they say it's a bunion.
5  All those pains that I was suffering over the
6  years, it became a bunion.  That's what they call
7  it.  I had got X-ray there, X-ray of my -- of my
8  left shoulder, X-ray of my back.
9    Q.   Okay.  So stomped on your toe and --
10  have this right, is it fair to say the first time
11  you sought treatment for your toe hurting was when
12  you were in IDOC?
13   A.   Yeah.
14   Q.   After your conviction, after being in
15  Cook County Jail, correct?
16   A.   Correct.
17   Q.   Okay.  And are you saying that, from
18  your understanding of the X-ray of your toe, it
19  said you had a bunion on your big toe?
20   A.   Yeah.
21   Q.   Okay.  Did anyone ever tell you it was
22  from being stepped on or stomped on from 1990?
23   A.   I say that.
24   Q.   You say that.  Okay.

Page 131

1         Okay.  Any other physical injuries
2  you're alleging were inflicted on you when you were
3  in the police station before you gave your
4  confession in this case?
5    A.   Not that I recall at this moment.
6    Q.   Is there some reason why you think you
7  might recall later on additional injuries you
8  received?
9    A.   Yeah.
10   Q.   Okay.  Why is that?
11   A.   Because I -- I get headaches too.
12   Q.   Okay.  So are you saying your headaches
13  are caused from this too?
14   A.   It could be.
15   Q.   Okay.  Well, let's talk about your
16  headaches then.  When did your headaches start?
17   A.   When I was in Cook County.
18   Q.   When you were in Cook County.
19   A.   But they give us Tylenol every day.
20   Q.   And do you still have headaches today?
21   A.   Sometimes.
22   Q.   Sometimes.
23        How often do you have headaches?
24   A.   A few times a week.

Page 132

1    Q.   Okay.  And is it your belief that your
2  headaches that you have a few times a week are
3  caused from being slapped in the face back in 19- --
4  August of 1990?
5    MR. STARR:  Form, foundation, calls for
6  speculation.
7    THE WITNESS:  Yeah.
8  BY MR. ENGQUIST:
9    Q.   Okay.  Have you ever gone to see a
10  doctor claiming that your headaches were caused
11  from being slapped in the face in August of 1990?
12   A.   They just give you Tylenol, ibuprofen.
13   Q.   So I understand you said you have a
14  headache and someone gave you a Tylenol and
15  ibuprofen.
16        What I'm asking is:  Did you ever go
17  to a medical professional, go to a doctor, you
18  know, medical thing at IDOC, and -- and claim that
19  you had headaches from being slapped in the face
20  back in 1990?
21   A.   No.  I never -- I never thought about it.
22   Q.   Okay.  You just thought about it just
23  now?
24   A.   No.

Page 133

1    Q.   You said you "never thought about it."
2    A.   No.  I -- that's what I believe it
3  happened at.
4    Q.   Okay.
5    A.   When the injuries.
6    Q.   Okay.  Any other injuries you believe
7  were inflicted on you prior to you giving your
8  confession to the double murders of the Wiley
9  brothers?
10   A.   No, not that -- not that I remember.
11   MR. ENGQUIST:  Okay.  Now would be a good
12  time if you want to take a break before we move on
13  to the next thing.
14   THE VIDEOGRAPHER:  The time is 12:44.  This
15  is the end of Media 4.  We're off the record.
16        (Recess taken.)
17   THE VIDEOGRAPHER:  The time is now 1:24 p.m.
18  the beginning of Media 5.  We're back on the
19  record.
20  BY MR. ENGQUIST:
21   Q.   All right.  Sir, when we took a break,
22  you had just mentioned -- we had gone through those
23  injuries that you alleged, but then you mentioned
24  the next thing that you recall after your toe was

ALFREDO GONZALEZ, 02/07/2023                    Page 134..137

Page 134

1 stomped on, at some point after that that you went
2 for a ride with an assistant state's attorney and
3 Guevara; is that correct?
4    A.   Correct.
5    Q.   Okay.  Just focusing on that, can
6 you -- do you know who this assistant state's
7 attorney was that you went on a ride with?
8    A.   Jennifer Borak (phonetic), I think it
9 was.
10   Q.   Can you describe her?
11   A.   She had kind of long, black hair -- I
12 mean brown hair.
13   Q.   Okay.  Did you speak with her before
14 going on the ride?
15   A.   No.
16   Q.   Okay.  And were you introduced to her
17 before going on the ride?
18   A.   Probably so.  Don't remember.
19   Q.   Do you remember speaking to her at all
20 during the car ride directly?
21   A.   Not direct.
22   Q.   Okay.
23   A.   Not --
24   Q.   Go ahead.

Page 135

1    A.   Not while you were going that way.
2    Q.   One more time?
3    A.   Not while we were going.
4    Q.   Okay.  Not when you were in the car.
5 That's what I'm talking about, just the car period.
6         Okay.  So were you told about going
7 on the ride?  How did that come about?
8    A.   Guevara said they was going to take me
9 to the crime scene.  And I said, I told him, I
10 don't know where it happened at.  So we went to --
11 by Donald Duk's.
12   Q.   Okay.  Now, in the car, was this a
13 police car?
14   A.   Yeah.
15   Q.   Was it the same police car --
16   A.   A detective car.
17   Q.   I'm sorry?
18   A.   Detective car.
19   Q.   Detective car.
20        Was this the same vehicle in which
21 Guevara transferred you to before he drove you into
22 the police station?
23   MR. STARR:  Objection, foundation.
24   THE WITNESS:  I believe so.

Page 136

1 BY MR. ENGQUIST:
2    Q.   Okay.  There was no cage in the back of
3 the car?
4    A.   No.
5    Q.   Correct?
6    A.   No.
7    Q.   Okay.  That -- that's correct, yes?
8    A.   Yes.
9    Q.   Okay.  And who was -- it was you,
10 Detective Guevara, the assistant state's attorney,
11 and was there anybody else in the car.
12   A.   Yeah.  Halvorsen.
13   Q.   Halvorsen, the same blond detective?
14   A.   Yeah.
15   Q.   Okay.  When you were in the car, you
16 know, you -- you said he was going to take you to
17 the scene of the crime, did you -- was it -- did
18 you -- you get asked any questions by any of the
19 occupants of the car while you were driving around
20 in the car?
21   A.   Any what?
22   Q.   Were you asked any questions while you
23 were in the car?
24   A.   I don't recall.  I don't recall.

Page 137

1    Q.   Do you recall talking to anybody while
2 you were in the car?
3    A.   No.
4    Q.   Okay.  Do you remember any
5 conversations at all going on in the car -- while
6 you were in the car other than just driving around
7 your neighborhood?
8    A.   When we got to the parking lot, yeah.
9    Q.   Okay.  So while you were driving, you
10 don't recall any conversations, but --
11   A.   No.
12   Q.   -- then you got to a parking lot?
13   A.   (Nodding.)
14   Q.   Okay.  And what parking lot would this
15 be?
16   A.   Donald Duk's parking lot.
17   Q.   Okay.  And when you got to Donald Duk's
18 parking lot, what happened?
19   A.   He say -- when we got to the parking
20 lot.  He said, Okay, where did the murder happen?
21 I said, It happened right here.  He said, No, it
22 didn't, it happened -- I don't know.  I told you, I
23 got nothing to do with this.  You told me to say
24 parking lot.  I thought that's what you trying to

ALFREDO GONZALEZ, 02/07/2023                    Page 138..141

Page 138

1 tell me. Because he kept saying Donald Duk's,
2 Donald Duk's, Donald Duk's, so I thought that's
3 what he meant for me to say.
4    Q.   Okay. So when you got to the parking
5 lot, did all four of you get out of the car?
6    A.   No.
7    Q.   Who got out of the car?
8    A.   Nobody.
9    Q.   No one got out. Okay.
10        So he parks the car and he asks you,
11 Where did the murder take place, and you said,
12 Here.
13   A.   Yeah.
14   Q.   Did you explain also, just like you
15 just did now, Because you told me where it was, or,
16 I didn't know where it was, you told me Donald
17 Duk's? Did you do that also?
18   A.   Yeah.
19   Q.   Okay. So you indicated then in the car
20 to everybody in the car that you only knew that's
21 where the murder took place because --
22   A.   Guevara --
23   Q.   -- Guevara told --
24   A.   -- was saying it.

Page 139

1    Q.   Okay.
2    A.   Guevara and Halvorsen were saying it
3 happened by Donald Duk's.
4    Q.   Okay.
5    A.   So he got mad.
6    Q.   All right. So "he got mad." "He,"
7 this is Guevara again, correct?
8    A.   Yeah.
9    Q.   So after you said that, that -- that
10 this is where the murder took place because you
11 told me that's where it took place and you knew
12 nothing about it, what's the next thing that
13 occurred?
14   A.   I told that I was innocent, you know
15 I'm innocent.
16   Q.   And then what happened after you said
17 that you were innocent again?
18   A.   He was mad. The state attorney say,
19 Stop the nonsense, something like that.
20       THE COURT REPORTER: I'm sorry, say --
21       THE WITNESS: Stop the nonsense. Because he
22 was arguing with me.
23 BY MR. ENGQUIST:
24   Q.   Oh, stop the nonsense.

Page 140

1    A.   And I told him, I thought that's what
2 you told me to -- I thought that's what you wanted
3 me to say, it happened at Donald Duk's, that's what
4 I say, it happened right here. He said, No, it
5 didn't happen here. Well, I don't know where it
6 happened. I've been telling I'm innocent.
7    Q.   Okay. So this argument's going on in
8 the car with everybody?
9    A.   Everybody in the car.
10   Q.   Okay. And then how long did this
11 conversation go on while you were in the parking
12 lot at --
13   A.   A few minutes.
14   Q.   -- Donald Duk's?
15        Okay. Was anything else said or was
16 it just back and forth of, I'm innocent, and, Stop
17 the nonsense?
18   A.   Well, the state attorney say, Stop the
19 nonsense, let's go, let's go back to the police
20 station.
21   Q.   Okay. Was this the first time you
22 heard the ASA speak?
23   A.   Yeah.
24   Q.   Okay. And that was basically she said,

Page 141

1 Stop the nonsense, let's go back to the -- stop
2 this nonsense, go back to the police station?
3    A.   Something like that.
4    Q.   Okay. And then did you guys go back to
5 the police station?
6    A.   Yeah.
7    Q.   Okay. Was there any conversation
8 conferring while you're driving back to the police
9 station?
10   A.   No, not that I recall.
11   Q.   Okay. So you get back to the police
12 station, and then what happens?
13   A.   He brought me to the interrogation room
14 again.
15   Q.   It was the same one?
16   A.   Yeah, the same room.
17   Q.   And you said we, who went back to
18 the -- who went to the interrogation room?
19   A.   Well, me and Detective Guevara,
20 Halvorsen, but then Halvorsen left.
21   Q.   Okay. When you were brought back to
22 the interrogation room by Detective Guevara and the
23 man you call Halvorsen, were you handcuffed again?
24   A.   Yeah. I was never let out.

ALFREDO GONZALEZ, 02/07/2023      Page 142..145

Page 142

1    Q.   You were never let out?

2    A.   I was always in handcuffs.

3    Q.   Okay. Were you handcuffed to the --

4 back to the wall?

5    A.   Not yet.

6    Q.   Okay. So when you were brought back to

7 the interrogation room, you said that Halvorsen

8 then left?

9    A.   Yes.

10    Q.   And then what happened?

11    A.   So he grab me by the neck, he hit my

12 testicle. And I told him, I thought that's what

13 you wanted me to say, it happened at Donald Duk's.

14 I don't know where it happened at.

15    Q.   Okay. When you said he grabbed you by

16 the neck, was this pinning you to the wall again or

17 was he choking you?

18    A.   Yeah. He was just pinning me up.

19    Q.   Okay. And how many times did he punch

20 you in the testicles?

21    A.   Just one that I recall.

22    Q.   And when you -- and how did he respond

23 to you when you said this is -- that you thought --

24 that's what you thought he was -- you were supposed

Page 143

1 to say?

2    A.   I repeated myself wanting the lawyer.

3 And he said, No lawyer going to help you out.

4    Q.   Okay. And then what happened?

5    A.   He left.

6    Q.   Okay. And then how long were you alone

7 before someone came back?

8    A.   I don't remember.

9    Q.   Did it seem like a long time?

10    A.   Maybe.

11    Q.   So what happens -- what's the next

12 thing you remember happening?

13    A.   Officer coming in and out, checking

14 making -- making sure I wasn't sleeping, sometimes

15 they kick the door.

16    Q.   And then what happened next?

17    A.   That was the time when three detectives

18 walks in.

19    Q.   And?

20    A.   And they tried to tell me to listen to

21 Guevara. And I told them, I'm innocent, I ain't

22 got nothing to do with this. They didn't want to

23 hear it.

24    Q.   Now, these three detectives that you

Page 144

1 said came in, are these the ones you described

2 earlier as the one Hispanic and two white guys?

3    A.   Yeah.

4    Q.   The same guys?

5    A.   The same guys.

6    Q.   All right. And how long was

7 this conversation with these -- with these three

8 detectives?

9    A.   Just a few minutes. They were just

10 telling me to listen to them, that I'll be okay. I

11 said, I'm not going to be okay, I'm not going to do

12 time for something I didn't do.

13     THE COURT REPORTER: Repeat the last part.

14     THE WITNESS: It's not going to be okay. I

15 don't want -- I'm not going to do time for

16 something I didn't do.

17 BY MR. ENGQUIST:

18    Q.   Okay. So after they left, what's the

19 next thing that happened?

20    A.   I believe Guevara came back.

21    Q.   And?

22    A.   He repeating himself that I was

23 supposed to listen to him. And I said, I already

24 told you, I ain't got nothing to do with this. I

Page 145

1 don't know who Jose Maysonet is. I don't know who

2 Rosa Bello is. I don't know which Fro that is.

3 Tino I knew because he my nephew, but I don't think

4 he was there.

5    Q.   Okay. So you denied the murder again

6 and what happens then?

7    A.   He said that -- that I got listen to

8 him. And I told him, I want to talk to a lawyer.

9 He said, I already told you, you're not going to

10 talk to no lawyer, a lawyer can't help you right

11 now because all officer believe that we did the

12 crime, Jose Maysonet, Fro, Tino, and I, that we --

13 that we committed the crime. I said, I ain't got

14 nothing to do with that.

15    Q.   Okay. And so what's the next thing

16 that happened?

17    A.   Then he left.

18    Q.   Okay. And how long were you alone this

19 time?

20    A.   I can't recall.

21    Q.   Did it seem like a long time?

22     MR. STARR: Objection, asked and answered.

23     THE WITNESS: Maybe.

24

ALFREDO GONZALEZ, 02/07/2023                    Page 146..149

Page 146
1 BY MR. ENGQUIST:
2    Q.   Okay.  So then what happened after
3 that?  What's the next thing you recall happening
4 after he left this time?
5    A.   Well, I wasn't allowed to use there
6 washroom.
7    Q.   Did you ask to use the washroom?
8    A.   Yeah, many times.
9    Q.   And who denied you use of the washroom?
10   A.   Everybody that -- that came in.
11   Q.   Okay.  Did you end up urinating or
12 going to the bathroom inside the interrogation
13 room?
14   A.   I urinate myself.
15   Q.   You urinated on yourself?
16   A.   (Nodding.)
17   Q.   Okay.  When did you urinate on
18 yourself?
19   A.   I can't recall what time it was.
20   Q.   Was it before or after you went on the
21 car ride?
22   A.   After.
23        MR. STARR:  Objection, asked and answered.
24        THE WITNESS:  After.  I believe it was after,

Page 147
1 after.
2 BY MR. ENGQUIST:
3    Q.   Okay.  Did you just urinate on yourself
4 or did you also defecate?
5    A.   No.  Just urine, twice.
6    Q.   Okay.  So what happened next?
7    A.   Well, he come in.  When I -- when I
8 first pee on myself.  He got mad.
9    Q.   Okay.  So he gets mad that you urinated
10 on yourself --
11   A.   Yeah.
12   Q.   -- twice?
13   A.   No one time, first, first.
14   Q.   Okay.  So what happened then?
15   A.   And I told him, I've been asking you
16 people to take me to the washroom, nobody listen.
17   Q.   Did you respond?
18   A.   I had to go.
19   Q.   No.  Did -- did Detective Guevara
20 respond when you said you -- explained why you
21 urinated on yourself?
22   A.   Yeah.  He got mad, so, you know, he
23 punched me in my testicle again.
24   Q.   Okay.  So he gets mad and punches you

Page 148
1 in your testicles after you urinated on yourself?
2    A.   Yeah, something like that.
3    Q.   And how many times did he punch you in
4 the testicles this time after you urinated on
5 yourself?
6    A.   Just once.
7    Q.   And after he punched you in the
8 testicles after you urinated on yourself, what
9 happened next?
10   A.   He left.  He was gone for few hours.
11   Q.   And during those few hours, were you
12 alone?
13   A.   Yeah.
14   Q.   And was it during these few hours that
15 you urinated on yourself a second time?
16   A.   I believe so.
17   Q.   Okay.  So you urinate again on yourself
18 after these few hours.  And then after those few
19 hours, what happens next?
20   A.   He come back in.
21   Q.   And the "he" you're talking about is
22 Guevara, correct?
23   A.   Guevara.  He said in for me to do less
24 time, to listen to him.  And I told him, I want my

Page 149
1 lawyer.  I repeated asked for my lawyer, Marty
2 Abrams, many occasion.  He said, No, you're not
3 going to get no lawyer.
4    Q.   Okay.  And then what happened next?
5    A.   Then he left.
6    Q.   And how long was he gone this time?
7    A.   I don't remember.  I know he came back.
8    Q.   Okay.  And when -- when Detective
9 Guevara came back, what happened next?
10   A.   He brought some clothes, some fish
11 sandwich.
12   Q.   When you said "he brought some
13 clothes," what clothes did he bring?
14   A.   My clothes.
15   Q.   So what clothes were there?  Was there
16 a change of underwear, socks, pants?
17   A.   Just pair of pants and like a sweater.
18   Q.   And you said he brought pants, sweater,
19 and you said -- did he bring food as well?
20   A.   Yeah.
21   Q.   Okay.  What did he bring you food wise?
22   A.   Fish sandwich.  But that was my
23 clothes.
24   Q.   Okay.

ALFREDO GONZALEZ, 02/07/2023                    Page 150..153

Page 150

1      A.   I asked him, How you got this?  He
2  said, Your family's downstairs.  Family brought my
3  clothes and fish sandwiches, two of them.
4      Q.   Okay.  And did he let you have the fish
5  sandwich?
6      A.   I tell him that -- since he was saying
7  that Tino was there, to take one to him.  He said
8  Tino didn't want none.
9      Q.   Okay.  So did you eat a fish sandwich?
10     A.   Just one.
11     Q.   Okay.  What happened to the other one?
12     A.   He took it.
13     Q.   Okay.  And did you change your clothes?
14     A.   Yeah.
15     Q.   Did he unhandcuff you so you could
16  change your clothes?
17     A.   Yeah.
18     Q.   So did he unhandcuff you, then he
19  waited for you to change?
20     A.   Yeah.
21     Q.   Okay.  So did you change your pants?
22     A.   Yeah.
23     Q.   Okay.  Did you take off your wet
24  underwear or leave those on?

Page 151

1      A.   Yeah.
2      Q.   You took those off too?
3      A.   I don't know what he did with the
4  clothes, but they never appears.
5      Q.   Okay.  So just to be clear, you took
6  off your wet pants and your wet underwear, correct?
7      A.   Yeah.  That I remember, yeah.
8      Q.   And you put on your new pants.  Okay.
9  Right?
10     A.   Yeah.
11     Q.   And then you -- you put on you said a
12  sweater or something, correct?
13     A.   Yeah.  Kind of -- kind of like a
14  sweater.
15     Q.   Okay.  And what did you have on before
16  then?
17     A.   I think it was a corona (phonetic)
18  suit, not -- not sweatsuit kind of -- kind of
19  thing.  It wasn't, you know, real thick.  It was
20  just --
21     Q.   Like a T-shirt or a shirt or --
22     A.   Kind of like a T-shirt.
23     Q.   Okay.  And after you changed your
24  clothes, did you say Guevara took your wet clothes

Page 152

1  away?
2      A.   Yeah.
3      Q.   Did you ever find out what happened to
4  your wet clothes?
5      A.   He told me he will give it to the
6  family, but he never did.
7      Q.   Did you ask your family about it?
8      A.   Yeah.
9      Q.   Okay.  Do you know why your family
10  brought you a change of clothes?
11     A.   Because they were calling numerous
12  time.
13     MR. STARR:  Belated objection to form,
14  foundation, calls for speculation.
15  BY MR. ENGQUIST:
16     Q.   Okay.  Who told you they had called
17  numerous times?
18     A.   My family told me.
19     Q.   Okay.  Do you remember who in your
20  family told you about that?
21     A.   Yeah.
22     Q.   Who?
23     A.   My sister.
24     Q.   Which sister?

Page 153

1      A.   Carmen Sanchez.
2      Q.   Were they told to bring clothes?
3      A.   Yeah.
4      Q.   And do you remember who she said she
5  spoke to?
6      A.   No.
7      Q.   All right.  So after you changed your
8  clothes and eat your fish sandwich, what's the next
9  thing that occurred?
10     A.   What was the question?
11     Q.   After you have your fish sandwich and
12  change your clothes, what's the next thing you
13  remember occurring?
14     A.   He wanted me to listen to him.  He was
15  coaching me how the crime happened.
16     Q.   Okay.  How long was Detective Guevara
17  telling you about the crime?
18     A.   Over and over and over.
19     Q.   I understand you're saying over and
20  over and over.  How long was this over and over and
21  over again when he was telling you about the crime?
22     A.   It could have been a few hours.
23     Q.   And what did he tell you about the
24  crime?

ALFREDO GONZALEZ, 02/07/2023                    Page 154..157

Page 154

1      A.   That he say it happened on North Avenue
2  and St. Louis.  And I told him:  I don't know where
3  it happened at.  I already -- you already took me
4  to Donald Duk's.  I already say happened in parking
5  lot and you say didn't happen there.  I don't know
6  where it happened at.
7      Q.   So did he tell you where it happened?
8      A.   Yeah.
9      Q.   Okay.  And did you -- do you know --
10 did you know that location?
11     A.   Yeah.
12     MR. STARR:  Objection, foundation.
13          Go ahead.
14     THE WITNESS:  Yeah.  I lived through there.
15 BY MR. ENGQUIST:
16     Q.   And how close is that to where the
17 Donald Duk's parking lot is?
18     A.   Not too far, I guess.
19     Q.   Okay.  Do you know why Guevara took you
20 and the state's attorney to the Donald Duk's
21 parking lot if the murder did not take place there?
22     MR. STARR:  Form, foundation, calls for
23 speculation.
24     THE WITNESS:  No clue.

Page 155

1  BY MR. ENGQUIST:
2      Q.   Okay.  Did Detective Guevara tell you
3  that you should say that you did not commit the
4  murder, that you were just there?
5      A.   No.  He just kept saying that everybody
6  said that I did it.
7      MR. STARR:  Objection to form.
8  BY MR. ENGQUIST:
9      Q.   Okay.  Did he tell you to say that you
10 did not commit the murder, but were present when
11 the murder occurred?
12     MR. STARR:  Objection, asked and answered.
13     THE WITNESS:  He just kept saying that they
14 said I did it.
15 BY MR. ENGQUIST:
16     Q.   I understand that he -- he told you
17 that he said that -- that the other people said
18 that you did it.
19          What I'm asking you, though, is did
20 Detective Guevara tell you to admit being present
21 for the murders but not committing the murders?
22     A.   Yeah.
23     Q.   Okay.  Was anybody else present during
24 these couple hours or these -- or the few hours you

Page 156

1  said that he was telling you what to say?
2      A.   No.
3      Q.   Okay.  And what happened after the few
4  hours?
5      A.   He kept on coaching me.  I kept asking
6  for a lawyer over and over and over.  I never seen
7  a lawyer.  I was scared.  I was scared for my life.
8  He mentioned my family, they were going to be
9  interrogated, violated too, what he's saying.
10     Q.   When did he threaten your family?
11 When?
12     A.   I don't remember exact time.
13     MR. STARR:  Objection; form, foundation
14 speculation.
15 BY MR. ENGQUIST:
16     Q.   It was during these few hours that he
17 was telling you what to say?
18     A.   Yes.
19     Q.   Okay.  So after these few hours where
20 he was telling you to say that you did not commit
21 the murder but were present for it and talked to
22 you about that, what's the next thing that
23 occurred?
24     MR. STARR:  Objection; form, foundation

Page 157

1  mischaracterizes his testimony.
2      THE WITNESS:  Well, I was afraid with my
3  life.  I was afraid that would implicate my family
4  too.
5  BY MR. ENGQUIST:
6      Q.   Okay.  So what's the next thing that
7  happened, sir?
8      A.   I decide to listen to him.
9      Q.   Okay.  So what's the next thing that
10 occurred, sir?
11     A.   He coach me where -- where did it
12 happen at.  So I did what he say.
13     Q.   What's the next thing that happened,
14 sir?
15     A.   He say it happened on the -- he say to
16 say that I was in the car, that I was in the back
17 seat, Tino was there, Fro, and Juan was in the
18 front.
19     Q.   Sir, what's the next thing that
20 happened?  Did you give a statement?
21     A.   Yeah.
22     Q.   Okay.
23     MR. STARR:  He's answering your question.
24     MR. ENGQUIST:  No, he wasn't.

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                          Page 158..161

Page 158

1    MR. STARR:  Yes, he was.
2    THE WITNESS:  Yes, I was.
3    MR. STARR:  I mean, he -- you asked him
4 what's the next thing that happened, he said
5 Guevara said X, Y, and Z.
6    MR. ENGQUIST:  I said after he told you that,
7 what's the next thing that happened.  That's what
8 I've been going at.  I'm sorry if --
9    MR. STARR:  You said yourself the next --
10 what's the next thing that happened.  I get it,
11 but five -- five times you said what happened next.
12 You didn't say what happened after he was done
13 coaching you.  You said --
14    MR. ENGQUIST:  I --
15    MR. STARR:  -- something.  I said
16 mischaracterizes his testimony.  And then you said
17 what happened next.
18 BY MR. ENGQUIST:
19    Q.    Did anyone else supposedly coach you
20 into what to say other than Detective Guevara?
21    A.    That I recall, only Guevara.
22    Q.    Okay.  Where did you go and give your
23 statement?
24    A.    In a different room.

Page 159

1    Q.    Okay.  Did --
2    A.    But before that --
3    Q.    Okay.  Before you gave your statement,
4 what happened?
5    A.    He took me to a lineup.
6    Q.    To a lineup?
7    A.    Yeah.
8    Q.    Okay.  And did you recognize anybody
9 else -- no.  I'm assuming you were a participant in
10 the lineup, not viewing the lineup, correct?
11    MR. STARR:  Objection to form.
12    THE WITNESS:  Just me.
13 BY MR. ENGQUIST:
14    Q.    What do you mean just you?
15    A.    Just me in the -- in the lineup.
16    Q.    It was just in a lineup room?
17    A.    (Nodding.)
18    Q.    Okay.  Do you know if anybody -- if
19 there were any witnesses viewing you?
20    A.    I don't know.
21    Q.    Were you told to stand up and move
22 around or turn or anything?
23    A.    Yeah.
24    Q.    Who was the person -- was Detective

Page 160

1 Guevara in the room with you?
2    A.    Not that I recall.
3    Q.    Then who was in the room with you
4 telling you to stand up or sit down or turn?
5    A.    I don't know who it was.
6    Q.    Okay.  Someone that you never met
7 before?
8    A.    He must have been behind, behind the --
9 the glass or whatever you call that.
10    Q.    So were you in the room behind the
11 glass by yourself?
12    A.    Yeah.
13    Q.    No one was in there with you?
14    A.    No.
15    Q.    Okay.  And where was the voice coming
16 from telling you to turn or whatever?
17    A.    I guess through a speaker.
18    Q.    Okay.  And was it Detective Guevara's
19 voice or somebody else's?
20    A.    I have no clue.
21    Q.    Okay.  And how long did this take place
22 where you were in what you called a lineup room by
23 yourself taking directions?
24    MR. STARR:  Objection to form.

Page 161

1    THE WITNESS:  Maybe a few minutes.
2 BY MR. ENGQUIST:
3    Q.    Okay.
4    A.    Went back to the room.
5    Q.    Who took you back to the room?
6    A.    Guevara.
7    Q.    Okay.  Was this the first time you were
8 every in a lineup?
9    A.    No, second time.
10    Q.    Second time.  When was the first time?
11    A.    The first time before that -- before I
12 got -- what you mean, the same night or before?
13    Q.    You said this was the second time you
14 were in a lineup.
15    A.    Yeah.
16    Q.    A lineup of one, just you, correct?
17    A.    First I went in, he took me back to the
18 room.  Took me back the second time, somebody hit
19 the window.
20    Q.    Okay.  So you stood in the lineup room
21 two times that night; is --
22    A.    Yes.
23    Q.    -- that correct?
24    A.    Correct.

ALFREDO GONZALEZ, 02/07/2023                     Page 162..165

Page 162

1    Q.   The first time you went there, you were
2  in the room by yourself, a voice through the
3  speaker told you to turn or stand up?
4    A.   Yeah.
5    Q.   Then you were taken back to the same
6  interrogation room by Detective Guevara, correct?
7    A.   Like a minute, two minute, took me
8  back.
9    Q.   And then he took you -- then Detective
10  Guevara took you back to the same lineup room?
11   A.   He said that they had a witness.
12   Q.   Okay.  Were you by yourself?
13   A.   Yeah.
14   Q.   Okay.  And you were in the room by
15  yourself and this time someone knocked on the
16  window.
17   A.   (Nodding.)
18   Q.   Is that correct?
19   A.   Yes.
20   Q.   Okay.  And what happened after someone
21  knocked on the window?
22   A.   Took me back to the room.  I started
23  crying.  He said:  Look at you, big baby.  When you
24  in the street, you act tough, now you over here

Page 163

1  crying like a baby, like a big baby.
2       And I told him:  I'm crying because
3  you want me to confess to something I ain't got
4  nothing to do with.  I didn't commit this crime.
5    Q.   And this was after you already agreed
6  to give your statement; isn't that correct?
7    A.   No.  Before.
8    Q.   Okay.  This is before, but this is
9  after all the coaching?
10   A.   Yeah.
11   Q.   Okay.  So after you cry and he tells
12  you that you've been -- did he tell you you were
13  picked out?
14   A.   Yeah.
15   Q.   Okay.  What happened next?
16   A.   He said, Just listen to me; I'm going
17  to keep coaching you.  And I said, No, I ain't got
18  nothing to do with this; I want my lawyer.  I
19  repeatedly asked for my lawyer over and over and
20  over and he kept saying, No, you're not going to
21  get a lawyer.
22   Q.   Okay.  After he told you he was not
23  going to get you a lawyer and he was going to
24  continue to coach you, what's the next thing that

Page 164

1  happened?
2    A.   He was going to implicate my family if
3  I didn't listen to him.
4    Q.   Okay.  Who in your family was he going
5  to implicate?
6    A.   The mother of my kids and my sister,
7  that he told me that was still downstairs.
8    Q.   Okay.  And who is --
9    A.   I don't know where.
10   Q.   Who is the mother of your kids that he
11  said he was going to implicate?  What's her name?
12   A.   Maria.
13   Q.   And, I'm sorry, did you give me Maria's
14  last name before?
15   A.   Well, she got married, so now it's
16  Perez, but before that I forgot -- Cintron, I think
17  it was.
18       THE COURT REPORTER:  I'm sorry?
19       THE WITNESS:  Cintron.
20  BY MR. ENGQUIST:
21   Q.   Cintron?
22   A.   (Nodding.)
23   Q.   And which -- and your sister Carmen?
24   A.   Carmen Sanchez.

Page 165

1    Q.   Okay.  Did he tell you how he was going
2  to implicate your mother of your child and your
3  sister Carmen in the murders of the Wiley brothers?
4    A.   He said he's going to do the same thing
5  he did me, torture them.
6    Q.   Did he say, I'm -- I'm going to torture
7  them?
8    A.   Yeah.
9    Q.   Okay.  And then after Detective Guevara
10  said that he was going to torture the mother of
11  your child and your sister Carmen, what happened
12  next?
13   A.   That's when I decided to listen to him.
14   Q.   Okay.  So that's when you decided that
15  you were going to give the statement?
16   A.   I couldn't allow -- I couldn't let it
17  happen to my family.
18   Q.   Okay.
19   A.   I already knew what I was going
20  through.  I was scared with my life they were going
21  to kill me right there.
22   Q.   Okay.  So after you tell him that yes,
23  now you're going to give a statement, what happened
24  next?

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                    Page 166..169

Page 166

1    A.   He kept on coaching me.
2    Q.   Okay.  So when he kept on coaching you,
3  how long was this coaching session?
4    A.   I don't recall how long it was.
5    Q.   Did it go on for a long time again?
6    MR. STARR:  Objection, asked and answered.
7    THE WITNESS:  I guess.
8    MR. STARR:  Don't speculate.
9  BY MR. ENGQUIST:
10   Q.   Okay.  And what happened after this --
11 this coaching session, this second coaching
12 session?
13   A.   What was the question?
14   Q.   What happened after the second coaching
15 session?
16   A.   I just said what I wanted me to say.
17   Q.   Okay.  Did you go to a different room?
18   A.   Yeah.
19   Q.   Were you handcuffed in that room?
20   A.   Yeah.
21   Q.   Okay.  Were you handcuffed during --
22 when you gave your statement?
23   A.   Yeah.
24   Q.   Who else was in the room when you gave

Page 167

1  your statement?
2    A.   The lady Jennifer.
3    Q.   The same state's attorney that was in
4  the car with you when you went to Donald Duk's,
5  correct?
6    A.   Yep, same one.
7    Q.   Okay.  And do you remember a court
8  reporter being in there?
9    A.   Yeah.
10   Q.   Okay.  Were your wrists at all damaged
11 or hurt when you're -- from wearing the handcuffs
12 during this period of time?
13   A.   Yeah.  There was a time where he gave
14 me a -- Styrofoam cup of water.
15   Q.   I'm sorry, what?
16   A.   He gave me a cup of water, a Styrofoam
17 cup.
18   Q.   A Styrofoam cup.  Okay.
19   A.   He took the handcuffs off.  That's when
20 I noticed they were all bruised up.
21   Q.   Okay.  Both wrists were bruised up?
22   A.   Yeah.
23   Q.   Okay.  And then was there anything
24 between the second coaching session and giving your

Page 168

1  court-reported stated?
2    A.   Yeah.
3    Q.   What?
4    A.   I heard him saying, The fingerprints
5  not his.
6    Q.   You heard who saying?
7    A.   Guevara talking to somebody in the
8  hallway.
9    Q.   Did you ever ask him what that was
10 about?
11   A.   Not really.
12   Q.   Do you know whether or not like a
13 murder weapon was ever recovered in this case?
14   A.   I never heard about it.
15   Q.   Do you know what fingerprints he could
16 have been talking about?
17   MR. STARR:  Objection, calls for speculation.
18   THE WITNESS:  No.
19   MR. ENGQUIST.  Okay.  This is Exhibit
20 Number 1.
21        (Deposition Exhibit No. 1,
22         Witness Gonzalez, was marked
23         for identification 02/07/2023.)
24   MR. STARR:  Before we look at the exhibit,

Page 169

1  can we take another bathroom break?
2    MR. ENGQUIST:  Sure.
3    THE VIDEOGRAPHER:  The time is 1:59.  This is
4  the end of Media 5.  We're off the record.
5        (Recess taken.)
6    THE VIDEOGRAPHER:  The time is now 2:06 p.m.
7  This is the beginning of Media Unit 6.  We're back
8  on the record.
9  BY MR. ENGQUIST:
10   Q.   All right.  Sir, I'm going to show you
11 what's been marked as Exhibit Number 1.  And just
12 for identification, it's been talked about earlier,
13 it's also Bates stamped CCSAO 727 through 736.
14 It's right in front of you.  It's your
15 court-reported statement, sir.
16        Sir, is this -- this is one of the
17 documents you reviewed during one of those many
18 prep meetings you had with your attorney, correct?
19   A.   Yeah.
20   Q.   Okay.  When's the last time you went --
21 went through this?
22   A.   Last week, few days ago.
23   Q.   Okay.  If we can to the -- the first
24 page of your statement, which is -- the number on

ALFREDO GONZALEZ, 02/07/2023                          Page 170..173

Page 170

1 the bottom is 730, where the words starts, where it
2 says, Investigation, (Fatal shooting of Torrence
3 Wiley and Kevin Wiley) at the top, then it says
4 Statement.  The first page is the statement, sir.
5 Yes.  We can to that -- that one right there.
6     A.  Yeah.
7     Q.  Okay.  It says here in the very top of
8 it that this was taken on Friday, August 24th at
9 2:00 o'clock in the morning.  Do you see that?
10    A.  Yeah.
11    Q.  Okay.  Was that -- is that correct,
12 sir, that was taken at that time and date?
13    MR. STARR:  Objection; calls for speculation,
14 foundation.
15    THE WITNESS:  I suppose.
16 BY MR. ENGQUIST:
17    Q.  Okay.  The opening part -- do you
18 remember the court reporter being there, sir?
19    A.  Yeah.
20    Q.  Okay.  This Janet Lupa, do you remember
21 being introduced to her at all?
22    A.  No.
23    Q.  Okay.  Do you remember what she looked
24 like at all?

Page 171

1     A.  No.
2     Q.  Okay.  Other than being asked these
3 questions in front of the court reporter and giving
4 these response, was there any other conversations
5 in front of the court reporter?
6     MR. STARR:  Objection, calls for speculation.
7     THE WITNESS:  Not that I recall.
8 BY MR. ENGQUIST:
9     Q.  Okay.  When you came in the room to
10 give this court-reported statement, were you given
11 the option of either having a court-reported
12 statement or a handwritten statement or a different
13 way to give a statement?
14    A.  Yeah.
15    Q.  Okay.  And who asked you about that,
16 was that the ASA?
17    A.  Yeah.
18    Q.  Okay.  Did she ask you that right
19 before the statement started or sometime earlier
20 did she ask you about how you wanted to record your
21 statement?
22    A.  I think before.
23    Q.  Before.  When was that?  Would that be
24 in the car?

Page 172

1     A.  No.  In the -- in the -- when it was
2 time to -- for the statement.
3     Q.  Okay.  When you came into the separate
4 room with the court reporter, is that when the
5 assistant state's attorney asked you how you wanted
6 to record it?
7     A.  Yeah.
8     Q.  Okay.  And you agreed to have it done
9 by a court reporter; is that correct?
10    A.  I don't recall.
11    Q.  Okay.  Well, let's kind of walk through
12 this.
13        You remember Detective Guevara being
14 in the room as well?
15    A.  Yeah.
16    Q.  Okay.  And where was he sitting, do you
17 remember?
18    A.  No.  Next -- next -- I mean, it was a
19 small room.
20    Q.  Okay.
21    MR. STARR:  You need to stop speculating.
22 He's not asking you to speculate.  If he asks you
23 to speculate, he'll tell you.  You need to stop
24 saying I guess and guessing.  Answer his questions.

Page 173

1 If you don't know the answers, you don't have to
2 answer them.
3 BY MR. ENGQUIST:
4     Q.  Sir, let me just kind of go back.
5        When you were in the car with the
6 ASA, you were in the back seat, correct?
7     A.  Correct.
8     Q.  Who was in the back seat with you?
9     A.  Halvorsen.
10    Q.  Okay.  And so Guevara and state's
11 attorney would be in the front seat?
12    A.  Yeah.
13    Q.  Okay.  All right.  So let's just go
14 back to when this statement was being taken here.
15        Okay.  You read through this before
16 today and so I just kind of want to ask you, do you
17 have any doubt that these were the questions being
18 asked and the answers being given on that day?
19    A.  Yeah.
20    Q.  Are you saying that there was something
21 else said or something different that was said that
22 wasn't recorded properly?
23    MR. STARR:  Speculation.
24    THE WITNESS:  I don't know.

ALFREDO GONZALEZ, 02/07/2023                    Page 174..177

Page 174

1      MR. STARR:  Foundation.
2      THE WITNESS:  I don't know.  I'm not looking
3 at it.
4 BY MR. ENGQUIST:
5      Q.   Sir, you reviewed this in preparation
6 for your dep.
7      A.   Yeah.
8      Q.   Okay.  When you reviewed this, did you
9 find anything in there saying that, No, that was
10 never said?
11     A.   Yeah, the -- I don't remember signing
12 this.
13     Q.   You don't remember signing this?
14     A.   The initials, AG.
15     Q.   Okay.  Is that your handwriting, sir?
16     MR. STARR:  Where are you talking about?
17     THE WITNESS:  The AG.
18 BY MR. ENGQUIST:
19     Q.   What page are you on, sir?
20     A.   Page 2.
21     Q.   Okay.  On page 2, is that your
22 handwriting where the AG is?
23     A.   I don't -- I don't recall signing that.
24     Q.   Okay.  That wasn't my question, sir.

Page 175

1 My question is that your handwriting?
2      A.   No.
3      Q.   You think that's someone else's
4 handwriting?
5      A.   Yeah.
6      Q.   Okay.  Well, let's look at page 1, sir,
7 if you can go back to page 1.  If you want to take
8 time to read it again, you can.  Page 1 of the
9 statement.  Okay.  On the very bottom there, there
10 are three names written, Alfredo Gonzalez,
11 handwritten in; Jennifer Borowitz; and Detective,
12 looks like Reynaldo Guevara and has the kind of
13 Bates stamp across it.
14          Did you write in your name there?
15 Is that your handwriting?
16     A.   Yeah.
17     Q.   Alfredo Gonzalez?
18     A.   Yeah.
19     Q.   Okay.  On page 2 on the bottom, is that
20 your handwriting that says Alfredo Gonzalez?
21     A.   I'm not sure about the signing.
22     Q.   Excuse me, what?
23     A.   I'm not sure about the signing.
24     Q.   Okay.  That's not what I'm -- we'll get

Page 176

1 to that point, sir.
2          Did you -- is that your handwriting?
3      A.   Yeah.
4      Q.   Okay.  On page 3, is that your
5 handwriting on that page as well?
6      A.   Yeah.
7      Q.   Do you know if that's your AG on the
8 correction?
9      A.   No.
10     Q.   Over glue to blue.
11     A.   No.
12     Q.   You don't -- you think that's not your
13 handwriting?
14     A.   It's different.
15     Q.   Okay.  On page 4, is that your
16 signature on the bottom?
17     A.   Yeah.
18     Q.   On page 5, is that your signature on
19 the bottom?
20     A.   Yes.
21     Q.   On page 5, are you also saying that the
22 AG on the correction is not you?
23     A.   No, I don't think so.
24     Q.   Okay.

Page 177

1      A.   I don't recall signing it.
2      Q.   Okay.  On page 6, is that your
3 signature on the bottom, sir?
4      A.   Yes.
5      Q.   And there are a couple different spots
6 where the AG -- where there's corrections next to
7 JB.  Is that your AG, sir, on page 6?
8      A.   No, I don't recall that.
9      Q.   Okay.  And on page 7, is that your
10 signature on the bottom, sir?
11     A.   Yeah.
12     Q.   Okay.  And do you recall whether or not
13 those are your AGs there?
14     A.   No.
15     Q.   Okay.  Other than what's recorded here
16 by the court reporter, was anything else said
17 during this question-and-answer period with ASA
18 Borowitz?
19     MR. STARR:  Objection to form.
20     THE WITNESS:  Any what?
21 BY MR. ENGQUIST:
22     Q.   Was anything else said that's not
23 recorded here during this question-and-answer
24 period with ASA Borowitz?

ALFREDO GONZALEZ, 02/07/2023

Page 178..181

Page 178

1    A.   I don't think so.
2    Q.   Whether it's true or not, sir, do you
3  agree that you gave the answers that are listed
4  here in this statement, sir?
5    A.   Yeah.
6    Q.   Okay.  So did you not give these
7  answers or did you give these answers?
8    A.   I did.
9    Q.   Okay.  And you're saying these are the
10 answers that were given to you by Detective
11 Guevara; isn't that correct?
12   A.   Yes.  I was coached by Detective
13 Guevara?
14   Q.   Okay.  Do you know where you were on
15 May 24th, 1990 between 11:30 and midnight?
16   A.   Yeah.  I was at home.
17   Q.   Okay.  When you were at home, who were
18 you at home with?
19   A.   With the mother of my kids and my
20 little -- and my youngest sister-in-law.
21   Q.   So you were home with Maria and who?
22   A.   My two kids and her little sister.
23   Q.   Okay.  And how old were your two kids
24 then back in 1990?

Page 179

1    A.   Like 7 and 5, I believe.
2    Q.   And how old was the mother of your
3  children's sister?
4    A.   She was young, maybe 13, 14.
5    Q.   Okay.  And what were you doing at your
6  house on May 24th, 1990 between 11:30 and midnight?
7    A.   I went to stay over there for a few
8  days.
9    Q.   I'm sorry.  Whose house were you at?
10   A.   I stay at my mother's house sometimes
11 and I stay at her house sometime.
12   Q.   Okay.  So you're saying on May 24th,
13 1990, you were staying at your girlfriend's house?
14   A.   Yeah.
15   Q.   Okay.  And, I'm sorry, you may have
16 mentioned this before and if you did I just can't
17 find it, but do you remember where she lived back
18 in 1990?
19   A.   Kedzie and -- Kedzie and Hirsch.
20   Q.   Okay.  Was that a house or an
21 apartment?
22   A.   Apartment.
23   Q.   Do you remember the apartment number?
24   A.   Nope.

Page 180

1    Q.   Do you remember what floor it was on?
2    A.   Second.
3    Q.   Okay.  Were you awake at 11:30 or
4  midnight?
5    A.   Yeah.
6    Q.   Okay.  Do you remember what you were
7  doing when you were there at that time?
8    A.   I was going on Santiago Sanchez
9  funeral.
10   Q.   You had gone to his funeral or you were
11 going to --
12   A.   I was going on a Friday, the next day.
13   Q.   Okay.  Do you know what you were doing
14 that night, though, before?
15   A.   No.
16   Q.   Okay.  So just to be clear, according
17 to you, you had an alibi of your babies' mother of
18 your two kids and your babies' mother sister,
19 correct?
20   A.   Yeah.
21   Q.   Did you ever tell anybody that you had
22 an alibi for that night?
23   A.   Yeah.
24   Q.   Who?

Page 181

1    A.   My lawyer.
2    Q.   Which lawyer?
3    A.   David Wiener.
4    Q.   Did you tell -- oh, Cohen, your
5  Attorney Cohen as well?
6    MR. STARR:  Objection.  I'm going to object
7  on the attorney/client privilege and instruct him
8  not to answer that question regarding conversations
9  he had with his attorneys.  His conversations --
10 communications with David Wiener have already
11 become a subject of his post-conviction petition.
12        And so I'll allow him to talk about
13 those communications regarding his testimony and
14 what he told David Wiener regarding his criminal
15 defense, but other communications with attorneys,
16 we're not going to waive that privilege.
17 BY MR. ENGQUIST:
18   Q.   Okay.  So are you going to take your
19 attorneys advice and not talk -- and not testify as
20 to what you told any other attorneys other than
21 David Wiener; is that correct?
22   A.   Yeah, correct.
23   Q.   Okay.
24   MR. STARR:  And just so we're clear, I'm

ALFREDO GONZALEZ, 02/07/2023                    Page 182..185

Page 182

1 going to allow him to answer questions regarding
2 what he told David Wiener in preparation for his
3 testimony.
4        MR. ENGQUIST: Well, I guess we'll cross that
5 bridge when we get there.
6        MR. STARR: Sure.
7 BY MR. ENGQUIST:
8     Q.   Okay. Did you tell any members of your
9 family that you had an alibi for the night of the
10 murders?
11       MR. STARR: Objection; form, foundation,
12 calls for speculation.
13           You can answer.
14       THE WITNESS: Yeah.
15 BY MR. ENGQUIST:
16    Q.   Who?
17    A.   My sister.
18    Q.   Which one?
19    A.   My oldest.
20    Q.   Can you spell the first name, please?
21    A.   Carmen Sanchez.
22    Q.   Oh, Carmen Sanchez.
23           Okay. Anybody else in your family
24 that you told about the alibi?

Page 183

1     A.   Not that I recall.
2     Q.   Did you ever tell Detective Guevara
3 that you had an alibi for that day?
4     A.   I don't recall.
5     Q.   Did you ever tell any of the officers
6 that night about the alibi you had for the night of
7 the murder?
8     A.   No, I don't recall.
9     Q.   Did you ever tell ASA Borowitz about
10 your alibi for the night of the murder?
11    A.   I don't recall.
12    Q.   Did your girlfriend Maria testify for
13 you at trial?
14    A.   Yeah.
15    Q.   Did she testify about the alibi?
16    A.   I don't recall.
17    Q.   Did Maria's sister testify for you at
18 trial?
19    A.   No, I don't think so.
20    Q.   When you told David Wiener about your
21 alibi, did he tell you about whether or not --
22 whether or not you were going to use the alibi at
23 trial?
24    A.   What was the question?

Page 184

1     Q.   You said you told David Wiener, your
2 criminal defense attorney, about the alibi,
3 correct?
4     A.   Yeah.
5     Q.   Okay. Did he tell you whether or not
6 you were going to be using the alibi at trial as
7 part of your defense?
8        MR. STARR: Again, this is subject to the
9 attorney/client privilege, but I'll allow him to
10 testify about this particular subject.
11       THE WITNESS: He really didn't look into it.
12 BY MR. ENGQUIST:
13    Q.   Do you know whether or not Maria spoke
14 to David Wiener prior to your trial?
15    A.   I believe so.
16    Q.   Did Maria ever fell you about her
17 conversations with David -- David Wiener?
18    A.   Some of it.
19    Q.   What did she tell you about her
20 conversation with David Wiener?
21    A.   She told him that -- that I was
22 innocent, that I was framed.
23    Q.   And did she tell you what David Wiener
24 said in response?

Page 185

1     A.   No.
2     Q.   Did you know Jose or as you refer to
3 him sometimes as Juan to own a weapon?
4        MR. STARR: Objection; form, foundation,
5 mischaracterizes prior testimony. He said he only
6 knew him as Juan. He didn't say he referred to him
7 sometimes as Juan.
8        MR. ENGQUIST: Okay.
9        MS. BONJEAN: I'm also going to object to the
10 extent on form and foundation.
11       MR. STARR: I'll join that.
12 BY MR. ENGQUIST:
13    Q.   Did you answer the question, sir?
14    A.   I only know him by Juan.
15    Q.   Okay. Did you ever know Juan to own a
16 weapon?
17    A.   No.
18    Q.   Okay. Did you ever know Tino to own a
19 weapon?
20    A.   No.
21    Q.   How about Fro?
22    A.   No.
23    Q.   Okay. Anybody in your set you know to
24 own a weapon?

Page 186

```
 1       MR. STARR:  Objection; form, foundation,
 2 speculation.
 3       THE WITNESS:  I don't know.
 4       MS. BONJEAN:  Join.
 5 BY MR. ENGQUIST:
 6       Q.   Sir, just to be question clear, are
 7 you -- are you saying -- are you now saying that
 8 all the details in here about being picked up by
 9 the Latin Kings in your set and being driven to a
10 location and then committing a murder, that was all
11 details fed to you by Detective Guevara; is that
12 your --
13       A.   Yes.
14       Q.   Okay.
15       MR. STARR:  And just for the record, when you
16 say "in here," you're referring to his statement,
17 correct?
18       MR. ENGQUIST:  Yes.
19       MR. STARR:  Okay.
20 BY MR. ENGQUIST:
21       Q.   If you can go to the last page of the
22 statement, page 7.
23       A.   Yeah.
24       Q.   If you look -- it's near the top
```

Page 187

```
 1 middle-ish part.  It's underneath the crossed-out
 2 section.  The question is:  "While you have been
 3 here, have the police treated you okay?"
 4            "Answer:  Yeah, they treated me
 5 all right.
 6            "Did they give you food?"
 7            "Yeah."
 8            Were you told to say those things, sir?
 9       A.   Yeah, by Detective Guevara.
10       Q.   Okay.  And the follow up is:  "What did
11 they give you?"  You have:  "Balcony sandwich,
12 coffee, sandwich, fish sandwich."  You see that?
13       A.   That's the fish sandwich.
14       Q.   Okay.
15       A.   That my family --
16       MR. STARR:  Freddy, just answer his
17 questions.
18 BY MR. ENGQUIST:
19       Q.   Do you see there where you responded,
20 "Balcony sandwich, coffee, sandwich, fish
21 sandwich?"  Do you see that?
22       A.   Yeah.
23       Q.   Okay.  And you already testified
24 earlier that you did have a fish sandwich that your
```

Page 188

```
 1 family brought you.
 2            The balcony sandwich, was that true?
 3 Did you have a baloney sandwich that night?
 4       A.   Not true.
 5       Q.   That's not true.
 6            The coffee, is that true?
 7       A.   Not true.
 8       Q.   The other sandwich, is that true?
 9       A.   Not true.
10       Q.   Okay.  Did someone tell you to say
11 baloney sandwich, coffee, and another sandwich?
12       A.   Yeah.
13       Q.   And who was that?
14       A.   Detective Guevara.
15       Q.   Okay.  So he specifically told you to
16 tell everybody that you had coffee and a balcony
17 sandwich?
18       MR. STARR:  Objection; form, foundation,
19 asked and answered.
20 BY MR. ENGQUIST:
21       Q.   Is that correct, sir?
22       A.   Correct.
23       Q.   Okay.  Next question is:  "Did they let
24 you go to the bathroom"?  And your answer here was:
```

Page 189

```
 1 "Yeah, every time I wanted."
 2            And you're saying, sir, that's a
 3 lie, that that's not true?
 4       A.   That's a lie.
 5       Q.   Okay.  And were you told to lie about
 6 that?
 7       A.   Yeah.
 8       Q.   Okay.  And what did Detective Guevara
 9 instruct you to say?
10       A.   To say what he says.
11       Q.   Which was?
12       A.   All these lie.
13       Q.   Okay.  And next question is:  Do you
14 smoke or -- "You don't smoke, do you"?
15       A.   No.
16       Q.   Answer is "no."
17       MR. STARR:  Form.
18 BY MR. ENGQUIST:
19       Q.   Is that correct?  Was that correct?
20       A.   Correct.
21       Q.   Okay.  Was that true back in 1990?
22       A.   Maybe.
23       Q.   What do you mean "maybe"?
24       A.   I don't remember.
```

ALFREDO GONZALEZ, 02/07/2023                    Page 190..193

Page 190

1    Q.   Okay.  And the next question was:
2 "Have I, the state's attorney, treated you okay?"
3 Answer, "Yeah."
4         Was that true?
5    A.   Yes.
6    Q.   Okay.
7         "Question:  Have any promises
8    or threats been made to you for this
9    statement?
10        "Answer:  No."
11        Was that true, sir?
12   A.   Not true.
13   Q.   Okay.  And did you review this
14 statement before signing it, sir?
15   A.   I didn't know how to read.
16   Q.   You didn't know how to read?
17   A.   Not English.
18   Q.   When did you learn how to read English,
19 sir?
20   A.   I guess being locked up.
21   Q.   Okay.  Did you take classes while you
22 were in -- locked up?
23   A.   No.
24   Q.   Did you ever tell your attorney, David

Page 191

1 Wiener, that you couldn't read English back when
2 you gave this statement in August of 1990?
3    MR. STARR:  Again, I'm going to object on
4 attorney/client privilege.  I'll allow him to
5 answer this question.
6    THE WITNESS:  Answer?
7    MR. STARR:  Yeah, if you know the answer.
8    THE WITNESS:  Yeah, I did.
9 BY MR. ENGQUIST:
10   Q.   And what did David Wiener -- did he
11 respond to you at all when you told him you
12 couldn't even read the statement?
13   A.   I don't recall what he said.
14   Q.   Okay.  Sir, if you look at the very
15 beginning of this statement, there are -- there's a
16 picture -- a Polaroid attached.  Do you see that?
17 You have a color copy of it.  You see that?
18   A.   Yeah.
19   Q.   Okay.  Who is that, sir?
20   A.   That's me.
21   Q.   Okay.  And that's you at the time you
22 gave your statement, sir?
23   MR. STARR:  Objection; form, foundation,
24 speculation.

Page 192

1    THE WITNESS:  I don't recall.
2 BY MR. ENGQUIST:
3    Q.   Okay.  If you go to the next page,
4 there's writing on the back of the picture.  You
5 see that?
6    A.   Yeah.
7    Q.   It says picture taken by J. Lupa, A-5,
8 8/24/90 at 3:05 a.m., Witness, then there's
9 Detective Guevara and a badge number, ASA Jennifer
10 Borowitz, and then there's your name, Alfredo
11 Gonzalez.  Do you see that?
12   MR. STARR:  The next -- the next page he's
13 talking about.
14   THE WITNESS:  Yeah.
15 BY MR. ENGQUIST:
16   Q.   Do you see that, sir?  That's your
17 signature, correct?
18   A.   Yeah.
19   Q.   Okay.  And the fact that it says it was
20 taken by this -- by the court reporter at 3:05 a.m.,
21 does that indicate to you that it was taken after --
22 your statement, sir?
23   MR. STARR:  Form, foundation, calls for
24 speculation.

Page 193

1    THE WITNESS:  I don't recall.
2 BY MR. ENGQUIST:
3    Q.   Okay.  Do you recall your picture being
4 taken by the -- by the court reporter?
5    A.   No.
6    Q.   Okay.  Do you think that's made up?
7    MR. STARR:  Objection; form, foundation,
8 calls for speculation, harassing.
9    THE WITNESS:  I don't know.
10 BY MR. ENGQUIST:
11   Q.   Okay.  Is that the -- the shirt you
12 were wearing when you gave your statement, sir?
13   MR. STARR:  Form, foundation, calls for
14 speculation.
15   THE WITNESS:  I don't recall.
16 BY MR. ENGQUIST:
17   Q.   Okay.  Are those the pants that were
18 brought to you, you said, by your family that
19 you're wearing?
20   MR. STARR:  Same objections.
21   THE WITNESS:  I don't recall.
22 BY MR. ENGQUIST:
23   Q.   Sir, where are the wrist injuries that
24 you described, the bruising on your wrist?

ALFREDO GONZALEZ, 02/07/2023                    Page 194..197

Page 194

1      MR. STARR:  Objection; form, foundation,
2  calls for speculation.  He already testified he
3  doesn't know when this photo was taken.
4      THE WITNESS:  I don't see it.
5  BY MR. ENGQUIST:
6      **Q.   Do you see any injuries on your body**
7  **depicted in this photograph?**
8      MR. STARR:  Objection; form, foundation,
9  calls for a medical opinion.
10     THE WITNESS:  Yeah.  I see my face swole up.
11 BY MR. ENGQUIST:
12     **Q.   Your face is swollen?**
13     A.   It look like it.
14     **Q.   Okay.  What part of your face is**
15 **swollen, sir?**
16     A.   The one on the right -- on the left
17 side.
18     **Q.   Your left cheek is swollen?**
19     A.   It looks swollen.
20     **Q.   Okay.  Anything else that you think**
21 **that you -- depicts an injury in this photograph,**
22 **sir?**
23     MR. STARR:  Same objections.
24     THE WITNESS:  My right eye, my left eye.

Page 195

1  BY MR. ENGQUIST:
2      **Q.   Your left eye or in your right eye or**
3  **which one or was it both?**
4      MR. STARR:  Can you specify?  Because he's --
5  I think he's pointing to one side and saying the
6  other side based on his physical orientation to the
7  photograph.
8          Can you be clear about where you're
9  talking about, Freddy?
10     THE WITNESS:  Yeah.  The left side on the
11 picture.
12 BY MR. ENGQUIST:
13     **Q.   The left side of the picture, which**
14 **would be your right eye; is that correct?**
15     A.   This eye.  It looks like it swollen
16 right there.
17     **Q.   Okay.  You just -- you just pointed to**
18 **your left eye.**
19     MR. STARR:  Can you -- can you indicate for
20 Mr. Engquist where you're pointing?
21 BY MR. ENGQUIST:
22     **Q.   You can hold it -- why don't we hold it**
23 **up to the camera and we can do it on that part of**
24 **it.**

Page 196

1          Do you have a clear shot?
2      **Q.   Okay.  Where -- which eye do you**
3  **think in that photograph it shows an injury?**
4      A.   This eye.
5      **Q.   Okay.  And that would be your left eye.**
6      **And what -- and just so it's clear,**
7  **can you hold it back up for the camera?  And can**
8  **you point where on your cheek you say it shows**
9  **swelling?  You have to point to the camera, though.**
10     A.   This eye.
11     **Q.   Okay.  Any other injury that you see**
12 **or -- that are depicted in this photograph that was**
13 **taken back in -- this photograph?**
14     MR. STARR:  Same objections.
15     THE WITNESS:  No.
16 BY MR. ENGQUIST:
17     **Q.   Okay.  Now, you had access -- you had**
18 **this -- you saw this photograph before your trial,**
19 **correct?**
20     MR. STARR:  Objection to form, foundation,
21 calls for speculation.
22     THE WITNESS:  I don't recall.
23 BY MR. ENGQUIST:
24     **Q.   You don't recall.**

Page 197

1          Okay.  Now, you testified at trial
2  too, correct, sir?
3      A.   Yes.
4      **Q.   And you reviewed your testimony in the**
5  **criminal trial before this deposition; isn't that**
6  **right?**
7      A.   Yes.
8      **Q.   Okay.  And when's the last time you**
9  **read through that, sir?**
10     A.   Few days ago.
11     **Q.   And, sir, isn't it true that during**
12 **your -- the criminal trial you gave testimony**
13 **consistent with your court-reported statement here**
14 **depicted in Exhibit Number 1?**
15     A.   Yeah.
16     **Q.   And why did you do that, sir?**
17     MR. STARR:  Objection; form, foundation,
18 invades the attorney/client privilege.
19         You can testify about it.
20     THE WITNESS:  David Wiener's advice.
21 BY MR. ENGQUIST:
22     **Q.   Okay.  Sir, are you saying that you**
23 **told David Wiener it was a lie, but he told you to**
24 **testify to the lie?**

Urlaub Bowen & Associates, Inc.    312-781-9586

ALFREDO GONZALEZ, 02/07/2023                    Page 198..201

Page 198

1    A.   He told me to testify to the same story
2 Detective Guevara told me because if I don't sound
3 good, then I could face death row, death penalty.
4    Q.   Okay.  Now, did you tell David Wiener
5 that you were beaten?
6    A.   Yeah.  Told him I was innocent.
7    MR. STARR:  Josh, can I have a -- just a
8 standing objection to attorney/client privilege and
9 instruct him that he's allowed to testify?  And if
10 there is an issue that comes up, I will identify it
11 instead of interrupting your flow every single
12 time.
13    MR. ENGQUIST:  That's fine.  If you're not --
14 if you're not asserting attorney/client privilege,
15 then there's really no reason for an objection.
16    MR. STARR:  Well, I can do it how I want to
17 do it, so --
18    MR. ENGQUIST:  Yeah, I know.  That's fine.
19    MR. STARR:  If you're comfortable with me
20 having a standing objection and allowing him to
21 testify on a limited basis about specific
22 conversations, that's what I'm asking.
23    MR. ENGQUIST:  Yeah.  And if you -- and if
24 you want to jump in at some point and instruct him

Page 199

1 not to answer, let me know.
2    MR. STARR:  Excellent.
3 BY MR. ENGQUIST:
4    Q.   Did you tell David Wiener of the fact
5 that you -- you told us today that you were punched
6 in the groin?
7    A.   Yes.
8    Q.   Did you tell him about being slapped in
9 the face?
10    A.   Yeah.
11    Q.   Did you tell him about being punched in
12 the stomach?
13    A.   Yeah.
14    Q.   Did you tell him about getting hit in
15 the side?
16    A.   Yeah.
17    Q.   Did you tell him about being --having
18 your toe stomped on?
19    A.   Yeah.
20    Q.   Okay.  Did you tell him about urinating
21 in your pants?
22    A.   Yes.
23    Q.   Twice?
24    A.   Twice.

Page 200

1    Q.   Okay.  And -- okay.  Did David Wiener
2 instruct you not to bring that up at the criminal
3 trial?
4    A.   Right.
5    Q.   Why?  Did he tell you why?
6    A.   Because if I will testify to my story,
7 what I went through, I would have been found
8 guilty.
9    Q.   Is that what he told you?
10    A.   Yeah.
11    Q.   Okay.  Did you tell David Wiener about
12 the two lineups of just -- just you while you were
13 at Area 5?
14    A.   Yes.
15    Q.   Okay.  And did he tell -- and was that
16 interview at all at trial?
17    A.   No.
18    Q.   Okay.  Did he tell you why it wasn't
19 going to be introduced at trial?
20    A.   No.
21    Q.   Okay.  Did you tell David Wiener about
22 how you told ASA Borowitz on -- previously on the
23 drive to Donald Duk's drive -- parking lot that you
24 did not commit the murder?

Page 201

1    A.   Yeah.
2    MR. STARR:  Objection; form, foundation,
3 mischaracterizes his testimony.
4 BY MR. ENGQUIST:
5    Q.   Okay.  Was that introduced at trial?
6    A.   I don't think so.
7    Q.   Okay.  Did David Wiener tell you why?
8    A.   Yeah.
9    Q.   And why is that?
10    A.   Because the jury wouldn't believe me,
11 to stick to the same story that Detective Guevara
12 told me.  Because if I don't, I was going to be
13 found guilty.
14    Q.   Did you ever tell anybody else in your
15 family -- did you tell anybody in your family about
16 being -- about your treatment there at Area 5?
17    MR. STARR:  Objection.  I believe that was
18 asked and answered.
19    You can answer again.
20    THE WITNESS:  I believe I did.
21 BY MR. ENGQUIST:
22    Q.   Okay.  When is the first time you told
23 someone in your family about that?
24    A.   When I was in the county.

Page 202

1    Q.    Okay.  And who in your family did you
2 tell about being abused at Area 5?
3    A.    The mother of my kids, my sister.
4    Q.    Anybody else?
5    A.    I don't recall.
6    Q.    Did you ever tell your mother?
7    A.    Yeah.
8    Q.    Did you tell her while you were at Cook
9 County Jail about that?
10    A.    Yeah.
11    MR. STARR:  Objection -- or strike that.
12 Sorry.
13 BY MR. ENGQUIST:
14    Q.    Besides telling Carmen, Maria, and your
15 mother about the abuse at Area 5 while you were at
16 Cook County Jail, did you tell anybody else, other
17 than your attorney Mr. Wiener?
18    MR. STARR:  Objection; form, foundation.
19        And I'm just going to mention it
20 sounds like -- the way that I understood that
21 question, it sounded like the abuse happened at
22 Cook County Jail.  I don't know if you want to
23 rephrase.
24    MR. ENGQUIST:  Oh, okay.  Let me just ...

Page 203

1 BY MR. ENGQUIST:
2    Q.    The abuse that you're alleging that
3 took place at Area 5 before you gave your
4 statement, you testified that you told Carmen and
5 Maria and your mother about that abuse while you
6 were staying at Cook County Jail awaiting trial,
7 correct?
8    A.    Yeah, correct.
9    Q.    Did you tell anybody else about that
10 alleged abuse while you were awaiting trial at Cook
11 County Jail?
12    A.    Yeah.
13    MR. STARR:  Objection; form, foundation,
14 asked and answered.
15 BY MR. ENGQUIST:
16    Q.    Who?
17    A.    My sisters, my brothers.
18    MR. STARR:  And, again, I'm going to instruct
19 my client not to speculate.
20        If -- if you know the answers to the
21 question, answer them.  Don't speculate.  He's not
22 asking you to speculate.
23    MR. ENGQUIST:  He wasn't speculating.  He
24 said his brothers and sisters.

Page 204

1 BY MR. ENGQUIST:
2    Q.    Other than your brothers and sisters,
3 your mother and Maria, did you tell anybody else
4 about this alleged abuse while you were still
5 awaiting trial at Cook County Jail?
6    MR. STARR:  Form, foundation, calls for
7 speculation, asked and answered.
8 BY MR. ENGQUIST:
9    Q.    Go ahead.
10    A.    I don't recall.
11    Q.    When you went to Cook County Jail after
12 you were charged, do you recall going through the
13 medical section before you were entered Cook County
14 Jail?
15    A.    I don't recall.
16    Q.    Did you ever complain of any injuries
17 while you were at Cook County Jail that you say you
18 suffered at the hands of Detective Guevara?
19    MR. STARR:  Objection; form, foundation,
20 calls for speculation, asked and answered.
21    THE WITNESS:  I don't recall.
22 BY MR. ENGQUIST:
23    Q.    Did anyone in your family testify in
24 your defense during the criminal trial?

Page 205

1    A.    Yeah.  My sisters and brother.  I
2 believe my -- I remember my brother.
3    MR. STARR:  Don't speculate.
4 BY MR. ENGQUIST:
5    Q.    Do you know if any of them ever brought
6 up the fact that you were innocent and you were
7 abused before you gave your statement?
8    A.    I don't recall.
9    Q.    Did you ever inform the court while you
10 were on trial that you could not read English?
11    A.    The state attorney?
12    Q.    Did you ever inform the court during
13 the trial that you could not read English?
14    A.    Yes.
15    Q.    Who did you tell?
16    A.    My lawyer.
17    Q.    Anybody else?
18    A.    I don't remem- -- recall.  But I did
19 tell the state attorney I was innocent.
20    Q.    Do you know any members of Jose
21 Maysonet's -- or Juan's family?
22    A.    Yeah.
23    Q.    Who?
24    A.    His mom.

ALFREDO GONZALEZ, 02/07/2023                          Page 206..209

Page 206
1    Q.   Okay.  Do you know his sister?
2    A.   Yeah.
3    Q.   What's his sister's name?
4    A.   She's also Rosa, I think it is.
5    Q.   I'm sorry, what?
6    A.   Rosa.
7    Q.   And how do you know Rosa?
8    A.   By his brother -- her brother.
9    Q.   Okay.  Do you know her outside of
10 seeing her with her brother or, you know, in a
11 situation with her brother, did you ever -- let me
12 just cut that, strike that.
13        Did her -- his Jose -- did Juan's
14 sister Rosa ever visit you while you were in Cook
15 County Jail?
16   A.   No.
17   Q.   Did she ever visit you while you were
18 in IDOC?
19   A.   She did.
20   Q.   Okay.  Do you remember when she did?
21   A.   No.  But not her by herself.
22   Q.   With who else?
23   A.   With my cousin.
24   Q.   Who's your cousin?

Page 207
1    A.   Olga.
2    Q.   And what's Olga's last name?
3    A.   Olga, I believe Corrasco.  Don't
4 remember.
5    Q.   Do you know how to spell that?
6    A.   C-o-r-r-a-s-c-o.
7    Q.   And the first name, is it O-l-g-a?
8    A.   O-l-g-a.
9    Q.   Okay.  And do you remember how many
10 times Rosa Maysonet came to visit you while you
11 were in prison?  Was it just that one time with
12 Olga or was it more than one time?
13   MR. STARR:  Objection, asked and answered.
14   THE WITNESS:  Can I?
15   MR. STARR:  Yeah, you -- you can answer the
16 question.
17   THE WITNESS:  Just one time.
18 BY MR. ENGQUIST:
19   Q.   And at that time, did you tell
20 Rosa Maysonet and Olga about the abuse you said you
21 suffered at the hands of Ray Guevara?
22   MR. STARR:  Form, foundation, speculation.
23   THE WITNESS:  Can I say something?
24   MR. STARR:  Freddy, answer his questions.

Page 208
1    THE WITNESS:  What was your question?
2    MR. ENGQUIST:  Sure.
3 BY MR. ENGQUIST:
4    Q.   When Rosa Maysonet and Olga Corrasco,
5 your cousin, came to visit you when you were in
6 prison, did you tell them about the alleged abuse
7 you suffered at the hands of Ray Guevara?
8    MR. STARR:  Form, foundation, speculation.
9    THE WITNESS:  I don't recall.
10   MR. STARR:  Do you want to take -- can we
11 take a break?
12   MR. ENGQUIST:  Sure.
13   THE VIDEOGRAPHER:  The time is now 2:44 p.m.
14 This is the end of Media 6.  We're off the record.
15        (Recess taken.)
16   THE VIDEOGRAPHER:  The time is now 2:46 p.m.
17 This is the beginning of Media 7.  We're back on
18 the record.
19   MR. ENGQUIST:  All right.  Sir, I want to you
20 who you what I want to mark Exhibit Number 2.
21        (Deposition Exhibit No. 2,
22         Witness Gonzalez, was marked
23         for identification 02/07/2023.)
24

Page 209
1 BY MR. ENGQUIST:
2    Q.   Sir, have you ever seen this document
3 before, Exhibit Number 2?
4    A.   No.
5    Q.   Okay.  Well, do you recall meeting with
6 a probation officer and being asked questions prior
7 to being sentenced in this murder case?
8    A.   Probation officer?
9    Q.   Yeah.
10   A.   I don't recall.
11   Q.   Okay.  All right.  Let's kind of go
12 through some of this information.
13        Probation officer's name was
14 Dunaway.  You see that at the bottom of page 1?
15 Does that ring a bell?
16   A.   Nope.
17   Q.   Okay.  If you go to the next -- next
18 page, for Criminal History, it says:  Defendant
19 denies any juvenile convictions.  Due to the
20 defendant's age, a juvenile record request was not
21 ordered.
22        Sir, did you have any juvenile
23 convictions?
24   A.   No.

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                                    Page 210..213

Page 210

1    Q.   Okay, the next part, it says for Adult.
2 It says:  The defendant reports he was put on
3 probation at the end -- end of the year in 1953,
4 but on examination defendant's -- defendant's
5 Chicago's B of I it appears the defendant was
6 placed on supervision.  It should be probably 1983.
7        MR. STARR:  You also said "end of the year"
8 where it says "for a year."
9        MR. ENGQUIST:  Oh, for a year.  I'm sorry.
10 For a year.
11 BY MR. ENGQUIST:
12    Q.   Sir, this have to do with, I believe,
13 the supervision you got for the gun arrest we
14 talked about earlier; is that correct?
15        MR. STARR:  Form, foundation, speculation.
16 BY MR. ENGQUIST:
17    Q.   Is that correct, sir?
18    A.   I guess.
19    Q.   Is that the only time you remember
20 being found guilty of something before this?
21    A.   I don't recall.
22    Q.   Okay.  Let's go to page -- it will be
23 4A where it says Defendant's Version.  I don't
24 think you're there.

Page 211

1    A.   4?
2        MR. STARR:  4A.
3 BY MR. ENGQUIST:
4    Q.   4A, the next page.
5    A.   4A.
6    Q.   Yeah.  Says Defendant's Version.  It
7 says:  The defendant states he was walking home on
8 May 25th, 1990, when he saw a blue car drive by and
9 he recognized the driver.  He asked them to stop
10 and when they did, defendant asked them for a ride.
11 The gentleman driving the car said they would give
12 him a ride home.  He states there were two
13 gentlemen in the car, but declined to -- declined
14 to give their names also.  He explains that they
15 turned down a street and the defendant asked why
16 they were going that way and would they take him
17 home.  The driver said they were going to take the
18 defendant home.  They kept going and suddenly
19 turned down the -- an alley and stopped.  The
20 defendant states the three gentlemen jumped out of
21 the car, two of them pulled their hoods up over
22 their head and took off in the same direction.  The
23 defendant states he heard shots and the defendant
24 saw the three run back to the car.  The defendant

Page 212

1 asked what happened and they told nothing
2 happened -- and was told nothing happened.  The
3 defendant states he was then dropped off at his
4 house by the gentleman in the blue car.
5        Do you see that?
6    A.   Yeah.
7    Q.   Do you know why you gave that version
8 of events to Probation Officer Dunaway after your
9 conviction?
10        MR. STARR:  Objection; form, foundation,
11 calls for speculation.  He already testified he has
12 no recollection of this.
13        THE WITNESS:  I don't recall.
14 BY MR. ENGQUIST:
15    Q.   Is there any reason --
16        MS. BONJEAN:  Objection --
17        MR. ENGQUIST:  I'm sorry.  Go ahead.  I'm
18 sorry.  I stepped over that objection.  Go ahead.
19 You can put it on the record.
20        MS. BONJEAN:  That's all right.  I think he
21 already said it, but I'm just adding a foundation
22 objection.
23        MR. ENGQUIST:  Okay.
24

Page 213

1 BY MR. ENGQUIST:
2    Q.   Sir, when -- were you ever instructed
3 by David Wiener or anybody else to keep to that --
4 keep to the story that you say Detective Guevara
5 fed you even after your conviction?
6        MR. STARR:  Form, foundation, calls for
7 speculation, and I'm going to assert the
8 attorney/client privilege and instruct him not to
9 answer.  This is not within the -- the province of
10 his testimony in court.
11        MR. ENGQUIST:  So you're going to instruct
12 him not to answer?
13        MR. STARR:  Yes.
14 BY MR. ENGQUIST:
15    Q.   Okay.  And I'm assuming you're going to
16 follow his advice and not answer, right?
17    A.   Right.
18    Q.   Let's go to page 5.  Actually, let's go
19 to page 6 where it says Marital Status.  The
20 defendant reports he has never been married.
21        Is that correct, sir?
22    A.   Correct.
23    Q.   But is a father of three children.
24        Did you have three children at that

ALFREDO GONZALEZ, 02/07/2023                          Page 214..217

Page 214

1 point when you had -- when you were convicted?
2    A.   Yeah.
3    Q.   Okay.  So:  The defendant states he has
4 a son, Alfredo Gonzalez, 8, a daughter Maria
5 Gonzalez, 6, and -- by Maria Rivera.  The defendant
6 reports he's the father of a five-year-old boy by a
7 woman he only knows as Babe.  He states the woman
8 told him that the boy was his child.  The defendant
9 is not sure where either reside.
10        Is the information in that paragraph
11 correct?
12    MR. STARR:  Correct as -- as of 19 --
13 whatever --
14 BY MR. ENGQUIST:
15    Q.   As the date of this report, which was
16 in -- let me go back to --
17    MR. STARR:  1992.
18 BY MR. ENGQUIST:
19    Q.   April 30th, 1992?
20    MR. STARR:  If you know.
21    THE WITNESS:  I don't know.
22 BY MR. ENGQUIST:
23    Q.   What is -- what don't you know about
24 that?

Page 215

1    A.   The whole question.
2    Q.   Okay.  In May of 1992, did you have two
3 children with Maria Rivera?
4    A.   Yes.
5    Q.   Okay.  Were there names Alfredo
6 Gonzalez and Maria Gonzalez?
7    A.   Yeah.
8    Q.   Was Alfredo 8?
9    A.   Yeah, I believe so.
10    Q.   Was Maria 6 at that time?
11    A.   Yeah.
12    Q.   Did you have another child by a woman
13 you only knew as Babe?
14    A.   I do have another child.
15    Q.   Okay.  In -- in 1992, did you only know
16 this woman as Babe?
17    MR. STARR:  Objection; form, foundation,
18 calls for speculation.
19    THE WITNESS:  I don't recall that.
20    MR. ENGQUIST:  How does it call for
21 speculation?
22    MR. STARR:  Because he already said he
23 doesn't know.
24    THE WITNESS:  I don't know.

Page 216

1 BY MR. ENGQUIST:
2    Q.   You don't know.
3        Do you know who you had the child --
4 the other child with?
5    A.   Yeah, but that's not her name.
6    Q.   What?
7    A.   That's not her name.
8    Q.   That's not her name.  Okay.
9        What is her name?
10    A.   Charlotte.
11    Q.   In 1992 when this report was written,
12 did you know where Charlotte and the other child,
13 the boy, lived?
14    A.   No.
15    Q.   All right.  You can put that to one
16 side.
17        Now, sir, do you recall a motion for
18 a new trial being filed on -- for you in this case?
19    A.   Yeah.
20    Q.   Do you know why there wasn't any
21 mention of you not reading -- not being able to
22 read English in that motion?
23    MR. STARR:  Form, foundation, calls for
24 speculation.

Page 217

1        And as far as any conversations you
2 had with attorneys about that, I would instruct you
3 not to answer.
4        But if you can -- if you can answer
5 without conversations based on -- conversation you
6 had with your attorney, then go ahead.
7    THE WITNESS:  What was question?
8    MR. ENGQUIST:  Why don't I just do it this
9 way.  Why don't we mark this as Exhibit Number 3.
10        (Deposition Exhibit No. 3,
11        Witness Gonzalez, was marked
12        for identification 02/07/2023.)
13    MR. ENGQUIST:  So Exhibit Number 3, for the
14 record, is CCSAO 469 through 471.
15 BY MR. ENGQUIST:
16    Q.   Sir, is this one of the documents you
17 reviewed in preparation for your deposition?
18    A.   I don't recall.
19    Q.   Okay.  Do you want a minute to read
20 through it?  It's only two pages, basically.
21    MR. STARR:  Go ahead.  Read through it.
22 BY MR. ENGQUIST:
23    Q.   Are you done looking through it, sir?
24    A.   I'm not a fast reader.

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                    Page 218..221

Page 218

1    Q.   I -- are you done reading it, sir?
2    A.   Yeah.
3    Q.   Okay.  Now, sir, do you know why
4  there's no mention in this motion for a new trial
5  of force being used on you by Detective Guevara?
6    MR. STARR:  Form, foundation, calls for
7  speculation.
8         And I'm going to instruct my client
9  that if he can answer without betraying any
10  client -- or attorney/client conversations he had,
11  then fine; but if you can't answer without
12  referring to what you and Mr. Wiener spoke about
13  after the trial, then I would instruct you not to
14  answer.
15    THE WITNESS:  No.
16  BY MR. ENGQUIST:
17    Q.   Okay.  So is fair -- okay.  Well, I
18  just need to know.
19         Could you answer that question --
20  well, let me ask it a different way.
21         Did you and attorney David Wiener
22  have a conversation about why there wasn't going to
23  be any mention of your allegations of force being
24  used on you by Detective Guevara?

Page 219

1    MR. STARR:  I'm going to assert the
2  attorney/client privilege and instruct him not to
3  answer that one.
4    MR. ENGQUIST:  Okay.
5    THE WITNESS:  No.
6  BY MR. ENGQUIST:
7    Q.   Did you and Detective -- I'm sorry.
8         Did you and David Wiener have any
9  conversations about why this motion for a new trial
10  would not indicate that your -- that your
11  confession coerced?
12    MR. STARR:  Same instruction.  Same
13  objection; same instruction.
14  BY MR. ENGQUIST:
15    Q.   And I'm assuming you're going to follow
16  your attorney's advice and not respond?
17    A.   Yes.
18    Q.   Did you and David Wiener have any
19  discussions about why your -- this motion for a new
20  trial would not include anything about your claims
21  of innocence to state's attorney prior to giving
22  your confession?
23    MR. STARR:  Same objection; same instruction.
24

Page 220

1  BY MR. ENGQUIST:
2    Q.   Are you going to follow your attorney's
3  advice and not answer?
4    A.   Yes.
5    Q.   Okay.  Did you and David Wiener discuss
6  why this motion for a new trial would not have
7  anything including -- would not include the fact
8  that you could not -- you could not allegedly read
9  English at the time you gave your statement?
10    MR. STARR:  Form, foundation.  Same
11  objection; same instruction.
12  BY MR. ENGQUIST:
13    Q.   Are you going to follow your attorney's
14  advice and not answer the question?
15    A.   Yes.
16    Q.   Now, sir, at some point you no longer
17  had David Wiener as your attorney, correct?
18    A.   Correct.
19    Q.   Who was your next attorney?  Do you
20  remember?
21    A.   Brendan.
22    Q.   What?
23    A.   Brendan.
24    Q.   Brendan.

Page 221

1         Do you remember a Frederick Cohen or
2  Cohn?
3    A.   Oh, that's the appeal lawyer.
4    Q.   Yes, the appellate lawyer.  Do you
5  remember him?
6    A.   Yeah.
7    Q.   Okay.  Let me ask you, when you were
8  working with your attorney David Wiener, did any --
9  did you work with anybody else from his office?
10    A.   Not that I recall.
11    Q.   Okay.  Do you know if he had other
12  people in his office that he worked with on this
13  case?
14    A.   No.
15    MR. STARR:  Form, foundation, speculation.
16    THE WITNESS:  No.
17  BY MR. ENGQUIST:
18    Q.   Now, David Cohen, your appellate
19  lawyer, did file appeals for you both in state --
20  both in state and in federal court; isn't that
21  correct?
22    A.   I don't recall.
23    Q.   Okay.  Do you know why none of the
24  filings by Frederick Cohen in both state and

ALFREDO GONZALEZ, 02/07/2023                          Page 222..225

Page 222

1 federal court include anything about force being
2 used against you or the fact that your allegation
3 that your confession was coerced or the fact that
4 you couldn't read English?
5        MR. STARR:  Form, foundation, calls for
6 speculation, invades attorney/client privilege.
7           I instruct you not to answer.
8        MS. BONJEAN:  It also calls for a legal type
9 of response and we all know that appellate lawyers
10 can't just, you know, create a record on appeal,
11 but maybe, you know, Mr. Gonzalez does not know.
12 It calls for a legal interpretation as well.
13       MR. STARR:  I'll join that objection.
14 BY MR. ENGQUIST:
15       Q.  Sir, can you answer the question?
16       MR. STARR:  I --
17       THE WITNESS:  No.
18       MR. STARR:  -- instruct you not to answer.
19       THE WITNESS:  No.
20       MR. ENGQUIST:  Okay.  So instructing you not
21 to answer.  Okay.
22 BY MR. ENGQUIST:
23       Q.   Okay.  Do you know the first time that
24 you ever made these allegations that your -- that

Page 223

1 your confession was false and coerced, you remember
2 what -- the first time you made that allegation in
3 any kind of court filing?
4        MR. STARR:  Form, foundation, speculation.
5           You can answer if you know.
6        THE WITNESS:  No.
7 BY MR. ENGQUIST:
8        Q.   Would it be accurate to say that it
9 wasn't until after Jose Juan Maysonet had his case
10 reversed is the first time that you made these
11 allegations in the court filing?
12       MR. STARR:  Form, foundation, calls for
13 speculation, asked and answered.
14 BY MR. ENGQUIST:
15       Q.   Sir?
16       A.   What?
17       MR. ENGQUIST:  Can you repeat the question,
18 please, read it back.
19          (Record read.)
20       THE WITNESS:  No.
21       MR. STARR:  My objection was form,
22 foundation, speculation, asked and answered.
23       THE WITNESS:  No.
24

Page 224

1 BY MR. ENGQUIST:
2        Q.   Okay.  So when did you first make these
3 allegations in the court filing, sir?
4        MR. STARR:  Asked and answered.
5        MR. ENGQUIST:  Well, he just answered no, so
6 that's why I'm asking.
7        MR. STARR:  Okay.  Asked and answered.
8        THE WITNESS:  I don't recall.
9 BY MR. ENGQUIST:
10       Q.   Okay.  But you think it was before Jose
11 Maysonet's case was reversed, sir?
12       MR. STARR:  Form, foundation, asked and
13 answered, mischaracterizes his testimony.
14       THE WITNESS:  Yes.
15       MR. ENGQUIST:  Okay.
16       MR. GREENBERG:  Can that person speak up?  I
17 can't hear what they're saying.
18       MR. ENGQUIST:  He just said yes.
19          But, yeah, you do need to speak up.
20 Okay, sir?
21 BY MR. ENGQUIST:
22       Q.   Do you know -- is it fair to say that
23 the first attorney who ever filed anything on your
24 behalf saying that your confession was coerced was

Page 225

1 Brendan Schiller in 2017?
2        MR. STARR:  Form, foundation, asked and
3 answered.
4           You can answer if you know.
5        THE WITNESS:  Yes.
6        MR. ENGQUIST:  Okay.  Now it's my turn to
7 take a little bit of a break.  So I'm going to take
8 a good five minutes or so.  Okay, guys?
9        THE VIDEOGRAPHER:  The time is now 3:07 p.m.
10 This is the end of Media 7.  We're off the record.
11          (Recess taken.)
12       THE VIDEOGRAPHER:  The time is now 3:20 p.m.
13 This is the beginning of Media 8.  We're back on
14 the record.
15 BY MR. ENGQUIST:
16       Q.   Okay.  So I know we kind of went step
17 by step through your time in Area 5 having to do
18 with this case.  I just want to double check.
19          Are there any other police officers
20 that you had contact with after your arrest up
21 until the time you gave your statement that we
22 haven't talked about?
23       A.   I don't recall.
24       Q.   Okay.  Are there any other state's

ALFREDO GONZALEZ, 02/07/2023                     Page 226..229

Page 226

1 attorneys that we have other than Ms. --
2 Ms. Borowitz, that we haven't talked about that you
3 had contact with?
4    A.   I don't recall.
5    Q.   Okay.  And just to be closer, for the
6 ASA Borowitz, the first time you saw her was when
7 you were getting into the car to go Donald Duk's?
8    A.   Donald Duk's.
9    Q.   Okay.  And the next time you saw her
10 was in the room when your statement was taken by
11 her, correct?
12   A.   Yes.
13   Q.   Okay.  Did you have any other times
14 where you had contact with her?
15   A.   No.  Just before I left.
16   Q.   Before you left what?
17   A.   The -- what you call it?  The --
18   Q.   The court-reported statement?
19   A.   Yeah.
20   Q.   Okay.  So after your court-reported
21 statement, did you have another conversation with
22 ASA Borowitz?
23   A.   I told her I was innocent.
24   Q.   Okay.  So after the statement was

Page 227

1 taken, after everything was done, before you left
2 the room, you told her you were innocent?
3    A.   Yeah.
4    Q.   Okay.  Did you tell her anything else?
5    A.   No, I don't recall.
6    Q.   Okay.  So you don't recall whether or
7 not you told her you had been beaten, correct?
8    A.   Detective Guevara wouldn't allow me.
9 We just walking out and I looked at her and I told
10 her I'm innocent.
11   Q.   Okay.  When you told her you were
12 innocent, did Detective Guevara respond in any way?
13   A.   No.
14   Q.   Okay.  Did she respond in any way?
15   A.   No.
16   Q.   Did you ever tell her you couldn't read
17 English?
18   A.   No, I don't recall.
19   Q.   Did you ever tell Detective Guevara you
20 couldn't read English?
21   A.   He knew.
22   Q.   How did he know?
23   A.   Because we would talk in Spanish
24 sometime.

Page 228

1    Q.   Okay.  Did you tell him you couldn't
2 read English?
3    A.   Yeah.
4    Q.   When?
5    A.   During the -- that time that I was with
6 him.
7    Q.   Okay.  How'd that come up?
8    A.   Because I keep telling him, Why you
9 talking to me in English when I know you're Puerto
10 Rican?
11   Q.   Okay.  And then did you tell him, And
12 by the way, I don't speak -- I don't -- I can't
13 read English?
14   A.   Yeah.
15   Q.   Okay.  And why did that come up?  Why
16 did you tell him that?
17   A.   Because he said I was supposed to sign
18 the statement.
19   Q.   Okay.  And when he told you you had to
20 sign the statement, was that after you had given
21 the statement or before?
22   A.   Before.
23   Q.   Okay.  And that was when you and him
24 were alone?

Page 229

1    A.   Yeah.
2    Q.   Okay.  And you told him you couldn't
3 read; is that correct?
4    A.   Right.
5    Q.   Okay.  Now, when you were in IDOC, in
6 the Illinois Department of Corrections, to be very
7 specific, I'm not asking you about any
8 conversations you would have had with attorneys,
9 but when you were there, you did use the phone
10 sometimes to talk to family members and friend; is
11 that correct?
12   A.   Yeah.
13   Q.   Okay.  Did you ever talk to anybody
14 when you were -- when you were -- they were calling
15 you or you were calling them when you were in IDOC
16 about your case?
17   A.   No, I don't recall.
18   Q.   Okay.  Did you ever -- you ever talk
19 about the fact that you were innocent with any of
20 them?
21   A.   Yeah.
22   MR. STARR:  Objection; form, foundation,
23 calls for speculation.
24

ALFREDO GONZALEZ, 02/07/2023                                    Page 230..233

Page 230

1 BY MR. ENGQUIST:
2    Q.  Okay.  Did --
3    A.  Yeah.
4    Q.  Did you ever tell any of your family
5 and friends -- family or friends about Detective
6 Guevara when you were in IDOC --
7    MR. STARR:  Form.
8    MR. ENGQUIST:  -- when you were on the phone?
9    MR. STARR:  Foundation, calls for
10 speculation, asked and answered.
11    THE WITNESS:  Yeah.
12 BY MR. ENGQUIST:
13    Q.  Okay.  And who did you talk to about
14 Detective Guevara when you were on the phone at
15 IDOC?
16    A.  Family.
17    Q.  Okay.  So that would be like your mom
18 and your sisters and your brothers?
19    A.  Yes.
20    MR. STARR:  Same objections.
21 BY MR. ENGQUIST:
22    Q.  Any cousins?
23    A.  I don't --
24    MR. STARR:  Same objections.

Page 231

1    THE WITNESS:  -- recall.
2    MR. STARR:  Let me get my objection in.
3 Okay?  This -- I know it's been a long day, but
4 just let me get it in.
5 BY MR. ENGQUIST:
6    Q.  Did you have any friends that you
7 talked to on the phone when you were in IDOC about
8 Detective Guevara?
9    MR. STARR:  Same objections.
10    THE WITNESS:  No.
11 BY MR. ENGQUIST:
12    Q.  Did you talk to any former -- did you
13 talk to any people that you knew that would be
14 Latin Kings on the phone when you were in IDOC?
15    MR. STARR:  Same objections.
16    THE WITNESS:  No.
17    MR. STARR:  I'm sorry.  Can you read that
18 question back?
19    (Record read.)
20    MR. STARR:  Okay.
21    MR. ENGQUIST:  Okay.  That's actually all I
22 have for right now.
23
24

Page 232

1    EXAMINATION
2 BY MR. RAHE:
3    Q.  Hi, Mr. Gonzalez.  My name is Austin
4 Rahe.  I'm an attorney for the City of Chicago in
5 this case.  I just have a few questions for you,
6 not too many.
7    Earlier we were talking about where
8 your -- your set of Latin Kings were based and I
9 think you said Kimball and you -- you couldn't
10 remember the other cross street.  Was that -- is
11 that Wabansia?
12    MR. STARR:  Asked and answered.
13    You can -- you can answer.
14    THE WITNESS:  It could be.
15 BY MR. RAHE:
16    Q.  Okay.  Do you have any other names that
17 you've ever went by besides Alfredo and your
18 nickname Lluvia?
19    A.  Yes.
20    Q.  What are those names?
21    A.  Wilfredo.
22    Q.  Wilfredo?
23    A.  (Nodding.)
24    Q.  Okay.  Any others?

Page 233

1    A.  Not that I recall.
2    Q.  Do you go by Freddy?
3    A.  Yeah.
4    Q.  Okay.  And why do you go by Wilfredo or
5 why have you went by Wilfredo in the past?
6    MR. STARR:  Form, foundation.
7    You can answer.
8    THE WITNESS:  Because I hated my name in the
9 first.
10 BY MR. RAHE:
11    Q.  I'm sorry.  Could you say that again?
12    A.  I hated my name Alfredo.
13    Q.  Oh, you hated your name Alfredo.
14    Okay.  So was --
15    A.  At first.
16    Q.  -- that a self -- you gave yourself
17 that name, Wilfredo?
18    A.  Yeah.
19    Q.  Okay.  And your children's mother's
20 name Maria, has she had multiple last names in her
21 life?
22    MR. STARR:  Objection, asked and answered.
23    THE WITNESS:  Yeah.
24

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023                    Page 234..237

Page 234

1 BY MR. RAHE:
2     Q.   And is that Rivera, Lozada, and Perez?
3     A.   Yes.
4     Q.   Any other last names that she's had?
5     A.   Perez, I believe she's still Perez.
6     Q.   Okay.
7     A.   She got married.
8     Q.   Okay.  And at the time that -- or in
9  1990, was her last name Rivera?
10    A.   Yeah.
11    Q.   Okay.  Do all your siblings have the
12 same parents as you?
13    A.   The same mother, yeah.
14    Q.   All your siblings have the same mother
15 as you?
16    A.   Yeah.
17    Q.   Okay.
18    A.   Different father, yeah.
19    Q.   Okay.  And how many different fathers
20 are there of your siblings?
21    A.   I believe five.
22    Q.   Five.  Okay.
23         Do you -- do you know the names of
24 all the fathers of your siblings?

Page 235

1     A.   No.
2     Q.   Do you know Yolanda's father's name?
3     A.   Velez.
4     Q.   What is it?
5     A.   Velez.
6     Q.   Can you spell that?
7     A.   V-e-l-e- --
8     Q.   Oh, Velez?
9     A.   Velez.
10    Q.   V-e-l-e-z?
11    A.   Yeah.
12    Q.   Okay.  I just want to make sure I have
13 that right.  You said Velez, V-e-l-e-z?
14    A.   Yeah.  V as in voice.
15    Q.   B, B-e-l-e-z?
16    A.   Yeah.
17    MR. STARR:  I'm not sure if -- I think
18 there's something being lost in translation still.
19    MR. RAHE:  Quite honestly.
20    MR. STARR:  Quite honestly.
21    MR. RAHE:  Okay.  I'll -- okay.
22 BY MR. RAHE:
23    Q.   Okay.  So are you saying V as in
24 victory or B as in boy?

Page 236

1     A.   V as in victory.
2     Q.   Okay.  So V, as in Victory, e-l-e-z?
3     A.   Yeah.  Z or S.  I don't really remember
4  the last -- one of them, either Z or S.
5     Q.   Okay.  And is Yolanda's last name,
6  currently, is it Garcia?
7     A.   Yes.
8     Q.   And when did she -- when did her last
9  name go from Velez to Garcia?
10    A.   She was married once upon a time.
11    Q.   Do you know when she was married?
12    A.   No.
13    Q.   Was it prior to your arrest in 1990?
14    MR. STARR:  Objection; form, foundation,
15 asked and answered.
16    THE WITNESS:  I don't recall.
17 BY MR. RAHE:
18    Q.   Okay.  Is Yolanda still married?
19    A.   No.
20    Q.   Okay.  What is Yolanda's date of birth;
21 do you know?
22         Is she -- is she older than you --
23 oh, sorry.  You have to answer out loud.
24    A.   No, I don't know.

Page 237

1     Q.   Okay.  Is she older than you?
2     A.   No.  She younger.
3     Q.   How much younger?
4     A.   About 15, I guess.
5     Q.   15 years?
6     A.   14, 13, something like that.
7     Q.   And you're talking in years?
8     A.   Yeah.
9     Q.   Okay.  I'm going to ask you a few
10 names.  I just want to see if you know any of these
11 people.
12         Ana Zavala?
13    A.   Yeah.
14    Q.   Who is that?
15    A.   She's my goddaughter.
16    Q.   Your goddaughter.  Okay.
17         What about Hector Villafuerte?
18    A.   I don't recall that one.
19    Q.   You don't know who that is?
20         Okay.  What about Janet Jarvis?
21    A.   I don't recall that one.
22    Q.   What about Jorge Vargas?
23    A.   Yeah.  He's a friend.
24    Q.   That's a friend of yours?

ALFREDO GONZALEZ, 02/07/2023                    Page 238..241

Page 238

1    And how -- in what way do you know
2 Jorge Vargas?
3       MR. STARR:  Objection; form, foundation.
4       THE WITNESS:  I know him back in the'70s.
5 BY MR. RAHE:
6    Q.    Okay.  So was he a childhood friend of
7 yours?
8    A.    Yeah.
9    Q.    Are you still friends with him today?
10   A.    No.
11   Q.    What about Virginia Perez?
12   A.    She's a friend.
13   Q.    She's a friend.  And have you known her
14 since your childhood?
15   A.    No.  When I was younger age, yeah.
16   Q.    Okay.  Is she still a friend today?
17   A.    Yeah.
18   Q.    Okay.  What about Elena Cintron?
19   A.    (Nodding.)
20   Q.    You know who that is?
21   A.    Yeah.
22   Q.    Who is that?
23   A.    My sister-in-law.
24   Q.    Sister-in-law.  Okay.

Page 239

1       Who's she married to?
2    A.    I don't recall.
3    Q.    Okay.  Maria Cintron?
4    A.    That's my mother-in-law, I believe.
5    Q.    Okay.  Jose Cruz?
6    A.    Jose Cruz, I don't know who that is.
7    Q.    Okay.  Jacques Rivera?
8    A.    Yeah.
9    Q.    Who's Jacques Rivera.
10   A.    He's an old friend of mine.
11   Q.    How long have you known Jacques Rivera?
12   A.    Say back in the '80s.
13   Q.    Back in the '80s.
14       Was he a member of the Latin Kings?
15   A.    Yes.
16   Q.    Yes.
17       And you've known him since you were
18 a child -- or, I guess, strike that.
19   A.    Young age.
20   Q.    You've known him since you came to the
21 United States?
22   A.    Yeah, young age.
23   Q.    Or Chicago.
24       Okay.  Did Jacques Rivera ever visit

Page 240

1 you in prison?
2    A.    No.
3    Q.    Did you ever speak to Jacques Rivera on
4 the phone while you were in prison?
5    A.    Yeah.
6    Q.    Okay.  Do you remember -- has Jacques
7 Rivera -- do you know if he had a lawsuit against
8 Reynaldo Guevara as well?
9       MR. STARR:  Objection to form, foundation.
10       You can answer if you know.
11       THE WITNESS:  Yes.
12 BY MR. RAHE:
13   Q.    Oh, he did.  Okay.
14       Did you talk to Jacques Rivera about
15 his lawsuit against Reynaldo Guevara?
16   A.    No.
17   Q.    You've never talked to him about his
18 lawsuit against Reynaldo Guevara?
19   A.    No.
20   Q.    Okay.  I think you said Juan's sister
21 Rose Maysonet visited you one time with Olga
22 Corrasco while you were in prison?
23   A.    Yes.
24   Q.    What -- do you remember what prison you

Page 241

1 were at when they visited you?
2    A.    Stateville.
3    Q.    Say that again?
4    A.    Stateville.
5    Q.    Stateville.  Okay.
6       And do you know how Olga and Rose
7 met each other?
8       MR. STARR:  Objection; foundation, speculation.
9       THE WITNESS:  They're sister-in-law.
10 BY MR. RAHE:
11   Q.    Rose and Olga are sister-in-laws.
12       And Olga's your cousin?
13   A.    Yeah.
14   Q.    Okay.  Do you know Rose Maysonet's
15 husband?
16   A.    No.
17   Q.    Do you know who is Olga Corrasco's
18 husband?
19       MR. STARR:  Foundation.
20       THE WITNESS:  Juan's brother.
21 BY MR. RAHE:
22   Q.    Juan's brother.
23       Do you know Juan's brother's name?
24   A.    Call him Tony.

ALFREDO GONZALEZ, 02/07/2023                    Page 242..245

Page 242

1    Q.   Tony.  Do you think his -- okay.  That
2  might be all I have.  One sec.
3         Did Efrain Cruz visit you while you
4  were in prison?
5    A.   Yeah.
6    Q.   He visited you in person?
7    A.   Yeah.
8    Q.   Did you speak about Reynaldo Guevara
9  and your case when he came to visit you in prison?
10    MR. STARR:  Form, foundation, asked and
11  answered previously.
12    THE WITNESS:  I don't recall.
13  BY MR. RAHE:
14    Q.   Don't recall.  Okay.
15         Did Efrain Cruz ever tell you that
16  he also visited with Justino Cruz when Justino was
17  in prison?
18    MR. STARR:  Form, foundation.
19    THE WITNESS:  I don't recall.
20  BY MR. RAHE:
21    Q.   You don't recall.
22         Has anyone ever told you who they
23  think -- well, has anyone ever, other than your
24  attorneys, told you who they think committed the

Page 243

1  murder of the Wiley brothers?
2    MR. STARR:  Form, foundation, speculation.
3         You can answer if --
4    THE WITNESS:  I don't recall.
5    MR. STARR:  What's -- what's the matter?  Can
6  we --
7    THE WITNESS:  Is there only supposed to be
8  two?
9    MR. RAHE:  I think Ashley -- is Ashley still
10  there?
11    MR. STARR:  I think they've got it covered.
12    MR. RAHE:  Yeah.  There's plenty of
13  plaintiff's attorneys on the phone.
14    MS. BONJEAN:  I'm here.
15    MR. RAHE:  Okay.
16  BY MR. RAHE:
17    Q.   Did you know -- or was there someone in
18  your set in Latin Kings back in 1990 that went by
19  the name of Black Jeffrey, the nickname Black
20  Jeffrey?
21    A.   I know him.
22    Q.   You know him.  Was he in your set?
23    A.   No.
24    Q.   No.

Page 244

1         Was he in another set of Latin
2  Kings?
3    A.   Yeah.
4    Q.   Okay.  Did Black Jeffrey have a car?
5    MR. STARR:  Form, foundation, calls for
6  speculation.
7    THE WITNESS:  He had multiple cars.
8  BY MR. RAHE:
9    Q.   Multiple cars.  Do you remember what
10  those cars were?
11    A.   No.
12    MR. RAHE:  No.  Okay.  That's all I have.
13    MR. IASPARRO:  I just have a few.
14         EXAMINATION
15  BY MR. IASPARRO:
16    Q.   Mr. Gonzalez, my name is Michael
17  Iasparro.  I represent Assistant State's Attorney
18  Frank DiFranco.
19         Do you know who that is?
20    A.   Not that I recall.
21    Q.   Okay.  Do you -- best of your
22  knowledge, did you ever meet a man named Frank
23  DiFranco in the context of the investigation of the
24  Wiley brothers murder?

Page 245

1    MR. STARR:  Form, foundation, speculation,
2  asked and answered.
3    THE WITNESS:  Not that I recall.
4  BY MR. IASPARRO:
5    Q.   Okay.  I want to take you back to the
6  time when Detective Guevara took you out to the
7  Donald Duk's restaurant, ask you a couple questions
8  about that.
9         The assistant state's attorney that
10  you've identified as Borowitz you indicated was in
11  the car at that time?
12    A.   Yeah.
13    Q.   Prior to that, if I understand you
14  correctly, you had not seen her before in the
15  context of this investigation; is that correct?
16    A.   Correct.
17    Q.   To the best of your knowledge, had you
18  ever seen her before in your -- in your whole life?
19    A.   No.
20    MR. STARR:  Prior to that moment in time?
21    MR. IASPARRO:  Correct.
22    MR. STARR:  Okay.
23    THE WITNESS:  No.
24

ALFREDO GONZALEZ, 02/07/2023                          Page 246..249

Page 246

1 BY MR. IASPARRO:
2      Q.   Okay.  And did you have any knowledge
3 about what, if anything, Detective Guevara and
4 Assistant State's Attorney Borowitz had spoken
5 about, if anything, regarding the Wiley brothers
6 murder investigation prior to that car ride?
7      A.   I don't recall.
8      Q.   After that car ride, if I understood
9 your testimony earlier, the next time you saw
10 Assistant State's Attorney Borowitz was in the --
11 the room where you gave your statement; is that
12 accurate?
13      A.   That's correct.
14      Q.   Was she already in that room when you
15 got to that room?
16      A.   I believe so.
17      Q.   Was the court reporter already in the
18 room as well?
19      A.   Yes.
20      Q.   Do you recall how long it took for you
21 to give your statement?
22      A.   I don't recall.
23      Q.   And do you have any knowledge about
24 what, if anything, Detective Guevara and Assistant

Page 247

1 State's Attorney Borowitz talked about regarding
2 the investigation into the Wiley brothers murder
3 prior to you getting into the room to give your
4 statement that day?
5      A.   I don't recall.
6      MR. STARR:  Form, foundation, speculation.
7           Go ahead.
8      THE WITNESS:  I don't recall.
9      MR. IASPARRO:  All right.  That's all I've
10 got.  Thanks.
11      MR. ENGQUIST:  Jennifer, Ashley, or -- oh,
12 actually, no.  Megan, anything?
13      MS. McGRATH:  Not right now, but thank you.
14      MR. ENGQUIST:  Any of the plaintiff's
15 attorneys?
16      MS. BONJEAN:  Plaintiffs have no questions.
17      MR. ENGQUIST:  Okay.  All right.
18      MR. STARR:  Let me take two minutes, look at
19 my notes.  I may have a couple follow-up questions,
20 but I may just -- may not.
21      MR. ENGQUIST:  Okay.
22      MR. STARR:  Just give me five minutes.
23      MR. ENGQUIST:  All right.  Let's go off the
24 record again.

Page 248

1      THE VIDEOGRAPHER:  The time is 3:41 p.m.
2 This is the end of Media 8.  We're off the record.
3           (Recess taken.)
4      THE VIDEOGRAPHER:  The time is now 3:46 p.m.
5 This is the beginning of Media 9.  We're back on
6 the record.
7      MR. STARR:  I don't have any questions.
8      MR. ENGQUIST:  All right.  Waive or reserve?
9      MR. STARR:  I'm going to reserve, just
10 because of the language issue.  I just want to --
11      MR. ENGQUIST:  The language issue?
12      MR. STARR:  Well, I mean, he's -- has a very
13 thick accent and there was a number of times where
14 like things were potentially -- I just want to --
15 want to reserve.
16      MR. ENGQUIST:  Okay.  Reserve it is.
17           Thank you very much, guys.
18      THE VIDEOGRAPHER:  The time is 3:46 p.m.
19 This is the end of Media Unit 9.  This concludes
20 the deposition.  We're off the record.
21           (The proceedings adjourned at
22            3:44 p.m.)
23
24

Page 249

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
  JOSE JUAN MAYSONET,        )
4                            )
            Plaintiff,       )
5                            )
       vs.                   )   No. 18 CV 2342
6                            )
  REYNALDO GUEVARA, et al.,  )
7                            )
            Defendants.      )
8
9       This is to certify that I have read my
10 deposition taken on Tuesday, February 7, 2023,
11 in the foregoing cause and that the foregoing
12 transcript accurately states the questions asked
13 and the answers given by me, with the changes or
14 corrections, if any, made on the Errata Sheet
15 attached hereto.
16
        _____
17              ALFREDO GONZALEZ
18
  No errata sheets submitted (Please initial)
19 Number of errata sheets submitted _____ pages
20 Subscribed and sworn to
   before me this _____ day
21 of _____2023.
22
23 _____
        Notary Public
24

ALFREDO GONZALEZ, 02/07/2023              Page 250..251

Page 250

1            REPORTER'S CERTIFICATE

2      I, Kathleen A. Hillgard, do hereby certify that ALFREDO GONZALEZ was duly sworn by me to

3 testify the whole truth, that the foregoing deposition was recorded stenographically by me and

4 was reduced to computerized transcript under my direction, and that said deposition constitutes a

5 true record of the testimony given by said witness.

6      I further certify that the reading and signing of the deposition was not waived and that

7 the deponent's counsel, Sean C. Starr, was notified of the availability of the transcript for review

8 and signature. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, if deponent does

9 not appear or read and sign the deposition within 30 days, the deposition may be used as fully as

10 though signed, and this certificate will then evidence such failure to appear as the reason for

11 signature not being obtained.

12      I further certify that I am not a relative or employee or attorney or counsel of any of the

13 parties, or a relative or employee of such attorney or counsel, or financially interested directly or

14 indirectly in this action.

15      IN WITNESS WHEREOF, I have hereunto set my hand of office at Chicago, Illinois, this 23rd day

16 of February 2023.

17

18                      _____

     Illinois CSR No. 084-004093

19

20

21

22

23

24

Page 251

1 Errata Sheet

2

3 NAME OF CASE: JOSE JUAN MAYSONET vs REYNALDO GUEVARA, et al.

4 DATE OF DEPOSITION: 02/07/2023

5 NAME OF WITNESS: Alfredo Gonzalez

6 Reason Codes:

7      1. To clarify the record.

8      2. To conform to the facts.

9      3. To correct transcription errors.

10 Page _____ Line _____ Reason _____

11 From _____ to _____

12 Page _____ Line _____ Reason _____

13 From _____ to _____

14 Page _____ Line _____ Reason _____

15 From _____ to _____

16 Page _____ Line _____ Reason _____

17 From _____ to _____

18 Page _____ Line _____ Reason _____

19 From _____ to _____

20 Page _____ Line _____ Reason _____

21 From _____ to _____

22 Page _____ Line _____ Reason _____

23 From _____ to _____

24

25                _____

ALFREDO GONZALEZ, 02/07/2023

**Exhibits**

**1 Gonzalez 020723-1** 168:19,20, 21 169:11 197:14

**2 Gonzalez 020723-2** 208:20,21 209:3

**3 Gonzalez 020723-3** 217:9,10, 13

**-**

**--having** 199:17

**0**

**02/07/2023** 168:23 208:23 217:12

**1**

**1** 5:2 23:14 168:20,21 169:11 175:6,7,8 197:14 209:14

**1-something** 11:18

**10** 78:20

**10:09** 5:10

**10:27** 23:13

**10:28** 23:16

**11** 25:14 26:15 38:5,20

**11:15** 64:1

**11:24** 64:5

**11:30** 178:15 179:6 180:3

**12:11** 107:11

**12:19** 107:14

**12:44** 133:14

**13** 179:4 237:6

**130** 11:18

**14** 32:13 179:4 237:6

**141** 5:7

**15** 19:24 237:4,5

**150** 11:18

**18** 5:5 19:11 22:10

**19** 22:10 214:12

**19-** 132:3

**1953** 210:3

**1964** 19:19

**1971** 19:22

**1975** 21:14

**1980s** 34:17

**1983** 210:6

**1988** 70:4,20,21 71:17

**1989** 27:5 70:4

**1990** 20:3 27:18 61:13 65:10 71:10 122:11,17 130:22 132:4,11,20 178:15,24 179:6,13,18 189:21 191:2 211:8 234:9 236:13 243:18

**1992** 20:3,7 214:17,19 215:2,15 216:11

**1:24** 133:17

**1:59** 169:3

**2**

**2** 23:17 64:2 174:20,21 175:19 208:20,21 209:3

**20** 5:13 32:19

**2017** 18:8 225:1

**2018** 18:22

**2022** 33:4

**2023** 5:9

**22** 7:7

**2342** 5:5

**24th** 170:8 178:15 179:6,12

**25th** 211:8

**2:00** 170:9

**2:06** 169:6

**2:44** 208:13

**2:46** 208:16

**3**

**3** 64:6 107:12 176:4 217:9,10,13

**30th** 214:19

**32** 76:20 77:8

**3:05** 192:8,20

**3:07** 225:9

**3:20** 225:12

**3:41** 248:1

**3:44** 248:22

**3:46** 248:4,18

**4**

**4** 107:15 133:15 176:15 211:1

**469** 217:14

**471** 217:14

**4A** 210:23 211:2,4,5

**5**

**5** 133:18 169:4 176:18,21 179:1 200:13 201:16 202:2,15 203:3 213:18 225:17

**58** 19:11,20

**6**

**6** 169:7 177:2,7 208:14 213:19 214:5 215:10

**64** 19:17

**6496** 7:7

**7**

**7** 177:9 179:1 186:22 208:17 225:10

**71** 19:15

**72** 19:15

**727** 169:13

**730** 170:1

**736** 169:13

**75** 21:13

**76** 24:12

**77-ish** 25:10

**7th** 5:9 21:7

**8**

**8** 214:4 215:8 225:13 248:2

ALFREDO GONZALEZ, 02/07/2023

**8/24/90** 192:8

**80s** 31:14 34:7,15,16 36:11 55:16, 18 57:16 60:10 66:24 67:1,2 76:12, 15,22 77:9 239:12,13

**88** 61:21 67:4 68:13 70:20

**89** 27:2 67:4 68:13 70:21

**8th** 21:7

---

9

**9** 248:5,19

**90s** 17:9 36:11

**9th** 33:4

---

A

**A-5** 192:7

**a.m.** 5:10 23:13,16 64:1,5 192:8,20

**ability** 11:1

**Abrams** 89:8,9,12 90:1 97:22,23 149:2

**abuse** 114:2 202:15,21 203:2,5,10 204:4 207:20 208:6

**abused** 202:2 205:7

**accent** 248:13

**access** 196:17

**accurate** 223:8 246:12

**acknowledge** 96:16

**act** 50:21 162:24

**adding** 212:21

**addition** 29:14

**additional** 131:7

**address** 95:24

**adjourned** 248:21

**admit** 98:16,20 99:1 109:22 155:20

**admitted** 86:5,19,20

**Adult** 210:1

**advice** 181:19 197:20 213:16 219:16 220:3,14

**affect** 11:1 12:6,22 13:3

**affecting** 12:10

**affiliate** 49:9

**affiliated** 49:24

**afraid** 157:2,3

**African-american** 54:21

**AG** 174:14,17,22 176:7,22 177:6,7

**age** 30:14,20 32:11,17 209:20 238:15 239:19,22

**agree** 6:19 7:24 8:1,3 70:7 178:3

**agreed** 7:11 163:5 172:8

**AGS** 177:13

**ahead** 41:23 62:12 65:14 134:24 154:13 204:9 212:17,18 217:6,21 247:7

**alcoholic** 10:22

**Alfredo** 5:3,20 8:7,14,16 29:21 175:10,17,20 192:10 214:4 215:5,8 232:17 233:12,13

**alibi** 180:17,22 182:9,24 183:3,6, 10,15,21,22 184:2,6

**allegation** 222:2 223:2

**allegations** 218:23 222:24 223:11 224:3

**allege** 128:6

**alleged** 133:23 203:10 204:4 208:6

**allegedly** 220:8

**alleging** 131:2 203:2

**alley** 61:16,18,24 62:7 65:7 211:19

**allowed** 44:10,11,12 146:5 198:9

**allowing** 198:20

**Ana** 237:12

**animosity** 96:18

**answering** 86:9 157:23

**answers** 9:9 123:15 173:1,18 178:3,7,10 203:20

**anxiety** 11:4,6,7,8 12:6,15,22 13:18,19

**Anyplace** 22:16,18

**apartment** 28:6,8,13 96:4 179:21, 22,23

**apologize** 118:9

**appeal** 221:3 222:10

**appeals** 221:19

**appears** 151:4 210:5

**appellate** 221:4,18 222:9

**applications** 54:4

**approximately** 5:10 14:16 27:5 31:18 96:8 122:16

**April** 19:11 214:19

**area** 42:19 44:17 45:16 65:5 102:20 103:7 119:13,14 200:13 201:16 202:2,15 203:3 225:17

**arguing** 139:22

**argument's** 140:7

**arm** 115:6 119:23

**armpit** 120:2,8,14

**arms** 115:9

**arrest** 27:14,18 55:11 65:10 72:20 77:15,23 95:10 210:13 225:20 236:13

**arrested** 54:19,23 56:1 61:12 71:10 72:15 73:12 76:2,5,16,22 77:9 92:16 110:3

**arrests** 77:12

**arrived** 78:24

**ASA** 140:22 171:16 173:6 177:17, 24 183:9 192:9 200:22 226:6,22

**Ashley** 6:9 243:9 247:11

**asks** 138:10 172:22

**assert** 213:7 219:1

**asserting** 198:14

**assistant** 134:2,6 136:10 172:5 244:17 245:9 246:4,10,24

**associate** 49:9

**associates** 5:12 37:2

**assume** 10:18

**assumed** 30:16

**assumes** 86:11

**assuming** 58:20 159:9 213:15 219:15

**attached** 191:16

**attend** 20:15

**attending** 21:12

Index: attention–bruise

ALFREDO GONZALEZ, 02/07/2023

**attention** 69:4

**attorney** 18:7 89:11,14,15 90:2,3 112:5 118:3 134:2,7 136:10 139:18 140:18 154:20 167:3 169:18 172:5 173:11 181:5 184:2 190:2,24 202:17 205:11,19 217:6 218:21 219:21 220:17,19 221:8 224:23 232:4 244:17 245:9 246:4,10 247:1

**attorney's** 219:16 220:2,13

**attorney/client** 70:24 181:7 184:9 191:4 197:18 198:8,14 213:8 218:10 219:2 222:6

**attorneys** 6:20 17:23 18:1,23 181:9,15,19,20 217:2 226:1 229:8 242:24 243:13 247:15

**attribute** 59:13

**attributed** 59:22

**August** 27:18 33:4 71:11 122:11 132:4,11 170:8 191:2

**Austin** 6:1 232:3

**availability** 7:16

**Ave** 24:10

**Avenue** 23:8 56:14,16,17 78:12, 13,19 110:3 111:21 154:1

**awaiting** 203:6,10 204:5

**awake** 180:3

**aware** 54:17 61:4

---

**B**

**B-E-L-E-Z** 235:15

**B-O-N-J-E-A-N** 6:6

**Babe** 214:7 215:13,16

**babies'** 180:17,18

**baby** 162:23 163:1

**back** 13:24 17:9 19:21 23:17 24:6 31:14 34:6 36:6,10 54:14,16 60:10 63:7,13 64:6 67:21 69:8 70:20 71:3 73:3 75:14 76:12 77:9,22 79:2,10, 13,19 85:16 88:3,7,8,23 92:8,22 93:1,7 98:12 102:16 103:2,7,8,18 107:15 110:20 113:15,22 114:13 115:12 117:19 118:13,14,21 119:4 122:11 129:14 130:8 132:3,20 133:18 136:2 140:16,19 141:1,2,4, 8,11,17,21 142:4,6 143:7 144:20 148:20 149:7,9 157:16 161:4,5,17,

18 162:5,8,10,22 169:7 173:4,6,8, 14 175:7 178:24 179:17 189:21 191:1 192:4 196:7,13 208:17 211:24 214:16 223:18 225:13 231:18 238:4 239:12,13 243:18 245:5 248:5

**background** 10:21

**badge** 192:9

**bag** 114:4

**balcony** 187:11,20 188:2,16

**baloney** 188:3,11

**based** 195:6 217:5 232:8

**basically** 100:24 101:5 103:15 109:7,9 140:24 217:20

**basis** 198:21

**basketball** 57:3

**Bates** 169:13 175:13

**bathroom** 146:12 169:1 188:24

**beat** 100:24 101:5,7 103:15,20 113:2,21

**beaten** 112:22 198:5 227:7

**beating** 101:16

**beatings** 128:7

**beginning** 23:17 64:6 107:15 133:18 169:7 191:15 208:17 225:13 248:5

**behalf** 5:22 6:1,4,10,12,13,21 224:24

**Belated** 90:18 152:13

**belief** 132:1

**bell** 209:15

**Bella** 93:20,22,23 94:4,13 96:23

**Bello** 96:23 97:3 145:2

**belong** 31:8,10,22 37:15 77:5

**Beto** 29:22

**betraying** 218:9

**big** 105:3 129:23,24 130:1,3,19 162:23 163:1

**birth** 19:10 236:20

**bit** 64:16,17 225:7

**black** 105:20,23 134:11 243:19 244:4

**bleeding** 68:24 87:21 88:14,17

**blond** 81:11,14,20 85:23 86:2,8,18 106:13,15,22 110:4,9 128:17 129:4 136:13

**blood** 88:20,21,22

**bloody** 88:11

**blue** 176:10 211:8 212:4

**body** 194:6

**Bonjean** 6:5,6,15 7:2,21,23 45:20 64:21 65:1 185:9 186:4 212:16,20 222:8 243:14 247:16

**Borak** 134:8

**born** 19:12,18

**Borowitz** 175:11 177:18,24 183:9 192:10 200:22 226:2,6,22 245:10 246:4,10 247:1

**bother** 118:6

**bottom** 117:1 170:1 175:9,19 176:16,19 177:3,10 209:14

**Boulevard** 5:7

**Bowen** 5:12

**boy** 214:6,8 216:13 235:24

**break** 10:1,2,7 62:9 63:22 106:17 107:8,9,19 110:17 133:12,21 169:1 208:11 225:7

**Brendan** 18:2,3,21 220:21,23,24 225:1

**bridge** 182:5

**bring** 149:13,19,21 153:2 200:2

**broken** 69:2

**brother** 205:1,2 206:8,10,11 241:20,22

**brother's** 241:23

**brothers** 29:12 30:10,11 42:9 54:18,21 55:8 56:3 65:11 133:9 165:3 203:17,24 204:2 230:18 243:1 244:24 246:5 247:2

**brothers'** 29:19

**brought** 125:22 141:13,21 142:6 149:10,12,18 150:2 152:10 188:1 193:18 205:5

**brown** 134:12

**bruise** 114:19 121:17

ALFREDO GONZALEZ, 02/07/2023

**bruised** 167:20,21

**bruising** 120:19 121:14 193:24

**build** 105:12 106:5

**building** 28:7,8 78:6 83:5

**bulletproof** 68:2,8 81:17,20 110:5

**bunch** 82:16

**bunion** 130:4,6,19

---

**C**

**C-O-R-R-A-S-C-O** 207:6

**cage** 136:2

**caliber** 77:8

**call** 13:24 22:24 27:6,7 28:1 40:24 59:22 63:3 74:20,23,24 94:10 130:6 141:23 160:9 215:20 226:17 241:24

**called** 8:8 74:21 94:11 152:16 160:22

**calling** 13:24 152:11 229:14,15

**calls** 44:6 51:23 52:24 80:17 86:11 90:10 92:7 101:19,24 102:7 104:3 115:24 132:5 152:14 154:22 168:17 170:13 171:6 182:12 192:23 193:8,13 194:2,9 196:21 204:6,20 212:11 213:6 215:18 216:23 218:6 222:5,8,12 223:12 229:23 230:9 244:5

**camera** 195:23 196:7,9

**car** 67:6 75:1,4,19 78:7,8,9,11,19 79:1,21,22 81:22 82:4 134:20 135:4,5,12,13,15,16,18,19 136:3, 11,15,19,20,23 137:2,5,6 138:5,7, 10,19,20 140:8,9 146:21 157:16 167:4 171:24 173:5 211:8,11,13, 21,24 212:4 226:7 244:4 245:11 246:6,8

**care** 35:2

**Carmelo** 29:20

**Carmen** 28:18,19 30:21 31:4,5 153:1 164:23,24 165:3,11 182:21, 22 202:14 203:4

**Carmen's** 29:2

**cars** 244:7,9,10

**case** 5:5 7:6,14 16:3,21,22 17:11 18:21 19:7,8 76:9 77:23 131:4 168:13 209:7 216:18 221:13 223:9 224:11 225:18 229:16 232:5 242:9

**cases** 89:13

**cashier** 24:22

**catch** 37:24

**caused** 58:6 131:13 132:3,10

**causing** 123:21 124:1

**CCSAO** 169:13 217:14

**Central** 75:10,20 78:1,11

**chairs** 82:15

**change** 123:20 149:16 150:13,16, 19,21 152:10 153:12

**changed** 93:4 151:23 153:7

**charge** 76:12 86:15

**charged** 204:12

**Charlotte** 216:10,12

**check** 91:5 104:8,10,12 107:20,23 122:21 123:10,11,12 127:8 225:18

**checked** 110:18 123:17

**checking** 107:1 108:22 143:13

**cheek** 194:18 196:8

**cheeks** 102:20 103:2,7

**Chicago** 5:7,13 6:2 19:14,23 20:2, 6,8,10,11,13 31:8 76:2,5 232:4 239:23

**Chicago's** 210:5

**child** 165:2,11 214:8 215:12,14 216:3,4,12 239:18

**childhood** 238:6,14

**children** 213:23,24 215:3

**children's** 179:3 233:19

**choking** 142:17

**Cintron** 164:16,19,21 238:18 239:3

**Cisco** 40:13 47:5 48:8,13 69:18

**city** 6:2 19:23 20:2,6 31:8 232:4

**civil** 7:6 16:22

**claim** 132:18

**claiming** 132:10

**claims** 219:20

**Clark** 5:13

**classes** 190:21

**clear** 9:14 49:5 103:5 151:5 180:16 181:24 186:6 195:8 196:1,6

**client** 11:21 18:11 70:24 203:19 218:8,10

**close** 26:23 47:11,13,14,17 48:20 49:2 75:10 154:16

**closed** 26:24 27:5 79:16,17

**closer** 226:5

**clothes** 67:24 68:1 81:15 93:4 149:10,13,14,15,23 150:3,13,16 151:4,24 152:4,10 153:2,8,12

**clue** 154:24 160:20

**coach** 157:11 158:19 163:24

**coached** 178:12

**coaching** 153:15 156:5 158:13 163:9,17 166:1,2,3,11,14 167:24

**Cocaine** 42:15

**codefendants** 19:8

**coerced** 219:11 222:3 223:1 224:24

**coffee** 187:12,20 188:6,11,16

**Cohen** 6:9 181:4,5 221:1,18,24

**Cohn** 221:2

**collecting** 27:6,8,13

**color** 81:8 106:12 191:17

**comfortable** 198:19

**commit** 155:3,10 156:20 163:4 200:24

**committed** 84:17,20 86:5,24 87:8, 9,14 93:9,11 94:2 98:17 145:13 242:24

**committing** 37:9 155:21 186:10

**Communicating** 60:21

**communications** 181:10,13,15

**community** 57:11

**compared** 80:22

**complain** 116:24 204:16

**complaint** 13:1 127:6

**complaints** 69:7

**computer** 24:3

ALFREDO GONZALEZ, 02/07/2023

**concentrate** 35:23

**concern** 64:10

**concludes** 248:19

**conferring** 141:8

**confess** 86:4 101:1 108:4,5,14
109:19 110:10 163:3

**confessing** 109:1 110:21 112:18

**confession** 131:4 133:8 219:11,
22 222:3 223:1 224:24

**consent** 6:18

**consistent** 197:13

**constantly** 13:8,10

**contact** 53:8 61:11 65:9 66:14
225:20 226:3,14

**context** 244:23 245:15

**continue** 163:24

**control** 44:18

**controlled** 42:23 43:5,21 44:3

**conversation** 103:16 140:11
141:7 144:7 184:20 217:5 218:22
226:21

**conversations** 18:12,18 71:1
75:17 137:5,10 171:4 181:8,9
184:17 198:22 217:1,5 218:10
219:9 229:8

**convicted** 20:3,7 76:8 214:1

**conviction** 130:14 212:9 213:5

**convictions** 77:12 209:19,23

**Cook** 117:17 120:23 122:3 127:7,
11,12 130:15 131:17,18 202:8,16,
22 203:6,10 204:5,11,13,17 206:14

**cop** 58:17,24 59:1,14,18,23 70:6,8

**copy** 63:2 191:17

**corner** 111:21

**corona** 151:17

**Corrasco** 207:3 208:4 240:22

**Corrasco's** 241:17

**correct** 11:15 16:13 32:9,15 37:12
38:5,8 39:11 41:2,7 42:9 46:2,3,20
47:2 49:6 55:1,2,5 61:24 63:15
67:12 71:11,13,19,20 72:10 73:9
74:2,3 83:24 89:17,21 101:5
104:23 110:5 111:23 112:18 114:7
115:18 124:14 128:3,18 130:15,16

134:3,4 136:5,7 139:7 148:22
151:6,12 159:10 161:16,23,24
162:6,18 163:6 167:5 169:18
170:11 172:9 173:6,7 178:11
180:19 181:21,22 184:3 186:17
188:21,22 189:19,20 192:17
195:14 196:19 197:2 203:7,8
210:14,17 213:21,22 214:11,12
220:17,18 221:21 226:11 227:7
229:3,11 245:15,16,21 246:13

**correction** 176:8,22

**corrections** 177:6 229:6

**correctly** 245:14

**counsel** 5:16 6:19 10:6 14:21
18:13,14 106:17 107:8

**Count** 120:23

**county** 117:17 122:3 127:7,11,12
130:15 131:17,18 201:24 202:9,16,
22 203:6,11 204:5,11,13,17 206:15

**couple** 8:22 155:24 177:5 245:7
247:19

**court** 5:14,17 7:12 8:17 15:23
16:5,6,7 21:22 27:8 39:5 48:9
74:14 84:18 94:20 99:17 139:20
144:13 164:18 167:7 170:18 171:3,
5 172:4,9 177:16 192:20 193:4
205:9,12 213:10 221:20 222:1
223:3,11 224:3 246:17

**court-reported** 16:2 168:1 169:15
171:10,11 197:13 226:18,20

**cousin** 206:23,24 208:5 241:12

**cousins** 230:22

**covered** 243:11

**cream** 117:14

**create** 222:10

**creates** 23:23

**crime** 98:17,20 99:2 112:18 135:9
136:17 145:12,13 153:15,17,21,24
163:4

**crimes** 76:9

**criminal** 16:21 19:8 94:19 97:7,13
181:14 184:2 197:5,12 200:2
204:24 209:18

**cross** 182:4 232:10

**crossed-out** 187:1

**Cruz** 32:7,21 33:7,11 34:4 38:12,
14,15 41:1 99:7,8,12 239:5,6

242:3,15,16

**cry** 163:11

**crying** 162:23 163:1,2

**Culbertson** 6:4

**cup** 167:14,16,17,18

**current** 18:13

**custody** 95:4,6

**cut** 26:11,12 206:12

**CV** 5:5 7:7

---

**D**

**D-I-E-P-P-A** 31:2

**damaged** 167:10

**dangerous** 44:16,21 45:5

**date** 19:10 37:7 55:10 170:12
214:15 236:20

**daughter** 214:4

**daughter's** 33:23,24 34:3

**David** 181:3,10,14,21 182:2
183:20 184:1,14,17,20,23 190:24
191:10 197:20,23 198:4 199:4
200:1,11,21 201:7 213:3 218:21
219:8,18 220:5,17 221:8,18

**day** 9:24 13:15,16 32:22 33:10,15
41:11,14 72:14 90:14 92:11,17
131:19 173:18 180:12 183:3 231:3
247:4

**days** 41:12 114:18 169:22 179:8
197:10

**deal** 42:5,18,22 43:4 44:2,17 73:22

**dealing** 41:18,20 42:3,7,12 62:19,
22 63:14

**dealings** 55:24 56:6,7 65:3

**death** 198:3

**decide** 157:8

**decided** 35:12 37:10 122:13
165:13,14

**declined** 211:13

**defecate** 147:4

**defendant** 5:23 6:2,4,14 209:18
210:2,5 211:7,10,15,18,20,23,24
212:3 213:20 214:3,5,8

ALFREDO GONZALEZ, 02/07/2023

**defendant's** 209:20 210:4,23 211:6

**defense** 181:15 184:2,7 204:24

**Dejesus** 29:21 30:1

**denial** 87:19

**denied** 97:18 145:5 146:9

**denies** 209:19

**dep** 14:22 174:6

**department** 69:8 76:2,6 229:6

**depicted** 194:7 196:12 197:14

**depicts** 194:21

**deposition** 5:3 6:17 7:5,9,16 8:1, 16,20 9:19 11:1 14:4,12 15:17,22 17:16,19,22 18:24 19:7 168:21 197:5 208:21 217:10,17 248:20

**deposition's** 5:6

**describe** 47:22 48:2 68:17 80:10 82:12 91:16 99:5 101:7 104:17,19 105:13,19,21 106:2 134:10

**desks** 82:15

**detail** 53:14

**details** 186:8,11

**detective** 55:9,11,14 56:1,2,6 57:16 58:23 60:23 61:11,23 78:4 79:22,24 80:7 81:14,19 82:3 84:6 87:2,3 90:23 91:1,2 96:21 104:10, 12,13 108:2,12 110:8 115:20 122:10 128:7,15 135:16,18,19 136:10,13 141:19,22 147:19 149:8 153:16 155:2,20 158:20 159:24 160:18 162:6,9 165:9 172:13 175:11 178:10,12 183:2 186:11 187:9 188:14 189:8 192:9 198:2 201:11 204:18 213:4 218:5,24 219:7 227:8,12,19 230:5,14 231:8 245:6 246:3,24

**detectives** 67:20,22 82:16 91:3,24 104:14 107:20 108:22 143:17,24 144:8

**diagnosis** 128:2

**died** 35:18 46:2,4

**Dieppa** 30:22,24

**difference** 32:11,17 52:15

**Difranco** 6:4 244:18,23

**direct** 134:21

**direction** 211:22

**directions** 160:23

**directly** 134:20

**dirty** 58:17,24 59:1,14,18,23 70:6,8

**discuss** 220:5

**discussed** 19:6,7

**discussions** 219:19

**district** 56:20

**divulge** 18:12

**doctor** 122:17 123:6 127:9 132:10, 17

**document** 209:2

**documentation** 15:17

**documents** 15:19,21 17:4,15 169:17 217:16

**Dollar** 54:6

**Donald** 108:6,8,9 110:22,24 111:1, 2,3,4,12,14,16 112:2,5,6,9,15,20 135:11 137:16,17 138:1,2,16 139:3 140:3,14 142:13 154:4,17,20 167:4 200:23 226:7,8 245:7

**door** 143:15

**dosage** 11:17

**dose** 11:14

**double** 84:17,18 87:9 93:9,11 94:2 133:8 225:18

**doubt** 173:17

**downstairs** 78:6 82:10 150:2 164:7

**Drake** 23:8 24:10 27:23,24 73:8

**dressed** 67:23 81:13

**drink** 10:22

**drive** 200:23 211:8

**driven** 186:9

**driver** 211:9,17

**driving** 67:15 136:19 137:6,9 141:8 211:11

**drop** 22:5 58:11

**dropped** 21:15,17 22:3,9,11 212:3

**dropping** 58:14,19 59:12,20

**drove** 135:21

**drug** 11:15,17 65:8

**drugs** 41:18,21 42:3,5,8,11,18 43:4 44:2,17 45:12,16 60:4,5,13

**dude** 73:20 80:11,12 110:4

**Due** 209:19

**Duk** 108:9 110:22,24

**Duk's** 108:6,8 111:1,2,3,4,13,14, 17 112:2,5,6,9,15,20 135:11 137:16,17 138:1,2,17 139:3 140:3, 14 142:13 154:4,17,20 167:4 200:23 226:7,8 245:7

**duly** 8:8

**Dunaway** 209:14 212:8

**duties** 24:21

**E**

**e-l-e-z** 236:2

**earlier** 48:11 51:13 52:8 114:2 144:2 169:12 171:19 187:24 210:14 232:7 246:9

**early** 67:2 76:12,15,22 77:9

**eat** 150:9 153:8

**Efrain** 32:7,12,14,21 33:6,14 38:14,15 40:14 242:3,15

**Efrain's** 33:24

**Elena** 238:18

**else's** 16:19 160:19 175:3

**employment** 24:24

**encroached** 45:16

**end** 23:14 64:2 67:2 107:12 133:15 146:11 169:4 208:14 210:3,7 225:10 248:2,19

**ended** 53:10

**English** 190:17,18 191:1 205:10, 13 216:22 220:9 222:4 227:17,20 228:2,9,13

**Engquist** 5:22 6:22 7:22 8:4,11, 15,18 12:1 17:3 18:16 22:1 23:12, 19 26:1 27:10 32:1 36:6,7,18 39:7 41:19 42:1 43:2,11,18 44:8 45:3,8, 19,21 46:7,18 47:1 48:12,19 49:1 50:10,13 51:12,19 52:6,7,16,21 53:4,20 55:6,17,23 56:10 57:14 59:3,11,19 60:2 61:3,8 62:11 63:21,24 64:8,16,19,23 65:2,17

Urlaub Bowen & Associates, Inc.  312-781-9586

ALFREDO GONZALEZ, 02/07/2023

67:5,10 68:5,7 69:23 71:3,7,14
72:3 74:17 77:4,17 80:20 81:1,7,12
83:9 84:21 86:14 90:13,20 92:9,15
95:5,8 97:12 98:18,23 99:20
101:21 102:2,9 104:5 105:8,16
106:19,20 107:7,17 114:5 116:4
118:1,10,11 119:18 123:16 132:8
133:11,20 136:1 139:23 144:17
146:1 147:2 152:15 154:15 155:1,
8,15 156:15 157:5,24 158:6,14,18
159:13 161:2 164:20 166:9 168:19
169:2,9 170:16 171:8 173:3 174:4,
18 177:21 181:17 182:4,7,15
184:12 185:8,12 186:5,18,20
187:18 188:20 189:18 191:9 192:2,
15 193:2,10,16,22 194:5,11 195:1,
12,20,21 196:16,23 197:21 198:13,
18,23 199:3 201:4,21 202:13,24
203:1,15,23 204:1,8,22 205:4
207:18 208:2,3,12,19 209:1 210:9,
11,16 211:3 212:14,17,23 213:1,
11,14 214:14,18,22 215:20 216:1
217:8,13,15,22 218:16 219:4,6,14
220:1,12 221:17 222:14,20,22
223:7,14,17 224:1,5,9,15,18,21
225:6,15 230:1,8,12,21 231:5,11,
21 247:11,14,17,21,23 248:8,11,16

**enter** 57:19

**entered** 204:13

**entire** 49:17

**entitled** 10:10

**Ernest** 29:20

**estimate** 12:3

**et al** 5:4 7:7

**event** 69:10

**events** 72:12 212:8

**everyday** 13:20

**everyone's** 16:16

**evidence** 86:12

**exact** 24:13 108:3 110:16 114:3
156:12

**examination** 8:10 210:4 232:1
244:14

**examined** 8:9

**Excellent** 64:19 199:2

**exception** 5:23

**Excuse** 175:22

**exhibit** 168:19,21,24 169:11
197:14 208:20,21 209:3 217:9,10,
13

**expect** 9:23

**experience** 127:23

**experiencing** 121:22 127:21

**explain** 23:22 97:4 138:14

**explained** 147:20

**explains** 211:14

**extent** 7:24 8:3 185:10

**eye** 114:23 126:1,10,15 127:7,8,18,
19 128:3 194:24 195:2,14,15,18
196:2,4,5,10

**eyedrops** 127:15

**F**

**face** 66:6 68:22 69:11 88:9,24
91:20 101:11,12,17 102:6,10,11,
15,17,21,23,24 103:6,18 113:2,15,
22 126:20 129:9,12,16 132:3,11,19
194:10,12,14 198:3 199:9

**fact** 86:11 192:19 199:4 205:6
220:7 222:2,3 229:19

**factory** 22:17 24:24 25:3,8,10,13,
15,23 26:3,6 27:4

**failed** 22:6

**fair** 10:8,18,19 42:7 50:1 60:22
71:8 120:4,10 126:23 130:10
218:17 224:22

**false** 223:1

**family** 12:18 13:24 31:21 33:15,17,
18 35:2 150:2 152:6,7,9,18,20
156:8,10 157:3 164:2,4 165:17
182:9,23 187:15 188:1 193:18
201:15,23 202:1 204:23 205:21
229:10 230:4,5,16

**family's** 150:2

**fast** 217:24

**fatal** 170:2

**father** 213:23 214:6 234:18

**father's** 235:2

**fathers** 234:19,24

**favor** 64:11

**February** 5:9

**fed** 186:11 213:5

**federal** 221:20 222:1

**fell** 66:6 184:16

**felt** 68:23 114:4

**fight** 47:19

**file** 54:4 221:19

**filed** 216:18 224:23

**filing** 223:3,11 224:3

**filings** 221:24

**finally** 79:3

**find** 152:3 174:9 179:17

**finding** 124:17

**fine** 6:22,23 7:1 12:4 63:21 198:13,
18 218:11

**fingerprints** 168:4,15

**finish** 126:3

**firm** 5:21 18:14

**fish** 149:10,22 150:3,4,9 153:8,11
187:12,13,20,24

**fist** 79:16

**five-year-old** 214:6

**flight** 126:11

**floaters** 126:14

**floor** 83:5,8 180:1

**flow** 198:11

**focus** 36:1

**focusing** 27:17 134:5

**follow** 187:10 213:16 219:15
220:2,13

**follow-up** 247:19

**food** 24:22 149:19,21 187:6

**force** 218:5,23 222:1

**forget** 12:11,13 13:24

**forgetting** 12:13

**forgot** 31:5 164:16

**form** 17:1 36:5,12 41:16,22 43:1
44:5,24 46:5,15,21 48:15,22 50:11
51:17,23 53:17 55:3,15,21 61:2,6
65:13 68:3 69:21 71:12 77:2 86:10
90:19 92:6,13 95:2 97:11 113:24
119:15 132:5 152:13 154:22 155:7

Index: found-gym

ALFREDO GONZALEZ, 02/07/2023

156:13,24 159:11 160:24 177:19
182:11 185:4,10 186:1 188:18
189:17 191:23 192:23 193:7,13
194:1,8 196:20 197:17 201:2
202:18 203:13 204:6,19 207:22
208:8 210:15 212:10 213:6 215:17
216:23 218:6 220:10 221:15 222:5
223:4,12,21 224:12 225:2 229:22
230:7 233:6 236:14 238:3 240:9
242:10,18 243:2 244:5 245:1 247:6

**found** 62:17 200:7 201:13 210:20

**foundation** 25:21 31:23 36:5,12
41:16,22 43:1,16 44:5,24 46:5,15,
21 48:15,22 50:11 51:17,23 53:1
55:3 57:12 65:13 68:3 69:21 77:2
80:17 86:10 90:10,19 92:6,13 95:2
113:24 116:1 119:15 132:5 135:23
152:14 154:12,22 156:13,24
170:14 174:1 182:11 185:4,10
186:1 188:18 191:23 192:23 193:7,
13 194:1,8 196:20 197:17 201:2
202:18 203:13 204:6,19 207:22
208:8 210:15 212:10,21 213:6
215:17 216:23 218:6 220:10
221:15 222:5 223:4,12,22 224:12
225:2 229:22 230:9 233:6 236:14
238:3 240:9 241:8,19 242:10,18
243:2 244:5 245:1 247:6

**founded** 38:4

**founding** 38:8,17,19

**framed** 184:22

**Frank** 6:4 244:18,22

**Freddy** 123:15 187:16 195:9
207:24 233:2

**Frederick** 221:1,24

**Friday** 170:8 180:12

**friend** 47:10 229:10 237:23,24
238:6,12,13,16 239:10

**friends** 47:6 69:15 230:5 231:6
238:9

**friends'** 89:13

**Fro** 99:15,19,21,22,24 100:2,7,13,
15 145:2,12 157:17 185:21

**front** 79:8 83:14 110:11 157:18
169:14 171:3,5 173:11

**Fros** 99:22 100:9

**full** 11:3 22:24 94:23

**function** 33:15

**funeral** 180:9,10

**future** 7:16

**G**

**G-O-N-Z-A-L-E-Z** 8:14

**gang** 31:8,10 37:2 39:13 44:18
45:15 58:20 59:21

**gangs** 44:14 45:11,15 51:1,14,15,
21 52:10,12,15 53:2 77:1,3

**Garcia** 236:6,9

**gave** 16:3 30:13 63:7,13 93:19
123:9 131:3 132:14 159:3 166:22,
24 167:13,16 178:3 191:2,22
193:12 197:12 203:3 205:7 212:7
220:9 225:21 233:16 246:11

**general** 7:6,9,20

**gentleman** 211:11 212:4

**gentlemen** 211:13,20

**get along** 47:18,23

**girlfriend** 73:3 94:6,19 97:8
183:12

**girlfriend's** 73:2 74:1 94:8 179:13

**give** 11:1 29:18 30:14,19 37:7
105:1 106:19 121:1 123:14 131:19
132:12 152:5 157:20 158:22 163:6
164:13 165:15,23 171:10,13 178:6,
7 187:6,11 211:11,14 246:21
247:3,22

**giving** 12:2 133:7 167:24 171:3
219:21

**glass** 160:9,11

**glasses** 127:20

**glue** 176:10

**goddaughter** 237:15,16

**Gonzalez** 5:3,20 6:7 7:6,7,10,24
8:7,14,16,19 28:22 29:21 168:22
175:10,17,20 192:11 208:22 214:4,
5 215:6 217:11 222:11 232:3
244:16

**Gonzalez's** 6:19 7:14

**good** 5:1 6:5,7,9 24:3 63:19 106:18
133:11 198:3 225:8

**Goosens** 100:6

**grab** 84:11,23 142:11

**grabbed** 83:21 84:7,14,22 142:15

**grade** 21:7,16

**grammar** 20:22,24

**Grand** 75:9,19 77:24 78:11,12,13,
19 110:3

**Greenberg** 6:11 224:16

**grocery** 22:15,21,23 23:1 24:9,21
25:3 71:16

**groin** 199:6

**ground** 8:22

**group** 6:6 69:14

**growing** 31:7

**guards** 51:3

**guess** 11:23 12:19 13:19 48:23
49:7 114:17 116:16 154:18 160:17
166:7 172:24 182:4 190:20 210:18
237:4 239:18

**guessing** 172:24

**Guevara** 5:4,24 6:14 7:7 55:9,11,
14 56:1,2,6 57:16,24 58:23 60:23
61:12,23 65:4,10 66:14 67:15
68:12 69:11 71:10,18 74:20 75:8
78:22,24 79:24 80:16 82:3 84:7
86:3,9,16,18 87:2,3 92:8,22 93:6
96:21 108:14,16,17 110:8,20 112:1
115:20 118:14 122:11 126:18
128:7 134:3 135:8,21 136:10
138:22,23 139:2,7 141:19,22
143:21 144:20 147:19 148:22,23
149:9 151:24 153:16 154:19 155:2,
20 158:5,20,21 160:1 161:6 162:6,
10 165:9 168:7 172:13 173:10
175:12 178:11,13 183:2 186:11
187:9 188:14 189:8 192:9 198:2
201:11 204:18 207:21 208:7 213:4
218:5,24 227:8,12,19 230:6,14
231:8 240:8,15,18 242:8 245:6
246:3,24

**Guevara's** 79:22 160:18

**guilty** 200:8 201:13 210:20

**gun** 76:12,15,18,21 77:5,7 210:13

**guy** 85:23 110:9 128:16 129:4

**guys** 47:19 69:12,13 106:12,22
107:22 122:20 141:4 144:2,4,5
225:8 248:17

**gym** 56:12,13 57:2,3,9,16,19 58:6
60:24 61:10 62:3 65:5 72:1

ALFREDO GONZALEZ, 02/07/2023

## H

**hair** 81:8,11,14,20 85:23 86:2,8,18
105:17,19,20,23 106:11,13,15,22
110:4 134:11,12

**half** 15:5 90:14

**hallway** 83:2 168:8

**Halvorsen** 80:5,6,7 83:21 109:17
110:1,2,9,12 112:5 128:15 129:3
136:12,13 139:2 141:20,23 142:7
173:9

**hand** 79:16 84:9,12 87:24 88:2
102:17 129:16

**handcuffed** 83:11 85:15 114:18
115:4,7,9,13,22 116:10 119:2
141:23 142:3 166:19,21

**handcuffs** 74:8,11,19 79:1,5,6
142:2 167:11,19

**handguns** 77:10

**hands** 83:13 84:9,12 204:18
207:21 208:7

**handwriting** 174:15,22 175:1,4,
15,20 176:2,5,13

**handwritten** 171:12 175:11

**hang** 43:20 48:3,5,6,13 49:20

**happen** 9:19,21 66:13 116:9
137:20 140:5 154:5 157:12 165:17

**happened** 62:21 63:1,6 65:22
66:1,4,9 70:20 74:19 78:1,21,23
79:20 82:5 85:9,14 86:21 87:15,18
88:24 89:24 90:6,22 93:6 97:1,20,
24 98:3 99:2,14 100:14,23 108:10
111:2,4,12 112:2,3 126:17,24
127:1 128:23 133:3 135:10 137:18,
21,22 139:3,16 140:3,4,6 142:10,
13,14 143:4,16 144:19 145:16
146:2 147:6,14 148:9 149:4,9
150:11 152:3 153:15 154:1,3,4,6,7
156:3 157:7,13,15,20 158:4,7,10,
11,12,17 159:4 162:20 163:15
164:1 165:11,23 166:10,14 202:21
212:1,2

**happening** 37:8 108:1 143:12
146:3

**harassing** 193:8

**hated** 233:8,12,13

**he'll** 109:16 172:23

**head** 9:12 79:10,13,19 211:22

**headache** 132:14

**headaches** 131:11,12,16,20,23
132:2,10,19

**heal** 116:11

**healed** 116:12

**hear** 9:6 64:13 75:7,11,14 143:23
224:17

**heard** 54:14,16,20 58:10,23 60:1,
3,10,13,18 64:9 140:22 168:4,6,14
211:23

**Hector** 237:17

**height** 104:23 105:7 106:5,8

**held** 5:6 33:18

**helped** 89:13

**Henry** 30:1,3,4

**Henry's** 30:5

**Herberto** 30:2

**Hey** 122:20

**high** 21:1,6,8,9,11,18 22:3

**Hillgard** 5:15

**Hinshaw** 6:3

**hired** 54:15

**Hirsch** 20:16 72:21,22 73:1 179:19

**Hispanic** 144:2

**History** 209:18

**hit** 72:11 79:12 101:9,17 102:11
103:1,6,10,16,17 109:2,7,10,12,15,
18 110:11 142:11 161:18 199:14

**hitting** 109:4

**hold** 85:6 195:22 196:7

**holding** 46:10

**Homan** 33:21

**home** 178:16,17,18,21 211:7,12,
17,18

**honestly** 235:20

**hoods** 211:21

**hospital** 125:4,6,12

**hour** 15:13,14

**hours** 15:13,14 92:8,10,22 104:4,
6,7 107:19,24 108:21 110:17

112:10,11 114:18 128:7 148:10,11,
14,18,19 153:22 155:24 156:4,16,
19

**house** 28:6 73:2,8 74:1 95:17
179:6,9,10,11,13,20 212:4

**How'd** 228:7

**hurt** 121:18 124:5 167:11

**hurting** 130:11

**hurts** 114:22 115:3,23 118:5
121:20 124:4

**husband** 241:15,18

## I

**Iasparro** 6:3 244:13,15,17 245:4,
21 246:1 247:9

**ibuprofen** 124:22 132:12,15

**idea** 92:11 105:1 111:6

**identification** 168:23 169:12
208:23 217:12

**identified** 245:10

**identify** 5:16 198:10

**IDOC** 49:17 121:7 122:6 124:14,24
127:14 130:12 132:18 206:18
229:5,15 230:6,15 231:7,14

**Illinois** 5:7,13 229:6

**implicate** 157:3 164:2,5,11 165:2

**impression** 86:7

**incident** 66:21 70:20

**include** 219:20 220:7 222:1

**including** 9:5 29:16,17 38:5 220:7

**incomplete** 117:23

**inflicted** 130:2 131:2 133:7

**inform** 11:21 205:9,12

**information** 53:13 209:12 214:10

**initial** 38:20

**initially** 38:4

**initials** 174:14

**injure** 128:20

**injured** 68:22 128:12 129:21

**injuries** 114:9,12 121:14 128:5
131:1,7 133:5,6,23 193:23 194:6

ALFREDO GONZALEZ, 02/07/2023

204:16

**injury** 114:15 120:24 123:23 130:2 194:21 196:3,11

**innocence** 219:21

**innocent** 100:17 139:14,15,17 140:6,16 143:21 184:22 198:6 205:6,19 226:23 227:2,10,12 229:19

**inside** 79:21 88:14,16 127:23 146:12

**instruct** 181:7 189:9 198:9,24 200:2 203:18 213:8,11 217:2 218:8,13 219:2 222:7,18

**instructed** 213:2

**instructing** 222:20

**instruction** 219:12,13,23 220:11

**intend** 7:15

**interaction** 61:9,17 70:3 71:9

**interactions** 71:18

**interpretation** 222:12

**interrogated** 156:9

**interrogation** 82:7,8 141:13,18,22 142:7 146:12 162:6

**interrupt** 6:17

**interrupted** 117:21

**interrupting** 198:11

**interview** 200:16

**introduced** 95:13 134:16 170:21 200:19 201:5

**invades** 197:18 222:6

**investigation** 170:2 244:23 245:15 246:6 247:2

**involved** 96:24 97:16

**issue** 13:17,19 198:10 248:10,11

**issues** 13:14,18 23:24

**Ivan** 39:2,8,11 47:5 69:19

---

**J**

**Jackson** 5:7

**Jacques** 239:7,9,11,24 240:3,6,14

**Jail** 117:17 120:23 122:3 127:7,11, 12 130:15 202:9,16,22 203:6,11

204:5,11,14,17 206:15

**Janet** 170:20 237:20

**Jarvis** 237:20

**JB** 177:7

**Jeffrey** 243:19,20 244:4

**Jennifer** 6:5 34:4 134:8 167:2 175:11 192:9 247:11

**job** 25:2,5,6 26:14,18 41:24 53:18, 23 59:6

**jobs** 24:20 54:2

**join** 6:20,23 7:4,23 45:20 185:11 186:4 222:13

**joined** 31:19 34:6

**Jorge** 237:22 238:2

**Jose** 5:4 6:8,10 38:10 40:18,19 49:6 93:19 96:23 97:2,8 109:22 145:1,12 185:2 205:20 206:13 223:9 224:10 239:5,6

**Josh** 5:22 63:20 117:20 198:7

**Juan** 5:4 40:23,24 47:5,11,13,14, 16,24 48:20 49:5 69:19 94:7 95:14 97:8,15 157:17 185:3,6,7,14,15 223:9

**Juan's** 94:6,8,18 205:21 206:13 240:20 241:20,22,23

**jump** 198:24

**jumped** 211:20

**junior** 21:6,18,19 22:2

**jury** 201:10

**Justino** 32:7,14,18 33:11 38:12 41:1 99:7,8,12 242:16

**juvenile** 209:19,20,22

---

**K**

**Kathy** 5:14

**Kedzie** 43:13,15 56:14,16,17 72:21,22 73:1 96:2,4 179:19

**Kevin** 170:3

**kick** 143:15

**kidney** 118:17 119:13,14,17

**kids** 35:23 36:1 164:6,10 178:19, 22,23 180:18 202:3

**kill** 165:21

**killed** 35:4,13,16 54:22

**Kimball** 37:20,23,24 41:7 42:19 111:21 232:9

**kind** 13:20 23:23 30:14,19 33:15 42:11 45:14 46:14 52:22 54:2 56:6 57:2,3 76:18 86:8 117:5 121:13 123:20 127:9 134:11 151:13,18,22 172:11 173:4,16 175:12 209:11 223:3 225:16

**kinds** 41:15

**King** 37:12 40:17 48:8,13 50:3,7,8 60:24 65:4 69:19 100:3

**Kings** 31:11,13,19,22 32:4,8 34:6, 9,14,22 35:1,13,22 36:4,10,20,23 37:3,6,15 38:21 41:2 43:22 44:4 46:13 49:9,20,24 50:10,22 51:6,9 53:8 57:1,10,13 58:11,14,18 59:12, 20 60:15,16,17 69:16 70:22 89:15, 16 111:23 186:9 231:14 232:8 239:14 243:18 244:2

**knew** 58:2 60:22 89:15 109:22 110:2 138:20 139:11 145:3 165:19 185:6 215:13 227:21 231:13

**knocked** 162:15,21

**knowing** 97:18

**knowledge** 244:22 245:17 246:2, 23

---

**L**

**L-L-U-V-I-A** 39:18

**L-O-W-E-L** 20:21

**Label** 25:16,17,18,20 26:20,22

**lady** 167:2

**language** 248:10,11

**large** 82:15

**larger** 81:3 82:24

**late** 36:11

**Latin** 31:11,13,19,22 32:3,8 34:6,9, 14,22 35:1,13,22 36:4,10,20,23 37:3,6,11,15 38:21 41:2 43:22 44:4 46:13 49:9,20,24 50:3,6,8,10,22 51:6,9 53:8 57:1 58:18 69:16 70:22 89:15,16 100:3 111:23 186:9 231:14 232:8 239:14 243:18 244:1

**Latino** 73:20,22 75:18 91:21,22

Index: law-meetings

ALFREDO GONZALEZ, 02/07/2023

92:2 104:18,19,20,21 105:22
107:21 110:18

**law** 5:21 6:6

**lawsuit** 240:7,15,18

**lawyer** 14:7,9,12 17:21 19:1 89:2,
3,5 97:21 98:2,11 100:18,19,20,21
113:17 143:2,3 145:8,10 149:1,3
156:6,7 163:18,19,21,23 181:1,2
205:16 221:3,4,19

**lawyers** 222:9

**leader** 46:1,4

**learn** 55:14 190:18

**leave** 25:2 26:20,22 35:12,21 36:4,
10,16,20 91:7,14 150:24

**leaving** 36:23 37:3

**left** 21:14 23:20 25:4 35:18 53:10
62:3 72:2 83:21,24 90:7 101:15
103:4,22,23 107:18 110:16 114:13,
16 115:2,3,6,14,21 116:9,15,21
117:6,8,10,16,22 118:2 119:1,5,6,
10,14 120:1 121:6 130:8 141:20
142:8 143:5 144:18 145:17 146:4
148:10 149:5 194:16,18,24 195:2,
10,13,18 196:5 226:15,16 227:1

**left-hand** 119:20 120:7,13,24

**legal** 222:8,12

**Lemoyne** 65:16,19,20 66:22 70:3
71:21 72:4

**lie** 189:3,4,5,12 197:23,24

**lied** 99:10

**life** 13:20 37:8 156:7 157:3 165:20
233:21 245:18

**lights** 114:24 126:11,14,20 127:6,
21,24

**limited** 198:21

**limiting** 7:15,17

**lineup** 159:5,6,10,15,16 160:22
161:8,14,16,20 162:10

**lineups** 200:12

**lip** 87:21 88:11

**liquid** 127:9

**listed** 178:3

**listen** 39:24 128:24 143:20 144:10,
23 145:7 147:16 148:24 153:14
157:8 163:16 164:3 165:13

**live** 20:1,5 27:22 96:1

**lived** 28:8,13,17 73:8 154:14
179:17 216:13

**living** 27:19

**Lluvia** 39:16,19 40:4,6,7 232:18

**located** 5:12 23:7 37:19 111:20

**location** 44:2 154:10 186:10

**locked** 190:20,22

**Loevy** 5:21

**long** 9:24 11:11 14:14 15:12 25:12
41:20 78:18 85:6,17 90:8,16 92:1,
11 95:1,9 98:13,19 101:16,17
104:2 134:11 140:10 143:6,9 144:6
145:18,21 149:6 153:16,20 160:21
166:3,4,5 231:3 239:11 246:20

**longer** 15:8 24:14 37:6 220:16

**looked** 16:12 53:23 60:23 61:4
80:19 104:21 106:7,9 170:23 227:9

**lookout** 50:19,20,21 51:20 52:9,13

**loss** 13:12

**lost** 41:24 235:18

**lot** 14:10,16 78:11,16 88:17 99:22
100:15 102:3 108:19 137:8,12,14,
16,18,20,24 138:5 140:12 154:5,
17,21 200:23

**loud** 9:10 21:23 24:7 236:23

**louder** 64:12,17

**Louis** 154:2

**Lowell** 20:16

**Lowells** 20:19,21,22

**Lozada** 234:2

**Lucy** 30:21

**Lupa** 170:20 192:7

---

**M**

---

**machine** 26:13

**Macho** 35:11,13,22 37:17 38:5
39:11 45:24 46:4 48:21 49:2 69:19

**mad** 139:5,6,18 147:8,9,22,24

**made** 13:1 190:8 193:6 222:24
223:2,10

**Mag** 31:4

**make** 7:4,19 8:23 9:2,4 25:20
26:11 43:7 59:5 64:11 69:7 91:2,
13,19 92:3,4 127:6 224:2 235:12

**makes** 6:19

**making** 18:18 90:23 91:8,9 143:14

**man** 105:3,4,11,12 110:11 129:3
141:23 244:22

**Maria** 73:4 74:1 164:12 178:21
183:12 184:13,16 202:14 203:5
204:3 214:4,5 215:3,6,10 233:20
239:3

**Maria's** 73:5 164:13 183:17

**Marital** 213:19

**mark** 208:20 217:9

**marked** 168:22 169:11 208:22
217:11

**married** 164:15 213:20 234:7
236:10,11,18 239:1

**Marty** 89:8,9,11 90:1 97:22,23
149:1

**masked** 9:4

**matter** 5:3 90:4 243:5

**Maysonet** 5:4 6:8,10,12,21 38:10
40:18,19 49:6 93:19 96:23 97:3
109:23 145:1,12 207:10,20 208:4
223:9 240:21

**Maysonet's** 6:20 205:21 224:11
241:14

**Mcgrath** 6:13 247:13

**means** 111:9

**meant** 111:6 138:3

**Media** 5:2 23:14,17 64:2,6 107:12,
15 133:15,18 169:4,7 208:14,17
225:10,13 248:2,5,19

**medical** 13:2 69:4 116:13,14
117:16 120:22 132:17,18 194:9
204:13

**medication** 11:12 12:21 13:23

**medications** 10:24

**meet** 14:8 15:10 17:22 18:3 75:9
95:15,16,17 244:22

**meeting** 17:21 23:10 209:5

**meetings** 5:8 15:12,15 19:4
169:18

ALFREDO GONZALEZ, 02/07/2023

**Megan** 6:13 247:12

**member** 31:12 34:8,14,17,22 35:1, 15 37:6,14 38:17,19 41:2 239:14

**members** 31:21 32:3 41:14 47:4 50:22 182:8 205:20 229:10

**memory** 12:7,10,23 13:2,12,14,17, 18

**men** 54:21

**Menard** 116:17 122:13,18,22 127:13

**Menards** 123:6 124:10

**mention** 202:19 216:21 218:4,23

**mentioned** 21:2 48:10 62:6 117:19 121:9 128:16 133:22,23 156:8 179:16

**met** 14:11,21 18:23 19:2 61:23 62:1,6 96:6,7 160:6 241:7

**Michael** 6:3 244:16

**mid** 67:1

**middle** 30:17

**middle-ish** 187:1

**midnight** 178:15 179:6 180:4

**Migdalia** 30:21,24

**mind** 89:3

**mine** 16:17 239:10

**minute** 162:7 217:19

**minutes** 78:20 85:19 90:15,17,21 98:22,24 101:4,20,22 140:13 144:9 161:1 225:8 247:18,22

**mischaracterizes** 48:16 67:8 68:4 69:22 114:1 157:1 158:16 185:5 201:3 224:13

**mischaracterizing** 68:6

**misheard** 118:8

**Moffat** 27:23 28:2,5

**mom** 205:24 230:17

**moment** 87:12 131:5 245:20

**money** 46:14,20 62:17,23 63:2,3, 13 65:8,24 66:2

**month** 14:18,20,22 15:11,15

**months** 125:8,12,23

**morning** 5:1 6:5,7,9 170:9

**mother** 27:20,22 28:12 164:6,10 165:2,10 178:19 179:2 180:17,18 202:3,6,15 203:5 204:3 234:13,14

**mother's** 179:10 233:19

**mother-in-law** 239:4

**motion** 216:17,22 218:4 219:9,19 220:6

**motioned** 119:22

**mouth** 102:19 103:2,7

**move** 19:14 118:12 133:12 159:21

**moved** 19:23

**muffled** 64:11

**multiple** 98:8 112:23,24 113:20 120:17 121:15 233:20 244:7,9

**murder** 17:11 20:7 42:8 54:18 56:2 65:11 72:15 76:9 84:17,19 86:6,20, 24 87:8,9,14 93:9,11 94:2 97:16 111:2,4 112:2 137:20 138:11,21 139:10 145:5 154:21 155:4,10,11 156:21 168:13 183:7,10 186:10 200:24 209:7 243:1 244:24 246:6 247:2

**murders** 54:23 55:8 96:24 133:8 155:21 165:3 182:10

## N

**named** 244:22

**names** 28:17,22 29:19 30:13,19 38:22 39:4 93:19 100:10 175:10 211:14 215:5 232:16,20 233:20 234:4,23 237:10

**ne** 20:18

**necessarily** 9:24

**neck** 83:22 84:7,11,15,22,23 85:2 142:11,16

**needed** 66:7

**neighborhood** 54:22 55:19,20 60:19 96:14 99:23 100:16 137:7

**nephew** 99:9 145:3

**nephews** 32:2,3

**nickname** 35:8,10 39:13,23 40:8, 14,16,18,21,22 41:4 232:18 243:19

**nicknames** 38:23 39:1,10

**night** 66:23 70:4 71:10 161:12,21 180:14,22 182:9 183:6,10 188:3

**nighttime** 65:21 92:18

**nine-ish** 105:22

**Nodding** 9:1,12 16:9 21:10,20 24:5 28:9 43:23 45:10 84:5 101:13 115:17 124:15 137:13 146:16 159:17 162:17 164:22 232:23 238:19

**nonsense** 139:19,21,24 140:17,19 141:1,2

**normal** 64:12

**North** 5:13 23:8 24:10 56:14,16,17 111:21 154:1

**note** 7:13

**notes** 247:19

**notice** 24:2

**noticed** 12:12 13:21 167:20

**number** 5:2,5 168:20 169:11,24 179:23 192:9 197:14 208:20 209:3 217:9,13 248:13

**numerous** 152:11,17

## O

**O-L-G-A** 207:7,8

**object** 7:5,10 181:6 185:9 191:3

**objected** 7:8

**objection** 6:20,21 7:3,20,24 17:1 25:21 31:23 36:5,12 41:16,22 43:1, 16 44:5,24 46:15 48:15 50:9,11 52:14 53:17 55:3,15 56:7 57:12 59:24 61:2,6 65:13 67:3,8 68:3 69:21 71:12 77:2 80:17 86:10 90:10,18 92:6,13 95:2 97:11 101:19,24 102:7 104:3 105:5 113:24 115:24 119:15 135:23 145:22 146:23 152:13 154:12 155:7,12 156:13,24 159:11 160:24 166:6 168:17 170:13 171:6 177:19 181:6 182:11 185:4 186:1 188:18 191:23 193:7 194:1,8 196:20 197:17 198:8,15,20 201:2,17 202:11,18 203:13 204:19 207:13 212:10,16,18,22 215:17 219:13,23 220:11 222:13 223:21 229:22 231:2 233:22 236:14 238:3 240:9 241:8

**objections** 6:23 43:8 45:6,17,20 52:18 59:6 81:5,10 193:20 194:23 196:14 230:20,24 231:9,15

ALFREDO GONZALEZ, 02/07/2023

**occasion** 149:2

**occasionally** 127:2,3

**occasions** 61:15

**occupants** 136:19

**occurred** 139:13 153:9 155:11 156:23 157:10

**occurring** 153:13

**office** 69:6 221:9,12

**officer** 57:23 60:23 61:12 65:4,10 66:14 67:15 68:12 69:10 71:9,18 73:22 74:22 75:5,6,18 78:24 83:24 86:1,8,17 103:15 104:20 115:21 118:14 143:13 145:11 209:6,8 212:8

**officer's** 79:6 209:13

**officers** 5:23 68:11 73:13,15,17 79:9 92:2 106:1 110:19 183:5 225:19

**older** 80:15 236:22 237:1

**oldest** 182:19

**Olga** 207:1,3,12,20 208:4 240:21 241:6,11,17

**Olga's** 207:2 241:12

**open** 79:16 82:23

**opened** 56:22,23 57:9

**opening** 170:17

**opinion** 194:9

**option** 171:11

**oral** 9:10

**order** 7:12,15 8:17 30:14,20 36:20 71:15 72:8,12 108:3,19 110:16 114:4

**ordered** 209:21

**orientation** 195:6

**owe** 63:7,10,11,16

---

**P**

**p.m.** 107:14 133:17 169:6 208:13, 16 225:9,12 248:1,4,18,22

**pages** 217:20

**paid** 46:14 62:24

**pain** 68:23 116:24 117:2 121:22,23 122:2,6,9,13,19,20,22 123:7,21 124:1,9,21 125:13,18

**painful** 36:2

**pains** 130:5

**pair** 149:17

**pants** 149:16,17,18 150:21 151:6,8 193:17 199:21

**paper** 26:12

**paragraph** 214:10

**parents** 234:12

**park** 56:19 75:10

**parked** 78:12

**parking** 78:11,15 137:8,12,14,16, 18,19,24 138:4 140:11 154:4,17,21 200:23

**parks** 138:10

**part** 102:10 126:3 144:13 170:17 184:7 187:1 194:14 195:23 210:1

**partially** 23:23

**participant** 159:9

**parties** 6:18

**partner** 68:14,16,17,19 80:2,3,4 85:19

**parts** 102:11 114:14 121:11,14

**party** 95:16

**pass** 22:6

**passed** 90:15

**past** 15:11,16 233:5

**pat** 62:15

**pay** 63:4,12 65:7 66:7,15 84:16

**paycheck** 63:4

**paying** 46:19

**Pedro** 29:21,23,24

**pee** 147:8

**penalty** 198:3

**pending** 7:6 10:6 62:10

**people** 38:5,8 44:13 48:8,10 55:22 60:4,13 91:4,17 147:16 155:17 221:12 231:13 237:11

**Perez** 73:6 74:2 164:16 234:2,5 238:11

**period** 98:7 103:24 135:5 167:12 177:17,24

**periodically** 91:5

**person** 85:20 110:8 159:24 224:16 242:6

**petition** 181:11

**phone** 229:9 230:8,14 231:7,14 240:4 243:13

**phonetic** 134:8 151:17

**photo** 194:3

**photograph** 194:7,21 195:7 196:3,12,13,18

**photographs** 17:13

**physical** 116:22 117:7 125:15,16 131:1 195:6

**physically** 113:19

**physiology** 123:20

**picked** 85:1 163:13 186:8

**picture** 191:16 192:4,7 193:3 195:11,13

**Pierce** 43:10,12,14 95:18,20,21, 23,24 96:1,4

**Pig** 54:8

**Piggly** 54:8,10,11

**pill** 11:2,7,8 12:6,15,22 13:3

**pills** 12:20 13:15

**pin** 60:4,5 84:24 85:2

**pinning** 142:16,18

**place** 6:16 20:1,5 26:17 33:19,23, 24 42:23 71:23 72:18 101:10,14 103:6 124:24 138:11,21 139:10,11 154:21 160:21 203:3

**places** 96:12

**plaintiff's** 243:13 247:14

**Plaintiffs** 247:16

**plant** 60:5,12,13

**plenty** 243:12

**point** 7:4 9:20 37:5,10 92:21 94:3 95:3 106:18 108:20 134:1 176:1 196:8,9 198:24 214:1 220:16

**pointed** 118:16,24 119:12,22 195:17

ALFREDO GONZALEZ, 02/07/2023

**pointing** 195:5,20

**Polaroid** 191:16

**police** 17:5,7 50:24 51:3 69:8 76:2, 5 78:16 82:1,6 103:14 127:1 128:13 131:3 135:13,15,22 140:19 141:2,5,8,11 187:3 225:19

**pops** 23:24

**positions** 46:9

**possibility** 125:21

**possibly** 116:8

**post-conviction** 181:11

**potentially** 248:14

**Potomac** 33:21

**Power** 25:16,17,18,20 26:20,22

**prep** 169:18

**preparation** 15:17,22 17:16,18,22 18:24 174:5 182:2 217:17

**prepare** 14:4,6,12,22

**present** 19:3 155:10,20,23 156:21

**previous** 18:14

**previously** 7:8 96:7 200:22 242:11

**principle** 7:9

**printing** 25:22 26:3,4,5,16

**prior** 14:3 55:10 65:3,10 76:9 114:1 133:7 184:14 185:5 209:6 219:21 236:13 245:13,20 246:6 247:3

**prison** 14:20 32:24 33:3,6,12 49:10,21 50:4,6,8,23 51:3,5,16,22 52:10,12 53:7,11,16 116:19 117:8 207:11 208:6 240:1,4,22,24 242:4, 9,17

**private** 114:13 121:10,14

**privilege** 181:7,16 184:9 191:4 197:18 198:8,14 213:8 219:2 222:6

**probation** 209:6,8,13 210:3 212:8

**problem** 6:24 13:17 64:23

**problems** 64:24

**proceedings** 248:21

**professional** 69:9 132:17

**professionals** 13:2

**promises** 190:7

**prompt** 9:15

**properly** 173:22

**protection** 46:14,20 50:1 66:8,16 76:23,24

**protocol** 7:15

**province** 213:9

**Puerto** 19:13 20:6 228:9

**pulled** 65:23 67:7,11 68:12 211:21

**punch** 98:5 113:5,9 142:19 148:3

**punched** 66:6 68:21 69:11 79:2,9, 19 98:4 101:4,23 102:6 116:2,6,8 119:14 121:6 122:10 123:1 147:23 148:7 199:5,11

**punches** 147:24

**punching** 98:9,14,19,24 113:13, 22,23 114:4

**pursuant** 8:17

**pursue** 7:15

**push** 85:3

**put** 30:16 74:8,11 79:1 82:3 83:10 115:12 127:9 151:8,11 210:2 212:19 216:15

---

## Q

**question** 10:6,7,12,15,17 52:2 62:10 68:5 71:2 153:10 157:23 166:13 174:24 175:1 181:8 183:24 185:13 186:6 187:2 188:23 189:13 190:1,7 191:5 202:21 203:21 207:16 208:1 215:1 217:7 218:19 220:14 222:15 223:17 231:18

**question-and-answer** 177:17,23

**questions** 7:17 10:11 64:9 136:18, 22 171:3 172:24 173:17 182:1 187:17 207:24 209:6 232:5 245:7 247:16,19 248:7

**quote-unquote** 59:14

---

## R

**R-A-H-E** 6:1

**radio** 75:2,4,12,15

**Rahe** 6:1 232:2,4,15 233:10 234:1 235:19,21,22 236:17 238:5 240:12

241:10,21 242:13,20 243:9,12,15, 16 244:8,12

**raining** 39:21,22

**rank** 45:22 51:6,8

**Ray** 110:4 207:21 208:7

**reaches** 9:5

**read** 71:3,5 173:15 175:8 190:15, 16,18 191:1,12 197:9 205:10,13 216:22 217:19,21 220:8 222:4 223:18,19 227:16,20 228:2,13 229:3 231:17,19

**reader** 217:24

**reading** 216:21 218:1

**ready** 108:4,14 109:18

**real** 94:22 100:9 151:19

**reason** 25:4 35:3 57:24 70:10 131:6 198:15 212:15

**recall** 14:14 15:8,24 17:15 18:8 20:17 21:13 22:10 23:6 24:13 31:16 32:19,22 34:20,23 37:4,21 38:2,13,20,22 41:8 46:6 47:5 54:13 57:8 60:8,11 66:20 70:1,9,10,18 71:6 72:14 73:17,19,21,23 75:24 77:13 78:20 80:14 83:6 86:22 91:23 102:1 108:1 109:3 110:13 112:3,4,12 116:18 119:3,11 121:8 122:4,9 123:2 126:8 127:12 131:5, 7 133:24 136:24 137:1,10 141:10 142:21 145:20 146:3,19 158:21 160:2 166:4 171:7 172:10 174:23 177:1,8,12 183:1,4,8,11,16 191:13 192:1 193:1,3,15,21 196:22,24 202:5 204:10,12,15,21 205:8,18 208:9 209:5,10 210:21 212:13 215:19 216:17 217:18 221:10,22 224:8 225:23 226:4 227:5,6,18 229:17 231:1 233:1 236:16 237:18, 21 239:2 242:12,14,19,21 243:4 244:20 245:3 246:7,20,22 247:5,8

**receive** 121:5 122:2,5,8,9 123:6 124:20,23 127:5

**received** 124:7 125:1 131:8

**recess** 23:15 64:4 107:13 133:16 169:5 208:15 225:11 248:3

**recognize** 159:8

**recognized** 211:9

**recollection** 70:14 212:12

**record** 5:17 6:16 7:14,20 8:13,15

ALFREDO GONZALEZ, 02/07/2023

9:14 18:10 23:11,14,18 39:24
63:24 64:3,7 71:5 107:12,16
117:22 133:15,19 169:4,8 171:20
172:6 186:15 208:14,18 209:20
212:19 217:14 222:10 223:19
225:10,14 231:19 247:24 248:2,6,
20

**recorded** 173:22 177:15,23

**records** 116:14 125:6

**recovered** 168:13

**refer** 185:2

**referred** 185:6

**referring** 186:16 218:12

**reflect** 8:15

**refresh** 70:14

**regular** 81:15

**relationship** 47:23

**release** 14:20 32:24 33:6,12 53:7,
15

**released** 33:3,16 53:24 54:3

**remark** 123:19,24 124:17

**remem-** 205:18

**remember** 12:19 14:11 17:7 21:3
26:24 31:15,18 38:23 39:4,10 46:9
56:8 61:20 66:23 67:23 70:4 73:5,
11,15 75:16 76:7,8,11,18 77:16,18,
20 78:10 80:15,21 81:2,8 82:9,22
83:18 84:13 91:20 93:5 94:8,18
108:3,18 114:3 116:3,5 119:9
120:18 121:1 125:8,20 128:22
133:10 134:18,19 137:4 143:8,12
149:7 151:7 152:19 153:4,13
156:12 167:7 170:18,20,23 172:13,
17 174:11,13 179:17,23 180:1,6
189:24 205:2 206:20 207:4,9
210:19 220:20 221:1,5 223:1
232:10 236:3 240:6,24 244:9

**remembering** 13:22

**remind** 18:11 70:23

**repeat** 10:13 15:18 22:7 48:9 52:5
144:13 223:17

**repeated** 111:2 143:2 149:1

**repeatedly** 163:19

**repeating** 113:16 144:22

**rephrase** 10:13 202:23

**report** 214:15 216:11

**reporter** 5:14,17 21:22 27:8 39:5
48:9 74:14 84:18 99:17 139:20
144:13 164:18 167:8 170:18 171:3,
5 172:4,9 177:16 192:20 193:4
246:17

**reports** 17:5,8 210:2 213:20 214:6

**represent** 6:8 244:17

**representing** 5:20

**reputation** 58:1,2,5,9

**request** 209:20

**reserve** 248:8,9,15,16

**reside** 214:9

**respect** 96:17

**respond** 85:12 142:22 147:17,20
191:11 219:16 227:12,14

**responded** 187:19

**response** 171:4 184:24 222:9

**rest** 69:14

**restaurant** 33:22 111:15,16 245:7

**restroom** 63:20

**reunion** 33:17,18

**reveal** 70:24

**reversed** 223:10 224:11

**review** 17:5,13 190:13

**reviewed** 15:16,19,21 16:19 17:5,
8,16 169:17 174:5,8 197:4 217:17

**Reynaldo** 5:4,23 175:12 240:8,15,
18 242:8

**Rican** 228:10

**Rico** 19:13 20:6

**ride** 134:2,7,14,17,20 135:7 146:21
211:10,12 246:6,8

**ring** 209:15

**rival** 59:21

**Rivera** 214:5 215:3 234:2,9 239:7,
9,11,24 240:3,7,14

**robin** 104:14

**rolls** 26:11

**room** 9:5 82:7,8,12,13,14,15,24
83:3,11,16,20 85:18 90:9 92:3 93:7
109:8,11 112:21 126:17 129:8

141:13,16,18,22 142:7 146:13
158:24 159:16 160:1,3,10,22
161:4,5,18,20 162:2,6,10,14,22
166:17,19,24 171:9 172:4,14,19
226:10 227:2 246:11,14,15,18
247:3

**Rosa** 93:20,22,23 94:4,13 96:23
97:3 145:2 206:4,6,7,14 207:10,20
208:4

**Rosario** 29:3 31:4,5

**Rose** 240:21 241:6,11,14

**Rosie** 94:10,11,12,18 95:1,9,13
96:13,19 97:15

**Rosie's** 94:22

**roughly** 15:5

**round** 104:14

**row** 198:3

**rules** 8:22

**rumors** 60:1,3

**run** 37:17 211:24

**S**

**Sanchez** 29:20 30:21 35:4,6,7,16
37:9 153:1 164:24 180:8 182:21,22

**sandwich** 149:11,22 150:5,9
153:8,11 187:11,12,13,20,21,24
188:2,3,8,11,17

**sandwiches** 150:3

**Santiago** 35:4,6,7,16 37:9 180:8

**sat** 85:15

**scared** 156:7 165:20

**scene** 135:9 136:17

**Schiller** 18:21 225:1

**school** 20:11,13,15,16,23 21:1,2,5,
8,9,11,12,14 22:3,11

**Scot** 5:11

**scream** 98:11

**screen** 24:3

**scrotum** 121:16,24 122:3,6,10
123:1,8,17 124:9,18 125:1,13,18,
24 126:4

**Sean** 5:19 19:1,2

Index: seat-spoke

ALFREDO GONZALEZ, 02/07/2023

**seat** 157:17 173:6,8,11

**seats** 83:17

**sec** 242:2

**seconds** 85:8

**section** 187:2 204:13

**security** 50:15,16 66:15

**seek** 69:4 120:22

**sell** 45:16

**selling** 45:12

**sentenced** 209:7

**separate** 172:3

**session** 166:3,11,12,15 167:24

**set** 37:15,17,19 38:4,20 41:6,10,15
42:19,20,23 43:5 44:3 45:22 46:1,
9,12,13 47:4,9 69:16 70:22 99:24
111:22 185:23 186:9 232:8 243:18,
22 244:1

**sets** 43:19

**shaking** 47:15

**Shiller** 18:2,4

**shirt** 151:21 193:11

**shooting** 170:2

**short** 10:1

**shot** 35:6,22 44:22 54:21 196:1

**shots** 211:23

**shoulder** 114:13,16 115:2,3,21,23
116:6,9,10,15,21 117:6,8,11,16,22
118:3 130:8

**shoulders** 9:13

**show** 65:7 96:17 169:10

**showed** 63:12

**showing** 65:7

**shows** 196:3,8

**shrugging** 9:12

**siblings** 29:4,7 234:11,14,20,24

**sic** 20:21

**side** 58:12,15 115:13,14,15,16
118:15,16,17,21,22,23 119:1,6,7,
10,20,23 120:1,7,13,24 121:6
194:17 195:5,6,10,13 199:15
216:16

**sides** 88:8 102:20 119:4 129:16

**sign** 228:17,20

**signature** 176:16,18 177:3,10
192:17

**signed** 99:7,12,15

**signing** 174:11,13,23 175:21,23
177:1 190:14

**single** 198:11

**sinus** 11:2,3

**sir** 8:12 19:12 64:9 133:21 157:7,
10,14,19 169:10,15,16 170:4,12,18
173:4 174:5,15,19,24 175:6 176:1
177:3,7,10 178:2,4 185:13 186:6
187:8 188:21 189:2 190:11,14,19
191:14,19,22 192:16,22 193:12,23
194:15,22 197:2,9,11,16,22 208:19
209:2,22 210:12,17 213:2,21
216:17 217:16,23 218:1,3 220:16
222:15 223:15 224:3,11,20

**sister** 28:14 31:3 152:23,24 164:6,
23 165:3,11 178:22 179:3 180:18
182:17 183:17 202:3 206:1,14
240:20

**sister's** 31:6 206:3

**sister-in-law** 178:20 238:23,24
241:9

**sister-in-laws** 241:11

**sisters** 28:14,16 29:5,8,12,14
30:18 203:17,24 204:2 205:1
230:18

**sit** 8:1 160:4

**sitting** 84:2 172:16

**situation** 206:11

**slap** 87:21,22 102:12,14 113:2

**slapped** 87:20 88:23 103:18
126:18 129:2,5,9,12 132:3,11,19
199:8

**slapping** 102:15 103:3,8 113:14,
21 126:19

**sleep** 92:4

**sleeping** 90:24 91:8,10,13,19 92:5
143:14

**slitter** 26:7,8,10

**slow** 10:14

**small** 26:11 82:13 83:3 105:4
172:19

**smaller** 81:3

**smoke** 189:14

**socks** 149:16

**someplace** 33:16 82:18 83:2

**son** 214:4

**song** 40:1,3

**sore** 114:20,21

**Sort** 12:16

**sought** 116:14 130:11

**sound** 198:2

**sounded** 202:21

**sounds** 202:20

**space** 45:12

**Spanish** 227:23

**Spaulding** 65:16,19,20 66:22 70:3
71:22 72:5

**speak** 68:19 81:21,23 134:13
140:22 224:16,19 228:12 240:3
242:8

**speaker** 160:17 162:3

**speaking** 134:19

**specific** 37:15 115:21 128:22
198:21 229:7

**specifically** 57:9 89:17 93:13
107:21 188:15

**speculate** 11:22 166:8 172:22,23
203:19,21,22 205:3

**speculating** 172:21 203:23

**speculation** 44:6 45:1 46:5,16,21
51:17,24 52:24 80:18 86:11 90:11,
18 92:7,14 98:15,21 101:19,24
102:7 104:3 115:24 132:6 152:14
154:23 156:14 168:17 170:13
171:6 173:23 182:12 186:2 191:24
192:24 193:8,14 194:2 196:21
204:7,20 207:22 208:8 210:15
212:11 213:7 215:18,21 216:24
218:7 221:15 222:6 223:4,13,22
229:23 230:10 241:8 243:2 244:6
245:1 247:6

**spell** 8:13 20:20 28:3,4 31:1 39:17
182:20 207:5 235:6

**spitting** 88:18

**spoke** 18:20 32:20 33:14 153:5
184:13 218:12

ALFREDO GONZALEZ, 02/07/2023

**spoken** 32:23 33:6,11 246:4

**spot** 117:5

**spots** 177:5

**squeeze** 84:23

**St** 154:2

**stamp** 175:13

**stamped** 169:13

**stand** 39:19 159:21 160:4 162:3

**Standards** 69:9

**standing** 8:3 84:4 198:8,20

**Starr** 5:19 7:1,3 11:20 17:1 18:10 23:10 25:21 31:23 36:5,12,14 41:16,22 43:1,7,16 44:5,24 45:6,17 46:5,15,21 48:15,22 50:9,11 51:11, 17,23 52:2,4,14,18,24 53:17 55:3, 15,21 56:7 57:12 59:2,5,9,16,24 61:2,6 62:9 63:19,23 65:13 67:3,8 68:3 69:21 70:23 71:12,24 77:2,14 80:17,23 81:5,10 83:7 86:10 90:10, 18 92:6,13 95:2 97:11 98:15,21 101:19,24 102:7 104:3 105:5,14 106:17 107:10 113:24 115:24 117:20 118:8 119:15 123:14 132:5 135:23 145:22 146:23 152:13 154:12,22 155:7,12 156:13,24 157:23 158:1,3,9,15 159:11 160:24 166:6,8 168:17,24 170:13 171:6 172:21 173:23 174:1,16 177:19 181:6,24 182:6,11 184:8 185:4,11 186:1,15,19 187:16 188:18 189:17 191:3,7,23 192:12,23 193:7,13,20 194:1,8,23 195:4,19 196:14,20 197:17 198:7,16,19 199:2 201:2,17 202:11,18 203:13,18 204:6,19 205:3 207:13,15,22,24 208:8,10 210:7,15 211:2 212:10 213:6,13 214:12,17,20 215:17,22 216:23 217:21 218:6 219:1,12,23 220:10 221:15 222:5,13,16,18 223:4,12,21 224:4,7,12 225:2 229:22 230:7,9, 20,24 231:2,9,15,17,20 232:12 233:6,22 235:17,20 236:14 238:3 240:9 241:8,19 242:10,18 243:2,5, 11 244:5 245:1,20,22 247:6,18,22 248:7,9,12

**start** 5:2 10:20 64:8 126:13 131:16

**started** 6:15 15:2 38:20 162:22 171:19

**starts** 170:1

**state** 8:12 112:5 139:18 140:18 205:11,19 221:19,20,24

**state's** 134:2,6 136:10 154:20 167:3 172:5 173:10 190:2 219:21 225:24 244:17 245:9 246:4,10 247:1

**stated** 168:1

**statement** 15:23 16:1,2 94:2 99:7, 12,16 100:13 112:15,17 157:20 158:23 159:3 163:6 165:15,23 166:22 167:1 169:15,24 170:4 171:10,12,13,19,21 172:2 173:14 175:9 178:4 186:16,22 190:9,14 191:2,12,15,22 192:22 193:12 197:13 203:4 205:7 220:9 225:21 226:10,18,21,24 228:18,20,21 246:11,21 247:4

**statements** 93:12,14 96:22 97:9, 15

**states** 211:7,12,20,23 212:3 214:3, 7 239:21

**Stateville** 116:16,20 124:13,16 126:16,23 127:13 241:2,4,5

**station** 78:16 82:1,6 127:1 128:13 131:3 135:22 140:20 141:2,5,9,12

**Status** 213:19

**stay** 70:16 179:7,10,11

**staying** 179:13 203:6

**step** 225:16,17

**stepped** 130:22 212:18

**Steve** 6:11

**stick** 115:1 201:11

**Stock** 24:22

**stomach** 101:9,17,23 103:17 113:5,14,23 199:12

**stomp** 129:1,18

**stomped** 129:4,8 130:9,22 134:1 199:18

**stood** 161:20

**stop** 21:12 24:1 34:8,13,17 74:5 139:19,21,24 140:16,18 141:1 172:21,23 211:9

**stopped** 34:22,24 62:13 71:16 72:5 74:2,4 211:19

**stopping** 65:5

**store** 22:15,21,23 23:2 24:21 25:3 54:6,8 62:8,13 65:6 71:16 115:3

**story** 198:1 200:6 201:11 213:4

**street** 5:13 27:24 31:8 37:21 38:2, 3 58:10 67:24 68:1 81:15 95:16,24 162:24 211:15 232:10

**streets** 51:14

**strike** 202:11 206:12 239:18

**strong** 105:12

**struck** 118:13,20 119:4,10,20 120:7,13 121:15

**stub** 63:4,12 65:7

**Styrofoam** 167:14,16,18

**subject** 181:11 184:8,10

**subservient** 86:9

**suddenly** 211:18

**suffer** 122:22

**suffered** 204:18 207:21 208:7

**suffering** 122:12,19 130:5

**suicide** 37:9

**suit** 151:18

**sun** 92:19

**supervision** 76:11 210:6,13

**suppose** 42:10 170:15

**supposed** 142:24 144:23 228:17 243:7

**supposedly** 84:20 158:19

**sur** 91:19

**suspect** 75:9

**swear** 5:18 8:4

**sweater** 149:17,18 151:12,14

**sweatsuit** 151:18

**swelling** 196:9

**switch** 79:5

**swole** 194:10

**swollen** 194:12,15,18,19 195:15

**sworn** 8:6,9

---

**T**

---

**T-SHIRT** 151:21,22

**table** 83:17

ALFREDO GONZALEZ, 02/07/2023

**taking** 12:6,15 13:7,15,22 58:11, 14,18 160:23

**talk** 43:9 45:11 55:22 57:21 58:7 59:9 60:19 89:2 98:2 100:18 122:13 131:15 145:8,10 181:12,19 227:23 229:10,13,18 230:13 231:12,13 240:14

**talked** 18:18 70:19,21 110:19 125:9 156:21 169:12 210:14 225:22 226:2 231:7 240:17 247:1

**talking** 33:19 44:20 45:7,9 49:5,6 51:2,3 66:22 72:18 79:4 85:11 87:17 97:19 100:16 108:5,8,13 125:9 135:5 137:1 148:21 168:7,16 174:16 192:13 195:9 228:9 232:7 237:7

**tall** 80:21 105:9

**tan** 25:4

**tasting** 88:20,22

**technical** 23:23

**telephone** 9:6

**telling** 70:7 140:6 144:10 153:17, 21 156:1,17,20 160:4,16 202:14 228:8

**tells** 86:18 163:11

**tend** 12:11

**tending** 12:13

**term** 56:7

**terri-** 58:19

**territory** 43:14 58:20 59:13,21 111:22

**testicle** 98:4 103:9 142:12 147:23

**testicles** 98:6,10,14,20 99:1 101:4 103:10,11,17 113:9,13,22 117:3 142:20 148:1,4,8

**testified** 8:9 51:13 52:8 114:1 187:23 194:2 197:1 203:4 212:11

**testify** 181:19 183:12,15,17 184:10 197:19,24 198:1,9,21 200:6 204:23

**testifying** 7:10 94:19

**testimony** 16:16,20 48:16 67:9 68:4 69:22 114:1 157:1 158:16 181:13 182:3 185:5 197:4,12 201:3 213:10 224:13 246:9

**the'70s** 238:4

**therapy** 116:22 117:7

**thick** 151:19 248:13

**thing** 10:5,21 12:19 63:3 75:1 79:20 82:4 97:1,20 99:14 100:14, 22 108:1 112:3 132:18 133:13,24 139:12 143:12 144:19 145:15 146:3 151:19 153:9,12 156:22 157:6,9,13,19 158:4,7,10 163:24 165:4

**things** 9:13 12:11,13 13:21 23:21 41:15 52:9 53:3 187:8 248:14

**thought** 118:3 132:21,22 133:1 137:24 138:2 140:1,2 142:12,23,24

**threaten** 156:10

**threats** 190:8

**threw** 26:7

**time** 5:10 10:2 14:11 15:4 20:2 23:13,16 27:14,17 32:20 35:16,24 37:8 42:8 46:1,12 47:7 48:4,7 49:17 54:20 56:5,15 58:13 63:19 64:1,5 65:15 66:10 71:9,17,21,22 72:1,4 76:1,14 90:16 92:16 95:3,10 96:6 98:7 103:24 104:9,15,16 107:2,5,11,14 109:1,2,7 110:16 112:12 113:1,3,6,10,11 116:3 120:15 121:19 126:17 129:2,12,20 130:10 133:12,14,17 135:2 140:21 143:9,17 144:12,15 145:19,21 146:4,19 147:13 148:4,15,24 149:6 152:12 156:12 161:7,9,10,11,13,18 162:1,15 166:5 167:12,13 169:3,6, 20 170:12 172:2 175:8 180:7 189:1 191:21 197:8 198:12 201:22 207:11,12,17,19 208:13,16 210:19 215:10 220:9 222:23 223:2,10 225:9,12,17,21 226:6,9 228:5 234:8 236:10 240:21 245:6,11,20 246:9 248:1,4,18

**times** 14:8,10,15,16,18,19,22 15:11,15 33:5 49:19 76:4 79:12 87:20,22,23 88:24 96:3,8,11 98:5, 7,8 101:23 102:5 108:19 109:4 110:7 112:21,23,24 113:20 114:6 118:19 119:9 120:6,12,17 121:15 129:11,13,18 131:24 132:2 142:19 146:8 148:3 152:17 158:11 161:21 207:10 226:13 248:13

**Tino** 41:5 69:24 145:3,12 150:7,8 157:17 185:18

**today** 5:9,14 7:10,18 10:22 11:1,9 14:3 16:24 124:5 131:20 173:16 199:5 238:9,16

**today's** 19:6

**toe** 128:10,11,20,21 129:2,5,8,19, 21,22,23,24 130:1,3,9,11,18,19 133:24 199:18

**told** 13:5 46:19 47:3 55:7 62:21 66:3,5 69:18,24 70:2,5,14 74:5,10 85:10 86:3 87:7,13,16 89:2 90:5 91:11,17,18 93:10,13 96:2 97:2 99:9,11,12 100:12,21 112:1,4 124:20 125:18 127:17 135:6,9 137:22,23 138:15,16,23 139:11,14 140:1,2 142:12 143:21 144:24 145:8,9 147:15 148:24 152:5,16, 18,20 153:2 154:2 155:16 158:6 159:21 162:3 163:2,22 164:7 181:14,20 182:2,24 183:20 184:1, 21 187:8 188:15 189:5 191:11 197:23 198:1,2,6 199:5 200:9,22 201:12,22 203:4 212:1,2 214:8 226:23 227:2,7,9,11 228:19 229:2 242:22,24

**Tony** 241:24 242:1

**top** 170:3,7 186:24

**Torrence** 170:2

**Torres** 30:1,7,8

**torture** 165:5,6,10

**tough** 162:24

**transcript** 16:13

**transferred** 135:21

**translation** 235:18

**transported** 75:19

**treated** 187:3,4 190:2

**treatment** 116:14,18 117:16 120:23 121:5 122:2,5,9 123:7 124:8,23 125:1,24 126:5 127:5 130:11 201:16

**tree** 26:15

**trial** 15:23 16:5,6,7,8,13 97:7,14 183:13,18,23 184:6,14 196:18 197:1,5,12 200:3,16,19 201:5 203:6,10 204:5,24 205:10,13 216:18 218:4,13 219:9,20 220:6

**trouble** 13:22 49:23 52:20,22

**true** 178:2 188:2,4,5,6,7,8,9 189:3, 21 190:4,11,12 197:11

**turn** 159:22 160:4,16 162:3 225:6

**turned** 211:15,19

Urlaub Bowen & Associates, Inc.   312-781-9586

ALFREDO GONZALEZ, 02/07/2023

**Tylenol** 124:8,20 131:19 132:12, 14

**Tylenols** 121:2,4 123:9

**type** 222:8

---

**U**

**Um-hmm** 62:4

**underlying** 16:20

**underneath** 119:23 120:2,7,13 187:1

**understand** 10:11,12 52:2 66:17 94:15,16 110:15 113:18 122:24 132:13 153:19 155:16 245:13

**understanding** 36:9 97:7,14 130:18

**understood** 10:18 202:20 246:8

**underwear** 149:16 150:24 151:6

**unemployment** 27:7,11,12,14 42:2

**unhandcuff** 150:15,18

**Unit** 64:2 169:7 248:19

**United** 239:21

**unnecessary** 6:17

**unsure** 34:5

**upper** 119:17

**upstairs** 82:9,11

**urinate** 146:14,17 147:3 148:17

**urinated** 146:15 147:9,21 148:1,4, 8,15

**urinating** 146:11 199:20

**urine** 147:5

**Urlaub** 5:12

---

**V**

**V-E-L-E-** 235:7

**V-E-L-E-S** 28:24

**V-E-L-E-Z** 235:10,13

**Vargas** 237:22 238:2

**vehicle** 135:20

**Veles** 28:23 31:4

**Velez** 235:3,5,8,9,13 236:9

**Veras** 38:16 40:8,10

**verbal** 123:14

**version** 210:23 211:6 212:7

**vest** 68:2,8 81:17,20 110:5 128:17 129:4

**victory** 235:24 236:1,2

**videos** 17:18

**view** 24:3

**viewing** 159:10,19

**Villafuerte** 237:17

**violated** 156:9

**violating** 45:12

**violence** 45:15 51:14,15 52:11 53:5

**Virginia** 238:11

**visible** 121:14

**visit** 206:14,17 207:10 208:5 239:24 242:3,9

**visited** 240:21 241:1 242:6,16

**voice** 9:3,5 64:10,12 160:15,19 162:2 235:14

---

**W**

**Wabansia** 232:11

**waist** 120:4,10,14

**wait** 78:3,5,6,7,18

**waited** 78:2 150:19

**waive** 181:16 248:8

**walk** 57:23 58:3,6 61:10 71:22 172:11

**walked** 57:17,18,24 60:24 61:1,10 62:5

**walking** 67:13,14 73:2,8 74:1 211:7 227:9

**walks** 143:18

**wall** 85:4,7,16 114:18 115:5,7,10, 23 142:4,16

**wanted** 7:19 25:6 36:16 62:23 66:15 98:16 100:24 109:22 140:2 142:13 153:14 166:16 171:20 172:5 189:1

**wanting** 143:2

**washroom** 146:6,7,9 147:16

**watch** 17:18 112:13

**water** 167:14,16

**weapon** 168:13 185:3,16,19,24

**weapons** 77:10

**wear** 68:10

**wearing** 68:9 81:16 110:5 128:17 129:4 167:11 193:12,19

**Weed** 42:13

**week** 131:24 132:2 169:22

**weight** 105:1 106:5

**weightlifting** 57:3,5,7 65:5 71:23

**weird** 24:2 48:1

**West** 5:7

**wet** 150:23 151:6,24 152:4

**when's** 18:20 32:20 56:5 169:20 197:8

**Whenever's** 63:19

**white** 73:20,22 75:18 80:11,12 81:19 83:23 85:23 86:1,8,17 91:24 92:2 104:18 106:1,3,12,21 107:22 110:4,19 114:23 126:11,14,20 127:6,21,24 144:2

**wide** 105:11

**Wiener** 181:3,10,14,21 182:2 183:20 184:1,14,17,20,23 191:1,10 197:23 198:4 199:4 200:1,11,21 201:7 202:17 213:3 218:12,21 219:8,18 220:5,17 221:8

**Wiener's** 197:20

**Wiley** 42:8 54:18,21 55:7 56:2 65:11 133:8 165:3 170:3 243:1 244:24 246:5 247:2

**Wilfredo** 232:21,22 233:4,5,17

**window** 161:19 162:16,21

**wise** 126:5 149:21

**witnesses** 86:23 87:8,11,14 93:8, 11 99:4 159:19

**woman** 214:7 215:12,16

**words** 170:1

**work** 22:12,14 25:3 26:16 61:19,22 221:9

ALFREDO GONZALEZ, 02/07/2023

**worked** 22:21 24:9,11 221:12

**working** 221:8

**worry** 124:3 127:22

**wrist** 193:23,24

**wrists** 167:10,21

**write** 175:14

**writing** 192:4

**written** 175:10 216:11

**wrong** 124:17 126:10 127:18
128:2

---

**X**

---

**X-RAY** 130:7,8,18

---

**Y**

---

**year** 14:13 15:5,11,16 21:11,13
24:13,14,15,19 27:3 31:17 32:22
34:20 56:8 61:20,21 66:23 210:3,7,
8,9,10

**years** 11:13 18:5 24:10,17,19
25:14 26:15 95:11 96:8 114:21
122:12,15,17,24 123:3,5 125:19
130:4,6 237:5,7

**YMCA** 56:19

**Yolanda** 28:18 31:4 236:18

**Yolanda's** 28:21 235:2 236:5,20

**young** 54:21 179:4 239:19,22

**younger** 28:14 32:14 80:16,19
110:4 237:2,3 238:15

**youngest** 178:20

---

**Z**

---

**Zavala** 237:12

**Ziarko** 5:11

**Zoom** 5:8 9:6 23:23 64:13

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 20

# In The Matter Of:

*Maysonet v.*
*Guevara*

*Justino Cruz*
*November 1, 2019*



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

---

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   JOSE JUAN MAYSONET, JR.,        )

4          Plaintiff,               )

5          vs.                      ) No. 18 CV 02342

6   REYNALDO GUEVARA, ERNEST        )
    HALVORSEN, EDWARD MINGEY,       )
7   LEE EPPLEN, FERNANDO            )
    MONTILLA, ROLAND PAULNITSKY,    )
8   FRANK DIFRANCO, CITY OF         )
    CHICAGO and COOK COUNTY,        )
9                                   )
           Defendants.              )
10

11

12          The deposition of JUSTINO CRUZ, called by

13   the Plaintiff for examination, pursuant to notice and

14   pursuant to the Federal Rules of Civil Procedure for the

15   United States District Courts pertaining to the taking

16   of depositions, taken before Mary Maslowski, Certified

17   Shorthand Reporter and Notary Public within and for the

18   County of Cook and State of Illinois at 141 West Jackson

19   Boulevard, Suite 1240A, Chicago, Illinois, commencing at

20   the hour of 10:32 o'clock on November 1, 2019.

21

22

23

24

25
```

---

Page 2

```
1   A P P E A R A N C E S :

2
         BONJEAN LAW GROUP, PLLC
3        BY MS. JENNIFER BONJEAN and MS. ASHLEY COHEN
         467 Saint Johns Place
4        Brooklyn, New York 11238
         (718) 875-1850
5        jennifer@bonjeanlaw.com
         ashley@bonjeanlaw.com
6
              and
7
         GREENBERG TRIAL LAWYERS
8        BY MR. STEVEN A. GREENBERG
         53 West Jackson Boulevard, Suite 1260
9        Chicago, Illinois 60604
         (312) 399-2711
10       steve@greenbergcd.com

11            On behalf of Plaintiff;

12   LEINENWEBER BARONI & DAFFADA, LLC
     BY MR. JUSTIN L. LEINENWEBER
13   120 North LaSalle Street, Suite 2000
     Chicago, Illinois 60602
14   (312) 380-6635
     justin@ilesq.com
15
              On behalf of Defendant Reynaldo Guevara;
16
     THE SOTOS LAW FIRM, P.C.
17   BY MR. JOSH M. ENGQUIST
     141 West Jackson Boulevard, Suite 1240A
18   Chicago, Illinois 60604
     (312) 735-3303
19   jengquist@jsotoslaw.com

20            On behalf of Defendants Ernest Halvorsen,
         Edward Mingey, Lee Epplen, Fernando Montilla
21       and Roland Paulnitsky;

22

23

24

25
```

---

Page 3

```
1   A P P E A R A N C E S : (Cont'd.)

2
         ROCK FUSCO & CONNELLY, LLC
3        BY MS. EILEEN E. ROSEN
         321 North Clark Street
4        Chicago, Illinois 60654
         (312) 494-1000
5        erosen@rfclaw.com

6             On behalf of the Defendant City of Chicago;

7   ASSISTANT STATE'S ATTORNEY OF COOK COUNTY
    BY MR. EDWARD M. BRENER
8   500 Richard J. Daley Center
    Chicago, Illinois 60602
9   (312) 603-5971
    edward.brener@cookcountyil.gov
10
              On behalf of Defendants Frank DiFranco and
11       Cook County;

12   DVORAK LAW OFFICES, LLC
     BY MR. ADRIAN BLEIFUSS PRADOS
13   900 West Jackson Boulevard, Suite 5W
     Chicago, Illinois 60607
14   (630) 308-3190
     adrianbp@civilrightsdefenders.com
15
              On behalf of the Witness.
16

17

18

19

20

21

22

23   CSR License No. 084-003278.

24

25
```

---

Page 4

```
1                    I N D E X

2   WITNESS                        DX   CX _RDX  RCX

3   JUSTINO CRUZ

4   By Ms. Bonjean                  5

5   By Ms. Rosen                        111

6   By Mr. Engquist                     242

7   By Mr. Leinenweber                  253

8   By Mr. Brener                       271

9

10                E X H I B I T S

11  DEPOSITION EXHIBIT                 MARKED FOR ID

12     No. 1                               5

13     No. 2                               5

14     No. 3                              33

15     No. 4                              59

16     No. 5                              62

17     No. 6                              80

18     No. 7                              87

19     No. 8                             103

20     No. 9                             115

21     No. 10                            219

22     No. 11                            222

23

24

25
```

Maysonet v.
Guevara

Page 5

1    (Whereupon Deposition Exhibit Nos. 1
2  and 2 were marked for identification prior to the
3  commencement of testimony.)
4    JUSTINO CRUZ,
5  called as a witness herein, having been first duly sworn,
6  was examined and testified as follows:
7    DIRECT EXAMINATION
8    BY MS. BONJEAN:
9  Q.  Good morning, Mr. Cruz.
10 A.  Good morning.
11 Q.  My name is Jennifer Bonjean and
12 I represent the plaintiff, Jose Maysonet, in
13 a federal civil action that's pending in the
14 United States District Court for the Northern
15 District of Illinois.  Are you aware of that?
16 A.  No.
17 Q.  Okay.  Well, the name of the case is
18 Maysonet vs. Guevara, et al. and it's pending in
19 federal court here in the city of Chicago, okay?
20 A.  (Nodding).
21 Q.  Do you know Jose Maysonet?
22 A.  Yes.
23 Q.  We're here today so that the parties,
24 with me starting off, can take your deposition.
25 Do you know what a deposition is?

Page 6

1  A.  Yes.
2  Q.  And have you ever had your deposition
3  taken before?
4  A.  Don't remember.
5  Q.  I'm going to ask you questions
6  related to the underlying events that were
7  related to your arrest and prosecution for the
8  Wiley brothers murders.  You understand that,
9  right?
10 A.  Yes.
11 Q.  And the court reporter is going to
12 be taking down my questions and she's going to
13 be taking down your answers, okay?
14 A.  (Nodding).
15 Q.  It's important that we not talk
16 over each other because she can't take us down
17 talking at the same time.  So I'd ask that you
18 let me finish my question before you answer it,
19 okay?
20 A.  Okay.
21 Q.  And I will do my best -- it's really
22 more my issue -- to try not to step on your
23 answers, okay?
24 A.  (Nodding).
25 Q.  I know these events took place in

Page 7

1  some respects over 30 years ago, so I'm going
2  to ask you to do your best to recollect.  If at
3  any time you need to estimate or approximate an
4  answer, that's fine.  Just let me know that
5  you're doing that, okay?
6  A.  (Nodding).
7  Q.  Understand?
8  A.  Yes.
9  Q.  And it's important that you answer yes
10 or no or audibly to all of my questions because
11 the court reporter can't take down you shaking
12 your head yes or no, okay?
13 A.  Okay.
14 Q.  That being said, I don't want you
15 to guess.  So if you don't know an answer to the
16 question, that's a perfectly acceptable response
17 as well, okay?
18 A.  Okay.
19 Q.  If you don't understand one of my
20 questions, will you let me know?
21 A.  Okay, yes.
22 Q.  And I'll try to rephrase it so you do,
23 okay?
24 A.  (Nodding).
25 Q.  If at any point you need a break,

Page 8

1  you certainly can have a break.  I'd just ask
2  that if I have a question pending, that you
3  answer it and then you let me know you need a
4  break and you can confer with your counsel, okay?
5  A.  Okay.
6  Q.  Or if you need a bathroom break.
7  Let's see.  Do you understand, sir, that you're
8  under oath today?
9  A.  Yes.
10 Q.  And that oath means that you're going
11 to tell the truth, to the best of your ability?
12 A.  Yes.
13 Q.  All right.  Give me one second
14 and we'll get started.  Can you please state your
15 full legal name for the court reporter.
16 A.  Yes, Justino Cruz.
17 Q.  And how do you spell your last name?
18 A.  C-r-u-z.
19 Q.  Do you have a nickname, Justino?
20 A.  Tino.
21 Q.  Tino.  Did you ever go by the nickname
22 or name Chris Cruz?
23 A.  No.
24 Q.  How old are you, Mr. Cruz?
25 A.  50.

Maysonet v.
Guevara

Page 9

1  Q.   And what is the highest level of
2  education you have received?
3  A.   College. I mean, I got an associate degree
4  when I was locked up.
5  Q.   Okay. Did you graduate high school?
6  A.   Yes.
7  Q.   Or did you get a GED?
8  A.   No, I graduated.
9  Q.   And what high school did you graduate
10  from?
11  A.   Clemente High School.
12  Q.   And what year did you graduate high
13  school?
14  A.   '88.
15  Q.   What's your birthday?
16  A.   ████████
17  Q.   And where did you go to grade school?
18  A.   Don't remember.
19  Q.   Okay. Did you grow up in Chicago?
20  A.   Yes.
21  Q.   What area or what neighborhood?
22  A.   Humboldt Park.
23  Q.   Do you have any siblings?
24  A.   Yes.
25  Q.   Who are your siblings?

Page 10

1  A.   Efrain Cruz, Luis Cruz, Nancy Cruz, Yolanda
2  Cruz and Rosie Sanchez.
3  Q.   So you have a big family it sounds like?
4  A.   Yes.
5  Q.   Where did you and Efrain Cruz fall
6  in the -- in terms of age? Are you older? Is he
7  older?
8  A.   Who?
9  Q.   Efrain.
10  A.   Oh, Efrain?
11  A.   Oh, my apologies. Efrain, yes.
12  A.   Efrain's my older brother.
13  Q.   Efrain's your older brother. Where do
14  you currently live? And you don't have to give
15  an exact address. Just generally.
16  A.   Franklin Park.
17  Q.   How long have you lived there?
18  A.   Sixteen years.
19  Q.   And with whom do you live in Franklin
20  Park?
21  A.   With my wife.
22  Q.   Do you have any children?
23  A.   Yes.
24  Q.   How many?
25  A.   Two.

Page 11

1  Q.   How long have you been married?
2  A.   Twelve years.
3  Q.   Do you work?
4  A.   Yes.
5  Q.   Where do you work?
6  A.   Acme Industry.
7  Q.   Can you spell that?
8  A.   A-c-m-e.
9  Q.   And what do you do for Acme Industry?
10  A.   Shipping and receiving.
11  Q.   How long have you worked for Acme?
12  A.   Seven years.
13  Q.   And prior to working for Acme did you
14  work anywhere else?
15  A.   Yes.
16  Q.   Where is that, if you remember?
17  A.   When I was -- I don't remember because
18  they changed their name.
19  Q.   Okay, understood. What type of work
20  were you doing before you worked in shipping and
21  receiving with Acme?
22  A.   Same thing.
23  Q.   Now, Mr. Cruz, you went to prison
24  in connection with the Wiley brothers murders,
25  right?

Page 12

1  A.   Yes.
2  Q.   What year were you released from prison?
3  A.   2001.
4  Q.   Do you remember what month it was?
5  A.   April.
6  Q.   So April 2001 you were released from
7  prison, is that right?
8  A.   Yes.
9  Q.   And after you were released from prison
10  in April of 2001, where did you live?
11  A.   Don't remember the address.
12  Q.   What city, though?
13  A.   Oh, it was in Chicago.
14  Q.   It was in Chicago. And did you live
15  with family or who did you live with?
16  A.   My wife.
17  Q.   Okay. Did you get married while you
18  were in prison?
19  A.   No.
20  Q.   So what year did you get married?
21  A.   2003.
22  Q.   So she was a girl friend, is that right?
23  A.   Yes.
24  Q.   Got it. So you moved in with your girl
25  friend when you got out of prison?

Maysonet v.
Guevara

Page 13

1  A.  (Nodding).
2  Q.  And you lived in Chicago for some time?
3  A.  Yes.
4  Q.  And then it sounds like you then moved
5  to Franklin Park?
6  A.  Yes.
7  Q.  When you got out of prison, did you work
8  or try to work immediately?
9  A.  Yes.
10  Q.  You've been out of prison it looks like
11  close to about 18 years, something like that?
12  A.  Yes.
13  Q.  Have you been back to prison since then?
14  A.  No.
15  Q.  And have you worked fairly consistently
16  from the time that you were released from prison
17  until today?
18  A.  Yes.
19  Q.  Have you been involved in any gang
20  activity since you were released from prison
21  until today?
22  A.  No.
23  Q.  When was the last time you spoke to Jose
24  Maysonet?
25  A.  I don't remember.

Page 14

1  Q.  Is it in the last 15 years?
2  A.  No.
3  Q.  Did you speak with him when you were
4  in prison?
5  A.  No.
6  Q.  Have you spoken to him since you got out
7  of prison?
8  A.  No.
9  Q.  It's possible you spoke to him in the
10  Cook County Jail at some point?
11  A.  No.
12  Q.  So pretty much since you've been
13  arrested is the last time you spoke to him it
14  sounds like?
15  A.  Yes.
16      MS. ROSEN: Objection, form.
17      BY MS. BONJEAN:
18  Q.  Can you remember a time that you've
19  spoken to him since you were arrested in 1990?
20  A.  No.
21  Q.  I'm going to hand you what's been marked
22  as Exhibit 1.
23      MS. BONJEAN: It's his affidavit.
24      MS. ROSEN: Okay.
25

Page 15

1      BY MS. BONJEAN:
2  Q.  Mr. Cruz, I'm going to have you look at
3  what's been marked as Exhibit 1.  It's a one-page
4  document, but it's double-sided so you can look
5  at both sides.  Do you recognize this document?
6  And you can turn it over.
7  A.  Yes.
8  Q.  Is that your signature on the back
9  there?
10  A.  Yes.
11  Q.  And is this an affidavit that you
12  prepared in connection with Alfredo Gonzalez's
13  case?
14  A.  Yes.
15  Q.  Who is Alfredo Gonzalez?
16  A.  My uncle.
17  Q.  All right.  And how is he your uncle
18  exactly?
19  A.  My mother's brother.
20  Q.  Got it.  And do you know when -- well,
21  it says you prepared this affidavit in January
22  of 2018, is that correct?
23  A.  Yes.
24  Q.  All right.  How often do you speak to
25  your uncle, Alfredo Gonzalez?

Page 16

1  A.  I don't.
2  Q.  When's the last time you spoke to him?
3  A.  Don't remember.
4  Q.  Would it have been around the same time
5  that you spoke to Mr. Maysonet?
6  A.  Don't remember.
7  Q.  Have you spoken to him since you were
8  released from prison?
9  A.  No.
10  Q.  Did you have an opportunity to speak to
11  him while you were in prison?
12  A.  No.
13  Q.  So you know for a fact you didn't
14  speak to him while you were in prison, right?
15  A.  No.
16  Q.  And you know you have not spoken to him
17  since you were released from prison?
18  A.  No.
19  Q.  That's correct, right?
20  A.  Yes.
21  Q.  I want to go through your affidavit
22  with you, if I could, okay?  At the time that
23  you prepared this affidavit you were -- a couple
24  years ago you were 48 years old it looks like,
25  right?

Maysonet v.
Guevara

Page 17

1  A.  Yes.
2  Q.  All right.  And specifically No. 7,
3  you swore in this affidavit -- and I'm going to
4  quote you -- "I did not participate in or witness
5  the murders of the Wiley brothers on May 25,
6  1990."  Do you see that?
7  A.  Yes.
8  Q.  Is that a true statement?
9  A.  Yes.
10 Q.  Okay.  Did you witness the murders of
11 the Wiley brothers on May 25, 1990?
12 A.  No.
13 Q.  Did you participate in the murders
14 of the Wiley brothers in 1990?
15 A.  No.
16 Q.  I want to draw your attention to the
17 next -- or No. 9.  It says on August 24, 1990
18 at approximately 5 a.m. I was arrested near the
19 intersection of North Avenue and Kimball.  Do you
20 see that?
21 A.  Yes.
22 Q.  Is that a true statement, sir?  Do
23 you remember being arrested at around that time
24 at North Avenue and Kimball?
25 A.  I think the time is --

Page 18

1  Q.  The time's a little off?
2  A.  Yeah.
3  Q.  It does say approximately.  What's your
4  recollection of when you were arrested?
5  A.  It was around 6 p.m.
6  Q.  Oh, you think it was earlier?  I mean --
7  A.  No, later.
8  Q.  Later?
9  A.  Yeah.
10 Q.  Okay.  So you think this time is not
11 exactly correct?
12 A.  Yeah.
13 Q.  Okay.  No. 10 it says, "Before he
14 began interrogating me, Detective Guevara did
15 not inform me that I had the right to contact an
16 attorney."  Do you see that?
17 A.  Yes.
18 Q.  Did Detective Guevara tell you you had
19 the right to an attorney?
20 A.  No.
21 Q.  No. 11, again, it says Detective Guevara
22 threatened you.  Did he threaten you?
23 A.  Yes.
24    MR. ENGQUIST: Objection, leading.
25

Page 19

1     BY MS. BONJEAN:
2  Q.  And it also says, "Detective Guevara
3  threatened me and told me I had killed the Wiley
4  brothers."  Did Detective Guevara tell you you
5  had killed the Wiley brothers?
6     MR. ENGQUIST: Objection, leading.
7  A.  Yes.
8     BY MS. BONJEAN:
9  Q.  It says in your affidavit, "At the time
10 I had no idea who the Wiley brothers were and had
11 no knowledge of any murders committed on May 25,
12 1990."  Do you see that?
13 A.  Yes.
14 Q.  Sir, did you have any knowledge about
15 the murders of the Wiley brothers when you were
16 arrested?
17 A.  No.
18    MR. ENGQUIST: Objection, leading.
19    BY MS. BONJEAN:
20 Q.  Did Detective Guevara tell you that
21 Mr. Maysonet and Mr. Gonzalez had implicated you
22 or pointed the finger at you in connection with
23 those murders?
24 A.  Yes.
25 Q.  Did Detective Guevara threaten to arrest

Page 20

1  members of your family unless you provided a
2  statement?
3  A.  Yes.
4  Q.  Did he strike you multiple times?
5  A.  Yes.
6  Q.  And I'm going to ask you for some
7  further detail, but I just wanted to go through
8  your affidavit first to make sure that it was
9  accurate, okay?
10 A.  Um-hmm, yes.
11 Q.  Did Detective Guevara tell you that
12 he would let you go and speak to an attorney if
13 you just went along with what he was telling you
14 to say?
15 A.  Yes.
16 Q.  Did Detective Guevara provide you
17 the story that he wanted you to go along with
18 and then tell you that, you know, you'd be able
19 to work it out after you were released?
20 A.  Yes.
21    MR. ENGQUIST: Objection, leading.
22    BY MS. BONJEAN:
23 Q.  How were your reading skills at the time
24 that you gave a statement to Detective Guevara?
25 A.  Not that good.

Maysonet v.
Guevara

Page 21

1 Q. And how about your English, how was it?
2 A. So-so.
3 Q. Okay. You can put it aside for now, and
4 then we'll get back to some of these questions.
5 A. (Witness complies).
6 Q. I do want to bring you back to around
7 this time period of May of 1990, okay?
8 A. Okay.
9 Q. You would have been 21 years old, sound
10 right?
11 A. Yes.
12 Q. Where did you live in May of 1990?
13 You don't have to give an exact address, but do
14 you know like an intersection?
15 A. North Avenue and Kedzie.
16 Q. North Avenue and Kedzie?
17 A. Yeah.
18 Q. Would that be Humboldt Park?
19 A. Yes.
20 Q. And with whom did you live in May
21 of 1990?
22 A. With Efrain Cruz.
23 Q. That's your brother?
24 A. Yes.
25 Q. Were you working at the time that you

Page 22

1 were arrested in May of 1990?
2 A. Yes.
3 Q. Where were you working?
4 A. In a printing shop.
5 Q. What type of work were you doing?
6 A. Printing checks.
7 Q. Okay. Now, were you a member of
8 the Latin Kings street gang at that time, May
9 of 1990?
10 A. Yes.
11 Q. And I take it your brother was as well,
12 right?
13 A. Yes.
14 Q. And did you know Jose Maysonet?
15 A. Yes.
16 Q. And, again, the time frame I'm talking
17 about is May of 1990, right?
18 A. Yes.
19 Q. Did you know Jose Maysonet as a fellow
20 member of the gang?
21 A. Yes.
22 Q. What about Alfredo Gonzalez, your uncle?
23 A. Yes.
24 Q. Okay. Did you know Christopher Goosens
25 back in May of 1990?

Page 23

1 A. Don't know the name.
2 Q. Okay. Let me ask you this. You said
3 you did know, of course, Efrain Cruz. What about
4 Francisco Varas, did you know a Francisco Varas
5 or Cisco?
6 A. Yes.
7 Q. Was he also a member of the Latin Kings
8 street gang?
9 A. Yes.
10 Q. Were you all part of the same sort
11 of sect or division, if you will, of the gang?
12 A. Yes.
13 Q. What about a person by the name of --
14 who went by either Jeffrey or Black Jeffrey, did
15 you know him?
16 A. Yes.
17 Q. Okay. Was he also a member of the Latin
18 Kings street gang?
19 A. Yes.
20 Q. Was he part of your sect?
21 A. Don't remember.
22 Q. Okay. Now, Christopher Goosens, was he
23 part of your sect of the Latin Kings street gang?
24     MS. ROSEN: Objection, foundation. He said
25 he doesn't know that name.

Page 24

1     BY MS. BONJEAN:
2 Q. You can answer.
3 A. I don't remember that name.
4 Q. What about the nickname Fro?
5 A. I know a lot of Fros.
6 Q. We do too actually. He would have been
7 Fro who was, I would say, more dark complected?
8     MS. ROSEN: Objection, form.
9 A. Don't remember.
10     BY MS. BONJEAN:
11 Q. Okay. Did you know a Fro that was a
12 dark-complected Hispanic or maybe half Hispanic
13 individual?
14 A. Yes.
15 Q. Okay. And where did you know him from?
16 A. From the neighborhood.
17 Q. Okay. Was he in your sect of the Latin
18 Kings?
19 A. No.
20 Q. Okay. Do you know whether he was a
21 Latin King?
22 A. Yes.
23 Q. And do you know what area he was from?
24 A. No.
25 Q. But he wasn't someone that you knew

Maysonet v.
Guevara

Page 25

1 from your group, right?
2 A. No.
3 Q. How about Santiago Sanchez, did you know
4 him?
5 A. No.
6 Q. He went by the nickname Macho?
7 A. Don't remember.
8 Q. Okay. When was the first time that
9 you learned anything about the Wiley brothers
10 murders?
11 A. When I got locked up.
12 Q. When you got arrested?
13 A. Yes.
14 Q. So prior to your arrest had you
15 heard even anything on the street about these
16 two African-American men that had been shot on
17 North Avenue?
18 A. No.
19 Q. Now, we talked about this. According to
20 police reports you were arrested on the morning
21 of August 24, 1990. Is that your recollection?
22 A. It was in the evening.
23 Q. You believe it was in the evening?
24 A. Yeah, because -- yes.
25 Q. Okay. Where were you when you were

Page 26

1 arrested?
2 A. On the corner of North Avenue and Homan.
3 Q. Were you near your home?
4 A. No, I was at the bus stop.
5 Q. And what were you doing?
6 A. I was going to take the bus to go to work.
7 Q. And what time did you start work?
8 A. Hopefully around 8 o'clock.
9 Q. All right. And who arrested you?
10 A. Officer -- I don't remember his name.
11 Q. Describe him.
12 A. Latino.
13 Q. Guevara?
14 A. Yeah, and --
15 MS. ROSEN: Object to the leading.
16 A. And another officer, a white officer.
17 BY MS. BONJEAN:
18 Q. Did it appear that they were partners?
19 MS. ROSEN: Objection, form, foundation.
20 A. Yes, they were in the car together.
21 BY MS. BONJEAN:
22 Q. Well, let me ask it this way. Were they
23 in plainclothes?
24 A. Yes.
25 Q. Were they detectives?

Page 27

1 A. Yes.
2 Q. One of them was Latino?
3 A. Yes.
4 Q. And another one was a white officer?
5 A. Yes.
6 Q. And how was it that they arrested
7 you? Strike that. Let me ask it differently.
8 You were standing at the bus stop you said?
9 A. Yes.
10 Q. Did they come together in a car?
11 A. Yes.
12 Q. Or were they on foot?
13 A. In a car.
14 Q. All right. Now, did you voluntarily
15 or willingly go with Detectives Guevara and
16 Halvorsen?
17 A. No.
18 MR. ENGQUIST: Objection, form.
19 MR. LEINENWEBER: Objection, form,
20 foundation, totally leading.
21 MS. BONJEAN: What?
22 MS. COHEN: You said Halvorsen.
23 MS. BONJEAN: Oh, did I? My apologies.
24 Q. You remember the Latino detective,
25 right?

Page 28

1 A. Yes.
2 Q. You don't know who the other detective
3 was, right?
4 A. He was a white guy who was with him.
5 Q. Was he in plainclothes or in uniform?
6 A. Plain -- they were both with a more plain
7 uniform.
8 Q. So did you go voluntarily with
9 Detective Guevara and the other plainclothes
10 detective who happened to be a white man?
11 A. No.
12 Q. All right. What if anything did
13 either of those detectives say to you when they
14 pulled up when you were standing at the bus stop?
15 A. They asked you if I was Justino Cruz.
16 Q. And what did you say?
17 A. Yes.
18 Q. Had you ever seen Detective Guevara
19 before?
20 A. No.
21 Q. Had you ever seen the other detective
22 before?
23 A. No.
24 Q. All right. And after they pulled
25 up and said were you Justino Cruz, what did you

Maysonet v.
Guevara

Page 29

1 say?
2 A. Yes.
3 Q. And what did either one of those
4 individuals, Detective Guevara or the other
5 detective, say to you at that time?
6 A. Don't remember.
7 Q. What did they do?
8 A. They jumped out of the car and arrested me.
9 Q. Did they put you in handcuffs?
10 A. Yes.
11 Q. Okay. Did they tell you why they were
12 handcuffing you?
13 A. For some questioning.
14 Q. Did they tell you what they were going
15 to question you about?
16 A. No.
17 Q. Did you have any idea why they
18 were going to arrest you --
19 A. No, no.
20 Q. Did you have any idea why they were
21 handcuffing you and indicating that they were
22 going to question you?
23 A. No.
24 Q. Did they tell you that it was related
25 to any type of murders or anything like that at

Page 30

1 the time?
2 A. No.
3 Q. So where did they put you, in the car?
4 A. Yes.
5 Q. And where did you go after
6 they handcuffed you and put you in the car?
7 A. Grand and Central.
8 Q. Had you been in Grand and Central
9 before?
10 A. No.
11 Q. Now, when you got to Grand and Central,
12 where were you placed?
13 A. In a holding room.
14 Q. Were you alone or were you with anyone?
15 A. Alone.
16 Q. Did you see anyone else in custody at
17 Grand and Central?
18 A. No.
19 Q. For instance, did you see Jose Maysonet
20 after you were brought to Area 5?
21 A. No.
22 Q. Did you see Alfredo Gonzalez after you
23 were brought to Area 5?
24 A. No.
25 Q. So you were placed in a holding area?

Page 31

1 A. Yes.
2 Q. Did you remain handcuffed?
3 A. Yes.
4 Q. And can you describe the room
5 that you were brought to, to the best of your
6 recollection?
7 A. Just a little small room with a bench.
8 I was handcuffed to the wall.
9 Q. Was there like a hook on the wall?
10 A. Don't remember.
11 Q. But you remember being handcuffed to the
12 wall?
13 A. Yes.
14 Q. Both hands or one?
15 A. Just one.
16 Q. And after you were brought to Area 5
17 and placed in this holding room where you were
18 handcuffed to the wall, did they tell you at that
19 point why you had been arrested?
20 A. No.
21 Q. Eventually at some point they told you
22 why you had been arrested, right?
23 A. Yes.
24     MR. ENGQUIST: Objection, form.
25

Page 32

1     BY MS. BONJEAN:
2 Q. After you were brought into this
3 holding area, where did Detective Guevara and the
4 other detective go, if you know?
5 A. Don't know.
6 Q. Did they leave you there?
7 A. Yes.
8 Q. How long were you left there?
9 A. Don't remember.
10 Q. Was it some period of time?
11 A. Yes.
12 Q. Were you wondering why you were in
13 custody?
14 A. Oh, yes.
15 Q. Were you scared?
16 A. Yes.
17 Q. Did you continue to -- oh, by the
18 way, did you speak to Guevara in Spanish or
19 English?
20 A. English.
21 Q. Did he give you a phone call or tell you
22 you could call anyone?
23     MS. ROSEN: Objection to form.
24 A. No.
25

Maysonet v.
Guevara

Page 33

1      BY MS. BONJEAN:
2   Q.  All right.  So what's the next thing
3   that happened after you were handcuffed in a
4   holding area at Area 5?
5   A.  Couple of hours later they walked into
6   the room.
7   Q.  And you're talking about Guevara?
8   A.  Yes.
9   Q.  And was it the same white detective?
10  A.  Yes.
11  Q.  The two of them?
12  A.  (Nodding).
13      MS. BONJEAN: Can you mark this.
14      (Whereupon Deposition Exhibit No. 3 was
15  marked for identification.)
16  Q.  Okay.  Mr. Cruz, I'm having you look at
17  what's been marked as Exhibit 3.  Have you ever
18  seen this supplemental report before?
19  A.  Don't remember.
20      MR. LEINENWEBER: I'm sorry.  Can I ask
21  you to clarify?  You said Exhibit 2 or Exhibit 3?
22      MS. BONJEAN: It's 3.  I premarked 2.
23      MR. LEINENWEBER: Oh, okay.
24      MS. BONJEAN: Sorry.
25      MR. ENGQUIST: Oh, this is 3?

Page 34

1      MS. BONJEAN: Yeah, it's going to be 3.
2   Sorry.  I deviated, which is why I never premark.
3      MR. ENGQUIST: Just to be clear, it's
4   two sup reports, right?
5      MS. BONJEAN: Yeah, it's two sup reports.
6      MR. ENGQUIST: Okay.
7      MR. LEINENWEBER: What was your question?
8   I'm sorry.
9      MS. BONJEAN: I asked him whether he'd ever
10  seen this supplemental report before.
11      MR. LEINENWEBER: Thank you.
12      BY MS. BONJEAN:
13  Q.  And your answer was?
14  A.  Don't remember.
15  Q.  You don't remember ever seeing it.
16  Do you see your name on -- about halfway down it
17  says In Custody, Justino Cruz?
18  A.  Yes.
19  Q.  And do you see below that it says
20  Arresting Officers?
21  A.  Yes.
22  Q.  I would like you to turn to the next
23  page.  Actually, it would be the third page of
24  this document and it's Bates stamped RFC Maysonet
25  44.

Page 35

1      MS. BONJEAN: Adrian, I don't know
2   if you want to help him get there.  I don't know
3   if he knows what a Bates stamp -- it's in the
4   right-hand corner there.  Yeah, you've got it.
5   Q.  I want to draw your attention about
6   halfway down where it says at 330 hours?
7   A.  Yes.
8   Q.  Are you able to follow along with me?
9   A.  Yes.
10  Q.  Okay.  It says at 330 hours --
11  and that is -- it's military time, so that would
12  be 3:30 a.m. in the morning -- on August 24, 1990
13  detectives located Justino Cruz a/k/a Chris Cruz.
14  Do you see that?
15  A.  Yes.
16  Q.  Did you also have an alias by the name
17  of Chris Cruz?
18  A.  No.
19  Q.  Do you know why whoever prepared
20  this report believed that you had an a/k/a or an
21  alias as Chris Cruz?
22  A.  No.
23      MS. ROSEN: Objection, foundation.
24      BY MS. BONJEAN:
25  Q.  And it says located you on the street

Page 36

1   at Kimball and North Avenue.  Is the location
2   correct?
3   A.  Yes.
4   Q.  Is that where you were waiting for the
5   bus?
6   A.  Yes.
7   Q.  It says he was known on sight by
8   Detective Guevara.  Cruz was informed of the
9   statements given by Jose Maysonet and Alfredo
10  Gonzalez implicating him in these murders.  Is
11  that true?  Did they tell you at the bus stop
12  that you had been implicated for murders by Jose
13  Maysonet and Alfredo Gonzalez?
14      MR. LEINENWEBER: Objection to form,
15  foundation.
16      MR. ENGQUIST: Join.
17      BY MS. BONJEAN:
18  Q.  "Cruz stated that it was a lie
19  and agreed to come to Area 5 and confront his
20  accusers."  Did you agree to go to Area 5 and
21  confront your accusers when you were arrested on
22  August 24, 1990?
23  A.  No.
24  Q.  This report also indicates that after
25  you arrived at Area 5 it says, next paragraph,

Maysonet v.
Guevara

Page 37

1  Justino Cruz was seen by both Alfredo Gonzalez
2  and Jose Maysonet and identified by both of these
3  persons as Tino, as being the Tino they spoke of.
4  Did you see Gonzalez and Maysonet at Area 5?
5  A.  No.
6  Q.  And then it says on August 24, 1990
7  at 5 a.m. Justino Cruz was arrested for these
8  murders, but due to the late hour Cruz was
9  allowed to sleep in an interview room at Area 5.
10  Did Detective Guevara allow you to sleep in the
11  cozy accommodations of Area 5?
12  A.  No.
13     MS. ROSEN: Object to the form, foundation.
14     MR. ENGQUIST: Form.
15     BY MS. BONJEAN:
16  Q.  Were you able to sleep?
17  A.  No.
18  Q.  So you can put that aside for
19  the moment.  We probably will return to that.
20  A.  (Witness complies).
21  Q.  So you previously testified that
22  when you were in this holding area, eventually
23  Detective Guevara and another white detective
24  came back a couple hours later I think is what
25  you said, is that right?

Page 38

1  A.  Yes.
2  Q.  Tell me when they came back, what
3  if anything did either of those detectives say
4  to you?
5  A.  They started asking me questions.
6  Q.  And did Detective Guevara ask you
7  questions?
8  A.  Yes.
9  Q.  And did the white detective ask you
10  questions too?
11  A.  Yes.
12  Q.  Okay.  And can you tell me what
13  Detective Guevara asked you?
14  A.  I don't remember.
15  Q.  Well, what was -- do you remember
16  generally what they were saying?
17  A.  That I was going to be arrested for murder.
18  Q.  And did they say who the murder was that
19  you were going to be arrested for?
20  A.  Don't remember.
21  Q.  What about the white detective,
22  did he say anything specific that you can recall?
23  A.  No.
24  Q.  And when they said you were going to
25  be arrested for murder, what did you say back to

Page 39

1  them?
2  A.  I don't know what you're -- they were
3  talking about.
4  Q.  And did you tell them you didn't know
5  what they were talking about?
6  A.  Yes.
7  Q.  And what did they say when they
8  told you -- when you told them I don't know what
9  you're talking about?
10  A.  I don't remember.
11  Q.  Well, what did they do?
12  A.  Don't remember.
13  Q.  Okay.  Well, in your affidavit, as you
14  recall -- as you said in your affidavit, at some
15  point you were threatened by Detective Guevara,
16  right?
17  A.  Yes.
18     MS. ROSEN: Object to the form.
19     MR. ENGQUIST: Leading.
20     MS. BONJEAN: Well, I'm --
21  Q.  Did they leave -- how long were they
22  in the interrogation room with you or the holding
23  room when they first came in?  Strike that.  How
24  long were they with you in that interview room
25  after they came in after --

Page 40

1  A.  Couple hours.
2  Q.  Okay.  How long -- I'm sorry.  Say that
3  again?
4  A.  Couple hours.
5  Q.  And how long did they stay in there
6  with you?
7  A.  Couple hours.
8  Q.  Were they coming in and out or were they
9  in there for two hours straight or what?
10  A.  Two hours straight.
11  Q.  They were in there for two hours
12  straight?
13  A.  (Nodding).
14  Q.  And what was being said?
15  A.  Asking questions.
16  Q.  Okay.  And what types of questions were
17  they asking you?
18  A.  Don't remember.
19  Q.  Okay.  Well, were they asking you about
20  the murders?
21  A.  Yes.
22     MS. ROSEN: Object to the form.
23  A.  About, yeah, the murders.
24     BY MS. BONJEAN:
25  Q.  Well, generally what do you remember?

Maysonet v.
Guevara

Page 41

1 I mean --
2 A.  Them asking me questions about the
3 murder.  They said that Alfredo and Juan Maysonet
4 said I was there with them.  I tell them I don't know
5 what they were talking about.
6 Q.  Okay.  And did at any point
7 Detective Guevara do anything against you or
8 with -- any sort of physical act towards you?
9    MS. ROSEN: Object to form.
10 A.  Yeah, he grabbed me through the throat.
11    BY MS. BONJEAN:
12 Q.  He what?
13 A.  He grabbed me through the throat.
14 Q.  He did?
15 A.  Yeah.
16 Q.  And when he grabbed you through the
17 throat, what did he say, if anything?
18 A.  That I murdered two guys.  I said I don't
19 know what you're talking about.
20 Q.  And did he do anything else after he
21 grabbed you by the throat?
22 A.  He hit me in my left ear.
23 Q.  And how did he hit you in your left ear?
24 A.  Slapped me.
25 Q.  And were you surprised by that?

Page 42

1 A.  Yes.
2 Q.  And were you frightened?
3 A.  Yes.
4 Q.  And what was the white detective doing
5 when he was doing this?
6 A.  Just sitting there.
7 Q.  Did he do anything, like say, hey, stop,
8 Guevara?
9 A.  No.
10 Q.  And when he hit you or was choking
11 you --
12    MR. ENGQUIST: Objection to the form.
13    BY MS. BONJEAN:
14 Q.  -- did he say anything?  Did
15 Detective Guevara say anything when he was taking
16 those actions against you?
17    MR. LEINENWEBER: Object to form, asked
18 and answered.
19    MS. ROSEN: Object to form.
20 A.  Just do you remember now what we're
21 talking about?  I still don't know what you're
22 talking about.
23    BY MS. BONJEAN:
24 Q.  Okay.  And this went on for some time?
25 A.  Yes.

Page 43

1    MS. ROSEN: Object to the form.
2    BY MS. BONJEAN:
3 Q.  How long?  Can you approximate?
4 A.  Around two hours.
5 Q.  Okay.  And during this two-hour period
6 that Guevara was telling you do you remember now
7 and either choking you or hitting you, what did
8 you keep telling him?
9    MS. ROSEN: Object to the form.
10 A.  I don't remember what --
11    MR. LEINENWEBER: Objection to form,
12 foundation.
13 A.  -- they're talking about.  I got
14 no understanding what they're talking about.
15    BY MS. BONJEAN:
16 Q.  And did you have any understanding
17 of what they were talking about?
18 A.  No.
19 Q.  In what other ways did Detective Guevara
20 threaten you?
21    MS. ROSEN: Object to the form.
22    MR. LEINENWEBER: Join.
23 A.  Threatened me about arresting my family
24 members.
25

Page 44

1    BY MS. BONJEAN:
2 Q.  Did he tell you he would arrest your
3 family members?
4 A.  Yes.
5    MS. ROSEN: Objection, asked and answered.
6    BY MS. BONJEAN:
7 Q.  Did he say that you were going to be
8 charged?
9 A.  No.
10 Q.  What did he say with regards to charging
11 anyone?
12    MS. ROSEN: Object to the form.
13 A.  Don't remember.
14    BY MS. BONJEAN:
15 Q.  What did he want you to do?
16    MR. ENGQUIST: Objection, foundation.
17    MR. LEINENWEBER: Foundation, form.
18 A.  Say that I was there, that I committed the
19 murder with Alfredo and Juan Maysonet.
20    BY MS. BONJEAN:
21 Q.  And whatever words he used, how many
22 times did he communicate to you that he wanted
23 you to implicate or say that you did it with Juan
24 Maysonet and Alfredo Gonzalez --
25    MS. ROSEN: Object to the form.

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Page 45

1    BY MS. BONJEAN:
2  Q.  -- if you remember?
3    MS. ROSEN: Object to the form.
4  A.  I don't remember.
5    MR. LEINENWEBER: Objection, leading.
6    BY MS. BONJEAN:
7  Q.  Was it more than once?
8  A.  Yes.
9  Q.  Was it multiple times?
10 A.  Yes.
11   MS. ROSEN: Object to the form.
12   BY MS. BONJEAN:
13 Q.  Did he tell you that he wanted you to
14 make a statement?
15   MS. ROSEN: Object to the leading.
16 A.  Yes.
17   BY MS. BONJEAN:
18 Q.  I'm going to have you look at
19 Exhibit 2.  Mr. Cruz, I'm going to have you look
20 at what's been marked as Exhibit 2.  First of
21 all, I'd like you to look at the first page where
22 it says Statement of Justino Cruz.  Do you see
23 that?
24 A.  Yes.
25 Q.  And it says on August 24, 1990 at

Page 46

1    2:45 p.m.  Do you see that?
2  A.  Yes.
3  Q.  Is it your belief that you were in
4  custody from -- or arrested actually the evening
5  before, is that right?
6    MR. LEINENWEBER: Objection to form.
7  A.  Don't remember.
8    BY MS. BONJEAN:
9  Q.  Well, this says 2:45 p.m., right?
10 A.  Yes.
11 Q.  And you didn't write that, though,
12 right?
13 A.  No.
14 Q.  And you said you were arrested at
15 6 o'clock p.m., right?
16 A.  Yes.
17 Q.  So obviously you were arrested before
18 you made this statement, right?
19 A.  That's what they're saying.
20 Q.  Okay.  You're suggesting --
21   MS. ROSEN: I'm sorry.  What was your answer?
22 What was his answer?
23   (Whereupon the portion of the record was read
24 as requested.)
25   MS. ROSEN: Okay, thank you.

Page 47

1    BY MS. BONJEAN:
2  Q.  You're saying that that's the time
3  they're saying, right?
4  A.  Yes.
5  Q.  You don't know if that's accurate,
6  though?
7  A.  Yes.
8  Q.  Fair enough.  I want you to look at
9  the last page of it and see if you see your name
10 or signature at the very end there where it says
11 Justino Cruz.  Do you see that?
12 A.  Yes.
13 Q.  Do you remember signing this statement?
14 A.  Don't remember.
15 Q.  All right.  You didn't write it, though,
16 right?
17 A.  No.
18 Q.  Would you agree that that's your
19 handwriting at the end, though, that says Justino
20 Cruz there?
21 A.  That printing?
22 Q.  Yeah.
23 A.  Yes.
24 Q.  Okay.  Now, I would like to go through
25 the statement -- oh, and also, I'm sorry, if you

Page 48

1  look and see your -- on the first page it says
2  Justino Cruz.  Is that your printing right there?
3  A.  Yes.
4  Q.  It says, "After first being advised of
5  his rights and stating he understood his rights,
6  I told Justino Cruz that I am an assistant
7  state's attorney."  Do you remember sitting with
8  an assistant state's attorney?
9  A.  Don't remember.
10 Q.  Okay.  Do you remember being told that
11 you had certain rights?
12 A.  Don't remember.
13 Q.  Okay.  Do you know what Miranda rights
14 are?
15 A.  No.
16 Q.  Were you told that you had the right
17 to an attorney?
18 A.  No.
19 Q.  Were you told that you didn't have to
20 speak to anybody if you didn't want to?
21 A.  No.
22 Q.  Were you told that if you wanted
23 an attorney, an attorney would be made available
24 to you?
25 A.  No.

Maysonet v.
Guevara

Page 49

1 Q. Going to the second paragraph,
2 second sentence it says, "He," being you,
3 "further stated that on the evening of May 24,
4 1990 at about 11:30 p.m., Justino, Alfredo
5 Gonzalez, Chris Hernandez and Jose Maysonet went
6 to Jose's house at 1302 North Homan to pick up a
7 gun." Do you see that?
8 A. Yes.
9 Q. Is that a true statement?
10 A. No.
11 Q. Now, did you write that statement here?
12 A. No.
13 Q. The next sentence is, "They picked
14 up the gun because Alfredo Gonzalez said they
15 were going to do a shooting. The gun was a
16 9 millimeter automatic" -- I think it says
17 chrome. I don't know what the word is before
18 that but -- "pistol and Alfredo put it in his
19 belt." Did you -- is that a true statement?
20 A. No.
21 Q. And did you write that statement?
22 A. No.
23 Q. "The four men got into the car with
24 Jose driving, Alfredo next to him, Chris seated
25 behind Alfredo and Justino Cruz seated behind the

Page 50

1 driver." Do you see that?
2 A. Yes.
3 Q. Did you write that statement?
4 A. No.
5 Q. And is that a true statement?
6 A. No.
7 Q. Justino stated that they drove
8 around for a short while and stopped in the
9 vicinity of North and St. Louis in the alley.
10 Do you see that?
11 A. Yes.
12 Q. Did you write that statement?
13 A. No.
14 Q. And is that a true statement?
15 A. No.
16 Q. Chris Hernandez and -- I want to stop
17 there. Do you even know who Chris Hernandez is?
18 A. No.
19 Q. Chris Hernandez and Alfredo Gonzalez
20 got out of the car with Justino. Chris and
21 Alfredo hooded up, meaning they put the hoods
22 from the sweatshirts on their heads. Justino
23 stated this indicated that they will shoot or
24 rob someone. Chris and Alfredo approached two
25 black guys in a vacant lot on North Avenue.

Page 51

1 Alfredo had the gun in his front pocket. While
2 Chris and Alfredo were talking to the black guys,
3 Jose was in the car with the car running and
4 Justino was watching their backs. Did you write
5 that?
6 A. No.
7 Q. Are any of those statements true?
8 A. No.
9 Q. Justino stated that he was making
10 sure no one, including the police, approached
11 from the alley. Justino said he heard five
12 to six shots and saw Chris and Alfredo running
13 from the car. Alfredo had the gun in his hand.
14 Justino said he jumped in the car and they drove
15 away. He stated he went home. Do you see that?
16 A. Yes.
17 Q. Did you write any of those statements?
18 A. No.
19 Q. And are any of those statements true?
20 A. No.
21 Q. Justino stated that he had been treated
22 well by the police and the state's attorneys.
23 Was that true?
24 A. No.
25 Q. Did you write that statement?

Page 52

1 A. No.
2 Q. Were you treated well by the police?
3 A. No.
4 Q. He was given something to eat and
5 drink and he was allowed to use the bathroom.
6 He said no one had coerced or threatened him in
7 any way to give this statement. Justino said he
8 gave this statement because it is the truth. Did
9 you write that?
10 A. No.
11 Q. And was the statement the truth?
12 A. No.
13 Q. Justino, why did you sign this statement
14 if it wasn't true?
15 A. I was threatened.
16 Q. And who were you threatened by?
17 A. By the officers.
18 Q. And which ones specifically?
19 A. The Latino.
20 Q. And do you know whether or not
21 there were any other detectives involved in --
22 well, strike that. Do you remember reading this
23 statement when you signed it?
24 A. No.
25 Q. Were you able to read cursive or script

Maysonet v.
Guevara

Page 53

1  like this?
2  A.  No.
3  Q.  So back in May of 1990 did you even have
4  the ability to read this statement?
5      MS. ROSEN: Object to the form, foundation.
6  A.  No.
7      BY MS. BONJEAN:
8  Q.  There's certain points where they
9  had -- where you have -- strike that.  Well, do
10 you see at the bottom of the first page there's
11 some words that are crossed out and it looks like
12 there's some initials that say JC?
13 A.  Yes.
14 Q.  Were you asked to initial certain parts
15 of the statement?
16 A.  Don't remember.
17 Q.  Okay.  You don't remember.  Again, do
18 you remember actually putting JC at the bottom of
19 this statement?
20 A.  Don't remember.
21 Q.  Are you able to read this statement
22 today?
23 A.  A little bit.
24 Q.  Can you read it for me starting at the
25 very top?

Page 54

1  A.  As far as being -- I can't even --
2  Q.  Just do your best.
3  A.  After just at first being of his right
4  and state he understood the right, I told Justino
5  Cruz that I am a state's attorney, an attorney
6  working with the police, and not his -- not his
7  attorney, Justino Cruz, to give the following
8  statement and summary.
9  Q.  Okay.  So today, almost what, 30 years
10 later, you're able to read it a little bit?
11     MS. ROSEN: Object to the form.
12     MR. LEINENWEBER: Objection, form.
13     MR. ENGQUIST: Join.
14 A.  Yes.
15     BY MS. BONJEAN:
16 Q.  Back in 1990 were you able to read -- as
17 a 21-year-old, were you able to read this script?
18 A.  No.
19     MS. ROSEN: Objection to form.
20     BY MS. BONJEAN:
21 Q.  Did you read this statement before you
22 signed it?
23     MS. ROSEN: Object to the form.
24 A.  No.
25

Page 55

1      BY MS. BONJEAN:
2  Q.  And what did you think was going
3  to happen after you signed this statement?
4  Strike that.  I'm going to ask it a little bit
5  different.  Back in May 25th, or I guess May --
6  I'm sorry, strike that.  August 24th of 1990,
7  after you put your signature on here, did you
8  have an understanding or did you believe
9  something was going to happen after you signed
10 it?
11 A.  Don't remember.
12 Q.  Did you know you were going to get
13 charged with murder?
14 A.  Don't remember.
15 Q.  Well, you don't remember what you
16 thought was going to happen?
17     MR. BRENER: Asked and answered.
18     MR. LEINENWEBER: Objection to form.
19     MS. ROSEN: Objection.
20     BY MS. BONJEAN:
21 Q.  I mean, did you think you were going
22 to go to jail or did you think you were going to
23 get released?
24     MS. ROSEN: Object to the form.
25 A.  Go to jail.

Page 56

1      BY MS. BONJEAN:
2  Q.  You did think you were going to go
3  to jail?
4  A.  Well, he said I was going to Cook County.
5  Q.  Okay.  He did tell you you were going to
6  go to Cook County?
7  A.  (Nodding).
8  Q.  And did you go to Cook County after
9  that?
10 A.  Yes.
11 Q.  Did Detective Guevara give you the
12 option to do a court-reported statement?
13     MS. ROSEN: Object to the form, foundation.
14 A.  Don't remember.
15     MR. LEINENWEBER: Form, foundation.
16     MR. ENGQUIST: Join.
17     BY MS. BONJEAN:
18 Q.  Do you know what a court-reported
19 statement is?
20 A.  No.
21 Q.  Did he give you the opportunity to make
22 a statement in front of a video?
23     MS. ROSEN: Object to the form, foundation.
24 A.  No.
25

Maysonet v.
Guevara

Page 57

1    BY MS. BONJEAN:
2  Q.   Okay.  Did he give you an opportunity
3  to make a statement with a court reporter like
4  this?
5  A.   No.
6      MS. ROSEN: Objection, form, foundation.
7      BY MS. BONJEAN:
8  Q.   Did he give you any options about how
9  you were going to make this statement?
10 A.   No.
11     MS. ROSEN: Object to the form, foundation.
12     BY MS. BONJEAN:
13 Q.   Did any detective give you an
14 option regarding how you were going to make this
15 statement?
16 A.   No.
17     MS. ROSEN: Object to the form, foundation.
18     BY MS. BONJEAN:
19 Q.   Okay.  Did any detective give you
20 the opportunity to have a video camera record
21 what you had to say?
22 A.   No.
23     MS. ROSEN: Objection, form, foundation.
24     BY MS. BONJEAN:
25 Q.   Did any detective ever show

Page 58

1  you statements that were signed by Jose Maysonet
2  while you were in custody at Area 5?
3  A.   No.
4  Q.   What about Alfredo Gonzalez, did
5  any detective ever show you any statement that
6  had been made by Alfredo Gonzalez while you were
7  at Area 5?
8  A.   No.
9  Q.   No?
10 A.   No.
11 Q.   You don't remember being shown anything,
12 right?
13 A.   No.
14 Q.   Did you know Rosa Bello?
15 A.   Who?
16 Q.   Rosa Bello?
17 A.   No.
18 Q.   Did you know Jose Maysonet's girl friend
19 or wife?
20 A.   No.
21 Q.   Had you ever been to Jose Maysonet's
22 home?
23 A.   No.
24 Q.   And I'm talking, again, back in
25 May, June, July of 1990.  Had you ever even been

Page 59

1  inside Mr. Maysonet's home?
2  A.   No.
3  Q.   And you didn't know his wife, correct?
4  A.   No.
5      MS. BONJEAN: Let's mark this one first.
6      (Whereupon Deposition Exhibit No. 4 was
7  marked for identification.)
8  Q.   Mr. Cruz, I'm handing you what
9  has been marked Exhibit 4, and it purports to
10 be a statement of Rosa Bello that was taken on
11 August 23, 1990 at 2:10 p.m.  Do you see that?
12 A.   Yes.
13 Q.   And you don't know who this person is,
14 right?
15 A.   No.
16 Q.   In this statement, if you look at
17 the first page, I'll read the second paragraph.
18 It says Rosa Bello stated that she's 24 years old
19 and lives with Jose Maysonet.  Rosa's currently
20 pregnant with Jose's child.  It goes on to say
21 on May 24, 1990 at around 11:30 p.m. Rosa was at
22 home with Jose and her two children watching
23 television.  Three of Jose's friends stopped by
24 known to Rosa as Lluvia, Fro and Tino.  Do you
25 see that?

Page 60

1  A.   Yes.
2  Q.   Did you ever stop by Jose's home
3  on May 24, 1990 at 11:30 p.m. with Lluvia, Fro
4  and yourself?
5  A.   No.
6  Q.   So this statement is not true, correct?
7      MS. ROSEN: Object to the form, foundation.
8  A.   Yes.
9      BY MS. BONJEAN:
10 Q.   She also goes on to say that Lluvia --
11 and, by the way, you know who Lluvia is, though,
12 right?
13 A.   Yes.
14 Q.   Who's Lluvia?
15 A.   Alfredo.
16 Q.   Okay.  So it goes on to say Lluvia
17 asked Jose for a gun.  Were you ever in Jose
18 Maysonet's home with Lluvia and Fro at which
19 point Lluvia asked Jose for a gun?
20 A.   No.
21 Q.   Rosa became upset because she does
22 not allow guns in the house.  Rosa said the gun
23 was a 9 millimeter and was wrapped in a towel.
24 Were you ever in Jose Maysonet's house on May 24,
25 1990 with Lluvia and Fro during which Lluvia

Maysonet v.
Guevara

Page 61

1   asked for a gun and Jose provided a 9 millimeter
2   that was wrapped in a towel?
3   A.  No.
4   Q.  That statement is false, right?
5   A.  Yes.
6   Q.  Rosa put the gun in a plastic bag
7   and Jose handed the gun to Lluvia.  It then
8   says that all four men, that being Lluvia, Fro,
9   yourself and Jose, left the apartment.  Did you
10  ever leave the apartment with a gun with Lluvia
11  and Fro on May 24th of 1990?
12  A.  No.
13  Q.  Can you go to the last page.
14  A.  (Witness complies).
15  Q.  Who is that?
16  A.  Don't know.
17  Q.  Don't recognize that?
18  A.  No.
19  Q.  Is that Alfredo Gonzalez?
20  A.  It could be.
21  Q.  Yeah.
22  A.  I don't know.
23  Q.  You haven't seen him in a lot of years?
24  A.  Yeah.
25  Q.  What about the last page -- the very

Page 62

1   last page, sorry.  Do you recognize this photo?
2   A.  No.
3   Q.  If you take a quick -- I mean, I know
4   it's kind of dark.  I'll give you two seconds --
5   I'll give you a little longer to look at it.  If
6   you don't, you don't.
7   A.  No.
8   MS. BONJEAN: Would you mark this Exhibit 5.
9   It's Maysonet's statement.
10  (Whereupon Deposition Exhibit No. 5 was
11  marked for identification.)
12  Q.  Mr. Cruz, I've handed you what's
13  been marked as Exhibit 5.  It says Statement of
14  Jose Maysonet.  Do you see that?
15  A.  Yes.
16  Q.  Have you ever seen this before?
17  A.  At court.
18  Q.  You remember seeing it at court?
19  A.  (Nodding).
20  Q.  When you were in custody?
21  A.  Yes.
22  Q.  I want to go through it with you.
23  I have one other question about this.  Did you
24  ever see this in the police station?
25  A.  No.

Page 63

1   Q.  Okay.  If you can go to the second
2   page of this document, and I'll -- actually,
3   the third page.  I'm sorry.  Well, let's start
4   on the second page.  I'm going to read it.  In
5   the middle of the page it says on May 20, 1990 at
6   approximately 12:45 p.m. where were you?  Answer,
7   home.  Question, where do you live?  1302 North
8   Homan.  Did anything unusual happen?  Answer,
9   yes, Lluvia came to my house.  He told me that
10  I -- if I can hide a pistol for him.  Question,
11  what did you say to Lluvia?  I told him I can
12  hide the pistol for you but you can go to get it
13  back as soon as possible.  What did Lluvia say
14  then?  He said don't worry about it.  I'll pick
15  it up as soon as possible.  You can go to the
16  next page.  Question, what kind of pistol or gun
17  did Lluvia give?  Answer, 9 millimeter.  Do you
18  see that?
19  A.  Yes.
20  Q.  Okay.  Then it goes on to say,
21  Question, on May 24, 1990 about 11:30 where were
22  you?  Answer, home.  What if anything happened
23  about that time?  Answer, Lluvia, Fro, Tino
24  came to my house.  Again, did you go to Jose
25  Maysonet's house on May 24, 1990 with Lluvia and

Page 64

1   Fro at about 11:30 p.m.?
2   A.  No.
3   MR. LEINENWEBER: Objection, asked and
4   answered.
5   MS. ROSEN: Objection, form, foundation.
6   BY MS. BONJEAN:
7   Q.  And that statement is a false statement,
8   correct?
9   MS. ROSEN: Objection, form, foundation.
10  A.  Yes.
11  BY MS. BONJEAN:
12  Q.  Well, is it a true statement?
13  A.  No.
14  MS. ROSEN: Object to the form.
15  MR. LEINENWEBER: Objection, also
16  argumentative.
17  BY MS. BONJEAN:
18  Q.  And then it says -- I'm going to
19  jump ahead to the bottom.  It says what happened
20  when Lluvia and Tino came over.  Do you see that
21  at the bottom of the page, or close to the bottom
22  of the page?
23  A.  Okay.
24  Q.  Question, what happened when Lluvia
25  and Tino came over?  Answer, they came over that

Rizman Rapaport (973)992-7650    (16) Pages 61 - 64
"When every word counts"

Maysonet v.
Guevara

---

Page 65

1  night and they told me they needed a pistol. Do
2  you see that, the answer? I can point it to you
3  if you need to.
4  A.  Okay, yeah.
5  Q.  Okay.  Did you ever go to Jose
6  Maysonet's house with your uncle on May 24,
7  1990 and tell Jose that you needed a pistol?
8  A.  No.
9      MS. ROSEN: Objection, foundation, asked
10  and answered.
11      BY MS. BONJEAN:
12  Q.  And, Question, it says what did
13  they say they needed the pistol for? Answer,
14  they got the two guys on Drake and North Avenue
15  waiting for dope, crossed out, and then
16  something.
17      Justino, did you ever go
18  to Jose Maysonet's house on May 24, 1990 with
19  your uncle and tell Jose that you needed a pistol
20  because you had two guys on Drake and North
21  Avenue waiting for either dope or something?
22  A.  No.
23  Q.  Again, is that statement a true or false
24  statement?
25      MS. ROSEN: Objection, form --

---

Page 66

1  A.  False.
2      MS. ROSEN: -- foundation.
3      MR. LEINENWEBER: Join.
4      BY MS. BONJEAN:
5  Q.  Going to the next page there's
6  a question that says, All right.  And what
7  were they going to do that evening, being Lluvia
8  and Tino.  Answer, what they were going to do
9  that evening is they were going to go to the two
10  guys they were waiting for for dope, crossed out,
11  something.  Question, when you left, who drove?
12  I drove.  Lluvia was in the front passenger seat.
13  Question, where was Fro?  In the back of Lluvia.
14  Question, where was Tino?  In my back, in the
15  back behind the driver's seat.  Question, who had
16  the gun at the time? Answer, Lluvia.
17      Mr. Cruz, did you ever
18  leave Jose Maysonet's house on -- shortly before
19  midnight on May 24, 1990 with Lluvia and Fro with
20  a gun to go toward the guys who were waiting for
21  dope or something?
22  A.  No.
23  Q.  Okay.  And are these statements true
24  or false statements?
25  A.  False.

---

Page 67

1      MS. ROSEN: Object to the form -- sorry,
2  late -- foundation.
3      BY MS. BONJEAN:
4  Q.  Okay.  Next question, where did you
5  go?  I go -- I took Homan to Potomac, Potomac
6  all the way to St. Louis, St. Louis all the way
7  to North Avenue, North Avenue to Drake and parked
8  in the alley.  Question, when you parked in the
9  alley, what happened then?  Answer, Lluvia got
10  out of the car.  He put the hood on his head and
11  put the front seat to the front.  Fro came out of
12  the car and Tino came out of the car.  Question,
13  was anyone else around at that time?  Answer, two
14  guys.  Who were the two guys -- or where were the
15  two guys?  Answer, by the corner.  Question,
16  okay.  Where was the gun at this time?  Answer,
17  Lluvia got the gun in his front pocket.
18  Question, okay.  What did Lluvia, Fro and Tino
19  do then?  Answer, they started walking towards
20  the guys.
21      Okay.  Mr. Cruz, did you
22  ever go to this location on North Avenue near
23  St. Louis with Lluvia, Fro and Jose Maysonet with
24  a gun?
25  A.  No.

---

Page 68

1  Q.  Did any of this happen that I've just
2  read to you?
3  A.  No.
4  Q.  And you'd agree that those statements
5  are untrue or false statements, right?
6      MS. ROSEN: Objection, form, foundation.
7  A.  Yes.
8      BY MS. BONJEAN:
9  Q.  Question, what happened next?
10  They waited.  They were waiting about five --
11  talking for about five minutes and then the
12  shooting happened.  Shot about five to six times.
13  Question, what did you see when you heard the
14  five or six shots?  Answer, I looked -- when I
15  looked, the two guys was on the floor laying down
16  and Lluvia had the 9 millimeter in his hand
17  pointing it at the guy to see if he was going to
18  move or not.  Question, what happened next?  And
19  then we didn't see no move.  We started walking
20  towards my car with the pistol.  Question, where
21  was Tino and Fro?  They started walking towards
22  my car too.  Question, all right.  And what
23  happened?  And they went inside the car, so then
24  I drove all the way to 1302 North Hammond --
25  Homan.

---

Maysonet v.
Guevara

Page 69

1    Sir, were you present at this
2  location while Lluvia shot the two black men that
3  were on North Avenue?
4  A.  No.
5  Q.  Okay.  Did you ever drive there in
6  a car with Tino -- strike that.  Did you ever
7  drive there in a car with Fro and Lluvia, get out
8  of the car and witness a double murder?
9  A.  No.
10  Q.  Are those statements true or false
11  statements?
12    MS. ROSEN: Objection, form, foundation.
13  A.  False.
14    BY MS. BONJEAN:
15  Q.  Now, it goes on to say, Question,
16  what happened when you got back home?  Answer,
17  when I got back home, I got out of the car.
18  Lluvia jumped in the driver's side and he left
19  with the car and the gun.  Let's see.  Go on
20  to the next page.  Well, I don't know if I read
21  this.  Question -- at the bottom of the fifth
22  page of the statement Bates stamped CCSAO291 it
23  says, Question, all right.  When did you see --
24  next see Lluvia that day?  Answer, I seen Lluvia
25  that day at 11 a.m.  Question, where did you see

Page 70

1  Lluvia?  Answer, at LeMoyne and Spaulding.
2  Question, what if anything did Lluvia say to
3  you?  Answer, I killed two black motherfuckers.
4  Question, what happened next?  Then they told me
5  you are not going to say nothing, right?  I said
6  no, I wasn't going to say nothing.  They said
7  keep it under your hat, keep my mouth shut.
8    Did you ever tell Jose Maysonet
9  to keep the murders under his hat?
10    MS. ROSEN: Objection, form, foundation.
11  A.  No.
12    BY MS. BONJEAN:
13  Q.  Were you present when Lluvia said
14  anything like that to Mr. Maysonet?
15  A.  No.
16  Q.  Did Lluvia ever tell you I killed two
17  black motherfuckers?
18  A.  No.
19  Q.  Now, it goes on, August 16, 1990
20  about 10 p.m., where were you?  Answer, home.
21  What if anything happened then?  Well, Lluvia,
22  Fro, Tino, Cisco, King, they came out to my
23  house.
24    Did you ever go to Mr. Maysonet's
25  house on August 16, 1990 at 10 p.m. with Alfredo

Page 71

1  Gonzalez, Christopher Goosens or Fro, Francisco
2  Varas or Cisco, Efrain Cruz or King?  Did you
3  ever go to Mr. Maysonet's house together as a
4  group?
5  A.  No.
6  Q.  Is that a true statement or a false
7  statement?
8    MS. ROSEN: Objection, form, foundation.
9  A.  False.
10    BY MS. BONJEAN:
11  Q.  What happened when they came to your
12  house?  Answer, they put a 9 millimeter to my
13  head.  Who put the 9 millimeter to your head?
14  Answer, King.  What did he say?  Answer, you know
15  about the two murders.  If you talk, we're going
16  to put you 6 feet under.
17    First of all, my first question
18  is were there movie cameras there?
19    MS. ROSEN: Object to the form.
20    BY MS. BONJEAN: I'm kidding.  I strike that.
21  Q.  But were you ever at Mr. Maysonet's
22  house with this crew of people with a
23  9 millimeter?
24  A.  No.
25  Q.  Did you ever threaten Mr. Maysonet with

Page 72

1  a 9 millimeter?
2  A.  No.
3  Q.  Did you ever see your brother threaten
4  Mr. Maysonet with a 9 millimeter?
5  A.  No.
6  Q.  Did you ever see Lluvia threaten
7  Mr. Maysonet with a 9 millimeter?
8  A.  No.
9  Q.  Did you ever see Fro or Cisco threaten
10  Mr. Maysonet with a 9 millimeter?
11  A.  No.
12  Q.  Were you ever in Mr. Maysonet's house
13  at any point together on August 16, 1990 or any
14  other time?
15  A.  No.
16    MR. LEINENWEBER: Objection to form.
17    MS. ROSEN: Object to the form --
18    MR. LEINENWEBER.  Asked and answered.
19    MS. ROSEN: -- foundation.
20    BY MS. BONJEAN:
21  Q.  All right.  You can put that to the
22  side.
23  A.  (Witness complies).
24  Q.  Now, after you provided -- or strike
25  that.  After you signed this statement that was

Maysonet v.
Guevara

Page 73

1  prepared by someone, you were brought to Cook
2  County Jail, right?
3  A.  Yes.
4      MS. ROSEN: Object to the form.
5      MR. ENGQUIST: Objection to form,
6  argumentative.
7      MS. ROSEN: Prepared by someone.
8      BY MS. BONJEAN:
9  Q.  Well, do you know who prepared this?
10 A.  No.
11     MS. ROSEN: Object to the form and
12 argumentative.
13     MS. BONJEAN: It's not argumentative.
14 What do you mean?
15     MR. LEINENWEBER: Your tone was reflecting --
16     MS. BONJEAN: What?
17     MR. LEINENWEBER: The tone of your voice
18 is reflecting the argument.
19     MS. BONJEAN: Okay.  The tone of my voice?
20     MS. ROSEN: Is reflecting the argumentative
21 nature of the question.  Really?  Some document
22 that someone on the planet prepared?  Maybe it was
23 prepared phantomly by, I don't know, an elf.
24     MS. BONJEAN: Do you know who prepared
25 this?  I don't think anyone at this table knows who

Page 74

1  prepared it.
2      MS. ROSEN: Object to the form of the
3  question.
4      MS. BONJEAN: I know you all take everything
5  at face value, but that doesn't mean the rest of the
6  world does always.
7      MR. LEINENWEBER: The issue is just making
8  the objection for the record.  That's all we're
9  trying to do.
10     MS. BONJEAN: Fair enough, okay.  But
11 even the objections are like, oh, my God, it's so
12 argumentative.  I can't believe it.
13     MS. ROSEN: Okay.  So if we had a video
14 recording here for your dramatic reading of all of
15 this, then we could like memorialize who's the one
16 that's got the tone of voice today, but we can move
17 on.
18     MS. BONJEAN: I will try to suppress my
19 inner passion.
20     MS. ROSEN: That's one way to describe it.
21     MR. LEINENWEBER: For acting?
22     MS. ROSEN: Talk about movie cameras.
23     BY MS. BONJEAN:
24 Q.  Mr. Cruz, your handwritten statement
25 that has been marked as Exhibit, I think, 3 --

Page 75

1  and I'm only calling it your handwritten
2  statement because you have a signature on it.
3      MS. COHEN: It's Exhibit 2, by the way.
4      BY MS. BONJEAN:
5  Q.  It's Exhibit 2.  I'm sorry.
6  A.  Okay.
7  Q.  You don't know who drafted this
8  statement, correct?
9  A.  No.
10 Q.  And do you remember seeing anyone draft
11 this statement?
12 A.  No.
13 Q.  Was the statement when you signed
14 it -- strike that.  Did someone put the words
15 on the piece of paper while you were present like
16 watching it?  If you don't understand my
17 question, don't try --
18 A.  I don't understand.
19 Q.  Okay.  Someone wrote these words on this
20 piece of paper, right?
21 A.  Yes.
22 Q.  Were you in the room when the person did
23 that?
24 A.  Don't remember.
25 Q.  Okay.  And if you don't remember that,

Page 76

1  do you remember who put the words on the piece of
2  paper?
3      MS. ROSEN: Object to the form.
4  A.  No.
5      BY MS. BONJEAN:
6  Q.  Okay.  Do you know if it was a woman or
7  a man, for instance?
8  A.  No.
9  Q.  Do you know what the race of the person
10 was who did it?
11 A.  No.
12 Q.  Do you know if it was a state's attorney
13 or a detective?
14 A.  No.
15 Q.  So after you left Area 5, did you know
16 you were charged with a double murder?
17 A.  Yes.
18 Q.  And where did you go?
19 A.  Cook County.
20 Q.  What happened when you got to Cook
21 County?
22 A.  I got processed to the County.
23 Q.  And had you seen Alfredo Gonzalez
24 or Jose Maysonet at any point prior to arriving
25 in Cook County and getting processed there?

Maysonet v.
Guevara

Page 77

1  A.  No.
2      MR. BRENER: Objection to form.
3      BY MS. BONJEAN:
4  Q.  After you got processed, what happened?
5  A.  Got sent to one of the divisions.
6  Q.  Did you have any contact with any family
7  members up until that point?
8  A.  No.
9  Q.  Were you trying to reach anyone?
10  A.  Don't remember.
11  Q.  So when is the first time you had
12  contact with someone other than a Chicago police
13  officer or someone associated with the Cook
14  County Jail?
15  A.  When I got to the County.
16  Q.  Okay.  And when you say when I got to
17  the County, what do you mean by that?
18  A.  Cook County, 26th and California.
19  Q.  And where were you when you had contact
20  with someone other than an officer or a --
21  A.  Division 6.
22  Q.  And who did you meet with or who did you
23  see?
24  A.  I had called one of my family members.
25  Q.  Do you remember what family member?

Page 78

1  A.  No.
2  Q.  All right.  And what did you tell your
3  family member when you called them?
4      MS. ROSEN: Objection, form.
5  A.  That I was locked up.
6      BY MS. BONJEAN:
7  Q.  Did you tell them why you were locked
8  up?
9  A.  Yes.
10  Q.  And did you tell them that you had been
11  wrongly accused?
12  A.  Yes.
13      MS. ROSEN: Objection, form, leading.
14      BY MS. BONJEAN:
15  Q.  And what else, if you remember, did you
16  tell them at the time?
17  A.  Just called and told them they were charging
18  me for murder.
19  Q.  And did you tell -- and what else did
20  you say, if anything?
21  A.  I don't remember.
22  Q.  Okay.  And what happened after you told
23  them that?
24  A.  Don't remember.
25  Q.  Did you ever meet with your family

Page 79

1  members at some point?
2  A.  Visiting hours.
3  Q.  Did you ever go to court?
4  A.  Yes.
5  Q.  How long after you arrived at Cook
6  County Jail did you go to court?
7  A.  Don't remember.
8  Q.  Did you eventually go to court?
9  A.  Yes.
10  Q.  Did you eventually get a lawyer?
11  A.  A public defender.
12  Q.  Yeah.  Did you eventually get assigned
13  a public defender?
14  A.  Yes.
15  Q.  All right.  And did you know who that
16  public defender is or was?
17  A.  No.
18  Q.  Did you eventually have a meeting with
19  a public defender?
20  A.  Yes.
21      MS. BONJEAN: Okay.  Can we take
22  a break?  I want to confer with Adrian about
23  privilege.  I don't know what they're going to do.
24      MS. ROSEN: Okay.
25

Page 80

1      (Whereupon a recess was taken from
2      11:46 a.m., to 11:52 a.m., after which the following
3  proceedings were had:)
4      (Whereupon Deposition Exhibit No. 6 was
5  marked for identification, MM.)
6      BY MS. BONJEAN:
7  Q.  Mr. Cruz, I've handed you what has been
8  marked as Exhibit 6.
9      MR. ENGQUIST: Which is --
10      MS. BONJEAN: The motion to suppress
11  statements.
12  Q.  Do you see the caption People of the
13  State of Illinois vs. Justino Cruz?
14  A.  Yes.
15  Q.  And do you know what a motion to
16  suppress statements is?
17  A.  Yes.
18  Q.  And this says that now comes
19  the defendant, Justino Cruz, and his attorney,
20  Randolph Stone, public defender of Cook County,
21  by Michael J. Vahey, assistant public defender.
22  Do you remember who Mr. Vahey was?
23  A.  Yes.
24  Q.  Because you remember him being your
25  public defender or --

Maysonet v.
Guevara

---

Page 81

1  A.  Yes.
2  Q.  Did your attorney file this for you?
3  A.  Yes.
4  Q.  Okay.  I want to draw your attention
5  specifically to paragraph 5.
6  A.  Okay.
7  Q.  I'm sorry.  Paragraph 6, actually.
8  Are you with me?
9  A.  Yes.
10  Q.  Okay.  Paragraph 6 says the statements
11  sought to be suppressed were obtained as a result
12  of physical coercion illegally directed against
13  the defendant, specifically, striking about the
14  ear and head, grabbing by the throat and pushing
15  his head against the wall and that as such
16  statements were, therefore, involuntary.  Do you
17  see that?
18  A.  Yes.
19  Q.  This information that your attorney put
20  in this motion, where did he get that information
21  from?
22  A.  From me.
23  Q.  Did you tell him that?
24  A.  Yes.
25  Q.  Okay.  And, No. 7, that the statements

---

Page 82

1  sought to be suppressed were obtained as a result
2  of psychological and mental coercion illegally
3  directed against the defendant and that such
4  statements were, therefore, involuntary.  Did
5  you tell your attorney about the circumstances
6  under which you made the statements?
7  A.  Yes.
8  Q.  Okay.  Did you tell your public
9  defender about the handwritten -- the statement
10  that you had signed that's marked as Exhibit 2?
11  A.  Yes.
12  Q.  Did you tell him that it was true or
13  false?
14  A.  That it was false.
15  Q.  Did you tell him that?
16  A.  Yes.
17  Q.  Did you tell him that you were innocent
18  of the crime?
19  A.  Yes.
20  Q.  Did you tell him who was responsible
21  for providing the story that you signed there, if
22  you understand my question?
23  A.  No, I don't understand.
24  Q.  Okay.  Did you tell your public defender
25  who had physically abused you?

---

Page 83

1  A.  Yes.
2  Q.  Did you describe the officer to him?
3  A.  Yes.
4  Q.  Okay.  And what did he say when you
5  told him you were innocent of the crime and that
6  the statement that you had signed was not true?
7  A.  Don't remember.
8  Q.  Okay.  You don't remember anything about
9  what he said?
10  A.  Who?
11  Q.  Don't answer my question if you --
12  A.  Oh, okay.
13  Q.  Don't just say I don't remember
14  unless you, you know -- if you don't understand
15  my question, tell me you don't understand and
16  I'll rephrase it, okay?
17  A.  Okay.  I don't understand.
18  Q.  Okay.  What did your attorney or your
19  public defender say to you when you said I didn't
20  make this statement, it's all a lie, generally?
21      MR. BRENER: Objection to the form.
22      MS. ROSEN: Object to the form.
23  A.  He's going to put a motion to dis -- to
24  throw it out.
25

---

Page 84

1      BY MS. BONJEAN:
2  Q.  Okay.  And is that what happened --
3  is that what was filed and marked as Exhibit 6?
4  A.  Yes.
5  Q.  Okay.  Did you ever end up going to
6  a hearing on this motion?
7  A.  Don't remember.
8  Q.  Did your attorney tell you that
9  he believed you about this, if you remember?
10  A.  No.
11  Q.  At some point --
12      MS. ROSEN: Is that no, you don't remember?
13      THE WITNESS: I don't remember.
14      MS. ROSEN: It was a bad question.
15      BY MS. BONJEAN:
16  Q.  At some point you worked out a deal with
17  the State, right?
18  A.  Yes.
19  Q.  Tell me how that happened.
20  A.  I don't --
21  Q.  You don't understand my question?
22  A.  Yeah.
23  Q.  Okay.  You ended up testifying against
24  your uncle, right?
25  A.  Yes.

---

Maysonet v.
Guevara

Page 85

1  Q.  Why?
2  A.  Because they threatened -- they said
3  you can take the deal or you can go to jail for
4  life.
5  Q.  And who told you that?
6  A.  State's attorney.
7  Q.  Did you ever have any conversations
8  directly with the Cook County state's attorney
9  who was prosecuting the case?
10     MR. BRENER: Objection to form.
11 A.  At court?
12    BY MS. BONJEAN:
13 Q.  Yeah, anywhere, yeah.
14 A.  Yeah, at the court hearing.
15 Q.  When did you first find out that the
16 Cook County state's attorney wanted to offer you
17 a deal?
18 A.  Public defender.
19 Q.  So your public defender told you that?
20 A.  Yeah.
21 Q.  And what did he tell you?
22 A.  That they wanted me -- to give me a deal
23 for my testimony, for me to turn state's on Alfredo
24 Gonzalez.
25 Q.  Okay.  Did you tell your attorney --

Page 86

1  well, strike that.  And what type of deal did
2  they want to give you?
3  A.  Don't remember.
4  Q.  Did they tell you that they wanted to
5  give you some lower sentence or something else?
6     MR. LEINENWEBER: Objection to form.
7  A.  Lower sentence.
8     BY MS. BONJEAN:
9  Q.  Well, what did you understand you were
10 going to get if you testified?
11 A.  Not life in prison.
12 Q.  Something less than life in prison?
13 A.  Yes.
14 Q.  And who first told you about this deal?
15 A.  My public defender.
16 Q.  And did he want you to take the deal?
17 A.  He said it was better in your interests
18 to take it.
19 Q.  And did he explain why it was in your
20 interests to take it?
21 A.  Because if I don't take it, I could go
22 to prison for life.
23 Q.  Did you want to go to prison for life --
24 A.  No.
25 Q.  -- for something you didn't do?

Page 87

1  A.  No.
2  Q.  Did you want to testify falsely against
3  your uncle?
4  A.  No.
5  Q.  Did you feel you had a choice?
6  A.  No.
7  Q.  Why not?
8  A.  They says you testify or you go to prison
9  for life.
10 Q.  But you knew --
11    MS. BONJEAN: Well, I'm going to mark this.
12    (Whereupon Deposition Exhibit No. 7 was
13    marked for identification.)
14 Q.  I'm handing you what's been marked
15 as Exhibit 7, which are transcripts from your
16 testimony, okay, Mr. Cruz?
17 A.  Yes.
18 Q.  And it says your name right there,
19 right?  Do you see that?
20 A.  Yes.
21 Q.  Justino Cruz?
22 A.  Yes.
23 Q.  And you were questioned by it looks like
24 a Mr. Marek.  Do you see that?
25 A.  Yes.

Page 88

1  Q.  And on the second page if you look,
2  maybe this will help refresh your recollection,
3  but it says -- the question that's asked of you,
4  do you have an agreement with the Cook County
5  State's Attorney's Office regarding your
6  testimony?  Answer, yes.  Tell the Ladies and
7  Gentlemen of the Jury what that agreement is.
8  Answer, for my testimony I'd be getting 22 years.
9  At the recommended 20 years for my testimony.
10 Do you see that?
11 A.  Yes.
12    MR. ENGQUIST: 22 years.
13    BY MS. BONJEAN:
14 Q.  I'm sorry, 22 years.  And is that what
15 your understanding of the deal you were going to
16 get if you testified?
17 A.  Yes.
18 Q.  And would that have been a day for
19 day -- would you get day-for-day good time for
20 that?
21 A.  Yes.
22 Q.  You didn't serve a full 22, right?
23 A.  No.
24 Q.  How much did you serve, about half that?
25 A.  Yes.

Page 89

1 Q. How much time in custody did you have
2 in by the time that you testified at your uncle's
3 trial?
4 A. Five years.
5 Q. And I'm going to have you look
6 at -- if you'd go to page, okay, page 23 of the
7 transcript that's starting at Maysonet 15586.
8 A. Which one?
9 Q. Page 23 of the transcript.
10 A. Okay.
11 Q. Do you see 23?
12 A. Yes.
13 Q. Just at the very last question it says,
14 Question, when you got to Belmont and Kimball,
15 what did you do? Answer -- if you can turn to
16 the next page, do you see that?
17 A. Um-hmm.
18 Q. Got on the Kimball bus. Do you see
19 that?
20 A. Yes.
21 Q. And, Question, where did you go on
22 the Kimball bus? Answer, towards North Avenue.
23 Question, and did you get off the bus? Answer,
24 I got off at LeMoyne and Kimball. Question,
25 and after you got off the bus, where were you

Page 90

1 walking? Answer, down LeMoyne going towards
2 Spaulding. Question, which direction were you
3 walking? Answer, east. As you were walking down
4 the street, did you see anybody? Answer, yes.
5 Who did you see? Alfredo Gonzalez and Fro.
6 Question, and Fro is also Chris Hernandez? Yes.
7     Okay. You provided this
8 testimony at your uncle's trial. Do you remember
9 that?
10 A. Yes.
11 Q. Was that a truthful statement?
12 A. No.
13 Q. And was Fro Chris Hernandez, as far as
14 you knew?
15 A. Yes.
16 Q. You knew him?
17 A. No, no.
18 Q. Listen to my question.
19 A. No, I thought you were just -- okay.
20 Q. Yeah, just listen.
21 A. Um-hmm.
22 Q. Did you know Fro as Chris Hernandez?
23 A. No.
24 Q. And that is the defendant who is here in
25 court today, Alfredo Gonzalez, correct? Answer,

Page 91

1 yes.
2     MS. ROSEN: Was that a question?
3     MS. BONJEAN: Hold on. I'm getting my
4 bearings.
5     MS. ROSEN: Well, you just asked a
6 question and an answer and now you're moving pages.
7 So is there --
8     MS. BONJEAN: Because I'm going to
9 the next page. I'm trying to see if I can cut to --
10 I don't need everything. I'm trying to --
11     MS. ROSEN: I know, but we now just have you
12 reading testimony.
13     MS. BONJEAN: Okay. Strike my reading the
14 testimony and give me a second.
15 Q. Let's go to page 39.
16 A. (Witness complies).
17 Q. Are you there, Mr. Cruz?
18 A. Yes.
19 Q. Okay. At the top it says, Mr. Cruz,
20 as you were standing next to the car containing
21 Alfredo Gonzalez and Fro, without telling the
22 Ladies and Gentlemen of the Jury what exactly was
23 said at that time, did you have a conversation,
24 a brief conversation with Fro? Answer, yes.
25 Question, after you had that very first brief

Page 92

1 conversation with Fro, what did you do? Answer,
2 jumped in the car. Do you see that testimony?
3 A. Yes.
4 Q. Was that testimony truthful?
5 A. No.
6 Q. And did you ever jump in a car with
7 Fro and Alfredo Gonzalez?
8 A. No.
9 Q. Why did you give that false testimony?
10 A. For a lower sentence.
11 Q. For the lower sentence?
12 A. (Nodding).
13 Q. Now, the next question is after you
14 got in the car, where were you going? Answer,
15 to Maysonet's house. Question, now, as you were
16 in the car, did the defendant Alfredo Gonzalez
17 say anything? Answer, going to Juan's house to
18 pick up a gun. Answer -- or, Question, at that
19 time did Fro say anything? Answer, yes, sir.
20 Question, while you were in the car on your way
21 to Maysonet's house, did Fro tell you why --
22 there's an objection. You can turn the page.
23 Question, while you were in the car with Alfredo
24 and Juan -- strike that. With Alfredo and Fro
25 on your way to Juan's house, did Fro tell you

Maysonet v.
Guevara

Page 93

1    why you were going to get a gun?  Answer, yes.
2    What did he tell you?  Answer, to do a drug sale.
3        Okay.  Was that testimony
4    that you provided at your uncle's trial truthful
5    testimony?
6    A.   No.
7    Q.   Were you ever in a car with Alfredo
8    and Fro and going to Juan's house to get a gun to
9    do a drug sale?
10   A.   No.
11   Q.   It goes on, Question, did you then
12   go anywhere in the car?  Answer, to Maysonet's
13   house.  Question, where was that?  On Potomac
14   and Homan.  Question, when you got -- by the way,
15   did Maysonet live in a house or an apartment?
16   Answer, an apartment.  And which floor did
17   he live on?  Answer, second floor.  Question,
18   did you get to the building where Maysonet's
19   apartment was?  Yes.  And what happened when
20   the car arrived at the location?  Got out of the
21   car.  Where did you park the car?  On Potomac and
22   Homan.  And after you got out of the car -- by
23   the way, who all got out of the car?  Me, Alfredo
24   and Fro.  Question, where did you go after you
25   got out of the car?  Answer, to Juan's house.

Page 94

1    Mr. Cruz, was that testimony truthful?
2    A.   No.
3    Q.   And did you ever go to Mr. Maysonet's
4    house with Alfredo and Fro and yourself?
5    A.   No.
6    Q.   Let's go to page 42.
7    A.   (Witness complies).
8    Q.   We'll start with, Question, when you
9    got inside the house, was anybody else in there?
10   Answer, Maysonet.  Question, while you were in
11   the apartment did the defendant Alfredo Gonzalez
12   say anything to Juan Maysonet?  Answer, yes.
13   What did he say?  Answer, let me get the --
14   come to get the gun.  Question, and after the
15   defendant Alfredo Gonzalez said go get the gun,
16   what happened then?  Juan and Alfredo went
17   into the bedroom.  Question, where were you at
18   the time?  In the living room.  Question, and
19   who was in the living room with you?  Answer,
20   Fro.  Question, by the way, where was Rosa Bello?
21   Answer, she was in the kitchen.  Then she walked
22   in the bedroom.  Question, is that the same
23   bedroom that the defendant Alfredo Gonzalez and
24   Juan Maysonet walked into?  Answer, yes, sir.
25   Question, did anyone come out of the bedroom?

Page 95

1    Answer, yes.  Question, who came out?  Juan and
2    Alfredo.  Question, were either of these people
3    carrying anything?  Answer, yes.  Question,
4    who was carrying something?  Answer, Alfredo.
5    Question, what was he carrying?  Answer, a gun.
6    Question, what kind of gun was it?  Answer,
7    a 9 millimeter automatic.  Do you see that
8    testimony?
9    A.   Yes.
10   Q.   Was any of that testimony truthful, sir?
11   A.   No.
12   Q.   Were you ever in Mr. Maysonet's house
13   with Alfredo Gonzalez and Fro obtaining a gun?
14   A.   No.
15       MR. LEINENWEBER: Objection to form,
16   foundation.
17       BY MS. BONJEAN:
18   Q.   Did you ever see Lluvia or Alfredo
19   Gonzalez holding a gun in Mr. Maysonet's house?
20   A.   No.
21   Q.   All right.  Go to page 45, please.
22   A.   (Witness complies).
23   Q.   We'll start with, Question, after the
24   defendant and Maysonet came out the bedroom, what
25   happened then?  Answer, we just left.  Question,

Page 96

1    do you mean you left the apartment?  Answer, yes.
2    Question, after you left the apartment, where did
3    you go?  Answer, towards the car.  Question, and
4    did you get back into the car?  Answer, yes.
5    Question, when you got -- what positions did
6    everyone get into inside the car?  Answer, Juan
7    was the driver.  Alfredo was the passenger.
8    Fro was behind the passenger.  I was behind the
9    driver.  Question, the defendants still had the
10   gun at the time?  Answer, yes, sir.  Question,
11   where did you go once you were in the car?
12   Answer, towards St. Louis.  Question, what
13   direction was St. Louis from where you were
14   coming from?  Answer, east.  Question, and were
15   you north or south of North Avenue?  Answer, we
16   were south.  Question, what street were you
17   driving on?  Answer, Potomac.  There are some
18   objections.  Question, where did you go after you
19   were on Potomac?  Answer, went towards St. Louis.
20   From St. Louis they went north to North Avenue.
21   Question, now, right before you -- by the way,
22   did you cross North Avenue?  Answer, yes, sir.
23   Question, now, right before you got to North
24   Avenue did you see the defendant Alfredo Gonzalez
25   do anything with the gun?  Answer, he looked

Maysonet v.
Guevara

---

Page 97

1  at it.  That's it.  Question, well, did he take
2  it out of his pants?  There's an objection.
3  Question, did he take the gun out of his pants
4  and look at it?  You can turn the page.  Do you
5  see that answer, yes?
6  A.  Yes.
7  Q.  Did you ever go to the location of
8  North Avenue and St. Louis with Alfredo Gonzalez
9  and observe him take a gun out and look at it?
10 A.  No.
11 Q.  And was that testimony that you provided
12 at Mr. Gonzalez's trial truthful testimony?
13 A.  No.
14 Q.  Let's go to page 49 at the top.
15 A.  (Witness complies).
16 Q.  Question, now, at the time you parked
17 the car, what happened then?  Answer, we jumped
18 out of the car.  Question, now, when you say we
19 jumped out of the car, who do you mean?  Answer,
20 me, Fro and Alfredo.  Question, as you got out of
21 the car, did anyone say anything to you?  Answer,
22 Fro.  What did he tell you?  Make sure nobody
23 come down the alley.  Question, so what did you
24 do at that time?  I started looking towards
25 St. Louis and Kimball.  Question, where were

Page 98

1  you standing?  In the alley.  Question, where
2  were you relative to the garbage that the car
3  was by?
4      MS. ROSEN: The garage.
5      MS. BONJEAN: Oh, shoot.  Sorry.
6  Q.  Where were you relative to the garage
7  that the car was by?  Answer, by the empty lot.
8      Mr. Cruz, did you actually
9  jump out of the car at around -- in the alley and
10 make sure nobody came down the alley?
11 A.  No.
12 Q.  Okay.  And was that testimony truthful
13 testimony?
14 A.  No.
15 Q.  Going to the next page, Question, what
16 did the defendant Alfredo Gonzalez and Fro do at
17 the time?  Answer, started walking down the empty
18 lot towards North Avenue.  Question, now, did you
19 see anybody in the empty lot?  Answer, two guys.
20 Question, describe these guys.  Answer, two black
21 guys.  Question, where were they standing in the
22 empty lot?  On North Avenue by the empty lot by
23 the house.  Question, now, what were you doing
24 at this time?  Answer, just looking towards
25 St. Louis and Kimball.  As you were doing that,

Page 99

1  could you see what Alfredo Gonzalez and Fro were
2  doing with the two black guys?  Answer, talking.
3  Question, for how long were Fro and Alfredo
4  Gonzalez talking to the two black guys?  Around
5  five or ten minutes.  And, Question, were you
6  watching the defendant Alfredo Gonzalez and Fro
7  talking to the two black guys the whole time or
8  were you also looking up and down the alley?
9  Answer, I was looking towards St. Louis and
10 Kimball.  Question, what happened then?  Answer,
11 when I was looking towards St. Louis and Kimball,
12 I heard three to four shorts.  Question, and what
13 happened then?  When I was looking, I heard one
14 or two shots.  I see Fro and Alfredo running
15 towards the car.  Question, and were they running
16 back through the empty lot?  Answer, yes.
17 Question, at the time that you saw Alfredo and
18 Fro running back towards the empty lot, did you
19 see anything else in the empty lot?  Answer, one
20 of the guys on the ground.  When you say one of
21 the guys on the ground, do you mean one of the --
22 Answer, black guys.  Question, those were the
23 black guys that had been talking to Alfredo and
24 Fro earlier?  Answer, yes, sir.
25     Okay.  That testimony, sir, did

Page 100

1  you ever see Fro and Alfredo Gonzalez talking to
2  the two black guys and then hear gunshots?
3  A.  No.
4  Q.  And was that testimony truthful
5  testimony?
6  A.  No.
7  Q.  And did you ever see Alfredo and
8  Fro come running back towards the car after the
9  gunshots were fired?
10 A.  No.
11 Q.  And was that testimony that you
12 provided at Alfredo Gonzalez's trial truthful
13 testimony?
14 A.  No.
15 Q.  Going on it says, Question, did
16 the defendant Alfredo Gonzalez and Fro get back
17 to the car?  Answer, yes.  Question, when they
18 got back to the car, did the defendant Alfredo
19 Gonzalez say anything?  Answer, let's get out
20 of here.  Question, did he say anything else?
21 Answer, we just shot two guys.  Question, what
22 did you do then?  Answer, we all jumped in the
23 car.
24     Sir, you provided that testimony.
25 Did you all jump in the car and Alfredo Gonzalez

Maysonet v.
Guevara

Page 101

1  admit that he had shot the two guys?
2  A.  No.
3  Q.  Did that ever happen?
4  A.  No.
5  Q.  And this testimony that you provided,
6  was it truthful?
7  A.  No.
8  Q.  Prior to giving this testimony
9  at Alfredo Gonzalez's trial were you designated
10  as a state witness or a state cooperating witness
11  in some way?
12      MS. ROSEN: Object to the form.
13  A.  Yes.
14      BY MS. BONJEAN:
15  Q.  And did you have to go anywhere
16  after you were going to become a state witness?
17  A.  Can you rephrase the question?
18  Q.  Sure.  Did you stay in your cell at the
19  Cook County Jail or did you get moved somewhere?
20  A.  I got moved somewhere else.
21  Q.  And where did you go?
22  A.  Someplace the state's attorney had state
23  witnesses, at Division 1 in the basement somewhere.
24  Q.  So you were moved to a portion
25  of Division 1 where other state witnesses were

Page 102

1  housed?
2  A.  Yes.
3  Q.  Do you remember what it looked like?
4  A.  No.
5  Q.  Do you know how long you were there?
6  A.  Don't remember.
7  Q.  Did you get any -- strike that.
8  While you were in the witness area or the witness
9  quarters, was it the same or -- strike that.  How
10  many other people were there housed in the area
11  where the witnesses were, do you know?
12      MR. BRENER: Foundation.
13  A.  Around seven guys.
14      BY MS. BONJEAN:
15  Q.  Were there Cook County sheriffs there
16  or was it a different type of security there?
17      MR. ENGQUIST: Objection, foundation.
18  A.  Don't know.
19      BY MS. BONJEAN:
20  Q.  Don't remember?
21      MS. ROSEN: No, don't know.
22      MR. ENGQUIST: No.
23      BY MS. BONJEAN:
24  Q.  Oh, don't know?
25  A.  I don't know if they're state's attorney

Page 103

1  cops or Cook County cops.  There were just officers
2  there.
3  Q.  Okay, fair enough.  Did you get some
4  financial benefits also?
5  A.  No.
6  Q.  Okay.  Did you get relocation money at
7  some point?
8  A.  No.
9  Q.  Nothing?
10  A.  Nothing.
11  Q.  Did you -- I'm going to ask you to --
12  oh, before I do, hold on a second.
13      MS. BONJEAN: Can you mark this.
14      (Whereupon Deposition Exhibit No. 8 was
15  marked for identification.)
16  Q.  I'm handing you what's been marked
17  as Exhibit 8.  Do you see this medical document
18  here?
19  A.  Yes.
20  Q.  Is that your name at the top, Justino
21  Cruz?
22  A.  Yes.
23  Q.  And the date is August 25, 1990?
24  A.  Yes.
25  Q.  Where were you living on August 25,

Page 104

1  1990?
2  A.  On Pierce, 3337 West Pierce.
3  Q.  Right.  That was your address -- and
4  let me be clear.  You were in custody, though, at
5  this point, right?
6  A.  Yes.
7  Q.  In fact, did you receive medical
8  assistance or medical services from Cermak Health
9  Services --
10  A.  Yes.
11  Q.  -- after you were arrested?
12  A.  Yes.
13  Q.  And I want to draw your attention
14  to the remarks there.  It says ear infection.  Do
15  you see that?
16  A.  Yes.
17  Q.  Did you get treated for an ear
18  infection when you got to the Cook County Jail?
19  A.  Yes.
20  Q.  Okay.  When you went to the Illinois
21  Department of Corrections, were you designated
22  to a particular area of the Illinois Department
23  of Corrections?  I'll start over.  Did you have
24  any specific or particular status when you went
25  to the Illinois Department of Corrections as

Maysonet v.
Guevara

Page 105

1  a witness?
2  A. I don't understand the question. Like when?
3  I left the County?
4  Q. Yeah. When you went to the Illinois
5  Department of Corrections after you had -- well,
6  let's back up. I'm sorry. Strike that. You
7  pled guilty at some point, right?
8  A. Yes.
9  Q. Did you plead guilty before or after you
10  testified against Alfredo Gonzalez?
11  A. After.
12  Q. After. And you ended up getting your
13  deal, right?
14  A. Yes.
15  Q. Which was what, 22 years?
16  A. Yes.
17  Q. Day-for-day good time?
18  A. Yes.
19  Q. How much time did you actually
20  do in the Illinois Department of Corrections,
21  do you know?
22  A. Got sentenced in '95 and got out 2001.
23  Q. So you actually were in the County until
24  1995?
25  A. Yes.

Page 106

1  Q. And were you supposed to testify against
2  Jose Maysonet also?
3  A. Don't remember.
4  Q. But you didn't, right?
5  A. No.
6  Q. And then you went to the Illinois
7  Department of Corrections in '95 and you got out
8  when? You said 2001?
9  A. Yes.
10  Q. So you were only in the Illinois
11  Department of Corrections for about six years,
12  is that right?
13  A. Yes.
14  Q. I don't mean to say only.
15  A. Yeah, yeah, yeah.
16  Q. That's a long time.
17  A. Yes.
18  Q. But it was not 22 years, right?
19  A. No.
20  Q. And while you were in the Illinois
21  Department of Corrections where did you do most
22  of your time?
23  A. Illinois Correctional Center.
24  Q. Illinois River?
25  A. Illinois River.

Page 107

1  Q. And were you in a specific unit at
2  Illinois River?
3     MR. BRENER: Form and foundation.
4  A. It was a -- I don't remember what
5  unit, but it was separated from the population.
6     BY MS. BONJEAN:
7  Q. That's what I'm asking.
8  A. Yes.
9  Q. Special Management Unit?
10  A. I don't remember the name.
11  Q. SMU sound familiar?
12  A. Yes, yes.
13  Q. Were you in the SMU?
14  A. Yes.
15  Q. And why were you in the SMU?
16  A. Because I was a protected witness.
17  Q. So were you in protective custody?
18  A. Yes.
19  Q. And why were you in protective custody?
20  A. Because of my statement, the testimony.
21  Q. And when you got out of custody, did the
22  state's attorney's office give you any relocation
23  funds?
24  A. No.
25  Q. In fact, they denied you relocation

Page 108

1  funds, didn't they?
2  A. Yes.
3  Q. I want to go back to Exhibit 1, which
4  is your affidavit.
5  A. (Witness complies).
6  Q. I'm sorry. Give me one second. At
7  No. 31 of your affidavit it says in approximately
8  2016 I learned of Detective Guevara's record of
9  abuse via a news article and I realized I should
10  tell my story and I began telling people. Do you
11  remember seeing Detective Guevara in a news
12  article or on TV or where did you first see
13  Detective Guevara in 2016?
14     MS. ROSEN: Object to the form.
15     MR. LEINENWEBER: Objection, form.
16  A. On the news.
17     BY MS. BONJEAN:
18  Q. On the news?
19  A. Yes.
20  Q. Did you see his face?
21  A. Yes.
22  Q. And did you recognize him?
23  A. Yes.
24  Q. And did you recognize him as the
25  person who had questioned you in that holding

Maysonet v.
Guevara

Page 109

1  room back in 1990?
2  A.  Yes.
3  Q.  Yes?
4  A.  Yes.
5      MR. LEINENWEBER: Wait, wait.  Object
6  to form and foundation.  Can we just make sure we're
7  not talking over each other?
8      MS. BONJEAN: Yeah, sure.
9      THE WITNESS: My apologies.
10     BY MS. BONJEAN:
11 Q.  That's okay.  You're fine.  So when
12 you saw Detective Guevara on the news, did you
13 recognize him as the person who had choked you in
14 the holding room?
15     MR. LEINENWEBER: Objection to form.
16 A.  Yes.
17     BY MS. BONJEAN:
18 Q.  And when you saw Detective Guevara
19 on the news, did you recognize him as the person
20 who had physically assaulted you in that room?
21     MR. LEINENWEBER: Objection to form.
22 A.  Yes.
23     BY MS. BONJEAN:
24 Q.  And when you saw Detective Guevara
25 on that news show, did you recognize him as the

Page 110

1  person who hit you in your ear on the side with
2  an open hand?
3      MR. LEINENWEBER: Objection to form.
4  A.  Yes.
5      BY MS. BONJEAN:
6  Q.  And when you saw Detective Guevara
7  on the news, did you recognize him as the person
8  who -- as the person who told you what to say in
9  that statement?
10     MS. ROSEN: Object to the form, leading.
11     MR. LEINENWEBER: Yes, join, yeah.
12 A.  Yes.
13     BY MS. BONJEAN:
14 Q.  I'm sorry?
15 A.  Yes.
16 Q.  And when I'm talking about the
17 statement, I'm talking about the statement you
18 put your name on when you were in custody, okay?
19 Did you recognize Guevara as the person who told
20 you that you had to put your name on a statement?
21     MS. ROSEN: Objection, form, foundation.
22     MR. LEINENWEBER: Join.
23 A.  Yes.
24     MR. LEINENWEBER: Also leading.
25     MS. BONJEAN: Okay.  Give me one minute.

Page 111

1  I think I might be finished.  Go off the record for
2  one second.
3      (Whereupon a recess was taken from
4  12:29 p.m., to 12:32 p.m., after which the following
5  proceedings were had:)
6      MS. BONJEAN: So, Mr. Cruz, I am finished
7  asking you questions.  The other attorneys in the
8  room are going to be asking you questions now.  And
9  also, I actually have to catch a flight.  So Ashley's
10 going to be defending from here on if that's okay, if
11 nobody has an objection to that.
12     MR. ENGQUIST: That's fine.
13     MS. ROSEN: No, not a problem.
14     (Whereupon a lunch recess was taken from
15 12:33 p.m., to 1:10 p.m., after which the following
16 proceedings were had:)
17     A F T E R N O O N   S E S S I O N
18     JUSTINO CRUZ,
19 called as a witness herein, having been previously
20 sworn and examined, testified further as follows:
21     CROSS-EXAMINATION
22     BY MS. ROSEN:
23 Q.  Okay.  So I'm going to now ask you
24 some questions and then some of the other lawyers
25 might.

Page 112

1  A.  Okay.
2  Q.  Okay.  You have a lawyer here today
3  yourself, right?
4  A.  Yes.
5  Q.  Why is that?
6  A.  For the questions you guys are asking me.
7  He's my attorney.
8  Q.  I know.  Why do you feel like you have
9  to have an attorney?
10 A.  I don't understand.
11 Q.  Yeah.  Why do you feel like you need
12 an attorney?
13     MR. PRADOS: I'm just going to object
14 on the grounds that, you know, we represent Mr. Cruz
15 in a Torture Commission claim.  And we, you know, we
16 don't want to get -- we don't want the questioning
17 to get into any conversations between Mr. Cruz and
18 his lawyers.
19     MS. ROSEN: I didn't ask him about any
20 conversations.  I asked him why he had a lawyer.
21 Q.  Why do you have a lawyer?
22 A.  Because a couple, like two years ago
23 the state's attorney came to my job and threatened
24 me about this case again and I said I'm going to go
25 get a lawyer.  That's when I went and got a lawyer.

Maysonet v.
Guevara

Page 113

1 Q. And what state's attorney threatened
2 you?
3 A. It was a state's attorney and detectives
4 who worked for the state's attorney came to my job.
5 Q. What was that state's attorney's name?
6 A. That was two years ago. I'd have to
7 go back and -- I don't remember from the top of
8 the head because they came to my job. I was like --
9 I was working and my boss came and said you got two
10 persons who want to talk to you. They said you got
11 know who they were when I walked in. That's when
12 they said they were from the state's attorney office.
13 Q. Was it a male state's attorney or a
14 female state's attorney?
15 A. Both men, both men.
16 Q. What were their race?
17 A. White.
18 Q. And how long did you speak with
19 those state's attorneys at your work two years
20 ago?
21 A. They came and they was asking me questions
22 around a half hour.
23 Q. And what kinds of questions were they
24 asking you?
25 A. Did I know about Juan Maysonet coming

Page 114

1 retrial. I said no.
2 Q. What else did they ask you about?
3 A. Don't remember.
4 Q. What was the threat? You said they
5 threatened you. What was the threat?
6 A. They asked -- talking about I need
7 to testify. I told them I never testified against
8 Juan Maysonet.
9 Q. And what was the threat? You said they
10 threatened you.
11 A. Oh, locking me up again. I said you
12 can't lock me up again. I already did my time.
13 Q. What did they say they were going to
14 lock you up for?
15 A. If I don't testify, like hold me in
16 contempt.
17 Q. Because you told them you didn't want to
18 testify?
19 A. I said I wasn't.
20 Q. You refused to testify?
21 A. Yes. I said I didn't testify against
22 him in the first time, and I wasn't doing none of
23 that stuff again. I was done with all that.
24 Q. And did they serve you with a subpoena?
25 A. No.

Page 115

1 (Whereupon Deposition Exhibit No. 9 was
2 marked for identification, MM.)
3 Q. I'm going to ask you to take
4 a look and what we've marked as Exhibit No. 9.
5 Do you see this document that's a subpoena with
6 the caption People vs. Jose Maysonet? Do you see
7 the document?
8 A. Yes.
9 Q. Okay. And it says at the top Subpoena.
10 "The People of the State of Illinois to all Peace
11 Officers in the State, Greeting: We command that
12 you summon Justino Cruz" -- that's your name,
13 right?
14 A. Yes.
15 Q. -- "2601 Silver Creek, Franklin Park,
16 Illinois, 60130." Was that your address in 2017?
17 A. Yes.
18 Q. Okay. And it says that you are
19 commanded to appear before the Honorable Judge
20 Rickey Jones on February 22, 2017 at 9 a.m. Do
21 you see that?
22 A. Yes.
23 Q. Okay. So did you receive a copy of this
24 subpoena?
25 A. No.

Page 116

1 Q. Do you see at the bottom of the
2 subpoena it says Service, I served this Subpoena
3 by handing a copy to Justino Cruz on January 31,
4 2017? Do you see that?
5 A. Yes, down at the bottom, yeah.
6 Q. Yeah. So this document indicates that
7 you were served on January 31, 2017. Is that not
8 accurate?
9 A. I don't remember.
10 Q. Do you understand that a subpoena is
11 a court order?
12 A. Yes.
13 Q. So if you were subpoenaed in 2017
14 to appear in court, did you understand that you
15 could not refuse that subpoena?
16 A. Yes.
17 Q. Do you believe that the conversation
18 that you had with the state's attorneys was after
19 you received the subpoena?
20 A. I don't understand the question.
21 Q. The discussion that you had that
22 you talked about with the state's attorney where
23 you said the state's attorney told you that you
24 could be held in contempt, do you believe that
25 that happened after you were served with the

Maysonet v.
Guevara

Page 117

1 subpoena?
2 　　MS. COHEN: Objection, form.
3 A. Like did I get that before they came to
4 see me?
5 　　BY MS. ROSEN:
6 Q. Yes.
7 A. No.
8 Q. You don't think you did?
9 A. No.
10 Q. Did they hand it to you when they saw
11 you?
12 A. No, they didn't give me nothing when --
13 they just came and talked to me.
14 Q. Okay. And as you sit here today,
15 are you saying you didn't get the subpoena or you
16 don't remember getting the subpoena?
17 A. I don't remember.
18 Q. Okay. And the attorney -- when did you
19 hire your attorney?
20 A. January 2, 2018.
21 Q. So did your attorney prepare
22 the affidavit that's marked Exhibit No. 1?
23 A. Yes.
24 Q. What's the name of your attorney that
25 prepared this document?

Page 118

1 A. It was the other attorney. I always forget
2 his name. It was his partner.
3 Q. And the attorney that's here with you
4 today, what's his name?
5 A. My attorney?
6 Q. The one that's here today sitting with
7 you, what's his name?
8 A. It starts with -- I'm bad with names.
9 That's why -- just I'm just real bad with names.
10 I can't -- his name's Adrian.
11 Q. Adrian?
12 A. Yeah.
13 Q. Do you know Adrian's last name?
14 A. No. The truth, I can't pronounce the last
15 name.
16 Q. And before today how many times have you
17 met with Adrian?
18 A. Just talked to him on the phone.
19 Q. How many times have you talked to him on
20 the phone?
21 A. Counting the times, a bunch of -- more than
22 five or six times.
23 Q. Okay. And the other attorney whose
24 name you can't remember, have you ever met with
25 him in person?

Page 119

1 A. Yes, in his office.
2 Q. Where's his office?
3 A. It's on 83rd and it's in the suburbs.
4 I always forget the other street because I've been
5 there one time, and the rest of the time I talked to
6 him on the phone.
7 Q. Got it. How did you find the attorneys
8 that you hired?
9 A. Through my wife's cousin.
10 　　MR. GREENBERG: I'm going to object to the
11 relevance.
12 　　BY MS. ROSEN:
13 Q. Okay. Through what?
14 A. Wife's cousin.
15 Q. And what was your wife's name?
16 A. Elizabeth Cruz.
17 Q. And what's the name of your wife's
18 cousin?
19 A. The one who gave us the attorney's
20 name is -- you know, I can't remember which one
21 because she -- we talked to around two of her
22 cousins. I don't remember which ones did it, who.
23 Q. And when did you decide you needed an
24 attorney?
25 A. After they came to my job.

Page 120

1 Q. So after the state's attorney and the
2 state's attorney investigator came to your job
3 about Mr. Maysonet's case, you decided you needed
4 to have a lawyer, right?
5 A. Yes.
6 Q. And if I understand you correctly,
7 you asked around and one of your wife's cousins
8 recommended the lawyer that you have today,
9 correct?
10 A. Yes.
11 Q. And what are the lawyers doing for you?
12 　　MR. PRADOS: I'd just caution my client
13 not to get into the substance of any conversations
14 that he's had with us.
15 　　BY MS. ROSEN:
16 Q. Sure, yeah. I don't want to know about
17 what you talked about. I want to know what work
18 they're doing for you.
19 A. Just keeping me out of jail because I was
20 threatened from the officers.
21 Q. Got it.
22 A. And the state's attorney.
23 Q. Now, your attorney when I started
24 asking these questions said that they represent
25 you in a TIRC Commission proceeding. Do you know

Maysonet v.
Guevara

Page 121

1 what that is?
2 A. No.
3 Q. Do you know what he's talking about?
4 A. Yes.
5 Q. What is he talking about?
6 A. About the officer who threatened me,
7 who abused me when I was locked up.
8 Q. So you have some proceeding that you're
9 bringing against the officer that locked you up?
10 A. Yes.
11 Q. And do you remember the officer's name?
12 A. The Latino officer.
13 Q. Do you remember his name?
14 A. No.
15 Q. Okay. So the Latino officer that you
16 have been talking about earlier today, the one
17 that you said choked you?
18 A. Yes.
19 Q. Okay. So you have filed some sort
20 of action against that police officer, correct?
21 A. Yes.
22 Q. And what is your goal in connection with
23 that action that you filed against the police
24 officer? What do you want to have happen?
25 A. Justice.

Page 122

1 Q. And what is justice for you?
2 A. Get my name clear.
3 Q. And how do you expect to get your name
4 cleared?
5 A. Overturn the conviction.
6 Q. So you want to get your conviction
7 overturned too, correct?
8 A. Yes.
9 Q. And then after you get your conviction
10 overturned, do you plan to file a lawsuit like
11 Mr. Maysonet?
12 A. I don't understand. I don't know what
13 he's doing, what Maysonet is doing. I don't --
14 Q. You don't know what Mr. Maysonet's
15 doing?
16 A. No.
17 Q. Do you know why you're here today?
18 A. For my statement.
19 Q. Right. But do you know, you know --
20 Ms. Bonjean, you had met her before today, right,
21 the lawyer?
22 A. Just one time, yeah.
23 Q. Yeah. And she told you she represents
24 Mr. Maysonet, right?
25 A. Yes.

Page 123

1 Q. And do you know today, this deposition,
2 for what kind of case it's for?
3 MS. COHEN: Objection, form.
4 A. No.
5 BY MS. ROSEN:
6 Q. Do you understand that Mr. Maysonet got
7 his conviction overturned?
8 A. Yes, it was on the news.
9 Q. Right, okay. And so that case is over,
10 right?
11 A. I don't know.
12 Q. Do you know that Mr. Maysonet has now
13 filed a lawsuit against the City of Chicago and
14 the police officers seeking money?
15 A. I don't know.
16 Q. If you get your conviction overturned,
17 are you planning to file a lawsuit to get money
18 to compensate you for the years you spent in
19 prison?
20 A. I'll discuss that with my lawyers.
21 Q. I understand that. But my question
22 is is that your goal, your plan? As you sit here
23 today, if you get your conviction overturned do
24 you plan to file a lawsuit to get money for the
25 ten years or so that you spent in prison?

Page 124

1 A. I don't know.
2 Q. Is it a possibility?
3 A. Maybe.
4 Q. Now, if you take a look at Exhibit
5 No. 1, do you see at the top there it says People
6 of the State of Illinois vs. Alfredo Gonzalez?
7 Do you see that there?
8 A. Yes.
9 Q. And do you know why that caption is
10 on the document? Did anybody tell you why this
11 document was prepared, other than your lawyers?
12 Do you know why it was prepared in The People vs.
13 Gonzalez case?
14 A. I don't understand the question.
15 Q. You told me that the state's attorney
16 came out to your work with his investigator to
17 talk to you about Mr. Maysonet's case, right?
18 A. Yes.
19 Q. He wasn't talking to you about
20 Mr. Gonzalez's case, right?
21 A. He did mention Alfredo too.
22 Q. He did?
23 A. Yes.
24 Q. And what did he say about Alfredo?
25 A. That he's still locked up.

Maysonet v.
Guevara

Page 125

1  Q.   Anything else?
2  A.   I don't remember.
3  Q.   So you don't know why the document says
4  what it says at the top?
5  A.   Maybe talking about my case and everything.
6  Q.   I just want to know if you know why
7  the top of the document says People vs. Gonzalez.
8  If you don't, that's fine --
9  A.   No, I don't know.
10 Q.   -- but do you know?
11 A.   No.
12 Q.   Okay.  And you said you did not
13 prepare this affidavit, right, your lawyers did?
14 A.   Yes.
15 Q.   Did your lawyers talk to anybody
16 other than you, to your knowledge, to prepare
17 this affidavit?
18 A.   I don't know.
19 Q.   Okay.  We'll get back to the affidavit
20 in a minute.  You said earlier today that at the
21 time of your arrest in 1990 you were a member of
22 the Latin Kings, correct?
23 A.   Yes.
24 Q.   When did you begin your membership with
25 the Latin Kings?

Page 126

1  A.   Don't remember.
2  Q.   You were what, 21 in 1990, is that
3  right?
4  A.   Yes.
5  Q.   How old were you when you started
6  hanging and associating with the Latin Kings?
7       MS. COHEN: Objection, foundation.
8  A.   I was in my teens.
9       BY MS. ROSEN:
10 Q.   Early teens or late teens?
11 A.   Late.
12 Q.   So 17, 18?
13 A.   Around there.  I was 16, around there.
14 Q.   16.  And why did you become a member of
15 the Latin Kings?
16 A.   I lived in the neighborhood.
17 Q.   And what about the fact that you
18 lived in that neighborhood caused you to join the
19 Latin Kings?
20 A.   Don't remember.
21 Q.   What did you do as a member of the Latin
22 Kings?  What were your activities?
23 A.   Sell drugs and hang around together.
24 Q.   Did you have any rank within the street
25 gang?

Page 127

1  A.   No.
2  Q.   Did your brother have rank within the
3  street gang?
4  A.   Yes.
5  Q.   What was your brother's rank?
6  A.   Don't remember.
7  Q.   And I'm talking about Efrain.  Efrain,
8  is that how you say it, Efrain?
9  A.   Efrain.
10 Q.   That's the brother I'm talking about.
11 A.   Yes.
12 Q.   You don't recall his rank?
13 A.   No.
14 Q.   Are you close with your brother Efrain?
15 A.   Yes.
16 Q.   Where does he live today?
17 A.   In Chicago.
18 Q.   Where?
19 A.   I don't know his address.
20 Q.   Do you have a phone number for him?
21 A.   No.
22 Q.   How do you get in touch with him?
23 A.   Through my sister.
24 Q.   Which sister?
25 A.   Yolanda Cruz.

Page 128

1  Q.   So if you want to get in touch with
2  your brother Efrain, you have to contact Yolanda?
3  A.   Yes.
4  Q.   Why?
5  A.   Because she sees him every day.
6  Q.   Why does she see him every day?
7  A.   Because I think they live close to each
8  other because they live in the city.  I live in
9  Franklin Park.
10 Q.   Do you have her phone number?
11 A.   Yes.
12 Q.   Do you know her address?
13 A.   Right now, no, because she just moved to
14 the South Side.
15 Q.   When's the last time you talked to your
16 brother Efrain?
17 A.   Probably around three weeks ago.
18 Q.   Does he know that you had to give
19 a deposition in this case?
20 A.   No.
21 Q.   Have you talked to him at all about the
22 deposition in this case?
23 A.   No.
24 Q.   Have you talked to him at all about
25 the affidavit that you prepared, Exhibit No. 1?

Maysonet v.
Guevara

Page 129

1  A.  No.
2  Q.  Have you talked to him at all about the
3  fact that the state's attorney's office came out
4  to your employment two years ago?
5  A.  No.
6  Q.  Is Efrain older than you or younger than
7  you?
8  A.  Older.
9  Q.  How much older?
10  A.  A year.
11  Q.  Are you still a member of the Latin
12  Kings?
13  A.  No.
14  Q.  When did you leave the Latin Kings?
15  A.  When I got locked up.
16  Q.  When you got locked up?
17  A.  Yes.
18  Q.  So on the date of your arrest?
19  A.  No.
20  Q.  Okay.  So when did you leave the Latin
21  Kings?
22  A.  Don't remember.  But I was locked up when
23  I left the Latin Kings.
24  Q.  Were you still in Cook County
25  Jail or were you in the Illinois Department of

Page 130

1  Corrections?
2  A.  Don't remember.
3  Q.  What did you do to remove yourself from
4  the gang?
5  A.  I just told them I was done.
6  Q.  Who did you tell?
7  A.  I don't recall who I talked to.
8  Q.  If you want to leave the street
9  gang, who do you have to tell, somebody of rank?
10  What's the procedure?
11  A.  I don't remember what the procedures
12  are.  I've been out of this over 20 years.  I don't
13  remember.
14  Q.  So you went and talked to somebody while
15  you were in custody?
16  A.  Yes.
17  Q.  So you talked to somebody that was in
18  custody or --
19  A.  No, I called somebody on the phone in the
20  County.
21  Q.  From the County?
22  A.  Yes.
23  Q.  So now you recall that you removed
24  yourself from the street gang while you were
25  still in County?

Page 131

1  A.  Yeah, that's what I -- yes, when I was
2  locked up.
3  Q.  Right.  But you were first locked
4  up in Cook County Jail and then you went to the
5  Illinois Department of Corrections.
6  A.  Yes.
7  Q.  Right.  So in terms of trying to
8  pinpoint when you left the street gang, it was
9  during the period of time while you were in Cook
10  County Jail, right?
11  A.  Yes.
12  Q.  So sometime before, what, 1995?
13  A.  Somewhere around there.
14  Q.  Right, because you went into the -- you
15  got sentenced in 1995, right?
16  A.  Yes.
17  Q.  And once you got sentenced you went to
18  the Illinois Department of Corrections, right?
19  A.  Yes.
20  Q.  So you called somebody and said you were
21  done, is that how it went?
22      MS. COHEN: Objection, form.
23  A.  Yes, that's what -- I called somebody.
24      BY MS. ROSEN:
25  Q.  You just don't remember who?

Page 132

1  A.  No.
2  Q.  Did you report to somebody in the street
3  gang when you were out on the street?
4  A.  No.
5  Q.  Was there somebody above you?
6  A.  Yeah, you got ranks, people who are
7  ranks.  You got soldiers and you got -- I think I was
8  just -- I was just a regular soldier.
9  Q.  Okay.  So you were a soldier.  And what
10  rank was above you?
11  A.  Like same thing like in the Army,
12  lieutenants and like that.
13  Q.  So what was the rank directly above
14  a soldier?
15  A.  Don't know.
16  Q.  If you wanted to quit the gang,
17  who would you call, the rank right above you or
18  somebody higher up in the chain of command?
19      MS. COHEN: Objection, foundation.
20  A.  Don't remember.
21      BY MS. ROSEN:
22  Q.  Did you suffer any consequences
23  as a result of removing yourself from the street
24  gang?
25  A.  Don't understand the question.  What do you

Maysonet v.
Guevara

Page 133

1  mean by that?
2  Q.  Do you know what it means to be
3  violated?
4  A.  Yes.
5  Q.  What does it mean?
6  A.  You get three minutes or -- depends what
7  they put -- you get beat up.
8  Q.  And that's by fellow gang members,
9  right?
10  A.  Yes.
11  Q.  And that's some sort of punishment,
12  right?
13  A.  Yes.
14  Q.  For a variety of things, right?
15  A.  Yes.
16  Q.  Do you have to get violated to gain
17  entrance into the Latin Kings?
18  A.  Yes, yes.
19  Q.  So you were violated to become a member
20  of the Latin Kings?
21  A.  Yes.
22  Q.  Do you have to get violated to exit the
23  Kings?
24  A.  Yes.
25  Q.  Did you get violated to exit the Kings?

Page 134

1  A.  Don't remember.
2  Q.  Other than being violated to become
3  a member of the Latin Kings, did you get violated
4  any other time during the course of time that you
5  were a member of the Latin Kings?
6  A.  Don't remember.
7  Q.  Were you concerned when you testified
8  against your uncle about what the gang would do
9  to you?
10  MS. COHEN: Objection, form.
11  A.  Don't remember.
12  BY MS. ROSEN:
13  Q.  At the time that you were a member of
14  the Latin Kings back in the late '80s and early
15  '90s, did gang members get violated for
16  testifying against fellow gang members?
17  A.  To my knowledge, yes.
18  Q.  So when you testified against your
19  uncle, Alfredo Gonzalez, a fellow Latin King,
20  were you concerned that you were going to get
21  violated?
22  A.  Yes.
23  Q.  Is your brother Efrain still a Latin
24  King?
25  A.  Don't know.

Page 135

1  Q.  Are there any other of your family
2  members that are Latin Kings?
3  A.  Don't know because I don't stay in touch
4  with none of them.
5  Q.  When's the last time you had any contact
6  with Mr. Maysonet?
7  MS. COHEN: Objection, asked and answered.
8  A.  I haven't talked to him.
9  BY MS. ROSEN:
10  Q.  I'm not asking solely about talking
11  to him.  I'm asking about any contact whatsoever.
12  So when's the last time you had any contact at
13  all with Mr. Maysonet, whether it's in person,
14  by phone, by text, by email, on social media,
15  any contact whatsoever?
16  MS. COHEN: Objection, form, compound.
17  A.  Don't remember.  Probably like in the '80s.
18  BY MS. ROSEN:
19  Q.  Okay.  And how did you know Mr. Maysonet
20  back in the 1980s?
21  A.  In the neighborhood.
22  Q.  Is he somebody you hung out with?
23  A.  No.
24  Q.  Somebody you sold drugs with?
25  A.  Yes.

Page 136

1  Q.  How often would you sell drugs for the
2  Latin Kings?
3  MS. COHEN: Objection, foundation.
4  A.  Don't remember.
5  BY MS. ROSEN:
6  Q.  Was it often?
7  A.  Like on the weekends.
8  Q.  Was it every weekend?
9  A.  Yes.
10  Q.  And how often did you sell drugs with
11  Mr. Maysonet?
12  MS. COHEN: Objection, foundation.
13  A.  I'd sell with a lot of different guys.
14  I don't remember who I sold with.
15  BY MS. ROSEN:
16  Q.  What kinds of drugs did you sell?
17  A.  Marijuana.
18  Q.  Anything else?
19  A.  No.
20  Q.  Your Uncle Alfredo, did he have rank in
21  the street gang?
22  A.  Don't know.
23  Q.  You didn't know back in the 1980s if he
24  had a rank or anything?
25  A.  Don't know.

Page 137

1  Q.  How much older than you is he?
2  A.  I've got no idea.
3  Q.  Well, back when you got arrested you
4  were 21, right?
5  A.  Yes.
6  Q.  And approximately how old was he?
7  A.  I don't know.
8  Q.  Was he 50?
9  A.  I don't know how old he was.  He was
10  older than me by I think around 10 or 15.  I think
11  so.
12  Q.  Okay.  So around 10 or 15 years older
13  than you?
14  A.  Yes.
15  Q.  And you said -- how is he related to
16  you?  He's your --
17  A.  He's my mom's brother.
18  Q.  Your mother's brother.  And when's the
19  last time you had any contact with him?
20  A.  Around in the '80s or '90s, like that.
21  Q.  Around the time of these events, the
22  arrests?
23  A.  Before.
24  Q.  Before that.  And your mother, is she
25  still alive?

Page 138

1  A.  Yes.
2  Q.  And what's your relationship with her?
3  A.  Talk to her on the phone all the time.
4  Q.  When's the last time you saw your
5  mother?
6  A.  Like a month ago I had to take -- I was in
7  the hospital with her.
8  Q.  She was in the hospital?
9  A.  Yes.
10  Q.  Is she okay?
11  A.  Yes.
12  Q.  And what's her relationship with your --
13  with her brother, if you know?
14  A.  They don't talk.
15  Q.  Do you know why not?
16  A.  I don't get into it.
17  Q.  She's never told you why she stopped
18  talking to her brother?
19  A.  No.
20  Q.  And why did you stop talking to your
21  uncle?
22  A.  Because of the case.  That's the last time.
23  Q.  Before you were arrested in 1990,
24  when's the last contact you recall you had with
25  your uncle?

Page 139

1    MS. COHEN: Objection, form.
2  A.  Maybe a birthday party or something.
3    BY MS. ROSEN:
4  Q.  Now, you testified earlier about being
5  arrested at a bus stop by the Latino detective
6  and a white detective.  How did you know they
7  were detectives?
8  A.  Because of the car they were in.  They
9  were in a plain car and they wore regular street --
10  regular uniforms, regular clothes.
11  Q.  So because of the car that they were
12  driving and the clothes that they were wearing?
13  A.  Yes.
14  Q.  Any other reason that you concluded they
15  were both detectives?
16  A.  No, because I lived in the neighborhood
17  and you know what kind of cars the detectives drive,
18  plain cars and they're in street clothes.
19  Q.  But there's no other reason other than
20  that, right?
21  A.  Yeah.
22  Q.  Okay.  And I think you said earlier
23  before you were arrested, you had never seen this
24  Latino officer before, right?
25  A.  Yes.

Page 140

1  Q.  After you gave your handwritten
2  statement that night, which is Exhibit 2, did you
3  ever see that Latino detective again?
4    MS. COHEN: Objection, form.
5  A.  After --
6    BY MS. ROSEN:
7  Q.  After you did that, after you signed
8  that document, did you ever see that Latino
9  detective again?
10  A.  Don't remember.
11  Q.  So I want to talk a little bit about
12  your questioning that you described earlier by
13  the Latino detective and the white detective.
14  And you said that they brought you to the police
15  station, put you in a room and left you there for
16  a couple hours, right?
17  A.  Yes.
18  Q.  And then they came back and then they
19  stayed in the room with you I think you said for
20  two hours straight, right?
21  A.  For over two hours or more.
22  Q.  Or more, okay.  And you told us
23  earlier they were asking you questions and then
24  you also described being grabbed by the throat
25  and slapped in the left ear, right?

Maysonet v.
Guevara

Page 141

1 A. Yeah. He grabbed me to the throat
2 and when he grabbed me to the throat, like I was
3 close to the wall because I was handcuffed to the
4 wall. That's when I got banged -- my head got hit
5 to the wall, and he slapped me a couple times in the
6 ear.
7 Q. Other than grabbing you by the
8 throat and pushing you against the wall, causing
9 you to strike the back of your head on the wall
10 and slapping you a couple times in the left
11 ear -- is that what you said?
12 A. Yes.
13 Q. -- did the Latino detective use any
14 other physical force against you?
15 A. No, just grabbed me to the throat and
16 smacked me around and everything.
17 Q. So how many times did he grab you by the
18 throat?
19 A. Don't recall. I know it was a couple
20 of times, more than twice or three times. He just --
21 every time he tried to talk to me maybe.
22 Q. So he on multiple occasions grabbed
23 you by the throat and knocked your head against
24 the wall?
25 A. Yes.

Page 142

1 Q. Was it more than three times?
2 A. Don't recall. I know it was just -- he
3 was -- every time he speak to me, he was grabbing me,
4 hitting me in the ear and everything.
5 Q. Okay. So I want to kind of break
6 it down a little bit, okay? So you said he
7 on multiple occasions grabbed you by the throat,
8 right?
9 A. Yes.
10 Q. Was it with one hand or two hands?
11 A. Both hands.
12 Q. And then he thrust you, pushed you
13 against the wall, right?
14 A. Yes.
15 Q. And each time he did that you hit your
16 head against the wall, correct?
17 A. Yes.
18 Q. Okay. And can you tell us approximately
19 how many times he did it? Was that five times or
20 a hundred times?
21 A. Around five to ten times.
22 Q. And each time he did that you struck
23 your head against the wall, correct?
24 A. Yeah, because I was like -- this is --
25 I was sitting right here and this -- I was handcuffed

Page 143

1 like this. Every time he grabbed me, I'm so close to
2 the wall, boom, boom and everything.
3 Q. And did he strike you against the wall
4 with force?
5 A. Yes.
6 Q. It was hard?
7 A. Yes.
8 Q. Did you crack your skull, you know? Did
9 your skull have any bleeding?
10 A. A bump.
11 Q. A bump?
12 A. Yeah.
13 Q. And you felt the bump at the -- later on
14 when you touched your head?
15 A. Yes.
16 Q. Did you have one bump or more than one
17 bump?
18 A. Just one.
19 Q. And can you tell us where the bump was?
20 A. In the back of the head because that's
21 where --
22 Q. So like about the middle of the back
23 of your head?
24 A. Yes.
25 Q. Okay. And then you said he slapped

Page 144

1 you in the face on the left side, right, by your
2 ear?
3 A. Ear, ear.
4 Q. And that just happened to be the
5 ear that you had an ear infection in, right?
6 A. Yes, because he knew I had an ear
7 infection because I had medication. When they picked
8 me up, they saw medication on me.
9 Q. I see. What kind of medication did you
10 have on you?
11 A. For an infection on my left ear.
12 Q. What kind of medication was it?
13 A. Whatever the doctor give you for an
14 infection.
15 Q. And when did you go to the doctor to get
16 that medication?
17 A. Like a couple of days before they picked
18 me up.
19 Q. And who was your doctor?
20 A. Don't recall.
21 Q. And did you have a regular doctor back
22 in 1990?
23 A. No.
24 Q. So where did you go to get the
25 medication? Did you go to a doctor's office or

Maysonet v.
Guevara

Page 145

1  a clinic or the hospital?
2      MS. COHEN: Objection, form.
3  A.  Doctor's office.
4      BY MS. ROSEN:
5  Q.  Doctor's office?
6  A.  Yes.
7  Q.  But you didn't have a regular doctor,
8  right?
9  A.  No.
10  Q.  So where did you get the name of a
11  doctor?
12  A.  Don't recall.
13  Q.  So you had this medication in your
14  pocket when you got arrested?
15  A.  Yes.
16  Q.  And did the medication say ear infection
17  in the left ear, ear infection in the right ear?
18  A.  In the left ear.
19  Q.  It said that on the medication?
20  A.  Yes.
21  Q.  And so did the Latino detective say
22  anything about your ear infection?
23  A.  Don't recall.
24  Q.  So how many times did he hit you in your
25  left ear?

Page 146

1  A.  More than five times.
2  Q.  More than five times.  And he hit you
3  hard, right?
4  A.  Yes.
5  Q.  And did you have swelling or redness
6  on your face?
7  A.  Redness around the ear and everything.
8  Q.  And did it bruise?
9  A.  Yes, because when I got to the County,
10  I had to go see -- they had to take me to go see
11  a doctor and everything.
12  Q.  And they saw the bruises, right?
13  You talked about the fact that your ear was
14  bruised?
15  A.  Yeah.
16  Q.  Yeah.  And that's why you went to the
17  doctor, right, because you had this ear infection
18  and then the police officer hit you?
19  A.  Yes.
20  Q.  And it was hurting you, right?
21  A.  Yes.
22  Q.  And so you told those doctors that the
23  detective hurt you, right?
24  A.  I think so.  I did.
25  Q.  Yeah.  And you showed them where you had

Page 147

1  the bruising --
2  A.  Yeah.
3  Q.  -- and they gave you whatever medicine
4  they gave you, right?
5  A.  Yes.
6  Q.  Okay.  Other than choking you -- did you
7  have, by the way, any marks on your throat from
8  the choking?
9  A.  Don't recall.  So many years.
10  Q.  Yeah.  Do you remember seeing bruises or
11  anything because of the way he grabbed you around
12  your throat?
13  A.  No.  The only bruise I remember, it
14  was the ear because it was bothering me.  I was like
15  kind of bleeding a little bit, and that's what I was
16  more concerned about, losing my ear from hearing and
17  everything.
18  Q.  Right.  Did you lose any hearing?
19  A.  A little bit.
20  Q.  Yeah.  And did you go to -- continue to
21  go to the doctors about your hearing loss?
22  A.  Yeah, when I was in the County and plus
23  when I was in the penitentiary.
24  Q.  Yeah.  So even into the Illinois
25  Department of Corrections you were still having

Page 148

1  trouble?
2  A.  Yes.
3  Q.  Okay.  And when you got out, did you go
4  to doctors for your hearing?
5  A.  Yes.
6  Q.  Yeah.  And what doctors when you got out
7  did you go to for your hearing?
8  A.  The doctor my wife was seeing at the time.
9  Q.  And what's his name?
10  A.  He's Indian.  I've got his name on my
11  phone, but I can't recall because it's like an Indian
12  name.
13  Q.  You can check your phone and give us his
14  name.
15      MR. GREENBERG: You can stop asking him
16  questions.
17      MS. ROSEN: Why?
18      MR. GREENBERG: Because he already -- he
19  doesn't remember him.
20      MR. ENGQUIST: He's got it right there.
21      MS. ROSEN: He's got it.
22  A.  Dr. Sawlani.
23  Q.  Can you spell it?
24  A.  S-a-w-l-a-i -- I mean n-i.
25  Q.  L-a-n-i?

Page 149

1 A. S-a-w-l-a-n-i.
2 Q. And do you have a phone number there?
3 A. (773) 237-4554.
4 Q. Thank you. And when's the last time you
5 saw Dr. Sawlani for your ear issue?
6 A. Don't remember.
7 Q. Was it within the last five years?
8 A. Every time I go he checks my ear.
9 Q. All right. So during this two
10 hours or more that you were with the detectives
11 and they were talking to you, you told us earlier
12 they were asking you questions and you didn't
13 remember all the questions. Do you remember any
14 of the questions that they asked you?
15 A. About Alfredo and Juan, that did I know
16 they were locked up, and I told them I told them
17 them being locked up. And they started asking me
18 about any murder. I said I don't know nothing about
19 no murder.
20 Q. So before you were arrested, you had
21 already heard that Alfredo and Mr. Maysonet had
22 been arrested?
23 A. I don't remember.
24 Q. Maybe I misunderstood you. I thought
25 what you just said is that --

Page 150

1 A. He asked me in there did I know --
2 he told me that Juan and Alfredo was locked up.
3 It was like I didn't know.
4 Q. Oh, you didn't know. He told you.
5 A. Yeah.
6 Q. I see, okay. I misunderstood you.
7 So he told you they were locked up. What else
8 did he tell you?
9 MS. COHEN: Objection, form.
10 A. I don't remember.
11 BY MS. ROSEN:
12 Q. And did he ask you questions about
13 the murders?
14 A. Yeah, he just started asking me questions
15 about murders. I told him I don't know what he was
16 talking about.
17 Q. Okay. And then he kept pressing you,
18 I take it?
19 A. Yes.
20 Q. And then did you eventually say you did
21 know what he was talking about?
22 A. No.
23 Q. So you never in that room with that
24 detective the whole time, never said that you
25 knew what he was talking about?

Page 151

1 A. I never knew what he was talking
2 about. I told him I don't know what he was talking
3 about.
4 Q. So he was in the room with you
5 for two hours or more asking you questions and
6 choked you and hit you and then the interview
7 ended, right? They were done talking to you at
8 some point?
9 A. Yeah, he would leave. Then they'd come
10 back then.
11 Q. At any point in time did you say,
12 yeah, I confess, I did it, I was part of it,
13 I was involved in the murder?
14 MS. COHEN: Objection, form.
15 A. No.
16 BY MS. ROSEN:
17 Q. You never admitted it?
18 A. I told them I didn't know what they were
19 talking about.
20 Q. The whole time?
21 A. Yes.
22 Q. So you never told the detectives
23 at the end of their talking to you that you were
24 involved in the murder?
25 A. No.

Page 152

1 Q. Or that you observed Mr. Maysonet and
2 Mr. Gonzalez --
3 A. No.
4 Q. -- in the murder, being involved in the
5 murders?
6 A. No.
7 Q. Okay. So I want to talk to you
8 then about your statement, Exhibit No. 2. So do
9 you recall this document from back in 1990 from
10 having seen it?
11 A. When the -- when they gave it to me.
12 Q. Who gave it to you?
13 A. The state's attorney or the officer.
14 Q. So do you remember talking to a state's
15 attorney?
16 A. I remember -- it was the officer or the
17 state's attorney handed it over.
18 Q. Right. So my question's a little
19 bit different. Do you recall while you were at
20 the police station at any point in time talking
21 to a state's attorney?
22 A. Don't remember.
23 Q. So it's possible you did and possible
24 you didn't?
25 MS. COHEN: Objection, form.

Maysonet v.
Guevara

Page 153

1  A.  Maybe.
2     BY MS. ROSEN:
3  Q.  Maybe.  Do you see at the top of this
4  statement it says Present ASA Perkaus?  Do you
5  see that there?
6  A.  Yes.
7  Q.  And do you understand that ASA means
8  assistant state's attorney?
9  A.  No.
10  Q.  You don't, okay.  And then beneath
11  that it says Detective Schak.  Do you see that,
12  S-c-h-a-k?
13  A.  Yes.
14  Q.  Do you recall speaking to a detective
15  named Schak?
16  A.  No.
17  Q.  And then if we look to the
18  typewritten language in the middle of the
19  statement, do you see it says I understand I
20  have a right to remain silent and that anything
21  I say can be used against me in a court of law.
22  I understand that I have a right to talk to
23  a lawyer and have him present with me during
24  questioning and if I can't afford to hire a
25  lawyer, one will be appointed by the court

Page 154

1  to represent me before any questioning.
2  Understanding these rights, I wish to give
3  a statement.  Do you see that there?
4  A.  Yes.
5  Q.  And do you see your signature below
6  that?
7  A.  Yes.
8  Q.  Is that your handwriting?
9  A.  Yes.
10  Q.  Okay.  Do you recall either reading
11  it, that paragraph, or somebody reading it to you
12  and then signing your name?
13  A.  Don't remember.
14  Q.  Do you doubt that that's your name?
15  A.  No.
16  Q.  In your handwriting?
17  A.  No, that's my writing.
18  Q.  Okay.  And I'm not going to go through
19  the whole statement with you.  Ms. Bonjean asked
20  you a bunch of questions about it.  And you have
21  told us that the statement basically is not true,
22  correct?
23  A.  Yes.
24  Q.  And at the time of these events and
25  before you signed the statement was somebody

Page 155

1  reading -- did somebody read this statement to
2  you?
3  A.  Don't remember.
4  Q.  Why did you sign this statement?
5  A.  Because I was threatened for my life.
6  Q.  Because what?
7  A.  I was threatened of my life.
8  Q.  Who threatened you?
9  A.  The officer abusing me in the -- when
10  I was in that little room.
11  Q.  And who came up with the story that's
12  in this statement?
13  A.  The officer.
14  Q.  The officer.  Did he discuss it
15  with you or was it all just written down and you
16  signed it?
17  A.  I just -- everything was already written.
18  Q.  So before the state's attorney -- you
19  don't recall the state's attorney at all, right?
20  A.  Don't recall.
21  Q.  Okay.  Before you signed this
22  statement, had you read what was in it or had it
23  been read to you so that you knew the words that
24  were on the page before you signed it?
25  A.  Don't recall.

Page 156

1  Q.  Before you signed this statement,
2  did the detectives tell you what you should say
3  about the crime?
4     MS. COHEN: Objection, form, foundation.
5  Detectives.
6  A.  I don't recall.
7     BY MS. ROSEN:
8  Q.  Did any detective tell you what to say
9  about the crime?
10  A.  The only thing I recall, they say if I sign
11  it, I'll get -- I could probably be let go.
12  Q.  Did you understand when you were
13  signing this statement that you were signing
14  a statement that involved you in a murder?
15     MS. COHEN: Objection, form.
16  A.  I don't recall.
17     BY MS. ROSEN:
18  Q.  If you look at the top part of
19  the document, it says this statement is taken
20  regarding the fatal shooting of Torrence Wiley
21  and Kevin Wiley.  Do you see that there?
22  A.  Yes.
23  Q.  So when you signed this document,
24  did you notice that it said it was about a fatal
25  shooting of two people?

Maysonet v.
Guevara

Page 157

1  A.   The only thing I knew was a shooting
2  because that's the questions they were asking me
3  in the room.
4  Q.   So you didn't pay attention to the
5  words on this piece of paper before you signed
6  it?
7  A.   No, no.
8  Q.   No?
9  A.   Because I didn't understand that much
10  English.
11  Q.   You said you graduated from high school,
12  right?
13  A.   Yeah, but I was a bilingual student when
14  I was in high school.
15  Q.   Spanish and English?
16  A.   Yes.
17  Q.   Where were you born?
18  A.   Puerto Rico.
19  Q.   When did you come to the United States?
20  A.   Don't recall.
21  Q.   Were you 5 or 15?
22  A.   I was young.  Then I went back to Puerto
23  Rico and lived there a couple more years.
24  Q.   How many years did you attend -- you
25  said you went to Clemente?

Page 158

1  A.   Yeah, four years.
2  Q.   And did you take English-speaking
3  classes at Clemente?
4  A.   It was bilingual, English and Spanish.
5  Q.   Right.  But you were taught in both
6  languages, right?
7  A.   Yes.
8  Q.   And did you go to grammar school here
9  in the United States?
10  A.   Went to both Puerto Rico and here.
11  Q.   In Puerto Rico did they teach you both
12  English and Spanish?
13  A.   Spanish.
14  Q.   Spanish only?
15  A.   (Nodding).
16  Q.   Yes?
17  A.   Yes.
18  Q.   When you graduated high school, could
19  you speak English?
20  A.   A little bit, not that good.  But to get
21  me around, yes.
22  Q.   And did you have a driver's license?
23  A.   Yes.
24  Q.   Did you take a driver's test?
25  A.   A Spanish one.

Page 159

1  Q.   And where did you say you worked?
2  A.   Acme Industry.
3  Q.   And what did you do for them?
4  A.   I do shipping and receiving.
5  Q.   Where did you work back in 1990?
6  A.   Oh, at that time?
7  Q.   Sorry.
8  A.   Oh, my fault.
9  Q.   No, bad question.
10  A.   I worked at a printing shop.
11  Q.   And what did you do at the printing
12  shop?
13  A.   Print checks, set it up to print checks.
14  Q.   I see, okay.  So I just want to go to
15  the statement.  If you look at the first page,
16  the second paragraph it says, "Justino stated
17  he is a graduate of Clemente High School and can
18  read and write."  Do you see that?
19  A.   Yes.
20  Q.   Did you tell either the detective or the
21  state's attorney that was talking to you that you
22  were a graduate of Clemente High School and could
23  read and write?
24  A.   Don't recall.  I just recall they asked
25  me if I went to -- if I graduated from high school,

Page 160

1  and I told them yes.
2  Q.   So that's not false information.  That's
3  true, right?
4  A.   Them asking me about if I graduated from
5  high school?
6  Q.   Yeah.
7  A.   Yes.
8  Q.   So that's accurate?
9  A.   That part, yes.
10  Q.   And you could read and write, yes?
11  A.   A little bit I told them.
12  Q.   Okay.  But it says you can read and
13  write.  That's accurate, right?
14  A.   Yes.
15  Q.   Now, the statement says that you on
16  May 24, 1990 at about 11:30 p.m. with Alfredo
17  Gonzalez, Chris Hernandez and Jose Maysonet went
18  to Jose's house at ███████████ to pick up a
19  gun.  Do you see that there?
20  A.   Yes.
21  Q.   Did you know that Mr. Maysonet lived
22  at 1302 North Homan?
23  A.   No.
24  Q.   As you sit here today, do you know
25  whether or not Mr. Maysonet lived at 1302 North

Maysonet v.
Guevara

Page 161

1 Homan back in 1990?
2 A. No.
3 Q. Okay. And you said you don't
4 know anybody by the name of Chris Hernandez?
5 A. Yes.
6 Q. Is that correct, you don't?
7 A. No, I don't.
8 Q. And I want to draw your attention
9 to the last page of the document where it has
10 your signature, Justino Cruz. Do you see that?
11 A. Yes.
12 Q. And then beneath your name it looks
13 like Detective, and then it's hard to make out
14 the name, but then it's got 5333. Do you see
15 that there?
16 A. Yes.
17 Q. Do you recall that the detective
18 that was with you signed this statement too?
19 A. Don't recall.
20 Q. And then below that you see it says
21 ASA Perkaus? Do you see that?
22 A. Yes.
23 Q. Do you recall that the assistant
24 state's attorney that was at the police station
25 that night --

Page 162

1 A. Don't recall.
2 Q. -- that talked to you signed that? You
3 don't recall?
4 A. No.
5    MR. PRADOS: I'd just remind my client
6 to wait for the question to be finished before you
7 answer.
8    BY MS. ROSEN:
9 Q. And I think you testified earlier that
10 you don't know Rosa Bello, right?
11 A. Yes.
12 Q. And you also told us that Lluvio
13 was your uncle, right?
14 A. Who?
15 Q. Lluvio? Did I say it right?
16    MR. ENGQUIST: Lluvia.
17 A. Oh, Lluvia? Yes.
18    BY MS. ROSEN:
19 Q. That's your uncle?
20 A. Yes.
21 Q. And you said he did not tell you that
22 he killed two black guys, right?
23 A. No, never had no conversation.
24 Q. So I want to have you take a look at
25 Exhibit No. 7, which is your testimony. Before

Page 163

1 your deposition today, have you had a chance to
2 review your testimony that you gave in the trial
3 against your uncle?
4 A. No.
5 Q. Have you ever looked at your testimony?
6 A. Don't recall.
7 Q. Since you hired your lawyers, have you
8 looked at your testimony?
9 A. No.
10 Q. All right. So I'm going to ask you
11 some questions about this. Now, do you remember,
12 you testified in a courtroom, right?
13 A. Yes.
14 Q. And there was a court reporter there
15 like there is one here?
16 A. Yes.
17 Q. And before you testified you were sworn
18 in, right?
19 A. Yes.
20 Q. You raised your hand and you were --
21 you promised to tell the truth, right?
22 A. Yes.
23 Q. Just like you did here today?
24 A. Yes.
25 Q. But as I understand your testimony

Page 164

1 from this morning, the testimony you gave was
2 not in fact truthful. It was false, right, in
3 the trial?
4 A. Yes.
5 Q. So that was false testimony?
6 A. This?
7 Q. Yes.
8 A. Yes.
9 Q. Just by the fact that you raised
10 your hand and said you were going to tell the
11 truth, you did not tell the truth, right?
12 A. Yes.
13 Q. So I want you to look at page 14. And
14 that was a jury trial, right? There were people,
15 a jury in that jury box, right? That wasn't just
16 the judge?
17 A. I don't recall.
18 Q. Okay. Let me -- maybe this will
19 help refresh your recollection. If you look at
20 the first question on page 14 it says, "Do you
21 have an agreement with the Cook County State's
22 Attorney's Office regarding your testimony?
23 Answer, yes. Question, tell the Ladies and
24 Gentlemen of the Jury what that agreement is."
25 Do you see that?

Maysonet v.
Guevara

Page 165

1  A.  Yes.
2  Q.  So does that help refresh your
3  recollection that there was actually a jury
4  there that was deciding your uncle's fate?
5  A.  Yes.
6  Q.  And your answer to the question of tell
7  the Ladies and Gentlemen of the Jury what that
8  agreement was, you testified, "For my testimony
9  I'd be getting 22 years.  At the recommended
10  22 years for my testimony."  And then the
11  followup question is, "Question, that's for
12  your truthful testimony?  Answer, yeah."
13  Do you see that there?
14  A.  Yes.
15  Q.  So you told those 12 ladies and
16  gentlemen of the jury that the testimony that
17  you were about to give was going to be the truth,
18  right?
19  A.  Yes.
20  Q.  But you were lying?
21  A.  Yes.
22  Q.  And you were lying to that jury
23  despite the fact that you knew that the testimony
24  that you were going to give could get you into
25  serious trouble with the Latin Kings, right?

Page 166

1  A.  I don't understand.
2  Q.  Well, you told us earlier that you
3  knew that if you testified against a fellow Latin
4  King, you could get violated, right?
5  A.  Yes.
6  Q.  So you told the ladies and gentlemen
7  of that jury that your testimony was going to be
8  truthful, and then you testified knowing that you
9  likely were going to get violated, right?
10      MS. COHEN:  Objection, form.
11  A.  Maybe.
12      BY MS. ROSEN:
13  Q.  And isn't it true that one of the
14  main reasons you were in the witness protection
15  section of the Cook County Jail was to protect
16  you from gang retaliation, right?
17  A.  I was put there at most -- around trial
18  time.  Before that I was in population.
19  Q.  Right.  But when you struck your deal
20  with the state's attorney's office and you were
21  going to testify, they moved you, right?
22  A.  Yes.
23  Q.  To protect you, right?
24  A.  Don't recall.
25  Q.  And then if we look at page 16,

Page 167

1  line 10 you were asked, "Now, Mr. Cruz, did
2  you ever approach the state's attorney's office
3  through your lawyer and offer to testify for the
4  State?  Answer, no."  Do you see that question
5  and answer?
6  A.  Yes.
7  Q.  Was that truthful testimony?
8  A.  I never approached the state's attorney.
9  Q.  So that was truthful?
10  A.  Yeah.
11  Q.  And then if we look at line 19,
12  "Question, in fact, we approached you through
13  your attorney, Mr. Vahey, in the beginning of
14  January of this year with regard to a possible
15  agreement for your testimony, correct?  Yes."
16  Do you see that there?
17  A.  Yes.
18  Q.  Is that accurate, truthful testimony?
19  A.  Yeah, they approached my lawyer.
20  Q.  So that's accurate?
21  A.  Yeah.
22  Q.  Okay.  So then if we go to the bottom
23  of page 16, line 24, "At that time how long had
24  you been in custody awaiting trial in Cook County
25  Jail?  Answer, around 15 months."  Was that

Page 168

1  accurate testimony?
2  A.  Don't recall.  Maybe.  I don't remember.
3  Q.  Okay.  And then reading further
4  beginning at line 3, "And when the state's
5  attorney's office first approached you through
6  your attorney about our agreement for your
7  truthfulness, in January you indicated to us
8  that you -- through your attorney -- that you
9  wouldn't testify for us, correct?  Answer, yes."
10      Is that accurate, that when
11  the State first approached you, you said no, you
12  weren't going to testify?
13  A.  Yes.
14  Q.  And then if you go to page 18,
15  line 10, the question was, "In fact, you,
16  through your attorney Mr. Vahey, did not accept
17  the State's proposed agreement to testify in this
18  case until March 13th of 1992, correct?"  And
19  then if you go to line 22 after the objections --
20  or line 24, your answer is yes.
21  A.  Yes.
22  Q.  But is it correct that you initially
23  rejected the State's offer?
24  A.  Yes.
25  Q.  But then eventually you agreed to

Maysonet v.
Guevara

Page 169

1 testify?
2 A. Yeah.
3 Q. Why? Why did you change your mind?
4 A. Don't recall.
5 Q. All right. Now, if you look at
6 page 19, you were asked some questions beginning
7 at line 4 about your Uncle Alfredo. And then at
8 the bottom there the question is, "How long have
9 you known the defendant, Alfredo Gonzalez?
10 Answer, all my life." Do you see that?
11 A. Yes.
12 Q. Is that accurate testimony?
13 A. Yes, he's my uncle.
14 Q. Okay. So you knew him for your entire
15 life, right?
16 A. Yes.
17 Q. And before the events that occurred
18 in 1990, how would you describe your relationship
19 with your uncle?
20     MS. COHEN: Objection, foundation, form.
21 A. I don't recall.
22     BY MS. ROSEN:
23 Q. Was he somebody you saw regularly?
24 A. No.
25 Q. Was he somebody that you were friendly

Page 170

1 with?
2 A. Just saw him like at birthday parties,
3 family gatherings.
4 Q. Did you participate in any street gang
5 activities with him?
6     MS. COHEN: Objection, foundation.
7 A. No.
8     BY MS. ROSEN:
9 Q. But you knew he was a member of the
10 Latin Kings, right?
11 A. Yes.
12 Q. And where did he live in relation
13 to where you lived?
14 A. Don't recall where he used to live at.
15 Q. Was it close to you?
16 A. Can't remember.
17 Q. But I think you told us earlier
18 today he was part of the same section of the
19 Latin Kings?
20 A. Yes.
21 Q. And that's a geographic location,
22 right? The way that the Latin Kings' sections
23 are divided is by geography, right?
24 A. Don't recall.
25 Q. Well, Latin King members that are

Page 171

1 part of your section are typically Latin Kings
2 that are in your neighborhood, right?
3     MR. GREENBERG: Objection, foundation.
4     MS. COHEN: Objection, form.
5     BY MS. ROSEN:
6 Q. You can answer.
7 A. Well, we all lived around Humboldt Park.
8 Q. So the Latin Kings that you hung around
9 with and that you participated in gang activities
10 with were not Latin Kings from the South Side of
11 Chicago, right?
12 A. I talked to them.
13 Q. You talked to the gang members from
14 other parts of the city?
15 A. Yeah.
16 Q. Yeah. Would you see your Uncle Alfredo
17 in the neighborhood?
18 A. Once in a while.
19 Q. Did he sell drugs?
20 A. Don't recall.
21 Q. Did the Latin Kings that you were
22 a part of have a particular territory in which
23 they sold drugs?
24 A. No.
25 Q. They sold drugs anywhere?

Page 172

1 A. Around Humboldt Park.
2 Q. And were there rivals to the Latin Kings
3 back in the mid '80s to early '90s?
4 A. Yeah, because there's People and Folks.
5 Latin Kings were one gang. Then Folks were like
6 Disciples, Dragons. That's the opposite gangs.
7 Q. So the Latin Kings were, what did you
8 say, People?
9 A. Yeah.
10 Q. So the rivals were gangs that were
11 a part of the Folk Nation, right?
12 A. Yes.
13 Q. So people that were part of the Folk
14 Nation couldn't come into Latin Kings territory,
15 right?
16 A. No.
17 Q. What would happen to them if they did?
18 A. They'd get beat up.
19 Q. And are there particular individuals
20 within the street gang that are responsible for
21 keeping rival gangs out of Latin King territory
22 or was it everybody's responsibility?
23     MS. COHEN: Objection to form.
24 A. I don't recall.
25

Maysonet v.
Guevara

Page 173

1    BY MS. ROSEN:
2  Q.  Did you ever have to keep the Latin
3  King territory secure and beat up somebody from
4  a rival gang that ever came into Latin King
5  territory?
6  A.  No.
7  Q.  What was your arrangement with the
8  Kings with respect to selling the drugs that you
9  sold on the weekends?
10  A.  I was just a Latin King member.
11  Everybody, we all sell drugs to make money in the
12  neighborhood.
13  Q.  Where did the drugs come from?
14  A.  Don't recall.
15  Q.  And what happened to the money that you
16  got from the drugs that you sold?
17  A.  It was my money.  I kept it for myself.
18  Q.  All of it?
19  A.  Yes.
20  Q.  But you would have to buy the drugs
21  to sell the drugs?
22  A.  Yes.
23  Q.  And would you buy the drugs from Latin
24  Kings?
25  A.  Get it from wherever -- I get it from

Page 174

1  it could be Latin Kings or it could be another
2  gang banger.
3  Q.  Of a different gang?
4  A.  No.  From People, from the gang People.
5  Q.  So other people -- other members of
6  gangs that were under the umbrella of the People
7  Nation?
8  A.  Yes.
9  Q.  And did you have to pay dues to the
10  gang?
11  A.  No.
12  Q.  If somebody from the Folks Nation came
13  to try and sell drugs in Latin King territory,
14  what would happen?
15  A.  They wouldn't even come to the neighborhood.
16  Q.  Why not?
17  A.  Because everybody had their -- where they
18  hang at.
19  Q.  Where did you hang?
20  A.  Humboldt Park.
21  Q.  The whole entire area of Humboldt Park?
22  A.  Pierce and Kedzie.
23  Q.  Did you know somebody named Jacques
24  Rivera?
25  A.  Who?

Page 175

1  Q.  Jacques Rivera.
2     MS. COHEN: Objection, relevance.
3  A.  Don't know who that is.
4     BY MS. ROSEN:
5  Q.  Have you ever heard of the rank of Inca
6  within the Latin Kings street gang?
7  A.  Yes.
8  Q.  What's an Inca?
9  A.  The chief of the Latin Kings.
10  Q.  Who was the chief of the Latin Kings in
11  1989 and 1990?
12  A.  Got no idea.
13  Q.  All right.  I'm going to direct your
14  attention back to the transcript now, page 20.
15  At the top of the page it says, "Question, how
16  old is Alfredo Gonzalez?  Answer, around 32."
17  Do you see that there?
18  A.  Yes.
19  Q.  And was that accurate, your estimate
20  of how old your uncle was back at the time you
21  gave this testimony?
22  A.  Maybe.
23  Q.  Well, you weren't lying about that,
24  right?
25  A.  I don't recall.

Page 176

1  Q.  Oh, you might have been?
2  A.  Lying?
3  Q.  Yeah.
4  A.  This is all false.
5  Q.  I know.  So that's what you're
6  saying today, is it's all false.  But what I'm
7  asking you is is it possible that this particular
8  answer was truthful and not a lie or were you
9  just making it all up?
10  A.  I don't recall his age.
11  Q.  And the next question is, "Do you also
12  know an individual named Jose Maysonet?  Answer,
13  yes, sir."  Now, that's not a lie, right?  You
14  know him?
15  A.  Around the neighborhood.
16  Q.  You've sold drugs with him?
17  A.  No.
18  Q.  You told us earlier you sold drugs with
19  him.
20  A.  I sold drugs around with different
21  guys, Latin Kings.  But specifically with him, no.
22  Different guys altogether.
23  Q.  So are you saying you don't know Jose
24  Maysonet?
25  A.  I knew him around the neighborhood.

Maysonet v.
Guevara

Page 177

1 Q.   What does that mean, I knew him around
2 the neighborhood?
3 A.   Because we all live around the same
4 neighborhood, I heard about him and everything.
5 But have a relationship with him, I never had a
6 relationship with him.
7 Q.   You knew his name?
8 A.   Yes.
9 Q.   You knew he was a Latin King?
10 A.   Yes.
11 Q.   You knew he sold drugs in the
12 neighborhood?
13 A.   To my knowledge, yes.
14 Q.   "Question, as of May 1990 how long
15 had you known Jose Maysonet?  Answer, around a
16 year and a half."  Is that the truth or a lie?
17 A.   Lie.
18 Q.   How did you come up with a year and
19 a half?
20 A.   That's around -- I was around the
21 neighborhood around -- that's when I was deep into
22 the neighborhood, around there.
23 Q.   When you were deep into the
24 neighborhood?
25 A.   Yes.

Page 178

1 Q.   What does that mean?
2 A.   Deep into like gang banging and selling
3 drugs, deep, real -- selling drugs real hard, a year
4 and a half of selling drugs, just selling drugs.
5 Q.   Did somebody tell you to say that you
6 had known Jose for a year and a half or was that
7 just something you made up on your own?
8 A.   Something I just did.  It was around there.
9 Q.   Okay.  So the Latino detective didn't
10 tell you to say you knew Maysonet for a year and
11 a half, right?
12 A.   Don't recall.
13 Q.   The state's attorney, did he tell you
14 to say that you knew Jose Maysonet for a year and
15 a half?
16 A.   I don't recall.
17 Q.   These questions in this transcript where
18 you testified, you were being asked questions by
19 an assistant state's attorney, right, not your
20 lawyer at the beginning here, these questions
21 that you were being asked, right?
22    MS. COHEN: Objection, form.
23 A.   I don't remember.
24    BY MS. ROSEN:
25 Q.   Do you remember --

Page 179

1 A.   I don't remember who was asking me
2 questions first, if it was state's attorney or my
3 lawyer.  I don't remember.
4 Q.   Well, both of them asked you questions,
5 right?
6 A.   Yes, but I don't know who went first and
7 who went second.
8 Q.   Okay.  Did you ever meet with
9 the state's attorney that was prosecuting your
10 uncle's case before you testified?
11 A.   The one -- whoever I made the deal with,
12 whoever came to my attorney, asked me -- said we'll
13 give you 22 years, that's the first time I spoke
14 to them.
15 Q.   And before you took the stand
16 and testified, did you meet with that state's
17 attorney or any other state's attorney to go over
18 your testimony?
19 A.   I might have.
20 Q.   Okay.  Did you meet with your own
21 lawyer, the lawyer that was representing you
22 before you testified in your uncle's case to go
23 over your testimony?
24 A.   Don't recall.
25 Q.   And I think you told us earlier that

Page 180

1 you told your lawyer that you were innocent and
2 that your statement was false, right?
3 A.   Yes.
4 Q.   And did you discuss with your lawyer
5 that you were going to get up on the stand and
6 lie?
7 A.   No.
8 Q.   So how is it that it came about that you
9 got up on the stand and lied?
10 A.   I don't understand the question.
11 Q.   Sure.  You knew you were going to have
12 to testify against your uncle?
13 A.   Yeah, after I made -- when the attorney --
14 when my -- when the state's attorney approached my
15 lawyer.  It's a plea bargain deal and everything.
16 Q.   Right.  So you knew in exchange
17 for that plea bargain deal you were going to have
18 to get up on the stand and testify against your
19 uncle, right?
20 A.   Yes.
21 Q.   And you were going to have to testify
22 about going to Mr. Maysonet's house, getting the
23 gun, going back to the intersection, your uncle
24 getting out of the car, shooting the two guys.
25 You knew you had to testify about all that,

Maysonet v.
Guevara

---

Page 181

1  right?
2  A.  Yes.
3      MS. COHEN: Objection, form.
4      BY MS. ROSEN:
5  Q.  And did you discuss -- and you had
6  already told your lawyer that all of that was
7  a lie, right?
8  A.  Yes.
9  Q.  So did you discuss your testimony,
10 what you were going to say up on the stand, with
11 your lawyer?
12 A.  Don't recall.
13 Q.  If we go back to page 20, line 9,
14 "Do you know an individual by the nickname of
15 Fro?  Answer, yes, sir.  Question, do you know
16 what Fro's real name is?  Answer" -- and these
17 are your words -- "Chris Hernandez."  Do you see
18 that there?
19 A.  Yes.
20 Q.  And I think you told us earlier
21 you don't know who Chris Hernandez is, right?
22 A.  Yes.
23 Q.  How did you know to answer the
24 question do you know what Fro's real name is to
25 say the words Chris Hernandez?

---

Page 182

1  A.  No.
2  Q.  How did you know to say that?
3  A.  Because that's what was on the statement.
4  Q.  What was on the statement?
5  A.  His name.
6  Q.  Who told you that Fro's name was Chris
7  Hernandez?
8  A.  The police officer and the state's attorney.
9  Q.  Which state's attorney?
10 A.  Don't recall the name.
11 Q.  The one that took the handwritten
12 statement?
13 A.  It could be.
14 Q.  So they're the ones that gave you the
15 name?
16 A.  Yes.
17 Q.  So when you told the jury in
18 your uncle's case that you knew Fro's real name
19 was Chris Hernandez, that was a lie, right?
20 A.  Yes.
21 Q.  Then the next line, "As of May 1990
22 how long had you known Chris Hernandez?  Answer,
23 around a year."  Do you see that there?
24 A.  Yes.
25 Q.  And was that a lie too?

---

Page 183

1  A.  Yes.
2  Q.  Who told you to say it was -- that
3  you had known Mr. Hernandez for about a year?
4  A.  Don't recall.
5  Q.  Is that something that you just made up?
6  A.  No.
7  Q.  So somebody told you to say one year?
8  A.  Like I tell you, I can't recall.
9  Q.  So it's possible you just made it up?
10 A.  I can't recall.
11 Q.  Then line 19, "What gang are you
12 a member of?  Answer, Latin Kings."  Now, that's
13 the truth, right?
14 A.  Yes, I was a Latin King.
15 Q.  Yeah.  And then line 21, "As of May
16 1990 how long had you been a Latin King?  Answer,
17 around two years."  Was that the truth or was
18 that a lie?
19 A.  Around there.
20 Q.  So that's the truth?
21 A.  The years, it could be more or it could
22 be less.
23 Q.  Did anybody tell you to say around two
24 years or did you just make that up?
25 A.  Maybe I said two years.

---

Page 184

1  Q.  Okay.  And then the last question
2  on that same page, "Is Alfredo Gonzalez a member
3  of the Latin Kings?  Answer, yes, sir.  Is Jose
4  Maysonet a member of the Latin Kings?  Answer,
5  yes, sir.  Question, is Chris Hernandez, also
6  known as Fro, a member of the Latin Kings?
7  Answer, yes, sir."
8      So with respect to your uncle
9  and Mr. Maysonet, that's true, right?
10 A.  Yeah, we all were Latin Kings.
11 Q.  Yeah.  And then with respect to
12 Mr. Hernandez, Fro, is that the truth, a lie,
13 you don't recall?
14 A.  Don't recall.
15     MS. COHEN: Objection, form.
16     BY MS. ROSEN:
17 Q.  You did know somebody named Fro, though,
18 that was a Latin King, right?
19 A.  I knew a couple of Fros.
20 Q.  Yeah.  If we go to page 22 of
21 the testimony, you were asked some questions
22 about your work.  At the top of the page it says,
23 "Question, back in May of 1990 what were your
24 hours of work?  Answer, from 3 to 11.  Question,
25 is that morning or in the afternoon?  In the

---

Maysonet v.
Guevara

Page 185

1　afternoon.  Question, would you get off -- do you
2　would get off at work at 11 o'clock at night?
3　Answer, yes, sir."
4　　　So was that accurate, that
5　in May of 1990 your hours of work were 3 p.m. to
6　11 p.m.?
7　A.  Maybe, maybe not.  I can't recall.
8　Q.  Okay.  Did a detective or a state's
9　attorney tell you to lie about your work hours?
10　A.  No.
11　Q.  And then if you look at line 9,
12　"Question, I'm going to direct your attention
13　to the evening of May 24th going into the morning
14　of May 25th.  Did you get off of work at about
15　11 o'clock in the evening?  Answer, yes.
16　Question, what did you do?  Answer, I was going
17　to my lady's house.  Question, when you say you
18　were going to your lady's house, was that near
19　North and St. Louis in Chicago?"  And then
20　there's some objections.  And the question's
21　reasked, "Question, where was your lady's house
22　located at that time?  Answer, Hirsch and
23　Kedzie."  Do you see that there?
24　A.  Yes.
25　Q.  Was that truthful testimony, the

Page 186

1　testimony I just read?
2　A.  Around that time she used to live around
3　Kedzie and Spaulding, around there.
4　Q.  Is that near Kedzie and Hirsch?
5　A.  Yes.
6　Q.  So was that accurate and truthful?
7　A.  Yes.
8　Q.  Okay.  And did you in the late evening
9　hours into early morning hours of May 24th into
10　the 25th get off of work at 11 o'clock and head
11　to your lady's house?
12　A.  Maybe.  Can't recall what time.
13　Q.  And then if you go to the next page,
14　page 23 at the top, line 4, "What is your lady's
15　name?  Answer, Elizabeth Rivera.  Question, do
16　you have any children by Elizabeth Rivera?
17　Answer, yes, one.  Question, is that a boy or a
18　girl?  Answer, a girl.  What's her name?  Answer,
19　Priscilla.  Question, how old is she?  Answer,
20　11 months."  Do you see that?
21　A.  Yes.
22　Q.  Was that all truthful testimony there?
23　A.  To my knowledge, yes.
24　Q.  Okay.  Then if you go to line 17,
25　"As you were going towards -- going from work

Page 187

1　to Elizabeth Rivera's house, how did you first
2　get from your place of work?  Answer, got on the
3　El station.  And where did you take the El to?
4　Answer, to Belmont and Kimball."  Do you see
5　that?
6　A.  Yes.
7　Q.  Is that accurate?  Is that the way you
8　would go from work to Elizabeth's house?
9　　　MS. COHEN:  Objection, form.
10　A.  Maybe.  And I'd take the bus and
11　the El train, but I don't remember which ones.
12　　　BY MS. ROSEN:
13　Q.  Okay.  Did anybody tell you to lie and
14　say that, that that's how you would go from work
15　to Elizabeth's house?
16　A.  No, because that's what I'd take, the bus
17　and the train to go to work.
18　Q.  And then if we go to the bottom of
19　page 23, "Question, when you got to Belmont and
20　Kimball, what did you do?  Answer, got on the
21　Kimball bus.  And where did you go on the Kimball
22　bus?  Answer, towards North Avenue.  And did you
23　get off the bus?  I got off at LeMoyne and
24　Kimball.  And after you got off the bus, where
25　were you walking?  Answer, down LeMoyne going

Page 188

1　towards Spaulding.  Which direction were you
2　walking?  East."  Do you see all that?
3　A.  Yes.
4　Q.  Is that how you would typically
5　go from work to your girl friend's house?
6　A.  Don't recall.  Might be.
7　Q.  Might be.  But it's close enough, right?
8　A.  Right.
9　Q.  It's in the vicinity?
10　A.  Yeah.
11　Q.  And then further down it says,
12　"As you were walking down the street, did
13　you see anybody?  Answer, yes.  Question, who
14　did you see?  Answer, Alfredo Gonzalez and Fro."
15　And then the question is, "And Fro is also Chris
16　Hernandez?  Answer, yes."  Do you see that?
17　A.  Yes, I see that.
18　Q.  Okay.  And was that truthful testimony
19　or a lie?
20　A.  A lie.
21　Q.  A lie, okay.  And then further
22　down, line 21, "Question, when you saw them,
23　were they on foot or in a car?  Answer, in a car.
24　Question, what kind of car was it?  Answer,
25　Buick.  Question, do you remember what color it

Maysonet v.
Guevara

---

Page 189

1  was? Answer, blue." Do you see those questions
2  and answers?
3  A.  Yes.
4  Q.  Were those truthful answers or were
5  those lies?
6  A.  Don't recall.
7  Q.  So it's possible that you saw Alfredo
8  Gonzalez in a car that was a blue Buick, right?
9  A.  No.
10 Q.  That's not possible?
11 A.  (Shaking head).
12 Q.  No?
13 A.  No.
14 Q.  So then that's a lie?
15 A.  Yes.
16 Q.  So where did you come up with blue
17 Buick?
18 A.  Maybe the officer or something.  Don't
19 remember.
20 Q.  Why don't you take a look at your
21 statement.  Do you see anything about a blue
22 Buick in the statement?
23 A.  No.
24 Q.  So when exactly would the officers have
25 told about the blue Buick?

---

Page 190

1  A.  I don't recall.
2  Q.  Do you remember how much time
3  passed between the time you gave your statement
4  on August 24, 1990 and the time you testified
5  against your uncle in his criminal case?
6  A.  No.
7  Q.  I think the transcript said you'd been
8  in custody for about 15 months, right?  When we
9  read it earlier, it said --
10 A.  From the first statement?  That one when
11 I was in the police station?
12 Q.  Correct.
13 A.  And this one?  No, that's -- I was locked
14 up longer.
15 Q.  You think you were locked up longer?
16 A.  Yes, because I got locked up in -- if you
17 see, in --
18 Q.  It's about August of 1990, right?
19 A.  -- '90 and I was sentenced in '95.  That
20 means I was already there going on almost four and
21 a half years.
22 Q.  Right, but I'm asking about your
23 testimony.  I think your testimony was in 1992.
24 A.  No.
25 Q.  No?

---

Page 191

1  A.  I don't think so.
2  Q.  You think it was later?
3  A.  Yes.
4  Q.  Okay.  Well, we'll get to that.  In
5  any event, between the time of your statement
6  in the police station and the time you testified,
7  you told us earlier you didn't see that Latino
8  detective again, right?
9  A.  Don't recall.
10 Q.  All right.  I'm going to have you
11 look at page 40.  Will you look at line 16?
12 The question is, "Did you then go anywhere in
13 the car?  Answer, to Maysonet's house.  Question,
14 where was that?  Answer, on Potomac and Homan."
15 And I think you told us earlier you'd never been
16 to Maysonet's house, right?
17 A.  Yes.
18 Q.  And you didn't know where he lived?
19 A.  Yes.
20 Q.  How did you know to answer the question
21 Potomac and Homan?
22 A.  Don't recall.
23 Q.  The next question is, "Did Maysonet
24 live in a house or an apartment?  Answer, an
25 apartment."  How did you know to answer the

---

Page 192

1  question apartment?
2  A.  Just because around there that's all
3  there is is apartment buildings around there.
4  Q.  Okay.  So you just knew there weren't
5  houses --
6  A.  Yes.
7  Q.  -- in the neighborhood because
8  of your familiarity with the neighborhood?
9  A.  Yes.
10 Q.  So you knew that neighborhood well
11 enough to know that the residential buildings
12 at Potomac and Homan are all apartment buildings?
13 A.  Yes.
14 Q.  Then the next question is, "And
15 which floor did he live on?  Answer, second
16 floor."  Do you see that?  How did you know to
17 say second floor?
18 A.  Don't remember.
19 Q.  Go to page 41 beginning at line 16.
20 "And when you got to the front door of the
21 apartment, what happened?  Answer, we rang the
22 doorbell.  Question, did anyone answer the door?
23 Answer, Rose.  Question, by the way, do you know
24 Rose?  Answer, yes.  And who did you know her to
25 be?  Answer, Maysonet's lady."  Do you see those

---

Maysonet v.
Guevara

---

Page 193

1  questions and answers?
2 A.  Yes.
3 Q.  Was that truthful testimony or a lie?
4 A.  It was a lie.
5 Q.  And how did you know to answer the
6  question who rang -- who answered the door, Rose?
7 A.  Like I said, it's a lie. I don't remember.
8 Q.  How did you know how to answer the
9  question who Rose was?
10     MS. COHEN: Objection, form.
11 A.  Maybe the state's attorney or something.
12  I don't remember.
13     BY MS. ROSEN:
14 Q.  So maybe the state's attorney told you
15  that?
16 A.  Might be.
17 Q.  If you go to page 42, line 13,
18  "Question, and after the defendant Alfredo
19  Gonzalez said go get the gun, what happened then?
20  Answer, Juan and Alfredo went into the bedroom.
21  Question, where were you at this time? Answer,
22  in the living room. Question, and who was in the
23  living room with you? Answer, Fro. Question, by
24  the way, where was Rosa Bello? Answer, she was
25  in the kitchen. Then she walked into the

---

Page 194

1  bedroom." Is that testimony truthful or a lie?
2 A.  Lie.
3 Q.  How did you know how to answer the
4  question, by the way, where was Rosa Bello to say
5  she was in the kitchen?
6 A.  Like I said, it was a lie.
7 Q.  How did you know how to answer
8  the question, by the way, where was Rosa Bello?
9 A.  I didn't.
10 Q.  So you just made it up?
11 A.  Like I said, it was a lie.
12 Q.  I know, but you answered a question.
13  So how did you know how to answer the question?
14 A.  Don't recall.
15 Q.  If you go to page 43, line 16,
16  "Question, had you ever seen a 9 millimeter
17  automatic pistol before? Answer, yes. Question,
18  where had you seen it? Answer, streets." Was
19  that truthful testimony?
20 A.  Yes, I would see plenty of guns in the
21  streets.
22 Q.  Have you ever owned a gun?
23 A.  No.
24 Q.  Have you ever held a gun?
25 A.  To my knowledge, yes.

---

Page 195

1 Q.  Have you ever fired a gun?
2 A.  Don't recall.
3 Q.  Question, line 21 at the same page,
4  "Now, where was the defendant, Alfredo Gonzalez,
5  carrying that 9 millimeter automatic pistol when
6  he came out of the bedroom? Answer, inside his
7  pants. Question, I would like you to stand up,
8  Mr. Cruz, and show the Ladies and Gentlemen of
9  the Jury where the defendant had the gun.
10  Answer, here. Question, may the record reflect
11  that the witness is pointing to the front of
12  his pants. You may sit down."
13     Do you remember doing that
14  in the courtroom, standing up for the ladies and
15  gentlemen of the jury and showing them where you
16  saw Mr. Gonzalez holding the 9 millimeter
17  automatic pistol?
18 A.  Don't recall.
19 Q.  How did you know to stand up and
20  do that, to show the ladies and gentlemen of
21  the jury where Mr. Gonzalez was holding the gun?
22 A.  Like I said, I can't remember. I don't
23  recall.
24 Q.  Was that truthful testimony?
25 A.  No.

---

Page 196

1 Q.  Page 44, line 12, "By the way, what was
2  everybody wearing that night? Answer, sweatshirt
3  hoodies. Question, would that be sweatshirts
4  with hoods? Answer, yes, sir. Question, you
5  were wearing one, correct? Answer, yes.
6  Question, and was the Defendant Gonzalez wearing
7  one? Answer, yes." Do you see that there?
8 A.  Yes.
9 Q.  Is that truthful testimony or was that
10  also a lie?
11 A.  Lie.
12 Q.  Did you typically back in the late '80s
13  and early '90s wear hoodies?
14 A.  Don't recall.
15 Q.  Was that something that you and your
16  fellow Latin King members wore on a regular
17  basis?
18 A.  Don't recall.
19 Q.  What were the colors of the Latin Kings?
20 A.  Black and gold.
21 Q.  And you guys often wore clothing that
22  were black and gold, right?
23 A.  No.
24 Q.  No, you didn't?
25 A.  No.

---

Maysonet v.
Guevara

Page 197

1 Q. All right. I'm going to have you take
2 a look at page 57.
3 A. (Witness complies).
4 Q. If you start at line 8, "Now, Mr. Cruz,
5 I'm going to show you what's been marked People's
6 Exhibit No. 15 for identification. Take a look
7 at that photograph. Tell the Ladies and
8 Gentlemen of the Jury if you remember what that
9 photograph shows. Answer, yes. Question, what
10 does it show? Answer, the empty lot where we was
11 at. Question, and which view or which direction
12 does that photo show? Answer, going towards
13 North Avenue. Question, can you see the location
14 that you were standing at in that photograph?
15 Answer, yes. Question, do you see the garage
16 that you were standing next to in that
17 photograph? Answer, yes."
18    Do you remember being shown
19 photographs when you were testifying at your
20 uncle's criminal trial?
21 A. Don't recall.
22 Q. Was your testimony here where you
23 indicate that you see the place that you were
24 standing near the empty lot truthful testimony or
25 false?

Page 198

1 A. Don't understand the question.
2 Q. This testimony that I just read to
3 you --
4 A. Is false.
5 Q. How did you known how to identify where
6 you were standing in the photograph?
7 A. Like I said, it's false because I don't
8 remember no photograph.
9 Q. I'm sorry. I don't understand what you
10 said.
11 A. I don't understand the question. This is --
12 all this is false.
13 Q. You don't remember being shown a
14 photograph, right? That's what you just said?
15 A. To my knowledge, no.
16 Q. At the trial?
17 A. I don't remember.
18 Q. Are you saying that the transcript
19 is wrong, that you weren't shown a photograph or
20 you just don't remember?
21 A. I don't remember. That's what I'm saying.
22 Q. Okay. So the testimony in
23 this transcript says that you were shown a
24 photograph and you were answering questions about
25 the photograph. So my question to you is are the

Page 199

1 answers that you gave about where you were
2 standing when you were looking at that photograph
3 and when the attorney was asking you questions
4 about that, is that truthful testimony or false
5 testimony?
6    MS. COHEN: Objection, form.
7 A. I was never in the empty lot. It was false.
8    BY MS. ROSEN:
9 Q. Okay. So when you were identifying
10 on the picture where you were standing, that was
11 a lie?
12 A. Yes.
13 Q. Okay. How did you know where to
14 point out on the picture where you were standing
15 if it was a lie?
16 A. I didn't.
17 Q. Okay. But the transcript says you did.
18 So how did you know how to do that?
19 A. I just pointed. The picture --
20 they showed me a picture. Maybe I just pointed.
21 I don't remember. Like I said, this was all a lie.
22 Q. If you go to page 58, line 9, "I'm
23 going to show you what has previously been marked
24 People's Exhibit No. 13 for identification. Take
25 a look at that. Do you recognize what that photo

Page 200

1 is? Answer, yes, the empty lot."
2    So based on this transcript,
3 it looks like you were shown a second photograph.
4 Do you agree with me?
5 A. Don't recall. That's -- maybe. I don't
6 recall. That's what it says. I don't recall.
7 Q. Well, you're not quarreling that the
8 court reporter got it wrong, right?
9 A. I don't know.
10 Q. It may be the court reporter got it
11 wrong?
12 A. The only thing I -- I don't remember seeing
13 no pictures. I don't remember.
14 Q. Okay, and that's fine. It was a
15 long time ago. My question is are you saying
16 that you think the transcript is in error or you
17 just don't remember?
18 A. I don't remember.
19 Q. Okay. So now if you look at
20 the question and the answer, you're shown
21 a photograph and then you answer -- do you
22 recognize what that photo is? And you say yes,
23 the empty lot, right? That's what your testimony
24 is, yes, the empty lot?
25 A. That's what my testimony states, yes.

Page 201

1 Q. Right, okay. So did you identify the
2 empty lot in front of the jury?
3 A. Don't recall.
4 Q. If you had identified the empty lot
5 in front of the jury, was that truthful testimony
6 or false testimony?
7 A. False.
8 Q. How did you know that you were to
9 identify the empty lot in front of that jury?
10    MS. COHEN: Objection, form.
11 A. Like I said the first time, it's false.
12    BY MS. ROSEN:
13 Q. I understand that you're saying
14 that it's false. My question's a little bit
15 different. You were shown a photograph when you
16 were testifying at your uncle's's trial.
17 A. Like I said, I can't remember.
18 Q. I understand that. But the transcript
19 tells us that you were shown a photograph, right?
20 A. Yes.
21 Q. Okay. And then you were asked what's
22 in that photograph and your answer was the empty
23 lot, right?
24 A. Yes.
25 Q. How did you know to answer that question

Page 202

1 the empty lot?
2 A. Picture.
3 Q. The next question is, "And which view of
4 the empty lot does that show? Answer, front of
5 the empty lot, North Avenue. Question, is that
6 from the alley going north towards North Avenue?
7 Answer, yes. Question, and can you see the side
8 of the garage next to where you were standing?
9 Answer, no. Question, can you see the side of
10 the building that was near the garage? Answer,
11 yes." Was that testimony truthful or false?
12 A. False.
13 Q. How did you know how to answer
14 those questions when you were being asked those
15 questions at your uncle's trial?
16    MS. COHEN: Objection, form.
17 A. Lie.
18    BY MS. ROSEN:
19 Q. I know it's a lie. How did you know
20 what lie to tell?
21 A. I don't.
22 Q. So you were just making it up?
23 A. I don't recall.
24    MR. PRADOS: Can we take a ten-minute break?
25 Unless you have just a few questions.

Page 203

1    MS. ROSEN: No, no, sure. I have a little
2 bit to go.
3    (Whereupon a recess was taken from 2:50 p.m.,
4 to 3 p.m., after which the following proceedings were
5 had:)
6 Q. All right. Now, I want to direct
7 your attention to page 70 -- actually, we're at
8 page 60. I'm going to direct your attention to
9 the bottom of page 60, line 21. "Does this chart
10 truly and accurately depict the area behind the
11 vacant lot and the two alleys and North Avenue?
12 Answer, yes. Question, now, Mr. Cruz, I would
13 like you to show the Ladies and Gentlemen of the
14 Jury with your hands how the car first came to
15 enter the alley behind North Avenue. Answer,
16 towards St. Louis. Question, and point which
17 direction you were first traveling in. Answer,
18 this way, we turned this way. Question, now,
19 point for the Ladies and Gentlemen of the Jury
20 to the area the defendant, Maysonet, turned the
21 car around. Answer, turned this alley. At the
22 alley, went back this way towards the lot.
23 Question, could you demonstrate slowly with your
24 hand exactly how he maneuvered the car? Answer,
25 this alley turned, came back this way and parked.

Page 204

1 Question, now could you show the Ladies and
2 Gentlemen with your finger where it was that
3 Defendant Maysonet parked the car? Answer,
4 right here. Question, at the time that he parked
5 the car show the Ladies and Gentlemen of the
6 Jury with your hand where you were standing.
7 Answer, on the side of the building right here.
8 Question, with your finger show where the
9 Defendant Alfredo Gonzalez and Fro went. Answer,
10 came down, walking down the empty lot towards
11 North Avenue. Question, show the Ladies
12 and Gentlemen of the Jury where you saw the two
13 black men. Answer, right here. Question, and
14 where did the conversation between Fro and the
15 Defendant Alfredo Gonzalez and the two black men
16 take place approximately? Answer, right here.
17 Question, Mr. Cruz, show the Ladies and Gentlemen
18 of the Jury where the one -- approximately with
19 your finger, where the one black man was laying
20 after you heard the shots. Answer, around here."
21 Do you recall utilizing some
22 kind of chart or map to demonstrate to the jury
23 the things that you saw at the shooting?
24 A. I can't recall.
25    MS. COHEN: Objection, form.

Maysonet v.
Guevara

Page 205

1    BY MS. ROSEN:
2  Q.  I'm sorry.  What?
3  A.  I can't recall.
4  Q.  Okay.  But having heard me read this
5  testimony, it sounds like that's what happened,
6  right, that there was a chart?
7  A.  Yes, yes.
8  Q.  And the person that was asking --
9  the lawyer that was asking you the question was
10  asking you to point out when different things
11  occurred?
12  A.  Yes.
13  Q.  How did you know how to answer those
14  questions and where to point?
15  A.  Can't recall.
16  Q.  I'm going to ask you to turn to
17  page 73, line 21.  Let me know when you're there.
18  A.  What page?
19  Q.  73, line 21.
20  A.  Okay.
21  Q.  Okay.  "Question, Mr. Cruz, I want
22  to direct your attention back to when you were
23  riding in the car towards the alley behind North
24  Avenue.  Did anyone in the car do anything with
25  regard to their clothes?  Answer, put on their

Page 206

1  hoodies.  Question, now, when you say put on
2  their hoodies, do you mean pull their hoodies
3  off their heads?  Yes.  Did you pull your hoodie
4  up?  Answer, yes.  And did everyone in the car
5  pull the hoods up on their sweatshirts?  Answer,
6  yes.  Question, what was the purpose of pulling
7  the hoods on the sweatshirts up?  For -- wasn't
8  for anything.  Question, well, what purpose does
9  it -- why did you pull the hood, your sweatshirt
10  over your head?  Answer, to cover your face."
11  Do you see that, those questions and answers
12  there?
13  A.  Yes.
14  Q.  Is that truthful testimony or a lie?
15  A.  A lie.
16  Q.  How did you know how to answer
17  the questions about what you guys did with the
18  hoodies?
19  A.  Can't recall.
20  Q.  I'm going to direct your attention
21  to the bottom of page 74, line 22.  "What
22  significance does it have in your experience
23  as a Latin King when the hoodies are pulled up?
24  Answer, when I stick up -- when you go stick
25  somebody up selling drugs, cover your face.

Page 207

1  Nobody will see it.  Question" -- actually,
2  that's sustained.
3    Is that truthful testimony that
4  you gave there about the significance of pulling
5  the hoodie up as a Latin King?
6  A.  No.
7  Q.  Would you typically pull your
8  hoodie up to cover your face if you were engaged
9  in criminal activity so nobody would see you and
10  recognize your face?
11  A.  Yes.
12  Q.  I want to direct your attention
13  to page 80, line 18.  "Question, and you said
14  that you're a friend of Jose Maysonet, is that
15  true?  Answer, yes.  Question, now, you were
16  a very close friend of Jose, isn't that true?
17  Answer, no.  Question, well, isn't it a fact that
18  you had been over to Jose and Bello's apartment
19  on several occasions prior to May 24th of 1990?
20  No.  Question, well, how many times had you been
21  there, sir?  Answer, once, May 24th.  Question,
22  oh, I see.  That was the first time you had been
23  at their apartment?  Answer, the last time I went
24  to their house, that was when they were living on
25  Pierce.  Question, so what you're saying is then

Page 208

1  that the first time you went to their apartment
2  on -- the apartment you visited on May 24th, was
3  on that day?  Yes."  Did you testify truthfully
4  there?
5  A.  No.
6  Q.  How did you know that Mr. Maysonet
7  lived on Pierce before he lived at the apartment
8  that -- I don't remember the name of the street,
9  on Homan?
10    MS. COHEN: Objection, form, foundation.
11  A.  Can't recall.
12    BY MS. ROSEN:
13  Q.  Go to page 82, please, line 4.
14  "Question, how many times had you been to the
15  other places where Jose and Bello Rosa were
16  living?  When they were living on Potomac -- I
17  mean, on Pierce?  A lot of times.  Question, and
18  you knew and socialized with Jose and Bello on
19  many occasions prior to May 24th of 1990, didn't
20  you?  Question, and Rosa Bello?  No.  Question,
21  well, you just said that you were at their other
22  place on a number of occasions, isn't that true?
23  Answer, because we used to hang around there,
24  that's why.  Used to be outside together all the
25  time.  Question, was Rosa Bello outside with you

Maysonet v.
Guevara

Page 209

1  at that time?  Answer, once in a while she used
2  to be outside with us."  Were those answers
3  truthful or a lie?
4  A.  Can't recall.  It's a lie.
5  Q.  You think it's a lie?
6  A.  To my knowledge, yes.
7  Q.  So who told you to say that you
8  used to hang out in front of Maysonet's house
9  on Pierce and that sometimes Rosa Bello was with
10 you?
11 A.  Maybe at the police station.
12 Q.  The police maybe told you to say that?
13 A.  Um-hmm.  It would be in the police
14 station because so many questions they asked me
15 and everything.
16 Q.  So you think that the detectives
17 told you that someday when you testify that
18 you should say that you were hanging out with
19 Mr. Maysonet on Pierce?
20 A.  No, I didn't say that.  No, he asked me
21 where we used to hang out and I told him we used to
22 hang out on Pierce, the officers.
23 Q.  So that's true, right?  You used to hang
24 out with Maysonet on Pierce?
25 A.  No, the whole group hang out on Pierce.

Page 210

1  I didn't know where he lives at.  We all were on
2  Pierce.  That's where we hang out at, Pierce.
3  Q.  You and Maysonet on Pierce with others,
4  is that what you're saying?
5  A.  Yes, that's where we all hang out,
6  all the guys.  All the guys hang out on Pierce.
7  Q.  Okay.  But this says that you knew that
8  he lived on Pierce, that he lived at a different
9  location on Pierce.
10 A.  No.
11    MS. COHEN: Objection, form.
12    BY MS. ROSEN:
13 Q.  How did you know that?
14 A.  I don't.
15 Q.  Then why did you say it?
16 A.  I didn't say -- maybe I did.  Maybe --
17 I don't remember.
18 Q.  I'm going to ask you to look at
19 page 83, line 1.  "When you were hanging with
20 Jose and Rosa, Alfredo Gonzalez wasn't hanging
21 around with you, was he?  Answer, yes.  He was?
22 In what year -- by the way, when did Rosa Bello
23 and Jose live on that apartment on Pierce?
24 Answer, since last time I know them in 1988.
25 Since I started knowing them in '88, they be

Page 211

1  living there.  Question, when did they move to
2  the apartment you visited on May 24th of 1990?
3  Answer, I don't know."  Is that truthful
4  testimony or is that false testimony?
5  A.  I can't recall because I would just
6  be around there all the time.  I don't know if they
7  lived there or not.
8  Q.  But you testified that you knew they
9  lived there, right?
10 A.  Yes.
11 Q.  So is it possible that you knew
12 that they lived there back in 1990 and you don't
13 remember it today?
14 A.  No.
15 Q.  You know that's a lie?
16 A.  Yes.
17 Q.  All right.  I'm going to ask you
18 to take a look at page 90, line 6.  "And you
19 say that when Alfredo Gonzalez got back to the
20 car, he said I just shot two guys, isn't that
21 right?  Answer, yes."  Now, you've told us that's
22 a lie, right?
23 A.  Yes.
24 Q.  Okay.  Now, line 10, "Question, but
25 on August 24, 1990 when you were interviewed

Page 212

1  and talked to about this case by Officer Smitka
2  and Officer -- and Detective Schak, you never
3  told them that Alfredo Gonzalez said anything,
4  did you?  Answer, repeat that question again.
5  Question, yes.  On August 24th of 1990 at Area 5,
6  Violent Crimes, when you were interviewed by
7  Detective Smitka and Detective Schak and you told
8  them what happened that night, you never told
9  them that Alfredo Gonzalez got into the car and
10 said I had shot two people, did you?  Answer,
11 I don't remember.  Question" -- do you remember
12 whether or not you told the detectives that --
13 these two detectives, Smitka and Schak, that
14 Alfredo Gonzalez got back in the car and said
15 I shot two guys?
16 A.  No.
17 Q.  You don't remember if you said it?
18 A.  No, I never -- I don't know who those
19 detectives are.
20 Q.  Oh, you don't even know who those
21 detectives are?
22 A.  Yes.
23 Q.  Do you remember talking to those
24 detectives at Area 5 the night of your arrest?
25 A.  No.  The one I was talking to was the

Maysonet v.
Guevara

---

Page 213

1 Latino.
2 Q. Only?
3 A. Latino and his partner.
4 Q. You never talked to Detective Smitka
5 and Detective Schak, is that what you're saying?
6 A. Yes. The only one -- like I said,
7 the only one I spoke to were the Spanish -- the
8 Latino, the Latino and his partner.
9 Q. And you figured that out when you saw
10 him on TV in 2016, right?
11 A. No, that's who was -- who picked me up.
12 Q. That's who picked you up?
13 A. Yeah.
14 A. Yeah.
15 A. And that's who was speaking to me when
16 I was locked up in Grand and Central.
17 Q. And this testimony where you're
18 asked questions about Detective Smitka and
19 Detective Schak, are you saying you never talked
20 to those detectives or you don't remember talking
21 to those --
22 A. I never talked to them.
23 Q. You did not talk to them? You are
24 absolutely saying today you did not talk to them,
25 right?

---

Page 214

1 A. To my knowledge, I never -- the only
2 ones, like I said, I spoke with the Latino guy and
3 his partner.
4 Q. All right. Line 22, "Well, on
5 August 24, 1990 when Assistant State's Attorney
6 Perkaus was questioning you, you never told
7 Assistant State's Attorney Perkaus that Alfredo
8 Gonzalez said I just shot two people, did you?"
9 Then there's an objection and then the question's
10 reasked. "You never told Assistant State's
11 Attorney Perkaus that Alfredo Gonzalez had
12 said I just shot two people, did you? Answer,
13 no. Question, in fact, the first time you ever
14 told anyone about that statement that Alfredo
15 Gonzalez made was when you made your deal with
16 the state's attorneys after March 13th of 1992,
17 isn't it? Answer, no. Who did you tell before
18 that? Answer, my lawyer knew about it.
19 Question, oh, your lawyer. Did you tell any
20 police officers? Yes. What police officers
21 did you tell? Police officers from the police
22 station."
23      Did you tell your lawyer that
24 Alfredo Gonzalez came back into the car and said
25 I just shot two guys?

---

Page 215

1 A. No.
2 Q. So the testimony here where you said
3 who did you tell before that at line 18, Answer,
4 my lawyer knew about it, that's a lie?
5 A. To my lawyer, this was a false statement.
6 Q. You lied to your lawyer?
7 A. I told my lawyer I never shot nobody.
8 I never was in no crime.
9 Q. I'm asking you about the question and
10 answer that you were asked at your uncle's trial.
11 You were questioned about the statement that
12 you testified to at your uncle's trial that your
13 uncle got back into the car and said he just shot
14 two guys, right? That's how you testified at the
15 trial, correct?
16      MR. GREENBERG: I'm going to object
17 to the form of that question.
18      BY MS. ROSEN:
19 Q. Okay. Isn't that how you testified at
20 the trial? Go to page 90, line 6. "And you say
21 that when Alfredo Gonzalez got back in the car,
22 he said I just shot two guys, isn't that right?
23 Answer, yes." That was your testimony at your
24 uncle's trial --
25      MR. GREENBERG: Objection, form of the

---

Page 216

1 question.
2      BY MS. ROSEN:
3 Q. -- right?
4 A. Yes.
5 Q. Okay. Then you're asked who was the
6 first person you ever told that your uncle got
7 back into the car and said I just shot two guys.
8 And when you're being asked those questions, do
9 you say at line 18, "Question, who did you tell
10 before that? Answer, my lawyer knew about it"?
11      MS. COHEN: Objection, form, foundation.
12      BY MS. ROSEN:
13 Q. Do you see that?
14      MR. GREENBERG: Wait, wait. You're on a
15 different page, right, page 91 now?
16      MS. ROSEN: Correct. Did I misspeak? 91,
17 I'm sorry. Let me start that over again.
18 Q. Okay. We've established that on
19 page 90 you testified at your uncle's trial that
20 your uncle came back into the car and said I just
21 shot two guys, correct? Page 90, line 6 through
22 line 9.
23 A. Yeah, that's what it says there.
24 Q. Right. And that's how you testified,
25 right?

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Page 217

1  A.  Yes.
2  Q.  Okay.  Then when you're being
3  asked more questions about that topic, you're
4  asked at page 91, line 18, "Question, who did you
5  tell before that?  Answer, my lawyer knew about
6  it."  Do you see that there?
7  A.  Where are you at?
8  Q.  Page 91.
9  A.  Yes.
10  Q.  Line 18.
11  A.  Yeah, I see it.
12  Q.  Okay.  So my question to you is did
13  you tell your lawyer before March 13th of 1992
14  that your uncle got back into the car and said
15  I just shot two guys?
16  A.  No.
17  Q.  Okay.  So when you testified that
18  you had told your lawyer before March 13th of
19  1992 that your uncle came back into the car and
20  said I just shot two guys, that was a lie?
21  A.  Yes.
22  Q.  Why did you say that?
23  A.  I don't recall but I -- I don't recall.
24  Q.  All right.  We can put that aside for
25  the moment.  Did you know that your Uncle Alfredo

Page 218

1  Gonzalez was an enforcer for the Latin Kings
2  street gang?
3     MS. COHEN: Objection, foundation.
4  A.  No.
5     BY MS. ROSEN:
6  Q.  Do you know what an enforcer is?
7  A.  No.
8  Q.  Never heard that phrase before?
9  A.  No, we were just Latin Kings.  We're
10  all Latin Kings and just whoever's lieutenants
11  and whoever's in charge of that group and everything.
12  Q.  Like the Inca?
13  A.  Yeah.
14  Q.  But you never heard anybody called an
15  enforcer?
16  A.  No.
17  Q.  All right.  Did you know that
18  after you had reached your deal with the state's
19  attorney's office and testified against your
20  uncle and pled guilty and got sentenced, that
21  the state's attorney's office was going to make
22  a recommendation to the Illinois Department of
23  Corrections to put you in that SMU unit?
24     MS. COHEN: Objection, form.
25  A.  Don't recall.  See, I was being sentenced

Page 219

1  and I was going to go down to -- from Joliet, then
2  from Joliet they will send me wherever Joliet going
3  to send me to.
4     BY MS. ROSEN:
5  Q.  Right.  But you knew that you -- you
6  ended up being housed in a special unit, right?
7  A.  Yes.
8  Q.  Did you know that the state's attorney
9  was going to make a recommendation for you to get
10  housed in that unit because of your cooperation?
11  A.  Don't remember.
12     MS. ROSEN: All right.  Let's go ahead and
13  mark this.
14     (Whereupon Deposition Exhibit No. 10 was
15  marked for identification.)
16  Q.  I'm going to ask you to take a look at
17  what we've marked as Exhibit No. 10, and you'll
18  see that it's a letter written by Assistant Cook
19  County State's Attorney Frank Marek and it's
20  dated July 21, 1995.  And do you see that it
21  references your name, Justino Cruz there?  Do you
22  see that?
23  A.  Yes.
24  Q.  And you'll see that it's written
25  to somebody named Ms. Diane Jockisch with

Page 220

1  the Illinois Department of Corrections and
2  it states that Mr. Cruz testified as a witness
3  for the prosecution against his Uncle Alfredo
4  Gonzalez, an enforcer for the Latin Kings street
5  gang.  And then it goes on to say as a result
6  of Mr. Cruz's testimony, Alfredo Gonzalez was
7  convicted of the murders of Torrence and Kevin
8  Wiley and sentenced to natural life imprisonment.
9  Mr. Gonzalez is now serving his sentence in the
10  Illinois Department of Corrections.  Without
11  the testimony of Mr. Cruz, the conviction of
12  Mr. Gonzalez, the man who actually pulled the
13  trigger during this execution-style double murder
14  by Latin Kings, would have been impossible.
15  There were no eyewitnesses to the crime except
16  the other participants, and Mr. Gonzalez denied
17  any participation in this incident.  By his own
18  admission, Mr. Cruz acted as the lookout while
19  the victims were shot to death after they were
20  mistaken for rival gang members while waiting
21  for a bus in Latin King turf.  On July 19, 1995
22  Mr. Cruz entered his plea of guilty to one count
23  of first degree murder and was sentenced to
24  22 years in the Illinois Department of
25  Corrections, which was the sentence recommended

Page 221

1 by the state's attorney's office. Because of the
2 obvious threat to Mr. Cruz's physical statement
3 resulting from the testimony against a high-level
4 street gang enforcer, the state's attorney's
5 office is requesting that Mr. Cruz serve his
6 sentence in the Special Protection Unit of the
7 Illinois River Correctional Center, Canton,
8 Illinois. Do you see that there?
9 A. Yes.
10 Q. Did you realize that the state's
11 attorney's office had written a letter like
12 that to get --
13 A. No, I didn't know.
14 Q. You have to let me finish the question.
15 A. Okay.
16 Q. Did you realize that the state's
17 attorney's office had written a letter like that
18 to ensure your safety in the Special Protection
19 Unit as a result of your testimony?
20 A. No.
21 Q. While you were in the Special
22 Protection Unit at Illinois River did you ever
23 have any threats made on you as a result of your
24 testimony?
25    MS. COHEN: Objection, form.

Page 222

1 A. I can't recall.
2    MS. ROSEN: All right. Let's mark this
3 one Exhibit No. 11.
4    (Whereupon Deposition Exhibit No. 11 was
5    marked for identification.)
6 Q. Do you recall when you were -- when it
7 was time, just about time for you to be released
8 that you wrote a letter to the state's attorney's
9 office about your status?
10 A. Can't recall making no letters.
11 Q. You don't remember?
12 A. (Shaking head.)
13 Q. I'm going to ask you to take a look at
14 Exhibit No. 11. Do you recognize this document?
15 A. Yes.
16 Q. Did you prepare the document?
17 A. I think I did when I was -- me and one
18 of the inmates there.
19 Q. Helped you to write it?
20 A. Yeah.
21 Q. Yes. That's your signature at the
22 bottom there?
23 A. Yes.
24 Q. Do you remember, is that your inmate
25 number?

Page 223

1 A. It could be. I don't remember my inmate
2 number.
3 Q. And at the bottom it says cc Elizabeth
4 Rivera. That's your wife now, right?
5 A. Yes.
6 Q. It was your girl friend then?
7 A. Yes.
8 Q. And this letter is dated October 13,
9 2000, right?
10 A. Yes.
11 Q. And it's directed to the Cook County
12 State's Attorney's Office, Victims and Witness
13 Unit, right?
14 A. Yes.
15 Q. And in the letter you state, "My
16 name is Justino Cruz and I am currently an inmate
17 at the Illinois River Correctional Center Special
18 Management Unit. SMU is designed to house
19 inmates who have cooperated with federal, state
20 and/or prison authorities. I have attached a
21 copy of my statement of facts as verification of
22 my cooperation with your office." Do you see
23 that there?
24 A. Yes.
25 Q. So you were writing to the

Page 224

1 state's attorney's office and reminding them
2 that you had cooperated with them in connection
3 with your uncle's case, right?
4 A. Yes.
5 Q. Okay. Then you write, "The reason why I
6 write is because I am requesting your assistance
7 under the Witness Protection Act and/or the Gang
8 Crime Witness Protection Act. On April 25, 2001
9 I will be released from prison, and due to my
10 cooperation with your office, my life is in
11 danger. I ask if you can submit me for these
12 funds so I can relocate and get my life back on
13 track." Do you see that there?
14 A. Yes.
15 Q. And so you believed that once you
16 got released from prison your life was in danger,
17 right?
18 A. Yes.
19 Q. Because of the fact that you testified
20 against your uncle, correct?
21 A. Yes.
22 Q. And that's for the reasons we
23 talked about earlier. He's a Latin King and
24 you testified against a Latin King and you could
25 suffer severe consequences as a result of that

Maysonet v.
Guevara

Page 225

1  testimony, right?
2     MS. COHEN: Objection, form.
3  A.  Yes.
4     BY MS. ROSEN:
5  Q.  And it says please inform me of the
6  procedures that I must take, if any.  If you have
7  any questions, please feel free to contact me.
8  And I think you testified earlier that you were
9  not provided any funds upon your release from the
10  state's attorney's office, right?
11  A.  Nope.  They never answered the letter
12  or nothing.
13  Q.  And how did that make you feel,
14  that they didn't respond to you after you had
15  cooperated in the case against your uncle?
16     MS. COHEN: Objection, form.
17  A.  Never thought about it.  I just left it
18  alone.
19     BY MS. ROSEN:
20  Q.  Were you angry?
21  A.  No.
22  Q.  Did you feel like they were abandoning
23  you after you had cooperated and provided that
24  testimony that secured the conviction of your
25  uncle?

Page 226

1  A.  Can't recall.
2  Q.  Were you afraid for your life?
3  A.  At first, yes, but by the time I was
4  getting out I had -- I had gave my life to God and
5  I wasn't even thinking about that.
6  Q.  So between October 13, 2000 when
7  you wrote the letter and April 25, 2001, which
8  was your scheduled release date, you no longer
9  worried about it because you gave your life to
10  God?
11  A.  I just left it in God's hands.  If they
12  want to help me, they do and if they don't, you know
13  what, I'll live my life and I'll just stay away
14  from the neighborhood.
15  Q.  And you have stayed away from the
16  neighborhood, haven't you?
17  A.  Yes.
18     MS. ROSEN: All right.  Why don't we take
19  a short break.
20     (Whereupon a recess was taken from 3:33 p.m.,
21  to 3:45 p.m., after which the following proceedings
22  were had:)
23  Q.  Okay.  I'm going to ask you to take
24  a look at Exhibit No. 1, which is your affidavit.
25  Got it?

Page 227

1  A.  Yeah.
2  Q.  Okay.  So my understanding from your
3  earlier testimony is this was prepared by one of
4  your own lawyers, correct?
5  A.  Yes.
6  Q.  Yes.  And do you know why that affidavit
7  was prepared, to give to who?
8  A.  To the state's attorney maybe?  I don't
9  remember.
10  Q.  You don't remember, okay.  And this
11  was prepared -- you've signed it January 2, 2018,
12  right?
13  A.  Yes.
14  Q.  So this was less than two years ago,
15  right?
16  A.  Yes.
17  Q.  But as you sit here today, you don't
18  remember why you were preparing the affidavit?
19  A.  This was because I was getting harassed
20  by the state's attorney and for them -- if they want
21  to talk to me, they got to go through my lawyer.
22  Q.  I see.  And do you know, did
23  your lawyers give the affidavit to the state's
24  attorneys that came out to your work?
25  A.  To my knowledge, yes.

Page 228

1  Q.  Okay.  And then paragraph 17 it says,
2  "I subsequently gave the coerced false statement
3  to the state's attorney and signed my name to
4  it."  Do you see that?
5  A.  Yes.
6  Q.  What is that referring to?
7  A.  Testimony, the statement at the police
8  station or something.
9  Q.  I'm asking you.  It's your affidavit.
10  So when you say, "I subsequently gave the coerced
11  false statement to the state's attorney and
12  signed my name to it," what are you referring to?
13  A.  To the one in the police station, the one
14  with -- No. 2.
15  Q.  Exhibit No. 2, is that what you're
16  saying?
17  A.  Yes.
18  Q.  Okay.  And so based on your affidavit,
19  does that mean that you gave that handwritten
20  statement to the state's attorney?
21  A.  To the officer or the state's attorney.
22  I mean --
23  Q.  Well, I'm asking you.  Your
24  affidavit says, "I subsequently gave the
25  coerced false statement to the state's attorney

Maysonet v.
Guevara

Page 229

1    and signed my name to it." And you've told
2    me that the statement you are referring to is
3    Exhibit No. 2, the handwritten statement that was
4    prepared while you were at the police station in
5    1990.
6         So my question is, is that
7    a statement that was prepared by the state's
8    attorney?
9    A.   State's attorney or police officer.
10   I don't remember. I think, to my knowledge, I think
11   when it was done, they turned it over to the state's
12   attorney.
13   Q.   Okay. Then what are you referring
14   to in paragraph 17? What coerced false statement
15   did you make to the state's attorney that you
16   signed your name to?
17   A.   The only one signed is only this one here
18   signed.
19   Q.   Okay. So does that lead you to believe
20   that your reference in paragraph 17 to a coerced
21   false statement you made to the state's attorney
22   is Exhibit No. 2?
23       MS. COHEN: Objection to the form.
24   A.   I don't understand. What, are you saying
25   I was lying or something?

Page 230

1        BY MS. ROSEN:
2    Q.   No, I'm not saying you were lying
3    at all. I'm asking you what you're talking about
4    in paragraph 17. So in paragraph 17 of your
5    affidavit that you prepared with your lawyers --
6    A.   Yeah, this one right here. This is --
7    Q.   The affidavit, right?
8    A.   Yes.
9    Q.   You prepared it with your lawyer, right?
10   A.   Yes.
11   Q.   Okay. So in the affidavit you say, "I
12   subsequently gave the coerced false statement to
13   the state's attorney and signed my name to it."
14   And when I asked you what you were referencing,
15   you said Exhibit No. 2, right?
16   A.   But I don't know -- I don't understand --
17   I don't remember which statement I gave the state's
18   attorney because I signed so many papers when I was
19   locked up and everything. And the only thing I gave
20   the state's attorney was -- false statement was the
21   one I -- was this one, Exhibit 7.
22   Q.   The testimony?
23   A.   The testimony.
24   Q.   Okay. But this says signed your
25   name to it, and you didn't sign your name to your

Page 231

1    testimony, right? That was just in a courtroom
2    and a court reporter was there and the court
3    reporter took it all down. So this paragraph 17
4    is talking about something else it sounds like.
5    A.   The only thing I signed was this when
6    I gave -- it was -- to my knowledge it was through
7    the officer. Maybe he gave it to the state's
8    attorney maybe -- it was so long ago. I know this --
9    these are the only two statements I ever say.
10   Q.   Okay. So the only two things that
11   you have -- the only statements you've made are
12   the handwritten statement that's Exhibit No. 2
13   and your testimony, right?
14   A.   Yes.
15   Q.   So the paragraph 17 then where you
16   say you gave the coerced false statement to the
17   state's attorney and signed my name to it has to
18   be Exhibit No. 2 because that's the only thing
19   you signed, right?
20   A.   Yes.
21   Q.   Okay. So did you remember back in
22   January of 2018 that in fact that statement,
23   Exhibit No. 2, was a statement you gave to the
24   state's attorney, not the police officer?
25   A.   I gave it to -- the police officer gave

Page 232

1    it to me and I just signed it. The Latino officer
2    gave it to me and I just signed it.
3    Q.   Did you ever speak to a state's attorney
4    at the police station?
5    A.   Can't recall.
6    Q.   So what are you talking about in
7    paragraph 17?
8    A.   This right -- and you said -- this is
9    the only one I signed, was Exhibit 1. I gave it
10   to the police officer. Maybe they gave it to the
11   state's attorney because so many years ago, I can't
12   recall who was in -- exactly who was in that little
13   room.
14       MR. PRADOS: And for the record, my client
15   referenced Exhibit 1. In fact, he's gesturing
16   towards Exhibit 2.
17       THE WITNESS: Oh, 2. My fault.
18       MS. ROSEN: Thank you for the clarification.
19   Q.   Okay. But paragraph 17 is something you
20   wrote with your lawyers, right?
21   A.   Yes.
22   Q.   In the affidavit. And that was, you
23   know, less than two years ago, right?
24   A.   Yes.
25   Q.   So you were talking about something,

Page 233

1  right, when you were talking about paragraph 17,
2  "I subsequently gave the coerced false statement
3  to the state's attorney and signed my name to
4  it," right?
5  A.  Yes.
6  Q.  Okay.  So the state's attorney, that
7  has to be that exhibit, right, Exhibit No. 2?
8  A.  Yes.
9  Q.  Okay.  So did you or didn't you talk
10 to the state's attorney that night when you were
11 in custody in 1990?
12 A.  Talked to the Latino officer.
13 Q.  That's it, the Latino officer.
14 A.  There was another person in there.  I don't
15 remember --
16 Q.  The white detective that was with him?
17 A.  Inside the room, yes.
18 Q.  I'm going to direct your attention
19 to paragraph 34 of your affidavit.  Actually,
20 let's start with 33.  In early 2017 an ASA and
21 an investigator -- an investigate SAO came over.
22 Through them I learned that Jose Maysonet was
23 challenging his conviction and was granted a
24 retrial.  Do you see that there?
25 A.  Yes.

Page 234

1  Q.  Okay.  So you knew in 2017 that
2  Mr. Maysonet was challenging his conviction,
3  right?
4  A.  Yeah, that's when they came to my work.
5  Q.  Right.  And you knew they came to
6  your work because Mr. Maysonet was challenging
7  his conviction?
8  A.  That's the first time I heard about it.
9  Q.  Right.  But that's how you knew it?
10 A.  Yes.
11 Q.  And then in paragraph 34 you say,
12 "Soon after the state's attorney dropped the
13 charges against Jose Maysonet, Brendan Shiller
14 from Shiller Preyar Law Offices contacted me
15 through my attorney Richard Dvorak."  Do you see
16 that there?
17 A.  Yes.
18 Q.  Why did Mr. Shiller contact you through
19 your attorneys?
20    MR. PRADOS: Objection.  That gets into
21 conversations he's had with his attorney.
22    BY MS. ROSEN:
23 Q.  Did you ever speak to Mr. Shiller?
24 A.  Who's Mr. Shiller?
25 Q.  I don't know.  You wrote it in your

Page 235

1  affidavit, paragraph 34.  It says --
2  A.  Oh, that was the state's attorney who
3  came to --
4  Q.  No, no.  Wait, wait.  "Soon after the
5  state's attorney dropped the charges against Jose
6  Maysonet, Brendan Shiller from the Shiller Preyar
7  Law Offices contacted me through my attorney."
8  Do you see that there?
9  A.  Yes.
10 Q.  Did you ever speak to Mr. Shiller
11 from Shiller Preyar Law Offices?
12 A.  No.
13 Q.  And how did you become aware that
14 Mr. Shiller was trying to contact you?
15 A.  Maybe through my attorney.
16 Q.  This is a yes-or-no question.  Did you
17 have a conversation with your attorney about why
18 Mr. Shiller was contacting you?
19    MR. PRADOS: You can answer yes or no,
20 if you can.
21 A.  No.
22    BY MS. ROSEN:
23 Q.  Why did you put paragraph 34 in your
24 affidavit?
25    MR. GREENBERG: I'm going to object.

Page 236

1  I think this is getting into -- I don't know if his
2  attorney wants to object -- privileged things.
3     MS. ROSEN: He put it in an affidavit.
4  If it's privileged --
5     MR. GREENBERG: Yeah, but why?
6     MR. PRADOS: I mean, the paragraph is
7  there to explain why this affidavit was authored.
8     MR. GREENBERG: It gets into work product,
9  doesn't it?
10    MS. ROSEN: I didn't put it in the
11 affidavit, so I'm asking -- it's his affidavit.
12 He signed it.  I get to ask questions.  They get to
13 object if they think it's privileged.
14    MR. GREENBERG: But you're asking about
15 what's in the affidavit.
16    MS. ROSEN: This is in the affidavit.
17    MR. GREENBERG: Well, asking about why it's
18 in the affidavit is a different question.
19    MS. ROSEN: Well, okay.  If there's an
20 objection, they can make the objection.  I don't know
21 why you're putting this information into an affidavit
22 if it's privileged information.
23    MR. GREENBERG: I said it could be work
24 product also.
25    MS. ROSEN: This would still be privileged.

Maysonet v.
Guevara

Page 237

1  I know.  Well, at some point you waive privilege when
2  you only like reveal the part you want to reveal, so
3  I'm exploring it.  I have no idea why anybody would
4  put this in an affidavit.
5  Q.  Okay.  I just want to be clear on
6  paragraph 34.  In the affidavit you write, "Soon
7  after the state's attorney's office dropped the
8  charges against Jose Maysonet, Brendan Shiller
9  from Shiller Preyar Law Offices contacted me
10 through my attorney, Richard Dvorak."  Do you see
11 that there?
12 A.  Yes.
13 Q.  Do you know why Mr. Shiller wanted
14 to contact you?
15     MS. ROSEN: And if you have an objection
16 to that, go ahead.
17     MR. PRADOS: I do have an objection based
18 on attorney-client privilege, and I would instruct
19 my client not to answer.
20     MS. ROSEN: Okay.
21     MR. LEINENWEBER: Can I ask a clarifying
22 question?
23     MS. ROSEN: Yeah.
24     MR. LEINENWEBER: I'm just curious.  Who does
25 Mr. Shiller represent?  Does he represent --

Page 238

1     MR. GREENBERG: Gonzalez.
2     MS. COHEN: Gonzalez.
3     MR. ENGQUIST: He did represent Gonzalez.
4     MR. LEINENWEBER: So you're claiming
5  there's a privilege over the communication between
6  Shiller and your client?
7     MR. PRADOS: Over discussions that
8  we had about what goes into this affidavit, yes.
9     MR. GREENBERG: I think the discussion
10 was between Shiller and the lawyers.  That's what
11 I'm getting at.
12     MR. LEINENWEBER: And I think that's
13 what the question is aimed at is what did Mr. Shiller
14 want to know, which would in no way, shape or form
15 encroach, I don't think.  I might be -- Eileen,
16 I might be stepping on your toes.
17     MS. ROSEN: No, no, no, it's fine.  I don't
18 really understand -- I don't understand at all why --
19     MS. COHEN: You're asking Justino what his
20 attorney told him about why --
21     MS. ROSEN: I'm not asking him -- his
22 attorney -- I'm asking him --
23     MR. GREENBERG: You're asking him why Shiller
24 wanted to do something.
25     MS. ROSEN: And if the only way he knows

Page 239

1  it is through conversations with his lawyer, then
2  that's the objection.
3     MR. GREENBERG: Right.
4     MS. COHEN: Right, right, right.
5     MS. ROSEN: But no one's said that yet.
6     MR. GREENBERG: But you haven't asked do you
7  know why.
8     MS. COHEN: Okay.  I can't even get there.
9     MR. GREENBERG: That's the first.  Start
10 there.  Thank you.
11 BY MS. ROSEN:
12 Q.  Do you know why Mr. Shiller was
13 contacting your lawyers?
14 A.  No.
15     MR. GREENBERG: That solves that.
16 BY MS. ROSEN:
17 Q.  And just to be clear, you've never had
18 a conversation with Mr. Shiller?
19 A.  No.
20 Q.  Do you know who Loevy & Loevy are,
21 lawyers from the law office of Loevy & Loevy?
22 Have you ever heard that name?
23 A.  No.
24 Q.  Do you know somebody by the name of
25 Steve Art?

Page 240

1  A.  No.
2  Q.  I take it nobody from Loevy & Loevy
3  have reached out to talk to you about this case?
4  A.  No.
5  Q.  Steve Art, has he reached out to talk to
6  you about this case?
7  A.  No.
8  Q.  How much are you paying your lawyers to
9  represent you?
10 A.  Nothing.
11 Q.  So they're just doing this for free,
12 representing you for free?
13     MR. PRADOS: I'm just going to object
14 on the basis of attorney-client privilege, and I'll
15 instruct my -- no, you can answer the question.
16 BY MS. ROSEN:
17 Q.  Are they just representing you for free?
18 A.  No.
19     MR. PRADOS: If you know.
20 A.  To my -- no.  When we sat down -- when I sat
21 down with the lawyer --
22     MR. PRADOS: I'm going to just -- I think
23 we're just going into a dangerous avenue and I would
24 just instruct you not to answer any further.
25     THE WITNESS: Okay.

Page 241

1     MS. ROSEN: Based on?
2     MR. PRADOS: Attorney-client privilege.
3     BY MS. ROSEN:
4  Q.  Do you have some kind of fee arrangement
5  with your lawyers?  That's a yes or a no.
6  A.  No.
7  Q.  Do you have any kind of deal with
8  your lawyers that if you get your conviction
9  overturned and they file a lawsuit for you or
10  a lawsuit gets filed on your behalf, that they
11  get a piece of the lawsuit?  They get paid out of
12  the proceeds of the lawsuit?
13     MS. COHEN: Objection to form.
14     MR. PRADOS: You can answer yes or no,
15  if you know.
16  A.  No, I don't know.
17     BY MS. ROSEN:
18  Q.  Did you sign any documents with your
19  lawyers related to their representation of you?
20     MR. PRADOS: You can answer yes or no,
21  if you know.
22  A.  Yes.
23     BY MS. ROSEN:
24  Q.  Was it some kind of a retainer
25  agreement?

Page 242

1     MR. PRADOS: Same instruction.
2  A.  Yes.
3     BY MS. ROSEN:
4  Q.  Do you have a copy of it?  I don't
5  mean with you today, but do you have a copy of
6  it?
7  A.  Yes.
8     MS. ROSEN: I don't have any more questions
9  at this time.
10     MR. ENGQUIST: All right.  I'm just going
11  to bounce around a little bit.
12     CROSS-EXAMINATION
13     BY MR. ENGQUIST:
14  Q.  Sir, when you were talking about --
15  you were selling drugs and at one point you were
16  talking about that you were -- the next couple
17  years you were heavy into the neighborhood.  Do
18  you remember those --
19  A.  Yes.
20  Q.  Okay.  When you were, as you put it,
21  heavy in the neighborhood when you were selling
22  drugs for the Latin Kings, how much money were
23  you making a week?
24  A.  Around 4 or $500.
25  Q.  And that was just your money, correct?

Page 243

1  A.  Yes.
2  Q.  As you said, you weren't kicking money
3  up to anybody else?
4  A.  No.
5  Q.  And that's when you were really invested
6  in the drug sales, correct?
7  A.  Yes.
8  Q.  And just to be clear, you didn't
9  have to give money up to any other Latin King
10  for kind of any protection or the right to sell
11  at a certain corner?
12  A.  No.
13  Q.  Okay.  And I think this is right.
14  Just to be clear, you didn't sell drugs with or
15  for Jose Maysonet, is that correct?
16  A.  Did I sell drugs for Jose?
17  Q.  Yeah.
18  A.  No.
19  Q.  And you never sold drugs with him,
20  correct?
21  A.  No.
22  Q.  Do you know if he sold drugs?
23  A.  I don't know.  I don't know.
24  Q.  Do you know Jose's sister, Rose?
25  A.  No.

Page 244

1  Q.  Have you ever heard about Jose or
2  Jose's sister supplying underage girls for sex?
3  A.  No.
4     MS. COHEN: Objection, foundation.
5     MR. ENGQUIST: It's from your questions,
6  actually.
7  Q.  Did you ever know them to procure
8  underage girls for sex?
9  A.  This is the first time I even heard about
10  that.
11     MS. COHEN: Just Rose?
12     MR. ENGQUIST: Rose or Jose, either one.
13  Q.  I just want to make sure it's clear
14  about Exhibit No. 2 again.  It's the handwritten
15  statement.
16  A.  Yes.
17  Q.  Just to be clear, the first time you
18  saw Exhibit No. 2 it was already filled out, is
19  that correct?
20  A.  Yes.
21  Q.  And just to be clear, you never told
22  anybody that you -- when you were at the police
23  station after your arrest, okay, that night you
24  never told anybody that you were involved in the
25  shooting of the Wiley brothers, correct?

Maysonet v.
Guevara

Page 245

1 A. Yes.
2 Q. And you never told anybody you knew
3 anything about it, is that correct?
4 A. Yes.
5 Q. Okay. So you never gave an oral
6 statement taking any responsibility that night,
7 is that right?
8 A. Yes, I didn't say nothing.
9 Q. So the first time there's a recorded
10 statement by you that you did anything -- where
11 you say you actually gave a statement was in
12 court, is that right?
13 A. Yes.
14 Q. Now, when you -- I'm talking about
15 after you made -- after you agreed to testify
16 for the prosecution, do you remember after that
17 point? At some point you agreed to testify for
18 the State?
19 A. Yes.
20 Q. Okay. After that point did you ever
21 meet with the state's attorney -- anybody from
22 the state's attorney's office with your attorney,
23 Mr. Vahey?
24 A. Before the testimony or --
25 Q. Before your testimony, yeah.

Page 246

1 A. Yes, with the state's attorney.
2 Q. Okay. Was Mr. Vahey with you?
3 A. Can't recall.
4 Q. Do you think you met with the state's
5 attorney's office without Mr. Vahey?
6 A. Could be, yes.
7 Q. Is it possible that you met him with
8 Mr. Vahey?
9 A. Can't recall.
10 Q. Did you meet with Mr. Vahey after
11 you gave your testimony against your uncle?
12 A. Yes.
13 Q. Okay. And was that before you pled
14 guilty for your sentencing?
15    MS. COHEN: Objection to the form.
16 A. I don't understand the question.
17    BY MR. ENGQUIST:
18 Q. Was Mr. Vahey your attorney all the
19 way up to the point where you pled guilty and
20 were sentenced?
21 A. Yes.
22 Q. And so you did talk to him about
23 your testimony after you gave it, your testimony
24 against your uncle, correct?
25 A. Don't recall.

Page 247

1 Q. Did Mr. Vahey ever raise any
2 concerns about the fact that you were going to
3 give perjured testimony on the stand?
4 A. Can't recall.
5 Q. Do you know what I mean by perjured
6 testimony?
7 A. Lying on the stand.
8 Q. Yes, that's what I mean. Did he
9 ever give you any -- express any concerns about
10 the fact that you were going to lie on the stand?
11 A. Can't recall.
12 Q. Okay. But just to be clear, you're
13 saying that Mr. Vahey knew you were going to lie
14 on the stand, correct?
15 A. No.
16 Q. Did you ever tell Mr. Vahey that you
17 did it, that you were involved in the murders?
18 A. No.
19 Q. You specifically, if I have this right,
20 you told Mr. Vahey that you didn't know anything
21 about the murders, correct?
22 A. Yes.
23 Q. And you told Mr. Vahey that you weren't
24 involved in the murders, correct?
25 A. Yes.

Page 248

1 Q. And so if Mr. Vahey knew that you
2 were going to give testimony opposite of that,
3 is it fair to say that Mr. Vahey was aware that
4 you were going to lie on the stand?
5 A. If I -- yes.
6 Q. When you pled guilty and got your -- and
7 were sentenced, up until that point had you ever
8 told Mr. Vahey you were involved in the murders
9 at all?
10 A. No.
11 Q. You always maintained to Mr. Vahey that
12 you knew nothing about this?
13 A. Yes.
14 Q. About the murders of the Wiley brothers,
15 correct?
16 A. Yes.
17 Q. When you were in Cook County Jail
18 for this case, were you in contact with any other
19 members of the Latin Kings?
20 A. No.
21 Q. When you were in Cook County Jail,
22 were you ever visited by your brother Efrain?
23 A. No.
24 Q. When you were in IDOC, were you ever
25 visited by your brother Efrain?

Maysonet v.
Guevara

Page 249

1  A.  No.
2  Q.  Were you ever visited by any members
3  of your family?
4  A.  My dad.
5  Q.  No one else?
6  A.  My dad, his wife, my girl friend, and she
7  used to bring my daughter.
8  Q.  Anybody else?
9  A.  Family member, like my dad's brother and
10  sisters.
11  Q.  Anybody else you can think of?
12  A.  No.
13  Q.  Did you receive any communications
14  from -- either letters or any other kind of
15  communications, phone calls or whatever, from
16  anybody from the Latin Kings, who were members
17  of the Latin Kings?
18  A.  No.
19  Q.  You said before that you're still
20  seeing your doctor having to do with some hearing
21  issues, is that correct?
22  A.  Yes.
23  Q.  Okay.  Have you ever been diagnosed
24  with any kind of hearing loss in your left ear?
25  A.  Just certain percentage loss on the left

Page 250

1  ear.
2  Q.  In your left ear?
3  A.  Yes.
4  Q.  Do you know what that is?  Do you
5  know what the percentage loss of hearing is in
6  your left ear?
7  A.  No.
8  Q.  Has it hindered you from anything in
9  your life, your work at all?
10  A.  Yeah, I have to -- where I work I have
11  to wear earplugs because the loud noise bothers
12  my ear.
13  Q.  Oh, okay.  Where you work there's a lot
14  of heavy machinery that makes a lot of noise?
15  A.  Yes.
16  Q.  And do other people where you work wear
17  ear protection?
18  A.  The ones who work at the production side,
19  but like I work in the shipping department.  I have
20  to wear them because the noise bothers me.  It gives
21  me headaches.
22  Q.  And when were you first diagnosed
23  with any kind of hearing loss in your left ear?
24  A.  Before -- when I was locked up.  When I was
25  locked up.

Page 251

1  Q.  In Cook County Jail or in the IDOC?
2  A.  Cook County.
3  Q.  In Cook County Jail?
4  A.  Yes.
5  Q.  And is that just in your left ear or do
6  you know if it's in both ears?
7  A.  No, the left.
8  Q.  Just in the left.  You talked about the
9  Latino officer and the white officer who arrested
10  you on the street.
11  A.  Yes.
12  Q.  Okay.  The white officer that was with
13  the Latino officer, can you describe him at all
14  other than a white male?
15  A.  No, they both -- he was a male.  I can't
16  recall.  He was a male officer, white.
17  Q.  So you can recall he was a male officer
18  and white, correct?
19  A.  Yes.
20  Q.  Do you remember height?
21  A.  Around 5'8", 5'9".
22  Q.  Okay.  Do you remember what color hair
23  at all?
24  A.  No.
25  Q.  Do you remember if he had glasses or

Page 252

1  anything like that?
2  A.  Like I said, it was like 20 years ago.  I
3  can't -- I can't recall what he wear and everything.
4  Q.  Facial hair?
5  A.  I know he had a beard or something.
6  Q.  He had a beard?
7  A.  Yeah.
8  Q.  Okay.  Like a full -- like you have like
9  more of a goatee and I have more of a full beard.
10  What kind of a beard did he have?
11  A.  Like a beard (indicating).
12  Q.  Like a what?
13  A.  Just a beard.
14  Q.  Just a mustache?
15  A.  Yeah, mustache.
16  Q.  Just a mustache?
17  A.  Yeah, just a mustache.
18  Q.  Okay.  And after that night at the
19  police station -- and just to be clear, those
20  were the only two police officers that you dealt
21  with at the police station, correct?
22  A.  Yes.
23  Q.  And after that night you never saw them
24  again, am I right?
25  A.  Just at the police station.

Page 253

1 Q. So after that night you never saw them
2 again?
3 A. Yes.
4 Q. Okay. And just to be clear, you never
5 saw them before then either, correct, before your
6 arrest?
7 A. No.
8 Q. Is that correct?
9 A. Yes.
10 MR. ENGQUIST: Go ahead.
11 MR. LEINENWEBER: Thanks.
12 CROSS-EXAMINATION
13 BY MR. LEINENWEBER:
14 Q. I just want to make sure. Are you
15 able to hear me okay from the opposite end of the
16 table?
17 A. Yeah, yeah.
18 Q. If you can't hear me, just let me know.
19 Sticking with the injured ear for a second, I
20 think you said the job you were working at at the
21 time of your arrest was a printing facility, is
22 that right?
23 A. Yes.
24 Q. Was that a sort of loud workplace with
25 lots of machinery and factory --

Page 254

1 A. We only had around six machines because
2 it was a small printing shop.
3 Q. Sure. What did they print?
4 A. Checks.
5 Q. Checks. Like checks that you would
6 write someone for money?
7 A. Yes.
8 Q. But so was the workplace, was it kind
9 of loud from the printing floor, if you will?
10 A. Not that loud.
11 Q. Not that loud. Did you wear hearing
12 protection?
13 A. No.
14 Q. Turning back to -- well, let
15 me -- earlier you testified that the first time
16 you heard that Mr. Maysonet was challenging his
17 conviction was when the state's attorneys came to
18 you, right?
19 A. Yes.
20 Q. And that that I think you said was in
21 early 2017?
22 A. Yeah, that's when they came to my job.
23 Q. Okay. In fact, if we look at your
24 affidavit -- which I think is Exhibit 2, is that
25 right?

Page 255

1 MR. ENGQUIST: I think it's Exhibit 1.
2 BY MR. LEINENWEBER:
3 Q. Exhibit 1. So take a look at
4 Exhibit 1, paragraph 33. It says, "In early of
5 2017 an ASA and an investigator -- investigate
6 SAO came over. Through them I learned that Jose
7 Maysonet was challenging his conviction and was
8 granted a retrial." Do you see that?
9 A. Yes.
10 Q. Is that a true statement?
11 A. Yes.
12 Q. Okay. Had you met with Ms. Bonjean
13 before that date?
14 A. Who?
15 Q. Ms. Bonjean, the attorney that was
16 questioning you this morning.
17 A. No, no.
18 Q. Did you ever meet with Ms. Bonjean?
19 A. Yes.
20 Q. When did you meet with Ms. Bonjean?
21 A. I think after the state's attorney came.
22 Q. After the state's attorney came?
23 A. Yeah.
24 Q. So it was after the state's attorney
25 came, then Ms. Bonjean found you?

Page 256

1 A. Yes.
2 Q. Okay. Did Ms. Bonjean tell you that
3 Mr. Maysonet was suing for his -- to have his
4 conviction overturned?
5 MS. COHEN: Objection to the form.
6 A. I think, to my knowledge, he was getting
7 a retrial.
8 BY MR. LEINENWEBER:
9 Q. That he was getting a retrial?
10 A. Yeah.
11 Q. So if the date that you met
12 with Ms. Bonjean was January 5, 2017, okay --
13 just listen to the question first, okay, before
14 looking. If the date that you met with
15 Ms. Bonjean was January 5, 2017, okay, then
16 according to your affidavit and according to your
17 statement, you would have had to have met with
18 the ASAs on either January 1st, January 2nd,
19 January 3rd, January 4th of 2017, right?
20 MS. COHEN: Objection to the form.
21 A. I don't remember the day. I know it was
22 early 2017.
23 BY MR. LEINENWEBER:
24 Q. It was early 2017, but it was
25 also -- you know that it was before you met with

Maysonet v.
Guevara

Page 257

1  Ms. Bonjean?
2  A.  To my knowledge, yes.
3  Q.  Okay.  So if I told you that you met
4  with Ms. Bonjean on January 5, 2017, okay, that
5  means it had to be during the first four days of
6  the year that you met with the ASA, right?
7  A.  I can't recall --
8  Q.  Okay.
9  A.  -- when I met with her and everything.
10  Q.  But if I'm telling you it was
11  January 5th -- I'll represent to you that it was
12  January 5, 2017.  So according to that then, you
13  would have had to have met with the ASA before
14  then, right?
15  A.  Yes.
16  Q.  Okay.  The area that you -- let's
17  talk about May 1990, okay?  So I want to go back
18  to the period of your life May 1990, okay?  You
19  said that you were living -- I think first you
20  said near North and Kedzie, right?
21  A.  Yeah.
22  Q.  Okay.  And I think on the medical
23  form -- which I don't know what exhibit number
24  it is.  But if someone could help me, that would
25  be awesome.

Page 258

1     MR. ENGQUIST: Exhibit 8.
2     BY MR. LEINENWEBER:
3  Q.  Exhibit 8 you list an address there,
4  right, on Pierce?
5  A.  Yes.
6  Q.  Is that the address that was near North
7  and Kedzie that you lived at?
8  A.  Yes.
9  Q.  So in May 1990 you were living at
10  3337 West Pierce in Chicago, Illinois?
11  A.  Yes.
12  Q.  Okay.  And you said that as a
13  member of the Latin Kings, you would -- well,
14  okay.  So what days of the week did you work at
15  the printing shop?
16  A.  Monday through Friday.
17  Q.  Okay.  So Monday through Friday you
18  were doing the night shift at the printing shop,
19  right?
20  A.  Yes.
21  Q.  Okay.  Weekends come around and you
22  are selling drugs with Latin King members, right?
23  A.  Yes.
24  Q.  Where were you selling these drugs?
25  A.  In the neighborhood.

Page 259

1  Q.  In the neighborhood around where you
2  lived?
3  A.  Yes.
4  Q.  Okay.  And you said that you spent
5  kind of a lot of time on the streets, right?  You
6  worked the streets I think you said essentially?
7  A.  Yeah.
8  Q.  Okay.  And you knew the other Latin
9  Kings that were out on the streets, right?
10  A.  Yeah.
11  Q.  And, in fact, you said I think --
12  correct me if I'm wrong -- that you knew Jose
13  Maysonet, at least knew who he was, by being out
14  on the streets, right?
15  A.  Yes.
16  Q.  And you said -- at one point today
17  you testified, yeah, that's where we hung out, on
18  Pierce, right?
19  A.  Yes.
20  Q.  So earlier Ms. Bonjean asked you
21  when the first time you heard anything about
22  the Wiley brothers was.  Do you remember that
23  question?
24  A.  Yes.
25  Q.  And you testified that the first

Page 260

1  time you heard anything about the fact that the
2  Wiley brothers were murdered was when you were in
3  custody with the Chicago police, right?
4  A.  Yes.
5  Q.  So do you know where the Wiley brothers
6  were murdered?
7  A.  I found out in the police station.
8  Q.  And where were they murdered?
9  A.  From the police station, they told me
10  they were murdered on St. Louis and North Avenue.
11  Q.  Okay.  How far away is St. Louis
12  and North Avenue from your apartment on Pierce
13  Street?
14  A.  St. Louis and North Avenue?
15  Q.  Yeah.
16  A.  I think around 2 miles.  I think so.
17  Q.  Two miles, is that what you said?
18  A.  I think so, yeah.
19  Q.  Would it surprise you to hear that it's
20  2/10s of a mile?
21  A.  Could be.
22  Q.  Okay.  So your address was 3357 West
23  Pierce?
24  A.  37.
25  Q.  3337 West Pierce.  So if I told

Maysonet v.
Guevara

Page 261

1  you that the Wiley brothers were murdered at
2  3428 West North Avenue, does that refresh your
3  recollection of this neighborhood as to how far
4  away it was that they were murdered from your
5  apartment?
6  A.  No.
7  Q.  It doesn't, okay.  Well, I'll
8  represent to you that I pulled it up on Google
9  Maps and it's .2 miles away.  So what I'd like to
10  know is how is it possible that the streets that
11  you worked on selling marijuana, that two people
12  were murdered .2 miles from your house and you
13  didn't know about it?
14  A.  Because you don't hear that on the news
15  or nothing.
16  Q.  You don't hear on the news?  What about
17  in the neighborhood?  You guys weren't talking,
18  hey, did you hear about the two guys that got
19  shot up over there?  Yeah, they got killed?
20  A.  No.
21  Q.  You didn't hear anything?
22  A.  No.
23  Q.  So your testimony is even though
24  these two guys were shot less than a five-minute
25  walk from your house and on the streets where you

Page 262

1  were selling drugs, you had no idea that they
2  were murdered?
3  A.  Yes.
4  Q.  How did you know that the Wiley brothers
5  were black?
6  A.  From the police station.
7  Q.  The police station told you?
8  A.  Yes.
9  Q.  So the only way that you knew they
10  were black was based on the police -- the
11  conversation you had --
12  A.  That I had with the Latino officer and
13  everything.
14  Q.  With the Latino officer in the police
15  station?
16  A.  Yes.
17  Q.  When was the first time you heard the
18  name Rosa Bello?
19  A.  Right now because I didn't --
20  Q.  No, no, no, that cannot be.  Let's
21  start over.  Let's start over for a second.  When
22  is the first time that you heard the name Rosa
23  Bello?
24  A.  Maybe the police station in the -- locked
25  up in the police station.

Page 263

1  Q.  So the detectives you think --
2  A.  Yes.
3  Q.  -- told you about Rosa Bello?  Okay.
4  Is that yes?
5  A.  Yes.
6  Q.  So between the time -- let's go to your
7  handwritten statement for a second, Exhibit 2,
8  okay?  Is that in front of you?
9  A.  Yes.
10  Q.  Did you see that statement at any
11  time between your -- the time you signed it and
12  then the time you testified?  Did you have a copy
13  of it?
14  A.  No.
15  Q.  Did you get to review it?
16  A.  First time I saw this when they took me
17  out of the police station lockup into their office.
18  Q.  Okay.
19  A.  First time.  That's the first time I saw
20  this.
21  Q.  And that was the time you signed it?
22  A.  Yes.
23  Q.  And I'm a little bit unclear.  Were you
24  able to read it at that time?
25  A.  I can't recall.

Page 264

1  Q.  Okay.  But you can read it now we
2  established, right?
3  A.  Yes.
4  Q.  Can you look in there and tell
5  me if Rosa Bello's name is in there anywhere?
6  A.  No.
7  Q.  No, it's not in there?  Is that your
8  testimony?
9  A.  Yes.
10  Q.  So let's go to -- I think it was
11  Exhibit 7 is the transcript testimony, and I'd
12  like you to go to page 41.  And just let me know
13  when you're there, okay?
14  A.  Yes.
15  Q.  Okay.  Page 41, line 19 -- let me
16  just back up for a second.  Page 41, line 12,
17  "Where did you go after you got out of the car?
18  To Juan's house.  Did you -- Question, did you go
19  to the front door of his apartment?  Answer, yes.
20  Question, and when you got to the front door of
21  the apartment, what happened?  Answer, we rang
22  the doorbell.  Question, did anyone answer the
23  door?  Answer, Rose.  Question, by the way, did
24  you know Rose?  Answer, yes.  Question, and who
25  did you know her to be?  Answer, Maysonet's

Maysonet v.
Guevara

Page 265

1  lady."
2     So my question for you is how
3  is it that you remembered her name between the
4  time it was told to you in the police station and
5  the time that you testified to it?
6  A.  In the police station, the officer.
7  Q.  So you heard it from the officer?
8  A.  Yes.
9  Q.  Okay.  And then you remembered it for
10 two years that Rose was her name?
11 A.  I think the state's attorney brung it up.
12 Q.  The state's attorney brought it up?
13 A.  Again before we talked about getting on the
14 stand, testimony.
15 Q.  So that -- what did the state's attorney
16 say?  First of all, which state's attorney talked
17 to you about Rose?
18 A.  Mark, when we were going through the
19 statement.
20 Q.  Mark?  Do you mean Mr. Marek?
21 A.  Yeah, Mr. Marek.
22 Q.  And you just said Mr. Marek when we were
23 going through the statement, right?
24 A.  Yeah, this.
25 Q.  What statement?

Page 266

1  A.  This one.
2  Q.  The testimony you mean?
3  A.  Yes.
4  Q.  So you're saying during the testimony
5  he told you Rosa Bello's name?
6  A.  No, at -- before trial at his office when
7  we was going through this.
8  Q.  So to prepare for the trial --
9  A.  Yeah.
10 Q.  -- you're saying that the state's
11 attorney told you Rosa Bello's name?
12 A.  At first I learned it at the police
13 station.  Then again he remind me at the state's
14 attorney's office when we were going through and
15 everything.
16 Q.  Okay.  So what else did he tell you
17 about Rosa Bello?
18 A.  That that was Juan's girl friend.
19 Q.  So did he tell you what to testify to?
20 Because you said -- earlier you said it was a
21 lie, that you did not know who she was, right?
22 A.  No, I didn't.  I learned about her in the
23 police station about when Juan and Alfredo was locked
24 up, the police station told me, the officers -- the
25 Latino officer asked me, told me did I knew I was

Page 267

1  getting locked up.  I said no.  He goes Alfredo
2  and Juan signed statements against you saying you --
3  and I said I don't know what they're talking about
4  because they're lying, and then he goes do you know
5  Rose.  That's Juan's girl friend he told me.  I go
6  no.
7  Q.  All right.  You're finished?
8  A.  Yes.
9  Q.  All right.  So what I want to know,
10 though, is what did the state's -- you said that
11 all your testimony -- a lot of your testimony
12 that you gave at the trial in Exhibit 7, that it
13 was a lie, right?
14 A.  Yes.
15 Q.  And part of that was that you knew
16 who Rose was.  And we talked about that it was
17 a lie that you had been to their house, it was a
18 lie that you knew that they had previously lived
19 on Pierce, it was a lie that you had been to the
20 apartment on Homan, right?
21 A.  Yes.
22 Q.  So who gave you all those details?
23 A.  Police officer at the police station.
24    MR. LEINENWEBER: I'm sorry.  Can you read
25 back his answer.

Page 268

1     (Whereupon the portion of the record was read
2  as requested.)
3  Q.  And I just want to clarify, we had
4  said Rose but I meant Rosa Bella, Rosa.  Is that
5  your understanding, it's Rosa Bella -- Rosa
6  Bello?
7  A.  Rose, Rosa Bello, yeah.
8  Q.  Okay.  Earlier you talked about
9  what it means to be violated.  Could you just
10 explain that a little bit?  What does it mean
11 to be violated in terms of the Latin Kings?
12 A.  You mean --
13    MS. COHEN: Objection, form.
14 A.  I don't understand, violated.
15    BY MR. LEINENWEBER:
16 Q.  Okay.  So earlier you were asked
17 if you knew what it meant to be violated, and
18 I believe you testified that it was a form of
19 either indoctrination into the Latin Kings or
20 retribution from the Latin Kings, right?
21 A.  Okay, how you get into the gang, okay.
22 Violated, you could take that as all different ways.
23 Q.  Sorry.  So I meant specifically when
24 you were talking about it earlier with regard to
25 essentially being beat up by the Latin Kings.

Maysonet v.
Guevara

Page 269

1　A.　To get into the Latin Kings you get
2　a three-minute violation.
3　Q.　And what does that mean?
4　A.　You get beat up.
5　Q.　How many people?
6　A.　Can't recall.
7　Q.　And it happened to you?
8　A.　It happens to everybody who wants to
9　become a Latin King.
10　Q.　So that's a yes, it did happen to you?
11　A.　Yes.
12　Q.　And how many people beat you up?
13　A.　Like I said, I can't recall.
14　Q.　You don't recall, okay.　Did you have
15　any injuries from it?
16　A.　No, because they show you how to cover
17　yourself up so you won't have that much bruises.
18　Q.　So you weren't injured from it?
19　A.　No.
20　Q.　So you didn't have to go to a hospital
21　or a clinic or anything like that?
22　A.　No.
23　Q.　You had said between the day you
24　gave your written statement to the police and the
25　day of your testimony you did not see the Latino

Page 270

1　detective, right?
2　A.　The last time I saw him was at the police
3　station.
4　Q.　At the time you gave the written
5　statement?
6　A.　When they brought me the statement.
7　　　MS. COHEN: Object to the form.
8　　　BY MR. LEINENWEBER:
9　Q.　And you would probably remember if you
10　saw him again, right?
11　A.　Yes.
12　Q.　In fact, you do remember seeing him on
13　TV almost 20 years later?
14　A.　On TV and in the newspaper.
15　Q.　Okay.　You said you graduated from
16　Clemente High School?
17　A.　Yes.
18　Q.　Were you -- do you have any recollection
19　what kind of student you were?
20　A.　D, C average.
21　Q.　D, C average.　But you graduated?
22　A.　Yes.
23　Q.　I can't remember if this question was
24　asked.　But Exhibit 1, your affidavit.
25　A.　Yes.

Page 271

1　Q.　Did you read that before you signed it?
2　A.　This one here, Exhibit 1?
3　Q.　Yes.
4　A.　Yes.
5　Q.　You read it?
6　A.　Yes.
7　Q.　Did you understand it?
8　A.　Yes, he had -- the state's attorney --
9　I mean, my attorney explained it to me.
10　Q.　I don't want to get into anything
11　that your attorney told you, but I just want to
12　make sure you read that and you understood it?
13　A.　Yes.
14　　　MR. LEINENWEBER: All right.　I don't have
15　any further questions.
16　　　CROSS-EXAMINATION
17　　　BY MR. BRENER:
18　Q.　Mr. Cruz, you testified today that
19　you didn't have much of a relationship with Jose
20　Maysonet in 1989 and 1990, right?
21　A.　Yes.
22　Q.　And to the extent you gave testimony
23　that the two of you were friends, that testimony
24　was a lie, right?
25　A.　Yes.

Page 272

1　Q.　And you've testified that you didn't
2　know his girl friend, Rosa Bello, correct?
3　A.　Yes.
4　Q.　You also didn't know his sister, Rose
5　Maysonet, correct?
6　A.　Yes.
7　Q.　Do you know his parents?
8　A.　No.
9　Q.　Do you know if he had siblings?
10　A.　No.
11　Q.　Do you know if he had a nickname in the
12　gang?
13　A.　No.
14　Q.　You referred to him as Juan repeatedly
15　today.　You also referred to him as Juan in your
16　trial testimony in a number of places.　Why
17　didn't you call him Jose?
18　A.　Because that's what everybody called
19　him, Juan.
20　Q.　Who's everybody?
21　A.　The guys in the street.
22　Q.　So the guys knew him as Juan?
23　A.　Yes.
24　Q.　Do you know if that's his name?
25　　　MS. ROSEN: You have to answer out loud.

Maysonet v.
Guevara

Page 273

1  A.  Don't know.
2     BY MR. BRENER:
3  Q.  Is that a yes or a no?
4  A.  Don't know.
5  Q.  So you don't know why you called him
6  Juan?
7  A.  Because that's what everybody called
8  him in the neighborhood when we was out there selling
9  drugs.
10 Q.  Did you refer to him as Juan in person
11 when you saw him?
12 A.  Whenever I saw him in the street when we
13 was out there sometimes.
14 Q.  And when would you see him out in the
15 street?
16 A.  Like I said, when we all together talking
17 or he passes buy.
18 Q.  When you were selling drugs, would
19 you see him in the street and call him Juan?
20 A.  Yes.
21 Q.  Okay.  I want to just clarify some
22 timing things here.  Your testimony is that you
23 were arrested on August 24th of 1990, is that
24 right?
25 A.  Yes.

Page 274

1  Q.  And your testimony is that the arrest
2  was in the evening, correct?
3  A.  Yes.
4  Q.  Approximately 6 o'clock in the evening?
5  A.  Around 5 or 6 in the evening.
6  Q.  Sure.  But not in the morning?
7  A.  No.
8  Q.  And not on the previous day either?
9  A.  Day?
10 Q.  You were not arrested before August 24th
11 of 1990 --
12 A.  No.
13 Q.  -- with respect to the Wiley brothers
14 murders, correct?
15 A.  No.
16    MR. GREENBERG: The record should
17 reflect when you asked the question earlier, that
18 he was looking at the exhibits in front of him
19 before answering.
20    MR. BRENER: Is that an objection?
21    MR. GREENBERG: No, it's just the record
22 should reflect that he was looking at the exhibits.
23    BY MR. BRENER:
24 Q.  So the answer to my question is no,
25 correct?

Page 275

1  A.  What was the question again?
2     MR. BRENER: Can you read it back, please.
3     (Whereupon the portion of the record was read
4  as requested.)
5  A.  Yes.
6  Q.  That's a yes, you were not arrested
7  prior to August 24, 1990, right?
8  A.  Yes.
9  Q.  That means that you didn't speak to
10 anybody in Area 5 on August 23, 1990, correct?
11    MR. GREENBERG: Can the record reflect
12 he's looking at these papers in front of him?  Can we
13 take the papers away?
14    MR. LEINENWEBER: He's been doing that the
15 entire time.
16    MR. ENGQUIST: And he has counsel.
17    MR. LEINENWEBER: Yeah.
18 A.  I can't recall the date.
19    BY MR. BRENER:
20 Q.  Let me reask my question.  You did not
21 speak to anyone in Area 5 the day before you were
22 arrested, correct?
23 A.  The day before, no.
24 Q.  And that's because you weren't at
25 Area 5 the day before you were arrested, right?

Page 276

1  A.  No.
2  Q.  You didn't go to Area 5 until after you
3  were arrested, correct?
4  A.  Yes.
5  Q.  Does the name Frank DiFranco mean
6  anything to you?
7  A.  No.
8  Q.  Do you remember speaking to anyone
9  by that name?
10 A.  No.
11 Q.  Have you ever heard it before, to the
12 best of your knowledge?
13 A.  No.
14    MR. BRENER: I have nothing further.
15    MR. GREENBERG: Can we have five minutes
16 before we decide if we're going to ask questions?
17    MR. ENGQUIST: Absolutely.
18    (Whereupon a recess was taken from 4:34 p.m.,
19 to 4:40 p.m., after which the following proceedings
20 were had:)
21    MR. GREENBERG: I don't have any questions,
22 but it's up to Ashley.
23    MS. COHEN: I don't think we have any other
24 questions.
25    MS. ROSEN: Oh, okay.

Maysonet v.
Guevara

---

Page 277

1     MR. ENGQUIST: I don't have any followup.
2  Waive or reserve?
3     MR. PRADOS: We waive.
4     MR. ENGQUIST: Thank you very much, sir.
5  We're done.
6     (Reporter retained exhibits.)
7     (WITNESS EXCUSED)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 279

1
2
3
4                    Mary Maslowski, CSR, RPR
5                    Notary Public
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 278

1  NORTHERN DISTRICT OF ILLINOIS)
   EASTERN DIVISION            )
2  STATE OF ILLINOIS           )
                               )  SS.
3  COUNTY OF COOK              )
4        I, Mary Maslowski, Certified Shorthand Reporter
5  and Notary Public in and for the County of Cook, State of
6  Illinois, do hereby certify that on November 1, 2019, the
7  deposition of the witness, JUSTINO CRUZ, called by the
8  Plaintiff, was taken before me, reported stenographically
9  and was thereafter transcribed by me.
10       The said witness, JUSTINO CRUZ, was first duly
11 sworn to tell the truth, the whole truth, and nothing but
12 the truth, and was then examined upon oral
13 interrogatories.
14       I further certify that the foregoing is a true,
15 accurate and complete record of the questions asked of
16 and answers made by the said witness, at the time and
17 place hereinabove referred to.
18        The signature of the witness was waived by
19 agreement.
20        The deposition terminated at 4:41 p.m.
21        The undersigned is not interested in the within
22 case, nor of kin or counsel to any of the parties.
23        Witness my official signature and seal as Notary
24 Public, in and for Cook County, Illinois on this 11th day
25 of November, A.D., 2019.

---

**$**

**$500 (1)**
242:24

**A**

**a/k/a (2)**
35:13,20
**abandoning (1)**
225:22
**ability (2)**
8:11;53:4
**able (10)**
20:18;35:8;37:16;
52:25;53:21;54:10,
16,17;253:15;263:24
**above (1)**
132:5,10,13,17
**absolutely (2)**
213:24;276:17
**abuse (1)**
108:9
**abused (2)**
82:25;121:7
**abusing (1)**
155:9
**accept (1)**
168:16
**acceptable (1)**
7:16
**accommodations (1)**
37:11
**According (4)**
25:19;256:16,16;
257:12
**accurate (14)**
20:9;47:5;116:8;
160:8,13;167:18,20;
168:1,10;169:12;
175:19;185:4;186:6;
187:7
**accurately (1)**
203:10
**accused (1)**
78:11
**accusers (2)**
36:20,21
**Acme (6)**
11:6,9,11,13,21;
159:2
**A-c-m-e (1)**
11:8
**act (3)**
41:8;224:7,8
**acted (1)**
220:18
**acting (1)**
74:21
**action (3)**
5:13;121:20,23
**actions (1)**

42:16
**activities (3)**
126:22;170:5;171:9
**activity (2)**
13:20;207:9
**actually (17)**
24:6;34:23;46:4;
53:18;63:2;81:7;98:8;
105:19,23;111:9;
165:3;203:7;207:1;
220:12;233:19;244:6;
245:11
**address (10)**
10:15;12:11;21:13;
104:3;115:16;127:19;
128:12;258:3,6;
260:22
**admission (1)**
220:18
**admit (1)**
101:1
**admitted (1)**
151:17
**Adrian (5)**
35:1;79:22;118:10,
11,17
**Adrian's (1)**
118:13
**advised (1)**
48:4
**affidavit (45)**
14:23;15:11,21;
16:21,23;17:3;19:9;
20:8;39:13,14;108:4,
7;117:22;125:13,17,
19;128:25;226:24;
227:6,18,23;228:9,18,
24;230:5,7,11;
232:22;233:19;235:1,
24;236:3,7,11,11,15,
16,18,21;237:4,6;
238:8;254:24;256:16;
270:24
**afford (1)**
153:24
**afraid (1)**
226:2
**African-American (1)**
25:16
**afternoon (2)**
184:25;185:1
**again (23)**
18:21;22:16;40:3;
53:17;58:24;63:24;
65:23;112:24;114:11,
12,23;140:3,9;191:8;
212:4;216:17;244:14;
252:24;253:2;265:13;
266:13;270:10;275:1
**against (43)**
41:7;42:16;81:12,
15;82:3;84:23;87:2;
105:10;106:1;114:7,

21;121:9,20,23;
123:13;134:8,16,18;
141:8,14,23;142:13,
16,23;143:3;153:21;
163:3;166:3;180:12,
18;190:5;218:19;
220:3;221:3;224:20,
24;225:15;234:13;
235:5;237:8;246:11,
24;267:2
**age (2)**
10:6;176:10
**ago (14)**
7:1;16:24;112:22;
113:6,20;128:17;
129:4;138:6;200:15;
227:14;231:8;232:11,
23;252:2
**agree (4)**
36:20;47:18;68:4;
200:4
**agreed (4)**
36:19;168:25;
245:15,17
**agreement (9)**
88:4,7;164:21,24;
165:8;167:15;168:6,
17;241:25
**ahead (4)**
64:19;219:12;
237:16;253:10
**aimed (1)**
238:13
**al (1)**
5:18
**Alfredo (103)**
15:12,15,25;22:22;
30:22;36:9,13;37:1;
41:3;44:19,24;49:4,
14,18,24,25;50:19,21,
24;51:1,2,12,13;58:4,
6;60:15;61:19;70:25;
76:23;85:23;90:5,25;
91:21;92:7,16,23,24;
93:7,23;94:4,11,15,
16,23;95:2,4,13,18;
96:7,24;97:8,20;
98:16;99:1,3,6,14,17,
23;100:1,7,12,16,18,
25;101:9;105:10;
124:6,21,24;134:19;
136:20;149:15,21;
150:2;160:16;169:7,
9;171:16;175:16;
184:2;188:14;189:7;
193:18,20;195:4;
204:9,15;210:20;
211:19;212:3,9,14;
214:7,11,14,24;
215:21;217:25;220:3,
6;266:23;267:1
**alias (2)**
35:16,21

alive (1)
137:25
**alley (15)**
50:9;51:11;67:8,9;
97:23;98:1,9,10;99:8;
202:6;203:15,21,22,
25;205:23
**alleys (1)**
203:11
**allow (2)**
37:10;60:22
**allowed (1)**
37:9;52:5
**almost (3)**
54:9;190:20;270:13
**alone (3)**
30:14,15;225:18
**along (3)**
20:13,17;35:8
**altogether (1)**
176:22
**always (4)**
74:6;118:1;119:4;
248:11
**and/or (2)**
223:20;224:7
**angry (1)**
225:20
**answered (10)**
42:18;44:5;55:17;
64:4;65:10;72:18;
135:7;193:6;194:12;
225:11
**apartment (26)**
61:9,10;93:15,16,
19;94:11;96:1,2;
191:24,25;192:1,3,12,
21;207:18,23;208:1,2,
7;210:23;211:2;
260:12;261:5;264:19,
21;267:20
**apologies (3)**
10:11;27:23;109:9
**appear (3)**
26:18;115:19;
116:14
**appointed (1)**
153:25
**approach (1)**
167:2
**approached (8)**
50:24;51:10;167:8,
12,19;168:5,11;
180:14
**approximate (2)**
7:3;43:3
**approximately (9)**
17:18;18:3;63:6;
108:7;137:6;142:18;
204:16,18;274:4
**April (5)**
12:5,6,10;224:8;
226:7

**area (32)**
9:21;24:23;30:20,
23,25;31:16;32:3;
33:4,4;36:19,20,25;
37:4,9,11,22;58:2,7;
76:15;102:8,10;
104:22;174:21;
203:10,20;212:5,24;
257:16;275:10,21,25;
276:2
**argument (1)**
73:18
**argumentative (6)**
64:16;73:6,12,13,
20;74:12
**Army (1)**
132:11
**around (68)**
16:4;17:23;18:5;
21:6;26:8;43:4;50:8;
59:21;67:13;98:9;
99:4;102:13;113:22;
119:21;120:7;126:13,
13,23;128:17;131:13;
137:10,10,12,20,21;
141:16;142:21;146:7;
147:11;158:21;
166:17;167:25;171:7,
8;172:1;175:16;
176:15,20,25;177:1,3,
15,20,20,21,22;178:8;
182:23;183:17,19,23;
186:2,2,3;192:2,3;
203:21;204:20;
208:23;210:21;211:6;
242:11,24;251:21;
254:1;258:21;259:1;
260:16;274:5
**arrangement (2)**
173:7;241:4
**arrest (12)**
6:7;19:25;25:14;
29:18;44:2;125:21;
129:18;212:24;
244:23;253:6,21;
274:1
**arrested (38)**
14:13,19;17:18,23;
18:4;19:16;22:1;
25:12,20;26:1,9;27:6;
29:8;31:19,22;36:21;
37:7;38:17,19,25;
46:4,14,17;104:11;
137:3;138:23;139:5,
23;145:14;149:20,22;
251:9;273:23;274:10;
275:6,22,25;276:3
**Arresting (2)**
34:20;43:23
**arrests (1)**
137:22
**arrived (3)**
36:25;79:5;93:20

**arriving (1)**
76:24
**Art (2)**
239:25;240:5
**article (2)**
108:9,12
**ASA (7)**
153:4,7;161:21;
233:20;255:5;257:6,
13
**ASAs (1)**
256:18
**Ashley (1)**
276:22
**Ashley's (1)**
111:9
**aside (3)**
21:3;37:18;217:24
**assaulted (1)**
109:20
**assigned (1)**
79:12
**assistance (2)**
104:8;224:6
**assistant (10)**
48:6,8;80:21;153:8;
161:23;178:19;214:5,
7,10;219:18
**associate (1)**
9:3
**associated (1)**
77:13
**associating (1)**
126:6
**attached (1)**
223:20
**attend (1)**
157:24
**attention (14)**
17:16;35:5;81:4;
104:13;157:4;161:8;
175:14;185:12;203:7,
8;205:22;206:20;
207:12;233:18
**attorney (135)**
18:16,19;20:12;
48:7,8,17,23,23;54:5,
5,7;76:12;80:19;81:2,
19;82:5;83:18;84:8;
85:6,8,16,25;101:22;
102:25;112:7,9,12,23;
113:1,3,4,12,13,14;
116:22,23;117:18,19,
21,24;118:1,3,5,23;
119:24;120:1,2,22,23;
124:15;152:13,15,17,
21;153:8;155:18,19;
159:21;161:24;167:8,
13;168:6,8,16;178:13,
19;179:2,9,12,17,17;
180:13,14;182:8,9;
185:9;193:11,14;
199:3;214:5,7,11;

219:8,19;227:8,20;
228:3,11,20,21,25;
229:8,9,12,15,21;
230:13,18,20;231:8,
17,24;232:3,11;233:3,
6,10;234:12,15,21;
235:2,5,7,15,17;
236:2;237:10;238:20,
22;245:21,22;246:1,
18;255:15,21,22,24;
265:11,12,15,16;
266:11;271:8,9,11
**attorney-client (3)**
237:18;240:14;
241:2
**attorneys (9)**
51:22;111:7;
113:19;116:18;119:7;
214:16;227:24;
234:19;254:17
**Attorney's (23)**
88:5;107:22;113:5;
119:19;129:3;164:22;
166:20;167:2;168:5;
218:19,21;221:1,4,11,
17;222:8;223:12;
224:1;225:10;237:7;
245:22;246:5;266:14
**audibly (1)**
7:10
**August (22)**
17:17;25:21;35:12;
36:22;37:6;45:25;
55:6;59:11;70:19,25;
72:13;103:23,25;
190:4,18;211:25;
212:5;214:5;273:23;
274:10;275:7,10
**authored (1)**
236:7
**authorities (1)**
223:20
**automatic (5)**
49:16;95:7;194:17;
195:5,17
**available (1)**
48:23
**Avenue (35)**
17:19,24;21:15,16;
25:17;26:2;36:1;
50:25;65:14,21;67:7,
7,22;69:3;89:22;
96:15,20,22,24;97:8;
98:18,22;187:22;
197:13;202:5,6;
203:11,15;204:11;
205:24;240:23;
260:10,12,14;261:2
**average (2)**
270:20,21
**awaiting (1)**
167:24
**aware (3)**

5:15;235:13;248:3
**away (7)**
51:15;226:13,15;
260:11;261:4,9;
275:13
**awesome (1)**
257:25

---

# B

---

**back (70)**
13:13;15:8;21:4,6;
22:25;37:24;38:2,25;
53:3;54:16;55:5;
58:24;63:13;66:13,
14,15;69:16,17;96:4;
99:16,18;100:8,16,18;
105:6;108:3;109:1;
113:7;125:19;134:14;
135:20;136:23;137:3;
140:18;141:9;143:20,
22;144:21;151:10;
152:9;157:22;159:5;
161:1;172:3;175:14,
20;180:23;181:13;
184:23;196:12;
203:22,25;205:22;
211:12,19;212:14;
214:24;215:13,21;
216:7,20;217:14,19;
224:12;231:21;
254:14;257:17;
264:16;267:25;275:2
**backs (1)**
51:4
**bad (4)**
84:14;118:8,9;
159:9
**bag (1)**
61:6
**banged (1)**
141:4
**banger (1)**
174:2
**banging (1)**
178:2
**bargain (2)**
180:15,17
**based (5)**
200:2;228:18;
237:17;241:1;262:10
**basement (1)**
101:23
**basically (1)**
154:21
**basis (2)**
196:17;240:14
**Bates (3)**
34:24;35:3;69:22
**bathroom (2)**
8:6;52:5
**beard (6)**
252:5,6,9,10,11,13

**bearings (1)**
91:4
**beat (6)**
133:7;172:18;
173:3;268:25;269:4,
12
**became (1)**
60:21
**become (6)**
101:16;126:14;
133:19;134:2;235:13;
269:9
**bedroom (8)**
94:17,22,23,25;
95:24;193:20;194:1;
195:6
**began (2)**
18:14;108:10
**begin (1)**
125:24
**beginning (5)**
167:13;168:4;
169:6;178:20;192:19
**behalf (1)**
241:10
**behind (8)**
49:25,25;66:15;
96:8,8;203:10,15;
205:23
**belief (1)**
46:3
**Bella (2)**
268:4,5
**Bello (22)**
58:14,16;59:10,18;
94:20;162:10;193:24;
194:4,8;208:15,18,20,
25;209:9;210:22;
262:18,23;263:3;
266:17;268:6,7;272:2
**Bello's (4)**
207:18;264:5;
266:5,11
**Belmont (3)**
89:14;187:4,19
**below (3)**
34:19;154:5;161:20
**belt (1)**
49:19
**bench (1)**
31:7
**beneath (2)**
153:10;161:12
**benefits (1)**
103:4
**best (6)**
6:21;7:2;8:11;31:5;
54:2;276:12
**better (1)**
86:17
**big (1)**
10:3
**bilingual (2)**

157:13;158:4
**birthday (3)**
9:15;139:2;170:2
**bit (15)**
53:23;54:10;55:4;
140:11;142:6;147:15,
19;152:19;158:20;
160:11;201:14;203:2;
242:11;263:23;
268:10
**Black (21)**
23:14;50:25;51:2;
69:2;70:3,17;98:20;
99:2,4,7,22,23;100:2;
162:22;196:20,22;
204:13,15,19;262:5,
10
**bleeding (2)**
143:9;147:15
**blue (5)**
189:1,8,16,21,25
**BONJEAN (128)**
5:8,11;14:17,23;
15:1;19:1,8,19;20:22;
24:1,10;26:17,21;
27:21,23;32:1;33:1,
13,22,24;34:1,5,9,12;
35:1,24;36:17;37:15;
39:20;40:24;41:11;
42:13,23;43:2,15;
44:1,6,14,20;45:6,16,
12,17;46:8;47:1;53:7;
54:15,20;55:1,20;
56:1,17;57:1,7,12,18,
24;59:5;60:9;62:8;
64:6,11,17;65:11;
66:4;67:3;68:8;69:14;
70:12;71:10,20;
72:20;73:8,13,16,19,
24;74:4,10,18,23;
75:4;76:5;77:3;78:6,
14;79:21;80:6,10;
84:1,15;85:12;86:8;
87:11;88:13;91:3,8,
13;95:17;98:5;
101:14;102:14,19,23;
103:13;107:6;108:17;
109:8,10,17,23;110:5,
13,25;111:6;122:20;
154:19;255:12,15,18,
20,25;256:2,12,15;
257:1,4;259:20
**boom (2)**
143:2,2
**born (1)**
157:17
**boss (1)**
113:9
**both (15)**
15:5;28:6;31:14;
37:1,2;113:15,15;
139:15;142:11;158:5,
10,11;179:4;251:6,15

**bothering (1)**
147:14
**bothers (2)**
250:11,20
**bottom (15)**
53:10,18;64:19,21,
21;69:21;116:1,5;
167:22;169:8;187:18;
203:9;206:21;222:22;
223:3
**bounce (1)**
242:11
**box (1)**
164:15
**boy (1)**
186:17
**break (8)**
7:25;8:1,4,6;79:22;
142:5;202:24;226:19
**Brendan (3)**
234:13;235:6;237:8
**BRENER (13)**
55:17;77:2;83:21;
85:10;102:12;107:3;
271:17;273:2;274:20,
23;275:2,19;276:14
**brief (2)**
91:24,25
**bring (2)**
21:6;249:7
**bringing (1)**
121:9
**brother (19)**
10:12,13;15:19;
21:23;22:11;72:3;
127:2,10,14;128:2,16;
134:23;137:17,18;
138:13,18;248:22,25;
249:9
**brothers (18)**
6:8;11:24;17:5,11,
14;19:4,5,10,15;25:9;
244:25;248:14;
259:22;260:2,5;
261:1;262:4;274:13
**brother's (1)**
127:5
**brought (9)**
30:20,23;31:5,16;
32:2;73:1;140:14;
265:12;270:6
**bruise (2)**
146:8;147:13
**bruised (1)**
146:14
**bruises (3)**
146:12;147:10;
269:17
**bruising (1)**
147:1
**brung (1)**
265:11
**Buick (5)**

188:25;189:8,17,
22,25
**building (3)**
93:18;202:10;204:7
**buildings (3)**
192:3,11,12
**bump (6)**
143:10,11,13,16,17,
19
**bunch (2)**
118:21;154:20
**bus (18)**
26:4,6;27:8;28:14;
36:5,11;89:18,22,23,
25;139:5;187:10,16,
21,22,23,24;220:21
**buy (3)**
173:20,23;273:17

# C

**California (1)**
77:18
**call (5)**
32:21,22;132:17;
272:17;273:19
**called (12)**
5:5;77:24;78:3,17;
111:19;130:19;
131:20,23;218:14;
272:18;273:5,7
**calling (1)**
75:1
**calls (1)**
249:15
**came (51)**
37:24;38:2;39:23,
25;63:9,24;64:20,25,
25;67:11,12;70:22;
71:11;95:1,24;98:10;
112:23;113:4,8,9,21;
117:3,13;119:25;
120:2;124:16;129:3;
140:18;155:11;173:4;
174:12;179:12;180:8;
195:6;203:14,25;
204:10;214:24;
216:20;217:19;
227:24;233:21;234:4,
5;235:3;254:17,22;
255:6,21,22,25
**camera (1)**
57:20
**cameras (2)**
71:18;74:22
**can (70)**
5:24;8:1,4,14;11:7;
14:18;15:4,6;21:3;
24:2;31:4;33:13,20;
37:18;38:12,22;43:3;
53:24;61:13;63:1,10,
11,12,15;65:2;72:21;
74:16;79:21;85:3,3;

89:15;91:9;92:22;
97:4;101:17;103:13;
109:6;142:18;143:19;
148:13,15,23;153:21;
159:17;160:12;171:6;
197:13;202:7,9,24;
217:24;224:11,12;
235:19,20;236:20;
237:21;240:15;
241:14,20;249:11;
251:13,17;264:1,4;
267:24;275:2,11,12;
276:15
**Canton (1)**
221:7
**caption (3)**
80:12;115:6;124:9
**car (83)**
26:20;27:10,13;
29:8;30:3,6;49:23;
50:20;51:3,3,13,14;
67:10,12,12;68:20,22,
23;69:6,7,8,17,19;
91:20;92:2,6,14,16,
20,23;93:7,12,20,21,
21,22,23,25;96:3,4,6,
11;97:17,18,19,21;
98:2,7,9;99:15;100:8,
17,18,23,25;139:8,9,
11;180:24;188:23,23,
24;189:8;191:13;
203:14,21,24;204:3,5;
205:23,24;206:4;
211:20;212:9,14;
214:24;215:13,21;
216:7,20;217:14,19;
264:17
**carrying (4)**
95:3,4,5;195:5
**cars (2)**
139:17,18
**case (25)**
5:17;15:13;85:9;
112:24;120:3;123:2,
9;124:13,17,20;
125:5;128:19,22;
138:22;168:18;
179:10,22;182:18;
190:5;212:1;224:3;
225:15;240:3,6;
248:18
**catch (1)**
111:9
**caused (1)**
126:18
**causing (1)**
141:8
**caution (1)**
120:12
**cc (1)**
223:3
**CCSAO291 (1)**
69:22

**cell (1)**
101:18
**Center (3)**
106:23;221:7;
223:17
**Central (5)**
30:7,8,11,17;
213:16
**Cermak (1)**
104:8
**certain (5)**
48:11;53:8,14;
243:11;249:25
**certainly (1)**
8:1
**chain (1)**
132:18
**challenging (5)**
233:23;234:2,6;
254:16;255:7
**chance (1)**
163:1
**change (1)**
169:3
**changed (1)**
11:18
**charge (1)**
218:11
**charged (3)**
44:8;55:13;76:16
**charges (3)**
234:13;235:5;237:8
**charging (2)**
44:10;78:17
**chart (3)**
203:9;204:22;205:6
**check (1)**
148:13
**checks (7)**
22:6;149:8;159:13,
13;254:4,5,5
**Chicago (12)**
5:19;9:19;12:13,14;
13:2;77:12;123:13;
127:17;171:11;
185:19;258:10;260:3
**chief (2)**
175:9,10
**child (1)**
59:20
**children (3)**
10:22;59:22;186:16
**choice (1)**
87:5
**choked (3)**
109:13;121:17;
151:6
**choking (4)**
42:10;43:7;147:6,8
**Chris (26)**
8:22;35:13,17,21;
49:5,24;50:16,17,19,
20,24;51:2,12;90:6,

13,22;160:17;161:4;
181:17,21,25;182:6,
19,22;184:5;188:15
**Christopher (3)**
22:24;23:22;71:1
**chrome (1)**
49:17
**circumstances (1)**
82:5
**Cisco (4)**
23:5;70:22;71:2;
72:9
**city (5)**
5:19;12:12;123:13;
128:8;171:14
**civil (1)**
5:13
**claim (1)**
112:15
**claiming (1)**
238:4
**clarification (1)**
232:18
**clarify (3)**
33:21;268:3;273:21
**clarifying (1)**
237:21
**classes (1)**
158:3
**clear (13)**
34:3;104:4;122:2;
237:5;239:17;243:8,
14;244:13,17,21;
247:12;252:19;253:4
**cleared (1)**
122:4
**Clemente (6)**
9:11;157:25;158:3;
159:17,22;270:16
**client (5)**
120:12;162:5;
232:14;237:19;238:6
**clinic (2)**
145:1;269:21
**close (9)**
13:11;64:21;
127:14;128:7;141:3;
143:1;170:15;188:7;
207:16
**clothes (4)**
139:10,12,18;
205:25
**clothing (1)**
196:21
**coerced (9)**
52:6;228:2,10,25;
229:14,20;230:12;
231:16;233:2
**coercion (2)**
81:12;82:2
**COHEN (56)**
27:22;75:3;117:2;
123:3;126:7;131:22;

132:19;134:10;135:7,
16;136:3,12;139:1;
140:4;145:2;150:9;
151:14;152:25;156:4,
15;166:10;169:20;
170:6;171:4;172:23;
175:2;178:22;181:3;
184:15;187:9;193:10;
199:6;201:10;202:16;
204:25;208:10;
210:11;216:11;218:3,
24;221:25;225:2,16;
229:23;238:2,19;
239:4;241:13;244:4,
11;246:15;256:5,20;
268:13;270:7;276:23
**College (1)**
9:3
**color (2)**
188:25;251:22
**colors (1)**
196:19
**coming (3)**
40:8;96:14;113:25
**command (2)**
115:11;132:18
**commanded (1)**
115:19
**commencement (1)**
5:3
**Commission (2)**
112:15;120:25
**committed (2)**
19:11;44:18
**communicate (1)**
44:22
**communication (1)**
238:5
**communications (2)**
249:13,15
**compensate (1)**
123:18
**completed (1)**
24:7
**complies (10)**
21:5;37:20;61:14;
72:23;91:16;94:7;
95:22;97:15;108:5;
197:3
**compound (1)**
135:16
**concerned (3)**
134:7,20;147:16
**concerns (2)**
247:2,9
**concluded (1)**
139:14
**confer (2)**
8:4;79:22
**confess (1)**
151:12
**confront (2)**
36:19,21

**connection (5)**
11:24;15:12;19:22;
62:1;132;224:2
**consequences (2)**
132:22;224:25
**consistently (1)**
13:15
**contact (16)**
18:15;77:6,12,19;
128:2;135:5,11,12,15;
137:19;138:24;225:7;
234:18;235:14;
237:14;248:18
**contacted (3)**
234:14;235:7;237:9
**contacting (2)**
235:18;239:13
**containing (1)**
91:20
**contempt (2)**
114:16;116:24
**continue (2)**
32:17;147:20
**conversation (9)**
91:23,24;92:1;
116:17;162:23;
204:14;235:17;
239:18;262:11
**conversations (6)**
85:7;112:17,20;
120:13;234:21;239:1
**convicted (1)**
220:7
**conviction (15)**
122:5,6,9;123:7,16,
23;220:11;225:24;
233:23;234:2,7;
241:8;254:17;255:7;
256:4
**Cook (32)**
14:10;56:4,6,8;
73:1;76:19,20,25;
77:13,18;79:5;80:20;
85:8,16;88:4;101:19;
102:15;103:1;104:18;
129:24;131:4,9;
164:21;166:15;
167:24;219:18;
223:11;248:17,21;
251:1,2,3
**cooperated (4)**
223:19;224:2;
225:15,23
**cooperating (1)**
101:10
**cooperation (3)**
219:10;223:22;
224:10
**cops (2)**
103:1,1
**copy (6)**
115:23;116:3;
223:21;242:4,5;

263:12
**corner (4)**
26:2;35:4;67:15;
243:11
**Correctional (3)**
106:23;221:7;
223:17
**Corrections (16)**
104:21,23,25;
105:5,20;106:7,11,21;
130:1;131:5,18;
147:25;218:23;220:1,
10,25
**correctly (1)**
120:6
**counsel (2)**
8:4;275:16
**count (1)**
220:22
**Counting (1)**
118:21
**County (42)**
14:10;56:4,6,8;
73:2;76:19,21,22,25;
77:14,15,17,18;79:6;
80:20;85:8,16;88:4;
101:19;102:15;103:1;
104:18;105:3,23;
129:24;130:20,21,25;
131:4,10;146:9;
147:22;164:21;
166:15;167:24;
219:19;223:11;
248:17,21;251:1,2,3
**couple (15)**
16:23;33:5;37:24;
40:1,4,7;112:22;
140:16;141:5,10,19;
144:17;157:23;
184:19;242:16
**course (2)**
23:3;134:4
**Court (24)**
5:14,19;6:11;7:11;
8:15;57:3;62:17,18;
79:3,6,8;85:11,14;
90:25;116:11,14;
153:21,25;163:14;
200:8,10;231:2,2;
245:12
**court-reported (2)**
56:12,18
**courtroom (3)**
163:12;195:14;
231:1
**cousin (3)**
119:9,14,18
**cousins (2)**
119:22;120:7
**cover (4)**
206:10,25;207:8;
269:16
**cozy (1)**

37:11
**crack (1)**
143:8
**Creek (1)**
115:15
**crew (1)**
71:22
**crime (7)**
82:18;83:5;156:3,9;
215:8;220:15;224:8
**Crimes (1)**
212:6
**criminal (3)**
190:5;197:20;207:9
**cross (1)**
96:22
**crossed (3)**
53:11;65:15;66:10
**CROSS-EXAMINATION (4)**
111:21;242:12;
253:12;271:16
**CRUZ (75)**
5:4,9;8:16,22,24;
10:1,1,1,2,5;11:23;
15:2;21:22;23:3;
28:15,25;33:16;
34:17;35:13,13,17,21;
36:8,18;37:1,7,8;
45:19,22;47:11,20;
48:2,6;49:25;54:5,7;
59:8;62:12;66:17;
67:21;71:2;74:24;
80:7,13,19;87:16,21;
91:17,19;94:1;98:8;
103:21;111:6,18;
112:14,17;115:12;
116:3;119:16;127:25;
161:10;167:1;195:8;
197:4;203:12;204:17;
205:21;219:21;220:2,
11,18,22;221:5;
223:16;271:18
**C-r-u-z (1)**
8:18
**Cruz's (2)**
220:6;221:2
**curious (1)**
237:24
**currently (3)**
10:14;59:19;223:16
**cursive (1)**
52:25
**custody (18)**
30:16;32:13;34:17;
46:4;58:2;62:20;89:1;
104:4;107:17,19,21;
110:18;130:15,18;
167:24;190:8;233:11;
260:3
**cut (1)**
91:9

**D**

**dad (2)**
249:4,6
**dad's (1)**
249:9
**danger (2)**
224:11,16
**dangerous (1)**
240:23
**dark (2)**
24:7;62:4
**dark-complected (1)**
24:12
**date (7)**
103:23;129:18;
226:8;255:13;256:11,
14;275:18
**dated (2)**
219:20;223:8
**daughter (1)**
249:7
**day (15)**
69:24,25;88:18,19;
128:5,6;208:3;
256:21;269:23,25;
274:8,9;275:21,23,25
**day-for-day (2)**
88:19;105:17
**days (3)**
144:17;257:5;
258:14
**deal (16)**
84:16;85:3,17,22;
86:1,14,16;88:15;
105:13;166:19;
179:11;180:15,17;
214:15;218:18;241:7
**dealt (1)**
252:20
**death (1)**
220:19
**decide (2)**
119:23;276:16
**decided (1)**
120:3
**deciding (1)**
165:4
**deep (4)**
177:21,23;178:2,3
**defendant (23)**
80:19;81:13;82:3;
90:24;92:16;94:11,
15,23;95:24;96:24;
98:16;99:6;100:16,
18;169:9;193:18;
195:4,9;196:6;
203:20;204:3,9,15
**defendants (1)**
96:9
**defender (13)**
79:11,13,16,19;

80:20,21,25;82:9,24;
83:19;85:18,19;86:15
**defending (1)**
111:10
**degree (2)**
9:3;220:23
**demonstrate (2)**
203:23;204:22
**denied (2)**
107:25;220:16
**Department (17)**
104:21,22,25;
105:5,20;106:7,11,21;
129:25;131:5,18;
147:25;218:22;220:1,
10,24;250:19
**depends (1)**
133:6
**depict (1)**
203:10
**Deposition (17)**
5:1,24,25;6:2;
33:14;59:6;62:10;
80:4;87:12;103:14;
115:1;123:1;128:19,
22;163:1;219:14;
222:4
**Describe (7)**
26:11;31:4;74:20;
83:2;98:20;169:18;
251:13
**described (2)**
140:12,24
**designated (2)**
101:9;104:21
**designed (1)**
223:18
**despite (1)**
165:23
**detail (1)**
20:7
**details (1)**
267:22
**Detective (75)**
18:14,18,21;19:2,4,
20,25;20:11,16,24;
27:24;28:2,9,10,18,
21;29:4,5;32:3,4;
33:9;36:8;37:10,23,
23;38:6,9,13,21;
39:15;41:7;42:4,15;
43:19;56:11;57:13,
19,25;58:5;76:13;
108:8,11,13;109:12,
18,24;110:6;139:5,6;
140:3,9,13;141:13;
145:21;146:23;
150:24;153:11,14;
156:8;159:20;161:13,
17;178:9;185:8;
191:8;212:2,7,7;
213:4,5,18,19;233:16;
270:1

**detectives (22)**
26:25;27:15;28:13;
35:13;38:3;52:21;
113:3;139:7,15,17;
149:10;151:22;156:2,
5;209:16;212:12,13,
19,21,24;213:20;
263:1
**deviated (1)**
34:2
**diagnosed (2)**
249:23;250:22
**Diane (1)**
219:25
**different (13)**
55:5;102:16;
136:13;152:19;174:3;
176:20,22;201:15;
205:10;210:8;216:15;
236:18;268:22
**differently (1)**
27:7
**DiFranco (1)**
276:5
**DIRECT (9)**
5:7;175:13;185:12;
203:6,8;205:22;
206:20;207:12;
233:18
**directed (3)**
81:12;82:3;223:11
**direction (5)**
90:2;96:13;188:1;
197:11;203:17
**directly (2)**
85:8;132:13
**dis (1)**
83:23
**Disciples (1)**
172:6
**discuss (5)**
123:20;155:14;
180:4;181:5,9
**discussion (2)**
116:21;238:9
**discussions (1)**
238:7
**District (2)**
5:14,15
**divided (1)**
170:23
**division (4)**
23:11;77:21;
101:23,25
**divisions (1)**
77:5
**doctor (10)**
144:13,15,19,21;
146:9,11;146:11,17;
148:8;249:20
**doctors (4)**
146:22;147:21;
148:4,6

**doctor's (3)**
144:25;145:3,5
**document (21)**
15:4,5;34:24;63:2;
73:21;103:17;115:5,
7;116:6;117:25;
124:10,11;125:3,7;
140:8;152:9;156:19,
23;161:9;222:14,16
**documents (1)**
241:18
**done (6)**
114:23;130:5;
131:21;151:7;229:11;
277:5
**door (6)**
192:20,22;193:6;
264:19,20,23
**doorbell (2)**
192:22;264:22
**dope (4)**
65:15,21;66:10,21
**double (3)**
69:8;76:16;220:13
**double-sided (1)**
15:4
**doubt (1)**
154:14
**down (27)**
6:12,13,16;7:11;
34:16;35:6;68:15;
90:1,3;97:23;98:10,
17;99:8;116:5;142:6;
155:15;187:25;
188:11,12,22;195:12;
204:10,10;219:1;
231:3;240:20,21
**Dr (2)**
148:22;149:5
**draft (1)**
75:10
**drafted (1)**
75:7
**Dragons (1)**
172:6
**Drake (3)**
65:14,20;67:7
**dramatic (1)**
74:14
**draw (5)**
17:16;35:5;81:4;
104:13;161:8
**drink (1)**
52:5
**drive (3)**
69:5,7;139:17
**driver (3)**
50:1;96:7,9
**driver's (4)**
66:15;69:18;
158:22,24
**driving (3)**
49:24;96:17;139:12

**dropped (3)**
234:12;235:5;237:7
**drove (5)**
50:7;51:14;66:11,
12;68:24
**drug (3)**
93:2,9;243:6
**drugs (36)**
126:23;135:24;
136:1,10,16;171:19,
23,25;173:8,11,13,16,
20,21,23;174:13;
176:16,18,20;177:11;
178:3,3,4,4;206:25;
242:15,22;243:14,16,
19,22;258:22,24;
262:1;273:9,18
**due (2)**
37:8;224:9
**dues (1)**
174:9
**duly (1)**
5:5
**during (9)**
43:5;60:25;131:9;
134:4;149:9;153:23;
220:13;257:5;266:4
**Dvorak (2)**
234:15;237:10

## E

**ear (40)**
41:22,23;81:14;
104:14,17;110:1;
140:25;141:6,11;
142:4;144:2,3,3,5,5,6,
11;145:16,17,17,17,
18,22,25;146:7,13,17;
147:14,16;149:5,8;
249:24;250:1,2,6,12,
17,23;251:5;253:19
**earlier (28)**
18:6;99:24;121:16;
125:20;139:4,22;
140:12,23;149:11;
162:9;166:2;170:17;
176:18;179:25;
181:20;190:9;191:7,
15;224:23;225:8;
227:3;254:15;259:20;
266:20;268:8,16,24;
274:17
**Early (10)**
126:10;134:14;
172:3;186:9;196:13;
233:20;254:21;255:4;
256:22,24
**earplugs (1)**
250:11
**ears (1)**
251:6
**east (3)**

90:3;96:14;188:2
**eat (1)**
52:4
**education (1)**
9:2
**Efrain (19)**
10:1,5,9,10,11;
21:22;23:3;71:2;
127:7,7,8,9,14;128:2,
16;129:6;134:23;
248:22,25
**Efrain's (2)**
10:12,13
**Eileen (1)**
238:15
**either (6)**
23:14;28:13;29:3;
38:3;43:7;65:21;95:2;
154:10;159:20;
244:12;249:14;253:5;
256:18;268:19;274:8
**El (3)**
187:3,3,11
**elf (1)**
73:23
**Elizabeth (5)**
119:16;186:15,16;
187:1;223:3
**Elizabeth's (2)**
187:8,15
**else (21)**
11:14;30:16;41:20;
67:13;78:15,19;86:5;
94:9;99:19;100:20;
101:20;114:2;125:1;
136:18;150:7;231:4;
243:3;249:5,8,11;
266:16
**email (1)**
135:14
**employment (1)**
129:4
**empty (22)**
98:7,17,19,22,22;
99:16,18,19;197:10,
24;199:7;200:1,23,
24;201:2,4,9,22;
202:1,4,5;204:10
**encroach (1)**
238:15
**end (5)**
47:10,19;84:5;
151:23;253:15
**ended (4)**
84:23;105:12;
151:7;219:6
**enforcer (5)**
218:1,6,15;220:4;
221:4
**engaged (1)**
207:8
**English (8)**
21:1;32:19,20;

157:10,15;158:4,12,
19
**English-speaking (1)**
158:2
**ENGQUIST (37)**
18:24;19:6,18;
20:21;27:18;31:24;
33:25;34:3,6;36:16;
37:14;39:19;42:12;
44:16;54:13;56:16;
73:5;80:9;88:12;
102:17,22;111:12;
148:20;162:16;238:3;
242:10,13;244:5,12;
246:17;253:10;255:1;
258:1;275:16;276:17;
277:1,4
**enough (5)**
47:8;74:10;103:3;
188:7;192:11
**ensure (1)**
221:18
**enter (1)**
203:15
**entered (1)**
220:22
**entire (3)**
169:14;174:21;
275:15
**entrance (1)**
133:17
**error (1)**
200:16
**essentially (2)**
259:6;268:25
**established (2)**
216:18;264:2
**estimate (2)**
7:3;175:19
**et (1)**
5:18
**even (13)**
25:15;50:17;53:3;
54:1;58:25;74:11;
147:24;174:15;
212:20;226:5;239:8;
244:9;261:23
**evening (12)**
25:22,23;46:4;49:3;
66:7,9;185:13,15;
186:8;274:2,4,5
**event (1)**
191:5
**events (5)**
6:6,25;137:21;
154:24;169:17
**Eventually (8)**
31:21;37:22;79:8,
10,12,18;150:20;
168:25
**Everybody (7)**
173:11;174:17;
196:2;269:8;272:18,

20;273:7
**everybody's (1)**
172:22
**everyone (2)**
96:6;206:4
**exact (2)**
10:15;21:13
**exactly (6)**
15:18;18:11;91:22;
189:24;203:24;
232:12
**EXAMINATION (1)**
5:7
**examined (2)**
5:6;111:20
**except (1)**
220:15
**exchange (1)**
180:16
**EXCUSED (1)**
277:7
**execution-style (1)**
220:13
**Exhibit (69)**
5:1;14:22;15:3;
33:14,17,21,21;45:19,
20;59:6,9;62:8,10,13;
74:25;75:3,5;80:4,8;
82:10;84:3;87:12,15;
103:14,17;108:3;
115:1,4;117:22;
124:4;128:25;140:2;
152:8;162:25;197:6;
199:24;219:14,17;
222:3,4,14;226:24;
228:15;229:3,22;
230:15,21;231:12,18,
23;232:9,15,16;233:7,
7;244:14,18;254:24;
255:1,3,4;257:23;
258:1,3;263:7;
264:11;267:12;
270:24;271:2
**exhibits (3)**
274:18,22;277:6
**exit (2)**
133:22,25
**expect (1)**
122:3
**experience (1)**
206:22
**explain (3)**
86:19;236:7;268:10
**explained (1)**
271:9
**exploring (1)**
237:3
**express (1)**
247:9
**extent (1)**
271:22
**eyewitnesses (1)**
220:15

# F

**face (8)**
74:5;108:20;144:1;
146:6;206:10,25;
207:8,10
**Facial (1)**
252:4
**facility (1)**
253:21
**fact (22)**
16:13;104:7;
107:25;126:17;129:3;
146:13;164:2,9;
165:23;167:12;
168:15;207:17;
214:13;224:19;
231:22;232:15;247:2,
10;254:23;259:11;
260:1;270:12
**factory (1)**
253:25
**facts (1)**
223:21
**Fair (4)**
47:8;74:10;103:3;
248:3
**fairly (1)**
13:15
**fall (1)**
10:5
**false (43)**
61:4;64:7;65:23;
66:1,24,25;68:5;
69:10,13;71:6,9;
82:13,14;92:9;160:2;
164:2,5;176:4,6;
180:2;197:25;198:4,
7,12;199:4,7;201:6,7,
11,14;202:11,12;
211:4;215:5;228:2,
11,25;229:14,21;
230:12,20;231:16;
233:2
**falsely (1)**
87:2
**familiar (1)**
107:11
**familiarity (1)**
192:8
**family (14)**
10:3;12:15;20:1;
43:23;44:3;77:6,24,
25;78:3,25;135:1;
170:3;249:3,9
**far (4)**
54:1;90:13;260:11;
261:3
**fatal (2)**
156:20,24
**fate (1)**
165:4

**fault (2)**
159:8;232:17
**February (1)**
115:20
**federal (3)**
5:13,19;223:19
**fee (1)**
241:4
**feel (6)**
87:5;112:8,11;
225:7,13,22
**feet (1)**
71:16
**fellow (6)**
22:19;133:8;
134:16,19;166:3;
196:16
**felt (1)**
143:13
**female (1)**
113:14
**few (1)**
202:25
**fifth (1)**
69:21
**figured (1)**
213:9
**file (5)**
81:2;122:10;
123:17,24;241:9
**filed (5)**
84:3;121:19,23;
123:13;241:10
**filled (1)**
244:18
**financial (1)**
103:4
**find (2)**
85:15;119:7
**fine (6)**
7:4;109:11;111:12;
125:8;200:14;238:17
**finger (4)**
19:22;204:2,8,19
**finish (2)**
6:18;221:14
**finished (4)**
111:1,6;162:6;
267:7
**fired (2)**
100:9;195:1
**first (58)**
5:5;20:8;25:8;
39:23;45:20,21;48:1,
4;53:10;54:3;59:5,17;
71:17,17;77:11;
85:15;86:14;91:25;
108:12;114:22;131:3;
159:15;164:20;168:5,
11;179:2,6,13;187:1;
190:10;201:11;
203:14,17;207:22;
208:1;214:13;216:6;

220:23;226:3;234:8;
239:9;244:9;17;
245:9;250:22;254:15;
256:13;257:5,19;
259:21,25;262:17,22;
263:16,19,19;265:16;
266:12
**five (14)**
51:11;68:10,11,12,
14;89:4;99:5;118:22;
142:19,21;146:1,2;
149:7;276:15
**five-minute (1)**
261:24
**flight (1)**
111:9
**floor (7)**
68:15;93:16,17;
192:15,16,17;254:9
**Folk (2)**
172:11,13
**Folks (3)**
172:4,5;174:12
**follow (1)**
35:8
**following (7)**
54:7;80:2;111:4,15;
203:4;226:21;276:19
**follows (2)**
5:6;111:20
**followup (2)**
165:11;277:1
**foot (2)**
27:12;188:23
**force (2)**
141:14;143:4
**forget (2)**
118:1;119:4
**form (121)**
14:16;24:8;26:19;
27:18,19;31:24;
32:23;36:14;37:13,
14;39:18;40:22;41:9;
42:12,17,19;43:1,9,
11,21;44:12,17,25;
45:3,11;46:6;53:5;
54:11,12,19,23;55:18,
24;56:13,15,23;57:6,
11,17,23;60:7;64:5,9,
14;65:25;67:1;68:6;
69:12;70:10;71:8,19;
72:16,17;73:4,5,11;
74:2;76:3;77:2;78:4,
13;83:21,22;85:10;
86:6;95:15;101:12;
107:3;108:14,15;
109:6,15,21;110:3,10,
21;117:2;123:3;
131:22;134:10;
135:16;139:1;140:4;
145:2;150:9;151:14;
152:25;156:4,15;
166:10;169:20;171:4;

172:23;178:22;181:3;
184:15;187:9;193:10;
199:6;201:10;202:16;
204:25;208:10;
210:11;215:17,25;
216:11;218:24;
221:25;225:2,16;
229:23;238:14;
241:13;246:15;256:5,
20;257:23;268:13,18;
270:7

**found (2)**
255:25;260:7

**foundation (46)**
23:24;26:19;27:20;
35:23;36:15;37:13;
43:12;44:16,17;53:5;
56:13,15,23;57:6,11,
17,23;60:7;64:5,9;
65:9;66:2;67:2;68:6;
69:12;70:10;71:8;
72:19;95:16;102:12,
17;107:3;109:6;
110:21;126:7;132:19;
136:3,12;156:4;
169:20;170:6;171:3;
208:10;216:11;218:3;
244:4

**four (6)**
49:23;61:8;99:12;
158:1;190:20;257:5

**frame (1)**
22:16

**Francisco (3)**
23:4,4;71:1

**Frank (2)**
219:19;276:5

**Franklin (5)**
10:16,19;13:5;
115:15;128:9

**free (4)**
225:7;240:11,12,17

**Friday (2)**
258:16,17

**friend (10)**
12:22,25;58:18;
207:14,16;223:6;
249:6;266:18;267:5;
272:2

**friendly (1)**
169:25

**friends (2)**
59:23;271:23

**friend's (1)**
188:5

**frightened (1)**
42:2

**Fro (60)**
24:4,7,11;59:24;
60:3,18,25;61:8,11;
63:23;64:1;66:13,19;
67:11,18,23;68:21;
69:7;70:22;71:1;72:9;

90:5,6,13,22;91:21,
24;92:1,7,19,21,24,
25;93:8,24;94:4,20;
95:13;96:8;97:20,22;
98:16;99:1,3,6,14,18,
24;100:1,8,16;
181:15;184:6,12,17;
188:14,15;193:23;
204:9,14

**front (18)**
51:1;56:22;66:12;
67:11,11,17;192:20;
195:11;201:2,5,9;
202:4;209:8;263:8;
264:19,20;274:18;
275:12

**Fros (2)**
24:5;184:19

**Fro's (4)**
181:16,24;182:6,18

**full (4)**
8:15;88:22;252:8,9

**funds (4)**
107:23;108:1;
224:12;225:9

**further (9)**
20:7;49:3;111:20;
168:3;188:11,21;
240:24;271:15;
276:14

## G

**gain (1)**
133:16

**gang (42)**
13:19;22:8,20;23:8,
11,18,23;126:25;
127:3;130:4,9,24;
131:8;132:3,16,24;
133:8;134:8,15,16;
136:21;166:16;170:4;
171:9,13;172:5,20;
173:4;174:2,3,4,10;
175:6;178:2;183:11;
218:2;220:5,20;
221:4;224:7;268:21;
272:12

**gangs (4)**
172:6,10,21;174:6

**garage (5)**
98:4,6;197:15;
202:8,10

**garbage (1)**
98:2

**gatherings (1)**
170:3

**gave (43)**
20:24;52:8;119:19;
140:1;147:3,4;
152:11,12;163:2;
164:1;175:21;182:14;
190:3;199:1;207:4;

226:4,9;228:2,10,19,
24;230:12,17,19;
231:6,7,16,23,25,25;
232:2,9,10;233:2;
245:5,11;246:11,23;
267:12,22;269:24;
270:4;271:22

**GED (1)**
9:7

**generally (4)**
10:15;38:16;40:25;
83:20

**Gentlemen (6)**
88:7;91:22;164:24;
165:7,16;166:6;
195:8,15,20;197:8;
203:13,19;204:2,5,12,
17

**geographic (1)**
170:21

**geography (1)**
170:23

**gesturing (1)**
232:15

**gets (3)**
234:20;236:8;
241:10

**girl (11)**
12:22,24;58:18;
186:18,18;188:5;
223:6;249:6;266:18;
267:5;272:2

**girls (2)**
244:2,8

**given (2)**
36:9;52:4

**gives (1)**
250:20

**giving (1)**
101:8

**glasses (1)**
251:25

**goal (2)**
121:22;123:22

**goatee (1)**
252:9

**God (3)**
74:11;226:4,10

**God's (1)**
226:11

**goes (3)**
59:20;60:10,16;
63:20;69:15;70:19;
93:11;113:10;220:5;
238:8;267:1,4

**gold (2)**
196:20,22

**Gonzalez (77)**
15:15,25;19:21;
22:22;30:22;36:10,
13;37:1,4;44:24;49:5,
14;50:19;58:4,6;
61:19;71:1;76:23;

85:24;90:5,25;91:21;
92:7,16;94:11,15,23;
95:13,19;96:24;97:8;
98:16;99:1,4,6;100:1,
16,19,25;105:10;
124:6,13;125:7;
134:19;152:2;160:17;
169:9;175:16;184:2;
188:14;189:8;193:19;
195:4,16,21;196:6;
204:9,15;210:20;
211:19;212:3,9,14;
214:8,11,15,24;
215:21;218:1;220:4,
6,9,12,16;238:1,2,3

**Gonzalez's (5)**
15:12;97:12;
100:12;101:9;124:20

**Good (6)**
5:9,10;20:25;88:19;
105:17;158:20

**Google (1)**
261:8

**Goosens (3)**
22:24;23:22;71:1

**grab (1)**
141:17

**grabbed (12)**
41:10,13,16,21;
140:24;141:1,2,15,22;
142:7;143:1;147:11

**grabbing (3)**
81:14;141:7;142:3

**grade (1)**
9:17

**graduate (5)**
9:5,9,12;159:17,22

**graduated (7)**
9:8;157:11;158:18;
159:25;160:4;270:15,
21

**grammar (1)**
158:8

**Grand (5)**
30:7,8,11,17;
213:16

**granted (2)**
233:23;255:8

**GREENBERG (25)**
119:10;148:15,18;
171:3;215:16,25;
216:14;235:25;236:5,
8,14,17,23;238:1,9,
23;239:3,6,9,15;
274:16,21;275:11;
276:15,21

**Greeting (1)**
115:11

**ground (2)**
99:20,21

**grounds (1)**
112:14

**group (4)**

25:1;71:4;209:25;
218:11

**grow (1)**
9:19

**guess (2)**
7:15;55:5

**Guevara (38)**
5:18;18:14,18,21;
19:2,4,20,25;20:11,
16,24;26:13;27:15;
28:9,18;29:4;32:3,18;
33:7;36:8;37:10,23;
38:6,13;39:15;41:7;
42:8,15;43:6,19;
56:11;108:11,13;
109:12,18,24;110:6,
19

**Guevara's (1)**
108:8

**guilty (7)**
105:7,9;218:20;
220:22;246:14,19;
248:6

**gun (40)**
49:7,14,15;51:1,13;
60:17,19,22;61:1,6,7,
10;63:16;66:16,20;
67:16,17,24;69:19;
92:18;93:1,8;94:14,
15;95:5,6,13,19;
96:10,25;97:3,9;
160:19;180:23;
193:19;194:22,24;
195:1,9,21

**guns (2)**
60:22;194:20

**gunshots (2)**
100:2,9

**guy (3)**
28:4;68:17;214:2

**guys (50)**
41:18;50:25;51:2;
65:14,20;66:10,20;
67:14,14,15,20;68:15;
98:19,20,21;99:2,4,7,
20,21,22,23;100:2,21;
101:1;102:13;112:6;
136:13;162:22;
176:21,22;180:24;
196:21;206:17;210:6,
6;211:20;212:15;
214:25;215:14,22;
216:7,21;217:15,20;
261:17,18,24;272:21,
22

## H

**hair (2)**
251:22;252:4

**half (10)**
24:12;88:24;
113:22;177:16,19;

178:4,6,11,15;190:21
**halfway (2)**
  34:16;35:6
**Halvorsen (2)**
  27:16,22
**Hammond (1)**
  68:24
**hand (10)**
  14:21;51:13;68:16;
  110:2;117:10;142:10;
  163:20;164:10;
  203:24;204:6
**handcuffed (8)**
  30:6;31:2,8,11,18;
  33:3;141:3;142:25
**handcuffing (2)**
  29:12,21
**handcuffs (1)**
  29:9
**handed (4)**
  61:7;62:12;80:7;
  152:17
**handing (4)**
  59:8;87:14;103:16;
  116:3
**hands (5)**
  31:14;142:10,11;
  203:14;226:11
**handwriting (3)**
  47:19;154:8,16
**handwritten (10)**
  74:24;75:1;82:9;
  140:1;182:11;228:19;
  229:3;231:12;244:14;
  263:7
**hang (12)**
  126:23;174:18,19;
  208:23;209:8,21,22,
  23,25;210:2,5,6
**hanging (4)**
  126:6;209:18;
  210:19,20
**happen (10)**
  55:3,9,16;63:8;
  68:1;101:3;121:24;
  172:17;174:14;
  269:10
**happened (34)**
  28:10;33:3;63:22;
  64:19,24;67:9;68:9,
  12,18,23;69:16;70:4,
  21;71:11;76:20;77:4;
  78:22;84:2,19;93:19;
  94:16;95:25;97:17;
  99:10,13;116:25;
  144:4;173:15;192:21;
  193:19;205:5;212:8;
  264:21;269:7
**happens (1)**
  269:8
**harassed (1)**
  227:19
**hard (4)**

143:6;146:3;
  161:13;178:3
**hat (2)**
  70:7,9
**head (19)**
  7:12;67:10;71:13,
  13;81:14,15;113:8;
  141:4,9,23;142:16,23;
  143:14,20,23;186:10;
  189:11;206:10;
  222:12
**headaches (1)**
  250:21
**heads (2)**
  50:22;206:3
**Health (1)**
  104:8
**hear (8)**
  100:2;253:15,18;
  260:19;261:14,16,18,
  21
**heard (24)**
  25:15;51:11;68:13;
  99:12,13;149:16,21;
  175:5;177:4;204:20;
  205:4;218:8,14;
  234:8;239:22;244:1,
  9;254:16;259:21;
  260:1;262:17,22;
  265:7;276:11
**hearing (12)**
  84:6;85:14;147:16,
  18,21;148:4,7;249:20,
  24;250:5,23;254:11
**heavy (3)**
  242:17,21;250:14
**height (1)**
  251:20
**held (2)**
  116:24;194:24
**help (6)**
  35:2;88:2;164:19;
  165:2;226:12;257:24
**Helped (1)**
  222:19
**herein (2)**
  5:5;111:19
**Hernandez (19)**
  49:5;50:16,17,19;
  90:6,13,22;160:17;
  161:4;181:17,21,25;
  182:7,19,22;183:3;
  184:5,12;188:16
**hey (2)**
  42:7;261:18
**hide (2)**
  63:10,12
**high (12)**
  9:5,9,11,12;157:11,
  14;158:18;159:17,22,
  25;160:5;270:16
**higher (1)**
  132:18

**highest (1)**
  9:1
**high-level (1)**
  221:3
**hindered (1)**
  250:8
**hire (2)**
  117:19;153:24
**hired (2)**
  119:8;163:7
**Hirsch (2)**
  185:22;186:4
**Hispanic (2)**
  24:12,12
**hit (10)**
  41:22,23;42:10;
  110:1;141:4;142:15;
  145:24;146:2,18;
  151:6
**hitting (2)**
  43:7;142:4
**Hold (3)**
  91:3;103:12;114:15
**holding (12)**
  30:13,25;31:17;
  32:3;33:4;37:22;
  39:22;95:19;108:25;
  109:14;195:16,21
**Homan (15)**
  26:2;49:6;63:8;
  67:5;68:25;93:14,22;
  160:18,22;161:1;
  191:14,21;192:12;
  208:9;267:20
**home (12)**
  26:3;51:15;58:22;
  59:1,22;60:2,18;63:7,
  22;69:16,17;70:20
**Honorable (1)**
  115:19
**hood (2)**
  67:10;206:9
**hooded (1)**
  50:21
**hoodie (3)**
  206:3;207:5,8
**hoodies (7)**
  196:3,13;206:1,2,2,
  18,23
**hoods (4)**
  50:21;196:4;206:5,
  7
**hook (1)**
  31:9
**Hopefully (1)**
  26:8
**hospital (4)**
  138:7,8;145:1;
  269:20
**hour (2)**
  37:8;113:22
**hours (22)**
  33:5;35:6,10;37:24;

40:1,4,7,9,10,11;43:4;
  79:2;140:16,20,21;
  149:10;151:5;184:24;
  185:5,9;186:9,9
**house (48)**
  49:6;60:22,24;63:9,
  24,25;65:6,18;66:18;
  70:23,25;71:3,12,22;
  72:12;92:15,17,21,25;
  93:8,13,15,25;94:4,9;
  95:12,19;98:23;
  160:18;180:22;
  185:17,18,21;186:11;
  187:1,8,15;188:5;
  191:13,16,24;207:24;
  209:8;223:18;261:12,
  25;264:18;267:17
**housed (4)**
  102:1,10;219:6,10
**houses (1)**
  192:5
**Humboldt (6)**
  9:22;21:18;171:7;
  172:1;174:20,21
**hundred (1)**
  142:20
**hung (3)**
  135:22;171:8;
  259:17
**hurt (1)**
  146:23
**hurting (1)**
  146:20

## I

**idea (7)**
  19:10;29:17,20;
  137:2;175:12;237:3;
  262:1
**identification (12)**
  5:2;33:15;59:7;
  62:11;80:5;87:13;
  103:15;115:2;197:6;
  199:24;219:15;222:5
**identified (2)**
  37:2;201:4
**identify (3)**
  198:5;201:1,9
**identifying (1)**
  199:9
**IDOC (2)**
  248:24;251:1
**illegally (2)**
  81:12;82:2
**Illinois (30)**
  5:15;80:13;104:20,
  22,25;105:4,20;106:6,
  10,20,23,24,25;107:2;
  115:10,16;124:6;
  129:25;131:5,18;
  147:24;218:22;220:1,
  10,24;221:7,8,22;

223:17;258:10
**immediately (1)**
  13:8
**implicate (1)**
  44:23
**implicated (2)**
  19:21;36:12
**implicating (1)**
  36:10
**important (2)**
  6:15;7:9
**impossible (1)**
  220:14
**imprisonment (1)**
  220:8
**Inca (3)**
  175:5,8;218:12
**incident (1)**
  220:17
**including (1)**
  51:10
**Indian (2)**
  148:10,11
**indicate (1)**
  197:23
**indicated (2)**
  50:23;168:7
**indicates (2)**
  36:24;116:6
**indicating (2)**
  29:21;252:11
**individual (3)**
  24:13;176:12;
  181:14
**individuals (2)**
  29:4;172:19
**indoctrination (1)**
  268:19
**Industry (3)**
  11:6,9;159:2
**infection (10)**
  104:14,18;144:5,7,
  11,14;145:16,17,22;
  146:17
**inform (2)**
  18:15;225:5
**information (5)**
  81:19,20;160:2;
  236:21,22
**informed (1)**
  36:8
**initial (1)**
  53:14
**initially (1)**
  168:22
**initials (1)**
  53:12
**injured (2)**
  253:19;269:18
**injuries (1)**
  269:15
**inmate (3)**
  222:24;223:1,16

**inmates (2)**
222:18;223:19
**inner (1)**
74:19
**innocent (3)**
82:17;83:5;180:1
**inside (6)**
59:1;68:23;94:9;
96:6;195:6;233:17
**instance (2)**
30:19;76:7
**instruct (3)**
237:18;240:15,24
**instruction (1)**
242:1
**interests (2)**
86:17,20
**interrogating (1)**
18:14
**interrogation (1)**
39:22
**intersection (3)**
17:19;21:14;180:23
**interview (3)**
37:9;39:24;151:6
**interviewed (2)**
211:25;212:6
**into (43)**
32:2;33:5;49:23;
94:17,24;96:4,6;
112:17;120:13;
131:14;133:17;
138:16;147:24;
165:24;172:14;173:4;
177:21,23;178:2;
185:13;186:9,9;
193:20,25;212:9;
214:24;215:13;216:7,
20;217:14,19;234:20;
236:1,8,21;238:8;
240:23;242:17;
263:17;268:19,21;
269:1;271:10
**invested (1)**
243:5
**investigate (2)**
233:21;255:5
**investigator (4)**
120:2;124:16;
233:21;255:5
**involuntary (2)**
81:16;82:4
**involved (10)**
13:19;52:21;
151:13,24;152:4;
156:14;244:24;
247:17,24;248:8
**issue (3)**
6:22;74:7;149:5
**issues (1)**
249:21

## J

**Jacques (2)**
174:23;175:1
**Jail (20)**
14:10;55:22,25;
56:3;73:2;77:14;79:6;
85:3;101:19;104:18;
120:19;129:25;131:4,
10;166:15;167:25;
248:17,21;251:1,3
**January (17)**
15:21;116:3,7;
117:20;167:14;168:7;
227:11;231:22;
256:12,15,18,18,19,
19;257:4,11,12
**JC (2)**
53:12,18
**Jeffrey (2)**
23:14,14
**Jennifer (1)**
5:11
**job (7)**
112:23;113:4,8;
119:25;120:2;253:20;
254:22
**Jockisch (1)**
219:25
**Join (8)**
36:16;43:22;54:13;
56:16;66:3;110:11,
22;126:18
**Joliet (3)**
219:1,2,2
**Jones (1)**
115:20
**Jose (62)**
5:12,21;13:23;
22:14,19;30:19;36:9,
12;37:2;49:5,24;51:3;
58:1,18,21;59:19,22;
60:17,17,19,24;61:1,
7,9;62:14;63:24;65:5,
7,18,19;66:18;67:23;
70:8;76:24;106:2;
115:6;160:17;176:12,
23;177:15;178:6,14;
184:3;207:14,16,18;
208:15,18;210:20,23;
233:22;234:13;235:5;
237:8;243:15,16;
244:1,12;255:6;
259:12;271:19;
272:17
**Jose's (7)**
49:6;59:20,23;60:2;
160:18;243:24;244:2
**Juan (23)**
41:3;44:19,23;
92:24;94:12,16,24;
95:1;96:6;113:25;

114:8;149:15;150:2;
193:20;266:23;267:2;
272:14,15,19,22;
273:6,10,19
**Juan's (7)**
92:17,25;93:8,25;
264:18;266:18;267:5
**Judge (2)**
115:19;164:16
**July (3)**
58:25;219:20;
220:21
**jump (4)**
64:19;92:6;98:9;
100:25
**jumped (7)**
29:8;51:14;69:18;
92:2;97:17,19;100:22
**June (1)**
58:25
**Jury (25)**
88:7;91:22;164:14,
15,15,24;165:3,7,16,
22;166:7;182:17;
195:9,15,21;197:8;
201:2,5,9;203:14,19;
204:6,12,18,22
**Justice (2)**
121:25;122:1
**JUSTINO (41)**
5:4;8:16,19;28:15,
25;34:17;35:13;37:1,
7;45:22;47:11,19;
48:2,6;49:4,25;50:7,
20,22;51:4,9,11,14,
21;52:7,13;54:4,7;
65:17;80:13,19;
87:21;103:20;111:18;
115:12;116:3;159:16;
161:10;219:21;
223:16;238:19

## K

**Kedzie (8)**
21:15,16;174:22;
185:23;186:3,4;
257:20;258:7
**keep (5)**
43:8;70:7,7,9;173:2
**keeping (2)**
120:19;172:21
**kept (2)**
150:17;173:17
**Kevin (2)**
156:21;220:7
**kicking (1)**
243:2
**kidding (1)**
71:20
**killed (6)**
19:3,5;70:3,16;
162:22;261:19

**Kimball (16)**
17:19,24;36:1;
89:14,18,22,24;97:25;
98:25;99:10,11;
187:4,20,21,21,24
**kind (22)**
62:4;63:16;95:6;
123:2;139:17;142:5;
144:9,12;147:15;
188:24;204:22;241:4,
7,24;243:10;249:14,
24;250:23;252:10;
254:8;259:5;270:19
**kinds (2)**
113:23;136:16
**King (26)**
24:21;70:22;71:2,
14;134:19,24;166:4;
170:25;172:21;173:3,
4,10;174:13;177:9;
183:14,16,18;
196:16;206:23;207:5;
220:21;224:23,24;
243:9;258:22;269:9
**Kings (64)**
22:8;23:7,18,23;
24:18;125:22,25;
126:6,15,19,22;
129:12,14,21,23;
133:17,20,23,25;
134:3,5,14;135:2;
136:2;165:25;170:10,
19;171:1,8,10,21;
172:2,5,7,14;173:8,
24;174:1;175:6,9,10;
176:21;183:12;184:3,
4,6,10;196:19;218:1,
9,10;220:4,14;
242:22;248:19;
249:16,17;258:13;
259:9;268:11,19,20,
25;269:1
**Kings' (1)**
170:22
**kitchen (3)**
94:21;193:25;194:5
**knew (52)**
24:25;87:10;90:14,
16;144:6;150:25;
151:1;155:23;157:1;
165:23;166:3;169:14;
170:9;176:25;177:1,
7,9,11;178:10,14;
180:11,16,25;182:18;
184:19;192:4,10;
208:18;210:7;211:8,
11;214:18;215:4;
216:10;217:5;219:5;
234:1,5,9;245:2;
247:13;248:1,12;
259:8,12;266:25;267:15,18;
268:17;272:22

**knocked (1)**
141:23
**knowing (2)**
166:8;210:25
**knowledge (16)**
19:11,14;125:16;
134:17;177:13;
186:23;194:25;
198:15;209:6;214:1;
227:25;229:10;231:6;
256:6;257:2;276:12
**known (9)**
36:7;59:24;169:9;
177:15;178:6;182:22;
183:3;184:6;198:5
**knows (3)**
35:3;73:25;238:25

## L

**Ladies (16)**
88:6;91:22;164:23;
165:7,15;166:6;
195:8,14,20;197:7;
203:13,19;204:1,5,11,
17
**lady (2)**
192:25;265:1
**lady's (5)**
185:17,18,21;
186:11,14
**language (1)**
153:18
**languages (1)**
158:6
**L-a-n-i (1)**
148:25
**last (26)**
8:17;13:23;14:1,13;
16:2;47:9;61:13,25;
62:1;89:13;118:13,
14;128:15;135:5,12;
137:19;138:4,22,24;
149:4,7;161:9;
207:23;210:24;270:2
**late (7)**
37:8;67:2;126:10,
11;134:14;186:8;
196:12
**later (8)**
18:7,8;33:5;37:24;
54:10;143:13;191:2;
270:13
**Latin (85)**
22:8;23:7,17,23;
24:17,21;125:22,25;
126:6,15,19,21;
129:11,14,20,23;
133:17,20;134:3,5,14,
19,23;135:2;136:2;
165:25;166:3;170:10,
19,22,25;171:1,8,10,
21;172:2,5,7,14,21;

173:2,4,10,23;174:1,
13;175:6,9,10;
176:21;177:9;183:12,
14,16;184:3,4,6,10,
18;196:16,19;206:23;
207:5;218:1,9,10;
220:4,14,21;224:23,
24;242:22;243:9;
248:19;249:16,17;
258:13,22;259:8;
268:11,19,20,25;
269:1,9

**Latino (29)**
26:12;27:2,24;
52:19;121:12,15;
139:5,24;140:3,8,13;
141:13;145:21;178:9;
191:7;213:1,3,8,8;
214:2;232:1;233:12,
13;251:9,13;262:12,
14;266:25;269:25

**law (6)**
153:21;234:14;
235:7,11;237:9;
239:21

**lawsuit (8)**
122:10;123:13,17,
24;241:9,10,11,12

**lawyer (38)**
79:10;112:2,20,21,
25,25;120:4,8;
122:21;153:23,25;
167:3,19;178:20;
179:3,21,21;180:1,4,
15;181:6,11;205:9;
214:18,19,23;215:4,5,
6,7;216:10;217:5,13,
18;227:21;230:9;
239:1;240:21

**lawyers (19)**
111:24;112:18;
120:11;123:20;
124:11;125:13,15;
163:7;227:4,23;
230:5;232:20;238:10;
239:13,21;240:8;
241:5,8,19

**laying (2)**
68:15;204:19

**lead (1)**
229:19

**leading (12)**
18:24;19:6,18;
20:21;26:15;27:20;
39:19;45:5,15;78:13;
110:10,24

**learned (6)**
25:9;108:8;233:22;
255:6;266:12,22

**least (1)**
259:13

**leave (8)**
32:6;39:21;61:10;

66:18;129:14,20;
130:8;151:9

**left (31)**
32:8;41:22,23;61:9;
66:11;69:18;76:15;
95:25;96:1,2;105:3;
129:23;131:8;140:15,
25;141:10;144:1,11;
145:17,18,25;225:17;
226:11;249:24,25;
250:2,6,23;251:5,7,8

**legal (1)**
8:15

**LEINENWEBER (50)**
27:19;33:20,23;
34:7,11;36:14;42:17;
43:11,22;44:17;45:5;
46:6;54:12;55:18;
56:15;64:3,15;66:3;
72:16,18;73:15,17;
74:7,21;86:6;95:15;
108:15;109:5,15,21;
110:3,11,22,24;
237:21,24;238:4,12;
253:11,13;255:2;
256:8,23;258:2;
267:24;268:15;270:8;
271:14;275:14,17

**LeMoyne (5)**
70:1;89:24;90:1;
187:23,25

**less (5)**
86:12;183:22;
227:14;232:23;
261:24

**letter (8)**
219:18;221:11,17;
222:8;223:8,15;
225:11;226:7

**letters (2)**
222:10;249:14

**level (1)**
9:1

**license (1)**
158:22

**lie (51)**
36:18;83:20;176:8,
13;177:16,17;180:6;
181:7;182:19,25;
183:18;184:12;185:9;
187:13;188:19,20,21;
189:14;193:3,4,7;
194:1,2,6,11;196:10,
11;199:11,15,21;
202:17,19,20;206:14,
15;209:3,4,5;211:15,
22;215:4;217:20;
247:10,13;248:4;
266:21;267:13,17,18,
19;271:24

**lied (2)**
180:9;215:6

**lies (1)**

189:5

**lieutenants (2)**
132:12;218:10

**life (20)**
85:4;86:11,12,22,
23;87:9;155:5,7;
169:10,15;220:8;
224:10,12,16;226:2,4,
9,13;250:9;257:18

**likely (1)**
166:9

**line (43)**
167:1,11,23;168:4,
15,19,20;169:7;
181:13;182:21;
183:11,15;185:11;
186:14,24;188:22;
191:11;192:19;
193:17;194:15;195:3;
196:1;197:4;199:22;
203:9;205:17,19;
206:21;207:13;
208:13;210:19;
211:18,24;214:4;
215:3,20;216:9,21,22;
217:4,10;264:15,16

**list (1)**
258:3

**Listen (3)**
90:18,20;256:13

**little (20)**
18:1;31:7;53:23;
54:10;55:4;62:5;
140:11;142:6;147:15,
19;152:18;155:10;
158:20;160:11;
201:14;203:1;232:12;
242:11;263:23;
268:10

**live (22)**
10:14,19;12:10,14,
15;21:12,20;63:7;
93:15,17;127:16;
128:7,8,8;170:12,14;
177:3;186:2;191:24;
192:15;210:23;
226:13

**lived (21)**
10:17;13:2;126:16,
18;139:16;157:23;
160:21,25;170:13;
171:7;191:18;208:7,
7;210:8,8;211:7,9,12;
258:7;259:2;267:18

**lives (2)**
59:19;210:1

**living (11)**
94:18,19;103:25;
193:22,23;207:24;
208:16,16;211:1;
257:19;258:9

**Lluvia (45)**
59:24;60:3,10,11,

14,16,18,19,25,25;
61:7,8,10;63:9,11,13,
17,23,25;64:20,24;
66:7,12,13,16,19;
67:9,17,18,23;68:16;
69:2,7,18,24,24;70:1,
2,13,16,21;72:6;
95:18;162:16,17

**Lluvio (2)**
162:12,15

**located (3)**
35:13,25;185:22

**location (8)**
36:1;67:22;69:2;
93:20;97:7;170:21;
197:13;210:9

**lock (2)**
114:12,14

**locked (26)**
9:4;25:11;78:5,7;
121:7,9;124:25;
129:15,16,22;131:2,3;
149:16,17;150:2,7;
190:13,15,16;213:16;
230:19;250:24,25;
262:24;266:23;267:1

**locking (1)**
114:11

**lockup (1)**
263:17

**Loevy (6)**
239:20,20,21,21;
240:2,2

**long (21)**
10:17;11:1,11;32:8;
39:21,24;40:2,5;43:3;
79:5;99:3;102:5;
106:16;113:18;
167:23;169:8;177:14;
182:22;183:16;
200:15;231:8

**longer (4)**
62:5;190:14,15;
226:8

**look (41)**
15:2,4;33:16;45:18,
19,21;47:8;48:1;
59:16;62:5;88:1;89:5;
97:4,9;115:4;124:4;
153:17;156:18;
159:15;162:24;
164:13,19;166:25;
167:11;169:5;185:11;
189:20;191:11,11;
197:2,6;199:25;
200:19;210:18;
211:18;219:16;
222:13;226:24;
254:23;255:3;264:4

**looked (6)**
68:14,15;96:25;
102:3;163:5,8

**looking (11)**

97:24;98:24;99:8,9,
11,13;199:2;256:14;
274:18,22;275:12

**lookout (1)**
220:18

**looks (6)**
13:10;16:24;53:11;
87:23;161:12;200:3

**lose (1)**
147:18

**losing (1)**
147:16

**loss (5)**
147:21;249:24,25;
250:5,23

**lot (33)**
24:5;50:25;61:23;
98:7,18,19,22,22;
99:16,18,19;136:13;
197:10,24;199:7;
200:1,23,24;201:2,4,
9,23;202:12;204:10;
203:11,22;204:10;
208:17;250:13,14;
259:5;267:11

**lots (1)**
253:25

**loud (6)**
250:11;253:24;
254:9,10,11;272:25

**Louis (18)**
50:9;67:6,6,23;
96:12,13,19,20;97:8,
25;98:25;99:9,11;
185:19;203:16;
260:10,11,14

**lower (4)**
86:5,7;92:10,11

**Luis (1)**
10:1

**lunch (1)**
111:14

**lying (8)**
165:20,22;175:23;
176:2;229:25;230:2;
247:7;267:4

## M

**machinery (2)**
250:14;253:25

**machines (1)**
254:1

**Macho (1)**
25:6

**main (1)**
166:14

**maintained (1)**
248:11

**makes (1)**
250:14

**making (6)**
51:9;74:7;176:9;

202:22;222:10;
242:23
**male (5)**
113:13;251:14,15,
16,17
**man (4)**
28:10;76:7;204:19;
220:12
**Management (2)**
107:9;223:18
**maneuvered (1)**
203:24
**many (18)**
10:24;44:21;
102:10;118:16,19;
141:17;142:19;
145:24;147:9;157:24;
207:20;208:14,19;
209:14;230:18;
232:11;269:5,12
**map (1)**
204:22
**Maps (1)**
261:9
**March (4)**
168:18;214:16;
217:13,18
**Marek (5)**
87:24;219:19;
265:20,21,22
**Marijuana (2)**
136:17;261:11
**mark (9)**
33:13;59:5;62:8;
87:11;103:13;219:13;
222:2;265:18,20
**marked (27)**
5:2;14:21;15:3;
33:15,17;45:20;59:7,
9;62:11,13;74:25;
80:5,8;82:10;84:3;
87:13,14;103:15,16;
115:2,4;117:22;
197:5;199:23;219:15,
17;222:5
**marks (1)**
147:7
**married (3)**
11:1;12:17,20
**May (45)**
17:5,11;19:11;21:7,
12,20;22:1,8,17,25;
49:3;53:3;55:5,5;
58:25;59:21;60:3,24;
61:11;63:5,21,25;
65:6,18;66:19;
160:16;177:14;
182:21;183:15;
184:23;185:5,13,14;
186:9;195:10,12;
200:10;207:19,21;
208:2,19;211:2;
257:17,18;258:9

**maybe (34)**
24:12;73:22;88:2;
124:3;125:5;139:2;
141:21;149:24;153:1,
3;164:18;166:11;
168:2;175:22;183:25;
185:7,7;186:12;
187:10;189:18;
193:11,14;199:20;
200:5;209:11,12;
210:16,16;227:8;
231:7,8;232:10;
235:15;262:24
**Maysonet (81)**
5:12,18,21;13:24;
16:5;19:21;22:14,19;
30:19;34:24;36:9,13;
37:2,4;41:3;44:19,24;
49:5;58:1;59:19;
62:14;67:23;70:8,14;
71:25;72:4,7,10;
76:24;89:7;93:15;
94:10,12,24;95:24;
106:2;113:25;114:8;
115:6;122:11,13,24;
123:6,12;135:6,13,19;
136:11;149:21;152:1;
160:17,21,25;176:12,
24;177:15;178:10,14;
184:4,9;191:23;
203:20;204:3;207:14;
208:6;209:19,24;
210:3;233:22;234:2,
6,13;235:6;237:8;
243:15;254:16;255:7;
256:3;259:13;271:20;
272:5
**Maysonet's (30)**
58:18,21;59:1;
60:18,24;62:9;63:25;
65:6,18;66:18;70:24;
71:3,21;72:12;92:15,
21;93:12,18;94:3;
95:12,19;120:3;
122:14;124:17;
180:22;191:13,16;
192:25;209:8;264:25
**mean (32)**
9:3;18:6;41:1;
55:21;62:3;73:14;
74:5;77:17;96:1;
97:19;99:21;106:14;
133:1,5;148:24;
177:1;178:1;206:2;
208:17;228:19,22;
236:6;242:5;247:5,8;
265:20;266:2;268:10,
12;269:3;271:9;276:5
**meaning (1)**
50:21
**means (7)**
8:10;133:2;153:7;
190:20;257:5;268:9;

275:9
**meant (3)**
268:4,17,23
**media (1)**
135:14
**medical (4)**
103:17;104:7,8;
257:22
**medication (9)**
144:7,8,9,12,16,25;
145:13,16,19
**medicine (1)**
147:3
**meet (9)**
77:22;78:25;179:8,
16,20;245:21;246:10;
255:18,20
**meeting (1)**
79:18
**member (22)**
22:7,20;23:7,17;
77:25;78:3;125:21;
126:14,21;129:11;
133:19;134:3,5,13;
170:9;173:10;183:12;
184:2,4,6;249:9;
258:13
**members (19)**
20:1;43:24;44:3;
77:7,24;79:1;133:8;
134:15,16;135:2;
170:25;171:13;174:5;
196:16;220:20;
248:19;249:2,16;
258:22
**membership (1)**
125:24
**memorialize (1)**
74:15
**men (8)**
25:16;49:23;61:8;
69:2;113:15,15;
204:13,15
**mental (1)**
82:2
**mention (1)**
124:21
**met (14)**
118:17,24;122:20;
246:4,7;255:12;
256:11,14,17,25;
257:3,6,9,13
**Michael (1)**
80:21
**mid (1)**
172:3
**middle (3)**
63:5;143:22;153:18
**midnight (1)**
66:19
**might (9)**
111:1,25;176:1;
179:19;188:6,7;

193:16;238:15,16
**mile (1)**
260:20
**miles (4)**
260:16,17;261:9,12
**military (1)**
35:11
**millimeter (16)**
49:16;60:23;61:1;
63:17;68:16;71:12,
13,23;72:1,4,7,10;
95:7;194:16;195:5,16
**mind (1)**
169:3
**minute (2)**
110:25;125:20
**minutes (4)**
68:11;99:5;133:6;
276:15
**Miranda (1)**
48:13
**misspeak (1)**
216:16
**mistaken (1)**
220:20
**misunderstood (2)**
149:24;150:6
**MM (2)**
80:5;115:2
**moment (2)**
37:19;217:25
**mom's (1)**
137:17
**Monday (2)**
258:16,17
**money (12)**
103:6;123:14,17,
24;173:11,15,17;
242:22,25;243:2,9;
254:6
**month (2)**
12:4;138:6
**months (3)**
167:25;186:20;
190:8
**more (21)**
6:22;24:7;28:6;
45:7;118:21;140:21,
22;141:20;142:1;
143:16;146:1,2;
147:16;149:10;151:5;
157:23;183:21;217:3;
242:8;252:9,9
**morning (10)**
5:9,10;25:20;35:12;
164:1;184:25;185:13;
186:9;255:16;274:6
**most (2)**
106:21;166:17
**mother (2)**
137:24;138:5
**motherfuckers (2)**
70:3,17

**mother's (2)**
15:19;137:18
**motion (5)**
80:10,15;81:20;
83:23;84:6
**mouth (1)**
70:7
**move (4)**
68:18,19;74:16;
211:1
**moved (7)**
12:24;13:4;101:19,
20,24;128:13;166:21
**movie (2)**
71:18;74:22
**moving (1)**
91:6
**much (13)**
14:12;88:24;89:1;
105:19;129:9;137:1;
157:9;190:2;240:8;
242:22;269:17;
271:19;277:4
**multiple (4)**
20:4;45:9;141:22;
142:7
**murder (17)**
38:17,18,25;41:3;
44:19;55:13;69:8;
76:16;78:18;149:18,
19;151:13,24;152:4;
156:14;220:13,23
**murdered (5)**
41:18;260:2,6,8,10;
261:1,4,12;262:2
**murders (27)**
6:8;11:24;17:5,10,
13;19:11,15,23;
25:10;29:25;36:10,
12;37:8;40:20,23;
70:9;71:15;150:13,
15;152:5;220:7;
247:17,21,24;248:8,
14;274:14
**must (1)**
225:6
**mustache (4)**
252:14,15,16,17
**myself (1)**
173:17

---

# N

**name (79)**
5:11,17;8:15,17,22;
11:18;23:1,13,25;
24:3;26:10;34:16;
35:16;47:9;87:18;
103:20;107:10;
110:18,20;113:5;
115:12;117:24;118:2,
4,7,13,15,24;119:15,
17,20;121:11,13;

122:2,3;145:10;
148:9,10,12,14;
154:12,14;161:4,12,
14;177:7;181:16,24;
182:5,6,10,15,18;
186:15,18;208:8;
219:21;223:16;228:3,
12;229:1,16;230:13,
25,25;231:17;233:3;
239:22,24;262:18,22;
264:5;265:3,10;
266:5,11;272:24;
276:5,9

**named (5)**
153:15;174:23;
176:12;184:17;
219:25

**names (2)**
118:8,9

**name's (1)**
118:10

**Nancy (1)**
10:1

**Nation (4)**
172:11,14;174:7,12

**natural (1)**
220:8

**nature (1)**
73:21

**near (9)**
17:18;26:3;67:22;
185:18;186:4;197:24;
202:10;257:20;258:6

**need (8)**
7:3,25;8:3,6;65:3;
91:10;112:11;114:6

**needed (6)**
65:1,7,13,19;
119:23;120:3

**neighborhood (30)**
9:21;24:16;126:16,
18;135:21;139:16;
171:2,17;173:12;
174:15;176:15,25;
177:2,4,12,21,22,24;
192:7,8,10;226:14,16;
242:17,21;258:25;
259:1;261:3,17;273:8

**news (11)**
108:9,11,16,18;
109:12,19,25;110:7;
123:8;261:14,16

**newspaper (1)**
270:14

**next (28)**
17:17;33:2;34:22;
36:25;49:13,24;
63:16;66:5;67:4;68:9,
18;69:20,24;70:4;
89:16;91:9,20;92:13;
98:15;176:11;182:21;
186:13;191:23;
192:14;197:16;202:3,

8;242:16

**n-i (1)**
148:24

**nickname (6)**
8:19,21;24:4;25:6;
181:14;272:11

**night (14)**
65:1;140:2;161:25;
185:2;196:2;212:8,
24;233:10;244:23;
245:6;252:18,23;
253:1;258:18

**nobody (7)**
97:22;98:10;
111:11;207:1,9;
215:7;240:2

**Nodding (12)**
5:20;6:14,24;7:6,
24;13:1;33:12;40:13;
56:7;62:19;92:12;
158:15

**noise (3)**
250:11,14,20

**none (2)**
114:22;135:4

**Nope (1)**
225:11

**North (47)**
17:19,24;21:15,16;
25:17;26:2;36:1;49:6;
50:9,25;63:7;65:14,
20;67:7,7,22;68:24;
69:3;89:22;96:15,15,
20,20,22,23;97:8;
98:18,22;160:18,22,
25;185:19;187:22;
197:13;202:5,6,6;
203:11,15;204:11;
205:23;257:20;258:6;
260:10,12,14;261:2

**Northern (1)**
5:14

**Nos (1)**
5:1

**notice (1)**
156:24

**number (8)**
127:20;128:10;
149:2;208:22;222:25;
223:2;257:23;272:16

---

## O

**oath (2)**
8:8,10

**Object (45)**
26:15;37:13;39:18;
40:22;41:9;42:17,19;
43:1,9,21;44:12,25;
45:3,11,15;53:5;
54:11,23;55:24;
56:13,23;57:11,17;
60:7;64:14;67:1;

71:19;72:17;73:4,11;
74:2;76:3;83:22;
101:12;108:14;109:5;
110:10;112:13;
119:10;215:16;
235:25;236:2,13;
240:13;270:7

**Objection (113)**
14:16;18:24;19:6,
18;20:21;23:24;24:8;
26:19;27:18,19;
31:24;32:23;35:23;
36:14;42:12;43:11;
44:5,16;45:5;46:6;
54:12,19;55:18,19;
57:6,23;64:3,5,9,15;
65:9,25;68:6;69:12;
70:10;71:8;72:16;
73:5;74:8;77:2;78:4,
13;83:21;85:10;86:6;
92:22;95:15;97:2;
102:17;108:15;
109:15,21;110:3,21;
111:11;117:2;123:3;
126:7;131:22;132:19;
134:10;135:7,16;
136:3,12;139:1;
140:4;145:2;150:9;
151:14;152:25;156:4,
15;166:10;169:20;
170:6;171:3,4;
172:23;175:2;178:22;
181:3;184:15;187:9;
193:10;199:6;201:10;
202:16;204:25;
208:10;210:11;214:9;
215:25;216:11;218:3,
24;221:25;225:2,16;
229:23;234:20;
236:20,20;237:15,17;
239:2;241:13;244:4;
246:15;256:5,20;
268:13;274:20

**objections (4)**
74:11;96:18;
168:19;185:20

**observe (1)**
97:9

**observed (1)**
152:1

**obtained (2)**
81:11;82:1

**obtaining (1)**
95:13

**obvious (1)**
221:2

**obviously (1)**
46:17

**occasions (5)**
141:22;142:7;
207:19;208:19,22

**occurred (2)**
169:17;205:11

**o'clock (6)**
26:8;46:15;185:2,
15;186:10;274:4

**October (2)**
223:8;226:6

**off (14)**
5:24;18:1;89:23,24,
25;111:1;185:1,2,14;
186:10;187:23,23,24;
206:3

**offer (3)**
85:16;167:3;168:23

**Office (32)**
88:5;107:22;
113:12;119:1,2;
129:3;144:25;145:3,
5;164:22;166:20;
167:2;168:5;218:19,
21;221:1,5,11,17;
222:9;223:12,22;
224:1,10;225:10;
237:7;239:21;245:22;
246:5;263:17;266:6,
14

**Officer (45)**
26:10,16,16;27:4;
77:13,20;83:2;121:6,
9,12,15,20,24;139:24;
146:18;152:13,16;
155:9,13,14;182:8;
189:18;212:1,2;
228:21;229:9;231:7,
24,25;232:1,10;
233:12,13;251:9,9,12,
13,16,17;262:12,14;
265:6,7;266:25;
267:23

**Officers (13)**
34:20;52:17;103:1;
115:11;120:20;
123:14;189:24;
209:22;214:20,20,21;
252:20;266:24

**officer's (1)**
121:11

**Offices (4)**
234:14;235:7,11;
237:9

**often (5)**
15:24;136:1,6,10;
196:21

**old (10)**
8:24;16:24;21:9;
59:18;126:5;137:6,9;
175:16,20;186:19

**older (10)**
10:6,7,12,13;129:6,
8,9;137:1,10,12

**once (7)**
45:7;96:11;131:17;
171:18;207:21;209:1;
224:15

**one (70)**

7:19;8:13;27:2,4;
29:3;31:14,15;51:10;
52:6;59:5;62:23;
74:15,20;77:5,24;
89:8;99:13,19,20,21;
108:6;110:25;111:2;
118:6;119:5,19,20;
120:7;121:16;122:22;
142:10;143:16,16,18;
153:25;158:25;
163:15;166:13;172:5;
179:11;182:11;183:7;
186:17;190:10,13;
196:5,7;204:18,19;
212:25;213:6,7;
220:22;222:3,17;
227:3;228:13,13;
229:17,17;230:6,21,
21;232:9;242:15;
244:12;249:5;259:16;
266:1;271:2

**one-page (1)**
15:3

**ones (6)**
52:18;119:22;
182:14;187:11;214:2;
250:18

**one's (1)**
239:5

**only (26)**
75:1;106:10,14;
147:13;156:10;157:1;
158:14;200:12;213:2,
6,7;214:1;229:17,17;
230:19;231:5,9,10,11,
18;232:9;237:2;
238:25;252:20;254:1;
262:9

**open (1)**
110:2

**opportunity (4)**
16:10;56:21;57:2,
20

**opposite (3)**
172:6;248:2;253:15

**option (2)**
56:12;57:14

**options (1)**
57:8

**oral (1)**
245:5

**order (1)**
116:11

**others (1)**
210:3

**out (78)**
12:25;13:7,10;14:6;
20:19;29:8;40:8;
50:20;53:11;65:15;
66:10;67:10,11,12;
69:7,17;70:22;83:24;
84:16;85:15;93:20,
22,23,25;94:25;95:1,

24;97:2,3,9,18,19,20;
98:9;100:19;105:22;
106:7;107:21;120:19;
124:16;129:3;130:12;
132:3;135:22;148:3,
6;161:13;172:21;
180:24;195:6;199:14;
205:10;209:8,18,21,
22,24,25;210:2,5,6;
213:9;226:4;227:24;
240:3,5;241:11;
244:18;259:9,13,17;
260:7;263:17;264:17;
272:25;273:8,13,14

**outside (3)**
208:24,25;209:2

**over (25)**
6:16;7:1;15:6;
64:20,25,25;104:23;
109:7;123:9;130:12;
140:21;152:17;
179:17,23;206:10;
207:18;216:17;
229:11;233:21;238:5,
7;255:6;261:19;
262:21,21

**Overturn (1)**
122:5

**overturned (7)**
122:7,10;123:7,16,
23;241:9;256:4

**own (4)**
178:7;179:20;
220:17;227:4

**owned (1)**
194:22

---

# P

**page (79)**
34:23,23;45:21;
47:9;48:1;53:10;
59:17;61:13,25;62:1;
63:2,3,4,5,16;64:21,
22;66:5;69:20,22;
88:1;89:6,6,9,16;91:9,
15;92:22;94:6;95:21;
97:4,14;98:15;
155:24;159:15;161:9;
164:13,20;166:25;
167:23;168:14;169:6;
175:14,15;181:13;
184:2,20,22;186:13,
14;187:19;191:11;
192:19;193:17;
194:15;195:3;196:1;
197:2;199:22;203:7,
8,9;205:17,18;
206:21;207:13;
208:13;210:19;
211:18;215:20;
216:15,15,19,21;
217:4,8;264:12,15,16

**pages (1)**
91:6

**paid (1)**
241:11

**pants (4)**
97:2,3;195:7,12

**paper (4)**
75:15,20;76:2;
157:5

**papers (3)**
230:18;275:12,13

**paragraph (25)**
36:25;49:1;59:17;
81:5,7,10;154:11;
159:16;228:1;229:14,
20;230:4,4;231:3,15;
232:7,19;233:1,19;
234:11;235:1,23;
236:6;237:6;255:4

**parents (1)**
272:7

**Park (12)**
9:22;10:16,20;13:5;
21:18;93:21;115:15;
128:9;171:7;172:1;
174:20,21

**parked (6)**
67:7,8;97:16;
203:25;204:3,4

**part (13)**
23:10,20,23;
151:12;156:18;160:9;
170:18;171:1,22;
172:11,13;237:2;
267:15

**participants (1)**
220:16

**participate (3)**
17:4,13;170:4

**participated (1)**
171:9

**participation (1)**
220:17

**particular (5)**
104:22,24;171:22;
172:19;176:7

**parties (2)**
5:23;170:2

**partner (4)**
118:2;213:3,8;
214:3

**partners (1)**
26:18

**parts (2)**
53:14;171:14

**party (1)**
139:2

**passed (1)**
190:3

**passenger (3)**
66:12;96:7,8

**passes (1)**
273:17

**passion (1)**
74:19

**pay (2)**
157:4;174:9

**paying (1)**
240:8

**Peace (1)**
115:10

**pending (3)**
5:13,18;8:2

**penitentiary (1)**
147:23

**people (27)**
71:22;80:12;95:2;
102:10;108:10;115:6,
10;124:5,12;125:7;
132:6;156:25;164:14;
172:4,8,13;174:4,4,5,
6;212:10;214:8,12;
250:16;261:11;269:5,
12

**People's (2)**
197:5;199:24

**percentage (2)**
249:25;250:5

**perfectly (1)**
7:16

**period (5)**
21:7;32:10;43:5;
131:9;257:18

**perjured (2)**
247:3,5

**Perkaus (5)**
153:4;161:21;
214:6,7,11

**person (17)**
23:13;59:13;75:22;
76:9;108:25;109:13,
19;110:1,7,8,19;
118:25;135:13;205:8;
216:6;233:14;273:10

**persons (2)**
37:3;113:10

**phantomly (1)**
73:23

**phone (13)**
32:21;118:18,20;
119:6;127:20;128:10;
130:19;135:14;138:3;
148:11,13;149:2;
249:15

**photo (4)**
62:1;197:12;
199:25;200:22

**photograph (16)**
197:7,9,14,17;
198:6,8,14,19,24,25;
199:2;200:3,21;
201:15,19,22

**photographs (1)**
197:19

**phrase (1)**
218:8

**physical (4)**
41:8;81:12;141:14;
221:2

**physically (2)**
82:25;109:20

**pick (4)**
49:6;63:14;92:18;
160:18

**picked (5)**
49:13;144:7,17;
213:11,12

**picture (5)**
199:10,14,19,20;
202:2

**pictures (1)**
200:13

**piece (5)**
75:15,20;76:1;
157:5;241:11

**Pierce (25)**
104:2,2;174:22;
207:25;208:7,17;
209:9,19,22,24,25;
210:2,2,3,6,8,9,23;
258:4,10;259:18;
260:12,23,25;267:19

**pinpoint (1)**
131:8

**pistol (12)**
49:18;63:10,12,16;
65:1,7,13,19;68:20;
194:17;195:5,17

**place (5)**
6:25;187:2;197:23;
204:16;208:22

**placed (3)**
30:12,25;31:17

**places (2)**
208:15;272:16

**Plain (4)**
28:6,6;139:9,18

**plainclothes (3)**
26:23;28:5,9

**plaintiff (1)**
5:12

**plan (3)**
122:10;123:22,24

**planet (1)**
73:22

**planning (1)**
123:17

**plastic (1)**
61:6

**plea (3)**
180:15,17;220:22

**plead (1)**
105:9

**please (6)**
8:14;95:21;208:13;
225:5,7;275:2

**pled (5)**
105:7;218:20;
246:13,19;248:6

**plenty (1)**
194:20

**plus (1)**
147:22

**pm (25)**
18:5;46:1,9,15;
49:4;59:11,21;60:3;
63:6;64:1;70:20,25;
111:4,4,15,15;160:16;
185:5,6;203:3,4;
226:20,21;276:18,19

**pocket (3)**
51:1;67:17;145:14

**point (33)**
7:25;14:10;31:19,
21;39:15;41:6;60:19;
65:2;72:13;76:24;
77:7;79:1;84:11,16;
103:7;104:5;105:7;
151:8,11;152:20;
199:14;203:16,19;
205:10,14;237:1;
242:15;245:17,17,20;
246:19;248:7;259:16

**pointed (3)**
19:22;199:19,20

**pointing (2)**
68:17;195:11

**points (1)**
53:8

**police (56)**
25:20;51:10,22;
52:2;54:6;62:24;
77:12;121:20,23;
123:14;140:14;
146:18;152:20;
161:24;182:8;190:11;
191:6;209:11,12,13;
214:20,20,21,21;
228:7,13;229:4,9;
231:24,25;232:4,10;
244:22;252:19,20,21,
25;260:3,7,9;262:6,7,
10,14,24,25;263:17;
265:4,6;266:12,23,24;
267:23,23;269:24;
270:2

**population (2)**
107:5;166:18

**portion (4)**
46:23;101:24;
268:1;275:3

**positions (1)**
96:5

**possibility (1)**
124:2

**possible (13)**
14:9;63:13,15;
152:23,23;167:14;
176:7;183:9;189:7,
10;211:11;246:7;
261:10

**Potomac (10)**

67:5,5;93:13,21;
96:17,19;191:14,21;
192:12;208:16
**PRADOS (18)**
112:13;120:12;
162:5;202:24;232:14;
234:20;235:19;236:6;
237:17;238:7;240:13,
19,22;241:2,14,20;
242:1;277:3
**pregnant (1)**
59:20
**premark (1)**
34:2
**premarked (1)**
33:22
**prepare (5)**
117:21;125:13,16;
222:16;266:8
**prepared (22)**
15:12,21;16:23;
35:19;73:1,7,9,22,23,
24;74:1;117:25;
124:11,12;128:25;
227:3,7,11;229:4,7;
230:5,9
**preparing (1)**
227:18
**present (5)**
69:1;70:13;75:15;
153:4,23
**pressing (1)**
150:17
**pretty (1)**
14:12
**previous (1)**
274:8
**previously (4)**
37:21;111:19;
199:23;267:18
**Preyar (4)**
234:14;235:6,11;
237:9
**Print (3)**
159:13,13;254:3
**printing (11)**
22:4,6;47:21;48:2;
159:10,11;253:21;
254:2,9;258:15,18
**prior (8)**
5:2;11:13;25:14;
76:24;101:8;207:19;
208:19;275:7
**Priscilla (1)**
186:19
**prison (27)**
11:23;12:2,7,9,18,
25;13:7,10,13,16,20;
14:4,7;16:8,11,14,17;
86:11,12,22,23;87:8;
123:19,25;223:20;
224:9,16
**privilege (6)**

79:23;237:1,18;
238:5;240:14;241:2
**privileged (5)**
236:2,4,13,22,25
**probably (5)**
37:19;128:17;
135:17;156:11;270:9
**problem (1)**
111:13
**procedure (1)**
130:10
**procedures (2)**
130:11;225:6
**proceeding (2)**
120:25;121:8
**proceedings (6)**
80:3;111:5,16;
203:4;226:21;276:19
**proceeds (1)**
241:12
**processed (3)**
76:22,25;77:4
**procure (1)**
244:7
**product (2)**
236:8,24
**production (1)**
250:18
**promised (1)**
163:21
**pronounce (1)**
118:14
**proposed (1)**
168:17
**prosecuting (2)**
85:9;179:9
**prosecution (3)**
6:7;220:3;245:16
**protect (2)**
166:15,23
**protected (1)**
107:16
**protection (9)**
166:14;221:6,18,
22;224:7,8;243:10;
250:17;254:12
**protective (2)**
107:17,19
**provide (1)**
20:16
**provided (11)**
20:1;61:1;72:24;
90:7;93:4;97:11;
100:12,24;101:5;
225:9,23
**providing (1)**
82:21
**psychological (1)**
82:2
**public (13)**
79:11,13,16,19;
80:20,21,25;82:8,24;
83:19;85:18,19;86:15

**Puerto (4)**
157:18,22;158:10,
11
**pull (5)**
206:2,3,5,9;207:7
**pulled (5)**
28:14,24;206:23;
220:12;261:8
**pulling (2)**
206:6;207:4
**punishment (1)**
133:11
**purports (1)**
59:9
**purpose (2)**
206:6,8
**pushed (1)**
142:12
**pushing (2)**
81:14;141:8
**put (33)**
21:3;29:9;30:3,6;
37:18;49:18;50:21;
55:7;61:6;67:10,11;
71:12,13,16;72:21;
75:14;76:1;81:19;
83:23;110:18,20;
133:7;140:15;166:17;
205:25;206:1;217:24;
218:23;235:23;236:3,
10;237:4;242:20
**putting (2)**
53:18;236:21

## Q

**quarreling (1)**
200:7
**quarters (1)**
102:9
**question's (4)**
152:18;185:20;
201:14;214:9
**quick (1)**
62:3
**quit (1)**
132:16
**quote (1)**
17:4

## R

**race (2)**
76:9;113:16
**raise (1)**
247:1
**raised (2)**
163:20;164:9
**Randolph (1)**
80:20
**rang (3)**
192:21;193:6;
264:21

**rank (11)**
126:24;127:2,5,12;
130:9;132:10,13,17;
136:20,24;175:5
**ranks (2)**
132:6,7
**reach (1)**
77:9
**reached (3)**
218:18;240:3,5
**read (33)**
46:23;52:25;53:4,
21,24;54:10,16,17,21;
59:17;63:4;68:2;
69:20;155:1,22,23;
159:18,23;160:10,12;
186:1;190:9;198:2;
205:4;263:24;264:1;
267:24;268:1;271:1,
5,12;275:2,3
**reading (9)**
20:23;52:22;74:14;
91:12,13;154:10,11;
155:1;168:3
**real (6)**
118:9;178:3,3;
181:16,24;182:18
**realize (2)**
221:10,16
**realized (1)**
108:9
**really (4)**
6:21;73:21;238:18;
243:5
**reask (1)**
275:20
**reasked (2)**
185:21;214:10
**reason (3)**
139:14,19;224:5
**reasons (2)**
166:14;224:22
**recall (104)**
38:22;39:14;
127:12;130:7,23;
138:24;141:19;142:2;
144:20;145:12,23;
147:9;148:11;152:9,
19;153:14;154:10;
155:19,20,25;156:6,
10,16;157:20;159:24,
24;161:17,19,23;
162:1,3;163:6;
164:17;166:24;168:2;
169:4,21;170:14,24;
171:20;172:24;
173:14;175:25;
176:10;178:12,16;
179:24;181:12;
182:10;183:4,8,10;
184:13,14;185:7;
186:12;188:6;189:6;
190:1;191:9,22;

194:14;195:2,18,23;
196:14,18;197:21;
200:5,6,6;201:3;
202:23;204:21,24;
205:3,15;206:19;
208:11;209:4;211:5;
217:23,23;218:25;
222:1,6,10;226:1;
232:5,12;246:3,9,25;
247:4,11;251:16,17;
252:3;257:7;263:25;
269:6,13,14;275:18
**receive (3)**
104:7;115:23;
249:13
**received (2)**
9:2;116:19
**receiving (3)**
11:10,21;159:4
**recess (6)**
80:1;111:3,14;
203:3;226:20;276:18
**recognize (14)**
15:5;61:17;62:1;
108:22,24;109:13,19,
25;110:7,19;199:25;
200:22;207:10;
222:14
**recollect (1)**
7:2
**recollection (8)**
18:4;25:21;31:6;
88:2;164:19;165:3;
261:3;270:18
**recommendation (2)**
218:22;219:9
**recommended (4)**
88:9;120:8;165:9;
220:25
**record (12)**
46:23;57:20;74:8;
108:8;111:1;195:10;
232:14;268:1;274:16,
21;275:3,11
**recorded (1)**
245:9
**recording (1)**
74:14
**redness (2)**
146:5,7
**refer (1)**
273:10
**reference (1)**
229:20
**referenced (1)**
232:15
**references (1)**
219:21
**referencing (1)**
230:14
**referred (2)**
272:14,15
**referring (4)**

228:6,12;229:2,13
**reflect (4)**
195:10;274:17,22;
275:11
**reflecting (3)**
73:15,18,20
**refresh (4)**
88:2;164:19;165:2;
261:2
**refuse (1)**
116:15
**refused (1)**
114:20
**regard (3)**
167:14;205:25;
268:24
**regarding (4)**
57:14;88:5;156:20;
164:22
**regards (1)**
44:10
**regular (7)**
132:8;139:9,10,10;
144:21;145:7;196:16
**regularly (1)**
169:23
**rejected (1)**
168:23
**related (5)**
6:6,7;29:24;137:15;
241:19
**relation (1)**
170:12
**relationship (6)**
138:2,12;169:18;
177:5,6;271:19
**relative (2)**
98:2,6
**release (2)**
225:9;226:8
**released (12)**
12:2,6,9;13:16,20;
16:8,17;20:19;55:23;
222:7;224:9,16
**relevance (2)**
119:11;175:2
**relocate (1)**
224:12
**relocation (3)**
103:6;107:22,25
**remain (2)**
31:2;153:20
**remarks (1)**
104:14
**remember (182)**
6:4;9:18;11:16,17;
12:4,11;13:25;14:18;
16:3,6;17:23;23:21;
24:3,9;25:7;26:10;
27:24;29:6;31:10,11;
32:9;33:19;34:14,15;
38:14,15,20;39:10,12;
40:18,25;42:20;43:6,

10;44:13;45:2,4;46:7;
47:13,14;48:7,9,10,
12;52:22;53:16,17,18,
20;55:11,14,15;
56:14;58:11;62:18;
75:10,24,25;76:1;
77:10,25;78:15,21,24;
79:7;80:22,24;83:7,8,
13;84:7,9,12,13;86:3;
90:8;102:3,6,20;
106:3;107:4,10;
108:11;113:7;114:3;
116:9;117:16,17;
118:24;119:20,22;
121:11,13;125:2;
126:1,20;127:6;
129:22;130:2,11,13;
131:25;132:20;134:1,
6,11;135:17;136:4,
14;140:10;147:10,13;
148:19;149:6,13,13,
23;150:10;152:14,16,
22;154:13;155:3;
163:11;168:2;170:16;
178:23,25;179:1,3;
187:11;188:25;
189:19;190:2;192:18;
193:7,12;195:13,22;
197:8,18;198:8,13,17,
20,21;199:21;200:12,
13,17,18;201:17;
208:8;210:17;211:13;
212:11,11,17,23;
213:20;219:11;
222:11,24;223:1;
227:9,10,18;229:10;
230:17;231:21;
233:15;242:18;
245:16;251:20,22,25;
256:21;259:22;270:9,
12,23;276:8
**remembered (2)**
265:3,9
**remind (2)**
162:5;266:13
**reminding (1)**
224:1
**remove (1)**
130:3
**removed (1)**
130:23
**removing (1)**
132:23
**repeat (1)**
212:4
**repeatedly (1)**
272:14
**rephrase (3)**
7:22;83:16;101:17
**report (5)**
33:18;34:10;35:20;
36:24;132:2
**reporter (10)**

6:11;7:11;8:15;
57:3;163:14;200:8,
10;231:2,3;277:6
**reports (3)**
25:20;34:4,5
**represent (10)**
5:12;112:14;
120:24;154:1;237:25,
25;238:3;240:9;
257:11;261:8
**representation (1)**
241:19
**representing (3)**
179:21;240:12,17
**represents (1)**
122:23
**requested (3)**
46:24;268:2;275:4
**requesting (2)**
221:5;224:6
**reserve (1)**
277:2
**residential (1)**
192:11
**respect (4)**
173:8;184:8,11;
274:13
**respects (1)**
7:1
**respond (1)**
225:14
**response (1)**
7:16
**responsibility (2)**
172:22;245:6
**responsible (2)**
82:20;172:20
**rest (2)**
74:5;119:5
**result (7)**
81:11;82:1;132:23;
220:5;221:19,23;
224:25
**resulting (1)**
221:3
**retained (1)**
277:6
**retainer (1)**
241:24
**retaliation (1)**
166:16
**retrial (5)**
114:1;233:24;
255:8;256:7,9
**retribution (1)**
268:20
**return (1)**
37:19
**reveal (2)**
237:2,2
**review (2)**
163:2;263:15
**RFC (1)**

34:24
**Richard (2)**
234:15;237:10
**Rickey (1)**
115:20
**Rico (4)**
157:18,23;158:10,
11
**riding (1)**
205:23
**right (282)**
6:9;8:13;11:25;
12:7,22;15:17,24;
16:14,19,25;17:2;
18:15,19;21:10;
22:12,17;25:1;26:9;
27:14,25;28:3,12,24;
31:22;33:2;34:4;
37:25;39:16;46:5,9,
12,15,18;47:3,15,16;
48:2,16;54:3,4;58:12;
59:14;60:12;61:4;
66:6;68:5,22;69:23;
70:5;72:21;73:2;
75:20;78:2;79:15;
84:17,24;87:18,19;
88:22;95:21;96:21,
23;104:3,5;105:7,13;
106:4,12,18;112:3;
115:13;120:4;122:19,
20,24;123:9,10;
124:17,20;125:13;
126:3;128:13;131:3,
7,10,14,15,18;132:17;
133:9,12,14;137:4;
139:20,24;140:16,20,
25;142:8,13,25;144:1,
5;145:8,17;146:3,12,
17,20,23;147:4,18;
148:20;149:9;151:7;
152:18;153:20,22;
155:19;157:12;158:5,
6;160:3,13;162:10,13,
15,22;163:10,12,18,
21;164:2,11,14,15;
165:18,25;166:4,9,16,
19,21,23;169:5,15;
170:10,22,23;171:2,
11;172:11,15;175:13,
24;176:13;178:11,19,
21;179:5;180:2,16,
19;181:1,7,21;
182:19;183:13;184:9,
18;188:7,8;189:8;
190:8,18,22;191:8,10,
16;196:22;197:1;
198:14;200:8,23;
201:1,19,23;203:6;
204:4,7,13,16;205:6;
209:23;211:9,17,21,
22;213:10,25;214:4;
215:14,22;216:3,15,
24,25;217:24;218:17;

219:5,6,12;222:2;
223:4,9,13;224:3,17;
225:1,10;226:18;
227:12,15;230:6,7,9,
15;231:1,13,19;232:8,
20,23;233:1,4,4,7;
234:3,5,9;239:3,4,4,4;
242:10;243:10,13;
245:7,12;247:19;
252:24;253:22;
254:18,25;256:19;
257:6,14,20;258:4,19,
22;259:5,9,14,18;
260:3;262:19;264:2;
265:23;266:21;267:7,
9,13,20;268:20;270:1,
10;271:14,20,24;
273:24;275:7,25
**right-hand (1)**
35:4
**rights (5)**
48:5,5,11,13;154:2
**rival (3)**
172:21;173:4;
220:20
**rivals (2)**
172:2,10
**River (3)**
106:24,25;107:2;
221:7,22;223:17
**Rivera (5)**
174:24;175:1;
186:15,16;223:4
**Rivera's (1)**
187:1
**rob (1)**
50:24
**room (26)**
30:13;31:4,7,17;
33:6;37:9;39:22,23,
24;75:22;94:18,19;
109:1,14,20;111:8;
140:15,19;150:23;
151:4;155:10;157:3;
193:22,23;232:13;
233:17
**Rosa (33)**
58:14,16;59:10,18,
21,24;60:21,22;61:6;
94:20;162:10;193:24;
194:4,8;208:15,20,25;
209:9;210:20,22;
262:18,22;263:3;
264:5;266:5,11,17;
268:4,4,5,5,7;272:2
**Rosa's (1)**
59:19
**Rose (16)**
192:23,24;193:6,9;
243:24;244:11,12;
264:23,24;265:10,17;
267:5,16;268:4,7;
272:4

**ROSEN (159)**
14:16,24;23:24;
24:8;26:15,19;32:23;
35:23;37:13;39:18;
40:22;41:9;42:19;
43:1,9,21;44:5,12,25;
45:3,11,15;46:21,25;
53:5;54:11,19,23;
55:19,24;56:13,23;
57:6,11,17,23;60:7;
64:5,9,14;65:9,25;
66:2;67:1;68:6;69:12;
70:10;71:8,19;72:17,
19;73:4,7,11,20;74:2,
13,20,22;76:3;78:4,
13;79:24;83:22;
84:12,14;91:2,5,11;
98:4;101:12;102:21;
108:14;110:10,21;
111:13,22;112:19;
117:5;119:12;120:15;
123:5;126:9;131:24;
132:21;134:12;135:9,
18;136:5,15;139:3;
140:6;145:4;148:17,
21;150:11;151:16;
153:2;156:7,17;
162:8,18;166:12;
169:22;170:8;171:5;
173:1;175:4;178:24;
181:4;184:16;187:12;
193:13;199:8;201:12;
202:18;203:1;205:1;
208:12;210:12;
215:18;216:2,12,16;
218:5;219:4,12;
222:2;225:4,19;
226:18;230:1;232:18;
234:22;235:22;236:3,
10,16,19,25;237:15,
20,23;238:17,21,25;
239:5,8,11,16;240:16;
241:1,3,17,23;242:3,
8;272:25;276:25
**Rosie (1)**
10:2
**running (6)**
51:3,12;99:14,15,
18;100:8

---

**S**

**safety (1)**
221:18
**sale (2)**
93:2,9
**sales (1)**
243:6
**same (13)**
6:17;11:22;16:4;
23:10;33:9;94:22;
102:9;132:11;170:18;
177:3;184:2;195:3;

242:1
**Sanchez (2)**
10:2;25:3
**Santiago (1)**
25:3
**SAO (2)**
233:21;255:6
**sat (2)**
240:20,20
**saw (29)**
51:12;99:17;
109:12,18,24;110:6;
117:10;138:4;144:8;
146:12;149:5;169:23;
170:2;188:22;189:7;
195:16;204:12,23;
213:9;244:18;252:23;
253:1,5;263:16,19;
270:2,10;273:11,12
**S-a-w-l-a-i (1)**
148:24
**Sawlani (2)**
148:22;149:5
**S-a-w-l-a-n-i (1)**
149:1
**saying (23)**
38:16;46:19;47:2,3;
117:15;176:6,23;
198:18,21;200:15;
201:13;207:25;210:4;
213:5,19,24;228:16;
229:24;230:2;247:13;
266:4,10;267:2
**scared (1)**
32:15
**Schak (7)**
153:11,15;212:2,7,
13;213:5,19
**S-c-h-a-k (1)**
153:12
**scheduled (1)**
226:8
**school (14)**
9:5,9,11,13,17;
157:11,14;158:8,18;
159:17,22,25;160:5;
270:16
**script (2)**
52:25;54:17
**seat (3)**
66:12,15;67:11
**seated (2)**
49:24,25
**second (21)**
8:13;49:1,2;59:17;
63:1,4;88:1;91:14;
93:17;103:12;108:6;
111:2;159:16;179:7;
192:15,17;200:3;
253:19;262:21;263:7;
264:16
**seconds (1)**
62:4

**sect (4)**
23:11,20,23;24:17
**section (3)**
166:15;170:18;
171:1
**sections (1)**
170:22
**secure (1)**
173:3
**secured (1)**
225:24
**security (1)**
102:16
**seeing (9)**
34:15;62:18;75:10;
108:11;147:10;148:8;
200:12;249:20;
270:12
**seeking (1)**
123:14
**sees (1)**
128:5
**Sell (12)**
126:23;136:1,10,
13,16;171:19;173:11,
21;174:13;243:10,14,
16
**selling (14)**
173:8;178:2,3,4,4;
206:25;242:15,21;
258:22,24;261:11;
262:1;273:8,18
**send (2)**
219:2,3
**sent (1)**
77:5
**sentence (9)**
49:2,13;86:5,7;
92:10,11;220:9,25;
221:6
**sentenced (10)**
105:22;131:15,17;
190:19;218:20,25;
220:8,23;246:20;
248:7
**sentencing (1)**
246:14
**separated (1)**
107:5
**serious (1)**
165:25
**serve (4)**
88:22,24;114:24;
221:5
**served (3)**
116:2,7,25
**Service (1)**
116:2
**services (2)**
104:8,9
**serving (1)**
220:9
**set (1)**

159:13
**Seven (2)**
11:12;102:13
**several (1)**
207:19
**severe (1)**
224:25
**sex (2)**
244:2,8
**shaking (3)**
7:11;189:11;222:12
**shape (1)**
238:14
**sheriffs (1)**
102:15
**shift (1)**
258:18
**Shiller (21)**
234:13,14,18,23,24;
235:6,6,10,11,14,18;
237:8,9,13,25;238:6,
10,13,23;239:12,18
**Shipping (4)**
11:10,20;159:4;
250:19
**shoot (2)**
50:23;98:5
**shooting (8)**
49:15;68:12;
156:20,25;157:1;
180:24;204:23;
244:25
**shop (6)**
22:4;159:10,12;
254:2;258:15,18
**short (2)**
50:8;226:19
**shortly (1)**
66:18
**shorts (1)**
99:12
**shot (21)**
25:16;68:12;69:2;
100:21;101:1;211:20;
212:10,15;214:8,12,
25;215:7,13,22;216:7,
21;217:15,20;220:19;
261:19,24
**shots (4)**
51:12;68:14;99:14;
204:20
**show (17)**
57:25;58:5;109:25;
195:8,20;197:5,10,12;
199:23;202:4;203:13;
204:1,5,8,11,17;
269:16
**showed (2)**
146:25;199:20
**showing (1)**
195:15
**shown (9)**
58:11;197:18;

198:13,19,23;200:3,
20;201:15,19
**shows (1)**
197:9
**shut (1)**
70:7
**siblings (3)**
9:23,25;272:9
**side (10)**
69:18;72:22;110:1;
128:14;144:1;171:10;
202:7,9;204:7;250:18
**sides (1)**
15:5
**sight (1)**
36:7
**sign (5)**
52:13;155:4;
156:10;230:25;
241:18
**signature (7)**
15:8;47:10;55:7;
75:2;154:5;161:10;
222:21
**signed (42)**
52:23;54:22;55:3,9;
58:1;72:25;75:13;
82:10,21;83:6;140:7;
154:25;155:16,21,24;
156:1,23;157:5;
161:18;162:2;227:11;
228:3,12;229:1,16,17,
18;230:13,18,24;
231:5,17,19;232:1,2,
9;233:3;236:12;
263:11,21;267:2;
271:1
**significance (2)**
206:22;207:4
**signing (4)**
47:13;154:12;
156:13,13
**silent (1)**
153:20
**Silver (1)**
115:15
**sister (5)**
127:23,24;243:24;
244:2;272:4
**sisters (1)**
249:10
**sit (5)**
117:14;123:22;
160:24;195:12;
227:17
**sitting (5)**
42:6;48:7;118:6;
142:25
**six (6)**
51:12;68:12,14;
106:11;118:22;254:1
**Sixteen (1)**
10:18

---

**skills (1)**
  20:23
**skull (2)**
  143:8,9
**Slapped (4)**
  41:24;140:25;
  141:5;143:25
**slapping (1)**
  141:10
**sleep (3)**
  37:9,10,16
**slowly (1)**
  203:23
**smacked (1)**
  141:16
**small (2)**
  31:7;254:2
**Smitka (5)**
  212:1,7,13;213:4,
  18
**SMU (5)**
  107:11,13,15;
  218:23;223:18
**social (1)**
  135:14
**socialized (1)**
  208:18
**sold (12)**
  135:24;136:14;
  171:23,25;173:9,16;
  176:16,18,20;177:11;
  243:19,22
**soldier (3)**
  132:8,9,14
**soldiers (1)**
  132:7
**solely (1)**
  135:10
**solves (1)**
  239:15
**somebody (25)**
  130:9,14,17,19;
  131:20,23;132:2,5,18;
  135:22,24;154:11,25;
  155:1;169:23,25;
  173:3;174:12,23;
  178:5;183:7;184:17;
  206:25;219:25;
  239:24
**someday (1)**
  209:17
**someone (12)**
  24:25;50:24;73:1,7,
  22;75:14,19;77:12,13,
  20;254:6;257:24
**Someplace (1)**
  101:22
**sometime (1)**
  131:12
**sometimes (2)**
  209:9;273:13
**somewhere (4)**
  101:19,20,23;

  131:13
**soon (5)**
  63:13,15;234:12;
  235:4;237:6
**sorry (24)**
  33:20,24;34:2,8;
  40:2;46:21;47:25;
  55:6;62:1;63:3;67:1;
  75:5;81:7;88:14;98:5;
  105:6;108:6;110:14;
  159:7;198:9;205:2;
  216:17;267:24;
  268:23
**sort (5)**
  23:10;41:8;121:19;
  133:11;253:24
**So-so (1)**
  21:2
**sought (2)**
  81:11;82:1
**sound (2)**
  21:9;107:11
**sounds (5)**
  10:3;13:4;14:14;
  205:5;231:4
**south (4)**
  96:15,16;128:14;
  171:10
**Spanish (8)**
  32:18;157:15;
  158:4,12,13,14,25;
  213:7
**Spaulding (4)**
  70:1;90:2;186:3;
  188:1
**speak (15)**
  14:3;15:24;16:10,
  14;20:12;32:18;
  48:20;113:18;142:3;
  158:19;232:3;234:23;
  235:10;275:9,21
**speaking (3)**
  153:14;213:15;
  276:8
**Special (6)**
  107:9;219:6;221:6,
  18,21;223:17
**specific (3)**
  38:22;104:24;107:1
**specifically (7)**
  17:2;52:18;81:5,13;
  176:21;247:19;
  268:23
**spell (3)**
  8:17;11:7;148:23
**spent (3)**
  123:18,25;259:4
**spoke (9)**
  13:23;14:9,13;16:2,
  5;37:3;179:13;213:7;
  214:2
**spoken (4)**
  14:6,19;16:7,16

**St (18)**
  50:9;67:6,6,23;
  96:12,13,19,20;97:8,
  25;98:25;99:9,11;
  185:19;203:16;
  260:10,11,14
**stamp (1)**
  35:3
**stamped (2)**
  34:24;69:22
**stand (13)**
  179:15;180:5,9,18;
  181:10;195:7,19;
  247:3,7,10,14;248:4;
  265:14
**standing (15)**
  27:8;28:14;91:20;
  98:1;21;195:14;
  197:14,16,24;198:6;
  199:2,10,14;202:8;
  204:6
**start (11)**
  26:7;63:3;94:8;
  95:23;104:23;197:4;
  216:17;233:20;239:9;
  262:21,21
**started (12)**
  8:14;38:5;67:19;
  68:19,21;97:24;
  98:17;120:23;126:5;
  149:17;150:14;
  210:25
**starting (3)**
  5:24;53:24;89:7
**starts (1)**
  118:8
**state (17)**
  8:14;54:4;80:13;
  84:17;101:10,10,16,
  22,25;115:10,11;
  124:6;167:4;168:11;
  223:15,19;245:18
**stated (9)**
  36:18;49:3;50:7,23;
  51:9,15,21;59:18;
  159:16
**statement (132)**
  17:8,22;20:2,24;
  45:14,22;46:18;
  47:13,25;49:9,11,19,
  21;50:3,5,12,14;
  51:25;52:7,8,11,13,
  23;53:4,15,19,21;
  54:8,21;55:3;56:12,
  19,22;57:3,9,15;58:5;
  59:10,16;60:6;61:4;
  62:9,13;64:7,7,12;
  65:23,24;69:22;71:6,
  7;72:25;74:24;75:2,8,
  11,13;82:9;83:6,20;
  90:11;107:20;110:9,
  17,17,20;112:18;
  140:2;152:8;153:4,

  19;154:3,19,21,25;
  155:1,4,12,22;156:1,
  13,14,19;159:15;
  160:15;161:18;180:2;
  182:3,4,12;189:21,22;
  190:3,10;191:5;
  214:14;215:5,11;
  221:2;223:21;228:2,
  7,11,20,25;229:2,3,7,
  14,21;230:12,17,20;
  231:12,16,22,23;
  233:2;244:15;245:6,
  10,11;255:10;256:17;
  263:7,10;265:19,23,
  25;269:24;270:5,6
**statements (21)**
  36:9;51:7,17,19;
  58:1;66:23,24;68:4,5;
  69:10,11;80:11,16;
  81:10,16,25;82:4,6;
  231:9,11;267:2
**States (5)**
  5:14;157:19;158:9;
  200:25;220:2
**state's (118)**
  48:7,8;51:22;54:5;
  76:12;85:6,8,16,23;
  88:5;101:22;102:25;
  107:22;112:23;113:1,
  3,4,5,12,13,14,19;
  116:18,22,23;120:1,2,
  22;124:15;129:3;
  152:13,14,17,21;
  153:8;155:18,19;
  159:21;161:24;
  164:21;166:20;167:2,
  8;168:4,17,23;178:13,
  19;179:2,9,16,17;
  180:14;182:8,9;
  185:8;193:11,14;
  214:5,7,10,16;218:18,
  21;219:8,19;221:1,4,
  10,16;222:8;223:12;
  224:1;225:10;227:8,
  20,23;228:3,11,20,21,
  25;229:7,9,11,15,21;
  230:13,17,20;231:7,
  17,24;232:3,11;233:3,
  6,10;234:12;235:2,5;
  237:7;245:21,22;
  246:1,4;254:17;
  255:21,22,24;265:11,
  12,15,16;266:10,13;
  267:10;271:8
**stating (1)**
  48:5
**station (33)**
  62:24;140:15;
  152:20;161:24;187:3;
  190:11;191:6;209:11,
  14;214:22;228:8,13;
  229:4;232:4;244:23;
  252:19,21,25;260:7,9;

  262:6,7,15,24,25;
  263:17;265:4,6;
  266:13,23,24;267:23;
  270:3
**status (2)**
  104:24;222:9
**stay (4)**
  40:5;101:18;135:3;
  226:13
**stayed (2)**
  140:19;226:15
**step (1)**
  6:22
**stepping (1)**
  238:16
**Steve (2)**
  239:25;240:5
**stick (2)**
  206:24,24
**Sticking (1)**
  253:19
**still (11)**
  42:21;96:9;124:25;
  129:11,24;130:25;
  134:23;137:25;
  147:25;236:25;
  249:19
**Stone (1)**
  80:20
**stop (10)**
  26:4;27:8;28:14;
  36:11;42:7;50:16;
  60:2;138:20;139:5;
  148:15
**stopped (3)**
  50:8;59:23;138:17
**story (4)**
  20:17;82:21;
  108:10;155:11
**straight (4)**
  40:9,10,12;140:20
**street (34)**
  22:8;23:8,18,23;
  25:15;35:25;90:4;
  96:16;119:4;126:24;
  127:3;130:8,24;
  131:8;132:2,3,23;
  136:21;139:9,18;
  170:4;172:20;175:6;
  188:12;208:8;218:2;
  220:4;221:4;251:10;
  260:13;272:21;
  273:12,15,19
**streets (8)**
  194:18,21;259:5,6,
  9,14;261:10,25
**strike (19)**
  20:4;27:7;39:23;
  52:22;53:9;55:4,6;
  69:6;71:20;72:24;
  75:14;86:1;91:13;
  92:24;102:7,9;105:6;
  141:9;143:3

**striking (1)**
81:13
**struck (2)**
142:22;166:19
**student (2)**
157:13;270:19
**stuff (1)**
114:23
**submit (1)**
224:11
**subpoena (12)**
114:24;115:5,9,24;
116:2,2,10,15,19;
117:1,15,16
**subpoenaed (1)**
116:13
**subsequently (5)**
228:2,10,24;
230:12;233:2
**substance (1)**
120:13
**suburbs (1)**
119:3
**suffer (2)**
132:22;224:25
**suggesting (1)**
46:20
**suing (1)**
256:3
**summary (1)**
54:8
**summon (1)**
115:12
**sup (2)**
34:4,5
**supplemental (2)**
33:18;34:10
**supplying (1)**
244:2
**supposed (1)**
106:1
**suppress (3)**
74:18;80:10,16
**suppressed (2)**
81:11;82:1
**sure (15)**
20:8;51:10;97:22;
98:10;101:18;109:6,
8;120:16;180:11;
203:1;244:13;253:14;
254:3;271:12;274:6
**surprise (1)**
260:19
**surprised (1)**
41:25
**sustained (1)**
207:2
**sweatshirt (2)**
196:2;206:9
**sweatshirts (4)**
50:22;196:3;206:5,
7
**swelling (1)**

146:5
**swore (1)**
17:3
**sworn (3)**
5:5;111:20;163:17

**T**

**table (2)**
73:25;253:16
**talk (20)**
6:15;71:15;74:22;
113:10;124:17;
125:15;138:3,14;
140:11;141:21;152:7;
153:22;213:23,24;
227:21;233:9;240:3,
5;246:22;257:17
**talked (31)**
25:19;116:22;
117:13;118:18,19;
119:5,21;120:17;
128:15,21,24;129:2;
130:7,14,17;135:8;
146:13;162:2;171:12,
13;212:1;213:4,19,
22;224:23;233:12;
251:8;265:13,16;
267:16;268:8
**talking (62)**
6:17;22:16;33:7;
39:3,5,9;41:5,19;
42:21,22;43:13,14,17;
51:2;58:24;68:11;
99:2,4,7,23;100:1;
109:7;110:16,17;
114:6;121:3,5,16;
124:19;125:5;127:7,
10;135:10;138:18,20;
149:11;150:16,21,25;
151:1,2,7,19,23;
152:14,20;159:21;
212:23,25;213:20;
230:3;231:4;232:6,
25;233:1;242:14,16;
245:14;261:17;267:3;
268:24;273:16
**taught (1)**
158:5
**teach (1)**
158:11
**teens (3)**
126:8,10,10
**television (1)**
59:23
**telling (6)**
20:13;43:6,8;91:21;
108:10;257:10
**tells (1)**
201:19
**ten (3)**
99:5;123:25;142:21
**ten-minute (1)**

202:24
**terms (3)**
10:6;131:7;268:11
**territory (6)**
171:22;172:14,21;
173:3,5;174:13
**test (1)**
158:24
**testified (43)**
5:6;37:21;86:10;
88:16;89:2;105:10;
111:20;114:7;134:7,
18;139:4;162:9;
163:12,17;165:8;
166:3,8;178:18;
179:10,16,22;190:4;
191:6;211:8;215:12,
14,19;216:19,24;
217:17;218:19;220:2;
224:19,24;225:8;
254:15;259:17,25;
263:12;265:5;268:18;
271:18;272:1
**testify (23)**
87:2,8;106:1;114:7,
15,18,20,21;166:21;
167:3;168:9,12,17;
169:1;180:12,18,21,
25;208:3;209:17;
245:15,17;266:19
**testifying (4)**
84:23;134:16;
197:19;201:16
**testimony (119)**
5:3;85:23;87:16;
88:6,8,9;90:8;91:12,
14;92:2,4,9;93:3,5;
94:1;95:8,10;97:11,
12;98:12,13;99:25;
100:4,5,11,13,24;
101:5,8;107:20;
162:25;163:2,5,8,25;
164:1,5,22;165:8,10,
12,16,23;166:7;167:7,
15,18;168:1;169:12;
175:21;179:18,23;
181:9;184:21;185:25;
186:1,22;188:18;
190:23,23;193:3;
194:1,19;195:24;
196:9;197:22,24;
198:2,22;199:4,5;
200:23,25;201:5,6;
202:11;205:5;206:14;
207:3;211:4,4;
213:17;215:2,23;
220:6,11;221:3,19,24;
225:1,24;227:3;
228:7;230:22,23;
231:1,13;245:24,25;
246:11,23,23;247:3,6;
248:2;261:23;264:3,
8,11;265:14;266:2,4;

267:11,11;269:25;
271:22,23;272:16;
273:22;274:1
**Thanks (1)**
253:11
**therefore (2)**
81:16;82:4
**thinking (1)**
226:5
**third (2)**
34:23;63:3
**though (10)**
12:12;46:11;47:6,
15,19;60:11;104:4;
184:17;261:23;
267:10
**thought (4)**
55:16;90:19;
149:24;225:17
**threat (4)**
114:4,5,9;221:2
**threaten (7)**
18:22;19:25;43:20;
71:25;72:3,6,9
**threatened (17)**
18:22;19:3;39:15;
43:23;52:6,15,16;
85:2;112:23;113:1;
114:5,10;120:20;
121:6;155:5,7,8
**threats (1)**
221:23
**Three (6)**
59:23;99:12;
128:17;133:6;141:20;
142:1
**three-minute (1)**
269:2
**throat (15)**
41:10,13,17,21;
81:14;140:24;141:1,
2,8,15,18,23;142:7;
147:7,12
**throw (1)**
83:24
**thrust (1)**
142:12
**times (24)**
20:4;44:22;45:9;
68:12;118:16,19,21,
22;141:5,10,17,20,20;
142:1,19,19,20,21;
145:24;146:1,2;
207:20;208:14,17
**time's (1)**
18:1
**timing (1)**
273:22
**Tino (15)**
8:20,21;37:3,3;
59:24;63:23;64:20,
25;66:8,14;67:12,18;
68:21;69:6;70:22

**TIRC (1)**
120:25
**today (33)**
5:23;8:8;13:17,21;
53:22;54:9;74:16;
90:25;112:2;117:14;
118:4,6,16;120:8;
121:16;122:17,20;
123:1,23;125:20;
127:16;160:24;163:1,
23;170:18;176:6;
211:13;213:24;
227:17;242:5;259:16;
271:18;272:15
**toes (1)**
238:16
**together (7)**
26:20;27:10;71:3;
72:13;126:23;208:24;
273:16
**told (96)**
19:3;31:21;39:8,8;
48:6,10,16,19,22;
54:4;63:9,11;65:1;
70:4;78:17,22;83:5;
85:5,19;86:14;110:8,
19;114:7,17;116:23;
122:23;124:15;130:5;
138:17;140:22;
146:22;149:11,16;
150:2,4,7,15;152:1,
18,22;154:21;160:1,
11;162:12;165:15;
166:2,6;170:17;
176:18;179:25;180:1;
181:6,20;182:6,17;
183:2,7;189:25;
191:7,15;193:14;
209:7,12,17,21;
211:21;212:3,7,8,12;
214:6,10,14;215:7;
216:6;217:18;229:1;
238:20;244:21,24;
245:2;247:20,23;
248:8;257:3;260:9,
25;262:7;263:3;
265:4;266:5,11,24,25;
267:5;271:11
**tone (4)**
73:15,17,19;74:16
**took (6)**
6:25;67:5;179:15;
182:11;231:3;263:16
**top (14)**
53:25;91:19;97:14;
103:20;113:7;115:9;
124:5;125:4,7;153:3;
156:18;175:15;
184:22;186:14
**topic (1)**
217:3
**Torrence (2)**
156:20;220:7

**Torture (1)**
112:15
**totally (1)**
27:20
**touch (3)**
127:22;128:1;135:3
**touched (1)**
143:14
**toward (1)**
66:20
**towards (27)**
41:8;67:19;68:20,
21;89:22;90:1;96:3,
12,19;97:24;98:18,
24;99:9,11,15,18;
100:8;186:25;187:22;
188:1;197:12;202:6;
203:16,22;204:10;
205:23;232:16
**towel (2)**
60:23;61:2
**track (1)**
224:13
**train (2)**
187:11,17
**transcript (12)**
89:7,9;175:14;
178:17;190:7;198:18,
23;199:17;200:2,16;
201:18;264:11
**transcripts (1)**
87:15
**traveling (1)**
203:17
**treated (3)**
51:21;52:2;104:17
**trial (25)**
89:3;90:8;93:4;
97:12;100:12;101:9;
163:2;164:3,14;
166:17;167:24;
197:20;198:16;
201:16;202:15;
215:10,12,15,20,24;
216:19;266:6,8;
267:12;272:16
**tried (1)**
141:21
**trigger (1)**
220:13
**trouble (2)**
148:1;165:25
**true (28)**
17:8,22;36:11;49:9,
19;50:5,14;51:7,19,
23;52:14;60:6;64:12;
65:23;66:23;69:10;
71:6;82:12;83:6;
154:21;160:3;166:13;
184:9;207:15,16;
208:22;209:23;
255:10
**truly (1)**

203:10
**truth (13)**
8:11;52:8,11;
118:14;163:21;
164:11,11;165:17;
177:16;183:13,17,20;
184:12
**truthful (35)**
90:11;92:4;93:4;
94:1;95:10;97:12;
98:12;100:4,12;
101:6;164:2;165:12;
166:8;167:7,9,18;
176:8;185:25;186:6,
22;188:18;189:4;
193:19;194:1,19;
195:24;196:9;197:24;
199:4;201:5;202:11;
206:14;207:3;209:3;
211:3
**truthfully (1)**
208:3
**truthfulness (1)**
168:7
**try (6)**
6:22;7:22;13:8;
74:18;75:17;174:13
**trying (6)**
74:9;77:9;91:9,10;
131:7;235:14
**turf (1)**
220:21
**turn (7)**
15:6;34:22;85:23;
89:15;92:22;97:4;
205:16
**turned (5)**
203:18,20,21,25;
229:11
**Turning (1)**
254:14
**TV (4)**
108:12;213:10;
270:13,14
**Twelve (1)**
11:2
**twice (1)**
141:20
**Two (77)**
10:25;25:16;33:11;
34:4,5;40:9,10,11;
41:18;43:4;50:24;
59:22;62:4;65:14,20;
66:9;67:13,14,15;
68:15;69:2;70:3,16;
71:15;98:19,20;99:2,
4,7,14;100:2,21;
101:1;112:22;113:6,
9,19;119:21;129:4;
140:20,21;142:10;
149:9;151:5;156:25;
162:22;180:24;
183:17,23,25;203:11;

204:12,15;211:20;
212:10,13,15;214:8,
12,25;215:14,22;
216:7,21;217:15,20;
227:14;231:9,10;
232:23;252:20;
260:17;261:11,18,24;
265:10;271:23
**two-hour (1)**
43:5
**type (5)**
11:19;22:5;29:25;
86:1;102:16
**types (1)**
40:16
**typewritten (1)**
153:18
**typically (4)**
171:1;188:4;
196:12;207:7

---

## U

**umbrella (1)**
174:6
**Um-hmm (4)**
20:10;89:17;90:21;
209:13
**uncle (39)**
15:16,17,25;22:22;
65:6,19;84:24;87:3;
134:8,19;136:20;
138:21,25;162:13,19;
163:3;169:7,13,19;
171:16;175:20;
180:12,19,23;184:8;
190:5;215:13;216:6,
20;217:14,19,25;
218:20;220:3;224:20;
225:15,25;246:11,24
**unclear (1)**
263:23
**uncle's (14)**
89:2;90:8;93:4;
165:4;179:10,22;
182:18;197:20;
202:15;215:10,12,24;
216:19;224:3
**uncle's's (1)**
201:16
**under (7)**
8:8;70:7,9;71:16;
82:6;174:6;224:7
**underage (2)**
244:2,8
**underlying (1)**
6:6
**understood (4)**
11:19;48:5;54:4;
271:12
**uniform (2)**
28:5,7
**uniforms (1)**

139:10
**unit (11)**
107:1,5,9;218:23;
219:6,10;221:6,19,22;
223:13,18
**United (3)**
5:14;157:19;158:9
**unless (3)**
20:1;83:14;202:25
**untrue (1)**
68:5
**unusual (1)**
63:8
**up (93)**
9:4,19;25:11;28:14,
25;49:6,14;50:21;
63:15;77:7;78:5,8;
84:5,23;92:18;99:8;
105:6,12;114:11,12,
14;121:7,9;124:25;
129:15,16,22;131:2,4;
132:18;133:7;144:8,
18;149:16,17;150:2,
7;155:11;159:13;
160:18;172:18;173:3;
176:9;177:18;178:7;
180:5,9,18;181:10;
183:5,9,24;189:16;
190:14,15,16;194:10;
195:7,14,19;202:22;
206:4,5,7,23,24,25;
207:5,8;213:11,12,16;
219:6;230:19;243:3,
9;246:19;248:7;
250:24,25;261:8,19;
262:25;264:16;
265:11,12;266:24;
267:1;268:25;269:4,
12,17;276:22
**upon (1)**
225:9
**upset (1)**
60:21
**use (2)**
52:5;141:13
**used (12)**
44:21;153:21;
170:14;186:2;208:23,
24;209:1,8,21,21,23;
249:7
**utilizing (1)**
204:21

---

## V

**vacant (2)**
50:25;203:11
**Vahey (19)**
80:21,22;167:13;
168:16;245:23;246:2,
5,8,10,18;247:1,13,
16,20,23;248:1,3,8,11
**value (1)**

74:5
**Varas (3)**
23:4,4;71:2
**variety (1)**
133:14
**verification (1)**
223:21
**via (1)**
108:9
**vicinity (2)**
50:9;188:9
**victims (2)**
220:19;223:12
**video (3)**
56:22;57:20;74:13
**view (2)**
197:11;202:3
**violated (16)**
133:3,16,19,22,25;
134:2,3,15,21;166:4,
9;268:9,11,14,17,22
**violation (1)**
269:2
**Violent (1)**
212:6
**visited (5)**
208:2;211:2;
248:22,25;249:2
**Visiting (1)**
79:2
**voice (3)**
73:17,19;74:16
**voluntarily (2)**
27:14;28:8
**vs (6)**
5:18;80:13;115:6;
124:6,12;125:7

---

## W

**Wait (7)**
109:5,5;162:6;
216:14,14;235:4,4
**waited (1)**
68:10
**waiting (7)**
36:4;65:15,21;
66:10,20;68:10;
220:20
**waive (3)**
237:1;277:2,3
**walk (1)**
261:25
**walked (5)**
33:5;94:21,24;
113:11;193:25
**walking (11)**
67:19;68:19,21;
90:1,3,3;98:17;
187:25;188:2,12;
204:10
**wall (16)**
31:8,9,12,18;81:15;

Maysonet v.
Guevara

Justino Cruz

141:3,4,5,8,9,24;
142:13,16,23;143:2,3
**wants (2)**
236:2;269:8
**watching (4)**
51:4;59:22;75:16;
99:6
**way (35)**
26:22;32:18;52:7;
60:11;67:6,6;68:24;
74:20;75:3;92:20,25;
93:14,23;94:20;
96:21;101:11;147:7,
11;170:22;187:7;
192:23;193:24;194:4,
8;196:1;203:18,18,22,
25;210:22;238:14,25;
246:19;262:9;264:23
**ways (2)**
43:19;268:22
**wear (6)**
196:13;250:11,16,
20;252:3;254:11
**wearing (4)**
139:12;196:2,5,6
**week (2)**
242:23;258:14
**weekend (1)**
136:8
**weekends (3)**
136:7;173:9;258:21
**weeks (1)**
128:17
**weren't (9)**
168:12;175:23;
192:4;198:19;243:2;
247:23;261:17;
269:18;275:24
**West (5)**
104:2;258:10;
260:22,25;261:2
**What's (23)**
9:15;14:21;15:3;
18:3;33:2,17;45:20;
62:12;87:14;103:16;
117:24;118:4,7;
119:17;130:10;138:2,
12;148:9;175:8;
186:18;197:5;201:21;
236:15
**whatsoever (2)**
135:11,15
**Whenever (1)**
273:12
**When's (8)**
16:2;128:15;135:5,
12;137:18;138:4,24;
149:4
**Where's (1)**
119:2
**Whereupon (19)**
5:1;33:14;46:23;
59:6;62:10;80:1,4;

87:12;103:14;111:3,
14;115:1;203:3;
219:14;222:4;226:20;
268:1;275:3;276:18
**wherever (2)**
173:25;219:2
**white (18)**
26:16;27:4;28:4,10;
33:9;37:23;38:9,21;
42:4;113:17;139:6;
140:13;233:16;251:9,
12,14,16,18
**whoever's (2)**
218:10,11
**whole (6)**
99:7;150:24;
151:20;154:19;
174:21;209:25
**Who's (4)**
60:14;74:15;
234:24;272:20
**whose (1)**
118:23
**wife (7)**
10:21;12:16;58:19;
59:3;148:8;223:4;
249:6
**wife's (5)**
119:9,14,15,17;
120:7
**Wiley (21)**
6:8;11:24;17:5,11,
14;19:3,5,10,15;25:9;
156:20,21;220:8;
244:25;248:14;
259:22;260:2,5;
261:1;262:4;274:13
**willingly (1)**
27:15
**wish (1)**
154:2
**within (5)**
126:24;127:2;
149:7;172:20;175:6
**without (3)**
91:21;220:10;246:5
**witness (33)**
5:5;17:4,10;21:5;
37:20;61:14;69:8;
72:23;84:13;91:16;
94:7;95:22;97:15;
101:10,10,16;102:8,8;
105:1;107:16;108:5;
109:9;111:19;166:14;
195:11;197:3;220:2;
223:12;224:7,8;
232:17;240:25;277:7
**witnesses (3)**
101:23,25;102:11
**woman (1)**
76:6
**wondering (1)**
32:12

**word (1)**
49:17
**words (9)**
44:21;53:11;75:14,
19;76:1;155:23;
157:5;181:17,25
**wore (3)**
139:9;196:16,21
**work (39)**
11:3,5,14,19;13:7,
8;20:19;22:5;26:6,7;
113:19;120:17;
124:16;159:5;184:22,
24;185:2,5,9,14;
186:10,25;187:2,8,14,
17;188:5;227:24;
234:4,6;236:8,23;
250:9,10,13,16,18,19;
258:14
**worked (9)**
11:11,20;13:15;
84:16;113:4;159:1,
10;259:6;261:11
**working (6)**
11:13;21:25;22:3;
54:6;113:9;253:20
**workplace (2)**
253:24;254:8
**world (1)**
74:6
**worried (1)**
226:9
**worry (1)**
63:14
**wrapped (2)**
60:23;61:2
**write (19)**
46:11;47:15;49:11,
21;50:3,12;51:4,17,
25;52:9;159:18,23;
160:10,13;222:19;
224:5,6;237:6;254:6
**writing (2)**
154:17;223:25
**written (8)**
155:15,17;219:18,
24;221:11,17;269:24;
270:4
**wrong (4)**
198:19;200:8,11;
259:12
**wrongly (1)**
78:11
**wrote (5)**
75:19;222:8;226:7;
232:20;234:25

## Y

**year (16)**
9:12;12:2,20;
129:10;167:14;
177:16,18;178:3,6,10,

14;182:23;183:3,7;
210:22;257:6
**years (49)**
7:1;10:18;11:2,12;
13:11;14:1;16:24,24;
21:9;54:9;59:18;
61:23;88:8,9,12,14;
89:4;105:15;106:11,
18;112:22;113:6,19;
123:18,25;129:4;
130:12;137:12;147:9;
149:7;157:23,24;
158:1;165:9,10;
179:13;183:17,21,24,
25;190:21;220:24;
227:14;232:11,23;
242:17;252:2;265:10;
270:13
**yes-or-no (1)**
235:16
**Yolanda (3)**
10:1;127:25;128:2
**young (1)**
157:22
**younger (1)**
129:6

## 1

**1 (18)**
5:1;14:22;15:3;
101:23,25;108:3;
117:22;124:5;128:25;
210:19;226:24;232:9,
15;255:1,3,4;270:24;
271:2
**1:10 (1)**
111:15
**10 (10)**
18:13;70:20,25;
137:10,12;167:1;
168:15;211:24;
219:14,17
**11 (11)**
18:21;69:25;
184:24;185:2,6,15;
186:10,20;222:3,4,14
**11:30 (6)**
49:4;59:21;60:3;
63:21;64:1;160:16
**11:46 (1)**
80:2
**11:52 (1)**
80:2
**12 (3)**
165:15;196:1;
264:16
**12:29 (1)**
111:4
**12:32 (1)**
111:4
**12:33 (1)**
111:15

**12:45 (1)**
63:6
**13 (4)**
193:17;199:24;
223:8;226:6
**1302 (6)**
49:6;63:7;68:24;
160:18,22,25
**13th (4)**
168:18;214:16;
217:13,18
**14 (2)**
164:13,20
**15 (7)**
14:1;137:10,12;
157:21;167:25;190:8;
197:6
**15586 (1)**
89:7
**16 (10)**
70:19,25;72:13;
126:13,14;166:25;
167:23;191:11;
192:19;194:15
**17 (12)**
126:12;186:24;
228:1;229:14,20;
230:4,4;231:3,15;
232:7,19;233:1
**18 (8)**
13:11;126:12;
168:14;207:13;215:3;
216:9;217:4,10
**19 (5)**
167:11;169:6;
183:11;220:21;
264:15
**1980s (2)**
135:20;136:23
**1988 (1)**
210:24
**1989 (2)**
175:11;271:20
**1990 (74)**
14:19;17:6,11,14,
17;19:12;21:7,12,21;
22:1,9,17,25;25:21;
35:12;36:22;37:6;
45:25;49:4;53:3;
54:16;55:6;58:25;
59:11,21;60:3,25;
61:11;63:5,21,25;
65:7,18;66:19;70:19,
25;72:13;103:23;
104:1;109:1;125:21;
126:2;138:23;144:22;
152:9;159:5;160:16;
161:1;169:18;175:11;
177:14;182:21;
183:16;184:23;185:5;
190:4,18;207:19;
208:19;211:2,12,25;
212:5;214:5;229:5;

233:11;257:17,18;
258:9;271:20;273:23;
274:11;275:7,10
**1992 (5)**
168:18;190:23;
214:16;217:13,19
**1995 (5)**
105:24;131:12,15;
219:20;220:21
**1st (1)**
256:18

## 2

**2 (30)**
5:2;33:21,22;45:19,
20;75:3,5;82:10;
117:20;140:2;152:8;
227:11;228:14,15;
229:3,22;230:15;
231:12,18,23;232:16,
17;233:7;244:14,18;
254:24;260:16;261:9,
12;263:7
**2/10s (1)**
260:20
**2/16/69 (1)**
9:16
**2:10 (1)**
59:11
**2:45 (2)**
46:1,9
**2:50 (1)**
203:3
**20 (7)**
63:5;88:9;130:12;
175:14;181:13;252:2;
270:13
**2000 (2)**
223:9;226:6
**2001 (7)**
12:3,6,10;105:22;
106:8;224:8;226:7
**2003 (1)**
12:21
**2016 (3)**
108:8,13;213:10
**2017 (16)**
115:16,20;116:4,7,
13;233:20;234:1;
254:21;255:5;256:12,
15,19,22,24;257:4,12
**2018 (4)**
15:22;117:20;
227:11;231:22
**21 (10)**
21:9;126:2;137:4;
183:15;188:22;195:3;
203:9;205:17,19;
219:20
**21-year-old (1)**
54:17
**22 (15)**

88:8,12,14,22;
105:15;106:18;
115:20;165:9,10;
168:19;179:13;
184:20;206:21;214:4;
220:24
**23 (7)**
59:11;89:6,9,11;
186:14;187:19;
275:10
**237-4554 (1)**
149:3
**24 (23)**
17:17;25:21;35:12;
36:22;37:6;45:25;
49:3;59:18,21;60:3,
24;63:21,25;65:6,18;
66:19;160:16;167:23;
168:20;190:4;211:25;
214:5;275:7
**24th (12)**
55:6;61:11;185:13;
186:9;207:19,21;
208:2,19;211:2;
212:5;273:23;274:10
**25 (7)**
17:5,11;19:11;
103:23,25;224:8;
226:7
**25th (3)**
55:5;185:14;186:10
**2601 (1)**
115:15
**26th (1)**
77:18
**2nd (1)**
256:18

## 3

**3 (11)**
33:14,17,21,22,25;
34:1;74:25;168:4;
184:24;185:5;203:4
**3:30 (1)**
35:12
**3:33 (1)**
226:20
**3:45 (1)**
226:21
**30 (2)**
7:1;54:9
**31 (3)**
108:7;116:3,7
**32 (1)**
175:16
**33 (2)**
233:20;255:4
**330 (2)**
35:6,10
**3337 (3)**
104:2;258:10;
260:25

**3357 (1)**
260:22
**34 (5)**
233:19;234:11;
235:1,23;237:6
**3428 (1)**
261:2
**37 (1)**
260:24
**39 (1)**
91:15
**3rd (1)**
256:19

## 4

**4 (6)**
59:6,9;169:7;
186:14;208:13;
242:24
**4:34 (1)**
276:18
**4:40 (1)**
276:19
**40 (1)**
191:11
**41 (4)**
192:19;264:12,15,
16
**42 (2)**
94:6;193:17
**43 (1)**
194:15
**44 (2)**
34:25;196:1
**45 (1)**
95:21
**48 (1)**
16:24
**49 (1)**
97:14
**4th (1)**
256:19

## 5

**5 (31)**
17:18;30:20,23;
31:16;33:4;36:19,20,
25;37:4,7,9,11;58:2,7;
62:8,10,13;76:15;
81:5;157:21;212:5,
24;256:12,15;257:4,
12;274:5;275:10,21,
25;276:2
**50 (2)**
8:25;137:8
**5333 (1)**
161:14
**57 (1)**
197:2
**58 (1)**
199:22

**5'8 (1)**
251:21
**5'9 (1)**
251:21
**5th (1)**
257:11

## 6

**6 (14)**
18:5;46:15;71:16;
77:21;80:4,8;81:7,10;
84:3;211:18;215:20;
216:21;274:4,5
**60 (2)**
203:8,9
**60130 (1)**
115:16

## 7

**7 (8)**
17:2;81:25;87:12,
15;162:25;230:21;
264:11;267:12
**70 (1)**
203:7
**73 (2)**
205:17,19
**74 (1)**
206:21
**773 (1)**
149:3

## 8

**8 (6)**
26:8;103:14,17;
197:4;258:1,3
**80 (1)**
207:13
**80s (5)**
134:14;135:17;
137:20;172:3;196:12
**82 (1)**
208:13
**83 (1)**
210:19
**83rd (1)**
119:3
**88 (2)**
9:14;210:25

## 9

**9 (24)**
17:17;49:16;60:23;
61:1;63:17;68:16;
71:12,13,23;72:1,4,7,
10;95:7;115:1,4,20;
181:13;185:11;
194:16;195:5,16;
199:22;216:22

**90 (5)**
190:19;211:18;
215:20;216:19,21
**90s (4)**
134:15;137:20;
172:3;196:13
**91 (4)**
216:15,16;217:4,8
**95 (3)**
105:22;106:7;
190:19

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 21

# In The Matter Of:

*Maysonet v.*
*Guevara*

---

*Christopher Goossens*
*January 22, 2021*



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

1

1           IN THE UNITED STATES DISTRICT COURT FOR
            THE NORTH EASTERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION
            CASE NO.  18 CV 02342
3

4           -----------------------
            JOSE JUAN MAYSONET,
5           JR.,                              CIVIL ACTION

6               Plaintiff(s),           Deposition of:
                                      CHRISTOPHER GOOSSENS
7               v.

8           REYNALDO GUEVARA, et
            al.,
9
                Defendant(s).
10          -----------------------

11

12

13          T R A N S C R I P T of the stenographic
    notes of the proceedings in the above-entitled

14  matter as taken by and before DIANE M. HOLMES, a

15  Certified Court Reporter and Notary Public of the

16  State of New Jersey, held via videoconference on

17  Friday, January 22, 2021, commencing at

18  approximately 11:22 in the morning, pursuant to

19  notice.

20

21

22

23

24

25

2

1   A P P E A R A N C E S:

2

    BONJEAN LAW GROUP, PLLC
3   Attorneys for Plaintiff Jose Juan Maysonet, Jr.
            467 Saint Johns Place
4           Brooklyn, New Jersey 11238
            718.875.1850
5           Jennifer@bonjeanlaw.com
    BY:  JENNIFER BONJEAN, ESQ.
6        ASHLEY COHEN, ESQ.
         STEVE GREENBERG, ESQ.
7        HALEY COOLBAUGH, PARALEGAL

8

9   LEINENWEBER BARONI & DAFFADA, LLC
    Attorneys for Defendant Reynaldo Guevara
10          1150 Wilmette Avenue, Suite D
            Wilmette, Illinois 60091
11          847.251.4091
            justin@ilesq.com
12   BY:  JUSTIN LEINENWEBER, ESQ.

13

14   THE SOTOS LAW FIRM, P.C.
    Attorneys for Defendants JoAnn Halvorsen, Edward
15   Mingey, Lee Epplen, Fernando Montilla and Ronald
    Paulnitsky
16          141 W. Jackson Boulevard, Suite 1240A
            Chicago, Illinois 60604
17          630.735.3303
            dbrueggen@jsotoslaw.com
18   BY:  DAVID A. BRUEGGEN, ESQ.

19

20

21

22

23

24

25

3

1    A P P E A R A N C E S: (Cont'd)

2

3    ROCK, FUSCO & CONNELLY, LLC
     Attorneys for Defendant City of Chicago
4         321 N. Clark Street, Suite 2200
          Chicago, Illinois 60654
5         312.494.1000
          arahe@rfclaw.com
6    BY:  AUSTIN RAHE, ESQ.

7

8    COOK COUNTY STATE'S ATTORNEY'S OFFICE
     Attorneys for Frank Di Franco and Cook County
9         50 W. Washington, 5th Floor
          Chicago, Illinois 60602
10        Edward.brener@cookcountyil.gov
     BY:  EDWARD M. BRENER, ESQ.
11

12

     HINSHAW & CULBERTSON, LLP
13   Attorneys for Frank Di Franco
          151 North Franklin Street
14        Suite 2500
          Chicago, Illinois 60606
15        312.704.3127
          mstephenson@hinshawlaw.com
16   BY:  MICHAEL C. STEPHENSON, ESQ.

17

18

19

20

21

22

23

24

25

4

1                        I N D E X

2    EXAMINATION                                  PAGE

3    CHRISTOPHER GOOSSENS
     DIRECT EXAMINATION BY MS. BONJEAN              5
4    CROSS-EXAMINATION BY MR. BRUEGGEN             88
     CROSS-EXAMINATION BY MR. RAHE                142
5    CROSS-EXAMINATION BY MR. LEINENWEBER         169
     CROSS-EXAMINATION BY MR. STEPHENSON          189

6
                          E X H I B I T S
7
     NUMBER         DESCRIPTION                    PAGE
8
     Goossens-1    Polaroid photo                   38
9
     Goossens-2    Investigative file               39
10
     Goossens-3    Jose Maysonet's statement        66
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1   C H R I S T O P H E R   G O O S S E N S, address

2                     ████████████████████████████,

3                     ████████████████ is duly sworn/affirmed

4                     by a Notary Public of the State of New

5                     Jersey and testifies under oath as

6                     follows:

7   DIRECT EXAMINATION BY MS. BONJEAN:

8         Q.     Good morning, Mr. Goossens.  My name is

9   Jennifer Bonjean, as you already know, and we are

10  here in the matter of Jose Maysonet versus Guevara,

11  et al., which is a civil rights case pending in the

12  United States District Court for the district -- for

13  the Northern District of Illinois.

14              Do you understand, sir, that you are

15  here today to have your deposition taken in

16  connection with this matter?

17        A.     Yes.

18        Q.     Have you ever had your deposition taken

19  before?

20        A.     I've never had a deposition.

21        Q.     Okay.  And I'm going to go through some

22  of the ground rules.  We did speak yesterday, as you

23  know, and I did explain some of the ground rules

24  then, but I'm going to make sure that we're -- I

25  remind you and we have it on the record.  Okay.

6

1          MS. BONJEAN:  First of all, I'm going

2    to ask that all the attorneys in the Zoom session

3    place their appearances on the record before we get

4    going.

5          As you know, my name is Jennifer

6    Bonjean.  I represent the plaintiff in this matter,

7    Mr. Maysonet, and you are in the room with Mr.

8    Greenberg who also represents Mr. Maysonet, and I'm

9    just going to put Ashley's appearance on the record.

10   Ashley is an attorney who works for my firm, and she

11   also represents Mr. Maysonet.

12         And now I'll have the other attorneys

13   identify themselves for you.

14         MR. BRUEGGEN:  Good morning, Mr.

15   Goossens.  My name is Dave Brueggen.  I represent

16   the defendant officers in this case.

17         THE WITNESS:  Yeah.  I spoke to you

18   yesterday over the phone, correct?

19         MR. BRUEGGEN:  Yes.

20         MR. RAHE:  Good morning, Mr. Goossens.

21   My name is Austin Rahe.  I represent the defendant,

22   City of Chicago, in this case.

23         THE WITNESS:  Good morning.

24         MR. STEPHENSON:  Good morning, sir.

25   Michael Stephenson on behalf of Defendant Di Franco.

7

1           MR. LEINENWEBER:  My name is Justin

2    Leinenweber on behalf of Defendant Guevara.

3           MR. BRENER:  Good morning.  My name is

4    Edward Brener on behalf of Cook County.

5           MS. BONJEAN:  And for the record, my

6    paralegal, Haley Coolbaugh, is present so she can

7    help us in case you need to look at some documents

8    on the screen.  Okay.  All right?

9      A.    You're asking me the question?

10     Q.    Yeah.  So we'll go through those ground

11   rules.

12          First of all, I'm going to be asking

13   questions.  You're going to be answering those

14   questions, and I'm going to ask that you do your

15   very best to remember to answer audibly so that the

16   court reporter can hear you.  Okay?

17     A.    Okay.

18     Q.    And, obviously, this is less than ideal

19   circumstances.  Normally, we're all in the same

20   conference room together, but you have a pretty good

21   resonating voice.

22          So, hopefully, we'll have no problems,

23   but I may ask you to repeat something or the court

24   reporter will so that she can take down what you've

25   said.  Okay?

8

1          A.     Okay.

2          Q.     And, also, if at any point you don't

3  understand one of my questions, please let me know.

4  All right?

5          A.     Yes.

6          Q.     And I will definitely try to rephrase

7  it so that we can be on the same page, and I'm also

8  going to ask that, even if you know where my

9  question is headed, I'd ask that you wait for me to

10  finish the question before you answer so that the

11  court reporter can get a nice, clean record of my

12  questions and your answers.  Okay?

13          A.     Okay.

14          Q.     And I will do the same and let you

15  finish your answer before I interrupt you with my

16  next question.  Okay?

17          A.     Yes.

18          Q.     So we're going to get started here

19  today.  I first want to ask you to again identify

20  your full legal name for the record.

21          A.     My full legal name for the record is

22  Christopher George Goossens.

23          Q.     And how do you spell that last name,

24  Mr. Goossens?

25          A.     G-O-O-S-S-E-N-S.

9

1    Q.    And how old are you, sir?

2    A.    I'm 48 years old.

3    Q.    And --

4    A.    Born ████████████.

5    Q.    Thank you.

6          And what part of the -- well, first of

7    all, what city do you live in?

8    A.    I live in Chicago, Illinois.  I still

9    live at the same address, ███████████████, that

10   I grew up in all of my life.

11   Q.    And is the address where you've grown

12   up your entire life in a particular neighborhood in

13   the City of Chicago?

14   A.    It's on the northwest side area called

15   West Humboldt Park.

16   Q.    And who do you presently live with?

17   A.    My mom, still at the same address.

18   Q.    All right.  And have you lived with

19   your mom at least off and on since your childhood at

20   that address?

21   A.    Really, no.

22   Q.    How long have you lived with your mom

23   at that address?

24   A.    From the time I went to prison in 1991.

25   I got out in 2006, and that was the only time that I

10

1    never stood there.  So for all of my life until this

2    day today I still live there.

3         Q.     I understand.  My apologies.

4                Now, where -- hold on a second.

5                Were you born in the City of Chicago,

6    Mr. Goossens?

7         A.     Yes.

8         Q.     And I want to ask you some questions

9    about growing up in the area where you grew up.

10   Okay.

11               When -- where did you go to high

12   school?

13        A.     I went to Schurz, Carl Schurz High

14   School.

15        Q.     And did you graduate from high school?

16        A.     No, I did not.

17        Q.     Okay.  How far did you make it in high

18   school?

19        A.     I made it to my second year of summer

20   school.  That's as far as I made it.

21        Q.     That would be sophomore year of summer

22   school?

23        A.     Yeah.

24        Q.     And at that point, did you drop out of

25   high school?

11

1      A.      Correct.  Yes.

2      Q.      And was there a reason you dropped out

3  of high school?

4      A.      A lot of fighting.  You know, moving

5  through the city was difficult, because between

6  where I live and where my school was at, there was a

7  lot of gang activity along the way whichever way you

8  went.

9              So it was pretty difficult for me to be

10  on public transportation to get to school all the

11  time running into incidents.  Yeah.  So that's why I

12  kind of dropped out.

13     Q.      Right.

14              And at some point did you affiliate or

15  join a street gang in the City of Chicago?

16     A.      Yes.

17     Q.      Okay.  What year did you join a street

18  gang in the City of Chicago, if you know?

19     A.      I mean I've always been affiliated with

20  the gang with the Latin Kings because I lived in the

21  neighborhood.

22              So it was like all of us knew each

23  other.  All of us knew each other's families, per

24  se, on that block.  So I would say maybe like '87,

25  '88.

12

1      Q.      And you raise a good point.  For you,
2   was it a matter of sort of officially joining the
3   Latin Kings or was that just sort of a -- the Latin
4   Kings a part of the community you lived in growing
5   up?
6      A.      Correct.  That was just a part of the
7   community that I lived in growing up.  I mean it
8   wasn't unlike my friend's father that I go to school
9   with, his father's a Latin King or his mother is a
10  Latin Queen or so on and so forth.  It was more
11  family-oriented thing at that time I guess looking
12  back at it.
13     Q.      I'm sorry.  Could you repeat that last
14  thing you said, looking back at it?
15     A.      Yeah.  Looking back now, you can see
16  how the community was structured with the Latin
17  Kings.
18     Q.      Okay.  And would it have been very
19  difficult not to associate yourself with the Latin
20  Kings living in that community as a teenager?
21     A.      Yeah.  It would have been very
22  difficult.
23     Q.      All right.  Now, did you know an
24  individual by the name of Jose Juan Maysonet,
25  Junior, back during your -- let's call it the late

13

1   '80s, early '90s?

2        A.    I knew of him.  We were not friends.

3   We did not hang out together.  He was just a Latin

4   King from a different street.

5        Q.    And explain how that worked because

6   there is a perception that all Latin Kings know each

7   other.  Is that an accurate perception?

8        A.    No.

9        Q.    Is the Latin King street gang a large

10  street gang?

11       A.    Yes.

12       Q.    I mean size.  Does it have many

13  members?

14       A.    Yes, I believe so.

15       Q.    Okay.  I'm not asking you to be an

16  expert here, but from your understanding, was the

17  Latin King street gang one of the larger gangs?

18       A.    I'm sorry.  Go ahead.

19       Q.    You can answer that.  Was it one of the

20  larger gangs?

21       A.    Yeah.  The Latin King street gang on my

22  block in my area was the dominant gang then for

23  probably two square miles in length.

24            So there was no -- you know, I went to

25  school, grammar school right down the street.  I

14

1   played in the park.  If there was no -- there was no

2   way I could not associate myself with somebody that

3   was a Latin King or had family that was a Latin King

4   or what have you.

5           Q.    Okay.  And, again, I don't want to make

6   this about the Latin Kings, but just, generally

7   speaking, were there different factions or sects of

8   the Latin Kings street gang?

9           A.    Yes.

10          Q.    And were they organized by way of sort

11  of blocks or geography within the city?

12          A.    Correct.  Yes, they were.

13          Q.    In your area, the I guess sect or

14  faction of the Latin Kings that you associated with,

15  how many square blocks did that sect I guess occupy?

16          A.    One corner.  Yeah, it was not big.

17          Q.    And to the best of your understanding,

18  back in the late '80s, early '90s, was Jose Juan

19  Maysonet, Junior, a member of the Latin King sect of

20  which you were a member?

21          A.    No.

22          Q.    Did you know what I guess sect or

23  faction he associated with?

24          A.    Somewhere on the Spaulding side.  On

25  the other side of Division, there's a street that

15

1    kind of separates the two areas I guess.  He was

2    more like by North Avenue, and I'm more like by

3    Division.  You know, he's on one end of the

4    neighborhood.  I'm way on the other end.

5          Q.    Okay.  Got it.

6                Now, you said you knew of him prior to

7    I'm going to call it August of 1990.  Okay.  You

8    knew of him, and you had some association with him,

9    but would you call him a good friend?

10               MR. STEPHENSON:  Objection,

11   mischaracterizes his testimony.

12         Q.    You can answer.

13         A.    No, I wouldn't call him a good friend.

14         Q.    Okay.

15         A.    He was just an acquaintance.  He had a

16   real nice car.  He used to drag race cars, and he

17   used to play his music loud.  So that's how I knew

18   him when he drove by.

19               I mean we knew who that was.  He was

20   not somebody who was outside of the neighborhood,

21   and that's how people know each other.

22         Q.    I'm going to ask you just for the

23   purposes of the record to do your best to describe

24   your -- your relationship, however you want to

25   describe it, with Mr. Maysonet prior to August of

16

1    1990.

2              You sort of did already, but if you

3    want to repeat how you knew him, how you met him,

4    that would be fine.

5         A.    I mean I knew his sister's boyfriend,

6    but I didn't know him.  Me and his sisters -- his

7    little sister's boyfriend, we all went to school

8    together, Lowell School, and that's how I knew him,

9    but he never went to Lowell School because he wasn't

10   from Chicago.

11             So it was hard, you know.  People that

12   come from Puerto Rico, basically, they came to that

13   neighborhood because their family was there.  I knew

14   their family members, but I didn't know them because

15   they didn't go to school with us.  They didn't grow

16   up with us.  You know, they weren't in the park

17   playing basketball, whatever, with us, but we knew

18   he was family to family.

19        Q.    Okay.  And you said he had a nice car.

20   What type of car was it?

21        A.    It was like a little red Toyota 1.8

22   with the loud mufflers and booming radio.

23        Q.    Was it a type of car that drew a lot of

24   attention to it?

25        A.    Yeah.  It was -- it was nice.  It

17

1  was -- it was -- it was red.  It was primer, you

2  know.  It wasn't a Toyota like now, you know.  It

3  was kind of banged up, but, you know, the bumpers

4  were shiny.  The music was loud.

5       Q.    Now, did you have any -- well, strike

6  that.

7             Can you describe to the best of your

8  ability Mr. Maysonet's English speaking capabilities

9  prior to August of 1990?

10      A.    Probably that's why we didn't talk to

11 each other the way that friends would talk to each

12 other, communicate, because he spoke predominantly

13 Spanish.  I spoke predominantly English.

14            His sister, she spoke English and

15 Spanish because she was younger like us.  His

16 English was not -- he probably couldn't get on the

17 bus.

18      Q.    You said he probably could not get on

19 the bus?

20      A.    Yeah.  If he had to speak English to

21 get on the bus to get home or to the airport, he's

22 not going to make it.

23      Q.    Okay.  And would it be fair to say he

24 did not speak conversational English?

25      A.    No, he did not.

18

1    Q.    All right.  I want to ask you a couple

2    things about other individuals that you may or may

3    not know.

4            Did you know an individual by the name

5    of Alfredo Gonzalez?  And I'm talking about in

6    August of 1990.

7    A.    No, I did not.

8    Q.    Okay.  Did you know an individual who

9    went by the nickname Lluvia?

10   A.    I did not.

11   Q.    What about an individual by the name of

12   Justino Cruz?

13   A.    Yes, I did.  I did know of him.  He

14   went to high school with my sister.  Yeah, and he

15   went to Lowell School as well.

16   Q.    All right.  And was Justino Cruz a

17   member of the faction of the Latin Kings that you

18   affiliated with?

19   A.    No.

20   Q.    Okay.  And I'm assuming Alfredo

21   Gonzalez or Lluvia was not a member of the Latin

22   Kings, at least the faction you affiliated with,

23   right?

24   A.    Correct.

25            MR. STEPHENSON:  Objection to

19

1    foundation.

2         Q.    Do you know -- well, strike that.  I

3    think you said this.

4              Did you meet Justino Cruz in school or

5    through school basically when you were younger?

6         A.    No.  He just went the same -- they were

7    the youngest from all of the defendants.

8         Q.    Okay.

9         A.    So they were in classes way above me.

10   I mean knowing now, Lluvia Gonzalez, he graduated in

11   '77.  I was five years old in '77.  You understand

12   what I'm saying?

13             So there was a lot of different ages,

14   but I knew that Justino -- because he's closer to my

15   age, I knew he went to Lowell School because he was

16   the class above ours, maybe fifth and eighth grade.

17        Q.    And I want the record to be clear on

18   this.

19        A.    Did I know him and hang out with him?

20             I'm sorry.  Did I hang out with him and

21   know him?  No.  We were in two different stages.

22        Q.    No.  No.  No.  That's fine.  Feel free

23   to do that, and I'll stop so you can finish your

24   answer.

25             You said you didn't know Alfredo

20

1  Gonzalez or Lluvia in August of 1990.  Did you later

2  come to know who he was?

3          A.      Yeah.  After he became my co-defendant,

4  yeah.

5          Q.      Did you know an individual by the name

6  of Efrain Cruz or Efrain Cruz who I think went by

7  the nickname King?

8          A.      Yes.

9          Q.      All right.  And how did you know Efrain

10  Cruz?

11          A.      He was a King from the neighborhood,

12  from that side of the neighborhood, and his name was

13  King.  So it was easy to remember this guy.  You

14  know, the word King and Latin King, you can get the

15  name real popular, but knowing him just being

16  friends or whatever, hanging out, no, but he had a

17  popular name and he was a popular guy.

18          Q.      And, again, this is not an individual

19  you considered a friend.  Is that right?

20          A.      Correct.  That's what I'm saying.

21          Q.      And I assume, based on your answer,

22  that's not an individual who associated with your

23  faction of the Latin Kings, right?

24                  MR. STEPHENSON:  Objection, foundation.

25          Q.      Is that correct?

21

1    A.    That's correct.

2    Q.    And would that be true of Justino Cruz

3  as well?

4    A.    That's correct.

5    Q.    Did at some point you know that Justino

6  Cruz was also associated with the Latin Kings?

7    A.    No.  I never knew that he was

8  associated with the Latin Kings until all of this.

9  I knew his brother was Efrain Cruz, but I didn't

10  know that he was.

11    Q.    Okay.  What about an individual by the

12  name of Francisco Veras or Cisco?  As you sit here

13  today, do you know an individual by that name?

14    A.    Yeah.  I know him by his name from the

15  other side.  Yeah.

16    Q.    And was he someone that you considered

17  a friend back in 1990, for instance?

18    A.    No.

19    Q.    Did you know an individual who went by

20  the nickname or who was called Black Jeffrey?

21    A.    Yes.

22    Q.    Who is that?  Who is Black Jeffrey?

23    A.    Jeffrey was one of the Kings on that

24  side of the neighborhood, but he was a little more

25  darker skinned, and he hung out a lot on our side of

22

1  the neighborhood.  So, yeah, we knew him kind of --

2  kind of well.

3         Q.    Do you know him by any other name than

4  Jeffrey or Black Jeffrey?

5         A.    Slick.

6         Q.    And do you -- do you know if he was

7  Latino or mixed or African American?

8         A.    No.  He was -- he was African American

9  100 percent, but he swore up and down that he was

10 Puerto Rican, and he talked Spanish, and he -- all

11 his girlfriend and baby's mamas are Puerto Rican.

12 Real lady's man.

13              MR. GREENBERG:  Jennifer claims she's

14 Jewish.

15              MS. BONJEAN:  That's true.  I do

16 sometimes.

17              THE WITNESS:  Puerto Rican Jew.

18              MR. GREENBERG:  No.  I don't think

19 she's a Puerto Rican Jew.

20        Q.    Mr. Goossens.

21        A.    That's the type of individual he was.

22 God rest his sole.  He's no longer with us, but,

23 yes, you know, we knew him.

24        Q.    Now, do you -- do you have any idea of

25 when he passed away?

23

1        A.      I want to say about five years ago, but

2   I'm not sure.  Anywhere between five and six years

3   ago.

4        Q.      And I just want to be clear about

5   something, Mr. Goossens.  Would it be fair to say

6   that you were able to identify people as a member of

7   the Latin Kings by colors or areas where they were

8   hanging out but not necessarily know them on a

9   firsthand or friendly basis?

10       A.      Yes.  It would be fair to say that.

11  More not with colors, but just where you lived would

12  automatically associate you with that area and that

13  street gang and the individuals from that block.

14       Q.      Now, I want to ask you a couple

15  questions about the Chicago Police Department

16  members who policed the area in which you lived.

17              Were you familiar with any detectives

18  from the Area 5 crimes division or Grand and Central

19  back in August of 1990?

20       A.      I don't understand the question.

21       Q.      Sure.

22              Were you familiar with any Area 5

23  detectives or detectives from Grand and Central back

24  in say the summer of 1990?

25       A.      Was I familiar with them?

24

1     Q.     Yeah.  Did you know them by being able
2     to recognize them?
3     A.     Well, in that sense, yes.  Yeah, by the
4     patrol car that they were driving or the tag number
5     on the top of the car.  Yeah, we would know who that
6     was.
7     Q.     Would you say that your neighborhood or
8     your block even was a highly policed or regularly
9     policed area?
10    A.     Highly policed.
11           MR. STEPHENSON:  Objection, foundation.
12    Q.     And can you explain what you mean by
13    that?
14    A.     There was a patrol car driving around
15    or detective car driving around every day.  I want
16    to say 24 hours a day.
17           I mean it was just -- it was bad with
18    drugs and gangs at that time.  So the area was real
19    hot.
20    Q.     Were you familiar back in August of
21    1990, and when I say familiar, I mean did you know
22    by able to recognize him and identify him, a
23    detective by the name of Reynaldo Guevara?
24    A.     Yes.
25    Q.     And how did you know Detective Guevara

25

1  back in August of 1990?

2       A.    From patrol and from the police

3  station.

4       Q.    And when you say from patrol and from

5  police station, can you elaborate on what you mean

6  by that?

7       A.    Well, I'll -- on the street, I would

8  see him patrolling the area, and in the police

9  station, sometimes I used to go to where -- excuse

10  me, where my mother worked, and I would see him

11  there as well.

12            My mom was court interpreter for all of

13  the precincts that have courtrooms in the City of

14  Chicago.  So, yeah, I frequent a lot of police

15  stations with my mom.

16       Q.    Let me ask you about that.  Your mother

17  worked in the City of Chicago when you were growing

18  up or when you were a teenager.  Is that right?

19       A.    Correct.

20       Q.    And what type of work did she do?

21       A.    She was a court interpreter.

22       Q.    And what does -- do you know what a

23  court interpreter does or what your understanding of

24  a court interpreter is?

25       A.    Whoever can't speak English, she

26

1    interprets for them I guess on the state side or I

2    guess on the defendant's side.  I don't know which

3    side she was on, but she just interpreted for the

4    court.

5         Q.    Right.

6               And when you say interprets for the

7    court, did she actually go to court to the best of

8    your knowledge?

9         A.    Yeah, every day.  That was her job.

10        Q.    And do you know where she was assigned

11   back in this time period of the, you know, early

12   '90s?

13        A.    Well, there were some bigger courtrooms

14   than others.  I'm not sure if it was Belmont and

15   Western, 55 and Grand or Harrison, but those were

16   her main places, and Augusta and Wood, but that was

17   a smaller one.

18        Q.    And are you saying that she would

19   actually go to the courtrooms that were associated

20   or connected with the precincts?

21        A.    Where she was assigned to, yes.  I'm

22   not an expert about my mom's job but --

23        Q.    I understand.

24        A.    We went to a lot of different places.

25        Q.    Okay.  And through your mom's job, did

27

1   you know -- and I don't mean necessarily become

2   friends with, but did you know who Detective Guevara

3   was?

4         A.     Yes.

5         Q.     Do you know if your mom ever responded

6   to police stations when somebody was -- before

7   anybody was charged during interrogations to do any

8   interpreting?

9         A.     I don't know about that.

10        Q.     Okay.

11        A.     She did -- she's listened to a lot of

12  tapes at home and write -- hand write whatever they

13  said on the tapes.  I don't know what that was.

14  Probably that was from the court itself.

15              No, she didn't respond like a police

16  officer.  No.  She just went to court in the morning

17  8 o'clock.  Court closes at five.  That was it.

18        Q.     And your mom's obviously Spanish.

19  She's obviously bilingual.  Is that fair?

20        A.     Yes.  My mom can speak five different

21  languages.

22        Q.     And what about you?  Do you speak any

23  other languages other than English?

24        A.     Just two, English and Spanish.

25        Q.     And are you more comfortable or equally

28

1   comfortable in those languages?

2        A.     I think I'm equally comfortable in

3   Spanish to a certain extent.  I mean I'm not

4   educated in Spanish.

5             I'm educated in English as far as I

6   went to school, but as far as Spanish, I just

7   learned that at home from my mom and my family.  So

8   I don't know a lot of Spanish words.  I can get on

9   the bus.

10       Q.     Got it.

11              And what is your mother's name?

12       A.     My mom's name is Trinidad Alamo,

13  A-L-A-M-O.  Trinidad like Trinidad and Tobago.

14       Q.     Do you have any siblings, Mr. Goossens?

15       A.     Yes.  I have three sisters and one

16  brother and one deceased brother.

17       Q.     I'm sorry.  I did not know that.  All

18  right.

19              Where do you fall in terms of age in

20  your family?

21       A.     I was the last one.

22       Q.     Okay.  All right.  Is it fair for me to

23  assume that your father's last name was Goossens?

24       A.     Yes.

25       Q.     And was your mother previously married

29

1   to anybody else prior to her marrying Mr. Goossens?

2       A.     I believe she was married -- I believe

3   my mom was married to my other siblings' father in

4   Cuba.

5       Q.     Okay.  And do you know -- I mean I'm --

6   do you know what her -- the father of your other

7   siblings' last name was?

8       A.     Fernandez with an F.

9       Q.     And your sisters, was their last name

10  Fernandez with an F?

11      A.     Two of my sisters are Fernandez, and my

12  younger sister is like me, Goossens.  We have the

13  same father.

14      Q.     Is your last name Fernandez?

15      A.     No.

16      Q.     Has your last name ever been Fernandez?

17      A.     No.

18      Q.     Okay.  I want to ask you did you know a

19  person by the name of Santiago Sanchez who went by

20  the nickname Macho?

21      A.     Yes.

22      Q.     How did you know Macho?

23      A.     Me and Macho we used to hang out

24  together a lot.  We used to go to the same school.

25  We went to the same school together.

30

1      Q.    Okay.  And this was before you dropped

2  out in sophomore year.  Is that right?

3      A.    No.  This is grammar school.

4      Q.    Oh, gotcha.

5            So you knew him -- you knew Macho from

6  grammar school, right?

7      A.    Correct.

8      Q.    Did you know or do you know that at

9  some point he passed away in 1990?

10     A.    Yes.

11     Q.    Okay.  And did you happen to attend his

12  funeral or any type of visitation for him?

13     A.    Yes.

14     Q.    All right.  So as you sit here today,

15  do you recollect his passing away or dying in spring

16  of 1990?

17     A.    Yes.  I remember -- I remember the day

18  that that happened.

19     Q.    Okay.  I would like to draw your

20  attention now specifically to -- first, I'm going to

21  draw your attention to May of 1990, the end of May.

22  Okay.

23            I know it's a long time ago, but at

24  sometime at the end of May of 1990 did you become

25  aware or learn that two individuals -- two African

31

1    American individuals were shot and killed on North

2    Avenue?

3         A.    Did I become aware of that?

4         Q.    Yeah.

5         A.    Back then?

6         Q.    Yeah, back then.

7         A.    It was -- it was news, yeah.  It was

8    news, because, you know, people weren't getting shot

9    and killed like that, you know, two people being

10   killed by the restaurant that we used to go to as

11   well.

12             The Donald Duk's Restaurant right

13   there, you know, that made it like dangerous.  So,

14   yeah, you kind of heard.

15        Q.    So fair to say that back in May of 1990

16   the shooting of these two individuals right on North

17   Avenue was something that --

18        A.    Was big news.

19        Q.    It was news, right?

20        A.    Yes.

21        Q.    And when that shooting occurred or in

22   the weeks that followed that shooting, did you hear

23   any information about who was responsible for that

24   shooting?

25        A.    No.

32

1       Q.    Did you have any information or receive

2  any information in the weeks that followed that

3  shooting that Latin Kings were responsible for that

4  shooting?

5       A.    No.  I never received any information.

6  I had no knowledge that anyone was involved.  It was

7  only, you know, two African Americans that got shot

8  and they didn't be about nothing.

9           That was the information that spread

10  through the neighborhood, you know.  Two guys that

11  were not gang members got killed right there.  That

12  was it.

13       Q.    And when you say that be about nothing,

14  do you mean that they weren't affiliated as best as

15  you and the neighborhood knew?

16       A.    Well, nobody from the neighborhood knew

17  them.  They didn't live around there.  They weren't

18  family to anybody.  So they were not -- not

19  affiliates, you know.

20           If somebody would have came out there,

21  started crying, oh, my uncle, this and that, or, you

22  know, you would know through the neighborhood, the

23  community the way it was ran, but, no, that wasn't

24  the case.

25           It was two individuals that were not

33

1    even from the area.

2         Q.     Okay.  Now, at some point, did you

3    learn that your name had been or had come up in

4    connection with the shooting or murders of these two

5    African American men?

6         A.     I'm sorry.  Can you say that question

7    again?

8         Q.     Sure.

9                At some point was your name associated

10   with this shooting?  Did you learn that your name

11   became associated with this shooting or that you

12   were accused of being involved in the shooting?

13        A.     Yes.

14        Q.     And do you recall how you first learned

15   that you specifically had been accused of being

16   involved in this shooting?

17        A.     Okay.  The police came to my house.

18   They raided my house, but I was not home.  They

19   never told my mother what it was for or she doesn't

20   recall what it was for.

21               That's what she told me and that the

22   police were looking for me.  That's it.

23        Q.     That's it?

24        A.     Yeah.

25        Q.     Do you recall what year it was that

34

1    they raided your house and were looking for you in

2    connection with this particular shooting?

3         A.    No.  It had to have been -- well, of

4    course, it had to have been after the shooting, but,

5    no, I don't recall.  I'm sorry.

6              I don't recall what year that was but,

7    they raided my house, and several months later I got

8    arrested by a detective that he told me -- and his

9    name, it was Detective Colon from by Lathrop Homes

10   projects.

11             When he arrested me at the gas station,

12   he told me my friends are looking for you.  He's

13   from Belmont and Western.  From there I was

14   transferred over to 55 and Grand, and that's where I

15   met Detective Guevara, and now I know what I'm

16   charged for.  Now I know why I'm here.

17        Q.    Okay.

18        A.    That's how I found out.

19        Q.    Okay.

20        A.    They were looking for me.  No

21   information.  What are you looking for me for?

22        Q.    Now, you mentioned at some point that

23   you actually went to prison, right?

24        A.    Correct.

25        Q.    Can you just tell me the years that you

35

1    were in prison?  Like when you went to prison and

2    when you got out, if you know?

3         A.    I went -- I went to prison April 14,

4    1992.

5         Q.    1992?

6         A.    Yeah.  I was sentenced to 30 years in

7    prison.

8         Q.    Is that your sentencing date?

9         A.    That was -- yeah, that was my

10   sentencing.  That was the day I went to prison,

11   yeah.

12        Q.    Okay.  And were you being detained at

13   the Cook County Jail prior to being sentenced and

14   facing charges?

15        A.    Yes.

16        Q.    I mean facing trial.

17        A.    Yes.

18        Q.    Okay.  Do you know how long or on which

19   date you were actually arrested in connection with

20   the case that you went to prison for?

21        A.    July 7, 1991.

22        Q.    So on July 7, 1991, you were

23   essentially as of that date off the streets, right?

24        A.    No.

25        Q.    Okay.

36

1      A.    I got arrested that day.  I post bail,

2  and I want to say October, somewhere in October I

3  had my trial and I was brought into custody.

4      Q.    Okay.  All right.  So let me just make

5  sure I understand.

6            So on July 7th of 1991 you were

7  arrested in connection with an entirely different

8  matter than the one we're here talking about today,

9  right?

10     A.    Correct.

11     Q.    And you believe you did at least a few

12 months in the Cook County Jail on that case before

13 posting bail.  Is that right?

14     A.    Yeah.  About two months, a month, two

15 months.

16     Q.    And then you were -- looks like you

17 were fighting the case from -- from the streets from

18 being out of custody, right?

19     A.    Yeah, but it wasn't -- it wasn't long.

20 I went straight to trial, and I got found guilty,

21 and by April -- as you can see, from July to April

22 of the next year I was already going Downstate.

23     Q.    And you were sentenced on April 14th of

24 1992.  Do you recall what your sentence was, how

25 long the sentence was?

37

1      A.      Thirty years.

2      Q.      Okay.  And did you do close to 15 real

3  time?

4      A.      Fifteen years and nine months.

5      Q.      All right.  So you were released from

6  the penitentiary in and around 2008.  Does that

7  sound right?

8      A.      '6.  2006 July 26.

9      Q.      Okay.  That just tells you how bad my

10  math is, but July 26th of 2006 is when you were

11  released from prison?

12      A.      Correct.

13      Q.      Did you and Jose cross paths at all

14  when you were in prison?

15      A.      No.  In county jail?

16      Q.      Yeah.

17      A.      Yes.  In prison, no.

18          MS. BONJEAN:  Okay.  I would like to

19  mark the investigative -- strike that.

20      Q.      Before I do that, I would like to have

21  you look at a photograph and see if you can identify

22  a photograph.  Okay.

23          MS. BONJEAN:  I'm going to mark this as

24  Goossens-1, and it's a Polaroid photo.

25          Haley, if you can pull it up.  It's a

38

1    Polaroid photo.

2                (Exhibit Goossens-1, Polaroid photo, is

3    marked for Identification.)

4          Q.     Do you recognize that photo, Mr.

5    Goossens?

6          A.     Yes, I do.

7          Q.     Who is that guy?

8          A.     That's me.  Jesus.

9          Q.     Do you know where that picture was

10   taken?

11         A.     That was taken in my sister's house in

12   the back.

13         Q.     Okay.  And there's --

14         A.     By my sister.  That was a -- that was a

15   family photo.

16         Q.     Right.  Do you know how that family

17   photo made it into a court file?

18         A.     Yeah.  When they went to my house, they

19   took this picture.  The police officers took this

20   picture from my room and labeled it Fro, because I

21   never put that on there.  That's not my writing.

22         Q.     Did you have a nickname back in '90?

23         A.     My nickname was Fro.  You can see my

24   Afro, my hairstyle right there in the picture.  I

25   was about 16 years old in that picture.

39

1      Q.     And this is a -- this was a family
2   photo that was confiscated by Chicago police
3   officers?
4      A.     Correct.
5      Q.     And that handwriting there does not --
6   is not your handwriting, right?
7      A.     No.
8      Q.     And do you know who wrote that Fro
9   there?
10      A.     No, I do not.
11             MS. BONJEAN:  Okay.  Well, you can take
12   that down, Haley.
13             Now I want to -- I would like to mark
14   the investigative file as Goossens-2.
15             One second.  Okay.  I'd like you to
16   pull up, Haley, if you don't mind, RFC-Maysonet 39.
17             (Exhibit Goossens-2, Investigative
18   file, is marked for Identification.)
19             MR. GREENBERG:  Jennifer, we'd like to
20   use the washroom.
21             MS. BONJEAN:  Okay.  Let's take a
22   break.  And you know what?  Steve, do you want me to
23   print out this investigative file so he can sit in
24   the chair with it or can you print it out?
25             MR. GREENBERG:  I do have a printer.

40

1          MS. BONJEAN:  Okay.  Haley, will you

2   send -- it's RFC-Maysonet 1 through 66.  Can you

3   send that to him, that specific bit, and so Steve

4   can print it out and give it to Mr. Goossens to look

5   at from his chair, the paper.

6          MR. COOLBAUGH:  Yes.  No problem.  I'll

7   email it to Mr. Greenberg.

8          MS. BONJEAN:  Five minutes.  Okay.  Do

9   you need more time, Mr. Goossens?

10          THE WITNESS:  Five minutes.

11          MS. BONJEAN:  Okay.  We're going to go

12   off the record for five minutes.  Thank you.

13          (Whereupon, a recess was taken.)

14      Q.    Mr. Goossens, I'm going to hand you

15   what we marked as Goossens-2.

16          MS. BONJEAN:  And for everyone else,

17   yes, it's -- Steve, did you pin the image of me so

18   he can see me as opposed to the --

19          MR. GREENBERG:  Yeah, I got it.  Give

20   me a second.  What is this, 2?

21          MS. BONJEAN:  Yeah, Goossens-2?

22          MR. GREENBERG:  Yeah, he can see you.

23          MS. BONJEAN:  Okay.  Can you see me?

24          MR. GREENBERG:  Yeah.  You're all he

25   sees.

41

1                MS. BONJEAN:  Okay.  I'm just making

2    sure.

3                MR. GREENBERG:  It's not amateur hour.

4        Q.    Okay.  Mr. Goossens, I've handed you

5    what's been marked as Goossens-2.  I'm going to ask

6    you to look at the first page of it and confirm that

7    the first page in the right-hand corner says

8    RFC-Maysonet 1 down in the right-hand corner, the

9    very first page.

10       A.    Okay.

11               MR. GREENBERG:  See the bottom right,

12   the printing down there.

13               THE WITNESS:  Yes.  It says

14   RFC-Maysonet.

15       Q.    One.

16       A.    Zeros one.

17       Q.    Now, I would like you to look at the

18   next set of documents and confirm that it says at

19   the same spot RFC-Maysonet 66?

20       A.    Yes, RFC-Maysonet 00066.

21       Q.    Okay.  Great.  So those are the numbers

22   I'm going to refer to when I refer to the page

23   number, and now I'm going to ask you to turn to the

24   page that is reflected as RFC-Maysonet 000039, and

25   let me know when you're there.

42

1          A.      39, supplementary report.

2          Q.      Yes, sir.   Exactly.

3                  Okay.   So I was going to ask you do you

4    see at the top it says supplementary report and

5    directly across from that it says date of original

6    occurrence May 25, 1990, and then it says 0100?

7          A.      Yes.

8          Q.      Okay.   And it says victim's name.   Do

9    you see Torrence Wiley there?

10         A.      Yes.

11         Q.      All right.   Did you after being charged

12   with this case or at some point prior come to learn

13   the names of the two black men or African American

14   men who were shot on North Avenue?

15         A.      Yes.

16         Q.      And what do you understand their names

17   to be or last name?

18         A.      Wileys brothers --

19         Q.      Wiley?

20         A.      Wileys brothers or Wileys brothers,

21   that's what I understood their name to be.

22         Q.      In the middle of the page it says

23   offender's name, and do you see a name that looks at

24   least similar to your name?

25         A.      Yes.

43

1        Q.    It says Gosens, Christopher.  It's

2  G-O-S-E-N-S.  Do you see that?

3        A.    Yep.

4        Q.    And do you see the address that is

5  allegedly the home address of ████████████████?

6        A.    That's my sister's address.

7        Q.    Interesting.  Okay.

8        So was that your address?

9        A.    No.  That's not my address, but that's

10  where I got arrested.

11        Q.    Okay.  Now, I want you to go down to

12  the lower third of the page where there's some

13  typewritten stuff if you don't mind.

14        A.    Uh-hmm.

15        Q.    It says in custody Christopher Gosens

16  a/k/a Fernandez.  Do you see that?

17        A.    Uh-huh.  Yes.

18        Q.    Did you have an alias or did you

19  also -- were you ever known by Fernandez?

20        A.    No.  I never was known by Fernandez.

21  That's my sister's last name.

22        Q.    Okay.  And then underneath it says

23  arresting officers, and do you recognize any of the

24  arresting officers' names there?

25        A.    Give me one second.

44

1          MR. GREENBERG:  He's getting his

2   reading glasses.

3          A.     Sorry.

4          Q.     That's okay.

5                 Okay.  I'm drawing your attention to

6   the arresting officers that are listed there.  Do

7   you see that?

8          A.     Yes.

9          Q.     And I think you mentioned one of them

10  earlier, but do you recognize any of the names

11  there?

12         A.     Yes.  Could he loan PO J. Colon.

13         Q.     And you referenced Officer Colon

14  earlier.  Is that the officer -- does that -- does

15  this I guess match your understanding of who

16  arrested you in connection with this matter back in

17  1990?

18         A.     Yes.

19         Q.     Right below that it says date, time,

20  location of arrest November 23, 1990, 1630 hours

21  which is 4:30 p.m. at 2801 North Damen on the

22  street.  Is that -- is that keeping with your

23  understanding of where and when you were arrested?

24         A.     Yes.  Yes.  This is -- this is the

25  address ██████████████████ and 2801 North Damen.

45

1    It's the corner of Damen and Diversey.

2              On the other side of the street is the

3    gas station.  My sister lives on that side, ████.

4    The gas station is on Damen.  That's where I got

5    arrested at that gas station.

6        Q.    So it would be fair to say you were in

7    your sister's neighborhood at the time you were

8    arrested?

9        A.    Correct.

10        Q.    And does it sound right that you were

11    arrested I guess November 23, 1990?

12        A.    Yes.

13        Q.    Sounds about right.  All right.

14        A.    Sounds about right.

15        Q.    And then it says released without

16    charging.  Do you recall that?

17        A.    Yeah, I recall it.  Yeah.

18        Q.    Yeah.  Okay.  And I'm going to just

19    draw your attention to a couple other parts of this

20    report.

21              Do you recall speaking to the reporting

22    detectives and/or any assistant state's attorneys

23    after your arrest on November 24th of 1990?

24        A.    Do I recall what?  I'm sorry.

25        Q.    Do you recall speaking to the

46

1    detectives?

2              We'll just start there.  Do you recall

3    speaking to the detectives after your arrest on this

4    date November 24, 1990?

5         A.    Do I recall speaking to them?

6         Q.    Yeah.

7         A.    Yeah.

8         Q.    Okay.  So I'm going to ask you to go to

9    the next page which would be RFC-Maysonet 40.

10        A.    Okay.

11        Q.    And it says statement Christopher

12   Gosens at the top, right?

13        A.    Yes.

14        Q.    Okay.  Then I'm going to go down to

15   the -- okay.  So I'm going to go in the middle of

16   the page where it says, if you can read, the

17   reporting detectives asked Goossens or Gosens if he

18   would be willing to take a polygraph test.  Do you

19   see that?

20        A.    Yes.

21        Q.    Do you recall ever taking a polygraph

22   test?

23        A.    Yes.

24        Q.    Okay.  And do you recall whether or not

25   you were told that you failed or passed or what do

47

1  you recall being advised as it relates to the
2  polygraph test?
3        A.    I don't know what the individual's name
4  is that takes the polygraph test but -- or his
5  title, but he told me on several occasions that I
6  was lying and that I just need to tell the
7  detectives what they wanted me to tell them.  That's
8  what he kept on telling me.
9            He says I know you're lying, and he's
10  showing me a paper with some squiggly lines.  I have
11  no idea what he's showing me.  He's showing me the
12  menu from someplace.  So he showed it to me and kept
13  on insisting that I was lying and that I should give
14  up the information to the detectives, that I know
15  what I did.
16        Q.    Okay.  Prior to being taken for the
17  polygraph test, were you told by any Area 5
18  detective that they wanted to talk to you or he
19  wanted to talk to you about the shooting of the
20  Wiley brothers or the shooting that occurred on
21  North Avenue back in May of 1990?
22        A.    Did he say he wanted to talk to me
23  about that?
24        Q.    Yeah.
25            After you were arrested, but before the

48

1  polygraph test, did any detectives say, listen, we

2  want to talk to you about this shooting that

3  occurred?

4       A.    Yes.  Yes.  Yes.  I mean I didn't just

5  enter the station and go straight to go to a

6  polygraph.  No.

7              I was in the station for a long time

8  before they suggested to me if I want to take a

9  polygraph test.  Yeah.  The paragraphs are real

10 close together, but that was not the time frame.

11      Q.    Okay.  So that's where I'd like you to

12 elaborate.  I'm just trying to put the end marks on

13 it from the time of your arrest to the time you took

14 the polygraph test.

15             Can you tell me, to the best of your

16 recollection, what occurred at the police station or

17 Area 5?

18      A.    Interrogation, Chicago police style

19 interrogation.  One detective comes in, grabs you,

20 pulls you.  The next detective comes in, slaps you,

21 punches you, gives you, you know, the script about,

22 oh, how they know that I did it and this and that,

23 you know, just the whole game and show, and then the

24 good cop comes in, those guys, they just want to

25 know what you know, blah, blah, blah, and the bad

49

1    cop comes in.  You know, just good cop, bad cop.

2    Mostly bad cop.

3          Q.    And prior to this arrest, had you ever

4    experienced this type of conduct from Area 5

5    detectives previously?

6          A.    Yeah.  Yeah.

7          Q.    So when you say this is, you know, the

8    kind of interrogation Area 5 style or Chicago police

9    department style, are you saying that from

10   experience?

11         A.    Yes.

12         Q.    And when the detective first asked you

13   what you knew about this shooting, what did you tell

14   him?

15         A.    I told him that I didn't know anything

16   about the shooting.  It says it right here on my

17   statement.

18         Q.    And after you denied having knowledge

19   about the shooting, did they say thank you for your

20   cooperation, you're free to go?

21         A.    No.  They didn't say anything.  The

22   turnkey, that's what we call him, I don't know his

23   function neither, but the jailer downstairs at the

24   precinct, he let me make a phone call.

25               I called my friend so he can tell my

50

1   mom.  They can tell my mom where I'm at, and at

2   least somebody knows where I'm at because I've been

3   missing for the last two days, and I couldn't make a

4   phone call or anything of that nature, and I was

5   told by my friend that they called a lawyer named

6   Marty Abrams, and Marty Abrams called down to the

7   police station, and that's when they let me go.

8               The turnkey let me go, but when I was

9   leaving, the officer -- turnkey officer was talking

10  to one of the detectives, and he was telling him why

11  did you let him make that phone call, why did you

12  let him make the phone call in Spanish, because they

13  thought that I didn't understand.  He was telling

14  him why did you let him make the phone call.

15       Q.    Did you know who the detective was that

16  said that to the turnkey?

17       A.    No.  He -- he had his back turned.

18       Q.    Okay.  So before this -- before you're

19  able to make a phone call, can you tell me again

20  what type of tactics were used to try to get you to

21  make a statement?

22       A.    Oh, I mean the police would use every

23  tactic in the book.  They would use -- we're going

24  to call DCFS to take your kids away.  We're going to

25  drop you off in the other gang's neighborhood, let

51

1    them beat your ass, or they'll take you to the

2    police station and beat you up or to the alley and

3    beat you up or in a gangway and beat you up and try

4    to make you confess and say where's the dope or

5    where's the gun.  I mean outside of the police

6    station and inside the police station.  There was no

7    cameras.  No nothing like that for anybody to be

8    monitoring that.

9        Q.     And then did sometimes they use more --

10   different types of tactics, like make promises or --

11              MR. BRUEGGEN:  Objection, leading.

12       Q.     Well, tell me about that.  It's normal

13   for the objection.  You're still going to answer the

14   question.

15              So elaborate on what you mean by or

16   what -- when you say, yes, they used to try to make

17   promises?

18       A.     Well, they -- they always promise you

19   that if while -- in this particular case, they told

20   me that, as soon as I sign this statement, that I

21   was going home because they knew that I wasn't the

22   shooter, I didn't do it, but I was just there, and

23   if you sign this statement, we'll send you home.

24              So the word promise didn't come out of

25   their mouth, but that was the bait.

52

1        Q.      And --

2        A.      The promise to let me go home if I

3   signed this paper, and I told them I wasn't signing

4   any statement, and I don't know these people.

5        Q.      Did you believe that if you signed the

6   statement that you would, in fact, go home after you

7   signed it?

8        A.      Oh, I already knew that I wasn't.  That

9   as soon as I involve myself in any manner, I'm not

10  going home.

11       Q.      And do you think that -- well, strike

12  that.

13               The experience that you underwent on

14  November 24, 1990, after you were arrested, had you

15  experienced this type of behavior from Area 5

16  detectives previously?

17               MR. BRUEGGEN:  Objection, asked and

18  answered and foundation.

19               Go ahead, sir.

20       Q.      You can answer.

21       A.      Yes.

22       Q.      And do you know how many times or can

23  you estimate how many times?

24       A.      Throughout my whole childhood, the

25  police always stopped us.  Even if we were walking

53

1    in a group of two or three, it was considered mob

2    action.  Something that was a jailable offense.

3    Stop and frisk.

4                I mean those were the times that I grew

5    up in.  We're talking about the '80s.  We're not

6    talking about 2020 where you can't stop and frisk

7    and all that stuff.  The laws were a little bit

8    different back then.  So, yeah, if you could imagine

9    that.  Yeah.

10       Q.    And was it uncommon that you were

11   actually taken into the police station back in the

12   late '80s, early '90s?

13               MR. BRUEGGEN:  Object to the form.

14       A.    Common.

15       Q.    And was that actually whether you

16   committed a crime or not?

17       A.    You didn't have to commit a crime.  You

18   just had to be outside in arm's reach of some

19   officer and you were going to jail for something.

20       Q.    And was it your experience that, once

21   you were in custody, police officers would attempt

22   to get you to give information or give information

23   about other crimes that were unsolved in the

24   neighborhood?

25       A.    Yes.

54

1          MR. LEINENWEBER:  Objection, leading,
2   compound question, lack of foundation.
3     Q.    And was it your experience or your
4   understanding that police officers were willing to
5   accept information whether it was true or not true?
6          MR. STEPHENSON:  Objection.
7          MR. LEINENWEBER:  Objection.
8     Q.    Again, just from what your impressions
9   were.  I know you're not speaking for police
10  officers, but what your impression was.
11         MR. LEINENWEBER:  Same objections.
12    A.    My impression of how the police done
13  their job was now we know it's not normal.  You
14  know, I didn't know anything about the law, per se,
15  then.
16         I just knew my mom worked in court and
17  stuff like that, and I knew little bits and pieces
18  of things.  I know you never said anything to the
19  police.  I knew that for sure because you're going
20  to go to jail.  You talk to the police you're going
21  to go to jail.
22         Sometimes the police knew that you
23  weren't going to talk to them.  So they had to use
24  different tactics to get you to talk and 90 percent
25  of those tactics were violent acts.

55

1      Q.      And --

2      A.      I don't know how --

3      Q.      That's helpful.  I just want to

4  reiterate what you already testified to, but tell me

5  if I'm right.

6              Did the Area 5 detectives sometimes use

7  physical violence to try to get you to make

8  statements?

9      A.      Yes.

10             MR. BRUEGGEN:  Object to foundation.

11     Q.      And sometimes they made threats about

12 taking your kids away?

13     A.      Yes.  Those were tactics that they used

14 on other people, on me, and those were the things

15 that -- the stories that everybody would say.  Hey,

16 when I got locked up this day, this is what happened

17 to me.

18             You know, as gang members that you know

19 from my faction, we used to talk to each other about

20 how the police treated them or whatever the case may

21 be, and I've heard those stories, and I've been

22 through my own.

23     Q.      Right.

24             Was it your experience that you were

25 threatened to be put in a position to --

56

1    A.    Sorry.

2    Q.    That's all right.

3    A.    Excuse me.

4    Q.    I'll start over.  Was it your

5  experience that you were -- that they threatened to

6  put you in a position where you could suffer harm

7  from rival gangs?

8              MR. BRUEGGEN:  Object to the form,

9  foundation.

10   A.    Who's they?

11   Q.    Well, you said that they threatened to

12 drop you off in rival gang territory, right?

13   A.    They is the police?

14   Q.    Yeah.  Did they threaten?

15   A.    Yes.

16   Q.    And what did you understand was the --

17   A.    And not only did they threaten, they

18 have.

19   Q.    And what -- what does it mean to be

20 dropped off in rival gang territory?

21             I mean I know I'm asking maybe what's

22 obvious, but if you could just articulate it for the

23 record.

24   A.    It's like a sheep being dropped off in

25 a wolf's den.  It's time to eat.  I mean they're

57

1    going to beat you up.

2               I mean you get dropped off in a rival

3    gang neighborhood, they might drop you off right

4    there on the corner where there's 20, 30 guys

5    hanging out and get out the car.  Tell you get out

6    and over the loud speaker inform them, hey, this

7    guy's a Latin King and drive off.

8        Q.    And from your understanding on

9    having -- have you actually experienced that or

10   known people that experienced that?

11       A.    It's happened to me on several

12   occasions.

13       Q.    And what happens?  Are you afraid for

14   your safety?

15       A.    Of course.  I mean you just get out of

16   the car and run as fast as you can back to your

17   neighborhood.

18               Sometimes they'll just drop you off on

19   the other side of the park or sometimes they'll go

20   deep into the territories of other gang members and

21   drop you off there.

22       Q.    Was another one of the tactics that you

23   sometimes experienced from Area 5 detectives is that

24   you would be told that you'd be released if you just

25   signed a statement?

58

1          A.     Yes.

2                 MR. BRUEGGEN:  Object to leading.

3          Q.     Okay.  And in your experience, when

4     that type of promise or enticement was made, did the

5     police officer seem to care whether the statement

6     was true or not?

7                 MR. STEPHENSON:  Objection,

8     speculation.

9          Q.     You can answer.

10         A.     They -- I'm sure they wanted privy

11    information, but if you're trying to get out of

12    jail, you'll probably tell them anything anyway just

13    to get out.

14                I mean, if you know what's coming, if

15    you know that if you don't say anything and you get

16    down to the police station and they'll beat your

17    ass, excuse me, they're going to do something to

18    you, you know, you say anything to get out of jail.

19         Q.     Right.

20                Did you have an abiding fear or a fear

21    that police officers would later retaliate if you

22    didn't cooperate with their investigations?

23         A.     Yeah.  Yeah.  You always had that fear.

24    I mean I lived where I live all my life.  They know

25    where I live.  Yeah.  I have to come outside, go to

59

1  school.  I was young.

2      Q.    Okay.  And I want to go back

3  specifically to November 24th of 1990 when you were

4  in custody.  You indicated that you had suffered a

5  physical coercion during your interrogation?

6      A.    Yes.

7          MR. LEINENWEBER:  Objection to

8  foundation.

9      Q.    And did the -- did the detective or

10 detectives who interrogated you inform you that you

11 had been implicated by other co-defendants or other

12 individuals in the crime?

13     A.    Yes.  They -- they told me the police

14 officers -- the detectives informed me while they

15 were interrogating me.  They were like here goes the

16 statements, one, two, three.  They had them pile up

17 and say here go your co-defendants' statements right

18 here, finish reading that and then let us know what

19 you want to do.  That's the first action that they

20 did, and they walked out of the room.

21          So I'm looking.  I see my picture, and

22 I'm saying what the hell is this, and then that's

23 where it all started.  This is where I -- this is

24 where I'm finding out, you know, Jose Maysonet, Juan

25 Gonzalez, Justino Cruz.

60

```
 1              I mean I don't know anybody by their
 2      real name anyways, you know.  So, yeah, it was -- it
 3      was shocking to be grouped into this with people
 4      that I don't even know technically.
 5           Q.    So was that the first time that you
 6      learned that other individuals had allegedly
 7      implicated you in this shooting of two people?
 8           A.    That was the first time that I knew
 9      that there was others saying that I was involved.
10      That was the moment.
11           Q.    Okay.  And you said that was shocking?
12           A.    Yeah.  Yeah.  That's my name on that
13      paper saying that I killed somebody.
14           Q.    Did you have any explanation for why
15      your name had been mentioned allegedly by these
16      individuals?
17           A.    At that time, I had no clue.
18           Q.    And did the detectives attempt to get
19      you to implicate yourself or others?
20           A.    Yeah, that was what they tried to do.
21      They tried to get me to implicate myself either as a
22      participant or a witness, a firsthand account
23      witness of what was going on, and I refused to
24      participate in any of that because I don't know what
25      you want me to tell you.
```

61

```
 1              I mean the truth is I don't know what
 2      you're talking about, and they didn't accept that
 3      too well.
 4          Q.    That -- I want to ask you to elaborate
 5      on that.  Were you told that you could act as a
 6      witness in the case or we just need you to give a
 7      statement to someone who witnessed the events?
 8              MR. BRUEGGEN:  Objection.
 9              MR. LEINENWEBER:  Objection.
10          A.    Yes.
11          Q.    Go ahead.  You can answer.
12          A.    Yeah.  That's what I'm trying to say.
13      They wanted me to say that -- you know, they kept
14      pointing to the part in the statement because they
15      let me read the statement.
16              I got the statement, and they kept
17      saying, yeah, you were in the car.  You were in the
18      car, weren't you?  What, were you a lookout man?
19      Were you one of the lookout guys or was Justino one
20      of the lookout guys?
21              And I'm like I wasn't in the car, you
22      know.  So how could I be looking out for Justino?  I
23      mean I wasn't there, you know, and they just kept on
24      trying to get me to put myself in the movie, you
25      know.
```

62

1      Q.     And did you put yourself in the movie?

2      A.     Hell no.  Excuse my language, but no

3  way.

4      Q.     And did you have any involvement

5  whatsoever in the shooting of the Wiley brothers on

6  May 25th of 1990?

7      A.     Nope, not at all.

8      Q.     And were you a witness to any -- the

9  shooting of the Wiley brothers on May 25th of 1990?

10     A.     No, I was not.

11     Q.     Were you -- were you or even are you

12  particularly happy that anyone put your name into

13  this incident as you sit here today?

14     A.     No.  I'm not happy that my name is

15  all -- not that my name is involved.  I went through

16  a whole life changing experience about this case,

17  and I'm -- you know, I don't want to put blame on

18  Maysonet or the other individuals because they just

19  were not as strong as I was in my position that I

20  wasn't involved, but I mean they're the ones that

21  got me involved in this, so to speak.

22         No.  I should have no reason to be here

23  trying to help somebody that put me in the hot

24  water, but the truth is the truth, and I didn't do

25  it.

63

1        Q.      And do you have any reason to believe
2    Jose Juan Maysonet did it?
3                 MR. BRUEGGEN:  Object to the form.
4        A.      From -- from everything that happened,
5    all similar experiences, there's no doubt in my mind
6    that Jose Maysonet, Gonzalez and Justino Cruz have
7    absolutely nothing to do with this case at all.
8    Absolutely nothing --
9                 MR. RAHE:  Object to foundation to that
10   last question.
11       A.      -- in my mind.
12       Q.      And even all these years later, have
13   you ever heard a rumor or any factual basis to
14   believe that Latin Kings were responsible for the
15   shooting of these two men?
16                MR. RAHE:  Object to form and
17   foundation.
18       A.      Never heard that anybody was involved
19   in that shooting that I knew as being a Latin King.
20       Q.      Okay.  As you sit here today, do you
21   remember the statements that were allegedly given by
22   the co-Defendants in this case, Jose Maysonet,
23   Alfredo Gonzalez and Justino Cruz?
24       A.      Do I remember the statements?
25       Q.      Yeah.

64

1      A.     Yeah.  Yeah.  I mean, probably, I might

2   get statements mixed up of who said what, but they

3   all said almost the same similar things in

4   different -- totally differently.  Yes, I probably

5   remember.

6      Q.     So, for instance, let me ask you this.

7   Did every statement consistently identify the same

8   shooter?

9      A.     No.

10     Q.     And what do you take from that?

11     A.     They didn't know who was -- the

12  investigating detectives were trying to put the gun

13  in anybody's hand.  That's what I believe.

14            I believe that the investigating

15  detectives that were on the case put the gun in

16  everybody's hands so that like everybody could have

17  a part in it except Justino Cruz because he was the

18  lookout man.  So he couldn't have had the gun in his

19  hand.

20     Q.     Right.

21     A.     And, of course, he's a state witness.

22     Q.     Now, you were released eventually after

23  the initial arrest, right?

24     A.     Yes.

25     Q.     And then, of course -- well, strike

65

1   that.

2           After you were released, did you --

3   were you aware of what was going on with the

4   criminal prosecution of the other three

5   co-defendants after you were -- after you were

6   released in November of 1990?

7       A.    No.  After I was released, I went -- I

8   talked to my friend.  His name was Wilfredo Rivera.

9   He's deceased now.  That was Maysonet's

10  boyfriend's -- sister's boyfriend.

11          I talked to him, and I told him, hey,

12  this is what happened to me, and he said, yeah,

13  that's my girl's brother.  I said, well, he's locked

14  up, you know.  I was trying to pass the word out to

15  maybe their family member because I didn't know if

16  they just went through what I just went through.

17          All I seen was their statements.  I

18  never seen them in the police station or nothing

19  like that.  I didn't recall no dates, seeing any

20  dates of the statements or anything like that.  I

21  just was reading the paper in shock.  This is what

22  was happening, and that's about it.

23          MS. BONJEAN:  Okay.  And, actually,

24  let's mark, if we can, Jose Maysonet's statement as

25  Goossens-3.

66

1              (Exhibit Goossens-3, Jose Maysonet's

2      statement, is marked for Identification.)

3              MS. BONJEAN:  Do you have that there,

4      Steve?

5              MR. GREENBERG:  Yeah, but I marked it

6      five.

7              MS. BONJEAN:  You can't write over it,

8      Steve?

9              MR. GREENBERG:  Sure.

10             MS. BONJEAN:  It's just for his

11     purposes anyway.  We're going to send the court

12     reporter the exhibits.

13             MR. BRUEGGEN:  Jennifer, do you have

14     the Bates range for that document that you're

15     referring to now?  I know it's in there a couple

16     times.

17             MS. BONJEAN:  It's CCSAO 001905 to

18     1911.

19             MR. LEINENWEBER:  Did you say 1905?

20             MS. BONJEAN:  Yeah.

21     Q.    Okay.  So, Mr. Goossens, I'm going to

22     go through this and ask you some questions.

23             Starting on the first page, there is a

24     little introduction by -- it says Ms. Di Franco but

25     it's actually Mr. Di Franco.  Do you see that?

67

1       A.      On the first page?

2       Q.      Yes.  It's like in the middle after --

3       A.      I see it.  Yes.

4       Q.      By the way, did you know a detective or

5   were you familiar with a detective Fred Montilla or

6   Montilla?

7       A.      I'm not sure.

8       Q.      If you could just look, do you see

9   where there's an introduction where it says let the

10  record reflect that we're in an interview room?  Do

11  you see that?

12      A.      Yes.  Yes.  Let the record reflect that

13  we are in an interview room at Area 5 violent

14  crimes.

15      Q.      And Mr. Di Franco says, now, I talked

16  to you earlier and I explained that I'm an assistant

17  state's attorney, a lawyer working with the police

18  and not your lawyer.  Is that correct?

19              And then there's an answer, yes.

20              Before we spoke, I advised you of your

21  constitutional rights.  Is that correct?

22              You can turn the page.

23              Yes.

24              I am going to advise you of your rights

25  again.  Do you understand you have the right to

68

1    remain silent?

2              Do you see that there?

3        A.    Yes.

4        Q.    And it goes through the Miranda rights.

5    Do you understand that anything you say can and will

6    be used against you in a court of law?

7              Do you see that?

8        A.    Yes, I see all of it.  Yes.

9        Q.    Okay.  Assuming that that was

10   communicated in English to Mr. Maysonet, what's your

11   understanding based on your interactions with him

12   about whether he would have been able to understand

13   any of that?

14             MR. BRUEGGEN:  Objection.

15             MR. STEPHENSON:  Objection.

16             MR. LEINENWEBER:  Objection,

17   foundation.

18             MR. STEPHENSON:  Yeah.  Objection,

19   foundation, speculation.

20       Q.    You can -- we are asking you to give an

21   opinion here.

22       A.    At that time on May 20, 1990?

23       Q.    Yes.

24       A.    He couldn't have -- he couldn't have --

25   he couldn't have -- he probably couldn't have said

69

1  this now in this day today.

2      Q.     Okay.  And, again, in May of 1990, from

3  your limited interactions with him, what was your

4  impression of his ability to speak and understand

5  English?

6             MR. STEPHENSON:  Objection,

7  speculation, foundation.

8      A.     Like out of a hundred percent, 5

9  percent maybe.

10      Q.     He could understand or speak maybe 5

11  percent of a hundred percent?

12      A.     Yeah.

13      Q.     If a hundred percent is fluency would

14  you say?

15      A.     Is fluency, regular American English,

16  he probably could understand maybe 5 percent and

17  probably respond in some slang English that he

18  learned off the street that probably you couldn't

19  even understand what he's saying.

20             I'm pretty sure everybody here has

21  talked to him.

22      Q.     Some of us have, but not everyone.

23             Okay.  I want to draw -- I don't want

24  to go through the whole thing.  I just want to go

25  through the parts that sort of mention you and ask

70

1    you some questions.  Okay?

2          A.    Okay.

3          Q.    Now, at the top of page 3 -- I'm sorry.

4    It's either 3 or it's CCSAO 1907.

5          A.    Yes.  That's the top of page 3.

6          Q.    Okay.  And then about three lines down

7    there's a question on May 24, 1990, about 11:30 p.m.

8    to 12 p.m.  Where were you?

9                  Answer:  Home.

10                 Question:  What, if anything, happened

11   about that time?

12                 Answer:  Lluvia, Fro, Tino came to my

13   house.

14                 Do you see that?

15         A.    Yes.

16         Q.    First of all, you went by the nickname

17   Fro that you testified to, but were there other Fros

18   in the neighborhood?

19         A.    Yes.

20         Q.    Did you go to Jose Maysonet's home on

21   May 24th of 1990 at about 11:30 p.m. to 12 p.m. with

22   Lluvia and Tino?

23                 MR. BRUEGGEN:  Objection, foundation.

24         Q.    The answer one more time?  What was

25   your answer?

71

1         A.      No, I did not.

2         Q.      Okay.  Thank you.

3                 Now, I want you -- I want to keep going

4    down where it says -- we'll just keeping going.

5                 Question:  All right.  Now, I ask you

6    to look at Exhibit 1.  Can you please identify who

7    that is in this picture?

8                 Answer:  Lluvia.

9                 Question:  And I will ask you to look

10   at Exhibit 2.  Can you please tell us who that is?

11                Answer:  Fro.

12                Do you know Fro by any other names?

13                Answer:  Christopher.  I forget his

14   last name.

15                Question:  Hernandez?

16                Answer:  Yeah, Hernandez.

17                Do you see that?

18        A.      I see it.

19        Q.      Okay.  Is your name Christopher

20   Hernandez?

21        A.      No.

22        Q.      Are your sisters named Hernandez?

23        A.      No.  Nobody in my family is named

24   Hernandez with an H.  Nobody.

25        Q.      Do you have any reason to believe why

72

1  Jose Maysonet would have referred to you, if he did,

2  as Christopher Hernandez?

3                    MR. RAHE:   Objection to form and

4  foundation.

5                    MR. STEPHENSON:   Join.

6        A.     Well, to me, this looks like -- I'm

7  going to go over this little segment one more time.

8        Q.     Sure.  Go ahead.

9        A.     It says:  Question:  Do you know Fro by

10 any other name?

11                   Answer Maysonet:  Christopher.  I

12 forgot his last name.

13                   Question Detective:  Hernandez.

14                   So he told him the answer.

15                   The next.  Answer:  Yeah, Hernandez.

16                   Whatever -- whatever you were going to

17 tell Maysonet, he was going to say that.  He could

18 barely understand English.  So that looks like

19 trickery right there, the way he's questioning him

20 about this.  He's suggesting the name.

21       Q.     Now, I want to then go down to -- well,

22 let me ask you this.

23                   Did you ever go to Mr. Maysonet's

24 apartment to get a pistol at any point in your life?

25       A.     I didn't even know where Mr. Maysonet

73

1  lived let alone go and get a pistol from his house

2  at any point in my whole entire life.  No.

3      Q.    On the bottom of page 3 there's a --

4  the third from the bottom, it says:

5          Question:  What happened when Lluvia

6  and Tino came over?

7          Answer:  They came over that night and

8  they told me they needed the pistol.

9          Question:  What did they say they

10  needed the pistol for?

11          Answer:  They got the two guys on Drake

12  and North Avenue waiting for dope, and then it's

13  crossed out.  It says something.

14          Do you see that?

15      A.    Uh-hmm.  Yes.

16      Q.    Okay.  Again, did you have any

17  knowledge back in May of 1990 about any plan or

18  discussions about getting guys on North Avenue and

19  Drake who were waiting for dope or something?

20      A.    No.  I didn't have any plans to go to

21  North Avenue and Drake to give any guys any dope or

22  something.  No.

23      Q.    Okay.  Then it goes on to say:

24          Question:  What Lluvia wearing that

25  evening?

74

1          And if you turn the page, Answer:  A
2   black-hooded shirt.

3        A.     Of course.

4               MR. STEPHENSON:  Objection,
5   mischaracterizes the statement.

6               MS. BONJEAN:  My apologies.

7        Q.     Answer:  A black-hooded sweatshirt.

8               Question:  What significance does it
9   have when a Latin King wears a black-hooded
10  sweatshirt?

11              Answer:  --

12       A.     I'm sorry.  I'm going to turn this off.

13       Q.     If you need to take it, we can break.

14       A.     No.  No.  No.  No.  I already hung up.
15  I just want to turn it down.  My apologies,
16  everybody.  Go ahead.

17       Q.     So the answer was a black-hooded
18  sweatshirt.

19              And then the next question is:  What
20  significance does it have when a Latin King wears a
21  black-hooded sweatshirt?

22              Answer:  Kill somebody, rob somebody or
23  rob a car.

24              Do you see that?

25       A.     Yes, I see that.

75

1    Q.    As a prior member of the Latin Kings,
2  did you -- was there a significance about wearing a
3  black-hooded sweatshirt?
4    A.    No, there was not.
5    Q.    And to the best of your understanding,
6  as a former Latin King, did wearing a black-hooded
7  sweatshirt mean you were going to kill somebody, rob
8  somebody or rob a car?
9    A.    No, it did not.
10   Q.    Were you aware of Latin Kings who had
11 committed crimes while not wearing a black-hooded
12 sweatshirt?
13   A.    I can't say that I do.
14   Q.    Was there any handbook that said, when
15 you go to commit a crime as a Latin King, you make
16 sure you put on your black-hooded sweatshirt?
17        MR. STEPHENSON:  Objection, form.
18   A.    There's no requirements to attire for
19 the Latin Kings.  No.
20   Q.    All right.  So what do you -- what --
21 what do you interpret this question and answer to
22 mean in reading this?  What do you take from it?
23        MR. RAHE:  Objection, foundation.
24        MR. STEPHENSON:  Yeah, foundation,
25 speculation.

76

1          Q.      You can answer.

2          A.      The question itself, what significance,

3   I don't think that if that word significance was

4   told to Jose Maysonet at this time in 1990 he would

5   understand what the word significant would mean.

6          Q.      Okay.

7          A.      That's number one.  Black-hooded

8   sweatshirt, I mean, at that time, now that we're

9   going back into those times, we look at what

10  happened with the Congressman that wore the hood,

11  the black hoodie.  Now, these times, and if you

12  could compare it, they were basically saying that a

13  black man with a hoodie or a man of color with a

14  hoodie was automatically viewed as a criminal, as a

15  suspect, as somebody that was sneaky, and that's not

16  the case.

17              It's just I'm cold, and I got a hoodie

18  on.  I mean -- so when we look back at it from this

19  point of view knowing what we know now, we could see

20  that was the attitude back then.  Remember, this is

21  1990.

22         Q.      All right.

23         A.      That's the significance that I get out

24  of it.

25         Q.      And then I'm not going to read it

77

1    word-for-word, but your name comes up again a couple

2    lines down, and it says:

3                    Question:  All right.  What were they

4    going to do that evening?

5                    And the answer is:  What they were

6    going to do that evening is they were going to go to

7    the two guys that were waiting for dope, crossed out

8    something.

9                    Do you see that?

10        A.    Yeah.

11                MR. LEINENWEBER:  Objection, leading.

12        Q.    Do you have any reason -- do you know

13    why the question was framed in terms of what were

14    they going to do?

15                MR. STEPHENSON:  Objection, same

16    foundation, speculation.

17        A.    I'm sorry.  I don't understand the

18    question.

19        Q.    That's all right.

20                Would you agree that Mr. Maysonet was

21    asked a question about not what he was going to do,

22    but what other people were going to do when he said

23    they?

24                MR. STEPHENSON:  Same objections.

25                MR. LEINENWEBER:  Yeah, form.

78

1        A.      Yeah.  I -- I don't know.  I'm sorry,

2   but I don't --

3        Q.      That's all right.  I'm not -- I'm not.

4   That's fine.

5               Can we agree, though, that they didn't

6   ask him what he was doing?  He asked him what they

7   were going to do that evening, right?

8        A.      From the statement?

9        Q.      Yes.

10       A.      Correct.  Yes.

11       Q.      Okay.

12       A.      He asked him what he was going to do.

13   Yeah, what you said.

14       Q.      And then there's a question a couple

15   lines down that says:  Where was Fro?

16               And the answer is:  In the back of

17   Lluvia.

18               Do you see that?

19       A.      Yeah.

20       Q.      Were you ever in a car with Lluvia and

21   Justino Cruz and Jose Maysonet on May 25th of 1990?

22       A.      No, I was not.

23       Q.      And if you keep going down about the

24   bottom fourth of the page, it says:  Question:  When

25   you parked in the alley, what happened then?

79

1                    Do you see that?

2        A.      Yeah.

3        Q.      Okay.  It says:  Answer:  Lluvia got

4    out of the car.  He put the hood on his head and put

5    the front seat front -- to the front, Fro came out

6    of the car and Tino came out of the car.

7                    Question:  Was anyone else around at

8    that time?

9                    Answer:  Two guys.

10                   Question:  Where were those two guys?

11                   Answer:  By the corner.

12                   Question:  Okay.  Where was the gun at

13   this time?

14                   Answer:  Lluvia got the gun in his

15   front pocket.

16                   Question:  Okay.  What did Lluvia, Fro

17   and Tino do then?

18                   Answer:  They started walking towards

19   the guy.

20                   Question:  What happened next?

21                   Answer:  They waited.  They were

22   talking about five minutes and then the shooting

23   happened, shot about five to six times.

24                   Do you see that?

25       A.      Yes.

80

1      Q.     Okay.  Were you ever with Lluvia and
2  Tino on the corner near -- on North Avenue and
3  participated or observed a shooting take place on
4  May 25th of 1990?
5                MR. STEPHENSON:  Objection, asked and
6  answered.
7      A.     No, I was not.
8      Q.     Did you notice that Mr. Maysonet does
9  not seemingly implicate himself in this?
10     A.     Correct.  Yeah.
11     Q.     Does that come as a surprise to you?
12     A.     Well --
13                MR. STEPHENSON:  Objection to form.
14     A.     No.  Of course, it's not a surprise
15  because they're trying to make him say he wasn't
16  involved.  You just took these guys over there.  You
17  weren't involved.  You're a witness to what happened
18  and just sign this statement here, and you're going
19  to go home.
20                I'm pretty sure that's what they told
21  him.
22     Q.     And is that one of the tactics you
23  mentioned earlier?
24     A.     That's exactly the tactics that I'm
25  talking about.

81

1       Q.     All right.  And then I want to go to

2  page 6.  About a fourth of the way down it says,

3  on -- when you get there, October -- I mean -- I'm

4  sorry.  On August 16, 1990, do you see that?

5       A.     Page 6, August what?

6       Q.     Yeah.  About one, two, three, four,

7  five.

8       A.     Yeah.  August 16, 1990, about 10 p.m.,

9  where were you?

10       Q.     And he says home.

11             Question:  What, if anything, happened

12  then?

13             Answer:  Lluvia, Fro, Tino, Cisco,

14  King, they came to my house.

15             Question:  What happened when they came

16  to your house?

17             Answer:  They put a 9 millimeter to my

18  head.

19             Question:  Who put the 9 millimeter to

20  your head?

21             Answer:  King.

22             Question:  What did he say?

23             Answer:  You know about the two

24  murders.  If you talk, we're going to put you 6 feet

25  under.

82

1            Do you see that?

2        A.        Uh-hmm.  Yes.  Yes.

3        Q.        Okay.  Did you ever accompany Lluvia,

4    Tino, Cisco and King to Mr. Maysonet's house on

5    August 16th of 1990?

6        A.        No.  I never accompanied Lluvia, Tino,

7    Cisco, King or Fro.

8        Q.        And were you ever present or involved

9    in putting a 9 millimeter to Mr. Maysonet's head?

10       A.        No, I was not.

11       Q.        Okay.  Hold on one second.  I want to

12   make sure.  One other question.

13            Do you know whose car was allegedly

14   involved in this incident according to -- you

15   don't -- you can put the statement down, but do you

16   know whose car was allegedly involved in this

17   shooting incident?

18       A.        No, I do not.

19       Q.        Okay.

20       A.        According from the statements, Jose

21   Maysonet was driving a car, but it doesn't say whose

22   car it was.

23       Q.        Okay.  Did you hear or receive

24   information at sometime that the car involved was

25   allegedly this Jeffrey's car?

83

1          A.     Yes.

2          Q.     Okay.  Go ahead.

3          A.     Hindsight.  At the time, no, but now,

4     yes.

5          Q.     Okay.  And did you know Jeffrey -- the

6     Jeffrey earlier that you referenced to have a car?

7          A.     Yeah.  Yeah.

8          Q.     And what's the likelihood that Jeffrey

9     would have given his car to anybody for use in a --

10    for any purpose?

11               MR. LEINENWEBER:  Objection,

12    foundation, speculation, form.

13               MR. STEPHENSON:  Yeah, objection.  Hang

14    on.  Sorry, Mr. Goossens.  Objection, foundation,

15    speculation.

16         Q.     You can answer.

17         A.     There's no question through my

18    friendship -- friendship, like I said, not

19    association, friendship with Jeffrey, he would have

20    never let anybody use his car because nobody let

21    anybody else use their car, and we had a saying in

22    the neighborhood, if you borrow your car, you borrow

23    your girl, and he was a lady's man.  He wasn't going

24    to borrow his girl or his car.

25         Q.     All right.  Now, at some point sometime

84

1   later you were, in fact, charged with this incident.

2   Is that right?

3       A.   Yes.  Surprisingly, yes.

4       Q.   And do you recall why or how it was

5   that you became ultimately charged with this

6   offense?  Like what changed?

7            MR. RAHE:  Objection to foundation.

8            MR. LEINENWEBER:  Compound question

9   too.

10      Q.   You can answer if you understand.

11      A.   Well, I'm just speculating that in --

12  in Gonzalez's trial, my name was brought up in his

13  trial that implicated me, and they indicted me after

14  that.

15           Once my name was established that I had

16  something to do with it on the stand under oath,

17  that was enough evidence right there to indict me.

18      Q.   Do you remember where you were when you

19  got indicted on this double murder?

20      A.   I was in prison.  I was in Menard

21  Correctional Facility.

22      Q.   And how did you experience or feel when

23  you were told you were indicted on a double murder

24  case?

25      A.   Well, I wasn't told anything while I

85

1  was in prison.  They didn't want -- you know, I

2  guess it was some security that they just told me

3  that I was on a writ, and I was going back to the

4  county jail, but they didn't tell me I was going

5  back to be arraigned for a double murder.  They

6  didn't tell me that.

7              When I got in front of Chief Justice

8  Fitzgerald -- Chief Judge Fitzgerald, that was

9  Courtroom 1 --

10        Q.    101?

11        A.    101.  He told me through -- first he

12  said that I was charged with a murder.  No, I was

13  charged with two.  No, I don't know what's going on.

14  There's something wrong here, and then they gave me

15  a continuance to the next day, and then I was

16  formally charged with the Wiley brothers' deaths.

17        Q.    And does it sound right that this was

18  in 1992?

19        A.    Yes, it sounds right.

20        Q.    And were you savvy enough to know --

21        A.    The 14th actually.

22        Q.    Were you knowledgeable enough to know

23  what type of sentence you're looking at on a double

24  murder?

25        A.    Oh, yeah.  I was already convicted for

86

1  one homicide, and for a double murder, I would be

2  facing the death penalty.

3            Actually, I went through alternative

4  sentencing.  I had alternative sentencing mitigation

5  lawyer.

6       Q.   Was it your understanding that the

7  state might seek the death penalty on you?

8       A.   Yes.  That was my total understanding,

9  yes.

10      Q.   And did you fight the case?

11      A.   All the way.

12      Q.   And how did it -- how did it result?

13      A.   I'm not dead.  So I was acquitted.  I

14  was acquitted.

15      Q.   And did you exercise your right or

16  exercise your right to waive a jury trial?

17      A.   Did I exercise my right to waive a jury

18  trial?  Yes, I went with a bench trial.

19      Q.   All right.  And were you tried -- how

20  were you -- were you tried at the same time as Mr.

21  Maysonet to the best of your recollection?

22      A.   Yeah.  To the best of my recollection,

23  there was some parts in the trial where we were

24  going to trial at the same time and some parts I was

25  sitting in on the trial.

87

1      Q.      Got it.  All right.

2      A.      When I say sit in on my trial, I mean

3  we had the court in the same courtroom.  The jury

4  was for him.  The judge was for me.  So they did it

5  simultaneously for certain pieces to try not to

6  waste taxpayers' dollars.

7      Q.      Okay.  Understood.

8              All right.  I don't think I have any

9  more questions for you, but I'd like to take a

10  couple-minute break so you can stretch your legs and

11  I can make sure that I don't have any questions, and

12  then the other side will get a chance to ask you

13  some questions.  Is that okay, Mr. Goossens?

14      A.      Okay.  Yeah, that sounds great.

15      Q.      You want to go feed the meter?

16      A.      Yeah.  Let me see if I have to.  I

17  don't have to for about 40 minutes.

18      Q.      Let's just keep going then.

19      A.      Yeah.  We can keep going for the next

20  40 minutes, and then I have to go feed the meter.

21              MS. BONJEAN:  Okay.  Fine.  Let's, if

22  we could, just take two minutes right this second so

23  I can confer and then I should be done.

24              THE COURT:  Okay.

25              MS. BONJEAN:  Thank you so much.

88

1          (Whereupon, a recess was taken.)

2      Q.      Okay.  Mr. Goossens, I just have a

3  couple more questions, and then I'm going to pass

4  the baton to my adversaries.

5          Did you ever find out whether or not

6  Efraiin Cruz or Francisco Veras had been arrested or

7  questioned in connection with this matter?

8      A.      No.

9      Q.      And what about Jeffrey?  Did you ever

10  find out whether he was questioned, arrested in

11  connection with this?

12      A.      No.

13          MS. BONJEAN:  All right.  I have

14  nothing further for Mr. Goossens.  Thank you so much

15  for your time, and I'm going to -- Mr. Brueggen, are

16  you taking over?

17          MR. BRUEGGEN:  Yes.  It's Brueggen, but

18  you can call me whatever you like.

19          MS. BONJEAN:  I'm sorry.  My apologies.

20  Mr. Brueggen is going to take over from here.  Thank

21  you.

22  CROSS-EXAMINATION BY MR. BRUEGGEN:

23      Q.      Mr. Goossens, I will start.  There may

24  be some other attorneys that have some other

25  questions, and since you just spent some time with

89

1  Ms. Bonjean, who covered a lot of material, I'll be

2  kind of jumping around.

3          So if at any time you don't know what

4  I'm talking about or don't remember the context of

5  maybe some of your previous testimony, just get my

6  attention and let me know, and I'll try to make sure

7  we're on the same page.  Okay?

8      A.    Yes.  Thank you.

9      Q.    Starting off, I just wanted to ask you

10 did you review any documents before your deposition

11 today?

12     A.    These are the only documents that I

13 have reviewed.

14     Q.    Okay.  And prior to seeing them today

15 during your deposition, had you seen them at any

16 time since you were acquitted back in 1995?

17     A.    Since I was acquitted, no.  No.

18     Q.    Okay.  So the first time you saw these

19 documents since you were acquitted and got out from

20 under this case is today, correct?

21     A.    Is today, yes.

22          Matter of fact, I've never seen this

23 document at all until today.  This is the

24 RFC-Maysonet 0001.  I've never seen this at all.

25     Q.    And that is the one that had the police

90

1    report that we looked at earlier?

2          A.     Police reports.  I've never seen any

3    police reports.

4          Q.     Okay.  What about to prepare for your

5    deposition?  Did you talk to Ms. Bonjean or Ms.

6    Cohen about your testimony today?

7          A.     Yeah, we talked.

8          Q.     And can you tell --

9          A.     She informed me that we were having

10   this deposition and what time.  Things like that.

11         Q.     Other than that, did you talk about any

12   testimony you planned to give or anything of that

13   nature?

14         A.     No.  I didn't talk about anything that

15   was planned.  I just told her ask me the questions,

16   and I'll see if I can recall them to the best of my

17   knowledge.

18              I mean that's what I can do for

19   whichever attorney was there.

20         Q.     Okay.  And prior to receiving the

21   deposition subpoena in this case, have you ever

22   talked to Ms. Bonjean or Ms. Cohen?

23         A.     Yes.

24         Q.     Do you recall when that was?

25         A.     This was maybe -- I think I talked to

91

1  Ms. Bonjean -- the first time I talked to her she
2  showed up at my mom's house, at my house, and maybe
3  this might be the fourth time in total that I've
4  spoken to her.
5        Q.    Okay.  That first time when she showed
6  up at your mother's house, that's the house you
7  currently live in today, right?
8        A.    Correct.
9        Q.    Can you give us a general idea of when
10 that was?  Was it a month ago, a couple years ago,
11 10 years ago?
12       A.    A couple years ago.
13       Q.    And at that time, what did you and Ms.
14 Bonjean talk about?
15       A.    We talked about Jose Maysonet, my
16 co-defendant.
17       Q.    And you talked about your involvement
18 in being tried for the Wiley brothers murder?
19       A.    Yes.  We talked about how I was
20 involved in this case.  Yes.
21       Q.    And what did Ms. Bonjean tell you why
22 she wanted to speak to you?
23       A.    I knew what she was there for.
24       Q.    And that was probably not a very good
25 question.

92

1      A.      The moment -- excuse me.  The moment
2  she told me who she came representing, I knew
3  exactly why she was there.
4      Q.      Okay.  And that was not a very precise
5  question by me.
6              I guess what I was looking at, do you
7  know if she was talking to you about trying to get
8  Mr. Maysonet freed from prison or whether she was
9  talking to you in regards to a civil litigation
10  after Mr. Maysonet had been freed?
11             MS. BONJEAN:  Objection to form of get
12  Mr. Maysonet freed.  I don't know what that means,
13  but objection to form.
14     Q.      Mr. Goossens, you can answer if you
15  understand the question, sir.
16     A.      Oh, I do understand the question.  She
17  never once said anything about any money, lawsuit or
18  whatever the case may be.
19             When we first spoke when she showed up
20  at my door, what she did want to know was my
21  involvement in the case and why did I get an
22  acquittal, and I told her the reason why I got an
23  acquittal, and I told her the reason why Jose
24  Maysonet will get an acquittal, because we didn't do
25  it.

93

1     Q.    Okay.  And you said, since that time,

2  you've talked to Ms. Bonjean on perhaps three

3  additional occasions?

4     A.    Well, the second time we didn't talk as

5  much.  She just texted me to inform me that, did you

6  see the news?

7          And I said, yeah, I saw the news, and

8  Maysonet was out, and that was it, and I told her to

9  give Maysonet my number to call me, and that was it,

10  and we still haven't spoken to this date.

11     Q.    When you say we still haven't spoken to

12  this date, are you referring to Mr. Maysonet?

13     A.    Yeah.  I still haven't seen him.

14     Q.    Mr. Goossens, can you tell us what was

15  your street name back in the 1990s?

16     A.    Little Afro, L-I-T-T-L-E A-F-R-O.

17     Q.    Did you say A-F-R-O or just F-R-O?

18     A.    A-F-R-O.

19     Q.    So like afro?

20     A.    Correct.

21     Q.    So I wanted to clear up some things.

22  You talked to Ms. Bonjean.  She had some questions

23  about Latin Kings in your neighborhood back in 1990.

24  Do you remember that?

25     A.    Yeah.  I remember her asking me those

94

1    questions.

2         Q.    And there was discussion about

3    affiliation with the Latin Kings, and I wanted to

4    clarify, when you say you were affiliated with them,

5    does that mean you were a member or you were friends

6    with members?

7              Can just tell us what you mean by

8    affiliated with?

9         A.    Well, she was -- I believe she was

10   asking me how did I -- at one point that I became a

11   Latin King.  So I was telling -- I was trying to say

12   with the word affiliation was that it was something

13   that was grown into, and it wasn't like an

14   initiation into the Latin Kings.

15             This is what I'm thinking that you're

16   talking about when Ms. Bonjean was asking me that

17   question.  So that's what the affiliation meant, but

18   over time, once I got a little older to join the

19   gang, I joined the gang.

20             Does that make sense?

21        Q.    Yeah.

22             So there's kind of two different types

23   of relationship.  You either be a gang member

24   joining the gang --

25        A.    Or an affiliate.

95

1     Q.     And when you're affiliated, that's

2  you're friends with gang members?

3     A.     Correct.  Correct.

4     Q.     And, again, that would be kind of a

5  neighborhood thing.  You told us you'd be friends

6  with gang members in the neighborhood?

7     A.     Correct.  Correct.

8     Q.     Do you remember at what age you joined

9  the Latin Kings?

10    A.     Maybe around '87, '88.  1987, 1988.

11    Q.     So you would have been 15?

12    A.     Fifteen.

13    Q.     Did that coincides with when you left

14  high school?

15    A.     Correct.

16    Q.     I think you told us one of the reasons

17  you left high school was because, to travel to high

18  school, you had to travel through rival gang

19  territories and it caused fights and other issues?

20    A.     Correct, because where you lived

21  automatically affiliated you with the gang of that

22  territory or that area.

23           You get it now?

24    Q.     Yes.  I think I understand that.

25           You know, could you have just stayed

96

1 affiliated with the Latin Kings without actually

2 having to join the gang given that you lived in the

3 neighborhood?

4     A.     Yeah.  I mean everybody that lived in

5 the neighborhood was not a Latin King.  They were

6 all affiliates given the street code.  They were --

7 everybody there was an affiliation.

8          Somebody had some family member or

9 themselves may have been part of the gang.  Yeah.

10 You could be a Latin King, and you could be an

11 affiliate.

12     Q.     When you talk about the neighborhood,

13 are you talking about like a block in the City of

14 Chicago or would it be a couple of blocks?

15     A.     Humboldt Park.  When I talk about the

16 neighborhood, Humboldt Park.

17     Q.     And throughout Humboldt Park there were

18 other gangs besides the Latin Kings, correct?

19     A.     Correct, on the other side of the park.

20 On the West Humboldt Park.  So the park is in the

21 middle.  I live on the west side of that park.

22     Q.     And so --

23     A.     On the east side of that park is

24 different gangs.

25     Q.     So, in general, the west area or the

97

1   west side of Humboldt Park was predominantly Latin

2   Kings?

3          A.     It was Latin Kings.  Yes, not

4   predominantly.  It was all Latin Kings, yes.

5          Q.     And I think you told us within the

6   Latin Kings there were kind of different groupings

7   or different factions?

8          A.     Different blocks, yes.

9          Q.     And how big were the blocks?  I think

10  you told us that your faction was just a corner or

11  so?

12         A.     Yeah, one street block.  If you want to

13  look at Google, Cortez or Spaulding runs from Kedzie

14  to Spaulding.  From Kedzie/Cortez to Cortez and

15  Spaulding, it only runs one little block.  There's

16  maybe 10 houses on each side of the block.  That's

17  how long the block is.

18         Q.     And when you were a Latin King, that

19  would have been your territory?

20         A.     Correct.

21         Q.     And the territory was, basically, you

22  would hang out in that area, and you guys controlled

23  what would happen there or the gang would, right?

24         A.     Correct.

25         Q.     And you would know what was going on

98

1    there.  If anybody was selling drugs there, you

2    would know about it?

3            A.    Correct.  Not only would I have known

4    about it, but I lived there.  I lived right on the

5    corner of that same corner.

6            Q.    And were these neighborhoods or this

7    block, was it a pretty close-knit block where

8    everybody knew each other?

9            A.    On that block, yes.

10           Q.    And so, in general, if there were

11   outsiders or people not from the block that were

12   hanging around, it would cause questions?

13           A.    Yeah, you can say that.  That's how we

14   knew Jeffrey, Slick.  He was from a different block,

15   but he used to come on our block and hang out.

16           Q.    But he was the same gang, though.  He

17   was a Latin King from a different block?

18           A.    The same gang, correct.

19           Q.    Earlier when you talked about Mr.

20   Maysonet, you said you knew of him.  Do you remember

21   that?

22           A.    Yes.

23           Q.    This is back in the '90s before the

24   case.  Okay.

25           A.    Correct.

99

1    Q.    You said you kind of -- it seemed like
2    you were implying you kind of looked up to him
3    because he had a nice car?  He would drag race?
4    A.    Well, I'm not going to say I looked up
5    to him, but you have to remember he's much older
6    than me.  While I was still peddling the two-wheeler
7    bike, he was driving a car, you know.  While I was
8    trying to get my first kiss, he probably had three
9    kids.  So, you know, he was ahead of us.
10           So you could see him.  You know, that's
11   this guy.  He just came from Puerto Rico with the
12   nice car, blah, blah, blah, blah.  It wasn't really
13   that nice of a car.  It was just a real nice car,
14   the way he had it made -- you know, he had a real
15   clean, junkie car that was really nice.
16   Q.    Fair enough.
17           So he was -- if you would, was he part
18   of the older generation of Latin Kings when you
19   joined?
20   A.    Correct.  Correct.  Correct.
21   Q.    And you mentioned that Mr. Maysonet --
22   you knew his sister through her boyfriend because of
23   school?
24   A.    No.  I knew her sister's boyfriend.
25   That's how I knew who she was to Maysonet.  Get it.

100

1        Q.      Yes.

2        A.      Okay.

3        Q.      And when we were talking about that, I

4    think you said Maysonet came from Puerto Rico?

5        A.      Yes.

6        Q.      And I didn't know if I fully

7    understood.  Are you saying that Mr. Maysonet was

8    not around for many years and then came from Puerto

9    Rico like within a year or two of this incident

10   happening?

11       A.      I'm saying I was saying in that context

12   that the only reason why I didn't personally know

13   Jose Maysonet was because he didn't go to school

14   with us in the neighborhood where everybody knows

15   everybody.

16               He didn't go to school with us.  So we

17   didn't know him in the context that I was saying

18   that.  Yeah.

19       Q.      Okay.  I'm just trying to clarify.

20   When you say he didn't go to school, that was

21   because he was much older than you?

22       A.      Not only he was much older than us, but

23   he went to school in Puerto Rico.  So his common

24   friends or maybe the friends that he had in Puerto

25   Rico and the high school they went to, I couldn't

101

1  have known their brothers or sisters or anybody that

2  was related to him to make a connection to me and

3  Maysonet.  That's what I'm trying to get at.

4        Q.    Okay.  So it's your understanding that

5  Mr. Maysonet went to the high school in Puerto Rico?

6        A.    Or he went to school in Puerto Rico,

7  yes.  He didn't go to our school.

8        Q.    Do you know at what age Mr. Maysonet

9  came from Puerto Rico to the Chicago area?

10        A.    No, I have no clue.

11        Q.    And what's the -- strike that.

12              When you knew of Mr. Maysonet's sister

13  through your friend who was dating his sister, how

14  old were you?

15        A.    That was maybe when I was starting to

16  hang out, you know, like 1985, '86.  We all went to

17  the same school together.  She went to the same

18  school as I did.

19              The school, James Russell Lowell

20  Elementary School, is in the middle of the

21  neighborhood.  I'm at this end, and they are on the

22  opposite end, but everybody comes to the middle to

23  go to the school.

24              Am I helping you out there anywhere?

25        Q.    You are.  I think I'm understanding.

102

1              So do you know -- you had known of

2    Maysonet since at least when you were 15 years old.

3    Is that accurate?

4         A.     No.  That's not accurate.

5         Q.     Okay.  When did you --

6         A.     I knew the sister, Maysonet's sister's

7    boyfriend, and this is how I come to find out who he

8    was in the end with this here.

9         Q.     Okay.  Now, I think I understand you.

10        A.     Which is the end of the beginning of

11   the process.

12        Q.     So how old were you when you knew of

13   Mr. Maysonet doing his drag racing with his not so

14   much car but that he took nice care of?

15        A.     Well, you see him just driving around.

16   I didn't know that he was Jose Maysonet.  I just see

17   him driving.  Mr. 1.8, that's what we called him.

18   That's Mr. 1.8, you know, uno punto ocho.  That was

19   the Toyota.  I guess that was the leader of -- with

20   like a 4 cylinder, something like that, 1.8 Toyota,

21   and he was Mr. 1.8.

22              I mean we just saw him driving --

23   there's nothing else to do in the neighborhood

24   except stand on the corner and watch cars.

25        Q.     Okay.  I think I understand.  So you

103

1  knew of his existence driving the cars, Mr. 1.8, and

2  then later on, through your friend who was dating

3  his sister, you knew of his identity, what his name

4  was?

5          A.     Yes.  Now we're on the same page.

6          Q.     Sometimes I can be a little slow, but I

7  get there.

8          A.     No.  No.  It's all right.

9          Q.     And then earlier you talked about -- I

10 think you said there was like two square miles and

11 you said in length?

12         A.     Yeah, length of the Latin Kings area.

13         Q.     Was that basically that west side of

14 Humboldt Park that you were talking about?

15         A.     The complete west side, yeah.

16         Q.     And do you know how far north that

17 extended?

18         A.     Probably to Armitage.

19         Q.     And how far south did it go?

20         A.     Augusta.

21         Q.     And you were over there you said,

22 around?

23         A.     Augusta.

24         Q.     Okay.

25         A.     That's one block off of -- I'm on

104

1    Cortez and Spaulding.  That's one block off Augusta.

2          Q.     And so the Latin King territories went

3    from North Armitage all the way down to the south to

4    Augusta?

5          A.     Yeah, along the Kedzie side.

6          Q.     And it ran from the park.  How far west

7    did it run?

8          A.     Central Park.

9          Q.     And so that entire big area was all

10   Latin Kings with different sects or factions within

11   there?

12         A.     Correct.

13         Q.     And was there any full centralized

14   control of the Latin Kings, somebody who was in

15   charge of all the factions or sects?

16                MS. BONJEAN:  Objection to form,

17   foundation.

18         A.     Like The White House and Donald Trump

19   and stuff like that?

20         Q.     Yes.  Akin to that, but at the Latin

21   King level.  Was there a chieftain or something like

22   that?

23         A.     No.  There was no headquarters.  No.

24         Q.     And did all the different groups or

25   sects of the Latin Kings in that neighborhood -- did

105

1    they all get along?

2          A.      Yeah, but by rule, we also had got

3    along because we were all Latin Kings.

4          Q.      So when you say by rule, I'm assuming

5    these are unwritten rules of being in the gang?

6          A.      Correct.

7          Q.      Who would enforce those rules?

8          A.      Self.

9          Q.      And within your sect, was there a

10   varying level of organization where there was

11   somebody who was in charge of the various sects or

12   factions that you were in?

13         A.      Yes.

14         Q.      And was there hierarchy where there was

15   somebody who was at the top and then somebody below

16   them and then there was at some point soldiers or

17   regular gang members?

18         A.      Correct.  Correct.  Both.

19         Q.      What do the Latin Kings do to make

20   money?

21         A.      Some people worked.  Some people sold

22   drugs.  Some people did whatever they had to do to

23   get by.

24         Q.      And for those people who were selling

25   drugs in the Latin Kings, was that organized with

106

1    the Latin Kings as far as you know?

2              MS. BONJEAN:  Objection, form.

3        A.    I'm not -- I kind of get where you're

4    going, but that's not where we're going to go.  That

5    is -- I mean you sold drugs or you stole car parts

6    or robbed houses or you did any criminal acts or

7    maybe you didn't do any criminal acts and maybe you

8    went to work to make your money to support your

9    family.

10              I mean that's just what it boils down

11   to.  It wasn't part of like we're going to make all

12   this money or I'm going to go to work and we're

13   going to say, well, this is for the Latin Kings.  I

14   mean you are a Latin King.  Shouldn't that be for

15   you?  Yeah.

16        Q.    Okay.  I think I understand.

17              And with that, if you were going to --

18   if you would break the law, whether it be rob people

19   or sell drugs, did the Latin Kings need to approve

20   of that?

21              MS. BONJEAN:  Objection, form,

22   foundation.  Go ahead, if you understand.

23        A.    Of course, there was rules and

24   regulations, the unwritten rules and regulations

25   that you don't commit crimes in the neighborhood,

107

1    especially where you lay your head.  It's like

2    crapping where you eat.  You don't do that.

3                So, no, they didn't want nobody to

4    steal somebody's car.  You don't know.  Maybe that's

5    this King brother's mother's ex-daughter's car that

6    you're stealing.  So they didn't want any of those

7    conflicts.

8                So there was no stealing in the

9    neighborhood.  There was none of that stuff.  No

10   drug using.  You know, just because they sold drugs

11   doesn't mean they used them or sold them to people

12   that were affiliated.

13        Q.    So if somebody was selling drugs, they

14   didn't want -- the Latin Kings, you weren't supposed

15   to be selling them in your neighborhood.  Do I

16   understand that correct?

17        A.    I wasn't supposed to be selling them to

18   you as another member of the Latin Kings.  You get

19   it.

20        Q.    Yes, or probably anybody who was

21   affiliated, whether it be another member's brother,

22   sister?

23        A.    On affiliation, well, yeah.  You want

24   to stay away from those things because -- and then

25   maybe that person that they're affiliated with might

108

1    come back and say, hey, you're selling crack to my

2    little sister.  Stop it, bro, or whatever.

3                  You understand what I'm saying?  It

4    eases all the problems if you don't associate with

5    your own kind on that level.

6         Q.    No.  I understand what you are saying.

7                  And so to that extent, if somebody was

8    selling drugs in a Latin King neighborhood to people

9    they shouldn't sell them to, would the Latin Kings

10   get involved and stop that?

11        A.    If there was an outsider doing it or

12   was the Latin Kings doing it?

13        Q.    We'll start with an outsider doing it.

14        A.    Oh, well, it wouldn't happen because

15   the outsiders won't come in there to do it.

16        Q.    Okay.

17        A.    It would be stopped.  It was activity

18   that's unwanted in the area.  So it would be

19   stopped.

20        Q.    Okay.  So if an outsider came into your

21   neighborhood and was doing something inappropriately

22   like selling drugs, that would be something the

23   Latin Kings would stop?

24        A.    Correct.

25        Q.    And if it was a Latin King who was

109

1    doing it in the neighborhood, the same thing.  The

2    Latin Kings would stop, but probably in a different

3    method or way?

4         A.    If he was doing it the wrong way, yes.

5         Q.    Earlier you testified about knowing

6    someone named Macho who passed away.

7         A.    Correct.

8         Q.    Do you know how Macho passed away, what

9    his cause of death was?

10        A.    I was told that he had a self-inflicted

11   gunshot wound.

12        Q.    Do you know whether Macho was a Latin

13   King?

14        A.    Yes, he was.

15        Q.    And was he from a different faction

16   than you?

17        A.    Yes, he was.

18        Q.    Do you know what his faction was?

19        A.    He was by North Avenue, on that side of

20   North Avenue.

21        Q.    Do you know if he was in the same

22   faction as Jose Maysonet?

23        A.    I believe they were closer to each

24   other than me and them.

25        Q.    Okay.

110

1          A.      I'm on this side.  They're on this

2     side.  But maybe one's here and maybe one's maybe a

3     couple blocks away from him, you know.

4          Q.      And when I --

5          A.      On the same side of the neighborhood.

6          Q.      And I keep saying faction.  Is there a

7     way you would describe the different factions?

8               Did you use cross streets or something

9     like the Kings at Spaulding and North or something

10    like that?

11         A.      Yeah.

12         Q.      And do you know what faction or what

13    Mr. Maysonet's faction -- what the cross streets

14    were to describe him?

15         A.      No.  I don't know what faction at that

16    time he was in.  Now, I come to find out that he was

17    from Pierce and Spaulding.

18         Q.      Pierce and Spaulding?

19         A.      Correct.

20         Q.      And how big -- do you know how big Mr.

21    Maysonet's territory was?

22         A.      That one block.

23         Q.      Okay.  So were all the factions the

24    same one block or did it just depend from faction to

25    faction how many blocks they controlled?

111

1      A.    Yeah.  You controlled your own block,

2 but that was all our neighborhood.  That was

3 everybody's neighborhood.  If you were a Latin King,

4 that was your whole neighborhood.

5      Q.    Okay.

6      A.    You made sure that there was no

7 stealing or stupid stuff happening on your block.

8      Q.    And, likewise, if there was within the

9 neighborhood, if you saw something happening

10 anywhere in your neighborhood that wasn't

11 acceptable, you would take care of it or make sure

12 somebody knew to take care of it in the Latin Kings?

13      A.    Yeah.  I guess you could say, yeah.

14           I don't know what this has to do with

15 Maysonet.  I know you're trying to go somewhere, but

16 we're going in circles about this.

17      Q.    I understand.  Sir, I'm just trying to

18 get some background on Latin Kings because it is a

19 part of this case.  It's alleged.  It's part of the

20 case.

21           So I'm just trying to learn a little

22 more about Latin Kings because, obviously, you have

23 knowledge I don't possess.

24      A.    I understand, but yes.

25           MS. BONJEAN:  But it is getting a

112

1    little repetitive, Dave.  So let's -- I mean go

2    ahead, but let's try to move it along I guess.

3                    MR. BRUEGGEN:  I had moved on, and I

4    came back just for sake of questions regarding Macho

5    that we were talking about.

6         Q.     Now, I think you told Ms. Bonjean that

7    you -- did you go to his funeral?

8         A.     Yes, I did.

9         Q.     Did you also go to his wake?

10        A.     Yes, I did.

11        Q.     And how did you know Macho?

12        A.     His little brother was in my class.

13        Q.     Okay.  So through school you knew his

14   little brother?

15        A.     Correct, and he was two classes above.

16   He was one class above -- two classes above.  So I

17   was in sixth grade.  He was in eighth grade.

18        Q.     And the he you're referring to, is that

19   Macho was in eighth grade or his little brother?

20        A.     Sanchez, yes.

21        Q.     You also told us about your mom and you

22   said her name was Trinidad Alamo?

23        A.     Yes.  That's still her current name.

24        Q.     Alamo, is that your mom's maiden name

25   or did she get remarried?

113

1      A.      She got remarried.

2      Q.      Mr. Goossens, you talked earlier about

3  having some interactions with police prior to what

4  we're talking about in this case.  Am I accurate in

5  saying that?

6      A.      Yes.  You're accurate in saying that.

7      Q.      In those interactions with police, did

8  you ever use aliases or not provide your real name

9  to try to stay out of trouble?

10     A.      No.  There was -- it was impossible.

11     Q.      And when you say it was impossible, why

12  did you believe that?

13     A.      Well, because I never left the

14  neighborhood.  It wasn't like different precincts or

15  different officers used to come into that

16  neighborhood.  It was the same officers all the

17  time.  They had a relationship with the community,

18  and everybody knew who everybody was.

19     Q.      Okay.

20     A.      Everybody knew who family was.

21     Q.      And speaking of that, you said it was

22  the same officers that, if you will, policed your

23  area where you lived?

24     A.      Yeah.  The same officers that policed

25  my area all the time.  I mean it was the same

1    officers, and we lived there for 48 years.  So the

2    same people.

3         Q.    Did you know where their district was

4    or what their district number was for the patrolmen

5    that were in your neighborhood?

6         A.    Well, it's -- it's funny that you ask,

7    because right where I am splits up three divisions

8    of police in that area.  It splits up the Harrison

9    and Kedzie, Grand and Central and Shakespeare and

10   California right on the division.

11              So I would say the officers that were

12   patrolling Maysonet's area was Shakespeare and

13   California, and the officers that were patrolling

14   our area was a combination of two officer -- two

15   police stations which was Harrison and Kedzie or 55

16   and Grand.

17        Q.    And did you know what area -- police

18   area you were in?

19        A.    Yes.

20        Q.    What area were you in?

21        A.    That was the 55/Grand area.

22        Q.    Earlier when we were talking about the

23   shooting of the Wiley brothers, you said you learned

24   about the shooting, and I just wanted to clarify how

25   did you learn about the shooting?

115

1      A.      Word of mouth.  Just word of mouth in

2  the neighborhood.

3      Q.      So word of mouth got around that two

4  African Americans had been shot up on North Avenue?

5      A.      Correct.  The old Twitter.  I don't

6  know.  You look young.  So --

7      Q.      Well, I appreciate that.

8              And so it was just word of mouth.  Was

9  it within the Latin Kings discussing that two people

10  had been killed?

11      A.      Well, I mean I can't -- I can't say

12  that anybody else didn't know, but when two people

13  get killed, you know, it's going to be word whether

14  they're killed in Humboldt Park or they get killed

15  on Michigan Avenue.  If two people get killed on

16  Michigan Avenue, it's going to be big news.

17  Everybody's going to know.

18      Q.      I understand that.  I was just trying

19  to --

20      A.      It was just big neighborhood news.

21      Q.      And when you say big neighborhood news,

22  again, the neighborhood was pretty much Latin King

23  or Latin King affiliated neighborhood, correct?

24      A.      Yeah.  Correct.

25      Q.      When something like that would happen,

the area they were shot on, North Avenue, that would be part of that Latin King area that we talked about that ran from all the way down to Augusta all the way up to I think you said Armitage?

A. Correct.

Q. So there was a double murder that happened in Latin King territory?

A. Correct.

Q. So would the Latin Kings be concerned about a double murder happening in their neighborhood?

A. Yeah. Yeah, because they knew that the heat was going to come down on them if somebody died in the neighborhood.

I mean, if that was your block, you knew that the heat was going to come down on you to find out what happened here or whatever.

Q. And if somebody else, some rival gang had killed people in Latin King territory, would there be a retaliation by the Latin Kings?

MS. BONJEAN: Objection. Hold on one second. Let me put an objection. Objection to the form, foundation of that question.

Q. Mr. Goossens, you can answer if you know.

117

1       A.      I would say there would probably be

2   retaliation depending on who the person was if an

3   outsider came in and shot somebody inside the

4   neighborhood.

5       Q.      And it could be kind of similar to what

6   we talked about.  If an outsider came in and tried

7   to sell drugs in the neighborhood, the Latin Kings

8   wouldn't want that happening.  So they'd take care

9   of it, right?

10      A.      Correct.

11      Q.      Mr. Goossens, I don't want to keep you

12  tied down.  If you need to feed the meter or take a

13  break, I'll give you a break.

14      A.      Let me see because I got it on the app.

15              (Whereupon, a discussion was held off

16  the record.)

17      Q.      Mr. Goossens, when you were answering

18  questions from Ms. Bonjean, you mentioned that you

19  had previous interactions with police.  Do you

20  recall talking about that?

21      A.      Yes.

22      Q.      And I just wanted to get into -- and

23  let's start with prior to your -- the time that you

24  were questioned on November 23 -- I'm sorry,

25  November 24th of 1990 for this case, how many

118

1   interactions had you had with police where you were

2   taken into custody?

3           A.      Probably on a daily basis.

4           Q.      So you were, let me clarify, taken into

5   custody.  Were you taken back to a police station?

6           A.      On a daily basis, no, but probably at

7   least twice a week for mob action or disorderly or

8   anything like that.

9           Q.      And over -- go ahead, sir.  I'm sorry.

10  I didn't mean to interrupt.

11          A.      No.  Go ahead.  That was it.

12          Q.      Over what period of time were you taken

13  to the police station for various things like mob

14  action?

15          A.      At the time, I was a juvenile.  So I

16  don't know it will show on my record, but many

17  times.  I even went to jail for a stolen car from

18  Lincolnwood, and I don't even know where Lincolnwood

19  is to this day.

20          Q.      What I'm getting at, you said you were

21  basically taken to the police station on average

22  twice a week.  I want to know did this happen over a

23  span of two or three years?  Was it over a couple of

24  months?

25          A.      All the way up until when I got -- all

119

1    the way up until -- to the date of this incident.

2         Q.     Okay.  And so when did it start?  When

3    you were about 15?

4         A.     Twelve years old, 10.  Ten, 11, 12

5    years old.  Once I started getting some height and I

6    was looking bigger, like I was looking older, the

7    police would stop me and question me and ask me if I

8    was in a gang or where was the guns at or where was

9    the drugs at.  You know, they just stop you and

10   asked you questions all the time.

11        Q.     On those occasions when they'd stop you

12   and ask you questions, that is when you would be on

13   the street, they'd pull up, they'd ask you some

14   questions, they'd leave and you'd go about whatever

15   you were doing?

16        A.     On several occasions, yeah.

17               Other occasions they'll take you for a

18   ride.  If they knew who you were and they knew that

19   you were part of a gang or you were affiliated, they

20   would try to muscle information from you, from

21   either rival gang members or from your own gang

22   members.

23        Q.     And did the police in your neighborhood

24   know that you were part of the Latin Kings, a member

25   of the Latin Kings?

120

1          A.     Eventually they did, yes.

2          Q.     Was that when they started asking you

3     questions about gang activity?

4          A.     No.  They were asking me gang activity

5     way before I was even a Latin King.

6          Q.     And what types of gang activity would

7     they ask about?  Would they ask you about murders

8     that took place in the Latin King territory?

9          A.     Murders and above.  Everything.

10    Everything from petty crimes to homicides.

11         Q.     And now -- strike that.

12                Differentiating that from times when

13    you were actually taken in and accused, how many

14    times were you taken in and accused of being

15    involved in a crime prior to November 24, 1990?

16         A.     Prior to 1990 what?

17         Q.     Prior to November 24, 1990, when you

18    were brought in for the Wiley brothers murder.

19         A.     Oh, I was never taken in and accused of

20    murder.

21         Q.     I'm not just talking about murder.

22    Taken in and accused of any crime where they were

23    investigating a crime and they thought you might

24    have committed that crime.

25         A.     I gave you one example.  I was taken in

121

1   for a car.  I was about maybe 11, maybe 12 years

2   old.  I was taken in for a stolen car that was

3   behind our house that we were just playing in, and

4   they took me to jail because they said that I stole

5   the car.

6                Like I said, it was in Lincolnwood.  I

7   don't even know where Lincolnwood is at.

8        Q.    Fair enough.  I'm just trying to get a

9   general idea of how many times that happened when

10  you were brought into a police station and accused

11  of a crime prior to.

12       A.    I'm not sure.  I can't give you a

13  definitive number, but it was more than once, more

14  than twice.

15       Q.    And how would those interactions go

16  when you were brought in?

17       A.    Not good.

18       Q.    And can you tell me what you mean by

19  not good?

20       A.    The police.

21       Q.    Can you expand on that and tell me why

22  they were not good?  What happened that made them

23  not good?

24       A.    The way they treated you.  The

25  treatment that the police gave any individual.

122

1      Q.    Okay.  And let's just talk about you as

2  an individual.  How did the police treat you in just

3  any interaction?

4            Let's start with the one where the car

5  was stolen from Lincolnwood and you were brought in.

6  How did the police treat you?  You said you were

7  about 11?

8      A.    Yeah.

9      Q.    Okay.  How did they treat you when you

10  were 11?

11      A.    Well, when the cops pulled up, me and

12  three of my friends ran.  I mean we were just -- the

13  car was stripped almost down to nothing.  I mean it

14  wasn't drivable.  It was on bricks.  It was in an

15  abandoned garage where the garage door was

16  completely -- the garage door was completely off.

17            So when the cops pulled up, they jumped

18  out of the car.  Everybody started running.  I got

19  caught.  He slammed me to the floor, slapped me,

20  took me back to the car, and one of my friends went

21  and got my mom.

22      Q.    And do you know what police station you

23  were taken to?

24      A.    I was taken to Harrison and Kedzie.

25      Q.    Can you tell me, prior to November 24,

123

1  1990, had you ever been taken to Area 5 over at

2  Grand and Central?

3          A.     I can't recall.  No, I can't recall.

4          Q.     And now I want to talk about November

5  24, 1990, that you -- the time that you were taken

6  into custody and picked up by -- I think you said

7  you recalled Officer Colon arrested you --

8          A.     Yes.

9          Q.     -- and several detectives.

10         A.     It was Officer Colon and his partner.

11  Colon and his partner.

12         Q.     At the time, do you know if he was a

13  detective or if he was just a police officer?

14         A.     I'm assuming that he was a detective

15  because he wore plain clothes and he was driving an

16  unmarked police interceptor.

17         Q.     Did Detective or Officer Colon,

18  whichever he was at the time -- did he ask you any

19  questions when after he took you into custody on

20  November 24, 1990?

21         A.     No.

22         Q.     Who were the police officers or

23  detectives that were asking you questions?

24         A.     Colon, Guevara, and I want to say he

25  was a Polish detective.  There was about four

124

1    detectives that came in and out.

2              So it was not just one detective

3    questioning me.  It was one come in, two come in,

4    and then one leaves or two leave and then another

5    detective comes in, a different detective with a

6    different name, but there was three European or

7    white detectives and one Spanish detective which was

8    Guevara.

9         Q.    Did you interact with all four of those

10   detectives prior to going for your polygraph?

11        A.    Yes.

12        Q.    And three white detectives, you said

13   one of them was Polish?

14        A.    Yeah.  He had a Polish last name or I'm

15   guessing he was of Polish orient.

16        Q.    Do you recall anything about the other

17   two detectives who questioned you prior to going to

18   the polygraph?

19        A.    One of them was big and real strong.

20   That's all I could remember about him.

21        Q.    And you told us things that happened

22   prior to being taken for your polygraph, that there

23   was grabbing, pushing, pulling, and I was hoping you

24   could expound on that and perhaps even identify

25   which of these detectives did which things to you.

125

1      A.      Well, the big -- the bigger detective,

2  he was the one that handcuffed me to the wall and

3  put the cuffs on tight.

4          The little shorter detective, he's the

5  one that loosened them up for me and tried to play

6  nice.  Guevara, he's the one that slapped me in the

7  back of my head and told me that I got you now.  I

8  got you now.

9      Q.      And when Guevara said I got you now,

10  did you say anything in response?

11      A.      Yeah.  I said for what?  He said you

12  know you did it.

13      Q.      At that point, did you know that you

14  were being questioned about the murder of the two

15  African Americans back in May?

16      A.      No, I did not.

17      Q.      So after that interaction with Guevara,

18  did you have any further interactions with Guevara?

19      A.      No.  From that point, another officer

20  came in, and I don't know -- I don't know his name.

21  He was -- he was telling me to -- he was basically

22  telling me to touch his gun or grab his gun.  Why?

23  I have no idea.  I mean I have no idea.

24      Q.      And then after that, after they

25  questioned you, and, again, I believe you told us

126

1   you denied any involvement throughout the whole

2   thing, at that point did you then go down to a

3   holding cell?

4           A.      No.   I was -- I was in the

5   interrogation room from there.   We went to do the

6   polygraph.   No.   No.   Hold on.

7                   From the interrogation room, correct, I

8   did go down to the holding area which that's where I

9   had a nervous breakdown and I started breaking out

10  in hives.

11                  From there, the detectives took me to

12  the hospital.   I'm pretty sure it was Cook County

13  Hospital.   I was given some Benadryl there and

14  transported back to the holding cell which they took

15  me back upstairs to the interview room, and then

16  from there they took me to go take my polygraph.

17  From there, they took me to Harrison and Kedzie, put

18  me in their holding room.

19          Q.      Okay.   So now I just want to kind of

20  put some times on this.   So my understanding is

21  that, after you were arrested, you're first taken to

22  Western and Belmont.   Is that correct?

23          A.      Correct.

24          Q.      And then from Western and Belmont,

25  you're then transferred to Grand and Central?

127

1          A.      Correct.

2          Q.      And at Grand and Central is where you

3     were interrogated by the detectives?

4          A.      Correct.

5          Q.      How long did that first interrogation

6     last until you were brought down to the holding

7     cell?

8          A.      Hours.  I'm not sure how many, but it

9     just seemed like they were running out of hours.  It

10    was all night.  Maybe five hours.  I'm not sure.

11         Q.      And so after that first interrogation,

12    you then go down to the holding cells and you break

13    out in hives and they take you to Cook County

14    Hospital you think?

15         A.      Yes.  Yes.  Yes.  I'm pretty sure it

16    was Cook County Hospital.

17         Q.      After Cook County Hospital, after you

18    got treated there, did the hives go away with the

19    treatment?

20         A.      Yes.

21         Q.      Then you go back to Area 5 and are put

22    in a holding cell again?

23         A.      Correct.

24         Q.      And then you're transferred up to the

25    interrogation room?

128

1       A.      I'm transferred back to the

2   interrogation room.

3       Q.      Were you --

4       A.      And I was told in the interrogation

5   room that if I wanted to take -- that if I wanted to

6   take a polygraph test to prove my innocence or

7   whatever.  Then from there I went to another police

8   station.  I'm guessing that it was Area 1 or police

9   headquarters where they have polygraph tests done.

10      Q.      So this second time you're brought up

11  to the interview room after you went to the

12  hospital, was there any questioning other than just

13  asking if you wanted to take a polygraph?

14      A.      No.  That was it.

15      Q.      And you agreed to take the polygraph?

16      A.      I agreed to take the polygraph.

17      Q.      And then they transferred you down to

18  another police station where you took the polygraph?

19      A.      Correct.

20      Q.      After the polygraph, did you get

21  transferred back to Grand and Central?

22      A.      No.  We stopped at Harrison and Kedzie,

23  and I stood there for some hours, and then I was

24  transferred to Grand and Central.

25      Q.      Where were you at Harrison and Kedzie?

129

1   Were you in a holding cell or were you in an

2   interview room?

3          A.     A holding cell.

4          Q.     And from Harrison and Kedzie, you then

5   got transferred back to Grand and Central?

6          A.     Correct.

7          Q.     And when you got transferred back to

8   Grand and Central, did you go back to the holding

9   cell or did you go right to an interview room?

10         A.     I went right to an interview room.

11         Q.     How long were you in an interview room

12  this time after coming from Harrison?

13         A.     I have no idea, but it wasn't -- it

14  wasn't too long because that's when I got to talk to

15  the state's attorney.

16         Q.     On that occasion, do you know any of

17  the detectives who were present?

18         A.     No.  I cannot recall the names of the

19  detectives.

20         Q.     Okay.  So this is after going for your

21  polygraph you come back.  You can't recall any names

22  of detectives that talked to you in the interview

23  room at Area 5?

24         A.     Correct.  It was -- it was the Polish

25  guy and the other one, not the big guy.

130

1     Q.    Was that the little guy that was --

2     A.    It was not Guevara.  It was not the

3  short guy.  It was the Polish guy and the big guy

4  that got me the last time or this time that I'm

5  talking about.

6     Q.    Okay.  And this time is after you had

7  the polygraph when you're back at Area 5 in the

8  interview room, right?

9     A.    Correct.

10    Q.    And you said you were in there for just

11 a short time with those two detectives?

12    A.    Yes.

13    Q.    And that eventually an ASA came in?

14    A.    Yes, upon, supposedly, my request.

15    Q.    And after -- did you speak to the ASA?

16    A.    Yes, I did.

17    Q.    And after speaking to the ASA, what

18 happened?

19    A.    She got up, left.  I went back down to

20 the holding cell where -- that's where I asked the

21 turnkey to let me make a phone call.  From there, he

22 let me make a phone call and maybe three hours later

23 or so I was released from custody.

24    Q.    And I think you told us in that phone

25 call you called your friend?

131

1       A.      Yes.

2       Q.      And you asked your friend to tell your

3   mother that you were in custody?

4       A.      Correct.

5       Q.      And you also mentioned something about

6   an attorney that --

7       A.      Abrams, yes.

8       Q.      Do you speak to Mr. Abrams?

9       A.      No, I did not.

10      Q.      How do you know that Mr. Abrams was

11  spoken to?

12      A.      Because the same friend that I called

13  came to pick me up.  I said I'm in 55/Grand and

14  they're moving me around.  So this is where I'm at.

15  Tell my mom this is where I'm at.  You know, so they

16  could know at least where I'm at and I don't get

17  shuffled around into the system which they do it on

18  purpose.

19          And when my friend came to pick me up,

20  the same one that I called, I told him what -- you

21  know what happened.  He says I called the lawyer and

22  then I called your mom.

23      Q.      And when he said he called the lawyer,

24  did you know who he was referring to?

25      A.      Yeah.

132

1      Q.      And how did you know he was referring
2  to Mr. Abrams when he said he called the lawyer?
3      A.      Because Martin Abrams was a popular
4  lawyer with the Latin King Nation.
5      Q.      Had he ever represented you?
6      A.      Prior to this?
7      Q.      Yes.
8      A.      No.
9      Q.      And after you're released from Area 5,
10 you go home with your friend.  You hear nothing
11 about -- else about this case until you're in prison
12 in Menard and you get routed back to Cook County.
13 Is that correct?
14     A.      Correct.
15     Q.      Mr. Goossens, earlier you were pretty
16 definitive in stating that Mr. Maysonet, Mr.
17 Gonzalez and Mr. Cruz were not involved in the
18 murder of the Wiley brothers, right?
19     A.      Yes, I was and I still am.
20     Q.      And that's not based on personal
21 knowledge, right?
22             MS. BONJEAN:  Objection.  Objection to
23 the form of that question and foundation of that
24 question.
25             I think hasn't he testified about his

133

1  personal knowledge.

2      Q.      Mr. Goossens, if you can answer the

3  question.

4      A.      Can you say that question one more

5  time?

6      Q.      So you were pretty definitive that Mr.

7  Maysonet, Mr. Gonzalez and Mr. Cruz were not

8  involved in the case.

9      A.      Correct.

10     Q.      And that's not based on any firsthand

11 knowledge, is it?

12     A.      No.

13             MS. BONJEAN:  Object to the form.

14     A.      No.  It's not based on any firsthand

15 knowledge like I know if somebody else done it.

16     Q.      And in addition to that, you also were

17 not present when the shooting happened, right?

18     A.      Correct.

19     Q.      So what is the basis for you to

20 definitively conclude that Mr. Maysonet, Mr. Cruz

21 and Mr. Gonzalez did not commit the murder?

22     A.      I sat in the county jail for three

23 years and nine months overlooking the only papers

24 that I had that were the three statements that Jose

25 Maysonet, Gonzalez and Justino Cruz gave, and from

134

1    the statements themselves, they were all

2    inconsistent.

3                Maysonet did become my cellmate, and we

4    spoke extensively about this case, and it was

5    determined then that I knew like them, like me, they

6    were not at fault or they had nothing to do with any

7    of this.

8         Q.    Mr. Goossens, are you done with your

9    answer?  I just don't want to interrupt you.

10        A.    No.  And the more I spoke to Maysonet

11   in Spanish, the more I found out that he had nothing

12   to do with the case just like me.

13        Q.    Okay.  So is it fair to say that your

14   belief that Mr. Maysonet, Mr. Cruz and Mr. Gonzalez

15   were not involved in the case is based on your

16   review of some of the police reports as well as your

17   discussions with Mr. Maysonet?

18                MS. BONJEAN:  Objection, misstates his

19   testimony.  He didn't say anything about police

20   reports.

21        A.    Right.  I said statements, not police

22   reports.

23        Q.    Oh, the statements.  I apologize.

24   That's what I meant.  Let me rephrase the question.

25   I withdraw that.  Let me rephrase it.

135

1          So is it your testimony then that based

2   on the -- strike that.

3          Let me step back.  What statements did

4   you have a chance to review?

5      A.    I had to re -- I had a chance to review

6   Maysonet's statements, Justino Cruz and Alfredo

7   Gonzalez.  That's his name.

8      Q.    Yes, sir.

9      A.    And Alfredo Gonzalez's statements.

10     Q.    In addition to those statements, did

11  you have any police reports or records?

12     A.    No, this is the first time.  Like I

13  said, this is the first time I've ever saw this

14  police report.

15     Q.    So then back to my question that was

16  imprecise before.

17          MR. GREENBERG:  Hold on one second.

18          (Whereupon, a discussion was held off

19  the record.)

20          MR. GREENBERG:  Go ahead.  I'm sorry.

21     Q.    Mr. Goossens, other than the statements

22  that you reviewed of Mr. Maysonet, Mr. Cruz and Mr.

23  Gonzalez and your discussions with Mr. Maysonet, is

24  there anything else that allows you to definitively

25  state that they were not involved?

136

1   A.  No.

2   Q.  What did Mr. Maysonet tell you about

3 his interactions with the police?

4   A.  Mr. Maysonet, through conversations

5 that we've had, you know, throughout the time that

6 we were cellmates, he told me that the police

7 threatened him, the police beat him.

8     They told him basically the same things

9 that they told me once we started putting together

10 everything that there was told to me and that was

11 told to him, and that's how I drew the conclusion.

12   Q.  And is that the time when you were

13 waiting for trial after you had been writ'ed to

14 Menard that you had these conversations with

15 Maysonet?

16     MS. BONJEAN:  You mean writ'ed from

17 Menard?

18     MR. BRUEGGEN:  Sorry.  From Menard.

19   A.  Yes.  I was already convicted for a

20 previous cases, and I was writ'ed from Menard back

21 to the county jail where I was arraigned.

22   Q.  And did you stay in the county jail at

23 that time until you went to trial on the Wiley

24 brothers case?

25   A.  Correct.  I was -- I was transferred

137

1 over to the custody of the state, Cook County, the

2 custody of Cook County Sheriff Department, and I

3 awaited trial with no bond.

4          Q.     I think you mentioned earlier you were

5 also cellmates with Mr. Maysonet for a period of

6 time in Cook County Jail?

7          A.     Yes, I was.

8          Q.     How long were you and Mr. Maysonet

9 cellmates?

10          A.     Probably a year.  Probably for about a

11 year, maybe six months.

12          Q.     Were you guys cellmates during that

13 time after you had been writ'ed from Menard to Cook

14 County Jail?

15          A.     No.  No.  No, not immediately right

16 away.

17          Q.     That's not what I'm asking.  Just for

18 the period of time, I think you told us you were in

19 jail for three years and nine months.

20          A.     Correct.

21          Q.     That was after you had been writ'ed

22 from Menard, correct?

23          A.     Correct.

24          Q.     And some time during that three years

25 and nine months, you and Mr. Maysonet were

138

1   cellmates?

2        A.     Correct.

3        Q.     Did you talk to Mr. Cruz while you were

4   incarcerated at the Cook County Jail during that

5   three years and nine months awaiting trial?

6        A.     Mr. Cruz was in protective custody, and

7   it was my understanding he was already in the

8   penitentiary.  He was not in the county jail.  A

9   fraction of the system.

10       Q.     What about Mr. Gonzalez?  Was he still

11  at Cook County Jail at the same time you were?

12       A.     No.  Mr. Gonzalez was already

13  convicted, and he was carrying out his sentence in

14  Stateville Correctional Facility or Pontiac.

15            I'm not sure which one of the two

16  maximum facilities that he was in, but he was not in

17  the same maximum facility that I was in which was

18  Menard Correctional Center.

19       Q.     Did you ever have any conversations

20  with either Mr. Gonzalez or Mr. Cruz while you were

21  in the Illinois Department of Corrections, the

22  penitentiary?

23       A.     I've never seen them, and until this

24  day, I've never seen them period at all let alone

25  have a conversation.

139

1       Q.      And then moving on, you eventually went
2    to trial for the charges being involved in the Wiley
3    brothers murder, right?
4       A.      Yes.
5       Q.      Do you recall that was in about 1995?
6       A.      Correct.
7       Q.      Do you remember who your attorney was
8    for that trial?
9       A.      I had a task force public defender.
10      Q.      Do you remember his or her name?
11      A.      No, I do not.
12      Q.      Did you testify at the trial against
13   you for the murder of the Wiley brothers?
14      A.      No, I did not.
15      Q.      Did you assert your Fifth Amendment
16   rights not to testify?
17      A.      No, I did not.
18      Q.      Sir, maybe -- did you assert your Fifth
19   Amendment rights so that you did not have to
20   testify?
21      A.      I didn't take the stand.  This is what
22   I'm trying to say.  I didn't take the stand.  I
23   didn't get up and say I raise my right hand, I plead
24   the fifth.  No, I didn't say any of that.
25              I just never took the stand.  I took a

140

1    bench trial.  They heard the case.  They gave me the

2    verdict.  It was over.

3         Q.    And then, sir, I'm just going to move

4    to my last area of inquiry.  It will be very brief.

5               I think at the beginning of the dep you

6    talked about the neighborhood when you were talking

7    about police presence and you said that it was --

8    there was lots of drugs and violence in your

9    neighborhood?

10        A.    Yeah, there was.

11        Q.    And you explained -- or you opined that

12   might be the reason there was a lot of police

13   around?

14        A.    Oh, of course.

15        Q.    And what types of violence was around

16   in the neighborhood, in your general neighborhood?

17        A.    Gang fightings, shootings, you know,

18   other opposition to the Latin Kings, gangs coming

19   over there, shooting people up.  Things of that

20   nature.

21        Q.    While you were a Latin King, were you

22   ever involved in a shooting with a rival gang?

23        A.    Was I?

24              MS. BONJEAN:  Hold on a second.  Hold

25   on.  Hold on.  Stop.

141

1           I don't understand what this line of

2    questioning -- if you want to ask him about his

3    prior conviction, I'm pretty sure you can ask him

4    directly about the prior conviction.

5           But general questions about his

6    involvement, I'm not prepared to -- I mean I'm not

7    his attorney, and he should be aware of -- he may

8    want to get a lawyer if you want to ask him about

9    generally his involvement in prior criminal

10   activities.

11          I mean I don't know.  We haven't talked

12   about that.  I don't know what he's going to say,

13   and I don't think that's fair.

14          It's fair to ask him about something

15   for which he's been previously convicted, but the

16   open-ended question about his prior involvement in

17   uncharged acts, I would advise him that -- he is a

18   savvy dude.  He obviously understands he has the

19   Fifth Amendment rights, and he may choose to invoke

20   them or at least consult with counsel.

21          So with that said, Mr. Goossens, I'm

22   not telling you how to answer, but I'm sure you're

23   aware of what your constitutional rights are.

24          THE WITNESS:  Yeah.  I would definitely

25   invoke my Fifth Amendment rights.  I'm not here to

142

1    talk about what I was involved in.

2              I mean I was convicted for a case, and

3    I was acquitted for another case, and that's the

4    only reason why I'm here.

5              MR. BRUEGGEN:  Okay.  Understood, Mr.

6    Goossens, and those are all the questions I have.

7    Thank you very much for your time.

8              I appreciate some of the other

9    attorneys may have some questions, but thank you.

10             THE WITNESS:  Okay.  Thank you.

11   CROSS-EXAMINATION BY MR. RAHE:

12        Q.    So my name is Austin Rahe.  I'm an

13   attorney for the City of Chicago in this case.  I

14   have a few questions for you.

15             I'm going to -- I'll probably skip

16   around a little bit because a lot of stuff has been

17   covered, but I'll try to be as quick as possible.

18        A.    Sure.

19        Q.    What was -- what was your -- your two

20   sisters with the last name Fernandez, what was their

21   father's name?

22        A.    Armalio.

23        Q.    Armalio.

24             Do you know anyone named George

25   Fernandez?

143

1      A.      George Fernandez?

2      Q.      Yeah.

3      A.      No.

4      Q.      Did you ever use that name when you

5  were arrested by police on any occasion?

6      A.      Not to my recollection, no.

7      Q.      Okay.  So I want to talk a little bit

8  about Black Jeffrey.  Do you know his real name?

9      A.      Okay.  His first real name is Jeffrey.

10     Q.      I figured that.

11     A.      Honestly, I'm not sure what his last

12  name is.  I'm not sure.

13     Q.      If I say Jeffrey Watts --

14     A.      Watts.

15     Q.      That was his last name.  Okay?

16     A.      Boom, there you go.

17     Q.      And the car he drove, do you know what

18  type of car it was?

19     A.      That year, yeah.  Yeah.  It was -- it

20  was a blue and light blue Bonneville.

21     Q.      Pontiac?

22     A.      Pontiac Bonneville.  Yes, it was.

23     Q.      Do you know the year?

24     A.      I have no idea.  Somewhere maybe late

25  '70s, early '80s model.

144

1    Q.    Can you name --

2    A.    Two door.

3    Q.    -- some of your fellow gang members or

4    friends that were in your sect back in 1990, first

5    name, nicknames?

6    A.    No.  I don't feel comfortable naming

7    anybody from my sect.

8    Q.    You're going to refuse to answer that

9    question?

10   A.    Yes, I refuse to answer that question.

11         But Maysonet, Gonzalez and Justino Cruz

12   were not in my sect.

13   Q.    Okay.  I just want to warn you, if you

14   do refuse to answer any questions, it's possible

15   that we may have to seek court intervention for you

16   to come back to answer specific questions.

17         I'm not saying that's what I am going

18   to do or not going to do, but those are just the

19   rules.

20         MS. BONJEAN:  Well, also, the rules are

21   that it should be relevant questions, and there are

22   safety issues and Fifth Amendment issues.

23         So, you know, there are other issues

24   involved.  It's not just he has to answer every

25   question about, you know, every gang related issue

145

1    that you want to grill him about but --

2                    MR. RAHE:  Sure.

3                    MS. BONJEAN:  He's right, Mr. Goossens.

4    They could seek court invention, and you could, of

5    course, you know, object and all that, but you

6    don't -- IF you don't feel comfortable and you want

7    to invoke a privilege or, you know, you have safety

8    concerns or any of those things, he has the right to

9    do that I think.

10                   THE WITNESS:  Correct.

11        Q.    So after all that, are you still going

12   to refuse to answer the question?

13        A.    Do I know anybody's nickname?

14        Q.    No.  Could you name some of your --

15        A.    What was the question again?

16        Q.    If you could name some of your friends

17   or nicknames of your friends in your sect back in

18   1990?

19        A.    The guy that I called, his name is

20   Javier.  Javie.  There was an example.

21        Q.    Any others you remember?

22        A.    No.

23        Q.    Okay.  And then do you -- do you know

24   if Jose Maysonet or Juan Jose Maysonet went by a

25   nickname?

146

1      A.      No.

2      Q.      You don't know if he did or not?

3      A.      We gave him -- the guy from my corner

4  gave him a nickname, but that wasn't his nickname.

5      Q.      Okay.  But you don't know -- you don't

6  know his nickname if, indeed, he has one?

7      A.      No.  I don't know his personal street

8  name, but we gave him 1.8.

9      Q.      Gotcha.  Okay.  Thank you.

10      A.      Because he used to pass by all the

11  time.

12      Q.      Right.

13              Do you know if Jose Maysonet sold drugs

14  back in around 1990 or before that?

15      A.      Do I know if he did?  No.  At that

16  time, I didn't know if he sold drugs or not.

17      Q.      Are you aware of any Latin King members

18  working with police in their drug selling

19  businesses?

20      A.      Am I aware of any?

21      Q.      Yes.

22      A.      Yeah, I'm aware of one.

23      Q.      You're aware of one.  Do you know -- is

24  he from your sect?

25      A.      No.

147

1       Q.    No.  Was he from Maysonet's sect?

2       A.    No.

3       Q.    Okay.  Do you know -- I'm good with

4 that.

5           Back in the day around 1990, did you

6 have a girlfriend?

7       A.    Yes, I did.

8       Q.    What was her name?

9       A.    Her name was Mirta Balaine (ph.) Cotto.

10 C-O-T-T-O, Cotto.

11       Q.    And you were dating her around the time

12 that the police came looking for you, right?

13       A.    She was with me the same day.  She

14 had -- she got arrested as well.

15       Q.    She got arrested?

16       A.    Well, they took her with me.  She was

17 with me when we were at the gas station, and they

18 took her with me.

19       Q.    Did they question her?

20       A.    They told me not to -- not to talk to

21 her.  They sat us in the backseat one on one side,

22 one on the other side, and the detective that was

23 sitting in the front seat passenger side, he was

24 turned around looking at both of us making sure that

25 we didn't talk.

148

1      Q.    Okay.  So they brought her to the

2  police station then?

3      A.    They took her to Belmont and Western,

4  and then I don't know what happened from there,

5  because like -- like I said, they transferred me all

6  over the place.  I don't know what happened to her

7  there.

8      Q.    So you don't know whether or not she

9  was actually questioned by the police while she was

10  at the police station?

11      A.    Correct.  I am pretty sure she was.

12      Q.    You're not by any chance still in

13  contact with her, are you?

14      A.    No.  She's my ex-wife.  I did marry

15  her.

16      Q.    When was that?

17      A.    She was my high school sweetheart.

18      Q.    When did you marry her?

19      A.    I married her while I was in jail.

20      Q.    Okay.  And then when did you get

21  divorced?

22      A.    While I was in jail.  While I was in

23  jail -- when they writ me back, that was in '92.

24  She stayed married from '92 until the moment I went

25  back to prison which was in '95.  So that was

149

1  probably about two years and some months that we

2  stood married before we got divorced.

3      Q.    What car did you drive back in 1990, if

4  you had one?

5      A.    I drove a Lincoln Town Car.

6      Q.    What color was it?

7      A.    It was gray.

8      Q.    It was gray.  Did you ever own a

9  Cutlass?

10      A.    Yes.

11      Q.    Okay.  Was it red?

12      A.    It was primer red.

13      Q.    And did it have a blue front and a blue

14  passenger door?

15      A.    Correct.

16      Q.    Okay.  Did you -- I was a little

17  unclear.  Did you personally know Jose Maysonet's

18  girlfriend, Rosa Bello?

19      A.    No, I did not know her, but I knew that

20  her and her sister had the same name or her and his

21  sister had the same.  No.  So, no, I didn't know

22  them personally.  No.

23      Q.    You just knew of her?

24      A.    Correct, and her name was Rosa or

25  Rosie, or the sister's name was Rosie or Rosa.  I'm

150

1  not sure which one was which.  Rose something.

2          Q.     Do you know if she knew of you?

3          A.     I mean I never seen her before, and

4  I've still never seen her before.  I don't even know

5  what she looks like.

6                  MS. BONJEAN:  And by she, we're talking

7  about Rosa Bello, right?

8                  MR. RAHE:  Correct.

9                  THE WITNESS:  Jose Maysonet's

10  girlfriend.

11         Q.     Right.

12         A.     That's who we're talking about.

13         Q.     Right.

14         A.     Okay.  No, I don't know her.  I never

15  seen her before.

16         Q.     Okay.  Did you have -- did you hold any

17  rank with the Latin Kings?

18         A.     No.

19                 MS. BONJEAN:  Objection.

20         A.     No.

21         Q.     Well, I guess I should ask first was

22  there some type of like hierarchy within the Latin

23  Kings?

24                 MS. BONJEAN:  Objection.  This was

25  asked and answered.  I don't know why we're going

151

1   to -- it's already really not that relevant about

2   the Latin King structure, but to the extent that it

3   is, at least try not to ask the same questions.

4                   MR. RAHE:  I'm sorry.  I must have

5   missed that that was asked.  I'll move on.  That's

6   fine.

7        Q.     Did the Latin Kings have a color, a

8   specific color associated with the gang?

9        A.     Black and gold.

10       Q.     Black and gold.  Okay.

11              Did you ever own a gun in 19901?

12       A.     No.

13       Q.     Did you ever use a gun 1in 1990?

14       A.     No.

15       Q.     Did you ever see your fellow Latin

16   Kings use a gun in 1990?

17       A.     No.

18              MS. BONJEAN:  Objection to the

19   foundation, but his answer will stand.

20       Q.     Did the Latin Kings have a stash box

21   for guns?

22       A.     Probably, yes.

23       Q.     Would the stash box be like at places

24   on the streets, abandoned buildings?

25              Did they -- would they stash them with

152

1    lower level members of the Latin Kings, if you know?

2         A.      I don't know.

3         Q.      You said you went to Santiago Sanchez's

4    funeral, right?

5         A.      Correct.

6         Q.      Did you see Jose Maysonet there?

7         A.      No, I did not.  There was a lot of

8    people there.

9         Q.      Okay.  Do you -- do you remember seeing

10   Justino Cruz or Alfredo Gonzalez there?

11        A.      No.  I don't remember -- I don't

12   remember seeing them there, but that doesn't mean

13   that they were not there.

14                There was so many people there that,

15   you know, everybody came to pay their respects, but

16   he was my friend.  So --

17        Q.      So you weren't worried about seeing

18   anyone there?

19        A.      Right.  I wasn't there to socialize.  I

20   was there to pay respects to my friend.

21        Q.      Okay.  And I want to -- Ms. Bonjean

22   showed you a photo earlier that you said was taken

23   at your sister's house.  Do you remember that photo?

24        A.      Yes, I do very well.

25        Q.      And I think you said the police took

153

1    that from your house?

2         A.    Yes.  Yes.  The police took the photo

3    from my house.  My sister was the one that actually

4    took the photo.

5         Q.    So they took it from your house, not

6    your sister's house, correct?

7         A.    Correct.  They took it -- they had to

8    have taken it from my house, my room.

9         Q.    Okay.  That was my next question.  It

10   was in your room?

11        A.    Yes.

12        Q.    Okay.  And do you know --

13        A.    Along with other photos they took from

14   my room.

15        Q.    Can you say that again?

16        A.    They took that photo and several other

17   photos from my room.

18        Q.    Did they take anything else that you

19   noticed?

20        A.    No, not -- not immediately.  No.  I

21   didn't notice anything else was missing.  I mean I

22   really didn't have anything of worth in there.

23        Q.    Did -- what's the time frame that the

24   police took these photos from your house?

25        A.    I'm not sure what you're saying.  What

154

1   do you mean what's the time frame?

2        Q.    Well, like, for instance, was it -- let

3   me see.  Was it while you were in jail, for

4   instance?

5        A.    No.  No.  I wasn't -- I was not in jail

6   at the time.  No.

7        Q.    Okay.  So did it happen before you were

8   arrested for the 1990 murder?

9        A.    Yes, it was.

10       Q.    Was anyone home at the time when the

11  police --

12       A.    My mother was home.

13       Q.    Okay.  Let me finish the question real

14  quick.

15             Was anyone home at the time that the

16  police came to your house and took these photos?

17       A.    Yes, my mother was home.

18       Q.    And do you know if your mother actually

19  saw them take the photos?

20       A.    Probably not.  My room is in the attic,

21  and my mother does not go upstairs to the attic.

22  She can't climb all those stairs.

23       Q.    All right.  At your -- for the criminal

24  case of the Wiley brothers' murder, for a while your

25  attorney was Martin Abrams, right?

155

1      A.      Correct.

2      Q.      And he ended up withdrawing as your

3  counsel, correct?

4      A.      Correct.

5      Q.      And do you know the reason why he

6  withdrew as your counsel?

7      A.      From my recollection, I think there was

8  a conflict of interest because at some point he had

9  represented Justino Cruz.

10     Q.      Was it Justino Cruz or Efrain Cruz he

11 had represented before?

12     A.      One or the other.

13     Q.      One or the other?

14     A.      I'm not sure from my recollection.  He

15 had defended one of the defendants there, and he

16 could no longer be my attorney.

17     Q.      Do you have an alibi for the date and

18 time of the Wiley brothers' murder?

19     A.      No.  I don't even remember what I was

20 doing.  I have no alibi.  I don't remember.

21     Q.      Okay.  While you were in IODC or IODC

22 custody, did you ever talk about this case on the

23 phone with anyone?

24     A.      No.

25     Q.      Never?

156

1          MS. BONJEAN:  Objection, asked and
2    answered.  Go ahead.
3      A.      From my recollection, no.
4      Q.      I think you said earlier, if you were
5    in a rival gang's territory, something bad would
6    probably happen to you, right?
7      A.      No.  I never said that.
8      Q.      You said -- I think you said the police
9    would drop people off in rival gang's territory?
10     A.      Yes.
11     Q.      And you would expect that, if that
12   would happen, something bad would happen to you,
13   right?
14     A.      Yes.  In that instance, yes.
15     Q.      Well, wouldn't it be the same if you
16   voluntarily went into a rival gang's territory and
17   they saw you hanging out there?
18     A.      Well, at that time, I mean, if I was to
19   go to any rival gang territory neighborhood, I would
20   probably be going with my mother in my mother's car
21   which my mother is not affiliated with any gang.
22   Her car is not affiliated with any gang, and I could
23   probably just get out of the car and walk into the
24   residence.
25          I'm not going to probably hang out in

157

1  the front of this rival gang territory that I know

2  and make myself be seen that, hey, I'm from the

3  other side, come and mess with me.  No.

4       Q.     That -- I want to talk about Maysonet's

5  car.  A red Toyota, right?

6       A.     Yeah.

7       Q.     Had you ever been inside of his car?

8       A.     No.  Just seen it from the outside.

9  Just seen it from the outside.

10      Q.     And then you talked about like drag

11 racing and stuff.  Was that like some sort of like

12 party where people were drag racing or was it like

13 you just saw him going fast down the street?

14      A.     That was just like going fast down the

15 street through the neighborhood.  No drag racing

16 like one person pitted against another.

17             Most of the time people used to try to

18 shine up their cars and stuff like that for the

19 Puerto Rican festival which, you know, people get

20 out in the street and celebrate and beep their

21 horns, and he had his car ready for those type of

22 festivals and events and stuff like that.

23             I'm guessing because it was a loud car,

24 you know, the music was loud, was primer and shiny.

25 You know, something like my Cutlass that was blue

158

1    and red.

2          Q.    Is it fair to say that you didn't like

3    the police back then in the '90s, early '90s, early

4    '80s?

5                MS. BONJEAN:  Objection to form.

6          Q.    You can answer.

7          A.    Would it be fair to say that I didn't

8    like them?

9          Q.    Right.

10         A.    I didn't like the way they treated me.

11   That's fair to say.

12         Q.    Okay.  So at the polygraph in this

13   case, which was I think on November 1990, what -- do

14   you remember exactly what questions you were asked

15   during the actual polygraph?

16         A.    No, but I'm pretty sure that all the

17   questions revolved around this case.  I don't know

18   any specific questions if that's what you're asking.

19         Q.    Okay.

20         A.    Or I don't remember any specific

21   questions.

22         Q.    And -- so during the polygraph, you

23   said you -- do you need to take a little break?

24         A.    No.  No.  No.  Go ahead.  I just want

25   to stretch.  I've been sitting down for a long time.

159

1      Q.      So around the time of the polygraph, I
2   think before you said you were beaten in some manner
3   by the police, correct?
4      A.      Correct.
5      Q.      I mean that's sort of a big deal when
6   someone's beaten by the police, right?
7              MS. BONJEAN:  Objection, form.  Go
8   ahead.
9      A.      No.  I mean in those days it was not a
10  big deal.  It's a big deal now that everybody has a
11  camera and they can record and see things like
12  George Floyd and stuff like that, but back then, if
13  you got beat down, you got beat down.  I mean it
14  wasn't a big deal because it was all hidden.
15     Q.      Right.
16             So the only way to be -- for police to
17  be held accountable is if other people learn about
18  it in some manner, right?
19     A.      Correct.
20     Q.      And there were no -- there weren't
21  really any video cameras handy on every person in
22  America back then, right?
23     A.      There was no video cameras handy, and
24  in most police stations there was no video cameras
25  in the interrogation rooms either, because if it

160

1   was, we wouldn't be having this conversation.

2          Q.     So did you ever tell anyone that you

3   were beaten by the police?

4          A.     No, but it was already -- how would you

5   say this word?  It was already presumed that if I

6   got caught by the police that I was going to get my

7   ass kicked.  I mean --

8          Q.     Presumed by you?

9          A.     Presumed by anybody that -- if I told

10  you, hey, I got picked up yesterday, first thing

11  that probably would come out of your mouth, did they

12  kick your ass?

13             So everybody knew the tactics of the

14  Chicago police and the way they handled their

15  business.  It wasn't a secret.

16         Q.     But you never told anyone, right, to

17  make them be accountable for those acts?

18             MS. BONJEAN:  Objection to -- objection

19  to the form and foundation of that question to be

20  accountable.

21         A.     Yeah.  Just because I never told

22  anybody doesn't mean that it never happened.

23         Q.     Did you ever tell any of your attorneys

24  that you were beaten by the police?

25         A.     No, didn't have to.  They already

161

1   assumed it as well if they were from Chicago.

2        Q.    Was your mother's last name ever

3   Fernandez?

4        A.    Excuse me?

5        Q.    Was your mother's last name ever

6   Fernandez?

7        A.    With an F, Fernandez?

8        Q.    Fernandez, right?

9              That's your sisters' last names, right?

10       A.    Correct.  That's -- yes.

11       Q.    Was that ever your mother's last name?

12       A.    I assume so because I'm the last one

13   and there's two in front of me.  There's five others

14   in front of me, and my first three siblings -- my

15   oldest brother and my two oldest sisters, they are

16   Fernandez.

17       Q.    So she was married to their dad then at

18   some point, right?

19       A.    I believe so at some point she was

20   married to him, but that was in Cuba.

21       Q.    Okay.  So when she came to -- well,

22   since she's been in the United States, has her last

23   name ever been Fernandez, if you know?

24       A.    I'm pretty sure in the beginning, yes.

25       Q.    And when was that?

162

1       A.     Way before my birth.  Maybe 1968, '67.

2       Q.     Okay.  So ever since you've been born,

3  her last name was Alamo?

4       A.     Correct, or from what I can remember.

5  My dad passed away when I was one years old.  One

6  year old three months.  Wait a minute.  July,

7  August, September.  I was one years and three months

8  old when my father passed away.  By the time I could

9  remember anything, my mom's name was always Alamo.

10      Q.     Okay.

11      A.     I actually don't even recall Mr. Alamo.

12  So my mom had to have gotten divorced before I was

13  five that I could remember stuff.

14      Q.     Okay.  And then so I'm going to ask you

15  a couple questions here.  They're somewhat related

16  to the 1991 murder conviction, but --

17          MR. RAHE:  One second, Jennifer.  I'm

18  not going to get into any specific like details or

19  anything like that.  I just wanted to let you know

20  that.

21          MS. BONJEAN:  Okay.  Go ahead.

22      Q.     So I mainly just wanted to know are

23  there -- were any of the same detectives from the

24  1990 murder involved in questioning you or the

25  investigation of the 1991 murder?

163

1       A.      No.

2       Q.      No.  Okay.

3               Do you know if any of the same

4   assistant states attorneys were involved in both

5   cases?

6       A.      No, I wouldn't know.

7       Q.      Okay.  And then -- so I noticed in your

8   file that there was an Efrain Cruz that was a

9   witness against you.  Was that the same Efrain Cruz

10  as was involved in the 19 -- or as you knew that we

11  talked about earlier today?

12              MS. BONJEAN:  I'm going to object.  I'm

13  sorry.  Let me just object to the form.

14              I don't have a problem with the

15  question, but when you say a witness against him, I

16  think that's confusing.  So I'm just going to object

17  to form.

18      Q.      You're right.  So there was -- so I'll

19  just put it this way.

20              There was an Efrain Cruz mentioned.  He

21  may have testified at your trial.  I'm not really

22  sure, but there was an Efrain Cruz mentioned in your

23  1991 murder file.  Is that the same Efrain Cruz,

24  King Cruz that we talked about earlier today?

25      A.      It's likely not.

164

1      Q.      But you don't know for sure?

2      A.      But I don't know for sure.

3      Q.      Okay.

4      A.      Because there was no Efrain Cruz that
5  came to my trial and testified against me.

6      Q.      Okay.  So you don't know if there was
7  any Efrain Cruz involved or not in your 1991 murder
8  case?

9      A.      Correct.  Correct.

10     Q.      I got it.

11     A.      I don't know if there was any
12  involvement -- like I said, this is the first time
13  I'm even seeing the police report.

14     Q.      Okay.  Were you beaten by the police at
15  all in relation to that case, the 1991 murder?

16     A.      Yeah, sure.

17     Q.      You were.

18            And can you explain what they did to
19  you?

20     A.      The same tactics.  Slap here.  Slap
21  there.  Pull here.  Pull there.  I mean just being
22  aggressive.

23     Q.      Okay.  Did you have to go to the
24  hospital at all in that one?

25     A.      No.  No.  No.  They make sure that they

165

1    don't mark you up.

2         Q.    And how do they do that?  What do you

3    mean by that?

4         A.    I mean if I have a head full of hair

5    and they slap me in the back of the head, who's

6    going to see the mark?

7         Q.    Okay.  So that -- was that the --

8         A.    Get it.

9         Q.    Right.

10              Was that the only thing they did to you

11   was slap you in the head?

12        A.    That was just an example of how they

13   would cover up.

14        Q.    Okay.

15        A.    Of that nature.

16        Q.    In this instance, in relation to the

17   1991 case, whenever you were questioned, other than

18   being slapped in the head, did they hit you or

19   physically put their hands on you in any other way?

20        A.    I mean a slap in the head is physically

21   putting their hands on me.

22        Q.    I mean, other than that, was there

23   anything else?

24        A.    No, not that I recall.

25        Q.    And then I think you were charged with

166

1   witness intimidation after that 1991 murder case.

2   Is that true?

3          A.      Yes.

4          Q.      What was the result of the witness

5   intimidation charges?

6          A.      I never got convicted for it.  So I'm

7   guessing that they threw it out.

8          Q.      Okay.  Do you know when it was thrown

9   out?  Was it after your trial?

10         A.      I have no idea.  This is -- this is the

11  first time I even hear that I was charged with

12  witness intimidating.

13         Q.      Oh, I was just asking you if you knew

14  that you were.  You didn't know that?

15         A.      I didn't know that I was.  I mean I got

16  my bond revoked, but there was a lot of gang

17  activity happening outside of the courtroom, and

18  they just revoked my bond and took me into custody.

19         Q.      So you don't know why they revoked your

20  bond?

21         A.      Well, I'm guessing -- now that you tell

22  me it was witness intimidation, I'm guessing that

23  that's the reason why they revoked my bond.

24                 However, I never went to trial or I

25  never -- to my recollection, I never had a hearing

167

1   about witness intimidation.

2          Q.     And then what -- what year did you get

3   out of jail for that charge, the 1991 murder case?

4          A.     July 26, 2006.

5          Q.     Okay.  Have you had any problems with

6   the law since then?

7          A.     No, I have not.  I learned my lesson.

8   Trust me.

9          Q.     Did you have a 2009 drug case against

10  you?

11         A.     Yeah.  I reverted to using drugs.  I

12  was hooked on drugs, depressed, stressed, PTSD for

13  being in jail for so long.  I was picked up for

14  possession of some drugs.  Yes, I was.

15         Q.     So you have had some problems with the

16  law since you've been out then?

17         A.     Oh, I mean I went to rehab.  They gave

18  me probation.  I mean I don't look at that as a

19  problem with the law itself like going out and

20  committing a crime as far as killing or shooting

21  somebody or beating up somebody.

22                I mean I had a sickness.  I was sick.

23  I had an addiction, and I just happened to get

24  caught with the drugs.

25         Q.     Okay.  Did you serve any time for that

168

1    conviction?

2            A.     I was put on probation.

3            Q.     Probation.  Okay.

4                   Has either Maysonet or Justino Cruz or

5    Alfredo Gonzalez ever tried to reach out to you

6    either personally or through some type of

7    intermediary?

8            A.     No.

9            Q.     Okay.  Did Jose Maysonet ever apologize

10   to you for implicating you in this murder?

11                  MS. BONJEAN:  Objection to form and

12   foundation of that question.

13           A.     And the answer to that is, no, not now,

14   but before we went to trial, he did say that he was

15   sorry that this is happening to us, but since he was

16   referring to it as us, me and him, I don't consider

17   that an apology to me.  You understand.

18           Q.     Right.

19           A.     Okay.

20           Q.     And then --

21           A.     But, no, he has not reached out to

22   apologize for anything.

23           Q.     Okay.

24           A.     He has nothing to apologize for.

25           Q.     I think you said something along the

169

1    lines of like it didn't matter what the police did

2    to you back then.  You were not going to admit to a

3    crime you didn't commit, right?

4         A.     Correct.  I'm not going to admit to any

5    crime that I did not commit.

6               Now, if I did commit a crime and I did

7    admit to it, then that's on me, but I'm not going to

8    say I did something and I didn't do it or say

9    somebody else did something.  No.  I'm not going to

10   do that.

11        Q.     And then I just had like two more.

12               Back in March of 2017, did the state's

13   attorney's office interview you in relation to Mr.

14   Maysonet's case?

15        A.     Yes.  Yes.

16        Q.     Do you remember that interview?

17        A.     Yes, I do.  He sat right in my house,

18   1035 North Spaulding, sat right in my dining room

19   table, him, the state's attorney and the

20   investigator.

21               MR. RAHE:  Okay.  That's all I have.

22   Thank you.  Thank you, Mr. Goossens.

23               THE WITNESS:  You're welcome.

24   CROSS-EXAMINATION BY MR. LEINENWEBER:

25        Q.     Mr. Goossens, my name is Justin

170

1    Leinenweber.  I'm one of the attorneys for the

2    defendants.  I just have a handful of questions

3    following up on that.

4                    So, first of all, thank you for your

5    time today.

6                    And your name, it's Goossens.  That's

7    the proper pronunciation.  I know it's been used in

8    sort of every variation today.

9         A.    That's proper pronunciation.

10        Q.    You can imagine, with a last name like

11   mine, I can appreciate when a name is mispronounced.

12   It's a little bit frustrating.

13        A.    It's been happening my whole life.

14        Q.    I'm sure.  I'm sure.

15                    What's your date of birth?

16        A.    ███████████████

17        Q.    ██████████████.  Okay.

18                    And then what's your full legal name?

19        A.    Christopher George Goossens.

20        Q.    Okay.  And you said -- okay.  The house

21   that you lived at on Spaulding, that's your mom's

22   house, right?

23        A.    Correct.

24        Q.    And then the house on -- near Diversey

25   that you referred to where you were -- when you were

171

1  picked up at Damen and Diversey?

2        A.     Correct.

3        Q.     You were picked up at Damen and

4  Diversey in fall of 1990 for the Wiley brothers'

5  murder, correct?

6        A.     Correct.

7        Q.     And that was a short distance from your

8  sister's house, right?

9        A.     It was right across the street from my

10 sister's house.  Correct.

11       Q.     Okay.  I think you mentioned Lathrop

12 Homes.  Is that where her house was?

13       A.     That's where she used to live, Lathrop

14 Homes.

15       Q.     Okay.  And that's a pretty big complex,

16 right?

17       A.     Yeah.  It's the projects.  Yes, it was

18 at that time.

19       Q.     Now it's becoming luxury apartments.

20 So she lived in that complex somewhere?

21       A.     Yes.

22       Q.     And I just have a handful of questions

23 here for you.

24              So your interactions with Detective

25 Guevara that you referenced were limited to this

172

1    instance where he I think you said slapped you in

2    the back of the head and said I got you now?

3          A.      Yeah.

4          Q.      Okay.  And that was after that November

5    arrest, November 1990 arrest for the Wiley brothers'

6    murder?

7          A.      That was the day that I got arrested.

8          Q.      Okay.  So before that day, had you had

9    any interactions with Detective Guevara to your

10   knowledge?

11         A.      I've seen him, and, yes, he has stopped

12   me before with stop and frisk, things like that of

13   that nature.  As far as him hitting me before that

14   day, no.  He has -- he did not.

15         Q.      Okay.  And when you say he had stopped

16   me, I think you had -- you had kind of described a

17   scenario where -- and I don't mean to minimize this.

18   So please don't misunderstand me.

19                 You know, you had started to describe a

20   scenario where you might be hanging out on the

21   street corner with two of your friends and that's

22   sufficient enough for the police to come and stop

23   you, correct?

24         A.      Correct.

25         Q.      The interactions where Detective

173

1   Guevara stopped you prior to your November 1990

2   arrest, were they of that type?

3        A.     Yes.

4        Q.     Okay.  So, in other words, you have no

5   reason to believe that Detective Guevara was

6   targeting you specifically, you know, Christopher

7   Goossens, right?

8        A.     Well, in those instances, no.  He was

9   targeting the group.  No one was being targeted, and

10  if I was part of the group, and then in a sense,

11  yeah, I was a target.  Yes, In a sense, but, in

12  general, he was targeting the group or the call that

13  came in over the radio that said, hey, there's a

14  group of guys standing out here.

15       Q.     So it was, you know, use the sort of

16  cliche of kind of guilt by association?

17       A.     Correct.

18       Q.     What about the other officers you

19  described?

20              I think you described a Polish one, a

21  big one and a little one.  Had you ever had any

22  interactions with either of those three prior to

23  that November 1990 arrest for the Wiley brothers'

24  murder?

25       A.     No.  I don't think I've ever seen any

174

1  of those officers.

2       Q.      So you hadn't seen any of those other

3  officers prior to that arrest?

4               I'm sorry.  Go ahead.

5       A.      They were detectives.

6       Q.      Detectives.  Excuse me.

7       A.      And they were homicide detectives.  So

8  I believe -- I'm not sure, but I believe Guevara was

9  a day detective.

10      Q.      Okay.

11      A.      Those other detectives were homicide

12 detectives.  So, no, I never seen them before.  I

13 never committed a homicide before.

14      Q.      Okay.  So you hadn't seen those other

15 detectives previously, and the interactions with

16 Detective Guevara were of the sort of stop and frisk

17 variety as opposed to I'm physically hitting you and

18 interrogating you?

19      A.      Correct.

20      Q.      Okay.  Let me see.  The interaction you

21 did have with the detectives when you were

22 physically hit, okay, so I'm talking about this

23 November 1990 arrest date when you were physically

24 hit by the officers, did you -- you said you did not

25 tell anyone about that, right?

175

1       A.      Correct.

2       Q.      Not your attorneys, not your friends,

3   not anybody else, right?

4       A.      Well, probably I may have told my

5   attorney, but there was no hospital records.  There

6   was no way to prove that.  So we didn't -- we didn't

7   go in that direction.  So probably I told them, but

8   I doubt if I did.

9       Q.      Okay.  That's fair.

10              And you didn't tell your mom then as

11  well?

12      A.      No.  No.

13      Q.      Okay?  So then the physical -- and I

14  think you had just said there were no medical

15  records.  So you didn't have any kind of medical

16  treatment for you?

17      A.      No busted head where I had to get

18  stitches.  Nothing of that nature.  Just roughing

19  up.

20      Q.      Okay.  And I think the timeline that

21  you -- and correct me if I'm wrong here, but the

22  timeline you described -- and I know it was kind of

23  a little bit back and forth with Dave about the

24  timeline.  So I'm a little bit confused of that.

25              But I think what you said is you got

176

1    arrested, brought to the station and you had some of

2    that physical --

3             A.      Roughing up.

4             Q.      -- roughing up with the detectives.

5                     After that is when you had the anxiety

6    response with the hives, right?

7             A.      Correct.

8             Q.      And then you were taken to Cook County

9    Hospital?

10            A.      Correct.

11            Q.      And then you came back, and I think

12   that's when the polygraph was taken some point after

13   that?

14            A.      Correct.

15            Q.      Okay.  So in addition to these other,

16   you know, questions I'd asked you about whether or

17   not you told anyone about the sort of injuries, you

18   did not tell anyone at Cook County that you had been

19   assaulted by the officers then, right?

20            A.      No.  No, I did not.

21            Q.      And when I say Cook County, you

22   understand I mean Cook County Hospital?

23            A.      Cook County Hospital.  No.  No nurse.

24   No nothing.

25                    I wasn't there for the assault.  I was

177

1   there because I was breaking out in hives, and,

2   plus, I mean I had a police officer there with me.

3   I wasn't going to say, hey, they're beating me up

4   while this guy is standing here.

5          Q.    Okay.  And so fair to say you did not

6   have any necessity of medical care related to that

7   physical abuse from the officers?

8          A.    Correct.  I didn't have no medical care

9   from the abuse from the officers.

10         Q.    Okay.  And you didn't need any medical

11  care?

12         A.    And I didn't need any either.  No.

13         Q.    Okay.  And I'm not -- I'm not trying to

14  minimize what you say happened or anything like

15  that.

16         A.    No.  I know where you're going.  I know

17  where you're going.

18         Q.    Okay.  And then let's see.  After the

19  November 1990 arrest for the Wiley brothers' murder

20  and the interaction with Detective Guevara and the

21  three other detectives you described, after that

22  day, did you have any other interactions with

23  Detective Guevara?

24         A.    No.

25         Q.    Okay.  What about the other three

178

1   detectives that you described?  Did you have any

2   other interactions with them after that day?

3        A.    No.  I didn't have no interactions with

4   any of the detectives after that day.

5        Q.    Okay.  So in terms of physical abuse

6   from the detectives, it is exclusively limited to

7   that day of the arrest and the hours after the

8   arrest?

9        A.    Correct.

10        Q.    Okay.  When's the last time you spoke

11   with Jose Maysonet?

12        A.    Last time I spoke to Jose Maysonet I

13   was in trial.  That's the last time we got to speak.

14   I haven't spoken to him since the end of my trial.

15        Q.    Okay.  So back in 1995?

16        A.    Correct.

17        Q.    Okay.  Got it.

18             And you had said that you had -- you

19   kind of knew him as the 1.8 guy or there's the 1.8

20   guy or you said I think uno punto ocho.  That's my

21   terrible Spanish.

22        A.    One is uno.  Punto is point.  Ocho is

23   eight.  Yes.

24        Q.    Got it.  Okay.

25             So prior to -- prior to you guys

179

1    becoming cellmates, you and Maysonet, in the Cook

2    County Jail, did you ever have much interaction with

3    him or not really?

4            A.      Not really.

5            Q.      Okay.  So how often would you have

6    spoken to him I guess prior to -- prior to becoming

7    cellmates with him?

8            A.      I -- I never spoken to him.  I mean --

9    well, not that I've never, ever spoken to him.

10   There was a hi here, a bye there.

11                   You know, he spoke nothing but -- he

12   spoke entirely in Spanish, and my Spanish is not

13   that great.  Now it's a lot better, but it's

14   difficult to talk to somebody that's talking

15   Spanish, and I'm from Cuba.

16                   Well, my parents are from Cuba.  I'm

17   born in the United States.  So our Spanish is a

18   little bit different.

19           Q.      The dialect?

20           A.      And not only do I have to translate his

21   Spanish into my Spanish, process it in English into

22   my head and say it out in Spanish into a Spanish

23   that he is going to understand as well.  So it was

24   like a task to even talk to him before, you know.

25                   So it wasn't -- it wasn't something

180

1    that I did frequently.  I mean he passed by with his

2    music.  He might stop.  He might not, you know, and

3    it wasn't like he was always talking to me.  We were

4    a group of people standing on the corner.

5              You understand what I'm saying?

6         Q.    Yeah.

7         A.    So I already knew that he had

8    difficulties of communicating in English.  So that

9    kind of kept me away from him.

10        Q.    And your belief that he had difficulty

11   communicating in English is based on the fact that

12   he would primarily speak to you guys in Spanish when

13   he would stop and chat for a little bit?

14        A.    Yeah.  That's all he would speak was

15   Spanish.

16        Q.    Okay.

17        A.    You know, he threw in a couple English

18   words like bro, but things like that.  Like he would

19   talk in Spanish, and you understand, bro.  You know,

20   words like that.  Something like that.

21        Q.    Okay.

22        A.    Like English words in the whole

23   conversation, Spanglish.

24        Q.    And what did you do for the Latin

25   Kings?

181

1              MS. BONJEAN:  Objection to form and

2     foundation of that question.

3          Q.     Do you understand my question?

4          A.     No.

5          Q.     Okay.  Yeah.  Let me just back up then.

6                 You were a member of the Latin Kings,

7     right?

8          A.     Correct.

9          Q.     Did you have any duties or

10    responsibilities or jobs as a member of the Latin

11    Kings?

12         A.     No.  My duty and my responsibility was

13    to excel self.

14         Q.     What were the benefits that you

15    obtained by being a member of the Latin Kings?

16         A.     There was no benefits.  There was no

17    401K.  There was no retirement plan.  You know,

18    there was nothing like that.

19         Q.     Okay.  And did you ever -- you

20    described a few ways that -- and folks in your

21    neighborhood, I think fellow gang members in the

22    neighborhood made money.  You talked about how some

23    people had jobs obviously, and some people sold

24    drugs.  Some people kind of did whatever they had to

25    do.  That might include stealing.

182

1                 Did you -- did you ever sell drugs on
2      behalf of the Latin Kings?
3             A.      No.
4             Q.      Okay.  Did you ever have any -- any
5      other duties like being an enforcer or anything, you
6      know, you described about how -- let me just stop
7      you for one second because I just want to make sure
8      we're fair to Diane so that we're not talking over
9      each other because it can be very difficult.
10                So let me withdraw that question, and
11     let me kind of say this a slightly different way.
12                One of the other things you described
13     was that, if somebody, whether it be a fellow Latin
14     King, does something that they're not supposed to do
15     in your territory, it will get dealt with I think is
16     the words you used, right?
17            A.      Uh-huh.
18            Q.      And you also talked about how, if an
19     outsider came into the neighborhood to sell drugs,
20     it would be stopped, right?
21            A.      Yes.
22            Q.      Okay.  So my question is did you ever
23     have any kind of a role or responsibility with the
24     Latin Kings to do either of those things, to either
25     stop an outsider from coming in and doing something

183

1    or stop a fellow Latin King member from doing

2    something that they shouldn't be doing?

3                MS. BONJEAN:  Objection to form and

4    foundation of that question.

5         A.    As far as numbers-wise, you could say

6    we did it in a group, but, no, I wasn't the one in

7    the front directing traffic like you say.

8         Q.    Directing traffic is kind of a

9    euphemism you're using for stopping?

10        A.    For being a chief or anything like

11   that.  For being a chief or for being -- having

12   any -- you know, I was just a foot soldier.

13              I was just a number.  I was just one

14   that made the group larger, and it was more you're

15   not going to be scared of one person.  You're going

16   to be scared of 10 people.

17        Q.    Safety in numbers?

18        A.    Yeah, just numbers.  So I was just a

19   numbers guy.

20        Q.    Okay.  All right.  Let me see.  I don't

21   have too much more.  So thanks again for sort of

22   bearing with me.

23        A.    Take your time.

24        Q.    Were there any -- you said there were

25   lots of Fros in the neighborhood or there were other

184

1    Fros in the neighborhood?

2         A.    Yes.

3         Q.    Any other Fros have the first name

4    Christopher to your knowledge?

5         A.    To my knowledge, no.

6         Q.    Okay.

7         A.    I don't know.

8         Q.    Okay.  And I think you were asked

9    something along the lines of whether or not you knew

10   if Mr. Maysonet was selling drugs.

11               Do you remember that, that question

12   that you were asked just a little bit ago I think?

13        A.    Do I remember the question?

14        Q.    Yeah.

15               Do you remember being asked that you

16   were asked something along the lines did Mr.

17   Maysonet sell drugs?

18        A.    I don't remember the exact question.

19   You can ask it again if you want.

20        Q.    Yeah.

21               I think your testimony was that, at the

22   time, so back in, you know, early 1990s, that were

23   sort of the relevant time period here.

24        A.    The late '80s.

25        Q.    Late '80s, early, right, because I

185

1    guess everybody was picked up in 1990.

2                    So late '80s to 1990, did you have any

3    knowledge whether or not Mr. Maysonet sold drugs on

4    behalf of the Latin Kings?

5         A.    No.  I didn't have any knowledge that

6    he sold drugs on behalf of the Latin Kings.

7         Q.    Okay.  Other than the -- I think you

8    described it as kind of a clean, well cared for beat

9    up car.

10                   Was he a flashy guy with a lot of cash

11   or anything like that?

12        A.    No.  His car was the flash.

13        Q.    Okay.  And so do you have any knowledge

14   as to whether or not Mr. Maysonet was paying money

15   to any police officers or anything like that or

16   detectives or anything?

17        A.    Do I have any knowledge now?

18                   I've heard, but back then, no, I didn't

19   have any knowledge back then that he was paying off

20   the police to sell drugs.

21        Q.    Okay.  Let me ask it this way just to

22   kind of clarify.  Do you personally know, do you

23   personally have any firsthand knowledge that he was

24   paying protection money to any detectives or police?

25        A.    No.  I do not have any firsthand

1  knowledge.

2       Q.    And to the extent you have any

3  knowledge now, how did you come about that

4  information?

5       A.    Well, Sanchez's brother which I'm not

6  sure how he came to this information.  I'm not sure

7  how he came to this.  It could be hearsay.  So I'm

8  just saying what somebody told me.

9       Q.    Yeah.

10      A.    That his brother that supposedly killed

11 himself, self-inflicted gun shot wound was

12 supposedly killed by the police because he wasn't

13 paying his dues and that Guevara was part of that.

14      Q.    And your knowledge of that is based

15 on -- could you just clarify again who told you that

16 information?

17      A.    Sanchez's brother.

18      Q.    And what's his name?

19      A.    His name is Gilberto Sanchez or

20 Gilberto.  I'm not sure, because the G and H in

21 Spanish, you could spell it either way, and it would

22 sound like either Gilberto or Gilbert in English.

23      Q.    Okay.  And when did this conversation

24 take place?

25      A.    Oh, I'm not sure.  Maybe seven years

187

1    back.  I try not to be around the neighborhood

2    anymore.  I try not to associate myself with anybody

3    that had anything to do with my childhood.

4                    I try to work.  I try to come home and

5    just live my life now.  I spent 15 years in prison.

6    I don't want to waste any more time.

7         Q.    Did your drug use -- did that begin

8    prior to going into prison?

9         A.    No.  That was afterwards.  I was trying

10   to self-medicate myself, and, obviously, it didn't

11   work.

12        Q.    Okay.  Let's see here.  Just one

13   second.  See if I have anything else.

14                    How long were you and Mr. Maysonet

15   cellmates?

16        A.    I'm not sure.  Anywhere between six and

17   12 months.

18        Q.    Six to 12 months?

19        A.    Yeah.  I'd say six to 12 months.

20        Q.    And the timing of that was prior to

21   1995 and after 1991?

22        A.    Yes.  In between those years, '91 to

23   '95, yes.

24        Q.    Okay.  And other than that conversation

25   you had with Mr. Santiago's brother, any -- anyone

188

1    else ever tell you that Detective Guevara or anyone

2    else from the Chicago Police Department was

3    essentially kind of demanding protection money from

4    Mr. Maysonet?

5         A.    No.  Nobody ever told me that.

6              MR. LEINENWEBER:  Okay.  I think that

7    that is -- those are all the questions that I have.

8              So thank you very much for your time,

9    and I'll turn it over.  I think there's one or

10   possibly two more folks.  So we're getting to the

11   end, though.

12             THE WITNESS:  You're welcome.  Have a

13   good day.

14             MR. STEPHENSON:  Good afternoon, Mr.

15   Goossens.  If counsel's okay, if we could take five,

16   hopefully, I can get to the point here after

17   reviewing some notes and be quick if that's okay

18   with everybody before I begin my cross-examination.

19             MS. BONJEAN:  Who is this?

20             MR. STEPHENSON:  This is Mike

21   Stephenson on behalf of Defendant Di Franco.

22             MS. BONJEAN:  Okay.

23             MR. STEPHENSON:  Thank you.

24             MS. BONJEAN:  How long are we taking?

25             MR. STEPHENSON:  Five minutes.

189

1                    (Whereupon, a recess was taken.)

2                    MR. STEPHENSON:  We'll go back on the

3    record.

4    CROSS-EXAMINATION BY MR. STEPHENSON:

5         Q.    Good afternoon, Mr. Goossens.  Earlier

6    you were shown a statement that Mr. Maysonet gave to

7    the police.  You recall that statement, correct?

8         A.    Correct.  Yes.

9         Q.    You weren't present for that statement,

10   right?

11        A.    No, I was not.

12        Q.    You don't have any firsthand knowledge

13   as to what transpired when that statement was taken,

14   correct?

15        A.    No, I do not have any firsthand

16   knowledge of what transpired.

17        Q.    And we talked quite a bit about your

18   speaking abilities, English, Spanish.  I want to

19   revisit that.

20               So you grew up in a house where your

21   mother spoke five different languages, correct?

22        A.    Not inside the house.  I mean that was

23   her job.

24        Q.    Understood.

25               But you grew up in a house with a mom

190

1   that could speak five different languages.  Is that

2   correct?

3        A.    Yes.  My mom could speak five different

4   languages.

5        Q.    She spoke English?

6        A.    Yes.

7        Q.    She spoke Spanish too, correct?

8        A.    Spanish, Italian, Portuguese.

9        Q.    When you were speaking with your mom

10   growing up, what was the language that you used?

11        A.    She spoke to me in Spanish, and I

12   returned in English, and I'd return in English

13   because I was using English the most because, my

14   brothers and sisters, they went to school and they

15   taught me English.

16           So I heard both.  My brothers and

17   sisters talked to me in English.  My mom talked to

18   me in Spanish, and when we talked to her, we would

19   tell her in English or in Spanish.  She did both of

20   them anyways, but she would prefer that we talk to

21   her in Spanish.

22        Q.    Did you develop a proficiency in both

23   languages as you grew up?

24        A.    Yes.

25        Q.    While you were incarcerated with Mr.

191

1    Maysonet as your cellmate, did he ever talk to you

2    about the statement that he gave to the police back

3    in August of 1990?

4          A.    Yes.

5          Q.    What did Mr. Maysonet tell you?

6          A.    He said that they made him sign this

7    statement.

8          Q.    Did he tell you how they made him sign

9    the statement?

10         A.    I'm pretty sure he did.  Word-for-word

11   what exactly he said some 27 years ago, I really

12   can't recall, but I'm pretty sure it was in the

13   ballpark of they made me sign it, they forced me,

14   they encouraged me.

15         Q.    Did he identify who made those types of

16   remarks to him about signing the statement?

17         A.    He just said the detectives.  So --

18         Q.    Detectives plural?

19         A.    Correct.

20         Q.    Did he say when the detectives told him

21   to do that?

22         A.    No, he didn't.  I mean I don't recall

23   if he did tell me or not.  I mean I really couldn't

24   say.  This was a long time ago.  There's some things

25   I remember vividly and some things that I do not.

1       Q.    And do you remember anything vividly

2  that Mr. Maysonet told you about giving the

3  statement other than what you've already testified

4  to just a moment ago?

5       A.    No.  He's never told me anything other

6  than what I've testified to.

7       Q.    And when Mr. Maysonet was communicating

8  these statements to you about his own statement back

9  in -- that he made in August of 1990, what language

10  was he speaking to you?

11       A.    Spanish.  He was speaking in Spanish.

12       Q.    And did you understand him?

13       A.    Of course, yes.

14       Q.    And were you able to speak with him in

15  Spanish as well?

16       A.    Yes.

17       Q.    And did you make any comments to Mr.

18  Maysonet at that time in Spanish about this

19  statement?

20           MS. BONJEAN:  Objection to the form of

21  that question.

22       A.    I don't understand the question.  I'm

23  sorry.

24           MR. STEPHENSON:  If the court reporter

25  could please reread the question, and perhaps I can

193

1    help adjust it, the form.

2                    (Whereupon, record read as follows:)

3                    "Question:  And did you make any

4    comments to Mr. Maysonet at that time in Spanish

5    about this statement?"

6        Q.    So the statement I'm referring to is

7    Mr. Maysonet's statement that he made to the police

8    in August of 1990.

9                    Now, did you communicate to Mr.

10   Maysonet about that statement in Spanish to him

11   while you guys were incarcerated together?

12                   MS. BONJEAN:  Objection to form and

13   foundation of that question.

14       A.    If -- Maysonet with me only spoke

15   Spanish because he knew I knew Spanish.  There was

16   no reason for him to talk to me in English which I

17   would have preferred him to talk to me in Spanish

18   anyways.

19       Q.    Did he ever talk to you in English?

20       A.    I prayed many nights that he did not

21   try to talk English if you could understand what I'm

22   saying.  He has a real broken English.

23       Q.    So the other question I had is did

24   you -- did you make any statements or comments to

25   him about the statement that he gave to the police

194

1  in August of 1990?

2      A.    Did I make any comments about the

3  statements to him about the statement?

4      Q.    Yeah, there you go.  You got it.

5      A.    I mean we were having a discussion.  I

6  don't know what comments I would have made.

7      Q.    That's what I'm trying to get at.  You,

8  obviously, had a conversation.  I'm assuming that

9  you didn't sit there and say nothing or maybe you

10  did.  That's what I'm asking.  That's all I'm

11  getting at.

12      A.    No.  No.  We were going back and forth

13  about all the statements where he's naming me too.

14  You know, I wanted to get to the point of why did

15  you name me, you know, and he was like they forced

16  me to sign it.

17      Q.    Okay.  So that's what I'm getting at.

18  What did you tell Mr. Maysonet?

19      A.    I asked -- I asked him why was he

20  naming me in these statements?

21            I mean that was probably one of the

22  conversations that we had, but to get into

23  word-for-word vividly, I'm sorry, I can't.

24            That was a long time ago, and it was in

25  a place where we're in a cell.  We're in a jail.

195

1 There's a lot of things going on around me at that

2 time to remember a conversation from jail. You

3 understand.

4     Q.    I do, and I'm just asking you to

5 testify to the best of your recollection.

6          If you don't remember something, that's

7 fair, and that's the way these things go.

8          Did you have a copy of the statement

9 with you in the cell with Mr. Maysonet?

10     A.    Yes.  I had my copies that my attorney

11 gave me.

12     Q.    And to the best of your recollection,

13 when you asked him why -- Mr. Maysonet, why did he

14 name you, what was his response?

15     A.    Because they forced me to.  They made

16 me sign it.  That's -- he didn't say force me.  They

17 made me sign it.  I don't know how they made him

18 sign it, but that's the word he was using.

19     Q.    Okay.  So other than that, what else

20 did you discuss, you and Mr. Maysonet, when you were

21 cellmates about this statement that Mr. Maysonet

22 gave to the police in August of 1990?

23     A.    What else did we discuss?  I have no

24 recollection of what else we discussed.

25     Q.    So it was just that one conversation

196

1   that you just testified to a moment ago that --

2        A.    No, it's not.

3             MS. BONJEAN:  Objection to the mis --

4   hold on.  Objection to mischaracterizing his

5   testimony, and, yeah, objection to

6   mischaracterization of the testimony and the form of

7   the question.

8             MR. STEPHENSON:  Okay.  So two things I

9   just ask for.  Let me get my question out and then

10  you can state the objection.  I kindly ask that.

11       Q.    The other part is, you know, Mr.

12  Goossens, just let me get my question out and then

13  you'll get your answer out.  I promise, and I'm not

14  here to mischaracterize.

15            So if there is something that appears

16  to be a mischaracterization, by all means, I want

17  you to correct it.

18            MS. BONJEAN:  Okay.  Ask the question.

19  Ask the question.  Go ahead.

20            MR. STEPHENSON:  Okay.  Thank you.

21       Q.    So, Mr. Goossens, any other

22  conversations that you recollect as you sit here

23  today with Mr. Maysonet that you had about this

24  statement that Maysonet gave to the police in August

25  of 1990?

197

1      A.    No.  There's nothing else that I could
2  recollect about this.

3      Q.    Okay.  Thank you for that.  One moment
4  please.

5      A.    Sure.

6           MR. STEPHENSON:  All right.  I have
7  nothing further for Defendant Di Franco.  I'll pass
8  the witness.

9           MS. BONJEAN:  There's no one to pass it
10  to.

11           MR. STEPHENSON:  There's no redirect
12  then?

13           MS. BONJEAN:  I don't have any
14  redirect.  That means you're done, Mr. Goossens.

15           MR. BRUEGGEN:  Jennifer, do you want to
16  explain signature just in case?

17           MS. BONJEAN:  So, Christopher, you have
18  a right to review the transcript of the deposition,
19  and, again, it's really more to make sure the court
20  reporter accurately transcribed everything that you
21  have testified to.

22           You have the right to do that.  You
23  don't have to.  You can waive that, but it's your
24  choice.

25           THE WITNESS:  I would love to have a

198

1   copy of the deposition just for my records.

2              MS. BONJEAN:  Okay.  Well, we will --

3   then we'll reserve for signature, and we'll make

4   sure that we order a copy and provide a copy to Mr.

5   Goossens.

6              THE WITNESS:  Thank you.

7              MR. STEPHENSON:  For the record,

8   Defendant Di Franco will order an etrans please.

9              MR. BRUEGGEN:  Mr. Goossens, thank you

10  very much for your time.  We appreciate you having,

11  you know, to relocate to do this.  It's appreciated.

12             THE WITNESS:  It's fine.  I'm not

13  really computer savvy.  So I had to -- I always

14  heard about Zoom, but I never got Zoomed in.  So

15  this is my first day.

16             THE COURT REPORTER:  If counsel could

17  just stay on the line, I'll call your name and ask

18  you if you want a copy of the transcript.

19             Mr. Leinenweber.

20             MR. LEINENWEBER:  I'm good for right

21  now.  Thanks.

22             THE COURT REPORTER:  Mr. Brueggen.

23             MR. BRUEGGEN:  Yes.  I will take a copy

24  of the transcript.  If plaintiff orders the

25  original, I'll take an electronic copy.

199

1                    THE COURT REPORTER:  Okay.  Mr. Rahe.

2                    MR. RAHE:  No.  Thanks.  We don't need

3    the taxpayers paying double.

4                    THE COURT REPORTER:  And Mr. Brener.

5                    MR. BRENER:  No.  Thank you.

6                    (Deposition concludes at 4:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

200

1                    CERTIFICATE OF OFFICER

2

3

4              I CERTIFY that the foregoing is a true

5    and accurate transcript of the testimony and

6    proceedings as reported stenographically by me at

7    the time, place and on the date as hereinbefore set

8    forth.

9              I DO FURTHER CERTIFY that I am neither

10   a relative nor employee nor attorney or counsel of

11   any of the parties to this action, and that I am

12   neither a relative nor employee of such attorney or

13   counsel, and that I am not financially interested in

14   the action.

15

16
            DIANE M. HOLMES, C.C.R.
17          Certificate No. XI01660

18

19

20

21

22

23

24

25

## A

**a/k/a (1)**
43:16
**abandoned (2)**
122:15;151:24
**abiding (1)**
58:20
**abilities (1)**
189:18
**ability (2)**
17:8;69:4
**able (6)**
23:6;24:1,22;50:19;
68:12;192:14
**above (6)**
19:9,16;112:15,16,
16;120:9
**Abrams (8)**
50:6,6;131:7,8,10;
132:2,3;154:25
**absolutely (2)**
63:7,8
**abuse (3)**
177:7,9;178:5
**accept (2)**
54:5;61:2
**acceptable (1)**
111:11
**accompanied (1)**
82:6
**accompany (1)**
82:3
**according (2)**
82:14,20
**account (1)**
60:22
**accountable (3)**
159:17;160:17,20
**accurate (5)**
13:7;102:3,4;113:4,
6
**accurately (1)**
197:20
**accused (7)**
33:12,15;120:13,
14,19,22;121:10
**acquaintance (1)**
15:15
**acquittal (3)**
92:22,23,24
**acquitted (6)**
86:13,14;89:16,17,
19;142:3
**across (2)**
42:5;171:9
**act (1)**
61:5
**action (4)**
53:2;59:19;118:7,
14
**activities (1)**

**141:10**
**activity (6)**
11:7;108:17;120:3,
4,6;166:17
**acts (5)**
54:25;106:6,7;
141:17;160:17
**actual (1)**
158:15
**actually (17)**
26:7,19;34:23;
35:19;53:11,15;57:9;
65:23;66:25;85:21;
86:3;96:1;120:13;
148:9;153:3;154:18;
162:11
**addiction (1)**
167:23
**addition (3)**
133:16;135:10;
176:15
**additional (1)**
93:3
**address (12)**
5:1;9:9,11,17,20,
23;43:4,5,6,8,9;44:25
**adjust (1)**
193:1
**admit (3)**
169:2,4,7
**adversaries (1)**
88:4
**advise (2)**
67:24;141:17
**advised (2)**
47:1;67:20
**affiliate (3)**
11:14;94:25;96:11
**affiliated (16)**
11:19;18:18,22;
32:14;94:4,8;95:1,21;
96:1;107:12,21,25;
115:23;119:19;
156:21,22
**affiliates (2)**
32:19;96:6
**affiliation (5)**
94:3,12,17;96:7;
107:23
**afraid (1)**
57:13
**African (8)**
22:7,8;30:25;32:7;
33:5;42:13;115:4;
125:15
**Afro (3)**
38:24;93:16,19
**A-F-R-O (3)**
93:16,17,18
**afternoon (2)**
188:14;189:5
**afterwards (1)**
187:9

**again (20)**
8:19;14:5;20:18;
33:7;50:19;54:8;
67:25;69:2;73:16;
77:1;95:4;115:22;
125:25;127:22;
145:15;153:15;
183:21;184:19;
186:15;197:19
**against (7)**
68:6;139:12;
157:16;163:9,15;
164:5;167:9
**age (4)**
19:15;28:19;95:8;
101:8
**ages (1)**
19:13
**aggressive (1)**
164:22
**ago (13)**
23:1,3;30:23;91:10,
10,11,12;184:12;
191:11,24;192:4;
194:24;196:1
**agree (2)**
77:20;78:5
**agreed (2)**
128:15,16
**ahead (18)**
13:18;52:19;61:11;
72:8;74:16;83:2;99:9;
106:22;112:2;118:9,
11;135:20;156:2;
158:24;159:8;162:21;
174:4;196:19
**airport (1)**
17:21
**Akin (1)**
104:20
**al (1)**
5:11
**Alamo (6)**
28:12;112:22,24;
162:3,9,11
**A-L-A-M-O (1)**
28:13
**Alfredo (8)**
18:5,20;19:25;
63:23;135:6,9;
152:10;168:5
**alias (1)**
43:18
**aliases (1)**
113:8
**alibi (2)**
155:17,20
**alleged (1)**
111:19
**allegedly (7)**
43:5;60:6,15;63:21;
82:13,16,25
**alley (2)**

**51:2;78:25**
**allows (1)**
135:24
**almost (2)**
64:3;122:13
**alone (2)**
73:1;138:24
**along (9)**
11:7;104:5;105:1,3;
112:2;153:13;168:25;
184:9,16
**alternative (2)**
86:3,4
**always (7)**
11:19;51:18;52:25;
58:23;162:9;180:3;
198:13
**amateur (1)**
41:3
**Amendment (5)**
139:15,19;141:19,
25;144:22
**America (1)**
159:22
**American (6)**
22:7,8;31:1;33:5;
42:13;69:15
**Americans (3)**
32:7;115:4;125:15
**and/or (1)**
45:22
**answered (4)**
52:18;80:6;150:25;
156:2
**anxiety (1)**
176:5
**anymore (1)**
187:2
**anyways (3)**
60:2;190:20;193:18
**apartment (1)**
72:24
**apartments (1)**
171:19
**apologies (4)**
10:3;74:6,15;88:19
**apologize (4)**
134:23;168:9,22,24
**apology (1)**
168:17
**app (1)**
117:14
**appearance (1)**
6:9
**appearances (1)**
6:3
**appears (1)**
196:15
**appreciate (4)**
115:7;142:8;
170:11;198:10
**appreciated (1)**
198:11

**approve (1)**
106:19
**April (3)**
35:3;36:21,21,23
**area (46)**
9:14;10:9;13:22;
14:13;23:12,16,18,22;
24:9,18;25:8;33:1;
47:17;48:17;49:4,8;
52:15;55:6;57:23;
67:13;95:22;96:25;
97:22;101:9;103:12;
104:9;108:18;113:23,
25;114:8,12,14,17,18,
20,21;116:1,2;123:1;
126:8;127:21;128:8;
129:23;130:7;132:9;
140:4
**areas (2)**
15:1;23:7
**Armalio (2)**
142:22,23
**Armitage (3)**
103:18;104:3;116:4
**arm's (1)**
53:18
**around (25)**
24:14,15;32:17;
37:6;79:7;89:2;95:10;
98:12;100:8;102:15;
103:22;115:3;131:14,
17;140:13,15;142:16;
146:14;147:5,11,24;
158:17;159:1;187:1;
195:1
**arraigned (2)**
85:5;136:21
**arrest (15)**
44:20;45:23;46:3;
48:13;49:3;64:23;
172:5,5;173:2,23;
174:3,23;177:19;
178:7,8
**arrested (23)**
34:8,11;35:19;36:1,
7;43:10;44:16,23;
45:5,8,11;47:25;
52:14;88:6,10;123:7;
126:21;143:5;147:14,
15;154:8;172:7;176:1
**arresting (3)**
43:23,24;44:6
**articulate (1)**
56:22
**ASA (3)**
130:13,15,17
**Ashley (1)**
6:10
**Ashley's (1)**
6:9
**ass (3)**
51:1;58:17;160:7,
12

Maysonet v.
Guevara

Christopher Goossens

assault (1)
176:25
assaulted (1)
176:19
assert (2)
139:15,18
assigned (2)
26:10,21
assistant (3)
45:22;67:16;163:4
associate (5)
12:19;14:2;23:12;
108:4;187:2
associated (9)
14:14,23;20:22;
21:6,8;26:19;33:9,11;
151:8
association (3)
15:8;83:19;173:16
assume (3)
20:21;28:23;161:12
assumed (1)
161:1
assuming (5)
18:20;68:9;105:4;
123:14;194:8
attempt (2)
53:21;60:18
attend (1)
30:11
attention (6)
16:24;30:20,21;
44:5;45:19;89:6
attic (2)
154:20,21
attire (1)
75:18
attitude (1)
76:20
attorney (13)
6:10;67:17;90:19;
129:15;131:6;139:7;
141:7;142:13;154:25;
155:16;169:19;175:5;
195:10
attorneys (9)
6:2,12;45:22;88:24;
142:9;160:23;163:4;
170:1;175:2
attorney's (1)
169:13
audibly (1)
7:15
August (19)
15:7,25;17:9;18:6;
20:1;23:19;24:20;
25:1;81:4,5,8;82:5;
162:7;191:3;192:9;
193:8;194:1;195:22;
196:24
Augusta (4)
26:16;103:20,23;
104:1,4;116:3

Austin (2)
6:21;142:12
automatically (3)
23:12;76:14;95:21
Avenue (16)
5:2;15:2;31:2,17;
42:14;47:21;73:12,
18,21;80:2;109:19,
20;115:4,15,16;116:1
average (1)
118:21
awaited (1)
137:3
awaiting (1)
138:5
aware (10)
30:25;31:3;65:3;
75:10;141:7,23;
146:17,20,22,23
away (14)
22:25;30:9,15;
50:24;55:12;107:24;
109:6,8;110:3;
127:18;137:16;162:5,
8;180:9

## B

baby's (1)
22:11
back (82)
12:12,14,15,25;
14:18;21:17;23:19,
23;24:20;25:1;26:11;
31:5,6,15;38:12,22;
44:16;47:21;50:17;
53:8,11;57:16;59:2;
73:17;76:9,18,20;
78:16;85:3,5;89:16;
93:15,23;98:23;
108:1;112:4;118:5;
122:20;125:7,15;
126:14,15;127:21;
128:1,21;129:5,7,8,
21;130:7,19;132:12;
135:3,15;136:20;
144:4,16;145:17;
146:14;147:5;148:23,
25;149:3;158:3;
159:12,22;165:5;
169:2,12;172:2;
175:23;176:11;
178:15;181:5;184:22;
185:18,19;187:1;
189:2;191:2;192:8;
194:12
background (1)
111:18
backseat (1)
147:21
bad (7)
24:17;37:9;48:25;
49:1,2;156:5,12

bail (2)
36:1,13
bait (1)
51:25
Balaine (1)
147:9
ballpark (1)
191:13
banged (1)
17:3
barely (1)
72:18
based (9)
20:21;68:11;
132:20;133:10,14;
134:15;135:1;180:11;
186:14
basically (8)
16:12;19:5;76:12;
97:21;103:13;118:21;
125:21;136:8
basis (5)
23:9;63:13;118:3,6;
133:19
basketball (1)
16:17
Bates (1)
66:14
baton (1)
88:4
bearing (1)
183:22
beat (10)
51:1,2,3,3;57:1;
58:16;136:7;159:13,
13;185:8
beaten (5)
159:2,6;160:3,24;
164:14
beating (2)
167:21;177:3
became (4)
20:3;33:11;84:5;
94:10
become (4)
27:1;30:24;31:3;
134:3
becoming (3)
171:19;179:1,6
beep (1)
157:20
begin (2)
187:7;188:18
beginning (3)
102:10;140:5;
161:24
behalf (7)
6:25;7:2,4;182:2;
185:4,6;188:21
behavior (1)
52:15
behind (1)
121:3

belief (2)
134:14;180:10
Bello (2)
149:18;150:7
Belmont (5)
26:14;34:13;
126:22,24;148:3
below (2)
44:19;105:15
Benadryl (1)
126:13
bench (2)
86:18;140:1
benefits (2)
181:14,16
besides (1)
96:18
best (5)
7:15;14:17;15:23;
17:7;26:7;32:14;
48:15;75:5;86:21,22;
90:16;195:5,12
better (1)
179:13
big (19)
14:16;31:18;97:9;
104:9;110:20,20;
115:16,20,21;124:19;
125:1;129:25;130:3;
159:5,10,10,14;
171:15;173:21
bigger (3)
26:13;119:6;125:1
bike (1)
99:7
bilingual (1)
27:19
birth (2)
162:1;170:15
bit (11)
40:3;53:7;142:16;
143:7;170:12;175:23,
24;179:18;180:13;
184:12;189:17
bits (1)
54:17
Black (9)
21:20,22;22:4;
42:13;76:11,13;
143:8;151:9,10
black-hooded (10)
74:2,7,9,17,21;75:3,
6,11,16;76:7
blah (7)
48:25,25,25;99:12,
12,12,12
blame (1)
62:17
block (23)
11:24;13:22;23:13;
24:8;96:13;97:12,15,
16,17;98:7,7,9,11,14,
15,17;103:25;104:1;

110:22,24;111:1,7;
116:15
blocks (7)
14:11,15;96:14;
97:8,9;110:3,25
blue (5)
143:20,20;149:13,
13;157:25
boils (1)
106:10
bond (5)
137:3;166:16,18,
20,23
BONJEAN (77)
5:7,9;6:1,6;7:5;
22:15;37:18,23;
39:11,21;40:1,8,11,
16,21,23;41:1;65:23;
66:3,7,10,17,20;74:6;
87:21,25;88:13,19;
89:1;90:5,22;91:1,14,
21;92:11;93:2,22;
94:16;104:16;106:2,
21;111:25;112:6;
116:21;117:18;
132:22;133:13;
134:18;136:16;
140:24;144:20;145:3;
150:6,19,24;151:18;
152:21;156:1;158:5;
159:7;160:18;162:21;
163:12;168:11;181:1;
183:3;188:19,22,24;
192:20;193:12;196:3,
18;197:9,13,17;198:2
Bonneville (2)
143:20,22
book (1)
50:23
Boom (1)
143:16
booming (1)
16:22
Born (4)
9:4;10:5;162:2;
179:17
borrow (3)
83:22,22,24
Both (6)
105:18;147:24;
163:4;190:16,19,22
bottom (1)
41:11;73:3,4;78:24
box (2)
151:20,23
boyfriend (6)
16:5;7;65:10;99:22,
24;102:7
boyfriend's (1)
65:10
break (8)
39:22;74:13;87:10;
106:18;117:13,13;

127:12;158:23
**breakdown (1)**
126:9
**breaking (2)**
126:9;177:1
**BRENER (4)**
7:3,4;199:4,5
**bricks (1)**
122:14
**brief (1)**
140:4
**bro (3)**
108:2;180:18,19
**broken (1)**
193:22
**brother (13)**
21:9;28:16,16;
65:13;107:21;112:12,
14,19;161:15;186:5,
10,17;187:25
**brothers (16)**
42:18,20,20;47:20;
62:5,9;91:18;101:1;
114:23;120:18;
132:18;136:24;139:3,
13;190:14,16
**brothers' (7)**
85:16;154:24;
155:18;171:4;172:5;
173:23;177:19
**brother's (1)**
107:5
**brought (10)**
36:3;84:12;120:18;
121:10,16;122:5;
127:6;128:10;148:1;
176:1
**BRUEGGEN (26)**
6:14,15,19;51:11;
52:17;53:13;55:10;
56:8;58:2;61:8;63:3;
66:13;68:14;70:23;
88:15,17,17,20,22;
112:3;136:18;142:5;
197:15;198:9,22,23
**buildings (1)**
151:24
**bumpers (1)**
17:3
**bus (4)**
17:17,19,21;28:9
**business (1)**
160:15
**businesses (1)**
146:19
**busted (1)**
175:17
**bye (1)**
179:10

## C

**California (2)**

114:10,13
**call (19)**
12:25;15:7,9,13;
49:22,24;50:4,11,12,
14,19,24;88:18;93:9;
130:21,22,25;173:12;
198:17
**called (14)**
9:14;21:20;49:25;
50:5,6;102:17;
130:25;131:12,20,21,
22,23;132:2;145:19
**came (34)**
16:12;32:20;33:17;
70:12;73:6,7;79:5,6;
81:14,15;92:2;99:11;
100:4,8;101:9;
108:20;112:4;117:3,
6;124:1;125:20;
130:13;131:13,19;
147:12;152:15;
154:16;161:21;164:5;
173:13;176:11;
182:19;186:6,7
**camera (1)**
159:11
**cameras (4)**
51:7;159:21,23,24
**can (86)**
7:6,16,24;8:7,11;
12:15;13:19;15:12;
17:7;19:23;20:14;
24:12;25:5;27:20;
28:8;33:6;34:25;
36:21;37:21,25;
38:23;39:11,23,24;
40:2,4,18,22,23;
46:16;48:15;49:25;
50:1,19;52:20,22;
57:16;58:9;61:11;
65:24;67:22;68:5,20;
71:6,10;74:13;76:1;
78:5;82:15;83:16;
84:10;87:10,11,19,23;
88:18;90:8,16,18;
91:9;92:14;93:14;
94:7;98:13;103:6;
116:24;121:18,21;
122:25;133:2,4;
141:3;144:1;153:15;
158:6;159:11;162:4;
164:18;170:10,11;
182:9;184:19;188:16;
192:25;196:10;
197:23
**capabilities (1)**
17:8
**car (62)**
15:16;16:19,20,23;
24:4,5,14,15;57:5,16;
61:17,18,21;74:23;
75:8;78:20;79:4,6,6;
82:13,16,21,22,24,25;

83:6,9,20,21,22,24;
99:3,7,12,13,13,15;
102:14;106:5;107:4,
5;118:17;121:1,2,5;
122:4,13,18,20;
143:17,18;149:3,5;
156:20,22,23;157:5,7,
21,23;185:9,12
**care (8)**
58:5;102:14;
111:11,12;117:8;
177:6,8,11
**cared (1)**
185:8
**Carl (1)**
10:13
**carrying (1)**
138:13
**cars (4)**
15:16;102:24;
103:1;157:18
**case (51)**
5:11;6:16,22;7:7;
32:24;35:20;36:12,
17;42:12;51:19;
55:20;61:6;62:16;
63:7,22;64:15;76:16;
84:24;86:10;89:20;
90:21;91:20;92:18,
21;98:24;111:19,20;
113:4;117:25;132:11;
133:8;134:4,12,15;
136:24;140:1;142:2,
3,13;154:24;155:22;
158:13,17;164:8,15;
165:17;166:1;167:3,
9;169:14;197:16
**cases (2)**
136:20;163:5
**cash (1)**
185:10
**caught (3)**
122:19;160:6;
167:24
**cause (2)**
98:12;109:9
**caused (1)**
95:19
**CCSAO (2)**
66:17;70:4
**celebrate (1)**
157:20
**cell (10)**
126:3,14;127:7,22;
129:1,3,9;130:20;
194:25;195:9
**cellmate (2)**
134:3;191:1
**cellmates (9)**
136:6;137:5,9,12;
138:1;179:1,7;
187:15;195:21
**cells (1)**

127:12
**Center (1)**
138:18
**Central (11)**
23:18,23;104:8;
114:9;123:2;126:25;
127:2;128:21,24;
129:5,8
**centralized (1)**
104:13
**certain (1)**
28:3;87:5
**chair (2)**
39:24;40:5
**chance (4)**
87:12;135:4,5;
148:12
**changed (1)**
84:6
**changing (1)**
62:16
**charge (3)**
104:15;105:11;
167:3
**charged (10)**
27:7;34:16;42:11;
84:1,5;85:12,13,16;
165:25;166:11
**charges (3)**
35:14;139:2;166:5
**charging (1)**
45:16
**chat (1)**
180:13
**Chicago (20)**
5:2;6:22;9:8,13;
10:5;11:15,18;16:10;
23:15;25:14,17;39:2;
48:18;49:8;96:14;
101:9;142:13;160:14;
161:1;188:2
**Chief (4)**
85:7,8;183:10,11
**chieftain (1)**
104:21
**childhood (3)**
9:19;52:24;187:3
**choice (1)**
197:24
**choose (1)**
141:19
**Christopher (12)**
8:22;43:1,15;46:11;
71:13,19;72:2,11;
170:19;173:6;184:4;
197:17
**circles (1)**
111:16
**circumstances (1)**
7:19
**Cisco (4)**
21:12;81:13;82:4,7
**City (12)**

6:22;9:7,13;10:5;
11:5,15,18;14:11;
25:13,17;96:13;
142:13
**civil (2)**
5:11;92:9
**claims (1)**
22:13
**clarify (6)**
94:4;100:19;
114:24;118:4;185:22;
186:15
**class (3)**
19:16;112:12,16
**classes (3)**
19:9;112:15,16
**clean (3)**
8:11;99:15;185:8
**clear (3)**
19:17;23:4;93:21
**cliche (1)**
173:16
**climb (1)**
154:22
**close (2)**
37:2;48:10
**close-knit (1)**
98:7
**closer (2)**
19:14;109:23
**closes (1)**
27:17
**clothes (1)**
123:15
**clue (2)**
60:17;101:10
**code (1)**
96:6
**co-defendant (2)**
20:3;91:16
**co-defendants (3)**
59:11;63:22;65:5
**co-defendants' (1)**
59:17
**coercion (1)**
59:5
**Cohen (2)**
90:6,22
**coincides (1)**
95:13
**cold (1)**
76:17
**Colon (8)**
34:9;44:12,13;
123:7,10,11,17,24
**color (4)**
76:13;149:6;151:7,
8
**colors (2)**
23:7,11
**combination (1)**
114:14
**comfortable (5)**

27:25;28:1,2;144:6;
145:6
**coming (4)**
58:14;129:12;
140:18;182:25
**comments (5)**
192:17;193:4,24;
194:2,6
**commit (7)**
53:17;75:15;
106:25;133:21;169:3,
5,6
**committed (4)**
53:16;75:11;
120:24;174:13
**committing (1)**
167:20
**Common (2)**
53:14;100:23
**communicate (2)**
17:12;193:9
**communicated (1)**
68:10
**communicating (3)**
180:8,11;192:7
**community (6)**
12:4,7,16,20;32:23;
113:17
**compare (1)**
76:12
**complete (1)**
103:15
**completely (2)**
122:16,16
**complex (2)**
171:15,20
**compound (2)**
54:2;84:8
**computer (1)**
198:13
**concerned (1)**
116:9
**concerns (1)**
145:8
**conclude (1)**
133:20
**concludes (1)**
199:6
**conclusion (1)**
136:11
**conduct (1)**
49:4
**confer (1)**
87:23
**conference (1)**
7:20
**confess (1)**
51:4
**confirm (2)**
41:6,18
**confiscated (1)**
39:2
**conflict (1)**

155:8
**conflicts (1)**
107:7
**confused (1)**
175:24
**confusing (1)**
163:16
**Congressman (1)**
76:10
**connected (1)**
26:20
**connection (9)**
5:16;33:4;34:2;
35:19;36:7;44:16;
88:7,11;101:2
**consider (1)**
168:16
**considered (3)**
20:19;21:16;53:1
**consistently (1)**
64:7
**constitutional (2)**
67:21;141:23
**consult (1)**
141:20
**contact (1)**
148:13
**context (3)**
89:4;100:11,17
**continuance (1)**
85:15
**control (1)**
104:14
**controlled (3)**
97:22;110:25;111:1
**conversation (8)**
138:25;160:1;
180:23;186:23;
187:24;194:8;195:2,
25
**conversational (1)**
17:24
**conversations (5)**
136:4,14;138:19;
194:22;196:22
**convicted (6)**
85:25;136:19;
138:13;141:15;142:2;
166:6
**conviction (4)**
141:3,4;162:16;
168:1
**Cook (20)**
7:4;35:13;36:12;
126:12;127:13,16,17;
132:12;137:1,2,6,13;
138:4,11;176:8,18,21,
22,23;179:1
**Coolbaugh (2)**
7:6;40:6
**cooperate (1)**
58:22
**cooperation (1)**

49:20
**cop (5)**
48:24;49:1,1,1,2
**copies (1)**
195:10
**cops (2)**
122:11,17
**copy (7)**
195:8;198:1,4,4,18,
23,25
**corner (14)**
14:16;41:7,8;45:1;
57:4;79:11;80:2;
97:10;98:5,5;102:24;
146:3;172:21;180:4
**Correctional (3)**
84:21;138:14,18
**Corrections (1)**
138:21
**Cortez (3)**
97:13,14;104:1
**Cotto (2)**
147:9,10
**C-O-T-T-O (1)**
147:10
**counsel (4)**
141:20;155:3,6;
198:16
**counsel's (1)**
188:15
**County (26)**
7:4;35:13;36:12;
37:13;85:4;126:12;
127:13,16,17;132:12;
133:22;136:21,22;
137:1,2,6,14;138:4,8,
11;176:8,18,21,22,23;
179:2
**couple (14)**
18:1;23:14;45:19;
66:15;77:1;78:14;
88:3;91:10,12;96:14;
110:3;118:23;162:15;
180:17
**couple-minute (1)**
87:10
**course (10)**
34:4;57:15;64:21,
25;74:3;80:14;
106:23;140:14;145:5;
192:13
**Court (28)**
5:12;7:16,23;8:11;
25:12,21,23,24;26:4,
7,7;27:14,16,17;
38:17;54:16;66:11;
68:6;87:3,24;144:15;
145:4;192:24;197:19;
198:16,22;199:1,4
**Courtroom (3)**
85:9;87:3;166:17
**courtrooms (3)**
25:13;26:13,19

**cover (1)**
165:13
**covered (2)**
89:1;142:17
**crack (1)**
108:1
**crapping (1)**
107:2
**crime (13)**
53:16,17;59:12;
75:15;120:15,22,23,
24;121:11;167:20;
169:3,5,6
**crimes (6)**
23:18;53:23;67:14;
75:11;106:25;120:10
**criminal (6)**
65:4;76:14;106:6,7;
141:9;154:23
**cross (3)**
37:13;110:8,13
**crossed (2)**
73:13;77:7
**CROSS-EXAMINATION (5)**
88:22;142:11;
169:24;188:18;189:4
**Cruz (39)**
18:12,16;19:4;20:6,
6,10;21:2,6,9;59:25;
63:6,23;64:17;78:21;
88:6;132:17;133:7,
20,25;134:14;135:6,
22;138:3,6,20;
144:11;152:10;155:9,
10,10;163:8,9,20,22,
23,24;164:4,7;168:4
**crying (1)**
32:21
**Cuba (2)**
29:4;161:20;
179:15,16
**cuffs (1)**
125:3
**current (1)**
112:23
**currently (1)**
91:7
**custody (16)**
36:3,18;43:15;
53:21;59:4;118:2,5;
123:6,19;130:23;
131:3;137:1,2;138:6;
155:22;166:18
**Cutlass (2)**
149:9;157:25
**cylinder (1)**
102:20

**D**

**dad (2)**
161:17;162:5
**daily (2)**

118:3,6
**Damen (6)**
44:21,25;45:1,4;
171:1,3
**dangerous (1)**
31:13
**darker (1)**
21:25
**date (12)**
35:8,19,23;42:5;
44:19;46:4;93:10,12;
119:1;155:17;170:15;
174:23
**dates (2)**
65:19,20
**dating (3)**
101:13;103:2;
147:11
**Dave (3)**
6:15;112:1;175:23
**day (24)**
10:2;24:15,16;26:9;
30:17;35:10;36:1;
55:16;69:1;85:15;
118:19;138:24;147:5,
13;172:7,8,14;174:9;
177:22;178:2,4,7;
188:13;198:15
**days (2)**
50:3;159:9
**DCFS (1)**
50:24
**dead (1)**
86:13
**deal (4)**
159:5,10,10,14
**dealt (1)**
182:15
**death (3)**
86:2,7;109:9
**deaths (1)**
85:16
**deceased (2)**
28:16;65:9
**deep (1)**
57:20
**defendant (7)**
6:16,21,25;7:2;
188:21;197:7;198:8
**defendants (3)**
19:7;155:15;170:2
**defendant's (1)**
26:2
**defended (1)**
155:15
**defender (1)**
139:9
**definitely (2)**
8:6;141:24
**definitive (3)**
121:13;132:16;
133:6
**definitively (2)**

133:20;135:24

**demanding (1)**
188:3

**den (1)**
56:25

**denied (2)**
49:18;126:1

**dep (1)**
140:5

**Department (5)**
23:15;49:9;137:2;
138:21;188:2

**depend (1)**
110:24

**depending (1)**
117:2

**deposition (11)**
5:15,18,20;89:10,
15;90:5,10,21;
197:18;198:1;199:6

**depressed (1)**
167:12

**describe (6)**
15:23,25;17:7;
110:7,14;172:19

**described (10)**
172:16;173:19,20;
175:22;177:21;178:1;
181:20;182:6,12;
185:8

**details (1)**
162:18

**detained (1)**
35:12

**detective (36)**
24:15,23,25;27:2;
34:8,9,15;47:18;
48:19,20;49:12;
50:15;59:9;67:4,5;
72:13;123:13,14,17,
25;124:2,5,5,7;125:1,
4;147:22;171:24;
172:9,25;173:5;
174:9,16;177:20,23;
188:1

**detectives (52)**
23:17,23,23;45:22;
46:1,3,17;47:7,14;
48:1;49:5;50:10;
52:16;55:6;57:23;
59:10,14;60:18;
64:12,15;123:9,23;
124:1,7,10,12,17,25;
126:11;127:3;129:17,
19,22;130:11;162:23;
174:5,6,7,11,15,
21;176:4;177:21;
178:1,4,6;185:16,24;
191:17,18,20

**determined (1)**
134:5

**develop (1)**
190:22

**Di (7)**
6:25;66:24,25;
67:15;188:21;197:7;
198:8

**dialect (1)**
179:19

**Diane (1)**
182:8

**died (1)**
116:13

**different (32)**
13:4;14:7;19:13,21;
26:24;27:20;36:7;
51:10;53:8;54:24;
64:4;94:22;96:24;
97:6,7,8;98:14,17;
104:10,24;109:2,15;
110:7;113:14,15;
124:5,6;179:18;
182:11;189:21;190:1,
3

**Differentiating (1)**
120:12

**differently (1)**
64:4

**difficult (6)**
11:5,9;12:19,22;
179:14;182:9

**difficulties (1)**
180:8

**difficulty (1)**
180:10

**dining (1)**
169:18

**DIRECT (1)**
5:7

**directing (2)**
183:7,8

**direction (1)**
175:7

**directly (2)**
42:5;141:4

**discuss (2)**
195:20,23

**discussed (1)**
195:24

**discussing (1)**
115:9

**discussion (4)**
94:2;117:15;
135:18;194:5

**discussions (3)**
73:18;134:17;
135:23

**disorderly (1)**
118:7

**distance (1)**
171:7

**District (5)**
5:12,12,13;114:3,4

**Diversey (6)**
43:5;44:25;45:1;
170:24;171:1,4

**Division (4)**
14:25;15:3;23:18;
114:10

**divisions (1)**
114:7

**divorced (3)**
148:21;149:2;
162:12

**document (2)**
66:14;89:23

**documents (5)**
7:7;41:18;89:10,12,
19

**dollars (1)**
87:6

**dominant (1)**
13:22

**Donald (2)**
31:12;104:18

**done (6)**
54:12;87:23;128:9;
133:15;134:8;197:14

**door (5)**
92:20;122:15,16;
144:2;149:14

**dope (5)**
51:4;73:12,19,21;
77:7

**double (8)**
84:19,23;85:5,23;
86:1;116:6,10;199:3

**doubt (2)**
63:5;175:8

**down (37)**
7:24;13:25;22:9;
39:12;41:8,12;43:11;
46:14;50:6;58:16;
70:6;71:4;72:21;
74:15;77:2;78:15,23;
81:2;82:15;104:3;
106:10;116:3,13,16;
117:12;122:13;126:2,
8;127:6,12;128:17;
130:19;157:13,14;
158:25;159:13,13

**downstairs (1)**
49:23

**Downstate (1)**
36:22

**drag (6)**
15:16;99:3;102:13;
157:10,12,15

**Drake (3)**
73:11,19,21

**draw (4)**
30:19,21;45:19;
69:23

**drawing (1)**
44:5

**drew (2)**
16:23;136:11

**drivable (1)**
122:14

**drive (2)**
57:7;149:3

**driving (10)**
24:4,14,15;82:21;
99:7;102:15,17,22;
103:1;123:15

**drop (7)**
10:24;50:25;56:12;
57:3,18,21;156:9

**dropped (6)**
11:2,12;30:1;56:20,
24;57:2

**drove (3)**
15:18;143:17;149:5

**drug (4)**
107:10;146:18;
167:9;187:7

**drugs (27)**
24:18;98:1;105:22,
25;106:5,19;107:10,
13;108:8,22;117:7;
119:9;140:8;146:13,
16;167:11,12,14,24;
181:24;182:1,19;
184:10,17;185:3,6,20

**dude (1)**
141:18

**dues (1)**
186:13

**Duk's (1)**
31:12

**duly (1)**
5:3

**during (9)**
12:25;27:7;59:5;
89:15;137:12,24;
138:4;158:15,22

**duties (2)**
187:9;182:5

**duty (1)**
181:12

**dying (1)**
30:15

**E**

**earlier (18)**
44:10,14;67:16;
80:23;83:6;90:1;
98:19;103:9;109:5;
113:2;114:22;132:15;
137:4;152:22;156:4;
163:11,24;189:5

**early (9)**
13:1;14:18;26:11;
53:12;143:25;158:3,
3;184:22,25

**eases (1)**
108:4

**east (1)**
96:23

**easy (1)**
20:13

**eat (2)**
56:25;107:2

**educated (2)**
28:4,5

**Edward (1)**
7:4

**Efraiin (1)**
88:6

**Efrain (12)**
20:6,6,9;21:9;
155:10;163:8,9,20,22,
23;164:4,7

**eight (1)**
178:23

**eighth (3)**
19:16;112:17,19

**either (14)**
60:21;70:4;94:23;
119:21;138:20;
159:25;168:4,6;
173:22;177:12;
182:24,24;186:21,22

**elaborate (4)**
25:5;48:12;51:15;
61:4

**electronic (1)**
198:25

**Elementary (1)**
101:20

**else (22)**
29:1;40:16;79:7;
83:21;102:23;115:12;
116:18;132:11;
133:15;135:24;
153:18,21;165:23;
169:9;175:3;187:13;
188:1,2;195:19,23,24;
197:1

**email (1)**
40:7

**encouraged (1)**
191:14

**end (11)**
15:3,4;30:21,24;
48:12;101:21,22;
102:8,10;178:14;
188:11

**ended (1)**
155:2

**enforce (1)**
105:7

**enforcer (1)**
182:5

**English (33)**
17:8,13,14,16,20,
24:25,25;27:23,24;
28:5;68:10;69:5,15,
17;72:18;179:21;
180:8,11,17,22;
186:22;189:18;190:5,
12,12,13,15,17,19;
193:16,19,21,22

**enough (6)**

84:17;85:20,22;
99:16;121:8;172:22
**enter (1)**
48:5
**enticement (1)**
58:4
**entire (3)**
9:12;73:2;104:9
**entirely (2)**
36:7;179:12
**equally (2)**
27:25;28:2
**especially (1)**
107:1
**essentially (2)**
35:23;188:3
**established (1)**
84:15
**estimate (1)**
52:23
**et (1)**
5:11
**etrans (1)**
198:8
**euphemism (1)**
183:9
**European (1)**
124:6
**even (20)**
8:8;24:8;33:1;
52:25;60:4;62:11;
63:12;69:19;72:25;
118:17,18;120:5;
121:7;124:24;150:4;
155:19;162:11;
164:13;166:11;
179:24
**evening (4)**
73:25;77:4,6;78:7
**events (2)**
61:7;157:22
**eventually (4)**
64:22;120:1;
130:13;139:1
**everybody (19)**
55:15;64:16;69:20;
74:16;96:4,7;98:8;
100:14,15;101:22;
113:18,18,20;122:18;
152:15;159:10;
160:13;185:1;188:18
**everybody's (3)**
64:16;111:3;115:17
**everyone (2)**
40:16;69:22
**evidence (1)**
84:17
**exact (1)**
184:18
**Exactly (5)**
42:2;80:24;92:3;
158:14;191:11
**EXAMINATION (1)**

5:7
**example (3)**
120:25;145:20;
165:12
**excel (1)**
181:13
**except (2)**
64:17;102:24
**exclusively (1)**
178:6
**excuse (7)**
25:9;56:3;58:17;
62:2;92:1;161:4;
174:6
**ex-daughter's (1)**
107:5
**exercise (3)**
86:15,16,17
**Exhibit (5)**
38:2;39:17;66:1;
71:6,10
**exhibits (1)**
66:12
**existence (1)**
103:1
**expand (1)**
121:21
**expect (1)**
156:11
**experience (9)**
49:10;52:13;53:20;
54:3;55:24;56:5;58:3;
62:16;84:22
**experienced (5)**
49:4;52:15;57:9,10,
23
**experiences (1)**
63:5
**expert (2)**
13:16;26:22
**explain (5)**
5:23;13:5;24:12;
164:18;197:16
**explained (2)**
67:16;140:11
**explanation (1)**
60:14
**expound (1)**
124:24
**extended (1)**
103:17
**extensively (1)**
134:4
**extent (4)**
28:3;108:7;151:2;
186:2
**ex-wife (1)**
148:14

**F**

**facilities (1)**
138:16

**Facility (3)**
84:21;138:14,17
**facing (3)**
35:14,16;86:2
**fact (4)**
52:6;84:1;89:22;
180:11
**faction (16)**
14:14,23;18:17,22;
20:23;55:19;97:10;
109:15,18,22;110:6,
12,13,15,24,25
**factions (7)**
14:7;97:7;104:10,
15;105:12;110:7,23
**factual (1)**
63:13
**failed (1)**
46:25
**fair (19)**
17:23;23:5,10;
27:19;28:22;31:15;
45:6;99:16;121:8;
134:13;141:13,14;
158:2,7,11;175:9;
177:5;182:8;195:7
**fall (2)**
28:19;171:4
**familiar (6)**
23:17,22,25;24:20,
21;67:5
**families (1)**
11:23
**family (16)**
14:3;16:13,14,18,
18;28:7,20;32:18;
38:15,16;39:1;65:15;
71:23;96:8;106:9;
113:20
**family-oriented (1)**
12:11
**far (11)**
10:17,20;28:5,6;
103:16,19;104:6;
106:1;167:20;172:13;
183:5
**fast (3)**
57:16;157:13,14
**father (5)**
12:8;29:3,6,13;
162:8
**father's (3)**
12:9;28:23;142:21
**fault (1)**
134:6
**fear (3)**
58:20,20,23
**feed (3)**
87:15,20;117:12
**Feel (4)**
19:22;84:22;144:6;
145:6
**feet (1)**

81:24
**fellow (5)**
144:3;151:15;
181:21;182:13;183:1
**Fernandez (17)**
29:8,10,11,14,16;
43:16,19,20;142:20,
25;143:1;161:3,6,7,8,
16,23
**festival (1)**
157:19
**festivals (1)**
157:22
**few (3)**
36:11;142:14;
181:20
**Fifteen (2)**
37:4;95:12
**fifth (7)**
19:16;139:15,18,
24;141:19,25;144:22
**fight (1)**
86:10
**fighting (2)**
11:4;36:17
**fightings (1)**
140:17
**fights (1)**
95:19
**figured (1)**
143:10
**file (6)**
38:17;39:14,18,23;
163:8,23
**find (5)**
88:5,10;102:7;
110:16;116:17
**finding (1)**
59:24
**fine (6)**
16:4;19:22;78:4;
87:21;151:6;198:12
**finish (5)**
8:10,15;19:23;
59:18;154:13
**firm (1)**
6:10
**First (37)**
6:1;7:12;8:19;9:6;
30:20;33:14;41:6,7,9;
49:12;59:19;60:5,8;
66:23;67:1;70:16;
85:11;89:18;91:1,5;
92:19;99:8;126:21;
127:5,11;135:12,13;
143:9;144:4;150:21;
160:10;161:14;
164:12;166:11;170:4;
184:3;198:15
**firsthand (8)**
23:9;60:22;133:10,
14;185:23,25;189:12,
15

**Fitzgerald (2)**
85:8,8
**five (28)**
19:11;23:1,2;27:17,
20;40:8,10,12;66:6;
79:22,23;81:7;
127:10;161:13;
162:13;188:15,25;
189:21;190:1,3
**flash (1)**
185:12
**flashy (1)**
185:10
**floor (1)**
122:19
**Floyd (1)**
159:12
**fluency (2)**
69:13,15
**folks (2)**
181:20;188:10
**followed (2)**
31:22;32:2
**following (1)**
170:3
**follows (2)**
5:6;193:2
**foot (1)**
183:12
**force (2)**
139:9;195:16
**forced (3)**
191:13;194:15;
195:15
**forget (1)**
71:13
**forgot (1)**
72:12
**form (29)**
53:13;56:8;63:3,16;
72:3;75:17;77:25;
80:13;83:12;92:11,
13;104:16;106:2,21;
116:23;132:23;
133:13;158:5;159:7;
160:19;163:13,17;
168:11;181:1;183:3;
192:20;193:1,12;
196:6
**formally (1)**
85:16
**former (1)**
75:6
**forth (3)**
12:10;175:23;
194:12
**found (3)**
34:18;36:20;134:11
**foundation (31)**
19:1;20:24;24:11;
52:18;54:2;55:10;
56:9;59:8;63:9,17;
68:17,19;69:7;70:23;

72:4;75:23,24;77:16;
83:12,14;84:7;
104:17;106:22;
116:23;132:23;
151:19;160:19;
168:12;181:2;183:4;
193:13
**four (3)**
81:6;123:25;124:9
**fourth (3)**
78:24;81:2;91:3
**fraction (1)**
138:9
**frame (3)**
48:10;153:23;154:1
**framed (1)**
77:13
**Francisco (2)**
21:12;88:6
**Franco (7)**
6:25;66:24,25;
67:15;188:21;197:7;
198:8
**Fred (1)**
67:5
**free (1)**
19:22;49:20
**freed (3)**
92:8,10,12
**frequent (1)**
25:14
**frequently (1)**
180:1
**friend (16)**
15:9,13;20:19;
21:17;49:25;50:5;
65:8;101:13;103:2;
130:25;131:2,12,19;
132:10;152:16,20
**friendly (1)**
23:9
**friends (17)**
13:2;17:11;20:16;
27:2;34:12;94:5;95:2,
5;100:24,24;122:12,
20;144:4;145:16,17;
172:21;175:2
**friend's (1)**
12:8
**friendship (3)**
83:18,18,19
**frisk (4)**
53:3,6;172:12;
174:16
**Fro (13)**
38:20,23;39:8;
70:12,17;71:11,12;
72:9;78:15;79:5,16;
81:13;82:7
**F-R-O (1)**
93:17
**front (11)**
79:5,5,5,15;85:7;

147:23;149:13;157:1;
161:13,14;183:7
**Fros (4)**
70:17;183:25;
184:1,3
**frustrating (1)**
170:12
**full (5)**
8:20,21;104:13;
165:4;170:18
**fully (1)**
100:6
**function (1)**
49:23
**funeral (3)**
30:12;112:7;152:4
**funny (1)**
114:6
**further (3)**
88:14;125:18;197:7

## G

**game (1)**
48:23
**gang (51)**
11:7,15,18,20;13:9,
10,17,21,22;14:8;
23:13;32:11;55:18;
56:12,20;57:3,20;
94:19,19,23,24;95:2,
6,18,21;96:2,9;97:23;
98:16,18;105:5,17;
116:18;119:8,19,21,
21;120:3,4,6;140:17,
22;144:3,25;151:8;
156:19,21,22;157:1;
166:16;181:21
**gangs (7)**
13:17,20;24:18;
56:7;96:18,24;140:18
**gang's (4)**
50:25;156:5,9,16
**gangway (1)**
51:3
**garage (3)**
122:15,15,16
**gas (5)**
34:11;45:3,4,5;
147:17
**gave (15)**
85:14;120:25;
121:25;133:25;140:1;
146:3,4,8;167:17;
189:6;191:2;193:25;
195:11,22;196:24
**general (7)**
91:9;96:25;98:10;
121:9;140:16;141:5;
173:12
**generally (2)**
14:6;141:9
**generation (1)**

99:18
**geography (1)**
14:11
**George (5)**
8:22;142:24;143:1;
159:12;170:19
**Gilbert (1)**
186:22
**Gilberto (3)**
186:19,20,22
**girl (2)**
83:23,24
**girlfriend (4)**
22:11;147:6;
149:18;150:10
**girl's (1)**
65:13
**given (5)**
63:21;83:9;96:2,6;
126:13
**gives (1)**
48:21
**giving (1)**
192:2
**glasses (1)**
44:2
**God (1)**
22:22
**goes (3)**
59:15;68:4;73:23
**gold (2)**
151:9,10
**Gonzalez (20)**
18:5,21;19:10;20:1;
59:25;63:6,23;
132:17;133:7,21,25;
134:14;135:7,23;
138:10,12,20;144:11;
152:10;168:5
**Gonzalez's (2)**
84:12;135:9
**Good (22)**
5:8;6:14,20,23,24;
7:3,20;12:1,15;9,13;
48:24;49:1;91:24;
121:17,19,22,23;
147:3;188:13,14;
189:5;198:20
**Google (1)**
97:13
**Goossens (49)**
5:8;6:15,20;8:22,
24;10:6;22:20;23:5;
28:14,23;29:1,12;
38:5;40:4,9,14;41:4;
46:17;66:21;83:14;
87:13;88:2,14,23;
92:14;93:14;113:2;
116:24;117:11,17;
132:15;133:2;134:8;
135:21;141:21;142:6;
145:3;169:22,25;
170:6,19;173:7;

188:15;189:5;196:12,
21;197:14;198:5,9
**G-O-O-S-S-E-N-S (1)**
8:25
**Goossens-1 (2)**
37:24;38:2
**Goossens-2 (5)**
39:14,17;40:15,21;
41:5
**Goossens-3 (2)**
65:25;66:1
**Gosens (4)**
43:1,15;46:12,17
**G-O-S-E-N-S (1)**
43:2
**gotcha (2)**
30:4;146:9
**grab (1)**
125:22
**grabbing (1)**
124:23
**grabs (1)**
48:19
**grade (4)**
19:16;112:17,17,19
**graduate (1)**
10:15
**graduated (1)**
19:10
**grammar (3)**
13:25;30:3,6
**Grand (13)**
23:18,23;26:15;
34:14;114:9,16;
123:2;126:25;127:2;
128:21,24;129:5,8
**gray (2)**
149:7,8
**Great (3)**
41:21;87:14;179:13
**Greenberg (16)**
6:8;22:13,18;39:19,
25;40:7,19,22,24;
41:3,11;44:1;66:5,9;
135:17,20
**grew (3)**
9:10;10:9;53:4;
189:20,25;190:23
**grill (1)**
145:1
**ground (3)**
5:22,23;7:10
**group (8)**
53:1;173:9,10,12,
14;180:4;183:6,14
**grouped (1)**
60:3
**groupings (1)**
97:6
**groups (1)**
104:24
**grow (1)**
16:15

**growing (5)**
10:9;12:4,7;25:17;
170:10
**grown (2)**
9:11;94:13
**guess (17)**
12:11;14:13,15,22;
15:1;26:1,2;44:15;
45:11;85:2;92:6;
102:19;111:13;112:2;
150:21;179:6;185:1
**guessing (6)**
124:15;128:8;
157:23;166:7,21,22
**Guevara (23)**
5:10;7:2;24:23,25;
27:2;34:15;123:24;
124:8;125:6,9,17,18;
130:2;171:25;172:9;
173:1,5;174:8,16;
177:20,23;186:13;
188:1
**guilt (1)**
173:16
**guilty (1)**
36:20
**gun (12)**
51:5;64:12,15,18;
79:12,14;125:22,22;
151:11,13,16;186:11
**guns (2)**
119:8;151:21
**gunshot (1)**
109:11
**guy (18)**
20:13,17;38:7;
79:19;99:11;129:25,
25;130:1,3,3,3;
145:19;146:3;177:4;
178:19,20;183:19;
185:10
**guys (18)**
32:10;48:24;57:4;
61:19,20;73:11,18,21;
77:7;79:9,10;80:16;
97:22;137:12;173:14;
178:25;180:12;
193:11
**guy's (1)**
57:7

## H

**hair (1)**
165:4
**hairstyle (1)**
38:24
**Haley (5)**
7:6;37:25;39:12,16;
40:1
**hand (5)**
27:12;40:14;64:13,
19;139:23

**handbook (1)**
75:14
**handcuffed (1)**
125:2
**handed (1)**
41:4
**handful (2)**
170:2;171:22
**handled (1)**
160:14
**hands (3)**
64:16;165:19,21
**handwriting (2)**
39:5,6
**handy (2)**
159:21,23
**hang (9)**
13:3;19:19,20;
29:23;83:13;97:22;
98:15;101:16;156:25
**hanging (6)**
20:16;23:8;57:5;
98:12;156:17;172:20
**happen (9)**
30:11;97:23;
108:14;115:25;
118:22;154:7;156:6,
12,12
**happened (27)**
30:18;55:16;57:11;
63:4;65:12;70:10;
73:5;76:10;78:25;
79:20,23;80:17;
81:11,15;116:7,17;
121:9,22;124:21;
130:18;131:21;
133:17;148:4,6;
160:22;167:23;
177:14
**happening (9)**
65:22;100:10;
111:7,9;116:10;
117:8;166:17;168:15;
170:13
**happens (1)**
57:13
**happy (2)**
62:12,14
**hard (1)**
16:11
**harm (1)**
56:6
**Harrison (9)**
26:15;114:8,15;
122:24;126:17;
128:22,25;129:4,12
**head (14)**
79:4;81:18,20;82:9;
107:1;125:7;165:4,5,
11,18,20;172:2;
175:17;179:22
**headed (1)**
8:9

**headquarters (2)**
104:23;128:9
**hear (5)**
7:16;31:22;82:23;
132:10;166:11
**heard (8)**
31:14;55:21;63:13,
18;140:1;185:18;
190:16;198:14
**hearing (1)**
166:25
**hearsay (1)**
186:7
**heat (2)**
116:13,16
**height (1)**
119:5
**held (3)**
117:15;135:18;
159:17
**hell (2)**
59:22;62:2
**help (3)**
7:7;62:23;193:1
**helpful (1)**
55:3
**helping (1)**
101:24
**Hernandez (8)**
71:15,16,20,22,24;
72:2,13,15
**Hey (8)**
55:15;57:6;65:11;
108:1;157:2;160:10;
173:13;177:3
**hi (1)**
179:10
**hidden (1)**
159:14
**hierarchy (2)**
105:14;150:22
**high (13)**
10:11,13,15,17,25;
11:3;18:14;95:14,17,
17;100:25;101:5;
148:17
**highly (2)**
24:8,10
**himself (2)**
80:9;186:11
**Hindsight (1)**
83:3
**hit (3)**
165:18;174:22,24
**hitting (2)**
172:13;174:17
**hives (5)**
126:10;127:13,18;
176:6;177:1
**hold (10)**
10:4;82:11;116:21;
126:6;135:17;140:24,
24,25;150:16;196:4

**holding (11)**
126:3,8,14,18;
127:6,12,22;129:1,3,
8;130:20
**home (20)**
17:21;27:12;28:7;
33:18;43:5;51:21,23;
52:2,6,10;70:9,20;
80:19;81:10;132:10;
154:10,12,15,17;
187:4
**Homes (3)**
34:9;171:12,14
**homicide (4)**
86:1;174:7,11,13
**homicides (1)**
120:10
**Honestly (1)**
143:11
**hood (2)**
76:10;79:4
**hoodie (4)**
76:11,13,14,17
**hooked (1)**
167:12
**hopefully (2)**
7:22;188:16
**hoping (1)**
124:23
**horns (1)**
157:21
**hospital (11)**
126:12,13;127:14,
16,17;128:12;164:24;
175:5;176:9,22,23
**hot (2)**
24:19;62:23
**hour (1)**
41:3
**hours (8)**
24:16;44:20;127:8,
9,10;128:23;130:22;
178:7
**house (35)**
33:17,18;34:1,7;
38:11,18;70:13;73:1;
81:14,16;82:4;91:2,2,
6,6;104:18;121:3;
152:23;153:1,3,5,6,8,
24;154:16;169:17;
170:20,22,24;171:8,
10,12;189:20,22,25
**houses (2)**
97:16;106:6
**Humboldt (8)**
9:15;96:15,16,17,
20;97:1;103:14;
115:14
**hundred (3)**
69:8,11,13
**hung (2)**
21:25;74:14

**I**

**idea (9)**
22:24;47:11;91:9;
121:9;125:23,23;
129:13;143:24;
166:10
**ideal (1)**
7:18
**Identification (3)**
38:3;39:18;66:2
**identify (9)**
6:13;8:19;23:6;
24:22;37:21;64:7;
71:6;124:24;191:15
**identity (1)**
103:3
**Illinois (4)**
5:3,13;9:8;138:21
**image (1)**
40:17
**imagine (2)**
53:8;170:10
**immediately (2)**
137:15;153:20
**implicate (3)**
60:19,21;80:9
**implicated (3)**
59:11;60:7;84:13
**implicating (1)**
168:10
**implying (1)**
99:2
**impossible (2)**
113:10,11
**imprecise (1)**
135:16
**impression (3)**
54:10,12;69:4
**impressions (1)**
54:8
**inappropriately (1)**
108:21
**incarcerated (3)**
138:4;190:25;
193:11
**incident (6)**
62:13;82:14,17;
84:1;100:9;119:1
**incidents (1)**
11:11
**include (1)**
181:25
**inconsistent (1)**
134:2
**indeed (1)**
146:6
**indicated (1)**
59:4
**indict (1)**
84:17
**indicted (3)**

84:13,19,23
**individual (13)**
12:24;18:4,8,11;
20:5,18,22;21:11,13,
19;22:21;121:25;
122:2
**individuals (10)**
18:2;23:13;30:25;
31:1,16;32:25;59:12;
60:6,16;62:18
**individual's (1)**
47:3
**inform (3)**
57:6;59:10;93:5
**information (16)**
31:23;32:1,2,5,9;
34:21;47:14;53:22,
22;54:5;58:11;82:24;
119:20;186:4,6,16
**informed (2)**
59:14;90:9
**initial (1)**
64:23
**initiation (1)**
94:14
**injuries (1)**
176:17
**innocence (1)**
128:6
**inquiry (1)**
140:4
**inside (4)**
51:6;117:3;157:7;
189:22
**insisting (1)**
47:13
**instance (7)**
21:17;64:6;154:2,4;
156:14;165:16;172:1
**instances (1)**
173:8
**interact (1)**
124:9
**interaction (5)**
122:3;125:17;
174:20;177:20;179:2
**interactions (17)**
68:11;69:3;113:3,7;
117:19;118:1;121:15;
125:18;136:3;171:24;
172:9,25;173:22;
174:15;177:22;178:2,
3
**interceptor (1)**
123:16
**interest (1)**
155:8
**Interesting (1)**
43:7
**intermediary (1)**
168:7
**interpret (1)**
75:21

**interpreted (1)**
26:3
**interpreter (4)**
25:12,21,23,24
**interpreting (1)**
27:8
**interprets (2)**
26:1,6
**interrogated (2)**
59:10;127:3
**interrogating (2)**
59:15;174:18
**Interrogation (12)**
48:18,19;49:8;59:5;
126:5,7;127:5,11,25;
128:2,4;159:25
**interrogations (1)**
27:7
**interrupt (3)**
8:15;118:10;134:9
**intervention (1)**
144:15
**interview (12)**
67:10,13;126:15;
128:11;129:2,9,10,11,
22;130:8;169:13,16
**intimidating (1)**
166:12
**intimidation (4)**
166:1,5,22;167:1
**into (29)**
11:11;36:3;38:17;
53:11;57:20;60:3;
62:12;76:9;94:13,14;
108:20;113:15;
117:22;118:2,4;
121:10;123:6,19;
131:17;156:16,23;
162:18;166:18;
179:21,21,22;182:19;
187:8;194:22
**introduction (2)**
66:24;67:9
**invention (1)**
145:4
**investigating (3)**
64:12,14;120:23
**investigation (1)**
162:25
**investigations (1)**
58:22
**investigative (4)**
37:19;39:14,17,23
**investigator (1)**
169:20
**invoke (3)**
141:19,25;145:7
**involve (1)**
52:9
**involved (29)**
32:6;33:12,16;60:9;
62:15,20,21;63:18;
80:16,17;82:8,14,16,

24;91:20;108:10;
120:15;132:17;133:8;
134:15;135:25;139:2;
140:22;142:1;144:24;
162:24;163:4,10;
164:7
**involvement (8)**
62:4;91:17;92:21;
126:1;141:6,9,16;
164:12
**IODC (2)**
155:21,21
**issue (1)**
144:25
**issues (4)**
95:19;144:22,22,23
**Italian (1)**
190:8

**J**

**Jail (30)**
35:13;36:12;37:15;
53:19;54:20,21;
58:12,18;85:4;
118:17;121:4;133:22;
136:21,22;137:6,14,
19;138:4,8,11;148:19,
22,23;154:3,5;167:3,
13;179:2;194:25;
195:2
**jailable (1)**
53:2
**jailer (1)**
49:23
**James (1)**
101:19
**Javie (1)**
145:20
**Javier (1)**
145:20
**Jeffrey (14)**
21:20,22,23;22:4,4;
83:5,6,8,19;88:9;
98:14;143:8,9,13
**Jeffrey's (1)**
82:25
**Jennifer (7)**
5:9;6:5;22:13;
39:19;66:13;162:17;
197:15
**Jersey (1)**
5:5
**Jesus (1)**
38:8
**Jew (2)**
22:17,19
**Jewish (1)**
22:14
**job (5)**
26:9,22,25;54:13;
189:23
**jobs (2)**

181:10,23
**join (5)**
11:15,17;72:5;
94:18;96:2
**joined (3)**
94:19;95:8;99:19
**joining (2)**
12:2;94:24
**Jose (30)**
5:10;12:24;14:18;
37:13;59:24;63:2,6,
22;65:24;66:1;70:20;
72:1;76:4;78:21;
82:20;91:15;92:23;
100:13;102:16;
109:22;133:24;
145:24,24;146:13;
149:17;150:9;152:6;
168:9;178:11,12
**Juan (5)**
12:24;14:18;59:24;
63:2;145:24
**Judge (2)**
85:8;87:4
**July (8)**
35:21,22;36:6,21;
37:8,10;162:6;167:4
**jumped (1)**
122:17
**jumping (1)**
89:2
**June (3)**
9:4;170:16,17
**Junior (2)**
12:25;14:19
**junkie (1)**
99:15
**jury (3)**
86:16,17;87:3
**Justice (1)**
85:7
**Justin (2)**
7:1;169:25
**Justino (20)**
18:12,16;19:4,14;
21:2,5;59:25;61:19,
22;63:6,23;64:17;
78:21;133:25;135:6;
144:11;152:10;155:9,
10;168:4
**juvenile (1)**
118:15

**K**

**Kedzie (9)**
97:13;104:5;114:9,
15;122:24;126:17;
128:22,25;129:4
**Kedzie/Cortez (1)**
97:14
**keep (6)**
71:3;78:23;87:18,

19;110:6;117:11
**keeping (2)**
44:22;71:4
**kept (6)**
47:8;12;61:13,16,
23;180:9
**kick (1)**
160:12
**kicked (1)**
160:7
**kids (3)**
50:24;55:12;99:9
**Kill (2)**
74:22;75:7
**killed (13)**
31:1,9,10;32:11;
60:13;115:10,13,14,
14,15;116:19;186:10,
12
**killing (1)**
167:20
**kind (30)**
11:12;15:1;17:3;
22:1,2;31:14;49:8;
89:2;94:22;95:4;97:6;
99:1,2;106:3;108:5;
117:5;126:19;172:16;
173:16;175:15,22;
178:19;180:9;181:24;
182:11,23;183:8;
185:8,22;188:3
**kindly (1)**
196:10
**King (50)**
12:9;13:4,9,17,21;
14:3,3,19;20:7,11,13,
14,14;57:7;63:19;
74:9,20;75:6,15;
81:14,21;82:4,7;
94:11;96:5,10;97:18;
98:17;104:2,21;
106:14;107:5;108:8,
25;109:13;111:3;
115:22,23;116:2,7,19;
120:5,8;132:4;
140:21;146:17;151:2;
163:24;182:14;183:1
**Kings (73)**
11:20;12:3,4,17,20;
13:6;14:6,8,14;18:17,
22;20:23;21:6,8,23;
23:7;32:3;63:14;75:1,
10,19;93:23;94:3,14;
95:9;96:1,18;97:2,3,4,
6;99:18;103:12;
104:10,14,25;105:3,
19,25;106:1,13,19;
107:14,18;108:9,12,
23;109:2;110:9;
111:12,18,22;115:9;
116:9,20;117:7;
119:24,25;140:18;
150:17,23;151:7,16,

20;152:1;180:25;
181:6,11,15;182:2,24;
185:4,6
**kiss (1)**
99:8
**knew (64)**
11:22,23;13:2;15:6,
8,17,19;16:3,5,8,13,
17;19:14,15;21:7,9;
22:1,23;30:5,5;32:15,
16;49:13;51:21;52:8;
54:16,17,19,22;60:8;
63:19;91:23;92:2;
98:8,14,20;99:22,24,
25;101:12;102:6,12;
103:1,3;111:12;
112:13;113:18,20;
116:12,16;119:18,18;
134:5;149:19,23;
150:2;160:13;163:10;
166:13;178:19;180:7;
184:9;193:15,15
**knowing (4)**
19:10;20:15;76:19;
109:5
**knowledge (24)**
26:8;32:6;49:18;
73:17;90:17;111:23;
132:21;133:1,11,15;
172:10;184:4,5;
185:3,5,13,17,19,23;
186:1,3,14;189:12,16
**knowledgeable (1)**
85:22
**known (6)**
43:19,20;57:10;
98:3;101:1;102:1
**knows (2)**
50:2;100:14

**L**

**labeled (1)**
38:20
**lack (1)**
54:2
**lady's (2)**
22:12;83:23
**language (2)**
62:2;190:10;192:9
**languages (2)**
27:21,23;28:1;
189:21;190:1,4,23
**large (1)**
13:9
**larger (3)**
13:17,20;183:14
**last (32)**
8:23;12:13;28:21,
23;29:7,9,14,16;
42:17;43:21;50:3;
63:10;71:14;72:12;
124:14;127:6;130:4;

140:4;142:20;143:11,
15;161:2,5,9,11,12,
22;162:3;170:10;
178:10,12,13
**late (7)**
12:25;14:18;53:12;
143:24;184:24,25;
185:2
**later (7)**
20:1;34:7;58:21;
63:12;84:1;103:2;
130:22
**Lathrop (3)**
34:9;171:11,13
**Latin (112)**
11:20;12:3,3,9,10,
16,19;13:3,6,9,17,21;
14:3,3,6,8,14,19;
18:17,21;20:14,23;
21:6,8;23:7;32:3;
57:7;63:14,19;74:9,
20;75:1,6,10,15,19;
93:23;94:3,11,14;
95:9;96:1,5,10,18;
97:1,3,4,6,18;98:17;
99:18;103:12;104:2,
10,14,20,25;105:3,19,
25;106:1,13,14,19;
107:14,18;108:8,9,12,
23,25;109:2,12;111:3,
12,18,22;115:9,22,23;
116:2,7,9,19,20;
117:7;119:24,25;
120:5,8;132:4;
140:18,21;146:17;
150:17,22;151:2,7,15,
20;152:1;180:24;
181:6,10,15;182:2,13,
24;183:1;185:4,6
**Latino (1)**
22:7
**law (6)**
54:14;68:6;106:18;
167:6,16,19
**laws (1)**
53:7
**lawsuit (1)**
92:17
**lawyer (9)**
50:5;67:17,18;86:5;
131:21,23;132:2,4;
141:8
**lay (1)**
107:1
**leader (1)**
102:19
**leading (4)**
51:11;54:1;58:2;
77:11
**learn (7)**
30:25;33:3,10;
42:12;111:21;114:25;
159:17

**learned (6)**
28:7;33:14;60:6;
69:18;114:23;167:7
**least (10)**
9:19;18:22;36:11;
42:24;50:2;102:2;
118:7;131:16;141:20;
151:3
**leave (2)**
119:14;124:4
**leaves (1)**
124:4
**leaving (1)**
50:9
**left (4)**
95:13,17;113:13;
130:19
**legal (3)**
8:20,21;170:18
**legs (1)**
87:10
**LEINENWEBER (18)**
7:1,2;54:1,7,11;
59:7;61:9;66:19;
68:16;77:11,25;
83:11;84:8;169:24;
170:1;188:6;198:19,
20
**length (3)**
13:23;103:11,12
**less (1)**
7:18
**lesson (1)**
167:7
**level (4)**
104:21;105:10;
108:5;152:1
**life (9)**
9:10,12;10:1;58:24;
62:16;72:24;73:2;
170:13;187:5
**light (1)**
143:20
**likelihood (1)**
83:8
**likely (1)**
163:25
**likewise (1)**
111:8
**limited (3)**
69:3;171:25;178:6
**Lincoln (1)**
149:5
**Lincolnwood (5)**
118:18,18;121:6,7;
122:5
**line (2)**
141:1;198:17
**lines (7)**
47:10;70:6;77:2;
78:15;169:1;184:9,16
**listed (1)**
44:6

**listen (1)**
48:1
**listened (1)**
27:11
**litigation (1)**
92:9
**little (30)**
16:7,21;21:24;53:7;
54:17;66:24;72:7;
93:16;94:18;97:15;
103:6;108:2;111:21;
112:1,12,14,19;125:4;
130:1;142:16;143:7;
149:16;158:23;
170:12;173:21;
175:23,24;179:18;
180:13;184:12
**L-I-T-T-L-E (1)**
93:16
**live (13)**
9:7,8,9,16;10:2;
11:6;32:17;58:24,25;
91:7;96:21;171:13;
187:5
**lived (18)**
9:18,22;11:20;12:4,
7;23:11,16;58:24;
73:1;95:20;96:2,4;
98:4,4;113:23;114:1;
170:21;171:20
**lives (1)**
45:3
**living (1)**
12:20
**Lluvia (18)**
18:9,21;19:10;20:1;
70:12,22;71:8;73:5,
24;78:17,20;79:3,14,
16;80:1;81:13;82:3,6
**loan (1)**
44:12
**location (1)**
44:20
**locked (2)**
55:16;65:13
**long (17)**
9:22;30:23;35:18;
36:19,25;48:7;97:17;
127:5;129:11,14;
137:8;158:25;167:13;
187:14;188:24;
191:24;194:24
**longer (2)**
22:22;155:16
**look (13)**
7:7;37:21;40:4;
41:6,17;67:8;71:6,9;
76:9,18;97:13;115:6;
167:18
**looked (3)**
90:1;99:2,4
**looking (16)**
12:11,14,15;33:22;

34:1,12,20,21;59:21;
61:22;85:23;92:6;
119:6,6;147:12,24
**lookout (4)**
61:18,19,20;64:18
**looks (5)**
36:16;42:23;72:6,
18;150:5
**loosened (1)**
125:5
**lot (18)**
11:4;7:16;23;19:13;
21:25;25:14;26:24;
27:11;28:8;29:24;
89:1;140:12;142:16;
152:7;166:16;179:13;
185:10;195:1
**lots (2)**
140:8;183:25
**loud (6)**
15:17;16:22;17:4;
57:6;157:23,24
**love (1)**
197:25
**Lowell (5)**
16:8,9;18:15;19:15;
101:19
**lower (2)**
43:12;152:1
**luxury (1)**
171:19
**lying (3)**
47:6,9,13

## M

**Macho (10)**
29:20,22,23;30:5;
109:6,8,12;112:4,11,
19
**maiden (1)**
112:24
**main (1)**
26:16
**mainly (1)**
162:22
**making (2)**
41:1;147:24
**mamas (1)**
22:11
**man (6)**
22:12;61:18;64:18;
76:13,13;83:23
**manner (2)**
52:9;159:2,18
**many (13)**
13:12;14:15;52:22,
23;100:8;110:25;
117:25;118:16;
120:13;121:9;127:8;
152:14;193:20
**March (1)**
169:12

**mark (6)**
37:19,23;39:13;
65:24;165:1,6
**marked (6)**
38:3;39:18;40:15;
41:5;66:2,5
**marks (1)**
48:12
**married (8)**
28:25;29:2,3;
148:19,24;149:2;
161:17,20
**marry (2)**
148:14,18
**marrying (1)**
29:1
**Martin (2)**
132:3;154:25
**Marty (2)**
50:6,6
**match (1)**
44:15
**material (1)**
89:1
**math (1)**
37:10
**matter (9)**
5:10;16:6;6:12:2;
36:8;44:16;88:7;
89:22;169:1
**maximum (2)**
138:16,17
**may (29)**
7:23;18:2,2;30:21,
21,24;31:15;42:6;
68:22;69:2;70:7,21;
73:17;78:21;80:4;
88:23;92:18;96:9;
125:15;141:7,19;
142:9;144:15;163:21;
175:4
**maybe (31)**
11:24;19:16;56:21;
65:15;69:9,10,16;
89:5;90:25;91:2;
95:10;97:16;100:24;
101:15;106:7,7;
107:4,25;110:2,2,2;
121:1,1;127:10;
130:22;137:11;
139:18;143:24;162:1;
186:25;194:9
**Maysonet (93)**
5:10;6:7,8,11;
12:24;14:19;15:25;
59:24;62:18;63:2,6,
22;68:10;72:1,11,17,
25;76:4;77:20;78:21;
80:8;82:21;86:21;
91:15;92:18,10,12,24;
93:8,9,12;98:20;
99:21,25;100:4,7,13;

101:3,5,8;102:2,13,
16;109:22;111:15;
132:16;133:7,20,25;
134:3,10,14,17;
135:22,23;136:2,4,15;
137:5,8,25;144:11;
145:24,24;146:13;
152:6;168:4,9;
178:11,12;179:1;
184:10,17;185:3,14;
187:14;188:4;189:6;
191:1,5;192:2,7,18;
193:4,10,14;194:18;
195:9,13,20,21;
196:23,24

**Maysonet's (20)**
17:8;65:9,24;66:1;
70:20;72:23;82:4,9;
101:12;102:6;110:13,
21;114:12;135:6;
147:1;149:17;150:9;
157:4;169:14;193:7

**mean (90)**
11:19;12:7;13:12;
15:19;16:5;19:10;
24:12,17,21;25:5;
27:1;28:3;29:5;32:14;
35:16;48:4;50:22;
51:5,15;53:4;56:19,
21,25;57:2,15;58:14,
24;60:1;61:1,23;
62:20;64:1;75:7,22;
76:5,8,18;81:3;87:2;
90:18;94:5,7;96:4;
102:22;106:5,10,14;
107:11;112:1;113:25;
115:11;116:15;
118:10;121:18;
122:12,13;125:23;
136:16;141:6,11;
142:2;150:3;152:12;
153:21;154:1;156:18;
159:5,9,13;160:7,22;
164:21;165:3,4,20,22;
166:15;167:17,18,22;
172:17;176:22;177:2;
179:8;180:1;189:22;
191:22,23;194:5,21

**means (3)**
92:12;196:16;
197:14

**meant (2)**
94:17;134:24

**medical (5)**
175:14,15;177:6,8,
10

**meet (1)**
19:4

**member (16)**
14:19,20;18:17,21;
23:6;65:15;75:1;94:5,
23;96:8;107:18;
119:24;181:6,10,15;

183:1

**members (16)**
13:13;16:14;23:16;
32:11;55:18;57:20;
94:6;95:2,6;105:17;
119:21,22;144:3;
146:17;152:1;181:21

**member's (1)**
107:21

**men (4)**
33:5;42:13,14;
63:15

**Menard (9)**
84:20;132:12;
136:14,17,18,20;
137:13,22;138:18

**mention (1)**
69:25

**mentioned (11)**
34:22;44:9;60:15;
80:23;99:21;117:18;
131:5;137:4;163:20,
22;171:11

**menu (1)**
47:12

**mess (1)**
157:3

**met (2)**
16:3;34:15

**meter (3)**
87:15,20;117:12

**method (1)**
109:3

**Michael (1)**
6:25

**Michigan (2)**
115:15,16

**middle (6)**
42:22;46:15;67:2;
96:21;101:20,22

**might (11)**
57:3;64:1;86:7;
91:3;107:25;120:23;
140:12;172:20;180:2,
2;181:25

**Mike (1)**
188:20

**miles (2)**
13:23;103:10

**millimeter (3)**
81:17,19;82:9

**mind (4)**
39:16;43:13;63:5,
11

**mine (1)**
170:11

**minimize (2)**
172:17;177:14

**minute (1)**
162:6

**minutes (8)**
40:8,10,12;79:22;
87:17,20,22;188:25

**Miranda (1)**
68:4

**Mirta (1)**
147:9

**mis (1)**
196:3

**mischaracterization (2)**
196:6,16

**mischaracterize (1)**
196:14

**mischaracterizes (2)**
15:11;74:5

**mischaracterizing (1)**
196:4

**mispronounced (1)**
170:11

**missed (1)**
151:5

**missing (2)**
50:3;153:21

**misstates (1)**
134:18

**misunderstand (1)**
172:18

**mitigation (1)**
86:4

**mixed (2)**
22:7;64:2

**mob (3)**
53:1;118:7,13

**model (1)**
143:25

**mom (22)**
9:17,19,22;25:12,
15;27:5,20;28:7;29:3;
50:1,1;54:16;112:21;
122:21;131:15,22;
162:12;175:10;
189:25;190:3,9,17

**moment (7)**
60:10;92:1,1;
148:24;192:4;196:1;
197:3

**mom's (8)**
26:22,25;27:18;
28:12;91:2;112:24;
162:9;170:21

**money (8)**
92:17;105:20;
106:8,12;181:22;
185:14,24;188:3

**monitoring (1)**
51:8

**month (2)**
36:14;91:10

**months (17)**
34:7;36:12,14,15;
37:4;118:24;133:23;
137:11,19,25;138:5;
149:1;162:6,7;
187:17,18,19

**Montilla (2)**
67:5,6

**more (24)**
12:10;15:2,2;21:24;
23:11;27:25;40:9;
51:9;70:24;72:7;87:9;
88:3;111:22;121:13,
13;133:4;134:10,11;
169:11;183:14;21;
187:6;188:10;197:19

**morning (7)**
5:8;6:14,20,23,24;
7:3;27:16

**Most (3)**
157:17;159:24;
190:13

**Mostly (1)**
49:2

**mother (13)**
12:9;25:10,16;
28:25;33:19;131:3;
154:12,17,18,21;
156:20,21;189:21

**mother's (7)**
28:11;91:6;107:5;
156:20;161:2,5,11

**mouth (6)**
51:25;115:1,1,3,8;
160:11

**move (3)**
112:2;140:3;151:5

**moved (1)**
112:3

**movie (2)**
61:24;62:1

**moving (3)**
11:4;131:14;139:1

**much (13)**
87:25;88:14;93:5;
99:5;100:21,22;
102:14;115:22;142:7;
179:2;183:21;188:8;
198:10

**mufflers (1)**
16:22

**murder (33)**
84:19,23;85:5,12,
24;86:1;91:18;116:6,
10;120:18,20,21;
125:14;132:18;
133:21;139:3,13;
154:8,24;155:18;
162:16,24,25;163:23;
164:7,15;166:1;
167:3;168:10;171:5;
172:6;173:24;177:19

**murders (4)**
33:4;81:24;120:7,9

**muscle (1)**
119:20

**music (4)**
15:17;17:4;157:24;
180:2

**must (1)**
151:4

**myself (7)**
14:2;52:9;60:21;
61:24;157:2;187:2,10

**N**

**name (103)**
5:8;6:5,15,21;7:1,3;
8:20,21,23;12:24;
18:4,11;20:5,12,15,
17;21:12,13,14;22:3;
24:23;28:11,12,23;
29:7;9,14,16,19;33:3,
9,10;34:9;42:8,17,21,
23,23,24;43:21;47:3;
60:2,12,15;62:12,14,
15;65:8;71:14,19;
72:10,12,20;77:1;
84:12,15;93:15;
103:3;112:22,23,24;
113:8;124:6,14;
125:20;135:7;139:10;
142:12,20,21;143:4,8,
9,12,15;144:1,5;
145:14,16,19;146:8;
147:8,9;149:20,24;
161:2,5,11,23;162:3,
9;169:25;170:6,10,11,
18;184:3;186:18,19;
194:15;195:14;
198:17

**named (5)**
50:5;71:22,23;
109:6;142:24

**names (8)**
42:13,16;43:24;
44:10;71:12;129:18,
21;161:9

**naming (3)**
144:6;194:13,20

**Nation (1)**
132:4

**nature (6)**
50:4;90:13;140:20;
165:15;172:13;
175:18

**near (2)**
80:2;170:24

**necessarily (2)**
23:8;27:1

**necessity (1)**
177:6

**need (11)**
7:7;40:9;47:6;61:6;
74:13;106:19;117:12;
158:23;177:10,12;
199:2

**needed (2)**
73:8,10

**neighborhood (69)**
9:12;11:21;15:4,20;
16:13;20:11,12;
21:24;22:1;24:7;

32:10,15,16,22;45:7;
50:25;53:24;57:3,17;
70:18;83:22;93:23;
95:5,6;96:3,5,12,16;
100:14;101:21;
102:23;104:25;
106:25;107:9,15;
108:8,21;109:1;
110:5;111:2,3,4,9,10;
113:14,16;114:5;
115:2,20,21,22,23;
116:11,14;117:4,7;
119:23;140:6,9,16,16;
156:19;157:15;
181:21,22;182:19;
183:25;184:1;187:1

**neighborhoods (1)**
98:6

**neither (1)**
49:23

**nervous (1)**
126:9

**New (1)**
5:4

**news (9)**
31:7,8,18,19;93:6,
7;115:16,20,21

**next (11)**
8:16;36:22;41:18;
46:9;48:20;72:15;
74:19;79:20;85:15;
87:19;153:9

**nice (11)**
8:11;15:16;16:19,
25;99:3,12,13,13,15;
102:14;125:6

**nickname (12)**
18:9;20:7;21:20;
29:20;38:22,23;
70:16;145:13,25;
146:4,4,6

**nicknames (2)**
144:5;145:17

**night (2)**
73:7;127:10

**nights (1)**
193:20

**nine (5)**
37:4;133:23;
137:19,25;138:5

**nobody (6)**
32:16;71:23,24;
83:20;107:3;188:5

**none (1)**
107:9

**Nope (1)**
62:7

**normal (2)**
51:12;54:13

**Normally (1)**
7:19

**North (21)**
5:2;9:9;15:2;31:1,

16;42:14;44:21,25;
47:21;73:12,18,21;
80:2;103:16;104:3;
109:19,20;110:9;
115:4;116:1;169:18

**Northern (1)**
5:13

**northwest (1)**
9:14

**Notary (1)**
5:4

**notes (1)**
188:17

**notice (2)**
80:8;153:21

**noticed (2)**
153:19;163:7

**November (21)**
44:20;45:11,23;
46:4;52:14;59:3;65:6;
117:24,25;120:15,17;
122:25;123:4,20;
158:13;172:4,5;
173:1,23;174:23;
177:19

**number (7)**
24:4;41:23;76:7;
93:9;114:4;121:13;
183:13

**numbers (4)**
41:21;183:17,18,19

**numbers-wise (1)**
183:5

**nurse (1)**
176:23

## O

**oath (2)**
5:5;84:16

**Object (12)**
53:13;55:10;56:8;
58:2;63:3,9,16;
133:13;145:5;163:12,
13,16

**Objection (60)**
15:10;18:25;20:24;
24:11;51:11,13;
52:17;54:1,6,7;58:7;
59:7;61:8,9;68:14,15,
16,18;69:6;70:23;
72:3;74:4;75:17,23;
77:11,15;80:5,13;
83:11,13,14;84:7;
92:11,13;104:16;
106:2,21;116:21,22,
22;132:22,22;134:18;
150:19,24;151:18;
156:1;158:5;159:7;
160:18,18;168:11;
181:1;183:3;192:20;
193:12;196:3,4,5,10

**objections (2)**

54:11;77:24

**observed (1)**
80:3

**obtained (1)**
181:15

**obvious (1)**
56:22

**obviously (8)**
7:18;27:18,19;
111:22;141:18;
181:23;187:10;194:8

**occasion (2)**
129:16;143:5

**occasions (6)**
47:5;57:12;93:3;
119:11,16,17

**occupy (1)**
14:15

**occurred (4)**
31:21;47:20;48:3,
16

**occurrence (1)**
42:6

**ocho (3)**
102:18;178:20,22

**o'clock (1)**
27:17

**October (3)**
36:2,2;81:3

**off (22)**
9:19;35:23;40:12;
50:25;56:12,20,24;
57:2,3,7,18,21;69:18;
74:12;89:9;103:25;
104:1;117:15;122:16;
135:18;156:9;185:19

**offender's (1)**
42:23

**offense (2)**
53:2;84:6

**office (1)**
169:13

**officer (14)**
27:16;44:13,14;
50:9,9;53:19;58:5;
114:14;123:7,10,13,
17;125:19;177:2

**officers (26)**
6:16;38:19;39:3;
43:23;44:6;53:21;
54:4,10;58:21;59:14;
113:15,16,22,24;
114:1,11,13;123:22;
173:18;174:1,3,24;
176:19;177:7,9;
185:15

**officers' (1)**
43:24

**officially (1)**
12:2

**often (1)**
179:5

**old (14)**

9:1,2;19:11;38:25;
101:14;102:2,12;
115:5;119:4,5;121:2;
162:5,6,8

**older (6)**
94:18;99:5,18;
100:21,22;119:6

**oldest (2)**
161:15,15

**once (7)**
53:20;84:15;92:17;
94:18;119:5;121:13;
136:9

**one (94)**
8:3;13:17,19;14:16;
15:3;21:23;26:17;
28:15,16,21;36:8;
39:15;41:15,16;
43:25;44:9;48:19;
50:10;57:22;59:16;
61:19,19;70:24;72:7;
76:7;80:22;81:6;
82:11,12;86:1;89:25;
94:10;95:16;97:12,
15;103:25;104:1;
110:22,24;112:16;
116:21;120:25;122:4,
20;124:2,3,4,7,13,19;
125:2,5,6;129:25;
131:20;133:4;135:17;
138:15;146:6,22,23;
147:21,21,22;149:4;
150:1;153:3;155:12,
13,15;157:16;161:12;
162:5,5,7,17;164:24;
170:1;173:9,20,21,21;
178:22;182:7,12;
183:6,13,15;187:12;
188:9;194:21;195:25;
197:3,9

**ones (1)**
62:20

**one's (2)**
110:2,2

**only (14)**
9:25;32:7;56:17;
89:12;97:15;98:3;
100:12,22;133:23;
142:4;159:16;165:10;
179:20;193:14

**open-ended (1)**
141:16

**opined (1)**
140:11

**opinion (1)**
68:21

**opposed (2)**
40:18;174:17

**opposite (1)**
101:22

**opposition (1)**
140:18

**order (2)**

198:4,8

**orders (1)**
198:24

**organization (1)**
105:10

**organized (2)**
14:10;105:25

**orient (1)**
124:15

**original (2)**
42:5;198:25

**others (5)**
26:14;60:9,19;
145:21;161:13

**other's (1)**
11:23

**ours (1)**
19:16

**out (76)**
9:25;10:24;11:2,12;
13:3;19:19,20;20:16;
21:25;23:8;29:23;
30:2;32:20;34:18;
35:2;36:18;39:23,24;
40:4;51:24;57:5,5,5,
15;58:11,13,18;59:20,
24;61:22;65:14;69:8;
73:13;76:23;77:7;
79:4,5,6;88:5,10;
89:19;93:8;97:22;
98:15;101:16,24;
102:7;110:16;113:9;
116:17;122:18;124:1;
126:9;127:9,13;
134:11;138:13;
156:17,23;157:20;
160:11;166:7,9;
167:3,16,19;168:5,21;
172:20;173:14;177:1;
179:22;196:9,12,13

**outside (7)**
15:20;51:5;53:18;
58:25;157:8,9;166:17

**outsider (7)**
108:11,13,20;
117:3,6;182:19,25

**outsiders (2)**
98:11;108:15

**over (25)**
6:18;34:14;56:4;
57:6;66:7;72:7;73:6,
7;80:16;88:16,20;
94:18;103:21;118:9,
12,22,23;123:1;
137:1;140:2,19;
148:6;173:13;182:8;
188:9

**overlooking (1)**
133:23

**own (7)**
55:22;108:5;111:1;
119:21;149:8;151:11;
192:8

Maysonet v.
Guevara

Christopher Goossens

# P

**page (22)**
8:7;41:6,7,9,22,24;
42:22;43:12;46:9,16;
66:23;67:1,22;70:3,5;
73:3;74:1;78:24;81:2,
5;89:7;103:5
**paper (5)**
40:5;47:10;52:3;
60:13;65:21
**papers (1)**
133:23
**paragraphs (1)**
48:9
**paralegal (1)**
7:6
**parents (1)**
179:16
**Park (17)**
9:15;14:1;16:16;
57:19;96:15,16,17,19,
20,20,21,23;97:1;
103:14;104:6,8;
115:14
**parked (1)**
78:25
**part (16)**
9:6;12:4,6;61:14;
64:17;96:9;99:17;
106:11;111:19,19;
116:2;119:19,24;
173:10;186:13;
196:11
**participant (1)**
60:22
**participate (1)**
60:24
**participated (1)**
80:3
**particular (3)**
9:12;34:2;51:19
**particularly (1)**
62:12
**partner (2)**
123:10,11
**parts (5)**
45:19;69:25;86:23,
24;106:5
**party (1)**
157:12
**pass (5)**
65:14;88:3;146:10;
197:7,9
**passed (8)**
22:25;30:9;46:25;
109:6,8;162:5,8;
180:1
**passenger (2)**
147:23;149:14
**passing (1)**
30:15

**paths (1)**
37:13
**patrol (4)**
24:4,14;25:2,4
**patrolling (3)**
25:8;114:12,13
**patrolmen (1)**
114:4
**pay (2)**
152:15,20
**paying (5)**
185:14,19,24;
186:13;199:3
**peddling (1)**
99:6
**penalty (2)**
86:2,7
**pending (1)**
5:11
**penitentiary (3)**
37:6;138:8,22
**people (37)**
15:21;16:11;23:6;
31:8,9;52:4;55:14;
57:10;60:3,7;77:22;
98:11;105:21,21,22,
24;106:18;107:11;
108:8;114:2;115:9,
12,15;116:19;140:19;
152:8,14;156:9;
157:12,17,19;159:17;
180:4;181:23,23,24;
183:16
**per (2)**
11:23;54:14
**percent (8)**
22:9;54:24;69:8,9,
11,11,13,16
**perception (2)**
13:6,7
**perhaps (3)**
93:2;124:24;192:25
**period (6)**
26:11;118:12;
137:5,18;138:24;
184:23
**person (6)**
29:19;107:25;
117:2;157:16;159:21;
183:15
**personal (3)**
132:20;133:1;146:7
**personally (6)**
100:12;149:17,22;
168:6;185:22,23
**petty (1)**
120:10
**ph (1)**
147:9
**phone (11)**
6:18;49:24;50:4,11,
12,14,19;130:21,22,
24;155:23

**photo (12)**
37:24;38:1,2,4,15,
17;39:2;152:22,23;
153:2,4,16
**photograph (2)**
37:21,22
**photos (5)**
153:13,17,24;
154:16,19
**physical (6)**
55:7;59:5;175:13;
176:2;177:7;178:5
**physically (5)**
165:19,20;174:17,
22,23
**pick (2)**
131:13,19
**picked (6)**
123:6;160:10;
167:13;171:1,3;185:1
**picture (7)**
38:9,19,20,24,25;
59:21;71:7
**pieces (2)**
54:17;87:5
**Pierce (2)**
110:17,18
**pile (1)**
59:16
**pin (1)**
40:17
**pistol (4)**
72:24;73:1,8,10
**pitted (1)**
157:16
**place (6)**
6:3;80:3;120:8;
148:6;186:24;194:25
**places (3)**
26:16,24;151:23
**plain (1)**
123:15
**plaintiff (2)**
6:6;198:24
**plan (2)**
73:17;181:17
**planned (2)**
90:12,15
**plans (1)**
73:20
**play (2)**
15:17;125:5
**played (1)**
14:1
**playing (2)**
16:17;121:3
**plead (1)**
139:23
**please (7)**
8:3;71:6,10;172:18;
192:25;197:4;198:8
**plural (1)**
191:18

**plus (1)**
177:2
**pm (7)**
44:21;70:7,8,21,21;
81:8;199:6
**PO (1)**
44:12
**pocket (1)**
79:15
**point (26)**
8:2;10:24;11:14;
12:1;21:5;30:9;33:2,
9;34:22;42:12;72:24;
73:2;76:19;83:25;
94:10;105:16;125:13,
19;126:2;155:8;
161:18,19;176:12;
178:22;188:16;
194:14
**pointing (1)**
61:14
**Polaroid (3)**
37:24;38:1,2
**Police (110)**
23:15;25:2,5,8,14;
27:6,15;33:17,22;
38:19;39:2;48:16,18;
49:8;50:7,22;51:2,5,
6;52:25;53:11,21;
54:4,9,12,19,20,22;
55:20;56:13;58:5,16,
21;59:13;65:18;
67:17;89:25;90:2,3;
113:3,7;114:8,15,17;
117:19;118:1,5,13,21;
119:7,23;121:10,20,
25;122:2,6,22;123:13,
16,22;128:7,8,18;
134:16,19,21;135:11,
14;136:3,6,7;140:7,
12;143:5;146:18;
147:12;148:2,9,10;
152:25;153:2,24;
154:11,16;156:8;
158:3;159:3,6,16,24;
160:3,6,14,24;164:13,
14;169:1;172:22;
177:2;185:15,20,24;
186:12;188:2;189:7;
191:2;193:7,25;
195:22;196:24
**policed (6)**
23:16;24:8,9,10;
113:22,24
**Polish (7)**
123:25;124:13,14,
15;129:24;130:3;
173:20
**polygraph (28)**
46:18,21;47:2,4,17;
48:1,6,9,14;124:10,
18,22;126:6,16;128:6,
9,13,15,16,18,20;

**129:21;130:7;158:12,**
15,22;159:1;176:12
**Pontiac (1)**
138:14;143:21,22
**popular (4)**
20:15,17,17;132:3
**Portuguese (1)**
190:8
**position (3)**
55:25;56:6;62:19
**possess (1)**
111:23
**possession (1)**
167:14
**possible (2)**
142:17;144:14
**possibly (1)**
188:10
**post (1)**
36:1
**posting (1)**
36:13
**prayed (1)**
193:20
**precinct (1)**
49:24
**precincts (3)**
25:13;26:20;113:14
**precise (1)**
92:4
**predominantly (4)**
17:12,13;97:1,4
**prefer (1)**
190:20
**preferred (1)**
193:17
**prepare (1)**
90:4
**prepared (1)**
141:6
**presence (1)**
140:7
**present (5)**
7:6;82:8;129:17;
133:17;189:9
**presently (1)**
9:16
**presumed (3)**
160:5,8,9
**pretty (17)**
7:20;11:9;69:20;
80:20;98:7;115:22;
126:12;127:15;
132:15;133:6;141:3;
148:11;158:16;
161:24;171:15;
191:10,12
**previous (3)**
89:5;117:19;136:20
**previously (5)**
28:25;49:5;52:16;
141:15;174:15
**primarily (1)**

Maysonet v.
Guevara

Christopher Goossens

180:12

**primer (3)**
17:1;149:12;157:24

**print (3)**
39:23,24;40:4

**printer (1)**
39:25

**printing (1)**
41:12

**prior (35)**
15:6,25;17:9;29:1;
35:13;42:12;47:16;
49:3;75:1;89:14;
90:20;113:3;117:23;
120:15,16,17;121:11;
122:25;124:10,17,22;
132:6;141:3,4,9,16;
173:1,22;174:3;
178:25,25;179:6,6;
187:8,20

**prison (18)**
9:24;34:23;35:1,1,
3,7,10,20;37:11,14,
17;84:20;85:1;92:8;
132:11;148:25;187:5,
8

**privilege (1)**
145:7

**privy (1)**
58:10

**probably (34)**
13:23;17:10,16,18;
27:14;58:12;64:1,4;
68:25;69:16,17,18;
91:24;99:8;103:18;
107:20;109:2;117:1;
118:3,6;137:10,10;
142:15;149:1;151:22;
154:20;156:6,20,23,
25;160:11;175:4,7;
194:21

**probation (3)**
167:18;168:2,3

**problem (3)**
40:6;163:14;167:19

**problems (4)**
7:22;108:4;167:5,
15

**process (2)**
102:11;179:21

**proficiency (1)**
190:22

**projects (2)**
34:10;171:17

**promise (5)**
51:18,24;52:2;58:4;
196:13

**promises (2)**
51:10,17

**pronunciation (2)**
170:7,9

**proper (2)**
170:7,9

**prosecution (1)**
65:4

**protection (2)**
185:24;188:3

**protective (1)**
138:6

**prove (2)**
128:6;175:6

**provide (2)**
113:8;198:4

**PTSD (1)**
167:12

**Public (3)**
5:4;11:10;139:9

**Puerto (14)**
16:12;22:10,11,17,
19;99:11;100:4,8,23,
24;101:5,6,9;157:19

**pull (5)**
37:25;39:16;
119:13;164:21,21

**pulled (2)**
122:11,17

**pulling (1)**
124:23

**pulls (1)**
48:20

**punches (1)**
48:21

**punto (3)**
102:18;178:20,22

**purpose (2)**
83:10;131:18

**purposes (2)**
15:23;66:11

**pushing (1)**
124:23

**put (27)**
6:9;38:21;48:12;
55:25;56:6;61:24;
62:1,12,17,23;64:12,
15;75:16;79:4,4;
81:17,19,24;82:15;
116:22;125:3;126:17,
20;127:21;163:19;
165:19;168:2

**putting (3)**
82:9;136:9;165:21

## Q

**Queen (1)**
12:10

**quick (3)**
142:17;154:14;
188:17

**quite (1)**
189:17

## R

**race (2)**
15:16;99:3

**racing (4)**
102:13;157:11,12,
15

**radio (2)**
16:22;173:13

**RAHE (16)**
6:20,21;63:9,16;
72:3;75:23;84:7;
142:11,12;145:2;
150:8;151:4;162:17;
169:21;199:1,2

**raided (3)**
33:18;34:1,7

**raise (2)**
12:1;139:23

**ran (4)**
32:23;104:6;116:3;
122:12

**range (1)**
66:14

**rank (1)**
150:17

**re (1)**
135:5

**reach (2)**
53:18;168:5

**reached (1)**
168:21

**read (4)**
46:16;61:15;76:25;
193:2

**reading (4)**
44:2;59:18;65:21;
75:22

**ready (1)**
157:21

**real (15)**
15:16;20:15;22:12;
24:18;37:2;48:9;60:2;
99:13,14;113:8;
124:19;143:8,9;
154:13;193:22

**Really (13)**
9:21;99:12,15;
151:1;153:22;159:21;
163:21;179:3,4;
191:11,23;197:19;
198:13

**reason (14)**
11:2;62:22;63:1;
71:25;77:12;92:22,
23;100:12;140:12;
142:4;155:5;166:23;
173:5;193:16

**reasons (1)**
95:16

**recall (32)**
33:14,20,25;34:5,6;
36:24;45:16,17,21,24,
25;46:2,5,21,24;47:1;
65:19;84:4;90:16,24;
117:20;123:3,3;
124:16;129:18,21;

139:5;162:11;165:24;
189:7;191:12,22

**recalled (1)**
123:7

**receive (2)**
32:1;82:23

**received (1)**
32:5

**receiving (1)**
90:20

**recess (3)**
40:13;88:1;189:1

**recognize (5)**
24:2,22;38:4;43:23;
44:10

**recollect (3)**
30:15;196:22;197:2

**recollection (11)**
48:16;86:21,22;
143:6;155:7,14;
156:3;166:25;195:5,
12,24

**record (20)**
5:25;6:3,9;7:5;8:11,
20,21;15:23;19:17;
40:12;56:23;67:10,
12;117:16;118:16;
135:19;159:11;189:3;
193:2;198:7

**records (4)**
135:11;175:5,15;
198:1

**red (6)**
16:21;17:1;149:11,
12;157:5;158:1

**redirect (2)**
197:11,14

**refer (2)**
41:22,22

**referenced (3)**
44:13;83:6;171:25

**referred (2)**
72:1;170:25

**referring (7)**
66:15;93:12;
112:18;131:24;132:1;
168:16;193:6

**reflect (2)**
67:10,12

**reflected (1)**
41:24

**refuse (4)**
144:8,10,14;145:12

**refused (1)**
60:23

**regarding (1)**
112:4

**regards (1)**
92:9

**regular (2)**
69:15;105:17

**regularly (1)**
24:8

**regulations (2)**
106:24,24

**rehab (1)**
167:17

**reiterate (1)**
55:4

**related (4)**
101:2;144:25;
162:15;177:6

**relates (1)**
47:1

**relation (3)**
164:15;165:16;
169:13

**relationship (3)**
15:24;94:23;113:17

**released (10)**
37:5,11;45:15;
57:24;64:22;65:2,6,7;
130:23;132:9

**relevant (3)**
144:21;151:1;
184:23

**relocate (1)**
198:11

**remain (1)**
68:1

**remarks (1)**
191:16

**remarried (2)**
112:25;113:1

**remember (39)**
7:15;20:13;30:17,
17;63:21,24;64:5;
76:20;84:18;89:4;
93:24,25;95:8;98:20;
99:5;124:20;139:7,
10;145:21;152:9,11,
12,23;155:19,20;
158:14,20;162:4,9,13;
169:16;184:11,13,15,
18;191:25;192:1;
195:2,6

**remind (1)**
5:25

**repeat (3)**
7:23;12:13;16:3

**repetitive (1)**
112:1

**rephrase (3)**
8:6;134:24,25

**report (6)**
42:1,4;45:20;90:1;
135:14;164:13

**reporter (10)**
7:16,24;8:11;66:12;
192:24;197:20;
198:16,22;199:1,4

**reporting (2)**
45:21;46:17

**reports (6)**
90:2,3;134:16,20,
22;135:11

**represent (3)**
6:6,15,21
**represented (3)**
132:5;155:9,11
**representing (1)**
92:2
**represents (2)**
6:8,11
**request (1)**
130:14
**requirements (1)**
75:18
**reread (1)**
192:25
**reserve (1)**
198:3
**residence (1)**
156:24
**resonating (1)**
7:21
**respects (2)**
152:15,20
**respond (2)**
27:15;69:17
**responded (1)**
27:5
**response (3)**
125:10;176:6;
195:14
**responsibilities (1)**
181:10
**responsibility (2)**
181:12;182:23
**responsible (3)**
31:23;32:3;63:14
**rest (1)**
22:22
**restaurant (2)**
31:10,12
**result (2)**
86:12;166:4
**retaliate (1)**
58:21
**retaliation (2)**
116:20;117:2
**retirement (1)**
181:17
**return (1)**
190:12
**returned (1)**
190:12
**reverted (1)**
167:11
**review (5)**
89:10;134:16;
135:4,5;197:18
**reviewed (2)**
89:13;135:22
**reviewing (1)**
188:17
**revisit (1)**
189:19
**revoked (4)**

166:16,18,19,23
**revolved (1)**
158:17
**Reynaldo (1)**
24:23
**RFC-Maysonet (9)**
39:16;40:2;41:8,14,
19,20,24;46:9;89:24
**Rican (5)**
22:10,11,17,19;
157:19
**Rico (9)**
16:12;99:11;100:4,
9,23,25;101:5,6,9
**ride (1)**
119:18
**right (140)**
7:8;8:4;9:18;11:13;
12:23;13:25;18:1,16,
23;20:9,19,23;25:18;
26:5;28:18,22;30:2,6,
14;31:12,16,19;
32:11;34:23;35:23;
36:4,9,13,18;37:5,7;
38:16,24;39:6;41:11;
42:11;44:19;45:10,
13,13,14;46:12;
49:16;55:5,23;56:2,
12;57:3;58:19;59:17;
64:20,23;67:25;71:5;
72:19;75:20;76:22;
77:3,19;78:3,7;81:1;
83:25;84:2,17;85:17,
19;86:15,16,17,19;
87:1,8,22;88:13;91:7;
97:23;98:4;103:8;
114:7,10;117:9;
129:9,10;130:8;
132:18,21;133:17;
134:21;137:15;139:3,
23;145:3,8;146:12;
147:12;150:7,11,13;
152:4,19;154:23,25;
156:6,13;157:5;
158:9;159:6,15,18,22;
160:16;161:8,9,18;
163:18;165:9;168:18;
169:3,17,18;170:22;
171:8,9,16;173:7;
174:25;175:3;176:6,
19;181:7;182:16,20;
183:20;184:25;
189:10;197:6,18,22;
198:20
**right-hand (2)**
41:7,8
**rights (9)**
5:11;67:21,24;68:4;
139:16,19;141:19,23,
25
**rival (13)**
56:7,12,20;57:2;
95:18;116:18;119:21;

140:22;156:5,9,16,19;
157:1
**Rivera (1)**
65:8
**rob (5)**
74:22,23;75:7,8;
106:18
**robbed (1)**
106:6
**role (1)**
182:23
**room (26)**
6:7;7:20;38:20;
59:20;67:10,13;
126:5,7,15,18;127:25;
128:2,5,11;129:2,9,
10,11,23;130:8;153:8,
10,14,17;154:20;
169:18
**rooms (1)**
159:25
**Rosa (4)**
149:18,24,25;150:7
**Rose (1)**
150:1
**Rosie (2)**
149:25,25
**roughing (3)**
175:18;176:3,4
**routed (1)**
132:12
**rule (2)**
105:2,4
**rules (9)**
5:22,23;7:11;105:5,
7;106:23,24;144:19,
20
**rumor (1)**
63:13
**run (2)**
57:16;104:7
**running (3)**
11:11;122:18;127:9
**runs (2)**
97:13,15
**Russell (1)**
101:19

## S

**safety (4)**
57:14;144:22;
145:7;183:17
**sake (1)**
112:4
**same (49)**
7:19;8:7,14;9:9,17;
19:6;29:13,24,25;
41:19;54:11;64:3,7;
77:15,24;86:20,24;
87:3;89:7;98:5,16,18;
101:17,17;103:5;
109:1,21;110:5,24;

113:16,22,24,25;
114:2;131:12,20;
136:8;138:11,17;
147:13;149:20,21;
151:3;156:15;162:23;
163:3,9,23;164:20
**Sanchez (3)**
29:19;112:20;
186:19
**Sanchez's (3)**
152:3;186:5,17
**Santiago (2)**
29:19;152:3
**Santiago's (1)**
187:25
**sat (4)**
133:22;147:21;
169:17,18
**savvy (3)**
85:20;141:18;
198:13
**saw (8)**
89:18;93:7;102:22;
111:9;135:13;154:19;
156:17;157:13
**saying (25)**
19:12;20:20;26:18;
49:9;59:22;60:9,13;
61:17;69:19;76:12;
83:21;100:7,11,11,17;
108:3,6;110:6;113:5,
6;144:17;153:25;
180:5;186:8;193:22
**scared (2)**
183:15,16
**scenario (2)**
172:17,20
**school (48)**
10:12,14,15,18,20,
22,25;11:3,6,10;12:8;
13:25,25;16:7,8,9,15;
18:14,15;19:4,5,15;
28:6;29:24,25;30:3,6;
59:1;95:14,17,18;
99:23;100:13,16,20,
23,25;101:5,6,7,17,
18,19,20,23;112:13;
148:17;190:14
**Schurz (2)**
10:13,13
**screen (1)**
7:8
**script (1)**
48:21
**se (2)**
11:24;54:14
**seat (2)**
79:5;147:23
**second (15)**
10:4,19;39:15;
40:20;43:25;82:11;
87:22;93:4;116:22;
128:10;135:17;

140:24;162:17;182:7;
187:13
**secret (1)**
160:15
**sect (11)**
14:13,15,19,22;
105:9;144:4,7,12;
145:17;146:24;147:1
**sects (5)**
14:7;104:10,15,25;
105:11
**security (1)**
85:2
**seeing (6)**
65:19;89:14;152:9,
12,17;164:13
**seek (3)**
86:7;144:15;145:4
**seem (1)**
58:5
**seemed (2)**
99:1;127:9
**seemingly (1)**
80:9
**sees (1)**
40:25
**segment (1)**
72:7
**Self (2)**
105:8;181:13
**self-inflicted (2)**
109:10;186:11
**self-medicate (1)**
187:10
**sell (7)**
106:19;108:9;
117:7;182:1,19;
184:17;185:20
**selling (10)**
98:1;105:24;
107:13,15,17;108:1,8,
22;146:18;184:10
**send (4)**
40:2,3;51:23;66:11
**sense (4)**
24:3;94:20;173:10,
11
**sentence (4)**
36:24,25;85:23;
138:13
**sentenced (3)**
35:6,13;36:23
**sentencing (4)**
35:8,10;86:4,4
**separates (1)**
15:1
**September (1)**
162:7
**serve (1)**
167:25
**session (1)**
6:2
**set (1)**

41:18
**seven (1)**
  186:25
**several (6)**
  34:7;47:5;57:11;
  119:16;123:9;153:16
**Shakespeare (2)**
  114:9,12
**sheep (1)**
  56:24
**Sheriff (1)**
  137:2
**shine (1)**
  157:18
**shiny (2)**
  17:4;157:24
**shirt (1)**
  74:2
**shock (1)**
  65:21
**shocking (2)**
  60:3,11
**shooter (2)**
  51:22;64:8
**shooting (34)**
  31:16,21,22,24;
  32:3,4;33:4,10,11,12,
  16;34:2,4;47:19,20;
  48:2;49:13,16,19;
  60:7;62:5,9;63:15,19;
  79:22;80:3;82:17;
  114:23,24,25;133:17;
  140:19,22;167:20
**shootings (1)**
  140:17
**short (3)**
  130:3,11;171:7
**shorter (1)**
  125:4
**shot (9)**
  31:1,8;32:7;42:14;
  79:23;115:4;116:1;
  117:3;186:11
**show (2)**
  48:23;118:16
**showed (5)**
  47:12;91:2,5;92:19;
  152:22
**showing (3)**
  47:10,11,11
**shown (1)**
  189:6
**shuffled (1)**
  131:17
**siblings (2)**
  28:14;161:14
**siblings' (2)**
  29:3,7
**sick (1)**
  167:22
**sickness (1)**
  167:22
**side (30)**

9:14;14:24,25;
20:12;21:15,24,25;
26:1,2,3;45:2,3;
57:19;87:12;96:19,
21,23;97:1,16;103:13,
15;104:5;109:19;
110:1,2,5;147:21,22,
23;157:3
**sign (10)**
  51:20,23;80:18;
  191:6,8,13;194:16;
  195:16,17,18
**signature (2)**
  197:16;198:3
**signed (4)**
  52:3,5,7;57:25
**significance (6)**
  74:8,20;75:2;76:2,
  3,23
**significant (1)**
  76:5
**signing (2)**
  52:3;191:16
**silent (1)**
  68:1
**similar (4)**
  42:24;63:5;64:3;
  117:5
**simultaneously (1)**
  87:5
**sister (15)**
  17:14;18:14;29:12;
  38:14;45:3;99:22;
  101:12,13;102:6;
  103:3;107:22;108:2;
  149:20,21;153:3
**sisters (10)**
  16:6;28:15;29:9,11;
  71:22;101:1;142:20;
  161:15;190:14,17
**sisters' (1)**
  161:9
**sister's (14)**
  16:5,7;38:11;43:6,
  21;45:7;65:10;99:24;
  102:6;149:25;152:23;
  153:6;171:8,10
**sit (8)**
  21:12;30:14;39:23;
  62:13;63:20;87:2;
  194:9;196:22
**sitting (3)**
  86:25;147:23;
  158:25
**six (6)**
  23:2;79:23;137:11;
  187:16,18,19
**sixth (1)**
  112:17
**size (1)**
  13:12
**skinned (1)**
  21:25

**skip (1)**
  142:15
**slammed (1)**
  122:19
**slang (1)**
  69:17
**Slap (5)**
  164:20,20;165:5,
  11,20
**slapped (4)**
  122:19;125:6;
  165:18;172:1
**slaps (1)**
  48:20
**Slick (2)**
  22:5;98:14
**slightly (1)**
  182:11
**slow (1)**
  103:6
**smaller (1)**
  26:17
**sneaky (1)**
  76:15
**socialize (1)**
  152:19
**sold (9)**
  105:21;106:5;
  107:10,11;146:13,16;
  181:23;185:3,6
**soldier (1)**
  183:12
**soldiers (1)**
  105:16
**sole (1)**
  22:22
**somebody (30)**
  14:2;15:20;27:6;
  32:20;50:2;60:13;
  62:23;74:22,22;75:7,
  8;76:15;96:8;104:14;
  105:11,15,15;107:13;
  108:7;111:12;116:13,
  18;117:3;133:15;
  167:21,21;169:9;
  179:14;182:13;186:8
**somebody's (1)**
  107:4
**someone (3)**
  21:16;61:7;109:6
**someone's (1)**
  159:6
**someplace (1)**
  47:12
**sometime (3)**
  30:24;82:24;83:25
**sometimes (10)**
  22:16;25:9;51:9;
  54:22;55:6,11;57:18,
  19,23;103:6
**somewhat (1)**
  162:15
**Somewhere (5)**

14:24;36:2;111:15;
143:24;171:20
**soon (2)**
  51:20;52:9
**sophomore (2)**
  10:21;30:2
**sorry (26)**
  12:13;13:18;19:20;
  28:17;33:6;34:5;44:3;
  45:24;56:1;70:3;
  74:12;77:17;78:1;
  81:4;83:14;88:19;
  117:24;118:9;135:20;
  136:18;151:4;163:13;
  168:15;174:4;192:23;
  194:23
**sort (13)**
  12:2,3;14:10;16:2;
  69:25;157:11;159:5;
  170:8;173:15;174:16;
  176:17;183:21;
  184:23
**sound (4)**
  37:7;45:10;85:17;
  186:22
**Sounds (4)**
  45:13,14;85:19;
  87:14
**south (2)**
  103:19;104:3
**span (1)**
  118:23
**Spanglish (1)**
  180:23
**Spanish (41)**
  17:13,15;22:10;
  27:18,24;28:3,4,6,8;
  50:12;124:7;134:11;
  178:21;179:12,12,15,
  17,21,21,22,22;
  180:12,15,19;186:21;
  189:18;190:7,8,11,18,
  19,21;192:11,11,15,
  18;193:4,10,15,15,17
**Spaulding (12)**
  5:2;9:9;14:24;
  97:13,14,15;104:1;
  110:9,17,18;169:18;
  170:21
**speak (18)**
  5:22;17:20,24;
  25:25;27:20,22;
  62:21;69:4,10;91:22;
  130:15;131:8;178:13;
  180:12,14;190:1,3;
  192:14
**speaker (1)**
  57:6
**speaking (13)**
  14:7;17:8;45:21,25;
  46:3,5;54:9;113:21;
  130:17;189:18;190:9;
  192:10,11

**specific (6)**
  40:3;144:16;151:8;
  158:18,20;162:18
**specifically (4)**
  30:20;33:15;59:3;
  173:6
**speculating (1)**
  84:11
**speculation (7)**
  58:8;68:19;69:7;
  75:25;77:16;83:12,15
**spell (2)**
  8:23;186:21
**spent (2)**
  88:25;187:5
**splits (2)**
  114:7,8
**spoke (17)**
  6:17;17:12,13,14;
  67:20;92:19;134:4,
  10;178:10,12;179:11,
  12;189:21;190:5,7,
  11;193:14
**spoken (8)**
  91:4;93:10,11;
  131:11;178:14;179:6,
  8,9
**spot (1)**
  41:19
**spread (1)**
  32:9
**spring (1)**
  30:15
**square (3)**
  13:23;14:15;103:10
**squiggly (1)**
  47:10
**stages (1)**
  19:21
**stairs (1)**
  125:4
**stand (6)**
  84:16;102:24;
  139:21,22,25;151:19
**standing (3)**
  173:14;177:4;180:4
**start (7)**
  46:2;56:4;88:23;
  108:13;117:23;119:2;
  122:4
**started (10)**
  8:18;32:21;59:23;
  79:18;119:5;120:2;
  122:18;126:9;136:9;
  172:19
**Starting (3)**
  66:23;89:9;101:15
**stash (3)**
  151:20,23,25
**State (7)**
  5:4;26:1;64:21;
  86:7;135:25;137:1;
  196:10

**statement (40)**
46:11;49:17;50:21;
51:20,23;52:4,6;
57:25;58:5;61:7,14,
15,16;64:7;65:24;
66:2;74:5;78:8;80:18;
82:15;189:6,7,9,13;
191:2,7,9,16;192:3,8,
19;193:5,6,7,10,25;
194:3;195:8,21;
196:24
**statements (23)**
55:8;59:16,17;
63:21,24;64:2;65:17,
20;82:20;133:24;
134:1,21,23;135:3,6,
9,10,21;192:8;
193:24;194:3,13,20
**States (4)**
5:12;161:22;163:4;
179:17
**state's (5)**
45:22;67:17;
129:15;169:12,19
**Stateville (1)**
138:14
**stating (1)**
132:16
**station (28)**
25:3,5,9;34:11;
45:3,4,5;48:5,7,16;
50:7;51:2,6,6;53:11;
58:16;65:18;118:5,
13,21;121:10;122:22;
128:8,18;147:17;
148:2,10;176:1
**stations (4)**
25:15;27:6;114:15;
159:24
**stay (4)**
107:24;113:9;
136:22;198:17
**stayed (2)**
95:25;148:24
**steal (1)**
107:4
**stealing (4)**
107:6,8;111:7;
181:25
**step (1)**
135:3
**STEPHENSON (33)**
6:24,25;15:10;
18:25;20:24;24:11;
54:6;58:7;68:15,18;
69:6;72:5;74:4;75:17,
24;77:15,24;80:5,13;
83:13;188:14,20,21,
23,25;189:2,4;
192:24;196:8,20;
197:6,11;198:7
**Steve (5)**
39:22;40:3,17;66:4,

8
**still (14)**
9:8,17;10:2;51:13;
93:10,11,13;99:6;
112:23;132:19;
138:10;145:11;
148:12;150:4
**stitches (1)**
175:18
**stole (2)**
106:5;121:4
**stolen (3)**
118:17;121:2;122:5
**stood (3)**
10:1;128:23;149:2
**stop (19)**
19:23;53:3,6;108:2,
10,23;109:2;119:7,9,
11;140:25;172:12,22;
174:16;180:2,13;
182:6,25;183:1
**stopped (8)**
52:25;108:17,19;
128:22;172:11,15;
173:1;182:20
**stopping (1)**
183:9
**stories (2)**
55:15,21
**straight (2)**
36:20;48:5
**street (25)**
11:15,17;13:4,9,10,
17,21,25;14:8,25;
23:13;25:7;44:22;
45:2;69:18;93:15;
96:6;97:12;119:13;
146:7;157:13,15,20;
171:9;172:21
**streets (5)**
35:23;36:17;110:8,
13;151:24
**stressed (1)**
167:12
**stretch (2)**
87:10;158:25
**strike (8)**
17:5;19:2;37:19;
52:11;64:25;101:11;
120:11;135:2
**stripped (1)**
122:13
**strong (2)**
62:19;124:19
**structure (1)**
151:2
**structured (1)**
12:16
**stuff (12)**
43:13;53:7;54:17;
104:19;107:9;111:7;
142:16;157:11,18,22;
159:12;162:13

**stupid (1)**
111:7
**style (3)**
48:18;49:8,9
**subpoena (1)**
90:21
**suffer (1)**
56:6
**suffered (1)**
59:4
**sufficient (1)**
172:22
**suggested (1)**
48:8
**suggesting (1)**
72:20
**summer (3)**
10:19,21;23:24
**supplementary (2)**
42:1,4
**support (1)**
106:8
**supposed (3)**
107:14,17;182:14
**supposedly (3)**
130:14;186:10,12
**sure (58)**
5:24;23:2,21;26:14;
33:8;36:5;41:2;54:19;
58:10;66:9;67:7;
69:20;72:8;75:16;
80:20;82:12;87:11;
89:6;111:6,11;
121:12;126:12;127:8,
10,15;138:15;141:3,
22;142:18;143:11,12;
145:2;147:24;148:11;
150:1;153:25;155:14;
158:16;161:24;
163:22;164:1,2,16,25;
170:14,14;174:8;
182:7;186:6,6,20,25;
187:16;191:10,12;
197:5,19;198:4
**surprise (2)**
80:11,14
**Surprisingly (1)**
84:3
**suspect (1)**
76:15
**sweatshirt (9)**
74:7,10,18,21;75:3,
7,12,16;76:8
**sweetheart (1)**
148:17
**swore (1)**
22:9
**sworn/affirmed (1)**
5:3
**system (2)**
131:17;138:9

**T**

**table (1)**
169:19
**tactic (1)**
50:23
**tactics (10)**
50:20;51:10;54:24,
25;55:13;57:22;
80:22,24;160:13;
164:20
**tag (1)**
24:4
**talk (37)**
17:10,11;47:18,19,
22;48:2;54:20,23,24;
55:19;81:24;90:5,11,
14;91:14;93:4;96:12,
15;122:1;123:4;
129:14;138:3;142:1;
143:7;147:20,25;
155:22;157:4;179:14,
24;180:19;190:20;
191:1;193:16,17,19,
21
**talked (31)**
22:10;65:8,11;
67:15;69:21;90:7,22,
25;91:1,15,17,19;
93:2,22;98:19;103:9;
113:2;116:2;117:6;
129:22;140:6;141:11;
157:10;163:11,24;
181:22;182:18;
189:17;190:17,17,18
**talking (28)**
18:5;36:8;50:9;
53:5,6;61:2;79:22;
80:25;89:4;92:7,9;
94:16;96:13;100:3;
103:14;112:5;113:4;
114:22;117:20;
120:21;130:5;140:6;
150:6,12;174:22;
179:14;180:3;182:8
**tapes (2)**
27:12,13
**target (1)**
173:11
**targeted (1)**
173:9
**targeting (3)**
173:6,9,12
**task (2)**
139:9;179:24
**taught (1)**
190:15
**taxpayers (1)**
199:3
**taxpayers' (1)**
87:6
**technically (1)**

60:4
**teenager (2)**
12:20;25:18
**telling (7)**
47:8;50:10,13;
94:11;125:21,22;
141:22
**tells (1)**
37:9
**Ten (1)**
119:4
**terms (3)**
28:19;77:13;178:5
**terrible (1)**
178:21
**territories (1)**
57:20;95:19;104:2
**territory (15)**
56:12,20;95:22;
97:19,21;110:21;
116:7,19;120:8;
156:5,9,16,19;157:1;
182:15
**test (9)**
46:18,22;47:2,4,17;
48:1,9,14;128:6
**testified (10)**
55:4;70:17;109:5;
132:25;163:21;164:5;
192:3,6;196:1;197:21
**testifies (1)**
5:5
**testify (4)**
139:12,16,20;195:5
**testimony (9)**
15:11;89:5;90:6,12;
134:19;135:1;184:21;
196:5,6
**tests (1)**
128:9
**texted (1)**
93:5
**thanks (3)**
183:21;198:21;
199:2
**thinking (1)**
94:15
**third (2)**
43:12;73:4
**Thirty (1)**
37:1
**though (3)**
78:5;98:16;188:11
**thought (2)**
50:13;120:23
**threaten (2)**
56:14,17
**threatened (4)**
55:25;56:5,11;
136:7
**threats (1)**
55:11
**three (25)**

Maysonet v.
Guevara

Christopher Goossens

28:15;53:1;59:16;
65:4;70:6;81:6;93:2;
99:8;114:7;118:23;
122:12;124:6,12;
130:22;133:22,24;
137:19,24;138:5;
161:14;162:6,7;
173:22;177:21,25
**threw (2)**
166:7;180:17
**Throughout (4)**
52:24;96:17;126:1;
136:5
**thrown (1)**
166:8
**tied (1)**
117:12
**tight (1)**
125:3
**timeline (3)**
175:20,22,24
**times (12)**
52:22,23;53:4;
66:16;76:9,11;79:23;
118:17;120:12,14;
121:9;126:20
**timing (1)**
187:20
**Tino (9)**
70:12,22;73:6;79:6,
17;80:2;81:13;82:4,6
**title (1)**
47:5
**Tobago (1)**
28:13
**today (21)**
5:15;8:19;10:2;
21:13;30:14;36:8;
62:13;63:20;69:1;
89:11,14,20,21,23;
90:6;91:7;163:11,24;
170:5,8;196:23
**together (9)**
7:20;13:3;16:8;
29:24,25;48:10;
101:17;136:9;193:11
**told (60)**
33:19,21;34:8,12;
46:25;47:5,17;49:15;
50:5;51:19;52:3;
57:24;59:13;61:5;
65:11;72:14;73:8;
76:4;80:20;84:23,25;
85:2,11;90:15;92:2,
22,23;93:8;95:5,16;
97:5,10;109:10;
112:6,21;124:21;
125:7,25;128:4;
130:24;131:20;136:6,
8,9,10,11;137:18;
147:20;160:9,16,21;
175:4,7;176:17;
186:8,15;188:5;

191:20;192:2,5
**took (29)**
38:19,19;48:13;
80:16;102:14;120:8;
121:4;122:20;123:19;
126:11,14,16,17;
128:18;139:25,25;
147:16,18;148:3;
152:25;153:2,4,5,7,
13,16,24;154:16;
166:18
**top (6)**
24:5;42:4;46:12;
70:3,5;105:15
**Torrence (1)**
42:9
**total (2)**
86:8;91:3
**totally (1)**
64:4
**touch (1)**
125:22
**towards (1)**
79:18
**Town (1)**
149:5
**Toyota (5)**
16:21;17:2;102:19,
20;157:5
**traffic (2)**
183:7,8
**transcribed (1)**
197:20
**transcript (3)**
197:18;198:18,24
**transferred (11)**
34:14;126:25;
127:24;128:1,17,21,
24;129:5,7;136:25;
148:5
**translate (1)**
179:20
**transpired (2)**
189:13,16
**transportation (1)**
11:10
**transported (1)**
126:14
**travel (2)**
95:17,18
**treat (3)**
122:2,6,9
**treated (4)**
55:20;121:24;
127:18;158:10
**treatment (3)**
121:25;127:19;
175:16
**trial (27)**
35:16;36:3,20;
84:12,13;86:16,18,18,
23,24,25;87:2;136:13,
23;137:3;138:5;

139:2,8,12;140:1;
163:21;164:5;166:9,
24;168:14;178:13,14
**trickery (1)**
72:19
**tried (8)**
60:20,21;86:19,20;
91:18;117:6;125:5;
168:5
**Trinidad (4)**
28:12,13,13;112:22
**trouble (1)**
113:9
**true (6)**
21:2;22:15;54:5,5;
58:6;166:2
**Trump (1)**
104:18
**Trust (1)**
167:8
**truth (3)**
61:1;62:24,24
**try (18)**
8:6;50:20;51:3,16;
55:7;87:5;89:6;112:2;
113:9;119:20;142:17;
151:3;157:17;187:1,
2,4,4;193:21
**trying (22)**
48:12;58:11;61:12,
24;62:23;64:12;
65:14;80:15;92:7;
94:11;99:8;100:19;
101:3;111:15,17,21;
115:18;121:8;139:22;
177:13;187:9;194:7
**turn (6)**
41:23;67:22;74:1,
12,15;188:9
**turned (2)**
50:17;147:24
**turnkey (5)**
49:22;50:8,9,16;
130:21
**Twelve (1)**
119:4
**twice (3)**
118:7,22;121:14
**Twitter (1)**
115:5
**two (56)**
13:23;15:1;19:21;
27:24;29:11;30:25,
25;31:9,16;32:7,10,
25;33:4;36:14,14;
42:13;50:3;53:1;
59:16;60:7;63:15;
73:11;77:7;79:9,10;
81:6,23;85:13;87:22;
94:22;100:9;103:10;
112:15,16;114:14,14;
115:3,9,12,15;118:23;
124:3,4,17;125:14;

130:11;138:15;
142:19;144:2;149:1;
161:13,15;169:11;
172:21;188:10;196:8
**two-wheeler (1)**
99:6
**type (15)**
16:20,23;22:21;
25:20;30:12;49:4;
50:20;52:15;58:4;
85:23;143:18;150:22;
157:21;168:6;173:2
**types (5)**
51:10;94:22;120:6;
140:15;191:15
**typewritten (1)**
43:13

**U**

**Uh-hmm (3)**
43:14;73:15;82:2
**ultimately (1)**
84:5
**uncharged (1)**
141:17
**uncle (1)**
32:21
**unclear (1)**
149:17
**uncommon (1)**
53:10
**under (4)**
5:5;81:25;84:16;
89:20
**underneath (1)**
43:22
**understands (1)**
141:18
**understood (5)**
42:21;87:7;100:7;
142:5;189:24
**underwent (1)**
52:13
**United (3)**
5:12;161:22;179:17
**unlike (1)**
12:8
**unmarked (1)**
123:16
**uno (3)**
102:18;178:20,22
**unsolved (1)**
53:23
**unwanted (1)**
108:18
**unwritten (2)**
105:5;106:24
**up (71)**
9:10,12;10:9,9;
12:5,7;16:16;17:3;
22:9;25:18;33:3;
37:25;39:16;47:14;

51:2,3,3;53:5;55:16;
57:1;59:16;64:2;
65:14;74:14;77:1;
84:12;91:2,6;92:19;
93:21;99:2,4;114:7,8;
115:4;116:4;118:25;
119:1,13;122:11,17;
123:6;125:5;127:24;
128:10;130:19;
131:13,19;139:23;
140:19;155:2;157:18;
160:10;165:1,13;
167:13,21;170:3;
171:1,3;175:19;
176:3,4;177:3;181:5;
185:1,9;189:20,25;
190:10,23
**upon (1)**
130:14
**upstairs (2)**
126:15;154:21
**use (16)**
39:20;50:22,23;
51:9;54:23;55:6;83:9,
20,21;110:8;113:8;
143:4;151:13,16;
173:15;187:7
**used (20)**
15:16,17;25:9;
29:23,24;31:10;
50:20;51:16;55:13,
19;68:6;98:15;
107:11;113:15;
146:10;157:17;170:7;
171:13;182:16;
190:10
**using (5)**
107:10;167:11;
183:9;190:13;195:18

**V**

**variation (1)**
170:8
**variety (1)**
174:17
**various (2)**
105:11;118:13
**varying (1)**
105:10
**Veras (2)**
21:12;88:6
**verdict (1)**
140:2
**versus (1)**
5:10
**victim's (1)**
42:8
**video (3)**
159:21,23,24
**view (1)**
76:19
**viewed (1)**

76:14
**violence (3)**
  55:7;140:8,15
**violent (2)**
  54:25;67:13
**visitation (1)**
  30:12
**vividly (3)**
  191:25;192:1;
  194:23
**voice (1)**
  7:21
**voluntarily (1)**
  156:16

## W

**wait (2)**
  8:9;162:6
**waited (1)**
  79:21
**waiting (4)**
  73:12,19;77:7;
  136:13
**waive (3)**
  86:16,17;197:23
**wake (1)**
  112:9
**walk (1)**
  156:23
**walked (1)**
  59:20
**walking (2)**
  52:25;79:18
**wall (1)**
  125:2
**warn (1)**
  144:13
**washroom (1)**
  39:20
**waste (2)**
  87:6;187:6
**watch (1)**
  102:24
**water (1)**
  62:24
**Watts (2)**
  143:13,14
**way (35)**
  11:7,7;14:2,10;
  15:4;17:11;19:9;
  32:23;62:3;67:4;
  72:19;81:2;86:11;
  99:14;104:3;109:3,4;
  110:7;116:3,4;
  118:25;119:1;120:5;
  121:24;158:10;
  159:16;160:14;162:1;
  163:19;165:19;175:6;
  182:11;185:21;
  186:21;195:7
**ways (1)**
  181:20

**wearing (4)**
  73:24;75:2,6,11
**wears (2)**
  74:9,20
**week (2)**
  118:7,22
**weeks (2)**
  31:22;32:2
**welcome (2)**
  169:23;188:12
**weren't (11)**
  16:16;31:8;32:14,
  17;54:23;61:18;
  80:17;107:14;152:17;
  159:20;189:9
**West (10)**
  9:15;43:5;44:25;
  96:20,21,25;97:1;
  103:13,15;104:6
**Western (5)**
  26:15;34:13;
  126:22,24;148:3
**what's (12)**
  41:5;56:21;58:14;
  68:10;83:8;85:13;
  101:11;153:23;154:1;
  170:15,18;186:18
**whatsoever (1)**
  62:5
**whenever (1)**
  165:17
**When's (1)**
  178:10
**where's (2)**
  51:4,5
**Whereupon (6)**
  40:13;88:1;117:15;
  135:18;189:1;193:2
**whichever (3)**
  11:7;90:19;123:18
**White (3)**
  104:18;124:7,12
**whole (9)**
  48:23;52:24;62:16;
  69:24;73:2;111:4;
  126:1;170:13;180:22
**Who's (2)**
  56:10;165:5
**whose (3)**
  82:13,16,21
**Wiley (19)**
  42:9,19;47:20;62:5,
  9;85:16;91:18;
  114:23;120:18;
  132:18;136:23;139:2,
  13;154:24;155:18;
  171:4;172:5;173:23;
  177:19
**Wileys (3)**
  42:18,20,20
**Wilfredo (1)**
  65:8
**willing (2)**

46:18;54:4
**withdraw (2)**
  134:25;182:10
**withdrawing (1)**
  155:2
**withdrew (1)**
  155:6
**within (8)**
  14:11;97:5;100:9;
  104:10;105:9;111:8;
  115:9;150:22
**without (2)**
  45:15;96:1
**WITNESS (28)**
  6:17,23;22:17;
  40:10;41:13;60:22,
  23;61:6;62:8;64:21;
  80:17;141:24;142:10;
  145:10;150:9;163:9,
  15;166:1,4,12,22;
  167:1;169:23;188:12;
  197:8,25;198:6,12
**witnessed (1)**
  61:7
**wolf's (1)**
  56:25
**Wood (1)**
  26:16
**word (13)**
  20:14;51:24;65:14;
  76:3,5;94:12;115:1,1,
  3,8,13;160:5;195:18
**word-for-word (3)**
  77:1;191:10;194:23
**words (6)**
  28:8;173:4;180:18,
  20,22;182:16
**wore (2)**
  76:10;123:15
**work (5)**
  25:20;106:8,12;
  187:4,11
**worked (5)**
  13:5;25:10,17;
  54:16;105:21
**working (2)**
  67:17;146:18
**works (1)**
  6:10
**worried (1)**
  152:17
**worth (1)**
  153:22
**wound (2)**
  109:11;186:11
**writ (2)**
  85:3;148:23
**write (3)**
  27:12,12;66:7
**writ'ed (5)**
  136:13,16,20;
  137:13,21
**writing (1)**

38:21
**wrong (3)**
  85:14;109:4;175:21
**wrote (1)**
  39:8

## Y

**year (14)**
  10:19,21;11:17;
  30:2;33:25;34:6;
  36:22;100:9;137:10,
  11;143:19,23;162:6;
  167:2
**years (31)**
  9:2;19:11;23:1,2;
  34:25;35:6;37:1,4;
  38:25;63:12;91:10,
  11,12;100:8;102:2;
  114:1;118:23;119:4,
  5;121:1;133:23;
  137:19,24;138:5;
  149:1;162:5,7;
  186:25;187:5,22;
  191:11
**Yep (1)**
  43:3
**yesterday (3)**
  5:22;6:18;160:10
**young (2)**
  59:1;115:6
**younger (3)**
  17:15;19:5;29:12
**youngest (1)**
  19:7

## Z

**Zeros (1)**
  41:16
**Zoom (2)**
  6:2;198:14
**Zoomed (1)**
  198:14

## 0

**000039 (1)**
  41:24
**0001 (1)**
  89:24
**00066 (1)**
  41:20
**001905 (1)**
  66:17
**0100 (1)**
  42:6

## 1

**1 (5)**
  40:2;41:8;71:6;
  85:9;128:8

**1.8 (9)**
  16:21;102:17,18,
  20,21;103:1;146:8;
  178:19,19
**10 (5)**
  81:8;91:11;97:16;
  119:4;183:16
**100 (1)**
  22:9
**101 (2)**
  85:10,11
**1035 (3)**
  5:2;9:9;169:18
**11 (4)**
  119:4;121:1;122:7,
  10
**11:30 (2)**
  70:7,21
**12 (7)**
  70:8,21;119:4;
  121:1;187:17,18,19
**14 (1)**
  35:3
**14th (2)**
  36:23;85:21
**15 (5)**
  37:2;95:11;102:2;
  119:3;187:5
**16 (3)**
  38:25;81:4,8
**1630 (1)**
  44:20
**16th (1)**
  82:5
**19 (1)**
  163:10
**1905 (1)**
  66:19
**1907 (1)**
  70:4
**1911 (1)**
  66:18
**1968 (1)**
  162:1
**1972 (3)**
  9:4;170:16,17
**1985 (1)**
  101:16
**1987 (1)**
  95:10
**1988 (1)**
  95:10
**1990 (71)**
  15:7;16:1;17:9;
  18:6;20:1;21:17;
  23:19,24;24:21;25:1;
  30:9,16,21,24;31:15;
  42:6;44:17,20;45:11,
  23;46:4;47:21;52:14;
  59:3;62:6,9;65:6;
  68:22;69:2;70:7,21;
  73:17;76:4,21;78:21;
  80:4;81:4,8;82:5;

Maysonet v.
Guevara

Christopher Goossens

93:23;117:25;120:15,
16,17;123:1,5,20;
144:4;145:18;146:14;
147:5;149:3;151:13,
16;154:8;158:13;
162:24;171:4;172:5;
173:1,23;174:23;
177:19;185:1,2;
191:3;192:9;193:8;
194:1;195:22;196:25
**19901 (1)**
151:11
**1990s (2)**
93:15;184:22
**1991 (13)**
9:24;35:21,22;36:6;
162:16,25;163:23;
164:7,15;165:17;
166:1;167:3;187:21
**1992 (4)**
35:4,5;36:24;85:18
**1995 (4)**
89:16;139:5;
178:15;187:21
**1in (1)**
151:13

## 2

**2 (2)**
40:20;71:10
**20 (2)**
57:4;68:22
**2006 (4)**
9:25;37:8,10;167:4
**2008 (1)**
37:6
**2009 (1)**
167:9
**2017 (1)**
169:12
**2020 (1)**
53:6
**2033 (3)**
43:5;44:25;45:3
**23 (3)**
44:20;45:11;117:24
**24 (9)**
24:16;46:4;52:14;
70:7;120:15,17;
122:25;123:5,20
**24th (4)**
45:23;59:3;70:21;
117:25
**25 (1)**
42:6
**25th (4)**
62:6,9;78:21;80:4
**26 (2)**
37:8;167:4
**26th (1)**
37:10
**27 (1)**

191:11
**2801 (2)**
44:21,25

## 3

**3 (4)**
70:3,4,5;73:3
**30 (2)**
35:6;57:4
**39 (2)**
39:16;42:1

## 4

**4 (1)**
102:20
**4:30 (2)**
44:21;199:6
**40 (3)**
46:9;87:17,20
**401K (1)**
181:17
**48 (2)**
9:2;114:1

## 5

**5 (18)**
23:18,22;47:17;
48:17;49:4,8;52:15;
55:6;57:23;67:13;
69:8,10,16;123:1;
127:21;129:23;130:7;
132:9
**55 (3)**
26:15;34:14;114:15
**55/Grand (2)**
114:21;131:13

## 6

**6 (7)**
9:4;37:8;81:2,5,24;
170:16,17
**60651 (1)**
5:3
**66 (2)**
40:2;41:19
**67 (1)**
162:1

## 7

**7 (2)**
35:21,22
**70s (1)**
143:25
**77 (2)**
19:11,11
**7th (1)**
36:6

## 8

**8 (1)**
27:17
**80s (9)**
13:1;14:18;53:5,12;
143:25;158:4;184:24,
25;185:2
**86 (1)**
101:16
**87 (2)**
11:24;95:10
**88 (2)**
11:25;95:10

## 9

**9 (3)**
81:17,19;82:9
**90 (2)**
38:22;54:24
**90s (7)**
13:1;14:18;26:12;
53:12;98:23;158:3,3
**91 (1)**
187:22
**92 (2)**
148:23,24
**95 (2)**
148:25;187:23

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 22

**Rosa Bello**
**October 15, 2021**

Pages 1-92
Exhibits 1-3
_____
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NO. 18CV2342


JOSE JUAN MAYSONET,
                Plaintiff,

v.

REYNALDO GUEVARA, et al.,
                Defendants.


_____



VIDEOCONFERENCE DEPOSITION

OF ROSA BELLO

TAKEN OCTOBER 15, 2021

AT THE OFFICES OF

REAL TIME COURT REPORTING

9 HAMMOND STREET

WORCESTER, MASSACHUSETTS



Reporter:  Rebecca J. Gladu



REAL-TIME COURT REPORTING
  14 Main Street              9 Hammond Street
Springfield, MA  01144    Worcester, MA  01610

**Rosa Bello**
**October 15, 2021**

**2..5**

Page 2

APPEARANCES:
For the Plaintiff:
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, New York 10022
BY:   JENNIFER A. BONJEAN, ESQ.
      ASHLEY B. COHEN, ESQ.
718.875.1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com
For the Defendants Halvorsen, Epplen, Mingey,
Montilla, and Paulnitsky:
THE SOTOS LAW FIRM, P.C.
141 West Jackson, Suite 124A
Chicago, Illinois 60604
BY:   JOSH M. ENGQUIST, ESQ.
630.735.3300
jengquist@jsotoslaw.com
For the Defendant Guevara:
LEINENWEBER, BARONI & DAFFADA, LLC
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
BY:   MEGAN K. MCGRATH, ESQ.
312.663.3003
mkm@ilesq.com
For the Defendant DiFranco:
HINSHAW & CULBERTSON, LLP
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
BY:   V. BRETTE BENSINGER, ESQ.
312.704.3000
bbensinger@hinshawlaw.com

Page 4

INDEX:

                                              PAGE

WITNESS:  ROSA BELLO

Examination by Mr. Engquist ............... 8

Examination by Ms. Bensinger .............. 54

Examination by Ms. Bonjean ................ 58

Further Examination by Mr. Engquist........ 79

Further Examination by Ms. Bonjean......... 82

Further Examination by Ms. Bensinger ...... 86

EXHIBITS:

EXHIBIT   DESCRIPTION                       PAGE

No. 1     Transcript dated March 26, 1992,  16
          Bates No. CCSAO002429 and
          CCSAO002519 - CCSAO002545

No. 2     Objection of Witness to Extended  29
          Media Coverage of Testimony,
          Bates No. CCSAO000493

No. 3     Statement of Rosa Bello dated     43
          8/23/90, Bates No. CCSAO000306 -
          CCSAO000309

Page 3

APPEARANCES:  (continued)

For the Defendant City of Chicago:

ROCK, FUSCO & CONNELLY, LLC

312 North Clark, Suite 2200

Chicago, Illinois 60654

BY:   EILEEN E. ROSEN, ESQ.

      AUSTIN G. RAHE, ESQ.

312.494.1000

erosen@rfclaw.com

arahe@rfclaw.com

In Attendance:

Alex Jandrow, Videographer, Real Time Court

Reporting

Carlos Melendez

Page 5

     S T I P U L A T I O N S

      It is agreed by and between the parties

that all objections, except objections as to the

form of the questions, are reserved and may be

raised at the time of trial for the first time.

      It is further agreed by and between the

parties that all motions to strike unresponsive

answers are reserved and may be raised at the

time of trial for the first time.

      It is further agreed by and between the

parties that the sealing of the original

deposition transcript is hereby waived.

      It is further agreed by and between the

parties that the notification to all parties of

the receipt of the original deposition

transcript is hereby waived.

**Real Time Court Reporting**
**413.732.1157**

**Rosa Bello**
**October 15, 2021**                                                        **6..9**

---

**Page 6**

```
1                * * * * *
2           ROSA BELLO, Deponent, having produced
3   satisfactory identification by means of
4   Massachusetts Driver's License, was duly sworn,
5   deposes and states as follows:
6               THE VIDEOGRAPHER:  We are on
7        the record.  The date is October 15, 2021,
8        and the time on the monitor is 10:13 a.m.
9               This is the video-recorded
10       deposition of Rosa Bello being taken in
11       the matter of Jose Juan Maysonet versus
12       Reynaldo Guevara, et al., Case
13       No. 18CV2342.  This matter is being heard
14       in the United States District Court for
15       the Northern District of Illinois, Eastern
16       Division.
17               This deposition is being held
18       via Zoom.  My name is Alex Jandrow.  I'm a
19       legal videographer representing Real Time
20       Reporting.  The court reporter is Rebecca
21       Gladu representing Real Time Reporting.
22               Counsel will now introduce
23       themselves for the record, beginning with
24       plaintiff's counsel, stating whom you
```

**Page 7**

```
1   represent and any stipulations that apply
2   to this deposition.
3           MS. BONJEAN:  Good morning.
4   Jennifer Bonjean -- that's
5   B-O-N-J-E-A-N -- and Ashley Cohen,
6   C-O-H-E-N, on behalf of the plaintiff.
7           MR. ENGQUIST:  John Engquist
8   on behalf of Defendants Halvorsen, Epplen,
9   Mingey, Montilla, and Paulnitsky.
10          MS. McGRATH:  Megan McGrath on
11  behalf of Defendant Guevara.
12          MS. BENSINGER:  Brette
13  Bensinger on behalf of Defendant State's
14  Attorney DiFranco.
15          MS. ROSEN:  Eileen Rosen and
16  Austin Rahe on behalf of Defendant City of
17  Chicago.
18          MR. ENGQUIST:  Just for the
19  record, the deponent's husband is also in
20  the room just as an observer.  Sir, if you
21  could just put your name on the record.
22          MR. MELENDEZ:  Carlos
23  Melendez.
24          THE VIDEOGRAPHER:  Will the
```

**Page 8**

```
1   court reporter please swear in the witness
2   and we can proceed.
3           (Witness sworn)
4   EXAMINATION BY MR. ENGQUIST:
5       Q.     Can you please state your name and
6   spell your last name?
7       A.     Rosa Bello, B-E-L-L-O.
8       Q.     Now, Ms. Bello, have you ever given
9   a deposition before?
10      A.     No.
11      Q.     Okay.  I know, right before this
12  started, you came in with -- your husband asked
13  about some of the ground rules.  And I talked
14  about them, but I'm going to go through them
15  again on the record, okay?
16      A.     Okay.  Sure.
17      Q.     Okay.  This is just like your other
18  testimony before.  It's under oath, like what
19  you just did, but what's a little bit different
20  about it is the fact that we don't have a judge
21  here.  So like I told you before, there's
22  probably going to be objections at certain
23  times.  So if you could do your best to wait
24  until the objection is complete before you start
```

**Page 9**

```
1   answering, just so we don't have people talking
2   over each other, all right?
3       A.     Okay.
4       Q.     Also, you may know exactly where
5   I'm going with a question, but if you could wait
6   until I'm done with it before you start
7   answering, that way it will be easier so that no
8   one will be talking over each other, all right?
9       A.     Okay.
10      Q.     If you don't understand a question
11  that anyone asks you, let us know.  We'll do our
12  best to rephrase it or repeat it or slow down or
13  whatever we need to do, okay?
14      A.     Okay.
15      Q.     Ah-huhs and mm-hmms -- this is one
16  of the things we talked about.  Ah-huhs and
17  mm-hmms and things like that don't come across
18  on the record.  So if you do that, someone will
19  probably prompt you, is that a yes or no, okay?
20      A.     Okay.  That's fine.
21      Q.     Also, this is not an endurance
22  contest.  If you need to take a break at any
23  time, just let us know.
24      A.     Okay.
```

**Rosa Bello**
**October 15, 2021**

10..13

```
 1      Q.      The only thing we ask is, if
 2 there's a question pending, you answer the
 3 question before we take the break.
 4              Is that okay?
 5      A.      That's fine.
 6      Q.      Okay.  Ma'am, where do you
 7 currently live?
 8      A.      I live in Fitchburg, Massachusetts.
 9      Q.      Okay.  And how long have you been
10 there?
11      A.      17 years.
12      Q.      And who do you currently live with
13 there?
14      A.      My husband and my four daughters.
15      Q.      And you also have a son; is that
16 correct?
17      A.      Yes, I do.
18      Q.      And where does he live?
19      A.      He lives in Fitchburg.
20      Q.      Okay.  Does he also live with you?
21      A.      No, he doesn't.
22      Q.      Are you currently employed?
23      A.      Yes, I am.
24      Q.      Where are you employed, ma'am?
```

```
 1      A.      I work in a market kitchen.
 2      Q.      In what kitchen?
 3      A.      Market Basket kitchen.  I'm a cook.
 4      Q.      Now, in 1990, where did you live?
 5      A.      In Chicago, Illinois.
 6      Q.      And do you remember where you lived
 7 back in 1990?
 8      A.      No, I do not.
 9      Q.      Do you remember living at 1302
10 North Bowman?
11      A.      It's been too many years.  I don't
12 recall.
13      Q.      I want to direct your attention to
14 August of 1990 -- I'm sorry, May 25 of 1990.
15              Do you recall who you lived with
16 back then?
17      A.      At the time it was my two youngest
18 daughters, my two oldest that I have now.
19      Q.      Did you also live with Jose
20 Maysonet at that time?
21      A.      Yes.
22      Q.      And how do you know Jose Maysonet?
23      A.      We were dating.
24      Q.      Okay.  And when did you start
```

```
 1 dating him?
 2      A.      I don't recall.  It's been a very
 3 long time on that, too.  So I don't keep track.
 4      Q.      Did he ever live with you?
 5              MS. BONJEAN:  Objection to the
 6      foundation of that question.
 7 BY MR. ENGQUIST:
 8      Q.      You can still answer.
 9              THE WITNESS:  I can still
10      answer?
11              MS. BONJEAN:  There will be
12      objections along the way.  You can answer.
13      A.      Yes, he did live with me a short
14 time.
15 BY MR. ENGQUIST:
16      Q.      And how long did he live with you?
17      A.      About six or seven months.  I'm not
18 sure.
19      Q.      Now, do you recall giving testimony
20 in the case of The People of the State of
21 Illinois versus Alfredo Gonzalez?
22      A.      It's been a very long time.  I
23 don't recall.  It's been a long time.
24      Q.      I understand it's been a long time.
```

```
 1 I'm not asking if you recall everything that's
 2 happened then, but do you recall testifying in a
 3 case -- a murder case of Alfredo Gonzalez?
 4              MS. BONJEAN:  Objection.
 5 BY MR. ENGQUIST:
 6      Q.      Go ahead.
 7      A.      Yes.
 8      Q.      And have you reviewed that
 9 testimony at all since you gave it back in March
10 of 1992?
11              MS. BONJEAN:  Objection to the
12      form and foundation of that question.
13      A.      I don't remember.
14 BY MR. ENGQUIST:
15      Q.      Okay.  When you testified back in
16 March 26 of 1992 in a case People versus Alfredo
17 Gonzalez, did you tell the truth?
18              MS. BONJEAN:  Objection to the
19      form and foundation of that question.  Are
20      you asking -- I'm sorry.
21              MR. ENGQUIST:  I'm asking the
22      question I asked, so --
23              MS. BONJEAN:  Okay.  Well, I
24      mean, I think you're asking questions
```

**Rosa Bello**
**October 15, 2021**

14..17

**Page 14**

1  that -- is she aware that she has certain
2  rights?
3        MR. ENGQUIST: You're really
4  pushing it on this certain position, and I
5  don't know why you're doing it. I'm just
6  asking her a question about whether or not
7  she told the truth back on March 26, 1992
8  when she testified under oath. It's a
9  fair question.
10       MS. BONJEAN: It's a fair
11 question. I just think she ought to know
12 that -- she's not represented here. She
13 doesn't have an attorney here. So she
14 should know that she has the right to have
15 an attorney, if she wanted an attorney. I
16 assume you told her that when you spoke to
17 her because that would be the right thing
18 to do.
19       MR. ENGQUIST: Are you
20 serious?
21       MS. BONJEAN: Yes. I mean,
22 you're the one that notified -- that
23 noticed her deposition. I think that you
24 would have let her know that she had a

**Page 15**

1        right to counsel if you're going to ask
2        her questions that would -- you know,
3        those types of questions.
4  BY MR. ENGQUIST:
5      Q.    Ma'am, could you answer the
6  question, please? Do you need it repeated?
7      A.    Yes, I told the truth.
8      Q.    Thank you.
9        Now, prior to testifying on March
10 26, 1992, you also gave a statement to an
11 assistant state's attorney by the name of Frank
12 DiFranco back in August of 1990.
13       Do you recall that?
14     A.    Like I said, it's been many years,
15 and I don't keep track of everything.
16     Q.    Ma'am, as you sit here today, do
17 you recall an incident back in 1990 involving
18 Jose Maysonet and some of his -- some people
19 that he knew and a handgun in your home?
20       MS. BONJEAN: Objection to the
21     form and foundation of that question. If
22     you understand it, you can answer.
23     A.    Like I said, it's been years.
24 BY MR. ENGQUIST:

**Page 16**

1      Q.    Do you recall the general subjects
2  that you testified to back in 1992 in a murder
3  trial of Alfredo Gonzalez?
4        MS. BONJEAN: Objection to the
5      form of that question. You can answer if
6      you understand.
7      A.    No, I don't understand. Can you
8  explain it?
9  BY MR. ENGQUIST:
10     Q.    Do you remember the subject that
11 you were testifying about in 1992?
12       MS. BONJEAN: Same objection
13     to the form.
14     A.    Like I said, it's been many years.
15       MR. ENGQUIST: Okay. I'll
16     mark this as Exhibit No. 1.
17     (Exhibit 1, Transcript dated March 26,
18     1992, Bates No. CCSAO002429 and
19     CCSAO002519 - CCSAO002545, marked for
20     identification)
21 BY MR. ENGQUIST:
22     Q.    I'm showing you what's been marked
23 as Exhibit No. 1. It's marked CCSAO2429 and
24 2519 through 2545.

**Page 17**

1        Do you have that in front of you?
2      A.    I was going through the whole
3  thing. I mean --
4      Q.    Okay. Do you want to read the
5  whole thing?
6      A.    Yes, I would. I would appreciate
7  that.
8        MR. ENGQUIST: Why don't we go
9      off the record rather than just sitting
10     here and reading it.
11       THE WITNESS: That's fine.
12       MR. ENGQUIST: And then we'll
13     come back on when she's done reading
14     through the exhibit.
15       THE VIDEOGRAPHER: Okay. Off
16     the record at 10:26.
17     (A recess was taken)
18       THE VIDEOGRAPHER: Back on the
19     record at 10:28.
20 BY MR. ENGQUIST:
21     Q.    Ma'am, I'm not sure if you went
22 through the entire thing, but --
23     A.    No. I just went through the part
24 where you talk about certain things and -- just

**Rosa Bello**
**October 15, 2021**                                                        **18..21**

**Page 18**

1 go ahead and ask your question.

2      Q.      Does that refresh your recollection

3 as to the subject matters that you testified to

4 on --

5      A.      Yes.

6      Q.      -- March 26, 1992?

7      A.      Yes.

8      Q.      Okay.  So that's actually what I

9 want to focus in on.

10          Do you have an independent

11 recollection of that night, ma'am?

12          MS. BONJEAN:  Objection to the

13      form of that question.

14              MR. ENGQUIST:  That's fine.  I

15      can rephrase that.

16 BY MR. ENGQUIST:

17      Q.      Do you have an independent

18 recollection of the night that you testified to

19 in here, May 24, 1990?

20      A.      I do not at this point, no.

21          MS. BONJEAN:  Objection to

22      form.  I'm sorry, go ahead.

23 BY MR. ENGQUIST:

24      Q.      Well, let me ask you a little bit

**Page 19**

1 about Mr. Maysonet.

2          Do you recall -- did Mr. Maysonet

3 belong to a street gang?

4              MS. BONJEAN:  Objection to the

5      foundation of that question, but you can

6      answer.

7      A.      Yes.

8 BY MR. ENGQUIST:

9      Q.      Which gang was that?

10      A.      The Latin Kings.

11      Q.      And do you know if he had any kind

12 of rank or authority within the gang?

13          MS. BONJEAN:  Objection to

14      form and foundation of that question.

15      A.      No, I do not.  I was never around

16 that.

17 BY MR. ENGQUIST:

18      Q.      Okay.  And do you remember who

19 Lupia is?

20      A.      No, I do not.

21      Q.      How about Alfredo Gonzalez, the

22 person you testified about there?

23      A.      Like I said, this happened many

24 years ago from now.  I don't recall any of it.

**Page 20**

1 I don't -- like I said, I don't pay any mind to

2 it.  I have moved on.

3      Q.      How about Justino Cruz?

4          MS. BONJEAN:  Objection.

5      What's the question?

6 BY MR. ENGQUIST:

7      Q.      Do you recall him?

8      A.      Like I said, that was many years

9 ago.  I don't keep track of everything.

10      Q.      When was the last time you spoke

11 with Jose Maysonet?

12      A.      I do not.

13      Q.      Okay.  Just try to give me an idea.

14 Would it be back in 1990?  Would it be in 1992?

15 Do you have a --

16      A.      My son was only two months old, and

17 that's when he was in jail.  Otherwise [sic]

18 than that, no other contact.

19      Q.      Now, shortly before giving this

20 testimony back in March of 1992, do you recall

21 an incident where you were almost run down by a

22 car?

23          MS. BONJEAN:  I'm sorry, I'm

24      going to -- just a belated objection to

**Page 21**

1      foundation.  Do you need some time?

2          THE WITNESS:  No.

3          MS. BONJEAN:  Take your time.

4      A.      Yes.

5 BY MR. ENGQUIST:

6      Q.      And shortly before you gave this

7 testimony, you were in -- you were being

8 relocated by the District Attorney's Office; is

9 that correct?

10          MS. BONJEAN:  I'm going to

11      object to the leading nature of this

12      question in case you actually intend to

13      present this testimony at some point, but

14      you can if you understand.

15      A.      Nobody did anything for me.  I did

16 everything on my own.

17 BY MR. ENGQUIST:

18      Q.      Okay.  Prior to giving this

19 testimony back in 1992 for Alfredo Gonzalez, did

20 you receive any kind of threats?

21          MS. BONJEAN:  Objection.

22      Foundation.  You can answer.

23      A.      Yes.

24 BY MR. ENGQUIST:

**Real Time Court Reporting**
**413.732.1157**

**Rosa Bello**
**October 15, 2021**

22..25

| Page 22 |
|---|

1    Q.    And what was the first time you
2 recall being threatened?
3    A.    I don't recall.
4    Q.    And do you recall who threatened
5 you?
6    A.    No.
7    Q.    Were you threatened by members of
8 the Latin Kings?
9          MS. BONJEAN:  Objection to the
10    form and foundation.
11    A.    Yes.
12 BY MR. ENGQUIST:
13    Q.    Do you know who any of them were at
14 the time they made those threats?
15    A.    No.
16    Q.    Were you ever physically harmed by
17 anybody from the Latin Kings prior to giving
18 this testimony back in 1992?
19    A.    No.
20    Q.    Was any of your family ever
21 threatened by the members of the Latin Kings
22 prior to giving this testimony in 1992?
23    A.    I don't know.  I broke all ties
24 with my family, so I don't know.

| Page 23 |
|---|

1    Q.    When did you break all ties with
2 your family?
3    A.    It's been years.  I haven't spoken
4 to my family.
5    Q.    Did Jose Maysonet ever threaten
6 you?
7    A.    The last time I saw that man was
8 when my son was only two months old.
9    Q.    Can you turn to the very bottom
10 page 2531 or page 103 if you have the full
11 transcript?
12          They don't have line numbers here,
13 but about halfway down the page, where it begins
14 "Why", do you see that, "Why had you been
15 staying at a hotel?"
16    A.    I see that.
17    Q.    "Question:  Why have you been
18 staying at a hotel?
19          "Answer:  Because someone tried to
20 run me over with my son.
21          "Question:  You said somebody tried
22 to run you over?
23          "Answer:  Yes, with my son.
24          "Question:  You had your son at the

| Page 24 |
|---|

1 time?
2          "Answer:  Yes.  I was on my way to
3 the doctor.
4          "Question:  And approximately when
5 did this happen?
6          "Answer:  About 1:30, 2 o'clock
7 Friday, last Friday."
8          Do you see that there?
9    A.    Yes, I do.
10    Q.    Do you recall that incident, ma'am?
11    A.    Yes, I do.
12    Q.    And do you know who tried to run
13 you over with a car?
14          MS. BONJEAN:  Her car?
15          MR. ENGQUIST:  With a car.
16    It's the mask.  This actually does come
17    up.  If it's hard understanding me with
18    the mask, let us know and we'll try to say
19    it again.
20          THE WITNESS:  That's fine.
21          MR. ENGQUIST:  It's hard with
22    the enunciation, I'm sorry.
23 BY MR. ENGQUIST:
24    Q.    Okay.  So do you know now who it

| Page 25 |
|---|

1 was who tried to run you over?
2    A.    No.
3    Q.    Do you have a belief as to why
4 someone tried to run you over just prior to your
5 testimony of Alfredo Gonzalez?
6          MS. BONJEAN:  Objection to the
7    form and foundation of that question.
8    A.    No.
9 BY MR. ENGQUIST:
10    Q.    Do you believe it was connected in
11 any way to giving testimony in the Alfredo
12 Gonzalez case?
13          MS. BONJEAN:  Objection to
14    form and foundation of that question.
15    A.    No.
16 BY MR. ENGQUIST:
17    Q.    Was that the only attempt on your
18 life?
19    A.    No.
20    Q.    How many other times have there
21 been attempts on your life, ma'am?
22    A.    Eight times.
23    Q.    When was the first?
24    A.    When they tried to run me over with

**Rosa Bello**
**October 15, 2021**                                                    **26..29**

---

**Page 26**

1  my son.
2      Q.     And you said there was eight, so
3  there's seven more after that?
4      A.     Yes.
5      Q.     When was the next time?
6      A.     I don't know.  I just kept moving
7  myself around with my kids.  I was never in one
8  place too long.
9      Q.     And when you said "they," who is
10 the "they" that you believe --
11     A.     I don't know.  I just wanted to
12 keep me and my children safe.
13     Q.     I understand.
14            Other than trying to run you over
15 with a car, how did the other attempts -- how
16 did they occur?
17     A.     Shot up my window, tried to break
18 in my house with my children.
19     Q.     Anything else?
20     A.     I don't know.  I just don't keep
21 track of everything anymore.  I just keep myself
22 moving.
23     Q.     Is that why you moved out of
24 Chicago, ma'am?

---

**Page 27**

1      A.     I left Chicago because I wanted a
2  better life for myself and my kids and I needed
3  to do something different, so I left.  So I just
4  decided to break all ties with family and
5  everybody else.
6      Q.     And when did you leave?
7      A.     I left Chicago in '94.
8      Q.     And I know you said earlier you
9  were dating Jose Maysonet for six or seven
10 months.
11            Can you describe your relationship
12 with him during that period of time?
13     A.     No comment on the relationship that
14 I had with Juan.  I have no comment on that at
15 all.
16     Q.     Did he ever threaten you during
17 that time you were together?
18            MS. BONJEAN:  Objection to
19     form and foundation of that question.
20     A.     I really don't have anything to say
21 about him.  I really don't.  I really don't.
22 When it comes to him, I have nothing to say
23 about him, nothing.  Like I said, the last time
24 I saw this man was when my son was two months

---

**Page 28**

1  old.  I have no type of relationship with this
2  man, and whatever we had was dead and gone.  I
3  really don't have anything to say.
4  BY MR. ENGQUIST:
5      Q.     Why did you break off the
6  relationship with Jose Maysonet?
7      A.     Do I have to answer that question?
8      Q.     Yes, you do.
9            MS. BONJEAN:  Again, I'll
10     object.  Objection to the form,
11     foundation, and the relevance, but you can
12     answer.
13     A.     He was abusive.  There you go.
14 BY MR. ENGQUIST:
15     Q.     Ma'am, do you want to take a
16 minute?
17     A.     No.
18            MS. BONJEAN:  Yes.  If you
19     need one, just let us know.
20            THE WITNESS:  No.  I just want
21     to get this over.  I want this over so I
22     don't have to deal with these people
23     anymore.  I mean, this has been consuming
24     my life right now and I just want this

---

**Page 29**

1      over.
2  BY MR. ENGQUIST:
3      Q.     Okay.  When you say that he was
4  abusive, was he abusive during that six or seven
5  months that you were dating him?
6      A.     We had our difficult -- a lot of
7  arguing and pushing and -- it's been a long --
8  he kicked me in my face one day and -- yeah, I
9  almost stabbed him, yes, so relationship wasn't
10 good.
11     Q.     You said you almost stabbed him?
12     A.     Yes, because he kicked me in my
13 face while I was sleeping.  So anybody is going
14 to react the way I reacted.
15     Q.     I'm going to show you Exhibit 2.
16 It's a one-page document.
17     (Exhibit 2, Objection of Witness to
18     Extended Media Coverage of Testimony,
19     Bates No. CCSAO000493, marked for
20     identification)
21 BY MR. ENGQUIST:
22     Q.     I'm showing you what's been marked
23 as Exhibit No. 2.  It's a one-page document.  It
24 is Bates stamp marked CCSAO493.

---

**Rosa Bello**
**October 15, 2021**

Page 30

1        Do you want to finish reading it?
2        A.      Okay.
3        Q.      Do you see the signature on the
4 bottom?
5        A.      Yes, it's my signature, but in '91?
6 Is that what this --
7        Q.      No.  This wouldn't be in 1991.  The
8 case is a 92CR case.  The case was from then,
9 but I'm just saying this wasn't necessarily done
10 in 1992.  You can see the filed stamp if you
11 turn it upside down so you can read it.
12       A.      Yes.
13       Q.      The filed stamp says, "February
14 2017."
15       A.      Okay.
16       Q.      So that's your signature on the
17 bottom?
18       A.      Yes, it is.
19       Q.      I just want to direct your
20 attention to -- is that your handwriting in
21 Section No. 3?
22       A.      No.
23       Q.      Well, do you remember signing this?
24       A.      No.

Page 31

1        Q.      Okay.  Do you recall asking -- I
2 want to read it.  The handwritten part says,
3 "I'm in fear of the safety of me as well as my
4 family.  He is my ex-boyfriend and I do have a
5 child with him and he is a very active gang
6 member.  For these reasons, I would like it not
7 to be aired.  Please respect my wishes."
8        A.      Okay.  That's not my writing.
9        Q.      Okay.  You never wrote that?
10       A.      No, I did not.
11       Q.      Did you submit this to the court?
12       A.      No, I didn't.
13       Q.      Did you ever ask for the media
14 coverage not to be covered in the -- covered by
15 the media in the Jose Maysonet case?
16       A.      No.
17       Q.      Do you recall talking to the state
18 attorney's office back in 2017 about testifying
19 in the post-admission process of Jose Maysonet?
20       A.      I talk to so many of these guys
21 it's, like, okay.  No, I don't recall none of
22 this.
23       Q.      Okay.  Do you still have concern
24 regarding Jose Maysonet?

Page 32

1        MS. BONJEAN:  Objection to
2 form and foundation of that question.  If
3 you understand it, you can answer.
4        A.      Am I in fear?
5        Q.      Yes.
6        A.      No.  I'm good.
7        Can I ask a question?
8        Q.      Sure.  What's the question?
9        A.      This here is saying in the county
10 court of Illinois.  How would my signature be on
11 this and get to Illinois?
12       Q.      I'm not sure, ma'am.  That's your
13 signature.  I'm not sure.
14       A.      Okay.  This is my signature, but I
15 did not -- you know what I'm saying, so --
16 yeah...
17       MS. BONJEAN:  You can only
18 answer what you can answer.
19       THE WITNESS:  Okay.
20 BY MR. ENGQUIST:
21       Q.      During the period of time Jose
22 Maysonet lived with you, did he ever keep
23 firearms in the apartment?
24       A.      Like I said, it's been years and I

Page 33

1 don't -- I don't keep track of everything.  I
2 don't.  I don't live in the past.  I go forward.
3        Q.      Okay.  Let's go back to Exhibit
4 No. 1, which is your testimony.
5        A.      I read it already.
6        MS. BONJEAN:  Can you please
7 lay the foundation?  This is testimony
8 from Alfredo Gonzalez's trial, not
9 Mr. Maysonet's trial.
10       MR. ENGQUIST:  Yes.
11       MS. BONJEAN:  Okay.  Just --
12 you say from the past.  You know, this is
13 not really very clear, sorry.  Which case
14 are you directing to?
15 BY MR. ENGQUIST:
16       Q.      I just want to go to -- you said
17 you reviewed it?
18       A.      Yes, but we've been talking about
19 other things, so it's like...
20       Q.      No, that's fine.  What I'm going to
21 be asking about starts on page 95.  I'm not sure
22 if you read that part before, but if you want to
23 read 95 through 99 or 100, you can read further
24 so that you get to 100, that's fine, 101.  I

**Real Time Court Reporting**
**413.732.1157**

**Rosa Bello**
**October 15, 2021**

34..37

**Page 34**

1  don't know if you read that far, if you want to
2  refresh your recollection in that way or if you
3  want to --
4      A.    No.  Whatever is in here is
5  everything that I said.
6      Q.    And was everything you said
7  truthful at the time?
8      A.    Yes.
9      Q.    But as you sit here today, you
10 don't recall the specifics, correct?
11     A.    Yes, only what I'm reading in the
12 report that I made.
13     Q.    So let me direct your attention to
14 page 95.
15     A.    Go ahead.  Ask me the question.
16     Q.    I want to direct your attention
17 to -- it would have been line -- the question
18 was, "Now, who do you know as Lluvia?
19           "Answer:  Alfredo Gonzalez.
20           "Question:  Alfredo Gonzalez?
21           "Answer:  Yes.
22           "And who did he come over with?
23           "With Tino and Fro.
24           "Question:  And what happened when

**Page 35**

1  these -- do you know Tino's last name?
2           "Answer:  I don't know.
3           "Question:  When these three guys
4  came over, what happened?
5           "Answer:  They rang the door bell
6  and I opened the door, let them in, and they had
7  wanted to speak to Juan."
8           When you gave that testimony, that
9  was truthful; is that correct?
10     A.    Yes.
11     Q.    Okay.  Go to the next page.  At the
12 very bottom of the page 96, "Question:  What
13 happened then?
14           "Answer:  Juan had called me and
15 told me to go into the room to get something.
16 So I went into the room and got what he asked me
17 for.
18           "Question:  Now, which room did you
19 go into to get something?
20           "Answer:  My bedroom.
21           "Question:  And what was it that
22 you went into the bedroom and got?
23           "Answer:  At the time I didn't know
24 what it was.

**Page 36**

1           "Question:  What was it -- well,
2  what actually did you get?
3           "Answer:  All I know is I went into
4  my room and I had picked up -- it was wrapped in
5  a plastic bag and then a towel.
6           "Question:  Did you know what was
7  in the towel?
8           "Answer: No, I didn't.
9           "Question:  This package in the
10 plastic bag, what did you do with it?
11           "I gave it to Lluvia."
12           When you gave those answers, were
13 those answers truthful?
14     A.    Yes.
15           MS. BONJEAN:  I'm going to
16      object to that manner of questioning, to
17      the form of that question.
18 BY MR. ENGQUIST:
19     Q.    In this testimony, you're talking
20 about Juan; you're talking about Mr. Maysonet;
21 is that correct?
22     A.    Yes.
23     Q.    Without reading and going through
24 the entire thing here, if you go to the bottom

**Page 37**

1  of page 98, third line from the bottom,
2  "Question:  Did you see what was inside at this
3  time?
4           "Answer:  No.
5           "Did you later see what was inside?
6           "Answer:  Yes."
7           Next page, "What was inside?
8           "Answer:  A gun.
9           "Had you seen a gun before?
10           "Answer:  No.
11           "When you saw the gun, who had the
12 gun?
13           "Lluvia.
14           "What did you see Lluvia do with
15 the gun?
16           "He stuck the bullets in the thing.
17 He stuck it in the pistol."
18           "Question:  When you say stuck the
19 bullets in the thing, what is the thing you're
20 talking about?
21           "I don't know what they call it.
22           "Question:  Was it a clip?
23           "Answer:  Yes."
24           When you gave that testimony, was

**Rosa Bello**
**October 15, 2021**

**Page 38**

1 that truthful testimony?
2     A.    Yes.
3     Q.    Let's go to the next page, page,
4 100, about seven lines down, "Question:  What
5 was your reaction and what did you do when you
6 first learned there was a gun inside that towel?
7          "Answer:  I got upset.
8          "Did you say anything?
9          "Answer:  Yes, I did.
10          "Who did you say something to?
11          "To Juan.
12          "Question:  After the gun was given
13 to Alfredo Gonzalez, what did he do with the
14 gun?
15          "Answer:  He wrapped it in the
16 plastic bag and stuck it back into the towel and
17 I gave him a plastic bag to stick it in.  After
18 that, he stuck it under his shirt."
19          Was that truthful testimony back in
20 1992?
21     A.    Yes.
22     Q.    Let's go to page 102.  Fifth line
23 down, "Question:  Now, after the gun was given
24 to Mr. Gonzalez and he put it inside of his

**Page 39**

1 shirt, what happened then?
2          "Answer:  They left.
3          "Question:  Did everybody leave?
4          "Answer:  All of them left.
5          "Question:  Including Jose
6 Maysonet?
7          "Answer:  Yes.
8          "Do you know where they went?
9          "No, I don't."
10          Do you see that?
11     A.    Yes, I do.
12     Q.    Was that truthful testimony?
13     A.    Yes.
14     Q.    Now, if we go to the next line,
15 "Now, I want to direct your attention to
16 sometime later that evening.  Did Maysonet
17 return?
18          "Answer:  After 12 o'clock.
19          "Do you remember about what time he
20 returned?
21          "No, I don't.
22          "Question:  It was sometime after
23 midnight?
24          "Answer:  Yes."

**Page 40**

1          Do you see that?
2     A.    Yes, I do.
3     Q.    Was that truthful testimony?
4     A.    Yes.
5     Q.    Now, at some point after that
6 night, you learned that two young
7 African-American men were shot and killed in
8 your neighborhood?
9          MS. BONJEAN:  I'm going to
10     object to the form and the foundation of
11     that question, the leading nature of that
12     question.  It assumes facts not in
13     evidence as to timing, and I'm going to
14     object.
15 BY MR. ENGQUIST:
16     Q.    Do you recall talking to anybody
17 about the Wiley brothers being murdered in your
18 neighborhood?
19     A.    No.
20     Q.    Okay.  Did you ever talk to Jose
21 Maysonet, Jose Juan Maysonet, regarding the
22 murders of the Wiley brothers?
23     A.    No.
24     Q.    I'm going to direct your attention

**Page 41**

1 to page 107, six lines down, I believe,
2 "Question:  Now, when you first learned that the
3 Wiley brothers had -- now, when did you first
4 learn that the Wiley brothers had been murdered?
5          "Answer:  The next day when I was
6 talking to my girlfriend.
7          "Question:  And that was May 26,
8 1990, right?
9          "Answer:  More or less, yes."
10          Was that truthful testimony when
11 you gave it?
12     A.    I don't recall.  Like I said, it's
13 been years.
14     Q.    Was that truthful?
15          MS. BONJEAN:  Objection to
16     form of that question.  She just answered
17     it and, you know, you're really trying to
18     set her up to, you know --
19          MR. ENGQUIST:  No, I'm not.
20     And don't try to imply something that --
21          MS. BONJEAN:  When you ask
22     people whether sworn testimony is
23     truthful, you know what you're indicating
24     or what the possibilities are.  We can go

**Page 42**

1        off the record, and I'll tell you what's

2 wrong with that type of question it is.

3 BY MR. ENGQUIST:

4        Q.     Can you answer the question, ma'am?

5            MS. BONJEAN:   To the best of

6 your ability.

7        A.     I don't recall.

8 BY MR. ENGQUIST:

9        Q.     After looking at that testimony, do

10 you have any memory of having a -- being upset

11 with Jose Juan Maysonet regarding a firearm

12 being in the house?

13        A.     We fought about it because I had --

14 at the time I had two little girls in the home.

15        Q.     And when did you fight about the

16 gun, that night or after he came home --

17        A.     I don't recall.

18        Q.     And do you recall if he told you

19 anything about why he had a gun in the house?

20        A.     No.

21        Q.     Do you recall anything other --

22 other than the fact that you fought, do you

23 recall anything else about the fight?

24        A.     Just basically, Why the hell do you

**Page 43**

1 have a gun in my house?

2        Q.     Do you recall the answer?

3        A.     I don't recall.   It's been years.

4        Q.     Was this the only time you had a

5 fight with Jose Maysonet regarding a firearm in

6 the house?

7        A.     Yes.

8        Q.     I'm going to show you Exhibit 2 --

9 3, I'm sorry.   Exhibit No. 3, for the record, is

10 CCSAAO306 through 309.

11        (Exhibit 3, Statement of Rosa Bello

12        dated 8/23/90, Bates No. CCSA0000306 -

13        CCSAO0000309, marked for identification)

14 BY MR. ENGQUIST:

15        Q.     Do you want to take a minute to

16 take a look at that, ma'am?

17        A.     Go ahead.   Ask your question.

18        Q.     Now, if you look at the top of

19 this, ma'am, it says taken on 8/23/1990 at 2:10

20 p.m.

21        Do you see that?

22        A.     Yes, I do.

23        Q.     It has "Present:   ASA Frank

24 DiFranco and Detective Fred Motilla."

**Page 44**

1        Do you see that?

2        A.     Yes, I do.

3        Q.     Do you recall speaking to ASA Frank

4 DiFranco?

5        A.     Like I said, it's been years.   This

6 happened in 1990.   No, I can't go back at that

7 point and really remember these people.

8        Q.     Okay.   Well, do you recall sitting

9 in the police station talking to a state's

10 attorney regarding that night that was already

11 talked about from your earlier testimony?

12            MS. BONJEAN:   I'm going to

13        object to the form and foundation of that

14        question.

15        A.     Like I said, it's been years.   1990

16 compared to the year that we're in now.   It's

17 been years.   So if I sat down with these people,

18 then yes.

19 BY MR. ENGQUIST:

20        Q.     Let's look at the bottom of the

21 first page?

22        A.     Okay.

23        Q.     Is that your signature?

24        A.     Yes, it is.

**Page 45**

1        Q.     Okay.   And if we go to the second

2 page, is that also your signature?

3        A.     Yes, it is.

4        Q.     Do you recall ever being threatened

5 in order to give this statement?

6            MS. BONJEAN:   Objection to the

7        foundation of that question.   By whom?

8            MR. ENGQUIST:   As I just said,

9        threatened to give this statement.

10 BY MR. ENGQUIST:

11        Q.     Go ahead.

12        A.     No.

13        Q.     Did any police officer ever

14 threaten you to give this statement to the

15 state's attorney?

16        A.     I'm going to say no.

17        Q.     Did any member of the state's

18 attorney office ever threaten you to give the

19 statement regarding the shooting death of

20 Torrence Wiley and Kevin Wiley?

21        A.     Can you repeat the question again?

22            MR. ENGQUIST:   Sure.   Can you

23        read it back, please?

24            MS. BONJEAN:   I'm sorry,

**Page 46**

1    before you read it back, I have an
2    objection to the form of that question.
3         (Question read by reporter)
4    A.    No.
5 BY MR. ENGQUIST:
6    Q.    Do you recall the detective by the
7 name of Fred Montilla?
8    A.    No, I do not.
9    Q.    Do you recall any of the officers
10 you dealt with the night you gave the statement?
11   A.    This happened in 1990.  We're in
12 2021.  I do not recall.  It's been years.
13   Q.    Okay.  I'm just going to go through
14 some names.  I just want to see whether or not
15 you recall any of these people.
16        Fred Montilla, Detective Montilla,
17 you don't recall, correct?
18   A.    No.
19   Q.    Do you recall ever dealing with
20 Roland Paulnitsky?
21   A.    I don't remember.
22   Q.    Okay.  Do you ever recall with a
23 Dectective Ernest Halvorsen?
24   A.    I don't recall.

**Page 47**

1    Q.    Do you recall ever dealing with a
2 sergeant by the name of Mingey?
3    A.    Who?
4    Q.    Mingey.
5    A.    No.
6    Q.    How about a sergeant with the last
7 name of Epplen?
8    A.    I don't recall.
9    Q.    Okay.  Do you recall ever dealing
10 with a detective by the name of Reynaldo
11 Guevara?
12   A.    I don't recall.
13   Q.    Now, have you had a chance to read
14 over the two-page handwritten statement there?
15   A.    Yes.
16   Q.    Okay.  Is there anything in there
17 that you believe to be incorrect or inaccurate?
18        MS. BONJEAN:  Objection to the
19     form of that question.
20   A.    No.  I have no objection to it.
21 BY MR. ENGQUIST:
22   Q.    I'm sorry, what was that?
23   A.    I have no objection to it,
24 everything that's in it.

**Page 48**

1    Q.    Do you speak Spanish?
2    A.    Yes, I do.
3    Q.    Are you fluent?
4    A.    When I need to be.
5    Q.    Okay.  Did Jose Maysonet speak
6 English?
7    A.    Yes, he did.
8    Q.    Do you recall, when you were dating
9 Jose Maysonet, when you were together, did you
10 speak English, Spanish, or a little bit of both?
11   A.    Both.
12   Q.    Do you have any independent
13 recollection, as you sit here today, about going
14 to the police station after Jose Maysonet was
15 arrested on this murder case?
16   A.    Can you repeat?
17   Q.    Sure.  Do you have any -- as you
18 sit here today, do you have any independent
19 recollection?  Do you recall actually going to
20 the police station after Jose Maysonet was
21 arrested for this murder case?
22   A.    Me and his mother?
23   Q.    Do you recall that?
24   A.    Me and his mother went to the

**Page 49**

1 police station when they arrested him.  That was
2 it.
3    Q.    And do you recall talking to any of
4 the detectives or any of the police officers
5 there?
6    A.    No.
7    Q.    You said before you don't recall
8 giving of the statement; is that correct?
9    A.    I don't recall.  Which one, the one
10 with --
11   Q.    The handwritten statement.
12   A.    This one here?
13   Q.    Yes, Exhibit No. 3.
14   A.    If it's here and it's my signature,
15 yes, I remember that.
16   Q.    Do you remember talking to anyone
17 prior to this being written up?
18   A.    No.
19   Q.    When you went to the police station
20 with Jose's mother, did you see Jose there at
21 all?
22   A.    No.
23   Q.    Did you talk to him at all when he
24 was there?

**Rosa Bello**
**October 15, 2021**                                                    **50..53**

Page 50

1      A.     No.
2      Q.     Just to be clear, when you were at
3  the police station, no one threatened you; is
4  that correct?
5             MS. BONJEAN:  Objection to the
6      form and foundation of that question.
7      A.     No.
8  BY MR. ENGQUIST:
9      Q.     Referring back to Exhibit No. 1,
10 which was your testimony in the Alfredo Gonzalez
11 trial, do you recall meeting with anyone from
12 the state's attorney office prior to giving that
13 testimony?
14     A.     No.
15     Q.     Okay.  Were you ever threatened by
16 anybody in the state attorney's office prior to
17 giving this testimony?
18     A.     I'm going to say no.
19     Q.     Were you ever threatened by anybody
20 from the police department prior to testifying
21 in the Alfredo Gonzalez case?
22     A.     I would say no.
23     Q.     Do you remember Jose Maysonet
24 having -- or taking any medication at the time

Page 51

1  you were dating?
2      A.     No.  To my knowledge, no.
3      Q.     Do you remember Jose Maysonet
4  having any problems with anxiety?
5      A.     To my knowledge, no.
6      Q.     Now, did you ever testify in front
7  of a grand jury?
8             MS. BONJEAN:  Objection.  Form
9      and foundation.
10            MR. ENGQUIST:  I'm sorry, let
11     me be more specific.
12 BY MR. ENGQUIST:
13     Q.     Do you recall testifying in front
14 of a grand jury regarding the incident that you
15 testified to in the People versus Alfredo
16 Gonzalez case?
17            MS. BONJEAN:  Form and
18     foundation.  Objection.
19     A.     No.
20 BY MR. ENGQUIST:
21     Q.     Did you testify against -- did you
22 testify at a trial against Jose Maysonet?
23     A.     I'm going to say yes.
24     Q.     Well, do you recall actually

Page 52

1  testifying against Jose Maysonet or you're just
2  not sure?
3             MS. BONJEAN:  Objection.  The
4      way you're phrasing that question,
5      objection to the form of that question.
6      If you understand, by all means.
7      A.     No, I don't understand.
8  BY MR. ENGQUIST:
9      Q.     How many times do you recall
10 testifying in court?
11            MS. BONJEAN:  Ever in her life
12     or in connection with this case?
13            MR. ENGQUIST:  Good point.  In
14     connection with this case.
15            MS. BONJEAN:  I can do it for
16     you if you need --
17     A.     One time.
18     Q.     One time, okay.
19            MR. ENGQUIST:  Why don't we
20     take a quick five-minute break?
21            THE VIDEOGRAPHER:  Off the
22     record at 11:11.
23     (A recess was taken)
24            THE VIDEOGRAPHER:  Back on the

Page 53

1      record at 11:16.
2  BY MR. ENGQUIST:
3      Q.     Ms. Bello, I want to go back when
4  we talked about threats.
5      Do you recall an incident where a
6  Molotov cocktail was thrown in the window of
7  your mother's apartment?
8             MS. BONJEAN:  Her mother?
9      A.     My mother?
10 BY MR. ENGQUIST:
11     Q.     I believe so.  Your family's
12 apartment.
13     A.     My mother has never -- I don't
14 think -- I think you're confusing it with
15 somebody else's.
16     Q.     I very well could be.
17     A.     Yes, because I don't know anything
18 about that.
19            MS. BONJEAN:  Are you talking
20     about the other Rosa?
21            MR. ENGQUIST:  Yes, I'm sorry,
22     Jose Maysonet's mother's apartment.
23 BY MR. ENGQUIST:
24     Q.     Do you recall a Molotov cocktail

**Rosa Bello**
**October 15, 2021**

54..57

**Page 54**

1  being thrown through that window?
2      A.    I don't recall anything about that.
3          MS. BONJEAN:  His sister's
4      name is Rosa, too.  You remember that.
5          MR. ENGQUIST:  Yes, I
6      remember.  I don't think I have anything
7      else right now, so I want to see if
8      anybody else has any questions.
9          MS. BONJEAN:  On the defense
10     side or --
11         MR. ENGQUIST:  I'm assuming
12     the defense side would ask first.
13         MS. ROSEN:  Nothing from the
14     city.
15         MS. McGRATH:  Nothing for
16     Defendant Guevara right now.
17         MS. BENSINGER:  I have a few
18     questions from DiFranco.
19         MS. BONJEAN:  Go ahead.
20  EXAMINATION BY MS. BENSINGER:
21     Q.    Good morning, Ms. Bello.  I'm
22  Brette Bensinger and I represent the state's
23  attorney, Defendant DiFranco, in this matter.
24  I've just got a couple of questions for you.

**Page 55**

1          First, if we could look back to the
2  statement that you gave, I believe it's Exhibit
3  3.
4      A.    This one here?
5      Q.    Yes.  And it's true that you gave
6  this statement to Assistant State's Attorney
7  DiFranco and Detective Montilla?
8      A.    Yes.
9      Q.    Okay.  And the information
10  contained in this statement is a true summary of
11  the information that you told State's Attorney
12  DiFranco?
13         MS. BONJEAN:  I'm going to
14     object to the form of that question.  I
15     don't think she's read every single line.
16     And you're also leading her, so I'm going
17     to object to the form.  If you want to ask
18     her a specific question, go ahead, but I'm
19     objecting to the form.
20  BY MS. BENSINGER:
21     Q.    Okay.  Ms. Bello, I want to make
22  sure that you have all the time that you need to
23  review this statement, every single word and
24  line, just so that we get the most accurate

**Page 56**

1  testimony.
2      A.    What is your question?
3      Q.    My question is:  Whether the
4  information contained in your statement is a
5  true summary that you provided to Assistant
6  State's Attorney DiFranco on August 23, 1990?
7          MS. BONJEAN:  Objection to the
8      form.
9      A.    Can you kind of explain that a
10  little bit better than what you're saying?
11  BY MS. BENSINGER:
12     Q.    I just -- as you sit here now, I
13  just want to make sure that all of the
14  information that is contained in this statement
15  is a true and accurate depiction of a summary
16  that you provided to Assistant State's -- let me
17  finish -- Assistant State's Attorney Frank
18  DiFranco on August 23, 1990?
19     A.    Yes.
20     Q.    Okay.  Now, you testified that you
21  can speak Spanish.
22         Can you also read Spanish?
23     A.    No, I don't read Spanish.
24     Q.    Okay.  Do you know if Jose Maysonet

**Page 57**

1  can read Spanish?
2      A.    Yes, he can.
3      Q.    Okay.  You testified that Jose
4  Maysonet can speak English, or at least the
5  time that you knew him, two months after -- you
6  know, up until two months after your child Jose,
7  Jr., was born, you understood that Jose Maysonet
8  could speak English, right?
9      A.    No [sic], he was able to speak
10  English.
11     Q.    Okay.  All right.  I'm sorry, my
12  question was a little bit convoluted.
13         When you dated Jose Maysonet, you
14  knew that he could speak English, right?
15     A.    Yes.
16     Q.    Okay.  Do you know if Maysonet, at
17  the time, could read English?
18     A.    I'm going to say no.  I really
19  don't know.
20     Q.    You don't know.
21         Do you remember writing notes?  If
22  you wrote notes to him, would they have been in
23  English?
24     A.    No.

**Rosa Bello**
**October 15, 2021**

58..61

**Page 58**

1    Q.    Okay. You don't remember ever
2 writing notes to him?
3    A.    No.
4    Q.    Okay. So just to be clear, you
5 don't know one way or the other if Jose Maysonet
6 can read English; is that correct?
7    A.    I don't know, yes.
8    Q.    All right. That's -- well, I've
9 got one more question.
10        Other than providing the statement
11 to State's Attorney DiFranco, do you remember
12 seeing or meeting with ASA DiFranco any other
13 time at the police station on --
14    A.    No.
15    Q.    Okay.
16        MS. BENSINGER: That's all I
17    have.
18        MS. BONJEAN: I just have a
19    few questions, if you bear with me.
20 EXAMINATION BY MS. BONJEAN:
21    Q.    Your son's birthday, when was that?
22    A.    ▮▮▮▮▮▮▮▮▮.
23    Q.    And fair to say then, based on your
24 prior testimony, that you've had no contact with

**Page 59**

1 Jose Juan Maysonet, Jr., since June of 1991,
2 correct?
3    A.    Yes.
4    Q.    I think you said --
5        MS. BENSINGER: I'm just going
6    to object. So when I was referencing
7    Juan, Jr., I was referencing your child.
8        MS. BONJEAN: Who is this?
9        MS. BENSINGER: It's Brette
10    Bensinger. I just want to clarify the Jr.
11    part, Juan Maysonet, Jr.
12        MS. BONJEAN: You can either
13    object or stay quiet. What are you doing?
14        MS. BENSINGER: I'm just
15    trying to clarify, so if you --
16        MS. BONJEAN: Clarify what?
17        MS. BENSINGER: Clarify the
18    identity of the individual you're asking
19    about, you know, but that's -- I'm happy
20    to help, but if you don't want the help,
21    then that's fine.
22        MS. BONJEAN: I definitely
23    don't need your help. Okay. We'll start
24    over.

**Page 60**

1 BY MS. BONJEAN:
2    Q.    You have one son with Jose
3 Maysonet, right?
4    A.    Yes, I do.
5    Q.    Okay. And he was born on ▮▮▮▮▮▮
6 of ▮▮▮▮
7    A.    Yes.
8    Q.    And fair to say then that you
9 haven't had any contact or conversations with
10 Jose Juan Maysonet, Jr., his father --
11    A.    No.
12    Q.    -- your former boyfriend, since
13 June of '91, right?
14    A.    Yes.
15    Q.    Okay. You were asked some
16 questions about prior testimony that you gave in
17 the matter of People versus Alfredo Gonzalez by
18 Mr. Engquist earlier.
19        As you sit here today, do you have
20 any recollection of the person that's been
21 referenced as Lluvia or Juvia (phonetic)?
22    A.    No.
23    Q.    For instance, if I asked you to
24 describe him, would you be able to?

**Page 61**

1    A.    No.
2    Q.    And the individual that was
3 referenced as Tino or Justino Cruz, any ability
4 to recollect what that person looked like?
5    A.    No.
6    Q.    And how about the other individual
7 that you referenced in your testimony who went
8 by Fro? Any idea who that is?
9    A.    No, I do not.
10    Q.    As you sit here today, can you
11 remember, for instance, his complexion or his
12 hair style?
13        I'm talking about back then.
14    A.    No.
15    Q.    By the way, do you remember Jose or
16 Juan, as you call him, having a good friend
17 named Santiago Sanchez who went by the name of
18 Macho?
19    A.    Yes. That he killed himself?
20    Q.    Yes.
21    A.    Yes.
22    Q.    Do you remember going to the
23 services?
24    A.    Yes.

**Rosa Bello**
**October 15, 2021**

62..65

**Page 62**

1    Q.    Do you remember going to his
2  funeral or his burial?
3    A.    To the funeral.
4    Q.    And do you remember that there were
5  a lot of people at that funeral?
6    A.    Oh, there was a whole bunch of
7  people.
8    Q.    Do you remember Jose being pretty
9  upset about it?
10   A.    Yes, because they were best
11  friends.
12   Q.    Were you aware that the
13  murders that they're trying to say Mr. Maysonet
14  committed occurred on the morning of Macho's
15  funeral?
16            MS. McGRATH:  Objection.
17     Form.  Foundation.
18   A.    No.
19 BY MS. BONJEAN:
20   Q.    Fair to say that Jose went to his
21  friend's funeral?
22   A.    Yes, because I went.  Yes.
23   Q.    So I want to go back to some
24  questions just about this statement as well.

**Page 63**

1    A.    That's fine.
2    Q.    And if you don't remember, that's
3  fine.
4    A.    Okay.
5    Q.    If you look at the top of the
6  statement, there's some information that has
7  your name and the time the statement was taken
8  and who was present.
9            Do you see all of that?
10   A.    Yes, I do.
11   Q.    Did you fill out that information?
12   A.    No, I did not.
13   Q.    Did you see that the statement was
14  purportedly taken on August 23, 1990, and it's
15  the second line underneath your name right there
16  at the top?
17   A.    This is August 23?
18            MS. McGRATH:  Objection to the
19     form, sorry.
20   A.    August 23, 1990?
21 BY MS. BONJEAN:
22   Q.    Yes, at the top.
23   A.    Okay.
24   Q.    Do you see that right there?

**Page 64**

1    A.    Yes, I do.
2    Q.    And then, if you go to the middle
3  part of the statement, it indicates that the --
4  the incident that they were asking you about was
5  from May 25 of 1990, the shooting.
6            Do you see that?
7    A.    Yes, I do.
8    Q.    Okay.  So we admit that that's
9  about three months --
10   A.    After, yes.
11   Q.    You were giving a statement about
12  something that had happened three months
13  earlier, allegedly, right?
14   A.    Yes.
15   Q.    Were you aware of that at that
16  time?
17   A.    No.
18   Q.    Do you remember being scared being
19  at the police station?
20   A.    Yes.
21   Q.    Okay.  Did you have young kids at
22  home?
23   A.    Two, the two youngest -- the two
24  oldest.

**Page 65**

1    Q.    Were you expecting a child as well?
2    A.    Yes.
3    Q.    And I know Mr. Engquist asked you
4  about whether or not you were threatened by the
5  police, and you said you were going to say no to
6  that question.
7            Did you ever feel that the police
8  were pressuring you to cooperate with this
9  investigation?
10   A.    Yes.
11   Q.    And I don't want to put words in
12  your mouth.
13            Can you explain to me how it was --
14  strike that.
15            I assume you didn't want to be in
16  the police station that night?
17   A.    No.  I wasn't at the police
18  station.  At first, I was at home with Jose's
19  mother.
20   Q.    And do you remember how you had to
21  go to the police station?
22   A.    They called her -- first, they
23  called and said that something happened to my
24  dad.  I remember that.  And then all of a

**Page 66**

```
 1  sudden, she said that we had to go to the police
 2  station.
 3       Q.      Do you know who called and said
 4  something happened to your dad?
 5       A.      My aunt, his sister.
 6       Q.      Oh, Rose, you're talking about?
 7       A.      No, my father's sister.  At the
 8  time my father had a stroke.
 9       Q.      Oh, I see.
10       A.      Okay.  And I was pregnant with my
11  son, and his sister, my father's sister, was
12  taking care of my dad.  So that day she went
13  out, and at the time I was with Juan's mother,
14  with Rose and Tony and -- at her house.  And we
15  were sitting, and his mother got a phone
16  call -- it was from my father's sister -- and
17  asked her if I was there.  She asked if I was
18  there.
19            She's like, Yeah.
20            She goes, Don't tell her nothing.
21  Something happened to her dad.
22            So she waited until she got off the
23  phone, and that's when she told me about my dad.
24       Q.      I see.  So you had a couple of
```

**Page 67**

```
 1  things going on that night?
 2       A.      Yes.
 3       Q.      You remember it vividly because
 4  of --
 5       A.      My dad.
 6       Q.      Your dad, okay.
 7            Did you have to go to the hospital
 8  to see your dad?
 9       A.      Yes.
10       Q.      Did he survive that or was that --
11       A.      No.  My dad died.
12       Q.      So that was around the same time
13  Juan was arrested, or Juan?
14       A.      He was in jail.  He wasn't with me.
15       Q.      Do you remember -- generally, it's
16  about the same time period; is that right?
17       A.      Yes.
18       Q.      When did your father die?  Do you
19  remember the date?
20       A.      I'm not sure.
21       Q.      Do you remember what year?
22       A.      It was 1990, but I don't really try
23  to remember that.
24       Q.      Sure.  Understood.
```

**Page 68**

```
 1            Now, it sounds like you had a lot
 2  on your mind.
 3            Do you have a recollection of going
 4  to Grand Central, the police station?
 5       A.      I know that his mother needed to go
 6  to the police station to find out if he had a
 7  bond.  That's what I recall, going with her to
 8  the police station because they said he had a
 9  bond.
10       Q.      So you weren't asked to go, but you
11  went with his mom?
12       A.      Yes.
13       Q.      Okay.  And were you seated in the
14  waiting area?
15       A.      We waited.
16       Q.      How was it that you come and you're
17  just seated in the waiting area, and then all of
18  a sudden, you end up being brought into an
19  interview to be interviewed?
20       A.      I don't know.
21       Q.      Did you tell the police, "I have
22  information to give you" or anything?
23       A.      No.  I just went to the police
24  station with her.
```

**Page 69**

```
 1       Q.      Do you recall where were you when
 2  you spoke to the detective and the assistant
 3  state's attorney within the police station?
 4       A.      I don't recall.
 5       Q.      Okay.  Did you have a lot on your
 6  mind?
 7       A.      Yes, because my dad was on
 8  machines.  And since I was the oldest daughter
 9  and they couldn't find my mom or -- I had to
10  make a decision.  So being pregnant with my
11  son -- so yes.
12       Q.      At any point while you were over at
13  the police station, did any police officer
14  suggest in any way to you that it would be in
15  your best interest and your children's best
16  interest if you cooperated with the
17  investigation?
18            MR. ENGQUIST:  Objection.
19       Leading.
20  BY MS. BONJEAN:
21       Q.      You can answer.
22       A.      Yes.
23       Q.      Do you remember how that was
24  communicated to you or how that was said to you?
```

**Rosa Bello**
**October 15, 2021**
**70..73**

---

**Page 70**

1    A.    Basically, I was a single mom and
2  they can take my kids from me.  I basically
3  looked at them and told them, Do what the hell
4  you needed [sic] to do, basically.
5    Q.    So at some point it was mentioned
6  that they had the power to take your kids from
7  you?
8    A.    Yes.
9    Q.    As a mother, when someone makes
10  that type of implication, how did it make you
11  feel?
12    A.    Like I wanted to get up and hit
13  you, basically, because these are my kids.
14  Nobody's going to take my children from me.  For
15  what?  There is no reason for you to threaten to
16  take my children.
17    Q.    You hadn't done anything wrong,
18  right?
19    A.    No.
20    Q.    Let me ask it this way:  Were your
21  children the most important thing to you?
22    A.    Oh, yes.
23    Q.    More important that Jose Juan
24  Maysonet?

---

**Page 71**

1    A.    Oh, yes.  I'm sorry to say because
2  men come and go.  These are mine.  I carried
3  them.  They belong to me.
4    Q.    And was it your first and foremost
5  priority to protect your children?
6    A.    Yes.
7    Q.    Now, when you went to the police
8  station, did you have any idea what Jose had
9  been arrested for or what they --
10    A.    No.
11    Q.    Okay.  And you said you didn't talk
12  to Jose there, right?
13    A.    No.
14    Q.    So how did you get your information
15  about why he was in police custody?  Do you
16  remember who told you?
17    A.    It's been years.  No, I don't.
18    Q.    Do you remember the police
19  detectives telling you the story of why he was
20  there?
21        MS. ROSEN:  Objection to form.
22    Foundation.
23    A.    No, I don't.
24  BY MS. BONJEAN:

---

**Page 72**

1    Q.    As an example, in your statement,
2  it says the gun that you saw in the house was a
3  9 millimeter.
4        Did you know the types of guns
5  there were out there?
6    A.    No.
7    Q.    Okay.  Who gave you the information
8  that it was a 9 millimeter?
9        MS. ROSEN:  Objection.  Form.
10    Foundation.
11    A.    I don't recall.
12  BY MS. BONJEAN:
13    Q.    Is it fair to say that you did not
14  actually write out this statement?  You signed
15  it, right?
16    A.    I signed it, but the statement I
17  did not write.
18    Q.    The words that are on this piece of
19  paper that are written here, other than your
20  signature, are someone else's words, correct?
21        MS. BENSINGER:  Objection.
22    A.    Yes.
23  BY MS. BONJEAN:
24    Q.    Do you know who wrote out the

---

**Page 73**

1  narrative in this statement?
2    A.    No.  I don't recall.  I don't
3  remember.
4    Q.    Okay.  Do you recall whether you
5  carefully read it after the person wrote it out
6  before you signed it?
7    A.    Probably didn't.  Probably didn't.
8    Q.    You weren't trying to lie to
9  anybody?
10    A.    No.
11    Q.    But fair to say you didn't probably
12  read this very closely after --
13        MR. ENGQUIST:  Objection.
14        MS. ROSEN:  Objection.  Form.
15    A.    Yes.
16  BY MS. BONJEAN:
17    Q.    Did you want to get out of the
18  police station?
19    A.    Yes.
20    Q.    Did you want to go home and protect
21  your kids?
22    A.    Yes.
23    Q.    So when -- for instance, there's a
24  bit of information here that says, "Rosa said

---

Rosa Bello
October 15, 2021                                                    74..77

**Page 74**

1  the gun was a 9 millimeter."
2            Was that you saying that or was
3  that something that the author put in there and
4  you agreed to?
5            MS. BENSINGER:  Objection.
6        Assumes.  Form and -- just...
7            MS. BONJEAN:  Any other
8        objection?  Go ahead.  You have the floor.
9  BY MS. BONJEAN:
10       Q.    Rosa, do you know what a 9
11 millimeter gun looks like?
12       A.    No.
13       Q.    Would you be able to distinguish a
14 9 millimeter from a .38 revolver or any other
15 type of gun?
16       A.    No, only what I see on Cops on TV.
17       Q.    Can you look at the last page of
18 this statement?  It's a photograph?
19       A.    Yes.
20       Q.    Well, that's the second to the
21 last.  We'll look at that first.
22            Do you recognize the individual in
23 the --
24       A.    In the last one?

**Page 75**

1        Q.    This one right here that says
2  Exhibit 1?
3        A.    No, I don't.
4            MS. ROSEN:  Can you give us
5        the Bates number of the page she's looking
6        at since it's not on the screen?
7            MS. BONJEAN:  Yes.  It's
8        Exhibit 1 to the statement.  It's Bates
9        No. CCSOA308, and I'll ask the question
10       again.
11 BY MS. BONJEAN:
12       Q.    Ms. Bello, do you recognize the
13 person that's depicted in this photograph?
14       A.    No.
15       Q.    And could you go to the last page,
16 Exhibit No. 2?  And it's CCSAO309.  I know it's
17 not a great picture.
18            Do you recognize the individual 234
19 this photograph?
20       A.    No.
21            MS. BENSINGER:  And I'm just
22       going to say for the record that these
23       photographs depicted in CCSAO308 and
24       309 -- these versions are photocopies of

**Page 76**

1  photocopies.
2            MS. BONJEAN:  Well, thank you
3        for making that record.  I'm sure the
4        record won't reflect that because it's
5        going to be attached as an exhibit, but if
6        you have better copies of them, why don't
7        you ask her whether she recognizes them
8        with the actual copy.
9            MS. BENSINGER:  Ms. Bonjean,
10       thank you for offering your help.
11            MS. BONJEAN:  No problem.  Any
12       time.
13 BY MS. BONJEAN:
14       Q.    Mr. Engquist asked you about the
15 murders of the Wiley brothers.
16            Do you have any idea who the Wiley
17 brothers were?
18       A.    No.
19       Q.    Do you know, for instance, where
20 they lived?
21       A.    No.
22       Q.    Do you know where they were
23 murdered?
24       A.    No.

**Page 77**

1        Q.    Do you know how they were murdered?
2        A.    No.
3        Q.    Do you know what their ethnicity
4  was?
5        A.    No.
6        Q.    Do you know what their race was?
7        A.    No.
8        Q.    Do you remember hearing any talk --
9  well, strike that.
10            It's not a secret Jose was a Latin
11 King, right?  You testified to that earlier?
12       A.    Yes.
13       Q.    Did you hear any Latin Kings
14 talking about the Wiley brothers?
15       A.    No.  I don't even know who those
16 guys were.
17       Q.    Do you remember any detectives
18 being in the home that you shared with or stayed
19 with Juan prior to his arrest?
20       A.    No.
21       Q.    Okay.  And prior to giving
22 testimony at Alfredo Gonzalez's trial -- you may
23 not remember, but do you remember coming to 26th
24 Street and going to the Cook County State's

**Real Time Court Reporting**
**413.732.1157**

**Rosa Bello**
**October 15, 2021**

78..81

Page 78

1  Attorney Office prior to giving your testimony?
2       A.    To the courthouse?
3       Q.    Yes.  You went to the courthouse,
4  but you went to some offices before you actually
5  testified?
6       A.    I didn't go to no office.  I went
7  to the courtroom.  It was going straight to the
8  courtroom.
9       Q.    Okay.  And do you remember who the
10  Cook County state's attorney was who was
11  handling the prosecution of --
12      A.    No, I do not.
13            MS. BONJEAN:  I may not have
14      anything more.
15  BY MS. BONJEAN:
16      Q.    Did you ever visit Juan in Cook
17  County jail?
18      A.    One time.
19      Q.    Okay.
20      A.    When my son was just born.  I took
21  his son to see him, and that was it.
22      Q.    And then after that --
23      A.    I haven't seen him since.
24      Q.    Right.  And do you remember

Page 79

1  seeing -- well, strike that.
2            Do you even remember who Alfredo
3  Gonzalez was?
4       A.    No.
5       Q.    Do you remember seeing him at the
6  Cook County jail?
7       A.    No.
8            MS. BONJEAN:  I don't think I
9       have anything further.  I appreciate your
10      time.
11           MR. ENGQUIST:  I have a couple
12      questions based on that.
13  FURTHER EXAMINATION BY MR. ENGQUIST:
14      Q.    I believe it's Exhibit No. 3.  If
15  we can go back, we were talking about that.  Go
16  to the last two pages, CCSAO308 and 309.
17           Can you look at page 308?  Is that
18  your signature at the bottom of that page with
19  the photograph?
20      A.    Yes.
21      Q.    And No. 309, is that also your
22  signature?
23      A.    Yes.
24      Q.    Okay.  If you go to page 307, right

Page 80

1  above your signature, that last line, it says,
2  "Rosa identified attached Exhibit 1 as Lluvia
3  and attached Exhibit 2 as Fro."
4            Do you see that?
5       A.    I'm going to tell you that's not my
6  signature because the "O" is like an "A."
7       Q.    So you don't think that's your
8  signature on 307?
9       A.    No.
10      Q.    Is that your signature on 308?
11      A.    Yes, but this one here on page 307,
12  it looks like an "A" on the end.  And when I do
13  my "O"s, I put the line up.  So I know my
14  signature.
15      Q.    Is it possible that back in 1990,
16  you could identify Lluvia and Fro?
17           MS. BONJEAN:  Objection to the
18      form and foundation of that question.
19      A.    To my knowledge, I could probably
20  tell you right now, at this point, if I were to
21  see them now, no.
22  BY MR. ENGQUIST:
23      Q.    Now I understand no.
24      A.    Then?

Page 81

1       Q.    Yes.
2       A.    Like I said, this is from 1990, and
3  compared to now, I probably wouldn't even
4  notice.
5       Q.    Let's go back to Exhibit No. 1,
6  please, the transcript.  Go to page -- it's
7  CCSAO2538.
8       A.    You said --
9       Q.    2538.
10      A.    Okay.
11      Q.    Okay.  All right.  Are you done?
12      A.    Yes.
13      Q.    Okay.  This was during your
14  cross-examine if you want at the middle of the
15  page, where it says, "What kind of gun?"
16           Do you follow me there?
17      A.    Yes.
18      Q.    "Question:  What kind of gun was
19  it?
20           "Answer:  A 9 millimeter.
21           "Question:  You knew what a 9
22  millimeter looked like on May 24, 1990?
23           "Answer:  I seen it when he
24  unwrapped it.

**Real Time Court Reporting**
**413.732.1157**

**Rosa Bello**
**October 15, 2021**                                                    **82..85**

| Page 82 |
|---|

1           "Question:  I know you did, but had
2  you seen a 9 millimeter gun before?
3           "Answer:  I seen it once.
4           "Question:  Well, does the 9
5  millimeter gun that you saw in May 24, 1990 have
6  9 millimeter written on it?
7           "Answer:  I wasn't looking at it.
8           "Question:  How do you know it was
9  a 9 millimeter gun?
10          "Answer:  Just by looking at it."
11          Do you see that?
12     A.   Yes, I do.
13     Q.   Was that honest testimony back in
14 1992 when you gave your testimony in the Alfredo
15 Gonzalez case?
16     A.   Yes.
17          MR. ENGQUIST:  I don't have
18     any other questions.
19          MS. BONJEAN:  I just have one
20     question.
21 FURTHER EXAMINATION BY MS. BONJEAN:
22     Q.   Ms. Bello, obviously, before you
23 testified -- well, strike that.
24          Before you testified at Alfredo

| Page 83 |
|---|

1  Gonzalez's trial, do you remember reviewing a
2  statement that you had provided to the police?
3     A.   No.
4     Q.   Okay.  Did you do your best to
5  testify truthfully at that proceeding?
6     A.   Yes.
7     Q.   Is it possible that there were
8  possibly mistakes that you might have made in
9  the course of that testimony?
10          MR. ENGQUIST:  Objection.
11     Foundation.
12          MS. ROSEN:  Objection.  Form.
13     Foundation.
14     A.   Probably.
15 BY MS. BONJEAN:
16     Q.   Okay.  Did you feel a lot of
17 pressure testifying there?
18     A.   Yes.
19     Q.   You were scared because you had
20 been threatened; isn't that right?
21     A.   Yes.
22          MS. BENSINGER:  Objection.
23 BY MS. BONJEAN:
24     Q.   And when you were asked if this was

| Page 84 |
|---|

1  truthful testimony, it was truthful to the best
2  of your ability, right?
3     A.   Yes.
4     Q.   You would never purposely -- you
5  know, you weren't purposely trying to lie,
6  right?
7     A.   No.
8     Q.   Okay.  But this doesn't mean that
9  when giving testimony, that sometimes people
10 make mistakes or are mistaken, correct?
11          MS. ROSEN:  Objection.  Form.
12     Foundation.
13     A.   Yes.
14 BY MS. BONJEAN:
15     Q.   And given the fact that this
16 testimony was in 1992, is it even possible for
17 you to look back and see whether you might have
18 been mistaken about anything you testified to?
19          MS. ROSEN:  Objection.  Form
20     and foundation.  Calls for speculation.
21     A.   Probably.  I don't know.
22 BY MS. BONJEAN:
23     Q.   Is it difficult to look back at
24 testimony from 1992 --

| Page 85 |
|---|

1     A.   Yes.  Compared to now, yes.
2     Q.   -- and to be able to look back and
3  say whether or not everything in there was
4  accurate or not accurate?
5          MS. ROSEN:  Objection.
6     A.   Yes.
7 BY MS. BONJEAN:
8     Q.   Would you say --
9     A.   I don't know.  I don't recall.
10          MS. ROSEN:  I object to the
11     question.  Form.  Objection.  Form.
12     Foundation.
13          MS. BONJEAN:  That's fine.  I
14     have nothing further.  Thank you.
15          THE WITNESS:  Okay.  Thank
16     you.
17          MR. ENGQUIST:  I don't think I
18     have anything based off of that.  Eileen
19     or anybody else?
20          MS. ROSEN:  I have nothing.
21     Thank you.
22          MS. McGRATH:  I don't have
23     anything.  Thank you.
24          MS. BENSINGER:  I've got a

**Rosa Bello**
**October 15, 2021**                                                     **86..89**

| Page 86 | Page 88 |
|---|---|

**Page 86**

1  couple of questions.  This is Brette
2  Bensinger again on behalf of State's
3  Attorney DiFranco.
4  EXAMINATION BY MS. BENSINGER:
5      Q.    And I just want to bring you back
6  to the time of that statement that you provided
7  in Exhibit 3.
8              MS. BONJEAN:  She has it.
9  BY MS. BENSINGER:
10      Q.    Do you recall being brought into a
11  room to provide this statement at the police
12  station?
13              MS. BONJEAN:  Objection.
14      Asked and answered.
15              MR. ENGQUIST:  Join.
16      A.    I don't recall.
17  BY MS. BENSINGER:
18      Q.    Okay.  So you said, you know, you
19  don't -- you probably didn't study it, study the
20  statement, after it was written or -- do you
21  remember that line of testimony?
22              MS. BONJEAN:  Are you
23      asking whether she -- objection to the
24      form.  If you understand it.

**Page 87**

1      A.    I don't understand what you're
2  asking.
3  BY MS. BENSINGER:
4      Q.    Okay.  As you sit here right now,
5  are you able to testify that you're certain that
6  you didn't read this statement after it was
7  taken?
8              MS. BONJEAN:  Objection to the
9      form.  Misstates --
10  BY MS. BENSINGER:
11      Q.    You do not know, as you sit here
12  right now?
13      A.    I'm going to say no, I'm not really
14  sure.
15      Q.    Okay.  You're not sure if you -- if
16  you --
17              MS. BONJEAN:  Oh, God.
18              MS. BENSINGER:  Excuse me?
19              MS. BONJEAN:  Can you ask your
20      question?  She would like to go.
21              MS. ROSEN:  Did you just say,
22      Oh, God?
23              MS. BONJEAN:  Yes, I said, Oh,
24      God.

**Page 88**

1              MS. BENSINGER:  What are
2      you -- would you like to say something?
3              MS. BONJEAN:  No.  Just
4      start -- we shouldn't be waiting for you
5      to make the question, and it --
6              MS. BENSINGER:  You know what,
7      Ms. Bonjean, everybody was patient when
8      you asked your questions.  Can you try to
9      give other people the same respect,
10      please, please, please?
11              MS. BONJEAN:  Go ahead and ask
12      the question.
13  BY MS. BENSINGER:
14      Q.    Okay.  With respect to State's
15  Attorney DiFranco, did he threaten you in any
16  way?
17              MS. BONJEAN:  Objection.
18      Asked and answered.
19              MS. BENSINGER:  It was not
20      answered with respect to DiFranco.
21              MR. ENGQUIST:  Actually, it
22      was.
23  BY MS. BENSINGER:
24      Q.    Did DiFranco -- I'm sorry, did

**Page 89**

1  state's attorney -- the state's attorney that
2  took your statement, did he threaten you in any
3  way?
4      A.    No.
5      Q.    Did the state's attorney say
6  anything about your children, the state's
7  attorney specifically?
8      A.    No.
9      Q.    Was the state's attorney present
10  when -- during your -- you know, when the police
11  mentioned something about your children?
12      A.    I'm going to say no.
13              MS. BENSINGER:  Okay.  I have
14      no further questions.
15              MS. BONJEAN:  Nothing based on
16      that.
17              MR. ENGQUIST:  Nothing for me.
18      Eileen, Megan?
19              MS. ROSEN:  Nothing for me.
20              MS. McGRATH:  Nothing from me.
21      Thanks.
22              MR. ENGQUIST:  Okay.
23      Ms. Bello, one more question.  The
24      question comes down to when this is typed

**Rosa Bello**
**October 15, 2021**

90..92

**Page 90**

1   up, this transcript is typed up, you have
2   the -- you have two different choices:  1)
3   you can waive your signature, which means
4   that you're trusting the court reporter,
5   who is remote over there, has typed
6   everything correctly; or you can say, I
7   reserve my signature, which gives you an
8   opportunity to read it over to verify --
9   you know, we're talking about -- we're not
10  talking about changing testimony
11  dramatically.  We're talking about if you
12  made a mistake as to what was said,
13  there's a spelling error, or something
14  like that, making those changes.  But you
15  have an opportunity to read it over
16  beforehand.  It's up to you whether you
17  want to waive it or reserve.  So either
18  way, we will reserve and either Ms.
19  Bonjean or I can't really tell you what to
20  do because we don't represent you.  So
21  it's really up to you.
22          MS. BONJEAN:  It's really up
23  to you.  If you trust that the court
24  reporter got your answers correctly, then

**Page 91**

1   so be it.  If you think that there could
2   have been a mistake, you have every right
3   to look at it.
4          THE WITNESS:  No.  I think
5   she's got everything correctly.
6          MR. ENGQUIST:  So waive?
7          THE WITNESS:  Yes.
8          MR. ENGQUIST:  Then waived.
9   Thank you very much.
10          THE WITNESS:  Thank you.
11          THE VIDEOGRAPHER:  Off the
12  record at 11:54.
13  (Deposition concluded)
14
15
16
17
18
19
20
21
22
23
24

**Page 92**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
      I, REBECCA J. GLADU, a Notary Public in
and for the Commonwealth of Massachusetts, do
hereby certify that there came before me on
October 15, 2021, at the offices of Real Time
Court Reporting, 9 Hammond Street, Worcester,
Massachusetts, the following named person, to
wit:  ROSA BELLO, who was by me duly sworn to
testify to the truth and nothing but the truth
as to her knowledge touching and concerning the
matters in controversy in this cause; that she
was thereupon examined upon her oath and said
examination reduced to writing by me; and that
the statement is a true record of the testimony
given by the witness, to the best of my
knowledge and ability.
      I further certify that I am not a relative
or employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.
      WITNESS MY HAND October *[signature]*
                              _____
                              Rebecca J. Gladu
                              Notary Public
My Commission expires:
July 28, 2028

**Real Time Court Reporting**
**413.732.1157**

Rosa Bello
October 15, 2021

93Index: 1..Bello

**1**

**1** 16:16,17,23 33:4
50:9 75:2,8 80:2
81:5 90:2

**100** 33:23,24 38:4

**101** 33:24

**102** 38:22

**103** 23:10

**107** 41:1

**10:13** 6:8

**10:26** 17:16

**10:28** 17:19

**11:11** 52:22

**11:16** 53:1

**11:54** 91:12

**12** 39:18

**13** 58:22 60:5

**1302** 11:9

**15** 6:7

**17** 10:11

**18CV2342** 6:13

**1990** 11:4,7,14
15:12,17 18:19
20:14 41:8 44:6,15
46:11 56:6,18
63:14,20 64:5
67:22 80:15 81:2,
22 82:5

**1991** 30:7 58:22
59:1 60:6

**1992** 13:10,16 14:7
15:10 16:2,11,18
18:6 20:14,20
21:19 22:18,22
30:10 38:20 82:14
84:16,24

**1:30** 24:6

**2**

**2** 24:6 29:15,17,23

**43**:8 75:16 80:3

**2017** 30:14 31:18

**2021** 6:7 46:12

**23** 56:6,18 63:14,
17,20

**234** 75:18

**24** 18:19 81:22
82:5

**25** 11:14 64:5

**2519** 16:24

**2531** 23:10

**2538** 81:9

**2545** 16:24

**26** 13:16 14:7
15:10 16:17 18:6
41:7

**26th** 77:23

**2:10** 43:19

**3**

**3** 30:21 43:9,11
49:13 55:3 79:14
86:7

**307** 79:24 80:8,11

**308** 79:17 80:10

**309** 43:10 75:24
79:16,21

**38** 74:14

**8**

**8/23/1990** 43:19

**8/23/90** 43:12

**9**

**9** 72:3,8 74:1,10,14
81:20,21 82:2,4,6,
9

**91** 30:5 60:13

**92CR** 30:8

**94** 27:7

**95** 33:21,23 34:14

**96** 35:12

**98** 37:1

**99** 33:23

**A**

**a.m.** 6:8

**ability** 42:6 61:3
84:2

**abusive** 28:13
29:4

**accurate** 55:24
56:15 85:4

**active** 31:5

**actual** 76:8

**admit** 64:8

**African-american**
40:7

**agreed** 74:4

**Ah-huhs** 9:15,16

**ahead** 13:6 18:1,
22 34:15 43:17
45:11 54:19 55:18
74:8 88:11

**aired** 31:7

**Alex** 6:18

**Alfredo** 12:21
13:3,16 16:3 19:21
21:19 25:5,11 33:8
34:19,20 38:13
50:10,21 51:15
60:17 77:22 79:2
82:14,24

**allegedly** 64:13

**answering** 9:1,7

**answers** 36:12,13
90:24

**anxiety** 51:4

**anymore** 26:21
28:23

**apartment** 32:23
53:7,12,22

**apply** 7:1

**approximately**
24:4

**April** 58:22 60:5

**area** 68:14,17

**arguing** 29:7

**arrest** 77:19

**arrested** 48:15,21
49:1 67:13 71:9

**ASA** 43:23 44:3
58:12

**Ashley** 7:5

**asks** 9:11

**assistant** 15:11
55:6 56:5,16,17
69:2

**assume** 14:16
65:15

**assumes** 40:12
74:6

**assuming** 54:11

**attached** 76:5
80:2,3

**attempt** 25:17

**attempts** 25:21
26:15

**attention** 11:13
30:20 34:13,16
39:15 40:24

**attorney** 7:14
14:13,15 15:11
44:10 45:15,18
50:12 54:23 55:6,
11 56:6,17 58:11
69:3 78:1,10 86:3
88:15 89:1,5,7,9

**attorney's** 21:8
31:18 50:16

**August** 11:14
15:12 56:6,18
63:14,17,20

**aunt** 66:5

**Austin** 7:16

**author** 74:3

**authority** 19:12

**aware** 14:1 62:12
64:15

**B**

**B-E-L-L-O** 8:7

**B-O-N-J-E-A-N**
7:5

**back** 11:7,16 13:9,
15 14:7 15:12,17
16:2 17:13,18
20:14,20 21:19
22:18 31:18 33:3
38:16,19 44:6
45:23 46:1 50:9
52:24 53:3 55:1
61:13 62:23 79:15
80:15 81:5 82:13
84:17,23 85:2 86:5

**bag** 36:5,10 38:16,
17

**based** 58:23 79:12
85:18 89:15

**basically** 42:24
70:1,2,4,13

**Basket** 11:3

**Bates** 16:18 29:19,
24 43:12 75:5,8

**bear** 58:19

**bedroom** 35:20,
22

**beginning** 6:23

**begins** 23:13

**behalf** 7:6,8,11,13,
16 86:2

**belated** 20:24

**belief** 25:3

**bell** 35:5

**Bello** 6:2,10 8:7,8
43:11 53:3 54:21

**Rosa Bello**
**October 15, 2021**

**94Index: belong..Defendants**

55:21 75:12 82:22
89:23

**belong** 19:3 71:3

**Bensinger** 7:12,
13 54:17,20,22
55:20 56:11 58:16
59:5,9,10,14,17
72:21 74:5 75:21
76:9 83:22 85:24
86:2,4,9,17 87:3,
10,18 88:1,6,13,
19,23 89:13

**birthday** 58:21

**bit** 8:19 18:24
48:10 56:10 57:12
73:24

**bond** 68:7,9

**Bonjean** 7:3,4
12:5,11 13:4,11,
18,23 14:10,21
15:20 16:4,12
18:12,21 19:4,13
20:4,23 21:3,10,21
22:9 24:14 25:6,13
27:18 28:9,18
32:1,17 33:6,11
36:15 40:9 41:15,
21 42:5 44:12
45:6,24 47:18 50:5
51:8,17 52:3,11,15
53:8,19 54:3,9,19
55:13 56:7 58:18,
20 59:8,12,16,22
60:1 62:19 63:21
69:20 71:24 72:12,
23 73:16 74:7,9
75:7,11 76:2,9,11,
13 78:13,15 79:8
80:17 82:19,21
83:15,23 84:14,22
85:7,13 86:8,13,22
87:8,17,19,23
88:3,7,11,17 89:15
90:19,22

**born** 57:7 60:5
78:20

**bottom** 23:9 30:4,
17 35:12 36:24
37:1 44:20 79:18

**Bowman** 11:10

**boyfriend** 60:12

**break** 9:22 10:3
23:1 26:17 27:4
28:5 52:20

**Brette** 7:12 54:22
59:9 86:1

**bring** 86:5

**broke** 22:23

**brothers** 40:17,22
41:3,4 76:15,17
77:14

**brought** 68:18
86:10

**bullets** 37:16,19

**bunch** 62:6

**burial** 62:2

———————

**C**

**C-O-H-E-N** 7:6

**call** 37:21 61:16
66:16

**called** 35:14
65:22,23 66:3

**Calls** 84:20

**car** 20:22 24:13,
14,15 26:15

**care** 66:12

**carefully** 73:5

**Carlos** 7:22

**carried** 71:2

**case** 6:12 12:20
13:3,16 21:12
25:12 30:8 31:15
33:13 48:15,21
50:21 51:16 52:12,
14 82:15

**CCSAAO306**
43:10

**CCSAO000306**
43:12

**CCSAO000309**
43:13

**CCSAO000493**
29:19

**CCSAO002429**
16:18

**CCSAO002519**
16:19

**CCSAO002545**
16:19

**CCSAO2429**
16:23

**CCSAO2538** 81:7

**CCSAO308** 75:23
79:16

**CCSAO309** 75:16

**CCSAO493** 29:24

**CCSOA308** 75:9

**Central** 68:4

**chance** 47:13

**changing** 90:10

**Chicago** 7:17 11:5
26:24 27:1,7

**child** 31:5 57:6
59:7 65:1

**children** 26:12,18
70:14,16,21 71:5
89:6,11

**children's** 69:15

**choices** 90:2

**city** 7:16 54:14

**clarify** 59:10,15,
16,17

**clear** 33:13 50:2
58:4

**clip** 37:22

**closely** 73:12

**cocktail** 53:6,24

**Cohen** 7:5

**comment** 27:13,
14

**committed** 62:14

**communicated**
69:24

**compared** 44:16
81:3 85:1

**complete** 8:24

**complexion**
61:11

**concern** 31:23

**concluded** 91:13

**confusing** 53:14

**connected** 25:10

**connection**
52:12,14

**consuming** 28:23

**contact** 20:18
58:24 60:9

**contained** 55:10
56:4,14

**contest** 9:22

**conversations**
60:9

**convoluted** 57:12

**cook** 11:3 77:24
78:10,16 79:6

**cooperate** 65:8

**cooperated** 69:16

**copies** 76:6

**Cops** 74:16

**copy** 76:8

**correct** 10:16 21:9
34:10 35:9 36:21
46:17 49:8 50:4
58:6 59:2 72:20
84:10

**correctly** 90:6,24
91:5

**counsel** 6:22,24
15:1

**county** 32:9 77:24
78:10,17 79:6

**couple** 54:24
66:24 79:11 86:1

**court** 6:14,20 8:1
31:11 32:10 52:10
90:4,23

**courthouse** 78:2,
3

**courtroom** 78:7,8

**coverage** 29:18
31:14

**covered** 31:14

**cross-examine**
81:14

**Cruz** 20:3 61:3

**custody** 71:15

———————

**D**

**dad** 65:24 66:4,12,
21,23 67:5,6,8,11
69:7

**date** 6:7 67:19

**dated** 16:17 43:12
57:13

**dating** 11:23 12:1
27:9 29:5 48:8
51:1

**daughter** 69:8

**daughters** 10:14
11:18

**day** 29:8 41:5
66:12

**dead** 28:2

**deal** 28:22

**dealing** 46:19
47:1,9

**dealt** 46:10

**death** 45:19

**decided** 27:4

**decision** 69:10

**Dectective** 46:23

**Defendant** 7:11,
13,16 54:16,23

**Defendants** 7:8

Rosa Bello
October 15, 2021

95Index: defense..Gonzalez's

**defense** 54:9,12

**department** 50:20

**depicted** 75:13,23

**depiction** 56:15

**Deponent** 6:2

**deponent's** 7:19

**deposes** 6:5

**deposition** 6:10,
17 7:2 8:9 14:23
91:13

**describe** 27:11
60:24

**detective** 43:24
46:6,16 47:10 55:7
69:2

**detectives** 49:4
71:19 77:17

**die** 67:18

**died** 67:11

**difficult** 29:6
84:23

**Difranco** 7:14
15:12 43:24 44:4
54:18,23 55:7,12
56:6,18 58:11,12
86:3 88:15,20,24

**direct** 11:13 30:19
34:13,16 39:15
40:24

**directing** 33:14

**distinguish** 74:13

**District** 6:14,15
21:8

**Division** 6:16

**doctor** 24:3

**document** 29:16,
23

**door** 35:5,6

**dramatically**
90:11

**Driver's** 6:4

**duly** 6:4

———

**E**

**earlier** 27:8 44:11
60:18 64:13 77:11

**easier** 9:7

**Eastern** 6:15

**Eileen** 7:15 85:18
89:18

**else's** 53:15 72:20

**employed** 10:22,
24

**end** 68:18 80:12

**endurance** 9:21

**English** 48:6,10
57:4,8,10,14,17,23
58:6

**Engquist** 7:7,18
8:4 12:7,15 13:5,
14,21 14:3,19
15:4,24 16:9,15,21
17:8,12,20 18:14,
16,23 19:8,17 20:6
21:5,17,24 22:12
24:15,21,23 25:9,
16 28:4,14 29:2,21
32:20 33:10,15
36:18 40:15 41:19
42:3,8 43:14 44:19
45:8,10,22 46:5
47:21 50:8 51:10,
12,20 52:8,13,19
53:2,10,21,23
54:5,11 60:18 65:3
69:18 73:13 76:14
79:11,13 80:22
82:17 83:10 85:17
86:15 88:21 89:17,
22 91:6,8

**entire** 17:22 36:24

**enunciation**
24:22

**Epplen** 7:8 47:7

**Ernest** 46:23

**error** 90:13

**et al** 6:12

**ethnicity** 77:3

**evening** 39:16

**evidence** 40:13

**ex-boyfriend**
31:4

**EXAMINATION**
8:4 54:20 58:20
79:13 82:21 86:4

**Excuse** 87:18

**exhibit** 16:16,17,
23 17:14 29:15,17,
23 33:3 43:8,9,11
49:13 50:9 55:2
75:2,8,16 76:5
79:14 80:2,3 81:5
86:7

**expecting** 65:1

**explain** 16:8 56:9
65:13

**Extended** 29:18

———

**F**

**face** 29:8,13

**fact** 8:20 42:22
84:15

**facts** 40:12

**fair** 14:9,10 58:23
60:8 62:20 72:13
73:11

**family** 22:20,24
23:2,4 27:4 31:4

**family's** 53:11

**father** 60:10 66:8
67:18

**father's** 66:7,11,
16

**fear** 31:3 32:4

**February** 30:13

**feel** 65:7 70:11
83:16

**fight** 42:15,23 43:5

**filed** 30:10,13

**fill** 63:11

**find** 68:6 69:9

**fine** 9:20 10:5
17:11 18:14 24:20
33:20,24 59:21
63:1,3 85:13

**finish** 30:1 56:17

**firearm** 42:11 43:5

**firearms** 32:23

**Fitchburg** 10:8,19

**five-minute** 52:20

**floor** 74:8

**fluent** 48:3

**focus** 18:9

**follow** 81:16

**foremost** 71:4

**form** 13:12,19
15:21 16:5,13
18:13,22 19:14
22:10 25:7,14
27:19 28:10 32:2
36:17 40:10 41:16
44:13 46:2 47:19
50:6 51:8,17 52:5
55:14,17,19 56:8
62:17 63:19 71:21
72:9 73:14 74:6
80:18 83:12 84:11,
19 85:11 86:24
87:9

**forward** 33:2

**fought** 42:13,22

**foundation** 12:6
13:12,19 15:21
19:5,14 21:1,22
22:10 25:7,14
27:19 28:11 32:2
33:7 40:10 44:13
45:7 50:6 51:9,18
62:17 71:22 72:10
80:18 83:11,13
84:12,20 85:12

**Frank** 15:11 43:23
44:3 56:17

**Fred** 43:24 46:7,16

**Friday** 24:7

**friend** 61:16

**friend's** 62:21

**friends** 62:11

**Fro** 34:23 61:8
80:3,16

**front** 17:1 51:6,13

**full** 23:10

**funeral** 62:2,3,5,
15,21

———

**G**

**gang** 19:3,9,12
31:5

**gave** 13:9 15:10
21:6 35:8 36:11,12
37:24 38:17 41:11
46:10 55:2,5 60:16
72:7 82:14

**general** 16:1

**generally** 67:15

**girlfriend** 41:6

**girls** 42:14

**give** 20:13 45:5,9,
14,18 68:22 75:4
88:9

**giving** 12:19 20:19
21:18 22:17,22
25:11 49:8 50:12,
17 64:11 77:21
78:1 84:9

**Gladu** 6:21

**God** 87:17,22,24

**Gonzalez** 12:21
13:3,17 16:3 19:21
21:19 25:5,12
34:19,20 38:13,24
50:10,21 51:16
60:17 79:3 82:15

**Gonzalez's** 33:8
77:22 83:1

**Rosa Bello**
**October 15, 2021**

**96Index: good..March**

**good** 7:3 29:10 32:6 52:13 54:21 61:16

**grand** 51:7,14 68:4

**great** 75:17

**ground** 8:13

**Guevara** 6:12 7:11 47:11 54:16

**gun** 37:8,9,11,12, 15 38:6,12,14,23 42:16,19 43:1 72:2 74:1,11,15 81:15, 18 82:2,5,9

**guns** 72:4

**guys** 31:20 35:3 77:16

**H**

**hair** 61:12

**halfway** 23:13

**Halvorsen** 7:8 46:23

**handgun** 15:19

**handling** 78:11

**handwriting** 30:20

**handwritten** 31:2 47:14 49:11

**happen** 24:5

**happened** 13:2 19:23 34:24 35:4, 13 39:1 44:6 46:11 64:12 65:23 66:4, 21

**happy** 59:19

**hard** 24:17,21

**harmed** 22:16

**hear** 77:13

**heard** 6:13

**hearing** 77:8

**held** 6:17

**hell** 42:24 70:3

**hit** 70:12

**home** 15:19 42:14, 16 64:22 65:18 73:20 77:18

**honest** 82:13

**hospital** 67:7

**hotel** 23:15,18

**house** 26:18 42:12,19 43:1,6 66:14 72:2

**husband** 7:19 8:12 10:14

**I**

**idea** 20:13 61:8 71:8 76:16

**identification** 6:3 16:20 29:20 43:13

**identified** 80:2

**identify** 80:16

**identity** 59:18

**Illinois** 6:15 11:5 12:21 32:10,11

**implication** 70:10

**imply** 41:20

**important** 70:21, 23

**inaccurate** 47:17

**incident** 15:17 20:21 24:10 51:14 53:5 64:4

**Including** 39:5

**incorrect** 47:17

**independent** 18:10,17 48:12,18

**indicating** 41:23

**individual** 59:18 61:2,6 74:22 75:18

**information** 55:9, 11 56:4,14 63:6,11 68:22 71:14 72:7 73:24

**inside** 37:2,5,7 38:6,24

**instance** 60:23 61:11 73:23 76:19

**intend** 21:12

**interest** 69:15,16

**interview** 68:19

**interviewed** 68:19

**introduce** 6:22

**investigation** 65:9 69:17

**involving** 15:17

**J**

**jail** 20:17 67:14 78:17 79:6

**Jandrow** 6:18

**Jennifer** 7:4

**John** 7:7

**Join** 86:15

**Jose** 6:11 11:19, 22 15:18 20:11 23:5 27:9 28:6 31:15,19,24 32:21 39:5 40:20,21 42:11 43:5 48:5,9, 14,20 49:20 50:23 51:3,22 52:1 53:22 56:24 57:3,6,7,13 58:5 59:1 60:2,10 61:15 62:8,20 70:23 71:8,12 77:10

**Jose's** 49:20 65:18

**Jr** 57:7 59:1,7,10, 11 60:10

**Juan** 6:11 27:14 35:7,14 36:20

38:11 40:21 42:11 59:1,7,11 60:10 61:16 67:13 70:23 77:19 78:16

**Juan's** 66:13

**judge** 8:20

**June** 59:1 60:13

**jury** 51:7,14

**Justino** 20:3 61:3

**Juvia** 60:21

**K**

**Kevin** 45:20

**kicked** 29:8,12

**kids** 26:7 27:2 64:21 70:2,6,13 73:21

**killed** 40:7 61:19

**kind** 19:11 21:20 56:9 81:15,18

**King** 77:11

**Kings** 19:10 22:8, 17,21 77:13

**kitchen** 11:1,2,3

**knew** 15:19 57:5, 14 81:21

**knowledge** 51:2,5 80:19

**L**

**Latin** 19:10 22:8, 17,21 77:10,13

**lay** 33:7

**leading** 21:11 40:11 55:16 69:19

**learn** 41:4

**learned** 38:6 40:6 41:2

**leave** 27:6 39:3

**left** 27:1,3,7 39:2,4

**legal** 6:19

**License** 6:4

**lie** 73:8 84:5

**life** 25:18,21 27:2 28:24 52:11

**lines** 38:4 41:1

**live** 10:7,8,12,18, 20 11:4,19 12:4, 13,16 33:2

**lived** 11:6,15 32:22 76:20

**lives** 10:19

**living** 11:9

**Lluvia** 34:18 36:11 37:13,14 60:21 80:2,16

**long** 10:9 12:3,16, 22,23,24 26:8 29:7

**looked** 61:4 70:3 81:22

**lot** 29:6 62:5 68:1 69:5 83:16

**Lupia** 19:19

**M**

**machines** 69:8

**Macho** 61:18

**Macho's** 62:14

**made** 22:14 34:12 83:8 90:12

**make** 55:21 56:13 69:10 70:10 84:10 88:5

**makes** 70:9

**making** 76:3 90:14

**man** 23:7 27:24 28:2

**manner** 36:16

**March** 13:9,16 14:7 15:9 16:17 18:6 20:20

Rosa Bello
October 15, 2021

97Index: mark..point

mark 16:16

marked 16:19,22, 23 29:19,22,24 43:13

market 11:1,3

mask 24:16,18

Massachusetts 6:4 10:8

matter 6:11,13 54:23 60:17

matters 18:3

Maysonet 6:11 11:20,22 15:18 19:1,2 20:11 23:5 27:9 28:6 31:15, 19,24 32:22 36:20 39:6,16 40:21 42:11 43:5 48:5,9, 14,20 50:23 51:3, 22 52:1 56:24 57:4,7,13,16 58:5 59:1,11 60:3,10 62:13 70:24

Maysonet's 33:9 53:22

Mcgrath 7:10 54:15 62:16 63:18 85:22 89:20

means 6:3 52:6 90:3

media 29:18 31:13,15

medication 50:24

meeting 50:11 58:12

Megan 7:10 89:18

Melendez 7:22,23

member 31:6 45:17

members 22:7,21

memory 42:10

men 40:7 71:2

mentioned 70:5 89:11

middle 64:2 81:14

midnight 39:23

millimeter 72:3,8 74:1,11,14 81:20, 22 82:2,5,6,9

mind 20:1 68:2 69:6

mine 71:2

Mingey 7:9 47:2,4

minute 28:16 43:15

Misstates 87:9

mistake 90:12 91:2

mistaken 84:10, 18

mistakes 83:8 84:10

mm-hmms 9:15, 17

Molotov 53:6,24

mom 68:11 69:9 70:1

monitor 6:8

months 12:17 20:16 23:8 27:10, 24 29:5 57:5,6 64:9,12

Montilla 7:9 46:7, 16 55:7

morning 7:3 54:21 62:14

mother 48:22,24 49:20 53:8,9,13 65:19 66:13,15 68:5 70:9

mother's 53:7,22

Motilla 43:24

mouth 65:12

moved 20:2 26:23

moving 26:6,22

murder 13:3 16:2

48:15,21

murdered 40:17 41:4 76:23 77:1

murders 40:22 62:13 76:15

___

N

named 61:17

names 46:14

narrative 73:1

nature 21:11 40:11

necessarily 30:9

needed 27:2 68:5 70:4

neighborhood 40:8,18

night 18:11,18 40:6 42:16 44:10 46:10 65:16 67:1

Nobody's 70:14

North 11:10

Northern 6:15

notes 57:21,22 58:2

notice 81:4

noticed 14:23

notified 14:22

number 75:5

numbers 23:12

___

O

O''s 80:13

oath 8:18 14:8

object 21:11 28:10 36:16 40:10,14 44:13 55:14,17 59:6,13 85:10

objecting 55:19

objection 8:24 12:5 13:4,11,18 15:20 16:4,12 18:12,21 19:4,13 20:4,24 21:21 22:9 25:6,13 27:18 28:10 29:17 32:1 41:15 45:6 46:2 47:18,20,23 50:5 51:8,18 52:3,5 56:7 62:16 63:18 69:18 71:21 72:9, 21 73:13,14 74:5,8 80:17 83:10,12,22 84:11,19 85:5,11 86:13,23 87:8 88:17

objections 8:22 12:12

observer 7:20

occur 26:16

occurred 62:14

October 6:7

offering 76:10

office 21:8 31:18 45:18 50:12,16 78:1,6

officer 45:13 69:13

officers 46:9 49:4

offices 78:4

oldest 11:18 64:24 69:8

one-page 29:16, 23

opened 35:6

opportunity 90:8, 15

order 45:5

___

P

p.m. 43:20

package 36:9

pages 79:16

paper 72:19

part 17:23 31:2 33:22 59:11 64:3

past 33:2,12

patient 88:7

Paulnitsky 7:9 46:20

pay 20:1

pending 10:2

people 9:1 12:20 13:16 15:18 28:22 41:22 44:7,17 46:15 51:15 60:17 62:5,7 84:9 88:9

period 27:12 32:21 67:16

person 19:22 60:20 61:4 73:5 75:13

phone 66:15,23

phonetic 60:21

photocopies 75:24 76:1

photograph 74:18 75:13,19 79:19

photographs 75:23

phrasing 52:4

physically 22:16

picked 36:4

picture 75:17

piece 72:18

pistol 37:17

place 26:8

plaintiff 7:6

plaintiff's 6:24

plastic 36:5,10 38:16,17

point 18:20 21:13 40:5 44:7 52:13 69:12 70:5 80:20

**Rosa Bello**
**October 15, 2021**

**police** 44:9 45:13 48:14,20 49:1,4,19 50:3,20 58:13 64:19 65:5,7,16, 17,21 66:1 68:4,6, 8,21,23 69:3,13 71:7,15,18 73:18 83:2 86:11 89:10

**position** 14:4

**possibilities** 41:24

**possibly** 83:8

**post-admission** 31:19

**power** 70:6

**pregnant** 66:10 69:10

**present** 21:13 43:23 63:8 89:9

**pressure** 83:17

**pressuring** 65:8

**pretty** 62:8

**prior** 15:9 21:18 22:17,22 25:4 49:17 50:12,16,20 58:24 60:16 77:19, 21 78:1

**priority** 71:5

**problem** 76:11

**problems** 51:4

**proceed** 8:2

**proceeding** 83:5

**process** 31:19

**produced** 6:2

**prompt** 9:19

**prosecution** 78:11

**protect** 71:5 73:20

**provide** 86:11

**provided** 56:5,16 83:2 86:6

**providing** 58:10

**purportedly** 63:14

**purposely** 84:4,5

**pushing** 14:4 29:7

**put** 7:21 38:24 65:11 74:3 80:13

---

**Q**

**question** 9:5,10 10:2,3 12:6 13:12, 19,22 14:6,9,11 15:6,21 16:5 18:1, 13 19:5,14 20:5 21:12 23:17,21,24 24:4 25:7,14 27:19 28:7 32:2,7,8 34:15,17,20,24 35:3,12,18,21 36:1,6,9,17 37:2, 18,22 38:4,12,23 39:3,5,22 40:11,12 41:2,7,16 42:2,4 43:17 44:14 45:7, 21 46:2,3 47:19 50:6 52:4,5 55:14, 18 56:2,3 57:12 58:9 65:6 75:9 80:18 81:18,21 82:1,4,8,20 85:11 87:20 88:5,12 89:23,24

**questioning** 36:16

**questions** 13:24 15:2,3 54:8,18,24 58:19 60:16 62:24 79:12 82:18 86:1 88:8 89:14

**quick** 52:20

**quiet** 59:13

---

**R**

**race** 77:6

**Rahe** 7:16

**rang** 35:5

**rank** 19:12

**react** 29:14

**reacted** 29:14

**reaction** 38:5

**read** 17:4 30:11 31:2 33:5,22,23 34:1 45:23 46:1,3 47:13 55:15 56:22, 23 57:1,17 58:6 73:5,12 87:6 90:8, 15

**reading** 17:10,13 30:1 34:11 36:23

**Real** 6:19,21

**reason** 70:15

**reasons** 31:6

**Rebecca** 6:20

**recall** 11:12,15 12:2,19,23 13:1,2 15:13,17 16:1 19:2,24 20:7,20 22:2,3,4 24:10 31:1,17,21 34:10 40:16 41:12 42:7, 17,18,21,23 43:2,3 44:3,8 45:4 46:6,9, 12,15,17,19,22,24 47:1,8,9,12 48:8, 19,23 49:3,7,9 50:11 51:13,24 52:9 53:5,24 54:2 68:7 69:1,4 72:11 73:2,4 85:9 86:10, 16

**receive** 21:20

**recess** 17:17 52:23

**recognize** 74:22 75:12,18

**recognizes** 76:7

**recollect** 61:4

**recollection** 18:2, 11,18 34:2 48:13, 19 60:20 68:3

**record** 6:7,23 7:19,21 8:15 9:18 17:9,16,19 42:1 43:9 52:22 53:1

75:22 76:3,4 91:12

**referenced** 60:21 61:3,7

**referencing** 59:6, 7

**Referring** 50:9

**reflect** 76:4

**refresh** 18:2 34:2

**relationship** 27:11,13 28:1,6 29:9

**relevance** 28:11

**relocated** 21:8

**remember** 11:6,9 13:13 16:10 19:18 30:23 39:19 44:7 46:21 49:15,16 50:23 51:3 54:4,6 57:21 58:1,11 61:11,15,22 62:1, 4,8 63:2 64:18 65:20,24 67:3,15, 19,21,23 69:23 71:16,18 73:3 77:8,17,23 78:9,24 79:2,5 83:1 86:21

**remote** 90:5

**repeat** 9:12 45:21 48:16

**repeated** 15:6

**rephrase** 9:12 18:15

**report** 34:12

**reporter** 6:20 8:1 46:3 90:4,24

**Reporting** 6:20,21

**represent** 7:1 54:22 90:20

**represented** 14:12

**representing** 6:19,21

**reserve** 90:7,17, 18

**respect** 31:7 88:9, 14,20

**return** 39:17

**returned** 39:20

**review** 55:23

**reviewed** 13:8 33:17

**reviewing** 83:1

**revolver** 74:14

**Reynaldo** 6:12 47:10

**rights** 14:2

**Roland** 46:20

**room** 7:20 35:15, 16,18 36:4 86:11

**Rosa** 6:2,10 8:7 43:11 53:20 54:4 73:24 74:10 80:2

**Rose** 66:6,14

**Rosen** 7:15 54:13 71:21 72:9 73:14 75:4 83:12 84:11, 19 85:5,10,20 87:21 89:19

**rules** 8:13

**run** 20:21 23:20,22 24:12 25:1,4,24 26:14

---

**S**

**safe** 26:12

**safety** 31:3

**Sanchez** 61:17

**Santiago** 61:17

**sat** 44:17

**satisfactory** 6:3

**scared** 64:18 83:19

**screen** 75:6

**seated** 68:13,17

**Rosa Bello**
**October 15, 2021**

**secret** 77:10

**Section** 30:21

**sergeant** 47:2,6

**services** 61:23

**set** 41:18

**shared** 77:18

**shirt** 38:18 39:1

**shooting** 45:19 64:5

**short** 12:13

**shortly** 20:19 21:6

**shot** 26:17 40:7

**show** 29:15 43:8

**showing** 16:22 29:22

**sic** 20:17 57:9 70:4

**side** 54:10,12

**signature** 30:3,5, 16 32:10,13,14 44:23 45:2 49:14 72:20 79:18,22 80:1,6,8,10,14 90:3,7

**signed** 72:14,16 73:6

**signing** 30:23

**single** 55:15,23 70:1

**Sir** 7:20

**sister** 66:5,7,11,16

**sister's** 54:3

**sit** 15:16 34:9 48:13,18 56:12 60:19 61:10 87:4, 11

**sitting** 17:9 44:8 66:15

**sleeping** 29:13

**slow** 9:12

**son** 10:15 20:16 23:8,20,23,24 26:1

27:24 60:2 66:11 69:11 78:20,21

**son's** 58:21

**sounds** 68:1

**Spanish** 48:1,10 56:21,22,23 57:1

**speak** 35:7 48:1,5, 10 56:21 57:4,8,9, 14

**speaking** 44:3

**specific** 51:11 55:18

**specifically** 89:7

**specifics** 34:10

**speculation** 84:20

**spell** 8:6

**spelling** 90:13

**spoke** 14:16 20:10 69:2

**spoken** 23:3

**stabbed** 29:9,11

**stamp** 29:24 30:10,13

**start** 8:24 9:6 11:24 59:23 88:4

**started** 8:12

**starts** 33:21

**state** 8:5 12:20 31:17 50:16

**state's** 7:13 15:11 44:9 45:15,17 50:12 54:22 55:6, 11 56:6,16,17 58:11 69:3 77:24 78:10 86:2 88:14 89:1,5,6,9

**statement** 15:10 43:11 45:5,9,14,19 46:10 47:14 49:8, 11 55:2,6,10,23 56:4,14 58:10 62:24 63:6,7,13 64:3,11 72:1,14,16

73:1 74:18 75:8 83:2 86:6,11,20 87:6 89:2

**states** 6:5,14

**stating** 6:24

**station** 44:9 48:14,20 49:1,19 50:3 58:13 64:19 65:16,18,21 66:2 68:4,6,8,24 69:3, 13 71:8 73:18 86:12

**stay** 59:13

**stayed** 77:18

**staying** 23:15,18

**stick** 38:17

**stipulations** 7:1

**story** 71:19

**straight** 78:7

**street** 19:3 77:24

**strike** 65:14 77:9 79:1 82:23

**stroke** 66:8

**stuck** 37:16,17,18 38:16,18

**study** 86:19

**style** 61:12

**subject** 16:10 18:3

**subjects** 16:1

**submit** 31:11

**sudden** 66:1 68:18

**suggest** 69:14

**summary** 55:10 56:5,15

**survive** 67:10

**swear** 8:1

**sworn** 6:4 8:3 41:22

---

**T**

**taking** 50:24 66:12

**talk** 17:24 31:20 40:20 49:23 71:11 77:8

**talked** 8:13 9:16 44:11 53:4

**talking** 9:1,8 31:17 33:18 36:19,20 37:20 40:16 41:6 44:9 49:3,16 53:19 61:13 66:6 77:14 79:15 90:9,10,11

**telling** 71:19

**testified** 13:15 14:8 16:2 18:3,18 19:22 51:15 56:20 57:3 77:11 78:5 82:23,24 84:18

**testify** 51:6,21,22 83:5 87:5

**testifying** 13:2 15:9 16:11 31:18 50:20 51:13 52:1, 10 83:17

**testimony** 8:18 12:19 13:9 20:20 21:7,13,19 22:18, 22 25:5,11 29:18 33:4,7 35:8 36:19 37:24 38:1,19 39:12 40:3 41:10, 22 42:9 44:11 50:10,13,17 56:1 58:24 60:16 61:7 77:22 78:1 82:13, 14 83:9 84:1,9,16, 24 86:21 90:10

**thing** 10:1 14:17 17:3,5,22 36:24 37:16,19 70:21

**things** 9:16,17 17:24 33:19 67:1

**threaten** 23:5 27:16 45:14,18 70:15 88:15 89:2

**threatened** 22:2, 4,7,21 45:4,9 50:3, 15,19 65:4 83:20

**threats** 21:20 22:14 53:4

**thrown** 53:6 54:1

**ties** 22:23 23:1 27:4

**time** 6:8,19,21 9:23 11:17,20 12:3,14,22,23,24 20:10 21:1,3 22:1, 14 23:7 24:1 26:5 27:12,17,23 32:21 34:7 35:23 37:3 39:19 42:14 43:4 50:24 52:17,18 55:22 57:5,17 58:13 63:7 64:16 66:8,13 67:12,16 76:12 78:18 79:10 86:6

**times** 8:23 25:20, 22 52:9

**timing** 40:13

**Tino** 34:23 61:3

**Tino's** 35:1

**today** 15:16 34:9 48:13,18 60:19 61:10

**told** 8:21 14:7,16 15:7 35:15 42:18 55:11 66:23 70:3 71:16

**Tony** 66:14

**top** 43:18 63:5,16, 22

**Torrence** 45:20

**towel** 36:5,7 38:6, 16

**track** 12:3 15:15 20:9 26:21 33:1

**transcript** 16:17 23:11 81:6 90:1

**trial** 16:3 33:8,9 50:11 51:22 77:22

---

**Rosa Bello**
**October 15, 2021**                                      **100Index: true..Zoom**

83:1

**true** 55:5,10 56:5,
15

**trust** 90:23

**trusting** 90:4

**truth** 13:17 14:7
15:7

**truthful** 34:7 35:9
36:13 38:1,19
39:12 40:3 41:10,
14,23 84:1

**truthfully** 83:5

**turn** 23:9 30:11

**TV** 74:16

**two-page** 47:14

**type** 28:1 42:2
70:10 74:15

**typed** 89:24 90:1,5

**types** 15:3 72:4

---

**U**

**underneath** 63:15

**understand** 9:10
12:24 15:22 16:6,7
21:14 26:13 32:3
52:6,7 80:23 86:24
87:1

**understanding**
24:17

**understood** 57:7
67:24

**United** 6:14

**unwrapped** 81:24

**upset** 38:7 42:10
62:9

**upside** 30:11

---

**V**

**verify** 90:8

**versions** 75:24

**versus** 6:11 12:21
13:16 51:15 60:17

**video-recorded**
6:9

**visit** 78:16

**vividly** 67:3

---

**W**

**wait** 8:23 9:5

**waited** 66:22
68:15

**waiting** 68:14,17
88:4

**waive** 90:3,17 91:6

**waived** 91:8

**wanted** 14:15
26:11 27:1 35:7
70:12

**Wiley** 40:17,22
41:3,4 45:20
76:15,16 77:14

**window** 26:17
53:6 54:1

**wishes** 31:7

**word** 55:23

**words** 65:11
72:18,20

**work** 11:1

**wrapped** 36:4
38:15

**write** 72:14,17

**writing** 31:8 57:21
58:2

**written** 49:17
72:19 82:6 86:20

**wrong** 42:2 70:17

**wrote** 31:9 57:22
72:24 73:5

---

**Y**

**year** 44:16 67:21

**years** 10:11 11:11
15:14,23 16:14
19:24 20:8 23:3
32:24 41:13 43:3
44:5,15,17 46:12
71:17

**young** 40:6 64:21

**youngest** 11:17
64:23

---

**Z**

**Zoom** 6:18

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 23

```
 1   STATE OF ILLINOIS )
                       ) SS:
 2   COUNTY OF COOK    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY
          COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
     THE PEOPLE OF THE  )
 5   STATE OF ILLINOIS  )Case 90 CR 21787-02
                        )
 6        -vs-          )Before: JUDGE LORETTA HALL
                        )                    MORGAN
 7   ALFREDO GONZALEZ   )March 26, 1992

 8                      JURY TRIAL

 9   Court having reconvened pursuant to adjournment.

10

11           HON. JACK O'MALLEY,
                  State's Attorney of Cook County, by
12           MR. JOEL LEIGHTON and
             MR. FRANK MAREK,
13                Assistant State's Attorneys,
                  appeared on behalf of the People of the
14                State of Illinois;

15

             MR. DAVID WIENER,
16                appeared on behalf of the Defendant.

17

18

19

20

21
     ROCHINA V. CHOLEWA
22   Official Court Reporter
     2650 S. California
23   Chicago, Illinois 60608

24
```

1

JGS_MAYSONET 4152
GONZALEZ 0169868

```
1   DATE OF HEARING:  March 26, 1992

2   NUMBER OF PAGES:  1 to 124

3

4   LIST OF WITNESSES    DX    CX    RDX    RCX

5   PRELIMINARY MOTIONS IN CHAMBERS---------------3

6   PRELIMINARY REMARKS BY THE COURT-------------10

7   OPENING STATEMENT BY:

8        MR. FRANK MAREK-------------------------15

9        MR. WIENER------------------------------25

10  MR. JOSEPH WILEY     30

11  OFF. LUIS MONTALVO   35    43    45

12  LUNCH RECESS---------------------------------46

13  AFTERNOON SESSION----------------------------47

14  OFF. JOHN BUTLER     48    68    70    71

15  CHAMBERS DISCUSSION--------------------------72

16  EXHIBITS 3-19 ADMITTED AND EXHIBITS PUBLISHED

17  TO THE JURY----------------------------------81

18  DET. E. DICKINSON    82

19  ROSA BELLO           87    99    109

20  DET. R. GUEVARA      114

21

22

23

24
```

2

JGS_MAYSONET 4153
GONZALEZ 0169869

1          (Whereupon, a discussion was

2          chambers outside the presence of the

3          jury.)

4     THE COURT:  Let the record show we are in chambers

5  on the case of People versus Alfredo Gonzalez.

6          It is my understanding we are getting ready

7  to take testimony and there are some kind of motions

8  to be heard.

9     MR. MAREK:  One of the co-offenders not on trial

10  here, Mr. Jose Maysonet, he is a co-offender in this

11  case but also has a pending attempt murder charge.

12          We don't think that that charge has any place

13  in this case.  He is not going to be testifying.  We

14  are asking that counsel be barred from any reference

15  to this in his opening statements.  We don't believe

16  there is any way it can come in in this trial, that it

17  can be in any way relevant.

18     MR. WIENER:  Let me respond.

19          I anticipated this motion.  It was clear they

20  had to make the motion.  Maysonet's wife will testify.

21  She is going to testify on May 24, 1990 --

22     THE COURT:  She is testifying as to whose case?

23     MR. MAREK:  Our case.  She is not his wife.  She

24  is his girlfriend.

3

JGS_MAYSONET 4154
GONZALEZ 0169870

1    MR. WIENER:  That Gonzalez and a couple other guys

2  came into their house, to Maysonet's and his

3  girlfriend's house, asked for the .09 millimeter gun,

4  took it and left; didn't bring it back.

5    THE COURT:  Okay.  What was the date?

6    MR. WIENER:  May 24th.

7    THE COURT: Okay.

8    MR. WIENER:  Everybody is arrested in August of

9  1990 in this case.  That is three months later.

10    THE COURT:  Okay.

11    MR. WIENER:  In between Maysonet is arrested and

12  charged with attempt murder using a .09 millimeter gun

13  in your courtroom that is pending right now.

14    I have a right to ask her, Mrs. Maysonet, or

15  Rosa Bello, No. 1, Did that gun come back, did you

16  ever see another .09 millimeter gun, and isn't it a

17  fact July of 1990 your boyfriend was arrested and

18  charged with using a .09; right, Judge?  I will tell

19  you why.

20    It goes to motive for her testifying.  She is

21  testifying today she is the girlfriend of Mr. Maysonet

22  or the wife of Mr. Maysonet and, Judge, if she can't

23  testify that there was another gun in that house that

24  --

4

JGS_MAYSONET 4155
GONZALEZ 0169871

1    THE COURT:  She can testify there is another gun
2    in the house?
3        MR. WIENER:  No.  She will deny there is another
4    gun and then in July he gets arrested, he gets out,
5    gets put out on bail.
6        THE COURT:  No, counsel, I won't allow that and I
7    will tell you why.
8        MR. WIENER:  Go ahead; tell me why.
9        THE COURT:  She is not here in the first place to
10   the tell hearsay.
11       MR. WIENER:  But, Judge --
12       THE COURT:  Counsel, it is hearsay.  I don't know
13   how you could get over that.
14       MR. WIENER:  It might be hearsay but I want to
15   tell you, Judge, it goes tremendously to her motive to
16   testify.
17       THE COURT:  It may be.  That does not make it
18   admissible.  I understand your reason you want to do
19   that.
20       MR. WIENER:  Sometimes the fact that he was
21   arrested and, you know, it might be hearsay in the
22   strict legal term that it was -- If she says, "No, I
23   don't know that," that is fine, I won't bring it up.
24       THE COURT:  I will tell you how I will let you get

5

JGS_MAYSONET 4156
GONZALEZ 0169872

1    it -- at it.  I won't have her testify he was arrested

2    and charged in any way and have something pending.

3         If you want to pose a question as to whether

4    or not there was any accusation that he used it in

5    some other place or something -- I guess that is what

6    you are trying to get to -- That is what you are

7    trying to get to?

8         MR. WIENER: Yes.

9         THE COURT:  The pending cases, I won't allow that.

10        MR. WIENER: Let me ask you this, if I can ask her:

11   Are you aware that Jose Maysonet is accused of using a

12   .09 millimeter gun in another situation?

13        THE COURT:  What is the point, counsel?

14        MR. WIENER:  The point is she is coming in here

15   today to in my opinion try to help her husband or

16   boyfriend by testifying against my client, giving an

17   exculpatory statement.

18        THE COURT:  That is totally speculative.  The more

19   you talk the more I think I won't let it in at all.

20        MR. WIENER: Judge, I have a right to cross examine

21   her with respect to the motive for her testifying.

22        THE COURT:  You have a right to cross examine her

23   with competent questions about issues that I find

24   admissible.  You don't have a right to examine her on

6

JGS_MAYSONET 4157
GONZALEZ 0169873

1   issues that I said I won't admit.

2     MR. WIENER: Of course I know that, Judge, but I

3   want to make a record and the record is this --

4     THE COURT:  I am giving it due consideration.

5   That is why I am trying to think what you are saying.

6     MR. WIENER: I would like to make a record right

7   now.

8       I expect Rosa Bello to testify that she knew

9   it was a .09 millimeter, she knew it was a.09

10  millimeter gun she took out of the house.

11     MR. MAREK:  On this night.

12     MR. WIENER:  On this night;

13       That they never brought the gun back, and --

14  three months later until she went into a police

15  station and made a statement -- and three months later

16  when she can say her husband or boyfriend was arrested

17  on this case.

18     MR. MAREK:  Here is -- This will bring us into the

19  shells from the two shootings, show a different .09

20  millimeter weapon.  And all he will do is open the

21  door for us to bring in firearm experts and different

22  people.

23     THE COURT: I don't want this muddied up with some

24  other case about somebody not even on trial.

7

JGS_MAYSONET 4158
GONZALEZ 0169874

1   MR. WIENER: I want to make a trial and that is

2   all.  It is important.  Then you can make your ruling.

3   I would just like to make a record that I have, think

4   I have a right to show that Jose Maysonet, the man she

5   lived with, was not only familiar with .09 millimeter

6   weapons, that he kept .09 millimeter weapons in his

7   house and she in fact saw a .09 millimeter weapon or

8   after that fact and if she denies that I have a right

9   to ask isn't it a fact Jose was arrested for a charge

10  using a .09 millimeter?

11      THE COURT:  Counsel, that is not necessarily

12  impeachment of her and I won't allow it.

13      MR. WIENER:   Okay. I made my record.  I will

14  object for the record.

15      THE COURT:  He may have had all kinds of .09

16  millimeters she was not aware of.  To me that is going

17  much too far afield.

18      MR. WIENER: I made my record.

19          What is the next motion?

20      MR. MAREK:  As counsel said the defendant gave an

21  exculpatory statement to the police and the State's

22  Attorney's office.

23          We don't intend to use that exculpatory

24  statement.  Ask they be barred from any mentioning of

JGS_MAYSONET 4159
GONZALEZ 0169875

1    it in opening.

2        THE COURT:  This is post arrest?

3        MR. MAREK:  Yes.

4        MR. WIENER: I am just going to mention he is going

5    to testify to what happened.

6        MR. MAREK:  That is fine.

7        MR. WIENER: I am going to lay out what was said in

8    the statement without mentioning he made the

9    statement.

10       MR. MR. MAREK:  Then we are in agreement.

11       THE COURT:  He can say whatever he wants to on the

12   stand.

13       MR. WIENER: I have no problem with that motion.

14       MR. MR. MAREK: Finally there is a Mr. Cruz who is

15   going to testify that --

16       THE COURT:  Is Cruz --

17       MR. WIENER:  Another codefendant.

18       MR. MR. MAREK:  He filed motion to suppress

19   various statements which was later withdrawn.  We ask

20   counsel be barred from mentioning any reference to

21   that.

22       MR. WIENER:  No problem with that.

23       MR. MR. MAREK:  That is it.

24           So, the only one contested is the first one.

9

JGS_MAYSONET 4160
GONZALEZ 0169876

1      MR. WIENER: I anticipated their motion on the

2   first one and the other ones I have no problem with.

3      THE COURT:  It is all very refreshing, counsel.

4      MR. WIENER:  What is?

5      THE COURT:  This whole process.

6                  (Whereupon the trial was resumed in

7                   open court.)

8      THE COURT:  Court is back in session.

9          Bring out the jury.

10

11                 (Whereupon the jury was returned

12                  to open court.)

13

14     THE COURT:  Good morning, ladies and gentlemen.

15         We are now going to commence the trial of

16  this case.

17         Before we start I want to kind of give you a

18  brief synopsis of the manner in which we will proceed

19  for those of you who may be unfamiliar.

20         We are first going to be hearing from the

21  attorneys in what is called opening statements.  I

22  want to stress to you now that opening statements are

23  not evidence.  Nothing the attorneys say is evidence,

24  but opening statements are very important and you

JGS_MAYSONET 4161
GONZALEZ 0169877

1    should pay attention because opening statements are an
2    opportunity for each side to tell you what they expect
3    the evidence will show; in essence to advance their
4    theory of the case.
5         The State will address you first in opening
6    statement.  That goes along with the proposition that
7    the State bears the burden.
8         Once they have concluded their opening
9    statement you will hear from the defense and their
10   opening statements.
11        Once the opening statements have been
12   concluded we will begin taking the testimonial
13   evidence in this case, meaning sworn evidence from the
14   witness stand from the mouths of witnesses.  That is
15   evidence which when you have heard it all you will be
16   considering.
17        Once the State has concluded what is called
18   its case in chief through witnesses the defense may
19   present evidence.
20        As I said to you before the defense has no
21   obligation to present evidence but may present
22   evidence if it chooses.
23        Assuming that there is some evidence
24   presented on behalf of the defense the defense will

11

1  then follow after the State closes its case in chief

2  to present their evidence to you.

3        Once that is concluded the State will have an

4  opportunity -- I don't know, they can avail themselves

5  of it, but there is an opportunity at that juncture at

6  the close of the defense case in chief for the State

7  to present additional evidence called evidence in

8  rebuttal.

9        Rebuttal evidence is evidence that gives the

10 State an opportunity to meet any evidence that may

11 have been raised in the defense case.

12       Once all of the evidence from both sides has

13 been concluded we will then be hearing from the

14 attorneys again in what is called closing argument.

15       Again closing argument by the attorneys is

16 not evidence and again the closing arguments of the

17 attorneys is very important and again you should pay

18 attention to it because that is the opportunity each

19 side will have to discuss with you what they feel the

20 evidence has in fact shown.

21       Again the State will address you first in

22 closing argument followed by the defense closing

23 argument.

24       The State will have a final opportunity to

12

JGS_MAYSONET 4163
GONZALEZ 0169879

1    address you in rebuttal argument and that is simply

2    designed to give the State an opportunity to address

3    any issues that may have been raised in the defense

4    argument.

5           Once all of that is over, once all the

6    evidence is completed and all the arguments have been

7    had I will then be instructing the jury on the law

8    applicable to this case and the case will be given to

9    you for deliberation. Just kind of a road map in terms

10   of how it will proceed.

11          The law in the State of Illinois does provide

12   that jurors may take notes as testimony is being

13   taken.

14          If any of you decide you want to take notes

15   you should let the Deputy Sheriff know.  The Deputy

16   Sheriff will provide you with paper and pencil with

17   which to do that.

18          I want to issue you a caveat around that

19   process, however, and take you back to when you were

20   in school and taking notes in lectures.  I am sure you

21   have had some involvement in getting involved in the

22   process of taking notes and you are not paying

23   attention to what is being said, you are not taking it

24   in in the totality that it ought to be taken in.

13

JGS_MAYSONET 4164
GONZALEZ 0169880

1       One of the things that I will be saying to
2  you by way of instruction at the end of the trial on
3  the issue of the credibility of witnesses, you are
4  entitled to take into account the demeanor of the
5  witness, their manner while testifying. That is very
6  difficult to observe when your head is buried taking
7  notes. When you decide you want to take notes please
8  keep that in mind.
9       The other thing is those notes may not leave
10 this courtroom.  Any time you leave the courtroom they
11 must be turned in to the Deputy Sheriff pursuant to
12 law.  They will be returned to you when you take it to
13 the jury box again.
14      At the conclusion of the jury trial pursuant
15 to State law those notes must be turned in to the
16 Deputy Sheriff who will pursuant to law destroy them.
17      I will caution you those notes if you take
18 them are your own private notes.  They are not to be
19 shown to other jurors; simply for your use and your
20 use only.
21      With those brief opening remarks and caveat,
22 State, are you ready to proceed?
23   MR. MAREK:  We are.
24   THE COURT:  Opening Statement; I misspoke.  I am

14

JGS_MAYSONET 4165
GONZALEZ 0169881

1    sorry.

2

3                    OPENING STATEMENT

4                    By: MR. MAREK

5

6        MR. MAREK:  Ladies and gentlemen, "Let's go.  I

7    just shot somebody!  I just shot two guys."

8            Ladies and gentlemen, those are the words of

9    this defendant, Alfredo Gonzalez, after he fatally

10   shot the victims in this case, Kevin Wiley, aged 26,

11   and his brother, Torrence Wiley, aged 27.

12           With those words Mr. Gonzalez and two of his

13   co-offenders piled into the car which was driven from

14   the scene by another offender, Jose Maysonet, and they

15   made good their escape.

16           And, ladies and gentlemen, what they were

17   escaping from were events which transpired on North

18   Avenue just moments before. What had happened, there

19   was a drug deal that went bad.  Four Latin Kings --

20   Mr. Gonzalez, Mr. Justino Cruz, a man named Fro and

21   Jose Maysonet -- went to a vacant lot in the 3400

22   block of North Avenue between Kimball and St. Louis to

23   sell some drugs to the victims.

24           During the course of that would-be drug

15

1  transaction something went wrong, the deal went sour

2  and this guy whose role in that transaction was to be

3  the muscle, to be the enforcer, fired a bullet into

4  the back of the neck of Kevin Wiley.

5       This bullet pierced the larynx, lodged in the

6  right mandible of Kevin Wiley.  He hit the ground.

7  Mr. Gonzalez then fired a bullet into the left chest

8  of Torrence Wiley.

9       That bullet went from left to right through

10  the heart, through the right lung, and lodged in the

11  right chest of Torrence Wiley.  He hit the ground.

12       But he wasn't through with Torrence Wiley.

13  After Torrence Wiley hit the ground, as Torrence Wiley

14  lie on the ground on his back, helpless and

15  defenseless, Mr. Gonzalez walked over and pumped

16  another shot into Torrence Wiley.  And that shot,

17  ladies and gentlemen, was to the groin.  And that

18  bullet entered the left shaft of the penis, went

19  through the abdomen, exited the right hip.

20       All of the offenders then fled from the scene

21  in the getaway car.

22       Ladies and gentlemen, you will hear testimony

23  from two 14th District beat officers; from Officer

24  Montalvo, who will testify that he and his partner

16

JGS_MAYSONET 4167
GONZALEZ 0169883

1    were actually in the vicinity of this shooting.  They

2    responded to a call of shots fired and they were there

3    within seconds of this crime having happened.

4            They were there to witness the victims

5    gurgling in their own blood.

6            They were there to witness the victims

7    actually expire on a street in our community.

8            They were there to see these two young men

9    die on the street in their own blood.

10           With the death of Kevin Wiley and with the

11   death of Torrence Wiley the police investigation

12   began.

13           You will hear one of the very first things

14   the police did to investigate this crime was they went

15   all up and down the 3400 block of North Avenue in a

16   search for witnesses.  They were unsuccessful.  Either

17   nobody saw it or nobody would come forward and say

18   they saw it.  They even went to an all-night

19   restaurant or whatever you want to call it -- a Ducks,

20   which is on the corner.  And, nobody had seen

21   anything.

22           But, ladies and gentlemen, even though there

23   were no traditional citizen witnesses who ever came

24   forward to say that they saw what happened, that they

17

JGS_MAYSONET 4168
GONZALEZ 0169884

1    witnessed the events of May 24, 1990, when this
2    vicious crime was committed you are going to hear from
3    an eye witness to this crime.
4          You are going to hear from one of the
5    individuals who participated in this crime, and he,
6    like Mr. Gonzalez, is a witness to his own crime.
7          You are going to hear from a young man named
8    Justino Cruz.  He is the nephew of Mr. Gonzalez.
9          He, like Mr. Gonzalez, are both members of a
10   street gang called the Latin Kings.
11         Ladies and gentlemen, he is going to give you
12   a rare opportunity to have an insider's view of this
13   crime.  He is going to be able to give you details
14   about this crime which no traditional eye witness
15   could ever have supplied.
16         He is going to testify about the events of
17   May 24th into May 25th of 1990, and you will learn
18   from him, ladies and gentlemen, that he has admitted
19   his complicity in this crime.
20         He is going to plead guilty to one count of
21   murder.  In exchange for his truthful testimony, in
22   exchange for his taking the witness stand and telling
23   you ladies and gentlemen of what he knows about what
24   happened to Torrence and Kevin Wiley, in exchange for

18

JGS_MAYSONET 4169
GONZALEZ 0169885

1    that truthful testimony the State's Attorney's office

2    is going to recommend that he be sentenced to 22 years

3    in the Illinois Department of Corrections.

4            Ladies and gentlemen, Mr. Cruz is going to

5    tell you that on May 24, 1990, he was working at

6    Schiller Park at a print shop.  He got off work and he

7    returned through public transportation to his

8    neighborhood, the vicinity of Kimball and North Avenue

9    and LeMoyne and Spaulding.

10           As he was -- After he got off of the bus

11   which took him down Kimball from Belmont he was

12   walking on the street -- his destination was his

13   girlfriend's house -- when three of his fellow Latin

14   Kings drove by in a car -- I am sorry, two of his

15   fellow Latin Kings drove by in a car.  One of them was

16   an individual known to them as Fro.  The other was his

17   uncle, Alfredo Gonzalez, and they offered him a ride

18   and he accepted and was told that they were going to

19   go over to another Latin Kings house, a man named Jose

20   Maysonet, to get a gun because they were going do a

21   drug deal and needed a gun in case something went

22   wrong.

23           Mr. Cruz freely went along with them knowing

24   what they were going to do.  He will testify that they

19

JGS_MAYSONET 4170
GONZALEZ 0169886

1   drove to the home of Jose Maysonet near Homan and

2   Potomac.  They were allowed inside by the live-in

3   girlfriend of Jose Maysonet, a woman by the name of

4   Rosa Bello.

5        Once inside the apartment Mr. Maysonet

6   supplied the weapon which was used in this crime, that

7   weapon being a .09 millimeter automatic pistol.  The

8   gun had been stored at Jose Maysonet's house, a fellow

9   Latin King.

10       When they left Mr. Cruz will tell you that

11  his uncle emerged from the bedroom and this is when he

12  saw the gun for the first time.

13       Mr. Maysonet -- Mr. Gonzalez took the gun,

14  put it in his pants, and all four individuals left

15  Jose Maysonet's house to do the drug deal.

16       Mr. Maysonet was the driver of the car.

17  Mr. Gonzalez' role was to be the muscle, the enforcer,

18  the man who carried the gun.

19       Fro was the person who had the drugs with

20  him.  He was the one that was going to do the talking

21  during the deal.

22       Mr. Cruz' role was to act as the lookout.

23  When they got to the vicinity of Kimball and North

24  Avenue what they did -- actually they drove down at

20

JGS_MAYSONET 4171
GONZALEZ 0169887

1    St. Louis and then they drove into the alley behind

2    North Avenue and when they got to a t-alley right at

3    the scene, right at the vacant lot where these two

4    young men were.  They turned the car around, did a

5    U-turn, and now the car is facing again westbound,

6    back toward St. Louis.

7            At this point Fro and Alfredo Gonzalez got

8    out of the car.  Justino Cruz also got out of the car

9    to fulfill his role in this prearranged operations

10   role to act as the lookout, to watch his back and to

11   watch the back of Fro.

12           He did that and he is going to come in and

13   admit to you that that is what he did.  As he was

14   standing by the car -- Mr. Maysonet, by the way, was

15   the getaway driver.  He sat in the car, kept it

16   running because you don't know when you are going to

17   have to get out of there fast.

18           As Mr. Cruz was watching both ends of the

19   alley for the police or anyone else who may come back

20   he saw Mr. Gonzalez and he saw Fro walk up to these

21   two young men and there was some conversation being

22   had for a period of, period of a few minutes at least

23   and then all of a sudden he heard four shots.  When he

24   looked up he saw one body on the ground.  You will

21

JGS_MAYSONET 4172
GONZALEZ 0169888

1    later learn -- You will learn that that was Kevin

2    Wiley who was shot in the back of the neck.

3            He will testify that as he looked toward

4    North Avenue and he is the full distance of the vacant

5    lot he is looking from the alley toward North Avenue

6    and he will testify that after hearing the shots he

7    looked up and he did not see anybody but almost

8    immediately he heard another shot.

9            After hearing the other shot he immediately

10   saw Mr. Gonzalez and Mr. Fro emerge from the front of

11   the building.

12           Mr. Gonzalez still had the .09 millimeter

13   weapon in his hand.  Fro and Mr. Gonzalez ran back

14   toward the car.  That is when Mr. Gonzalez said,

15   "Let's go.  I just shot two guys."

16           Mr. Maysonet fulfilled his role.  He drove

17   the car away from the scene.  They drove back towards

18   St. Louis, went to Wabansia, down Kedzie, and Mr. Cruz

19   will testify that he was the first person dropped off

20   after this happened.  What the other offenders did

21   after that he cannot testify about.

22           Ladies and gentlemen, you, as jurors, will

23   fulfill the role of judges in this case.  You will sit

24   as judges of the facts.  It will be your job, your

JGS_MAYSONET 4173
GONZALEZ 0169889

1    role, your function, to assess the credibility of the

2    witnesses, to sort out all of the physical evidence

3    and to decide what the facts in this case are.

4            In doing so you will take with you three very

5    important tools.  The first one, obviously, will be

6    the evidence in the case.  That will consist of

7    primarily the testimony of live witnesses who will get

8    on the stand, swear an oath to tell the truth, and

9    they will testify about what they know about this case

10   or about this investigation.

11           The evidence will also consist of

12   photographs, physical objects which will be introduced

13   into evidence and it may also consist of a stipulation

14   which is an agreement among both sides that a certain

15   fact is a fact and it is not necessary to call a

16   particular witness to prove it up.

17           Ladies and gentlemen, in addition to the

18   evidence you will have the law of the State of

19   Illinois.  At the conclusion of this trial her Honor,

20   Judge Morgan, will instruct you on the law which is

21   applicable to this cause.

22           Mr. Gonzalez sits here in this courtroom

23   before you today charged with two counts of First

24   Degree Murder.  He is charged with the First Degree

23

JGS_MAYSONET 4174
GONZALEZ 0169890

1   Murder of Kevin Wiley and he is charged with the First

2   Degree Murder of Torrence Wiley.

3           Ladies and gentlemen, one final tool that you

4   will have, and it is a very important tool, and that

5   is your common sense, your simple good old-fashioned

6   every-day common sense and the collective wisdom and

7   experience that you as mature people bring into this

8   courtroom.

9           There is nothing in the law that prevents you

10  from using common sense in deciding the facts in this

11  case.  And there is nothing in the law that requires

12  you to leave your common sense outside.

13          Ladies and gentlemen, Mr. Gonzalez was

14  charged by the State's Attorney's office in August of

15  1990, with the offenses of First Degree Murder, with

16  two counts of the offense of First Degree Murder.

17          When we charged him we assumed the

18  responsibility at that time of proving to you beyond a

19  reasonable doubt that he is guilty of those offenses.

20          At the conclusion of all the evidence in this

21  case we will ask you to find Mr. Gonzalez guilty of

22  the murder of Torrence Wiley and guilty of the murder

23  of Kevin Wiley.

24          Thank you.

24

JGS_MAYSONET 4175
GONZALEZ 0169891

```
 1        THE COURT:  Thank you, Mr. Marek.
 2            MR. WIENER.

 3

 4                    OPENING STATEMENT
 5                    By: MR. WIENER

 6

 7     MR. WIENER:  Your Honor, Mr. Marek, Mr. Leighton.
 8            Common sense.  Mr. Marek tells you common
 9     sense is something you will be using in assessing the
10     guilt or innocence of Alfredo Gonzalez in this case.
11            Common sense will tell you, will show you
12     that the evidence in this case consists of no police
13     testimony that they saw any persons when events
14     occurred on May 23, 1990; no physical evidence, no
15     piece -- no wallet or piece of clothing, no gun to
16     connect Alfredo Gonzalez to the killing of these two
17     individuals, no fingerprint evidence to connect Alfredo
18     Gonzalez with the killing of these two individuals.
19     But Mr. Marek tells you to use your common sense.
20            Your common sense will be used by the two
21     witnesses that will be here to testify that Alfredo
22     Gonzalez participated in this crime.  One of them is
23     Justino Cruz.  Mr. Marek tells you that Justino Cruz
24     will testify that Mr. Gonzalez was involved and in
```

25

JGS_MAYSONET 4176
GONZALEZ 0169892

1  fact was the person that committed this crime.

2       Mr. Marek told you that in return for his

3  testimony Mr. Cruz is going to be sentenced to 22

4  years in the Illinois State Pen --

5       MR. MAREK:  Objection.

6       THE COURT:  Basis?

7       MR. MAREK:  That we would recommend.

8       THE COURT:  That is correct.  I am sure that is

9  what he meant.

10      MR. WIENER:  22 years in the Illinois State

11  Penitentiary.

12      What he did not tell you and what he -- you

13  will find out is that Justino Cruz is now charged

14  along with Alfredo Gonzalez and along with Jose

15  Maysonet with the exact crime in which Alfredo

16  Gonzalez is going to be presenting his case before

17  you.

18      What Mr. Marek didn't tell you is that prior

19  to making this deal, prior to the State intervening to

20  dismiss one of the charges and recommend 22 years,

21  that the only two sentences that Mr. Cruz could have

22  gotten if he decided to go to trial was the death

23  penalty or natural life in jail.

24      Mr. Cruz will tell you that he is going to be

JGS_MAYSONET 4177
GONZALEZ 0169893

1    testifying truthfully to you, that he expects a

2    recommendation for this truthful testimony of 22

3    years.

4            He is going to tell you what he expects after

5    my questioning, I believe, to be released from the

6    penitentiary approximately in ten-and-a-half years.

7    My, my!

8            You will hear from Mr. Cruz.  You are going

9    to hear from Mr. Cruz saying Mr. Gonzalez, his uncle

10   was involved.

11           You are also going to hear from somebody

12   else.  We expect Rosa Bello, who is the common-law

13   wife, live-in girlfriend of another person who is

14   charged with the murder of these two individuals.

15           You will hear them and I believe these two

16   people will be the sum and substance of the evidence

17   that will in some way link Alfredo Gonzalez to these

18   events.

19           But you are going to hear from one other

20   individual in this case.  And you will be using your

21   common sense and you will be using the law as the

22   Judge gives it to you at the end of the case.

23           And you will be using all sorts of intuitive

24   and observational tools that you have because the

27

1  final witness that you are going to be hearing from in

2  this case is Alfredo Gonzalez.  And he will take the

3  witness stand in this case and he will tell you his

4  relationship with his nephew, his nephew Justino Cruz.

5         He will tell you about the Latin Kings and

6  about how many members there are in -- or there were

7  in 1990 in the Latin Kings.

8         He will tell you about being picked up in an

9  automobile in which Justino Cruz, Mr. Maysonet, and

10  another man by the name of Fro were in a car.  And he

11  will tell you that he asked them for a ride home.

12         He will tell you that they didn't take him

13  home, that they stopped, that Mr. Maysonet and Fro got

14  out of the car, put their hoods up, and he knew

15  something was happening, that he noticed the gun in

16  Mr. Maysonet's hand, that he left the car, they heard

17  shots, they came back to the car, that Justino Cruz

18  was outside the car looking around at this time, that

19  he sat in the back of the car, that he had no prior

20  knowledge of a drug deal or a shooting, and that Mr.

21  Maysonet and Fro came back to the car, the car left

22  the scene, and he was taken home.

23         He will tell you that in August of 1990, he

24  was arrested and he will tell you at the time that he

28

JGS_MAYSONET 4179
GONZALEZ 0169895

1   had nothing to do, no prior knowledge, no involvement

2   in the case of the Wiley brothers.

3           Now, you are going to use your common sense.

4   You will hear the evidence.  I am convinced that at

5   the end of this case you will clearly believe not

6   beyond a reasonable doubt but clearly believe that

7   Alfredo Gonzalez had nothing to do with the murders of

8   these two young men.

9           Thank you very much.

10      THE COURT:  Thank you, Mr. Wiener.

11          State, are you ready to present your first

12  witness?

13      MR. MAREK:  We are.  We call Mr. Joseph Wiley.

14          There will be a brief delay.

15      THE COURT:  Ladies and gentlemen, let me take this

16  opportunity to let you know between witnesses we

17  sometimes do experience a delay.  That is because

18  whomever designed these courtrooms when the office

19  space was formerly put up here and courtrooms were

20  made out of that space obviously never attended a

21  trial or had any idea how trials work.

22          They provided no place for witnesses to await

23  their turn to testify, so they have to be placed in as

24  close proximity as they can and we have to await their

29

1    arrival from the courtroom across the hall or
2    wherever.  So just bear with us.  They put them as
3    close as they can.
4         Step around to the platform, sir.  Before you
5    take your seat, raise your hand to be sworn.
6
7              J O S E P H   W I L E Y,
8
9    called as a witness by the State's Attorney herein,
10   having been first duly sworn, was examined and
11   testified as follows:
12
13                DIRECT EXAMINATION
14                By:  Mr. Marek
15
16        Q.   Sir, would you state your name for the
17   record?
18        A.   My name is Joseph Wiley.
19        Q.   And how old are you, sir?
20        A.   29 years old.
21        Q.   Sir, did you know Kevin and Torrence Wiley?
22        A.   Yes, I did.
23        Q.   How did you know them?
24        A.   They are my brothers.

JGS_MAYSONET 4181
GONZALEZ 0169897

```
 1        Q.   And I want to direct your attention back to
 2   May 24th, in the early morning hours of May 25, 1990.
 3             Were your brothers, Torrence and Kevin, alive
 4   at that time?
 5        A.   No, they was dead.
 6        Q.   Do you know when they were killed?
 7        A.   Sometime early -- Late Thursday night, early
 8   Friday morning.
 9        Q.   So prior to that time they were alive?
10        A.   Yes; between that time.
11        Q.   Now back in May of 1990, how old was your
12   brother, Kevin?
13        A.   He would be 26, I believe.
14        Q.   And back in May of 1990, how old was your
15   brother, Torrence?
16        A.   27.
17        Q.   Now where -- Do you have any other brothers?
18        A.   Yes, I do.
19        Q.   Where did you fit in with respect to -- Were
20   you older or younger than Torrence and Kevin?
21        A.   I am older.
22        Q.   What year were you born?
23        A.   
24        Q.   Do you know what year Torrence was born?
```

31

JGS_MAYSONET 4182
GONZALEZ 0169898

1     A.     █████

2     Q.     How about Kevin?

3     A.     █████

4     Q.     Now, back in May, Mr. Wiley, was your brother

5     Torrence employed?

6     A.     Sure.  Yes, he was.

7     Q.     Do you know what he did?

8     A.     He worked for United Cerebral Palsy.

9     Q.     Back in May of 1990, was your brother, Kevin,

10    employed?

11    A.     He did odd jobs with my grandfather.

12    Q.     Were either of your brothers married?

13    A.     No.

14    Q.     Were either of your brothers engaged?

15    A.     Yes.   Torrence Wiley was engaged.

16    Q.     Who was he engaged to?

17    A.     Sandy Montoya, I think.

18    Q.     Is that a woman that he worked with?

19    A.     Yes.

20    Q.     Now, in addition to doing odd jobs do you

21    know whether your brother, Kevin, was a general

22    assistance recipient?

23    A.     Yes, he was.

24    Q.     And do you know when he got his last check

32

JGS_MAYSONET 4183
GONZALEZ 0169899

```
 1    prior to his death?

 2         A.   Sure I do.

 3         Q.   When was that?

 4         A.   It would be on the 24th of -- that day he got

 5    killed.

 6         Q.   How do you know that?

 7         A.   Because I get a GA check on that day also.

 8         Q.   Back on May 24th of '90, your check had also

 9    come, Mr. Wiley?

10         A.   Yes.

11         Q.   About how much would that amount to; if you

12    know?

13         A.   164.

14         Q.   About $164?

15         A.   Yes.

16         MR. MAREK:  Let me have a moment, Judge.

17         THE COURT:  Sure.

18                      (Short pause.)

19         MR. MAREK:  I believe at this time there will be a

20    stipulation.

21         MR. WIENER:  That is correct.

22         MR. MAREK:  Your Honor, it will be stipulated

23    between the parties that if Mr. Joseph Wiley were

24    shown People's Exhibit No. 1 for Identification he
```

33

1    would identify the person depicted in that photo as

2    his brother, Kevin Wiley.

3                So stipulated?

4       MR. WIENER: So stipulated.

5       MR. MAREK:  It is also stipulated between the

6    parties, your Honor, that if Mr. Joseph Wiley were

7    shown People's Exhibit No. 2 for Identification he

8    would identify the person depicted in that photo as

9    his brother, Torrence Wiley.

10               So stipulated?

11      MR. WIENER: So stipulated.

12      MR. MAREK:  We have no further questions, your

13   Honor.

14      MR. WIENER:  Your Honor, I have no questions of

15   this witness.

16      THE COURT:  Very well, sir.

17               You may step down.  Thank you.

18

19                   (Witness excused.)

20

21      THE COURT:  Mr. Marek, for the clarification of

22   the Court's own notes the first photograph is of which

23   of the victims?

24      MR. MAREK:  Kevin.

34

JGS_MAYSONET 4185
GONZALEZ 0169901

```
 1        THE COURT:  And the second is of Torrence?
 2        MR. MAREK:  Yes.
 3        THE COURT:  Thank you.
 4
 5             O F F.    L U I S    M O N T A L V O,
 6
 7    called as a witness by the State's Attorney herein,
 8    having been first duly sworn, was examined and
 9    testified as follows:
10
11                    DIRECT EXAMINATION
12                    By: Mr. Marek
13
14        Q.    Officer, would you state your name for the
15    record, please?
16        A.    Officer Luis Montalvo.
17        Q.    Officer Montalvo, by whom are you employed?
18        A.    Chicago Police Department.
19        Q.    How long have you been a Chicago police
20    officer?
21        A.    Five years.
22        Q.    What is your unit of assignment within the
23    Police Department at the present time?
24        A.    I am now assigned to the 25th District.
```

35

1    Q.   I am going to direct your attention back to

2  May of 1990.  Where were you assigned for the Police

3  Department at that time?

4    A.   I was assigned to the 14th District.

5    Q.   And, Officer Montalvo, what area roughly of

6  the City does the 14th District encompass?

7    A.   Streetwise?

8    Q.   Yes.

9    A.   From Central Park to the river, from Belmont

10  Avenue to Division Street.

11    Q.   Directing your attention to the evening hours

12  of May 24th, 1990, into the early morning hours of May

13  25, 1990, were you working?

14    A.   Yes, I was.

15    Q.   And were you working a particular beat?

16    A.   Yes.  I was working 1422 beat.

17    Q.   Were you working in uniform?

18    A.   Yes, I was.

19    Q.   In a marked police car?

20    A.   Yes.

21    Q.   Were you working with a partner?

22    A.   Yes, I was.

23    Q.   Who was that?

24    A.   Officer Ruben Dones.

36

JGS_MAYSONET 4187
GONZALEZ 0169903

1      Q.    And do you know how to spell his last name?

2      A.    D-o-n-e-s.

3      Q.    Officer Montalvo, I want to direct your

4  attention to May 25th, 1990, at approximately 1:00

5  o'clock a.m.  Did you respond to a call?

6      A.    Yes.

7      Q.    What was the call that you responded to?

8      A.    To shots fired on Kimball and North Avenue.

9      Q.    How did you receive this call?

10      A.    Through COS radio dispatcher.

11      Q.    And when you received this call approximately

12  where were you at?

13      A.    I was in LeMoyne and Homan.

14      Q.    And about how far away from Kimball and North

15  Avenue is LeMoyne and Homan?

16      A.    About a block.

17      Q.    Upon receipt of that call what did you do?

18      A.    At that time we put our lights on, blue

19  lights, and sped toward the scene.

20      Q.    About how long did it take you to get to the

21  scene?

22      A.    From ten to 15 seconds.

23      Q.    When you got to that scene what if anything

24  did you observe?

37

JGS_MAYSONET 4188
GONZALEZ 0169904

1      A.    I observed two male blacks lay on the

2    sidewalk.

3      Q.    What did you do at this time?

4      A.    I went and called COS and notified that shot

5    fired verified and we got two males down.

6      Q.    What did you do then?

7      A.    At that time I approached with caution the

8    two males down.

9          I observed one bleeding through the mouth and

10   the back of the head, the other male I couldn't see

11   any physical wounds on him at the time.

12     Q.    Did you have your gun out at this time as you

13   approached?

14     A.    Yes, I did.

15     Q.    And with respect to the person that you said

16   was bleeding from the mouth, were you able to tell

17   whether he was still alive or not?

18     A.    Yes.  They were both alive.

19     Q.    What were you able to see them doing that

20   indicated to you they were alive?

21     A.    They were gasping for air, moving, quivering,

22   I'd say.

23     Q.    Did you note -- Did you call an ambulance?

24     A.    Yes, I did.

38

1    Q.   And what happened then?

2    A.   We were waiting for the ambulance and the one

3  bleeding from the mouth, he stopped moving.  He was

4  not moving after a while.  A couple minutes I was

5  there he stopped moving.

6         Then I looked over to the other victim that

7  was laying there and he also was -- had stopped

8  moving, also.

9         I assumed they were both dead at the time.

10   Q.   Did the ambulance arrive?

11   A.   Yes, it -- they did.

12   Q.   Did the paramedics look at both victims?

13   A.   Yes, they did.

14   Q.   Was either victim removed from the scene by

15 the paramedics?

16   A.   No, they weren't.

17   Q.   Do you know why not?

18   A.   The paramedic informed me they both had

19 expired.

20   Q.   Now you testified, Officer Montalvo, that you

21 saw a wound to the head of the one victim; is that

22 correct?

23   A.   Yes.

24   Q.   Now about where was he lying?

39

JGS_MAYSONET 4190
GONZALEZ 0169906

1    A.   If you get too close to that building, he was

2    like near the lot itself, the empty lot that was there

3    and the sidewalk.

4    Q.   Now the second victim you said you at first

5    did not see any apparent wounds to him?

6    A.   No, I did not.

7    Q.   Where was he lying with respect to the other

8    victim?

9    A.   He was laying west from the other victim,

10   about ten to 15 feet away from him, west of his

11   location.

12   Q.   Was he actually on the sidewalk on North

13   Avenue?

14   A.   Yes.

15   Q.   Now did you at any time observe a wound to

16   his person?

17   A.   Until the paramedic showed me the wound that

18   is the only time I seen it.

19   Q.   What did the paramedic do to show you the

20   wound?

21   A.   They lifted his shirt up.  They were looking

22   for an apparent wound and what happened.

23   Q.   When the paramedic lifted the second victim's

24   shirt up what if anything did you notice?

40

JGS_MAYSONET 4191
GONZALEZ 0169907

1      A.   I noticed a bullet hole going through the

2   body and almost coming out the other side of the body,

3   so pushing the skin out, but didn't go all the way

4   through.

5      Q.   Officer Montalvo, did you or your partner at

6   any time move the victims?

7      A.   No.  We can't do that.

8      Q.   Did you look for identification on the

9   victims?

10     A.   Yes, we did.

11     Q.   Did you find identification?

12     A.   Yes, we did.

13     Q.   Now, this incident, or your response to this

14  call, was that approximately 1:00 o'clock a.m.; is

15  that correct?

16     A.   Yes.

17     Q.   Officer Montalvo, as you responded to the

18  scene were there any other cars out that night?

19     A.   I didn't notice any; no, I didn't.

20     Q.   Did you see any other kind of traffic on

21  North Avenue as you responded?

22     A.   No.  As a matter of fact it was dead.

23     Q.   Were there any other people on the street?

24     A.   Not at the time we arrived; no.

41

JGS_MAYSONET 4192
GONZALEZ 0169908

1    Q.    Did onlookers or bystanders later arrive?

2    A.    Yes; many.

3    Q.    Did you ever see any vehicles speeding away

4    from the scene?

5    A.    No, I didn't.

6    Q.    Officer Montalvo, I am going to show you what

7    has been marked People's Exhibit No. 3 for

8    Identification and ask you if you recognize what is

9    depicted in that photo?

10   A.    The two male blacks that were victims.

11   Q.    Does that photo truly and accurately depict

12   the location of the bodies as you observed them back

13   on May 25, 1990?

14   A.    Yes, it does.

15   Q.    And, Officer Montalvo, I am going to show you

16   what has been marked People's Exhibit No. 4 for

17   Identification.  And do you recognize -- Do you

18   recognize the scene in that photo?

19   A.    This is the male black, the paramedic pulling

20   the shirt off.

21   Q.    Does that photo which depicts the shirt being

22   pulled up, is that the way the shirt looked after the

23   paramedic pulled it up?

24   A.    Yes.

42

JGS_MAYSONET 4193
GONZALEZ 0169909

1    Q.   Over to the left of the photo there is a

2  bulge?

3    A.   That is a projectile came through the body

4  forcing, almost came through to the other side, but it

5  didn't.  It just pushed the skin out.

6    Q.   This photo accurately and truly depicts that

7  portion of the scene as you saw it on the night in

8  question?

9    A.   Yes; exactly.

10    MR. MAREK:  No further questions, your Honor.

11    THE COURT:  Very well.

12

13               CROSS EXAMINATION

14               By: MR. WIENER

15

16    Q.   Good afternoon, Officer.

17    A.   How you doing, sir?

18    Q.   Great.

19         At about 1:00 o'clock in the morning on May

20  25, 1990, you received a report of shots fired; isn't

21  that true?

22    A.   Yes, sir.

23    Q.   You don't know for certain how long that

24  report came in after in fact the victims were shot; do

43

1    you?

2         A.   I have no idea.

3         Q.   Okay.

4              And you said that it took you approximately

5    ten to 15 seconds to get to the scene?

6         A.   When we got the call; yes.

7         Q.   And at the scene other than calling for an

8    ambulance and looking for identification on the

9    victims what other duties did you have at that

10   particular point?

11        A.   At that time trying to get some witness that

12   had witnessed the case or witnessed the incident.

13        Q.   Did you see any -- Did you look around the

14   scene for physical evidence?

15        A.   Yes, we did.

16        Q.   Did you discover any physical evidence at

17   that time?

18        A.   Yes, we did.

19        Q.   What did you discover?

20        A.   Some emptied .09 millimeter shells.

21        Q.   Okay.

22             And did you discuss anything else?

23        A.   Not that I can recall at this time.

24        Q.   Did you call for an evidence technician?

44

JGS_MAYSONET 4195
GONZALEZ 0169911

1      A.    Yes.

2      Q.    Did you do that that night?

3      A.    Yes.

4      Q.    And while you were there did an evidence

5  technician arrive at the scene?

6      A.    Yes, he did.

7      Q.    And while you were there did the evidence

8  technician conduct an investigation of the scene?

9      A.    I am assuming he did; yes.

10     MR. WIENER:  Thank you, Officer.

11         I have no further questions of the officer.

12

13             REDIRECT EXAMINATION

14             By: MR. MAREK

15

16     Q.    Officer Montalvo, it is not your function at

17  the crime scene to actually recover evidence; is that

18  correct?

19     A.    No; that is beyond my scope.

20     Q.    That is done by the evidence technician?

21     A.    Yes.

22     MR. MAREK:  No further questions.

23     MR. WIENER: Nothing further, Judge.

24     THE COURT:  Thank you, Officer.  You may step

JGS_MAYSONET 4196
GONZALEZ 0169912

1   down.

2               (Witness excused.)

3

4     MR. MAREK:  May we approach?

5     THE COURT:  Yes, you may.

6            (Whereupon, a discussion was held

7            off the record.)

8

9     THE COURT:  Deputy Tennent, I think this is an

10  auspicious time to have the jury go to lunch.

11

12           (Whereupon a lunch recess was taken.)

13           (Whereupon, a discussion was had

14            outside the presence of the jury.)

15

16     THE COURT:  We will be in lunch recess until 2:00

17  o'clock.  Try to get here as close to 2:00 as we can

18  assuming the jury is over there and back by then.

19

20

21

22

23

24

46

JGS_MAYSONET 4197
GONZALEZ 0169913

```
 1    STATE OF ILLINOIS )

 2                      )  SS:

 3    COUNTY OF COOK    )

 4

 5              IN THE CIRCUIT COURT OF COOK
                DEPARTMENT-CRIMINAL DIVISION
 6
      PEOPLE OF THE    )
 7    STATE OF ILLINOIS )Case No. 90 CR 21787
                        )
 8        -vs-          )Before: JUDGE LORETTA HALL
                        )                  MORGAN
 9    ALFREDO GONZALEZ  )

10

11    The Court having reconvened pursuant to recess.

12

13            HON. JACK O'MALLEY,
                  State's Attorney of Cook County, by
14            MR. FRANK MAREK and
              MR. JOEL LEIGHTON,
15                Assistant State's Attorneys
                  appeared on behalf of the People;
16

17            MR. DAVID WIENER,
                  appeared on behalf of the Defendant.
18

19

20

21
      ROCHINA V. CHOLEWA
22    Official Court Reporter
      2650 S. California
23    Chicago, Illinois 60608

24
```

47

```
 1        THE COURT:  Bring out the jury if we are ready.
 2                    (Whereupon the jury was returned
 3                     to open Court.)
 4        THE COURT:  State, are you ready to proceed?
 5        MR. LEIGHTON:  Yes, Judge.
 6            People would call Officer Butler.
 7        THE COURT:  Very well.
 8            Officer, step up to be sworn, please.
 9
10        O F F.    J O H N    B U T L E R,
11
12   called as a witness by the State's Attorney herein,
13   having been first duly sworn, was examined and
14   testified as follows:
15
16                   DIRECT EXAMINATION
17                   By: Mr. Leighton
18
19        Q.   Sir, could you tell the ladies and gentlemen
20   of this jury your name and spell your last name for
21   the court reporter?
22        A.   John R. Butler, B-u-t-l-e-r.
23        Q.   What is your occupation, sir?
24        A.   I am a Chicago Police Officer Evidence
```

48

JGS_MAYSONET 4199
GONZALEZ 0169915

1    Technician assigned to the Crime Laboratory mobile
2    unit.
3        Q.    How long have you been a Chicago police
4    officer?
5        A.    26 years.
6        Q.    How long have you been an Evidence Technician
7    assigned to Mobile Crime Lab?
8        A.    I have been an Evidence Technician for 23
9    years.
10        Q.    Explain to the ladies and gentlemen of the
11    jury what an Evidence Technician is?
12        A.    An Evidence Technician primarily processes
13    crime scenes in the mobile unit section of the Crime
14    Laboratory.  We process major crime scenes.
15        Q.    When you say process a crime scene could you
16    explain what exactly you mean by that?
17        A.    A crime scene is processed basically by
18    photographing the scene, searching it for physical
19    evidence, recovering, identifying the physical
20    evidence, transporting it to the crime laboratory for
21    further analysis and on some occasions examining
22    surfaces for ridge impressions or fingerprints.
23        Q.    Now, Officer Butler, were you assigned to the
24    Chicago Police Mobile Crime Lab as an Evidence

JGS_MAYSONET 4200
GONZALEZ 0169916

1    Technician on the 25th of May, 1990?

2        A.   Yes, I was.

3        Q.   And on that day in the early morning hours

4    did you receive an assignment?

5        A.   Yes, we did.

6        Q.   By the way were you working alone or with a

7    partner?

8        A.   I was working with a partner.

9        Q.   What is your partner's name?

10       A.   Tom Bachelder, B-a-c-h-e-l-d-e-r.

11       Q.   Now, what was the nature of this assignment

12   that you received?

13       A.   Our assignment was to investigate a homicide.

14       Q.   About what time did you receive this

15   assignment?

16       A.   We received that about approximately 1:15

17   a.m.

18       Q.   Now after you received that assignment did

19   you go anywhere?

20       A.   We were assigned to go to 38 -- 3428 West

21   North Avenue, the scene of the homicide.

22       Q.   That is in Chicago; correct?

23       A.   That is correct.

24       Q.   Did you go to that location?

JGS_MAYSONET 4201
GONZALEZ 0169917

1     A.    Yes, we did.

2     Q.    About what time did you arrive?

3     A.    We arrived there at approximately 1:35 a.m.

4     Q.    Now when you got there about 1:35 in the

5    morning were there other police officers at that

6    location?

7     A.    Yes, there were.

8     Q.    I would like you to describe for the ladies

9    and gentlemen of the jury exactly what is located

10    right there at that approximate address on North

11    Avenue?

12     A.    It is a business street, North Avenue is, and

13    on the north side of the street at 3428 is a store

14    front, two level building.

15          To the east of that is a vacant lot and to

16    the east of the vacant lot is another store front,

17    two-story building, frame building.

18     Q.    Now, when you arrived at the scene did you

19    notice anything on the sidewalk?

20     A.    Yes, we did.

21     Q.    What did you notice?

22     A.    I had noticed two bodies lying on the

23    sidewalk.

24     Q.    Where were these two bodies located?

JGS_MAYSONET 4202
GONZALEZ 0169918

1       A.   One body was located on the sidewalk next to

2    the curb of North Avenue in front of 34 -- the

3    building, the store front building at 3428 and the

4    other body was located on the southeast corner in the

5    lot of, adjacent to the east of the 3428 building.

6           The body that I am referring to on the

7    southeast corner is approximately several feet east

8    into the lot from the building on the sidewalk.

9       Q.   Now, Officer, after you observed the victims

10   -- Strike that.

11          Did you observe whether or not they were

12   alive or dead?

13      A.   They were dead when we arrived.

14      Q.   And did you observe any wounds on any of the

15   victims?

16      A.   On the -- When we arrived on the scene with

17   visual observation indicated that the victim that was

18   lying on the sidewalk in front of the lot, vacant lot,

19   had a head wound and the victim that was lying on the

20   sidewalk next to the curb of North Avenue received

21   body wounds.

22          That was our first observations.

23      Q.   Now what action did you -- did you take after

24   you observed the victims?

52

JGS_MAYSONET 4203
GONZALEZ 0169919

1      A.    My next action was to photograph the scene in

2  the surrounding area.

3      Q.    And did you in fact do that?

4      A.    Yes, we did.

5      Q.    After you took a number of photographs what

6  did you do then?

7      A.    Then it was our usual procedure to search the

8  scene in the immediate area for any physical evidence.

9      Q.    And did you find any physical evidence?

10     A.    Yes, we did.

11     Q.    What did you find first?

12     A.    We found four cartridge cases, firearms

13 cartridge cases.  They were located along the east

14 side of the 3428 building in the vacant lot.  There

15 was also a can recovered.

16     Q.    What kind of can was that?

17     A.    That was a beer can.

18     Q.    Now did you recover the cartridge casings?

19     A.    Yes, we did.

20     Q.    By the way did you have an opportunity to

21 examine the bottoms of the cartridge casings?

22     A.    Yes, we did.

23     Q.    Did you ascertain anything from that?

24     A.    They were .09 millimeter cartridge cases.

53

JGS_MAYSONET 4204
GONZALEZ 0169920

1    Q.    Now with regard to the can what did you do

2  with that?

3    A.    The can was examined for nonsuitable ridge

4  impressions and taken to the crime laboratory.

5    Q.    Did you examine that can?

6    A.    Yes.

7    Q.    What if anything did you ascertain about the

8  ridge impressions?

9    A.    They were nonsuitable.

10   Q.    Would you explain what that means?

11   A.    That means these ridge impressions,

12 fingerprints could not be compared to any other

13 fingerprint.

14   Q.    Why was that?

15   A.    There was not enough -- There was not enough

16 ridge impressions there for comparison.

17   Q.    They were not like complete fingerprints?

18   A.    That is correct; partial fingerprints.

19   Q.    Now after you recovered the evidence did you

20 have occasion to go anywhere?

21   A.    After recovering the evidence we then

22 proceeded to the Medical Examiner's facility.

23   Q.    When you got to the Medical Examiner's

24 facility did you have occasion to do anything further

54

```
 1    in connection with your investigation of this double
 2    homicide?
 3         A.    We then examined the bodies for gunshot
 4    wounds.
 5         Q.    And did you find any?
 6         A.    Yes, we did.
 7         Q.    What wounds did you find?
 8         A.    On Victim No. 1 as listed in our report,
 9    Torrence had a gunshot wound to the left side of the
10    chest, also to the right hip, and also to the penis.
11         Q.    Did you go through that victim's clothing?
12         A.    Yes, we did.
13         Q.    And did you find anything in his clothing?
14         A.    In his clothing we found a fired bullet which
15    was in his underpants.
16         Q.    And did you recover that bullet and inventory
17    it?
18         A.    Yes, we did.
19         Q.    Did you have occasion to take any photographs
20    at the Medical Examiner's office?
21         A.    Yes, we did.
22         Q.    Officer Butler, could you explain to the
23    ladies and gentlemen of the jury how it was that you
24    inventoried the fired bullet that was found in the
```

55

JGS_MAYSONET 4206
GONZALEZ 0169922

1    underwear?

2        A.   The fired bullet is placed in a sealed

3    envelope and -- it is sealed and then our initials are

4    placed on that envelope.

5            A description of where it was found was then

6    placed on the envelope and it was then taken to the

7    Crime laboratory where it was turned over to the

8    Firearms section for further analysis.

9        Q.   By the way did you also follow that procedure

10   with regard to the four expended .09 millimeter

11   cartridge cases that were found in the lot?

12       A.   That is correct.

13       Q.   And did you assign inventory numbers to each

14   of those items?

15       A.   There is an inventory number that is taken

16   and assigned to the cartridge cases which were from

17   the scene and the fired bullet which was recovered

18   from the victim at the Medical Examiner's facility.

19       MR. LEIGHTON:  Judge, may I have one moment?

20       THE COURT:  Sure.

21       MR. LEIGHTON:  At this time, your Honor, there

22   would be a stipulation between the People of the State

23   of Illinois and the defendant through his attorney

24   that Officer Butler inventoried the four fired

56

1   cartridge cases, .09 millimeter, found next to the
2   sidewalk on the east side of the building at 3428 West
3   North Avenue under No. 773257.
4       MR. WIENER:  So stipulated.
5       MR. LEIGHTON:  There would be a further
6   stipulation that the bullet recovered from the
7   underwear of the victim at the Cook County Medical
8   Examiner's Office was inventoried by Officer Butler
9   under No. 773257 also.
10      MR. WIENER: So stipulated.
11      THE COURT:  Very well.
12          I will remind the stipulation -- the jury a
13  stipulation is an agreement between the parties that a
14  certain fact is not in dispute.  Both sides agree that
15  is a fact.
16      MR. LEIGHTON:  May I approach the witness, your
17  Honor?
18      THE COURT:  Yes, you may.
19  BY MR. LEIGHTON:
20      Q.   Officer Butler, I am going to show you what
21  has been marked for identification purposes as
22  People's Exhibit No. 5.
23          I would like you to take a look at that and
24  tell the ladies and gentlemen of the jury if you

57

JGS_MAYSONET 4208
GONZALEZ 0169924

1    recognize what that is?

2         A.   Yes, I do.

3              This is an overall photo of the scene

4    depicting the two victims lying on the sidewalk;

5    Victim No. 1 in front of the building 3428 and Victim

6    No. 2 lying adjacent to the north or the southeast

7    corner in front of the vacant lot.

8         Q.   I am now going to show you what has been

9    marked for identification as People's Exhibit No. 3.

10   Take a look at that.

11        A.   This again is an overall of the scene here

12   with the two victims on the sidewalk.  It further

13   depicts the victims, 1 and 2; 1 lying in front of the

14   building and the other one lying in front of the

15   vacant lot.

16             This photograph is a view from the west to

17   the east on North Avenue.

18        Q.   Sir, I will show you what has been marked as

19   People's Exhibit No. 6 for Identification.  Take a

20   look at that.

21        A.   This is a close-up of Victim No. 1 that was

22   lying on the sidewalk next to the curb, perpendicular

23   position to the curb of North Avenue.  That is that.

24        Q.   I will show you People's Exhibit No. 4 for

58

1   Identification.  Take a look at that.

2           Do you recognize what that is?

3       A.   No. 4 is a close-up showing an identification

4   photo of the victim on the scene and also a gunshot

5   wound to the left side of the chest.

6       MR. WIENER:  Excuse me.  That is Victim No. 1?  I

7   am sorry.

8       THE WITNESS:  Victim No. 1; yes.

9   BY MR. LEIGHTON:

10      Q.   Showing what you has been previously marked

11  as People's Exhibit No. 7 for Identification.

12          Please take a look at that.

13      A.   This is Victim No. 2 who is lying in front of

14  the vacant lot here adjacent to the southeast corner

15  of the 3428 building.  It is an overall view of him

16  showing a large portion of blood from the head wound,

17  gunshot head wound.

18      Q.   Showing you what has been previously marked

19  B.   Take a look at that and tell the ladies and

20  gentlemen of the jury if you recognize what that is?

21      A.   This is a close-up photo showing the

22  identification of Victim No. 2 on the scene.

23      Q.   I will show you what has been marked as

24  People's Exhibit No. 9 for Identification.

59

JGS_MAYSONET 4210
GONZALEZ 0169926

1        Take a look at that and tell the ladies and

2   gentlemen of the jury if you recognize what that is?

3        A.   This is -- This photo here is a close-up

4   photo of the firearms evidence recovered along the

5   east wall of the building at 3428 West North Avenue.

6        These are one on the sidewalk and one is in

7   the gravel area of the vacant lot.

8        These are approximately four feet from the

9   North Avenue sidewalk, the sidewalk that travels

10  parallel with North Avenue.

11       Q.   Now, Officer, I am going to show you what has

12  been previously marked as People's No. 10 for

13  Identification.

14       I would like you to take a look at that and

15  tell the ladies and gentlemen of the jury if you

16  recognize what is shown in that photograph?

17       A.   This is a photograph taken from the alley

18  showing the vacant lot south to North Avenue.

19       Q.   I am going to show you what has been marked

20  as People's 11 for Identification.  Take a look at

21  that.

22       Do you recognize what is shown in that

23  photograph?

24       A.   This photograph is similar to the previous

60

JGS_MAYSONET 4211
GONZALEZ 0169927

1   one, although the view is taken a little bit east

2   from the first one, again showing the overall view of

3   the vacant lot from the alley.

4       Q.   Show you what has been marked as People's 12

5   for Identification.

6           Do you recognize what is shown in that

7   photograph?

8       A.   This photograph here again is an overall of

9   the vacant lot, view from the alley again, and again

10  the photograph is from a little bit further east than

11  the two previous ones and showing more of a view of

12  the building at 3428, the east wall of the building,

13  east side of it.

14      Q.   Show you what has been previously marked as

15  People's Exhibit No. 13 for identification.  Take a

16  look at that.

17          Do you recognize what is shown in that

18  photograph?

19      A.   This again is a view of the vacant lot which

20  shows the walkway area from the vacant lot; the

21  walkway area of the building on the east side at 3428

22  West North Avenue.

23      Q.   Show you what has been previously marked as

24  People's 14 for Identification.  Take a look at those.

JGS_MAYSONET 4212
GONZALEZ 0169928

1          Do you recognize what that shows?

2     A.    Again this is an overall.  It is taken from

3   the -- actually the rear corner of the building.  That

4   would be the west corner of the building, east of the

5   vacant lot and it shows again the overall photo of the

6   east side of 3428 North Avenue, the east side of the

7   building.

8     Q.    I will show you what has been marked as

9   People's Exhibit No. 15 for Identification.  Take a

10  look at that.

11         Do you recognize what that is?

12    A.    This here is an overall view showing the

13  sidewalk along the east side of 3428.  This is the

14  sidewalk from the alley south to North Avenue, to the

15  front sidewalk.

16    Q.    By the way, Officer Butler, was it along that

17  walkway that you found the four fired shell casings?

18    A.    Yes, it was.

19    Q.    Now, I am going to show you what has been

20  previously marked People's 16 for Identification.

21         Take a look at that and tell the ladies and

22  gentlemen of the jury if you recognize what is shown

23  in that photo?

24    A.    This is a close-up view of the gunshot wound

62

JGS_MAYSONET 4213
GONZALEZ 0169929

1    Victim No. 2 had received to the -- just to the rear
2    of the left ear.
3            This would be in the left rear, left side of
4    Victim No. 2's head.
5        Q.    Now I will show you what has been previously
6    marked People's No. 17 for Identification.  Take a
7    look at that.
8            Do you recognize what is shown there?
9        A.    This is a close-up of the gunshot wound to
10   Victim No. 1, the left side of his chest.  This is
11   taken -- These two photos here both were taken at the
12   Medical Examiner's facility.
13       Q.    I am going to show you what has been marked
14   as People's Exhibit No. 18 for Identification.
15           Take a look at that and tell the ladies and
16   gentlemen of the jury if you recognize what is shown
17   there?
18       A.    This is a close-up photo taken at the Medical
19   Examiner's facility of the wound to Victim No. 2's
20   penis and also the recovered fired bullet.
21       Q.    Where is the recovered fired bullet located
22   within the photograph?
23       A.    It was in the groin area.
24       Q.    Where is it shown in the photograph?

JGS_MAYSONET 4214
GONZALEZ 0169930

1    A.   The same location.  That is where we
2    recovered it.
3    Q.   Is it shown in the lower right corner of the
4    photograph?
5    A.   No.  It is -- The fired bullet is shown in
6    the center right of the photograph.
7    Q.   Finally I will show you what has been marked
8    as People's No. 19 for Identification.
9    A.   This here is a photograph of a gunshot wound
10   to the right hip of Victim No. 2 taken at the Medical
11   Examiner's facility.
12   THE COURT:  Mr. Leighton, may we pause for a
13   minute?  I have a phone call I have to take.
14   MR. LEIGHTON:  All right, Judge.
15
16              (Brief pause.)
17
18   THE COURT:  Sorry for the interruption.
19   MR. LEIGHTON:  May I proceed, your Honor?
20   THE COURT:  Yes, you may.
21   BY MR. LEIGHTON:
22   Q.   Officer Butler, People's Exhibits Nos. 16,
23   17, 18, and 19, who took those photographs?
24   A.   Myself and my partner.

JGS_MAYSONET 4215
GONZALEZ 0169931

1    Q.    Where Were those photographs taken?

2    A.    They were taken at the -- Myself and my

3    partner took these photographs at the Cook County

4    Medical Examiner's facility.

5    Q.    Were those photographs taken on the date that

6    you received the assignment?

7    A.    Yes, they were.

8    Q.    Do those photographs truly and accurately

9    depict what is shown in them?

10   A.    Yes, they do.

11   Q.    Now, I am going to ask you to look at

12   People's 3, 5, 6, 4, 7, 8 and 9.

13         Take a look at those photographs again and

14   tell the ladies and gentlemen of the jury if you

15   recognize or if you are able to tell who took those

16   photographs?

17   A.    My partner and I took these photographs.

18   Q.    Were they taken at the scene of the killing?

19   A.    Yes; that is correct.

20   Q.    And do those photographs truly and accurately

21   depict what is shown in them?

22   A.    Yes, they do.

23   Q.    Now, I am going to show you People's 10, 11,

24   12, 13, 14, and 15.  Take a look at these photographs.

65

1          Were those photographs taken by you and your

2      partner?

3          A.    No, they were not.

4          Q.    But do you recognize what is shown in them?

5          A.    Yes, I do.

6          Q.    What do you recognize that to be?

7          A.    This is the scene from the alley to North

8      Avenue.

9          Q.    And other than the snow that appears in those

10     photographs does that truly and accurately depict the

11     view from the alley to North Avenue --

12         A.    Yes, it does.

13         Q.     -- at the scene?

14         A.    Yes.

15         Q.    Now, Officer, I am going to show you what has

16     been previously marked People's Group Exhibit 20.

17          I would like you to take a look at that and

18     tell the ladies and gentlemen of the jury if you

19     recognize what that is?

20         A.    Yes, I do.

21         Q.    What do you recognize that to be?

22         A.    The sealed plastic envelope and within that

23     are two evidence envelopes.

24         Q.    Do you recognize what those contain?

66

JGS_MAYSONET 4217
GONZALEZ 0169933

1    A.   These are the envelopes that contain the

2    fired bullet recovered from Victim No. 2 at the Cook

3    County Medical Examiner's facility and sealed by us,

4    me and my partner, my partner and I, and this is the

5    evidence envelope containing four .09 millimeter

6    cartridge cases that were found on the scene.

7    Q.   Now are those envelopes in the same condition

8    today as they were when you submitted them to the

9    Crime Lab?

10   A.   They are with an exception that they have

11   been sliced open on the one end and also there has

12   been some additional writing placed on them since I --

13   we have sealed them at the Crime Lab.

14   Q.   Other than that, however, those openings, are

15   those envelopes in the same sealed condition today as

16   they were when you sent them onto the Firearms

17   Identification section?

18   A.   Yes, they are.

19   Q.   Officer, what was the distance approximately

20   between the body of Torrence Wiley and the body of

21   Kevin Wiley on the sidewalk on North Avenue when you

22   first arrived?

23   A.   I would have to say 10, 15 feet.

24   MR. LEIGHTON:  One moment, your Honor.

67

```
 1                    (Brief pause.)
 2   BY MR. LEIGHTON:
 3        Q.   The writing that appeared on the envelopes in
 4   People's Group 20, that being the four fired -- strike
 5   that -- the one fired bullet and the four  millimeter
 6   cartridge casings, the writing other than your writing
 7   is the writing from the Crime Lab; is that correct?
 8        A.   That is correct.
 9        Q.   The Firearms Unit?
10        A.   The Firearms Unit; that is correct.
11        MR. LEIGHTON:  One moment, your Honor.
12                    (Brief pause.)
13             No further questions.
14        THE COURT:  Very well.
15             Mr. Wiener.
16
17                    CROSS EXAMINATION
18                    By: MR. WIENER
19
20        Q.   Good afternoon, Det. Butler -- excuse me,
21   Officer Butler.  How are you today?
22        A.   Fine, sir.  Thank you.
23        Q.   Officer, a few questions.
24             First of all you are an Evidence Technician
```

JGS_MAYSONET 4219
GONZALEZ 0169935

1    and were on May 25, 1990; isn't that true?

2         A.    That is correct.

3         Q.    And you did process the crime scene on May

4    25, 1990, as you testified; isn't that true?

5         A.    That is correct.

6         Q.    And at that time, sir, did you find a weapon

7    of any kind at the crime scene?

8         A.    No, we did not.

9         Q.    Did you find other than the beer can any

10   evidence that it was, that had the possibility of

11   having fingerprint analysis from it?

12        A.    The cartridge cases.

13        Q.    Okay.

14              And I take it you examined the cartridge

15   cases?

16        A.    That is correct.

17        Q.    And there were no prints on the cases; is

18   that true?

19        A.    That is correct.

20        Q.    And you indicated on the beer can that the

21   prints were partial and so that they were not suitable

22   for identification; is that true?

23        A.    That is correct.

24        Q.    Other than the photographs that you took and

69

1    the spent bullet and the four cartridge casings and

2    the beer can did you discover any other physical

3    evidence at the scene with respect to the killings of

4    the Wiley brothers?

5        A.    No, we did not.

6        MR. WIENER: Thank you, sir.

7            I have no further questions of Officer

8    Butler.

9        LEIGHTON:  One moment, your Honor.

10

11                    REDIRECT EXAMINATION

12                    By: Mr. Leighton

13

14       Q.    Officer Butler, the four cartridges -- the

15   four cartridge cases that you recovered, those were

16   not complete bullets; were they?

17       A.    No, they were not.

18       Q.    As a matter of fact are you familiar at all

19   with firearms?

20       A.    Yes, I am, in regards to being a technician

21   and a police officer for the number of years that I

22   have been on the police department.

23       Q.    In order to have just the casings on the

24   street like that that meant that the bullets, that the

70

JGS_MAYSONET 4221
GONZALEZ 0169937

1    casings were a part of, were fired from a gun;

2    correct?

3        A.    That is correct.

4        Q.    That means the casings had been ejected from

5    a gun; is that correct?

6        A.    That is correct.

7        Q.    Would you expect to find any fingerprints on

8    them?

9        A.    No, we would not.  Generally we don't find

10   fingerprints on the cartridge cases but we do have to

11   examine them.

12       MR. LEIGHTON:  Nothing else.

13

14                 RECROSS EXAMINATION

15                 By: MR. WIENER

16

17       Q.    Officer Butler, you have found fingerprints

18   on cartridge casings before, haven't you?

19       MR. LEIGHTON:  Objection.

20       MR. WIENER:  State opened up.  I can ask.

21       THE COURT:  Overruled.  He may answer.

22       THE WITNESS:  I have.

23       MR. WIENER: Thank you.

24           No further questions.

71

JGS_MAYSONET 4222
GONZALEZ 0169938

```
 1        THE COURT:  Anything else, State?
 2        MR. LEIGHTON:  No.
 3        THE COURT:  Thank you, sir.  You may step down.
 4
 5                    (Witness excused.)
 6
 7        MR. LEIGHTON:  May we approach the bench, your
 8   Honor?
 9        THE COURT:  Deputy Tennent or Deputy Soto?
10        DEPUTY SHERIFF TENNENT:  Yes?
11        THE COURT:  I am going to give the jury a short
12   break because there are some matters that must be
13   addressed in chambers with counsel.
14            That may be an opportunity for them to
15   stretch their legs a little bit.
16            Please have them come back in shortly.
17                    (Whereupon a recess was taken.)
18
19                    (Whereupon, a discussion was had
20                     in Chambers outside the presence
21                     of the jury.)
22        THE COURT:  Let's do this systematically if we
23   could so it would comport with my list.
24        MR. MAREK:  1 and 2.
```

JGS_MAYSONET 4223
GONZALEZ 0169939

1    THE COURT:  They are the photographs that were

2  identified by stipulation by the life/death witness?

3    MR. MAREK:  Right.  We are not offering them yet.

4    THE COURT:  Very well.

5    MR. MAREK:  I will be, but for now --

6    THE COURT:  Which ones are you offering at this

7  point?

8    MR. MAREK:  Okay.  We are offering many.  This is

9  from 3 to 8.

10   THE COURT:  You are offering 3 through 8?

11   MR. WIENER:  I have no objection to No. 3.

12   THE COURT:  Okay.  The first issue; I am assuming

13  that you are offering at this point because you want

14  them published?

15   MR. WIENER:  Obviously.

16   THE COURT:  3, there is no objection.  This was --

17   MR. WIENER:  Overall view of both bodies.

18   THE COURT:  Very well.  That will be admitted and

19  may be published.  That is 3.

20   MR. WIENER:  I object to No. 4.  It is a close-up

21  of Torrence, I believe.

22   THE COURT:  4 is a close-up of Victim No. 1.

23   MR. MAREK: That is Torrence.

24   MR. WIENER: I think the overall view sufficiently

73

1    show the position of the bodies and I believe -- I

2    don't necessarily believe that --

3        MR. MAREK:  Here is the bulge.

4        MR. WIENER: I don't necessarily believe the bulge

5    adds anything to the case of the defendant and a

6    close-up of the dead man only inflames the jury and

7    its prejudicial effect in my opinion only outweighs

8    the substantial evidentiary significance of the bulge.

9        I don't think a close-up view of the victim

10   should be published to the jury.

11       THE COURT:  Very well.

12       I think the law is replete that it may be

13   shown.  I am going to allow it to be shown.  There is

14   a great deal of testimony as to the placement of the

15   wounds and all the rest of it.

16       This is a murder case.  I will admit it and

17   it may be published.

18       MR. WIENER:  Over my objection.

19       THE COURT:  Absolutely.

20       MR. WIENER: No. 5, I have no objection.

21       THE COURT:  No. 5 is the side of the building.  I

22   guess it shows one of the bodies, an overall -- police

23   officers on the scene, overall scene.

24       I guess you do see both of them.

74

JGS_MAYSONET 4225
GONZALEZ 0169941

1          My note says with the victims and they are

2     both there.

3          MR. WIENER:  They are there.

4          THE COURT:  Okay.

5               4 was admitted over objection.

6               5 is being admitted with no objection and it

7     may be published.

8          MR. WIENER:  No. 6 is the same photo as No. 5.

9     You can see the body.  I don't think there is any

10    reason to get a close-up again.

11              I object.  I believe the effect would be to

12    inflame the passions of the jury and it would have a

13    prejudicial effect and no significant relevance as

14    opposed to the last, which is No. 5.

15              It shows the same view here as No. 5.

16         THE COURT:  Not the same view.

17         MR. WIENER: It is the same view.

18         THE COURT:  But it is not the same view.  It is a

19    close-up.  You are objecting?

20         MR. WIENER:  That is what I am objecting to; the

21    close-up.

22         THE COURT:  State, why are you offering it?  What

23    does it add?

24         MR. MR. MAREK:  It shows a different view.

JGS_MAYSONET 4226
GONZALEZ 0169942

1      THE COURT:  What does it add?

2      MR. MAREK:  You can hardly see where he is with

3 respect to the sidewalk and everything.  This brings

4 it into focus.  This does not show the wounds.

5      THE COURT:  I am going to admit it.  I don't think

6 it shows anything else but a close-up of the same

7 body.

8        What else does it add?

9      MR. WIENER: If you agree I suggest from the

10 standpoint of my objection I am going to ask you not

11 to admit it.

12      THE COURT:  But I don't see it as prejudicial.  It

13 may be admitted.

14      MR. WIENER:  You will put it in in that case; is

15 that correct?

16      THE COURT:  I put No. 7 is Victim No. 2.  You can

17 see the victim lying there.

18      MR. MAREK:  This is Victim 2.  There was testimony

19 the blood was gushing out of his head and mouth.

20      MR. WIENER: I certainly would object to that view

21 of him.

22      THE COURT:  Very well.  It will be admitted over

23 objection.

24      MR. WIENER: Of course the close-up of the Victim

JGS_MAYSONET 4227
GONZALEZ 0169943

1   No. 2 is the same picture as No. 8.  It is closer to

2   the sidewalk.  They can see -- I don't know what it

3   adds.  It is such a horrible picture it will

4   definitely have a prejudicial effect and I would

5   object to Picture No. 8 being published to the jury.

6       MR. LEIGHTON:  It shows in more detail the blood.

7           There is testimony about when the officers

8   arrived the fact he is bleeding from the mouth and

9   nose.  In addition to that it is an identification

10  photo of the victim at the scene.

11          As far as it being a horrible picture it is a

12  horrible crime and that kind of goes with it.

13      MR. WIENER: Look at No. 7 and No. 8.  It adds

14  absolutely nothing except to get a little closer.  You

15  put 7 in over objection.  I object strenuously to No.

16  8.

17      THE COURT:  Okay.  That is because the law is very

18  clear it does have prejudicial effect.  But everything

19  the State puts on has prejudicial effect.

20      MR. WIENER:  We have to measure that.

21      THE COURT:  When there has been significant

22  testimony on a photograph, unless I see -- because it

23  is corroborative of the testimony and the law is clear

24  that even when they are grisly that is not a basis for

77

1   keeping them out.

2     MR. WIENER:  It might not be a basis but the law

3   is clear for purposes of the record that you have the

4   discretion to keep the photograph out.

5     THE COURT:  Exactly.

6     MR. WIENER:  When you believe that photograph is

7   either duplicitous in evidence that it is going to

8   show --

9     THE COURT:  I understand and I have exercised my

10   discretion.  It will be admitted over your objection.

11     MR. WIENER:  All right.

12     MR. MAREK:  Here is 9.  That is the casings.

13     MR. WIENER:  No objection.

14     THE COURT:  Any objection?

15     MR. WIENER: No objection.

16     MR. MAREK:  10 through 15 are the six shots from

17   the alley to North Avenue.

18     THE COURT:  Those are all scene shots.

19     MR. LEIGHTON:  Showing a different view.

20     MR. WIENER:  No objection.

21     THE COURT:  That is 10 through --

22     MR. MAREK:  15.  There is no bodies in these.

23     THE COURT:  10, 11, 12, 13, 14, 15.  I am going

24   through that so I make sure I make all my marks

78

1  correctly.

2          What else is being offered at this time, if

3  anything?

4      THE COURT:  16.

5      MR. MAREK:  16 is a close-up at the morgue; a

6  close-up to the back of the head that is not seen in

7  the other photographs.

8      MR. LEIGHTON:  In that photograph some of the

9  blood has been cleaned away.  You can see the wound.

10     THE COURT:  Anymore pictures depicting that?

11     MR. MAREK:  No.

12     MR. WIENER: You have photographs of the man's

13  head. What does it show?  What does it add?

14     THE COURT:  It adds to show where the bullet

15  entered the back of his head.

16          It will be entered over objection.

17     MR. WIENER:  My objection.

18     THE COURT:  Very often they have two or three and

19  I make them choose.  It shows -- They only have one.

20     MR. MAREK: 17 is the entrance wound to the chest.

21     MR. LEIGHTON:  Again where the blood has been

22  cleaned.  You can see the hole.

23     MR. WIENER:  No objection.

24     MR. MAREK:  18 is the wound to the shaft of the

JGS_MAYSONET 4230
GONZALEZ 0169946

1   penis.

2       MR. WIENER:  Same objection.

3       MR. LEIGHTON:  That is not shown directly.

4       THE COURT:  Admitted over objection.

5       MR. MAREK:  19 is the exit wound in the hip.

6       MR. WIENER:  Same objection that I gave before.

7       THE COURT:  Admitted over objection.

8           Is -- That is 20, the bullets and casings?

9       MR. LEIGHTON:  We won't be doing anything with

10   that for right now.

11      THE COURT:  Very well.

12          To recap, for the record admitted with no

13   objection and to be published are 3, 5, 9 through 15.

14   Those were admitted without objection.

15          Admitted over objection of counsel and,

16   counsel, just -- I am not sure whether -- I am

17   assuming the objection was really directed at them

18   being published as opposed to them being admitted.

19      MR. WIENER:  Of course only to being published.  I

20   have no objection to their being admitted.

21      THE COURT:  4, 6, 7, 8, 16, 17, 18 and 19 admitted

22   without objection.  Being published over objection; is

23   that correct?

24      MR. WIENER:  That is correct.

JGS_MAYSONET 4231
GONZALEZ 0169947

1    THE COURT:  Okay.  Okay.

2

3            (Whereupon the trial was resumed in

4            open court in the presence of the

5            jury.)

6

7    MR. LEIGHTON:  Your Honor, at this time the People

8    would be moving into evidence People's Exhibits 3

9    through 19 inclusive.

10           We would ask that the identification marks

11   being stricken and they be received as People's

12   Exhibit No. 3 through 19 inclusive.

13           And at this time we ask they be published to

14   the jury.

15   THE COURT:  Very well.  People's 3 through 19 is,

16   the identifying marks may be stricken and will be

17   received into evidence.

18           Are you asking further that they be

19   published?

20   MR. LEIGHTON:  Yes, Judge.

21   THE COURT:  Very well.  They may be published to

22   the jury.

23           As the exhibits are tendered to you please

24   make your observations, pass them on to your neighbor.

81

JGS_MAYSONET 4232
GONZALEZ 0169948

1          When it comes down to this end pass it to the

2    back.  They will be collected to you -- from you on

3    the back side.

4

5                    (Whereupon the exhibits were

6                    published to the jury.)

7

8       MR. MAREK:  At this time People call Det.

9    Dickinson.

10

11     D E T.    E D W A R D    D I C K I N S O N,

12

13   called as a witness by the State's Attorney herein,

14   having been first duly sworn, was examined and

15   testified as follows:

16

17                    DIRECT EXAMINATION

18                    By: MR. MAREK

19

20      Q.    Detective, would you state your name for the

21   record?

22      A.    Detective Edward Dickinson,

23   D-i-c-k-i-n-s-o-n.

24      Q.    What is your profession or occupation?

82

JGS_MAYSONET 4233
GONZALEZ 0169949

1       A.    Chicago Police Detective.

2       Q.    How long have you been a Chicago police

3    officer?

4       A.    Going on 20 years.

5       Q.    How long have you been a detective?

6       A.    Ten years.

7       Q.    Detective, what is your current assignment

8    within the Chicago Police Department?

9       A.    Area 5, Violent Crimes.

10      Q.    How long you have you been assigned to Area

11   5, Violent Crimes?

12      A.    10 years.

13      Q.    Det. Dickinson, what area of the City does

14   Area 5, Violent Crimes take in?

15      A.    Northwest side of the city.

16      Q.    And what are the duties of a Violent Crimes

17   detective?

18      A.    We investigate all crimes against persons.

19      Q.    Det. Dickinson, I want to direct your

20   attention back to May 25, 1990.  On that day were you

21   working as a detective at Area 5, Violent Crimes?

22      A.    Yes, I was.

23      Q.    And Det. Dickinson, were you assigned to

24   participate in the investigation of the murder of

83

JGS_MAYSONET 4234
GONZALEZ 0169950

1    Terrance -- Torrence Wiley and Kevin Wiley?

2        A.   Yes, I was.

3        Q.   And in connection with that investigation did

4    you conduct what is known as a canvas?

5        A.   Yes, I did.

6        Q.   And when you go about doing a canvas how do

7    you do that, Detective?

8        A.   You go the area of the crime.  You go

9    door-to-door in search of any witnesses to the crime.

10       Q.   And in connection with the investigation of

11   this homicide did you do a canvas of the vicinity of

12   the 3400 block of North Avenue?

13       A.   Yes, I did.

14       Q.   And do you recall with particularity exactly

15   what area you canvassed?

16       A.    It would have been both sides of the street

17   of the 3400 block of North Avenue, especially the

18   other or the south side of the street which would have

19   been facing the crime scene.

20       Q.   And would that be then basically the area on

21   North Avenue between Kimball and St. Louis?

22       A.   Yes.

23       Q.   And, Detective, approximately how long did it

24   take you to conduct this canvas?

84

JGS_MAYSONET 4235
GONZALEZ 0169951

1   A. Half hour, 45 minutes.

2   Q. And in conducting this canvas did you locate

3 any witnesses to the homicide of the two Wiley

4 brothers?

5   A. No, I did not.

6   Q. On the corner of Kimball and North Avenue is

7 there an all-night restaurant or eating place or

8 something?

9   A. Yes, there is.

10   Q. What is that place called?

11   A. Donald Ducks.

12   Q. Did your canvas also include going into the

13 Donald Ducks and inquiring of the owner and/or any

14 patrons?

15   A. I don't know if he was the owner.  I believe

16 he was just the night manager.

17   Q. Did your canvas in fact include that

18 location?

19   A. Yes, it did.

20   Q. Did you locate anybody at that location that

21 came forward as a witness to this homicide?

22   A. No, I didn't.

23   Q. Did you at any time in the course of your

24 investigation locate any witnesses to this homicide?

JGS_MAYSONET 4236
GONZALEZ 0169952

1      A.    No.

2      Q.    Detective, in the course of conducting a

3  canvas did you locate some people who had heard shots?

4      A.    Yes, I did.

5      Q.    Did any of the people who heard shots ever

6  indicate to you they had seen any offenders?

7      A.    No.

8      MR. MAREK:  I have nothing else.

9      MR. WIENER: I have no questions of Det. Dickinson.

10     THE COURT:  Thank you, Detective.  You may step

11 down.

12                 (Witness excused.)

13

14     MR. MAREK: If I may have just a moment to se.

15 If the next witness has arrived.

16     THE COURT:  Yes.

17

18                 (brief pause.)

19

20     MR. MAREK:  At this time the People, your Honor,

21 call Rosa Bello.

22     THE COURT:  Very well.

23

24

86

```
 1                     R O S A   B E L L O,

 2

 3    called as a witness by the State's Attorney herein,

 4    having been first duly sworn, was examined and

 5    testified as follows:

 6

 7                   DIRECT EXAMINATION

 8                   By: MR. MAREK

 9

10        Q.    Miss Bello, state your name for the record,

11    please.

12        A.    My name is Rosa Bello.

13        Q.    You have to speak nice and loud.

14        A.    Rosa Bello.

15        Q.    Miss Bello, do you know an individual by the

16    name of Jose Maysonet?

17        A.    He is the father to my son.

18        Q.    How long have you known Jose Maysonet?

19        A.    Four years.

20        Q.    Do you know an individual by the name of

21    Alfredo Gonzalez?

22        A.    Yes, I do.

23        Q.    How long have you known him?

24        A.    About two years.
```

87

```
1      Q.   Is he in court right now?

2      A.   Yes.

3      Q.   He is.  Would you point him out for the

4   record?

5      A.   There he is; there.

6      Q.   What is he wearing right now?

7      A.   White shirt with gray pants.

8      MR. MAREK:  May the record reflect in-court

9   identification of the defendant, Alfredo Gonzalez.

10     THE COURT:  Very well.

11  BY MR. MAREK:

12     Q.   Do you also know the name of -- an individual

13  by the name of Justino Cruz?

14     A.   Yes, I do.

15     Q.   How long have you known him?

16     A.   About the same time; two years.

17     Q.   Do you know an individual by the -- whose

18  street nickname is Fro?

19     A.   Yes.

20     Q.   Do you know his real name?

21     A.   No.

22     Q.   How long have you known him?

23     A.   Long time.

24     Q.   Do you know all of these individuals to be
```

88

```
 1   members of any street gang?
 2        A.   Yes, I do.
 3        Q.   What street gang is that?
 4        A.   Latin Kings.
 5        Q.   Miss Bello, I want to direct your attention
 6   to May 25th of -- Strike that.
 7             I want to direct your attention to the
 8   evening of May 24th, 1990.
 9             Where were you living back then?
10        A.   1302 North Homan.
11        Q.   Who were you living there with?
12        A.   Juan Maysonet.
13        Q.   Is Juan Maysonet, is his full name Juan Jose
14   Maysonet?
15        A.   Yes.
16        Q.   Were you living there with any children also?
17        A.   Yes; my two daughters.
18        Q.   Now is Juan Jose Maysonet the father of your
19   two daughters?
20        A.   No, he is not.
21        Q.   Do you have a child by Juan Jose Maysonet?
22        A.   Yes, I do.
23        Q.   Which child is that?
24        A.   A little boy.  His name was Juan.
```

89

JGS_MAYSONET 4240
GONZALEZ 0169956

1       Q.   When was Juan born?

2       A.   ▓▓▓▓▓▓▓▓▓▓▓▓.

3       Q.   Were you -- So Juan was born after the

4   evening of May 24, 1990?

5       A.   Yes, he was.

6       Q.   Miss Bello, I want to direct your attention

7   to May 24, 1990, about 11:30 p.m.

8            Do you know where you were on that date at

9   that time?

10      A.   I was in my house.

11      Q.   Who else if anybody was with you?

12      A.   Me, my two daughters, and the baby's father,

13  Juan.

14      Q.   And what was everybody doing?

15      A.   The girls had went to sleep and I went into

16  the kitchen to clean up the kitchen.

17      Q.   Was anybody watching TV?

18      A.   No.   The TV was just on.

19      Q.   Did anybody come by your house May 24, 1990?

20      A.   Yes.

21      Q.   Who was that?

22      A.   Lluvia, Tino, and Fro.

23      Q.   Now, the name Lluvia, is that a nickname or

24  street name?

90

JGS_MAYSONET 4241
GONZALEZ 0169957

```
 1       A.    Nickname.

 2       Q.    Do you know how that is spelled?

 3       A.    No, I don't.

 4       Q.    Would it be like, is that L-l-u-v-i-a as far

 5  as you know?

 6       MR. WIENER:  Objection.  She said she didn't know

 7  how it was spelled.

 8       THE COURT:  Overruled.  It may stand.

 9  BY MR. MAREK:

10       Q.    Now, who do you know as Lluvia?

11       A.    Fredo.  Alfredo.

12       Q.    Alfredo Gonzalez?

13       A.    Yes.

14       Q.    And who did he come over with?

15       A.    With Tino and Fro.

16       Q.    And what happened when these -- Do you know

17  Tino's last name?

18       A.    No, I don't.

19       Q.    When these three guys came over what

20  happened?

21       A.    They had rung the doorbell and I had opened

22  the door, let them in, and they had wanted to speak to

23  Juan.

24       Q.    Did you let them into the apartment?
```

91

1     A.   Yes, I did.

2     Q.   What happened when you let them into the

3 apartment?

4     A.   They wanted to speak to him.  So he was

5 taking a shower and I had knocked on the door and he

6 had came out.

7     Q.   Did Juan speak to any of these three

8 individuals?

9     A.   Yes, he did.

10     Q.   Who was that?

11     A.   Lluvia, Tino, and Fro.

12     Q.   And where were you at when Juan was speaking

13 to these three individuals?

14     A.   I was in the kitchen.

15     Q.   Where were Jose, Lluvia, Tino, and Fro when

16 they were speaking to each other?

17     A.   Like in the front room, like in the middle

18 part of the house.

19     Q.   Is that where the TV was?

20     A.   No.  The TV was by the window.  They were by

21 a closet.

22     Q.   Were they in the same room, though, in the

23 living room?

24     A.   Right.

JGS_MAYSONET 4243
GONZALEZ 0169959

1     Q.   Were you, Miss Bello, able to overhear

2   anything that these four guys were talking about?

3     A.   No.

4     Q.   What happened then?

5     A.   Juan had called me and told me to go into the

6   room to get something.  So I went into the room and I

7   had got what he had asked me for.

8     Q.   Now which room did you go into to get

9   something?

10     A.   My bedroom.

11     Q.   And what was it that you went into the

12   bedroom and got?

13     A.   At the time I didn't know what it was.

14     Q.   What was it -- Well, what actually did you

15   get?

16     A.   All I know is I went into my room and I had

17   picked up, it was wrapped in a plastic bag and then a

18   towel.

19     Q.   Did you know what was in the towel?

20     A.   No, I didn't.

21     Q.   This package or this plastic bag, what did

22   you do with it?

23     A.   I gave it to Lluvia.

24     Q.   What if anything -- Was that -- Is there any

93

1   reason why you gave it to Lluvia?

2      A.   Juan had told me to give it to him.

3      Q.   And where were Juan and Lluvia when you

4   handed over this package or this towel?

5      A.   In the middle of the front room by the

6   closet.

7      Q.   Let me ask you this.  Where did you go to get

8   this package?

9      A.   In my bedroom in the closet on the top shelf.

10      Q.   When you went into your bedroom and got this

11   from your closet where were Alfredo Gonzalez and Jose

12   Maysonet?

13      A.   By the closet.  They didn't go into my room.

14      Q.   Were they outside your room?

15      A.   Yes; by the door.

16      Q.   Now, Jose, when you handed over this package,

17   this towel to Alfredo Gonzalez where did you do that?

18      A.   When did I do what?

19      Q.   Where was he standing when you handed this

20   over; by the door?

21      A.   By the door.

22      Q.   And did you see what was inside at this time?

23      A.   No.

24      Q.   Did you later see what was inside?

JGS_MAYSONET 4245
GONZALEZ 0169961

```
 1        A.    Yes.

 2        Q.    What was inside?

 3        A.    A gun.

 4        Q.    Had you ever seen that gun before?

 5        A.    No.

 6        Q.    When you saw the gun who had the gun?

 7        A.    Lluvia.

 8        Q.    What did you see Lluvia do with the gun?

 9        A.    He stuck the bullets in the thing.  He stuck

10   it in the pistol.

11        Q.    When you say he stuck the bullets in the

12   thing, what is the thing that are talking about?

13        A.    I don't know how they call it.

14        Q.    Was it a clip?

15        A.    Yes.

16        Q.    So first, and just so it is clear, Lluvia is

17   Alfredo Gonzalez; is that right?

18        A.    Right.

19        Q.    First he put the bullets in the clip?

20        MR. WIENER:  Objection.  He is leading the

21   witness.  She can testify.

22        THE COURT:  That has been testified to.  I am

23   assuming he is just reorienting the witness.

24             Overruled.
```

95

JGS_MAYSONET 4246
GONZALEZ 0169962

1    BY MR. MAREK:

2        Q.    You saw him put the bullets in the clip?

3        A.    Yes.

4        Q.    What did he then do with the clip?

5        A.    He put the clip in the gun.

6        Q.    What part of the gun?

7        A.    The back part.

8        Q.    What was your reaction or what did you do

9    when you first learned that there was a gun inside

10   that towel?

11       A.    I got upset.

12       Q.    Did you say anything?

13       A.    Yes, I did.

14       Q.    Who did you say something to?

15       A.    To Juan.

16       Q.    Now after the gun was given to Alfredo

17   Gonzalez what did he do with the gun?

18       A.    He wrapped it back in the plastic bag and

19   stuck it back into the towel and I gave him a plastic

20   bag to stick it.

21             After that he stuck it under his shirt.

22       Q.    Now where under his shirt did he stick the

23   bag?

24       A.    He had a hood.

96

1    Q.    Where under his shirt?

2    A.    Like underneath and stuck it like this.

3    MR. MAREK:  For the record the witness has

4    indicated the front of the shirt at approximately the

5    waist area.

6    THE COURT:  That is the description you would

7    agree to, counsel?

8    MR. WIENER:  Surely.

9    THE COURT:  Very well.

10   BY MR. MAREK:

11   Q.    Now, what kind of a sweatshirt was Alfredo

12   Gonzalez wearing that night?

13   A.    A black hoodie.

14   MR. WIENER:  Objection.  There is no testimony

15   that he was wearing a sweatshirt.

16   THE COURT:  I believe the witness testified to it

17   as a hoodie.  Perhaps we can clarify.

18   BY MR. MAREK:

19   Q.    What is a hoodie, Miss Bello?

20   A.    Just a long black shirt with a hat.

21   Q.    By a hat you mean a hood?

22   A.    Hooked to the shirt; hooked up.

23   Q.    Okay.  And that is what Mr. Gonzalez was

24   wearing that night?

97

JGS_MAYSONET 4248
GONZALEZ 0169964

1 A. Yes.

2 Q. Do you remember -- When he left do you
3 remember did he have the hood on or off?

4 A. Don't recall.

5 Q. Now after the gun was given to Mr. Gonzalez
6 and he put it inside of his shirt what happened then?

7 A. They left.

8 Q. Did everybody leave?

9 A. All of them left.

10 Q. Including Jose Maysonet?

11 A. Yes.

12 Q. Do you know where they went?

13 A. No, I don't.

14 Q. Now, I want to direct your attention to some
15 time later that evening.  Did Jose Maysonet return?

16 A. After 12:00 o'clock.

17 Q. Do you remember about what time he returned?

18 A. No, I don't recall.

19 Q. It was sometime after midnight?

20 A. Yes.

21 Q. Did he return with anybody or did he return
22 by himself?

23 A. By hisself.

24 Q. Now, Miss Bello, in exchange for your

98

JGS_MAYSONET 4249
GONZALEZ 0169965

1    testimony here today the State's Attorney's office has

2    offered to relocate you; is that correct?

3       A.   Yes.

4       Q.   And in fact the last several days you have

5    been staying in a hotel at the State's -- at the

6    expense of the State's Attorney's Office; is that

7    correct?

8       A.   Yes.

9       Q.   Why have you been staying at a hotel?

10      A.   Because somebody tried to run me over with my

11   son.

12      Q.   You said somebody tried to run you over?

13      A.   Yes; with my son.

14      Q.   You had your son at the time?

15      A.   Yes.  I was on my way to the doctor.

16      Q.   And approximately when did this happen?

17      A.   About 1:30, 2:00 o'clock Friday, last Friday.

18    MR. MAREK:  No further questions.

19    THE COURT:  Go ahead.

20

21               CROSS EXAMINATION

22               By: MR. WIENER

23

24      Q.   Miss Bello, you say you have known Alfredo

99

```
 1    Gonzalez for two years?
 2         A.    Yes.
 3         Q.    When did you first meet him?
 4         A.    I met him through Juan.
 5         Q.    When did you first meet him?
 6         A.    It has been a long time.  I don't recall.
 7         Q.    Well this is March of 1992.  Did you meet him
 8    in March of 1990?
 9         A.    No, I didn't.
10         Q.    Did you meet him in April of 1990?
11         A.    No, I didn't.
12         Q.    Well when did you meet him?
13         A.    Don't recall.  It has been a long time.
14         Q.    You just told the State, you answered a
15    question, you said you have known him for two years.
16         MR. MAREK:  Objection.
17         THE COURT:  Overruled.
18         THE WITNESS:  About two years.
19    BY MR. WIENER:
20         Q.    Two years from today?
21         A.    Yes.
22         Q.    So May 25, 1990, was 22 months ago from
23    today; isn't that true?
24         A.    Should be; yes.
```

100

JGS_MAYSONET 4251
GONZALEZ 0169967

```
 1        Q.   So you knew him about two months before you
 2   said he came to your apartment on May 24, 1990?
 3        A.   That is a lie.
 4        Q.   Excuse me; that is a lie?
 5        A.   That is a lie.
 6        Q.   How long had you known him then?
 7        A.   I been knowing him for two years.  He did
 8   have came to my house a couple of times.
 9        Q.   Now you lived on May 25th of 1990, with Jose
10   Maysonet; right?
11        A.   Right.
12        Q.   How long had you lived with him at that time?
13        A.   About two-and-a-half years.
14        Q.   And you agreed with the State to testify
15   today in return for their relocating you; is that
16   right?
17        A.   Yes.
18        Q.   And you know Jose Maysonet is a defendant in
19   this case, don't you?
20        A.   Yes, I do.
21        Q.   And he is charged along with Mr. Justino Cruz
22   and this defendant with the murders of the Wiley
23   brothers; isn't he?
24        A.   Yes.
```

101

JGS_MAYSONET 4252
GONZALEZ 0169968

1    Q.    You want to see justice served, don't you?

2    A.    Yes, I do.

3    Q.    And you agreed with the State that you would

4    also testify against Jose Maysonet, didn't you?

5    A.    No, I didn't.

6    Q.    You did not agree to testify in the trial if

7    any of Jose Maysonet that a gun was supplied to

8    Alfredo Gonzalez by Jose Maysonet that evening?

9    A.    No.

10    Q.    You are not going to testify at the trial of

11    Jose Maysonet, if any?

12    A.    No, I am not.

13    Q.    That Jose Maysonet left with three other

14    people?

15    A.    No, I am not.

16    Q.    And took a gun with him that night?

17    A.    No, I am not.

18    Q.    In fact the only person you agreed to testify

19    against was Alfredo Gonzalez; isn't that true?

20    A.    Yes.

21    Q.    Now when did you first learn that the Wiley

22    brothers had been murdered?

23    A.    The next day when I was talking to my

24    girlfriend.

102

JGS_MAYSONET 4253
GONZALEZ 0169969

1    Q.   That was May 26th, 1990; right?

2    A.   More or less; yes.

3    Q.   You went to the police, didn't you?

4    A.   Did I go to the police?  The police came and

5  got me.

6    Q.   On May 26th?

7    A.   May 25th.

8    Q.   The police came and got you on May 25th?

9    A.   Yes.

10   Q.   You told them about this on May 25th; didn't

11  you?

12   A.   Think so. It has been a while.

13   Q.   And you told them exactly what happened on

14  May 25, 1990, when they came to your house?  You told

15  them the exact same story that you told the jury;

16  isn't that true?

17   A.   Yes.

18   Q.   Isn't it a fact that the first time you told

19  the police anything about what happened was on August

20  23rd of 1990, three months after this alleged visit to

21  your house occurred?

22   A.   I don't recall when I did it.

23   Q.   You didn't tell the police anything in May of

24  1990, about Alfredo Gonzalez; did you?

103

JGS_MAYSONET 4254
GONZALEZ 0169970

```
 1      A.   No.
 2      Q.   You didn't tell the police anything in June
 3  of 1990, about Alfredo Gonzalez?
 4      A.   No.
 5      Q.   You didn't tell the police anything in July
 6  of 1990, about Alfredo Gonzalez?
 7      A.   No.
 8      Q.   You didn't tell anybody about this until
 9  August 23, 1990, after Jose Maysonet was arrested and
10  charged with this crime; isn't that true?
11      A.   Yes.
12      Q.   So you knew the next day that two brothers
13  were killed and you say you saw a gun taken out of
14  your place and you never went to the police; isn't
15  that true?
16      A.   Yes.
17      Q.   Now you say that when these people came to
18  your house Jose asked you to get a package out of your
19  bedroom; isn't that right?
20      A.   Yes.
21      Q.   But you told on August 23, 1990, Assistant
22  State's Attorney DeFranco and Det. Fred Montilla when
23  they came to your house Lluvia, Fro, and Tino asked
24  Jose for a gun?
```

104

JGS_MAYSONET 4255
GONZALEZ 0169971

1      A.    I did not hear the conversation.

2      Q.    Well, you didn't tell Officer, I mean

3  Assistant State's Attorney DeFranco and Det. Fred

4  Montilla on August 23, 1990, that Lluvia, Fro, and

5  Tino asked Jose for a gun?

6      A.    I did not listen to the conversation.

7      Q.    So when you went to the closet you didn't

8  know you were getting a gun?

9      A.    No, I didn't.

10     Q.    And on August 22, 1990, didn't you tell Det.

11 Halvorsen, Gawrys, Guevara and Paulnitsky that when

12 the three of them came into your house they asked Jose

13 to get a gun?

14     A.    I did not hear the conversation.

15     Q.    So you didn't tell those detectives that; did

16 you?

17     A.    I didn't hear the conversation.

18     Q.    And when you saw that gun did you recognize

19 what kind of a gun that was?

20     A.    At first I didn't.

21     Q.    I asked you did you ever recognize what kind

22 of a gun that was?

23     A.    After a while I did.

24     Q.    What kind of a gun was it?

105

JGS_MAYSONET 4256
GONZALEZ 0169972

1      A.   .09 millimeter.

2      Q.   You knew what a .09 millimeter gun looked

3 like on May 24, 1990?

4      A.   I seen it when he unwrapped it.

5      Q.   I know you did.  But had you seen .09

6 millimeter guns before?

7      A.   I seen it once.

8      Q.   Well does the .09 millimeter gun that you saw

9 on May 24, 1990, have .09 millimeter written on it?

10      A.   I wasn't looking at it.

11      Q.   Well how did you know it was a .09 millimeter

12 gun?

13      A.   Just by looking at it.

14      MR. MAREK:  Objection.  She has answered it.

15      THE COURT:  Overruled.

16 BY MR. WIENER:

17      Q.   How did you know it was a .09 millimeter gun?

18      A.   Just by looking at it.

19      Q.   Had you seen other .09 millimeter guns?

20      A.   No.  Only by books.

21      Q.   By books?

22      A.   Yes.

23      Q.   Did you have gun books in your house?

24      A.   No, I didn't.

106

1    Q.    When did you study guns so that you could

2  identify a .09 millimeter gun?

3    A.    It was just looking at it; glancing.

4    Q.    After May 24, 1990, in fact after Jose came

5  home May 25, 1990, did you ever see any other guns in

6  your house?

7    MR. MR. MAREK:  Objection.

8    MR. WIENER:  I asked her --

9    MR. MR. MAREK:  Objection.  How is it relevant?

10   THE COURT:  Sustained.

11 BY MR. WIENER:

12   Q.    Well, have you ever seen another .09

13 millimeter gun in your house after May 25th, 19 --

14   MR. MAREK:  Objection.

15   THE WITNESS: No.

16   THE COURT:  Sustained.  That is the same question.

17        The objection will be sustained; the answer

18 stricken

19 BY MR. WIENER:

20   Q.    Before May 25, 1990, how many .09 millimeter

21 guns had you seen?

22   A.    None.

23   Q.    But didn't you tell Dets. Halvorsen, Gawrys,

24 Rivera, and Paulnitsky August 22, 1990, or 23rd, that

107

JGS_MAYSONET 4258
GONZALEZ 0169974

1   you recognized the gun as a .09 millimeter automatic

2   pistol, 15-shot?

3       A.   Just by looking at it.

4       Q.   And didn't you tell on August 23, 1990,

5   Assistant State's Attorney DeFranco and Det. Fred

6   Montilla that you recognized the gun as a .09

7   millimeter gun and it was wrapped in a towel?

8       MR. MAREK:  Objection.  That is not impeaching.

9       THE COURT:  Sustained.

10          The jury is instructed to disregard it.

11  BY MR. WIENER:

12      Q.   How many times before May 24th of 1990, had

13  Tino visited your house?

14      A.   Only been to my house a couple times.

15      Q.   How many times before May 24, 1990, did

16  Alfredo Gonzalez visit your house?

17      A.   The same amount; a couple times.

18      Q.   How many times did Fro visit your house?

19      A.   Twice.

20      Q.   You remember all of these events.  What

21  makes this night so special that you remember all of

22  these events?

23      A.   Because I got very upset.

24      Q.   And you remember where you were at the time;

JGS_MAYSONET 4259
GONZALEZ 0169975

```
 1    is that correct?
 2         A.   Yes, I do.
 3         Q.   You remember what rooms you were in?
 4         A.   I was in the kitchen.
 5         Q.   And you remember where you went?
 6         A.   From the kitchen to the bedroom.
 7         Q.   And at any time when you went into the
 8    bedroom did anybody tell you to go get a gun?
 9         A.   No.  They just told me to go in the closet
10    and get the package.
11         MR. WIENER:  Thank you.
12              I have nothing further of Miss Bello.
13         THE COURT:  Any Redirect?
14         MR. MR. MAREK:  May we have a moment, Judge?
15         THE COURT:  Yes.
16
17                    REDIRECT EXAMINATION
18                    By: MR. MAREK
19
20         Q.   Miss Bello, the statement that you gave to
21    the Assistant State's Attorney about the .09
22    millimeter weapon -- Strike that.  I am going to show
23    you --
24         MR. WIENER: Objection.
```

JGS_MAYSONET 4260
GONZALEZ 0169976

```
 1        THE COURT:  Objection to what, counsel?
 2        MR. WIENER:  That he show her a written statement.
 3   I just asked what he said.
 4        THE COURT:  I have no idea what he is going to
 5   show her.
 6        MR. WIENER: All right.
 7   BY MR. MAREK:
 8        Q.   A I am going to show you People's Exhibit No.
 9   21.  Do you recognize this?
10        THE COURT:  Did you show it to him?
11        MR. WIENER:  I know what it is.  I have an
12   objection at this time.
13        MR. MAREK:  May I approach?
14        THE COURT:  Yes. Let's step around here.
15             (Whereupon, a discussion was had in
16              chambers outside the presence of the
17              jury.)
18        THE COURT:  First of all somebody tell me what
19   People's 21 is.
20        MR. WIENER:  A statement.
21        MR. MAREK:  Felony Review.
22        MR. LEIGHTON: The handwritten counsel cross
23   examined her on.
24        MR. WIENER: Not handwritten.  Written by the
```

110

JGS_MAYSONET 4261
GONZALEZ 0169977

1    Felony Assistant.

2        THE COURT:  I know what those are.

3        MR. WIENER:  I Cross Examined her, I asked her if

4    in fact --

5        THE COURT:  I remember all of that.

6        MR. WIENER: Okay.

7            She said she did.  To show her a statement

8    that she wrote, merely a statement that she signed in

9    order to restore her is improper.

10       THE COURT:  I have no idea that is what you will

11   do.

12           What is it you are going to do?

13       MR. MAREK:  Counsel left the distorted impression

14   she identified this as a .09 millimeter gun.  The

15   statement said, she said the gun was a.09 millimeter

16   and wrapped in a towel.

17       MR. WIENER: That is correct.  I said that and in

18   her other statement she said many other things that I

19   impeached her on.

20       MR. LEIGHTON:  He does not get it both ways.

21       THE COURT:  There is the rule of completeness and

22   that is correct.

23           When you utilize a document and take out a

24   segment of that document your opponent, whichever side

111

JGS_MAYSONET 4262
GONZALEZ 0169978

1    that is, is entitled to bring out other things.  But

2    what I am saying is the point to which you, what you

3    just read I have stricken as not impeaching.

4         MR. WIENER:  That is correct.

5         THE COURT:  The jury has been instructed to

6    disregard.  I am saying what you just read to me --

7    that she went to the closet and it was a .09

8    millimeter wrapped in a towel -- he read that in, you

9    objected.

10             I don't know that she answered or not.  I

11   struck that question because it was not impeaching,

12   that is what she said she did.  I didn't see any

13   impeachment there.

14             That has been stricken so I don't know where

15   that leaves it.  All I am saying is that was stricken.

16        MR. MAREK:  You are right, Judge.

17

18                  (Whereupon the trial was resumed in

19                   open court in the presence of the

20                   jury.)

21

22        MR. MAREK:  Your Honor, we have no further

23   questions of this witness.

24        THE COURT:  Very well.  You may step down.

112

JGS_MAYSONET 4263
GONZALEZ 0169979

1              (Witness excused.)

2      MR. MAREK:  May we approach?

3      THE COURT:  Sure.

4

5                    (Whereupon, a discussion was held

6                     off the record.)

7

8      THE COURT:  Ladies and gentlemen, I have just had

9  a conversation with the attorneys.  The next witness

10  does have to come over from the other building.

11          If you have experienced those elevators you

12  have some sense that may be ten minutes or so.  Rather

13  than having you sit there under the hot lights let

14  them stretch their legs a little bit.

15          We will be coming back quickly.

16

17                    (Whereupon a recess was taken.)

18

19                    (Whereupon the trial was resumed in

20                     open court.)

21

22      THE COURT:  Everyone please be seated.

23          State, proceed.

24      MR. LEIGHTON:  At this time People would call Det.

113

JGS_MAYSONET 4264
GONZALEZ 0169980

```
 1    Ray Guevara.

 2           May I proceed, your Honor.

 3       THE COURT:  Yes, you may.

 4

 5       D E T.   R E N A L D O   G U E V A R A,

 6

 7    called as a witness by the State's Attorney herein,

 8    having been first duly sworn, was examined and

 9    testified as follows:

10

11                    DIRECT EXAMINATION

12                    By: MR. LEIGHTON

13

14       Q.   Sir, tell the ladies and gentlemen of the

15    jury your name and spell your last name for the court

16    reporter.

17       A.   Det. Renaldo Guevara, G-u-e-v-a-r-a; Star No.

18    is 20861.

19       Q.   What is your occupation?

20       A.   My occupation is a Detective for the Chicago

21    Police Department, Area 5, Violent Crimes.

22       Q.   How long have you been a Chicago Police

23    Officer?

24       A.   Approximately 20 years.
```

114

JGS_MAYSONET 4265
GONZALEZ 0169981

1    Q.   How long have you been a detective assigned
2    to Area 5, Violent Crimes?
3    A.   Two years.
4    Q.   Where were you assigned before you were in
5    Area 5, Violent Crimes?
6    A.   I was assigned as an investigator to the Gang
7    Crime Unit.
8    Q.   That is Gang Crimes North?
9    A.   That is correct.
10   Q.   Now, I am going to direct your attention to
11   August 22, 1990.
12        Were you a detective assigned to Area 5,
13   Violent Crimes on that date?
14   A.   Yes, I was.
15   Q.   Did you receive an assignment?
16   A.   Yes, I did.
17   Q.   And what was that assignment?
18   A.   The assignment was the double homicide of the
19   Wiley brothers.
20   Q.   Now what watch were you working on that day?
21   A.   I was working the third watch.
22   Q.   Could you explain to the ladies and gentlemen
23   of the jury what watch that was?
24   A.   Third watch is -- Some shifts start at 3:00

115

JGS_MAYSONET 4266
GONZALEZ 0169982

1   to 11:30 and others start at 4:30 to 1:00 o'clock in

2   the morning.

3        Q.   So that is 3:30 in the afternoon?

4        A.   That is correct.

5        Q.   Now, directing your attention to August 22,

6   1990, did you have occasion to interview an individual

7   at Area 5, Violent Crimes?

8        A.   Yes, I did.

9        Q.   And who was that individual?

10       A.   Jose Maysonet.

11       Q.   After you had that conversation -- Strike

12   that.

13            Directing your attention to about 9:00 p.m.

14   on August 22, 1990, did you -- did anyone else come to

15   Area 5, Violent Crimes?

16       A.   Yes.

17       Q.   Who is that?

18       A.   The common-law wife of Jose Maysonet.

19       Q.   What was her name?

20       A.   Rosa, don't remember her last name.

21       Q.   Could it be Rosa Bello?

22       A.   Correct.

23       Q.   After you spoke to -- Strike that.

24            After you had interviewed Jose Maysonet did

JGS_MAYSONET 4267
GONZALEZ 0169983

1    you have occasion to interview Rosa Bello?

2        A.   Yes, I did.

3        Q.   After you interviewed Jose Maysonet and Rosa

4    Bello what if anything did you do?

5        A.   After the interview Jose Maysonet told us

6    that he --

7        MR. WIENER: Objection.

8        THE COURT:  Sustained.

9    BY MR. LEIGHTON:

10       Q.   Without relating the substance of the

11   conversation from Jose Maysonet what if anything did

12   you do?

13       A.   Okay.  We went out -- We went out on the

14   street to find out where two of the subjects lived.

15       Q.   Did you go out on the street with anyone

16   else?

17       A.   Yes.

18       Q.   Who was that?

19       A.   Maysonet.

20       Q.   And was another detective with you?

21       A.   Yes.

22       Q.   And who were you looking for at that time?

23       A.   At that time we were looking for Alfredo

24   Gonzalez and Fro.

JGS_MAYSONET 4268
GONZALEZ 0169984

```
 1        Q.   Do you know Fro's real name?

 2        A.   I believe it is Hernandez at this point.  I

 3   am not for sure now.

 4        Q.   Did Jose Maysonet direct you anywhere?

 5        A.   Yes.

 6        Q.   Where did he direct you?

 7        A.   To the residence of where Fro was -

 8        MR. WIENER:  Objection.  This calls for a hearsay

 9   answer.  It is nonverbal.

10        MR. LEIGHTON:  Excuse me, counsel.  May we have a

11   sidebar?

12        THE COURT:  We don't need a sidebar.  It is

13   overruled.

14             You have to keep it very narrow, State.

15   BY MR. LEIGHTON:

16        Q.   Where if anywhere did Jose Maysonet direct

17   you?

18        A.   First he directed us to Thomas and Spaulding

19   and pointed out a house there.  He said, "This is

20   where Fro lives."

21        MR. WIENER:  Objection to what he said.

22        THE COURT:  Sustained.

23             Please admonish the witness that he may not

24   talk about what someone else said.
```

118

JGS_MAYSONET 4269
GONZALEZ 0169985

BY MR. LEIGHTON:

Q.   Without getting into the conversation, the actual conversation with Maysonet, after he -- he directed you to that location and did he direct you anywhere else?

A.   Yes.  From there we went on to Kedzie and showed us another place.

Q.   What was your purpose in going to that location?

A.   To find out where Fro and Alfredo Gonzalez lived.

Q.   While you were out in the car with Jose Maysonet did you observe anyone in the street?

A.   Yes, I did.

Q.   Who was that?

A.   I observed Alfredo Gonzalez standing on the corner of LeMoyne and Spaulding.

Q.   Now, take a look around the courtroom.

Do you see that individual here in court today?

A.   Yes, I do.

Q.   Would you point to him, describe what he is wearing for the record?

A.   He is the gentlemen over there with the white

119

JGS_MAYSONET 4270
GONZALEZ 0169986

1    turtleneck.

2       Q.   At that time did you take Alfredo Gonzalez

3    into custody?

4       A.   No, I did not.

5       Q.   Why not?

6       A.   Because I didn't want Alfredo to see

7    Maysonet.

8       Q.   What did you then do?

9       A.   Proceeded to Area 5.

10      Q.   When you got to Area 5 what did you do then?

11      A.   Area 5, showed some photos to Maysonet.

12      Q.   Without relating what Maysonet told you what

13   is the next thing you did after you took Maysonet back

14   to Area 5?

15      A.   Showed him some photos to get the identity.

16      MR. WIENER:  Objection.  For the witness --

17      THE COURT:  Sustained.

18           Mr. Witness, if you would just answer what is

19   asked, precisely what is asked.

20   BY MR. LEIGHTON:

21      Q.   After you returned to Area 5 did you

22   subsequently leave Area 5?

23      A.   Yes, I did.

24      Q.   And where did you go?

120

JGS_MAYSONET 4271
GONZALEZ 0169987

1    A.    Went around looking with Maysonet.    Went

2    around looking for Gonzalez, Fro, or Justino Cruz.

3         Q.    I am going to direct your attention to August

4    23, 1990.    Did you return to work?

5         A.    Yes, I did.

6         Q.    What hours were you working?

7         A.    Same hours; from 3:00 to 11:30.

8         Q.    Are you aware of whether or not Alfredo

9    Gonzalez was in custody at Area 5, Violent Crimes at

10   that time?

11        A.    Yes.    I was aware he was in custody.

12        Q.    Directing your attention to August 23, 1990,

13   to before -- shortly before 11:00 p.m. did you have

14   occasion to observe anyone else on the street?

15        A.    Yes, I did.

16        Q.    Who was that?

17        A.    Justino Cruz.

18        Q.    Did you subsequently bring Justino Cruz back

19   to Area 5, Violent Crimes?

20        A.    Yes, I did.

21        MR. LEIGHTON:    May I have one moment?

22                    (Brief pause.)

23   BY MR. LEIGHTON:

24        Q.    Did you ever actually find Alfredo Gonzalez?

121

1    A.   No, I did not.

2    Q.   Do you know who did?

3    A.   Yes, I do.

4    Q.   Who?

5    A.   It was Det. Gawrys and Sgt. Mingey.

6    MR. LEIGHTON:  One moment, Judge.

7

8             (Brief pause.)

9

10   MR. LEIGHTON:  Nothing else, your Honor.

11   MR. WIENER:  I have no questions of this witness.

12   THE COURT:  Very well, sir.  You may step down.

13          (Witness excused.)

14   THE COURT: Off the record.

15

16          (Whereupon, a discussion was

17          held off the record.)

18

19   THE COURT:  Ladies and gentlemen, we have

20  conferred relative to scheduling.  We are going to

21  conclude the testimony for today.

22       The State indicates the next witness is

23  likely to be lengthy and it being late in the

24  afternoon our concern is that might run a while and

JGS_MAYSONET 4273
GONZALEZ 0169989

1    get you out pretty late. Based on that we are going to

2    recess for this evening.

3            I need for you to be back at 10:45 tomorrow

4    morning.

5            Now of course the admonitions that were given

6    to you last night are much more meaningful. You have

7    heard substantial testimony and seen exhibits. You may

8    not under any circumstances discuss this case with

9    anyone, including each other.

10           You are not to even discuss it among yourself

11   at this time.  That won't come until the end of the

12   case.  Don't allow anyone to discuss it with you or in

13   your presence.

14           Again, should there be any media coverage you

15   may not look at it, listen to it or read it.

16           Have a good evening.  See you tomorrow

17   morning at 10:45.

18

19                       (Which were all the proceedings had

20                        at the hearing of the above-entitled

21                        cause.  At which time case was

22                        continued to March 27, 1992.)

23

24

JGS_MAYSONET 4274
GONZALEZ 0169990

```
1    STATE OF ILLINOIS  )
                        )
2    COUNTY OF COOK     )

3
                  I, ROCHINA V. CHOLEWA, Official
4
5    Court Reporter of the Circuit Court of Cook County,
6    County Department-Criminal Division, do hereby certify
7    that I reported in shorthand the proceedings had in the
8    above-entitled cause, that I thereafter caused to be
9    transcribed into typewriting the above Report of
10   Proceedings, which I hereby certify is a true and
11   correct transcript of the proceedings had before the
12   Honorable HALL MORGAN, Judge of said Court.

13
14
15
16                   Official Court Reporter of the
17                   Circuit Court of Cook County
18
19
20
21
22
23
24
```

124

JGS_MAYSONET 4275
GONZALEZ 0169991

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 24

```
 1  STATE OF ILLINOIS  )
                       )    SS.
 2  COUNTY OF C O O K  )

 3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
    THE PEOPLE OF THE  )
 5  STATE OF ILLINOIS  )
                       )    Case No. 92-10146
 6      VS             )
                       )    Before JUDGE LORETTA H. MORGAN
 7  JOSE MAYSONET,     )              (And a Jury)
    CHRISTOPHER GOSSENS)
 8                          AUGUST 9, 1995

 9
        Court convened pursuant to adjournment.
10
        Present:
11
            HONORABLE JACK O'MALLEY,
12              State's Attorney of Cook County, by
            MR. FRANK MAREK, and
13          MS. ELLEN MANDELTORT,
                Assistant State's Attorneys,
14              appeared for the People;

15          MR. RICHARD BEUKE,
                appeared for the defendant Maysonet,
16
            MR. RANDY RUECKERT,
17              appeared for the defendant Gossens.

18

19

20

21

22

23  Paul P. Marzano, CSR, RPR
    Official Court Reporter
24  2650 S. California, Room 4C02
    Chicago, IL  60608


                        N-1
```

FILED

MAR 1 5 1996

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

MAYSONET 537

&

1
2                          I N D E X
3
4  DATE:   8/9/95
5
6  PAGES:   N-1 through N-200
7
8  Jury Trial
9
10  Opening Statement by:
11           Ms. Mandeltort.....43
12           Mr. Beuke.......48
13
14                         DX        CX        RDX
15
16  WILMAN DONES           63        72
17
18  JOHN BUTLER            89        110
19
20  BARRY LIFSCHULTZ       123       141       151
21
22  ERNEST WARNER          153       163
23
24  FERNANDO MONTILLA      173


                         N-2


MAYSONET 538

```
 1                         (The following proceedings

 2                         were had out of the

 3                         hearing of the jury:)

 4      MS. MANDELTORT:    Judge, counsel indicated to

 5 me that he attempted to serve Doctor Thampi who was

 6 listed as a Defense witness yesterday to testify.

 7          Apparently, Doctor Thampi has some sort of

 8 conflict in court testifying tomorrow, but we had a

 9 motion that we think might need to be resolved which

10 would obviate that whole issue.

11          My understanding is that the defendant was

12 examined by Doctor Thampi pretrial for the purpose of

13 determining whether the defendant could understand

14 Miranda.

15          The doctor's one-page report that's in the

16 court file indicates that the defendant is able to

17 understand Miranda, but understands it better if it's

18 read to him in English.  Our position is--

19      MR. BEUKE:    Spanish.

20      MS. MANDELTORT:    I'm sorry, in Spanish.  Our

21 position is that's been litigated.

22      THE COURT:    Now, is it he understands it

23 better, or is he more comfortable?

24      MR. BEUKE:    Well, I'll get the report, Judge.
```

N-3

1 I´ll get the report.

2     MS. MANDELTORT:    But the point that´s in

3 issue, that´s already been litigated by this Court.

4     MR. BEUKE:    Wait for me.

5     MS. MANDELTORT:    The next motion -- I am

6 sorry.  What does the report say?

7     MR. BEUKE:    Here´s what the report says.  Dear

8 Judge Morgan:  Pursuant to your Honor´s order, the

9 undersigned psychiatrist examined the above defendant

10 on March 11, 94.

11         On the basis of the current examination,

12 Mr. Maysonet has the capability of understanding his

13 Constitutional parenthesis Miranda rights if they

14 were read to him in Spanish.  I´m unable to determine

15 his level of understanding English.

16         This examination found no significant

17 evidence of mental retardation.  IQ testing done at

18 age 16 found him to be operating in the normal

19 parenthesis below average range.

20         So, I think what Doctor Thampi would be

21 testifying to is that in his opinion, based on his

22 conversation and his examination with the defendant,

23 he can understand his Miranda rights if they´re read

24 to him in Spanish.  Now, the issue --

N-4

1      MS. MANDELTORT:    My problem is the doctor says

2  he can´t give an opinion as to whether he can

3  understand them in English, and we have an English

4  court-reported statement.

5          I mean, I don´t understand how this is

6  going to resolve any issue for the jury.  The

7  defendant -- I mean--

8      MR. BEUKE:    Well, Judge--

9      THE COURT:    Wait, wait, wait.

10     MR. BEUKE:    Okay.

11     THE COURT:    When the statement was taken --

12 because I don´t really remember this motion -- when

13 the statement was taken, okay, I want to be sure I´m

14 understanding what happened.  Somebody read him his

15 Miranda rights in Spanish?

16     MS. MANDELTORT:    No.

17         When he was first interviewed by -- he was

18 interviewed several times.

19     THE COURT:    Okay.

20     MS. MANDELTORT:    The officers spoke to him in

21 both, English and Spanish, and the officer will

22 testify he appeared more comfortable in Spanish so

23 most of the the conversation was in Spanish, although

24 he did speak in English as well.

N-5

MAYSONET 541

1       When they get to the court-reported

2  statement, that was all done in English.  The state's

3  attorney doesn't speak Spanish.  He gave him his

4  rights in English and spoke to him in English, and

5  the defendant responded in English throughout the

6  entire court-reported statement.

7       THE COURT:  Okay.  He responded in English?

8       MS. MANDELTORT:   Yes, you don't take

9  court-reported in foreign languages.  It's an English

10 court-reported all around.

11      THE COURT:   All right.

12      I would guess -- because I really don't

13 remember -- that there was nothing in that

14 court-reported statement or any of his responses to

15 questions put to him that were bizarre or weird?

16      MS. MANDELTORT:   No.

17      THE COURT:  Or give any indication that he did

18 not comprehend?

19      MS. MANDELTORT:   No, not at all.

20      THE COURT:  See, I think you can bring out --

21 you can probably bring it out on cross-examination.

22 I don't see what Doctor Thampi adds.

23      You can certainly bring out the fact

24 that -- I guess the cops said he appeared to be more

<center>N-6</center>

1  comfortable?

2      MS. MANDELTORT:    Yes.   They are going to

3  testify to that on direct.

4      THE COURT:    They are going to have the

5  statement.   You can certainly argue, did he really

6  understand.

7          I mean, you can argue that.   But it seems

8  to me that if you are -- I don´t see what Thampi´s

9  report adds frankly.

10     MR. BEUKE:    Judge, all we would be seeking to

11 introduce is Thampi, or to put Thampi on the witness

12 stand to testify to the fact that he spoke with

13 Maysonet, spoke to him, examined him, conducted

14 whatever examinations he did in order to come to an

15 opinion.   And in his opinion, based upon the report

16 that we have, he is capable of understanding Miranda

17 rights when they´re read to him in Spanish.

18          That completely contradicts how this

19 court-reported statement was taken by the state´s

20 attorney in this case.   Whether or not the state´s

21 attorney spoke Spanish I don´t think is of any

22 relevance in this case.   There are certainly state´s

23 attorneys in the office who speak Spanish.

24     THE COURT:    I don´t see the contradiction.

N-7

MAYSONET 543

1  What's the contradiction?

2      MR. BEUKE:    Well, Judge, the contradiction is

3  that the jury in this case -- and as I understand the

4  State's case, they are going to basically present to

5  this jury a statement only case.   There will be a

6  series of oral statements that will come in through

7  police officers who will testify.

8      THE COURT:    Right.

9      MR. BEUKE:    Who converse in Spanish.

10     THE COURT:    I assume the person who took the

11 statement is going to testify.   You will be at

12 liberty to cross-examine.

13     MR. BEUKE:    What I'm saying, Judge, is when it

14 comes down to the jury making a decision as to

15 whether or not they believe this court-reported

16 statement -- and that will be the only physical

17 document that they're probably going to have in front

18 of them -- I think it's important, at least in our

19 defense, for the jury to know that a psychiatrist has

20 examined him.

21         And when he's given these Miranda rights in

22 English, I believe that that psychiatrist's opinion

23 would be that he may not be able to understand those

24 Miranda rights, when they're given to him in English,

N-8

1  and those are fundamental to somebody giving a

2  knowing and voluntary statement.

3         You know, understanding your Miranda rights

4  is fundamental, and that´s why they´re given at the

5  beginning of every statement, and this jury has to

6  make a decision if that statement is voluntary.

7      THE COURT:   No, they don´t.  I made that

8  decision.

9      MR. BEUKE:   You did for--

10     THE COURT:   I made that decision.

11     MR. BEUKE:   You did for the purpose of the

12 pretrial motion.

13     THE COURT:   That´s right, and there´s been a

14 legal finding around that.

15         If you are talking about all of the

16 circumstances, certainly they are entitled to

17 consider all of the circumstances under which it was

18 taken.

19     MR. BEUKE:   Okay.

20     THE COURT:   You can certainly cross-examine.  I

21 don´t have any problem with that.

22         The thing that concerns me, as I said, he

23 can say anything he wants, but I think if you are

24 talking -- what´s Thampi going to say?  He

                        N-9

1  understands -- that he understands his Miranda?

2      MR. BEUKE:    In Spanish, Judge.   That's what

3  he's going to say.

4      MS. MANDELTORT:    The other problem is you are

5  trying to get it in through the back door.

6          I have no problem if the defendant wants to

7  testify he doesn't understand his Miranda rights.

8  But the point is, you are trying to kind of do it

9  through the back door what you are choosing not to do

10 through the front door.

11     MR. BEUKE:    Well, Judge, once again, I don't

12 know if I'm going to call the defendant or not.

13 That's a decision--

14     THE COURT:    But that's your choice.

15     MR. BEUKE:    That decision has not been made.

16     THE COURT:    There are some things you can only

17 get in through the defendant.

18     MR. BEUKE:    So I'm clear, Judge, are you

19 telling me if I put the defendant on and he testifies

20 he didn't understand his Miranda rights when they

21 were given to him by the state's attorney in English,

22 then you'll allow me to call Thampi to testify that

23 in his opinion, consistent with his report, that he

24 would not be able to understand his Miranda rights

                          N-10

1 unless they were in, you know, read to him in

2 Spanish?

3     THE COURT:   I don´t understand why this is

4 being relitiated, this issue.

5     MS. MANDELTORT:   Can I interject one thing?

6        Just so the record is clear, the State´s

7 position is he speaks English.  I mean, the court

8 personnel have heard him speak English.

9     THE COURT:   You have a rebuttal case.

10     MS. MANDELTORT:   I´m saying the defendant has

11 represented to Doctor Thampi that he does not speak

12 English, which is not a hard thing to do.  We are

13 misleading the jury.

14     THE COURT:   Right.

15        But I don´t think that´s the issue.  If the

16 State wants to meet that issue in rebuttal, you have

17 an opportunity to do that.  You can put on people to

18 say they had a conversation with him, and he doesn´t

19 seem to have any problem.

20     MR. BEUKE:   Sure.

21     THE COURT:   Okay?

22        What I don´t want to do is I don´t want

23 this jury relitigating the motion to suppress.

24 That´s what I don´t want to happen.

N-11

MAYSONET 547

1    MR. BEUKE:    I think I understand.

2    THE COURT:    So, if you're talking about putting

3 Doctor Thampi on and he just kind of comes out with

4 this, that just kind of bothers me.

5    MR. BEUKE:    Judge, I think I understand -- I

6 understand your Honor's ruling, that the purpose of

7 the motion to suppress is for you to determine

8 whether or not the statement was voluntarily given.

9    THE COURT:    As a legal finding.

10    MR. BEUKE:    As a legal finding.

11    THE COURT:    Right.

12    MR. BEUKE:    I agree with the Court's analysis

13 of that.

14    THE COURT:    I'm not saying that you can't

15 attack the circumstances under which it was made, but

16 I don't think it's appropriate for--

17    MR. BEUKE:    That's what I would be doing,

18 Judge.  That's what I would be doing, Judge.

19        I would be attacking the circumstances

20 under which the statement was made, by virtue of the

21 fact that the Constitutional rights that are given to

22 Mr. Maysonet by the state's attorney are given to him

23 in English and not in Spanish at the most crucial

24 time and during the most crucial conversation that

N-12

MAYSONET 548

1 he's going to have in this case.

2     THE COURT:   You can certainly argue that.   You

3 can certainly argue that because it seems to me you

4 are going to bring out in the State's case -- this

5 issue is going to come out in the State's case, I

6 would think.

7     MR. BEUKE:    I think so.

8     THE COURT:   And in terms of you having a basis

9 to argue and maybe if I knew, what is it you expect

10 Thampi to say other than what's in this report?

11     MR. BEUKE:    Judge, I fully expect him to

12 testify consistently with this report, and that's

13 just it, that he -- he has the capability of

14 understanding his Constitutional rights if they are

15 read to him in Spanish.

16     THE COURT:   Maybe, what I'm going to do is

17 this.  The issue of whether or not he understood what

18 was going on, around the language issue, it seems to

19 me is going to come up.  It's clearly going to come

20 up.

21     MR. BEUKE:    Hmm, hmm.

22     THE COURT:   What I'm going to do is I'm going

23 to -- when you get a chance to talk to Thampi and

24 somebody make me a specific proffer about -- I mean,

N-13

MAYSONET 549

1 that report is not exactly expansive.

2      MR. BEUKE:    I understand, Judge.

3      THE COURT:    I´m going to reserve ruling on

4 that.

5      MR. BEUKE:    Okay.

6      THE COURT:    What I´m saying, I don´t know that

7 that impedes either side from touching on that, that

8 issue in opening.  It seems it will come out whether

9 or not if Thampi testifies.  I´m not really trying be

10 difficult, Rick.

11      MR. BEUKE:    I understand.

12      THE COURT:    There´s a very strange interplay

13 there.

14      MR. BEUKE:    Okay.

15      THE COURT:    I´m concerned about it.

16      MR. BEUKE:    All right.

17      THE COURT:    So, maybe the thing to do would be

18 to find out with some precision whether Thampi was

19 talking to him through an interpreter.

20      MR. BEUKE:    Okay.

21      THE COURT:    I mean, how he arrived -- how did

22 he arrive at that conclusion; I have no idea.

23      MR. BEUKE:    All right.

24      MS. MANDELTORT:    Judge, the other motions in

N-14

MAYSONET 550

```
 1  limine that the State has, as the Court knows, there
 2  were two other defendants that have been resolved.
 3          I would make a motion in limine --
 4  obviously, we are going to bring in the fact they
 5  were arrested for this offense as part of the
 6  investigation, but no reference to what the ultimate
 7  disposition was as to Justino Cruz and Mr. Gonzalez.
 8  Mr. Gonzalez, as the Court knows, is doing natural
 9  life, and Mr. Cruz is doing 22 years.  I have a
10  motion in limine that their dispositions not be
11  referred to.
12      MR. BEUKE:   I'm going to ask that -- I don't
13  have any problem with the fact that they were
14  arrested in this case.
15          I'm going to ask the Court not to allow any
16  reference to the fact they were even charged in this
17  case.  You know, not only do I not want dispositions
18  in, I don't have a problem with that.
19      THE COURT:   I don't see any reason for that to
20  come out.  It seems to me that their names cannot
21  help but come up in the testimony of this case.
22      MR. BEUKE:    Sure.
23      THE COURT:   And that they were, in fact,
24  arrested.  I mean, what else?
```

N-15

MAYSONET 551

1    MS. MANDELTORT:    Okay.

2    THE COURT:    So, your motion is -- both of your

3  motions, your joint motion is granted.

4    MR. BEUKE:    Okay.

5    THE COURT:    I think it would be difficult to

6  excise them completely from the case.

7    MS. MANDELTORT:    All right.

8    THE COURT:    The other reality is at least one

9  of the other defendants is going to be sitting out

10 there.  So, obviously they are going to understand

11 where he is.

12   MR. BEUKE:    Judge, will you -- had you planned

13 to let the jury know?

14   THE COURT:    I will tell them who he is, and

15 they are not concerned with that.  That case is being

16 heard by the Court and to be concerned only--

17   MR. BEUKE:    Okay.

18   THE COURT:    -- with Mr. Maysonet.

19   MR. BEUKE:    All right.

20   MS. MANDELTORT:    The other thing, we had a

21 motion in limine yesterday.

22        Counsel was referring to the other incident

23 that the defendant was in custody on.

24        My understanding from Mr. Beuke is he

N-16

1  wanted to refer to that as an unrelated incident

2  involving a gun, and that kind of evolved into an

3  incident unrelated to this incident, and I think if

4  he could make his position clear, and we could make

5  our position clear.

6      THE COURT:   I read some case law on this last

7  night.

8      MR. BEUKE:   I´m asking the Court -- and I

9  guess seeking your guidance in this.

10         I would prefer, after giving it some

11 thought myself, to just have that referred to as an

12 unrelated incident that he was in custody on.

13         It´s going to come out during the course of

14 the State´s case.  My understanding is that Mr.

15 Maysonet was in Area 5 on an unrelated attempt murder

16 that involved a nine millimeter shooting.

17     THE COURT:   Yeah.

18     MR. BEUKE:   While he was there on July 15,

19 he´s questioned about this double murder, and he

20 gives a statement to a detective and a sergeant about

21 this double murder.

22         The detective and the sergeant go to visit

23 him at the jail two weeks later to question him about

24 the double murder.  And he is -- you know, the jury

N-17

1 is going to know that obviously the conversation

2 occurs at the jail. He's in custody for something.

3          I just have some problem with telling the

4 jury that the offense that he was in custody on was

5 an incident involving a gun, involving a shooting,

6 involving a nine millimeter.

7          I think given the facts of this case, I

8 just think that's some real dangerous waters to tread

9 on.  I'm going to ask that it be referred to as an

10 unrelated incident.

11     MS. MANDELTORT:    I understand counsel's

12 concern, and I obviously have a concern for the

13 record.

14          However, the problem you got is it was the

15 nine millimeter that made them want to talk to Jose

16 Maysonet.  I mean, otherwise the jury is not going to

17 know why.  He's just sitting there in the jail, and

18 they decide to talk to him.

19     THE COURT:    Well, over the lunch hour

20 yesterday, I was sitting here reading the new advance

21 sheet, and there is a case in that new advance sheet

22 that really raises the question about bringing out

23 that he was in custody on another matter.

24          I paused over that because it seems to me

N-18

1  had he at the point at which this all began -- let me

2  just get this straight.  Based upon this case that I

3  read last night -- the issue of the nine millimeter

4  first came up, that was in Area 5, is that right?

5      MS. MANDELTORT:    Judge, I´ll give you a brief

6  breakdown of what happened, okay?  This shooting, the

7  murders happened on May 25.

8      THE COURT:    Okay.

9      MS. MANDELTORT:    On July 3, there is a

10  shooting of three other individuals with a nine

11  millimeter weapon.

12      THE COURT:    Okay.

13      MS. MANDELTORT:    Okay.

14          On July 15, he is in custody in Area 5 for

15  questioning or under arrest actually for the other

16  three shootings on July 3 involving a nine

17  millimeter.

18      THE COURT:    Okay.

19      MS. MANDELTORT:    The cops basically say we got

20  a nine millimeter shooting here.  This is just a few

21  blocks away, not that long ago.  Let´s see if he

22  knows anything about the murder.

23          He then, at that time, says he has

24  knowledge.  They came by his house.  They wanted the

N-19

1  gun.  He was holding it.  He gave them the gun, but

2  did not give them any other information, at that

3  time.

4       THE COURT:    They go by his house.  He's out of

5  custody now?

6       MS. MANDELTORT:    No.  He says that these

7  individuals came by his house.

8       THE COURT:   Oh, okay.

9       MS. MANDELTORT:  He supplied the gun.  He later

10  learned of the shooting.

11       THE COURT:   Okay.

12       MS. MANDELTORT:    Okay.  He wouldn't give any

13  other information.  He says he knew the names of

14  them, wouldn't give it to them.

15       MR. BEUKE:   Just so it's clear, that shooting

16  is the double murder that he's talking about?

17       MS. MANDELTORT:    Right.

18       THE COURT:   Okay.

19       MS. MANDELTORT:    Okay?

20       THE COURT:   Okay.

21       MS. MANDELTORT:    Then on August 1, they go to

22  the jail.  They talk to him again.

23            At that point, he says he was involved in

24  those murders.  He was not the shooter, but he was

N-20

1 present.  He knew the other people that were

2 involved.

3         The problem you get into, he says he won´t

4 cooperate unless you get me out of jail, and they say

5 we are not getting you out of jail, see you later.

6 He then makes bond on this other case.  That´s when

7 Paulnitsky picks him up.

8     THE COURT:   Yeah.  I tell you what the problem

9 is.

10    MS. MANDELTORT:    Okay.

11    THE COURT:   Because that essentially -- how can

12 I put it?

13         I mean, it is proof of other crimes, okay?

14 It is proof of other crimes.

15         One of the things that this case said was

16 how far does the exception go that talks about the

17 course of investigation to explain why the police did

18 what they did?

19         And it really said, you have to be very

20 careful about that when you´re talking about the

21 defendant -- not talking about other witnesses -- but

22 when a defendant is in custody and you bring out the

23 fact that he´s, in fact, charged or in custody on

24 some other case.

N-21

1          So, what I began thinking about was -- they
2  have a right to bring out how they ever got to this
3  in the first place, but the question becomes how
4  critical is it to say he´s in custody on an unrelated
5  incident.
6       MS. MANDELTORT:    Can I say something?
7       THE COURT:    I mean, I don´t know we have get
8  into the fact he was under arrest for something else.
9       MS. MANDELTORT:    As to July 15, that´s not a
10 problem.  We can say he´s at Area 5 in regards to
11 another incident.  That´s not a problem.  The problem
12 is when you get to the fact he won´t give them any
13 information unless they get him out.
14      THE COURT:    But they didn´t, so what´s the
15 point?
16      MR. MAREK:    That´s part of the motive for him
17 to later, and I think the Defense is going to go into
18 this, too.  I think the whole thing is going to come
19 out.
20      THE COURT:    I think there´s ways for each of
21 you -- they are going to bring it out?  I think it
22 can be dealt with.  I just think we have to think
23 this through carefully, particularly since it would
24 appear that this other incident -- this involves a

                        N-22

1   nine millimeter.  Do you understand what I'm saying?

2      MR. BEUKE:   Yes, Judge.

3      THE COURT:   Because it would be very hard for

4   that not to be used substantively, and that's the

5   problem.  To say that he's charged and in custody on

6   another case involving a nine millimeter, I just

7   don't know how you could ever expect -- even in this

8   case, where there had been a limiting instruction.

9      MS. MANDELTORT:   Okay.

10     THE COURT:   The Court took the view -- and I

11  think that's true.  I mean realistically, I don't

12  know how you would ever claim that they wouldn't use

13  that substantively.

14     MS. MANDELTORT:   Could I do this?

15     THE COURT:   That's the problem.

16         I'm trying to make clear what that case saw

17  the problem as because of the peculiar linkage.  Do

18  you understand what I'm saying, Frank?

19         And they are saying a limiting instruction,

20  number one, that it was beyond what was ever intended

21  for the course of investigation scenario, and it's

22  very difficult, even with the limiting instruction,

23  to prevent them from using it substantively.

24     MS. MANDELTORT:   Would this appease the

                          N-23

1  Court?  I would have to lead the officer on a lot

2  there, just to make sure nothing came out about July

3  15.  Were you aware of an unrelated incident that had

4  taken place in the area?

5        This is like five blocks away from 3428

6  West North Avenue.  Were you aware that Jose Maysonet

7  was being questioned in regards to that other

8  incident?  Did you then begin to question him about

9  this case?

10       THE COURT:   I don´t see how that solves the

11  problem.

12       MS. MANDELTORT:   How does it not solve the

13  problem?  You don´t know whether he is in the area as

14  a witness or--

15       MR. MAREK:  He´s not in custody.

16       MR. BEUKE:   Judge, the next conversation that

17  they have with him is in the Cook County Jail.

18       MS. MANDELTORT:   No.  We won´t put in where

19  that second conversation takes place.

20       MR. BEUKE:   I think two and two is going to

21  get this jury four.  He´s in Area 5 being spoken to

22  about one incident.  Two weeks later, he´s in the

23  Cook County Jail.

24       MS. MANDELTORT:   What I´m saying is that then

N-24

1 do you talk to him on July 15?

2     THE COURT:   People -- they conduct

3 investigations and talk to people all the time.

4         They don't have to have been in custody to

5 have been talked to.  It seems to me, you know, did

6 you have occasion to discuss -- during the course of

7 an investigation of an unrelated situation, did you

8 have an occasion to talk with Mr. Maysonet?

9     MS. MANDELTORT:   Right.

10     THE COURT:   That's the question.  Yes, we did.

11 In that conversation, okay, whatever.

12     MS. MANDELTORT:   Okay.  I can solve it.

13     THE COURT:   You can do that without saying he

14 was in jail charged and all this, and another case

15 involving a nine millimeter.  That's the problem.

16     MS. MANDELTORT:   I will just say on August 1,

17 did you have another occasion to meet with him and

18 not say where they met, and at that time what did

19 they tell you about the murders and not saying

20 anything about him getting out of jail, not referring

21 to it being a jail conversation.

22     MR. MAREK:   If he testifies, he's going to

23 open up the door, I think, on a whole lot of this

24 stuff.

<center>N-25</center>

1      THE COURT:   But that´s a whole other issue.

2      MS. MANDELTORT:   That´s him bringing it in, as

3 opposed to us.

4      THE COURT:   I´m concerned about the State

5 bringing that out because I agree with that case.   If

6 it was a different gun, you know what I´m saying?

7 Because of the -- because of the nexus.

8      MR. BEUKE:   Let me tell you, Judge.

9          I have some real concerns about, you know,

10 this jury knowing that he is charged with an

11 unrelated offense.

12     MS. MANDELTORT:   I´m not putting it into--

13     MR. BEUKE:   No, but I know in my

14 cross-examination, I´m going to have -- I´m going to

15 go into the fact that he was -- they went to see him

16 in jail.  They went to see him -- I mean, I´m going

17 to, at some point, get it out.   And part of the

18 Defense--

19     THE COURT:   That´s fine.

20     MS. MANDELTORT:   Why should I be prevented?

21     MR. BEUKE:   That´s what I´m saying, Judge.

22         If we just handle it that it´s an unrelated

23 incident, that he was in custody on an unrelated

24 incident and leave it at that.


N-26

1      MS. MANDELTORT:   Judge, let me--

2      THE COURT:   I don´t think the State ought to

3 bring that out.  If you want to bring it out, that´s

4 fine.

5      MR. BEUKE:   Well--

6      MR. RUECKERT:   I guess what you´re saying, if

7 I can?

8          If you bring it up, he just doesn´t want

9 the State to come back and say, well, yeah, it was a

10 shooting, and it was a nine millimeter.

11      MR. BEUKE:   This is where I´m going, Judge.

12      MR. RUECKERT:   He wants to limit it to what

13 they can say about the charge.

14      MR. BEUKE:   These detectives know that as of

15 July 15, Maysonet was charged with this unrelated

16 incident, okay?  They know that the process is.  The

17 kid goes to jail.

18          He then appears the following day in bond

19 court.  If he doesn´t have the funds to hire an

20 attorney, he´s appointed a public defender, okay?

21      THE COURT:   Get to the point.

22      MR. BEUKE:   Okay.

23          There is a lawyer as of the next day that

24 represents Juan Maysonet.

N-27

1        When these detectives go to talk to him on

2  August 1, they don't attempt to contact or find out

3  who his lawyer is.

4        They do get him, and I'll grant that he

5  signs a consent to interview form, but my point is

6  that these detectives, you know, go to see him

7  without making any attempts, first off, to talk and

8  find out from his lawyer whether or not they want to

9  see him.

10       It further complicates itself because on

11  the day that he's arrested by Paulnitsky, he's here

12  to be arraigned on that case.  He has hired an

13  attorney.

14       We are going to put in evidence that the

15  family and Mr. Maysonet came here with an attorney

16  who they had hired, Bill Swano.

17       Swano doesn't show up at the arraignment.

18  He's arraigned.  He's told to go up to room 302,

19  which was your courtroom.

20    THE COURT:   What's the point?

21    MR. BEUKE:   Well, the point is, Judge, again

22  that there's these series of statements that are

23  going to come in, over almost a month-and-a-half

24  period of time where no attorney is allowed.

N-28

1      THE COURT:   Then, let's do it this way.

2      MR. BEUKE:   Okay.

3      THE COURT:   Because you have a right to pursue

4 whatever trial strategy you want.   The State is in a

5 different position in terms of what it's allowed to

6 do, do you understand what I'm saying?

7      MR. BEUKE:   Yes.

8      THE COURT:   Now, to cut through all this, if

9 you want to indicate on the record that because you

10 are going to delve into these issues, then you're not

11 objecting to the State bringing them out, and there

12 is an agreement as to that, that's fine.   If you want

13 to make clear that you really need this out as part

14 of your trial strategy, then that's fine.   Off the

15 record a minute, Paul.

16                          (A discussion was had off

17                           the record, after which

18                           the following proceedings

19                           were had:)

20      THE COURT:   On the record.

21      MR. BEUKE:   Judge, just so the record is

22 clear, what I'm asking the Court to do -- and I'm

23 going to concede the fact that based upon the

24 evidence as I understand it, it's going to come out

                        N-29

1  that my client was in custody as of July 15 and

2  remained in custody in the county jail when at least

3  one other conversation was had with him by two Area 5

4  detectives.

5      THE COURT:   Okay.

6      MR. BEUKE:   I´m going to go into that.

7          I´m going to ask to be allowed to go into

8  that about the charging process, the court process,

9  the officer´s understanding of that process and the

10  attorney process in terms of a defendant having an

11  attorney at the various stages of that preliminary

12  hearing process.

13     THE COURT:   I don´t know how you are going to

14  do that through a cop.

15     MR. BEUKE:   Well, Judge, I mean, these police

16  officers go to court everyday.  I think Detective

17  Montilla can certainly testify that Mr. Maysonet was

18  in custody on this unrelated incident.  He was at the

19  county jail.

20     THE COURT:   Hmm, hmm.

21     MR. BEUKE:   He understands the process to be

22  that.

23     THE COURT:   It´s not what he understands the

24  process to be.

N-30

1    MR. BEUKE:    Well, but here's the other

2 problem, Judge.

3        I have a -- I have a client who, at that

4 particular point in time, was represented -- well, he

5 was represented initially by one attorney, a Mr.

6 Abrams, and then by another attorney who substituted

7 in for Mr. Abrams, Mr. Swano.

8        Now, we all know that Mr. Swano has been

9 found--

10    THE COURT:    How is that coming in?

11    MR. BEUKE:    Well, Judge, here's my problem.

12    THE COURT:    Who's going to--

13    MR. BEUKE:    If you won't let me get it in

14 through the police officer, okay, that when a

15 defendant -- the likelihood is that -- and I got the

16 dates the defendant appeared in court on July 16 when

17 the defendant--

18    THE COURT:    I'm not going to let somebody talk

19 about likelihood.  You can talk about what happened

20 in this case, but what's likelihood?

21    MR. BEUKE:    Well, but I got a defendant who at

22 the time was represented by an attorney who's now

23 been convicted in federal court and is in federal

24 custody and will not be able to come in and testify

N-31

1  about his representation of this defendant.

2      THE COURT:   I don't think it's appropriate for

3  an officer to start talking about what he understands

4  that process to be because what he understands--

5      MR. BEUKE:   Can I ask him, Judge, if he

6  believed at the time that he went to speak with him

7  that Mr. Maysonet had an attorney?

8      THE COURT:   You can ask him that.

9      MR. BEUKE:   Okay.

10         And if he believed at the time that he went

11  to speak to him--

12      THE COURT:   Believed bothers me.  You should --

13  do you know whether or not he had an attorney?

14      MR. BEUKE:   But the reality of the situation,

15  Judge, is this.

16         I mean, if he didn't have a private lawyer,

17  he would have been appointed a public defender by any

18  preliminary hearing court.  If a police officer says,

19  I don't know, then, you know--

20      THE COURT:   Right.

21         But you are asking him to conjecture.

22  Maybe, he knew or didn't know.  I mean, I don't

23  know.  I think you can bring that out.

24      MR. BEUKE:   All right.


                    N-32


MAYSONET 568

1      MR. MAREK:    Judge, we'd even stipulate he was

2 represented by a private attorney--

3      MR. BEUKE:   Okay.

4      MR. MAREK:    -- on that charge.

5      MS. MANDELTORT:   When they go to talk to him

6 on the 1st, they get an attorney waiver.   He waived

7 his appearance.

8      MR. BEUKE:    Okay.

9      MR. MAREK:    We all knew that.

10      THE COURT:   I don't want some officer talking

11 about what usually happens.

12      MR. MAREK:    It would be better to just "stip"

13 to it and just do it like that, instead of going all

14 over creation.  Who knows what -- I don't know what

15 he'll say on these things.

16      MR. BEUKE:    All right.

17      MS. MANDELTORT:   Can I--

18      THE COURT:   You got that right.

19      MS. MANDELTORT:    Are you done, Rick?

20      MR. BEUKE:    Yes.

21      MS. MANDELTORT:    Am I clear now we can refer

22 to -- I got to go back to square one here as far as

23 the incident involving a nine millimeter?  That is

24 how it is to be referred to?

N-33

MAYSONET 569

 1        MR. BEUKE:    I'm asking that the nine

 2 millimeter--

 3        MS. MANDELTORT:    I'm asking she decide.

 4        MR. BEUKE:    Just so the record is clear, I

 5 don't want any reference to a nine millimeter.

 6        THE COURT:    I stand by my ruling.  You can't

 7 have it both ways.  I will say that again.

 8        MR. BEUKE:    All right.

 9        THE COURT:    When I started this whole thing, my

10 concern was him being in custody and being arrested.

11 None of that was around my concern about the nine

12 millimeter.

13        I think they got a right to bring that out

14 because that certainly is a course of the

15 investigation.  Otherwise, they just pop in there and

16 talk to him just out of nowhere?  That doesn't make

17 sense.

18        Now, whether you want to say incident

19 involving, or they had information about an incident

20 involving, but I don't want to get into it.  I mean,

21 an incident could have been anything.

22        MR. MAREK:    It could have just been a UUW.

23        THE COURT:    Exactly.  That's what I'm saying.

24 What I'm saying I don't want a shooting involving a

                         N-34

MAYSONET 570

1  nine millimeter, just another incident involving a

2  nine millimeter.

3      MS. MANDELTORT:    Judge, at that time and given

4  the hour, I don´t think we´ll get to Montilla until

5  this afternoon anyway, but I will lead him through

6  those preliminary questions.

7      THE COURT:    But also caution him so he doesn´t

8  come gushing out with something.

9      MS. MANDELTORT:    We do have two witnesses for

10 this morning before lunch, though.

11     THE COURT:    All right.  Is there anything

12 else?

13     MR. BEUKE:    No.

14                      (Whereupon, there was a recess

15                      had in the above-entitled

16                      cause, after which the

17                      following proceedings were had:)

18     THE COURT:    Bring out Maysonet and Goossens.

19 Are we ready for the jury?

20     MS. MANDELTORT:    The State´s ready.

21     MR. BEUKE:    Yes, Judge.

22     MS. MANDELTORT:    Once again, we have a motion

23 to exclude witnesses.

24     MS. MANDELTORT:    Motion to exclude witnesses.


                        N-35

1    MR. BEUKE:    We'd join in the motion.

2    THE COURT:   Very well.

3         Anyone that's going to be testifying in the

4  trial of this matter may not be present in the

5  courtroom during the testimony of any other

6  witnesses.

7         I'd also caution the spectators in the

8  Court, I don't want to hear any comments or gestures

9  or any kind of reaction to the testimony as it comes

10  in.

11        Counsels for both sides, while we are

12  waiting for the jury to be brought in, just keep in

13  mind to keep your voices up to insure that everybody

14  can hear you.

15    THE SHERIFF:  All rise for the jury.

16             (The following proceedings were

17             had in the hearing and the

18             presence of the jury:)

19    THE COURT:   Everyone may be seated.   Good

20  morning, ladies and gentlemen.   Good morning.

21    THE JURORS:   Good afternoon.

22    THE COURT:   I want to say a few preliminary

23  things to you, housekeeping matters.

24        The first is that if you would kind of pay

N-36

MAYSONET 572

1 attention and make a mental note of the seat that you

2 are now occupying because I am going to ask you to

3 keep that same seat during the duration of the

4 trial. It just makes it easier for the Court and

5 easier for the parties.

6         The second thing I want to say to you of a

7 housekeeping nature is the law in the State of

8 Illinois now provides that jurors may take notes as

9 the evidence is coming in. That has not always been

10 the rule, but it is now the rule. I just want to

11 caution you about a couple of things in terms of

12 taking notes.

13         At the conclusion of the case, when I

14 instruct you on the law, particularly on the issue of

15 the credibility or the believability of witnesses, in

16 that instruction, I'm going to be telling you that in

17 your determination of the credibility of a witness,

18 you are entitled to take into account, not only the

19 words spoken, but the manner of the witness

20 testifying, the demeanor of the witness on the

21 stand.

22         If you bury your head taking notes

23 copiously during the taking of testimony, then you

24 are not looking at the witness, and you may be

N-37

1  missing vital information to aid you in your

2  determination of the credibility of witnesses.

3          So, if you remember back when you were in

4  school and sitting in a lecture hall taking your

5  notes, and you never looked up and there were spiders

6  on the wall, you never would have known it because

7  you never looked up because you were busy taking

8  notes.

9          Certainly, take notes if you choose to do

10 that, but don't get so involved in that mechanical

11 operation that you're not paying attention to all of

12 those factors that you would be allowed to take into

13 account in determination the credibility of each of

14 the witnesses that will testify.

15         The other thing I want to say to you about

16 notetaking is those notes are yours and yours alone.

17 They are not to be shown to, discussed with, with any

18 other juror.  They are for your personal use to aid

19 you in recalling the testimony.  It's terribly

20 important.

21         Every time you leave the jury box and leave

22 the courtroom, those notes must be turned into the

23 deputy sheriff.  So, you must put some identifying

24 mark on them so we can find them again.


                           N-38


MAYSONET 574

1          When you take the jury box again, those

2   notes will be returned to you.

3          At the conclusion of the trial, when

4   everything is over, those notes then must be turned

5   into the deputy sheriff who is charged by state

6   statute with destroying those notes.  But the most

7   important thing to remember is that they are

8   confidential to you.  They are not to be discussed

9   with or shown with or shared with other jurors.

10          And we are about to begin the trial of this

11  case.  Just a birds-eye view for those of you who may

12  not be familiar with the progress of a trial, how it

13  goes forward, just to aid you so you kind of know

14  what's going to go on.

15          The first thing we are going to be hearing

16  is opening statements by the attorneys.

17          It's important to understand that at the

18  outset, that opening statements are not evidence.

19  Nothing the attorneys say is evidence.

20          The evidence will come from sworn testimony

21  from this witness stand and perhaps through physical

22  exhibits if accepted by the Court as evidence.

23          Even though opening statements by the

24  attorneys are not evidence, they are, however, very

                        N-39

1   important and should have your full attention.

2          Opening statements by the attorneys is an

3   opportunity for them to talk with you about the case

4   and about what they expect the evidence to show.

5          Once opening statements have been

6   concluded, we will begin taking the evidence in the

7   case, the testimony in the case.

8          The State will put its case on first.  The

9   State will present its witnesses first.  That's

10  because the State has the burden in a criminal case.

11         Once the State has presented its evidence

12  and what is called its case-in-chief, the Defense, if

13  it so desires, will present its evidence.

14         Once the Defense evidence has been

15  concluded, the State has an opportunity, if it cares

16  to, to present more evidence to the jury, which is

17  called rebuttal evidence.  That is evidence that the

18  State puts on to meet any issues that may have arisen

19  in the Defense case.

20         The State gets that second opportunity to

21  present evidence because it bears the burden.

22         Once all of the evidence in the case has

23  been concluded, you are going to be hearing from the

24  attorneys from each side again.  You are going to be

N-40

MAYSONET 576

1 hearing from them in what is called closing

2 argument.

3       Again, closing arguments are not evidence,

4 but again they are very important. That's the

5 opportunity to each side to talk with you about what

6 they feel the evidence has shown.

7       The State will proceed first in closing

8 argument.

9       The Defense will then present its closing

10 argument, and the State will have an opportunity to

11 address you in rebuttal argument.

12       Again, they get that opportunity to speak

13 with you a second time because the State bears the

14 burden.

15       Rebuttal argument is an opportunity for the

16 State to address any issues that may have been raised

17 in the Defense argument.

18       Once all of the evidence and the arguments

19 have been concluded, the Court will then instruct the

20 jury in the law that is applicable to this particular

21 case, and you will be charged to deliberate upon your

22 verdicts.

23       Now, ladies and gentlemen, when you look at

24 the Defense table, you will notice that there are two

N-41

MAYSONET 577

1 individuals present at the Defense table that were

2 not there on yesterday when you were selected.

3          Mr. Rueckert, an attorney, who represents

4 Mr. Goossens who is another defendant with which you

5 are not concerned.  That case is being tried by the

6 Court sitting alone without a jury.

7          Your only concern as this case goes on is

8 with Mr. Maysonet.  You are Mr. Maysonet's jury.  You

9 have no concern with and no interest in Mr.

10 Goossens's case.

11          The Court is hearing that case sitting

12 without a jury.  It's a combination of a jury/bench,

13 but it's really important that you know you have no

14 no issues to decide as to Mr. Goossens.

15          Your only issues will be Mr. Maysonet.

16 Anything else, counsels, that I need to bring to the

17 jury's attention?  Very well.

18      MR. BEUKE:    No, Judge.

19      THE COURT:    Okay.

20          Then we are going to get under way now with

21 opening statements, and we hope to get a couple of

22 witnesses on before we break for lunch to move us

23 along and stay on our schedule.

24          I'm pretty good with keeping a trial on

N-42

1  schedule.  I gave you an estimate of closing this

2  case tomorrow.

3          We are a little bit late getting started

4  today because we had other matters to take care of,

5  but I have no reason to think that we won't make up

6  that time.

7          State, are you ready to proceed in

8  opening?

9                  OPENING STATEMENT

10               BY MS. MANDELTORT:

11     MS. MANDELTORT:    Thank you, Judge.

12         May it please the Court?  Counsel?

13     MR. BEUKE:    Counsel.

14     MS. MANDELTORT:    Frank.

15         On May 25, 1990, at about 1:00 in the

16  morning, Chicago police officers Montalvo and Dones

17  responded to a radio call, a radio call of shots

18  fired, shots fired at 3428 West North Avenue.

19         When Officers Montalvo and Jones proceeded

20  to that area, they didn't know what they'd find

21  there.

22         They didn't know that there were two people

23  at 3428 West North Avenue lying in pools of their own

24  blood.  They didn't know that two people had been

                        N-43

1  murdered.

2        Good morning, ladies and gentlemen.  My

3  name is Ellen Mandeltort.  Along with my partner,

4  Frank Marek, we represent the People of the State of

5  Illinois in this trial against the defendant, Jose

6  Maysonet.

7        At 3428 West North Avenue, the police found

8  Torrence Wiley, age 27.  Torrence Wiley had multiple

9  gunshot wounds.  He had a gunshot wound to his chest

10  and a gunshot wound to his genitals.

11        They also found Kevin Wiley, his brother,

12  age 26.  Kevin Wiley had a gunshot wound to his

13  head.

14        When the officers got there, they notified

15  the ambulance when they saw the conditions of the

16  victims.

17        But the ambulance got there too late.

18  Torrence Wiley and Kevin Wiley died on the street

19  that evening.

20        At that moment is when the police

21  investigation began.  And until July 15, 1990, the

22  crime was unsolved.  But on July 15, 1990, they got

23  their first lead.

24        On that day, Detective Montilla, who you

N-44

MAYSONET 580

1  will see in this courtroom, spoke with someone.  He

2  spoke with someone at Area 5 police headquarters,

3  someone who had information about the murders.

4          But what Detective Montilla didn´t know as

5  he first spoke to that person is that he was actually

6  speaking to one of the killers of the Wiley

7  brothers.  He was speaking on July 15, 1990 to Jose

8  Maysonet.

9          Detective Montilla spoke again with Jose

10  Maysonet on August 1 of 1990 and again on August 22,

11  1990.  It was on August 22 of 1990 that Jose Maysonet

12  fully confessed to his involvement and his

13  participation in the murders of Kevin Wiley and

14  Torrence Wiley.

15          He spoke to Detective Guevara who you will

16  meet, and he also spoke with an assistant state´s

17  attorney, Frank DiFranco.

18          You will learn that the defendant gave a

19  court-reported statement, that a court reporter was

20  called into Area 5, much like the court reporter that

21  sits here, and took down the questions that were

22  asked by the state´s attorney and the answers that

23  were given by Jose Maysonet.

24          You will see that court-reported statement,

N-45

1 and you will hear the words of the defendant, Jose

2 Maysonet.

3        You will learn that the Wiley brothers were

4 actually killed by four people.  There were four

5 murderers of the Wiley brothers.  There was Jose

6 Maysonet.  There was Alfredo Gonzalez, who you will

7 hear referred to as Lluvia.  There was Christopher

8 Goossens who you will hear referred to as Fro, and

9 there was Justino Cruz, referred to as Tino.

10       You will learn that each one of those

11 individuals had a role, had his own individual role

12 in the murder of Torrence and Kevin Wiley.

13       Mr. Maysonet, you will learn, was holding a

14 gun in his house for the Latin Kings.

15       You will learn that he supplied the nine

16 millimeter weapon that was used to kill Torrence and

17 Kevin Wiley.

18       You will also learn that he drove the car

19 that took Mr. Gonzalez, Mr. Goossens, and Mr. Cruz to

20 the murder scene at 3428 West North Avenue.  And that

21 he waited in the car while these boys were executed

22 on the street, and then he drove himself and his

23 three other murdering partners away from that scene.

24       You will learn during this trial that at

N-46

1  the time that that trigger was pulled on that nine

2  millimeter gun that sent those bullets into the

3  bodies of Torrence and Kevin Wiley that they were

4  actually four hands on that trigger.  You will learn

5  that under the law, each of those individuals is

6  responsible--

7      MR. BEUKE:    Objection.

8      MS. MANDELTORT:    -- for the murder.

9      MR. BEUKE:    Objection to that being discussed

10  in opening.

11      THE COURT:   Overruled.

12      MS. MANDELTORT:    You will learn that Jose

13  Maysonet, Alfredo Gonzalez, Christopher Goossens, and

14  Justino Cruz are equally and legally responsible for

15  the murders of Kevin Wiley and Torrence Wiley.

16          You will learn that they are legally

17  responsible for, not only what he did out there, Mr.

18  Maysonet, but he´s also -- you will find legally

19  responsible for the conduct of his partners in

20  crime.

21          What you will find is that after you´ve

22  heard all of the evidence and the judge has

23  instructed you on the law that is applicable to that

24  evidence, that Jose Maysonet is legally responsible

N-47

MAYSONET 583

1   for the murders of Kevin Wiley and Torrence Wiley.

2           When all of the evidence is over, and

3   you´ve heard from all of the witness, and you´ve seen

4   the physical evidence that we will put into evidence

5   before you, myself and my partner will come back

6   before you, and we will ask you for the only verdict

7   that is justified by the law and the evidence, and

8   that is that Jose Maysonet is guilty of the first

9   degree murder of Torrence Wiley, and he´s guilty of

10  the first degree murder of Kevin Wiley.

11      THE COURT:   Thank you, Miss Mandeltort.   Mr.

12  Beuke?

13                  OPENING STATEMENT

14                  BY MR. BEUKE:

15      MR. BEUKE:   Yes, Judge.

16          Good afternoon, ladies and gentlemen.   May

17  it please the Court, Judge Morgan, Randy, Mr.

18  Goossens, Mr. Maysonet, prosecutors.

19          Ladies and gentlemen, you over the past day

20  and now leading into today have had the opportunity

21  to get a brief experience in our criminal justice

22  system.

23          You know, through the benefit of Judge

24  Morgan´s questions yesterday, we were given an

N-48

1  opportunity to learn a little bit about you, ladies

2  and gentlemen, to learn a little bit about some of

3  your backgrounds, some of your hobbies, some of your

4  interests, some of your family lives.

5       And when Judge Morgan told you those things

6  yesterday, that we're not trying to pry into your

7  backgrounds, I think that that goes for the

8  prosecutors as well as myself.

9       We are interested, ladies and gentlemen, in

10 having justice done, and this system that we have

11 that Judge Morgan spoke to you about yesterday is a

12 system that requires justice to be done in a certain

13 way.

14       This happens in every criminal case, that

15 prospective jurors are spoken to by a judge.  Defense

16 attorneys and prosecutors are allowed to learn a

17 little bit about the individuals that they are going

18 to ask to sit in judgment of the case that's before

19 them, the case that's presented to them.

20       Ladies and gentlemen, this case, and so

21 there's no confusion about this, involves the murder

22 of two young men -- two young men back in 1990 on May

23 25 who happened to be on North Avenue at a particular

24 location who were killed.

N-49

1          They were killed through the use of a gun,
2     I believe a nine millimeter weapon.  There's no
3     dispute about that, ladies and gentlemen.  This is
4     not a cause of death type case.
5          This is a case that you are going to be
6     asked to sit in judgment of Mr. Maysonet in terms of
7     his involvement in what went on that evening or lack
8     of involvement in what went on that evening.
9          I think, as Miss Mandeltort indicated to
10    you, ladies and gentlemen, that you are going to be
11    taken back to May 25 of 1990 through the testimony of
12    some police officers.
13         You will learn that on May 25 of 1990 at
14    about 1:00 in the morning, Anthony or Kevin and
15    Torrence Wiley were out on the street on North
16    Avenue.
17         Some of you, ladies and gentlemen, may be
18    familiar with North Avenue.  Some of you may not.
19         It's a main thoroughfare, I would suggest,
20    on the northwest side of our city.  There is a block
21    that I believe the officers will describe to you that
22    contains a number of businesses.
23         There was an all night restaurant that was
24    open on the corner.  There were some individual

                              N-50

MAYSONET 586

1 people who reside in apartments that are both, on the

2 south and the north side of that street.

3         One thing that you will learn, ladies and

4 gentlemen, through the testimony of the officers I

5 believe is that there were no apparent witnesses to

6 what happened out on the street.

7         That the detectives and the initial beat

8 officers who responded to the scene when they got

9 there attempted to speak with a number of

10 individuals, including the individual who called 911

11 and reported the shots that had been fired.

12         Nobody saw what happened out on the

13 street. So, when Miss Mandeltort comes to you and

14 tells you that you will be given some evidence, you

15 will not be given any evidence concerning who it was

16 or anybody who was able to say, I saw this

17 individual, Lluvia or Goossens or Cruz, or any of

18 these individuals out on the street. That´s

19 something that you will never hear during the course

20 of this trial.

21         I believe through the testimony of some of

22 the officers, ladies and gentlemen, that you will

23 hear during the course of the officer´s attempt to

24 interview witnesses at the scene, who lived around

N-51

1 the scene, that there was at least one witness or

2 possibly two young women who heard an argument, who

3 heard an argument out on the street that night, who

4 heard an argument out on the street that involved

5 people using words, males using words like I'll kill

6 you or words to that effect.

7        I believe that the detectives will tell you

8 that those young women heard the argument and

9 believed it to begin around midnight, and the

10 argument lasted for almost an hour.

11        They'll tell you that the argument

12 culminated in the hearing of some shots and

13 ultimately the police were called.

14        Ladies and gentlemen, that was the status

15 of the police department's case on May 25 of 1990.

16        It was basically the status of the police

17 department's case on May 30, on June 5, on June 10,

18 on June 20.

19        The police department's case, I think it's

20 fair to say, didn't develop any further at all for

21 almost two months.

22        On July 15, as Miss Mandeltort told you,

23 Mr. Maysonet was in Area 5 police headquarters.  Just

24 so you, ladies and gentlemen, know, if you don't

N-52

MAYSONET 588

1  know, that's a police facility that's located at the

2  corner of Grand Avenue and Central, basically up on

3  the northwest side of the city.  That detective

4  division handles incidents that occur in the

5  northwest side of the city.

6          You'll hear, ladies and gentlemen, that Mr.

7  Maysonet was at that facility on an unrelated

8  offense.

9          You'll hear that Mr. Maysonet -- at some

10 point, detectives came in to speak with him about

11 this case.

12          How that interrogation proceeded, what was

13 said to him, that's something that we're all going to

14 learn over the next couple of days.

15          The detectives who involved themselves in

16 questioning Mr. Maysonet will come before you, and

17 they'll swear to tell an oath, and they'll give you

18 their version or their recollection of how that

19 conversation transpired and what was said.

20          What's important here, ladies and

21 gentlemen, is that what Miss Mandeltort or Mr. Marek

22 say to you, what Miss Mandeltort just told you in her

23 very eloquent and emotional opening statement isn't

24 evidence.

                        N-53

1         She is not the person who puts evidence

2 before you. What she says doesn't have any bearing

3 on this case.

4         Evidence will come to you, ladies and

5 gentlemen, from here, from the witness stand, from

6 people who were actually involved in this

7 investigation. That's where the evidence comes.

8         Evidence also, ladies and gentlemen, comes

9 to you in the form of evidence that's responsive to

10 questions that are posed by Miss Mandeltort or Mr.

11 Marek, but it also comes to you in terms of questions

12 that are posed by myself on behalf of Mr. Maysonet.

13         What I'm telling you is you heard a lot

14 about direct examination and cross-examination from,

15 you know, the fiasco in California, but that's

16 important.

17         And what's important for you people to

18 understand is that you have to listen to all of the

19 questions of, not only the prosecutors, but the

20 defense lawyers because only then, ladies and

21 gentlemen, can you in my opinion get a full flavor

22 for how this case unfolds.

23         You'll hear, I believe, folks, that Mr.

24 Maysonet in that July 15th conversation with the

N-54

MAYSONET 590

1    detectives told the detectives, I have some

2    information about that case.  I know who the shooters

3    are, or I know the people who were involved, but I

4    can't tell you.  You know, I'm afraid to tell you

5    because they'll kill me.  And so we're clear on this,

6    we are talking about people that Mr. Maysonet was

7    describing who were members of a street gang in the

8    city, the Latin Kings street gang.

9            The conversation lasted for -- I'm not sure

10   how long, but basically Mr. Maysonet and the

11   detectives parted company.

12           Mr. Maysonet, you'll later learn, was in

13   the custody of the Cook County Jail on that unrelated

14   case.

15           He went to court the following day.  He was

16   represented by an attorney the following day.

17           He had a bond set on that case.  He

18   appeared in court on, I believe, two other occasions

19   prior to August 1 of 1990.

20           He was represented by attorneys in that --

21   in all of those proceedings in that case, in that

22   court.

23           The attorney, at some point, was a Mr.

24   Abrams.  The attorney switched at some point, I

N-55

MAYSONET 591

1 believe after August 1, to a Mr. Swano.

2        You´ll hear, ladies and gentlemen, that

3 these detectives who saw Maysonet on July 15 -- and I

4 believe it will be clear that he had an attorney --

5 went to see him at the Cook County Jail.

6        They had another conversation with him at

7 the Cook County Jail. That conversation, I think --

8 we´ll leave up to you as to what exactly was said,

9 who was said, who said what to whom. It´s important

10 again for you, ladies and gentlemen, for you to

11 understand how police work unfolds.

12        You should -- when evidence comes out about

13 conversations, one important tool that all of you

14 have at your disposal is your own common sense and

15 your own experiences in life.

16        I´m not a person who has a tremendous

17 memory. I have to write down a lot of things in

18 terms of my ability to recollect what it is that is

19 said by someone to me or me to someone.

20        Some of you people may sit here today, and

21 you may have photographic memories. Some of you may

22 not. Some of you may be like me.

23        But you´ll hear, ladies and gentlemen,

24 about the police officers and how they did their

MAYSONET 592

1  work, and I´m going to suggest to you now that I

2  am -- I´m going to tell you now that I´m going to

3  call into question the way that the police officers

4  did their jobs in this case.

5       They were looking to solve this crime.

6  They had a young man who´s sitting in the Cook County

7  Jail who had told them he knew who the people who

8  were involved in this case were.  That´s when the

9  pressures began to unfold.

10      You´ll hear, ladies and gentlemen, that Mr.

11  Maysonet came to this building on a date of August 22

12  of 1990.

13      He appeared down in the first floor of this

14  building in what´s called the Chief Judge´s

15  courtroom, where your case is -- the formal charges

16  are given to you, and your case is basically assigned

17  to a trial judge.

18      He went there that morning at about 9:00

19  with his sister, his wife, and a friend.  He appeared

20  in front of that judge who sat in the first floor of

21  the building.

22      He had an attorney named William Swano who

23  represented him, who wasn´t able to appear at that

24  9:00 hearing.  For whatever reason, I don´t know.

N-57

1          But his case was assigned to Judge Morgan.

2  Judge Morgan back in 1990 sat in room 302.

3          You are going to hear testimony, ladies and

4  gentlemen, if not from the prosecutors´ case, then

5  you will hear it in the Defense case that Mr.

6  Maysonet was physically taken from that courtroom as

7  he walked out of that courtroom on his way up to

8  appear in room 302.

9          He was taken by this police -- by a police

10 detective named Paulnitsky who was involved in this

11 investigation and physically taken from this

12 building, not allowed to speak with his family, not

13 allowed to confer with his attorney, not allowed to

14 make a phone call, and he was basically abducted and

15 taken to Grand and Central.

16          He was placed in an interview room at Grand

17 and Central, sent down to a lockup.  He was

18 interviewed for, approximately, the next day or so,

19 countless times, and after this entire process

20 unfolded, you will be -- at some point, ladies and

21 gentlemen, as Miss Mandeltort told you, you will be

22 given a copy of or the court-reported statement that

23 Mr. Maysonet eventually gave to an assistant state´s

24 attorney in the presence of a detective.


N-58

1        Miss Mandeltort talked to you a little bit
2   about the law, and the law of accountability and the
3   law of responsibility that exists in our state.
4        That is kind of a tool that the 14 of you
5   right now don't really have yet because that's a tool
6   that ultimately is going to be given to you by Judge
7   Morgan.
8        You, at the end of all of this testimony
9   and all of the arguments of counsel, will at some
10  point be advised by Judge Morgan as to what is the
11  law in the State of Illinois in terms of
12  responsibility, in terms of accountability, whether
13  or not you are to be held responsible for the conduct
14  of other people.  That is something that Judge Morgan
15  will give you at the end of the case.
16       And when you go back and hit the jury room
17  and sit amongst the 12 of you and are asked to decide
18  and come to a verdict on this case, that will be your
19  guide.  That will be the -- one of the major tools
20  that you will use, that in conjunction with your
21  notes, in conjunction with what you recall the
22  testimony being, in conjunction with what the
23  physical evidence shows in this case.
24       You're going to use all of those tools, and

                        N-59

MAYSONET 595

&

1  I would submit to you, ladies and gentlemen, when you
2  have all of the tools available to you, when you´re
3  given all of the evidence, when you´re given the
4  judge´s instructions as to the law in this case, you
5  will see that what ultimately Mr. Maysonet said in
6  that court-reported statement doesn´t prove him
7  guilty of anything.
8          You will have some question, I submit to
9  you, as to how these conversations with these police
10 officers were conducted, whether or not they´re being
11 up front and honest, honest with all of you people
12 when they give you their version of how everything
13 transpired.
14         I submit to you, ladies and gentlemen, you
15 have to and I implore you to use your common sense
16 and your life experiences when you listen to the
17 testimony from the witness stand.
18         You will hear at some point that Mr.
19 Maysonet, during these hours that he sat at Area 5,
20 had to have pills brought to him, nerve pills.  He
21 was held in custody and at some point was not allowed
22 to see his family.
23         At some point, they brought his wife in.
24 At some point, ladies and gentlemen, there were

N-60

1  people running in and out of his interview room

2  almost at will.  It was like a revolving door and

3  it´s because, ladies and gentlemen, there is

4  pressure.

5          There is pressure to solve cases.  There´s

6  pressure to bring homicides to a conclusion.  It´s

7  pressure that is brought to bear on the very people

8  who will hit the stand in this case.

9          I submit to you, ladies and gentlemen, that

10  you´ll understand Mr. Maysonet a little clearer over

11  the next couple of days.  He is not an intelligent

12  man.

13          You´ll learn that at the time he had been

14  in this country for maybe five or six years, that he

15  did not speak English very well.

16          He was able to converse in English, but he

17  was absolutely much more comfortable in conversing in

18  his native language, which was Spanish.

19          You´ll begin to get a feeling, and maybe

20  some of you in the use of your life experiences can

21  try to feel or comprehend what it was that he was

22  being put through back then, what was the pressures

23  that were being brought to bear on this young man as

24  he sat in an eight by eight interview cell at Area 5

N-61

MAYSONET 597

1  Violent Crimes for almost a day-and-a-half.

2          All of the facts and the circumstances

3  surrounding that evidence that Miss Mandeltort tells

4  you proves him guilty beyond a reasonable doubt.

5          Their entire case here, this entire

6  prosecution is surrounding the interview of Mr.

7  Maysonet by possibly six or eight police detectives

8  over a month-and-a-half period of time.

9          As I indicated to you, that is all they

10 have.  And in the end, you will have to determine if

11 the circumstances under which these statements, if

12 you believe they were given at all, how they were

13 given, what exactly may or may not have been said.

14 That's going to be up to you people to decide, and

15 that's when this system works.

16          You have to listen to what's said on the

17 witness stand.  I know you will all listen carefully

18 and certainly at the conclusion of this case, when

19 all of the evidence is in and the judge gives you her

20 instructions on the law, I'm going to have an

21 opportunity to address you again.  And at that time,

22 I can tell you candidly I'm going to be asking you to

23 find Mr. Maysonet not guilty.  Thank you, folks.

24      THE COURT:   Thank you, Mr. Beuke.

N-62

1      THE COURT:   State, do you think we can get one

2  witness on, understanding that they have to get up

3  there before the cafeteria closes?

4      MS. MANDELTORT:     Certainly, Judge.

5      THE COURT:   Okay.

6          Ladies and gentlemen, we are going to try

7  to at least hear one witness.  I´ll still get you up

8  in time to have lunch.

9      THE CLERK:  Officer, would you raise your right

10 hand?

11              (Witness is sworn.)

12              WILMAN DONES,

13 called as a witness on behalf of the People of the

14 State of Illinois, being first duly sworn, was

15 examined and testified as follows:

16              DIRECT EXAMINATION

17              BY MR. MAREK:

18     THE CLERK:  Be seated.

19     MR. MAREK:

20     Q.   Officer, would you state your name, for the

21 record, please?

22     A.   My name is Wilman Dones.

23     Q.   And would you spell both of your names,

24 please?

N-63

1        A.    W-i-l-m-a-n, D-o-n-e-s.

2        Q.    And, Officer--

3        THE COURT:    Excuse me, Mr. Marek, just for a

4   second.

5              Members of the jury, if at any time you

6   cannot hear the witness, so indicate so that we

7   know.

8              Officer, I'm going to ask you to really

9   keep your voice up.  This is a cavernous room.

10             Even though there is a microphone, try to

11  keep your voice up so everybody in the courtroom can

12  hear you.

13       A.    Yes, ma'am.

14       THE COURT:    I am sorry, Mr. Marek.

15       MR. MAREK:    Thank you.

16       Q.    Officer, what is your profession or

17  occupation?

18       A.    Police officer.

19       Q.    And how long -- you are a Chicago police

20  officer?

21       A.    Yes, sir.

22       Q.    Excuse me.

23             How long have you been a Chicago police

24  officer?

N-64

1    A.    Today´s date, 17 years and six months.

2    Q.    And what is your unit of assignment within

3 the Chicago Police Department at the present time?

4    A.    10th District.

5    Q.    I´m going to direct your attention back to

6 May of 1990.

7         What was your unit of assignment within the

8 police department, at that time?

9    A.    14th District.

10    Q.    And, Officer, where is the 14th District

11 located?

12    A.    The 14th District station is located at

13 2150 North California.  The boundaries are Belmont,

14 the river, Division Street, and Central Park.

15    Q.    Now, I´m going to direct your attention to

16 the early morning hours -- to the evening hours of

17 May 24, 1990 and into the early morning hours of May

18 25 of 1990.  Excuse me.  Were you working, at that

19 time?

20    A.    Yes, I was.

21    Q.    And were you working alone or with a

22 partner?

23    A.    I was working with my partner.

24    Q.    And who was your partner, at that time?

N-65

MAYSONET 601

1      A.    Luis Montalvo.

2      Q.    And would you spell his name, for the

3  record, please?

4      A.    L-u-i-s, M-o-n-t-a-l-v-o.

5      Q.    And, Officer Dones, were you and Officer

6  Montalvo in uniform?

7      A.    Yes, sir.

8      Q.    And were you working in a marked police

9  vehicle?

10     A.    Yes, sir.

11     Q.    I'm going to direct your attention

12 specifically to May the 25th of 1990, at,

13 approximately, 1:00 a.m..  Did you respond to a call?

14     A.    Yes, I did.

15     Q.    What was that call that you responded to?

16     A.    I responded to shots fired on the street.

17     Q.    And was there an address where the shots

18 were fired?

19     A.    Approximately 3420, 3430 West North

20 Avenue.

21     Q.    And when you -- is this a call that you

22 monitored in your police car?

23     A.    Yes.

24     Q.    And when you heard this call, where were

N-66

1  you at?

2      A.   I was, approximately, at LeMoyne and

3  Homan.

4      Q.   And, approximately, how far away were you

5  from the location that was given where the shots had

6  been fired?

7      A.   Less than a block.

8      Q.   Upon hearing the call of shots fired, what

9  did you do?

10     A.   We immediately went northbound on Homan,

11 made a left turn on North Avenue.

12     Q.   And what did you do then?

13     A.   We saw there were two male blacks laying on

14 the ground in front of an open lot and we pulled up

15 to where they were laying, and we examined them, and

16 we -- we determined that these people had been shot.

17     Q.   Now, when you saw these two individuals,

18 they were lying on the ground?

19     A.   Yes, sir.

20     Q.   And was that in front of what would be 3428

21 West North Avenue?

22     A.   Yes, sir.

23     Q.   And the closest intersection would be

24 Kimball and North Avenue?

N-67

MAYSONET 603

1    A.    Yes, sir.

2    Q.    And, Officer, when you first arrived at the

3 scene, were either of these two individuals moving at

4 all?

5    A.    They were both still jerking.  They were

6 like moving irregularly.  They were just -- they

7 would jerk every few seconds.

8    Q.    Were you ever able to speak to any of these

9 individuals in any way?

10    A.    No, sir.

11    Q.    What is the first thing that you did?

12    A.    Called for an ambulance.

13    Q.    And did you remain on the scene until an

14 ambulance arrived?

15    A.    Yes, sir.

16    Q.    By the time that the ambulance arrived,

17 were either of these individuals still alive?

18    A.    No.

19    Q.    You said you did observe apparent injuries,

20 apparent gunshot wounds to these individuals?

21    A.    Yes, sir.

22    Q.    Did you also -- did you also obtain any

23 identification from the bodies of either of these

24 individuals?

N-68

1    A.   Yes, my partner and I did, yes.

2    Q.   Now, the wounds that you -- what wounds did

3 you observe on these two individuals?

4    A.   On the individual that was in the -- on the

5 sidewalk, we walked up to him, and we thought he

6 had -- he had a wound or trauma to his face because

7 blood was coming out from near his mouth.  But when

8 we looked at it, the back of his head, we saw that he

9 had some type of injury to the back of his head,

10 probably the gunshot.

11    Q.   And that individual did have identification

12 on him?

13    A.   Yes, sir.

14    Q.   And was that identification which indicated

15 that he was Kevin Wiley?

16    A.   Yes, sir.

17    Q.   Now, the second individual that you saw,

18 what, if any -- what, if any, wounds did you observe

19 on him?

20    A.   He was also bleeding, and we looked at him

21 without moving him around in any way, shape, or form,

22 and we -- my partner and I decided -- agreed that he

23 had been shot through the side, through his left

24 side, and that he had another wound close to his

N-69

MAYSONET 605

1  waistline.

2      Q.    Now, when the paramedics arrived, did they

3  pull up this individual's shirt?

4      A.    They examined the bodies to determine what

5  type of weapon or projectile was used, and they also

6  concurred that it was gunshot wounds.

7      Q.    Now, this individual that you observed shot

8  somewhere about the chest, is that correct?

9      A.    Yes, sir.

10     Q.    And did he have identification indicating

11 that he was Torrence Wiley?

12     A.    Yes, sir.

13     Q.    Now, Officer, as a -- you have certain

14 responsibilities when you are the first officer to

15 arrive at a crime scene, is that correct?

16     A.    Yes, sir.

17     Q.    And one of those -- the primary

18 responsibility is to preserve that crime scene for

19 other investigating officers who come along later, is

20 that correct?

21     A.    Preserve the crime scene, make sure that

22 nobody damages or steps or picks up anything that

23 could be valuable in the investigation.

24     Q.    And did you do that at this crime scene?

N-70

MAYSONET 606

1     A.   Oh, yes, sir.

2     Q.   And did you notify the mobile crime lab?

3     A.   We requested the crime lab to come out,

4  yes.

5     Q.   And were you there, Officer Dones, when the

6  mobile crime lab arrived?

7     A.   Yes, I was.

8     Q.   Did you also notify Violent Crimes

9  detectives?

10     A.   Yes.

11          It's a process -- once you've determined

12  that an aggravated battery has occurred and somebody

13  has died, you have to notify the Violent Crimes

14  detectives.

15          You have to notify the first deputy.  You

16  have to notify the crime lab.

17     Q.   You made all of those notifications?

18     A.   Yes, I did.

19     Q.   Officer, when you got to the scene, were

20  there -- other than the two individuals that you

21  described who were on the ground, did you observe any

22  other persons on North Avenue?

23     A.   There were no persons walking around, no.

24     Q.   And what was the traffic like?

N-71

1    A.    There was no traffic.

2    Q.    I´m sorry?

3    A.    There was no traffic whatsoever.

4    MR. MAREK:    If I may have a moment?  I have no

5 further questions, your Honor.

6    THE COURT:    Mr. Beuke?

7                CROSS-EXAMINATION

8                BY MR. BEUKE:

9    MR. BEUKE:

10    Q.    Good afternoon.

11          Officer, I am sorry.  How do you pronounce

12 your name?

13    A.    Dones.

14    Q.    I have a name that people butcher pretty

15 good, too.

16          Officer, when you first got the call, I´m

17 sorry, you indicated that you were at what location?

18    A.    LeMoyne and Homan.

19    Q.    Okay.

20          LeMoyne and Homan is, approximately, how

21 far from the crime scene?

22    A.    About a block.

23    Q.    Okay.

24          When you -- when you got the call, am I

N-72

1 correct in assuming that you didn't hear any shots?

2     A.   Yes, we did.

3     Q.   You heard shots?

4         Were you able to determine that the shots

5 were coming from the area around that address at 3400

6 North Avenue?

7     A.   We knew the shots had come from north of

8 us, and we went northbound to investigate them.

9     Q.   Okay.

10         When you say, northbound, you would have

11 gone -- were you going north on Homan or south on

12 Homan when you heard the shots?

13     A.   I can't really remember which way.

14     Q.   You don't know?  You don't remember if you

15 had to make a U-turn or you were going into the

16 direction you heard the shots?

17     A.   No, I don't.

18     Q.   If you were going in the direction that you

19 heard the shots, it would be fair to say, would it

20 not, that you guys would have activated your

21 emergency lights?

22     A.   No.

23     Q.   You wouldn't have done that?

24     A.   No, because if -- if you want to tell

N-73

1  somebody that you're coming, you activate the blue

2  lights.

3          If you want to play surprise, you don't

4  generally put the blue lights on.

5      Q.   Well, I am sorry.

6          Homan Avenue, that is -- the corner of

7  Homan Avenue and North Avenue, there's a traffic

8  light, is that correct?

9      A.   Yes, sir.

10     Q.   And the corner of Homan Avenue, if you were

11 to proceed north, past North Avenue, Homan actually

12 turns into Kimball, is that correct?

13     A.   Yes, sir; yes, sir.

14     Q.   Okay.

15          And so I'm clear, when you went and hit

16 that -- at some point, did you hit the traffic light

17 at Kimball and North or Homan and North?

18     A.   Did I hit it?  No.

19     Q.   Okay.

20     A.   We went through the intersection.

21     Q.   Okay.

22          You weren't concerned about any traffic

23 possibly being in the intersection?

24     A.   No.


                        N-74

1              We -- my partner and I have the habit of

2      reducing our speeds when we´re going on in-progress

3      calls when approaching intersections with signals on

4      them.  So, we slowed down quite a bit.

5          Q.    When you got to the area of North Avenue

6      and Homan, you would have been, approximately, maybe

7      a half a block from where the two young men were

8      laying, is that correct?

9          A.    Yes, sir.

10         Q.    Did you see, Officer, and this would have

11     been within maybe a matter of 10 or -- I am sorry --

12     maybe within a matter of a half a minute or less of

13     hearing the shots, is that fair to say?

14         A.    Yes, sir.

15         Q.    Did you see any cars speeding out of any

16     alleys or down Homan or down Kimball or out of the

17     alley just behind North Avenue to the north?

18         A.    If we would have seen a car pulling away at

19     high rate of speed, we would have stopped it.

20         Q.    I assume by that answer, Officer, you´re

21     telling the ladies and gentlemen of the jury that you

22     didn´t see anything?

23         A.    No.

24         Q.    Okay.

                        N-75

MAYSONET 611

&

1          And when you drove up to the -- to where

2 the two young men were lying on the sidewalk in front

3 of the address on North Avenue, you immediately began

4 to do your preservation of the crime scene, is that

5 correct?

6     A.    After we determined that they were victims

7 and that they were near death, yes.

8     Q.    Okay.

9          I mean, that was fairly easy to determine.

10 They were bleeding onto the sidewalk, is that

11 correct?

12    A.    Yes, sir.

13    Q.    Okay.

14         So, I'm clear, Detective (sic), you worked

15 in that district, that's the 14th District for,

16 approximately, how long?

17    A.    Ten and a half years.

18    Q.    You are familiar, I assume, or were you

19 familiar back in 1990 with all of the streets and

20 thoroughfares within the geographic boundaries of the

21 14th District?  Is that fair to say?

22    A.    Four and a half years ago, I could have

23 named you every street area and intersection, yeah.

24    Q.    Okay.

N-76

MAYSONET 612

```
 1            If you were coming down -- when North
 2  Avenue, if you were coming down Saint Louis from
 3  Potomac, okay, proceeding northbound, approaching
 4  North Avenue, is there a stop sign or a traffic light
 5  at the corner of North Avenue and Saint Louis?
 6      A.   Stop sign.
 7      Q.   If you were to continue northbound,
 8  Detective (sic), across North Avenue, am I correct
 9  that you would basically drive into a building?
10      A.   Yes, sir.
11      Q.   North Avenue -- or I'm sorry.
12            Saint Louis when it hits North Avenue going
13  in a northerly direction jogs to the right, correct?
14      A.   No.
15      Q.   When you -- if you're going northbound on
16  Saint Louis, okay, and you come to North Avenue,
17  follow me?
18      A.   Okay.
19      Q.   If you were to go to the -- how would you
20  follow Saint Louis if you wanted to continue down
21  Saint Louis in a northerly direction?
22      A.   You would jog left and then right.
23      Q.   You would jog left?
24      A.   And then right.
```

N-77

MAYSONET 613

1    Q.   Okay.

2        The area, Homan, the next street to the

3 east, or I am sorry, to the west is Saint Louis, is

4 it not?

5    A.   Could you repeat that, please?

6    Q.   What´s the north/south street directly to

7 the east of Homan -- or I am sorry, directly to the

8 west of Homan Avenue?

9    A.   That´s Spaulding.

10    Q.   Spaulding?  Okay.  What´s the next street

11 to the west?

12    A.   It´s not Spaulding.  Spaulding is east.

13        The first street would be Saint Louis --

14 yes, Saint Louis.

15    Q.   What´s the next street to the west?

16    A.   Drake.

17    Q.   Okay.

18        So, Drake would be the very next street

19 going westbound down North Avenue, correct?

20    A.   From Kimball?

21    Q.   From Kimball.

22    A.   No, it would be the second intersection.

23    Q.   There would be Kimball, Saint Louis, Drake,

24 is that correct?

N-78

MAYSONET 614

1    A.   Right.

2    Q.   Now, it's your testimony that if you were

3 going northbound on Saint Louis, and you come to

4 North Avenue, you have to jog to the left to get to

5 Saint Louis, correct?

6    A.   No, you have to go right and then left.

7    Q.   All right.

8    So, you were mistaken a little earlier?

9    A.   Yes.

10    Q.   Is it fair to say, Detective (sic), that on

11 the south side -- I am sorry, on the north side of

12 North Avenue, between Drake and Saint Louis, there

13 are businesses that line up along that entire

14 street?

15    A.   Yes.

16    Q.   Back in May of 1990, there were businesses

17 on the north side of North Avenue between Drake and

18 Saint Louis, is that correct?

19    A.   Yes, sir.

20    Q.   There's an alley directly behind those

21 North Avenue addresses, correct, between Drake and

22 Saint Louis?

23    A.   Yes, there is.

24    Q.   And there are garages that are in back of a

N-79

MAYSONET 615

1 number of the businesses that line that block,

2 correct?

3    A.   Yes.

4    Q.   If you were to park in the alley between

5 Drake and Saint Louis, would you be able to see the

6 sidewalk of 3428 West North Avenue?

7    MR. MAREK:    Judge, objection.

8    THE COURT:    Sustained.  Form of the question.

9    MR. BEUKE:

10    Q.   Well, Detective -- I am sorry, Officer, you

11 are familiar, are you not, with that entire area,

12 that neighborhood?  You worked there for a number of

13 years?

14    A.   Yes.

15    Q.   I´m going to ask you to put yourself in the

16 alley between Drake and Saint Louis, okay, directly

17 behind North Avenue to the north.

18    A.   Okay.

19    Q.   Okay?

20        If you were to be parked in that alley,

21 Detective (sic), would you be able to see out onto

22 North Avenue in front of the address of 3428 West

23 North Avenue?

24    MR. MAREK:    Same objection.  Where in the

N-80

MAYSONET 616

1 alley?

2     MR. BEUKE:

3     Q.  Well, if you were to be parked -- I´ll

4 withdraw it, Judge.

5         If you were to be parked in the most

6 eastern part of that alley so you´re closest to Saint

7 Louis, okay, just in the alley, though, all right, on

8 the northeast corner -- or I am sorry, the northwest

9 corner of North Avenue and Saint Louis, there is a

10 building, correct?

11     A.  There used to be.

12     Q.  Well, there was back in May of 1990,

13 correct?

14     A.  Yes.

15     Q.  Correct?

16     A.  Yes.

17     Q.  Okay.

18         There was a three-flat that is the next

19 building in on -- between Saint Louis and Homan,

20 correct?

21     A.  I haven´t worked there in four and a half

22 years so I can´t--

23     Q.  I´m talking about back in May of 90 when

24 this incident happened.

N-81

1     A.    I can't recall the buildings.

2     Q.    You don't--

3     A.    The specific building.

4     Q.    You don't remember anything about the

5 buildings as they stood on the block between Saint

6 Louis and Homan, or the block between Drake and Saint

7 Louis as your you sit here today?

8     A.    In know there were buildings there, but I

9 can't tell you exactly which buildings were there.

10     Q.    Okay.

11          Do you recall seeing a hair salon or a

12 lumber company or a Hispanic travel agency, or an El

13 Jardin burrito establishment, a one story house, a

14 Torres grocery, any of those businesses between Drake

15 and Saint Louis?

16     A.    I know there was businesses there, but I

17 couldn't enumerate them.  There's no reason for me to

18 remember them.

19     Q.    Okay.

20          Between the corner of Saint Louis -- where

21 the two bodies that you discovered were lying on the

22 sidewalk, it was on the north side of the street,

23 correct?

24     A.    North side of the street.

N-82

MAYSONET 618

1      Q.   Okay.

2           And between where the bodies were found and

3  the corner of Saint Louis and North Avenue, there

4  were, approximately, four or five structures,

5  correct?

6      A.   Yes.

7      Q.   And those structures were basically

8  businesses.  Some were one or two flats or three

9  flats, is that correct?

10     A.   Yes, sir.

11     Q.   Is it fair to say, Officer, that those

12 businesses or those structures in the alley anyway

13 had garages behind them?

14     A.   They might have.

15     Q.   Okay.

16          Also, Officer, so I'm clear, you got the

17 call at 1:00, is that correct?

18     A.   The call was a broadcast.

19     Q.   Okay.

20          You heard the shots almost at the same

21 time?

22     A.   Yes, sir.

23     Q.   You didn't hear the shots at 12:30, is that

24 correct?

N-83

MAYSONET 619

1    A.   No.

2    Q.   You indicated that when you got to the

3 scene, there weren't any individuals out on the

4 scene, correct?

5    A.   There was nobody there.

6    Q.   Okay.

7        There was an all night hot dog stand on the

8 corner of Kimball and North Avenue or Homan and North

9 Avenue, is that correct?

10    A.   Yes, there was.

11    Q.   Did you begin to canvass the area to

12 determine if there were any people who saw what

13 happened?

14    A.   No, I didn't leave the area until -- until

15 the detectives got there.

16    Q.   Did you leave that job to the detectives?

17    A.   Well, I couldn't leave the crime scene.

18    Q.   I am sorry.

19        As to the search for any possible

20 witnesses, did you take it upon yourself to do that?

21    A.   Oh, no, I don't tell the detectives what to

22 do.  They know what to do.

23    Q.   All right.

24        Did you, Officer, ever speak to a young

N-84

1 lady by the name of Isabel Negron?

2     A.   Yes.

3     Q.   Okay.

4        That was a young lady that you spoke to out

5 on the scene that night?

6     A.   I spoke to her through a window.

7     Q.   Okay.

8        She was a young lady who lived where in

9 relationship to the shooting?

10     A.   Across the street.

11     Q.   Okay.

12        Did she call out to you or did you call

13 out -- or did you somehow find her?

14     A.   She called out to me that she was the one

15 who called the police.

16     MS. MANDELTORT:   I would object to any

17 substance of what she said.  That's hearsay.

18     THE COURT:   Sustained.

19     MR. BEUKE:   Judge, I just ask to go into it

20 for the purposes of showing this officer's

21 investigation.

22     THE COURT:   He said he spoke to her, counsel.

23     MR. BEUKE:

24     Q.   After you spoke to her, Officer, did you

MAYSONET 621

1  give her name to the detectives?

2      A.   Yes.  It's on the report.

3      Q.   All right.

4           Did you ever speak to a young lady by the

5  name of Alma Crisio (phonetic spelling) who lived at

6  3419 West North Avenue?

7      A.   No, I didn't.

8      Q.   Did you ever speak to a Carmen Macias who

9  also lived at 3419 West North Avenue?

10     A.   No, I didn't.

11     Q.   Did you ever provide any of those names to

12 any other police officers involved in this

13 investigation?

14     A.   No.

15     Q.   Officer, did you see some physical evidence

16 that you attempted to preserve until the crime lab

17 got there?

18     A.   No.

19     MR. BEUKE:    Nothing further.

20     MR. MAREK:    Nothing else, your Honor.

21     THE COURT:   Thank you, Officer.  You may step

22 down.

23              (Witness is excused.)

24     THE COURT:   I think, counsels, we have to send

MAYSONET 622

1 the jury out to lunch. Deputy Woodard, take the jury

2 to lunch.

3      THE SHERIFF:  All rise for the jury.

4                          (The following proceedings

5                          were had out of the

6                          hearing of the jury:)

7      THE COURT:   Counsel, let's try to be ready to

8 resume at 2:30.

9      MR. BEUKE:    Fine.

10      THE COURT:   Let's try and resume at 2:30.

11 Court will stand in recess for lunch until 2:30.

12                          (Whereupon, there was a recess

13                          had in the above-entitled

14                          cause, after which the

15                          following proceedings were had:)

16

17

18

19

20

21

22

23

24

          MAYSONET 623

```
 1

 2    STATE OF ILLINOIS   )
                          )    SS.
 3    COUNTY OF C O O K   )

 4              IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 5
      THE PEOPLE OF THE   )
 6    STATE OF ILLINOIS   )
                          )    Case No. 92-10146
 7         VS             )
                          )    Before JUDGE LORETTA H. MORGAN
 8    JOSE MAYSONET,      )              (And a Jury)
      CHRISTOPHER GOOSSENS)
 9
                          AUGUST 9, 1995
10
                            2:30 P.M.
11
           Court convened pursuant to recess.
12
           Present:
13
                HONORABLE JACK O'MALLEY,
14                   State's Attorney of Cook County, by
                MS. ELLEN MANDELTORT, and
15              MR. FRANK MAREK,
                     Assistant State's Attorneys,
16                   appeared for the People;

17              MR. RICHARD BEUKE,
                     appeared for the defendant Maysonet,
18
                MR. RANDY RUECKERT,
19                   appeared for the defendant Goossens.

20

21

22

23                              (The following proceedings

24                              were had out of the
```

MAYSONET 624

1                           hearing of the jury:)

2       THE COURT:   Bring out the jury.

3       THE SHERIFF:  All rise for the jury.

4                   (The following proceedings were

5                   had in the hearing and the

6                   presence of the jury:)

7       THE COURT:   You may be seated.  State, are you

8  ready to call your next witness?

9       MR. MAREK:   We are, your Honor.  The People

10 call Officer Butler.

11                   (Witness is sworn.)

12                   JOHN BUTLER,

13 called as a witness on behalf of the People of the

14 State of Illinois, being first duly sworn, was

15 examined and testified as follows:

16                   DIRECT EXAMINATION

17                   BY MR. MAREK:

18      THE CLERK:  Be seated.

19      MR. MAREK:

20      Q.   Officer, would you state your name, for the

21 record, please?

22      A.   John R. Butler, B-u-t-l-e-r.

23      Q.   And, Officer, what is your profession or

24 occupation?

MAYSONET 625

1      A.    I'm a crime scene processor, forensic

2  investigator.

3      Q.    And how long have you been a forensic

4  investigator?

5      A.    Twenty-seven years.

6      Q.    And how long have you been a Chicago police

7  officer?

8      A.    I've been a Chicago police officer for 30

9  years.

10     Q.    And, Officer Butler, are you assigned to

11 the mobile crime lab?

12     A.    Yes, I am.

13     Q.    And as a forensic investigator assigned to

14 the mobile crime lab, would you just briefly describe

15 what your duties are in processing a crime scene?

16     A.    Primarily, we process major crime scenes.

17 That is done by photographing the scene, searching

18 the scene, collecting the evidence, identifying the

19 evidence, and transporting the evidence to -- the

20 physical evidence to the crime laboratory.

21          We also examine scenes or parts of scenes

22 for ridge impressions, also commonly referred to as

23 fingerprints.

24     Q.    And do you also recover items of physical

MAYSONET 626

1  evidence at crime scenes?

2       A.   Yes, we do.

3       Q.   Officer Butler, I want to direct your

4  attention back to May the 25th of 1990.

5            Were you working as a forensic

6  investigator, at that time?

7       A.   Yes, I was.

8       Q.   And on May the 25th of 1990, did you

9  receive an assignment at, approximately, 1:15 a.m.?

10      A.   Yes, we did.

11      Q.   And were you working with a partner that

12  evening or that early morning?

13      A.   Yes, I was.

14      Q.   And what was your partner's name?

15      A.   Thomas Bachelder, B-a-c-h-e-l-d-e-r.

16      Q.   And the assignment that you received -- you

17  received an assignment to process a crime scene, at

18  that time?

19      A.   Yes, we did.

20      Q.   And where -- where did you go pursuant to

21  that assignment?

22      A.   We were assigned to investigate a homicide

23  scene at 3428 West North Avenue.

24      Q.   And, approximately, what time did you

MAYSONET 627

1  arrive there?

2      A.    Approximately 1:35 a.m..

3      Q.    And what is the first thing that you did at
4  the scene?

5      A.    We had observed the two victims on the
6  scene, and we had then photographed the general area
7  of the scene, which was our first execution of
8  processing the scene.

9      Q.    And after photographing the scene, what did
10  you do then?

11      A.    We then photographed the two victims, and
12  then we began to search the scene for physical
13  evidence.

14      Q.    And did you locate any physical evidence at
15  the scene?

16      A.    Yes, we did.

17      Q.    And what is it that you located, Officer?

18      A.    We had located some firearms evidence,
19  which was four fired cartridge cases, and we had also
20  recovered a beer can that was on the scene.

21      Q.    Now, these cartridge cases that you
22  recovered, approximately where did you recover them?

23      A.    We recovered them on the sidewalk, which
24  was next to the east wall of 3428, the building 3428

MAYSONET 628

1  West North Avenue.

2          They were, approximately, four feet from

3  the front sidewalk.  They were four feet north of

4  that front sidewalk.

5      Q.    Now, the two individuals that you observed

6  on the ground, they were in front of 3428 West North

7  Avenue?

8      A.    The first victim was on the sidewalk in

9  front of 3428.

10          The second victim was adjacent to the

11  southeast corner of that building, which was in front

12  of the vacant lot.

13      Q.    So, the vacant lot is directly east of the

14  building at 3428?

15      A.    That's correct.

16      Q.    And these -- you testified that you found

17  fired shell casings?

18      A.    Yes, we did.

19      Q.    And specifically, what are those?

20  Officer?

21      A.    It's the fired cartridge case, that's the

22  metal container, copper mostly.  Most of the time,

23  it's a copper container that houses the powder and

24  the primer of a bullet.

MAYSONET 629

1    Q.    And does something happen when bullets are

2  fired in certain types of weapons which causes these

3  cartridge cases to be left behind at the scene?

4    A.    That's correct.

5         In the case of an automatic, they are

6  ejected out of the automatic pistol, the cartridge

7  case is.  The power from the ignition of the powder

8  projects the bullet forward, the fired bullet,

9  forward through the barrel.  The slide comes back and

10 pulls out the cartridge case which falls on the

11 ground.

12   Q.    And these four cartridge cases which you

13 said that you -- that you said that you saw, did

14 you -- did you look at them?

15   A.    Yes, I did.

16   Q.    Did you -- did you test them for

17 fingerprints?

18   A.    Yes, I did.

19   Q.    Did you find any fingerprints on any of the

20 cartridge cases?

21   A.    No, I did not.

22   Q.    Was that unusual to you in your experience,

23 Officer Butler?

24   A.    No, it is not.

MAYSONET 630

1      Q.    And why is that?

2      A.    Well, primarily because of the heat and the

3 circumstances in which the cartridge case is under

4 when it is fired and extracted from a weapon and also

5 placed in the environment outside on the ground.

6      Q.    They are also rather small, is that true?

7      A.    They have a small curved surface.  That has

8 a considerable amount to do with it also.

9      Q.    Did you determine what type -- did you look

10 at these cartridge cases and determine what type of

11 cartridge case they were?

12     A.    Yes.  They were nine millimeters.

13     Q.    Now, you also testified that you -- that

14 you observed a beer can at the scene?

15     A.    That's correct.

16     Q.    And did you also test that beer can --

17 strike that question.

18           Did you also examine the beer can for

19 fingerprints?

20     A.    Yes, I did.

21     Q.    Were you able, Officer Butler, to find any

22 suitable ridge impressions on the beer can?

23     A.    There were no suitable ridge impressions on

24 the beer can.

MAYSONET 631

1    Q.    Now, when you -- when you speak of ridge

2 impressions as being suitable or unsuitable for

3 comparison, what does that mean?

4    A.    That means that these ridges have to have

5 so many points of identification in order to be

6 compared to another fingerprint.  And in this case,

7 there were none on that can that was -- that were

8 suitable for comparison.

9    Q.    So, in other words, the prints that you

10 were able to see did not have sufficient ridge

11 impressions which would allow anybody to ever make

12 any comparison to another fingerprint?

13   A.    That's true.

14   Q.    Officer, after photographing the crime

15 scene and inspecting and looking for physical

16 evidence, is there anything else that you did at the

17 actual crime scene?

18   A.    We photographed the two individuals,

19 identification photos, and then we had then went to

20 the morgue from there.

21   Q.    And the morgue is also referred to?

22   A.    I'm sorry, the medical examiner's facility.

23   Q.    They are one in the same, is that correct?

24   A.    That's correct.

MAYSONET 632

1      Q.   And when you went to the medical examiner's

2   facility, what did you do there?

3      A.   We examined, visually examined the victims

4   for gunshot wounds, and we had photographed their

5   wounds and physical evidence that we had recovered

6   from the victims.

7      Q.   Now, the -- what wounds did you observe on

8   the victims at the medical examiner's facility?

9      A.   On victim number one which was Torrence, we

10  had photographed the wound on the left side of the

11  chest, and the right hip and the penis.

12        We had also, when we had pulled the under

13  garment down, we had also found a -- it also revealed

14  a fired bullet that we had photographed and recovered

15  the fired bullet which was later submitted to the

16  lab.

17     Q.   And with respect to the second victim, Mr.

18  Kevin Wiley, what injuries, if any, did you observe

19  at the medical examiner's facility?

20     A.   I had a gunshot -- he had a gunshot wound

21  to the head.

22     MR. MAREK:   If I may approach, your Honor?

23     THE COURT:   Yes, you may.

24     MR. MAREK:

MAYSONET 633

1          Q.    Officer Butler, I'm going to show you

2     initially what has been marked as People's Exhibit

3     Number 1, 2, and 3 for identification.

4               I ask you if you recognize what is depicted

5     in People's Exhibit Number 1 for identification?

6          A.    In Exhibit Number 1 is a photograph

7     depicting the overall of the scene with the two

8     victims, the front of the building, a portion of the

9     front of the building at 3428 West North Avenue, and

10    the two victims on the scene in the vacant lot east

11    of 3428 north -- West North Avenue.

12         Q.    And directing your attention now to

13    People's Exhibit Number 2 for identification, what is

14    depicted in that photo?

15         A.    Exhibit Number 2 depicts an overall again

16    of the scene.

17              This is an overall view east -- going east

18    on the sidewalk, showing again the front of 3428, a

19    portion of the vacant lot, and the two victims on the

20    scene.

21         Q.    And I now direct your attention to People's

22    Exhibit Number 3 for identification.

23              I'll ask you what is depicted in that

24    photo, Officer?

                                    MAYSONET 634

1          A.     In this photo, there are four cartridge

2    cases that we had recovered on the sidewalk which was

3    adjacent or next to the east wall of 3428 West North

4    Avenue.

5              These cartridges are recovered,

6    approximately, four feet north of the sidewalk.  That

7    would -- that sidewalk that I'm referring to is the

8    front sidewalk parallel to North Avenue.

9          Q.     Officer Butler, if you would, I ask you to

10   take this pen and circle each of the shell casings in

11   the photo.

12         MR. MAREK:   May the record reflect that the

13   witness has circled the four shell casings depicted

14   in the photo, your Honor?

15         THE COURT:   Very well.  Will counsel and the

16   witness keep your voices up?

17         MR. MAREK:

18         Q.     Officer Butler, I'm going to show you what

19   has been marked as People's Exhibit Number 4 through

20   8 for identification.

21              I'll ask you specifically with reference to

22   People's Exhibit Number 4, do you recognize what is

23   depicted in that photo?

24         A.     This photograph depicts victim number one,

MAYSONET 635

1  Torrence, who is on the sidewalk in front of 3428.

2  The victim's body is perpendicular to the curb of

3  North Avenue on the sidewalk.

4      Q.   And I would direct your attention to --

5  well, is there anything else that you've testified

6  about that is depicted in People's Exhibit Number 4

7  for identification?

8      A.   It is an overall of the victim.  It does

9  show a wound on the left side of the chest, and his

10 shirt is pulled up.

11     Q.   And is that the wound that you later

12 observed when you -- that you later observed at the

13 medical examiner's facility?

14     A.   That is correct.  We also had photographed

15 that wound.

16     Q.   And that is also the way that you saw Mr.

17 Torrence Wiley at the scene, is that correct?

18     A.   That's correct.

19     Q.   I direct your attention, Officer, if you

20 would, to People's Exhibit Number 5 for

21 identification.  I'd ask you what is depicted in that

22 photo?

23     A.   This photo is a photograph depicting victim

24 number one, Torrence.  It is a front view of his

MAYSONET 636

1 upper body.

2          It depicts also the wound on the left side

3 of his chest, and also an identification photo of the

4 victim on the scene.

5     Q.   I would direct your attention, Officer

6 Butler, to People's Exhibit Number 6 for

7 identification.  I would ask you, what is depicted in

8 that photo?

9     A.   This is a close-up photo depicting the

10 wound in the left side of victim number 1, Torrence's

11 chest.  This photograph is taken at the medical

12 examiner's facility.

13     Q.   And I would also ask you -- I would also

14 direct your attention to People's Exhibit Number 7

15 for identification.

16          I would ask you what is depicted in that

17 photo?

18     A.   This photograph depicts the wound to the

19 penis of victim number one, and also the fired bullet

20 that was recovered from the victim's body.

21     Q.   Officer Butler, I would ask you, if you

22 would, to circle the recovered bullet, where it

23 appears in that photo?  Thank you.

24     A.   You're welcome.

MAYSONET 637

1          MR. MAREK:   May the record reflect that the

2  witness has circled the bullet, the fired bullet

3  which is shown in People's Exhibit Number 7 for

4  identification?

5          THE COURT:   Very well.

6          MR. MAREK:

7          Q.   I would also direct your attention to

8  People's Exhibit Number 8 for identification,

9  Officer.

10          And I would ask you what is depicted in

11  that photo?

12          A.   This photograph depicts a close-up wound to

13  the right hip of victim number one, Torrence.  This

14  photograph was also taken at the medical examiner's

15  facility.

16          Q.   Officer Butler, the three -- I previously

17  showed you People's Exhibit Number 1 through 3 for

18  identification.

19          Do each of those photos truly and

20  accurately depict the crime -- the scene at 3428 West

21  North Avenue as it appeared to you on May 25 of

22  1990?

23          A.   Yes, it does.

24          Q.   And were each of those photos, People's 1

MAYSONET 638

1   through 3 for identification, actually taken by you

2   or -- were they actually taken by you or your

3   partner?

4        A.   Yes, they were.

5        Q.   And, Officer, with respect to People's

6   Exhibit Number 4 through 8 for identification, do

7   each of those photos truly and accurately depict the

8   wounds that you observed about the body of Torrence

9   Wiley either at the crime scene or at the medical

10  examiner's facility on May 25 of 1990?

11       A.   Yes, they do.

12       Q.   And do they truly and accurately depict

13  those injuries?

14       A.   Yes, they do.

15       Q.   And were each of those photos taken by

16  either yourself or your partner?

17       A.   Yes, they were.

18       Q.   Officer Butler, at this time, I'm going to

19  show you what has been marked as People's Exhibit

20  Number 9, 10, and 11 for identification.

21            I would specifically direct your attention

22  to People's Exhibit Number 9 for identification, and

23  I would ask you, sir, what is depicted in that

24  photo.

MAYSONET 639

1      A.    This is -- this photo, Exhibit Number 9,

2 depicts an overall view of victim number 2, Kevin

3 Wiley, on the scene as we saw him.  It depicts a

4 large amount of blood flowing from the victim's

5 head.

6      Q.    I would also direct your attention now to

7 People's Exhibit Number 10 for identification.  I

8 would ask you what is depicted in that photo?

9      A.    This photo here is a close-up photo

10 depicting an identification in the upper body of

11 victim number 2, Kevin Wiley.

12      Q.    And I would also direct your attention to

13 People's Exhibit Number 11 for identification and ask

14 what is depicted in that photo?

15      A.    This is a close-up photo of the gunshot

16 wound to the left side of Kevin Wiley's head.  This

17 photo was taken at the medical examiner's facility.

18      Q.    And, Officer Butler, do each of those

19 photos, People's Exhibit Number 9, 10, and 11 for

20 identification, do they truly and accurately portray

21 the victim, Kevin Wiley, as he appeared both, at the

22 scene and at the medical examiner's facility?

23      A.    Yes, they do.

24      Q.    And are each of those photos photos taken

MAYSONET 640

1   by yourself personally or by your partner?

2        A.   Yes, they were.

3        Q.   Officer Butler, I'm going to show you what

4   has been marked People's Group Exhibit Number 12 for

5   identification.  I would ask you if you recognize

6   what that exhibit is?

7        A.   This is the envelope that we had placed the

8   cartridges in after we recovered the cartridges on

9   the scene.

10            Once placed inside of this envelope, it was

11  sealed, and the information that is on there

12  regarding the case number, inventory number,

13  location, and the contents was placed on the

14  envelope, then sealed and transported to the crime

15  laboratory.

16       Q.   And were they directed to any -- were they

17  submitted to any particular unit within the Chicago

18  Police Department's crime lab?

19       A.   After we had recovered them, examined them,

20  and sealed them, they were transported and turned

21  over to the firearms section for further analysis.

22       Q.   Officer Butler, I'd ask you to look inside

23  the envelope.  Are there any contents inside of the

24  envelope?

MAYSONET 641

1      A.    There are four copper cartridge cases.

2      Q.    Do those -- excuse me.

3            Do those cartridge cases appear to be in

4 the same condition as they were when you recovered

5 them at the scene on May 25 of 1990?

6      A.    Yes.  Yes, they are.

7            There is -- with the exception of writing

8 on the cartridge case, engraving on the cartridge

9 case, they are in the same condition.

10     Q.    And do you know who it is that put that

11 engraving on the cartridge case?

12     A.    That was the firearms section.

13     Q.    And you testified earlier that you were

14 able to determine that these were nine millimeter

15 shell casings, is that correct?

16     A.    That's correct.

17     Q.    How is it that you were able to do that?

18     A.    It is labeled on the back of the cartridge

19 case.

20     Q.    And is -- is nine millimeter labeled on

21 each one of those cases?

22     A.    Nine millimeter is labeled on each one.

23     Q.    And, Officer, if I may just just see the

24 envelope?

MAYSONET 642

```
 1              Now, this -- now, on the front of this
 2  envelope, there is an inventory number, 773257, is
 3  that correct?
 4       A.    That's correct.
 5       Q.    And then underneath, there's the date, May
 6  25, 1990, at 3428 West North?
 7       A.    That's correct.
 8       Q.    And it says exhibit, four nine millimeter
 9  cartridge cases found on ground, sidewalk.
10              Is that your writing on the envelope?
11       A.    That's my partner's writing.
12       Q.    Were you present when he put this writing
13  on the envelope?
14       A.    Yes, I was.
15       Q.    And the envelope was then sealed by your
16  partner in your presence?
17       A.    Yes, and our initials were placed on the
18  envelope, and then it was sealed with tape.
19       Q.    And the envelope was subsequently opened,
20  is that correct?
21       A.    Yes, it was.
22       Q.    Do you know by whom?
23       A.    This was opened by the firearms section
24  when they receive the envelope.  They open it up from
```

MAYSONET 643

1 the bottom to maintain the integrity of our seal on

2 the top. They then write on it and identify their

3 seal -- their -- the area where they cut into it.

4     Q. Officer Butler, I'm also going to show you

5 what has been marked as People's Exhibit Number 13

6 for identification. I ask you if you recognize that

7 exhibit?

8     A. Yes, I do.

9     Q. And what do you recognize that to be,

10 Officer?

11     A. This is the envelope that we had placed the

12 recovered bullet that was found on the victim at the

13 medical examiner's facility.

14     Q. And I'd ask you to look inside of that

15 envelope, the contents. What is contained inside the

16 envelope, Officer?

17     A. This is the fired bullet that we had

18 recovered.

19     Q. Does that appear to be in the same

20 condition now as it was when you recovered it back on

21 May 25 of 1990?

22     A. Yes, it does, with the exception of

23 markings from the firearms section on the back of the

24 bullet, of the jacket of the back of the bullet.

```
 1        Q.    And, Officer, there are also -- well, there
 2   is also writing on the face of the envelope which is
 3   People's Exhibit Number 13 for identification?
 4        A.    That's correct.
 5        Q.    And what is that writing?
 6        A.    The writing is the number of the case.
 7              The number of the case, the inventory
 8   number -- would you want these numbers?
 9        Q.    If you would, please.
10        A.    The case number or the number that's
11   assigned this case is N, as in Nora, 234297 and the
12   inventory number is 773257.
13              The writing on the envelope is by us, and
14   it states the date, 25, May, 90, at the medical
15   examiner's facility, and it describes one fired
16   bullet found from the victim's clothing, victim
17   number two.
18        Q.    And, excuse me, was that writing also
19   placed on the envelope by your partner?
20        A.    That's correct.
21        Q.    And was the -- was that envelope, People's
22   Exhibit Number 13, was that also sealed before it was
23   submitted to the firearms section?
24        A.    We had sealed the envelope, placed our
```

MAYSONET 645

1 initials on it, and then sealed the envelope again

2 with tape.

3     Q.   And the envelope was subsequently opened,

4 is that correct?

5     A.   That's correct.

6     Q.   And do you know by whom?

7     A.   It was firearms examiner Warner, Ernie

8 Warner.

9     Q.   If I may, Officer?

10        Now, Officer, you, as a forensic

11 investigator, are not -- you're not present when any

12 testing or test firing of any of this evidence is

13 done by the firearms examiner, Mr. Warner, is that

14 correct?

15     A.   That's correct.

16     MR. MAREK:   I have no further questions, your

17 Honor.

18     THE COURT:   Mr. Beuke?

19     MR. BEUKE:   Thanks, Judge.

20           CROSS-EXAMINATION

21           BY MR. BEUKE:

22     MR. BEUKE:

23     Q.   Good afternoon, Officer.

24     A.   Good afternoon, sir.

MAYSONET 646

1       Q.    Officer, you were requested initially to

2  come to the scene pursuant to a request that was made

3  by some other policeman, is that correct?

4       A.    That's correct.

5       Q.    Would that have been the detectives or one

6  of the original scene officers who were present out

7  at North Avenue that morning?

8       A.    As I recall, it was one of the scene

9  officers that made the request.

10      Q.    When you got there, Officer, you initially

11 began your part of this investigation by looking

12 around the general scene, is that correct?

13      A.    That's our first act I would say, yes.

14      Q.    Okay.

15            In this case, you got there, I think you

16 indicated, at 1:35, is that correct?

17      A.    That's correct.

18      Q.    All right.

19            Is it fair to say, Officer, that you and

20 your partner -- you've been doing this for 27 odd

21 years, is that correct?

22      A.    That's correct.

23      Q.    And you and your partner are called to

24 crime scenes for the purposes of doing your job and

MAYSONET 647

1  processing crime scenes almost every day, correct?

2      A.   That's correct.

3      Q.   And you have specific responsibilities, at

4  least as it pertains to any individual investigation

5  that you become involved in, and that responsibility

6  is processing the scene?

7      A.   That's correct.

8      Q.   You're basically there to see if there's

9  any physical evidence that you observe that somehow

10 can be preserved for further analysis, fair to say?

11     A.   That's correct.

12     Q.   You have reports that you made in terms of

13 your involvement in this case, is that correct?

14     A.   That's correct.

15     Q.   And those reports are filled out by you and

16 your partner almost immediately after you finish your

17 job as it pertains to any particular case, correct?

18     A.   That's correct.

19     Q.   In your reports, you attempt to document,

20 as best you can, everything that you observed, as

21 well as everything that you collected.

22          You have a responsibility to give inventory

23 numbers to all of the physical evidence that you

24 collect, correct?

MAYSONET 648

1        A.    Yes, sir.

2        Q.    And there is an evidence report -- a crime

3   lab division report that you prepare on every case,

4   correct?

5        A.    That's correct, sir.

6        Q.    That report details the time that you

7   initially got to a scene, correct?

8        A.    That's correct, sir.

9        Q.    The time that you got the assignment,

10  correct?

11       A.    Yes, sir.

12       Q.    The time that you completed your

13  investigation, correct?

14       A.    Yes, sir.

15       Q.    You write all of that down in the report?

16       A.    Yes, sir.

17       Q.    In this case, you completed your

18  investigation at 4:30 in the morning, is that

19  correct?

20       A.    Yes, sir.

21       Q.    That would have been after you had gone to

22  the morgue, correct?

23       A.    Yes, sir.

24       Q.    Okay.

MAYSONET 649

1          And in your report, you detail or you --
2  you took, I believe, ten photos in this case, is that
3  correct?

4      A.   At least, yes.

5      Q.   And you detail each photo in your report
6  and what it's a photograph of, correct?

7      A.   Yes, sir.

8      Q.   For instance--

9      A.   Sometimes, we may take two photographs of
10  the same thing.

11      Q.   Okay.

12          For instance, Officer, you write in your
13  report overall scene and surrounding area, correct?

14      A.   That's correct.

15      Q.   That's a close up of the cartridge cases on
16  and next to sidewalk, correct?

17      A.   That's correct.

18      Q.   I mean, all of your photographs are
19  detailed in your report, is that correct?

20      A.   Yes, sir.

21      Q.   You also place in your report the names and
22  all of the information that you had on the victims,
23  correct?

24      A.   Yes, sir.

MAYSONET 650

1      Q.    In addition to that, there's a section on

2  your report that pertains to your involvement in --

3  in attempting to ascertain fingerprints, correct?

4      A.    That's correct.

5      Q.    And in this case, you and your partner,

6  when you got out there, process the scene.  For the

7  benefit of the ladies and gentlemen of the jury, you

8  have to dust for prints, correct?

9      A.    That's correct.

10      Q.    How do you do that, Officer?  I'm sorry.

11      A.    We place in most instances a contrasting

12  powder on a smooth surface that we feel that we can

13  recover a fingerprint from.

14          In this particular case, the beer can was

15  examined by placing the powder.  The powder adheres

16  to the oils from the skin or the surface of the

17  person's hand or fingers.

18          And that is then taken to the crime

19  laboratory where it is photographed and later on

20  further examined by a fingerprint -- a fingerprint

21  technician.

22      Q.    Again, Officer, I mean, your part of the

23  job is to examine as many pieces of evidence that are

24  out at the scene to see if you can even lift a

MAYSONET 651

1    print.

2            Somebody else's job is to determine whether

3    or not that print can be identified against any

4    particular individual, correct?

5        A.    That's correct.

6        Q.    Okay.

7            There was a beer can that was apparently

8    out on the scene when you got there?

9        A.    Yes, sir.

10       Q.    The beer can was unopened, is that

11   correct?

12       A.    That's correct.

13       Q.    And you were able to recover a ridge

14   impression from the scene, am I right?

15       A.    That's correct.

16       Q.    Okay.

17            All of that, Officer, is documented in your

18   report, correct?

19       A.    Yes, sir.

20       Q.    You talked a little bit about the evidence

21   envelopes that Mr. Marek showed you, and I am sorry,

22   was it your partner's writing or your writing on the

23   envelopes?

24       A.    That's my partner's writing.

MAYSONET 652

1      Q.    You were there when he wrote it, correct?

2      A.    That's correct.

3      Q.    He wrote the lab case number, inventory

4  number, the date, where they were recovered from,

5  what's in each envelope, and four nine millimeter

6  cartridge cases, and one fired bullet.

7            I mean, that's all written on the envelope,

8  is that correct?

9      A.    Yes, sir.

10     Q.    You do that for a purpose, is that correct,

11  Officer?

12     A.    Yes, sir.

13     Q.    So evidence doesn't get mixed up in between

14  cases, you have control over the physical evidence

15  that you recover on any particular case, correct?

16     A.    That's correct.

17     Q.    Okay.

18           And that's a process that you've been

19  taught to follow your entire police career, correct?

20     A.    That's correct.

21     Q.    Sometimes, cases such as this, I mean, this

22  is an incident that happened in May of 1990,

23  correct?

24     A.    Yes, sir.

MAYSONET 653

1      Q.    You've probably processed thousands of

2   crime scenes in between then and now, correct?

3      A.    Yes, sir.

4      Q.    When you come to court and are asked to

5   testify in any particular case, is it fair to say,

6   Officer, that the first thing that you are going to

7   do is look at your evidence report?

8      A.    It would be fair to say that, yes.

9      Q.    And you do that in order to refresh your

10  recollection about what you did, correct?

11     A.    That's correct.

12     Q.    You try to be as detailed in your evidence

13  report as you can for the purposes of helping you

14  when you are getting ready to testify, correct?

15     A.    Also to document what we did there.

16     Q.    Okay.

17     A.    On the scene.

18     Q.    In this case, you did -- you documented

19  everything, correct?

20     A.    Everything that we did pertaining to the

21  recovery of evidence and the photographing of the

22  scene.

23     Q.    Okay.

24            The photographs that you -- that you've

MAYSONET 654

1  identified, Officer, at this point, you're not sure

2  if you took the photographs or your partner took the

3  photographs, is that fair to say?

4       A.   I can recall that.

5       Q.   Did you take them or did your partner?

6       A.   My partner took them photographs.

7       Q.   Okay.

8            So, did you direct him where to stand, or

9  was he taking the photographs on his own?

10      A.   We had both discussed the location from

11 where we will take these photographs.

12      Q.   This was kind of a joint decision?

13      A.   Yes, sir.

14      Q.   The street, Officer, where the bodies were

15 found, to the east would have been a street called

16 Kimball, correct?

17      A.   That's correct.

18      Q.   And to the west would have been what

19 street?

20      A.   That I cannot tell you.  I don't really

21 recall.  I am familiar with the scene, but I don't

22 know all of the streets around there.  We work on a

23 city-wide basis, so I know Saint Louis is to the

24 west, and I don't know the sequence of the other

MAYSONET 655

1    streets.

2        Q.    Okay.

3              When you were photographing the scene,

4    Officer, do you recall as you stood on the

5    sidewalk -- as you stood on the sidewalk you looked,

6    I'm sure, eastbound, is that correct?

7        A.    Yes, sir.

8        Q.    You looked westbound, is that correct?

9        A.    That's correct.

10       Q.    As you sit here today, Officer, do you

11   recall how many buildings were between where the

12   bodies lay and Saint Louis which was the closest

13   street to the west?

14       MR. MAREK:    Objection.   That's not the

15   testimony.

16       THE COURT:   Sustained, counsel.

17       MR. BEUKE:

18       Q.    All right.   I'm sorry, Officer.

19             Do you know from where the bodies lay, if

20   you were to turn and look in the westerly direction,

21   okay, what the first street you would have seen would

22   have been?  Do you know?

23       A.    I don't recall the street.   I do recall

24   there was a street there.

MAYSONET 656

```
1        Q.   Okay.

2             Do you recall, as you sit here now,

3   Officer, how many buildings were between the bodies

4   as they lay on the sidewalk and that street?

5        A.   The exact number of buildings?

6        Q.   Yes.

7        A.   I don't recall the exact number of

8   buildings.

9        Q.   Approximately.

10       A.   Approximately three.

11       Q.   Three?

12            Do you recall if there were any vacant lots

13  in between any of those buildings?

14       A.   We are referring to the east or west now?

15       Q.   Going towards the west.

16       A.   Going towards--

17       Q.   Towards that first street.

18       A.   Yes, I do recall from the 3428 building

19  going towards the west, there were no vacant lots

20  between 3428 and the street.

21       Q.   And that street would have been the first

22  street to the west, is that correct?

23       A.   That's correct.

24       Q.   All right.
```

MAYSONET 657

1            So, all of those lots, however many lots

2  there were, were all occupied by structures?

3      A.   That's correct.

4      Q.   Officer, have you ever gone out, in terms

5  of your duties as an evidence technician, to a crime

6  scene and processed the crime scene and not done a

7  report concerning your observations?

8      MS. MANDELTORT:    Objection, Judge.

9      THE COURT:   Sustained.

10     MR. BEUKE:

11     Q.   Well, is it your practice, Officer, in

12 terms of how you do your job, to document everything

13 that you see and observe at a crime scene, like you

14 did in this case?

15     A.   Yes, it is my job to document that.

16     Q.   This was a double homicide, correct,

17 Officer?

18     A.   That's correct.

19     Q.   In terms of crime, this is about as serious

20 as it gets, is that fair to say?

21     A.   Yes, it is.

22     MR. BEUKE:    Thank you, sir.

23     MR. MAREK:    Nothing else.  No redirect.

24     THE COURT:   Very well.  Thank you, Officer.

MAYSONET 658

1 You are excused.

2        A.    You're welcome.

3                (Witness is excused.)

4        MR. BEUKE:    Thank you, Officer.

5        A.    You're welcome.

6        THE CLERK:  Raise your right hand.

7                (Witness is sworn.)

8                BARRY LIFSCHULTZ,

9  called as a witness on behalf of the People of the

10 State of Illinois, being first duly sworn, was

11 examined and testified as follows:

12              DIRECT EXAMINATION

13              BY MR. MAREK:

14      THE CLERK:  Be seated.

15      MR. MAREK:    Good afternoon, Doctor.

16      Q.    Would you state your name, for the record,

17 please?

18      A.    My name is Doctor Barry Lifschultz.  That's

19 spelled L-i-f-s-c-h-u-l-t-z.

20      Q.    And, Doctor, what is your profession or

21 occupation?

22      A.    I'm a staff forensic pathologist at the

23 Cook County Medical Examiner's Office.

24      Q.    And, Doctor, are you licensed to practice

MAYSONET 659

1 medicine in the State of Illinois?

2     A.    Yes, I am.

3     Q.    And, Doctor, would you just briefly

4 describe for the ladies and gentlemen of the jury

5 your educational background starting with medical

6 school?

7     A.    In 1977, I received my M.D. from Loyola

8 University Medical School, which is in Maywood,

9 Illinois.

10         Then, in 1981, I finished a four-year

11 residency in general anatomic pathology at

12 Northwestern University Medical School in Chicago.

13         In 1982, I finished a one-year residency in

14 forensic pathology at the Cook County Medical

15 Examiner's Office.

16         And then since that time, I have been

17 employed at the Cook County Medical Examiner's Office

18 as a staff pathologist.

19     Q.    And, Doctor, in the course of your

20 employment with the Cook County Medical Examiner, as

21 a staff pathologist, have you performed what are

22 known as postmortem examinations or autopsies?

23     A.    Yes, I have.

24     Q.    On, approximately, how many times?

MAYSONET 660

1      A.    Well, I perform about three hundred

2  autopsies each year, and I've been there now for 14

3  years.

4           So, I've performed well over three thousand

5  autopsies.

6      Q.    And, Doctor, when is it that you perform an

7  autopsy upon the remains of a deceased person?

8      A.    Basically, the cases that we investigate

9  are cases where the death is sudden, unexpected, or

10 possibly violent, and we perform the autopsies to

11 determine why the person died.

12     Q.    And, Doctor, are you board certified in any

13 specialty?

14     A.    Yes, I am.

15     Q.    And what is that?

16     A.    I'm board certified in general anatomic

17 pathology, and I was board certified in that in 1982,

18 and I'm also board certified in forensic pathology as

19 of 1983.

20     Q.    And, Doctor, what is anatomic pathology?

21     A.    Anatomic pathology or general anatomic

22 pathology is essentially the study of diseases and

23 injuries as those diseases and injuries appear in the

24 tissues of the body, whether we look at the tissues

MAYSONET 661

1  with our naked eye or with the identify of a

2  microscope.

3      Q.    And what is forensic pathology?

4      A.    In forensic pathology, which is a

5  sub-speciality of general anatomic pathology, we use

6  the principles of general anatomic pathology

7  specifically to investigate sudden and unexpected

8  deaths or possibly violent deaths.

9      Q.    Doctor, do you belong to any professional

10  organizations?

11      A.    Yes, I do.

12      Q.    And what are some of those?

13      A.    I'm a fellow in the American Academy of the

14  Forensic Sciences, and I'm also a fellow of the

15  College of American Pathologists.

16      Q.    And, Doctor Lifschultz, have you testified

17  before in the Circuit Court of Cook County as an

18  expert witness in the field of forensic pathology?

19      A.    Yes, I have.

20      Q.    Approximately, how many times?

21      A.    I've testified -- I testify about once

22  every month, and I've been employed at the office for

23  14 years.  So, I've testified well over a hundred

24  times.

MAYSONET 662

1    MR. MAREK:    Your Honor, at this time, the

2  State would offer to the Court Doctor Lifschultz as

3  an expert in the field of forensic pathology.  We

4  would tender to counsel for any questions.

5    MR. BEUKE:    Judge, I have no doubt that this

6  doctor is an expert in his field.  No questions as to

7  that aspect.

8    THE COURT:   All right.  Mr. Rueckert?

9    MR. RUECKERT:    No, Judge, thank you.

10    THE COURT:   Thank you.

11       The Court then makes a finding that Doctor

12  Lifschultz will be accepted by the Court as an expert

13  in the field of forensic pathology.

14    MR. MAREK:

15    Q.   Doctor Lifschultz, I would like to direct

16  your attention to May the 25th of 1990.

17       On that date, did you perform an autopsy

18  upon Kevin Wiley?

19    A.   Yes, I did.

20    Q.   And, Doctor, during the course of

21  performing that autopsy, did you find any evidence of

22  injury on Mr. Kevin Wiley?

23    A.   Yes, I did.

24    Q.   And what evidence of injury did you find?

MAYSONET 663

1       A.    Kevin Wiley had one main injury, and this
2  was a gunshot wound which was of the left back of the
3  neck.
4           And in the area that I'm pointing to here,
5  the course of the wound went through the skin of the
6  left back of the neck.
7           It went through the blood vessels and
8  larynx of the neck.  And then finally from the skin
9  over the right jaw, in the area that I'm pointing to
10 here with my right hand, we recovered a medium
11 caliber bullet.  So, the course of the wound was from
12 back to front and left to right.
13      Q.    And, Doctor, did you notice any type of
14 abrasions about the wound of entry?
15      A.    Yes, we did.
16      Q.    And what is it that you noticed?
17      A.    There was an area around the wound on the
18 left back of the neck which had multiple punctate or
19 pinpoint hemorrhages on the skin.
20      Q.    And what, if anything, did that indicate to
21 you?
22      A.    This was evidence of close range firing.
23      Q.    Doctor Lifschultz, did you also -- during
24 the course of your autopsy, did you examine the lungs

MAYSONET 664

N-128

1  of Kevin Wiley?

2       A.    Yes, I did.

3       Q.    And what did you find of significance in

4  your examination of the lungs of Kevin Wiley?

5       A.    When I examined the lungs, I found that the

6  airways of both lungs were filled with clotted and

7  also fluid blood that had apparently come from the

8  gunshot wound of the larynx.

9       Q.    Doctor Lifschultz, based upon your autopsy

10 of Mr. Kevin Wiley and based upon your experience and

11 expertise in the field of forensic pathology, do you

12 have an opinion to a reasonable degree of scientific

13 and medical certainty as to the cause of death of

14 Kevin Wiley?

15      A.    Yes, I do.

16      Q.    And what is that opinion?

17      A.    Kevin Wiley died as a result of the gunshot

18 wound of the neck that I've described.

19      Q.    Doctor, just briefly, how exactly did this

20 gunshot wound to the neck kill Kevin Wiley?

21      A.    The way that the gunshot wound of the neck

22 killed Kevin Wiley was really in two ways.

23           First of all, the gunshot wound perforated

24 major blood vessels of the neck, and those blood

MAYSONET 665

1  vessels then could bleed outward so that the blood

2  would no longer be available for him to transport

3  oxygen to his tissues.

4       So, in one sense, he was actually bleeding

5  to death outside of the body.

6       But then also, the blood from these blood

7  vessels went into the airways and finally down into

8  his lungs so that also at the same time he was

9  bleeding to death outside of the body, he was also

10 actually drowning in his own blood.

11     Q.   Doctor Lifschultz, I'm going to show you

12 what has been marked as People's Exhibit 14 through

13 17 for identification and first specifically

14 directing your attention to People's Exhibit Number

15 14, do you recognize what's depicted in that photo?

16     A.   Yes, I do.

17     Q.   And what is depicted or who is depicted in

18 that photo?

19     A.   This is a picture of the face of medical

20 examiner's case number 446, May 90, and there was the

21 person who was identified to me as Kevin Wiley.

22     Q.   And I would -- I would direct your

23 attention to People's Exhibit Number 15 for

24 identification.

MAYSONET 666

1          And what specifically, if anything, is

2    shown in People's Exhibit Number 15 for

3    identification?

4        A.    This is a picture of the left back of the

5    neck of Kevin Wiley, and it shows the gunshot wound

6    of entrance of the left back of the neck.

7          Also, it shows several of the pinpoint

8    hemorrhages around the wound which are evidence of

9    close range firing, and it also shows the medical

10   examiner's tag which has the case number 446, May

11   90.

12       Q.    And, Doctor, I would also direct your

13   attention to People's Exhibit Number 16 for

14   identification, and I would ask you what is depicted

15   in that photo?

16       A.    This is a close-up picture of the same

17   gunshot wound of the left back of the neck of Kevin

18   Wiley, and it shows even better than the other

19   picture the pinpoint hemorrhages around the wound

20   which are evidence of close range firing.

21       Q.    And, Doctor, I would also direct your

22   attention to People's Exhibit Number 17 for

23   identification, and I would ask you what is depicted

24   in that photo?

MAYSONET 667

1    A.    This is a picture of the medium caliber,

2 partially metal jacketed lead bullet that was

3 recovered from beneath the right jaw of Kevin Wiley.

4        It shows the bullet and the autopsy tag

5 which has the number 446, May, 90, which was Kevin

6 Wiley's number.

7    Q.    Doctor, this bullet which is depicted in

8 People's Exhibit Number 17 for identification, was

9 that bullet recovered by you and submitted to the

10 Chicago Police Department's crime lab?

11   A.    Yes, it was.

12   Q.    Doctor Lifschultz, I would like to again

13 direct your attention to May the 25th of 1990.

14        Did you also perform an autopsy on that day

15 on Mr. Torrence Wiley?

16   A.    Yes, I did.

17   Q.    And, Doctor, during the course of your

18 autopsy of Mr. Torrence Wiley, did you find any

19 evidence of injury?

20   A.    Yes, I did.

21   Q.    And what evidence of injury did you find on

22 Mr. Torrence Wiley?

23   A.    Torrence Wiley had two main injuries.  The

24 first was a gunshot wound of the left chest in the

MAYSONET 668

1  area that I'm pointing to here with my hand.

2          The course of this wound perforated the

3  skin of the left chest.

4          It went through the major blood vessels of

5  the left chest, through the heart, through the right

6  lung, and then finally from beneath the skin of the

7  right chest, again we recovered a medium caliber,

8  partially metal jacketed lead bullet, and the course

9  of this wound was basically from left to right.

10         The second injury that we found was a

11 gunshot wound of the genitals.

12         The course of this wound went through the

13 genitals and through the soft tissues of the abdomen,

14 and then finally exited on the right side of the body

15 in the area that I'm pointing to here.

16         The course of this wound was basically from

17 left to right.

18    Q.    Doctor, just so the record is clear, the

19 area that you indicated as the exit wound, that would

20 be about the right hip?

21    A.    Yes.

22    Q.    And, Doctor, was any bullet -- was any

23 bullet recovered in connection with the exit wound of

24 the right hip by you?

MAYSONET 669

1     A.   No.

2     Q.   Doctor, based upon your autopsy of Mr.

3 Torrence Wiley and based upon your experience in the

4 field of forensic pathology, do you have an opinion

5 to a reasonable degree of scientific and medical

6 certainty as to the cause of death of Mr. Torrence

7 Wiley?

8     A.   Yes, I do.

9     Q.   And, Doctor, what is that opinion?

10    A.   Torrence Wiley died as a result of the two

11 gunshot wounds that I've described.

12    Q.   Doctor Lifschultz, I'm going to show you

13 initially what what has been marked as People's

14 Exhibit Number 18 for identification.

15       I'll ask you if you recognize the -- excuse

16 me -- the person depicted in that photo?

17    A.   Yes, I do.

18    Q.   And who do you recognize that to be?

19    A.   This is a picture of the face of medical

20 examiner's case number 447 May 90, and this is the

21 person who was identified to me as Torrence Wiley.

22    Q.   And is the medical examiner's case number

23 indicated on there?

24    A.   Yes.

MAYSONET 670

1          The medical examiner's number is on a gray

2   tag which is just beneath Mr. Wiley's chin.

3       Q.   What is that number?

4       A.   447 May, 90.

5       Q.   And, Doctor, I'd also direct your attention

6   to People's Exhibit Number 19 for identification.

7   I'd ask you what is depicted in that photo.

8       A.   This is a picture of the left chest of

9   Torrence Wiley, and it shows the gunshot wound of the

10  left chest that I described and also the gray autopsy

11  tag, and the tag again reads 447 May 90.

12      Q.   And, Doctor, I would also direct your

13  attention to People's Exhibit Number 20 for

14  identification.  I'd ask you, what is depicted in

15  that photo?

16      A.   This is a picture which was taken much

17  closer up of the gunshot wound of the left chest of

18  Torrence Wiley, and it shows the left nipple, the

19  gunshot wound of entrance in the center of the

20  picture and again the medical examiner's case number

21  447 May 90, which was Mr. Wiley's case number.

22      Q.   And, Doctor, I would direct your attention

23  to People's Exhibit Number 21 for identification, and

24  I'd ask you what is depicted in that photo?

MAYSONET 671

1      A.    This is a picture of the gunshot wound of

2 the genitals, and the main portion of the gunshot

3 wound is of the left side of the penis and also then,

4 just adjacent to the main gunshot wound, higher up on

5 the groin, there is a gunshot -- or a gunshot wound

6 which is probably the result of a fragment of the

7 bullet striking the skin.

8      Q.    And, Doctor, I would direct your attention

9 to People's Exhibit Number 22 for identification, and

10 I'd ask you what is depicted in that photo.

11      A.    This is a picture of the right hip of Mr.

12 Wiley, and it shows the exit of the gunshot wound of

13 the genitals.

14          The gunshot wound of the genitals went from

15 front to back and left to right, and this is where

16 the gunshot wound exited.

17          Also, too, the medical examiner's case

18 number, 447 May 90, is shown on this picture of the

19 right hip.

20      Q.    And, Doctor, I would also direct your

21 attention to People's Exhibit Number 23 for

22 identification, and I'd ask you what is depicted in

23 that photo?

24      A.    This is a closer-up picture of the gunshot

MAYSONET 672

1   wound of exit on the right hip, and it has the

2   characteristics of a gunshot wound of exit because

3   it's torn or lacerated at its edges.

4        Q.   And finally, I would direct your attention

5   to People's Exhibit Number 24 for identification.

6             I'd ask you, what is depicted in that

7   photo?

8        A.   This is a picture of a bullet which was

9   recovered from the clothing of the deceased, and it

10  shows the case number again on the autopsy tag, 447

11  May 90, and the deformed lead bullet above it.

12       Q.   Was that recovered from the clothing or

13  from the chest of the victim, Doctor?

14       A.   It was not recovered from the body.  So, as

15  I understand it, it was recovered from the clothing.

16       Q.   But you yourself did recover this bullet,

17  is that correct?

18       A.   I don't believe that I recovered that

19  bullet.

20       Q.   Would you just refer to the -- would you

21  just refer to your autopsy notes?

22       A.   I believe it was recovered from the

23  clothing.

24       Q.   Doctor, I would direct your attention to

                    MAYSONET 673

1   the first page of your report of postmortem

2   examination.

3           It does refer to the deformed medium

4   caliber partially lead bullet recovered from beneath

5   the skin of the right chest?

6       A.   Oh, I'm sorry.  I'm confused because I know

7   that there was a bullet recovered from gunshot wound

8   number two.

9       Q.   Right.

10       A.   But this bullet in that picture was

11   recovered from gunshot wound number one.

12       Q.   You did not -- you did not recover any

13   bullet from gunshot wound number two, and that was

14   actually recovered from clothing by someone else, is

15   that correct?

16       A.   Yes, that's correct.

17       Q.   Doctor Lifschultz, do each of the

18   photographs which you testified to, People's Exhibit

19   Number 14 through 24 inclusive, do they truly and

20   accurately depict what you observed during your

21   autopsies of Kevin Wiley and Torrence Wiley?

22       A.   Yes, they do.

23       Q.   Doctor Lifschultz, you testified that you

24   did recover a bullet from the body of Torrence Wiley

MAYSONET 674

1  which you later submitted to the crime lab, is that

2  correct?

3      A.   Yes, I did.

4      Q.   I'm going to show you what has been marked

5  as People's Exhibit Number 25 for identification.

6           I'll ask you if you recognize what that

7  is?

8      A.   Yes, I do.

9      Q.   And what do you recognize that to be?

10     A.   This is the blue paper envelope for case

11 number 447 May 90, from Torrence Wiley, and it was

12 into this blue paper envelope that I put a brown

13 paper envelope which contained the deformed medium

14 caliber bullet that I recovered from gunshot wound

15 number one of Torrence Wiley, the gunshot wound of

16 the left chest.

17     Q.   And did you submit that to -- did you

18 submit that to the Chicago Police Department Crime

19 Lab in a sealed condition?

20     A.   Yes.

21          After I took a picture of the bullet, I put

22 the bullet into the brown paper envelope, which is

23 inside of the blue paper envelope.

24          I sealed the brown paper envelope, and then

MAYSONET 675

1  I sealed the blue paper envelope and turned it over

2  to the Chicago Police Department.

3      Q.   And, Doctor Lifschultz, I'm also going to

4  show you what has been marked as People's Exhibit

5  Number 26 for identification.  I'll ask you if you

6  recognize what that is?

7      A.   Yes, I do.

8      Q.   What do you recognize that to be?

9      A.   This is also a blue paper envelope, and

10 this is the envelope into which I put the brown paper

11 envelope containing the deformed medium caliber lead

12 bullet from case number 446 of May 90, Kevin Wiley.

13      Q.   And was that also submitted to the Chicago

14 Police Department in a sealed condition?

15      A.   Yes, it was.

16      Q.   And was that bullet also put inside of a

17 brown envelope?

18      A.   Yes, it was.

19      Q.   And does that envelope appear to be --

20 other than the fact it's been opened, does it appear

21 to be in the same condition as it was when you sealed

22 it and submitted it to the crime lab?

23      A.   Yes, except for some writing on the

24 envelope that wasn't there when I originally

MAYSONET 676

1 submitted it.

2    Q.    And as far as you know, that's writing put

3 on there by -- that's writing put on there by the

4 crime lab?

5    A.    Yes.

6    Q.    The same is also true of People's Exhibit

7 Number 25 for identification?

8    A.    Yes, some writing and also a label.

9    Q.    That's the evidence tag?

10    A.    Yes.

11    Q.    Okay.  Thank you, Doctor.

12    MR. MAREK:    If I may have a moment?  No

13 further questions.

14    THE COURT:    Very well.

15    MR. BEUKE:    Thanks, Judge.

16            CROSS-EXAMINATION

17            BY MR. BEUKE:

18    MR. BEUKE:

19    Q.    Doctor,--

20    THE COURT:    Would you hold on just a second?

21    MR. BEUKE:    Sure.

22    THE COURT:    If I can see counsels at the

23 bench?

24            (Whereupon, there was a sidebar

MAYSONET 677

1              discussion had out of the hearing of the

2              court reporter and jury, after which the

3              following proceedings were had:)

4         THE COURT:   Very well.   Mr. Beuke.

5         MR. BEUKE:    Thank you.

6         Q.   Doctor, I notice that you have in front of

7    you the report of postmortem examination that you

8    prepared, I believe, pursuant to your involvement in

9    this case, is that correct?

10        A.   Yes.

11        Q.   That was a postmortem examination that you

12   prepared on each individual victim that you examined

13   in this case, correct?

14        A.   Yes.

15        Q.   That is a report, Doctor, at least as to

16   Torrence Wiley, that is some four pages in length, is

17   that correct?

18        A.   Yes.

19        Q.   And as to Kevin Wiley, three pages in

20   length, is that correct?

21        A.   Yes.

22        Q.   When the bodies come into the morgue,

23   Doctor, you initially assign them a medical

24   examiner's case number, correct?

MAYSONET 678

1      A.    No, I don't actually assign the case

2   numbers.   Those are assigned by someone else.

3      Q.    That's assigned by somebody.

4            But when you begin your examination, the

5   body has been given a number, is that correct?

6      A.    Yes.

7      Q.    That's kind of a mechanism that's designed

8   to allow you to keep track of each individual

9   examination, correct?

10     A.    Yes.

11     Q.    And you do that for the expressed purpose

12  of trying to maintain, as best you can, a record of

13  all of your work that you perform in your job at the

14  Medical Examiner's Office, fair to say?

15     A.    Yes.

16     Q.    You initially begin this process that you

17  told us about, the autopsy, by conducting an external

18  examination, correct?

19     A.    Yes.

20     Q.    And that initially, you -- you view the

21  body as it's presented to you at the morgue,

22  correct?

23     A.    Yes.

24     Q.    You view the clothing, correct?

MAYSONET 679

```
 1        A.    Yes.

 2        Q.    You make an overall observation of the

 3   frontal view, side views, back view of the body, is

 4   that correct?

 5        A.    Yes.

 6        Q.    Anything that you note of any significance,

 7   you include or attempt to include in your notes,

 8   correct?

 9        A.    Yes.

10        Q.    You make notes of basically everything that

11   you do during the course of your examination,

12   correct, Officer -- or Doctor?

13        A.    Most things.

14        Q.    Most things.

15              Everything certainly that is significant,

16   correct, that you see?

17        A.    I try to, yes.

18        Q.    Okay.

19              That is done again, Doctor, for the purpose

20   of maintaining as -- as thorough a document

21   concerning your observations as you can because at

22   some point, you may be asked to come into court and

23   testify, correct?

24        A.    Yes.
```

1    Q.   You indicated that you personally, Doctor,

2 do, approximately, how many autopsies a month?

3    A.   Well, I perform well over three hundred a

4 year.

5    Q.   Okay.

6         So, fair to say, I guess, between the time

7 that you did the post on Torrence and Kevin Wiley,

8 you've probably done 15 hundred?

9    A.   Probably, yes.

10    Q.   Specifically, Doctor, you don't have any

11 independent recollection of your autopsies that you

12 performed back in May of 1990 on these two young men

13 as you sit here today, correct?

14    A.   Only as it's refreshed by these documents.

15    Q.   Okay.

16         That's the purpose of the document,

17 correct?

18    A.   Yes.

19    Q.   You also in your document, the report of

20 postmortem examination, Doctor, you detail everything

21 that you observed concerning what's called an

22 internal examination, is that correct?

23    A.   Yes.

24    Q.   Your observation of the body cavities, the

MAYSONET 681

1 neck organs, the respiratory system, cardiovascular

2 system, spleen and lymph nodes, gastrointestinal

3 system -- am I saying it right, Doctor?

4      THE COURT:   We get the point, counsel.

5      MR. BEUKE:    All right.

6      THE COURT:  Move on.

7      MR. BEUKE:

8      Q.   All of these are documented in all of the

9 work that you did on these bodies, is that correct?

10      A.   Yes.

11      Q.   Additionally, Doctor, you took some blood

12 from the bodies, is that correct?

13      A.   Yes, I do.

14      Q.   Would you tell the ladies and gentlemen of

15 the jury what your purpose in drawing the blood was?

16      A.   We take in most of our cases samples of the

17 body fluids, including the blood, so that we can do

18 later studies for drugs and poisons.

19      Q.   Doctor, the blood that you took from the

20 body of Torrence Wiley, did you ultimately send that

21 blood anywhere, that sample?

22      A.   Yes, I did.

23      Q.   Where was that sent?

24      A.   The blood from -- actually, both cases was

MAYSONET 682

1 sent to our toxicology laboratory which is where they

2 do the tests for drugs and poisons.

3     Q.    Okay.

4          Likewise, with Kevin Wiley, you did that

5 also?

6     A.    Yes.

7     Q.    You had an opportunity to review the

8 toxicological reports that were submitted pursuant to

9 your sending the blood samples to the toxicology lab,

10 have you not?

11     A.    Yes.

12     Q.    Can you tell the ladies and gentlemen of

13 the jury, Doctor, what the toxicological results on

14 the blood of Kevin Wiley indicated?

15     A.    The blood of Kevin Wiley, our case number

16 446 of May 90, was tested for three major

17 substances.

18          It was tested for cocaine, and actually the

19 test for cocaine is done by testing for a breakdown

20 product of cocaine, which is called benzolecognine.

21          The blood was also tested for ethanol or

22 drinking alcohol.  And it was tested for opiates,

23 which are drugs like heroin or morphine.  And the

24 blood of Kevin Wiley was positive for drinking

MAYSONET 683

1    alcohol at a level of 332 milligrams per deciliter.

2        Q.    Doctor, you're familiar with the -- with

3    the legal, I guess, limit blood alcohol in terms of

4    legally being drunk, are you not?

5        MR. MAREK:    Objection.

6        THE COURT:    Sustained.  Sidebar?

7        MR. BEUKE:    Yes, Judge.

8                         (The following proceedings

9                          were had out of the

10                         hearing of the jury:)

11       THE COURT:    You can rephrase your question.

12       MR. BEUKE:  Okay.

13       THE COURT:  I don't know if there is any

14   standard for illegally drunk outside of the

15   contention of DUI.

16       MR. BEUKE:    Okay.

17                      (The following proceedings were

18                       had in the hearing and the

19                       presence of the jury:)

20       MR. BEUKE:

21       Q.   Doctor, how does that -- that figure

22   translate into -- or the blood workup that was done

23   on Kevin Wiley, have you reviewed that, those

24   results, or were those results that you just gave

MAYSONET 684

1  me?

2       A.    Those were the results that I just gave

3  you.

4       Q.    Okay.

5             How about the blood results of Torrence

6  Wiley?

7       A.    Yes, I also reviewed the blood results of

8  Torrence Wiley.

9       Q.    And can you tell the ladies and gentlemen

10 of the jury what the results of the toxicological    .

11 analysis as to blood of Torrence Wiley indicated?

12      A.    The blood of Torrence Wiley was tested the

13 same way that the blood of Kevin Wiley was tested.

14 And in Torrence Wiley's blood, we found a level of

15 186 milligrams per deciliter of drinking alcohol.

16      Q.    In your experience, Doctor, would the

17 figures that you have just related to the ladies and

18 gentlemen of the jury, 332, I believe it's

19 megaliters, is that right?

20      A.    Milligrams.

21      Q.    Milliliters, 186 milliliters.

22            Can you -- do you have an opinion as to

23 whether or not an individual with that amount of

24 alcohol in his blood would be legally drunk?

MAYSONET 685

1      MR. MAREK:    Objection.

2      MS. MANDELTORT:    Objection.

3      THE COURT:   Sustained.

4      MR. BEUKE:

5      Q.   Do you have an opinion as to what his

6  condition may be with that amount of alcohol in his

7  blood?

8      A.   Well, both values are above the level at

9  which a person is -- in Illinois, as I understand, is

10  considered intoxicated for purposes of operating a

11  motor vehicle.

12      Q.   Okay.

13          That level as you understand it, Doctor, is

14  what?

15      A.   Is a hundred.

16      Q.   Okay.

17          So this, at least as to Kevin Wiley, was

18  over three times that, is that correct?

19      A.   Yes.

20      Q.   And as to Torrence Wiley, it was almost

21  twice that, is that correct?

22      A.   Yes.

23      MR. BEUKE:    Thank you, Doctor.

24

MAYSONET 686

```
 1                    REDIRECT EXAMINATION

 2               BY MR. MAREK:

 3        MR. MAREK:

 4        Q.    Just briefly, Doctor.

 5               The tests indicated that Kevin Wiley had

 6   consumed alcoholic beverages shortly before death,

 7   right?

 8        A.    Yes.  It indicated that he had consumed

 9   alcohol.

10        Q.    It indicated actually that no use of any

11   other illicit drugs, at least no use of cocaine or

12   opiates?

13        A.    That's correct.

14        Q.    It was negative for that?

15        A.    Yes.  The tests were negative for cocaine

16   and opiates.

17        Q.    And the testing results, the toxicological

18   testing results, were the same for Torrence Wiley, is

19   that correct?

20        A.    Yes, also negative for opiates and

21   cocaine.

22        MR. MAREK:      Nothing else.

23        MR. BEUKE:      Nothing else.  Thank you, Doctor.

24        MR. RUECKERT:     No thanks, Judge.
```

MAYSONET 687

1    THE COURT:   Thank you very much, Doctor.

2    A.   I'll leave these documents here.

3    THE COURT:   Yes.   They should be withdrawn from

4  the witness stand.

5              (Witness is excused.)

6    THE COURT:   I think this is an auspicious time

7  to take the afternoon break.   Let's plan -- Deputy

8  Woodard?

9    THE SHERIFF:   Yes.   All rise for the jury.

10    THE COURT:   We'll take a 15 minute break.

11  Let's be back by 4:10.

12    THE SHERIFF:   Yes, Judge.

13              (Whereupon, there was a recess

14              had in the above-entitled

15              cause, after which the

16              following proceedings were had:)

17    THE COURT:   Bring out the defendants, and then

18  bring out the jury.

19              (The following proceedings were

20              had in the hearing and the

21              presence of the jury:)

22    THE COURT:   Very well.   Every one may be

23  seated.   State, call your next witness.

24    THE CLERK:   Would you raise your right hand,

MAYSONET 688

1  please?

2  (Witness is sworn.)

3  ERNEST WARNER,

4  called as a witness on behalf of the People of the

5  State of Illinois, being first duly sworn, was

6  examined and testified as follows:

7  DIRECT EXAMINATION

8  BY MS. MANDELTORT:

9  THE CLERK:  Be seated.

10  MS. MANDELTORT:

11  Q.  Sir, can you, please, introduce yourself to

12  the ladies and gentlemen of the jury?

13  A.  My name is Ernest Warner.

14  Q.  Could you spell both, your first and last

15  name for the court reporter?

16  A.  E-r-n-e-s-t, W-a-r-n-e-r.

17  Q.  Mr. Warner, what is your occupation or

18  profession?

19  A.  I'm a firearms examiner for the Chicago

20  Police Department Crime Laboratory.

21  Q.  And how long have you been employed in that

22  capacity?

23  A.  Twenty-nine years.

24  Q.  Could you tell the ladies and gentlemen of

MAYSONET 689

1  the jury a little bit about your duties as a firearms

2  examiner?

3      A.   My duties as a firearms examiner include

4  receiving fired evidence, assigning laboratory

5  control numbers to fired evidence, microscopically

6  examining fired evidence, receiving weapons,

7  assigning control numbers to weapons, test firing

8  weapons, microscopically comparing my tests from

9  weapons to fired evidence.

10     Q.   Okay.

11          Sir, have you had the opportunity to study

12  under a recognized expert in the field of firearms

13  identification?

14     A.   Yes.  I studied under John C. Stouffer, a

15  former chief firearms examiner at the Chicago Police

16  Department.

17     Q.   Likewise, sir, have you read textbooks in

18  that field?

19     A.   Yes, I've read the standard textbooks,

20  including Firearms Identification by Matthews,

21  Firearms Identification Investigation and Evidence by

22  Hatcher, Firearms Identification by Bouregard,

23  Firearms Identification from the Ammunition Fired

24  Therein by Gunther and Gunther.

MAYSONET 690

1      Q.    Is there any sort of continued training

2  that goes on within your field?

3      A.    Yes, there is.

4      Q.    What type of continued training goes on?

5      A.    There are specialized classes at the FBI

6  Academy in Quantico, Virginia.

7      Q.    Have you taken those classes?

8      A.    I have.

9      Q.    Sir, have you had the opportunity to

10 testify in court before as an expert in the field of

11 firearms identification and firearms examination?

12     A.    Yes, I have.

13     Q.    How many times have you testified as an

14 expert?

15     A.    Approximately two hundred times.

16     MS. MANDELTORT:    Your Honor, at this time, I

17 would offer Mr. Warner as an expert in the field of

18 firearms examination and identification and tender

19 him to counsel for any questions regarding his

20 qualification.

21     MR. BEUKE:    No questions.  I know he is an

22 expert.

23     THE COURT:    Very well.

24         The Court will accept him as an expert in

MAYSONET 691

1  the field of firearms testing and identification.

2      MS. MANDELTORT:

3      Q.    Mr. Warner, can you tell us what is the

4  basis for firearms identification?

5      A.    The basis for firearms identification is

6  the similarity in the reproduction of class and

7  individual characteristics on fired ammunition

8  components.

9      Q.    And what -- tell us a little bit about

10 those characteristics.

11     A.    Class characteristics are characteristics

12 that are common to any number of weapons.  They

13 include caliber, which is the nominal diameter of

14 fired bullets and in gun barrels.

15         In the manufacture of weapons, spiral

16 grooves are cut in the barrel of the weapon.

17         The number of these grooves that are cut in

18 the weapon barrel are imparted to the ammunition

19 fired therein varies, but any number of weapons can

20 have the same number of lands and grooves.

21         Whether the spiral in the barrel spirals to

22 the right or left is an individual manufacturer's

23 prerogative, and many thousands of weapons can have

24 the spiral to the right, and many other thousands of

MAYSONET 692

1  weapons can have the spiral to the left.

2        Those are the three major class

3  characteristics, caliber, number of lands and

4  grooves, and direction of twist.

5        In addition, when a gun barrel is

6  manufactured, microscopic imperfections occur on the

7  lands and in the grooves of the barrel.

8        As a bullet travels through the barrel of

9  the weapon, these microscopic imperfections are

10  imparted to the bullet traveling through the barrel..

11        These are what are called individual

12  characteristics, unique to one weapon and only one

13  weapon.

14        It's on the basis of the reproduction of

15  both, class characteristics and individual

16  characteristics, on fired ammunition components that

17  I can come to a conclusion that two fired bullets

18  were fired from the same weapon.

19        Q.   And what type of instrument is used to do

20  that type of comparison?

21        A.   It's called a comparison microscope.

22        Q.   Can you explain to the ladies and gentlemen

23  of the jury how a comparison microscope works?

24        A.   The comparison microscope has two

MAYSONET 693

1    independent stages for mounting two objects, matched

2    optical systems allow both objects, one on one,

3    mounted on each stage to be compared microscopically

4    side by side, simultaneously.

5         Q.   Sir, can you tell the ladies and gentlemen

6    of the jury the difference between an automatic

7    weapon and a revolver?

8         A.   A semiautomatic weapon, during the course

9    of its operation, throws discharged cartridge cases

10   away from the weapon, to the side of the weapon, as a

11   bullet is fired out the front of the weapon.

12              This is just the nature of the way that the

13   weapon operates.  That's as opposed to a revolver

14   which has a cylinder that holds the cartridge cases,

15   and the cartridge cases remain within the revolver

16   until the operator manually removes the cartridge

17   cases from the revolver.

18        Q.   Sir, I'm showing you -- counsel has already

19   seen this -- People's Exhibit Number 12 for

20   identification.

21              Could you, please, sir, tell the ladies and

22   gentlemen of the jury if you recognize that exhibit?

23        A.   Yes, I do.

24        Q.   And can you tell the ladies and gentlemen

MAYSONET 694

1  of the jury what it is, please?

2      A.  It's an envelope that was submitted to me

3  with fired evidence involved in the Wiley homicide.

4      Q.  And could you look within that envelope and

5  tell me what type of fired evidence you received

6  within that envelope?

7      A.  These are four nine millimeter caliber

8  discharged cartridge cases.

9      Q.  Are those the cases that you referred to in

10  describing how a semiautomatic weapon ejects a case

11  as it is fired?

12      A.  This is an example of that, of what I was

13  talking about, that is ejected during the firing

14  process.

15      Q.  Likewise, sir, I'm showing you what's been

16  marked as People's Exhibit Number 13 for

17  identification.

18      Could you look inside of that envelope and

19  tell the ladies and gentlemen if you recognize that

20  as well?

21      A.  Yes, I do.

22      Q.  And what is contained within the envelope

23  of People's Exhibit Number 13, sir?

24      A.  One nine millimeter caliber fired bullet.

MAYSONET 695

1      Q.    And likewise, sir, in People's Exhibit

2   Number 25, can you tell the ladies and gentlemen of

3   the jury what's contained within that envelope and

4   whether you recognize that?

5      A.    Yes.   That's a one nine millimeter caliber

6   fired bullet.

7      Q.    And People's Exhibit Number 26 for

8   identification, do you recognize what's contained

9   within that envelope, sir?

10     A.    Yes, I do.

11     Q.    What is that, sir?

12     A.    That's one nine millimeter caliber fired

13  bullet that has separated into two parts.

14     Q.    Now, sir, as part of your duties at the

15  Chicago Police Department Crime Lab, were you called

16  upon previously to examine the evidence that is

17  before you?

18     A.    Yes, in 1990.

19     Q.    And specifically, sir, as to People's

20  Exhibit Number 12, the four cartridge cases, could

21  you tell the ladies and gentlemen of the jury, were

22  you able to do a comparison within those four

23  cartridge cases of each other?

24     A.    Yes, I did make a comparison.

MAYSONET 696

1      Q.    And how did you go about doing that

2  comparison?

3      A.    By placing the cartridge cases on the

4  comparison microscope and examining the head of the

5  cartridge case for class and individual

6  characteristics to see if anything reproduced from

7  cartridge case to cartridge case.

8      Q.    Were you able to reach a conclusion to a

9  reasonable degree of scientific evidence as to those

10 cartridge cases and their origin or where they were

11 fired from?

12     A.    It's my opinion they were fired from a nine

13 millimeter caliber auto pistol, and all four

14 cartridge cases were fired from the same pistol.

15     Q.    Likewise, sir, in People's -- if you

16 look -- were you also called upon to compare People's

17 Exhibit Number 13, the fired nine millimeter bullet,

18 People's Exhibit Number 25, the fired nine millimeter

19 bullet, and People's Exhibit Number 26, the fired

20 nine millimeter bullet?

21     A.    Yes.

22     Q.    And did you likewise do a comparison of

23 those bullets?

24     A.    Yes, I did.

MAYSONET 697

1    Q.    What was involved in the comparison of

2  those fired bullets?

3    A.    Again, it involves the use of the

4  comparison microscope to look for class and

5  individual characteristics on the fired bullets and

6  to determine if class and individual characteristics

7  reproduced from fired bullet to fired bullet.

8    Q.    And, sir, did you reach a conclusion as to

9  those three fired bullets, that being People's

10 Exhibit Number 13, 25, and 26?

11   A.    Yes, I did.

12   Q.    What is that conclusion, sir?

13   A.    It's my opinion that the three fired

14 bullets in those People's Exhibits were all fired in

15 one weapon.

16   Q.    Is there anyway, sir, to your knowledge, to

17 compare the fired bullets with the cases?

18   A.    No.

19   Q.    Why is that?

20   A.    The cartridge cases come in contact with

21 one area of the weapon, and the bullets come in

22 contact with the interior of the barrel only, a

23 different area of the weapon.

24        Since the bullets and the cartridge cases

MAYSONET 698

1  don't come in contact with the -- with the same areas

2  of the weapon, there's no way for them to have

3  characteristics that reproduce one to another.

4      MS. MANDELTORT:    Judge, if I can just have a

5  moment?  Judge, I have nothing further.

6                  CROSS-EXAMINATION

7              BY MR. BEUKE:

8      MR. BEUKE:

9      Q.    Officer, you have been a Chicago policeman

10  for 30 years, is that correct?

11      A.    I've -- I'm not an officer.  I'm a

12  civilian.  I've been an employee of the Chicago

13  Police Department for 29 years.

14      Q.    Mr. Warner, back in May, I believe of 1990,

15  you had occasion to make certain or to have these

16  cartridge casings submitted to your lab for the

17  purposes of analysis, correct?

18      A.    They were submitted to the laboratory for

19  the purpose of analysis, yes, sir.

20      Q.    They were submitted to your lab by members

21  of the Detective Division at Area 5, Violent Crimes,

22  correct?

23      A.    No.

24      Q.    Were they initially gathered by an evidence

MAYSONET 699

1 technician?

2     A.   Yes, sir.

3     Q.   Okay.

4        There were inventory numbers that were

5 assigned to the particular cartridge casings,

6 correct?

7     A.   Yes, sir.

8     Q.   And through the proper chain of custody

9 within the department, ultimately they wound up at

10 your department, correct?

11     A.   Yes, sir.

12     Q.   And when you get -- when your department

13 physically gets the evidence envelopes that contain

14 the cartridge casings, does somebody within your

15 department initially check in each particular item of

16 evidence?

17     A.   No.  They check in the evidence envelope.

18     Q.   The evidence envelope that those cartridge

19 casings came in was checked in by whom?

20     A.   I would have to refer to my notes to

21 determine that.

22     Q.   Do you have them with you, Mr. Warner?

23     A.   Yes, I do.

24     Q.   Can you refer to them?

N-164

MAYSONET 700

1       A.    In this particular instance, I was the

2   individual who checked in the evidence envelope.

3       Q.    Okay.

4           And when you check it in, Mr. Warner, do

5   you -- can you describe for the ladies and gentlemen

6   of the jury the process that you follow when you

7   check items in that have been submitted to your lab?

8       A.    Yes.

9           The envelope is submitted in a sealed

10  condition.

11          I prepare a laboratory receipt indicating

12  that I received a sealed envelope involved in this

13  investigation.

14          I initial and date the envelope the day

15  that I receive it, and then I assign it to a

16  technician to actually do the microscopic comparison

17  work that's involved in the investigation.

18      Q.    The microscopic comparison work that was

19  done in this case, which individual did you assign

20  that to?

21      A.    Myself.

22      Q.    Okay.

23          So, there are how many other examiners at

24  the -- at the office?

MAYSONET 701

1       A.      Seven.

2       Q.      Okay.

3               The -- if I understand you correctly, Mr.

4   Warner, the four cartridge casings that were

5   submitted to you, you microscopically examine and you

6   determine that those four cartridge casings were

7   fired from the same gun, correct?

8       A.      That is correct, sir.

9       Q.      Okay.

10              And if I also understand you correctly, the

11  fired bullets that were submitted to you, you had an

12  opportunity to compare them, and you determined that

13  all of the fired bullets in this case were fired from

14  the same weapon, correct?

15      A.      That is correct.

16      Q.      There's no way, according to your

17  testimony, to determine if the four cartridge casings

18  and the fired bullets were fired from the same

19  weapon, correct?

20      A.      That is correct.

21      Q.      So, as far as you know -- or as far as you

22  are able to testify, there may have been one gun used

23  in the firing of this recovered evidence, there may

24  have been two guns used, is that correct?

           MAYSONET 702

1      A.    That is correct.

2      Q.    All of the tests and all of the recording

3  of information that you did pursuant to your

4  involvement in this investigation, was that all done

5  almost contemporaneously with -- after you finished

6  your -- your work?

7      MS. MANDELTORT:    I object to the form of the

8  question.

9      MR. BEUKE:    I'll rephrase.

10      THE COURT:    I honestly don't understand the

11  question.

12      MR. BEUKE:    I'll rephrase it, your Honor.

13      Q.    Mr. Warner, you made your observations at

14  some -- as of some particular date, is that correct?

15      A.    Yes, that's correct, sir.

16      Q.    Okay.

17          And you recorded certain notes concerning

18  the observations that you made, is that correct?

19      A.    Yes.

20      Q.    You recorded the notes contemporaneous with

21  your observations, is that fair to say?

22      A.    Yes.

23      Q.    Subsequent to taking down these various

24  notes about what you observed on the various pieces

MAYSONET 703

1   of fired evidence, you ultimately transposed those

2   into a written report, is that correct?

3       A.   That is correct, sir.

4       Q.   And that was done basically from your using

5   your notes to compile your conclusions in your

6   report, is that fair to say?

7       A.   The report didn't reflect my conclusions.

8   The report only reflected the submission of the

9   evidence to the unit.

10      Q.   Okay.

11           But in any event, you used your notes that

12  you took down while you made these observations for

13  the purposes of preparing this ultimate report, is

14  that correct?

15      A.   Yes, sir.

16      Q.   Okay.

17           You indicated, I believe, Mr. Warner, that

18  all of these items, the items -- either the shell

19  casings or the fired bullets were suitable for

20  comparison, correct?

21      A.   Yes, sir.

22      Q.   Can you, please, tell the ladies and

23  gentlemen of the jury what that means?

24      A.   When I say evidence is suitable for

MAYSONET 704

1  comparison, it means that that evidence bears class

2  and individual characteristics which I can

3  microscopically look at and use for purposes of

4  identity.

5      Q.   Am I correct in assuming, Mr. Warner, that

6  you then take that evidence and maintain it in some

7  way in order to possibly compare it against other

8  evidence recovered in other cases or in this case,

9  correct?

10     A.   That is correct, sir.

11     Q.   Okay.

12          The evidence that you testified about,

13  either the shell casings or the fired bullets, that

14  was all maintained for the purposes of possible

15  future comparison, is that correct?

16     A.   Yes, sir, it was.

17     Q.   Would the evidence have been maintained

18  down at your office?

19     A.   It was maintained down at my office for a

20  period of time.  We have a file in the office called

21  an open case file which contains evidence from

22  unsolved cases, in other words, cases where the

23  suspect weapon hasn't been recovered.

24          The purpose of maintaining the fired

MAYSONET 705

1  evidence in the open case file is for microscopic

2  comparison against weapons that are subsequently

3  received at the laboratory with no direct related

4  relationship to the particular case, in the hopes

5  of -- in the hopes of making an open case find, in

6  other words tying up a gun that was possibly

7  recovered in a UUW investigation with one of the

8  homicides in the open case file for purposes of an

9  investigative lead to the detective division.

10     Q.   So, I'm clear, Mr. Warner, what you're

11  talking about is on occasion, other police officers

12  just doing other police work occasionally come upon

13  weapons that they would submit to your office to

14  compare against evidence that you have in the open

15  case files, is that correct?

16     A.   That is correct, sir.

17     Q.   And sometimes you're able to match up the

18  open -- let's say the shell casings or the fired

19  bullet evidence against certain firearms that are

20  submitted to you on other cases, correct?

21     A.   Yes.

22     Q.   Has there ever been a -- a comparison done

23  by your unit of the recovered shell casings or the

24  fired bullet evidence with any particular weapon from

MAYSONET 706

1  May of 1990 until today's date, if you know?

2     A.    No specific weapon was submitted as a

3  suspect weapon in this shooting.

4     Q.    Okay.

5     MR. BEUKE:    Can I have a moment, Judge?

6     THE COURT:    Sure.

7     MR. BEUKE:    Thanks, Mr. Warner.

8     MS. MANDELTORT:    Judge, I have no further

9  questions.

10     THE COURT:    Thank you, sir.  You may step

11  down.

12     MR. BEUKE:    Judge, can we have a brief

13  sidebar?  I don't think we need the court reporter.

14     THE COURT:    All right.

15          (Whereupon, there was a sidebar

16          discussion had out of the hearing of the

17          court reporter and jury, after which the

18          following proceedings were had:)

19     THE COURT:    All right.  State, call your next

20  witness.

21     MS. MANDELTORT:    At this time, Judge, we'd

22  proceed by way of stipulation briefly, Judge.

23     THE COURT:    Okay.  Let me get to my stipulation

24  speech.

N-171

1          Ladies and gentlemen, for your information,
2 a stipulation is evidence.  The content of the
3 stipulation is evidence.  It´s evidence about which
4 there is no dispute.
5          Both sides simply agree that the content of
6 the stipulation is fact, and we save time by not
7 having a witness come and testify to something that
8 everybody agrees is correct.  That´s what a
9 stipulation is.
10     MS. MANDELTORT:     Thank you, Judge.
11          At this time, it is stipulated by and
12 between the defendant, Jose Maysonet, through his
13 attorney, Mr. Rick Beuke, and through the People of
14 the State of Illinois, through myself, Ellen
15 Mandeltort, and Frank Marek that the chain of custody
16 was preserved and maintained throughout this
17 investigation as to People´s Exhibit Number 12, that
18 is nine millimeter, four nine millimeter shell cases
19 recovered at the scene by Officer Butler, People´s
20 Exhibit Number 13, which is a nine millimeter fired
21 bullet recovered from the clothing of Torrence Wiley
22 by Officer Butler at the Medical Examiner´s Office,
23 as to People´s Exhibit Number 25, which is the fired
24 bullet recovered by Torrence Wiley´s body by Doctor

N-172

1  Lifschultz and as to People´s Exhibit Number 26, a

2  fired bullet recovered from Kevin Wiley´s body by

3  Doctor Lifschultz during the course of the autopsy.

4  So stipulated?

5      MR. BEUKE:    So stipulated.

6      MR. RUECKERT:    I´d stipulate to the same.

7      THE COURT:   On behalf of Mr. Goossens.

8      MR. RUECKERT:    Yes.

9      THE COURT:   Very well.

10     THE CLERK:   Officer, would you raise your right

11 hand, please?

12     A.   Let me stand up.   Okay.

13              (Witness is sworn.)

14          FERNANDO MONTILLA,

15 called as a witness on behalf of the People of the

16 State of Illinois, being first duly sworn, was

17 examined and testified as follows:

18          DIRECT EXAMINATION

19          BY MS. MANDELTORT:

20     THE CLERK:   Be seated.

21     MS. MANDELTORT:

22     Q.   Sir, could you, please, tell us your name

23 and spell both, your first and last name?

24     A.   Detective Fernando Montilla,


                    N-173


MAYSONET 709

1  M-o-n-t-i-l-l-a.

2      Q.   What is your star, sir?

3      A.   20778.

4      Q.   What is your occupation or profession?

5      A.   I'm a detective.

6      Q.   Where are you currently assigned?

7      A.   Area 5.

8      Q.   And how long have you been a Chicago police

9  officer?

10     A.   Starting my 23rd year.

11     Q.   How long have you been assigned to Area 5?

12     A.   A little over eight years.

13     Q.   Where is Area 5 Headquarters located?

14     A.   Grand and Central.

15     Q.   Directing your attention, sir, to July 15

16 of 1990, were you working as a detective in Area 5,

17 at that time?

18     A.   Yes, ma'am.

19     Q.   And, sir, on that date, that being July 15,

20 1990, were you aware of an incident involving a nine

21 millimeter weapon which had occurred on July 3 of

22 1990?

23     A.   Yes, ma'am.

24     Q.   Were you also aware that an individual by

N-174

1  the name of Jose Maysonet was in Area 5 in regards to

2  that incident involving the nine millimeter weapon on

3  July 15 of 1990?

4      A.   Yes, ma´am.

5      Q.   Were you also aware, sir, of the murder of

6  Torrrence and Kevin Wiley which had occurred on May

7  25 of 1990 at 3428 West North Avenue?

8      A.   Yes, ma´am.

9      Q.   Were you aware, sir, that the murder of

10 Torrence and Kevin Wiley involved a nine millimeter

11 weapon?

12     A.   Yes, ma´am.

13     Q.   Did you then, sir, have an occasion to

14 speak with Jose Maysonet on July 15, 1990, in the

15 evening hours?

16     A.   Yes, ma´am.

17     Q.   Other than yourself and Mr. Maysonet, who

18 was present?

19     A.   Sergeant Mingey.

20     Q.   And the person that you spoke with that

21 evening, do you see him in court today?

22     A.   Yes, ma´am.

23     MR. BEUKE:    We´d stipulate to the ID.

24     MS. MANDELTORT:    Judge, we accept the

N-175

1  stipulation that if the officer were to identify, he

2  would point out the defendant, Jose Maysonet, as he

3  sits in court today.

4      THE COURT:   Very well.

5      MS. MANDELTORT:

6      Q.   And prior to speaking with Mr. Maysonet in

7  the evening hours of July 15, 1990, did you advise

8  him of anything?

9      A.   I advised him of his rights.

10      Q.   Now, sir, did you do that in English or in

11  Spanish?

12      A.   I did it in both, English and Spanish.

13      Q.   Sir, are you fluent in English and

14  Spanish?

15      A.   Yes, ma´am.

16      Q.   And did the defendant acknowledge that he

17  understood his rights?

18      A.   Yes, ma´am.

19      Q.   Did he acknowledge them both, in English to

20  you and in Spanish, if you recall?

21      A.   I think in Spanish.

22      Q.   And after he acknowledged he understood his

23  rights, did you have a conversation with Mr. Maysonet

24  in the evening hours of July 15 of 1990 at Area 5?

N-176

MAYSONET 712

```
1        A.    Yes, ma´am.

2        Q.    Was that about the murder of Torrrence and

3   Kevin Wiley?

4        A.    Yes, ma´am.

5        Q.    And, at that time, sir, what did the

6   defendant tell you?

7        A.    He had knowledge of the -- that he had

8   knowledge of the murder of the two brothers.  He -- I

9   got to get my -- he said someone -- guys came over to

10  his house, and he picked up a nine millimeter.

11       Q.    Did he indicate to you whether or not--

12       MR. BEUKE:    Objection.  I ask he be allowed to

13  finish his answer.

14       MS. MANDELTORT:    I thought he was done.

15       THE COURT:  Overruled.  I don´t want him going

16  into a narrative.  Overruled.

17       MS. MANDELTORT:

18       Q.    Did he indicate to you what he did with

19  that nine millimeter gun?

20       A.    He gave it to some guys.

21       Q.    Did he indicate to you in that conversation

22  that, at some point, he learned of the shooting that

23  had taken place on the 25th of May of 1990?

24       A.    Yes.
```

N-177

1     MR. BEUKE:   I object to leading.

2     THE COURT:   I think that's already been

3 testified to.

4     MS. MANDELTORT:

5     Q.   What did he tell you?

6     A.   He told me that -- I can't remember --

7 someone came over to his house was talking to him

8 about the -- about the murders and -- -- oh, God,

9 I've been here too long.  I'm sorry, your Honor.

10     MS. MANDELTORT:

11     Q.   Sir, is there anything that would refresh

12 your recollection?

13     A.   The reports.

14     THE COURT:   Are you feeling all right?

15     MR. BEUKE:   I'm going to object.

16     THE COURT:   What are you objecting to?  What's

17 the basis of your objection?

18     MR. BEUKE:   Judge, I don't believe that he

19 indicated that.

20     THE COURT:   He indicated something would

21 refresh his memory.  Are you feeling all right?

22     A.   I have been sitting all day, and my leg

23 hurts.  I can't take a pain killer.

24     MS. MANDELTORT:   Counsel.

N-178

1       Q.    Sir, I'm showing you what's marked as

2  People's Exhibit Number 27 for identification.

3            Could you tell the ladies and gentlemen of

4  the jury if you recognize this document?

5       A.    Yes, that's a supplementary that was made

6  by Detective Halvorsen, Guevara, Paulnitsky, and

7  Gawyrs.

8       Q.    I'd like to direct your attention, I

9  believe, to page 6 of that report, sir -- I am sorry,

10 page 4 of that report.

11           Is there a conversation that you had with

12 Jose Maysonet on July 15 of 1990 referred to in that

13 report?

14      A.    Yes, ma'am.

15      Q.    Would you, please, read that document, sir,

16 the portion that refers to that conversation to

17 yourself?

18      MR. BEUKE:     Objection, Judge.

19      THE COURT:    Overruled.

20      MR. BEUKE:     Can I have a brief sidebar?

21      THE COURT:    No.  Overruled.

22      A.    Yes.

23      MS. MANDELTORT:

24      Q.    Sir, has your memory been refreshed as to


                        N-179

1 the conversation that you had with Jose Maysonet on

2 July 15 of 1990?

3    A.   Yes.

4    Q.   Can you tell the ladies and gentlemen of

5 the jury what he said to you during that

6 conversation?

7    A.   He said he was holding a gun in his house.

8 Three Latin Kings came over and asked him for the

9 nine millimeter.

10       He gave them the gun, and they left.  The

11 next day, he was on North Avenue, and he heard a

12 conversation where two black guys were killed, and

13 they were shot with a nine millimeter.  He assumed

14 then -- he said he figured that the Latin Kings did

15 it, the ones he gave the gun to.

16    Q.   At that time, sir, did he give you any

17 names of the individuals who he had given the gun

18 to?

19    A.   No, ma´am.

20    Q.   I´d like to talk to you now, sir, about

21 August 1 of 1990.

22       Did you then have the occasion to speak

23 with Jose Maysonet?

24    A.   Yes, ma´am.

N-180

MAYSONET 716

1    Q.   Where did you speak with him, at that time,

2  on the 1st of August?

3    A.   Cook County Jail.

4    Q.   And prior to speaking with him, sir, did

5  you do anything?  Did you execute any sort of

6  documents?

7    A.   We had had him sign a waiver for -- of

8  lawyer.

9    Q.   Sir, I'm showing -- let the record reflect

10  I'm showing counsel what's marked as People's Exhibit

11  Number 28 for identification.

12        Sir, I'm showing you what's been marked as

13  People's Exhibit Number 28 for identification.

14        Could you tell the ladies and gentlemen of

15  the jury if you recognize that document?

16    A.   Yes, ma'am.

17    Q.   What is that, sir?

18    A.   Cook County Department of Corrections.

19  It's a waiver for attorney.

20    Q.   Is that copy, sir, a true and accurate copy

21  of the attorney waiver that the defendant executed in

22  your presence prior to you talking to him on the 1st

23  of August of 1990 at Cook County Jail?

24    A.   Yes, ma'am.


N-181

1    Q.    Does his signature appear on that document?

2    A.    Yes, ma´am.

3    Q.    Did he sign that, sir, in your presence

4 after that document was explained to him?

5    A.    Yes, ma´am.

6    Q.    Who, in fact, explained to the defendant

7 what this document was?

8    A.    Myself.

9    Q.    And other than yourself, sir, who was

10 present at the jail other than yourself and the

11 defendant?

12    A.    Sergeant Mingey.

13    Q.    Did you again speak with the defendant

14 about the murder and any knowledge that he had of the

15 murder of Kevin and Torrrence Wiley?

16    A.    Yes, ma´am.

17    Q.    What did he tell you on that date, that

18 being August 1 of 1990?

19    A.    Basically, what he told us -- what he told

20 me the first time--

21    Q.    Did he give you any further information?

22    A.    No, he wanted -- he wanted to cut a deal.

23    Q.    When you say, he wanted to cut a deal, what

24 did he say to you?

N-182

1    MR. BEUKE:    Objection, Judge.

2    THE COURT:   Basis?

3    MR. BEUKE:    He testified.  He said he wanted a

4 deal.

5    THE COURT:   Overruled.

6    MS. MANDELTORT:

7    Q.   What was the nature of the deal that the

8 defendant wanted from you?

9    A.   He wanted to get out of jail.

10    Q.   In exchange for getting out of jail, he

11 would do what, sir?

12    A.   Give up the people for the murder of the

13 Wiley brothers.

14    Q.   Did he indicate to you prior to making that

15 offer for a deal that he actually knew who the other

16 people involved were?

17    A.   Yes, ma'am.

18    MR. BEUKE:    Objection to the leading.

19    THE COURT:   Overruled, counsel.

20    MS. MANDELTORT:

21    Q.   Did you or Sergeant Mingey indicate to the

22 defendant, at that time, whether or not you would

23 deal with him -- in other words, get him out of jail

24 in exchange for that information?

N-183

1    A.    We told him we couldn't make any deals.

2    Q.    At that time, sir, was the conversation

3 ended?

4    A.    Yes, ma'am.

5    Q.    I'd like to talk to you now about the 22nd

6 of August, 1990.

7         Did you then have the occasion, sir, to be

8 back at Area 5 Headquarters?

9    A.    Yes, ma'am.

10   Q.    Did you have occasion, at that time, to see

11 the defendant, Jose Maysonet?

12   A.    Yes, ma'am.

13   Q.    Other than yourself and the defendant, who

14 was present at that conversation?

15   A.    Detective Paulnitsky.

16   Q.    At that time, sir, did the defendant again

17 speak to you about the murder of Kevin and Torrrence

18 Wiley?

19   A.    Yes, ma'am.

20   Q.    After that conversation, sir, did you place

21 the defendant under arrest for the murder of

22 Torrrence and Kevin Wiley?

23   A.    Yes, ma'am.

24   Q.    And after that conversation, sir, was the

N-184

1 investigation, at that time, handed over to another

2 detective?

3    A.   Yes.

4    Q.   Would that be a Detective Guevara?

5    A.   Yes.

6    Q.   Is that unusual for an investigation to be

7 handed off from one officer within Area 5 to another

8 officer?

9    A.   Yes, I don't work homicides.  I was working

10 Property Crimes.  So, I had to turn it over to the

11 Violent Crimes Section.

12   Q.   Was that unusual?

13   A.   No.

14   Q.   I'd like to talk to you now about the 23rd

15 of August of 1990, the following day, at about 9:28

16 in the morning.

17        Did you have occasion again to be at Area

18 5, Violent Crimes?

19   A.   Yes, ma'am.

20   Q.   Were you again working on the homicide of

21 Torrence and Kevin Wiley?

22   A.   Yes, ma'am.

23   Q.   Were you present, sir, for the taking of a

24 court-reported statement of the defendant, Jose

N-185

1  Maysonet?

2       A.   Yes, ma´am.

3       Q.   Other than yourself and the defendant, was

4  there an assistant state´s attorney present?

5       A.   Yes.

6       Q.   Do you recall his name?

7       A.   Frank DiFranco.

8       Q.   And likewise, was there a court reporter?

9       A.   Yes.

10      Q.   Showing counsel what´s been marked as

11  People´s Exhibit Number 29 for identification.

12      Q.   Sir, I´m showing you People´s Exhibit

13  Number 29, I believe, for identification.

14           Do you recognize that seven-page document,

15  sir?

16      A.   Yes, ma´am.

17      Q.   Can you tell the ladies and gentlemen of

18  the jury what that seven-page document is?

19      A.   This is the written statement taken down

20  between Frank DiFranco, myself, and the court

21  reporter.

22      Q.   And-- I am sorry.

23      A.   You know, signed by all of us, and the

24  defendant Maysonet.

N-186

1     Q.   And did the defendant sign that in your

2 presence, sir?

3     A.   Yes, ma´am.

4     Q.   Now, have you had a chance to review that

5 since that date, sir?

6     A.   No, ma´am.

7     Q.   Have you ever looked that over?

8     A.   A long time ago.

9     Q.   Okay.

10      When you looked it over, sir, does that

11 document, that seven-page document accurately reflect

12 the questions that were asked and the answers that

13 were given during the course of that court-reported

14 statement?

15     A.   Yes, ma´am.

16     Q.   And who asked the questions during that

17 court-reported statement?

18     A.   State´s attorney DiFranco.

19     Q.   And who answered the questions?

20     A.   Jose Maysonet.

21     Q.   Was that done, sir, in English or in

22 Spanish?

23     A.   In English.

24     Q.   Sir, after the court-reported statement was

N-187

1 taken, did you have occasion later that morning, on

2 the 23rd of August of 1990, to leave Area 5?

3     A.   Yes, ma´am.

4     Q.   Did you leave with the defendant?

5     A.   Yes, ma´am.

6     Q.   Other than yourself and the defendant, who

7 else left?

8     A.   Detective Paulnitsky and state´s attorney

9 DiFranco.

10     Q.   For what purpose did you, the defendant,

11 assistant state´s attorney DiFranco and Detective

12 Paulnitsky leave Area 5?

13     A.   Jose Maysonet was going to take us and show

14 us the steps that were taken for the homicide of the

15 Wiley brothers.

16     Q.   Did you, in fact, go out to the scene at

17 3428 West North Avenue with the defendant after the

18 court-reported statement?

19     A.   Yes, ma´am.

20     Q.   Showing counsel what´s previously been

21 shown to him as People´s Exhibit Number 30 for

22 identification.

23          Sir, I´m showing you a photograph, People´s

24 Exhibit Number 30.  Could you tell the ladies and

N-188

MAYSONET 724

1  gentlemen of the jury if you recognize what is shown

2  in that photograph?

3     A.   Yes, ma'am.  It's a photograph taken from

4  the alley south towards North Avenue.

5     Q.   Okay.

6        Is that, in fact, the scene at 3428 West

7  North Avenue?

8     A.   Yes, ma'am.

9     Q.   Now, this photograph has snow in it, does

10  it not?

11     A.   Yes, ma'am.

12     Q.   There was not snow present in May of 1990,

13  is that correct?

14     A.   That's correct.

15     Q.   Other than the snow being present in that

16  photograph, does that photograph truly and accurately

17  show the area, the physical structures at that area

18  as seen in May of 1990?

19     A.   Yes, ma'am.

20    MS. MANDELTORT:   If I can have a moment?

21     Q.   Does that accurately reflect the structures

22  that were out there when you went out there on August

23  23 of 1990 with the defendant, Jose Maysonet?

24     A.   Yes.

N-189

1   Q. And did, in fact, the defendant show you

2 what took place out there and what he was able to see

3 at the time of the murders of Torrrence and Kevin

4 Wiley?

5   A. Yes, ma´am.

6   Q. Did he, in fact, demonstrate the facts that

7 he had previously articulated in his court-reported

8 statement?

9   A. Yes.

10   Q. Sir, you indicated earlier that you spoke

11 both, English and Spanish, to Mr. Maysonet, is that

12 correct?

13   A. Yes, ma´am.

14   Q. When you spoke to him in English, sir, were

15 you able to converse with him in English?

16   A. Yes, ma´am.

17   Q. Did he appear to understand what you were

18 saying?

19   A. Yes.

20   Q. Did you also converse with him in Spanish?

21   A. Yes, ma´am.

22   Q. Did he appear to understand what you were

23 saying?

24   A. Yes, ma´am.

N-190

MAYSONET 726

1      MS. MANDELTORT:    Judge, if I can just have one

2 moment?  Judge, I have nothing further.  Thank you,

3 sir.

4      THE COURT:   Very well.  Let me see counsel at

5 the side.

6           (Whereupon, there was a sidebar

7           discussion had out of the hearing of the

8           court reporter and jury, after which the

9           following proceedings were had:)

10     THE COURT:   Counsel, since I just have remarks

11 to make to the jury, I am going to let the detective

12 get off the stand and go back into the witness room.

13           (Witness is excused.)

14     A.    Thank you, your Honor.

15     THE COURT:   Okay.  You need to stick around,

16 though.

17     A.    Okay.

18     THE COURT:   There's some information to give

19 you.

20     A.    Okay.

21     THE COURT:   Ladies and gentlemen, I have just

22 conferred with the attorneys in the case relevant to

23 our schedule.

24           We are going to break for this evening.  We

N-191

MAYSONET 727

1 are going to start early tomorrow.  I'm going to
2 continue with the jury trial before I do my regular
3 call.  We'll do my regular call.  You go to lunch.

4          So, I really need you to be here at 9:30
5 tomorrow.  I expect to start taking testimony at
6 10:00.

7          I'm saying 9:30 because that allows for the
8 vagaries of this person gets here this minute and
9 this person gets here the next minute, and then have
10 a chance to have your coffee and rolls, or whatever
11 happens back there.

12          I just want to stress, we are trying to
13 pick up sometime.  We are going to start earlier
14 tomorrow, in the courtroom ready to go at 10:00.

15          I will do nothing before I start this jury
16 trial tomorrow.  We need you here at 9:30 tomorrow
17 morning.

18          Now, those admonitions that I gave you last
19 night weren't very meaningful, but are extremely
20 meaningful now.

21          You've heard a good deal of testimony.
22 Please remember you are not to discuss the testimony
23 with anyone, absolutely no one.  Don't let anybody
24 discuss it with you or in your presence.


                      N-192

MAYSONET 728

1              Again, if there´s any media coverage, you

2    may not avail yourselves of that media coverage.

3    Have a wonderful evening.  I hope you get through the

4    raindrops and stay dry as best you can.  9:30

5    tomorrow morning.  We are going to be under way

6    taking testimony at 10:00 quite promptly.  Have a

7    wonderful evening.

8         THE JURORS:   Thank you.

9         THE SHERIFF:   All rise for the jury.

10                       (The following proceedings

11                        were had out of the

12                        hearing of the jury:)

13        MR. MAREK:   Before we leave, I would like to

14   make one motion.   Is it okay?

15             Judge, we´ve been asked to produce Jennifer

16   Borowitz.

17        THE COURT:   You may be seated.

18        MR. MAREK:    Jennifer Borowitz is an assistant

19   state´s attorney who is currently with the State´s

20   Attorney´s Office.  This is certainly the first

21   request.

22        THE COURT:   Wait a minute.   You said currently

23   she is or is not?

24        MR. MAREK:    She is.  She is an assistant

                          N-193

1 state's attorney, your Honor, with the office, at the

2 present time.   She may or may not be here tomorrow.

3      THE COURT:    I did read her name.

4      MR. MAREK:    She was read.   She was left on our

5 witness list.

6      THE COURT:    Yes.

7      MR. MAREK:    But the motion in limine that I

8 would have, I believe that based upon

9 cross-examinations that have been done so far, that

10 the reason that the Defense will be seeking to call

11 Miss Borowitz is just to bring out the fact that she

12 prepared a memorandum in connection with her

13 court-reported statement of Alfredo Gonzalez.

14      I believe that the reason that Mr. Beuke

15 would be calling her would be to show that she

16 prepared a report and Mr. DiFranco did not.

17      We would certainly have a motion in limine

18 to bar any reference to the court-reported statements

19 of Mr. Alfredo Gonzalez.

20      Miss Borowitz had nothing to do with any

21 kind of a written statement, with the written

22 statement taken by Mr. Maysonet, and so we would be

23 moving in limine to bar the Defense from going into

24 any documents or any felony review memoranda prepared

N-194

MAYSONET 730

1 by Miss Borowitz in connection with the

2 court-reported statement of Mr. Alfredo Gonzalez, the

3 co-defendant who's not on trial here.

4     I think there is also the possibility of --

5 of -- of I mean that statement is simply not

6 admissible against Mr. Maysonet.

7   THE COURT:  Of course not.  Mr. Beuke?

8   MR. BEUKE:   Judge, I'm not calling her to go

9 into anything close to the statement of Alfredo

10 Gonzalez.

11     She's a felony review state's attorney

12 who's involved in this case from its very inception.

13 She followed it through.

14     She met with my client.  She spoke with my

15 client.  I think she'll have some relevant evidence

16 to give to this jury.  And based upon that, we are

17 putting everybody on notice that we want to call

18 her.

19   THE COURT:   Well, let me just say this.  It's

20 my understanding that she's not under subpoena by

21 you, Mr. Beuke.

22   MR. BEUKE:   Judge, you're correct.  Your

23 Honor?

24   THE COURT:   Let me finish.

N-195

```
 1              It´s my understanding, just listening to
 2   the conversation going on between the state´s
 3   attorneys and you, that they didn´t understand you
 4   wanted her.
 5              All I´m saying is if she´s available fine,
 6   the motion in limine having to do with Alfredo´s
 7   statement, if she took that statement.
 8        MR. MAREK:    Yes.
 9        THE COURT:    Obviously, that motion would be
10   granted.  Nothing concerning his statement could
11   possibly come in against Mr. Maysonet.
12              Now, if she had other involvements, I can´t
13   preclude him from putting her on.
14        MR. MAREK:    That´s fine.
15        THE COURT:    If he was involved in some way.
16        MR. MAREK:    We will do what we can can -- the
17   only reason she would be here is if she´s not going
18   to be in tomorrow or something.  It is 5:30 now.
19        MR. BEUKE:    I´m going to go back and call her
20   office now and see if I can locate her, and I´ll
21   deliver a subpoena to her.
22        THE COURT:    I do want to say, if you can´t find
23   her, it´s always a good idea that you are going to
24   put anybody you want to use under subpoena before the
```

N-196

1 detective leaves the courtroom.

2        Detective, I'm sure the state's attorney

3 has now apprised you that we are going to take your

4 cross-examination tomorrow because it's going to be

5 lengthy.

6        You have been here all day.  The jury has

7 been here all day, and you indicated, upon my

8 inquiry, that you were in some discomfort.

9        I just think the better part of prudence,

10 not withstanding common sense, is while I'm sure it's

11 a hassle for you to come back tomorrow, it's my

12 judgment that that makes more sense under all of the

13 circumstances.

14        But the thing that's important to remember,

15 Detective, is that you remain under oath.  You may

16 not discuss your testimony with anybody.

17        When you take the stand tomorrow, you will

18 still be under oath.  But I should hope you can go

19 home now and relax and rid yourself of some of that

20 pain.

21     A.   Okay.

22     THE COURT:   The Court does apologize that we

23 have to bring you back tomorrow, but we just don't

24 have a lot of choices with all of the things that

                        N-197

1  happened today.

2       You can take your pain pill because I'm

3  sure you can't take that and drive.

4       A.   Right.

5       THE COURT:   Okay?

6       A.   Okay.

7       THE COURT:   Thank you very much for your

8  indulgence, but sometimes I have to make an unpopular

9  decision?

10      A.   I'll be back tomorrow, your Honor.

11      THE COURT:   Thank you.

12      MR. BEUKE:  Thank you, Detective.

13      A.   I'll see you tomorrow.

14      MR. BEUKE:   Good night.

15      THE COURT:   Do we need a dry run-through with

16 the instructions?  I don't think we need the court

17 reporter.

18      MR. BEUKE:   Okay.

19      THE COURT:   So, as far as everybody else is

20 concerned, one of the things, Paul, that I need to be

21 sure is that your office knows is that I've asked the

22 jury to be back at 9:30.  I need a court reporter

23 here and ready to go and commence testimony

24 approximately at 10:00.  Will you take care of that

N-198

1   for me, please, Paul?

2       THE REPORTER:  Yes, Your Honor.

3       THE COURT:  Thank you.

4                    (A continuance

5                    was taken to 8-10-95.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

N-199

MAYSONET 735

```
1

2   STATE OF ILLINOIS )
                      )  SS.
3   COUNTY OF C O O K )

4

5

6       I, PAUL P. MARZANO, CSR, RPR, Official Court

7   Reporter for the Circuit Court of Cook County,

8   Illinois Judicial Circuit of Illinois, do hereby

9   certify that I reported in shorthand the proceedings

10  had in the above-entitled cause; that I thereafter

11  caused the foregoing to be transcribed, which I

12  hereby certify to be a true and accurate transcript

13  of the report of proceedings had before the Honorable

14  LORETTA MORGAN, Judge of said court.

15

16

17                  _____
                     Official Court Reporter

18

19

20  Dated this  _ _ 8TH _day

21  of _ _ _ December _ 1996.

22

23

24
```

N-200

MAYSONET 736

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALFREDO GONZALEZ, )
)
Plaintiff, )
) Case No. 22 CV 06496
v. )
)
REYNALDO GUEVARA, GERI LYNN YANOW ) Hon. Judge John F. Kness
as SPECIALREPRESENTATIVE of the ESTATE )
OF ERNEST HALVORSEN, EDWARD MINGEY, ) Hon. Magistrate Judge
STEVEN GAWRYS, LEE EPPLEN, FERNANDO ) Heather K. McShain
MONTILLA, ROLAND PAULNITSKY, )
RICHARD SCHAK, GERI LYNN YANOW as )
SPECIAL REPRESENTATIVE of the ESTATE OF )
ROBERT SMITKA, deceased, JENNIFER )
BOROWITZ,  FRANK DiFRANCO, JOHN )
PERKAUS, the CITY OF CHICAGO, and COOK )
COUNTY, )
)
Defendants. )

## DECLARATION OF RICHARD WILEY WORTHAM

I, Richard Wiley Wortham, declare as follows:

1. I am over 18 years of age and I make this declaration of my own personal knowledge. If
called as a witness at trial, I could competently testify to the matters herein.

2. I am the brother of Torrence and Kevin Wiley ("Torrence and Kevin"), who were shot and
killed on May 25, 1990.

3. In 1990 Torrence, Kevin, and I had a sister named Jolanda Wiley.

4. Torrence, Kevin and I referred to Jolanda by her nickname "Lulu."

I declare under penalty of perjury under the law of the United States of America that
the foregoing is true and correct.

Executed on this 4th day of October 2023

Richard Wiley Wortham

1

JGS_AGonzalez 1346