*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 26

# SUPPLEMENTARY REPORT

CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE—TIME |
|---|
| * DAY 25 * MO May * YR 90 TIME 0100 |

| 1. OFFENSE-CLASSIFICATION LAST PREVIOUS REPORT | I-UCR CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE X 1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/Murder First Degree | 0110 | 3428 W. North Ave. | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT XX YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27 | 6. FIRE RELATED ☐1 YES X 2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5526 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| On Street | 304 | Two | Unknown |

| | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|
| CIRCUM. X VERIFIED ☐ UPDATE TO | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | |

19. DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN, R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

| PROPERTY ☐ VERIFIED DNA ☐ UPDATE TO | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
|---|---|---|---|---|---|---|
| | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 10 CONSUM. GOODS ☐ T $ ☐ R | (-) FIREARMS ☐ T $ ☐ R | 16 NARC./DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T $ ☐ R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN BURFD YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO./Y.D. NO. OR J.D.A. NO. | OFFENDER (REL. CODE) | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT. NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | | | | | | | | |
| OFF. 2 | | | | | | | | |

| 33. OFF'S. VEHICLE ☐USED ☐STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD ASSIGNED | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | DNA | X 1 FIELD ☐3 SUMMARY | 652 | X 0 PROGRESS ☐1 SUSPENDED ☐2 UNFOUNDED |

STATUS CONT'D.  ☐3 CLRD. CLOSED  ☐4 CLRD. OPEN  ☐5 EXC. CLRD. CLOSED  ☐6 EXC. CLRD. OPEN  ☐7 CLSD. NON-CRIM.

| 54. IF CASE CLEARED, HOW CLEARED | | | | | ☐ADULT ☐JUV. |
|---|---|---|---|---|---|
| ☐1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. RFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. | |

55. ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

THIS IS A CANVASS REPORT:

PERSONS INTERVIEWED:    HERNANDEZ, Alicia F/WH/ a barmaid at the Jose POBRE Tavern 3409 W. North Ave. related that there were no male black patrons in the tavern the evening of 25May90.

PRECEEO, Alma F/WH/ 3419 W. North Ave. related that she was awakened 2400 hrs. by the sound of two male english voices that were engaged in an argument. PRECEEO stated that she could only hear bits of the conversation. (I am trying to help you. I am going to kill you. I am going to kill you first. you said that we would get the last bus) The total argument lasted for about an hour. After hearing four shots, PRECEEO called the police. PRECEEO then gave R/Dets. her sister's MACIAS, Carmen business telephone number. 243-1300 who was also home when the incident occured.

MILAN, David M/WH/ 3429 W. North Ave. Staff member Solder of God Church. Only heard four shots.

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| Normal | 91 | * DAY 25 | * MO May | * YR 90 | TIME 07:25 | MUGGEY #131 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. WARE, Willie | 7428 | Det. KONDAL Joseph | 4620 | |

| SIGNATURE | SIGNATURE | 95. DATE APPROVED (DAY-MO-YR) | TIME |
|---|---|---|---|
| | | 26 MAY 1990 | 1715 |

CPD-11.413-B (Rev. 8/85)    *MUST BE COMPLETED IN ALL CASES

JGS_MAYSONET 01708

Case: 1:18-cv-02342 Document #: 367-5 Filed: 07/17/24 Page 3 of 111 PageID #:20478

WILEY, Torrence
WILEY, Kevin
First Degree Murder

Page four

CANVASS CONTINUED..        MACIAS, Carmen F/WH/ 3419 W. North Ave. was contacted by teleph-
phone at place of employment 243-1300, related that she was
awakened around 2400 Hrs. 24May90 by the sound of two male blacks having an argument. One
had a very calm voice, the second had a loud abrasive type of voice and sounded as if he may
have been drunk. MACIAS was only able to hear parts of the argument, that lasted for at least
an hour. Both subjects refered a number of times to someone called Lulu Dog, and also had
some disagreement about a bus. MACIAS did not call the police after hearing shots because
she did not have a telephone in her apartment, but considered going downstairs to her father
(INOCENCI who was also interviewed) apartment and using his telephone #235-7409 to call the
police. MACIAS later looked out of her window and saw the two victim's down on the street.

ALVARDO, Rosa F/WH/ 3428 W. North Ave heard nothing.
GOZMAN, Maria F/WH/ 3417 W. North Ave heard nothing.
MOJICA, Minerva F/WH/ 3432 W. North Ave heard nothing.

No answer was received at 3419, 21, 23, W. North Ave. The R/Dets. went to each open tavern
and liquor store in the area trying to determine if any male blacks had purchased any Mil-
waukee's Best beer, with negative results. End of canvass report.
Dets. WARE,W & KONDAL J. #7428/4620

N-234297

-6 JUN 1990 20 16



*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 27

# In The Matter Of:

*Maysonet v.*
*Guevara*

---

*Maria Del Carmen Macias*
*January 18, 2021*

---



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

1

1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
               NO. 18-CV 02342

3

4

5
   JOSE JUAN MAYSONET JR.,
6                               )
          Plaintiff,            )
7                                    DEPOSITION UPON
       v.                            ORAL EXAMINATION
8                                          OF
   REYNALDO GUEVARA, ERNEST          MARIA DEL CARMEN
9  HALVORSEN, EDWARD                      MACIAS
   MINGEY, LEE EPPLEN,
10 FERNANDO MONTILLA,          VIA VIDEOCONFERENCE
   ROLAND PAULNITSKY, FRANK )
11 DIFRANCO, CITY OF          )
   CHICAGO, and COOK          )
12 COUNTY,                    )
                              )
13        Defendants.

14

15

16        T R A N S C R I P T  of the stenographic

17  notes of AUDREY ZABAWA, a Certified Court Reporter

18  of the State of New Jersey, Certificate No.

19  XI01410, taken via videoconference, on Monday,

20  January 18, 2021, commencing at 2:08 p.m.

21

22

23

24

25

2

```
 1    A P P E A R A N C E S:

 2   BONJEAN LAW GROUP, PLLC
     467 Saint Johns Place
 3   Brooklyn, New York 11238
     718.875.1850
 4   jennifer@bonjeanlaw.com
     ashley@bonjeanlaw.com
 5   BY:   JENNIFER BONJEAN, ESQ.
           ASHLEY COHEN, ESQ.
 6   Counsel for Plaintiff

 7    GREENBERG TRIAL LAWYERS
      53 West Jackson Boulevard, Suite 1260
 8   Chicago, Illinois 60604
     312.399.2711
 9   steve@greenbergcd.com
     BY:   STEVEN A. GREENBERG, ESQ.
10   Counsel for Plaintiff

11   LEINENWEBER, BARONI & DAFFADA, LLC
     120 North LaSalle Street, Suite 200
12   Chicago, Illinois 60602
     312.380.6635
13   justin@ilesq.com
     BY:   JUSTIN L. LEINENWEBER, ESQ.
14   Counsel for Defendant Reynaldo Guevara

15   THE SOTOS LAW FIRM, P.C.
     141 West Jackson Boulevard, Suite 1240A
16   Chicago, Illinois 60604
     312.735.3303
17   dbrueggen@jsotoslaw.com
     BY:   DAVID BRUEGGEN, ESQ.
18   Counsel for Defendants Ernest Halvorsen, Edward
     Mingey, Lee Epplen, Fernando Montilla, and Roland
19   Paulnitsky

20   ROCK, FUSCO & CONNELL, LLC
     312 North Clark Street
21   Chicago, Illinois 60654
     312.494.1000
22   arahe@rfclaw.com
     BY:   AUSTIN G. RAHE, ESQ.
23   Counsel for Defendant City of Chicago

24

25
```

3

1    A P P E A R A N C E S:   (CONTINUED)

2    HINSHAW & CULBERTSON LLP
     151 North Franklin Street, Suite 2500
3    Chicago, Illinois 60606
     312.704.3127
4    mstephenson@hinsawhlaw.com
     BY:  MICHAEL C. STEPHENSON, ESQ.
5    Counsel for Defendant Frank DiFranco

6    ASSISTANT STATE'S ATTORNEY OF COOK COUNTY
     500 Richard J. Daley Center
7    Chicago, Illinois 60602
     312.603.5971
8    edward.brener@cookcountyil.gov
     BY:  EDWARD M. BRENER, ESQ.
9    Counsel for Defendant Cook County

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                       I N D E X

2    WITNESS          DIRECT   CROSS    REDIRECT    RECROSS

3    MARIA DEL CARMEN MACIAS

4    Ms. Bonjean     5                   74

5    Mr. Leinenweber          46

6    Mr. Brueggen             49

7    Mr. Rahe                 72

8

9    NOTE:  Exhibits marked digitally.
            (Attached herewith.)
10

11                     E X H I B I T S

12   NUMBER    DESCRIPTION                FOR IDENT.

13    Macias-1, Bates RSC-Maysonet 000055 and   21
      56
14
      Macias-2, Bates CCSAO410                  67
15

16

17

18

19

20

21

22

23

24

25

5

1  M A R I A   D E L   C A R M E N   M A C I A S,

2      called as a witness, having been first duly

3      sworn, testified as follows:

4  DIRECT EXAMINATION BY MS. BONJEAN:

5      Q.    Good afternoon, Ms. Macias.

6  A.      Good afternoon.

7      Q.    And thank you for joining us here

8  today.  Have you ever had your deposition taken

9  before, ma'am?

10  A.      This is, I think this is gonna be the first

11  time.  You know, I don't know, if it was

12  deposition 30 years ago when I think it was the

13  detective went to my house.  I don't know if it

14  was just information or deposition.

15      Q.    Okay.  So today we are obviously

16  doing questioning and answering over the Zoom

17  platform, which is new to all of us.  So you're

18  kind of in the same boat as the rest of us, and

19  we're going to try to take up as little amount of

20  your time as possible.  But I do appreciate you

21  joining us with the understanding that we're asking

22  you to reflect on things many, many decade ago at

23  this point.  Okay?

24  A.      Yes.

25      Q.    I'm just going to just start with

Macias - Direct/Bonjean

6

1    giving you some guidelines, just so you understand

2    how this is going to go today.  I'm going to ask

3    you some questions, not many questions, but I'm

4    going to ask you some questions, and I'm going to

5    ask that you answer to the best of your ability.

6    And just, you know, if you don't remember

7    something, it's fine.  Just say, I don't remember,

8    but it's to the best of your ability that you're

9    able to answer, that's what we're asking you to do.

10   Okay?

11   A.     Sure.

12          Q.    And because this is a weird format,

13   I'm going to ask that you wait for me to finish my

14   question before you answer so that the court

15   reporter can take it down accurately.

16   A.     Sure.

17          Q.    And then I'm going to also do the

18   same and try to wait to let you answer before I

19   start my next question.  Okay?

20   A.     Yes.

21          Q.    I'm going to be doing some of the

22   questioning, but there may be some other attorneys

23   who are on this Zoom conference that may want to

24   ask you some questions as well.  Okay?

25   A.     Sure.

1    Q.    Okay.  Wonderful.  And you

2  understand, ma'am, that you are under oath today.

3  Do you understand that?

4  A.    Yes.

5    Q.    And that's the same oath that you

6  would take in a court of law or if you were in

7  front of a judge.  Okay?

8  A.    Yes, I do.

9    Q.    Okay.  Wonderful.  Okay.  Thank you.

10  I know you already told us your name.  I know

11  Macias is your last name.  What first name do you

12  prefer to go by?

13  A.    Carmen.

14    Q.    Carmen.  Okay.

15  A.    Yes.

16    Q.    Ms. Macias, where do you currently

17  live?  You don't have to give an exact address, but

18  where in the State of Illinois do you presently

19  live?

20  A.    Chicago.

21    Q.    And do you work, ma'am?

22  A.    Yes, I do.

23    Q.    What type of work do you do?

24  A.    I am a licensed childcare provider.

25    Q.    And do you run a childcare service?

Macias - Direct/Bonjean

8

1  A.      Yes.   From my house.   That's home childcare

2  program.

3          Q.    Okay.  And do you work alone, or do

4  you work with any -- do you have any partners or

5  people that you work with?

6  A.      Usually we have an assistant.  But right

7  now because of the pandemic, you know, I don't

8  have an assistant.

9          Q.    Understood.  And do you work with

10  your sister in the childcare?

11  A.     No.   These are independent programs.

12         Q.   I see.  Okay.  And how long have you

13  been doing that?

14  A.      At least 13 years.

15         Q.    All right.   Now, I want to actually

16  just draw your attention back to many years ago,

17  spring of 1990.  Okay.  Let me ask you this.  How

18  old are you currently?

19  A.      57.

20         Q.    And what's your date of birth?

21  A.      ████████████

22         Q.    All right.   Do you recall, and my

23  math is terrible, do you recall how old that would

24  have made you on May 25 of 1990?

25  A.      Probably 25.

**Macias - Direct/Bonjean**

9

```
1          Q.    Do you recall where you lived in May
2    of 1990?
3    A.    Yes.  Same, you know, in Chicago, in the
4    northwest side of Chicago.  The same, in Chicago.
5          Q.    Do you recall what street you lived
6    on in May of 1990?
7    A.    Yes.
8          Q.    You do?
9    A.    North Avenue.
10         Q.    North Avenue.  All right.  And do you
11   recall what the cross streets were where you lived
12   on North Avenue?
13   A.    I think it is -- we're between Central Park
14   and Kimball.
15         Q.    And would you agree that you lived on
16   the 3400 block of North Avenue?
17   A.    Yes.
18         Q.    Now, back in May of 1990 when you
19   lived on the 3400 block of North Avenue, did you
20   live with anyone?
21   A.    My husband.
22         Q.    And what was his name?
23   A.    His name is Oscar Macias.
24         Q.    Okay.  And is Mr. Macias still with
25   us today?
```

Macias - Direct/Bonjean

1   A.      Yes, he is.

2           Q.      And back in May of 1990, did you and

3   your husband have any children?

4   A.      No.

5           Q.      And did you and your husband live

6   with any other members of the family in May of

7   1990?

8   A.      Every -- you know, this is multi-units

9   building, and in one of the floors my parents used

10  to live, and we used to live in the third floor.

11          Q.      I see.

12  A.      But not together.

13          Q.      Understood.  So it was a family-owned

14  building that you all lived in?

15  A.      Yes.

16          Q.      And you and your husband lived on the

17  third floor, you said?

18  A.      Yes.

19          Q.      And where did your parents live?

20  A.      The second floor.

21          Q.      The second floor?

22  A.      Yes.

23          Q.      And I know you had a sister as well;

24  correct?

25  A.      Yes.

Macias - Direct/Bonjean

11

1          Q.    And where did she live?

2     A.    She used to live, I think, on -- I think

3     it's Parker, Parker Avenue.

4          Q.    Okay.

5     A.    Chicago, too.

6          Q.    She didn't live in the building in

7     May of 1990?

8     A.    No.

9          Q.    Okay.  Do you remember her being

10    present in the building on May 25 of 1990 when the

11    shooting occurred?

12    A.    I think she was visiting my mom.

13         Q.    I see.

14    A.    Yes.

15         Q.    I see.  Got it.  Okay.  And did

16    anyone apart from your husband live on the third

17    floor apartment with you?

18    A.    No, just him and I.

19         Q.    Okay.  And you and your sister, are

20    -- let's see -- who's older?

21    A.    I am.

22         Q.    All right.  And did you have other

23    family members who lived on the first floor of the

24    apartment?

25    A.    Well, my little brother, you know, he was a

Macias - Direct/Bonjean

12

1    baby, you know, and my -- and another sister, but,

2    you know, they were very young.

3         Q.    I see.  And did your parents occupy

4    the first and second floor, or was the first floor

5    like a retail space?

6    A.    The first floor is a commercial space.

7         Q.    I see.  So the ground level was a

8    commercial space?

9    A.    Yes.

10        Q.    And do you remember what business

11   occupied that ground floor?

12   A.    It was a print shop.

13        Q.    So this was a print shop that your

14   family rented out type of thing?

15   A.    It was owned by my father.

16        Q.    Ah, okay.  So it was a whole family

17   affair in the building?

18   A.    Yes.

19        Q.    All right.  Now, back in May of 1990,

20   how would you describe the 3400 block of North

21   Avenue if you were telling someone about the

22   neighborhood?

23   A.    Well, still, you know, until today, kind of

24   a dangerous place.  There was, you know, certain

25   time of today that you have to go inside your

Macias - Direct/Bonjean

13

1    house, but when living in Chicago sometimes, you

2    know, you think, oh, it's this type of

3    neighborhood, like that.  You know, thank God,

4    nothing happened to us, but it used to be, you

5    know, used to -- something will happen.

6         Q.    I would like you to just describe,

7    when you say dangerous, would you say that there

8    was a lot of violence in that area?

9    A.    Not a lot, but violence.  You know, you

10   will hear, you know, fights.  You will hear

11   sometimes shots, but I mean, we used to live

12   there.

13        Q.    Yeah.

14   A.    And like I said, until this time, you know,

15   the building is owned by my family, and it has not

16   changed that much.

17        Q.    I see.  Back in May of 1990, were you

18   aware of gang activity on the 3400 block of North

19   Avenue?

20   A.    You know, we came to live in that area in

21   like 1981.  You know, this -- how can I put it?

22   This issue about gangs, it was pretty new for us,

23   because where we used to live in Mexico, we didn't

24   experience anything like that.  When we starting

25   to go to school, I remember my parents just making

14

1   us aware, but we didn't understood.  They just

2   told us, you know, "Somebody stop you in the

3   street and they ask you for your coat, give the

4   coat.  They want your backpack, give them the

5   backpack, but do not put any resistance."  And

6   that's how we lived, right.

7         Q.   I see.  Now, I hadn't asked you this,

8   and you kindly brought it to my attention.  In

9   1990, how long had you lived in the building?

10  A.    In 1990, let's see, probably a couple of

11  years.

12        Q.   Okay.

13  A.    Because my parents bought the building.

14        Q.   Right.

15  A.    And we used to live just like, probably

16  like a block away, but on the same side of the

17  street, on North Avenue.

18        Q.   Understood.  Now, North Avenue, the

19  3400 block specifically, was there a number of

20  buildings that had commercial spaces on the ground

21  floor and then residential apartments above?

22  A.    Yes.

23        Q.   And would you say that it was mostly

24  people of Hispanic descent that lived on North

25  Avenue at that time, or was it more of a mixed type

Macias - Direct/Bonjean

15

1   of population?

2   A.    I will say that most of them, you know,

3   Hispanic.

4          Q.    Okay.  And if someone asked you what

5   neighborhood you lived in, what would you call that

6   North Avenue 3400 block approximately?

7   A.    I don't know.  You know, until a few years

8   ago, I find out, you know, that neighborhoods have

9   some kind of name, like Hermosa and

10  Belmont-Cragin.  I don't know right now what kind

11  of neighborhood it is.  Probably Humboldt Park

12  because it's nearby.

13         Q.    Right.  North Avenue seemed like it

14  was kind of a boundary of some type, but I'm just

15  speculating, but I wasn't sure what you called it.

16              So, specifically, I would like to

17  draw your attention to the early morning hours of

18  May 25th of 1990.  And specifically, I want to draw

19  your attention to whether or not you heard an

20  altercation or any type of activity that was

21  followed by gunshots?  Tell me if you remember.

22  A.    I remembered, you know, that -- at that

23  time, I was expecting my first child.  I was

24  around probably six months pregnant, and we heard,

25  my husband and I, noise.  You know, we didn't know

```
 1   if it was a fight.  We didn't know because it was
 2   not clear.  You know, you cannot understand.  It
 3   was just noise, and that wake me up, and I said to
 4   him, you know, "Close the window because I cannot
 5   go to sleep," and I think, you know, I remembered,
 6   I think he just wake up, close the window.  We
 7   went back to sleep.  And I was falling asleep
 8   again.  I do not know how much time passed.  I
 9   don't know what time it was, but I remember, you
10   know, that I was, you know, falling asleep again,
11   and we heard, I don't know how many, but we heard
12   the gunshots.  You know, I remember that they were
13   not -- I didn't hear them nearby, like pretty
14   close.  We just heard them.  And then, you know, I
15   said, "Oh," but, you know, I do remember -- I
16   don't remember hearing the police.  I don't
17   remember -- you know, it was kind of weird because
18   we didn't hear not even cars passing by, like it
19   was deserted, like it was alone.  Then, you know,
20   I said, you know, because of the fear that you
21   don't know what's going on outside, you know, we
22   just went back to sleep.  We didn't hear anything
23   else, and then, you know, the next morning because
24   of the news, we find out.  Yeah.
25            Q.    All right.  Was that the only
```

1   gunshots you heard during that evening?

2   A.     Yes.

3          Q.    And do you recall whether there was

4   one gunshot or multiple gunshots?

5   A.     I think it was multiple gunshots.

6          Q.    Okay.  Now, I know you don't remember

7   specifics about time and things like that, and I'm

8   not gonna press you for that, but you do recall

9   that you were sleeping, or trying to sleep; right?

10  A.     Yes, yes.

11         Q.    And I can assume it was dark outside?

12  A.     It was dark, yes.

13         Q.    And the fight or the argument or the

14  noise that preceded gunshots, do you have an

15  estimate of how long that went on?

16             MR. STEPHENSON:  Objection.

17  Mischaracterizes the testimony that the witness

18  gave.

