*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 31

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT-CRIMINAL DIVISION

2

3   THE PEOPLE OF THE STATE OF        )
    ILLINOIS,                          )
                                       )
4            Plaintiff,                )
                                       )
5   vs.                                )    No. 92 CR 10146
                                       )
6   JOSE MAYSONET and CHRISTOPHER      )    Charge:  Murder
    GOSSENS,                           )
7                                      )
             Defendants.               )
8   - - - - - - - - - - - - - - - - - - - - - - - )

9                        REPORT OF PROCEEDINGS had at the

10  hearing of the above-entitled cause before the

11  Honorable LORETTA HALL MORGAN, judge of said Court, on

12  the 10th day of January, 1995, at the hour of 11:00

13  a.m.

14       PRESENT:

15            HON. JACK O'MALLEY
              State's Attorney of Cook County, by
16            MR. FRANK MAREK and
              MS. ELLEN MANDELTORT
17              Assistant State's Attorneys
                Appearing on behalf of the Plaintiff;

18

19            HON. RITA FRY
              Public Defender of Cook County, by
              MR. KEVIN FOSTER
20              Assistant Public Defender
                Appearing on behalf of Mr. Gossens;

21

22            MR. RANDY RUECKERT
                Appearing on behalf of Mr. Maysonet.

23  Paul W. O'Connor
    Official Court Reporter
24  Circuit Court of Cook County
    County Department

1

CCSAO002571

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

I N D E X
MOTION TO QUASH ARREST (Maysonet)

Date:   January 10, 1995

| WITNESS | DX | CX | RDX | RCX | FD | FC |
|---|---|---|---|---|---|---|
| ROLAND PAULNITSKY | 6 | 10 | 17 | | | |
| JOSE MAYSONET | 32 | 34 | | | | |
| FERNANDO MONTILLA | 50 | 59 | | | | |

| | |
|---|---|
| Defendant Maysonet Sworn to Motion | 5 |
| Petitioner Rests | 50 |
| Motion for Directed Finding | 50 |
| Respondent Rests | 64 |
| Arguments on the Motion | 64 |
| Ruling on the Motion | 74 |

2

CCSAO002572

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    THE CLERK:  People versus Jose Maysonet.

2    MS. MANDELTORT:  We are passing for motions.

3  I believe the defense, Mr. Rueckert, is here and

4  stated he will be ready.

5    I told Mr. Reuckert likely about 1:00,

6  1:30.

7    ********************************

8    THE CLERK:  Christopher Gossens and Jose

9  Maysonet.

10    MR. FOSTER:  This is Christopher Gossens to

11  my left.  My name is Kevin Foster, assistant public

12  defender.

13    THE COURT:  Mr. Gossens, when we get a

14  resolution on Maysonet murder --

15    MS. MANDELTORT:  How about if we give it a

16  relatively brief date.

17    MR. FOSTER:  That's fine.

18    MS. MANDELTORT:  January 26?

19    MR. FOSTER:  That looks good.

20    MS. MANDELTORT:  If we got a trial date or

21  something in the interim, I will contact counsel

22  before we set that date and hold that over.

23    THE COURT:  1-26.  Mr. Gossens, sheet 12

24  line 10, by agreement, 1-26-95, status.  He only

CCSAO002573

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   appears on the sheet once I believe. He has only this

2   case.

3             MR. GOSSENS: Yes, ma'am.

4             MR. FOSTER: Yes.

5             THE COURT: Is she on her way?

6             MS. MANDELTORT: I called for one at 1:15.

7   I said -- called again, they said they would page the

8   interpreter.

9             THE COURT: Let's give it a few minutes.

10             Jose Maysonet, in custody, please.

11             THE COURT: The interpreter make his name of

12   record in the case of Jose Maysonet. In motion to

13   quash.

14             THE INTERPRETER: For the record, Fredrico

15   Rodriguez.

16             THE COURT: Official court interpreter?

17             THE INTERPRETER: Yes, judge.

18             THE COURT: Very well. Mr. Maysonet, have a

19   seat at counsel table.

20             MR. RUECKERT: So the record's clear and

21   pursuant to our conversation with the state's

22   attorney, we have submitted a motion that in fact is

23   one motion that has two motions incorporated.

24             So for the Court's purposes, if the Court

CCSAO002574

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    would consider paragraphs one through five as our

2    motion to quash the arrest, for lack of probable

3    cause, and therefore to suppress any evidence that may

4    result from that arrest, we would proceed on that.

5         If the court would then take the rest of

6    the written motion, paragraph 6 through 11:00, as a

7    motion to suppress statements, and the state can go

8    ahead on that.  Is that right?

9         MS. MANDELTORT:  That's fine.  I would ask

10   the defendant be sworn to the motion, judge, prior

11   to.

12        THE COURT:  Have him stand and have the

13   defendant sworn to the motion.

14        (Defendant sworn to the motion)

15        MS. MANDELTORT:  We have a motion to exclude

16   witnesses.  There are witnesses present in the

17   courtroom, I don't know.

18        MR. RUECKERT:  They are not witnesses.

19        THE COURT:  There has been a motion to

20   exclude, which has been granted.  Anyone that's going

21   to testify in these proceedings may not be present in

22   the courtroom for the testimony of any other

23   witnesses.

24        MR. RUECKERT:  We call Roland Paulnitsky.

CCSAO002575

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       MS. MANDELTORT:  Detective.

2          (Witness sworn)

3       THE COURT:  You may proceed.  I assume there

4  was no opening statements by either side.

5       MR. RUECKERT:  No.

6       MR. MAREK:  No, your Honor.

7          ROLAND PAULNITSKY,

8  called as a witness herein, having been first duly

9  sworn, was examined upon oral interrogatories and

10  testified as follows:

11          DIRECT EXAMINATION

12          by Mr. Rueckert:

13       Q.   Tell the Court your name and spell your last

14  name?

15       A.   Detective Roland Paulnitsky,

16  P-a-u-l-n-i-t-s-k-y.

17       Q.   How are you employed, Mr. Paulnitsky?

18       A.   I'm detective of police, assigned to Area 5

19  detective division.

20       Q.   How long have you been over there?

21       A.   12 years, sir.

22       Q.   You were there in 1990, is that right?

23       A.   Yes, sir.

24       Q.   What's your star number?

CCSAO002576

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   20709.

2      Q.   Are you familiar with my client, Juan

3   Maysonet, sitting right here?

4      A.   Yes.

5      Q.   I want to call your attention to August 22,

6   1990.

7           Did you have occasion at about 9:00

8   o'clock or 9:30 in the morning on that date,

9   August 22, 1990, to take Mr. Maysonet into custody?

10      A.   Not at that time.  It was later in the day.

11      Q.   How much later was it?

12      A.   I believe it was perhaps 11:00 or 11:15.

13      Q.   Where did you first run into Mr. Maysonet on

14   that day?

15      A.   I was walking into the building, into this

16   building.

17           However, I was on a public sidewalk.

18      Q.   Okay.  What time was that?

19      A.   Around 11:00, 11:15.

20      Q.   That's when you first encountered

21   Mr. Maysonet?

22      A.   Yes.

23      Q.   You then had occasion to take him into

24   custody, is that correct?

CCSAO002577

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   Yes, I did.

2      Q.   From here you transported him or at least

3 some Chicago police officers transported him to

4 Area 5, right?

5      A.   Subsequently, after I had contact with him,

6 I brought him back into the building, and went to the

7 third floor, which was the police room at the time.

8      Q.   At that time, officer, did you have a

9 warrant for Mr. Maysonet's arrest?

10     A.   No.

11     Q.   And just prior to your taking him into

12 custody, did he commit or had he committed any crimes

13 in your presence?

14     A.   Not in my presence.

15     MR. RUECKERT:  I have nothing further.

16     THE COURT:  Counsel, if you would clarify

17 before you start, Mr. Marek, clarify for the court

18 whether Mr. Maysonet was arrested outside of this or

19 inside of this building, and was he arrested outside

20 and then subsequently brought into the building or was

21 he arrested on the sidewalk outside of the building.

22       It's not clear to me from the testimony.

23     MR. RUECKERT:  Q   Detective, where did you

24 first encounter Mr. Maysonet?

CCSAO002578

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE WITNESS:  A   Outside on the public

2  sidewalk.

3      Q.   Did you have occasion at some point to take

4  him back into this building?

5      THE COURT:  Counsel, it's going to be the

6  same problem.  Encounter, what does encounter mean.

7      Did he arrest him out there?

8      MR. RUECKERT:  Judge, I suppose that's up to

9  the Court's interpretation.

10     THE COURT:  I don't know what encounter

11 means.  You can see somebody and that's an encounter.

12 I have no idea.

13     MR. RUECKERT:  Q   Did you require

14 Mr. Maysonet to go back in the building with you from

15 the outside?

16     THE WITNESS:  A   Yes.

17     Q.   So when you first encountered Mr. Maysonet,

18 from that point on he was not free to leave your

19 custody, is that right?

20     A.   As I approached him, I told him who I was.

21 I explained a few things to him and he agreed to

22 voluntarily assist my investigation back at the Area 5

23 detective division.

24     Q.   My question is, from the time you

9

CCSAO002579

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    encountered him outside, he was not free to leave your

2    custody, was he?

3        A.    That question never came up at the time.

4        Q.    If he had said officer, I want to leave,

5    would you have let him leave?

6        A.    I believe I would not.

7            MR. RUECKERT:   Thank you.

8                    CROSS EXAMINATION

9                 by Mr. Marek:

10       Q.    Detective, back in August of 1990, you were

11   assigned to Area 5 violent crimes?

12       A.    Yes.

13       Q.    And were you familiar with the investigation

14   of the murders of the Wiley brothers which had

15   occurred on May 25 of 1990?

16       A.    Yes.

17       Q.    And were you familiar with how the

18   investigation had proceeded up to that date?

19       A.    Yes.

20       Q.    And did those murders occur in the vicinity

21   of North Avenue and Kedzie?

22       A.    Yes.

23       Q.    You were familiar with that fact?

24       A.    Yes, sir.

CCSAO002580

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.    Was a 9-millimeter -- were you familiar with

2    the fact that a 9-millimeter weapon was used to kill

3    the Wiley brothers?

4          A.    Yes.

5          Q.    Detective, Mr. -- the defendant Mr. Maysonet

6    had been placed under arrest for an unrelated offense

7    on July 15 of 1990, is that correct?

8          A.    Yes.

9          Q.    You were not -- did you not participate in

10   that arrest, is that correct?

11         A.    That's correct.

12         Q.    Were you familiar with an interview

13   conducted by Sergeant Mingey in the presence of

14   Detective Montilla, with the defendant Jose Maysonet

15   on July 15, 1990?

16         A.    I was.

17         Q.    Were you familiar with the substance of that

18   interview?

19         A.    Yes.

20         Q.    And did you know that on July 15, of 1990,

21   the defendant Jose Maysonet had told Sergeant Mingey

22   and Detective Montilla that he had knowledge of the

23   murder of the Wiley brothers?

24         A.    Yes.

CCSAO002581

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    MR. RUECKERT:  I'm going to object to the

2 form of that question.

3    THE COURT:  You may redirect.

4    MR. MAREK:  Q  And were you familiar,

5 Detective Paulnitsky, that during this interview on

6 July 15, 1990, Mr. Maysonet had told Sergeant Mingey

7 and Detective Montilla that he had supplied the gun

8 for the murder of two black youths on Kedzie?

9    THE WITNESS:  A   Yes.

10    Q.   Or on North Avenue?

11    MR. RUECKERT:  Same objection.

12    THE COURT:  What's the basis of the

13 objection.

14    MR. RUECKERT:  He's leading the witness.

15    THE COURT:  It's cross-examination,

16 counsel.

17    MR. RUECKERT:  To the facts in the

18 statement?

19    THE COURT:  It's cross-examination.  It's

20 the nature of cross-examination.  That's where leading

21 is allowed.

22    MR. MAREK:  Q  Were you familiar with that,

23 detective?

24    THE WITNESS:  A   Yes, sir, I was.

12

CCSAO002582

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.    Were you familiar with the fact that on

2     July 15 of 1990, Mr. Maysonet was charged in

3     connection with 3 unrelated shootings?

4          A.    I was.

5          Q.    And were you familiar that the weapon used

6     in those 3 unrelated shootings was a 9-millimeter

7     caliber weapon?

8          A.    I was.

9          Q.    Detective, were you also familiar with the

10    fact that there was a subsequent interview of the

11    defendant Jose Maysonet on August 1 of 1990, by

12    Sergeant Mingey and again Detective Montilla?

13         A.    Yes, sir.

14              THE COURT:  What date was that, August 1?

15              MR. MAREK:  August 1 of 1990.

16         Q.    You were familiar with that, detective?

17              THE WITNESS:  A    Yes, sir.

18         Q.    Were you familiar with the fact that during

19    this interview, the defendant Jose Maysonet told

20    Sergeant Mingey and Detective Montilla that he was

21    involved in the murders of the Wiley brothers on North

22    Avenue?

23         A.    Yes, sir.

24         Q.    Were you familiar with the fact that at this

13

CCSAO002583

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    time, he also -- he Mr. Maysonet -- also told Sergeant

2    Mingey and Detective Montilla that he was not the

3    shooter, but was present when the Wiley brothers were

4    killed?

5        A.    Yes.

6        Q.    Were you familiar with the fact that

7    Mr. Maysonet also told Detective Montilla and Sergeant

8    Mingey during this interview that he had supplied the

9    weapon used to commit these murders?

10       A.    Yes.

11       Q.    This interview had occurred at the Cook

12   County jail, is that correct?

13       A.    It did.

14       Q.    To the best of your knowledge?

15       A.    Yes.

16       Q.    Now when you saw Mr. Maysonet on -- outside

17   this building on August 22 of 1990, did you have any

18   knowledge prior to that date that Mr. Maysonet was

19   anywhere other than in Cook County jail?

20       A.    I was under the impression he was still

21   incarcerated.

22       Q.    And am I correct that you first knew that he

23   was not incarcerated when you saw him outside this

24   building?

14

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
1        A.    That's correct.

2        Q.    And it was at that time that you asked him

3   if he would assist further in this investigation, is

4   that correct?

5        A.    Yes.

6        Q.    You did not formally place him under arrest

7   at this building?

8        A.    No, I did not.

9        Q.    Detective Paulnitsky, you said when you saw

10  Mr. Maysonet, you were on your way into the building,

11  is that correct?

12       A.    Yes.

13       Q.    And specifically where did you see

14  Mr. Maysonet?

15       A.    Outside on the sidewalk that runs parallel

16  to California Avenue.

17       Q.    Was he standing there, was he walking, what

18  was he doing?

19       A.    He was walking eastbound.

20       Q.    Out of the building?

21       A.    Eastbound down the stairs to the sidewalk,

22  where I encountered him.

23       Q.    So he was coming away from the building?

24       A.    He was walking eastbound towards the street,
```

CCSAO002585

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     away from the building.

2          Q.   His back -- as he was walking, his back was

3     to the building?

4          A.   That's correct.

5          Q.   You were not familiar at that time with any

6     court dates or any court appearance required by

7     Mr. Maysonet in this building at that time, is that

8     correct?

9          A.   No.

10         Q.   If I may have a moment, your Honor.

11               Detective Paulnitsky, were you surprised

12    to see Mr. Maysonet walking from this building on that

13    day?

14         A.   I think I was more shocked than surprised.

15         Q.   And Mr. Maysonet had been charged in

16    connection with 3 shootings, is that correct?

17         A.   That's correct.

18         Q.   And you were aware of the statements he had

19    given about his involvement in the double homicide --

20         A.   Yes, I was.

21         Q.   -- in addition to that?

22         A.   Yes.

23         Q.   When you answered Mr. Rueckert's question

24    that if, if Mr. Maysonet had asked to leave, you would

16

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    not have allowed him to do so, is that the reason?

2         A.    If he would have asked not to, I would have

3    placed him in custody right then and there.

4         Q.    Detective Paulnitsky, at any time on

5    August 22 of 1990, did Mr. Maysonet ask to go to any

6    courtroom in this building to wait for his attorney?

7         A.    No, sir.

8         Q.    Did he ever ask for an opportunity to

9    discuss anything with his attorney or any attorney?

10        A.    No, sir.

11        Q.    Was Mr. Maysonet handcuffed at any time by

12   you?

13        A.    I did not have handcuffs that day.

14              MR. MAREK:  No further questions, your

15   Honor.

16                    REDIRECT EXAMINATION

17                    by Mr. Rueckert:

18        Q.    You had your service revolver, did you not?

19        A.    No, I did not.  I had a off-duty weapon.

20        Q.    An off-duty weapon?

21        A.    Yes, sir.

22        Q.    A revolver?

23        A.    Yes, sir.

24        Q.    And you showed him your star, right?

17

CCSAO002587

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.  Yes, I did.

2      Q.  And you told him who you were, right?

3      A.  Yes, I did.

4      Q.  As you told us, you wouldn't have let him

5  leave even if he wanted to?

6      A.  That question never came up, but I would

7  have denied him to leave.

8      Q.  Now, you told Mr. Marek about the fact that

9  in the triple attempt murder, for lack of a better

10  term, a 9-millimeter weapon was used, right?

11      A.  Yes.

12      Q.  Now you recovered cartridges or cartridges

13  were recovered from that shooting, correct?

14      A.  Yes, there was.

15      Q.  Bullets were recovered from that shooting,

16  right?

17      A.  The exact what was recovered, I would have

18  to look at that report, but there was from what I saw

19  9-millimeter cartridges.

20      Q.  Suitable for comparison?

21      A.  I don't recall at this time.

22      Q.  Well, this is now January of '95.

23         Have you done any more investigation on

24  the murder?

18

CCSAO002588

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

 1          MR. MAREK:  Objection.

 2          THE COURT:  Sustained.

 3          MR. RUECKERT:  Do you know now --

 4          THE COURT:  The issue is not what he knows

 5    now.  The issue is what he knew back then.

 6          MR. RUECKERT:  I'm asking a different

 7    question.

 8          THE COURT:  You said do you know now.

 9          MR. RUECKERT:  Q  Are you telling us you

10    don't know if there were cartridges or bullets

11    recovered from the triple attempt murder that were

12    suitable for comparison?

13          MS. MANDELTORT:  Objection, judge.

14          THE COURT:  Sustained.

15          MR. RUECKERT:  Q  On August 22 did you

16    know?

17          THE WITNESS:  A  Yes, I did.

18      Q.   That they were suitable for comparison?

19      A.   I don't recall.  I know that I saw the

20    evidence request.

21      Q.   Well, I guess incumbent in that, then, is

22    you don't know and you didn't know on August 22, if

23    the gun used in the double murder was the same gun

24    used in the triple attempt murder, do you?

CCSAO002589

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   A.   I knew that there was a 9-millimeter.

2   Q.   That's not my question.  You don't know if

3   it's the same gun?

4   A.   I don't recall at this time.

5   Q.   You didn't know on August 22 if it was the

6   same gun?

7   A.   On August 22, all the submitted facts, I was

8   aware of at that time about the weapons.

9   Q.   Do you understand my question?

10   A.   Yes, I do.

11   Q.   My question is pretty simple.

12       Did you know on August 22, 1990, if the

13   gun used in the double murder was the same gun used in

14   the attempt murder?

15   A.   I don't recall.

16   Q.   You don't recall or you didn't know?

17   A.   At the time --

18       MS. MANDELTORT:  Objection, asked and

19   answered.

20       THE COURT:  Sustained.  He answered the

21   question.  I don't recall means I don't recall.

22       MR. RUECKERT:  But I wanted to know if he

23   doesn't recall if he knew.

24       THE COURT:  Counsel, I sustained the

20

CCSAO002590

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    objection.

2              MR. RUECKERT:   Q   Are there any reports,

3    Detective Paulnitsky, in the file, that would indicate

4    to you whether or not that comparison was made prior

5    to August 22, 1990?

6         A.   There should be reports in the file, sir.

7         Q.   Did you review those reports before you came

8    here today, before you testified?

9         A.   I haven't reviewed this file, no, sir.

10        Q.   So you don't know as you sit there whether

11   that comparison was made?

12        A.   At this time, I don't recall if it was or

13   not, sir.

14        Q.   The double murder occurred in May of 1990,

15   is that right?

16        A.   Yes, sir.

17        Q.   And according to your testimony today,

18   Mr. Maysonet made some statements on the 15th of July,

19   right?

20        A.   Yes, sir.

21        Q.   And on August 1, right?

22        A.   Yes, sir.

23        Q.   Did you ever attempt to get an arrest

24   warrant for Mr. Maysonet after July 15, for the double

21

CCSAO002591

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  murder?

2       A.    I did not.

3       Q.    Did anybody from Area 5?

4       A.    No.

5       Q.    After August 1, after he apparently made

6  this second statement, did you ever attempt to get an

7  arrest warrant for Mr. Maysonet for the double murder?

8       A.    I did not.

9       Q.    Did anybody from Area 5?

10      A.    I believe not.

11      Q.    Was there ever an arrest warrant obtained

12  for Mr. Maysonet for the double murder?

13      A.    There was not.

14      Q.    Now, I am looking at a police report that

15  appears to be authored August 23, 1990.  I will show

16  it to you.  I'll mark it Defendant's Exhibit No. 1 for

17  purposes of the motion.

18            May I approach the witness?

19            THE COURT:  Yeah.

20            MR. RUECKERT:  Q   Thank you.  Now I

21  understand that's page 4 of a report.

22            Do you need to see the end page to know if

23  you authored that or partly responsible for authoring

24  that report?

22

CCSAO002592

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1            THE WITNESS:   A    I did not author this
 2    report.
 3            Q.    I'm going to show you what's been marked as
 4    Defendant's No. 2 for the purpose of this motion.   I
 5    believe that's the last page of that report, same
 6    report.
 7            A.    This appears to be page 8, sir.
 8            Q.    Right.
 9            A.    Of the same report.
10            Q.    Of the same report?
11            A.    Yes, sir.
12            Q.    On the bottom it has a listing of 5
13    different detectives, correct?
14            A.    Yes, sir.
15            Q.    Your name appears there, Detective
16    Paulnitsky, right?
17            A.    Number 4, sir.
18            Q.    Star 6503?
19            A.    At that time that was the star number.
20            Q.    Now, I take it from that that you
21    participated in the formation of this report.   May I
22    see the first page, sir.
23                  I'm showing you the state's copy of the
24    first page.   I'm not going to mark it because it's
```

23

CCSAO002593

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1    their copy.

 2         A.   Yes, sir.

 3         Q.   This also has your name on it, right?

 4         A.   Yes, it does.

 5         Q.   Down at the bottom, Paulnitsky?

 6         A.   Yes, sir.

 7         Q.   Does that indicate to you that you had

 8    something to do with the formation of that report?

 9         A.   I did not write this report, sir.

10         Q.   That's not my question.  Did you have

11    something to do with the formation of this report, the

12    information that's in this report?

13              MS. MANDELTORT:  Objection to the form of

14    question.

15              THE COURT:  Sustained to the form of the

16    question.

17              MR. RUECKERT:  Q   Well on page 4 it

18    indicates there was a statement made by Mr. Maysonet

19    to Sergeant Mingey and Montilla; page 4, Defendant's

20    Exhibit No. 1?

21              THE WITNESS:  A   Yes, sir.

22         Q.   That's the statement I take it you testified

23    about today?

24         A.   Yes, sir.
```

CCSAO002594

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.    You were not present on July 15, 1990 when

2     that statement was made, right?

3          A.    That's correct.

4          Q.    Below that in the next paragraph, it speaks

5     about a statement on August 1, 1990, again to Sergeant

6     Mingey and Detective Montilla, right?

7          A.    Yes, sir.

8          Q.    You were not present when that statement was

9     made either, were you?

10          A.    That's correct.

11          Q.    So don't have personal knowledge of those

12     statements?

13          A.    That's correct.

14               MS. MANDELTORT:   Objection as to the form of

15     question.

16               THE COURT:   Overrule.  It may stand.

17               MR. RUECKERT:   Q   You don't have personal

18     knowledge of those statements?

19               THE WITNESS:   A   Just what I was told.

20          Q.    What you were told.  Except for this page 4

21     of this report, that bears your name, is there any

22     other police report, any other writing that

23     memorializes those two statements?

24          A.    I believe not.

CCSAO002595

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    There wasn't a report drawn up or any

2  written document drawn up on the 15th, 16th of July or

3  thereafter by Sergeant Mingey or Montilla, right?

4      A.    Perhaps the GPR.

5           MS. MANDELTORT:  I would object.  This is

6  redirect at this point and I would object, judge.

7           THE COURT:  Well, it may stand for what it's

8  worth.

9           MR. RUECKERT:  Q   The same way about the

10  August 1 statement, there is no writing to memorialize

11  that, is there?

12      A.    Unless there is a GPR by them.

13      Q.    Did you ever find a GPR?

14      A.    I didn't look for one.

15      Q.    Do you know if one exists?

16      A.    I'd be guessing.

17           THE COURT:  Sustained, counsel.  He said he

18  doesn't know whether one was made by them.

19           MR. RUECKERT:  Q   When did Sergeant Mingey

20  and Detective Montilla tell you about these

21  statements?

22           THE WITNESS:  A   I was aware of the

23  statement on 15th of July, and I was also aware of

24  what was said on August 1.

26

CCSAO002596

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    I'm asking you how you became aware of

2  those?

3      A.    Verbal communication.

4      Q.    Between who?

5      A.    Ed Mingey.

6      Q.    On July 15, Sergeant Mingey told you.

7            Where did he tell you?

8      A.    At Area 5 detective division.

9      Q.    About what time?

10     A.    I couldn't say.

11     Q.    Did you write a note about that at that

12  time?

13     A.    I believe not.

14     Q.    On August 1, who told you about the

15  statement?

16     A.    Sergeant Mingey.

17     Q.    Where was that?

18     A.    Area 5, detective division.

19     Q.    What time?

20     A.    I'd be guessing.

21     Q.    Don't you remember?

22     A.    No, I don't.

23           MS. MANDELTORT:  Objection.

24           THE COURT:  Sustained.  He said he would be

CCSAO002597

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1    guessing.  Don't argue with the witness.
 2            MR. RUECKERT:  Q   You remember Sergeant
 3    Mingey told you, right?
 4            THE WITNESS:  A   I remember having
 5    conversations with him.
 6        Q.   And you remember it was in Area 5?
 7        A.   Yes, sir.
 8        Q.   But you don't remember the time?
 9            THE COURT:  Sustained.  He's answered that
10    question.
11            MR. RUECKERT:  Q   Did you write a note
12    about Sergeant Mingey telling you about that
13    statement?
14            THE WITNESS:  A   No, sir.
15        Q.   You made no attempts to go get an arrest
16    warrant at that point for Mr. Maysonet?
17            MS. MANDELTORT:  Objection, asked and
18    answered.
19            THE COURT:  Sustained.
20            MR. RUECKERT:  Q   I want you to look at
21    page 4 there, that Defendant's No. 2.  At the bottom
22    paragraph it says on August 22, 1990 --
23            THE COURT:  So I'm not confused, the
24    Defendant's 2 is the last page of the report.  Talking
```

28

CCSAO002598

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   about Defendant's 1, which is page 4.

2        MR. RUECKERT:  Q   That's right.  Page 4

3   again was authored August 23, right, 1990?

4        THE WITNESS:  A   Yes, sir.

5    Q.   That's after Mr. Maysonet's been arrested

6   and charged with this double murder, right?

7    A.   Yes, sir.

8    Q.   The bottom paragraph there, it says on

9   August 22, 1990, Detective R. Paulnitsky was in court

10  and saw that Jose Maysonet had made bond and was also

11  in court.

12       Now it's your testimony today that you met

13  him outside the building, right?

14   A.   Yes, sir.

15   Q.   So are you telling us you didn't see him in

16  court?

17       MS. MANDELTORT:  Objection, judge.

18       MR. RUECKERT:  Q   Did you see him in court?

19       THE WITNESS:  A   I saw him outside, sir.

20   Q.   My question is did you see him in court?

21       MS. MANDELTORT:  Objection, judge, asked and

22  answered.

23       THE COURT:  He may answer that for whatever

24  it's worth.  You may answer.

CCSAO002599

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE WITNESS:  A   No, I saw him outside,

2  sir.

3      MR. RUECKERT:  Q   I understand you're

4  testifying to you saw him outside.  I have a different

5  question.

6      My question is did you see him in court?

7      A.   No, I did not.

8      Q.   Were you there for court?

9      A.   That's why I was going into the building.

10     Q.   And the sentence says that saw -- that

11  Jose Maysonet had made bond, was also in court, was

12  that in error?

13     MS. MANDELTORT:  Objection.

14     THE COURT:  Sustained.  Counsel, he didn't

15  author that report.  So I don't think that's a proper

16  question.  He has stated he did not author it.

17     MR. RUECKERT:  Q   Detective Paulnitsky,

18  between August 1, 1990 and August 22, 1990, tell the

19  court in addition to the statement that was made on

20  August 1, 1990 to Sergeant Mingey, what additional

21  evidence did you have that implicated Mr. Maysonet in

22  those double murder?

23     THE WITNESS:  A   I only had the two

24  conversations that I was aware of.

30

CCSAO002600

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   So between July 15 and August 22, the only

2   information you had were those two statements?

3           THE COURT:  Sustained.  He just testified.

4   You don't need to repeat it.

5           MR. RUECKERT:  It's a different question,

6   but I will withdraw it.

7           THE COURT:  It's not a different question.

8   Any recross?

9           MR. MAREK:  No, your Honor.  We have nothing

10  else.

11          THE COURT:  He's not excused?

12          MS. MANDELTORT:  Right.

13          THE COURT:  Do not discuss it.  Do not

14  discuss your testimony with anyone.

15          MS. MANDELTORT:  Go back by the ante room by

16  chambers.  Don't go back into the juryroom.

17          MR. RUECKERT:  I'm going to call the

18  defendant.

19          THE COURT:  Mr. Maysonet, before you take

20  your seat, raise your right hand to be sworn, please.

21               (Witness sworn)

22

23

24

31

CCSAO002601

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
1                    JOSE MAYSONET,
2    called as a witness herein, having been first duly
3    sworn, was examined upon oral interrogatories and
4    testified as follows:
5                    DIRECT EXAMINATION
6                    by Mr. Rueckert:
7         Q.   Tell us your name and spell your last name
8    for the court reporter.
9         A.   Jose Maysonet.  You want my ID number?
10        Q.   No.  Can he spell it?
11        A.   J-o-s-e.
12        Q.   You're the defendant in this case, is that
13   right?
14        A.   Yes.
15        Q.   I want to call your attention to August 22,
16   1990.
17                  On that date, did you see the detective
18   that just testified in court today?
19        A.   I saw him in court.
20        Q.   Were you inside the building or outside the
21   building when you first saw him?
22        A.   Inside the building, at court.
23        Q.   Did you ever agree to go with that policeman
24   to Area 5 police headquarter?
```

CCSAO002602

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   No.

2      Q.   And when you left this building to go to

3  Area 5, were you handcuffed?

4      A.   When I went outside, he put me against the

5  wall outside the court.

6      Q.   Where did he first handcuff you?

7      A.   On the court hallway.

8           MR. RUECKERT:   Thank you.  I have nothing

9  further.

10          THE COURT:   Can I see counsels before cross

11  at the bench for a moment.

12                     (Discussion had off the record)

13          MR. RUECKERT:   Q   Mr. Maysonet, on

14  August 22, were you still in custody on August 22?

15          THE WITNESS:   A   No.

16     Q.   You had made bond, is that right, on your

17  other case?

18     A.   The 16th of August, yes.

19     Q.   You made bond?

20     A.   Yes.

21     Q.   And so you were on bond on August 22?

22     A.   Yes.

23     Q.   You were coming to court on August 22 for

24  your arraignment on that other case?

33

CCSAO002603

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    No, so I could be assigned to this lady, to

2   this judge.

3      Q.    You went first to Room 101, right?

4      A.    101.

5           THE COURT:  Thank you, counsel.  I

6   appreciate that.

7           Cross?  Sorry, Mr. Marek.  I wanted to get

8   that clarified.

9                    CROSS EXAMINATION

10                   by Mr. Marek:

11     Q.    Mr. Maysonet, which -- had you actually

12  appeared in court before your arrest?

13     A.    Yes.  On the 22nd of August I came here to

14  court before I was arrested.

15     Q.    Did you actually step up before the judge

16  and have your case called?

17          MR. RUECKERT:  I am only going to object

18  because I think if counsel could clarify in what court

19  he is talking about.

20          MR. MAREK:  I will rephrase it.

21          THE COURT:  I think that's a legitimate

22  request.

23          MR. MAREK:  Q   You had made bond on the

24  pending -- the case that was pending against you, is

34

CCSAO002604

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    that correct?

2              THE WITNESS:   A    Yes.

3       Q.    And the bond slip required your appearance

4    in this building on August 22, 1990, is that correct?

5       A.    Yes.

6       Q.    And it required you to appear in a specific

7    courtroom in this building?

8       A.    To 101.

9       Q.    Did you actually go into Room 101?

10      A.    Yes, I went to 101.

11      Q.    What happened in Room 101?

12      A.    I got there at 5 to 9:00.  About 10 minutes

13   later, the judge called me before him.

14      Q.    What happened then?

15      A.    He called me and gave me this pass.  And he

16   told me that I have to go to report to 302, to

17   Margaretta Morgan.

18      Q.    Did you report to Room 302?

19      A.    The judge gave me the pass.  I asked him if

20   I had to go today, and he said yes.

21              When I was going out the door, that's when

22   I told my family come with me.  I opened the door, the

23   detective was behind the door waiting for me.

24      Q.    So he was downstairs in courtroom 101?

35

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    A.    Yes.

2    Q.    And you were handcuffed outside courtroom

3 101 down on the first floor is your testimony?

4    A.    Yes.

5    Q.    So you never came up to the third floor and

6 never appeared before her honor Judge Morgan on

7 August 22 of 1990?

8    A.    Well, I wanted to come to court, but the

9 policeman didn't let me come to court.

10   Q.    But the policeman placing under arrest

11 stopped you from getting up here to courtroom 302,

12 correct?

13   A.    Yeah.   I told him I wanted to come to court

14 so I wouldn't be in trouble before judge, and my

15 attorney was waiting for me.

16   Q.    Now you said that your family members were

17 waiting for you outside courtroom 101.

18            Who were they, sir?

19   A.    My sister was there, my other girlfriend,

20 myself and a friend of mine.

21   Q.    The girlfiend, that Rosa Bellow (phonetic)?

22   A.    Yes.

23   Q.    And who was the other friend?

24   A.    It was another young man.   His name is

CCSAO002606

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  Pantoja.  I don't know his complete name.

2       Q.   Do you know how to spell his name?

3            P-a-n-t-o-j-a.

4            MS. MANDELTORT:  Let the record reflect the

5  defendant had taken a pen from the interpreter and

6  written something down for the interpreter.

7            THE INTERPRETER:  Interpreter words, he

8  wrote P-a-n-t-o-j-a-s.

9            MR. MAREK:  Q  Mr. Maysonet, the -- you

10 were out on bond on August 22 of 1990, correct?

11           THE WITNESS:  A   Yes.

12      Q.   So you had paid a certain amount of -- you

13 or someone on your behalf had paid a certain amount of

14 cash to secure your release from jail?

15      A.   I'm sorry, your Honor.  Counsel, your

16 question was --

17           MR. RUECKERT:  I will object to the

18 question.  I don't know how that's relevant.

19           THE COURT:  I will reserve.

20           MR. MAREK:  Thank you, judge.

21      Q.   Money had been posted on your behalf by

22 either yourself or some family to secure your release?

23           THE WITNESS:  A   Through my family.

24      Q.   That money was later turned over by you to

CCSAO002607

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    your attorney, Mr. Swano, is that correct?

2         A.    I saw him on the 18th of August of '90,

3    which was a Saturday, and I gave him the bond paper

4    and I signed it to him.

5         Q.    Sir, after your arrest on August 22 of 1990,

6    for the murder, you signed that money over in court to

7    Mr. Swano, is that correct?

8         A.    No, not in that court, in his office.

9         Q.    Well, when as you say, you did not appear

10   before Judge Morgan on August 22, 1990, you didn't

11   lose that money for not appearing in court, did you?

12         MR. RUECKERT:   I'm going to object to that,

13   too.   There is a lot of reasons why that could have

14   happened.

15         I don't see how any of them are relevant

16   to this.

17         MR. MAREK:   If I may, I think based on the

18   defendant's testimony, if what he says is true, there

19   should have been a bond forfeiture warrant issued by

20   this court when Mr. Maysonet --

21         THE COURT:   I was assuming that's where you

22   were going.

23         MR. RUECKERT:   That assumes the court was in

24   session, that assumes everybody was here.   That

CCSAO002608

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    assumes a lot of things that aren't in evidence, your

2    Honor.

3              THE COURT:  The court can certainly take

4    judicial notice of its own records.

5              MR. RUECKERT:  May I inquire then about your

6    record?

7              THE COURT:  The half sheet in this case?

8              MR. RUECKERT:  Is that your writing on

9    there?

10             THE COURT:  August 22, I was sitting.  I can

11   verify that.  A continuance was taken to August 27.

12   My clerk indicated that the parties were present on

13   August 27, it went over to August 28.

14             On August 28, Mr. Swano filed his

15   appearance finally.  The defendant was arraigned.

16             MR. RUECKERT:  That's not your writing

17   though, right?

18             THE COURT:  No, but it's my clerk's writing

19   and I don't have any reason to think that she conjured

20   me up on the 22nd, but I can certainly check to see

21   with the chief judge that -- to see if I wasn't

22   sitting that day.

23             MR. RUECKERT:  Our information is you were

24   not so, that's why it's important.

CCSAO002609

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          THE COURT:  Where did you get that

2     information?

3          MR. RUECKERT:  Our investigation reveals you

4     were on vacation that week.  That's why nothing

5     happened in this courtroom on the 22nd.

6          THE COURT:  I don't know, counsel.  I'm

7     telling you what the half sheet indicates.

8          MR. RUECKERT:  Perhaps you can check that

9     out.

10         THE COURT:  I don't think that's the point.

11    I think the point is whether or not the defendant was

12    here.  I don't know why it's relevant whether I was

13    here.

14         MR. RUECKERT:  That's why I don't think if

15    it's relevant about the bond forfeiture.  If you're

16    not here, you can't enter a bond forfeiture.

17         THE COURT:  Somebody was probably sitting in

18    my stead, even if I wasn't here.

19              That's not the issue.  The issue is

20    whether or not the defendant was here.

21         MR. RUECKERT:  That's exactly right.  That's

22    why I'm saying a bond forfeiture isn't relevant.

23    That's my objection.

24         THE COURT:  Overruled.  I think it is

CCSAO002610

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    relevant.

2            MR. MAREK:   Q   Mr. Maysonet, as far as you

3    know, you never lost that money when you didn't appear

4    in this courtroom?

5            THE WITNESS:   A   No, I don't think so.

6        Q.   Mr. Maysonet, on July 15 of 1990, you did

7    speak to Sergeant Mingey and Detective Montilla at

8    Area 5 violent crimes,?

9            MR. RUECKERT:   Objection, beyond the scope.

10           THE COURT:   Overruled.

11           THE WITNESS:   A   They said -- excuse me.   I

12   was attained because of the intent murder, and they

13   are asking me questions about the intent murder.

14           MR. MAREK:   Q   But you also spoke to them

15   about a double murder that you knew about on North

16   Avenue at that time, didn't you?

17           MR. RUECKERT:   Objection, beyond the scope.

18   My questions to him were very simple.

19           THE COURT:   Counsel, this is

20   cross-examination and when the defendant takes the

21   stand, he gets cross-examined like any other witness.

22           MR. RUECKERT:   I understand that.   And if I

23   made the same objection, you would sustain it.   It's

24   beyond the scope.

CCSAO002611

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       THE COURT:  Counsel, that's in my discretion

2   and I think I ruled.

3       MR. RUECKERT:  Something on July 15 is --

4       THE COURT:  I'm not going to argue with

5   you.  I have ruled.

6       MR. RUECKERT:  Thank you, judge.

7       THE COURT:  You're welcome.

8       MR. MAREK:  May I have the question read

9   back.

10          (Record read as requested)

11      THE WITNESS:  A   They were asking me about

12  questions about a double murder.  And I said I didn't

13  know anything.  But if they wanted to talk to me about

14  it, they should talk through an attorney.

15      MR. MAREK:  Q   Sir, didn't you offer to

16  make a deal with the police at that time?

17      MR. RUECKERT:  Objection.

18      THE COURT:  Counsel, let me make my ruling

19  clear so we can move ahead.

20          I can cite you some cases if you'd like,

21  when a defendant takes the stand and opens himself to

22  cross-examination, that cross-examination cannot be

23  limited by the fact that the attorney that put him on

24  in direct, namely his own attorney, chose not to go

CCSAO002612

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    into certain matters.

2            I can cite all kind of law about that.

3    Once he takes the stand, he opens himself up to any

4    reasonable question going to the issue that is before

5    the court.  So overruled.

6            MR. RUECKERT:  Well for the record, judge, I

7    don't know how at this point a deal talked about back

8    in July 15 is relevant to the issue of probable cause

9    for this person's arrest.  Especially when all he is

10   testifying to --

11           THE COURT:  That may be, counsel, but I see

12   how it might be relevant in the court and the court in

13   its discretion has overruled your objection.

14           If it turns out not to be relevant, then I

15   will strike it from my mind.  But I can certainly see

16   how it could be relevant.

17           You may proceed.

18           MR. MAREK:  Q   Mr. Maysonet, on July 15,

19   did you offer to make a deal with Sergeant Mingey and

20   Detective Montilla, did you offer them information

21   about the double murder on North Avenue if they would

22   make a deal with you as -- on the case that you were

23   then being charged with?

24           THE WITNESS:  A   They told me that if I

43

CCSAO002613

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   wanted to make an agreement, or deal with them, about

2   double murder or some information, they wanted to know

3   about the double murders and they wanted to make a

4   deal and I said no, that if they wanted to talk about

5   it, I should have an attorney present.

6       Q.    You told them you wanted to have a lawyer.

7             You wanted to deal with them through your

8   lawyer, right?

9       A.    I said if they wanted to talk to me, if they

10  wanted to ask me questions, they should do it with an

11  attorney because I didn't know what they were trying

12  to ask me.

13      Q.    So didn't want to talk to these officers

14  except with your lawyer present, that's your

15  testimony, right?

16      A.    No.   I don't know what they were asking me

17  and I don't know what they were trying to do.

18      Q.    On August 1, these same two officers came to

19  the Cook County jail to talk to you again, did they

20  not?

21            MR. RUECKERT:  Same objection, judge.

22            THE COURT:  Overruled.

23            THE WITNESS:  A   Yes.

24            MR. MAREK:  Q   Did you talk to them at that

44

CCSAO002614

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  time about your involvement in the murders on North

2  Avenue?

3      A.   You talking about the death?

4      Q.   That's right.

5      A.   Once again, they came to talk to me about

6  the death and I didn't want to talk about anything.

7      Q.   So you again said you just wanted to deal

8  with them through your lawyer, correct?

9      A.   I wanted to have an attorney present to see

10  what they were talking about.

11     Q.   There was a Spanish speaking officer there

12  both of these times that you spoke to the police,

13  correct?

14     A.   Yeah.  He wanted me -- to talk to me in

15  Spanish, yes.

16     Q.   You do also speak English, do you not?

17     A.   No.

18     Q.   Well, when Detective Paulnitsky placed you

19  under arrest outside courtroom 101, did he speak

20  Spanish to you?

21     A.   No, he was talking to my sister in English.

22     Q.   And you understood what he was saying,

23  didn't you?

24     A.   Well, until I saw him placing my hand

45

CCSAO002615

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    against the wall and handcuffing me.

2        Q.   So your testimony, Mr. Maysonet, is you do

3    not understand any English?

4        A.   No.

5        Q.   And you don't speak any English?

6        A.   No.

7        Q.   Mr. Maysonet, I'm going to show you what has

8    been marked Respondent's Exhibit No. 1 for

9    identification.

10            That's your signature there, is it not?

11       A.   This one, yes.

12       Q.   You signed that, right?

13       A.   Yes.

14       Q.   You signed that on August 1, 1990?

15       A.   1st of August, '90.

16       Q.   That's the date, right?

17       A.   Yes.

18       Q.   And this was your inmate number and is your

19   inmate number, right, 9034835?

20       A.   I don't remember.

21       Q.   You don't know your inmate number right now?

22       A.   The one that I have right now?

23       Q.   Yeah.

24       A.   901 -- no, 904 -- I believe it's 8017.

CCSAO002616

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   So you have a different one.  So let me
2   rephrase that question.
3           Sir, you were incarcerated and then made
4   bond, correct?
5      A.   16th of August of '90.
6      Q.   Do you remember what your inmate number was
7   before you made bond?
8      A.   I don't remember.  It's been a long time.  I
9   don't remember.
10     Q.   This form that you signed, Mr. Maysonet,
11  says I, inmate Jose Maysonet, do herein consent to be
12  interviewed without my attorney present.
13     A.   You're saying did I sign here when the
14  policeman asked me?  I don't understand.
15     Q.   My question, sir, is are you able to read
16  what's printed right before your signature?
17     A.   No, I didn't read a thing.
18     Q.   You just signed this over at the Cook County
19  jail without reading any of it is your testimony?
20     A.   I didn't read it.  I signed it, but I didn't
21  read it.
22     Q.   Well, did you ask the police what form this
23  was that they were asking you to sign, Mr. Maysonet?
24     A.   Which officer, Montilla?

47

CCSAO002617

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       Q.   Yes.

2       A.   They didn't bring me that.  This was another

3 person who brought that.

4       Q.   Who brought this for you?

5       A.   It was an older man.  He said sign here, the

6 police is here.  They want to talk to you.

7       Q.   And you signed it?

8       A.   Yes.

9       Q.   Did you ask Detective Montilla afterwards

10 what was that form I signed, would you read that for

11 me?

12       A.   No, I didn't ask him.

13       Q.   So you signed this -- your understanding was

14 you were signing this form because the police wanted

15 to talk to you, right?

16       A.   I signed because the man told me to sign it

17 because they wanted to talk to me.

18       Q.   And you wanted to talk to the police,

19 correct?

20       A.   Well, I had nothing to say to the police.

21       Q.   Why did you sign the form then,

22 Mr. Maysonet?

23       MR. RUECKERT:  I think it's been asked and

24 answered, so I'm going to object.

48

CCSAO002618

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1              THE COURT:  Overruled.

2              THE WITNESS:   A   Because the man who

3    brought me that blank paper told me that the police

4    wanted to talk to me.

5              MR. MAREK:   Q   And you didn't want to talk

6    to the police?

7         A.   No.

8         Q.   But you signed it anyway?

9         A.   I told you because other policeman told me

10   to sign it.

11             MR. MAREK:  Nothing else at this time, your

12   Honor.

13             THE COURT:  Redirect.

14             MR. RUECKERT:  I don't have any.

15             THE COURT:  Thank you, Mr. Maysonet.  You

16   may step down.

17             MR. RUECKERT:  I would like to for the

18   record, though, I may state for the record that there

19   appears to be a signature at the bottom, star 17, star

20   No. 17.

21             THE COURT:  Signature at the bottom of what.

22             MR. RUECKERT:  Their exhibit.

23             THE COURT:  Respondent's Exhibit No. 1?

24             MR. RUECKERT:  Yes.

CCSAO002619

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    THE COURT:  I don't know what you're talking

2    about, but for the record --

3    MR. RUECKERT:  At the bottom of Respondent's

4    Exhibit No. 1 there is a signature and a star No. 17.

5    We'd rest, judge.

6    THE COURT:  State.

7    MS. MANDELTORT:  Can we have one moment.

8    At this time we'd be making a motion for

9    directed finding.

10    THE COURT:  Motion's denied.

11    MS. MANDELTORT:  State would call Detective

12    Montilla.

13    (Witness sworn)

14    FERNANDO MONTILLA,

15    called as a witness herein, having been first duly

16    sworn, was examined upon oral interrogatories and

17    testified as follows:

18    DIRECT EXAMINATION

19    by Ms. Mandeltort:

20    Q.   Sir, could you please tell us your name and

21    spell your last name?

22    A.   Detective Fernando E. Montilla,

23    M-o-n-t-i-l-l-a, star 20778, Area 5.

24    Q.   Sir, how long have you been a Chicago police

CCSAO002620

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1    officer?

 2         A.    22 years.

 3         Q.    How long have you been assigned to Area 5?

 4         A.    About 6 or 7 years right now.

 5         Q.    Directing your attention to July 15 of

 6    1990.

 7               Were you working at Area 5 at that time?

 8         A.    Yes, I was.

 9         Q.    And did you become aware of somebody by the

10    name of Jose Maysonet was in Area 5 in regards to a

11    shooting that had taken place I believe on July 3 of

12    1990?

13         A.    Yes, ma'am.

14         Q.    And the person -- did you see Jose Maysonet

15    at Area 5 in the evening hours on the 15th of July,

16    1990?

17         A.    Yes, ma'am.

18         Q.    Other than yourself and the defendant, who

19    was present?

20         A.    Sergeant Mingey.

21         Q.    Could you spell that?

22         A.    M-i-n-g-e-y.

23         Q.    The person you know as Jose Maysonet, do you

24    see him in court today?
```

51

CCSAO002621

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    Yes, I do.

2      Q.    Could you please point to him and describe

3  something he's wearing today?

4      A.    He's wearing the department of correction

5  uniform.

6            MS. MANDELTORT:  Your Honor, may the record

7  reflect in-court identification of the defendant.

8            THE COURT:  Very well.

9            MS. MANDELTORT:  Q   How is it you came to

10 speak with Jose Maysonet in the evening hours of

11 July 15, 1990 at Area 5?

12           THE WITNESS:  A   Sergeant Mingey asked me

13 to assist him and interpret from English to Spanish.

14     Q.    Are you fluent in a language other than

15 English?

16     A.    Yes, ma'am.

17     Q.    What language is that?

18     A.    Spanish.

19     Q.    Have you translated before from Spanish to

20 English and English to Spanish both in your

21 professional capacity as a Chicago police officer and

22 in your personal life?

23     A.    Yes, ma'am.

24     Q.    And did you in fact have a conversation with

52

CCSAO002622

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   Jose Maysonet on July 15, 1990?

2        A.    Yes, I did.

3        Q.    Could you tell the judge at that time what

4   you said to the defendant what the defendant said to

5   you?

6        A.    I was called in by Sergeant Mingey to assist

7   him in interpreting.  I read him his rights in

8   Spanish.  I advised him, he agreed to talk to me.

9              At that time, he told me that he had some

10  information on two young black males that were killed

11  on North Avenue.

12             He said that on that day when the shooting

13  happened, 3 Latin Kings came to his house and asked

14  him for the 9-millimeter that they had given him to

15  hide.

16             He said that the next day, he heard that

17  two black guys were killed on North Avenue and that a

18  9-millimeter was used.  I asked him if he could supply

19  the names of the 3 guys and he refused.

20       Q.    Did you have a further conversation with him

21  at that time regarding any other information he had?

22       A.    No, I did not.

23       Q.    At the time that you talked and got that

24  information from Jose Maysonet, were you aware of the

53

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    ongoing investigation into the murder of the Wiley

2    brothers?

3         A.   Yes, ma'am.

4         Q.   When you first spoke to Jose Maysonet, did

5    you make the connection between the information he was

6    giving you and the Wiley investigation?

7         A.   Not at that time.

8         Q.   Subsequent, did you at some point make a

9    connection between the information that the defendant

10   had given you and the murder of the Wiley brothers?

11        A.   Yes, ma'am.

12        Q.   Can you tell the judge how that was?

13        A.   Started looking through the files and we

14   found that two young black guys were killed on North

15   Avenue and a 9-millimeter was used.

16        Q.   Were you aware at that time that the

17   shooting for which the defendant had been charged,

18   that he was in Area 5 on July 15, involved a

19   9-millimeter?

20        A.   Yes, ma'am.

21        Q.   Did you have the occasion on August 1 of

22   1990 -- if I can have one moment.

23             At any time on July 15, 1990, did the

24   defendant tell you that if you wanted to speak with

CCSAO002624

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    him, you should speak with him through his attorney?

2        A.    No, ma'am.

3        Q.    Directing your attention now to August 1 of

4    1990.

5              Did you have the occasion to go to Cook

6    County jail that day?

7        A.    Yes, ma'am.

8        Q.    Who were you with?

9        A.    Sergeant Mingey.

10       Q.    For what purpose did you go to the Cook

11   County jail on that day?

12       A.    To find out if -- to talk to Jose Maysonet

13   and get further information on the shooting of the two

14   young black guys.

15       Q.    Showing counsel what's previously been shown

16   as Respondent's Exhibit No. 1.

17             Sir, I'm showing you what's been marked as

18   Respondent's Exhibit No. 1 for identification.

19             Could you tell the judge if you recognize

20   what that document is?

21       A.    Yes.   Department of correction, this is a

22   waiver for attorney.

23       Q.    Do you recognize that particular form that's

24   in your hand?

CCSAO002625

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    Yes, ma'am.

2        Q.    What do you recognize it to be?

3        A.    Pardon me?

4        Q.    What do you recognize it to be?

5        A.    It is a document signed by Jose, and he

6    consented to be interviewed by Sergeant Mingey and I.

7        Q.    Were you present when that document was

8    presented to the defendant on August 1, 1990 at the

9    Cook County jail?

10       A.    Yes, ma'am.

11       Q.    Did the defendant sign that document in your

12   presence?

13       A.    Yes, ma'am.

14       Q.    The signature that appears there, Jose

15   Maysonet, did he sign that signature in your presence?

16       A.    Yes, ma'am.

17       Q.    Did you or anyone explain to the defendant

18   what this document was?

19       A.    Yes, ma'am.

20       Q.    Who did that?

21       A.    Sergeant Mingey said in English and I

22   interpreted to him in Spanish.

23       Q.    What was explained to the defendant about

24   that document before he signed it?

56

CCSAO002626

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    That he was waiving his rights to have a

2    counsel present with him when we were questioning him

3    about that case.

4          Q.    Is that -- this document, have you ever seen

5    a document like this before?

6          A.    Yes, ma'am.

7          Q.    How many times?

8          A.    In 22 years, I have seen it quite a bit.

9          Q.    Under what circumstances do you usually

10   present someone with a document such as this?

11         A.    So that we are not charged.

12         Q.    Let me rephrase the question.

13              When you go to see an in-custody defendant

14   in the jail, is it routine procedure for a defendant

15   to sign a form such as this?

16         A.    Yes, ma'am.

17         Q.    On August 1, after the defendant signed that

18   attorney waiver, did you in fact have a conversation

19   with the defendant or did Sergeant Mingey have a

20   conversation with the defendant that you translated?

21         A.    Sergeant Mingey did the asking of the

22   questions.  I interpreted into Spanish and the answer

23   back into English.

24         Q.    At that time, what did you learn from the

57

CCSAO002627

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    defendant?

2        A.    That he told us at that time that he was

3    present during the shooting of the two young black

4    guys, but that he did not do the actual shooting.

5              He wanted to make a deal and we told him

6    we don't make deals.  He said he wouldn't elaborate

7    and give us the names of the 3 guys that were involved

8    to -- that came to his house to get the 9-millimeter.

9        Q.    At that time, sir, did you place the

10   defendant under arrest for the murder of the Wiley

11   brothers?

12       A.    No.

13       Q.    Why is that?

14       A.    We wanted to go back and get more

15   information to find out if we had any witness that we

16   could corroborate his story on 3 guys that did the

17   shooting.

18       Q.    During your August 1, 1990 conversation, did

19   the defendant indicate to you in Spanish whether or

20   not he was involved in the murders?

21       A.    He said he was there, but he did not do the

22   shooting.

23              MS. MANDELTORT:  I have no further

24   questions.

58

CCSAO002628

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          THE COURT: Very well. Counsel.

2                 <u>CROSS EXAMINATION</u>

3           by Mr. Rueckert:

4       Q.   Detective, I think we have been

5 mispronouncing your name. You say it Montilla?

6       A.   Yes.

7       Q.   Detective Montilla, tell us what information

8 was developed between August 1 and August 22 that

9 corroborated the statement you say was made on

10 August 1?

11       A.   That was done by the other detectives.  I

12 only did the interpreting, sir.

13       Q.   You yourself then didn't collect any of this

14 corroborating evidence?

15       A.   No, sir, I did not.

16       Q.   Have you had occasion at some point since

17 August 22, to review the file in this case, the police

18 reports?

19       A.   Yes.

20       Q.   From your review of those police reports,

21 can you tell us what information was developed between

22 August 1 and August 22 that corroborated that

23 statement?

24       A.   I don't know, sir.  I didn't go into further

59

CCSAO002629

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    the entire -- the report.

2        Q.    Show you what's been shown to you as

3    Respondent's Exhibit No. 1.

4            Does your name appear on that anywhere?

5        A.    No, sir.

6        Q.    Does -- is a Sergeant Mingey's name appear

7    on there?

8        A.    Yes, sir.

9        Q.    That's up here, consent to be interviewed by

10   Sergeant Mingey, right?

11       A.    Yes, sir.

12       Q.    Department, CPD?

13       A.    Yes, sir.

14       Q.    Do you happen to know Sergeant Mingey's star

15   number?

16       A.    Yes, sir, 1731.

17       Q.    It's not 17?

18       A.    No, sir.

19       Q.    Who is this officer down here?

20       A.    That was one of the -- I think it was the

21   guard that was present with us when he was brought to

22   the interview room.

23       Q.    His star number is 17?

24       A.    I'm pretty sure.

CCSAO002630

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   He's a Cook County sheriff?

2      A.   I think so.

3      Q.   Is he the one that presented this form to

4  Mr. Maysonet?

5      A.   Yes, through us.  Yes, right there.

6      Q.   Now, I'm going to show what's been marked as

7  Defendant's Exhibit No. 1 and 2, and the reason I'm

8  doing that is No. 1 is page 4 of that final report on

9  this case, August -- authored August 23.

10         Okay.  And I'm showing you page 8 because

11  it has your name on here at the bottom, Detective

12  Montilla, right?

13      A.   Yes, sir.

14      Q.   This is your correct star number, 16410?

15      A.   That's my old star.

16      Q.   You have a new star number now?

17      A.   Yes, detectives have new stars.

18      Q.   Was this your star number back in 1990?

19      A.   Yes, sir.

20      Q.   What's the purpose of your name being at the

21  bottom of that report?

22         MS. MANDELTORT:  Objection, judge, form of

23  the question.

24         THE COURT:  If he understands, he can answer

61

CCSAO002631

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    if he can.

2              THE WITNESS:   A    No purpose.

3              MR. RUECKERT:    Q    Does that indicate that

4    you were involved in this investigation at all?

5         A.   Yes.

6         Q.   That you helped provide some of the

7    information for this report, right?

8         A.   Yes.

9         Q.   Now, you have testified on direct that on

10   July 15, Mr. Maysonet made a statement about a murder

11   on North Avenue?

12        A.   Yes.

13        Q.   But you didn't connect it at that time with

14   the Wiley murder, is that right?

15        A.   That's right.

16        Q.   On July 15, Jose Maysonet was in there for a

17   different attempt murder, was he not?

18        A.   Yes, sir.

19        Q.   And Sergeant Mingey then went in to talk to

20   him?

21        A.   I guess so, yes.

22        Q.   Are you telling us that Sergeant Mingey

23   didn't know about the Wiley murder either?

24        A.   I don't know, I wasn't there.  I come later

CCSAO002632

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    in the evening.

2        Q.    So you weren't there when Sergeant Mingey

3    first went in to talk to Jose Maysonet?

4        A.    No, sir, I was not.

5        Q.    Sergeant Mingey doesn't speak Spanish?

6        A.    That's right.

7        Q.    That's right, he does not?

8        A.    He does not speak Spanish.

9        Q.    In your 22 years as a police officer, you

10   certainly become familiar with the procedure to get an

11   arrest warrant, have you not?

12       A.    Yes, sir.

13       Q.    You're aware you can go get an arrest

14   warrant for somebody who is in Cook County jail?

15       A.    Yes, sir.

16       Q.    You can have him writted out of jail and

17   have him arrested on arrest warrant?

18       A.    Yes, sir.

19       Q.    Was any attempt made by anyone at Area 5 to

20   get an arrest warrant for Mr. Maysonet on the double

21   murder?

22       A.    Not that I know of, sir.

23       Q.    After the statement was made on July 15,

24   there was no attempt to get an arrest warrant?

63

CCSAO002633

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    No, sir.

2        Q.    After the statement on August 1, there was

3   no attempt to get an arrest warrant for Mr. Maysonet?

4            MS. MANDELTORT:    We will stipulate no arrest

5   warrant was attempted on Mr. Maysonet.    No arrest

6   warrant was ever issued for Mr. Maysonet.

7            MR. RUECKERT:    Thank you, detective.

8   Nothing else.

9            MS. MANDELTORT:    We have no further

10  questions.

11           THE COURT:    Thank you, detective.    You may

12  step down.

13           MR. MAREK:    People rest on the motion, your

14  Honor.

15           THE COURT:    Do you have anything else?

16           MR. RUECKERT:    No.

17           THE COURT:    Both sides ready to argue?

18           MR. RUECKERT:    Yes.

19           THE COURT:    Mr. Rueckert.

20           MR. RUECKERT:    Judge, most of the time in

21  motions like this, the court will say that I have had

22  occasion to listen to both sides and it's a matter of

23  credibility, and I'm going to choose to believe the

24  police officer.    And most of the time all you have to

CCSAO002634

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1    go on is the testimony of the police officer versus

 2    the testimony of the defendant.

 3              I suggest in this case, what a lot of

 4    things that weren't done goes directly to the

 5    credibility of the police officers in this case.

 6              If you are to believe, if you are to

 7    believe the version of the police, this defendant made

 8    an incriminating statement in a double murder case on

 9    July 15.  No paper was made.  None.  Not one shred of

10    written evidence to suggest that that statement was

11    made.

12              MR. MAREK:  Objection, there is no evidence

13    of that.

14              MR. RUECKERT:  Detective Paulnitsky

15    testified to that.

16              MS. MANDELTORT:  He testified he didn't make

17    any paper.

18              MR. RUECKERT:  Is there any evidence from

19    the state that there is?

20              THE COURT:  That's not the point.  I don't

21    know that you can.

22              MR. RUECKERT:  According to the police, on

23    August 1, this defendant made incriminating statement

24    in a double murder case.
```

CCSAO002635

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Again, no written documentation of that.

2 Nothing.  No evidence that between August 1 and

3 August 22 the police did anything to develop that

4 information.

5    Now if they had probable cause on

6 August 22 to arrest him, they certainly had probable

7 cause in their mind on August 1.  Yet no attempt was

8 made, none, to get an arrest warrant, to go to Cook

9 County jail and arrest him on that case.  And are we

10 now supposed to believe that the reason they didn't do

11 it is because they felt safe he was in Cook County

12 jail?

13    That's what Paulnitsky wants us to

14 believe, that hey, we didn't have to do anything

15 because we felt he was secure in Cook County jail so

16 we will leave him there.  But as soon as I see him on

17 the street, I'm going to grab him.

18    Unfortunately, that doesn't make probable

19 cause.  Either they had it on the one or they didn't.

20 I'm suggesting to you they didn't.  And I think the

21 best evidence of that is what they didn't do.

22    Paulnitsky wants to tell you that well,

23 the reason we first started looking into this thing is

24 because a 9-millimeter was used in one case and a

CCSAO002636

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    9-millimeter was used in another case.  But there is

2    no attempt to match those bullets up.  None.

3            I think the credible evidence here is in

4    this case what the defendant tells you.  I leave the

5    courtroom, I get handcuffed, I get taken somewhere by

6    Paulnitsky and that's it.  And I am suggesting to you,

7    judge, that the credible evidence in this case

8    suggests there was no probable cause for that arrest.

9            And if there is no probable cause for the

10   arrest, it needs to be quashed.

11           THE COURT:  Thank you, counsel.  State?

12           MR. MAREK:  Your Honor, counsel places heavy

13   emphasis on the fact that supposedly there is no

14   written documentation of these conversations to

15   Sergeant Mingey and to Detective Montilla.  And

16   therefore, they must not have occurred.

17           I would answer that by saying if indeed

18   Mr. Maysonet did not incriminate himself, at the very

19   least on August 1, 1990, which is the state's

20   position, then why in the world would Detective

21   Paulnitsky have placed him under arrest when he saw

22   him free and loose on the 22nd.

23           If there is nothing out there, if there

24   are no statements, no conversations made by

CCSAO002637

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Mr. Maysonet, Detective Paulnitsky has no reason

2    whatsoever and can't even possibly know anything,

3    anything at all about who is a suspect in the murder

4    of the two Wiley brothers.

5            Based upon the testimony which has been

6    adduced during this hearing, I think it should be

7    clear to the court the course of events that this case

8    traveled.  Mr. Maysonet was placed under arrest for an

9    unrelated shooting.  Parenthetically, the gun, there

10   is evidence the gun used in that shooting was a

11   9-millimeter weapon.

12           Mr. Maysonet made known to the police on

13   the 15th of July when he was at Area 5, that he had

14   knowledge of a double murder on North Avenue and that

15   he in fact had supplied the weapon used in that double

16   murder.  Whether or not that statement in and of

17   itself would be probable cause to predicate his arrest

18   upon is not something this court has to decide because

19   there is a further admission.

20           At that point, they know from his own

21   mouth that he has knowledge of this murder.  Now

22   whether Sergeant Mingey has connected it to the Wiley

23   brothers or not I submit to the court is not

24   relevant.

CCSAO002638

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   Detective Montilla testified he heard the

2   statements, he didn't know, he continued to look and

3   he then made the connection through further research.

4   He finds that in fact the Wiley brother murder did

5   occur on North Avenue. The weapon used was a

6   9-millimeter handgun.

7   They then go and speak to Mr. Maysonet on

8   August 1 at the Cook County jail. And now they learn

9   a very, very critical additional fact. And that is,

10   yes, Mr. Maysonet is involved, is personally involved

11   in that. Obviously the police based on his prior

12   statements and his refusal to name the other people

13   involved with him, would have suspected him. And as I

14   said before, that may have only been mere suspicion.

15   But I submit to the court now we have the

16   man who said I supplied the weapon and I was with them

17   when the murder was committed. I submit to the court

18   that that constitutes probable cause to arrest

19   Mr. Maysonet for the murder of these two young men.

20   Probable cause clearly is not proof beyond

21   a reasonable doubt. His presence at the crime scene

22   after supplying the weapon may or may not be evidence

23   in and of itself to convict, but it is certainly

24   evidence sufficient to place him under arrest for the

CCSAO002639

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   murders, based upon full probable cause.

2           Now, do the police, once probable cause

3   arises, have an obligation to act on it and

4   immediately place the defendant under arrest.  Clearly

5   the case law says no, they do not.  They may if they

6   wish, continue to investigate and develop a stronger

7   case.  Which is what they did here.

8           Now counsel castigates these officers

9   because they decided not to place Mr. Maysonet under

10  arrest because he was already in the county jail.

11          But I submit to the court that under these

12  circumstances, that is a reasonable approach.  He's

13  already been arrested, he's been charged with 3

14  shootings and as far as they know, he's off the street

15  and he is not a danger to public safety anymore.  It's

16  reasonable under those circumstances to continue to

17  investigate, even though they have developed full

18  probable cause against Mr. Maysonet.

19          Then, when Detective Paulnitsky sees that

20  in fact Mr. Maysonet is now walking free among the

21  general populace, he decides to act on the probable

22  cause.  And I submit to the court that that is

23  something that is clearly within his discretion as an

24  officer.

CCSAO002640

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Once probable cause was developed, the
2   police do not have an obligation to go out and obtain
3   an arrest warrant.  The arrest was made and by either
4   version, the arrest is made somewhere where he is in a
5   public place.  This is not a Payton issue, there is no
6   allegations he was arrested inside of his own home.
7   He's out and about in public.
8          And I submit to the court on the
9   credibility issue, clearly the extrinsic facts support
10  Detective Paulnitsky.  Had Mr. Maysonet not made it to
11  this courtroom or to courtroom 302, his bond would
12  surely have been forfeited.  And it would never have
13  been available for him for his later disposition.
14  That is certainly an inference to be drawn here and
15  that is certainly an inference which supports the
16  testimony of Detective Paulnitsky.
17          I submit to the court in neither event
18  does it ultimately matter.  It is the state's position
19  that Mr. Maysonet did go along voluntarily to Area 5.
20  To continue to speak to these police officers.  As we
21  submitted he had been doing since day one.
22          And he had an inducement, your Honor, to
23  go along and speak to these officers.  This is not a
24  case where somebody is just walking down the street,

CCSAO002641

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1　has had no other contact with the police in this case

2　at all and is now hailed into a police station.

3　　　　　This man has freely dealt with these

4　police officers before.  And again, this is a

5　credibility issue, but I submit to the court that the

6　facts strongly support the testimony of

7　Detective Montilla that in fact this man had been

8　dealing with the police and I submit to the court that

9　his signature on this waiver, this attorney waiver

10　form, is further evidence of that.

11　　　　　He has dealt with the police on July 15 of

12　1990.  He has dealt with the police on August 1 of

13　1990.  And he chooses to go along and deal with the

14　police again on August 22, 1990, because there is

15　something in it for him.  He has an inducement.  He

16　wants to make a deal.  He's out and now on August 22,

17　1990 he has even greater reason.  He's out on bond and

18　he'd like to stay there.  And he has a reason to deal

19　with the police and talk to them is, because he wants

20　to make a deal.  He has everything to gain by dealing

21　with the police and I submit to the court that is

22　very, very strong evidence to support the position

23　that Mr. Maysonet went along as a volunteer.

24　　　　　But it is the state's position bolstered

CCSAO002642

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    by the testimony of Detective Paulnitsky that yes, had

2    Mr. Maysonet refused to come along, the police would

3    have and could have placed Mr. Maysonet under arrest.

4              Your Honor, I would ask the court based

5    upon credibility of the issues, based upon the law

6    that's applicable in this case, to deny defendant's

7    motion.

8              THE COURT:  Counsel?

9              MR. RUECKERT:  Judge, with all due respect,

10   I think it strains the bounds of rational thought to

11   think that Jose Maysonet after being charged with a

12   triple attempt murder, after being in Cook County jail

13   for a month and a half, after being twice approached

14   by Chicago police officers to tell them about a double

15   murder, once he makes bond, would voluntarily go to

16   Area 5 is just ludicrous.  And we all know that.

17             More importantly, I'm not castigating the

18   police officers for not getting an arrest warrant.

19   What I am suggesting to you is very simply this:  If

20   they had probable cause on August 1, they would have

21   gotten a warrant.  And we all know that.  And I think

22   the best evidence of the fact they didn't have

23   probable cause is they didn't get a warrant.

24             Now on August 23, when they have to write

CCSAO002643

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    up a final report, because now they got a confession

2    or what they consider to be a confession, when they

3    got to write up this final report, and they know this

4    motion is coming down the pike, then they write up

5    conveniently enough that hey, back on July 15, he made

6    a statement, back on August 1 he made a statement.

7    Because that's going to give us the requisite probable

8    cause.

9            The problem with that is that's the first

10   time it's ever been documented.  The very first time.

11   When they got to have it.  That's why I bring it up,

12   judge.

13           I'm not saying the police officers should

14   have done this, should have done that.  But I'm saying

15   it absolutely strains their credibility to try to make

16   us believe that those statements were made like they

17   say they were made.  And if they weren't made that

18   way, there ain't probable cause.

19           THE COURT:  It is an interesting case in

20   many respects, different from most motions.  There

21   certainly are issues of credibility quite aside from

22   the legal issue of whether or not probable cause

23   existed at any point prior to Mr. Maysonet being

24   placed under arrest.  But the court it seems to me on

74

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    this record is faced with a dilemma.  That being if

2    there were no statement by Mr. Maysonet on July 15, if

3    he did not make any statement on August 1, then why

4    Mr. Maysonet.  Where did it come from.

5           The court would have to believe that for

6    some reason it was kind of a Russian roulette kind of

7    situation.  Officer Paulnitsky sees him walking

8    around, decides to pounce on him.

9           There's been put in front of this Court in

10   this record, nothing to suggest that that would have

11   happened.  That to me seems not logical.

12          The Court paid strict attention as I

13   always do as the manner in which the officers

14   testified, and Officer Montilla seems to me was

15   perfectly credible.  I found nothing incredible about

16   his testimony.

17          He testifies to the fact that on 7-15-1990

18   there was an interview by the sergeant with him simply

19   interpreting, with the sergeant putting the

20   questions.  He didn't testify a lot as to that

21   particular conversation other than to offer testimony

22   that rebutted the defendant's contention about what

23   was said in there.

24          But he does say that he never indicated --

75

CCSAO002645

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    the defendant never indicated that he would talk only

2    through an attorney.  Certainly if the question was --

3    even if I take the evidence as to what was said in

4    that first conversation, there certainly wasn't

5    probable cause of that.

6              Let's be clear, we are talking about

7    credibility and the Court is entitled to use common

8    sense.  The Court doesn't have to operate in a

9    vacuum.  Why go back if nothing was said on the 15th,

10   didn't say anything that associated him with the

11   double murder that is at issue in this case.  Why make

12   the trip to the jail to talk to him on the 1st.

13             Again, one just has to assume that

14   somebody just likes talking to Mr. Maysonet.  They

15   felt they'd go back and talk to him again.  About

16   what?  What are they going and talking to him about on

17   August 1 if nothing was said by Mr. Maysonet on

18   July 15.  I don't understand what that would have been

19   about.

20             The Court does believe Detective Montilla

21   that on the 1st of August when he went to Cook County

22   jail, he did apprise the defendant of what that form

23   was and defendant signed it.  I found Officer Montilla

24   perfectly credible.

CCSAO002646

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Now, I agree with counsel for the defense,

2    that is the real question in this case.  And I think

3    the Court's position about whether or not the

4    conversations took place, I think to suggest they

5    didn't take place would then place anybody in position

6    to just assuming they of all the possible people in

7    Cook County jail, of all the possible people that

8    frequent the neighborhood which these events occurred,

9    for some reason they are picking on Mr. Maysonet.

10          Somehow the Court finds that very hard to

11    believe.  The Court using rational inferences, must

12    accept the idea that he did say something on the

13    15th.  He didn't say enough to make them pounce him

14    and arrest him, and they certainly wouldn't have had

15    probable cause on that day.  I -- but he did say

16    enough, he associated himself with that event.

17          In the meantime, between the -- strike

18    that -- the 15th and 1st of August, the connection was

19    made.  Around the issue of the gun.  And I don't think

20    the issue is whether or not they had done ballistics

21    yet.

22          All of us have been in this system a long

23    time.  Very often ballistics are not done until well

24    after the case -- the case is ready to go to trial

CCSAO002647

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    practically.  I don't think they were required to have

2    run ballistics based on what the testimony is about

3    what he said.

4           He said that he provided the gun.  That's

5    what he says on the 15th.  That's a 9-millimeter.  On

6    the 1st he not only provided the gun, but now he is

7    present.  That's really quite interesting.  I think

8    when you have provided the gun, when you are present

9    at the shooting, what else can that be seen as but

10   facilitating the use of the gun in the way that it was

11   used and he at the very least, whether he was the

12   shooter or not, it seems to me there was probable

13   cause to arrest him on the grounds of credibility.

14          Now the question about why they didn't

15   arrest him on August 1 and why they didn't get an

16   arrest warrant.  I suspect the police did rely

17   somewhat to their detriment, on the fact that he was

18   locked up.  I would imagine on a triple attempt

19   murder, although this does not -- did not come into

20   evidence, so the court has -- just has to infer, but I

21   think it's reasonable for the Court to infer that

22   there was a substantial bond.

23          He was in custody on the 15th, Paulnitsky

24   sees him on the 22nd.  In that interim, obviously he

CCSAO002648

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  did make bond.  He made bond on the 16th.  But I do

2  think there was probable cause to arrest him on

3  August 1.  I think the probable cause existed then.

4          Now as a legal question, whether one was

5  to act on probable cause immediately, I don't think

6  that's the case.  It may be preferrable, it may not be

7  preferrable.  That's a judgment call by the police

8  officers.

9          As this worked out, their reliance of him

10  being in custody and therefore not having to worry

11  about him particularly for a while, let's face it,

12  it's not like it was a 4-month lapse.  August 1 to

13  August 22 is only 3 weeks.

14          In many ways I think the police were very

15  lucky in that he happened to see him walking around.

16  But I think there was probable cause to arrest the

17  defendant based on the fact that I cannot accept the

18  fact that Mr. Maysonet never said a thing about this,

19  never implicated himself and it seems to me at bare

20  minimum, there was probable cause based on the theory

21  of accountability that he not only provided the gun,

22  but was present at the time of the shootings.

23          So for all of those reasons, most

24  respectfully the motion to quash the arrest of

CCSAO002649

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Jose Maysonet, that arrest having occurred on

2    August 22, is denied.

3            I would also note that it makes little

4    difference it seems to me to the real issues that are

5    put forth on the motion, whether or not he was

6    arrested inside the court building or outside the

7    court building or whether it happened at Area 5.  As

8    far as this Court's concerned, based on the testimony

9    of Officer Paulnitsky, he was arrested at the time

10   that Paulnitsky detained him based on his testimony

11   that he would have "arrested him" if he had thought he

12   was going to try to leave.

13           I think all of that has nothing to do with

14   anything because I think the probable cause did exist

15   back on August 1.

16           For all of those reasons, most

17   respectfully the motion is denied.  And we have

18   another motion to deal with.  But I don't know that

19   the Court with this headache, is up to dealing with

20   that today.  What date did we give the other one.  I

21   would like to try to get the motion to suppress

22   statements done prior to that date.

23           MS. MANDELTORT:  We gave Gossens 1-26.

24           THE COURT:  Do counsels for both sides, have

CCSAO002650

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   you got a sense of how many witnesses and how long

2   that might take?

3           MS. MANDELTORT:   Are you available

4   January 24, Tuesday?

5           MR. RUECKERT:   How about the 25th?

6           THE COURT:   Set it for 1:30.

7           MR. RUECKERT:   2:00 o'clock?

8           MS. MANDELTORT:   Try for the 24th.

9           THE COURT:   Set it for a special time.

10          MS. MANDELTORT:   1:30.

11          THE COURT:   Set it for 1:30 and maybe we

12  will be under way by 2:00.

13          1-24-95 with for motions.   1:30.   All of

14  the other matters associated with this case that are

15  not elected and the prior indictments, et cetera, I

16  will put them all over that same date.

17

18                  (Whereupon, proceedings were

19                  adjourned)

20

21

22

23

24

81

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT-CRIMINAL DIVISION
2

3

4                    I, PAUL W. O'CONNOR, an Official

5    Court Reporter for the Circuit Court of Cook County,

6    County Department/Criminal Division, do hereby certify

7    that I reported in shorthand the proceedings had at

8    the hearing in the above-entitled cause; that I

9    hereafter caused the foregoing to be transcribed into

10   typewriting, which I hereby certify to be a true and

11   accurate transcript of the proceedings had before the

12   Honorable LORETTA HALL MORGAN, Judge of said court.

13

14

15                          Official Court Reporter

16

17   Lic. No. 084-002955

18

19   Dated this_____14th_____ day

20   of_____January_____, 1995.

21

22

23

24

82

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 32

# SUPPLEMENTARY REPORT

CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE—TIME | | |
|---|---|---|
| DAY | MO. | YR. |
| 3 | July 1990 | 2200 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☐1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Battery/ Aggravated:Handgun | 041A | 4028 West Wabansia Avenue | 2532 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☐1 YES ☐2 NO XX | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. ☐1 YES ☐2 NO | 6. FIRE RELATED ☐1 YES ☐2 NO XX | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| MOLINA, Oscar Nmi. | | | | 5547/652 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 3 | 2 |

| 19. GROUND DAMAGE ☐ PROPERTY ATTACHED ☐ UPDATE TO | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP |
|---|---|---|---|---|---|---|---|
| | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | CODE NO. | CODE NO. |

| 19. DESCRIBE PROPERTY IN NARRATIVE. T=TAKEN; R = RECOVERED |
|---|

| PROPERTY DNA VERIFIED / UPDATE TO | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
|---|---|---|---|---|---|---|
| | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 0 CONSUM. GOODS ☐ T $ ☐ R | (-) FIREARMS ☐ T $ ☐ R | & NARC/DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T ☐ R |

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

| VICTIM UPDATE N/A | 20. NAME (LAST—FIRST—M.I.) | 21.1-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN JURE YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |

| OFFENDERS UPDATE N/A | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | (MAYSONET, Jose Juan) | (1302 North Homan Avenue) | (M/4/22) | 5'11 | 160 | Brn | Blk | Olive |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A NO. | 1 OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARREST/UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 | (8596 356) | (772 277) | (24) | OFF. 2 | | | (1) (652) |

| 33. OFF'S. VEHICLE ☐ USED ☐ STOLEN | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|---|

| 34. SERIAL NOS. OR IDENTIFICATION NOS. ☐ 1 DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | 1 UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | XXX FIELD ☐ 3 SUMMARY | | 652 | ☐ 0 PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |

| STATUS CONT'D. ☐ 3 CLRD. CLOSED | XX XX 4 CLRD. OPEN | 5 EXC. ☐ CLRD. CLOSED | 6 EXC. ☐ CLRD. OPEN | 7 CLSD. ☐ NON- CRIM. | 84. IF CASE CLEARED, HOW CLEARED XXX 1 ARREST & PROSEC. ☐ 2 DIRECTED TO JUV. CRT. ☐ 3 COMPL. RFUSD. TO PROSECUTE ☐ 4 COMMUNITY ADJUSTMENT ☐ 5 OTHER EXCEPT. XX 1 ADULT ☐ 2 JUV. |
|---|---|---|---|---|---|

| 55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION. |
|---|

## 80. NARRATIVE

Field Investigation:                          Cleared And Open

In Custody;                    MAYSONET, Jose Juan, aka Jose MAYSONET-LaJARA JR.,
                               aka King Leo, M/WH, ██████████ 1302 North Homan
                               Avenue, Ix.none, Single, Unemployed,IR#772277.
                               Member of the Latin King Street Gang, frequents
                               Spaulding Avenue and Beach Avenue.

Arresting Officers;            MB#5547
                               Det. PAULNITSKY #6503
                               Det. BONGIORNO #6176

Interpreter;                   P.O. ACEVEDO #9747, 025 Th District

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 16 July 1990 | | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE | |
|---|---|---|---|---|---|
| Det. PAULNITSKY | 6503 | | | | |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY-MO.-YR.) | TIME |

CPD-11.411-B (Rev. 8/86)          *MUST BE COMPLETED IN ALL CASES

MAYSONET 9604

Area 5 Violent Crimes Unit                           R.D.N-303 737

Aggravated Battery
Oscar MOLINA
2269 North Kedzie Avenue

### PAGE NUMBER #2

| | |
|---|---|
| **Assisting In Arrest:** | MB#2564B<br>P.O. WILLIAMS #10647<br>P.O. KEARNEY #4680 |
| **Date, Time, Location Of Arrest:** | 15 July 1990, 1945 hours at 5555 West Grand Avenue |
| **Charges:** | Aggravated Battery/3 Counts. |
| **Court Date:** | 17 July 1990. |
| **Court Branch:** | 42 |
| **Evidence:** | Line-Up Photos<br><br>Inventory 794126<br>One Color Photo |
| **Manner/Motive:** | Drive By Shooting<br>Gang related |
| **Notifications:** | Felony Review<br>A.S.A.MUCHIN |
| **Witnesses:** | GONZALEZ, Flor Nmi.,M/Wh,⬛ 2514 North Keeler Avenue, #3, Tx.278-7308, Student at Devry College 3200 North Campbell Avenue, S.S⬛ (EYE)<br><br>ORTIZ, Steve J.,M/Wh,⬛ 3709 North Troy Avenue, Tx.none, Single, Unemployed, S.S.⬛ (EYE) |
| **Interviewed:** | RIVERA, Anibal Nmi.,M/Wh,⬛ 4141 West Dicken Avenue, Tx.384-8409, Unemployed,S.S.⬛ |
| **Investigation:** | The reporting detective was assigned to a Follow-Up Investigation of the Aggravated Battery that had occurred 3 |

July 1990, 2200 hours at 4028 West Wabansia Avenue, by the Third Watch, Watch Commander
Sgt. Edward MINGEY #1731, of the Area 5 Violent Crimes Command. During this Investigation information was developed that the possible Shooter in this incident was a
Latin King Street Gang Member with the Street Name of King Leo

King Leo was known to the reporting detective as Jose
MAYSONET, that frequents the area of Spaulding Avenue and
Beach Avenue, and was known to reside at 1302 North Homan Avenue. Proceeding to this
location, this individual was observed and the reporting detective along with Detectiv
BONGIORNO #6176, of the Area 5 Violent Crimes Unit informed the subject of the allegat
against him and asked him to appear at the Area 5 Violent Crimes Unit for additional
Investigation. He replied that he would assist the Police in any manner that he could.

MAYSONET 9605

Area 5 Violent Crimes Unit                          R.D.N-303 737

Aggravated Battery
Oscar MOLINA
2269 North Kedzie Avenue


PAGE NUMBER #3


Investigation:
Continued
           It should be noted that Jose MAYSONET stated that he spoke and
           was able to communicate in English without any problems.

           Jose MAYSONET was advised of the allegation against him, and
           was informed of his Miranda Warnings and stated that he under-
stood these Warnings, and was transported to the Area 5 Violent Crimes Unit.

           While at the Area 5 Violent Crimes Unit the victims of this in-
           cident and witnesses were contacted and asked to appear at the
Area 5 Violent Crimes Unit to view a Line-Up. A Line-Up was conducted at 2100 hours
with these individuals viewing the same. A Line-Up Supplementary Case Report has been
completed and is part of this file.

           During a interview with the above mentioned witnesses the follow-
           ing facts were related.

FLOR GONZALEZ           related in essence but not verbatim the following. That as he
                        we standing at the intersection of Wabansia Avenue and Keystone
Avenue he observed a light color Motorvehicle west bound on Wabansia Avenue. This
Vehicle slowed down and a male white hispnaic that was located in the right front pass-
enger seat displayed a handgun out the window and began to discharge the weapon at
numerous individuals that were standing by the intersection.

STEVE ORTIZ            related in essence but not verbatim the following. That while
                      standing near the intersection of Wabansia Avenue and Keystone
Avenue 3 July 1990, at about 10:00 P.M. he observed a Auto west bound on Wabansia Ave-
nue slowing down. As the Auto reached the intersection a male white hispanic that
was seated in the right front passenger seat pointed a handgun out the window and open-
ed fire on a group of males that were standing around the corner.

           The passenger of the Vehicle fired 5 or 6 Shots at the group
           and then drove off.

ANIBAL RIVERA          related in essence but not verbatim the following. That about
                       3 to 7 days prior to this incident he observed a light color
Vehicle west bound on Wabansia Avenue near Keystone Avenue. This Vehicle contained two
male hispanics. As the Vehicle approached the intersection a male hispanic that was
seated in the right front passenger seat Yelled Out and pointed his finger in a menacin
manner towards him and the Vehicle drove off.

           Anibal RIVERA viewed this Line-Up, and identified Jose MAY-
           SONET as the subject that he observed at that time.

           After learning the above mentioned facts Jose MAYSONET was
           readvsied of his Miranda Warnings and stated that he understo
these Warnings and related the following.

MAYSONET 9606

Area 5 Violent Crimes Unit

R.D.N-303 737

Aggravated Battery
Oscar MOLINA
2269 North Kedzie Avenue

## PAGE NUMBER #4

Investigation:
Continued
JOSE MAYSONET              related in essence but not verbatim the following. That he
cannot recall or account for his whereabouts 3 July 1990.
This individual then related that he did not understand English and wanted to speak to
a Spanish Speaking Police Officer.

It should be noted that this request was made in English to
the reporting detective .

The reporting detective summoned a Spanish Interperter from
the 025 Th District. Police Officer ACEVEDO #9747 responed
to the Area 5 Violent Crimes Unit and assisted in a interview. During this interview
the following facts were related.

Jose MAYSONET again stated that he could not account for
his whereabouts or actions 3 July 1990. However, during
this interview this individual stopped speaking Spanish to Police Officer ACEVEDO
#9747 and spoke English.

Jose MAYSONET further related that he did not Shot anyone
and he could not understand why the Police had accussed
him of this incident.

Felony Review was contacted and A.S.A.MUCHIN responded to
the Area 5 Violent Crimes Unit and interviewed all victims
and witnesses of this incident. After interviewing these individuals A.S.A.MUCHIN along
with the reporting detective reinterviewed Jose MAYSONET while in the company of Police
Officer ACEVEDO #9747. The same facts were again related by Jose MAYSONET.

After reviewing these facts the approval of the Charge of
three counts of Aggravated Battery was granted for the
charging of Jose MAYSONET for the reported incident.

Due to the above mentioned facts and the lack of the ident
of the second offender, the reporting detective request
that this incident be Classified as Cleared and Open.

Detective Roland H.PAULNITSKY #6503

MAYSONET 9607

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 33

**ARREST REPORT**     7-1     **FELONY**     **MAYSONET JOSE JUAN**   M   WH

5555 West Grand Avenue      22      Jose MAYSONET-LaJARA Jr.     896 356

Police Facility (33B)      014      1302 North Homan Avenue      N-303 737

XXX    XXX    XXX    XX     N.Y.      None      772 237

DNA      5'11   160   Brn   Blk   Olive

XX   XX      2522   15July90      1945

     38-12-4B1      Agg. Battery

Not      38-12-4B1      Agg. Battery

     38-12-4B1      Agg. Battery

Laborer

One

DNA

WM. VALE          M    WH

652      Arresting Officers

Above placed in custody at the Area 5 Violent Crimes
Unit for the Triple Roll By Shooting that had occurred 3
July 1990, 2200 hours at 4028 West Wabansia Avenue. The above subject and a unknown companion
approached Oscar MOLINA WM VALE, AND Martin VALENTIN in a Motorvehicle and the victims were
standing on the Public Street. As the subjects approached the victims numerous Gunshots were
fired by Jose MAYSONET AND HIS COMPANION STRIKING the victims numerous times about their
bodies.
All victims were taken to the Belmont Hospital by C.F.D. Ambulances for Medical Treatment.

Additional Arresting Officers: P.O. WILLIAMS #10647    Patrol #2564B
                            P.O. KEARNEY #4680
A.S.A. MUCHIN      approved Felony Charges

XXX      17 July 1990 427?      XXXX

Det. PAULNITSKY     6503 652   5547      Det. BONGIORNO    6176   5547   5547

TEMPORARY RECORD COPY

RFC-Maysonet 001704

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 34

# SUPPLEMENTARY REPORT
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE–TIME**
DAY MO. YR.
3 JULY 90 | 2200

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| BATTERY / AGGRAVATED–HANDGUN | 041A | 4028 W Wabansia | 2532 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒1 YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFOR-MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| MOLINA, OSCAR | | | | 5525 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | (3) three | (2) two |

11. ☐ VERI-FIED ☒ FIED ☐ UPDATE TO
12. OBJECT/WEAPON — 13. FIREARM FEATURES — 14. POINT/ENTRY — 15. POINT/EXIT — 16. BURGLAR ALARM — 17. SAFE BURGLARY METHOD — 18. IF RESIDENCE WHERE WERE OCCUP

19. PROPERTY
T = TAKEN:  R = RECOVERED
FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT

DESCRIBE PROPERTY IN NARRATIVE.

VERIFIED
1 MONEY ☐ T $ ☐ R
2 JEWELRY ☐ T $ ☐ R
3 FURS ☐ T $ ☐ R
4 CLOTHING ☐ T $ ☐ R
7 OFFICE EQUIPMENT ☐ T $ ☐ R
8 TV, RADIO, STEREO ☐ T $ ☐ R

UPDATE TO
9 HOUSEHOLD GOODS ☐ T $ ☐ R
0 CONSUM. GOODS ☐ T $ ☐ R
(-) FIREARMS ☐ T $ ☐ R
& NARC./DANGEROUS DRUGS ☐ T $ ☐ R
5 OTHER ☐ T $ ☐ R
6 NONE ☐ T $ ☐ R

VICTIMS UPDATE ONLY

| 20.NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 26. BUSINESS PHONE | 26. IN ☐YES ☐NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

OFFENDERS UPDATE ONLY

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER (REL. CODE) | C.B. NO. | I.R. NO., Y.D. NO. OR J.O.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. | | OFF. 2 | | | | STATE LICENSE NO. | STATE |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. |
|---|---|---|---|---|---|
| ☐ USED ☐ STOLEN | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. ☒ DNA ☐2 VERIFIED ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS | ☐1 SUSPENDED | ☐2 UNFOUNDED |
|---|---|---|---|---|---|---|---|
| DNA | | DNA | ☒1 FIELD ☐3 SUMMARY | 652 | ☒0 PROGRESS | | |

STATUS CONT'D.
☐3 CLRD. CLOSED ☐4 CLRD. OPEN ☐5 EXC. CLRD. CLOSED ☐6 EXC. CLRD. OPEN ☐7 CLSD. NON-CRIM.
54. IF CASE CLEARED, HOW CLEARED
☐1 ARREST & PROSEC. ☐2 DIRECTED TO JUV. CRT. ☐3 COMPL. RFUSD. TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPT.
☐ADULT ☐JUV.

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**80. NARRATIVE**

THIS IS A LINE-UP REPORT:

DATE,TIME,LOCATION OF LINE-UP:   15 JULY 1990 AT 2100hrs 5555 W GRAND AVE
                                 AREA 5 VIOLENT CRIMES UNIT (VIEWING ROOM

E.T. ASSIGNED:                   DET. R. PAULNITSKY, 6503, 652

E.I. NUMBER:                     RD# N 303737

PERSONS CONDUCTING LINE-UP:      DET. R. PAULNITSKY, 6503,652

PERSONS PRESENT DURING LINE-UP:  DET. A. BONGIORNO,  6176,652

TURN TO PAGE TWO....

TURN TO PAGE TWO....

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY MO. YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| NORMAL DISTRIBUTION | 15 JULY 1990 | 2200HRS | | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| DET A BONGIORNO, | 6176 | DET R. PAULNITSKY, | 6503 | |
| SIGNATURE Bongiorno | | SIGNATURE | | 95. DATE APPROVED (DAY-MO.-YR.) TIME |

CPO-11.411-8 (Rev. 8/85)          *MUST BE COMPLETED IN ALL CASES

N 3 0 3 7 3 7  (25. R.D. NO.)

MAYSONET 9602

DETECTIVE DIVISION        —PAGE TWO—      15   JULY   1990
AREA FIVE VIOLENT CRIMES UNIT                 RD# N 3 0 3 7 3 7

BATTERY/AGGRAVATED—HANDGUN
MOLINA, OSCAR—VICTIM

LINE—UP (CONT)

PERSONS VIEWING LINE—UP:            MOLINA, OSCAR
                                     VALE, WILLIAM
                                     HERNANDEZ, ROBERT
                                     GONZALEZ, FLOR
                                     ORTIZ, STEVE
                                     RIVERA, ANIBAL

PERSONS PARICIPTAING IN LINE—UP:    #1—MONDRAGON, TEDDY M/WH 18 DOB.
                                     6952 W DIVERSEY AVE.

                                     #2—VARGAS, JASON M/WH 21,DOB.
                                     962 N AVERS

                                     #3—MAYSONET, JOSE M/WH 22
                                     1302 N HOMAN ST.

                                     #4—PAWLOWSKI, MARCELLO M/WH 17 DOB
                                     6952 W DIVERSEY AVE.

PERSONS IDENTIFIED IN LINE—UP:      #—3 MAYSONET, JOSE

INVESTIGATION:                        THE OFFENDR WAS POSITIVELY IDENTIFIED
                                     IN THE LINE—UP. THE OFFENDER WAS NOT
REQUIRED TO USE ANY WORDS OR PHRASES IN THE LINE—UP.

MAYSONET 9603

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 35

# SUPPLEMENTARY REPORT

CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE—TIME**
DAY MO. YR.
25 May 1990 0100

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE [X] 1 VERIFIED [_] 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 3428 W. North Ave. | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT [X] 1 YES [_] 2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED [_] 1 YES [X] 2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5535 |

| 6. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | (4) |

**PROPERTY / CIRCUMSTANCES section:**

12. OBJECT WEAPON / 13. FIREARM FEATURES / 14. POINT/ENTRY / 15. POINT/EXIT / 16. BURGLAR ALARM / 17. SAFE BURGLARY METHOD / 18. IF RESIDENCE WHERE WERE FIRED

DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN; R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

1 MONEY / 2 JEWELRY / 3 FURS / 4 CLOTHING / 7 OFFICE EQUIPMENT / 8 TV, RADIO, STEREO
9 HOUSEHOLD GOODS / 8 CONSUM. GOODS / 1E FIREARMS / & NARC./DANGEROUS DRUGS / 5 OTHER / 6 NONE

**VICTIMS UPDATE ONLY:**

| 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. INJURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

**OFFENDERS UPDATE ONLY:**

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. MAYSONET, Jose J. | 1302 N. Homan | M/4/22 | 5-11 | 160 | Brn | Blk | Med. |
| 2. GONZALEZ, Alfredo | 1835 N. Kedzie | M/4/31 | 5-10 | 150 | Brn | Blk | Med. |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 8628-787 | 772277 | OFF. 2 8629-893 | | 610697 | | 2 | 652 |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| [_] USED [_] STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. [XX] DNA [_] 2 VERIFIED [_] 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|
| DNA | |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | | [X] FIELD [_] 3 SUMMARY | 652 | [_] 0 PROGRESS [_] 1 SUSPENDED [_] 2 UNFOUNDED |

| STATUS CONT'D. | 54. IF CASE CLEARED, HOW CLEARED | |
|---|---|---|
| [_] 3 CLRD. CLOSED [_] 4 CLRD. OPEN [_] 5 EXC. CLRD. CLOSED [_] 6 EXC. CLRD. OPEN [_] 7 CLSD. NON-CRIM. | [_] 1 ARREST [_] 2 DIRECTED TO ANO. UNIT [_] 3 COMPL. RFUSD. TO PROSECUTE [_] 4 COMMUNITY ADJUSTMENT [_] 5 OTHER EXCEPT.: | [X] ADULT [_] JUV. |
| [XX] OPEN | [XX] PROSEC. | [XX] |

55. [_] FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

**80. NARRATIVE**

IN CUSTODY:  MAYSONET, Jose J.   M/WH/Age 22, DOB ▮▮▮▮▮

1302 N. Homan Ave.  Married Unemployed, Admitted

Member of the Latin Kings Street Gang, CB# 8628-787,

IR# 772277

GONZALEZ, Alfredo  M/WH/Age 31, DOB ▮▮▮▮▮

1835 N. Kedzie 1st fl. Single, Unemployed, Admitted

Member of the Latin Kings Street Gangs, AKA "Lluvia"

IR# ▮▮▮▮▮

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY MO. YR. | TIME | 92. STAR NO. OF APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 23 Aug. 90 | | EA PLEN | 890 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | 95. DATE APPROVED (DAY-MO.-YR.) | TIME |
|---|---|---|---|---|---|
| Det. E. HALVORSEN | #6036 | Det. R. GUEVARA | #16345 | 24 Aug 90 | 2345 |
| Det. S. GAWRYS | #16899 | Det. R. PAULNITSKY | #6503 | | |

CPD-11.411-8 (Rev. 8/85)   *MUST BE COMPLETED IN ALL CASES

N-234297

CRC [_] 228

RFC-Maysonet 000047

DETECTIVE DIVISION
AREA FIVE VIOLENT CRIMES

23 AUG. 1990
RD# N-234297

PAGE (2)

HOMICIDE/FIRST DEGREE MURDER
VICTIM: WILEY, Torrence

WANTED:

Tino, Possible name of Chris CRUZ,
M/WH/Age 20-25, 5-07, Muscular build
Known Latin King

FERNANDEZ, Chris  M/B/Age 20-25,
1035 N. Spualding, House
Known Latin King, nickname of "FRO"

ARRESTING OFFICERS:

MAYSONET
Det. R. PAULNITSKY       #6503
Det. F. MONTILLA         #16410

GONZALEZ
Det. S. GAWRYS           #16899
Det. E. HALVORSEN        #6036
Det. R. GUEVARA          #16345

DATE, TIME, LOCATION,
OF ARREST:

MAYSONET
22 Aug. 90, 1200 hrs. 5555 W. Grand Ave.

GONZALEZ
23 Aug. 90, 1830 hrs. 5555 W, Grand Ave.

CHARGES, COURT BRANCH
AND DATE:

MAYSONET
First Degree Murder, (2) Counts, Br. 66,
24 Aug. 90, Charges approved per A.S.A.
Frank D.FRANCO, Felony Review

GONZALEZ
Charges are pending at this time.

Continued On Pagae (3)

RFC-Maysonet 000048

```
DETECTIVE DIVISION                                    23 AUG. 1990
AREA FIVE VIOLENT CRIMES                              RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                          PAGE (3)
VICTIM: WILEY, Torrence
```

| | |
|---|---|
| WEAPON: | 9mm Automatic pistol, 4" barrel, B/S, Not Recovered. |
| MANNER/MOTIVE: | Victims who were male black youths were standing on the street when they were approached by the offenders who are Latin and members of the Latin Kings. Offenders shot victims to death. Motive was gang rivalry. |
| VEHICLE USED: | Older model Pontiac Bonv. 2 Dr. Light blue top/over dark blue bottom. This car is alleged to belong to a Latin King first name Jeffery. |
| NOTIFICATIONS: | A.S.A. Jennifer BOROWITZ, Felony Review<br>A.S.A. Frank DIFRANCO, Felony Review |
| STATEMENTS: | <u>MAYSONET</u><br>Has provided a court reported typed statement. |
| INTERVIEWED: | BELLO, Rosa  F/WH /Age 24, DOB ████<br>1302 N. Homan, Wife of Jose MAYSONETT<br>Ph# 235-4081    SS# ████ |

INVESTIGATION:         On 15 July 90, Sgt. E. MINGEY #1713, Area Five Violent Crimes, became aware of an offender charged in a shooting incident, in which three persons were shot on the street. This person was Jose MAYSONET, IR# 772277.

Continued On Page (4)

RFC-Maysonet 000049

DETECTIVE DIVISION                                    23 AUG. 1990
AREA FIVE VIOLENT CRIMES                              RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                          PAGE (4)
VICTIM: WILEY, Torrence


    This shooting incident was reported under RD# N-303737. Recovered from the scene of this shooting were three fired cartridge casings, with a class of 9MM 00. These casings were inventoried under Inventory #784562.

    Sgt. MINGEY was aware of the fact that the weapon used to kill Torrence and Kevin WILEY was a 9mm automatic pistol. Sgt. MINGEY believed that there might be a connection between these two seperate shooting incidents.

    On 15 July 90, Sgt. MINGEY in company with Det. F. MONTILLA #16410, Area Five Propety Crimes, interviewed Jose MAYSONET while he was at Area Five. Det. F. MONTILLA speaks Spanish. Det. E. MONTILLA advised Jose MAYSONET of his Miranda Rights in Spanish. Jose MAYSONET acknowledged understanding these rights and agreed to speak with these detectives. Jose MAYSONET indicated that he did have some knowledge of the murders of the two black youths on North Av. He stated that on the night the blacks were shot, three Latin Kings came by his house and wanted to get a 9mm automatic pistol that he had been given by the gang to hold. He gave the gun to these guys and they left. The next day he learned about the shooting of the two blacks on North Ave. and assumed that the Kings he gave the gun to must have done this shooting. Jose MAYSONET declined to provide the names of the individuals who had the gun.

    Jose MAYSONET was thereafter locked up in the Cook County Jail. On 1 Aug. 90, Sgt. MINGEY and Det. MONTILLA went to interview Jose MAYSONET at the Cook County Jail. Jose MAYSONET signed the required attorney waiver form and agreed to be interviewed. Jose MAYSONET stated that he was involved in the murders of the two black youths. He stated that he was not the shooter but was present when the shooting occured. He stated that he knew who the shooter was and the other persons with him. He stated that he would not co-operate in this investigation unless a deal was cut to get him out of jail. Jose MAYSONET was informed by Sgt. MINGEY that no deal would be made even if possible.

    On 22 Aug. 90, Det. R. PAULNITSKY was in court and saw that Jose MAYSONET had made bond and was also in court. Det. R. PAULNITSKY was aware of the previous admissions that Jose MAYSONET had made and asked Jose MAYSONET to come with him to Area Five for additional investigation of these murders.

Continued On Page (5)

RFC-Maysonet 000050

DETECTIVE DIVISION                                23 AUG. 1990
AREA FIVE VIOLENT CRIMES                          RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                      PAGE (5)
VICTIM: WILEY, Torrence


        At Area Five, Jose MAYSONET was advised of his Miranda Rights by Det. F. MONTILLA. Jose MAYSONET acknowledged understanding each of his rights and agreed to talk with the detectives. Jose MAYSONET again repeated his previous statements about supplying the gun used in these murders and the fact that he knew who the offenders were. Jose MAYSONET stated that he could not provide an further information because he had been threatened by Latin King Gang Members with the death of himself, his wife and child, if he informed to the police. Jose MAYSONET was informed that he was being placed in custody for these murders.

        On 22 Aug. 90, Dets. E. HALVORSEN, R. GUEVARA, and S. GAWRYS, arrived at Area Five to work the third watch. This investigation was passed on to these detectives.

        On 22 Aug. 90, at 2000 hrs. Jose MAYSONET was interviewed by Det. R. GUEVARA, who speaks Spanish. During this interview Jose MAYSONET agreed to tell all he knew.

<u>MAYSONET, Jose</u> in summary acknowledged understanding his Miranda Rights as they were read to him by Det. GUEVARA, from a pre-printed paper. Jose MAYSONET agreed to make a statement. On 20 May 90, some members of the Latin Kings came by his house. He is a member of the Latin Kings. One of the Latin Kings was a guy called "Lluiva" He was asked by "Llviva" to hide a gun at his house. He agreed to do so. "Lluiva gave him a 9mm automatic pistol, 4' barrel, 15 shot, dark finish. On 24 May between 2330-0000, he was at home with his wife Rosa BELLO. Three Latin Kings came to his apartment. One of the Kings was "Lluiva. The other two guys were "Fro" and "Tino" They told him that they needed the pistol They told him they had something to do with two guys at Drake and North Ave. that involved dope and they wanted the pistol. He saw that "Lluiva was wearing a black hooded sweatshirt, which ment that they planed on doing a "Roll". He walked out of his apartment and they asked him if he wanted to drive the the car they had. He recognized the car as being the older model, light blue over dark blue, Pontiac Bonv. that belonged to another Latin King named Jeffery. He agreed to drive the car. He drove down Homan to Potomac, then turned and went down Potomac to St. Louis, and went down St. Louis to North Ave. He then drove from North Ave. to Drake and parked in the alley.


Continued On Page (6)

RFC-Maysonet 000051

Case: 1:18-cv-02342 Document #: 367-6 Filed: 07/17/24 Page 100 of 406 PageID #:20686

DETECTIVE DIVISION
AREA FIVE VIOLENT CRIMES

23 AUG. 1990
RD# N-234297

HOMICIDE/FIRST DEGREE MURDER
VICTIM: WILEY, Torrence

PAGE (6)

MAYSONET, Jose "Lluiva", "Fro", and "Tino" all got out of the car. "Lluiva" pulled the hooded sweatshirt over his head. MAYSONET saw two guys standing on the street. "Lluiva", "Fro", and "Tino"started walking towards the guys. They waited about five minutes and then he heard five or six gunshots. He looked and saw that the two guys were on the ground. "Lluiva" had the 9mm pistol in his hand pointing the gun at the guys to see if they still moved. When no one moved, all three guys started to walk back towards the car. All three guys got back into the car and he drove off. He drove back to his home at 1302 N. Kimball. He got out of the car. "Lluiva" got into the drivers seat and drove off. That same morning the shooting occurred, he saw "Lluiva" about 1100 hrs. He met up with "Lluiva" at LeMoyne and Spualding. "Lluiva" said, "I killed two black motherfuckers". MAYSONET was told to keep his mouth shut and not say nothing. MAYSONET was then locked up on 15 July 90, that involved a different shooting. MAYSONET stayed in the Cook County Jail until he was able to make bond on Thrusday 16 Aug. 90. That same day about 2200 hrs. he was at home. "Lluiva", "Fro", "Tino", "Cisco", and "King" all came by his house. "Tino" and "King" are brothers. "King" showed MAYSONET that he was carrying a gun, the same gun used in the murders. "King" put the gun to MAYSONET'S head and told him that if he ever talked about the two murders he would be six feet under.

On 22 Aug. 90, at 2100 hrs. MAYSONET"s wife Rosa BELLO arrived at Area Five. She was allowed to talk with MAYSONET, in the presence of detectives. MAYSONET told her to tell the truth about the night the blacks were killed. She agreed to do so.

BELLO, Rosa in summary stated the following. On the evening of 24 May 90, at about 2330 hrs. she was at home with Jose MAYSONET. Three of Jose's friends she knows as, "Lluiva", "Fro", and "Tino"came to the apartment. "Lluiva" asked Jose for the gun. She saw the gun, and knows about guns. She recognized the gun as being a 9mm automatic pistol 15 shot. The gun was wrapped in a towel and Rosa put the gun in a plastic bag. Jose handed the gun to "LlUiva" All four men left the apartment. Jose returned about 0100 hrs. Jose told her that he had been out with the guys, and that he had been driving. Jose later told her that two guys had been shot.

Continued On Page (7)

RFC-Maysonet 000052

DETECTIVE DIVISION                                    23 AUG. 1990
AREA FIVE VIOLENT CRIMES                              RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                          PAGE (7)
VICTIM: WILEY, Torrence


Jose MAYSONET stated that he knew where both "Lluiva" and "Fro" lived. He offered to show detectives these addresses. MAYSONET also stated that he knew that "Tino's" last name was CRUZ. MAYSONET identified an apartment building on Kedzie as being where "Lluiva"stayed.He also identified a house at 1035 N. Spualding as where "Fro" lived. While MAYSONET was being driven around he spotted "Lluiva"at the corner of LeMoyne and Spualding. MAYSONET was returned to Area Five. At Area Five MAYSONET was shown loose candid photos of Latin King menbers. He identified a photo of Chris FERNANDEZ as being "Fro".

The R/Dets. and Sgt. E. MINGEY spent the next hours searching the neighborhood for all three offenders. During the early morning hours of 23 Aug. 90, "Lluiva" was seen on the street by Det. S. GAWRYS. and Sgt. E. MINGEY. "Lluiva" was now identified as being Alfredo GONZALEZ. GONZALEZ was informed of the allegation made against him by Jose MAYSONET. GONZALEZ was asked to come to Area Five and be interviewed. GONZALEZ stated that he would and was driven to Area Five.

At Area Five GONZALEZ denied any knowledge of the murders or of knowing Jose MAYSONET.

At Area Five Jose MAYSONET saw Alfredo GONZALEZ. He again identified GONZALEZ as being "Lluiva", and the person he saw shoot and kill the victims.

On 23 Aug. at 0430 hrs. A.S.A. Jennifer BOROWITZ, Felony Review was assigned to this investigation. She had been in the office at Area Five on an unrelated investigation and was familiar with this homicide investigation. An interview was conducted with Jose MAYSONET. Present for this interview were A.S.A. BOROWITZ, and Dets. GUEVARA and MONTILLA. Jose MAYSONET repeated his previous statement.

At the conclusion of this interview Jose MAYSONET agreed to provide a court reported typed statement. Due to the amount of time these statements take a second Assistant States Attorney was assigned to replace A.S.A. BOROWITZ.

Continued On Page (8)

RFC-Maysonet 000053

DETECTIVE DIVISION                                    23 AUG. 1990
AREA FIVE VIOLENT CRIMES                              RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                          PAGE (8)
VICTIM: WILEY, Torrence


On 23 Aug. 90, at 0630 hrs. A.S.A. Frank DIFRANCO arrived and conducted his first interview with Jose MAYSONET. Also present for this interview were Dets. R. GURVARA and F. MONTILLA. MAYSONET repeated his previous statements.

On 23 Aug. 90 at 0710 hrs. MAYSONET was moved from the interview room he was at to the conference room. Another interview was then conducted by A.S.A. DIFRANCO. Present for this interview were Dets. R. GUEVARA and F. MONTILLA.

On 23 Aug. 90 at 0928 hrs. another interview was conducted with MAYSONET for the purpose of taking his court reported typed statement. Present for this interview were A.S.A. DIFRANCO, Det. F. MONTILLA, and court reporter Joseph SZYBIST.

Jose MAYSONET thereafter read his statement which he signed.

A.S.A. DIFRANCO requested that Jose MAYSONET be driven to the scene of the murder to corroborate the statement that he had just given. A.S.A. DIFRANCO, accompanied by Dets. R. PAULNITSKY and F. MONTILLA, drove Jose MAYSONET to 3428 W. North Ave. where he demonstrated the facts set forth in his statement.

A.S.A. DIFRANCO defered formal charging of Jose MAYSONET pending additional interviews with Alfredo GONZALEZ.

On 23 Apr. 90, at 1800 hrs. A.S.A. DIFRANCO charging Jose MAYSONET with two counts of First Degree Murder. Charges against Alfredo GONZALEZ are pending at the time of this report.

With the arrest and charging of one of the four offenders in this crime, it is requested that this case be filed, CLEARED BY ARREST/OPEN FOR ADDITIONAL  INVESTIGATION.


Det. E. HALVORSEN     #6036
Det. R. GUEVARA       #16345
Det. S. GAWRYS        #16899
Det. R. PAULNITSKY    #6503
Det. F. MONTILLA      #16410

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 36

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  STATE OF ILLINOIS )
                     ) SS.
2  COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION
4
   THE PEOPLE OF THE      )
5  STATE OF ILLINOIS      )
                          )   Case No. 92-CR-10146
6       -vs-              )
                          )   Charge:  MURDER
7  JOSE MAYSONET          )

8

9              MOTION TO SUPPRESS STATEMENT

10     REPORT OF PROCEEDINGS of the trial before the

11 Honorable LORETTA HALL MORGAN, on the 31st day of

12 January 1995.

13

        APPEARANCES:
14
        HONORABLE JACK O'MALLEY,
15           State's Attorney of Cook County, by
        MR. FRANK MAREK and
16      MS. ELLEN MANDELTORT,
             Assistant State's Attorneys,
17           for the People of the State of
             Illinois;
18
        MR. RANDY RUECKERT,
19           Attorney at Law,
             for the Defendant.
20

21

22 Robert P. Kutzmer, CSR
   Official Court Reporter
23 2650 South California Avenue
   Chicago, Illinois 60608
24

                        1

CCSAO002653

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1                    I N D E X
 2          Date of Proceedings: 1-31-95
 3                 Pages 1 to 175
 4   Witness:          DX        CX        RD        RCX
 5   Fernando Montilla    14        29
 6   Reynaldo Guevara     49        54
 7   Rose Maysonet        66        76        98
 8   People Rest         100
 9   Jose Maysonet       100       121
10   Defendant Rests     149
11   Reynaldo Guevara    150       153
12   Frank Montilla      154       158
13
14
15
16
17
18
19
20
21
22
23
24
```

CCSAO002654

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        THE CLERK:    Jose Maysonet.

2        THE COURT:    This is the motion to suppress

3   statements?

4        MS. MANDELTORT:    It's one motion.

5        THE COURT:    I do have something told him a

6   motion to suppress.

7        MS. MANDELTORT:    That's from a previous

8   attorney.   The motion filed April 22nd of '94 was the

9   motion, paragraphs 1 through 5 inclusive dealt with

10  probable cause issue and paragraph 6, 7, 8 and 9, 10,

11  11 dealt with the motion to suppress.

12       THE COURT:    We are dealing with the --

13       MR. MAREK:    92-10146.

14       THE COURT:    I need that file.   Motion to quash

15  arrest and suppress statements?

16       MS. MANDELTORT:    Yes.

17       THE COURT:    Mr. Maysonet, please?   What we are

18  looking at at this time is the motion to suppress

19  statements essentially; is that right?

20       MR. REUCKERT:    Yes.

21       MS. MANDELTORT:    I believe, Judge, and I

22  believe counsel would concur, that the motion to

23  quash arrest and suppress evidence, that was

24  litigated on January 10th and denied by the Court

3

CCSAO002655

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    encompasses paragraphs 1 through 5.  And the motion

2    to suppress statement is actually paragraph 6 all the

3    way through to the end to 11.  Where the allegations

4    are actually contained in 10, I believe.

5            THE COURT:    Now, I notice that the physical

6    coercion is alleged in 7; is that correct?

7            MS. MANDELTORT:   Yes, Judge.  Judge, the

8    State's reading of this, Judge, is that there's

9    physical coercion, material misrepresentations,

10   direct and indirect promises and threats.  He was not

11   afforded an opportunity to knowingly waive Miranda.

12   He asked for an attorney and was unable to understand

13   Miranda.

14            I don't know, are we proceeding with

15   paragraph 10?

16            MR. REUCKERT:   I'm just going to leave it in

17   there.

18            THE COURT:   Also he wasn't Mirandized?

19            MS. MANDELTORT:   Right.

20            THE COURT:   That he exercised his right for a

21   request for an attorney and that was not complied

22   with?

23            MS. MANDELTORT:   That's correct, Judge.

24            THE COURT:   Very well.

4

CCSAO002656

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      MR. REUCKERT:  Judge for the record, my name is

2  Randy Reuckert.  I'm an attorney and I have been

3  hired by Mr. Beuke as you know to assist him with

4  these motions.  Mr. Beuke is Mr. Maysonet's attorney

5  of record.  I'm asking the Court now if we can enter

6  my appearance non pro tunc to January 10th when we

7  started those motions?

8      THE COURT:  Right. If you prepare that, I'll

9  being glad to sign it and the order will be entered

10  non pro tunc.

11      MR. REUCKERT:  In addition to that we have

12  extensive conversations with Mr. Maysonet and he

13  knows at this point that I have been contacted by Mr.

14  Goosens to represent Mr. Goosens at trial.

15      THE COURT:  Mr. Goosens being another defendant

16  involved in this same case?

17      MR. REUCKERT:  Right, same case.  It's clear

18  they will be severed trials when they occur.  We

19  don't perceive any conflict, any problem.  I have

20  explain all this to Mr. Maysonet I'm I have explained

21  all this to Mr. Maysonet.  I've explained to him that

22  you will want to know from him if it's okay with him

23  if I represent him and continue to represent him on

24  these motions.

5

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE COURT:  It's my understanding that Mr.

2  Beuke perhaps with your assistance, Mr. Beuke will be

3  trying the matter?

4      MR. REUCKERT:  That's right.

5      THE COURT:  The trial on its merits; is that

6  correct.

7      MR. REUCKERT:  Yes.

8      THE COURT:  Very well.  Mr. Maysonet, you have

9  heard what Mr. Reuckert has just indicated to the

10  Court.  The Court simply must inquire of you

11  directly, not that I doubt the representations of

12  counsel, but I want to inquire of you directly, do

13  you understand that Mr. Rueckert apparently will be

14  representing Mr. Goosens in Mr. Goosens trial in this

15  same case?

16      DEFENDANT MAYSONET:  Yes.

17      THE COURT:  He is now under the direction of

18  Mr. Beuke, who is your attorney of record, trying

19  these motions before the Court on your behalf.  Do

20  you have any difficulty with the fact that Mr.

21  Rueckert is representing you for the purposes of

22  these motions?  Understanding that he's going to be

23  representing Mr. Goosens when Mr. Goosens goes to

24  trial on this matter?

6

CCSAO002658

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    DEFENDANT MAYSONET:  No problem.

2    THE COURT:  My understanding is Mr. Goosnens'

3    matter is severed from this matter and the Court

4    wants stress that the Court did not see any apparent

5    conflict, but nevertheless, the Court feels some

6    concern for any appearance of a potential conflict.

7    And the Court simply wanted to be sure,

8    Mr. Maysonet, that you were willing to indicate that

9    you have no difficulty with Mr. Rueckert litigating

10   these motions in your case, understanding that Mr.

11   Beuke is going to be trying your case at trial.  Is

12   that correct?

13   DEFENDANT MAYSONET:  I have no problem with

14   that.

15   THE COURT:  Mr. Maysonet, is there anything

16   that you want to ask the Court about that?  Anything

17   you don't understand?

18   DEFENDANT MAYSONET:  No.

19   THE COURT:  Very well.  I think the Court is

20   satisfied.  I stress again that the Court doesn't see

21   any conflict, it's just the appearance that I had

22   some concern about.

23   MR. RUECKERT:  And I want to make it clear I

24   had never spoken to Mr. Goosens up until last week-

7

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    end, so when I started these motions I had never

2    spoken to Mr. Goosens.   Basically all the information

3    I gathered about these motions was before I to spoke

4    to anybody.

5          THE COURT:  Very well.

6          MR. MAREK:  Two preliminary matters.  We would

7    be making a motion to exclude witnesses.

8          THE COURT:  Very well, anybody that's going to

9    be testifying in these proceedings may not be present

10   in the courtroom during the testimony of any other

11   witness.

12         MR. MAREK:  Secondly I notice the defendant has

13   come into open court with a folder under his arm.  I

14   would only be inquiring whether or not he has any

15   police reports or other materials that have been

16   tendered during discovery?  Obviously custody of

17   those materials is to remain with the attorney.  If

18   indeed any such materials are in the custody of Mr.

19   Maysonet, I would ask they be relinquished to Mr.

20   Rueckert.

21         MR. RUECKERT:  I'll take a look at them.  I

22   don't know what's in here.  If there is anything

23   illegal, I'll take them.

24              We have a preliminary matter also.  We

8

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  consider Rosa Bella to be an essential witness to our

2  motion.  And the last we knew of Rosa Bella is that

3  she had been relocated by the State.  We are unable

4  to find her.  It's our position that the State was

5  the last one to have control of miss Bella and that

6  it's their obligation to present her at this motion.

7  And she is in our opinion essential to the conduct of

8  our motion.

9       THE COURT:  State?

10      MR. MAREK:  Miss Bella as the Court knows did

11 testify as a State witness during the trial of Mr.

12 Alfredo Gonzales.  Subsequent to that --

13      THE COURT:  Who is another defendant in this

14 same case?

15      MR. MAREK:  Yes.  Subsequent to that testimony

16 she was relocated by the state's attorney's office

17 here in the city.  Investigator Stevens handled the

18 relocation at that time.

19      THE COURT:  How long ago was that?

20      MR. MAREK:  That was back in 1992.  It was

21 during, I believe in March or at the very latest

22 April of 1992 that she was initially relocated by us.

23      THE COURT:  Within the City of Chicago?

24      MR. MAREK:  Yes.  And I believe Investigator

9

CCSAO002661

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   Stevens would have personal knowledge of this because

2   he handled the relocation of Miss Bella.  I believe

3   there was a second site that Miss Bella was moved to

4   again local within the city.  It was away from the

5   vicinity of North Avenue and Kedzie which was the

6   area that she had been living in and with Mr.

7   Maysonet.

8           It was away from an area where other Latin

9   King gang members were felt would have any knowledge

10  of he ever whereabouts.  However, sometime subsequent

11  to her being relocated, her whereabouts were

12  discovered and Miss Bella voluntarily relocated

13  herself without telling the state's attorney's office

14  where she went.

15          And the last information I have is that

16  she has moved out of town and right now we do not

17  know where Miss Bella is or who she might be living

18  with and we have no way of contacting Miss Bella.

19  And I have in previous discussions with Mr. Beuke, I

20  have made that known to Mr. Beuke.

21          At one time as the Court knows this

22  litigation has been pending for sometime, and at one

23  point we did state to Mr. Beuke that we would make

24  her available at whatever time was convenient to Mr.

10

CCSAO002662

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Beuke.   And that certainly remained or intention

2    until Miss Bella relocated herself.

3            To my knowledge she has been gone now for

4    at least a year.

5        THE COURT:  Mr. Rueckert, do you have any

6    reason to question the representations made by Mr.

7    Marek?

8        MR. RUECKERT:  No.

9        THE COURT:  You indicate she was essential.

10   What does that mean in terms of your motion?  If they

11   can't find her, they can't produce her.

12       MR. RUECKERT:  As an offer of proof I would

13   tell the Court I believe if she were called to

14   testify, she would testify about 2 issues.  One that

15   in Area 5 there was a representation made by the

16   defendant to the police that he wanted to talk to his

17   lawyer, which I think is critical to this motion.

18           I'll also make the representation to the

19   Court that we believe she would have testified, she

20   would testify when she was brought to Area 5, police

21   confronted the defendant with the notion that Rosa

22   Bella would not be able to leave the police station,

23   and they would take her children unless Mr. Maysonet

24   were to cooperate with them in giving a statement.

11

CCSAO002663

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          So it goes to the voluntariness of

2    whatever statement he had made.

3          MR. MAREK:  Just so it's clear, these lines of

4    inquiry were disclosed to us quite a long time ago by

5    Mr. Beuke, and while Miss Bella was in town

6    Investigator Stevens did inquire of Miss Bella about

7    that and she related to Mr. Stevens that in fact that

8    would not be her testimony.  And if in fact she were

9    here, Mr. Stevens would certainly be able to testify

10   in rebuttal to any testimony she gave to the contrary

11   on those points.

12         THE COURT:  Well, it seems to me both sides

13   must understand that it was Miss Bella has absented

14   herself.

15          Mr. Rueckert, have you or Mr. Beuke made

16   any efforts to locate Miss Bella?

17         MR. RUECKERT:  We sent -- well, I don't know.

18   I haven't.  I can't speak for Mr. Beuke.  I have

19   not.

20         THE COURT:  I don't think there's much we can

21   do about that.  If she were deceased, I don't know

22   that there's anything -- I have no idea.  I don't

23   have any reason at this point to feel that the State

24   has not made a honest effort to locate her and if

12

CCSAO002664

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  they can't locate her, they just can't locate her.

2          And I gather your office hasn't been able

3  the locate her either.  That brings us down to

4  whether you want to proceed, understanding she is

5  apparently not available or whether you have some

6  other idea about this motion.  You still want to

7  proceed understanding you probably will not have her

8  testimony?

9      MR. RUECKERT:  Yeah.  We'll go ahead.

10      THE COURT:  Very well.

11      THE INTERPRETER:   Judge, for the record my

12  name is Raul Castillo, c-a-s-t-i-l-l-o-, court

13  interpreter.

14      THE COURT:  Thank you,.

15      MR. RUECKERT:  I have one witness who's in the

16  courtroom now.  I'll tell her to leave right now.

17      MR. RUECKERT:  Part of what was in Mr.

18  Maysonet's folder is a legal pad and pen.  I'm giving

19  that back to him.

20      THE COURT:  State, did you hear the

21  representation of Mr. Rueckert?

22      MR. MAREK:  Yes.  We also ask that the

23  defendant be sworn to the assertions in the motion.

24      THE COURT:  Very well.  Mr. Reuckert, if you

13

CCSAO002665

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   will have Mr. Maysonet stand to be sworn to the

2   assertions made in the motion.

3                           (Defendant sworn.)

4       THE COURT:  Thank you.

5       MS. MANDELTORT:  Do you have any sort of

6   opening statement?

7       MR. RUECKERT:  No.

8       MS. MANDELTORT:  The State would also waive.  I

9   believe it's our burden, Judge.

10      THE COURT:  I think so.

11      THE COURT:  Swear the witness, please.

12                  FERNANDO MANTILLA,

13  called as a witness on behalf of the People of the

14  State of Illinois, being first duly sworn, was

15  examined and testified as follows:

16                  DIRECT EXAMINATION

17              By MS. MANDELTORT:

18      Q.   Sir, could you please state your name AND

19  spell both your first and your last name.

20      A.   Detective Fernando E. Mantilla

21  f-e-r-n-a-n-d-o, m-o-n-t-i-l-l-a.

22      Q.   And by whom are you employed?

23      A.   Chicago Police Department.

24      Q.   And how long have you been a Chicago

                            14

CCSAO002666

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    police officer?

2         A.    22 years.

3         Q.    What is your current star number?

4         A.    20778.

5         Q.    Sir, I'd like to talk to you about August

6    22nd of 1990.  Where were you assigned at that time?

7         A.    Area 5.

8         Q.    And on that date, sir, were you involved

9    in the investigation into the murder of the Wylie

10   brothers that being Torrance Wylie and Kevin Wylie?

11        A.    Was I assigned to that case?

12        Q.    Were you working on that case on that day?

13        A.    Yes.

14        Q.    Now, specifically, sir, on August 22, 1990

15   did you have occasion to be at Area 5 at about 11:30

16   in the morning?

17        A.    Yes, I did.

18        Q.    And at that time, sir, did you see a

19   individual at that time you learned to be Jose

20   Maysonet?

21        A.    Yes, I did.

22        Q.    Do you see him in court today?

23        A.    Yes.  The gentleman wearing the --

24        MR. RUECKERT:  We'll stipulate, Judge.

15

CCSAO002667

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        THE COURT:  The record may reflect the

2   identification in court of the defendant.

3        MS. MANDELTORT:

4        Q.   At 11:30 in the morning at Area 5 other

5   than yourself and the defendant, was anyone else in

6   the room?

7        A.   Yes.

8        Q.   Who would that be?

9        A.   Detective Paulnitski.

10       Q.   And likewise, sir, I'd like to talk to you

11  now about the 23rd of August, q990, did you have

12  occasion again to be at Area 5?

13       A.   Yes.

14       Q.   And at about 4:30 in the morning were you

15  present with the defendant at that time as well?

16       A.   Yes, I was.

17       THE COURT:  What time was that?

18       MS. MANDELTORT:  4:30 in the morning, Judge.

19       Q.   And, sir, other than yourself and the

20  defendant at 4:30 in the morning, was there another

21  detective present?

22       A.   Yes.

23       Q.   Who was that?

24       A.   Detective Guevara.

16

CCSAO002668

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    And was likewise there an assistant
2   state's attorney present?
3      A.    Yes.
4      Q.    Who was that?
5      A.    Berkowitz.
6      Q.    Would that be Borowitz?  Jennifer
7   Borowitz?
8      A.    Yes.
9      Q.    And on the 23rd of August, 1990 at 6:30 in
10  the morning were you again at area 5 with the
11  defendant?
12     A.    Yes, I was.
13     Q.    Now, other than yourself was there another
14  detective at that time?
15     A.    Yes.
16     Q.    Who was that?
17     A.    Detective Guevara.
18     Q.    And was there a different assistant
19  state's attorney at that time?
20     A.    Yes.
21     Q.    Who was that?
22     A.    Assistant State's Attorney DiFranco.
23     Q.    Now, on the 23rd of August, 1990 at about
24  7:10 in the morning were you again present for a

17

CCSAO002669

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    conversation with the defendant?

2         A.   Yes, I was.

3         Q.   And was there another detective present?

4         A.   Yes.

5         Q.   And who was that?

6         A.   Guevara.

7         Q.   And likewise was there an assistant

8    state's attorney present for that conversation?

9         A.   Yes.

10        Q.   Who was that?

11        A.   DiFranco again.

12        Q.   And finally, sir, on the 23rd of August,

13   1990 at approximately 9:28 in the morning, were you

14   present for a court reported statement of the

15   defendant Jose Maysonet?

16        A.   Yes, I was.

17        Q.   And at that time other than yourself and

18   the defendant were there any other detectives

19   present?

20        A.   No.

21        Q.   Was there an assistant state's attorney?

22        A.   Yes.

23        Q.   Who was that?

24        A.   DiFranco.

18

CCSAO002670

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   And likewise was there a court reporter?

2      A.   Yes, there was.

3      Q.   Now, sir, at anytime during those 5

4  conversations that you were present for with the

5  defendant at Area 5, did you or Detective Guevara at

6  any of those conversations place black leather gloves

7  on your hands, place a telephone book to the

8  defendant's left side as well as the top of his head

9  and the middle of his chest and then slam the

10  telephone directory with a large police style

11  flashlight causing the defendant enormous pain?

12      A.   No, ma'am.

13      Q.   Did you, Detective Guevara or anyone else

14  do that to the defendant in your presence?

15      A.   No, ma'am.

16      Q.   And at anytime during those 5

17  conversations, sir, did you or anyone in your

18  presence make material misrepresentations of fact to

19  the defendant?

20      A.   No, ma'am.

21      Q.   Specifically was the defendant told that

22  he had been implicated as the shooter in this offense

23  by other individuals not named, and that if he wanted

24  to protect both his wife and child, he would have to

19

CCSAO002671

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  provides the detectives with information concerning

2  the names of the individuals involved in the crime?

3      A.    No, ma'am.

4      Q.    At anytime during those 5 conversations

5  that you were present for, sir, did anyone, either

6  you or anyone in your presence, make my direct or

7  indirect promises or threats to the defendant?

8      A.    No, ma'am.

9      Q.    Specifically, did anybody make suggestions

10  or offers of leniency?

11      A.    No, ma'am.

12      Q.    Inferences that charges would be dropped?

13      A.    No, ma'am.

14      Q.    Inferences that in exchange for his

15  statement and any self incriminating actions the

16  number and severity of possible charges against him

17  would be limited?

18      A.    No, ma'am.

19      Q.    At any time did anybody speak to him about

20  the immediate release of his wife Rosa Bella?

21      A.    No, ma'am.

22      Q.    To your knowledge, sir, was Rosa Bella

23  ever in custody at Area 5?

24      A.    No, ma'am.

20

CCSAO002672

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1        Q.   Now, sir, the 11:30 conversation that you
 2   testified that you were present for with Detective
 3   Paulnitski --
 4        A.   Yes, ma'am.
 5        Q.   Prior to that conversation beginning, was
 6   the defendant advised of his constitutional rights?
 7        A.   Yes, ma'am.
 8        Q.   By whom?
 9        A.   By me.
10        Q.   Sir, did you do that -- in what manner did
11   you do that?  From memory or from a preprinted
12   source?
13        A.   From a preprinted book.
14        Q.   And what book was that?
15        A.   My FOP book.
16        Q.   Sir, did you do it in Spanish or in
17   English?
18        A.   I did it both in English and in Spanish.
19        Q.   Can you tell the judge why you spoke to
20   the defendant to advise him of his rights in both
21   English and Spanish?
22        A.   I did it in English and then I did it in
23   Spanish because he felt more comfortable with the
24   Spanish language.
```

21

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        Q.   Did he in fact speak in your presence in

2  English?

3        A.   Yes, ma'am.

4        Q.   Now at 4:30 in the morning on the 23rd of

5  August, 1990 when it was yourself, Detective Guevara

6  and Assistant State's Attorney Borowitz, was the

7  defendant advised of his rights prior to that

8  conversation beginning?

9        A.   Yes, ma'am.

10       Q.   By whom?

11       A.   ASA Borowitz read it from her file and we

12  interpreted in Spanish to make sure he was

13  comfortable.

14       Q.   On the 23rd of August 1990 at 6:30 in the

15  morning when yourself Detective Guevara and Assistant

16  State's Attorney DiFranco was present, was the

17  defendant advised of his rights at that time?

18       A.   Yes, ma'am.

19       Q.   By whom?

20       A.   ASA DiFranco.

21       Q.   And during the course of the court

22  reported statement, was the defendant advised of is

23  rights?

24       A.   Yes, ma'am.

22

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        Q.    And by whom?

2        A.    ASA DiFranco.

3        Q.    During the times you were present where

4   the defendant was advised of his rights in both

5   English and Spanish, did the defendant acknowledge to

6   you he understood his rights?

7        A.    Yes, ma'am.

8        Q.    Did he waive those rights?

9        A.    Yes, ma'am.

10       Q.    And at anytime, sir, during the 5

11  conversations that you were present with the

12  defendant, did the defendant ever make numerous

13  requests to contact either family members or his

14  attorney William Swano for the purposes of seeking

15  his counsel and advice in the case?

16       A.    No, ma'am.

17       MS. MANDELTORT:    Judge, if I could have just

18  one moment.    Judge, I'm showing counsel what has been

19  marked, actually I think we had exhibits in the other

20  motion.    We'll make it Respondent's Exhibit No. 1 for

21  purposes of this motion.

22                          (Respondent's Exhibit No. 1

23                          was marked for

24                          identification.)

23

CCSAO002675

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        THE COURT:  Very well.

2        MS. MANDELTORT:  I don't want to confuse the

3   record.  I think there were some exhibits in the last

4   one.

5        THE COURT:  I think you're right.

6        MS. MANDELTORT:  Showing counsel.  May I

7   approach?

8        THE COURT:  Yes, you may.

9        MS. MANDELTORT:

10        Q.   Sir, I'm showing you what's been marked

11   Respondent's Exhibit No. 1 for identification.  Could

12   you look through that document.  Sir, do you

13   recognize that 7-page document?

14        A.   Yes, ma'am.

15        Q.   Could you tell the Judge what you

16   recognize it to be?

17        A.   This is the court reported statement with

18   ASA DiFranco and the court reporter.

19        Q.   That the actual court reported statement

20   generated that evening?

21        A.   Yes, ma'am.

22        Q.   And is it in substantially the same

23   condition as when you saw it that evening?

24        A.   Yes, ma'am.

24

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    In the course of that 7-page statement

2  does the defendant's signature appear?

3      A.    Yes, ma'am.

4      Q.    Where does his signature appear?

5      A.    At the bottom above my signature of page

6  1.

7      Q.    And did he sign that, sir, in your

8  presence?

9      A.    Yes, ma'am.

10     Q.    And likewise, sir, does his signature

11  appear at the end of the statement on the top of page

12  7?

13     A.    Yes, ma'am.

14     Q.    And likewise, sir, your signature appears

15  on each and every place?

16     A.    Yes, ma'am.

17     Q.    And the Assistant State's Attorney

18  DiFranco, does his signature appear on that document?

19     A.    Yes, ma'am.

20     Q.    And is that document a true and accurate

21  transcript of the conversation that took place

22  between Assistant State's Attorney DiFranco and the

23  defendant in Area 5 at 9:28 in the morning on

24  Thursday, August 23, 1990?

25

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    Yes, ma'am.

2        MS. MANDELTORT:  Your Honor, at this time I'd

3   be offering the statement specifically just the

4   beginning portion and the end portion for purposes of

5   rebutting the allegations in the motion.

6        THE COURT:  Counsel, care to comment?

7        MR. RUECKERT:  No, I have no objection.

8        THE COURT:  Very well.

9        MS. MANDELTORT:

10       Q.    Sir, specifically on page 1 and going into

11  page 2, do you a section, sir, wherein the defendant

12  is advised of  his rights in that court reported

13  statement?

14       A.    Yes, ma'am.

15       Q.    Could you please read those questions and

16  answers to the Judge as they appear on page 1 and

17  page 2?

18       THE COURT:  For the record, the court has

19  admitted Respondent's Exhibit No. 1 in pertinent

20  part.

21       MS. MANDELTORT:  Thank you, Judge.

22       Q.    Where it starts by Mr. DeFranco, the first

23  question?

24       A.    Now, I talked to you earlier and explained

26

CCSAO002678

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  that I'm an assistant state's attorney, a lawyer

2  working with the police and not your lawyer; is that

3  correct?

4          Answer:  Yes.

5          Question:  Before we spoke I advised you

6  of your constitutional rights; is that correct?

7          Answer:  Yes.

8          I'm going to advise you of your rights

9  again.  Do you understand you have the right to

10 remain silent?

11         Answer:  Was yes.

12         Do you understand anything you say can be

13 used again you in a court of law?

14         Answer was yes.

15         You understand you have a right to talk to

16 a lawyer and have him present with you while you are

17 being questioned?

18         Answer was yes.

19         Do you understand if you cannot afford or

20 hire a lawyer, one will be appointed by the court to

21 represent you before any questioning if you wish

22 one?

23         Answer was yes.

24         Understanding these rights do you wish to

27

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    talk to us now?

2              Answer was yes.

3         MS. MANDELTORT:

4         Q.    Now, sir, I'd like you to go now to page 6

5    and into page 7 of that statement.  Specifically I

6    guess the bottom third of the page, sir.  Do you see

7    questions to the defendant regarding how he was

8    treated by the police and the assistant state's

9    attorney?

10        A.    Yes.

11        Q.    Could you please read that series of

12   questions and answers for the judge?

13        A.    Question:  Did anyone for, then it's force

14   or threaten you to make this statement?  Answer was

15   no.

16              Are you giving this statement freely and

17   voluntarily?

18              Answer:  Uh-huh, yes.

19              Have you been threatened by the police.

20   I'm sorry.  Excuse me.  Have you been treated by the

21   police --

22        Q.    The question is how?

23        A.    Yes, I'm sorry.  How have you been treated

24   by the police?  The answer was good.

                            28

CCSAO002680

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          How have you been treated by myself?

2          The answer was good.

3          Has anyone made any promise to you for

4   your statement?

5          Answer was no.

6     Q.   Sir, just so we're clear, during the

7   course of that court reported statement, the

8   defendant spoke in English, did he not?

9     A.   Yes, ma'am.

10    Q.   That was not prepared through the aid of

11  any sort of interpreter, was it?

12    A.   No, ma'am.

13    MS. MANDELTORT:  If I could just have one

14  moment, Judge.

15         I have no further questions.  I would

16  tender the witnesses to the defense.

17    THE COURT:  Very well.  Mr. Rueckert, cross

18  examination.

19              CROSS EXAMINATION

20              By MR. RUECKERT:

21    Q.   Detective, if I understand your testimony

22  correctly, in this statement when Mr. DeFranco

23  speaks, he was speaking in English; is that right?

24    A.   Yes, sir.

29

CCSAO002681

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     Q.    And you were not interpreting?

2     A.    During the statement?

3     Q.    Yes?

4     A.    Yes, sir, I was not interpreting.

5     Q.    So whenever it says Mr. DeFranco here,

6  that means he was speaking directly to Mr. Maysonet

7  in English?

8     A.    Yes, sir.

9     Q.    And where it says "answer," Mr. Maysonet

10 according to you was answering back in English; is

11 that right?

12    A.    Yes, sir.

13    Q.    So at the bottom of page 1 Mr. DiFranco

14 used the word "constitutional," did he not?

15    A.    Yes, sir.

16    Q.    Did you interpret constitutional for Mr.

17 Maysonet?

18    A.    No, sir.

19    Q.    Can you say constitutional in Spanish?

20    A.    I have a hard time with that word.

21    Q.    That's a yes?  Can you do it?

22    A.    Not very well.

23    Q.    Well, when you first advised him of his

24 rights back at 11 o'clock in the morning and you said

30

CCSAO002682

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    you did it in Spanish, how did you say

2    constitutional?

3        A.    I used the word (Speaking in Spanish.)

4        Q.    Did Mr. Maysonet indicate to you he

5    understood that?

6        A.    He indicated he understood, yes.

7        Q.    How did he do that?

8        A.    He said he understood.

9        Q.    Did he say he understood constitutional?

10        A.    I explained to him that was the

11    constitution of the United States.  According to the

12    constitution he had that right.

13        Q.    Did you say that in Spanish?

14        A.    Yes.

15        Q.    How would you say that in Spanish?

16        A.    I told him (Speaking in Spanish.)

17        MS. MANDELTORT:  May the record reflect that

18    the witness is responding in Spanish.  I don't think

19    that will appear in the transcript.

20        THE COURT:  Very well.

21        MR. RUECKERT:

22        Q.    Once again, according to you, Mr. Maysonet

23    indicated he understood that?

24        A.    Yes, sir.

31

CCSAO002683

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    According to your testimony here today Mr.

2  Maysonet was interviewed 5 different times, right?

3      A.    Yes, sir.

4      Q.    And I note that every time there was

5  someone there who spoke Spanish?  Either yourself or

6  Detective Guevara?

7      A.    Yes, sir.

8      Q.    But yet it's your testimony that Mr.

9  Maysonet understood English, right?

10     A.    Yes, sir.

11     Q.    Nevertheless, the police found it

12  important to have someone who spoke Spanish there

13  every time they spoke to Mr. Maysonet?

14     MS. MANDELTORT:  Objection to the form of the

15  question.

16     THE COURT:  Sustained.

17     MR. RUECKERT:

18     Q.    In fact there was somebody there who spoke

19  Spanish every time, correct?

20     THE COURT:  Sustained.  That's been asked and

21  answered.  The Court heard it the first time.

22     MR. RUECKERT:

23     Q.    In fact, before August 22nd you had other

24  conversations with Mr. Maysonet, did you not?

32

CCSAO002684

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   Yes, sir.

2      Q.   And that was with Sgt. Mink?

3      MS. MANDELTORT:  Objection, beyond the scope of

4 the motion.

5      MR. RUECKERT:  It's not beyond the scope.

6      THE COURT:  I beg your pardon?

7      MR. RUECKERT:  I don't believe it's beyond the

8 scope of the motion.  We're talking about whether or

9 not he can understand English.

10     MS. MANDELTORT:  The motion specifically --

11     THE COURT:  Sustained.  Conversations with

12 detective Mink are not in issue.

13     MR. RUECKERT:

14     Q.   When you first saw Mr. Maysonet in Area 5,

15 that was on the 22nd of August, right?

16     A.   Yes, sir.

17     Q.   At 11:30?

18     A.   Yes, sir.

19     Q.   Where was he at that point?

20     A.   I don't understand what you're saying.

21     Q.   Where physically was he in the area?

22     A.   Upstairs in the detective division.

23     Q.   Well, I know the detective division and

24 it's a big room and there's a lot of little rooms

CCSAO002685

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  around it.  Where specifically was Mr. Maysonet?

2      A.    He was in an interview room.

3      Q.    Was he there by himself?

4      A.    Yes, sir.

5      Q.    Was he handcuffed at that point?

6      A.    I don't recall.

7      Q.    Was the door locked?

8      MS. MANDELTORT:  Objection.  Beyond the scope

9  of the motion.  There is no such allegation involving

10 handcuffs or locked doors.

11     MR. RUECKERT:  If we are talking about

12 voluntariness and coerciveness, all of those things

13 are relevant.  Plus if we are talking about whether

14 or not, and it's going to get to this point whether

15 or not the defendant initiated the conversation, it

16 becomes important to know if he could in fact

17 initiate conversations.

18     THE COURT:  Counsel, it's your allegations.

19 You haven't alleged that he was cuffed to the wall or

20 anything in your motion as part of your allegations.

21         He can answer for whatever that's worth.

22     MR. RUECKERT:  It goes to the voluntariness.

23     THE COURT:  I just ruled.

24     MR. RUECKERT:

34

CCSAO002686

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   Was he cuffed, officer?

2      A.   I don't think he was.

3      Q.   Was the door locked?

4      A.   No, sir.

5      Q.   So he could go in and out of that room by

6 himself if he wanted to?

7      MS. MANDELTORT:  Objection.

8      THE COURT:  Sustained.  The form of the

9 question.

10     MR. RUECKERT:

11     Q.   You knew on August 22nd at 11 o'clock in

12 the morning Mr. Maysonet had been charged with

13 another case, did you not?

14     MS. MANDELTORT:  Objection, Judge.

15     THE COURT:  Overruled.  He can answer.

16     THE WITNESS:  Yes.

17     MR. RUECKERT:

18     Q.   And you knew he had a lawyer in that other

19 case, did you not?

20     MS. MANDELTORT:  Objection.

21     THE COURT:  What's the basis?

22     MS. MANDELTORT:  That motion as to his attorney

23 was resolved in the other motion, Judge.  That's not

24 the allegation in this motion.

CCSAO002687

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        THE COURT:  Yes, it is.

2        MR. RUECKERT:  Sure it is.

3        THE COURT:  One of the allegations is that he

4   asked repeatedly for an attorney and somewhere in

5   this now, nobody moved to strike it, but I can see

6   statements in number 11, I inquired about that before

7   we began and after the appearance of counsel for

8   record.

9        MS. MANDELTORT:  Withdraw the objection.

10       MR. REUCKERT:

11       Q.   I believe you answer was yes; is that

12  right?

13       A.   Yes, sir.

14       Q.   Now, when you gave him his Miranda

15  warnings at 11:30 in the morning, I assume one of the

16  warnings you gave him was the that he had a right to

17  talk to his lawyer, right?

18       A.   Yes, sir.

19       Q.   And didn't he tell you at that point that

20  I want to see my layer?

21       A.   No, sir, he did not.

22       Q.   Was Paulnitski present at 11:30 when you

23  spoke to him?

24       A.   Yes, sir.

36

CCSAO002688

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   It was just you 2 detectives and Mr.
2   Maysonet in that room, right?
3      A.   Yes, sir.
4      Q.   And did Paulnitski advise him of his
5   rights in English?
6      A.   I don't recall that, sir.
7      Q.   Was Paulnitski in there prior to you?
8      A.   I don't know, sir.  I couldn't tell you.
9      Q.   Was Paulnitski in there when you got in
10  there?
11     A.   He called me into the room, yes, sir.
12     Q.   So he's already in with Mr. Maysonet
13  before you got there?
14     A.   Yes, sir.
15     Q.   So something could have go on between Mr.
16  Maysonet and Paulnitski before you got in there?
17     MS. MANDELTORT:  Objection.
18     THE COURT:  Sustained, form of the question.
19  You're asking the witness to speculate.
20     MR. RUECKERT:  How long was Paulnitski in with
21  Mr. Maysonet before you got in there?
22     A.   I don't know, sir.
23     Q.   But he was in there before you got in
24  there?

CCSAO002689

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       THE COURT:   Sustained.

2       MS. MANDELTORT:   Objection.

3       THE COURT:   I listen very careful Mr.

4  Rueckert.

5       MR. RUECKERT:

6       Q.   Now, you stated you had another

7  conversation with Mr. Maysonet about 4:30 in the

8  afternoon; is that right?  I take that back.  Strike

9  that question.  4:30 in the morning on the 23rd?

10      A.   Yes, sir.

11      Q.   What time did you come into work?

12      A.   I came in I think around 11 p.m.  I start

13  early on midnights.

14      Q.   Were you working midnights on the 22nd as

15  well?

16      A.   Yes, sir.

17      Q.   Did you stay late?

18      A.   Yes, sir.

19      Q.   So you stayed late on the 22nd.  Was that

20  specifically to speak to Mr. Maysonet?

21      A.   I don't recall, sir.

22      Q.   But you came in early on the 23rd?

23      A.   I come in early every night when I was

24  working midnights.

38

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Q.    And at 4:30 you went to speak to Mr.
2  Maysonet again, right?

3    A.    Yes, sir.

4    Q.    Now, were you the first one in the room or
5  was Guevara already in the room?

6    A.    I don't recall, sir.

7    Q.    And where did this conversation take
8  place?

9    A.    Area 5, sir, in one of the interview
10 rooms.

11   Q.    The same room or a different room?

12   A.    I don't recall whether it was the same
13 room or not.

14   Q.    Do you know if Mr. Maysonet had been down
15 to the lockup between the time you saw at 11:30 on
16 the 22nd and 4:30 on the 23rd?

17   A.    No, sir, I do not.

18   Q.    You don't know?

19   A.    No, sir.

20   Q.    You know if he was held past court call on
21 the 22nd?

22   A.    No, sir, I do not.

23   Q.    You know what a hold past court call is,
24 the form, don't you?

39

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    Yes, sir.

2      Q.    Judge I'm going to mark this as

3  Petitioner's Exhibit A.  I'm going to use letters

4  because I used numbers in the other motion?

5      THE COURT:  Okay.

6                         (Petitioner's Exhibit A was

7                         marked for identification.)

8      MR. RUECKERT:

9      Q.    Detective Montilla, I show you what's been

10  marked Petitioner's Exhibit A for identification.

11  Can you tell us what that is?

12      A.    This is one of our hold past court call.

13      Q.    This Petitioner's Exhibit A specifically

14  relates to Jose Maysonet, right?

15      A.    Yes, sir.

16      Q.    That's the defendant in this case?

17      A.    Yes, sir.

18      Q.    Either known as Jose or Juan?

19      A.    Yes, sir.

20      Q.    And this indicates that some detective, I

21  can't read his name, if you can help me.  Doesn't

22  really matter to me.  Regardless, somebody was

23  requesting Jose Maysonet be held past court call

24  until midnight on the 23rd, right?

40

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   Yes, sir.

2      Q.   That means he was not allowed to go to

3  court on the 22nd when he was brought in?

4      MS. MANDELTORT:  Objection.

5      THE COURT:  Sustained as to what it means.

6      MR. RUECKERT:

7      Q.   Well, he didn't go to court on the 22nd?

8      MS. MANDELTORT:  Objection.

9      THE WITNESS:  I don't know if he had court or

10  not, sir.

11      THE COURT:  He answered that question before.

12      MR. RUECKERT:

13      Q.   Now, at 4:30 in the morning on the 23rd

14  did Assistant State's Attorney Borowitz give Mr.

15  Maysonet his Miranda warnings in English?

16      A.   Yes, sir.

17      Q.   And did you, either you or Mr. Guevara

18  give him those rights in Spanish?

19      A.   As the state's attorney is giving their

20  rights, we'll say them in Spanish.

21      Q.   Okay.  So you were saying them at the same

22  time?

23      A.   Yes, sir.

24      Q.   At 4:30 with Assistant State's Attorney

41

CCSAO002693

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Borowitz?

2         A.    Yes, sir.

3         Q.    Now, at 6:30 again it was yourself and

4    Detective Guevara and this is the first time

5    Assistant State's Attorney DiFranco is there; is that

6    right?

7         A.    Yes, sir.

8         Q.    At that point you say the assistant

9    state's attorney gave Mr. Maysonet his warnings; is

10   that right?

11        A.    Yes, sir.

12        Q.    Was that in English also?

13        A.    Yes, sir.

14        Q.    And did you at that point give him his

15   rights in Spanish?

16        A.    I don't know if it was me or Guevara, but

17   we always repeat them in Spanish just do make sure

18   they feel comfortable.

19        Q.    But you didn't do it during the court

20   reported statement?

21        A.    No.   I didn't recite anything then.

22        Q.    At 4:30 did Mr. Maysonet ask for his

23   lawyer?

24        A.    No, sir, he did not.

42

CCSAO002694

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    After being advised he had a right to talk
2  to that same lawyer?
3      A.    Never asked for a lawyer.
4      Q.    At 6:30 did he ask for his lawyer?
5      A.    No, sir.
6      Q.    Now, what time did Rosa Bella come to Area
7  5?
8      A.    Who is Rosa Bella?
9      Q.    His wife.
10     A.    I don't know, sir.
11     Q.    Well, when the state's attorney asked you
12  a question about was Rosa Bella in custody you said
13  no?
14     A.    There was no Rosa Bella in custody at all.
15     Q.    You don't know if Rosa Bella was there at
16  all?
17     A.    At the time I didn't know who Rosa Bella
18  was, okay.  And then they said later on I found out
19  this was his wife because she talked to me personally
20  for a little while.
21     Q.    She spoke to you in area 5?
22     A.    Yes.
23     Q.    What time was that?
24     A.    I don't recall.  That was later on.

43

CCSAO002695

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   Well, he didn't give his court reported

2   statement until 9:30 or thereabouts on August 23rd.

3   You had spoken to Miss Bella before then.   Did you

4   not?

5      A.   Someone introduced -- she talked to me

6   in.   I don't recall the conversation.

7      Q.   That may be and I'm not asking you about

8   the contents of the conversation.   I'm saying you

9   spoke to her at sometime before he gave the court

10  reported statement?

11     A.   Yes.

12     Q.   You also spoke to his sister Rose, did you

13  not?

14     A.   No, sir.

15     Q.   You don't remember Rose asking to take him

16  his pills?

17     A.   No, sir.

18     Q.   You don't remember talking to Rose about

19  whether or not she had spoken to the Attorney Swano?

20     A.   No, sir.

21     Q.   You don't remember talking to Rose about

22  he'll be released in 72 hours?

23     A.   No, sir.

24     MS. MANDELTORT:   I would object to all this.

44

CCSAO002696

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   There's no allegation in any motion about any

2   recommendations of relatives.

3        THE COURT:  That's correct.  But I'll let it

4   stand.

5        MR. RUECKERT:

6        Q.   Detective, I note in the court reported

7   statement on page 1, the part that's been admitted by

8   the prosecution here.

9        THE COURT:  It was a admitted by the Court.

10       MR. RUECKERT:

11       Q.   Admitted by the Court and presented by the

12  prosecution.

13       THE COURT:  There is a difference.

14       MR. RUECKERT:  You are absolutely right.  And I

15  stand corrected.

16       Q.   I note on the front page here that Mr.

17  Maysonet's name is used at least 3 different times.

18  Statement of Jose Maysonet.  Down in the first

19  paragraph where Mr. DiFranco is talking he used Jose

20  Maysonet's name twice.  And in there they spell his

21  name M-a-i, the court reporter does.  Did you tell

22  the court reporter to put down m-a-i?

23       A.   No, sir.

24       Q.   Do you know why the court reporter put

45

CCSAO002697

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    down m-a-i?

2         MS. MANDELTORT:  Objection.

3         THE COURT:  Sustained.

4         MR. RUECKERT:

5         Q.   Jose Maysonet never spelled his name

6    m-a-i, did he?

7         A.   He signed it m-a-y.

8         Q.   Right.  But my question is did he ever say

9    m-a-i to you, Jose Maysonet?

10        A.   Not that I recall.

11        Q.   Now, after this statement was given at

12   9:30, you and Jose Maysonet and Assistant State's

13   Attorney DiFranco and Guevara got in a car, did you

14   not?

15        MS. MANDELTORT:  Objection.  Beyond the motion.

16        THE COURT:  Yes, counsel.

17        MR. RUECKERT:

18        Q.   Page 4.  Officer, I'm going to show you

19   page 4 of the People's Exhibit No. 1.  And on direct

20   you testified that the exhibit here was the original

21   court reported statement given by Mr. Maysonet;

22   right?

23        A.   Yes, sir.

24        Q.   On page 4 in response to a question by Mr.

                              46

CCSAO002698

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    DiFranco it says, "where did you go?"  The answer was

2    I go, I took Homan to Potomac, Potomac all the way to

3    St. Louis, St. Louis all the way to North Avenue,

4    North Avenue to Drake, and parked in the alley.

5           And it's your testimony that's what Mr.

6    Maysonet said in English, right?

7        A.    Yes, sir.

8        Q.    When you parked in the alley, what

9    happened then?

10       THE COURT:  Wait a minute, wait a minute.  I

11   don't understand why we're in the statement.  I don't

12   hear any objection, but I don't understand that.  Nor

13   do I understand how that's relevant to the issue.

14       MR. RUECKERT:  Well, because my -- one of my

15   issues is voluntariness, Judge, and I think if

16   there's something in the statement that isn't true,

17   then I think that goes to whether or not this is a

18   voluntary statement.

19       THE COURT:  Counsel.  No.

20       MR. RUECKERT:  That's what I'm attempting to do

21   and that's my offer of proof.

22       THE COURT:  Very well.  The Court has sustained

23   the objection that was not made.

24       MR. RUECKERT:

                          47

CCSAO002699

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   During every one of those 5 conversations
2  Mr. Maysonet was in a conference room in Area 5 or
3  interview room?
4      A.   Yes, sir.
5      Q.   And the only other people there besides
6  Mr. Maysonet were police officers; is that not right?
7      A.   Yes, sir.
8      Q.   And you were present during the court
9  reported statement where Mr. Maysonet was asked if he
10  had been treated okay by the police; right?
11      A.   Yes, sir.
12      Q.   Had you told Mr. Maysonet by that point
13  that you had spoken to Rosa Bella, his wife?
14      A.   I don't recall.
15      Q.   Do you remember if you ever told Mr.
16  Maysonet that you had spoken to his wife?
17      A.   I can't recall.
18      Q.   Do you know if you ever presented his wife
19  to him in Area 5?
20      A.   That I don't think I ever presented her to
21  him.
22      MR. RUECKERT:   Thank you.   I don't think I have
23  anything else.
24      MS. MANDELTORT:   Nothing further, Judge.

48

CCSAO002700

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    THE COURT:  Very well.  Detective, you can step

2    down.  The Court is now in recess.

3                              (Witness excused.)

4                              (Recess taken.)

5              REYNALDO GUEVARA,

6    called as a witness on behalf of the People of the

7    State of Illinois, being first duly sworn, was

8    examined and testified as follows:

9              DIRECT EXAMINATION

10             By MS. MANDELTORT:

11       Q.   Sir, please tell us your name and spell

12   both your first and last name?

13       A.   Detective Reynaldo Guevara.  First name is

14   R-e-y-n-a-l-d-o.  Last name is G-u-e-v-a-r-a.  My

15   star number is 20861.

16       Q.   And, sir, directing your attention to the

17   22nd of August 1990, were you involved in the

18   investigation of the murder of Torrance and Kevin

19   Wylie?

20       A.   Yes, I was.

21       Q.   And pursuant to your duties as an Area 5

22   detective, were you at Area 5 about 8 o'clock in the

23   evening in regards to that case?

24       A.   Yes, I was.

49

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    And did you have occasion, sir, at that

2    time to speak with someone?

3      A.    Yes, I did.

4      Q.    With whom did you speak?

5      A.    I spoke with Maysonet.

6      Q.    And other than yourself and the defendant

7    at that 8:00 o'clock conversation, who else was

8    present?  Was it just yourself?

9      A.    I believe it was just myself.

10      Q.    And do you recall where specifically in

11    the area you were?

12      A.    Interview room.  I believe interview room

13    F, if I'm not mistaken.  The closest interview room.

14      Q.    Is that F like in frank?

15      A.    Yes, I believe that was.

16      Q.    And prior to the time that you spoke with

17    the defendant at 8:00 o'clock, did you advise him of

18    anything?

19      A.    I advised him of his rights.

20      Q.    Did you do that from memory or from a

21    preprinted source?

22      A.    From a preprinted card.

23      Q.    Did you do it, sir, in English or in

24    Spanish?

50

CCSAO002702

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     A.    I did it both in English and Spanish.

2     Q.    Did the defendant after you advised him of

3 his rights acknowledge that he understood his rights?

4     A.    Yes.

5     Q.    In what way?

6     A.    In English.

7     Q.    He said yes?

8     A.    Yes.

9     Q.    And why did you do it in Spanish and

10 English?

11    A.    Because he told me he felt more

12 comfortable speaking Spanish.

13    Q.    After this conversation with the

14 defendant, sir, did you have the occasion to be

15 present again with the defendant?

16    A.    Yes, I did.

17    Q.    And other than yourself and the defendant

18 for the second conversation, somewhere between 9:15

19 and 9:30 who else was present?

20    A.     It was myself, my partner and Rosa, Rosa

21 Bella, the -- whichever, or girlfriend of the

22 defendant.

23    Q.    When you say your partner, would that be a

24 Detective Halverson?

51

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       A.    That's correct.

2       Q.    And at anytime, sir, during either the

3  8:00 o'clock conversation or when you went back in

4  about 9:15 with Rosa Bella and Detective Halverson,

5  did you, Officer Montilla or anyone else in your

6  presence place a black leather glove on their hand,

7  place a telephone book to the defendant's left side

8  as well as to the top of his head and middle of his

9  chest and then slam a telephone directory with large

10  police style flashlight causing the defendant

11  enormous pain?

12       A.    No, we did not.

13       Q.    At anytime during the 2 conversations that

14  you were present, sir, did anyone confront the

15  defendant with material misrepresentations of fact?

16       A.    No.

17       Q.    Specifically did you or anyone in your

18  presence tell the defendant that he had been

19  implicated as the shooter in the case by other

20  individuals not named, and that if he wanted to

21  protect both his wife and his child, he would have to

22  provide the detectives with information concerning

23  the names of the individuals involved in the crime?

24       A.    No, we didn't.

52

CCSAO002704

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   And at anytime, sir, during the two

2   conversations you were present for, did you or anyone

3   in your presence make direct or indirect promises and

4   threats to the defendant?

5      A.   No, I didn't.

6      Q.   Specifically did anybody make suggestions

7   or offers of leniency, inferences that charges would

8   be dropped and inferences that in exchange for his

9   statements and self-incriminating actions the number

10  and severity of possible charges against him would be

11  limited?

12     A.   No, we did not.

13     Q.   At anytime did you or anyone in your

14  presence tell the defendant that if he spoke to you

15  his wife Rosa Bella would be immediately released

16  from custody?

17     A.   No, we didn't.

18     Q.   Was Rosa Bella in custody at area 35?

19     A.   No, she was not.

20     Q.   At anytime during the 2 conversations you

21  were present with the defendant, sir, did he make

22  requests to contact either family members or his

23  attorney William Swano for the purpose of seeking his

24  counsel and advise?

53

CCSAO002705

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    No, he did not.

2          Q.    In fact, sir, during that second

3    conversation between 9:15 and 9:30, was the defendant

4    afforded the opportunity to speak with Rosa Bella?

5          A.    Yes, he did.

6          Q.    Did he speak with her?

7          A.    Yes, he did.

8          MS. MANDELTORT:   Judge, if I could have just

9    one moment.   I have no further questions of the

10   witness.

11         THE COURT:  Mr. Rueckert.

12                   CROSS EXAMINATION

13                   By MR. RUECKERT:

14         Q.    Detective Guevara, how many conversations

15   were you present for with this defendant?

16         A.    I was present for numerous conversations

17   through the night.

18         Q.    Can you put a number on that?

19         A.    No, I couldn't.

20         Q.    Well, is it more than 2?

21         A.    Yes, it's more than 2.

22         Q.    More than 5?

23         A.    Probably.

24         Q.    More than 10?

                        54

CCSAO002706

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    I don't think so, no.

2          Q.    What time was the first conversation you

3    had with him?

4          A.    My first conversation with Mr. Maysonet

5    was around 20 hundred hours.

6          Q.    That's 8:00 o'clock p.m. on the 22nd?

7          A.    That's correct.

8          Q.    Now, did you have to go down to the lockup

9    to get him at that time?

10         A.    No, I did not.

11         Q.    You know that he had been in the lockup

12   prior to that, right?

13         A.    No, I didn't.

14         Q.    Do you know who was present with him at

15   8:00 o'clock when you went in the interview room?

16         A.    It was myself and Maysonet.

17         Q.    No one else was in there?

18         A.    No, not for the first conversation.

19         Q.    Do you know how long he had been in that

20   interview room alone?

21         A.    No, I do not.

22         Q.    Was he handcuffed when you went in?

23         A.    I believe he wasn't handcuffed.

24         Q.    Was or was not?

                              55

CCSAO002707

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    Wasn't, was not.

2      Q.    Was the door locked on the interview room?

3      A.    I believe so, yes.

4      Q.    And you went in there on your own

5  initiative, right?

6      MS. MANDELTORT:  Objection to the form of the

7  question.

8      THE COURT:  To the form of the question

9  sustained.

10     MR. RUECKERT:

11     Q.    You decided to go into the interview room?

12     A.    No.  I didn't decide.

13     Q.    Someone else decided for you?

14     A.    My sergeant told me I was to take over the

15  investigation.

16     Q.    Your sergeant told you?

17     A.    That's right.

18     Q.    And when you went to the interview room

19  where Mr. Maysonet was, did you have to open the

20  door?

21     A.    Yes.

22     Q.    Mr. Maysonet didn't knock on the window

23  and tell you to come here, did he?

24     MS. MANDELTORT:  Objection.  There is no such

56

CCSAO002708

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    allegation in the motion.  It's not an issue.

2        MR. RUECKERT:  With all due respect, anytime

3    there's an issue about whether or not I asked for my

4    lawyer, it is always an issue about who--

5        THE COURT:  Sustained, counsel.  Sustained.

6        THE COURT:  He told you why he went in.  What's

7    the point asking whether Mr. Maysonet knocked on the

8    window?  It's not before a jury.  Go ahead.

9        MR. RUECKERT:

10       Q.    Now when you went in at 8:00 o'clock, Mr.

11   Maysonet asked for his lawyer at the time?

12       A.    No, he did not.

13       Q.    You knew he had a lawyer, did you not?

14       A.    I wasn't aware.

15       Q.    You knew he had another case pending, did

16   you not?

17       A.    No, I wasn't aware.

18       Q.    You weren't aware of his other case

19   pending?

20       A.    No.

21       Q.    So it's your testimony at 8:00 o'clock you

22   read his Miranda warnings from this card?

23       A.    From a preprinted card.

24       Q.    That's in English?

57

CCSAO002709

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    That's in English, yes.

2      Q.    And then you also gave him those rights in

3  Spanish?

4      A.    Yes.

5      Q.    How do you say "constitutional rights" in

6  Spanish?

7      A.    (Speaking Spanish).

8      Q.    That's what you told Mr. Maysonet?  Well,

9  that's what you starts with.  I was looking at the

10  preprinted card and as I read the preprinted card I

11  would translate it back to Spanish for him.

12      Q.    You don't have a copy of that card with

13  the rights in Spanish, do you?

14      A.    Not in Spanish, no.

15      Q.    Now, was one of the numerous conversations

16  you were involved in at 4:30 with ASA Borowitz?

17      A.    I believe so.  I believe I was present for

18  that one.

19      Q.    And who advised Mr. Maysonet at that time

20  of his rights?

21      A.    The state's attorney.

22      Q.    Did she do that in English?

23      A.    Yes, she did.

24      Q.    Did anybody advise him in Spanish at that

CCSAO002710

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   time?

2        A.   I don't recall if anybody did or not.

3        Q.   Now, it's your testimony that Rosa Bella

4   was not in custody; is that right?

5        A.   That's correct.

6        Q.   She was in the area though, was she not?

7        A.   No, she wasn't there at 8:00 o'clock.  She

8   arrived there about 9:00 o'clock or shortly before 9.

9        Q.   Prior to her arriving there, was Mr.

10  Maysonet given the opportunity to call her?

11       A.   He didn't ask me, no.

12       Q.   Was he given the opportunity to call

13  anybody?

14       A.   No, he didn't ask to call anybody.

15       Q.   If he would have asked to call his lawyer,

16  would you have let him?

17       A.   Sure.

18  MS. MANDELTORT:  Objection.

19  THE COURT:  Sustained.  Answer stricken.

20  MR. RUECKERT:

21       Q.   Do you know how Rosa Bella got to Area 5?

22       A.   No.

23       Q.   Did she come by herself?

24       A.   Yes, she did.

59

CCSAO002711

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.    Police officers didn't bring her?

2          A.    I don't recall.  No.

3          Q.    And it's your testimony you took her in to

4    see Mr. Maysonet, right?

5          A.    After I spoke with her, yes.

6          Q.    Detective Guevara, is it your testimony

7    here today under oath that Mr. Maysonet never asked

8    to talk to his lawyer?

9          A.    Yes, it is.

10         Q.    From almost 11:30 in the morning on August

11   22nd until 9:30 in the morning on August 23rd, never

12   once asked to talk to his lawyer?

13         MS. MANDELTORT:  Objection, Judge.

14         THE COURT:  Sustained.

15         MR. RUECKERT:

16         Q.    During the numerous conversations you had

17   with him which may be up to 10, did he ever ask to

18   talk to his lawyer?

19         A.    No, he did not.

20         Q.    Do you recall any time when Detective

21   Paulnitski was alone with Mr. Maysonet?

22         A.    No, I do not.

23         Q.    Pardon me?

24         A.    No, I do not.

60

CCSAO002712

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   But you didn't become involved until 8
2  o'clock on the 22nd, right?
3      A.   That's correct.
4      Q.   You were present at 6:30 for an interview
5  with Assistant State's Attorney DiFranco?
6      A.   I might have been.  I don't recall.
7      Q.   Were you present at 7:10 for an interview
8  with Assistant State's Attorney DiFranco?
9      A.   I don't remember if I was.
10     Q.   Do you remember Mr. Maysonet being moved
11 from one room to another between those 2 interviews?
12     A.   No, I don't remember.
13     Q.   Do you remember talking to Mr. Maysonet's
14 sister Rose?
15     A.   No.
16     Q.   Do you remember his sister asking to give
17 him his pills?
18     A.   No.
19     Q.   Do you remember anybody asking to give him
20 his pills?
21     A.   If I recall, it was his girlfriend or his
22 wife.  Whatever.
23     Q.   Rosa Bella?
24     A.   Rosa.

61

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    When was that?

2      A.    I believe that was the time she came in.

3      Q.    What time was that?

4      A.    About 2100 hours I'd say.  Something like

5   that.

6      Q.    Prior to that did you no he had to have

7   his pills?

8      A.    No, I didn't.

9      Q.    He never told you?

10     A.    No.

11     Q.    It was Rosa Bella that told you at 2100

12   hours, I got to give him his pills?

13     A.    Somewhere around that time, yes.

14     Q.    And you let her?

15     A.    I believe I gave it to him.

16     THE COURT:  Mr. Rueckert, hold your train of

17   thought while the interpreters change.

18     Please state your name for the record.

19     THE INTERPRETER:  For the record my name is

20   Frederico Rodriguez.

21     THE COURT:  Thank you, sir.

22     MR. RUECKERT:

23     Q.    Detective Guevara, you were around, were

24   you around the area from 8:00 o'clock on the 22nd

62

CCSAO002714

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    until 9:30 in the morning on the 23rd?

2          A.    I don't remember the time I went home.

3          Q.    Well, were you present for a conversation

4    that occurred at 7:10 in the morning?

5          A.    I don't remember if I was.

6          Q.    Well, at anytime you were there, did you

7    give Mr. Maysonet anything to eat or drink?

8          MS. MANDELTORT:   Objection.   There's no

9    allegation in the motion.

10          THE COURT:   He can answer if he knows.

11          THE WITNESS:   I don't remember if I did or

12    not.   I might have.   I don't know.

13          MR. RUECKERT:

14          Q.    Just so I'm clear, you gave Mr. Maysonet

15    rights in both English and Spanish because he told

16    you he would rather have them them Spanish; is that

17    right?

18          A.    Yes.

19          MR. RUECKERT:   Thank you.   I have nothing

20    further.

21          MS. MANDELTORT:   If I could have a moment,

22    Judge.   Judge, I have no further questions for the

23    detective.   You can wait IN THE room.   We may need to

24    recall you.

63

CCSAO002715

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Judge, at this time I believe that we have

2  presented all THE witnesses covered in the time

3  period alleged IN THE motion and have accounted for

4  all conversations with the defendant during that

5  period of time as is alleged.

6    We believe that we have shown sufficiently

7  to this Court that the statements were voluntary and

8  rebutted the allegations in the motion.  I ask that

9  the burden be shifted to the defense, Judge.

10    THE COURT:  Very well.

11    MR. RUECKERT:  Judge, I think it's my

12  obligation to object to the fact that Paulnitski is

13  not here to testify.  I believe we have established

14  through Detective Montilla that there was a time when

15  Paulnitski was alone with the defendant, and they

16  have not put forward his testimony to explain what

17  happened during that time.

18    I also suggest that Rosa Bella has become

19  a material witnesses in this incident.

20    THE COURT:  Well, we have addressed that.

21  Paulnitski purportedly was present with this

22  defendant prior to the giving of any statement.  The

23  allegations that are contained in your motion that

24  would go to the issue of whether or not any of the

64

CCSAO002716

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   constitutional rights of the defendant have been

2   compromised during the taking of these statements,

3   and whether or not there was any physical abuse of

4   this defendant do not involve Detective Paulnitski.

5   So --

6        MS. MANDELTORT:  Judge, if I could also state

7   for the record, there are officers specifically

8   named, Officer Detective Montilla, Detective Guevara

9   as the specific named officers who violated his

10  rights.

11       THE COURT:  And there's no testimony that

12  Detective Paulnitski was present during any of these

13  alleged violations.  I don't think that is a problem

14  of I do find that the burden has shifted to the

15  defense.

16       MR. RUECKERT:  I'll call Rose Maysonet.

17       THE COURT:  Mr. Rueckert, you are calling one

18  Rose Maysonet who is the sister as opposed to this

19  person Rosa Bella?

20       MR. RUECKERT:  Right.

21       THE COURT:  Those are 2 different people?

22

23

24

65

CCSAO002717

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1                    ROSE MAYSONET,

2  called as a witness on behalf of the

3  Petitioner-Defendant, being first duly sworn, was

4  examined and testified as follows:

5                 DIRECT EXAMINATION

6                 By MR. RUECKERT:

7       Q.    Now, I want you to keep your voice up so

8  everybody can here you, okay?

9       A.    Okay.

10      Q.    Little louder than that.  And tell the

11  Court your name?

12      A.    My name is Rose Maysonet.

13      Q.    Spell your last name.

14      A.    M-a-y-s-o-n-e-t.

15      Q.    And you are the sister of the defendant

16  Jose Maysonet, Juan Maysonet?

17      A.    Yes, I am.

18      Q.    Now, I want to call your attention to

19  August 22nd at about 9:30 in the morning.  Can you

20  tell the court where you were at that time?

21      A.    I was in court with my brother, room 101.

22      Q.    When you say your brother, you're talking

23  about the defendant, right?

24      A.    Yes, I am.

                         66

CCSAO002718

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   When you're talking about room 101, you're

2  talking about 101 in this building?

3      A.   Yes.

4      Q.   Did you guys leave courtroom 101?

5      A.   Yes.  Because the judge wasn't there.  So

6  we were supposed to go to room 302.

7      Q.   Your brother was supposed to go to room

8  302?

9      A.   Yes.

10     Q.   What happened when you left courtroom 101?

11     A.   As soon as we got out of the courtroom,

12  the policeman, I don't know his name, Paulnitski I

13  think it is.

14     Q.   Paulnitski?

15     A.   Uh-huh.  He told my brother he needed to

16  talk to my brother.  My brother told him if you have

17  anything to say to me, you got to talk to me in front

18  of my lawyer.

19     Q.   What happened then?

20     A.   Well, he told my brother come with me,  I

21  want to talk to you.  My brother said no.  You got to

22  talk to me upstairs.  So he grabbed him, put him on

23  the wall, handcuffed him and took him.

24     Q.   Now, did your brother have a lawyer at

67

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   that time?

2         A.   Yes, he did.

3         Q.   Who was his lawyer?

4         A.   His name was Swano.

5         Q.   Were you supposed to meet Swano in room

6   302?

7         A.   Yes, we were.

8         Q.   Were you on your our way to 302 when this

9   happened?

10        A.   Yes.

11        Q.   What happened next after this conversation

12  with Paulnitski?

13        A.   I followed the cop and my brother to the

14  elevator, but soon as I was going to get in the

15  elevator with them, the cop told me I couldn't get

16  in.  I asked him why?  He said he didn't have to

17  explain nothing to me.

18             So he went up the elevator and I ran up

19  the stairs.  I went to room 302 and I asked the

20  sheriff if they had seen my brother.  They told me

21  may brother wasn't back there.

22        A.   302 was a courtroom?  In this building?

23        A.   Yeah.

24        Q.   Is that where your brother was supposed to

68

CCSAO002720

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    go?

2         A.    Yes.

3         Q.    Did you stay in room 302?

4         A.    Yes, I stood their until court was over.

5         Q.    During the time you were in courtroom 302,

6    did you see your brother?

7         A.    No, I didn't.

8         Q.    Was the judge on the bench during that

9    time?

10        A.    No.  He was absent.

11        Q.    Where did you go after a couple hours in

12   the courtroom?

13        A.    Well after the court was over, I went

14   outside and I sit in front of the building thinking

15   the cop was going to out there with my brother.  I

16   stood there like for 2 hours, and then I left for

17   home.

18        Q.    What happened when you got home?

19        A.    Soon as I got home,  I called Swano.

20        Q.    That's Jose's lawyer?

21        A.    Yeah.

22        Q.    Did you talk to him?

23        A.    Yes, I did.  He told me the try to locate

24   my brother?

69

CCSAO002721

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    I kept calling the stations until I found

2    him.  He was in Area 5.

3        Q.    How long did it take you to find out he

4    was in Area 5?

5        A.    Well, I was in my house at 3.  When I

6    found out he was in Area 5, it was 15 minutes to 4.

7        Q.    Quarter to four in the afternoon?

8        A.    Yeah.

9        Q.    What did you do when you found out he was

10   in Area 5?

11       A.    As soon as they told me he was in Area 5,

12   I got in the car and I left to Area 5 to see if he

13   was there.  But before I left, I called the lawyer

14   and I told him I was on my way that way.

15       Q.    Who do you call?

16       A.    Swano.

17       Q.    Did you talk to him?

18       A.    Yes, I did.

19       Q.    What did you tell him?

20       A.    I told him I had found my brother, that he

21   was in Area 5.  And I was on my way to the Area 5 and

22   that I was going to him and let him if he was really

23   there or not.

24       Q.    Did you get too Area 5?

70

CCSAO002722

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1        A.    Yes, I did.
 2        Q.    When you got to Area 5 who did you speak
 3   to?
 4        A.    I speak to Officer Montilla.
 5        Q.    Did you speak -- do you remember where you
 6   spoke to Officer Montilla?
 7        A.    Yes?
 8        A.    I spoke to him upstairs in Area 5 by the
 9   door, and I didn't believe my brother was there, so
10   he show me my brother.
11        Q.    You were able the see your brother in Area
12   5?
13        A.    Yes, I seen him twice.
14        Q.    Where was you when saw him?
15        A.    When I see my brother he was in this room.
16        Q.    Was anybody else in there with him?
17        A.    No, he was by himself.
18        Q.    Were you able the talk to him?
19        A.    Not the first time.
20        Q.    What did you do after finding out that
21   your brother was in Area 5?
22        A.    I called the lawyer.  I called Swano.
23        Q.    Did you talk to Swano?
24        A.    Yes, I did.
```

71

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   What did Swano tell you?

2      A.   Swano told me call him back in like ten

3 minutes, he was go to call the Area 5 to see if they

4 were there.

5      Q.   All right.  Did you call Swano back in 10

6 minutes?

7      A.   Yes, I did.

8      Q.   Did you speak to him?

9      A.   Yes I did.

10     Q.   What did Swano tell you?

11     A.   He told me that he had called Area 5, but

12 they told him my brother wasn't there.

13     Q.   Swano told you that he had called area 5?

14     A.   And they told the him, the officer told

15 him my brother wasn't there.

16     Q.   What did you do tell Swano at that point?

17     A.   Well, I told him how could they tell you

18 that he's not there when I'm here?  And I seen him?

19 He told me call me back in 5 minutes, I'm going to

20 try again.

21     Q.   Now, did you speak to Detective Montilla

22 about the fact you were going to call a lawyer?

23     A.   Yes, I did.

24     Q.   What did Detective Montilla do?

CCSAO002724

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    He told me to call him.

2          Q.    And is that when you called him?

3          A.    No, I called him way before I even told

4    Montilla.

5          Q.    Did you ever tell Detective Montilla that

6    you had spoken to Juan's lawyer?

7          A.    Yes, I did.

8          Q.    What did Detective Montilla tell you?

9          A.    He didn't say nothing.  He said that if he

10   was on his way over, and I told him he's calling and

11   you are telling him my brother's not there.  How do

12   you expect him to come over here if you're telling

13   him that my brother's not here?

14         Q.    How long did you stay in Area 5?

15         A.    I stood there until 8:30 at night.

16         Q.    Now, during that time were you able to

17   talk to your brother?

18         A.    Well, Officer Montilla came down and told

19   me any brother had a nervous break down.

20         Q.    About what time was that?

21         A.    That was around 6, 6:30.  He told me my

22   brother had a breakdown, nervous breakdown.  So I

23   went home and got some pills for my brother.

24         Q.    And what did you do when you got the

                              73

CCSAO002725

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    pills?

2         A.    Well, I went to Area 5, back to Area 5

3    with the pills.  I went upstairs and I told Montilla

4    that I had the pills.  So he told me to go and give

5    my brother the pills.

6         Q.    Were you able to do that?

7         A.    Yes, I did.

8         Q.    When you went in to give the pills to your

9    brother, did police officers go in there with you?

10        A.    No he had, no.  He didn't.

11        Q.    You were able to go in by yourself?

12        A.    Yeah.

13        Q.    Did you notice if your brother was

14   handcuffed when you went in there?

15        A.    No, he wasn't.

16        Q.    Now, while you were in Area 5 -- strike

17   that --  for a second.  Do you know a woman by the

18   name of Rosa Bella?

19        A.    Yes, I do.

20        Q.    And did she have a relationship with your

21   brother?

22        A.    Yes, she did.

23        Q.    What was that relationship?

24        A.    They were going out.

74

CCSAO002726

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    Did they have children together?

2      A.    Yeah, they got one.

3      Q.    While you were in Area 5 did you have

4  occasion to see Rosa Bella?

5      A.    Yes.  I was always with her.  All the

6  time.  Except when they took her upstairs.

7      Q.    She went upstairs at some point?

8      A.    She went upstairs and she came back down,

9  and she told me, I told her what's going on?  She

10 told me they want me to sign papers stating that the

11 guys did what they did and they were going to let go

12 my brother in 72 hours.

13     Q.    That's what Rosa Bella told you?

14     A.    Yes.

15     Q.    Did she tell you that she had ever signed

16 some papers?

17     A.    When she went upstairs like for she stood

18 there long.  It was long when she was upstairs.  When

19 she came back down, she told me she signed papers.  I

20 told her why you signed papers?  She goes, well, the

21 reason my brother was going to get out in 72 hours.

22     Q.    After you spoke to Rosa Bella, did you

23 speak to Detective Montilla again?

24     A.    Yes, I did.

75

CCSAO002727

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    What was said in that conversation?

2      A.    Okay.  Well, I asked him what was going on

3  with my brother.  He told me they were going to hold

4  him for questioning for 72 hours.  They were going to

5  let him go.

6      Q.    That was after you had spoken to Rosa

7  Bella, right?

8      A.    Yes.

9      MR. RUECKERT:  I don't think I have anything

10 else.

11     THE COURT:  Cross?

12               CROSS EXAMINATION

13               By MR. MAREK:

14     Q.    Miss Maysonet?

15     A.    Yes.

16     Q.    Miss Maysonet, are you employed?

17     A.    No.  I'm not.

18     Q.    Have you ever been employed outside the

19 home?

20     A.    No, I'm not.  I'm taking care of my 2

21 kids.

22     Q.    What's the extent of your education?

23     A.    Well, I got my diploma from 4th year.

24     Q.    From where?

76

CCSAO002728

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    High school.

2          Q.    Which high school?

3          A.    Shurz High School.

4          Q.    And you have been living in the Chicago

5     area for how long?

6          A.    Since I was 8.

7          Q.    Since you were 8 years old?  You came here

8     from Puerto Rico?

9          A.    Yes, we did.

10         Q.    Your brother is older than you?

11         A.    Yes, he is.

12         Q.    When you came at the age of 8, did your

13    brother come with you?

14         A.    No, he didn't.

15         Q.    How long has your brother been here in

16    Chicago?

17         A.    Like I think 6 or 7 years.

18         Q.    6 or 7 years?  Now, your native language

19    is Spanish?

20         A.    Yes, it is.

21         Q.    Obviously you're fluent in the English

22    language?

23         A.    Yes.

24         Q.    How did you learn English?

77

CCSAO002729

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   In school.  I took, after school I took an

2  English course.

3      Q.   Well, did you also speak English in

4  school?

5      A.   Yeah.

6      Q.   So when you came to the States, your

7  brother Jose did not come with the family?

8      A.   Yeah.

9      Q.   How is it that Jose came 6 years ago?

10     A.   Pardon me?

11     Q.   How is the that Jose came here 6 years

12  ago?

13     MR. RUECKERT:  I don't see the relevance of

14  that.  I'm going to object.

15     THE COURT:  What's the relevance, counsel?

16     MR. MAREK:  Well, Judge, there's accusations,

17  certainly the tenure of these motions was that the

18  defendant was not understanding what was being said

19  to him.

20     THE COURT:  I understand that.  But what

21  difference does ti make why he came to the United

22  States?

23     MR. MAREK:  If I may rephrase the question.

24     THE COURT:  Go ahead.

78

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          MR. MAREK:

2          Q.    When you left Puerto Rico at age 8, your

3     brother Jose was there?

4          A.    He was in Puerto Rico, yes.

5          Q.    Does your brother Jose speak English?

6          A.    Well, he don't because he was in a special

7     group.  He was always in a special group.

8          Q.    What kind of special groups?

9          A.    Like for slow people.

10         Q.    Where was this?

11         A.    This was in Shurz High School.

12         Q.    So Jose went to high school here in the

13    City of Chicago?

14         A.    Yes.

15         Q.    Well --

16         A.    His last 2 years.

17         Q.    How old was Jose when he came here?

18         A.    He was, I really don't remember.

19         Q.    Let me ask you this, Miss Maysonet.  How

20    old is Jose?

21         A.    How old is he?

22         Q.    How old is he right now?

23         A.    That I know he's 27.

24         Q.    And he came here 6 years ago you say?

79

CCSAO002731

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    A.    Um-hmm.

2    Q.    So he was 21 years of age when he came

3 here 6 years ago from Puerto Rico?

4    A.    Um-hmm.

5    Q.    Yet he went to Shurz High School?

6    A.    Nighttime school.

7    Q.    What was that for?

8    A.    Like I told you, when we were in the

9 Puerto Rico we were with my grandmother.  Because my

10 mother had to come here.  She didn't hardly send us

11 to school.  So when he came here, he needed, to get a

12 job he needed GED.

13    Q.    Let me rephrase.  Let me ask you the

14 question I asked you before.  Does Jose speak

15 English?

16    A.    No, he don't.

17    Q.    He does not speak any English?

18    A.    No, he don't.

19    Q.    And when he went to Shurz High School,

20 those were entirely Spanish classes is your

21 testimony?

22    A.    Well, his were they were.

23    Q.    You never heard your brother Jose speak

24 English?

CCSAO002732

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    A.    No, I haven't.  Not that I know.

2    Q.    Has Jose worked since he's been here?

3    A.    No, he can't work.

4    Q.    He's never worked?

5    A.    Um-hmm.

6    Q.    I'm going to show you what has been marked

7  Respondent's Exhibit 2 for identification.  Do you

8  know what this is?

9         THE COURT:  Marking that as Respondent's

10  exhibit?

11        MR. MAREK:  Yes.

12    Q.    What is that?

13    A.    Those are nerve pills.

14    Q.    Is that something you brought with you

15  today?

16    A.    No.  I gave this, was given to the cop in

17  Area 5.

18    Q.    So your testimony is this is the bottle

19  that you gave to the cop at Area 5?

20    A.    Yes.

21    Q.    On August 22nd of 1990?

22    A.    Yes.

23    Q.    And this is Jose's prescription?

24    A.    Well, it's not his prescription.  It's got

81

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   my mother's name.

2        Q.   That's Miriam Lahara?

3        A.   Yeah.  I couldn't find his.

4        Q.   And it's for lorazipam?

5        A.   Yes, a nerve pill.

6        Q.   And you're sure that this is the very

7   bottle that you had on August 22nd of 1990 and gave

8   to the cops?

9        A.   Yes, I do.

10       Q.   You are sure?

11       A.   Well, I gave them one just like that one.

12       Q.   Well, that's my question, ma'am.  Is it

13  this one or one just like that?

14       A.   Yeah, it's that one.

15       Q.   And you have kept this in your possession

16  since you gave it to the cops at Area 5?

17       A.   Yes.

18       Q.   So you gave it to the cops and the cops

19  gave it back to you?

20       A.   No, no, I  gave to the cops and they stood

21  with it.

22       Q.   And the cops gave you the bottle back?

23       A.   No, they didn't.

24       Q.   Well, how did you get the bottle back?

82

CCSAO002734

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     A.    They probably gave to it Rosa Bella.

2     Q.    So they probably gave it to Rosa Bella?

3     A.    When I gave them the pills and my brother

4  swallow the pills, the bottle stood there with my

5  brother.  Now Rosa Bella was inside the room with us.

6     Q.    Ma'am, how is it that you're able to

7  testify that this is the same bottle?

8     A.    Because I remember when my mother wrote

9  this.

10     Q.    How did the bottle get back to you?

11     A.    What you mean get back to me?  I didn't

12  have it.  You just came out with the bottle right

13  now.

14     Q.    SO you did not give this to anybody's

15  attorney and say to them -- you did not give this to

16  your brother'S attorney and say here's the bottle

17  that I gave to the COPS?

18     A.    To Beuke, yes, I did.

19     Q.    So you gave this to Mr. Beuke?

20     A.    Uh-huh.

21     Q.    When did you give this to Mr. Beuke?

22     A.    You getting me confused right here.

23     Q.    I don't one to get you confused.

24     A.    I don't know if the bottle that you got

CCSAO002735

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    right now is the one Swano had because I had gave

2    Swano one too.

3            Q.    So you gave one to Swano too?

4            A.    Yes.  So I don't if that was the one.

5            Q.    Why did you give a bottle of these pills

6    to Mr. Swano?

7            A.    He needed to analyze them.

8            Q.    To analyze them?

9            A.    Yes.

10           Q.    Well, this bottle right here, this you

11   gave to Mr. Beuke, correct?

12           A.    Um-hmm.

13           Q.    When did you give it to Mr. Beuke?

14           A.    As soon as he started the case.

15           Q.    You gave it to Mr. Beuke?

16           A.    Um-hmm.

17           Q.    Where did you get it?

18           A.    Where do I got it?

19           Q.    Where did you get it so you could give it

20   to Mr. Beuke?

21           A.    Well, I guess when I gave it to the cops,

22   it got to my house so I guess Rosa Bella gave it to

23   my mother and my mother gave it to me.

24           Q.    So you're guessing how you got it?

84

CCSAO002736

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   No.  My mother gave it to me.  That bottle

2   my mother gave to me.  The thing is I don't know it's

3   the one the police had because Rosa Bella gave it to

4   you.

5      Q.   My question is are you testifying under

6   oath that this is the bottle you gave to the cops or

7   are you guessing it's the bottle you gave to the

8   cops?

9      A.   Well this is the bottle I gave to the

10   cops.

11      Q.   Because you guess Rosa Bella took it back

12   and gave it to your mother who you guess gave it back

13   to you?

14      A.   No, she did give it back to me.  I'm not

15   guessing that part.

16      Q.   There's something written on here in

17   handwriting; is that correct?  Nervios (phonetic)?

18      A.   Yes, it is.

19      Q.   Do you know who wrote that on there?

20      A.   My mother did.

21      Q.   Is that the reason you're able to

22   recognize this because it has your mother's

23   handwriting?

24      A.   That's not the reason I know it.  I know

85

CCSAO002737

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    it because I see my brother drink the pills and I

2    know what kind of pills he drinks.

3         Q.   He drinks these?  You saw your brother

4    drink those?

5         A.   Yes, I did.

6         Q.   Now, when you were in the building here on

7    August 22, 1990, you knew Mr. Swano had been hired by

8    your brother to represent him in the case he was

9    coming to this building for?

10        A.   Yes, I did.

11        Q.   And you knew Mr. Swano's phone number?

12        A.   Yes, I did.

13        Q.   And after the cop took your brother you

14   say outside of courtroom 101, you called Mr. Swano,

15   right?

16        A.   No, I didn't.

17        Q.   You did not call?

18        A.   I left behind the cop to go with him to

19   room 302.  He didn't let me go in the elevator with

20   him.

21        Q.   What time was that that the cop took your

22   brother outside room 101?

23        A.   9:30 in the morning.

24        Q.   What time did you call Mr. Swano the first

86

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   time?

2        A.   What you mean the first time?

3        Q.   On August 22 --

4        A.   I call him soon as I got to my house

5   because he was supposed to be in court with us.

6        Q.   About what time was that?

7        A.   Around 3 o'clock.

8        Q.   In the afternoon?

9        A.   Yes.

10       Q.   And at about 4 o'clock you were able to

11  find out that your brother was at Area 5?

12       A.   At 4 o'clock I was in Area 5.

13       Q.   So sometime between 3 o'clock and 4

14  o'clock you got on the phone to Area 5 and Area 5

15  told you your brother was there?

16       A.   Well, I called district 14.  I called

17  every district I know and they told me my brother was

18  there in Area 5.

19       Q.   So the answer to my question is the police

20  told you that your brother was at Area 5?

21       A.   Yes.

22       Q.   You were able to get that information over

23  the phone?

24       A.   Pardon me?

87

CCSAO002739

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        Q.   You were successful in learning by phone

2  where your brother was?

3        A.   Well, I don't know if I was successful or

4  not, but they told me he was there.

5        Q.   And you later learned he was there?

6        A.   Yes.

7        Q.   Because you saw him there?

8        A.   Yes.

9        Q.   So you succeeded?

10       A.   Yeah, I guess so.

11       Q.   You got the right information on the

12  phone, right?

13       A.   I guess so, yeah.

14       Q.   And you went there about 4 o'clock p.m.?

15       A.   Yes.

16       Q.   When's the next time you called Bill

17  Swano?

18       A.   I called Swano around 4:15.

19       Q.   And this is when he said -- what did you

20  say to him when you called at 4:15?

21       A.   I called him and I told him, well, Swano,

22  I told him my brother, he's in Area 5.  He told me

23  call me back in 10 minutes, I'm going to call there.

24       THE COURT:  We don't have a witness that

CCSAO002740

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  entered the room, do we?

2       MS. MANDELTORT:  No, I don't believe so.

3       MR. MAREK:

4       Q.    Let me just see if I have this right, Miss

5  Maysonet.  You called bill Swano.  You knew Bill

6  Swano was Mr. Maysonet's lawyer, right?

7       A.    Yes, I did.

8       Q.    You called him at 3 o'clock, correct?

9       A.    Yes, I did.

10      Q.    And he said try to locate your brother?

11      A.    Yes, he was in court that's why.

12      Q.    You located your brother by phone?  Is

13  that right?

14      A.    Yes, I did.

15      Q.    You went to Area 5 and saw your brother?

16      A.    Yes, I did.

17      Q.    And then you called Bill Swano and you

18  told Bill Swano that your brother was in the police

19  station and you had seen him with your very own eyes

20  correct?

21      A.    Yes, I did.

22      Q.    Aunt he then said to you I will call the

23  police and try to find out where he is, right?

24      A.    He told me he was going to call there to

89

CCSAO002741

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    make sure he was there.

2         Q.    So Bill Swano told you he didn't believe

3    what you were telling him?

4         A.    It's not that, he said he had court that

5    day.

6         Q.    So he said he had court that day?

7         A.    He was in court when I called him.

8         Q.    So, but you called him back in 10 minutes?

9         A.    Yes, I did.

10        Q.    And he told you that he called Area 5 and

11   Area 5 said he wasn't there, right?

12        A.    Well, before I called him I told him to

13   talk to Officer Montilla.  He said he talked to

14   Officer Montilla and he said that Juan Maysonet was

15   not there.

16        Q.    But you knew he was there?

17        A.    Yes, because I had seen him.

18        Q.    How many times did you talk by phone to

19   Mr. Swano that day?

20        A.    I talked to him once at the house and

21   twice at the police station.

22        Q.    That's 3 times, right?

23        A.    Yes.

24        Q.    The last thing you said to Mr. Swano or he

                              90

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    said to you was what?

2         A.    The last time I called him he told me they

3    kept denying him, and he said right now I'm in court

4    and I can't do nothing about it, but I will be there

5    first thing in the morning.

6         Q.    And this was at about what time?

7         A.    Last time I called him?

8         Q.    Yes?

9         A.    It was around 5, 5:30.

10        Q.    So at 5:30 pm., you told Mr. Swano where

11   your brother was, right?

12        A.    No.  I told him way at 3 o'clock.

13        Q.    Okay.  Okay.  But at 5:30 you again told

14   him where your brother was?

15        A.    At 5:30 I asked him if he was going to

16   make it to where my brother was.

17        Q.    And he refused to come?

18        A.    He said he couldn't because he had court.

19        Q.    So at that time Mr. Swano knew through you

20   where Mr. Maysonet was?

21        A.    Yes, he did.

22        Q.    And he refused to to come?

23        A.    He said he had court.

24        MR. RUECKERT:   Objection.

91

CCSAO002743

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE COURT:  Sustained to the characterization.

2  Sustained.

3      MR. MAREK:

4      Q.   At any time you were there that evening,

5  did you ever see Mr. Swano arrive?

6      A.   No, I didn't.

7      Q.   Did you try to call any other lawyer?

8      A.   No.  We had paid him so he was my

9  brother's lawyer.

10     Q.   Did you ask Mr. Swano if he could send

11  another attorney that he might be associated with to

12  come and represent your brother at the police

13  station?

14     A.   No, it didn't cross my mind.  I'm pretty

15  sure if he was the lawyer, he should know what to do.

16     Q.   Now, these pills that you went home and

17  got, was that some medication that your brother had

18  been taking?

19     A.   Yes, whenever he felt depressed.

20     Q.   When he felt depressed?

21     A.   And nervous.

22     Q.   He would take your mother's prescription?

23     A.   No, he would take his but I couldn't find

24  his at that time.

92

CCSAO002744

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   And he had the same, you're sure it was

2  the same medication that had been prescribed for your

3  brother?

4      A.   Yes.

5      Q.   What is that medication again?

6      A.   I don't know.  The name is right there.

7      Q.   But --

8      A.   Before that he was drinking that way, he

9  was drinking prosac before that one.

10     Q.   So do you know what his prescription was

11 for back then?

12     A.   Yes, I knew what it was for.

13     Q.   Which was?

14     A.   For his nerve problem.

15     Q.   What was the medication that he was

16 taking?

17     A.   What you mean?  The name of the

18 medication?

19     Q.   Let me make it real nice and simple.  On

20 August 22, 1990 was your brother, Mr. Maysonet, under

21 the care of a physician?

22     A.   Well, yeah, yeah, he was.

23     Q.   And was medication prescribed for him by

24 that physician?

93

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   Yes, it was.

2      Q.   What was the medication, if you know?

3      A.   Pardon me?

4      Q.   What was the medication he was taking on

5   August 22, 1990?

6      A.   What was the name of it?

7      Q.   Yes?

8      A.   I don't know the name, but I know it was

9   nerve pills.

10     Q.   Well, do you know if it's the same nerve

11  pills that you brought over to the station?

12     A.   Yes, they are.

13     Q.   Rosa Bella did not come with you, correct?

14     A.   Yes, she was with me all the time.

15     Q.   She was with you the whole time?

16     A.   Yes, she was.

17     Q.   So she was here outside room 101?

18     A.   We with in court together.  We were in the

19  police station together.

20     Q.   Who who drove over there?

21     A.   Pardon me?

22     Q.   Who drove over to the police station?

23     A.   A friend of mine.

24     Q.   That was who?

94

CCSAO002746

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    Well, I know him by his nickname Pantoja
2  (phonetic).
3      Q.    P-a-n-t-o-j-a?
4      A.    Yes.
5      Q.    So he came to the court building?  How
6  many people came to the court building?
7      A.    No, not to the court building.  He went to
8  me to the police station.  Only me, my brother and
9  Rosa Bella came to court?
10     A.    How did Pantoja gets over here to take you
11 to the police station?
12     A.    No, he went to my house.  Soon as we went
13 back home in the bus, I was calling the police
14 stations and I called him and I paged him and he
15 called me back I told him do me a favor, I'm trying
16 to locate my brother.  And as soon as I locate him,
17 take me where he's at?  He told me yeah.
18     Q.    So he came by and took you and Rosa down
19 to the station?
20     A.    Yes.
21     Q.    Now, you said that Rosa went upstairs by
22 herself at some point; is that correct?
23     A.    Most of the time she was upstairs by
24 herself.

95

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   When you say she is upstairs by herself,

2   where are you at?

3      A.   I'm downstairs in the lobby.

4      Q.   Where?

5      A.   In the lobby.

6      Q.   So when you walk into Area 5 there's a

7   lobby?

8      A.   There's the cops and then there's the

9   little room with a glass.  I was in there.

10     Q.   You brother was up out second floor?

11     A.   Yes, he was.

12     Q.   When you went up and saw him, that's where

13  you saw him?

14     A.   Yes.

15     Q.   The rest of the time you were waiting on

16  the first floor?

17     A.   Um-hmm.

18     MR. MAREK:  If I could have a moment, your

19  Honor.

20     Q.   Let me ask you, Miss Maysonet, how did you

21  find out that your brother had had a nervous

22  breakdown?

23     A.   We were living together before he started

24  living with Rosa Bella.

96

CCSAO002748

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Q.   I'm talking about a nervous breakdown in
2  the police station?  How were you advised in the
3  police station?
4    A.   Oh, Officer Montilla told me.
5    Q.   So he came down to the first floor where
6  you were?
7    A.   Yes, he was.
8    Q.   And those are his words, your brother just
9  had a nervous breakdown?
10    A.   Yes.  He told me you brother got a nervous
11  breakdown and he wants his medicine.
12    Q.   Just so it's clear, those were the words
13  used by Detective Montilla?
14    A.   Yes, it was.
15    Q.   Your brother had a nervous breakdown?
16    A.   All the time he was talking to me, he was
17  talking to me in Spanish.
18    Q.   Now, your brother was living with Rosa at
19  the time?
20    A.   Yes.
21    Q.   In August of '90?
22    A.   Um-hmm.
23    Q.   He had being living with her for sometime?
24    A.   Um-hmm.

97

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   Had a child, Juan, by her?

2      A.   She had the child after he got locked up.

3  When he got locked up, she was pregnant.

4      Q.   And Juan Jr., was born of their union?

5      A.   Um-hmm.

6      THE COURT:  You have to answer yes not Um-hmm.

7  Try to remember to say yes.

8      THE WITNESS:  Okay.

9      MR. MAREK:  No further questions.

10              REDIRECT EXAMINATION

11            BY Mr. RUECKERT:

12      Q.   So after Detective Montilla told you to go

13  gets the pills, you weren't and got some pills for

14  Juan?

15      A.   Yes, I did.

16      Q.   And you were able the take them to him,

17  right?

18      A.   Yes, I did.

19      Q.   When you left 101 on August 22nd, you were

20  going to a particular courtroom, were you not?

21      A.   Yes.  We were going to Court.

22      Q.   302?

23      A.   302.

24      Q.   Did you expect to meet Swano in 302?

CCSAO002750

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    He was supposed to be with us in 101.

2          Q.    Were you surprised he wasn't there?

3          A.    Yes, I was.

4          MS. MANDELTORT:  Objection.  This was all

5     covered --

6          THE COURT:  Sustained.  We heard all this on

7     direct the first time.

8          MR. RUECKERT:

9          Q.    Now, Mr. Marek asked if you called any

10    other attorneys.  You didn't call anybody but Swano,

11    did you?

12         A.    Just Swano.

13         Q.    And that's because he was his lawyer?

14         A.    Yes.

15         Q.    Did you do the best you could to try to

16    get him to Area 5?

17         A.    Yes, I did.

18         MS. MANDELTORT:  Objection.

19         THE COURT:  Sustained.

20         MR. RUECKERT:  Nothing further.

21         MR. MAREK:  Nothing else.

22         THE COURT:  Thank you, ma'am.  You may step

23    down.

24                          (Witness excused.)

                              99

CCSAO002751

1                    (Recess taken.)

2        MR. REUCKERT:  There would be a stipulation

3   between myself and the prosecution that William Swano

4   entered his appearance in this case 90 CR 18419 on

5   August 8th.

6              We would call the defendant.

7        MS. MANDELTORT:  I would ask that Miss Maysonet

8   leave the courtroom.

9        MR. RUECKERT:  I don't perceive her testifying

10  anymore.

11       MS. MANDELTORT:  That may arise or not arise.

12       THE COURT:  Witnesses that have testified

13  even?  She might have occasion to be recalled for

14  some reason.  Better to err on the side of caution.

15                   JUAN MAYSONET,

16  the Petitioner herein, called as a witness on his own

17  behalf, being first duly sworn, was examined and

18  testified through an interpreter as follows:

19                 DIRECT EXAMINATION

20                 By MR. RUECKERT:

21       Q.    Tell us your name, please?

22       A.    Jose Juan Maysonet.

23       Q.    And how do you spell the -- strike that.

24  You are the defendant in this case, are you not?

                          100

CCSAO002752

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    Yes.

2        Q.    I want to call your attention to August

3   22, 1990.  At about 9:30 in the morning.  Can you

4   tell us where you were at that time?

5        A.    That day I don't remember what floor it

6   was the policeman took me.  I was here in this

7   building.

8        Q.    Where were you at 9:00 o'clock in the

9   morning?

10       A.    I was in front of courtroom 101.

11       Q.    You were there as a defendant; is that

12  right?

13       A.    Yes.

14       Q.    In another case?

15       A.    Yes.

16       Q.    Did you have a lawyer on that case?

17       A.    Yes.

18       Q.    What was his name?

19       A.    His name was Swano.

20       Q.    Now, did the judge in 101 tell you to go

21  some other courtroom?

22       A.    Yes.  He gave me this pass when I went up

23  front.

24       Q.    And where were you supposed to go?

101

CCSAO002753

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
 1          A.   I had to go to 302 in front of her.
 2          Q.   And when you say in front of her, you are
 3   talking about Judge Morgan?
 4          A.   Loretta Hall Morgan, yes.
 5          Q.   Was Swano in room 101?
 6          A.   Swano wasn't there.  I was in 302.
 7          Q.   Was anybody with you in room 101?
 8          A.   My sister, my ex-girlfriend and a friend
 9   of mine.  His name was Pantoja.
10          Q.   Your sister is Rose Maysonet, the person
11   who just testified?
12          A.   Yes.
13          Q.   And your girlfriend was Rosa Bella; is
14   that right?
15          A.   Yes.
16          Q.   Now, did you leave courtroom 101.
17          Q.   Excuse me.  Just ask him if he left
18   courtroom 101.
19          A.   To come here, yes.
20          Q.   What happened when you left courtroom 101?
21          A.   I went outside, the policeman put me
22   against the wall.
23          Q.   Do you know that policeman's name?
24          A.   Starts with a P, Policki.
```

102

CCSAO002754

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.    What did the policeman tell you when he

2    put you against the wall?

3          A.    He told me something.  I couldn't

4    understand.

5          Q.    Did you say something to him?

6          A.    No.

7          Q.    What else did he tell you?

8          A.    The policeman had me put my hands against

9    the wall.

10          Q.    At some point did you tell him where you

11    were going?

12          A.    Yes, I was going to 302 because my

13    attorney was there.

14          Q.    What did the policeman say to you?

15          A.    He told me according to what my sister

16    translates he he was going to put me in jail for two

17    deaths.

18          Q.    Two deaths?

19          A.    Two deaths.

20          Q.    Did he ever get to courtroom 302?

21          A.    I didn't even get to the corner around the

22    cafeteria.

23          THE COURT:  By "he" you mean the defendant?

24          THE WITNESS:  Yes.

103

CCSAO002755

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE COURT: You are talking to him. That's why
2 I got confused. I thought you meant Paulnitski.
3      MR. RUECKERT:
4      Q. Did you ever get to courtroom 302?
5      A. No.
6      Q. Why not?
7      A. The policeman had me handcuffed and he
8 took me to another floor. I don't know what floor it
9 was and then he took me to a police room.
10      Q. Did you tell that police officer that you
11 need to talk to your lawyer?
12      A. Yes. I also told him that I had a case in
13 front of the lady, the judge.
14      Q. Were you worried if you weren't able to go
15 to 302, to show up in front of judge?
16      MS. MANDELTORT: Objection to the form of the
17 question.
18      THE COURT: Sustained.
19      MR. RUECKERT:
20      Q. Did you think you had to go to 302 to see
21 the judge?
22      A. Yes. I had a pass that the judge gave to
23 me so I could come and see the lady.
24      Q. Did that detective or that police officer

104

CCSAO002756

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  take you from this building and take you somewhere

2  else?

3      A.    Afterward, after he took me to that room

4  or that floor, I don't know which one, he got on the

5  phone and he called.  About 15 or 20 minutes after he

6  had made the phone call, a policeman came to pick me

7  up.  They brought me all the way down.  They took me

8  downstairs.  And then they put me inside the police

9  car to go to the police station.

10     Q.    Were you handcuffed when they put you in

11  the police car?

12     A.    Yes.

13     Q.    And was this a blue marked squad car?

14     A.    It was a detective's car.

15     Q.    How many police officers were in the car

16  with you?

17     A.    Two.

18     Q.    And they took you to a police station?

19     A.    Yes.

20     Q.    Where did they take you?

21     A.    55 West Grand.

22     Q.    Now, where did the police take you when

23  they got you to 5555 West Grand?

24     A.    I'm sorry, that was too fast.

105

CCSAO002757

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   Where did the police take you once they

2  got you to 5555 West Grand?

3      A.   They put me into an interview room.  And

4  after that Detective Montilla and his partner and I

5  think Sgt. Mengi, and when they came, policeman

6  Detective Montilla told me not to worry, that I

7  shouldn't get nervous.

8      Q.   Had you been able the speak to your lawyer

9  Mr. Swano at that point?

10     A.   Yeah, when I told the police to let me

11  talk to my attorney, who was waiting for me to in

12  court, they told me that I couldn't.

13     Q.   They told you you couldn't?

14     A.   No, I couldn't talk to him or call him.

15     Q.   Now, you know Detective Paulnitski by now,

16  right?

17     A.   Yes, sir.

18     Q.   And he's the guy that arrested you outside

19  the courtroom?

20     A.   Yes, he arrested me in the hallway behind

21  the door by the court.

22     Q.   Did he come to see you in one one of those

23  interview rooms in Area 5?

24     A.   He came to see me to see if I spoke

106

CCSAO002758

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    English.

2         Q.    At anytime while he was there to see you,

3    did he hit you?

4         A.    When Detective Montilla came, he wanted me

5    to point out who was the detectives that arrested

6    me.  When I looked out the door I said that's the

7    detective that arrested me and he saw me.

8         Q.    When he says "he," who are you talking

9    about?

10        A.    Detectives Polinski.

11        Q.    Did Paulnitski ever hit you?

12        A.    When he saw me pointing the finger at him,

13   the officer was asking me about him in Spanish.  He

14   saw me pointing at him and speaking in Spanish.  He

15   came into the room angry.  He took me by the throat

16   and he told me that if I was talking about him in

17   Spanish.  He pushed me against the floor.  He told me

18   next time you speak in Spanish and I point him out,

19   he was going to hit me.

20        Q.    Have you graduated from high school?

21        A.    No.

22        Q.    Did you speak English back in 1990?

23        A.    No.

24        Q.    Now, after Detective Paulnitski came into

107

CCSAO002759

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   the room -- by the way, what time was that?

2       A.   I would say it was about 10:45, 11 o'clock

3   in the morning.

4       Q.   Did you make any sort of statement to

5   Detective Paulnitski at that time?

6       A.   I didn't tell anything outside of me

7   wanting to talk to my attorney.

8       Q.   Were you taken from that interview room

9   and taken to a lockup?

10      A.   Yeah, they took me to the jail downstairs

11  and took my fingerprints.

12      Q.   What time was that about?

13      A.   I could say it's about 11:15, 11:20,

14  something like that.

15      Q.   Were you given any chance to talk to your

16  lawyer at that time?

17      A.   No.

18      Q.   And you were fingerprinted?

19      A.   Yes.

20      Q.   And put in the lock-up?

21      A.   Yes.

22      Q.   How long did you stay in the lock-up?

23      A.   About 4:30 to 5 in the afternoon.

24      Q.   What happened at 4:30 or 5 in the

108

CCSAO002760

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     afternoon.

2          Q.   Guevara, the detective came.  He came

3     down.  He took me out of that jail where I was in.

4     He put my hand against the wall and put the handcuffs

5     on me.  He told me I was going to go with him to the

6     second floor upstairs.  And he told me he was going

7     to bring me to another interrogation room.

8          Q.   Did you go to another room?

9          A.   Yes.

10         Q.   What happened?  Were you put in that room?

11         A.   Yes.

12         Q.   Were you handcuffed when you were in that

13    room?

14         A.   Yes.

15         Q.   How were you handcuffed?

16         A.   The wall had like a ring and he put me

17    there.  He handcuffed me there.

18         Q.   Now, that's about 5 o'clock in the

19    afternoon on August 22nd?

20         A.   Yes.

21         Q.   Had anybody told you at that point you had

22    a right to talk to your lawyer?

23         A.   No.

24         Q.   Had you asked to talk to your lawyer?

                        109

CCSAO002761

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     A.   Yes.

2     Q.   Had anybody told you you had a right to

3  remain silent at that time?

4     A.   No.

5     Q.   Had anybody told you that anything you

6  cared to say would be used against you at that point?

7     A.   No.

8     Q.   And you had already been down to the

9  lockup, right,?

10     A.   (No response.)

11     Q.   And you had already been fingerprinted?

12     A.   Yes.

13     Q.   Now, how long -- this is 5 o'clock in the

14  afternoon, right?

15     A.   Yes.

16     Q.   How long did you stay in that interview

17  room?

18     A.   I was there, I was there until the next

19  day, the 23rd in the morning.

20     Q.   How many different times during that

21  period did Detective Guevara come into the room?

22     A.   He brought me up at 5.  He sat on a

23  chair.  He said he wanted me to talk to him.  I told

24  him I didn't want to talk to him.  I couldn't talk to

110

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    him until my attorney was present.  He said if he

2    alludes me to make a phone call or not, he wasn't

3    going to let me talk to my attorney.

4        Q.   Now, did Detective Guevara come back into

5    that room more than once after you told him that?

6        A.   I told him I want to talk to my attorney.

7    He got up.  He left.  About half an hour later he

8    came back.

9        Q.   When he came back were you still

10   handcuffed?

11       A.   Yes.

12       Q.   So you couldn't get to the door, could

13   you?

14       A.   No.

15       Q.   How far was the door from where you were

16   handcuffed?

17       A.   I could say about 5 feet.

18       Q.   So Detective Guevara came back in by

19   himself, right?

20       A.   Yes.

21       Q.   How many different times did he come back

22   in there?

23       A.   Several times.

24       Q.   At some point did you find out that your

                          111

CCSAO002763

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   girlfriend, Rosa Bella, was in Area 5?

2       A.   Well, the way I was handcuffed --

3       THE INTERPRETER:  I'm sorry, counsellor.

4       MR. RUECKERT:

5       Q.   May I inquire, please tell him to answer

6   that question.  He's trying to talk about a window

7   and door.  I just want to know if he saw Rosa Bella?

8       MS. MANDELTORT:  We'd ask that the last answer

9   be translated.  The defendant did give an answer.

10      MR. RUECKERT:  Okay.

11      THE COURT:  I don't know.  Give the answer

12  whatever it was.

13      THE INTERPRETER:  I had difficulty

14  understanding what he was trying to tell me.  That's

15  why I was going to inquire.  I didn't understand the

16  answer very well myself.

17      THE COURT:  Why don't you put another question

18  and perhaps you could instruct the witness just

19  answer what you asked.

20      MR. RUECKERT:  Please tell the witness --

21      THE INTERPRETER:  Counsel, you tell him and

22  I'll interpret it.

23      THE COURT:  You have to talk to him.

24      MR. RUECKERT:

                    112

CCSAO002764

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.   Just and my question.

2               Now my question is while you were in Area

3     5 in that interview room, did you find out that Rosa

4     Bella was also in Area 5?

5          A.   Yes.

6          Q.   And did somebody tell you that or did you

7     see her?

8          A.   The policeman came and told me that my

9     wife was inside, excuse me, my wife was outside

10    trying to find out if I was there.

11         Q.   At some point did you get to see Rosa

12    Bella?

13         A.   Late at night, yes.

14         Q.   Did the police ever tell you they were

15    going to lock up Rosa Bella unless you cooperated

16    with them in this investigation?

17         A.   Yes.

18         Q.   Did they ever say anything about what they

19    would do with your children?

20         A.   Yeah.

21         Q.   What did they say?

22         A.   They were going to lock her up, take my

23    children, lock my family up if I didn't cooperate

24    with them and give them names.

                          113

CCSAO002765

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.   And they wanted you to give them some

2 names at that point; is that right?

3      A.   Yes.

4      Q.   Now, about what time was that?  Do you

5 remember?

6      A.   I couldn't remember exactly.  I was

7 handcuffed to the wall.  I couldn't look at the

8 clock.  It was dark.

9      Q.   At some point between the time you were

10 taken upstairs to the lockup and the time that the

11 police told you about Rosa Bella, did your sister

12 bring you some pills?

13      A.   Yes.

14      Q.   And why did she bring you some pills?

15      A.   I have a problem with nerves.

16      Q.   And did you have that problem when you

17 were locked up in Area 5?

18      A.   Yes.

19      Q.   Now, which police officer or were there

20 more than one that told you about Rosa Bella?

21      A.   Montilla went in to verify that was my

22 wife.  I told him yes that is my wife.  And the

23 police went outside.

24      Q.   Was he speaking to you in Spanish at that

CCSAO002766

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    time?

2         A.    Yes.

3         Q.    Juan, did you then cooperate with the

4    police?

5         A.    No.   What I wanted to do was talk to my

6    attorney.

7         Q.    Did they let you talk to your attorney?

8         A.    No.

9         Q.    Did they let you try to make a phone call

10   to your attorney?

11        A.    No.

12        Q.    But you asked them to contact your lawyer,

13   right?

14        MS. MANDELTORT:   Objection, asked and answered.

15        THE COURT:   Sustained.

16        MR. RUECKERT:

17        Q.    Now, you have seen that court reported

18   statement that the prosecution has entered into

19   evidence here, right?

20        THE INTERPRETER:   I'm sorry.   Question again?

21        MR. RUECKERT:

22        Q.    You've seen that court reported statement

23   that the prosecutors are introducing into evidence,

24   have you not?

                            115

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    A.    They brought me some papers to sign the

2  23rd in the morning.

3    Q.    When you say they brought the papers to

4  you, who is they?

5    A.    Detective Montilla.

6    Q.    Do you remember talking to Detective

7  Montilla and a state's attorney just before they

8  brought you those papers?

9    A.    He talked to me in the morning.  But

10 Guevara is the one who's asking me questions when I

11 was telling him I wanted to talk to my attorney.

12   Q.    My question is though, did he speak to the

13 assistant state's attorney --

14   THE INTERPRETER:  Don't ask me, counsel.

15   MR. RUECKERT:

16   Q.    Did you speak to the assistant state's

17 attorney with Detective Montilla there just before

18 they brought you those papers to sign?

19   A.    Detective Montilla is the one who's

20 talking to me the whole time in Spanish.

21   Q.    Was the state's attorney present during

22 that?

23   A.    At first it was a woman and there was a

24 young man.

116

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Q.    When the young man was there, did he ask

2 you questions?

3    A.    He was asking questions of Detective

4 Montilla.

5    Q.    What did Detective Montilla do?

6    A.    He was telling them to me in Spanish.

7    Q.    What did you do when Detective Montilla

8 told you those questions in Spanish?

9    A.    I want to talk to my attorney.

10    Q.    At some point, Juan, you answered some

11 questions for Detective Montilla; is that right?

12    A.    He was asking me questions like what day,

13 where was I on May some date, I don't know.

14    Q.    Is this your signature down here?

15    THE COURT:    Let the record reflect that

16 counsel has presented the witness with something.

17    MR. RUECKERT:    This is Respondent's Exhibit 1.

18 The court reported statement.

19    Q.    Is that your signature down there?

20    A.    That is my signature, yes.

21    Q.    And is this your signature down on the

22 bottom of page 7?

23    A.    Yes.

24    Q.    Now, at some point somebody asked you to

117

CCSAO002769

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    sign this, right?

2          A.    Yes.

3          Q.    Who asked you to sign it?

4          A.    Detective Montilla.

5          Q.    Why did you sign it?

6          A.    He told me if I signed this about 12

7    o'clock in the afternoon I would go home.

8          Q.    Before they brought you these papers to

9    sign, you talked to detective Montilla and the

10   state's attorney and a court reporter, right?

11         A.    Yes.

12         Q.    Who was asking the questions?

13         A.    The attorney for the State was asking the

14   questions.   Montilla was asking me questions in

15   Spanish.

16         Q.    Did you have something with you when they

17   were asking you these questions?

18         A.    Something like?

19         Q.    A piece of paper?

20         A.    I had a yellow paper like the notebook

21   that the man is using.

22         Q.    Was there something written on that

23   notebook?

24         A.    The attorney for the State put a question

                              118

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  there in English, and the Detective Montilla the same

2  question that was in English he would put it below in

3  Spanish.

4  　　Q.　Was there an answer written down on that

5  piece of paper?

6  　　A.　The attorney for the State told the

7  detective that this was the answer that I had to give

8  to put in Spanish below.

9  　　Q.　And did you then say an answer back to

10  Detective Montilla?

11  　　A.　First he tried me out in English.　But he

12  saw that he couldn't understand me, so and he told me

13  Detective Montilla to take me to the room to learn

14  what he had written on the paper.

15  　　Q.　Did you then give those answers back to

16  Detective Montilla?

17  　　A.　When I learned the paper that he wanted me

18  to learn in Spanish, the attorney for the State asked

19  me the questions in English.　He would ask me the

20  question in Spanish, I would answer in Spanish and he

21  would give them to the person with that thing in

22  English.

23  　　Q.　Montilla would do that?

24  　　A.　Yes.

119

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Q.   Why did you give those answers to

2  Detective Montilla?

3    A.   Because he told me if I didn't help him or

4  did what they wanted me to do, they said they were

5  going to take the 2 girls from Rosa Bella and as soon

6  as she gave birth, they would take her son away.  And

7  they said they would lock her up and take the

8  children to one of those places where they keep

9  little children.  And my family is going to be locked

10  up also.

11    Q.   Now, at anytime did he get to talk to his

12  lawyer?  At anytime between the time he was taken

13  from this building --

14    THE COURT:  You've got to talk to him not to

15  the interpreter.

16    MR. RUECKERT:

17    Q.   At anytime from the time you were taken

18  from this building at 9:30 in the morning on the 22nd

19  until 10:00 o'clock the next morning on the 23rd were

20  you allowed to talk to your lawyer?

21    A.   They wouldn't let me talk to my attorney.

22    Q.   During the time you were in Area 5, you

23  have testified about Paulnitski grabbing you by the

24  neck?

                         120

CCSAO002772

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    Yes.

2        Q.    Were you struck by any other police

3   officers while you were there?

4        A.    Detective Guevara who was here.  He took a

5   telephone book.

6        Q.    What did he do with the telephone book?

7        A.    They handcuffed me behind.  They put

8   another handcuff to the ring on the wall.  They put

9   the book here against my ribs and they told me if I

10  cooperated, they asked me to cooperate with them and

11  I say I want to talk to my attorney.  So he hit me

12  here several times.  He put the book on my head.  He

13  told me you want to keep saying that you want to talk

14  to your attorney?  And I said yes.  And he hit the

15  book once and hit me on the head.

16       MR. RUECKERT:  I don't have anything else.

17  Thank you very much.

18                    CROSS EXAMINATION

19                    By MR. MAREK:

20       MR. MAREK:  Were you and Rosa married?

21       A.    No.

22       Q.    How long did you know Rosa Bella as of

23  August of 1990?

24       A.    I knew her from '87.  Until the day that

                         121

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    the State, the police made me a prisoner.

2        Q.   I'm sorry?

3        A.   A prisoner.

4        Q.   Did you meet Rosa in Puerto Rico?

5        A.   No.

6        Q.   So you've been here since 1987?

7        A.   I don't remember.  It was a long time.  I

8    can't remember.

9        Q.   When did you come here to Chicago?

10        A.   I can't remember.

11        Q.   You don't remember?  Well, you heard your

12   sister say it was 6 years ago.  Is that accurate?

13        A.   She says it was 6 years, but I can't

14   remember when.

15        Q.   How old were you when you came here?

16        A.   I was -- I can't remember either.

17        Q.   How many children do you have by Rosa

18   Bella?

19        A.   One.

20        Q.   That's Juan Jr.?

21        A.   Juan, yes.

22        Q.   And that child was born after August of

23   1990, correct?

24        A.   He was born on the 13th of April of '91.

122

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Q.    Do you have any other children?

2    A.    No.

3    Q.    So when you testified that the police were

4 going to take your children away from Rosa, what

5 children did you have?

6    A.    She had two very, very cute girls.

7    Q.    But you didn't have any children; correct?

8    A.    But I felt like I was their father because

9 they don't have a father.

10    Q.    How old were these children?

11    A.    One was about 4 when I first met her.  The

12 other one was about 2 and a half.

13    Q.    What were there names?

14    A.    One was Celidia Mitchell.  The eldest or

15 the elder.  And the little one was Rita Mitchell.

16    Q.    Do you know how the spell the name of the

17 first girl?

18    A.    No, but I can write it down.

19    Q.    Ask if the witness would please write it

20 down.

21    THE COURT:  Let the record reflect the

22 defendant is in fact writing down on a piece of paper

23 supplied by the state's attorney.

24    THE COURT:  The record play so reflect.

123

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          MR. MAREK:  For the record the witness has

2     written C-e-l-i-d-i-a.  Celidia?

3          A.   Celidia, yes.

4          Q.   She was 4 when you first met Rosa?

5          A.   Yes.

6          Q.   So how old was she in 1990 when you got

7     arrested?

8          A.   She was going to turn 8, 9.

9          Q.   So that means you had known Rose about 4,

10    5 years at that time, right?

11         A.   4, 5 years, yes.

12         Q.   So that helps you recall when you first

13    met Rosa, right?

14         A.   If that helps me when I met Rosa?

15         Q.   That's my question, sir.  Does that help

16    you recall?

17         A.   Yes, it helps me remember.

18         Q.   So that means you had to have met Rosa at

19    sometime at least during 1986?

20         A.   About '87.

21         Q.   And Rita was 2 and half when you met

22    Rosa.

23         A.   When I met Rosa she was about 2 and a

24    half.

                          124

CCSAO002776

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    Does Rosa Bella -- back in August of 1990,

2  did Rosa Bella speak English?  Back in August of 1990

3  did Rosa Bella speak English?

4      A.    She spoke English and Spanish also.

5      Q.    She only spoke Spanish to you?

6      A.    Yes.

7      Q.    Have you ever worked here in this country?

8      A.    I did some mechanic work fixing cars.

9      Q.    Did you ever work for anybody else?

10      A.    No.

11      Q.    You went to Shurz High School?

12      A.    Yes.

13      Q.    What years did you attend Shurz High

14  School?

15      A.    I don't remember.

16      Q.    Remember how old?

17      THE COURT:  Mr. Marek, I'm sorry I have to do

18  it to you again.

19                      (Recess taken.)

20      MR. MAREK:  How old were you, Mr. Maysonet,

21  when you attended Shurz High School?

22      A.    I was about 16, 17 years old.

23      Q.    And you are how old now?

24      A.    26 years old.

125

CCSAO002777

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          Q.    What's your date of birth?

2          A.

3          Q.    And you went to Shurz High School, this

4     was nights?

5          A.    Yes.

6          Q.    And what did you study?

7          A.    I wanted to follow a career in mechanics

8     but I first had to learn English.  And the teacher --

9     the classes were very hard for me.  I kept on

10    studying math and social sciences.  I was studying to

11    get to a certain level where I could understand

12    English.

13         Q.    So you were studying English?

14         A.    The teachers wanted to teach it to me, but

15    they couldn't teach it to me.

16         Q.    Well, my question, sir, is you did have

17    English courses as Shurz High School, correct?

18         A.    No.

19         Q.    Well, you said that you had to first learn

20    English in order to take these other courses, didn't

21    you?

22         A.    I had to learn English to take the

23    mechanics course.

24         Q.    Did you take the mechanics course?

                        126

CCSAO002778

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.    No.

2      Q.    What courses did you take?

3      A.    Social sciences and science, math.  I took

4 math 1 and 2 because they noted I knew a lot about

5 math.

6      Q.    All of these courses were taught

7 completely in Spanish?

8      A.    Yes.

9      Q.    Now, you testified that at some point, I

10 believe you said the assistant state's attorney tried

11 you out in English?

12     A.    Yes, he tried me out in English.

13     Q.    How did he do that?

14     A.    He had me read what he had written.  And

15 when he saw I couldn't neither read it or write it,

16 that's when the policeman told me he's going to want

17 you to do things in Spanish.

18     Q.    Just so I'm clear, what is it that was

19 written out for you on these yellow pages?

20     A.    What you have there with my photographs,

21 he had made the question out in English.  Below the

22 policeman put the same question but in Spanish.  Then

23 they put the answer in English, and then they put it

24 in Spanish also.

CCSAO002779

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      Q.    Who wrote out the answers in his Spanish?

2      A.    Detective Montilla.

3      Q.    So he wrote out on a piece of paper a

4  whole series of answers in Spanish?

5      A.    He wrote on one of those yellow pages that

6  you have there on the table.

7      Q.    He wrote out the questions and the answers

8  in Spanish; is that right?

9      A.    Yeah, he had written the questions in

10 Spanish and the answers in Spanish as well.

11     Q.    And you gave those answers before a court

12 reporter like this gentleman here this afternoon,

13 correct?

14     A.    He wanted me to learn them first.

15     Q.    At some point did you speak those answers

16 in either English or Spanish before a court reporter?

17     A.    Well, the man who was with that thing

18 wasn't there yet.

19     Q.    At some point the man with this Stenograph

20 machine did get there though, didn't he?

21     A.    By the morning, yes.

22     Q.    That's what I'm asking you about, Mr.

23 Maysonet.  What did you do in front of that man with

24 the Stenographic machine?

128

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    A.    When the man came with the machine, the

2  policeman and the attorney for the State would tell

3  him the questions in English so he could tell them to

4  me.  And I answer according to the paper that I'd

5  been given to learn from.

6    Q.    Did you still have that paper in front of

7  you at that time?

8    A.    How could I?  The police took it away.

9    Q.    When did the police take it away?

10   A.    Before the man that is -- I was in another

11  room and then they brought me to where the man was

12  with the machine, with the paper.

13   Q.    So then you memorized the answers that

14  were written out for you on this paper; correct?

15   A.    When he wanted me to learn, then I did at

16  that moment, yes.

17   Q.    After you memorized them, you repeated

18  them back before the court reporter with the machine,

19  correct?

20   A.    I would give the answers to the

21  detective.  The detective would give them in English

22  to the man with the machine.

23   Q.    When I memorized the questions and

24  answers, you memorized them in Spanish, correct?

129

CCSAO002781

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      A.   Not the questions but the answers what

2  they wanted me to keep in  my head more.

3      Q.   And you repeated them back in Spanish

4  before the court reporter with the machine, correct?

5      A.   I would tell them to the policeman and the

6  policeman would tell them to the other one in English

7  because the other guy didn't speak Spanish.

8      Q.   Sir, my question is when you repeated

9  these answers in front of the court reporter, did you

10  do that in Spanish?

11      A.   Yes, in Spanish.

12      Q.   Because that's the only language you

13  speak, right?

14      A.   Yes.

15      Q.   Now, this nervous problem that you have,

16  when did you first get that?

17      A.   The nervous problem I have had since I

18  fell from a window.  I fell onto a garbage can from

19  the second floor.

20      Q.   And you were being treated for that

21  condition back in August of 1990?

22      A.   Not from August of '90.  I was getting

23  treatment from 1980.  I don't remember exactly.

24      Q.   Were you under the care of a physician for

130

CCSAO002782

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   this nervous problem back in August of 1990?

2        A.   I was taking medicine for the nerves, yes.

3        Q.   That was prescribed by a physician,

4   correct?

5        A.   Yes.  The physician's name was Diaz I

6   think.

7        Q.   Diaz, D-i-a-z?

8        A.   Diaz.  I don't know how to spell it in

9   Spanish.

10       Q.   Where was his office?

11       A.   I can't remember.  It's been a long time.

12   I don't remember that.

13       Q.   And do you recall what prescription

14   medication it was that you were taking?

15       A.   It was a pill, little one.

16       Q.   Do you know the name of it?

17       A.   No.  I don't remember.

18       Q.   So you had been taking this for several

19   years, correct?

20       A.   Yes.

21       Q.   And well, have you had to take it since

22   your arrest?

23       A.   I didn't have to take the pills unless I

24   have a problem with my nerves.

131

CCSAO002783

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     Q.   So you haven't had any problems with your

2  nerves since August 22nd of 1990?

3     A.   Yes.

4     Q.   So your problem just appeared?

5     A.   I have always had a problem with my

6  nerves.

7     Q.   But you have taken no medication since

8  August of 1990; is that correct?

9     A.   I went to a doctor, but he said that I'm

10  too young to be taking so much medication, that I

11  should learn to control this.

12     Q.   Now, the prescription that you were taking

13  back in August of 1990, that was at your house,

14  correct?

15     A.   In '90 when I was jailed?

16     Q.   On August 22nd of 1990 when you were out

17  on bond, Mr. Maysonet?

18     A.   Yes.

19     Q.   That was at the home you shared with Rosa

20  Bella, correct?

21     A.   The pills were not there.

22     Q.   You were living on Homan with Rosa Bella

23  in August of 1990, were you not?

24     A.   To live and to stay there are 2 different

132

CCSAO002784

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  thinks.

2      Q.   Sir, were you living at 1302 North Homan

3  on August 22nd of 1990?  Was this your residence?

4      A.   I was staying there, but I didn't live

5  there permanently.  I was staying at my mother's

6  house.

7      Q.   Where did you keep your medication?

8      A.   My mother's house.

9      Q.   I show you what has been marked Respondent

10  Exhibit No. 2 for identification.  Was this your

11  medication?

12      A.   Can I take it?

13      Q.   Is this the bottle that your medication

14  came in?

15      A.   Yes.

16      Q.   Now, when you say yes, is this a

17  prescription, is this the prescription medication

18  that was prescribed for you in this bottle?

19      A.   No.

20      Q.   It's your mother's prescription.  Is this

21  the medication you were taking?

22      A.   I don't know the name of the pill but if

23  you let me see the pill inside, I can identify it.

24      THE COURT:  Let the record reflect that the

133

CCSAO002785

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    state's attorney has removed to cap of the

2    Respondent's 2 and I think is shaking out its

3    contents.

4         THE WITNESS:  Yes.

5         MR. MAREK:

6         Q.   So that's the medication you were taking

7    back in August of 1990?

8         A.   That is the medicine that was taken to me

9    at the police station when I was arrested.

10        Q.   You are able to identify this bottle as

11   the bottle that you took medication from on August

12   22, 1990 at the police station; is that correct?

13        A.   My medicine came in the same bottle.  But

14   I don't know if it's the same name.

15        Q.   Sir, is this the bottle that you took

16   medicine from when you were at the police station on

17   August 22 1990?

18        MR. RUECKERT:  I'm going to object.  It's been

19   asked and answered to the best he can do it.

20        THE COURT:  Well, it hasn't been answered but

21   I'm sure that's because he's not understanding the

22   question.  I'll let you try one more time to see if

23   you can make him understand it.

24        THE INTERPRETER:  I can ask the question.

134

CCSAO002786

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        THE WITNESS:  Yes, yes.

2        MR. MAREK:

3        Q.    Mr. Maysonet, your testimony is that you

4   were brought to the police station by Detective

5   Paulnitski, correct?

6        A.    Yes.

7        Q.    And you stayed there all day on August

8   22nd and into the next day, correct?

9        A.    I was not upstairs.  I was downstairs

10  until the officers left about 11 o'clock.  I'm sorry,

11  11:20 in the morning.

12       Q.    So it's your testimony, sir, you never

13  left the police station on either August 22nd or

14  August 23rd of 1990; is that correct?

15       MR. RUECKERT:  I'm going to object to that.  I

16  was limited to 9:30 in the morning on the 23rd by

17  objection of the State.  Now if they're going to get

18  into what happened after 9:30 on the 23rd, I want to

19  be able to talk about it too.

20       THE COURT:  I certainly didn't limit you to

21  that.

22       MR. RUECKERT:  I inquired about them leaving

23  the police station.

24       THE COURT:  That has nothing to do with 9:30 on

135

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    the 23rd.

2         MR. RUECKERT:  That's when it was signed.

3         THE COURT:  You were asking after that time

4    whether they left and went somewhere.

5         MR. RUECKERT:  That's right.  That's what he's

6    talking about right now.

7         THE COURT:  I don't know what he's talking

8    about.  I haven't heard the question.

9         MR. REUCKERT:  He talked about the 23rd.

10        MR. MAREK:  Judge, I'm going to rephrase the

11   question.

12        Q.   Mr. Maysonet, on the evening of August

13   22nd of 1990 around 9:30 p.m., did you leave the

14   police station and go somewhere with Detective

15   Guevara?

16        A.   No.

17        Q.   Now, you have testified already that you

18   spoke to Rosa Bella at the police station; correct?

19        A.   Yes.

20        Q.   You told Rosa Bella in the presence of the

21   detectives to tell the detectives the truth about

22   what had happened, did you not?

23        THE INTERPRETER:  I'm sorry.  Could you ask the

24   question again?  I apologize.

136

CCSAO002788

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     MR. MAREK:

2     Q.  Mr. Maysonet, you told Rosa Bella to tell

3 the detectives the truth about what had happened, did

4 you not?

5     MR. RUECKERT:  Objection.

6     THE COURT:  Basis?

7     MR. RUECKERT:  I don't see how it's relevant to

8 this at all.  What's in the mind of Rosa Bella got to

9 do with it?

10     THE COURT:  I don't think he's inquired about

11 anything in the mind of Rosa Bella.  He's asking the

12 defendant did he say a certain thing.  Overruled.

13     MR. RUECKERT:  My objection is relevance.

14     THE COURT:  Very well.  Overruled.

15     THE WITNESS:  No.

16     MR. MAREK:

17     Q.  Shortly after you spoke to Rosa Bella, you

18 went out into the neighborhood with Detective Guevara

19 to show them where an individual named Luvio, lived,

20 did you not?

21     A.  When they were asking, the police were

22 asking me things about names, they were asking me

23 where did these people spend their time.

24     Q.  Sir, my question, my question to you is

CCSAO002789

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  did you not go out with Detective Guevara and show

2  Detective Guevara where a individual named Juvia

3  lived?

4      THE COURT:   Where are you going with this?

5  Counsel's previous objection now seems to lie.

6      MR. MAREK:   Your Honor, our position is

7  contrary to what the defendant says that he only

8  invoked his right to counsel and did not cooperate

9  and only signed a statement, something that was

10 rehearsed and something that he regurgitated in front

11 of a court reporter, it's our position that this

12 individual was cooperative the entire night.

13     THE COURT:   The problem is I don't know whether

14 -- what I understood Mr. Rueckert to be asking was

15 about something that occurred after the statement was

16 signed.

17     MR. MAREK:   That's correct.   And that's

18 something else.   There's 2 times actually that Mr.

19 Maysonet went out into the neighborhood with the

20 officers.   And I have limited this to something that

21 happened during the time these statements are being

22 made.

23     THE COURT:   Very well.   I want to be sure.   I

24 didn't understand there were 2 different times.   I'm

138

CCSAO002790

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    not going to preclude Mr. Rueckert from going into

2    something then let you go into it.  You're talking

3    about some other time.

4        MR. MAREK:  This is after the arrest but before

5    the court reported statement.

6        THE COURT:  Very well.

7        THE INTERPRETER:  The question again, counsel.

8        MR. MAREK:

9        Q.   Did you go with Detective Guevara to show

10   them Juvia's house?

11       A.   After I signed the papers?

12       Q.   Before?

13       A.   No.

14       Q.   Did you go with Detective Guevara and show

15   them where Fro lived?

16       A.   No.

17       Q.   As a matter of fact, when you were out

18   with Detective Guevara you saw Juvia on the street

19   and pointed him out to Detective Guevara; didn't you?

20       A.   No.

21       Q.   Did you ever indicate -- strike that --

22            You do know Juvia?

23       A.   No.

24       Q.   You don't know that person?

139

CCSAO002791

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1       A.    I know him by name, not by last name.

2       Q.    What's his name?

3       MR. RUECKERT:  I object to the relevance of all

4   this too.

5       THE COURT:  Counsel, if you had like to

6   respond.

7       MR. MAREK:  Judge, our position is certainly

8   that Mr. Maysonet is the first individual arrested in

9   connection with this.  And the facts which are in his

10  statement could only have come from Mr. Maysonet.

11  Now, Mr. Maysonet --

12      THE COURT:  The difficulty is I don't know of

13  anything in this record that indicates to this Court

14  he was the first one arrested.  There's no testimony

15  to that effect.

16      MR. RUECKERT:  Even more than that with all due

17  respect, you wouldn't let me go into the statement.

18  In fact you told me I couldn't.

19      THE COURT:  That's 2 different issues, Mr.

20  Rueckert.  It's 2 different issues.  You were going

21  into that statement in a very different way for a

22  very different purpose and that ruling still stands.

23      MR. RUECKERT:  They're trying to show it's

24  voluntary and I'm trying to show it's involuntary.

140

CCSAO002792

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          THE COURT:   Counsel, please.

2          MR. RUECKERT:   Okay.

3          THE COURT:   Excuse me, are you looking for

4    someone?

5                         (Discussion off the record.)

6          MR. MAREK:   I'll withdraw the last question.

7          Q.   Mr. Maysonet, I'm going to show you once

8    again what you have already identified as the court

9    reported statement you signed.

10         THE COURT:   That's Respondent's one?

11         MR. MAREK:   Respondent's Exhibit No. 1.   Thank

12   you your Honor.

13         Q.   That's your signature on the bottom of

14   page 1 of this statement, correct?

15         A.   Yes.

16         Q.   Now, there is a total of 3 photos attached

17   to your court reported statement?

18         A.   Three photographs.

19         Q.   Yes.   Do you see those?

20         A.   Yes.

21         Q.   Well, the first one also has your

22   signature on the back, correct?

23         A.   Yes.

24         Q.   That's you, right?

                          141

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    Yes.

2        Q.    The second photo, which is marked as

3  Exhibit No. 1, who is that a photo of?

4        A.    This is Juvia.

5        Q.    And you knew that individual, right?

6        A.    I knew him, but not for too long.

7        Q.    And the third photo is marked Exhibit 2.

8  Who is that a photo of?

9        THE COURT:   Instruct the witness not to do

10  anything to the photographs.

11     MR. MAREK:

12        Q.    Who is that a photo of, Mr. Maysonet?

13        A.    This is his name, isn't it?

14        Q.    Do you know that individual, Mr. Maysonet?

15        A.    No.

16        Q.    Is this not the person that you identified

17  to the police as Fro, short for Fernandez?

18        A.    No.

19        Q.    Have you ever seen that photo before?

20        A.    No.   Right now.

21        Q.    This is the first time you've ever seen

22  that photo?

23        A.    Yes, right now.

24        Q.    You did not identify this photo to the

142

CCSAO002794

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    police back on August 22, 1990?

2          A.    No.

3          MR. MAREK:   If I may have a moment, your

4    Honor.

5          Q.    Mr. Maysonet, you said when you were in

6    the interview room at Area 5, Detective Paulnitski

7    came into the interview room; is that correct?

8          A.    When he had me in custody?

9          Q.    Yes?

10         A.    Yes, inside the room.

11         Q.    Is it your testimony that Detective

12   Paulnitski took you by the throat and asked if you

13   were talking about Detective Paulnitski?

14         A.    He told policeman Montilla that, if he

15   told him if he point at me again, he was going to

16   bust my face.

17         Q.    Did he ever lay a hand on you?

18         A.    He took me by the throat and pushed me

19   back.

20         Q.    And then he said something to Detective

21   Montilla?

22         A.    And he told to Detective Montilla and

23   Detective Montilla told that to me and Detective

24   Montilla told me don't worry about it, he's not going

143

CCSAO002795

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     to do anything about it.

2          Q.    So Detective Paulnitski did not speak to

3     you in Spanish, correct?

4          A.    He never talked to me there.  It was

5     Detective Montilla.

6          Q.    Do you know what Detective Paulnitski said

7     to you while he had his hands around your throat?

8          A.    What he said, he told Detective Montilla

9     if he points to me again and speaks Spanish, and he

10    points at me, you tell him that I'm going to bust his

11    face.

12         Q.    And Detective Montilla translated this for

13    you, correct?

14         A.    Yes, he told me that in Spanish.

15         Q.    So Detective Montilla was present all the

16    time that this happened you say?

17         A.    Yes.

18         Q.    Detective Paulnitski never spoke to you

19    alone about this case, right?

20         A.    No.

21         Q.    You couldn't understand anything Detective

22    Paulnitski was saying to you, right?

23         A.    Even if I could understand him, I couldn't

24    understand what he was telling me.

                              144

CCSAO002796

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   Q. Who did you testify hit you while the

2 phone book was up against your body?

3   A. Guevara.

4   Q. Just Guevara?

5   A. Yes.

6   Q. Did Detective Paulnitski ever strike you

7 at anytime while the phone book was against your

8 person?

9   A. Paulnitski was not in the room at that

10 time.  It was already afternoon, 4:35.

11   Q. That was so just Detective Guevara was in

12 the room at that time?

13   A. Yes.

14   Q. Did Detective Montilla, did he ever strike

15 you?

16   A. No.

17   Q. Now, you said it was a phone book.  The

18 phone book was placed where on your body?

19   A. They had it up here and they hit it with a

20 flashlight about 4 times, 3 or 4 times.

21   Q. Now, when you say "they", are you talking

22 about just Detective Guevara?

23   A. Guevara, yes.

24   Q. I'm sorry?

CCSAO002797

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          A.    Detective Guevara, yes.

2          Q.    So Detective Guevara put on these black

3    leather gloves?

4          A.    He put on black gloves.  He told me that

5    if I didn't talk, he would let me have it.  So I told

6    him let me very it.

7          Q.    And Detective Guevara held the phone book

8    up against your body?

9          Q.    He put it on this side right here.

10         Q.    And then he hit you with what?

11         A.    He put the book and he hit me with a

12   flashlight on top of the book.  Like he said that way

13   it wouldn't leave any marks.

14         Q.    What hand did he have the flash light in?

15         A.    I think he had the flashlight in the right

16   hand or the left.  I don't remember well.

17         Q.    Did you ever tell anybody that Detective

18   Montilla had also hit you with a flashlight?

19         A.    Detective Montilla never hit me.

20         Q.    My question is did you ever tell anybody

21   that Detective Montilla hit you with the flashlight?

22         A.    Detective Montilla or Guevara?

23         MR. MAREK:  May I have the question read back?

24         THE COURT:  Sure.

146

CCSAO002798

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          (Record read.)

2      THE WITNESS:  No.  Montilla never hit me with a

3  flashlight.

4      THE COURT:  Why didn't you move on.

5      MR. MAREK:  Thank you.  No further questions.

6      MR. RUECKERT:  No questions.

7      THE COURT:  Thank you.  Mr. Maysonet, you may

8  step down.

9      MR. RUECKERT:  Judge, there would be a

10  stipulation that the arrest report for Jose Maysonet

11  indicates his arrest date was August 22, 1990, and

12  his arrest time was 12 o'clock noon.

13      THE COURT:  What was the date?

14      MR. RUECKERT:  August 22, 1990.

15      MS. MANDELTORT:  Parts of that stipulation --

16      THE COURT:  Hold on.  What was the time?

17      MR. RUECKERT:  Noon.

18      MS. MANDELTORT:  Part of that stipulation at

19  this point, we don't know who generated that police

20  report.

21      THE COURT:  What is the document?

22      MS. MANDELTORT:  It's an arrest report.

23      MR. RUECKERT:  It's his arrest report.

24      THE COURT:  So what  is the stipulation?

147

CCSAO002799

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      MS. MANDELTORT:   Stipulation is that's what

2   that police report says, but there's no stipulation

3   as to who prepared the report.   It's unknown.

4      THE COURT:   All right.

5      MR. RUECKERT:   Before I rest, Judge, I brought

6   this up last time to your Honor, and it became an

7   issue in the prior motion.   I don't know if it's

8   going to be an issue here, but we have had testimony

9   now that Rose Maysonet came to your courtroom on the

10  22nd and there was no Judge, that you weren't

11  present, there as no other judge present.

12          I don't know what your records indicate.

13  If there's a problem, I suspect I would need a

14  continuance and get the chief judge's records to find

15  out if in fact you were here or weren't here, or get

16  the half sheet.

17      THE COURT:   What difference does it make?

18      MR. RUECKERT:   Well, it was an issue last time.

19      THE COURT:   I don't see how it's an issue on

20  this motion.   What has it got to do with anything?

21  Whether or not I was there --

22      MR. RUECKERT:   Well, if there's going to be

23  some argument made he had to have been here in 302,

24  then I think that's an issue.

CCSAO002800

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE COURT:  I don't see what it's got to do

2  with the issue raised in this motion.

3      MR. MAREK:  Our position is this motion only

4  concerns itself with what happened at Area 5.

5      THE COURT:  I though this was a motion to

6  suppress statements.

7      MR. RUECKERT:  It doesn't concern itself with

8  what happened in --

9      THE COURT:  I said I don't see what the

10  relevance is of whether I was or was not on the bench

11  in 302 that morning.

12      MR. RUECKERT:  If you are -- starts at that

13  point.

14      THE COURT:  It doesn't start at that point.

15  Haven't I just said what my feeling was about that?

16      MR. RUECKERT:  Thanks.

17      THE COURT:  Nobody has argued about it.  So if

18  you want to take a continuance and do whatever you

19  want to do, that's fine.  It seems to me more

20  properly you might ask the State if that's going to

21  be an issue for them.  I'm note defining the issues.

22  I don't see what it's got to do with anything.  But

23  you are at liberty if they're going to try to make a

24  issue of it, you need to talk to them.

149

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

 1          MR. RUECKERT:  Judge, I'll rest.

 2          MS. MANDELTORT:  We have brief rebuttal.  Would

 3     you bring out Detective Guevara first.

 4          THE COURT:  Will you both stipulate he remains

 5     under oath?

 6          MR. RUECKERT:  That's fine.

 7          THE COURT:  Detective, you were sworn earlier

 8     in these proceedings when you testified.  You are to

 9     consider yourself still being under oath.

10          THE WITNESS:  Yes, ma'am.

11                    REYNALDO GUEVARA,

12     recalled as a witness in rebuttal on behalf of the

13     People of the State of Illinois, having been

14     previously duly sworn, was examined and testified as

15     follows:

16                    DIRECT EXAMINATION

17                    BY MS. MANDELTORT:

18          Q.    State your name again gist for the

19     record.

20          A.    Detective Reynaldo Guevara.

21          Q.    Detective Guevara, in the time that you

22     were present with the defendant, Jose Maysonet, sir,

23     did you ever tell him that if he didn't talk to you

24     you were going to let's him /SRA it?

                        150

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1     A.   No, I did not.

2     Q.   Did you ever put on any black gloves and

3 attack him by putting a telephone book to his chest

4 and hitting that telephone book with a flashlight?

5     A.   No, I do not own a flashlight nor own

6 leather gloves.

7     Q.   Or black gloves of some sort?

8     A.   Or black gloves, right.

9     Q.   And just briefly, sir, you testified

10 earlier that you had a conversation with both Rosa

11 Bella present and the defendant; is that right?

12    A.   That's correct.

13    Q.   And after that conversation, sir, did you

14 go somewhere with the defendant Jose Maysonet?

15    A.   Back to the interview room.

16    Q.   And then after that, sir, did you and Jose

17 Maysonet leave Area 5 and go looking for Juvio and

18 Fro?

19    A.   Yes, we did.

20    Q.   Now, that again would be sometime after

21 9:30 in the evening on the 22nd of August, 1990; is

22 that correct?

23    A.   That's correct.

24    Q.   And he did in fact show you Luvia, just

151

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    for the record it's Lluvia?

2          A.    Correct.

3          Q.    Lluvia's home, did he not?

4          A.    Yes, he did.

5          Q.    And he also pointed out to you Fro's

6    house?  That's f-r-o, isn't that right?

7          A.    That's correct.

8          Q.    That was approximately 1035 North

9    Spaulding; isn't that right?

10         A.    That's correct.

11         Q.    And in fact while you were out with the

12   defendant, you saw Lluvia on the street; isn't that

13   right?

14         A.    Yes, we did.

15         Q.    And the defendant pointed him out to you?

16         A.    That's correct.

17         Q.    Then you went back to the area, did you

18   not?

19         A.    Yes, we did.

20         Q.    And at that time the defendant looked at

21   some photographs, some loose photographs, did he not?

22         A.    Yes, he did.

23         Q.    And he identified the photograph of Fro,

24   did he not?

CCSAO002804

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    That's correct he did.

2        MS. MANDELTORT:   Judge, I have nothing further.

3        THE COURT:   Cross?

4                    CROSS EXAMINATION

5                    By MR. RUECKERT:

6        Q.    This is going out on on the street and

7   this identifying photographs all occurred after Mr.

8   Maysonet had seen and talked to Rosa Bella, right?

9        A.    That's correct, yes.

10       Q.    You didn't take him out before he saw Rosa

11  Bella, did you?

12       A.    No, I didn't.

13       Q.    You didn't take him out anything time

14  during the afternoon of 22nd, did you?

15       A.    No, I didn't get involved until 2000

16  hours.

17       Q.    At 8:00 o'clock in the evening when you

18  first came in you didn't take him out on the street,

19  did you?

20       A.    No, I did not.

21       Q.    It was only after he had seen Rosa Bella,

22  correct?

23       A.    That's correct.

24       MS. MANDELTORT:   Nothing further.

                         153

CCSAO002805

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1      THE COURT:  Thank you.  You may step down.

2                          (Witness excused.)

3      MS. MANDELTORT:  Could you send out Detective

4   Montilla, please.

5      THE COURT:  Again, I would ask the parties if

6   they're agreeable to Detective Montilla being

7   considered still under oath or would you like him to

8   be sworn?

9      MR. REUCKERT:  No, not necessary.

10      THE COURT:  State, do you want the officer

11   resworn?

12      MS. MANDELTORT:  No, I don't.

13      THE COURT:  Very well.  Detective Montilla, you

14   are to consider yourself still under oath.  You were

15   sworn previously.

16                      FERNANDO MONTILLA,

17   recalled as a witness in rebuttal on behalf of the

18   People of the State of Illinois, having been

19   previously duly sworn, was examined and testified as

20   follows:

21                      DIRECT EXAMINATION

22                      BY MS. MANDELTORT:

23      Q.    Please state your your name.

24      A.    Detective Fernando E.  Montilla.

                          154

CCSAO002806

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    Q.   Mr. Montilla, when you testified before,

2  you testified about a series of conversations you had

3  with the defendant or were present with the defendant

4  for; is that correct?

5    A.   Yes, ma'am.

6    Q.   And among things you talked about is a

7  court reported statement that took place at

8  approximately 9:28 in the morning on the 23rd of

9  August 1990?

10   A.   Yes, ma'am.

11   Q.   Prior to that court reported statement,

12 sir, was a script written out for the defendant as to

13 what he should say during that court reported

14 statement?

15   A.   No, ma'am.

16   Q.   Specifically were questions written down

17 in English then translated by you into Spanish in

18 writing, then answers written out in English and then

19 translated into Spanish?

20   A.   No, ma'am.

21   Q.   Sir, you are fluent in the Spanish

22 language, are you not?

23   A.   Yes, ma'am.

24   Q.   Can you read and write Spanish as well as

155

CCSAO002807

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    speak it?

2         A.    No, ma'am.

3         Q.    You can speak Spanish but you do not write

4    Spanish?

5         A.    No, ma'am.

6         Q.    Have you ever been able to write Spanish?

7         A.    No, ma'am.

8         Q.    Showing you what's again Respondent's

9    Exhibit No. 1 for identification.  Portions of it are

10   in evidence, sir.  You testified before that was a

11   true and accurate transcript of the questions that

12   were asked and the answers that were given; is that

13   right?

14        A.    Yes, ma'am.

15        Q.    Sir, where it says"A" or "answer" is that

16   you speaking or the defendant speaking?

17        A.    That's the defendant speaking.

18        Q.    During this court reported statement, sir,

19   did the defendant answer in Spanish and then you

20   translated into English and your English words were

21   transcribed there?

22        A.    No, ma'am.

23        Q.    Whose English words were transcribed where

24   it says "A" for answer?

156

CCSAO002808

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1        A.    The defendant.

2        Q.    Sir, when you first went in to talk to the

3    defendant about 11:30 in the morning, did Detective

4    Paulnitski say to the defendant through you and your

5    translation, "if he points at me again, I'll bust his

6    face"?

7        A.    No, ma'am.

8        Q.    Did you see at that time Detective

9    Paulnitski in your presence take the defendant by the

10   throat and throw him up against the wall?

11       A.    No, ma'am.

12       Q.    Sir, you had become involved in the

13   investigation of the Wylie brothers murder earlier

14   than on August 22, 1990; is that correct?

15       A.    Yes, ma'am.

16       Q.    Was Jose Maysonet the first person

17   arrested in the course of the police investigation of

18   the murder of the Wylie brothers?

19       A.    Yes, ma'am.

20       MS. MANDELTORT:   Nothing further.

21       THE COURT:  Very well.  Cross.

22

23

24

157

CCSAO002809

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1                          CROSS EXAMINATION

2                          By MR. RUECKERT:

3        Q.    Now, you just talked about these series of

4   conversations you had with Mr. Maysonet and the

5   State's Attorney DiFranco, right?

6        A.    Yes, sir.

7        Q.    The first one was at 6:30, right?

8        A.    Yes, sir.

9        Q.    And that was with yourself and Assistant

10  State's Attorney DiFranco?

11       A.    Yes, sir.

12       Q.    And that was in one room, right?

13       A.    Yes, sir.

14       Q.    He was then moved to another room and at

15  7:10 there was another conversation with the

16  Assistant State's Attorney DiFranco and yourself,

17  right?

18            MR. MAREK:    Objection.  Beyond the scope.

19            THE COURT:    Sustained, counsel.  This is

20  rebuttal.

21            MR. RUECKERT:    I'm sorry.  She went into it.

22            THE COURT:    Counsel, the objection is

23  sustained.  I have heard all this before.  The

24  question was whether or not the Paulnitski incident,

                              158

1   that's what it's was confined to.  You didn't ask a

2   single question you haven't asked before and that I

3   hadn't heard the answer to.

4        MR. REUCKERT:

5        Q.   You knew from Rosa Bella, you knew the

6   names Juvia and Tino from talking to Rosa Bella,

7   right?

8        A.   No, sir.

9        Q.   She didn't say that in her conversation

10  with the police?

11       MS. MANDELTORT:  Objection, Judge.  There's no

12  evidence that this officer spoke with Rosa Bella.

13       THE COURT:  Sustained.

14       MR. RUECKERT:

15       Q.   You're familiar with the police reports,

16  are you not?

17       A.   What reports are you referring to?

18       Q.   The ones that include Rosa Bella's

19  statement.

20       MS. MANDELTORT:  I object.  He was not present

21  for a conversation with Rosa Bella.  How can he

22  testify off a police report about what Rosa Bella

23  said.

24       MR. RUECKERT:  Maybe he can.

159

CCSAO002811

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    MS. MANDELTORT:  I believe it's improper.

2    THE COURT:  Are you making an objection?

3    MS. MANDELTORT:  Yes.

4    THE COURT:  I don't know what the answer is

5    going to be, but the objection is sustained.

6    MR. RUECKERT:  You won't let me ask him about

7    that?

8    THE COURT:  He wasn't present.  He said he

9    doesn't know anything about that.  That's somebody

10   else's report.  Counsel, this is rebuttal.  Let us

11   not beat it all to death.

12   MR. RUECKERT:  Thanks a lots.  I have nothing

13   further.

14   MS. MANDELTORT:  Nothing further from the State

15                           (Witness excused.)

16   THE COURT:  The gist of the State's rebuttal

17   was take answer issues you had raised.  They did

18   that.  You can go around forever contradicting each

19   other.  That's not the purpose of rebuttal testimony.

20   MR. RUECKERT:  May I say just for the record,

21   Judge, during their rebuttal, they bring up the fact

22   he went out on the street and pointed out certain

23   people.  And they're making the implication and they

24   made it during rebuttal that's because of what he

160

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    said.

2         THE COURT:  Counsel, that was impeaching the

3    defendant.

4         MR. RUECKERT:  May I make my record?

5         THE COURT:  Very quickly.

6         MR. RUECKERT:  Also during the rebuttal they

7    got Officer Guevara to admit that it occurred after

8    Rosa Bella made a statement.  My offer of proof would

9    be Rosa Bella in her statement supplied those names.

10        THE COURT:  That's what you brought out,

11   counsel.  Fine.  You made your record.  Both sides

12   ready to argue?

13        MS. MANDELTORT:  Yes, Judge.  I would offer

14   Respondent's Exhibit No. 2, the bottle into evidence.

15        THE COURT:  Okay.  Any objection?

16        MR. RUECKERT:  No.

17        MS. MANDELTORT:  I believe it's his motion.

18   We'd waive opening and reserve rebuttal.

19        THE COURT:  Mr. Rueckert.

20        MR. RUECKERT:  I think the law is very clear

21   that once a defendant invokes his right, his

22   constitutional right to speak to his lawyer, that all

23   questioning must cease.

24        THE COURT:  Absolutely.

                          161

CCSAO002813

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          MR. RUECKERT:  Unless it can be shown by the

2    prosecution because it's their burden, to show it was

3    initiated by the defendant.

4          Now, let's take a look at this scenario

5    for just a second.  This defendant who has been

6    represented by Mr. Swano since August 8th, comes to

7    this building to be arraigned.  He's told to go from

8    101 to 302.  He has counsel.

9          In between his trip from 101 to 302 he's

10   interrupted by Detective Paulnitski, handcuffed and

11   taken to Area 5.  And the police officers and the

12   prosecution want us to believe that at no time

13   between the time in this building at 9:30, when he's

14   arrested by Detective Paulnitski, and 9:30 the next

15   morning did he ever ask for his attorney.  That's

16   what they want us to believe.

17          I suggest to you that is completely

18   incredible, completely incredible, and it goes

19   against the evidence suggested by not only the

20   defendant, but his sister.  His sister testifies that

21   at the very time Paulnitski took him into custody, he

22   started talking about his lawyer, requesting his

23   lawyer.  In fact, he said, "I've got to go to 302 to

24   see my lawyer."

162

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          And there is no question that information
2   given to Paulnitski is information given to Area 5,
3   period.  If Paulnitski knew about the lawyer, if the
4   request was made to Paulnitski, that is inferred the
5   everybody in Area 5.  Period.
6          The prosecution has given you no evidence,
7   absolutely no evidence to suggest that this defendant
8   initiated any conversations once he was taken from
9   this building.  He's taken from this building, he's
10  taken to an interview room in Area 5, and by noon
11  he's fingerprinted and thrown in the lockup.  And
12  they want us to believe that at no time did he ask
13  for his lawyer.
14         The evidence is he's held past court call
15  not only on the 22nd but the 23rd.  And at no time
16  according to them did he ever ask for counsel.  A
17  counsel he has paid for.  That is the scenario they
18  want you to believe.
19         If you believe that this person was taken
20  from this building, taken to Area 5 and not allowed
21  to talk to his lawyer, what good is the right?  What
22  possible good is it to tell someone you have the
23  right to talk to your lawyer, but not let him do it?
24  What possible good is there to advise someone, you

163

CCSAO002815

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   can remain silent, you can talk to your lawyer, but

2   not let him do it?

3           This defendant is taken to Area 5 and held

4   there for 24 hours.  Never given the right to talk to

5   his lawyer, even though he continually asked for it.

6           I just want to read something from the

7   case of the People versus Mrozek, M-r-o-z-e-k.  It's

8   cited at 367 Northeast 2nd 783.  And in there it

9   talks about in ascertaining whether defendant's

10  statements are voluntary, the court must consider the

11  totality of the circumstances surrounding the

12  statement.  Including the defendant's age, his

13  intelligence, his background mental capacity and

14  education.  Other factors include whether defendant

15  was subject to lengthy interrogation or incommunicado

16  incarceration.  Whether there was a delay in

17  presenting the defendant to a judge for preliminary

18  hearing.  Whether defendant slept while

19  incarcerated.  Whether the defendant was emotionally

20  distraught.  If one of those things is present in

21  this case, every one of them.  Lengthy

22  interrogation.  Lengthy incarceration.  Lengthy

23  periods of time when he's incommunicado.  Not

24  presented to court when he should have been.  He was

164

CCSAO002816

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  held over.  He had a nervous condition that required

2  his sister to bring pills.

3           He asked for his lawyer and didn't get

4  it.  He was taken to the lockup, taken to various

5  rooms in Area 5.  And we are supposed to believe that

6  after all of that, what he did was give a voluntary

7  statement to a double murder.  And we are supposed to

8  believe that that's voluntary.

9           Judge, I can only say I can only end by

10 saying I don't know what good the rights are whether

11 they were given or not.  Whether he was ever advised

12 of those rights or not, I don't care what good they

13 are if you are not allowed to pursue them.  I don't

14 know what good it is to tell somebody you have a

15 right to talk to your lawyer and never give him the

16 chance to do it.

17          I suggest to you that this case, this

18 confession cries out for involuntary.  With all due

19 respect, Judge, this is a very serious case.  And the

20 best evidence the prosecution is ever go going to

21 have in this case is this coerced statement.  And I

22 think it should be suppressed with all due respect.

23          THE COURT:  Thank you, Mr. Rueckert.  State.

24          MR. MAREK:  Clearly O'Neil versus Wisconsin and

165

CCSAO002817

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   its progeny, one of which is People versus Maxwell

2   which is and Illinois Supreme Court opinion at 148

3   Ill. 2nd 116.  The mere fact that the defendant is

4   represented by counsel in an unrelated case does not

5   operate as a invocation of his right to counsel

6   during questioning in an unrelated case.  The

7   defendant has to invoke that right again.

8          The evidence I submit to the court is

9   overwhelming that the defendant did not do so.  That

10  the defendant waived his rights repeatedly.

11  Cooperated with the police.  Spoke to the police.

12  Identified offenders.  Went out into the neighborhood

13  and pointed out where those offenders lived, and when

14  he saw one of them on the street, pointed that person

15  out.

16         This is not a situation of incommunicado

17  incarceration as counsel refers to it.  Rosa Bella

18  very clearly had contact with the defendant.  Miss

19  Rose Maysonet, his sister, we now know also had some

20  contact with the defendant.  As to this allegation

21  that there was repeated and incessant questioning,

22  that's simply not the case.

23         He was in the lockup by his own testimony

24  for several hours in between interrogations.  He was

166

CCSAO002818

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   out in the neighborhood as the investigation was

2   progressing.   This was not repeated interrogation.

3            As to his nervous condition.  If in fact

4   Mr. Maysonet even suffered from one at all, or if he

5   was only nervous because he knew he had been

6   apprehended and was facing a rather serious charge

7   and rather serious consequences, but the medication

8   was given to him.  Detective Guevara says it was

9   given in his presence from a bottle that Rosa Bella

10  brought.

11           I submit to the Court that this whole

12  medication is really a red herring and all it really

13  reflects on is the credibility of all the witnesses.

14           I submit to the Court that Detective

15  Guevara's recollection is that Rosa Bella brought the

16  medication in his presence and he allowed the

17  defendant, he, Detective Guevara allowed the

18  defendant to take some of the medication, I submit to

19  the Court it is far more reasonable than the fact

20  that Rosa Bella would have access to the defendant's

21  medication, since he was living with Rosa Bella,

22  although he would have us believe that he was living

23  with Rosa Bella or staying with his mother or some

24  such semantic games that the defendant is playing

167

CCSAO002819

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   from the stand.

2          The reason the State asked both defense

3   witnesses about the prescription bottle and the

4   bottle is in evidence and the Court can certainly

5   examine it.  Clearly it's dated and the date is from

6   March of 1991.  So I submit to the Court whatever

7   prescription bottle was handed to Mr. Maysonet, it is

8   not the one which has been brought to the court

9   that's been represented by both the defendant and

10  Miss Maysonet as the prescription bottle given to

11  him.  It reflects clear and directly on their

12  credibility and I would ask the Court to consider it

13  only for that reason.

14         I submit to the Court what we have here is

15  a situation where the defendant did cooperate with

16  the police and now once again has remorse for doing

17  so.  As to what this Court has to believe, this Court

18  has to believe the defendant is telling the truth

19  that the defendant engaged in this process whereby he

20  merely regurgitated some facts which the police fed

21  to him.

22         Where the police would have gotten these

23  facts from, we can only imagine since the defendant

24  is the first person arrested in this investigation.

                          168

CCSAO002820

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1          The Court would have to believe that the

2    assistant state's attorney and the court reporter I

3    suppose are also in on this charade, and that

4    certainly Detective Montilla is lying when he said he

5    didn't translate during the court reported

6    statement.  Those are the words of the defendant.

7          Your Honor, I would ask the Court to deny

8    the motion.

9       THE COURT:  There's not much that you said, Mr.

10   Rueckert, about the law that this Court would have

11   any difficulty with.  I think you have made an

12   absolutely correct statement of the law.  This

13   happens to be a situation in which the credibility of

14   the witnesses it seems to me is pivotal in the Court

15   reaching its decision about the totality of the

16   circumstances as they are reflected on the record

17   through the testimony adduced here.

18          I'm not going to go back offer it again.

19   Everybody heard it.  It may have seemed like a long

20   time, but it really wasn't that long.

21          A couple of things I would touch on.  I

22   believe this was Respondent's 2, which Miss Rose

23   Maysonet says is the bottle.  It being in evidence,

24   the Court does examine it.  There is some handwriting

169

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   on it that says "nervios." It's kind of interesting

2   as to why that was written on there in ink. It

3   indicates it's harasapom (phonetic). It is a

4   prescription bottle bearing an issue date of, looks

5   like March of 1991. It is for someone named Miriam

6   Lajara. It is written in Spanish and the court knows

7   there are 2 tiny pills inside.

8           When I juxtapose that with Rose Maysonet's

9   testimony that the officer came down and said her

10  brother had a nervous breakdown, all of that seems a

11  little strange. But at any rate, I don't know what

12  weight this has, if anything. The prescription

13  issued after these events took place. It's a

14  prescription to someone else, which there's been some

15  overlay of writing, nervios, which I assume I assume

16  in Spanish means nervous, I don't know what that

17  means or where it came from. None of that is very

18  persuasive to the Court.

19          The Court does not believe that Mr.

20  Maysonet at Area 5 in the course of these events had

21  a nervous breakdown. I don't even know what those

22  pills are in there. If some pills were given to Mr.

23  Maysonet, I don't have any idea what those were.

24  They may have been aspirin.

CCSAO002822

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1    At any rate, I don't believe he had a

2 nervous breakdown and I don't believe the officer

3 told his sister he had a nervous breakdown.

4    In large part I find, and this lengthy

5 interrogation, it seems to me the interrogation may

6 have spanned a period of hours.  I don't think

7 there's any doubt about that.  But I haven't heard

8 anything that suggests lengthy interrogation.  It

9 sounds much more based on the testimony, is that they

10 were sort popping in and out and talking with him.

11    Certainly even if I didn't believe the

12 police officers ever Mirandized him, it's a little

13 hard to believe that 2 separate and different state's

14 attorneys talked with him.  One at 4:30 and one at

15 6:30 and another one at 9:28 and nobody ever

16 Mirandized him.  I don't believe that.  I believe the

17 defendant was Mirandized.

18    And certainly the most recent case coming

19 down which I believe -- is it Maxwell?

20    MR. MAREK:  Yes.

21    THE COURT:  Certainly indicates to me the mere

22 fact he was being represented by Mr. Swano in an

23 unrelated case does not serve to automatically invoke

24 the request for an attorney in another case.  He has

171

CCSAO002823

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  to invoke it.  And I think that case makes it clear.

2  It's really based on an U. S. Supreme Court case.

3  That is nothing that should make this Court tarry.

4         Just because Swano was representing him in

5  the case that was pending in 302 doesn't then mean

6  that he's exercising his option to invoke his right

7  to attorney in the instant case.  That just isn't

8  what the law is.

9         When I look at the totality of the

10  circumstances, when I weigh particularly, because it

11  is Mr. Maysonet's testimony that's probably the most

12  critical in the Court's assessment, the officers

13  certainly in their direct from the State didn't

14  establish anything that would make this Court think

15  that the statement was coerced or involuntary.

16         So I'm left with essentially with Mr.

17  Maysonet's testimony and perhaps tangently Rosa's,

18  but I did not find Mr. Maysonet's testimony credible

19  at all.  I particularly didn't find credible this

20  idea that he understands no English and speaks no

21  English.  He indicated he came to this country, which

22  is his country, at about 16 years of age.  He's now

23  26 or 27.  I don't think it's reasonable to expect

24  that a kid of that age -- perhaps if you've got an

172

CCSAO002824

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1   elderly person coming into a country where you don't

2   know the language, they my never in fact become

3   conversant in the second language.  But I don't for a

4   minute believe that Mr. Maysonet doesn't understand

5   at least at a rudimentary level.  I'm not saying how

6   conversant he is, but I think he understands English

7   and I think he speaks English.

8        When you talk about the situation with

9   Paulnitski, I can't imagine that the other officer

10   was translating Paulnitski's alleged remarks to the

11   defendant while grabbing him about the neck and

12   throwing him up against the wall.  I didn't hear any

13   indication that anybody observed any bruises or

14   anything else on his neck that would substantiate

15   that testimony.

16        When I take Mr. Maysonet's testimony as a

17   whole, I did not find it credible.  And certainly not

18   in pertinent part.

19        So for all those reasons without

20   belaboring it, the motion to suppress the defendant's

21   statement is denied.

22      MS. MANDELTORT:  Judge, if I may, briefly this

23   morning Mr. Beuke stopped by and we tried to

24   ascertain a trial schedule and pick out a date in the

173

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1  future for that.  Upon conferring with the detective,

2  there's going to be some furlough problems on that

3  day.  Mr. Goosens is up on the 6th.  May I suggest we

4  hold Mr. Maysonet to the same date, which is Monday?

5  I can then speak with Mr. Beuke before then or he can

6  appear that day and we can pick a date.  Looks like

7  it may have to be a little longer because for most of

8  the month of April --

9       THE COURT:  When was Mr. Goosens last here.

10      MR. RUECKERT:  I think last Thursday.

11      MS. MANDELTORT:  Yeah, on the 26th.  He's back

12  up on February 6th.  Perhaps that way we can get a

13  court date that's convenient for everyone.

14      THE COURT:  Okay.  Why don't we do that then?

15  2-6-95.

16                          (A continuance

17                          was taken to February 6,

18                          1995.)

19

20

21

22

23

24

174

CCSAO002826

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

1

2  STATE OF ILLINOIS )
                    )  SS.
3  COUNTY OF C O O K )

4

5

6       I, ROBERT P. KUTZMER, CSR, Official Court

7  Reporter for the Circuit Court of Cook County,

8  Illinois Judicial Circuit of Illinois, do hereby

9  certify that I reported in shorthand the proceedings

10 had on the hearing in the above-entitled cause; that

11 I thereafter caused the foregoing to be transcribed,

12 which I hereby certify to be a true and accurate

13 transcript of the proceedings had before the

14 Honorable LORETTA HALL MORGAN, Judge of said court.

15

16

17                    Official Court Reporter
                      Circuit Court of Cook County
18                    State of Illinois

19

20

21

22

23

24

175

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 37

# In The Matter Of:

*Maysonet v.*
*Guevara*

---

*Lee Epplen*
*August 28, 2019*
*Video Deposition*

---



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

## Page 1

```
 1              THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   JOSE JUAN MAYSONET, JR.,

 4        Plaintiff,

 5        vs.                        No. 18-cv-02342

 6   REYNALDO GUEVARA, ERNEST
     HALVORSEN, EDWARD MINGEY,
 7   EPPLEN; FERNANDO MONTILLA,
     ROLAND PAULNITSKY, FRANK
 8   DIFRANCO, CITY OF CHICAGO, and
     COOK COUNTY,
 9
          Defendants.
10                                   /

11

12          The video-recorded discovery deposition

13   of LEE EPPLEN, taken in the above-entitled case, on the

14   28th day of August, 2019, at 10:40 o'clock a.m. at the

15   offices of The Sotos Law Firm, 141 West Jackson

16   Boulevard, Suite 1240A, Chicago, Illinois, pursuant to

17   agreement of counsel.

18

19   Reported by:  Karyn H. Chalem, RPR, CSR
     License No.:  084-004167
20

21

22

23

24

25
```

## Page 2

```
 1   A P P E A R A N C E S

 2        BONJEAN LAW GROUP
          100 Dean Street
 3        Suite 422
          Brooklyn, New York  11238
 4        BY:  JENNIFER A. BONJEAN
               ASHLEY COHEN   (partial proceeding)
 5        (718) 875-1850
          jennifer@bonjeanlaw.com
 6             On behalf of the Plaintiff;

 7        STEVEN A. GREENBERG, LTD.
          53 West Jackson Boulevard
 8        Suite 1260
          Chicago, Illinois  60604
 9        BY:  KYLE JORGENSEN  (partial proceedings)
          (312) 879-9500
10        kyle@greenbergcd.com
               On behalf of the Plaintiff;
11
          THE SOTOS LAW FIRM
12        141 West Jackson Boulevard
          Suite 1240A
13        Chicago, Illinois  60604
          BY:  DAVID A. BRUEGGEN
14        (312) 735-3300
          dbrueggen@jsotoslaw.com
15             On behalf of the Defendants
               Ernest Halvorsen
16             Edward Mingey
               Lee Epplen
17             Fernando Montilla
               Roland Paulnitsky;
18
          ROCK, FUSCO & CONNELLY
19        321 North Clark Street
          Suite 2200
20        Chicago, Illinois  60654
          BY:  AUSTIN G. RAHE
21        (312) 494-1000
          arahe@rfclaw.com
22             On behalf of the Defendant
               City of Chicago;
23

24

25
```

## Page 3

```
 1   A P P E A R A N C E S (cont'd)

 2        LEINENWEBER BARONI & DAFFADA
          120 North LaSalle Street
 3        Suite 2000
          Chicago, Illinois  60602
 4        BY:  THOMAS M. LEINENWEBER
          (847) 251-4091
 5        thomas@ilesq.com
               On behalf of the Defendant
 6             Reynaldo Guevara;

 7        COOK COUNTY STATE'S ATTORNEY'S OFFICE
          50 West Washington Street
 8        Suite 500
          Chicago, Illinois  60602
 9        BY:  EDWARD M. BRENER
          (312) 603-5971
10        edward.brener@cookcountyil.gov
               On behalf of the Defendants
11             Frank DiFranco
               Cook County.
12

13   Also Present:

14        SAMANTHA DAMIANO, videographer

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1                    I N D E X

 2   WITNESS:                              PAGE:

 3   LEE EPPLEN

 4        Examination by Ms. Bonjean         6

 5

 6   EXHIBITS:

 7        Exhibit 1                          363

 8        (Exhibit 1 retained and not attached to transcript.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Maysonet v.
Guevara

Video Deposition

Page 5

1    THE VIDEOGRAPHER: We are now on the
2  record in the matter of Jose Maysonet, Jr., versus
3  Reynaldo Guevara, et al., in the United States
4  District Court for the Northern District of
5  Illinois, Eastern Division, Case Number 18-cv-02347
6  (sic).  Today's date is August 28th, 2019, and the
7  time is now 10:40 a.m.
8    This is the video-recorded deposition
9  of Lee Epplen.  We are located at the Sotos Law
10  Firm, 141 West Jackson Boulevard, Suite 1240A,
11  Chicago, Illinois.  My name is Samantha Damiano,
12  legal video specialist, representing Rizman
13  Rappaport.  The court reporter is Karyn Chalem,
14  also with Rizman Rappaport.
15    For the record, would counsel please
16  introduce themselves and who they represent.
17    MS. BONJEAN: Jennifer Bonjean on
18  behalf of the plaintiff Jose Maysonet.
19    MR. BRENER: Edward Brener,
20  B-R-E-N-E-R.  I represent Frank DiFranco and Cook
21  County.
22    MR. LEINENWEBER: Justin Leinenweber,
23  L-E-I-N-E-N-W-E-B, as in "boy," E-R.  I represent
24  defendant Guevara.
25    MR. RAHE: Austin Rahe on behalf of the

Page 6

1  City of Chicago.
2    MR. BRUEGGEN: Dave Brueggen for the
3  defendant officers, including deponent Lee Epplen.
4    THE VIDEOGRAPHER: The court reporter
5  will now swear in the witness.
6    THE REPORTER: Will you raise your
7  right hand, please.
8    (Witness sworn.)
9    LEE EPPLEN,
10  called as a witness herein, having been first duly
11  sworn, was examined and testified as follows:
12    THE WITNESS: I do.
13    EXAMINATION
14    BY MS. BONJEAN:
15  Q.  Good morning, Mr. Epplen.
16  A.  Yes.
17  Q.  Can you please tell me your full name so
18    that I am pronouncing it correctly.
19  A.  Lee Epplen.
20  Q.  And my name is Jennifer Bonjean.  I
21    represent the plaintiff Jose Maysonet in this
22    lawsuit in which you are a named defendant.
23    Have you ever had your deposition taken
24    before?
25  A.  Yes, ma'am.

Page 7

1  Q.  How many times?
2  A.  Probably close to a half dozen.
3  Q.  Well, I'm sure you understand how
4    depositions proceed, but I'd like to go over a few
5    ground rules so that we're on the same page.  Okay?
6  A.  Uh-huh.
7  Q.  First thing I'm going to ask you to do is
8    make sure you speak audibly so that we can hear
9    you.  Try to refrain from uh-huhs or shaking of
10    your head --
11  A.  Yeah.
12  Q.  -- because, obviously, the court reporter
13    can get it -- can't get that down, even though the
14    videographer may.
15    MS. BONJEAN: And for the record, my
16  associate Ashley Cohen has just joined us.  This is
17  Ashley Cohen.  She also represents --
18    THE WITNESS: How do you do.
19    MS. BONJEAN: -- the plaintiff, Jose
20  Maysonet.
21    BY MS. BONJEAN:
22  Q.  Sir, do you understand that you are under
23    oath here today?
24  A.  Yes.
25  Q.  And do you understand that the oath you take

Page 8

1  here today is the same oath you would take as if
2    you were in a court of law?
3  A.  Yes.
4  Q.  And do you understand that by taking the
5    oath, you are swearing that your testimony is
6    truthful to the best of your ability?
7  A.  Yes.
8  Q.  And you understand that you're expected to
9    give truthful answers to every single question that
10    I'm going to ask of you to the best of your
11    ability?
12  A.  Yes.
13  Q.  And you understand that any willful false
14    statements that you make here today may subject you
15    to the penalties of perjury?
16  A.  Yes.
17  Q.  Now, I am looking for full and complete
18    responses to my questions.  Do you understand that?
19  A.  Yes.
20  Q.  Okay.  And can you agree that you will not
21    purposefully omit a material fact that would be
22    naturally responsive to one of my questions?
23  A.  Yes.
24  Q.  And I understand the events that underlie
25    this lawsuit took place almost three decades ago

Maysonet v.
Guevara

Video Deposition

Page 9

1  and that there are matters that you may not
2  remember.  If you are -- it's perfectly okay to let
3  me know that.  If you're able to provide some
4  information, but maybe not with the clarity that
5  you would like to, you can just let us know so that
6  the record reflects that.  Okay?
7  A.  Yes.
8  Q.  I'm not asking you to guess, but if you can
9  give me the best response you can, and if you feel
10  that it's incomplete or may not be a hundred
11  percent accurate, you can let me know that so the
12  record reflects that.  Okay?
13  A.  Yes, ma'am.
14  Q.  If you do not understand any of my
15  questions, let me know and I will rephrase them
16  until you do understand.  Okay?
17  A.  Yes.
18  Q.  If you do answer a question, I am going to
19  assume that you understood that question.  Is that
20  fair?
21  A.  Yes.
22  Q.  And if at any point during the deposition
23  you remember something that was responsive to an
24  earlier question, will you let me know?
25  A.  Yes.

Page 10

1  Q.  Okay.  And then I'll give you the
2  opportunity to clarify or amend your prior answer
3  so that it is full and complete to the best of your
4  abilities.  Okay?
5  A.  Okay.
6  Q.  The court reporter is transcribing my
7  questions and your answers.  It is a natural
8  tendency to sometimes anticipate my question and
9  start answering before I have completed it.  That's
10  normal in an everyday conversation, but it makes it
11  difficult on the court reporter.  So I'm going to
12  ask that you try to let me finish my question
13  before you answer it, even if you think you know
14  where I'm going with it.  Okay?
15  A.  Okay.
16  Q.  And I'll do the same and try not to step on
17  your answers.
18  If you need a break, let us know.  You are
19  at liberty to take a break at any point.  I would
20  just ask that if there's a question pending, that
21  you'd answer the question before we break.  Okay?
22  A.  Yes.
23  Q.  Before we get started, is there any reason
24  you can think of why you cannot give truthful and
25  full testimony here to the best of your abilities?

Page 11

1  A.  No.
2  Q.  Okay.  You testified earlier that you have
3  had your deposition taken before on at least a half
4  a dozen occasions.
5  Do you have -- can you tell me the times in
6  which you've had your deposition taken, if you
7  remember any or all of them.
8  A.  Probably the first time was in the year 2000.
9  It was a deposition on a civil matter regarding the
10  death of my wife.
11  Q.  Were you a party to that lawsuit?
12  A.  Yes.
13  Q.  Were you a plaintiff in that lawsuit?
14  A.  Yes.
15  Q.  Okay.  And that was in 2000?
16  A.  I believe so, yes.
17  Q.  Okay.  Sorry to hear that.
18  Any other times in which you've given
19  depositions?
20  A.  Yes, on a -- let's see.  When I was an
21  assistant deputy superintendent, there was a
22  deposition regarding the alleged wrongful death of a
23  subject by the hands of the police.  And that would
24  have been in two thousand and I, think, 7 or after
25  that.  It was after I retired that I took the

Page 12

1  deposition.
2  Q.  Can you tell me who the defendant -- strike
3  that.
4  Can you tell me who the plaintiff was in
5  that matter.
6  A.  I don't remember his name, no.
7  Q.  Okay.  And was this a police shooting case?
8  A.  Yes.
9  Q.  And did the plaintiff -- was this -- did the
10  victim die?
11  A.  Yes.
12  Q.  Okay.  So this was a lawsuit brought on
13  behalf of his family or her -- is this --
14  A.  Yes.
15  Q.  Okay.  That was in 2007, you said?
16  A.  I believe it was, because I think I was
17  already retired.
18  Q.  Okay.  Were you a named defendant in the
19  case?
20  A.  No.
21  Q.  Were you acting as a designee for the City
22  of Chicago?
23  A.  I don't remember what my title was or what it
24  was for.  I was the assistant deputy
25  superintendent --

Rizman Rapaport (973)992-7650
"When every word counts"

**Page 13**

1 Q. Got on it.
2 A. -- on duty at the time --
3 Q. I see.
4 A. -- and at the scene of the investigation.
5 Q. Okay. But you were not named as a
6 defendant?
7 A. Not to my knowledge.
8 Q. Do you know how that case resolved?
9 A. No, ma'am, I don't.
10 Q. And were you represented?
11 A. I'm sure that there was somebody there --
12 Q. From the City?
13 A. -- from the City.
14 Q. Okay. And you don't remember -- do you
15 remember the names of any of the defendants in the
16 case, besides the City of Chicago, I'm assuming?
17 A. No, because I think I sat by myself for that
18 deposition. I don't recall the names specifically.
19 Q. What officer was accused of doing the
20 shooting?
21 A. The shooter?
22 Q. Yeah.
23 A. I don't remember his name.
24 Q. Oh, you don't remember his name?
25 A. Correct.

**Page 14**

1 Q. Well, if it comes to you, will you let us
2 know?
3 A. Yes, ma'am.
4 Q. I think that's two. Any others come to mind
5 in which you've been deposed?
6 A. Another was the death of a young man, and I
7 believe the district was -- in the 15th district,
8 15th police district, where the police were driving
9 the wrong way down a one-way street on their way to
10 an investigation that they had been conducting, and
11 this young man was driving down the street in a
12 little -- I don't know what they call it, a little
13 scooter motorcycle-type thing.
14 And I don't know if he -- I don't remember if
15 he hit another car and subsequently fell off of the
16 motorcycle and got hit, or what the circumstances
17 were, but the officers that were driving the wrong
18 way were sued --
19 Q. I see.
20 A. -- for causing that death. And I don't know
21 what the resolution was of that either.
22 Q. That was like a police chase type of case?
23 A. Well, I don't -- I don't remember if they
24 were chasing him, because, like I say, I think they
25 were on another investigation.

**Page 15**

1 Q. No, I understand it was -- they were chasing
2 someone else, but someone else got injured.
3 A. And I think he may have panicked. I don't
4 remember all the specifics of it.
5 Q. And you were not a named defendant in that
6 case?
7 A. No, ma'am.
8 Q. And I'm assuming you were testifying as some
9 type of third party or designee for the City. Is
10 that right?
11 A. I believe so, yes.
12 Q. Okay. Do you remember any of the parties to
13 the lawsuit?
14 A. No, ma'am, I don't.
15 Q. What year was that?
16 A. 2006, 2007, through there.
17 Q. Okay. Any others?
18 A. I don't know if it was -- got to a
19 deposition. I don't remember. It was regarding a
20 CR number from an officer who was suing another
21 member of the department for assault or harassment
22 or something. And I remember going down to the
23 corporation counsel, and I think the year would have
24 been probably 2001, but I don't remember if I
25 actually gave or sat for a deposition in that

**Page 16**

1 matter. And I never heard after, other than the
2 fact that I was dropped as a plaintiff.
3 Q. As a plaintiff?
4 A. Yeah. I believe I was initially a
5 plaintiff --
6 Q. Okay.
7 A. -- on the CR number. I don't know if I was a
8 plaintiff --
9 Q. Oh, I see.
10 A. -- on the lawsuit --
11 Q. Got it.
12 A. -- but I was an accused.
13 Q. Okay. That's at least five -- five.
14 A. Okay.
15 Q. I think you've given me five, four or five.
16 Any others that you recall?
17 A. No, ma'am.
18 Q. Okay. You're currently a defendant in
19 another lawsuit right now, right?
20 A. Yes.
21 Q. And that is Ricardo Rodriguez?
22 A. Yes.
23 Q. Another case involving Detective Guevara?
24 A. Yes.
25 Q. Have you had your deposition taken in that

Maysonet v.
Guevara

Video Deposition

Page 17

1 case yet?
2 A. No.
3 Q. Are you a defendant in any other pending
4 lawsuits?
5 A. Not to my knowledge.
6 Q. Just this one and the Rodriguez?
7 A. Yes.
8 Q. Okay. All right. What did you do to
9 prepare for your deposition here today?
10 A. Spoke with my attorneys.
11 Q. Okay. And without revealing any of your
12 communications with your attorneys, how many times
13 did you speak with your attorneys?
14 A. Three, I believe.
15 Q. Three separate occasions?
16 A. Yes.
17 Q. And when was the first occasion you spoke
18 with them?
19 A. Last year some time, I think.
20 Q. Okay. And was that in person?
21 A. Yes.
22 Q. In these offices or some other offices?
23 A. Up in the suburbs.
24 Q. Okay. And how long did that meeting last?
25 A. A couple hours.

Page 18

1 Q. And then another time in preparation for
2 your deposition here today?
3 A. Yes.
4 Q. And when was that?
5 A. Two weeks ago, three weeks ago.
6 Q. Okay. And that was here as well?
7 A. Yes.
8 Q. And how long was that meeting?
9 A. A couple hours.
10 Q. Okay. And who was present for that meeting?
11 A. Josh Engquist, Dave, and Caroline Golden.
12 Q. Okay. Any other defendants in the matter
13 present?
14 A. Detective -- on the second meeting or the
15 first?
16 Q. First and second.
17 A. The first was Detective Halvorsen.
18 And the second was Detective Halvorsen,
19 Detective Paulnitsky, Detective Montilla and
20 Sergeant Mingey.
21 Q. Anyone else present besides those
22 individuals at the first meeting -- strike that.
23 Anyone present besides yourself, your
24 attorneys and Detective Halvorsen at the first
25 meeting?

Page 19

1 A. And the attorneys.
2 Q. Apart from yourself, the attorneys and
3 Detective Halvorsen, were there any other
4 individuals present for the meeting at your
5 attorney's offices the first time?
6 A. Not to my recollection.
7 Q. Okay. And how about the second time, apart
8 from the detectives you identified, yourself and
9 your attorneys, was anyone present for the meeting
10 here a couple weeks ago?
11 A. Not to my recollection.
12 Q. Okay. How long did that meeting last?
13 A. Three hours, three-and-a-half.
14 Q. And then you said you had a third meeting
15 with your attorneys?
16 A. Yes.
17 Q. Also at these offices?
18 A. Yes.
19 Q. Who else was present?
20 A. Just my attorneys and myself.
21 Q. Okay. And the other defendants were not
22 present?
23 A. No.
24 Q. And when did that take place?
25 A. The 22nd, I believe.

Page 20

1 Q. Okay. How long did it last?
2 A. About three hours.
3 Q. Did you review any documents in preparation
4 for your deposition here today?
5 A. Police reports.
6 Q. Okay. And when you say "police reports,"
7 what do you mean by that?
8 A. The police reports regarding the death of the
9 Wiley brothers.
10 Q. And do you have an understanding of where
11 those police reports came from?
12 A. I would imagine the permanent retention file
13 of the Chicago Police Department.
14 Q. Did you have -- you're familiar with
15 something called area files or investigative files?
16 A. Yes, ma'am.
17 Q. Do you know if you looked at the
18 investigative file or area file in this case?
19 A. No, ma'am.
20 Q. No, you don't know, or you don't think you
21 did?
22 A. I know I didn't in preparation for this.
23 Q. Okay. So the only thing you looked at in
24 preparation for this was the permanent retention
25 file?

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 21

1　A.　Correct.
2　Q.　And what makes you say that?  Was it stamped
3　"permanent retention," or how do you know it was
4　the permanent retention file versus something else?
5　A.　I don't remember if it was stamped.  All I
6　remember is it was given to me by the attorneys and
7　it was all the information they had on this case as
8　it was reported to me.
9　Q.　I see.  But how do you know they didn't give
10　you the area file, I guess is what I'm asking you.
11　A.　Because there were no notes attached with it.
12　Q.　There were no notes attached with it?
13　A.　Correct.
14　Q.　And would that have -- and tell me why that
15　led you to believe that that was not the area file.
16　A.　Because the area file doesn't go to the same
17　location as far as my understanding.
18　Q.　Right, but you don't know where your
19　attorneys got the file, right?
20　A.　No.
21　Q.　Okay.  So, again, why do you assume that you
22　weren't looking at the area file when you were
23　reviewing the documents?
24　You said -- you said that there were no
25　notes, right?

Page 22

1　A.　Correct.
2　Q.　Would you have expected to see notes in the
3　area file?
4　A.　Yes, ma'am.
5　Q.　Okay.  So the absence of notes in the file
6　you were looking at gives you the belief that you
7　were looking at the permanent retention file?
8　A.　Yes, ma'am.
9　Q.　Okay.  And when you say "notes," what are
10　you talking about?
11　A.　GPRs, general progress report notes.
12　Q.　And the file that you looked at did not
13　contain any GPRs?
14　A.　No, ma'am.
15　Q.　Or -- did you see any GPRs or minimal GPRs?
16　A.　No, ma'am, I didn't see any.
17　Q.　Okay.  Is that unusual if you were looking
18　at a case -- strike that.
19　Would that be unusual if you were looking at
20　an area file?
21　A.　In an area file, I would expect to see GPRs
22　or other handwritten memoranda in there.
23　Q.　Okay.  Anything else you would expect to see
24　in the area file that you did not see in the file
25　that you reviewed?

Page 23

1　　　MR. BRUEGGEN: Object to form.  Go
2　ahead.
3　　　THE WITNESS: Inventory reports, if
4　there were any.
5　　　BY MS. BONJEAN:
6　Q.　What about an inventory index of some type,
7　did --
8　A.　Yes, ma'am.
9　Q.　-- the area files have those?
10　A.　It should be, yes.
11　Q.　And what is that?
12　A.　It's a record that the detective, when he
13　puts a memorandum in the file, also logs it on the
14　other side of the file folder, to put down the
15　memorandum that he authored it, it's the case, and
16　the date that he put it in there.
17　Q.　Okay.  And does it serve as an index or a
18　log of all the documents that should be in the area
19　file?
20　A.　Yes, ma'am.
21　　　MR. BRUEGGEN: Object to form.
22　　　BY MS. BONJEAN:
23　Q.　And do you use the word "area file" or
24　"investigative file"?  I want to make sure that
25　we're using the same vocabulary.

Page 24

1　A.　Investigative file.
2　Q.　Okay.  Now, we'll get back to all that.  I
3　just wanted to -- since it naturally came about in
4　your response, but I do have some more questions
5　about that, and we'll get back to that.
6　Apart from the reports that you did look at,
7　did you look at any prior testimony?
8　A.　No, ma'am.
9　Q.　Anything else that you reviewed in
10　preparation for your deposition here today?
11　A.　No, ma'am.
12　Q.　Now, prior to seeing Detective Halvorsen at
13　your attorney's offices a year ago, roughly, when
14　was the last time you saw him prior to that date,
15　Detective Halvorsen specifically?
16　A.　The second meeting that we had down here.
17　Q.　Yeah.  Sorry.  You met -- let's work
18　backwards.
19　You saw Detective Halvorsen a couple of
20　weeks ago --
21　A.　Uh-huh.
22　Q.　-- correct, here at the offices?
23　A.　Yes.
24　Q.　And then I think you said you saw him about
25　a year ago in your attorney's offices, right?

Maysonet v.
Guevara

Video Deposition

Page 25

1　A.　Yes.
2　Q.　Had you -- when was the last time you saw
3　him before that?
4　A.　Probably before I retired in 2007.
5　Q.　Okay.　So after your retirement, did you
6　keep in touch with Detective Halvorsen?
7　A.　No, ma'am.
8　Q.　And was he still on the force when you
9　retired?
10　A.　I don't know because I wasn't assigned to the
11　same unit area as he.
12　Q.　Fair to say, then, you -- when you were no
13　longer working in proximity with Detective
14　Halvorsen, you didn't stay in contact with him even
15　when you were still in the department, is that
16　right?
17　A.　Correct.
18　　　MR. BRUEGGEN: Object.
19　　　BY MS. BONJEAN:
20　Q.　Okay.　I'm going to ask the question as to
21　Detective Paulnitsky.　You saw him a couple of
22　weeks ago, correct?
23　A.　Correct.
24　Q.　Before that, when was the last time you saw
25　him?

Page 26

1　A.　I want to say I ran into him someplace in our
2　neighborhood.　We live not too far from each other.
3　Q.　And what neighborhood is that?
4　A.　Around Touhy and Lehigh.
5　Q.　In Chicago?
6　A.　In Chicago.　And I don't know -- I don't
7　remember if it was in a store, but it was just in
8　passing.
9　Q.　Do you consider him a friend?
10　A.　No.　Work associate.
11　Q.　And in that time when you ran into him in
12　your neighborhood, what, if anything, did he say to
13　you about your work together as a police officer?
14　A.　Nothing.
15　Q.　Police officers.
16　A.　Nothing.　I had learned that he had retired
17　and he was working for the Board of Education.
18　Q.　Did he mention anything about litigation
19　against Area 5 detectives?
20　A.　No, ma'am.
21　Q.　Mention anything about lawsuits against
22　police officers?
23　A.　No, ma'am.
24　Q.　Did you talk about your prior days in the
25　department at all?

Page 27

1　A.　No, just how the department was changing.
2　That's all.
3　Q.　And how was -- how did he believe it was
4　changing?
5　A.　Just that we were glad we were retired.
6　Q.　And why is that?
7　A.　Because enough was enough.　It was a great
8　job. I'm sure it still is a great job, but you just
9　get to know, it's like a fine meal, and enough is
10　enough.　It's just time to go.
11　Q.　And do you think the department has changed?
12　A.　Oh, certainly.　It --
13　　　MR. BRUEGGEN: Object to form.
14　　　BY MS. BONJEAN:
15　Q.　Since your days there.
16　A.　It always evolves.
17　Q.　And do you think it's evolving for the
18　better?
19　　　MR. BRUEGGEN: Object to form.
20　　　THE WITNESS: I can't really say. I'm
21　not there.
22　　　BY MS. BONJEAN:
23　Q.　Well, you must have an opinion.
24　　　MR. BRUEGGEN: Wait for a question,
25　please.

Page 28

1　　　BY MS. BONJEAN:
2　Q.　I mean, do you feel that the department --
3　in what ways do you think the department is
4　different now than it was when you were at your
5　highest ranking position in the department?
6　　　MR. BRUEGGEN: Object to form and
7　foundation.　You can answer.
8　　　THE WITNESS: I think that the
9　politicians have created an environment that is not
10　friendly or conducive to policemen doing their job
11　properly.
12　　　BY MS. BONJEAN:
13　Q.　And do you think it's difficult to be a
14　police officer now, more difficult?
15　　　MR. BRUEGGEN: Object to form and
16　foundation.
17　　　THE WITNESS: I do, yes.
18　　　BY MS. BONJEAN:
19　Q.　Okay.　We could probably get sidetracked by
20　that line of questioning, but I'm going to show
21　some discipline and move on.
22　Let's talk about -- okay.　So you had that
23　conversation with Detective Paulnitsky.　Do you see
24　him sort of regularly in your neighborhood or was
25　that --

Maysonet v.
Guevara

Video Deposition

Page 29

1  A.  No.  That was the only time I remember seeing
2  him.
3  Q.  Was he someone that you kept in contact with
4  after your retirement?
5  A.  No.
6  Q.  And I think he was on the force after 2007.
7  Does that sound right?
8      MR. BRUEGGEN: Object to foundation.
9      THE WITNESS: I don't know.
10      BY MS. BONJEAN:
11  Q.  Okay.  You didn't stay in contact with him
12  even before you retired, is that right?
13  A.  Correct.
14  Q.  What about -- is that true for Montilla as
15  well?
16  A.  Yes.
17  Q.  When's the last time you saw Detective
18  Montilla before two weeks ago?
19  A.  I can't remember.
20  Q.  Okay.
21  A.  It was a long time ago.
22  Q.  What about Guevara, when's the last time you
23  saw him?
24  A.  Probably the same as Montilla.  I mean, long
25  before I retired.

Page 30

1  Q.  Okay.  Any of the defendants in this case
2  you consider friends?
3  A.  No.  They were all work associates.  I don't
4  remember socializing with any.  I may have run
5  across, you know, Sergeant Mingey at a wake or
6  something of that nature.  I don't remember who
7  passed away, but...
8  Q.  I omitted him.  When was the last time you
9  saw him prior to a couple weeks ago?
10  A.  I think it was at a wake for a sergeant who
11  passed away.
12  Q.  Okay.  And do you know when that wake took
13  place?
14  A.  No, but the sergeant's name was Steve
15  Schweiger, and I think I saw him at that wake.
16  Q.  Okay.  Did you have any conversations with
17  him there?
18  A.  Just hello.
19  Q.  Anything about pending litigations against
20  Area 5 detectives?
21  A.  No.
22  Q.  Any conversations about his own civil
23  litigations?
24  A.  No.
25  Q.  Okay.  Mr. Epplen, how old are you?

Page 31

1  A.  73.
2  Q.  And where did you grow up?
3  A.  The area of Belmont and Kimball in Chicago.
4  Q.  Chicago, correct.  Were you born in Chicago?
5  A.  Yes.
6  Q.  And where did you go to high school?
7  A.  Lane Tech.
8  Q.  Do you have any members of your immediate
9  family who are in law enforcement?
10  A.  No.
11  Q.  And what year did you graduate Lane Tech?
12  A.  1964.
13  Q.  Were you a good student?
14      MR. BRUEGGEN: Object to form.
15      THE WITNESS: Average.
16      BY MS. BONJEAN:
17  Q.  After graduating Lane Tech in 1964, what did
18  you do with your time, either by way of education,
19  military, work?
20  A.  I was working.  My job after high school was
21  first at fast food restaurants.  They were called
22  Henry's Hamburgers.  There was a series of two.  I
23  started while I was still in high school.  It was
24  at -- across the street from Riverview Park, at 3300
25  on Western Avenue.  Then the owner of that store

Page 32

1  purchased another one at Belmont and Hamlin, which
2  was closer to my neighborhood, so I went over and I
3  became the manager of that store.
4  Q.  How long did you do that for?
5  A.  I think about three years.
6  Q.  And were you going to school during that
7  time or just working full-time?
8  A.  No.  Actually, I got married right out of
9  high school.
10  Q.  Okay.  Are you still married?
11  A.  Yes, not the same lady, but still married.
12  Q.  Yeah.  I'm sorry.
13  You -- did you get married to like a high
14  school sweetheart?
15  A.  She didn't go to high school with me, but
16  yes.
17  Q.  Okay.  Okay.  And so -- and do you have
18  children?
19  A.  Two.
20  Q.  Okay.  I assume they're grown at this point?
21  A.  One is deceased, and my son is still with us.
22  Q.  Okay.  Sorry to hear that as well.
23  And what does your son do for a living?
24  A.  He is an electrical contractor.
25  Q.  Okay.  Now, after you got married and was

Maysonet v.
Guevara

Video Deposition

Page 33

1    working for three years after high school, did you
2    change employment?
3    A.  Yes.
4    Q.  Where did you go?
5    A.  I went from there to the Frederick Post
6    Company.  They were manufacturers of drafting
7    materials, paper, instruments.
8    Q.  And what did you do for them?
9    A.  I worked as a -- what would you call that,
10   paper coater.  They made microfiche papers or -- and
11   drafting paper, and they also made T-squares and
12   rulers and things that are now on computers.
13   Q.  How long did you do that?
14   A.  Two years.
15   Q.  And then what did you do?
16   A.  Then I went to work for the printing company
17   IS Berlin Press, who was located -- or who were
18   located right at Belmont and Kimball as well.
19   Q.  And what did you do for the printing
20   company?
21   A.  I was a cutting board print paper handler.  I
22   would put the paper on the machines.  It was about a
23   ream thick and printed, and then the paper cutter
24   would cut those into whatever sizes were due.  And
25   then I would stack those up and move the pallets

Page 34

1    away from that.
2    Q.  And how long did you do that?
3    A.  I think two years again.
4    Q.  And so let's see.  That puts us at -- are we
5    in the '70s?
6    A.  Well, we're probably late '68 and into '69 --
7    Q.  Okay.
8    A.  -- because I took the test, I believe, in the
9    beginning of -- or the end of 1968, beginning of
10   1969.  And at that time the police department was
11   giving that exam like every two weeks because of the
12   Vietnam War and they weren't getting as many
13   applicants as they needed.
14   So I took the test, and it was like five
15   months later I was in the police academy.
16   Q.  I take it, then, you did not serve in
17   Vietnam.  Correct?
18   A.  Correct.
19   Q.  Were you ever a member of the military?
20   A.  No, ma'am.
21   Q.  Now, did you take the test more than once or
22   just one time?
23   A.  Just one time.
24   Q.  And you believe it was about 1968 or 1969?
25   A.  Correct.

Page 35

1    Q.  And why did you want to go into law
2    enforcement?
3    A.  Because working in a factory, doing the same
4    repetitious things, became somewhat old.  And my
5    last job at Frederick Post was mixing chemicals, and
6    sometimes I would almost pass out doing it.  So I
7    just figured there was a better way to make a better
8    life, so...
9    Q.  Makes sense.
10   Is it fair to say that you didn't have a
11   passion for law enforcement necessarily or --
12   A.  No, I did.  My first wife's cousin was a
13   member of the force and I would talk to him about
14   it.  And he says it's really a tremendous job if you
15   like people, if you like dealing with people, and I
16   did.
17   And at that time I weighed 260 pounds or so.
18   Q.  Wow.
19   A.  So I went on a diet and got down to a weight
20   of, you know, 190 pounds or so, and took the test,
21   and I took the physical test and passed it and just
22   come on the job.  They called me much sooner than I
23   expected.
24   Q.  I see.
25   So do you remember the month and year that

Page 36

1    you were hired by the Chicago Police Department?
2    A.  May of 1969.
3    Q.  Okay.  Went through the police academy?
4    A.  Yes.
5    Q.  Do you have a recollection of what the
6    police academy was like at that time?
7    A.  We were one of the first classes.  I was in
8    class 6910A, and it was the 10th class that switched
9    from a 14-week program to a seven-month program.
10   Q.  Seven-month?
11   A.  Yes, ma'am.
12   Q.  Can you tell me -- the best you can,
13   summarize what the police academy was like in terms
14   of what type of instruction you received, not
15   necessarily subject matters, but was it classroom
16   instruction, was it --
17   A.  It was classroom instruction.  It was
18   defensive tactics.  We had, I think, five different
19   weeks in the field, where you would spend a week
20   with the patrol division, working inside, seeing
21   what their clerical duties were, lockup duties were.
22   Then we spent another week in the detective
23   division, where you rode a day -- at that time the
24   detective bureau had five different categories.
25   There was robbery, there was homicide, there was

Page 37

1 general assignment, burglary, and auto theft. And
2 you spent a day with each one of those, riding
3 around with detectives and seeing what they did and
4 what their job entailed.
5 Then we were supposed to spend a week with
6 traffic, but we never did. Because of the Days of
7 Rage in 1969, in the fall of 1969, we were pulled
8 out of that week and we spent that on crowd control
9 down in the Loop, right actually down the street
10 here --
11 Q. Uh-huh.
12 A. -- during all those demonstrations and
13 subsequent civil disobedience.
14 And then after that, we had another, I think,
15 two weeks that were ride-alongs also. We had our
16 weapons and we rode around in a beat car for a
17 couple of weeks. And I think I was in the 11th
18 district at that time, which was at 1150 South
19 Fillmore.
20 Q. Did the training that you received in the
21 academy cover such areas as report writing?
22 A. Yes.
23 Q. And how would -- how was that taught, if you
24 understand the question?
25 MR. BRUEGGEN: Object to form. Go

Page 38

1 ahead.
2 THE WITNESS: The instructor,
3 instructors, came in. They introduced you to what
4 the reports looked like. At that time there were
5 multiple different color-coded reports actually,
6 and they would explain to you how to fill out each
7 report as to content and form.
8 BY MS. BONJEAN:
9 Q. So there was actually an instructor that
10 would come in and introduce the new police
11 officer -- I guess they're --
12 A. Recruits, we called them.
13 Q. Recruits. Recruits. To the different forms
14 that they may be filling out as part of the patrol
15 division or all --
16 A. Well, anybody could fill them out, but it was
17 basically for patrol, because everybody out of the
18 academy at that time went to patrol.
19 Q. And in addition to just the mechanics of
20 filling out reports, were you taught or were the
21 recruits taught how to prepare a report for
22 substance?
23 MR. BRUEGGEN: Object to form. Go
24 ahead.
25 THE WITNESS: As well as I can recall,

Page 39

1 yes.
2 BY MS. BONJEAN:
3 Q. Was -- were you taught at the time why it's
4 important to fill out a police report?
5 A. So that you could memorialize the facts of
6 what you were being told in what's your
7 investigation.
8 Q. So in 1969, it was conveyed to recruits that
9 it was important to memorialize your conduct, your
10 activities as a police officer, correct?
11 MR. BRUEGGEN: Object to form. Go
12 ahead.
13 THE WITNESS: Yes.
14 BY MS. BONJEAN:
15 Q. Okay. And was it taught that it was
16 important to be accurate in, to the best of your
17 ability, in memorializing your actions or
18 information you might be receiving from a third
19 party?
20 MR. BRUEGGEN: Object to form,
21 compound. Go ahead.
22 THE WITNESS: As accurate as you -- as
23 you could do.
24 BY MS. BONJEAN:
25 Q. Let me get back on my train of thought.

Page 40

1 Were recruits taught to be truthful in police
2 reports?
3 MR. BRUEGGEN: Object to form.
4 THE WITNESS: Yes.
5 BY MS. BONJEAN:
6 Q. Were recruits taught that it was important
7 to be truthful in police reports?
8 MR. BRUEGGEN: Object to form.
9 THE WITNESS: Yes.
10 BY MS. BONJEAN:
11 Q. And were recruits taught that it was
12 important to be -- I think we covered -- accurate
13 as much as possible, right?
14 A. Correct.
15 Q. And was there -- was it taught that a report
16 should have sort of the fundamentals, like the who,
17 the what, the where, the why, that type of thing?
18 MR. BRUEGGEN: Object to form. Go
19 ahead.
20 THE WITNESS: Yes.
21 BY MS. BONJEAN:
22 Q. Okay. Oh, and was it taught to recruits
23 that in preparing reports, the timing of preparing
24 reports, when you should prepare a report?
25 A. Well, my training concentrated almost

Maysonet v.
Guevara

Video Deposition

Page 41

1  exclusively on the detective -- or on the patrol
2  division, so that required that you completed your
3  reports before you went home. They had to be
4  submitted.
5  Q. So close in time to whatever you were
6  reporting about, correct?
7  A. Correct.
8  Q. And I know you probably received additional
9  reporting training when you did training for the --
10  becoming a detective, right?
11  A. Yes.
12  Q. I'm going to get to that in a second, but
13  even in the academy, this was an area that was
14  covered?
15  A. Yes.
16  Q. Okay. What about interviewing witnesses to
17  an event, whether it's a crime or a car accident or
18  anything like that, was that something that was
19  covered in the training?
20  A. Yes.
21  Q. Okay. And can you -- was that done by
22  classroom instruction with an instructor?
23  A. Yes.
24  Q. And can you highlight for me some of the
25  messages or themes that were taught during that

Page 42

1  training.
2      MR. BRUEGGEN: Object to form. Go
3  ahead.
4      THE WITNESS: The differences between
5  interviewing witnesses, interviewing persons in
6  department custody, interviews with potential
7  suspects, things of that nature.
8      BY MS. BONJEAN:
9  Q. And so you were taught different tactics or
10  how -- how -- what were the messages that were
11  conveyed about the different ways to approach those
12  interviews?
13      MR. BRUEGGEN: Object to form,
14  compound. Go ahead.
15      THE WITNESS: Just different techniques
16  that one could use in interviewing, say, a witness
17  to a crime who was upset, in using compassion and
18  empathy to try to calm that individual down so that
19  they can have time to recollect, you know, going
20  back in their mind what this traumatic incident
21  really entailed.
22      And the same thing with other people
23  that may have witnessed a crime, not necessarily
24  being the victim of the crime, but they had
25  witnessed, you know, some horrific event and were

Page 43

1  upset, so you tried to use, again, compassion and
2  empathy in trying to get them to be able to relate
3  to you the best of their recollection what they had
4  just seen.
5      BY MS. BONJEAN:
6  Q. And were recruits taught how to interview
7  suspects? I'm guessing that is not something that
8  they were -- a new recruit would frequently, or
9  someone new to the force would necessarily be --
10      MR. BRUEGGEN: Object to form. Go
11  ahead.
12      THE WITNESS: I think that there were
13  beginning level classes on that and, you know,
14  techniques that you could use to talk to people,
15  you know, and develop your own, based upon what you
16  perceived coming from the individual that you were
17  talking to, you know, looking at body language and
18  things of that nature.
19      BY MS. BONJEAN:
20  Q. Would you say that the training that an
21  officer receives in the police academy -- well, in
22  the police academy when you were still in the
23  department before you retired, is different than
24  the training that you received in the academy as it
25  relates to interviewing suspects?

Page 44

1      MR. BRUEGGEN: Object to form and
2  foundation.
3      THE WITNESS: I don't know.
4      BY MS. BONJEAN:
5  Q. Did an -- were you instructed during your
6  police academy days regarding whether or not it was
7  consistent with policy to lie to a suspect in order
8  to induce some type of statement?
9      MR. BRUEGGEN: Object to form. Go
10  ahead.
11      THE WITNESS: I believe that was okay
12  at the time I was in the academy.
13      BY MS. BONJEAN:
14  Q. And was it any type of lie or was there a
15  distinction, if you remember?
16      MR. BRUEGGEN: Object to form. Go
17  ahead.
18      THE WITNESS: I think that we were -- I
19  don't know if there was a line drawn in the sand
20  anywhere, but I think that you could let a suspect
21  believe that you had a witness that he may have
22  been unaware of that had identified them, or
23  through some other means, had gotten a license
24  plate number or something which was traced back to
25  them, things of that nature.

Page 45

1 BY MS. BONJEAN:
2 Q. Okay. Were -- to the best of your ability
3 to remember this, were recruits taught that there
4 were certain lines that they couldn't cross or
5 shouldn't cross as it relates to interviewing
6 suspects, when it comes to truthfulness?
7 MR. BRUEGGEN: Object to form, vague.
8 MR. BRENER: Join.
9 MR. RAHE: Are you referring to
10 recruits in general or to him?
11 MS. BONJEAN: I'm talking about
12 during -- I'll be clearer.
13 BY MS. BONJEAN:
14 Q. I'm talking about the training you received
15 as a recruit and that your fellow recruits
16 received, okay, about interviewing suspects. I'm
17 trying to get -- I'm trying to get a flavor of what
18 the training messages were in 1969, okay, and
19 specifically on the issue of interviewing suspects,
20 people who were believed to have been involved in a
21 crime.
22 And I think you testified that at least back
23 then it was generally acceptable that you could
24 mislead or tell a suspect something false; for
25 instance, that there was some evidence you had that

Page 46

1 implicated them, that that was a tactic that could
2 be used. Am I fair -- is that fair?
3 MR. BRUEGGEN: Object to form,
4 misstates his testimony. Go ahead.
5 BY MS. BONJEAN:
6 Q. Feel free to correct me if I got that wrong.
7 A. If I could clarify the answer, I think when
8 you addressed the question about a line, I think the
9 terminology that was used was that you could say
10 something that was not truthful or accurate as long
11 as it would not be suspect -- would not make a
12 suspect confess wrongly to a crime.
13 Q. Okay. And as a young recruit that putting
14 that into motion or play might be sometimes
15 difficult, were -- and I'm not going to ask you to
16 remember it word for word, but were there scenarios
17 that you went over in training about what might be
18 an acceptable lie and what might not be?
19 A. There might have been, but I don't remember
20 what they were.
21 Q. Fair enough.
22 And was there discussion about using
23 physical force in order to gain?
24 A. That was absolutely prohibited.
25 Q. And that was prohibited in 1969 as well,

Page 47

1 right?
2 A. Yes, ma'am.
3 Q. I may have some more questions about
4 training when you became a detective about these
5 issues, but we'll move on for now. Okay?
6 A. Okay.
7 Q. So you did your seven months in the academy,
8 and then what was your first assignment?
9 A. The 20th police district.
10 Q. In patrol?
11 A. Yes.
12 Q. What are the geographical boundaries of the
13 20th police district?
14 A. At that time?
15 Q. Yeah.
16 A. It went all the way down from Addison Street,
17 which is 3600 north, to Juneway Terrace, which is
18 the last street of the city. And it went from the
19 lakefront to the Chicago River.
20 Q. And how long were you in the 20th district?
21 A. Approximately two-and-a-half years.
22 Q. Did you have one supervisor that entire time
23 or different supervisors?
24 A. No, they were different, because at that time
25 we rotated watches. So you had a different watch

Page 48

1 commander, who was usually a captain, then you had a
2 field lieutenant, and then you had sergeants,
3 depending upon what geographical area within the
4 district that you worked in.
5 Q. What were your duties and responsibilities
6 in the patrol division at the 20th district?
7 A. Answering radio assignments.
8 Q. So a call would come in and you'd respond to
9 it?
10 A. If we were assigned to it or assigned to an
11 assist, yes.
12 Q. Yeah, how did that work? If there was a
13 call, did you have to be dispatched there by a
14 supervisor or...
15 A. If you were close, you would go on the radio,
16 which was just in the car at that point, and you
17 would say I'm only a half block away, do you want
18 me to take this.
19 My partner and I, we had a geographical area
20 which was a half block by a half block down off
21 of Wilson Avenue, so we kind of were close.
22 Q. You could put yourself out pretty easily.
23 Who was your partner during those days?
24 A. My main partner was Marvin Shear.
25 Q. After your two-and-a-half years in the 20th

Maysonet v.
Guevara

Video Deposition

Page 49

1  district, where did you go?
2  A.  I was promoted to detective.
3  Q.  Okay.  What year were you promoted to
4  detective?
5  A.  1972.
6  Q.  I meant to ask you this.  Were you in the
7  police academy with any of the defendants who are
8  named in this lawsuit?
9  A.  No.
10  Q.  And when you graduated -- strike that.
11  When you went to the -- when you got
12  promoted to detective in 1972, had you worked with
13  any of the defendants in this lawsuit?
14  A.  No.
15  Q.  Okay.  Now, how did you get promoted to
16  detective, what was the process?
17  A.  Examination.  I don't remember how many
18  questions on the exam, but it was an exam that was
19  graded right when you left.  We took the test at
20  Lane Tech High School, and you walked out of there
21  knowing what your score was, and then they
22  eventually posted the scores and you were promoted
23  from there.
24  Q.  There -- in 1972, was there more than one
25  way to be promoted to detective?

Page 50

1  A.  It could be honorary detective.
2  Q.  Was that meritoriously promoted?
3  A.  Meritorious, yes.
4  Q.  And then taking a test?
5  A.  Other than completing the academy, I don't
6  believe you had to take the test.  It could be for
7  some heroics that you did as a police officer in a
8  patrol division or whatever your assignment was at
9  the time; say you got into a shootout with bank
10  robbers or something and you were injured.  A lot of
11  times it was officers who were injured in the line
12  of duty who were --
13  Q.  That got promoted?
14  A.  -- who got promoted, if it was a shootout or
15  something, not a traffic accident or something of
16  that nature, but...
17  Q.  Well, help -- help me understand this.  Why
18  does the mere fact that someone got injured in
19  maybe even a heroic incident mean that they should
20  be promoted to detective?
21      MR. BRUEGGEN: Object to foundation.
22      THE WITNESS: I -- I wasn't at the
23  level then to understand why it was.  It just was.
24      BY MS. BONJEAN:
25  Q.  Well, you did eventually move your way up

Page 51

1  the ranks pretty -- to a pretty high appoint.  Do
2  you have any idea why that would be a policy of the
3  department?
4  A.  I think --
5      MR. BRUEGGEN: Object to foundation,
6  vague, scope, time.
7      THE WITNESS: I think it was a morale
8  issue for not only those officers who were
9  promoted, but morale for the rest of the men, who
10  knew if they did a good job as police officers,
11  that that chance existed if they wanted it.
12      There were some officers that never
13  wanted to be a detective.  They were happy just
14  dealing with the people on the street.
15      BY MS. BONJEAN:
16  Q.  The test that you took to become a
17  detective, what type of questions are on the test?
18  What do they inquire about?  What's the test like?
19      MR. BRUEGGEN: Object to form,
20  compound.  Go ahead.
21      THE WITNESS: If recollection serves me
22  correctly, it had cases about -- or questions, I
23  should say, not cases.  It had questions about
24  general police work.  It had questions about
25  robbery investigations.  It had questions about the

Page 52

1  criminal statutes, questions about homicide
2  investigations and things of that nature.
3      BY MS. BONJEAN:
4  Q.  And were there other types of people who
5  were viewed as good police officers, but who
6  probably wouldn't do very well on the test?
7      MR. BRUEGGEN: Object to form,
8  foundation.
9      THE WITNESS: Could you rephrase that
10  or -- rephrase it?
11      BY MS. BONJEAN:
12  Q.  Sure.  And I'm talking about, you know, the
13  time period that you became a detective.
14  There are these two avenues in which you
15  could become a detective, as I understand it.
16  Right?
17  A.  Yes.
18  Q.  And it seems to me that there are certain
19  detectives, who weren't that bright, that were able
20  to become detectives, they wouldn't have been able
21  to pass the test, but maybe they were good in other
22  ways.  They were good on the street.  You know,
23  people like Detective Guevara.
24  A.  Okay.
25  Q.  Is -- is my assessment off base?

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 53

1     MR. BRUEGGEN: Object to form.
2     MR. LEINENWEBER: Object to form and
3  foundation.
4     MR. BRUEGGEN: Vague.
5     THE WITNESS: Well, there were some --
6  well, like in any occupation, there are some people
7  that are better performers than others.
8     Back when I was a detective, I don't
9  know what the time frame was, but every so often
10  you had detectives who were continually rated low
11  who were sent back to the patrol division. They
12  were removed from the detective division, demoted,
13  if you will, to -- back to the patrol division.
14  And that happened, you know, like I say,
15  infrequently, but it did happen.
16     BY MS. BONJEAN:
17  Q.  And did they tend to be people who had been
18  meritoriously promoted versus --
19     MR. BRUEGGEN: Object to form,
20  foundation.
21     THE WITNESS: I can't speak to that. I
22  don't know.
23     BY MS. BONJEAN:
24  Q.  Are there -- do you know if there were
25  statistics kept about who was meritoriously

Page 54

1  promoted versus who took tests to get promoted?
2  Like -- I don't know. Was there any data kept
3  about that as far as you know?
4     MR. RAHE: Object to foundation.
5     THE WITNESS: I don't know.
6     BY MS. BONJEAN:
7  Q.  Did you -- do you think the -- do they --
8  when you left the department, were they still doing
9  meritorious promotions?
10     MR. BRUEGGEN: Object to foundation.
11     THE WITNESS: I believe so.
12     BY MS. BONJEAN:
13  Q.  Do you know to this day whether you can
14  still be promoted meritoriously versus having to
15  take some type of written exam?
16     MR. BRUEGGEN: Same objection. Go
17  ahead.
18     THE WITNESS: No, I don't.
19     BY MS. BONJEAN:
20  Q.  Or whether it's a -- well, you don't know,
21  okay.
22  Do you think -- do you think being able to
23  be promoted meritoriously is a good policy?
24     MR. RAHE: Object to form.
25     THE WITNESS: In some instances.

Page 55

1     BY MS. BONJEAN:
2  Q.  What are the risks of promoting someone
3  purely on a sort of discretionary meritorious
4  basis?
5     MR. RAHE: Object to foundation.
6     MR. BRENER: Foundation.
7     MR. BRUEGGEN: Speculation.
8     THE WITNESS: I don't feel qualified to
9  answer that.
10     BY MS. BONJEAN:
11  Q.  No? Well, in your experience. I'm not
12  asking you as an expert. You're not designated as
13  a City -- you're not speaking for the City of
14  Chicago. I'm just asking you as a police officer,
15  who worked in the department for a long time and
16  who was a detective a long time and supervised
17  detectives, you must have formed some views about
18  the process by which people become detectives.
19     MR. BRUEGGEN: Object to form.
20     MR. RAHE: And foundation.
21     THE WITNESS: Well, I mean, some
22  people, they may go and not really have the -- I'm
23  trying to think of the word.
24     He just might be not their best way to
25  perform. You know, some officers were excellent of

Page 56

1  observation of things happening right in front of
2  them; others, not so much. And necessarily as a
3  detective, you don't need to because you don't
4  spend your time on patrol, you know, and actively
5  looking for that, and they may not be the best
6  report writers in recording facts, but in the
7  patrol division, you know, you're doing a summary
8  of one basic thing and you go on from there.
9     So I mean, that's about the best I
10  can -- I can give you.
11     BY MS. BONJEAN:
12  Q.  Do you agree that report writing, though, is
13  an important part of being a detective?
14     MR. BRUEGGEN: Object to the form.
15     THE WITNESS: Yes.
16     BY MS. BONJEAN:
17  Q.  Both for the integrity of the
18  investigation -- well, for the integrity of the
19  investigation. Would you agree with that?
20  A.  Yes.
21  Q.  And also for the protection of an officer so
22  he can justify his work, right?
23     MR. BRUEGGEN: Object to form. Go
24  ahead.
25     THE WITNESS: To a certain degree.

Page 57

BY MS. BONJEAN:
1 BY MS. BONJEAN:
2 Q. So let me get into this a little bit. You
3 obviously went and received some type of training
4 before you became a detective. Is that right?
5 A. Yes.
6 Q. And what was -- what was the training
7 called?
8 A. Pre-detective division training.
9 Q. Okay. Detective training division or just
10 detective training?
11 A. I think it was always with a "pre" in front
12 of it.
13 Q. Okay. If I call it detective training, does
14 that make sense to you?
15 A. Well, you weren't sworn in until after you
16 completed the course --
17 Q. Okay.
18 A. -- in case -- they weeded you out. If you
19 didn't perform well in the class and you didn't pass
20 the exams or didn't do the required work, you
21 weren't a detective yet, so you could be shuffled
22 right back. And it was the same thing with every
23 promotion. It was not until the last day.
24 Q. This pre-detective training, how long was
25 it?

Page 58

1 A. I believe it was four weeks.
2 Q. And, again, how was it carried out? Was
3 there -- was it classroom instruction?
4 A. Yes.
5 Q. Anything else?
6 A. Range.
7 Q. This is shooting?
8 A. Shooting, correct.
9 Q. Did you have in-field training?
10 A. I don't recall in-field training.
11 Q. Were there syllabi presented for the
12 classroom instructions?
13 A. I didn't see a syllabus. I don't know if the
14 instructors had a syllabus or what the criteria was
15 for them to teach the class.
16 Q. When you showed up for instructions, did you
17 get a list of what subject matters were going to be
18 covered on any particular day?
19 A. You'd get a weekly schedule, I believe.
20 Q. And how large was your detective class,
21 pre-detective class?
22 A. 35, I think.
23 Q. And were there different instructors for
24 different subject matters?
25 A. Yes.

Page 59

1 Q. Can you tell me what subject matters you
2 covered? I mean, you may not be exhaustive, but
3 what ones do you remember?
4 A. Criminal law, report writing, interviews and
5 interrogations, probably processing persons under
6 department control.
7 Q. Detainees, processing detainees essentially?
8 A. Yeah. I think in the order, it was called
9 processing persons under department control.
10 Q. Okay.
11 A. And then there were classes on each
12 individual type of investigation in the department
13 at that time, and there were robbery investigations,
14 homicide, sex investigations, burglary
15 investigations, general assignment, bomb and arson.
16 Q. Were the classes that were related to each
17 category of crime that you were referencing, were
18 they specific to investigating those crimes?
19 A. As I recall, yes.
20 Q. Would you agree that the fundamentals of any
21 investigation are sort of the same regardless of
22 what you're investigating?
23 MR. BRUEGGEN: Object to form.
24 THE WITNESS: Could you give me a
25 little more detail as to --

Page 60

1 BY MS. BONJEAN:
2 Q. Sure. Investigating robberies may be
3 different in some ways than investigating
4 homicides, but would you agree that the
5 fundamentals remain the same?
6 MR. BRUEGGEN: Object to form.
7 THE WITNESS: The who, what, when,
8 where, why part?
9 MS. BONJEAN: Yes.
10 THE WITNESS: Yes.
11 BY MS. BONJEAN:
12 Q. Okay. Now, you said you were trained in
13 criminal law. Was that looking at the criminal
14 code?
15 A. Criminal statutes, yes.
16 Q. The statutes.
17 A. Yes.
18 Q. Understanding the statutes?
19 A. Yes.
20 Q. Were you taught on, for instance, what the
21 elements of a particular offense are?
22 A. Yes.
23 Q. And is the purpose for knowing what to
24 charge or what you could charge?
25 MR. BRUEGGEN: Object to foundation.

Maysonet v.
Guevara

Video Deposition

---

Page 61

1 THE WITNESS: Yes.
2 MR. BRUEGGEN: Form.
3 BY MS. BONJEAN:
4 Q. And also what you needed to investigate to
5 learn so that you could charge, right?
6 MR. BRUEGGEN: Object to form.
7 THE WITNESS: To make sure you had all
8 the elements of the offense.
9 BY MS. BONJEAN:
10 Q. Okay. Report writing, you revisited report
11 writing training in your pre-detective --
12 A. Yes.
13 Q. -- school, correct?
14 A. Yes.
15 Q. Okay. Can you tell me what you remember
16 about the training that you received in the
17 detective school or pre-detective school on report
18 writing specifically.
19 A. It was a much more -- much more thorough
20 process, you know, and we got into interview and
21 interrogations along with that. So it was just more
22 about focusing your attention on more detail than
23 you necessarily would in the patrol division.
24 Q. Was it conveyed to you during your training
25 in detective school that it was important to

---

Page 62

1 memorialize your investigative steps in an
2 investigation?
3 A. I wouldn't say the word "steps." It was
4 important to memorialize what you learned from
5 whatever task you were -- you were doing at the
6 time.
7 Q. Okay. So I'll -- I'll rephrase it and tell
8 me if I'm saying this correct.
9 You were trained that it was important to
10 memorialize whatever tasks you were doing or had
11 completed in the course of an investigation, is
12 that fair?
13 A. Yes.
14 Q. And were you taught about the different
15 types of reports that could be prepared in the
16 course of an investigation?
17 A. Yes.
18 Q. And were you also taught that it was
19 important to complete reports close in time to
20 whatever incident you were reporting about?
21 MR. BRUEGGEN: Object to form.
22 THE WITNESS: Yes.
23 BY MS. BONJEAN:
24 Q. Back in 1972, what types of reports existed
25 for the possibilities that you could be working

---

Page 63

1 with if you were an investigator?
2 A. General offense case report, homicide case
3 report, sexual assault case report.
4 Did I say burglary?
5 Q. No, but...
6 A. Burglary, robbery, missing/lost person, lost
7 and found, miscellaneous incident x-ray report,
8 miscellaneous incident report. I think that's all
9 of them, so...
10 Q. Where does supplemental reports fall into
11 that, was that something that existed in 1972?
12 A. Yes. That was the follow-up investigation.
13 Those were the -- the main ones.
14 Q. Okay. So just so I understand, those -- the
15 general offense case report is an initiating
16 report, is that fair?
17 A. The general offense case report covered cases
18 that were not in, as I remember, that were not
19 included, like kidnappings, things of that nature.
20 Q. Okay. So all -- you mentioned sex crimes,
21 homicide, burglary. There were actual forms for
22 each one of those offenses that were the initial
23 form that would be prepared?
24 A. Right. Auto theft was another one.
25 Q. Okay. A general offense case report was

---

Page 64

1 sort of the residual for crimes that didn't fall
2 into those categories?
3 A. Crimes that didn't occur that often, that
4 they didn't have a whole separate report for.
5 Q. Got it.
6 And those reports were prepared at the start
7 of an investigation, correct?
8 A. Yes.
9 Q. And then if there was -- I mean, you would
10 agree that sometimes investigations don't get
11 resolved within the first 15 minutes or 24 hours
12 even?
13 A. Yes.
14 Q. So an ongoing investigation might require
15 additional reporting, correct?
16 A. Yes.
17 Q. And that's when supplemental reports would
18 come in?
19 A. Yes.
20 Q. And you were trained on how to prepare
21 supplemental reports?
22 A. Yes.
23 Q. Tell me how you were trained how to prepare
24 a supplemental report back in 1972 during your
25 detective training.

---

Maysonet v.
Guevara

Video Deposition

Page 65

1   A.  Each different --
2       MR. BRUEGGEN: Object to form.  Go
3   ahead.
4       THE WITNESS: Each different unit that
5   you were in -- if you went to the auto theft unit,
6   which handled strictly auto theft, they had a
7   format, where they wanted their who, what, when,
8   where and why, which was possibly somewhat
9   different than homicide, which was the most
10  thorough, and then robbery and then burglary.  They
11  each had their separate format that the leaders or
12  the officers that were in charge of those
13  individual units thought were the most important to
14  put in that format, and they wanted those included
15  in the supplemental report.
16      BY MS. BONJEAN:
17  Q.  Okay.  And speaking specifically, let's say,
18  about homicide supplemental reports, were you
19  taught that they should be fairly detailed?
20  A.  Yes.
21      MR. BRUEGGEN: Object to form.
22      BY MS. BONJEAN:
23  Q.  Any pertinent information should be included
24  into them -- included in them?
25  A.  Pertinent verifiable information.

Page 66

1   Q.  What do you mean "verifiable"?
2   A.  Verifiable in that if somebody -- say you're
3   at the scene of a homicide as a detective, and they
4   come out and they blurt, you know, a tip or clue,
5   you know, I saw this car going by fast.  You know,
6   you may put a description of that car in there, but
7   you don't necessarily say it's involved in the case,
8   because you don't know.
9   Q.  I see.  Okay.
10  But it would be important to put that
11  information into a report because you may later
12  find out that it was the person, right --
13  A.  Possibly, yes.
14  Q.  -- or it was the car?
15  In fact, you'd agree that one of the reasons
16  it's important to memorialize information during
17  the course of an investigation is because you don't
18  necessarily know its importance in the moment, but
19  it might end up being important later on, right?
20      MR. BRUEGGEN: Object to form.  Go
21  ahead.
22      THE WITNESS: Yes.
23      BY MS. BONJEAN:
24  Q.  So someone might describe a suspicious
25  person they saw on the street near the time of a

Page 67

1   crime.  You don't know if it's him or her, but you
2   want to memorialize that description, because if
3   you get five other descriptions, it might be --
4   become very valuable evidence, right?
5       MR. BRUEGGEN: Object to form.
6       THE WITNESS: Yes, but one has to be
7   careful just to do just that and not --
8       MS. BONJEAN: Right.
9       THE WITNESS: -- go further with it,
10  you know.
11      BY MS. BONJEAN:
12  Q.  Understood.  Not to draw assumptions.  You
13  don't want to go make an assumption about some --
14  that somebody is or is not a perpetrator, for
15  instance, but you still would want to memorialize
16  whatever information a witness told you that could
17  be of evidentiary value down the line.  Would you
18  agree with that?
19  A.  Yes.
20  Q.  How were you -- strike that.
21  At your pre-detective training in 1972, were
22  you taught how to utilize general progress reports?
23      MR. BRUEGGEN: Objection.
24      THE WITNESS: There was no such thing.
25  /////

Page 68

1       BY MS. BONJEAN:
2   Q.  There was no such thing back then?
3   A.  Correct.
4   Q.  Okay.  How were supplemental reports
5   prepared in 1972, off of handwritten notes, or how
6   did it work?
7       MR. BRUEGGEN: Object to foundation.
8       THE WITNESS: You took notes or
9   depending upon the circumstances -- I mean, if a
10  witness came into the police station and you talked
11  to him, and you sat there and you got the
12  information, you could just type up a supplemental
13  report right then and there without taking any
14  notes.
15      BY MS. BONJEAN:
16  Q.  Right.  So that's one possibility, that if
17  you have your witness right there and then, and you
18  have access to a computer or a typewriter or
19  whatever you're working on, you could actually
20  memorialize a witness statement right directly into
21  a supplemental report, right?
22  A.  Correct.
23  Q.  But if you're in the field and you're going
24  to be interviewing a number of people over the
25  course of a day, or trying to, and you don't have

Maysonet v.
Guevara

Video Deposition

Page 69

1    access to that, how would you make sure that you
2    were accurately recording what someone might tell
3    you so that you can later include it in the
4    supplemental report?
5        MR. BRUEGGEN: To clarify, this is back
6    in '72?
7        MS. BONJEAN: Yeah, '72. We're still
8    here.
9        THE WITNESS: Just use notepaper and
10   then would memorialize it on a supplemental report.
11       BY MS. BONJEAN:
12   Q.  Were you trained to not rely on your memory
13   if there was going to be some passage of time
14   before you get it into the supplemental report?
15       MR. BRUEGGEN: Object to form.
16       MS. BONJEAN: Or...
17       THE WITNESS: Well, back in 1972, as I
18   remember, there was no overtime, as far as payment,
19   and we were required to do a report on whatever we
20   learned on an investigation before we went home, in
21   the homicide unit now exclusively.
22       MS. BONJEAN: Sure.
23       THE WITNESS: The other units were, if
24   it was a major investigation, they wanted the
25   report done before you went home so that the people

Page 70

1    that were going to follow up on the next watch
2    would clearly understand what you had accomplished,
3    didn't accomplish, so that they could go from
4    there.
5        BY MS. BONJEAN:
6    Q.  When did that change?
7    A.  It probably started --
8        MR. BRUEGGEN: Object to foundation.
9        THE WITNESS: It probably started in
10   1981, when the detective division merged their
11   units together.
12       BY MS. BONJEAN:
13   Q.  Okay. I'm assuming that even in 1972, it
14   was impressed upon you, as a detective in training,
15   that if a witness gave you direct information about
16   a crime, that you should record it, period, at some
17   point quickly?
18       MR. BRUEGGEN: Object to form.
19       MR. BRENER: Form.
20       THE WITNESS: Yes.
21       BY MS. BONJEAN:
22   Q.  Okay. And similarly, I am assuming that in
23   your training in 1972, that if a suspect gave you
24   information, inculpating himself in a crime, that
25   is also information that should be recorded

Page 71

1    promptly?
2        MR. BRUEGGEN: Object to form,
3    incomplete hypothetical.
4        THE WITNESS: It would depend upon the
5    degree and where you were going to go -- I'm trying
6    to -- give me the question again, please.
7        BY MS. BONJEAN:
8    Q.  Sure. If -- if a suspect gave a detective
9    information --
10   A.  Uh-huh.
11   Q.  -- that implicated himself in a crime --
12   A.  Okay.
13   Q.  -- were you trained that that needed to be
14   documented?
15       MR. BRUEGGEN: Same objections.
16       THE WITNESS: Yes.
17       BY MS. BONJEAN:
18   Q.  Okay. And were you trained that that needed
19   to be documented -- well, strike this.
20   In what time frame were you required to
21   document that information?
22       MR. BRUEGGEN: Object to form,
23   incomplete hypothetical. Go ahead.
24       THE WITNESS: It wasn't necessarily a
25   time frame that we were -- if what he had to say

Page 72

1    didn't logically make sense, you could go and
2    investigate further.
3        I mean, say we have -- in the
4    department, sometimes you run across people who
5    will come in to talk about things or claim that
6    they were witnesses or claim that they were part
7    and parcel to something that occurred, and in your
8    investigation, you go right out and try to verify
9    that information, and you find out that it has no
10   merit.
11       So in those instances, if you spend a
12   day doing that, it's not necessarily to memorialize
13   that into a formal police report because it has
14   no -- no bearing on the case.
15       BY MS. BONJEAN:
16   Q.  That's your determining, though, right?
17   You're making -- you're sort of judge, jury and
18   executioner on that, then.
19       MR. BRUEGGEN: Object to form,
20   argumentative.
21       MR. BRENER: Form.
22       THE WITNESS: Well, one has to go with
23   what their experience is in the way that you go
24   about saying that this person was not involved, you
25   know. You go and you find out that this guy has

Maysonet v.
Guevara

Video Deposition

Page 73

1 psychological issues, he wasn't possibly or
2 couldn't possibly have been in that location at the
3 time because other people say he was someplace
4 else.
5      BY MS. BONJEAN:
6 Q.  But are you saying, then, you don't have to
7 record it at all?
8 A.  No, I did not say that.
9 Q.  Okay.  So --
10 A.  I did not say that.  I said that you don't
11 have to necessarily do that that day.  You would put
12 it in there eventually, but it wouldn't necessarily
13 have to be that day before you go home, because it
14 has no merit.
15 Q.  What are the outer limits of time in which
16 you could memorialize a statement?
17 A.  I never had -- I never had the occasion,
18 so...
19      MR. BRUEGGEN: Object to form,
20 incomplete hypothetical.
21      MR. RAHE: And form and foundation.
22      BY MS. BONJEAN:
23 Q.  As a supervisor -- well, strike that.  We'll
24 get to as a supervisor.  Let's stick with your
25 training.

Page 74

1      How were you -- so maybe I'm
2 misunderstanding you.  In 1972, if someone made
3 statements, saying "I was at this shooting and I
4 was" -- "I helped out in this way," it's your
5 testimony that a police detective could take as
6 much time as he wants to go investigate that and
7 then eventually get around to putting that in a
8 report?
9      MR. BRUEGGEN: Objection, misstates his
10 testimony.  Go ahead.
11      THE WITNESS: I could probably best
12 answer that by saying that you would do it, but,
13 again, if you spent eight hours investigating what
14 this individual told you, and you completely
15 discredited him as far as his truthfulness, the
16 impossibility of him being involved because he
17 wasn't anywhere near there --
18      MS. BONJEAN: Right.
19      THE WITNESS: -- you wouldn't have to
20 do it.  Come in the next day; you do it the next
21 day.
22      BY MS. BONJEAN:
23 Q.  Right, but you would do it within a day or
24 two, right?
25 A.  Hopefully, yes.

Page 75

1 Q.  Okay.  If you -- we started this
2 conversation off saying that, and you agreed, that
3 it was important and you were trained to document
4 the investigative tasks that you took, right?
5 A.  Yes.
6 Q.  And if someone confesses or makes statements
7 that are inculpatory, that you want to go ahead --
8 that you're suspicious about, want to go ahead and
9 investigate, eventually you would record that,
10 correct?
11 A.  Correct.
12 Q.  And even though it may not be in 24 hours,
13 you would want to do it certainly at the
14 conclusion -- or strike that.
15      You would want to do it within a time
16 period -- a reasonable time period, right?
17 A.  Yes.
18 Q.  Okay.  And was there any outer limits of
19 what that reasonable time period might be?
20      MR. BRUEGGEN: Object to form,
21 incomplete hypothetical.  Go ahead.
22      THE WITNESS: So one could be accurate
23 in which you were recording, I would imagine you
24 try to do it as quickly as possible.
25 /////

Page 76

1      BY MS. BONJEAN:
2 Q.  We're talking, you know, hopefully within 72
3 hours, right?
4      MR. BRUEGGEN: Same objections.
5      THE WITNESS: Well, again, I -- as an
6 individual, I would have done it quickly, you know.
7 I can't speak to however other officers did it.
8 Some units did things differently, you know.
9      BY MS. BONJEAN:
10 Q.  Would you agree that if you waited too long
11 of a time to document something that allegedly
12 happened, there's -- there's risk in doing that as
13 well, right?
14      MR. BRUEGGEN: Object to form.
15      THE WITNESS: If you didn't take any
16 notes, yes.
17      MS. BONJEAN: Yes, right.
18      (Mr. Jorgensen enters deposition room.)
19      BY MS. BONJEAN:
20 Q.  And on that point, were you trained that if
21 you were in interviewing a witness, you would want
22 to take contemporaneous notes?
23      MR. BRUEGGEN: Object to form,
24 foundation, incomplete hypothetical.
25      THE WITNESS: You did take notes, but

Video Deposition

Page 77

1  you had to get a feel for the person that you were
2  interviewing, was this person excitable, did this
3  person get nervous if he saw you writing on a piece
4  of paper.  And there were many, many times with
5  witnesses, eyewitnesses, circumstantial witnesses,
6  suspects, where you didn't take notes right away
7  because it made that person a little bit nervous or
8  a lot nervous.  So you sat and had a conversation
9  and developed a rapport with them before you
10  started writing things down.
11      BY MS. BONJEAN:
12  Q.  Sure.  Fair enough.
13      And in a circumstance like that, where
14  some -- a witness may feel uneasy being forthcoming
15  if you were sitting there with a pen and paper,
16  would you agree that at the end of that interview,
17  you would want to promptly memorialize what was
18  told to you?
19      MR. BRUEGGEN: Object to form,
20  foundation, incomplete hypothetical.
21      THE WITNESS: Yes.
22      BY MS. BONJEAN:
23  Q.  And I think we already talked about the fact
24  that you could, I guess, go immediately to your
25  typewriter and do it into your supplemental report,

Page 78

1  but if you didn't do it that way, you would want to
2  at least make handwritten notes, correct?
3  A.  Yes.
4  Q.  And were you trained in 1972 about whether
5  or not there should be inducements provided to
6  witnesses for their cooperation?
7      MR. BRUEGGEN: Object to form.
8      THE WITNESS: "Inducements" meaning?
9      BY MS. BONJEAN:
10  Q.  Well, not all witnesses are, shall we say,
11  the highest people of society, that, you know,
12  they're just going to do it because it's the right
13  thing to do, they're going to cooperate, right?  I
14  mean, there are people who will cooperate just
15  because it's the right thing to do, but there are
16  people who are reluctant to cooperate, right?
17  A.  Yes.
18  Q.  And I'm not talking about suspects.  I'm
19  talking about witnesses even.  Correct?
20  A.  Yes.
21  Q.  And that there are witnesses who may believe
22  that they should get something in return for their
23  cooperation, right?
24      MR. RAHE: Object to form, foundation.
25      THE WITNESS: Could you explain "get

Page 79

1  something"?
2      BY MS. BONJEAN:
3  Q.  Yeah.  They -- they -- have you ever -- was
4  it discussed during your training that there might
5  be witnesses who want some type of benefit in
6  exchange for their cooperation?
7  A.  I had had cases where witnesses were
8  reluctant to come forward because they were in fear
9  of reprisals, in fear of injury to themselves or
10  their families.  And with that, we would explain
11  that we will express their concerns to the State's
12  Attorney's Office, and if they deem it verifiable
13  and agree with you, that they will try to make
14  arrangements to relocate you so that you and your
15  family are safe.
16      BY MS. BONJEAN:
17  Q.  I understand.
18      And in 1972, when you went through the
19  pre-detective training, was this a subject matter
20  that was discussed?
21  A.  I don't think so.
22  Q.  Okay.  What about interviewing suspects,
23  that's something you discussed during your
24  pre-detective training, right?
25  A.  Yes.

Page 80

1  Q.  And were you trained that you needed to
2  memorialize any benefits you offered a suspect for
3  his confession?
4      MR. BRUEGGEN: Object to form.
5      THE WITNESS: We didn't offer benefits.
6  We told them during the course of the interrogation
7  that if they cooperated, we would let the State's
8  Attorney's Office know that they were cooperative
9  during the course of their statements that they
10  gave.
11      BY MS. BONJEAN:
12  Q.  And so you weren't trained about -- so --
13  strike that.
14      Was it communicated to you during the
15  training that you were not permitted to offer
16  benefits to suspects in exchange for their
17  testimony?
18  A.  I think so because we couldn't do it.
19  Q.  Or in exchange for their statements.
20  A.  Yeah.  It wasn't -- there was nothing that we
21  could do, so...
22  Q.  So you were prohibited from offering
23  suspects benefits in exchange for their confession
24  or their statements, right?
25      MR. BRUEGGEN: Object to the form,

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 81

1    "benefits."
2        THE WITNESS: That would be fair.
3        BY MS. BONJEAN:
4    Q.   And during this training that you received
5    in 1972, I'm assuming the issue of using any type
6    of physical force or violence was something that
7    was covered?
8    A.   Yes.
9    Q.   And what was -- what was the general message
10   that the detectives in training received about the
11   use of physical abuse?
12       MR. BRUEGGEN: Object to form and vague
13   as to scope.
14       THE WITNESS: It was absolutely
15   prohibited.
16       BY MS. BONJEAN:
17   Q.   No circumstances under which you could use
18   any form of physical abuse during an interrogation,
19   correct?
20   A.   Correct.
21   Q.   Back to the subject matter of lying to
22   suspects or giving false information to suspects.
23   Was that permitted in 1972 or trained -- were you
24   trained that that was a permitted tactic, to give
25   false information to a suspect in order to see if

Page 82

1    they would be willing to confess or would give a
2    statement?
3    A.   As long as what you were being deceitful with
4    would not compel an innocent person to confess to a
5    crime.
6    Q.   Right. And which I'm -- that comes directly
7    from U.S. Supreme Court law, and as a lawyer, I
8    understand that, and you seem like a smart man and
9    seem to understand it, but for people like
10   Detective Guevara, how did that get communicated so
11   that they could understand it in practice?
12       MR. BRUEGGEN: Object to form and
13   foundation.
14       MR. LEINENWEBER: Objection to form and
15   foundation as well.
16       THE WITNESS: I don't feel qualified to
17   answer that. I don't know what Detective under --
18   Detective Guevara understood or didn't understand.
19   I mean, if he didn't understand something, it was
20   my experience with him he would come and ask me,
21   and I don't remember ever being asked that question
22   by Detective Guevara.
23       BY MS. BONJEAN:
24   Q.   Well, during the training that you received
25   in 1972, did your instructor give you examples of

Page 83

1    what would be a permissible lie and what would
2    cross a line into unconstitutional conduct?
3    A.   I think I gave you two examples in a previous
4    answer and that's about the best I can do.
5    Q.   Right. You might be able to say, oh, you
6    know, a witness saw you there, and that could be
7    false, because an innocent person knows he's not
8    there and knows that that witness couldn't have
9    possibly seen him there, right?
10   A.   Correct.
11       MR. BRUEGGEN: Object to form.
12       BY MS. BONJEAN:
13   Q.   Could you say "if you do not cooperate, I'm
14   going to take your kids away from you and send them
15   to DCFS"?
16   A.   No.
17   Q.   So would that be a lie that would fall into
18   the category of unconstitutional or impermissible
19   conduct?
20       MR. BRUEGGEN: Object to form,
21   incomplete hypothetical.
22       MR. RAHE: Foundation.
23       THE WITNESS: I'm not qualified to
24   answer that.
25   /////

Page 84

1        BY MS. BONJEAN:
2    Q.   So there are circumstances under which --
3    A.   Well, you asked about -- I don't -- I'm
4    familiar with the constitutional --
5    Q.   Fair. Fair, fair. Let's keep it within
6    practices and policies of the department. Okay?
7    Was it a permissible practice or policy of
8    the department that a detective could threaten to
9    report a person to DCFS and have their kids
10   possibly taken away if they either didn't confess
11   or didn't cooperate with an investigation?
12   A.   Not that I'm aware.
13       MR. BRUEGGEN: Object to form.
14       THE WITNESS: Not that I'm aware of.
15       MR. RAHE: And foundation.
16       BY MS. BONJEAN:
17   Q.   What about making statements to a suspect
18   that if you adopt some narrative and a statement,
19   you'll be free to go home?
20       MR. BRUEGGEN: Object to foundation.
21       MS. BONJEAN: Let me strike that.
22       BY MS. BONJEAN:
23   Q.   What -- what -- what -- was it discussed
24   during the training in 1972 about making promises
25   that somebody could go home if they made a

Page 85

1  statement?
2      MR. BRUEGGEN: Object to form,
3  incomplete hypothetical.
4      THE WITNESS: Could you repeat that
5  question?
6      BY MS. BONJEAN:
7  Q.  Sure.  And I'm talking about suspects right
8  now.
9      Were you trained or was it discussed during
10  your training whether or not it was a proper tactic
11  or an admissible -- permissible tactic to promise
12  someone that they could go home if they just
13  confessed or signed the statement?
14  A.  No.
15  Q.  Was it a permissible tactic to tell a
16  suspect that another accomplice implicated them in
17  a crime, even if that was untrue?
18      MR. BRUEGGEN: Object to form,
19  incomplete hypothetical.
20      THE WITNESS: I believe it was
21  acceptable.
22      BY MS. BONJEAN:
23  Q.  That's something that was used from time to
24  time during investigations.  Would you agree?
25      MR. BRUEGGEN: Object to form, scope,

Page 86

1  time.
2      THE WITNESS: Time frame, the time
3  frame, I don't remember if it changed, if it's
4  still possible.
5      BY MS. BONJEAN:
6  Q.  What about conducting sort of bogus lineups,
7  meaning having a suspect stand in a lineup, where
8  there was really no witness actually viewing him,
9  and then later saying that he was identified, is
10  that something -- is that a tactic that was
11  permissible?
12  A.  It may have been.  I don't remember going
13  back.
14  Q.  Do you remember seeing that done ever?
15  A.  Not specifically, no.
16  Q.  Okay.  Okay.  So detective -- did your
17  pre-detective training -- you became a detective in
18  1972.  Upon becoming a detective, where were you
19  assigned?
20  A.  Area 4, robbery.
21  Q.  Area 4, robbery?
22  A.  Yes.
23  Q.  What year was that?
24  A.  1972, March.
25  Q.  March.  And did you work at Area 4 with any

Page 87

1  of the defendants in this case?
2  A.  No.
3  Q.  Montilla wasn't there?
4  A.  I was in robbery.  I don't know where Freddie
5  was.
6  Q.  Okay.  How long were you in robbery?
7  A.  I was in Area 4 robbery for probably four
8  months.
9  Q.  And then where did you go?
10  A.  Area 6, robbery.
11  Q.  What's the geographic location of Area 6?
12  A.  It was at that time 3801 North Damen, and
13  then moved to 2452 West Belmont after the building
14  was completed in 1976, I think, '75.
15  Q.  How long were you at Area 6?
16  A.  Until 1980.
17  Q.  And then where did you go?
18  A.  I had a short respite in between there, where
19  I went to the organized crime division for six
20  months.  That would have been probably 1973, '74.  I
21  was in organized crime for six months, and then I
22  went back to Area 6, robbery.
23  Q.  The organized crime, what did you do for
24  them?
25  A.  Followed mafiosos.

Page 88

1  Q.  This is in the early '70s?
2  A.  Yes.
3  Q.  What was that unit like, one or two guys?
4  A.  No.  No.  It was probably 50 or 60.
5  Q.  And then you went back to Area 6 in 19 --
6  well, you were there until 1980?
7  A.  Yes.
8  Q.  Okay.
9  A.  Yes.
10  Q.  Still doing robberies?
11  A.  No.  In 1976, I went over to homicide.
12  Q.  So you started investigating homicides in
13  1976?
14  A.  Yes.
15  Q.  Who was your supervisor at Area 6 in 1976 or
16  around that time?
17  A.  In homicide or robbery?
18  Q.  Homicide.
19  A.  Julian Gallet.
20  Q.  Did you have a partner?
21  A.  I had a couple of partners.
22  Q.  And who were they?
23  A.  Joe Stachula, S-T-A-C-H-U-L-A, and Larry
24  Flood.
25  Q.  Flood?

Page 89

1   A.   Yeah.  Lawrence Flood.  He's now a judge.
2   Q.   Yeah.
3   So from 1976 to 1980, you were a homicide
4   detective at Area 6.  Is that right?
5   A.   Yes.
6   Q.   Then where did you go?
7   A.   I went to the Office of Municipal
8   Investigations shortly after Jane Byrne became
9   mayor.
10  Q.   Uh-huh.
11  A.   And I was there until I was promoted to
12  sergeant also in 1980.
13  Q.   Okay.  What did you do in the Office of
14  Municipal Investigations?
15  A.   Followed firemen for living outside the city.
16  Q.   Was that a desirable position?
17  A.   No, it wasn't.
18  Q.   Did you get out of it?
19  A.   I got promoted.
20  Q.   Why -- what did you do to get there, just --
21  I mean, was there a reason?
22  A.   The individual that Jane Byrne put in charge
23  of that whole thing I had worked with in the
24  department.  He got that job and he asked me to come
25  down and -- along with several others to help him

Page 90

1   set up the office.
2   Q.   I see.  It wasn't a punishment.  It just
3   wasn't something you enjoyed?
4   A.   Right.
5   Q.   Okay.  Now, you -- how did you get promoted
6   to sergeant and what was the process?
7   A.   Written examination.  I think there was an
8   oral component to it as well.  Yeah, I believe there
9   was.  There was an oral component, written
10  examination.
11  Q.   And after being promoted to sergeant, what
12  was your assignment?
13  A.   The 18th district at that time at 113 West
14  Chicago Avenue.
15  Q.   And were you supervising patrol officers?
16  A.   Yes.
17  Q.   How long did you do that?
18  A.   Until April of 1981.
19  Q.   And what -- what were your duties as a
20  supervisor in the 18th district?
21  A.   Respond to the men in my sector to their
22  assignments, making sure that they were doing things
23  properly, reviewing reports that men in my sector
24  had written for their completeness and accuracy.
25  Q.   Were you in the field?

Page 91

1   A.   Yes.
2   Q.   And so you actually went to locations to
3   make sure your officers were doing what they were
4   supposed to do?
5   A.   Correct.
6   Q.   Is there a difference between a in-the-field
7   sergeant versus, say, a desk sergeant?
8   A.   I did that, too, but normally the desk
9   sergeant would be a job that would be one desk
10  sergeant, because he would have his whole crew and
11  he would know all the different things that took
12  place within the district and for that particular
13  watch commander, because at that time you rotated.
14  Every 28 days, you went to a different watch and you
15  followed the watch commander.
16  As a new sergeant, you were kind of the
17  leftover and you filled in wherever you filled in.
18  So sometimes you might work two months on the
19  midnights or two months on the afternoons, and days
20  was the hardest one, but once you got into a
21  rotation where a captain says I want him on my
22  watch, you rotated with him.
23  Q.   You also said that part of your
24  responsibilities were reviewing reports.  Right?
25  A.   Correct.

Page 92

1   Q.   Okay.  Were you trained -- well, strike
2   that.
3   You obviously received training about how to
4   complete reports --
5   A.   Correct.
6   Q.   -- throughout your career.
7   Did you also receive training as it relates
8   to how to review and approve reports?
9   A.   Yes, but at that particular juncture, it was
10  kind of self-explanatory.
11  Q.   Sure.
12  A.   You knew what was required of you, so you
13  looked for probably those same things to make sure
14  that the officers that worked for you were doing the
15  same thing.
16  Q.   So when you received a report as a
17  supervisor in the 18th district, what was your
18  process for reviewing a report to ensure that it
19  was complete and accurate?
20  A.   Basically, I would try to meet up with the
21  men before I even went in.  I would tell them I'm at
22  a location, I'm going to be here for a while, if you
23  got any paper, is what we called it on the air, if
24  you got any paper, drop it off here, and I would
25  review it there.  And if I had any questions or I

Page 93

1  didn't like the report, I would get the officer to
2  correct whatever inconsistencies I found before I
3  signed it.
4  Q.  And what did you need to see to feel
5  confident that the report was complete and
6  accurate?
7    MR. BRUEGGEN: Object to form.
8    THE WITNESS: The basics of the who,
9  what, when, where and why to the best of their
10  ability to report it.
11    BY MS. BONJEAN:
12  Q.  Okay.  So when you were approving a report
13  as a sergeant in the 18th district, you weren't
14  just making sure that boxes were checked.  You were
15  actually reviewing for substance as well, correct?
16  A.  Yes.
17  Q.  Okay.  And you wanted to make sure it was
18  complete in the sense that everything was filled
19  out as it was supposed to be, correct?
20  A.  Yes.  Yes.
21  Q.  But also that you wanted to make sure that
22  all of the information, pertinent information, the
23  who, the what, the where and the why, were included
24  in the report, correct?
25  A.  Yes.

Page 94

1  Q.  And if there were any internal
2  inconsistencies, you wanted to reconcile or resolve
3  those inconsistencies, is that --
4  A.  Right.  If I read it and I didn't understand
5  a particular part of what I was reading, I would ask
6  him, you know, to explain it or why don't I
7  understand this, you know.  Probably the officer may
8  have well understood what he was doing because he
9  was there.
10  So if there were anything that I thought was
11  inconsistent, I would either ask him to correct it
12  or maybe I was misreading something.
13  Q.  All right.  And these were patrol officers,
14  right?  Chances are they would have one set of
15  reports, and that would be the end of it, right?
16  A.  Well, I don't remember exactly when all those
17  reports became the general offense case report.  I
18  think we still had that whole flurry of them that I
19  gave you earlier.  I think there were all still
20  different types of reports back in those early days.
21  Q.  In the 18th district, you weren't reviewing
22  detectives' reports, though, right?
23  A.  Right.
24  Q.  Okay.  Now, after your stint in the 18th
25  district, where did you go?

Page 95

1  A.  To Area 5, homicide.
2  Q.  Area 5.  What year is that?
3  A.  1981.
4  Q.  Okay.  So in 1981, you went to Area 5,
5  homicide.
6  Were any of the defendants who are named in
7  this lawsuit assigned to Area 5 at the time that
8  you started there as a sergeant?
9    MR. RAHE: Object to foundation.
10    THE WITNESS: No.  I can't address
11  Freddie Montilla because I don't remember seeing
12  him.
13    BY MS. BONJEAN:
14  Q.  He was in property crime, so maybe --
15  A.  Okay.  Well, at that time, too, Area 5 was on
16  Shakespeare above the old 14th district on
17  California Avenue.
18  Q.  Uh-huh.
19  A.  And it was all kind of divided up.  It was an
20  older building, so you had to go through some
21  different hallways to get there, but I don't
22  remember seeing Freddie.
23  Q.  Okay.  Fair enough.
24  And was Sergeant Biebel there?
25  A.  No.

Page 96

1  Q.  At some point Area 5 moved to Grand and
2  Central?
3  A.  Correct.
4  Q.  What year was that?
5  A.  '81, '82.
6  Q.  So you weren't at Shakespeare very long,
7  then?
8  A.  Right.
9  Q.  And then Area 5 moved to Grand and Central
10  along with the 15th -- 25th district?
11  A.  25th district, yes.
12  Q.  Okay.  Do you know what the geographic
13  boundaries were for the 25th district?
14  A.  Division Street on the south, Cicero
15  Avenue -- or I'm sorry, Central Park on the east,
16  city limits on the west, and the geographic
17  boundaries of whatever the 17th district was.  17
18  was Devon, I think.
19  Q.  Uh-huh.
20  A.  And then it became Lincolnwood.  And then
21  west, it would go all the way up to Touhy Avenue, or
22  just north.  There's a couple streets that go north
23  of Touhy all the way to, I think, Birchwood,
24  whatever the northern geographical boundaries were
25  of 16 and 17.

Maysonet v.
Guevara

Video Deposition

Page 97

1 Q. So the 25th district was on the first floor
2 of Grand and Central?
3 A. Yes.
4 Q. Okay. And then Area -- strike that.
5 The detective divisions were on the second
6 floor?
7 A. Yes, along with the youth division.
8 Q. And the youth division, right.
9 Now, at some point the structure changed for
10 the areas, right?
11 A. Yes.
12 Q. Violent crimes became a unified unit, is
13 that?
14 A. Robbery -- robbery, homicide, sex came
15 together. Auto theft, burglary, general assignment,
16 they came together.
17 Q. Okay. And that -- that would have been
18 property crimes?
19 A. Yes.
20 Q. Okay. And then violent crimes was --
21 A. Robbery --
22 Q. -- homicides, robberies?
23 A. -- homicides, sex.
24 Q. Okay. Do you know what year that was where
25 it was restructured?

Page 98

1 A. 1981.
2 Q. And gang crimes, when did that come into
3 existence?
4 MR. BRUEGGEN: Object to foundation.
5 THE WITNESS: I don't have a -- a
6 correct or confident recollection of when that
7 happened. I mean, there was a gang intelligence
8 unit, but I don't remember exactly where their
9 offices were, so I don't have a real accurate...
10 BY MS. BONJEAN:
11 Q. Sure. Am I right that at some point there
12 was a gang crimes north and a gang crimes south?
13 A. Yes.
14 MR. BRUEGGEN: Object to foundation.
15 BY MS. BONJEAN:
16 Q. And can we agree that those divisions
17 existed in 1990?
18 MR. BRUEGGEN: Object to foundation,
19 form.
20 BY MS. BONJEAN:
21 Q. You don't know?
22 A. No, I don't have an accurate answer for you.
23 Q. Fair enough.
24 Was gang crimes north at some point located
25 at Area 5 -- or strike that.

Page 99

1 Was gang crimes north ever located in Grand
2 and Central?
3 MR. BRUEGGEN: Object to foundation.
4 If you know.
5 THE WITNESS: Not located. What I
6 think they did with the gang crimes unit was they
7 assigned their gang crimes specialist to certain
8 areas so they could more concentrate on knowing the
9 members of the gang and what gangs were active in a
10 particular geographic area. So I think that they
11 may have concentrated them by district --
12 MS. BONJEAN: I see.
13 THE WITNESS: -- so that they could do
14 that.
15 BY MS. BONJEAN:
16 Q. And there would be gang crimes specialists,
17 for instance, in the 25th district?
18 MR. BRUEGGEN: Object to foundation.
19 THE WITNESS: I don't know if they
20 headquartered there.
21 MS. BONJEAN: Right.
22 THE WITNESS: I think they probably had
23 their roll call, I think, at Area 6 or Area 3,
24 whatever it was called back at that time, and then
25 they would just branch out. I don't remember if

Page 100

1 they had an office in Area 5 or not. They weren't
2 on our floor. If they had an office, it would have
3 been someplace else in the building.
4 BY MS. BONJEAN:
5 Q. And Humboldt Park --
6 A. Uh-huh.
7 Q. -- what district is Humboldt Park or was
8 Humboldt Park in 1990?
9 A. 14.
10 Q. And where was the 14th district located in
11 1990, if you remember?
12 A. It was right down the street from the current
13 one, I think. The old 14 was 2138 California, and I
14 think the other one is right there someplace, within
15 a block or so.
16 Q. And how far from Grand and Central would
17 that have been?
18 A. A couple miles.
19 Q. Okay. So in 1981, you began as a sergeant
20 in homicide at Area 5, right?
21 A. Yes.
22 Q. And what were your duties and
23 responsibilities as a sergeant at Area 5, homicide?
24 A. Supervising investigations, reading case
25 files, signing reports.

Maysonet v.
Guevara

Video Deposition

Page 101

1  Q.  And then did you eventually become, around
2  that same time, just a supervisor in violent
3  crimes?  Is that what happened?
4  A.  When it came together, yes.
5  Q.  Okay.  So in the early '80s, it came
6  together, and then you would have been considered a
7  violent crimes supervisor or sergeant?
8  A.  Yes.
9  Q.  Still at Area 5, right?
10  A.  Yes.
11  Q.  And your responsibilities as a violent
12  crimes sergeant in the early '80s was reviewing
13  case files?
14  A.  Yes.
15  Q.  Area files, investigative files?
16  A.  Yes.
17  Q.  Approving reports?
18  A.  Yes.
19  Q.  Were you in the field?
20  A.  Sometimes, yes.
21  Q.  When you were in the field, what was your --
22  what were your duties or responsibilities in the
23  field?
24  A.  It would depend upon the circumstances that I
25  was out there.  If it was a robbery investigation or

Page 102

1  a major robbery investigation, I would go and assist
2  the supervision of the detectives that were
3  responding to that, seeing if they had any other
4  needs that I could get for them that would help
5  their investigation, making sure that a good canvass
6  was done of any potential witnesses that were on the
7  scene, general supervisory duties.
8  Q.  And did you continue those duties in --
9  well, strike that.
10  For how long did you serve as a supervisor
11  in violent crimes at Area 5?
12  A.  Until 1987.
13  Q.  And did your duties and responsibilities
14  change at any point --
15  A.  At one point -- I don't know exactly when it
16  was -- they went with coordinators, crime
17  coordinators, robberies, sex coordinators, homicide
18  coordinators.  They evolved in that.  It was kind of
19  a fluid thing.
20  I mean, we all helped each other out because
21  manpower constraints became somewhat of an issue
22  sometimes, where you didn't have enough sergeants
23  working, you didn't have enough detectives working,
24  as far as what you were supposed to be allotted, so
25  you just kind of filled in where you could.

Page 103

1  Q.  Do you know what year these coordinator
2  positions came about?
3  A.  I want to say '89 maybe.
4  Q.  Okay.
5  A.  That's just a guess, though.
6  Q.  Okay.  So specifically in 1990, you were a
7  sergeant in violent crimes, right?
8  A.  Yes.
9  Q.  Okay.  Did you consider yourself a hands-on
10  sergeant?
11  MR. BRUEGGEN: Object to form.
12  THE WITNESS: Could you be more
13  specific?
14  BY MS. BONJEAN:
15  Q.  Sure.  Were you someone who -- I'll be --
16  I'll be very specific.
17  Did you review area files of ongoing
18  investigations of detectives you were supervising?
19  A.  Yes.
20  Q.  And did you do that on a regular basis or on
21  an as-needed basis?
22  MR. BRUEGGEN: Object to form.
23  THE WITNESS: Every day that I
24  worked -- and it wouldn't necessarily be files.  We
25  would have a board, a clipboard, where officers

Page 104

1  would put memorandum on cases, supplemental --
2  copies of supplemental reports on cases, original
3  case reports sometimes, and we would review those.
4  Homicide had their own board, and the other crimes,
5  robbery, criminal sexual assaults, they had their
6  other board.
7  I made it a point every day that I
8  worked to go in, look at those boards from the last
9  day that I worked to see what was new in the
10  investigations.  And that was not only to keep up
11  with them.  It was so that I could pass along the
12  information when we went to roll calls, which were
13  a half hour before their starting time, so that I
14  could let everybody know exactly what everybody
15  else was doing as far as the major investigations
16  were concerned.
17  BY MS. BONJEAN:
18  Q.  And this board that you referenced, this
19  would have been a board that had open cases, right?
20  A.  Yes.
21  Q.  And you said that there was a place where
22  the files -- strike that.
23  There was a place where reports would go, on
24  a clipboard I think?
25  A.  It would -- xerox copies of a report, when

Maysonet v.
Guevara

Video Deposition

Page 105

1  the officer completed a report, he would have one
2  for the investigative file.  He would have the
3  original, which went to the first, second or third
4  watch for the supervisor to sign, review and sign.
5  And then a copy would go on that board, depending
6  upon what crime criteria it was.
7  Q.  I see.
8  And in -- again, I'm talking about the time
9  frame of 1990 at this point.  This board, was it in
10  the general conference area of Area 5 or where was
11  it?
12  A.  No.  It was right next to the sergeant's
13  desk.
14  Q.  Oh, okay.  And you had your own office as a
15  sergeant, right?
16  A.  Well, you shared it.  There were two case
17  management, we called them deskmen, that would also
18  be there to help to distribute case reports, answer
19  the telephone, take messages, things of that nature.
20  I had two guys on my watch who were -- at
21  that time I think I was on afternoon shift.  I had
22  two officers -- or two detectives that were light
23  duty.  One would enter data into the computer.  He
24  had multiple sclerosis, so he was light duty.  And
25  the other officer is recovering from brain surgery,

Page 106

1  so he would be my foreman that would help breakup
2  case reports and also answer telephones and take
3  messages and requests for service.
4  Q.  So you had this board in -- it actually was
5  in your office essentially --
6  A.  Right.  It was --
7  Q.  -- with these other two people?
8  A.  -- right to the right as you were in the
9  office.
10  Q.  Okay.  And it would have a list or a log of
11  open cases?
12  A.  Not a log.  It would --
13  Q.  Okay.
14  A.  -- just be copies of a supplemental report as
15  they were put on the board.
16  Q.  Is it just like -- was it just like hung up
17  somewhere?
18  A.  Yes.
19  Q.  I'm trying to visualize it.
20  A.  Yeah.  Hung up on a screw on the concrete
21  wall.
22  Q.  Got it.
23  And for every open case, copies of
24  supplemental reports would be attached to this
25  clipboard so you could easily access it and -- and

Page 107

1  look at the reports that had been created in the
2  case, but --
3  A.  Within the last two watches.
4  Q.  Right.  And that was -- so you wouldn't have
5  to go pull out the area file and look for it there,
6  right?
7  A.  Correct.
8  Q.  It was pretty accessible, right?
9  A.  Correct.
10  Q.  Within arm's length, correct?
11  A.  Uh-huh.
12  Q.  And your practice was to, when you came in
13  on your shift, to make sure you kept up-to-date on
14  the reports that had been written in the last
15  couple of watches, right?
16  A.  Yes.
17  Q.  So would it be fair to say that you had some
18  level of familiarity with the investigations that
19  were going on in Area 5 -- at any given time you
20  had some familiarity with all the investigations
21  that were going on?
22  MR. BRUEGGEN: Object to form.
23  THE WITNESS: With the exception that
24  if I had been off for any period of time, regular
25  days off or something, coming in, and then if you

Page 108

1  came in and all hell was breaking loose at a
2  particular time and you didn't get a chance to read
3  it, but --
4  MS. BONJEAN: Right.
5  THE WITNESS: -- I would make an effort
6  to catch up as fastly as I could.
7  BY MS. BONJEAN:
8  Q.  I understand it's not a science, but it was
9  your practice to try to keep up with all of the
10  open investigations in -- at Area 5?
11  A.  Yes.
12  Q.  Now, as I understand through testimony
13  through other people that worked at Area 5, there
14  was a place where the area files were kept.
15  Correct?
16  A.  Yes.
17  Q.  Do you have a name for it?  Was it like the
18  detective room?  Was there a room?  Where -- where
19  were they kept?  What would you call it?
20  A.  Well, I think at one point -- I don't know
21  when that point started -- they called it the
22  homicide office.
23  Q.  Okay.
24  A.  And that was a separate room that was just to
25  the -- what would be the north of where the homicide

Page 109

1  office was.
2  Q.  And were there filing cabinets in there?
3  A.  Yes.
4  Q.  And they contained the complete --
5  A.  Open -- open homicide files.
6  Q.  Open homicide files?
7  A.  Yes.
8  Q.  And these were the investigative files,
9  right?
10  A.  Correct.
11  Q.  Or area files, as I've heard them called?
12  A.  Yes.
13  Q.  Where did closed files go?
14  A.  Downtown.
15  Q.  Okay.  So when -- so when a homicide case
16  was closed, the investigative file went -- was
17  shipped downtown?
18  A.  Yes.  That would be -- it would first go in
19  the basement, and they would only make those runs
20  downtown after they didn't have any more room
21  downstairs in the basement.
22  Q.  Got it.  And again I'm talking about the
23  time frame of 1990.  So if a homicide file was
24  closed, cleared and closed, it would first go into
25  the basement, correct?

Page 110

1  A.  Yes.
2  Q.  Was it organized in the basement by RD
3  number?
4  MR. RAHE: Object to form.
5  MR. BRUEGGEN: Foundation.
6  THE WITNESS: I don't remember if it
7  filed.
8  BY MS. BONJEAN:
9  Q.  Okay.  So it would go into the basement, and
10  then when things got crowded down there and things
11  filled up, it would all be shipped downtown, right?
12  MR. BRUEGGEN: Object to foundation.
13  THE WITNESS: Yes, I believe so.
14  BY MS. BONJEAN:
15  Q.  Okay.  Now, specifically with respect to
16  open homicide files, that remained on the second
17  floor in a homicide office or some office, right?
18  A.  Yes.
19  Q.  And those were in filing cabinets as well,
20  correct?
21  A.  Yes.
22  Q.  And how were they organized?
23  A.  By RD number.
24  Q.  And were the filing cabinets locked or were
25  they accessible to any detective at Area 5?

Page 111

1  MR. BRUEGGEN: Object to foundation.
2  THE WITNESS: I believe they were
3  accessible.
4  BY MS. BONJEAN:
5  Q.  Was there a detective who was assigned to
6  the filing cabinets or were they just unattended in
7  this office?
8  MR. RAHE: Object to foundation.
9  MR. BRUEGGEN: This is 1990 still,
10  right?
11  MS. BONJEAN: I'm in 1990.
12  THE WITNESS: I don't remember as to
13  the year, but there were different detectives that
14  were back in there that were in charge of putting
15  those files together and making sure that they had
16  that card, you know, the sign-out card with it, and
17  everything coincided with each other, but I don't
18  remember what time frame that was, because there
19  were several detectives in there through the years.
20  BY MS. BONJEAN:
21  Q.  I've heard reference to a sign-out card --
22  A.  Uh-huh.
23  Q.  -- which you just referenced.
24  When you say "sign-out card," what are you
25  referencing?

Page 112

1  A.  It's a card, I don't know, it was 8-by-11 or
2  maybe a little bit narrower, and it had a series of
3  lines on it, you know, the case -- the RD number of
4  the case, I think the victim's name of the case and
5  the detective that signed it out and when he signed
6  it out and signed it back in.
7  Q.  Okay.  So the card tracked -- tracked the
8  file?
9  A.  Right.  So that if you were looking at it and
10  you were to come look at -- you couldn't find the
11  file, that card would be in there and say, oh,
12  it's -- Lee Epplen's still got that file out, he
13  didn't sign it back in.
14  Q.  Okay.
15  A.  So you would have a way of tracking that.
16  Q.  Understood.
17  And that -- that card was supposed to stay
18  in the filing cabinet, where that file would be
19  if -- if someone had checked it out?
20  A.  Yes.
21  Q.  Was it the policy and practice of the
22  department that if you were going to take an area
23  file out of the filing cabinet, you had to sign
24  that card?
25  A.  Yes.

Page 113

1    MR. RAHE: Foundation.
2    MR. BRUEGGEN: Foundation, form.
3    THE WITNESS: Yes.
4    MR. RAHE: Hey, Jennifer, whenever you
5  find a good time.
6    MS. BONJEAN: Yeah, we've been going a
7  while. Do you need a break? Okay. Let's take a
8  break.
9    THE VIDEOGRAPHER: We're going off --
10   MS. BONJEAN: You can let me know at
11  any time.
12   THE VIDEOGRAPHER: We're going off the
13  record at 12:29 p.m.
14   (Recess taken from 12:29 to 12:43.)
15   THE VIDEOGRAPHER: We are now back on
16  the record at 12:43 p.m.
17   BY MS. BONJEAN:
18 Q.  Mr. Epplen, I -- before we broke, we were
19  talking about some of the mechanics of the
20  filing -- the intricacies of filing the files at
21  Area 5, so I want to follow up on some of that
22  again if you don't mind. You can indulge me on
23  that.
24   We were discussing the area files that were
25  kept in those filing cabinets up on the second

Page 114

1  floor. Again, we're talking about the time frame
2  of 1990, and you had explained to me the card that
3  was used for logging the file in and out, right?
4 A.  Yes.
5 Q.  Were the detectives at Area 5 at liberty to
6  get a file if they needed it for the purposes of an
7  investigation?
8    MR. BRUEGGEN: Object to form.
9    THE WITNESS: Yes.
10   BY MS. BONJEAN:
11 Q.  I mean, they were -- they didn't have to get
12  approval from anyone before going to get a file, is
13  that right?
14 A.  That's right.
15 Q.  As long as they signed it out, it was
16  perfectly acceptable for them to go grab a file
17  from this filing area, right?
18 A.  Yes.
19 Q.  Now, we also discussed the inventory card,
20  or inventory index, I think I referenced earlier.
21  Do you remember that?
22 A.  Yes.
23 Q.  Okay. Am I using the right terminology?
24  Was there something called an inventory index or
25  card?

Page 115

1 A.  I don't remember what the name of it was, but
2  I know what you're referring to.
3 Q.  Was it a particular color?
4 A.  Just a white sheet, lined.
5 Q.  White sheet.
6  Was the log in and out a particular color?
7 A.  I think that was green.
8 Q.  Okay. So the sign-in and out card was
9  green, but the -- there was also something called
10  an inventory -- I'll call it an inventory log.
11 A.  Okay.
12 Q.  Does that sound right?
13 A.  Okay.
14 Q.  Okay. Was there a document that purported
15  to identify all of the reports that were contained
16  in an area file?
17   MR. BRUEGGEN: Object to form. Go
18  ahead.
19   THE WITNESS: I believe so.
20   BY MS. BONJEAN:
21 Q.  Okay. Now, was that inventory log a
22  document that detectives were trained on, how to
23  use it, when to use it, what it's for?
24   MR. BRUEGGEN: Object to form,
25  foundation. Go ahead.

Page 116

1    THE WITNESS: Yes.
2    BY MS. BONJEAN:
3 Q.  And what was your understanding of its
4  function?
5 A.  That you would use that form every time you
6  created a supplemental report or a GPR, a memo, or a
7  memo on a plain piece of paper, if need be, and you
8  would log it in there with the date, your name, the
9  name of the homicide victim.
10  That's all I remember as far as what you
11  would log in.
12 Q.  And who was responsible for logging a report
13  that would go into an area file? Would it be the
14  detective who --
15 A.  The detective.
16 Q.  -- who prepared the report?
17 A.  Yes.
18 Q.  Okay. And was the detective who prepared a
19  report responsible for actually putting it into the
20  file?
21   MR. BRUEGGEN: Object to form.
22   THE WITNESS: To my recollection, yes.
23   BY MS. BONJEAN:
24 Q.  Because I'm a little confused how this all
25  went, because when a detective prepared a, for

Maysonet v.
Guevara

Video Deposition

Page 117

```
 1  instance, a supplemental report, they would first
 2  have to submit it to a sergeant for approval,
 3  right?
 4  A.   Yes.
 5  Q.   That's the first place it would go after the
 6  report was completed, correct?
 7  A.   Correct.
 8  Q.   And then after the report was approved, what
 9  happened to it?
10  A.   It would go to case management.
11  Q.   And what is case management?
12  A.   Case management would be the ones that would
13  make the necessary copies for whatever different
14  units would get them, whether it be the
15  superintendent's office, the commander's office,
16  whatever it would be, whoever had a need for them,
17  and then they would send it downtown to the -- what
18  do you call it?  The records division, they would
19  send it down there.
20  Q.   Now, the case management person who would
21  receive the report, was that person responsible for
22  putting that report into the area file?
23  A.   I believe, again, I believe it was a
24  detective who would put it in there, but there was a
25  time when we had a detective who was also in charge
```

Page 118

```
 1  of making sure those files were complete.
 2  So if the report -- if he saw the report in
 3  one location and it wasn't in there, he would make
 4  sure that a copy got in there.
 5  Q.   But if the detective was responsible for
 6  putting the report into the area file, he would be
 7  putting in reports that were not yet approved,
 8  right?
 9  A.   Not always.
10      MR. BRUEGGEN: Object to form.
11      BY MS. BONJEAN:
12  Q.   So how did the detective -- did the
13  detective get an approved report back after it's
14  approved?
15  A.   I don't remember.
16  Q.   The system just doesn't make sense to me at
17  all, so I'm trying to understand it, and since you
18  worked there for so long and was a sergeant there,
19  I thought you might be able to shed some light on
20  it.
21  Obviously, you would agree that it would be
22  important for all paperwork that was prepared in
23  the course of an investigation to be filed in a --
24  filed somewhere, right?
25      MR. BRUEGGEN: Object to form.
```

Page 119

```
 1      THE WITNESS: Yes.
 2      BY MS. BONJEAN:
 3  Q.   Okay.  And preferably filed in -- in one
 4  place, and if it's going to be filed in another
 5  place, that it would be duplicates filed elsewhere,
 6  right?
 7      MR. BRUEGGEN: Object to form.
 8      THE WITNESS: Yes.
 9      BY MS. BONJEAN:
10  Q.   So if a detective prepared a supplemental
11  report that he then gave to his supervisor or
12  sergeant for approval, was he obligated under the
13  policies and practices of the department to make a
14  copy of that report and also put it in the area
15  file?
16      MR. BRUEGGEN: Object to form.  We're
17  still talking about 1990?
18      MS. BONJEAN: Yeah.
19      MR. BRUEGGEN: Just making sure,
20  because we took a break.
21      MS. BONJEAN: Yeah, that's fine.  We're
22  sticking to 1990 probably for the rest of the
23  deposition, so...
24      THE WITNESS: Okay.  Could you repeat
25  it?  I'm sorry.
```

Page 120

```
 1      BY MS. BONJEAN:
 2  Q.   Sure.  When a detective completed a
 3  supplemental report and he submitted it to his
 4  sergeant or supervisor for approval --
 5  A.   Uh-huh.
 6  Q.   -- was he also required under the policies
 7  and practices of the department to make a copy and
 8  put it into the area file?
 9      MR. BRUEGGEN: Object to form and
10  foundation.  Go ahead.
11      THE WITNESS: I don't know if it was
12  policies and practices of the entire department.  I
13  mean, there were some things that were autonomous
14  to each area that worked for them or that their
15  bosses at the time wanted them to do.  I don't know
16  if that was one of them, but copies would go in
17  there, you know.
18      BY MS. BONJEAN:
19  Q.   They don't walk themselves, though, right?
20  A.   Correct.  Correct.
21  Q.   Okay.  So what was the policy and practice
22  of the department at the time to ensure that the
23  area file was complete and had all of the reports
24  that memorialized an investigation?
25      MR. BRUEGGEN: Object to form,
```

Maysonet v.
Guevara

Video Deposition

Page 121

1 foundation. Go ahead.
2 THE WITNESS: We had -- the detective
3 in the back would make sure that whatever was on
4 that log, there was a report corresponding to that
5 log that was in there.
6 MS. BONJEAN: Okay.
7 THE WITNESS: So I mean, that's the
8 best I can do.
9 BY MS. BONJEAN:
10 Q. It's -- it's not very good, because you're
11 not really explaining to me --
12 MR. BRUEGGEN: Objection,
13 argumentative.
14 BY MS. BONJEAN:
15 Q. -- how it is that the information even got
16 onto the log.
17 Was the detective required by policy to log
18 his reports on this inventory log?
19 A. I would have to --
20 MR. RAHE: Objection, foundation.
21 THE WITNESS: I would have to read the
22 order as it applied in 1990 to --
23 MS. BONJEAN: Okay.
24 THE WITNESS: -- familiarize myself
25 with it once again.

Page 122

1 BY MS. BONJEAN:
2 Q. All right. Well, was the practice that was
3 expected of the detectives to log their reports
4 onto the inventory log?
5 MR. RAHE: Objection, foundation.
6 THE WITNESS: I believe it was, yeah,
7 to the best of my recollection.
8 BY MS. BONJEAN:
9 Q. And -- and I guess I'm still not following
10 how the reports got into the area file, because
11 I've seen a lot of area files and many of them
12 are --
13 A. You're talking about the investigative file
14 now?
15 Q. Correct. I'm now using the words
16 interchangeably. I'll use an investigative --
17 "investigative file," if that's the term you're
18 more comfortable with, but I've seen a number of
19 investigative files, and sometimes they contain
20 approved reports and sometimes they don't --
21 A. Okay.
22 Q. -- contain approved reports.
23 So I -- I guess my question is: Was there a
24 practice in Area 5 in 1990 that governed how
25 approved files would get into the investigative

Page 123

1 file?
2 MR. BRUEGGEN: Object to form and
3 foundation.
4 BY MS. BONJEAN:
5 Q. I'm sorry. Approved reports would get into
6 the investigative files.
7 MR. BRUEGGEN: Same objections, but go
8 ahead.
9 THE WITNESS: I don't think that there
10 was an absolute procedure on how that was done. I
11 don't recollect. I mean, I know what you're
12 referencing when you talk about investigative files
13 and reports that weren't signed, but I don't know
14 who that would be, you know. I would think in most
15 cases it would be the detective that did that.
16 BY MS. BONJEAN:
17 Q. Okay. But as you sit here today, you can't
18 tell us that the police department required
19 detectives to put copies of their supplemental
20 reports into the investigative file, right?
21 A. I would have to --
22 MR. RAHE: Objection, form.
23 THE WITNESS: -- reread that order as
24 it applied in the time frame that you're
25 referencing.

Page 124

1 BY MS. BONJEAN:
2 Q. Okay. I'm talking about 1990, but even --
3 A. Okay.
4 Q. -- I understand you don't have it memorized
5 and you've been retired for quite some time, but
6 you just don't know at this time.
7 A. Correct.
8 Q. Is that what you're telling me?
9 And what was the practice in terms of when
10 the report was supposed to be logged onto the
11 inventory log? Was it at the time that it went
12 into the file? Was it contemporaneous with when it
13 went --
14 A. At the time --
15 MR. BRUEGGEN: Object to form,
16 foundation. Go ahead.
17 THE WITNESS: At the time it was going
18 to go into the file.
19 BY MS. BONJEAN:
20 Q. Okay. I have a strong suspicion that there
21 were times when that inventory log was prepared
22 after the case was closed.
23 Would that be consistent with the policies
24 of the department or the -- or Area 5?
25 MR. RAHE: Objection.

Maysonet v.
Guevara

Video Deposition

Page 125

1    MR. BRUEGGEN: Object to form,
2  foundation.
3    THE WITNESS: Not consistent, but I
4  could see it happening if somehow, through the
5  course of a long, lengthy investigation, that paper
6  got ripped or destroyed in some manner.
7    BY MS. BONJEAN:
8  Q.  Sure.  So putting aside the original getting
9  destroyed and there having -- there having to be a
10  duplicate made, was it acceptable practice to wait,
11  purposefully wait, to log the reports onto that
12  inventory log until after the case was closed?
13    MR. BRUEGGEN: Object to form.
14    THE WITNESS: No.
15    MR. BRUEGGEN: Foundation.
16    THE WITNESS: No.
17    BY MS. BONJEAN:
18  Q.  Because if that was the practice, it would
19  permit someone to omit reports that weren't helpful
20  to the prosecution, right?
21    MR. BRUEGGEN: Objection, form,
22  speculation.  Go ahead.
23    THE WITNESS: That was not the
24  policy --
25    MS. BONJEAN: Right.

Page 126

1    THE WITNESS: -- nor the practice that
2  I'm aware of.
3    BY MS. BONJEAN:
4  Q.  Okay.  In fact, it would not have been a
5  condoned policy or practice, correct?
6  A.  Absolutely not.
7    MR. BRUEGGEN: Same objections.
8    BY MS. BONJEAN:
9  Q.  And do you agree that there would be a
10  risk -- even if it was untrue, there would be a
11  risk of a false allegation, even, that somebody --
12  if somebody had made the log after the fact, that
13  maybe the log wasn't thorough or fully reflective
14  of all the reports that were in that file at least
15  at one time?
16    MR. BRUEGGEN: Object to form,
17  speculation.
18    THE WITNESS: I don't see that
19  happening.
20    BY MS. BONJEAN:
21  Q.  So to the best of your knowledge, that's not
22  something that occurred at Area 5?
23  A.  Not that I know of.
24    MR. BRUEGGEN: Object to form, asked
25  and answered.

Page 127

1    BY MS. BONJEAN:
2  Q.  And if it did happen, as a supervisor would
3  you have approved that practice?
4  A.  Absolutely not.
5  Q.  Okay.  We got down a little road that I --
6  and I want to go back to some questions about your
7  functions as a supervisor sergeant at Area 5 in and
8  around 1990.  Okay?
9  A.  Okay.
10  Q.  You talked about how you also continued your
11  responsibilities of approving reports.  Right?
12  A.  Yes.
13  Q.  And I think -- correct me if I'm wrong --
14  one of your practices was, when you came in on your
15  shift, you would try to review the clipboards that
16  had the supplemental reports that were prepared in
17  the last shift or two to keep up-to-date and
18  abreast of the ongoing investigations.  Is that
19  right?
20  A.  Yes.
21  Q.  Did those clipboards also contain GPRs or
22  were they just supplemental reports?
23  A.  They had GPRs in them as well.
24  Q.  All right.  And when you were submitted a
25  report or a report was submitted to you, what was

Page 128

1  your process for reviewing it to determine whether
2  you were going to approve it or not?
3    MR. BRUEGGEN: Object to form.  Go
4  ahead.
5    THE WITNESS: I would read it for
6  content, whether or not I understood everything
7  that was in there as far as the investigation was
8  concerned, if it flowed correctly, and if it made
9  sense, if everything made sense as they were
10  writing it, and I just signed it.
11    BY MS. BONJEAN:
12  Q.  Now, in order to determine whether the
13  content of the report made sense, would you agree
14  that that might require you to understand what
15  happened before that report was prepared, like what
16  was reported in a previous report?
17    MR. BRUEGGEN: Object to form.
18    THE WITNESS: It would depend.
19    BY MS. BONJEAN:
20  Q.  For instance, a report might have a witness
21  statement that on its face seems perfectly
22  plausible, but not so plausible as compared to, for
23  instance, if you looked at the scene report and
24  there was something in there that contradicted this
25  witness statement, right?

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 129

1    MR. BRUEGGEN: Object to form,
2  incomplete hypothetical.
3    BY MS. BONJEAN:
4  Q.  I could start over.  It wasn't a great
5  question, but if you understand.
6  A.  Start over.
7  Q.  Sure.  To know whether a report is logical
8  or makes sense --
9  A.  Uh-huh.
10  Q.  -- would you agree that it might require
11  looking at prior reports to see what had been done
12  before what was reported in the report that you're
13  now looking at for approval, right?
14    MR. BRUEGGEN: Object to form.  Go
15  ahead.
16    THE WITNESS: If I did not understand
17  why that person was interviewed in the first place,
18  especially if he had no information available and
19  he wasn't by the scene or whatever the case may be,
20  I would look at that report and then try to go back
21  to see why they did or I would ask the detective
22  what is this about.
23    BY MS. BONJEAN:
24  Q.  Right.  Well, let me give you an example,
25  totally unrelated to this case, and I guess it's a

Page 130

1  hypothetical, but it is one of my cases.
2  I have a case where a witness told a
3  detective, a young witness, a young teenage boy
4  told the detective that he witnessed a murder and
5  he witnessed a particular defendant beat the woman
6  with a crowbar until she was dead.  Okay?
7  And if you looked at that witness statement,
8  which was in the supplemental report, on its face
9  it looks perfectly reasonable.  However, it
10  wouldn't be reasonable if you'd looked at the
11  original report, which showed that she was actually
12  stabbed to death, right?
13    MR. BRUEGGEN: Object to form.
14    THE WITNESS: Right.
15    MR. BRUEGGEN: Incomplete hypothetical.
16    BY MS. BONJEAN:
17  Q.  Okay.  Work with me.  I guess so my question
18  is: You would have to know what the original
19  report said to -- to recognize that this
20  statement -- something's wrong here, right?
21    MR. BRUEGGEN: Object to form.
22    THE WITNESS: Again, I could see, if
23  you -- if you sit down and analyze it a little bit
24  more thoroughly, I could see where, if somebody
25  sees somebody get hit with a crowbar, they may

Page 131

1  think that's the weapon that caused the death;
2  however, that that person had been stabbed previous
3  or got stabbed afterwards --
4    MS. BONJEAN: Right.
5    THE WITNESS: -- it would be somewhat
6  of a different circumstance.
7    BY MS. BONJEAN:
8  Q.  Right.  I understand that it could
9  theoretically be reconciled.  My point is, is as an
10  investigator, you have to -- strike that.
11  As a sergeant, would you agree that you kind
12  of have to look globally at the investigation to
13  determine whether any individual report makes sense
14  or not?
15    MR. BRUEGGEN: Object to form,
16  incomplete hypothetical.
17    THE WITNESS: You have to be -- you
18  have to have some sort of a grasp on that
19  investigation, where it's been, where it's going.
20    MS. BONJEAN: Right.
21    THE WITNESS: So that's...
22    BY MS. BONJEAN:
23  Q.  There are reports that you can look at in
24  isolation that make a lot of sense, but maybe have
25  a lot -- maybe should raise questions or red flags

Page 132

1  in context with the entire investigation.  Can we
2  agree on that?
3    MR. BRUEGGEN: Object to form,
4  incomplete hypothetical.
5    THE WITNESS: Yeah, I don't know if we
6  can agree on it.  Some of them may not make sense,
7  but they've been -- they've eliminated other points
8  that have been there earlier, you know, and you do
9  your best to keep up with what you have to read,
10  you know, so...
11    BY MS. BONJEAN:
12  Q.  Yeah, and I -- going back to really what
13  your function was, I'm just wondering how a
14  supervisor grapples with that.
15  A.  The best they can.
16  Q.  And ideally or optimally, you would want to
17  have kind of an understanding of the entire
18  investigation, right?
19    MR. BRUEGGEN: Object to form.
20    THE WITNESS: Optimally, yes.
21    BY MS. BONJEAN:
22  Q.  Okay.  I mean, just making sure boxes are
23  checked on a report isn't going to really ensure
24  that the investigation is a thorough and integris
25  one, right?

Page 133

1    MR. BRUEGGEN: Object to form.
2    THE WITNESS: Well, one has to develop
3  a trust for the investigators that are working on
4  it as well, you know, that they are going to do
5  what has been trained to them to do and they do
6  their job correctly.
7    BY MS. BONJEAN:
8  Q.  So as a supervisor, you gave your detectives
9  the benefit of the doubt, right?
10    MR. BRUEGGEN: Object to form,
11  incomplete hypothetical.
12    THE WITNESS: I don't think that's a
13  terminology I would agree with, "the benefit of the
14  doubt." If I had doubts, I would investigate
15  further. If I thought they were doing a good job,
16  I would accept their work on face value.
17    BY MS. BONJEAN:
18  Q.  Right, but you can't control what they're
19  omitting from a report?
20    MR. BRUEGGEN: Object to form.
21    THE WITNESS: I would have no way of
22  knowing what they're omitting from a report.
23    BY MS. BONJEAN:
24  Q.  Right. And you assume that they're not
25  omitting, for instance, "I beat the defendant into

Page 134

1  the confession," right?
2    MR. BRUEGGEN: Object to form.
3    THE WITNESS: Run that by me again.
4    BY MS. BONJEAN:
5  Q.  You have to have -- you just said that you
6  have to have some faith that your detectives are
7  behaving in a way that is proper. Right?
8  A.  Yes.
9  Q.  Okay. Typically, an officer who engages in
10  misconduct isn't going to report his own
11  misconduct. Can we agree on that?
12  A.  Yes.
13  Q.  Okay. And by the way, how long were you a
14  Chicago police officer?
15  A.  Almost 38 years.
16  Q.  Okay, 38 years.
17    Did you ever witness misconduct as a Chicago
18  police officer?
19  A.  If I did, I got a CR number and we worked on
20  it.
21  Q.  Okay. Didn't answer my question, so is that
22  a yes?
23  A.  I didn't personally witness, but if it was
24  brought to my attention that something happened
25  regarding the investigation I was conducting, I

Page 135

1  would get a CR number, I would complete a report as
2  to what I learned during that investigation and
3  forward it.
4  Q.  Right. So if someone reported misconduct to
5  you, you had to get a CR number, right?
6  A.  Yes.
7  Q.  Okay. I'm asking if you've ever personally
8  witnessed any misconduct by any officer in your
9  near 40 years on the department.
10    MR. RAHE: Objection, asked and
11  answered.
12    THE WITNESS: No.
13    BY MS. BONJEAN:
14  Q.  What are the odds of that.
15    MR. BRUEGGEN: Objection,
16  argumentative.
17    MR. RAHE: Objection.
18    BY MS. BONJEAN:
19  Q.  I mean, in what profession can anyone say
20  that they've never witnessed any wrongdoing by
21  anybody in their profession, a profession that they
22  did for 40 years? Excuse that I -- me that I'm
23  incredulous about that.
24    MR. RAHE: Objection.
25    MR. BRUEGGEN: Objection,

Page 136

1  argumentative.
2    MR. RAHE: Form, foundation.
3    THE WITNESS: As far as to what degree
4  you're talking about misconduct, I mean, there were
5  instances where you would see an officer on a
6  parade detail without his hat on, which would be a
7  violation of rules and regulations, so you would
8  orally reprimand him --
9    MS. BONJEAN: Right.
10    THE WITNESS: -- things of that nature.
11  I mean, there were minor functions, minor
12  discretions that you handled yourself.
13    BY MS. BONJEAN:
14  Q.  I'm not really talking about that. I'm
15  talking about misconduct that led to constitutional
16  violations of civilians.
17  A.  No, I did not.
18  Q.  So you never saw an officer use any
19  excessive force in your 40 years on the department,
20  right?
21  A.  I saw officers defend themselves from being
22  assaulted or battered --
23  Q.  Right, but...
24  A.  -- but I did not see any excessive force,
25  what I would term "excessive force."

Page 137

1   Q.   Again, defending yourself is not misconduct,
2   right?
3   A.   No, it's not.
4   Q.   Okay. So back to my question. In your 40
5   years on the force, you never saw anyone use
6   unreasonable or excessive force against a suspect,
7   an arrestee or any other civilian?
8      MR. BRUEGGEN: Objection, asked and
9   answered.
10      BY MS. BONJEAN:
11   Q.   Did not?
12   A.   Did not.
13   Q.   Never saw a police officer include a false
14   statement in a police report?
15   A.   Not that I was aware of.
16   Q.   Never discovered a police officer give
17   testimony at a grand jury or a pretrial hearing or
18   trial that was less than honest?
19      MR. BRUEGGEN: Object to form.
20      MR. RAHE: Objection, asked and
21   answered.
22      THE WITNESS: I wouldn't -- number one,
23   I wouldn't be in a grand jury with another
24   detective.
25   /////

Page 138

1      BY MS. BONJEAN:
2   Q.   Fair, but you might read transcripts later,
3   but you've never witnessed or become aware of an
4   officer who gave false testimony at any proceeding,
5   correct?
6   A.   Not knowingly, no.
7   Q.   In your 40 years on the department, you
8   never looked a blind eye -- never looked away from
9   some act of -- some act of misconduct, right?
10      MR. RAHE: Objection, form.
11      MR. BRUEGGEN: Objection, form.
12      MR. LEINENWEBER: Also asked and
13   answered.
14      THE WITNESS: Yeah, I did answer what I
15   did.
16      BY MS. BONJEAN:
17   Q.   Okay. Never saw a detective put together a
18   suggestive lineup?
19      MR. BRUEGGEN: Object to form.
20      THE WITNESS: I can't say that I
21   made -- knew it was suggestive when I -- when the
22   lineup took place. I mean, you went with the
23   available individuals that you had. Whether or not
24   it was suggestive is up to the person that's
25   actually viewing the lineup.

Page 139

1      BY MS. BONJEAN:
2   Q.   Well, not really. The law --
3   A.   You know, I mean, you did --
4   Q.   -- has something to say about it, right?
5   A.   Well, they do.
6      MR. BRUEGGEN: Object to form,
7   argumentative.
8      THE WITNESS: But you went to the best
9   extent that you could with the witness availability
10   being what they are. Whether the participants were
11   in a lockup or they were volunteers, you would try
12   to get as close as you possibly could.
13      BY MS. BONJEAN:
14   Q.   Right. And if the suspect was a white
15   person and you only had black people in the
16   lineup --
17   A.   You wouldn't do a lineup.
18   Q.   -- you did the best you can, right?
19   A.   You wouldn't do a lineup.
20   Q.   So back to my question, though. You
21   personally never observed any detective put
22   together a patently suggestive lineup?
23      MR. BRUEGGEN: Object to form, asked
24   and answered.
25      THE WITNESS: Not knowingly, no.

Page 140

1      BY MS. BONJEAN:
2   Q.   Okay. And you never -- have you ever seen a
3   detective signal to a witness who he or she should
4   identify from a lineup?
5   A.   No, I did not.
6   Q.   And in your 40 years, as a -- oh, she needs
7   you to --
8   A.   Oh, I'm sorry.
9   Q.   In your 40 years as an officer, did you ever
10   see another officer signal to a witness who he or
11   she should identify from a photo array?
12      MR. RAHE: Objection, form, asked and
13   answered.
14      THE WITNESS: No, I didn't.
15      BY MS. BONJEAN:
16   Q.   And did you ever see a police officer put
17   together a photo array where one person stuck out
18   like a sore thumb?
19      MR. BRUEGGEN: Object to form.
20      THE WITNESS: Not that I can recall,
21   no.
22      BY MS. BONJEAN:
23   Q.   Did you ever witness any police officer
24   offer benefits of any kind, anything of value, to
25   someone who was in your custody in exchange for an

Maysonet v.
Guevara

Video Deposition

Page 141

1  inculpatory statement?
2      MR. BRUEGGEN: Object to form, asked
3  and answered.
4      THE WITNESS: I think I answered that.
5      BY MS. BONJEAN:
6  Q.  You never witnessed that?
7  A.  Nothing other than what I said to you.
8  Q.  Right, which wouldn't be improper, right?
9  A.  Not to my knowledge.
10  Q.  Okay.  It wouldn't be improper to say "I'll
11  let the prosecutor know that you've cooperated,"
12  right?
13  A.  I would let the prosecutor know, as I said
14  before, that this witness has reservations because
15  they're afraid.
16  Q.  Right.  Okay.  Yeah, fair enough.  Again,
17  not improper.  I'm talking about offering, for
18  instance, that you'll drop one charge if he admits
19  to this other charge, something along those -- that
20  nature.
21      MR. BRUEGGEN: Object to form.
22      THE WITNESS: We had no authority to do
23  that.
24      BY MS. BONJEAN:
25  Q.  Right.  Just because you don't have the

Page 142

1  authority doesn't mean --
2  A.  Well, no.
3  Q.  -- theoretically somebody could do that,
4  right?
5  A.  It was not the way I operated, so...
6  Q.  I understand.
7  There's a lot of people out there who are in
8  prison who recount detectives doing any number of
9  things that were improper, right?
10      MR. RAHE: Objection, foundation.
11      MR. BRUEGGEN: Foundation.
12      THE WITNESS: From what I read in the
13  papers, there are, yes.
14      BY MS. BONJEAN:
15  Q.  Sure.  And I'm guessing in your career, you
16  were aware, at least, that people who are accused
17  of crimes have made allegations of -- that their
18  statements were coerced or were the product of
19  false promises, yes?
20      MR. BRUEGGEN: Object to form,
21  compound.
22      THE WITNESS: From what I've read, yes.
23      BY MS. BONJEAN:
24  Q.  Okay.  But you've never seen anything like
25  that ever happen in your 40 years of -- as a

Page 143

1  detective or a --
2  A.  Not that I -- not that I witnessed, no.
3      MR. BRUEGGEN: Object to form.
4      MR. RAHE: Asked and answered.
5      BY MS. BONJEAN:
6  Q.  And so -- well, strike that.
7  So you reviewed reports for content, right?
8  A.  Yes.
9  Q.  Okay.  And you didn't just rubber stamp
10  them, correct?
11  A.  Correct.
12  Q.  You wanted to make sure that they were
13  complete, correct?
14  A.  Correct.
15  Q.  Thorough as possible?
16  A.  Yes.
17  Q.  Made sense?
18  A.  Yes.
19  Q.  And if you had questions, what did you do?
20  A.  Asked the detective to help resolve them.
21  Q.  Did you have regular conversations with the
22  detectives under your command about their
23  investigations?
24      MR. BRUEGGEN: Object to form.
25      THE WITNESS: It would depend upon what

Page 144

1  type of investigations they were working on,
2  whether or not they had issues with the
3  investigation, where it was going, if they had any
4  questions about what they could do further to try
5  to solve the investigations, whatever other
6  resources that they thought I might know about that
7  they don't know about, they could inquire about,
8  you know; if I received inquiries from outside
9  places, the press, other bosses, other departments,
10  other units, as to where the investigation was, if
11  the other units could cooperate in any way to try
12  to help find somebody that they were looking for,
13  things of that nature.
14  Q.  And your duties as a sergeant also brought
15  you into the field at times, right?
16  A.  At times, yes.
17  Q.  Okay.  And were there sergeants who were
18  more hands-on than others?
19      MR. BRUEGGEN: Object to form,
20  foundation.
21      THE WITNESS: "Hands-on," you mean in
22  the field?
23      BY MS. BONJEAN:
24  Q.  Well, I mean, more actually got involved in
25  the investigations, like did the investigative work

Maysonet v.
Guevara

Video Deposition

Page 145

1  of an investigation.
2     MR. BRUEGGEN: Object to form.
3     THE WITNESS: I would not say
4  investigative work. I would say supervised
5  investigations. I would not necessarily say go out
6  and interview people.
7     MS. BONJEAN: Right.
8     THE WITNESS: I would say go out and,
9  you know, tell investigators where they think they
10  should go, if they weren't going into places they
11  believed they should go in, but not actually do
12  those investigations on their own.
13     BY MS. BONJEAN:
14  Q.  Right. You would agree Sergeant Mingey was
15  someone who got pretty deeply involved in
16  investigations, wouldn't you?
17     MR. BRUEGGEN: Object to form and
18  foundation.
19     THE WITNESS: Sergeant Mingey had a
20  great deal of information regarding the gangs,
21  especially in the 14th, 25th and even the south end
22  of the 17th district. I mean, he worked in gang
23  crimes for quite a long time, and a good part of
24  that unit was supposed to be gathering intelligence
25  on gangs, gang members, their activities and such.

Page 146

1     So he was one of the forefront
2  supervisors over there for a time.
3     BY MS. BONJEAN:
4  Q.  And because of his experience and knowledge
5  base, he often was actively involved in
6  investigations in particularly gang crimes, right?
7     MR. BRUEGGEN: Object to form and
8  foundation. Go ahead.
9     THE WITNESS: It was my understanding,
10  I mean, the areas that he had concentrated his
11  expertise on, he was able to provide intelligence
12  to the detectives that was working on the case, or
13  who were working on the case, as to what gangs were
14  in a particular area, what gangs may or may not be
15  feuding in a particular area, who leaders were in a
16  particular area, and he could guide the detectives
17  in those directions so that they would have
18  someplace to start the basis, because many times in
19  those investigations, you would have witnesses who
20  were extremely reluctant to talk to, and you may
21  get an information from somebody who calls on the
22  telephone, that, you know, somebody may have a full
23  name on when somebody only says Boo-Boo was out
24  there at the time and that's all they gave them.
25     Sergeant Mingey was very helpful in

Page 147

1  those ways, in saying that, you know, the Boo-Boo
2  that I knew from Cortland and Pulaski is this
3  guy --
4     MS. BONJEAN: Right.
5     THE WITNESS: -- you know, so it would
6  portion -- it would -- he was very helpful.
7     BY MS. BONJEAN:
8  Q.  I know he was helpful on intelligence and
9  I -- and I suspect he had a wealth of information
10  about the gangs.
11  My question is: Was he a sergeant who
12  actively investigated cases rather than just
13  directed detectives or gave his valuable
14  information to those detectives, but actually
15  actively investigated cases when he was a sergeant?
16     MR. BRUEGGEN: Objection, form,
17  foundation, and asked and answered.
18     THE WITNESS: I think I've answered
19  that as thoroughly as I know how because I wasn't
20  sitting there next to him. I don't know exactly
21  what went on in the street. I can tell you that he
22  provided that information and was very well revered
23  by the detectives that worked there because he gave
24  them starting points.
25  /////

Page 148

1     BY MS. BONJEAN:
2  Q.  Yeah, no, I'm sure he was highly respected.
3  That's not my question, and you really didn't
4  answer it. So either -- it's either a "yes"
5  answer, a "no" answer or "I don't know."
6     MR. BRUEGGEN: Objection,
7  argumentative, asked and answered.
8     THE WITNESS: Well, I think I've
9  answered it, I'm sorry.
10     BY MS. BONJEAN:
11  Q.  Okay. Did you -- did you observe him
12  interviewing witnesses, for example?
13  A.  Not that I recall, no.
14  Q.  Did you observe him interrogating suspects?
15  A.  Not that I recall, no.
16  Q.  And I'm talking about as a sergeant.
17  A.  No.
18  Q.  Okay. Did you see him conducting lineups?
19  A.  I saw him present at lineups. I never saw
20  him conducting lineups.
21  Q.  And was it the role of the supervisor to
22  actually participate in or conduct witness
23  interviews?
24     MR. BRUEGGEN: Object to form,
25  foundation, incomplete hypothetical.

Page 149

1    THE WITNESS: I don't think
2 necessarily. I think that Sergeant Mingey may have
3 been present during interviews. I don't think he
4 conducted them.
5    BY MS. BONJEAN:
6 Q. Were you sometimes present during
7 interviews?
8 A. Sometimes.
9 Q. And why would you be present during -- what
10 would make you want to participate in an interview?
11 A. If it was a major investigation.
12 Q. Okay. Let's see.
13    Would you agree that lineups, regardless of
14 the outcome of the lineup, should be memorialized
15 in a report?
16    MR. BRUEGGEN: Object to form.
17    MR. RAHE: Foundation.
18    THE WITNESS: I believe at one time it
19 wasn't considered necessary; another time it was.
20 I don't remember what the time frame is.
21    BY MS. BONJEAN:
22 Q. Okay. At some point -- well, in 1990
23 specifically, was it your understanding under the
24 policies of the department that a lineup should be
25 memorialized in a report irrespective of the

Page 150

1 outcome of the lineup?
2 A. I'd have to see the general order on lineup
3 procedures to accurately answer that.
4 Q. Okay. Well, do you have a recollection of
5 your time at Area 5 in and around 1990?
6 A. Not specifically, no.
7 Q. Okay. So it's your testimony that at some
8 point during your career as a supervisor --
9 A. No, not as a supervisor. As a detective
10 and/or supervisor.
11 Q. Okay. So at some point in your career as
12 either a detective or a supervisor, it was your
13 understanding that the department did not obligate
14 you to memorialize a lineup in every situation,
15 right?
16    MR. BRUEGGEN: Object to form. Go
17 ahead.
18    THE WITNESS: I think in my initial
19 days as a detective, if it was a negative lineup, I
20 don't think you needed a report.
21    BY MS. BONJEAN:
22 Q. Okay. What about if a filler was picked out
23 of the lineup, did you need to report that --
24    MR. BRUEGGEN: Object to --
25    /////

Page 151

1    BY MS. BONJEAN:
2 Q. -- in -- in your days as a detective?
3    MR. BRUEGGEN: Object to form.
4    MR. RAHE: Object to foundation.
5    MR. BRUEGGEN: Foundation.
6    THE WITNESS: I don't -- I don't -- I
7 can't answer that because if the person that was in
8 the lineup turned out to be the offender, obviously
9 you would do it.
10    BY MS. BONJEAN:
11 Q. You might not know that at the time?
12 A. You might not know that at the time. I don't
13 remember it ever happening to me when I was in
14 robbery, which we did a lot of lineups in robbery.
15 Q. Right.
16 A. But I don't remember that ever happening to
17 where it became an issue.
18 Q. Okay. Well, I'm not really asking about
19 whether it became an issue. I'm just really asking
20 about the practice --
21 A. Okay.
22 Q. -- and the policy at the time that you were
23 a detective. Do you know whether you were required
24 to prepare a report for a lineup if a filler was
25 chosen?

Page 152

1    MR. BRUEGGEN: Object to form,
2 foundation. Go ahead.
3    THE WITNESS: It never happened, so
4 I -- I can't accurately answer that. I mean, you
5 would certainly warrant further investigation, if
6 you had a filler that was identified in a lineup,
7 to see whether or not that was good, if it was good
8 information.
9    BY MS. BONJEAN:
10 Q. But you wouldn't have to report it on a
11 piece of paper?
12 A. Not if you eliminated him, no. I don't think
13 that at that time it was required that you
14 eliminated him.
15 Q. So -- and that practice, you would agree, is
16 a terrible practice now, right, in hindsight?
17    MR. RAHE: Objection.
18    MR. BRUEGGEN: Objection, form.
19    MR. RAHE: Foundation.
20    THE WITNESS: I guess in hindsight,
21 that's why they change things.
22    BY MS. BONJEAN:
23 Q. I mean, you would agree that sometimes
24 investigators or detectives could make mistakes,
25 right?

Page 153

1   A.  Everybody's human, yes, ma'am.
2   Q.  Right.  And while you may reach a conclusion
3   because your investigation led you down this road
4   and you think you are absolutely right and no need
5   to document that lineup, but it turns out maybe you
6   got it wrong and you haven't documented the lineup,
7   right, that would be a bad thing?
8       MR. BRUEGGEN: Object to form,
9   foundation.
10      THE WITNESS: Well, again, if we -- if
11  we go back to the original question you asked,
12  where if a filler was identified --
13      MS. BONJEAN: Yeah.
14      THE WITNESS: -- that would require
15  investigation, further investigation, to see where
16  that person was at the time of the occurrence or
17  whatever the offense was, and to see if he is a
18  viable suspect, and then go from there and try to
19  put a case together.  And in that case, you would
20  put him down as being identified in the lineup.
21      BY MS. BONJEAN:
22  Q.  Okay.  But it's -- but what you're saying
23  is, if he was -- if the filler was identified in a
24  lineup, it would -- what's the harm in just
25  reporting it, documenting it?

Page 154

1       MR. BRUEGGEN: Object to form,
2   argumentative.
3       THE WITNESS: I don't know that there
4   is any harm.  It just wasn't required.  That's all.
5       BY MS. BONJEAN:
6   Q.  And you said at some point, it's your
7   understanding, when you were a detective that you
8   didn't have to document negative lineups, right?
9   A.  Yes.
10  Q.  Okay.  We can agree that that is a bad
11  practice, right --
12      MR. BRUEGGEN: Objection, asked and
13  answered.
14      BY MS. BONJEAN:
15  Q.  -- or was a bad practice?
16      MR. BRUEGGEN: Same objection.
17      THE WITNESS: It's been changed, so...
18      MR. RAHE: Object to form and
19  foundation.
20      BY MS. BONJEAN:
21  Q.  So do you agree with it or not?
22      MR. BRUEGGEN: Object to form.
23      THE WITNESS: I agreed.  I have no
24  issue with it.
25  /////

Page 155

1       BY MS. BONJEAN:
2   Q.  I'm not asking if you have an issue with it.
3   As a --
4   A.  Well, I agree if it's something that has to
5   be done, you do it.
6   Q.  Not having to be done.  I'm asking you, as a
7   detective, someone who did this for his entire
8   life, that had a passion for it, apparently, at
9   some point, presumably part of that passion is
10  getting the right guys and not the wrong guys,
11  right?
12  A.  Uh-huh.
13  Q.  Do you go home feeling good at night if you
14  get the wrong guy, no, right?
15  A.  No.
16  Q.  That doesn't feel good, right?
17  A.  No, ma'am.
18  Q.  Doesn't help the victims, either, right?
19  A.  Correct.
20  Q.  So can we agree that not reporting negative
21  lineups could actually lead to injustices,
22  miscarriages of justice?
23      MR. BRUEGGEN: Object to form,
24  speculation, asked and answered.
25      THE WITNESS: We're not on the same

Page 156

1   page.  I -- I don't see any harm in doing it, and
2   if it's a negative lineup, you know, I -- you've
3   eliminated that person, that witness, for the most
4   part.
5       BY MS. BONJEAN:
6   Q.  You know people who have been eliminated at
7   lineups sometimes do get, not only accused, but
8   prosecuted and convicted?
9       MR. BRUEGGEN: Object to form,
10  foundation.
11      BY MS. BONJEAN:
12  Q.  That's happened, right?
13      MR. BRUEGGEN: Object to form,
14  foundation.
15      THE WITNESS: I'd have to see specific
16  examples.
17      BY MS. BONJEAN:
18  Q.  How about Jacques Rivera, do you know who
19  that is?
20  A.  No, ma'am.
21  Q.  He was someone wrongly convicted out of Area
22  5, your department.
23  A.  Okay.
24  Q.  By Detective Guevara.
25  A.  Okay.

Maysonet v.
Guevara

Video Deposition

Page 157

1    MR. BRUEGGEN: Object to form,
2  foundation.
3    BY MS. BONJEAN:
4  Q.  A federal jury just awarded him $17 million.
5  Are you aware of that?
6  A.  No.
7    MR. BRUEGGEN: Objection,
8  argumentative.
9    BY MS. BONJEAN:
10 Q.  Are you aware that the City of Chicago
11 acknowledged he was innocent?
12   MR. RAHE: Objection, form, foundation.
13   THE WITNESS: No, I wasn't.
14   BY MS. BONJEAN:
15 Q.  And are you aware that there was a negative
16 lineup that was not reported in that case?
17   MR. RAHE: Objection, form, foundation.
18   MR. BRUEGGEN: Objection, form,
19 foundation.
20   THE WITNESS: No, ma'am.
21   BY MS. BONJEAN:
22 Q.  Okay.  So my question is:  You can't at
23 least admit, as we sit here today, that the failure
24 to report negative lineups, the practice of not
25 reporting negative lineups, could lead to a

Page 158

1  miscarriage of justice?
2    MR. BRUEGGEN: Same objections, asked
3  and answered, form, foundation, argumentative,
4  asked and answered.
5    THE WITNESS: If what you're telling me
6  is truthful and if those instances happened as you
7  said them, then they should have been reported.
8    BY MS. BONJEAN:
9  Q.  But in your practice, you don't -- you
10 don't -- you don't have any personal reason to
11 believe that the failure to report negative lineups
12 is problematic.  You never saw any problem with
13 that, right?
14   MR. BRUEGGEN: Objection to form,
15 misstates his testimony.
16   THE WITNESS: Nothing came back during
17 my experience as a detective where there was a
18 negative lineup that turned out to be something
19 other than just a negative lineup, so...
20   MS. BONJEAN: Right.  Okay.
21   THE WITNESS: That was my experience.
22   BY MS. BONJEAN:
23 Q.  Because sometimes people spend two decades
24 in prison, when you retire, so it wouldn't come
25 back, you wouldn't know, right, unless you read the

Page 159

1  newspapers?
2    MR. BRUEGGEN: Object to form,
3  argumentative, asked --
4    BY MS. BONJEAN:
5  Q.  He doesn't -- that's fine.  You -- you can't
6  even go there.  You can't even admit that the
7  practice of not reporting a negative lineup was a
8  bad one?
9    MR. BRUEGGEN: Jennifer, there's no
10 reason to yell at him or lecture him.
11   MS. BONJEAN: I'm not yelling at him.
12   MR. BRUEGGEN: There's no reason to
13 lecture him.  He answered.
14   MS. BONJEAN: It's fine.  He doesn't
15 agree.
16   BY MS. BONJEAN:
17 Q.  Am I correct?  You cannot agree with me
18 that --
19 A.  I agree with whatever those people have, when
20 they change policies, they change it for a reason.
21 Obviously, those who have much more knowledge on the
22 law than I do felt that there was a need to change
23 policies.  I completely agree with it.  You change
24 policies.
25 Q.  You agree with the -- you agree with the

Page 160

1  concept of people changing policies --
2  A.  Right.
3  Q.  -- because -- in theory, but I'm saying in
4  practice, your own practice, your own experience,
5  you didn't see any problem with failing to report
6  negative lineups, right?
7    MR. BRUEGGEN: Objection, form,
8  misstates his testimony, argumentative, asked and
9  answered.
10   THE WITNESS: At the time I didn't see
11 any reason for it.  You pointed out examples where
12 there is reason for it, and the department changed
13 its policies.
14   BY MS. BONJEAN:
15 Q.  Okay.  But you're not aware personally of
16 any reason why you would do it?  Personally.  I'm
17 saying your experience.
18 A.  I did not have --
19   MR. BRUEGGEN: Objection,
20 argumentative, harassing, asked and answered.
21   THE WITNESS: I did not have that
22 experience.  I'm sorry.
23   BY MS. BONJEAN:
24 Q.  Okay.  I mean, there could be a fascist
25 government that comes in someplace and starts

Maysonet v.
Guevara

Video Deposition

Page 161

1  changing policy, too.  It doesn't necessarily make
2  it for the better, right?
3      MR. BRUEGGEN: Objection,
4  argumentative, harassing, and --
5      THE WITNESS: I guess that depends on
6  your politics.  I don't know.
7      BY MS. BONJEAN:
8  Q.  Right.  I'm not even talking about here.
9  I'm talking anywhere in the world.
10 A.  So...
11 Q.  I mean, you -- it sounds to me like what
12 you're telling me is, hey, if the people up above
13 say it's better, then it's better.
14 A.  Well, I don't consider --
15     MR. BRUEGGEN: Objection.  It's not a
16 question.
17     THE WITNESS: -- myself to be the
18 smartest person, you know.
19     BY MS. BONJEAN:
20 Q.  It's not a matter of being smart.  It's a
21 matter of just your own experience as a detective,
22 and I -- I think the record's clear, or not.
23 But in 1990, what was -- what was -- what
24 was the policy at the time?  You don't -- you said
25 you don't remember.  Is that right?

Page 162

1  A.  I'd have to see that order.
2  Q.  Okay.  So to the best of your recollection,
3  whatever the order says, to the best of your
4  recollection, was it the practice of the detectives
5  under your supervision in 1990 to memorialize all
6  lineups?
7      MR. BRUEGGEN: Object to foundation,
8  asked and answered.
9      THE WITNESS: Again, I know that that
10 order changed.  It even required a supervisor to be
11 present during the lineup, but I don't remember the
12 year that it happened.
13     BY MS. BONJEAN:
14 Q.  Okay.  So you can't tell us whether or not
15 in 1990 a detective was obligated to report a
16 lineup or memorialize a lineup regardless of the
17 outcome?
18     MR. BRUEGGEN: Object to form,
19 misstates his testimony.
20     THE WITNESS: Not without reviewing
21 that order, lineup procedures.
22     BY MS. BONJEAN:
23 Q.  Okay.  All right.  GPRs, 1990, they were
24 used, right?
25 A.  Yes.

Page 163

1  Q.  Okay.  What's the purpose of a GPR?  Or
2  strike that.
3  In 1990, what was the purpose of a GPR?
4      MR. BRUEGGEN: Object to form.
5      THE WITNESS: To write out notes of
6  investigations as they were going on.
7      BY MS. BONJEAN:
8  Q.  And why was it important to write up notes
9  of an investigation as it was going on?
10 A.  Accuracy, timeliness.
11 Q.  And how were officers trained to use GPRs
12 under your command, the detectives?
13 A.  They were trained --
14     MR. BRUEGGEN: Object to form,
15 foundation.
16     THE WITNESS: -- at the training
17 division, I believe.
18     BY MS. BONJEAN:
19 Q.  Okay.  And -- but were GP -- GPRs had to be
20 approved, right, also, right?
21 A.  They were initialed, I think.
22 Q.  By a supervisor?
23 A.  Yes.
24 Q.  And you had the occasion to approve GPRs
25 from time to time?

Page 164

1  A.  I'm sure I did.
2      MR. BRUEGGEN: Object to form.
3      BY MS. BONJEAN:
4  Q.  And what would you review a GPR for?
5  A.  Just that it was submitted, you know.
6  Q.  You didn't read it for content?
7  A.  If I could.  You know, sometimes they were
8  just scribbled.
9  Q.  Okay.  And what happened to the GPRs after
10 they were submitted for approvals?
11     MR. RAHE: Objection to foundation.
12     THE WITNESS: They would put -- be put
13 into the investigative file.
14     BY MS. BONJEAN:
15 Q.  The file that was kept on the second floor
16 at Area 2, while it was open, and then --
17 A.  Area 5.
18 Q.  I'm sorry, Area 5?
19 A.  Yes.
20 Q.  Did detectives at Area 5, in 1990, also do
21 handwritten notes like on memo pads or was -- did
22 the general progress report completely replace that
23 practice?
24 A.  It was --
25     MR. RAHE: Objection to foundation.

Maysonet v.
Guevara

Video Deposition

Page 165

1	MR. BRUEGGEN: Objection.
2	THE WITNESS: It completely replaced
3	it; however, if they were in the field and they ran
4	out of general progress reports, they would use
5	regular typewritten paper.
6	BY MS. BONJEAN:
7	Q.	All right.  Apart from some circumstance
8	like that, the practice, the general practice, was
9	that if you were taking handwritten notes during an
10	investigation, they should go on a GPR, right?
11	A.	Correct.
12	Q.	And --
13	A.	Unless, as we covered earlier, I believe, if
14	you were sitting down in an interview like this and
15	it was nothing that was very intricate, you could go
16	down and do a supplemental report right away and,
17	therefore, not need a GPR, but if you took a GPR, it
18	belonged in that file.
19	Q.	Right.  What was the policy or practice
20	about how long an officer or detective should wait
21	before memorializing an interview --
22	MR. BRUEGGEN: Object to form.
23	BY MS. BONJEAN:
24	Q.	-- in any form?
25	MR. BRUEGGEN: Object to form.

Page 166

1	MR. RAHE: Asked and answered.
2	THE WITNESS: As soon as possible.
3	BY MS. BONJEAN:
4	Q.	Okay.  It wasn't asked and answered because
5	I'm talking specifically about 1990 right now.
6	So the practice was, in 1990, that a
7	detective should memorialize the substance of an
8	interview, whether it be on a GPR or directly into
9	a supplemental report, as soon as possible,
10	correct?
11	A.	Correct.
12	Q.	And why is that?
13	A.	Accuracy.
14	MR. BRUEGGEN: Object to form,
15	foundation.
16	BY MS. BONJEAN:
17	Q.	Accuracy?
18	A.	Yes, ma'am.
19	Q.	Because your memory could fade over the
20	course of time?
21	A.	Depending --
22	MR. BRUEGGEN: Same objections.
23	THE WITNESS: Depending upon the
24	intricacy and the length of that interview, to make
25	sure that it was accurate, you should record it as

Page 167

1	soon as you could.
2	BY MS. BONJEAN:
3	Q.	Okay.  And would you agree that you would
4	want to record an interview with a suspect as soon
5	as possible as well?
6	MR. BRUEGGEN: Object to form.
7	THE WITNESS: Are we talking about on a
8	GPR or...
9	BY MS. BONJEAN:
10	Q.	Anywhere, as long -- anywhere.
11	A.	As soon as you're done with him as far as
12	your interview is concerned, as soon as possible,
13	yes.
14	Q.	You would want to record it, right?
15	A.	Yes, ma'am.
16	Q.	And not just for accuracy, but also to
17	corroborate that the statements were made, right?
18	MR. BRUEGGEN: Object to form.
19	THE WITNESS: To corroborate?
20	BY MS. BONJEAN:
21	Q.	That the statements were made.
22	A.	Sure.
23	Q.	I mean, have you ever heard of a situation
24	where a suspect says something and then denies that
25	he said it?

Page 168

1	A.	Oh, yes.
2	Q.	It happens all the time, right?
3	A.	Sure.
4	Q.	And one way that an officer can ensure that
5	their testimony or their later testimony saying
6	that the suspect made that statement is to be able
7	to point to a report saying he made the statement,
8	I made a report right there and then or within 24
9	hours, right?
10	MR. BRUEGGEN: Object to form.
11	THE WITNESS: Yes.
12	BY MS. BONJEAN:
13	Q.	But there was no, again, no hard time period
14	in which a detective was expected to memorialize
15	the substance of an interview with a suspect?
16	MR. BRUEGGEN: Object to form.  Go
17	ahead.
18	THE WITNESS: I'd have to go back to
19	the directive and refresh my memory as to if there
20	was a designated time frame, but I think detectives
21	just did that out of practice.
22	BY MS. BONJEAN:
23	Q.	Okay.  But you're saying that the department
24	didn't have a policy.  You could wait five months
25	if you wanted to?

Maysonet v.
Guevara

Video Deposition

Page 169

1 A. I don't know --
2    MR. BRUEGGEN: Objection to form,
3 foundation, misstates his testimony.
4    THE WITNESS: -- if they had a policy.
5 I'd have to look at that order that was in force at
6 that time to make sure I was answering you
7 accurately.
8    BY MS. BONJEAN:
9 Q. Okay. But could we agree that it would be
10 inappropriate to wait three months, for instance,
11 to record a statement of a suspect?
12    MR. BRUEGGEN: Object to form,
13 incomplete hypothetical.
14    THE WITNESS: It would not be optimal
15 for sure.
16    BY MS. BONJEAN:
17 Q. If you were a supervisor and you had a
18 detective come to you with a report, and it said
19 this guy confessed to being the Brown's Chicken
20 murderer, and the report is prepared, you know,
21 three months after he confessed, wouldn't -- as a
22 supervisor, wouldn't you find that suspicious?
23 A. Are we talking about the clearing report or
24 about GPRs?
25 Q. If the first -- if the first time you

Page 170

1 received a piece of paper memorializing a
2 confession is three months after that confession,
3 wouldn't you find that suspicious?
4    MR. BRUEGGEN: Object to form.
5    MR. RAHE: Object to foundation.
6    THE WITNESS: It would depend upon
7 if -- if he's just creating it three months after?
8    BY MS. BONJEAN:
9 Q. Yes.
10 A. Yeah, that would be a problem, yes.
11 Q. That would be a problem, right?
12 A. Yeah.
13 Q. I mean, if there was no GPR or no --
14 A. Correct, it would be a problem.
15 Q. And I'm -- and I've used the word
16 "contemporaneous writing," but a writing that was
17 made within a short period of time or a reasonable
18 amount of time from when the statement was made,
19 that would be a problem, right?
20    MR. RAHE: Objection, form, incomplete
21 hypothetical.
22    THE WITNESS: Repeat that question,
23 please.
24    BY MS. BONJEAN:
25 Q. Yeah. You would want to see a writing that

Page 171

1 memorialized an inculpatory statement within a
2 reasonable amount of time from when that
3 inculpatory statement was made, right?
4 A. Yes.
5    MR. RAHE: Same objections.
6    BY MS. BONJEAN:
7 Q. Okay. When you were a supervisor at Area 5,
8 did you assign detectives to cases?
9 A. Sex cases.
10 Q. Assign detectives to cases.
11 A. Yes.
12 Q. Okay. And how did detectives get assigned
13 to cases as a general proposition?
14 A. It depended upon what detectives were
15 working, what kind of case came in and who was
16 available to do those cases.
17 Q. Okay. Could detectives assign themselves to
18 cases?
19 A. Not generally, no.
20 Q. Did sometimes they pitch in and say I'll
21 take a crack at this suspect and interview him or
22 her? Was that acceptable?
23    MR. BRUEGGEN: Object to form.
24    THE WITNESS: I don't know about
25 acceptable. It wasn't generally done, no.

Page 172

1    BY MS. BONJEAN:
2 Q. Detective Guevara did it from time to time,
3 right?
4    MR. BRUEGGEN: Object to form,
5 foundation.
6    THE WITNESS: I don't know.
7    BY MS. BONJEAN:
8 Q. I mean, you were a supervisor there. You're
9 not aware of him doing that?
10    MR. LEINENWEBER: Same objections.
11    THE WITNESS: Where he just jumped in?
12    MS. BONJEAN: Yeah.
13    THE WITNESS: Not unless somebody asked
14 him to. I don't remember Rey just jumping into a
15 room and going in there without somebody asking for
16 his assistance.
17    BY MS. BONJEAN:
18 Q. Well, my question is: Can anybody ask for
19 his assistance or did he have to be assigned by a
20 supervisor?
21    MR. BRUEGGEN: Objection, form,
22 misstates the previous question.
23    THE WITNESS: I -- it would depend. If
24 they were using Rey for an interpreter and I had no
25 other reason --

Page 173

1    MS. BONJEAN: Okay.
2    THE WITNESS: -- not to want him in
3  there.
4    MS. BONJEAN: Sure.
5    THE WITNESS: -- he could go in there.
6    BY MS. BONJEAN:
7  Q.  Putting aside the interpreter business.  I'm
8  talking about Rey is really good at getting
9  statements, let's call him in.
10    MR. BRUEGGEN: Object to form.
11    MR. LEINENWEBER: Objection, form and
12  hypothetical.
13    MR. BRUEGGEN: There's no question
14  there.
15    THE WITNESS: I think if they were
16  going to ask Rey to come into it, it would be
17  because he had some expertise in the gang area that
18  they were working on.
19    BY MS. BONJEAN:
20  Q.  So they could.  That's the answer to your
21  question.  It was -- it was --
22  A.  They could or they would -- they would tell
23  me that they were going to do it, and if I had any
24  objection to it, I would object.  I don't remember
25  ever objecting to Rey going in to assist another

Page 174

1  detective because of his expertise with gangs.
2  Q.  Okay.  But it was something that could be
3  done, it wasn't prohibited?
4  A.  Correct.
5  Q.  Were you responsible for giving performance
6  evaluations to your detectives?
7    MR. BRUEGGEN: Object to form.
8    THE WITNESS: Yes, I believe I was.
9    BY MS. BONJEAN:
10  Q.  And what was involved in doing that?
11  A.  There were these little cards.  I think they
12  were, I don't know, three or four inches by seven
13  inches or so, and there were different
14  classifications on them.  You didn't get to pick out
15  who you evaluated.  It was done by the unit
16  commanding officer.
17  Q.  And when -- I lost my train of thought.
18    MS. BONJEAN: Can you go back up there?
19    MR. RAHE: Performance evaluations.
20    MS. BONJEAN: Performance.
21    MR. BRUEGGEN: Kind of cheating there.
22    MS. BONJEAN: I just couldn't remember.
23    Little cards, got it.
24    BY MS. BONJEAN:
25  Q.  What were you reviewing detectives for in

Page 175

1  substance?
2    MR. BRUEGGEN: Object to form.
3    THE WITNESS: Their activities,
4  knowledge of their job.
5    I think there were five categories.  I
6  don't remember all those categories now.
7    BY MS. BONJEAN:
8  Q.  Did you have an occasion to review Rey
9  Guevara in a performance evaluation?
10  A.  I don't remember.
11  Q.  Okay.  Do you ever remember giving a
12  negative performance evaluation to Detective
13  Guevara?
14    MR. BRUEGGEN: Object to foundation.
15    MR. LEINENWEBER: Same.
16    THE WITNESS: I don't remember.
17    BY MS. BONJEAN:
18  Q.  Do you remember giving negative performance
19  evaluations to any detective that you ever
20  supervised in your career?
21    MR. BRUEGGEN: Object to form,
22  foundation.
23    THE WITNESS: I remember giving some
24  less-than-good evaluations, yes.
25  /////

Page 176

1    BY MS. BONJEAN:
2  Q.  Okay.  What did you do with the performance
3  evaluations?  Did you have to send them downtown?
4  A.  I didn't.  We completed whatever amount we
5  got, and we turned them in to the sergeant -- or the
6  lieutenant, who ultimately approved them, and he'd
7  send them on to the commander.
8  Q.  And do you know --
9  A.  And then --
10  Q.  Go ahead.
11  A.  And then they would go downtown, I guess.
12  Q.  That's where they ended up to the best of
13  your knowledge?
14  A.  To the best --
15    MR. BRUEGGEN: Objection, foundation.
16    THE WITNESS: To the best of my
17  knowledge, yes.
18    BY MS. BONJEAN:
19  Q.  Do you remember giving a negative
20  performance evaluation to any of the defendants in
21  this case?
22  A.  I don't.
23  Q.  And do you remember giving any performance
24  evaluations to any of the defendants in this case?
25  A.  Not specifically, no.

Maysonet v.
Guevara

Video Deposition

Page 177

1 Q. You worked with Rey Guevara for a period of
2 time?
3 MR. BRUEGGEN: Object to form.
4 THE WITNESS: He was on the same watch
5 I was on.
6 BY MS. BONJEAN:
7 Q. For what period of time?
8 A. Oh, gosh.
9 Whenever he got there to the unit, I was there. I
10 got there in '81 and Rey wasn't there. So whenever
11 he got there, until I left in '97, he was still
12 there when I left in 1997, so...
13 Q. So if he got there in the late '80s, and you
14 left in '97, during that entire period of time you
15 would have been one of his sergeants, is that
16 right?
17 A. If I was on his watch, yes.
18 Q. Okay. And during your, whatever it would
19 be, six, seven, eight years that you supervised
20 Detective Guevara, did you ever have concerns about
21 his performance as a detective?
22 MR. BRUEGGEN: Object to the form.
23 THE WITNESS: No, not that I can tell
24 you about.
25 /////

Page 178

1 BY MS. BONJEAN:
2 Q. Not --
3 A. No.
4 Q. Never saw any red flags about how he
5 conducted his investigations?
6 A. No, ma'am.
7 MR. LEINENWEBER: Objection to form.
8 BY MS. BONJEAN:
9 Q. Never saw any investigative conduct that you
10 thought was either problematic or failed to comport
11 with the policies of the department?
12 MR. BRUEGGEN: Object to form.
13 MR. LEINENWEBER: Same.
14 MR. BRUEGGEN: Compound.
15 THE WITNESS: No, ma'am.
16 BY MS. BONJEAN:
17 Q. If you had to grade him as a detective, what
18 letter grade would you give him?
19 MR. LEINENWEBER: Objection.
20 MR. BRUEGGEN: Object to form,
21 speculation.
22 MR. LEINENWEBER: Same.
23 MR. BRUEGGEN: Foundation.
24 MR. LEINENWEBER: Same.
25 THE WITNESS: Letter grade?

Page 179

1 MS. BONJEAN: Yeah.
2 THE WITNESS: Probably a B.
3 BY MS. BONJEAN:
4 Q. So a B is good. Above average, right?
5 A. Uh-huh.
6 Q. And an A is excellent, right?
7 A. Uh-huh.
8 Q. So I'm assuming there -- you would agree
9 that Guevara had strengths and weaknesses as a
10 detective?
11 A. Yes.
12 Q. Okay. So tell me what strengths you saw in
13 Detective Guevara.
14 MR. BRUEGGEN: Object to foundation.
15 THE WITNESS: In his field of expertise
16 that they were using him at, his intelligence
17 level, as far as knowledge of gangs, gangs dealing
18 with drugs and drug-related homicides, gang-related
19 homicides, people who resided in geographic areas
20 that he was familiar with from his experience in
21 gang crime, he was outstanding with that, as was
22 Sergeant Mingey.
23 If I had to say that he had a negative,
24 sometimes his report writing wasn't as flowable as
25 it could have been, so that was an issue that -- I

Page 180

1 wouldn't say struggled with. It's just that he
2 wasn't as good as other detectives.
3 BY MS. BONJEAN:
4 Q. And that's why you put him with Detective
5 Halvorsen, right?
6 A. One of the reasons.
7 MR. BRUEGGEN: Object to form,
8 foundation.
9 BY MS. BONJEAN:
10 Q. I mean, Detective Halvorsen was considered a
11 good report writer, right?
12 A. Yes.
13 Q. You would consider him a good report writer,
14 correct?
15 A. Yes, ma'am.
16 Q. What about Ernie Halvorsen, where would you
17 put him -- what grade would you give him?
18 MR. BRUEGGEN: Object to form,
19 foundation, speculation.
20 THE WITNESS: He was at an A level.
21 BY MS. BONJEAN:
22 Q. Never saw any problematic tactics used by
23 him in the course of his investigations?
24 MR. BRUEGGEN: Object to form.
25 THE WITNESS: No, I did not.

Page 181

1    BY MS. BONJEAN:
2 Q.  Never saw either one of those gentlemen
3  mistreat a person in custody?
4    MR. BRUEGGEN: Object to form.
5    MR. LEINENWEBER: Same.
6    THE WITNESS: No, ma'am.
7    BY MS. BONJEAN:
8 Q.  What about Montilla?
9 A.  I didn't work with Freddie that much.
10 Q.  Okay.  Did you ever supervise Mingey or were
11  you just both supervisors at the same time?
12 A.  We were equal.  He was actually senior to me
13  as a sergeant.
14 Q.  I see.  Okay.  All right.  I may come back
15  to some of that, but at the moment, let's move on.
16  You said you reviewed police reports in
17  connection with the Wiley brothers' murders in
18  preparation for this deposition here today.  Is
19  that correct?
20 A.  Yes.
21 Q.  Do you have an independent recollection of
22  the shootings that resulted in the deaths of
23  Torrence and Kevin Wiley?
24 A.  No, ma'am.
25 Q.  After reviewing the police reports connected

Page 182

1  to that investigation, was your memory refreshed
2  regarding the deaths of Torrence and Kevin Wiley?
3 A.  Somewhat.
4 Q.  Okay.  Tell me what you remember about the
5  crime itself.
6 A.  Well, from reviewing those reports, that they
7  were both over at a sister's house, I believe, and
8  left that house about 11:00 at night and wound up
9  being shot on the street around North Avenue and
10  St. Louis, 1:00 in the morning, two hours later.
11 Q.  And would you agree in 1990 was a kind of
12  violent crime in the -- violent time in the city?
13    MR. BRUEGGEN: Object to form.
14    THE WITNESS: Especially in Area 5,
15 yes, ma'am.
16    BY MS. BONJEAN:
17 Q.  Okay.  There was a lot of gang crime going
18  on in 1990, right?
19 A.  Correct.
20 Q.  A lot of homicides as a result of gang crime
21  in 1990, correct?
22 A.  Correct.
23 Q.  And presumably there was also other types of
24  crimes going on related to gang activity in 1990 in
25  Area 5, right?

Page 183

1    MR. BRUEGGEN: Object to form.
2    THE WITNESS: Correct.
3    BY MS. BONJEAN:
4 Q.  Drug -- drug crime, correct?
5 A.  Correct.
6 Q.  And when there's drugs, there's also going
7  to be burglaries and robberies and that type of
8  crime as well, correct?
9    MR. BRUEGGEN: Object to form.
10    THE WITNESS: Correct.
11    BY MS. BONJEAN:
12 Q.  Were there a lot of shootings during that
13  time, in 1990, in Area 5?
14 A.  To my recollection, yes.
15 Q.  Okay.  And as a sergeant, I'm assuming that
16  you kept up with the crime data for whatever area
17  that you were supervising.  Right?
18    MR. BRUEGGEN: Object to form,
19  foundation.
20    THE WITNESS: By "data," you mean?
21    BY MS. BONJEAN:
22 Q.  Crime rates.  You kind of were -- you were
23  familiar with the crime rates of your district or
24  your area, right?
25 A.  Yes.

Page 184

1 Q.  Okay.  I would imagine that part of your
2  performance as a supervisor and then even higher
3  ranking officers, at least there was some fact that
4  your -- your superiors factored in, you know, your
5  ability to solve crimes, right?
6    MR. BRUEGGEN: Object to foundation.
7    MR. RAHE: Form.
8    THE WITNESS: Well, that -- the ability
9  to solve crimes was an issue for sure.  I mean,
10  that was one of the things you were rated on, your
11  ability to do so, but I believe during that time,
12  they also took into the amount of resources that
13  you had to deal with those crimes.
14    BY MS. BONJEAN:
15 Q.  Sure, but closing cases was important,
16  correct?
17    MR. BRUEGGEN: Object to form.
18    THE WITNESS: Successfully closing
19  cases is always important, yes.
20    BY MS. BONJEAN:
21 Q.  Well, how would you know whether you
22  successfully closed a case in the long run?
23    MR. BRUEGGEN: Object to form.
24    BY MS. BONJEAN:
25 Q.  What does it mean to successfully close a

Maysonet v.
Guevara

Video Deposition

Page 185

1  case?
2      MR. BRUEGGEN: Object to form.
3      THE WITNESS: Meaning you arrest an
4  offender --
5      MS. BONJEAN: Right.
6      THE WITNESS: -- and have him charged,
7  or you find out that the victim wasn't telling the
8  truth and you get rid of the case that way.
9      And I'm not talking exclusively of
10 homicides. I'm talking about all cases.
11     BY MS. BONJEAN:
12 Q.  Okay. There was pressure to close cases,
13 though, right?
14     MR. BRUEGGEN: Object to form.
15     MR. RAHE: Foundation.
16     THE WITNESS: I wouldn't call it
17 pressure. I think that probably the powers to be
18 were interested in more cases, especially those
19 that were related to press coverage. They asked
20 for updates, you know, more often.
21     BY MS. BONJEAN:
22 Q.  It was a goal to close cases?
23 A.  It was always a goal, certainly.
24 Q.  And there were rewards for closing cases,
25 right?

Page 186

1      MR. BRUEGGEN: Object to form.
2      THE WITNESS: Rewards?
3      BY MS. BONJEAN:
4  Q.  Yeah. Accolades?
5  A.  Well, there were --
6      MR. BRUEGGEN: Object to form.
7      THE WITNESS: -- department awards,
8  yes.
9      BY MS. BONJEAN:
10 Q.  What's that?
11 A.  There were department awards, honorable
12 mentions, department commendations, things of that
13 nature, sure.
14 Q.  Nobody got a reward for failing to close a
15 case, right?
16 A.  Not that I'm aware of, no.
17 Q.  And did you as a supervisor get
18 notifications about how many cases were closed in
19 your area once a year or twice a year?
20     MR. BRUEGGEN: Object to form.
21     THE WITNESS: I'm sure we did.
22     BY MS. BONJEAN:
23 Q.  Having open murder investigations was not
24 desirable, correct?
25 A.  Not optimally, no.

Page 187

1  Q.  And were -- did you or the department
2  track -- track the numbers of cases that detectives
3  closed?
4  A.  I'm sure they did.
5  Q.  I mean, even informally, were you aware of
6  detectives who closed more cases than others?
7      MR. RAHE: Object to foundation.
8      THE WITNESS: Not specifically. I
9  don't recall specifically at that time.
10     BY MS. BONJEAN:
11 Q.  Well, I mean, there had to be detectives who
12 were deemed better at closing cases than others,
13 no?
14     MR. BRUEGGEN: Object to form.
15     THE WITNESS: There were detectives
16 that were better at closing cases. I don't know if you
17 could say closing cases.
18     BY MS. BONJEAN:
19 Q.  Well, part of closing -- part of closing a
20 case requires doing work, right?
21 A.  Yes, ma'am.
22 Q.  So there might be lazy detectives, and if
23 they didn't -- if they were lazy and didn't do
24 work, they probably weren't going to close many
25 cases, right?

Page 188

1  A.  They wouldn't probably be working homicides
2  if they were lazy.
3  Q.  Okay. But would you say that Detective
4  Guevara was a detective who had a reputation for
5  closing cases?
6      MR. BRUEGGEN: Object to form.
7      MR. LEINENWEBER: Same objection.
8      MR. RAHE: Object to foundation.
9      MR. BRUEGGEN: Are we still in 1990?
10     MS. BONJEAN: Yes.
11     MR. BRUEGGEN: Okay.
12     MS. BONJEAN: And after.
13     THE WITNESS: I think he was considered
14 to be a good detective, who closed cases, yes.
15     BY MS. BONJEAN:
16 Q.  And do you still hold that view --
17     MR. LEINENWEBER: Same objection.
18     MR. BRUEGGEN: Object to form.
19     BY MS. BONJEAN:
20 Q.  -- as you sit here today?
21 A.  Well, from what I'm reading, that his cases
22 have some under suspicion, but I had no inclination
23 of that at the time that they were being
24 investigated.
25 Q.  Right. You're aware that since 2017 there's

Maysonet v.
Guevara

Video Deposition

Page 189

1  been a dozen murder convictions vacated that were
2  investigated by Detective Guevara?
3      MR. BRUEGGEN: Objection, foundation.
4      MR. LEINENWEBER: Same objection.
5      THE WITNESS: I don't know the number.
6  I've read that in the press. I saw Mr. Greenberg's
7  press conference going back. I don't remember
8  which case that would involve, but I remember him
9  saying --
10      MR. BRUEGGEN: Maybe he'll be here
11  before we finish.
12      BY MS. BONJEAN:
13  Q. Right, but -- and you're aware that the
14  scrutiny is largely on Detective Guevara, right?
15  A. Yes.
16  Q. You don't think there's a wide range in
17  conspiracy just to target Detective Guevara, do
18  you?
19      MR. BRUEGGEN: Object to form.
20      MR. LEINENWEBER: Same objection.
21      THE WITNESS: I don't know. I don't
22  know.
23      BY MS. BONJEAN:
24  Q. Possible?
25      MR. BRUEGGEN: Object to form.

Page 190

1      MR. LEINENWEBER: Same objection. Also
2  asked and answered.
3      THE WITNESS: I don't know.
4      BY MS. BONJEAN:
5  Q. But it's possible?
6      MR. LEINENWEBER: Same objection and
7  also asked and answered.
8      THE WITNESS: It's also possible
9  there's a conspiracy on the other end.
10      BY MS. BONJEAN:
11  Q. What's the other end?
12  A. People in prison got nothing else to do but
13  figure out how to make money and get out.
14  Q. Right. Right. And just -- but they only
15  want to -- they just want to go after -- that's
16  what I'm saying. You think that's possible, that
17  all these people, they just want Guevara,
18  because -- did Detective Guevara put every man in
19  prison, that's in prison right now?
20      MR. BRUEGGEN: Object to form.
21      MR. LEINENWEBER: Same objection.
22      MR. RAHE: And foundation.
23      THE WITNESS: No.
24      BY MS. BONJEAN:
25  Q. No. There were a lot of detectives in the

Page 191

1  City of Chicago that closed homicide investigations
2  since 1990, right?
3  A. Sure.
4  Q. Okay. And it's your thought that for some
5  reason it's just those guys that were convicted as
6  a result of investigations conducted by Guevara
7  that got together and they decided it was going to
8  be Guevara, right?
9      MR. BRUEGGEN: Object to form,
10  misstates his testimony.
11      MR. LEINENWEBER: Same objection.
12      THE WITNESS: No.
13      BY MS. BONJEAN:
14  Q. That's possible?
15  A. Are you asking me to give you another reason,
16  you know.
17  Q. No, I'm not asking you to give me another
18  reason, but why Detective Guevara? I mean, why do
19  you think Detective Guevara's convictions are all
20  under scrutiny and have been vacated?
21      MR. BRUEGGEN: Object to form,
22  foundation, speculation. Go ahead.
23      MR. LEINENWEBER: Same objections.
24      THE WITNESS: Because the Court has
25  agreed that they should be reviewed.

Page 192

1      BY MS. BONJEAN:
2  Q. Okay. And does -- I mean, what I'm saying
3  is the Court -- the Court doesn't -- you know, the
4  Court hasn't agreed that, for instance, all of -- I
5  don't know. Let's see. All of Detective -- let's
6  get a different name on here -- all of Detective
7  Dickinson's cases should be -- although maybe they
8  should, but all of Detective Dickinson's cases
9  should be reviewed and -- right?
10      MR. BRUEGGEN: Object to form.
11      MR. RAHE: Foundation.
12      MR. LEINENWEBER: Same objections.
13      MR. BRENER: Join.
14      THE WITNESS: Well, my only answer to
15  that can be that Detective Guevara's cases were
16  more or less confined to the geographical knowledge
17  that he had of the gangs in that area, and that's
18  what he concentrated on and those are the people
19  that he put in jail.
20      I mean, that's about as good an answer
21  as I can give you.
22      BY MS. BONJEAN:
23  Q. Okay. So you think it's possible that these
24  guys have the ability in prison to communicate and
25  just all get together and -- and you -- you think

Maysonet v.
Guevara

Video Deposition

Page 193

1 that's possible, right?
2     MR. BRUEGGEN: Object to form.
3     MR. RAHE: Asked and answered.
4     THE WITNESS: I think that the people
5 in gangs are much smarter than we give them credit
6 for.
7     BY MS. BONJEAN:
8 Q. Okay. And -- I'm not going to even go
9 there. Let's move on.
10 It would be hard to admit you got it that
11 wrong that often, right?
12     MR. BRUEGGEN: Object to form,
13 argumentative, foundation.
14     BY MS. BONJEAN:
15 Q. Okay. So you recall after looking at the
16 reports that there were two African-American men
17 who were shot on North Avenue, right?
18 A. Correct.
19 Q. Okay. Do you remember being involved in
20 supervising this investigation at any point?
21 A. No, ma'am.
22 Q. Have you looked at any of the reports that
23 you signed off on?
24 A. Yes, ma'am.
25 Q. Okay. And -- one second. I'm going to --

Page 194

1 I'm going to have you look at what was marked
2 yesterday as Exhibit 3 and have you please thumb
3 through that, if you would, as a starting point.
4 I really am not looking for you to read for
5 substance. If you want to, go ahead. I'll give
6 you the opportunity to if there's a particular
7 question.
8 A. Well, as long as I can go to refer back to
9 it.
10 Q. Yeah. I'll -- if you -- I mean, if you need
11 to refer and -- we'll go there, but I wanted you
12 just to sort of thumb through that and tell me if,
13 A, if any of that is familiar to you.
14 A. Well, it became familiar to me in the last
15 couple months, because it's been almost 30 years,
16 but...
17 Q. Sure. Did you look at these documents prior
18 to your deposition here today, in preparation for
19 your deposition here today?
20 A. Yes. Yes.
21 Q. Okay. So are these the police reports you
22 were looking at?
23 A. They appear to be, yes.
24 Q. Okay. You can keep thumbing through, but
25 I'm going to ask as you do, tell me if this appears

Page 195

1 to you to be the complete investigative file for
2 the Wiley brothers' murder investigation?
3 A. Well, there's no GPRs that --
4     MR. RAHE: Objection, foundation.
5     THE WITNESS: There's no GPRs here that
6 I saw.
7     MR. BRUEGGEN: Make sure you look
8 through the whole thing.
9     THE WITNESS: Okay.
10 Okay.
11     BY MS. BONJEAN:
12 Q. Okay. I'll ask again. Does that, to you,
13 appear to be the complete investigative file for
14 the Wiley brothers' murder investigation?
15     MR. RAHE: Objection, foundation.
16     THE WITNESS: No. I don't see any GPRs
17 in here.
18     BY MS. BONJEAN:
19 Q. Okay. And for a double murder investigation
20 that spanned a couple of months, you would expect
21 there to be GPRs in there, right?
22 A. Yes.
23 Q. Okay. In fact, it would be highly unusual
24 for there to be no GPRs in an investigative file
25 that documented an investigation that began in May

Page 196

1 of 1990 and was not closed until late August of
2 1990, correct?
3 A. Correct.
4     MR. BRUEGGEN: Object to form.
5     THE WITNESS: Correct.
6     BY MS. BONJEAN:
7 Q. Now, after your memory was refreshed about
8 the Wiley brothers' murder or in the process of
9 this, do you have any other -- does anything else
10 come to mind about this investigation without
11 looking at the reports? Did you have any sort of
12 independent recollection now that it's -- you know,
13 you've been thinking about it?
14     MR. BRUEGGEN: Object to form. Go
15 ahead.
16     THE WITNESS: No, ma'am.
17     BY MS. BONJEAN:
18 Q. Zero?
19 A. Zero.
20 Q. Okay. Your entire memory of this
21 investigation is going to depend on reviewing the
22 investigative file, right?
23 A. Yes, ma'am.
24 Q. All right. Now I'm going to have you
25 look...

Maysonet v.
Guevara

Video Deposition

Page 197

1     MR. BRUEGGEN: She'll direct you to the
2   page numbers.
3     BY MS. BONJEAN:
4   Q.  Yeah.  There's Bates stamps in the
5   right-hand corner and I'm going to actually ask you
6   to look at that.
7   First, if you would, let's start at the
8   beginning, I guess, but the beginning -- not the
9   beginning of the document, but the beginning of the
10  investigation, which appears to be more towards the
11  end.
12  Can you look at the last two pages of
13  Exhibit 3, which is Bates stamped 63 and 64.
14    MR. BRUEGGEN: Yep, these two pages.
15    THE WITNESS: Okay.
16    BY MS. BONJEAN:
17  Q.  Okay.  Do you see that?
18  A.  Uh-huh.
19  Q.  I'm sorry.  Also -- actually, I'm going to
20  strike that.
21  I'm going to have you look at page 57 and --
22  no, I'm sorry.  59 through 62.  My apologies.  59
23  through 62.
24  By the way, do -- does -- was there a
25  practice -- I don't think there was, but just

Page 198

1   confirm for me -- of numbering supplemental
2   reports, meaning original report and then
3   supplemental one, two, three, anything like that?
4     MR. BRUEGGEN: Object to form.
5     THE WITNESS: No.
6     BY MS. BONJEAN:
7   Q.  You're looking at me strangely, but I
8   practice in New York, and I'm asking because in New
9   York -- and I know, you know, New York's New York,
10  but every supplemental report actually has a number
11  associated with it, so it would go sequentially.
12  So I wasn't sure if the Chicago Police Department
13  had anything like that.
14  A.  No.  All we would put down would be progress
15  report.
16  Q.  Right.  So you don't know -- you don't know
17  where sequentially this -- I guess you could look
18  at the date, but if there were three different
19  reports submitted on May 25th, 19 -- three
20  supplemental reports submitted on May 25th, 1990,
21  you wouldn't necessarily know which -- what order
22  they came in, right?
23  A.  This would be considered the beginning
24  because it's a scene report.  It's the actual crime
25  scene.

Page 199

1   Q.  Right, I know, but you're deducing that
2   based on looking at this.  I'm saying, there's not
3   a number somewhere that tells us --
4   A.  No.
5   Q.  -- whether this was the first supplemental
6   report or the second supplemental report or
7   anything like that, right?
8   A.  No.
9   Q.  Okay.  So this is a supplemental report that
10  was prepared on May 25th, 1990, right?
11  A.  Yes.
12  Q.  And it was approved by Sergeant Mingey?
13  A.  Yes.
14  Q.  And what's a field investigation?
15  A.  Detectives went out in the field and didn't
16  do it on the telephone.
17  Q.  Okay.  And are detectives trained in how to
18  prepare field investigation reports?
19  A.  Sure, yes.
20  Q.  And if you were the sergeant reviewing this
21  report -- I'm not asking you to do that, but if you
22  were the sergeant who was assigned to approve this
23  report, what sort of things would you look at in a
24  field investigation report before approving it?
25  A.  Well, the entire format over -- over here

Page 200

1   would give me some idea as to where it happened and
2   injuries, etcetera, etcetera, and then the narrative
3   on what they discovered when they went out to the
4   scene and conducted interviews with the officers
5   that were there, any witnesses that were there, the
6   medical examiner reviewing the body as it was on the
7   scene, recording that.
8   Q.  And as a supervisor, after reviewing a field
9   investigation report, did you sometimes give
10  feedback or guidance to detectives on next steps,
11  what they should next do in their investigation?
12  A.  Sure.
13  Q.  So if you read in a narrative and you saw a
14  witness interview, for instance, that you thought
15  maybe should result in some other investigative
16  acts, would you then let the detective know that
17  they should do something or at least suggest it?
18    MR. BRUEGGEN: Object to form.
19    THE WITNESS: Yes.
20    BY MS. BONJEAN:
21  Q.  Now, in this investigative -- field
22  investigation, there's a portion that says manner
23  and motive.  Do you see that?  It's the second
24  page.  What is that?
25  A.  The manner in which the person received his

Maysonet v.
Guevara

Video Deposition

Page 201

1 injuries and the motive for, if we knew it --
2 Q. And why --
3 A. -- as to --
4 Q. I'm sorry, didn't mean to cut you off.
5 A. And the motive as to why he received his
6 injuries.
7 Q. And why is determining -- why is determining
8 the manner of a murder important to the
9 investigation?
10 A. It gives you a starting place as to where to
11 start to look, you know, whether it's narcotic
12 related or gang related or domestic violence related
13 or, you know, robbery related, street robbery
14 related.
15 Q. The manner will tell you that?
16 A. Yes, if they knew it. Most times they don't.
17 Q. So, for instance, a shooting, that gives you
18 some information about who might be responsible for
19 it?
20 A. It depends upon the circumstances. Again,
21 these two young men were just found dead on the
22 street.
23 Q. Right.
24 A. At the time they didn't know if it was
25 robbery, they didn't know if it was narcotics, they

Page 202

1 didn't know if it was a domestic, because some of
2 the people reported, as I remember, that they heard
3 arguing on the street, so I mean, there were a whole
4 thing. So rather than put it down, they left it
5 blank, unknown.
6 Q. Right, that's the motive. That's the
7 motive. I'm talking specifically about the manner.
8 They did put the manner down. They were shot,
9 right?
10 A. Right.
11 Q. Okay. And the manner itself can give some
12 clues as to who's responsible, right?
13 A. Can, yes.
14 Q. Okay. And in fact, there is a reference to
15 the type of handgun that was possibly used, right?
16 A. I believe it was empty shell casings.
17 Q. So some empty shell casings suggested that a
18 nine millimeter weapon might have been used, right?
19 A. Possibly, yes.
20 Q. And why would it be important to include
21 that information in the field investigation report?
22 A. So that you know that you're possibly looking
23 for this kind of a weapon. And if there are other
24 street arrests made just for somebody walking with a
25 nine millimeter down, and he's in that area or he is

Page 203

1 a member of a gang that is in that area, you can
2 have ballistics checks to compare those guns.
3 Q. Right. Again, give some clues as to who
4 might be responsible for the shooting, right?
5 A. Yes.
6 Q. It may not -- the fact that it's a nine
7 millimeter may not have any relevance or it may not
8 have particular relevance when this report is being
9 prepared, but could at some later juncture be
10 important evidence to connect someone to the crime,
11 correct?
12 A. Correct.
13 Q. And you were talking about motive. Motive
14 is sometimes excellent evidence of who might be
15 responsible for a crime, right?
16 A. Yes.
17 MR. BRUEGGEN: Object to form.
18 BY MS. BONJEAN:
19 Q. Motive is not required to prove a case, but
20 it can be excellent evidence to establish that a
21 particular person is responsible for the crime,
22 right?
23 MR. BRUEGGEN: Object to form.
24 THE WITNESS: Yes.
25 /////

Page 204

1 BY MS. BONJEAN:
2 Q. And that's one inquiry that a detective
3 would have in investigating a case, right?
4 A. Yes.
5 Q. And in this case, they said motive unknown
6 at this time, right?
7 A. Yes.
8 Q. It wasn't plainly obvious that it was a
9 gang-related crime, right?
10 A. No.
11 Q. In fact, and it wasn't plainly obvious that
12 it was a drug-related crime, right?
13 A. Right.
14 Q. It wasn't plainly obvious that it was a
15 robbery-related crime, right?
16 A. Right.
17 Q. And that's why it says motive unknown,
18 correct?
19 A. Yes.
20 Q. In this regard, that is, looking at
21 motive -- or looking at anything, would you agree
22 that trying to find out who the victims were and
23 what they were doing and what their background was
24 is all important information for trying to find out
25 who might want to -- might want to have killed

Maysonet v.
Guevara

Video Deposition

Page 205

1  them?
2  A.  Yes.
3  Q.  Now, there's also a narrative here.  Do you
4  see that?
5  A.  Yes.
6  Q.  It says canvass.  What's that?
7  A.  It's when you go to the locations of the
8  geographical areas that may have people either
9  living in there or working in there, and you
10  interview them or attempt to interview them to find
11  out if they heard or saw anything at the time you
12  think the crime was committed.
13  Q.  And in fact, this was a busy street, right?
14  A.  North Avenue, yes.
15  Q.  Yeah.  A lot of people actually lived on the
16  street, correct?
17     MR. BRUEGGEN: Object to foundation.
18     THE WITNESS: I believe so.  It was
19     1:00 in the morning, but yes.
20  BY MS. BONJEAN:
21  Q.  Right, it was late, but there would have
22  been some traffic on the street, right?
23  A.  Some.
24     MR. RAHE: Object to foundation,
25  speculation.

Page 206

1     BY MS. BONJEAN:
2  Q.  And there were, at least in this report, a
3  number of addresses where the detectives who were
4  investigating thought somebody might have heard
5  something or seen something, right?
6  A.  That's correct.
7  Q.  And as a supervisor, you would have read --
8  if you were, again, the supervisor of this report,
9  you would have read this investigation, correct?
10  A.  Yes.
11  Q.  And if anything stood out to you about what
12  was reported here, you would give feedback to the
13  detective, correct?
14  A.  Yes.
15  Q.  Now, after this report was submitted,
16  according to you, there would have been a copy made
17  and it would have been put on the clipboard?
18  A.  Correct.
19  Q.  And it looks like Sergeant Mingey signed off
20  on it, but it's possible, for instance, you would
21  come in on the next watch, and you would be able to
22  look at this report and find out something about
23  this murder that occurred, correct?
24  A.  Would you repeat that?  I'm sorry.
25  Q.  Yeah.

Page 207

1  A.  I had a cramp in my leg.
2  Q.  Sure.  My apologies.
3  Even though it was Sergeant Mingey who
4  approved this report, it's possible that you could
5  have come in the next day or the day after, or
6  whatever the case may be, and you would have, in
7  keeping with your practice, picked up the clipboard
8  and reviewed this report to find out what was going
9  on in this open investigation, is that right?
10  A.  Yes.
11  Q.  Now I want to show you what was marked as
12  Montilla Exhibit Number 6.
13     MR. BRUEGGEN: Set this down.
14     MS. BONJEAN: We'll get back to those,
15  but...
16     BY MS. BONJEAN:
17  Q.  Tell me if you recognize generally what
18  those documents are.
19  A.  Documents of the arrest records of Kevin and
20  Torrence Wiley.
21  Q.  And those were the victims, right?
22  A.  Yes.
23  Q.  And there's a stamp on there about what --
24  the date of the inquiry, correct?
25  A.  Yes.

Page 208

1  Q.  And what is that date?
2  A.  May 25th, 1990.
3  Q.  And that's actually the same date that they
4  were shot, correct?
5  A.  Yes.
6  Q.  Would it be -- would you -- do you find it
7  unusual that their arrest histories were pulled on
8  the date that they were shot and killed?
9  A.  No.
10  Q.  Okay.  And we talked about it earlier.  I
11  asked about it earlier.  Finding out about these
12  guys's criminal histories might shed some light
13  into who actually killed them, correct?
14  A.  Yes.
15  Q.  Okay.  And you can see that the gentlemen
16  that were shot and killed didn't have very
17  pronounced criminal histories, did they?
18  A.  No.
19     MR. BRUEGGEN: Object to form.
20     BY MS. BONJEAN:
21  Q.  In fact, one of them had two arrests.  The
22  other had, I think, four arrests, and they were all
23  minor offenses, right?
24  A.  Yes.
25  Q.  Nothing -- nothing -- no convictions?

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 209

1  A.  No.
2  Q.  And these were not actually even young men.
3  They were men in their mid -- mid-20s at least,
4  correct?
5  A.  Correct.
6  Q.  I mean, young -- that is young, but they
7  weren't teenagers, I guess is what I'm trying to
8  say.
9  A.  No, they were not.
10  Q.  Okay.  And would you agree that as a
11  detective who did this for many years, if you were
12  going solely on those criminal histories, it does
13  not appear as if these individuals were heavily
14  involved in gang activity?
15      MR. BRUEGGEN: Object to form,
16  speculation.
17      BY MS. BONJEAN:
18  Q.  It is speculation, but would you agree?
19      MR. BRUEGGEN: Same objection.
20      THE WITNESS: Yes.
21      BY MS. BONJEAN:
22  Q.  Okay.  You would agree with what I said,
23  that it does not appear, at least based solely on
24  this, that they were heavily involved in gang
25  activity, correct?

Page 210

1      MR. BRUEGGEN: Same objections.
2      THE WITNESS: No, it doesn't.
3      MS. BONJEAN: Okay.  You can put that
4  to the side.
5      BY MS. BONJEAN:
6  Q.  So if you were a detective investigating
7  this case and you pulled these rap sheets on May
8  25th, 1990, doesn't tell you who did it, doesn't --
9  gives you a little bit of information, though,
10  about who the victims were, correct?
11  A.  Correct.
12  Q.  And if you were a detective working this
13  case, at least you would have in your mind that,
14  hmm, you know, they don't appear to be active --
15  actively out there committing lots of felonies,
16  right?
17  A.  Correct.
18  Q.  And it's not clear, at least from these rap
19  sheets, that this crime had anything to do with
20  gang motivation, right?
21      MR. BRUEGGEN: Object to form and
22  foundation.
23      THE WITNESS: Would you repeat that?
24      BY MS. BONJEAN:
25  Q.  Yeah.  There's obviously -- obviously, you

Page 211

1  don't know anything at the beginning of the
2  investigation for sure, but if you're looking at
3  this investigation, if Torrence and Kevin Wiley had
4  long rap sheets that showed all types of gun
5  crimes, drug crimes, things that tend to be
6  associated with gang activity, you might think, oh,
7  this could be a gang-motivated crime, right?
8  A.  Right.
9  Q.  These rap sheets don't lead to that
10  conclusion, correct?
11  A.  Right.
12  Q.  They don't necessarily exclude the
13  possibility of gang motivation, but they don't --
14  they don't suggest gang motivation, either, right?
15  A.  No.  What suggests -- as a detective, what
16  suggests possible gang motivation is the location
17  where it happened.
18  Q.  Right, because North Avenue and --
19  A.  St. Louis, Central Park.
20  Q.  -- whatever the cross-street was had a lot
21  of gang activity, right?
22  A.  Yes, ma'am.
23  Q.  But wouldn't you agree most of Humboldt Park
24  had a lot of gang activity?
25      MR. BRUEGGEN: Object to form,

Page 212

1  foundation.
2      THE WITNESS: Humboldt Park had a lot
3  of gang activity, the park itself, and I don't
4  remember or know factually what boundaries were
5  there.  I know Central Park used to be a boundary,
6  but I don't know in what direction, and Central
7  Park would be a block west of that.
8      MS. BONJEAN: Right.
9      THE WITNESS: And many times gangs
10  would go across areas, especially late at night, to
11  see if they could shoot at one of their rivals --
12      MS. BONJEAN: Right.
13      THE WITNESS: -- rip off one of their
14  rivals.  So I mean, those were factors that I'm
15  sure started it off looking at a gang.
16      BY MS. BONJEAN:
17  Q.  Right, but for it to be gang motivated would
18  suggest that the other -- the victim was in a gang,
19  too, right?
20  A.  No.
21  Q.  Well, why would you be shooting at someone
22  who wasn't in --
23  A.  They don't know who they're shooting at.
24      MR. RAHE: Objection, foundation.
25      THE WITNESS: All they know is he's not

Maysonet v.
Guevara

Video Deposition

Page 213

1 part of that gang.
2     BY MS. BONJEAN:
3 Q. Okay. That's what I'm getting at.
4 A. Okay.
5 Q. But from what you're saying is that just by
6 seeing an unknown face in this area, they could be
7 subject to a shooting?
8 A. Yes, ma'am.
9 Q. Is that right?
10 A. Yes, ma'am.
11 Q. And what -- but there's nothing in here --
12 there's nothing from this report, from what I've
13 showed you thus far, that would suggest that Kevin
14 and Torrence Wiley were new to this area, right?
15     MR. RAHE: Objection, form, foundation.
16     THE WITNESS: I don't remember. I'd
17 have to look at their addresses and stuff. I don't
18 remember.
19     BY MS. BONJEAN:
20 Q. They lived in Garfield Park. That's pretty
21 close to North Avenue, right?
22 A. Garfield Park is at the south end. Garfield
23 Park is --
24 Q. Right on the other side of North Avenue.
25 A. It's on the other side of Chicago Avenue, I

Page 214

1 believe, Garfield Park.
2 Q. Okay. Well, we --
3 A. I mean, it's a good mile away and even more,
4 I think.
5 Q. Okay. But --
6 A. I think Garfield Park comes in around Lake
7 Street, which is 200 north. I mean, it runs on kind
8 of an angle, but I think it's about 200 north.
9 Q. Okay. So as I understand it, just the
10 fact -- so I'm not seeing it, though. From -- and
11 I know -- I know that we've only looked at the
12 field investigation, but if you're looking at the
13 field investigation and you're looking at these
14 guys' rap sheets, what evidence is there that it
15 would have been gang motivated?
16 A. I'm --
17 Q. Just because it was a gang area?
18 A. It's a starting point. It's a starting point
19 in their investigation. Because of the gang
20 activity, especially in the late '80s, '90s, the
21 gang activity was tremendous because, as I recall,
22 you had a lot of narcotics going on, a lot of crack
23 cocaine that was infiltrating, and that became
24 money. And when you see strange faces on a corner,
25 where if that's your corner, as a gang you're going

Page 215

1 to investigate because that's going to be lost money
2 if these people are out there slinging dope, which
3 they don't know one way or the other. And most
4 gangs, their first inclination is to shoot.
5 Q. Okay. So it's your -- you start with the
6 proposition that it has -- strike that.
7 You start with the proposition that there's
8 a good chance that it's gang activity because -- or
9 gang motivated because there's so much gang
10 activity at this location, is that right?
11 A. It's a starting point, yes, ma'am.
12 Q. Okay. Which really then means any crime,
13 then, that happens in that area, you start with the
14 proposition that it could be gang motivated?
15     MR. BRUEGGEN: Object to form.
16     THE WITNESS: No. It's the
17 circumstance. It's the circumstances of what you
18 find when you get there.
19     BY MS. BONJEAN:
20 Q. Right, but any shooting that happened on
21 North Avenue, you start with the proposition that
22 it could be gang motivated, right?
23 A. Or narcotic. If there's nobody there to tell
24 you anything different, that's a pointing point,
25 yes, ma'am.

Page 216

1 Q. Okay. And all that being said, there's
2 nothing in these rap sheets that suggested that
3 these fellows were drug dealers, right?
4 A. That's correct.
5 Q. Nothing in these rap sheets that would
6 suggest that these fellows were members of any
7 gang, correct?
8 A. Correct.
9 Q. And there doesn't seem --
10 A. Although the first arrest on one of them, I
11 think, is from a gang crimes officer.
12 Q. Okay. Where, here?
13 A. Whichever. Yeah, Officer Duggan.
14 Q. Okay. But that's just for possession of
15 marijuana?
16 A. Right.
17 Q. And that would have been even eight years
18 before this event --
19 A. Okay.
20 Q. -- but as a whole, this does not look like
21 the rap sheet of someone who is an active gang
22 member, correct?
23 A. Correct.
24 Q. Okay. Now, you can, now, if you would,
25 please --

Page 217

1    MR. BRUEGGEN: Jennifer, are we getting
2  to a place where we can take another break?
3    MS. BONJEAN: Do you need a break?
4  Does anyone need a break or do you need a break?
5    MR. BRUEGGEN: I was going to eat
6  something real quick.
7    MS. BONJEAN: Oh, okay.
8    MR. BRUEGGEN: Getting a little hungry.
9  I don't know if anybody else -- you know, like 15
10  minutes.
11    MS. BONJEAN: Sure. Fine.
12    MR. BRUEGGEN: Get something quick.
13  Does that work?
14    MS. BONJEAN: I'm okay with it. Is
15  everyone else?
16    MR. RAHE: Works for me.
17    THE VIDEOGRAPHER: We're going off the
18  record at 2:27 p.m.
19    (Recess taken from 2:27 to 2:54.)
20    THE VIDEOGRAPHER: We're now back on
21  the record at 2:54 p.m.
22    BY MS. BONJEAN:
23  Q.  Okay. Mr. Epplen, that report we were
24  looking at earlier that had the Bates stamp 59
25  through 62, do you have that there?

Page 218

1  A.  Yes, ma'am.
2  Q.  We discussed it, but I had one follow-up
3  question.
4    Do you see the date and time that it was
5  submitted? I assume it's on the first page. Is
6  that right?
7  A.  25 May, 0800.
8  Q.  Okay. And what time is that?
9  A.  8:00 in the morning.
10  Q.  8:00 in the morning.
11    And this -- the occurrence or the shooting
12  is reported to have occurred at what time?
13  A.  1:00 in the morning.
14  Q.  Okay. So this report was prepared shortly
15  after the shooting, correct?
16  A.  Correct.
17  Q.  Do you have a strong sense that this
18  probably was the first supplemental report that was
19  prepared?
20  A.  It was -- let me see here.
21    MR. BRUEGGEN: Object to the form.
22    THE WITNESS: Yes.
23    BY MS. BONJEAN:
24  Q.  Okay. All right. Now, I'm going to now
25  have you look at what -- same Exhibit 3, but Bates

Page 219

1  stamps 63 through 64.
2    MR. BRUEGGEN: This one.
3    THE WITNESS: Oh.
4    MR. BRUEGGEN: Did you already pull it
5  out?
6    There it is, 63 and 64.
7    THE WITNESS: Okay.
8    BY MS. BONJEAN:
9  Q.  Do you see it?
10  A.  Yes, ma'am.
11  Q.  Okay. And this is another supplemental
12  report, correct?
13  A.  Yes.
14  Q.  And it's prepared by Detective Boyle and
15  Brennan?
16  A.  Yes.
17  Q.  Are you able to tell, by looking at a
18  supplemental report, who actually authored the
19  report? And by "authored," I mean actually wrote
20  the words onto the piece of paper.
21  A.  Normally, the first officer, he would have
22  completed at least this page. There are times,
23  though, when another officer -- say if they had
24  split up to do a canvass, where they would come back
25  together and they would compile it into one report.

Page 220

1  Say if they were partners here, and one took
2  one side of the street and the other took the other
3  side of the street --
4  Q.  Okay.
5  A.  -- and they interviewed different people, but
6  they're still partners, and they would come back and
7  they would do one report to cover all of their
8  canvass results.
9  Q.  Okay. Thank you, but that wasn't the answer
10  to my question.
11    My question was: Can you tell, by looking
12  at the report, who put the words onto the piece of
13  paper? I understand investigators break up their
14  responsibilities, but --
15  A.  Well, I would say, this page, John Boyle.
16  Q.  Okay. Who did the second page?
17  A.  I don't know. It would be one of those two.
18  That's the best answer I can give you.
19  Q.  You can't tell me who did this, who wrote
20  the words on this piece of paper?
21  A.  You asked me who normally writes it. I'm
22  telling you that the person that writes page one
23  would be John Boyle.
24  This here, I was not present. This here can
25  be a compilation, but I can't tell you for sure.

Maysonet v.
Guevara

Video Deposition

Page 221

1  Q.  Okay.
2  A.   Under normal circumstances, it would be John
3  Boyle, but depending upon if they split up to get
4  things done faster, I don't know.
5  Q.   Okay.  So it's possible, and it was possible
6  in 1990 under the practices of the department, that
7  somebody could actually author a report without
8  taking -- without taking responsibility for it?
9  A.   No.  His name is right here.
10      MR. RAHE: Objection, foundation.
11      MR. BRUEGGEN: Misstates the testimony.
12      THE WITNESS: Bernard Brennan's name is
13  right here.
14      BY MS. BONJEAN:
15  Q.   Yeah, I know his name's there, but we don't
16  know who wrote the second page.  You can't tell me
17  who wrote the second page?
18  A.   No, ma'am.
19      MR. BRUEGGEN: Objection, misstates his
20  testimony.
21      BY MS. BONJEAN:
22  Q.   Can you tell me who wrote the second page?
23  A.   No, ma'am.
24  Q.   Okay.  Can you see why that might be
25  problematic if you were looking at an investigation

Page 222

1  one year later, five years later, 20 years later,
2  30 years later?
3      MR. RAHE: Objection.
4      THE WITNESS: Not if you can find
5  Detectives Brennan and Boyle.
6      BY MS. BONJEAN:
7  Q.   Why should I have to find Detectives Brennan
8  and Boyle to determine who wrote the page of a
9  formal document that's filed in connection with a
10  double murder case?
11      MR. RAHE: Objection, form, foundation.
12      MR. BRUEGGEN: Objection,
13  argumentative.
14      MR. RAHE: Argumentative.
15      THE WITNESS: Well, I don't know why I
16  would be required to remember something from 30
17  years ago if I didn't, you know, but...
18      BY MS. BONJEAN:
19  Q.   I'm not asking you to remember.  I am
20  asking --
21  A.   Well, you're asking me to give you a
22  conclusion based on a report with two names on it,
23  and I told you what the possibilities were.
24  Q.   Well, why would there ever be a practice --
25  how dumb are the people in the Chicago Police

Page 223

1  Department that they would have a practice where
2  you wouldn't have the ability to determine, by
3  looking at a formal report, who authored it?
4      MR. BRUEGGEN: Objection, form,
5  argumentative.
6      THE WITNESS: It's in the interest of
7  efficiency, number one, if they're both detectives
8  and one is sitting there dictating and the other
9  one is typing, or the other one says, you know, by
10  the time you read my handwriting, I can have this
11  done and we can be on our way someplace else.
12      BY MS. BONJEAN:
13  Q.   I'm not talking about -- I'm not suggesting
14  that there's anything wrong with splitting up the
15  responsibilities.
16  A.   Well, then I'm misunderstanding the entire
17  question that you're asking me.
18  Q.   What I'm suggesting is that whoever is
19  reading the report should have the ability to say,
20  by looking at the report, who authored it.  Would
21  you agree with that?
22  A.   Well, I would say that it's coauthored.
23  Q.   So both people are responsible for the
24  contents of that report, correct?
25  A.   Yes, ma'am.

Page 224

1  Q.   Equally responsible for the contents of that
2  report?
3  A.   Yes, ma'am.
4      MR. BRUEGGEN: Object to form.
5      BY MS. BONJEAN:
6  Q.   So if there's a report with six names at the
7  end of it, every person that's identified on that
8  report is equally responsible for that report,
9  right?
10  A.   Yes, ma'am.
11  Q.   This particular report was submitted at 1630
12  hours, right?
13  A.   Uh-huh.
14  Q.   What time is that, please?
15  A.   4:30 p.m.
16  Q.   This, again, is still May 25th, 1990.  This
17  is still the same day that the Wiley brothers were
18  murdered, right?
19  A.   Yes.
20  Q.   And by the way, I don't think I asked you
21  this.  In May of 1990, what shift did you work?
22  A.   Afternoons, I believe.
23  Q.   Okay.  And what would be the starting time
24  and the ending time?
25  A.   The starting time for me would have been 4:00

Page 225

```
 1   until 12:30, but I usually got in there a little bit
 2   early because 4:00 would be roll call.
 3   Q.  Uh-huh.  So you wouldn't have been present,
 4   for instance, at 8 a.m., right?
 5   A.  No.
 6   Q.  Okay.  And at 1630, you would just have been
 7   getting on duty, is that right?
 8   A.  Correct.
 9   Q.  Now, this report is -- says field
10   investigation.  Again, what does that mean?
11   A.  They actually went out in the street and
12   interviewed these people.
13   Q.  And do these people appear to have the same
14   last name as the victims?
15   A.  Except for Sandra Montoya.
16   Q.  And as part of an investigation, would it be
17   prudent to interview family members of a victim?
18   A.  Yes.
19   Q.  Why is that?
20   A.  To see if they could add any light to the
21   circumstances of them being over at North Avenue and
22   St. Louis, for one.  Whether they had any friends or
23   associates over at North Avenue and St. Louis.  You
24   know just reasons as to why they would be there.
25   Q.  Okay.  Any other reason why you'd want to
```

Page 226

```
 1   interview family members?
 2   A.  They might be able to tell you what sort of
 3   interests they had, what would bring them over that
 4   way, did they in fact have a narcotic problem, you
 5   know, things of that nature.
 6   Q.  Right.
 7   A.  Did they drink in taverns over there, you
 8   know.
 9   Q.  Would you agree that, particularly since the
10   shooting happened in a gang area, it would -- might
11   be useful to ask family members if their brothers
12   or loved one was a member of a gang?
13   A.  It may be, yes.
14   Q.  In this case, don't you think that's
15   something that the reporting detectives would want
16   to ask the family members?
17       MR. RAHE: Objection, foundation.
18       THE WITNESS: Possibly, yes.
19       BY MS. BONJEAN:
20   Q.  Well, not possibly.  Yes.  I mean, any good
21   detective --
22   A.  Yeah.
23   Q.  -- would want to know if they were in a
24   gang, right?
25   A.  Sure.
```

Page 227

```
 1   Q.  Particularly if you're considering gang
 2   motive, right?
 3   A.  Yes.
 4   Q.  And if you're considering gang motive,
 5   that's going to lead to whose world of possible
 6   suspects are, right?
 7   A.  Uh-huh.
 8   Q.  I mean, I'm not a detective, but that seems
 9   pretty straightforward, correct?
10   A.  Uh-huh.  Yes, ma'am.
11   Q.  All right.  And in looking at this report,
12   is there any evidence in here that would suggest,
13   A, that -- well, first, that these victims,
14   Torrence and Kevin Wiley, were associated with any
15   gang?
16   A.  No.
17   Q.  And was there anything in -- in this report
18   that suggested that these individuals had a drug
19   problem?
20   A.  No.
21   Q.  Either they were drug users or were drug
22   distributors?
23   A.  No.
24   Q.  And in fact, when we looked at this -- their
25   rap sheets, apart from a 1982 marijuana possession,
```

Page 228

```
 1   these individuals didn't have any history of being
 2   arrested for possession of narcotics, correct?
 3   A.  Correct.
 4   Q.  Or selling narcotics, right?
 5   A.  Correct.
 6   Q.  Okay.  So -- so you would agree that
 7   including into our equation this report, that is
 8   dated May 25th, 1990, and submitted at 1630, has
 9   not provided any additional information to suggest
10   that this was a gang-motivated crime, right?
11       MR. BRUEGGEN: Object to form.
12       THE WITNESS: Correct.
13       BY MS. BONJEAN:
14   Q.  We're still working on the possibility
15   because it's a gang area, but nothing from these
16   interviews yielded information to suggest it was
17   gang motivated apart from that, right?
18   A.  Correct.
19   Q.  Put that aside.
20   I would like you now, if you would, to look
21   at 55 and 56.
22   Is that right?  You got it?
23   A.  Yes, ma'am.
24   Q.  Oh, good.  Okay.
25   This is also a report that was submitted on
```

Maysonet v.
Guevara

Video Deposition

Page 229

1  May 25th, 1990.  Do you see that?
2  A.  Yes.
3  Q.  It doesn't have a time, though.  If you got
4  a report that didn't have a time on it, would you
5  kick it back and tell them to put in a time or is
6  that like no big deal?
7  A.  It's not a big deal.
8      MR. BRUEGGEN: Object to form.
9      THE WITNESS: Not a big deal.
10     BY MS. BONJEAN:
11 Q.  And why would you say it's not a big deal?
12 A.  Well, the information in it is -- it's just
13  the results of a canvass report, and they have the
14  information as to the people that they interviewed
15  on there, the remainder of the canvass report.  And
16  these officers work days, so they would have gone
17  home at 4:30.  So it was not something that you
18  would necessarily have to reject it for, as far as
19  the time.
20 Q.  Okay.  Although if the prosecutor or a
21  defense attorney or somebody was looking at this
22  report later on, they wouldn't be able to tell from
23  looking at it whether it preceded the last
24  supplemental report or was after the last
25  supplemental report, right?

Page 230

1      MR. RAHE: Object to foundation.
2      MR. BRUEGGEN: Speculation.
3      THE WITNESS: Well, it was signed the
4  next day by Sergeant Mingey, so it was prepared in
5  a relatively short time after it was done.
6      BY MS. BONJEAN:
7  Q.  Yeah, but just to prove the point, you can't
8  tell me whether this report came first or the one
9  we just looked at, right?
10 A.  No, that's correct.
11 Q.  And if the --
12 A.  You're talking about the Boyle/Brennan
13  report?
14 Q.  Yeah.
15 A.  That's correct, yeah, I can't.
16 Q.  And if there was a time on the Willie
17  Ware/Joseph Kondal report, you would be able to
18  tell me which one came first, right, at least which
19  one was --
20 A.  No, because they could turn it in as they're
21  walking out the door at 4:30 as well, 5:00.
22 Q.  You could tell me at least which one was
23  submitted first, right?
24 A.  No, because they could put them -- they put
25  them in their watch bin, all right, that go in a

Page 231

1  pile.
2  Q.  Yeah.
3  A.  All right?  So Sergeant Mingey didn't sign it
4  until the next day.
5  Q.  I'm not talking about Sergent Mingey.  I'm
6  talking about the time of this -- where it says
7  date this report submitted, date and time.
8  A.  Correct.  Correct.  Right.
9  Q.  Right.
10 A.  They could have both put 1630 down, and it
11  wouldn't have made -- I couldn't have told you who
12  put it in the bin first.
13 Q.  We're talking passed each other.
14  My question is:  If the time here said
15     12:30 --
16 A.  Okay.
17 Q.  -- you would know it came -- it was
18  submitted before the one --
19 A.  Okay.  Yes, ma'am.
20 Q.  -- that said 1630, right?
21 A.  Yeah.  Yes, ma'am.
22 Q.  So if there was a time on this, you would
23  have an indication of whether it was submitted
24  before or after this report that -- the
25  Brennan/Boyle report, right?

Page 232

1  A.  Yes.
2  Q.  Okay.  That's all I was asking.
3  Now, the Willie Ware/Joseph Kondal report,
4  which is Bates stamped 55 through 56, is another
5  canvass report, correct?
6  A.  Yes.
7  Q.  It looks like additional individuals were
8  interviewed, right?
9  A.  Yes.
10 Q.  There's an Alicia Hernandez, who's a
11  barmaid -- I guess they called them barmaids in
12  those days -- at the Jose Pobre Tavern, right?
13 A.  Yes.
14 Q.  And there's this Alma Preceeo, who lives
15  there, there on North Avenue, right?
16 A.  Yes.
17 Q.  David Milan, who's a staff member, Soldier
18  of God Church, works at the church, correct?
19 A.  Yes.
20 Q.  So there were people who lived in the
21  community who weren't gang members, right?
22 A.  Yes.
23     MR. BRUEGGEN: Object to form.
24     BY MS. BONJEAN:
25 Q.  I mean, Humboldt Park wasn't all gang

Maysonet v.
Guevara

Video Deposition

Page 233

1  members, was it?
2  A.  No.
3  Q.  There were good working people there,
4  correct?
5  A.  Yes.
6  Q.  Okay.  Alma Preceeo was -- lived at 3419
7  West North Avenue, which was on the same block as
8  where Torrence and Kevin Wiley were killed, right?
9  A.  Yes.
10  Q.  And she gave a report -- or gave an account
11  about what she heard in the hour that preceded the
12  shootings, correct?
13  A.  Yes.
14  Q.  Do you see that?
15  A.  Uh-huh.
16  Q.  And she said that she was awakened by some
17  arguing, correct?
18  A.  Yes.
19  Q.  And she reported two male English voices?
20  A.  Yes.
21  Q.  They were engaged in an argument, and could
22  hear a conversation with bits and pieces, that:  I
23  am trying to help you, I'm going to kill you, I'm
24  going to kill you first, you said that we would get
25  the last bus.  Do you see that?

Page 234

1  A.  Yes.
2  Q.  And that this argument lasted over the
3  course of an hour?
4  A.  Yes.
5  Q.  And then she heard four shots, right?
6  A.  Yes.
7  Q.  And then if you look on the next page, her
8  sister gives a similar account.  Do you see that?
9  That's Carmen Macias.
10  A.  Yes.
11  Q.  And she said she was awakened by the sound
12  of two male black voices having an argument.  One
13  was calm.  One had a louder -- or I'm sorry, a more
14  abrasive -- loud, abrasive voice.  Do you see that?
15  A.  Uh-huh.
16  Q.  At least one of them seemed drunk.  And
17  there was a reference to Lulu Dog.  Do you see
18  that?
19  A.  Yes.
20  Q.  And this argument lasted, she says, for
21  about an hour.  Do you see that?
22  A.  Uh-huh.  Yes, I do.
23  Q.  And that would have been in the hour
24  preceding the gunshots and leading up to the
25  gunshots, right?

Page 235

1  A.  Leading up to the gunshots, yes.
2  Q.  Okay.  Would you agree that these accounts
3  provide some leads for a detective?
4  A.  Yes.
5  Q.  Okay.  And, again, anything about these
6  accounts that tell you one way or another whether
7  or not this was gang motivated?
8  A.  Not really, no.
9  Q.  Not really suggest gang motivation, does it?
10  A.  No.
11  Q.  I mean, usually gang members don't sit on
12  the street for an hour before they pull out their
13  guns and shoot each other, right?
14  (Simultaneous objections from counsel.)
15  THE REPORTER: Wait, wait, wait.  Start
16  that again.
17  MR. RAHE: Objection to form and
18  foundation.
19  And just for the record, one objection
20  is an objection for all, right?
21  MS. BONJEAN: Yeah, sure.
22  MR. BRENER: I'll join the objection.
23  MR. RAHE: Yeah, one objection is an
24  objection for all.
25  /////

Page 236

1  BY MS. BONJEAN:
2  Q.  And you would agree that neither of these
3  women, who appeared to have been of Hispanic or
4  Latina heritage themselves, and I'm making an
5  assumption based on their names, recounted hearing
6  any Spanish speakers, right?
7  A.  Correct.
8  Q.  Or anyone with a -- an accent that sounded
9  like a Spanish speaker, right?
10  A.  Right.
11  Q.  They specifically said that they heard
12  English voices, right?
13  A.  Yes.
14  Q.  And then the other sisters could attribute
15  them to being -- the individuals being
16  African-American or black?
17  A.  Yes.
18  Q.  And as a detective, would you want to try to
19  find out who Lulu Dog was?
20  A.  Possibly, yes.
21  Q.  Talk to the family, see do you know a Lulu
22  Dog?
23  A.  Yes.
24  Q.  Would you have expected the detectives on
25  this case to do that?

Page 237

1      MR. BRUEGGEN: Object to form,
2  foundation.
3      THE WITNESS: It would be appropriate,
4  yeah.
5      BY MS. BONJEAN:
6  Q.  Do you know whether they did that?
7  A.  No, I don't.
8      MR. BRUEGGEN: Object to foundation.
9      BY MS. BONJEAN:
10 Q.  If you were the person reviewing this
11 supplemental report as the sergeant, are these the
12 types of things you might discuss with your
13 detectives, sort of leads to go look at?
14     MR. BRUEGGEN: Objection, speculation.
15     THE WITNESS: Yes.
16     BY MS. BONJEAN:
17 Q.  Is that something you would, in the course
18 of doing your supervising at Area 5 in this time
19 period, would have done?
20     MR. BRUEGGEN: Same objection.
21     THE WITNESS: Quite possibly.
22     BY MS. BONJEAN:
23 Q.  Yeah.  I'm not talking specifically about
24 this case.  I know you didn't supervise -- or
25 didn't approve this report, but in keeping with

Page 238

1  your practice, if you came in on your next shift
2  and read this report, if it -- and it was sitting
3  on the clipboard, and you were going to send your
4  detectives off to do some investigative work, is
5  this a type of conversation you might have?
6  A.  Yes.
7  Q.  Okay.  Now, you can put that aside.
8  I would like to know if you are able to
9  point me in this packet of material to any
10 additional supplemental reports that precede August
11 23rd, 1990.
12 A.  Are we talking about police department
13 reports or --
14 Q.  Any report --
15 A.  -- medical examiner report?
16 Q.  Good question.  Any police department
17 reports.
18 A.  Okay.
19 Q.  I guess there is the cause of death report,
20 right?
21 A.  Right.  It looks like 26 May.
22 Q.  It was submitted on May 25th and approved on
23 the 26th, right?
24 A.  Yes.
25 Q.  Okay.  So we have the three supplemental

Page 239

1  reports you looked at, the cause of death report.
2  Are there any other supplemental reports
3  that you can point me to that precede August 23rd,
4  1990?
5  A.  None that precede it.
6  Q.  Okay.  So by looking at this investigative
7  file, the file we've looked at, are you able to
8  tell me what, if anything, was done to advance the
9  investigation of the Wiley brothers' murders
10 between May 25th, 1990, and August 23rd, 1990?
11     MR. BRUEGGEN: Object to form and
12 foundation.
13     THE WITNESS: Only by reading the
14 report that was submitted by Ernie Halvorsen on the
15 23rd.
16     BY MS. BONJEAN:
17 Q.  Okay.  Anything that would tell me what
18 happened during the investigation in realtime?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: I believe Ernie started
21 out with --
22     BY MS. BONJEAN:
23 Q.  I'm not -- I'm not -- I'm not asking for
24 Ernie Halvorsen's telling me what happened three
25 months after the fact.  I'm asking for any reports

Page 240

1  that tell me what happened as it is happening
2  during this investigation.
3      MR. BRUEGGEN: Object to form.  Go
4  ahead.
5      THE WITNESS: Are we talking about a
6  report specifically about something that happened?
7      BY MS. BONJEAN:
8  Q.  If you didn't have this August 23rd -- put
9  the August 23rd report aside.  You don't have it.
10 Okay?
11 A.  Okay.
12 Q.  It was destroyed with all the other stuff.
13 A.  Okay.
14 Q.  Okay?  What -- without the August 23rd
15 report, is there anything in this investigative
16 file that will tell us what happened to advance the
17 investigation of the Wiley brothers' murders
18 between May 25th, 1990, and August 23rd, 1990?
19     MR. BRUEGGEN: Object to form,
20 argumentative, incomplete hypothetical.
21     THE WITNESS: This is not the
22 investigative file.  This is the permanent
23 retention file.
24     BY MS. BONJEAN:
25 Q.  You'll have to tell the City of Chicago

Maysonet v.
Guevara

Video Deposition

Page 241

1  that, but let's put that aside for a second.
2  Based on Exhibit 3 that you've looked at,
3  okay, let's -- Exhibit 3 starts at RFC-Maysonet 1
4  and --
5  A.  I think it's eight pages.  Right?
6  Q.  Hold on.  Hold on.
7  RFC-Maysonet 1 through RFC-Maysonet 62.
8      MR. RAHE: 66.
9      MS. BONJEAN: 66.
10     THE WITNESS: If that's the one she's
11  referring to.
12     MR. BRUEGGEN: Different question.
13  Listen to the question now.
14     THE WITNESS: Okay.
15     MS. BONJEAN: So let me start over and
16  ask you the question.
17     BY MS. BONJEAN:
18  Q.  Exhibit 3 consists of RFC-Maysonet 1 through
19  RFC-Maysonet 66, is that correct?
20  A.  Yes.
21  Q.  Okay.  Exhibit 3 -- let's not put a label on
22  it.  Let's just call it Exhibit 3.
23  By looking at Exhibit 3 -- you've had an
24  opportunity to review it, right?
25  A.  Uh-huh.

Page 242

1  Q.  Without looking at Ernie Halvorsen's report
2  from August 23rd, 1990, is there any other report
3  in Exhibit 3 that can tell us how the investigation
4  of the Wiley brothers' murders was advanced between
5  the dates of May 25th, 1990, and August 23rd, 1990?
6  A.  No.
7      MR. RAHE: Objection, form, foundation.
8      THE WITNESS: No.
9      BY MS. BONJEAN:
10  Q.  And in fact, you would agree, there is not a
11  single report that was prepared between May 25th,
12  1990, and August 23rd, 1990, in Exhibit 3, correct?
13  A.  Not in Exhibit 3, no.
14  Q.  Okay.  All right.  And, again, without Ernie
15  Halvorsen's report, you have no way of knowing what
16  was done in this investigation by simply looking at
17  Exhibit 3, if you're not taking into account Ernie
18  Halvorsen's report, right?
19     MR. BRUEGGEN: Object to form,
20  foundation.
21     THE WITNESS: At the present time, no.
22     BY MS. BONJEAN:
23  Q.  Okay.  Do you think at any point you would
24  have been to?  You think at the time you probably
25  would have, right?

Page 243

1  A.  If there were GPRs that were submitted or put
2  in regarding the investigation, yes, I probably
3  would have known.
4  Q.  Right.  You would have been reviewing those
5  GPRs, correct?
6  A.  Yes.
7  Q.  And you would have been reviewing any
8  supplemental reports that were submitted to you,
9  correct?
10  A.  If they were submitted at -- yes.
11  Q.  I'm talking about in and around the time
12  that this occurred.
13  A.  Yes, I would have eventually read them, yes.
14  Q.  And -- but as we sit here now, if Exhibit 3
15  is the entirety of the investigative file, you have
16  no idea what happened in this investigation,
17  without looking at Ernie Halvorsen's report, after
18  May 25th, 1990, right?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: If this were the entire
21  investigative file, yes, but as, again, I say,
22  there appears to be documents that are not there,
23  the GPRs, so...
24     BY MS. BONJEAN:
25  Q.  What makes you think there were GPRs to

Page 244

1  start with?
2  A.  Because there's a lot of detailed notes that
3  are there.
4  Q.  It would be unusual for there not to be GPRs
5  that correspond to some of the details that are
6  contained in these supplemental reports?
7      MR. BRUEGGEN: Object to form.
8      MR. RAHE: Objection, speculation.
9      THE WITNESS: Yes.
10     BY MS. BONJEAN:
11  Q.  Okay.  Now let's look at Ernie Halvorsen's
12  novella.
13     MR. BRUEGGEN: Which page is that?
14     THE WITNESS: This.  I think it's this
15  one.  That's the one I signed.
16     BY MS. BONJEAN:
17  Q.  Okay.  This is going to be RFC-Maysonet 47
18  through 54.
19  What is this document, Mr. Epplen?
20  A.  It's an in-custody report, cleared/open,
21  which means somebody's been charged with the
22  homicides of the two brothers.
23  Q.  So this Exhibit 3 that we've been looking at
24  doesn't tell us how we got from May 25th, 1990, to
25  a cleared/open report, does it?

Page 245

1      MR. BRUEGGEN: Object to form,
2  misstates his prior testimony.
3      THE WITNESS: Well, there is a
4  narrative in there giving additional information.
5      BY MS. BONJEAN:
6  Q.  It's retroactive, though.  It's talking --
7  A.  Yes.
8  Q.  -- about what happened in the past --
9  A.  Yes.
10 Q.  -- correct?
11 A.  Yes.  Correct.
12 Q.  There's no -- you agree that we don't have
13 anything to look at in realtime about what happened
14 between May 25th and August 23rd, right?
15     MR. BRUEGGEN: Object to form.
16     THE WITNESS: Correct.
17     BY MS. BONJEAN:
18 Q.  So this is a report that -- I see four names
19 at the bottom, and this is a report that was
20 prepared by Detective Halvorsen, correct?
21 A.  His name is first, yes.
22 Q.  Okay.  So that's a good assumption, right?
23 A.  Yes.
24 Q.  But per your testimony, all of the
25 individuals at the end of this report are

Page 246

1  responsible for this report, correct?
2  A.  Correct.
3  Q.  And that's the understanding of the police
4  department, right?
5      MR. RAHE: Objection, foundation.
6      THE WITNESS: I would believe so, yes.
7      BY MS. BONJEAN:
8  Q.  And this is a report that you personally
9  approved, correct?
10 A.  Yes.
11 Q.  And in keeping with your prior testimony,
12 you would have reviewed this report for content,
13 correct?
14 A.  Yes.
15 Q.  You would have reviewed it for thoroughness,
16 correct?
17 A.  Yes.
18 Q.  You would have reviewed it to make sure it
19 made sense, correct?
20 A.  Yes.
21 Q.  You would have reviewed it to ensure that it
22 adequately documented what it purports to document,
23 which is putting Jose Maysonet into custody and
24 Alfredo Gonzalez into custody?
25     MR. BRUEGGEN: Object to form.

Page 247

1      THE WITNESS: Yes.
2      BY MS. BONJEAN:
3  Q.  And at the time that you looked at this
4  report, you would have had familiarity with the
5  reports that preceded it, correct?
6  A.  I believe so, yes.
7  Q.  I mean, according to your prior testimony,
8  it was your practice to review the supplemental
9  reports of an investigation and --
10 A.  It was my practice to review reports off of
11 the board.  It was not my responsibility necessarily
12 to sign them all.  I did this.  We all kind of
13 helped out each other.  If one person was off or
14 sick or ill or on vacation, we all got together and
15 just helped each other sign reports that were coming
16 in.  I would not necessarily have signed them all or
17 had responsibility to sign them all --
18 Q.  I didn't --
19 A.  -- but I would have -- I would have tried to
20 read them all.
21 Q.  Okay.  I didn't ask you whether you signed
22 them all.
23 A.  Okay.  Well, I'm just trying to clarify it.
24 Q.  Thank you, but what I asked was:  When you
25 did approve this report that you did in fact sign,

Page 248

1  you would have had familiarity with the
2  supplemental reports that preceded it, right?
3  A.  More than likely, yes.
4  Q.  Now, this report says Jose Maysonet's in
5  custody and Alfredo Gonzalez is in custody.  Do you
6  see that?
7  A.  Yes.
8  Q.  By the way, had you had any police contacts
9  with Jose Maysonet prior to August 23rd, 1990?
10 A.  I don't believe so.
11 Q.  Do you know if you had any contacts with
12 Mr. Maysonet after August 23rd, 1990?
13 A.  I don't believe so.
14 Q.  And what about Alfredo Gonzalez, a/k/a
15 Lluvia?
16 A.  I don't think so.
17 Q.  That name ring a bell to you?
18 A.  No, ma'am.
19 Q.  Let's go to the next page.  It says there
20 are a number of individuals who are listed as
21 wanted here.
22 Tino and Chris Fernando, do you see that?
23 A.  Yes.
24 Q.  All right.  Do you have a recollection of
25 ever meeting or speaking with a Tino or Chris Cruz?

Page 249

1  A.  No.
2  Q.  What about a Justino Cruz?
3  A.  No.
4  Q.  How about Chris Fernandez?
5  A.  No.
6  Q.  What about Christopher Goossens?
7  A.  No.
8  Q.  These names don't ring a bell to you, right?
9  A.  No, ma'am.
10  Q.  And you can't tell us whether or not you had
11  any prior contacts with these individuals, right?
12  A.  Correct.
13  Q.  What about the name Efrain Cruz, does that
14  name sound familiar?
15  A.  No.
16  Q.  What about Francisco Varas, how about that
17  name?
18  A.  No.
19  Q.  Ever heard of a guy named Black Jeffrey?
20  A.  No.
21  Q.  All right.  I'm assuming you weren't --
22  didn't have the same skill set as Sergeant Mingey,
23  in that you weren't someone who had a lot of
24  intelligence about gang activities from your prior
25  days.  Correct?

Page 250

1  A.  That's a fair statement.
2  MR. BRUEGGEN: Object to form.
3  BY MS. BONJEAN:
4  Q.  Okay.  Okay.  Now, this indicates that
5  arresting officers of Maysonet were Detective
6  Paulnitsky and Detective Montilla.  Do you see
7  that?
8  A.  Yes.
9  Q.  What does it mean to be an arresting
10  officer?
11  A.  That you took physically somebody into
12  custody.
13  Q.  So that means you put the cuffs on them or
14  charged them or what does it mean exactly?
15  A.  Put the cuffs on them.
16  Q.  So by looking at this, this tells you that
17  Detective Paulnitsky and Detective Montilla
18  actually physically took Mr. Maysonet into custody,
19  right?
20  A.  Yes.
21  MR. BRUEGGEN: Object to form,
22  misstates the testimony.
23  BY MS. BONJEAN:
24  Q.  And Detective Montilla is listed as an
25  arresting officer.  Strike that.  We'll -- let's

Page 251

1  move on.  Go to the next page.
2  Now, are you familiar with the statement
3  that Jose Maysonet made to a court reporter?
4  A.  No, ma'am.
5  Q.  Have you had a chance to read it?
6  A.  No, ma'am.
7  Q.  Okay.  Well, let's -- let's come back to
8  this, then.
9  You have again manner and motive, right?
10  A.  Yes.
11  Q.  And this again is an important piece of an
12  investigation, right?
13  A.  Yes.
14  Q.  It allows you to determine who may be
15  responsible and can strengthen a prosecution
16  against an individual if you can demonstrate why he
17  did something, right?
18  A.  Yes.
19  Q.  Vehicle used can connect people to crimes,
20  right?
21  A.  Yes.
22  Q.  And also here we have a Rosa Bello, who
23  seems to have been -- it says wife of Jose
24  Maysonet, but was interviewed, right?  Do you see
25  that?

Page 252

1  A.  Yes.
2  Q.  Okay.  Now there's the narrative section,
3  correct?
4  A.  Yes, ma'am.
5  Q.  Now, this narrative starts with, "on July
6  15th, 1990, Sergeant E. Mingey, Area 5 violent
7  crimes, became aware of an offender charged in a
8  shooting incident in which three persons were shot
9  on the street.  This person was Jose Maysonet."
10  Do you see that?
11  A.  Yes.
12  Q.  "This shooting incident was reported under
13  RD N-303737.  Recovered from the scene of this
14  shooting were three fired cartridge casings, with a
15  class of nine millimeters.  These casings were
16  inventoried under inventory 784562."  Right?
17  A.  Yes.
18  Q.  So this is reporting that Mingey becomes
19  aware of someone who's in custody who's been
20  charged with shooting a nine millimeter, right?
21  A.  Yes.
22  Q.  And as a detective, this would be of
23  interest because the Wiley brothers' murders
24  involved a nine millimeter?
25  A.  Yes.

Maysonet v.
Guevara

Video Deposition

---

Page 253

1 Q. That's all it takes, just the fact that it's
2 the same caliber or...
3 MR. BRUEGGEN: Object to form.
4 THE WITNESS: Same caliber.
5 Mr. Maysonet, I think, lived close by, close
6 proximity.
7 MS. BONJEAN: Okay.
8 THE WITNESS: So it might have been
9 worth a look/see.
10 BY MS. BONJEAN:
11 Q. Okay. Now, why would Sergeant Mingey be
12 doing this rather than the detective assigned to
13 the case?
14 MR. BRUEGGEN: Object to foundation.
15 THE WITNESS: He may have been familiar
16 with Mr. Maysonet, had a rapport with him. I don't
17 know.
18 BY MS. BONJEAN:
19 Q. Okay. But you would agree that barring some
20 prior relationship or having a familiarity, it
21 would be unusual for Sergeant Mingey to take up an
22 investigation or any sergeant to take up an
23 investigation at this micro level, right?
24 A. Yes.
25 MR. BRUEGGEN: Object to form and

---

Page 254

1 foundation.
2 THE WITNESS: Yes.
3 BY MS. BONJEAN:
4 Q. Now, I'm going to keep reading on that page.
5 It says, "Sergeant Mingey was aware of the fact
6 that the weapon used to kill Torrence and Kevin
7 Wiley was a nine millimeter automatic pistol.
8 Sergeant Mingey believed that there might be a
9 connection between these two separate shooting
10 incidents."
11 Right?
12 A. Yes.
13 Q. And: On July 15th, 1990, Sergeant Mingey in
14 company with Detective F. Montilla, Area 5 property
15 crimes, interviewed Jose Maysonet while he was at
16 the Area 5 -- Area 5. Detective Montilla speaks
17 Spanish and advised Mr. Maysonet of his Miranda
18 rights.
19 Does this lead you to believe Mr. Maysonet
20 was a Spanish speaker?
21 A. Quite possibly, yes.
22 Q. Well, I mean, Montilla -- Montilla wasn't
23 assigned to violent crimes, right?
24 A. Correct.
25 Q. So why would he be involved in a homicide

---

Page 255

1 investigation?
2 A. He might be the only --
3 MR. BRUEGGEN: Object to foundation.
4 THE WITNESS: He might be the only
5 Spanish speaker on the floor.
6 BY MS. BONJEAN:
7 Q. Okay. So -- well, Guevara was a Spanish
8 speaker, too. We know that.
9 A. But I don't know if he was there.
10 Q. But he might have not been there, right?
11 A. Correct.
12 Q. So can you think of any other reason why
13 Montilla would have been brought into the case, if
14 not for his Spanish-speaking abilities?
15 A. No, ma'am.
16 Q. You didn't usually get detectives from
17 properties just to come over and help with violent
18 crimes, right?
19 A. We did quite -- quite often. Quite often.
20 Q. Well, why?
21 A. Because you didn't have enough people to
22 cover all the different things that were happening
23 in your area.
24 Q. Okay. So is it possible that Montilla came
25 over to help because of manpower shortage?

---

Page 256

1 MR. BRUEGGEN: Object to speculation,
2 foundation.
3 THE WITNESS: Spanish speaker shortage
4 probably more than anything.
5 BY MS. BONJEAN:
6 Q. Okay. So that's your best guess, that it's
7 because it was a Spanish speaker?
8 A. Yes, ma'am.
9 Q. And: Mr. Maysonet indicated that he did not
10 have -- he did have knowledge of the murders of the
11 two black youths on North Avenue, and he stated
12 that on the night of the -- the night the blacks
13 were shot, three Latin Kings came by his house and
14 wanted to get a nine millimeter automatic pistol --
15 sorry -- that he had been given by the gang to
16 hold. He gave the gun to these guys, and they
17 left. The next day he learned about the shooting
18 of the two blacks on North Avenue and assumed that
19 the Kings he gave the gun to must have done this
20 shooting. Jose Maysonet declined to provide the
21 names of the individuals who had the gun.
22 Do you see that?
23 A. Yes, ma'am.
24 Q. Now, this is some information that is
25 obtained as part of this investigation on July

---

Page 257

15th, 1990?

1  15th, 1990?
2  A.  Yes.
3  Q.  Before we get to that, can you tell me if
4  there's anything in Exhibit 3 that can tell us what
5  happened to the investigation -- what happened in
6  this investigation prior to July 15th, 1990?
7  A.  No, there's not.
8  Q.  Nothing, right?
9  A.  Correct.
10  Q.  Now, July 15th, 1990, yields some very
11  interesting information, correct?
12  A.  Yes.
13      MR. BRUEGGEN: Object to form.
14      BY MS. BONJEAN:
15  Q.  Gives you some evidence about motive, right,
16  potentially?
17  A.  Yes.
18  Q.  Who might be involved, right?
19  A.  Yes.
20  Q.  The number of offenders?
21  A.  Yes.
22  Q.  The gang that was responsible for the
23  shooting?
24  A.  Yes.
25  Q.  This is all important information, right?

Page 258

1  A.  Yes.
2  Q.  And you would expect that information to be
3  recorded or memorialized in a report in and around
4  the time of July 15th, 1990, right?
5  A.  Yes.
6      MR. BRUEGGEN: Object to form.
7      THE WITNESS: Yes.
8      BY MS. BONJEAN:
9  Q.  Okay.  So -- and whose responsibility would
10  it have been to memorialize the information that
11  was provided to Sergeant Mingey and Detective
12  Montilla on July 15th, 1990?
13      MR. BRUEGGEN: Object to foundation.
14      THE WITNESS: Either Sergeant Mingey or
15  Sergeant -- or Detective Montilla.
16      BY MS. BONJEAN:
17  Q.  One of the two of them, right?
18  A.  Yes.
19  Q.  They were one of the two of the individuals
20  who heard this information, so one of them should
21  have prepared either a GPR or prepared a
22  supplemental report, right?
23  A.  Correct.
24      MR. BRUEGGEN: Object to form.
25  /////

Page 259

1      BY MS. BONJEAN:
2  Q.  And do you feel confident that one or two of
3  those individuals did in fact do that?
4      MR. BRUEGGEN: Object to foundation.
5      MR. RAHE: Form.
6      THE WITNESS: Yes.
7      BY MS. BONJEAN:
8  Q.  And if I wanted to know -- if I wanted to
9  see this report, where would I go to find it?
10      MR. BRUEGGEN: Object.
11      MS. BONJEAN: Strike that.
12      BY MS. BONJEAN:
13  Q.  If I wanted to see the report that you feel
14  confident existed and was prepared in and around
15  the time of July 15th, 1990, where would I find
16  that report?
17      MR. BRUEGGEN: Object to foundation.
18      THE WITNESS: Wherever they store the
19  permanent retention investigative files.
20      BY MS. BONJEAN:
21  Q.  So do you think the permanent retention file
22  is more inclusive than the investigative file?
23      MR. BRUEGGEN: Objection, misstates his
24  testimony.
25      MR. RAHE: Objection, foundation.

Page 260

1      THE WITNESS: I'm sorry.  Go over that
2  again, please.
3      BY MS. BONJEAN:
4  Q.  Sure.  If I wanted to locate whatever report
5  memorialized the statements that Mr. Maysonet made
6  to Sergeant Mingey and Detective Montilla on July
7  15th, 1990, what are the possible places that
8  report would be?
9      MR. RAHE: Objection, foundation.
10      THE WITNESS: In the storage area where
11  they kept the investigative files after the case
12  was completed.
13      BY MS. BONJEAN:
14  Q.  So in the investigative file would be one
15  place, correct?
16  A.  Correct.
17  Q.  What are the other possibilities?
18  A.  If it was a supplemental report, the
19  permanent retention file.
20  Q.  Okay.  What if it was just on a GPR?
21  A.  That would be the investigative file, which
22  would be, last I heard, at 31st and California or
23  something, the warehouse.
24  Q.  All right.  So a report would be either in
25  the permanent retention file, if it was made in a

Page 261

1  supplemental report, correct?
2  A.   Correct.
3  Q.   If it was on a GPR, it would be in the
4  investigative file, correct?
5  A.   Correct.
6  Q.   Any other places where you can think of a
7  report would go that would memorialize this
8  statement of July 15th, 1990?
9  A.   Not within the department, no.
10 Q.   Okay.  Now, when you reviewed this
11 particular supplemental report that Mr. Halvorsen
12 wrote, and you see this reference to July 15th,
13 1990 --
14 A.   Okay.
15 Q.   -- okay, what did you do to ensure that
16 there actually had been a supplemental report
17 prepared on July 15th, 1990?
18     MR. BRUEGGEN: Object to foundation.
19     THE WITNESS: I don't know if I would
20 have done anything.
21     MS. BONJEAN: Okay.
22     THE WITNESS: I mean, if the
23 investigative file was there, I would have gone
24 through the investigative file and made sure that I
25 had documents for whatever was on that inventory,

Page 262

1  and I would have reviewed those to make sure they
2  corresponded.
3      BY MS. BONJEAN:
4  Q.   Would you have?
5  A.   Yeah.
6  Q.   You would have gone back to see if there was
7  a GPR or a supplemental report that corresponded
8  with this?
9  A.   I believe I would have, yes.
10 Could I back up --
11 Q.   Sure.
12 A.   -- the previous answer just for a second --
13 Q.   Yeah.
14 A.   -- because when this case would have went to
15 trial --
16 Q.   Uh-huh.
17 A.   -- I would imagine the State's Attorney would
18 have got a copy of the investigative file as well.
19 I mean, should have gotten it.
20 So anyway, that was my only other place I
21 think they could find it.
22 Q.   Okay.  Thank you for elaborating.
23 But in any event, there's no doubt in your
24 mind that there would have been some type of
25 report, whether it was a GPR or a supplemental

Page 263

1  report or -- that would have memorialized
2  Mr. Maysonet's statements to Sergeant Mingey and
3  Detective Montilla in and around July 15th, 1990,
4  right?
5  A.   Yes.
6      MR. BRUEGGEN: Object to form.
7      MR. RAHE: What?
8      MS. BONJEAN: Oh, I was waiting.
9      MR. RAHE: Oh, no.  I was just --
10     MR. BRUEGGEN: I was first.
11     MS. BONJEAN: Okay.
12     BY MS. BONJEAN:
13 Q.   Let me ask you this.  If you were looking at
14 this report, and you went -- and were looking at
15 the complete investigative file, and you couldn't
16 find a supplemental report or a GPR from July 15th,
17 1990, or in and around that time, would that have
18 been a concern to you?
19 A.   Yeah.
20     MR. BRUEGGEN: Object to form,
21 speculation.
22     BY MS. BONJEAN:
23 Q.   Why?
24     MR. BRUEGGEN: Same objections.
25     THE WITNESS: Because I would want to

Page 264

1  know where this information was, you know, that's
2  coming into this report now that I hadn't seen
3  before.
4      BY MS. BONJEAN:
5  Q.   Okay.  Was it customary for detectives in
6  closing reports like this to record events that
7  happened weeks and even months prior to the
8  submission of the report?
9      MR. RAHE: Objection.
10     MR. BRUEGGEN: Form, characterization.
11     MR. RAHE: Foundation.
12     THE WITNESS: It would be a summary of
13 the investigation as it proceeded from beginning to
14 end in case somebody of a higher rank wanted to
15 know exactly what transpired and they wouldn't have
16 the investigative file with them, so they could go
17 through it all and just see a summary of all the
18 investigative work that had been done.
19     BY MS. BONJEAN:
20 Q.   And is it your testimony that in every
21 closing report that you approved, you went back to
22 the investigative file to make sure that everything
23 that was recorded in the closing report
24 corresponded with prior reports and GPRs and
25 basically confirmed or corroborated what was in the

Maysonet v.
Guevara

Video Deposition

Page 265

1  closing report?
2  A.  If it was --
3      MR. BRUEGGEN: Object to form and
4  mischaracterization.  Go ahead.
5      THE WITNESS: If it was available for
6  me to review.  There were times when the
7  investigative file was put together after the
8  report was reviewed and turned in, because it was
9  just, you know, stacks of paper.
10      BY MS. BONJEAN:
11  Q.  Where were these stacks of paper?
12  A.  Well, the detective would have the
13  investigative file.  All right?  He'd be working,
14  you know, no matter how many hours, or went home and
15  had some sleep so he could come back and form a
16  report, and he would go through those, and then he
17  would prepare the file and he would turn this in.
18  Q.  Yeah, but this is an investigation that
19  lasted three months.
20  A.  Uh-huh.
21  Q.  Are you saying that one detective had this
22  investigative file for that three-month period?
23  A.  No, ma'am, I'm not saying that at all.  I'm
24  just saying that if the investigative file came with
25  this report, I would have correlated the two, but I

Page 266

1  may well have signed it without seeing that
2  investigative file completed.
3  Q.  Got it.  Okay.
4  So it's possible that you would have signed
5  this without actually looking back through the
6  entire investigative file, right?
7  A.  Yes.
8  Q.  Now, would you agree that another place we
9  might be able to look to to determine if in fact
10  there was a report corresponding to July 15th, 1990
11  events would be that inventory log?
12      MR. BRUEGGEN: Object to form.
13      THE WITNESS: Yes.
14      BY MS. BONJEAN:
15  Q.  At least we could see if there was a report
16  prepared in and around that time?
17  A.  Yes.
18  Q.  Because there should be a -- there should be
19  an entry that reflects that a report or a GPR was
20  prepared in and around July 15th, 1990, correct?
21  A.  Yes.
22  Q.  The inventory log wouldn't necessarily tell
23  us what's in that report, but it would give us a
24  sense of the date, correct?
25  A.  Yes.

Page 267

1  Q.  Let's keep going.  All right?
2  "Jose Maysonet was thereafter locked up in
3  the Cook County Jail.  On August 1st, 1990,
4  Sergeant Mingey and Detective Montilla went to
5  interview Jose Maysonet at the Cook County Jail.
6  Jose Maysonet signed the required attorney waiver
7  form and agreed to be interviewed.  Jose Maysonet
8  stated that he was involved in the murders of the
9  two black youths.  He stated that he was not the
10  shooter, but was present when the shooting
11  occurred.  He stated that he knew the shooter
12  was" -- "who the shooter was and the other persons
13  with him.  He stated that he would not cooperate in
14  this investigation unless a deal was cut to get him
15  out of jail.  Jose Maysonet was informed by
16  Sergeant Mingey that no deal would be made if even
17  possible."
18  Do you see that?
19  A.  Yes, ma'am.
20  Q.  So essentially Jose Maysonet has implicated
21  himself in this double murder here on August 1st,
22  1990, right?
23  A.  Yes.
24  Q.  In fact, that makes out -- these two
25  statements together certainly make out a charge of

Page 268

1  first degree murder under an accountability theory,
2  right?
3      MR. BRUEGGEN: Object to form and
4  foundation.
5      THE WITNESS: It could make a probable
6  cause for an additional arrest.  I don't think
7  there's any way in the world the State's Attorney
8  would approve that based upon just this.
9      BY MS. BONJEAN:
10  Q.  Okay.  But it provides probable cause for an
11  arrest, right?
12  A.  I think so, yes.
13  Q.  We have Jose Maysonet saying that he
14  provided a nine millimeter to three Latin Kings,
15  right?
16  A.  Uh-huh.
17  Q.  We have him saying that he was involved in
18  the murders, correct?
19  A.  Yes.
20  Q.  He said he was involved in the murders, he
21  was present at the murders, correct?
22  A.  Yes.
23  Q.  And he said that there are other individuals
24  who were present at the murders, right?
25  A.  Yes.

Maysonet v.
Guevara

Video Deposition

Page 269

1  Q.  Okay.  So easily making probable cause here,
2  correct?
3  A.  Yes.
4  Q.  This statement, which is if not a full out
5  confession, is certainly inculpatory, correct?
6  A.  Yes.
7  Q.  And, again, you would agree that Sergeant
8  Mingey or Detective Montilla would have or should
9  have memorialized these statements in some type of
10  report in and around August 1st, 1990, correct?
11      MR. BRUEGGEN: Object to form.
12      THE WITNESS: Yes.
13      BY MS. BONJEAN:
14  Q.  You would expect to see either a
15  supplemental report or a GPR memorializing these
16  statements on August 1st, 1990, correct?
17  A.  Correct.
18      MR. BRUEGGEN: Object to form.
19      THE WITNESS: Yes.
20      BY MS. BONJEAN:
21  Q.  And if you knew that no such supplemental
22  report or GPR existed at the time that you were
23  reviewing this closing report, that would be a
24  concern to you, correct?
25  A.  Yes.

Page 270

1  Q.  You certainly would ask them, hey, where's
2  the reports from August 1st, 1990, memorializing
3  this inculpatory statement, would you not?
4  A.  Yes.
5  Q.  And based on this, I think you said this,
6  you would agree that Sergeant Mingey and Detective
7  Montilla could have charged Mr. Maysonet, right?
8      MR. BRUEGGEN: Object to form.
9      THE WITNESS: In my experience, they
10  could have arrested him for it.  They had probable
11  cause.  But there was no way they can charge him,
12  because it's a murder case, without the approval of
13  the State's Attorney.  And I believe that the
14  State's Attorney's Office, who has a higher level
15  of provability, would have rejected charges.
16      BY MS. BONJEAN:
17  Q.  Just based on this confession?
18  A.  Yes.
19  Q.  You mean without corroboration, correct?
20  A.  Correct.
21  Q.  But if Mr. Maysonet wasn't already in
22  custody, you would have taken him into custody if
23  he told you this, right?
24  A.  Right.
25      MR. BRUEGGEN: Objection, speculation.

Page 271

1      THE WITNESS: Quite possibly, yes.
2      BY MS. BONJEAN:
3  Q.  Right.  In any event, it would have been
4  important to document this inculpatory statement
5  somewhere, correct?
6  A.  Correct.
7      MR. BRUEGGEN: Object to form.
8      THE WITNESS: Correct.
9      BY MS. BONJEAN:
10  Q.  And would you agree that a report
11  memorializing Mr. Maysonet's statements to Sergeant
12  Mingey and Detective Montilla on August 1st, 1990,
13  would come -- could come in the form of a
14  supplemental report, right?
15  A.  Yes.
16  Q.  And that could be in the -- and that -- that
17  should be in either the permanent retention file or
18  the investigative file or probably both, right?
19  A.  Yes.
20  Q.  And if it was on a GPR, it would at least be
21  in the investigative file, right?
22  A.  Correct.
23  Q.  And, again, you would also see an entry on
24  the inventory log of some type of report in and
25  around August 1st, 1990, right?

Page 272

1  A.  Yes.
2  Q.  Now, the next entry is August 22nd, 1990.
3  Do you see that?
4  A.  Yes.
5  Q.  By looking at this report or any other
6  documents in Exhibit 3, are you able to tell us
7  what, if anything, occurred between August 1st and
8  August 22nd, 1990?
9  A.  No.
10  Q.  Do you know what conduct -- strike that.
11  Do you know what Sergeant Mingey and
12  Detective Montilla did to corroborate these
13  statements by Jose Maysonet?
14      MR. BRUEGGEN: Object to foundation.
15      THE WITNESS: No.
16      BY MS. BONJEAN:
17  Q.  Would you agree that it would be a goal of
18  the investigation to try to learn more information
19  about what Jose Maysonet had allegedly confessed
20  to?
21      MR. BRUEGGEN: Object to form.
22      THE WITNESS: Yes.
23      BY MS. BONJEAN:
24  Q.  And would you agree that it would be a goal
25  of the detectives looking at this case to try to

Page 273

1  corroborate Mr. Maysonet's inculpatory statements?
2      MR. BRUEGGEN: Object to form.
3      THE WITNESS: Yes.
4      BY MS. BONJEAN:
5  Q.  And -- and your detectives would have done
6  that, correct?
7      MR. BRUEGGEN: Object to form.
8      THE WITNESS: Yes.
9      BY MS. BONJEAN:
10 Q.  I mean, so is it your assumption -- and it's
11 an assumption because you've already testified that
12 it's not in Exhibit 3, but that there are reports
13 that would detail what happened between August 1st
14 and August 22nd?
15     MR. BRUEGGEN: Object to form,
16 speculation.
17     THE WITNESS: I believe there certainly
18 should have been.
19     BY MS. BONJEAN:
20 Q.  Because there would have been investigative
21 conduct undertaken after Mr. Maysonet allegedly
22 basically confessed, right?
23     MR. BRUEGGEN: Object to form.
24     THE WITNESS: Correct.
25     MR. BRUEGGEN: Speculation.

Page 274

1      BY MS. BONJEAN:
2  Q.  I mean, if -- if Mr. Maysonet basically says
3  he's involved in this double murder, I mean, two --
4  two people are dead, you wouldn't just be like, eh,
5  eh, who cares, right?
6      MR. BRUEGGEN: Object to form.
7      THE WITNESS: It should have been
8  documented.
9      BY MS. BONJEAN:
10 Q.  Right, but somebody would have done an
11 investigation based on those statements, right?
12 A.  Well, continued it, certainly.
13 Q.  Right, but we can't tell what happened here
14 because there's nothing reported at least in this
15 report, right?
16 A.  Right.
17 Q.  Okay.  So where -- where would I find that
18 information?
19 A.  Again, it should have been either in a
20 supplemental report or a GPR, at minimum, which
21 would be in that investigative file.
22 Q.  Okay.  Let's keep going:  On August 22nd,
23 1990, Detective Paulnitsky was in court and saw
24 Jose Maysonet had made bond and was in court.
25 Paulnitsky was aware of the previous admissions

Page 275

1  that Jose Maysonet had made and asked Jose Maysonet
2  to come with him to Area 5 for additional
3  investigation of these murders.
4  Do you see that?
5  A.  Yes.
6  Q.  Okay.  How would have -- how would Detective
7  Paulnitsky have been aware of these admissions by
8  Mr. Maysonet, what are the possibilities?
9      MR. RAHE: Objection, foundation, form.
10     MR. BRUEGGEN: Speculation.
11     THE WITNESS: Conversations among
12 detectives.
13     BY MS. BONJEAN:
14 Q.  So just from happenstance having
15 conversations is --
16 A.  No.  It could also be that he went in and saw
17 the major board, you know, where I would be reading
18 the reports from the copies of the reports.
19 Q.  Okay.
20 A.  Maybe he saw a copy there, you know.  Like I
21 say, he had discussions with the other detectives
22 about it, so...
23 Q.  Okay.  And he asked Jose Maysonet to come
24 with him to Area 5 for additional investigation of
25 these murders.  Do you see that?

Page 276

1  A.  Yes, ma'am.
2  Q.  Now, when you looked at this report, did you
3  find that odd?
4      MR. BRUEGGEN: Object to form.
5      THE WITNESS: Odd, in that?
6      BY MS. BONJEAN:
7  Q.  That Mr. Maysonet just agreed to leave court
8  and come with Paulnitsky to Area 5 to discuss a
9  double murder?
10 A.  Not if he was aware that Sergeant Mingey
11 wanted to talk to him again.
12 Q.  Did you find it -- was it typical that
13 people who were involved in violent crimes, such as
14 murders, were willing to come to the areas and
15 speak to the detectives who were investigating
16 those crimes?
17     MR. RAHE: Objection, form, foundation,
18 speculation.
19     THE WITNESS: Many times they would
20 come in and surrender if they knew they were being
21 looked for.
22     BY MS. BONJEAN:
23 Q.  Well, if they knew that there was a warrant
24 out for them, I suppose.
25 A.  Not necessarily even a warrant.  If they

Page 277

```
 1  knew -- if you left a card at a relative's home, a
 2  parent's home, and you said I want to talk to this
 3  guy about this or that, sometimes they would come
 4  in.  They would think that, wow, this guy doesn't
 5  have anything, nobody saw me, so I'm going to go
 6  talk to him.
 7  Q.  Okay.  So it didn't strike you as unusual
 8    that he just came from court and went with
 9    Paulnitsky?
10  A.  No.
11  Q.  All right.  Let's -- let's go to the next
12    page:  At Area 5, Jose Maysonet was advised of his
13    Miranda rights by Detective Montilla.  Jose
14    Maysonet acknowledged understanding each of his
15    rights and agreed to talk with the detectives.
16    Jose Maysonet again repeated his previous
17    statements about supplying the gun used in these
18    murders and the fact that he knew who the offenders
19    were.  Jose Maysonet stated that he could not
20    provide any further information because he had been
21    threatened by Latin King gang members with the
22    death of himself, his wife and his child if he
23    informed the police.  Maysonet was informed that he
24    was being placed in custody for these murders.
25    Correct?
```

Page 278

```
 1  A.  Yes.
 2  Q.  Okay.  Again we have Mr. Maysonet making
 3    some inculpatory statements, correct?
 4  A.  Yes.
 5  Q.  Allegedly he essentially repeated his prior
 6    statements?
 7  A.  Yes.
 8  Q.  Okay.  So -- and he was in fact arrested,
 9    right?  According to this, he was placed in custody
10    for these murders.
11  A.  Okay.
12  Q.  He was charged, right?
13  A.  He wasn't charged yet.
14    MR. BRUEGGEN: Object to form.
15    BY MS. BONJEAN:
16  Q.  Well, he's under arrest, right?
17  A.  Uh-huh.  I don't think it says that, does it?
18  Q.  Well, he's placed in custody for these
19    murders.  What does that mean?
20  A.  Okay.  Could have been that they transported
21    him.  I don't know if they transported him in a
22    wagon or if they transported him in their own
23    vehicle.
24  Q.  Well, it says -- it says at the top of the
25    paragraph, "at Area 5."
```

Page 279

```
 1  A.  Okay.
 2  Q.  So he's already at Area 5.
 3  A.  Okay.
 4  Q.  Apparently he went voluntarily with
 5    Paulnitsky --
 6  A.  Okay.
 7  Q.  -- and they were at Area 5, and he gives the
 8    same information he provided on July 15th and
 9    August 1st to Sergeant Mingey.  He repeats it.
10  A.  Okay.
11  Q.  This is the third time he's making some
12    inculpatory statements.
13  A.  Okay.
14  Q.  And he's arrested, right?
15  A.  Okay.
16    MR. BRUEGGEN: Object to form and
17    characterization.
18    THE WITNESS: Okay.
19    BY MS. BONJEAN:
20  Q.  Would you agree with that?
21  A.  Yeah.
22  Q.  That's what the report reflects, correct?
23  A.  Yes.
24  Q.  Anything in this report -- strike that.
25    You said -- stated earlier that
```

Page 280

```
 1    Mr. Maysonet's statements alone would -- you'd
 2    never charge on that because you're never going to
 3    get approval from the State's Attorneys, right?
 4    MR. BRUEGGEN: Objection, misstates his
 5    testimony.
 6    THE WITNESS: Correct.
 7    BY MS. BONJEAN:
 8  Q.  Okay.  So can you tell from looking at this
 9    what information corroborated Mr. Maysonet's
10    statements?
11  A.  Well, what this says now, he knows who the
12    offenders are, so now he's going to provide
13    additional information.
14  Q.  He said that on August 1st as well.  He said
15    it actually on July 15th, too.
16  A.  Okay.
17  Q.  What is new about what Mr. Maysonet said on
18    August 22nd when he was placed into custody?
19    MR. BRUEGGEN: Object to form.
20    THE WITNESS: That the only reason he
21    wasn't cooperating was because of the threats made
22    to him by fellow gang members.
23    BY MS. BONJEAN:
24  Q.  Okay.  How does that change the calculus?
25    MR. BRUEGGEN: Object to form.
```

Maysonet v.
Guevara

Video Deposition

Page 281

1    THE WITNESS: It no longer asks for a
2 deal for him. Now he's telling you he's in fear,
3 and he's acknowledging that he's in fear because he
4 spent X number of days in jail. I mean, I can
5 surmise that. That would be my opinion, if that's
6 what you're asking for.
7    BY MS. BONJEAN:
8 Q. Well, he just got out on bond when he was
9 arrested?
10 A. Right.
11 Q. Okay. So I'm confused. What is -- by
12 looking at this report, what changed between August
13 1st and August 22nd that now he's going to be
14 arrested for these murders?
15    MR. BRUEGGEN: Objection, asked and
16 answered.
17    THE WITNESS: Because with further
18 interview, he may well become more comfortable with
19 telling us who the offenders are so they can be
20 taken into custody and get a more full account of
21 exactly what transpired on the night of May the
22 1st.
23    BY MS. BONJEAN:
24 Q. Okay. Well, why do you need to take him
25 into custody to do that? Why can't you just

Page 282

1 continue to interview him as you had been doing?
2 A. Because the State's Attorney may want to
3 charge him.
4    MR. BRUEGGEN: Objection, calls for
5 speculation.
6    BY MS. BONJEAN:
7 Q. You testified earlier that you didn't think
8 that that was enough to just go ahead and charge
9 somebody -- strike that.
10 After his August 1st statement, you said you
11 didn't believe it was enough -- if he was on the
12 street, it wouldn't necessarily be enough because
13 you're never going to get approval, right?
14 A. Correct.
15 Q. And he didn't give any additional
16 information on August 22nd, other than to say that
17 the reason he hasn't provided the names is he was
18 in fear, right?
19 A. Right.
20 Q. But no additional information about who the
21 offenders were or anything else about the crime,
22 right?
23 A. Not at that juncture, but that's an important
24 thing. That line there is an important line, I
25 believe.

Page 283

1 Q. It may be important, but why -- why --
2 A. Because you may be able to, with further
3 interview, allay his fears of what's going to happen
4 to him possibly and/or his family and get him to
5 cooperate.
6 Q. But why do you need to arrest him to do
7 that?
8    MR. BRUEGGEN: Objection, speculation.
9    THE WITNESS: I -- Detective Montilla
10 or Detective Mason -- or I'm sorry, Detective
11 Paulnitsky may not have had that information
12 before. I don't know exactly how much Detective
13 Paulnitsky had regarding what he said that he
14 wanted to do.
15    BY MS. BONJEAN:
16 Q. Well, according to Ernie Halvorsen, he had
17 information from the prior admissions.
18 Anyway, in any event, on August 22nd, these
19 detectives finally decide that they want to arrest
20 him after he's made inculpatory statements on July
21 15th and August 1st, right?
22 A. Uh-huh.
23    MR. BRUEGGEN: Object to form and
24 characterization.
25 /////

Page 284

1    BY MS. BONJEAN:
2 Q. August 22nd, he repeats the prior
3 inculpatory statements, correct --
4 A. Yes.
5 Q. -- according to this report, and then he
6 offers some other information about being
7 threatened, etcetera, right?
8 A. Yes.
9 Q. Okay. And who was present for this
10 interview with Mr. Maysonet according to his
11 report?
12 A. Detective Montilla.
13 Q. And Paulnitsky, right?
14 A. And Paulnitsky, yeah.
15 Q. Now, you'd expect one of those detectives to
16 prepare a GPR memorializing this interview with
17 Mr. Maysonet, right?
18    MR. BRUEGGEN: Object to form,
19 speculation.
20    THE WITNESS: Well, I think -- I'll
21 have to go back and review, but I think on the
22 clearing report that we're discussing, they're all
23 in here.
24    BY MS. BONJEAN:
25 Q. I understand. So you're -- I understand

Page 285

1 that, but at the time that he was arrested,
2 Paulnitsky and Montilla didn't know the case was
3 going to be closed, right?
4 A. No, they didn't.
5 Q. Okay. So they weren't going to assume that
6 they are going to at some point in the next 24
7 hours prepare a closing report, correct?
8    MR. RAHE: Objection.
9    MR. BRUEGGEN: Objection.
10    MR. RAHE: Foundation, form,
11 speculation.
12    MR. BRUEGGEN: Characterization.
13    THE WITNESS: I don't know what they
14 expected.
15    BY MS. BONJEAN:
16 Q. Okay. But they would have prepared a GPR,
17 don't you think?
18    MR. BRUEGGEN: Objection, speculation.
19    THE WITNESS: Well, again going back to
20 this, Detective Paulnitsky was part and parcel to
21 the entire investigation, so it's inclusive in this
22 report.
23    BY MS. BONJEAN:
24 Q. The report was prepared after the statement
25 that Mr. Maysonet made, correct?

Page 286

1 A. Yes.
2 Q. And it was made at a time when Paulnitsky
3 had no idea what was going to happen with the
4 investigation, right?
5    MR. RAHE: Objection.
6    THE WITNESS: Right.
7    MR. RAHE: Foundation and speculation.
8    THE WITNESS: But he did as it
9 progressed. To me --
10    MS. BONJEAN: You're -- stop. Stop.
11    MR. BRUEGGEN: Hold on. Let him
12 answer. There was a question pending. Let him
13 answer the question.
14    MS. BONJEAN: He's not answering the
15 question, though.
16    MR. BRUEGGEN: But he still gets to say
17 his piece and then you can ask the question again.
18    MS. BONJEAN: Well, if he wants to be
19 here all night.
20    BY MS. BONJEAN:
21 Q. Go ahead, say your piece.
22 A. Well, I mean, you keep asking questions in
23 different ways, and I'm trying to give you the most
24 plausible reason that I can understand 30 years
25 later.

Page 287

1 Q. Okay. I'm not -- I don't want you to try to
2 make excuses up for the cops that --
3 A. Well, I'm not making excuses.
4    MR. BRUEGGEN: Objection, form,
5 foundation.
6    THE WITNESS: You're asking me --
7    MS. BONJEAN: Let me ask -- let me ask
8 the next question. It's -- it's simple.
9    BY MS. BONJEAN:
10 Q. You would agree that at the time that
11 Detective Paulnitsky and Detective Montilla
12 interviewed Mr. Maysonet after he was taken into
13 custody on August 22nd, 1990, they did not know
14 that the case would be closed on August 23rd, 1990,
15 did they?
16    MR. BRUEGGEN: Objection.
17    MR. RAHE: Objection to what they would
18 have known, so speculation, form, foundation.
19    MR. BRUEGGEN: And mischaracterization
20 of the facts.
21    THE WITNESS: No, I don't believe they
22 would have necessarily known it was going to be
23 successfully completed.
24    BY MS. BONJEAN:
25 Q. Okay. Did Detective Paulnitsky have ESP?

Page 288

1    MR. BRUEGGEN: Objection,
2 argumentative.
3    MR. RAHE: Harassing.
4    THE WITNESS: No, ma'am.
5    BY MS. BONJEAN:
6 Q. Okay. No, I'm just wondering. Did he have
7 some, you know, powers?
8    MR. RAHE: I mean, you're obviously
9 being sarcastic.
10    BY MS. BONJEAN:
11 Q. Well, I mean, if we're going to fight over
12 obvious things, he didn't know what was going to
13 happen, right?
14    MR. RAHE: How can he speak for him?
15 It's pure speculation.
16    MS. BONJEAN: How do you know any --
17 how would anybody know what's going to happen in
18 the future, so it's not speculation, unless he
19 has -- he's speculating that he doesn't have ESP?
20 I mean, come on.
21    BY MS. BONJEAN:
22 Q. Detective Paulnitsky, as far as you know,
23 has no ability to predict the future, correct?
24 A. Correct.
25    MR. BRUEGGEN: Objection,

Maysonet v.
Guevara

Video Deposition

Page 289

1 argumentative.
2 BY MS. BONJEAN:
3 Q. So when he was interviewing Mr. Maysonet
4 with Mr. Montilla, he could not assume that the
5 case was going to be closed in the next 24 hours,
6 right?
7 MR. BRUEGGEN: Object to form,
8 mischaracterization.
9 THE WITNESS: Right.
10 BY MS. BONJEAN:
11 Q. Okay. And you would agree that it would
12 have been better practice -- or strike that.
13 It would have been good practice to
14 memorialize such an important statement by
15 Mr. Maysonet shortly after, like within the same
16 shift, that he made the statement, right?
17 MR. BRUEGGEN: Objection, form,
18 misstates prior testimony.
19 THE WITNESS: Sure.
20 BY MS. BONJEAN:
21 Q. So I understand what you're saying. You're
22 saying that this case ended up being closed in the
23 next 24 or, I don't know, 36 hours, and maybe he
24 just -- they just put in their, you know, their
25 report about what they heard from Mr. Maysonet at

Page 290

1 the time this report was being prepared, is that
2 right?
3 A. Well, like a GPR to refresh and make sure
4 that what they said was accurate.
5 Q. No, what I'm saying is: Mr. Paulnitsky
6 didn't actually prepare this report.
7 A. Correct.
8 Q. Okay. I mean, his name is on it so he's
9 responsible for it, but I can promise you -- I can
10 promise you that when Paulnitsky is sitting in this
11 chair, he is going to tell me that he did not
12 author this report. Okay?
13 MR. BRUEGGEN: Object to form.
14 BY MS. BONJEAN:
15 Q. So -- and I've heard already from Detective
16 Montilla that was Halvorsen who wrote this report.
17 All right?
18 A. Okay.
19 Q. Okay. So Halvorsen had to get this
20 information from somewhere, correct?
21 A. Correct.
22 Q. All right. And when he prepared this
23 report, he either got it directly from Paulnitsky
24 and Montilla by speaking to them, correct?
25 A. Correct.

Page 291

1 Q. Or he would have gotten it from a GPR maybe?
2 A. Possibly, yes.
3 Q. All right. So my point is, is: What if it
4 had taken five days to close this case?
5 MR. BRUEGGEN: Object to speculation.
6 BY MS. BONJEAN:
7 Q. Okay? What if there were so many witnesses
8 that needed to be interviewed, you got to get
9 people in, you got to do lineups. You know, many
10 things take time, correct?
11 A. Uh-huh.
12 Q. Would you agree that since Paulnitsky had no
13 idea what -- where this investigation was going to
14 go, he should have memorialized this very important
15 statement by Mr. Maysonet in a GPR?
16 MR. BRUEGGEN: Objection, asked and
17 answered, speculation.
18 THE WITNESS: I can agree with that.
19 BY MS. BONJEAN:
20 Q. Okay. Now, we're going to keep going: On
21 August 22nd, 1990, Detectives Halvorsen, Guevara
22 and Gawrys arrived at Area 5 to work the third
23 watch. This investigation was passed on to these
24 detectives.
25 Do you see that?

Page 292

1 A. Yes.
2 Q. Okay. So now we have Detective Paulnitsky
3 and Detective Montilla's shifts are ending, right?
4 A. Yes.
5 Q. And would you agree that before their shift
6 ends, they should probably have put a confession to
7 a murder on a piece of paper somewhere?
8 A. Yeah.
9 MR. BRUEGGEN: Object to form,
10 speculation.
11 BY MS. BONJEAN:
12 Q. Because this report certainly wasn't
13 prepared on August 22nd, 1990, right?
14 A. Right.
15 Q. So before they left their shift, they
16 probably should have scribbled it down somewhere
17 that Maysonet confessed to us to this double
18 murder, right?
19 MR. BRUEGGEN: Objection, asked and
20 answered, form.
21 THE WITNESS: I don't think
22 Mr. Maysonet said that he was there. I mean, he
23 acknowledged being there and knowing who the
24 offenders were.
25 /////

Maysonet v.
Guevara

Video Deposition

---

Page 293

1    BY MS. BONJEAN:
2  Q.  Sir, August 1st, 1990 --
3  A.  And supplying the gun.
4  Q.  -- he not only -- he said he knew who the
5    shooter was.  He said he was involved in the
6    murders, and he stated that...
7  A.  He could not provide any further information.
8  Q.  Hold on a second.  Hold on.
9    Here, August 1st.  He stated that he was not
10   the shooter, but he was present when the shooting
11   occurred.  That was on August 1st, 1990.  And then
12   he repeated that information, according to this
13   report, on August 22nd, 1990, correct?
14  A.  Yes.
15  Q.  Okay.  And without getting absolutely silly,
16   and I know you're not going to be silly, we can
17   agree that before Detective Paulnitsky left work
18   that day, he would have or should have memorialized
19   that on a GPR or in some form or fashion before he
20   ended his shift, correct?
21  A.  Yes.
22     MR. BRUEGGEN: Object to form,
23   compound.
24     BY MS. BONJEAN:
25  Q.  He has no idea where this investigation is

---

Page 294

1    going to go when he leaves work that day, correct?
2     MR. BRUEGGEN: Objection, asked and
3    answered.
4     THE WITNESS: Yes.
5     BY MS. BONJEAN:
6  Q.  Okay.  And certainly he would want the
7    detectives who are taking over the case to know
8    that Mr. Maysonet confessed, correct?
9  A.  I believe --
10     MR. RAHE: Objection, speculation.
11     THE WITNESS: -- as it states over
12   here, they passed on the information, so orally, I
13   believe it would have been passed on.
14     BY MS. BONJEAN:
15  Q.  Where does he say that?  The investigation
16   was passed on to these detectives.
17  A.  Correct.  I think that they would have given
18   him that additional information orally if they
19   didn't type out a GPR.
20  Q.  Okay.  So it's possible, but we don't know
21   that, right?
22  A.  That's correct.
23  Q.  And we don't know whether Paulnitsky is
24   going to ever come back to work.  He could get hit
25   by a car, right?

---

Page 295

1     MR. BRUEGGEN: Objection,
2    argumentative.
3     THE WITNESS: That's correct.
4     BY MS. BONJEAN:
5  Q.  I mean, you know, this isn't -- this is like
6    kind of important stuff.  It should be documented,
7    no?
8     MR. BRUEGGEN: Object to form, asked
9    and answered, tone.
10     THE WITNESS: Yes.
11     BY MS. BONJEAN:
12  Q.  "August 22nd at 2000 hours, Jose Maysonet
13   was interviewed by Detective Guevara, who speaks
14   Spanish.  During this interview, Jose Maysonet
15   agreed to tell all he knew."  All right?
16  A.  Yes.
17  Q.  Now, we have a full on confession here at
18   2200 hours on August 22nd, 1990, to Detective
19   Guevara.
20   Does this report indicate whether anyone
21   else was present during that interview?
22     MR. BRUEGGEN: Object to form,
23   compound.
24     THE WITNESS: No, it doesn't.
25   /////

---

Page 296

1     BY MS. BONJEAN:
2  Q.  Okay.  So at least -- and how else -- how
3    could we tell if there was anyone else present when
4    Maysonet confessed to Detective Guevara?
5  A.  We can't by reading that report.
6  Q.  And any -- what are the other -- strike
7    that.
8    If you wanted to know -- let me start over.
9    You actually approved this closing report,
10   right?
11  A.  Yes.
12     MR. BRUEGGEN: Object to
13   characterization.
14     BY MS. BONJEAN:
15  Q.  And you know it was prepared by Halvorsen,
16   right?
17  A.  Yes.
18  Q.  You also know that Detective Guevara isn't
19   the strongest report writer, correct?
20  A.  Correct.
21  Q.  We also know Halvorsen wasn't present, at
22   least according to this, when this confession was
23   made, correct?
24     MR. BRUEGGEN: Object to form.
25     THE WITNESS: We don't know he wasn't

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 297

1　present.  It isn't indicated in here that anybody
2　else was present.
3　　　BY MS. BONJEAN:
4　Q.  Okay.  But if you wanted to know if someone
5　else was present as the approving supervisor, would
6　you -- without asking them specifically, is there
7　anything you would look for in the investigative
8　file?
9　　　MR. BRUEGGEN: Object to form.
10　　　THE WITNESS: In the investigative
11　file?
12　　　BY MS. BONJEAN:
13　Q.  Anywhere.
14　A.  Well, it might have been noted in the
15　investigative file if there was another person in
16　the room, but also could have been notified -- or
17　noted in the report.  Present also was, but it's not
18　here.
19　Q.  Right.  But we have a scenario where we have
20　a confession to a double murder, right?
21　A.  Yes.
22　Q.  Made to a detective who did not actually
23　prepare the report that memorializes this
24　statement?
25　A.  Correct.

Page 298

1　Q.  Okay.  Is that in keeping -- strike that.
2　Is that acceptable practice --
3　　　MR. BRUEGGEN: Object to form.
4　　　BY MS. BONJEAN:
5　Q.  -- in your mind?
6　　　MR. BRUEGGEN: Object to form,
7　foundation, vague.
8　　　THE WITNESS: I don't know exactly --
9　could you state that question another way?
10　　　BY MS. BONJEAN:
11　Q.  Sure.  I suspect when I get Detective
12　Halvorsen sitting here, he's going to tell me he
13　wasn't present when this confession was made to Rey
14　Guevara.
15　A.  Okay.
16　Q.  Maybe he will, but let's just work off the
17　assumption right now --
18　A.  Okay.
19　Q.  -- that he was not present, because the
20　report does not indicate he was present.
21　A.  Okay.
22　Q.  All right.  Because Detective Halvorsen
23　knows how to write a report, and I suspect if he
24　was present, he would have written on August
25　22nd -- August 22nd, 1990, at 2000 hours, Jose

Page 299

1　Maysonet was interviewed by Detective R. Guevara
2　and Detective E. Halvorsen or Detective R. Guevara
3　and the --
4　A.  Uh-huh.
5　Q.  -- you know, the undersigned detective,
6　however they write these things, right?
7　A.  Correct.
8　　　MR. BRUEGGEN: Object to form and
9　foundation.
10　　　BY MS. BONJEAN:
11　Q.  And that is not what's on here, correct?
12　A.  Correct.
13　Q.  So we have here a confession in some very
14　significant detail, correct?
15　A.  Yes.
16　Q.  Authored by someone who did not hear that
17　confession?
18　　　MR. BRUEGGEN: Object to form.
19　　　MR. RAHE: Object to foundation.
20　　　THE WITNESS: Well, I don't know that.
21　　　BY MS. BONJEAN:
22　Q.  Assume for me that he didn't hear.  What --
23　what makes you think Halvorsen was there?
24　A.  What makes me think he wasn't there.
25　Q.  Because his name doesn't say I was there.

Page 300

1　A.  Well, okay.  Okay.  I don't know if there was
2　anybody else there in the room.  I mean, you're
3　asking me to speculate.  I can speculate that based
4　on this report, it appears that Rey was in there by
5　himself.
6　Q.  Okay.  Based on that report.  I'm not asking
7　you to attest that that is in fact the truth.  I'm
8　asking you to work with the information that we
9　have, because if you-all did a better job reporting
10　or actually reporting things, we might not have to
11　do so much speculation, right?
12　　　MR. BRUEGGEN: Objection.
13　　　BY MS. BONJEAN:
14　Q.  That's part of the problem.
15　　　MR. BRUEGGEN: Objection,
16　argumentative.
17　　　BY MS. BONJEAN:
18　Q.  Or maybe if the City kept their files.  I
19　don't know.
20　　　MR. BRUEGGEN: Objection.
21　　　BY MS. BONJEAN:
22　Q.  But we're all in the same boat here.
23　　　MR. BRUEGGEN: Objection,
24　argumentative.  No question pending.
25　/////

Page 301

1    BY MS. BONJEAN:
2  Q.  Without knowing exactly what happened,
3  because we weren't there, either one of us, we can
4  only work with what we have before us.  And you
5  would agree that this report does not reflect that
6  Halvorsen was present when Jose Maysonet confessed
7  to Rey Guevara, correct?
8  A.  Correct.
9    MR. BRUEGGEN: Objection, asked and
10  answered.
11    BY MS. BONJEAN:
12  Q.  Now, assuming that turns out to be true,
13  that he was not present, and we will find out from
14  Detective Halvorsen himself, that would mean that
15  this confession that's written on this report was
16  authored by someone who did not actually hear the
17  confession, correct?
18  A.  Yes.
19  Q.  All right.  So that means that when he wrote
20  this, he either had to get this information
21  directly from Rey Guevara, right?
22  A.  Yes.
23  Q.  Rey saying, okay, this is what Jose Maysonet
24  said to me line by line by line, right?
25    MR. BRUEGGEN: Object to form.

Page 302

1    THE WITNESS: I would think so, yeah.
2    BY MS. BONJEAN:
3  Q.  Or he would have had to get it from, what, a
4  GPR, right?
5  A.  Yes.
6  Q.  Any other way he would have been able to get
7  this information if he himself was not present
8  during this interview with Jose Maysonet?
9    MR. BRUEGGEN: Object to form, calls
10  for speculation.
11    THE WITNESS: I can't think of any
12  other way.
13    BY MS. BONJEAN:
14  Q.  Okay.  Now, if Detective Guevara -- well,
15  strike this.
16  Do you think it's more likely that Detective
17  Guevara prepared a GPR about this -- with this --
18  reflecting this confession or that he told
19  Halvorsen all of this information line by line?
20    MR. BRUEGGEN: Object to form.
21    MR. RAHE: Speculation.
22    THE WITNESS: I would think he would
23  have done a GPR at some point.
24    BY MS. BONJEAN:
25  Q.  It would -- right.  It would be hard to

Page 303

1  remember all of this even a day later, right?
2  A.  There's a lot of detail in there, yes.
3  Q.  Right, a lot of detail.  In fact, there's
4  even quotations.  Lluvia said, I killed two black
5  motherfuckers, there's quotation marks around that,
6  right?
7  A.  Yes.
8  Q.  Okay.  Those quotation marks, assuming
9  Halvorsen wasn't there, had to have been reported
10  by Detective Guevara, correct?
11  A.  Yes.
12  Q.  And as a sergeant who was supervising
13  detectives, can I assume that you would hope that
14  Guevara would have done a GPR?
15  A.  Yeah.
16    MR. BRUEGGEN: Object to form.
17    THE WITNESS: Yes.
18    BY MS. BONJEAN:
19  Q.  Okay.  And, again, that GPR would be in the
20  investigative file, right?
21  A.  Yes.
22  Q.  Should be in the investigative file?
23  A.  Yes.
24  Q.  It also should be listed on an inventory log
25  of all the reports in an investigative file,

Page 304

1  correct?
2  A.  Yes.
3  Q.  Moving on.
4  Oh, strike that.  Before we move on, did you
5  have a chance to read the confession?
6  A.  Just the narrative that was on this report.
7  I didn't read --
8  Q.  Right.
9  A.  Yeah.
10  Q.  Yeah.  And did you -- did you see that
11  there's a mention of a -- that the car was a light
12  blue over dark black Pontiac Bonaventure that
13  belonged to another Latin King named Jeffrey?
14    MR. RAHE: Which page is that?
15    MS. BONJEAN: Yeah, that's the bottom
16  of 51.
17    MR. BRUEGGEN: Can you repeat the
18  question now that he's got the place?
19    MS. BONJEAN: Yeah.
20    BY MS. BONJEAN:
21  Q.  Do you see the mention that the car used in
22  this double murder was a car that was apparently
23  owned by a fellow named Jeffrey, a Latin King named
24  Jeffrey?
25  A.  Yes.

Page 305

1 Q. Would you expect the reporting detectives or
2 the investigating detectives to try to go find
3 Jeffrey?
4 A. Yes.
5 MR. BRUEGGEN: Objection, speculation.
6 BY MS. BONJEAN:
7 Q. That would be an obvious lead to follow up
8 on, correct?
9 MR. BRUEGGEN: Object to form.
10 THE WITNESS: Yes.
11 BY MS. BONJEAN:
12 Q. In fact, earlier in this report, the section
13 on the vehicle used is Jeffrey's vehicle was used
14 in this double murder, according to this report,
15 right?
16 MR. RAHE: What page is that?
17 MS. BONJEAN: 49.
18 THE WITNESS: Yes.
19 BY MS. BONJEAN:
20 Q. And if you were reviewing this report, this
21 closing report, which you were apparently, do you
22 believe it would have been keeping with your
23 practice to say, hey, are we pursuing Jeffrey,
24 anyone looking for Jeffrey, finding Jeffrey,
25 where's Jeffrey, something like that?

Page 306

1 MR. BRUEGGEN: Object to form,
2 characterization, speculation.
3 THE WITNESS: Quite possibly.
4 BY MS. BONJEAN:
5 Q. I mean, you'd want to know -- you'd want to
6 talk to the guy whose car was used in a double
7 murder, correct?
8 A. Yes.
9 Q. And you would want to ensure that Jeffrey
10 was not -- maybe he was present. He could have
11 also been a co-conspirator, correct?
12 A. Possibly.
13 Q. You would want to find out?
14 A. Possibly, yes.
15 Q. That's what detectives do, correct?
16 A. Yes.
17 Q. And in looking at Exhibit 3, do you know
18 whether or not Jeffrey was ever located or...
19 A. No, it doesn't indicate that.
20 Q. Okay. Let's keep going.
21 Middle of page 52, we have: On August 22nd,
22 1990, at 2100 hours, Maysonet's wife Rosa Bello
23 arrived at Area 5. She was allowed to talk with
24 Maysonet in the presence of detectives. Maysonet
25 told her to tell the truth about the night the

Page 307

1 blacks were killed. She agreed to do so.
2 Do you see that?
3 A. Yes.
4 Q. So here's another -- I don't know what to
5 call it, but it's another interaction between
6 Mr. Maysonet and here a third party apparently
7 witnessed by somebody, right, a detective of some
8 type, correct?
9 A. Maybe even sitting outside the room. I don't
10 know.
11 Q. We don't know, right?
12 A. Right, we don't know.
13 Q. And shouldn't a report tell us how this came
14 to be?
15 MR. BRUEGGEN: Object to form,
16 speculation.
17 THE WITNESS: There should be a bit
18 more information in there, yes.
19 BY MS. BONJEAN:
20 Q. Right. Let's say I'm a prosecutor and I
21 want to prosecute Mr. Maysonet for a double
22 homicide.
23 A. Uh-huh.
24 Q. And here is an admission that I want to
25 introduce to show that he was responsible for this

Page 308

1 double murder, correct?
2 A. Okay.
3 MR. BRUEGGEN: Object to form.
4 BY MS. BONJEAN:
5 Q. Well, he's telling his wife, hey, tell them
6 the truth about the -- the night these individuals
7 were killed, right?
8 A. Yes.
9 Q. And this report wouldn't tell me which
10 police officer I have to put on the stand to
11 testify to that, does it?
12 A. No.
13 Q. Okay. So how would I find out if I was the
14 prosecutor and wanted to call that detective to the
15 stand to testify about this admission?
16 A. You couldn't, unless you had the information
17 from another source.
18 Q. Right, because shouldn't -- we talked about
19 this at length. Shouldn't the reports have the
20 who, the what, the where, the how, the why and all
21 of that?
22 A. Ideally, yes.
23 Q. And this does not, correct?
24 A. Correct.
25 Q. Would you have expected there to be a GPR,

Maysonet v.
Guevara

Video Deposition

Page 309

1  perhaps, that would have reflected this interaction
2  that was witnessed by some detective?
3      MR. RAHE: Objection, speculation.
4      THE WITNESS: Perhaps, but it's -- it's
5  recorded here. And like I say, everything is
6  flowing here. Everything is going. You know, from
7  the 22nd, it's going right straight through, so...
8      BY MS. BONJEAN:
9  Q.  You mean besides that big gap between July
10  15th, August 1st --
11  A.  Yes.
12  Q.  -- and then August 22nd?
13  A.  Yes, ma'am.
14  Q.  Okay. As of August 22nd, it's flowing,
15  agreed. He's in custody on August 22nd, and from
16  there on, it starts flowing, correct?
17  A.  Yes.
18  Q.  But this -- this report doesn't tell us who
19  witnessed, again, another admission to a double
20  murder, does it? We don't know if it was
21  Paulnitsky. We don't know if it was Montilla. We
22  don't know if it was Halvorsen himself, if it was
23  Guevara. We don't know if it was you. You don't
24  know who it was by looking at this report?
25      MR. BRUEGGEN: Object to form.

Page 310

1      THE WITNESS: In this report as I read
2  it, he's just telling his wife to tell the truth.
3      BY MS. BONJEAN:
4  Q.  Correct. And that would be an admission,
5  wouldn't it?
6      MR. BRUEGGEN: Objection, form.
7      THE WITNESS: It would be -- I don't
8  know what the correct legal term is, but she wasn't
9  personally involved in it, other than she got the
10  gun out of a bag, I think.
11      MS. BONJEAN: Right.
12      THE WITNESS: So...
13      BY MS. BONJEAN:
14  Q.  That's evidence that suggests -- that makes
15  it more likely --
16  A.  Right. There should have been a GPR. I
17  mean, you're not going to stop an investigation
18  after each interview and do a supplemental report.
19  It should have been on a GPR. I have no qualms with
20  that.
21  Q.  I have no qualms with that either.
22  A.  Okay.
23  Q.  Can you tell me where the GPR is?
24      MR. BRUEGGEN: Objection.
25      THE WITNESS: No, ma'am, I can't.

Page 311

1      BY MS. BONJEAN:
2  Q.  Okay. And even though there's no GPR, how
3  about just telling us who was there.
4  A.  Okay.
5  Q.  This doesn't tell us who was there, does it?
6  A.  No, it doesn't.
7  Q.  So if Mr. Maysonet testifies this is a lie,
8  I never said that to my wife, who's going to come
9  in and say, no, no, no, Mr. Maysonet, I was there,
10  I heard you say it? Who is going to testify to
11  that?
12  A.  Perhaps Rosa Bella.
13  Q.  Okay. If not his wife, what detective is
14  going to testify to that?
15  A.  I don't know. Possibly -- again, it's not
16  recorded anywhere, but maybe one of these four were
17  in the room. I don't know.
18  Q.  And the report doesn't tell us?
19  A.  It doesn't tell us.
20  Q.  And the report should tell us, correct?
21      MR. BRUEGGEN: Object to form.
22      THE WITNESS: Based on the standards of
23  now, yes.
24      BY MS. BONJEAN:
25  Q.  Not the standards of now.

Page 312

1  A.  If it -- it was in the GPR, if it was in the
2  GPR, which we don't know if it existed or not, I
3  don't know, that would be a place for it as well.
4  Q.  Okay. Agreed. It should be somewhere,
5  though, right?
6  A.  Yes. Yes.
7  Q.  We have a statement from Rosa Bello that
8  apparently was provided. Again, this report
9  doesn't tell us who she said this to, but we do
10  have a handwritten statement from her. So if
11  there's a handwritten statement, that would tell us
12  who's present, right?
13  A.  Yes.
14  Q.  Moving on.
15  Oh, I'm sorry, before we do that.
16  Top of page 53, it says, "Jose Maysonet
17  stated that he knew where both Lluvia and Fro
18  lived. He offered to show detectives these
19  addresses. Maysonet also stated that he knew that
20  Tino's last name was Cruz. Maysonet identified an
21  apartment building on Kedzie as being where Lluvia
22  stayed. He also identified a house at 1035 North
23  Spaulding as where Fro lived. While Maysonet was
24  being driven around, he spotted Lluvia at the
25  corner of LeMoyne and Spaulding. Maysonet was

Maysonet v.
Guevara

Video Deposition

Page 313

1  returned to Area 5.  At Area 5, Maysonet was shown
2  loose candid photos of Latin King members.  He
3  identified a photo of Chris Fernando as being Fro."
4  Do you see that?
5  A.  Yes.
6  Q.  Okay.  Now, you said these statements was
7  flowing, right?
8  A.  Yes.
9  Q.  Does this paragraph tell us who was driving
10 Mr. Maysonet around?
11 A.  No.
12 Q.  Does it tell us who was present when
13 Mr. Maysonet was out in the streets with whoever he
14 was out in the streets with?
15 A.  No.
16 Q.  Should it tell us that?
17 A.  It could be, yes.
18 Q.  Shouldn't there be a report documenting what
19 photos -- candido photos he was looking at?
20 Candida.
21     MR. BRUEGGEN: Candid?  It says candid.
22     MS. BONJEAN: It's cop speak.  You
23 wouldn't know anything about it.
24     THE WITNESS: Yes.
25 /////

Page 314

1     BY MS. BONJEAN:
2  Q.  This is information that is apparently taken
3  from Mr. Maysonet in a subsequent interview,
4  correct?
5     MR. BRUEGGEN: Object to form,
6  characterization.
7     THE WITNESS: Yes, when they're out
8  riding around.
9     BY MS. BONJEAN:
10 Q.  Right.  And every time you interview a
11 suspect, it should be recorded in some way with
12 some particularity, correct?
13     MR. BRUEGGEN: Object to form.
14     BY MS. BONJEAN:
15 Q.  I mean, if they're making statements that
16 you are going to be using against them at some
17 point in time, correct?
18 A.  You mean a separate interview?
19 Q.  I'm not even --
20 A.  I think -- I think this would suffice if
21 you're recording it in close proximity.
22 Q.  Right.
23 A.  I think that you could just go like a new
24 paragraph and say this is what happened and this is
25 what he said when we were out driving around and

Page 315

1  this is what happened when we got back.  I think
2  that's acceptable.
3  Q.  It's acceptable if it's Halvorsen who heard
4  him say it, right?
5  A.  Right.
6  Q.  But we don't know, right, from looking at
7  this who he --
8  A.  Or who -- who typed it.  I mean, you're
9  saying that all of them -- Steve -- who else is on
10 this report?
11 Steve Gawrys is on there.  I mean, he's a
12 good typist.  He's a street guy who worked with
13 Guevara, so I mean...
14 Q.  So it's possible anybody typed it, right?
15     MR. BRUEGGEN: Objection, speculation.
16     THE WITNESS: It's possible.  You know,
17 it is speculation, like you asked me on the other
18 report.
19     BY MS. BONJEAN:
20 Q.  Yeah, but you've already testified that it's
21 your best guess that whose name is in that front
22 box, that first box, is probably the person who
23 authored -- put the words on the piece of paper,
24 right?
25 A.  Right, but I also said that -- the first

Page 316

1  page.  I don't know, during the course of a long,
2  drawn out investigation, if other people contributed
3  while we were --
4  Q.  Contributed to the investigation or the
5  writing process?
6  A.  No, contributed to the writing of the
7  project.
8  Q.  Okay.  Well, I'm not going to fight with you
9  about that, but if that's the practice of the
10 Chicago Police Department, it explains why you-all
11 are sued as much as you're sued, because that is a
12 practice that is really abhorrent.
13     MR. BRUEGGEN: Objection to the
14 comments.
15     BY MS. BONJEAN:
16 Q.  Well, I mean, it allows police officers to
17 not take responsibility for their -- for -- for
18 their -- their written work, right?
19     MR. RAHE: Objection.
20     MR. BRUEGGEN: Objection, form,
21 argumentative.
22     THE WITNESS: I don't agree.
23     MR. RAHE: Foundation.
24     MR. BRUEGGEN: Misstates the testimony.
25     THE WITNESS: I don't agree.

Rizman Rappaport (973)992-7650
"When every word counts"

Page 317

1      BY MS. BONJEAN:
2  Q.  Do you know how many transcripts I have read
3    where detectives say "I didn't write that"?
4      MR. RAHE: Objection, form.
5      MR. BRENER: Objection, foundation.
6      MR. RAHE: Foundation, speculation.
7      BY MS. BONJEAN:
8  Q.  It happens a lot, right?
9  A.  I don't know if it happens a lot.
10 Q.  Okay.  I'm not going to -- I'm not going to
11   argue with you about it, but now you're telling me
12   that, you know, you just can't -- you just can't
13   know who wrote this thing if you look at it, right?
14     MR. BRUEGGEN: Objection, misstates his
15   testimony.
16     THE WITNESS: I mean, in my experience,
17   there were times when you're putting a whole final
18   clearing, closing report together, that you just
19   take breaks, you know.  And one detective, out of
20   these four, might have been in part and parcel to
21   one of these statements.  Another detective might
22   have been part and parcel to another part of his
23   statements.  So they write exactly on that
24   supplemental report what happened to the best of
25   their recollection.

Page 318

1      BY MS. BONJEAN:
2  Q.  Okay.  And how difficult would it be to say
3    when I, Detective Montilla, interviewed Jose
4    Maysonet, this is what he said?
5  A.  It wouldn't be difficult at all.
6      MR. BRUEGGEN: Object to form,
7    argumentative.
8      BY MS. BONJEAN:
9  Q.  Okay.  And there's no -- this does not
10   reflect on page seven who was driving around with
11   Jose Maysonet, right?
12 A.  Correct.
13 Q.  We don't know who was in the car, correct?
14 A.  Correct.
15 Q.  We don't know who he made these statements
16   to, correct?
17     MR. RAHE: Objection, asked and
18   answered.
19     THE WITNESS: Correct.
20     BY MS. BONJEAN:
21 Q.  We don't know who showed him the candid
22   photos of the Latin King members, right?
23 A.  Right.
24 Q.  This doesn't tell us what Latin King candid
25   photos he looked at, correct?

Page 319

1      MR. RAHE: Objection, asked and
2    answered.
3      THE WITNESS: Not from this report, no.
4      BY MS. BONJEAN:
5  Q.  Right.  And have you seen any report that
6    would reflect that?
7  A.  I haven't personally seen any report.
8  Q.  Okay.  And this also doesn't tell us or
9    reflect the identification of a photo of Chris
10   Fernandez, does it?
11     MR. BRUEGGEN: Object to form.
12     THE WITNESS: This report does not, no.
13     BY MS. BONJEAN:
14 Q.  So if a prosecutor was prosecuting this case
15   and wanted to get in any of this evidence -- I know
16   you're not a lawyer and I know you don't know the
17   rules of evidence necessarily, but if I was a
18   prosecutor and I wanted to present this evidence to
19   a jury or a judge, I would look at this report and
20   have to actually go figure out which one of these
21   fellows at the end can tell me this, right?
22     MR. BRUEGGEN: Object to speculation,
23   foundation.
24     THE WITNESS: There would be, I would
25   imagine, several meetings with all the officers

Page 320

1    involved so they could dissect who did what --
2      MS. BONJEAN: Okay.
3      THE WITNESS: -- and when they did it
4    and who they were with when they did it.
5      BY MS. BONJEAN:
6  Q.  Right.  And 30 years later, when these
7    fellows are being sued --
8  A.  Uh-huh.
9  Q.  -- nobody can remember, right?
10     MR. BRUEGGEN: Objection, speculation.
11     THE WITNESS: Well, there's court
12   transcripts.
13     MR. BRUEGGEN: Foundation.
14     THE WITNESS: I would imagine that
15   court transcripts would have more information for
16   you.
17     MS. BONJEAN: Oh.  I...
18     THE WITNESS: I would think.
19     MS. BONJEAN: You'd be wrong.
20     THE WITNESS: Well, okay.
21     BY MS. BONJEAN:
22 Q.  Okay.  Well, we will talk to Detective
23   Halvorsen and find out, but I can tell you this.
24   Detective Montilla testified yesterday that he took
25   no role in preparing this report.

Maysonet v.
Guevara

Video Deposition

Page 321

1  A.  Okay.
2  Q.  Cross him off the list.
3  A.  Okay.
4  Q.  Took no role in it.  Not only that, he
5  stated he took no part in the investigation, that
6  he served merely as an interpreter.
7       MR. BRUEGGEN: Object, mischaracterizes
8  Montilla's testimony.
9       THE WITNESS: Okay.
10      BY MS. BONJEAN:
11 Q.  So if I take the depositions of all these
12 fellows here and nobody remembers having been the
13 person responsible for authoring this, I guess
14 we're just all screwed, right?
15      MR. RAHE: Objection, argumentative,
16 foundation.
17      THE WITNESS: Again, I would think that
18 the court transcripts would provide more
19 information.
20      MR. RAHE: Form as well.
21      THE WITNESS: I haven't seen them.
22      BY MS. BONJEAN:
23 Q.  Okay.  Well, they don't.  But suffice it to
24 say, as a supervising sergeant, it's really
25 unacceptable that this paragraph doesn't identify

Page 322

1  any of the detectives that were involved in these
2  investigative acts, correct?
3       MR. BRUEGGEN: Object to form,
4  mischaracterizes prior testimony.
5       THE WITNESS: Not that report, no, it
6  does not.
7       BY MS. BONJEAN:
8  Q.  Right.  And you supervised and approved this
9  report.  Why didn't you say somebody amend this
10 report to identify who was responsible for this
11 investigative work?
12      MR. BRUEGGEN: Objection, calls for
13 speculation.
14      THE WITNESS: Again, I don't know that
15 I didn't see GPRs on there that identified those
16 things.  They're apparently unavailable.  So I
17 can't tell you one way or the other, but I can't
18 disagree with you that that would make it easier
19 for everybody.
20      BY MS. BONJEAN:
21 Q.  Not just a matter of easier.  It's just --
22 you know.
23 A.  Well, you would know the right person to ask
24 the questions of.
25 Q.  No.  I mean, you're right, I would know the

Page 323

1  right person.  I mean, where I sit, I don't think
2  it happened.  I think it's a lie.
3       MR. BRUEGGEN: Object to the
4  commentary.
5       BY MS. BONJEAN:
6  Q.  And you would be able to disprove my theory
7  that this is all a lie if you had some reports to
8  show me, wouldn't you?
9       MR. RAHE: Objection.
10      MR. BRUEGGEN: Objection, calls for
11 speculation, argumentative.
12      THE WITNESS: Yes.
13      BY MS. BONJEAN:
14 Q.  If somebody could show me a GPR that was
15 signed in and around the time that this happened, I
16 might be more inclined to believe it happened.
17 See, isn't that one of the pitfalls of not
18 preparing GPRs?
19      MR. BRUEGGEN: Objection, form.
20      THE WITNESS: Yes.
21      MR. BRUEGGEN: Calls for speculation.
22      BY MS. BONJEAN:
23 Q.  All right. So let's keep going.  "The
24 reporting detectives and Sergeant Mingey spent the
25 next hours searching the neighborhoods for all

Page 324

1  three offenders.  During the early morning hours of
2  August 23rd, 1990, Lluvia was seen on the street by
3  Detective Gawrys and Sergeant Mingey.  Lluvia was
4  now identified as being Alfredo Gonzalez.  Gonzalez
5  was informed of the allegation made against him by
6  Jose Maysonet.  Gonzalez was asked to come to Area
7  5 to be interviewed.  Gonzalez stated that he would
8  and was driven to Area 5."
9  Do you see that?
10 A.  Yes.
11 Q.  Okay.  Hold on one second.
12 Okay.  Do you remember -- I don't think
13 you -- I think you said you don't remember an
14 Alfredo Gonzalez.  Right?
15 A.  Right.
16 Q.  You don't remember any of these characters
17 in this -- mentioned in this report, right?
18 A.  Correct.
19      MR. BRUEGGEN: Object to form.
20      BY MS. BONJEAN:
21 Q.  I'm going to have you look at -- you can put
22 it aside for the moment.
23      MR. BRUEGGEN: Are we switching
24 documents?
25      MS. BONJEAN: Yeah.

Maysonet v.
Guevara

Video Deposition

Page 325

1  MR. BRUEGGEN: Can we take a quick
2  break?
3  MS. BONJEAN: Uh-huh.  Sure.
4  MR. BRUEGGEN: Thanks.
5  THE VIDEOGRAPHER: We're going off the
6  record at 4:34 p.m.
7  (Recess taken from 4:34 to 4:46.)
8  THE VIDEOGRAPHER: We are now back on
9  the record at 4:46 p.m.
10  BY MS. BONJEAN:
11  Q.  Okay.  Mr. Epplen, I'm going to -- this
12  closing report we've been looking at, you can
13  just -- we'll get back to it, but if you could just
14  sort of push it to the side for a minute.
15  A.  The cleared/open report, you mean?
16  Q.  Yes.  I'm sorry.
17  A.  Okay.
18  Q.  I mean, I called it a closing record.  It's
19  a -- what's a cleared -- what's the difference?
20  What's a cleared/open report?
21  A.  That there's additional offenders out that
22  haven't been charged.
23  Q.  Okay.  But there have been individuals who
24  have been charged, right?
25  A.  Yes.

Page 326

1  Q.  Okay.
2  A.  But they weren't at this time.
3  Q.  Right.
4  Okay.  I'd like you to look at RFC-Maysonet
5  47 through -- strike that.  I'm sorry.  That's what
6  we were just looking at, right?
7  A.  Yes.
8  MR. RAHE: Uh-huh.
9  BY MS. BONJEAN:
10  Q.  I'm sorry.  Could you look at RFC-Maysonet
11  45.
12  A.  Okay.
13  MR. BRUEGGEN: 45 and 46 probably.
14  MS. BONJEAN: 45 and 46.
15  THE WITNESS: Okay.
16  MR. BRUEGGEN: Thank you.
17  BY MS. BONJEAN:
18  Q.  This is a supplemental report, right?
19  A.  Yes.
20  Q.  And this is a report that was -- it looks
21  like the reporting officer was a Detective Smitka
22  and a Detective Schak?
23  A.  Yes.
24  Q.  And it's also a report that you approved as
25  the supervisor?

Page 327

1  A.  Yes.
2  Q.  Right?
3  And it deals -- did we call it an in-custody
4  report?
5  A.  It can, yes.
6  Q.  And this deals with or is about Justino
7  Cruz.  This reflects that he was in custody, right?
8  A.  Yes.
9  Q.  And it was submitted on August 24th, 1990,
10  correct?
11  A.  Yes.
12  Q.  And that would have been the day after this
13  report that maybe was prepared by Halvorsen, but
14  could have been a joint effort by a number of
15  detectives, the one that we've been looking at?
16  MR. BRUEGGEN: RFC 47?
17  BY MS. BONJEAN:
18  Q.  RF -- I'm saying RFC 45 was submitted just a
19  day after this long report that we think was done
20  by Halvorsen, but who knows, right?
21  A.  Yes.
22  Q.  Okay.  Now, this report, I'll call it the
23  Smitka/Schak report, if you go to the second page,
24  it tells us that:  In continuation -- continuance
25  of the above-captioned investigations conducted by

Page 328

1  Halvorsen, Paulnitsky, Gawrys and Guevara and
2  supervised by Sergeant Mingey, it has been
3  established that there were four individuals
4  responsible for the above-captioned double
5  homicide.  Two subjects, Gonzalez -- Alfredo
6  Gonzalez and Jose Maysonet, had previously been
7  taken into custody and charged.  Both implicated
8  Cruz.
9  Do you see that?
10  A.  Yes.
11  Q.  And do you see in the middle, it appears to
12  summarize a statement by Justino Cruz?
13  MR. BRUEGGEN: Can I direct him?
14  MS. BONJEAN: Yeah.
15  THE WITNESS: Yes, I see it.
16  BY MS. BONJEAN:
17  Q.  Right.  And it even says:  In subsequent
18  statement to the undersigned.  Correct?
19  A.  Yes.
20  Q.  So we know by looking at Detective Smitka's
21  report, that Justino Cruz made statements to them,
22  correct?
23  A.  Yes.
24  Q.  To Detective Smitka, correct?
25  A.  Detective Smitka, yes.

Page 329

1  Q.  Uh-huh.  And that is a useful piece of
2  information that is absent in the other report,
3  correct?
4  A.  Yes.
5  Q.  So it's not that these detectives aren't
6  capable of indicating, when they want to, who was
7  present for an interview, right?
8      MR. BRUEGGEN: Object to form.
9      THE WITNESS: Correct.
10     BY MS. BONJEAN:
11 Q.  And also this supplemental report documented
12 an interview with an offender that occurred in and
13 around the time that the report was submitted,
14 right?
15 A.  Yes.
16 Q.  And we don't see a report like this that
17 reflects the interview that Guevara did alone with
18 Mr. Maysonet, right?
19     MR. BRUEGGEN: Object to form.
20     BY MS. BONJEAN:
21 Q.  We haven't seen that in this exhibit,
22 correct?
23     MR. BRUEGGEN: Object to form and
24 foundation.
25     THE WITNESS: Well, if I may, in

Page 330

1  reading what I'm reading here, Detective Smitka --
2      MS. BONJEAN: Uh-huh.
3      THE WITNESS: -- is the first box, so
4  I'm assuming he's the author.
5      MS. BONJEAN: Yep.
6      THE WITNESS: And it just says to the
7  undersigned.  So I think there, that they're saying
8  is both of them were in the room.
9      MS. BONJEAN: Right.
10     THE WITNESS: That would be my
11 impression.
12     MS. BONJEAN: Right.
13     THE WITNESS: So okay.
14     BY MS. BONJEAN:
15 Q.  It's either one or both of them, right?
16 A.  Yes.
17 Q.  And it's memorialized, correct?
18 A.  Correct, yes.
19 Q.  And I'm drawing a distinct between a report
20 like this, which tells us information about who was
21 present when Justino Cruz made the statement, at
22 least we know it's one or both of the authors of
23 this report, correct?
24 A.  Yes.
25 Q.  But we don't have any similar report like

Page 331

1  this as it relates to the statement that Jose
2  Maysonet made to Guevara, correct?
3  A.  Correct.
4      MR. BRUEGGEN: Object to form.
5      BY MS. BONJEAN:
6  Q.  All we have is a report written by maybe
7  Halvorsen after the fact, correct?
8  A.  Yes.
9  Q.  And if you could look at RFC 42 through 44,
10 we have a report that also seems to be prepared by
11 Halvorsen, right?
12 A.  Yes.
13 Q.  It's signed by Halvorsen, correct?
14 A.  Yes.
15 Q.  And this report also summarizes a statement
16 made by Alfredo Gonzalez, correct?
17 A.  Yes.
18 Q.  And -- let's see.
19 It says at the bottom of page -- on 43:
20 During the third watch on August 23rd, 1990,
21 Detective E. Halvorsen and R. Guevara searched to
22 find the two remaining named offenders, Chris Cruz,
23 a/k/a Tino, and Christopher Fernandez.
24 Do you see that?
25 A.  Yes.

Page 332

1  Q.  "At 2300 hours, the reporting detectives
2  returned to Area 5 to interview Alfredo Gonzalez
3  further."  Correct?
4  A.  Yes.
5  Q.  And who are those reporting detectives?
6  A.  Halvorsen and Guevara.
7  Q.  Right.  So again we have a report where they
8  are capable of indicating who is doing the
9  interviewing, right?
10 A.  Uh-huh.
11 Q.  And according to this, they interviewed
12 Gonzalez, and then there's a summary of what
13 Gonzalez told Halvorsen and Guevara, correct?
14 A.  Yes.
15 Q.  Again, can you point to me any report that
16 you've seen or draw my attention to any report
17 you've seen where there's a supplemental that was
18 prepared in connection with Jose Maysonet's
19 statements to Guevara, other than a report written
20 by Halvorsen?
21     MR. RAHE: Objection.
22     THE WITNESS: Not that I've seen, no.
23     MR. RAHE: Form, foundation.
24     MS. BONJEAN: All right.  You could put
25 those aside.

Page 333

1 MR. BRUEGGEN: The whole exhibit or
2 just that one piece?
3 MS. BONJEAN: Hold on. You may be able
4 to put the whole exhibit aside. I want to see if
5 there's anything else I want to ask about.
6 I think you can put the whole exhibit
7 aside. That's fine.
8 BY MS. BONJEAN:
9 Q. Mr. Epplen, I'm also going to have you look
10 at Exhibit 3A.
11 Do you know what that is?
12 MR. BRUEGGEN: Take your time, look at
13 it.
14 MR. RAHE: That's from Montilla's dep?
15 MR. BRUEGGEN: Yes.
16 MS. BONJEAN: Yes.
17 BY MS. BONJEAN:
18 Q. Before you start looking at it, I'm going to
19 tell you what I'm going to ask you to look for so
20 we'll make this efficient. Okay?
21 Would you agree that you are looking at a
22 multipage document that has, on the first page,
23 stamped "permanent retention file"?
24 A. Yes.
25 Q. Okay. And I'm going to represent for the

Page 334

1 record that it's Exhibit 3A. It was used in
2 Montilla's dep, and it bears Bates stamps
3 RFC-Maysonet 67 through 107. Okay?
4 Now I'm going to hand it to you. You are
5 free to look at it. I'm going to represent that
6 that is what has been produced to plaintiffs and
7 represented as the permanent retention file, as
8 it's reflected, stamped.
9 And as you review it, if you could tell me
10 if you find any supplemental reports in this packet
11 of material that you did not see in Exhibit 3 that
12 we haven't discussed or any GPRs that you would
13 have expected to see as part of this investigation.
14 A. Okay.
15 MR. BRUEGGEN: Look through the
16 exhibit. She'll reiterate her question.
17 MS. BONJEAN: Yeah.
18 MR. BRUEGGEN: Off the record.
19 (Off stenographic record discussion.)
20 THE WITNESS: I believe from here back,
21 I have not seen these documents.
22 THE VIDEOGRAPHER: Counsel, I never
23 said we were off the record. Would you like me to
24 say that we're back on?
25 MS. BONJEAN: Sure.

Page 335

1 THE VIDEOGRAPHER: Okay. We're going
2 back on the record at 5:02 p.m.
3 MS. BONJEAN: Thank you.
4 BY MS. BONJEAN:
5 Q. Having you look at Exhibit 3A, I believe
6 you've indicated, Mr. Epplen, that there are some
7 evidence reports that are new to you from this
8 exhibit?
9 A. That's correct.
10 Q. And can you just indicate by Bates stamp
11 number which -- which reports are contained in what
12 is stamped the permanent retention file that you
13 didn't see in the other file, which is marked as
14 Exhibit 3.
15 A. This is a crime scene report, 00099.
16 Q. Okay. And what's the date on that report?
17 A. The 25th of May.
18 Q. Okay. And is this report the 25th of May,
19 1990, right?
20 A. Yes.
21 Q. Which is the date of the murders, correct?
22 A. Yes.
23 Q. Okay. And the next report?
24 A. It's a polygraph report.
25 Q. And do you know who that polygraph report is

Page 336

1 of?
2 A. Christopher Goossens.
3 Q. Okay. What's the date of that?
4 A. 29 November 1990.
5 Q. November of 1990?
6 A. Yes.
7 Q. So approximately six months later?
8 A. Yes.
9 Q. Okay.
10 A. A firearms evidence report.
11 Q. And the date on that?
12 A. May 30th, 1990.
13 MR. BRUEGGEN: What's the page number
14 on that?
15 THE WITNESS: This is -- I'm sorry.
16 This is document 000101.
17 This report, I believe I've seen.
18 MS. BONJEAN: Okay.
19 THE WITNESS: Christopher Goossens, the
20 warrant information.
21 And these are criminal history reports,
22 arrest report. This is an arrest report.
23 MR. BRUEGGEN: And that's, for the
24 record, RFC 103.
25 THE WITNESS: This is an arrest report.

Page 337

1    MR. BRUEGGEN: RFC 104.
2    THE WITNESS: This is an arrest report
3 of Justino Cruz, 105.
4    Again Justino Cruz, 106.
5    And Alfredo Gonzalez, 107.
6 BY MS. BONJEAN:
7 Q.  Okay.  You've identified some documents in
8 Exhibit 3A that you did not see in Exhibit 3,
9 correct?
10 A.  Correct.
11 Q.  But none of those documents are supplemental
12 reports prepared by investigating detectives,
13 correct?
14 A.  Not individual supplemental reports, no, but
15 I believe that the information regarding the crime
16 lab would have been included on the sup.  I'd have
17 to go back to it again, if you want me to, and read
18 it.  It wouldn't contain necessarily all of this
19 information.
20 Q.  I'm not -- I didn't ask anything about that.
21 I asked specifically whether there were any
22 supplemental reports in Exhibit 3A that you didn't
23 see in Exhibit 3, other than what you've
24 identified.
25 A.  Just the one I identified here, which is the

Page 338

1 warrant information on Christopher Goossens.
2 Q.  Okay.  I thought you said you did see that
3 one.
4 A.  I did see that one, yeah.
5 Q.  Okay.
6 A.  This is the only one that's different, in
7 this pile, in this -- because I -- my first
8 statement was, from here back, I don't think I saw,
9 but I did see this one.
10 Q.  Okay.  Let me ask the question again so the
11 record is clear.
12 You've now looked at the complete Exhibit
13 Number 3 we were looking at before.  That's this,
14 right?
15 A.  Okay.  Yes.
16 Q.  And now you've looked at the complete
17 Exhibit Number 3A, right?
18 A.  Yes.
19 Q.  Is there any supplemental report in Exhibit
20 3A that you did not see in Exhibit 3?
21 A.  No.
22 Q.  Okay.  And did you find any GPRs in Exhibit
23 3A?
24 A.  No.
25 Q.  So you didn't find them in Exhibit 3 or 3A,

Page 339

1 right?
2 A.  Right.
3 Q.  And Exhibit 3A did not contain any
4 supplemental reports, GPRs, any reports whatsoever,
5 documenting what investigative acts were taken
6 between May 25th, 1990, the date of the actual
7 shooting, until August 21st, 1990, correct?
8    MR. RAHE: Objection, form.
9    THE WITNESS: Through August 21st.  I
10 believe I answered that before.
11 BY MS. BONJEAN:
12 Q.  Well, I'm talking about a different exhibit
13 now.
14 A.  Okay.
15 Q.  I'm just making sure.  You didn't -- we -- I
16 asked you earlier about whether or not you saw any
17 reports that documented the investigative acts of
18 the officers or the detectives who were
19 investigating the case between the date of the
20 crime and the date of Mr. Maysonet's arrest.
21 Do you remember that?
22 A.  Vaguely.
23 Q.  Okay.  The Halvorsen report.  Do you
24 remember that?
25 A.  Yes.

Page 340

1 Q.  Okay.  And I don't want to put words in your
2 mouth, but I -- I believe you testified or admitted
3 that you saw no reports in between those two dates
4 that documented the investigative conduct that was
5 undertaken, if any --
6 A.  Correct.
7 Q.  -- in Exhibit 3.  Correct?
8 A.  Yes.
9 Q.  And that's also true for Exhibit 3A as well,
10 right?
11 A.  Well, this one, May 30th, I hadn't seen this
12 one before.
13 Q.  Okay.  Fair enough.
14 A.  Firearms report.
15 Q.  The firearms report.  Okay.  That's fine,
16 and I thank you for clarifying that.
17 But, for instance, did you see any
18 supplemental reports in and around July 15th, 1990,
19 that memorialized that interview with Mr. Maysonet
20 at Area 5 by Sergeant Mingey and Mr. Montilla?
21 A.  Not that I remember.
22 Q.  Okay.  And did you see any supplemental
23 reports in Exhibit 3A that memorialized the
24 interview with Mr. Maysonet at the Cook County Jail
25 on August 1st, 1990, by Mingey and Montilla?

Maysonet v.
Guevara

Video Deposition

Page 341

1  A.  Not that I remember.
2  Q.  Okay.  And did you see any supplemental
3  reports or GPRs prepared by Detective Guevara?
4  A.  Not that I remember.
5  Q.  Okay.  You can put that aside.  Thank you.
6  We're almost finished, so...
7  I believe we -- you testified earlier that
8  it would be important to corroborate Mr. Maysonet's
9  statements after he made them at the Cook County
10  Jail, correct?
11  A.  Memorialize, I think I said.
12  Q.  Right.  It would be important to memorialize
13  them also, but you would also want to corroborate
14  them or learn more information, correct, about
15  whether or not the statements --
16  A.  Well, sure.
17  Q.  -- were true or...
18  A.  Sure.
19     MR. RAHE: Wait.  What statements are
20  you talking about?
21     MS. BONJEAN: The statements he made at
22  the Cook County Jail.
23     BY MS. BONJEAN:
24  Q.  Do you remember that?
25     MR. RAHE: I'm not sure which ones

Page 342

1  you're talking about.
2     BY MS. BONJEAN:
3  Q.  On August 1st, 1990, remember when -- strike
4  that.
5  A.  It's when he asked Sergeant Mingey to give
6  him a deal or something.  He was going to guarantee
7  he was going to get a deal and then he had more
8  information to offer.
9  Q.  Yeah.  And you get that information from
10  Halvorsen's report that was prepared on August
11  23rd, 1990, right?
12  A.  Correct.
13  Q.  Okay.  And what I'm asking is:  After
14  Mr. Maysonet made these highly inculpatory
15  statements, we agreed that before -- before the
16  detectives would charge him with this double
17  murder, they would want to check those statements
18  out, correct?
19  A.  Yes.
20     MR. BRUEGGEN: Object to form,
21  characterization.
22     MS. BONJEAN: All right.
23     THE WITNESS: Yes.
24     BY MS. BONJEAN:
25  Q.  They want to -- and I used the word

Page 343

1  "corroborate," but to test the veracity of the
2  statements.  Would that be fair?
3  A.  Yes.
4  Q.  And in all the documents you've looked at
5  either today or even prior to today, have you seen
6  any reports or GPRs or any paper that would
7  demonstrate to you that Sergeant Mingey or
8  Detective Montilla or anyone did in fact attempt to
9  corroborate or test the veracity of the statements
10  that Mr. Maysonet allegedly made on August 1st,
11  1990?
12     MR. BRUEGGEN: Object to form.
13     THE WITNESS: Not that I remember.
14     BY MS. BONJEAN:
15  Q.  Okay.  And if Mr. Maysonet confessed to the
16  crime, which he did according to the detectives who
17  investigated this case, that the car was owned by a
18  guy named Black Jeffrey, we agreed that it would be
19  important for the investigating detectives to
20  attempt to locate Black Jeffrey, right?
21     MR. BRUEGGEN: Object to form.
22     MR. RAHE: Asked and answered.
23     THE WITNESS: Yes.
24     BY MS. BONJEAN:
25  Q.  And to interview him, if they can, right?

Page 344

1  A.  Yes.
2  Q.  And to determine whether or not he was an
3  unwitting participant in a double murder or
4  actually knowingly participated in a double murder,
5  correct?
6  A.  Yes.
7     MR. BRUEGGEN: Objection, asked and
8  answered.
9     BY MS. BONJEAN:
10  Q.  I'm going to show you what's been marked as
11  Exhibit Number 4 from Montilla's dep.
12  What is that document that you have in front
13  of you?
14  A.  It's a court-reported -- a typed out
15  court-reported statement.
16  Q.  Right.  And that's a court-reported
17  statement that purports to reflect a statement of
18  who?
19  A.  Jose Maysonet.
20  Q.  All right.  And is it in a question/answer
21  form as best as you can tell?
22  A.  Yes.
23  Q.  Okay.  Now, I'm not going to go through it
24  line by line or anything, but I wanted to ask you a
25  question about -- if you turn to -- I believe it's

Maysonet v.
Guevara

Video Deposition

Page 345

1  page 292, and I'm going to draw your attention to
2  like five lines down, or six.  There's a question
3  that starts with "on August 16th, 1990."
4  A.  Okay.
5  Q.  It says:  On August 16th, 1990, about -- on
6  August 16th, 1990, about 10:00 p.m., where were
7  you?
8  Answer:  Home.
9  Question:  What, if anything, happened then?
10  Answer:  Lluvia, Fro, Tino, Cisco, King,
11  they came to my house.
12  Question:  What happened when they came to
13  your house?
14  They put a nine millimeter to my head.
15  Question:  Who put the nine millimeter to
16  your head?
17  Answer:  King.
18  What did he say?
19  Answer:  You know about the two murders.  If
20  you talk, we're going to put you six feet under.
21  Question:  Did anyone for, indecipherable,
22  or threaten force?
23      MR. BRUEGGEN: Force.
24      BY MS. BONJEAN:
25  Q.  Sorry.  "Did anyone force or threaten you to

Page 346

1  make this statement?"
2  Answer:  No.
3  Okay.  Do you see that?
4  A.  Yes.
5  Q.  How important would it be for detectives to
6  try to track down Lluvia, Fro, Tino, Cisco and
7  King, after Mr. Maysonet has disclosed that they
8  came to his house, put a gun to his head and
9  threatened to kill him because he knew about the
10  two murders?
11      MR. RAHE: Objection, form.
12      THE WITNESS: If Mr. Maysonet was going
13  to proceed, it would be important to me to do it.
14  If Mr. Maysonet said leave it alone, I don't want
15  to go any further with what they threatened me
16  with, my life has got enough problems, then I don't
17  know where we would go with it, because what
18  you're -- what the question is, Mr. Maysonet is
19  becoming a threatened victim of a crime.  All
20  right?
21      If he refuses to cooperate further with
22  that, implicating them, you know, I would still try
23  to find out who they are, but I don't know exactly
24  where I would go from there.
25  /////

Page 347

1      BY MS. BONJEAN:
2  Q.  Mr. Maysonet may be a threatened victim of a
3  crime, but he's also suggesting that five other
4  people participated in a double murder.
5      MR. BRUEGGEN: Objection.
6      MR. LEINENWEBER: Objection.
7      MR. BRUEGGEN: Misrepresenting the
8  record.
9      THE WITNESS: I don't see the word
10  "participate" in there.
11      MS. BONJEAN: Well...
12      THE WITNESS: This is on August 16th
13  that he's talking about.
14      BY MS. BONJEAN:
15  Q.  Right.  And he -- it says:  Who put the nine
16  millimeter to your head?
17  Answer:  King.
18  A.  Right.
19  Q.  "What did he say?"
20  "You know about the two murders.  If you
21  talk, we're going to put you six feet under."
22  A.  Uh-huh.
23  Q.  Doesn't that suggest that they were involved
24  in a crime --
25      MR. BRUEGGEN: Objection.

Page 348

1      BY MS. BONJEAN:
2  Q.  -- the two murders?
3      MR. BRUEGGEN: Objection, misrepresents
4  the record.
5      THE WITNESS: In Illinois, to my
6  knowledge, we don't have accessory after the fact
7  that they have knowledge of it.
8      BY MS. BONJEAN:
9  Q.  But you're making all types of assumptions.
10  The point is --
11  A.  Well, I believe that you are as well.
12  Q.  Right.  I'm making assumptions because I
13  didn't investigate the case.  You did.
14  A.  No, I didn't.
15      MR. BRUEGGEN: Objection, misstates his
16  testimony.
17      THE WITNESS: I signed the clearing
18  report.
19      BY MS. BONJEAN:
20  Q.  Okay.  But wouldn't you agree that you want
21  to go find these people?
22  A.  Oh, I don't have any argument with that --
23      MR. BRUEGGEN: Objection, asked and
24  answered.
25      THE WITNESS: -- but I'm giving you a

Page 349

1 supposition again as to what Mr. Maysonet did or
2 didn't want to do.
3      BY MS. BONJEAN:
4 Q.  I don't care what Mr. Maysonet wanted,
5 did --
6 A.  Well...
7 Q.  You just charged him with double murder.
8 Why do you care what he wants from you?
9      MR. RAHE: Objection, argumentative.
10     THE WITNESS: Well, a life is a life.
11     MR. BRUEGGEN: Misstatement of the
12 record.
13     BY MS. BONJEAN:
14 Q.  Okay.  Sir, this is bordering on silly.
15 Silly.  What you're telling me is that
16 Mr. Maysonet, who you just charged with murdering
17 two men, tell you that there are these other
18 possible offenders who are threatening his life and
19 are going to kill him if he discloses their
20 involvement in a double murder of two innocent
21 people, and, eh, we're not going to go look into
22 that because poor Mr. Maysonet.  Are you kidding me
23 right now?
24     MR. BRUEGGEN: Objection, misstates his
25 testimony.

Page 350

1      BY MS. BONJEAN:
2 Q.  That sounds utterly ridiculous.
3 A.  Ma'am, it doesn't.
4      MR. BRUEGGEN: Objection,
5 argumentative.
6      THE WITNESS: It's not what I said.  It
7 says "you know about two murders" and if he is
8 acknowledging in this statement -- and I haven't
9 read it all the way through, if he's acknowledging
10 that, yes, he was in fact in there, he knows about
11 that and he knows about his companions, whoever
12 they were.
13     BY MS. BONJEAN:
14 Q.  So it's your testimony that if Mr. Maysonet
15 told you that King threatened to kill him if he
16 disclosed information about two murders --
17 A.  Uh-huh.
18 Q.  -- you do not believe that it would be
19 necessary to go find King or talk to him if
20 Mr. Maysonet didn't want you to?
21 A.  I didn't say it wouldn't be a good thing to
22 do.  I'm just saying I don't know how far it was
23 taken and I don't know if another police report was
24 taken regarding this information or not.
25 Q.  Okay.  I know you don't know that and I'm

Page 351

1 not asking you whether you know that.  I'm telling
2 you that if Mr. Maysonet told you about five other
3 people that may or may not have been involved in
4 the double murder --
5 A.  Uh-huh.
6 Q.  -- but certainly are threatening to kill him
7 if he discloses information about the double
8 murder --
9 A.  Uh-huh.
10 Q.  -- that a good detective might want to
11 investigate these individuals.
12 A.  Okay.
13 Q.  Would you agree with that?
14 A.  Yes.
15 Q.  Okay.  As a supervisor, would you might --
16 would you have had the conversation with your
17 detectives, so who's this King guy, who's this
18 Cisco guy, should we try to find them, has anyone
19 talked to them?  Is that a conversation that would
20 be worth having?
21     MR. BRUEGGEN: Objection, foundation.
22     MR. RAHE: Form.
23     MR. BRUEGGEN: Whether he had this back
24 then.
25     THE WITNESS: I don't recall ever

Page 352

1 seeing this.
2      BY MS. BONJEAN:
3 Q.  I know, but I'm just -- I'm just asking a
4 very simple question, that if, as a matter of a
5 fundamental investigative strategy, that if -- if
6 a -- someone who you're charging with a double
7 murder tells you about accomplices to that murder,
8 potential accomplices, that it is incumbent upon
9 you to find them and to determine whether in fact
10 they participated in double murder?
11     MR. RAHE: Objection, form, foundation.
12     MR. LEINENWEBER: Also asked and
13 answered several times.
14     THE WITNESS: Well, I think my original
15 statement would stand.  I mean, you would attempt
16 to interview them, and, again, were -- and you took
17 it if they have nothing to say to you, I don't know
18 what else you're going to do.  It will be your
19 interview information that you get from that
20 against what Mr. Maysonet says, if he even wants to
21 go further.
22     He is going to be the only witness to
23 testify, from what I just read in this small space
24 here.  If they have nothing to say or we didn't do
25 it, it's not going to go anywhere.

Maysonet v.
Guevara

Video Deposition

Page 353

     BY MS. BONJEAN:
1
2    Q.   Well, if you don't go talk to them, you
3    don't know one way or another, do you?
4    A.   Well, that's true.  Yes, that's true.
5    Q.   And if you don't go -- and don't
6    investigations sort of build on each other?
7    A.   They do, but there comes a point where one
8    stops and one starts.
9    Q.   Right.  But if -- but you would agree that
10   the detectives should have gone and at least try to
11   locate Cisco and King, correct?
12        MR. RAHE: Objection, form and
13   foundation.
14        THE WITNESS: I don't know if they felt
15   it was necessary.  I don't know.  I wasn't part of
16   that.
17        BY MS. BONJEAN:
18   Q.   So -- okay.  But -- so given what we do
19   know, that is that Mr. Maysonet has just implicated
20   Cisco and King in at least threatening him with
21   death and possibly being involved in the double
22   murder, you're saying that the Chicago Police
23   Department was at liberty to ignore that
24   information if they chose not to?
25        MR. BRUEGGEN: Objection, misstates his

Page 354

1    testimony, misrepresents the record and assumes
2    facts that haven't been established.
3         THE WITNESS: Yeah.  I don't think that
4    that would be something that should be ignored and
5    I don't know that it was ignored.
6         BY MS. BONJEAN:
7    Q.   I'm not -- I'm not asking you to -- I
8    know --
9    A.   Well, you're asking --
10   Q.   No.
11   A.   I don't know where you're --
12        MR. BRUEGGEN: Let her ask.
13        BY MS. BONJEAN:
14   Q.   First of all, I'm going to tell you right
15   now so you can -- we don't have to pussyfoot around
16   this.  I have never seen a report, a GPR or any
17   shred of paper that reflects that Cisco or King
18   were ever spoken to.
19   A.   Okay.
20   Q.   Okay?
21   A.   Okay.
22   Q.   I don't know whether such a thing existed at
23   any point.  I know I've never seen it.
24   A.   Okay.
25   Q.   I've never seen it in the prosecutor's file.

Page 355

1    I've never seen it in the defense attorney's files.
2    I've never seen it in the investigative file.  I've
3    never seen it in the permanent retention file.  I
4    have never seen it anywhere.  Okay?
5    A.   Okay.
6    Q.   Now, I'm just a lawyer trying to do my job
7    here, but that leads me to believe that either it
8    never existed and they didn't do that or it did
9    exist and it was destroyed, one of those two
10   things.
11   A.   Or lost.
12        MR. BRUEGGEN: Object to form.
13        BY MS. BONJEAN:
14   Q.   Or lost.  Okay?
15   So there are no secrets.  That's -- that's
16   where I'm coming from.  So with that information,
17   I'm going to ask again.
18   Would you agree that a thorough
19   investigation would have demanded the investigating
20   detectives to at least try to locate Cisco and
21   King?
22        MR. BRUEGGEN: Objection, form.
23        MR. RAHE: Foundation.
24        THE WITNESS: It may have helped the
25   investigation, yes.

Page 356

1         BY MS. BONJEAN:
2    Q.   And not only helped the investigation.  You
3    may have found additional offenders, correct?
4         MR. RAHE: Objection, speculation.
5         THE WITNESS: Well, I don't know what
6    Cisco's real name was or King's real name was.  So
7    I mean, it's possible.
8         BY MS. BONJEAN:
9    Q.   Yeah.  Well, that's what investigating is
10   about, right, to try to find people's real names?
11   A.   It is, and I don't know they didn't do that.
12   Q.   I mean, maybe Sergeant Mingey, in his wealth
13   of knowledge, would know who all the Ciscos were in
14   the neighborhood?  Didn't --
15   A.   That's possible.
16   Q.   Didn't he have like a rolodex of
17   gangbangers' names and nicknames in his brain?
18        MR. RAHE: Objection, foundation.
19        THE WITNESS: I don't know about a
20   rolodex, but he knew a lot of people.
21        BY MS. BONJEAN:
22   Q.   Okay.  So -- but you would at least agree
23   that the detectives should have talked to -- tried
24   to find out who Cisco was and who King was and
25   interview them, right?

Maysonet v.
Guevara

Video Deposition

Page 357

1    MR. RAHE: Objection, asked and
2  answered.
3    THE WITNESS: If they felt that it
4  would help their case, yes, absolutely.
5    BY MS. BONJEAN:
6  Q.  What do you -- if they felt it would help
7  their case?
8  A.  If they felt if --
9  Q.  What's their case?  Isn't their case to
10  solve crimes and find out who killed the Wiley
11  brothers?
12  A.  Yes.
13    MR. BRUEGGEN: Objection,
14  argumentative.
15    MR. RAHE: And form.
16    THE WITNESS: They have one of the
17  offenders right here.
18    BY MS. BONJEAN:
19  Q.  Right.  And that offender told them about
20  other potential offenders, correct?
21  A.  I believe he told them that he was
22  threatened.  They put a gun to his head and said you
23  know about the two murders.
24  Q.  And do you think that -- is it your
25  experience that people go around putting guns to

Page 358

1  people's heads that don't have an interest in the
2  investigation?
3  A.  They have an --
4    MR. BRUEGGEN: Object to form.
5    THE WITNESS: They have an interest in
6  the investigation and they are also part and parcel
7  to the gangs, which is a big, big, close family.
8    BY MS. BONJEAN:
9  Q.  Right.  And isn't it a crime to have a gun
10  and threaten someone's life?
11  A.  Absolutely.
12  Q.  Okay.  So are you telling me that
13  Mr. Maysonet -- it wasn't -- it wasn't justified
14  to -- strike that.
15  That even if Cisco and King were not at all
16  involved in the double murder, that it's not worth
17  trying to investigate that they held a gun to
18  Mr. Maysonet's head?
19    MR. BRUEGGEN: Objection, misstates his
20  testimony from earlier when we got in a fight.
21    THE WITNESS: I said that they could go
22  out and --
23    MR. LEINENWEBER: It's also been asked
24  and answered several times.
25    THE WITNESS: -- do it; however, if

Page 359

1  Mr. Maysonet said I don't want to do anything about
2  this, I've got enough problems on my mind right
3  now, there would be no further prosecution, unless
4  you saw them on the street walking with that gun.
5    BY MS. BONJEAN:
6  Q.  Okay.  Right, but don't you want to maybe
7  try to find the murder weapon?
8  A.  Well, I just said you could go out there and
9  find them and try to interview them and see, within
10  the rules of evidence, if you could find a gun.
11  Absent that, if Mr. Maysonet didn't want to go any
12  further with that, there would be no case.
13  Q.  Again, I -- I really don't understand where
14  we're talking passed each other, but he has -- he
15  is suggesting one of these people might be in
16  possession of the murder weapon, right?
17    MR. BRUEGGEN: Objection, misrepresents
18  the record.
19    THE WITNESS: He's saying that it's the
20  same caliber weapon that we know.
21    BY MS. BONJEAN:
22  Q.  Right.  Well, you draw all types of
23  assumption from it being the same caliber.  That's
24  the whole reason Sergeant Mingey went and spoke to
25  Maysonet in the first place, right?

Page 360

1  A.  Yeah.
2    MR. BRUEGGEN: Objection, misstates
3  prior testimony.
4    MR. RAHE: Argumentative.
5    BY MS. BONJEAN:
6  Q.  I mean, that is what Halvorsen reported in
7  his report, that Sergeant Mingey heard about
8  someone in custody who had a nine millimeter, and
9  so let's go talk to him because it's the same
10  caliber that was used in the Wiley murders, so
11  maybe he knows something and maybe he's involved
12  because he had -- he shot a nine millimeter,
13  correct?
14    MR. BRUEGGEN: Objection, misrepresents
15  the record.
16    MR. RAHE: Form.
17    THE WITNESS: Yes.
18    BY MS. BONJEAN:
19  Q.  Okay.  So now we have Mr. Maysonet saying "I
20  was threatened by these other guys who were
21  involved in the shooting, plus two other guys, with
22  a nine millimeter."  And all I want you to do is
23  admit that good detectives would go out and try to
24  speak to these guys.
25    MR. BRUEGGEN: Objection, asked and

Maysonet v.
Guevara

Video Deposition

Page 361

1  answered.
2      BY MS. BONJEAN:
3  Q.  If for no other reason that it might lead to
4  finding the murder weapon.
5      MR. BRUEGGEN: Objection, asked and
6  answered.
7      THE WITNESS: It's always a good thing.
8      BY MS. BONJEAN:
9  Q.  Now, if --- if there was a witness who
10  testified or made a statement that he was arrested
11  by Detective Guevara, Halvorsen and other Area 5
12  detectives and brought to Area 5 to be questioned
13  about the Wiley brothers' murders -- okay?
14  A.  Okay.
15  Q.  You would agree that there should be some
16  paper out there that memorializes that interview,
17  right?
18      MR. BRUEGGEN: Object to form.
19      THE WITNESS: Yes.
20      BY MS. BONJEAN:
21  Q.  And would that be true whether or not that
22  person confessed or denied or any involvement?
23      MR. BRUEGGEN: Object, incomplete
24  hypothetical.  Go ahead.
25      THE WITNESS: Yeah, some report, GPR,

Page 362

1  supplemental report.
2      BY MS. BONJEAN:
3  Q.  Okay.  There should be some paper, right?
4  A.  Correct.
5  Q.  And if Detective Guevara, Halvorsen or any
6  detective put that individual into a lineup in
7  connection with the Wiley brothers' murders, would
8  you expect to see some report reflecting that
9  lineup?
10      MR. RAHE: Objection, form.
11      THE WITNESS: Again, I think we covered
12  that.  I don't know when the rules changed for
13  positive or negative lineups.
14      Like I say, my recollection was, when I
15  was a detective, if it was a negative lineup, you
16  didn't have to do a report.  Later on that changed
17  to whether you had an identification or no
18  identification, you put it in a report.
19      So I don't know what that time frame
20  was and I'd have to see the applicable orders so I
21  could give you an honest, truthful answer.
22      BY MS. BONJEAN:
23  Q.  Well, since you're not familiar with the
24  policies that were in place in 1990 off the top of
25  your head, which is understandable, let me ask the

Page 363

1  question this way.
2      If the policy in 1990 was that you were
3  required to memorialize a negative ID, would you
4  expect there to be a supplemental report, if --
5  A.  Yes.
6  Q.  -- somebody was placed into a lineup and was
7  either identified or not identified?
8  A.  Yes.
9      MR. BRUEGGEN: Object to form.
10      BY MS. BONJEAN:
11  Q.  And if in 1990, specifically in May and June
12  and July of 1990, the policy of the Chicago Police
13  Department was not to memorialize negative IDs, are
14  you saying it would not be unusual, then, to not
15  have a report if there was no ID made?
16      MR. BRUEGGEN: Object to form.
17      THE WITNESS: I think to save other
18  detectives who may investigate that at a further
19  time, a GPR would have been in order, that
20  so-and-so was in here, we had him in a lineup,
21  etcetera, etcetera, and he was not identified.
22      BY MS. BONJEAN:
23  Q.  You would expect one way or another in 1990
24  to be some paper reflecting a lineup, whether there
25  was a positive ID or a negative ID, is that right?

Page 364

1      MR. BRUEGGEN: Object to form.
2      THE WITNESS: Yes.  Yes.
3      MS. BONJEAN: All right.  Give me one
4  second.  I just have...
5      Can you mark this for me, please.
6      (Exhibit 1 marked.)
7      BY MS. BONJEAN:
8  Q.  Mr. Epplen, I'm going to have you look at
9  what I've marked as Epplen 1.  Hold on one second
10  so I can -- and just see if you -- it refreshes
11  your recollection about a particular case.
12      MR. BRUEGGEN: Jennifer, was this
13  disclosed in this case?  I don't see any Bates page
14  numbers.
15      If it hasn't been disclosed, I'm going
16  to object.  It's kind of come out of left field.
17      MS. BONJEAN: Yeah, I'm not sure if it
18  was or was not.  And that's fine.  I'm not -- I'm
19  not going to ask him any -- it's definitely been
20  disclosed in one or more of these cases.  I just
21  don't know if it was disclosed in Maysonet's case.
22      MR. BRUEGGEN: Was it disclosed with
23  Bates stamped in that case --
24      MS. BONJEAN: I don't know.  Hold on.
25      MR. BRUEGGEN: -- because that's --

Page 365

1     MS. BONJEAN: Hold on one second.  Let
2  me...
3     I'm not sure where the page is that I
4  want to direct him to.
5     Okay.  That's fine.  I'm not -- I won't
6  show him the exhibit, but I'm going to ask him a
7  couple questions, then.  Okay?
8     BY MS. BONJEAN:
9  Q.  Mr. Epplen, do you have any recollection of
10  an investigation involving Detective Guevara of a
11  murder that happened on Kostner and Cortland?  It
12  was a beating death of an individual, a Mexican
13  man, who was driving a car with three other
14  individuals inside of it?
15  A.  No, ma'am.
16  Q.  Doesn't ring a bell at all?
17  A.  No, ma'am.
18  Q.  And this was a case that Detective Guevara
19  allegedly got an anonymous call, saying that the
20  offender was already in custody.  Ring a bell?
21  A.  No, ma'am.
22  Q.  The name of the -- just see if this helps
23  you along.  The victim's name was Jose Mendoza.
24  Probably does not at all --
25  A.  No.

Page 366

1  Q.  -- ring a bell, right?
2     And the offender that was ultimately charged
3  was a person by the name of Nelson Gonzalez.
4  A.  No.
5  Q.  Okay.  That's fine.
6     MR. BRUEGGEN: So we're not going to
7  attach that, right?
8     MS. BONJEAN: Yeah, you don't have to
9  attach it.  You can give it back to me.  I didn't
10  even find what I was looking for anyway.
11     MR. BRUEGGEN: Look through the
12  twenty -- 30,000 pages to see if I can find it
13  somewhere.
14     MS. BONJEAN: Yeah.  Yeah.
15     I don't think I have any more questions
16  for Mr. Epplen.  Let me just make sure, though.
17     All right.  I have nothing further for
18  Mr. Epplen.
19     MR. BRENER: No questions.
20     MR. LEINENWEBER: No questions.
21     MR. RAHE: No questions.
22     MR. BRUEGGEN: Mr. Epplen, I don't have
23  any questions.
24     THE WITNESS: Okay.
25     MR. BRUEGGEN: We're done.

Page 367

1     THE WITNESS: Thank you.
2     MR. BRUEGGEN: We will reserve
3  signature.
4     MS. BONJEAN: Okay.
5     THE VIDEOGRAPHER: This marks the end
6  of the deposition of Lee Epplen.  We are going off
7  the record at 5:35 p.m.
8     (Deposition concluded at 5:35.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 368

1  STATE OF ILLINOIS      )
2  COUNTY OF COOK         )
3                JOSE JUAN MAYSONET, JR.
                      vs.
4             REYNALDO GUEVARA, et al.
5                18-cv-02342
6
7
8         I hereby certify that I have read the
9  foregoing transcript of my deposition, given on
10  August 28, 2019, consisting of pages      through     ,
11  inclusive, and I do again subscribe and make oath that
12  the same is a true, correct and complete transcript of
13  my deposition so given as aforesaid, as it now appears.
14
15         Please check one:
16                I have no corrections
17                Number of errata sheets
18                   enclosed
19  (signed)              LEE EPPLEN
20  SUBSCRIBED AND SWORN TO
21  before me this      day
    of            , A.D., 2019.
22
23     NOTARY PUBLIC
24
25

Maysonet v. Guevara     Video Deposition

Page 369

1                 CERTIFICATE

2                    OF

3         CERTIFIED SHORTHAND REPORTER

4

5         I, KARYN H. CHALEM, a Certified Shorthand

6 Reporter of the State of Illinois, CSR License No.

7 084-004167, do hereby certify:

8          That previous to the commencement of the

9 examination of the aforesaid witness, the witness was

10 duly sworn by me to testify the whole truth concerning

11 the matters herein;

12          That the foregoing deposition transcript was

13 stenographically reported by me and was thereafter

14 reduced to typewriting under my personal direction and

15 constitutes a true and accurate record of the testimony

16 given and the proceedings had at the aforesaid

17 deposition;

18          That the said deposition was taken before me

19 at the time and place specified;

20          That I am not a relative or employee or

21 attorney or counsel for any of the parties herein, nor a

22 relative or employee of such attorney or counsel for any

23 of the parties hereto, nor am I interested directly or

24

25

Page 370

1 indirectly in the outcome of this action.

2          IN WITNESS WHEREOF, I do hereunto set my

3 hand at Chicago, Illinois, this 9th day of September,

4 2019.

5

6

7

8

9        KARYN CHALEM, CSR, RPR
          CSR No: 084-004167

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$17 (1)**
157:4

**/**

**///// (18)**
67:25;75:25;83:25;
137:25;147:25;
150:25;154:25;
175:25;177:25;
203:25;235:25;
258:25;283:25;
292:25;295:25;
300:25;313:25;
346:25

**A**

**a/k/a (2)**
248:14;331:23
**abhorrent (1)**
316:12
**abilities (3)**
10:4,25;255:14
**ability (12)**
8:6,11;39:17;45:2;
93:10;184:5,8,11;
192:24;223:2,19;
288:23
**able (22)**
9:3;43:2;52:19,20;
54:22;83:5;118:19;
146:11;168:6;206:21;
219:17;226:2;229:22;
230:17;238:8;239:7;
266:9;272:6;283:2;
302:6;323:6;333:3
**above (3)**
95:16;161:12;179:4
**above-captioned (2)**
327:25;328:4
**abrasive (2)**
234:14,14
**abreast (1)**
127:18
**absence (1)**
22:5
**absent (2)**
329:2;359:11
**absolute (1)**
123:10
**absolutely (8)**
46:24;81:14;126:6;
127:4;153:4;293:15;
357:4;358:11
**abuse (2)**
81:11,18
**academy (15)**
34:15;36:3,6,13;
37:21;38:18;41:13;

43:21,22,24;44:6,12;
47:7;49:7;50:5
**accent (1)**
236:8
**accept (1)**
133:16
**acceptable (10)**
45:23;46:18;85:21;
114:16;125:10;
171:22,25;298:2;
315:2,3
**access (3)**
68:18;69:1;106:25
**accessible (3)**
107:8;110:25;111:3
**accessory (1)**
348:6
**accident (2)**
41:17;50:15
**Accolades (1)**
186:4
**accomplice (1)**
85:16
**accomplices (2)**
352:7,8
**accomplish (1)**
70:3
**accomplished (1)**
70:2
**according (11)**
206:16;247:7;
278:9;283:16;284:5,
10;293:12;296:22;
305:14;332:11;
343:16
**account (4)**
233:10;234:8;
242:17;281:20
**accountability (1)**
268:1
**accounts (2)**
235:2,6
**accuracy (5)**
90:24;163:10;
166:13,17;167:16
**accurate (12)**
9:11;39:16,22;
40:12;46:10;75:22;
92:19;93:6;98:9,22;
166:25;290:4
**accurately (4)**
69:2;150:3;152:4;
169:7
**accused (4)**
13:19;16:12;
142:16;156:7
**acknowledged (3)**
157:11;277:14;
292:23
**acknowledging (3)**
281:3;350:8,9
**across (4)**
30:5;31:24;72:4;

212:10
**act (2)**
138:9,9
**acting (1)**
12:21
**actions (1)**
39:17
**active (3)**
99:9;210:14;216:21
**actively (5)**
56:4;146:5;147:12,
15;210:15
**activities (4)**
39:10;145:25;
175:3;249:24
**activity (11)**
182:24;209:14,25;
211:6,21,24;212:3;
214:20,21;215:8,10
**acts (4)**
200:16;322:2;
339:5,17
**actual (3)**
63:21;198:24;339:6
**actually (41)**
15:25;32:8;37:9;
38:5,9;68:19;86:8;
91:2;93:15;106:4;
116:19;130:11;
138:25;144:24;
145:11;147:14;
148:22;155:21;
181:12;197:5,19;
198:10;205:15;208:3,
13;209:2;219:18,19;
221:7;225:11;250:18;
261:16;266:5;280:15;
290:6;296:9;297:22;
300:10;301:16;
319:20;344:4
**add (1)**
225:20
**Addison (1)**
47:16
**addition (1)**
38:19
**additional (15)**
41:8;64:15;228:9;
232:7;238:10;245:4;
268:6;275:2,24;
280:13;282:15,20;
294:18;325:21;356:3
**address (1)**
95:10
**addressed (1)**
46:8
**addresses (3)**
206:3;213:17;
312:19
**adequately (1)**
246:22
**admissible (1)**
85:11

**admission (4)**
307:24;308:15;
309:19;310:4
**admissions (2)**
274:25;275:7;
283:17
**admit (4)**
157:23;159:6;
193:10;360:23
**admits (1)**
141:18
**admitted (1)**
340:2
**adopt (1)**
84:18
**advance (2)**
239:8;240:16
**advanced (1)**
242:4
**advised (2)**
254:17;277:12
**afraid (1)**
141:15
**African-American (2)**
193:16;236:16
**afternoon (1)**
105:21
**afternoons (2)**
91:19;224:22
**afterwards (1)**
131:3
**again (57)**
21:21;34:3;43:1;
58:2;71:6;74:13;76:5;
105:8;109:22;113:22;
114:1;117:23;121:25;
130:22;134:3;137:1;
141:16;153:10;162:9;
168:13;195:12;
201:20;203:3;206:8;
224:16;225:10;235:5,
16;242:14;243:21;
251:9,11;260:2;
269:7;271:23;274:19;
276:11;277:16;278:2;
285:19;286:17;
303:19;309:19;
311:15;312:8;321:17;
322:14;332:7,15;
337:4,17;338:10;
349:1;352:16;355:17;
359:13;362:11
**against (8)**
26:19,21;30:19;
137:6;251:16;314:16;
324:5;352:20
**ago (12)**
8:25;18:5,5;19:10;
24:13,20,25;25:22;
29:18,21;30:9;222:17
**agree (76)**
8:20;56:12,19;
59:20;60:4;64:10;

66:15;67:18;76:10;
77:16;79:13;85:24;
98:16;118:21;126:9;
128:13;129:10;
131:11;132:2,6;
133:13;134:11;
145:14;149:13;
152:15,23;154:10,21;
155:4,20;159:15,17,
19,23,25,25;167:3;
169:9;179:8;182:11;
204:21;209:10,18,22;
211:23;223:21;226:9;
228:6;235:2;236:2;
242:10;245:12;
253:19;266:8;269:7;
270:6;271:10;272:17,
24;279:20;287:10;
289:11;291:12,18;
292:5;293:17;301:5;
316:22,25;333:21;
348:20;351:13;353:9;
355:18;356:22;
361:15
**agreed (13)**
75:2;154:23;
191:25;192:4;267:7;
276:7;277:15;295:15;
307:1;309:15;312:4;
342:15;343:18
**ahead (44)**
23:2;38:1,24;39:12,
21;40:19;42:3,14;
43:11;44:10,17;46:4;
51:20;54:17;56:24;
65:3;66:21;71:23;
74:10;75:7,8,21;
115:18,25;120:10;
121:1;123:8;124:16;
125:22;128:4;129:15;
146:8;150:17;152:2;
168:17;176:10;
191:22;194:5;196:15;
240:4;265:4;282:8;
286:21;361:24
**air (1)**
92:23
**al (1)**
5:3
**Alfredo (9)**
246:24;248:5,14;
324:4,14;328:5;
331:16;332:2;337:5
**Alicia (1)**
232:10
**allay (1)**
283:3
**allegation (2)**
126:11;324:5
**allegations (1)**
142:17
**alleged (1)**
11:22

**allegedly (6)**
76:11;272:19;
273:21;278:5;343:10;
365:19
**allotted (1)**
102:24
**allowed (1)**
306:23
**allows (2)**
251:14;316:16
**Alma (2)**
232:14;233:6
**almost (6)**
8:25;35:6;40:25;
134:15;194:15;341:6
**alone (3)**
280:1;329:17;
346:14
**along (7)**
61:21;89:25;96:10;
97:7;104:11;141:19;
365:23
**although (3)**
192:7;216:10;
229:20
**always (6)**
27:16;57:11;118:9;
184:19;185:23;361:7
**amend (2)**
10:2;322:9
**among (1)**
275:11
**amount (4)**
170:18;171:2;
176:4;184:12
**analyze (1)**
130:23
**and/or (2)**
150:10;283:4
**angle (1)**
214:8
**anonymous (1)**
365:19
**answered (44)**
126:25;135:11;
137:9,21;138:13;
139:24;140:13;141:3,
4;143:4;147:17,18;
148:7,9;154:13;
155:24;158:3,4;
159:13;160:9,20;
162:8;166:1,4;190:2,
7;193:3;281:16;
291:17;292:20;294:3;
295:9;301:10;318:18;
319:2;339:10;343:22;
344:8;348:24;352:13;
357:2;358:24;361:1,6
**anticipate (1)**
10:8
**Apart (6)**
19:2;7;24:6;165:7;
227:25;228:17

**apartment (1)**
312:21
**apologies (2)**
197:22;207:2
**apparently (8)**
155:8;279:4;
304:22;305:21;307:6;
312:8;314:2;322:16
**appear (6)**
194:23;195:13;
209:13,23;210:14;
225:13
**appeared (1)**
236:3
**appears (5)**
194:25;197:10;
243:22;300:4;328:11
**applicable (1)**
362:20
**applicants (1)**
34:13
**applied (2)**
121:22;123:24
**appoint (1)**
51:1
**approach (1)**
42:11
**appropriate (1)**
237:3
**approval (8)**
114:12;117:2;
119:12;120:4;129:13;
270:12;280:3;282:13
**approvals (1)**
164:10
**approve (7)**
92:8;128:2;163:24;
199:22;237:25;
247:25;268:8
**approved (19)**
117:8;118:7,13,14;
122:20,22,25;123:5;
127:3;163:20;176:6;
199:12;207:4;232:22;
246:9;264:21;296:9;
322:8;326:24
**approving (5)**
93:12;101:17;
127:11;199:24;297:5
**Approximately (2)**
47:21;336:7
**April (1)**
90:18
**area (128)**
20:15,18;21:10,15,
16,22;22:3,20,21,24;
23:9,18,23;25:11;
26:19;30:20;31:3;
41:13;48:3,19;86:20,
21,25;87:7,10,11,15,
22;88:5,15;89:4;95:1,
2,4,7,15;96:1,9;97:4;
98:25;99:10,23,23;

100:1,20,23;101:9,15;
102:11;103:17;
105:10,10;107:5,19;
108:10,13,14;109:11;
110:25;112:22;
113:21,24;114:5,17;
115:16;116:13;
117:22;118:6;119:14;
120:8,14,23;122:10,
11,24;124:24;126:22;
127:7;146:14,15,16;
150:5;156:21;164:16,
17,18,20;171:7;
173:17;182:14,25;
183:13,16,24;186:19;
192:17;202:25;203:1;
213:6,14;214:17;
215:13;226:10;
228:15;237:18;252:6;
254:14,16,16;255:23;
260:10;275:2,24;
276:8;277:12;278:25;
279:2,7;291:22;
306:23;313:1,1;
324:6,8;332:2;
340:20;361:11,12
**areas (8)**
37:21;97:10;99:8;
146:10;179:19;205:8;
212:10;276:14
**argue (1)**
317:11
**arguing (2)**
202:3;233:17
**argument (5)**
233:21;234:2,12,
20;348:22
**argumentative (31)**
72:20;121:13;
135:16;136:1;139:7;
148:7;154:2;157:8;
158:3;159:3;160:8,
20;161:4;193:13;
222:13,14;223:5;
240:20;288:2;289:1;
295:2;300:16,24;
316:21;318:7;321:15;
323:11;349:9;350:5;
357:14;360:4
**arm's (1)**
107:10
**Around (30)**
26:4;37:3,16;74:7;
88:16;101:1;127:8;
150:5;182:9;214:6;
243:11;258:3;259:14;
263:3,17;266:16,20;
269:10;271:25;303:5;
312:24;313:10;314:8,
25;318:10;323:15;
329:13;340:18;
354:15;357:25
**arrangements (1)**

79:14
**array (2)**
140:11,17
**arrest (14)**
185:3;207:19;
208:7;216:10;268:6,
11;278:16;283:6,19;
336:22,22,25;337:2;
339:20
**arrested (8)**
228:2;270:10;
278:8;279:14;281:9,
14;285:1;361:10
**arrestee (1)**
137:7
**arresting (3)**
250:5,9,25
**arrests (2)**
202:24;208:21,22
**arrived (2)**
291:22;306:23
**arson (1)**
59:15
**Ashley (2)**
7:16,17
**aside (11)**
125:8;173:7;
228:19;238:7;240:9;
241:1;324:22;332:25;
333:4,7;341:5
**as-needed (1)**
103:21
**assault (2)**
15:21;63:3
**assaulted (1)**
136:22
**assaults (1)**
104:5
**assessment (1)**
52:25
**assign (3)**
171:8,10,17
**assigned (12)**
25:10;48:10,10;
86:19;95:7;99:7;
111:5;171:12;172:19;
199:22;253:12;
254:23
**assignment (6)**
37:1;47:8;50:8;
59:15;90:12;97:15
**assignments (2)**
48:7;90:22
**assist (3)**
48:11;102:1;173:25
**assistance (2)**
172:16,19
**assistant (2)**
11:21;12:24
**associate (2)**
7:16;26:10
**associated (3)**
198:11;211:6;

227:14
**associates (2)**
30:3;225:23
**assume (9)**
9:19;21:21;32:20;
133:24;218:5;285:5;
289:4;299:22;303:13
**assumed (1)**
256:18
**assumes (1)**
354:1
**assuming (11)**
13:16;15:8;70:13,
22;81:5;179:8;
183:15;249:21;
301:12;303:8;330:4
**assumption (7)**
67:13;236:5;
245:22;273:10,11;
298:17;359:23
**assumptions (3)**
67:12;348:9,12
**attach (2)**
366:7,9
**attached (3)**
21:11,12;106:24
**attempt (4)**
205:10;343:8,20;
352:15
**attention (4)**
61:22;134:24;
332:16;345:1
**attest (1)**
300:7
**attorney (6)**
229:21;262:17;
267:6;268:7;270:13;
282:2
**attorneys (12)**
17:10,12,13;18:24;
19:1,2,9,15,20;21:6,
19;280:3
**attorney's (7)**
19:5;24:13,25;
79:12;80:8;270:14;
355:1
**attribute (1)**
236:14
**audibly (1)**
7:8
**August (68)**
5:6;196:1;238:10;
239:3,10;240:8,9,14,
18;242:2,5,12;
245:14;248:9,12;
267:3,21;269:10,16;
270:2;271:12,25;
272:2,7,8;273:13,14;
274:22;279:9;280:14,
18;281:12,13;282:10,
16;283:18,21;284:2;
287:13,14;291:21;
292:13;293:2,9,11,13;

295:12,18;298:24,25;
306:21;309:10,12,14,
15;324:2;327:9;
331:20;339:7,9;
340:25;342:3,10;
343:10;345:3,5,6;
347:12
**Austin (1)**
5:25
**author (3)**
221:7;290:12;330:4
**authored (8)**
23:15;219:18,19;
223:3,20;299:16;
301:16;315:23
**authoring (1)**
321:13
**authority (2)**
141:22;142:1
**authors (1)**
330:22
**auto (5)**
37:1;63:24;65:5,6;
97:15
**automatic (2)**
254:7;256:14
**autonomous (1)**
120:13
**availability (1)**
139:9
**available (4)**
129:18;138:23;
171:16;265:5
**Avenue (20)**
31:25;48:21;90:14;
95:17;96:15,21;
182:9;193:17;205:14;
211:18;213:21,24,25;
215:21;225:21,23;
232:15;233:7;256:11,
18
**avenues (1)**
52:14
**Average (2)**
31:15;179:4
**awakened (2)**
233:16;234:11
**awarded (1)**
157:4
**awards (2)**
186:7,11
**aware (21)**
84:12,14;126:2;
137:15;138:3;142:16;
157:5,10,15;160:15;
172:9;186:16;187:5;
188:25;189:13;252:7,
19;254:5;274:25;
275:7;276:10
**away (10)**
30:7,11;34:1;48:17;
77:6;83:14;84:10;
138:8;165:16;214:3

# B

**back (64)**
24:2,5;39:25;42:20;
44:24;45:22;53:8,11,
13;57:22;62:24;
64:24;68:2;69:5,17;
81:21;86:13;87:22;
88:5;94:20;99:24;
111:14;112:6,13;
113:15;118:13;121:3;
127:6;129:20;132:12;
137:4;139:20;153:11;
158:16,25;168:18;
174:18;181:14;189:7;
194:8;207:14;217:20;
219:24;220:6;229:5;
251:7;262:6,10;
264:21;265:15;266:5;
284:21;285:19;
294:24;315:1;325:8,
13;334:20,24;335:2;
337:17;338:8;351:23;
366:9
**background (1)**
204:23
**backwards (1)**
24:18
**bad (4)**
153:7;154:10,15;
159:8
**bag (1)**
310:10
**ballistics (1)**
203:2
**bank (1)**
50:9
**barmaid (1)**
232:11
**barmaids (1)**
232:11
**barring (1)**
253:19
**base (2)**
52:25;146:5
**based (13)**
43:15;199:2;
209:23;222:22;236:5;
241:2;268:8;270:5,
17;274:11;300:3,6;
311:22
**basement (5)**
109:19,21,25;
110:2,9
**basic (1)**
56:8
**basically (5)**
38:17;92:20;
264:25;273:22;274:2
**basics (1)**
93:8
**basis (4)**

55:4;103:20,21;
146:18
**Bates (9)**
197:4,13;217:24;
218:25;232:4;334:2;
335:10;364:13,23
**battered (1)**
136:22
**bearing (1)**
72:14
**bears (1)**
334:2
**beat (3)**
37:16;130:5;133:25
**beating (1)**
365:12
**became (16)**
32:3;35:4;47:4;
52:13;57:4;86:17;
89:8;94:17;96:20;
97:12;102:21;151:17,
19;194:14;214:23;
252:7
**become (8)**
51:16;52:15,20;
55:18;67:4;101:1;
138:3;281:18
**becomes (1)**
252:18
**becoming (3)**
41:10;86:18;346:19
**began (2)**
100:19;195:25
**beginning (10)**
34:9,9;43:13;197:8,
8,9,9;198:23;211:1;
264:13
**behalf (3)**
5:18,25;12:13
**behaving (1)**
134:7
**belief (1)**
22:6
**bell (5)**
248:17;249:8;
365:16,20;366:1
**Bella (1)**
311:12
**Bello (3)**
251:22;306:22;
312:7
**Belmont (4)**
31:3;32:1;33:18;
87:13
**belonged (2)**
165:18;304:13
**benefit (3)**
79:5;133:9,13
**benefits (6)**
80:2,5,16,23;81:1;
140:24
**Berlin (1)**
33:17

**Bernard (1)**
221:12
**besides (4)**
13:16;18:21,23;
309:9
**best (32)**
8:6,10;9:9;10:3,25;
36:12;39:16;43:3;
45:2;55:24;56:5,9;
74:11;83:4;93:9;
121:8;122:7;126:21;
132:9,15;139:8,18;
162:2,3;176:12,14,16;
220:18;256:6;315:21;
317:24;344:21
**better (11)**
27:18;35:7,7;53:7;
161:2,13,13;187:12,
16;289:12;300:9
**Biebel (1)**
95:24
**big (7)**
229:6,7,9,11;309:9;
358:7,7
**bin (2)**
230:25;231:12
**Birchwood (1)**
96:23
**bit (7)**
57:2;77:7;112:2;
130:23;210:9;225:1;
307:17
**bits (1)**
233:22
**black (10)**
139:15;234:12;
236:16;249:19;
256:11;267:9;303:4;
304:12;343:18,20
**blacks (3)**
256:12,18;307:1
**blank (1)**
202:5
**blind (1)**
138:8
**block (6)**
48:17,20,20;
100:15;212:7;233:7
**blue (1)**
304:12
**blurt (1)**
66:4
**Board (13)**
26:17;33:21;
103:25;104:4,6,18,19;
105:5,9;106:4,15;
247:11;275:17
**boards (1)**
104:8
**boat (1)**
300:22
**body (2)**
43:17;200:6

**bogus (1)**
86:6
**bomb (1)**
59:15
**Bonaventure (1)**
304:12
**bond (2)**
274:24;281:8
**Bonjean (577)**
5:17,17;6:14,20;
7:15,19,21;23:5,22;
25:19;27:14,22;28:1,
12,18;29:10;31:16;
38:8;39:2,14,24;40:5,
10,21;42:8;43:5,19;
44:4,13;45:1,11,13;
46:5;50:24;51:15;
52:3,11;53:16,23;
54:6,12,19;55:1,10;
56:11,16;57:1;60:1,9,
11;61:3,9;62:23;
65:16,22;66:23;67:8,
11;68:1,15;69:7,11,
16,22;70:5,12,21;
71:7,17;72:15;73:5,
22;74:18,22;76:1,9,
17,19;77:11,22;78:9;
79:2,16;80:11;81:3,
16;82:23;83:12;84:1,
16,21,22;85:6,22;
86:5;93:11;95:13;
98:10,15,20;99:12,15,
21;100:4;103:14;
104:17;108:4,7;
110:8,14;111:4,11,20;
113:6,10,17;114:10;
115:20;116:2,23;
118:11;119:2,9,18,21;
120:1,18;121:6,9,14,
23;122:1,8;123:4,16;
124:1,19;125:7,17,25;
126:3,8,20;127:1;
128:11,19;129:3,23;
130:16;131:4,7,20,22;
132:11,21;133:7,17,
23;134:4;135:13,18;
136:9,13;137:10;
138:1,16;139:1,13;
140:1,15,22;141:5,24;
142:14,23;143:5;
144:23;145:7,13;
146:3;147:4,7;148:1,
10;149:5,21;150:21;
151:1,10;152:9,22;
153:13,21;154:5,14,
20;155:1;156:5,11,
17;157:3,9,14,21;
158:8,20,22;159:4,11,
14,16;160:14,23;
161:7,19;162:13,22;
163:7,18;164:3,14;
165:6,23;166:3,16;
167:2,9,20;168:12,22;

169:8,16;170:8,24;
171:6;172:1,7,12,17;
173:1,4,6,19;174:9,
18,20,22,24;175:7,17;
176:1,18;177:6;
178:1,8,16;179:1,3;
180:3,9,21;181:1,7;
182:16;183:3,11,21;
184:14,20,24;185:5,
11,21;186:3,9,22;
187:10,18;188:10,12,
15,19;189:12,23;
190:4,10,24;191:13;
192:1,22;193:7,14;
195:11,18;196:6,17;
197:3,16;198:6;
200:20;203:18;204:1;
205:20;206:1;207:14,
16;208:20;209:17,21;
210:3,5,24;212:8,12,
16;213:2,19;215:19;
217:3,7,11,14,22;
218:23;219:8;221:14,
21;222:6,18;223:12;
224:5;226:19;228:13;
229:10;230:6;232:24;
235:21;236:1;237:5,
9,16,22;239:16,22;
240:7,24;241:9,15,17;
242:9,22;243:24;
244:10,16;245:5,17;
246:7;247:2;250:3,
23;253:7,10,18;
254:3;255:6;256:5;
257:14;258:8,16;
259:1,7,11,12,20;
260:3,13;261:21;
262:3;263:8,11,12,22;
264:4,19;265:10;
266:14;268:9;269:13,
20;270:16;271:2,9;
272:16,23;273:4,9,19;
274:1,9;275:13;
276:6,22;278:15;
279:19;280:7,23;
281:7,23;282:6;
283:15;284:1,24;
285:15,23;286:10,14,
18,20;287:7,9,24;
288:5,10,16,21;289:2,
10,20;290:14;291:6,
19;292:11;293:1,24;
294:5,14;295:4,11;
296:1,14;297:3,12;
298:4,10;299:10,21;
300:13,17,21;301:1,
11;302:2,13,24;
303:18;304:15,19,20;
305:6,11,17,19;306:4;
307:19;308:4;309:8;
310:3,11,13;311:1,24;
313:22;314:1,9,14;
315:19;316:15;317:1,

7;318:1,8,20;319:4,
13;320:2,5,17,19,21;
321:10,22;322:7,20;
323:5,13,22;324:20,
25;325:3,10;326:9,14,
17;327:17;328:14,16;
329:10,20;330:2,5,9,
12,14;331:5;332:24;
333:3,8,16,17;334:17,
25;335:3,4;336:18;
337:6;339:11;341:21,
23;342:2,22,24;
343:14,24;344:9;
345:24;347:1,11,14;
348:1,8,19;349:3,13;
350:1,13;352:2;
353:1,17;354:6,13;
355:13;356:1,8,21;
357:5,18;358:8;
359:5,21;360:5,18;
361:2,8,20;362:2,22;
363:10,22;364:3,7,17,
24;365:1,8;366:8,14;
367:4
**Boo-Boo (2)**
146:23;147:1
**bordering (1)**
349:14
**born (1)**
31:4
**bosses (2)**
120:15;144:9
**Both (2)**
56:17;181:11;
182:7;223:7,23;
231:10;271:18;
312:17;328:7;330:8,
15,22
**bottom (3)**
245:19;304:15;
331:19
**Boulevard (1)**
5:10
**boundaries (5)**
47:12;96:13,17,24;
212:4
**boundary (1)**
212:5
**box (3)**
315:22,22;330:3
**boxes (2)**
93:14;132:22
**boy (2)**
5:23;130:3
**Boyle (6)**
219:14;220:15,23;
221:3;222:5,8
**Boyle/Brennan (1)**
230:12
**brain (2)**
105:25;356:17
**branch (1)**
99:25

**break (12)**
10:18,19,21;113:7,
8;119:20;217:2,3,4,4;
220:13;325:2
**breaking (1)**
108:1
**breaks (1)**
317:19
**breakup (1)**
106:1
**Brener (10)**
5:19,19;45:8;55:6;
70:19;72:21;192:13;
235:22;317:5;366:19
**B-R-E-N-E-R (1)**
5:20
**Brennan (3)**
219:15;222:5,7
**Brennan/Boyle (1)**
231:25
**Brennan's (1)**
221:12
**bright (1)**
52:19
**bring (1)**
226:3
**broke (1)**
113:18
**brothers (5)**
20:9;224:17;
226:11;244:22;
357:11
**brothers' (10)**
181:17;195:2,14;
196:8;239:9;240:17;
242:4;252:23;361:13;
362:7
**brought (5)**
12:12;134:24;
144:14;255:13;
361:12
**Brown's (1)**
169:19
**Brueggen (472)**
6:2,2;23:1,21;
25:18;27:13,19,24;
28:6,15;29:8;31:14;
37:25;38:23;39:11,
20;40:3,8,18;42:2,13;
43:10;44:1,9,16;45:7;
46:3;50:21;51:5,19;
52:7;53:1,4,19;54:10,
16;55:7,19;56:14,23;
59:23;60:6,25;61:2,6;
62:21;65:2,21;66:20;
67:5,23;68:7;69:5,15;
70:8,18;71:2,15,22;
72:19;73:19;74:9;
75:20;76:4,14,23;
77:19;78:7;80:4,25;
81:12;82:12;83:11,
20;84:13,20;85:2,18,
25;93:7;98:4,14,18;

99:3,18;103:11,22;
107:22;110:5,12;
111:1,9;113:2;114:8;
115:17,24;116:21;
118:10,25;119:7,16,
19;120:9,25;121:12;
123:2,7;124:15;
125:1,13,15,21;126:7,
16,24;128:3,17;129:1,
14;130:13,15,21;
131:15;132:3,19;
133:1,10,20;134:2;
135:15,25;137:8,19;
138:11,19;139:6,23;
140:19;141:2,21;
142:11,20;143:3,24;
144:19;145:2,17;
146:7;147:16;148:6,
24;149:16;150:16,24;
151:3,5;152:1,18;
153:8;154:1,12,16,22;
155:23;156:9,13;
157:1,7,18;158:2,14;
159:2,9,12;160:7,19;
161:3,15;162:7,18;
163:4,14;164:2;
165:1,22,25;166:14,
22;167:6,18;168:10,
16;169:2,12;170:4;
171:23;172:4,21;
173:10,13;174:7,21;
175:2,14,21;176:15;
177:3,22;178:12,14,
20,23;179:14;180:7,
18,24;181:4;182:13;
183:1,9,18;184:6,17,
23;185:2,14;186:1,6,
20;187:14;188:6,9,11,
18;189:3,10,19,25;
190:20;191:9,21;
192:10;193:2,12;
195:7;196:4,14;
197:1,14;198:4;
200:18;203:17,23;
205:17;207:13;
208:19;209:15,19;
210:1,21;211:25;
215:15;217:1,5,8,12;
218:21;219:2,4;
221:11,19;222:12;
223:4;224:4;228:11;
229:8;230:2;232:23;
237:1,8,14,20;239:11,
19;240:3,19;241:12;
242:19;243:19;244:7,
13;245:1,15;246:25;
250:2,21;253:3,14,25;
255:3;256:1;257:13;
258:6,13,24;259:4,10,
17,23;261:18;263:6,
10,20,24;264:10;
265:3;266:12;268:3;
269:11,18;270:8,25;

271:7;272:14,21;
273:2,7,15,23,25;
274:6;275:10;276:4;
278:14;279:16;280:4,
19,25;281:15;282:4;
283:8,23;284:18;
285:9,12,18;286:11,
16;287:4,16,19;288:1,
25;289:7,17;290:13;
291:5,16;292:9,19;
293:22;294:2;295:1,
8,22;296:12,24;
297:9;298:3,6;299:8,
18;300:12,15,20,23;
303:16;304:17;305:5,
9;306:1;307:15;
308:3;309:25;310:6,
24;311:21;313:21;
314:5,13;315:15;
316:13,20,24;317:14;
318:6;319:11,22;
320:10,13;321:7;
322:3,12;323:3,10,19,
21;324:19,23;325:1,
4;326:13,16;327:16;
328:13;329:8,19,23;
331:4;333:1,12,15;
334:15,18;336:13,23;
337:1;342:20;343:12,
21;344:7;345:23;
347:5,7,25;348:3,15,
23;349:11,24;350:4;
351:21,23;353:25;
354:12;355:12,22;
357:13;358:4,19;
359:17;360:2,14,25;
361:5,18,23;363:9,16;
364:1,12,22,25;366:6,
11,22,25;367:2
**build (1)**
353:6
**building (4)**
87:13;95:20;100:3;
312:21
**bureau (1)**
36:24
**burglaries (1)**
183:7
**burglary (7)**
37:1;59:14;63:4,6,
21;65:10;97:15
**bus (1)**
233:25
**business (1)**
173:7
**busy (1)**
205:13
**Byrne (2)**
89:8,22

**C**

**cabinet (2)**
112:18,23
**cabinets (5)**
109:2;110:19,24;
111:6;113:25
**calculus (1)**
280:24
**caliber (5)**
253:2,4;359:20,23;
360:10
**California (3)**
95:17;100:13;
260:22
**call (18)**
14:12;33:9;48:8,13;
57:13;99:23;108:19;
115:10;117:18;173:9;
185:16;225:2;241:22;
307:5;308:14;327:3,
22;365:19
**called (16)**
6:10;20:15;31:21;
35:22;38:12;57:7;
59:8;92:23;99:24;
105:17;108:21;
109:11;114:24;115:9;
232:11;325:18
**calls (7)**
104:12;146:21;
282:4;302:9;322:12;
323:10,21
**calm (2)**
42:18;234:13
**came (27)**
20:11;24:3;38:3;
68:10;97:14,16;
101:4,5;103:2;
107:12;108:1;127:14;
158:16;171:15;
198:22;230:8,18;
231:17;238:1;255:24;
256:13;265:24;277:8;
307:13;345:11,12;
346:8
**Can (112)**
6:17;7:8,13;8:20;
9:5,8,9,11;10:24;
11:5;12:2,4;28:7;
36:12,12;38:25;
41:21,24;42:19;
54:13;56:10,10,22;
59:1;61:15;69:3;83:4;
98:16;113:10,22;
121:8;131:23;132:1,
6,15;134:11;135:19;
139:18;140:20;
147:21;154:10;
155:20;168:4;172:18;
174:18;177:23;
192:15,21;194:8,24;
197:12;202:11,13;
203:1,20;208:15;
210:3;216:24;217:2;

**220:11,18,24;221:22,**
24;222:4;223:10,11;
238:7;239:3;242:3;
251:15,16,19;255:12;
257:3,4;261:6;
270:11;280:8;281:4,
19;286:17,24;288:14;
290:9,9;291:18;
293:16;300:3;301:3;
303:13;304:17;
310:23;319:21;320:9,
23;324:21;325:1,12;
327:5;328:13;332:15;
333:6;335:10;341:5;
343:25;344:21;
354:15;364:5,10;
366:9,12
**candid (5)**
313:2,21,21;
318:21,24
**Candida (1)**
313:20
**candido (1)**
313:19
**canvass (7)**
102:5;205:6;
219:24;220:8;229:13,
15;232:5
**capable (2)**
329:6;332:8
**captain (2)**
48:1;91:21
**car (15)**
14:15;37:16;41:17;
48:16;66:5,6,14;
294:25;304:11,21,22;
306:6;318:13;343:17;
365:13
**card (14)**
111:16,16,21,24;
112:1,7,11,17,24;
114:2,19,25;115:8;
277:1
**cards (2)**
174:11,23
**care (2)**
349:4,8
**career (5)**
92:6;142:15;150:8,
11;175:20
**careful (1)**
67:7
**cares (1)**
274:5
**Carmen (1)**
234:9
**Caroline (1)**
18:11
**carried (1)**
58:2
**cartridge (1)**
252:14
**Case (97)**

**5:5;12:7,19;13:8,**
16;14:22;15:6;16:23;
17:1;20:18;21:7;
22:18;23:15;30:1;
57:18;63:2,2,3,15,17,
25;66:7;72:14;87:1;
94:17;100:24;101:13;
104:3;105:16,18;
106:2,23;107:2;
109:15;112:3,4,4;
117:10,11,12,20;
124:22;125:12;
129:19,25;130:2;
146:12,13;153:19,19;
157:16;171:15;
176:21,24;184:22;
185:1,8;186:15;
187:20;189:8;203:19;
204:3,5;207:6;210:7,
13;222:10;226:14;
236:25;237:24;
253:13;255:13;
260:11;262:14;
264:14;270:12;
272:25;285:2;287:14;
289:5,22;291:4;
294:7;319:14;339:19;
343:17;348:13;357:4,
7,9,9;359:12;364:11,
13,21,23;365:18
**cases (38)**
51:22,23;63:17;
79:7;104:1,2,19;
106:11;123:15;130:1;
147:12,15;171:8,9,10,
13,16,18;184:15,19;
185:10,13,18,22,24;
186:18;187:2,6,12,17,
25;188:5,14,21;192:7,
8,15;364:20
**casings (4)**
202:16,17;252:14,
15
**catch (1)**
108:6
**categories (4)**
36:24;64:2;175:5,6
**category (2)**
59:17;83:18
**cause (6)**
238:19;239:1;
268:6,10;269:1;
270:11
**caused (1)**
131:1
**causing (1)**
14:20
**Central (9)**
96:2,9,15;97:2;
99:2;100:16;211:19;
212:5,6
**certain (5)**
45:4;52:4,18;56:25;

99:7
**certainly (12)**
27:12;75:13;152:5;
185:23;267:25;269:5;
270:1;273:17;274:12;
292:12;294:6;351:6
**chair (1)**
290:11
**Chalem (1)**
5:13
**chance (5)**
51:11;108:2;215:8;
251:5;304:5
**Chances (1)**
94:14
**change (9)**
33:2;70:6;102:14;
152:21;159:20,20,22,
23;280:24
**changed (9)**
27:11;86:3;97:9;
154:17;160:12;
162:10;281:12;
362:12,16
**changing (4)**
27:1,4;160:1;161:1
**characterization (8)**
264:10;279:17;
283:24;285:12;
296:13;306:2;314:6;
342:21
**characters (1)**
324:16
**charge (15)**
60:24,24;61:5;
65:12;89:22;111:14;
117:25;141:18,19;
267:25;270:11;280:2;
282:3,8;342:16
**charged (14)**
185:6;244:21;
250:14;252:7,20;
270:7;278:12,13;
325:22,24;328:7;
349:7,16;366:2
**charges (1)**
270:15
**charging (1)**
352:6
**chase (1)**
14:22
**chasing (2)**
14:24;15:1
**cheating (1)**
174:21
**check (1)**
342:17
**checked (3)**
93:14;112:19;
132:23
**checks (1)**
203:2
**chemicals (1)**

35:5
**Chicago (25)**
5:11;6:1;12:22;
13:16;20:13;26:5,6;
31:3,4,4;36:1;47:19;
55:14;90:14;134:14,
17;157:10;191:1;
198:12;213:25;
222:25;240:25;
316:10;353:22;
363:12
**Chicken (1)**
169:19
**child (1)**
277:22
**children (1)**
32:18
**chose (1)**
353:24
**chosen (1)**
151:25
**Chris (6)**
248:22,25;249:4;
313:3;319:9;331:22
**Christopher (5)**
249:6;331:23;
336:2,19;338:1
**church (2)**
232:18,18
**Cicero (1)**
96:14
**circumstance (4)**
77:13;131:6;165:7;
215:17
**circumstances (9)**
14:16;68:9;81:17;
84:2;101:24;201:20;
215:17;221:2;225:21
**circumstantial (1)**
77:5
**Cisco (9)**
345:10;346:6;
351:18;353:11,20;
354:17;355:20;
356:24;358:15
**Ciscos (1)**
356:13
**Cisco's (1)**
356:6
**City (16)**
6:1;12:21;13:12,13,
16;15:9;47:18;55:13,
13;89:15;96:16;
157:10;182:12;191:1;
240:25;300:18
**civil (3)**
11:9;30:22;37:13
**civilian (1)**
137:7
**civilians (1)**
136:16
**claim (2)**
72:5,6

**clarify (4)**
10:2;46:7;69:5;
247:23
**clarifying (1)**
340:16
**clarity (1)**
9:4
**class (7)**
36:8,8;57:19;58:15,
20,21;252:15
**classes (4)**
36:7;43:13;59:11,
16
**classifications (1)**
174:14
**classroom (5)**
36:15,17;41:22;
58:3,12
**clear (3)**
161:22;210:18;
338:11
**cleared (2)**
109:24;325:19
**cleared/open (4)**
244:20,25;325:15,
20
**clearer (1)**
45:12
**clearing (4)**
169:23;284:22;
317:18;348:17
**clearly (1)**
70:2
**clerical (1)**
36:21
**clipboard (6)**
103:25;104:24;
106:25;206:17;207:7;
238:3
**clipboards (2)**
127:15,21
**close (17)**
7:2;41:5;48:15,21;
62:19;139:12;184:25;
185:12,22;186:14;
187:24;213:21;253:5,
5;291:4;314:21;358:7
**closed (17)**
109:13,16,24,24;
124:22;125:12;
184:22;186:18;187:3,
6;188:14;191:1;
196:1;285:3;287:14;
289:5,22
**closer (1)**
32:2
**closing (19)**
184:15,18;185:24;
187:12,17,19,19;
188:5;264:6,21,23;
265:1;269:23;285:7;
296:9;305:21;317:18;
325:12,18

**clue (1)**
66:4
**clues (2)**
202:12;203:3
**coater (1)**
33:10
**coauthored (1)**
223:22
**cocaine (1)**
214:23
**co-conspirator (1)**
306:11
**code (1)**
60:14
**coerced (1)**
142:18
**Cohen (2)**
7:16,17
**coincided (1)**
111:17
**color (2)**
115:3,6
**color-coded (1)**
38:5
**comfortable (2)**
122:18;281:18
**coming (5)**
43:16;107:25;
247:15;264:2;355:16
**command (2)**
143:22;163:12
**commander (4)**
48:1;91:13,15;
176:7
**commander's (1)**
117:15
**commanding (1)**
174:16
**commendations (1)**
186:12
**commentary (1)**
323:4
**comments (1)**
316:14
**committed (1)**
205:12
**committing (1)**
210:15
**communicate (1)**
192:24
**communicated (2)**
80:14;82:10
**communications (1)**
17:12
**community (1)**
232:21
**companions (1)**
350:11
**Company (4)**
33:6,16,20;254:14
**compare (1)**
203:2
**compared (1)**

128:22
**compassion (2)**
42:17;43:1
**compel (1)**
82:4
**compilation (1)**
220:25
**compile (1)**
219:25
**complete (17)**
8:17;10:3;62:19;
92:4,19;93:5,18;
109:4;118:1;120:23;
135:1;143:13;195:1,
13;263:15;338:12,16
**completed (13)**
10:9;41:2;57:16;
62:11;87:14;105:1;
117:6;120:2;176:4;
219:22;260:12;266:2;
287:23
**completely (4)**
74:14;159:23;
164:22;165:2
**completeness (1)**
90:24
**completing (1)**
50:5
**component (2)**
90:8,9
**comport (1)**
178:10
**compound (7)**
39:21;42:14;51:20;
142:21;178:14;
293:23;295:23
**computer (2)**
68:18;105:23
**computers (1)**
33:12
**concentrate (1)**
99:8
**concentrated (4)**
40:25;99:11;
146:10;192:18
**concept (1)**
160:1
**concern (2)**
263:18;269:24
**concerned (3)**
104:16;128:8;
167:12
**concerns (2)**
79:11;177:20
**concluded (1)**
367:8
**conclusion (4)**
75:14;153:2;
211:10;222:22
**concrete (1)**
106:20
**condoned (1)**
126:5

**conducive (1)**
28:10
**conduct (8)**
39:9;83:2,19;
148:22;178:9;272:10;
273:21;340:4
**conducted (5)**
149:4;178:5;191:6;
200:4;327:25
**conducting (5)**
14:10;86:6;134:25;
148:18,20
**conference (2)**
105:10;189:7
**confess (4)**
46:12;82:1,4;84:10
**confessed (11)**
85:13;169:19,21;
272:19;273:22;
292:17;294:8;296:4;
301:6;343:15;361:22
**confesses (1)**
75:6
**confession (18)**
80:3,23;134:1;
170:2,2;269:5;
270:17;292:6;295:17;
296:22;297:20;
298:13;299:13,17;
301:15,17;302:18;
304:5
**confident (4)**
93:5;98:6;259:2,14
**confined (1)**
192:16
**confirm (1)**
198:1
**confirmed (1)**
264:25
**confused (2)**
116:24;281:11
**connect (2)**
203:10;251:19
**connected (1)**
181:25
**connection (5)**
181:17;222:9;
254:9;332:18;362:7
**consider (5)**
26:9;30:2;103:9;
161:14;180:13
**considered (5)**
101:6;149:19;
180:10;188:13;
198:23
**considering (2)**
227:1,4
**consistent (3)**
44:7;124:23;125:3
**consists (1)**
241:18
**conspiracy (2)**
189:17;190:9

**constitutional (2)**
84:4;136:15
**constraints (1)**
102:21
**contact (3)**
25:14;29:3,11
**contacts (3)**
248:8,11;249:11
**contain (6)**
22:13;122:19,22;
127:21;337:18;339:3
**contained (4)**
109:4;115:15;
244:6;335:11
**contemporaneous (3)**
76:22;124:12;
170:16
**content (6)**
38:7;128:6,13;
143:7;164:6;246:12
**contents (2)**
223:24;224:1
**context (1)**
132:1
**continually (1)**
53:10
**continuance (1)**
327:24
**continuation (1)**
327:24
**continue (2)**
102:8;282:1
**continued (2)**
127:10;274:12
**contractor (1)**
32:24
**contradicted (1)**
128:24
**contributed (3)**
316:2,4,6
**control (4)**
37:8;59:6,9;133:18
**conversation (8)**
10:10;28:23;75:2;
77:8;233:22;238:5;
351:16,19
**conversations (5)**
30:16,22;143:21;
275:11,15
**conveyed (2)**
39:8;42:11;61:24
**convicted (3)**
156:8,21;191:5
**convictions (3)**
189:1;191:19;
208:25
**Cook (6)**
5:20;267:3,5;
340:24;341:9,22
**cooperate (9)**
78:13,14,16;83:13;
84:11;144:11;267:13;
283:5;346:21

**cooperated (2)**
80:7;141:11
**cooperating (1)**
280:21
**cooperation (3)**
78:6,23;79:6
**cooperative (1)**
80:8
**coordinator (1)**
103:1
**coordinators (4)**
102:16,17,17,18
**cop (1)**
313:22
**copies (8)**
104:2,25;106:14,
23;117:13;120:16;
123:19;275:18
**cops (1)**
287:2
**copy (7)**
105:5;118:4;
119:14;120:7;206:16;
262:18;275:20
**corner (4)**
197:5;214:24,25;
312:25
**corporation (1)**
15:23
**correctly (4)**
6:18;51:22;128:8;
133:6
**correlated (1)**
265:25
**correspond (1)**
244:5
**corresponded (3)**
262:2,7;264:24
**corresponding (2)**
121:4;266:10
**corroborate (8)**
167:17,19;272:12;
273:1;341:8,13;
343:1,9
**corroborated (2)**
264:25;280:9
**corroboration (1)**
270:19
**Cortland (2)**
147:2;365:11
**counsel (4)**
5:15;15:23;235:14;
334:22
**County (6)**
5:21;267:3,5;
340:24;341:9,22
**couple (14)**
17:25;18:9;19:10;
24:19;25:21;30:9;
37:17;88:21;96:22;
100:18;107:15;
194:15;195:20;365:7
**course (14)**

57:16;62:11,16;
66:17;68:25;80:6,9;
118:23;125:5;166:20;
180:23;234:3;237:17;
316:1
**Court (20)**
5:4,13;6:4;7:12;
8:2;10:6,11;82:7;
191:24;192:3,3,4;
251:3;274:23,24;
276:7;277:8;320:11,
15;321:18
**court-reported (3)**
344:14,15,16
**cousin (1)**
35:12
**cover (3)**
37:21;220:7;255:22
**coverage (1)**
185:19
**covered (9)**
40:12;41:14,19;
58:18;59:2;63:17;
81:7;165:13;362:11
**CR (5)**
15:20;16:7;134:19;
135:1,5
**crack (2)**
171:21;214:22
**cramp (1)**
207:1
**created (3)**
28:9;107:1;116:6
**creating (1)**
170:7
**credit (1)**
193:5
**crew (1)**
91:10
**crime (50)**
41:17;42:17,23,24;
45:21;46:12;59:17;
67:1;70:16,24;71:11;
82:5;85:17;87:19,21,
23;95:14;102:16;
105:6;179:21;182:5,
12,17,20;183:4,8,16,
22,23;198:24;203:10,
15,21;204:9,12,15;
205:12;210:19;211:7;
215:12;228:10;
282:21;335:15;
337:15;339:20;
343:16;346:19;347:3,
24;358:9
**crimes (39)**
59:18;63:20;64:1,3;
97:12,18,20;98:2,12,
12,24;99:1,6,7,16;
101:3,7,12;102:11;
103:7;104:4;142:17;
145:23;146:6;182:24;
184:5,9,13;211:5,5,

216:11;251:19;252:7;
254:15,23;255:18;
276:13,16;357:10
**criminal (10)**
52:1;59:4;60:13,13,
15;104:5;208:12,17;
209:12;336:21
**criteria (2)**
58:14;105:6
**cross (4)**
45:4,5;83:2;321:2
**cross-street (1)**
211:20
**crowbar (2)**
130:6,25
**crowd (1)**
37:8
**crowded (1)**
110:10
**Cruz (12)**
248:25;249:2,13;
312:20;327:7;328:8,
12,21;330:21;331:22;
337:3,4
**cuffs (2)**
250:13,15
**current (1)**
100:12
**currently (1)**
16:18
**custody (24)**
42:6;140:25;181:3;
246:23,24;248:5,5;
250:12,18;252:19;
270:22,22;277:24;
278:9,18;280:18;
281:20,25;287:13;
309:15;327:7;328:7;
360:8;365:20
**customary (1)**
264:5
**cut (3)**
33:24;201:4;267:14
**cutter (1)**
33:23
**cutting (1)**
33:21

**D**

**Damen (1)**
87:12
**Damiano (1)**
5:11
**dark (1)**
304:12
**data (4)**
54:2;105:23;
183:16,20
**date (20)**
5:6;23:16;24:14;
116:8;198:18;207:24;
208:1,3,8;218:4;

231:7,7;266:24;
335:16,21;336:3,11;
339:6,19,20
**dated (1)**
228:8
**dates (2)**
242:5;340:3
**Dave (2)**
6:2;18:11
**David (1)**
232:17
**day (26)**
36:23;37:2;54:13;
57:23;58:18;68:25;
72:12;73:11,13;
74:20,21,23;103:23;
104:7,9;207:5,5;
224:17;230:4;231:4;
256:17;293:18;294:1;
303:1;327:12,19
**days (16)**
26:24;27:15;37:6;
44:6;48:23;91:14,19;
94:20;107:25;150:19;
151:2;229:16;232:12;
249:25;281:4;291:4
**DCFS (2)**
83:15;84:9
**dead (3)**
130:6;201:21;274:4
**deal (11)**
145:20;184:13;
229:6,7,9,11;267:14,
16;281:2;342:6,7
**dealers (1)**
216:3
**dealing (3)**
35:15;51:14;179:17
**deals (2)**
327:3,6
**death (12)**
11:10,22;14:6,20;
20:8;130:12;131:1;
238:19;239:1;277:22;
353:21;365:12
**deaths (2)**
181:22;182:2
**decades (2)**
8:25;158:23
**deceased (1)**
32:21
**deceitful (1)**
82:3
**decide (1)**
283:19
**decided (1)**
191:7
**declined (1)**
256:20
**deducing (1)**
199:1
**deem (1)**
79:12

**deemed (1)**
187:12
**deeply (1)**
145:15
**defend (1)**
136:21
**defendant (11)**
5:24;6:3,22;12:2,
18;13:6;15:5;16:18;
17:3;130:5;133:25
**defendants (10)**
13:15;18:12;19:21;
30:1;49:7,13;87:1;
95:6;176:20,24
**defending (1)**
137:1
**defense (2)**
229:21;355:1
**defensive (1)**
36:18
**definitely (1)**
364:19
**degree (4)**
56:25;71:5;136:3;
268:1
**demanded (1)**
355:19
**demonstrate (2)**
251:16;343:7
**demonstrations (1)**
37:12
**demoted (1)**
53:12
**denied (1)**
361:22
**denies (1)**
167:24
**dep (3)**
333:14;334:2;
344:11
**department (53)**
15:21;20:13;25:15;
26:25;27:1,11;28:2,3,
5;34:10;36:1;42:6;
43:23;51:3;54:8;
55:15;59:6,9,12;72:4;
84:6,8;89:24;112:22;
119:13;120:7,12,22;
123:18;124:24;135:9;
136:19;138:7;149:24;
150:13;156:22;
160:12;168:23;
178:11;186:7,11,12;
187:1;198:12;221:6;
223:1;238:12,16;
246:4;261:9;316:10;
353:23;363:13
**departments (1)**
144:9
**depend (7)**
71:4;101:24;
128:18;143:25;170:6;
172:23;196:21

**depended (1)**
171:14
**depending (6)**
48:3;68:9;105:5;
166:21,23;221:3
**depends (2)**
161:5;201:20
**deponent (1)**
6:3
**deposed (1)**
14:5
**deposition (23)**
5:8;6:23;9:22;11:3,
6,9,22;12:1;13:18;
15:19,25;16:25;17:9;
18:2;20:4;24:10;
76:18;119:23;181:18;
194:18,19;367:6,8
**depositions (3)**
7:4;11:19;321:11
**deputy (2)**
11:21;12:24
**describe (1)**
66:24
**description (2)**
66:6;67:2
**descriptions (1)**
67:3
**designated (2)**
55:12;168:20
**designee (2)**
12:21;15:9
**desirable (2)**
89:16;186:24
**desk (4)**
91:7,8,9;105:13
**deskmen (1)**
105:17
**destroyed (4)**
125:6,9;240:12;
355:9
**detail (7)**
59:25;61:22;136:6;
273:13;299:14;303:2,
3
**detailed (2)**
65:19;244:2
**details (1)**
244:5
**detainees (2)**
59:7,7
**Detective (220)**
16:23;18:14,17,18,
19,19,24;19:3;23:12;
24:12,15,19;25:6,13,
21;28:23;29:17;
36:22,24;41:1,10;
47:4;49:2,4,12,16,25;
50:1,20;51:13,17;
52:13,15,23;53:8,12;
55:16;56:3,13;57:4,9,
10,13,21;58:20;61:17,
25;64:25;66:3;70:10,

14;71:8;74:5;82:10,
17,18,22;84:8;86:16,
17,18;89:4;97:5;
108:18;110:25;111:5;
112:5;116:14,15,18,
25;117:24,25;118:5,
12,13;119:10;120:2;
121:2,17;123:15;
129:21;130:3,4;
137:24;138:17;
139:21;140:3;143:1,
20;150:9,12,19;151:2,
23;154:7;155:7;
156:24;158:17;
161:21;162:15;
165:20;166:7;168:14;
169:18;172:2;174:1;
175:12,19;177:20,21;
178:17;179:10,13;
180:4,10;188:3,4,14;
189:2,14,17;190:18;
191:18,19;192:5,6,8,
15;200:16;204:2;
206:13;209:11;210:6,
12;211:15;219:14;
226:21;227:8;235:3;
236:18;245:20;250:5,
6,17,17,24;252:22;
253:12;254:14,16;
258:11,15;260:6;
263:3;265:12,21;
267:4;269:8;270:6;
271:12;272:12;
274:23;275:6;277:13;
283:9,10,10,12;
284:12;285:20;
287:11,11,25;288:22;
290:15;292:2,3;
293:17;295:13,18;
296:4,18;297:22;
298:11,22;299:1,2,2,
5;301:14;302:14,16;
303:10;307:7;308:14;
309:2;311:13;317:19,
21;318:3;320:22,24;
324:3;326:21,22;
328:20,24,25;330:1;
331:21;341:3;343:8;
351:10;361:11;362:5,
6,15;365:10,18
**detectives (99)**
19:8;26:19;30:20;
37:3;52:19,20;53:10;
55:17,18;81:10;
102:2,23;103:18;
105:22;111:13,19;
114:5;115:22;122:3;
123:19;133:8;134:6;
142:8;143:22;146:12,
16;147:13,14,23;
152:24;162:4;163:12;
164:20;168:20;171:8,
10,12,14,17;174:6,25;

180:2;187:2,6,11,15,
22;190:25;199:15,17;
200:10;206:3;222:5,
7;223:7;226:15;
236:24;237:13;238:4;
255:16;264:5;272:25;
273:5;275:12,21;
276:15;277:15;
283:19;284:15;
291:21,24;294:7,16;
303:13;305:1,2;
306:15,24;312:18;
317:3;322:1;323:24;
327:15;329:5;332:1,
5;337:12;339:18;
342:16;343:16,19;
346:5;351:17;353:10;
355:20;356:23;
360:23;361:12;
363:18
**detectives' (1)**
94:22
**determine (9)**
128:1,12;131:13;
222:8;223:2;251:14;
266:9;344:2;352:9
**determining (3)**
72:16;201:7,7
**develop (2)**
43:15;133:2
**developed (1)**
77:9
**Devon (1)**
96:18
**Dickinson's (2)**
192:7,8
**dictating (1)**
223:8
**die (1)**
12:10
**diet (1)**
35:19
**difference (2)**
91:6;325:19
**differences (1)**
42:4
**different (36)**
28:4;36:18,24;38:5,
13;42:9,11,15;43:23;
47:23,24,25;58:23,24;
60:3;62:14;65:1,4,9;
91:11,14;94:20;
95:21;111:13;117:13;
131:6;174:13;196:6;
198:18;215:24;220:5;
241:12;255:22;
286:23;338:6;339:12
**differently (1)**
76:8
**difficult (6)**
10:11;28:13,14;
46:15;318:2,5
**DiFranco (1)**

5:20
**direct (4)**
70:15;197:1;
328:13;365:4
**directed (1)**
147:13
**direction (1)**
212:6
**directions (1)**
146:17
**directive (1)**
168:19
**directly (5)**
68:20;82:6;166:8;
290:23;301:21
**disagree (1)**
322:18
**discipline (1)**
28:21
**disclosed (7)**
346:7;350:16;
364:13,15,20,21,22
**discloses (2)**
349:19;351:7
**discovered (2)**
137:16;200:3
**discredited (1)**
74:15
**discretionary (1)**
55:3
**discretions (1)**
136:12
**discuss (2)**
237:12;276:8
**discussed (8)**
79:4,20,23;84:23;
85:9;114:19;218:2;
334:12
**discussing (2)**
113:24;284:22
**discussion (2)**
46:22;334:19
**discussions (1)**
275:21
**disobedience (1)**
37:13
**dispatched (1)**
48:13
**disprove (1)**
323:6
**dissect (1)**
320:1
**distinct (1)**
330:19
**distinction (1)**
44:15
**distribute (1)**
105:18
**distributors (1)**
227:22
**District (31)**
5:4,4;14:7,7,8;
37:18;47:9,13,20;

48:4,6;49:1;90:13,20;
91:12;92:17;93:13;
94:21,25;95:16;
96:10,11,13,17;97:1;
99:11,17;100:7,10;
145:22;183:23
**divided (1)**
95:19
**Division (21)**
5:5;36:20,23;38:15;
41:2;48:6;50:8;53:11,
12,13;56:7;57:8,9;
61:23;70:10;87:19;
96:14;97:7,8;117:18;
163:17
**divisions (2)**
97:5;98:16
**document (15)**
71:21;75:3;76:11;
115:14,22;153:5;
154:8;197:9;222:9;
244:19;246:22;271:4;
333:22;336:16;
344:12
**documented (10)**
71:14,19;153:6;
195:25;246:22;274:8;
295:6;329:11;339:17;
340:4
**documenting (3)**
153:25;313:18;
339:5
**documents (14)**
20:3;21:23;23:18;
194:17;207:18,19;
243:22;261:25;272:6;
324:24;334:21;337:7,
11;343:4
**Dog (3)**
234:17;236:19,22
**domestic (2)**
201:12;202:1
**done (28)**
41:21;69:25;76:6;
86:14;102:6;123:10;
129:11;155:5,6;
167:11;171:25;174:3,
15;221:4;223:11;
230:5;237:19;239:8;
242:16;256:19;
261:20;264:18;273:5;
274:10;302:23;
303:14;327:19;
366:25
**door (1)**
230:21
**dope (1)**
215:2
**double (26)**
195:19;222:10;
267:21;274:3;276:9;
292:17;297:20;
304:22;305:14;306:6;

307:21;308:1;309:19;
328:4;342:16;344:3,
4;347:4;349:7,20;
351:4;7;352:6,10;
353:21;358:16
**doubt (3)**
133:9,14;262:23
**doubts (1)**
133:14
**down (33)**
7:13;14:9,11;15:22;
23:14;24:16;35:19;
37:9,9;42:18;47:16;
48:20;67:17;77:10;
89:25;100:12;110:10;
117:19;127:5;130:23;
153:3,20;165:14,16;
198:14;202:4,8,25;
207:13;231:10;
292:16;345:2;346:6
**downstairs (1)**
109:21
**Downtown (7)**
109:14,17,20;
110:11;117:17;176:3,
11
**dozen (3)**
7:2;11:4;189:1
**drafting (2)**
33:6,11
**draw (4)**
67:12;332:16;
345:1;359:22
**drawing (1)**
330:19
**drawn (2)**
44:19;316:2
**drink (1)**
226:7
**driven (2)**
312:24;324:8
**driving (7)**
14:8,11,17;313:9;
314:25;318:10;
365:13
**drop (2)**
92:24;141:18
**dropped (1)**
16:2
**Drug (7)**
183:4,4;211:5;
216:3;227:18,21,21
**drug-related (2)**
179:18;204:12
**drugs (2)**
179:18;183:6
**drunk (1)**
234:16
**due (1)**
33:24
**Duggan (1)**
216:13
**duly (1)**

6:10
**dumb (1)**
222:25
**duplicate (1)**
125:10
**duplicates (1)**
119:5
**during (41)**
9:22;32:6;37:12;
41:25;44:5;45:12;
48:23;61:24;64:24;
66:16;79:4,23;80:6,9,
14;81:4,18;82:24;
84:24;85:9,24;135:2;
149:3,6,9;150:8;
158:16;162:11;165:9;
177:14,18;183:12;
184:11;239:18;240:2;
295:14,21;302:8;
316:1;324:1;331:20
**duties (10)**
36:21,21;48:5;
90:19;100:22;101:22;
102:7,8,13;144:14
**duty (5)**
13:2;50:12;105:23,
24;225:7

E

**earlier (15)**
9:24;11:2;94:19;
114:20;132:8;165:13;
208:10,11;217:24;
279:25;282:7;305:12;
339:16;341:7;358:20
**early (6)**
88:1;94:20;101:5,
12;225:2;324:1
**easier (2)**
322:18,21
**easily (3)**
48:22;106:25;269:1
**east (1)**
96:15
**Eastern (1)**
5:5
**eat (1)**
217:5
**Education (2)**
26:17;31:18
**Edward (1)**
5:19
**efficiency (1)**
223:7
**efficient (1)**
333:20
**effort (2)**
108:5;327:14
**Efrain (1)**
249:13
**eh (3)**
274:4,5;349:21

**eight (4)**
74:13;177:19;
216:17;241:5
**either (27)**
14:21;31:18;84:10;
94:11;148:4,4;
150:12;155:18;
178:10;181:2;205:8;
211:14;227:21;
258:14,21;260:24;
269:14;271:17;
274:19;290:23;301:3,
20;310:21;330:15;
343:5;355:7;363:7
**elaborating (1)**
262:22
**electrical (1)**
32:24
**elements (2)**
60:21;61:8
**eliminated (5)**
132:7;152:12,14;
156:3,6
**else (26)**
15:2,2;18:21;19:19;
21:4;22:23;24:9;58:5;
73:4;100:3;104:15;
190:12;196:9;217:9,
15;223:11;282:21;
295:21;296:2,3;
297:2,5;300:2;315:9;
333:5;352:18
**elsewhere (1)**
119:5
**empathy (2)**
42:18;43:2
**employment (1)**
33:2
**empty (2)**
202:16,17
**end (14)**
34:9;66:19;77:16;
94:15;145:21;190:9,
11;197:11;213:22;
224:7;245:25;264:14;
319:21;367:5
**ended (3)**
176:12;289:22;
293:20
**ending (2)**
224:24;292:3
**ends (1)**
292:6
**enforcement (3)**
31:9;35:2,11
**engaged (1)**
233:21
**engages (1)**
134:9
**English (2)**
233:19;236:12
**Engquist (1)**
18:11

**enjoyed (1)**
90:3
**enough (18)**
27:7,7,9,10;46:21;
77:12;95:23;98:23;
102:22,23;141:16;
255:21;282:8,11,12;
340:13;346:16;359:2
**ensure (7)**
92:18;120:22;
132:23;168:4;246:21;
261:15;306:9
**entailed (2)**
37:4;42:21
**enter (1)**
105:23
**enters (1)**
76:18
**entire (12)**
47:22;120:12;
132:1,17;155:7;
177:14;196:20;
199:25;223:16;
243:20;266:6;285:21
**entirety (1)**
243:15
**entry (3)**
266:19;271:23;
272:2
**environment (1)**
28:9
**Epplen (19)**
5:9;6:3,9,15,19;
30:25;113:18;217:23;
244:19;325:11;333:9;
335:6;364:8,9;365:9;
366:16,18,22;367:6
**Epplen's (1)**
112:12
**equal (1)**
181:12
**Equally (2)**
224:1,8
**equation (1)**
228:7
**E-R (1)**
5:23
**Ernie (10)**
180:16;239:14,20,
24;242:1,14,17;
243:17;244:11;
283:16
**ESP (2)**
287:25;288:19
**especially (6)**
129:18;145:21;
182:14;185:18;
212:10;214:20
**essentially (4)**
59:7;106:5;267:20;
278:5
**establish (1)**
203:20

**established (2)**
328:3;354:2
**et (1)**
5:3
**etcetera (5)**
200:2,2;284:7;
363:21,21
**evaluated (1)**
174:15
**evaluation (3)**
175:9,12;176:20
**evaluations (6)**
174:6,19;175:19,
24;176:3,24
**even (41)**
7:13;10:13;25:14;
29:12;41:13;50:19;
64:12;70:13;75:12;
78:19;85:17;92:21;
121:15;124:2;126:10,
11;145:21;159:6,6;
161:8;162:10;184:2;
187:5;193:8;207:3;
209:2;214:3;216:17;
264:7;267:16;276:25;
303:1,4;307:9;311:2;
314:19;328:17;343:5;
352:20;358:15;
366:10
**event (6)**
41:17;42:25;
216:18;262:23;271:3;
283:18
**events (3)**
8:24;264:6;266:11
**eventually (7)**
49:22;50:25;73:12;
74:7;75:9;101:1;
243:13
**everybody (4)**
38:17;104:14,14;
322:19
**Everybody's (1)**
153:1
**everyday (1)**
10:10
**everyone (1)**
217:15
**evidence (15)**
45:25;67:4;203:10,
14,20;214:14;227:12;
257:15;310:14;
319:15,17,18;335:7;
336:10;359:10
**evidentiary (1)**
67:17
**evolved (1)**
102:18
**evolves (1)**
27:16
**evolving (1)**
27:17
**exactly (13)**

94:16;98:8;102:15;
104:14;147:20;
250:14;264:15;
281:21;283:12;298:8;
301:2;317:23;346:23
**exam (4)**
34:11;49:18,18;
54:15
**EXAMINATION (4)**
6:13;49:17;90:7,10
**examined (1)**
6:11
**examiner (2)**
200:6;238:15
**example (2)**
129:24;148:12
**examples (4)**
82:25;83:3;156:16;
160:11
**exams (1)**
57:20
**excellent (4)**
55:25;179:6;
203:14,20
**Except (1)**
225:15
**exception (1)**
107:23
**excessive (4)**
136:19,24,25;137:6
**exchange (5)**
79:6;80:16,19,23;
140:25
**excitable (1)**
77:2
**exclude (1)**
211:12
**exclusively (3)**
41:1;69:21;185:9
**Excuse (1)**
135:22
**excuses (2)**
287:2,3
**executioner (1)**
72:18
**exhaustive (1)**
59:2
**Exhibit (49)**
194:2;197:13;
207:12;218:25;241:2,
3,18,21,22,23;242:3,
12,13,17;243:14;
244:23;257:4;272:6;
273:12;306:17;
329:21;333:1,4,6,10;
334:1,11,16;335:5,8,
14;337:8,8,22,23;
338:12,17,19,20,22,
25;339:3,12;340:7,9,
23;344:11;364:6;
365:6
**exist (1)**
355:9

**existed (9)**
51:11;62:24;63:11;
98:17;259:14;269:22;
312:2;354:22;355:8
**existence (1)**
98:3
**expect (10)**
22:21,23;195:20;
258:2;269:14;284:15;
305:1;362:8;363:4,23
**expected (9)**
8:8;22:2;35:23;
122:3;168:14;236:24;
285:14;308:25;
334:13
**experience (14)**
55:11;72:23;82:20;
146:4;158:17,21;
160:4,17,22;161:21;
179:20;270:9;317:16;
357:25
**expert (1)**
55:12
**expertise (4)**
146:11;173:17;
174:1;179:15
**explain (4)**
38:6;78:25;79:10;
94:6
**explained (1)**
114:2
**explaining (1)**
121:11
**explains (1)**
316:10
**express (1)**
79:11
**extent (1)**
139:9
**extremely (1)**
146:20
**eye (1)**
138:8
**eyewitnesses (1)**
77:5

**F**

**face (4)**
128:21;130:8;
133:16;213:6
**faces (1)**
214:24
**fact (35)**
8:21;16:2;50:18;
66:15;77:23;126:4,
12;184:3;195:23;
202:14;203:6;204:11;
205:13;208:21;
214:10;226:4;227:24;
239:25;242:10;
247:25;253:1;254:5;
259:3;266:9;267:24;

277:18;278:8;300:7;
303:3;305:12;331:7;
343:8;348:6;350:10;
352:9
**factored (1)**
184:4
**factors (1)**
212:14
**factory (1)**
35:3
**facts (4)**
39:5;56:6;287:20;
354:2
**factually (1)**
212:4
**fade (1)**
166:19
**failed (1)**
178:10
**failing (2)**
160:5;186:14
**failure (2)**
157:23;158:11
**fair (21)**
9:20;25:12;35:10;
46:2,2,21;62:12;
63:16;77:12;81:2;
84:5,5,5;95:23;98:23;
107:17;138:2;141:16;
250:1;340:13;343:2
**fairly (1)**
65:19
**faith (1)**
134:6
**fall (4)**
37:7;63:10;64:1;
83:17
**false (9)**
8:13;45:24;81:22,
25;83:7;126:11;
137:13;138:4;142:19
**familiar (10)**
20:14;84:4;179:20;
183:23;194:13,14;
249:14;251:2;253:15;
362:23
**familiarity (5)**
107:18,20;247:4;
248:1;253:20
**familiarize (1)**
121:24
**families (1)**
79:10
**family (10)**
12:13;31:9;79:15;
225:17;226:1,11,16;
236:21;283:4;358:7
**far (17)**
21:17;26:2;54:3;
69:18;74:15;100:16;
102:24;104:15;
116:10;128:7;136:3;
167:11;179:17;

213:13;229:18;
288:22;350:22
**fascist (1)**
160:24
**fashion (1)**
293:19
**fast (2)**
31:21;66:5
**faster (1)**
221:4
**fastly (1)**
108:6
**fear (5)**
79:8,9;281:2,3;
282:18
**fears (1)**
283:3
**federal (1)**
157:4
**feedback (2)**
200:10;206:12
**feel (11)**
9:9;28:2;46:6;55:8;
77:1,14;82:16;93:4;
155:16;259:2,13
**feeling (1)**
155:13
**feet (2)**
345:20;347:21
**fell (1)**
14:15
**fellow (3)**
45:15;280:22;
304:23
**fellows (5)**
216:3,6;319:21;
320:7;321:12
**felonies (1)**
210:15
**felt (5)**
159:22;353:14;
357:3,6,8
**Fernandez (3)**
249:4;319:10;
331:23
**Fernando (2)**
248:22;313:3
**feuding (1)**
146:15
**few (1)**
7:4
**field (22)**
36:19;48:2;68:23;
90:25;101:19,21,23;
144:15,22;165:3;
179:15;199:14,15,18,
24;200:8,21;202:21;
214:12,13;225:9;
364:16
**fight (3)**
288:11;316:8;
358:20
**figure (2)**

190:13;319:20
**figured (1)**
35:7
**file (104)**
20:12,18,18,25;
21:4,10,15,16,19,22;
22:3,5,7,12,20,21,24,
24;23:13,14,19,23,24;
24:1;105:2;107:5;
109:16,23;112:8,11,
12,18,23;114:3,6,12,
16;115:16;116:13,20;
117:22;118:6;119:15;
120:8,23;122:10,13,
17;123:1,20;124:12,
18;126:14;164:13,15;
165:18;195:1,13,24;
196:22;239:7,7;
240:16,22,23;243:15,
21;259:21,22;260:14,
19,21,25;261:4,23,24;
262:18;263:15;
264:16,22;265:7,13,
17,22,24;266:2,6;
271:17,18,21;274:21;
297:8,11,15;303:20,
22,25;333:23;334:7;
335:12,13;354:25;
355:2,3
**filed (7)**
110:7;118:23,24;
119:3,4,5;222:9
**files (30)**
20:15,15;23:9;
100:25;101:13,15,15;
103:17,24;104:22;
108:14;109:5,6,8,11,
13;110:16;111:15;
113:20,24;118:1;
122:11,19,25;123:6,
12;259:19;260:11;
300:18;355:1
**filing (10)**
109:2;110:19,24;
111:6;112:18,23;
113:20,20,25;114:17
**fill (3)**
38:6,16;39:4
**filled (5)**
91:17,17;93:18;
102:25;110:11
**filler (5)**
150:22;151:24;
152:6;153:12,23
**filling (2)**
38:14,20
**Fillmore (1)**
37:19
**final (1)**
317:17
**finally (1)**
283:19
**find (48)**

66:12;72:9,25;
112:10;113:5;144:12;
169:22;170:3;185:7;
204:22,24;205:10;
206:22;207:8;208:6;
215:18;222:4,7;
236:19;259:9,15;
262:21;263:16;
274:17;276:3,12;
301:13;305:2;306:13;
308:13;320:23;
331:22;334:10;
338:22,25;346:23;
348:21;350:19;
351:18;352:9;356:10,
24;357:10;359:7,9,
10;366:10,12
**Finding (3)**
208:11;305:24;
361:4
**fine (10)**
27:9;119:21;159:5,
14;217:11;333:7;
340:15;364:18;365:5;
366:5
**finish (2)**
10:12;189:11
**finished (1)**
341:6
**firearms (3)**
336:10;340:14,15
**fired (1)**
252:14
**firemen (1)**
89:15
**Firm (1)**
5:10
**first (47)**
6:10;7:7;11:8;
17:17;18:15,16,17,22,
24;19:5;31:21;35:12;
36:7;47:8;64:11;97:1;
105:3;109:18,24;
117:1,5;129:17;
169:25,25;197:7;
199:5;215:4;216:10;
218:5,18;219:21;
227:13;230:8,18,23;
231:12;233:24;
245:21;263:10;268:1;
315:22,25;330:3;
333:22;338:7;354:14;
359:25
**five (15)**
16:13,13,15,15;
34:14;36:18,24;67:3;
168:24;175:5;222:1;
291:4;345:2;347:3;
351:2
**flags (2)**
131:25;178:4
**flavor (1)**
45:17

**Flood (3)**
88:24,25;89:1
**floor (7)**
97:1,6;100:2;
110:17;114:1;164:15;
255:5
**flowable (1)**
179:24
**flowed (1)**
128:8
**flowing (4)**
309:6,14,16;313:7
**fluid (1)**
102:19
**flurry (1)**
94:18
**focusing (1)**
61:22
**folder (1)**
23:14
**follow (3)**
70:1;113:21;305:7
**Followed (3)**
87:25;89:15;91:15
**following (1)**
122:9
**follows (1)**
6:11
**follow-up (2)**
63:12;218:2
**food (1)**
31:21
**force (15)**
25:8;29:6;35:13;
43:9;46:23;81:6;
136:19,24,25;137:5,6;
169:5;345:22,23,25
**forefront (1)**
146:1
**foreman (1)**
106:1
**form (335)**
23:1,21;27:13,19;
28:6,15;31:14;37:25;
38:7,23;39:11,20;
40:3,8,18;42:2,13;
43:10;44:1,9,16;45:7;
46:3;51:19;52:7;53:1,
2,19;54:24;55:19;
56:14,23;59:23;60:6;
61:2,6;62:21;63:23;
65:2,21;66:20;67:5;
69:15;70:18,19;71:2,
22;72:19,21;73:19,
21;75:20;76:14,23;
77:19;78:7,24;80:4,
25;81:12,18;82:12,
14;83:11,20;84:13;
85:2,18,25;93:7;
98:19;103:11,22;
107:22;110:4;113:2;
114:8;115:17,24;
116:5,21;118:10,25;

119:7,16;120:9,25;
123:2,22;124:15;
125:1,13,21;126:16,
24;128:3,17;129:1,
14;130:13,21;131:15;
132:3,19;133:1,10,20;
134:2;136:2;137:19;
138:10,11,19;139:6,
23;140:12,19;141:2,
21;142:20;143:3,24;
144:19;145:2,17;
146:7;147:16;148:24;
149:16;150:16;151:3;
152:1,18;153:8;
154:1,18,22;155:23;
156:9,13;157:1,12,17,
18;158:3,14;159:2;
160:7;162:18;163:4,
14;164:2;165:22,24,
25;166:14;167:6,18;
168:10,16;169:2,12;
170:4,20;171:23;
172:4,21;173:10,11;
174:7;175:2,21;
177:3,22;178:7,12,20;
180:7,18,24;181:4;
182:13;183:1,9,18;
184:7,17,23;185:2,14;
186:1,6,20;187:14;
188:6,18;189:19,25;
190:20;191:9,21;
192:10;193:2,12;
196:4,14;198:4;
200:18;203:17,23;
208:19;209:15;
210:21;211:25;
213:15;215:15;
218:21;222:11;223:4;
224:4;228:11;229:8;
232:23;235:17;237:1;
239:11,19;240:3,19;
242:7;19;243:19;
244:7;245:1,15;
246:25;250:2,21;
253:3,25;257:13;
258:6,24;259:5;
263:6,20;264:10;
265:3,15;266:12;
267:7;268:3;269:11,
18;270:8;271:7,13;
272:21;273:2,7,15,23;
274:6;275:9;276:4,
17;278:14;279:16;
280:19,25;283:23;
284:18;285:10;287:4,
18;289:7,17;290:13;
292:9,20;293:19,22;
295:8,22;296:24;
297:9;298:3,6;299:8,
18;301:25;302:9,20;
303:16;305:9;306:1;
307:15;308:3;309:25;
310:6;311:21;314:5,

13;316:20;317:4;
318:6;319:11;321:20;
322:3;323:19;324:19;
329:8,19,23;331:4;
332:23;339:8;342:20;
343:12,21;344:21;
346:11;351:22;
352:11;353:12;
355:12,22;357:15;
358:4;360:16;361:18;
362:10;363:9,16;
364:1
**formal (3)**
72:13;222:9;223:3
**format (4)**
65:7,11,14;199:25
**formed (1)**
55:17
**forms (2)**
38:13;63:21
**forthcoming (1)**
77:14
**forward (2)**
79:8;135:3
**found (4)**
63:7;93:2;201:21;
356:3
**foundation (148)**
28:7,16;29:8;44:2;
50:21;51:5;52:8;53:3,
20;54:4,10;55:5,6,20;
60:25;68:7;70:8;
73:21;76:24;77:20;
78:24;82:13,15;
83:22;84:15,20;95:9;
98:4,14,18;99:3,18;
110:5,12;111:1,8;
113:1,2;115:25;
120:10;121:1,20;
122:5;123:3;124:16;
125:2,15;136:2;
142:10,11;144:20;
145:18;146:8;147:17;
148:25;149:17;151:4,
5;152:2,19;153:9;
154:19;156:10,14;
157:2,12,17,19;158:3;
162:7;163:15;164:11,
25;166:15;169:3;
170:5;172:5;175:14,
22;176:15;178:23;
179:14;180:8,19;
183:19;184:6;185:15;
187:7;188:8;189:3;
190:22;191:22;
192:11;193:13;195:4,
15;205:17,24;210:22;
212:1,24;213:15;
221:10;222:11;
226:17;230:1;235:18;
237:2,8;239:12;
242:7,20;246:5;
253:14;254:1;255:3;

256:2;258:13;259:4,
17,25;260:9;261:18;
264:11;268:4;272:14;
275:9;276:17;285:10;
286:7;287:5,18;
298:7;299:9,19;
316:23;317:5,6;
319:23;320:13;
321:16;329:24;
332:23;351:21;
352:11;353:13;
355:23;356:18
**four (10)**
16:15;58:1;87:7;
174:12;208:22;234:5;
245:18;311:16;
317:20;328:3
**frame (13)**
53:9;71:20,25;86:2,
3;105:9;109:23;
111:18;114:1;123:24;
149:20;168:20;
362:19
**Francisco (1)**
249:16
**Frank (1)**
5:20
**Freddie (5)**
87:4;95:11,22;
181:9
**Frederick (2)**
33:5;35:5
**free (3)**
46:6;84:19;334:5
**frequently (1)**
43:8
**friend (1)**
26:9
**friendly (1)**
28:10
**friends (2)**
30:2;225:22
**Fro (5)**
312:17,23;313:3;
345:10;346:6
**front (4)**
56:1;57:11;315:21;
344:12
**full (8)**
6:17;8:17;10:3,25;
146:22;269:4;281:20;
295:17
**full-time (1)**
32:7
**fully (1)**
126:13
**function (2)**
116:4;132:13
**functions (2)**
127:7;136:11
**fundamental (1)**
352:5
**fundamentals (3)**

40:16;59:20;60:5
**further (18)**
67:9;72:2;133:15;
144:4;152:5;153:15;
277:20;281:17;283:2;
293:7;332:3;346:15,
21;352:21;359:3,12;
363:18;366:17
**future (2)**
288:18,23

**G**

**gain (1)**
46:23
**Gallet (1)**
88:19
**gang (65)**
98:2,7,12,12,24;
99:1,6,7,9,16;145:22,
25;146:6;173:17;
179:21;182:17,20,24;
201:12;203:1;209:14,
24;210:20;211:6,13,
14,16,21,24;212:3,15,
17,18;213:1;214:15,
17,19,21,25;215:8,9,
9,14,22;216:7,11,21;
226:10,12,24;227:1,4,
15;228:15,17;232:21,
25;235:7,9,11;
249:24;256:15;
257:22;277:21;
280:22
**gangbangers' (1)**
356:17
**gang-motivated (2)**
211:7;228:10
**gang-related (2)**
179:18;204:9
**gangs (14)**
99:9;145:20,25;
146:13,14;147:10;
174:1;179:17,17;
192:17;193:5;212:9;
215:4;358:7
**gap (1)**
309:9
**Garfield (5)**
213:20,22,22;
214:1,6
**gathering (1)**
145:24
**gave (17)**
15:25;70:15,23;
71:8;80:10;83:3;
94:19;119:11;133:8;
138:4;146:24;147:13,
23;233:10,10;256:16,
19
**Gawrys (4)**
291:22;315:11;
324:3;328:1

**general (20)**
22:11;37:1;45:10;
51:24;59:15;63:2,15,
17,25;67:22;81:9;
94:17;97:15;102:7;
105:10;150:2;164:22;
165:4,8;171:13
**generally (4)**
45:23;171:19,25;
207:17
**gentlemen (2)**
181:2;208:15
**geographic (5)**
87:11;96:12,16;
99:10;179:19
**geographical (6)**
47:12;48:3,19;
96:24;192:16;205:8
**gets (1)**
286:16
**given (7)**
11:18;16:15;21:6;
107:19;256:15;
294:17;353:18
**gives (7)**
52:6;201:10,17;
210:9;234:8;257:15;
279:7
**giving (10)**
34:11;81:22;174:5;
175:11,18,23;176:19,
23;245:4;348:25
**glad (1)**
27:5
**globally (1)**
131:12
**goal (4)**
185:22,23;272:17,
24
**God (1)**
232:18
**Golden (1)**
18:11
**Gonzalez (16)**
246:24;248:5,14;
324:4,4,6,7,14;328:5,
6;331:16;332:2,12,
13;337:5;366:3
**Good (36)**
6:15;31:13;51:10;
52:5,21,22;54:23;
102:5;113:5;121:10;
133:15;145:23;152:7,
7;155:13,16;173:8;
179:4;180:2,11,13;
188:14;192:20;214:3;
215:8;226:20;228:24;
233:3;238:16;245:22;
289:13;315:12;
350:21;351:10;
360:23;361:7
**Goossens (4)**
249:6;336:2,19;

338:1
**gosh (1)**
177:8
**governed (1)**
122:24
**government (1)**
160:25
**GP (1)**
163:19
**GPR (44)**
116:6;163:1,3;
164:4;165:10,17,17;
166:8;167:8;170:13;
258:21;260:20;261:3;
262:7,25;263:16;
266:19;269:15,22;
271:20;274:20;
284:16;285:16;290:3;
291:1,15;293:19;
294:19;302:4,17,23;
303:14,19;308:25;
310:16,19,23;311:2;
312:1,2;323:14;
354:16;361:25;
363:19
**GPRs (31)**
22:11,13,15,15,21;
127:21,23;162:23;
163:11,19,24;164:9;
169:24;195:3,5,16,21,
24;243:1,5,23,25;
244:4;264:24;322:15;
323:18;334:12;
338:22;339:4;341:3;
343:6
**grab (1)**
114:16
**grade (4)**
178:17,18,25;
180:17
**graded (1)**
49:19
**graduate (1)**
31:11
**graduated (1)**
49:10
**graduating (1)**
31:17
**Grand (7)**
96:1;97:2;99:1;
100:16;137:17,23
**grapples (1)**
132:14
**grasp (1)**
131:18
**great (4)**
27:7,8;129:4;
145:20
**green (2)**
115:7,9
**Greenberg's (1)**
189:6
**ground (1)**

7:5
**grow (1)**
31:2
**grown (1)**
32:20
**guarantee (1)**
342:6
**guess (20)**
9:8;21:10;38:11;
77:24;103:5;122:9,
23;129:25;130:17;
152:20;161:5;176:11;
197:8;198:17;209:7;
232:11;238:19;256:6;
315:21;321:13
**guessing (2)**
43:7;142:15
**Guevara (54)**
5:3,24;16:23;29:22;
52:23;82:10,18,22;
156:24;172:2;175:9,
13;177:1,20;179:9,
13;188:4;189:2,14,
17;190:17,18;191:6,8,
18;255:7;291:21;
295:13,19;296:4,18;
298:14;299:1,2;
301:7,21;302:14,17;
303:10,14;309:23;
315:13;328:1;329:17;
331:2,21;332:6,13,19;
341:3;361:11;362:5;
365:10,18
**Guevara's (2)**
191:19;192:15
**guidance (1)**
200:10
**guide (1)**
146:16
**gun (13)**
211:4;256:16,19,
21;277:17;293:3;
310:10;346:8;357:22;
358:9,17;359:4,10
**guns (3)**
203:2;235:13;
357:25
**gunshots (3)**
234:24,25;235:1
**guy (12)**
72:25;147:3;
155:14;169:19;
249:19;277:3,4;
306:6;315:12;343:18;
351:17,18
**guys (10)**
88:3;105:20;
155:10,10;191:5;
192:24;256:16;
360:20,21,24
**guys' (1)**
214:14
**guys's (1)**

208:12

**H**

**half (6)**
7:2;11:3;48:17,20,
20;104:13
**hallways (1)**
95:21
**Halvorsen (46)**
18:17,18,24;19:3;
24:12,15,19;25:6,14;
180:5,10,16;239:14;
245:20;261:11;
283:16;290:16,19;
291:21;296:15,21;
298:12,22;299:2,23;
301:6,14;302:19;
303:9;309:22;315:3;
320:23;327:13,20;
328:1;331:7,11,13,21;
332:6,13,20;339:23;
360:6;361:11;362:5
**Halvorsen's (7)**
239:24;242:1,15,
18;243:17;244:11;
342:10
**Hamburgers (1)**
31:22
**Hamlin (1)**
32:1
**hand (2)**
6:7;334:4
**handgun (1)**
202:15
**handled (2)**
65:6;136:12
**handler (1)**
33:21
**hands (1)**
11:23
**hands-on (3)**
103:9;144:18,21
**handwriting (1)**
223:10
**handwritten (7)**
22:22;68:5;78:2;
164:21;165:9;312:10,
11
**happen (7)**
53:15;127:2;
142:25;283:3;286:3;
288:13,17
**happened (39)**
53:14;76:12;98:7;
101:3;117:9;128:15;
134:24;152:3;156:12;
158:6;162:12;164:9;
200:1;211:17;215:20;
226:10;239:18,24;
240:1,6,16;243:16;
245:8,13;257:5,5;
264:7;273:13;274:13;

301:2;314:24;315:1;
317:24;323:2,15,16;
345:9,12;365:11
**happening (7)**
56:1;125:4;126:19;
151:13,16;240:1;
255:22
**happens (4)**
168:2;215:13;
317:8,9
**happenstance (1)**
275:14
**happy (1)**
51:13
**harassing (3)**
160:20;161:4;288:3
**harassment (1)**
15:21
**hard (3)**
168:13;193:10;
302:25
**hardest (1)**
91:20
**harm (3)**
153:24;154:4;156:1
**hat (1)**
136:6
**head (8)**
7:10;345:14,16;
346:8;347:16;357:22;
358:18;362:25
**headquartered (1)**
99:20
**heads (1)**
358:1
**hear (7)**
7:8;11:17;32:22;
233:22;299:16,22;
301:16
**heard (18)**
16:1;109:11;
111:21;167:23;202:2;
205:11;206:4;233:11;
234:5;236:11;249:19;
258:20;260:22;
289:25;290:15;
311:10;315:3;360:7
**hearing (2)**
137:17;236:5
**heavily (2)**
209:13,24
**held (1)**
358:17
**hell (1)**
108:1
**hello (1)**
30:18
**help (14)**
50:17,17;89:25;
102:4;105:18;106:1;
143:20;144:12;
155:18;233:23;
255:17,25;357:4,6

**helped (6)**
74:4;102:20;
247:13,15;355:24;
356:2
**helpful (4)**
125:19;146:25;
147:6,8
**helps (1)**
365:22
**Henry's (1)**
31:22
**herein (1)**
6:10
**here's (1)**
307:4
**heritage (1)**
236:4
**Hernandez (1)**
232:10
**heroic (1)**
50:19
**heroics (1)**
50:7
**Hey (5)**
113:4;161:12;
270:1;305:23;308:5
**high (9)**
31:6,20,23;32:9,13,
15;33:1;49:20;51:1
**higher (3)**
184:2;264:14;
270:14
**highest (2)**
28:5;78:11
**highlight (1)**
41:24
**highly (3)**
148:2;195:23;
342:14
**himself (8)**
70:24;71:11;
267:21;277:22;300:5;
301:14;302:7;309:22
**hindsight (2)**
152:16,20
**hired (1)**
36:1
**Hispanic (1)**
236:3
**histories (4)**
208:7,12,17;209:12
**history (2)**
228:1;336:21
**hit (4)**
14:15,16;130:25;
294:24
**hmm (1)**
210:14
**hold (12)**
188:16;241:6,6;
256:16;286:11;293:8,
8;324:11;333:3;
364:9,24;365:1

**home (13)**
41:3;69:20,25;
73:13;84:19,25;
85:12;155:13;229:17;
265:14;277:1,2;345:8
**homicide (33)**
36:25;52:1;59:14;
63:2,21;65:9,18;66:3;
69:21;88:11,17,18;
89:3;95:1,5;97:14;
100:20,23;102:17;
104:4;108:22,25;
109:5,6,15,23;110:16,
17;116:9;191:1;
254:25;307:22;328:5
**homicides (10)**
60:4;88:12;97:22,
23;179:18,19;182:20;
185:10;188:1;244:22
**honest (2)**
137:18;362:21
**honorable (1)**
186:11
**honorary (1)**
50:1
**hope (1)**
303:13
**Hopefully (2)**
74:25;76:2
**horrific (1)**
42:25
**hour (6)**
104:13;233:11;
234:3,21,23;235:12
**hours (22)**
17:25;18:9;19:13;
20:2;64:11;74:13;
75:12;76:3;168:9;
182:10;224:12;
265:14;285:7;289:5,
23;295:12,18;298:25;
306:22;323:25;324:1;
332:1
**house (7)**
182:7,8;256:13;
312:22;345:11,13;
346:8
**human (1)**
153:1
**Humboldt (6)**
100:5,7,8;211:23;
212:2;232:25
**hundred (1)**
9:10
**hung (2)**
106:16,20
**hungry (1)**
217:8
**hypothetical (21)**
71:3,23;73:20;
75:21;76:24;77:20;
83:21;85:3,19;129:2;
130:1,15;131:16;

132:4;133:11;148:25;
169:13;170:21;
173:12;240:20;
361:24

**I**

**ID (4)**
363:3,15,25,25
**idea (6)**
51:2;200:1;243:16;
286:3;291:13;293:25
**ideally (2)**
132:16;308:22
**identification (3)**
319:9;362:17,18
**identified (19)**
19:8;44:22;86:9;
152:6;153:12,20,23;
224:7;312:20,22;
313:3;322:15;324:4;
337:7,24,25;363:7,7,
21
**identify (5)**
115:15;140:4,11;
321:25;322:10
**IDs (1)**
363:13
**ignore (1)**
353:23
**ignored (2)**
354:4,5
**ill (1)**
247:14
**Illinois (3)**
5:5,11;348:5
**imagine (6)**
20:12;75:23;184:1;
262:17;319:25;
320:14
**immediate (1)**
31:8
**immediately (1)**
77:24
**impermissible (1)**
83:18
**implicated (6)**
46:1;71:11;85:16;
267:20;328:7;353:19
**implicating (1)**
346:22
**importance (1)**
66:18
**important (37)**
39:4,9,16;40:6,12;
56:13;61:25;62:4,9,
19;65:13;66:10,16,
19;75:3;118:22;
163:8;184:15,19;
201:8;202:20;203:10;
204:24;251:11;
257:25;271:4;282:23,
24;283:1;289:14;

132:4;133:11;148:25;
169:13;170:21;
173:12;240:20;
361:24

291:14;295:6;341:8,
12;343:19;346:5,13
**impossibility (1)**
74:16
**impressed (1)**
70:14
**impression (1)**
330:11
**improper (4)**
141:8,10,17;142:9
**inappropriate (1)**
169:10
**inches (2)**
174:12,13
**incident (7)**
42:20;50:19;62:20;
63:7,8;252:8,12
**incidents (1)**
254:10
**inclination (2)**
188:22;215:4
**inclined (1)**
323:16
**include (3)**
69:3;137:13;202:20
**included (6)**
63:19;65:14,23,24;
93:23;337:16
**including (2)**
6:3;228:7
**inclusive (2)**
259:22;285:21
**incomplete (20)**
9:10;71:3,23;73:20;
75:21;76:24;77:20;
83:21;85:3,19;129:2;
130:15;131:16;132:4;
133:11;148:25;
169:13;170:20;
240:20;361:23
**inconsistencies (3)**
93:2;94:2,3
**inconsistent (1)**
94:11
**incredulous (1)**
135:23
**inculpating (1)**
70:24
**inculpatory (13)**
75:7;141:1;171:1,3;
269:5;270:3;271:4;
273:1;278:3;279:12;
283:20;284:3;342:14
**incumbent (1)**
352:8
**in-custody (2)**
244:20;327:3
**indecipherable (1)**
345:21
**independent (2)**
181:21;196:12
**index (4)**
23:6,17;114:20,24

indicate (4)
295:20;298:20;
306:19;335:10
indicated (3)
256:9;297:1;335:6
indicates (1)
250:4
indicating (2)
329:6;332:8
indication (1)
231:23
individual (12)
42:18;43:16;59:12;
65:13;74:14;76:6;
89:22;131:13;251:16;
337:14;362:6;365:12
individuals (20)
18:22;19:4;138:23;
209:13;227:18;228:1;
232:7;236:15;245:25;
248:20;249:11;
256:21;258:19;259:3;
268:23;308:6;325:23;
328:3;351:11;365:14
induce (1)
44:8
inducements (2)
78:5,8
indulge (1)
113:22
in-field (2)
58:9,10
infiltrating (1)
214:23
informally (1)
187:5
information (84)
9:4;21:7;39:18;
65:23,25;66:11,16;
67:16;68:12;70:15,
24,25;71:9,21;72:9;
81:22,25;93:22,22;
104:12;121:15;
129:18;145:20;
146:21;147:9,14,22;
152:8;201:18;202:21;
204:24;210:9;228:9,
16;229:12,14;245:4;
256:24;257:11,25;
258:2,10,20;264:1;
272:18;274:18;
277:20;279:8;280:9,
13;282:16,20;283:11,
17;284:6;290:20;
293:7,12;294:12,18;
300:8;301:20;302:7,
19;307:18;308:16;
314:2;320:15;321:19;
329:2;330:20;336:20;
337:15,19;338:1;
341:14;342:8,9;
350:16,24;351:7;
352:19;353:24;

355:16
informed (4)
267:15;277:23,23;
324:5
infrequently (1)
53:15
initial (2)
63:22;150:18
initialed (1)
163:21
initially (1)
16:4
initiating (1)
63:15
injured (4)
15:2;50:10,11,18
injuries (3)
200:2;201:1,6
injury (1)
79:9
injustices (1)
155:21
innocent (4)
82:4;83:7;157:11;
349:20
inquire (2)
51:18;144:7
inquiries (1)
144:8
inquiry (2)
204:2;207:24
inside (2)
36:20;365:14
instance (16)
45:25;60:20;67:15;
99:17;117:1;128:20,
23;133:25;141:18;
169:10;192:4;200:14;
201:17;206:20;225:4;
340:17
instances (4)
54:25;72:11;136:5;
158:6
instructed (1)
44:5
instruction (5)
36:14,16,17;41:22;
58:3
instructions (2)
58:12,16
instructor (4)
38:2,9;41:22;82:25
instructors (3)
38:3;58:14,23
instruments (1)
33:7
integris (1)
132:24
integrity (2)
56:17,18
intelligence (6)
98:7;145:24;
146:11;147:8;179:16;

249:24
interaction (2)
307:5;309:1
interchangeably (1)
122:16
interest (4)
223:6;252:23;
358:1,5
interested (1)
185:18
interesting (1)
257:11
interests (1)
226:3
internal (1)
94:1
interpreter (3)
172:24;173:7;321:6
interrogating (1)
148:14
interrogation (2)
80:6;81:18
interrogations (2)
59:5;61:21
interview (43)
43:6;61:20;77:16;
145:6;149:10;165:14,
21;166:8,24;167:4,
12;168:15;171:21;
200:14;205:10,10;
225:17;226:1;267:5;
281:18;282:1;283:3;
284:10,16;295:14,21;
302:8;310:18;314:3,
10,18;329:7,12,17;
332:2;340:19,24;
343:25;352:16,19;
356:25;359:9;361:16
interviewed (15)
129:17;220:5;
225:12;229:14;232:8;
251:24;254:15;267:7;
287:12;291:8;295:13;
299:1;318:3;324:7;
332:11
interviewing (15)
41:16;42:5,5,16;
43:25;45:5,16,19;
68:24;76:21;77:2;
79:22;148:12;289:3;
332:9
interviews (8)
42:6,12;59:4;
148:23;149:3,7;
200:4;228:16
in-the-field (1)
91:6
into (63)
26:1,11;33:24;34:6;
35:1;46:14;50:9;57:2;
61:20;63:10;64:2;
65:24;66:11;68:10,
20;69:14;72:13;

77:25;83:2,17;91:20;
98:2;105:23;109:24;
110:9;116:13,19;
117:22;118:6;120:8;
122:10,25;123:5,20;
124:12,18;133:25;
144:15;145:10;
164:13;166:8;172:14;
173:16;184:12;
208:13;219:25;228:7;
242:17;246:23,24;
250:11,18;255:13;
264:2;270:22;280:18;
281:20,25;287:12;
328:7;349:21;362:6;
363:6
intricacies (1)
113:20
intricacy (1)
166:24
intricate (1)
165:15
introduce (3)
5:16;38:10;307:25
introduced (1)
38:3
inventoried (1)
252:16
Inventory (19)
23:3,6;114:19,20,
24;115:10,10,21;
121:18;122:4;124:11,
21;125:12;252:16;
261:25;266:11,22;
271:24;303:24
investigate (10)
61:4;72:2;74:6;
75:9;133:14;215:1;
348:13;351:11;
358:17;363:18
investigated (5)
147:12,15;188:24;
189:2;343:17
investigating (16)
59:18,22;60:2,3;
74:13;88:12;204:3;
206:4;210:6;276:15;
305:2;337:12;339:19;
343:19;355:19;356:9
investigation (111)
13:4;14:10,25;39:7;
56:18,19;59:12,21;
62:2,11,16;63:12;
64:7,14;66:17;69:20,
24;72:8;84:11;
101:25;102:1,5;
114:7;118:23;120:24;
125:5;128:7;131:12,
19;132:1,18,24;
134:25;135:2;144:3,
10;145:1;149:11;
152:5;153:3,15,15;
163:9;165:10;182:1;

193:20;195:2,14,19,
25;196:10,21;197:10;
199:14,18,24;200:9,
11,22;201:9;202:21;
206:9;207:9;211:2,3;
214:12,13,19;221:25;
225:10,16;239:9,18;
240:2,17;242:3,16;
243:2,16;247:9;
251:12;253:22,23;
255:1;256:25;257:5,
6;264:13;265:18;
267:14;272:18;
274:11;275:3,24;
285:21;286:4;291:13,
23;293:25;294:15;
310:17;316:2,4;
321:5;334:13;355:19,
25;356:2;358:2,6;
365:10
investigations (34)
51:25;52:2;59:13,
14,15;64:10;85:24;
89:8,14;100:24;
103:18;104:10,15;
107:18,20;108:10;
127:18;143:23;144:1,
5,25;145:5,12,16;
146:6,19;163:6;
178:5;180:23;186:23;
191:1,6;327:25;353:6
investigative (70)
20:15,18;23:24;
24:1;62:1;75:4;
101:15;105:2;109:8,
16;122:13,16,17,19,
25;123:6,12,20;
144:25;145:4;164:13;
178:9;195:1,13,24;
196:22;200:15,21;
238:4;239:6;240:15,
22;243:15,21;259:19,
22;260:11,14,21;
261:4,23,24;262:18;
263:15;264:16,18,22;
265:7,13,22,24;266:2,
6;271:18,21;273:20;
274:21;297:7,10,15;
303:20,22,25;322:2,
11;339:5,17;340:4;
352:5;355:2
investigator (2)
63:1;131:10
investigators (4)
133:3;145:9;
152:24;220:13
involve (1)
189:8
involved (29)
45:20;66:7;72:24;
74:16;144:24;145:15;
146:5;174:10;193:19;
209:14,24;252:24;

254:25;257:18;267:8;
268:17,20;274:3;
276:13;293:5;310:9;
320:1;322:1;347:23;
351:3;353:21;358:16;
360:11,21

**involvement (2)**
349:20;361:22

**involving (2)**
16:23;365:10

**irrespective (1)**
149:25

**isolation (1)**
131:24

**issue (10)**
45:19;51:8;81:5;
102:21;151:17,19;
154:24;155:2;179:25;
184:9

**issues (3)**
47:5;73:1;144:2

**J**

**Jackson (1)**
5:10

**Jacques (1)**
156:18

**jail (8)**
192:19;267:3,5,15;
281:4;340:24;341:10,
22

**Jane (2)**
89:8,22

**Jeffrey (13)**
249:19;304:13,23,
24;305:3,23,24,24,25;
306:9,18;343:18,20

**Jeffrey's (1)**
305:13

**Jennifer (6)**
5:17;6:20;113:4;
159:9;217:1;364:12

**job (16)**
27:8,8;28:10;31:20;
35:5,14,22;37:4;
51:10;89:24;91:9;
133:6,15;175:4;
300:9;355:6

**Joe (1)**
88:23

**John (3)**
220:15,23;221:2

**Join (3)**
45:8;192:13;235:22

**joined (1)**
7:16

**joint (1)**
327:14

**Jorgensen (1)**
76:18

**Jose (45)**
5:2,18;6:21;7:19;

232:12;246:23;248:4,
9;251:3,23;252:9;
254:15;256:20;267:5,
5,6,7,15,20;268:13;
272:13,19;274:24;
275:1,1,23;277:12,13,
16,19;295:12,14;
298:25;301:6,23;
302:8;312:16;318:3,
11;324:6;328:6;
331:1;332:18;344:19;
365:23

**Josh (1)**
18:11

**Jr (1)**
5:2

**judge (3)**
72:17;89:1;319:19

**Julian (1)**
88:19

**July (22)**
252:5;254:13;
256:25;257:6,16;
258:4,12;259:15;
260:6;261:8,12,17;
263:3,16;266:10,20;
279:8;280:15;283:20;
309:9;340:18;363:12

**jumped (1)**
172:11

**jumping (1)**
172:14

**juncture (3)**
92:9;203:9;282:23

**June (1)**
363:11

**Juneway (1)**
47:17

**jury (5)**
72:17;137:17,23;
157:4;319:19

**justice (2)**
155:22;158:1

**justified (1)**
358:13

**justify (1)**
56:22

**Justin (1)**
5:22

**Justino (7)**
249:2;327:6;
328:12,21;330:21;
337:3,4

**K**

**Karyn (1)**
5:13

**Kedzie (1)**
312:21

**keep (14)**
25:6;84:5;104:10;
108:9;127:17;132:9;

194:24;254:4;267:1;
274:22;286:22;
291:20;306:20;
323:23

**keeping (5)**
207:7;237:25;
246:11;298:1;305:22

**kept (11)**
29:3;53:25;54:2;
107:13;108:14,19;
113:25;164:15;
183:16;260:11;
300:18

**Kevin (8)**
181:23;182:2;
207:19;211:3;213:13;
227:14;233:8;254:6

**kick (1)**
229:5

**kidding (1)**
349:22

**kidnappings (1)**
63:19

**kids (2)**
83:14;84:9

**kill (7)**
233:23,24;254:6;
346:9;349:19;350:15;
351:6

**killed (9)**
204:25;208:8,13,
16;233:8;303:4;
307:1;308:7;357:10

**Kimball (2)**
31:3;33:18

**kind (18)**
48:21;91:16;92:10;
95:19;102:18,25;
131:11;132:17;
140:24;171:15;
174:21;182:11;
183:22;202:23;214:7;
247:12;295:6;364:16

**King (19)**
277:21;304:13,23;
313:2;318:22,24;
345:10,17;346:7;
347:17;350:15,19;
351:17;353:11,20;
354:17;355:21;
356:24;358:15

**Kings (3)**
256:13,19;268:14

**King's (1)**
356:6

**knew (18)**
51:10;92:12;
138:21;147:2;201:1,
16;267:11;269:21;
276:20,23;277:1,18;
293:4;295:15;312:17,
19;346:9;356:20

**knowing (7)**

49:21;60:23;99:8;
133:22;242:15;
292:23;301:2

**knowingly (3)**
138:6;139:25;344:4

**knowledge (15)**
13:7;17:5;126:21;
141:9;146:4;159:21;
175:4;176:13,17;
179:17;192:16;
256:10;348:6,7;
356:13

**known (3)**
243:3;287:18,22

**knows (8)**
83:7,8;280:11;
298:23;327:20;
350:10,11;360:11

**Kondal (2)**
230:17;232:3

**Kostner (1)**
365:11

**L**

**lab (1)**
337:16

**label (1)**
241:21

**lady (1)**
32:11

**Lake (1)**
214:6

**lakefront (1)**
47:19

**Lane (4)**
31:7,11,17;49:20

**language (1)**
43:17

**large (1)**
58:20

**largely (1)**
189:14

**Larry (1)**
88:23

**Last (25)**
17:19,24;19:12;
20:1;24:14;25:2,24;
29:17,22;30:8;35:5;
47:18;57:23;104:8;
107:3,14;127:17;
194:14;197:12;
225:14;229:23,24;
233:25;260:22;
312:20

**lasted (3)**
234:2,20;265:19

**late (6)**
34:6;177:13;196:1;
205:21;212:10;
214:20

**later (19)**
34:15;66:11,19;

69:3;86:9;138:2;
168:5;182:10;203:9;
222:1,1,1,2;229:22;
286:25;303:1;320:6;
336:7;362:16

**Latin (8)**
256:13;268:14;
277:21;304:13,23;
313:2;318:22,24

**Latina (1)**
236:4

**Law (10)**
5:9;8:2;31:9;35:1,
11;59:4;60:13;82:7;
139:2;159:22

**Lawrence (1)**
89:1

**lawsuit (11)**
6:22;8:25;11:11,13;
12:12;15:13;16:10,
19;49:8,13;95:7

**lawsuits (2)**
17:4;26:21

**lawyer (3)**
82:7;319:16;355:6

**lazy (1)**
187:22,23;188:2

**lead (7)**
155:21;157:25;
211:9;227:5;254:19;
305:7;361:3

**leaders (2)**
65:11;146:15

**leading (2)**
234:24;235:1

**leads (3)**
235:3;237:13;355:7

**learn (3)**
61:5;272:18;341:14

**learned (5)**
26:16;62:4;69:20;
135:2;256:17

**least (28)**
11:3;16:13;45:22;
78:2;126:14;142:16;
157:23;184:3;200:17;
206:2;209:3,23;
210:13,18;219:22;
230:18,22;234:16;
266:15;271:20;
274:14;296:2,22;
330:22;353:10,20;
355:20;356:22

**leave (2)**
276:7;346:14

**leaves (1)**
294:1

**lecture (2)**
159:10,13

**led (3)**
21:15;136:15;153:3

**Lee (6)**
5:9;6:3,9,19;

112:12;367:6
**left (12)**
  49:19;54:8;177:11,
  12,14;182:8;202:4;
  256:17;277:1;292:15;
  293:17;364:16
**leftover (1)**
  91:17
**leg (1)**
  207:1
**legal (2)**
  5:12;310:8
**Lehigh (1)**
  26:4
**L-E-I-N-E-N-W-E-B (1)**
  5:23
**LEINENWEBER (28)**
  5:22,22;53:2;82:14;
  138:12;172:10;
  173:11;175:15;178:7,
  13,19,22,24;181:5;
  188:7,17;189:4,20;
  190:1,6,21;191:11,23;
  192:12;347:6;352:12;
  358:23;366:20
**LeMoyne (1)**
  312:25
**length (3)**
  107:10;166:24;
  308:19
**lengthy (1)**
  125:5
**less (2)**
  137:18;192:16
**less-than-good (1)**
  175:24
**letter (2)**
  178:18,25
**level (7)**
  43:13;50:23;
  107:18;179:17;
  180:20;253:23;
  270:14
**liberty (3)**
  10:19;114:5;353:23
**license (1)**
  44:23
**lie (8)**
  44:7,14;46:18;83:1,
  17;311:7;323:2,7
**lieutenant (2)**
  48:2;176:6
**life (7)**
  35:8;155:8;346:16;
  349:10,10,18;358:10
**light (6)**
  105:22,24;118:19;
  208:12;225:20;
  304:11
**likely (3)**
  248:3;302:16;
  310:15
**limits (3)**

73:15;75:18;96:16
**Lincolnwood (1)**
  96:20
**line (15)**
  28:20;44:19;46:8;
  50:11;67:17;83:2;
  282:24,24;301:24,24,
  24;302:19,19;344:24,
  24
**lined (1)**
  115:4
**lines (3)**
  45:4;112:3;345:2
**lineup (38)**
  86:7;138:18,22,25;
  139:16,17,19,22;
  140:4;149:14,24;
  150:1,2,14,19,23;
  151:8,24;152:6;
  153:5,6,20,24;156:2;
  157:16;158:18,19;
  159:7;162:11,16,16,
  21;362:6,9,15;363:6,
  20,24
**lineups (16)**
  86:6;148:18,19,20;
  149:13;151:14;154:8;
  155:21;156:7;157:24,
  25;158:11;160:6;
  162:6;291:9;362:13
**list (3)**
  58:17;106:10;321:2
**listed (3)**
  248:20;250:24;
  303:24
**Listen (1)**
  241:13
**litigation (1)**
  26:18
**litigations (2)**
  30:19,23
**little (14)**
  14:12,12;57:2;
  59:25;77:7;112:2;
  116:24;127:5;130:23;
  174:11,23;210:9;
  217:8;225:1
**live (1)**
  26:2
**lived (7)**
  205:15;213:20;
  232:20;233:6;253:5;
  312:18,23
**lives (1)**
  232:14
**living (3)**
  32:23;89:15;205:9
**Lluvia (9)**
  248:15;303:4;
  312:17,21,24;324:2,3;
  345:10;346:6
**locate (4)**
  260:4;343:20;

353:11;355:20
**located (8)**
  5:9;33:17,18;98:24;
  99:1,5;100:10;306:18
**location (7)**
  21:17;73:2;87:11;
  92:22;118:3;211:16;
  215:10
**locations (2)**
  91:2;205:7
**locked (2)**
  110:24;267:2
**lockup (2)**
  36:21;139:11
**log (25)**
  23:18;106:10,12;
  115:6,10,21;116:8,11;
  121:4,5,16,17,18;
  122:3,4;124:11,21;
  125:11,12;126:12,13;
  266:11,22;271:24;
  303:24
**logged (1)**
  124:10
**logging (2)**
  114:3;116:12
**logical (1)**
  129:7
**logically (1)**
  72:1
**logs (1)**
  23:13
**long (33)**
  17:24;18:8;19:12;
  20:1;29:21,24;32:4;
  33:13;34:2;46:10;
  47:20;55:15,16;
  57:24;76:10;82:3;
  87:6,15;90:17;96:6;
  102:10;114:15;
  118:18;125:5;134:13;
  145:23;165:20;
  167:10;184:22;194:8;
  211:4;316:1;327:19
**longer (2)**
  25:13;281:1
**look (46)**
  24:6,7;104:8;107:1,
  5;112:10;129:20;
  131:12,23;169:5;
  194:1,17;195:7;
  196:25;197:6,12,21;
  198:17;199:23;
  201:11;206:22;
  213:17;216:20;
  218:25;228:20;234:7;
  237:13;244:11;
  245:13;266:9;297:7;
  317:13;319:19;
  324:21;326:4,10;
  331:9;333:9,12,19;
  334:5,15;335:5;
  349:21;364:8;366:11

**look/see (1)**
  253:9
**looked (24)**
  20:17,23;22:12;
  38:4;92:13;128:23;
  130:7,10;138:8,8;
  193:22;214:11;
  227:24;230:9;239:1,
  7;241:2;247:3;276:2,
  21;318:25;338:12,16;
  343:4
**looking (62)**
  8:17;21:22;22:6,7,
  17,19;43:17;56:5;
  60:13;112:9;129:11,
  13;144:12;193:15;
  194:4,22;196:11;
  198:7;199:2;202:22;
  204:20,21;211:2;
  212:15;214:12,13;
  217:24;219:17;
  220:11;221:25;223:3,
  20;227:11;229:21,23;
  239:6;241:23;242:1,
  16;243:17;244:23;
  250:16;263:13,14;
  266:5;272:5,25;
  280:8;281:12;305:24;
  306:17;309:24;
  313:19;315:6;325:12;
  326:6;327:15;328:20;
  333:18,21;338:13;
  366:10
**looks (5)**
  130:9;206:19;
  232:7;238:21;326:20
**Loop (1)**
  37:9
**loose (2)**
  108:1;313:2
**lost (5)**
  63:6;174:17;215:1;
  355:11,14
**lot (24)**
  50:10;77:8;122:11;
  131:24,25;142:7;
  151:14;182:17,20;
  183:12;190:25;
  205:15;211:20,24;
  212:2;214:22,22;
  244:2;249:23;303:2,
  3;317:8,9;356:20
**lots (1)**
  210:15
**loud (1)**
  234:14
**louder (1)**
  234:13
**Louis (4)**
  182:10;211:19;
  225:22,23
**loved (1)**
  226:12

**low (1)**
  53:10
**Lulu (1)**
  234:17;236:19,21
**lying (1)**
  81:21

## M

**ma'am (74)**
  6:25;9:13;13:9;
  14:3;15:7,14;16:17;
  20:16,19;22:4,8,14,
  16;23:8,20;24:8,11;
  25:7;26:20,23;34:20;
  36:11;47:2;153:1;
  155:17;156:20;
  157:20;166:18;
  167:15;178:6,15;
  180:15;181:6,24;
  182:15;187:21;
  193:21,24;196:16,23;
  211:22;213:8,10;
  215:11,25;218:1;
  219:10;221:18,23;
  223:25;224:3,10;
  227:10;228:23;
  231:19,21;248:18;
  249:9;251:4,6;252:4;
  255:15;256:8,23;
  265:23;267:19;276:1;
  288:4;309:13;310:25;
  350:3;365:15,17,21
**machines (1)**
  33:22
**Macias (1)**
  234:9
**mafiosos (1)**
  87:25
**main (1)**
  48:24;63:13
**major (5)**
  69:24;102:1;
  104:15;149:11;
  275:17
**makes (11)**
  10:10;21:2;35:9;
  75:6;129:8;131:13;
  243:25;267:24;
  299:23,24;310:14
**making (19)**
  72:17;84:17,24;
  90:22;93:14;102:5;
  111:15;118:1;119:19;
  132:22;236:4;269:1;
  278:2;279:11;287:3;
  314:15;339:15;348:9,
  12
**male (2)**
  233:19;234:12
**man (5)**
  14:6,11;82:8;
  190:18;365:13

**management (5)**
105:17;117:10,11,
12,20
**manager (1)**
32:3
**manner (9)**
125:6;200:22,25;
201:8,15;202:7,8,11;
251:9
**manpower (2)**
102:21;255:25
**manufacturers (1)**
33:6
**many (17)**
7:1;17:12;34:12;
49:17;77:4,4;122:11;
146:18;186:18;
187:24;209:11;212:9;
265:14;276:19;291:7,
9;317:2
**March (2)**
86:24,25
**marijuana (2)**
216:15;227:25
**mark (1)**
364:5
**marked (6)**
194:1;207:11;
335:13;344:10;364:6,
9
**marks (3)**
303:5,8;367:5
**married (5)**
32:8,10,11,13,25
**Marvin (1)**
48:24
**Mason (1)**
283:10
**material (3)**
8:21;238:9;334:11
**materials (1)**
33:7
**matter (12)**
5:2;11:9;12:5;16:1;
18:12;79:19;81:21;
161:20,21;265:14;
322:21;352:4
**matters (5)**
9:1;36:15;58:17,24;
59:1
**may (82)**
7:14;8:14;9:1,10;
15:3;30:4;36:2;38:14;
42:23;44:21;47:3;
55:22;56:5;59:2;60:2;
66:6,11;75:12;77:14;
78:21;86:12;94:7;
99:11;129:19;130:25;
132:6;146:14,14,20,
22;149:2;153:2;
181:14;195:25;
198:19,20;199:10;
203:6,7,7;205:8;

207:6;208:2;210:7;
218:7;224:16,21;
226:13;228:8;229:1;
238:21,22;239:10;
240:18;242:5,11;
243:18;244:24;
245:14;251:14;
253:15;266:1;281:18,
21;282:2;283:1,2,11;
329:25;333:3;335:17,
18;336:12;339:6;
340:11;347:2;351:3,
3;355:24;356:3;
363:11,18
**maybe (29)**
9:4;50:19;52:21;
74:1;94:12;95:14;
103:3;112:2;126:13;
131:24,25;153:5;
189:10;192:7;200:15;
275:20;289:23;291:1;
298:16;300:18;
306:10;307:9;311:16;
327:13;331:6;356:12;
359:6;360:11,11
**mayor (1)**
89:9
**Maysonet (110)**
5:2,18;6:21;7:20;
246:23;248:9,12;
250:5,18;251:3,24;
252:9;253:5,16;
254:15,17,19;256:9,
20;260:5;267:2,5,6,7,
15,20;268:13;270:7,
21;272:13,19;273:21;
274:2,24;275:1,1,8,
16,19,23;278:2;
280:17;284:10,17;
285:25;287:12;289:3,
15,25;291:15;292:17,
22;294:8;295:12,14;
296:4;299:1;301:6,
23;302:8;306:24,24;
307:6,21;311:7,9;
312:16,19,20,23,25;
313:1,10,13;314:3;
318:4,11;324:6;
328:6;329:18;331:2;
340:19,24;342:14;
343:10,15;344:19;
346:7,12,14,18;347:2;
349:1,4,16,22;350:14,
20;351:2;352:20;
353:19;358:13;359:1,
11,25;360:19
**Maysonet's (12)**
248:4;263:2;
271:11;273:1;280:1,
9;306:22;332:18;
339:20;341:8;358:18;
364:21

**meal (1)**
27:9
**mean (99)**
20:7;28:2;29:24;
50:19;55:21;56:9;
59:2;64:9;66:1;68:9;
72:3;78:14;82:19;
89:21;98:7;102:20;
114:11;120:13;121:7;
123:11;132:22;
135:19;136:4,11;
138:22;139:3;142:1;
144:21,24;145:22;
146:10;152:4,23;
160:24;161:11;
167:23;170:13;172:8;
180:10;183:20;184:9,
25;187:5,11;191:18;
192:2,20;194:10;
201:4;202:3;209:6;
212:14;214:3,7;
219:19;225:10;
226:20;227:8;232:25;
235:11;247:7;250:9,
14;254:22;261:22;
262:19;270:19;
273:10;274:2,3;
278:19;281:4;286:22;
288:8,11,20;290:8;
292:22;295:5;300:2;
301:14;306:5;309:9;
310:17;314:15,18;
315:8,11,13;316:16;
317:16;322:25;323:1;
325:15,18;352:15;
356:7,12;360:6
**meaning (4)**
78:8;86:7;185:3;
198:2
**means (5)**
44:23;215:12;
244:21;250:13;
301:19
**meant (1)**
49:6
**mechanics (2)**
38:19;113:19
**medical (2)**
200:6;238:15
**meet (1)**
92:20
**meeting (12)**
17:24;18:8,10,14,
22,25;19:4,9,12,14;
24:16;248:25
**meetings (1)**
319:25
**member (7)**
15:21;34:19;35:13;
203:1;216:22;226:12;
232:17
**members (15)**
31:8;99:9;145:25;

216:6;225:17;226:1,
11,16;232:21;233:1;
235:11;277:21;
280:22;313:2;318:22
**memo (3)**
116:6,7;164:21
**memoranda (1)**
22:22
**memorandum (3)**
23:13,15;104:1
**memorialize (26)**
39:5,9;62:1,4,10;
66:16;67:2,15;68:20;
69:10;72:12;73:16;
77:17;80:2;150:14;
162:5,16;166:7;
168:14;258:10;261:7;
289:14;341:11,12;
363:3,13
**memorialized (13)**
120:24;149:14,25;
171:1;258:3;260:5;
263:1;269:9;291:14;
293:18;330:17;
340:19,23
**memorializes (2)**
297:23;361:16
**memorializing (7)**
39:17;165:21;
170:1;269:15;270:2;
271:11;284:16
**memorized (1)**
124:4
**memory (6)**
69:12;166:19;
168:19;182:1;196:7,
20
**men (9)**
51:9;90:21,23;
92:21;193:16;201:21;
209:2,3;349:17
**Mendoza (1)**
365:23
**mention (4)**
26:18,21;304:11,21
**mentioned (2)**
63:20;324:17
**mentions (1)**
186:12
**mere (1)**
50:18
**merely (1)**
321:6
**merged (1)**
70:10
**merit (2)**
72:10;73:14
**Meritorious (3)**
50:3;54:9;55:3
**meritoriously (5)**
50:2;53:18,25;
54:14,23
**message (1)**

81:9
**messages (5)**
41:25;42:10;45:18;
105:19;106:3
**met (1)**
24:17
**Mexican (1)**
365:12
**micro (1)**
253:23
**microfiche (1)**
33:10
**mid (1)**
209:3
**mid-20s (1)**
209:3
**Middle (2)**
306:21;328:11
**midnights (1)**
91:19
**might (54)**
39:18;46:14,17,18,
19;55:24;64:14;
66:19,24;67:3;69:2;
75:19;79:4;83:5;
91:18;118:19;128:14,
20;129:10;138:2;
144:6;151:11,12;
187:22;201:18;
202:18;203:4,14;
204:25,25;206:4;
208:12;211:6;221:24;
226:2,10;237:12;
238:5;253:8;254:8;
255:2,4,10;257:18;
266:9;297:14;300:10;
317:20,21;323:16;
351:10,15;359:15;
361:3
**Milan (1)**
232:17
**mile (1)**
214:3
**miles (1)**
100:18
**military (2)**
31:19;34:19
**millimeter (14)**
202:18,25;203:7;
252:20,24;254:7;
256:14;268:14;
345:14,15;347:16;
360:8,12,22
**millimeters (1)**
252:15
**million (1)**
157:4
**mind (8)**
14:4;42:20;113:22;
196:10;210:13;
262:24;298:5;359:2
**Mingey (44)**
18:20;30:5;145:14,

19;146:25;149:2;
179:22;181:10;
199:12;206:19;207:3;
230:4;231:3,5;
249:22;252:6,18;
253:11,21;254:5,8,13;
258:11,14;260:6;
263:2;267:4,16;
269:8;270:6;271:12;
272:11;276:10;279:9;
323:24;324:3;328:2;
340:20,25;342:5;
343:7;356:12;359:24;
360:7
**minimal (1)**
22:15
**minimum (1)**
274:20
**minor (3)**
136:11,11;208:23
**minute (1)**
325:14
**minutes (2)**
64:11;217:10
**Miranda (2)**
254:17;277:13
**miscarriage (1)**
158:1
**miscarriages (1)**
155:22
**miscellaneous (2)**
63:7,8
**mischaracterization (3)**
265:4;287:19;289:8
**mischaracterizes (2)**
321:7;322:4
**misconduct (9)**
134:10,11,17;
135:4,8;136:4,15;
137:1;138:9
**mislead (1)**
45:24
**misreading (1)**
94:12
**Misrepresenting (1)**
347:7
**misrepresents (4)**
348:3;354:1;
359:17;360:14
**missing/lost (1)**
63:6
**Misstatement (1)**
349:11
**misstates (22)**
46:4;74:9;158:15;
160:8;162:19;169:3;
172:22;191:10;
221:11,19;245:2;
250:22;259:23;280:4;
289:18;316:24;
317:14;348:15;
349:24;353:25;
358:19;360:2

**mistakes (1)**
152:24
**mistreat (1)**
181:3
**misunderstanding (2)**
74:2;223:16
**mixing (1)**
35:5
**moment (3)**
66:18;181:15;
324:22
**money (3)**
190:13;214:24;
215:1
**month (1)**
35:25
**months (18)**
34:15;47:7;87:8,20,
21;91:18,19;168:24;
169:10,21;170:2,7;
194:15;195:20;
239:25;264:7;265:19;
336:7
**Montilla (40)**
18:19;29:14,18,24;
87:3;95:11;181:8;
207:12;250:6,17,24;
254:14,16,22,22;
255:13,24;258:12,15;
260:6;263:3;267:4;
269:8;270:7;271:12;
272:12;277:13;283:9;
284:12;285:2;287:11;
289:4;290:16,24;
309:21;318:3;320:24;
340:20,25;343:8
**Montilla's (5)**
292:3;321:8;
333:14;334:2;344:11
**Montoya (1)**
225:15
**morale (2)**
51:7,9
**more (41)**
24:4;28:14;34:21;
47:3;49:24;59:25;
61:19,19,21,22;99:8;
103:12;109:20;
122:18;130:24;
144:18,24;159:21;
185:18,20;187:6;
192:16;197:10;214:3;
234:13;248:3;256:4;
259:22;272:18;
281:18,20;302:16;
307:18;310:15;
320:15;321:18;
323:16;341:14;342:7;
364:20;366:15
**morning (7)**
6:15;182:10;
205:19;218:9,10,13;
324:1

**most (8)**
65:9,13;123:14;
156:3;201:16;211:23;
215:3;286:23
**motherfuckers (1)**
303:5
**motion (1)**
46:14
**motivated (7)**
212:17;214:15;
215:9,14,22;228:17;
235:7
**motivation (5)**
210:20;211:13,14,
16;235:9
**motive (15)**
200:23;201:1,5;
202:6,7;203:13,13,19;
204:5,17,21;227:2,4;
251:9;257:15
**motorcycle (1)**
14:16
**motorcycle-type (1)**
14:13
**mouth (1)**
340:2
**move (8)**
28:21;33:25;47:5;
50:25;181:15;193:9;
251:1;304:4
**moved (5)**
87:13;96:1,9
**Moving (2)**
304:3;312:14
**much (13)**
35:22;40:13;56:2;
61:19,19;74:6;
159:21;181:9;193:5;
215:9;283:12;300:11;
316:11
**multipage (1)**
333:22
**multiple (2)**
38:5;105:24
**Municipal (2)**
89:7,14
**murder (40)**
130:4;186:23;
189:1;195:2,14,19;
196:8;201:8;206:23;
222:10;267:21;268:1;
270:12;274:3;276:9;
292:7,18;297:20;
304:22;305:14;306:7;
308:1;309:20;342:17;
344:3,4;347:4;349:7,
20;351:4,8;352:7,7,
10;353:22;358:16;
359:7,16;361:4;
365:11
**murdered (1)**
224:18
**murderer (1)**

169:20
**murdering (1)**
349:16
**murders (31)**
181:17;239:9;
240:17;242:4;252:23;
256:10;267:8;268:18,
20,21,24;275:3,25;
276:14;277:18,24;
278:10,19;281:14;
293:6;335:21;345:19;
346:10;347:20;348:2;
350:7,16;357:23;
360:10;361:13;362:7
**must (3)**
27:23;55:17;256:19
**myself (4)**
13:17;19:20;
121:24;161:17

**N**

**N-303737 (1)**
252:13
**name (31)**
5:11;6:17,20;12:6;
13:23,24;30:14;
108:17;112:4;115:1;
116:8,9;146:23;
192:6;221:9,12;
225:14;245:21;
248:17;249:13,14,17;
290:8;299:25;312:20;
315:21;356:6,6;
365:22,23;366:3
**named (12)**
6:22;12:18;13:5;
15:5;49:8;95:6;
249:19;304:13,23,23;
331:22;343:18
**names (11)**
13:15,18;222:22;
224:6;236:5;245:18;
249:8;256:21;282:17;
356:10,17
**name's (1)**
221:15
**narcotic (3)**
201:11;215:23;
226:4
**narcotics (4)**
201:25;214:22;
228:2,4
**narrative (8)**
84:18;200:2,13;
205:3;245:4;252:2,5;
304:6
**narrower (1)**
112:2
**natural (1)**
10:7
**naturally (2)**
8:22;24:3

**nature (13)**
30:6;42:7;43:18;
44:25;50:16;52:2;
63:19;105:19;136:10;
141:20;144:13;
186:13;226:5
**near (3)**
66:25;74:17;135:9
**necessarily (27)**
35:11;36:15;42:23;
43:9;56:2;61:23;66:7,
18;71:24;72:12;
73:11,12;103:24;
145:5;149:2;161:1;
198:21;211:12;
229:18;247:11,16;
266:22;276:25;
282:12;287:22;
319:17;337:18
**necessary (4)**
117:13;149:19;
350:19;353:15
**need (16)**
10:18;56:3;93:4;
113:7;116:7;117:16;
150:23;153:4;159:22;
165:17;194:10;217:3,
4,4;281:24;283:6
**needed (8)**
34:13;61:4;71:13,
18;80:1;114:6;
150:20;291:8
**needs (2)**
102:4;140:6
**negative (21)**
150:19;154:8;
155:20;156:2;157:15,
24,25;158:11,18,19;
159:7;160:6;175:12,
18;176:19;179:23;
362:13,15;363:3,13,
25
**neighborhood (6)**
26:2,3,12;28:24;
32:2;356:14
**neighborhoods (1)**
323:25
**neither (1)**
236:2
**Nelson (1)**
366:3
**nervous (3)**
77:3,7,8
**new (8)**
38:10;43:8,9;91:16;
104:9;198:8,8,9,9;
213:14;280:17;
314:23;335:7
**newspapers (1)**
159:1
**next (24)**
70:1;74:20,20;
105:12;147:20;

200:10,11;206:21;
207:5;230:4;231:4;
234:7;238:1;248:19;
251:1;256:17;272:2;
277:11;285:6;287:8;
289:5,23;323:25;
335:23
**nicknames (1)**
356:17
**night (9)**
155:13;182:8;
212:10;256:12,12;
281:21;286:19;
306:25;308:6
**nine (15)**
202:18,25;203:6;
252:15,20,24;254:7;
256:14;268:14;
345:14,15;347:15;
360:8,12,22
**Nobody (5)**
186:14;215:23;
277:5;320:9;321:12
**None (2)**
239:5;337:11
**nor (1)**
126:1
**normal (2)**
10:10;221:2
**normally (3)**
91:8;219:21;220:21
**north (24)**
47:17;87:12;96:22,
22;98:12,24;99:1;
108:25;182:9;193:17;
205:14;211:18;
213:21,24;214:7,8;
215:21;225:21,23;
232:15;233:7;256:11,
18;312:22
**Northern (2)**
5:4;96:24
**noted (2)**
297:14,17
**notepaper (1)**
69:9
**notes (20)**
21:11,12,25;22:2,5,
9,11;68:5,8,14;76:16,
22,25;77:6;78:2;
163:5,8;164:21;
165:9;244:2
**notifications (1)**
186:18
**notified (1)**
297:16
**novella (1)**
244:12
**November (2)**
336:4,5
**Number (29)**
5:5;15:20;16:7;
44:24;68:24;110:3,

23;112:3;122:18;
134:19;135:1,5;
137:22;142:8;189:5;
198:10;199:3;206:3;
207:12;223:7;248:20;
257:20;281:4;327:14;
335:11;336:13;
338:13,17;344:11
**numbering (1)**
198:1
**numbers (3)**
187:2;197:2;364:14

## O

**oath (4)**
7:23,25;8:1,5
**Object (320)**
23:1,21;25:18;
27:13,19;28:6,15;
29:8;31:14;37:25;
38:23;39:11,20;40:3,
8,18;42:2,13;43:10;
44:1,9,16;45:7;46:3;
50:21;51:5,19;52:7;
53:1,2,19;54:4,10,24;
55:5,19;56:14,23;
59:23;60:6,25;61:6;
62:21;65:2,21;66:20;
67:5;68:7;69:15;70:8,
18;71:2,22;72:19;
73:19;75:20;76:14,
23;77:19;78:7,24;
80:4,25;81:12;82:12;
83:11,20;84:13,20;
85:2,18,25;93:7;95:9;
98:4,14,18;99:3,18;
103:11,22;107:22;
110:4,12;111:1,8;
114:8;115:17,24;
116:21;118:10,25;
119:7,16;120:9,25;
123:2;124:15;125:1,
13;126:16,24;128:3,
17;129:1,14;130:13,
21;131:15;132:3,19;
133:1,10,20;134:2;
137:19;138:19;139:6,
23;140:19;141:2,21;
142:20;143:3,24;
144:19;145:2,17;
146:7;148:24;149:16;
150:16,24;151:3,4;
152:1;153:8;154:1,
18,22;155:23;156:9,
13;157:1;159:2;
162:7,18;163:4,14;
164:2;165:22,25;
166:14;167:6,18;
168:10,16;169:12;
170:4,5;171:23;
172:4;173:10,24;
174:7;175:2,14,21;

177:3,22;178:12,20;
179:14;180:7,18,24;
181:4;182:13;183:1,
9,18;184:6,17,23;
185:2,14;186:1,6,20;
187:7,14;188:6,8,18;
189:19,25;190:20;
191:9,21;192:10;
193:2,12;196:4,14;
198:4;200:18;203:17,
23;205:17,24;208:19;
209:15;210:21;
211:25;215:15;
218:21;224:4;228:11;
229:8;230:1;232:23;
237:1,8;239:11,19;
240:3,19;242:19;
243:19;244:7;245:1,
15;246:25;250:2,21;
253:3,14,25;255:3;
256:1;257:13;258:6,
13,24;259:4,10,17;
261:18;263:6,20;
265:3;266:12;268:3;
269:11,18;270:8;
271:7;272:14,21;
273:2,7,15,23;274:6;
276:4;278:14;279:16;
280:19,25;283:23;
284:18;289:7;290:13;
291:5;292:9;293:22;
295:8,22;296:12,24;
297:9;298:3,6;299:8,
18,19;301:25;302:9,
20;303:16;305:9;
306:1;307:15;308:3;
309:25;311:21;314:5,
13;318:6;319:11,22;
321:7;322:3;323:3;
324:19;329:8,19,23;
331:4;342:20;343:12,
21;355:12;358:4;
361:18,23;363:9,16;
364:1,16
**objecting (1)**
173:25
**objection (158)**
54:16;67:23;74:9;
82:14;121:12,20;
122:5;123:22;124:25;
125:21;135:10,15,17,
24,25;137:8,20;
138:10,11;140:12;
142:10;147:16;148:6;
152:17,18;154:12,16;
157:7,12,17,18;
158:14;160:7,19;
161:3,15;164:11,25;
165:1;169:2;170:20;
172:21;173:11,24;
176:15;178:7,19;
188:7,17;189:3,4,20;
190:1,6,21;191:11;

195:4,15;209:19;
212:24;213:15;
221:10,19;222:3,11,
12;223:4;226:17;
235:17,19,20,22,23,
24;237:14,20;242:7;
244:8;246:5;259:23,
25;260:9;264:9;
270:25;275:9;276:17;
280:4;281:15;282:4;
283:8;285:8,9,18;
286:5;287:4,16,17;
288:1,25;289:17;
291:16;292:19;294:2,
10;295:1;300:12,15,
20,23;301:9;305:5;
309:3;310:6,24;
315:15;316:13,19,20;
317:4,5,14;318:17;
319:1;320:10;321:15;
322:12;323:9,10,19;
332:21;339:8;344:7;
346:11;347:5,6,25;
348:3,15,23;349:9,24;
350:4;351:21;352:11;
353:12,25;355:22;
356:4,18;357:1,13;
358:19;359:17;360:2,
14,25;361:5;362:10
**objections (13)**
71:15;76:4;123:7;
126:7;158:2;166:22;
171:5;172:10;191:23;
192:12;210:1;235:14;
263:24
**obligate (1)**
150:13
**obligated (2)**
119:12;162:15
**observation (1)**
56:1
**observe (2)**
148:11,14
**observed (1)**
139:21
**obtained (1)**
256:25
**obvious (5)**
204:8,11,14;
288:12;305:7
**obviously (9)**
7:12;57:3;92:3;
118:21;151:8;159:21;
210:25,25;288:8
**occasion (4)**
17:17;73:17;
163:24;175:8
**occasions (2)**
11:4;17:15
**occupation (1)**
53:6
**occur (1)**
64:3

**occurred (9)**
72:7;126:22;
206:23;218:12;
243:12;267:11;272:7;
293:11;329:12
**occurrence (2)**
153:16;218:11
**odd (2)**
276:3,5
**odds (1)**
135:14
**off (27)**
14:15;48:20;52:25;
68:5;75:2;92:24;
107:24,25;113:9,12;
193:23;201:4;206:19;
212:13,15;217:17;
238:4;247:10,13;
298:16;321:2;325:5;
334:18,19,23;362:24;
367:6
**offender (7)**
151:8;185:4;252:7;
329:12;357:19;
365:20;366:2
**offenders (13)**
257:20;277:18;
280:12;281:19;
282:21;292:24;324:1;
325:21;331:22;
349:18;356:3;357:17,
20
**offense (8)**
60:21;61:8;63:2,15,
17,25;94:17;153:17
**offenses (2)**
63:22;208:23
**offer (4)**
80:5,15;140:24;
342:8
**offered (2)**
80:2;312:18
**offering (2)**
80:22;141:17
**offers (1)**
284:6
**Office (18)**
79:12;80:8;89:7,13;
90:1;100:1,2;105:14;
106:5,9;108:22;
109:1;110:17,17;
111:7;117:15,15;
270:14
**officer (38)**
13:19;15:20;26:13;
28:14;38:11;39:10;
43:21;50:7;55:14;
56:21;93:1;94:7;
105:1,25;134:9,14,18;
135:8;136:5,18;
137:13,16;138:4;
140:9,10,16,23;
165:20;168:4;174:16;

216:11,13;219:21,23;
250:10,25;308:10;
326:21
**officers (27)**
6:3;14:17;26:15,22;
50:11;51:8,10,12;
52:5;55:25;65:12;
76:7;90:15;91:3;
92:14;94:13;103:25;
105:22;136:21;
163:11;184:3;200:4;
229:16;250:5;316:16;
319:25;339:18
**offices (8)**
17:22,22;19:5,17;
24:13,22,25;98:9
**often (7)**
53:9;64:3;146:5;
185:20;193:11;
255:19,19
**old (4)**
30:25;35:4;95:16;
100:13
**older (1)**
95:20
**omit (2)**
8:21;125:19
**omitted (1)**
30:8
**omitting (3)**
133:19,22,25
**once (4)**
34:21;91:20;
121:25;186:19
**one (123)**
8:22;17:6;32:1,21;
34:22,23;36:7;37:2;
42:16;47:22;49:24;
56:8;63:22,24;66:15;
67:6;68:16;72:22;
75:22;88:3;91:9,20;
94:14;100:13,14;
102:15;105:1,23;
108:20;118:3;119:3;
120:16;126:15;
127:14;130:1;132:25;
133:2;137:22;140:17;
141:18;146:1;149:18;
159:8;168:4;177:15;
180:6;181:2;184:10;
193:25;198:3;204:2;
208:21;212:11,13;
215:3;216:10;218:2;
219:2,25;220:1,2,7,
17,22;222:1;223:7,8,
9,9;225:22;226:12;
230:8,18,19,22;
231:18;234:12,13,16;
235:6,19,23;241:10;
244:15,15;247:13;
258:17,19,20;259:2;
260:14;265:21;
284:15;301:3;311:16;

317:19,21;319:20;
322:17;323:17;
324:11;327:15;
330:15,22;333:2;
337:25;338:3,4,6,9;
340:11,12;353:3,7,8;
355:9;357:16;359:15;
363:23;364:3,9,20;
365:1
**ones (4)**
59:3;63:13;117:12;
341:25
**one-way (1)**
14:9
**ongoing (3)**
64:14;103:17;
127:18
**only (23)**
20:23;29:1;48:17;
51:8;104:10;109:19;
139:15;146:23;156:7;
190:14;192:14;
214:11;239:13;255:2,
4;262:20;280:20;
293:4;301:4;321:4;
338:6;352:22;356:2
**onto (6)**
121:16;122:4;
124:10;125:11;
219:20;220:12
**open (11)**
104:19;106:11,23;
108:10;109:5,5,6;
110:16;164:16;
186:23;207:9
**operated (1)**
142:5
**opinion (2)**
27:23;281:5
**opportunity (3)**
10:2;194:6;241:24
**optimal (1)**
169:14
**optimally (3)**
132:16,20;186:25
**oral (2)**
90:8,9
**orally (3)**
136:8;294:12,18
**order (15)**
44:7;46:23;59:8;
81:25;121:22;123:23;
128:12;150:2;162:1,
3,10,21;169:5;
198:21;363:19
**orders (1)**
362:20
**organized (5)**
87:19,21,23;110:2,
22
**original (8)**
104:2;105:3;125:8;
130:11,18;153:11;

198:2;352:14
**others (10)**
14:4;15:17;16:16;
53:7;56:2;89:25;
144:18;187:6,12,16
**out (101)**
32:8;35:6;37:8;
38:6,14,16,17,20;
39:4;48:22;49:20;
57:18;58:2;66:4,12;
72:8,9,25;74:4;89:18;
93:19;99:25;101:25;
102:20;107:5;112:5,
6,12,19,23;114:3,15;
115:6,8;140:17;
142:7;145:5,8;
146:23;150:22;151:8;
153:5;156:21;158:18;
160:11;163:5;165:4;
168:21;174:14;185:7;
190:13,13;199:15;
200:3;204:22,24;
205:11;206:11,22;
207:8;208:11;210:15;
215:2;219:5;225:11;
230:21;235:12;
236:19;239:21;
247:13;267:15,24,25;
269:4;276:24;281:8;
294:19;301:12,13;
306:13;308:13;
310:10;313:13,14;
314:7,25;316:2;
317:19;319:20;
320:23;325:21;
342:18;344:14;
346:23;356:24;
357:10;358:22;359:8;
360:23;361:16;
364:16
**outcome (3)**
149:14;150:1;
162:17
**outer (2)**
73:15;75:18
**outside (3)**
89:15;144:8;307:9
**outstanding (1)**
179:21
**over (26)**
7:4;32:2;46:17;
68:24;88:11;129:4,6;
146:2;166:19;182:7;
199:25,25;225:21,23;
226:3,7;234:2;
241:15;255:17,25;
260:1;288:11;294:7,
11;296:8;304:12
**overtime (1)**
69:18
**own (10)**
30:22;43:15;104:4;
105:14;134:10;

145:12;160:4,4;
161:21;278:22
**owned (2)**
304:23;343:17
**owner (1)**
31:25

## P

**packet (2)**
238:9;334:10
**pads (1)**
164:21
**page (33)**
7:5;156:1;197:2,21;
200:24;218:5;219:22;
220:15,16,22;221:16,
17,22;222:8;234:7;
244:13;248:19;251:1;
254:4;277:12;304:14;
305:16;306:21;
312:16;316:1;318:10;
327:23;331:19;
333:22;336:13;345:1;
364:13;365:3
**pages (4)**
197:12,14;241:5;
366:12
**pallets (1)**
33:25
**panicked (1)**
15:3
**paper (27)**
33:7,10,11,21,22,
23;77:4,15;92:23,24;
116:7;125:5;152:11;
165:5;170:1;219:20;
292:7;315:23;343:6;
354:17;361:16;362:3;
363:24
**papers (2)**
33:10;142:13
**paperwork (1)**
118:22
**parade (1)**
136:6
**paragraph (4)**
278:25;313:9;
314:24;321:25
**parcel (5)**
72:7;285:20;
317:20,22;358:6
**parent's (1)**
277:2
**Park (17)**
31:24;96:15;100:5,
7,8;211:19,23;212:2,
3,5,7;213:20,22,23;
214:1,6;232:25
**part (24)**
38:14;56:13;60:8;
72:6;91:23;94:5;

145:23;155:9;156:4;
184:1;187:19,19;
213:1;225:16;256:25;
285:20;300:14;
317:20,22,22;321:5;
334:13;353:15;358:6
**participant (1)**
344:3
**participants (1)**
139:10
**participate (3)**
148:22;149:10;
347:10
**participated (3)**
344:4;347:4;352:10
**particular (19)**
58:18;60:21;91:12;
92:9;94:5;99:10;
108:2;115:3,6;130:5;
146:14,15,16;194:6;
203:8,21;224:11;
261:11;364:11
**particularity (1)**
314:12
**particularly (3)**
146:6;226:9;227:1
**parties (1)**
15:12
**partner (4)**
48:19,23,24;88:20
**partners (3)**
88:21;220:1,6
**party (4)**
11:11;15:9;39:19;
307:6
**pass (4)**
35:6;52:21;57:19;
104:11
**passage (1)**
69:13
**passed (9)**
30:7,11;35:21;
231:13;291:23;
294:12,13,16;359:14
**passing (1)**
26:8
**passion (3)**
35:11;155:8,9
**past (1)**
245:8
**patently (1)**
139:22
**patrol (15)**
36:20;38:14,17,18;
41:1;47:10;48:6;50:8;
53:11,13;56:4,7;
61:23;90:15;94:13
**Paulnitsky (30)**
18:19;25:21;28:23;
250:6,17;274:23,25;
275:7;276:8;277:9;
279:5;283:11,13;
284:13,14;285:2,20;

286:2;287:11,25;
288:22;290:5,10,23;
291:12;292:2;293:17;
294:23;309:21;328:1

**payment (1)**
69:18

**pen (1)**
77:15

**penalties (1)**
8:15

**pending (5)**
10:20;17:3;30:19;
286:12;300:24

**people (61)**
35:15,15;42:22;
43:14;45:20;51:14;
52:4,23;53:6,17;
55:18,22;68:24;
69:25;72:4;73:3;
78:11,14,16;82:9;
106:7;108:13;139:15;
142:7,16;145:6;
156:6;158:23;159:19;
160:1;161:12;179:19;
190:12,17;192:18;
193:4;202:2;205:8,
15;215:2;220:5;
222:25;223:23;
225:12,13;229:14;
232:20;233:3;251:19;
255:21;274:4;276:13;
291:9;316:2;347:4;
348:21;349:21;351:3;
356:20;357:25;
359:15

**people's (2)**
356:10;358:1

**per (1)**
245:24

**perceived (1)**
43:16

**percent (1)**
9:11

**perfectly (4)**
9:2;114:16;128:21;
130:9

**perform (2)**
55:25;57:19

**performance (11)**
174:5,19,20;175:9,
12,18;176:2,20,23;
177:21;184:2

**performers (1)**
53:7

**perhaps (3)**
309:1,4;311:12

**period (13)**
52:13;70:16;75:16,
16,19;107:24;168:13;
170:17;177:1,7,14;
237:19;265:22

**perjury (1)**
8:15

**permanent (15)**
20:12,24;21:3,4;
22:7;240:22;259:19,
21;260:19,25;271:17;
333:23;334:7;335:12;
355:3

**permissible (5)**
83:1;84:7;85:11,15;
86:11

**permit (1)**
125:19

**permitted (3)**
80:15;81:23,24

**perpetrator (1)**
67:14

**person (38)**
17:20;63:6;66:12,
25;72:24;77:1,2,3,7;
82:4;83:7;84:9;
117:20,21;129:17;
131:2;138:24;139:15;
140:17;151:7;153:16;
156:3;161:18;181:3;
200:25;203:21;
220:22;224:7;237:10;
247:13;252:9;297:15;
315:22;321:13;
322:23;323:1;361:22;
366:3

**personal (1)**
158:10

**personally (8)**
134:23;135:7;
139:21;160:15,16;
246:8;310:9;319:7

**persons (5)**
42:5;59:5,9;252:8;
267:12

**pertinent (3)**
65:23,25;93:22

**photo (4)**
140:11,17;313:3;
319:9

**photos (5)**
313:2,19,19;
318:22,25

**physical (5)**
35:21;46:23;81:6,
11,18

**physically (2)**
250:11,18

**pick (1)**
174:14

**picked (2)**
150:22;207:7

**piece (14)**
77:3;116:7;152:11;
170:1;219:20;220:12,
20;251:11;286:17,21;
292:7;315:23;329:1;
333:2

**pieces (1)**
233:22

**pile (2)**
231:1;338:7

**pistol (2)**
254:7;256:14

**pitch (1)**
171:20

**pitfalls (1)**
323:17

**place (21)**
8:25;19:24;30:13;
91:12;104:21,23;
108:14;117:5;119:4,
5;129:17;138:22;
201:10;217:2;260:15;
262:20;266:8;304:18;
312:3;359:25;362:24

**placed (5)**
277:24;278:9,18;
280:18;363:6

**places (4)**
144:9;145:10;
260:7;261:6

**plain (1)**
116:7

**plainly (3)**
204:8,11,14

**plaintiff (10)**
5:18;6:21;7:19;
11:13;12:4,9;16:2,3,5,
8

**plaintiffs (1)**
334:6

**plate (1)**
44:24

**plausible (3)**
128:22,22;286:24

**play (1)**
46:14

**please (11)**
5:15;6:7,17;27:25;
71:6;170:23;194:2;
216:25;224:14;260:2;
364:5

**plus (1)**
360:21

**pm (10)**
113:13,16;217:18,
21;224:15;325:6,9;
335:2;345:6;367:7

**Pobre (1)**
232:12

**point (41)**
9:22;10:19;32:20;
48:16;70:17;76:20;
96:1;97:9;98:11,24;
102:14,15;104:7;
105:9;108:20,21;
131:9;149:22;150:8,
11;154:6;155:9;
168:7;193:20;194:3;
214:18,18;215:11,24;
230:7;238:9;239:3;
242:23;285:6;291:3;

302:23;314:17;
332:15;348:10;353:7;
354:23

**pointed (1)**
160:11

**pointing (1)**
215:24

**points (2)**
132:7;147:24

**police (63)**
11:23;12:7;14:8,8,
22;20:5,6,8,11,13;
26:13,15,22;28:14;
34:10,15;36:1,3,6,13;
38:10;39:4,10;40:1,7;
43:21,22;44:6;47:9,
13;49:7;50:7;51:10,
24;52:5;55:14;68:10;
72:13;74:5;123:18;
134:14,18;137:13,14,
16;140:16,23;181:16,
25;194:21;198:12;
222:25;238:12,16;
246:3;248:8;277:23;
308:10;316:10,16;
350:23;353:22;
363:12

**policemen (1)**
28:10

**policies (13)**
84:6;119:13;120:6,
12;124:23;149:24;
159:20,23,24;160:1,
13;178:11;362:24

**policy (17)**
44:7;51:2;54:23;
84:7;112:21;120:21;
121:17;125:24;126:5;
151:22;161:1,24;
165:19;168:24;169:4;
363:2,12

**politicians (1)**
28:9

**politics (1)**
161:6

**polygraph (2)**
335:24,25

**Pontiac (1)**
304:12

**poor (1)**
349:22

**portion (2)**
147:6;200:22

**position (2)**
28:5;89:16

**positions (1)**
103:2

**positive (2)**
362:13;363:25

**possession (4)**
216:14;227:25;
228:2;359:16

**possibilities (4)**

62:25;222:23;
260:17;275:8

**possibility (3)**
68:16;211:13;
228:14

**possible (31)**
40:13;75:24;86:4;
143:15;166:2,9;
167:5,12;189:24;
190:5,8,16;191:14;
192:23;193:1;206:20;
207:4;211:16;221:5,
5;227:5;255:24;
260:7;266:4;267:17;
294:20;315:14,16;
349:18;356:7,15

**possibly (23)**
65:8;66:13;73:1,2;
83:9;84:10;139:12;
202:15,19,22;226:18,
20;236:20;237:21;
254:21;271:1;283:4;
291:2;306:3,12,14;
311:15;353:21

**Post (2)**
33:5;35:5

**posted (1)**
49:22

**potential (4)**
42:6;102:6;352:8;
357:20

**potentially (1)**
257:16

**pounds (2)**
35:17,20

**powers (2)**
185:17;288:7

**practice (45)**
82:11;84:7;107:12;
108:9;112:21;120:21;
122:2,24;124:9;
125:10,18;126:1,5;
127:3;151:20;152:15,
16;154:11,15;157:24;
158:9;159:7;160:4,4;
162:4;164:23;165:8,
8,19;166:6;168:21;
197:25;198:8;207:7;
222:24;223:1;238:1;
247:8,10;289:12,13;
298:2;305:23;316:9,
12

**practices (6)**
84:6;119:13;120:7,
12;127:14;221:6

**pre (1)**
57:11

**precede (3)**
238:10;239:3,5

**preceded (4)**
229:23;233:11;
247:5;248:2

**preceding (1)**

234:24

**Preceeo (2)**
232:14;233:6

**Pre-detective (9)**
57:8,24;58:21;
61:11,17;67:21;
79:19,24;86:17

**predict (1)**
288:23

**preferably (1)**
119:3

**preparation (7)**
18:1;20:3,22,24;
24:10;181:18;194:18

**prepare (12)**
17:9;38:21;40:24;
64:20,23;151:24;
199:18;265:17;
284:16;285:7;290:6;
297:23

**prepared (40)**
62:15;63:23;64:6;
68:5;116:16,18,25;
118:22;119:10;
124:21;127:16;
128:15;169:20;
199:10;203:9;218:14,
19;219:14;230:4;
242:11;245:20;
258:21,21;259:14;
261:17;266:16,20;
285:16,24;290:1,22;
292:13;296:15;
302:17;327:13;
331:10;332:18;
337:12;341:3;342:10

**preparing (4)**
40:23,23;320:25;
323:18

**presence (1)**
306:24

**present (41)**
18:10,13,21,23;
19:4,9,19,22;148:19;
149:3,6,9;162:11;
220:24;225:3;242:21;
267:10;268:21,24;
284:9;293:10;295:21;
296:3,21;297:1,2,5,
17;298:13,19,20,24;
301:6,13;302:7;
306:10;312:12;
313:12;319:18;329:7;
330:21

**presented (1)**
58:11

**Press (5)**
33:17;144:9;
185:19;189:6,7

**pressure (2)**
185:12,17

**presumably (2)**
155:9;182:23

**pretrial (1)**
137:17

**pretty (7)**
48:22;51:1,1;107:8;
145:15;213:20;227:9

**previous (7)**
83:3;128:16;131:2;
172:22;262:12;
274:25;277:16

**previously (1)**
328:6

**print (1)**
33:21

**printed (1)**
33:23

**printing (2)**
33:16,19

**prior (25)**
10:2;24:7,12,14;
26:24;30:9;129:11;
194:17;245:2;246:11;
247:7;248:9;249:11,
24;253:20;257:6;
264:7,24;278:5;
283:17;284:2;289:18;
322:4;343:5;360:3

**prison (6)**
142:8;158:24;
190:12,19,19;192:24

**probable (4)**
268:5,10;269:1;
270:10

**Probably (34)**
7:2;11:8;15:24;
25:4;28:19;29:24;
34:6;41:8;52:6;59:5;
70:7,9;74:11;87:7,20;
88:4;92:13;94:7;
99:22;119:22;179:2;
185:17;187:24;188:1;
218:18;242:24;243:2;
256:4;271:18;292:6,
16;315:22;326:13;
365:24

**problem (9)**
158:12;160:5;
170:10,11,14,19;
226:4;227:19;300:14

**problematic (4)**
158:12;178:10;
180:22;221:25

**problems (2)**
346:16;359:2

**procedure (1)**
123:10

**procedures (2)**
150:3;162:21

**proceed (2)**
7:4;346:13

**proceeded (1)**
264:13

**proceeding (1)**
138:4

**process (8)**
49:16;55:18;61:20;
90:6;92:18;128:1;
196:8;316:5

**processing (3)**
59:5,7,9

**produced (1)**
334:6

**product (1)**
142:18

**profession (3)**
135:19,21,21

**program (2)**
36:9,9

**progress (5)**
22:11;67:22;
164:22;165:4;198:14

**progressed (1)**
286:9

**prohibited (5)**
46:24,25;80:22;
81:15;174:3

**project (1)**
316:7

**promise (3)**
85:11;290:9,10

**promises (2)**
84:24;142:19

**promoted (20)**
49:2,3,12,15,22,25;
50:2,13,14,20;51:9;
53:18;54:1,1,14,23;
89:11,19;90:5,11

**promoting (1)**
55:2

**promotion (1)**
57:23

**promotions (1)**
54:9

**promptly (2)**
71:1;77:17

**pronounced (1)**
208:17

**pronouncing (1)**
6:18

**proper (2)**
85:10;134:7

**properly (2)**
28:11;90:23

**properties (1)**
255:17

**property (3)**
95:14;97:18;254:14

**proposition (5)**
171:13;215:6,7,14,
21

**prosecute (1)**
307:21

**prosecuted (1)**
156:8

**prosecuting (1)**
319:14

**prosecution (3)**

**process (8)**
125:20;251:15;
359:3

**prosecutor (7)**
141:11,13;229:20;
307:20;308:14;
319:14,18

**prosecutor's (1)**
354:25

**protection (1)**
56:21

**provability (1)**
270:15

**prove (3)**
203:19;230:7

**provide (8)**
9:3;146:11;235:3;
256:20;277:20;
280:12;293:7;321:18

**provided (8)**
78:5;147:22;228:9;
258:11;268:14;279:8;
282:17;312:8

**provides (1)**
268:10

**proximity (3)**
25:13;253:6;314:21

**prudent (1)**
225:17

**psychological (1)**
73:1

**Pulaski (1)**
147:2

**pull (3)**
107:5;219:4;235:12

**pulled (3)**
37:7;208:7;210:7

**punishment (1)**
90:2

**purchased (1)**
32:1

**pure (1)**
288:15

**purely (1)**
55:3

**purported (1)**
115:14

**purports (2)**
246:22;344:17

**purpose (3)**
60:23;163:1,3

**purposefully (2)**
8:21;125:11

**purposes (1)**
114:6

**pursuing (1)**
305:23

**push (1)**
325:14

**pussyfoot (1)**
354:15

**put (65)**
23:14,16;33:22;
48:22;65:14;66:6,10;

73:11;89:22;104:1;
106:15;117:24;
119:14;120:8;123:19;
138:17;139:21;
140:16;153:19,20;
164:12,12;180:4,17;
190:18;192:19;
198:14;202:4,8;
206:17;210:3;220:12;
228:19;229:5;230:24,
24;231:10,12;238:7;
240:8;241:1,21;
243:1;250:13,15;
265:7;289:24;292:6;
308:10;315:23;
324:21;332:24;333:4,
6;340:1;341:5;
345:14,15,20;346:8;
347:15,21;357:22;
362:6,18

**puts (2)**
23:13;34:4

**putting (12)**
46:13;74:7;111:14;
116:19;117:22;118:6,
7;125:8;173:7;
246:23;317:17;
357:25

**Q**

**qualified (3)**
55:8;82:16;83:23

**qualms (2)**
310:19,21

**question/answer (1)**
344:20

**quick (3)**
217:6,12;325:1

**quickly (3)**
70:17;75:24;76:6

**quite (9)**
124:5;145:23;
237:21;254:21;
255:19,19,19;271:1;
306:3

**quotation (2)**
303:5,8

**quotations (1)**
303:4

**R**

**radio (2)**
48:7,15

**Rage (1)**
37:7

**RAHE (122)**
5:25,25;45:9;54:4,
24;55:5,20;73:21;
78:24;83:22;84:15;
95:9;110:4;111:8;
113:1,4;121:20;

122:5;123:22;124:25;
135:10,17,24;136:2;
137:20;138:10;
140:12;142:10;143:4;
149:17;151:4;152:17,
19;154:18;157:12,17;
164:11,25;166:1;
170:5,20;171:5;
174:19;184:7;185:15;
187:7;188:8;190:22;
192:11;193:3;195:4,
15;205:24;212:24;
213:15;217:16;
221:10;222:3,11,14;
226:17;230:1;235:17,
23;241:8;242:7;
244:8;246:5;259:5,
25;260:9;263:7,9;
264:9,11;275:9;
276:17;285:8,10;
286:5,7;287:17;
288:3,8,14;294:10;
299:19;302:21;
304:14;305:16;309:3;
316:19,23;317:4,6;
318:17;319:1;321:15,
20;323:9;326:8;
332:21,23;333:14;
339:8;341:19,25;
343:22;346:11;349:9;
351:22;352:11;
353:12;355:23;356:4,
18;357:1,15;360:4,
16;362:10;366:21
**raise (2)**
6:6;131:25
**ran (3)**
26:1,11;165:3
**Range (2)**
58:6;189:16
**rank (1)**
264:14
**ranking (2)**
28:5;184:3
**ranks (1)**
51:1
**rap (9)**
210:7,18;211:4,9;
214:14;216:2,5,21;
227:25
**Rappaport (2)**
5:13,14
**rapport (2)**
77:9;253:16
**rated (2)**
53:10;184:10
**rates (2)**
183:22,23
**rather (3)**
147:12;202:4;
253:12
**RD (4)**
110:2,23;112:3;

252:13
**reach (1)**
153:2
**read (27)**
94:4;108:2;121:21;
128:5;132:9;138:2;
142:12,22;158:25;
164:6;189:6;194:4;
200:13;206:7,9;
223:10;238:2;243:13;
247:20;251:5;304:5,
7;310:1;317:2;
337:17;350:9;352:23
**reading (10)**
94:5;100:24;
188:21;223:19;
239:13;254:4;275:17;
296:5;330:1,1
**real (5)**
98:9;217:6;356:6,6,
10
**really (21)**
27:20;35:14;42:21;
55:22;86:8;121:11;
132:12,23;136:14;
139:2;148:3;151:18,
19;173:8;194:4;
215:12;235:8,9;
316:12;321:24;
359:13
**realtime (2)**
239:18;245:13
**ream (1)**
33:23
**reason (20)**
10:23;89:21;
158:10;159:10,12,20;
160:11,12,16;172:25;
191:5,15,18;225:25;
255:12;280:20;
282:17;286:24;
359:24;361:3
**reasonable (6)**
75:16,19;130:9,10;
170:17;171:2
**reasons (3)**
66:15;180:6;225:24
**recall (12)**
13:18;16:16;38:25;
58:10;59:19;140:20;
148:13,15;187:9;
193:15;214:21;
351:25
**receive (2)**
92:7;117:21
**received (17)**
36:14;37:20;41:8;
43:24;45:14,16;57:3;
61:16;81:4,10;82:24;
92:3,16;144:8;170:1;
200:25;201:5
**receives (1)**
43:21

**receiving (1)**
39:18
**Recess (3)**
113:14;217:19;
325:7
**recognize (2)**
130:19;207:17
**recollect (2)**
42:19;123:11
**recollection (19)**
19:6,11;36:5;43:3;
51:21;98:6;116:22;
122:7;150:4;162:2,4;
181:21;183:14;
196:12;248:24;
317:25;362:14;
364:11;365:9
**reconcile (1)**
94:2
**reconciled (1)**
131:9
**record (36)**
5:2,15;7:15;9:6,12;
23:12;70:16;73:7;
75:9;113:13,16;
166:25;167:4,14;
169:11;217:18,21;
235:19;264:6;325:6,
9,18;334:1,18,19,23;
335:2;336:24;338:11;
347:8;348:4;349:12;
354:1;359:18;360:15;
367:7
**recorded (6)**
70:25;258:3;
264:23;309:5;311:16;
314:11
**recording (5)**
56:6;69:2;75:23;
200:7;314:21
**records (2)**
117:18;207:19
**record's (1)**
161:22
**recount (1)**
142:8
**recounted (1)**
236:5
**Recovered (1)**
252:13
**recovering (1)**
105:25
**recruit (3)**
43:8;45:15;46:13
**Recruits (13)**
38:12,13,13,21;
39:8;40:1,6,11,22;
43:6;45:3,10,15
**red (2)**
131:25;178:4
**refer (2)**
194:8,11
**reference (4)**

111:21;202:14;
234:17;261:12
**referenced (3)**
104:18;111:23;
114:20
**referencing (4)**
59:17;111:25;
123:12,25
**referring (3)**
45:9;115:2;241:11
**reflect (5)**
301:5;318:10;
319:6,9;344:17
**reflected (2)**
309:1;334:8
**reflecting (3)**
302:18;362:8;
363:24
**reflective (1)**
126:13
**reflects (7)**
9:6,12;266:19;
279:22;327:7;329:17;
354:17
**refrain (1)**
7:9
**refresh (2)**
168:19;290:3
**refreshed (2)**
182:1;196:7
**refreshes (1)**
364:10
**refuses (1)**
346:21
**regard (1)**
204:20
**regarding (12)**
11:9,22;15:19;20:8;
44:6;134:25;145:20;
182:2;243:2;283:13;
337:15;350:24
**regardless (3)**
59:21;149:13;
162:16
**regular (4)**
103:20;107:24;
143:21;165:5
**regularly (1)**
28:24
**regulations (1)**
136:7
**reiterate (1)**
334:16
**reject (1)**
229:18
**rejected (2)**
270:15
**relate (1)**
43:2
**related (8)**
59:16;182:24;
185:19;201:12,12,12,
13,14

**relates (4)**
43:25;45:5;92:7;
331:1
**relationship (1)**
253:20
**relatively (1)**
230:5
**relative's (1)**
277:1
**relevance (2)**
203:7,8
**relocate (1)**
79:14
**reluctant (3)**
78:16;79:8;146:20
**rely (1)**
69:12
**remain (1)**
60:5
**remainder (1)**
229:15
**remained (1)**
110:16
**remaining (1)**
331:22
**remember (89)**
9:2,23;11:7;12:6,
23;13:14,15,23,24;
14:14,23;15:4,12,19,
22,24;21:5,6;26:7;
29:11;19;30:4,6;35:25;
44:15;45:3;46:16,19;
49:17;59:3;61:15;
63:18;69:18;82:21;
86:3,12,14;94:16;
95:11,22;98:8;99:25;
100:11;110:6;111:12,
18;114:21;115:1;
116:10;118:15;
149:20;151:13,16;
161:25;162:11;
172:14;173:24;
174:22;175:6,10,11,
16,18,23;176:19,23;
182:4;189:7,8;
193:19;202:2;212:4;
213:16,18;222:16,19;
303:1;320:9;324:12,
13,16;339:21,24;
340:21;341:1,4,24;
342:3;343:13
**remembers (1)**
321:12
**removed (1)**
53:12
**repeat (6)**
85:4;119:24;
170:22;206:24;
210:23;304:17
**repeated (3)**
277:16;278:5;
293:12
**repeats (2)**

279:9;284:2

**repetitious (1)**
35:4

**rephrase (4)**
9:15;52:9,10;62:7

**replace (1)**
164:22

**replaced (1)**
165:2

**report (348)**
22:11;37:21;38:7,
21;39:4;40:15,24;
56:6,12;59:4;61:10,
10,17;63:2,3,3,7,8,15,
16,17,25;64:4,24;
65:15;66:11;68:13,
21;69:4,10,14,19,25;
72:13;74:8;77:25;
84:9;92:16,18;93:1,5,
10,12,24;94:17;
104:25;105:1;106:14;
116:6,12,16,19;117:1,
6,8,21,22;118:2,2,6,
13;119:11,14;120:3;
121:4;124:10;127:25,
25;128:13,15,16,20,
23;129:7,12,20;130:8,
11,19;131:13;132:23;
133:19,22;134:10;
135:1;137:14;149:15,
25;150:20,23;151:24;
152:10;157:24;
158:11;160:5;162:15;
164:22;165:16;166:9;
168:7,8;169:18,20,23;
179:24;180:11,13;
198:2,10,15,24;199:6,
6,9,21,23,24;200:9;
202:21;203:8;206:2,
8,15,22;207:4,8;
213:12;217:23;
218:14,18;219:12,18,
19,25;220:7,12;
221:7;222:22;223:3,
19,20,24;224:2,6,8,8,
11;225:9;227:11,17;
228:7,25;229:4,13,15,
22,24,25;230:8,13,17;
231:7,24,25;232:3,5;
233:10;237:11,25;
238:2,14,15,19;239:1,
14;240:6,9,15;242:1,
2,11,15,18;243:17;
244:20,25;245:18,19,
25;246:1,8,12;247:4,
25;248:4;258:3,22;
259:9,13,16;260:4,8,
18,24;261:1,7,11,16;
262:7,25;263:1,14,16;
264:2,8,21,23;265:1,
8,16,25;266:10,15,19,
23;269:10,15,22,23;
271:10,14,24;272:5;

274:15,20;276:2;
279:22,24;281:12;
284:5,11,22;285:7,12,
24;289:25;290:1,6,12,
16,23;292:12;293:13;
295:20;296:5,9,19;
297:17,23;298:20,23;
300:4,6;301:5,15;
304:6;305:12,14,20,
21;307:13;308:9;
309:18,24;310:1,18;
311:18,20;312:8;
313:18;315:10,18;
317:18,24;319:3,5,7,
12,19;320:25;322:5,9,
10;324:17;325:12,15,
20;326:18,20,24;
327:4,13,19,22,23;
328:21;329:2,11,13,
16;330:19,23,25;
331:6,10,15;332:7,15,
16,19;335:15,16,18,
23,24,25;336:10,17,
22,22,25;337:2;
338:19;339:23;
340:14,15;342:10;
348:18;350:23;
354:16;360:7;361:25;
362:1,8,16,18;363:4,
15

**reported (14)**
21:8;128:16;
129:12;135:4;157:16;
158:7;202:2;206:12;
218:12;233:19;
252:12;274:14;303:9;
360:6

**reporter (8)**
5:13;6:4,6;7:12;
10:6,11;235:15;251:3

**reporting (17)**
41:6,9;62:20;64:15;
153:25;155:20;
157:25;159:7;226:15;
252:18;300:9,10;
305:1;323:24;326:21;
332:1,5

**reports (111)**
20:5,6,8,11;23:3;
24:6;38:4,5,20;40:2,7,
23,24;41:3;62:5,15,19,
24;63:10;64:6,17,21;
65:18;67:22;68:4;
90:23;91:24;92:4,8;
94:15,17,20,22;
100:25;101:17;104:2,
3,23;105:18;106:2,
24;107:1,14;115:15;
118:7;120:23;121:18;
122:3,10,20,22;123:5,
13,20;125:11,19;
126:14;127:11,16,22;
129:11;131:23;143:7;

165:4;181:16,25;
182:6;193:16,22;
194:21;196:11;198:2,
19,20;199:18;238:10,
13,17;239:1,2,25;
243:8;244:6;247:5,9,
10,15;248:2;264:6,
24;270:2;273:12;
275:18,18;303:25;
308:19;323:7;334:10;
335:7,11;336:21;
337:12,14,22;339:4,4,
17;340:3,18,23;
341:3;343:6

**represent (6)**
5:16,20,23;6:21;
333:25;334:5

**represented (2)**
13:10;334:7

**representing (1)**
5:12

**represents (1)**
7:17

**reprimand (1)**
136:8

**reprisals (1)**
79:9

**reputation (1)**
188:4

**requests (1)**
106:3

**require (4)**
64:14;128:14;
129:10;153:14

**required (16)**
41:2;57:20;69:19;
71:20;92:12;120:6;
121:17;123:18;
151:23;152:13;154:4;
162:10;203:19;
222:16;267:6;363:3

**requires (1)**
187:20

**reread (1)**
123:23

**reservations (1)**
141:14

**reserve (1)**
367:2

**resided (1)**
179:19

**residual (1)**
64:1

**resolution (1)**
14:21

**resolve (2)**
94:2;143:20

**resolved (2)**
13:8;64:11

**resources (2)**
144:6;184:12

**respect (1)**
110:15

**respected (1)**
148:2

**respite (1)**
87:18

**respond (2)**
48:8;90:21

**responding (1)**
102:3

**response (2)**
9:9;24:4

**responses (1)**
8:18

**responsibilities (9)**
48:5;91:24;100:23;
101:11,22;102:13;
127:11;220:14;
223:15

**responsibility (5)**
221:8;247:11,17;
258:9;316:17

**responsible (21)**
116:12,19;117:21;
118:5;174:5;201:18;
202:12;203:4,15,21;
223:23;224:1,8;
246:1;251:15;257:22;
290:9;307:25;321:13;
322:10;328:4

**responsive (2)**
8:22;9:23

**rest (2)**
51:9;119:22

**restaurants (1)**
31:21

**restructured (1)**
97:25

**result (3)**
182:20;191:6;
200:15

**resulted (1)**
181:22

**results (2)**
220:8;229:13

**retention (15)**
20:12,24;21:3,4;
22:7;240:23;259:19,
21;260:19,25;271:17;
333:23;334:7;335:12;
355:3

**retire (1)**
158:24

**retired (10)**
11:25;12:17;25:4,9;
26:16;27:5;29:12,25;
43:23;124:5

**retirement (2)**
25:5;29:4

**retroactive (1)**
245:6

**return (1)**
78:22

**returned (2)**
313:1;332:2

**revealing (1)**
17:11

**revered (1)**
147:22

**review (15)**
20:3;92:8,25;
103:17;104:3;105:4;
127:15;164:4;175:8;
241:24;247:8,10;
265:6;284:21;334:9

**reviewed (14)**
22:25;24:9;143:7;
181:16;191:25;192:9;
207:8;246:12,15,18,
21;261:10;262:1;
265:8

**reviewing (21)**
21:23;90:23;91:24;
92:18;93:15;94:21;
101:12;128:1;162:20;
174:25;181:25;182:6;
196:21;199:20;200:6,
8;237:10;243:4,7;
269:23;305:20

**revisited (1)**
61:10

**reward (1)**
186:14

**rewards (2)**
185:24;186:2

**Rey (13)**
172:14,24;173:8,
16,25;175:8;177:1,
10;298:13;300:4;
301:7,21,23

**Reynaldo (1)**
5:3

**RF (1)**
327:18

**RFC (5)**
327:16,18;331:9;
336:24;337:1

**RFC-Maysonet (9)**
241:3,7,7,18,19;
244:17;326:4,10;
334:3

**Ricardo (1)**
16:21

**rid (1)**
185:8

**ride-alongs (1)**
37:15

**ridiculous (1)**
350:2

**riding (2)**
37:2;314:8

**right (523)**
6:7;15:10;16:19,19;
17:8;21:18,19,25;
24:25;25:16;29:7,12;
32:8;33:18;37:9;
40:13;41:10;47:1;
49:19;52:16;56:1,22;

57:4,22;61:5;63:24;
66:12,19;67:4,8;
68:13,16,17,20,21;
72:8,16;74:18,23,24;
75:4,16;76:3,13,17;
77:6;78:12,13,15,16,
23;79:24;80:24;82:6;
83:5,9;85:7;89:4;
90:4;91:24;94:4,13,
14,15,22,23;96:8;
97:8,10;98:11;99:21;
100:12,14,20;101:9;
103:7;104:19;105:12,
15;106:6,8,8;107:4,6,
8,15;108:4;109:9;
110:11,17;111:10;
112:9;114:3,13,14,17,
23;115:12;117:3;
118:8,24;119:6;
120:19;122:2;123:20;
125:20,25;127:11,19,
24;128:25;129:13,24;
130:12,14,20;131:4,8,
20;132:18,25;133:9,
18,24;134:1,7;135:4,
5;136:9,20,23;137:2;
138:9;139:4,14,18;
141:8,8,12,16,25;
142:4,9;143:7;
144:15;145:7,14;
146:6;147:4;150:15;
151:15;152:16,25;
153:2,4,7;154:8,11;
155:10,11,14,16,18;
156:12;158:13,20,25;
160:2,6;161:2,8,25;
162:23,24;163:20,20;
165:7,10,16,19;166:5;
167:14,17;168:2,8,9;
170:11,19;171:3;
172:3;177:16;179:4,
6;180:5,11;181:14;
182:18,25;183:17,24;
184:5;185:5,13,25;
186:15;187:20,25;
188:25;189:13,14;
190:14,14,19;191:2,8;
192:9;193:1,11,17;
195:21;196:22,24;
198:16,22;199:1,7,10;
201:23;202:6,9,10,12,
15,18;203:3,4,15,22;
204:3,6,9,12,13,15,
16;205:13,21,22;
206:5;207:9,21;
208:23;210:16,20;
211:7,8,11,14,18,21;
212:8,12,17,19;213:9,
14,21,24;215:10,20,
22;216:3,16;218:6,
24;221:9,13;224:9,12,
18;225:4,7;226:6,24;
227:2,6,11;228:4,10,

17,22;229:25;230:9,
18,23,25;231:3,8,9,
20,25;232:8,12,15,21;
233:8;234:5,25;
235:13,20;236:6,9,10,
12;238:20,21,23;
241:5,24;242:14,18,
25;243:4,18;245:14,
22;246:4;248:2,24;
249:8,11,21;250:19;
251:9,12,17,20,24;
252:16,20;253:23;
254:11,23;255:10,18;
257:8,15,18,25;258:4,
17,22;260:24;263:4;
265:13;266:6;267:1,
22;268:2,11,15,24;
270:7,23,24;271:3,14,
18,21,25;273:22;
274:5,10,11,13,15,16;
277:11;278:9,12,16;
279:14;280:3;281:10;
282:13,18,19,22;
283:21;284:7,13,17;
285:3;286:4,6;
288:13;289:6,9,16;
290:2,17,22;291:3;
292:3,13,14,18;
294:21,25;295:15;
296:10,16;297:19,20;
298:17,22;299:6;
300:11;301:19,21,24;
302:4,25;303:1,3,6,
20;304:8;305:15;
307:7,11,12,20;308:7,
18;309:7;310:11,16;
312:5,12;313:7;
314:10,22;315:4,5,6,
14,24,25;316:18;
317:8,13;318:11,22,
23;319:5,21;320:6,9;
321:14;322:8,23,25;
323:1,23;324:14,15,
17;325:24;326:3,6,
18;327:2,7,20;
328:17;329:7,14,18;
330:9,12,15;331:11;
332:7,9,24;335:19;
338:14,17;339:1,2;
340:10;341:12;
342:11,22;343:20,25;
344:16,20;346:20;
347:15,18;348:12;
349:23;353:9;354:14;
356:10,25;357:17,19;
358:9;359:2,6,16,22,
25;361:17;362:3;
363:25;364:3;366:1,
7,17
**right-hand (1)**
197:5
**rights (3)**
254:18;277:13,15

**ring (5)**
248:17;249:8;
365:16,20;366:1
**rip (1)**
212:13
**ripped (1)**
125:6
**risk (3)**
76:12;126:10,11
**risks (1)**
55:2
**rivals (2)**
212:11,14
**River (1)**
47:19
**Rivera (1)**
156:18
**Riverview (1)**
31:24
**Rizman (2)**
5:12,14
**road (2)**
127:5;153:3
**robberies (5)**
60:2;88:10;97:22;
102:17;183:7
**robbers (1)**
50:10
**robbery (24)**
36:25;51:25;59:13;
63:6;65:10;86:20,21;
87:4,6,7,10,22;88:17;
97:14,14,21;101:25;
102:1;104:5;151:14,
14;201:13,13,25
**robbery-related (1)**
204:15
**rode (2)**
36:23;37:16
**Rodriguez (2)**
16:21;17:6
**role (3)**
148:21;320:25;
321:4
**roll (3)**
99:23;104:12;225:2
**rolodex (2)**
356:16,20
**room (11)**
76:18;108:18,18,
24;109:20;172:15;
297:16;300:2;307:9;
311:17;330:8
**Rosa (4)**
251:22;306:22;
311:12;312:7
**rotated (3)**
47:25;91:13,22
**rotation (1)**
91:21
**roughly (1)**
24:13
**rubber (1)**

143:9
**rulers (1)**
33:12
**rules (5)**
7:5;136:7;319:17;
359:10;362:12
**run (4)**
30:4;72:4;134:3;
184:22
**runs (2)**
109:19;214:7

## S

**safe (1)**
79:15
**Samantha (1)**
5:11
**same (62)**
7:5;8:1;10:16;
21:16;23:25;25:11;
29:24;32:11;35:3;
42:22;54:16;57:22;
59:21;60:5;71:15;
76:4;92:13,15;101:2;
123:7;126:7;154:16;
155:25;158:2;166:22;
171:5;172:10;175:15;
177:4;178:13,22,24;
181:5,11;188:7,17;
189:4,20;190:1,6,21;
191:11,23;192:12;
208:3;209:19;210:1;
218:25;224:17;
225:13;233:7;237:20;
249:22;253:2,4;
263:24;279:8;289:15;
300:22;359:20,23;
360:9
**sand (1)**
44:19
**Sandra (1)**
225:15
**sarcastic (1)**
288:9
**sat (4)**
13:17;15:25;68:11;
77:8
**save (1)**
363:17
**saw (40)**
24:14,19,24;25:2,
21,24;29:17,23;30:9,
15;66:5,25;77:3;83:6;
118:2;136:18,21;
137:5,13;138:17;
148:19,19;158:12;
178:4,9;179:12;
180:22;181:2;189:6;
195:6;200:13;205:11;
274:23;275:16,20;
277:5;338:8;339:16;
340:3;359:4

**saying (37)**
62:8;72:24;73:6;
74:3,12;75:2;86:9;
147:1;153:22;160:3,
17;168:5,7,23;189:9;
190:16;192:2;199:2;
213:5;265:21,23,24;
268:13,17;289:21,22;
290:5;301:23;315:9;
327:18;330:7;350:22;
353:22;359:19;
360:19;363:14;
365:19
**scenario (1)**
297:19
**scenarios (1)**
46:16
**scene (15)**
13:4;66:3;102:7;
128:23;129:19;
198:24,25;200:4,7;
252:13;335:15
**Schak (1)**
326:22
**schedule (1)**
58:19
**school (13)**
31:6,20,23;32:6,9,
14,15;33:1;49:20;
61:13,17,17,25
**Schweiger (1)**
30:15
**science (1)**
108:8
**sclerosis (1)**
105:24
**scooter (1)**
14:13
**scope (3)**
51:6;81:13;85:25
**score (1)**
49:21
**scores (1)**
49:22
**screw (1)**
106:20
**screwed (1)**
321:14
**scribbled (2)**
164:8;292:16
**scrutiny (2)**
189:14;191:20
**searched (1)**
331:21
**searching (1)**
323:25
**second (26)**
18:14,16,18;19:7;
24:16;41:12;97:5;
105:3;110:16;113:25;
164:15;193:25;199:6;
200:23;220:16;
221:16,17,22;241:1;

262:12;293:8;324:11;
327:23;364:4,9;365:1
**secrets (1)**
355:15
**section (2)**
252:2;305:12
**sector (2)**
90:21,23
**seeing (12)**
24:12;29:1;36:20;
37:3;86:14;95:11,22;
102:3;213:6;214:10;
266:1;352:1
**seem (3)**
82:8,9;216:9
**seemed (1)**
234:16
**seems (5)**
52:18;128:21;
227:8;251:23;331:10
**sees (1)**
130:25
**self-explanatory (1)**
92:10
**selling (1)**
228:4
**send (6)**
83:14;117:17,19;
176:3,7;238:3
**senior (1)**
181:12
**sense (16)**
35:9;57:14;72:1;
93:18;118:16;128:9,
9,13;129:8;131:13,
24;132:6;143:17;
218:17;246:19;
266:24
**sent (1)**
53:11
**separate (6)**
17:15;64:4;65:11;
108:24;254:9;314:18
**sequentially (2)**
198:11,17
**Sergeant (79)**
18:20;30:5,10;
89:12;90:6,11;91:7,7,
9,10,16;93:13;95:8,
24;100:19,23;101:7,
12;103:7,10;105:15;
117:2;118:18;119:12;
120:4;127:7;131:11;
144:14;145:14,19;
146:25;147:11,15;
148:16;149:2;176:5;
179:22;181:13;
183:15;199:12,20,22;
206:19;207:3;230:4;
231:3;237:11;249:22;
252:6;253:11,21,22;
254:5,8,13;258:11,14,
15;260:6;263:2;

267:4,16;269:7;
270:6;271:11;272:11;
276:10;279:9;303:12;
321:24;323:24;324:3;
328:2;340:20;342:5;
343:7;356:12;359:24;
360:7
**sergeants (4)**
48:2;102:22;
144:17;177:15
**sergeant's (2)**
30:14;105:12
**Sergent (1)**
231:5
**series (2)**
31:22;112:2
**serve (3)**
23:17;34:16;102:10
**served (1)**
321:6
**serves (1)**
51:21
**service (1)**
106:3
**set (4)**
90:1;94:14;207:13;
249:22
**seven (4)**
47:7;174:12;
177:19;318:10
**seven-month (2)**
36:9,10
**several (5)**
89:25;111:19;
319:25;352:13;
358:24
**sex (6)**
59:14;63:20;97:14,
23;102:17;171:9
**sexual (2)**
63:3;104:5
**Shakespeare (2)**
95:16;96:6
**shaking (1)**
7:9
**shall (1)**
78:10
**shared (1)**
105:16
**Shear (1)**
48:24
**shed (2)**
118:19;208:12
**sheet (3)**
115:4,5;216:21
**sheets (8)**
210:7,19;211:4,9;
214:14;216:2,5;
227:25
**shell (2)**
202:16,17
**shift (10)**
105:21;107:13;

127:15,17;224:21;
238:1;289:16;292:5,
15;293:20
**shifts (1)**
292:3
**shipped (2)**
109:17;110:11
**shoot (3)**
212:11;215:4;
235:13
**shooter (6)**
13:21;267:10,11,
12;293:5,10
**shooting (26)**
12:7;13:20;58:7,8;
74:3;201:17;203:4;
212:21,23;213:7;
215:20;218:11,15;
226:10;252:8,12,14,
20;254:9;256:17,20;
257:23;267:10;
293:10;339:7;360:21
**shootings (3)**
181:22;183:12;
233:12
**shootout (2)**
50:9,14
**short (3)**
87:18;170:17;230:5
**shortage (2)**
255:25;256:3
**shortly (3)**
89:8;218:14;289:15
**shot (9)**
182:9;193:17;
202:8;208:4,8,16;
252:8;256:13;360:12
**shots (1)**
234:5
**show (8)**
28:20;207:11;
307:25;312:18;323:8,
14;344:10;365:6
**showed (5)**
58:16;130:11;
211:4;213:13;318:21
**shown (1)**
313:1
**shred (1)**
354:17
**shuffled (1)**
57:21
**sic (1)**
5:6
**sick (1)**
247:14
**side (7)**
23:14;210:4;
213:24,25;220:2,3;
325:14
**sidetracked (1)**
28:19
**sign (9)**

105:4,4;112:13,23;
231:3;247:12,15,17,
25
**signal (2)**
140:3,10
**signature (1)**
367:3
**signed (20)**
85:13;93:3;112:5,5,
6;114:15;123:13;
128:10;193:23;
206:19;230:3;244:15;
247:16,21;266:1,4;
267:6;323:15;331:13;
348:17
**significant (1)**
299:14
**sign-in (1)**
115:8
**signing (1)**
100:25
**sign-out (3)**
111:16,21,24
**silly (4)**
293:15,16;349:14,
15
**similar (2)**
234:8;330:25
**similarly (1)**
70:22
**simple (2)**
287:8;352:4
**simply (1)**
242:16
**Simultaneous (1)**
235:14
**single (2)**
8:9;242:11
**sister (1)**
234:8
**sisters (1)**
236:14
**sister's (1)**
182:7
**sit (7)**
123:17;130:23;
157:23;188:20;
235:11;243:14;323:1
**sitting (8)**
77:15;147:20;
165:14;223:8;238:2;
290:10;298:12;307:9
**situation (2)**
150:14;167:23
**six (8)**
87:19,21;177:19;
224:6;336:7;345:2,
20;347:21
**sizes (1)**
33:24
**skill (1)**
249:22
**sleep (1)**

265:15
**slinging (1)**
215:2
**small (1)**
352:23
**smart (2)**
82:8;161:20
**smarter (1)**
193:5
**smartest (1)**
161:18
**Smitka (4)**
326:21;328:24,25;
330:1
**Smitka/Schak (1)**
327:23
**Smitka's (1)**
328:20
**so-and-so (1)**
363:20
**socializing (1)**
30:4
**society (1)**
78:11
**Soldier (1)**
232:17
**solely (2)**
209:12,23
**solve (4)**
144:5;184:5,9;
357:10
**somebody (27)**
13:11;66:2;67:14;
84:25;126:11,12;
130:24,25;142:3;
144:12;146:21,22,23;
172:13,15;202:24;
206:4;221:7;229:21;
250:11;264:14;
274:10;282:9;307:7;
322:9;323:14;363:6
**somebody's (1)**
244:21
**somehow (1)**
125:4
**someone (29)**
15:2,2;29:3;43:9;
50:18;55:2;66:24;
69:2;74:2;75:6;85:12;
103:15;112:19;
125:19;135:4;140:25;
145:15;155:7;156:21;
203:10;212:21;
216:21;249:23;
252:19;297:4;299:16;
301:16;352:6;360:8
**someone's (1)**
358:10
**someplace (7)**
26:1;73:3;100:3,14;
146:18;160:25;
223:11
**something's (1)**

130:20

**sometimes (22)**
10:8;35:6;46:14;
64:10;72:4;91:18;
101:20;102:22;104:3;
122:19,20;149:6,8;
152:23;156:7;158:23;
164:7;171:20;179:24;
200:9;203:14;277:3

**somewhat (5)**
35:4;65:8;102:21;
131:5;182:3

**somewhere (9)**
106:17;118:24;
199:3;271:5;290:20;
292:7,16;312:4;
366:13

**son (2)**
32:21,23

**soon (6)**
166:2,9;167:1,4,11,
12

**sooner (1)**
35:22

**sore (1)**
140:18

**Sorry (25)**
11:17;24:17;32:12,
22;96:15;119:25;
123:5;140:8;148:9;
160:22;164:18;
197:19,22;201:4;
206:24;234:13;
256:15;260:1;283:10;
312:15;325:16;326:5,
10;336:15;345:25

**sort (15)**
28:24;40:16;55:3;
59:21;64:1;72:17;
86:6;131:18;194:12;
196:11;199:23;226:2;
237:13;325:14;353:6

**Sotos (1)**
5:9

**sound (4)**
29:7;115:12;
234:11;249:14

**sounded (1)**
236:8

**sounds (2)**
161:11;350:2

**source (1)**
308:17

**South (5)**
37:18;96:14;98:12;
145:21;213:22

**space (1)**
352:23

**Spanish (9)**
236:6,9;254:17,20;
255:5,7;256:3,7;
295:14

**Spanish-speaking (1)**

255:14

**spanned (1)**
195:20

**Spaulding (2)**
312:23,25

**speak (8)**
7:8;17:13;53:21;
76:7;276:15;288:14;
313:22;360:24

**speaker (6)**
236:9;254:20;
255:5,8;256:3,7

**speakers (1)**
236:6

**speaking (4)**
55:13;65:17;
248:25;290:24

**speaks (2)**
254:16;295:13

**specialist (2)**
5:12;99:7

**specialists (1)**
99:16

**specific (4)**
59:18;103:13,16;
156:15

**specifically (21)**
13:18;24:15;45:19;
61:18;65:17;86:15;
103:6;110:15;149:23;
150:6;166:5;176:25;
187:8,9;202:7;
236:11;237:23;240:6;
297:6;337:21;363:11

**specifics (1)**
15:4

**speculate (2)**
300:3,3

**speculating (1)**
288:19

**Speculation (49)**
55:7;125:22;
126:17;155:24;
178:21;180:19;
191:22;205:25;
209:16,18;230:2;
237:14;244:8;256:1;
263:21;270:25;
273:16,25;275:10;
276:18;282:5;283:8;
284:19;285:11,18;
286:7;287:18;288:15,
18;291:5,17;292:10;
294:10;300:11;
302:10,21;305:5;
306:2;307:16;309:3;
315:15,17;317:6;
319:22;320:10;
322:13;323:11,21;
356:4

**spend (5)**
36:19;37:5;56:4;
72:11;158:23

**spent (6)**
36:22;37:2,8;74:13;
281:4;323:24

**split (2)**
219:24;221:3

**splitting (1)**
223:14

**Spoke (3)**
17:10,17;359:24

**spoken (1)**
354:18

**spotted (1)**
312:24

**St (4)**
182:10;211:19;
225:22,23

**stabbed (3)**
130:12;131:2,3

**Stachula (1)**
88:23

**S-T-A-C-H-U-L-A (1)**
88:23

**stack (1)**
33:25

**stacks (2)**
265:9,11

**staff (1)**
232:17

**stamp (4)**
143:9;207:23;
217:24;335:10

**stamped (8)**
21:2,5;197:13;
232:4;333:23;334:8;
335:12;364:23

**stamps (3)**
197:4;219:1;334:2

**stand (4)**
86:7;308:10,15;
352:15

**standards (2)**
311:22,25

**start (16)**
10:9;64:6;129:4,6;
146:18;197:7;201:11;
215:5,7,13,21;235:15;
241:15;244:1;296:8;
333:18

**started (11)**
10:23;31:23;70:7,9;
75:1;77:10;88:12;
95:8;108:21;212:15;
239:20

**starting (9)**
104:13;147:24;
194:3;201:10;214:18,
18;215:11;224:23,25

**starts (6)**
160:25;241:3;
252:5;309:16;345:3;
353:8

**state (1)**
298:9

**stated (13)**
256:11;267:8,9,11,
13;277:19;279:25;
293:6,9;312:17,19;
321:5;324:7

**statement (47)**
44:8;68:20;73:16;
82:2;84:18;85:1,13;
128:21,25;130:7,20;
137:14;141:1;168:6,
7;169:11;170:18;
171:1,3;250:1;251:2;
261:8;269:4;270:3;
271:4;282:10;285:24;
289:14,16;291:15;
297:24;312:7,10,11;
328:12,18;330:21;
331:1,15;338:8;
344:15,17,17;346:1;
350:8;352:15;361:10

**statements (43)**
8:14;74:3;75:6;
80:9,19,24;84:17;
142:18;167:17,21;
173:9;260:5;263:2;
267:25;269:9,16;
271:11;272:13;273:1;
274:11;277:17;278:3,
6;279:12;280:1,10;
283:20;284:3;313:6;
314:15;317:21,23;
318:15;328:21;
332:19;341:9,15,19,
21;342:15,17;343:2,9

**States (2)**
5:3;294:11

**State's (8)**
79:11;80:7;262:17;
268:7;270:13,14;
280:3;282:2

**station (1)**
68:10

**statistics (1)**
53:25

**statutes (4)**
52:1;60:15,16,18

**stay (3)**
25:14;29:11;112:17

**stayed (1)**
312:22

**stenographic (1)**
334:19

**step (1)**
10:16

**steps (3)**
62:1,3;200:10

**Steve (3)**
30:14;315:9,11

**stick (1)**
73:24

**sticking (1)**
119:22

**still (30)**

25:8,15;27:8;31:23;
32:10,11,21;43:22;
54:8,14;67:15;69:7;
86:4;88:10;94:18,19;
101:9;111:9;112:12;
119:17;122:9;177:11;
188:9,16;220:6;
224:16,17;228:14;
286:16;346:22

**stint (1)**
94:24

**stood (1)**
206:11

**stop (3)**
286:10,10;310:17

**stops (1)**
353:8

**storage (1)**
260:10

**store (3)**
26:7;31:25;32:3;
259:18

**straight (1)**
309:7

**straightforward (1)**
227:9

**strange (1)**
214:24

**strangely (1)**
198:7

**strategy (1)**
352:5

**street (30)**
14:9,11;31:24;37:9;
47:16,18;51:14;
52:22;66:25;96:14;
100:12;147:21;182:9;
201:13,22;202:3,24;
205:13,16,22;214:7;
220:2,3;225:11;
235:12;252:9;282:12;
315:12;324:2;359:4

**streets (3)**
96:22;313:13,14

**strengthen (1)**
251:15

**strengths (2)**
179:9,12

**strictly (1)**
65:6

**strike (34)**
12:2;18:22;22:18;
49:10;67:20;71:19;
73:23;75:14;83:13;
84:21;92:1;97:4;
98:25;102:9;104:22;
131:10;143:6;163:2;
197:20;215:6;250:25;
259:11;272:10;277:7;
279:24;282:9;289:12;
296:6;298:1;302:15;
304:4;326:5;342:3;
358:14

**strong (2)**
124:20;218:17
**strongest (1)**
296:19
**structure (1)**
97:9
**struggled (1)**
180:1
**stuck (1)**
140:17
**student (1)**
31:13
**stuff (3)**
213:17;240:12;
295:6
**subject (9)**
8:14;11:23;36:15;
58:17,24;59:1;79:19;
81:21;213:7
**subjects (1)**
328:5
**submission (1)**
264:8
**submit (1)**
117:2
**submitted (25)**
41:4;120:3;127:24,
25;164:5,10;198:19,
20;206:15;218:5;
224:11;228:8,25;
230:23;231:7,18,23;
238:22;239:14;243:1,
8,10;327:9,18;329:13
**subsequent (3)**
37:13;314:3;328:17
**subsequently (1)**
14:15
**substance (6)**
38:22;93:15;166:7;
168:15;175:1;194:5
**suburbs (1)**
17:23
**Successfully (4)**
184:18,22,25;
287:23
**sued (4)**
14:18;316:11,11;
320:7
**suffice (2)**
314:20;321:23
**suggest (10)**
200:17;211:14;
212:18;213:13;216:6;
227:12;228:9,16;
235:9;347:23
**suggested (3)**
202:17;216:2;
227:18
**suggesting (4)**
223:13,18;347:3;
359:15
**suggestive (4)**
138:18,21,24;

139:22
**suggests (3)**
211:15,16;310:14
**suing (1)**
15:20
**Suite (1)**
5:10
**summarize (2)**
36:13;328:12
**summarizes (1)**
331:15
**summary (4)**
56:7;264:12,17;
332:12
**sup (1)**
337:16
**superintendent (2)**
11:21;12:25
**superintendent's (1)**
117:15
**superiors (1)**
184:4
**supervise (2)**
181:10;237:24
**supervised (6)**
55:16;145:4;
175:20;177:19;322:8;
328:2
**supervising (8)**
90:15;100:24;
103:18;183:17;
193:20;237:18;
303:12;321:24
**supervision (2)**
102:2;162:5
**supervisor (37)**
47:22;48:14;73:23,
24;88:15;90:20;
92:17;101:2,7;
102:10;105:4;119:11;
120:4;127:2,7;
132:14;133:8;148:21;
150:8,9,10,12;162:10;
163:22;169:17,22;
171:7;172:8,20;
184:2;186:17;200:8;
206:7,8;297:5;
326:25;351:15
**supervisors (3)**
47:23;146:2;181:11
**supervisory (1)**
102:7
**supplemental (75)**
63:10;64:17,21,24;
65:15,18;68:4,12,21;
69:4,10,14;77:25;
104:1,2;106:14,24;
116:6;117:1;119:10;
120:3;123:19;127:16,
22;130:8;165:16;
166:9;198:1,3,10,20;
199:5,6,9;218:18;
219:11,18;229:24,25;

237:11;238:10,25;
239:2;243:8;244:6;
247:8;248:2;258:22;
260:18;261:1,11,16;
262:7,25;263:16;
269:15,21;271:14;
274:20;310:18;
317:24;326:18;
329:11;332:17;
334:10;337:11,14,22;
338:19;339:4;340:18,
22;341:2;362:1;363:4
**supplying (2)**
277:17;293:3
**suppose (1)**
276:24
**supposed (7)**
37:5;91:4;93:19;
102:24;112:17;
124:10;145:24
**supposition (1)**
349:1
**Supreme (1)**
82:7
**sure (79)**
7:3,8;13:11;23:24;
27:8;52:12;60:2;61:7;
69:1,22;71:8;77:12;
85:7;90:22;91:3;
92:11,13;93:14,17,21;
98:11;102:5;103:15;
107:13;111:15;118:1,
4;119:19;120:2;
121:3;125:8;129:7;
132:22;142:15;
143:12;148:2;164:1;
166:25;167:22;168:3;
169:6,15;173:4;
184:9,15;186:13,21;
187:4;191:3;194:17;
195:7;198:12;199:19;
200:12;207:2;211:2;
212:15;217:11;
220:25;226:25;
235:21;246:18;260:4;
261:24;262:1,11;
264:22;289:19;290:3;
298:11;325:3;334:25;
339:15;341:16,18,25;
364:17;365:3;366:16
**surgery (1)**
105:25
**surmise (1)**
281:5
**surrender (1)**
276:20
**suspect (25)**
44:7,20;45:24;
46:11,12;70:23;71:8;
80:2;81:25;84:17;
85:16;86:7;137:6;
139:14;147:9;153:18;
167:4,24;168:6,15;

169:11;171:21;
298:11,23;314:11
**suspects (16)**
42:7;43:7,25;45:6,
16,19;77:6;78:18;
79:22;80:16,23;
81:22,22;85:7;
148:14;227:6
**suspicion (2)**
124:20;188:22
**suspicious (4)**
66:24;75:8;169:22;
170:3
**swear (1)**
6:5
**swearing (1)**
8:5
**sweetheart (1)**
32:14
**switched (1)**
36:8
**switching (1)**
324:23
**sworn (3)**
6:8,11;57:15
**syllabi (1)**
58:11
**syllabus (2)**
58:13,14
**system (1)**
118:16

**T**

**tactic (6)**
46:1;81:24;85:10,
11,15;86:10
**tactics (3)**
36:18;42:9;180:22
**talk (20)**
26:24;28:22;35:13;
43:14;72:5;123:12;
146:20;236:21;
276:11;277:2,6,15;
306:6,23;320:22;
345:20;347:21;
350:19;353:2;360:9
**talked (7)**
68:10;77:23;
127:10;208:10;
308:18;351:19;
356:23
**talking (46)**
22:10;43:17;45:11,
14;52:12;76:2;78:18,
19;85:7;105:8;
109:22;113:19;114:1;
119:17;122:13;124:2;
136:4,14,15;141:17;
148:16;161:8,9;
166:5;167:7;169:23;
173:8;185:9,10;
202:7;203:13;223:13;

169:11;171:21;
298:11,23;314:11
**suspects (16)**
42:7;43:7,25;45:6,
16,19;77:6;78:18;
79:22;80:16,23;
81:22,22;85:7;
148:14;227:6
**suspicion (2)**
124:20;188:22
**suspicious (4)**
66:24;75:8;169:22;
170:3
**swear (1)**
6:5
**swearing (1)**
8:5
**sweetheart (1)**
32:14
**switched (1)**
36:8
**switching (1)**
324:23
**sworn (3)**
6:8,11;57:15
**syllabi (1)**
58:11
**syllabus (2)**
58:13,14
**system (1)**
118:16

**230:12;231:5,6,13;**
237:23;238:12;240:5;
243:11;245:6;339:12;
341:20;342:1;347:13;
359:14
**target (1)**
189:17
**task (1)**
62:5
**tasks (2)**
62:10;75:4
**taught (19)**
37:23;38:20,21;
39:3,15;40:1,6,11,15,
22;41:25;42:9;43:6;
45:3;60:20;62:14,18;
65:19;67:22
**Tavern (1)**
232:12
**taverns (1)**
226:7
**teach (1)**
58:15
**Tech (4)**
31:7,11,17;49:20
**techniques (2)**
42:15;43:14
**teenage (1)**
130:3
**teenagers (1)**
209:7
**telephone (3)**
105:19;146:22;
199:16
**telephones (1)**
106:2
**telling (15)**
124:8;158:5;
161:12;185:7;220:22;
239:24;281:2,19;
308:5;310:2;311:3;
317:11;349:15;351:1;
358:12
**tells (5)**
199:3;250:16;
327:24;330:20;352:7
**tend (2)**
53:17;211:5
**tendency (1)**
10:8
**term (3)**
122:17;136:25;
310:8
**terminology (3)**
46:9;114:23;133:13
**terms (2)**
36:13;124:9
**Terrace (1)**
47:17
**terrible (1)**
152:16
**test (15)**
34:8,14,21;35:20,

21;49:19;50:4,6;
51:16,17,18;52:6,21;
343:1,9
**testified (10)**
6:11;11:2;45:22;
273:11;282:7;315:20;
320:24;340:2;341:7;
361:10
**testifies (1)**
311:7
**testify (5)**
308:11,15;311:10,
14;352:23
**testifying (1)**
15:8
**testimony (39)**
8:5;10:25;24:7;
46:4;74:5,10;80:17;
108:12;137:17;138:4;
150:7;158:15;160:8;
162:19;168:5,5;
169:3;191:10;221:11,
20;245:2,24;246:11;
247:7;250:22;259:24;
264:20;280:5;289:18;
316:24;317:15;321:8;
322:4;348:16;349:25;
350:14;354:1;358:20;
360:3
**tests (1)**
54:1
**Thanks (1)**
325:4
**theft (5)**
37:1;63:24;65:5,6;
97:15
**themes (1)**
41:25
**theoretically (2)**
131:9;142:3
**theory (3)**
160:3;268:1;323:6
**thereafter (1)**
267:2
**therefore (1)**
165:17
**thick (1)**
33:23
**thinking (1)**
196:13
**third (8)**
15:9;19:14;39:18;
105:3;279:11;291:22;
307:6;331:20
**thorough (6)**
61:19;65:10;
126:13;132:24;
143:15;355:18
**thoroughly (2)**
130:24;147:19
**thoroughness (1)**
246:15
**though (19)**

7:13;56:12;72:16;
75:12;94:22;103:5;
120:19;139:20;
185:13;207:3;210:9;
214:10;219:23;229:3;
245:6;286:15;311:2;
312:5;366:16
**thought (12)**
39:25;65:13;94:10;
118:19;133:15;144:6;
174:17;178:10;191:4;
200:14;206:4;338:2
**thousand (1)**
11:24
**threaten (4)**
84:8;345:22,25;
358:10
**threatened (9)**
277:21;284:7;
346:9,15,19;347:2;
350:15;357:22;
360:20
**threatening (3)**
349:18;351:6;
353:20
**threats (1)**
280:21
**three (25)**
8:25;17:14,15;18:5;
19:13;20:2;32:5;33:1;
169:10,21;170:2,7;
174:12;198:3,18,19;
238:25;239:24;252:8,
14;256:13;265:19;
268:14;324:1;365:13
**three-and-a-half (1)**
19:13
**three-month (1)**
265:22
**throughout (1)**
92:6
**thumb (3)**
140:18;194:2,12
**thumbing (1)**
194:24
**thus (1)**
213:13
**timeliness (1)**
163:10
**times (18)**
7:1;11:5,18;17:12;
50:11;77:4;124:21;
144:15,16;146:18;
201:16;212:9;219:22;
265:6;276:19;317:17;
352:13;358:24
**timing (1)**
40:23
**Tino (5)**
248:22,25;331:23;
345:10;346:6
**Tino's (1)**
312:20

**tip (1)**
66:4
**title (1)**
12:23
**today (15)**
7:23;8:1,14;17:9;
18:2;20:4;24:10;
123:17;157:23;
181:18;188:20;
194:18,19;343:5,5
**Today's (1)**
5:6
**together (18)**
26:13;70:11;97:15,
16;101:4,6;111:15;
138:17;139:22;
140:17;153:19;191:7;
192:25;219:25;
247:14;265:7;267:25;
317:18
**told (17)**
39:6;67:16;74:14;
77:18;80:6;130:2,4;
222:23;231:11;
270:23;302:18;
306:25;332:13;
350:15;351:2;357:19,
21
**tone (1)**
295:9
**took (25)**
8:25;11:25;30:12;
34:8,14;35:20,21;
49:19;51:16;54:1;
68:8;75:4;91:11;
119:20;138:22;
165:17;184:12;220:1,
2;250:11,18;320:24;
321:4,5;352:16
**top (3)**
278:24;312:16;
362:24
**Torrence (8)**
181:23;182:2;
207:20;211:3;213:14;
227:14;233:8;254:6
**totally (1)**
129:25
**touch (1)**
25:6
**Touhy (3)**
26:4;96:21,23
**towards (1)**
197:10
**traced (1)**
44:24
**track (3)**
187:2,2;346:6
**tracked (2)**
112:7,7
**tracking (1)**
112:15
**traffic (3)**

37:6;50:15;205:22
**train (2)**
39:25;174:17
**trained (21)**
60:12;62:9;64:20,
23;69:12;71:13,18;
75:3;76:20;78:4;80:1,
12;81:23,24;85:9;
92:1;115:22;133:5;
163:11,13;199:17
**training (42)**
37:20;40:25;41:9,9,
19;42:1;43:20,24;
45:14,18;46:17;47:4;
57:3,6,8,9,10,13,24;
58:9,10;61:11,16,24;
64:25;67:21;70:14,
23;73:25;79:4,19,24;
80:15;81:4,10;82:24;
84:24;85:10;86:17;
92:3,7;163:16
**transcribing (1)**
10:6
**transcripts (5)**
138:2;317:2;
320:12,15;321:18
**transpired (2)**
264:15;281:21
**transported (3)**
278:20,21,22
**traumatic (1)**
42:20
**tremendous (2)**
35:14;214:21
**trial (2)**
137:18;262:15
**tried (3)**
43:1;247:19;356:23
**true (7)**
29:14;301:12;
340:9;341:17;353:4,
4;361:21
**trust (1)**
133:3
**truth (5)**
185:8;300:7;
306:25;308:6;310:2
**truthful (8)**
8:6,9;10:24;40:1,7;
46:10;158:6;362:21
**truthfulness (2)**
45:6;74:15
**Try (29)**
7:9;10:12,16;42:18;
72:8;75:24;79:13;
92:20;108:9;127:15;
129:20;139:11;144:4,
11;153:18;236:18;
272:18,25;287:1;
305:2;346:6,22;
351:18;353:10;
355:20;356:10;359:7,
9;360:23

**trying (16)**
43:2;45:17,17;
55:23;68:25;71:5;
106:19;118:17;
204:22,24;209:7;
233:23;247:23;
286:23;355:6;358:17
**T-squares (1)**
33:11
**turn (3)**
230:20;265:17;
344:25
**turned (4)**
151:8;158:18;
176:5;265:8
**turns (2)**
153:5;301:12
**twenty (1)**
366:12
**twice (1)**
186:19
**two (62)**
11:24;14:4;18:5;
29:18;31:22;32:19;
33:14;34:3,11;37:15;
52:14;74:24;83:3;
88:3;91:18,19;
105:16,20,22,22;
106:7;107:3;127:17;
158:23;182:10;
193:16;197:12,14;
198:3;201:21;208:21;
220:17;222:22;
233:19;234:12;
244:22;254:9;256:11,
18;258:17,19;259:2;
265:25;267:9,24;
274:3,4;303:4;328:5;
331:22;340:3;345:19;
346:10;347:20;348:2;
349:17,20;350:7,16;
355:9;357:23;360:21
**two-and-a-half (2)**
47:21;48:25
**type (23)**
14:22;15:9;23:6;
36:14;40:17;44:8,14;
51:17;54:15;57:3;
59:12;68:12;79:5;
81:5;144:1;183:7;
202:15;238:5;262:24;
269:9;271:24;294:19;
307:8
**typed (3)**
315:8,14;344:14
**types (9)**
52:4;62:15,24;
94:20;182:23;211:4;
237:12;348:9;359:22
**typewriter (2)**
68:18;77:25
**typewritten (1)**
165:5

**typical (1)**
276:12
**Typically (1)**
134:9
**typing (1)**
223:9
**typist (1)**
315:12

**U**

**uh-huhs (1)**
7:9
**ultimately (2)**
176:6;366:2
**unacceptable (1)**
321:25
**unattended (1)**
111:6
**unavailable (1)**
322:16
**unaware (1)**
44:22
**unconstitutional (2)**
83:2,18
**under (22)**
7:22;59:5,9;81:17;
82:17;84:2;119:12;
120:6;143:22;149:23;
162:5;163:12;188:22;
191:20;221:2,6;
252:12,16;268:1;
278:16;345:20;
347:21
**underlie (1)**
8:24
**undersigned (3)**
299:5;328:18;330:7
**understandable (1)**
362:25
**understood (6)**
9:19;67:12;82:18;
94:8;112:16;128:6
**undertaken (2)**
273:21;340:5
**uneasy (1)**
77:14
**unified (1)**
97:12
**unit (11)**
25:11;65:4,5;69:21;
88:3;97:12;98:8;99:6;
145:24;174:15;177:9
**United (1)**
5:3
**units (7)**
65:13;69:23;70:11;
76:8;117:14;144:10,
11
**unknown (4)**
202:5;204:5,17;
213:6
**unless (7)**

158:25;165:13;
172:13;267:14;
288:18;308:16;359:3
**unreasonable (1)**
137:6
**unrelated (1)**
129:25
**untrue (2)**
85:17;126:10
**unusual (8)**
22:17,19;195:23;
208:7;244:4;253:21;
277:7;363:14
**unwitting (1)**
344:3
**Up (42)**
17:23;31:2;33:25;
50:25;58:16;66:19;
68:12;70:1;90:1;
92:20;95:19;96:21;
104:10;106:16,20;
108:6,9;110:11;
113:21,25;132:9;
138:24;161:12;163:8;
174:18;176:12;182:8;
183:16;207:7;219:24;
220:13;221:3;223:14;
234:24;235:1;253:21,
22;262:10;267:2;
287:2;289:22;305:7
**updates (1)**
185:20
**upon (16)**
43:15;48:3;68:9;
70:14;71:4;86:18;
101:24;105:6;143:25;
166:23;170:6;171:14;
201:20;221:3;268:8;
352:8
**upset (2)**
42:17;43:1
**up-to-date (2)**
107:13;127:17
**use (15)**
23:23;42:16;43:1,
14;69:9;81:11,17;
115:23,23;116:5;
122:16;136:18;137:5;
163:11;165:4
**used (20)**
46:2,9;85:23;114:3;
162:24;170:15;
180:22;202:15,18;
212:5;251:19;254:6;
277:17;304:21;
305:13,13;306:6;
334:1;342:25;360:10
**useful (2)**
226:11;329:1
**users (1)**
227:21
**using (9)**
23:25;42:17;46:22;

81:5;114:23;122:15;
172:24;179:16;
314:16
**usually (4)**
48:1;225:1;235:11;
255:16
**utilize (1)**
67:22
**utterly (1)**
350:2

**V**

**vacated (2)**
189:1;191:20
**vacation (1)**
247:14
**vague (5)**
45:7;51:6;53:4;
81:12;298:7
**Vaguely (1)**
339:22
**valuable (2)**
67:4;147:13
**value (3)**
67:17;133:16;
140:24
**Varas (1)**
249:16
**Vehicle (4)**
251:19;278:23;
305:13,13
**veracity (2)**
343:1,9
**verifiable (4)**
65:25;66:1,2;79:12
**verify (1)**
72:8
**versus (6)**
5:2;21:4;53:18;
54:1,14;91:7
**viable (1)**
153:18
**victim (8)**
12:10;42:24;116:9;
185:7;212:18;225:17;
346:19;347:2
**victims (6)**
155:18;204:22;
207:21;210:10;
225:14;227:13
**victim's (2)**
112:4;365:23
**video (1)**
5:12
**VIDEOGRAPHER (13)**
5:1;6:4;7:14;113:9,
12,15;217:17,20;
325:5,8;334:22;
335:1;367:5
**video-recorded (1)**
5:8
**Vietnam (2)**

34:12,17
**view (1)**
188:16
**viewed (1)**
52:5
**viewing (2)**
86:8;138:25
**views (1)**
55:17
**violation (1)**
136:7
**violations (1)**
136:16
**violence (2)**
81:6;201:12
**Violent (13)**
97:12,20;101:2,7,
11;102:11;103:7;
182:12,12;252:6;
254:23;255:17;
276:13
**visualize (1)**
106:19
**vocabulary (1)**
23:25
**voice (1)**
234:14
**voices (3)**
233:19;234:12;
236:12
**voluntarily (1)**
279:4
**volunteers (1)**
139:11

**W**

**wagon (1)**
278:22
**Wait (10)**
27:24;125:10,11;
165:20;168:24;
169:10;235:15,15,15;
341:19
**waited (1)**
76:10
**waiting (1)**
263:8
**waiver (1)**
267:6
**wake (4)**
30:5,10,12,15
**walk (1)**
120:19
**walked (1)**
49:20
**walking (3)**
202:24;230:21;
359:4
**wall (1)**
106:21
**wants (4)**
74:6;286:18;349:8;

352:20
**War (1)**
34:12
**Ware/Joseph (2)**
230:17;232:3
**warehouse (1)**
260:23
**warrant (3)**
152:5;276:23,25;
336:20;338:1
**watch (14)**
47:25;70:1;91:13,
14,15,22;105:4,20;
177:4,17;206:21;
230:25;291:23;
331:20
**watches (3)**
47:25;107:3,15
**way (41)**
14:9,9,18;31:18;
35:7;47:16;49:25;
50:25;55:24;72:23;
74:4;78:1;96:21,23;
112:15;133:21;134:7,
13;142:5;144:11;
168:4;185:8;197:24;
215:3;223:11;224:20;
226:4;235:6;242:15;
248:8;268:7;270:11;
298:9;302:6,12;
314:11;322:17;350:9;
353:3;363:1,23
**ways (6)**
28:3;42:11;52:22;
60:3;147:1;286:23
**weaknesses (1)**
179:9
**wealth (2)**
147:9;356:12
**weapon (8)**
131:1;202:18,23;
254:6;359:7,16,20;
361:4
**weapons (1)**
37:16
**weeded (1)**
57:18
**week (4)**
36:19,22;37:5,8
**weekly (1)**
58:19
**weeks (13)**
18:5,5;19:10;24:20;
25:22;29:18;30:9;
34:11;36:19;37:15,
17;58:1;264:7
**weighed (1)**
35:17
**weight (1)**
35:19
**weren't (21)**
21:22;34:12;52:19;
57:15,21;80:12;

93:13;94:21;96:6;
100:1;123:13;125:19;
145:10;187:24;209:7;
232:21;249:21,23;
285:5;301:3;326:2
**West (7)**
5:10;87:13;90:13;
96:16,21;212:7;233:7
**Western (1)**
31:25
**what's (21)**
39:6;51:18;87:11;
153:24;163:1;186:10;
190:11;199:14;205:6;
266:23;283:3;288:17;
299:11;325:19,19,20;
335:16;336:3,13;
344:10;357:9
**whatsoever (1)**
339:4
**whenever (3)**
113:4;177:9,10
**When's (2)**
29:17,22
**where's (2)**
270:1;305:25
**wherever (2)**
91:17;259:18
**Whichever (1)**
216:13
**white (3)**
115:4,5;139:14
**whole (12)**
64:4;89:23;91:10;
94:18;195:8;202:3;
216:20;317:17;333:1,
4,6;359:24
**who's (9)**
202:12;232:10,17;
252:19,19;311:8;
312:12;351:17,17
**whose (4)**
227:5;258:9;306:6;
315:21
**wide (1)**
189:16
**wife (8)**
11:10;251:23;
277:22;306:22;308:5;
310:2;311:8,13
**wife's (1)**
35:12
**Wiley (22)**
20:9;181:17,23;
182:2;195:2,14;
196:8;207:20;211:3;
213:14;224:17;
227:14;233:8;239:9;
240:17;242:4;252:23;
254:7;357:10;360:10;
361:13;362:7
**willful (1)**
8:13

**Willie (2)**
230:16;232:3
**willing (2)**
82:1;276:14
**Wilson (1)**
48:21
**within (16)**
48:3;64:11;74:23;
75:15;76:2;84:5;
91:12;100:14;107:3,
10;168:8;170:17;
171:1;261:9;289:15;
359:9
**without (19)**
17:11;68:13;136:6;
162:20;172:15;
196:10;221:7,8;
240:14;242:1,14;
243:17;266:1,5;
270:12,19;293:15;
297:6;301:2
**witness (458)**
6:5,8,10,12;7:18;
23:3;27:20;28:8,17;
29:9;31:15;38:2,25;
39:13,22;40:4,9,20;
42:4,15,16;43:12;
44:3,11,18,21;50:22;
51:7,21;52:9;53:5,21;
54:5,11,18,25;55:8,
21;56:15,25;59:24;
60:7,10;61:1,7;62:22;
65:4;66:22;67:6,9,16,
24;68:8,10,17,20;
69:9,17,23;70:9,15,
20;71:4,16,24;72:22;
74:11,19;75:22;76:5,
15,21,25;77:14,21;
78:8,25;80:5;81:2,14;
82:16;83:6,8,23;
84:14;85:4,20;86:2,8;
93:8;95:10;98:5;99:5,
13,19,22;103:12,23;
107:23;108:5;110:6,
13;111:2,12;113:3;
114:9;115:19;116:1,
22;119:1,8,24;
120:11;121:2,7,21,24;
122:6;123:9,23;
124:17;125:3,14,16,
23;126:1,18;128:5,18,
20,25;129:16;130:2,3,
7,14,22;131:5,17,21;
132:5,20;133:2,12,21;
134:3,17,23;135:12;
136:3,10;137:22;
138:14,20;139:8,9,25;
140:3,10,14,20,23;
141:4,14,22;142:12,
22;143:25;144:21;
145:3,8,19;146:9;
147:5,18;148:8,22;
149:1,18;150:18;

151:6;152:3,20;
153:10,14;154:3,17,
23;155:25;156:3,15;
157:13,20;158:5,16,
21;160:10,21;161:5,
17;162:9,20;163:5,
16;164:12;165:2;
166:2,23;167:7,19;
168:11,18;169:4,14;
170:6,22;171:24;
172:6,11,13,23;173:2,
5,15;174:8;175:3,16,
23;176:16;177:4,23;
178:15,25;179:2,15;
180:20,25;181:6;
182:14;183:2,10,20;
184:8,18;185:3,6,16;
186:2,7,21;187:8,15;
188:13;189:5,21;
190:3,8,23;191:12,24;
192:14;193:4;195:5,
9,16;196:5,16;
197:15;198:5;200:14,
19;203:24;205:18;
209:20;210:2,23;
212:2,9,13,25;213:16;
215:16;218:22;219:3,
7;221:12;222:4,15;
223:6;226:18;228:12;
229:9;230:3;237:3,
15,21;239:13,20;
240:5,21;241:10,14;
242:8,21;243:20;
244:9,14;245:3,16;
246:6;247:1;253:4,8,
15;254:2;255:4;
256:3;258:7,14;
259:6,18;260:1,10;
261:19,22;263:25;
264:12;265:5;266:13;
268:5;269:12,19;
270:9;271:1,8;
272:15,22;273:3,8,17,
24;274:7;275:11;
276:5,19;279:18;
280:6,20;281:1,17;
283:9;284:20;285:13,
19;286:6,8;287:6,21;
288:4;289:9,19;
291:18;292:21;294:4,
11;295:3,10,24;
296:25;297:10;298:8;
299:20;302:1,11,22;
303:17;305:10,18;
306:3;307:17;309:4;
310:1,7,12,25;312:12;
313:24;314:7;315:16;
316:22,25;317:16;
318:19;319:3,12,24;
320:3,11,14,18,20;
321:9,17,21;322:5,14;
323:12,20;326:15;
328:15;329:9,25;

330:3,6,10,13;332:22;
334:20;336:15,19,25;
337:2;339:9;342:23;
343:13,23;346:12;
347:9,12;348:5,17,25;
349:10;350:6;351:25;
352:14,22;353:14;
354:3;355:24;356:5,
19;357:3,16;358:5,21,
25;359:19;360:17;
361:7,9,19,25;362:11;
363:17;364:2;366:24;
367:1
**witnessed (12)**
42:23,25;130:4,5;
135:8,20;138:3;
141:6;143:2;307:7;
309:2,19
**witnesses (16)**
41:16;42:5;72:6;
77:5,5;78:6,10,19,21;
79:5,7;102:6;146:19;
148:12;200:5;291:7
**woman (1)**
130:5
**women (1)**
236:3
**wondering (2)**
132:13;288:6
**word (8)**
23:23;46:16,16;
55:23;62:3;170:15;
342:25;347:9
**words (6)**
122:15;219:20;
220:12,20;315:23;
340:1
**work (34)**
24:17;26:10,13;
30:3;31:19;33:16;
48:12;51:24;56:22;
57:20;68:6;86:25;
91:18;130:17;133:16;
144:25;145:4;181:9;
187:20,24;217:13;
224:21;229:16;238:4;
264:18;291:22;
293:17;294:1,24;
298:16;300:8;301:4;
316:18;322:11
**worked (17)**
33:9;48:4;49:12;
55:15;89:23;92:14;
103:24;104:8,9;
108:13;118:18;
120:14;134:19;
145:22;147:23;177:1;
315:12
**working (23)**
25:13;26:17;31:20;
32:7;33:1;35:3;36:20;
62:25;68:19;102:23,
23;133:3;144:1;

146:12,13;171:15;
173:18;188:1;205:9;
210:12;228:14;233:3;
265:13
**Works (2)**
217:16;232:18
**world (3)**
161:9;227:5;268:7
**worth (3)**
253:9;351:20;
358:16
**wound (1)**
182:8
**Wow (2)**
35:18;277:4
**write (6)**
163:5;8;298:23;
299:6;317:3,23
**writer (3)**
180:11,13;296:19
**writers (1)**
56:6
**writes (2)**
220:21,22
**writing (15)**
37:21;56:12;59:4;
61:10,11,18;77:3,10;
128:10;170:16,16,25;
179:24;316:5,6
**written (10)**
54:15;90:7,9,24;
107:14;298:24;
301:15;316:18;331:6;
332:19
**wrong (11)**
14:9,17;46:6;
127:13;130:20;153:6;
155:10,14;193:11;
223:14;320:19
**wrongdoing (1)**
135:20
**wrongful (1)**
11:22
**wrongly (2)**
46:12;156:21
**wrote (10)**
219:19;220:19;
221:16,17,22;222:8;
261:12;290:16;
301:19;317:13

---

**X**

---

**xerox (1)**
104:25
**x-ray (1)**
63:7

---

**Y**

---

**year (19)**
11:8;15:15,23;
17:19;24:13,25;

31:11;35:25;49:3;
86:23;95:2;96:4;
97:24;103:1;111:13;
162:12;186:19,19;
222:1
**years (27)**
32:5;33:1,14;34:3;
47:21;48:25;111:19;
134:15,16;135:9,22;
136:19;137:5;138:7;
140:6,9;142:25;
177:19;194:15;
209:11;216:17;222:1,
1,2,17;286:24;320:6
**yell (1)**
159:10
**yelling (1)**
159:11
**Yep (2)**
197:14;330:5
**yesterday (2)**
194:2;320:24
**yielded (1)**
228:16
**yields (1)**
257:10
**York (3)**
198:8,9,9
**York's (1)**
198:9
**you-all (2)**
300:9;316:10
**young (9)**
14:6,11;46:13;
130:3,3;201:21;
209:2,6,6
**youth (2)**
97:7,8
**youths (2)**
256:11;267:9

## Z

**Zero (2)**
196:18,19

## 0

**000101 (1)**
336:16
**00099 (1)**
335:15
**0800 (1)**
218:7

## 1

**1 (5)**
241:3,7,18;364:6,9
**1:00 (3)**
182:10;205:19;
218:13
**10:00 (1)**

345:6
**10:40 (1)**
5:7
**103 (1)**
336:24
**1035 (1)**
312:22
**104 (1)**
337:1
**105 (1)**
337:3
**106 (1)**
337:4
**107 (2)**
334:3;337:5
**10th (1)**
36:8
**11:00 (1)**
182:8
**113 (1)**
90:13
**1150 (1)**
37:18
**11th (1)**
37:17
**12:29 (2)**
113:13,14
**12:30 (2)**
225:1;231:15
**12:43 (2)**
113:14,16
**1240A (1)**
5:10
**14 (2)**
100:9,13
**141 (1)**
5:10
**14th (3)**
95:16;100:10;
145:21
**14-week (1)**
36:9
**15 (2)**
64:11;217:9
**15th (24)**
14:7,8;96:10;252:6;
254:13;257:1,6,10;
258:4,12;259:15;
260:7;261:8,12,17;
263:3,16;266:10,20;
279:8;280:15;283:21;
309:10;340:18
**16 (1)**
96:25
**1630 (5)**
224:11;225:6;
228:8;231:10,20
**16th (4)**
345:3,5,6;347:12
**17 (2)**
96:17,25
**17th (2)**
96:17;145:22

**18-cv-02347 (1)**
5:5
**18th (6)**
90:13,20;92:17;
93:13;94:21,24
**19 (2)**
88:5;198:19
**190 (1)**
35:20
**1964 (2)**
31:12,17
**1968 (2)**
34:9,24
**1969 (8)**
34:10,24;36:2;37:7,
7;39:8;45:18;46:25
**1972 (20)**
49:5,12,24;62:24;
63:11;64:24;67:21;
68:5;69:17;70:13,23;
74:2;78:4;79:18;81:5,
23;82:25;84:24;
86:18,24
**1973 (1)**
87:20
**1976 (5)**
87:14;88:11,13,15;
89:3
**1980 (4)**
87:16;88:6;89:3,12
**1981 (6)**
70:10;90:18;95:3,4;
98:1;100:19
**1982 (1)**
227:25
**1987 (1)**
102:12
**1990 (116)**
98:17;100:8,11;
103:6;105:9;109:23;
111:9,11;114:2;
119:17,22;121:22;
122:24;124:2;127:8;
149:22;150:5;161:23;
162:5,15,23;163:3;
164:20;166:5,6;
182:11,18,21,24;
183:13;188:9;191:2;
196:1,2;198:20;
199:10;208:2;210:8;
221:6;224:16,21;
228:8;229:1;238:11;
239:4,10,10;240:18,
18;242:2,5,5,12,12;
243:18;244:24;248:9,
12;252:6;254:13;
257:1,6,10;258:4,12;
259:15;260:7;261:8,
13,17;263:3,17;
266:10,20;267:3,22;
269:10,16;270:2;
271:12,25;272:2,8;
274:23;287:13,14;

291:21;292:13;293:2,
11,13;295:18;298:25;
306:22;324:2;327:9;
331:20;335:19;336:4,
5,12;339:6,7;340:18,
25;342:3,11;343:11;
345:3,5,6;362:24;
363:2,11,12,23
**1997 (1)**
177:12
**1st (22)**
267:3,21;269:10,
16;270:2;271:12,25;
272:7;273:13;279:9;
280:14;281:13,22;
282:10;283:21;293:2,
9,11;309:10;340:25;
342:3;343:10

## 2

**2 (1)**
164:16
**2:27 (2)**
217:18,19
**2:54 (2)**
217:19,21
**20 (1)**
222:1
**200 (2)**
214:7,8
**2000 (4)**
11:8,15;295:12;
298:25
**2001 (1)**
15:24
**2006 (1)**
15:16
**2007 (4)**
12:15;15:16;25:4;
29:6
**2017 (1)**
188:25
**2019 (1)**
5:6
**20th (5)**
47:9,13,20;48:6,25
**2100 (1)**
306:22
**2138 (1)**
100:13
**21st (2)**
339:7,9
**2200 (1)**
295:18
**22nd (23)**
19:25;272:2,8;
273:14;274:22;
280:18;281:13;
282:16;283:18;284:2;
287:13;291:21;
292:13;293:13;
295:12,18;298:25,25;

306:21;309:7,12,14,
15
**2300 (1)**
332:1
**23rd (18)**
238:11;239:3,10,
15;240:8,9,14,18;
242:2,5,12;245:14;
248:9,12;287:14;
324:2;331:20;342:11
**24 (6)**
64:11;75:12;168:8;
285:6;289:5,23
**2452 (1)**
87:13
**24th (1)**
327:9
**25 (1)**
218:7
**25th (25)**
96:10,11,13;97:1;
99:17;145:21;198:19,
20;199:10;208:2;
210:8;224:16;228:8;
229:1;238:22;239:10;
240:18;242:5,11;
243:18;244:24;
245:14;335:17,18;
339:6
**26 (1)**
238:21
**260 (1)**
35:17
**26th (1)**
238:23
**28 (1)**
91:14
**28th (1)**
5:6
**29 (1)**
336:4
**292 (1)**
345:1

## 3

**3 (28)**
99:23;194:2;
197:13;218:25;241:2,
3,18,21,22,23;242:3,
12,13,17;243:14;
244:23;257:4;272:6;
273:12;306:17;
334:11;335:14;337:8,
23;338:13,20,25;
340:7
**30 (5)**
194:15;222:2,16;
286:24;320:6
**30,000 (1)**
366:12
**30th (2)**
336:12;340:11

**31st (1)**
  260:22
**3300 (1)**
  31:24
**3419 (1)**
  233:6
**35 (1)**
  58:22
**36 (1)**
  289:23
**3600 (1)**
  47:17
**38 (2)**
  134:15,16
**3801 (1)**
  87:12
**3A (12)**
  333:10;334:1;
  335:5;337:8,22;
  338:17,20,23,25;
  339:3;340:9,23

---

**4**

**4 (5)**
  86:20,21,25;87:7;
  344:11
**4:00 (2)**
  224:25;225:2
**4:30 (3)**
  224:15;229:17;
  230:21
**4:34 (2)**
  325:6,7
**4:46 (2)**
  325:7,9
**40 (8)**
  135:9,22;136:19;
  137:4;138:7;140:6,9;
  142:25
**42 (1)**
  331:9
**43 (1)**
  331:19
**44 (1)**
  331:9
**45 (4)**
  326:11,13,14;
  327:18
**46 (2)**
  326:13,14
**47 (3)**
  244:17;326:5;
  327:16
**49 (1)**
  305:17

---

**5**

**5 (57)**
  26:19;30:20;95:1,2,
  4,7,15;96:1,9;98:25;
  100:1,20,23;101:9;

102:11;105:10;
107:19;108:10,13;
110:25;113:21;114:5;
122:24;124:24;
126:22;127:7;150:5;
156:22;164:17,18,20;
171:7;182:14,25;
183:13;237:18;252:6;
254:14,16,16;275:2,
24;276:8;277:12;
278:25;279:2,7;
291:22;306:23;313:1,
1;324:7,8;332:2;
340:20;361:11,12
**5:00 (1)**
  230:21
**5:02 (1)**
  335:2
**5:35 (2)**
  367:7,8
**50 (1)**
  88:4
**51 (1)**
  304:16
**52 (1)**
  306:21
**53 (1)**
  312:16
**54 (1)**
  244:18
**55 (2)**
  228:21;232:4
**56 (2)**
  228:21;232:4
**57 (1)**
  197:21
**59 (3)**
  197:22,22;217:24

---

**6**

**6 (9)**
  87:10,11,15,22;
  88:5,15;89:4;99:23;
  207:12
**60 (1)**
  88:4
**62 (4)**
  197:22,23;217:25;
  241:7
**63 (3)**
  197:13;219:1,6
**64 (3)**
  197:13;219:1,6
**66 (3)**
  241:8,9,19
**67 (1)**
  334:3
**68 (1)**
  34:6
**69 (1)**
  34:6
**6910A (1)**

36:8

---

**7**

**7 (1)**
  11:24
**70s (2)**
  34:5;88:1
**72 (3)**
  69:6,7;76:2
**73 (1)**
  31:1
**74 (1)**
  87:20
**75 (1)**
  87:14
**784562 (1)**
  252:16

---

**8**

**8 (1)**
  225:4
**8:00 (2)**
  218:9,10
**80s (4)**
  101:5,12;177:13;
  214:20
**81 (2)**
  96:5;177:10
**82 (1)**
  96:5
**89 (1)**
  103:3
**8-by-11 (1)**
  112:1

---

**9**

**90s (1)**
  214:20
**97 (2)**
  177:11,14