*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 38

**Rosa Bello Melendez**
**May 16, 2024**

PAGES 1-100

EXHIBITS A-E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CASE NO. 22 CV 06496

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Alfredo Gonzalez,

     Plaintiff

vs.

Reynaldo Guevara, et al.,

     Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of Rosa Bello Melendez

Thursday, May 16, 2024

The Varallo Group LLC

34 Grafton Street, Suite 2

Millbury, Massachusetts 01527

------Kristen C. Krakofsky------
Stenographer

Real Time Court Reporting
P.O. Box 506
Millbury, Massachusetts 01527
(413) 732-1157

JGS_MAYSONET 3209

**Rosa Bello Melendez**
**May 16, 2024**                                                          **2**

```
 1                      APPEARANCES

 2

 3  Counsel for the Plaintiff:

 4          Loevy & Loevy
            Annie Prossnitz, Esquire
 5          prossnitz@loevy.com
            Sean Starr, Esquire
 6          sean@loevy.com
            311 North Aberdeen Street, 3rd Floor
 7          Chicago, Illinois 60607
            Phone: (312) 243-5900

 8

 9  Counsel for the City of Chicago:

10          The Sotos Law Firm, P.C.
            Allison L. Romelfanger, Esquire
11          aromelfanger@jsotoslaw.com
            141 W. Jackson Boulevard, Suite 1240A
12          Chicago, Illinois 60604
            Phone: (630) 735-3300

13          And

14
            Rock, Fusco & Connelly
15          Austin Gordon Rahe, Esquire
            arahe@rfclaw.com
16          333 West Wacker Drive, 19th Floor
            Chicago, Illinois 60606
17          Phone: (312) 494-1000

18
    Counsel for Defendants Jennifer Borowitz,
19  Frank DiFranco, and John Perkaus:

20          Hinshaw & Culbertson
            Michael F. Iasparro, Esquire
21          miasparro@hinshawlaw.com
            100 Park Avenue
22          Rockford, Illinois 61101
            Phone: (815) 490-4945

23

24
```

JGS_MAYSONET 3210

**Rosa Bello Melendez**
**May 16, 2024**                                                                 **3**

```
 1   Counsel for Defendant Cook County

 2            Cook County State's Attorney's Office
              Elizabeth Francine Brogan, Esquire
 3            elizabeth.brogan@cookcountyil.gov
              500 Richard J. Daley Center
 4            Chicago Illinois 60602
              Phone: (312) 603-3151

 5

 6   Counsel for Defendant Reynaldo Guevara:

 7            Leinenweber, Baroni & Daffada, LLC
              Michael J. Schalka, Esquire
 8            mjs@ilesq.com
              120 N. LaSalle Street, Suite 2000
 9            Chicago, Illinois 60602
              Phone: (312) 606-8705

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

JGS_MAYSONET 3211

**Rosa Bello Melendez**
**May 16, 2024**                                                                4

```
 1                      INDEX PAGE

 2   Deposition of Rosa Bello Melendez

 3   Examination by                              Page

 4   Ms. Romelfanger                           7, 86

 5   Mr. Gordon Rahe                          31, 89

 6   Ms. Prossnitz                           34, 92

 7                    EXHIBIT INDEX

 8
     Exhibit A
 9           Deposition of Rosa Bello taken on    12
             October 15, 2021
10
     Exhibit B
11           Subpoena                             14

12   Exhibit C
             Declaration of Rosa Bello            17
13
     Exhibit D
14           Statement of Rosa Bello taken on     46
             8/23/1990
15
     Exhibit E
16           Cook County State's Attorney's Office 74
             Investigations Bureau Investigative
17           Report

18

19
     The exhibits were returned to Ms. Romelfanger.
20

21

22

23

24
```

JGS_MAYSONET 3212

```
 1                      PROCEEDINGS:

 2                         11:14 a.m.

 3                THE VIDEOGRAPHER:  We're on the record.

 4   The date is May 16, 2024, and the time on the monitor

 5   is 11:14 a.m.

 6                This is the videorecorded deposition of

 7   Rosa Bello Melendez being taken in the matter of

 8   Alfredo Gonzalez versus Reynaldo Guevara, et al.,

 9   Case No. 22 CV 06496.

10                This matter is being heard in the

11   United States District Court for the Northern

12   District of Illinois, Eastern Division.

13                This deposition is being held at the

14   Varallo Group in Millbury, Massachusetts and is being

15   taken by counsel for the defendant.

16                My name is Jake Before.  I'm a legal

17   videographer representing Real Time Reporting.  The

18   court reporter is Kristen Krakofsky representing Real

19   Time Reporting.

20                Counsel will now introduce themselves

21   for the record, beginning with the plaintiff's

22   counsel, stating whom they represent and any

23   stipulations that apply to this deposition.

24                MS. PROSSNITZ:  This is Annie Prossnitz
```

JGS_MAYSONET 3213

1  on behalf of the plaintiff, Alfredo Gonzalez, and

2  Sean Starr on behalf of the plaintiff, Alfredo

3  Gonzalez.

4              MS. ROMELFANGER:  Allison Romelfanger

5  on behalf of defendant detectives Halvorsen, Smitka,

6  Mingey, Gawrys, Epplen, Montilla, Paulinitsky, and

7  Schak.

8              MR. GORDON RAHE:  Austin Rahe on behalf

9  of the City of Chicago.

10              MR. IASPARRO:  Michael Iasparro on

11  behalf of Jennifer Borowitz, Frank DiFranco, and John

12  Perkaus.

13              MR. SCHALKA:  Michael Schalka on behalf

14  of Defendant Guevara appearing --

15              MS. BROGAN:  Elizabeth Brogan,

16  assistant state's attorney, on behalf of Cook County.

17              MS. ROMELFANGER:  And I believe we are

18  stipulating that this is, in fact, Rosa Bello

19  Melendez; correct?

20              (All affirmative responses.)

21              THE VIDEOGRAPHER:  All right.  Will the

22  court reporter -- is there anyone else on Zoom?

23              Will the court reporter please swear in

24  the witness, and we can proceed.

JGS_MAYSONET 3214

1              Rosa Bello Melendez was duly sworn by

2      the notary public, examined, and testified as

3      follows:

4                          EXAMINATION

5              BY MS. ROMELFANGER:

6          Q.   Good morning, Ms. -- do you prefer Melendez

7      or Bello Melendez?

8          A.   Melendez.

9          Q.   Melendez.  Okay.

10             Good morning, Ms. Melendez.

11             As I introduced myself earlier, my name is

12     Allison Romelfanger.  I represent some of the Chicago

13     police detectives that are getting sued in this case.

14             To start with, can you please just state

15     and spell your name for the record?

16         A.   My name is Rosa Bello Melendez.  First name

17     R-O-S-A, Bello, B-E-L-L-O, Melendez, M-E-L-E-N-D-E-Z.

18         Q.   Okay.  Ms. Bello, do you recall being

19     deposed -- and when I say "deposed," I mean in a room

20     similar to this, maybe a little bit bigger, with a

21     court reporter taking down everything you say -- in

22     the case of Jose Juan Maysonet versus Guevara?

23         A.   Yes.

24         Q.   Okay.  Is that the only other time you've

JGS_MAYSONET 3215

1  ever given a deposition before?

2       A.   Yes.

3       Q.   Okay.  And you also testified in the

4  criminal court proceedings against an individual

5  named Alfredo Gonzalez.

6            Do you recall that?

7       A.   Yes.

8       Q.   Okay.  Is that the only time you've ever

9  testified in a court proceeding before?

10      A.   Yes.

11      Q.   Okay.  Do you understand you're under oath

12 today?

13      A.   Yes.

14      Q.   Okay.  And you understand being under oath

15 means you're sworn to tell the truth here today?

16      A.   Yes.

17      Q.   Okay.  And I have a couple questions that I

18 ask of everybody that I depose, so please do not take

19 any offense to them.

20      A.   Not a problem.

21      Q.   Are you currently under the influence of

22 any alcohol?

23      A.   No.

24      Q.   Are you currently under the influence of an

JGS_MAYSONET 3216

1  illegal drug?

2       A.   No.

3       Q.   Are you are currently under the influence

4  of any marijuana?

5       A.   No.

6       Q.   Any medication that would prevent you from

7  testifying fully and accurately here today?

8       A.   I do take medication, but no.

9       Q.   Nothing that would affect your memory?

10       A.   No.

11       Q.   Okay.  Is there any reason you can think of

12  that you wouldn't be able to give truthful and

13  accurate testimony here today?

14       A.   No.

15       Q.   Okay.  And you're already doing a really

16  good job, but since you've only been deposed one

17  other time, I'll just go through a couple ground

18  rules with you here today.

19       A.   Not a problem.

20       Q.   Since the court reporter is taking down

21  everything you and I say today, I would just ask that

22  you let me finish my question before you begin

23  answering, and I'm going to do the same for you and

24  let you finish answering before I begin my next

**Rosa Bello Melendez**
**May 16, 2024**                                                    **10**

1  question.

2       A.   Okay.

3       Q.   Along the same lines, although it's being

4  videorecorded, the court reporter here can't take

5  down uh-huhs or uh-uhs.

6       A.   Okay.

7       Q.   So you're doing a great job already.  Just

8  make sure all your answers are out loud.  Okay?

9       A.   Okay.

10      Q.   If you need a break at any point -- we're

11 in a small room -- you need some water, need to take

12 a smoke break, need to use the restroom, just let us

13 know, and we can take a break.  The only thing I ask

14 is if there's a question pending, you answer the

15 question before we take that break.

16      A.   Not a problem.

17      Q.   If you don't understand a question that I

18 ask of you, please just let me know, and I will try

19 to rephrase that for you.  Okay?

20      A.   Okay.

21      Q.   All right.  Ms. Melendez, earlier we talked

22 about the fact that you were deposed before in the

23 matter of Maysonet versus Guevara; correct?

24      A.   Yes.

1      Q.   Okay.  Do you recall that deposition?

2      A.   Happened many years ago, but still got some

3 type of memory and try to forget about it.

4      Q.   Okay.  If I say it occurred October 15,

5 2021, does that sound accurate to you?

6      A.   I would probably say no.

7      Q.   No?  Okay.

8          When do you believe that it happened?

9      A.   It was over the summer.

10      Q.   Okay.  Is there a specific reason you think

11 it happened over summer?

12      A.   Say that again?

13      Q.   Is there a specific reason you think your

14 deposition happened over summer?

15      A.   I was eight months pregnant with my son.

16      Q.   Okay.  So just to clarify, I'm talking not

17 about your testimony at the criminal trial.  I'm

18 talking about your deposition given in the civil

19 case.

20          Do you remember that?

21         MS. PROSSNITZ:  Object to the form.

22      A.   I would probably say I don't recall.

23      Q.   Okay.

24      A.   It's been a long time, like I said.

JGS_MAYSONET 3219

```
 1        Q.   Okay.

 2                  MS. ROMELFANGER:  I don't have a lot

 3   of copies of the dep, but I can have someone email

 4   it to you if you guys want.  Okay.

 5                  Can you mark this as Exhibit A,

 6   please?

 7                  (Exhibit A, deposition of Rosa Bello

 8   taken on October 15, 2021, marked for

 9   identification.)

10        BY MS. ROMELFANGER:

11        Q.   Ms. Melendez, I'm going to hand you what

12   I've marked as Bello Exhibit A for today.  Okay?  If

13   you could just take a very brief look at it.

14        A.   It's a whole lot of papers.

15        Q.   It's a lot of paper.  I don't expect you to

16   look through it.  If you just want to kind of browse

17   through really quick and let me know --

18        A.   What am I looking for?

19        Q.   So my question is going to be do you recall

20   sitting for a deposition?

21                  If you look on that first page, do you see

22   how it says, "Videoconference Deposition of Rosa

23   Bello taken October 15, 2021"?  Do you see that?

24        A.   Yes, I do.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                    **13**

```
 1        Q.   Okay.  Do you recall sitting for this
 2   deposition in Worcester, Massachusetts?
 3        A.   Yes, I do.
 4        Q.   Okay.  And does that October 15, 2021, date
 5   sound correct to you, or do you know one way or the
 6   other?
 7                  MS. PROSSNITZ:  Objection to form.
 8        A.   I would say it was over the summer because
 9   it was -- it was summertime.
10        Q.   Okay.
11        A.   It wasn't in October.
12             Because I recall that my daughter took me,
13   so it was over the summertime, and it was in
14   Worcester.
15        Q.   Okay.  You do you recall it being in
16   Worcester, though?
17        A.   Yes.
18        Q.   And you do recall that you were asked some
19   questions about the testimony that you gave in
20   Alfredo Gonzalez's criminal trial?
21                  MS. PROSSNITZ:  Objection to form,
22   foundation.
23        A.   Basically, it was talking about Juan Jose
24   Maysonet, basically.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                    **14**

```
1        Q.   Okay.  And do you understand that in that

2   earlier deposition that you gave in Worcester, that

3   you were also under oath at that deposition?

4        A.   Yes.

5        Q.   And you told the truth at that deposition?

6        A.   Yes.

7        Q.   Okay.  I'm going to switch gears a little

8   bit for right now, and I'm going to show what I'll

9   have marked as Exhibit B.

10                (Exhibit B, subpoena, marked for

11   identification.)

12                BY MS. ROMELFANGER:

13        Q.   Ms. Melendez, can you go ahead and take a

14   look at that?

15                Do you recognize this document?

16        A.   I'm going to probably tell you I don't

17   recall, but --

18        Q.   Okay.

19        A.   -- like I said, it's been...

20        Q.   Why don't you go ahead and turn to that

21   second page for me that says, "proof of service" on

22   there.

23                Do you see that, where it says proof of

24   service at the top of that second page?
```

**Rosa Bello Melendez**
**May 16, 2024**                                                    **15**

1      A.    Yes, ma'am.

2      Q.    Okay.  And on there, it's -- on that first

3  line, it says she received the subpoena for Rosa

4  M. Bello on May 3, 2023, and that she served a copy

5  of this document on you on May 31, 2023, and it's

6  signed by a Cindy Cheringo.  I might be saying that

7  wrong.

8           Do you see that, Ms. Bello?

9      A.    She showed up at my house.  She lied at

10  first.  So, behaviorally, she talked to my husband

11  and told my husband that I requested her to come to

12  my home.  She gave me this paper.

13           Yes, I recall.

14      Q.    Okay.  So you said that she told your

15  husband that you requested her --

16      A.    That I requested her to come to my home.

17           She lied, so he told her that I was

18  upstairs.

19           So when I went -- she came upstairs.  I

20  came to the porch, and, basically, I turned around

21  and told Cindy, "I'm not understanding why you're at

22  my home, why you had to lie to my husband.  I told

23  you that I didn't want to be bothered anymore with

24  this stuff."  That's behaviorally what I said.

JGS_MAYSONET 3223

```
 1          I was very highly upset with her because
 2   she turned around and told her that I requested her
 3   to come to my home.
 4       Q.   Okay.  Is that the first time you ever met
 5   Cindy, in this incident that you're talking about?
 6               MS. PROSSNITZ:  Objection to form.
 7       A.   I'm going to probably say no.
 8       Q.   Okay.
 9       A.   Because she showed up at my home three
10   times.
11       Q.   Okay.  Do you recall the dates that Cindy
12   showed up at your home?
13       A.   No.
14       Q.   Okay.  Does May of last year sound right
15   for one of those times?
16               MS. PROSSNITZ:  Objection to form.
17       A.   Yes.
18       Q.   And if you turn back to page 1 of
19   exhibit --
20       A.   The beginning?
21       Q.   Yeah.  Where it says, "Subpoena to testify
22   at a deposition in a civil action," do you see that,
23   Ms. Bello?
24       A.   Yes.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                17

1        Q.    I'm sorry.  Ms. Melendez.

2              And on the date and time on that, it says,

3    July 21, 2023.

4              Do you see that?

5        A.    Yes, I do.

6        Q.    When you received this subpoena, did you

7    believe that you needed to show up for a deposition

8    on July 21, 2023?

9              MS. PROSSNITZ:  Objection to form.

10       A.    No.

11       Q.    Okay.  Why not?

12       A.    Because they -- she showed -- like I said,

13   on the second page -- on the second page here, when

14   she served me with this one, she basically turned

15   around and told me not to worry about this one.

16       Q.    Okay.

17       A.    So yes.

18       Q.    I'm going to show you now what I'll have

19   marked as Exhibit C.

20             (Exhibit C, Declaration of Rosa Bello,

21   marked for identification.)

22             BY MS. ROMELFANGER:

23       Q.    I'm going to ask that you read through

24   this, Ms. Melendez, and let me know when you're

**Rosa Bello Melendez**
**May 16, 2024**                                                    **18**

```
 1   done.  Okay?

 2        A.   Just the first page?

 3        Q.   The whole document, please.

 4        A.   Okay.

 5        Q.   Ms. Melendez, do you recognize this

 6   document at all?

 7        A.   Yes.

 8               MS. PROSSNITZ:  Objection to form.

 9             BY MS. ROMELFANGER:

10        Q.   You can still answer.

11        A.   Yes, I did see this document before.

12        Q.   And turning to page 3, I think it is,

13   that's marked Gonzalez 6022 at the bottom, is that

14   your signature on the page?

15        A.   Yes, it is.

16        Q.   Okay.  And that is dated July 20, 2023;

17   correct?

18        A.   I'm not sure about the date, but that is my

19   signature.

20        Q.   Okay.  On that page, though, it says

21   7/20/23?

22        A.   Yes.

23        Q.   Is that your handwriting, the date on

24   there?
```

**Rosa Bello Melendez**
**May 16, 2024**                                                    **19**

```
 1        A.    No.

 2        Q.    Okay.

 3        A.    The date on there is not my writing.

 4        Q.    Okay.

 5        A.    But the signature is.

 6        Q.    Okay.  The signature is.  Okay.

 7              And then turning to that next page where

 8   it says Gonzalez 6023, is this also your signature

 9   that appears on that page?

10        A.    Yes, it is.

11        Q.    Is that -- and that is also dated 7/20/23?

12        A.    That's not the -- that's not how I write my

13   dates.

14        Q.    So that's not your handwriting?

15        A.    No.

16              MS. PROSSNITZ:  Objection to form.

17        A.    But the signature and the printing is mine.

18        Q.    Okay.  On Gonzalez 6023, all of that

19   handwriting that appears on that page, is that your

20   handwriting?

21        A.    No, it's not.

22        Q.    Okay.  Do you know whose handwriting that

23   is?

24        A.    This is Cindy.
```

1      Q.   Okay.  Did you read what Cindy wrote down

2  here before you signed off on this page?

3      A.   I'm going to basically tell you yes, I

4  have, for the simple fact she showed up at my job.

5  I sat in the car with Cindy.  She gave me this paper

6  here.  This is her writing, and basically wasn't

7  really paying no mind to it, and I just signed it.

8      Q.   So when you say "wasn't paying no mind to

9  it," you weren't paying any mind to what she was

10  writing down --

11      A.   No.

12           MS. PROSSNITZ:  Objection to form.

13      A.   We were having a conversation.  She was

14  asking me questions, how I was feeling, how was my

15  health.  We were really having a conversation.

16           Then she showed me this, and I was looking

17  over it.  And, basically, I think she was on the

18  phone.  I wasn't sure if she was on the phone with

19  you or another attorney, because she had him on

20  speaker.

21      Q.   Okay.

22      A.   I'm still trying to remember everything we

23  talked about.

24           She asked me questions about this, and I

**Rosa Bello Melendez**
**May 16, 2024**                                                                21

```
 1  basically turned around and told her basically
 2  everything that I said on here was basically true,
 3  and then she started writing this.
 4           And, I mean, the conversation we were
 5  having, it was basically how everything was going
 6  with me, my family, were we safe.
 7           And I was, like, distraught, not really
 8  paying attention, so I just signed it.
 9      Q.   Okay.  So you weren't really paying
10  attention to what she was writing down.  You just
11  signed off --
12      A.   Yes.
13              MS. PROSSNITZ:  Objection to form.
14              BY MS. ROMELFANGER:
15      Q.   And then in terms of this typed document
16  here that's Gonzalez 6020 to 6022 --
17      A.   Okay.
18      Q.   -- did you type this document up?
19      A.   No, I did not.
20      Q.   Do you know who typed this document up?
21      A.   No, I do not.
22      Q.   Did you discuss the contents of this typed
23  statement before it was shown to you?
24              MS. PROSSNITZ:  Objection to form.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                 **22**

```
 1      A.   No.

 2      Q.   No?  Okay.

 3           Do you know how the individual that typed

 4  this statement up got the information that is in

 5  this declaration?

 6               MS. PROSSNITZ:  Objection to form.

 7      A.   I don't know.

 8      Q.   Okay.  Did you understand what you were

 9  saying when you signed this declaration?

10               MS. PROSSNITZ:  Objection to form.

11      A.   No.

12      Q.   And this July 20, 2023, date is the day

13  before the date that appears on the subpoena for

14  your first deposition.

15           Do you see that?

16      A.   Yes.

17      Q.   Did anyone tell you that you wouldn't have

18  to appear for that deposition if you signed off on

19  this declaration?

20               MS. PROSSNITZ:  Objection to form.

21  Hearsay.

22      A.   Basically, she -- Cindy -- basically, she

23  represented herself as a private investigator, that

24  she came down to talk to me about this, and
```

1  basically I broke it down.  I was very highly upset

2  and told her didn't want to be bothered with this no

3  more, that I'm sick of it and it was causing a lot

4  of problems with my marriage.  That's basically what

5  I told her.

6            I really don't like talking about this,

7  because it is my past.  I moved on, and I just got

8  tired of being harassed with this over and over

9  again, basically.  It's like I can't get away from

10  it.  That's how I feel about it.

11      Q.   Okay.  What, if anything, did Cindy say to

12  you when you said that to her?

13            MS. PROSSNITZ:  Objection to form.

14  Hearsay.

15      A.   Basically, she turned around and told me

16  that they're coming down to see me for the simple

17  fact because I refuse to go to Chicago.  And like I

18  said, I don't -- I would never go back to Chicago,

19  because, like I said, that is my past, happened many

20  years ago, and that I was done.

21      Q.   Okay.  So from your recollection -- and

22  tell me if I'm misunderstanding what you're

23  saying -- when she showed up with this typed

24  declaration, was that at your work, or was that at

```
 1   your home?

 2                MS. PROSSNITZ:  Objection to form.

 3   Compound.

 4        A.   At my job.  She showed me this at my job.

 5        Q.   Okay.  Did Cindy make any promises to you

 6   if you signed this document?

 7                MS. PROSSNITZ:  Objection.  Hearsay.

 8        A.   Basically, this would be the last time that

 9   I would see her, basically.

10        Q.   Before you signed off on this document, did

11   you thoroughly read through what --

12        A.   No.

13                (Multiple parties speaking.

14   Interruption by the court reporter.)

15                BY MS. ROMELFANGER:

16        Q.   Before you signed off on this typed

17   declaration, did you thoroughly read through what

18   was stated in this declaration?

19                MS. PROSSNITZ:  Objection to form.

20   Asked and answered.

21        A.   No.

22        Q.   Okay.  So are you able to say if you know

23   all of the content in this declaration is actually

24   true or not?
```

JGS_MAYSONET 3232

**Rosa Bello Melendez**
**May 16, 2024**                                                        **25**

```
 1                    MR. STARR:  Objection to form.  Asked
 2   and answered.
 3        A.   I would probably say no.
 4        Q.   Okay.  Did Cindy explain to you the
 5   significance of what you were signing when you
 6   signed this declaration?
 7                    MR. STARR:  Objection.  Hearsay.
 8        A.   I would probably say no.
 9        Q.   Okay.  Did Cindy give you your deposition
10   transcript from your Maysonet testimony before you
11   signed this declaration to read?
12                    MS. PROSSNITZ:  Objection.  Form.
13   Foundation.
14        A.   I'm not sure.
15        Q.   Okay.  Do you remember if she gave you
16   anything to look at before she had you sign off on
17   this declaration?
18                    MS. PROSSNITZ:  Objection.  Form.
19   Foundation.
20        A.   She showed me pictures of Alfredo and
21   another guy, but the picture was kind of blurry
22   because it was, like, printed out.
23        Q.   Okay.
24        A.   That's basically -- I can recall.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                    **26**

1      Q.   Okay.  So just photographs is all you

2  recall sitting here today?

3              MS. PROSSNITZ:  Objection to form.

4      A.   Yes.

5      Q.   Did Cindy ever explain to you that there

6  were statements in this declaration that were

7  inconsistent with your statements that you gave in

8  your sworn deposition in Maysonet?

9              MR. STARR:  Objection.  Form.

10  Hearsay.

11      A.   Yes.

12      Q.   She did tell you that there were some

13  inconsistencies in there?

14      A.   Yes.

15              MS. PROSSNITZ:  Same objection.

16      Q.   Do you recall what she said about that?

17              MS. PROSSNITZ:  Objection.  Hearsay.

18      A.   Basically, our conversations were

19  basically -- trying to think about it offhand.

20              Our conversations where she showed up, she

21  wanted to talk about Alfredo.  Mostly -- it wasn't

22  basically about Juan, because he was free already.

23  They were trying to get him out -- Alfredo out of

24  jail.  That's mostly I can remember about the

JGS_MAYSONET 3234

**Rosa Bello Melendez**
**May 16, 2024**                                                                                    **27**

```
 1  conversation.
 2        Q.   Okay.  Do you recall at what time --
 3  because you -- strike that.
 4            You said Cindy visited you three times;
 5  correct?
 6                 MS. PROSSNITZ:  Objection.  Form.
 7  Leading.
 8        A.   There was one day I was at home.  It was
 9  about 11:30.  My husband was outside.  She went up
10  to my husband, and, basically, she's like, "I'm here
11  to see Rosa."
12            And my husband asked her who she was, and
13  my husband just basically told her, "Oh, she's
14  upstairs."  That's basically what I got, where she
15  showed upstairs.
16            He called me before she came up.  "Hey,
17  that lady Cindy's here.  She wants to speak to you.
18  She said that you told her to come here."
19            And I was like, "What the hell you talking
20  about?" is basically what I said.
21            She came up.  I met her on the porch.
22  She's like, "I apologize for disturbing you.  You
23  know, I'm not here to cause you no problems.  I know
24  this is stressful."
```

```
 1          I got upset and just basically told her --
 2   I was like, "Didn't I just tell you, basically,
 3   leave me alone?"
 4          I just didn't want to be bothered with this
 5   anymore.  I was over it.  I don't care what happens.
 6   If they're all free, more power to them.  Move on
 7   with your life.  That's basically what I said.
 8          She apologized again for showing up at my
 9   home, and then she left.  She gave me that paper,
10   the one you're talking about.  She gave me that
11   paper, and she left.  After that, I didn't see her
12   for a while.
13          That's basically it for -- at that time
14   frame.
15          And then the second time she showed up, she
16   showed up at my job.  I was going on my break, and I
17   was outside with a couple of my coworkers.  And I
18   told my coworkers, "Go on.  You know, I'm going to
19   have a I conversation with Cindy."
20          That's basically what I did.  We sat in the
21   car.  We had a conversation, and she's like, "You
22   know, I'm sorry for coming to your job."
23          And I wanted her to understand that I did
24   not appreciate her coming to my home because
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                 **29**

 1  basically it was causing conflicts with me and my

 2  husband because of -- you know, because this is

 3  still going on, and I was very highly upset.

 4          And that's when we started talking, and I

 5  explained to her, you know, this is really stressing

 6  me out.  My health is not too good.  I just

 7  basically -- and then she gave me this paper.

 8          And, like I said, we were just really

 9  having a conversation.  And at the beginning, it

10  wasn't about this.  She was just asking me how was

11  my family?  Is everything okay?  How am I feeling?

12  Are you stressed or whatever?

13          I was like, yeah, I'm stressed out every

14  day because, basically, I can't get over this.  It's

15  just -- I can't -- you know, yous guys don't want to

16  let this go.  Yous guys keep, like, bothering me,

17  and I'm done with this.  I just don't want to be

18  bothered.  That's basically what I said.

19          Then she left.  Didn't see her for about a

20  couple months after that.

21          She was texting my phone.

22          I've been avoiding her texts and not

23  responding to none of the texts.

24          She wanted to know what was going on, you

JGS_MAYSONET 3237

1 | know, what am I thinking or how am I feeling, and I

2 | just, like, left it alone.

3 |          She called me -- what's today?  Thursday;

4 | right?  She called me Monday, this Monday that just

5 | passed, "Oh, I'm just checking in with you.  How are

6 | you feeling?  I know you have to do your thing on

7 | Thursday the 16th."

8 |          And I'm like -- and I'm just sitting back,

9 | "Uh-huh.  Yeah, I know.  All right.  Not a problem."

10 | That's what I'm saying on the phone.

11 |          And she goes, "All right.  Have a nice

12 | day."

13 |          And it's like, "You too."

14 |          And I hung up, and basically that was it.

15 |    Q.   Okay.  So the first time you saw Cindy, if

16 | I'm understanding your testimony, she gave you

17 | Exhibit B, which is the subpoena; right?

18 |    A.   Yes.

19 |               MS. PROSSNITZ:  Objection to form.

20 |               BY MS. ROMELFANGER:

21 |    Q.   And then the second time you saw Cindy,

22 | when she showed up at your job, is when you got

23 | Exhibit C from her; correct?

24 |               MS. PROSSNITZ:  Objection to form.

**Rosa Bello Melendez**
**May 16, 2024**                                                                31

```
 1            BY MS. ROMELFANGER:

 2       Q.   Which is the declaration.

 3       A.   Yes.

 4       Q.   Okay.  Ms. Melendez, when you testified in

 5  Mr. Gonzalez's criminal trial, you testified in your

 6  Maysonet deposition that you told the truth.

 7            Do you recall that?

 8                MS. PROSSNITZ:  Objection to form.

 9  Leading.

10       A.   Yes.

11       Q.   Is that still true today?

12       A.   Yes.

13                MS. ROMELFANGER:  Can I have just a

14  quick break?

15                THE VIDEOGRAPHER:  The time is

16  11:45 a.m., and we're going off the record.

17                (Recess taken.)

18                THE VIDEOGRAPHER:  The time is

19  11:57 a.m., and we are back on the record.

20                     EXAMINATION

21            BY MR. GORDON RAHE:

22       Q.   Hi, Ms. Bello.  My name is -- or I'm

23  sorry -- Ms. Melendez.

24       A.   You can use Bello if you like.  I'm okay
```

JGS_MAYSONET 3239

1 | with it.

2 | Q. Okay. My name is Austin Rahe. I'm an

3 | attorney for the City of Chicago in this case. I

4 | just have a couple questions for you.

5 | A. That's fine.

6 | Q. Do you -- back in 1990, around the time

7 | that all of this occurred, did you know someone by

8 | the name of Eduardo Ramirez? He may have had the

9 | nickname Yuma or Juma?

10 | MS. PROSSNITZ: Objection to form.

11 | A. I don't -- I'll say probably no because

12 | it's been so long, so --

13 | Q. You may have? You just don't know one way

14 | or the other?

15 | MS. PROSSNITZ: Objection to form.

16 | A. Yeah. Let's put it that way, because, like

17 | I said, it's been so many years.

18 | Q. Okay.

19 | A. And, you know, when you -- as the years

20 | pass, you forget people's names. They're really

21 | just -- yeah.

22 | Q. Yeah. I understand. It may have been a

23 | person that Juan Maysonet knew or was friends with

24 | or dealt with.

JGS_MAYSONET 3240

**Rosa Bello Melendez**
**May 16, 2024**                                                                                    33

```
 1              Does that ring any bells for you?
 2                   MS. PROSSNITZ:  Objection to form.
 3       A.   Basically, he knew a lot of people.  They
 4  never called him Juan.  They always called him
 5  Double J.  I knew him as -- even though I know his
 6  full name because I have his son -- but everybody
 7  called him Double J.
 8       Q.   Okay.  Gotcha.
 9       A.   I remember Tito, Macho.  These are all
10  nicknames to the people he socialized with, so yeah.
11       Q.   Okay.  And then right before the
12  deposition, did you talk to Mr. Starr sitting
13  here -- before you came into this court reporters'
14  office?
15                   MS. PROSSNITZ:  Objection.
16       A.   Now?
17       Q.   No.  Before the deposition started.
18       A.   You're talking about this gentleman here?
19       Q.   Yes.  Sorry.  That's Mr. Starr right there
20  sitting to your left.
21       A.   That's kind of sad.  I'm sorry.  I don't
22  remember.
23       Q.   Whenever you were walking in this court
24  reporters' office, you were with your husband;
```

**Rosa Bello Melendez**
**May 16, 2024**                                                    **34**

```
 1  right?

 2              MS. PROSSNITZ:  Objection to form.

 3       A.    Carlos.

 4       Q.    Carlos?

 5              And who was the other person you were with?

 6       A.    My son Juan.

 7       Q.    Oh, your son Juan.  Okay.

 8              Did Mr. Starr sitting here -- did he come

 9  up and talk to you before you guys came in?

10       A.    He was standing outside, and he introduced

11  himself, who he was and who he was representing.

12       Q.    Oh, okay.

13              Is that all he said to you?

14              MS. PROSSNITZ:  Objection to form.

15       A.    Tell you the truth, my mind is just kind of

16  nervous in being here.

17              Basically, I would say yes.

18       Q.    Okay.  All right.  That's all I wanted to

19  know, and that's all the questions I have.

20       A.    Okay.

21              MR. IASPARRO:  I don't have any

22  questions for you right now.

23                       EXAMINATION

24              BY MS. PROSSNITZ:
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                                              **35**

```
 1        Q.    Okay.  Good morning, Ms. Melendez.

 2        A.    Good morning.

 3        Q.    I'm going to be asking you some questions

 4    now.

 5        A.    Not a problem.

 6        Q.    My name is Annie Prossnitz.  I represent

 7    Plaintiff Alfredo Gonzalez in this matter.

 8        A.    Okay.

 9        Q.    In the event that you're unable to attend

10    if we have a trial, we'll be replaying this

11    deposition to the jury in the case, so I'm going to

12    ask you some questions that you might have already

13    gone over with Ms. Romelfanger here, just to prepare

14    you that there might be some questions that you've

15    already been asked.

16        A.    Okay.

17        Q.    Okay.  So first off, I want to get straight

18    the day that Alfredo Gonzalez came over to your

19    apartment to see Juan Maysonet in 1990.  I'm going

20    to ask you some questions about that.

21              The police told you that Alfredo Gonzalez

22    came to your apartment in May 1990 on the night of

23    the Wiley brothers' shooting; is that correct?

24              MS. ROMELFANGER:  Objection to form.
```

JGS_MAYSONET 3243

```
 1  Foundation.  Misstates her prior testimony.

 2                  You can answer.

 3                  MR. IASPARRO:  Join.

 4       A.   Yes.

 5       Q.   But you have said that Alfredo Gonzalez

 6  actually came over to your apartment to see Juan

 7  Maysonet a few days before Juan was arrested in July

 8  1990.  Isn't that correct?

 9                  MS. ROMELFANGER:  Objection.  Form.

10  Foundation.  Misstates her prior testimony.

11                  MR. IASPARRO:  I'll just join all of

12  those objections so I don't clog the record.

13                  MS. ROMELFANGER:  And leading.

14                  MS. PROSSNITZ:  I would just say on

15  the record that we believe Ms. Melendez is an

16  adverse witness, so we're allowed to lead her.

17                  MS. ROMELFANGER:  I don't think you

18  are, so we can respectfully disagree, but go ahead.

19                  MS. PROSSNITZ:  That's fine.

20                  MR. IASPARRO:  Join.

21       A.   Okay.

22       Q.   Would you like me to ask that question

23  again?

24       A.   Yes.
```

JGS_MAYSONET 3244

```
 1      Q.   Okay.  So, Ms. Melendez, you have said that
 2 Alfredo Gonzalez actually came over to your
 3 apartment to see Juan Maysonet a few days before
 4 Juan was arrested in July 1990; isn't that correct?
 5           MS. ROMELFANGER:  Objection.  Form.
 6 Foundation.  Misstates her prior testimony.
 7      A.   Yes.
 8      Q.   Okay.  And there's no doubt in your mind
 9 that this happened a few days before Juan Maysonet
10 was arrested in July 1990; correct?
11      A.   Yes.
12           MS. ROMELFANGER:  Form.  Foundation.
13 Misstates her prior testimony.  Leading.
14           BY MS. PROSSNITZ:
15      Q.   Okay.  Just to get that clear, you're sure
16 that this incident where Alfredo Gonzalez came over
17 to your apartment happened a few day before Juan
18 Maysonet was arrested; is that correct?
19           MS. ROMELFANGER:  Same objections.
20      A.   I would say yes.
21      Q.   Okay.  How do you remember that Alfredo
22 came to your apartment a few days before Juan was
23 arrested in 1990?
24      A.   I know it nice and clear.
```

JGS_MAYSONET 3245

**Rosa Bello Melendez**
**May 16, 2024**                                                      38

1          Basically, it was about, like, 10:00, 10:30
2   that night.  I'm not sure exactly the date.  It's
3   been -- like I said, it's been years.
4          I can recall him showing at my house, him
5   and another -- another guy.
6          Me and Juan were sitting back watching TV.
7   We get a knock on the door.  I let Alfredo and the
8   other person in because they wanted to speak to
9   Juan.  They came in.
10          Them three started talking.  I walked away,
11  started taking care of my two little girls at the
12  time.
13          All I recall is Juan asking me, go to my
14  room and get this plastic bag that was wrapped up.
15          I went to the room.  At the time, I didn't
16  know what it was.  I went to the room, and it was
17  wrapped up.  I gave it to him, and all three of them
18  left.
19     Q.   Okay.  And when did that happen?
20     A.   It was, like, in the summertime.  Like I
21  said, I don't recall the date because it's been
22  over -- what?  If this happened in 1990 and we're in
23  2024, it's been a very long time.
24     Q.   Did it happen shortly before Juan was

**Rosa Bello Melendez**
**May 16, 2024**                                                    39

```
 1  arrested?

 2              MS. ROMELFANGER:  Objection.  Calls

 3  for speculation.

 4      A.   I can recall, a couple days after they

 5  showed up at my house, me and Juan was walking down

 6  the street with my two little girls, and we got

 7  surrounded by police officers in front of a store,

 8  said that he was under arrest.  They took him.

 9          I kept going.  They told me to go, and I

10  took my two little girls, and I went home.

11          I went to his mom, and I turned around and

12  said, "Listen, they just surrounded us in front of a

13  store, and they took your son."  That's basically...

14      Q.   Okay.  Do you know what he was being

15  arrested for?

16      A.   He said murder.

17      Q.   Okay.  So backing up a little bit, when

18  Juan told you to go get something from the bedroom,

19  did you know what you were retrieving?

20      A.   In the beginning, I didn't, until I went

21  and gave it to him, and I asked him what the hell

22  was this.

23          Turned around and said it was a gun.

24          I got very upset because I don't like guns
```

JGS_MAYSONET 3247

1  in my home, for one.  I had two kids at the time.

2            And he said, "Just give it to me," and them

3  three left.

4      Q.   Did you know Juan to have ever kept a gun

5  in your house before that occasion?

6      A.   No.  At the time, he wasn't living with me.

7  He was living with his mom.

8      Q.   So at no point in time before July 1990 did

9  Juan ever have a gun in the house that you were

10  aware of?

11            MS. ROMELFANGER:  Objection to form.

12      A.   Like I said, at the time --

13            Before, you said?

14      Q.   Yes, before.

15      A.   No.

16      Q.   And at no point in time before July 1990

17  did Alfredo Gonzalez come to your apartment to

18  retrieve anything; correct?

19            MS. ROMELFANGER:  Objection.  Form.

20  Misstates her testimony.

21            You can answer.

22      A.   Basically, like I said, he showed up at the

23  home and talked to Juan, and I gave him what was

24  wrapped up in the plastic.  Like I said, they all

**Rosa Bello Melendez**
**May 16, 2024**                                                                41

```
 1   left.
 2        Q.   And that was in July of 1990?
 3             MS. ROMELFANGER:  Objection.  Form.
 4   Misstates her prior testimony.
 5             You can answer.
 6        A.   I would say yes.
 7        Q.   Do you remember how long the three of them
 8   were in your apartment on that day?
 9        A.   I'm not sure.
10        Q.   Do you remember if it was a short period of
11   time?
12        A.   I would say a short time.
13             MR. GORDON RAHE:  Objection to form to
14   that question.
15             BY MS. PROSSNITZ:
16        Q.   Do you know when the Wiley brothers were
17   shot and killed?
18        A.   Say that again?
19        Q.   Do you know when the Wiley brothers were
20   shot and killed?
21             MS. ROMELFANGER:  Objection.
22   Foundation.
23        A.   I do not know.
24        Q.   I'm going to represent to you that they
```

```
1   were shot and killed on May 25, 1990.
2           Do you remember how you learned that the
3   Wiley brothers had been shot?
4                   MS. ROMELFANGER:  Objection to
5   foundation.
6       A.   All I can recall, when they locked up Juan,
7   a couple days later they came to my home, told me
8   that I needed to go to the police station.
9           I ended up in the police station.  I was
10  pregnant with my son.  They stuck me in a room with
11  a district attorney and a cop, and basically -- "Oh,
12  we're going to take your children away."
13          And basically, I -- basically, I just
14  turned around and said, "I don't know what you're
15  talking about.  I don't know nothing."
16          "Oh, we're going to take your children."
17          And basically, "Do what you want to do."
18  That's basically what I said.
19      Q.   Did the police mention the Wiley brothers'
20  murder at that time?
21                  MS. ROMELFANGER:  Objection to
22  foundation.  Form.
23      A.   I'm going to probably say no, because they,
24  basically, was asking questions:  Where was Juan?
```

JGS_MAYSONET 3250

**Rosa Bello Melendez**
**May 16, 2024**                                                    43

```
 1   Who was he with?  Do I know anything or --
 2            I'm not -- like I said, it's been years.
 3       Q.   Okay.  I'm going to pull what's been marked
 4   as Exhibit C.  That's your declaration.
 5       A.   This one here?
 6       Q.   Yes.
 7            So let's turn to that.  Let's go to the
 8   last page of the declaration.
 9       A.   Talking about this paper?
10       Q.   Yes, exactly.
11       A.   Okay.
12       Q.   Do you see that last paragraph where it
13   says, "Rosa states she was never told that anyone
14   was shot.  She learned that on the news"?
15       A.   If I signed it, I'm gonna probably say yes.
16       Q.   Do you know what shooting that was
17   referring to in that paragraph?
18       A.   No.
19       Q.   So you had said -- testified just now that
20   shortly after Juan was arrested, you were brought
21   into the police station and asked some questions; is
22   that right?
23       A.   Yes.
24       Q.   Okay.  Did the police ask you if Juan had a
```

**Rosa Bello Melendez**
**May 16, 2024**                                                              **44**

1  gun?

2       A.   Yes.

3       Q.   Did the police ask you if you had seen Juan

4  with a gun?

5       A.   Basically, I told the cops that I was the

6  one who gave the gun to Juan Maysonet because it was

7  wrapped up in a plastic.  He asked me to get it for

8  him.  And at the time, I didn't know what it was.

9       Q.   So you were telling the cops about that

10 night when Alfredo and the other man came to your

11 apartment; is that right?

12                MS. ROMELFANGER:  Objection.  It's

13 okay.  Objection.  Form.

14                You can answer.

15      A.   Basically, when the cops took me to the

16 police station, they asked me who came to my home,

17 and I basically told them who came to my home.

18 Shortly, they left, and that was the end of it.

19      Q.   Okay.  Did you tell the police that that

20 had happened a few days before Juan was arrested?

21                MS. ROMELFANGER:  Objection.  Form.

22 Misstates her prior testimony.

23      A.   I don't recall.

24      Q.   Let's go to paragraph 17 of your

JGS_MAYSONET 3252

**Rosa Bello Melendez**
**May 16, 2024**                                                          **45**

1  declaration in front of you.

2          Do you see paragraph 17 where it says, "I

3  told police that this occurred just a few days

4  before Juan was arrested when I had seen him,

5  Alfredo, and the other man with what I thought might

6  be a gun"?

7      A.   Yes.

8      Q.   Is that correct?  Did you tell police that

9  Alfredo --

10     A.   Yes.

11     Q.   Okay.  Did the police suggest to you that

12 people had come to your home before a shooting?

13              MS. ROMELFANGER:  Objection to form.

14     A.   I don't recall.

15     Q.   Okay.  So what happened after you told the

16 police that Alfredo and the other man had come to

17 your apartment a few days before Juan was arrested?

18              MS. ROMELFANGER:  Objection to form.

19     A.   Can you repeat the question again?

20     Q.   What happened after you told the police

21 that Alfredo Gonzalez and another man had come to

22 your apartment a few days before Juan was arrested?

23     A.   This was after Juan Maysonet was arrested.

24     Q.   Yes, exactly.

JGS_MAYSONET 3253

1      A.    Okay.

2      Q.    So what happened after you told the police

3  what had happened with -- in the incident where

4  Alfredo Gonzalez --

5      A.    Nothing.  They let me go home.  After that,

6  I don't know what happened.

7      Q.    Did you sign this statement?

8      A.    Can't tell you if I did.  If I did -- I

9  probably did.

10     Q.    Okay.  I'm going to pull out what we can

11 mark as Exhibit D.

12            (Exhibit D, statement of Rosa Bello

13 taken on 8/23/1990, marked for identification.)

14            BY MS. PROSSNITZ:

15     Q.    Do you recognize this document,

16 Ms. Melendez?

17     A.    Oh, my God.  It's been years.  Really?

18            Yes, I do.

19     Q.    Okay.  Was this the statement that you

20 signed at the police station?

21            MS. ROMELFANGER:  Objection to form.

22 Foundation.

23     A.    Yes.

24     Q.    Okay.  And did you write out this statement

**Rosa Bello Melendez**
**May 16, 2024**                                                               **47**

1    yourself?

2              MS. ROMELFANGER:  Objection.  Asked

3    and answered.

4        A.   No.

5        Q.   Did someone write out this statement for

6    you?

7        A.   Yes.

8        Q.   Do you know who wrote out this statement

9    for you?

10             MS. ROMELFANGER:  Objection.  Asked

11   and answered in her prior dep.

12       A.   I think this district attorney -- the

13   public -- the district attorney that was in the room

14   with me.

15             Like I said, it's been years, to recall

16   everything at once.

17       Q.   Okay.  On the first page, that third

18   paragraph, do you see where it says, "On May 24,

19   1990, around 11:30 p.m., Rosa was at home with Jose

20   and her two children watching television.  Three of

21   Jose's friends stopped by, known to Rosa as Lluvia,

22   Fro, and Tino"?

23       A.   Yes.

24       Q.   Okay.  Did you read this paragraph closely

JGS_MAYSONET 3255

1  before you signed it?

2      A.   Yes, I did.

3      Q.   Did you read this whole statement closely

4  before you signed it?

5      A.   Yes, I did.

6      Q.   Sorry.  I'm going to have us shuffling

7  between documents a little bit.

8           But earlier, Ms. Romelfanger showed you a

9  deposition in the case of Jose Juan Maysonet versus

10 Guevara, No. 18CV2342, from October 15, 2021;

11 correct?

12     A.   Yes.

13     Q.   Okay.  So I'm going to turn your attention

14 to page 73, lines 4 through 7, and I'll hand them to

15 you for your convenience.

16          Okay.  Ms. Melendez, in the October 2021

17 deposition were you asked this question, and did you

18 giver this answer?

19          "Question:  Okay.  Do you recall whether

20 you carefully read it after the person wrote it out

21 before you signed it?

22          "Answer:  Probably didn't."

23          Am I reading that correctly?

24     A.   Yes, ma'am.

JGS_MAYSONET 3256

**Rosa Bello Melendez**
**May 16, 2024**                                                    49

```
 1      Q.   Okay.  Were you asked that question, and
 2   did you give that answer?
 3                MR. GORDON RAHE:  Object to form.
 4   Foundation.
 5      A.   Repeat it again?
 6      Q.   Were you asked that question, and did you
 7   give that answer?
 8      A.   Right now at this point?
 9      Q.   No.  During your October 2021 deposition.
10      A.   Yes.
11      Q.   Okay.  And was your answer truthful?
12      A.   Yes.
13      Q.   When you signed this statement, were you
14   aware that it said that this incident where Alfredo
15   Gonzalez came to your house had happened three
16   months earlier, in May 1990?
17                MS. ROMELFANGER:  Objection to form.
18      A.   Okay.  Repeat that again?
19      Q.   Totally.  Okay.
20           When you signed this statement, were you
21   aware that it said that the incident where Alfredo
22   Gonzalez came to your house had happened three
23   months before you signed this statement?
24      A.   No, I did not.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                         **50**

```
 1        Q.   Okay.  So I'm just going to go through all
 2   of that one more time because I know that was a lot
 3   of questions.
 4             You remember a time when Alfredo Gonzalez
 5   and another man came over to your apartment to see
 6   Jose Maysonet; correct?
 7        A.   Yes.
 8                  MR. GORDON RAHE:  Objection to form.
 9   Asked and answered.
10                  MS. ROMELFANGER:  Asked and answered
11   multiple times.
12                  BY MS. PROSSNITZ:
13        Q.   When did they come over to your apartment?
14                  MR. GORDON RAHE:  Asked and answered.
15        A.   When?
16        Q.   Yes.
17        A.   Like I said, I can't recall exactly a date,
18   so -- like I said, it's been years.
19        Q.   Uh-huh.
20        A.   So I can't really give you, offhand, right
21   now, to the date.
22        Q.   But you know it was a few days before Juan
23   was arrested; is that right?
24                  MS. ROMELFANGER:  Objection.  Form.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                              **51**

1   Leading.  Misstates her prior testimony.

2        A.   Yes.

3        Q.   Okay.  I'm going to ask again so that we

4   have it clear for the court reporter.

5        A.   Not a problem.

6        Q.   You know it was a few days before Juan

7   Maysonet was arrested; correct?

8                   MS. ROMELFANGER:  Same objections.

9        A.   Yes.

10       Q.   Did the police ask you about that incident

11  where Alfredo Gonzalez came over to your apartment?

12                  MS. ROMELFANGER:  Asked and answered.

13       A.   Yes.

14       Q.   Okay.  And you told the police that -- the

15  date that they had come to your apartment; is that

16  right?

17                  MS. ROMELFANGER:  Asked and answered.

18       A.   Like I said, it happened in 1990 and we're

19  in 2024, so, like I said, it's been many years.

20       Q.   Okay.  But critically, if you're saying

21  today that the three of them came over to your

22  apartment a few days before Juan Maysonet's arrest,

23  was it the police who told you that this incident

24  happened where they came over to your apartment in

```
 1  May of 1990?

 2                  MS. ROMELFANGER:  Objection to form.

 3  Misstates her prior testimony.

 4      A.   Like I said, it's been years to really --

 5  if we were back in 1990, I would say everything in

 6  here is true because I was there.  I -- it was the

 7  worst time.

 8                  So we're in 2024, so you're asking me to go

 9  back all the way to 1990.  So yeah.

10      Q.   I understand.  I just want to be clear on

11  whether the police are the ones who gave you that

12  date of when the three of them came over.

13                  MS. ROMELFANGER:  Objection to form.

14                  MR. IASPARRO:  Form.

15      A.   Like I said, when they took me to the

16  police station, I can't give you exact date, because

17  it's been that long, so yeah.

18      Q.   Okay.  I'm going to pause and just ask you

19  some questions about yourself, Ms. Melendez.

20      A.   That's fine.

21      Q.   Okay.  How old were you in May of 1990?

22      A.   Really?  You want me to go that far?

23                  I was probably -- what? -- somewhere in my

24  20s.
```

**Rosa Bello Melendez**
**May 16, 2024**                                              **53**

1    Q.   Okay.  And do you remember where you were

2  living in May of 1990?

3    A.   It was Homan Street on the second floor.

4  Like I said, it's been so many places.  It's like --

5  I can't keep track of everything.

6    Q.   Were you living in Chicago?

7    A.   Yes, I was.

8    Q.   Okay.  And who were you living with in May

9  of 1990?

10    A.   I was living with my two daughters and Juan

11  Maysonet.

12    Q.   And what was your relationship with Juan

13  Maysonet in May of 1990?

14            MS. ROMELFANGER:  Objection.  Asked

15  and answered at a previous deposition.

16    A.   Boyfriend and girlfriend.

17    Q.   Were your two daughters also Juan Maysonet's

18  daughters?

19    A.   No.

20    Q.   Okay.  Was the father of your children in

21  the picture during that time?

22    A.   He would come get his daughters on the

23  weekend.

24    Q.   Okay.  But you were primarily the one

JGS_MAYSONET 3261

1  taking care of them?

2       A.   Yes.

3       Q.   Were you living with Juan Maysonet in May

4  of 1990?

5       A.   Yes.

6       Q.   Okay.  And how long had you been living

7  with him?

8       A.   Not even a year and a half.

9       Q.   Okay.  And how old were your daughters at

10  that time, if you remember?

11       A.   I would say 2 and 1.  They were very --

12  they were little, so yeah.

13       Q.   And were you close with your daughters?

14       A.   Now, yes.

15       Q.   Okay.  And at that time when they were

16  really little?

17       A.   No.  Because I was their protector, even

18  though Juan was in the picture.  But it was

19  basically me, yes.

20       Q.   And did you consider yourself a devoted

21  mom?

22       A.   Yes.

23       Q.   At that time, in May of 1990, would you

24  have considered your children the most important

JGS_MAYSONET 3262

**Rosa Bello Melendez**
**May 16, 2024**                                                                    **55**

```
 1  people to you?

 2       A.   Oh, yes.

 3       Q.   And was it your first and foremost priority

 4  to protect them?

 5       A.   Automatically.

 6       Q.   Okay.  I'm going to ask you about some

 7  other relationships, Ms. Melendez.

 8       A.   That's fine.

 9       Q.   Are you still in contact with Juan Maysonet

10  today?

11       A.   Oh, no.

12       Q.   Do you remember when the last time was that

13  you communicated with him?

14            MS. ROMELFANGER:  Objection.  Asked

15  and answered at her last deposition.

16       A.   When my son was born.  When my son was

17  born, I took him to the Cook County jail and let him

18  see his son, and that was the last time I ever saw

19  that man.

20       Q.   Okay.  And how old is your son today?

21       A.   32.

22       Q.   Okay.  So that would have been roughly 32

23  years ago?

24       A.   Basically.
```

JGS_MAYSONET 3263

**Rosa Bello Melendez**
**May 16, 2024**                                                              **56**

1          Q.   Do you know Alfredo Gonzalez, the plaintiff

2     in this case?

3                    MR. GORDON RAHE:  Form.

4          A.   I knew him as -- with Juan.

5          Q.   Okay.  Do you remember the last time you

6     communicated with Alfredo Gonzalez?

7          A.   Oh, my God.  No.

8          Q.   Do you remember a man named Santiago

9     Sanchez with a nickname of Macho?

10                   MS. ROMELFANGER:  Objection.  Asked

11    and answered at her last deposition.

12         A.   The one who killed himself?

13         Q.   Yes.

14         A.   Yeah.

15         Q.   Who was Macho?

16         A.   He was a Latin King.

17         Q.   Was he friends with Juan Maysonet?

18         A.   He was friends with all of them.

19         Q.   Including Juan?  Is that right?

20         A.   Yes.

21         Q.   And do you remember going to Macho's

22    funeral?

23                   MS. ROMELFANGER:  Objection.  Asked

24    and answered at her last deposition.

```
 1      A.    Yes.

 2      Q.    Did you go with Juan?

 3      A.    Yes.

 4      Q.    Do you remember the date of Macho's

 5  funeral?

 6      A.    Oh, my God.  No.

 7      Q.    Are you aware that Macho's funeral took

 8  place on the same day as the Wiley brothers'

 9  shooting?

10            MS. ROMELFANGER:  Objection.  Form.

11      A.    No.

12      Q.    Okay.  I'm going to switch gears a bit.

13            How familiar were you with guns back in May

14  of 1990?

15            MR. GORDON RAHE:  Form.  Objection to

16  form.

17            (Multiple parties speaking.

18  Interruption by the court reporter.)

19            BY MS. PROSSNITZ:

20      Q.    I'm going to ask again so we can have that

21  clear for the record.

22      A.    Okay.

23      Q.    How familiar were you with guns back in May

24  of 1990?
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                              **58**

```
 1      A.    Never held a gun in my life.

 2      Q.    Had you seen guns in May of 1990?

 3      A.    Of course.  I grew up around Latin Kings.

 4      Q.    Do you know what a 9 millimeter gun looked

 5 like in May of 1990?

 6                MR. GORDON RAHE:  Form.

 7      A.    I'm going to probably tell you no.

 8      Q.    Would you have been able to distinguish a

 9 9 millimeter gun from any other type of gun in May

10 of 1990?

11                MR. GORDON RAHE:  Objection to the

12 form.

13      A.    I watch a lot of TV.  Of course I've see

14 different guns.

15            I'm going to probably tell you no.

16      Q.    Okay.  So even though you've seen a lot of

17 different guns on TV --

18      A.    Not just on TV.  In real life, too.  But

19 never held one, so I really don't pay attention what

20 kind of guns are which or which or which.

21      Q.    But am I correct in understanding that you

22 wouldn't have been able to distinguish a 9

23 millimeter gun from another type of gun back in May

24 of 1990?
```

**Rosa Bello Melendez**
**May 16, 2024**                                                            **59**

```
 1              MS. ROMELFANGER:  Objection.  Form.
 2       A.   I probably can.
 3       Q.   You probably can?
 4       A.   Yes.
 5       Q.   You probably can distinguish it today?
 6       A.   No.
 7       Q.   Okay.  But back then, you could have
 8  distinguished it?
 9       A.   Probably then, yes.
10       Q.   Okay.  So I'm going to turn to page 74
11  of -- I think you have that in front of you -- of
12  your October '21 deposition.
13            Oh, it's right there.
14       A.   This one?
15       Q.   Uh-huh.
16       A.   This one here?
17       Q.   Yes.  If you flip it to the other side.
18       A.   Okay.
19       Q.   So let's turn to lines 13 through 16.
20            In this October 2021 deposition, were you
21  asked this question, and did you give this answer?
22            "Question:  Would you be able to
23  distinguish a 9 millimeter from a .38 revolver or
24  any other type of gun?
```

1          "Answer:  No.  Only what I see on Cops on

2   TV."

3              MR. GORDON RAHE:  Objection to form

4   and foundation.  Not impeaching.

5              MS. ROMELFANGER:  And I'm going to

6   object to completeness because there's other

7   testimony that relates to those questions.

8              You can answer, Ms. Melendez.

9          BY MS. PROSSNITZ:

10     Q.   Sorry, Ms. Melendez.  Let me reask that.

11          In the October 2021 deposition, were you

12  asked these questions, and did you give these

13  answers, lines 10 through 16?

14          "Rosa, do you know what a 9 millimeter gun

15  looks like?

16          "Answer:  No.

17          "Question:  Would you be able to

18  distinguish a 9 millimeter from a .38 revolver or

19  any other type of gun?

20          "Answer:  No.  Only what I see on Cops on

21  TV."

22              MS. ROMELFANGER:  Same objection about

23  completeness.

24              MR. GORDON RAHE:  Same objections for

JGS_MAYSONET 3268

```
 1  me as well.
 2       A.   Yes.
 3       Q.   Were you asked those questions, and did you
 4  give those answers?
 5       A.   Yes.
 6       Q.   Were those answers truthful?
 7       A.   Yes.
 8       Q.   So I want to turn back to your time at the
 9  police station in 1990.  I'm going to ask you some
10  questions about your experience there.
11            Do you remember when you went to the
12  police station in 1990?
13       A.   No, I do not.
14       Q.   Okay.  Do you remember when you gave your
15  statement at the police station?
16       A.   The day they took me to the police station.
17       Q.   Okay.  Let's pull the exhibit that's your
18  handwritten statement.  I believe that's Exhibit D,
19  this one.
20       A.   This one here?
21       Q.   Uh-huh.
22            It's says at the top of that statement that
23  it was taken on August 23, 1990, at 2:10 p.m.
24            Does that sound right to you?
```

JGS_MAYSONET 3269

**Rosa Bello Melendez**
**May 16, 2024**                                              **62**

1        A.    I would probably say yes.

2        Q.    Okay.  Did you go to the police station

3   voluntarily?

4        A.    No.

5        Q.    Okay.  How did you go to the police

6   station?

7        A.    The police picked me up at home.

8        Q.    Do you remember any of the police officers

9   who brought you to the police station?

10       A.    I can't recall -- remember nobody's name

11  because, like I said, it happened in 1990.

12       Q.    And then what happened when you arrived at

13  the police station?

14       A.    Oh, they took me to a room.  I sat in a

15  room.  Like I said, the district attorney and a

16  police officer came in, and they started talking to

17  me and basically asked me questions.

18             And basically, at first, in the beginning,

19  I turned around and told them I didn't know nothing.

20  I wasn't getting -- I don't know what was going on.

21  Why was I here?

22             And basically, they turned around and told

23  me about Juan, why he was in jail for.

24             I basically turned around and told them

JGS_MAYSONET 3270

1   that he just asked me to give him what was wrapped

2   up in the plastic, and him and his friends left.

3           After that, I don't recall anything else.

4           They turned around, like, "Oh, I don't

5   believe you.  We can take your" -- you know, they

6   kind of made kind of a threat, if you want to call

7   it that.  "We can take your kids away if you're not

8   telling the truth."

9           And basically, I turned around and told

10  them, You can't do -- I don't care what you do.  Do

11  whatever you needed to do.  But when it comes to my

12  children, do not play with -- that's the one

13  thing -- I don't care.  Anything else -- when it

14  comes to my children, do not play with them.

15      Q.   Do you remember who specifically said, "We

16  can take your kids away"?

17      A.   They were both talking, so...

18           I would say the district attorney.

19      Q.   Okay.  And do you remember what they

20  specifically said in terms of taking your kids away?

21      A.   Basically, just tell the truth, and I did

22  tell the truth.

23      Q.   So did they say something in terms of,

24  like, you need to tell the truth or your kids could

JGS_MAYSONET 3271

```
1   be taken away?

2        A.   Yes.

3        Q.   Okay.  And then am I understanding

4   correctly, in response, that you said, "Do what you

5   need to do"?

6        A.   Basically, because I was getting mad.

7   There was no reason for me to be there.  I didn't

8   know, at the time, what was going on, why was I

9   here.

10       Q.   Did you want to speak with the police at

11  that time?

12       A.   No.  Because, like I said, at the time, I

13  didn't know what was going on, so yeah.

14       Q.   Did you feel scared when you were at the

15  police station?

16       A.   I was more angry because I had to leave my

17  two daughters, and I was pregnant and -- yeah.  So

18  when you're pregnant and -- yeah, you get frustrated

19  and angry.

20       Q.   Okay.  So you were also pregnant at the

21  time?

22       A.   Yes.

23       Q.   Do you remember how many months pregnant

24  you were?
```

```
 1        A.    My son was born in ████ , so I would say
 2    it's sometime in May.
 3        Q.    Did you feel that the police were
 4    pressuring you to cooperate in the investigation?
 5                MS. ROMELFANGER:  Objection.  Asked
 6    and answered in her prior dep.
 7                You can answer.
 8        A.    No.
 9        Q.    Okay.  Let's pull page 65.
10                (Discussion held off the record.)
11                BY MS. PROSSNITZ:
12        Q.    Okay.  So now if we turn to page 65 of your
13    October 2021 deposition, just below.
14        A.    You're talking about this one?
15        Q.    Yes.
16        A.    415?
17        Q.    Yes, exactly.
18        A.    65?
19        Q.    Yes.
20        A.    Okay.
21        Q.    It's the one right in -- that you're
22    holding.
23                Okay.  Let's turn to lines 7 through 10.
24                Ms. Melendez, were you asked this question,
```

1  and did you give this answer?

2        "Question:  Did you ever feel that the

3  police were pressuring you to cooperate with this

4  investigation?

5        "Answer:  Yes."

6     A.   Yes.

7     Q.   Did I read that correctly?

8     A.   Yes.

9     Q.   Okay.  Were you asked that question at your

10  October 2021 deposition, and did you give that

11  answer?

12     A.   Yes.

13           MR. GORDON RAHE:  Objection to form

14  and foundation.

15           MS. ROMELFANGER:  Join.

16           MR. IASPARRO:  Join.

17        BY MS. PROSSNITZ:

18     Q.   Was that answer truthful?

19     A.   Yes.

20     Q.   Okay.  And did any police officers suggest

21  in any way to you that it was in your best interest

22  and your children's best interest if you cooperated

23  with this investigation?

24           MS. ROMELFANGER:  Objection.  Form.

**Rosa Bello Melendez**
**May 16, 2024**                                                                        **67**

 1  Leading.

 2        A.    No.

 3        Q.    Okay.  Let's turn to page 69.  I'll pull it

 4  for you so that you don't...

 5        Okay.  Ms. Melendez, in the October 2021

 6  deposition, were you asked this question, and did

 7  you give this answer?  It's page 69, lines 12

 8  through 22.

 9        "Question:  At any point while you were

10  over at the police station, did any police officer

11  suggest in any way to you that it would be in your

12  best interest and your children's best interest if

13  you cooperated with the investigation?

14        "Answer:  Yes."

15        Did I read that correctly?

16        A.    Yes, you did.

17        Q.    Okay.  Were you asked that question, and

18  did you give that answer?

19        A.    I'm going to probably say it's been -- like

20  I said, if this happened in 1990, I can't tell you

21  yeah, and I can't tell you no.  We're gonna be in

22  between those.

23        Q.    I understand.

24              But just in terms of whether you were asked

1  that question in your October 2021 deposition --

2      A.   I would probably say yes.

3      Q.   Okay.  And was your answer in the October

4  2021 deposition truthful?

5      A.   Yes.

6           Do you want this back?

7      Q.   You can keep that.

8           So you testified earlier that your kids

9  were the most important thing to you; correct?

10     A.   Yes.

11     Q.   Okay.  And would you have told the police

12  anything to protect your kids back in August of

13  1990?

14              MS. ROMELFANGER:  Objection to form.

15              MR. GORDON RAHE:  Form.

16              MS. ROMELFANGER:  You can answer.

17     A.   I would say no.

18     Q.   Did you tell the police what they wanted to

19  hear back in 1990 to protect your kids?

20              MS. ROMELFANGER:  Objection to form.

21              MR. GORDON RAHE:  Join.

22     A.   No.

23     Q.   What -- okay.

24           Do you remember testifying at the --

```
 1              Sorry.  I'm going to ask you some questions
 2    about Alfredo Gonzalez's criminal trial.
 3              Do you remember testifying at the trial of
 4    Alfredo Gonzalez in March of 1992?
 5         A.   I only went to one trial, and that was for
 6    Juan Maysonet.  Otherwise -- and I only had to
 7    testify in front of a judge only one time, so...
 8         Q.   Okay.
 9         A.   After that, I had to kind of let --
10    disappear after that because they tried to have me
11    killed with my son.  So I just basically
12    disappeared.
13         Q.   Uh-huh.  But do you remember -- is the
14    trial that you remember testifying at Juan Maysonet's
15    or Alfredo Gonzalez's?
16                   MS. ROMELFANGER:  Objection.
17    Foundation.
18         A.   Like I said, when I went to court, it was
19    only for one person.  I never went to court for
20    Alfredo or another person.  It was just one.
21         Q.   Okay.  I understand.
22              So you went to testify at one trial?  Is
23    that what you're saying?
24         A.   Yes.
```

JGS_MAYSONET 3277

1      Q.    Okay.  And you don't remember whose trial

2   that was; is that correct?

3      A.    Like I said, it's been years.

4      Q.    Okay.

5      A.    So yeah.

6      Q.    Fair enough.

7           Do you remember meeting with anyone from

8   the state's attorney's office prior to giving your

9   testimony at that trial?

10              MS. ROMELFANGER:  Objection.  Asked

11   and answered at a previous dep.

12      A.    I'm going to probably tell you yeah, but I

13   don't know exactly who.  All I know, that they gave

14   me somebody, like a bodyguard -- they gave me

15   somebody to make sure I didn't get hurt.  And they

16   lied to my family and told my family I was in jail

17   because between Juan and the other two people that

18   got arrested for this -- was trying to have me

19   killed.  That's all I remember.

20           After that, after everything was over and

21   done, I went my way, and I never heard about

22   anything ever since.

23      Q.    Okay.  But do you remember meeting with

24   someone from the state's attorney's office prior to

1   your testimony in that trial?

2        A.   I'm going to probably -- probably yes.

3             MS. ROMELFANGER:  Objection.

4        A.   I'm not sure.  Like I said, it's been

5   years.

6        Q.   Okay.  That's fair.

7             We're going to pull this page,

8   October 15 -- or sorry -- page 15.

9             So Ms. Melendez, in the October 2021

10  deposition, were you asked this question, and did

11  you give this answer, page 50, lines 9 through 14?

12             "Question:  Referring back to Exhibit 1,

13  which was your testimony in the Alfredo Gonzalez

14  trial, do you recall meeting with anyone from the

15  state's attorney's office prior to giving that

16  testimony?

17             "Answer:  No."

18             MS. ROMELFANGER:  Objection.  Not

19  impeaching.

20             BY MS. ROMELFANGER:

21        Q.   Did I read that correctly?

22        A.   If it's on there, I'm gonna probably say

23  yes.

24        Q.   Okay.  And was your answer truthful?

JGS_MAYSONET 3279

```
 1        A.    Yes.

 2        Q.    Did you feel a lot of pressure testifying

 3   at this trial?

 4                MS. ROMELFANGER:  Objection.  Form.

 5                MR. GORDON RAHE:  Form.

 6        A.    I was scared for my life.  I had to make

 7   sure my kids were protected, so yeah.

 8        Q.    Were you scared of testifying at this trial

 9   because you had been threatened?

10        A.    I was scared.  I was worried about my

11   safety, for me and my kids, so it was really

12   nerve-racking, scared.  I didn't know what to

13   expect.  Yeah.

14        Q.    Okay.  Ms. Melendez, have you spoken to any

15   of the lawyers who are representing any of the

16   police officers in this case prior to today's

17   deposition?

18        A.    No.

19        Q.    Okay.  Have you spoken to any of the

20   lawyers representing the city in this case?

21        A.    I would say no.

22        Q.    Okay.  Have you spoken with any of the

23   lawyers sitting here today previously?

24        A.    I don't even know anybody here, so I would
```

JGS_MAYSONET 3280

```
 1  probably say no.

 2       Q.   Okay.

 3       A.   First time meeting everybody, so

 4  basically...

 5            MS. PROSSNITZ:  Okay.  Let's take a

 6  five-minute break.  I might be done.

 7            THE VIDEOGRAPHER:  All right.  The

 8  time is 12:40 p.m., and we're going off the record.

 9            (Recess taken.)

10            THE VIDEOGRAPHER:  The time is

11  12:57 p.m.  We're back on the record.

12            BY MS. PROSSNITZ:

13       Q.   Okay, Ms. Melendez.  I just have a few more

14  questions for you.

15       A.   Not a problem.

16       Q.   Do you remember meeting with an assistant

17  state's attorney in December 2018?

18       A.   Say that again?

19       Q.   Do you remember meeting with an assistant

20  state's attorney in December 2018?

21       A.   I'm not sure.

22       Q.   Okay.  I'm going to provide you with a

23  document that we'll mark as Exhibit E.

24            (Exhibit E, Cook County State's
```

1  Attorney's Office Investigations Bureau

2  Investigative Report, marked for identification.)

3           BY MS. PROSSNITZ:

4     Q.   So this document is entitled "Cook County

5  State's Attorney's Office Investigations Bureau

6  Investigative Report.  It has the Bates Stamp

7  CCSAO 53 through 54.

8           So can you take a minute to review this,

9  and let me know when you're done?

10              MR. GORDON RAHE:  Can you say the

11  Bates again?

12              MS. PROSSNITZ:  Sure.  It's CCSAO 53

13  through 54.

14              MR. GORDON RAHE:  Thank you.

15              MR. IASPARRO:  Do you have another

16  copy of that, Annie?

17              MS. PROSSNITZ:  Oh, yes.

18           BY MS. PROSSNITZ:

19     Q.   And we'll just be focusing on the first two

20  pages.

21     A.   Yeah.  But I just wanted to read the whole

22  thing.

23     Q.   Does this refresh your recollection about a

24  meeting with an assistant state's attorney in

```
 1  December 2018?
 2              MS. ROMELFANGER:  Objection to form.
 3  Foundation.
 4      A.   I would probably say at my home, but I'm
 5  not sure about the dates.
 6      Q.   Okay.  But you remember meeting with an
 7  assistant state's attorney at your home?
 8      A.   I can't recall.
 9      Q.   Okay.  I want to draw your attention to
10  that second page, Bates Stamp CCSAO 54.
11              Do you see where it says, "Point #9"?
12      A.   Point #9?
13      Q.   Uh-huh.  In the second paragraph?
14      A.   Yeah.
15      Q.   And this third sentence, it says,
16  "Ms. Bello Melendez stated that at no time did she
17  ever say she was unwilling to testify and/or not
18  willing to return to Chicago to testify.  Ms. Bello
19  Melendez stated that she is very willing and able to
20  return to Chicago to testify if called upon."
21              Do you see that?
22      A.   Yes.
23      Q.   Okay.
24      A.   But I never said that.  I would never go
```

**Rosa Bello Melendez**
**May 16, 2024**                                                          **76**

 1  back to Chicago.

 2       Q.   Okay.  And then finishing that up, it says,

 3  "Ms. Bello Melendez stated she remembers perfectly

 4  clear what happened that day and, again, is willing

 5  to come to court and testify if called upon."

 6            Do you see that?

 7       A.   Yes.

 8       Q.   Did you tell the assistant state's attorney

 9  that you were very willing and able to return to

10  Chicago if called to testify?

11       A.   I told her I would never return to Chicago.

12       Q.   Okay.  So does this not look accurate to

13  you?

14            MS. ROMELFANGER:  Objection to form.

15       A.   Like I said, I can't tell you yeah.  But

16  anybody that I have spoken to is basically going to

17  say the same answer:  I will never, ever return back

18  to Chicago, Illinois, in no type of term.

19       Q.   Okay.  Understood.

20            Okay.  So earlier in the deposition,

21  Ms. Melendez, you said that Cindy lied to you.

22            What did Cindy lie to you about?

23       A.   Basically, when she showed up at my home,

24  she told me this is the last time that I was going

JGS_MAYSONET 3284

1  to see her, that they just wanted a deposition.

2          This is what you call -- this is what we're

3  doing; right?

4          To do this.  And I just basically turned

5  around and said that I just didn't want to do this

6  anymore.  You know, stop trying to blow up my phone.

7  Stop texting me and -- yeah, basically.

8     Q.   Okay.  Did she lie to you about anything

9  else?

10    A.   She just told me once I do this, I was

11  done.

12    Q.   What do you mean by once you do this?

13    A.   Once I just do whatever I needed to do,

14  this will be over, that I won't be bothered with it

15  anymore.

16    Q.   Okay.

17    A.   And just, basically -- I just want this

18  over and done with.  That's basically...

19    Q.   Okay.  So did she say once you do this

20  deposition --

21    A.   I was done, that I wouldn't be harassed

22  anymore, basically.

23    Q.   Okay.  You mentioned earlier as well that

24  you believed someone was trying to kill you before

1  you testified during that trial in 1992.  Do you

2  remember talking about that?

3      A.   Yes.

4      Q.   Okay.  Do you know who was trying to kill

5  you?

6      A.   I'm going to say Juan's friends because,

7  like I said, between Juan and his friends, they were

8  all Latin Kings.  Okay?

9           And at that time, for me, I had my son.  My

10 son was only two months old.  I was walking down the

11 street.  All I know, I was going to get runned over

12 with my son.  I grabbed my son, and I ran.

13          And then I found out that they're the ones

14 who sent them to hurt me because they didn't want me

15 to testify.

16          So basically, the district attorney -- I

17 explained to them what happened, and they gave --

18 like I said, they gave me somebody to protect me.

19 They stuck me in a hotel, different name.

20          My mother and them was trying to figure out

21 where was I at, and basically, they turned around

22 and told my family I was locked up for the

23 possession of cocaine.

24      Q.   Okay.

JGS_MAYSONET 3286

1      A.    So -- for Juan and his friends not to find

2   me, basically.

3      Q.    How did you find this out, that your --

4   sorry.  Strike that.

5            How did you find this out?

6      A.    How did I find out?  The streets.

7            Remember, I was born and raised in Chicago,

8   Illinois.  I know -- I grew up around nothing but

9   Latin Kings, nothing but gangbangers.

10           So yeah, when it came to that, one day, I

11   decided to contact his mom just to let her know that

12   I did have her grandson.  You know, she was a

13   grandma.

14           And basically, they said they were -- she

15   basically told me that Juan and his friends are

16   going to try to kill you because they're all

17   gangbangers, so I went on the run.  And I did it for

18   so many years, watching my back.  So yeah.

19      Q.    Do you know which of Juan's friends?

20      A.    No.  Like I said, they're all gangbangers.

21   If they want somebody hurt, they will get to you,

22   one way or the other.

23           Until this day, even though Juan is out of

24   prison -- and when I found out, it broke me, yeah.

JGS_MAYSONET 3287

```
1   I was scared because now his son is 32 years old, so
2   it's like -- he wants to get to know his son.  But
3   the first thing that comes out of his mouth was
4   "Where's your mother?"
5           And my son's -- "Why you want my mother
6   for?"
7           So yeah.  So Juan -- my son plays it -- "I
8   don't know where she's at.  I don't know anything
9   about her."  And that's it.
10          But I'm with my son every day, so it's
11  like -- me and my son talk.  And like I told my son,
12  it's his decision if he wants to meet his dad.  It
13  has nothing to do with me.  Just leave me out of it.
14          Because I feel, now that he's released,
15  he's still a danger to me.  And like I said -- and
16  I'll say it to anybody -- before, he tried -- he can
17  come.  If he wants me that bad, he can come get me.
18  But remember, I'm not going to go down easy, either.
19  I'm going to fight.  Okay?
20          So I don't know if he's still in that kind
21  of life.  I don't know anything about him, but it
22  does scare me, yes.
23      Q.  Okay.  Understood.
24          Just because I didn't finish that question,
```

**Rosa Bello Melendez**
**May 16, 2024**                                                      81

```
 1  do you know which of Juan's friends specifically
 2  were trying to kill you?
 3      A.   No, I do not.
 4      Q.   Okay.  I am going to pull a couple pages --
 5  okay.  Pages 24 through 25, lines 24 through 8.
 6      A.   Okay.  So 24.
 7      Q.   Uh-huh.  Starting at line 24.
 8      A.   Okay.
 9      Q.   Okay.  So, Ms. Melendez, at your October
10  2021 deposition, were you asked these questions, and
11  did you give these answers?
12          Line 24.  "Question:  Okay.  So do you know
13  now who it was who tried to run you over?
14          "Answer:  No.
15          "Question.  Do you have a belief as to why
16  someone tried to run you over just prior to your
17  testimony of Alfredo Gonzalez?
18          "Answer:  No."
19          Were you asked those questions, and did you
20  give those answers?
21              MS. ROMELFANGER:  Objection.  Not
22  impeaching.
23      A.   If it's on this paper, I'm going to
24  probably say yeah.
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                 **82**

1      Q.   And were those answers truthful?

2      A.   Yes.

3      Q.   Okay.  Ms. Melendez, do you know who former

4  Chicago Police Detective Reynaldo Guevara is?

5             MR. GORDON RAHE:  Form.

6      A.   No.

7      Q.   Okay.  You testified earlier that you

8  believe it was the district attorney who made the

9  statement about your kids potentially being taken

10  away.

11             Is it possible that Detective Guevara said

12  that as well?

13             MS. ROMELFANGER:  Objection to form.

14             MR. ISAPARRO:  Join.

15      A.   Like I said, I don't know who the detective

16  was in the room with him.  Like I said, this

17  happened in 1990, so to recall everything all at

18  once, it's going to be difficult.

19      Q.   I understand.

20             And you said -- you testified earlier that

21  they presented you with a statement that you signed;

22  is that correct?

23             MS. ROMELFANGER:  Objection to form.

24      A.   Probably have, because it's 1990 now.  Come

**Real Time Court Reporting**
**413.732.1157**

JGS_MAYSONET 3290

**Rosa Bello Melendez**
**May 16, 2024**                                                                                    83

```
 1   on.  It's been a long time.

 2        Q.   Do you remember that statement that I

 3   showed you that was handwritten?  I believe it's

 4   Exhibit D.

 5        A.   D, you said?

 6        Q.   D.

 7        A.   I know she marked it.

 8        Q.   There.

 9        A.   Okay.

10        Q.   Okay.  Do you remember the police and

11   district attorney presenting you this statement?

12                 MR. IASPARRO:  Form.

13                 MS. ROMELFANGER:  Objection.  Asked

14   and answered.  And join form.

15        A.   Yes.

16        Q.   Okay.  And was the police officer who you

17   spoke with at the station Latino?

18        A.   I can't remember.

19        Q.   Okay.  And we've talked a bit about this

20   already, but you've testified you would have done

21   anything to protect your kids.

22        A.   I would do anything to protect my kids, but

23   not to sit up there and lie.  That's one thing.

24   There's no reason -- I'm not going to sit up there
```

```
 1  and protect somebody who did something.  Even though

 2  I'm going to do anything for my kids, there's one

 3  thing I'm not going to do, is sit up there and lie.

 4       Q.   Understood.

 5            Would you have signed a statement to

 6  protect your kids?

 7                 MS. ROMELFANGER:  Objection to form.

 8       A.   Would I sign a statement to protect my

 9  kids?

10                 MS. ROMELFANGER:  Objection to form.

11       A.   I'm going to tell you no.

12       Q.   Okay.  So last few questions.

13            You've testified that Alfredo and another

14  man came to retrieve something wrapped in plastic in

15  July of 1990; is that correct?

16                 MS. ROMELFANGER:  Objection.

17  Misstates her testimony.

18                 MR. GORDON RAHE:  Form.  Asked and

19  answered.

20                 MR. IASPARRO:  Join all those.

21                 MS. ROMELFANGER:  Join.

22       A.   Yes.

23       Q.   And do you remember that time clearly

24  because it was close in time to when Juan was
```

1  arrested that summer?

2          MS. ROMELFANGER:  Asked and answered.

3  Form.  Misstates her prior testimony.

4      A.   Repeat the question?

5      Q.   Do you remember that -- the time of that

6  incident clearly because it was close in time to

7  when Juan was arrested that summer?

8          MS. ROMELFANGER:  Same objections.

9      A.   No.

10     Q.   Okay.  You've -- do you know who the other

11 person that came to your apartment was with Alfredo

12 Gonzalez?

13     A.   Like I said, it's 1990 now, and to remember

14 everybody's faces -- like I said, Cindy showed me

15 two pictures.  One of them was Alfredo, and the

16 other one -- the picture, like I said, it was like a

17 copy.  It wasn't like a real picture where you can

18 really look at it and know who that person is,

19 because in the background, it's so dark.  So yeah.

20     Q.   Okay.  So just to clarify, do you remember

21 who that person was?

22     A.   I do not know his name.

23     Q.   Okay.  Understood.  Thank you,

24 Ms. Melendez.

JGS_MAYSONET 3293

**Rosa Bello Melendez**
**May 16, 2024**                                                      **86**

```
 1        A.    You're welcome.

 2                   MS. ROMELFANGER:  Do you have anything

 3   else?

 4                   MS. PROSSNITZ:  No.

 5                   MS. ROMELFANGER:  Okay.  I have some

 6   follow-up based on that.

 7                        EXAMINATION

 8        BY MS. ROMELFANGER:

 9        Q.    Ms. Melendez, I think you've talked about

10   this quite some time, but we're asking you about an

11   event that occurred 34 years ago; correct?

12        A.    Yes.

13        Q.    Okay.  And you gave a statement to police

14   officers back in August of 1990; correct?

15        A.    Yes.

16        Q.    And you were truthful to the police when

17   you gave that statement?

18        A.    Yes.

19        Q.    Okay.  Is it fair to say that your memory

20   was better back in August of 1990 than it is sitting

21   here 34 years later?

22        A.    Yes.

23                   MS. PROSSNITZ:  Objection to form.

24        BY MS. ROMELFANGER:
```

JGS_MAYSONET 3294

1      Q.   And you also have testified extensively

2   about the testimony you gave in court.

3           Do you recall that testimony today?

4               MS. PROSSNITZ:  Objection to form.

5      A.   Yes.

6      Q.   Okay.  And you were truthful when you gave

7   that testimony in court; correct?

8               MS. PROSSNITZ:  Objection to form.

9   Asked and answered.

10     A.   Yes.

11     Q.   And that was back in -- is it -- I'll

12  represent to you that that was back in 1992.

13          Does that sound correct?

14     A.   Yes.

15     Q.   Okay.  Is it fair to say that your memory

16  was better back in 1992 than it is sitting here 34

17  years later?

18              MS. PROSSNITZ:  Objection to form.

19  Asked and answered.  Leading.

20     A.   Yes.

21     Q.   Do you know, back in 1990, how many times

22  Juan got arrested?

23              MS. PROSSNITZ:  Objection to form.

24  Foundation.

JGS_MAYSONET 3295

**Rosa Bello Melendez**
**May 16, 2024**                                                                    **88**

1      A.    I'm going to say no.

2      Q.    Okay.  So you have no way of knowing,

3   sitting here today, whether or not he was actually

4   arrested multiple times in 1990?

5           MS. PROSSNITZ:  Objection to form.

6   Mischaracterizes her testimony.

7      A.    I would say yes.

8      Q.    Okay.  Yes that he was, or yes, you don't

9   know?

10          MS. PROSSNITZ:  Objection to form.

11  Compound.

12     A.    No.

13     Q.    Do you know if Juan was actually arrested

14  both in July and August of 1990?

15          MS. PROSSNITZ:  Objection to form.

16  Compound.

17     A.    I would probably say I don't know.

18     Q.    Okay.  And you mentioned you're a little

19  nervous here today; correct?

20     A.    Yes.

21          MS. PROSSNITZ:  Objection to form.

22          MS. ROMELFANGER:  That might be all I

23  have.  I'll let the other attorneys ask you

24  questions while I check my notes.

JGS_MAYSONET 3296

```
 1                    THE WITNESS:  That's fine.

 2                    MS. ROMELFANGER:  Thank you.

 3                         EXAMINATION

 4            BY MR. GORDON RAHE:

 5       Q.   Hi, Ms. Bello.  Austin Rahe again.

 6            I think you had said that by the time that

 7  Mr. Maysonet was arrested for the murder, you had

 8  been living with him for like a year and a half.  Is

 9  that right?

10                    MS. PROSSNITZ:  Objection to form.

11       A.   Yes.

12       Q.   Okay.  How many times was Mr. Maysonet

13  arrested during the time frame that you were living

14  with him?

15                    MS. PROSSNITZ:  Objection to form.

16  Asked and answered.

17       A.   From the time that we were together?

18       Q.   Well, actually, let's go back.

19            Were you with Mr. Maysonet prior to living

20  with him?  Were you dating him?

21                    MS. PROSSNITZ:  Objection to form.

22       A.   He would just come to the house, and we

23  would just hang out in the beginning, and then he

24  started spending nights, and that was about it.
```

1     Q.   Okay.  So about how long before you moved

2   in with him did you, like, sort of have that

3   relationship you just explained with him?

4                  MS. PROSSNITZ:  Objection to form.

5     A.   I would say two months after we got

6   together, even though we were just seeing each other

7   at the time.  We were just hanging out.  But then

8   after that, the relationship started to get closer,

9   so then he decided to move in with me.

10     Q.   Okay.  So that was about two months before

11   you guys had moved in together?  Is that what you're

12   saying?

13                  MS. PROSSNITZ:  Objection to form.

14     A.   Yeah.

15     Q.   So that's, you know, getting close to two

16   years, I guess, that you guys were kind of together

17   before --

18     A.   Yeah.

19     Q.   -- he was arrested for the murder?

20                  MS. PROSSNITZ:  Objection to form.

21     A.   Yeah.

22     Q.   Okay.  During that time frame, do you know

23   how many times he was arrested by police?

24                  MS. PROSSNITZ:  Objection to form.

JGS_MAYSONET 3298

**Rosa Bello Melendez**
**May 16, 2024**                                              91

```
 1  Asked and answered.
 2      A.   That I know of, he got arrested one time
 3  for marijuana, possession of marijuana.
 4      Q.   Okay.  That you remember?
 5      A.   Yeah.
 6      Q.   Okay.
 7      A.   That was it.
 8      Q.   And do you know if there were any other
 9  times during that time frame we're talking about
10  where he had otherwise been to the police station?
11      A.   No.
12      Q.   Okay.
13            MS. PROSSNITZ:  Objection to form.
14            BY MR. GORDON RAHE:
15      Q.   Is it possible that Mr. Maysonet was
16  arrested more times that you just don't recall today
17  during that time frame that we were just discussing?
18            MS. PROSSNITZ:  Objection to form.
19  Foundation.  Calls for speculation.
20      A.   Like I said, he was a gangbanger, so it's
21  like -- we wasn't always together, so I can't give
22  you a straight answer on that.
23      Q.   Okay.  And I think you had testified that
24  your son was born in --
```

**Rosa Bello Melendez**
**May 16, 2024**                                                              **92**

1       A.   April 13, 1991.

2       Q.   Oh, 1991.   Okay.

3       A.   Uh-huh.

4       Q.   Never mind.

5                MR. GORDON RAHE:  All right.  That's

6   all I have.

7                MR. IASPARRO:  I don't have anything.

8                MS. PROSSNITZ:  I'm sorry.  Could we

9   take like a two-minute break?  I might have recross.

10               MS. ROMELFANGER:  Sure.

11               THE VIDEOGRAPHER:  The time is

12  1:19 p.m.  We're going off the record.

13               (Recess taken.)

14               THE VIDEOGRAPHER:  The time is

15  1:23 p.m., and we're back on the record.

16                    EXAMINATION

17       BY MS. PROSSNITZ:

18       Q.   Okay, Ms. Melendez.  I promise we're almost

19  done.

20            Do you remember talking to an attorney

21  named Jennifer Bonjean in June of 2017?

22               MR. GORDON RAHE:  Objection to form.

23       A.   What's the name?

24       Q.   Jennifer Bonjean.

**Real Time Court Reporting**
**413.732.1157**

JGS_MAYSONET 3300

```
 1        A.    A lawyer?

 2        Q.    Yes, a lawyer.

 3        A.    Is it for Juan Maysonet?

 4        Q.    Yes.  Do you remember talking to a lawyer

 5   for Juan Maysonet named Jennifer Bonjean in 2017?

 6        A.    When I went to Worcester?

 7              I went to Worcester for something like

 8   this, but she was there for Juan.

 9        Q.    Do you remember talking to her on the phone

10   in 2017?

11        A.    '17.  I'm going to probably say -- probably

12   yeah, because she asked me --

13              Oh, my God.  The conversation is, like,

14   really -- 2017.  It's kind of a little distance, but

15   I know I'd spoken to somebody, and asked me was I

16   okay, was I -- if I have any questions.  If Juan

17   tries to get ahold of me or anything, just to let her

18   know.

19              And basically the conversation that I had

20   was with my son.  And basically, when my son turned

21   around and told me that he's spoken to Juan's

22   lawyer -- basically, he was supposed to go to

23   New York and sign some papers because his father was

24   going to give him money or whatever the situation may
```

JGS_MAYSONET 3301

**Rosa Bello Melendez**
**May 16, 2024**                                                                94

1  be.

2          Basically, I'm gonna probably say yeah, I

3  did have a conversation with her, but I don't know

4  what the -- I can't remember what, really, our

5  conversation was about.

6          Basically, I just told my son, "Please

7  don't tell her anything about me.  I don't want to be

8  involved.  If your dad's free, more power to the man.

9  I just don't want this man to stalk me."  That's

10  basically it.

11     Q.   But in your conversation -- if you remember

12  having this conversation with Juan Maysonet's lawyer

13  in 2017, would you have been truthful in that

14  conversation?

15               MS. ROMELFANGER:  Objection.  Form.

16               MR. GORDON RAHE:  Foundation.

17               MR. IASPARRO:  Join.

18     A.   I would probably say yeah.

19     Q.   So Mr. Rahe asked you some questions about

20  the time frame of Juan Maysonet's arrests when you

21  were dating.

22          Do you remember those questions?

23     A.   Right now?

24     Q.   Yes.

1       A.    Yes, I do.

2       Q.    Okay.  And you testified that he was

3   arrested for marijuana during the time that you were

4   together; is that right?

5       A.    That I know of at the time, yes.

6       Q.    Okay.  And you've also testified today that

7   Juan was arrested in July of 1990; is that correct?

8       A.    If it's in the paperwork, I would say yes.

9       Q.    Okay.  And that was a couple days after

10  Alfredo Gonzalez came to your house and retrieved

11  something wrapped in plastic; is that correct?

12              MS. ROMELFANGER:  Objection to form.

13  Asked and answered multiple times at this point.

14              MR. IASPARRO:  Join.

15      A.    Yes.

16              MS. PROSSNITZ:  Okay.  Thank you.  No

17  further questions.

18              THE WITNESS:  Yous guys really play

19  hardball.

20              THE VIDEOGRAPHER:  No one has any more

21  questions?

22              MS. ROMELFANGER:  Can we just take a

23  quick break, really quick?

24              THE VIDEOGRAPHER:  Sure.

JGS_MAYSONET 3303

```
 1                 MS. ROMELFANGER:  Thanks.  Sorry.

 2                 THE VIDEOGRAPHER:  The time is

 3   1:27 p.m., and we're going off the record.

 4                 (Recess taken.)

 5                 THE VIDEOGRAPHER:  The time is

 6   1:38 p.m., and we're back on the record.

 7                 MS. ROMELFANGER:  I don't have any

 8   further questions.  I don't know if anybody else --

 9                 MR. GORDON RAHE:  No questions from the

10   city.

11                 MR. IASPARRO:  None from the ASA

12   defendants.

13                 MS. PROSSNITZ:  We just have one

14   logistical question, Ms. Melendez.

15                 If we go to trial in this case, will

16   you travel to Chicago to testify if we paid for

17   travel costs?

18                 THE WITNESS:  No.

19                 THE VIDEOGRAPHER:  All right.  Are we

20   ready to conclude?

21                 MR. GORDON RAHE:  I think so.

22                 MS. PROSSNITZ:  Yes.

23                 THE VIDEOGRAPHER:  This concludes

24   today's deposition.  The time is 1:38 p.m., and we're
```

JGS_MAYSONET 3304

**Rosa Bello Melendez**
**May 16, 2024**                                                                97

```
1   going off the record.

2                  (The court reporter requested the

3   transcript orders to be put on the record.)

4                  MS. ROMELFANGER:  We'll order, yeah.

5   PDF is fine.

6                  (Deposition concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Rosa Bello Melendez**
**May 16, 2024**                                                                98

 1            I, Kristen C. Krakofsky, court reporter and

 2   notary public in and for the Commonwealth of

 3   Massachusetts, certify:

 4            That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6            That the testimony of the witness, the

 7   questions propounded, and all objections and

 8   statements made at the time of the examination were

 9   recorded stenographically by me and were thereafter

10   transcribed;

11            That the foregoing is a true and correct

12   transcript of my shorthand notes so taken.

13            I further certify that I am not a relative

14   or employee of any of the parties, nor am I

15   financially interested in the action.

16            I declare under penalty of perjury that the

17   foregoing is true and correct.

18            Dated this 29th day of May, 2024.

19   _____

20   Kristen Krakofsky, Notary Public

21   My commission expires October 25, 2024.

22

23

24

**Real Time Court Reporting**
**413.732.1157**

JGS_MAYSONET 3306

**Rosa Bello Melendez**
**May 16, 2024**                                                                          **99**

```
 1              DISCOVERY DEPOSITION

 2  WITNESS:  Rosa Bello Melendez

 3  DATE:     May 16, 2024

 4  CASE:     Alfredo Gonzalez

 5            vs.

 6            Reynaldo Guevara, et al.

 7

 8  DISTRIBUTION TO COUNSEL:  The original signature

 9  page/errata sheet was sent to Ms. Romelfanger to

10  obtain signature from the deponent.  When signed,

11  please attach to the original deposition transcript.

12

13  WITNESS INSTRUCTIONS:  After reading the transcript

14  of your deposition, please note any change or

15  correction and the reason for it on the errata sheet.

16  DO NOT make any notations on the transcript itself.

17  Use additional sheets if necessary.

18

19  SIGN AND DATE THE ERRATA SHEET and return it, along

20  with the transcript, to Ms. Romelfanger.

21

22

23

24
```

JGS_MAYSONET 3307

**Rosa Bello Melendez**
**May 16, 2024**                                                                   **100**

```
1                        ERRATA SHEET

2              I, Rosa Bello Melendez, hereby certify

3    under the pains and penalties of perjury that I have

4    read the foregoing transcript of my testimony and

5    further certify that said transcript is a true and

6    accurate record of my testimony with the exception of

7    the corrections, additions, and/or deletions noted

8    below.

9    PAGE        LINE            CORRECTIONS, ADDITIONS, AND/OR

10                               DELETIONS

11   _____       _____           _____

12   _____       _____           _____

13   _____       _____           _____

14   _____       _____           _____

15   _____       _____           _____

16   _____       _____           _____

17   _____       _____           _____

18   _____       _____           _____

19

20              Signed under the pains and penalties of

21   perjury this _____ day of _____, 2024.

22

23                               _____

24                                    Rosa Bello Melendez
```

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 39

jgs 1

RE: INVESTIGATION (SHOOTING DEATHS OF TORRENCE AND KEVIN WILEY)

S T A T E M E N T

OF

JOSE MAISONET,

taken in an interview room, 2nd floor, Area 5 Violent Crimes Headquarters,

5555 West Grand Avenue, Chicago, Cook County, Illinois, on Thursday, August 23,

1990, at the hour of 9:28 a.m.

PRESENT:   Mr. Frank DiFranco,
           Assistant State's Attorney.

           Det. Fred Montilla, #16410,
           Area 5 Violent Crimes.

Reported By:  Joseph A. Szybist, CSR.
BOOK NO. 9008-23

-------------------------------------------------------------

MS. DIFRANCO:  Let the record reflect that we are in an interview room at

Area 5 Violent Crimes.  Today's date is August 23, 1990.  The time is 9:28 a.m.

Present in the room with me, Assistant State's Attorney Frank DiFranco are

Detective Frank Montilla; the court reporter; and Jose Maisonet.  We are here

to take the statement of Jose Maisonet concerning the investigation of the

shooting deaths which occurred on May 25, 1990, at 3428 North Avenue, Chicago,

Illinois.

BY MR. DIFRANCO:

     Q     Now, I talked to you earlier and explained that I am an Assistant

State's Attorney, a lawyer working with the police and not your lawyer, is

that correct?

     A     Yes.

     Q     And before we spoke, I advised you of your consitutional rights,

is that correct?

-1-

JGS_MAYSONET 02537

A       Yes.

Q       I am going to advise you of your rights again.

        Do you understand you have a right to remain silent?

A       Yes.

Q       Do you understand that anything you say can be used against you in a court of law?

A       Yes.

Q       Do you understand you have a right to talk to a lawyer and have him present with you while you are being questioned?

A       Yes.

Q       Do you understand if you cannot afford to hire a lawyer, one will be appointed by the court to represent you before any questioning if you wish one?

A       Yes.

Q       Understanding these rights, do you wish to talk to us now?

A       Yes.

Q       On May 20, 1990, at approximately 12:45 p.m. where were you?

A       Home.

Q       Where do you live?

A       1302 North Homan.

Q       Did anything unusual happen at that time?

A       Yes.  Lluvia came to my house.  He told me that if I can hide a pistol for him.

Q       What did you say to Lluvia?

A       I told him I can hide the pistol for you, but you can go to get it back as soon as possible.

Q       What did Lluvia say then?

A       He said, don't worry about it.  I will pick it up as soon as possible.

-2-

JGS_MAYSONET 02538

jas 3

Q    What kind of pistol or gun did Lluvia give?

A    .9 millimeter.

Q    On May 24, 1990, about 11:30 p.m. to 12:00 p.m., where were you?

A    Home.

Q    What if anything happened about that time?

A    Lluvia, Fro, Tino came to my house.

Q    All right.  Now, I ask you to look at Exhibit One.  Can you please identify who that is in this picture?

A    Lluvia.

Q    And I will ask you to look at Exhibit Two.  Can you please tell us who is in that picture?

A    Fro.

Q    Do you know Fro by any other names?

A    Christopher.  I forget his last name.

Q    Hernandez?

A    Yeah, Hernandez.

Q    Okay.  And do you know what Tino's real name is?

A    Tino Cruz.

Q    Are these individuals the member of any gang?

A    Latin Kings.

Q    Were you a member of the Latin Kings?

A    I was a member.

Q    What happened when Lluvia and Tino came over?

A    They came over that night and they told me they needed the pistol.

Q    What did they say they needed the pistol for?

A    They got the two guys on Drake and North Avenue waiting for dope.

Q    What Lluvia wearing that evening?

-3-

**JGS_MAYSONET 02539**

jgs 4

A       A black hooded sweat shirt.

Q       What significance does it have when a Latin King wears a black hooded sweat shirt?

A       Kill somebody, rob somebody or rob a car.

Q       All right.  And what were they going to do that evening?

A       What they were going to do that evening is they were going to go to the two guys that were waiting for ~~dope.~~ something.  *ED*  *J.J.M.*

Q       When you left, who drove?

A       I drove.  Lluvia was in the front passenger's side.

Q       Where was Fro?

A       In the back of Lluvia.

Q       Where was Tino?

A       In my back, in the back behind the driver's seat.

Q       Who had the gun at that time?

A       Lluvia.

Q       Where did you go?

A       I go -- I took Homan to Potomac, Potomac all the way to St. Louis, St. Louis all the way to North Avenue, North Avenue to Drake and parked in the alley.

Q       When you parked in the alley, what happened then?

A       Lluvia got out of the car.  He put the hood on his head and put the front seat front -- to the front, Fro came out of the car and Tino came out of the car.

Q       Was anyone else around at that time?

A       Two guys.

Q       Where were those two guys?

A       By the corner.

-4-

JGS_MAYSONET 02540

jas 5

Q     Okay.  Where was the gun at this time?

A     Lluvia got the gun in his front pocket.

Q     Okay.  What did Lluvia, Fro and Tino do then?

A     They started walking towards the guys.

Q     What happened next?

A     They waited, they were talking about five minutes and then the shooting happened, shot about five to six times.

Q     What did you see when you heard the five or six shots?

A     I looked, and when I looked, the two guys was on the floor laying down, and Lluvia had -- had the .9 millimeter in his hand pointing it at the guy to see if he was going to move or not.

Q     What happened next?

A     And then when he didn't see *them* ~~no~~ move, he started walking towards my car with the pistol in his hand.

*I.D. ✓ J.J.M.*

Q     Where was Tino and Fro?

A     They started walking towards my car too.

Q     All right.  And what happened then?

A     And they went inside the car.  So then I drive all the way to 1302 North Homan.

Q     What happened when you got back home?

A     When I got back home, I got out of the car.  Lluvia jumped in the driver's side and he left with the car, *and the gun. I.D. ✓ J.J.M.*

Q     Approximately what time was it when Lluvia shot the two men?

A     About 12:30.  I didn't have no watch.  About 12:30.

Q     All right.  When did you next seet Lluvia that day?

A     I seen Lluvia that day at 11:00 a.m.

Q     Where did you see Lluvia?

-5-

JGS_MAYSONET 02541

jas 6

A    At Lemoyne and Spaulding.

Q    What if anything did Lluvia say to you?

A    I killed to black motherfuckers.

Q    What happened next?

A    Then they told me, you are not going to say nothing, right?  I said, no, I wasn't going to say nothing.  They said, keep it under your hat. Keep my mouth shut.

Q    On August 16, 1990, about 10:00 p.m., where were you?

A    Home.

Q    What if anything happened then?

A    Lluvia, Fro, Tino, Cisco, King, they came out to my house.

Q    What happened when they came to your house?

A    They put a .9 millimeter  to my head.

Q    Who put the .9 millimeter to your head?

A    King.

Q    What did he say?

A    You know about the two murders.  If you talk, we're going to put you six feet under.    *ce* JP *Afm* J.J.m.

Q    Did anyone for or threaten you to make this statement?

A    No.

Q    Are you giving this statement freely and voluntarily?

A    Uh-huh, yes.

Q    How have you been treated by the police?

A    Good.

Q    How have you been treated by myself?

A    Good.

Q    Has anyone made any promises to you for your statement?

-6-

JGS_MAYSONET 02542

jas 7

A    No.

BY MR. DIFRANCO:  It is now 9:38 a.m., and this concludes the statement

of Jose Maisonet.

------------------------------------------------------------

WITNESSES TO SIGNATURE:

-7-

**JGS_MAYSONET 02543**

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 40

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4

5

6       JOSE JUAN MAYSONET vs. REYNALDO GUEVARA, et al.

7

8                    Case No. 18 CV 2342

9

10

11          VIDEOTAPED VIDEOCONFERENCE DEPOSITION

12                   OF JOSEPH SZYBIST

13

14

15                    ON BEHALF OF THE

16         INDIVIDUAL POLICE OFFICER DEFENDANTS

17

18

19

20                    JUNE 9, 2021

21

22

23

24

JOSEPH SZYBIST, 06/09/2021

Page 2

```
 1              I N D E X
 2                                        PAGE
 3  WITNESS
 4  For the Individual Police Officer Defendants:
 5  JOSEPH SZYBIST
 6      Examination by Mr. Brueggen............  7
 7      Examination by Ms. Bonjean ............ 37
 8
 9
10             E-X-H-I-B-I-T-S
11  No.    Description          Marked/Referenced
12
13  1      8-23-90 Statement of Jose Maysonet
14         CCSAO 754-760 ......................  25
15  2      Polaroid Photograph of Jose Maysonet,
16         CCSAO 1473-1474 ....................  33
17
18
19
20
21
22
23
24
```

Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4
 5  JOSE JUAN MAYSONET,              )
 6                                   )
 7           Plaintiff,             )
 8                                   )
 9  vs.                             ) No. 18 CV 2342
10                                   )
11  REYNALDO GUEVARA, et al.,        )
12                                   )
13           Defendants.            )
14
15
16    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JOSEPH
17  SZYBIST, sworn and examined on behalf of the
18  individual Police Officer Defendants on June 9, 2021,
19  before RUTH S. MORRIS, an Illinois Certified Shorthand
20  Reporter, commencing at 1:06 p.m.
21
22
23
24
```

Page 4

```
 1  APPEARANCES:
        FOR THE PLAINTIFF:
 2          STEVEN A. GREENBERG, LTD.
            53 West Jackson Boulevard, Suite 1260
 3          Chicago, IL  60604
            By: Steven A. Greenberg   (via Zoom)
 4          (312) 879-9500
            steve@greenberged.com
 5      and
            BONJEAN LAW GROUP, PLLC
 6          750 Lexington Avenue, 9th Floor
            New York, NY  10022
 7          By:  Jennifer Bonjean    (via Zoom)
                 Ashley Cohen        (via Zoom)
 8          (718) 875-1850
            jennifer@bonjeanlaw.com
 9
        FOR THE COOK COUNTY DEFENDANTS:
10          COOK COUNTY STATE'S ATTORNEY'S OFFICE
            50 West Washington Street, Suite 500
11          Chicago, IL  60602
            By Andrew Horvat
12          (312) 603-3362
            andrew.horvat@cookcountyil.gov
13
        FOR THE DEFENDANT CITY OF CHICAGO:
14          ROCK FUSCO & CONNELLY, LLC
            321 North Clark Street, Suite 2200
15          Chicago, IL  60654
            By:  Theresa Carney   (via Zoom)
16          (312) 494-1000
            tcarney@rfclaw.com
17
        FOR THE INDIVIDUAL POLICE OFFICER DEFENDANTS:
18          THE SOTOS LAW FIRM, P.C.
            141 West Jackson Boulevard, Suite 1240A
19          Chicago, IL  60604
            By:  David A. Brueggen  (via Zoom)
20          (630) 735-3300
            dbrueggen@jsotoslaw.com
21
        FOR THE DEFENDANT GUEVARA:
22          LEINENWEBER BARONI & DAFFADA, LLC
            120 North LaSalle Street, Suite 2000
23          Chicago, IL  60602
            By:  Michael Schalka    (via Zoom)
24          (866) 786-3705
            michael@ilesq.com
```

Page 5

```
 1  APPEARANCES:  (Cont.)
 2  FOR THE DEFENDANT DIFRANCO:
    HINSHAW CULBERTSON
 3    150 North Franklin Street, Suite 2500
      Chicago, IL  60606
 4    By:  V. Brette Bensinger   (via Zoom)
      (312) 704-3027
 5    bbensinger@hinshawlaw.com
 6  ALSO PRESENT:
      Haley Coolbaugh, Paralegal
 7    Brett Schatzle, Legal Videographer
      Ruth S. Morris, Certified Shorthand Reporter
 8
 9            * * * * * * *
10
11      THE VIDEOGRAPHER:  This is the beginning
12  of Media Unit 1, and we are now on the video
13  record at 1:06 p.m.  This is the videotaped
14  videoconference deposition of Joseph Szybist
15  taken on June 9th, 2021.  This deposition is
16  being taken on behalf of the Defendant in the
17  matter of Jose Juan Maysonet versus Reynaldo
18  Guevara.  The Case Number is 18 CV 2342 filed
19  in the United States District Court for the
20  Northern District of Illinois, Eastern
21  Division.
22      My name is Brett Schatzle, legal
23  videographer representing Urlaub Bowen &
24  Associates with offices at 20 North Clark
```

JOSEPH SZYBIST, 06/09/2021                                    Page 6..9

Page 6

1   Street, Suite 600, Chicago, Illinois.  The
2   court reporter today is Ruthie Morris, also of
3   Urlaub Bowen & Associates.
4        Counsel, please identify yourselves for
5   the video record and the parties which you
6   represent.
7        MS. BONJEAN:  Jennifer Bonjean,
8   B-o-n-j-e-a-n, on behalf of the Plaintiff, Jose
9   Maysonet, also present I believe is my associate,
10  Ashley Cohen, and paralegal Haley Coolbaugh,
11  C-o-o-l-b-a-u-g-h, to assist with documents if we
12  need to.
13       MR. BRUEGGEN:  Good afternoon.  Dave
14  Brueggen on behalf of the Defendant Officers.
15       MS. CARNEY:  Good afternoon.  Theresa
16  Carney, C-a-r-n-e-y, on behalf of the Defendant
17  City of Chicago.
18       MS. BENSINGER:  Brette Bensinger on behalf
19  of Defendant DiFranco.
20       MR. SCHALKA:  Good afternoon.  Michael
21  Schalka on behalf of Defendant Guevara.
22       MR. HORVAT:  Good afternoon.  Andrew
23  Horvat, H-o-r-v-a-t, on behalf of the deponent,
24  Mr. Joseph Szybist.

Page 7

1        THE VIDEOGRAPHER:  Will the court reporter
2   please swear in the witness.
3        THE COURT REPORTER:  We are going on the
4   record now.  My name is Ruthie Morris, CSR No.
5   2322.  I will ask all counsel to stipulate on
6   the record that this deposition is being taken
7   pursuant to Amended Illinois Supreme Court Rule
8   206(h) and that the court reporter will
9   administer the oath to the witness remotely.
10       MS. BONJEAN:  Plaintiff agrees.
11       MR. BRUEGGEN:  Defendant officers agree.
12       MS. CARNEY:  Defendant City agrees.
13       MS. BENSINGER:  Defendant DiFranco agrees.
14       MR. SCHALKA:  Defendant Guevara agrees.
15            JOSEPH SZYBIST,
16  of lawful age, being sworn and examined on behalf of
17  the Chicago Police Officer Defendants, testified as
18  follows:
19            EXAMINATION
20  QUESTIONS BY MR. BRUEGGEN:
21       Q   Good afternoon, Mr. Szybist.  Could you
22  please state your full name for the record?
23       A   Joseph Szybist, S-z-y-b-i-s-t.
24       Q   Mr. Szybist, have you ever given a

Page 8

1   deposition before?
2        A   Yes.
3        Q   So, you're generally familiar with the
4   rules.  If you could wait until I'm done with my
5   question before you pose an answer, and likewise
6   I'll wait until you're done answering before posing
7   a new question so the court reporter can get down
8   everything that's said, okay?
9        A   Okay.
10       Q   If at any time you need to take a break,
11  just let me know.  You need to talk to your attorney,
12  you need to use the bathroom or anything, just let
13  me know.  I just ask if there's a question pending
14  you answer the question and then we can take a
15  break, okay?
16       A   Okay.
17       Q   Also, I need all your answers to be out
18  loud and oral.  If you use uh-huh or huh-uh I may
19  follow up with, "Is that a yes," or "Is that a no."
20  If you shake your head or nod your head, I may follow
21  up.  That's just so we have a clear record, okay?
22       A   Okay.
23       Q   Finally, if there's any question I pose
24  or any other attorney poses that you don't hear

Page 9

1   or doesn't make sense to you or it gets cut off by
2   the internet, let us know and we will rephrase it or
3   restate it.  If you answer a question, we will assume
4   you understood it.  Is that fair?
5        A   That's fair, yes.
6        Q   And since we're doing this deposition via
7   zoom, there are some questions I wanted to
8   ask.  Is there anybody else present in the room with
9   you right now?
10       A   No, there is not.
11       Q   Do you have any documents with you that are
12  related to this deposition?
13       A   Yes, I do.
14       Q   And what documents do you have with you,
15  sir?
16       A   The typed statement of Jose Maysonet.
17       Q   Do you have any other documents with you?
18       A   That's the only thing I have.
19       Q   And if you could just let us know if you
20  are referring to that typed statement that's in
21  front of you to answer any question, if you could
22  just let us know what you're looking at.  Since we're
23  not in the same room we might not be able to see
24  that you're referring to a document.  Okay, sir?

JOSEPH SZYBIST, 06/09/2021                                    Page 10..13

Page 10

1   A  Yes.
2   Q  Did you review any documents in preparation
3   for this deposition?
4   A  I looked at this statement.
5   Q  Did you review any other documents besides
6   the typed statement?
7   A  No.
8   Q  And have you read or seen any media coverage
9   about Mr. Maysonet and him being released from prison
10  or filing a lawsuit?
11  A  No.
12  Q  Mr. Szybist, how old are you today?
13  A  Sixty-eight.
14  Q  In what city do you reside?
15  A  Naperville, Illinois.
16  Q  Who resides there with you?
17  A  My wife.
18  Q  What's the highest level of education that
19  you've obtained?
20  A  Went to a junior college and then went to
21  a court reporting school.
22  Q  Did you obtain any type of Associate's
23  Degree from the junior college?
24  A  I think I did.

Page 11

1   Q  And what was that Associate's degree in?
2   A  It was business administration,
3   accounting, general subjects.
4   Q  Do you recall when you obtained that
5   degree?
6   A  Well, I went to junior college right out
7   of high school.  And then six months later I went
8   into the Air Force Reserves and did six months
9   active duty, so my junior college was broken up.
10  Did six months active duty, came back, did some
11  other work, and then I went back to school part-time,
12  back and forth, and that's where I left off, that's
13  where I finished it.
14  Q  How long were you in the military, sir?
15  A  I was in the Air Force Reserves for six
16  years, and I was in the 33rd Brigade Army, Judge
17  Advocate General for two years.
18  Q  When were you last either with the Air
19  Force Reserves or in JAG?
20  A  The Air Force was 1976, and the JAG Corps
21  was like '81, '82, '83, somewhere in that area, a
22  couple of years.
23  Q  I believe you also mentioned you went to
24  court reporting school, did you say?

Page 12

1   A  That is correct.
2   Q  Where did you go to court reporting school?
3   A  Chicago College of Commerce.
4   Q  Did you graduate or complete that program?
5   A  Yes, I did.  I became certified and
6   completed the program at Chicago College of Commerce.
7   Q  When did you complete that program to
8   become a court reporter?
9   A  That was in '76.
10  Q  After completing that course, did you have
11  to take a test to become a certified court reporter?
12  A  Yes, I did.  I took the Illinois court
13  reporter examination.
14  Q  Did you pass that examination and become
15  licensed as an Illinois court reporter?
16  A  Yes, I did.
17  Q  What year did you become licensed as an
18  Illinois court reporter?
19  A  In 1976.
20  Q  Are you currently employed, sir?
21  A  No, I'm not.
22  Q  When were you last employed?
23  A  I was last employed full time in 2007.
24  Q  Who were you last employed with?

Page 13

1   A  The State's Attorney's Office of Cook
2   County.
3   Q  How long were employed with the Cook
4   County State's Attorney's Office?
5   A  From 1977 to 2007.
6   Q  What did you -- what was your position at
7   the Cook County State's Attorney's Office?
8   A  I was a court reporter.
9   Q  And can you give us a general idea what
10  your duties were as a court reporter at the Cook
11  County State's Attorney's Office?
12  A  As a court reporter, we took -- made
13  verbatim transcripts of all legal proceedings, and
14  the proceedings we did were depositions.  We did
15  depositions for like the Child Support Division,
16  Juvenile.  We did that for the State's Attorneys,
17  the Public Defenders, private attorneys.
18      We also covered the Special Grand Jury.
19  We also covered the full time regular Cook County
20  Grand Jury.  And then we also covered assignments
21  for the Felony Review Unit, and then various other
22  units of the office that required court reporting
23  procedures.
24  Q  What type of assignments did you cover for

JOSEPH SZYBIST, 06/09/2021                                    Page 14..17

Page 14

1  the Felony Review Unit?

2      A   Our assignment was to take court reported

3  statements.

4      Q   Sir, during your thirty years with the

5  Cook County State's Attorney, did you have any

6  supervisory positions or were you just a court

7  reporter the entire time?

8      A   I was a court reporter for ten years, and

9  then I became the supervisor of the office.

10     Q   Do you recall what year you became the

11 supervisor of the office?

12     A   Somewhere around 1989, in that range.

13     Q   When you were the supervisor of the

14 office, did you still do court reported statements?

15     A   Yes.

16     Q   Can you give us a general idea of what

17 your duties entailed as a supervisor at the Cook

18 County State's Attorney court reporting unit?

19     A   Well, I supervised the court reporters in

20 the office.  I had anywhere from six to I think it

21 was up to nine at one point.  My duties were to make

22 schedules, make sure the assignments were covered,

23 do my regular court reporting duties.  I was

24 basically a working supervisor.

Page 15

1      Q   Can you tell us how assignments were given

2  to the court reporters in the Cook County State's

3  Attorney's Office when you were the supervisor?

4      A   Well, again, the Felony Review Unit, we

5  covered that unit three hundred and sixty-five days

6  a year, twenty-four hours a day.  We were on call

7  for that.

8          And that would be a schedule of one person

9  on call, a backup reporter, and through the years we

10 adjusted the scheduling to different types of ideas

11 or programs on -- for Felony Review.  That was

12 basically it.  So, there was a main reporter and

13 then a backup reporter.

14         During the day the assignments came through

15 our main office or the office we were lodged in at

16 26th Street.

17     Q   And when you say the assignments, what

18 assignments are you speaking of?

19     A   The assignments were -- through the years

20 everything was always evolving.  We did deposition

21 work, like I said, covered different units.  We also

22 did the Special Grand Jury which ran in the beginning

23 just two to three days a week, and then it became full

24 time.

Page 16

1          And then we covered the regular Grand

2  Jury, and we started that assignment again in 19 --

3  I'm trying to get the date right here, probably

4  1992.  The office used to cover that assignment, but

5  they didn't cover it for a couple of years and then we

6  took it over again.

7      Q   How would a court reporter be assigned to

8  take a statement for Felony Review in 1990?

9      A   Well, the Felony Review Unit would call my

10 office if it was during the daytime.  Or if it was

11 at night or after business hours, they would call

12 the reporter which was usually at home or on a pager

13 or what have you.  And they would call you and tell

14 you the assignment where you had to go and do the

15 reporting.

16     Q   When you received that assignment, would

17 you be told anything about the assignment other than

18 the location of it?

19     A   They would just tell us the location and

20 the State's Attorney that we would meet out there.

21     Q   After being assigned a case to -- strike

22 that.  After being assigned to do a Felony Review

23 statement, what would the court reporter then do?

24     A   Well, if you were at home and it was, say,

Page 17

1  at two, three, four, five in the morning, what have

2  you, you would get in your car, drive to the area or

3  police district or wherever it was in the City of

4  Chicago, or basically anywhere in the County.  We

5  worked also in the suburbs.  You would drive out to

6  that location and meet the State's Attorney, and

7  then take the court reported statement or statements.

8      Q   And you said you would meet the State's

9  Attorney prior to taking the court reported statement,

10 did I understand you correctly?

11     A   Yes.  We would walk into either the police

12 station or the area headquarters or wherever.  And

13 then we would find the State's Attorney, introduce

14 ourselves and say we were the reporter, and set up

15 and take the assignment.

16     Q   And at these various police stations,

17 where would you set up?

18     A   For the --

19         MS. BONJEAN:  Hold on, let me place my

20         objection on the record, please.  I'm going to

21         object to the form of that question.

22     Q   (By Mr. Brueggen) Sir, you can go ahead

23 and answer if you understand my question.

24     A   Where we would set up, we would be -- we

JOSEPH SZYBIST, 06/09/2021                                     Page 18..21

Page 18

1  would go into the room where the person giving the
2  statement was situated.
3      Q   And would you always go into a room where
4  a person was situated or were there times when you
5  would go into a room, set up, and that person would
6  be brought in to give a statement?
7      A   We --
8      MS. BONJEAN:  Objection to the form,
9  incomplete hypothetical, you can answer.
10     THE WITNESS:  We would go into a room
11     again, and sometimes we would be in a room and
12     they would bring in the person giving the
13     statement.
14     Q   (By Mr. Brueggen) And who normally asked
15  -- strike that.  Who would ask the witness questions
16  during a Felony Review Statement?
17     MS. BONJEAN:  Objection to the form,
18     foundation, incomplete hypothetical.  You can
19     answer.
20     THE WITNESS:  The State's Attorney or
21     Assistant State's Attorney that was assigned to
22     that unit was the person that asked the
23     questions.
24     Q   (By Mr. Brueggen) And what was your job in

Page 19

1  taking that statement?
2      A   To stenographically record verbatim the
3  questions and answers given, just as our court
4  reporter is doing right here.
5      Q   So, would you record all people that spoke
6  during the Felony Review Statement?
7      A   Yes.
8      Q   And -- strike that.  When you were court
9  reporting for a Felony Review Statement, did you
10  also note motions by witnesses?
11     A   If there was a motion like a person
12  indicating or something, yes, we would put a
13  parenthetical into the transcript.  It's a standard
14  court reporter procedure.
15     MS. BONJEAN:  I'm sorry, what was the word
16     you used, motion?
17     MR. BRUEGGEN:  Me?  Yes, like a motion,
18     like any type of motion by a witness, and he
19     changed it to indicating.
20     MS. BONJEAN:  Okay.  I think his word is
21     better.  I wasn't sure if you said emotion or
22     motion.  Okay.
23     Q   (By Mr. Brueggen) What would you do with a
24  transcribed -- or strike that.  What would happen

Page 20

1  after you completed the statement?
2      MS. BONJEAN:  Objection to the form,
3      foundation, incomplete hypothetical.  Go ahead.
4      Q   (By Mr. Brueggen) You can answer, Joe.
5      A   Okay.  After stenographically recording
6  the statement, we would set up somewhere in the
7  area, police station, wherever we were, and type the
8  statement up, reduce it into an English transcript.
9      Q   What would you do with that transcript after
10  it was typed up?
11     A   After the transcript was completed, I
12  would give it to the State's Attorney.
13     Q   Do you know what the State's Attorney
14  would do with it at that point?
15     MS. BONJEAN:  Objection to form.
16     Q   (By Mr. Brueggen) Go ahead.
17     A   They would go into the room where the
18  person was, and they would go over the court
19  reported statement.
20     Q   How do you know that that's what the
21  State's Attorney would do with the court reported
22  statement after you had typed it up?
23     A   That was standard procedure, and after
24  they came out, the statements were signed or

Page 21

1  initialed, and corrections were made.  So, we knew
2  that they were going over the statement.
3      Q   After you received that statement with
4  signature and any corrections, what did you then do?
5      A   After that we would go into the room with
6  the person that gave the statement and we used to
7  carry a Polaroid camera at that time or through the
8  years, and we would take a picture of the person who
9  gave the statement.
10     Q   Why did you take a picture of the person
11  who gave a statement with the Polaroid camera?
12     A   That was the standard procedure the very
13  first day I worked in the office.  That was to show
14  the person that gave the statement, who it was, and
15  their condition at the time they gave the statement.
16     Q   Sir, after taking that Polaroid photo,
17  would you write on it or make any notations on the
18  photo itself?
19     A   Yes.  We would attach a sticker to it, and
20  we would write in the person who gave the statement,
21  his name or her name, whoever, date it and time it,
22  and then I would have the people -- the State's
23  Attorney or the investigator also initial and sign
24  the -- the sticker.

JOSEPH SZYBIST, 06/09/2021                                    Page 22..25

Page 22

1     Q   What would you then do with that photograph
2  with the signatures and information on it?
3     A   That would be attached to the statement,
4  and then we would take that statement back -- back
5  to the office, and then it would be delivered to the
6  Felony Review Unit where they took over the statement.
7     Q   When you were transcribing a statement, if
8  you saw an Assistant State's Attorney or a police
9  officer whisper in the ear of a witness, would that
10 be recorded on your transcript?
11    A   I never really remember anybody whispering
12 in anybody's ear that I can recall. It's a non-verbal
13 response.
14    Q   At times when you were transcribing a
15 witness statement, would photos be shown to witnesses?
16    A   Yes. Certain exhibits would be shown to
17 certain people, certain people that gave statements,
18 correct.
19    Q   What would you do with those exhibits then
20 after the transcript was typed up?
21    A   Those exhibits usually were not given to
22 us. The State's Attorneys handled that, and I
23 believe they took it to Felony Review with them, the
24 best I can recall.

Page 23

1     Q   When transcribing a statement, if a
2  witness said something that you did not hear, what
3  would you do?
4     A   I would ask the person to please repeat or
5  speak up.
6     Q   If when transcribing a statement, a
7  witness said something that was unintelligible, how
8  would you record that?
9     A   I would ask them to repeat it. I couldn't
10 understand it, I would have to put a parenthetical
11 in there saying "no response" or "did not understand."
12    Q   And you mentioned parentheticals, what
13 were parentheticals used for as a court reporter in
14 a transcript?
15    A   Basic -- basic format was to show
16 indicating -- it's been a while since I've been
17 reporting. Indicating, pointing to something,
18 non-verbal response, shaking the head, nodding the
19 head. There we go, I always remember that.
20    Q   If during when you were recording a
21 statement a witness began speaking in a foreign
22 language, how would you record that?
23    A   I could not record a foreign language
24 since the machine is not set up to record it. And

Page 24

1  number two is I don't understand a foreign language,
2  so we just do everything in English.
3     Q   Did you ever use a translator when doing a
4  Felony Review statement?
5     A   I really don't recall interpreters in
6  Felony Review. I recall some in the Grand Jury and
7  in some deposition work.
8     Q   If an interpreter was used during a
9  statement, would that be recorded on the transcript?
10    A   Yes, the interpreter would be identified.
11 The interpreter is usually -- well, not usually --
12 is sworn in by either me in a deposition or in a
13 Grand Jury by the foreman.
14       And then it would be indicated on the
15 record the person's name, and it would also state
16 that this person was the interpreter, interpreting
17 from whatever language to the English language on a
18 title page. Or in this case the statement would
19 have been on the title page on the statement.
20    Q   Sir, after you completed your assignment,
21 transcribing the statement, providing to the State's
22 Attorney, getting it back, and taking the photograph,
23 what would you do with that copy?
24    A   Again, I didn't have the copy kept by me.

Page 25

1  I would just take that to the Felony Review Unit or
2  my office, and somebody from my office would take it
3  to the Felony Review Unit.
4     Q   Sir, I'm going to show you a document that
5  we'll mark as Exhibit 1. Sir, do you see a document
6  on your screen?
7     A   Yes, I do.
8     Q   And is that the document that you have in
9  front of you in hard copy form?
10    A   Yes.
11    Q   And would it be easier to refer to the
12 hard copy form that you have?
13    A   Yes, it would. It's kind of small on my
14 screen.
15    Q   Fair enough, so I'll take this down and
16 you can refer to the copy that you have. And you
17 can just let us know if you're looking at a specific
18 page, if you could just identify it for us by the
19 page number, we'd appreciate that. Okay, sir?
20    A   Yes.
21    Q   Can you tell us what Exhibit 1 is?
22    A   This is the court reported statement that
23 I took and transcribed.
24    Q   For the record, Exhibit 1 is CCSAO754 to

JOSEPH SZYBIST, 06/09/2021                               Page 26..29

Page 26

1  760?
2      A   Yes.
3      MR. HORVAT:  In the bottom right-hand
4  corner there might be some numbers and Bates
5  stamps.
6      THE WITNESS:  Yeah, I see that there.
7      Q   (By Mr. Brueggen) And sir, can you tell us
8  who was the person giving the statement in Exhibit 1?
9      A   Well, the people present and the person
10  giving the -- it's a statement of Jose Maysonet.
11     Q   Who was the court reporter for that
12  statement?
13     A   The court reporter was me, Joseph Szybist.
14     Q   When did you create that statement, sir?
15     A   The statement was stenographically
16  recorded at the time it was given at 9:28, started.
17  It ended at 9:38.  And then after that, like I
18  explained before, transcribed it into the transcript
19  form.
20     Q   Where did you create that statement, sir?
21     A   Somewhere in the area.
22     Q   Do you know which area?
23     A   It was Area 5, and somewhere in the area
24  where we took the statement.

Page 27

1      Q   And can you tell us who was present for
2  that statement based on your review of that statement?
3      MS. BONJEAN:  Objection.  Hold on one
4  second, please.  I'm going to object to the form
5  and foundation.
6      Dave, are you -- I'm going to just object
7  if you're asking him to independently recollect,
8  or if you're asking him to answer based on what
9  he's reading.  I think the record should be
10  clear.
11     MR. BRUEGGEN:  Okay, fair enough.
12     Q   (By Mr. Brueggen) So, Mr. Szybist, do you
13  have a recollection of taking the statement of Jose
14  Maysonet?
15     A   No, I don't.
16     Q   And will you need to rely on Exhibit 1,
17  the transcribed copy of Mr. Maysonet's statement, to
18  be able to provide testimony today?
19     A   Yes, I do.
20     Q   And if you rely on that and you can just
21  direct us to what you're relying on, if there's a
22  specific part of it, just so we're clear.  Okay,
23  sir?
24     A   Yes.

Page 28

1      Q   And likewise, clarify if you remember
2  something independently as we go along, just let us
3  know that it's a memory as opposed to a reference.
4      A   Okay.
5      Q   Sir, can you tell us based on your
6  statement who was present for the statement of
7  Mr. Maysonet?
8      A   Again, referring to the statement in front
9  of me, present was Mr. Frank DiFranco, Assistant
10  State's Attorney; Detective Fred Montilla, Star
11  Number 16410, he's from Area 5, Violent Crimes; and
12  also me, according to the statement.
13     Q   If anybody else had been present for that
14  statement, would they have been recorded on what is
15  Exhibit 1, the transcription of that statement?
16     A   Yes.  Referring to the statement, you can
17  look at the beginning here.  "Let the record reflect
18  that we are in an interview room at Area 5.  Today's
19  date is August 23, 1990.  The time is 9:28."  And then
20  "Present in the room with me and Assistant State's
21  Attorney DiFranco are Detective Frank Montilla, the
22  court reporter, and Jose Maisonet."
23     So, the ASA stated who was present in the
24  room.

Page 29

1      Q   Does the statement indicate whether anybody
2  was translating from a foreign language into English?
3      A   No, the statement shows nothing of that.
4      Q   And if you were to put that on a statement,
5  where would it be placed on the statement, Exhibit 1?
6  Where would that be listed?
7      MS. BONJEAN:  Objection to the form and
8  foundation.  Incomplete hypothetical based on
9  his prior testimony.
10     Q   (By Mr. Brueggen) Let me rephrase the
11  question, sir.  Earlier you told us if there was a
12  translator it would be noted on the transcript.  Am
13  I correct, did you tell us that?
14     A   Yes.
15     Q   Where would it be noted on the transcript
16  if there was a translator?
17     A   Okay.  Again referring to the statement it
18  would be right here, under "Present."  It would be
19  under Mr. DiFranco, the Detective, and then it
20  would be the person that was the interpreter, part
21  of that title page, part of the statement.
22     Q   And sir, if the police officer that was
23  present was translating from a foreign language,
24  would that be noted on the statement?

JOSEPH SZYBIST, 06/09/2021                                    Page 30..33

Page 30

1    A    If the investigator or the detective was
2  interpreting something, yes, it would be
3    Q    Where would that be noted on the transcript,
4  sir?
5    A    The -- first off, it would be stated by the
6  ASA that the detective is interpreting from English to
7  Spanish and Spanish to English.  And then on the first
8  answer it would be noted on -- again on the title part
9  page acting also as interpreter.
10      And then the statement itself, the first
11  answer would be "through interpreter" or "through
12  investigator" or "detective."
13    Q    And sir, going back up to the top, right
14  below your name, "Reported By: Joseph A. Szybist,"
15  right below that it says, "Book Number 9008-23."  Do
16  you see that, sir?
17    A    Yes.
18    Q    Can you tell us what that indicates?
19    A    The book number is referenced of the year,
20  the month, and the date that we took the statement.
21    Q    And sir, do you have a recollection of who
22  requested your services to take this statement of
23  Mr. Maysonet?
24    A    Evidently it came from Felony Review, and

Page 31

1  I was contacted to go out to the area.
2    Q    Sir, is Exhibit 1 a complete and accurate
3  copy of the transcription of the interview of Mr.
4  Maysonet by ASA DiFranco?
5      MS. BONJEAN:  Objection to form and
6      foundation.  He has no independent recollection.
7      You're asking him to speculate.
8    Q    (By Mr. Brueggen) Sir, you can answer.
9    A    Yes, this statement is a true part of the
10  statement, yes.
11    Q    And sir, when you took this statement back
12  in August of 1990, would you have tried to write
13  down everything as true and accurately as possible?
14      MS. BONJEAN:  Objection to form, foundation,
15      calls for speculation given his lack of
16      independent recollection.  But go ahead, you can
17      answer.
18      THE WITNESS:  Again, being a court reporter,
19      a certified licensed court reporter, our job is
20      to make a verbatim transcript of all legal
21      proceedings, so I would be stenographically
22      recording this just again as our court reporter
23      is doing right here.
24    Q    (By Mr. Brueggen) When you took the court

Page 32

1  reported statement of Mr. Maysonet, would you have
2  recorded everything that was said during that
3  statement?
4    A    Yes.
5      MS. BONJEAN:  Object, form, foundation.
6    Q    (By Mr. Brueggen) Would your transcription
7  of the statement of Mr. Maysonet indicate everybody
8  that spoke during that statement?
9      MS. BONJEAN:  Objection, form, foundation.
10      THE WITNESS:  Yes.
11    Q    (By Mr. Brueggen) And you've had a chance
12  to review the statement that's Exhibit Number 1,
13  correct?
14    A    Correct.
15      MS. BONJEAN:  Asked and answered multiple
16      times.
17    Q    (By Mr. Brueggen) From reviewing that
18  statement, can you confirm that the words that are
19  attributed to Mr. Maysonet in the transcript were
20  said by him?
21      MS. BONJEAN:  Objection, form, foundation.
22      THE WITNESS:  Yes, it's the statement of
23      Jose Maysonet.
24    Q    (By Mr. Brueggen) Sir, after you completed

Page 33

1  taking the statement of Mr. Maysonet, what would you
2  have done?
3      MS. BONJEAN:  Objection, form, foundation,
4      speculation.
5      THE WITNESS:  Again, you're referring to
6      right after I took the court reporting and left
7      the interview room?
8    Q    (By Mr. Brueggen) Correct.  After you were
9  done stenographically recording the court reported
10  statement of Mr. Maysonet, what would you have done?
11    A    Like I said before, I would transcribe
12  this into this transcript.
13    Q    And when you say transcribe into this
14  transcript, do you mean type up the transcript that
15  we see as Exhibit Number 1?
16    A    Correct.
17    Q    Sir, let me show you what we'll mark as
18  Exhibit Number 2.  Sir, do you see a document up on
19  your screen?
20    A    Yes, I do.
21    Q    And for the record, Exhibit Number 2 is
22  CCSAO Pages 1473 and 1474.  Sir, I just would like
23  you to look at both pages of Exhibit Number 2, if
24  you would please.

JOSEPH SZYBIST, 06/09/2021                          Page 34..37

Page 34

1    A   Okay.  I see right now the picture of Jose
2  Maysonet, and if you scroll down, that's the back side
3  of the picture.
4    Q   And so can you tell us what Exhibit 2
5  depicts?
6    A   That is the Polaroid picture that I took
7  of Mr. Maysonet.
8    Q   And can you tell us when you would have
9  taken the Polaroid photo of Mr. Maysonet?
10   A   After I got the court reported transcript
11  from the ASA, I would go into the room and take the
12  person's picture or Mr. Maysonet's picture.
13   Q   And sir, focusing on the second page of
14  Exhibit Number 2, which is CCSAO 1474, can you
15  identify that there is writing on the back of that --
16   A   Yes, I do.
17   Q   -- photograph?
18   A   Yes.
19   Q   And is any of that handwriting your
20  handwriting, sir?
21   A   Yes.
22   Q   And can you tell us what your handwriting
23  is?
24   A   The top portion of that sticker, and it

Page 35

1  states at Area 5VC, headquarters or HQ, on Thursday,
2  August 23, 1990, at ten -- I can't make that --
3    Q   10:35, sir?  I can zoom in further, sorry.
4    A   All right, you can control that.  I believe
5  that's 10:35 or 10:55, I am not correct on that, a.m.,
6  and there's my name.  And I also put on there CSR.
7  That stands for Certified Shorthand Reporter.
8    Q   Sir, why did you write this information on
9  the back of the photograph of Mr. Maysonet?
10   A   That was our standard procedure when we
11  took pictures of the people that gave the statements.
12   Q   What is below your writing on the back of
13  this photograph?
14   A   On the back underneath my writing is the
15  person's name, Jose Juan Maysonet, Junior; ASA Frank
16  DiFranco; and Detective Frank Montilla.
17   Q   And sir, are these signatures on the back
18  of the exhibit?
19   A   Yes, they're signatures.
20   Q   And would you have obtained these signatures
21  from the witness and the other people present during
22  the statement?
23   A   Yes, I would tender over that sticker to
24  the person that gave the statement, they would sign

Page 36

1  it.  And then I would have the ASA sign it, and also
2  the investigator, detective, or whoever was in the
3  room.
4    Q   And sir, after what is depicted in Exhibit
5  2 was signed by everybody, what would you do with that
6  exhibit?
7    A   That exhibit again would be attached to the
8  court reported statement.
9    Q   Mr. Szybist, those are all the questions I
10  have.  Thank you very much for your time.
11   A   You're welcome.
12   Q   Are you okay to keep going before other
13  people ask questions?
14   A   I'm fine.
15      MR. BRUEGGEN:  Mike, Theresa, or Brette,
16  do you guys have any questions?
17      MS. CARNEY:  The City has no questions.
18      MR. SCHALKA:  Defendant Guevara has no
19  questions.
20      MS. BENSINGER:  DiFranco has no questions
21  at this time.
22      MS. BONJEAN:  Can you take the exhibit down,
23  Dave?
24      MR. BRUEGGEN:  Oh, I'm sorry.  (Attorney

Page 37

1  complies.)
2  QUESTIONS BY MS. BONJEAN:
3    Q   Good afternoon, Mr. Szybist.  I hope I'm
4  pronouncing that correctly.  My name is Jennifer
5  Bonjean.  That's B-o-n-j-e-a-n, and I represent the
6  Plaintiff, Jose Maysonet, in this matter, along with
7  Mr. Steven Greenberg who is here, and Ashley Cohen.
8  I do have some questions for you this afternoon, so
9  if you can bear with me.
10      So, you were employed by the Cook County
11  State's Attorney's Office as a court reporter for
12  thirty years, is that right?
13   A   That's correct.
14   Q   Okay.  And in fact, you're represented
15  here today by a Cook County State's Attorney, is
16  that right?
17   A   That's correct.
18   Q   And you were not employed, for instance,
19  by the official -- the specific Court of Cook County
20  official court reporters, you were employed by the
21  Cook County State's Attorney's Office, just so I
22  understand, is that right?
23   A   Through those thirty years, yes.
24   Q   Okay.  Well, were you employed by the

Page 38

1  official court reporter at some other time?
2      MS. BENSINGER:  Objection, form.
3      THE WITNESS:  I -- when I became licensed,
4  I freelanced for a while.  And like this court
5  reporter is doing here, she's a freelance court
6  reporter.  That's what they call them.
7      And then I also went to the Illinois
8  Official Court Reporters, and I was there for a
9  short while, and then this job came up and then
10 I went to the State's Attorney's Office of Cook
11 County.
12     Q    (By Ms. Bonjean) Okay.  So, for a short
13 time in the early 1970's or mid 1970's, you worked
14 for the Illinois Official Court Reporter, but then
15 in 1977 you took a position working exclusively for
16 the Cook County State's Attorney's Office, is that
17 -- am I right?
18     A    Yeah, you're correct.
19     Q    When you received your paycheck every month,
20 who paid you?
21     A    The County of Cook.
22     Q    Okay.  Now, in your thirty years as a court
23 reporter, can you estimate how many court reported
24 statements you took in Felony Review?

Page 39

1      A    Hundreds.
2      Q    And did you work at a particular police
3  station or area or did you work at all the different
4  areas?
5      A    Like I said before, we would cover all of
6  Cook County, would be the Suburbs Felony Review or
7  the City of Chicago Felony Review.
8      Q    Okay.  Do you know how many -- let's talk
9  about in the early part of your career before you
10 became a supervisor.  Can you estimate for me how
11 many times a week, for instance, you were dispatched
12 to an area to take a court reported statement?
13     MR. BRUEGGEN:  Object to form, area.
14     MS. BONJEAN:  A general area.
15     MR. BRUEGGEN:  Okay, that's what I was
16 looking at, was general.  Answer if you
17 understand.
18     THE WITNESS:  Yeah, I don't have a recall
19 of how many times we went -- or I went out on
20 statements, or the reporters in my office.
21     Q    (By Ms. Bonjean) All right.  But your
22 estimate is that in -- well, strike that.  Let me
23 ask you this:  When you became a supervisor, did you
24 take fewer court reported statements as a -- in

Page 40

1  conjunction with the Felony Review assistants, or did
2  you still keep the same workload as it relates to
3  taking court reported statements with the Felony
4  Review assistants?
5      MR. BRUEGGEN:  Object to form.
6      MS. BENSINGER:  Join, Bensinger, object to
7  form.
8      Q    (By Ms. Bonjean) You can answer.
9      MR. BRUEGGEN:  Go ahead, sir.
10     THE WITNESS:  I took the same statements
11 and depositions and Grand Jury assignments like
12 everybody else.  We only had eight reporters in
13 the office.  We were quite busy.
14     Q    (By Ms. Bonjean) Right.  Okay.  So, even
15 when you became a supervisor you maintained the same
16 workload as your colleagues in terms of going into
17 the field and taking statements, right?
18     A    That's right.
19     Q    And the Cook County State's Attorney's
20 Office to the best of your recollection employed
21 less than ten court reporters for the entire County
22 of Cook, is that right?
23     A    Yes.
24     Q    So, fair to say, for instance, in the late

Page 41

1  seventies and throughout the eighties, you sometimes
2  would go, for instance, to Area 2 to take court
3  reported statements, is that right?
4      MS. BENSINGER:  Objection, form, and
5  relevance.
6      MS. BONJEAN:  Who -- who's that over
7  there talking?
8      MS. BENSINGER:  I objected, it's Bensinger.
9      MS. BONJEAN:  I can't see you.  I don't
10 know if you have your camera on or not.
11     Q    (By Ms. Bonjean) You can answer, sir.
12     A    We went to Area 2, Area 3, Area 4, Area 1
13 Area 6.  All the areas.
14     Q    Right.  So, in the eighties, you would go to
15 Area 2 to take court reported statements, is that
16 right?
17     A    If we were called there, yes, we did.
18     Q    And did you become familiar with the
19 detectives who worked these cases at these different
20 violent crime areas when given the amount of time
21 you spent with them?
22     MR. BRUEGGEN:  Object to form.  You can
23 answer, Joe.
24     THE WITNESS:  Yeah, I would recognize the

JOSEPH SZYBIST, 06/09/2021                                   Page 42..45

Page 42

1    detectives when I went to the areas.
2        Q    (By Ms. Bonjean) For example, did you know
3    who Detective John Byrne was from Area 2?
4        A    I don't recall that person.
5        Q    What about Peter Dignan, did you know who
6    that is?
7        A    Some of the names you're mentioning right
8    now, yeah, I can remember the name.
9        Q    So -- and if you were at an area, likely
10   is -- the likelihood is that you were taking a court
11   reported statement?  You weren't over there
12   socializing, were you?
13       A    No.  I was there to take the statement of
14   the person that I was required to do at that time.
15       Q    What about Jon Burge, did you ever have an
16   opportunity to interact with Jon Burge when you were
17   taking statements at Area 2 in the 1980s?
18       MR. BRUEGGEN:  Object to form, interact.
19       THE WITNESS:  He was the commander of that
20   area, so he really didn't sit on statements.
21       Q    (By Ms. Bonjean) That wasn't my question.
22   Did you have the opportunity to interact with him
23   when you were taking statements at Area 2 in the
24   1980s?

Page 43

1        MR. BRUEGGEN:  Object to the form, asked
2    and answered.
3        Q    (By Ms. Bonjean) Not answered.  You can
4    answer.
5        A    If I saw him there, he would say "Hi" and
6    I would say "Hi."
7        Q    So, you knew him well enough to say "Hi"
8    to him, right?
9        MR. BRUEGGEN:  Objection, form.
10       MS. BENSINGER:  Objection, form, misstates
11   his testimony.
12       THE WITNESS:  I recognized who he was, yes.
13       Q    (By Ms. Bonjean) And you would take
14   statements, court reported statements, with detectives
15   under his command in Area 2 in the 1980s, right?
16       A    Correct.
17       Q    Now, did you ever bring tape recorders
18   with you when you went to go take these statements
19   or when you worked in the Cook County State's
20   Attorney's Office?  And I'm talking specifically
21   when you worked with the Felony Review Assistants.
22       A    We did not use tape recorders, but at the
23   end of, say, like 1990s, '8 or '9 we also started
24   doing video statements.  We also carried the

Page 44

1    equipment, set up like the CLVS, Certified Legal
2    Video Specialists.  We had equipment, and we started
3    doing video statements instead of court reported.
4    So, people had an option of video or court reported.
5        Q    Right, because the State Legislature told
6    you you had to do that, right?
7        MR. BRUEGGEN:  Object to form, foundation.
8        MR. HORVAT:  You can answer if you know,
9    Joe.
10       THE WITNESS:  They didn't tell me, but it
11   became an operating system, yes.
12       Q    (By Ms. Bonjean) It became the law, right?
13       A    Right.
14       MR. BRUEGGEN:  Object --
15       Q    (By Ms. Bonjean) It wasn't an internal
16   change in your office, in the Cook County State's
17   Attorney's Office.  You started video recording
18   statements because it became the law, you had to,
19   correct?
20       MS. BENSINGER:  Speaking objection, form,
21   foundation.
22       MS. BONJEAN:  Speaking objection?  What
23   are you talking about?  I'm not objecting, I'm
24   asking questions.

Page 45

1        MR. HORVAT:  Joe, if you know the status
2    of the law, you can answer.
3        THE WITNESS:  Yeah, again --
4        MS. BENSINGER:  I don't know what you're
5    saying.  I just objected.
6        Q    (By Ms. Bonjean) Okay.  So, you didn't
7    know that the law changed that required court
8    reporters to video record statements for murder
9    cases?
10       MS. BENSINGER:  Objection, form.
11       THE WITNESS:  I don't know who did all
12   that.  We provided the video, and then later on
13   they went to full video.  So, I don't know when
14   the law actually became the law.
15       Q    (By Ms. Bonjean) Okay.  But, you know, you
16   testified earlier today about all your credentials
17   and you went to the College of Commerce and you --
18   you know, you were a certified court reporter and
19   you did things, standard procedures, you're telling
20   me that you weren't aware of what the law required --
21       MR. HORVAT:  Hold on one second.  Ms.
22   Bonjean, don't chastise my client, just ask
23   your question.  If you're going to go down this
24   path, I'll -- I'll terminate the deposition and

JOSEPH SZYBIST, 06/09/2021                                    Page 46..49

Page 46

1  seek protection.
2      MS. BONJEAN:  Okay.  I'm --
3      MR. HORVAT:  Just be kind.  I don't care
4  if you got to ask a leading question.  I don't
5  even care if you got to get hyped up about it.
6  Don't be disrespectful.
7      MS. BONJEAN:  He's -- he's not my witness.
8  he's --
9      MR. HORVAT:  He is your witness right now.
10  Just be respectful, that's all.  I know it's
11  difficult, but give it a shot.
12      MS. BONJEAN:  I can ask leading questions,
13  he's not my witness.  He's --
14      MR. HORVAT:  As I indicated, I said you
15  can go ahead and ask leading questions.  Don't
16  be disrespectful or I'll seek the Court's
17  intervention.  It's that simple.
18      MS. BONJEAN:  Do what you got to do.  We
19  all got to do what we got to do.
20      Q   (By Ms. Bonjean) So, I'm saying you
21  testified earlier that you were a certified court
22  reporter with certain credentials, right?
23      A   That's correct.
24      Q   And it's based on that training that you

Page 47

1  were confident in that court reported statement that
2  you identified earlier being an accurate reflection
3  of what happened in that interrogation room, right?
4      MS. BENSINGER:  Objection, form,
5  foundation, argumentative.
6      MR. HORVAT:  You can answer if you know,
7  Joe?
8      THE WITNESS:  I stenographically recorded
9  the statement, correct.
10      Q   (By Ms. Bonjean) And you testified several
11  times that this was our standard operating procedure.
12  You testified a number of times in response to Mr.
13  Brueggen's questions that, you know, you did certain
14  things because it was standard operating procedure,
15  right?
16      A   Again, taking a statement, recording it
17  just as the reporter is doing right now, was our
18  process of recording the statements, correct.
19      Q   Okay.  Now, did you ever, for instance,
20  receive additional training in your career or was it
21  just that initial training in the seventies that you
22  received?
23      A   Well, we had to have continuing education to
24  maintain our license.  We also had to have -- I

Page 48

1  belonged to the National Court Reporters Association,
2  so I also took continuing education for that.
3      Q   So, in any of this continuing education did
4  you learn that at some point the law required that
5  confessions or court reported statements be
6  videotaped in homicide cases?
7      A   Yes, it became the procedure to use
8  videotaping.
9      Q   You keep saying procedure.  I know it was
10  a procedure, but it wasn't a procedure that was
11  implemented by the Cook County State's Attorney's
12  Office until after the law changed, right?
13      MS. BENSINGER:  Objection, form,
14  foundation.
15      MR. HORVAT:  Joe, you can answer if you
16  know.
17      THE WITNESS:  Again, we provided video and
18  court reported.  Then down the line, I don't
19  remember when, they went into full videotaping
20  of statements or videotaping of people in
21  custody.  That's when I guess it became the
22  law.  I don't know.
23      Q   (By Ms. Bonjean) But you didn't keep up
24  with the law on this is basically what you're telling

Page 49

1  us?
2      MS. BENSINGER:  Objection, misstates
3  testimony.
4      MS. CARNEY:  Argumentative, asked and
5  answered.
6      MR. HORVAT:  You can answer, Joe.
7      THE WITNESS:  That's correct.  I'm not a
8  lawyer.
9      Q   (By Ms. Bonjean) Okay.  Now, you testified
10  that you stenographically recorded statements or
11  recorded statements when you would be asked to at
12  these areas, and I'm talking about the violent crime
13  areas, right?  What type of equipment did you use to
14  stenographically record statements?
15      A   Stenograph machine.
16      Q   And in the -- let's call it 1990, the
17  stenograph machines that you used in the 1990s, are
18  they the same, similar, or different than, for
19  instance, the machines that are used today to
20  stenographically record statements?
21      MR. BRUEGGEN:  Object to foundation.
22      THE WITNESS:  The machines were -- through
23  the years evolved.  There was manual machines,
24  then it became computer aided transcribing

Page 50

1    machines, and we migrated through the years to
2    use different equipment.
3       Q    (By Ms. Bonjean) And in the 1990s -- in
4    1990 you were still using manual machines, right?
5       A    1990 -- I don't remember exactly what we
6    were using exactly in 1990, but we did migrate into
7    the computer machine in the early 90s. I don't
8    recall when.
9       Q    Well, am I correct that the manual machines
10   generated like -- almost like a -- it looked like
11   almost like a ticker tape or like a tape with holes in
12   it essentially?
13      A    No holes, it was just the steno notes.
14      Q    Okay. So, in the early 1990s, what did
15   you do with those steno notes after you took a court
16   reported statement?
17      A    They would be filed in the file room of our
18   office.
19      Q    So, the Cook County State's Attorney's
20   Office you're talking about?
21      A    It would be in the -- my court reporter's
22   office, and then they would be put into storage.
23      Q    Again, and your office was in the Cook
24   County State's Attorney's Office, correct?

Page 51

1    A    Correct.
2       Q    Okay. So, you would take the original
3    steno notes and you would put them in your office,
4    is that right?
5       A    Right.
6       Q    Would you label them or did you just throw
7    them in a box, or how did you maintain them?
8       A    They would be dated.
9       Q    Okay. And did you keep them in order by
10   date?
11      A    Correct.
12      Q    And then once you maintained them in
13   order -- how long did you maintain them in your
14   office before they went to the storage room?
15      A    For several years, I don't recall how
16   long. Until we ran out of room.
17      Q    Okay. So, you were not only responsible
18   for taking stenographically recorded statements but
19   also maintaining the original notes in your office
20   in the Cook County State's Attorney's Office, is
21   that right?
22      A    Myself and all the reporters did the same
23   thing.
24      Q    Okay. So, all eight reporters would keep

Page 52

1    the notes, the original steno notes in their offices
2    for years, and then eventually they would go into a
3    storage facility, is that right?
4       A    Correct.
5       Q    If I wanted to find the steno notes for
6    the statement of Mr. Maysonet, where would they be
7    today?
8          MR. BRUEGGEN: Object to foundation,
9    speculation. Go ahead, sir?
10         THE WITNESS: I don't know where they're
11   at right now. I haven't been there in fourteen
12   years.
13      Q    (By Ms. Bonjean) Now, you testified earlier
14   you don't recall taking stenographically recorded
15   statements when you were assisting the Felony Review
16   Assistants where the Defendant was speaking a language
17   other than English, is that right?
18      A    Could you repeat that question again?
19   It's a little --
20      Q    Sure, no problem. Previously you testified
21   that you didn't recall ever having been in a position
22   to take a court reported statement of someone who
23   didn't speak English, right?
24         MS. BENSINGER: Objection, misstates the

Page 53

1    testimony, and form.
2          MR. HORVAT: You can answer, Joe.
3          THE WITNESS: Again, I did not record
4    statements in any other foreign language.
5       Q    (By Ms. Bonjean) So again, in your thirty
6    years as a court reporter for the Cook County
7    State's Attorney's Office, you're confident that not
8    once did you take a stenographically recorded
9    statement of someone who did not speak the English
10   language, right?
11         MR. HORVAT: I'm going to object, it
12   misstates the testimony. Go ahead, Joe.
13         THE WITNESS: Like I said, I could not
14   record somebody speaking a foreign language.
15      Q    (By Ms. Bonjean) Right. And you don't
16   understand a foreign language, right?
17      A    Correct.
18      Q    And I think you said that you didn't have
19   a recollection of there being a scenario where there
20   were interpreters or translators in Felony Review
21   when you took a court reported statement, am I right
22   or did I get that wrong?
23      A    I don't remember interpreters to my best
24   recall in these statements.

Page 54

1    Q   I'm sorry?
2    A   I said to the best of my recollection I
3  don't recall interpreters in these statements.
4    Q   I think you said you did recall sometimes
5  at Grand Jury proceedings or in other Court
6  proceedings you did see interpreters, but specifically
7  in the Felony Review process at these areas when you
8  would go take these court reported statements you
9  don't have a recollection of seeing or having the
10  opportunity to use an interpreter or translator, is
11  that right?
12       MS. BENSINGER:  Objection, form.
13       Interpreter translator?
14       MR. BRUEGGEN:  Compound.
15       MS. BONJEAN:  An interpreter or translator,
16  what don't you understand about that?
17       MS. BENSINGER:  Are you asking me?  I
18       don't know -- I mean are you talking about an
19       official licensed interpreter, or are you
20       talking about somebody who is actually doing
21       interpreting who might not be officially
22       licensed?
23       MS. BONJEAN:  I'm going to ask you to stop
24       trying to coach because it's pretty --

Page 55

1       MS. BENSINGER:  Stop being so obnoxious.
2       MS. BONJEAN:  Listen -- I -- this is --
3       relax, okay?  You'll get to know me, okay,
4       relax.  I'm doing my --
5       MR. HORVAT:  Joe, do you remember the
6       question or do you need her to repeat it?
7    Q   (By Ms. Bonjean) I'm happy to repeat it.
8    A   Repeat it for me, please.
9    Q   And in case you're operating under the
10  same misapprehension as -- I'm sorry I forgot your
11  name, but anyway -- not your name, the lawyer's
12  name, it's not in front of me so I apologize.  I
13  believe you testified that during your time taking
14  court reported statements at these violent crime
15  areas that you do not have a recollection of there
16  being an interpreter or a translator present, is
17  that right?
18       MS. BENSINGER:  Objection.
19       THE WITNESS:  I have no recall.
20    Q   (By Ms. Bonjean) Okay.  Do you recall ever
21  taking a court reported statement where a police
22  officer served as an interpreter during the course
23  of the taking of the statement?
24    A   I don't recall.

Page 56

1       MS. BENSINGER:  Objection.
2    Q   (By Ms. Bonjean) You don't recall a single
3  time when that ever happened?
4    A   Correct.
5    Q   So, in thirty years you can't tell me one
6  single time even ever that that ever happened?
7    A   I don't recall.
8       MR. BRUEGGEN:  Object to form.
9    Q   (By Ms. Bonjean) Is that a no?
10    A   I don't recall, no.
11    Q   You're not suggesting that people who didn't
12  speak English never confessed, are you?
13       MR. BRUEGGEN:  Objection to form.
14       MR. HORVAT:  Objection, argumentative.  Joe,
15       you can answer if you understand the question.
16       THE WITNESS:  If they confessed but they
17       spoke a foreign language, there wasn't a court
18       reporter there.
19    Q   (By Ms. Bonjean) Okay.  Did the Cook
20  County State's Attorney's Office employ interpreters
21  or translators that would be called on to assist in
22  the taking of court reported statements by
23  non-English speakers?
24       MR. BRUEGGEN:  Object to foundation.

Page 57

1       THE WITNESS:  I don't know who employed
2       them, but in the Grand Jury there were official
3       interpreters.
4       Depositions, whoever set up the deposition,
5       which lawyer, would probably contact the
6       professional interpreter.
7    Q   (By Ms. Bonjean) Right.  And what about
8  when you were going to the violent crime areas to
9  take court reported statements of Defendants, were
10  there interpreters available from the Cook County
11  State's Attorney's Office?
12    A   That I don't know.  You would have to ask
13  the people in Felony Review, the attorneys that ran
14  it, if they had them.
15    Q   Like I guess I'm asking you in your thirty
16  years experience taking statements in Felony -- with
17  Felony Review if you ever saw one?
18    A   Again, like I said, I don't recall an
19  interpreter in these statements.  I just don't recall
20  it.
21    Q   So, what's your best recollection of what
22  would happen if somebody didn't speak English and they
23  were going to make a statement, a court reported
24  statement?

Page 58

1    MR. BRUEGGEN:  Object to foundation.

2    MS. BENSINGER:  Join, and asked and

3 answered.

4    Q   (By Ms. Bonjean) Let me ask it again.  And

5 I don't know -- we'll put a time frame on it.  In

6 the 1990 time, okay, early nineties, if there was a

7 Defendant who was in custody that was going to make

8 a statement and wanted to make a court reported

9 statement, how was that accomplished, to the best of

10 your knowledge and experience?

11    MR. BRUEGGEN:  Object to foundation,

12    incomplete hypothetical.  Go ahead, sir.

13    THE WITNESS:  I don't recall, again me

14    personally, taking a court reported statement

15    with an interpreter.  I just don't recall it.

16    Q   (By Ms. Bonjean) Well, as a supervisor in

17 the Cook County State's Attorney's Office, certainly

18 this came up during your supervision of all the other

19 State's Attorneys, did it not?

20    A   I wasn't a supervisor of State's Attorneys.

21    Q   I misspoke, apologies.  During the course

22 of your supervision of Cook County State's Attorney

23 court reporters, did it ever come up what -- what do

24 we do if the guy doesn't speak English?

Page 59

1    A   That was handled by the Felony Review

2 Assistant State's Attorneys.

3    Q   And what's your understanding of what

4 would happen in that -- in that interview room at

5 Area 5 when you were called there to take a

6 statement of someone who didn't speak English?

7    A   All I recall is they used to do handwritten

8 statements.

9    Q   So, essentially your recollection is if --

10 if someone couldn't speak English, they would do

11 some type of handwritten statement?

12    MR. BRUEGGEN:  Objection, misstates his

13    testimony.  You can answer, Joe.

14    THE WITNESS:  All I know is there was

15    handwritten statements and court reporter

16    statements.  As far as interpreters or foreign

17    speaking, I do not recall.

18    Q   (By Ms. Bonjean) Okay.  All right.  In

19 your thirty years of taking statements for the Cook

20 County State's Attorney's Office, were you ever

21 present when a Defendant indicated in some form or

22 fashion that he had not been treated well by either

23 the police or the prosecutors?

24    A   If something was stated on the record, it

Page 60

1 was on the record, it would be on the statement.

2    Q   Wasn't my question.  My question is in

3 your thirty years of being a court reporter for the

4 Cook County State's Attorney's Office, do you ever

5 recall ever -- meaning ever -- recall a Defendant

6 indicating in your presence that he had not been

7 treated well by either the Chicago Police Officers

8 or the prosecutors?

9    A   I don't recall that, no.

10    Q   And how were court reporters trained or

11 what were they trained to do if a Defendant stated

12 in your presence that they had been mistreated,

13 being abused, anything along those lines?

14    A   Again, we were making a verbatim transcript,

15 and just like the reporter's doing now, we wrote

16 everything down.

17    Q   So, you just went ahead and took that

18 statement then?

19    A   If something came up like that, again,

20 everything verbatim was taken by us, the court

21 reporters.

22    Q   Right.  And -- and my question is, if a

23 Defendant indicated that he had been beaten and was

24 not giving his statement voluntarily, you would take

Page 61

1 it down, you would continue to take that statement,

2 right?

3    A   That's correct.

4    Q   And you were not trained by the Cook

5 County State's Attorney's Office to be like, "Wow,

6 nope, I'm not taking this statement."  You know, "Hold

7 up, let's get a supervisor in here.  He's saying he

8 was mistreated."  You weren't trained to do that,

9 right?

10    A   We were the -- the court reporters are the

11 guardian of the record.  Our job was to make a

12 verbatim transcript of what was said.

13    Q   Okay.  And even if there was a physical

14 beating going on in your presence, so long as you

15 took down verbatim what was happening, that's all

16 you were responsible for doing, right?

17    A   Again, of my thirty years, I've never seen

18 anybody, as you're saying, beaten or what have you.

19 And if something like that happened, that statement

20 would be -- I'd get out of the room and it would be

21 terminated.

22    Q   Okay.  Do you mean if -- but, if someone

23 told you or in your presence stated that he had been

24 beaten, you would record it but you would keep going,

Page 62

1  right?

2     A    To the questions and answers or the part

3  of the questioning from the State's Attorney, if the

4  question was asked how you've been treated, and the

5  person said I was beaten, what have you, it would be

6  all on the record.

7     Q    Okay.  Fair to say that you have no idea

8  how Mr. Maysonet was treated before you arrived to

9  take his court reported statement, correct?

10    A    That's correct.

11    Q    And all those statements that you took at

12  Area 2 by detectives under the command of Jon Burge,

13  you didn't know how they were treated before you

14  came and took their statements, right?

15    A    That's correct.

16    Q    Now, you indicated that -- you indicated

17  that you took a Polaroid of Defendants after a

18  statement was typed up, is that right?

19    A    That's right.

20    Q    And I want to just go back a second.  So,

21  I want to understand how this went down.  When you

22  were taking these stenographically recorded

23  statements, how did you convert your steno notes

24  into -- into a typewritten -- typewritten form, how

Page 63

1  did you do that?

2     A    Either on a typewriter or a word

3  processor, and then further down the road we had a

4  computer aided transcription.  And the biggest

5  problem at the areas was in producing a transcript is

6  if you use a computer, you couldn't like get the

7  type to type it up, so we basically did a lot of

8  typing on typewriters.  That's the best way I can

9  answer.

10    Q    And did you actually read from your steno

11  notes as you were typing?  Is that how it worked?

12    A    Correct.

13    Q    And steno notes -- am I correct in saying

14  that steno notes are something that another court

15  reporter could interpret, but probably an -- you

16  know, the average lay person like myself would not

17  be able to interpret, right?

18    A    Some reporters can interpret some reported

19  writings.  Everybody has their own style, different

20  briefs, what have you.  So, you can basically figure

21  it out, but I wouldn't say one hundred percent.

22    Q    All right.  So, it was your practice to

23  take those steno notes after the court reported

24  statement and immediately transcribe them into a

Page 64

1  typewritten statement, right?

2     A    Correct.

3     Q    You didn't, for instance, leave the police

4  station and do it later and send it over?  You did

5  it right there and then, correct?

6     A    Correct.

7     Q    All right.  And then I think you testified

8  that then you would then hand a copy to the State's

9  Attorney who would then go back into the room with

10  the Defendant, usually I'm assuming with a detective,

11  and go over the statement with them, correct?

12    A    That's correct.

13    Q    You didn't go back into the room with the

14  Cook County State's Attorney or the detective to go

15  through the statement, is that right?

16    A    That's right.

17    Q    Is there a reason why you did not accompany

18  the State's Attorney and detectives back into the room

19  as they went through the court reported statement with

20  the Defendant or with the suspect?

21    A    No, there was no reason.  That was -- like

22  I said from day one, I was a court reporter there.

23  That's how the procedure went.

24    Q    And yet you were the person who was tasked

Page 65

1  with taking that Polaroid photo after the statement

2  had been reviewed and signed, right?

3     A    Right.

4     Q    Okay.  But you have no idea what happened

5  in that room after the State's Attorney and/or the

6  detectives went in there to review the statement,

7  right?

8     A    Right, right.

9     Q    You would have been outside the room,

10  fair?

11    A    I was outside the room.

12    Q    And I think you said that one of the

13  purposes in taking the Polaroid was to capture the

14  condition of the Defendant, is that correct?

15    A    Yes, to show that the person that gave the

16  statement was the person and also their condition.

17    Q    And what do you mean by condition?

18    A    As they appeared at the time of the

19  statement physically.

20    Q    All right.

21       MS. BONJEAN:  Can you pull up the -- what

22  is it, Exhibit 2, Dave?

23       MR. BRUEGGEN:  The photo?

24       MS. BONJEAN:  Yeah.

JOSEPH SZYBIST, 06/09/2021                                    Page 66..69

Page 66

1       MR. BRUEGGEN: Yeah.
2       MS. BONJEAN: Do you mind?
3       MR. BRUEGGEN: (Attorney complies.)
4       Q   (By Ms. Bonjean) Okay. Mr. Szybist, am I
5   correct that you don't independently recognize this
6   young man here, do you?
7       A   That's correct, I do not.
8       Q   Okay. And in looking at this photo, you
9   can't tell us whether he had urinated on himself,
10   can you?
11       A   That's correct.
12       Q   And you cannot tell us whether he had been
13   struck in his genitals prior to the taking of the
14   Polaroid, can you?
15       A   That's correct.
16       Q   And you cannot tell whether he had been
17   struck in his abdomen or around any part of his
18   back, is that right?
19       A   That's right.
20       Q   And you can't tell whether he had been
21   struck on -- on his -- you know, on the top of his
22   head, for instance, is that right?
23       A   That's right.
24       Q   And in looking at this photo you can't

Page 67

1   tell whether he had been threatened with physical
2   violence, right?
3       A   That's right.
4       Q   And in looking at this photo you can't
5   tell whether he -- whether anyone had threatened to,
6   for instance, take his children away or take his
7   children away from his wife or girlfriend, right?
8       A   That's right.
9       Q   And this photo doesn't tell you whether
10   this individual is frightened, does it?
11       A   That's correct.
12       Q   And this photo doesn't tell you whether or
13   not this person had a belief that he was going to be
14   released after he made this statement, right?
15       A   That's right.
16       Q   So, can we agree that it doesn't entirely
17   capture the condition of the Defendant, fair?
18       A   The picture is a picture of the person is
19   the best way I can describe it.
20       Q   Right. And unless this person had overt
21   injuries to their face or their forearms, you
22   wouldn't be able to tell whether or not he had
23   suffered any type of physical abuse, correct?
24       MS. BENSINGER: Objection, form.

Page 68

1       THE WITNESS: I don't understand that
2   question.
3       Q   (By Ms. Bonjean) Unless you could see
4   obvious and apparent injuries to his face and the
5   parts of his body that are exposed, you would have
6   no idea whether he had suffered any physical
7   injuries, correct?
8       A   Correct. If there were no bruises or
9   bleeding on his face or forearms like in this
10   picture, no, of course not.
11       Q   Okay. And you didn't ask them to take
12   their pants off to inspect other parts of their
13   bodies, right?
14       A   That's correct.
15       Q   So, when you signed the back of this
16   Polaroid, what was your purpose in doing so?
17       A   To have the person that gave the -- that I
18   took the picture of, to sign that picture to make
19   sure that's the person that I took the picture of.
20       Q   Well, were you vouching for his well-being
21   when you signed the back of it?
22       A   I wasn't vouching for anything.
23       Q   Okay. All right. If we could take one
24   minute I may be finished, if you don't mind.

Page 69

1       MR. HORVAT: Take five minutes or literally
2   one minute, Jennifer?
3       MS. BONJEAN: Do you want to take five?
4       MR. HORVAT: We don't have to. I mean it
5   just depends on how much you got. I know Mr.
6   Szybist might need to stretch his legs. It's
7   up to everybody else.
8       MS. BONJEAN: Mr. Szybist, would you like
9   to take five or would you rather just take two?
10   I'm comfortable --
11       THE WITNESS: Can I take two? I'll go to
12   the bathroom and I'll be right back.
13       MS. BONJEAN: Absolutely.
14       THE WITNESS: Thank you.
15       THE VIDEOGRAPHER: We're off the record at
16   2:26.
17       (At this time, a short break was
18   taken off the record.)
19       THE VIDEOGRAPHER: We are back on the
20   video record at 2:35.
21       Q   (By Ms. Bonjean) I just have a couple more
22   questions, Mr. Szybist, and I won't keep you much
23   longer.
24       You mentioned a couple of times throughout

JOSEPH SZYBIST, 06/09/2021                                    Page 70..73

Page 70

1  your testimony that there was a standard procedure
2  that you -- that you followed when you were a court
3  reporter in the Cook County State's Attorney's
4  Office.  Who created the procedure, to the best of
5  your understanding?
6      A   Again, procedure -- which procedure are we
7  talking about as far as?
8      Q   So, I can narrow that question.  I mean
9  obviously I'm most interested in procedure as it
10 relates to taking court reported statements from
11 suspects in police stations, okay.
12         And you indicated in response to questions
13 by Mr. Brueggen and myself that, you know, this was
14 the standard procedure that you did X, Y, and Z.
15 And I'm wondering who was responsible for creating
16 the procedure that court reporters would follow when
17 they were taking court reported statements as part
18 of the Felony Review process.
19     A   As far as getting call-out and all the
20 other stuff that I mentioned, going to the Areas,
21 that was all set up by the Felony Review Unit.
22         As far as the court reporting end of it,
23 we are, like I said, licensed and we take the verbatim
24 testimony.  So, that's another procedure that we use

Page 71

1  just like -- again like the reporter is doing here.
2  That's the best I can describe it.
3      Q   But, for instance, the format and, for
4  instance, that you used with the court reported
5  statement, is that something that you learned in
6  court reporting school as part of a certified court
7  reporter, or is that a format that was established
8  by someone in the Cook County State's Attorney's
9  Office?
10     A   These statements, again I'm referring to
11 this, this format here, this statement was a form
12 that I received the first day that I started court
13 reporting back in 1977 with the office.
14         That was a standard format for statements.
15 Then we had a form book for depositions.  Then we
16 had a form book for Grand Jury, what have you.
17     Q   So, when you started with the Cook County
18 State's Attorney's Office, you were provided with a
19 format to use for taking court reported statements,
20 and that's the format that you adopted throughout
21 your time there, is that right?
22     A   Yes.  We kept it the same throughout the
23 years.
24     Q   Okay.  And when you took a Polaroid photo

Page 72

1  of someone who had provided a court reported
2  statement, did you say anything to that person
3  before you took the Polaroid photo?
4      A   No.  I would just ask them to sit -- move
5  over if they were, you know, standing up or
6  something, to sit down or sit in their chair, and
7  look at me, and take their picture.
8      Q   Okay.  And so you didn't ask, for instance,
9  for permission to do so, right?
10     A   No.
11     Q   And you didn't ask them how they were
12 feeling or anything, or ask them any questions about
13 their condition when you took the photo, right?
14     A   That's correct.
15     Q   Are you able to say whether there was one
16 violent crime area that you spent more time at than
17 others when you were doing Felony Review statements?
18     MR. BRUEGGEN:  Object to form, scope,
19 time.
20     MS. BONJEAN:  Yeah, I can narrow that
21 down.
22     Q   (By Ms. Bonjean) Let's talk about again
23 the relevant time period which would have been in
24 1990 or the early nineties.  Did you find yourself

Page 73

1  being called out to one particular violent crime
2  area more often than others?
3      A   Not really, no.
4      Q   It was a busy time I think you said, right?
5      A   Very busy.
6      Q   And did you form any longstanding
7  friendships with any Chicago Police Detectives
8  during your tenure as a court reporter?
9      A   Not really, no.
10     Q   If I showed you a picture of, for
11 instance, Detective Reynaldo Guevara, would you be
12 able to recognize him?
13     A   If you show me the picture I might recognize
14 him from walking in the courtrooms or in the areas, of
15 course.
16     Q   Uh-huh.
17     MS. BONJEAN:  Actually, I don't know if,
18 Haley, you have any of those, but if you could
19 pull up --
20     MS. COOLBAUGH:  Say that again.  What would
21 you like me to pull up?
22     MS. BONJEAN:  A photo of Reynaldo Guevara.
23     MS. COOLBAUGH:  Yes, one moment.
24     MS. BONJEAN:  We're going to mark that.

JOSEPH SZYBIST, 06/09/2021                                    Page 74..77

Page 74

1     Sorry, I didn't actually anticipate doing that,
2  so it might take her a second.  I think they're
3  all together, no?
4     MS. COOLBAUGH:  No, I'm not sure if they
5  are, but I'm looking into that now.
6     MS. BONJEAN:  Ashley is getting on a
7  plane, so she's not -- normally she would know
8  where to find these things.
9     MS. COOLBAUGH:  Or since she's not helping
10 us, so just give me one more minute.
11    MS. BONJEAN:  Okay.
12    Q   (By Ms. Bonjean) I have a couple of
13 questions, though, we can go through while you're
14 looking.
15       Does the name Detective Reynaldo Guevara or
16 Guevara ring a bell to you?
17    A   No, it doesn't.
18    Q   What about Detective Ernest Halvorsen?
19    A   Vaguely recall the name.  Probably some
20 transcript in a Grand Jury or what have you.
21    Q   Okay.  What about Detective Roland
22 Paulnitsky?
23    A   Paulnitsky, yes, I remember that name.  Same
24 thing, in a transcript or in a Grand Jury or in a

Page 75

1  statement.
2     Q   What about Detective Montilla, the name
3  that's reflected on the court reported statement, do
4  you remember him?
5     A   That name doesn't strike a bell with me,
6  no, Montilla.
7     Q   What about Sergeant Edward Mingey?
8     A   Say the last name again.
9     Q   Edward Mingey, M-i-n-g-e-y.
10    A   That doesn't recall -- I don't recall that
11 name.
12    Q   And did you know Assistant State's Attorney
13 DiFranco?
14    A   The only thing that I can remember is this
15 -- I really don't recall him, I really don't.
16    Q   Fair enough.
17    A   Yeah.
18    Q   Okay.
19    MS. BONJEAN:  And if we can't find him it's
20 not a big deal, Haley.  I'm not overly concerned.
21    MS. COOLBAUGH:  What about just a photo of
22 Reynaldo Guevara?
23    MS. BONJEAN:  No, because he wouldn't --
24 it would be too old -- not a recent photo, that

Page 76

1  doesn't help us.  That's fine.  I have no further
2  questions for Mr. Szybist.  Thank you, sir.
3     THE WITNESS:  You're welcome, ma'am.
4     MR. BRUEGGEN:  Mr. Szybist, I don't have
5  anything to follow up.  Anybody else?
6     MS. CARNEY:  The City doesn't have any
7  follow-up either.
8     MR. SCHALKA:  Nothing from me.
9     MS. BENSINGER:  Nothing.
10    MR. BRUEGGEN:  Andrew, how about signature?
11    MR. HORVAT:  We'll show it waived.  Joe,
12 you're free to go, so you can log off.
13    MR. BRUEGGEN:  Thank you very much, Mr.
14 Szybist.
15    MS. BONJEAN:  Did you want to stay --
16 thank you, Mr. Szybist.
17    Did you want to stay on and talk scheduling,
18 Dave?
19    MR. BRUEGGEN:  Yeah, if you have time.  I
20 just want to make sure that we -- you know,
21 fair amount to do in a short time.
22    THE VIDEOGRAPHER:  This concludes the
23 deposition.  We are going off the video record
24 at 2:44 at the end of Media Unit 1.

Page 77

1     MR. BRUEGGEN:  Thank you very much, Mr.
2  Szybist, have a nice day.
3     THE WITNESS:  You, too, sir.  Thank you.
4  Miss Court Reporter, nice meeting you.
5     THE COURT REPORTER:  You, too, sir.  Enjoy
6  your retirement.
7     THE WITNESS:  Okay, you, too.  Thank you.
8     MS. CARNEY:  Not for me right now, thank
9  you.
10       (SIGNATURE OF THE WITNESS WAS WAIVED
11    BY AGREEMENT OF COUNSEL AND CONSENT OF THE
12    WITNESS.)
13
14
15
16
17
18
19
20
21
22
23
24

JOSEPH SZYBIST, 06/09/2021                                    Page 78

```
                                              Page 78
 1              CERTIFICATE OF REPORTER

 2

 3          I, RUTH S. MORRIS, an Illinois Certified

 4    Shorthand Reporter, do hereby certify that the witness

 5    whose testimony appears in the foregoing deposition

 6    transcript was duly sworn by me; that the testimony of

 7    said witness was taken by me to the best of my

 8    ability, and thereafter reduced to typewriting under

 9    my direction; that I am neither counsel for, related

10    to, nor employed by any of the parties to the action

11    in which this deposition was taken; and further, that

12    I am not a relative or employee of any attorney or

13    counsel employed by the parties hereto; nor am I

14    financially or otherwise interested in the outcome of

15    this action.

16              IN WITNESS WHEREOF I have hereunto set my

17    hand this 30th day of June, 2021.

18

19

20              Ruth S. Morris

21              Ruth S. Morris

22              IL CSR 084.002322

23

24
```

**Exhibits**

**1 Szybist 060921-1** 25:5,21,24
26:8 27:16 28:15 29:5 31:2 32:12
33:15

**2 Szybist 060921-2** 33:18,21,23
34:4,14 36:4,5 65:22

**1**

**1** 5:12 25:5,21,24 26:8 27:16 28:15
29:5 31:2 32:12 33:15 41:12 76:24

**10:35** 35:3,5

**10:55** 35:5

**1473** 33:22

**1474** 33:22 34:14

**16410** 28:11

**18** 5:18

**19** 16:2

**1970's** 38:13

**1976** 11:20 12:19

**1977** 13:5 38:15 71:13

**1980s** 42:17,24 43:15

**1989** 14:12

**1990** 16:8 28:19 31:12 35:2 49:16
50:4,5,6 58:6 72:24

**1990s** 43:23 49:17 50:3,14

**1992** 16:4

**1:06** 5:13

**2**

**2** 33:18,21,23 34:4,14 36:5 41:2,12,
15 42:3,17,23 43:15 62:12 65:22

**20** 5:24

**2007** 12:23 13:5

**2021** 5:15

**206(h)** 7:8

**23** 28:19 35:2

**2322** 7:5

**2342** 5:18

**26th** 15:16

**2:26** 69:16

**2:35** 69:20

**2:44** 76:24

**3**

**3** 41:12

**33rd** 11:16

**4**

**4** 41:12

**5**

**5** 26:23 28:11,18 59:5

**5VC** 35:1

**6**

**6** 41:13

**600** 6:1

**7**

**76** 12:9

**760** 26:1

**8**

**8** 43:23

**81** 11:21

**82** 11:21

**83** 11:21

**9**

**9** 43:23

**9008-23** 30:15

**90s** 50:7

**9:28** 26:16 28:19

**9:38** 26:17

**9th** 5:15

**A**

**a.m.** 35:5

**abdomen** 66:17

**Absolutely** 69:13

**abuse** 67:23

**abused** 60:13

**accompany** 64:17

**accomplished** 58:9

**accounting** 11:3

**accurate** 31:2 47:2

**accurately** 31:13

**acting** 30:9

**active** 11:9,10

**additional** 47:20

**adjusted** 15:10

**administer** 7:9

**administration** 11:2

**adopted** 71:20

**Advocate** 11:17

**afternoon** 6:13,15,20,22 7:21
37:3,8

**age** 7:16

**agree** 7:11 67:16

**AGREEMENT** 77:11

**agrees** 7:10,12,13,14

**ahead** 17:22 20:3,16 31:16 40:9
46:15 52:9 53:12 58:12 60:17

**aided** 49:24 63:4

**Air** 11:8,15,18,20

**Amended** 7:7

**amount** 41:20 76:21

**and/or** 65:5

**Andrew** 6:22 76:10

**answering** 8:6

**answers** 8:17 19:3 62:2

**anticipate** 74:1

**anybody's** 22:12

JOSEPH SZYBIST, 06/09/2021

**apologies** 58:21

**apologize** 55:12

**apparent** 68:4

**appeared** 65:18

**area** 11:21 17:2,12 20:7 26:21,22, 23 28:11,18 31:1 35:1 39:3,12,13, 14 41:2,12,13,15 42:3,9,17,20,23 43:15 59:5 62:12 72:16 73:2

**areas** 39:4 41:13,20 42:1 49:12,13 54:7 55:15 57:8 63:5 70:20 73:14

**argumentative** 47:5 49:4 56:14

**Army** 11:16

**arrived** 62:8

**ASA** 28:23 30:6 31:4 34:11 35:15 36:1

**Ashley** 6:10 37:7 74:6

**assigned** 16:7,21,22 18:21

**assignment** 14:2 16:2,4,14,16,17 17:15 24:20

**assignments** 13:20,24 14:22 15:1,14,17,18,19 40:11

**assist** 6:11 56:21

**Assistant** 18:21 22:8 28:9,20 59:2 75:12

**assistants** 40:1,4 43:21 52:16

**assisting** 52:15

**associate** 6:9

**Associate's** 10:22 11:1

**Associates** 5:24 6:3

**Association** 48:1

**assume** 9:3

**assuming** 64:10

**attach** 21:19

**attached** 22:3 36:7

**attorney** 8:11,24 14:5,18 16:20 17:6,9,13 18:20,21 20:12,13,21 21:23 22:8 24:22 28:10,21 36:24 37:15 58:22 62:3 64:9,14,18 65:5 66:3 75:12

**Attorney's** 13:1,4,7,11 15:3 37:11, 21 38:10,16 40:19 43:20 44:17 48:11 50:19,24 51:20 53:7 56:20 57:11 58:17 59:20 60:4 61:5 70:3 71:8,18

**attorneys** 13:16,17 22:22 57:13 58:19,20 59:2

**attributed** 32:19

**August** 28:19 31:12 35:2

**average** 63:16

**aware** 45:20

---

**B**

**B-O-N-J-E-A-N** 6:8 37:5

**back** 11:10,11,12 22:4 24:22 30:13 31:11 34:2,15 35:9,12,14,17 62:20 64:9,13,18 66:18 68:15,21 69:12, 19 71:13

**backup** 15:9,13

**based** 27:2,8 28:5 29:8 46:24

**basic** 23:15

**basically** 14:24 15:12 17:4 48:24 63:7,20

**Bates** 26:4

**bathroom** 8:12 69:12

**bear** 37:9

**beaten** 60:23 61:18,24 62:5

**beating** 61:14

**began** 23:21

**beginning** 5:11 15:22 28:17

**behalf** 5:16 6:8,14,16,18,21,23 7:16

**belief** 67:13

**bell** 74:16 75:5

**belonged** 48:1

**Bensinger** 6:18 7:13 36:20 38:2 40:6 41:4,8 43:10 44:20 45:4,10 47:4 48:13 49:2 52:24 54:12,17 55:1,18 56:1 58:2 67:24 76:9

**big** 75:20

**biggest** 63:4

**bleeding** 68:9

**bodies** 68:13

**body** 68:5

**Bonjean** 6:7 7:10 17:19 18:8,17 19:15,20 20:2,15 27:3 29:7 31:5,14 32:5,9,15,21 33:3 36:22 37:2,5

38:12 39:14,21 40:8,14 41:6,9,11 42:2,21 43:3,13 44:12,15,22 45:6, 15,22 46:2,7,12,18,20 47:10 48:23 49:9 50:3 52:13 53:5,15 54:15,23 55:2,7,20 56:2,9,19 57:7 58:4,16 59:18 65:21,24 66:2,4 68:3 69:3,8, 13,21 72:20,22 73:17,22,24 74:6, 11,12 75:19,23 76:15

**book** 30:15,19 71:15,16

**bottom** 26:3

**Bowen** 5:23 6:3

**box** 51:7

**break** 8:10,15 69:17

**Brett** 5:22

**Brette** 6:18 36:15

**briefs** 63:20

**Brigade** 11:16

**bring** 18:12 43:17

**broken** 11:9

**brought** 18:6

**Brueggen** 6:13,14 7:11,20 17:22 18:14,24 19:17,23 20:4,16 26:7 27:11,12 29:10 31:8,24 32:6,11,17, 24 33:8 36:15,24 39:13,15 40:5,9 41:22 42:18 43:1,9 44:7,14 49:21 52:8 54:14 56:8,13,24 58:1,11 59:12 65:23 66:1,3 70:13 72:18 76:4,10,13,19 77:1

**Brueggen's** 47:13

**bruises** 68:8

**Burge** 42:15,16 62:12

**business** 11:2 16:11

**busy** 40:13 73:4,5

**Byrne** 42:3

---

**C**

**C-A-R-N-E-Y** 6:16

**C-O-O-L-B-A-U-G-H** 6:11

**call** 15:6,9 16:9,11,13 38:6 49:16

**call-out** 70:19

**called** 41:17 56:21 59:5 73:1

**calls** 31:15

JOSEPH SZYBIST, 06/09/2021

**camera** 21:7,11 41:10

**capture** 65:13 67:17

**car** 17:2

**care** 46:3,5

**career** 39:9 47:20

**Carney** 6:15,16 7:12 36:17 49:4
76:6 77:8

**carried** 43:24

**carry** 21:7

**case** 5:18 16:21 24:18 55:9

**cases** 41:19 45:9 48:6

**CCSAO** 33:22 34:14

**CCSAO754** 25:24

**certified** 12:5,11 31:19 35:7 44:1
45:18 46:21 71:6

**chair** 72:6

**chance** 32:11

**change** 44:16

**changed** 19:19 45:7 48:12

**chastise** 45:22

**Chicago** 6:1,17 7:17 12:3,6 17:4
39:7 60:7 73:7

**Child** 13:15

**children** 67:6,7

**city** 6:17 7:12 10:14 17:3 36:17
39:7 76:6

**clarify** 28:1

**Clark** 5:24

**clear** 8:21 27:10,22

**client** 45:22

**CLVS** 44:1

**coach** 54:24

**Cohen** 6:10 37:7

**colleagues** 40:16

**college** 10:20,23 11:6,9 12:3,6
45:17

**comfortable** 69:10

**command** 43:15 62:12

**commander** 42:19

**Commerce** 12:3,6 45:17

**complete** 12:4,7 31:2

**completed** 12:6 20:1,11 24:20
32:24

**completing** 12:10

**complies** 37:1 66:3

**Compound** 54:14

**computer** 49:24 50:7 63:4,6

**concerned** 75:20

**concludes** 76:22

**condition** 21:15 65:14,16,17
67:17 72:13

**confessed** 56:12,16

**confessions** 48:5

**confident** 47:1 53:7

**confirm** 32:18

**conjunction** 40:1

**CONSENT** 77:11

**contact** 57:5

**contacted** 31:1

**continue** 61:1

**continuing** 47:23 48:2,3

**control** 35:4

**convert** 62:23

**Cook** 13:1,3,7,10,19 14:5,17 15:2
37:10,15,19,21 38:10,16,21 39:6
40:19,22 43:19 44:16 48:11 50:19,
23 51:20 53:6 56:19 57:10 58:17,
22 59:19 60:4 61:4 64:14 70:3
71:8,17

**Coolbaugh** 6:10 73:20,23 74:4,9
75:21

**copy** 24:23,24 25:9,12,16 27:17
31:3 64:8

**corner** 26:4

**Corps** 11:20

**correct** 12:1 22:18 29:13 32:13,14
33:8,16 35:5 37:13,17 38:18 43:16
44:19 46:23 47:9,18 49:7 50:9,24
51:1,11 52:4 53:17 56:4 61:3 62:9,
10,15 63:12,13 64:2,5,6,11,12
65:14 66:5,7,11,15 67:11,23 68:7,
8,14 72:14

**corrections** 21:1,4

**correctly** 17:10 37:4

**counsel** 6:4 7:5 77:11

**County** 13:2,4,7,11,19 14:5,18
15:2 17:4 37:10,15,19,21 38:11,16,
21 39:6 40:19,21 43:19 44:16
48:11 50:19,24 51:20 53:6 56:20
57:10 58:17,22 59:20 60:4 61:5
64:14 70:3 71:8,17

**couple** 11:22 16:5 69:21,24 74:12

**court** 5:19 6:2 7:1,3,7,8 8:7 10:21
11:24 12:2,8,11,12,15,18 13:8,10,
12,22 14:2,6,8,14,18,19,23 15:2
16:7,23 17:7,9 19:3,8,14 20:18,21
23:13 25:22 26:11,13 28:22 31:18,
19,22,24 33:6,9 34:10 36:8 37:11,
19,20 38:1,4,5,8,14,22,23 39:12,24
40:3,21 41:2,15 42:10 43:14 44:3,4
45:7,18 46:21 47:1 48:1,5,18
50:15,21 52:22 53:6,21 54:5,8
55:14,21 56:17,22 57:9,23 58:8,14,
23 59:15 60:3,10,20 61:10 62:9
63:14,23 64:19,22 70:2,10,16,17,
22 71:4,6,12,19 72:1 73:8 75:3
77:4,5

**Court's** 46:16

**courtrooms** 73:14

**cover** 13:24 16:4,5 39:5

**coverage** 10:8

**covered** 13:18,19,20 14:22 15:5,
21 16:1

**create** 26:14,20

**created** 70:4

**creating** 70:15

**credentials** 45:16 46:22

**crime** 41:20 49:12 55:14 57:8
72:16 73:1

**Crimes** 28:11

**CSR** 7:4 35:6

**custody** 48:21 58:7

**cut** 9:1

**CV** 5:18

**D**

**date** 16:3 21:21 28:19 30:20 51:10

**dated** 51:8

JOSEPH SZYBIST, 06/09/2021

**Dave** 6:13 27:6 36:23 65:22 76:18

**day** 15:6,14 21:13 64:22 71:12 77:2

**days** 15:5,23

**daytime** 16:10

**deal** 75:20

**Defendant** 5:16 6:14,16,19,21 7:11,12,13,14 36:18 52:16 58:7 59:21 60:5,11,23 64:10,20 65:14 67:17

**Defendants** 7:17 57:9 62:17

**Defenders** 13:17

**degree** 10:23 11:1,5

**delivered** 22:5

**depends** 69:5

**depicted** 36:4

**depicts** 34:5

**deponent** 6:23

**deposition** 5:14,15 7:6 8:1 9:6,12 10:3 15:20 24:7,12 45:24 57:4 76:23

**depositions** 13:14,15 40:11 57:4 71:15

**describe** 67:19 71:2

**detective** 28:10,21 29:19 30:1,6, 12 35:16 36:2 42:3 64:10,14 73:11 74:15,18,21 75:2

**detectives** 41:19 42:1 43:14 62:12 64:18 65:6 73:7

**difficult** 46:11

**Difranco** 6:19 7:13 28:9,21 29:19 31:4 35:16 36:20 75:13

**Dignan** 42:5

**direct** 27:21

**dispatched** 39:11

**disrespectful** 46:6,16

**district** 5:19,20 17:3

**Division** 5:21 13:15

**document** 9:24 25:4,5,8 33:18

**documents** 6:11 9:11,14,17 10:2, 5

**drive** 17:2,5

**duties** 13:10 14:17,21,23

**duty** 11:9,10

## E

**ear** 22:9,12

**earlier** 29:11 45:16 46:21 47:2 52:13

**early** 38:13 39:9 50:7,14 58:6 72:24

**easier** 25:11

**Eastern** 5:20

**education** 10:18 47:23 48:2,3

**Edward** 75:7,9

**eighties** 41:1,14

**emotion** 19:21

**employ** 56:20

**employed** 12:20,22,23,24 13:3 37:10,18,20,24 40:20 57:1

**end** 43:23 70:22 76:24

**ended** 26:17

**English** 20:8 24:2,17 29:2 30:6,7 52:17,23 53:9 56:12 57:22 58:24 59:6,10

**Enjoy** 77:5

**entailed** 14:17

**entire** 14:7 40:21

**equipment** 44:1,2 49:13 50:2

**Ernest** 74:18

**essentially** 50:12 59:9

**established** 71:7

**estimate** 38:23 39:10,22

**eventually** 52:2

**Evidently** 30:24

**evolved** 49:23

**evolving** 15:20

**examination** 7:19 12:13,14

**examined** 7:16

**exclusively** 38:15

**exhibit** 25:5,21,24 26:8 27:16 28:15 29:5 31:2 32:12 33:15,18,21,

23 34:4,14 35:18 36:4,6,7,22 65:22

**exhibits** 22:16,19,21

**experience** 57:16 58:10

**explained** 26:18

**exposed** 68:5

## F

**face** 67:21 68:4,9

**facility** 52:3

**fact** 37:14

**fair** 9:4,5 25:15 27:11 40:24 62:7 65:10 67:17 75:16 76:21

**familiar** 8:3 41:18

**fashion** 59:22

**feeling** 72:12

**Felony** 13:21 14:1 15:4,11 16:8,9, 22 18:16 19:6,9 22:6,23 24:4,6 25:1,3 30:24 38:24 39:6,7 40:1,3 43:21 52:15 53:20 54:7 57:13,16, 17 59:1 70:18,21 72:17

**fewer** 39:24

**field** 40:17

**figure** 63:20

**file** 50:17

**filed** 5:18 50:17

**filing** 10:10

**Finally** 8:23

**find** 17:13 52:5 72:24 74:8 75:19

**fine** 36:14 76:1

**finished** 11:13 68:24

**focusing** 34:13

**follow** 8:19,20 70:16 76:5

**follow-up** 76:7

**Force** 11:8,15,19,20

**forearms** 67:21 68:9

**foreign** 23:21,23 24:1 29:2,23 53:4,14,16 56:17 59:16

**foreman** 24:13

**forgot** 55:10

**form** 17:21 18:8,17 20:2,15 25:9,12

JOSEPH SZYBIST, 06/09/2021

26:19 27:4 29:7 31:5,14 32:5,9,21
33:3 38:2 39:13 40:5,7 41:4,22
42:18 43:1,9,10 44:7,20 45:10 47:4
48:13 53:1 54:12 56:8,13 59:21
62:24 67:24 71:11,15,16 72:18
73:6

**format** 23:15 71:3,7,11,14,19,20

**foundation** 18:18 20:3 27:5 29:8
31:6,14 32:5,9,21 33:3 44:7,21
47:5 48:14 49:21 52:8 56:24 58:1,
11

**fourteen** 52:11

**frame** 58:5

**Frank** 28:9,21 35:15,16

**Fred** 28:10

**free** 76:12

**freelance** 38:5

**freelanced** 38:4

**friendships** 73:7

**frightened** 67:10

**front** 9:21 25:9 28:8 55:12

**full** 7:22 12:23 13:19 15:23 45:13
48:19

## G

**gave** 21:6,9,11,14,15,20 22:17
35:11,24 65:15 68:17

**general** 11:3,7 13:9 14:16 39:14,
16

**generally** 8:3

**generated** 50:10

**genitals** 66:13

**girlfriend** 67:7

**give** 13:9 14:16 18:6 20:12 46:11
74:10

**giving** 18:1,12 26:8,10 60:24

**Good** 6:13,15,20,22 7:21 37:3

**graduate** 12:4

**Grand** 13:18,20 15:22 16:1 24:6,13
40:11 54:5 57:2 71:16 74:20,24

**Greenberg** 37:7

**guardian** 61:11

**guess** 48:21 57:15

**Guevara** 5:18 6:21 7:14 36:18
73:11,22 74:15,16 75:22

**guy** 58:24

**guys** 36:16

## H

**H-O-R-V-A-T** 6:23

**Haley** 6:10 73:18 75:20

**Halvorsen** 74:18

**hand** 64:8

**handled** 22:22 59:1

**handwriting** 34:19,20,22

**handwritten** 59:7,11,15

**happen** 19:24 57:22 59:4

**happened** 47:3 56:3,6 61:19 65:4

**happening** 61:15

**happy** 55:7

**hard** 25:9,12

**head** 8:20 23:18,19 66:22

**headquarters** 17:12 35:1

**hear** 8:24 23:2

**helping** 74:9

**high** 11:7

**highest** 10:18

**Hold** 17:19 27:3 45:21 61:6

**holes** 50:11,13

**home** 16:12,24

**homicide** 48:6

**hope** 37:3

**Horvat** 6:22,23 26:3 44:8 45:1,21
46:3,9,14 47:6 48:15 49:6 53:2,11
55:5 56:14 69:1,4 76:11

**hours** 15:6 16:11

**HQ** 35:1

**huh-uh** 8:18

**hundred** 15:5 63:21

**Hundreds** 39:1

**hyped** 46:5

**hypothetical** 18:9,18 20:3 29:8
58:12

## I

**idea** 13:9 14:16 62:7 65:4 68:6

**ideas** 15:10

**identified** 24:10 47:2

**identify** 6:4 25:18 34:15

**Illinois** 5:20 6:1 7:7 10:15 12:12,
15,18 38:7,14

**immediately** 63:24

**implemented** 48:11

**incomplete** 18:9,18 20:3 29:8
58:12

**independent** 31:6,16

**independently** 27:7 28:2 66:5

**indicating** 19:12,19 23:16,17 60:6

**individual** 67:10

**information** 22:2 35:8

**initial** 21:23 47:21

**initialed** 21:1

**injuries** 67:21 68:4,7

**inspect** 68:12

**instance** 37:18 39:11 40:24 41:2
47:19 49:19 64:3 66:22 67:6 71:3,4
72:8 73:11

**interact** 42:16,18,22

**interested** 70:9

**internal** 44:15

**internet** 9:2

**interpret** 63:15,17,18

**interpreter** 24:8,10,11,16 29:20
30:9,11 54:10,13,15,19 55:16,22
57:6,19 58:15

**interpreters** 24:5 53:20,23 54:3,6
56:20 57:3,10 59:16

**interpreting** 24:16 30:2,6 54:21

**interrogation** 47:3

**intervention** 46:17

**interview** 28:18 31:3 33:7 59:4

JOSEPH SZYBIST, 06/09/2021

**introduce** 17:13

**investigator** 21:23 30:1,12 36:2

---

**J**

**JAG** 11:19,20

**Jennifer** 6:7 37:4 69:2

**job** 18:24 31:19 38:9 61:11

**Joe** 20:4 41:23 44:9 45:1 47:7 48:15 49:6 53:2,12 55:5 56:14 59:13 76:11

**John** 42:3

**Join** 40:6 58:2

**Jon** 42:15,16 62:12

**Jose** 5:17 6:8 9:16 26:10 27:13 28:22 32:23 34:1 35:15 37:6

**Joseph** 5:14 6:24 7:15,23 26:13 30:14

**Juan** 5:17 35:15

**Judge** 11:16

**June** 5:15

**junior** 10:20,23 11:6,9 35:15

**Jury** 13:18,20 15:22 16:2 24:6,13 40:11 54:5 57:2 71:16 74:20,24

**Juvenile** 13:16

---

**K**

**kind** 25:13 46:3

**knew** 21:1 43:7

**knowledge** 58:10

---

**L**

**label** 51:6

**lack** 31:15

**language** 23:22,23 24:1,17 29:2, 23 52:16 53:4,10,14,16 56:17

**late** 40:24

**law** 44:12,18 45:2,7,14,20 48:4,12, 22,24

**lawful** 7:16

**lawsuit** 10:10

**lawyer** 49:8 57:5

**lawyer's** 55:11

**lay** 63:16

**leading** 46:4,12,15

**learn** 48:4

**learned** 71:5

**leave** 64:3

**left** 11:12 33:6

**legal** 5:22 13:13 31:20 44:1

**Legislature** 44:5

**legs** 69:6

**level** 10:18

**license** 47:24

**licensed** 12:15,17 31:19 38:3 54:19,22 70:23

**likelihood** 42:10

**likewise** 8:5 28:1

**lines** 60:13

**listed** 29:6

**Listen** 55:2

**literally** 69:1

**location** 16:18,19 17:6

**lodged** 15:15

**log** 76:12

**long** 11:14 13:3 51:13,16 61:14

**longer** 69:23

**longstanding** 73:6

**looked** 10:4 50:10

**lot** 63:7

**loud** 8:18

---

**M**

**M-I-N-G-E-Y** 75:9

**machine** 23:24 49:15 50:7

**machines** 49:17,19,22,23 50:1,4,9

**made** 13:12 21:1 67:14

**main** 15:12,15

**maintain** 47:24 51:7,13

**maintained** 40:15 51:12

**maintaining** 51:19

**Maisonet** 28:22

**make** 9:1 14:21,22 21:17 31:20 35:2 57:23 58:7,8 61:11 68:18 76:20

**making** 60:14

**man** 66:6

**manual** 49:23 50:4,9

**mark** 25:5 33:17 73:24

**matter** 5:17 37:6

**Maysonet** 5:17 6:9 9:16 10:9 26:10 27:14 28:7 30:23 31:4 32:1, 7,19,23 33:1,10 34:2,7,9 35:9,15 37:6 52:6 62:8

**Maysonet's** 27:17 34:12

**meaning** 60:5

**media** 5:12 10:8 76:24

**meet** 16:20 17:6,8

**meeting** 77:4

**memory** 28:3

**mentioned** 11:23 23:12 69:24 70:20

**mentioning** 42:7

**Michael** 6:20

**mid** 38:13

**migrate** 50:6

**migrated** 50:1

**Mike** 36:15

**military** 11:14

**mind** 66:2 68:24

**Mingey** 75:7,9

**minute** 68:24 69:2 74:10

**minutes** 69:1

**misapprehension** 55:10

**misspoke** 58:21

**misstates** 43:10 49:2 52:24 53:12 59:12

**mistreated** 60:12 61:8

**moment** 73:23

JOSEPH SZYBIST, 06/09/2021

**month** 30:20 38:19

**months** 11:7,8,10

**Montilla** 28:10,21 35:16 75:2,6

**morning** 17:1

**Morris** 6:2 7:4

**motion** 19:11,16,17,18,22

**motions** 19:10

**move** 72:4

**multiple** 32:15

**murder** 45:8

### N

**names** 42:7

**Naperville** 10:15

**narrow** 70:8 72:20

**National** 48:1

**nice** 77:2,4

**night** 16:11

**nineties** 58:6 72:24

**nod** 8:20

**nodding** 23:18

**non-english** 56:23

**non-verbal** 22:12 23:18

**North** 5:24

**Northern** 5:20

**notations** 21:17

**note** 19:10

**noted** 29:12,15,24 30:3,8

**notes** 50:13,15 51:3,19 52:1,5 62:23 63:11,13,14,23

**number** 5:18 24:1 25:19 28:11 30:15,19 32:12 33:15,18,21,23 34:14 47:12

**numbers** 26:4

### O

**oath** 7:9

**object** 17:21 27:4,6 32:5 39:13 40:5,6 41:22 42:18 43:1 44:7,14 49:21 52:8 53:11 56:8,24 58:1,11

**72:18**

**objected** 41:8 45:5

**objecting** 44:23

**objection** 17:20 18:8,17 20:2,15 27:3 29:7 31:5,14 32:9,21 33:3 38:2 41:4 43:9,10 44:20,22 45:10 47:4 48:13 49:2 52:24 54:12 55:18 56:1,13,14 59:12 67:24

**obnoxious** 55:1

**obtain** 10:22

**obtained** 10:19 11:4 35:20

**obvious** 68:4

**office** 13:1,4,7,11,22 14:9,11,14,20 15:3,15 16:4,10 21:13 22:5 25:2 37:11,21 38:10,16 39:20 40:13,20 43:20 44:16,17 48:12 50:18,20,22, 23,24 51:3,14,19,20 53:7 56:20 57:11 58:17 59:20 60:4 61:5 70:4 71:9,13,18

**officer** 7:17 22:9 29:22 55:22

**officers** 6:14 7:11 60:7

**offices** 5:24 52:1

**official** 37:19,20 38:1,8,14 54:19 57:2

**officially** 54:21

**operating** 44:11 47:11,14 55:9

**opportunity** 42:16,22 54:10

**opposed** 28:3

**option** 44:4

**oral** 8:18

**order** 51:9,13

**original** 51:2,19 52:1

**overly** 75:20

**overt** 67:20

### P

**p.m.** 5:13

**pager** 16:12

**pages** 33:22,23

**paid** 38:20

**pants** 68:12

**paralegal** 6:10

**parenthetical** 19:13 23:10

**parentheticals** 23:12,13

**part** 27:22 29:20,21 30:8 31:9 39:9 62:2 66:17 70:17 71:6

**part-time** 11:11

**parties** 6:5

**parts** 68:5,12

**pass** 12:14

**path** 45:24

**Paulnitsky** 74:22,23

**paycheck** 38:19

**pending** 8:13

**people** 19:5 21:22 22:17 26:9 35:11,21 36:13 44:4 48:20 56:11 57:13

**percent** 63:21

**period** 72:23

**permission** 72:9

**person** 15:8 18:1,4,5,12,22 19:11 20:18 21:6,8,10,14,20 23:4 24:16 26:8,9 29:20 35:24 42:4,14 62:5 63:16 64:24 65:15,16 67:13,18,20 68:17,19 72:2

**person's** 24:15 34:12 35:15

**personally** 58:14

**Peter** 42:5

**photo** 21:16,18 34:9 65:1,23 66:8, 24 67:4,9,12 71:24 72:3,13 73:22 75:21,24

**photograph** 22:1 24:22 34:17 35:9,13

**photos** 22:15

**physical** 61:13 67:1,23 68:6

**physically** 65:19

**picture** 21:8,10 34:1,3,6,12 67:18 68:10,18,19 72:7 73:10,13

**pictures** 35:11

**place** 17:19

**Plaintiff** 6:8 7:10 37:6

**plane** 74:7

**point** 14:21 20:14 48:4

JOSEPH SZYBIST, 06/09/2021

**pointing** 23:17

**Polaroid** 21:7,11,16 34:6,9 62:17 65:1,13 66:14 68:16 71:24 72:3

**police** 7:17 17:3,11,16 20:7 22:8 29:22 39:2 55:21 59:23 60:7 64:3 70:11 73:7

**portion** 34:24

**pose** 8:5,23

**poses** 8:24

**posing** 8:6

**position** 13:6 38:15 52:21

**positions** 14:6

**practice** 63:22

**preparation** 10:2

**presence** 60:6,12 61:14,23

**present** 6:9 9:8 26:9 27:1 28:6,9, 13,20,23 29:18,23 35:21 55:16 59:21

**pretty** 54:24

**Previously** 52:20

**prior** 17:9 29:9 66:13

**prison** 10:9

**private** 13:17

**problem** 52:20 63:5

**procedure** 19:14 20:23 21:12 35:10 47:11,14 48:7,9,10 64:23 70:1,4,6,9,14,16,24

**procedures** 13:23 45:19

**proceedings** 13:13,14 31:21 54:5, 6

**process** 47:18 54:7 70:18

**processor** 63:3

**producing** 63:5

**professional** 57:6

**program** 12:4,6,7

**programs** 15:11

**pronouncing** 37:4

**prosecutors** 59:23 60:8

**protection** 46:1

**provide** 27:18

**provided** 45:12 48:17 71:18 72:1

**providing** 24:21

**Public** 13:17

**pull** 65:21 73:19,21

**purpose** 68:16

**purposes** 65:13

**pursuant** 7:7

**put** 19:12 23:10 29:4 35:6 50:22 51:3 58:5

## Q

**question** 8:5,7,13,14,23 9:3,21 17:21,23 29:11 42:21 45:23 46:4 52:18 55:6 56:15 60:2,22 62:4 68:2 70:8

**questioning** 62:3

**questions** 7:20 9:7 18:15,23 19:3 36:9,13,16,17,19,20 37:2,8 44:24 46:12,15 47:13 62:2 69:22 70:12 72:12 74:13 76:2

## R

**ran** 15:22 51:16 57:13

**range** 14:12

**read** 10:8 63:10

**reading** 27:9

**reason** 64:17,21

**recall** 11:4 14:10 22:12,24 24:5,6 39:18 42:4 50:8 51:15 52:14,21 53:24 54:3,4 55:19,20,24 56:2,7,10 57:18,19 58:13,15 59:7,17 60:5,9 74:19 75:10,15

**receive** 47:20

**received** 16:16 21:3 38:19 47:22 71:12

**recent** 75:24

**recognize** 41:24 66:5 73:12,13

**recognized** 43:12

**recollect** 27:7

**recollection** 27:13 30:21 31:6,16 40:20 53:19 54:2,9 55:15 57:21 59:9

**record** 5:13 6:5 7:4,6,22 8:21 17:20 19:2,5 23:8,22,23,24 24:15

25:24 27:9 28:17 33:21 45:8 49:14, 20 53:3,14 59:24 60:1 61:11,24 62:6 69:15,18,20 76:23

**recorded** 22:10 24:9 26:16 28:14 32:2 47:8 49:10,11 51:18 52:14 53:8 62:22

**recorders** 43:17,22

**recording** 20:5 23:20 31:22 33:9 44:17 47:16,18

**reduce** 20:8

**refer** 25:11,16

**reference** 28:3

**referenced** 30:19

**referring** 9:20,24 28:8,16 29:17 33:5 71:10

**reflect** 28:17

**reflected** 75:3

**reflection** 47:2

**regular** 13:19 14:23 16:1

**related** 9:12

**relates** 40:2 70:10

**relax** 55:3,4

**released** 10:9 67:14

**relevance** 41:5

**relevant** 72:23

**rely** 27:16,20

**relying** 27:21

**remember** 22:11 23:19 28:1 42:8 48:19 50:5 53:23 55:5 74:23 75:4, 14

**remotely** 7:9

**repeat** 23:4,9 52:18 55:6,7,8

**rephrase** 9:2 29:10

**reported** 14:2,14 17:7,9 20:19,21 25:22 30:14 32:1 33:9 34:10 36:8 38:23 39:12,24 40:3 41:3,15 42:11 43:14 44:3,4 47:1 48:5,18 50:16 52:22 53:21 54:8 55:14,21 56:22 57:9,23 58:8,14 62:9 63:18,23 64:19 70:10,17 71:4,19 72:1 75:3

**reporter** 6:2 7:1,3,8 8:7 12:8,11, 13,15,18 13:8,10,12 14:7,8 15:9, 12,13 16:7,12,23 17:14 19:4,14 23:13 26:11,13 28:22 31:18,19,22

35:7 37:11 38:1,5,6,14,23 45:18
46:22 47:17 53:6 56:18 59:15 60:3
63:15 64:22 70:3 71:1,7 73:8 77:4,
5

**reporter's** 50:21 60:15

**reporters** 14:19 15:2 37:20 38:8
39:20 40:12,21 45:8 48:1 51:22,24
58:23 60:10,21 61:10 63:18 70:16

**reporting** 10:21 11:24 12:2 13:22
14:18,23 16:15 19:9 23:17 33:6
70:22 71:6,13

**represent** 6:6 37:5

**represented** 37:14

**representing** 5:23

**requested** 30:22

**required** 13:22 42:14 45:7,20 48:4

**Reserves** 11:8,15,19

**reside** 10:14

**resides** 10:16

**respectful** 46:10

**response** 22:13 23:11,18 47:12
70:12

**responsible** 51:17 61:16 70:15

**restate** 9:3

**retirement** 77:6

**review** 10:2,5 13:21 14:1 15:4,11
16:8,9,22 18:16 19:6,9 22:6,23
24:4,6 25:1,3 27:2 30:24 32:12
38:24 39:6,7 40:1,4 43:21 52:15
53:20 54:7 57:13,17 59:1 65:6
70:18,21 72:17

**reviewed** 65:2

**reviewing** 32:17

**Reynaldo** 5:17 73:11,22 74:15
75:22

**right-hand** 26:3

**ring** 74:16

**road** 63:3

**Roland** 74:21

**room** 9:8,23 18:1,3,5,10,11 20:17
21:5 28:18,20,24 33:7 34:11 36:3
47:3 50:17 51:14,16 59:4 61:20
64:9,13,18 65:5,9,11

**Rule** 7:7

**rules** 8:4

**Ruthie** 6:2 7:4

---

## S

**S-Z-Y-B-I-S-T** 7:23

**scenario** 53:19

**Schalka** 6:20,21 7:14 36:18 76:8

**Schatzle** 5:22

**schedule** 15:8

**schedules** 14:22

**scheduling** 15:10 76:17

**school** 10:21 11:7,11,24 12:2 71:6

**scope** 72:18

**screen** 25:6,14 33:19

**scroll** 34:2

**seek** 46:1,16

**send** 64:4

**sense** 9:1

**Sergeant** 75:7

**served** 55:22

**services** 30:22

**set** 17:14,17,24 18:5 20:6 23:24
44:1 57:4 70:21

**seventies** 41:1 47:21

**shake** 8:20

**shaking** 23:18

**short** 38:9,12 69:17 76:21

**Shorthand** 35:7

**shot** 46:11

**show** 21:13 23:15 25:4 33:17
65:15 73:13 76:11

**showed** 73:10

**shown** 22:15,16

**shows** 29:3

**side** 34:2

**sign** 21:23 35:24 36:1 68:18

**signature** 21:4 76:10 77:10

**signatures** 22:2 35:17,19,20

**signed** 20:24 36:5 65:2 68:15,21

**similar** 49:18

**simple** 46:17

**single** 56:2,6

**sir** 9:15,24 11:14 12:20 14:4 17:22
21:16 24:20 25:4,5,19 26:7,14,20
27:23 28:5 29:11,22 30:4,13,16,21
31:2,8,11 32:24 33:17,18,22 34:13,
20 35:3,8,17 36:4 40:9 41:11 52:9
58:12 76:2 77:3,5

**sit** 42:20 72:4,6

**situated** 18:2,4

**Sixty-eight** 10:13

**sixty-five** 15:5

**small** 25:13

**socializing** 42:12

**Spanish** 30:7

**speak** 23:5 52:23 53:9 56:12 57:22
58:24 59:6,10

**speakers** 56:23

**speaking** 15:18 23:21 44:20,22
52:16 53:14 59:17

**Special** 13:18 15:22

**Specialists** 44:2

**specific** 25:17 27:22 37:19

**specifically** 43:20 54:6

**speculate** 31:7

**speculation** 31:15 33:4 52:9

**spent** 41:21 72:16

**spoke** 19:5 32:8 56:17

**stamps** 26:5

**standard** 19:13 20:23 21:12 35:10
45:19 47:11,14 70:1,14 71:14

**standing** 72:5

**stands** 35:7

**Star** 28:10

**started** 16:2 26:16 43:23 44:2,17
71:12,17

**state** 7:22 24:15 44:5

**State's** 13:1,4,7,11,16 14:5,18
15:2 16:20 17:6,8,13 18:20,21
20:12,13,21 21:22 22:8,22 24:21

JOSEPH SZYBIST, 06/09/2021

Index: stated-transcription

28:10,20 37:11,15,21 38:10,16 40:19 43:19 44:16 48:11 50:19,24 51:20 53:7 56:20 57:11 58:17,19, 20,22 59:2,20 60:4 61:5 62:3 64:8, 14,18 65:5 70:3 71:8,18 75:12

**stated** 28:23 30:5 59:24 60:11 61:23

**statement** 9:16,20 10:4,6 16:8,23 17:7,9 18:2,6,13,16 19:1,6,9 20:1, 6,8,19,22 21:2,3,6,9,11,14,15,20 22:3,4,6,7,15 23:1,6,21 24:4,9,18, 19,21 25:22 26:8,10,12,14,15,20, 24 27:2,13,17 28:6,8,12,14,15,16 29:1,3,4,5,17,21,24 30:10,20,22 31:9,10,11 32:1,3,7,8,12,18,22 33:1,10 35:22,24 36:8 39:12 42:11, 13 47:1,9,16 50:16 52:6,22 53:9,21 55:21,23 57:23,24 58:8,9,14 59:6, 11 60:1,18,24 61:1,6,19 62:9,18 63:24 64:1,11,15,19 65:1,6,16,19 67:14 71:5,11 72:2 75:1,3

**statements** 14:3,14 17:7 20:24 22:17 35:11 38:24 39:20,24 40:3, 10,17 41:3,15 42:17,20,23 43:14, 18,24 44:3,18 45:8 47:18 48:5,20 49:10,11,14,20 51:18 52:15 53:4, 24 54:3,8 55:14 56:22 57:9,16,19 59:8,15,16,19 62:11,14,23 70:10, 17 71:10,14,19 72:17

**states** 5:19 35:1

**station** 17:12 20:7 39:3 64:4

**stations** 17:16 70:11

**status** 45:1

**stay** 76:15,17

**steno** 50:13,15 51:3 52:1,5 62:23 63:10,13,14,23

**stenograph** 49:15,17

**stenographically** 19:2 20:5 26:15 31:21 33:9 47:8 49:10,14,20 51:18 52:14 53:8 62:22

**Steven** 37:7

**sticker** 21:19,24 34:24 35:23

**stipulate** 7:5

**stop** 54:23 55:1

**storage** 50:22 51:14 52:3

**Street** 6:1 15:16

**stretch** 69:6

**strike** 16:21 18:15 19:8,24 39:22 75:5

**struck** 66:13,17,21

**stuff** 70:20

**style** 63:19

**subjects** 11:3

**suburbs** 17:5 39:6

**suffered** 67:23 68:6

**suggesting** 56:11

**Suite** 6:1

**supervised** 14:19

**supervision** 58:18,22

**supervisor** 14:9,11,13,17,24 15:3 39:10,23 40:15 58:16,20 61:7

**supervisory** 14:6

**Support** 13:15

**Supreme** 7:7

**suspect** 64:20

**suspects** 70:11

**swear** 7:2

**sworn** 7:16 24:12

**system** 44:11

**Szybist** 5:14 6:24 7:15,21,23,24 10:12 26:13 27:12 30:14 36:9 37:3 66:4 69:6,8,22 76:2,4,14,16 77:2

---

## T

**taking** 17:9 19:1 21:16 24:22 27:13 33:1 40:3,17 42:10,17,23 47:16 51:18 52:14 55:13,21,23 56:22 57:16 58:14 59:19 61:6 62:22 65:1, 13 66:13 70:10,17 71:19

**talk** 8:11 39:8 72:22 76:17

**talking** 41:7 43:20 44:23 49:12 50:20 54:18,20 70:7

**tape** 43:17,22 50:11

**tasked** 64:24

**telling** 45:19 48:24

**ten** 14:8 35:2 40:21

**tender** 35:23

**tenure** 73:8

**terminate** 45:24

**terminated** 61:21

**terms** 40:16

**test** 12:11

**testified** 7:17 45:16 46:21 47:10, 12 49:9 52:13,20 55:13 64:7

**testimony** 27:18 29:9 43:11 49:3 53:1,12 59:13 70:1,24

**Theresa** 6:15 36:15

**thing** 9:18 51:23 74:24 75:14

**things** 45:19 47:14 74:8

**thirty** 14:4 37:12,23 38:22 53:5 56:5 57:15 59:19 60:3 61:17

**threatened** 67:1,5

**throw** 51:6

**Thursday** 35:1

**ticker** 50:11

**time** 8:10 12:23 13:19 14:7 15:24 21:7,15,21 26:16 28:19 36:10,21 38:1,13 41:20 42:14 55:13 56:3,6 58:5,6 65:18 69:17 71:21 72:16,19, 23 73:4 76:19,21

**times** 18:4 22:14 32:16 39:11,19 47:11,12 69:24

**title** 24:18,19 29:21 30:8

**today** 6:2 10:12 27:18 37:15 45:16 49:19 52:7

**Today's** 28:18

**told** 16:17 29:11 44:5 61:23

**top** 30:13 34:24 66:21

**trained** 60:10,11 61:4,8

**training** 46:24 47:20,21

**transcribe** 33:11,13 63:24

**transcribed** 19:24 25:23 26:18 27:17

**transcribing** 22:7,14 23:1,6 24:21 49:24

**transcript** 19:13 20:8,9,11 22:10, 20 23:14 24:9 26:18 29:12,15 30:3 31:20 32:19 33:12,14 34:10 60:14 61:12 63:5 74:20,24

**transcription** 28:15 31:3 32:6 63:4

JOSEPH SZYBIST, 06/09/2021

**transcripts** 13:13

**translating** 29:2,23

**translator** 24:3 29:12,16 54:10,13, 15 55:16

**translators** 53:20 56:21

**treated** 59:22 60:7 62:4,8,13

**true** 31:9,13

**twenty-four** 15:6

**type** 10:22 13:24 19:18 20:7 33:14 49:13 59:11 63:7 67:23

**typed** 9:16,20 10:6 20:10,22 22:20 62:18

**types** 15:10

**typewriter** 63:2

**typewriters** 63:8

**typewritten** 62:24 64:1

**typing** 63:8,11

---

**U**

**uh-huh** 8:18 73:16

**underneath** 35:14

**understand** 17:10,23 23:10,11 24:1 37:22 39:17 53:16 54:16 56:15 62:21 68:1

**understanding** 59:3 70:5

**understood** 9:4

**unintelligible** 23:7

**unit** 5:12 13:21 14:1,18 15:4,5 16:9 18:22 22:6 25:1,3 70:21 76:24

**United** 5:19

**units** 13:22 15:21

**urinated** 66:9

**Urlaub** 5:23 6:3

---

**V**

**Vaguely** 74:19

**verbatim** 13:13 19:2 31:20 60:14, 20 61:12,15 70:23

**versus** 5:17

**video** 5:12 6:5 43:24 44:2,3,4,17 45:8,12,13 48:17 69:20 76:23

**videoconference** 5:14

**violence** 67:2

**violent** 28:11 41:20 49:12 55:14 57:8 72:16 73:1

**voluntarily** 60:24

**vouching** 68:20,22

---

**W**

**wait** 8:4,6

**waived** 76:11 77:10

**walk** 17:11

**walking** 73:14

**wanted** 9:7 52:5 58:8

**week** 15:23 39:11

**well-being** 68:20

**whisper** 22:9

**whispering** 22:11

**wife** 10:17 67:7

**witnesses** 19:10 22:15

**wondering** 70:15

**word** 19:15,20 63:2

**words** 32:18

**work** 11:11 15:21 24:7 39:2,3

**worked** 17:5 21:13 38:13 41:19 43:19,21 63:11

**working** 14:24 38:15

**workload** 40:2,16

**Wow** 61:5

**write** 21:17,20 31:12 35:8

**writing** 34:15 35:12,14

**writings** 63:19

**wrong** 53:22

**wrote** 60:15

---

**Y**

**year** 12:17 14:10 15:6 30:19

**years** 11:16,17,22 14:4,8 15:9,19 16:5 21:8 37:12,23 38:22 49:23 50:1 51:15 52:2,12 53:6 56:5 57:16 59:19 60:3 61:17 71:23

**young** 66:6

---

**Z**

**zoom** 9:7 35:3

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 41

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

STATEMENT OF

Rosa Bello

Taken 8-23-90 At 2:10 pm

At Area 5 Violent Crimes

Present ASA Frank DiFranco
Det. Fred Motilla

This statement taken regarding the Shooting Deaths
of Kevin Wiley / Torrence Wiley which occurred on May 25 1990
at 1:00 am at 3428 North ave. Chg IL.

I understand I have the right to remain silent and that anything I
say can be used against me in a court of law. I understand that I
have the right to talk to a lawyer and have him present with me
during questioning, and if I cannot afford to hire a lawyer one
will be appointed by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement.

After being advised that Frank DiFranco
is an Assistant States Attorney, a lawyer working
with the police and not Jose Maisonet's
lawyer. Rosa Bello agreed to give the
following statement in summary.
Rosa Bello stated that she is 24
years old and lives with Jose Maisonet.
Rosa is currently pregnant with Jose's
child.
On May 24 1990 around 11:30 pm
Rosa was at home with Jose and
her two children watching television.
Three of Jose's friends stopped by known
to Rosa as, Liuvia, Fro and Tina.
~~One of the three~~ asked Jose for

A.D. Liuvia [signature]                      Rosa Bello

F-156

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

a gun. Rosa became upset because she does not allow guns in the house. Rosa said the gun was a 9mm and was wrapped in a towel. Rosa put the gun in a plastic bag and Jose handed the gun to Lluvia.

All four men then left the apartment and only Jose returned about 1:00am. Rosa asked Jose where he had been and Jose stated that he was no where special. Jose stated that he went out with the guys and that he was driving. Later that evening Jose told Rosa that two guys got shot.

Rosa identified Attached exhibit #1 as Lluvia and attached exhibit #2 as Fro.

ASA Frank D. Isave                    Rosa Bello
Det.

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



Exhibit #1



CCSAO000308

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER









Exhibit #2

Frank D. Sure #SA

Rosa Deller

CCSAO000309

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 42

Identify, and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE—TIME**
DAY 25 MO. May YR. 1990 — 0100

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 3428 W. North Ave. | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | ☐1 YES ☐2 NO ☒ | | ☐1 YES ☒ NO | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | 4 |

Offenders section:

| #3) CRUZ, Justino | 3337 W. Pierce | M/4/21 | 5-8 | 175 | Brn | Blk | Med. |
|---|---|---|---|---|---|---|---|

31. C.B. NO. 8630-335 | I.R. NO., Y.D. NO. 871356 | OFFENDER 3 | 32. NO. 652

33. DNA — 1 DNA
50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA): DNA — 53. STATUS UNIT NO. 652

### 80. NARRATIVE

IN CUSTODY: CRUZ, Justino M/WH/Age 21, DOB ▓▓▓▓

3337 W. Pierce, Admitted member of the Latin

Kings Street Gang, Nickname of "Tino", IR# 871356,

CB# 8630-335

ARRESTING OFFICERS:   Det. R. GUEVARA      #16345, Area Five VC
                      Det. E. HALVORSEN    #6036,         "
                      Det. F. MONTILLA     #16410,        " PC
                      GCSP P. ZACHARIAS    #          Gang Crimes North

90. EXTRA COPIES REQUIRED: Normal
91. DATE REPORT SUBMITTED: 24 Aug..90

93. REPORTING OFFICER: Det. E. HALVORSEN #6036
94. REPORTING OFFICER: Det. R. GUEVARA #16345

95. DATE APPROVED: 27 AUG 1990

CPD-11.414-3 (Rev. 8/85)

N-234297

RFC-AGonzalez 000042

DETECTIVE DIVISION                                              24 AUG. 1990
AREA FIVE VIOLENT CRIMES                                        RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                                   PAGE (2)
VICTIM: WILEY, Torrence


DATE, TIME, LOCATION            24 Aug. 0500, 5555 W. Grand Ave.
OF ARREST:

CHARGES, COURT BRANCH           GONZALEZ, Alfredo
AND DATE:                       (2) counts of First Degree Murder, Chp. 38-9-1a2,
                                Br. 66, 24 Aug. 90, Charges approved by A.S.A.
                                Jennifer BOROWITZ, Felony Review


                                CRUZ, Justino
                                Charges are pending at this time

NOTIFICATIONS:                  A.S.A. Jennifer BOROWITZ, Felony Review

INVESTIGATION:                  On 23 Aug. at 0928 hrs. Jose MAYSONET gave a court
                                reported typed statement. In this statement MAYSONET
identified Alfredo GONZALEZ, AKA Lluiva, as the person he witnessed kill the two victims.

                                A.S.A. Frank DIFRANCO defered charging MAYSONET at
                                this time until all efforts had been exhausted to
locate the other two individuals named in MAYSONET'S statement.   A.S.A. DiFRANCO also
wanted MAYSONET returned to the scene of the murders and re-create the events that he
observed.

                                During the second watch detectives were not successful
                                in locating, the other two wanted offenders.   On
23 Aug. 90, at 1800 hrs. A.S.A. DIFRANCO approved charging Jose MAYSONET with two counts
of First Degree Murder.

                                Alfredo GONZALEZ had been in the office of Area Five
                                due to the allegation made against him by MAYSONET.
On 23 Aug. 90, at 1830 hrs. Alfredo GONZALEZ was informed that MAYSONET had signed a
statement implicating GONZALEZ as the person who killed the two victims.   GONZALEZ again
stated that he did not know anything about these murders.   GONZALEZ was placed in custody
based on the statement of Jose MAYSONET.

                                During the 3rd watch on 23 Aug. 90, Dets. E. HALVORSEN,
                                and R. GUEVARA searched to find the two remaining
named offenders, Chris CRUZ, AKA "Tino", and Chris FERNANDEZ, AKA "Fro".

                                At 2300 hrs. the R/Dets. returned to Area Five to
                                interview Alfredo GONZALEZ further.   GONZLEZ was
given a copy of the statement signed by Jose MAYSONET to read.   After reading this
statement GONZALEZ anounced, that Jose MAYSONET was a liar, and that GONZALEZ wanted
to tell the true story.

GONZALEZ, Alfredo               in summary acknowledged understanding his Miranda
                                rights as they were read to him by Det. R. GUEVARA
from a pre-printed card.   GONZALEZ stated that he wanted to talk with the detectives.

Continued On Page (3)

RFC-AGonzalez 000043

DETECTIVE DIVISION                                              24 AUG. 1990
AREA FIVE VIOLENT CRIMES                                        PAGE (3)

HOMICIDE/FIRST DEGREE MURDER                                    RD# N-234297
VICTIM: WILEY, Torrence


GONZALEZ, Alfredo                    He is a member of the Latin Kings.  On 24 May 90,
                                     about 2330 hrs. he was walking to his house.  He
was at LeMoyne and Spualding.  He saw a blue car and recognized, "Fro" inside the car
and told him to stop.  The car stopped.  The car was a midsize, two door model.  Also
in the car were Jose, and Tino.  "Fro", Jose and Tino are also members of the Latin
Kings Street Gang.  Tino is his nephew.  Jose was driving the car.  Jose was wearing a
dark blue hoodie.  "Fro" was wearing a black hoodie.  Tino was weaing a white hoodie.
GONZALEZ got into the car and asked for a ride home.  They did not drive him home
but instead drove to an alley by North ave. and St. Louis.  Jose was carrying a gun.
The gun was 9mm automatic.  They parked in the alley.  Jose, Tino and "Fro" all got
out of the car.  They all put their hoodies up.  GONZALEZ now realized that they were
going to do a "Roll", and try to kill someone.  They walked away and disappeared.  The
nect thing he heard was five to six gunshots.  All three guys got back into the car.
As they drove off he looked and saw two bodies on the sidewalk on North ave.  They
then drove him home.

                                     The R/Dets. contacted A.S.A. J. BOROWITZ, Felony
                                     Review who arrived at Area Five.  A.S.A. BOROWITZ
was familiar with this investigation, having previously interviewed Jose MAYSONET.
A.S.A. BOROWITZ in company with Det. R. GUEVARA interviewed Alfredo GONZALEZ.  After
this interview GONZALEZ agreed to give a court reported typed statement.

                                     On 24 Aug. 90 at 0200 hrs.Alfredo GONZALEZ gave
                                     a court reported typed statement.  Present for
this statement were Det. R. GUEVARA, A.S.A. J. BOROWITZ and court reporter J. LUPA .
Alfredo GONZALEZ subsequently read and signed his statement.  After signing this
statement Alfredo GONZALEZ was charged by A.S.A. J. BOROWITZ with two counts of
First Degree Murder.

                                     At 0330 hrs. on 24 Aug. 90, detectives  located
                                     Justino CRUZ, AKA Chris CRUZ on the street at
Kimball and North Ave.  He was known on sight by Det. R. GUEVARA.  CRUZ was informed
of the statements given by Jose MAYSONET and Alfredo GONZALEZ, implicating him in
these murders.  CRUZ stated that it was a lie and agreed to come to Area Five and
confront his accusers.

                                     After arriving at Area Five Justino CRUZ was seen
                                     by both Alfredo GONZALEZ, and Jose MAYSONET and
identified by both of these persons as being the "Tino" they spoke of.

                                     On 24 Aug. 90 at 0500 hrs. Justino CRUZ was arrested
                                     for these murders.  Due to the late hour CRUZ was
allowed to sleep in an interview room at Area Five.

                                     At 0900 hrs. the R/Dets. turned this investigation
                                     over to Dets. R. Schak and R. Smitka.  Their
investigation is reported under a seperate Supp. Report.

Det. E. HALVORSEN #6036
Det. R. GUEVARA   #16345


RFC-AGonzalez 000044

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 43

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

ORIGINAL STATEMENTS

CCSAO000727

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



CCSAO000728

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



CCSAO000729

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

j1 1

RE: INVESTIGATION (FATAL SHOOTING OF TORRENCE WILEY AND KEVIN WILEY)

S T A T E M E N T

OF

ALFREDO GONZALEZ,

taken in an interview room, Area 5 Violent Crimes, Chicago Police

Department, 5555 West Grand Avenue, Chicago, Cook County, Illinois,

on Friday, August 24, 1990, at the hour of 2:00 o'clock a.m.

> PRESENT:  Ms. Jennifer Borowitz
> Assistant State's ATtorney
>
> Detective Ronaldo Guevara,
> Star No. 16345
> Area 5 Violent Crimes
>
> Reported by:  Janet K. Lupa
> Book No. 9008-25

- - - - - - - - - - - - - -

MS. BOROWITZ:  Let the record reflect that we are in an interview

room at Area 5 Violent Crimes.  Today's date is August 24, 1990.  The

time is 2:00 o'clock in themorning.  Present in the room with me is

Detective --

DETECTIVE GUEVARA:  Ronaldo Guevara.

MS. BOROWITZ:  --- the court reporter and Alfredo Gonzalez.  I am

assistant state's attorney Jennifer Borowitz.

We are here to take the statement of Alfredo Gonzalez

concerning the investigation of the fatal shooting of Torrence Wiley

and Kevin Wiley which occurred on May 25, 1990 at 3428 West

North Avenue in Chicago, Illinois.

Alfredo, now I talked to you earlier and explained to you

that I'm an assistant state's attorney, a lawyer working with the

police and not your lawyer, is that correct?

-1-

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

j1 2

MR. GONZALEZ:   Yes.

Q     And before we spoke I advised you of your constitutional

rights, is that correct?

A     Yeah.

Q     Now, I'm going to advise you of your rights again.

      Do you understand that you have a right to remain silent?

A     Yes.

Q     Do you understand that anything you say can be used against

you in a court of law?

A     Yeah.

Q     Do you understand that you have a right to talk to a lawyer

and have him present with you while you are being questioned?

A     Yes.

Q     Do you understand if you cannot afford to hire a lawyer one

would be appointed by the court to represent you before any

questioning, if you wish one?

A     Yes.

Q     Understanding these rights do you wish to talk to us now?

A     Yes.

Q     I'm going to draw your atention to May 24, 1990, between 11:30

and midnight, do you remember that time?

A     Yeah.                    A.G. GM

Q     What were you doing?

A     I was walking to my house.

Q     Okay.  Where were you walking, on what street?

A     Lemoyne and Spaulding.

Q     While you were walking to your house what did you see?



Alfredo GONZALEZ

Jennifer Bonjour

-2-                                           CCSAO000731

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

jl 3

A    I seen a blue car and I was looking at Fro, and I told him to stop so he could give me a ride home.

Q    Did he stop?

A    Yes.

Q    Was the blue car a two door or a four door?

A    Two door.

Q    Was it sort of a middle-sized car?

A    Middle size.

Q    Who else was in the car?

A    In the front seat there was Jose, the passenger, Fro, the back seat, Tino.

Q    Is Tino your nephew?

A    Yeah.

Q    Who was driving?

A    Jose.

Q    What was Jose wearing?

A    A dark blue hoodie.

Q    When you say hoodie what do you mean? Do you mean like a sweatshirt?

A    Sweatshirt.

Q    With a hood on it?

A    With a hood on it.

Q    What was Fro wearing?

A    Same thing, black.

Q    What was Tino wearing?

A    White sweatshirt.

Q    Was he wearing a hooded sweatshirt?

CCSAO000732

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

jl 4

A    Yeah.

Q    Did you get in the car?

A    Yeah, I asked him for a ride home and ---

Q    Did you get in the car?

A    Yeah.

Q    After you got in the car where did you go?

A    I told him to drive me over to my house.

Q    Did they?

A    No.

Q    Where did you go?

A    I went all the way to St. Louis.  Then he turned on St. Louis down over to North Avenue back to St. Louis again to the alley.

Q    When you got in the car and they didn't take you home what did they say to you?

A    I asked them to drop me off home.  They told me they wouldn't.

Q    And then what did Jose say?

A    Jose said he was going to do something, see somebody.

Q    Now, did Jose have a gun with him at that time?

A    Yeah.

Q    What kind of gun was it?

A    Nine millimeter.

Q    After they didn't drop you off at home where did you go?

A    St. Louis and the alley.

Q    The alley on St. Louis Street?

A    Yeah.

-4-

CCSAO000733

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

j1 5

Q   What other streets are near the alley?

A   Between St. Louis and Kimball.

Q   What is the main stret that's near there?

A   North Avenue.

Q   When you got to the alley what happened?

A   He stopped and pulled over.

Q   And did they turn the lights off or what?

A   Yeah.  Then Jose and Fro and Tino, they jumped out of the
car.

Q   What did Jose do with the gun?

A   He took it outside.

Q   He took it outside with him?   What did Jose and Fro do with
their sweatshirts?

A   Pull the hoodie up.

Q   What does put the hoodie on mean?

A   That they going to kill.

Q   Now, after they put their hoodies on where did Jose,
Tino and Fro go?

A   They started walking.  All of a sudden they disappeared.

Q   Where did they walk to?

A   About a few steps.

Q   Okay.  Where did they walk to?

A   To the side to the lot.

Q   To the side to the empty lot?

A   Yeah.

Q   Did they go over the fence or around the fence?

A   I don't know because I couldn't tell.

-5-

CCSAO000734

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

j1 6

Q    And what was the next thing that you heard?

A    I heard shooting, about five or six shots.

Q    What happened after you heard the five or six shots?

A    I looked to he side then Tino jumped in the back.

Q    Tino jumped in the car?

A    Yeah, in the back seat.

Q    What happened then?

A    Then I was -- I asked Tino what was up.  He said, nothing.
Then at the same time Fro and Jose jumped in and they said
everything was all right.

Q    And what did Jose and Fro do with their hoodies?

A    They pulled it down.  They started driving.

Q    Did Jose havethe gun with him?

A    Yes.

Q    What did he do with  the gun?

A    Put it on the side by the seat.

Q    He put it on the side of the seat?

A    Yes.

Q    Where did you go then?

A    He told them to drop me off home.

Q    After they took their sweatshirt hoods off what did you
do -- what did they do?

A    They started driving.  I looked up --

Q    When you looked up what did you see?

A    I seen two guys on the floor.

Q    Where did you see the bodies?

A    By the sidewalk on North Avenue

-6-    CCSAO000735

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

j1 7

Q    On North Avenue?

A    By the lot.

Q    By the lot?    Okay.

     And then you said they drove you home?

A    Yeah.

Q    Now, you became a Latin King you said in 1978?

A    Yeah.    A G

Q    While you have been here have the police treated you okay?

A    Yeah, they treated me all right.

Q    Did they give you food?

A    Yeah.

Q    What did they give you?

A    Bologna sandwich, coffee, sandwich, fish sandwich.

Q    Did they let you go to the bathroom?

A    Yeah, every time I wanted.

Q    You don't smoke, do you?

A    No.

Q    Have I, the state's attorney, treated you okay?

A    Yeah.

Q    Have any promises or threats been made to you for this statement?

A    No.

     MS. BOROWITZ:    May the record reflect that it is now 2:05 on August 24, 1990 and this concludes the statement of Alfredo Gonzalez.

WITNESSES TO SIGNATURE:                    Alfredo Gonzalez

ASA  Jennifer Brown

D.I. Reynaldo

                                           -7-                    CCSAO000736

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 44

(inventory numbers). If property taken was seized for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE—TIME**

| DAY | MO. | YR. | |
|---|---|---|---|
| 25 | May | 90 | 0100 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☐ VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 3438 W. North | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☐1 YES ☒NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5549 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street ☒ | 304 | Two | (4) |

| CIRCUM. STANCES | 11. VERIFIED ☐ | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY CODE | 15. POINT/EXIT CODE | 16. BURGLAR ALARM CODE | 17. SAFE BURGLARY METHOD CODE | 18. IF RESIDENCE WHERE WERE OCCUP. CODE |
|---|---|---|---|---|---|---|---|---|
| 19. | UPDATE TO ☐ | CODE NOS. | CODE NO. | NO. | NO. | NOS. | NO. | NO. |

DESCRIBE PROPERTY IN NARRATIVE.  T = TAKEN.  R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| PROPERTY | VERIFIED ☐ | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
|---|---|---|---|---|---|---|---|
| | UPDATE TO ☐ | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 0 CONSUM. GOODS ☐ T $ ☐ R | I FIREARMS ☐ T $ ☐ R | & NARC./DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T ☐ R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN JURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | CRUZ, Justino | 3337 W. Pierce | M/4/21 | 5'8 | 175 | brn | blk | med |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER I.REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER I. REL. CODE | 32. NO. ARRESTED UNIT NO. | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| | 8630335 | | 024 OFF. 2 | | | | 1 | 652 |

| 33. OFF'S VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐USED ☐STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☒NA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE. |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | 53. STATUS | | |
|---|---|---|---|---|---|---|
| D N A | | XX | ☒1 FIELD ☐3 SUMMARY | 652 | ☐0 PROGRESS | ☐1 SUSPENDED ☐2 UNFOUNDED |

| STATUS CONT'D. | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|
| ☐3 CLRD. CLOSED ☒CLRD. OPEN | 5 EXC. CLRD. CLOSED | 6 EXC. CLRD. OPEN | 7 CLSD. NON-CRIM. | ☐1 ARREST & PROSEC. ☐2 DIRECTED TO JUV. CRT. ☐3 COMPL. RFUSD. TO PROSECUTE ☐4 COMMUNITY ADJUSTMENT ☐5 OTHER EXCEPT. | ☒ADULT ☐JUV. |

| 55. ☐ FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO OTHER PERTINENT INFORMATION. |
|---|

**80. NARRATIVE**

In Custody : CRUZ, Justino M/WH ▓▓▓▓▓, age 21, resides at 3337 W. Pierce. Subject is 5'8, 175 lbs. blk/brn.

Arrested By : Dets. GUEVARA #16345 A/5 VC & GCSP ZACHARIAS #.

Subject was taken into custody on 24 Aug. 90 at 0500hrs at A/5 Hdqtrs. after he was implicated in the double homicide by two other offenders in this matter.

Charges/Court : Br. 66 on 27 Aug. 90
2 – First Degree Murder Complaints

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| | DAY 24 | MO. Aug. | YR. 90 | 1700 | | 870 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE | |
|---|---|---|---|---|---|
| Det. R. Smitka | 5577 | Det. R. Schaek | 5333 | | |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY—MO.—YR.) | TIME |
| | | | | 25 AUG 90 | 2150 |

CPD-11.411-B (Rev. 8/89)     *MUST BE COMPLETED IN ALL CASES

CRC ☐ 22B

RFC-Maysonet 000045

Page   Two

Detective Division                                                24 August 90
Area 5 Violent Crimes
                                                                  R.D. # N-234297

Homicide/First Degree Murder
WILEY, Torrence

Investigation :                     In Continuance of the above captioned
                                     investigation conducted by Dets.
                                     HALVORSEN #6036, PAULNITSKY #6503,
                                     GAWRYS #16899 & GUEVARA #16345 and super-
vised by Sgt. E. MINGEY, it had been established that there were four individuals respon-
sible for the above captioned double homicide. Two subjects, GONZALEZ, Alfredo and
MAYSONET, Jose had previously been taken into custoy and charged. Both implicated CRUZ,
JUSTINO as having been present and involved. Efforts then continued to locate and app-
rehend the two named subjects, HERNANDEZ and CRUZ. On this date at 0500 hrs. CRUZ was
taken into custody and processed.

                                     The undersigned detectives, working the
                                     2nd. Watch were then subsequently assigned
the follow-up in this matter. After having been informed again of his Rights, CRUZ indic-
ated that he wished to tell his side of the story.

CRUZ, Justino                        In a subsequent statement to the under-
                                     signed, CRUZ stated that he and the other
offenders, MAYSONET, GONZALEZ & HERNANDEZ all met at MAYSONET's residence. At that time,
they picked up the 9mm automatic machine pistol and then left to go out and do a shooting.
They rode around for a short time, MAYSONET drove, GONZALEZ rode in the front passenger
seat, HERNANDEZ in the rear passenger seat and CRUZ in the rear passenger seat behind the
driver. After a short while they pulled into an alley in the vicinity of North and St.
Louis, at which time GONZALEZ, HERNANDEZ and CRUZ got out. MAYSONET remained with the
vehicle, continued to keep it running, CRUZ walked a short distance with the other two
subjects and acted as a lookout in case the police came by. GONZALEZ & HERNANDEZ then
walked over to the two victim stood and remained there for a few minutes. At that time
CRUZ heard 5-6 shots and GONZALEZ and HERNANDEZ came running back to the car, GONZALEZ
was carrying the machine pistol and they all got back into the vehicle in their respect-
ive places and drove off. They just drove around after that and finally, split up some
time later.

                                     ASA John PERKAUS of Felony Review
                                     responded to Area 5 Headquarters after
the necessary notifications. He then reviewed the file, interviewed CRUZ who reiterated
what he had told the undersigned. ASA PERKAUS then prepared a handwritten statement con-
cerning what CRUZ had stated concerning his knowledge and involvement in this incident.
After reviewing this statement, CRUZ then signed same, with the undersigned witnessing.

                                     ASA PERKAUS then approved the charging
                                     of Justin CRUZ with two counts of First
Degree Murder in this matter. Until the apprehension of the 4th. wanted offender, HERNAN-
DEZ, the undersigned would request that this matter remain CLEARED/OPEN.

Det. Robert Smitka    #5577
Det. Richard Schak    #5333

RFC-Maysonet 000046

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 45

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSE JUAN MAYSONET, JR.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. |
| **REYNALDO GUEVARA, ERNEST** | ) | |
| **HALVORSEN, EDWARD MINGEY,** | ) | |
| **EPPLEN; FERNANDO MONTILLA,** | ) | |
| **ROLAND PAULNITSKY, FRANK** | ) | |
| **DIFRANCO, CITY OF CHICAGO, and** | ) | **JURY TRIAL DEMANDED** |
| **COOK COUNTY.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, JOSE JUAN MAYSONET, JR. by his undersigned attorney, for his complaint against former Police Detectives, REYNALDO GUEVARA, ERNEST HALVORSEN, EDWARD MINGEY, SERGEANT EPPLEN, FERNANDO MONTILLA, ROLAND PAULNITSKY, FRANK DIFRANCO, the CITY OF CHICAGO, and COOK COUNTY.

## INTRODUCTION

1.      Plaintiff, Jose Juan Maysonet, Jr., spent 27 years incarcerated in the Illinois Department of Corrections for the murders of Torrence and Kevin Wiley ("the Wiley brothers") – a crime he did not commit.

2.      In and around August 22, 1990, the Police Officer Defendants conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murders of the Wiley brothers while indifferent to the fact that he was innocent.

3.      Former Assistant Cook County State's Attorney defendant Frank DIFRANCO, while acting in an investigatory function and prior to the existence of any probable cause to believe Plaintiff committed the crime, conspired with the defendant officers to procure a fabricated confession from Plaintiff.

4.      All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murders by attributing fabricated oral admissions to the Plaintiff, by coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murders, and by physically coercing a fabricated court-reported statement from Plaintiff that was transcribed in English even though Plaintiff spoke little to any English at the time of his arrest.

5.      There were no eyewitnesses to the murders, no plausible motive, and no physical evidence connecting Plaintiff to the crime. Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

6.      For nearly three decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension.

7.      On October 19, 2016, Cook County Circuit Court Judge Ricky Jones vacated Plaintiff's convictions without objection from the State after it was discovered that his trial attorney, Richard Beuke, labored under a *per se* conflict of interest while defending Plaintiff against the double murder charges. Unbeknownst to Plaintiff, at the time of his trial, Mr. Beuke was simultaneously representing defendant GUEVARA in unrelated child-support proceedings.

8.      On November 15, 2017, the State moved for an order to *nolle prosequi* the charges against Plaintiff after *all* of the defendant officers represented through counsel that they

would exercise their Fifth Amendment rights to remain silent in response to questions about their investigation of the Wiley brothers' murders. That same day, Plaintiff was released from custody after having spent 27 years of his live in the Illinois Department of Corrections.

9.     Sadly, Plaintiff is among a growing group of Latino men from Humboldt Park who have proven that they were framed for crimes they did not commit at the hands of the defendant officers. Just by way of example, defendants GUEVARA, HALVORSEN, and MINGEY framed Armando Serrano and Jose Montanez for the 1993 murder of Rodrigo Vargas. Serrano and Montanez were exonerated on July 20, 2016, following the Illinois Appellate Court's issuance of a pair of scathing decisions acknowledging GUEVARA's pattern and practice of misconduct. *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) *& People v. Montanez,* 2016 IL App (1st) 133726 (June 7, 2016). Serrano and Montanez received Certificates of Innocence in November 2016 and both filed federal civil rights actions that are currently pending in this Court. *See Serrano v. Guevara*, *et al.*, 17-cv-2869 and *Montanez v. Guevara, et al.* 17-cv-4560.

10.     Defendants GUEVARA, HALVORSEN, and MINGEY framed Roberto Almodovar, Jr. and William Negron for the murders of Jorge Rodriguez and Amy Merkes in September 1994. Both men were exonerated in April 2017 and received Certificates of Innocence on November 20, 2017.

11.     Defendants GUEVARA and MINGEY also framed Jacques Rivera who was wrongfully convicted of the 1988 murder of Felix Valentin. The Cook County State's Attorney's office vacated Rivera's conviction on October 4, 2011, and he received a Certificate of Innocence on September 5, 2012. Rivera's civil suit against GUEVARA and MINGEY is currently pending in this Court. *Rivera v. Guevara, et al.,* 12-cv-4428.

12.    Since Plaintiff's exoneration less than a year ago, the State has vacated murder convictions of at least five other individuals who have demonstrated that they were framed by GUEVARA, HALVORSEN and MINGEY, including Arturo Reyes, Gabriel Solache, Thomas Sierra, Ariel Gomez, and Ricardo Rodriguez.

13.    Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct

## JURISDICTION AND VENUE

14.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

15.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

16.    Plaintiff Jose Juan Maysonet, Jr., a 49-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

17.    At all relevant times hereto, Defendants Reynaldo GUEVARA (Star No. 16345), Ernest HALVORSEN (Star No. 6036), and Roland PAULNTISKY (Star No. 6503) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Fernando MONTILLA (Star No. 16410) was a member of the Chicago Police Department assigned to Area Five Property Crime Unit. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate

witness testimony, coerce fabricated statements, and maliciously prosecute Plaintiff for the

murders of the Wiley brothers.

18. Defendants Sergeant Edward MINGEY (Star No. 1731) and Sergeant EPPLEN

(Star No. 890) were members of the Chicago Police Department and assigned to Area Five's

Violent Crimes Unit. MINGEY and EPPLEN were, at all relevant times, supervisors of the

Police Officer Defendants. They facilitated, condoned and approved the constitutional violations

committed by the Police Officer Defendants. In addition, Defendant MINGEY directly

fabricated oral statements of the Plaintiff that were later used to convict him.

19. Defendant Frank DIFRANCO, at all relevant times, was an Assistant Cook

County State's Attorney. Defendant DIFRANCO, while acting in an investigatory fashion,

helped procure fabricated statements from Plaintiff and his girlfriend that were later introduced

at trial and used to wrongfully convict Plaintiff. Defendant DIFRANCO is sued for conspiring

with the Defendant Officers to frame Plaintiff while acting in an investigatory capacity and

without probable cause to believe Plaintiff committed a crime.

20. Defendant CITY OF CHICAGO is an Illinois Municipal Corporation, which

employs or employed the Police Officer Defendants at the time of the events giving rise to this

suit.

21. Defendant COOK COUNTY is a governmental entity within the State of Illinois

which provides funding for the Cook County State's Attorney's office which is responsible for

paying any judgment entered against the defendant Frank DIFRANCO.

22. Each of the individual Chicago Police officer defendants and defendant DIFRANCO are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

23. In the mid-1980s, Plaintiff lived with his mother, step-father, and siblings in the Humboldt Park area of Chicago. Plaintiff had spent much of his childhood in Puerto Rico but settled in Chicago to attend high school.

24. Plaintiff struggled academically since he did not fluently speak English. He dropped out of high school around his junior year. Like many of the young men in his community, Plaintiff became a member of the Latin Kings street gang.

25. Shortly after dropping out of high school, Plaintiff moved into the basement of his family building with his girlfriend Rosa Bello and her two daughters.

### A "Deal with the Devil"

26. As a member of the Latin Kings street gang, Plaintiff was involved in selling narcotics in the area of Pierce and Kedzie. In the summer of 1988, defendant GUEVARA and Joseph Miedzianowski,[1] both officers from the 25th district gang crimes unit, raided Plaintiff's home searching for drugs and guns. Although the officers came up empty handed, defendant GUEVARA told Plaintiff (in Spanish) that he wasn't "dumb" and knew what Plaintiff was up to (i.e., selling drugs) and that if Plaintiff didn't want trouble from them [the police] there was a "price to pay." At the time, Plaintiff did not give much thought to GUEVARA's statements.

27. After the raid, Plaintiff and Rosa Bello (and her children) moved out of Plaintiff's mother's building into an apartment on North Homan Avenue.

---

[1] Joseph Miedzianowski is currently serving a life sentence in the federal Bureau of Prisons after being convicted of racketeering and drug conspiracy in April 2001.

28.     Several months later, Plaintiff was formally introduced to defendant GUEVARA and Miedzianowski in the kitchen of a Cuban restaurant on North Avenue. Plaintiff was friendly with the owner of the restaurant who was involved in the drug trade and used the restaurant mostly as a front for narcotics activity.

29.     Plaintiff vividly recalls the day he met GUEVARA and Miedzianowski in the kitchen of the Cuban restaurant. Plaintiff had finished eating a meal and walked to the kitchen to drop off his dirty plate when he noticed the owner speaking to defendant GUEVARA and Miedzianowki. Plaintiff recognized the officers from the raid of his home several months earlier. The owner introduced Plaintiff to GUEVARA and Miedzianowski and told him that if he ever had any problems with other officers in the neighborhood, GUEVARA and Miedzianowski could be of assistance.

30.     Defendant GUEVARA spoke in Spanish to Plaintiff and told him that he remembered him from the raid of his home. Defendant GUEVARA confirmed that he could help protect Plaintiff from arrest for his drug activities but that there was a cost involved. Plaintiff asked GUEVARA what type of "cost" was involved and Defendant GUEVARA told him that he would talk to him later about the details.

31.     After another conversation a week later, Plaintiff began paying defendant GUEVARA protection money in the amount of $1000 per week so that Plaintiff and a small crew with whom he worked could sell drugs without police interference. Plaintiff did not feel at liberty to decline defendant GUEVARA's offer. GUEVARA made it clear that if Plaintiff did not pay him the fee he was charging, he and his crew would be targeted for arrest.

32.     For roughly a year, Plaintiff paid GUEVARA his weekly fee and GUEVARA delivered on his promise to protect Plaintiff from police interference in his drug sales. However,

in late 1989, Plaintiff and GUEVARA had a "falling-out" when Area Five detectives arrested and falsely charged one of Plaintiff's best friends, Santiago Sanchez ("Macho") with attempt murder. Upset that his friend had been charged, Plaintiff confronted GUEVARA about the situation. GUEVARA was unsympathetic to Plaintiff's complaint and told Plaintiff, in sum and substance, that Sanchez was getting "hooked up" and there was nothing Plaintiff could do about it.

33.     Plaintiff reluctantly continued to pay GUEVARA his weekly "protection" fee, fearful that the notorious "hook-up" artist might turn his sights on him. But that all changed on May 21, 1990.

34.     On May 21, 1990, Sanchez, who was out on bond, missed a court appearance for his attempt murder case. Later that day Sanchez committed suicide by shooting himself in a car near Crystal and Kedzie avenues.

35.     Although violence was common-place in the Humboldt Park community, suicide was highly unusual which made this period of time striking and memorable. Plaintiff was devastated by the loss of his friend and blamed GUEVARA and the crooked Area Five detectives for the tragedy. Plaintiff stopped making "protection payments" to defendant GUEVARA from that day forward.

36.     On the morning of May 25, 1990, Plaintiff attended Sanchez's funeral along with numerous other friends and fellow Latin Kings from the neighborhood.

**The Wiley Brothers' Murders**

37.     Earlier on the morning of May 25, 1990 at roughly 1:00 a.m., Torrence and Kevin Wiley, two African-American men in their late 20s, were shot and killed in front of a vacant lot

8

at 3428 W. North Avenue. The brothers were not associated with any street gangs or drug activity and did not live in Humboldt Park.

38.     There were no eye-witnesses to the crime, but two women who lived on the block told the police that they heard an argument between two black males just before the shooting. The argument lasted for about an hour and the voices they heard were of African-American men, not men speaking Spanish or speaking English with Puerto Rican accents. The women heard bits and pieces of the argument, including the statements, "I'm trying to help you," and "I'm going to kill you first" and "you said we would get the last bus." Of particular note, the men kept saying the name "Lulu Dog."

39.     After an initial canvas of the neighborhood that yielded little information, defendant MINGEY, who was the supervising sergeant on the case, decided that he would close the case by finding a gang-banger to pin the murders on rather than conduct a meaningful investigation designed to identify the real offenders. Police reports show that detectives made no further attempts to locate potential witnesses who lived or worked on the busy street where the shooting occurred. Incredibly, detectives did nothing to identify or track down "Lulu Dog" even though the victims' sister confirmed that he was a person known to the victims and provided a phone number and address for him.

40.     Area Five detectives supervised by defendant MINGEY had no interest in solving this senseless murder of two young black men but instead saw it as an opportunity to frame "gang bangers."

41.     A couple of weeks after the Wiley brothers' murders, defendants GUEVARA and HALVORSEN arrested two Latin Kings from the area, Efrain Cruz ("King") and Francisco Veras ("Cisco") for the petty offense of "mob action." Cruz was being targeted by GUEVARA,

HALVORSEN and MINGEY because he had recently beat an armed robbery case. It was a known practice of Area Five detectives that if a gang-banger "beat" a case, he would be prioritized for a "frame-up."

42.     Cruz and Veras were taken to Grand and Central where they were interrogated and accused of killing the Wiley brothers. The men were put in line-ups and falsely told they were identified as the shooters, presumably in hopes that they would make an inculpatory statement that could be used against them or, more likely, would make an exculpatory statement pointing the finger at someone else, thereby providing probable cause to arrest that person who could then be interrogated and tricked, manipulated or coerced into pointing the finger back at Cruz and Veras. This tactic was standard operating procedure for Area Five detectives under the supervision of defendant MINGEY.

43.     Defendants GUEVARA and HALVORSEN told both Cruz and Veras that they knew another Latin King was the get-away driver and that whoever implicated the other first would get leniency. Neither Cruz nor Veras took the bait. The men were eventually released from Grand and Central after they figured out that they had been in police custody at the time of the Wiley brothers' murders.

44.     As fate would have it, Santiago Sanchez's visitation on the evening of May 24, 1990 had raised tensions in the neighborhood and that same evening, officers conducted a sweep on North Avenue that resulted in the arrests of more than a dozen Latin Kings, including Cruz and Veras. Thus, Cruz and Veras were sitting in a police lock-up at the exact time the Wiley brothers were shot and killed.

45.     With airtight alibis for the night of the Wiley brothers' murders, detectives GUEVARA, HALVORSEN, and MINGEY realized that they could not pin the murders on Cruz

and Veras or any of the other Latin Kings who were in custody that night. Unfortunately for

Plaintiff, on the night of May 24, 1990 after attending Sanchez's visitation, he spent a quiet night

at home with his girlfriend, mourning the loss of his close friend.

### Plaintiff's July 15, 1990 Arrest

46.     On July 15, 1990, defendant PAULNITSKY arrested Plaintiff in connection with

an unrelated shooting that occurred on July 3, 1990.

47.     Plaintiff was brought to Area Five, Grand and Central, where he was placed in a

line-up and purportedly identified as being involved in the unrelated July 3, 1990 shooting. With

the assistance of a Spanish-speaking police officer, Defendant PAULNITSKY interviewed

Plaintiff about the July 3, 1990 shooting. Plaintiff denied his involvement in the shooting and

exercised his right to counsel. Defendant PAULNITSKY stated, in sum and substance that "he

didn't need a statement from Plaintiff, because he was identified and was getting charged."

However, defendant PAULNITSKY told Plaintiff that his supervisor, defendant MINGEY,

wanted to talk to him about another matter.

48.     Plaintiff was brought into a different interview room where he was interviewed by

defendants MINGEY and MONTILLA. MINGEY did the questioning while MONTILLA acted

as an interpreter. Defendant MINGEY asked Plaintiff where he was in the early morning hours

of May 25, 1990. Plaintiff responded that he was at home because he was mourning the loss of

his good friend, Santiago Sanchez, and that they buried him the morning of May 25, 1990.

Plaintiff asked MINGEY why he was asking for his whereabouts during that time period.

49.     Defendant MINGEY told Plaintiff that two "brothers" had been shot on North

Avenue and that the ballistics evidence found at the scene of the murders suggested that the

weapon used in the murder of the Wiley brothers was the same caliber weapon used in the

shooting that Plaintiff had just been arrested for. Recognizing defendants MINGEY and MONTILLA's design to implicate Plaintiff in the double murders, Plaintiff told the detectives that they were on some "bullshit" and that he wanted his lawyer.

50.     Defendant MINGEY stated in sum and substance [through defendant MONTILLA], "you'll be hearing from us again. We know where to find you." Plaintiff was then taken to the Cook County jail on charges for attempted murder related to the July 3, 1990 shooting.

**Defendants MINGEY and MONTILLA Make a Surprise Visit to Cook County Jail**

51.      Two weeks later on August 1, 1990, a correctional officer retrieved Plaintiff from Division 2 of the Cook County jail where he was being housed. Plaintiff followed the correctional officer to Division 5 where he was met by an older supervising Cook County sheriff dressed in jeans and a white shirt. The sheriff directed Plaintiff to sign a piece of paper and Plaintiff complied without question. Plaintiff did not read the paper as it was written in English and assumed it was just protocol. No one translated the paper to Plaintiff or explained its contents.

52.     After signing the paper, the sheriff brought Plaintiff into an interview room where Plaintiff was surprised to see defendants MINGEY and MONTILLA seated at a table. MINGEY and MONTILLA told Plaintiff to sit down. Again, MONTILLA was acting as an interpreter, translating from English to Spanish and vice versa. Plaintiff complied but told the detectives that he had nothing to say to them and that they should contact his lawyer, William Swano. Plaintiff had Swano's business card in his pocket and pulled it out and handed it to the detectives.

53.     Defendants MINGEY and MONTILLA told Plaintiff that they weren't calling his lawyer and only wanted to talk to him about the murders of those "niggers" on North Avenue.

Plaintiff went to grab a telephone that was in the interview room and defendant MINGEY grabbed it out of his hand. MINGEY told Plaintiff "we have a CTA bus full of people who identified you." Plaintiff responded by stating, "then why are you here talking to me?" Plaintiff stood up with an intent to leave the room and the detectives also stood up aggressively and began yelling at Plaintiff to sit down. The conversation got so heated that the Cook County sheriff came into the room and stated something sternly to the detectives. The sheriff looked at Plaintiff and asked him, "you ok?" and then escorted Plaintiff out of the interview room.

54.     On August 16, 1990, Plaintiff made bond on the attempted murder case and was released from Cook County jail.

### Plaintiff's August 22, 1990 Arrest for the Wiley Brothers' Murders

55.     Shortly before 9:00 a.m. on August 22, 1990, Plaintiff appeared before the Chief Judge of the criminal division of the Circuit Court of Cook County (Room 101) at 26th and California for assignment of his attempted murder case. Plaintiff was accompanied by a friend and his sister Rose Maysonet.

56.     Plaintiff noticed that defendant PAULNITSKY entered the courtroom and seemed surprised to see Plaintiff out of custody. Defendant PAULNITSKY quickly left room 101.

57.     Plaintiff's case was called shortly after 9:00 a.m. and acting Chief Judge Bastone told Plaintiff that his case was assigned to Judge Loretta Lee Morgan and ordered him to appear in her courtroom, located in the same building, *instanter*. Plaintiff's attorney William Swano had previously told Plaintiff that he would meet Plaintiff in the assigned court room.

58.     Plaintiff walked out of courtroom 101 and toward the elevator bank that led to Judge Morgan's courtroom when he was grabbed and physically pushed up against the wall by defendant PAULNITSKY in the hallway outside courtroom 101. Defendant's bi-lingual sister

13

immediately questioned the detective in English, "what are you doing?" and PAULNITSKY told Plaintiff's sister that Plaintiff was wanted for two murders and that he had to go with him. Plaintiff, with the assistance of his sister, told defendant PAULNTISKY that he wanted his attorney who was waiting for him in Judge Morgan's courtroom. Defendant PAULNITSKY ignored Plaintiff's request, handcuffed him, and took him to the other side of the building that housed the administrative offices.

59.     Defendant PAULNTISKY took Plaintiff up to the offices of the Cook County State's Attorney where he made a phone call. Defendant PAULNTISKY then brought Plaintiff to the basement of the building where he was brought outside, placed in a marked police car, and driven to the police station at Grand and Central. Plaintiff never made it to Judge Morgan's courtroom.

60.     Meanwhile, Plaintiff's sister contacted Plaintiff's attorney to tell him that Plaintiff had just been arrested in the courthouse.

61.     Once at Grand and Central, Plaintiff was placed in an interview room. Defendants MONTILLA and MINGEY entered the room and Plaintiff immediately told the detectives that he wanted to speak to his attorney, William Swano.

62.     Speaking in Spanish, defendant MONTILLA asked Plaintiff who arrested him, and Plaintiff pointed at defendant PAULNTISKY who was standing outside the interview room. Upon seeing Plaintiff pointing at him, defendant PAULNTISKY ran into the interview room, grabbed Plaintiff by the throat and threw Plaintiff to the floor while hitting him in the face. Defendant PAULNITSKY threatened to "bust" his face if Plaintiff ever spoke about him in Spanish again.

63. After that assault, Plaintiff was taken to the lock-up for the better part of the afternoon. During that time, William Swano called Area Five numerous times but was repeatedly told that Plaintiff was not there. Plaintiff's sister went to Grand and Central to locate her brother and was falsely told that he was not there.

64. Plaintiff was held *in communicado* until defendants GUEVARA and HALVORSEN arrived to Grand and Central to start their shift. GUEVARA was eager to frame Plaintiff for the murders since Plaintiff had stopped paying "protection money" to GUEVARA and knew that Plaintiff had information about GUEVARA that could expose GUEVARA as a corrupt officer.

65. At roughly 5:00 p.m. defendant GUEVARA retrieved Plaintiff from the lock up and brought him to an interview room. GUEVARA told Plaintiff that he wanted Plaintiff to tell him "about them two niggers that was shot on North Avenue." Plaintiff responded that he knew nothing about the murders and wanted to speak to his attorney William Swano.

66. Defendant GUEVARA left the interrogation room and returned with a telephone book and large black flashlight. Detective Guevara asked Defendant whether he was "ready to talk." Plaintiff again exercised his right to counsel by saying, "I want my lawyer." Defendant GUEVARA put on black leather gloves and began beating Defendant in the head and body with the phonebook.

67. Guevara left the interview room a number of times only to return and continue the beating by placing the telephone book on various parts of Defendant's body, including his head and genitals, striking the book with the flashlight with all of his force. During the beating, Guevara repeatedly asked Defendant "do you still want to talk to your lawyer?" Guevara also falsely told Defendant that he already knew that he was involved in the shooting and that they

15

had witnesses who said it was him. Defendant eventually began to cry, and Guevara said, "you wasn't crying like a little bitch when you shot those two niggers?" Guevara eventually left, and detective MONTILLA returned to the interview room.

68. Defendant MONTILLA told Plaintiff to calm down and that he would allow Plaintiff to see his sister who was at the police station and had some anxiety medicine for him. MONTILLA uncuffed Plaintiff and brought him to another interview room. Shortly after being brought to another room, MONTILLA returned to the room with Plaintiff's sister, Rose Maysonet. Plaintiff and Rose had a short conversation and Rose gave him an anxiety pill that she obtained from her mother.

69. Defendant MONTILLA also brought Plaintiff's pregnant and live-in girlfriend, Rosa Bello, to the interview room to speak with Plaintiff. Rosa was terrified because the detectives told her that she could have her kids taken away if Plaintiff didn't cooperate with their investigation. Rosa tried to persuade Plaintiff to "talk" to the officers, but Plaintiff told her that he had no knowledge about the shootings. Rosa expressed her fear that the police were going to arrest her and take the kids from her and begged him to "cooperate."

70. Defendant MONTILLA told Rosa she had to leave and after escorting her out, MONTILLA returned and asked Plaintiff in sum and substance, "do you want your kids to grow up without their family? Just tell us what happened." Plaintiff again asked for his attorney.

71. After some time, GUEVARA returned to the interview room and again began beating Plaintiff with the phone book and flashlight, yelling at him in Spanish to tell him about the murders. Plaintiff lost track of time but after several hours, a female State's attorney came into the interview room to speak with him. The female State's Attorney, ASA Jennifer Borowitz, read Plaintiff his rights with defendant MONTILLA translating and asked Plaintiff what he knew

about the murders on North Avenue. Plaintiff told the ASA that he knew nothing and wanted his lawyer. ASA Borowitz then got up and left the room.

72.     Sometime after ASA Borowitz left, defendant GUEVARA returned to the room and began threatening Plaintiff again. Apart from the physical punishment, GUEVARA told Plaintiff that he would get the death penalty if he did not admit his involvement in the murders and that he just needed to admit that he was present at the shooting not that he was the shooter. GUEVARA repeatedly asked Plaintiff for the names of other people who may have done the shooting and urged Plaintiff to point the finger at someone else. GUEVARA also continually threated to "lock up" Plaintiff's girlfriend and sister.

73.     After nearly 20 hours in custody, much of it involving physical and psychological abuse by defendants GUEVARA and MONTILLA, Plaintiff's will was overborne, and he agreed to tell GUEVARA whatever he wanted him to say. Plaintiff was overcome with fear that the beatings would continue and that the detectives would arrest his sister and girl-friend and place Rosa's children with DCFS.

74.     Assistant State's Attorney defendant DIFRANCO arrived at Area Five shortly after Plaintiff succumbed to defendant GUEVARA's physical abuse and agreed to "cooperate." At roughly 7:00 am., defendants GUEVARA, MONTILLA, and DIFRANCO met in a room with Plaintiff to construct a false narrative that Plaintiff would regurgitate in front of a court-reporter. DIFRANCO knew that Plaintiff had been physically beaten and had exercised his right to counsel to ASA Borowitz, but nonetheless approved of, conspired with, and aided GUEVARA and MONTILLA in creating a false narrative that Plaintiff would repeat under oath before a court reporter.

75.     However, defendant DIFRANCO realized that Plaintiff would not be able to give a statement in English and DIFRANCO did not speak Spanish. Defendant DIFRANCO wrote out the questions and answers in English on a yellow pad of paper, and defendant MONTILLA translated the questions and answers in Spanish. Plaintiff was then instructed to study the pad of paper.

76.     Approximately two hours later, a court-reporter arrived at the station to transcribe a statement from Plaintiff. Defendant DIFRANCO began questioning Plaintiff in English according to the script the group had previously prepared. Defendant MONTILLA translated the question into Spanish for Plaintiff, and Plaintiff responded in Spanish as he had practiced. MONTILLA provided the English translation of Plaintiff's response, and the court-reporter transcribed the English provided by MONTILLA. At no point did any party put on the record that Plaintiff was speaking only in Spanish.

77.     Plaintiff's court-reported statement was taken on August 23, 1990 at 9:28 a.m.

78.     Consistent with the false narrative concocted by defendants, Plaintiff falsely confessed that on May 20, 1990 at around 12:45 a.m. Alfredo Gonzalez ("Lluvia") came to his house at 1320 North Homan to ask him to hide a .9 mm pistol. Lluvia returned to his home between 11:30 p.m and 12:00 p.m. on May 24, 1990 with two other Latin Kings, Christopher Hernandez who went by the nickname "Fro," and "Tino" Cruz.  According to the physically coerced false statement, Plaintiff stated that Lluvia, Fro, and Tino told him that "they got two guys on Drake and North avenue waiting for dope." Plaintiff then falsely stated that he drove to Drake and North with Lluvia, Fro and Tino. Plaintiff drove the car; Lluvia was in the front passenger seat with the gun, and Fro and Tino were in the back. According to the false statement, when they got to the area, Plaintiff waited in the car while Lluvia, Fro, and Tino approached the

two black men. Plaintiff could see them talking and then heard five or six shots and saw the two

men on the ground and Lluvia pointing the .9 mm at them. The three returned to Plaintiff's car

and he drove away. According to the false statement, Lluvia, Fro, Tino, Cisco (Francisco Veras)

and King (Efrain Cruz) came to his house on August 16, 1990, and King put a gun to his head

and threatened to kill him if he talked.

79.    Plaintiff was unable to read English but signed the statement per DIFRANCO's

direction. The statement was false in its entirety and procured from Plaintiff through physical

abuse and threats and other coercive tactics.

80.    Subsequent to Plaintiff's false and physically coerced statement, Area Five

detectives arrested Alfredo Gonzalez ("Lluvia"), Justino Cruz ("Tino"), and Christopher

Goosens ("Fro"). Like Plaintiff, Gonzalez and Cruz were also physically coerced by defendant

GUEVARA to confess to the crimes and both men were charged and then later wrongfully

convicted of the Wiley brothers' murders. Goosens was charged but acquitted after a bench trial.

### Coerced and Manipulated Statement of Rosa Bello

81.    After coercing Plaintiff's court-reported statement, defendants MONTILLA and

DIFRANCO threatened and coerced a statement from Plaintiff's pregnant girlfriend Rosa Bello.

82.    On August 23, 1990 at 2:10 p.m., Bello provided a hand-written statement in

which she falsely stated that Lluvia, Fro, and Tino came to the house she shared with Plaintiff

and retrieved a .9mm weapon at roughly 11:30 p.m. on May 24, 1990.

83.    Defendants MONTILLA and DIFRANCO told Bello that Plaintiff had already

confessed to the murders and that her kids would be taken away from her if she did not admit

that she saw the men retrieve a gun from the house on that particular date.

84.     After spending over 24 hours at the police station, Bello eventually agreed to sign whatever statement the assistant state's attorney and the detective prepared for her.

85.     Defendants DIFRANCO and MONTILLA knew that they had fed a false statement to Bello and that she signed the statement out of fear that she would lose custody of her kids if she did not cooperate with the defendants.

### Defendant HALVORSEN Authors a False and Fabricated Supplemental Police Report with the Help of All the Defendants

86.     After Plaintiff and his co-defendants were charged with the double murder of the Wiley brothers, defendant DIFRANCO realized that Plaintiff's court-reported statement was subject to suppression since no probable cause existed to justify his arrest in the first place. Indeed, no evidence existed whatsoever that suggested Plaintiff was involved in the Wiley brothers' murder.

87.     With the collaboration of all of the defendants, defendant HALVORSEN put his report-writing skills to work and began drafting a supplemental police report replete with false and fabricated statements that served to justify Plaintiff's unlawful arrest and bolster the bogus investigation. The report was written on the evening of August 24, 1990 and approved by defendant sergeant EPPLEN at 11:45 p.m. – long after Plaintiff was charged.

88.     Defendants MINGEY and MONTILLA directed Defendant HALVORSEN to falsely report that on July 15, 1990, Plaintiff told them he *did* have knowledge of the murders of the two black youths on North Avenues, and that on the night of the murders, three Latin Kings came to his house to get a 9mm pistol. Plaintiff never made this statement; its contents are false in their entirety and completely fabricated by the defendants. No police report or General Progress Report ("GPR") reflects that Plaintiff made this statement on July 15, 1990. Defendant

EPPLEN approved this false and fabricated oral statement even though the defendant officers and defendant MINGEY could not provide a writing of any kind that suggested it ever occurred.

89.     Defendant HALVORSEN further reported (at defendant MINGEY's direction) that Plaintiff told defendants MONTILLA and MINGEY at Cook County Jail on August 1, 1990 that he was involved in the murders of the black men but that he was not the shooter and was only present for the shooting. According to the fabricated statement, Plaintiff told MINGEY and MONTILLA that he knew who the shooter was but would only reveal the information in exchange for leniency on his attempt murder case. Plaintiff never made this statement; its contents are false in their entirety, completely contrived by the defendants. No police report or GPR reflects that Plaintiff made these admissions on August 1, 1990. Defendant EPPLEN approved this false and fabricated oral statement even though the defendant officers and defendant MINGEY could not provide a writing of any kind that suggested it ever occurred.

90.     According to the supplemental police report signed by the defendant officers but authored by defendant HALVORSEN, Plaintiff admitted his involvement in the shooting to defendant GUEVARA on August 22, 1990 at approximately 8:00 p.m. Plaintiff never admitted his involvement in the murders of the Wiley brothers to defendant GUEVARA. Only after being physically abused and threatened for nearly 24 hours by GUEVARA and his accomplices did Plaintiff eventually agree to repeat a false and fabricated statement that was fed to him by defendants GUEVARA, MONTILLA and DIFRANCO and later recorded by a court reporter.

91.     Defendant HALVORSEN also falsely reported that after providing a court-reported statement, Plaintiff drove to the area of 3428 W. North Ave., the scene of the murders, with defendants MONTILLA, PAULNITSKY, and DIFRANCO to "corroborate" his court-reported statement. Plaintiff never drove to the crime scene with the defendants nor did he

demonstrate or point out any of the facts set forth in his physically coerced and fabricated statement.

## Plaintiff's Wrongful Conviction

92.     Defendants HALVORSEN and PAULNITSKY falsely testified before the grand jury that Plaintiff had supplied the murder weapon that was used to shoot the Wiley brothers and that Plaintiff had driven the car to and from the murder scene.

93.     Prior to Plaintiff's trial, Plaintiff was forced to hire a new attorney after his attorney William Swano was indicted in connection with allegations that he had "payed off" a judge in exchange for a favorable outcome in a criminal case. Unfortunately for Plaintiff, Plaintiff's new attorney, Richard Beuke, was no more ethical than his prior one.

94.     While Beuke was defending Plaintiff against these double murder charges, he was concurrently representing defendant GUEVARA (the State's key witness against Plaintiff) in unrelated family and child-support proceedings. Indeed, Beuke and GUEVARA had a decade-long personal and professional friendship that Beuke failed to disclose to Plaintiff. Unsurprisingly, Beuke's efforts at challenging the State's evidence and cross-examining his buddy defendant GUEVARA were feeble and ineffectual.

95.     At Plaintiff's trial, defendant MONTILLA falsely testified that Plaintiff made inculpatory statements to him and defendant MINGEY on July 15, 1990 and August 1, 1990 as set out in detail above. Defendant MONTILLA also falsely testified at Plaintiff's trial that Plaintiff made a voluntary confession to the murders as described in detail above.

96.     Defendant PAULNTISKY falsely testified at Plaintiff's trial that he had knowledge of Plaintiff's inculpatory oral statements made on July 15 and August 1, 1990 when he arrested Plaintiff on August 22, 1990. Defendant PAULNITSKY had no knowledge about

those statements as Plaintiff never made the statements and the defendants did not fabricate the statements until after Plaintiff's arrest on August 22, 1990.

97.    Defendant GUEVARA falsely testified that Plaintiff first orally confessed his involvement to him for the murders of the Wiley brothers as reflected above. GUEVARA denied that he used any sort of physical coercion or threats to coerce those statements. GUEVARA further denied that he supplied the false narrative that Plaintiff regurgitated before a court reporter on August 23, 1990.

98.     Defendant DIFRANCO falsely testified at Plaintiff's trial that he conversed with Plaintiff in English and that Plaintiff had no difficulties communicating with him in English. DIFRANCO falsely testified that Plaintiff gave his court-reported statement in English and that it was a voluntarily given statement free from physical coercion or suggestion. DIFRANCO further falsely testified that he accompanied Plaintiff and defendants MONTILLA and PAULNITSKY to the crime scene so that Plaintiff could "act out" the shooting. This field-trip to the crime scene never happened.

99.    Although Plaintiff wanted to testify, his attorney (whose conflict was so disabling that Plaintiff was essentially left without counsel at all) told him that no one would believe him and that he shouldn't testify.

100.    Based on the foregoing false and fabricated testimony, a jury convicted Plaintiff of two counts of first degree murder and Plaintiff was sentenced to a prison term of natural life imprisonment.

**Plaintiff's Exoneration**

101.    Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the 1990 murders of the Wiley brothers.

102.     Plaintiff, through his counsel, filed a successor post-conviction petition, alleging Plaintiff's actual innocence. Plaintiff further claimed that Plaintiff's Sixth Amendment right to conflict free counsel was violated when his trial attorney, Richard Beuke, simultaneously represented defendant GUEVARA on unrelated family/child support proceedings.

103.     The State agreed that Beuke labored under a *per se* conflict of interest and on October 19, 2016, the State consented to the court vacating Plaintiff's convictions and sentence. The matter was set for a new trial scheduled to commence on November 15, 2017. However, the State moved to *nolle prosequi* all charges against Plaintiff after *all* of the defendant officers indicated that they would plead the Fifth Amendment in response to any questions regarding their investigation of the Wiley brothers' murders.

104.     After spending 27 years in the Illinois Department of Corrections, Plaintiff was released from custody on November 2017.

### Defendants GUEVARA, HALVORSEN and MINGEY's
### History of Framing Innocent Persons

105.     Tragically, Plaintiff's wrongful conviction at the hands of defendant GUEVARA and his accomplices, including defendants HALVORSEN and MINGEY, is not an isolated miscarriage of justice. Over the course of two decades, the trio framed literally dozens of other innocent men who have all lodged independent accusations of similar misconduct against him.[2]

106.     GUEVARA, HALVORSEN, and MINGEY are the subject of an ever-growing number of litigations both in criminal and civil courts. All three defendants are now refusing to testify about any of their activities as Chicago police officer on grounds that truthful testimony would subject them to criminal liability.

---

[2] https://www.buzzfeed.com/melissasegura/detective-GUEVARAs-witnesses?utm_term=.tymQzXk3Yn#.lhx2y8nblB

107.     Defendant GUEVARA has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, physical coercion of inculpatory statements, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which GUEVARA has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as he did in this case. In many of these cases, detective HALVORSEN worked hand-in-hand with GUEVARA while MINGEY supervised the rogue detectives, approved their investigations, and sometimes played an even more active role in framing suspects.

108.     Given this extensive history, it is apparent that GUEVARA, HALVORSEN, and MINGEY engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline then for doing so.

109.     Regarding their role in framing Plaintiff, the Defendant Officers have all indicated that they will assert their Fifth Amendment rights to silence when questioned about: whether they physical coerced a court-reported statement from Plaintiff, whether they manipulated, threatened and coerced a statement from Plaintiff's girlfriend, and whether they attributed false oral statements to Plaintiff, and whether they prepared false reports.

110.     On at least seven occasions in the last few years, defendant GUEVARA has invoked his Fifth Amendment right and refused to answer any questions about allegations that he physically coerced suspects and/or manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below. And recently, defendants HALVORSEN and

MINGEY have begun asserting their Fifth Amendment rights to refuse to answer questions about their involvement in Area Five investigations, most recently in response to interrogatories propounded to them in the federal civil rights litigation brought by Armando Serrano and Jose Montanez.

111.    Bill Dorsch is a former Area Five Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant GUEVARA brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter.

112.    Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant GUEVARA pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with GUEVARA, saying that was the person who committed the shooting.

113.    Dorsch then directed Defendant GUEVARA to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification.

114.    Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant GUEVARA being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

115.    Defendant GUEVARA's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including defendant

GUEVARA. The report details that defendant GUEVARA, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, GUEVARA also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that GUEVARA, using an attorney [Richard Beuke] as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

116.    In 1989, Defendant GUEVARA coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant GUEVARA put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

117.    In 1989, Defendant GUEVARA also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

118.    Juan Johnson was later exonerated and brought suit against Defendant GUEVARA. A federal jury found that GUEVARA framed Johnson for murder and awarded Johnson $21 million in damages.

119.    In 1989, Defendant GUEVARA coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

120.    In 1989, Defendant GUEVARA coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

122.     In 1991, Defendant GUEVARA coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. GUEVARA fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

123.     In 1991, Defendant GUEVARA physically coerced sixteen-year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by GUEVARA.

124.     In 1993, Defendant GUEVARA coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with GUEVARA's tactics, believed that GUEVARA would honor this threat.

125.     In 1995, Defendant GUEVARA arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder.   After Davila told GUEVARA that he did not do it, GUEVARA forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

126. In 1991, Defendant GUEVARA told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant GUEVARA's misconduct to light.

127. In 1995, Defendant GUEVARA coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

128. In 1995, Defendant GUEVARA told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

129. In 1995, Defendant GUEVARA coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, GUEVARA yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

130. In 1995, Defendant GUEVARA coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by GUEVARA and identified Ricardo Rodriguez as the offender because GUEVARA told him that Rodriguez was the shooter.

131. In 1995, Defendant GUEVARA engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the

shooter. Melendez identified Sierra but recanted his identification at trial. Thomas Sierra was exonerated last year but only after serving his enter sentence.

132.    In 1996, Defendant GUEVARA coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at GUEVARA's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

133.    In 1997, Defendant GUEVARA coerced Robert Ruiz into making a false identification. GUEVARA detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling GUEVARA that he had not seen the shooter or the driver involved in the crime, GUEVARA told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that GUEVARA would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that GUEVARA was the lead detective in the case because the victim was GUEVARA's nephew.

134.    In 1997, Defendant GUEVARA withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told GUEVARA that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. GUEVARA continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial. Gomez was also exonerated last year.

135.    In 1998, Defendant GUEVARA used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera. Rivera was awarded a Certificate of Innocence and his federal civil rights action is currently pending in this Court.

136.    In 1982, Defendant GUEVARA and another officer arrested and physically assaulted Annie Turner for smoking on a bus.  GUEVARA called her a "bitch" and pushed her out the back door of the bus.  He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke.  He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch."  Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

137.    In 1982, Defendant GUEVARA and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her  home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

138.    In 1983, Defendant GUEVARA and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23  hours and deprived of food, water, and sleep until after he confessed.  Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a

beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

139.     In 1984, Defendant GUEVARA and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. GUEVARA repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was dislocated/broken and she spent one week in the hospital.

140.     In 1985, Defendant GUEVARA attempted to coerce a false statement from Reynaldo Munoz. GUEVARA handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people GUEVARA was asking about, GUEVARA repeatedly hit him in the mouth with his fist. GUEVARA then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head. Munoz was later framed by defendant HALVORSEN for the murder of after HALVORSEN induced a false identification from an alleged witness to the shooting.

141.     In 1986, Defendant GUEVARA threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although GUEVARA denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that GUEVARA had lied about the incident and recommended that GUEVARA be suspended for two days.

142.     In 1986, Defendant GUEVARA and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

143.     In 1986, Defendant GUEVARA pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. GUEVARA called Warren a "nigger dog" and "threatened to tear [Warren's] head off." GUEVARA hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that GUEVARA initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that GUEVARA had physically and verbally assaulted him and recommended that GUEVARA be reprimanded.

144.     In 1989, Defendant GUEVARA coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

145.     In 1991, Defendant GUEVARA coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. GUEVARA told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. GUEVARA then promised Rivera that if he signed a statement, he could go home.

146.    In 1991, Defendant GUEVARA coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en-route to the police station, GUEVARA threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by GUEVARA's partner, Defendant HALVORSEN in the chest and torso. GUEVARA provided details of the crime to Rodriguez to include in Rodriguez's false confession.

147.    In 1992, Defendant GUEVARA engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

148.    In 1993, Defendant GUEVARA arrested fifteen-year-old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. GUEVARA also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

149.    In 1993, Defendant GUEVARA used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant GUEVARA, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room.  GUEVARA threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and GUEVARA

translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

150.     In 1994, Defendant GUEVARA, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.  Duta complained to his father of being struck in the head and stomach by GUEVARA.

151.     In 1994, defendants GUEVARA and HALVORSEN manipulated, coerced and induced false identifications of Robert Almodovar and William Negron from Kennelly Saez and Jacqueline Grande for the murders of Jorge Rodriguez and Amy Merkes. Saez admitted that GUEVARA showed him and Grande photos of Almodovar and Negron prior to having them view a line-up. Almodovar and Negron were wrongfully convicted of the murders based on these fabricated eye-witnesses identifications and sentenced to natural life imprisonment. Both men were exonerated and received Certificates of Innocence in November 2017.

152.     In 1995, Defendants GUEVARA and HALVORSEN coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the  11-hour interrogation, GUEVARA yelled at him, slapped him numerous times on the side of his head, and told him that if he  did not confess he would never see the light of day.  Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

153.     In 1997, Defendant GUEVARA coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by GUEVARA without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

154.     In 1998, Defendant GUEVARA repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Rosauro never confessed and was finally released after being held in custody for three days.

155.     In 1998, Defendant GUEVARA repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

156.     In 1998, Defendant GUEVARA repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

157.     In 1998, Defendant GUEVARA repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

158.     Reyes and Solache were also exonerated last year and released from prison. Reyes recently filed a civil rights action in this Court, *DeLeon-Reyes v. Guevara, et al.* 18-cv-1028.

**Plaintiff's Damages**

159.     Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff faced the risk of being executed for a crime he did not commit and spent 27 years of his life

imprisoned for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family or child again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

160.    Over the course of his 27 years of imprisonment, Plaintiff was separated from his son who was not even born when he was incarcerated. Plaintiff lost the chance to raise, care for, and mentor his child who was a grown man by the time Plaintiff was released from prison.

161.    As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## COUNT I
## 42 U.S.C. § 1983 – Due Process:  False Confession

162.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

163.    In the manner described more fully above, the Police Officer Defendants and Defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff of committing any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

164.    In addition, the Police Officer Defendants and defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and psychological coercion in order to force Plaintiff

to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

165.    Similarly, Defendant DIFRANCO, acting individually, jointly, and in conspiracy with the Police Officer Defendants, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments when he knowingly solicited a physically coerced statement from the Plaintiff that he knew to be false. Indeed, DIFRANCO directly participated in crafting the false statement with the defendant officers that was then fed to the Plaintiff whose will had been overborne by the physical and psychological abuse he incurred at the hands of the Defendant officers.

166.    In addition, the Police Officer Defendants and defendant DIFRANCO, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

167.    Specifically, Police Officer Defendants and defendant DIFRANCO conducted, participated in, encouraged, advised, and ordered an unconstitutional 24-hour interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the murders of Kevin and Torrence Wiley.

168.   Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff who was forced to regurgitate the statements before a court reporter.

169.   Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Wiley brothers' murders.

170.   The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

171.   As a result of Defendants' misconduct described in this County, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

172.   The misconduct described in this County by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT II
## 42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence

173.   Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

174.   As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements.

175.   In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Rosa Bello implicating Plaintiff in the crimes

that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

176. The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

177. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murders of the Wiley brothers. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

178. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

179. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

180. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT III
### 42 U.S.C. § 1983 – *Brady* Violations

181. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

182. As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of

their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

183.    Defendant DIFRANCO, while acting in an investigatory function, also withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction.

184.    The Police Officer Defendants and defendant DIFRANCO continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 27 years in prison for a crime he did not commit.

185.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

186.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

187.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT IV
### 42 U.S.C. § 1983 – Malicious Prosecution

188.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

189.     In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

190.     The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

191.     Similarly, defendant DIFRANCO, acting in an investigatory function, exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

192.     In so doing, the Defendant officers and Defendant DIFRANCO caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

193.     The Defendant officers and defendant DIFRANCO subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

194.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

193.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

195.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy**

196.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

197.     All of the individual Police Officer Defendants, defendant DIFRANCO, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of confessions, admissions, witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

198.     All of the individual Police Officer Defendants, defendant DIFRANCO, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

199.     In this manner, the Police Officer Defendants and defendant DIFRANCO acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

200.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

201.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

202.     As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

203.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VI
### 42 U.S.C. § 1983 – Failure to Intervene

204.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

205.     In the manner described above, one or more of the individual Police Officer Defendants, defendant DIFRANCO, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

206.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

207.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

208.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII
### 42 U.S.C. § 1983 – *Monell* Policy Claim

209.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

210.    The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

211.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants GUEVARA, HALVORSEN, MINGEY, PAULNITSKY, and MONTILLA employed against Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications; and (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other

45

tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

212. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false inculpatory and incriminating statements against themselves. As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

213. Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to regurgitate a false and fabricated confession that was later used as the primary piece of evidence against at his trial for the murders of the Wiley brothers.

214. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

215. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants,

concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's court-reported statement was involuntary and procured through physical coercion, that Plaintiff's girlfriend's statement was procured through manipulation, threats and coercion, that certain oral statements attributed to the Plaintiff were fabricated and all police reports reflecting that two other suspects (Efrain Cruz and Francisco Veras) were interrogated and allegedly identified as the perpetrators of the Wiley brothers' murders.

216.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

217.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of Rosa Bello to falsely implicate Plaintiff in the shooting of the Wiley brothers' by threatening to take her children away from her.

218.    The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

219.    Prior to and during 1990, the year in which Plaintiff was falsely charged with the Wiley brothers' murders, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers

accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

220.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

221.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

222.    The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the physical coercion of fabricated confessions, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are approximately 40 known cases in which GUEVARA and HALVORSEN have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. Defendants engaged in such misconduct because he had no

reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

223.     The City of Chicago and its Police Department failed in 1994 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

    a.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    b.     The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

    c.     The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

    d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

    e.     The risks of engaging in tunnel vision during investigation.

    f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

224.     The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

225.    The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendants GUEVARA, HALVORSEN, and MINGEY effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

226.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

227.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

228.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

        a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

b.     manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

c.     filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

d.     failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants GUEVARA and HALVORSEN.

e.     perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code

of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

229.     The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

230.     As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

231.     The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

### COUNT VIII
### State Law Claim – Malicious Prosecution

232.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

233.     All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

234.     The Defendants accused Plaintiff of murdering the Wiley brothers, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated

witness testimony, and withheld exculpatory evidence. The individual Defendant officers and defendant DIFRANCO knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

235.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

236.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### COUNT IX
### State Law Claim – Civil Conspiracy

237.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

238.    As described more fully in the preceding paragraphs, the individual Defendant officers and defendant DIFRANCO acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

239.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

240.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

241.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### COUNT X
### State Law Claim – Intentional Infliction of Emotional Distress

242.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

243.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

244.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

245.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

246.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

247.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

248.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

249.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim – Indemnification

250.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

251. Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

252. The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

253. Defendant Cook County is responsible for any judgment entered against defendant DIFRANCO.

**WHEREFORE**, Plaintiff Jose Juan Maysonet, Jr. prays this Court enter judgment in his favor and against Defendants Reynaldo GUEVARA, Ernest HALVORSEN, Edward MINGEY, EPPLEN, Fernando MONTILLA, Roland PAULNITSKY, Frank DIFRANCO, the CITY OF CHICAGO, and COOK COUNTY awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

**JOSE JUAN MAYSONET, JR.**

By:    <u>/s/JENNIFER BONJEAN</u>
*His Attorney*

Jennifer Bonjean
Bonjean Law Group, PLLC
1000 Dean St., Ste. 422
Brooklyn, New York 11238
718-875-1850

Steven A. Greenberg
Greenberg Trial Lawyers
53 W. Jackson Blvd., Ste. 1260
Chicago, Illinois 60604
312-879-9500

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 46

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

STATEMENT OF

Justino Cruz

Taken 8-24-90 At 2:45 P.M.

At Area 5

Present ASA Perkaus

Det. Schak #5333

This statement taken regarding the fatal shooting
of Torrence Wiley and Kevin Wiley which occurred on May 25, 1990

at 3428 W. North Ave at 1:00 AM.


I understand I have the right to remain silent and that anything I
say can be used against me in a court of law.  I understand that I
have the right to talk to a lawyer and have him present with me
during questioning, and if I cannot afford to hire a lawyer one
will be appointed by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement.

Justino Cruz

After first being advised of his rights and
stating he understood his rights, I told
Justino Cruz that I am an assistant states attorney,
an attorney working with the police and not his
attorney. Justino Cruz agreed to give the following
statement in summary.

Justino stated he is a graduate of Clemente
High School and can read and write. He further
stated that on the evening of May 24, 1990 at
about 11:30 P.M Justino, Alfredo Gonzalez, Chris
Hernandez and Jose Maysonett went to Jose's
house at 1302 N. Homan to pick up a gun. They
picked up the gun because Alfredo Gonzalez said
they were going to to do a shooting. The gun

ASA Perkaus        Det. Schak 5333     Justino Cruz

CCSAO000750

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 225 of 428 PageID #:21217
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

was _____ and
Alfredo put it in his belt. The four men
got into the _____ car with Jose driving,
Alfredo next to him, Chris seated behind Alfredo
and Justino seated behind the driver. Justino
stated they drove around for a short while
and stopped in the vicinity of North and
St. Louis in the alley.

Chris Hernandez & Alfredo Gonzalez got
out of the car with Justino. Chris and Alfredo
hooded up, meaning they put the hoods
from their sweatshirts on their heads. Justino stated
this indicates they will shoot or rob someone.
Chris and Alfredo approached 2 black guys
in a vacant lot on North Avenue. Alfredo
had the gun in his front pocket. While Chris
and Alfredo were talking to the black _____
guys, Jose was in the car with the car
running and Justino was "watching their backs."
Justino stated he was making sure the police
_____ approached from the alley. Justino
said he heard 5-6 shots and saw Chris and
Alfredo running for the car. Alfredo had the
gun in his hand. Justino said he jumped
in the car and they drove away. He stated
he went home.

Justino stated he has been treated
well by the police and the state attorney.
He was given something to eat & drink and

GCBA000794 5333

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 226 of 428 PageID #:21218
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

He said no one had coerced or threatened
him in any way to give this statement.
Justin said he gave this statement
because it is the truth.    Justino Cruz

Det Rohan 5333

ASA Perkaus

CCSAO000752

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 47

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 1:22-CV-06496**

**ALFREDO GONZALEZ**

V.

**REYNALDO GUEVARA, ET AL.**

**DEPONENT:**

**JOHN PERKAUS**

**DATE:**

**December 06, 2023**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

JGS MAYSONET 3008

1               IN THE UNITED STATES DISTRICT

2           COURT FOR THE NORTHERN DISTRICT

3             OF ILLINOIS EASTERN DIVISION

4                 JUDGE JOHN F. KNESS

5         MAGISTRATE JUDGE HEATHER K. MCSHAIN

6               CASE NO. 1:22-CV-06496

7

8                 ALFREDO GONZALEZ,

9                    Plaintiff

10

11                       V.

12

13             REYNALDO GUEVARA, ET AL.,

14                   Defendants

15

16

17

18

19

20

21

22

23    DEPONENT:   JOHN PERKAUS

24    DATE:       DECEMBER 6, 2023

25    REPORTER:   TALIA JACKSON

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS



JGS_MAYSONET 3009

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 230 of 428 PageID #:21222
The Deposition of JOHN PERKAUS, taken on 11/30/2023

2

```
 1                          APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF, ALFREDO GONZALEZ:

 4    Annie Prossnitz, Esquire

 5    Sean Starr, Esquire (Appeared via Videoconference)

 6    Loevy & Loevy

 7    311 North Aberdeen, Third Floor

 8    Chicago, Illinois 60607

 9    Telephone No.: (312) 243-5900

10    E-mail: prossnitz@loevy.com

11    sean@loevy.com

12

13    ON BEHALF OF THE DEFENDANTS, JOHN PERKAUS, FRANK

14    DIFRANCO, JENNIFER BOROWITZ:

15    Michael Iasparro, Esquire

16    Hinshaw & Culbertson LLP

17    100 Park Avenue

18    Rockford, Illinois 61101

19    Telephone No.: (815) 490-4945

20    E-mail: miasparro@hinshawlaw.com

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



Kentuckiana
COURT REPORTERS

JGS_MAYSONET 3010

```
 1                   APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, LEE EPPLEN, STEVEN GAWRYS,

 4   EDWARD MINGEY, FERNANDO MONTILLA, ROLAND PAULNITSKY,

 5   RICHARD SCHAK:

 6   Allison L. Romelfanger, Esquire

 7   The Sotos Law Firm, P.C.

 8   141 West Jackson Boulevard

 9   Suite 1240A

10   Chicago, Illinois 60604

11   Telephone No.: (630) 735-3315

12   E-mail: aromelfanger@jsotoslaw.com

13

14   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

15   Austin Rahe, Esquire

16   Rock Fusco & Connelly, LLC

17   333 West Wacker

18   19th Floor

19   Chicago, Illinois 60606

20   Telephone No.: (312) 494-1000

21   E-mail: arahe@rfclaw.com

22

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3011

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

 4   James V. Daffada, Esquire

 5   Leinenweber Baroni & Daffada LLC

 6   1150 Wilmette Avenue

 7   Suite D

 8   Wilmette, Illinois 60091

 9   Telephone No.: (847) 251-4091

10   E-mail: jim@ilesq.com

11

12   Also Present: Krystal Barnes, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3012

```
1                          INDEX

2                                        Page

3     PROCEEDINGS                          7

4     DIRECT EXAMINATION BY MS. PROSSNITZ       8

5     CROSS-EXAMINATION BY MS. ROMELFANGER     166

6     EXAMINATION BY MR. RAHE                  172

7     REDIRECT EXAMINATION BY MS. PROSSNITZ    173

8

9

10                        EXHIBITS

11    Exhibit                              Page

12    1 - Trial Testimony People v. Gonzalez    74

13    2 - Interrogatory Responses In Civil Case  75

14    3 - Supplementary Report Dated

15        August 24, 1990                        79

16    4 - Prefatory E-mail And Handwritten

17        Statement                              89

18    5 - Alfredo Gonzalez Court Reported

19        Statement Taken In Conjunction With

20        Criminal Case                         129

21    6 - Felony Review Folder From Cruz        154

22    7 - Report Of Proceeding That Took Place

23        Between People v. Maysonet Dated

24        November 2017                         159

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3013

```
1                          STIPULATION

2

3    The REAL VIDEO deposition of JOHN PERKAUS was taken at

4    LOEVY & LOEVY, 311 NORTH ABERDEEN, 3RD FLOOR, CHICAGO,

5    ILLINOIS 60607 on WEDNESDAY the 6TH day of DECEMBER 2023

6    at 10:04 a.m. CENTRAL TIME; said deposition was taken

7    pursuant to the FEDERAL Rules of Civil Procedure.

8

9    It is agreed that TALIA JACSKSON, being a Notary Public

10   and Digital Reporter for the State of ILLINOIS, may

11   swear the witness and that the reading and signing

12   of the completed transcript by the witness is not

13   waived.

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3014

```
 1                        PROCEEDINGS

 2

 3        THE VIDEOGRAPHER:  My name is Kyrstal Barnes,

 4   I'm the videographer, and Talia Jackson is the court

 5   reporter.  Today is the 6th day of December 2023,

 6   and the time is 10:04 a.m. Central Time.  We're at

 7   the offices of Loevy & Loevy to take the deposition

 8   of John Perkaus in the matter of Alfredo Gonzalez v.

 9   Reynaldo Guevara, et al., pending in the United

10   States District Court for the Northern District of

11   Illinois, the Eastern Division, case number

12   1:22-CV-06496.  Will Counsel please identify

13   themselves for the record?

14        MR. IASPARRO:  Good morning.  Michael Iasparro

15   on behalf of Frank DiFranco, Jennifer Borowitz, and

16   Mr. Perkaus this morning.

17        MS. PROSSNITZ:  Annie Prossnitz on behalf of

18   Plaintiff Alfredo Gonzalez.

19        MS. ROMELFANGER:  Allison Romelfanger --

20        MR. STARR:  Sean Starr -- sorry.  Go ahead.

21        MS. ROMELFANGER:  Okay.  Allison Romelfanger.

22   Sorry.  Why don't you go since you're with Annie?

23   Go on.

24        MR. STARR:  Yeah, I apologize for interrupting

25   you.  Sean Starr also on behalf of Plaintiff Alfredo
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3015

```
 1        Gonzalez.
 2            MS. ROMELFANGER:  Okay.  Allison Romelfanger on
 3        behalf of the defendants other than Defendant
 4        Guevara.
 5            MR. DAFFADA:  Jim Daffada on behalf of Rey
 6        Guevara, defendant.
 7            MR. RAHE:  Austin Rahe, R-A-H-E, on behalf of
 8        the city of Chicago.
 9            THE VIDEOGRAPHER:  Sir, will you please raise
10        your right hand so the court reporter can swear you
11        in?
12            THE REPORTER:  Do you solemnly swear or affirm
13        that the testimony you're about to give will be the
14        truth, the whole truth and nothing but the truth?
15            THE WITNESS:  I do.
16            THE REPORTER:  Thank you.  You may begin.
17                       DIRECT EXAMINATION
18   BY MS. PROSSNITZ:
19        Q.   Good morning.  I'm Annie Prossnitz.  I
20   represent Plaintiffs in this -- or Plaintiff in this
21   matter, and I'll be asking questions first today.
22        A.   Good morning.
23        Q.   Would you please state and spell your name for
24   the record?
25        A.   Yes.  John Perkaus.  The last name is spelled
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3016

```
 1    P as in Paul, E-R-K-A-U-S.

 2         Q.    Thank you.  Have you been deposed before?

 3         A.    Yes.

 4         Q.    How many times?

 5         A.    Probably three.

 6         Q.    Okay.  In what cases?

 7         A.    Civil cases, investor matters.  The last one

 8    would have been a couple years ago.

 9         Q.    Have you ever been deposed in a wrongful

10    conviction case before?

11         A.    No.

12         Q.    So please give an audible response to my

13    questions.

14         A.    Yes.

15         Q.    And let me complete a question first and then

16    you'll complete your answer; is that fair?

17         A.    Yes.

18         Q.    Great.  If I ask a question that seems

19    unclear, please ask me to clarify and I'll do my best to

20    clarify that question.

21         A.    Yes.

22         Q.    But if you under -- if you answer, I assume

23    you'll have understood the question.

24         A.    Yes.

25         Q.    Is there any reason you can't testify
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3017

```
 1    accurately today?

 2         A.    No.

 3         Q.    Do you have any conditions that might affect

 4    your ability to provide truthful and accurate testimony

 5    today?

 6         A.    No.

 7         Q.    Do you have any conditions affecting your

 8    memory?

 9         A.    No.

10         Q.    Do you have any medications that might affect

11    your ability to provide truthful and accurate testimony?

12         A.    No.

13         Q.    Or medications that might affect your memory?

14         A.    No.

15         Q.    Is there anything else that might affect your

16    ability to provide accurate testimony or that might have

17    an effect on your memory today?

18         A.    Just the fact that it was 33 years ago, but

19    other than that, nothing.

20         Q.    Understood.  What did you do to prepare for

21    the deposition today?

22         A.    I spoke with Michael for probably a half an

23    hour and reviewed my prior handwritten statement,

24    reviewed my prior trial testimony, and a couple of other

25    documents.  I think one was a supplemental report, my
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3018

1    Felony Review folder, and some other testimony of the

2    trial when I testified.  I believe it was when I

3    testified, at any rate.

4        Q.   Do you remember any other documents that you

5    reviewed?

6        A.   A -- a handwritten, maybe, from Rosa Bella,

7    but that was -- that was it.

8        Q.   And was that half an hour discussion with

9    Michael the only conversation you had with your lawyer

10   in preparation for today?

11       A.   Yes.

12       Q.   Did you speak with anyone else about the

13   substance of the deposition?

14       A.   No.

15       Q.   Did you talk to anyone from the Cook County

16   State's Attorney's Office?

17       A.   No.

18       Q.   Did you talk to any attorneys at your current

19   firm about the substance of --

20       A.   At my current firm?

21       Q.   Uh-huh.

22       A.   Not the substance, no.

23       Q.   Did you do anything else to prepare?

24       A.   No.

25       Q.   Okay.  And if you need a break, just let me

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3019

```
 1    know.  I'll finish --
 2         A.   Sure.
 3         Q.   -- the line of questioning again and then
 4    we'll go off the record.
 5         A.   Okay.  Yeah.  I mean, this -- my parking's two
 6    hours now, so --
 7         Q.   Okay.
 8         A.   -- it's on the street.
 9         Q.   Okay.  We can definitely stop for that.
10         A.   I'd appreciate that.
11         Q.   Okay.  So I'm going to ask you some background
12    questions.
13         A.   Sure.
14         Q.   Where did you go to law school?
15         A.   University of Illinois, John Marshall.
16         Q.   And what year did you graduate?
17         A.   1986.
18         Q.   Where did you go for undergrad?
19         A.   I went to Miami of Ohio and then finished up
20    at the College of Santa Fe in Santa Fe, New Mexico.
21         Q.   Okay.  What did you study in undergrad?
22         A.   Business administration.
23         Q.   And what year were you admitted to the bar?
24         A.   1986.
25         Q.   Was that in Illinois?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3020

1  A. Yes.

2  Q. **Are you admitted to practice in any other**

3 **jurisdictions?**

4  A. Not other states, but federal jurisdictions.

5  Q. **Okay.**

6  A. I mean, I've been prohate (phonetic) in -- in

7 different jurisdictions, but not admitted past the bar,

8 no.

9  Q. **Okay.  Did you work between undergrad and law**

10 **school?**

11  A. Yeah.  I mean, I -- I -- like, part-time when

12 I was in law school.

13  Q. **Okay.**

14  A. I mean, did I go straight into school or --

15  Q. **Yeah.  Did you go straight to law school --**

16  A. I did, yes.

17  Q. **-- from undergrad?  Okay.  What did you do**

18 **part-time in law school?**

19  A. I just clerked for judges law firms when I was

20 in law school.

21  Q. **Have you ever held elected office in Cook**

22 **County?**

23  A. No.

24  Q. **What about anywhere else?**

25  A. No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3021

```
 1        Q.    Okay.  Where did you first work when you
 2   graduated from law school?
 3        A.    My first job was the State's Attorney's
 4   Office.
 5        Q.    And what was your position there?
 6        A.    Assistant Cook County State's Attorney.
 7        Q.    So you joined the State's Attorney's Office in
 8   1986?
 9        A.    '87.
10        Q.    '87.  Okay.  And what positions did you hold
11   while you were there?
12        A.    I started in the Appellate Division, then went
13   to Juvenile Court, then went to Felony Review,
14   Preliminary Hearings, Night Drug Court, Felony Trial
15   Division.
16        Q.    Okay.  So how -- do you remember how long you
17   were in the Appellate Division for?
18        A.    Just a couple months.
19        Q.    And then how long you were in the Juvenile
20   Court division?
21        A.    Probably 18 months.
22        Q.    What about the Felony Review?
23        A.    A year.
24        Q.    And that would have been 1990?
25        A.    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3022

1     Q.   How long were you in the Preliminary Hearing,

2   which -- to the best of your memory?

3     A.   Yeah.  Six, eight months.  I don't remember

4   exactly, but --

5     Q.   And what about the Night Drug Division?

6     A.   Another six months, I guess.

7     Q.   And the Felony Trial Division?

8     A.   I was there for probably two and a half years.

9     Q.   So how long were you at the Cook County

10  State's Attorney's Office in total?

11    A.   Almost six years.

12    Q.   And where did you work after the Cook County

13  State's Attorney's Office?

14    A.   I went to the Attorney General's office and

15  ran a financial crimes unit prosecuting fraud in the

16  federal entitlement programs.

17    Q.   And how long were you there?

18    A.   Two years.

19    Q.   Okay.  And what about after that?

20    A.   I started my own practice in 1995 or '96 and

21  then took on a partner in 1999.  And we've been together

22  as Perkaus & Farley since then.

23    Q.   And what kind of practice is it?

24    A.   Boutique business litigation.

25    Q.   What cases do you do?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3023

 1        A.    Right now, a lot of new market tax credit

 2  litigation, placement of some, like, litigation for

 3  banking.  Recently did a -- a whistleblower

 4  investigation for a -- a multinational corporation, so

 5  it's a fairly varied practice.

 6        Q.    Okay.  And do you do any criminal?

 7        A.    No.

 8        Q.    And why did you decide to leave criminal law?

 9        A.    I didn't want to be a -- a defense attorney

10  and I had contacts in -- in the business community.  It

11  was far more potentially lucrative, and I had small

12  children on the way, so it was time to start making some

13  money.

14        Q.    Uh-huh.  And why did you leave the Cook County

15  State's Attorney's Office at the time?

16        A.    Because I had this opportunity at the Attorney

17              General's Office.  There was a federal grant

18  that was funded for this position, and I wanted to get

19  away from the more difficult aspects: homicides, gang

20  crimes, rapes.  And financial crimes was -- was a good

21  stepping stone using my business degree to still do good

22  for the community through prosecution.

23        Q.    When you say difficult aspects, what was

24  difficult about those practices?

25        A.    It's -- it's hard on prosecutors.  Obviously,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3024

1    it's very hard on -- on victims.  But the 26th Street

2    and prosecuting on behalf of, like, homicide victims is

3    -- is not easy.  It definitely takes a toll and it takes

4    a toll on your relationships.  It gives you a skewed

5    view of -- of society.  And it's healthier, especially

6    as you're trying to raise a family, to be in a more

7    balanced environment.

8        Q.    So turning back to the Cook County State's

9    Attorney's Office, what was your assignment in August of

10   1990?

11       A.    I was in the Felony Trial -- or sorry, Felony

12   Review unit.

13       Q.    Okay.  And when you were assigned to the

14   Felony Review unit, what generally were your duties?

15       A.    You would work as a team in 12-hour shifts,

16   either a day shift or a night shift, working 6 a.m. to 6

17   p.m. or overnight from 6 p.m. to 6 a.m.  And you'd be

18   assigned to various areas across the city and any calls

19   that we'd received from the police regarding

20   investigations that would require, like, in-person

21   interviews, you would be assigned those.  And then you'd

22   be dispatched and go to the different areas to interview

23   people.

24       Q.    What would you do after you interviewed

25   people?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3025

1      A.   Write, in a Felony Review folder, the

2 situation, whatever the case may be.  Possibly interview

3 witnesses, interview defendants, you know, interview

4 victims.  And then ultimately make an assessment

5 regarding the case and either approve or reject felony

6 charges for whatever crime you deem to be the one that

7 was committed.

8      **Q.   And who would you provide that assessment to?**

9      A.   Well, I mean, I'd discuss it with my

10 supervisor and then make the decision and then inform

11 the police of our decision.  Or if we deemed that they

12 had to do something else, get other witnesses, interview

13 additional people, we would make that a, I believe,

14 continuing investigation and then go from there.

15      **Q.   Okay.  Were you involved in the cases that you**

16 **were called out for beyond Felony Review?**

17      A.   I don't understand the question.

18      **Q.   Did you do anything after that initial**

19 **assessment and recommending charges for the cases that**

20 **you were called out for?**

21      A.   I'm -- you mean if I took a statement?

22      **Q.   Yes.**

23      A.   Okay.  Yes.  I mean, then you would be called

24 at trial, which happened in the case that we're

25 presently discussing.  I gave a -- I took a statement

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3026

```
1   and then was called at trial, at a jury trial, and
2   testified in that trial.
3          Q.   And would you ever follow-up on these cases
4   where you recommended charges beyond testifying at
5   trial?
6          MR. IASPARRO:  Object to form.
7          THE WITNESS:  I'm not clear what you mean,
8      follow-up?
9   BY MS. PROSSNITZ:
10         Q.   Would you ever follow-up to see how -- what
11  the disposition of the case was at the end?
12         A.   Oh, sure.  Yes.
13         Q.   You talked to other Felony Review state's
14  attorneys on -- about the cases who are working the same
15  shift as you?
16         MR. IASPARRO:  Object to form.  Go ahead.
17         MS. ROMELFANGER:  Join.
18         THE WITNESS:  Yeah.  I mean, sometimes.
19  BY MS. PROSSNITZ:
20         Q.   Was there ever felony charges that, as a
21  Felony Review ASA, that you could review over the phone?
22         A.   Yes.
23         Q.   Okay.  And did you ever go to police stations
24  to review charges?
25         A.   Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



JGS_MAYSONET 3027

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 248 of 428 PageID #:21240
The Deposition of JOHN PANOZZO, taken on 12/13/2023

20

```
 1        Q.    So what differentiated the ones that you could
 2    do over the phone versus in -- at the police station?
 3        A.    Severity of the charges.
 4        Q.    Do you know how often you would go in-person
 5    versus over the phone?
 6            MR. IASPARRO:  Object to form.
 7            THE WITNESS:  It depended on -- the violent
 8        crimes you'd go in-person.  The property crimes you
 9        would be able to do over the phone, as a general
10        rule. I mean, there may be exceptions.  But that's
11        basically what it came down to.
12    BY MS. PROSSNITZ:
13        Q.    And so do you remember if you had more violent
14    crimes or property crimes during your time at the Felony
15    Review?
16        A.    There were always more property crimes.  I
17    mean, there's more stolen cars than there are murders,
18    thankfully.
19        Q.    Okay.  How are cases assigned to prosecutors
20    in Felony Review?
21        A.    By area.
22        Q.    Can law enforcement bring a particular case to
23    a particular ASA?
24            MR. IASPARRO:  Object to form.
25            MS. ROMELFANGER:  Join.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3028

```
1              THE WITNESS:  I don't believe so.  I mean, I
2     -- I -- I shouldn't say that.  I'm sure that there
3     were exceptions for specific units, like arson or
4     gangs or something that was specialized.  But for,
5     like, general cases in the areas, it was, you know,
6     you're stuck with who's working.
7  BY MS. PROSSNITZ:
8     Q.   Was it unusual to have different prosecutors
9  handling the same case?
10             MR. IASPARRO:  Object to form.
11             MS. ROMELFANGER:  Join.
12             THE WITNESS:  Can you be more specific?
13 BY MS. PROSSNITZ:
14    Q.   So let's say there's a case with multiple
15 defendants -- potential defendants.  Would there be a
16 prosecutor on that case or could there be multiple
17 prosecutors on that case?
18             MR. IASPARRO:  Object to form.
19             MS. ROMELFANGER:  Join.
20             THE WITNESS:  Okay.  When you say prosecutor,
21    you mean Felony Review?
22 BY MS. PROSSNITZ:
23    Q.   Yes.  Sorry.  That was --
24    A.   Okay.
25    Q.   -- my mistake.  I mean Felony Review.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3029

```
 1        A.    There will be multiple people depending upon
 2   when the case comes in, which aspects of it are being
 3   handled by different people, and the timing.  Because if
 4   a case is, like, a triple homicide, I mean, you know,
 5   you can't have one state's attorney working three days
 6   straight on the case.  That wouldn't work.  So -- so you
 7   never know who's going to get picked up, who the
 8   witnesses are.  So there will be different state's
 9   attorneys on -- on different cases.
10        Q.    Okay.
11        A.    Even if it is, like, one big case.
12        Q.    Does that really just come down to timing,
13   like who is on shift when?
14        A.    Yes.
15        Q.    Okay.  So it's fair to say it wasn't unusual
16   for multiple Felony Review --
17        A.    No, not at all.
18        Q.    Okay.  So I want to talk about your practices
19   as a Felony Review assistant state's attorney.  We
20   already talked about this a little bit, but could you
21   just explain to me what Felony Review is?
22        A.    Felony Review is a unit that is on call 24
23   hours a day, seven days a week, holidays, every day of
24   the year, to assist the police in making proper
25   decisions regarding cases that are cases, crimes, that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3030

1    occur in the City of Chicago.

2        Q.   What's the job of a Felony Review assistant

3    state's attorney?

4        A.   The job of a Felony Review assistant state's

5    attorney when I was there was to drive around in the

6    crappiest Ford Tauruses that would, like, break down on

7    the west side in the middle of the night with only a

8    hand radio to contact the unit.  It was not exactly a

9    great job then.  But then you would be dispatched out to

10   the different -- and -- and depending upon -- I mean,

11   obviously the -- the -- we call them phone cases, where

12   you could take them over the phone are different. I

13   assume you want me to kind of focus on the personals, as

14   we call them, where you'd have to go to the locations?

15       Q.   Yes.

16       A.   Okay.

17       Q.   Go ahead.

18       A.   Yes.  You would be assigned a case in a given

19   area.  You'd be -- first off, you'd be assigned an area.

20   Like, you know, most times the women would be assigned

21   the north side.  The men would be assigned the south and

22   west sides.  And you would be assigned a case when a

23   detective would call in to Felony Review dispatcher.

24   You'd go out to the location and see what the situation

25   was and start working the case.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3031

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 252 of 428 PageID #:21244
The Deposition of JOHN PHOGAS, taken on 12/18/2018

24

1      Q.   Oh, why were women assigned to the north side?

2      A.   It's safer.  And it wasn't -- you didn't have

3 a cell phone.  You really had a crappy car that could

4 literally break down at any time and -- and it happened

5 sometimes.  And if you were, you know, on the west side

6 in the middle of a -- a case, then we certainly --

7 anyway.  And that was a long time ago.  Things are

8 different now, so --

9      Q.   When you say you would start working the case,

10 can you walk me through what that process was?

11      A.   It depended on the situation.

12      Q.   Okay.  So for a homicide case?

13      A.   For a homicide case, you would start with the

14 detectives, whether they -- you would assume that when

15 they called you that they had somebody in custody.  So

16 then you would talk to them, see what the evidence was

17 for the person who was in custody, determine what the

18 circumstances were, whether it was a domestic, whether

19 it was gang-related, whether it was a -- a robbery,

20 whatever the circumstances were surrounding it.  And

21 then based upon that, you would ascertain whether other

22 witnesses, you know, what the -- the proof was.  Are

23 there eyewitnesses?  Are there -- what are -- what is

24 the evidence against this guy?  And then based upon

25 that, whether he would talk to you, whether he was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3032

1    requesting a lawyer, whatever the circumstances were,

2    and then based upon the totality of the evidence,

3    whether you would approve charges for a homicide against

4    the individual who was in custody.

5        Q.    So at what point in the course of an

6    investigation did the Felony Review assistant state's

7    attorney get involved?

8            MR. IASPARRO:  Object to form.

9            THE WITNESS:  I don't know exactly, but I

10       believe there had to be a guy in custody.

11           MS. ROMELFANGER:  Hey, Annie?

12           MS. PROSSNITZ:  Uh-huh.

13           MS. ROMELFANGER:  So I don't have to keep

14       joining his objections, do we have that agreement

15       that one objection from one defendant applies to all

16       defendants?

17           MS. PROSSNITZ:  Yes.

18           MS. ROMELFANGER:  Okay.

19    BY MS. PROSSNITZ:

20       Q.    Okay.  What -- sorry.  So did you receive

21    training to be a Felony Review assistant state attorney?

22       A.    Yes.

23       Q.    What did that training consist of?

24       A.    I honestly don't remember.

25       Q.    And we talked about this a little bit already,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3033

1   but what -- what role does the Felony Review assistant
2   state's attorney play in the approval of felony charges?
3       A.   We make recommendations.
4       Q.   And what materials would you use to make the
5   -- a recommendation for felony charges?
6           MR. IASPARRO:  Object to form.
7           THE WITNESS:  What do you mean by the periods?
8   BY MS. PROSSNITZ:
9       Q.   Aside from -- sorry, let me rephrase that
10  question.  When you were making the determination on
11  recommending a felony charge, what were you basing that
12  on?
13      A.   The totality of the evidence, the
14  circumstances, statements, whatever the situation,
15  whatever we had at the time.
16      Q.   Okay.  So would that include witnesses as they
17  were --
18      A.   Yes.
19      Q.   -- identified by the police?
20      A.   Yes.
21      Q.   What about written statements identified by
22  the police?
23          MS. ROMELFANGER:  Objection.  Form.
24          THE WITNESS:  I don't remember.  I mean, the
25      police would do summaries that they'd include in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3034

```
 1        their supplementals, but police didn't really, like,
 2        take, like, handwritten statements or court reported
 3        statements.  That is really the purview of the
 4        state's attorney.
 5   BY MS. PROSSNITZ:
 6        Q.   Okay.  What about police reports?
 7             MR. IASPARRO:  Object to form.
 8             THE WITNESS:  Usually you didn't have police
 9        reports because they hadn't been written yet.  So
10        those were kind of, you know, after the fact you'd
11        get -- there would be police reports based upon what
12        was done.
13   BY MS. PROSSNITZ:
14        Q.   Okay.  What about police interviews?
15        A.   I mean, they'd tell you who they interviewed
16   and what they said.  And then you would confirm that
17   information with the interviews.
18        Q.   Is there anything else you can think of that
19   you would rely on to make the determination for felony
20   charges?
21             MR. IASPARRO:  Form.
22             THE WITNESS:  Like I said, it -- it was a long
23        time ago.  I can't remember what the training was,
24        but it's the totality of the evidence and the
25        circumstances.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3035

```
 1   BY MS. PROSSNITZ:
 2        Q.   Okay.  So now I want to talk about how you
 3   typically handled starting a review duty when you had to
 4   go into the police station, which we've talked about a
 5   little bit already.  So when you were called to come
 6   into the station, how were you contacted?
 7        A.   The police would call the dispatcher.  And
 8   either we'd be in the office on the 13th floor at 26th
 9   and California, or if we were out, then we would get a
10   call on the radio.  Or we actually had pagers then too.
11   So we'd get paged.
12        Q.   That was my next question.  So you would get -
13   -
14        A.   Yeah.
15        Q.   -- paged sometimes?
16        A.   Yeah.
17        Q.   And so it was a dispatcher who would speak
18   with you first?
19        A.   Yeah.  I mean, brief conversations.  "Go to
20   Area 5 and see Detective whoever."
21        Q.   What would they usually say in that initial
22   conversation?
23        A.   I have no idea.
24             MR. IASPARRO:  Object to form.
25             THE WITNESS:  I mean, I don't remember.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3036

BY MS. PROSSNITZ:

 Q. Okay.  Do you remember if they would provide information about the suspect that they had --

 A. No, not really.

 Q. -- at the scene?  Okay.  What about -- would they provide information about the crime?

 A. Probably.  I mean, I can't remember exactly.  But robbery or homicide or --

 Q. So when you would go into the police station, you wouldn't know who you were speaking -- who you were about to speak with?

  MR. IASPARRO:  Object to form.

  THE WITNESS:  I'd -- I'd know the detective to see.

BY MS. PROSSNITZ:

 Q. Uh-huh.  Sorry, that was my mistake.

 A. Yeah.  I'm not clear on that.

 Q. Would you know the suspect that you were about to speak with, who they were, their identification?

 A. Before I talked to the detective?

 Q. Yeah.

 A. No.

 Q. Okay.  Would you know what involvement the suspect had in the crime before you talked to the detective?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3037

```
 1        A.   No.

 2        Q.   Okay.  Then what would happen when you first

 3   arrived at the station?

 4        A.   You'd talk to the detective, get a assessment

 5   from him of the crime.  Like I said, there's usually a

 6   defendant in custody.  Circumstances, and then get --

 7   kind of make an -- an initial assessment of what else

 8   may be required for the case moving forward in the

 9   investigation.

10        Q.   Would you talk to the detective about the

11   larger case beyond just that individual suspect?

12             MS. ROMELFANGER:  Object to form.

13             THE WITNESS:  If there -- I mean, if there was

14      a larger case.

15   BY MS. PROSSNITZ:

16        Q.   Did you review anything before you went in to

17   talk to the suspect?

18        A.   I mean, usually there wasn't much to review.

19   It, you know -- the case -- everything's just kind of

20   happening.  So, I mean, there wasn't any -- first off, I

21   mean, everything was typed.  So it -- it -- it was not

22   like that you could just get a print-out of something

23   quickly.  But whatever there was, you'd look at.  And

24   was there anything?  I mean, I -- I don't know.  I mean,

25   as a -- as a general rule, it's kind of happening at
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3038

1    that time, so there's nothing to review.

2        Q.   Would you talk to anyone else beyond the

3    detective before going into talk to the suspect?

4        A.   It would depend on the circumstances.  If

5    there's, you know, arresting officers there, then you'd

6    -- you'd probably talk to them if -- if there was

7    something that they could add.  Whatever it was, try and

8    get the best idea of what the situation is prior to

9    talking to the defendant in custody.

10       Q.   Okay.  Would you ever ask the detective how

11   long the suspect had been at the police station before

12   you arrived?

13           MR. IASPARRO:  Object to form.

14           THE WITNESS:  I -- I -- I would, but my

15       practice was to interview every single defendant

16       before -- without the police there.  Before anything

17       else, I would ask to speak to the defendant just

18       alone, he and I, and ask him, I mean, determine,

19       yeah, how long he had been there.  Did he get food?

20       Did he get water? In those days it was, did he

21       smoke?  Did he need a cigarette?  Was he allowed to

22       go to the bathroom?  You know, was he comfortable?

23       You know, did they keep waking him up?  Has he been

24       there a long time?  Those kinds of things.  So I

25       would do that as a general practice every time to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3039

```
 1        make my own assessment of the situation.  So -- and
 2        then -- and then based upon that determination, we
 3        would -- we would either move forward or, you know,
 4        we -- we -- I'd have a discussion with the
 5        detectives.
 6   BY MS. PROSSNITZ:
 7        Q.   Okay.  Do you know how long on average
 8   suspects were kept at the station before you interviewed
 9   them?
10        A.   No idea.
11             MR. IASPARRO:  Object to form.
12   BY MS. PROSSNITZ:
13        Q.   Would 12 hours seem like a long time to you or
14   --
15        A.   You know what?  It -- it would depend on the
16   circumstances.  If the guy got pulled out of bed and he
17   wanted to go to sleep and there wasn't a detective there
18   to talk to him and, you know, they'd let him sleep for a
19   while or -- so, once again, it would all be based upon
20   the circumstances.
21        Q.   Okay.  So you said it was your practice to
22   interview the suspect or defendant without the police in
23   the room?
24        A.   Yes.
25        Q.   Why was that important?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3040

1    A.   Because I needed to make my own assessment of

2    the situation and not just take their word for it.

3        Q.   Would you ever have police in the room with

4    you when you initially talked to a suspect?

5        A.   I mean, did I ever?  I don't know.  I mean, my

6    practice was to always interview them first.  The first

7    contact was me alone with the -- with the defendant so I

8    could talk to him without the police there.

9        Q.   And then would the police come in after your

10   initial assessment?

11       A.   Yes.

12       Q.   What was your understanding of the police

13   officer's role when they joined you during the

14   interview?

15            MS. ROMELFANGER:  Object to form.

16            THE WITNESS:  You got to ask that question

17       again.  I don't even know what you're asking.

18   BY MS. PROSSNITZ:

19       Q.   No, that's fair.  So if the police were

20   joining you when you were interviewing suspects, why

21   were they there?

22            MR. IASPARRO:  Objection.

23            MS. ROMELFANGER:  Form and foundation.

24            THE WITNESS:  They were -- if -- if I was

25       taking a statement or at any time -- I mean, and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3041

```
 1        this -- this is civil litigation, too.  You need
 2        what we call a prover.  You need somebody who's
 3        going to sit there and say, yes, that's what was
 4        said, yes, these were the circumstances.  Because
 5        otherwise, it's -- it is a one-on-one, he said, she
 6        said or whatever.  So you always want to avoid that
 7        circumstance, so you have to have somebody else
 8        there when you're having these discussions.
 9   BY MS. PROSSNITZ:
10        Q.   Okay.  Would the police ever speak to suspects
11   when you were interviewing them?
12             MR. IASPARRO:  Object to form.
13             THE WITNESS:  Sure.
14   BY MS. PROSSNITZ:
15        Q.   Were they allowed to do that?  Do you know?
16             MR. IASPARRO:  Object to form.  Foundation.
17             THE WITNESS:  Were they allowed?  I mean, yeah.
18        Why wouldn't they be?
19   BY MS. PROSSNITZ:
20        Q.   And if a police officer tried to influence a
21   suspect when you were interviewing them, would that be
22   inappropriate?
23             MR. IASPARRO:  Form.
24             THE WITNESS:  I'm not going to answer
25        hypotheticals like that.  What does influence mean?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3042

BY MS. PROSSNITZ:

    Q.   If a police officer tried to interject into the interview, would that be inappropriate?

        MR. IASPARRO:  Same objection.

        THE WITNESS:  No.  He can say things.

BY MS. PROSSNITZ:

    Q.   That's not something you would put a stop to?

        MR. IASPARRO:  Form.

        THE WITNESS:  To a -- when I'm talking to a
     defendant and the police officer says something, no,
     it -- I'm not going to tell him he can't speak to
     the guy who -- you know, I'm not his boss.  I mean,
     this is a collaborative process.

BY MS. PROSSNITZ:

    Q.   Okay.  How would you usually begin the conversation with the suspects?

    A.   I'd introduce myself after -- first off, I'd talk to them -- well, I mean, I -- I would talk to them outside the presence of the police and I'd tell them my name and then I'd tell them that I am a lawyer, a Cook County State -- assistant state's attorney. I'm not their lawyer and I'm working with the police, make all that understood up front.  And I would tell them that twice. I'd tell them once in my initial conversation with them and then again with the police present and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3043

1  then read them their Miranda rights and then see if they

2  wanted to talk to me.  If they wanted to talk to me,

3  we'd talk.  If they didn't and that - nobody was going

4  to talk to them, and it wasn't just me, I'd tell them

5  the cops, no, you can't talk to them.  He has invoked

6  his Miranda rights and that's it.

7      **Q.   Okay.  Would you ask them if they were**

8  **comfortable speaking English?**

9      A.   Yes.  Always make sure that they were - and --

10  and it wouldn't just be English.  It could be Polish, it

11  could be -- but yeah, if we needed an interpreter, that

12  was also an -- an issue that we would always talk about.

13  But obviously, you'd know, because if they can't respond

14  and we need somebody to -- to interpret what they are

15  saying in our initial conversation, then obviously we

16  need an interpreter. You can call for an official

17  interpreter if they are willing to speak to you.

18      **Q.   Okay.  And would you ask them if they were**

19  **comfortable reading English as well?**

20      A.   Yes.  I mean, that was another one of the

21  questions that was in -- you know, part of the training,

22  so that you could make sure that they understood how to

23  read and write English.

24      **Q.   Okay.  So you mentioned that you would ask**

25  **suspects, how they -- how they'd been treated by the**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3044

```
 1    police; is that right?

 2         A.   I mean, yeah.  I mean, and -- and maybe not in

 3    so many words at various times, but yeah, that -- that

 4    was definitely a -- a -- one of the topics.

 5         Q.   Okay.  And when would you ask them that?

 6         A.   In -- at the very beginning.

 7         Q.   And why is that important?

 8         A.   Because you want to make sure that they are --

 9    if they are going to give a statement, that it's

10    voluntary, and if there is any problems or issues, I

11    need to know upfront because then I have to figure that

12    into my calculus for charging decisions.

13         Q.   And if they told you that they had been

14    mistreated by the police, what would you do?

15         A.   I'm not going to answer that hypothetical, but

16    I will tell you that, like, certain circumstances that I

17    encountered where defendants were, like, going through

18    withdrawal from drugs and I stopped the interviews and

19    told the guys that they needed to get this guy to the

20    hospital.  And so that happened, you know, a few times.

21         Q.   Okay.  You anticipated my next question.  I

22    was going to ask if that ever happened --

23         A.   Yeah.

24         Q.   -- in your time as a felony review ASA.

25         A.   Yeah.  I mean, it -- it was, but -- but it was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3045

1   clear.  I mean, these guys are going through withdrawals

2   and so -- yeah, so there was a immediate decision to

3   terminate any investigation and -- and get them to the

4   hospital.

5       Q.   Okay.  Do you remember ever having a suspect

6   telling you that they had been hit by the police?

7       A.   No.

8       Q.   Okay.  So when you started talking about --

9       A.   And -- and I'll tell you that I never observed

10  any, like, beating or bruises or anything on any

11  defendants.  I did see police that had been beaten,

12  scratched, hit, but never on a defendant.

13      Q.   Okay.  So it sounds like, if you observed that

14  something -- or strike that.  If the suspect was having

15  some issue that caused you to stop the interview, you

16  would stop the interview and alert the police?

17          MR. IASPARRO:  Object to the form.

18  BY MS. PROSSNITZ:

19      Q.   Is that right?

20      A.   Depending upon the circumstances, I would

21  either alert the police and tell them, like the guys

22  that were going through withdrawal, or depending upon

23  the other circumstances, then I would -- I would go to

24  like the felony review supervisors.

25      Q.   Do you remember any of those circumstances

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JCS_MAYSONET 3046

```
 1   where you went to the felony review supervisors?
 2        A.   I didn't have to.
 3        Q.   Okay.
 4        A.   I never had to.
 5        Q.   When you started talking about the substance
 6   of the case with the suspect, how would you elicit
 7   information?
 8        A.   I'd be very upfront and ask him what happened.
 9        Q.   Would you ask open-ended questions?
10        A.   Yes.
11        Q.   Would you ever ask leading questions?
12        A.   Of course.
13        Q.   Did suspects ever refuse to talk to you?
14        A.   Yes.
15        Q.   Did you take notes when you talked to the
16   suspects?
17        A.   Usually not just because, until you had an
18   idea of what the case was all about, taking notes didn't
19   really make sense because you didn't know what was the
20   truth, what was a lie, what was BS, so taking notes was
21   not something that I -- I did.
22        Q.   I want to turn back really quickly to the
23   circumstances where suspects said they had been
24   mistreated.  Was there a certain protocol or policy in
25   place for how to handle those situations?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3047

```
 1        A.   I -- I don't know because it never happened to
 2   me.
 3        Q.   Okay.  You don't remember receiving training
 4   on that?
 5        A.   Honestly, I don't -- I don't know.
 6        Q.   Okay.  And then what would happen after the
 7   initial interview of the suspect?
 8             MR. IASPARRO:  Object to form.
 9             THE WITNESS:  It would depend upon the
10        circumstances.
11   BY MS. PROSSNITZ:
12        Q.   How would you determine whether or not to take
13   a statement from a suspect?
14        A.   Did he want to talk to me? Was it a statement
15   that I could confirm the veracity of? Did it make sense
16   within the other evidence that we had received, and
17   whether this was going to benefit the case and -- and
18   -- and the charges were going to ultimately be approved.
19        Q.   And just for my own understanding, would you
20   do an initial interview and then determine whether to
21   take the statement?
22        A.   Yeah, and making more than one initial
23   interview, depending upon the information we receive.
24        Q.   But there would always be an initial interview
25   before the actual --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3048

1     A.   Oh, yes.

2     Q.   -- statement?  Okay.  What are the ways you

3  took statements from suspects?

4     A.   Handwritten, court reported were the main ways

5  that we took statements back then because we didn't have

6  video or -- so -- so there was some limitations.

7     Q.   How would you determine which option to use?

8     A.   It was usually based upon a time assessment,

9  number one.  Availability of a court reporter, number

10  two.  Position of the person in the case.  Was he the

11  primary actor in a homicide?  I mean, there were also

12  cost considerations.  So, I mean, I don't know if it was

13  a rule, but I'd -- I'd be pretty surprised if -- if you

14  took court reported statements on, like, armed robberies

15  or anything but homicides.

16     Q.   If he was the primary actor in a homicide, was

17  the preference to take a court reported statement?

18     A.   Yes.  I mean, it's definitely the best

19  evidence at trial, at least for what we had back then.

20     Q.   And would you present these options to the

21  suspect of how to take the statement?

22     A.   Probably.  I -- I don't remember.

23     Q.   And how long would it usually take to take a

24  statement?

25          MR. IASPARRO:  Object to form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3049

The Deposition of JOHN HALLORAN, taken on 11/14/2023

42

```
 1              THE WITNESS:  It would depend upon the
 2       complexity of the case.
 3    BY MS. PROSSNITZ:
 4         Q.    So it could take more than 20 minutes?
 5         A.    Oh yes.
 6         Q.    Sometimes would it take more than an hour?
 7         A.    Depending upon some of the cases, sure, it
 8    could take more than an hour.
 9         Q.    So either during the interview or the
10    statement, if you wanted to talk to the suspect outside
11    the presence of the police, how would you handle that?
12         A.    Okay.
13              MR. IASPARRO:  Object to form.
14              THE WITNESS:  Yeah.  Can you give me a
15       different question or just rephrase it?  Because I
16       think it was kind of a multiple part --
17    BY MS. PROSSNITZ:
18         Q.    Definitely.
19         A.    Okay.
20         Q.    Let's start with just the interview.  If you
21    wanted to talk to the suspect outside the presence of
22    the police, what would you do?
23              MR. IASPARRO:  Same objection.
24              THE WITNESS:  Ask the police to leave.
25    BY MS. PROSSNITZ:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3050

1     Q.   Okay.  And if you needed to leave the room

2   during the interview, would you ever leave the suspect

3   alone in the room with a police officer?

4     A.   Sure.  Yeah.

5     Q.   Were there times where the court reporter had

6   to leave the room and you had to leave the suspect alone

7   in the room?

8     A.   I'd be surprised.  Once the court reporters

9   got there, that was all business until you got the thing

10  done.  Nobody was, like, walking in and out of the room

11  if the court reporter was there, so -- and I shouldn't

12  say that it never happened.  It -- but once again, I

13  don't remember.  It was a long time ago.

14     Q.   Okay.  Were you aware of any rules in 1990,

15  that prohibited the felony review assistant state's

16  attorney from leaving an interview during the taking of

17  the statement?

18         MR. IASPARRO:  Object to form.

19         THE WITNESS:  No.

20  BY MS. PROSSNITZ:

21     Q.   And would anyone be in the room with you while

22  an official statement is being taken beyond the witness?

23         MR. IASPARRO:  Same objection.

24         THE WITNESS:  Yeah.  Yeah, the police.

25  BY MS. PROSSNITZ:



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3051

1    Q.   And we talked about this a little bit before

2    in the interview context, but during the taking of an

3    official statement, what was the police's role in being

4    in the room?

5    A.   I -- I mean, again, it was as a prover.  And

6    as -- I mean, some of these guys could be really

7    violent, so you may want the police there too, because,

8    I mean, if -- if they start trying to attack, you know,

9    the court reporter or the state's attorney or -- I mean,

10   especially if -- I mean, if a guy murdered somebody,

11   obviously, there is a, you know, real penchant for

12   violence there, so there was definitely a safety factor,

13   too.

14   Q.   So they could serve like a protective role,

15   right?

16   A.   At all times, yes.  I mean, these guys are in

17   custody.  They've already been arrested and they have

18   pending charges and yeah, there is definitely a safety

19   concern.

20   Q.   Would the police be allowed to ask questions

21   during the statement being taken?

22   A.   Usually by that time, we had gotten a real

23   solid narrative of what had happened and the questions

24   we were asking.  And so the -- the state -- I mean, not

25   that they couldn't ask a question, there was no

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3052

1   prohibition, but generally the state's attorney would do

2   all the questioning in that circumstance.

3        **Q.    Did you ever witness a suspect physically**

4   **trying to harm a police officer?**

5        A.    Yes.

6        **Q.    And let me clarify.  Did you ever witness this**

7   **while they were taking -- while you -- they were giving**

8   **a statement?**

9        A.    We -- no, not during a statement.

10        **Q.    Okay.  And while the statement was being**

11   **taken, could the police tell a suspect what to say?**

12        A.    No.

13        **Q.    Would that be inappropriate?**

14        A.    Very.

15        **Q.    Why?**

16        A.    Because you don't want a, you know, canned

17   statement, you want the truth.  I mean, I want to tell

18   you that being a state's attorney was a privilege, and I

19   took significantly less money.  You work harder, and

20   like I said before, I mean, you work in very difficult

21   circumstances.  I mean, I remember going at midnight to

22   the old Robert Taylor Homes to get a witness for a

23   murder case for the next morning.  And, I mean, you did

24   a lot because you made a difference.  You represented

25   the people by -- I mean, seeing the satisfaction in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3053

1    eyes of like victims' families when, you know, justice

2    had been done meant a lot.  And it was the best job I

3    ever had, but you need to make money and take care of

4    your family too and you can't do it on that salary.

5        Q.    Okay.  Understood.  If a police officer was

6    ever telling the suspect what to say during the

7    statement --

8        A.    I would never allow that.

9        Q.    -- would --

10          THE REPORTER:  Sorry, can we just make sure

11       she's finishing her question before --

12          THE WITNESS:  I'm sorry.  Yes.

13          THE REPORTER:  It's okay.

14   BY MS. PROSSNITZ:

15       Q.    So if a police officer was telling a suspect

16   what to say during a statement, would you report that?

17       A.    I'd tell them to get out.

18       Q.    Did that ever happen?

19       A.    No.  I mean, with me, it never would get to

20   that level because, I mean, you need to be assertive.

21   Depending upon who the cops are, what the circumstances

22   are.  I mean, they like to run the show, they are

23   obviously a lot of Alpha males, and under the

24   circumstances, you just need to let them know that their

25   help is appreciated, but they are not in charge.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3054

1    Q.   Do you feel like they respected that when you

2  were taking the statement, typically, that you were the

3  one in charge?

4    A.   You made them respect that because if they

5  were out of line, then you'd just tell them that they

6  had to leave.

7    Q.   Okay.  Can you ever remember telling a police

8  officer to leave while you were taking a statement?

9    A.   Not during a statement.  Not that I recall

10  anyway.  I mean, once you get to the level where you're

11  taking, like, either a handwritten or -- or a court

12  reported statement, I mean, you set the groundwork for

13  the whole situation and -- and I never had problems with

14  the police, I always got along well with them, but on

15  the other hand, I wasn't like some of these guys where

16  they were, you know, going out with them all the time,

17  so --

18    Q.   Do you remember ever telling that -- a police

19  officer to leave while you were doing the initial

20  interview with a suspect?

21    A.   Not specifically, but, I mean, I -- could it

22  have happened?  Yeah.

23    Q.   Can I ask -- when you said that there were

24  ASA's who were going out with police officers, were

25  there particular ones that you knew who were doing that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3055

```
 1       A.   No.  I mean, after -- if you had a jury trial

 2  and you were waiting for the jury to come back, you

 3  know, the public defenders would go too, we'd go to

 4  Gene's, the old bar, and -- you know, back then it was a

 5  -- the camaraderie was good between the prosecutors and

 6  the -- most of the defense -- defense bar.  And, I mean,

 7  you fought in court hard, but, I mean, it was still a

 8  pretty collegial group.  And I understand it's not like

 9  that -- well, now, I won't even comment, but anyway.

10       Q.   Would the officers join them after court?

11       A.   Yes.

12       Q.   Okay.  Do you remember going out with police

13  during this trial?

14       A.   I mean, I don't remember.  I was only given a

15  statement, I wasn't trying the case, so, I mean, I'm --

16  I don't think I would go out, no.

17       Q.   Okay.  Have you ever witnessed an officer

18  force a witness to sign a statement?

19       A.   No.

20       Q.   Would that be inappropriate?

21       A.   Yes.

22       Q.   Would you have reported that if that happened?

23       A.   I would've stopped it immediately, yeah, and

24  reported it.

25       Q.   And when you took a handwritten statement, how
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3056

1    would you write them down?

2         A.   How would I write them down?   I mean, like,

3    with a pen, you know?

4         Q.   Okay.   That's a fair question.   Did you write

5    them down contemporaneously in front of the suspect?

6         A.   Yes.   We sat there with the suspect and went

7    through the whole process with him and I would write it

8    down and he would -- there were corrections, we'd go

9    through the whole process.   And then I would sign it,

10   the detective would sign it, the defendant would sign

11   it.

12        Q.   Okay.   Would you write it out word for word?

13        A.   No, it was a summary.   I mean, you can't do --

14   that's what the good thing was about the court reported

15   statements because then it would be verbatim.

16        Q.   So would you write it out a sentence at a time

17   and then read the sentence to the suspect or witness?

18        A.   I don't remember.

19        Q.   Do you remember if you would write out the

20   whole statement and then show it to the --

21        A.   Probably not.   I'd probably just go through,

22   like, okay, this is what you said here and -- but once

23   again, I don't -- I don't remember.

24        Q.   Okay.   Would you ever write down the statement

25   outside of the witness's presence?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3057

```
 1        A.    No.
 2        Q.    Why not?
 3        A.    Because I wanted to make sure what he was
 4   telling me was accurate.
 5        Q.    What would happen after the statement was
 6   transcribed?
 7        A.    After the handwritten?
 8        Q.    Yes.
 9        A.    We'd go over it, make corrections, and then
10   everybody would sign off on it.
11        Q.    Okay.  And what was the purpose of reviewing
12   the transcribed statement with --
13        A.    Make sure that it was accurate.
14        Q.    Would you have the witness initial each page?
15        A.    Yeah.  I mean, there was initial pages,
16   initial scratch outs.  Once again, I don't remember the
17   whole process.  It was a while ago.
18        Q.    And did you have the suspect sign it at the
19   end?
20        A.    Yes.
21        Q.    And what was the purpose of that?
22        A.    Because he put his signature on it indicating
23   that he agreed with everything that was in there and
24   that it was an accurate statement of -- of what he told
25   me, an accurate summary of what he told me.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
JGS_MAYSONET 3058

1    Q.   Okay.  And then you yourself would sign the

2  statement; is that right?

3    A.   I would sign it and the detective or whoever

4  else was there, the police, would sign it, too.

5    Q.   Okay.  And why would you sign it?

6    A.   Because I wanted to make sure that they knew

7  that it was accurate and then I could testify in court

8  as it had been signed contemporaneously with all

9  parties.

10   Q.   And why would you have the detective or police

11 officer also --

12   A.   Because he was also there as a witness, and he

13 can testify that it was an accurate statement of what

14 the defendant told us.

15   Q.   Were there ever times when a suspect said that

16 they couldn't read or write?

17   A.   If they said they couldn't read or write,

18 obviously, we're not taking a statement because they

19 can't read it and it doesn't do us any good.

20   Q.   So what would you do in those circumstances?

21   A.   I mean, depending upon -- if -- if it was,

22 like, a Hispanic, we'd have a Hispanic, like, officer or

23 a police interpreter, and they might write it up on,

24 like, their supplemental reports or something like that

25 where, "This is the statement that he gave us, but the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3059

1  person couldn't speak English," or if you had a court

2  reporter, that would obviously remedy that issue.

3      Q.   So if someone said they had trouble reading

4  English, would you always call in an interpreter?

5      A.   Yes.

6          MR. IASPARRO:  Object to form.

7  BY MS. PROSSNITZ:

8      Q.   And this whole process can take hours; is that

9  right?

10     A.   Yes.

11     Q.   Is it always continuous?

12         MR. IASPARRO:  Form.

13 BY MS. PROSSNITZ:

14     Q.   Is it always, like, in one go or are there

15 breaks?

16         MR. IASPARRO:  Same objection.

17         THE WITNESS:  So, like, what do you mean?  I'm

18   not --

19 BY MS. PROSSNITZ:

20     Q.   Is it -- so when you're taking the statement,

21 is it always, like, you just go start to finish or would

22 there ever --

23     A.   Once you begin taking the statement, you go

24 straight through and finish the statement, yes.

25     Q.   Would there ever be breaks between taking the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3060

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 281 of 428 PageID #:21273
The Deposition of JOHN PASKO, taken 11/30/2023, 2023

53

```
 1    statement and then reviewing it with the suspect?
 2        A.   I can't say no.  I mean, the guy needed to go
 3    to the bathroom or have a cigarette or drink of water
 4    or, you know, get a McDonald's or something, yeah, that
 5    could certainly happen.
 6        Q.   But was it best practice to review it right
 7    away with them after taking it?
 8            MR. IASPARRO:  Object to form.
 9            THE WITNESS:  I mean, I don't really want to
10       get into what best practice was, it just depended
11       upon the circumstances.  There certainly would not
12       be like, a long break, and it would be -- best case
13       scenario is you're going over it right after the guy
14       gives -- gives his statement and then you have him
15       sign it.
16    BY MS. PROSSNITZ:
17        Q.   Do you remember there ever being breaks where
18    you would leave the suspect in the interview room alone
19    after taking the statement?
20            MR. IASPARRO:  Object to form.
21            THE WITNESS:  I -- I don't remember it, but it
22       certainly could've happened.
23    BY MS. PROSSNITZ:
24        Q.   And if this was a multi-defendant case, would
25    you review statements that had already been taken
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3061



Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 282 of 428 PageID #:21274
The Deposition of JOHN FRANCIS HALLORAN, taken on December 5, 2023

54

1    related to the crime before interviewing an additional

2    suspect?

3              MR. IASPARRO:  Form.

4              THE WITNESS:  It would depend.  I mean, a lot

5         of times, those statements would not be done by the

6         time -- you know, if they were court reported or

7         handwritten, you know, it would depend upon the

8         timing, once again.  I mean, it wasn't like these

9         were instantly available.

10   BY MS. PROSSNITZ:

11        Q.   Okay.  But there were times where you were

12   able to review the statements before going to -- or

13   strike that.  There were times where you could interview

14   previous statements by co-defendants before going to

15   interview a suspect; is that right?

16             MR. IASPARRO:  Form.

17             THE WITNESS:  I don't know if there were or

18        not.  I don't remember.

19   BY MS. PROSSNITZ:

20        Q.   Okay.  In that situation, what would you do if

21   the statement you got was not consistent with those of

22   the co-defendants?

23             MR. IASPARRO:  Form.

24             THE WITNESS:  Once again, I mean, I don't know

25        the hypotheticals.  I can't tell you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS-MAYSONET 3062

BY MS. PROSSNITZ:

Q.    That doesn't bring to mind a situation where that ever happened, where you got an inconsistent statement from one person?

A.    Once again, it's -- you know, you're talking about 33 years ago.  No, it doesn't bring it to mind anything in particular.  It's not like anything stands out, no.

Q.    Okay.  Really quickly, turning back to going out with the police, was there ever a time when you went to get drinks with Detective Guevara?

A.    No, not that I can recall.  I mean, could he have been somewhere that I was?  Yeah, obviously, but I did not know Rey Guevara at all.  He was not like one of the detectives that I, you know, was -- was closer with.

Q.    Okay.  What about Detective Halvorsen?

A.    I knew -- I think it was Ernie Halvorsen?

Q.    Uh-huh.

A.    He -- he was a -- Is he still alive?  Is he alive?

Q.    No.

A.    Oh, that's too bad.  He was a good guy.  I -- once again, I didn't know him well, but I -- I knew him a lot better than I knew Guevara.

Q.    Do you remember what his reputation was at the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS-MAYSONET 3063

```
1   time that you knew him?
2           MS. ROMELFANGER:  Object to form.
3           MR. IASPARRO:  Same objection.
4           THE WITNESS:  Who?
5   BY MS. PROSSNITZ:
6       Q.    Halvorsen.
7       A.    Halvorsen's reputation was good.  He was --
8   yeah, he was a good guy.
9       Q.    What about Detective Guevara's reputation?
10          MR. IASPARRO:  Same objection.
11          THE WITNESS:  What -- again, I -- I -- I didn't
12      know him well enough to -- to really know what his
13      reputation was, but he was not -- I mean, he was a
14      solid detective as far as anybody knew, and there
15      was never any inkling that there were any issues
16      with him, that's for sure.  Because it wasn't in the
17      best interest of state's attorneys to work with guys
18      that could potentially undermine their -- their
19      cases, so, I mean, if there was a problem, then you
20      -- you wouldn't want to work with a guy.  So yeah,
21      Guevara never had any kind of a bad reputation at
22      all when I was there, that's for sure.
23  BY MS. PROSSNITZ:
24      Q.    Did you work with Detective Guevara on any
25  cases?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3064

KENTUCKIANA
COURT REPORTERS

1     A.   Not that I remember, no.  And he wasn't -- I

2  never worked with him on this case.

3     Q.   Okay.  So you had mentioned before that felony

4  review ASA's were assigned to specific areas; is that

5  right?

6     A.   Yes.

7     Q.   What area were you assigned to in August of

8  1990?

9     A.   Well, August 24th -- I mean, there were

10 different area codes assigned on, like, different days.

11 So -- and I -- we worked three days on and three days

12 off.  So that day, I was assigned to Area 5.

13    Q.   Okay.

14    A.   And that was I believe it was August 24.  You

15 want to help me out here?

16    Q.   That's correct.  Yes.

17    A.   Okay.

18    Q.   So you were assigned to a different area

19 depending on the day?

20    A.   Yes.

21    Q.   Okay.  And on August 24th, 1990, you were

22 assigned to Area 5; is that right?

23    A.   That's what the paperwork says, so it's yes.

24    Q.   Do you remember any specific cases you had

25 that came out of Area 5?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3065

 1          A.    That day I remember this one because I -- I

 2    think I was a defendant in a civil rights case, so I

 3    remember this one now.

 4          **Q.    Do you remember any others?  Any other cases**

 5    **you had out of Area 5?**

 6          A.    Not really.  You mean at the time of Felony

 7    Review?

 8          **Q.    Yes.**

 9          A.    Yeah, no, I don't really.

10          **Q.    How often did you go to Area 5 as a felony**

11    **review attorney?**

12          A.    Not that often.  Most of the times, I was

13    working west and south side.

14          **Q.    Do you know the layout in the rooms of Area 5?**

15          A.    I mean, generally, the detective division --

16    first off, it was a newer facility.  Detective division

17    was on the second floor.  All of the interview rooms

18    had, I believe, a long, thin window right next to the

19    door so you could always see into the rooms no matter

20    what.

21          **Q.    Do you know the officers at Area 5?**

22               MS. ROMELFANGER:  Object to form.

23               THE WITNESS:  I knew some of them.

24               MR. IASPARRO:  Join.

25    BY MS. PROSSNITZ:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3066

1     Q.   Do you remember which ones you knew at the

2 time?

3     A.   One guy who was a friend, Mark Hawkins, was

4 25.  He ran a tac unit there.  I mean, yeah, there was -

5 - I knew Schak who was the detective on this case. And

6 there's a handful of guys.

7     Q.   Did you work with the same officers a lot at

8 Area 5?

9     A.   No.  You never do, really.

10    Q.   Do you work with Schak a lot?

11    A.   I don't -- I think this might've been the only

12 case I had.  I -- I don't -- I don't remember, but I

13 worked with him on this one.

14    Q.   Okay.  Would you work with the same felony

15 review ASAs?

16    A.   You were on a team, yeah, so you always had

17 the same guys that you were on your team with, but you

18 never worked together.  I mean, it was always a solo job

19 going out to the area because, you know, they needed

20 other people to cover other parts of the city with --

21 where other crimes were happening.

22    Q.   Got it.  So to clarify, you said you knew

23 Schak, but you only worked -- you may have only worked

24 with him on this one case.  So did you know him outside

25 this case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JCS_MAYSONET 3067

```
 1        A.    You'd see guys walking around, you know, from,

 2   like, felony trial division.  They'd be on different

 3   cases.  And I mean, yeah, you were friendly with them

 4   and say hi to them, just like any co-worker.

 5        Q.    Were you friends with Detective Schak outside

 6   of work?

 7        A.    No.

 8        Q.    Okay.  Did you ever witness any misconduct by

 9   detectives at Area 5?

10        A.    No.

11              MS. ROMELFANGER:  Object to the form.

12   BY MS. PROSSNITZ:

13        Q.    Did you ever hear about any misconduct by

14   detectives at Area 5 --

15        A.    No.

16        Q.    -- in 1990?

17        A.    No.

18        Q.    Did any detectives ever do anything in front

19   of you at Area 5 that you thought was questionable when

20   you were a felony review ASA?

21        A.    No.

22        Q.    Okay.  Do you know who Jennifer Borowitz is?

23        A.    Yes.

24        Q.    Who is she?

25        A.    She was another ASA who was working at -- on
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3068

```
 1   felony review, and she was on the team that was opposite
 2   hours.
 3        Q.    Did you ever work with her?
 4        A.    In juvenile court for a little while, I worked
 5   with her.
 6        Q.    Remind me, that was before you were in felony
 7   review?
 8        A.    Yes.  That was before felony review, yes.
 9        Q.    What was her reputation at the state's
10   attorney's office?
11        A.    Good.
12        Q.    Do you have any professional opinion about
13   Jennifer Borowitz's work?
14        A.    She was good.
15        Q.    Okay.  Do you know who Frank DiFranco is?
16        A.    Yes.
17        Q.    Who is he?
18        A.    He's another ASA.
19        Q.    Did you ever work with him?
20        A.    Yes.
21        Q.    In what division?
22        A.    I worked with him in felony trial division,
23   just briefly on a couple of different matters.  I think
24   we were in appeals together for a few weeks together
25   too, so --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3069

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 290 of 428 PageID #:21282
The Deposition of JOHN PROVAS, taken on 11/21/2023

62

```
 1        Q.    And what was his reputation at the state's
 2   attorney's office?
 3        A.    Very good.
 4        Q.    And did you have any professional opinion
 5   about his work?
 6        A.    Very good.
 7        Q.    Earlier you had mentioned -- sorry, I'm
 8   circling back to this.  But that Schak you saw --
 9   Detective Schak, you saw him around just like you would
10   any other co-worker.  Would you have considered
11   detectives co-workers at the time?
12        A.    From the standpoint of our interaction when
13   you were working in felony trial division and your
14   witnesses were always detectives, at least in some facet
15   of the case, you would have a lot of interaction with
16   them, sometimes very, you know, detailed interaction on
17   different cases.  And so from that standpoint, yeah,
18   they were like coworkers.
19        Q.    Okay.  So for my next several questions, I'm
20   just going to ask you to base your answers on your
21   independent recollection of this case without reference
22   to documents.
23        A.    Okay.
24        Q.    So what do you recall about the prosecution of
25   Justino Cruz for the murder of the Wiley brothers as you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3070

```
 1    sit here today?

 2            MS. ROMELFANGER:  Objection.  Foundation.

 3            THE WITNESS:  It was 33 years ago.  I remember

 4       -- no independent recollection.

 5    BY MS. PROSSNITZ:

 6       Q.   Okay.  Do you remember what your role was in

 7    that case?

 8       A.   I mean, I know I was the felony review

 9    assistant.

10       Q.   And what do you recall about the prosecution

11    of Alfredo Gonzalez for the murders of the Wiley

12    brothers?

13       A.   Nothing.

14       Q.   So as you sit here today, do you have any

15    independent recollection of going to Area 5 on August

16    24, 1990?

17       A.   No.

18       Q.   Do you recall interviewing Justino Cruz on

19    August 24, 1990, at Area 5?

20       A.   No.

21       Q.   Do you remember him -- do you remember

22    anything you said during that interview independently?

23       A.   No.

24       Q.   Do you remember what he looked like?

25       A.   Not really.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3071

```
1        Q.    Do you remember what the crime was that he was
2   in custody regarding?
3        A.    Double homicide.
4        Q.    Okay.  Do you remember what Alfredo Gonzalez's
5   alleged role was in the crime?
6        A.    Independently?
7        Q.    Yeah.
8        A.    I have no recollection of that from 33 years
9   ago, no.
10       Q.    Okay.  Do you recall talking with other
11  prosecutors about this case in August of 1990?
12       A.    No independent recollection.
13       Q.    Who was your supervisor in August 1990?
14       A.    No independent recollection.
15       Q.    So when you went into Area 5 on August 24,
16  1990, do you recall if police officers told you that
17  they'd already interrogated anyone else regarding this
18  crime?
19       A.    No independent recollection.
20       Q.    Do you remember officers mentioning Alfredo
21  Gonzalez?
22       A.    No, no independent recollection.
23       Q.    What about Jose Maysonet?
24       A.    No, no independent recollection.
25       Q.    Christopher Goossens?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3072

```
 1        A.    No independent recollection.

 2        Q.    And Rosa Bella?

 3        A.    No independent recollection.

 4        Q.    Did you learn that both Alfredo Gonzalez and

 5   Jose Maysonet had named Cruz in their handwritten

 6   statements when you went into Area 5 in August 1990?

 7        A.    No independent recollection.

 8        Q.    Did you learn that both Alfredo Gonzalez and

 9   Jose Maysonet had been charged with murder at that time?

10        A.    No independent recollection.

11        Q.    If you knew that a suspect had been named by

12   other defendants, was it your practice to speak with the

13   other felony review ASAs who'd interviewed those

14   suspects about the case?

15        A.    I would review their folders, the felony

16   review folders.  The problem is that, I mean, they just

17   got off a 12-hour night shift, or day shift, and they're

18   probably sleeping.  And am I going to call them up and

19   wake them up after they've been up for who knows how

20   many hours?  Probably not, no.  And once again, we

21   didn't have cell phones.  So you're calling somebody's

22   apartment.

23        Q.    Was it your practice to talk to the police

24   officers who would've interrogated the other defendants?

25               MS. ROMELFANGER:  Object to form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS MAYSONET 3073

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 294 of 428 PageID #:21286
The Deposition of JOHN PROFANO, taken on 11/20/2023

66

```
 1              THE WITNESS:  If they were around, maybe, yeah.
 2         But once again, they also just finished a -- a - - a
 3         long shift of nights, and I certainly would not be
 4         calling the cops at all.
 5    BY MS. PROSSNITZ:
 6         Q.   Okay.  Why not?
 7         A.   It's because you don't call people at home,
 8    number one.  If they're ASAs and they're your, you know,
 9    co-workers and felony review, that's one thing. But
10    bothering a cop who you don't know what his hours
11    might've been, I mean, that's just rude.
12         Q.   And if it was -- if you were about to
13    interview a suspect who would've been named by other
14    defendants, would you check those defendants' statements
15    for consistency?
16         A.   If I had them.
17         Q.   Okay.  And you told me before, but I'm
18    forgetting.  Why -- what were the circumstances that you
19    wouldn't have had those statements?
20              MS. ROMELFANGER:  Form.
21              THE WITNESS:  I -- like, if they were court
22         reported they wouldn't be available.
23    BY MS. PROSSNITZ:
24         Q.   Okay.
25         A.   If they were handwritten, they might not be
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3074

1   available, you never know.  I mean, if they were

2   available, you'd look at them, yeah.  But they may not

3   be.

4       Q.   Would inconsistencies in confessions from

5   different suspects be indications of a false confession

6   among one of those suspects?

7           MR. IASPARRO:  Objection to form and

8       foundation.

9           THE WITNESS:  I'm not going to answer that

10      hypothetical.  Come on.

11  BY MS. PROSSNITZ:

12      Q.   You unfortunately have to answer.

13      A.   Okay.  Read it to me again.

14      Q.   Would inconsistencies in confessions from this

15  -- different suspects be indications of a false

16  confession -- of false confession?

17      A.   Would inconsistencies from various defendants'

18  statements --

19      Q.   Be an indication of a false confession?

20          MR. IASPARRO:  Form and foundation.

21          THE WITNESS:  Yep.  On the same case, you mean?

22  BY MS. PROSSNITZ:

23      Q.   Yes.

24      A.   Okay.  So you're assuming co-defendants,

25  number one.  You're assuming that they were co-

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3075

```
 1   conspirators in a case.  Is that -- I mean, I'm making a
 2   lot of assumptions here, you know?  So I'm not really
 3   comfortable giving you that.  But you know, it - - it --
 4   it -- it -- I don't know.  It may or may not be,
 5   depending upon once again, the circumstances.  I mean,
 6   you'd have to make a thousand assumptions in order for
 7   that to be empirically, you know, 100 percent true.
 8       Q.   Okay.  Would it raise any red flags?
 9            MR. IASPARRO:  Form and foundation.
10            THE WITNESS:  Once again, I mean, it depends on
11       the circumstances.  I -- I can't really tell you.
12   BY MS. PROSSNITZ:
13       Q.   Would you have any obligation to vet those
14   inconsistencies?
15       A.   Well, of course.
16       Q.   Do you recall playing any role in the decision
17   to charge in Alfredo's -- Alfredo Gonzalez's case?
18       A.   I had no role in that.
19       Q.   Do you know who approved the charge?
20       A.   No.
21       Q.   Do you remember having any conversations with
22   that person?
23       A.   I didn't know who it was, so I couldn't have
24   talked to him.
25       Q.   Did you play any role in the decision to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3076

```
 1   charge in Jose Maysonet's case?

 2        A.   No.

 3        Q.   Do you know who approved the murder charge?

 4        A.   No.

 5        Q.   Do you know who recommended the murder charge?

 6             MS. ROMELFANGER:  Object to form.

 7             THE WITNESS:  I can speculate, but I don't know

 8        for sure.  No.

 9   BY MS. PROSSNITZ:

10        Q.   Okay.  Do you know who recommended the murder

11   charge in Alfredo Gonzalez's case?

12             MS. ROMELFANGER:  Asked and answered.

13             THE WITNESS:  Once again, I mean, I can

14        speculate, but I don't know for sure.  No.

15   BY MS. PROSSNITZ:

16        Q.   Do you recall interviewing witnesses in the

17   Justino Cruz prosecution independently of police

18   officers?

19             MR. IASPARRO:  Object to form.

20             THE WITNESS:  I don't -- I don't have any

21        independent recollection.

22   BY MS. PROSSNITZ:

23        Q.   Do you recall being present during the

24   interview of Alfredo Gonzalez?

25        A.   I -- I was not there.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3077

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 298 of 428 PageID #:21290
Video Deposition of John Philbin taken 6/30/2023

70

1     Q.    What about Jose Maysonet's interview?

2     A.    I mean, I can't -- I -- I -- I wasn't there. I

3 have no independent recollection and I'm about 99

4 percent sure that I was not there.

5     Q.    Okay.  Do you remember being present in

6 Christopher Goossens interview?

7     A.    Once again, I have no independent recollection

8 and I'm about 99 percent sure I wasn't there.

9     Q.    Okay.  And what about for Rosa Bella's

10 interview?

11    A.    Same.

12    Q.    Do you have an independent recollection of

13 interacting with Detective Schak during this case?

14    A.    No.

15    Q.    Were you aware at any point, during the

16 prosecution of Justino Cruz, that police had engaged in

17 this conduct?

18    A.    No.

19    Q.    Were you aware of any witness coercion that

20 had happened --

21    A.    No.

22    Q.    -- in Justino Cruz's case?

23    A.    Sorry.  No.

24    Q.    Were you aware of any physical violence that

25 police had undertaken in Justino Cruz's case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3078

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 299 of 428 PageID #:21291
Video Deposition of John Panozzo taken 11/28/23, Vol 2

71

```
1        A.    No.
2        Q.    Were you aware of any threats made to
3    witnesses in Justino Cruz's case?
4        A.    No.
5        Q.    Were you aware of any staged photo lineups
6    performed on witnesses in Justino Cruz's case?
7        A.    No.
8        Q.    Were you aware of any witnesses being fed
9    facts in Justino Cruz's case?
10       A.    No.
11       Q.    Were you aware of any witnesses being taken on
12   a walk through the crime scene in Justino Cruz's case?
13       A.    No.
14       Q.    And were you aware of any police officers
15   threatening family members of witnesses in Justino
16   Cruz's case?
17       A.    No.
18       Q.    If you had been aware that any of this
19   misconduct had occurred, what would you have done?
20            MR. IASPARRO:  Form.
21            MS. ROMELFANGER:  Join.
22            MR. IASPARRO:  Foundation.
23            THE WITNESS:  If I had been aware that any of
24       this happened, I would've put a stop to it and I
25       would've reported it to our state's attorney
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3079

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 300 of 428 PageID #:21292
The Deposition of JOHN PROSSNITZ, taken on 12/12/2023

72

```
 1        superiors.
 2   BY MS. PROSSNITZ:
 3        Q.   Would you have made sure it was turned over to
 4   Justino Cruz and his defense attorneys as well?
 5             MR. IASPARRO:  Object to form.
 6             THE WITNESS:  It would've never gotten to that
 7        stage.  It would've been way before then.  I mean,
 8        it would never have been, you know, charges approved
 9        if there was any indication of coercion.  I wouldn't
10        have approved charges against Justino Cruz if there
11        was any indication that people have been committing
12        misconduct.
13   BY MS. PROSSNITZ:
14        Q.   Would you agree with me that if any of this
15   kind of misconduct had occurred during the prosecution
16   of Justino Cruz, that would be exculpatory information?
17             MR. IASPARRO:  Form.  Foundation.
18             THE WITNESS:  Well, like I said, I mean, you're
19        asking me for a hypothetical and I'm telling you
20        that it never would've gotten there if I had known
21        any of this was going on because Justino never
22        would've been charged.
23             MS. PROSSNITZ:  Okay.  If it's okay with
24        everyone, I'd like to take a ten-minute break.
25             THE WITNESS:  Let's see how I'm doing on the --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS MAYSONET 3080

```
 1              MS. ROMELFANGER:  I think you got 30 minutes on
 2        your parking.
 3              THE VIDEOGRTAPHER:  We are off the record.  The
 4        time is 11:24.
 5                 (OFF THE RECORD)
 6              THE VIDEOGRAPHER:  Back on the record.  The
 7        time is 11:42 a.m.
 8  BY MS. PROSSNITZ:
 9        Q.   Okay.  So now I'm going to ask you questions,
10  which you can rely on your review of documents to answer
11  to clarify.  No longer just asking about your
12  independent recollection.  On August 24, 1990, were you
13  called to Area 5?
14        A.   Yes.
15        Q.   How were you called to Area 5?
16        A.   I'm assuming by a either beeper or call on the
17  handheld radio in one of our lovely felony review cars.
18        Q.   Who called you to Area 5?
19        A.   I don't remember who the dispatcher was.  One
20  of the dispatchers.
21        Q.   And what did they say to you during the call?
22        A.   I have no independent recollection, but they
23  told me to go to Area 5, I believe, and talk to
24  Detective Schak regarding a homicide.
25        Q.   Okay.  Do you remember what you said to them?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3081



```
 1        A.    Nothing.

 2        Q.    And did you go to Area 5?

 3        A.    I did.

 4        Q.    What time did you go to Area 5?

 5        A.    I'd have to look at a document to refresh my

 6  recollection, but I believe it was approximately noon.

 7        Q.    Okay.  I'm going to present you with what I'll

 8  mark as Exhibit 1.

 9              (EXHIBIT 1 MARKED FOR IDENTIFICATION)

10              MS. PROSSNITZ:  Thanks.

11  BY MS. PROSSNITZ:

12        Q.    And I'll represent to you that this is your

13  trial testimony from People v. Gonzalez.

14        A.    Okay.

15        Q.    If we turn to Bates stamp 0007, do you see

16  Lines 13 to 14?

17        A.    Yes.

18        Q.    Okay.  And so what time did you arrive at Area

19  5 based on your testimony here?

20        A.    1:00 in the afternoon.

21        Q.    Okay.  What did you do when you arrived at

22  Area 5?

23        A.    I assume I talked to Detective Schak.  It

24  doesn't say here in my transcript.

25        Q.    Do you remember any other detectives you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3082

1  talked to when you arrived?

2      A.   No.

3      Q.   Okay.  Can you tell me everything you remember

4  the police telling you that they'd learned from Justino

5  Cruz before you arrived at Area 5?

6      A.   I -- I had -- like I said, I have no

7  independent recollection.  And I mean, the other

8  documents actually will help me more than I think this

9  will.  If you want to give me my felony review folder,

10 that will have some indication of what had happened

11 prior to my taking over the case and that there were, I

12 believe, indications that other people had been charged

13 at that time.

14     Q.   Okay.  Well, let's turn to -- let's mark this

15 as Exhibit 2.

16          (EXHIBIT 2 MARKED FOR IDENTIFICATION)

17     A.   Thank you.

18 BY MS. PROSSNITZ:

19     Q.   I'll represent to you that these are your

20 interrogatory responses in this civil case.

21     A.   Okay.

22     Q.   So if you would turn to answer 3.  Page 5.

23     A.   Okay.  "My definition started at" -- is that

24 what it's supposed to be?

25     Q.   Yes.  But if you turn to Page 5.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3083

```
 1        A.    Okay.   Page 5.   Got it.   All right.
 2        Q.    So if you review that, then can you tell me
 3   everything you remember the police telling you that
 4   they'd learned from Justino Cruz?
 5             MS. ROMELFANGER:  Objection.  Form.
 6             MR. IASPARRO:  Objection.  Form.
 7             THE WITNESS:  Want me to read this into the
 8        record?  What do you want me to do?
 9   BY MS. PROSSNITZ:
10        Q.    Sure.   In response to my question, what did
11   you -- what did police tell you that they learned from
12   Justino Cruz when you arrived?
13             MS. ROMELFANGER:  Same objection to form.
14             THE WITNESS:  Okay.  "I went to Area 5 and
15        spoke with police who informed me that they had a
16        suspect, Justino Cruz, in custody, who had agreed to
17        give a statement.  Police further told me a summary
18        of the statement that Cruz already provided to the
19        police."
20   BY MS. PROSSNITZ:
21        Q.    Okay.   Do you remember who these police were?
22        A.    I'm believe it was Detective Schak, but I
23   don't have an independent recollection.
24        Q.    And did they tell you what Justino Cruz's
25   initial story was?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3084

```
 1              MS. ROMELFANGER:  Object to form.
 2              MR. IASPARRO:  Same objection.
 3              THE WITNESS:  I'm sure they did, yeah.  I don't
 4        -- I don't know what they told me, but that -- yeah.
 5   BY MS. PROSSNITZ:
 6        Q.   Had you had other experiences working with
 7   Detective Schak by this time in 1990?
 8        A.   Not that I can recall.
 9        Q.   In August 1990, when you were a felony review
10   ASA, had you heard anything about Detective Schak's
11   misconduct?
12        A.   No.
13              MS. ROMELFANGER:  Object to form.
14   BY MS. PROSSNITZ:
15        Q.   What about Detective Guevara?
16        A.   No.
17              MS. ROMELFANGER:  Object to form.
18   BY MS. PROSSNITZ:
19        Q.   And Detective Halvorsen?
20        A.   No.
21              MS. ROMELFANGER:  Object to form.
22   BY MS. PROSSNITZ:
23        Q.   Had you heard anything about any of these
24   three detectives coercing confessions?
25        A.   No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3085

1      Q.   Had you heard anything about these three

2 detectives using physical violence on witnesses?

3      A.   No.

4           MS. ROMELFANGER:  Object to form.

5 BY MS. PROSSNITZ:

6      Q.   Had you heard anything about these detectives

7 making threats to witnesses?

8      A.   No.

9           MS. ROMELFANGER:  Object to form.

10 BY MS. PROSSNITZ:

11      Q.   Okay.  Had you heard anything about any of

12 these three detectives threatening to take away

13 witnesses' children?

14      A.   No.

15      Q.   Had you heard anything about these three

16 detectives threatening witnesses' significant others?

17      A.   No.

18      Q.   So eventually on August 24, 1990, you went to

19 interview Justino Cruz; is that right?

20      A.   Yes.

21      Q.   Do you know what time that happened?

22      A.   Well, I -- I arrived there at 1:00, and I

23 think it says that I was taking the statement at 2:00 on

24 my transcript of my testimony.  So sometime in there.

25 1:00, 1:30.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3086

1    Q.    Did you review any documents before

2  interviewing Justino Cruz?

3    A.    Like I said, I mean, none that I recall

4  independently.  And I can review my answers to

5  interrogatories that may shed some light on this if you

6  want to direct me to a specific paragraph.

7    Q.    That's okay.  We'll move on.  Did you review

8  any other witness statements before talking to Justino

9  Cruz?

10   A.    I -- I don't know if I reviewed witness

11 statements or not.

12   Q.    Okay.  I'm going to hand you another exhibit.

13 We'll mark this as 3.  And I'll represent to you that

14 this is a supplementary report dated May 25, 1990 -- or

15 sorry, that's the date of the occurrence.  It's dated

16 August 24, 1990.  The reporting officers are Detective

17 Schak and Detective Smitka.  If you turn to the second

18 page, the second paragraph from the bottom where you see

19 your name, could you read those two paragraphs and let

20 me know when you're done?

21         (EXHIBIT 3 MARKED FOR IDENTIFICATION)

22   A.    Okay.

23 BY MS. PROSSNITZ:

24   Q.    Okay.  Do you see that second sentence where

25 it says, "He then reviewed the file, interviewed Cruz,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3087

```
 1   who reiterated what he told the undersigned"?

 2       A.   Yes.

 3       Q.   What file would that have been that you

 4   reviewed?

 5       A.   I have no idea.

 6       Q.   Do you know if that would've contained other

 7   witness statements?

 8       A.   It -- it may have.

 9       Q.   Okay.  Where was Justino Cruz when you went to

10   interview him on August 24, 1990?

11       A.   Interview room, second floor, Area 5.

12       Q.   Was he alone in that room?

13       A.   At various times, he was alone, yeah, because

14   I was alone with him when I spoke to him.  And then

15   other detectives were coming in and out, I'm sure.

16       Q.   What other detectives were coming in?

17       A.   I -- I know Schak was there.  I don't know who

18   else, but --

19       Q.   Do you remember -- or sorry.  Do you know if

20   there was anyone but Schak?

21       A.   I don't know.

22       Q.   Was Justino Cruz handcuffed in the room?

23       A.   I don't believe so, no.

24       Q.   Do you know if he was seated when he went in?

25       A.   He probably was.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3088

1      Q.    Do you know how old he was at this time?

2      A.    Late teens, early 20s.

3      Q.    And why don't you think he was handcuffed?

4      A.    He was not, like, somebody who was violent,

5 who was threatening.  And from my experience, especially

6 if you were talking to a cooperating witness or

7 defendant, the last thing you want to do is have them

8 chained to the wall because they're much less likely to

9 cooperate.  So I mean, they're more likely to tell the

10 truth if -- if they're happy.  And I mean, I want to say

11 he was not a very big kid, too.  I mean, my independent

12 recollection or maybe that was from seeing him in court,

13 but I mean, it -- it -- it wasn't like his physical

14 presence was something that you -- you'd potentially be

15 afraid of.  So -- but yeah, I'm -- I'm pretty sure he

16 was not --

17      Q.    Okay.

18      A.    -- handcuffed.

19      Q.    But is it fair to say you have no independent

20 recollection?

21      A.    I don't -- yeah, I don't know.  It would've

22 been rare for a defendant who's giving a statement to be

23 handcuffed.

24      Q.    Did Justino Cruz appear beaten or bruised --

25      A.    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3089

1    Q.    -- at all?  How can you be sure of that?

2    A.    Because if he was, then I would've noted it.

3    And as it says, I believe in my interrogatories, I did

4    speak to him alone.  The other factor is that after I

5    arrived, he gave us the statement quickly, which also

6    indicates that -- that there's a clear willingness on

7    his part to speak with us.  I don't remember there being

8    -- you know, the stuff you remember is when there's some

9    problem with the guy or -- but stuff that goes smoothly,

10   you don't remember.  And I don't remember.  So -- which

11   -- and -- and that and the timing on the various

12   statements makes it clear that -- that he was -- he was

13   very willing to talk, that there was not any, like --

14   like, friction or, like, it wasn't really that much of

15   an adversarial process for him to give a -- a statement

16   that quickly.

17   Q.    Okay.  But is it fair to say you don't have an

18   independent recollection one way or the other?

19   A.    Yes.

20   Q.    Did he appear disheveled?

21   A.    No.

22   Q.    Did he mention that he was sick at the time?

23   A.    No.

24   Q.    Do you know who had interviewed Cruz before

25   you arrived at Area 5?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3090

 1      A.   I think just Schak.  I don't know.

 2      Q.   Do you know if Guevara had interviewed him?

 3      A.   I have no idea.

 4      Q.   So you don't know what Guevara had said to him

 5   before you interviewed him; is that right?

 6           MS. ROMELFANGER:  Objection.  Leads to -- calls

 7      for facts not in evidence.

 8           MR. IASPARRO:  Joined.

 9           THE WITNESS:  Yeah.  I don't -- I don't know if

10      Guevara interviewed him, so --

11   BY MS. PROSSNITZ:

12      Q.   Do you know what Schak said to him before you

13   interviewed him?

14      A.   No.

15      Q.   So when you arrived there, you had no idea

16   what interactions Cruz had had with the police

17   beforehand; is that right?

18      A.   From my observations, he was not beaten.  He

19   was not disheveled.  He was not sick.  And he, according

20   to the timeline, was very cooperative.

21      Q.   Okay.

22      A.   But once again, I have no independent

23   recollection.

24      Q.   Understood.  And you can't say one way or the

25   other if he had been coerced into giving a statement by

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JCS_MAYSONET 3091

84

```
 1    the time you had arrived?
 2              MR. IASPARRO:  Object to form.
 3              MS. ROMELFANGER:  Joined.
 4              THE WITNESS:  I can say that he told me he was
 5        not coerced because that was my practice.  Once
 6        again, I have no independent recollection of him
 7        telling me that.  But I know that if he told me he
 8        was coerced, then everything would've hit the
 9        brakes.
10    BY MS. PROSSNITZ:
11        Q.   Do you know how long he had been at the
12    station before you arrived?
13        A.   I don't.
14        Q.   I have mixed up my exhibit.  Turning back to
15    the supplementary report -- I believe this is Exhibit
16    3.
17        A.   Yeah.
18        Q.   Do you see on that page, on the second page,
19    the bottom of the first paragraph, could you read that
20    to yourself and tell me when you're done?
21        A.   Second page, bottom of first paragraph?
22        Q.   Yes.
23        A.   Okay.
24        Q.   Do you see the time that Cruz was taken into
25    custody now?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3092

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 313 of 428 PageID #:21305
The Deposition of JOHN P. GUEVARA, taken on 11/16/2023

85

```
 1        A.   At 5:00 in the morning.
 2        Q.   So would the fact that you'd been there at
 3   5:00 and you were speaking with him around 1:30, would
 4   that length of time concern you?
 5             MR. IASPARRO:  Objection to form.
 6             THE WITNESS:  Not at all.
 7   BY MS. PROSSNITZ:
 8        Q.   Okay.  Why not?
 9        A.   Because that's not very long for somebody to
10   be in custody.
11        Q.   When you arrived in the interview room, did
12   you introduce yourself to Cruz?
13        A.   I'm sure I did, yes.
14        Q.   Okay.  What did you say to him?
15        A.   What I always -- I don't know what exactly I
16   said to him, but like I told you before, I told him my
17   name, I told him I was a state's attorney, I told him
18   that I was there to investigate a homicide that he was
19   implicated in, and then I asked him the basic questions
20   of, are you -- if you need go to the bathroom?  Have you
21   been fed?  Have you got something to drink?  Have they
22   been keeping you up?  How have you been treated? And
23   assuming all of those answers were correct, then we move
24   forward to the next phase, which is taking of the
25   statement or whether he'd talk to me or not.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3093

```
 1        Q.    Did you ask him if he could understand
 2   English?
 3        A.    I'm sure I did, yes.  And that comes before
 4   everything else because I'm just wasting my breath, if I
 5   -- he doesn't speak English, so --
 6        Q.    And you would have read him his rights; is
 7   that right?
 8        A.    Yes.  Yes.  We had a -- I want to say I had a
 9   pre-printed card for him that I carried around so we
10   didn't mess it up.
11        Q.    And you would have asked him if he was willing
12   to talk to you?
13        A.    Yes.
14        Q.    How long did your interview with Cruz last?
15        A.    Not that long.  I mean, if I started talking
16   to him and -- did I get there at 1:00 or start talking
17   to him at 1:00?  Anyway, but he was giving me a
18   statement by 2:00, so --
19        Q.    What do you remember Cruz telling you during
20   your interview with him?
21        A.    Independently, nothing.
22        Q.    Based on your review of the documents?
23        A.    I mean, they speak for themselves, so I can
24   give you -- give me the handwritten and I'll tell you
25   what he said.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3094

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 315 of 428 PageID #:21307
The Deposition of JOHN PADUANI, taken on 11/16/2023

87

1      Q.    What happened after your interview with him?

2      A.    Everything was signed up and he was charged

3    with double homicide.

4      Q.    Did you speak with Cruz privately at any point

5    during your interactions with him?

6      A.    Yeah, before I started talking to him.

7      Q.    Did you ask Schak to leave the room?

8      A.    Yes, I'm sure I did.  No cops were allowed at

9    the start of any process.

10     Q.    And then would you have asked Schak to return

11   to the room?

12     A.    I would have told him, yeah, it's okay to come

13   back.

14     Q.    Did you ask Cruz if he wanted to memorialize

15   his statement?

16     A.    Yeah.  I mean, I don't know that I used the

17   word memorialized but yeah, I asked if I could write, he

18   said yes.

19     Q.    And we talked about this earlier, but were you

20   required to explain the different ways that you could

21   give a statement to him?

22         MR. IASPARRO:  Object to form.

23         THE WITNESS:  I don't know if I was required

24     to, but yes, I -- I did do it.  Why I chose a

25     handwritten over a court reporter, I have no idea.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3095

```
 1        I think we only had one court reporter, she might
 2        have been somewhere else and --
 3   BY MS. PROSSNITZ:
 4        Q.   Would it have been unusual to take a
 5   handwritten statement from someone who was confessing to
 6   homicide?
 7             MS. ROMELFANGER:  Object to form.
 8             MR. IASPARRO:  Joined.
 9             THE WITNESS:  I mean, I don't know what's
10        unusual, but like I said, I mean, I don't remember
11        why it was handwritten instead of court reported,
12        could have been a lot of different reasons.
13   BY MS. PROSSNITZ:
14        Q.   Did you have a tape recorder back in --
15        A.   No.
16        Q.   -- 1990?  Okay.  What about a video recorder?
17        A.   No, that was well beyond the resources of the
18   office at the time.  I'd love to show you the resources
19   at the time.
20        Q.   Okay.  So after you took the statement, you
21   said that you recommended --
22        A.   Yes.
23        Q.   -- felony murder charges?
24        A.   Double homicide, I mean, it was not a --
25   felony murder is a term of art, so --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3096

```
 1        Q.   And who did you recommend those charges to?
 2        A.   The detectives, I approved the charges that
 3   they submitted.
 4        Q.   Okay.  So I'm going to hand you another
 5   exhibit, we'll mark this one as 4.
 6             (EXHIBIT 4 MARKED FOR IDENTIFICATION)
 7        A.   Thank you.
 8   BY MS. PROSSNITZ:
 9        Q.   So there's an -- a prefatory e-mail on this
10   page, but if you turn to the second page.
11        A.   Yes.
12        Q.   Do you recognize this document?
13        A.   I mean, I -- I do.  I mean, I -- I know I -- I
14   -- I did talk to Jim Papa back in 2016.
15        Q.   What were you talking to Jim Papa about at
16   that time?
17        A.   Re-trying, I believe it was Mr. Gonzalez?
18   Yeah, we were going to retry Mr. Gonzalez.
19        Q.   Okay.  And if you turn to the second page of
20   this document?
21        A.   Yes.
22        Q.   Do you recognize what this document is?
23        A.   Yes, my handwritten statement.
24        Q.   Okay.  And when was it taken?
25        A.   It was taken on August 24, 1990 at 2:45 p.m at
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3097

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 318 of 428 PageID #:21310
The Deposition of JOHN PENACIUS, taken on 11/28/2023, page 90

90

```
 1    Area 5.
 2         Q.    Okay.  And who was present for the statement?
 3         A.    Myself and Detective Schak.
 4         Q.    Is this your handwriting?
 5         A.    Yes.
 6         Q.    Could you read the first sentence of the
 7    statement out loud, sorry?
 8         A.    Yes.  "The statement taken regarding the fatal
 9    shooting of Torrence Wiley and Kevin Wiley, which
10    occurred on May 25, 1990 at 3428 West North Avenue at
11    1:00 a.m."  Then there is the Miranda warnings typed
12    out, so there is no issue regarding them being correct.
13    And then underneath that is the signature of Justino
14    Cruz.
15         Q.    Okay.  Could you read the first sentence of
16    your handwritten statement after that?
17         A.    "After first being advised of his rights and
18    stating he understood his rights, I told Justino Cruz
19    that I'm an assistant state's attorney, an attorney
20    working with the police and not his attorney.  Justino
21    agreed to give the following statement in summary."
22         Q.    Okay.  Do you remember advising Justino Cruz
23    of his rights after reading this?
24         A.    I have no independent recollection.
25         Q.    Okay.  Do you remember telling him you were an
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3098

1   assistant state's attorney?

2      A.   I mean, I -- like I said, I don't remember him

3  -- you know, the specifics of this statement, I have no

4  independent recollection, but obviously this is my

5  handwriting, and I did take this statement.

6      Q.   Okay.  Could you read the second sentence?

7      A.   "Justino stated he is a graduate of Clemente

8  High School and can read and write.  He further stated

9  that on the evening of May 24, 1990, at about 11:30

10  p.m., Justino, Alfredo Gonzalez, Chris Hernandez, and

11  Jose Maysonet went to Jose's house at 1302 North Homan

12  to pick up a gun."

13      Q.   Okay.  Do you remember Justino telling you

14  that he could read and write?

15      A.   I don't remember him specifically telling me

16  that, no.

17      Q.   Okay.  Do you remember if he specified whether

18  he could read and write in English or Spanish?

19      A.   I don't remember.

20      Q.   Okay.  So that third sentence, do you remember

21  him telling you that on May 24, 1990, he went to Jose

22  Maysonet's house with Alfredo Gonzalez and Chris

23  Hernandez?

24      A.   I don't have an independent recollection, but

25  that's what I wrote at the time.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3099

1    Q.   Okay.  And do you remember him telling you
2  they picked up a gun because Alfredo Gonzalez said they
3  were -- wait, sorry, I've gotten ahead of myself.  Could
4  you read that last sentence on that page?
5    A.   "They picked up the gun because Alfredo
6  Gonzalez said they were -- they were going to do a
7  shooting."
8    Q.   Okay.  Do you have an independent recollection
9  of Justino Cruz telling you that?
10    A.   No.
11    Q.   Okay.  Can you read that next sentence for me?
12    A.   "The gun was a nine-millimeter automatic," --
13  I can't tell.  Does it say machine pistol?  I don't know
14  what that word is.  "Nine-millimeter automatic," and
15  then I can't read the next word, and then it says,
16  "pistol and Alfredo put it in his belt."
17    Q.   Okay.  Do you remember Justino Cruz telling
18  you it was a nine-millimeter automatic machine pistol
19  and -- Alfredo --
20    A.   I don't already have an independent
21  recollection of it.
22    Q.   Okay.  Could you read that next sentence for
23  me?
24    A.   "The four men got into the car with Jose
25  driving, Alfredo next to him, Chris seated behind

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3100

 1  Alfredo, and Justino seated behind the driver.  Justino

 2  stated that they drived for a while and stopped in the

 3  vicinity of North and St. Louis in the alley."

 4      Q.   Okay.  Do you have an independent recollection

 5  of him telling you --

 6      A.   No.

 7      Q.   -- that information?  Are you familiar with

 8  this area, North and St. Louis?

 9      A.   I mean, I -- I used to be.

10      Q.   Okay.  Do you know where it's located?

11      A.   Oh, sure.

12      Q.   Okay.  Where -- where is it?

13      A.   Well, St. Louis is a little bit east of

14  Pulaski, so, you know, it's -- it's not too far from

15  like North Pulaski, Humboldt Park kind of area.  So

16  yeah, I used to go there a lot when I was working as a

17  state's attorney.

18      Q.   Why did you go there a lot?

19      A.   Just the general neighborhood, a lot of crime

20  in those days.

21      Q.   Do you remember doing anything to confirm what

22  Cruz was saying about this location?

23          MS. ROMELFANGER:  Object to form.

24          THE WITNESS:  I don't -- I don't have an

25      independent recollection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3101

```
 1   BY MS. PROSSNITZ:
 2        Q.    Okay.  Would you have relied on the detectives
 3   in the case to confirm that type of information?
 4             MS. ROMELFANGER:  Object to form.
 5             THE WITNESS:  I mean, I might have, I do
 6        remember in 2016 when I talked to Jim Papa that they
 7        were convinced, and the state's attorney's office
 8        was convinced that the case was solid and they were
 9        ready to retry it.  And then Kim Foxx not only
10        decided not to try the case, but then gave them a
11        certificate of innocence, which is why we're here,
12        so --
13   BY MS. PROSSNITZ:
14        Q.    What basis did Jim Papa tell you about this
15   case, that he was convinced this case was solid?
16        A.    That all the evidence, I don't remember
17   exactly what he was telling me, but the fact that, I
18   believe Kim Foxx was still the state's attorney and they
19   were ready to retry somebody under Kim Foxx, I -- that
20   was an extraordinary occurrence under Kim Foxx. And I
21   don't know what happened that she decided after it was
22   set to go to trial and I was ready to testify that it
23   was then all of a sudden dismissed, but then not only
24   dismissed, but granted certificates of innocence was
25   quite the turn of events.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3102

1      Q.   So did you and Jim Papa talk to each other

2  about the potential retrial of this case outside of this

3  email?

4      A.   We had brief conversations, it was just more a

5  scheduling thing.  So, yeah, I need you to come in and

6  testify.  And I said, great, let me know.  And then Kim

7  Foxx's office politics occurred and -- and here we are.

8      Q.   Were those over the phone?

9      A.   Yes.

10     Q.   Were there ever texts between you two about

11  this?

12     A.   No.

13     Q.   Did Papa say that he wanted Kim Foxx to retry

14  the case?

15     A.   Wanted Kim Foxx to retry?

16     Q.   Or sorry.  Did he say that Foxx wanted to

17  retry this case?

18     A.   They were retrying it.  I don't know what --

19  you know, they were -- he -- he contacted me because

20  they were going to retry it and that's why he needed me

21  to testify.  I mean, there was no -- I don't know what

22  the -- anything else that was going on, but --

23     Q.   Did he tell you what evidence they had against

24  Mr. Gonzalez that they were prepared to take to trial?

25     A.   I didn't get into any specifics, it was just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3103

```
 1   more scheduling me to testify to my part in the case.
 2        Q.   Do you remember how soon after this email they
 3   decided they weren't going to retry this case?
 4             MR. IASPARRO:  Objection.
 5             MS. ROMELFANGER:  Objection to foundation.
 6             THE WITNESS:  I don't, I -- I mean, I think it
 7        may be here.  December 20, 2016.  As I stated
 8        yesterday, the trial is currently set for January
 9        23rd before Judge Rickey Jones, so that was a month
10        beforehand, and let me know when the case is ready,
11        thanks for your help, call me if you have any
12        questions.
13   BY MS. PROSSNITZ:
14        Q.   Okay.  So what office politics are you
15   referring to that happened that caused this case to be
16   dropped?
17        A.   You'd know better than I would.  I mean, I
18   don't know.  All of a sudden, a case that's going to go
19   back for trial where three guys were convicted in a
20   double homicide and then not only does it not get
21   retried, then the case is dropped.  And then Kim Foxx
22   grants certificates of innocence to three guys who
23   committed a double homicide.  And then their
24   certificates of innocence, and based upon that, then
25   your firm has now got me as a defendant and got this
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3104

1   Counsel having to defend me, and it's quite a turn of

2   events I'd say.

3       Q.   Did he contact you again to let you know that

4   the trial wasn't happening?

5       A.   He -- he did at some point, I don't remember,

6   but yeah, he said that they decided to drop it, which

7   was disappointing.

8       Q.   Were you aware that all the Defendant officers

9   said that they were going to take the Fifth if the case

10  was retried?

11          MS. ROMELFANGER:  Objection to the extent it

12      misstates the evidence.

13          THE WITNESS:  No, and I don't believe that was

14      true.  I think what you're stating is misstating it.

15      I believe that Mr. Guevara said that he may take the

16      Fifth, but nobody else said they were taking the

17      Fifth and Guevara had nothing to do with Justino

18      Cruz or my involvement in the case.  So as your

19      theory of the case goes from the civil mitigation

20      standpoint, it's a bit of a stretch.

21  BY MS. PROSSNITZ:

22      Q.   Okay.  So you were aware that Guevara was

23  going to take the Fifth if the case is retried?

24      A.   I heard that he may, yeah.  I mean, but like I

25  said, I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3105

```
 1        Q.    Who did you hear that from?

 2        A.    I think it was from the news.

 3        Q.    And how would you know that Guevara had

 4   nothing to do with Justino Cruz's case?

 5        A.    I never saw him.  Justino was not beaten,

 6   Justino was not disheveled, Justino told me nobody had

 7   mistreated him and based upon all those factors and the

 8   fact that he quickly gave me that statement, what he

 9   told me was the truth.  And if I thought it wasn't the

10   truth, then I would not under any circumstances risk our

11   system, which I believe in firmly.  And I certainly

12   would never risk my reputation and my law license to

13   facilitate some kind of a coverup or -- or a conviction

14   of the wrong guy.

15        Q.    Okay.  So I think I was asking a bit of a

16   different question, not whether you knew or you can be

17   sure that, you know, Cruz wasn't beaten, but how you

18   know that Guevara had nothing to do with this case at

19   all?

20             MS. ROMELFANGER:  Objection.  This was asked

21     and answered.

22             MR. IASPARRO:  Join.

23             THE WITNESS:  I never saw him.

24   BY MS. PROSSNITZ:

25        Q.    Okay.  But you don't --
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3106

1    A.   He was never there when I was there.  I

2  interviewed the witness, I made an assessment of his

3  credibility, I made an assessment of his condition, I

4  made an assessment of whether anybody had made him any

5  promises.  I ask these questions all the time, has

6  anybody beaten you?  Has anybody done anything to you?

7  Have you been allowed to go to the bathroom, food,

8  drink, all that.  And Justino was a 100 percent honest.

9  And over the years as a state's attorney, you get to a

10 sense of credibility or lack thereof of a witness based

11 upon, you know, literally years and years of experience.

12 And Justino Cruz was not lying, and I testified in front

13 of a jury, and if I thought Justino Cruz was lying, boy,

14 I sure would never have done that and I would never have

15 taken that statement.

16    **Q.   Okay.  Understood.  But you don't know one way**

17 **or the other, if Guevara had interrogated Justino Cruz**

18 **before you arrived?**

19    A.   I don't know what happened before I arrived,

20 but I can tell you that based upon my observation and my

21 literally expert opinion at the time as the state's

22 attorney regarding the condition of the witness and

23 whether he was telling the truth, Justino was 100

24 percent telling the truth and nobody threatened him.

25    **Q.   And you said that I had misstated earlier that**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JCS_MAYSONET 3107

1  all the defendant officers were going to take the Fifth

2  if this case was retried.  What are you basing that

3  opinion on?

4       A.   Because I mean, if you call Detective Schak,

5  was he going to take the Fifth, is that what you're

6  saying?  Or, you know, Ernie Halvorsen, God rest his

7  soul, was he going to take the Fifth?  I mean, all the

8  cops, you're saying everybody in the whole case was

9  going to take the Fifth?  I find that very -- highly

10 improbable, let's say.

11      Q.   Okay.

12      A.   And if you think I'm getting a little upset

13 because you're attacking a system that I believe in,

14 that's a 100 percent accurate.

15      Q.   Understood.  Okay.  So let's turn back to the

16 statement, the second page.  We just finished that first

17 paragraph, but could you read that next sentence

18 starting with "Chris Hernandez" out loud?

19      A.   "Chris Hernandez and Alfredo Gonzalez got out

20 of the car with Justino.  Chris and Alfredo hooded up,

21 meaning they put the hoods from their sweatshirts on

22 their heads.  Justino stated this indicated they will

23 shoot or rob someone.  Chris and Alfredo approached two

24 Black guys in a vacant lot on North Avenue.  Alfredo had

25 the gun in his front pocket.  While Chris and Alfredo

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3108

1   were talking to the Black guys, Jose was in the car with

2   the car running and Justino was, 'watching their backs.'

3   Justino, he was -- was -- stated he was making sure no

4   one, including the police approached from the alley.

5   Justino said he heard five to six shots and saw Chris

6   and Alfredo running for the car. Alfredo had the gun in

7   his hand, Justino said he jumped in the car and they

8   drove away.  He stated he went home."

9       Q.   Okay.  So let's take that sentence by

10  sentence.  Do you remember Justino saying that Chris

11  Hernandez and Alfredo Gonzalez got out of the car with

12  him?

13      A.   I have no independent recollection of any of

14  these statements being made directly.

15      Q.   Okay.  And this statement where he says "Chris

16  and Alfredo hooded up," had you heard that phrase

17  before?

18      A.   Yes.

19      Q.   Okay.  And what was your understanding of that

20  phrase?

21      A.   In mostly gang parlance, and these guys were

22  Latin Kings, hooding up means that you're about to

23  commit a crime.

24      Q.   Does it mean you're about to commit a certain

25  kind of crime?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3109

```
 1        A.   Not -- not -- not really.
 2        Q.   Okay.  Could you read that last paragraph for
 3   me?
 4        A.   "Justino stated he has been treated well by
 5   the police and the state's attorney.  He was given
 6   something to eat and drink, and he was allowed to use
 7   the bathroom.  He said no one had coerced or threatened
 8   him in any way to give this statement.  Justino said he
 9   gave the statement because it is the truth."
10        Q.   Okay.  Do you remember him saying he was given
11   something to eat and drink and allowed to use the
12   bathroom?
13        A.   Like I said, I don't -- I don't independently
14   recall that, but --
15        Q.   Okay.
16        A.   I mean, that's how I did things.  Whether it
17   was on the statement or not, I mean, that's the truth.  I
18   made sure that everybody I ever talked to was not
19   coerced, was not beaten, was not -- you know, always
20   treated well.
21        Q.   So would you ask someone, "Have you been
22   coerced?"
23        A.   Oh, yeah.
24        Q.   That was your practice?
25        A.   Any promises made, anybody say anything,
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3110

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 331 of 428 PageID #:21323
The Deposition of John P. Halloran, taken on 11/16/2023
103

1  anybody do anything?  I mean, I wouldn't use the word

2  coerced because that would not necessarily -- but no,

3  like has anybody done anything to you?  Did -- did

4  anybody make any promises?  Did anybody tell you, yeah,

5  like okay, we'll let your buddy off on a, you know,

6  another case, if you tell me this or whatever?  Yeah. I

7  mean, I asked that all the time, every time.

8       **Q.    And can you remember a time where any suspect**

9  **you interviewed said yes to one of these questions?**

10      A.    Like I said, the only cases that really stood

11  out where I would put my foot down and say we're not

12  going forward at all were the cases where the guys were

13  on drugs, and they were really having a hard time.

14      **Q.    Have you heard that Justino Cruz has**

15  **subsequently said that he was coerced during -- in order**

16  **to give the statement?**

17      A.    I -- I heard that, yes.

18      **Q.    What did you make of that?**

19          MS. ROMELFANGER:  Objection to form.

20          THE WITNESS:  I mean, it's -- it's fabrication.

21      He's trying to do what a lot of people have done and

22      use any tangential relationship to Rey Guevara to

23      hit the jackpot and get a few million out of the

24      City of Chicago.

25  BY MS. PROSSNITZ:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3111

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 332 of 428 PageID #:21324
The Deposition of JOHN PROFUSEK, taken on 11/28/2023
104

1      Q.    Okay.  Do you remember him saying he was

2  giving the statement because it is the truth?

3      A.    I -- I mean, I don't have an independent

4  recollection, but yeah, that's what he said.

5      Q.    Would you usually ask people why they were

6  giving the statement?

7      A.    I -- all I wanted him to do was tell the truth

8  and that was through everything, that was felony trial

9  division, you know, I don't want to hear a story, I want

10 you to tell me the truth.  And -- and that's always like

11 when, you know, there's a defense attorney cross-

12 examining somebody, I mean, you know, what did I tell

13 you on the stand?  I told you to tell the truth, a 100

14 percent, you know, whatever it is, unvarnished,

15 unblemished, tell the truth and then, you know what, you

16 don't have to remember anything then, you know?

17     Q.    Would you have asked at the end of the

18 statement like, is the statement you've given me

19 truthful?

20     A.    I -- I would have asked that all along.

21     Q.    Okay.

22     A.    Not just at the end of the statement.  It

23 would have been okay, and this is the truth, right? Yes.

24 Or if not, you know, how do you want to change it, what

25 isn't correct on here?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3112

1     Q.   Do you ever have witnesses afterwards who

2  would say, "This -- this isn't correct, and I want to

3  change it"?

4     A.   If that happened, I -- it didn't happen to me,

5  but if it happened, it would be changed.

6     Q.   Did you write the summary in the room with

7  Justino and Schak?

8     A.   Right there, yes, that was our practice

9  anyway.  I don't -- like I said, I don't remember - like

10  -- independently, but that was always what I did.

11     Q.   Okay.  Do you remember Schak speaking to you

12  at all while you wrote this out?

13     A.   I have no remembrance, no recollection.

14     Q.   Okay.  So looking at the bottom of the first

15  page, Bates stamp ASA Defendants 002.  Do you see that

16  first word that's crossed out and there are initials

17  there?

18     A.   Yeah.

19     Q.   What does that mean?

20     A.   It means that I screwed up and miswrote

21  something, like that was illegible and since it was a

22  change, I initialed it and I had him initial it.

23     Q.   Okay.  So who would have corrected that, you

24  or the witness?

25     A.   I mean, I wrote it, but he -- he initialed it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3113

1    Q.   But who caught that mistake?

2    A.   I don't remember.

3    Q.   Okay.

4    A.   It looks more like me writing the wrong thing

5    or like it was illegible.

6    Q.   Okay.  So would you do that as you were

7    writing or would you do that at the end, you would go

8    back through and read it and correct it?

9    A.   We'd usually, I mean, go back through and

10   reread it and then if something didn't, you know, look

11   right or you couldn't read it, then you'd rewrite it and

12   cross out and make a correction.

13   Q.   Going to the next page, Bates stamp 003, if

14   you flip this.  Do you see that there's -- hood is

15   crossed out?

16   A.   Yeah.

17   Q.   Okay.  What -- what's the mistake there that

18   would have been corrected?

19   A.   I don't know.  It looks like I wrote hooding

20   or something else instead of hooded, is my guess.

21   Q.   Okay.

22   A.   Wrong tense.

23   Q.   And do you see the next one that's crossed

24   out?

25   A.   Yeah.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3114

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 335 of 428 PageID #:21327
The Deposition of JOHN FRANCIS HALLORAN, taken on 7/28/2023

107

```
 1        Q.    What's the mistake there?
 2        A.    I don't know, it look like -- I can't tell.
 3   Something with guys.
 4        Q.    Okay.  And I want to ask about that the next
 5   one that's crossed out after, "No one including."
 6        A.    Yeah.
 7        Q.    Before "approach," do you see that?
 8        A.    Making sure that no one, including the police,
 9   like I wrote "or anyone."  I crossed that out.
10        Q.    Do you know why that would've been crossed
11   out?
12        A.    You know what -- I mean, it looks like it was
13   just easier to write, "no one including" instead of --
14   make sure the police, or any -- I don't know.
15        Q.    Oh, I got you.  But it kind of means the same?
16   Okay.  What happened after you wrote up the statement?
17        A.    I -- like I said, I don't have an independent
18   recollection, but I believe that I proved double murder
19   charges against Justino, who were acting as a look out
20   on the double on the side of the Wiley brothers.
21        Q.    Okay.  Backing up a little bit.  Like right
22   after you wrote up this statement.
23        A.    Okay.
24        Q.    Would you have -- what did you do then?
25        A.    I have no idea.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3115

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 336 of 428 PageID #:21328
The Deposition of JOHN P. HALLORAN, taken on 07/26/2023

108

1      Q.   Okay.  Would you have shown it to Justino?

2      A.   Justino was right there with me.  He signed

3  everything.

4      Q.   Okay.  Would he have watched you as you were

5  writing this up?

6      A.   Yeah.  Yeah.  I mean, you write it up right in

7  front of him, make sure that the summary is correct.  And

8  then you go through it again.  Once you've written it

9  up, make sure that everything's correct and, you know,

10  make any corrections and then sign it up.

11     Q.   And did you have Schak review the statement as

12  well?

13     A.   I don't think he reviewed it independently.  He

14  probably -- he was going through it at the same time as

15  we all were, we were all sitting around and making the

16  corrections.  That's usually what happened.

17     Q.   But you had him sign it?

18     A.   He signed it, yeah.  Yeah.  I think he -- he

19  also initialed the pages.

20     Q.   Okay.  So was it typical to have the officer

21  verify the accuracy of the handwritten statements?

22          MS. ROMELFANGER:  Objection.  Form.

23          THE WITNESS:  He was there during the process,

24     so he would sign it.  It was -- yeah.  I mean, you

25     need -- like, we talked about a reporter.  Somebody

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3116

```
 1        else there besides me and the defendant, and -- in
 2        fact, detective was there, too, and he signed off on
 3        all locations that both myself and the defendant had
 4        signed off on.
 5   BY MS. PROSSNITZ:
 6        Q.   Would an officer ever make corrections to a
 7   handwritten statement?
 8             MR. IASPARRO:  Object to form.
 9             MS. ROMELFANGER:  Join.
10             THE WITNESS:  I -- I mean, I wrote it, so I --
11        they didn't repeat -- make it their own corrections.
12        No.
13   BY MS. PROSSNITZ:
14        Q.   Do you read the statement aloud to Cruz or
15   have him read it to himself?
16        A.   I don't remember.
17        Q.   Okay.  Let's turn to your interrogatory
18   responses.  I think this is on Page 6 in that first
19   paragraph.
20        A.   Okay.
21        Q.   Do you see where it says, "During this review,
22   Cruz read a portion of the statement aloud to confirm
23   that he understood English and could read Defendant's
24   handwriting"?
25        A.   There you go.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3117

1    Q.   Okay.  So would you have asked him to read a

2  portion of this out loud?

3    A.   Yes, I would've.

4    Q.   Okay.  Would you have asked him if he could

5  read cursive handwriting?

6    A.   You know, this was 30 years ago when people

7  actually wrote in cursive often.  So unlike now, when

8  you ask somebody if they can read cursive, no, I would

9  not have made that distinction between cursive and block

10 print.

11   Q.   And what happened after Cruz read the

12 statement?

13   A.   Like I said, I have no independent

14 recollection.

15   Q.   Okay.  Would he -- did he sign it?

16   A.   Oh, yeah.

17   Q.   Okay.  Do you know who was present when he

18 signed it?

19   A.   I think Schak, myself, and Cruz.

20   Q.   And then what happened after the statement was

21 signed?

22   A.   I approved the felony charges.

23   Q.   Okay.  Did you complete the felony review?

24   A.   Right.  I completed the folder.

25   Q.   Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3118

1     A.    Contacted my trial supervisor and recommended

2  to first-degree murder charges against Cruz.  Trial

3  supervisor approved those charges.

4     **Q.    What does completing your felony review folder**

5  **entail?**

6     A.    You've got to see the folder, and I'm sure

7  you've got a copy of it.  So it's basically fill in the

8  blanks, and -- office to the next phase, which is the

9  preliminary hearings, or in this case, because it's a

10  double homicide, it would go straight to what was called

11  arrange 66 (phonetic), which would be a grand jury, and

12  the case would be indicted.

13     **Q.    Okay.  Did you review that felony review**

14  **folder in preparation for today?**

15     A.    I -- I saw it yesterday, yes.

16     **Q.    Okay.  So we haven't received that, but we'll**

17  **be asking Counsel to produce it.**

18     A.    I think it was produced.

19          MS. ROMELFANGER:  You guys have the Cook County

20     State's Attorney's file in this case?

21          MR. IASPARRO:  I'll tell you what the Bates

22     numbers are.

23          MS. PROSSNITZ:  Okay.  It's under -- okay.

24          MR. IASPARRO:  Yeah.

25          MS. PROSSNITZ:  Then I'll check that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3119

BY MS. PROSSNITZ:

    Q.   So you recommended approval of felony charges against Cruz to your trial supervisor at the time; is that right?

    A.   Yes.

    Q.   Okay.  And you said you don't remember who that was?

    A.   No, I don't.

    Q.   Was it Kevin Sheehan by chance?

    A.   I -- I don't know.  I don't think so, though.

    MR. IASPARRO:  And for the record, the Bates numbers of the felony review order are CCSAO-002031 and 2032.

    MS. PROSSNITZ:  Okay.  Thank you.

    MR. IASPARRO:  Want me to e-mail that to you?

    MS. PROSSNITZ:  That would be great, thank you.  Okay.

BY MS. PROSSNITZ:

    Q.   So what did you base that determination of felony -- of approving felony review charges on for Justino Cruz?

    A.   The surrounding facts of the case and the statement that he gave me.

    Q.   Anything else?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3120

1    A.   I -- not that I can recall.  I mean, that was

2    -- I don't -- I -- you know, actually once you get the

3    felony review folder, there was an indication in there

4    that I had information that -- Gonzalez and I believe

5    Maysonet had previously been charged.  But I don't know

6    what -- you know, like I said, I have no dependent

7    recollection of that, but it was included in my felony

8    review folder.  So I -- I had that information at the

9    time and the -- but -- but whether I -- I reviewed any

10   documents, I have no idea.  It's -- doesn't say.

11   **Q.   How do you think Justino Cruz confessed to**

12   **you?**

13       MR. IASPARRO:  Objection.  Objection to

14    foundation.

15       MS. ROMELFANGER:  Joined.  Go ahead.

16       THE WITNESS:  Why did he do it?  Because he

17    told me the truth.

18   BY MS. PROSSNITZ:

19   **Q.   And were you aware that Alfredo Gonzalez and**

20   **Jose Maysonet had implicated Justino Cruz in the crime?**

21   A.   I think I was.

22   **Q.   Do you know why they implicated him?**

23       MR. IASPARRO:  Foundation.

24       THE WITNESS:  Because he was the lookout,

25    because he did it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3121

BY MS. PROSSNITZ:

    **Q.   Are you aware that Alfredo Gonzalez and Jose Maysonet had also both confessed to the crime at the time?**

    A.   I don't know what -- I knew they had been charged. I don't know if I -- I mean, I'm guessing if they gave statements overnight and have been charged, that I probably did not have the statements. So because that would've taken a lot of coordination and, you know -- our office is like a dinosaur back then. I mean, it was -- it was not technologically advanced at all. So I knew they had been charged, but I -- I'm betting that I didn't know. I didn't have the statements, anyway. That's my recollection.

    **Q.   Do you know why Alfredo Gonzalez confessed to this time?**

    A.   I'm going to say because he shot the Wiley brothers.

    **Q.   Okay. And Jose Maysonet, do you know why he confessed to the crime?**

    A.   Because he was there and they -- they were in the vacant lot when the deal went down, and I don't know if they were going to rob drug dealers or what -- there was supposed to be some marijuana deal going down, and it was easier to shoot them.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3122

1       Q.   And what's your basis for that opinion?

2       A.   Because that's what the evidence showed.

3       Q.   Is there any evidence in particular that

4 you're thinking of?

5       A.   I mean, just from what I know about what

6 Justino said, from the evidence against Gonzalez -- from

7 the evidence and, you know, I -- I don't know all the

8 evidence.  I do remember I testified, but obviously

9 there was a motion to exclude witnesses, but I mean, he

10 had David Wiener, who's a good attorney, as his Counsel,

11 and the jury found Gonzalez guilty, and they found him

12 guilty because he was guilty.  And it may have been

13 something as simple as, you know, that corner of, you

14 know, St. Louis may have been like, borderline Latin

15 Kings turf.  And these two guys were -- I don't know

16 what gang they were in, but, I mean, it -- it's -- like,

17 it's going up now.  I mean, for the stupidest things,

18 you know, young guys in gangs murder other people.

19       Q.   So you mentioned that maybe a drug deal was

20 happening at the time.  What --

21       A.   I thought I read something that -- there was

22 something about a -- they were going to buy marijuana,

23 okay?  That would've been -- that was just from

24 something I think I read yesterday.  I don't know if

25 that was in the -- maybe the transcript from Gonzalez's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3123

Deposition of John Provast taken 11/22/edcage, 2023

1  trial, but yeah, something that I just recently read and

2  -- in prepping.

3      Q.   Do you remember any evidence of the Wiley

4  brothers being drug dealers?

5      A.   No.  I mean, I don't remember anything about

6  them except they died.

7      Q.   Do you know if there was any evidence that the

8  Wiley brothers were in a gang specifically?

9      A.   No, but -- no.

10     Q.   Did you play any role in the approval of

11 felony charges against Alfredo Gonzalez?

12     A.   No.

13     Q.   Did you play any further role in the

14 prosecution of Justino Cruz other than what you've

15 talked about previously?

16     A.   I testified that in front of the jury about my

17 statement.  It was Gonzalez's trial, wasn't it?

18     Q.   Yeah, that's my next question.  Do you

19 remember what -- whose trial that was that you testified

20 in?

21     A.   It's Alfredo Gonzalez's case.

22     Q.   Did you speak with any of the trial ASAs in

23 preparation for testifying at Alfredo Gonzalez's trial?

24     A.   Yeah, I'm sure I did.

25     Q.   What did you talk to them about?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3124

```
 1        A.   Not the statement.  I didn't give prep to your
 2   witnesses before you go to trial.
 3        Q.   Do you remember talking to David Wiener?
 4        A.   He cross-examined me.
 5        Q.   Do you remember talking about him before that
 6   cross-examination?
 7        A.   I -- I mean, obviously he -- he's got a right
 8   to talk to me as a witness.  I -- I probably did, I --
 9   but I don't remember.
10        Q.   Do you know the disposition of Alfredo
11   Gonzalez's criminal case?
12        A.   He was found guilty.  I don't think the jury
13   was out for anyone.
14        Q.   So to clarify, you weren't involved in the
15   investigation of the Wiley brothers' murders prior to
16   taking Justino Cruz's statement; is that right?
17        A.   I was not.
18        Q.   So whatever you learned about the
19   investigation, you learned from the detectives you spoke
20   to?
21        A.   Yes.
22        Q.   And that would've been Schak?
23        A.   Yes.
24        Q.   And did you rely on Schak to provide you with
25   truthful and accurate information?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3125

1      A.   Yes.

2      Q.   And you expected him to do this investigation

3 by the book?

4      A.   Yes.

5      Q.   If you had been made aware that any of the

6 detectives had done anything not by the book, what would

7 you have done?

8         MS. ROMELFANGER:  Objection.  Form.

9         MR. IASPARRO:  Asked and answered.

10        THE WITNESS:  As it relates to just, you know,

11    Cruz -- my part in this.  If there was any

12    indication that anybody had done anything

13    threatening, coercing him, I would've shut down the

14    investigation as it related to just -- you know,

15    Cruz, and reported it to my supervisors.

16 BY MS. PROSSNITZ:

17      Q.   And in your entire career as an -- a felony

18 review ASA, did you ever do that?

19      A.   Like I said, I mean, when guys were -- yeah.

20 When there were -- there were guys that were on heroin,

21 or that were experiencing withdrawals who were like --

22 clearly impaired, or had mental health issues, or -- I

23 mean, yeah, I did it on -- on a, you know, not a lot,

24 but probably a handful of times.  I mean, you make an

25 assessment and if a guys in no condition, and he can't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3126

1  tell up and down, or truth from, you know, fiction and

2  you're not going to do anything, you're going to let the

3  guy get it straight or get healthy, and then we can move

4  forward.  But yeah, just shut the investigation down and

5  move forward until there's some kind of a resolution of

6  the issue regarding drugs, health, whatever.

7      **Q.   Okay.  But you never remember doing that**

8  **because of any police misconduct; is that right?**

9          MS. ROMELFANGER:  Object to form.

10         THE WITNESS:  That I recall, no.

11 BY MS. PROSSNITZ:

12     **Q.   Back to your trial testimony, did you ever**

13 **talk to David Wiener after you testified about other**

14 **defendants -- other of Alfredo Gonzalez's co-defendants?**

15     A.   I'm guessing I didn't.  I knew David, he was a

16 nice guy, and so I -- I would talk to him occasionally,

17 but I don't remember ever talking to him about the other

18 -- the co-defendants.  And I don't know if he was

19 representing the co-defendants.  If he was he never

20 called me on any, you know, parts of that case in his

21 defenses.

22     **Q.   Okay.  And just to clarify.  If you had**

23 **learned there was misconduct committed by police in**

24 **relation to Justino Cruz's co-defendants, he would've**

25 **reported it; is that right?**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3127

```
1           MS. ROMELFANGER:  Objection.  Form.  Asked and
2       answered.
3           THE WITNESS:  I mean, all I had was Justino
4       Cruz, so I don't know how I would've heard if there
5       was something about the co-defendants.  If Justino
6       told me there was something about his co-defendants,
7       yeah, absolutely, I would've.
8   BY MS. PROSSNITZ:
9       Q.   What if Jennifer Borowitz had told you that
10  there -- she had observed misconduct during Alfredo
11  Gonzalez's interview?  Would you have reported it?
12          MR. IASPARRO:  Objection.  Speculation.
13          THE WITNESS:  Well, I mean, obviously that'd be
14      -- she -- she'd be the one going to the, you know,
15      state's attorney and she'd be the one making the
16      decision to -- to shut that down.  I mean, I -- you
17      know, honestly, I knew her, but it wasn't like we
18      were like, you know, good friends, like -- Frank
19      DiFranco was my brother's fraternity brother.  So I
20      mean, I knew Frank pretty well.  Jennifer, I never -
21      - you know, knew that well.  So I mean, she would
22      not be one to tell me that, I'll tell you that.  But
23      obviously if it was something that would be -- it
24      wouldn't have happened number one, but I mean,
25      that'd be her duty then to, you know, tell this
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3128

```
 1        trial supervisors.  Not -- not me, and she wouldn't
 2        tell me that anyway.
 3  BY MS. PROSSNITZ:
 4        Q.   Okay.  But if she did tell you, it would've
 5  been her duty to report it, not yours?
 6             MR. IASPARRO:  Object to form.
 7             THE WITNESS:  Well, no.  I mean, I would've
 8        reported it, too.  If there's any misconduct, you --
 9        you report it.  I mean, and -- and -- and it's not
10        being a state's attorney, it's being a lawyer, you
11        know?  I mean, whether it's -- you know, whatever,
12        you've got a duty to report misconduct, no matter
13        what.
14  BY MS. PROSSNITZ:
15        Q.   Okay.  So no matter if it had happened to a
16  witness you were dealing with, or a coworker had dealt
17  with a witness and come to you about it, you would have
18  a duty to report it?
19             MR. IASPARRO:  Form.  Calls for speculation.
20        Presents an incomplete hypothetical.
21             THE WITNESS:  You have a duty to report, yeah.
22        You know, I mean, that's like Himmel.  I mean,
23        what's the rule for you reporting it, or you guys,
24        or any of us lawyers?  I mean, Himmel says you have
25        duty to report it, so how that's any different for a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3129

```
 1        state's attorney?  It's not.
 2   BY MS. PROSSNITZ:
 3        Q.    Understood.  And just to follow-up on that, if
 4   Frank DiFranco had told you that he had absolutely
 5   observed misconduct --
 6        A.    Absolutely.
 7        Q.    -- would you have reported it?
 8        A.    Yes.  And he -- I know he would've reported
 9   it, too.
10        Q.    Okay.  Do you know if Jennifer Borowitz would
11   have reported it?
12        A.    Oh, sure she would've.  Yeah.  Nobody's
13   risking their law license.  And because nobody -- the
14   worst thing that can happen as a prosecutor is the wrong
15   guy who goes to jail.  God, if you have that on your --
16   on your conscience and -- and you know, you're -- you're
17   supposed to be, you know, it's -- it's a calling.  It's
18   not a job that you do for the money. That's for damn
19   sure.  And so that would be the worst- case scenario.  I
20   mean, you're not just looking at clear cases, either you
21   do the right thing, or you don't, so --
22        Q.    Understood.  Okay.  Let's turn back to your
23   interrogative responses.
24        A.    Okay.
25              THE WITNESS:  I'll give more yes or no's, Mike.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3130

```
 1        I'm sorry.
 2            MR. IASPARRO:  Just tell the truth.
 3            THE WITNESS:  Dude, that's what I'm doing.
 4   BY MS. PROSSNITZ:
 5        Q.   So for -- on Page 5, could you read that
 6   second paragraph starting with, "The defendant proceeded
 7   to the interview room"?
 8        A.   "Defendant proceeded to the interview room
 9   where Cruz was located.  A detective was also present in
10   the interview room.  Defendant, who only spoke English,
11   introduced himself to Cruz, read him his Miranda rights,
12   confirmed that Cruz understood his Miranda rights, and
13   asked Cruz if he was willing to speak with him.  Cruz,
14   in English, told Defendant that he would speak with
15   him."
16        Q.   Okay.  What do you mean when you wrote, "who
17   only spoke English"?
18        A.   I only speak English.  I don't speak Spanish.
19   I'm the defendant.
20        Q.   Okay.  In that -- could you read that third
21   paragraph, the next paragraph, for me?
22        A.   "Cruz gave an oral statement to Defendant with
23   Detective Schak present confessing to his involvement in
24   the double homicide.  This oral statement to Defendant
25   was consistent with what Cruz told the police earlier.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3131

1   Afterwards, Defendant spoke with Cruz in private outside

2   the presence of the police, and asked how the police and

3   the state's attorneys treated him. Cruz told the

4   Defendant the police and state's attorneys had treated

5   him well."

6      **Q.   Okay.  So that sentence, "This oral statement**

7   **to Defendant was consistent with what Cruz told the**

8   **police earlier."  How did you know the oral statement**

9   **was consistent with what Cruz told the police earlier?**

10      A.   Because Schak told me what he said, and I

11   don't have an independent recollection, but obviously

12   it's the most important part of the case in his

13   testimony.

14      **Q.   And you believed what Schak told you that --**

15      A.   Absolutely.

16      **Q.   Okay.  Could you read that last paragraph that**

17   **starts, "Defendant interviewed Cruz again"?**

18      A.   "Defendant interviewed Cruz again in the

19   presence of Schak.  Defendant reintroducing himself to

20   Cruz and reread him his Miranda rights.  Cruz again

21   acknowledged he understood his Miranda rights, which is

22   evidenced by his signature underneath the three printed

23   Miranda warnings on the handwritten statement. Defendant

24   then asked Cruz again what he knew about the double

25   homicide, if anything, and wrote down in summary what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3132

1   Cruz said.  After Defendant finished writing what Cruz

2   retold him, he, along with Cruz and Schak, reviewed the

3   statement to verify its accuracy.  During this review,

4   Cruz read a portion of the statement aloud to confirm

5   that he understood English and could read Defendant's

6   handwriting.  Also during the review, Cruz and the

7   defendant made corrections to the statement where

8   appropriate and initialed those corrections. Cruz,

9   Defendant, and Schak signed it to confirm it accurately

10  reflected what Cruz retold Defendant and Schak."

11       **Q.   So flipping back to where you wrote that you**

12  **reintroduced yourself to Cruz and re-read -- well, let's**

13  **just start with reintroduced yourself to Cruz. Why did**

14  **you reintroduce yourself to him?**

15       A.   Because we were starting the formal process of

16  -- of taking the handwritten statement, is my guess. And

17  then -- because with the reintroductions, with -- what I

18  was writing down was exactly that, you know, the -- the

19  -- my name, here you are, here I am, Mirandas. That

20  would be, you know, how the process would work. And once

21  again, I don't have an independent recollection, but

22  that's what we always did.

23       **Q.   Okay.**

24       A.   And that's just consistent with the statement.

25       **Q.   Okay.  You wrote that Cruz acknowledged he**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3133

1  understood his Miranda rights.  How did he acknowledge

2  he understood his Miranda rights?

3      A.   He would've said yes.

4      Q.   Do you think a signature is enough evidence

5  that someone understood their Miranda rights, if they

6  sign below the Miranda explanation?

7          MR. IASPARRO:  Object to form.

8          THE WITNESS:  Well, he told me yes.  And then

9      he signed it.

10 BY MS. PROSSNITZ:

11     Q.   Okay.  That sentence -- I'm going to ask you a

12 question about this sentence.  "During this review, Cruz

13 read a portion of the statement aloud to confirm that he

14 understood English and could read Defendant's

15 handwriting."  So did you not know until this point that

16 Cruz could read English?

17     A.   No.  I mean, one of the other things you do --

18 and unless he lied to me, I mean, you ask him, can you

19 read and write English?  So just confirming that fact,

20 though.

21     Q.   All right.  Could you read the last paragraph

22 starting with, "Defendant spoke with assistant state's

23 attorney"?

24     A.   "Defendants spoke with assistant state's

25 attorney James Papa in December 2016 about retrying

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3134

1  Maysonet's criminal case.  ASA Papa called the
2  defendant, informing him the state intended to retry
3  Maysonet's criminal case in January of 2017, and the
4  state wanted to call Defendant as a witness.  ASA Papa
5  further asked if Defendant was available in January to
6  testify.  Defendant agreed to testify, but said that," -
7  - it said I was not inbound.  "In January 2017, ASA Papa
8  then sent a follow-up email, summarizing their telephone
9  conversation."
10      Q.   Okay.  And could you read that -- the next
11  paragraph?
12      A.   "In 2018, Defendant and Co-Defendant Mr.
13  DiFranco exchanged e-mails in connection with
14  Defendant's interview of Justino Cruz."  And here,
15  "Before 2018, Defendant sent DiFranco an email stating
16  he took the handwritten statement of Justino Cruz and
17  later testified about it, then attached a copy of the
18  statement and transcript of the testimony.  Mr. DiFranco
19  sent an e-mail in response thanking him."
20      Q.   So why did you exchange e-mails in 2018 with
21  Mr. DiFranco about the statement?
22      A.   Because I found out that Frankie had been
23  named as a defendant by your firm in the Alfredo
24  Gonzalez case and -- because I, you know, talked to him
25  occasionally, and I told him that I was tangentially

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3135

1   involved, and I had taken the statement.  And obviously,

2   you want to support your friends when they've been named

3   as defendants in cases like this. And so I told him what

4   I had done on the case and wished him well, and I should

5   have known that I would be the next defendant on it, so

6   --

7       **Q.   Did he ask for a copy of the statement?**

8       A.   No.

9       **Q.   Okay.  You just provided it?**

10      A.   I don't know that I gave it to him.  Oh, I did

11  attach a copy of the statement.  Okay.  Yeah, I did.

12  Okay.  Yeah.  And you know what, the reason why I had

13  it, I'm sure was because Papa had just given it to me

14  and prepped me from the year before when we were

15  supposed to go to trial.

16      **Q.   Just to clarify, are you sure this was**

17  **Mr. Gonzalez's case in 2018?**

18     A.   Am I sure that -- what, you mean where

19  DiFranco was named the defendant?

20     **Q.   Yes?**

21     A.   That's what I don't remember.  He got named in

22  something; I remember.

23     **Q.   Do you know if it was --**

24     A.   If it was Maysonet, or if it was Gonzalez, or

25  whoever.  It was one of -- one of -- it was one of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3136

 1  defendants in this case, so I knew that it was related.

 2      Q.   All right.  What did you base these

 3  interrogatory answers on when you provided them?

 4      A.   Documents that I reviewed, you know, general

 5  recollections regarding policies, procedures, and

 6  conversations I had with my attorney.

 7      Q.   Are there any documents that you relied on

 8  that we haven't talked about today?

 9      A.   No.

10      Q.   Okay.

11      A.   Except -- I mean, you don't -- you haven't

12  shown me the felony review folder, but that was --

13      Q.   Okay.  So we talked about earlier that Alfredo

14  Gonzalez and Jose Maysonet had been interviewed before

15  you interviewed Justino Cruz.  Do you remember that?

16      A.   Yes.

17      Q.   Okay.  And you said that you weren't sure if

18  you had seen their handwritten statements, but you're

19  guessing you probably didn't?

20      A.   I don't think I did, but I could have.  I

21  don't know.  But like I said, the -- my felony review

22  folder indicates that I made a notation in the folder

23  that the two co-defendants had been charged prior to my

24  interviewing of Mr. Cruz.

25      Q.   Okay.  We will mark this as Exhibit 5.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3137

```
 1              (EXHIBIT 5 MARKED FOR IDENTIFICATION)

 2        A.    Thank you.

 3   BY MS. PROSSNITZ:

 4        Q.    And I'll represent to you that this is

 5   Alfredo's.  It's also a reported statement taken in

 6   conjunction with his criminal case.  Do you see the date

 7   that this was taken on?

 8        A.    Yes.

 9        Q.    Can you tell me that date?

10        A.    August 24, 1990.

11        Q.    And do you see the time?

12        A.    2:00 in the morning.

13        Q.    Okay.  So this would've been before your

14   interview with Justino; is that right?

15        A.    Yes.

16        Q.    Do you have any independent recollection of

17   seeing this document?

18        A.    I don't.

19        Q.    Okay.  And you don't know if you saw it before

20   speaking with Justino Cruz, this document?

21        A.    I am -- just based upon how quickly our office

22   could print out a court reported statement, I'm almost a

23   hundred percent positive I did not see this, because

24   there's no way that they took a statement at 2:00 in the

25   morning from a court reporter, and then I had it at ten
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3138

 1    hours later at the -- Area 5.

 2        Q.   Okay.  Understood.  So let's turn to Page 2.

 3    You see, like, about three quarters of the way down

 4    there's a question that I'm going to draw your attention

 5    to.

 6        A.   Yes.

 7        Q.   Okay.  Could you just read that question

 8    answers until the bottom of the page?

 9        A.   "Going to draw your attention to May 24, 1990,

10    between 11:30 and midnight.  Do you remember that time?"

11    "Answer: Yeah."  "Question: What were you doing?"

12    "Answer: I was walking to my house."

13             "Question: Okay.  Where were you walking?  On

14    what street?"  "Answer: LeMoyne and Spaulding."

15    "Question: While you were walking to her house, what did

16    you see?" Do you want me to keep going?

17        Q.   Yeah.  Could you just read the --

18        A.   Answer, "I seen a blue car, and I was looking

19    at Fro, and I told him to stop so he could give me a

20    ride home."

21        Q.   Okay.  Perfect.  Is it fair to say that this

22    is inconsistent with Cruz's statement given that Cruz

23    said they all met at Jose Maysonet's house the night of

24    the crime?

25             MR. IASPARRO:  Object to form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3139

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 360 of 428 PageID #:21352
The Deposition of John Francis Guerin, on December 12, 2023

132

```
 1              THE WITNESS:  I -- I have no idea.
 2   BY MS. PROSSNITZ:
 3       Q.   Okay.  If you had seen this before talking
 4   with Justino Cruz, would you have talked about that
 5   difference between their two statements?
 6              MR. IASPARRO:  Calls for speculation.  Form.
 7              THE WITNESS:  I don't -- I don't know that it's
 8       different.
 9   BY MS. PROSSNITZ:
10       Q.   Okay.  Are you aware that Rosa Bella now says
11   today that this interaction at Maysonet's house where
12   they went to look at a gun happened later in July of
13   1990, not in May of 1990?
14              MR. IASPARRO:  Object to form.  Misstates the
15       evidence.
16              MS. ROMELFANGER:  Joined.
17              THE WITNESS:  I'm not -- I'm not aware that she
18       changed her story, but I -- it's not surprising.
19   BY MS. PROSSNITZ:
20       Q.   Okay.  Why is it not surprising?
21       A.   Because she's going to hopefully get a million
22   bucks of her own through Jose, her boyfriend.
23       Q.   If you had known that that was her story back
24   when you were working this case, what would you have
25   done to address that inconsistency?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3140

```
 1              MR. IASPARRO:  Object to form.  Calls for
 2         speculation.
 3              THE WITNESS:  She -- she gave a hand in
 4         statement I believe, so that wasn't her statement.
 5         She just changed it recently, is my understanding
 6         from you. Is that correct?  When did she change her
 7         statement?
 8    BY MS. PROSSNITZ:
 9         Q.   Well, just to clarify, if she had given that
10    statement, that it was inconsistent, what would you have
11    done to --
12              MR. IASPARRO:  Form, calls and speculation.
13              MS. PROSSNITZ:  Okay.
14              THE WITNESS:  I'm not going to go there. Asking
15         for a triple hypothetical.  I have no idea.
16    BY MS. PROSSNITZ:
17         Q.   I guess I'm asking generally if there was
18    facts that were inconsistent between statements, what
19    would you do?
20              MR. IASPARRO:  Form, incomplete hypothetical.
21              THE WITNESS:  Same thing I told you that I'd do
22         before.  If -- if there were inconsistent
23         statements, then you get to the bottom of it, find
24         out what the real story is, and go from there and
25         make your charging decision based upon what you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3141

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 362 of 428 PageID #:21354
The Deposition of JOHN FOLINO, taken on 11/21/2023

134

```
 1        determine to be the truth.
 2  BY MS. PROSSNITZ:
 3        Q.   And what do you mean when you say get to the
 4  bottom of it?
 5        A.   I mean, determine who's telling the truth,
 6  who's not.
 7        Q.   Would you do any independent investigation to
 8  figure that out?
 9             MR. IASPARRO:  Object to form.
10             THE WITNESS:  I mean, independent meaning what?
11  BY MS. PROSSNITZ:
12        Q.   Would you independently interview witnesses?
13        A.   I mean, I direct the detectives to bring in
14  witnesses.  Sure.  The statements don't add up, then you
15  bring in other witnesses and try and find out what
16  really happened.  All you're looking for is the truth.
17        Q.   And what would you do if you found out after
18  the fact that statements were inconsistent, after they'd
19  already taken?
20             MR. IASPARRO:  Object to form.
21             THE WITNESS:  Then you -- it depends on the
22        circumstances.  If there's credible evidence that
23        the prior statements were incorrect, then I mean,
24        obviously, by then it's -- it's the trial assistance
25        issue.  So I would probably not be privy to any
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3142

```
 1        subsequent statements that were potentially
 2        inconsistent.  Because then you've got it in a
 3        courtroom.  I mean, then you really start, you know,
 4        working the case up and putting all the witnesses
 5        together for -- for trial.  So -- and obviously, if
 6        there's conflicting testimony and the guy's already
 7        been charged, then you turn over that information to
 8        the defense attorneys, and then it's up to you to
 9        see where you go with it, too, you know?  I mean,
10        it's the same situation.  You turn over the
11        exculpatory evidence and then let the defense go and
12        see what they can -- can do about it.
13   BY MS. PROSSNITZ:
14        Q.    Understood.  So you had a duty to disclose
15   that information?
16        A.    Of course.
17        Q.    Okay.  One more question about this statement.
18   If you could turn to Page 5, you see the question that
19   starts, "When you got to the alley, what happened?" It's
20   like a -- the begin -- almost at the top of the page.
21        A.    When you got to the alley, what happened?
22        Q.    Could you --
23        A.    Question --
24        Q.    Yes.  Could you read that through the end of
25   the page?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3143

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 364 of 428 PageID #:21356
The Deposition of JOHN PANOZZO, taken on 11/16/2023
136

1      A.    "Question: When you got to the alley, what

2   happened?"  "Answer: He stopped and pulled over."

3         "Question: And did they turn the lights off or

4   what?"

5         "Answer: Yeah, then Jose and Pro and Tino,

6   they jumped out of the car."  "Question: What did Jose

7   do with the gun?"  He took it outside.  "Answer: He took

8   it outside."  "Question: He took it outside with him?

9   What did Jose and Pro do with their sweatshirts?"

10        "Answer: Pulled the hoodies up -- hoodie up."

11        "Question: What does the hoodie on mean?"

12   "Answer:

13        That they going to kill."  "Question: Now

14   after they put their hoodies on, where did Jose, Tino,

15   and Pro go?"  "Answer: They started walking.  All of a

16   sudden they disappeared."  "Question: Where did they

17   walk to?"

18        "Answer: About a few steps."  "Question: Okay.

19   Where did they walk to?"  "Answer: To the side of the

20   lot."

21        "Question: To the side of the empty lot?

22   "Answer:

23        Yeah."  "Question: Did they go over the fence

24   or around the fence?"  "Answer: I don't know, because I

25   couldn't tell."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3144

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 365 of 428 PageID #:21357
The Deposition of John P. Maysonet, taken on December 1, 2023
137

1        Q.    And can you read - like -- the next six lines

2 on Page 6?

3        A.    Sure.  "Question: And what was the next thing

4 that you heard?"  "Answer: I heard shooting, about five

5 or six shots."  "Question: What happened after you heard

6 the five or six shots?"  "Answer: I looked to the side,

7 then Tino jumped in the back."  "Question: Tino jumped

8 in the car?"  "Answer: Yeah.  In the back seat."

9        "What happened then?"  "Answer: Then I was --

10 I asked

11        Tino what was up?  He said nothing -- nothing.

12 And at the same time, Pro and Jose jumped in and they

13 said everything was all right."  "Question: And what did

14        Jose and Pro do with their hoodies?"  "Answer:

15 They pulled it down.  They started driving."  "Question:

16 Did

17        Jose have the gun with him?"  "Answer: Yes."

18        "Question: What did he do with the gun?"

19 "Answer: Put it on the side by the seat."  "Question: He

20 put it on the side of the seat?"  "Answer: Yes."

21 "Question:

22        Where did you go then?"  "Answer: I told him

23 to drop me off at home."  Want me to keep going?

24        Q.    That -- that's perfect.

25        A.    Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3145

1    Q.   Okay.  So is it fair to say that this is

2  inconsistent with Cruz's statement because Cruz said he

3  acted as the lookout while Alfredo ran into the alley

4  with the gun?

5         MR. IASPARRO:  Object to form.

6         THE WITNESS:  It's inconsistent, but it's

7    entirely expected.

8  BY MS. PROSSNITZ:

9    Q.   Why is that?

10    A.   Because Alfredo's not going to put himself as

11  the shooter on a double homicide.  I mean, you know,

12  they had the death penalty back then, and so it -- it's

13  -- of course he -- he's going to say that somebody else

14  did it.  So and -- and I don't know if Tino was his

15  nephew, so is Alfredo now putting the -- the gun in the

16  hands of his nephew saying his nephew committed the

17  double homicide?  But that's 100 percent expected. It'd

18  be more bizarre if a guy actually says no, out of the

19  four of us in the car, I was the one who got out and

20  shot him.  So I mean, that's just, you know, once again,

21  talking about common sense experience.  And I mean,

22  that's -- that's the most plausible inconsistency of

23  all, 100 percent.

24    Q.   If you had this statement before you talked to

25  Justino Cruz, would you have brought that up?  The fact

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3146

1  that Alfredo said that Justino was the one who ran --

2      MR. IASPARRO:  Object to form.

3  BY MS. PROSSNITZ:

4      Q.    -- out with the gun?

5      MR. IASPARRO:  Calls for speculation.

6      THE WITNESS:  You know, I don't know.  I mean,

7      because it's uncle and nephew, if he was putting it

8      on him, he might because that's pretty low down.

9      But I don't know.

10  BY MS. PROSSNITZ:

11      Q.   Would -- these types of confessions and gang

12  related shootings common in your experience as a felony

13  review ASA?

14      MR. IASPARRO:  Form, foundation.

15      THE WITNESS:  You know, most people want to

16      talk.  I mean, as you guys know, you know, you pick

17      up the pieces after these supposed, you know,

18      beatings take place.  And most of the guys talk, and

19      then the story afterwards is, oh, the only reason I

20      talked was because they beat it out of me, which is

21      not the case. But -- so how it goes.

22  BY MS. PROSSNITZ:

23      Q.   Do you know how the -- they -- do you know how

24  the police determines that these three co-defendants

25  were involved in the shootings of the Wiley brothers?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3147

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 368 of 428 PageID #:21360
The Deposition of JOHN P. GUEVARA, taken on 11/16/2023

140

```
 1              MS. ROMELFANGER:  Form.
 2              THE WITNESS:  Do I know how they --
 3  BY MS. PROSSNITZ:
 4      Q.    How they determined that.
 5      A.    What do you mean?  How --
 6      Q.    How did they -- how did --
 7      A.    Come about arresting them?
 8      Q.    Yes, exactly.
 9      A.    I don't remember.  I knew back then, I'm sure.
10  But --
11      Q.    You would've known back then prior to the
12  confessions?
13      A.    I don't, about prior to the confession.  Well,
14  yeah.  I mean, I probably -- yeah.  I mean, what was the
15  probable cause to arrest?  Of course.  I mean, I'm sure
16  I'd have that information.  Otherwise, then you'd be
17  filing motions to suppress saying, why did you guys even
18  arrest these guys?  You know, they were at the church.
19      Q.    And were you aware that before they arrested
20  Jose Maysonet, Alfredo Gonzalez, and Justino Cruz that
21  Detective Guevara had two other suspects in this case
22  arrested, and brought them in for lineups?
23              MS. ROMELFANGER:  Objection.
24              MR. IASPARRO:  Object to form, foundation.
25              MS. ROMELFANGER:  And to the extent it
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3148

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 369 of 428 PageID #:21361
The Deposition of JOHN PIANOJA, taken on 7/11/2023, at Chicago, 2023
141

```
 1        misstates the evidence.
 2              THE WITNESS:  I have no idea what I would have
 3        known at that time.
 4   BY MS. PROSSNITZ:
 5        Q.    Okay.
 6        A.    So wait.  So Rey Guevara had brought in two
 7   other people, and then -- and then he let them go and
 8   focused on these guys?
 9        Q.    I -- I'm asking if you were aware that that
10   happened.
11        A.    I'm -- I'm ask -- that happened?  That -- that
12   sounds like that -- that goes in Rey Guevara's favor.  If
13   you let people go and then, why didn't he pin the --
14   this on those two?  He picked them up already.
15        Q.    Okay.  What would you have done if you had
16   known that information at the time?
17              MR. IASPARRO:  Object to form.
18              THE WITNESS:  If -- if Guevara pick up other
19        people and let them go?  Sounds like they got better
20        information and now they're arresting the right
21        guys, and they let the wrong guys go.
22   BY MS. PROSSNITZ:
23        Q.    Do you know if Justino Cruz filed a motion to
24   suppress?
25        A.    I'm guessing he didn't because I didn't
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



JGS_MAYSONET 3149

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 370 of 428 PageID #:21362
Videotaped Deposition of John P. Halloran - taken 07/13/2023
142

1    testify.  I mean, if he did, then obviously it would've

2    been my -- you know, it would've been something about

3    what I did.  Right?  I mean, not that I'm about to ask

4    questions of you during that deposition, but --

5        Q.   Do you know if he went to trial?

6        A.   I don't.  I'm guessing he pled.

7        Q.   Okay.

8        A.   That's what I'm guessing, just because I don't

9    -- I -- the only case I testified in was Gonzalez.  So

10   I'm guessing that Justino pled guilty, because he was

11   treated so well.

12       Q.   So I want to circle back to those two other

13   suspects.  If you had known that they had been

14   identified in a lineup, would that have been important

15   information?

16            MR. IASPARRO:  Form.

17            THE WITNESS:  I would've had to wade through

18        all the information and see.  But, you know, like

19        you said, you trust the police and they're making

20        the right decisions.  And obviously in this case,

21        they did, and they let the wrong guys go and they

22        had the right guys.

23   BY MS. PROSSNITZ:

24       Q.   So do you have any opinion today of the police

25   investigation into the Wiley brothers murders?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3150

1          MR. IASPARRO:  Object to form.

2          THE WITNESS:  I think it was solid.  I mean,

3     Papa was ready to try it again, and if you know him,

4     he's a really good prosecutor.  And I mean, should

5     have retried it.  Should have never been granted.

6     It's a travesty of justice.  It's a slap in the face

7     of the family of the Wiley brothers.

8  BY MS. PROSSNITZ:

9     Q.    Do you have any opinion about the law

10 enforcement officers involved in this case?

11         MR. IASPARRO:  Form.

12         THE WITNESS:  They did a good job.  I did a

13    good job.  We got a good result, and justice was

14    done. And if at any time I thought there was

15    something that was kinky about this or that

16    something was not right, I would've shut it down

17    right away, testifying under oath.  And I wouldn't

18    be helping a system that was beating people and

19    trying to make them, you know, confess when they

20    didn't do it, because then the right guys are -- are

21    -- you know, the wrong guys are in jail and the --

22    the guys that actually did the crime are -- are

23    still walking the streets.

24 BY MS. PROSSNITZ:

25    Q.    What's your opinion about Reynaldo Guevara

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3151

```
 1    today?

 2              MR. IASPARRO:  Form.

 3              THE WITNESS:  I don't have an opinion.  I don't

 4         know.  I mean, all I can tell you is that Justino

 5         Cruz was not -- never said anything at all about

 6         anybody.  Not just Guevara.  He never said anything

 7         about that.  And assuming, like I said, that he pled

 8         guilty, he knew what he did.  I mean, if he was

 9         beaten or, you know, his new story, whatever the

10         hell that may be, was totally based upon fabrication

11         and based upon a fantasy of him becoming a

12         millionaire at this time in his life.  And we did

13         the right thing back then, and he did his time and

14         now he's out.  So --

15    BY MS. PROSSNITZ:

16         Q.   But just to clarify, you don't have an

17    independent recollection one way or the nother --

18    another of what Justino Cruz might have said to you

19    about Guevara?

20         A.   I don't.  No.

21         Q.   Do you know about the exonerations that have

22    resulted from Reynaldo Guevara's investigations?

23         A.   I have no independent information.

24         Q.   But you've heard about them.

25         A.   Oh yeah.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3152

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 373 of 428 PageID #:21365
The Deposition of JOHN HALVORSEN, taken on 11/30/2023

145

1      Q.   Are you aware that Jose Maysonet and Alfredo

2   Gonzalez were exonerated?

3             MR. IASPARRO:  Object to form.

4             THE WITNESS:  What you call exonerated is -- is

5        a travesty of justice by Kim Foxx getting

6        certificates of innocence, the people who were, as

7        of 2017, going to be retried by Jim Papa and the

8        State's Attorney's Office.  And now Kim Foxx is a

9        warrior for victims -- or warrior for defendants,

10       and with no care for victims, and certificates of

11       innocence like they're Halloween candy, even though

12       people were convicted of the crimes, and she

13       should've retried them.  And so here we are, and in

14       a -- in a vicious cycle of injustice where victims

15       are thrown to the side.

16  BY MS. PROSSNITZ:

17     Q.   So the fact that they were exonerated just --

18  that doesn't change your opinion on their innocence?

19            MR. IASPARRO:  Object to form.

20            THE WITNESS:  I think that the word exonerated

21       is -- is -- under the circumstances that -- I

22       shouldn't say it's -- it's a legal term.  It's a

23       term of art that allows you guys, with an

24       exoneration certificate of innocence, whatever you

25       want to call it, to file cases and -- and to jackpot

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3153

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page: 374 of 428 PageID #:21366
The Deposition of JOHN FRUGAS, taken 11/16/2023
146

```
 1        the system on behalf of, like, Justino Cruz filing a
 2        case.  That's a joke.
 3   BY MS. PROSSNITZ:
 4        Q.   Okay.  So is that a no, that doesn't change
 5   your opinion, the fact that they were exonerated?
 6             MR. IASPARRO:  Object to form.
 7             THE WITNESS:  It -- it -- not -- it -- it -- it
 8        -- it's symptomatic of a -- of a broken system that
 9        -- that forgets about victims and glorifies
10        defendants and doesn't prosecute people anymore.
11        I'm sure you're glad you're -- you're asking me
12        these questions.  Now you know why I don't do this
13        kind of litigation.
14   BY MS. PROSSNITZ:
15        Q.   Fair enough.  Okay.  So circling back, could
16   Jim Papa have retried the Maysonet case if all the
17   defendant officers were on the Fifth?
18             MR. IASPARRO:  Object to form.  Calls for
19        speculation.
20             THE WITNESS:  I mean, I don't -- I don't -- I
21        mean, I think you could probably -- I'd retry that
22        case and just take Guevara out.  I think everybody
23        else is not going to take the Fifth.  I don't think
24        that's what happened.  Guevara is going to take the
25        Fifth because you're going to ask him about other
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3154

1    cases and he's afraid of, you know, the implications

2    for that.  So anyway, I won't talk about it, Jim

3    Daffada.  Sorry, dude.  But yeah, I think Papa

4    could've tried the case. I don't know how much Rey

5    had to do with -- with the other, you know, cases.

6    But, you know, you throw out one statement, big

7    deal.  I mean, there's a lot of ways to try cases.

8  BY MS. PROSSNITZ:

9      Q.    So do you know today if Justino Cruz has a

10  pending post-conviction proceeding?

11      A.    If there is a --

12      Q.    A post-conviction -- sorry.  A pending post-

13  conviction petition for Justino Cruz?

14      A.    I have no idea.

15      Q.    Okay.  Have you been contacted by anyone

16  regarding his -- this pending post-conviction petition?

17      A.    No.

18      Q.    Will you testify if that case goes to an

19  evidentiary hearing?

20      A.    I'll do whatever they need me to do because I

21  did the right thing and everything that happened in that

22  case was fully 100 percent legitimate.

23      Q.    Is there anything someone could show you that

24  would change your opinion of this case?

25      A.    With Justino Cruz?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3155

1    Q.   Yes.

2    A.   I know what happened.  I mean, I was there and

3  he -- he pled guilty.  I mean, innocent people -- I know

4  people say, oh, well they're beaten.  They're this.

5  They're that.  But I saw him.  I mean, if there was

6  anything out of the ordinary, I would've noticed it, and

7  I would've said something.  I would've done something.

8  I mean, his -- his conviction is solid.  He was the

9  lookout and his uncle shot two guys in cold blood.  And

10 I mean, now all of a sudden, it's coming back and

11 everybody's got a different story and it's all Rey

12 Guevara's fault.  Well, I mean, that's just wrong. I

13 don't know what Rey might've done or not done, but the

14 fact that every single case that Rey Guevara's

15 fingerprints are on, even tangentially, like mine, are

16 all of a sudden turning into Innocence Project, you

17 know, reversals seeking millions of dollars is -- is a

18 real travesty.  And -- and I mean, obviously nothing

19 against you personally.  I know you're, you know, doing

20 good work.  And -- but I mean, this is -- this is not

21 right.  And so I mean, you -- you could try and show me

22 something, but I mean, nothing exists.  Let me tell you

23 that.

24    Q.   So is it possible -- is it not -- or strike

25 that.  Is it possible that you got it wrong with Justino

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3156

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 377 of 428 PageID #:21369
The Deposition of John P. Halloran, taken on 11/28/2023

149

1    Cruz?

2        A.    No.

3        Q.    If Guevara did beat Justino Cruz, would that

4    change your opinion at all?

5        A.    I wouldn't know if he beat Justino Cruz

6    because seven hours later after he got arrested, I don't

7    even know if Guevara was still on duty.  He took a

8    statement at 2:00.  Justino gets picked up at 5:00.

9    There's no indication that, you know -- Guevara wasn't

10   the AO on the case.  He wasn't the arresting officer. So

11   the kid gets picked up at 5:00.  I talked to him seven

12   hours later.  No indication of anything.  Yeah, that's -

13   - that -- and -- and you know, and -- and the other

14   thing is, I mean, nobody's beating guys at Area 5

15   upstairs in those open rooms because it's not just

16   detectives.  I mean, it's wide open.  I mean, it's so

17   implausible.  I mean, for your theory of these cases to

18   hold -- hold true, there would have to be probably 50

19   people, officers, detectives, state's attorneys, you

20   know, civil employees in the various offices, holding

21   cell people, that all conspired against these guys with

22   Rey Guevara at the center of this massive conspiracy

23   controlling all these people.  And the chances of that

24   actually happening are astronomical against.  So I mean,

25   I -- I -- I know it didn't happen because I'm one of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3157

1    those people.  And I know a lot of those people and I

2    know they were not involved.  So to believe that one

3    person in this whole grand plan could effectuate these

4    outcomes and basically railroad these guys is just not

5    plausible.

6        Q.   Okay.  Have you ever seen an interrogation

7    room with paper over the window?

8        A.   Yes.

9        Q.   Okay.  Did you ever see that at Area 5?

10       A.   I don't remember.

11       Q.   Do you think it's a travesty of justice what's

12   happened to Rey Guevara since 1990?

13           MR. IASPARRO:  Object to form.

14           THE WITNESS:  You know what?  I don't know

15       enough.  Like I said, I don't know Rey.  I'm not

16       saying that bad cops don't exist.  All I'm saying

17       that, in my opinion, I never had any dealings with

18       him.  I'll tell you if -- you know, I remember going

19       to area two when Jon Burge was there, and I never

20       saw anything.  But there was, you know, definitely a

21       different air out there.  So --

22   BY MS. PROSSNITZ:

23       Q.   When you say you never had any dealings with

24   them, do you mean you never had any dealings with bad

25   cops?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3158

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 379 of 428 PageID #:21371
The Deposition of JOHN PHILBIN, taken on 11/16/2023

151

```
 1          MS. ROMELFANGER:  Object to form.
 2          THE WITNESS:  I never had any dealings with bad
 3      cops.  No.
 4   BY MS. PROSSNITZ:
 5      Q.   And you've never had bad dealings with Rey
 6   Guevara?
 7      A.   Like I said, I mean, I don't think I ever did
 8   a case with Rey Guevara.
 9      Q.   We're almost there.  I just want to ask you
10   again.  If you learned that Justino Cruz's co-defendants
11   were beaten by Guevara, would that affect your opinion
12   in way even though you didn't see it?
13          MR. IASPARRO:  Object to form.  Calls for
14      speculation.
15          MR. DAFFADA:  Objection.
16          THE WITNESS:  Did you get Mr. Guevara's --
17      okay, good.  Yeah.  Like I said, I mean, it doesn't
18      change Justino, what he told me.  So and -- and I
19      don't know if they were or they weren't, but I know
20      one thing: Justino told me the truth, and that's
21      what happened, and justice was done.  And I mean, if
22      -- if - - you know, if he was beaten or not beaten,
23      if -- if a guy tells the truth, I mean, and you can
24      verify it's the truth through third parties in other
25      situations, I mean, nothing would ameliorate a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3159

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 380 of 428 PageID #:21372
The Deposition of JOHN PROASS, taken 07/17/2024, Page 380 of 428

152

```
 1        situation where somebody did that.  But like I said,
 2        from my tangential relationship to this case with
 3        Rey Guevara, there's no way that this isn't the
 4        truth.
 5   BY MS. PROSSNITZ:
 6        Q.   But just to clarify again, you're saying this
 7   based on Justino Cruz's statement, but you have no
 8   independent recollection as we sit here today?
 9             MR. IASPARRO:  Form.
10             THE WITNESS:  No.
11             MS. ROMELFANGER:  And misstates his testimony.
12   BY MS. PROSSNITZ:
13        Q.   Okay.  I have a few final questions that, I'm
14   sorry, I have to ask.
15        A.   Go ahead.
16        Q.   But did you conspire with any police officer
17   in this case to deprive Alfredo Gonzalez of his
18   constitution rights?
19        A.   No.
20        Q.   Did you withhold any exculpatory evidence from
21   Alfredo Gonzalez?
22        A.   No, I have nothing to do with Alfredo
23   Gonzalez.
24        Q.   If you've been made aware that Justino Cruz
25   was physically abused by police into falsely confessing
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS-MAYSONET 3160

1   to the Wiley brothers' murders, you would have reported

2   that information, correct?

3       A.   100 percent yes.

4       Q.   If you had been made aware that Alfredo

5   Gonzalez was physically abused by police into falsely

6   confessing to the Wiley brother murders, you would've

7   documented and reported that information; is that right?

8       A.   Yes.

9       Q.   Did Reynaldo Guevara ever tell you that he

10  physically abused Justino Cruz?

11      A.   I never talked to Rey Guevara.

12      Q.   Did any police officer tell you that he

13  physically abused Justino Cruz?

14      A.   No.

15      Q.   Did any police officer tell you that he

16  physically abused Alfredo Gonzalez?

17      A.   No.

18           MS. PROSSNITZ:  Okay.  I just want to take a

19      quick ten-minute break.

20           THE WITNESS:  Great.  Look at your -- talk to

21      your -- yeah.

22           THE VIDEOGRAPHER:  We are going off the record.

23      The time is 1:31 p.m.

24           (OFF THE RECORD)

25           THE VIDEOGRAPHER:  Back on the record.  The

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JCS_MAYSONET 3161

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 382 of 428 PageID #:21374
The Deposition of JOHN PERKAUS, taken on 11/28/2023
154

 1        time is 1:48 p.m.

 2   BY MS. PROSSNITZ:

 3        Q.   Okay.  We're almost done, Mr. Perkaus.  So I

 4   am going to hand you this.  Exhibit 6, I'll mark it.

 5             (EXHIBIT 6 MARKED FOR IDENTIFICATION)

 6        A.   Thank you.

 7   BY MS. PROSSNITZ:

 8        Q.   Do you recognize this document?

 9        A.   Yes.

10        Q.   What is this?

11        A.   This is my -- copy of my felony review folder

12   from Justino Cruz.

13        Q.   Okay.  And can you explain the second page to

14   me, what you filled out here?

15             MS. ROMELFANGER:  Object to form.

16             THE WITNESS:  Explain -- oh, okay.  The felony

17        review folder is a manila eight by 12 folder with a

18        pre-printed form with three carbon copies in the

19        middle of it.  And this is the pre-printed form that

20        we fill out for each one of our cases.  And this is

21        the one that I printed out for Justino Cruz.

22   BY MS. PROSSNITZ:

23        Q.   Okay.  Do you have a separate felony review

24   folder for each crime, or is it per witness or suspect

25   that you're interviewing?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3162

 1      A.    It -- per case.  As you can see, there is
 2    areas for additional defendants in the form.  But in
 3    this case, we only have one defendant.
 4      Q.    Okay.  Got it.  Can you read what it says in
 5    that incident column, or incident -- I don't know how to
 6    describe it, square?
 7      A.    Yeah.  Okay.  The date, 5-24-90.  Time, 11:30
 8    p.m.  Weapon, nine-millimeter auto machine pistol.  So
 9    from and to situation where it basically sets the time
10    parameters for the crime.  In this case, it was 11:30
11    p.m. to 1:30 a.m. on the evening of 5-24, morning of
12    5-25-90.  The location was 3428 West North Avenue, which
13    I believe is the corner of St. Louis and North Avenue.
14    Okay.  And you know how bad my eyes are. Alfredo
15    Gonzalez also -- already -- sorry, "charged" --
16            MR. IASPARRO:  You can skip the first line.
17            THE WITNESS:  Okay.  Oh, Incident Summary.
18      Okay.  "On 5-24-90 at approximately 11:30 p.m.,
19      Defendant 1," which is Justino Cruz, "with Jose
20      Maysonet and Alfredo Gonzalez already charged and
21      Chris Hernandez still at large, went to Jose's house
22      and picked up machine pistol.  Defendant" -- I'm
23      sorry, this is terrible -- "1, and other three got
24      into car and drove to vicinity of St. Louis and
25      North Avenue in alley.  Chris and Alfredo got out.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3163

1    Alfredo had gun, talked to Victim 1 and Victim 2 by

2    -- at 5" something. I can't read that either.  "Jose

3    stayed" -- blank something with car.  I can't read

4    it.  "And D1 acted as lookout.  He heard five to six

5    shots and saw Chris and

6         Alfredo running to car.  Alfredo had gun.

7    Defendant 1 then jumped into -- in backseat, and they

8    all drove off.  Previously charged: Jose Maysonet,

9    Alfredo

10        Gonzalez.  Still sought: Chris Hernandez."

11   BY MS. PROSSNITZ:

12        Q.    Thank you.  I know that wasn't easy to read.

13        A.    Yeah.  I -- I needed a magnifying glass.

14   Apologies.

15        Q.    So when you filled this out, you -- just to

16   confirm, you would have known or you knew that --

17        A.    Yes.

18        Q.    -- Jose Maysonet and Alfredo Gonzalez had been

19   charged?

20        A.    Yes.

21        Q.    Okay.  Do you remember who Chris Hernandez

22   was?

23        A.    Who he was?

24        Q.    Uh-huh.  Or what his involvement in the case

25   was?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3164

1    A.   Chris Hernandez was the driver.  Oh, Chris and

2  Alfredo got out.  Okay.  Alfredo had the gun.  I mean,

3  like I said, I have no independent recollection, and

4  this is a very poor copy.  Chris and Alfredo were

5  running to the car.  Okay.  So Chris and Alfredo were

6  the shooters.  Or -- actually, Alfredo was the shooter.

7  Chris was with him.  Maysonet was driving, and Justino

8  was the lookout, is what it appears.

9    **Q.   Okay.  Does this document refresh your**

10  **independent recollection of your involvement with**

11  **Justino Cruz's prosecution at all?**

12       MS. ROMELFANGER:  Objection.  Form.

13       THE WITNESS:  I'm not sure what you mean.  In

14    what way would it refresh my recollection?

15  BY MS. PROSSNITZ:

16    **Q.   About anything of any --**

17    A.   Well, it refreshes my recollection that Jose

18  Maysonet and Alfredo Gonzalez, I knew that they were

19  previously charged, and I knew that Chris Hernandez was

20  being sought.  So, from that standpoint, yes, it

21  refreshes my recollection.

22    **Q.  Okay.**

23    A.   It also makes clear how poor my eyesight is

24  becoming.

25    **Q.   Okay.  Did you know that Jose Maysonet and**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3165

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 386 of 428 PageID #:21378
The Deposition of JOHN HALVORSEN, taken on 11/16/2023
158

1  Reynaldo Guevara had a relationship prior to Maysonet's

2  arrest?

3          MR. IASPARRO:  Object to form.

4  BY MS. PROSSNITZ:

5      Q.   Could that have been exculpatory evidence, in

6  your opinion, if they had been --

7          MR. IASPARRO:  Form.  Foundation.

8  BY MS. PROSSNITZ:

9      Q.   -- in a relationship?

10     A.   I have no idea.  I mean, that we previously

11  arrested him or what was the relationship?  I mean, he

12  dated his mom?  What --

13     Q.   We have the -- where there's evidence in the

14  record that Maysonet was paying Guevara a tax to let him

15  sell drugs.

16         MR. IASPARRO:  Object to form.  Misstates the

17    evidence.

18  BY MS. PROSSNITZ:

19     Q.   So would that be exculpatory information?

20         MS. ROMELFANGER:  I'm sorry.  Can we just

21    repeat that question again for everyone?

22  BY MS. PROSSNITZ:

23     Q.   Sure.  There's evidence in the record that

24  Maysonet was paying Guevara a tax to let him sell drugs.

25  Would that be exculpatory information?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3166

The Deposition of John Thomas Heaton, 12/16/2020

```
 1              MR. IASPARRO:  Object to form.

 2              MS. ROMELFANGER:  Join.

 3              THE WITNESS:  It depends on the source of the

 4        evidence and a lot of factors that had been

 5        verified. I mean, what is it?  But I mean, it -- it

 6        still has nothing to do with me or just, you know,

 7        Cruz.

 8    BY MS. PROSSNITZ:

 9         Q.   Were you aware, back when you were a Felony

10    Review ASA, if Guevara dated a lot of women?

11              MR. IASPARRO:  Object to form.

12              THE WITNESS:  Yeah.  A lot of guys dated.  I'm

13        not going there.

14    BY MS. PROSSNITZ:

15         Q.   Do you know specifically --

16         A.   I didn't.

17         Q.   Do you know specifically of Guevara ever did?

18         A.   I don't know.  Like I said, I did not know

19    Guevara.  I mean, it wasn't like he was, you know,

20    somebody I talked to often, somebody I had a lot of

21    deals with.  So, no, I would not have known.

22         Q.   Okay.  New exhibit.  This I'm going to mark

23    Exhibit 7.

24              (EXHIBIT 7 MARKED FOR IDENTIFICATION)

25         A.   Thank you.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3167

```
 1   BY MS. PROSSNITZ:
 2       Q.    So I'll state for the record, this is a report
 3   of proceedings that took place in People v. Maysonet,
 4   November 15, 2017.  Could you just read for me, to
 5   yourself, and then let me know when you're done, that
 6   page, Page 2 through 3?
 7             MR. RAHE:  What is the document?
 8             MS. PROSSNITZ:  Oh, this is a report of
 9       proceedings in People v. Maysonet, number
10       92-CR-10146-01.
11             MR. RAHE:  Does that have Bates numbers?
12             MS. PROSSNITZ:  Yeah.  Sorry.  It's Gonzalez
13       0172308 through 0172312.
14             MR. RAHE:  Thanks.
15             THE WITNESS:  Okay.
16   BY MS. PROSSNITZ:
17       Q.    Okay.  Do you know if this was the case that
18   you were contacted by Attorney Papa about potentially
19   testifying in?
20       A.    It certainly could be.  No.  It says that was
21   Alfredo Gonzalez.  Not Jose.
22       Q.    Okay.  But as far as Jose Maysonet's case, do
23   you see the paragraph on Page 3 where it says,
24   "Nevertheless, we've been advised over the last several
25   days, including just now by Counsel for the former
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3168

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 389 of 428 PageID #:21381
The Deposition of JOHN PENZAUS BYRNE, taken on 11/28/2023
161

```
1   police detectives, that each detective will invoke their
2   Fifth Amendment right not to incriminate themselves and
3   refuse to testify"?
4       A.   Yes.
5       Q.   Okay.  Does that change your opinion at all
6   about how you view the outcome of these cases?
7            MR. IASPARRO:  Object to form.
8            MS. ROMELFANGER:  Joined.  And speculation.
9            THE WITNESS:  It doesn't change my view about
10          just, you know, Cruz and about what happened.  I
11          understand that in the interest of their own
12          self-preservation, their own asset preservation,
13          their own family assets, and that they're -- they
14          have personal liability to fear them.  They have
15          personal liability and that therefore they decided
16          that, I'll accept the risk in this case.
17  BY MS. PROSSNITZ:
18      Q.   Does it change your opinion about the decision
19  not to retry this case?
20      A.   Yes.
21           MR. IASPARRO:  Object to form.
22  BY MS. PROSSNITZ:
23      Q.   How does it change your opinion?
24      A.   I think you can't retry it with none of the
25  detectives willing to testify.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JCS_MAYSONET 3169

```
 1        Q.   Do you know what kind of liability these
 2   detectives would've faced in a criminal context for this
 3   case?
 4             MR. IASPARRO:  Form.  Foundation.
 5             THE WITNESS:  Criminal context?  I don't know,
 6        but I'm sure that, you know, you guys would be going
 7        after the original assets if they made statements
 8        that were potentially contrary and you're able to
 9        prove them in the Court.
10   BY MS. PROSSNITZ:
11        Q.   Does this change your opinion about Jose
12   Maysonet's innocence?
13             MR. IASPARRO:  Form.
14             THE WITNESS:  No, not at all.
15   BY MS. PROSSNITZ:
16        Q.   Okay.  What about Justino Cruz's?
17        A.   Not at all.
18        Q.   And Alfredo Gonzalez's?
19        A.   No.
20        Q.   So just a few last questions, I promise.  You
21   testified earlier that you viewed your work with police
22   officers when you were a Felony Review ASA as a
23   collaborative process; is that right?
24        A.   Yes.
25        Q.   And when you arrived at the station to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3170

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 391 of 428 PageID #:21383
The Deposition of JOHN* PIMENTEL, taken on December 14, 2023

163

```
 1   interview a suspect, you would talk to a detective

 2   before you went in; is that correct?

 3        A.    Yes.

 4        Q.    Would you talk to police about what you wanted

 5   the statement to say with the suspect?

 6             MS. ROMELFANGER:  Object to form.

 7             THE WITNESS:  They would give me information.  I

 8        wouldn't come in with any preconceived notions.  I

 9        would have no information at all on the case.

10   BY MS. PROSSNITZ:

11        Q.    But once you had done that initial interview,

12   would you then talk to whoever the detective was on the

13   case about what the statement should look like or what

14   it should say?

15             MR. IASPARRO:  Object to form.

16             MS. ROMELFANGER:  Join.

17             THE WITNESS:  I mean, I wouldn't make any --

18        you know, I wouldn't make any statements or -- or

19        try and get them to say what it should say, because

20        if -- whatever the truth was, that's what we wanted.

21   BY MS. PROSSNITZ:

22        Q.    Okay.

23        A.    I mean, I'm not coming in with any

24   preconceived notions.  I'm not coming in with any

25   opinions.  But yeah, I mean, if their testimony is
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3171

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 392 of 428 PageID #:21384
The Deposition of JOHN PARROT, taken on 11/16/2023

164

```
 1   diametrically opposite from what the facts say, then,
 2   you know, that's something we definitely have to look
 3   into.  You've got to clear up the -- and resolve all the
 4   loose ends and -- and come up with a cohesive case,
 5   wherever that may lead you.
 6        Q.   And given your role, would you want the
 7   statement to say certain things from a legal standpoint
 8   --
 9             MR. IASPARRO:  Object to form.
10   BY MS. PROSSNITZ:
11        Q.   -- when you were imposing it?
12        A.   I mean, I -- I -- I -- from -- from a legal
13   standpoint, you mean like if they satisfied the -- the,
14   you know, elements of cause of action?
15        Q.   Yeah, exactly.
16        A.   I mean, if -- if that's -- if -- if that's
17   what the truth was, obviously yes.
18        Q.   And in order to get at that truth, would you
19   collaborate with the police?
20             MS. ROMELFANGER:  Object to form.
21             MR. IASPARRO:  Object to form.
22             THE WITNESS:  I mean, of course.  Yeah. You're
23        talking to police.  You're talking to -- if the
24        defendant will talk to you, you talk to them.  You
25        got, you know, whatever the other evidence may be,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
JGS_MAYSONET 3172

```
 1        whether, you know, gunshot residue or shell casings,
 2        tool marks.
 3   BY MS. PROSSNITZ:
 4        Q.   Okay.  So you testified earlier a bit about
 5   this -- the exonerations involved in this case.  Do you
 6   have any reason to dispute the, I guess, correctness of
 7   the exonerations in other cases due to Guevara's
 8   misconduct?
 9             MR. IASPARRO:  Object to form.
10             MS. ROMELFANGER:  Join.
11             THE WITNESS:  I have no knowledge of anything
12        like that.
13   BY MS. PROSSNITZ:
14        Q.   When you say you have no knowledge -- you have
15   no knowledge of whether those were the right call or
16   not?
17        A.   Good, bad, indifferent?  No, I have no
18   knowledge of that.  I can only speak to the case that is
19   now.
20        Q.   Okay.  So you wouldn't say all those other
21   exonerations were travesties of justice?
22             MR. IASPARRO:  Object to form.
23             MR. DAFFADA:  Object to form.
24             THE WITNESS:  Like I said, I have no idea.
25   BY MS. PROSSNITZ:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3173

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 394 of 428 PageID #:21386
The Deposition of JOHN PATRICK LICKER, taken on 12/11/2013

166

```
 1        Q.   Okay.

 2        A.   I can't speculate on those that I have no idea

 3   about.  No.

 4        Q.   You have no opinion one way or the other?

 5        A.   No.

 6             MS. ROMELFANGER:  Asked and answered.

 7             MS. PROSSNITZ:  Okay.  Those are all my

 8   questions.  Thank you.

 9             THE WITNESS:  Thank you.

10             MR. IASPARRO:  Allison?

11             MS. ROMELFANGER:  I have very short.

12             MR. IASPARRO:  Okay.

13                  CROSS-EXAMINATION

14   BY MS. ROMELFANGER:

15        Q.   I know we've already met, but I'm Allison, and

16   I represent all of the Chicago Police Detectives minus

17   Detective Guevara.

18        A.   Yes.

19        Q.   And do you still have Exhibit 4 in front of

20   you?

21        A.   What one is that?

22        Q.   It's the handwritten statement and that email

23   with --

24        A.   Sure.

25        Q.   -- Papa.  And for the record, it's ASA
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3174

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 395 of 428 PageID #:21387
Video Deposition of John Prebouse, taken 11/30/2023

167

```
 1   Defendants 1 through 4.  And you were asked a series of
 2   questions by Plaintiff's Counsel about whether you had
 3   an independent recollection of the statements in this
 4   statement from Justino Cruz; is that correct?
 5        A.   Yes.
 6        Q.   And while you don't have an independent
 7   recollection, was it your practice to accurately write
 8   down any of the information Cruz would provide to you?
 9        A.   Yes.
10        Q.   Okay.  And is there any reason that you have
11   to believe that any information in here was not
12   accurate?
13        A.   No.
14        Q.   And in the middle of that page, on that very
15   first -- first short line on Page 2, you see Justino
16   Cruz's name, right?  Do you see that?  Page 2 it says
17   Justino Cruz like in the middle of the statement.  Do
18   you see that?
19        A.   Where you wrote his name on the line?
20        Q.   Yes.
21        A.   Okay.
22        Q.   And you kind of answered my question already,
23   but that is his handwriting, correct?
24        A.   Yes.
25        Q.   And if you turn to ASA Defendant's Page 3, at
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

602.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3175

```
 1   the very bottom, it looks like it got cut off in this
 2   copy, but there to start at the very bottom, it says
 3   Justino and then a CR next to it, right?  Do you see
 4   that?
 5        A.   Yeah.  So it looks like he started to write
 6   his name and he miswrote it, so he scratched it out and
 7   then wrote it next to it.
 8        Q.   And it's your understanding that's his
 9   handwriting, correct?
10        A.   Yes.
11        Q.   And then ASA Defendant's Page 4, again, you
12   see Justino Cruz's name on there?
13        A.   Yes.
14        Q.   And that's his handwriting, right?
15        A.   Yes.
16        Q.   Did you tell Cruz what to say in this
17   statement?
18        A.   No.
19        Q.   At any point in time in your presence, did
20   Schak tell Cruz what to say in his statement?
21        A.   No.
22        Q.   And while you were asked a series of questions
23   about your independent recollection as to what Cruz told
24   you, in nothing that you've reviewed here did you put
25   down any statement that Cruz told you he was coerced to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com


KENTUCKIANA
COURT REPORTERS

JCS_MAYSONET 3176

```
1   give this statement, correct?
2           MS. PROSSNITZ:  Objection.  Form.
3           THE WITNESS:  He was not coerced.
4   BY MS. ROMELFANGER:
5       Q.   And while you been asked a series of questions
6   about not having any independent recollection, I think
7   your testimony here today has been that if you had any
8   inclination that Mr. Cruz was mistreated, you would've
9   reported that?
10      A.   Absolutely.
11      Q.   The fact that it wasn't reported in this case
12  means that you think it did not happen; is that correct?
13      A.   Yes.
14      Q.   Couple questions.  You testified today that
15  you knew someone by the name David Wiener; is that
16  correct?
17      A.   Yes.
18      Q.   How well did you know Mr. Wiener?
19      A.   Casual.
20      Q.   Okay.  Did you ever hear any rumors that
21  Mr. Wiener would have his client lie on the stand when
22  on trial before?
23      A.   No.
24      Q.   Did you ever hear any rumors that Mr. Wiener
25  was having Mr. Gonzalez lie in his criminal trial in
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3177

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 398 of 428 PageID #:21390
The Deposition of JOHN PANOZZO, taken on 12/14/2023
170

1    this case?

2        A.    No.

3        Q.    I know you testified a little bit that you

4    recall Mr. Schak.  Do you recall ever dealing with

5    Detective Smitka in this case?

6        A.    I -- I remember the name.

7        Q.    Okay.  At any point in time did Detective

8    Smitka tell you what to have Cruz say in this case?

9        A.    No.

10       Q.    At any point in time in your presence did

11   Mr. Smitka tell Mr. Cruz what to say in this case?

12       A.    No.  Sorry.  I'll let you finish the question.

13       Q.    Do you know if you ever had any dealings in

14   this case with Ernie Halvorsen?

15       A.    I don't think I did.

16       Q.    What about Edward Mingey?  Do you know Edward

17   Mingey?

18           MS. PROSSNITZ:  Objection.  Form.

19           THE WITNESS:  Who is it?

20   BY MS. ROMELFANGER:

21       Q.    Edward Mingey.  Do you know Mr. Mingey?

22       A.    Mingey?

23       Q.    Yeah.

24       A.    That name doesn't sound familiar.  Halvorsen,

25   I -- I had cases with, and I -- I knew him, not fairly

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JCS_MAYSONET 3178

KENTUCKIANA
COURT REPORTERS

```
 1   well, but -- but Mingey, I don't know at all.

 2       Q.   Okay.  What about a Lee Epplen?  Did you ever

 3   recall dealing with a Lee Epplen?

 4       A.   No.  Was he a detective or a cop?

 5       Q.   He was a sergeant.

 6       A.   Sergeant?  No.

 7       Q.   What about a Detective Montilla?

 8       A.   No, not -- doesn't ring a bell.

 9       Q.   What about a Detective Montilla?

10       A.   No.

11       Q.   What about a Detective Gawrys?

12       A.   No.

13       Q.   Detective Paulnitsky?

14       A.   Yes.

15       Q.   Okay.  Did you deal with Detective Paulnitsky

16   in this specific case?

17       A.   No.

18       Q.   Okay.  I'm going to check my notes real quick.

19   That may be all that I have for you.  That's all I have

20   for you.    Oh, you were asked a lot of questions

21   today about suspects being able to read and write and

22   speak English.  Do you recall those questions?

23       A.   Yes.

24       Q.   If Mr. Cruz at any time had indicated to you

25   that he could not speak English, would you have an
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3179

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 400 of 428 PageID #:21392
The Deposition of JOHN PROVOST, taken on 11/16/2023

172

1    obtained an interpreter?

2         MS. PROSSNITZ:  Objection.  Form.

3    BY MS. ROMELFANGER:

4         Q.    And if at any point in time Mr. Cruz indicated

5    to you that he couldn't read or write English, would you

6    have obtained a -- an interpreter?

7         MS. PROSSNITZ:  Objection.  Form.

8         THE WITNESS:  I would've done something.  I

9         don't know if an interpreter would've been

10        appropriate, but if he couldn't read or write

11        English, yes, we would've made some accommodations.

12        And I mean, that certainly would've been a situation

13        where you'd get a court reporter instead of having a

14        handwritten statement.

15        MS. ROMELFANGER:  Okay.  That's all I have.

16        Thank you very much.

17        THE WITNESS:  Thank you.

18        MR. IASPARRO:  Anybody on the Zoom? Austin or

19        Jim, Mr. Daffada, any questions?

20        MR. DAFFADA:  I do not have any questions.

21        MR. IASPARRO:  Okay.

22        MR. RAHE:  No, I just have like one or two.

23        MR. IASPARRO:  Sure.

24                      EXAMINATION

25    BY MR. RAHE:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3180

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 401 of 428 PageID #:21393
The Deposition of JOHN PERKAUS, taken on 11/28/2023

173

```
 1        Q.    This is Austin Rahe.  I represent the City of
 2   Chicago in this case.  When you were interviewing
 3   someone in your capacity as a Felony Review Assistant
 4   State's Attorney and you were writing a handwritten
 5   statement, did you ever write that statement outside of
 6   that person's presence?
 7        A.    No.
 8             MS. PROSSNITZ:  Objection.  Form.
 9             THE WITNESS:  Practice was to write the
10        statement at the table with myself, the detective,
11        and the defendant all at the same time.
12   BY MR. RAHE:
13        Q.    Okay.  Did the police officer ever write the
14   handwritten statement for you?
15             MS. PROSSNITZ:  Objection.  Form.
16             THE WITNESS:  Not in -- in the cases that I
17        had.  Never.
18             MR. RAHE:  Okay.  That's all I have.
19             THE WITNESS:  Okay.
20             MR. RAHE:  Thank you, Mr. Perkaus.
21             MR. IASPARRO:  I don't have any questions.
22        Anybody else?  Anymore?
23                    REDIRECT EXAMINATION
24   BY MS. PROSSNITZ:
25        Q.    I just have a couple.  Giving you the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3181

```
 1    opportunity.  Okay.  So Counsel just asked you about --
 2    a couple questions, if you had heard rumors about David
 3    Wiener.  To clarify, had you heard any rumors about
 4    David Wiener at all?
 5         A.   No.  None.
 6         Q.   Okay.  And Counsel just asked you if you or
 7    Schak told Cruz what to say in his statement and you
 8    testified that neither of you did; is that right?
 9         A.   Yes.
10         Q.   But just to clarify, as you sit here today,
11    you have no independent recollection whatsoever of
12    Justino Cruz's statement?
13              MS. ROMELFANGER:  Object to form.
14              THE WITNESS:  No, I don't have any independent
15         recollection.
16    BY MS. PROSSNITZ:
17         Q.   Okay.  And so as you sit here today, you can't
18    say one way or another what was said to Cruz on the day
19    he gave the statement before you arrived?
20              MR. IASPARRO:  Form.
21              MS. ROMELFANGER:  Misstates testimony.
22              THE WITNESS:  I can state unequivocally that
23         Schak did not tell him what to say.  I can state
24         unequivocally that he never told me that he had been
25         beaten, coerced, not given a chance to go to the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3182

```
 1        bathroom, not given food, water.  Because if any of
 2        those things that occurred, then I immediately
 3        would've stopped the questioning and taken a
 4        different tactic in this case.
 5   BY MS. PROSSNITZ:
 6        Q.   How can you say that unequivocally if you have
 7   no independent recollection?
 8             MR. IASPARRO:  Object to form.
 9             THE WITNESS:  Because I know what I would've
10        done.  Because I know what my practice was.  And if
11        this ever happened, that would have taken this case
12        in a whole different way, which would've been not to
13        take the statement, which would've been to further
14        investigate a situation where someone was coerced.
15        Because under no circumstances would I ever risk
16        doing something as terrible as putting the wrong
17        person in jail or falsifying a statement or doing
18        anything like that because I believe in the rule of
19        law, and I believe that it is the highest calling
20        for a lawyer to be a prosecutor and to do the right
21        thing at all times.
22   BY MS. PROSSNITZ:
23        Q.   Okay.  And you just testified that your
24   practice was to write the -- a witness statement in the
25   room.  Would you ever write it outside the presence of a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

JGS_MAYSONET 3183

```
 1    witness though?
 2                MS. ROMELFANGER:  Asked and answered.
 3                THE WITNESS:  No.
 4    BY MS. PROSSNITZ:
 5         Q.   Okay.  Just talked a little bit about the
 6    worst thing that could happen would be for the wrong guy
 7    to go to jail.  Do wrongful convictions happen?
 8                MR. IASPARRO:  Object to foundation.  Form.
 9                THE WITNESS:  I'm -- yeah, I'm sure they do.
10    BY MS. PROSSNITZ:
11         Q.   Okay.  And --
12         A.   But they didn't here.
13         Q.   Do you think they ever happened because of
14    police misconduct?
15                MR. IASPARRO:  Form.  Foundation.
16                THE WITNESS:  I'm sure they do.
17    BY MS. PROSSNITZ:
18         Q.   Do you think that happened here?
19         A.   No, definitely not.
20                MS. PROSSNITZ:  Okay.  No further questions.
21                MR. IASPARRO:  Okay.  We'll reserve.
22                THE VIDEOGRAPHER:  Orders for the transcript
23      and video?
24                MS. PROSSNITZ:  We'll wait.
25                MR. IASPARRO:  I'll take it.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3184

```
 1        THE REPORTER:  Sure.  Okay.  How would you like
 2   your copy?
 3        MR. IASPARRO:  Mini's fine.
 4        THE REPORTER:  Absolutely.
 5        MR. IASPARRO:  I'll give the signature.  Okay.
 6   Yeah, reserve signature, please.
 7        THE REPORTER:  Absolutely.  Okay.
 8        MR. IASPARRO:  Okay.
 9          (DEPOSITION CONCLUDED AT 2:17 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3185

```
 1              CERTIFICATE OF DIGITAL REPORTER
 2                   STATE OF ILLINOIS
 3
 4   I do hereby certify that the witness in the foregoing
 5   transcript was taken on the date, and at the time and
 6   place set out on the Title page here of by me after
 7   first being duly sworn to testify the truth, the whole
 8   truth, and nothing but the truth; and that the said
 9   matter was recorded digitally by me and then reduced to
10   type written form under my direction, and constitutes a
11   true record of the transcript as taken, all to the best
12   of my skill and ability. I certify that I am not a
13   relative or employee of either counsel, and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.
16
17
18
19
20
21
22   TALIA JACKSON,
23   DIGITAL REPORTER / NOTARY
24   MY COMMISSION EXPIRES ON: 11/28/2027
25   SUBMITTED ON: 12/15/2023
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3186

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 407 of 428 PageID #:21399
The Deposition of JOHN PERKAUS, taken on December 06, 2023

179

**Exhibits**

**Exhibit 1_**
**Perkaus** 74:8,9

**Exhibit 2_**
**Perkaus** 75:15,
16

**Exhibit 3_**
**Perkaus** 79:21
84:15,16

**Exhibit 4_**
**Perkaus** 89:6
166:19

**Exhibit 5_**
**Perkaus**
129:25 130:1

**Exhibit 6_**
**Perkaus** 154:4,
5

**Exhibit 7_**
**Perkaus**
159:23,24

**0**

**0007** 74:15

**002** 105:15

**003** 106:13

**0172308**
160:13

**0172312**
160:13

**1**

**1** 74:8,9 155:19,
23 156:1,7
167:1

**100** 68:7 99:8,
23 100:14
104:13 138:17,
23 147:22
153:3

**10:04** 7:6

**11:24** 73:4

**11:30** 91:9
131:10 155:7,
10,18

**11:42** 73:7

**12** 32:13 154:17

**12-hour** 17:15
65:17

**13** 74:16

**1302** 91:11

**13th** 28:8

**14** 74:16

**15** 160:4

**18** 14:21

**1986** 12:17,24
14:8

**1990** 14:24
17:10 43:14
57:8,21 60:16
63:16,19 64:11,
13,16 65:6
73:12 77:7,9
78:18 79:14,16
80:10 88:16
89:25 90:10
91:9,21 130:10
131:9 132:13
150:12

**1995** 15:20

**1999** 15:21

**1:00** 74:20
78:22,25 86:16,
17 90:11

**1:22-CV-06496**
7:12

**1:30** 78:25 85:3
155:11

**1:31** 153:23

**1:48** 154:1

**2**

**2** 75:15,16
131:2 156:1
160:6 167:15,
16

**20** 42:4 96:7

**2016** 89:14
94:6 96:7
126:25

**2017** 127:3,7
145:7 160:4

**2018** 127:12,
15,20 128:17

**2023** 7:5

**2032** 112:14

**20s** 81:2

**23rd** 96:9

**24** 22:22 57:14
63:16,19 64:15
73:12 78:18
79:16 80:10
89:25 91:9,21
130:10 131:9

**24th** 57:9,21

**25** 59:4 79:14
90:10

**26th** 17:1 28:8

**2:00** 78:23
86:18 130:12,
24 149:8

**2:17** 177:9

**2:45** 89:25

**3**

**3** 75:22 79:13,
21 84:16 160:6,
23 167:25

**30** 73:1 110:6

**33** 10:18 55:6
63:3 64:8

**3428** 90:10
155:12

**4**

**4** 89:5,6 166:19
167:1 168:11

**5**

**5** 28:20 57:12,
22,25 58:5,10,
14,21 59:8
60:9,14,19
63:15,19 64:15
65:6 73:13,15,
18,23 74:2,4,
19,22 75:5,22,
25 76:1,14
80:11 82:25
90:1 123:5
129:25 130:1
131:1 135:18
149:14 150:9
156:2

**5-24** 155:11

**5-24-90** 155:7,
18

**5-25-90** 155:12

**50** 149:18

**5:00** 85:1,3
149:8,11

**6**

**6** 17:16,17
109:18 137:2
154:4,5

**66** 111:11

**6th** 7:5

**7**

**7** 159:23,24

**8**

**87** 14:9,10

**9**

**92-CR-10146-**
**01** 160:10

**96** 15:20

**99** 70:3,8

**A**

**a.m.** 7:6 17:16,
17 73:7 90:11
155:11

**ability** 10:4,11,
16

**absolutely**
120:7 122:4,6
124:15 169:10
177:4,7

**abused** 152:25
153:5,10,13,16

**accept** 161:16

**accommodati**
**ons** 172:11

**accuracy**
108:21 125:3

**accurate** 10:4,
11,16 50:4,13,
24,25 51:7,13
100:14 117:25
167:12

**accurately**
10:1 125:9
167:7

**acknowledge**
126:1

**acknowledged**
124:21 125:25

**acted** 138:3
156:4

**acting** 107:19

**action** 164:14

**actor** 41:11,16

**actual** 40:25

**add** 31:7
134:14

**additional**
18:13 54:1
155:2

**address**
132:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3187

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 408 of 428 PageID #:21400
The Deposition of JOHN PEKUSIC, taken on December 06, 2023

180

administration 12:22

admitted 12:23 13:2,7

advanced 114:11

adversarial 82:15

advised 90:17 160:24

advising 90:22

affect 10:3,10, 13,15 151:11

affecting 10:7

affirm 8:12

afraid 81:15 147:1

afternoon 74:20

agree 72:14

agreed 50:23 76:16 90:21 127:6

agreement 25:14

ahead 7:20 19:16 23:17 92:3 113:15 152:15

air 150:21

alert 38:16,21

Alfredo 7:8,18, 25 63:11 64:4, 20 65:4,8 68:17 69:11,24 91:10, 22 92:2,5,16, 19,25 93:1 100:19,20,23, 24,25 101:6,11, 16 113:19 114:2,15 116:11,21,23 117:10 119:14 120:10 127:23 129:13 138:3, 15 139:1 140:20 145:1

152:17,21,22 153:4,16 155:14,20,25 156:1,6,9,18 157:2,4,5,6,18 160:21 162:18

Alfredo's 68:17 130:5 138:10

alive 55:19,20

alleged 64:5

alley 93:3 101:4 135:19, 21 136:1 138:3 155:25

Allison 7:19,21 8:2 16:10,15

allowed 31:21 34:15,17 44:20 87:8 99:7 102:6,11

aloud 109:14, 22 125:4 126:13

Alpha 46:23

ameliorate 151:25

Amendment 161:2

Annie 7:17,22 8:19 25:11

answers 62:20 79:4 85:23 129:3 131:8

anticipated 37:21

anymore 146:10 173:22

AO 149:10

apartment 65:22

Apologies 156:14

apologize 7:24

appeals 61:24

appears 157:8

Appellate 14:12,17

applies 25:15

appreciated 46:25

approach 107:7

approached 100:23 101:4

approval 26:2 112:2 116:10

approve 18:5 25:3

approved 40:18 68:19 69:3 72:8,10 89:2 110:22 111:3

approving 112:21

approximately 74:6 155:18

area 20:21 23:19 28:20 57:7,10,12,18, 22,25 58:5,10, 14,21 59:8,19 60:9,14,19 63:15,19 64:15 65:6 73:13,15, 18,23 74:2,4, 18,22 75:5 76:14 80:11 82:25 90:1 93:8,15 131:1 149:14 150:9, 19

areas 17:18,22 21:5 57:4 155:2

armed 41:14

arrange 111:11

arrest 140:15, 18 158:2

arrested 44:17 140:19,22

149:6 158:11

arresting 31:5 140:7 141:20 149:10

arrive 74:18

arrived 30:3 31:12 74:21 75:1,5 76:12 78:22 82:5,25 83:15 84:1,12 85:11 99:18,19 162:25 174:19

arson 21:3

art 88:25 145:23

ASA 19:21 20:23 37:24 60:20,25 61:18 77:10 105:15 118:18 127:1,4, 7 139:13 159:10 162:22 166:25 167:25 168:11

ASA's 47:24 57:4

ASAS 59:15 65:13 66:8 116:22

ascertain 24:21

aspects 16:19, 23 22:2

assertive 46:20

assessment 18:4,8,19 30:4, 7 32:1 33:1,10 41:8 99:2,3,4 118:25

asset 161:12

assets 161:13 162:7

assigned 17:13,18,21 20:19 23:18,19, 20,21,22 24:1 57:4,7,10,12,

18,22

assignment 17:9

assist 22:24

assistance 134:24

assistant 14:6 22:19 23:2,4 25:6,21 26:1 35:21 43:15 63:9 90:19 91:1 126:22,24 173:3

assume 9:22 23:13 24:14 74:23

assuming 67:24,25 73:16 85:23 144:7

assumptions 68:2,6

astronomical 149:24

attach 128:11

attached 127:17

attack 44:8

attacking 100:13

attention 131:4,9

attorney 14:6 15:14 16:9,16 22:5,19 23:3,5 25:7,21 26:2 27:4 35:21 43:16 44:9 45:1,18 58:11 71:25 85:17 90:19,20 91:1 93:17 94:18 99:9,22 102:5 104:11 115:10 120:15 121:10 122:1 126:23, 25 129:6 160:18 173:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3188

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 409 of 428 PageID #:21401
The Deposition of JOHN PEREZ, taken on December 409, of 2023
181

**attorney's**
11:16 14:3,7
15:10,13 16:15
17:9 61:10 62:2
94:7 111:20
145:8

**attorneys**
11:18 19:14
22:9 56:17 72:4
124:3,4 135:8
149:19

**audible** 9:12

**August** 17:9
57:7,9,14,21
63:15,19 64:11,
13,15 65:6
73:12 77:9
78:18 79:16
80:10 89:25
130:10

**Austin** 8:7
172:18 173:1

**auto** 155:8

**automatic**
92:12,14,18

**Availability**
41:9

**Avenue** 90:10
100:24 155:12,
13,25

**average** 32:7

**avoid** 34:6

**aware** 43:14
70:15,19,24
71:2,5,8,11,14,
18,23 97:8,22
113:19 114:2
118:5 132:10,
17 140:19
141:9 145:1
152:24 153:4
159:9

————————
**B**
————————

**back** 17:8
39:22 41:5,19
48:2,4 55:9
62:8 73:6 84:14

87:13 88:14
89:14 96:19
100:15 106:8,9
114:10 119:12
122:22 125:11
132:23 137:7,8
138:12 140:9,
11 142:12
144:13 146:15
148:10 153:25
159:9

**background**
12:11

**Backing**
107:21

**backs** 101:2

**backseat**
156:7

**bad** 55:22
56:21 150:16,
24 151:2,5
155:14 165:17

**balanced** 17:7

**banking** 16:3

**bar** 12:23 13:7
48:4,6

**Barnes** 7:3

**base** 62:20
112:20 129:2

**based** 24:21,24
25:2 27:11
32:2,19 41:8
74:19 86:22
96:24 98:7
99:10,20
130:21 133:25
144:10,11
152:7

**basic** 85:19

**basically**
20:11 111:7
150:4 155:9

**basing** 26:11
100:2

**basis** 94:14
115:1

**Bates** 74:15

105:15 106:13
111:21 112:11
160:11

**bathroom**
31:22 53:3
85:20 99:7
102:7,12 175:1

**beat** 139:20
149:3,5

**beaten** 38:11
81:24 83:18
98:5,17 99:6
102:19 144:9
148:4 151:11,
22 174:25

**beating** 38:10
143:18 149:14

**beatings**
139:18

**bed** 32:16

**beeper** 73:16

**begin** 8:16
35:15 52:23
135:20

**beginning**
37:6

**behalf** 7:15,17,
25 8:3,5,7 17:2
146:1

**believed**
124:14

**bell** 171:8

**Bella** 11:6 65:2
132:10

**Bella's** 70:9

**belt** 92:16

**benefit** 40:17

**betting** 114:12

**big** 22:11 81:11
147:6

**bit** 22:20 25:25
28:5 44:1 93:13
97:20 98:15
107:21 165:4
170:3 176:5

**bizarre** 138:18

**Black** 100:24
101:1

**blank** 156:3

**blanks** 111:8

**block** 110:9

**blood** 148:9

**blue** 131:18

**book** 118:3,6

**borderline**
115:14

**Borowitz** 7:15
60:22 120:9
122:10

**Borowitz's**
61:13

**boss** 35:12

**bothering**
66:10

**bottom** 79:18
84:19,21
105:14 131:8
133:23 134:4
168:1,2

**Boutique**
15:24

**boy** 99:13

**boyfriend**
132:22

**brakes** 84:9

**break** 11:25
23:6 24:4 53:12
72:24 153:19

**breaks** 52:15,
25 53:17

**breath** 86:4

**briefly** 61:23

**bring** 20:22
55:2,6 134:13,
15

**broken** 146:8

**brother** 120:19
153:6

**brother's**
120:19

**brothers** 62:25
63:12 107:20
114:18 116:4,8
139:25 142:25
143:7

**brothers'**
117:15 153:1

**brought**
138:25 140:22
141:6

**bruised** 81:24

**bruises** 38:10

**BS** 39:20

**bucks** 132:22

**buddy** 103:5

**Burge** 150:19

**business**
12:22 15:24
16:10,21 43:9

**buy** 115:22

————————
**C**
————————

**calculus** 37:12

**California** 28:9

**call** 22:22
23:11,14,23
28:7,10 34:2
36:16 52:4
65:18 66:7
73:16,21 96:11
100:4 127:4
145:4,25
165:15

**called** 18:16,
20,23 19:1
24:15 28:5
73:13,15,18
111:10 119:20
127:1

**calling** 65:21
66:4 122:17
175:19

**calls** 17:18
83:6 121:19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3189

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 410 of 428 PageID #:21402
The Deposition of JOHN PROANO, taken on December 18, 2023

182

132:6 133:1,12
139:5 146:18
151:13

**camaraderie**
48:5

**candy** 145:11

**canned** 45:16

**capacity** 173:3

**car** 24:3 92:24
100:20 101:1,2,
6,7,11 131:18
136:6 137:8
138:19 155:24
156:3,6 157:5

**carbon** 154:18

**card** 86:9

**care** 46:3
145:10

**career** 118:17

**carried** 86:9

**cars** 20:17
73:17

**case** 7:11 9:10
18:2,5,24 19:11
20:22 21:9,14,
16,17 22:2,4,6,
11 23:18,22,25
24:6,9,12,13
30:8,11,14,19
39:6,18 40:17
41:10 42:2
45:23 48:15
53:12,24 57:2
58:2 59:5,12,
24,25 62:15,21
63:7 64:11
65:14 67:21
68:1,17 69:1,11
70:13,22,25
71:3,6,9,12,16
75:11,20 94:3,
8,10,15 95:2,
14,17 96:1,3,
10,15,18,21
97:9,18,19,23
98:4,18 100:2,8
103:6 111:9,12,
20 112:23
116:21 117:11

119:20 122:19
124:12 127:1,3,
24 128:4,17
129:1 130:6
132:24 135:4
139:21 140:21
142:9,20
143:10 146:2,
16,22 147:4,18,
22,24 148:14
149:10 151:8
152:2,17 155:1,
3,10 156:24
160:17,22
161:16,19
162:3 163:9,13
164:4 165:5,18
169:11 170:1,5,
8,11,14 171:16
173:2 175:4,11

**cases** 9:6,7
15:25 18:15,19
19:3,14 20:19
21:5 22:9,25
23:11 42:7
56:19,25 57:24
58:4 60:3 62:17
103:10,12
122:20 128:3
145:25 147:1,5,
7 149:17
154:20 161:6
165:7 170:25
173:16

**casings** 165:1

**Casual** 169:19

**caught** 106:1

**caused** 38:15
96:15

**CCSAO-
002031** 112:12

**cell** 24:3 65:21
149:21

**center** 149:22

**Central** 7:6

**certificate**
94:11 145:24

**certificates**
94:24 96:22,24
145:6,10

**chained** 81:8

**chance** 112:9
174:25

**chances**
149:23

**change** 104:24
105:3,22 133:6
145:18 146:4
147:24 149:4
151:18 161:5,9,
18,23 162:11

**changed** 105:5
132:18 133:5

**charge** 26:11
46:25 47:3
68:17,19 69:1,
3,5,11

**charged** 65:9
72:22 75:12
87:2 113:5
114:6,7,12
129:23 135:7
155:15,20
156:8,19
157:19

**charges** 18:6,
19 19:4,20,24
20:3 25:3 26:2,
5 27:20 40:18
44:18 72:8,10
88:23 89:1,2
107:19 110:22
111:2,3 112:2,
21 116:11

**charging**
37:12 133:25

**check** 66:14
111:25 171:18

**Chicago** 8:8
23:1 103:24
166:16 173:2

**children** 16:12
78:13

**chose** 87:24

**Chris** 91:10,22
92:25 100:18,
19,20,23,25
101:5,10,15
155:21,25

156:5,10,21
157:1,4,5,7,19

**Christopher**
64:25 70:6

**church** 140:18

**cigarette**
31:21 53:3

**circle** 142:12

**circling** 62:8
146:15

**circumstance**
34:7 45:2

**circumstance
s** 24:18,20 25:1
26:14 27:25
30:6 31:4
32:16,20 34:4
37:16 38:20,23,
25 39:23 40:10
45:21 46:21,24
51:20 53:11
66:18 68:5,11
98:10 134:22
145:21 175:15

**city** 8:8 17:18
23:1 59:20
103:24 173:1

**civil** 9:7 34:1
58:2 75:20
97:19 149:20

**clarify** 9:19,20
45:6 59:22
73:11 117:14
119:22 128:16
133:9 144:16
152:6 174:3,10

**clear** 19:7
29:17 38:1
82:6,12 122:20
157:23 164:3

**Clemente** 91:7

**clerked** 13:19

**client** 169:21

**closer** 55:15

**co-** 67:25

**Co-defendant**
127:12

**co-defendants**
54:14,22 67:24
119:14,18,19,
24 120:5,6
129:23 139:24
151:10

**co-worker**
60:4 62:10

**co-workers**
62:11 66:9

**codes** 57:10

**coerced** 83:25
84:5,8 102:7,
19,22 103:2,15
168:25 169:3
174:25 175:14

**coercing**
77:24 118:13

**coercion**
70:19 72:9

**cohesive**
164:4

**cold** 148:9

**collaborate**
164:19

**collaborative**
35:13 162:23

**College** 12:20

**collegial** 48:8

**column** 155:5

**comfortable**
31:22 36:8,19
68:3

**comment** 48:9

**commit**
101:23,24

**committed**
18:7 96:23
119:23 138:16

**committing**
72:11

**common**
138:21 139:12

**community**
16:10,22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3190

**complete** 9:15, 16 110:23

**completed** 110:24

**completing** 111:4

**complexity** 42:2

**concern** 44:19 85:4

**CONCLUDED** 177:9

**condition** 99:3,22 118:25

**conditions** 10:3,7

**conduct** 70:17

**confess** 143:19

**confessed** 113:11 114:3, 15,20

**confessing** 88:5 123:23 152:25 153:6

**confession** 67:5,16,19 140:13

**confessions** 67:4,14 77:24 139:11 140:12

**confirm** 27:16 40:15 93:21 94:3 109:22 125:4,9 126:13 156:16

**confirmed** 123:12

**confirming** 126:19

**conflicting** 135:6

**conjunction** 130:6

**connection** 127:13

**conscience** 122:16

**consideration s** 41:12

**considered** 62:10

**consist** 25:23

**consistency** 66:15

**consistent** 54:21 123:25 124:7,9 125:24

**conspiracy** 149:22

**conspirators** 68:1

**conspire** 152:16

**conspired** 149:21

**constitution** 152:18

**contact** 23:8 33:7 97:3

**contacted** 28:6 95:19 111:1 147:15 160:18

**contacts** 16:10

**contained** 80:6

**contemporane ously** 49:5 51:8

**context** 44:2 162:2,5

**continuing** 18:14

**continuous** 52:11

**contrary** 162:8

**controlling** 149:23

**conversation** 11:9 28:22 35:16,24 36:15

127:9

**conversations** 28:19 68:21 95:4 129:6

**convicted** 96:19 145:12

**conviction** 9:10 98:13 147:13 148:8

**convictions** 176:7

**convinced** 94:7,8,15

**Cook** 11:15 13:21 14:6 15:9,12 16:14 17:8 35:20 111:19

**cooperate** 81:9

**cooperating** 81:6

**cooperative** 83:20

**coordination** 114:9

**cop** 66:10 171:4

**copies** 154:18

**cops** 36:5 46:21 66:4 87:8 100:8 150:16, 25 151:3

**copy** 111:7 127:17 128:7, 11 154:11 157:4 168:2 177:2

**corner** 115:13 155:13

**corporation** 16:4

**correct** 57:16 85:23 90:12 104:25 105:2 106:8 108:7,9 133:6 153:2

163:2 167:4,23 168:9 169:1,12, 16

**corrected** 105:23 106:18

**correction** 106:12

**corrections** 49:8 50:9 108:10,16 109:6,11 125:7, 8

**correctness** 165:6

**cost** 41:12

**could've** 53:22 147:4

**Counsel** 7:12 97:1 111:17 115:10 160:25 167:2 174:1,6

**County** 11:15 13:22 14:6 15:9,12 16:14 17:8 35:21 111:19

**couple** 9:8 10:24 14:18 61:23 169:14 173:25 174:2

**court** 7:4,10 8:10 14:13,14, 20 27:2 41:4,9, 14,17 43:5,8,11 44:9 47:11 48:7,10 49:14 51:7 52:1 54:6 61:4 66:21 81:12 87:25 88:1,11 130:22, 25 162:9 172:13

**courtroom** 135:3

**cover** 59:20

**coverup** 98:13

**coworker** 121:16

**coworkers** 62:18

**CR** 168:3

**crappiest** 23:6

**crappy** 24:3

**credibility** 99:3,10

**credible** 134:22

**credit** 16:1

**crime** 18:6 29:6,24 30:5 54:1 64:1,5,18 71:12 93:19 101:23,25 113:20 114:3, 20 131:24 143:22 154:24 155:10

**crimes** 15:15 16:20 20:8,14, 16 22:25 59:21 145:12

**criminal** 16:6,8 117:11 127:1,3 130:6 162:2,5 169:25

**cross** 106:12

**cross-** 104:11

**cross- examination** 117:6 166:13

**cross- examined** 117:4

**crossed** 105:16 106:15, 23 107:5,9,10

**Cruz** 62:25 63:18 65:5 69:17 70:16 72:4,10,16 75:5 76:4,12,16,18 78:19 79:2,9,25 80:9,22 81:24 82:24 83:16 84:24 85:12 86:14,19 87:4,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3191

14 90:14,18,22
92:9,17 93:22
97:18 98:17
99:12,13,17
103:14 109:14,
22 110:11,19
111:2 112:3,22
113:11,20
116:14 118:11,
15 120:4 123:9,
11,12,13,22,25
124:1,3,7,9,17,
18,20,24 125:1,
2,4,6,8,10,12,
13,25 126:12,
16 127:14,16
129:15,24
130:20 131:22
132:4 138:2,25
140:20 141:23
144:5,18 146:1
147:9,13,25
149:1,3,5
152:24 153:10,
13 154:12,21
155:19 159:7
161:10 167:4,8,
17 168:16,20,
23,25 169:8
170:8,11
171:24 172:4
174:7,18

**Cruz's** 70:22,
25 71:3,6,9,12,
16 76:24 98:4
117:16 119:24
131:22 138:2
151:10 152:7
157:11 162:16
167:16 168:12
174:12

**current** 11:18,
20

**cursive** 110:5,
7,8,9

**custody** 24:15,
17 25:4,10 30:6
31:9 44:17 64:2
76:16 84:25
85:10

**cut** 168:1

**cycle** 145:14

---

## D

**D1** 156:4

**Daffada** 8:5
147:3 151:15
165:23 172:19,
20

**damn** 122:18

**date** 79:15
130:6,9 155:7

**dated** 79:14,15
158:12 159:10,
12

**David** 115:10
117:3 119:13,
15 169:15
174:2,4

**day** 7:5 17:16
22:23 57:12,19
58:1 65:17
174:18

**days** 22:5,23
31:20 57:10,11
93:20 160:25

**deal** 114:22,24
115:19 147:7
171:15

**dealers** 114:23
116:4

**dealing** 121:16
170:4 171:3

**dealings**
150:17,23,24
151:2,5 170:13

**deals** 159:21

**dealt** 121:16

**death** 138:12

**December** 7:5
96:7 126:25

**decide** 16:8

**decided** 94:10,
21 96:3 97:6
161:15

**decision**
18:10,11 38:2

68:16,25
120:16 133:25
161:18

**decisions**
22:25 37:12
142:20

**deem** 18:6

**deemed** 18:11

**defend** 97:1

**defendant** 8:3,
6 25:15 30:6
31:9,15,17
32:22 33:7
35:10 38:12
49:10 51:14
58:2 81:7,22
96:25 97:8
100:1 109:1,3
123:6,8,10,14,
19,22,24 124:1,
4,7,17,18,19,23
125:1,7,9,10
126:22 127:2,4,
5,6,12,15,23
128:5,19
146:17 155:3,
19,22 156:7
164:24 173:11

**Defendant's**
109:23 125:5
126:14 127:14
167:25 168:11

**defendants**
8:3 18:3 21:15
25:16 37:17
38:11 65:12,24
66:14 105:15
119:14 126:24
128:3 129:1
145:9 146:10
155:2 167:1

**defendants'**
66:14 67:17

**defenders**
48:3

**defense** 16:9
48:6 72:4
104:11 135:8,
11

**defenses**
119:21

**definition**
75:23

**degree** 16:21

**depend** 31:4
32:15 40:9 42:1
54:4,7

**depended**
20:7 24:11
53:10

**dependent**
113:6

**depending**
22:1 23:10
38:20,22 40:23
42:7 46:21
51:21 57:19
68:5

**depends** 68:10
134:21 159:3

**deposed** 9:2,9

**deposition** 7:7
10:21 11:13
142:4 177:9

**deprive** 152:17

**describe** 155:6

**detailed** 62:16

**detective**
23:23 28:20
29:13,20,25
30:4,10 31:3,10
32:17 49:10
51:3,10 55:11,
16 56:9,14,24
58:15,16 59:5
60:5 62:9 70:13
73:24 74:23
76:22 77:7,10,
15,19 79:16,17
90:3 100:4
109:2 123:9,23
140:21 161:1
163:1,12
166:17 170:5,7
171:4,7,9,11,
13,15 173:10

**detectives**

**defenses**
119:21

24:14 32:5
55:15 60:9,14,
18 62:11,14
74:25 77:24
78:2,6,12,16
80:15,16 89:2
94:2 117:19
118:6 134:13
149:16,19
161:1,25 162:2
166:16

**determination**
26:10 27:19
32:2 112:20

**determine**
24:17 31:18
40:12,20 41:7
134:1,5

**determined**
140:4

**determines**
139:24

**diametrically**
164:1

**died** 116:6

**difference**
45:24 132:5

**differentiated**
20:1

**difficult** 16:19,
23,24 45:20

**Difranco** 7:15
61:15 120:19
122:4 127:13,
15,18,21
128:19

**dinosaur**
114:10

**direct** 8:17
79:6 134:13

**directly** 101:14

**disappeared**
136:16

**disappointing**
97:7

**disclose**
135:14



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

JGS_MAYSONET 3192

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 413 of 428 PageID #:21405
The Deposition of JOHN PIXIUS, taken on December 13, 2023

185

discuss 18:9

discussing 18:25

discussion 11:8 32:4

discussions 34:8

disheveled 82:20 83:19 98:6

dismissed 94:23,24

dispatched 17:22 23:9

dispatcher 23:23 28:7,17 73:19

dispatchers 73:20

disposition 19:11 117:10

dispute 165:6

distinction 110:9

District 7:10

division 7:11 14:12,15,17,20 15:5,7 58:15,16 60:2 61:21,22 62:13 104:9

document 74:5 89:12,20, 22 130:17,20 154:8 157:9 160:7

documented 153:7

documents 10:25 11:4 62:22 73:10 75:8 79:1 86:22 113:10 129:4,7

dollars 148:17

domestic 24:18

door 58:19

double 64:3 87:3 88:24 96:20,23 107:18,20 111:10 123:24 124:24 138:11, 17

draw 131:4,9

drink 53:3 85:21 99:8 102:6,11

drinks 55:11

drive 23:5

drived 93:2

driver 93:1 157:1

driving 92:25 137:15 157:7

drop 97:6 137:23

dropped 96:16,21

drove 101:8 155:24 156:8

drug 14:14 15:5 114:23 115:19 116:4

drugs 37:18 103:13 119:6 158:15,24

dude 123:3 147:3

due 165:7

duties 17:14

duty 28:3 120:25 121:5, 12,18,21,25 135:14 149:7

—————

E

e-mail 89:9 112:16 127:19

e-mails 127:13,20

E-R-K-A-U-S 9:1

earlier 62:7 87:19 99:25 123:25 124:8,9 129:13 162:21 165:4

early 81:2

easier 107:13 114:25

east 93:13

Eastern 7:11

easy 17:3 156:12

eat 102:6,11

Edward 170:16,21

effect 10:17

effectuate 150:3

elected 13:21

elements 164:14

elicit 39:6

email 95:3 96:2 127:8,15 166:22

empirically 68:7

employees 149:20

empty 136:21

encountered 37:17

end 19:11 50:19 104:17, 22 106:7 135:24

ends 164:4

enforcement 20:22 143:10

engaged 70:16

English 36:8, 10,19,23 52:1,4

86:2,5 91:18 109:23 123:10, 14,17,18 125:5 126:14,16,19 171:22,25 172:5,11

entail 111:5

entire 118:17

entitlement 15:16

environment 17:7

Epplen 171:2,3

Ernie 55:17 100:6 170:14

et al 7:9

evening 91:9 155:11

events 94:25 97:2

eventually 78:18

everybody's 148:11

everything's 30:19 108:9

evidence 24:16,24 25:2 26:13 27:24 40:16 41:19 83:7 94:16 95:23 97:12 115:2,3,6,7,8 116:3,7 126:4 132:15 134:22 135:11 141:1 152:20 158:5, 13,17,23 159:4 164:25

evidenced 124:22

evidentiary 147:19

EXAMINATIO N 8:17 172:24 173:23

examining 104:12

exceptions 20:10 21:3

exchange 127:20

exchanged 127:13

exclude 115:9

exculpatory 72:16 135:11 152:20 158:5, 19,25

exhibit 74:8,9 75:15,16 79:12, 21 84:14,15 89:5,6 129:25 130:1 154:4,5 159:22,23,24 166:19

exist 150:16

exists 148:22

exonerated 145:2,4,17,20 146:5

exoneration 145:24

exonerations 144:21 165:5,7, 21

expected 118:2 138:7,17

experience 81:5 99:11 138:21 139:12

experiences 77:6

experiencing 118:21

expert 99:21

explain 22:21 87:20 154:13, 16

explanation 126:6



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3193

**extent** 97:11
140:25

**extraordinary**
94:20

**eyes** 46:1
155:14

**eyesight**
157:23

**eyewitnesses**
24:23

**F**

**fabrication**
103:20 144:10

**face** 143:6

**faced** 162:2

**facet** 62:14

**facilitate** 98:13

**facility** 58:16

**fact** 10:18
27:10 85:2
94:17 98:8
109:2 126:19
134:18 138:25
145:17 146:5
148:14 169:11

**factor** 44:12
82:4

**factors** 98:7
159:4

**facts** 71:9 83:7
112:23 133:18
164:1

**fair** 9:16 22:15
33:19 49:4
81:19 82:17
131:21 138:1
146:15

**fairly** 16:5
170:25

**false** 67:5,15,
16,19

**falsely** 152:25
153:5

**falsifying**
175:17

**familiar** 93:7
170:24

**families** 46:1

**family** 17:6
46:4 71:15
143:7 161:13

**fantasy** 144:11

**Farley** 15:22

**fatal** 90:8

**fault** 148:12

**favor** 141:12

**Fe** 12:20

**fear** 161:14

**fed** 71:8 85:21

**federal** 13:4
15:16 16:17

**feel** 47:1

**felony** 11:1
14:13,14,22
15:7 17:11,14
18:1,5,16
19:13,20,21
20:14,20 21:21,
25 22:16,19,21,
22 23:2,4,23
25:6,21 26:1,2,
5,11 27:19
37:24 38:24
39:1 43:15 57:3
58:6,10 59:14
60:2,20 61:1,6,
8,22 62:13 63:8
65:13,16 66:9
73:17 75:9 77:9
88:23,25 104:8
110:22,23
111:4,13 112:2,
12,21 113:3,7
116:11 118:17
129:12,21
139:12 154:11,
16,23 159:9
162:22 173:3

**fence** 136:23,
24

**fiction** 119:1

**figure** 37:11
134:8

**file** 79:25 80:3
111:20 145:25

**filed** 141:23

**filing** 140:17
146:1

**fill** 111:7
154:20

**filled** 154:14
156:15

**final** 152:13

**financial** 15:15
16:20

**find** 100:9
133:23 134:15

**fine** 177:3

**fingerprints**
148:15

**finish** 12:1
52:21,24
170:12

**finished** 12:19
66:2 100:16
125:1

**finishing** 46:11

**firm** 11:19,20
96:25 127:23

**firmly** 98:11

**firms** 13:19

**first-degree**
111:2

**flags** 68:8

**flip** 106:14

**flipping** 125:11

**floor** 28:8
58:17 80:11

**focus** 23:13

**focused** 141:8

**folder** 11:1
18:1 75:9
110:24 111:4,6,

14 113:3,8
129:12,22
154:11,17,24

**folders** 65:15,
16

**follow-up**
19:3,8,10 122:3
127:8

**food** 31:19 99:7
175:1

**foot** 103:11

**force** 48:18

**Ford** 23:6

**forgets** 146:9

**forgetting**
66:18

**form** 19:6,16
20:6,24 21:10,
18 25:8 26:6,23
27:7,21 28:24
29:12 30:12
31:13 32:11
33:15,23 34:12,
16,23 35:8
38:17 40:8
41:25 42:13
43:18 52:6,12
53:8,20 54:3,
16,23 56:2
58:22 60:11
65:25 66:20
67:7,20 68:9
69:6,19 71:20
72:5,17 76:5,6,
13 77:1,13,17,
21 78:4,9 84:2
85:5 87:22 88:7
93:23 94:4
103:19 108:22
109:8 118:8
119:9 120:1
121:6,19 126:7
131:25 132:6,
14 133:1,12,20
134:9,20 138:5
139:2,14 140:1,
24 141:17
142:16 143:1,
11 144:2 145:3,
19 146:6,18
150:13 151:1,

13 152:9
154:15,18,19
155:2 157:12
158:3,7,16
159:1,11 161:7,
21 162:4,13
163:6,15 164:9,
20,21 165:9,22,
23 169:2
170:18 172:2,7
173:8,15
174:13,20
175:8 176:8,15

**formal** 125:15

**forward** 30:8
32:3 85:24
103:12 119:4,5

**fought** 48:7

**found** 115:11
117:12 127:22
134:17

**foundation**
33:23 34:16
63:2 67:8,20
68:9 71:22
72:17 96:5
113:14,23
139:14 140:24
158:7 162:4
176:8,15

**Foxx** 94:9,18,
19,20 95:13,15,
16 96:21 145:5,
8

**Foxx's** 95:7

**Frank** 7:15
61:15 120:18,
20 122:4

**Frankie** 127:22

**fraternity**
120:19

**fraud** 15:15

**friction** 82:14

**friend** 59:3

**friendly** 60:3

**friends** 60:5
120:18 128:2

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3194

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 415 of 428 PageID #:21407
The Deposition of JOHN PANOZZO, taken on December 18, 2023
187

**Fro** 131:19

**front** 35:23
49:5 60:18
99:12 100:25
108:7 116:16
166:19

**fully** 147:22

**funded** 16:18

---

**G**

**gang** 16:19
101:21 115:16
116:8 139:11

**gang-related**
24:19

**gangs** 21:4
115:18

**gave** 18:25
51:25 82:5
94:10 98:8
102:9 112:24
114:7 123:22
128:10 133:3
174:19

**Gawrys** 171:11

**Gene's** 48:4

**general** 20:9
21:5 30:25
31:25 93:19
129:4

**General's**
15:14 16:17

**generally**
17:14 45:1
58:15 133:17

**give** 8:13 9:12
37:9 42:14 75:9
76:17 82:15
86:24 87:21
90:21 102:8
103:16 117:1
122:25 131:19
163:7 169:1
177:5

**giving** 45:7
68:3 81:22
83:25 86:17

104:2,6 173:25

**glad** 146:11

**glass** 156:13

**glorifies** 146:9

**God** 100:6
122:15

**Gonzalez** 7:8,
18 8:1 63:11
64:21 65:4,8
69:24 74:13
89:17,18 91:10,
22 92:2,6 95:24
100:19 101:11
113:4,19 114:2,
15 115:6,11
116:11 127:24
128:24 129:14
140:20 142:9
145:2 152:17,
21,23 153:5,16
155:15,20
156:10,18
157:18 160:12,
21 169:25

**Gonzalez's**
64:4 68:17
69:11 115:25
116:17,21,23
117:11 119:14
120:11 128:17
162:18

**good** 7:14
8:19,22 16:20,
21 48:5 49:14
51:19 55:22
56:7,8 61:11,14
62:3,6 115:10
120:18 143:4,
12,13 148:20
151:17 165:17

**Goossens**
64:25 70:6

**graduate**
12:16 91:7

**graduated**
14:2

**grand** 111:11
150:3

**grant** 16:17

**granted** 94:24
143:5

**grants** 96:22

**great** 9:18 23:9
95:6 112:17
153:20

**groundwork**
47:12

**group** 48:8

**guess** 15:6
106:20 125:16
133:17 165:6

**guessing**
114:6 119:15
129:19 141:25
142:6,8,10

**Guevara** 7:9
8:4,6 55:11,14,
24 56:21,24
77:15 83:2,4,10
97:15,17,22
98:3,18 99:17
103:22 140:21
141:6,18
143:25 144:6,
19 146:22,24
149:3,7,9,22
150:12 151:6,8,
11 152:3 153:9,
11 158:1,14,24
159:10,17,19
166:17

**Guevara's**
56:9 141:12
144:22 148:12,
14 151:16
165:7

**guilty** 115:11,
12 117:12
142:10 144:8
148:3

**gun** 91:12 92:2,
5,12 100:25
101:6 132:12
136:7 137:17,
18 138:4,15
139:4 156:1,6
157:2

**gunshot** 165:1

**guy** 24:24
25:10 32:16
35:12 37:19
44:10 53:2,13
55:22 56:8,20
59:3 82:9 98:14
119:3,16
122:15 138:18
151:23 176:6

**guy's** 135:6

**guys** 37:19
38:1,21 44:6,16
47:15 56:17
59:6,17 60:1
96:19,22
100:24 101:1,
21 103:12
107:3 111:19
115:15,18
118:19,20,25
121:23 139:16,
18 140:17,18
141:8,21
142:21,22
143:20,21,22
145:23 148:9
149:14,21
150:4 159:12
162:6

---

**H**

**half** 10:22 11:8
15:8

**Halloween**
145:11

**Halvorsen**
55:16,17 56:6
77:19 100:6
170:14,24

**Halvorsen's**
56:7

**hand** 8:10 23:8
47:15 79:12
89:4 101:7
133:3 154:4

**handcuffed**
80:22 81:3,18,
23

**handful** 59:6
118:24

**handheld**
73:17

**handle** 39:25
42:11

**handled** 22:3
28:3

**handling** 21:9

**hands** 138:16

**handwriting**
90:4 91:5
109:24 110:5
125:6 126:15
167:23 168:9,
14

**handwritten**
10:23 11:6 27:2
41:4 47:11
48:25 50:7 54:7
65:5 66:25
86:24 87:25
88:5,11 89:23
90:16 108:21
109:7 124:23
125:16 127:16
129:18 166:22
172:14 173:4,
14

**happen** 30:2
40:6 46:18 50:5
53:5 105:4
122:14 149:25
169:12 176:6,7

**happened**
18:24 24:4
37:20,22 39:8
40:1 43:12
44:23 47:22
48:22 53:22
55:3 70:20
71:24 75:10
78:21 87:1
94:21 96:15
99:19 105:4,5
107:16 108:16
110:11,20
120:24 121:15
132:12 134:16
135:19,21
136:2 137:5,9
141:10,11
146:24 147:21
148:2 150:12

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3195

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 416 of 428 PageID #:21408
The Deposition of JOHN PROBUS, taken on December 16, 2023
188

151:21 161:10
175:11 176:13,
18

**happening**
30:20,25 59:21
97:4 115:20
149:24

**happy** 81:10

**hard** 16:25
17:1 48:7
103:13

**harder** 45:19

**harm** 45:4

**Hawkins** 59:3

**heads** 100:22

**health** 118:22
119:6

**healthier** 17:5

**healthy** 119:3

**hear** 60:13 98:1
104:9 169:20,
24

**heard** 77:10,23
78:1,6,11,15
97:24 101:5,16
103:14,17
120:4 137:4,5
144:24 156:4
174:2,3

**hearing** 15:1
147:19

**hearings**
14:14 111:9

**held** 13:21

**hell** 144:10

**helping** 143:18

**Hernandez**
91:10,23
100:18,19
101:11 155:21
156:10,21
157:1,19

**heroin** 118:20

**Hey** 25:11

**High** 91:8

**highest** 175:19

**highly** 100:9

**Himmel**
121:22,24

**Hispanic**
51:22

**hit** 38:6,12 84:8
103:23

**hold** 14:10
149:18

**holding** 149:20

**holidays** 22:23

**Homan** 91:11

**home** 66:7
101:8 131:20
137:23

**Homes** 45:22

**homicide** 17:2
22:4 24:12,13
25:3 29:8
41:11,16 64:3
73:24 85:18
87:3 88:6,24
96:20,23
111:10 123:24
124:25 138:11,
17

**homicides**
16:19 41:15

**honest** 99:8

**honestly** 25:24
40:5 120:17

**hood** 106:14

**hooded** 100:20
101:16 106:20

**hoodie** 136:10,
11

**hoodies**
136:10,14
137:14

**hooding**
101:22 106:19

**hoods** 100:21

**hospital** 37:20
38:4

**hour** 10:23
11:8 42:6,8

**hours** 12:6
22:23 32:13
52:8 61:2 65:20
66:10 131:1
149:6,12

**house** 91:11,
22 131:12,15,
23 132:11
155:21

**Humboldt**
93:15

**hundred**
130:23

**hypothetical**
37:15 67:10
72:19 121:20
133:15,20

**hypotheticals**
34:25 54:25

———————

**I**

**Iasparro** 7:14
19:6,16 20:6,24
21:10,18 25:8
26:6 27:7,21
28:24 29:12
31:13 32:11
33:22 34:12,16,
23 35:4,8 38:17
40:8 41:25
42:13,23 43:18,
23 52:6,12,16
53:8,20 54:3,
16,23 56:3,10
58:24 67:7,20
68:9 69:19
71:20,22 72:5,
17 76:6 77:2
83:8 84:2 85:5
87:22 88:8 96:4
98:22 109:8
111:21,24
112:11,16
113:13,23
118:9 120:12
121:6,19 123:2

126:7 131:25
132:6,14 133:1,
12,20 134:9,20
138:5 139:2,5,
14 140:24
141:17 142:16
143:1,11 144:2
145:3,19 146:6,
18 150:13
151:13 152:9
155:16 158:3,7,
16 159:1,11
161:7,21 162:4,
13 163:15
164:9,21 165:9,
22 166:10,12
172:18,21,23
173:21 174:20
175:8 176:8,15,
21,25 177:3,5,8

**idea** 28:23 31:8
32:10 39:18
80:5 83:3,15
87:25 107:25
113:10 132:1
133:15 141:2
147:14 158:10
165:24 166:2

**identification**
29:19 74:9
75:16 79:21
89:6 130:1
154:5 159:24

**identified**
26:19,21
142:14

**identify** 7:12

**illegible**
105:21 106:5

**Illinois** 7:11
12:15,25

**immediately**
48:23 175:2

**impaired**
118:22

**implausible**
149:17

**implicated**
85:19 113:20,
22

**implications**
147:1

**important**
32:25 37:7
124:12 142:14

**imposing**
164:11

**improbable**
100:10

**in-person**
17:20 20:4,8

**inappropriate**
34:22 35:3
45:13 48:20

**inbound** 127:7

**incident** 155:5,
17

**inclination**
169:8

**include** 26:16,
25

**included** 113:7

**including**
101:4 107:5,8,
13 160:25

**incomplete**
121:20 133:20

**inconsistencie
s** 67:4,14,17
68:14

**inconsistency**
132:25 138:22

**inconsistent**
55:3 131:22
133:10,18,22
134:18 135:2
138:2,6

**incorrect**
134:23

**incriminate**
161:2

**independent**
62:21 63:4,15
64:12,14,19,22,
24 65:1,3,7,10
69:21 70:3,7,12

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3196

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 417 of 428 PageID #:21409
The Deposition of JOHN PANOZZO, taken on December 14, 2023
189

73:12,22 75:7
76:23 81:11,19
82:18 83:22
84:6 90:24
91:4,24 92:8,20
93:4,25 101:13
104:3 107:17
110:13 124:11
125:21 130:16
134:7,10
144:17,23
152:8 157:3,10
167:3,6 168:23
169:6 174:11,
14 175:7

**independently**
63:22 64:6
69:17 79:4
86:21 102:13
105:10 108:13
134:12

**indicating**
50:22

**indication**
67:19 72:9,11
75:10 113:3
118:12 149:9,
12

**indications**
67:5,15 75:12

**indicted**
111:12

**indifferent**
165:17

**individual** 25:4
30:11

**influence**
34:20,25

**inform** 18:10

**information**
27:17 29:3,6
39:7 40:23
72:16 93:7 94:3
113:4,8 117:25
135:7,15
140:16 141:16,
20 142:15,18
144:23 153:2,7
158:19,25
163:7,9 167:8,

11
**informed**
76:15

**informing**
127:2

**initial** 18:18
28:21 30:7
33:10 35:24
36:15 40:7,20,
22,24 47:19
50:14,15,16
76:25 105:22
163:11

**initialed**
105:22,25
108:19 125:8

**initially** 33:4

**initials** 105:16

**injustice**
145:14

**inkling** 56:15

**innocence**
94:11,24 96:22,
24 145:6,11,18,
24 148:16
162:12

**innocent** 148:3

**instantly** 54:9

**intended** 127:2

**interacting**
70:13

**interaction**
62:12,15,16
132:11

**interactions**
83:16 87:5

**interest** 56:17
161:11

**interject** 35:2

**interpret** 36:14

**interpreter**
36:11,16,17
51:23 52:4
172:1,6,9

**interrogated**

64:17 65:24
99:17

**interrogation**
150:6

**interrogative**
122:23

**interrogatorie
s** 79:5 82:3

**interrogatory**
75:20 109:17
129:3

**interrupting**
7:24

**interview**
17:22 18:2,3,12
31:15 32:22
33:6,14 35:3
38:15,16 40:7,
20,23,24 42:9,
20 43:2,16 44:2
47:20 53:18
54:13,15 58:17
63:22 66:13
69:24 70:1,6,10
78:19 80:10,11
85:11 86:14,20
87:1 120:11
123:7,8,10
127:14 130:14
134:12 163:1,
11

**interviewed**
17:24 27:15
32:8 65:13
79:25 82:24
83:2,5,10,13
99:2 103:9
124:17,18
129:14,15

**interviewing**
33:20 34:11,21
54:1 63:18
69:16 79:2
129:24 154:25
173:2

**interviews**
17:21 27:14,17
37:18

**introduce**
35:17 85:12

**introduced**
123:11

**investigate**
85:18 175:14

**investigation**
16:4 18:14 25:6
30:9 38:3
117:15,19
118:2,14 119:4
134:7 142:25

**investigations**
17:20 144:22

**investor** 9:7

**invoke** 161:1

**invoked** 36:5

**involved** 18:15
25:7 117:14
128:1 139:25
143:10 150:2
165:5

**involvement**
29:23 97:18
123:23 156:24
157:10

**issue** 36:12
38:15 52:2
90:12 119:6
134:25

**issues** 37:10
56:15 118:22

---

**J**

**jackpot** 103:23
145:25

**Jackson** 7:4

**jail** 122:15
143:21 175:17
176:7

**James** 126:25

**January** 96:8
127:3,5,7

**Jennifer** 7:15
60:22 61:13
120:9,20
122:10

**Jim** 8:5 89:14,
15 94:6,14 95:1
145:7 146:16
147:2 172:19

**job** 14:3 23:2,4,
9 46:2 59:18
122:18 143:12,
13

**John** 7:8 8:25
12:15

**join** 19:17
20:25 21:11,19
48:10 58:24
71:21 98:22
109:9 159:2
163:16 165:10

**joined** 14:7
33:13 83:8 84:3
88:8 113:15
132:16 161:8

**joining** 25:14
33:20

**joke** 146:2

**Jon** 150:19

**Jones** 96:9

**Jose** 64:23
65:5,9 69:1
70:1 91:11,21
92:24 101:1
113:20 114:2,
19 129:14
131:23 132:22
136:5,6,9,14
137:12,14,17
140:20 145:1
155:19 156:2,8,
18 157:17,25
160:21,22
162:11

**Jose's** 91:11
155:21

**Judge** 96:9

**judges** 13:19

**July** 132:12

**jumped** 101:7
136:6 137:7,12
156:7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3197

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 418 of 428 PageID #:21410
The Deposition of JOHN PIMENTEL, taken on December 18, 2023
190

**jurisdictions**
13:3,4,7

**jury** 19:1 48:1,2
99:13 111:11
115:11 116:16
117:12

**justice** 46:1
143:6,13 145:5
150:11 151:21
165:21

**Justino** 62:25
63:18 69:17
70:16,22,25
71:3,6,9,12,15
72:4,10,16,21
75:4 76:4,12,
16,24 78:19
79:2,8 80:9,22
81:24 90:13,18,
20,22 91:7,10,
13 92:9,17 93:1
97:17 98:4,5,6
99:8,12,13,17,
23 100:20,22
101:2,3,5,7,10
102:4,8 103:14
105:7 107:19
108:1,2 112:22
113:11,20
115:6 116:14
117:16 119:24
120:3,5 127:14,
16 129:15
130:14,20
132:4 138:25
139:1 140:20
141:23 142:10
144:4,18 146:1
147:9,13,25
148:25 149:3,5,
8 151:10,18,20
152:7,24
153:10,13
154:12,21
155:19 157:7,
11 162:16
167:4,15,17
168:3,12
174:12

**juvenile** 14:13,
19 61:4

---

## K

**keeping** 85:22

**Kevin** 90:9
112:9

**kid** 81:11
149:11

**kill** 136:13

**Kim** 94:9,18,19,
20 95:6,13,15
96:21 145:5,8

**kind** 15:23
23:13 27:10
30:7,19,25
42:16 56:21
72:15 93:15
98:13 101:25
107:15 119:5
146:13 162:1
167:22

**kinds** 31:24

**Kings** 101:22
115:15

**kinky** 143:15

**knew** 47:25
51:6 55:17,23,
24 56:1,14
58:23 59:1,5,22
65:11 98:16
114:5,12
119:15 120:17,
20,21 124:24
129:1 140:9
144:8 156:16
157:18,19
169:15 170:25

**knowledge**
165:11,14,15,
18

**Kyrstal** 7:3

---

## L

**lack** 99:10

**large** 155:21

**larger** 30:11,14

**Late** 81:2

**Latin** 101:22
115:14

**law** 12:14 13:9,
12,15,18,19,20
14:2 16:8 20:22
98:12 122:13
143:9 175:19

**lawyer** 11:9
25:1 35:20,22
121:10 175:20

**lawyers**
121:24

**layout** 58:14

**lead** 164:5

**leading** 39:11

**Leads** 83:6

**learn** 65:4,8

**learned** 75:4
76:4,11 117:18,
19 119:23
151:10

**leave** 16:8,14
42:24 43:1,2,6
47:6,8,19 53:18
87:7

**leaving** 43:16

**Lee** 171:2,3

**legal** 145:22
164:7,12

**legitimate**
147:22

**Lemoyne**
131:14

**length** 85:4

**level** 46:20
47:10

**liability**
161:14,15
162:1

**license** 98:12
122:13

**lie** 39:20
169:21,25

**lied** 126:18

**life** 144:12

**light** 79:5

**lights** 136:3

**limitations**
41:6

**lines** 74:16
137:1

**lineup** 142:14

**lineups** 71:5
140:22

**literally** 24:4
99:11,21

**litigation** 15:24
16:2 34:1
146:13

**located** 93:10
123:9

**location** 23:24
93:22 155:12

**locations**
23:14 109:3

**Loevy** 7:7

**long** 14:16,19
15:1,9,17 24:7
27:22 31:11,19,
24 32:7,13
41:23 43:13
53:12 58:18
66:3 84:11 85:9
86:14,15

**longer** 73:11

**looked** 63:24
137:6

**lookout** 113:24
138:3 148:9
156:4 157:8

**loose** 164:4

**lot** 16:1 45:24
46:2,23 54:4
55:24 59:7,10
62:15 68:2
88:12 93:16,18,
19 100:24
103:21 114:9,
22 118:23

**136:20,21**
147:7 150:1
159:4,10,12,20
171:20

**loud** 90:7
100:18 110:2

**Louis** 93:3,8,
13 115:14
155:13,24

**love** 88:18

**lovely** 73:17

**low** 139:8

**lucrative** 16:11

**lying** 99:12,13

---

## M

**machine**
92:13,18 155:8,
22

**made** 45:24
47:4 71:2 72:3
99:2,3,4 101:14
102:18,25
110:9 118:5
125:7 129:22
152:24 153:4
162:7 172:11

**magnifying**
156:13

**main** 41:4

**make** 18:4,10,
13 26:3,4 27:19
30:7 32:1 33:1
35:22 36:9,22
37:8 39:19
40:15 46:3,10
50:3,9,13 51:6
68:6 103:4,18
106:12 107:14
108:7,9,10
109:6,11
118:24 133:25
143:19 163:17,
18

**makes** 82:12
157:23

**making** 16:12



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS-MAYSONET 3198

22:24 26:10
40:22 68:1 78:7
101:3 107:8
108:15 120:15
142:19

**males** 46:23

**manila** 154:17

**marijuana**
114:24 115:22

**mark** 59:3 74:8
75:14 79:13
89:5 129:25
154:4 159:22

**MARKED** 74:9
75:16 79:21
89:6 130:1
154:5 159:24

**market** 16:1

**marks** 165:2

**Marshall** 12:15

**massive**
149:22

**materials** 26:4

**matter** 7:8 8:21
58:19 121:12,
15

**matters** 9:7
61:23

**Maysonet**
64:23 65:5,9
91:11 113:5,20
114:3,19
128:24 129:14
140:20 145:1
146:16 155:20
156:8,18 157:7,
18,25 158:14,
24 160:3,9

**Maysonet's**
69:1 70:1 91:22
127:1,3 131:23
132:11 158:1
160:22 162:12

**Mcdonald's**
53:4

**meaning**
100:21 134:10

**means** 101:22
105:20 107:15
169:12

**meant** 46:2

**medications**
10:10,13

**members**
71:15

**memorialize**
87:14

**memorialized**
87:17

**memory** 10:8,
13,17 15:2

**men** 23:21
92:24

**mental** 118:22

**mention** 82:22

**mentioned**
36:24 57:3 62:7
115:19

**mentioning**
64:20

**mess** 86:10

**met** 131:23
166:15

**Mexico** 12:20

**Miami** 12:19

**Michael** 7:14
10:22 11:9

**middle** 23:7
24:6 154:19
167:14,17

**midnight**
45:21 131:10

**might've** 59:11
66:11 148:13

**Mike** 122:25

**million** 103:23
132:21

**millionaire**
144:12

**millions**
148:17

**mind** 55:2,6

**mine** 148:15

**Mingey**
170:16,17,21,
22 171:1

**Mini's** 177:3

**minus** 166:16

**minutes** 42:4
73:1

**Miranda** 36:1,6
90:11 123:11,
12 124:20,21,
23 126:1,2,5,6

**Mirandas**
125:19

**misconduct**
60:8,13 71:19
72:12,15 77:11
119:8,23
120:10 121:8,
12 122:5 165:8
176:14

**misstated**
99:25

**misstates**
97:12 132:14
141:1 152:11
158:16 174:21

**misstating**
97:14

**mistake** 21:25
29:16 106:1,17
107:1

**mistreated**
37:14 39:24
98:7 169:8

**miswrote**
105:20 168:6

**mitigation**
97:19

**mixed** 84:14

**mom** 158:12

**money** 16:13
45:19 46:3
122:18

**month** 96:9

**months** 14:18,
21 15:3,6

**Montilla** 171:7,
9

**morning** 7:14,
16 8:19,22
45:23 85:1
130:12,25
155:11

**motion** 115:9
141:23

**motions**
140:17

**move** 32:3 79:7
85:23 119:3,5

**moving** 30:8

**multi-**
**defendant**
53:24

**multinational**
16:4

**multiple** 21:14,
16 22:1,16
42:16

**murder** 45:23
62:25 65:9
69:3,5,10
88:23,25
107:18 111:2
115:18

**murdered**
44:10

**murders** 20:17
63:11 117:15
142:25 153:1,6

_____

**N**

**named** 65:5,11
66:13 127:23
128:2,19,21

**narrative**
44:23

**necessarily**
103:2

**needed** 33:1
36:11 37:19
43:1 53:2 59:19
95:20 156:13

**neighborhood**
93:19

**nephew**
138:15,16
139:7

**newer** 58:16

**news** 98:2

**nice** 119:16

**night** 14:14
15:5 17:16 23:7
65:17 131:23

**nights** 66:3

**nine-**
**millimeter**
92:12,14,18
155:8

**no's** 122:25

**nobody's**
122:12 149:14

**noon** 74:6

**north** 23:21
24:1 90:10
91:11 93:3,8,15
100:24 155:12,
13,25

**Northern** 7:10

**notation**
129:22

**noted** 82:2

**notes** 39:15,
18,20 171:18

**nother** 144:17

**noticed** 148:6

**notions** 163:8,
24

**November**
160:4

**number** 7:11
41:9 66:8 67:25
120:24 160:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS MAYSONET 3199

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 420 of 428 PageID #:21412
The Deposition of JOHN PERKAUS, taken on December 20, 2023
192

**numbers**
111:22 112:12
160:11

**O**

**oath** 143:17

**Object** 19:6,16
20:6,24 21:10,
18 25:8 26:6
27:7 28:24
29:12 30:12
31:13 32:11
33:15 34:12,16
38:17 40:8
41:25 42:13
43:18 52:6
53:8,20 56:2
58:22 60:11
65:25 69:6,19
72:5 77:1,13,
17,21 78:4,9
84:2 87:22 88:7
93:23 94:4
109:8 119:9
121:6 126:7
131:25 132:14
133:1 134:9,20
138:5 139:2
140:24 141:17
143:1 145:3,19
146:6,18
150:13 151:1,
13 154:15
158:3,16 159:1,
11 161:7,21
163:6,15 164:9,
20,21 165:9,22,
23 174:13
175:8 176:8

**objection**
25:15 26:23
33:22 35:4
42:23 43:23
52:16 56:3,10
63:2 67:7 76:5,
6,13 77:2 83:6
85:5 96:4,5
97:11 98:20
103:19 108:22
113:13 118:8
120:1,12
140:23 151:15
157:12 169:2

**objections**
25:14

**obligation**
68:13

**observation**
99:20

**observations**
83:18

**observed**
38:9,13 120:10
122:5

**obtained**
172:1,6

**occasionally**
119:16 127:25

**occur** 23:1

**occurred**
71:19 72:15
90:10 95:7
175:2

**occurrence**
79:15 94:20

**office** 11:16
13:21 14:4,7
15:10,13,14
16:15,17 17:9
28:8 61:10 62:2
88:18 94:7 95:7
96:14 111:8
114:10 130:21
145:8

**officer** 34:20
35:2,10 43:3
45:4 46:5,15
47:8,19 48:17
51:11,22
108:20 109:6
149:10 152:16
153:12,15
173:13

**officer's** 33:13

**officers** 31:5
47:24 48:10
58:21 59:7
64:16,20 65:24
69:18 71:14

**offices** 7:7
149:20

**official** 36:16
43:22 44:3

**Ohio** 12:19

**one-on-one**
34:5

**open** 149:15,16

**open-ended**
39:9

**opinion** 61:12
62:4 99:21
100:3 115:1
142:24 143:9,
25 144:3
145:18 146:5
147:24 149:4
150:17 151:11
158:6 161:5,18,
23 162:11
166:4

**opinions**
163:25

**opportunity**
16:16 174:1

**opposite** 61:1
164:1

**option** 41:7

**options** 41:20

**oral** 123:22,24
124:6,8

**order** 68:6
103:15 112:12
164:18

**Orders** 176:22

**ordinary** 148:6

**original** 162:7

**outcome** 161:6

**outcomes**
150:4

**outs** 50:16

**overnight**
17:17 114:7

**P**

**p.m** 89:25

**p.m.** 17:17
91:10 153:23
154:1 155:8,11,
18 177:9

**paged** 28:11,
15

**pagers** 28:10

**pages** 50:15
108:19

**Papa** 89:14,15
94:6,14 95:1,13
126:25 127:1,4,
7 128:13 143:3
145:7 146:16
147:3 160:18
166:25

**paper** 150:7

**paperwork**
57:23

**paragraph**
79:6,18 84:19,
21 100:17
102:2 109:19
123:6,21
124:16 126:21
127:11 160:23

**paragraphs**
79:19

**parameters**
155:10

**Park** 93:15

**parking** 73:2

**parking's** 12:5

**parlance**
101:21

**part** 36:21
42:16 82:7 96:1
118:11 124:12

**part-time**
13:11,18

**parties** 51:9
151:24

**partner** 15:21

**parts** 59:20
119:20

**past** 13:7

**Paul** 9:1

**Paulnitsky**
171:13,15

**paying** 158:14,
24

**pen** 49:3

**penalty** 138:12

**penchant**
44:11

**pending** 7:9
44:18 147:10,
12,16

**people** 17:23,
25 18:13 22:1,3
45:25 59:20
66:7 72:11
74:13 75:12
103:21 104:5
110:6 115:18
139:15 141:7,
13,19 143:18
145:6,12
146:10 148:3,4
149:19,21,23
150:1 160:3,9

**percent** 68:7
70:4,8 99:8,24
100:14 104:14
130:23 138:17,
23 147:22
153:3

**perfect** 131:21
137:24

**performed**
71:6

**periods** 26:7

**Perkaus** 7:8,16
8:25 15:22
154:3 173:20

**person** 24:17
41:10 52:1 55:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3200

68:22 150:3
175:17

**person's**
173:6

**personal**
161:14,15

**personally**
148:19

**personals**
23:13

**petition**
147:13,16

**phase** 85:24
111:8

**phone** 19:21
20:2,5,9 23:11,
12 24:3 95:8

**phones** 65:21

**phonetic** 13:6
111:11

**photo** 71:5

**phrase** 101:16,
20

**physical** 70:24
78:2 81:13

**physically**
45:3 152:25
153:5,10,13,16

**pick** 91:12
139:16 141:18

**picked** 22:7
92:2,5 141:14
149:8,11
155:22

**pieces** 139:17

**pin** 141:13

**pistol** 92:13,
16,18 155:8,22

**place** 39:25
139:18 160:3

**placement**
16:2

**Plaintiff** 7:18,
25 8:20

**Plaintiff's**
167:2

**Plaintiffs** 8:20

**plan** 150:3

**plausible**
138:22 150:5

**play** 26:2 68:25
116:10,13

**playing** 68:16

**pled** 142:6,10
144:7 148:3

**pocket** 100:25

**point** 25:5
70:15 87:4 97:5
126:15 168:19
170:7,10 172:4

**police** 17:19
18:11 19:23
20:2 22:24
26:19,22,25
27:1,6,8,11,14
28:4,7 29:9
31:11,16 32:22
33:3,8,9,12,19
34:10,20 35:2,
10,19,22,25
37:1,14 38:6,
11,16,21 42:11,
22,24 43:3,24
44:7,20 45:4,11
46:5,15 47:7,
14,18,24 48:12
51:4,10,23
55:10 64:16
65:23 69:17
70:16,25 71:14
74:4 76:3,11,
15,17,19,21
83:16 90:20
101:4 102:5
107:8,14 119:8,
23 123:25
124:2,4,8,9
139:24 142:19,
24 152:16,25
153:5,12,15
161:1 162:21
163:4 164:19,
23 166:16
173:13 176:14

**police's** 44:3

**policies** 129:5

**policy** 39:24

**Polish** 36:10

**politics** 95:7
96:14

**poor** 157:4,23

**portion** 109:22
110:2 125:4
126:13

**position** 14:5
16:18 41:10

**positions**
14:10

**positive**
130:23

**Possibly** 18:2

**post-** 147:12

**post-
conviction**
147:10,12,16

**potential** 21:15
95:2

**potentially**
16:11 56:18
81:14 135:1
160:18 162:8

**practice** 13:2
15:20,23 16:5
31:15,25 32:21
33:6 53:6,10
65:12,23 84:5
102:24 105:8
167:7 173:9
175:10,24

**practices**
16:24 22:18

**pre-printed**
86:9 154:18,19

**preconceived**
163:8,24

**prefatory** 89:9

**preference**
41:17

**preliminary**
14:14 15:1
111:9

**prep** 117:1

**preparation**
11:10 111:14
116:23

**prepare** 10:20
11:23

**prepared**
95:24

**prepped**
128:14

**prepping**
116:2

**presence**
35:19 42:11,21
49:25 81:14
124:2,19
168:19 170:10
173:6 175:25

**present** 35:25
41:20 69:23
70:5 74:7 90:2
110:17 123:9,
23

**presently**
18:25

**Presents**
121:20

**preservation**
161:12

**pretty** 41:13
48:8 81:15
120:20 139:8

**previous**
54:14

**previously**
113:5 116:15
156:8 157:19
158:10

**primary** 41:11,
16

**print** 110:10
130:22

**print-out** 30:22

**printed** 124:22
154:21

**prior** 10:23,24
31:8 75:11
117:15 129:23
134:23 140:11,
13 158:1

**private** 124:1

**privately** 87:4

**privilege** 45:18

**privy** 134:25

**Pro** 136:5,9,15
137:12,14

**probable**
140:15

**problem** 56:19
65:16 82:9

**problems**
37:10 47:13

**procedures**
129:5

**proceeded**
123:6,8

**proceeding**
147:10

**proceedings**
7:1 160:3,9

**process** 24:10
35:13 49:7,9
50:17 52:8
82:15 87:9
108:23 125:15,
20 162:23

**produce**
111:17

**produced**
111:18

**professional**
61:12 62:4

**programs**
15:16

**prohate** 13:6

**prohibited**
43:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3201

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 422 of 428 PageID #:21414
The Deposition of JOHN PROSSNITZ, taken on December 22, 2023

194

prohibition
45:1

Project 148:16

promise
162:20

promises 99:5
102:25 103:4

proof 24:22

proper 22:24

property 20:8,
14,16

prosecute
146:10

prosecuting
15:15 17:2

prosecution
16:22 62:24
63:10 69:17
70:16 72:15
116:14 157:11

prosecutor
21:16,20
122:14 143:4
175:20

prosecutors
16:25 20:19
21:8,17 48:5
64:11

Prossnitz 7:17
8:18,19 19:9,19
20:12 21:7,13,
22 25:12,17,19
26:8 27:5,13
28:1 29:1,15
30:15 32:6,12
33:18 34:9,14,
19 35:1,6,14
38:18 40:11
42:3,17,25
43:20,25 46:14
52:7,13,19
53:16,23 54:10,
19 55:1 56:5,23
58:25 60:12
63:5 66:5,23
67:11,22 68:12
69:9,15,22
72:2,13,23 73:8
74:10,11 75:18

76:9,20 77:5,
14,18,22 78:5,
10 79:23 83:11
84:10 85:7
88:3,13 89:8
94:1,13 96:13
97:21 98:24
103:25 109:5,
13 111:23,25
112:1,15,17,19
113:18 114:1
118:16 119:11
120:8 121:3,14
122:2 123:4
126:10 130:3
132:2,9,19
133:8,13,16
134:2,11
135:13 138:8
139:3,10,22
140:3 141:4,22
142:23 143:8,
24 144:15
145:16 146:3,
14 147:8
150:22 151:4
152:5,12
153:18 154:2,7,
22 156:11
157:15 158:4,8,
18,22 159:8,14
160:1,8,12,16
161:17,22
162:10,15
163:10,21
164:10 165:3,
13,25 166:7
169:2 170:18
172:2,7 173:8,
15,24 174:16
175:5,22 176:4,
10,17,20,24

protective
44:14

protocol 39:24

prove 162:9

proved 107:18

prover 34:2
44:5

provide 10:4,
11,16 18:8
29:2,6 117:24
167:8

provided
76:18 128:9
129:3

public 48:3

Pulaski 93:14,
15

pulled 32:16
136:2,10
137:15

purpose
50:11,21

purview 27:3

put 35:7 50:22
71:24 92:16
100:21 103:11
136:14 137:19,
20 138:10
168:24

putting 135:4
138:15 139:7
175:16

## Q

quarters 131:3

question 9:15,
18,20,23 18:17
26:10 28:12
33:16 37:21
42:15 44:25
46:11 49:4
76:10 98:16
116:18 126:12
131:4,7,11,13,
15 135:17,18,
23 136:1,3,6,8,
11,13,16,18,21,
23 137:3,5,7,
13,15,18,19,21
158:21 167:22
170:12

questionable
60:19

questioning
12:3 45:2 175:3

questions
8:21 9:13 12:12
36:21 39:9,11
44:20,23 62:19

73:9 85:19
96:12 99:5
103:9 142:4
146:12 152:13
162:20 166:8
167:2 168:22
169:5,14
171:20,22
172:19,20
173:21 174:2
176:20

quick 153:19
171:18

quickly 30:23
39:22 55:9
82:5,16 98:8
130:21

## R

R-A-H-E 8:7

radio 23:8
28:10 73:17

Rahe 8:7
160:7,11,14
172:22,25
173:1,12,18,20

railroad 150:4

raise 8:9 17:6
68:8

ran 15:15 59:4
138:3 139:1

rapes 16:20

rare 81:22

rate 11:3

re-read 125:12

Re-trying
89:17

read 36:1,23
49:17 51:16,17,
19 67:13 76:7
79:19 84:19
86:6 90:6,15
91:6,8,14,18
92:4,11,15,22
100:17 102:2
106:8,11
109:14,15,22,

23 110:1,5,8,11
115:21,24
116:1 123:5,11,
20 124:16
125:4,5 126:13,
14,16,19,21
127:10 131:7,
17 135:24
137:1 155:4
156:2,3,12
160:4 171:21
172:5,10

reading 36:19
52:3 90:23

ready 94:9,19,
22 96:10 143:3

real 44:11,22
133:24 148:18
171:18

reason 9:25
128:12 139:19
165:6 167:10

reasons 88:12

recall 47:9
55:12 62:24
63:10,18 64:10,
16 68:16 69:16,
23 77:8 79:3
102:14 113:1
119:10 170:4
171:3,22

receive 25:20
40:23

received 17:19
40:16 111:16

receiving 40:3

recently 16:3
116:1 133:5

recognize
89:12,22 154:8

recollection
62:21 63:4,15
64:8,12,14,19,
22,24 65:1,3,7,
10 69:21 70:3,
7,12 73:12,22
74:6 75:7 76:23
81:12,20 82:18
83:23 84:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3202

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 423 of 428 PageID #:21415
The Deposition of JOHN PANOZZO, taken on December 13, 2023
195

90:24 91:4,24
92:8,21 93:4,25
101:13 104:4
105:13 107:18
110:14 113:7
114:14 124:11
125:21 130:16
144:17 152:8
157:3,10,14,17,
21 167:3,7
168:23 169:6
174:11,15
175:7

**recollections**
129:5

**recommend**
89:1

**recommendati on** 26:5

**recommendati ons** 26:3

**recommended**
19:4 69:5,10
88:21 111:1
112:2

**recommendin g** 18:19 26:11

**record** 7:13
8:24 12:4 73:3,
5,6 76:8 112:11
153:22,24,25
158:14,23
160:2 166:25

**recorder**
88:14,16

**red** 68:8

**REDIRECT**
173:23

**reference**
62:21

**referring** 96:15

**reflected**
125:10

**refresh** 74:5
157:9,14

**refreshes**
157:17,21

**refuse** 39:13
161:3

**reintroduce**
125:14

**reintroduced**
125:12,13

**reintroducing**
124:19

**reintroduction s** 125:17

**reiterated** 80:1

**reject** 18:5

**related** 54:1
118:14 129:1
139:12

**relates** 118:10

**relation** 119:24

**relationship**
103:22 152:2
158:1,9,11

**relationships**
17:4

**relied** 94:2
129:7

**rely** 27:19
73:10 117:24

**remedy** 52:2

**remember**
11:4 14:16 15:3
20:13 25:24
26:24 27:23
28:25 29:2,7
38:5,25 40:3
41:22 43:13
45:21 47:7,18
48:12,14 49:18,
19,23 50:16
53:17,21 54:18
55:25 57:1,24
58:1,3,4 59:1,
12 63:3,6,21,24
64:1,4,20 68:21
70:5 73:19,25
74:25 75:3
76:3,21 80:19
82:7,8,10 86:19
88:10 90:22,25
91:2,13,15,17,

19,20 92:1,17
93:21 94:6,16
96:2 97:5
101:10 102:10
103:8 104:1,16
105:9,11 106:2
109:16 112:6
115:8 116:3,5,
19 117:3,5,9
119:7,17
128:21,22
129:15 131:10
140:9 150:10,
18 156:21
170:6

**remembrance**
105:13

**Remind** 61:6

**repeat** 109:11
158:21

**rephrase** 26:9
42:15

**report** 10:25
46:16 79:14
84:15 121:5,9,
12,18,21,25
160:2,8

**reported** 27:2
41:4,14,17
47:12 48:22,24
49:14 54:6
66:22 71:25
88:11 118:15
119:25 120:11
121:8 122:7,8,
11 130:5,22
153:1,7 169:9,
11

**reporter** 7:5
8:10,12,16 41:9
43:5,11 44:9
46:10,13 52:2
87:25 88:1
108:25 130:25
172:13 177:1,4,
7

**reporters** 43:8

**reporting**
79:16 121:23

**reports** 27:6,9,

11 51:24

**represent** 8:20
74:12 75:19
79:13 130:4
166:16 173:1

**represented**
45:24

**representing**
119:19

**reputation**
55:25 56:7,9,
13,21 61:9 62:1
98:12

**requesting**
25:1

**require** 17:20

**required** 30:8
87:20,23

**reread** 106:10
124:20

**reserve** 176:21
177:6

**residue** 165:1

**resolution**
119:5

**resolve** 164:3

**resources**
88:17,18

**respect** 47:4

**respected**
47:1

**respond** 36:13

**response** 9:12
76:10 127:19

**responses**
75:20 109:18
122:23

**rest** 100:6

**result** 143:13

**resulted**
144:22

**retold** 125:2,10

**retrial** 95:2

**retried** 96:21
97:10,23 100:2
143:5 145:7,13
146:16

**retry** 89:18
94:9,19 95:13,
15,17,20 96:3
127:2 146:21
161:19,24

**retrying** 95:18
126:25

**return** 87:10

**reversals**
148:17

**review** 11:1
14:13,22 17:12,
14 18:1,16
19:13,21,24
20:15,20 21:21,
25 22:16,19,21,
22 23:2,4,23
25:6,21 26:1
28:3 30:16,18
31:1 37:24
38:24 39:1
43:15 53:6,25
54:12 57:4
58:7,11 59:15
60:20 61:1,7,8
63:8 65:13,15,
16 66:9 73:10,
17 75:9 76:2
77:9 79:1,4,7
86:22 108:11
109:21 110:23
111:4,13
112:12,21
113:3,8 118:18
125:3,6 126:12
129:12,21
139:13 154:11,
17,23 159:10
162:22 173:3

**reviewed**
10:23,24 11:5
79:10,25 80:4
108:13 113:9
125:2 129:4
168:24

**reviewing**
50:11 53:1

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3203

rewrite 106:11

Rey 8:5 55:14
103:22 141:6,
12 147:4
148:11,13,14
149:22 150:12,
15 151:5,8
152:3 153:11

Reynaldo 7:9
143:25 144:22
153:9 158:1

Rickey 96:9

ride 131:20

rights 36:1,6
58:2 86:6
90:17,18,23
123:11,12
124:20,21
126:1,2,5
152:18

ring 171:8

risk 98:10,12
161:16 175:15

risking 122:13

rob 100:23
114:23

robberies
41:14

robbery 24:19
29:8

Robert 45:22

role 26:1 33:13
44:3,14 63:6
64:5 68:16,18,
25 116:10,13
164:6

Romelfanger
7:19,21 8:2
19:17 20:25
21:11,19 25:11,
13,18 26:23
30:12 33:15,23
56:2 58:22
60:11 63:2
65:25 66:20
69:6,12 71:21
73:1 76:5,13
77:1,13,17,21

78:4,9 83:6
84:3 88:7 93:23
94:4 96:5 97:11
98:20 103:19
108:22 109:9
111:19 113:15
118:8 119:9
120:1 132:16
140:1,23,25
151:1 152:11
154:15 157:12
158:20 159:2
161:8 163:6,16
164:20 165:10
166:6,11,14
169:4 170:20
172:3,15
174:13,21
176:2

room 32:23
33:3 43:1,3,6,7,
10,21 44:4
53:18 80:11,12,
22 85:11 87:7,
11 105:6 123:7,
8,10 150:7
175:25

rooms 58:14,
17,19 149:15

Rosa 11:6 65:2
70:9 132:10

rude 66:11

rule 20:10
30:25 41:13
121:23 175:18

rules 43:14

rumors
169:20,24
174:2,3

run 46:22

running 101:2,
6 156:6 157:5

___

S

safer 24:2

safety 44:12,18

salary 46:4

Santa 12:20

sat 49:6

satisfaction
45:25

satisfied
164:13

scenario 53:13
122:19

scene 29:5
71:12

Schak 59:5,10,
23 60:5 62:8,9
70:13 73:24
74:23 76:22
77:7 79:17
80:17,20 83:1,
12 87:7,10 90:3
100:4 105:7,11
108:11 110:19
117:22,24
123:23 124:10,
14,19 125:2,9,
10 168:20
170:4 174:7,23

Schak's 77:10

scheduling
95:5 96:1

school 12:14
13:10,12,14,15,
18,20 14:2 91:8

scratch 50:16

scratched
38:12 168:6

screwed
105:20

Sean 7:20,25

seat 137:8,19,
20

seated 80:24
92:25 93:1

seeking
148:17

self-
preservation
161:12

sell 158:15,24

sense 39:19
40:15 99:10
138:21

sentence
49:16,17 79:24
90:6,15 91:6,20
92:4,11,22
100:17 101:9,
10 124:6
126:11,12

separate
154:23

sergeant
171:5,6

series 167:1
168:22 169:5

serve 44:14

set 47:12 94:22
96:8

sets 155:9

Severity 20:3

she'd 120:14,
15

shed 79:5

Sheehan
112:9

shell 165:1

shift 17:16
19:15 22:13
65:17 66:3

shifts 17:15

shoot 100:23
114:25

shooter 138:11
157:6

shooters
157:6

shooting 90:9
92:7 137:4

shootings
139:12,25

short 166:11
167:15

shot 114:17
138:20 148:9

shots 101:5
137:5,6 156:5

should've
145:13

show 46:22
49:20 88:18
147:23 148:21

showed 115:2

shown 108:1
129:12

shut 118:13
119:4 120:16
143:16

sick 82:22
83:19

side 23:7,21
24:1,5 58:13
107:20 136:19,
21 137:6,19,20
145:15

sides 23:22

sign 48:18
49:9,10 50:10,
18 51:1,3,4,5
53:15 108:10,
17,24 110:15
126:6

signature
50:22 90:13
124:22 126:4
177:5,6

signed 51:8
87:2 108:2,18
109:2,4 110:18,
21 125:9 126:9

significant
78:16

significantly
45:19

simple 115:13

single 31:15
148:14

Sir 8:9

sit 34:3 63:1,14
152:8 174:10,
17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3204

sitting 108:15

situation 18:2
23:24 24:11
26:14 31:8 32:1
33:2 47:13
54:20 55:2
135:10 152:1
155:9 172:12
175:14

situations
39:25 151:25

skewed 17:4

skip 155:16

slap 143:6

sleep 32:17,18

sleeping 65:18

small 16:11

Smitka 79:17
170:5,8,11

smoke 31:21

smoothly 82:9

society 17:5

solemnly 8:12

solid 44:23
56:14 94:8,15
143:2 148:8

solo 59:18

somebody's
65:21

sought 156:10
157:20

soul 100:7

sound 170:24

sounds 38:13
141:12,19

source 159:3

south 23:21
58:13

Spanish 91:18
123:18

Spaulding
131:14

speak 11:12
28:17 29:11,19
31:17 34:10
35:11 36:17
52:1 65:12
82:4,7 86:5,23
87:4 116:22
123:13,14,18
165:18 171:22,
25

speaking
29:10 36:8 85:3
105:11 130:20

specialized
21:4

specific 21:3,
12 57:4,24 79:6
171:16

specifically
47:21 91:15
116:8 159:15,
17

specifics 91:3
95:25

speculate
69:7,14 166:2

speculation
120:12 121:19
132:6 133:2,12
139:5 146:19
151:14 161:8

spell 8:23

spelled 8:25

spoke 10:22
76:15 80:14
117:19 123:10,
17 124:1
126:22,24

square 155:6

St 93:3,8,13
115:14 155:13,
24

stage 72:7

staged 71:5

stamp 74:15
105:15 106:13

stand 104:13

169:21

standpoint
62:12,17 97:20
157:20 164:7,
13

stands 55:7

Starr 7:20,24,
25

start 16:12
23:25 24:9,13
42:20 44:8
52:21 86:16
87:9 125:13
135:3 168:2

started 14:12
15:20 38:8 39:5
75:23 86:15
87:6 136:15
137:15 168:5

starting 28:3
100:18 123:6
125:15 126:22

starts 124:17
135:19

state 8:23
25:21 35:21
44:24 127:2,4
160:2 174:22,
23

state's 11:16
14:3,6,7 15:10,
13 16:15 17:8
19:13 22:5,8,19
23:3,4 25:6
26:2 27:4 35:21
43:15 44:9
45:1,18 56:17
61:9 62:1 71:25
85:17 90:19
91:1 93:17
94:7,18 99:9,21
102:5 111:20
120:15 121:10
122:1 124:3,4
126:22,24
145:8 149:19
173:4

stated 91:7,8
93:2 96:7
100:22 101:3,8

102:4

statement
10:23 18:21,25
33:25 37:9
40:13,14,21
41:2,17,21,24
42:10 43:17,22
44:3,21 45:8,9,
10,17 46:7,16
47:2,8,9,12
48:15,18,25
49:20,24 50:5,
12,24 51:2,13,
18,25 52:20,23,
24 53:1,14,19
54:21 55:4
76:17,18 78:23
81:22 82:5,15
83:25 85:25
86:18 87:15,21
88:5,20 89:23
90:2,7,8,16,21
91:3,5 98:8
99:15 100:16
101:15 102:8,9,
17 103:16
104:2,6,18,22
107:16,22
108:11 109:7,
14,22 110:12,
20 112:24
116:17 117:1,
16 123:22,24
124:6,8,23
125:3,4,7,16,24
126:13 127:16,
18,21 128:1,7,
11 130:5,22,24
131:22 133:4,7,
10 135:17
138:2,24 147:6
149:8 152:7
163:5,13 164:7
166:22 167:4,
17 168:17,20,
25 169:1
172:14 173:5,
10,14 174:7,12,
19 175:13,17,
24

statements
26:14,21 27:2,3
41:3,5,14 49:15
53:25 54:5,12,
14 65:6 66:14,

19 67:18 79:8,
11 80:7 82:12
101:14 108:21
114:7,8,13
129:18 132:5
133:18,23
134:14,18,23
135:1 162:7
163:18 167:3

states 7:10
13:4

stating 90:18
97:14 127:15

station 20:2
28:4,6 29:9
30:3 31:11 32:8
84:12 162:25

stations 19:23

stayed 156:3

stepping 16:21

steps 136:18

stolen 20:17

stone 16:21

stood 103:10

stop 12:9 35:7
38:15,16 71:24
131:19

stopped 37:18
48:23 93:2
136:2 175:3

story 76:25
104:9 132:18,
23 133:24
139:19 144:9
148:11

straight 13:14,
15 22:6 52:24
111:10 119:3

street 12:8
17:1 131:14

streets 143:23

stretch 97:20

strike 38:14
54:13 148:24

stuck 21:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3205

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 426 of 428 PageID #:21418
The Deposition of JOHN PANOZZO, taken on December 20, 2023

198

study 12:21

stuff 82:8,9

stupidest 115:17

submitted 89:3

subsequent 135:1

subsequently 103:15

substance 11:13,19,22 39:5

sudden 94:23 96:18 136:16 148:10,16

summaries 26:25

summarizing 127:8

summary 49:13 50:25 76:17 90:21 105:6 108:7 124:25 155:17

superiors 72:1

supervisor 18:10 64:13 111:1,3 112:3

supervisors 38:24 39:1 118:15 121:1

supplemental 10:25 51:24

supplementals 27:1

supplementary 79:14 84:15

support 128:2

supposed 75:24 114:24 122:17 128:15 139:17

suppress 140:17 141:24

surprised 41:13 43:8

surprising 132:18,20

surrounding 24:20 112:23

suspect 29:3, 18,24 30:11,17 31:3,11 32:22 33:4 34:21 38:5,14 39:6 40:7,13 41:21 42:10,21 43:2,6 45:3,11 46:6,15 47:20 49:5,6,17 50:18 51:15 53:1,18 54:2,15 65:11 66:13 76:16 103:8 154:24 163:1,5

suspects 32:8 33:20 34:10 35:16 36:25 39:13,16,23 41:3 65:14 67:5,6,15 140:21 142:13 171:21

swear 8:10,12

sweatshirts 100:21 136:9

symptomatic 146:8

system 98:11 100:13 143:18 146:1,8

——————

**T**

table 173:10

tac 59:4

tactic 175:4

takes 17:3

taking 33:25 39:18,20 43:16 44:2 45:7 47:2, 8,11 51:18 52:20,23,25 53:7,19 75:11

78:23 85:24 97:16 117:16 125:16

Talia 7:4

talk 11:15,18 22:18 24:16,25 28:2 30:4,10,17 31:2,3,6 32:18 33:8 35:18 36:2,3,4,5,12 39:13 40:14 42:10,21 65:23 73:23 82:13 85:25 86:12 89:14 95:1 116:25 117:8 119:13,16 139:16,18 147:2 153:20 163:1,4,12 164:24

talked 19:13 22:20 25:25 28:4 29:20,24 33:4 39:15 44:1 68:24 74:23 75:1 87:19 94:6 102:18 108:25 116:15 127:24 129:8,13 132:4 138:24 139:20 149:11 153:11 156:1 159:20 176:5

talking 31:9 35:9 38:8 39:5 55:5 64:10 79:8 81:6 86:15,16 87:6 89:15 101:1 117:3,5 119:17 132:3 138:21 164:23

tangential 103:22 152:2

tangentially 127:25 148:15

tape 88:14

Tauruses 23:6

tax 16:1 158:14,24

Taylor 45:22

team 17:15 59:16,17 61:1

technologically 114:11

teens 81:2

telephone 127:8

telling 38:6 46:6,15 47:7,18 50:4 72:19 75:4 76:3 84:7 86:19 90:25 91:13,15, 21 92:1,9,17 93:5 94:17 99:23,24 134:5

tells 151:23

ten 130:25

ten-minute 72:24 153:19

tense 106:22

term 88:25 145:22,23

terminate 38:3

terrible 155:23 175:16

testified 11:2,3 19:2 99:12 115:8 116:16, 19 119:13 127:17 142:9 162:21 165:4 169:14 170:3 174:8 175:23

testify 9:25 51:7,13 94:22 95:6,21 96:1 127:6 142:1 147:18 161:3, 25

testifying 19:4 116:23 143:17 160:19

testimony 8:13 10:4,11, 16,24 11:1 74:13,19 78:24

119:12 124:13 127:18 135:6 152:11 163:25 169:7 174:21

texts 95:10

thankfully 20:18

thanking 127:19

that'd 120:13, 25

theory 97:19 149:17

thereof 99:10

thin 58:18

thing 43:9 49:14 66:9 81:7 95:5 106:4 122:14,21 133:21 137:3 144:13 147:21 149:14 151:20 175:21 176:6

things 24:7 31:24 35:5 102:16 115:17 126:17 164:7 175:2

thinking 115:4

thought 60:19 98:9 99:13 115:21 143:14

thousand 68:6

threatened 99:24 102:7

threatening 71:15 78:12,16 81:5 118:13

threats 71:2 78:7

throw 147:6

thrown 145:15

time 7:6 16:12, 15 20:14 24:4,7 26:15 27:23 31:1,24,25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3206



32:13 33:25 37:24 41:8 43:13 44:22 47:16 49:16 54:6 55:10 56:1 58:6 59:2 62:11 65:9 73:4,7 74:4,18 75:13 77:7 78:21 81:1 82:22 84:1,24 85:4 88:18,19 89:16 91:25 99:5,21 103:7, 8,13 108:14 112:3 113:9 114:4,16 115:20 130:11 131:10 137:12 141:3,16 143:14 144:12, 13 153:23 154:1 155:7,9 168:19 170:7, 10 171:24 172:4 173:11

**timeline** 83:20

**times** 9:4 23:20 37:3,20 43:5 44:16 51:15 54:5,11,13 58:12 80:13 118:24 175:21

**timing** 22:3,12 54:8 82:11

**Tino** 136:5,14 137:7,11 138:14

**today** 7:5 8:21 10:1,5,17,21 11:10 63:1,14 111:14 129:8 132:11 142:24 144:1 147:9 152:8 169:7,14 171:21 174:10, 17

**told** 37:13,19 50:24,25 51:14 64:16 66:17 73:23 76:17 77:4 80:1 84:4, 7 85:16,17 87:12 90:18

98:6,9 104:13 113:17 120:6,9 122:4 123:14, 25 124:3,7,9, 10,14 126:8 127:25 128:3 131:19 133:21 137:22 151:18, 20 168:23,25 174:7,24

**toll** 17:3,4

**tool** 165:2

**top** 135:20

**topics** 37:4

**Torrence** 90:9

**total** 15:10

**totality** 25:2 26:13 27:24

**totally** 144:10

**training** 25:21, 23 27:23 36:21 40:3

**transcribed** 50:6,12

**transcript** 74:24 78:24 115:25 127:18 176:22

**travesties** 165:21

**travesty** 143:6 145:5 148:18 150:11

**treated** 36:25 85:22 102:4,20 124:3,4 142:11

**trial** 10:24 11:2 14:14 15:7 17:11 18:24 19:1,2,5 41:19 48:1,13 60:2 61:22 62:13 74:13 94:22 95:24 96:8,19 97:4 104:8 111:1,2 112:3 116:1,17,19,22, 23 117:2

119:12 121:1 128:15 134:24 135:5 142:5 169:22,25

**triple** 22:4 133:15

**trouble** 52:3

**true** 68:7 97:14 149:18

**trust** 142:19

**truth** 8:14 39:20 45:17 81:10 98:9,10 99:23,24 102:9, 17 104:2,7,10, 13,15,23 113:17 119:1 123:2 134:1,5, 16 151:20,23, 24 152:4 163:20 164:17, 18

**truthful** 10:4, 11 104:19 117:25

**turf** 115:15

**turn** 39:22 74:15 75:14,22, 25 79:17 89:10, 19 94:25 97:1 100:15 109:17 122:22 131:2 135:7,10,18 136:3 167:25

**turned** 72:3

**turning** 17:8 55:9 84:14 148:16

**type** 94:3

**typed** 30:21 90:11

**types** 139:11

**typical** 108:20

**typically** 28:3 47:2

_____

**U**

**Uh-huh** 11:21 16:14 25:12 29:16 55:18 156:24

**ultimately** 18:4 40:18

**unblemished** 104:15

**uncle** 139:7 148:9

**unclear** 9:19

**undergrad** 12:18,21 13:9, 17

**undermine** 56:18

**underneath** 90:13 124:22

**undersigned** 80:1

**understand** 18:17 48:8 86:1 161:11

**understanding** 33:12 40:19 101:19 133:5 168:8

**understood** 9:23 10:20 35:23 36:22 46:5 83:24 90:18 99:16 100:15 109:23 122:3,22 123:12 124:21 125:5 126:1,2, 5,14 131:2 135:14

**undertaken** 70:25

**unequivocally** 174:22,24 175:6

**unit** 15:15 17:12,14 22:22

23:8 59:4

**United** 7:9

**units** 21:3

**University** 12:15

**unlike** 110:7

**unusual** 21:8 22:15 88:4,10

**unvarnished** 104:14

**upfront** 37:11 39:8

**upset** 100:12

**upstairs** 149:15

_____

**V**

**vacant** 100:24 114:22

**varied** 16:5

**veracity** 40:15

**verbatim** 49:15

**verified** 159:5

**verify** 108:21 125:3 151:24

**versus** 20:2,5

**vet** 68:13

**vicinity** 93:3 155:24

**vicious** 145:14

**Victim** 156:1

**victims** 17:1,2 18:4 145:9,10, 14 146:9

**victims'** 46:1

**video** 41:6 88:16 176:23

**VIDEOGRTAP HER** 73:3

**view** 17:5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

JGS_MAYSONET 3207

Case: 1:18-cv-02342 Document #: 367-7 Filed: 07/17/24 Page 428 of 428 PageID #:21420
The Deposition of JOHN PINZON, taken on December 06, 2023

200

161:6,9

**viewed** 162:21

**violence** 44:12
70:24 78:2

**violent** 20:7,13
44:7 81:4

**voluntary**
37:10

———————

**W**

**wade** 142:17

**wait** 92:3 141:6
176:24

**waiting** 48:2

**wake** 65:19

**waking** 31:23

**walk** 24:10
71:12 136:17,
19

**walking** 43:10
60:1 131:12,13,
15 136:15
143:23

**wall** 81:8

**wanted** 16:18
32:17 36:2
42:10,21 50:3
51:6 87:14
95:13,15,16
104:7 127:4
163:4,20

**warnings**
90:11 124:23

**warrior** 145:9

**wasting** 86:4

**watched** 108:4

**watching**
101:2

**water** 31:20
53:3 175:1

**ways** 41:2,4
87:20 147:7

**Weapon** 155:8

**week** 22:23

**weeks** 61:24

**west** 23:7,22
24:5 58:13
90:10 155:12

**whatsoever**
174:11

**whistleblower**
16:3

**who'd** 65:13

**wide** 149:16

**Wiener** 115:10
117:3 119:13
169:15,18,21,
24 174:3,4

**Wiley** 62:25
63:11 90:9
107:20 114:17
116:3,8 117:15
139:25 142:25
143:7 153:1,6

**willingness**
82:6

**window** 58:18
150:7

**wished** 128:4

**withdrawal**
37:18 38:22

**withdrawals**
38:1 118:21

**withhold**
152:20

**witness's**
49:25

**witnessed**
48:17

**witnesses**
18:3,12 22:8
24:22 26:16
62:14 69:16
71:3,6,8,11,15
78:2,7 105:1
115:9 117:2
134:12,14,15
135:4

**witnesses'**

78:13,16

**women** 23:20
24:1 159:10

**word** 33:2
49:12 87:17
92:14,15 103:1
105:16 145:20

**words** 37:3

**work** 13:9 14:1
15:12 17:15
22:6 45:19,20
56:17,20,24
59:7,10,14 60:6
61:3,13,19 62:5
125:20 148:20
162:21

**worked** 57:2,
11 59:13,18,23
61:4,22

**working** 17:16
19:14 21:6 22:5
23:25 24:9
35:22 58:13
60:25 62:13
77:6 90:20
93:16 132:24
135:4

**worst** 122:14
176:6

**worst-** 122:19

**would've**
48:23 65:24
66:13 71:24,25
72:6,7,20,22
80:6 81:21 82:2
84:8 107:10
110:3 114:9
115:23 117:22
118:13 119:24
120:4,7 121:4,7
122:8,12 126:3
130:13 140:11
142:1,2,17
143:16 148:6,7
153:6 162:2
169:8 172:8,9,
11,12 175:3,9,
12,13

**write** 18:1
36:23 49:1,2,4,

7,12,16,19,24
51:16,17,23
87:17 91:8,14,
18 105:6
107:13 108:6
126:19 167:7
168:5 171:21
172:5,10 173:5,
9,13 175:24,25

**writing** 106:4,7
108:5 125:1,18
173:4

**written** 26:21
27:9 108:8

**wrong** 98:14
106:4,22
122:14 141:21
142:21 143:21
148:12,25
175:16 176:6

**wrongful** 9:9
176:7

**wrote** 91:25
105:12,25
106:19 107:9,
16,22 109:10
110:7 123:16
124:25 125:11,
25 167:19
168:7

———————

**Y**

**year** 12:16,23
14:23 22:24
128:14

**years** 9:8 10:18
15:8,11,18 55:6
63:3 64:8 99:9,
11 110:6

**yesterday**
96:8 111:15
115:24

**young** 115:18

———————

**Z**

**Zoom** 172:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



JGS_MAYSONET 3208