19         Q.    You can answer, Ms. Macias, if you

20  understand the question.

21  A.     Yeah, I can't -- I don't recall, you know,

22  how much time it was, yeah, because I was

23  sleeping, you know.

24         Q.    And do you recall if it was -- could

25  you hear multiple voices?

Macias - Direct/Bonjean

1   A.      No, I -- what I can recall, and I think

2   it's the same thing that I told the detectives, is

3   that I could hear like far away -- I don't know,

4   you know, who was outside, but I remember

5   something like they were saying something like

6   Lulu, Zulu.  I don't know what it was, but it

7   sounded like that.  Because it was, you know, you

8   cannot -- it was not understandable, you know,

9   what you're hearing.  It was just like some kind

10  of noise, but that's all I can recall.

11          Q.    Sure.  And could you describe the

12  voices in terms of could you tell whether they were

13  Hispanic speakers -- or Spanish speakers or African

14  Americans or any other ethnicity?

15  A.      No.  Very hard.  No, I wouldn't speculate

16  because it could have been any, anybody.  You

17  know, we just heard, you know, voices.

18          Q.    Could you tell whether they were

19  speaking English or Spanish or some other language?

20  A.      The only thing, you know, the words that I

21  recall it just is Lulu, Zulu, but I didn't hear --

22  I don't remember hearing nothing in English,

23  nothing in Spanish.  I don't know if because it

24  was far away, my windows were closed, but that's

25  all.  You know, I cannot say if it was English, if

Macias - Direct/Bonjean

19

1   it was Spanish.

2           Q.    Okay.  I would like to show you a

3   document and have you review it with me, and I may

4   have some questions about it afterwards.  Okay?

5   A.      Sure.

6           Q.    But before I do that, you did say

7   that detectives came to speak to you the next

8   morning or the following morning?

9   A.      No, that was like three months.  Because,

10  you know, I had my baby on August, and I remember

11  that it was very hot, and I think in that week, or

12  that day, that's when I came back from the

13  hospital, and it was very -- I do not know the

14  exact day they were there, but it was like in

15  August, because I just had my baby, and, you know,

16  one of the things that, you know, that I remember

17  very well is because I had some kind of fight

18  outside with one of the detectives because they

19  were inside my house.  It was very hot, and he --

20  they were white.  You know, they were not

21  Hispanic.  They were white, both of them, and he

22  wanted to smoke, and I said, "You cannot smoke

23  here in my house.  I just came back from the

24  hospital with my baby."  And he didn't like it.

25  And I said, well, you know, they can leave.  You

Macias - Direct/Bonjean

1   know, this is my house.  That's because I remember

2   that day that it was very hot, and I just came

3   from the store.  You know, I just came back from

4   the hospital, but it was in August.

5          Q.    Interesting.  So the child that you

6   gave birth to, what's her birthday?  Is it a her or

7   a he?

8   A.     It's a her.

9          Q.    Okay.  And what's her birthday?

10  A.     It's ███████████████

11         Q.    So she was born on ████████████████

12  is that right?

13  A.     Yes.

14         Q.    And you specifically recall that when

15  detectives came to speak to you, you had just given

16  birth to her recently; right?

17  A.     Yeah, because, you know, I think that day,

18  you know, we just had bought these pots to boil

19  the bottles that I don't think they do anymore,

20  and yeah, that's what I recall.

21         Q.    And do you recall her being only like

22  a week or two old, or a couple months old, or you

23  don't know?

24  A.     No, days.  Probably days or weeks.  Yeah.

25         Q.    Got it.  And you specifically

Macias - Direct/Bonjean

21

1　remember the date-ish, like the month at least,

2　because you know when you gave birth; right?

3　A.　Oh, yeah.　You don't ever forget that.

4　　　Q.　Right.　I've done it four times

5　myself so I can appreciate that.

6　　　　　But you recall this interaction with

7　the police officers; is that right?

8　A.　I don't know if they were police officers

9　because they were not wearing any police clothes.

10　They wear plain, regular clothes.

11　　　Q.　And was that the first time you had

12　spoken to either a detective or investigator

13　officer about that shooting that had occurred in

14　May of 1990?

15　A.　Yes, that was the first time.

16　　　　　MS. BONJEAN:　All right.　So I'm

17　going to mark as Exhibit Macias-1 a report that is

18　Bates stamped RSC-Maysonet 000055 to 56.

19　　　　　(Macias-1, Bates RSC-Maysonet 000055

20　and 56, marked for identification.)

21　　　Q.　Ms. Macias, are you able to see this

22　document, or is it a little difficult?

23　A.　I can see it.

24　　　Q.　Okay.　Wonderful.　And do you see in

25　the left-hand corner, it says, Supplementary

Macias - Direct/Bonjean

22

1    Report?

2    A.     Yes.

3         Q.    All right.  And I want to draw your

4    attention directly to the right of that, you will

5    see, and it's kind of hard to see, but there's a

6    date, and let me know if you can't see.  We might

7    be able to enlarge certain portions.

8              MS. BONJEAN:  Yes.  Great.  Thank

9    you, Haley.

10        Q.    It says, Date of original occurrence,

11   or orig occurrence time, and you will see it says,

12   May 25, '90, at 1:00 a.m.  Do you see that?

13   A.     Yes.

14        Q.    And then below it, you will see it

15   says, 3428 West North Avenue.  Do you see that?

16   A.     Yes.

17        Q.    Do you recall what your exact address

18   was back in May of 1990?

19   A.     The address?

20        Q.    Yes.

21   A.     Yeah, I think the address is 3419.

22        Q.    Okay.  And I'm sorry, you probably

23   said this earlier.  Do you know if your building

24   was on the north or south side of the street?

25   A.     The right side.

Macias - Direct/Bonjean

1      Q.    Okay.  So if you're facing west, like
2  you're going west, would your building be on the
3  right side?
4  A.     West, like going to the lake?
5      Q.    No, that's east.  That's east.  So --
6  A.     East.
7      Q.    So if you're going east, would you be
8  on the left side, is your building the left side or
9  the right side?
10  A.     I'm --
11      Q.    I don't want you to make a mistake
12  about this.  Let's see if we can figure it out.
13  A.     Sure.
14      Q.    Do you recall the video store that
15  was on your block?
16  A.     Yes, yes.  Almost in front of us.  That
17  building is in front.
18      Q.    So did you live on that side of the
19  street or across the street?
20  A.     Across the street.
21      Q.    Got it.  All right.
22           MS. BONJEAN:  Now, I would like to
23  go, let's see, to the narrative portion, if you
24  would, Haley.  Okay.  No, no.  Please go back
25  down.  Right there.

Macias - Direct/Bonjean

24

1    Q.    Now, Ms. Macias, do you see that it
2  says, "This is a canvass report."  Right there,
3  that portion?
4  A.    Yes, yes.
5    Q.    And it indicates that there was some
6  people interviewed.  Alicia Hernandez.  Do you see
7  that?
8  A.    Yes, I do.
9    Q.    Do you know Alicia Hernandez?
10 A.    No, I don't know who she is.
11   Q.    Okay.  It indicates that she was a
12 barmaid -- that's what they used to call them back
13 in 1990, I guess -- at the Jose Pobre, and I may be
14 saying that incorrectly, Tavern.  Do you see that?
15 A.    Yes.
16   Q.    Do you remember that tavern?
17 A.    Yes, I do.
18   Q.    And was that on your side of the
19 street where your building was or across the
20 street?
21 A.    No, in the same side of the building.
22   Q.    Okay.  And then if you go down a
23 little -- you don't have to go down, but the next
24 name that is capitalized is Alma Preceeo?
25 A.    Um-hum.

Macias - Direct/Bonjean

1          Q.    Did I say that incorrectly?  I

2     probably did.

3     A.     Well, it is write incorrect.

4          Q.    Okay.  Is that your sister?

5     A.     Yes, she is.

6          Q.    And what's the name supposed to be,

7     or what was it supposed to be?

8     A.     Well, you know, at that time she was

9     married, and that's her married last name.  But

10    it's P --

11         Q.    Can you spell it?  Yes, go ahead.

12    A.     P-R-E-C-I-D-O -- D-A-D-O.  Precidado.

13         Q.    Okay.

14    A.     Yeah.  She's not Precidado anymore.

15         Q.    And her current name is Reyes; is

16    that right?

17    A.     Yes.

18         Q.    Do you recall whether she was present

19    when you gave a statement to the detectives that

20    came to your house in August of 1990?

21    A.     No.  It was just my husband and myself.

22    She was not present.

23         Q.    All right.  Let me ask you this.

24    When the detectives or investigators came to your

25    house in August, did the detective eventually put

1  out his cigarette so that you could speak to him?

2  A.      He was not able to put it out.

3      Q.      Okay.  All right.  And did you tell

4  them the information that you knew about what you

5  heard on the night of the shooting?

6  A.      Yeah.  It was the same, you know.  It was

7  dark.  You know, I was sleeping.  The same thing

8  that I just said right now.

9      Q.      Okay.  When you made that statement

10  to the police, it was just you, yourself, and how

11  many investigators or police officers?

12  A.      There was two of them.

13      Q.      All right.  And was your husband

14  present?

15  A.      Yes, he was.

16      Q.      Anyone else?

17  A.      No.

18      Q.      Okay.  So I'm going to -- well,

19  strike that.

20          Have you ever spoken to your sister

21  about what happened that evening or in the early

22  morning hours?

23  A.      You know, since she didn't live there, you

24  know, we just, you know, we will talk about it,

25  you know, if we saw something on the news, but not

27

1  really, no.

2          Q.    Okay.  So there's a summary here of

3  what she, or at least what the police have reported

4  summarized her statement to the police.  Okay.  And

5  I'd like you to draw your attention to it.  And you

6  can just read along with me, if you can see it.

7  Okay?

8  A.      Okay.

9          Q.    It says, "Alma," I guess it's

10 Precidado?

11 A.      Preciado.

12         Q.    Preciado.  Okay.  "Related that she

13 was awakened in an argument.  Preciado" -- they got

14 it spelled wrong -- "stated that she could only

15 hear bits of the conversation.  (I am trying to

16 help you -- I am going to kill you - I am going to

17 kill you first - you said that we could get the

18 last bus)  The total argument lasted for about an

19 hour.  After hearing four shots, Ms. Preciado

20 called the police.  Preciado then gave the

21 reporting detectives her sister's Macias, Carmen

22 business telephone number, who was also home when

23 the incident occurred."

24              Do you see that?

25 A.      Yes.

Macias - Direct/Bonjean

28

1      Q.    Does that sound, at least based on
2    your conversations with your sister, accurate in
3    terms of what she did and what she said?
4    A.     Well, you know, she was in the second floor
5    with my mom, and I was in the third floor, you
6    know, where I used to live, you know.
7      Q.    Sure.
8    A.     Yeah.
9      Q.    Okay.  And then if we go to the next
10   page, and this purports or supposedly summarizes
11   your statement to the police back in 1990.  Okay.
12   And I want to go through it line by line and tell
13   me if it matches or mirrors your recollection or
14   not.  Okay.
15              It says, "Carmen Macias, 3419 West
16   North Avenue," which I think you said was the
17   location of your family's building?
18   A.     Yes.
19     Q.    "-- was contacted by telephone" --
20   "was contacted by telephone at place of
21   employment."  Do you recall the police calling you?
22   A.     No.  I work for 20 years for the
23   Archdiocese of Chicago.  That was the phone, but I
24   don't recall receiving a phone call at the office.
25     Q.    I see.  And do you have a

**Macias - Direct/Bonjean**

29

1   recollection of the police ever coming to your

2   place of employment?

3   A.      No.

4           Q.      Okay.

5   A.      No.

6           Q.      Okay.  And it says she was contacted

7   at her place of employment and "related that she

8   was awakened around 2400 hours," which is I guess

9   around midnight, "by the sound of two male blacks

10  having an argument.  One had a very calm voice.

11  The second had a loud abrasive type voice and

12  sounded as if he may have been drunk."

13              Does that refresh your recollection

14  about what you may have told the police back in

15  1990?

16  A.      Well, the thing is that, you know, this is

17  the first time I'm reading this, and, you know, it

18  will be -- I don't know -- kind of hard for me,

19  you know, to see if it was dark.  I didn't have,

20  you know, like the view to see outside, or even to

21  say that there were two black persons.

22          Q.      Right.  It indicates that you said

23  the sound, not that you saw, but do you have any

24  reason to -- and I understand today your

25  recollection isn't what it would have been 30 years

Macias - Direct/Bonjean

30

1   ago.

2   A.      Right.

3           Q.    But do you have any reason to doubt

4   that you told the police this back in 1990?

5   A.      Well, the thing, you know, the point, you

6   know, because of all the noise and the argument,

7   it sounds like, I mean, like they were fighting

8   and probably drunk, yes.  But, you know, I

9   couldn't understand, you know, words, exactly

10  words or anything.  Probably I assumed, you know,

11  they were drunk because of all the noise and

12  screaming, but, yeah.

13          Q.    Okay.  And were you aware of what

14  racial makeup the victims were, not at the time,

15  but later did you learn who the victims were?

16  A.      Yes.

17          Q.    Okay.  And you knew they were --

18  A.      From the news.

19          Q.    Were you aware that they were two

20  African American brothers?

21  A.      Yes, because the news.  We saw that on the

22  news.

23          Q.    Gotcha.  And it goes on to say,

24  "Macias was only able to hear parts of the argument

25  that lasted for at least an hour.  Both subjects

Macias - Direct/Bonjean

1  referred a number of times to someone called Lulu

2  Dog, and also had some disagreement about a bus."

3            Does that sort of match what you

4  recall to this day, or at least partially?

5  A.    Partially.

6            Q.   Yeah.  I know you said earlier that

7  you remember the Lulu?

8  A.    Yes.

9            Q.   "Macias did not call the police after

10 hearing shots because she did not have a telephone

11 in her apartment, but considered going downstairs

12 to her father's apartment and using his telephone

13 to call the police.  Macias later looked out of her

14 window and saw the two victims down on the street."

15           Do you recall seeing them laying on

16 the street?

17 A.    No, I don't.

18           Q.   Okay.  Do you recall what was

19 directly across the street from your building at

20 3419 West North Avenue, like if you looked directly

21 out your third floor window onto North Avenue,

22 across North Avenue, what would you be looking at?

23 A.    There's some other buildings.

24           Q.   Okay.

25 A.    Yeah.

Macias - Direct/Bonjean

32

1       Q.    So it wasn't a vacant lot you were

2   looking into; is that right?

3   A.    A vacant lot?  I don't remember a vacant

4   lot.

5       Q.    Okay.  All right.  And as you sit

6   here today, is it your distinct memory that this

7   conversation, the one conversation you had with the

8   detectives, was at your home?

9   A.    Yes, it was at my living room.

10      Q.    And as you sit here today, do you

11  have a recollection of telling them what I just

12  read to you on the telephone?

13  A.    I have a recollection, you know, they were

14  also, you know, asking me these questions.  I told

15  them exactly what I remembered, you know, that it

16  was late, it was dark, that the noise wake me up,

17  that I asked my husband to close the window.

18  Later, I don't know how much time had passed, you

19  know, we had heard gunshots.  You know, we were

20  really afraid to just go out because you don't

21  know what's going on.  We went back to sleep.  And

22  then in the morning, you know, we heard the news,

23  and that's when we found out more of the details,

24  but nothing else.

25      Q.    I see.  Okay.  Were you ever

Macias - Direct/Bonjean

33

```
 1    interviewed by anyone -- well, strike that.
 2                    Let me ask it this way.  How long did
 3    you live at 3419 West North Avenue after the
 4    shooting, like how long were you there?
 5    A.    I -- we live there for -- until 1994 and
 6    then, you know, we moved.
 7           Q.    Okay.  So during the period of time
 8    between 1990 when the shooting occurred until you
 9    moved, were you interviewed by anyone other than
10    the two white detectives, or what you assumed to be
11    detectives, about this incident?
12    A.    Never.
13           Q.    Do you recall ever being subpoenaed
14    to come to court or anything like that in
15    connection with this case?
16    A.    Never.  This is the first time.
17           Q.    All right.  Now, after 1994, after
18    you moved, do you recall whether anyone has
19    contacted you to speak with you about this
20    incident?
21    A.    Yeah.  When we move in 1994 because, you
22    know, we bought our new house, you know, for like
23    20 minutes away, and then we lived there for
24    13 years, and then we moved to the actual house
25    where I'm right here right now, and it was
```

1   probably like, I'm not sure if it was two or three

2   years ago -- I cannot recall the exact day, but

3   probably two or three years ago that I received

4   receive a phone call, and it was -- I want to

5   remember, I don't know if he said a retired

6   detective.  He was African American.  And with, I

7   don't know if it was another detective, it was a

8   white woman, and they asked me if they could

9   interview me, that they just had some questions

10  and if I could receive them in my house.  So we

11  agree on a date, and it had to be because of the

12  daycare, you know, in the morning I cannot have

13  anybody that is not related to the kids that I

14  take care of, we met here in the living room, in

15  the daycare, and probably around 6 o'clock in the

16  afternoon.  Both of them came.  I don't -- I do

17  not recall if they gave me some papers, but it was

18  just the same questions, you know.  They said -- I

19  think they said that they were trying to gather

20  more information, and also they asked me for my

21  sister, and I said, you know, she doesn't -- she

22  didn't live at the North Avenue address.  She used

23  to live, you know, in her house.  She used to have

24  her own house, and now, you know, she moved to the

25  suburbs, and I don't see her every day, but that

Macias - Direct/Bonjean

1    day, you know, they spend probably like an hour in

2    my living room just, you know, making me -- you

3    know, same questions, "What do you remember?"  But

4    that was it.

5              And then probably like a year and a

6    half ago, I got a phone call from -- and this, I'm

7    sorry, I don't remember if it was a retired police

8    or retired detective, but he -- I want to remember

9    his name, but he was Puerto Rican.

10         Q.    Spanish?

11   A.     Spanish.  And I felt -- like I didn't feel

12   this kind of pressure the first time.  You know, I

13   mean, the second time when they contacted me, you

14   know, the lady and the retired police or

15   detective, they were very kind, very

16   understandable.  But this time, you know, with

17   this -- you know, I don't remember if he was a

18   retired police or retired detective, he was very

19   insisting.  You know, he was making a lot of

20   calls, calling me almost every time.  He wanted to

21   come to my house.  And he wanted me to get in

22   contact with my sister.  He wanted to go to her

23   house.  And I said, you know, "I already told them

24   what I remember.  I already told them what I knew

25   of 30 years ago.  What else do you need?"  And I

Macias - Direct/Bonjean

36

1    do not know why he was so persistent to come to my

2    house and do the interview.  And I said I can't,

3    because, again, the morning, you know, I have my

4    children here, and at that time I do -- I was

5    doing the second shift, that it's, you know, from

6    6 o'clock in the afternoon until 11, so I was not

7    able to make any time to meet with him.

8                    And I remember, you know, one day I

9    was coming out of the doctor's office, and, you

10   know, I was driving, and he was calling me and

11   calling me, and I said, "Please, you know, I think

12   my sister does not want to do anything with this.

13   You know, she just was interviewed.  She just --

14   and I don't have any other information that I can

15   give you, you know.  Besides, you know, it has

16   been so many years ago, you know, that what can I

17   tell you?"  But like a year and a half ago that

18   it was the last time, you know, I was contacted by

19   this, I don't remember if it was retired police or

20   retired detective, but he was Hispanic, speak

21   Spanish.

22            Q.    I see.

23                  MS. BONJEAN:  Haley, you can take

24   that down, if you don't mind.

25            Q.    Okay.  So, Ms. Macias, let me just

Macias - Direct/Bonjean

37

1   back up for a second, and I just want to make sure
2   -- I have just a few questions about what you just
3   shared with us.
4               So, if I'm correct, sometime after
5   you moved, not once, but twice; right?  You moved
6   in '94, and then you moved again 13 years later;
7   right?
8   A.      Yes.
9           Q.      At some point, you said you were
10  contacted by a woman and then also a individual who
11  was either a retired detective or a retired police
12  officer, something of that nature; is that right?
13  A.      Yes.
14          Q.      And you invited them to come to your
15  home at a designated time, and you were interviewed
16  by them; is that fair?
17  A.      Yes.
18          Q.      And you said, I think, the interview
19  lasted about an hour, and you told them everything
20  you knew at that time; is that right?
21  A.      Yes.
22          Q.      And during that interview, you didn't
23  feel particularly pressured or, you know,
24  uncomfortable; is that fair?
25  A.      Yes.  Nothing.  It was -- it was -- I mean,

1  I didn't feel any pressure.

2          Q.    Okay.  And then you're saying about a

3  year and a half ago, you were contacted by another

4  individual who represented himself as a retired

5  detective, a retired police officer?

6  A.    Yes.

7          Q.    And was it just him, or was he with,

8  or on the phone, with anyone else?

9  A.    It was just him.

10          Q.    Did he tell you his name and you just

11  don't remember it, or he never told you his name,

12  or what's your best recollection of that?

13  A.    He did tell me his name, but I do not

14  remember his name.

15          Q.    If you heard the name, would you

16  remember it, or you don't know?

17  A.    Probably if I heard the name, but I'm not

18  100 percent sure.

19          Q.    Okay.  And you said you knew he was a

20  Hispanic detective; correct?

21  A.    Yes, you know, Puerto Rican.

22          Q.    And how could you tell he was a

23  Puerto Rican Hispanic?

24  A.    He told me.

25          Q.    Oh, okay.

Macias - Direct/Bonjean

1    A.      And I have a lot of friends that are from

2    Puerto Rico.  I mean, you know.  I mean, he told

3    me.

4            Q.    Yeah.  And could you tell by his

5    Spanish that he was Puerto Rican rather than

6    Mexican?

7    A.      I can say so.

8            Q.    Yeah.  Sure.  And did you speak with

9    him in Spanish, or did you speak with himself in

10   English?

11   A.      In Spanish.

12           Q.    Could you tell about how old he was?

13   A.      No.

14           Q.    Okay.  Did he tell you anything else

15   about himself?

16   A.      No, just his name.  Where, you know, he

17   identified himself as, like I said, someone

18   retired, and that they wanted to ask me some

19   questions and, you know, the same information,

20   this thing that happened so many years ago and all

21   that stuff, but like I said, I felt a lot of

22   pressure because he was calling me almost every

23   day, and he wanted me to tell him my sister's

24   address, and I said I can't.  You know, as far as

25   I know, you know, that is something not that you

Macias - Direct/Bonjean

40

1    want to remember, but if she doesn't want to be

2    contacted, you know, I cannot do anything about

3    it.

4        Q.    Okay.  Can you estimate how many

5    times he contacted you by telephone?

6    A.    I will say at least five times.

7        Q.    And when you say you felt like he was

8    putting pressure on you, did he want to come see

9    you and talk to you?

10   A.    Yes, yes.  And if I remember very well, it

11   was a weekday, probably around 8, 9 o'clock in the

12   morning, that is a very busy time for me, and the

13   ring bell sound, and, you know, since we are not

14   expecting anybody, we do not open the door because

15   of safety.  And then my phone, you know, was

16   ringing, and he said, "I'm outside."  And I said,

17   "Well, why?  Who are you?"

18            "Oh, remember, that I called you on

19   the phone about this and this."

20            And I said, "I'm sorry, but I cannot

21   receive you right now.  You know, I have my

22   children here."

23            And that was it.  But yeah, one day

24   he showed up at my door.  He ring the bell, but I

25   never open.  I never let him in.

**Macias - Direct/Bonjean**

41

1    Q.    Right.  Did you get a look at him?

2    A.    No.  Because, you know, at that time, I had

3    my assistant, and I remember that I was cooking

4    here in the back, and he said, "Miss Carmen, there

5    is a person at the door," and I said, "Do we know

6    him?"

7              And he said, "No."

8              And then, "Don't open."

9              And then that's when my phone ring

10   and say, "I'm outside."

11             "Who are you?"

12             "Oh, remember, that I called you

13   about this and this and this?"

14             "Well, yes, but I am working right

15   now."  And since I didn't -- and I didn't really,

16   I didn't go outside to see how he look like,

17   nothing.  I just take care of 17 children, so...

18   Q.    No, I understand.  Did you write down

19   his phone number, or would you be able to get his

20   phone number?

21   A.    Well, you know, probably -- I didn't write

22   it down, but the thing is that I have changed --

23   in that time, I have changed twice my phone.

24   Q.    Right.  Now, do you know whether he

25   tried, the same detective, or maybe what you

Macias - Direct/Bonjean

42

1   believed to be the same detective, contacted your

2   sister?

3   A.     I do not know.  I don't know.

4          Q.    And when he was trying to speak with

5   you about this incident, was there anything

6   specific about -- at least that you recall about

7   what types of things he was asking you?

8   A.     Same questions.  He said, you know, they

9   just wanted to interview me to get more

10  information about this case and nothing else.

11         Q.    Okay.  And did you say that he wanted

12  you to provide him with identifying information

13  about where your sister lived or her phone number?

14  A.     Yes.

15         Q.    Okay.  And did you feel comfortable

16  doing that?

17  A.     No, I did not feel comfortable, and I

18  didn't share anything with him.

19         Q.    Okay.  And so to the best of your

20  recollection, he called you at least five times and

21  came to your house uninvited; right?

22  A.     Yes.

23         Q.    And this was after you told him that

24  you really didn't want to speak to him or have

25  anything more to say; is that right?

Macias - Direct/Bonjean

1  A.      Exactly.

2          Q.    Okay.

3  A.      And I said yes.

4          Q.    Go ahead.  You can finish.

5  A.    I said, you know, "I don't have -- you

6  know, it has been 30 years.  I don't have any

7  other information."

8              You know -- we -- you know, once it

9  happened, you go along with your life, and really,

10  you know, you want to forget these type of things,

11  but you cannot forget about it because, you know,

12  you were interviewed at that time by the

13  detectives.  You knew about it.  It was just, you

14  know, like there in your neighborhood, but I said,

15  you know, "I don't have any other information.

16  You know, I cannot sit down and start, you know,

17  looking through my mind to see what else, you

18  know, I can't."  You know, and no, I can't.  So I

19  was not, you know, like willing to invite him

20  inside.  For what?  I mean, I don't have anything

21  new, you know, and that was it.  I said, you know,

22  "They were here already."  You know, the woman and

23  the other person.  "What else can I give you?  I

24  don't have anything else."  And, you know, as

25  time pass by, I don't want to make up things that

Macias - Direct/Bonjean

44

1  probably didn't happen, you know.  I don't

2  remember.  This is what I said.  And that's it.

3          Q.    And he stopped calling?

4  A.      Yeah, he stopped calling.

5          Q.    Are you fairly confident that he

6  first started calling you, you said, about a year

7  and a half ago?

8  A.      I think so.

9          Q.    Okay.  Do you recall whether he told

10  you his name was Reynaldo or Detective Guevara?

11  A.      I don't remember really.  I don't.

12          Q.    Okay.  I think I asked you this, and

13  I don't remember what you said, so I apologize.

14  Did you say you were speaking in English or Spanish

15  or both?

16  A.      Spanish.  Mainly Spanish.

17              MS. BONJEAN:  Okay.  All right.  I

18  don't think I have any more questions for you at

19  this time.  What I'd like to do, if you don't

20  mind, is take like a 30-second or one-minute

21  break, so I can look at my notes and make sure,

22  and then maybe some of the other attorneys may

23  have some questions for you, but we shouldn't take

24  too long, I don't think.  Okay?

25              THE WITNESS:  That's fine.

Macias - Direct/Bonjean

45

1          MS. BONJEAN:  Okay.  Thank you.  If
2   you could just give me a second.  I'm going to
3   stay on, but I'm just going to look at my notes,
4   if you don't mind.
5          THE WITNESS:  Sure.  That's fine.
6   BY MS. BONJEAN:
7          Q.   I just wanted to ask you did the
8   person who was calling you identify himself as
9   Delorto?
10  A.    I do not remember.
11         Q.    What about --
12         MR. LEINENWEBER:  Jennifer, that got
13  garbled on my end.  Can you just ask that question
14  one more time?
15         MS. BONJEAN:  Sure, I sure can.
16         Q.    Did the individual who contacted you
17  that we were talking about, the Spanish-speaking
18  retired detective, do you know if he identified
19  himself with the last name Delorto?
20  A.    I don't.
21         Q.    Okay.  What about, here is one more
22  name.  See if it rings a bell.  Or Mazzola?
23  A.    No, that's -- no.
24         MS. BONJEAN:  Okay.  Fair enough.  I
25  have no further questions for you, but some of the

Macias - Cross/Leinenweber

46

1    other attorneys may want to ask some questions.

2                    THE WITNESS:  Sure.

3                    MS. BONJEAN:  Thank you for your

4    time.

5                    THE WITNESS:  Thank you.

6                    MR. LEINENWEBER:  I do have a couple

7    questions, but if you guys don't mind, can we just

8    take a five-minute break off the record?  And then

9    my questions will literally be probably five

10   minutes.  Would that be okay?

11                   MS. BONJEAN:  That's fine by me.

12                   (Break taken.)

13   CROSS-EXAMINATION BY MR. LEINENWEBER:

14        Q.    Ms. Macias, my name is Justin

15   Leinenweber.  I'm one of the attorneys on this

16   case.  I represent Defendant Guevara in this

17   matter.  Thanks very much for your appearance

18   today.  I just have a couple quick questions for

19   you --

20   A.    Sure.

21        Q.    -- primarily concerning this phone

22   call that you were just talking about with Ms.

23   Bonjean.  And I just want to kind of confirm a

24   couple things to make sure I have a clear

25   understanding.  What was the address that you were

Macias - Cross/Leinenweber

47

```
 1    living at at the time that you received this phone
 2    call from the gentleman you described as a Puerto
 3    Rican retired detective?
 4    A.      That's my actual address right now.  Do you
 5    need the address?
 6         Q.      Did you give it on the record
 7    earlier?
 8    A.      No.
 9         Q.      Do you mind giving the address?
10    A.      Sure.   ███████████████████.
11         Q.      Great.  And that's here in Chicago,
12    Illinois?
13    A.      It is.
14         Q.      And then the phone number, I think
15    you said you changed phones a couple times.  Have
16    you change phone numbers as well?
17    A.      No, not yet, not recently.
18         Q.      And what was the phone number that
19    you had when you received those phone calls?
20    A.      It's ████████████.
21         Q.      Okay.  And the individual who you
22    received some phone calls from and who you said you
23    believe was even outside your door kind of saying,
24    "Hey, I'm outside," at one point, you did not
25    actually see what that person looks like; is that
```

48

1    right?

2    A.     Yes, I didn't.

3           Q.    Okay.  And the basis of your

4    understanding that they are Puerto Rican was, I

5    think you said, the accent?  I think Ms. Bonjean

6    asked if you could identify the accent.

7    A.     Yes.

8           Q.     Anything else?

9    A.     No.

10          Q.     And then, I think you said, pretty

11   clearly that you have no recollection of what the

12   name of the individual was?

13   A.     I don't, no, I don't remember his name.

14          Q.    Okay.  And do you remember if the

15   individual who called you said they were calling on

16   anyone's behalf or anything like that?

17   A.     No, nothing.  He didn't mention any names,

18   nothing.

19          Q.    Okay.  And what did he tell you was

20   the purpose of his call?

21   A.     He said that they were like opening the

22   case, and they were trying to gather more

23   information, and also that they were, you know,

24   like trying to interview again most of the people

25   that was interviewed back, you know, 30 years ago,

Macias - Cross/Brueggen

49

1   and that's it.

2                MR. LEINENWEBER:  Okay.  I don't have

3   any further questions then.  So thank you very

4   much for your time.  And I will turn it over to

5   some of the other attorneys on the call.  Okay.

6                THE WITNESS:  Sure.

7                MR. LEINENWEBER:  Thank you.

8                THE WITNESS:  Thank you.

9   CROSS-EXAMINATION BY MR. BRUEGGEN:

10        Q.    Good afternoon, Mr. Macias.

11   A.      Hello.

12        Q.    My name is Dave Brueggen.  I

13   represent some of the other defendant officers in

14   this case, and I have some questions.  I'm going to

15   kind of jump around a little bit because I'm

16   following up on what Ms. Bonjean asked you to get

17   some more information.  So if at any time you don't

18   know what I'm talking about, just let me know, and

19   I'll try to make sure you understand what I'm

20   asking.  Okay?

21   A.      Yes.

22        Q.    I just want to ask did you review any

23   documents or do anything to prepare for this

24   deposition?

25   A.      It was just the letter and copy of the

1    subpoena, but that's it.  I don't have any

2    other -- you know, that was delivered by a person

3    at my door, yeah.

4           Q.    Okay.  So you just looked at the

5    subpoena and the letter that accompanied the

6    subpoena telling you about the deposition?

7    A.      Yeah.  And since I didn't know anything

8    about it, you know, I contacted the office.

9           Q.    Who did you speak to when you

10   contacted the office?

11   A.      I don't remember the name, but she said

12   that Ms. Bonjean was not available at the moment

13   but that she will contact me because, you know, I

14   said, I don't know what is this paper for.  I was

15   kind of, you know, apprehensive because, you know,

16   the paper came without an envelope, and, you know,

17   the person that deliver it, he said, you know,

18   "I'll suggest that you get in contact with this

19   law firm.  They will tell you what it is all

20   about."  That's what I did.

21          Q.    Okay.  So you called the law firm,

22   and you spoke to somebody there, and they -- did

23   you talk about the case with that person --

24   A.      No.

25          Q.    -- or did they just tell you --

Macias - Cross/Brueggen

1 A.      Yes.  I just said, "I just received this.

2 I would like to have more information.  What is

3 this for?"  Because I didn't recognize nothing of

4 the names.  I said, "I don't -- I do not know any

5 of these people that -- you know, the names here.

6 I don't know them.  I don't know what this is all

7 about."

8              For a moment, I thought it was some

9 kind of a mistake, but then when Ms. Bonjean

10 called me later that same day, you know, she just

11 told me what this is all about, and I have never

12 been, you know, given me a subpoena.  I didn't

13 know how it -- I know it has to like when you go

14 to court, but that was about it.

15          Q.    Understandable.  And what did Ms.

16 Bonjean talk to you about later that day?  Do you

17 recall what she said to you about the case?

18 A.      She just explained to me how it will work

19 because of the platform, you know, by Zoom.  That

20 usually this is done in a courtroom, and this is

21 something that you have to do.  This is not

22 something that no, I don't want to go, I don't

23 want to do it.  This is something that you have to

24 do.

25          Q.    Okay.  Did you talk about your

Macias - Cross/Brueggen

52

1    recollection or any details about the case or just

2    the format of how the deposition would proceed?

3    A.      The only thing we talk about, and this is

4    something I just told -- the only thing, you know,

5    that I remember we already, you know, talked, you

6    know, when this -- this investigators came, I

7    talked to her that this is something I remember

8    well, because, you know, I was pregnant, and then

9    they came and talked to me, and I already have my

10   daughter, that I just came back from the hospital,

11   and I remember because I didn't let the

12   investigator smoke inside, but, you know, that was

13   it.  Nothing in detail.  I mean, I said, "Well, if

14   this is something that I have to do, yeah, I will

15   do it."

16          Q.    And did you just speak to Ms. Bonjean

17   on that one occasion, or did you speak to her

18   again?

19   A.      No, that was the only time.

20          Q.    How long did you live on North

21   Avenue?  I think you said you had two residences on

22   North Avenue, going back to the '90s.  How long had

23   you lived on North Avenue?

24   A.      On North Avenue, you know, when we came

25   from Mexico in 1981, we lived also it was a

Macias - Cross/Brueggen

53

1   building that is in the same side on North Avenue,

2   and I think the crossing street it's St. Louis.  I

3   think so.  And then later, you know, my parents

4   bought this building that is at 3419-3417 because

5   it's a -- it's two buildings together.  So they

6   shared two different addresses and two different

7   numbers, but it was North Avenue, and I think I

8   lived there for around -- oh, my God -- well, 14

9   years in total until I move.

10          Q.    So you lived on North Avenue roughly

11  for about 14 years from when you lived with your

12  parents to when you moved into an apartment with

13  your husband?

14  A.      Something like that.

15          Q.    Are you familiar with a North Avenue

16  bus that runs, the 72 bus now?  I think was it the

17  same.

18  A.     I don't remember.  I know I used to take

19  the bus, but I don't remember the route or

20  anything.

21          Q.    Do you remember there was a bus that

22  ran east and west along North Avenue there?

23  A.     Yes, yes.

24          Q.    Do you remember back in 1990 what the

25  hours of operation for that bus were?  Did it run

Macias - Cross/Brueggen

54

1   all night, or was it just during the day?

2   A.    I think it was all night.

3         Q.    And you also mentioned that back in

4   1990, you worked for the Archdiocese of Chicago?

5   A.    I did.  I worked 20 years for the

6   Archdiocese of Chicago.  I was the editor of the

7   official Spanish Catholic language publication.

8         Q.    And I wanted to ask you some

9   questions, if you could go --

10             MR. BRUEGGEN:  Haley, is there way

11  you could put that exhibit back up, and

12  particularly the statement attributed to Ms.

13  Macias?

14             MS. COOLBAUGH:  Yes.  Give me one

15  second.

16             MR. BRUEGGEN:  Thank you.  Jennifer,

17  did we mark this as an exhibit?  Is this

18  Exhibit 1?

19             MS. BONJEAN:  Yes, we did Macias-1.

20             MR. BRUEGGEN:  Okay.

21             MS. COOLBAUGH:  Can you see the

22  screen?

23             MR. BRUEGGEN:  Yes.  That is perfect.

24  Thank you very much, Haley.

25         Q.    Ms. Macias, if you could take a

Macias - Cross/Brueggen

55

1    moment and look at Macias-1, and I wanted to direct

2    you to the part of this document that is attributed

3    to you that and you and Ms. Bonjean talked about

4    before.  Okay?  Do you see that?

5    A.    Yes, I do.

6         Q.    Okay.  I think you told us, but I

7    just wanted to confirm, the phone number that your

8    sister had provided for you was your phone number

9    at the Archdiocese?

10   A.    I think so, yeah.

11            MR. BRUEGGEN:  Haley, could you

12   scroll up just a little so she can see the phone

13   number.

14        Q.    The 243-1300?

15   A.    Yes.

16        Q.    That was your phone number?

17   A.    Yes.

18            MR. BRUEGGEN:  Haley, if you scroll

19   back you down, I apologize.  Thank you so much.

20        Q.    You talked about this with Ms.

21   Bonjean.  You said certain of the facts in here

22   were consistent with your recollection today; is

23   that correct?

24   A.    Yes.

25        Q.    And I wanted to ask you about some of

Macias - Cross/Brueggen

56

1   the other facts if they're accurate as they are

2   stated.  And specifically, did you have a telephone

3   in your apartment in May of 1990?

4   A.      You know, we just have, you know, renovated

5   that floor, and I think I didn't have a phone at

6   the moment.  I think so.

7           Q.      So you didn't have a phone in your

8   apartment in May of 1990.  Did your father have a

9   telephone in his apartment?

10  A.      Yes.

11          Q.      And there's a phone number attributed

12  to your father that's 235-7409.  Do you see that?

13  A.      Yes.

14          Q.      Was that your father's phone number

15  back in May of 1990?

16  A.      Yes.

17          Q.      And what's your father's name?

18  A.      Inocencio.

19          Q.      And is that his first name?

20  A.      Yes, that's -- his complete name is Jose

21  Inocencio Reyes.

22          Q.      Does your father still own that

23  building at 3419?

24  A.      Yes, they do.

25          Q.      And does he and your family still

Macias - Cross/Brueggen

57

1   live above that?

2   A.      Pardon me?

3        Q.    Does he and your other family still

4   live above it?

5   A.      No.

6        Q.    So he owns the building, but they

7   have moved to a new location?

8   A.      Yes.  It is owned by my mom and my brother

9   because my dad passed away.

10       Q.    Okay.  I'm sorry to hear that.  You

11  talked about detectives coming to visit you in

12  August after this happened, and I think you said it

13  was, you said it was August 10th, the day your

14  daughter was born?

15  A.      Something in August.  You know, she was

16  born on the 10th, and, you know, I don't remember

17  how many days I was in the hospital, but I

18  remember that these two detectives came to my

19  house just right before I came back from the

20  hospital.

21       Q.    Okay.  So you remember it was after

22  August 10th when your daughter was born --

23  A.      Yes.

24       Q.    -- and within several days to a week

25  of that date?

Macias - Cross/Brueggen

58

1    A.      Yes.

2             Q.     Do you remember -- you mentioned that

3    one of the detectives smoked cigarettes?

4    A.      Yes.

5             Q.     And you said they were both white

6    detectives?

7    A.      White detectives.

8             Q.     And can you describe them in any

9    other way?  Height, weight, glasses?

10   A.      They were tall.  Probably around 40 years

11   old.  You know, slim complexion.  But that's about

12   it, what I remember.

13            Q.     Do you recall any names?

14   A.      No.

15            Q.     Do you recall whether they had hair,

16   were bald, or what color their hair was?

17   A.      Hmm, let's see.  You know, they had hair,

18   but exactly the color, you know, I don't remember.

19            Q.     And I understand, Ms. Macias.  It was

20   a long time ago.  I'm just seeing if you could

21   remember, especially from now having talked about

22   it now, something else sparked a memory, so if you

23   remember, let us know.

24   A.      Hm-hum.

25            Q.     Then you said two to three years ago,

59

1  you were visited by a white woman and an African

2  American man who said he was a former police

3  officer?

4  A.     Something like that.  Investigator,

5  retired.  I don't -- really do not recall if it

6  was a police.  I don't.

7            Q.    Okay.  Do you remember what the

8  woman, if she was affiliated with any entity, or

9  whether --

10  A.     Uh, I think, you know, she said that she

11  was working the case.  Something like that.

12            Q.    Did she say whether she worked for

13  the Cook County State's Attorney or whether she

14  worked for the police or worked for an attorney?

15  A.     You know what, I do not remember.

16            Q.    You said that you met with her and

17  the gentleman for about an hour to talk about what

18  you remembered?

19  A.     Yes.

20            Q.    And that's similar to what we've

21  talked about today?

22  A.     Exactly.

23            Q.    After that conversation with her, did

24  you have any further contact with her or the

25  gentleman that was with her?

Macias - Cross/Brueggen

60

1    A.      Never, nothing.

2            Q.    And then more recently, you said in

3    the last year and a half, you were contacted by a

4    gentleman who said he was a retired detective?

5    A.      Something like that, yes.

6            Q.    And he spoke to you in Spanish?

7    A.      Hispanic, yes.

8            Q.    You said he called about five times;

9    is that correct?

10   A.      Yes, five, like -- I will say five times

11   because I remember that it lasted like for a week,

12   he was calling me and calling me, and yeah.

13           Q.    And the substance of those calls, was

14   he calling you trying to get you to set up a time

15   to sit down and talk to him?

16   A.      Yes.

17           Q.    Did he ever ask you questions about

18   what you remembered in any of the phone calls?

19   A.      He said, you know, that he wanted to ask me

20   some questions about the case, but we never talk

21   about it in detail or whatever.

22           Q.    Okay.  So he was calling you trying

23   to set up a time when you guys could actually talk

24   in detail?

25   A.      Yes.

Macias - Cross/Brueggen

61

1      Q.   And you said he was persistent?

2  A.   Yes.

3      Q.   And he was also persistent in trying

4  to get contact information for your sister Alma?

5  A.   Yes.

6      Q.   And the pressure that you felt was

7  you felt he was trying to pressure you to get you

8  to sit down with him; is that the pressure?

9  A.   I can say that the pressure was because he

10  was calling me like every day.  "When do you have

11  time?  When do you have time?"  And because of the

12  nature of my work, you know, it was difficult, to

13  set up a time.

14      Q.   After that week, week and a half,

15  however long it lasted, he then stopped reaching

16  out to you?

17  A.   He did.

18      Q.   And you never talked to him about the

19  substance of the case, about what we talked about

20  today, what you recall?

21  A.   Nothing.

22      Q.   And he didn't provide you any facts

23  or information about the case other than its name?

24  A.   Nothing, no.

25      Q.   Earlier today, you testified that you

Macias - Cross/Brueggen

62

1    recalled something like Lulu or Zulu or something
2    of that nature; is that correct?
3    A.     Yes.
4           Q.    And that's something, you said, you
5    couldn't remember any other words or anything, but
6    that was something that stuck out in your mind?
7    A.     Yeah, because it was like a word that I
8    keep on hearing and hearing, but nothing coherent,
9    not, I don't even remember if it was in Spanish,
10   if it was in English.  You know, I had my window
11   closed, so it was just a noise, but I was not able
12   to understand anything else.
13          Q.    So you can't put that into context
14   whether Lulu referred to a person or a place or a
15   thing, or it was just some type of expression?
16   A.     Oh, yeah, no.
17          Q.    Earlier you told us that the 3400
18   block of North Avenue was kind of, I think you
19   said, a dangerous neighborhood?
20   A.     Well, you know, it used to be a bar in the
21   front, a bar on the side, you know.  On weekends
22   there's going to be some fights.  Like I said
23   before, you know, me and my family, we didn't
24   understand this thing about gangs.  You know, we
25   had to be -- my parents, you know, they let us

Macias - Cross/Brueggen

63

1    know what it was, you know, to be away from it, so

2    we really didn't -- you know, I didn't even know

3    my neighbors.  You know, it was just going to

4    school and go back to your house, going to school

5    or going to work, but I didn't even know, you

6    know, the names of my neighbors or nothing.

7           Q.    And you had grown up in that area

8    from when you had come over from Mexico in about

9    1981, I think you said?

10   A.    Yes.

11          Q.    And you were in your early teens at

12   that time?

13   A.    18.

14          Q.    You were how old?  18?

15   A.    Yes.

16          Q.    And so did you go to school here, or

17   when you came over, did you start working

18   immediately?

19   A.    No, I went to high school, and then I start

20   working.

21          Q.    What high school did you go to?

22   A.    It's in Spanish.  Roberto Clemente -- no,

23   no, no, no.  No, no.  I went to pick up my sister

24   there.  I went to Kelvyn Park.  That, you know, it

25   was a shock for me because that school looked like

1  a jail compared to the schools in Mexico where I

2  was used to.

3       Q.   You said Kelvyn High School looked

4  like a jail?

5  A.   Yeah, yes.  I don't know if it's the

6  different today, but at the time, you know, it

7  was.  I was not familiar with all these, you know,

8  food fights and fights and the police and the

9  metal detectors.  It was something new for us.

10       Q.   And did you understand that one of

11  the reasons why there was all the security was

12  because of the gangs that lived in the area?

13  A.   Yes.

14       Q.   And your parents had told you about

15  the gangs, and basically told you if you had any

16  problems, just give them whatever they want and

17  move on?

18  A.   Yes.

19       Q.   Do you remember if there was a

20  particular gang in your neighborhood in that 3400

21  block of North Avenue, the gang the Latin Kings?

22  Does that ring a bell?

23  A.   That's a name we used to hear, you know,

24  but I didn't know anybody.

25       Q.   Is it fair to say that you never

65

1   associated with anybody from the Latin Kings?   Is

2   that true that you did not associate with them?

3   A.     No.

4              MS. BONJEAN:   Objection to form.

5   A.     No.

6         Q.    Did you associate with someone from

7   the Latin Kings?   That's probably the easiest way

8   to ask it.

9              MS. BONJEAN:   Objection.   Foundation.

10        Q.     Let me withdraw that question and

11  ask.   To your knowledge, did you hang out or were

12  you friends with anybody who was a member of the

13  Latin King gang?

14  A.     No.  Oh, my God, no.  My parents would kill

15  me.   No.  Oh, my God, no.  No.   We wouldn't

16  leave -- even my parent didn't let us, you know,

17  stay outside in the night.

18        Q.    Do you recall back in May of 1990

19  what the lighting was like on North Avenue?  Was it

20  lit up brightly so you could see well, or was it

21  kind of dark?

22  A.     I will say kind of dark.

23        Q.    Okay.  And do you recall behind your

24  building, was there an alley to get rear access to

25  your building?

Macias - Cross/Brueggen

66

1  A.     Yes, there is an alley behind the building.

2         Q.    And I believe you told us that you
3  were on the south side of North Avenue based on how
4  you describe it?

5  A.     Yes.  Well, given, you know, the reference
6  that Mrs. Bonjean, you know, I remembered, what do
7  you call, the video store that they used to rent
8  videos, we used to live across that store.

9         Q.    Okay.  I think you said when you were
10 headed towards the lake, your house would be on the
11 right-hand side?

12 A.     Yes, yes.

13        Q.    And I will let you know that that is
14 the south side of North Avenue.

15 A.     Oh, sorry.  I'm very bad with directions.

16        Q.    No, it's understandable.  It's
17 easier.  What about the north side of North Avenue,
18 were you aware of whether there was an alley behind
19 the buildings on the north side of North Avenue?

20 A.     I don't know.  I don't know.

21        Q.    Did you ever go to the video store on
22 the north side of North Avenue?

23 A.     We used to, yeah, almost every day, to rent
24 movies.

25        Q.    And I think you said you don't recall

Macias - Cross/Brueggen

67

1   whether there was a vacant lot across the street
2   from your building?
3   A.    I don't remember.
4         Q.    Ms. Macias, I'd like to show you a
5   picture now.
6               MR. BRUEGGEN:  Ms. Court reporter,
7   can I share my screen and show a picture?
8               COURT REPORTER:  Yes.
9               MR. BRUEGGEN:  Can we mark this as
10  Exhibit 2?  And, Ms. Court Reporter, I will email
11  it to you.  But for the record, it is page
12  CCSAO410.
13              (Macias-2, Bates CCSAO410, marked for
14  identification.)
15        Q.    Ms. Macias, can you see a page with
16  two photographs on your screen?
17  A.    Yes.  Yeah.
18        Q.    Okay.  And can you take a moment and
19  look at that first photograph, the top photograph?
20  A.    Um-hum.
21        Q.    And is that building that's straight
22  ahead, that red building, is that the building that
23  you lived in?
24  A.    You know, it looks like.  I think it is,
25  yeah.

Macias - Cross/Brueggen

68

1       Q.   Okay.  And you said you lived on the

2  third floor with your husband; is that correct?

3  A.    Yes.

4       Q.   Were there two apartments on the

5  third floor, or was it just one, or were there more

6  than two?

7  A.    There's four.  Two and two.  That's a

8  double building.

9       Q.   Okay.  So two apartments in the

10  front, two apartments in the back?

11  A.    No, no.  There's two and two.

12       Q.   Okay.  And I think you said this

13  earlier, that building 3417, which is also attached

14  to 3419; is that correct?

15  A.    Um-hum, I think so, yeah.

16       Q.   So looking at that red building, is

17  that the building that's 3417 and 3419?

18  A.    My address is 3419.  The address.

19       Q.   Okay.  And was there 3417, was that a

20  similar building that was next to yours?

21  A.    It is next, yeah.

22       Q.   Okay.  And so do you know which set

23  of windows or which windows were yours in looking

24  at this photo on the building?

25          Can we hold on?  Ms. Macias, is that

Macias - Cross/Brueggen

69

1   noise coming from you?

2              MS. BONJEAN:  That was me.  I'm

3   sorry.  I accidentally hit unmute.  Go ahead.  I'm

4   sorry.

5              MR. BRUEGGEN:  No problem.

6         Q.    Ms. Macias, do you remember, looking

7   at that building, whether you were on the left side

8   or the right side as we look at the building in

9   this photo?

10  A.    I was -- looking at the picture right now,

11  I was in the right apartment.

12         Q.    Okay.  And that would have been the

13  third floor?

14  A.      Third floor.

15         Q.    And you were in the front of the

16  building?  You looked out on North Avenue?

17  A.      Yes.

18         Q.    Were your parents directly below you?

19  A.      Yes.

20         Q.    And in looking at this photo, do you

21  see a vacant lot, and I will tell you this photo

22  was taken from an alley just north of the north

23  buildings on North Avenue looking south.  Do you

24  see that vacant lot?

25  A.      Yes, I do.

Macias - Cross/Brueggen

1      Q.   Does that refresh your recollection

2  of having a vacant lot that was in front of your

3  building back in May of 1990?

4  A.     See, the point is that I think in that same

5  side of the street, there used to be a bar that

6  burned down, and when -- and it was like in that

7  time, because I remember my daughter was around

8  two, probably -- but it was a similar vacant lot

9  because of the bar and some houses burned down,

10  and it was they tear down everything.  It was also

11  vacant.  So, you know, if I see it, you know, it

12  doesn't say anything to me, if it was there.

13      Q.   Okay.  That's fair.  I appreciate

14  that.  It was 30 years ago.  It's hard to remember.

15  A.     Yeah.

16      Q.   I think you told us, but I just want

17  to confirm, the night of the shooting, I think you

18  told us you heard the gunshots; is that right?

19  Yes?

20  A.     Yes.

21      Q.   Do you recall hearing police sirens

22  or hearing police commotion?

23  A.     Nothing.

24      Q.   You don't recall that one way or

25  another?

Macias - Cross/Brueggen

71

1  A.     No.

2          Q.    Did you ever talk to your sister Alma

3  about whether she spoke with the police?

4  A.     I don't remember asking her, but we knew

5  that, you know, we were contacted by the police or

6  investigators to ask questions, but that's about

7  it.

8          Q.    Did Alma tell you, and we saw it in

9  the report, did Alma tell you that, Hey, by the

10  way, I talked to the police, and I gave them your

11  phone number?  Did she tell you that?

12  A.     Uh, I don't remember, you know, that she

13  told me that, but probably.  I don't know.  But I

14  don't remember that she told me, Oh, police came,

15  and I gave them all your information.  I don't

16  remember.

17              MR. BRUEGGEN:  Ms. Macias, those are

18  all the questions I have right now.  Thank you so

19  much for your time.  I appreciate it.

20              THE WITNESS:  Sure.  You're welcome.

21              MS. BONJEAN:  Can you take that down,

22  Haley?

23              MR. BRUEGGEN:  I will.  I'm sorry.

24              MS. BONJEAN:  Oh, that was you,

25  David.  I'm sorry.

Macias - Cross/Rahe

72

1          MR. RAHE:  Hey, Jennifer, I just have
2    just like three questions.
3    CROSS-EXAMINATION MR. RAHE:
4          Q.   Hi, Ms. Macias.  My name is Austin
5    Rahe.  I'm the attorney for the City of Chicago in
6    this case.  I just have a couple real quick
7    questions for you.
8               You said you remember seeing about
9    the murder the next morning on the news; right?
10   A.     Yes.
11         Q.   Do you remember what news station you
12   saw it on?
13   A.     No, I don't.
14         Q.   No.  You weren't loyal to a news
15   station back then?
16   A.     No.
17         Q.   Okay.
18   A.     No.  Sorry, but I don't remember.
19         Q.   And then do you remember whether you
20   looked out your window at any point around the time
21   that the incident happened?
22   A.     I don't think so, because what I remember
23   is that I asked my husband to close the window
24   because of all the noise.  And like I said, I was
25   sleeping, and that wake me up, but then, you know,

Macias - Cross/Rahe

73

 1    like I said, you know, we wouldn't -- we couldn't
 2    understand.  You know, we know it was a fight
 3    because, you know, and then when he close the
 4    window, it was, you know, harder to understand,
 5    and then later I don't know how much time had
 6    passed because, like I said, I was pregnant, I
 7    went back to sleep, trying to go back to sleep,
 8    and then we heard the shots, but since we don't
 9    know what was going on, whether it was someone
10    shooting around, and we will come out, and no, no,
11    no, no, I don't -- I really do not recall looking
12    to it.
13         Q.   So I know you heard, you said you
14    heard two people out there, but did you ever hear
15    any more people than that talking out there?
16    A.    No.
17         Q.    No.  Okay.  And then Mr. Brueggen
18    showed you that picture of what was the front of
19    your building.  Where was your -- where was the
20    window -- was the window to your room one of the
21    windows that we saw in that picture?
22    A.    Yes.
23         Q.    Okay.  And then your -- do you know
24    if your mother was ever interviewed by the police?
25    A.    I do not know.  You know, we have never

Macias - Redirect/Bonjean

1    talked about it, but probably not, because, you

2    know, she have never said anything, and I don't

3    think she was interviewed.

4                    MR. RAHE:  Okay.  Thank you, Ms.

5    Macias.  That's all the questions I have.

6                    THE WITNESS:  Sure.

7    REDIRECT EXAMINATION BY MS. BONJEAN:

8         Q.   Ms. Macias, I just have a couple

9    follow-ups based on that, and then, you know, I

10   don't think we'll have much beyond that, but we'll

11   see.

12                   MR. STEPHENSON:  Real quick before

13   you start.

14                   MS. BONJEAN:  I'm sorry.  Did I miss

15   somebody?

16                   MR. STEPHENSON:  Yeah, you did.

17   That's quite all right.  I'm new to the case as of

18   this morning.  And before you start your redirect,

19   I just want to confirm that Defendant DiFranco

20   doesn't have any cross.

21                   MS. BONJEAN:  Oh, sorry about that.

22   I apologize.  You don't have anything; is that

23   right?

24                   MR. STEPHENSON:  Right.  I just

25   wanted to confirm before you started redirect.  So

Macias - Redirect/Bonjean

75

1   by all means, go ahead.

2              MS. BONJEAN:  I appreciate that.

3   Thank you.

4   BY MS. BONJEAN:

5        Q.    Ms. Macias, a couple things.  Did you

6   and your husband ever speak about that evening at

7   any point after the shooting?

8   A.     No.  No, we didn't.

9        Q.    Okay.  And have you spoken to him

10  since then about, Oh, do you remember that night,

11  type of thing?

12  A.     I told him, you know, because of the

13  interview today, I said, you know, "They contacted

14  me.  They want me to do this."  But that's about

15  it.

16       Q.    And does he have any recollection of

17  that evening as best you recall?  Or did he, you

18  know, did he indicate to you that he has any

19  recollection of what happened?

20  A.     No, no.  You know, he remembers the same,

21  you know, that he wakes up, close the window, went

22  back to sleep.  You know, we heard the shots.  And

23  then, you know, later the next morning we heard

24  about the news.  You know, we heard the rest of

25  the details in the news, and that was it.  You

Macias - Redirect/Bonjean

76

1    know, I didn't even tell him about the other

2    occasions when the -- you know, like two or three

3    years ago when this lady and this other person

4    came.  I said, you know, well, this is not -- I

5    thought, you know, this is not that I need to tell

6    him because it was, you know, and because I also,

7    you know, I don't want him to start like making

8    all these questions or worrying about it.  You

9    know, and no, I just didn't.

10           Q.    Okay.  So basically what you've

11   shared here today is sort of the same information

12   that he and you have spoken about; is that fair to

13   say?

14   A.      Yes.

15           Q.    Okay.  And the only question I

16   have -- I just want to go back to one thing about

17   the block that you lived on.  It sounds like your

18   parents were very protective and just kind of

19   warned you to keep your nose down and stay safe;

20   right?

21   A.      Yes.

22           Q.    Okay.  On your block did you see

23   people selling drugs ever to the best of your

24   understanding?

25   A.      I have never seen, you know, selling

1   anything because, you know, the only time I was in

2   the street is when I went out and I took the bus.

3   I was not like hanging out on the streets.  For 20

4   years, I had a very demanding job that I used to

5   leave around seven, and I used come back at seven

6   and be ready for the next day.  And the thing is

7   that, you know, it was just a small time that I

8   used to take the bus because then, you know, my

9   sister used to work with me, and she's the one

10  that used to pick me up and drop me off so...

11          Q.   Okay.  Understood.  And even though

12  you said you didn't necessarily look out the window

13  on the night of the shooting, you later became

14  aware of the individuals who were shot and killed

15  near or across the street from where you lived;

16  right?

17  A.      Yes.

18          Q.   Did you recognize those people?

19  A.      No.  I didn't even -- I don't know who they

20  are, how they look like, nothing.

21          Q.   Okay.  You said you knew that they

22  were African American; right?

23  A.      Because of the news --

24          Q.   Right.

25  A.      -- we find out.  That's how I find out.

Macias - Redirect/Bonjean

78

1      Q.    Right.  And I understand that you

2   found that out after the fact.  But did you ever

3   notice, for instance, two African American men

4   hanging out right across the street from you

5   selling drugs or doing any activities prior to the

6   shooting?

7   A.    No.

8      Q.   Okay.  And when you later learned who

9   these people were, you didn't connect any dots

10  like, Oh, those are the guys that hang out across

11  the street, or anything like that; right?

12  A.    No, never, nothing.

13     Q.   Okay.  And even though you knew there

14  was drug activity or gang activity in your

15  neighborhood, the individuals who were the victims

16  in this case were not people that were in any way

17  familiar to you?

18  A.    No.

19     Q.   And they're not people that you saw

20  regularly on the street to say, Oh, I know Lulu, or

21  I know this person, nothing like that; right?

22  A.    No, nothing.  You know, like I said, the

23  only time I was in the street is when I had to

24  take the bus and, you know, whenever, you know,

25  like the video, the video store in front, we would

1    just cross the street and come back to our house.

2    And whenever we have to go out, we used to, you

3    know, later, take a car, but we were not never in

4    the street outside.

5         Q.    Right.  And I just want to

6    understand.  You did go to that video store from

7    time to time; right?

8    A.    Yes, yes.

9         Q.    So you would go across the street and

10   then come back; right?

11   A.    Yes.

12        Q.    And then, I'm guessing, at times, you

13   looked out your front window occasionally?

14   A.    Yes.

15        Q.    Did you ever notice two African

16   American men that you later learned were the

17   victims of this shooting?

18   A.    No, never.

19             MS. BONJEAN:  Okay.  All right.  I

20   have nothing further for you, and I don't know if

21   anyone else has any follow-up based on that.

22             MR. STEPHENSON:  Nothing from

23   Defendant DiFranco.

24             MR. BRUEGGEN:  Nothing from the

25   defendant officers.

Macias - Redirect/Bonjean

1              MR. LEINENWEBER:  Nothing as well.

2              MR. RAHE:  Nothing from me.

3              MS. BONJEAN:  All right.  Ms. Macias,

4  thank you so much for your time.  We do greatly

5  appreciate it, and you completed your obligations

6  here.  So thank you again for your cooperation.

7              MR. RAHE:  Jennifer, do you want to

8  explain the signature?

9              MS. BONJEAN:  Oh, sure.  You have the

10  right to review the transcript of your deposition

11  here today.  And it's basically an opportunity to

12  make sure that the court reporter didn't take down

13  something inaccurately.  It's not an opportunity

14  to change testimony, but if there was a

15  typographical or a mistake, like something got

16  misheard, you could say, Oh, that's not what I

17  said, I said this.  Something like that.  Okay.

18  So you have the right to do that, but you don't

19  have to.  You can just assume she got it right,

20  and that's the end of it.  It's really up to you.

21  If you want to, you can reserve signature, meaning

22  you can review the deposition, the transcript, and

23  sign off on it, or you can be done with it.  It's

24  really up to you.

25              THE WITNESS:  I would like to,

81

1    because then I do not know if like in the future

2    somebody else is going to contact me and ask me,

3    and I don't know anything about it, like names, or

4    who they were.

5             MS. BONJEAN:  Fair enough.

6             THE WITNESS:  But I would to.

7             MS. BONJEAN:  It's absolutely your

8    right, and we will make sure you get an

9    opportunity to review it.  Okay.

10            THE WITNESS:  Thank you.

11            MS. BONJEAN:  All right.  So we will

12    reserve signature, Audrey.  And thank you all.

13            (Discussion off the record.)

14            MR. BRUEGGEN:  After speaking to the

15    state's attorney, Exhibit Number 2, which are

16    photos from the state's attorney's production, the

17    state's attorney has no objection to these being

18    attached to the transcript or any issue with the

19    confidential subject protective order stamp being

20    waived as to these photos since they've been

21    previously produced in this case.  Is that

22    correct, Ed?

23            MR. BRENER:  That sounds good.

24            MR. BRUEGGEN:  Perfect.  Thank you.

25            (Concluded at 3:40 p.m.)

82

1                     CERTIFICATE OF OFFICER

2

3          I CERTIFY that the foregoing is a true and

4    accurate transcript of the testimony and

5    proceedings as reported stenographically by me at

6    the time, place and on the date as hereinbefore

7    set forth.

8

9          I DO FURTHER CERTIFY that I am neither a

10   relative nor employee nor attorney or counsel of

11   any of the parties to this action, and that I am

12   neither a relative nor employee of such attorney

13   or counsel, and that I am not financially

14   interested in the action.

15

16

17

18                    AUDREY ZABAWA, C.C.R.
                      Certificate No. XI01410
19

20

21

22

23

24

25

83

1      I, MARIA DEL CARMEN MACIAS, have read the

2  foregoing transcript and hereby certify that it is

3  a true and accurate transcript of my testimony.

4

5               MARIA DEL CARMEN MACIAS

6

7

8

9

10  Sworn and subscribed to before me

11  this    day of        , 2021.

12

13

14

15  A Notary Public of the

16  State of            .

17  My Commission Expires:

18

19

20

21

22

23

24

25

## A

**ability (2)**
6:5,8
**able (8)**
6:9;21:21;22:7;
26:2;30:24;36:7;
41:19;62:11
**above (3)**
14:21;57:1,4
**abrasive (1)**
29:11
**absolutely (1)**
81:7
**accent (2)**
48:5,6
**access (1)**
65:24
**accidentally (1)**
69:3
**accompanied (1)**
50:5
**accurate (2)**
28:2;56:1
**accurately (1)**
6:15
**across (11)**
23:19,20;24:19;
31:19,22;66:8;67:1;
77:15;78:4,10;79:9
**activities (1)**
78:5
**activity (4)**
13:18;15:20;78:14,
14
**actual (2)**
33:24;47:4
**actually (3)**
8:15;47:25;60:23
**address (12)**
7:17;22:17,19,21;
34:22;39:24;46:25;
47:4,5,9;68:18,18
**addresses (1)**
53:6
**affair (1)**
12:17
**affiliated (1)**
59:8
**afraid (1)**
32:20
**African (7)**
18:13;30:20;34:6;
59:1;77:22;78:3;
79:15
**afternoon (5)**
5:5,6;34:16;36:6;
49:10
**afterwards (1)**
19:4
**again (7)**
16:8,10;36:3;37:6;

**48:24;52:18;80:6**

**ago (19)**
5:12,22;8:16;15:8;
30:1;34:2,3;35:6,25;
36:16,17;38:3;39:20;
44:7;48:25;58:20,25;
70:14;76:3
**agree (2)**
9:15;34:11
**Ah (1)**
12:16
**ahead (5)**
25:11;43:4;67:22;
69:3;75:1
**Alicia (2)**
24:6,9
**alley (4)**
65:24;66:1,18;
69:22
**Alma (6)**
24:24;27:9;61:4;
71:2,8,9
**Almost (4)**
23:16;35:20;39:22;
66:23
**alone (2)**
8:3;16:19
**along (3)**
27:6;43:9;53:22
**altercation (1)**
15:20
**American (6)**
30:20;34:6;59:2;
77:22;78:3;79:16
**Americans (1)**
18:14
**amount (1)**
5:19
**anymore (2)**
20:19;25:14
**apart (1)**
11:16
**apartment (9)**
11:17,24;31:11,12;
53:12;56:3,8,9;69:11
**apartments (4)**
14:21;68:4,9,10
**apologize (3)**
44:13;55:19;74:22
**appearance (1)**
46:17
**appreciate (6)**
5:20;21:5;70:13;
71:19;75:2;80:5
**apprehensive (1)**
50:15
**approximately (1)**
15:6
**Archdiocese (4)**
28:23;54:4,6;55:9
**area (4)**
13:8,20;63:7;64:12
**argument (6)**

**17:13;27:13,18;
29:10;30:6,24**

**around (12)**
15:24;29:8,9;34:15;
40:11;49:15;53:8;
58:10;70:7;72:20;
73:10;77:5
**asleep (2)**
16:7,10
**assistant (3)**
8:6,8;41:3
**associate (2)**
65:2,6
**associated (1)**
65:1
**assume (2)**
17:11;80:19
**assumed (2)**
30:10;33:10
**attached (2)**
68:13;81:18
**attention (6)**
8:16;14:8;15:17,19;
22:4;27:5
**Attorney (5)**
59:13,14;72:5;
81:15,17
**attorneys (5)**
6:22;44:22;46:1,15;
49:5
**attorney's (1)**
81:16
**attributed (3)**
54:12;55:2;56:11
**Audrey (1)**
81:12
**August (11)**
19:10,15;20:4,10,
11;25:20,25;57:12,13,
15,22
**Austin (1)**
72:4
**available (1)**
50:12
**Avenue (39)**
9:9,10,12,16,19;
11:3;12:21;13:19;
14:17,18,25;15:6,13;
22:15;28:16;31:20,
21,22;33:3;34:22;
52:21,22,23,24;53:1,
7,10,15,22;62:18;
64:21;65:19;66:3,14,
17,19,22;69:16,23
**awakened (2)**
27:13;29:8
**aware (6)**
13:18;14:1;30:13,
16;38:18;77:14
**away (6)**
14:16;18:3,24;
33:23;57:9;63:1

## B

**baby (4)**
12:1;19:10,15,24
**back (40)**
8:16;9:18;10:2;
12:19;13:17;16:7,22;
19:12,23;20:3;22:18;
23:24;24:12;28:11;
29:14;30:4;32:21;
37:1;41:4;48:25;
52:10,22;53:24;54:3,
11;55:19;56:15;
57:19;63:4;65:18;
68:10;70:3;72:15;
73:7,7;75:22;76:16;
77:5;79:1,10
**backpack (2)**
14:4,5
**bad (1)**
66:15
**bald (1)**
58:16
**bar (4)**
62:20,21;70:5,9
**barmaid (1)**
24:12
**based (4)**
28:1;66:3;74:9;
79:21
**basically (3)**
64:15;76:10;80:11
**basis (1)**
48:3
**Bates (3)**
21:18,19;67:13
**became (1)**
77:13
**behalf (1)**
48:16
**behind (3)**
65:23;66:1,18
**bell (4)**
40:13,24;45:22;
64:22
**Belmont-Cragin (1)**
15:10
**below (2)**
22:14;69:18
**Besides (1)**
36:15
**best (6)**
6:5,8;38:12;42:19;
75:17;76:23
**beyond (1)**
74:10
**birth (4)**
8:20;20:6,16;21:2
**birthday (2)**
20:6,9
**bit (1)**
49:15

**bits (1)**
27:15
**black (1)**
29:21
**blacks (1)**
29:9
**block (12)**
9:16,19;12:20;
13:18;14:16,19;15:6;
23:15;62:18;64:21;
76:17,22
**boat (1)**
5:18
**boil (1)**
20:18
**BONJEAN (39)**
5:4;21:16;22:8;
23:22;36:23;44:17;
45:1,6,15,24;46:3,11,
23;48:5;49:16;50:12;
51:9,16;52:16;54:19;
55:3,21;65:4,9;66:6;
69:2;71:21,24;74:7,
14,21;75:2,4;79:19;
80:3,9;81:5,7,11
**born (4)**
20:11;57:14,16,22
**both (5)**
19:21;30:25;34:16;
44:15;58:5
**bottles (1)**
20:19
**bought (4)**
14:13;20:18;33:22;
53:4
**boundary (1)**
15:14
**break (3)**
44:21;46:8,12
**BRENER (1)**
81:23
**brightly (1)**
65:20
**brother (2)**
11:25;57:8
**brothers (1)**
30:20
**brought (1)**
14:8
**BRUEGGEN (17)**
49:9,12;54:10,16,
20,23;55:11,18;67:6,
9;69:5;71:17,23;
73:17;79:24;81:14,24
**building (38)**
10:9,14;11:6,10;
12:17;13:15;14:9,13;
22:23;23:2,8,17;
24:19,21;28:17;
31:19;53:1,4;56:23;
57:6;65:24,25;66:1;
67:2,21,22,22;68:8,
13,16,17,20,24;69:7,

8,16;70:3;73:19
**buildings (5)**
  14:20;31:23;53:5;
  66:19;69:23
**burned (2)**
  70:6,9
**bus (10)**
  27:18;31:2;53:16,
  16,19,21,25;77:2,8;
  78:24
**business (2)**
  12:10;27:22
**busy (1)**
  40:12

**C**

**call (12)**
  15:5;24:12;28:24;
  31:9,13;34:4;35:6;
  46:22;47:2;48:20;
  49:5;66:7
**called (11)**
  5:2;15:15;27:20;
  31:1;40:18;41:12;
  42:20;48:15;50:21;
  51:10;60:8
**calling (15)**
  28:21;35:20;36:10,
  11;39:22;44:3,4,6;
  45:8;48:15;60:12,12,
  14,22;61:10
**calls (5)**
  35:20;47:19,22;
  60:13,18
**calm (1)**
  29:10
**came (21)**
  13:20;19:7,12,23;
  20:2,3,15;25:20,24;
  34:16;42:21;50:16;
  52:6,9,10,24;57:18,
  19;63:17;71:14;76:4
**can (38)**
  6:15;13:21;17:11,
  19;18:1,10;19:25;
  21:5,23;23:12;25:11;
  27:6,6;36:14,16,23;
  39:7;40:4;43:4,23;
  44:21;45:13,15;46:7;
  54:21;55:12;58:8;
  61:9;67:7,9,15,18;
  68:25;71:21;80:19,
  21,22,23
**canvass (1)**
  24:2
**capitalized (1)**
  24:24
**car (1)**
  79:3
**care (2)**
  34:14;41:17
**Carmen (5)**

7:13,14;27:21;
  28:15;41:4
**cars (1)**
  16:18
**case (16)**
  33:15;42:10;46:16;
  48:22;49:14;50:23;
  51:17;52:1;59:11;
  60:20;61:19,23;72:6;
  74:17;78:16;81:21
**Catholic (1)**
  54:7
**CCSAO410 (2)**
  67:12,13
**Central (1)**
  9:13
**certain (3)**
  12:24;22:7;55:21
**change (2)**
  47:16;80:14
**changed (4)**
  13:16;41:22,23;
  47:15
**Chicago (11)**
  7:20;9:3,4,4;11:5;
  13:1;28:23;47:11;
  54:4,6;72:5
**child (2)**
  15:23;20:5
**childcare (4)**
  7:24,25;8:1,10
**children (4)**
  10:3;36:4;40:22;
  41:17
**cigarette (1)**
  26:1
**cigarettes (1)**
  58:3
**City (1)**
  72:5
**clear (2)**
  16:2;46:24
**clearly (1)**
  48:11
**Clemente (1)**
  63:22
**Close (7)**
  16:4,6,14;32:17;
  72:23;73:3;75:21
**closed (2)**
  18:24;62:11
**clothes (2)**
  21:9,10
**coat (2)**
  14:3,4
**coherent (1)**
  62:8
**color (2)**
  58:16,18
**comfortable (2)**
  42:15,17
**coming (4)**
  29:1;36:9;57:11;

69:1
**commercial (3)**
  12:6,8;14:20
**commotion (1)**
  70:22
**compared (1)**
  64:1
**complete (1)**
  56:20
**completed (1)**
  80:5
**complexion (1)**
  58:11
**concerning (1)**
  46:21
**Concluded (1)**
  81:25
**conference (1)**
  6:23
**confident (1)**
  44:5
**confidential (1)**
  81:19
**confirm (5)**
  46:23;55:7;70:17;
  74:19,25
**connect (1)**
  78:9
**connection (1)**
  33:15
**considered (1)**
  31:11
**consistent (1)**
  55:22
**contact (6)**
  35:22;50:13,18;
  59:24;61:4;81:2
**contacted (17)**
  28:19,20;29:6;
  33:19;35:13;36:18;
  37:10;38:3;40:2,5;
  42:1;45:16;50:8,10;
  60:3;71:5;75:13
**context (1)**
  62:13
**conversation (4)**
  27:15;32:7,7;59:23
**conversations (1)**
  28:2
**Cook (1)**
  59:13
**cooking (1)**
  41:3
**COOLBAUGH (2)**
  54:14,21
**cooperation (1)**
  80:6
**copy (1)**
  49:25
**corner (1)**
  21:25
**County (1)**
  59:13

couple (9)
  14:10;20:22;46:6,
  18,24;47:15;72:6;
  74:8;75:5
**court (8)**
  6:14;7:6;33:14;
  51:14;67:6,8,10;
  80:12
**courtroom (1)**
  51:20
**cross (3)**
  9:11;74:20;79:1
CROSS-EXAMINATION (3)
  46:13;49:9;72:3
**crossing (1)**
  53:2
**current (1)**
  25:15
**currently (2)**
  7:16;8:18

**D**

**dad (1)**
  57:9
**D-A-D-O (1)**
  25:12
**dangerous (3)**
  12:24;13:7;62:19
**dark (7)**
  17:11,12;26:7;
  29:19;32:16;65:21,22
**date (5)**
  8:20;22:6,10;34:11;
  57:25
**date-ish (1)**
  21:1
**daughter (4)**
  52:10;57:14,22;
  70:7
**Dave (1)**
  49:12
**David (1)**
  71:25
**day (18)**
  19:12,14;20:2,17;
  31:4;34:2,25;35:1;
  36:8;39:23;40:23;
  51:10,16;54:1;57:13;
  61:10;66:23;77:6
**daycare (2)**
  34:12,15
**days (4)**
  20:24,24;57:17,24
**decade (1)**
  5:22
**Defendant (5)**
  46:16;49:13;74:19;
  79:23,25
**deliver (1)**
  50:17
**delivered (1)**
  50:2

Delorto (2)
  45:9,19
**demanding (1)**
  77:4
**deposition (8)**
  5:8,12,14;49:24;
  50:6;52:2;80:10,22
**descent (1)**
  14:24
**describe (5)**
  12:20;13:6;18:11;
  58:8;66:4
**described (1)**
  47:2
**deserted (1)**
  16:19
**designated (1)**
  37:15
**detail (3)**
  52:13;60:21,24
**details (3)**
  32:23;52:1;75:25
**detective (18)**
  5:13;21:12;25:25;
  34:6,7;35:8,15,18;
  36:20;37:11;38:5,20;
  41:25;42:1;44:10;
  45:18;47:3;60:4
**detectives (16)**
  18:2;19:7,18;20:15;
  25:19,24;27:21;32:8;
  33:10,11;43:13;
  57:11,18;58:3,6,7
**detectors (1)**
  64:9
**different (3)**
  53:6,6;64:6
**difficult (2)**
  21:22;61:12
**DiFranco (2)**
  74:19;79:23
**DIRECT (2)**
  5:4;55:1
**directions (1)**
  66:15
**directly (4)**
  22:4;31:19,20;
  69:18
**disagreement (1)**
  31:2
**Discussion (1)**
  81:13
**distinct (1)**
  32:6
**doctor's (1)**
  36:9
**document (3)**
  19:3;21:22;55:2
**documents (1)**
  49:23
**Dog (1)**
  31:2
**done (3)**

21:4;51:20;80:23

**door (5)**
40:14,24;41:5;
47:23;50:3
**dots (1)**
78:9
**double (1)**
68:8
**doubt (1)**
30:3
**down (18)**
6:15;23:25;24:22,
23;31:14;36:24;
41:18,22;43:16;
55:19;60:15;61:8;
70:6,9,10;71:21;
76:19;80:12
**downstairs (1)**
31:11
**draw (5)**
8:16;15:17,18;22:3;
27:5
**driving (1)**
36:10
**drop (1)**
77:10
**drug (1)**
78:14
**drugs (2)**
76:23;78:5
**drunk (3)**
29:12;30:8,11
**duly (1)**
5:2
**during (4)**
17:1;33:7;37:22;
54:1

---

**E**

**earlier (6)**
22:23;31:6;47:7;
61:25;62:17;68:13
**early (3)**
15:17;26:21;63:11
**easier (1)**
66:17
**easiest (1)**
65:7
**east (5)**
23:5,5,6,7;53:22
**Ed (1)**
81:22
**editor (1)**
54:6
**either (2)**
21:12;37:11
**else (15)**
16:23;26:16;32:24;
35:25;38:8;39:14;
42:10;43:17,23,24;
48:8;58:22;62:12;
79:21;81:2

**email (1)**
67:10
**employment (3)**
28:21;29:2,7
**end (2)**
45:13;80:20
**English (6)**
18:19,22,25;39:10;
44:14;62:10
**enlarge (1)**
22:7
**enough (2)**
45:24;81:5
**entity (1)**
59:8
**envelope (1)**
50:16
**especially (1)**
58:21
**estimate (2)**
17:15;40:4
**ethnicity (1)**
18:14
**even (11)**
16:18;29:20;47:23;
62:9;63:2,5;65:16;
76:1;77:11,19;78:13
**evening (1)**
17:1;26:21;75:6,17
**eventually (1)**
25:25
**exact (4)**
7:17;19:14;22:17;
34:2
**exactly (5)**
30:9;32:15;43:1;
58:18;59:22
**EXAMINATION (2)**
5:4;74:7
**Exhibit (6)**
21:17;54:11,17,18;
67:10;81:15
**expecting (2)**
15:23;40:14
**experience (1)**
13:24
**explain (1)**
80:8
**explained (1)**
51:18
**expression (1)**
62:15

---

**F**

**facing (1)**
23:1
**fact (1)**
78:2
**facts (3)**
55:21;56:1;61:22
**fair (7)**
37:16,24;45:24;

64:25;70:13;76:12;
81:5
**fairly (1)**
44:5
**falling (2)**
16:7,10
**familiar (3)**
53:15;64:7;78:17
**family (8)**
10:6;11:23;12:14,
16;13:15;56:25;57:3;
62:23
**family-owned (1)**
10:13
**family's (1)**
28:17
**far (3)**
18:3,24;39:24
**father (4)**
12:15;56:8,12,22
**father's (1)**
31:12;56:14,17
**fear (1)**
16:20
**feel (5)**
35:11;37:23;38:1;
42:15,17
**felt (5)**
35:11;39:21;40:7;
61:6,7
**few (2)**
15:7;37:2
**fight (4)**
16:1;17:13;19:17;
73:2
**fighting (1)**
30:7
**fights (5)**
13:10;62:22;64:8,8
**figure (1)**
23:12
**find (4)**
15:8;16:24;77:25,
25
**fine (4)**
6:7;44:25;45:5;
46:11
**finish (2)**
6:13;43:4
**firm (2)**
50:19,21
**first (17)**
5:2,10;7:11;11:23;
12:4,4,6;15:23;21:11,
15;27:17;29:17;
33:16;35:12;44:6;
56:19;67:19
**five (6)**
40:6;42:20;46:9;
60:8,10,10
**five-minute (1)**
46:8
**floor (19)**

10:10,17,20,21;
11:17,23;12:4,4,6,11;
14:21;28:4,5;31:21;
56:5;68:2,5;69:13,14
**floors (1)**
10:9
**followed (1)**
15:21
**following (2)**
19:8;49:16
**follows (1)**
5:3
**follow-up (1)**
79:21
**follow-ups (1)**
74:9
**food (1)**
64:8
**forget (3)**
21:3;43:10,11
**form (1)**
65:4
**format (2)**
6:12;52:2
**former (1)**
59:2
**found (2)**
32:23;78:2
**Foundation (1)**
65:9
**four (3)**
21:4;27:19;68:7
**friends (2)**
39:1;65:12
**front (10)**
7:7;23:16,17;62:21;
68:10;69:15;70:2;
73:18;78:25;79:13
**further (4)**
45:25;49:3;59:24;
79:20
**future (1)**
81:1

---

**G**

**gang (5)**
13:18;64:20,21;
65:13;78:14
**gangs (4)**
13:22;62:24;64:12,
15
**garbled (1)**
45:13
**gather (2)**
34:19;48:22
**gave (8)**
17:18;20:6;21:2;
25:19;27:20;34:17;
71:10,15
**gentleman (4)**
47:2;59:17,25;60:4
**given (3)**

20:15;51:12;66:5
**giving (2)**
6:1;47:9
**glasses (1)**
58:9
**God (4)**
13:3;53:8;65:14,15
**goes (1)**
30:23
**gonna (2)**
5:10;17:8
**Good (4)**
5:5,6;49:10;81:23
**Gotcha (1)**
30:23
**Great (2)**
22:8;47:11
**greatly (1)**
80:4
**ground (3)**
12:7,11;14:20
**grown (1)**
63:7
**guess (3)**
24:13;27:9;29:8
**guessing (1)**
79:12
**Guevara (2)**
44:10;46:16
**guidelines (1)**
6:1
**gunshot (1)**
17:4
**gunshots (8)**
15:21;16:12;17:1,4,
5,14;32:19;70:18
**guys (3)**
46:7;60:23;78:10

---

**H**

**hair (3)**
58:15,16,17
**Haley (8)**
22:9;23:24;36:23;
54:10,24;55:11,18;
71:22
**half (6)**
35:6;36:17;38:3;
44:7;60:3;61:14
**hang (2)**
65:11;78:10
**hanging (2)**
77:3;78:4
**happen (2)**
13:5;44:1
**happened (7)**
13:4;26:21;39:20;
43:9;57:12;72:21;
75:19
**hard (4)**
18:15;22:5;29:18;
70:14

**harder (1)**
73:4
**headed (1)**
66:10
**hear (13)**
13:10,10;16:13,18,
22;17:25;18:3,21;
27:15;30:24;57:10;
64:23;73:14
**heard (19)**
15:19,24;16:11,11,
14;17:1;18:17;26:5;
32:19,22;38:15,17;
70:18;73:8,13,14;
75:22,23,24
**hearing (9)**
16:16;18:9,22;
27:19;31:10;62:8,8;
70:21,22
**Height (1)**
58:9
**Hello (1)**
49:11
**help (1)**
27:16
**Hermosa (1)**
15:9
**Hernandez (2)**
24:6,9
**Hey (3)**
47:24;71:9;72:1
**Hi (1)**
72:4
**high (3)**
63:19,21;64:3
**himself (6)**
38:4;39:9,15,17;
45:8,19
**Hispanic (8)**
14:24;15:3;18:13;
19:21;36:20;38:20,
23;60:7
**hit (1)**
69:3
**Hm-hum (1)**
58:24
**Hmm (1)**
58:17
**hold (1)**
68:25
**home (4)**
8:1;27:22;32:8;
37:15
**hospital (6)**
19:13,24;20:4;
52:10;57:17,20
**hot (3)**
19:11,19;20:2
**hour (5)**
27:19;30:25;35:1;
37:19;59:17
**hours (4)**
15:17;26:22;29:8;

53:25
**house (21)**
5:13;8:1;13:1;
19:19,23;20:1;25:20,
25;33:22,24;34:10,23,
24;35:21,23;36:2;
42:21;57:19;63:4;
66:10;79:1
**houses (1)**
70:9
**Humboldt (1)**
15:11
**husband (13)**
9:21;10:3,5,16;
11:16;15:25;25:21;
26:13;32:17;53:13;
68:2;72:23;75:6

## I

**identification (2)**
21:20;67:14
**identified (2)**
39:17;45:18
**identify (2)**
45:8;48:6
**identifying (1)**
42:12
**Illinois (2)**
7:18;47:12
**immediately (1)**
63:18
**inaccurately (1)**
80:13
**incident (5)**
27:23;33:11,20;
42:5;72:21
**incorrect (1)**
25:3
**incorrectly (2)**
24:14;25:1
**independent (1)**
8:11
**indicate (1)**
75:18
**indicates (3)**
24:5,11;29:22
**individual (6)**
37:10;38:4;45:16;
47:21;48:12,15
**individuals (2)**
77:14;78:15
**information (16)**
5:14;26:4;34:20;
36:14;39:19;42:10,
12;43:7,15;48:23;
49:17;51:2;61:4,23;
71:15;76:11
**Inocencio (2)**
56:18,21
**inside (4)**
12:25;19:19;43:20;
52:12

**insisting (1)**
35:19
**instance (1)**
78:3
**interaction (1)**
21:6
**Interesting (1)**
20:5
**interview (7)**
34:9;36:2;37:18,22;
42:9;48:24;75:13
**interviewed (9)**
24:6;33:1,9;36:13;
37:15;43:12;48:25;
73:24;74:3
**into (3)**
32:2;53:12;62:13
**investigator (3)**
21:12;52:12;59:4
**investigators (4)**
25:24;26:11;52:6;
71:6
**invite (1)**
43:19
**invited (1)**
37:14
**issue (2)**
13:22;81:18

## J

**jail (2)**
64:1,4
**Jennifer (4)**
45:12;54:16;72:1;
80:7
**job (1)**
77:4
**joining (2)**
5:7,21
**Jose (2)**
24:13;56:20
**judge (1)**
7:7
**July (1)**
8:21
**jump (1)**
49:15
**Justin (1)**
46:14

## K

**keep (2)**
62:8;76:19
**Kelvyn (2)**
63:24;64:3
**kids (1)**
34:13
**kill (3)**
27:16,17;65:14
**killed (1)**
77:14

**Kimball (1)**
9:14
**kind (21)**
5:18;12:23;15:9,10,
14;16:17;18:9;19:17;
22:5;29:18;35:12,15;
46:23;47:23;49:15;
50:15;51:9;62:18;
65:21,22;76:18
**kindly (1)**
14:8
**King (1)**
65:13
**Kings (3)**
64:21;65:1,7
**knew (9)**
26:4;30:17;35:24;
37:20;38:19;43:13;
71:4;77:21;78:13
**knowledge (1)**
65:11

## L

**lady (2)**
35:14;76:3
**lake (2)**
23:4;66:10
**language (2)**
18:19;54:7
**last (6)**
7:11;25:9;27:18;
36:18;45:19;60:3
**lasted (2)**
27:18;30:25;37:19;
60:11;61:15
**late (1)**
32:16
**later (13)**
30:15;31:13;32:18;
37:6;51:10,16;53:3;
73:5;75:23;77:13;
78:8;79:3,16
**Latin (4)**
64:21;65:1,7,13
**law (3)**
7:6;50:19,21
**laying (1)**
31:15
**learn (1)**
30:15
**learned (2)**
78:8;79:16
**least (9)**
8:14;21:1;27:3;
28:1;30:25;31:4;40:6;
42:6,20
**leave (3)**
19:25;65:16;77:5
**left (3)**
23:8,8;69:7
**left-hand (1)**
21:25

**LEINENWEBER (7)**
45:12;46:6,13,15;
49:2,7;80:1
**letter (2)**
49:25;50:5
**level (1)**
12:7
**licensed (1)**
7:24
**life (1)**
43:9
**lighting (1)**
65:19
**line (2)**
28:12,12
**lit (1)**
65:20
**literally (1)**
46:9
**little (6)**
5:19;11:25;21:22;
24:23;49:15;55:12
**live (26)**
7:17,19;9:20;10:5,
10,10,19;11:1,2,6,16;
13:11,20,23;14:15;
23:18;26:23;28:6;
33:3,5;34:22,23;
52:20;57:1,4;66:8
**lived (24)**
9:1,5,11,15,19;
10:14,16;11:23;14:6,
9,24;15:5;33:23;
42:13;52:23,25;53:8,
10,11;64:12;67:23;
68:1;76:17;77:15
**living (5)**
13:1;32:9;34:14;
35:2;47:1
**location (2)**
28:17;57:7
**long (10)**
8:12;14:9;17:15;
33:2,4;44:24;52:20,
22;58:20;61:15
**look (9)**
41:1,16;44:21;45:3;
55:1;67:19;69:8;
77:12,20
**looked (8)**
31:13,20;50:4;
63:25;64:3;69:16;
72:20;79:13
**looking (10)**
31:22;32:2;43:17;
68:16,23;69:6,10,20,
23;73:11
**looks (2)**
47:25;67:24
**lot (13)**
13:8,9;32:1,3,4;
35:19;39:1,21;67:1;
69:21,24;70:2,8

loud (1)
29:11
Louis (1)
53:2
loyal (1)
72:14
Lulu (7)
18:6,21;31:1,7;
62:1,14;78:20

## M

ma'am (3)
5:9;7:2,21
Macias (29)
5:5;7:11,16;9:23,
24;17:19;21:21;24:1;
27:21;28:15;30:24;
31:9,13;36:25;46:14;
49:10;54:13,25;
58:19;67:4,15;68:25;
69:6;71:17;72:4;74:5,
8;75:5;80:3
Macias-1 (4)
21:17,19;54:19;
55:1
Macias-2 (1)
67:13
Mainly (1)
44:16
makeup (1)
30:14
making (4)
13:25;35:2,19;76:7
male (1)
29:9
man (1)
59:2
many (10)
5:22,22;6:3;8:16;
16:11;26:11;36:16;
39:20;40:4;57:17
mark (3)
21:17;54:17;67:9
marked (2)
21:20;67:13
married (2)
25:9,9
match (1)
31:3
matches (1)
28:13
math (1)
8:23
matter (1)
46:17
may (27)
6:22,23;8:24;9:1,6,
18;10:2,6;11:7,10;
12:19;13:17;15:18;
19:3;21:14;22:12,18;
24:13;29:12,14;
44:22;46:1;56:3,8,15;

65:18;70:3
maybe (2)
41:25;44:22
Mazzola (1)
45:22
McVicker (1)
47:10
mean (8)
13:11;30:7;35:13;
37:25;39:2,2;43:20;
52:13
meaning (1)
80:21
means (1)
75:1
meet (1)
36:7
member (1)
65:12
members (2)
10:6;11:23
memory (2)
32:6;58:22
men (2)
78:3;79:16
mention (1)
48:17
mentioned (2)
54:3;58:2
met (2)
34:14;59:16
metal (1)
64:9
Mexican (1)
39:6
Mexico (4)
13:23;52:25;63:8;
64:1
midnight (1)
29:9
might (1)
22:6
mind (7)
36:24;43:17;44:20;
45:4;46:7;47:9;62:6
minutes (2)
33:23;46:10
mirrors (1)
28:13
Mischaracterizes (1)
17:17
misheard (1)
80:16
Miss (2)
41:4;74:14
mistake (3)
23:11;51:9;80:15
mixed (1)
14:25
mom (3)
11:12;28:5;57:8
moment (5)
50:12;51:8;55:1;

56:6;67:18
month (1)
21:1
months (3)
15:24;19:9;20:22
more (14)
14:25;32:23;34:20;
42:9,25;44:18;45:14,
21;48:22;49:17;51:2;
60:2;68:5;73:15
morning (12)
15:17;16:23;19:8,8;
26:22;32:22;34:12;
36:3;40:12;72:9;
74:18;75:23
most (2)
15:2;48:24
mostly (1)
14:23
mother (1)
73:24
move (3)
33:21;53:9;64:17
moved (10)
33:6,9,18,24;34:24;
37:5,5,6;53:12;57:7
movies (1)
66:24
Mrs (1)
66:6
much (12)
13:16;16:8;17:22;
32:18;46:17;49:4;
54:24;55:19;71:19;
73:5;74:10;80:4
multiple (3)
17:4,5,25
multi-units (1)
10:8
murder (1)
72:9
myself (2)
21:5;25:21

## N

name (32)
7:10,11,11;9:22,23;
15:9;24:24;25:6,9,15;
35:9;38:10,11,13,14,
15,17;39:16;44:10;
45:19,22;46:14;
48:12,13;49:12;
50:11;56:17,19,20;
61:23;64:23;72:4
names (6)
48:17;51:4,5;58:13;
63:6;81:3
narrative (1)
23:23
nature (1)
37:12;61:12;62:2
near (1)

77:15
nearby (2)
15:12;16:13
necessarily (1)
77:12
need (3)
35:25;47:5;76:5
neighborhood (8)
12:22;13:3;15:5,11;
43:14;62:19;64:20;
78:15
neighborhoods (1)
15:8
neighbors (2)
63:3,6
new (7)
5:17;13:22;33:22;
43:21;57:7;64:9;
74:17
news (12)
16:24;26:25;30:18,
21,22;32:22;72:9,11,
14;75:24,25;77:23
next (6)
6:19;16:23;19:7;
24:23;28:9;68:20,21;
72:9;75:23;77:6
night (7)
26:5;54:1,2;65:17;
70:17;75:10;77:13
noise (10)
15:25;16:3;17:14;
18:10;30:6,11;32:16;
62:11;69:1;72:24
North (45)
9:9,10,12,16,19;
12:20;13:18;14:17,
18,24;15:6,13;22:15,
24;28:16;31:20,21,
22;33:3;34:22;47:10;
52:20,22,23,24;53:1,
7,10,15,22;62:18;
64:21;65:19;66:3,14,
17,17,19,19,22,22;
69:16,22,22,23
northwest (1)
9:4
nose (1)
76:19
notes (2)
44:21;45:3
notice (2)
78:3;79:15
number (16)
14:19;27:22;31:1;
41:19,20;42:13;
47:14,18;55:7,8,13,
16;56:11,14;71:11;
81:15
numbers (2)
47:16;53:7

## O

oath (2)
7:2,5
Objection (4)
17:16;65:4,9;81:17
obligations (1)
80:5
obviously (1)
5:15
occasion (1)
52:17
occasionally (1)
79:13
occasions (1)
76:2
occupied (1)
12:11
occupy (1)
12:3
occurred (4)
11:11;21:13;27:23;
33:8
occurrence (2)
22:10,11
o'clock (3)
34:15;36:6;40:11
off (4)
46:8;77:10;80:23;
81:13
office (4)
28:24;36:9;50:8,10
officer (4)
21:13;37:12;38:5;
59:3
officers (5)
21:7,8;26:11;49:13;
79:25
official (1)
54:7
old (7)
8:18,23;20:22,22;
39:12;58:11;63:14
older (1)
11:20
once (2)
37:5;43:8
one (21)
10:9;17:4;19:16,18;
29:10;32:7;36:8;
40:23;45:14,21;
46:15;47:24;52:17;
54:14;58:3;64:10;
68:5;70:24;73:20;
76:16;77:9
one-minute (1)
44:20
only (11)
16:25;18:20;20:21;
27:14;30:24;52:3,4,
19;76:15;77:1;78:23
onto (1)

31:21
**open (3)**
40:14,25;41:8
**opening (1)**
48:21
**operation (1)**
53:25
**opportunity (3)**
80:11,13;81:9
**order (1)**
81:19
**orig (1)**
22:11
**original (1)**
22:10
**Oscar (1)**
9:23
**out (29)**
12:14;15:8;16:24;
23:12;26:1,2;31:13,
21;32:20,23;36:9;
61:16;62:6;65:11;
69:16;72:20;73:10,
14,15;77:2,3,12,25,
25;78:2,4,10;79:2,13
**outside (12)**
16:21;17:11;18:4;
19:18;29:20;40:16;
41:10,16;47:23,24;
65:17;79:4
**over (4)**
5:16;49:4;63:8,17
**own (2)**
34:24;56:22
**owned (3)**
12:15;13:15;57:8
**owns (1)**
57:6

**P**

**page (3)**
28:10;67:11,15
**pandemic (1)**
8:7
**paper (2)**
50:14,16
**papers (1)**
34:17
**Pardon (1)**
57:2
**parent (1)**
65:16
**parents (12)**
10:9,19;12:3;13:25;
14:13;53:3,12;62:25;
64:14;65:14;69:18;
76:18
**Park (3)**
9:13;15:11;63:24
**Parker (2)**
11:3,3
**part (1)**

55:2
**partially (2)**
31:4,5
**particular (1)**
64:20
**particularly (2)**
37:23;54:12
**partners (1)**
8:4
**parts (1)**
30:24
**pass (1)**
43:25
**passed (4)**
16:8;32:18;57:9;
73:6
**passing (1)**
16:18
**people (12)**
8:5;14:24;24:6;
48:24;51:5;73:14,15;
76:23;77:18;78:9,16,
19
**percent (1)**
38:18
**perfect (2)**
54:23;81:24
**period (1)**
33:7
**persistent (3)**
36:1;61:1,3
**person (10)**
41:5;43:23;45:8;
47:25;50:2,17,23;
62:14;76:3;78:21
**persons (1)**
29:21
**phone (29)**
28:23,24;34:4;35:6;
38:8;40:15,19;41:9,
19,20,23;42:13;
46:21;47:1,14,16,18,
19,22;55:7,8,12,16;
56:5,7,11,14;60:18;
71:11
**phones (1)**
47:15
**photo (4)**
68:24;69:9,20,21
**photograph (2)**
67:19,19
**photographs (1)**
67:16
**photos (2)**
81:16,20
**pick (2)**
63:23;77:10
**picture (5)**
67:5,7;69:10;73:18,
21
**place (2)**
12:24;28:20;29:2,7;
62:14

plain (1)
21:10
**platform (2)**
5:17;51:19
**Please (2)**
23:24;36:11
**pm (1)**
81:25
**Pobre (1)**
24:13
**point (7)**
5:23;30:5;37:9;
47:24;70:4;72:20;
75:7
**police (33)**
16:16;21:7,8,9;
26:10,11;27:3,4,20;
28:11,21;29:1,14;
30:4;31:9,13;35:7,14,
18;36:19;37:11;38:5;
59:2,6,14;64:8;70:21,
22;71:3,5,10,14;73:24
**population (1)**
15:1
**portion (2)**
23:23;24:3
**portions (1)**
22:7
**possible (1)**
5:20
**pots (1)**
20:18
**preceded (1)**
17:14
**Preceeo (1)**
24:24
**Preciado (5)**
27:11,12,13,19,20
**Precidado (3)**
25:12,14;27:10
**P-R-E-C-I-D-O (1)**
25:12
**prefer (1)**
7:12
**pregnant (3)**
15:24;52:8;73:6
**prepare (1)**
49:23
**present (4)**
11:10;25:18,22;
26:14
**presently (1)**
7:18
**press (1)**
17:8
**pressure (8)**
35:12;38:1;39:22;
40:8;61:6,7,8,9
**pressured (1)**
37:23
**pretty (3)**
13:22;16:13;48:10
**previously (1)**

81:21
**primarily (1)**
46:21
**print (2)**
12:12,13
**prior (1)**
78:5
**Probably (25)**
8:25;14:10,15;
15:11,24;20:24;
22:22;25:2;30:8,10;
34:1,3,15;35:1,5;
38:17;40:11;41:21;
44:1;46:9;58:10;65:7;
70:8;71:13;74:1
**problem (1)**
69:5
**problems (1)**
64:16
**proceed (1)**
52:2
**produced (1)**
81:21
**production (1)**
81:16
**program (1)**
8:2
**programs (1)**
8:11
**protective (2)**
76:18;81:19
**provide (2)**
42:12;61:22
**provided (1)**
55:8
**provider (1)**
7:24
**publication (1)**
54:7
**Puerto (7)**
35:9;38:21,23;39:2,
5;47:2;48:4
**purports (1)**
28:10
**purpose (1)**
48:20
**put (6)**
13:21;14:5;25:25;
26:2;54:11;62:13
**putting (1)**
40:8

**Q**

**quick (3)**
46:18;72:6;74:12
**quite (1)**
74:17

**R**

**racial (1)**
30:14

**RAHE (6)**
72:1,3,5;74:4;80:2,
7
**ran (1)**
53:22
**rather (1)**
39:5
**reaching (1)**
61:15
**read (2)**
27:6;32:12
**reading (1)**
29:17
**ready (1)**
77:6
**real (2)**
72:6;74:12
**really (11)**
27:1;32:20;41:15;
42:24;43:9;44:11;
59:5;63:2;73:11;
80:20,24
**rear (1)**
65:24
**reason (2)**
29:24;30:3
**reasons (1)**
64:11
**recall (42)**
8:22,23;9:1,5,11;
17:3,8,21,24;18:1,10,
21;20:14,20,21;21:6;
22:17;23:14;25:18;
28:21,24;31:4,15,18;
33:13,18;34:2,17;
42:6;44:9;51:17;
58:13,15;59:5;61:20;
65:18,23;66:25;
70:21,24;73:11;75:17
**recalled (1)**
62:1
**receive (3)**
34:4,10;40:21
**received (5)**
34:3;47:1,19,22;
51:1
**receiving (1)**
28:24
**recently (3)**
20:16;47:17;60:2
**recognize (2)**
51:3;77:18
**recollection (14)**
28:13;29:1,13,25;
32:11,13;38:12;
42:20;48:11;52:1;
55:22;70:1;75:16,19
**record (4)**
46:8;47:6;67:11;
81:13
**red (2)**
67:22;68:16
**REDIRECT (3)**

74:7,18,25
**reference (1)**
66:5
**referred (2)**
31:1;62:14
**reflect (1)**
5:22
**refresh (2)**
29:13;70:1
**regular (1)**
21:10
**regularly (1)**
78:20
**Related (3)**
27:12;29:7;34:13
**remember (79)**
6:6,7;11:9;12:10;
13:25;15:21;16:9,12,
15,16,17;17:6;18:4,
22;19:10,16;20:1;
21:1;24:16;31:7;32:3;
34:5;35:3,7,8,17,24;
36:8,19;38:11,14,16;
40:1,10,18;41:3,12;
44:2,11,13;45:10;
48:13,14;50:11;52:5,
7,11;53:18,19,21,24;
57:16,18,21;58:2,12,
18,21,23;59:7,15;
60:11;62:5,9;64:19;
67:3;69:6;70:7,14;
71:4,12,14,16;72:8,
11,18,19,22;75:10
**remembered (6)**
15:22;16:5;32:15;
59:18;60:18;66:6
**remembers (1)**
75:20
**renovated (1)**
56:4
**rent (2)**
66:7,23
**rented (1)**
12:14
**report (4)**
21:17;22:1;24:2;
71:9
**reported (1)**
27:3
**reporter (5)**
6:15;67:6,8,10;
80:12
**reporting (1)**
27:21
**represent (2)**
46:16;49:13
**represented (1)**
38:4
**reserve (2)**
80:21;81:12
**residences (1)**
52:21
**residential (1)**

14:21
**resistance (1)**
14:5
**rest (2)**
5:18;75:24
**retail (1)**
12:5
**retired (17)**
34:5;35:7,8,14,18,
18;36:19,20;37:11,
11;38:4,5;39:18;
45:18;47:3;59:5;60:4
**review (5)**
19:3;49:22;80:10,
22;81:9
**Reyes (2)**
25:15;56:21
**Reynaldo (1)**
44:10
**Rican (6)**
35:9;38:21,23;39:5;
47:3;48:4
**Rico (1)**
39:2
**right (79)**
8:6,15,22;9:10;
11:22;12:19;14:6,14;
15:10,13;16:25;17:9;
20:12,16;21:2,4,7,16;
22:3,4,25;23:3,9,21,
25;24:2;25:16,23;
26:3,8,13;29:22;30:2;
32:2,5;33:17,25,25;
37:5,7,12,20;40:21;
41:1,14,24;42:21,25;
44:17;47:4;48:1;
57:19;69:8,10,11;
70:18;71:18;72:9;
74:17,23,24;76:20;
77:16,22,24;78:1,4,
11,21;79:5,7,10,19;
80:3,10,18,19;81:8,11
**right-hand (1)**
66:11
**ring (4)**
40:13,24;41:9;
64:22
**ringing (1)**
40:16
**rings (1)**
45:22
**Roberto (1)**
63:22
**room (4)**
32:9;34:14;35:2;
73:20
**roughly (1)**
53:10
**route (1)**
53:19
**RSC-Maysonet (2)**
21:18,19
**run (2)**

7:25;53:25
**runs (1)**
53:16

## S

**safe (1)**
76:19
**safety (1)**
40:15
**same (22)**
5:18;6:18;7:5;9:3,
4;14:16;18:2;24:21;
26:6,7;34:18;35:3;
39:19;41:25;42:1,8;
51:10;53:1,17;70:4;
75:20;76:11
**saw (8)**
26:25;29:23;30:21;
31:14;71:8;72:12;
73:21;78:19
**saying (4)**
18:5;24:14;38:2;
47:23
**school (8)**
13:25;63:4,4,16,19,
21,25;64:3
**schools (1)**
64:1
**screaming (1)**
30:12
**screen (3)**
54:22;67:7,16
**scroll (2)**
55:12,18
**second (10)**
10:20,21;12:4;28:4;
29:11;35:13;36:5;
37:1;45:2;54:15
**security (1)**
64:11
**seeing (3)**
31:15;58:20;72:8
**seemed (1)**
15:13
**selling (3)**
76:23,25;78:5
**service (1)**
7:25
**set (4)**
60:14,23;61:13;
68:22
**seven (2)**
77:5,5
**several (1)**
57:24
**share (2)**
42:18;67:7
**shared (3)**
37:3;53:6;76:11
**shift (1)**
36:5
**shock (1)**

63:25
**shooting (11)**
11:11;21:13;26:5;
33:4,8;70:17;73:10;
75:7;77:13;78:6;
79:17
**shop (2)**
12:12,13
**shot (1)**
77:14
**shots (5)**
13:11;27:19;31:10;
73:8;75:22
**show (3)**
19:2;67:4,7
**showed (2)**
40:24;73:18
**side (22)**
9:4;14:16;22:24,25;
23:3,8,8,9,18;24:18,
21;53:1;62:21;66:3,
11,14,17,19,22;69:7,
8;70:5
**sign (1)**
80:23
**signature (3)**
80:8;21;81:12
**similar (3)**
59:20;68:20;70:8
**sirens (1)**
70:21
**sister (17)**
8:10;10:23;11:19;
12:1;25:4;26:20;28:2;
34:21;35:22;36:12;
42:2,13;55:8;61:4;
63:23;71:2;77:9
**sister's (2)**
27:21;39:23
**sit (5)**
32:5,10;43:16;
60:15;61:8
**six (1)**
15:24
**sleep (8)**
16:5,7,22;17:9;
32:21;73:7,7;75:22
**sleeping (4)**
17:9,23;26:7;72:25
**slim (1)**
58:11
**small (1)**
77:7
**smoke (3)**
19:22,22;52:12
**smoked (1)**
58:3
**Somebody (4)**
14:2;50:22;74:15;
81:2
**someone (6)**
12:21;15:4;31:1;
39:17;65:6;73:9

63:25
**sometime (1)**
37:4
**sometimes (2)**
13:1,11
**sorry (12)**
22:22;35:7;40:20;
57:10;66:15;69:3,4;
71:23,25;72:18;
74:14,21
**sort (2)**
31:3;76:11
**sound (4)**
28:1;29:9,23;40:13
**sounded (2)**
18:7;29:12
**sounds (3)**
30:7;76:17;81:23
**south (4)**
22:24;66:3,14;
69:23
**space (3)**
12:5,6,8
**spaces (1)**
14:20
**Spanish (17)**
18:13,19,23;19:1;
35:10,11;36:21;39:5,
9,11;44:14,16,16;
54:7;60:6;62:9;63:22
**Spanish-speaking (1)**
45:17
**sparked (1)**
58:22
**speak (13)**
19:7;20:15;26:1;
33:19;36:20;39:8,9;
42:4,24;50:9;52:16,
17;75:6
**speakers (2)**
18:13,13
**speaking (3)**
18:19;44:14;81:14
**specific (1)**
42:6
**specifically (6)**
14:19;15:16,18;
20:14,25;56:2
**specifics (1)**
17:7
**speculate (1)**
18:15
**speculating (1)**
15:15
**spell (1)**
25:11
**spelled (1)**
27:14
**spend (1)**
35:1
**spoke (3)**
50:22;60:6;71:3
**spoken (2)**
21:12;26:20;75:9;

76:12
**spring (1)**
8:17
**St (1)**
53:2
**stamp (1)**
81:19
**stamped (1)**
21:18
**start (8)**
5:25;6:19;43:16;
63:17,19;74:13,18;
76:7
**started (2)**
44:6;74:25
**starting (1)**
13:24
**State (1)**
7:18
**stated (2)**
27:14;56:2
**statement (5)**
25:19;26:9;27:4;
28:11;54:12
**State's (4)**
59:13;81:15,16,17
**station (2)**
72:11,15
**stay (3)**
45:3;65:17;76:19
**STEPHENSON (5)**
17:16;74:12,16,24;
79:22
**still (5)**
9:24;12:23;56:22,
25;57:3
**stop (1)**
14:2
**stopped (3)**
44:3,4;61:15
**store (7)**
20:3;23:14;66:7,8,
21;78:25;79:6
**straight (1)**
67:21
**street (24)**
9:5;14:3,17;22:24;
23:19,19,20,24:19,20;
31:14,16,19;53:2;
67:1;70:5;77:2,15;
78:4,11,20,23;79:1,4,
9
**streets (2)**
9:11;77:3
**strike (2)**
26:19;33:1
**stuck (1)**
62:6
**stuff (1)**
39:21
**subject (1)**
81:19
**subjects (1)**

30:25
**subpoena (4)**
50:1,5,6;51:12
**subpoenaed (1)**
33:13
**substance (2)**
60:13;61:19
**suburbs (1)**
34:25
**suggest (1)**
50:18
**summarized (1)**
27:4
**summarizes (1)**
28:10
**summary (1)**
27:2
**Supplementary (1)**
21:25
**supposed (2)**
25:6,7
**supposedly (1)**
28:10
**Sure (27)**
6:11,16,25;15:15;
18:11;19:5;23:13;
28:7;34:1;37:1;38:18;
39:8;44:21;45:5,15,
15;46:2,20,24;47:10;
49:6,19;71:20;74:6;
80:9,12;81:8
**sworn (1)**
5:3

## T

**talk (11)**
26:24;40:9;50:23;
51:16,25;52:3;59:17;
60:15,20,23;71:2
**talked (12)**
52:5,7,9;55:3,20;
57:11;58:21;59:21;
61:18,19;71:10;74:1
**talking (4)**
45:17;46:22;49:18;
73:15
**tall (1)**
58:10
**Tavern (2)**
24:14,16
**tear (1)**
70:10
**teens (1)**
63:11
**telephone (9)**
27:22;28:19,20;
31:10,12;32:12;40:5;
56:2,9
**telling (3)**
12:21;32:11;50:6
**terms (2)**
18:12;28:3

**terrible (1)**
8:23
**testified (2)**
5:3;61:25
**testimony (2)**
17:17;80:14
**Thanks (1)**
46:17
**third (9)**
10:10,17;11:16;
28:5;31:21;68:2,5;
69:13,14
**though (2)**
77:11;78:13
**thought (2)**
51:8;76:5
**three (6)**
19:9;34:1,3;58:25;
72:2;76:2
**times (9)**
21:4;31:1;40:5,6;
42:20;47:15;60:8,10;
79:12
**today (19)**
5:8,15;6:2;7:2;
9:25;12:23,25;29:24;
32:6,10;46:18;55:22;
59:21;61:20,25;64:6;
75:13;76:11;80:11
**together (2)**
10:12;53:5
**told (26)**
7:10;14:2;18:2;
29:14;30:4;32:14;
35:23,24;37:19;
38:11,24;39:2;42:23;
44:9;51:11;52:4;55:6;
62:17;64:14,15;66:2;
70:16,18;71:13,14;
75:12
**took (1)**
77:2
**top (1)**
67:19
**total (2)**
27:18;53:9
**towards (1)**
66:10
**transcript (3)**
80:10,22;81:18
**tried (1)**
41:25
**true (1)**
65:2
**try (3)**
5:19;6:18;49:19
**trying (11)**
17:9;27:15;34:19;
42:4;48:22,24;60:14,
22;61:3,7;73:7
**turn (1)**
49:4
**twice (2)**

37:5;41:23
**two (29)**
20:22;26:12;29:9,
21;30:19;31:14;
33:10;34:1,3;52:21;
53:5,6,6;57:18;58:25;
67:16;68:4,6,7,7,9,10,
11,11;70:8;73:14;
76:2;78:3;79:15
**type (10)**
7:23;12:14;13:2;
14:25;15:14,20;
29:11;43:10;62:15;
75:11
**types (1)**
42:7
**typographical (1)**
80:15

## U

**Uh (2)**
59:10;71:12
**Um-hum (3)**
24:25;67:20;68:15
**uncomfortable (1)**
37:24
**under (1)**
7:2
**understandable (4)**
18:8;35:16;51:15;
66:16
**Understood (5)**
8:9;10:13;14:1,18;
77:11
**uninvited (1)**
42:21
**unmute (1)**
69:3
**up (21)**
5:19;16:3,6;32:16;
37:1;40:24;43:25;
49:16;54:11;55:12;
60:14,23;61:13;63:7,
23;65:20;72:25;
75:21;77:10;80:20,24
**used (26)**
10:9,10;11:2;13:4,
5,11,23;14:15;24:12;
28:6;34:22,23;53:18;
62:20;64:2,23;66:7,8,
23;70:5;77:4,5,8,9,10;
79:2
**using (1)**
31:12
**Usually (2)**
8:6;51:20

## V

**vacant (9)**
32:1,3,3;67:1;
69:21,24;70:2,8,11

**victims (5)**
30:14,15;31:14;
78:15;79:17
**video (6)**
23:14;66:7,21;
78:25,25;79:6
**videos (1)**
66:8
**view (1)**
29:20
**violence (2)**
13:8,9
**visit (1)**
57:11
**visited (1)**
59:1
**visiting (1)**
11:12
**voice (2)**
29:10,11
**voices (3)**
17:25;18:12,17

## W

**wait (2)**
6:13,18
**waived (1)**
81:20
**wake (4)**
16:3,6;32:16;72:25
**wakes (1)**
75:21
**warned (1)**
76:19
**way (7)**
33:2;54:10;58:9;
65:7;70:24;71:10;
78:16
**wear (1)**
21:10
**wearing (1)**
21:9
**week (6)**
19:11;20:22;57:24;
61:14,14,14
**weekday (1)**
40:11
**weekends (1)**
62:21
**weeks (1)**
20:24
**weight (1)**
58:9
**weird (2)**
6:12;16:17
**welcome (1)**
71:20
**weren't (1)**
72:14
**West (8)**
22:15;23:1,2,4;
28:15;31:20;33:3;

53:22

**what's (8)**
8:20;16:21;20:6,9;
25:6;32:21;38:12;
56:17

**whenever (2)**
78:24;79:2

**white (7)**
19:20,21;33:10;
34:8;58:5,7;59:1

**whole (1)**
12:16

**who's (1)**
11:20

**willing (1)**
43:19

**window (14)**
16:4,6;31:14,21;
32:17;62:10;72:20,
23;73:4,20,20;75:21;
77:12;79:13

**windows (4)**
18:24;68:23,23;
73:21

**withdraw (1)**
65:10

**within (1)**
57:24

**without (1)**
50:16

**witness (13)**
5:2;17:17;44:25;
45:5;46:2,5;49:6,8;
71:20;74:6;80:25;
81:6,10

**woman (5)**
34:8;37:10;43:22;
59:1,8

**Wonderful (3)**
7:1,9;21:24

**word (1)**
62:7

**words (4)**
18:20;30:9,10;62:5

**work (11)**
7:21,23;8:3,4,5,9;
28:22;51:18;61:12;
63:5;77:9

**worked (5)**
54:4,5;59:12,14,14

**working (4)**
41:14;59:11;63:17,
20

**worrying (1)**
76:8

**write (3)**
25:3;41:18,21

**wrong (1)**
27:14

---

**Y**

**year (5)**

---

35:5;36:17;38:3;
44:6;60:3

**years (24)**
5:12;8:14,16;14:11;
15:7;28:22;29:25;
33:24;34:2,3;35:25;
36:16;37:6;39:20;
43:6;48:25;53:9,11;
54:5;58:10,25;70:14;
76:3;77:4

**young (1)**
12:2

---

**Z**

**Zoom (3)**
5:16;6:23;51:19

**Zulu (3)**
18:6,21;62:1

---

**0**

**000055 (2)**
21:18,19

---

**1**

**1 (1)**
54:18

**1:00 (1)**
22:12

**100 (1)**
38:18

**10th (5)**
20:10,11;57:13,16,
22

**11 (1)**
36:6

**13 (3)**
8:14;33:24;37:6

**14 (2)**
53:8,11

**17 (1)**
41:17

**18 (3)**
8:21;63:13,14

**1981 (3)**
13:21;52:25;63:9

**1990 (30)**
8:17,24;9:2,6,18;
10:2,7;11:7,10;12:19;
13:17;14:9,10;15:18;
20:11;21:14;22:18;
24:13;25:20;28:11;
29:15;30:4;33:8;
53:24;54:4;56:3,8,15;
65:18;70:3

**1994 (3)**
33:5,17,21

---

**2**

**2 (2)**

---

67:10;81:15

**20 (4)**
28:22;33:23;54:5;
77:3

**235-7409 (1)**
56:12

**2400 (1)**
29:8

**243-1300 (1)**
55:14

**25 (4)**
8:24,25;11:10;
22:12

**25th (1)**
15:18

**2724 (1)**
47:10

---

**3**

**3:40 (1)**
81:25

**30 (6)**
5:12;29:25;35:25;
43:6;48:25;70:14

**30-second (1)**
44:20

**3400 (8)**
9:16,19;12:20;
13:18;14:19;15:6;
62:17;64:20

**3417 (3)**
68:13,17,19

**3419 (8)**
22:21;28:15;31:20;
33:3;56:23;68:14,17,
18

**3419-3417 (1)**
53:4

**3428 (1)**
22:15

---

**4**

**40 (1)**
58:10

---

**5**

**56 (2)**
21:18,20

**57 (1)**
8:19

---

**6**

**6 (2)**
34:15;36:6

**63 (1)**
8:21

---

**7**

---

**72 (1)**
53:16

**773-318-8627 (1)**
47:20

---

**8**

**8 (1)**
40:11

---

**9**

**9 (1)**
40:11

**90 (1)**
22:12

**90s (1)**
52:22

**94 (1)**
37:6

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 28

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly how found, when found, who found it and its description (include Property Inventory numbers). If property taken as scribed for Operation I dentification, indicate I.D. number at end of Narrative. Offender's appro *imate description, if possible, should include name if known, ickname, sex, race code, age, height, weight, color eyes & hair lexion, scars, marks, etc. If suspect is arrested, give name, sex, race e, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME
DAY MO. YR.
25 May 1990 0100

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒ 1 VERIFIED ☐ 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDR/1st degree Murder | 0110 | 3428 W. North | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒ 1 YES ☐ 2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐ 1 YES ☒ 2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5548 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| street | 304 | 2 | unknown |

| | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE OCCUP. |
|---|---|---|---|---|---|---|---|
| ☒☒ VERIFIED | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | | CODE NO. |
| ☐ UPDATE TO | | | | | | | |

19. DESCRIBE PROPERTY IN NARRATIVE. T - TAKEN, R - RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| | 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|---|
| ☒☒ VERIFIED | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ |
| | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |
| ☐ UPDATE TO | 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & NARC./DANGEROUS DRUGS | 5 OTHER | 6 NONE |
| | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T |
| | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |

| 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN. YES NO | 27. VICTIM IREL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER IREL. CODE | 32. NO. ARRESTED UNIT NO. |
|---|---|---|---|---|---|---|
| OFF. | | | | | OFF. 2 | |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐ USED ☐ STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. ☒☒ DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| dna | | dna | ☒ 1 FIELD ☐ 3 SUMMARY | 652 | ☒ 0 PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |

| STATUS CONT'D. | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|
| ☐ 3 CLRD. CLOSED ☐ 4 CLRD. OPEN ☐ 5 EXC. CLRD. CLOSED ☐ 6 EXC. CLRD. OPEN ☐ 7 CLSD. NON-CRIM. | ☐ 1 ARREST & PROSEC. ☐ 2 DIRECT TO JUV. CRT. ☐ 3 COMPL. REFUSD. TO PROSECUTE ☐ 4 COMMUNITY ADJUSTMENT ☐ 5 OTHER EXCEPT. | | | ☐ ADULT ☐ JUV. |

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

60. NARRATIVE

FIELD INVESTIGATION:        PROGRESS REPORT

INTERVIEWED:        1.  Richard Wiley WORTHAM (brother of victims) M/B/32 ▮▮▮

        ▮▮▮ of  440 N Drake unemployed laborer single residing at

        440 N Drake   IR #  444 668

        2.  Zearl WILEY (brother of victims) M/B/24  ▮▮▮

        9177 S South Chicago single and unemployed, home phone

        # 375 3578

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| normal | 25 May 90 | 1630 | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. J. Boyle | 6945 | Det. B. Brennan | 14888 | |

| SIGNATURE | 95. DATE APPROVED (DAY–MO.–YR.) | TIME |
|---|---|---|

CPD-11.411-B (Rev. 8/85)        *MUST BE COMPLETED IN ALL CASES

CRC © 228

* J.R.D. NO.
N
234
297

RFC-Maysonet 000057

DETECTIVE DIVISION
AREA FIVE VIOLENT CRIMES

RD # N 234 297
25 May 1990

HOMICIDE / 1st DEGREE MURDER
WILEY, Torrence
WILEY, Kevin

### PAGE TWO

INTERVIEWED:

3. Jolanda WILEY (sister of victims) single and
unemployed, residing at 1925 N Drake 3rd Floor
Rear ▮▮▮▮▮▮▮

4. Sandra MONTOYA F/WH/38 years ▮▮▮▮▮▮▮
single and residing at 2168 Wildwood Lane
Hanover Pk. Ill, home phone 708-213 8797
a Supervisor for United Cerebral Palsy
4540 W Washington Blvd (fiancee of Torrence
Wiley and his co-worker)

INVESTIGATION:

The Reporting Detectives in the continuing investi-
gation into the above captioned incident were con-
tacted by Sgt. Biebel of this command.    He related
that the sister of the victims had called the office of Area Five Violent Crimes and
requested to speak with the undersigned.    The undersigned responded to the residence of
Ms. Wiley and met with her and several members of her family.    The undersigned requested
that a member of the family accompanied them to the Medical Examiner office.    The victims
two brothers Richard and Zearl along with Sandra Montoya went to the Medical examiners
office and positively identified the two victims as Torrence and Kevin Wiley.

The undersigned returned to the residence of
Jolanda  Wiley and spoke with several members of the family who related the following in
essence but not verbatim.

RICHARD WILEY WORTHAM                    stated that he last saw his brother Torrence on
                                        24 May 1990 at 2145 hours.    Torrence left Richard
                                        residence stating that he was on his way to Jolanda
house.  He could add nothing more

JOLANDA WILEY                            stated that her brother Torrence came to her
                                        house at about 2200 hours on 24 May 1990. He stayed
                                        for a while speaking with their brother Kevin.
Kevin and Torrence left together sometime after 2300 hours.    They did not say where they
were going other than saying that they had to go out.    She could add nothing more other
than to say that she knew of no one who would do this to her brothers.

ZEARL WILEY                              stated that he heard about his brothers on the
                                        radio this morning(25 May 1990).    He stated that
                                        he hadn't seen his brothers in several days and
could add nothing more.

SANDRA MONTOYA                           stated that she is the fiancee of Torrence WILEY
                                        She stated that she first met him on 26 June 1989
                                        when he came to work at United Cerebral Palsy.
She stated that she last saw Torrence on Wednesday 23 May 1990.    She could add nothing
more other than to say that Torrence was a very gentle man and would not hurt anyone.

The undersigned will attempt to locate any
witness to this incident.    Any information garnered will become the subject of a future
appropriate report.    This investigation continues.................

Det. John Boyle # 6945
Det. Bernard Brennan  # 14888
DDA FIVE VIOLENT CRIMES

RFC-Maysonet 000058

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 29

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operat... entification, indicate I.D. number at end of Narrative. Offender's ap... tate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair... .plexion, scars, marks, etc. If suspect is arrested, give name, sex, race c... age, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME
- DAY 25  MO. May  YR. 90  |  0100

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☐1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE   MURDER FIRST DEGREE | 0110 | 3428 W. North Ave. | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☐1 YES ☐2 NO  XX | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☐2 NO  XX | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5522 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| STREET | 304 | Two | Unknown |

| CIRCUMSTANCES | 11. RECOVERED/VERIFIED/EXONERATED | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUR. |
|---|---|---|---|---|---|---|---|---|
| | ☐ UPDATE TO | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | FROM OR |

19. DESCRIBE PROPERTY IN NARRATIVE.  T - TAKEN.  R - RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

| PROPERTY | ☐1 RECOVERED/VERIFIED | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
|---|---|---|---|---|---|---|---|
| DNA | ☐ UPDATE TO | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 0 CONSUM. GOODS ☐ T $ ☐ R | (-) FIREARMS ☐ T $ ☐ R | & NARC./DANGEROUS DRUGS ☐ T $ ☐ R | 6 OTHER ☐ T $ ☐ R | 6 NONE ☐ T ☐ R |

| | 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN JURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| VICTIMS UPDATE ONLY | 1. | | | | | | | |
| | 2. | | | | | | | |
| | 3. | | | | | | | |

| | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| OFFENDERS UPDATE ONLY | 1. | | | | | | | |
| | 2. | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | | | | OFF. 2 | | | | |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|---|
| ☐ USED ☐ STOLEN | | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☐1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|
| DNA | | | | |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED ☐1 FIELD ☐3 SUMMARY  XX | UNIT NO. 652 | 53. STATUS ☐0 PROGRESS  XX | ☐1 SUSPENDED | ☐2 UNFOUNDED |
|---|---|---|---|---|---|---|---|
| DNA | | | | | | | |

| STATUS CONT'D. | | | | | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|---|---|---|
| ☐3 CLRD. CLOSED | ☐4 CLRD. OPEN | 5 EXC. CLRD. CLOSED | 6 EXC. CLRD. OPEN | 7 CLSD. NON-CRIM. | ☐1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. RFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. | ☐ ADULT ☐ JUV. |

55. ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

FIELD INVESTIGATION:                                                     Progress Report

VICTIM: .......................................... WILEY, Torrence M/B/27
                                                   11 S. Parkside   SSN/▮▮▮▮
                                                   IR# 887249

                                                   WILEY, Kevin  M/B/26  DOB. ▮▮▮▮
                                                   3334 W. Maypole   SSN/▮▮▮▮
                                                   IR# 636256

                        continued on page # 2

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY 25  MO. May  YR. 90 | TIME 0800 | 92. SUPERVISOR APPROVING (PRINT NAME) TANGEY #1731 |
|---|---|---|---|
| Normal | | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. R.S. Tapkowski  #15665 | | Det. P. Boyle  #14633 | | |

| SIGNATURE | | 95. DATE APPROVED (DAY–MO.–YR.) |
|---|---|---|
| | | 20 MAY 1990  1650 |

CPD-11.411-B (Rev. 8/86)                    * MUST BE COMPLETED IN ALL CASES

N-234297

CRC ☐ 228

RFC-Maysonet 000059

```
DETECTIVE DIVISION                                    25 May 90
AREA FIVE VIOLENT CRIMES                              N 234 297
WILEY, Torrence
WILEY, Kevin
MURDER FIRST DEGREE                                  Page Two
```

WANTED:                 Unknown at this time.

INJURIES:               Torrence WILEY
                        GSW to the left chest, lodged in Rt. chest.
                        GSW to the genitals exiting the right thigh
                        pellet recovered in under shorts.

                        Kevin WILEY
                        GSW to the head below and to the rear of the
                        left ear. Apparently exiting the mouth.

TAKEN TO:               FIFM by MB 1472, pronounced at the scene
                        by ME Thompson #53, Torrence WILEY at
                        0217hrs ME case 447 May. Kevin WILEY at
                        0215hrs ME case 446 May.

WEAPON:                 A 9MM weapon possibly a handgun.

LOCATION:               Torrence WILEY was found on the street
                        at 3428 W. North Ave.
                        Kevin WILEY was found on the street at
                        3426 W. North Ave.

DATE and TIME:          25 May 90 @ 0100hrs Fri.

WEATHER and LIGHTING:   Temp. in the low 60s, good visibility,
                        good overhead street lighting.

MANNER and MOTIVE:      The victims were shot on the street. Motive
                        unknown at this time.

IDENTIFIED BY:          IDPA cards found on the persons of the
                        victims.

EVIDENCE:               Photos of the victims and scene.
                        Four shell casings 9MM
                        One can of Beer, Milwaukee's Best
                        One bullet recovered from Torrence WILEY's
                        under pants at FIFM.

NOTIFICATIONS:          First Dep office, MEs office, Crime lab

Continued to page three...

N 234 297

```
DETECTIVE DIVISION                                      25 May 90
AREA FIVE VIOLENT CRIMES                                N 234 297

WILEY, Torrence
WILEY, Kevin
MURDER FIRST DEGREE                                     Page Three
```

PERSONNEL ASSIGNED:

| | | |
|---|---|---|
| | Sgt Peterson #2111 | MB 1420 |
| | PO Montalvo #13102 | MB 1422 |
| | PO Dones #5457 | |
| | PO Horodny #17759 | MB 1421 |
| | PO Magnus #10609 | |
| | PO Heyn #6626 | MB 1472 |
| | PO Maxwell #5954 | |
| | Tech Bacheder #12680 | MB 9601 |
| | Tech Butler # 10448 | |
| | Det Boyle #14633 | MB 5522 |
| | Det Tapkowski #15665 | |
| | Det Dickinson #4588 | MB 5535 |

WITNESS:                  NEGRON, Isabella F/WH 30yrs DOB ███████
                          3445 W. North Ave. 2nd Ph 384-6037 (Circ)

CANVASS:                  In included in this report.

INVESTIGATION:            The R/Ds were assigned to investigate the
                          homicide at 3428 W. North Ave. by Sgt.
Cappitelli of this command. The R/Ds proceeded to that address and interviewed the original
reporting officers who related essentially the same as contained on their report. The mobile
crime lab arrived and processed the scene as the R/Ds were collecting information from the
officers. The R/Ds then took the clothing discriptions and identification from the victims.
                          The scene is on West North Ave. and consists
                          of street level busniesses with residences
on the second floors. The street is four lanes wide and the sidewalk abuts with the street.
at 3428 W. North Ave is Star wars video store, on the sidewalk in front of this busniess
is Torrence WILEY. His head is to the South and at the curb of the street. His feet are to the
North. The torso of this victim is twisted to the right and his arms are outstreched. There
is a key ring with three keys next to the victims right hand. Torrence WILEY is wearing a
black sweater, black belt, grey pants, black under shorts, white socks with blue trim, and
white shoes.

                          The scene where Kevin WILEY is found is Approx.
                          20 Ft. East of where Torrence is found. This
location si at 3426 W. North Ave. This address is a vacant lot which was graded. There is
a sidewalk (Passageway) running North to South on the West edge of this lot and abuting with
the building at 3428 W. North Ave. The rest of this lot is dirt. Three shell casings are
found on the sidewalk (Passageway) Approx. 8 Ft. North of the North Ave sidewalk. There is
another casing in the dirt just to the East of these casings. Kevin WILEY is found on the
sidewalk of North Ave. lying tward the vacant lot with his head to the East and feet to the
West. He is lying on his back with his left arm along side his body and the right arm extended
above his head. There is a large quantity of blood running from the head to the street.
Kevin WILEY is wearing a black sweat shirt, purple Tee shirt, black belt, blue jeans, purple
under shorts, grey socks with blue and red trim, and white grey and black gym shoes.
                          The R/Ds were then informed that paramedics
                          were at the scene prior to the R/Ds arrival
and had moved the bodies of the victims to some extent.
                          As the R/Ds were conducting this part of the
                          investigation Det. Dickinson of this command
was conducting a canvass of the area and interviewing the person who called the police
NEGRON, the witness in this case.

Continued to page four...

DETECTIVE DIVISION                                          25 May 90
AREA FIVE VIOLENT CRIMES                                    N 234 297

WILEY, Torrence
WILEY, Kevin
MURDER FIRST DEGREE                                         Page Four

INVESTIGATION Cont..                    The R/Ds then proceeded to the office of the
                                        ME to ascertain the injuries to the victims.
and get the physical statistics. The results of this examination are contained in the format
of this report. The R/Ds were then met by Det. Dickinson who gave the R/Ds the results of his
canvass which are as follows.

                                        NEGRON, Isabella the witness in this case
                                        related that she heard three shots, looked out
the window and saw a body on the sidewalk across the street. She called the police.
                                        GONZALEZ, Jenny F/WH 21yrs DOB ████████
                                        3443 W. North Ave Ph 276-7241. Related that
she heard a shot followed by a pause then three shots fired in succession. She didn't look
out untill police arrived.

                                        FELACIANO, Aurelio M/WH 36yrs DOB ██████████
                                        3425 W. North Ph 486-7457. Related that he
was asleep and didn't see or hear anything.

                                        WINSON, Nelson M/W 37yrs DOB ██████████
                                        3406 W. North Ave. Night Mgr. DUK'S Ph 384-459
Related that he starts at 0001 hrs and he didn't see or hear anything.

                                        The following addresses on North Ave were no
                                        answers.
                                        3428 W. North
                                        3423 W. North
                                        3420 W. North
                                        3417 W. North
                                        3419 W. North
                                        3432 W. North

                                        The R/Ds then proceeded to this office and
                                        attempted to confirm the identities of the
victims and notify relatives. The addresses listed in the format of this report are the
last known addresses of the victims. The address at 11 S. Parkside was answered by a resident
who denied knowing the victim Torrence. Kevin's address at 3334 W. Maypole is a multi unit
building and entry could not be gained.
                                        END

Det Boyle 14633
Det R.S. Tapkowski 15665

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 30

**UPPLEMENTARY REPORT**
CAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE–TIME**
| DAY | MO. | YR. |
|---|---|---|
| 03 | JULY | 1990 | 2200 |

| FFENSE CLASSIFICATION LAST PREVIOUS REPORT | 1 UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| BATTERY/AGGRAVATED—HANDGUN | 041A | 4028 W. Wabansia | 2532 |

CTIM'S NAME AS SHOWN ON CASE REPORT: MOLINA, Oscar

CORRECT ☒1 YES ☐2 NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27.

**6. FIRE RELATED** ☐1 YES ☒2 NO — **7 BEAT ASSIGNED** 5533

| PE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | | 1 LOCATION CODE | 9. NO. OF VICTIMS | 10.NO. OF OFFENDERS |
|---|---|---|---|---|
| Street | | 304 | 3 | 2 |

Narrative section:

**FIELD INVESTIGATION** — PROGRESS REPORT

**VICTIM:** #1—MOLINA, Oscar nmi M/WH/18, DOB ▮▮▮▮ SS▮▮▮

2269 N. Kedzie 2nd Fl., N/P, Single, Unemployed

Self admitted member of "Y.O.L.D" street gang name "JUNEBUG"

I.R.# 894 931

**ADDITIONAL VICTIMS:** #2—VALE, William nmi M/WH/21, ▮▮▮▮, SS# ▮▮▮

1818 N. Pulaski 1st Fl., Ph#276-8835 (freind's#),

I.R.# 841 886

Single, Unemployed, former "YLOD" member name "WILLIE"

| EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| | DAY 04 | MO. JULY | YR. 199) | 0800 | J. HEALY | 1393 |

| NORMAL DISTRIBUTION | | SIGNATURE John Healy |
|---|---|---|

| REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. |
|---|---|---|---|
| Det. L.G. Holec | 17155 | | |

SIGNATURE: B Holec

95. DATE APPROVED (DAY–MO.–YR.) 4 Jul 90 2355

0-11,411-B (Rev. 8/85) *MUST BE COMPLETED IN ALL CASES

MAYSONET 9596

RD# N 303 - 737
04 JULY 1990

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES

PAGE 2

BATTERY/AGGRAVATED-HANDGUN          (041A)
MOLINA, Oscar                        (3)


ADDITIONAL VICTIMS (cont):    #3--VALENTIN, Martin  M/WH/19, DOB ████████ SS#█████████
                              4637 W. Shakespeare house Ph#237-0056,Single,Unemployed
                              Member "Y,L.O.D."s name: :RICK" - I.R.#865 330

WANTED:                       #1--UNKNOWN (possibly "KING LEO" member of LATIN KINGS)
                              M/WH/20-22 yoa  6', 175 lbs., black hair worn short or
                              combed straight back, mustache, goatee  NFD

                              #2--UNKNOWN  M/WH  NFD

INJURIES:                     Victim #1--MOLINA: GSW T&T right upper arm, GSW right
                                         side rib cage, GSW right lower back - possible
                                         exit wound.
                              Victim #2--VALE : GSW T&T left upper arm, GSW T&T right
                                         forearm

                              Victim #3--VALENTIN : GSW lodged upper left thigh

                              All victims listed in GOOD condition

TAKEN TO:                     All victims initially taken to Belmont Hospital via
                              friends - victim #3--VALENTIN subsequently transferred
                              to C.C.H. trauma unit ward #32.
                              Treated by Dr. Delmundo at Belmont Community hospital
                              Treated by Dr. Pursell at C.C.H.

WEAPON:                       Possible .9 mm semi-automatic handgun - NOT RECOVERED

LOCATION:                     4028 W. Wabansia - on the street

DATE & TIME:                  Tuesday 04 July 1990 at 2200 hrs.

WEATHER & LIGHTING:           Clear, seasonally hot/humid, mid-80's, good artificial
                              overhead street lighting.

MANNER/MOTIVE:                "Drive-By" shooting / possibly gang related.

VEHICLE USED:                 Possible 1983/84 Buick Regal 2-Dr., white w/half blue
                              vinyl top on back NO LICENSE information

EVIDENCE:                     Three (3) spent cartridge cases (possibly .9 mm)
                              Overall photos of scene
                              Recovered/Inventoried by Crime Lab 9601

NOTIFICATIONS:                All proper notifications made by MB2522

R.D.# N 303 - 737

CONTINUED TO PAGE 3                           MAYSONET 9597

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES

PAGE 3

04 JULY 1990

BATTERY/AGGRAVATED-HANDGUN    (041A)
MOLINA, Oscar    (3)

PERSONNEL ASSIGNED:

MB2522
P.O. J. Fuller    #7650    025th District
P.O. B. Hoffman #9096          "
(Original Investigating Officers)

MB2520
Sgt. D. Koplitz #1585    025th District
(District Field Supervisor)

MB2530
Sgt. D. Malinski #679    025th District
(District Field Supervisor)

CL9601
Tech. J. Butler #10448    Mobile Crime Lab
Tech. R. Ricks #7361          "
(Processed Crime Scene)

DD5533
Det. L.G. Holec #17155    A/5 Violent Crimes
(Investigating Detective)

WITNESSES:

NELSON, Phillip    M/W/21 DOB ▓▓▓▓ ,SS# ▓▓▓▓
1910 N. Kedzie 1st Fl., N/P, WkPh#384-3666 , Employed
as stock clerk @ Accurate Metal - 2338 N. Milwaukee
Admitted member Y.L.O.D. street gang name "White Boy"

HERNANDEZ, Robert    M/WH/18 DOB ▓▓▓▓ ,SS# ▓▓▓▓
4141 W. Dickens 2nd Fl., Ph#384-3666 (friend's WkPh#) 489-7924
Admitted member Y.L.O.D. street gang name "Rob"

INVESTIGATION:

The R/D was assigned by Sgt. J. Healy #1383 of this
command to the investigation of an Aggravated Battery -
"Drive By" shooting with three victims at the Belmont hospital. The R/D received that
assignment on 04 July 1990 at 0040 hrs. The original investigating officers had completed
their tour of duty and were not available. The R/D obtained a copy of the original
case report and proceeded to the Belmont hospital.

The R/D spoke with attending physician Dr. Delmundo
who related the above described the victims wounds and
conditions (see INJURIES category). Dr. Delmundo went on to say that the victim Martin
VALENTIN had been transferred to Cook County hospital in anticipation of a surgical
procedure that could not be performed at the Belmont hospital.

The R/D then proceeded to interview the victims and the
witnesses who were at the Belmont hospital.

CONTINUED TO PAGE 4

MAYSONET 9598

DETECTIVE DIVISION
AREA 5 VIOLENT CRIMES

RD# N 303 - 737
04 JULY 1990

PAGE 4

BATTERY/AGGRAVATED-HANDGUN        (0431A)
MOLINA, Oscar                      (3)

INVESTIGATION (cont):

Both Oscar MOLINA and William Vale related essentially the same account of the above captioned incident. Their accounts are recorded in essence and not verbatim.

Oscar MOLINA

William VALE

Related that on 3 July 1990 at approximately 2200 hrs they and friends were standing on the sidewalk/parkway on the north side of Wabansia at Keystone (indicating approximately 4028 W. Wabansia). At that time a white Buick Regal (see VEHICLE USED category) was observed W/B on Wabansia. As that vehicle approached MOLINA, VALE and their companions the vehicle slowed down. The passenger (see WANTED category #1) brandished a handgun (NFD) and without provocation fired that weapon twice. As the pedestrians began to flee the passenger fired that handgun at least five (5) more times.

As the offenders vehicle sped W/B on Wabansia to S/B Karlov the victims realized they were shot and were all transported to the Belmont hospital by friends.

Although neither MOLINA nor VALE could provide a description of the driver MOLINA went on to say that a group photo of LATIN KINGS was shown to him and MOLINA made a tentative identification of one of the persons in that photo as the shooter.

It should be noted that the person picked out of that photo has yet to be identified by name.

The R/D then proceeded to interview the available witnesses Phillip NELSON and Robert HERNANDEZ. Their accounts are recorded in essence and not verbatim.

Phillip NELSON

Related that on the date and time in question he was with friends on the sidewalk/parkway at Wabansia and Keystone. At that time a 1983/84 white Buick Regal w/rear half blue landau top was W/B on Wabansia. As that vehicle approached NELSON and his companions the vehicle slowed down. NELSON was able to see the passenger and not the driver. NELSON described the the passenger as a M/WH/20-22 appeared to be tall at least 5'11", 170 lbs., short black hair combed back and had a mustache and goatee.

NELSON went on to say that the above described passenger brandished a handgun (NFD) from within the auto and fired two (2) rapid shots followed immediately by approximately six (6) more shots fired in rapid succession. The offenders vehicle sped W/B on Wabansia to S/B Karlov. NELSON then aided in transporting the wounded to the Belmont hospital.

NELSON had also viewed the same photo as had MOLINA and tentatively identified the same M/WH dressed in a white sweatshirt w/"Leo" in script over a indistinguishable muti-colored design.

MAYSONET 9599

AREA 5 VIOLENT CRIMES                                                04 JULY 1990

PAGE 5


BATTERY/AGGRAVATED-HANDGUN        (041A)
MOLINA, Oscar                     (3)


INVESTIGATION (cont):

Robert HERNANDEZ                    Related essentially the same account as did NELSON.
                                    HERNANDEZ went on to say that he had provided the
above mentioned photo.  HERNANDEZ obtained that photo some time ago from a female friend
who was a former girlfriend of a LATIN KING.

                                    The R/D proceeded to the 014th district tactical
                                    offices in an attempt to identify by name the person
in the above captioned photo.  The R/D's check of nickname and photo files proved negative.

                                    While en route to the C.C.H. the R/D stopped at the scene
                                    of the above captioned incident.  The scene was the street
and sidewalk area of 4028 W. Wabansia.  That area is residential with a playlot on the S/W
corner of Wabansia and Keystone and a church on the N/W corner.

                                    The scene had been processed prior to the R/D's arrival
                                    by the Mobile Crime Lab who had recovered spent cases
and took overall photos of the scene.  The R/D noted two separate pools of apparent blood
one on the sidewalk and one on the soil parkway.  Nothing else of evidentiary value or any
additional witnesses could be located.

                                    The R/D proceeded to the Cook County hospital and was
                                    able to interview the victim Martin VALENTIN who related
the following account of the above captioned incident.  His account is recorded in essence.

Martin VALENTIN                     Related that he was present on the sidewalk during
                                    the above captioned incident.  At that time he was
conversing with a female companion.  VALENTIN heard several gunshots and began to run.
While he was fleeing for his safety he realized he was shot in the leg and then heard
additional shots from the same direction.

                                    VALENTIN went on to say that he did not observe any
                                    auto or offender.

                                    The above mentioned photo will be maintained by A/5 V.C.
                                    in attempts to identify the person in that group
photo.

                                    THIS INVESTIGATION REMAINS IN PROGRESS...


REPORT OF:
Det. L.G. Holec #17155              AREA 5 VIOLENT CRIMES

MAYSONET 9600