*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 48

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly when found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Ide...tion, indicate I.D. number at end of Narrative. Describe approx... scription, if possible, should include number if known, nick...me, sex, race, code, age, height, weight, color eyes & hair, comp... scars, marks, etc. If suspect is arrested, give name, sex, race code, a... ...d, or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
**CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY**

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE–TIME | | |
|---|---|---|
| DAY **25** | MO. **May** | YR. **90** |

TIME **0100**

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ☒1 VERIFIED ☐2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE, 1st. Degree Murder | 0110 | 3438 W. North Ave. | 1422 |

| 5. VICTIM'S NAME ON CASE REPORT | CORRECT ☒ YES ☐2 NO | IF NO, CORRECT ALL VICTIM INFOR- MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ☐1 YES ☒ NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5532 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | 4 |

| CIRCUM STANCES | 11. ☒VERI- FIED | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|---|
| | ☐UPDATE TO | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | CODE NO. | CODE NO. |

| 19. | DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN : R = RECOVERED | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT. | | | | | |
|---|---|---|---|---|---|---|---|
| PROPERTY | ☒VERIFIED **Dna** | 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R |
| | ☐UPDATE TO | 3 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | 1 FIREARMS ☐T $ ☐R | 6 NARC/DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R |

| VICTIMS UPDATE ONLY | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN- JURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

| OFFENDERS UPDATE ONLY | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|
| 1. | GOSENS, Christopher | 2033 W. Diversey | M 4 18 | 6-0 | 175 | Brn | Blk | Dk |
| 2. | | | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | I/OFFENDER I/REL CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL CODE | 32. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF 1 | 8703-496 | 885625 | 24 | OFF 2 | | | 1 | 652 |

| 33. OFF'S VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐USED ☐STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☒1 DNA | ☐2 VERIFIED | ☐3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE† | 52. METHOD GENERAL | 617 | 53. STATUS | | |
|---|---|---|---|---|---|---|---|
| Dna | Dna | Dna | ☒ FIELD ☐3 SUMMARY | 652 | ☐0 PROGRESS | ☐1 SUSPENDED | ☐2 UNFOUNDED |

| STATUS CONT'D. | | | | | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|---|---|---|
| ☒1 CLRD. CLOSED | ☐4 CLRD. OPEN | 5 EXC. ☐ CLRD. CLOSED | 6 EXC. ☐ CLRD. OPEN | 7 CLSD. ☐ NON- CRIM. | ☒1 ARREST & PROSEC. | ☐2 DIRECTED TO JUV. CRT. | ☐3 COMPL. RFUSD. TO PROSECUTE | ☐4 COMMUNITY ADJUSTMENT | ☐5 OTHER EXCEPT. | ☒ ADULT ☐ JUV. |

95. ☐FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

| 80. NARRATIVE | |
|---|---|
| IN CUSTODY: | GOSENS, Christopher AKA FERNANDEZ, Christopher, Street Name "Fro", M/WH/18; [redacted] 2033 W. Diversey; 6-0, 175 lbs.; Brn. Blk. Dark Comp. IR# 885625. |
| ARRESTING OFFICERS: | Det. J. Bogucki #16640, A/5 V.C. Det. R. Schalk #14250, A/5 V.C. P.O. J. Colon #17820, 019 Dist. Tact. P.O. J. Delpilar #3902, 019 Dist. Tact. |
| DATE, TIME, LOCATION OF ARREST: | 23 Nov 90, 1630 hours at 2801 N. Damen on the street |
| CHARGES & COURT: | Released without charging |
| NOTIFICATIONS: | ASA Cenar & ASA Eannace, Felony review |

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| Normal | DAY **24** | MO. **Nov** | YR. **90** | 2100 | KuHn | 1013 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE | |
|---|---|---|---|---|---|
| Det. J. Bogucki | 16640 | Det. R. Schalk | 14250 | | |
| SIGNATURE | | SIGNATURE | | 95. DATE APPROVED (DAY–MO.–YR.) | TIME |
| | | | | 24/11/90 | 0945 |

PO-11.541-B (Rev. 8/85) *MUST BE COMPLETED IN ALL CASES

RFC-AGonzalez 000039

Detective Division A/5 V.C.   Page 2    24 Nov 90
HOMICIDE, 1st. Degree Murder
Torrence & Kevin WILEY          RD# N-234 297

STATEMENT:    Christopher GOSENS

INVESTIGATION:   The R/Dets. were made aware that the before mentioned 019 Dist.
         officers had who they believed to be "Fro" in custody. This
subject had identified himself as Christopher GOSENS. This subject was transported to
Area 5 for further investigation. The R/Dets. observed that the picture of "Fro", which
was in the street file, looked identical to Christopher GOSENS. The R/Dets. obtained
the arrest record of GOSENS and found that he had used the last name of FERNANDEZ on his
last arrest.

       GOSENS denied that he had ever been called "Fro" or that he had
ever used the name FERNANDEZ. He did state that he at one time lived at 1035 N. Spauld-
ing. The R/Dets. interviewed Mirta COTTO who is the girlfriend of GOSENS and was with
GOSENS at the time of his arrest. She stated that she thought his name to be GOSENS,
but knew that his sister's name was FERNANDEZ.
       The R/Dets. advised Christopher GOSENS of his rights per Miranda
afterwhich he stated the following in essense:

Christopher GOSENS:  GOSENS again denied that he had ever been called by the street
         name of "Fro". He again denied that he ever used the name of
FERNANDEZ. He stated that he had no knowledge of this incident. When the R/Dets.
asked GOSENS if he knew Jose MAYSONET, Justino CRUZ, or Alfredo GONZALEZ. He replied
that he did not know any of these subjects. GOSENS also stated that he had no idea
what he was doing on 25 May 90 at about 0100 hours.

       The R/Dets. asked GOSENS if he would be willing to take a poly-
graph test. He stated that he would. Arrangements were then made for GOSENS to be
tested. At about 0100 hours, polygraph examiner TOVAR advised GOSENS of his rights
per Miranda afterwhich he was tested. Following the polygraph test, GOSENS admitted
knowing Jose MAYSONET, Justino CRUZ & Alfredo GONZALEZ to Tech. TOVAR. He told TOVAR
that he was a Latin King and that those three subjects were Latin Kings from a different
faction than he. GOSENS was transported back to Area 5 by the R/Dets. at which time
the Felony Review Unit was notified. It was the opinion of Examiner Tovar that GOSENS
was being untruthful, and was a participant in the homicides.

       The R/Dets. further interviewed GOSENS, who now also told the
R/Dets. what he told Examiner Tovar. He further related that he is known by the nick-
name "Fro". He stated that after the police had gone to his house on Spaulding Ave.,
he moved to Diversey Ave. He continued to deny any participation in the homicides,
or ever going to Jose MAYSONET & Rosa BELLO's apartment on 24/25MAY90.

       ASA Cenar arrived at Area 5 and was advised of the facts of the
case. After reviewing all the reports, ASA Cenar interviewed Christopher GOSENS. ASA
Cenar advised GOSENS of his rights and questioned him regarding the homicides. GOSENS
continued to deny his participation, and related the same account as last told the
R/Dets. ASA Cenar then consulted with ASA John Eannace and GOSENS was subsequently
held in the 025 District lock-up pending further investigation and interviews.

       On 24NOV90, ASA Cenar and the R/Dets. interviewd Rosa BELLO.
She related the same account as in her written statement which was previously taken.

Continued on Page 3

RFC-AGonzalez 000040

Detective Division A/5 V.C.      Page 3      24 NOV 90
HOMICIDE, 1st Degree Murder
Torrence & Kevin WILEY                        RD# N-234-297

INVESTIGATION:      Christopher GOSENS was again interviewed by ASA Cenar and the
R/Dets. He then continued to deny any knowledge or partici-
pation.

      ASA Cenar again contacted ASA John Eannace, who rejected charges
on Christopher GOSENS due to insufficient evidence. GOSENS was subsequently released
from custody.

      The R/Dets. request that this previously Cleared by Arrest
case be now considered Closed, with the apprehension of the final offender.

      Det. R. Schalk#14250
      Det. J. Bogucki#16640

RFC-AGonzalez 000041

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 49

Criminal Division

## Case Summary

🔒 **Case No. 90111987901**

| | | | |
|---|---|---|---|
| **People of the State of Illinois vs. JOSE J MAYSONET** | § | Location: | **Criminal Division** |
| | § | Judicial Officer: | **Martin, LeRoy K, Jr.** |
| | § | Filed on: | **08/28/1990** |
| | § | Central Booking Number/Document Control Number: | **8628787** |
| | § | Record Division Number: | **N303737** |
| | § | IR Number: | **0772277** |

---

### Case Information

---

| Offense | Statute | Degree | Offense Date | Filed Date | | |
|---|---|---|---|---|---|---|
| Jurisdiction: **Chicago (25th) District 25** | | | | | Case Type: | Municipal |
| 001. 38 9-1A2 | 38 9-1A2 | MA | 01/01/1900 | 08/28/1990 | Case Status: | **09/05/1990 Case Disposed** |

Arrest
Date: 08/22/1990
Agency: 125 - Chicago (25th) Grand Central
DCN: 8628787    Sequence: 001

### Statistical Closures

09/05/1990   Disposed

---

### Assignment Information

---

**Current Case Assignment**
Case Number        90111987901
Court              Criminal Division
Date Assigned      08/28/1990
Judicial Officer   Martin, LeRoy K, Jr.

---

### Party Information

---

**Defendant   MAYSONET, JOSE J**
Other Agency Number:   0772277 IR Number

---

### Events and Orders of the Court

---

10/03/1990   **Continued to**   (9:30 AM)
Resource: Location CR1701 Criminal Division, Courtroom 101

09/05/1990   **Motion State**   (9:30 AM)
Resource: Location CR1166 Branch 66/Room 101

09/05/1990   **Disposition** (Judicial Officer: Bastone, Robert P.)
001. 38 9-1A2
Superceded by Direct Indictment
DCN:   8628787
Sequence:   001

09/05/1990   Superseded By Direct Indictment   (Judicial Officer: Bastone, Robert P.)
*ROOM: BRANCH 66 RM 101 JDGE: 0277 REF: C001 CDATE: 10/03/1990 ROOM: 101 DESC: RM*

Printed on 06/27/2024 at 5:12 PM

JGS_MAYSONET 5026

Criminal Division

## Case Summary

🔒 **Case No. 90111987901**

08/24/1990   Probable Cause To Detain     (Judicial Officer: Locallo, Daniel M)
*ROOM: BRANCH 66 RM 101 JDGE: 0214 DESC: RM*

08/24/1990   No Bail     (Judicial Officer: Locallo, Daniel M)
*ROOM: BRANCH 66 RM 101 JDGE: 0214 DESC: RM*

08/24/1990   Motion State - Continuance     (Judicial Officer: Locallo, Daniel M)
*ROOM: BRANCH 66 RM 101 JDGE: 0214 CDATE: 09/05/1990 ROOM: BRANCH 66 RM 101 DESC: RM*

JGS_MAYSONET 5027

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 50

```
STATE OF ILLINOIS )
                  ) ss.
COUNTY OF C O O K )

        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE   )
STATE OF ILLINOIS   )   Indictment No. 90-21787
                    )
        VS          )   Before JUDGE LORETTA HALL
                    )   MORGAN
                    )   (and a Jury)
ALFREDO GONZALEZ    )   Friday, March 27th, 1992

                        12:00 o'clock p.m.


        Court convened pursuant to adjournment.


     PRESENT:

        Hon. Jack O'Malley,
           State's Attorney of Cook County, by
        Mr. Frank Marek, and
        Mr. Joel Leighton,
           Assistant State's Attorneys,
           appeared for the People.

        Mr. David Wiener,
           appeared for the Defendant.

               - - - - - - - -
```

24

F1

JGS_MAYSONET 4276
GONZALEZ 0165388

```
 1          THE CLERK:  Alfredo Gonzalez.

 2                          (Following proceedings in

 3                          chambers)

 4          THE COURT:  If we can shut that outer door.

 5   Mr. Label, just have a seat.

 6          I did receive the communications you sent

 7   to me relative to the concerns that your having

 8   about this case.  One of the concerns that I have

 9   is whether or not you have communicated any of this

10   to any of the other jurors?

11          JUROR LABEL:  No.  I haven't said a thing.

12          THE COURT:  Q  This was typed at home?

13          A    That's right.

14          Q    Have you said anything at all to them

15   about --

16          A    No.

17          Q    -- your situation and your connection with

18   the Latin Kings?

19          A    I realized it was important not too, so I

20   didn't.

21          Q    Okay.  All right.

22               Anything else anybody want to inquire?

23          MR. WIENER:  No, nothing else.

24          THE COURT:  Mr. Label, we are all sympathetic
```

F2

JGS_MAYSONET 4277
GONZALEZ 0165389

1    to your concerns and I think it is the

2    conscientious of the parties as well as the court

3    that we are going to excuse you from service on

4    this jury pursuant to your information.  You did

5    the appropriate thing.  The only concern we had,

6    and I'm sure you can understand why, that none of

7    this was communicated to anybody else on the jury.

8        Q    Your absolutely sure that's true?

9        A    Yes.

10       Q    Because if it is, you just need to tell me

11   because there are things I need to do about that?

12       A    Right.

13       Q    You have not, is that corret?

14       A    No, I have not.

15    THE COURT:  Okay.

16        Counsels for either side, any other

17   questions you would like me to put to the

18   gentlemen?

19    MR. WIENER:  Not at all.

20    MR. MAREK:  No.

21    THE COURT:  Very well.  I'm going to be

22   excusing Mr. Label.  So you are excused?

23    JUROR LABEL:  Thank you very much.

24            (Juror Label excused)

F3

JGS_MAYSONET 4278
GONZALEZ 0165390

THE COURT: All right. It's amazing how often this happens. I mean, that is why alternate jurors do make a difference. When I give that speech, it just isn't PR.

When the jury takes the box, I am simply announcing the first alternate will go in.

MR. LEIGHTON: Don't --

MR. MAREK: Can we do one thing. Could we just bring our guy who is in custody like through the outer door and into the courtroom and put him in the probation office?

MR. WIENER: Im told the State their next witness is?

THE COURT: Who is this.

MR. WIENER: Justino Cruz.

The next witness they have is a police technician and I told him I had no objection to Cruz being put into that room so if he even might hear that witnesses testimony, it has no bearing on what his testimony would be.

THE COURT: That's doesn't matter to me.

MR. WIENER: We're talking about for the purposes of the motion to exclude.

THE COURT: What room?

F4

JGS_MAYSONET 4279
GONZALEZ 0165391

```
 1        MR. WIENER:  I have no problem.  It is just a

 2   one minute witness with a stipulation.

 3        THE COURT:  Now, in terms of timing, though.  I

 4   would expect Mr. Cruz to be a lengthy witness.

 5        MR. WIENER:  I don't think so, Judge.  I mean

 6   my cross-examination is going to be to the point.

 7        THE COURT:  I'm trying to figure out for lunch.

 8   They have to order things.  I'm trying to get a

 9   sense of that.

10          You think we can break at one?

11        MR. WIENER:  Probably.

12        MR. LEIGHTON:  I mean, that's going to be

13   pretty much up to Mr. Wiener.

14        MR. WIENER:  Yes.

15        MR. LEIGHTON:  That's going to depend on how

16   long your cross is.

17        MR. WIENER:  Well, my crosses are never long.

18   Unfortunately, I just don't have the mental

19   capacity.

20        THE COURT:  It is refreshing.

21          Thank you.

22                         (Following proceedings in

23                          open court)

24        THE COURT:  For the record, let the record
```

F5

JGS_MAYSONET 4280

GONZALEZ 0165392

1   reflect there was, even though, that was on the

2   record, but I don't know whether it was formally

3   stated on the record that Mr. Richard Label, who

4   was a juror in this case has been excused by this

5   court pursuant to the disclosures of his letter

6   which he directed to this court this morning which

7   was shared with counsel for both sides and which in

8   fact counsel, for your information, is going into

9   the court file to be made part of the common law

10  record.

11          Mr. Wiener.

12      MR. WIENER:  Thank you very much, Judge.

13      THE COURT:  If you would put that in the court

14  file.

15      MR. WIENER:  That's a good idea.

16      THE COURT:  I put all notes.  I put everything

17  in there.

18      MR. WIENER:  Thank you, Judge.

19      THE COURT:  That comes from being an old

20  appellate lawyer.

21      MR. WIENER:  A young appellate lawyer, Judge.

22      THE COURT:  Thank you.

23          Now, I just want to check back.  The first

24  alternate is Mr., the name I cannot pronounce.

F6

JGS_MAYSONET 4281
GONZALEZ 0165393

```
 1          MR. WIENER:  That's -- who it is, Judge?

 2          THE COURT:  Do you remember how to pronounce

 3      it?

 4          MR. MAREK:  I know how.  Wichisony.

 5          THE COURT:  Wichisony.

 6               Deputy Soto, our best guesstimate we're

 7      going to have to two witnesses before lunch.  One

 8      is very short, one may be a little lengthy.  We

 9      will expect to be breaking between one and 1:15 for

10      lunch.  And Deputy Tenant, for your information in

11      terms of the jurors, somewhere between one and

12      1:15.

13               All right.  I guess we're ready for the

14      jury.  And just have them seated in their normal

15      seats and I will formally apprise Mr. Wichisony

16      that he is to take the other jurors seat.

17                          (Jury returned to open

18                          court)

19          THE COURT:  Good morning, ladies and gentlemen.

20          THE JURY:  Good morning.

21          THE COURT:  Everyone maybe seated.

22               We are, this morning, going to take two

23      witnesses before we break for lunch.  Ladies and

24      gentlemen, I have had occasion to excuse one of the
```

JGS_MAYSONET 4282
GONZALEZ 0165394

1    persons who was in the primary jury of 12.

2    Alternate number one, Mr. -- say the word.

3        JUROR WICHISONY:  Wichisony.

4        THE COURT:  Wichisony.

5            Mr. Wichisony, being alternate number one,

6    you will replace the excused juror.  If you would

7    step down and take that seat and have that seat for

8    for remainder of the trial.

9            Alternate number one has been seated.

10           State, are you ready to proceed?

11       MR. LEIGHTON:  We are, your Honor.

12       THE COURT:  Very well.  Call your next witness.

13       MR. MAREK:  At this time the People call

14   Detective Steve Gawrys.

15       THE CLERK:  Raise your righthand, sir.

16               STEVEN GAWRYS,

17   called as a witness on behalf of the People of the

18   State of Illinois, having been first duly sworn,

19   was examined and testified as follows:

20               DIRECT EXAMINATION

21               BY MR. MAREK:

22       MR. MAREK:  Q  Detective Gawrys, would you

23   state your full name and spell your last name

24   please, for the record?

F8

JGS_MAYSONET 4283
GONZALEZ 0165395

```
 1        A     Detective Steven Gawrys.  Last named

 2   spelled G A W R Y S.  Star number is 20689,

 3   assigned to Area 5 Violent Crimes.

 4        Q     And Detective Gawrys, how long have you

 5   been a Chicago Police Officer?

 6        A     Almost 15 years now.

 7        Q     And how long have you been assigned to

 8   Area 5 Violent Crimes?

 9        A     About two years.

10        Q     Now, Detective Gawrys, I want to direct

11   your attention to August the 23rd of 1990.  Were

12   you assigned to Area 5 Violent Crimes at that time?

13        A     Yes.

14        Q     And on August 23rd, 1990, you were

15   assigned to work on the investigation into the

16   homicide of Kevin and Torrence Wiley, which had

17   occurred earlier in May of 1990?

18        A     Yes, I was.

19        Q     Now, in connection with that

20   investigation, on August 23rd of 1990, during the

21   early morning hours were you looking for anybody in

22   particular?

23        A     Yes.

24        Q     And who was that?
```

F9

JGS_MAYSONET 4284

GONZALEZ 0165396

1     A    Subject by the name of Alfredo Gonzalez.

2     Q    And were you searching for Mr. Gonzalez by

3  yourself or in the company of another police

4  officer?

5     A    I was with a supervisor sergeant Edward

6  Mingey.

7     Q    Now, on August 23rd, 1990, during the

8  early morning hours, were you successful in

9  locating the person you were searching for?

10     A    Yes.

11     Q    And do you remember approximately where

12  you located Mr. Gonzalez?

13     A    Around Lemoyne and Homan.

14     Q    And is that person in the courtroom?

15     A    Yes.

16     Q    Would you point him out for the record?

17     A    The subject in the black and whiteish

18  sweater with the turtle neck.

19    MR. MAREK:  May the record reflect in court

20  identification of the defendant Alfredo Gonzalez,

21  your Honor?

22    THE COURT:  Very well.

23    MR. MAREK:  Q  Now, when Mr. Gonzalez was

24  located, did you take him anywhere?

F10

JGS_MAYSONET 4285

GONZALEZ 0165397

1          A       No.   We took him about a block up to North

2     Avenue which would be Homan and Kimball.   The same

3     street.

4          Q       And what was at that location?

5          A       We made a meet with two other detectives.

6          Q       And who were those detectives?

7          A       Detective Guevara and Detective Halvorsen.

8          Q       And was -- what was your purpose in

9     meeting up with Detective Halvorsen and Detective

10    Guevara?

11         A       So they could identify the subject that we

12    had.

13         Q       And did they in fact identify the subject

14    as Alfredo Gonzalez?

15         A       Yes, they did.

16         Q       And after that, was Mr. Gonzalez taken to

17    the Area 5 Violent Crimes Offices?

18         A       Yes, he was.

19         Q       And did you participate any further in the

20    investigation of this case?

21         A       No.

22         Q       Mr. Gonzalez at that time was turned over

23    to Detectives Halvorsen and Guevara?

24         A       That's correct.

F11

JGS_MAYSONET 4286
GONZALEZ 0165398

1     Q    Now, Detective Gawrys, you have been

2    working in the, at Area 5 Violent Crimes for about

3    how long?

4     A    A couple years there.

5     Q    Now, are you familiar with the vicinity of

6    3400 west on North Avenue?

7     A    Yes.

8     Q    And are you familiar with the alley behind

9    North Avenue at that approximate location?

10    A    Yes.

11    Q    Detective Gawrys, I'm going to show you

12   what has been marked People's Exhibit Number 21 for

13   identification and I'll ask you if this diagram

14   truly and accurately portrays the, at least a

15   portion of the 3400 block of West North Avenue?

16    A    Yes, it is.

17    Q    And does it also truly and accurately

18   depict the alley behind North Avenue at that

19   location?

20    A    Yes.

21    Q    And is this in fact the alley behind North

22   Avenue there?

23    A    There is a alley there.

24   MR. MAREK:  No further questions.

F12

JGS_MAYSONET 4287

GONZALEZ 0165399

1    MR. WIENER:  Judge, I have no questions of

2  Detective Gawrys.

3    THE COURT:  Thank you, detective.  You may step

4  down.

5                              (Witness excused)

6    MR. LEIGHTON:  Judge, may we approach?  May I

7  approach the bench for one moment?

8    THE COURT:  Yes, you may.

9                         (Conference at the bench

10                        out of the hearing of the

11                        reporter and the jury,

12                        after which time the

13                        following proceedings had

14                        in their hearing)

15    MR. LEIGHTON:  May I call our next witness,

16  Judge?

17    THE COURT:  Yes, you may.

18    MR. LEIGHTON:  At this time the People have the

19  State of Illinois call Justin Cruz.

20    THE CLERK:  Yes, sir.  Raise your righthand,

21  sir.

22                    JUSTINO CRUZ,

23  called as a witness on behalf of the People of the

24  State of Illinois, having been first duly sworn,

F13

JGS_MAYSONET 4288

GONZALEZ 0165400

1    was examined and testified as follows:

2                    DIRECT EXAMINATION

3                    BY MR. LEIGHTON:

4        THE CLERK:  Please be seated.

5        MR. LEIGHTON:  May I proceed, your Honor?

6        THE COURT:  Yes, you may.

7        MR. LEIGHTON:  Mr. Cruz, I want you to keep

8    your voice up nice and loud so that all the ladies

9    and gentlemen on the jury can hear every word you

10   say, all right?

11       A    Yes.

12       Q    Sir, tell the ladies and gentlemen of the

13   jury your name?

14       A    Justino Cruz.

15       Q    And I would like you to spell your last

16   name for the court reporter?

17       A    C R U Z.

18       Q    Mr. Cruz, how old are you?

19       A    Twenty-three.

20       Q    Mr. Cruz, are you a defendant in this case

21   charged with the murders of Torrence -- strike

22   that.  Torrence and Kevin Wiley?

23       A    Yes, sir.

24       Q    Do you have an agreement with the Cook

                        F14

JGS_MAYSONET 4289

GONZALEZ 0165401

1    County State's Attorneys Office regarding your

2    testimony?

3         A    Yes.

4         Q    Tell the ladies and gentlemen of the jury,

5    what that agreement is?

6         A    For my truty I be getting 22 years.  They

7    recommend 22 years for my testimony.

8         Q    That's for your truthful testimony?

9         A    Yeah.

10        Q    Now, Mr. Cruz, we will recommend 22 years,

11   correct?

12        A    Yes.

13        Q    Who will make the actual decision as to

14   what you will be sentenced to?

15        A    The Judge.

16        Q    That is Judge Morgan, correct?

17        A    Yes.

18        Q    And you will also be pleading guilty to

19   only one of the murders, correct?

20        A    Yes, sir.

21        Q    Now, without this agreement, what range of

22   sentences were you looking at in this case?

23        A    Life in prison or death penalty.

24        Q    What range of sentences would you

F15

JGS_MAYSONET 4290
GONZALEZ 0165402

```
 1    theoretically be eligible for the one murder to

 2    which you are going to plead guilty?

 3        A    Twenty to 60.

 4        Q    Mr. Cruz, have you ever been convicted of

 5    a crime?

 6        MR. WIENER:  Objection.

 7        THE COURT:  Basis?

 8        MR. MAREK:  Can we approach and have a side

 9    bar?

10        THE COURT:  You may.

11                              (Conference at the bench

12                               out of the hearing of the

13                               reporter and the jury,

14                               after which time the

15                               following proceedings had

16                               in their hearing)

17        THE COURT:  Very well.

18            The objection I gather has been withdrawn.

19    You may proceed.

20            Would you read the question back for the

21    benefit of the witness who is instructed he may now

22    answer the question.

23                              (Record read)

24        THE WITNESS:  Yes.
```

F16

JGS_MAYSONET 4291
GONZALEZ 0165403

1       MR. LEIGHTON:  Q  What were you convicted of?

2       A    Marijuana.

3       Q    Was that possession of marijuana?

4       A    Yes.

5       Q    What sentence did you receive for that?

6       A    Year probation non reporting.

7       Q    You were on that probation that one year

8  non reporting probation at the time that you were

9  involved in this case, correct?

10      A    Yes, sir.

11      Q    Where are you currently residing, Mr.

12  Cruz?

13      A    The witness protection center of Cook

14  County Jail.

15      Q    Now, Mr. Cruz, did you ever approach the

16  State's Attorneys Office through your lawyer and

17  offer to testify for the State?

18      A    No.

19      MR. WIENER:  Objection as to who he approached

20  through his lawyer, Judge.

21      THE COURT:  Overruled.

22          The answer may stand.  The answer was

23  "no," I believe.

24      MR. LEIGHTON:  Q  In fact, we approached you

F17

JGS_MAYSONET 4292
GONZALEZ 0165404

1    through your attorney Mr. Vahey, in the beginning

2    of January of this year with regard to a possible

3    agreement for your testimony, correct?

4        A   Yes.

5        Q   At that time how long had you been in

6    custody awaiting trial in Cook County Jail?

7        A   Around 15 months.

8        Q   And when the State's Attorneys Office

9    first approached you through your attorney about

10   our agreement for your truthful testimony in

11   January, you indicated to us that through your

12   attorney that you wouldn't testify for us, correct?

13      MR. WIENER:  Objection.

14      THE WITNESS:  Yes.

15      MR. WIENER:  As to what his attorney told.

16      MR. LEIGHTON:  May we approach the witness,

17   Judge?

18      THE COURT:  Counsel, yes.  Just approach for a

19   second.

20                  (Conference at the bench

21                  out of the hearing of the

22                  reporter and and the jury,

23                  after which time the

24                  following proceedings had

JGS_MAYSONET 4293

GONZALEZ 0165405

1                          in their hearing)

2        THE COURT:  Overruled.

3        MR. LEIGHTON:  Could I have the last question

4   read back to the witness?

5        THE COURT:  Yes, you may.

6                                  (Record read)

7        THE COURT:  Very well.  The objection is

8   overruled.  The witness may answer.

9        MR. LEIGHTON:  Q  So you initially indicated to

10  us that you would not testify as a State witness,

11  right?

12       MR. WIENER:  Objection.  Asked and answered,

13  Judge.

14       THE COURT:  Overruled.  You may answer again.

15       THE WITNESS:  No, sir.

16       MR. LEIGHTON:  Q  In fact, you, through your

17  attorney Mr. Vahey, did not accept the State's

18  proposed agreement to testify in this case until

19  March 13th of 1992, correct?

20       MR. WIENER:  Judge, it assumes a fact and it

21  wasn't the same agreement.

22       MR. LEIGHTON:  Excuse me, counsel.  May we

23  approach the bench?

24       THE COURT:  Counsel, do not argue.

JGS_MAYSONET 4294
GONZALEZ 0165406

1        Counsel, the objection is overruled.  You

2    may cross-examine.

3        MR. WIENER:  Thank you.

4        MR. LEIGHTON:  May I have the question read

5    back?

6        THE COURT:  Yes.

7                              (Record read)

8        THE WITNESS:  Yes.

9        MR. LEIGHTON:  Q  Mr. Cruz, how old are you?

10       A    Twenty-three.

11       Q    Do you know Alfredo Gonzalez?

12       A    Yes, sir.

13       Q    How do you know Alfredo Gonzalez?

14       A    We related.

15       Q    How are you related?

16       A    He is my uncle.

17       Q    How is he your uncle?

18       A    He is my mother's brother.

19       Q    Is your mother living now?

20       A    No.

21       Q    Mr. Cruz, take a look around the

22   courtroom.  Do you see Alfredo Gonzalez here today?

23       MR. WIENER:  I'll stipulate he could identify

24   the defendant in open court, Judge.

F20

JGS_MAYSONET 4295

GONZALEZ 0165407

```
 1        THE COURT:  You wish to stipulate?

 2        MR. LEIGHTON:  So stipulated.

 3        THE COURT:  Very well.

 4        MR. LEIGHTON:   Q   How long have you known the

 5   defendant Alfredo Gonzalez?

 6        A     All my life.

 7        Q     How old is Alfredo Gonzalez?

 8        A     Around 32.

 9        Q     Do you also know an individual named Jose

10   Maysonet

11        A     Yes, sir.

12        Q     As of May, 1990, how long had you known

13   Jose Maysonet?

14        A     Around a year and a half.

15        Q     Do you know an individual with the

16   nickname of Fro?

17        A     Yes, sir.

18        Q     Do you know what Fro's real name is?

19        A     Chris Hernandez.

20        Q     As of May of 1990, how long had you known

21   Chris Hernandez?

22        A     Around a year.

23        Q     Did he know -- are you a member of a

24   street gang?
```

F21

JGS_MAYSONET 4296
GONZALEZ 0165408

```
 1        A    Yes, sir.

 2        Q    What gang are you a member of?

 3        A    Latin King.

 4        Q    As of May of 1990, how long had you been a

 5   Latin King?

 6        A    Around two years.

 7        Q    Is Alfredo Gonzalez a member of the Latin

 8   Kings?

 9        A    Yes, sir.

10        Q    Is Jose Maysonet a member of the Latin

11   Kings?

12        A    Yes, sir.

13        Q    Is Chris Hernandez, also known as Fro, a

14   member of the Latin Kings?

15        A    Yes, sir.

16        Q    Mr. Cruz, back in May of 1990, were you

17   working?

18        A    Yes, sir.

19        Q    Where were you working?

20        A    At Form Service.

21        MR. WIENER:  I'm sorry, I didn't get the

22   answer, Judge.  May it be read back?

23        THE COURT:  I think it should be read back.

24   Can you read back the answer, Mr. Court Reporter.
```

F22

JGS_MAYSONET 4297

GONZALEZ 0165409

1                                              (Record read)

2         MR. WIENER:  Thank you.

3         MR. LEIGHTON:   Q   What kind of business is

4    that?

5         A    Print shop.

6         Q    What did you do for that company?

7         A    Shipping and receiving.

8         Q    Back in May of 1990, what were your hours

9    of work?

10        A    From 3 to 11.

11        Q    Okay.

12             And is that morning or in the afternoon?

13        A    In the afternoon.

14        Q    So you would get off work at 11:00 o'clock

15   at night?

16        A    Yes, sir.

17        Q    I'm going to direct your attention to the

18   evening of May 24th, going into the morning of May

19   25th, 1990.  Did you get off work at about 11:00

20   o'clock in the evening?

21        A    Yes, sir.

22        Q    What did you do?

23        A    I went -- I was going to my lady's house.

24        Q    When you say you were going to your lady's

F23

JGS_MAYSONET 4298
GONZALEZ 0165410

1    house.  Was that near North and St. Louis in

2    Chicago.

3         MR. WIENER:  Objection.  Leading the witness,

4    Judge.

5         THE COURT:  Sustained.

6         MR. LEIGHTON:  Q  All right.

7         Q    Where was your lady's house located at

8    that time?

9         A    On Hirsch and Kedzie.

10        Q    Where is that relative to North Avenue and

11   St. Louis?

12        A    Around five blocks or six.

13        Q    What's your lady's name?

14        A    Elizabeth Rivera.

15        Q    Do you have any children by Elizabeth

16   Rivera?

17        A    Yes.  One.

18        Q    Is that a boy or girl?

19        A    A girl.

20        Q    What's her name?

21        A    Priscilla.

22        Q    How old is she?

23        A    Eleven months.

24        Q    Now, as a matter of fact, she wasn't even

F24

JGS_MAYSONET 4299
GONZALEZ 0165411

1     born when you were arrested for this, correct?

2        A    No, sir.

3        Q    As you were going towards, going from work

4     to Elizabeth Rivera's house, how did you first get

5     from your place of work?

6        A    Got on the L station.

7        Q    Okay.

8            And where did you take the L to?

9        A    To Belmont and Kimball.

10       Q    When you got to Belmon and Kimball, what

11    did you do?

12       A    Got on the Kimball bus.

13       Q    And where did you go on the Kimball bus?

14       A    Towards North Avenue.

15       Q    And did you get off the bus?

16       A    I got off on Lemoyne and Kimball.

17       Q    And after you got off the bus, where were

18    you walking?

19       A    Down Lemoyne going towards Spalding.

20       Q    Which direction were you walking?

21       A    East.

22       Q    As you were walking down the street, did

23    you see anybody?

24       A    Yes.

F25

JGS_MAYSONET 4300
GONZALEZ 0165412

1      Q    Who did you see?

2      A    Alfredo Gonzalez and Fro.

3      Q    And Fro is also Chris Hernandez?

4      A    Yes.

5      Q    And that's the defendant who is here in

6 court today, Alfredo Gonzalez, correct?

7      A    Yes.

8      Q    And when you saw them, were they on foot

9 or in a car?

10     A    In a car.

11     Q    What kind of car was it?

12     A    Buick.

13     Q    Do you remember what color it was?

14     A    Blue.

15     Q    When you saw Fro and the defendant Alfredo

16 Gonzalez in that car, what did you do?

17     A    I was talking to them.

18     Q    Did they stop the car?

19     A    Yes.

20     Q    Who were you talking to first?

21     A    Fro.

22     Q    What did you say to him and what did he

23 say to you?

24     A    He asked me where I was going.

JGS_MAYSONET 4301
GONZALEZ 0165413

```
1          Q    And what did you tell him?

2          A    I said I was going to my lady's house.

3          Q    And what did Fro say to you at that time?

4          MR. WIENER:  Objection to what Fro said to him

5     at that time.

6          THE COURT:  Sustained.

7          MR. LEIGHTON:  Judge, may I approach the bench?

8          THE COURT:  Yes.

9                              (Conference at the bench

10                             out of the hearing of the

11                             reporter and the jury,

12                             after which time the

13                             following proceedings had

14                             in their hearing)

15         THE COURT:  Court reporter in chambers.

16                             (Following proceedings in

17                             chambers)

18         MR. MAREK:  This is going to come up again.  We

19    may as well do it now.  I meant to do it

20    beforehand, Judge.

21              Judge, it's our position that Fro's

22    statements, at least at this point these statements

23    which are admissible to show their effect on the

24    listner.  Because Fro said, and I'm not sure what
```

F27

JGS_MAYSONET 4302
GONZALEZ 0165414

1    the answers is going to be here.  But Fro said

2    something that caused him to get in the car and go

3    along.  And so therefore, that should come in under

4    the definition of non hearsay.

5              Now, later on there will be at least one

6    statement that Fro makes which we will submit is

7    going to be part of the res gestae.  That's going

8    to be Fro said "we're going to do a drug deal."  We

9    think that is certainly admissible because that is

10   what makes him culpable and that is what gives him

11   knowledge as to what they are going there to do.

12        MR. LEIGHTON:  Judge, there is an additional

13   basis for admissibility as well.  That is we would

14   take the position -- if I could make an offer of

15   proof briefly Judge, so it would perhaps be clearer

16   to your Honor.

17        THE COURT:  That would help.

18        MR. LEIGHTON:  Fro states to this witness "get

19   in the car, do you want to go to Juan's house,"

20   being Juan Maysonet.  This witness will then get

21   into the car.  This witness, when he is in the car,

22   the defendant Alfredo Gonzalez will state "we are

23   going to Juan's house to get a gun," at which point

24   Fro will state "we're going to sell some drugs to a

F28

JGS_MAYSONET 4303
GONZALEZ 0165415

1    person.  To some people and we need the gun.  They

2    will then go to Juan's house.  At Juan's house the

3    defendant Alfredo Gonzalez will get the gun or

4    there will be testimony anyway, that he will get

5    the gun.

6            As they are riding in the car right when

7    they get to the scene Judge, all three of them will

8    get out of the car and at that time Fro will state,

9    will direct Mr. Cruz "watch out for any cars coming

10   down the alley."  We will explain why he will

11   testify and incidently I believe -- well, strike

12   that.  That's what he is going to testify Judge, he

13   stays in the alley looking up and down while

14   Gonzalez and Fro or Chris Hernandez walk into the

15   vacant lot and have a brief conversation with the

16   two victims.

17           Now, we take the position first, these

18   statements are offered for the state of mind of the

19   witness, but secondly Judge, well, they are non

20   hearsay for that reason.  Secondly, they are

21   admissible as statements of co-conspirators.  It is

22   our position that indeed our theory of criminal

23   liability for this individual is accountability.

24   This defendant, and when I say that I'm referring

F29

JGS_MAYSONET 4304
GONZALEZ 0165416

1    to Mr. Cruz, because he is technically a defendant

2    in this case.

3        THE COURT:  Accept he is not on trial today.

4    They don't have to deal with him.

5        MR. LEIGHTON:  That's true.

6        MR. MAREK:  But we think they do.  They have to

7    know why it is he is pleading guilty to murder.

8        THE COURT:  There are other ways of doing that.

9    The first statement you have indicated to me I

10   think is hearsay.  And it seems to me that your

11   certainly entitled to, he said that he had a

12   conversation with him.  Pursuant to that he gets

13   into the car.

14       MR. WIENER:  Absolutely.

15       THE COURT:  I don't think you have to introduce

16   Fro saying anything.  Anybody with half a grain of

17   sense knows they have had conversation and got into

18   the car.  there is street no conspiracy count.

19           Doesn't have to have been.

20       MR. WIENER:  I know that, Judge.  But the

21   alleged acts, conversations of co-conspirators, I

22   think there has to be.  Well, I'm just saying

23   Judge, that it is hearsay.  It's designed to prove

24   the truth of what Mr. Cruz is saying on the witness

F30

JGS_MAYSONET 4305

GONZALEZ 0165417

1    stand.

2        THE COURT:  I made my ruling on the first one

3    which I'm not inclined to reconsider.  The first

4    thing you want him to say Fro tells him to get in

5    the car, right?  They are going to get a gun.

6        MR. LEIGHTON:  Okay.

7        THE COURT:  But you got that coming out.

8        MR. LEIGHTON:  Alfredo Gonzalez tells him

9    "we're going to get a gun at Maysonet's house,"

10   that's admissible.

11       THE COURT:  Absolutely.

12       MR. WIENER:  I'm not objecting to -- I'm not

13   objecting to what your going to say Alfredo

14   Gonzalez says.

15       THE COURT:  The first thing I understood which

16   is the question pending where you raised the

17   objection you want him to the say that Fro tells

18   him to get in the car, going to Juan's house.  I'm

19   saying I don't think that comes in under any of

20   your theories.

21       MR. LEIGHTON:  Okay.

22       THE COURT:  And I'm saying as a reality of the

23   matter he has a conversation with him, he gets into

24   the car.  I don't even know what that adds one way

F31

JGS_MAYSONET 4306

GONZALEZ 0165418

1  or the other, frankly. So I'm not going to allow

2  that. I think that is rank hearsay. I don't think

3  that comes in under any exception I'm aware of.

4  I'm not aware of them all. I am willing to listen

5  if you have some to say to me.

6       Now, what's the next thing and I think

7  counsel obviously agrees as I would rule that he

8  can certainly testify as to what the defendant said

9  to him.

10      MR. WIENER: Absolutely.

11      THE COURT: I don't think there is any question

12  about that.

13      MR. WIENER: I can't object to that.

14      THE COURT: The problem you're going to be

15  having is what Fro is saying.

16      MR. LEIGHTON: Well, Judge, Fro says "we need

17  the gun because we're going to go sell some drugs."

18      MR. WIENER: Absolutely, Judge.

19      MR. LEIGHTON: Excuse me, counsel. I'm not

20  finished making my argument.

21      MR. WIENER: Oh, I'm sorry.

22      MR. LEIGHTON: I do have case law I would ask

23  your Honor to consider it.

24      THE COURT: Why don't you tender it to me and I

F32

JGS_MAYSONET 4307
GONZALEZ 0165419

1 will.

2  MR. LEIGHTON: Absolutely, Judge.

3  MR. WIENER: May I have a copy?

4  MR. LEIGHTON: Certainly.

5  THE COURT: If there is not a copy, I'll read

6 it and give it to you, counsel.

7  MR. LEIGHTON: Here is People versus Jackson.

8  THE COURT: Oh, they are prepared.

9  MR. LEIGHTON: We also have Judge, People

10 versus Goodman, which I'll tender to counsel. I

11 would also tender to counsel --

12  THE COURT: No. What statement is this too?

13  MR. MAREK: That we're going to sell drugs.

14  MR. LEIGHTON: If we're going to sell drugs.

15  THE COURT: Being said by Fro.

16  MR. LEIGHTON: To explain why they need the

17 gun.

18   Judge, I have some more case law. People

19 versus Cortez.

20  THE COURT: Well, I don't have any doubt about

21 this rule. But the threshhold question is whether

22 or not this is evidence to support a conspiracy.

23  MR. LEIGHTON: That's also in these cases.

24  THE COURT: One, there is a conspiracy, of

F33

JGS_MAYSONET 4308

GONZALEZ 0165420

1    course, the co-conspirator exception.

2         MR. LEIGHTON:  Well, here, Judge.  I'll tender

3    the last case Thomas, because that is covered in

4    these cases also.

5              Judge, do you want me to proceed further

6    on the issue of --

7         THE COURT:  Why don't you hold on for a second.

8    Let me just read these.  Well, here is, however, an

9    element of the foundation of the use of this

10   exception is because of conspiracy established by

11   evidence independent of the hearsay.

12        MR. LEIGHTON:  Independent of the hearsay, not

13   independent of the witness.  An important

14   distinction.

15        THE COURT:  I never thought about independent

16   of the witness.

17        MR. LEIGHTON:  Yes, Judge.

18        THE COURT:  Well, Jackson doesn't really deal

19   with that.  It deals with a non conspirator.

20   Establishing a conspiracy.  Certainly conspiracy

21   does not need to be charged.

22        MR. LEIGHTON:  Judge, may I be heard?  It's our

23   position that I believe one of the cases addresses

24   this.  You can have the independent evidence of the

F34

JGS_MAYSONET 4309
GONZALEZ 0165421

1    conspiracy can be entirely circumstantial.  Here,

2    Judge, you are going to have the acts in addition

3    to the statements going to getting the case to the

4    location.

5        MR. MAREK:  We also submit Rosa Bello's

6    testimony has a right to support it as

7    corroboration for the conspiracy, Judge.

8        MR. LEIGHTON:  The being present, the

9    conversation which he observed, although he didn't

10   hear, he saw them talking with the two black

11   victims followed by the gun.  Followed by the gun

12   fire.  Judge, that is sufficient circumstantial

13   evidence to support a conspiracy that he is acting,

14   that he is in the alley looking out.  That Alfredo

15   Gonzalez goes walking up to the two men.

16       THE COURT:  Yeah, but that's after all these

17   statements you want to be in.

18       MR. LEIGHTON:  Judge, there is no requirement

19   that they be -- if you look at the case law --

20       MR. MAREK:  Judge, we would submit even what's

21   in the record so far street Rosa Bello, they all

22   come together and they get the gun.

23       MR. LEIGHTON:  More importantly Judge, that's

24   not necessary.  It's not relevant when this is in

JGS_MAYSONET 4310
GONZALEZ 0165422

1   the record that appears.  The question is is there

2   evidence in the record independent of the

3   statement.  And it can be observations by a witness

4   as to what certain individuals did.

5      THE COURT:  Right.

6         But what I'm saying there is nothing in

7   that record.  What your talking about is not in

8   that record yet.  Bello's testimony is in the

9   record.

10      MR. LEIGHTON:  That's true, Judge.

11      MR. MAREK:  They all come together, get the gun

12   and then leave together.  Adding an additional

13   person.

14      MR. LEIGHTON:  Also make an offer of proof,

15   Judge.

16      THE COURT:  Yeah, I understand.

17        Now, Mr. Wiener.

18      MR. WIENER:  Well, first of all Judge, I think

19   under the rules of discovery and evidence that the

20   State would have had to have given me notice that

21   they were going to use evidence of co-conspirator

22   statement.  I do believe that's true.  I believe if

23   a conspiracy exists --

24      THE COURT:  Don't have any such rule.

JGS_MAYSONET 4311
GONZALEZ 0165423

1        MR. WIENER:  I believe, and I haven't been

2    given notice also your Honor, I don't believe that

3    anything that anything Fro said, especially on

4    their theory that this Mr. Cruz is going to be held

5    to this case on the theory of accountability and

6    that is not necessarily a part of a conspiracy, but

7    someone who is a by-stander who was there who

8    didn't back out of the scheme.

9        THE COURT:  That is not what that is, counsel.

10    Come on, you know better than that.

11        MR. WIENER:  I don't believe this is an

12    exception to the hearsay rule under the -- even

13    though conspiracy need not be charged, I think that

14    your Honor in letting this in will allow the jury

15    to feel with benefit of hearsay testimony that this

16    defendant, my defendant is more involved than he

17    would otherwise be with just the competent

18    testimony of Mr. Cruz and clearly Judge, the

19    prejudical affect of that on the hearsay.  The

20    reason for the hearsay rule has been diluted over

21    the years, obviously.  But the reason for the

22    hearsay rule in this case is that the State's

23    offering that these statements not only as

24    co-conspirator, but as truthful statements to

F37

JGS_MAYSONET 4312
GONZALEZ 0165424

1 buttress the testimony of Mr. Cruz, the man who has

2 made a deal for the statement.

3   THE COURT: That is for argument.

4   MR. WIENER: It is. I know it is for argument.

5   THE COURT: Goes to the weight, not

6 admissibility.

7   MR. WIENER: It should not come in. It is

8 blatant hearsay. I'm objecting for the record.

9   THE COURT: The first statement that was

10 proffered to me, I don't know if there is any

11 others. I will repeat so it is clear. Get in the

12 car, going to Juan's. I don't know what that has

13 to do with anything. I think that is hearsay. I'm

14 not going to allow you to do that.

15   I do think based on the offer of proof,

16 based on the evidence already in the record and in

17 fact based on what the statements ought to be kept

18 out goes to the issue of a conspiracy, however not

19 charged, doesn't have to be charged. But it does

20 sound to me as if the State is going to be able to

21 establish a prima facie case of conspiracy and I

22 think that for that next statement I think it does

23 rightly come in under the co-conspirator exception,

24 not to say that counsel can't cross-examine. But I

JGS_MAYSONET 4313
GONZALEZ 0165425

1    think it is admissible under that exception.

2           Now, what else?  Let's thrash it out now.

3    Go smoothly out there.  So the jury can understand

4    what he is likely to object to.

5        MR. MAREK:  That is what basically Fro made

6    statements they were going to sell drugs.  When he

7    gets there he tells him to "watch our back or watch

8    the alley."

9        MR. LEIGHTON:  Watch the alley.

10       MR. MAREK:  That is all that emanates from Fro.

11       MR. WIENER:  "Watch our back and watch the

12   alley," again is just blatant hearsay.  I'm

13   objecting to it.  I can't cross-examine Fro.  I

14   have no ability to do so.

15       THE COURT:  That's correct.

16       MR. WIENER:  The State can put --

17       THE COURT:  It seems to me you can elicit that

18   same information to elicit Mr. Cruz that he agreed

19   to watch.

20       MR. LEIGHTON:  Okay.  So we're clear

21   Judge, --

22       MR. MAREK:  Judge --

23       THE COURT:  Or what was your job.  There are

24   ways you can do that without eliciting Fro's

F39

1   statement.

2       MR. LEIGHTON:  Without eliciting the actual

3   words from Fro.

4       MR. MAREK:  Are we going to get the same

5   objection then we're leading him or whatever?

6       MR. WIENER:  Whether your lead him.  If you

7   lead him, I'll object if your leading him.

8       THE COURT:  You can't have it both ways,

9   counsel.

10      MR. LEIGHTON:  This puts it in a position.  If

11  he wants me up there asking open ended questions,

12  I'll happy to do it.

13      THE COURT:  They are trying to establish what

14  the participation of this witness was.  I don't

15  think there is any question about that.

16      MR. WIENER:  I agree.

17      THE COURT:  But what I was trying to avoid on

18  your behalf was the bringing in Fro's words.

19      MR. WIENER:  Exactly.

20      THE COURT:  Okay.  It seems to me, but however

21  understanding that they certainly have to be able

22  to ask a question that trying to elicit the fact he

23  agreed to go out there and be a look-out.

24      MR. WIENER:  Obviously.  And I won't object to

F40

JGS_MAYSONET 4315
GONZALEZ 0165427

```
 1    that.

 2         THE COURT:  I think, you know.  To me that is a

 3    much better way of doing that.

 4         MR. LEIGHTON:  Very well.

 5         THE COURT:  Off the record.

 6                             (Conference had off the

 7                             record, after which time

 8                             the following proceedings

 9                             had in open court)

10         MR. LEIGHTON:  Q  Mr. Cruz, as you were

11    standing next to the car containing Alfredo

12    Gonzalez and Fro, without telling the ladies and

13    gentlemen of the jury what exactly was said at that

14    time.  Did you have a conversation, a brief

15    conversation with Fro?

16         A    Yes.

17         Q    After you had that very first brief

18    conversation with Fro, what did you do?

19         A    Jumped in the car.

20         Q    After you got in the car, where were you

21    going?

22         A    To Maysonet's house.

23         Q    Now, as you were in the car, did the

24    defendant Alfredo Gonzalez say anything?
```

F41

JGS_MAYSONET 4316

GONZALEZ 0165428

1      A    Going to Juan's house to pick up a gun.

2      Q    At that time did Fro say anything?

3      A    Yes, sir.

4      Q    While you were in the car on your way to

5 Maysonet's house, did Fro tell you why you were --

6      MR. WIENER:  Objection as to why.  Judge, he

7 said he didn't say anything.  He is leading the

8 witness.

9      MR. LEIGHTON:  Judge, he said he didn't say

10 anything at that exact time.

11      THE COURT:  I didn't understand that was his

12 testimony.  Why don't you rephrase your question.

13      MR. LEIGHTON:  Q  While you were in the car

14 with Alfredo and Juan -- strike that.  Were Alfredo

15 and Fro on your way to Juan's house, did Fro tell

16 you why you were going to get a gun?

17      A    Yes.

18      Q    What did he tell you?

19      A    To do a drug sale.

20      MR. WIENER:  I'm sorry.  I would ask the answer

21 be read back.  I couldn't understand.

22      THE COURT:  I didn't either.

23      Read it back.

24                       (Record read)

F42

JGS_MAYSONET 4317
GONZALEZ 0165429

1        MR. WIENER:  Thank you.

2        MR. LEIGHTON:  Q  Did you then go anywhere in

3  the car?

4        A    To Maysonet's house.

5        Q    Where was that?

6        A    On Potomac and Homan.

7        Q    When you got -- by the way, did Maysonet

8  live in a house or an apartment?

9        A    An apartment.

10       Q    And which floor did he live on?

11       A    Second floor.

12       Q    Did you get to the building where

13  Maysonet's apartment was?

14       A    Yes.

15       Q    And what happened when the car arrived at

16  that location?

17       A    We got out the car.

18       Q    Where did you park the car?

19       A    On Potomac and Homan.

20       Q    And after you get out of the car -- by the

21  way, who all got out of the car?

22       A    Me, Alfredo and Fro.

23       Q    Where did you go after you got out of the

24  car?

JGS_MAYSONET 4318

GONZALEZ 0165430

```
 1          A     To Juan's house.

 2          Q     Did you go to the front door of his

 3     apartment?

 4          A     Yes.

 5          Q     And when you got to the front door of the

 6     apartment, what happened?

 7          A     We rang the doorbell.

 8          Q     Did anyone answer the door?

 9          A     Rose.

10          Q     By the way, did you know rose?

11          A     Yes.

12          Q     And who did you know her to be?

13          A     Maysonet's lady.

14          Q     And after Rose opened the door, where did

15     you and the defendant Alfredo Gonzalez and Fro go?

16          A     We went inside the house.

17          Q     When you got inside the house, was anybody

18     else in there?

19          A     Maysonet.

20          Q     While you were in the apartment, did the

21     defendant Alfredo Gonzalez say anything to Juan

22     Maysonet?

23          A     Yes.

24          Q     What did he say?
```

F44

JGS_MAYSONET 4319
GONZALEZ 0165431

1    A    Go get the gun.

2    Q    And after the defendant Alfredo Gonzalez

3  said "go get the gun," what happened then?

4    A    Juan and Alfredo went into the bedroom.

5    Q    Where were you at this time?

6    A    In the living room.

7    Q    And who was in the living room with you?

8    A    Fro.

9    Q    By the way, where was Rosa Bello?

10   A    She was in the kitchen, then she walked in

11  the bedroom.

12   Q    Is that the same bedroom that the

13  defendant Alfredo Gonzalez and Juan Maysonet walked

14  into?

15   A    Yes, sir.

16   Q    Did anyone come out of that bedroom?

17   A    Yes.

18   Q    Who came out?

19   A    Juan and Alfredo.

20   Q    Were either of those people carrying

21  anything?

22   A    Yes.

23   Q    Who was carrying something?

24   A    Alfredo.

F45

JGS_MAYSONET 4320

GONZALEZ 0165432

1      Q    What was he carrying?

2      A    A gun.

3      Q    What kind of gun was it?

4      A    Nine millimeter automatic.

5      Q    Was it a pistol?

6      A    Yes.

7      Q    Had you ever seen a nine millimeter

8 automatic pistol before?

9      A    Yes.

10      Q    Where had you seen it?

11      A    Streets.

12      Q    Now, where was the defendant Alfredo

13 Gonzalez carrying that nine millimeter automatic

14 pistol when he came out of the bedroom?

15      A    Inside his pants.

16      Q    I would like you to stand up Mr. Cruz, and

17 show the ladies and gentlemen of the jury, where

18 the defendant had the gun?

19      A    Here.

20    MR. LEIGHTON: May the record reflect that the

21 witness is pointing to the front of his pants?

22      You may sit down.

23    THE COURT: You concur, Mr. Wiener.

24    MR. WIENER: Yes.

F46

JGS_MAYSONET 4321
GONZALEZ 0165433

1      THE COURT: Very well. The record may so

2   reflect.

3      MR. LEIGHTON: Q By the way, what was everyone

4   wearing that night?

5      A   Sweatshirt hoodies.

6      Q   Would that be sweatshirts with hoods?

7      A   Yes, sir.

8      Q   You were wearing one, correct?

9      A   Yes.

10      Q   And was the defendant Gonzalez wearing

11  one?

12      A   Yes.

13      Q   The nine millimeter -- by the way, at the

14  time he came out of the bedroom, what part of the

15  gun could you see?

16      A   The handle.

17      Q   Did you see the defendant Alfredo Gonzalez

18  do anything with his sweatshirt?

19      A   Put it over the gun.

20      Q   After the defendant and Maysonet came out

21  of the bedroom, what happened then?

22      A   We just left.

23      Q   Do you mean you left the apartment?

24      A   Yes.

JGS_MAYSONET 4322

GONZALEZ 0165434

1    Q    After you left the apartment, where did

2    you go?

3    A    Towards the car.

4    Q    And did you get back into the car?

5    A    Yes.

6    Q    Who got -- what positions did everyone get

7    into inside the car?

8    A    Juan was the driver, Alfredo was the

9    passenger, Fro was behind the passenger, I was

10   behind the driver.

11   Q    Did the defendant still have the gun at

12   that time?

13   A    Yes, sir.

14   Q    Where did you go once you were in the car?

15   A    Towards St. Louis.

16   Q    What direction was St. Louis from where

17   you were coming from?

18   A    East.

19   Q    And were you north or south of North

20   Avenue?

21   A    We were south.

22   Q    What street were you driving on?

23   A    Potomac.

24   MR. WIENER:  I'm sorry, Judge.  Could that be

F48

JGS_MAYSONET 4323
GONZALEZ 0165435

1 read back.  I did not hear the street.

2  THE COURT:  Yes.

3         (Record read)

4  MR. WIENER:  Thank you.

5  MR. LEIGHTON:  Q  Once you got to -- strike

6 that.

7    Where did you go after you were on

8 Potomac?

9  A Went toward St. Louis.  From St. Louis we

10 went north to North Avenue.

11  Q Now, right before you -- by the way, did

12 you cross North Avenue?

13  A Yes, sir.

14  Q Now, right before you got to North Avenue,

15 did you see the defendant Alfredo Gonzalez do

16 anything with the gun?

17  A He looked at it.  That's it.

18  Q Well, did he take it out of his pants?

19  MR. WIENER:  Objection.  Leading.

20  MR. LEIGHTON:  Your Honor, I'm asking the

21 witness to clarify.

22  MR. WIENER:  He said he looked at it.  That's

23 all.

24  THE COURT:  That's correct.  But I think he is

F49

JGS_MAYSONET 4324
GONZALEZ 0165436

1    entitled to clarify what manner he looked at it.

2            I will allow the question.  He may answer.

3        MR. LEIGHTON:  Q  Did he take the gun out of

4    his pants and look at it?

5        A    Yes, sir.

6        Q    After the car crossed North Avenue, what

7    happened then?

8        A    Went towards the alley between North

9    Avenue and Wabansia.

10       Q    Is Wabansia the next street north from

11   North Avenue?

12       A    Yes.

13       Q    When you got to the alley, is that the

14   alley between North Avenue and Wabansia?

15       A    Yes, sir.

16       Q    Did you turn?

17       A    Yes.

18       Q    Which direction did the car turn?

19       A    East going towards Kimball.

20       Q    And once you turned down that alley, did

21   the car go all the way through the alley to

22   Kimball?

23       A    No.

24       Q    Was there another T-alley that was off of

F50

JGS_MAYSONET 4325
GONZALEZ 0165437

```
 1      the alley behind North Avenue?

 2          A    Yes.

 3          Q    What did the -- what did Juan Maysonet do

 4      with the car?

 5          A    He turned it in there and reversed it,

 6      went toward St. Louis again.

 7          Q    So which direction were you going at that

 8      time?

 9          A    Back west.  Towards St. Louis.

10          Q    Now, after you, the car went back towards

11      St. Louis, did you pass anything?

12          A    Yes.

13          Q    What did you pass?

14          A    Empty lot.

15          Q    And did the defendant Maysonet do anything

16      with the car?

17          A    Yeah.  He parked it.

18          Q    Where did he park it?

19          A    By the empty lot.

20          Q    Well, did he park it directly next to the

21      empty lot or did he pass the empty lot?

22          A    He passed by a garage.

23          Q    Where was that garage located relative to

24      the empty lot?
```

F51

JGS_MAYSONET 4326

GONZALEZ 0165438

1      A     East from the empty lot.

2      Q     Now, at the time that he parked the car,

3   what happened then?

4      A     We jumped out the car.

5      Q     Now, when you say "we jumped out of the

6   car."  Who all do you mean?

7      A     Me, Fro and Alfredo.

8      Q     As you got out of the car, did anyone say

9   anything to you?

10     A     Fro.

11     Q     What did he tell you?

12     A     Make sure nobody come down the alley.

13     Q     So what did you do at that time?

14     A     I started looking towards St. Louis and

15   Kimball.

16     Q     Where were you standing?

17     A     In the alley.

18     Q     Where were you relative to the garage that

19   the car was by?

20     A     By the empty lot.

21     MR. WIENER:  What.  Could you read the answer?

22   I could not understand that at all.

23                         (Record read)

24     THE COURT:  Mr. Witness, try to keep your voice

F52

JGS_MAYSONET 4327
GONZALEZ 0165439

```
 1     up so everyone can hear.

 2                               (Record read)

 3        MR. WIENER:  Thank you.

 4        MR. LEIGHTON:   Q   What did the defendant

 5     Alfredo Gonzalez and Fro do, at that time?

 6        A    Started walking down the empty lot towards

 7     North Avenue.

 8        Q    Now, did you see anybody in the empty lot?

 9        A    Two guys.

10        Q    Describe these guys?

11        A    Two black guys.

12        Q    Where were they standing in the empty lot?

13        A    On North Avenue by the empty lot.  By the

14     house.

15        Q    Now, what were you doing at this time?

16        A    Just looking towards St. Louis and

17     Kimball.

18        Q    As you were doing that, could you see what

19     Alfredo Gonzalez and Fro were doing with the two

20     black guys?

21        A    Talking.

22        Q    For how long were Fro and Alfredp Gonzalez

23     talking to the two black guys?

24        A    Around five or 10 minutes.
```

F53

JGS_MAYSONET 4328
GONZALEZ 0165440

1      Q    Were you watching the defendant Alfredo

2   Gonzalez and Fro talking to the two black guys the

3   whole time or were you also looking up and down to

4   alley?

5      A    I was looking towards St. Louis and

6   Kimball.

7      Q    What happened then?

8      A    When I was looking towards St. Louis and

9   Kimball, I heard three to four shots.

10      Q    And what happened then?

11      A    When I was look, I heard one or two shots.

12   I seen Fro and Alfredo running towards the car.

13      Q    And were they running back through the

14   empty lot?

15      A    Yes.

16      Q    At the time that you saw Alfredo and Fro

17   running back towards the empty lot, did you see

18   anything else in the empty lot?

19      A    One of the guys on the ground.

20      Q    When you say one of the guys on the

21   ground.  Do you mean one of the --

22      A    Black guys.

23      Q    Those were the black guys that had been

24   talking to Alfredo Gonzalez and Fro earlier?

F54

JGS_MAYSONET 4329

GONZALEZ 0165441

1      A    Yes, sir.

2      Q    Did the defendant Alfredo Gonzalez and Fro

3  get back to the car?

4      A    Yes.

5      Q    When they got back to the car, did the

6  defendant Alfredo Gonzalez say anything?

7      A    "Let's get out of here."

8      Q    Did he say anything else?

9      A    "We just shot two guys."

10     Q    What did you do then?

11     A    We all jumped in the car.

12     Q    After you all got into the car, what

13  happened then?

14     A    We left.

15     Q    Now, when you left, which direction did

16  the car drive?

17     A    Towards St. Louis.

18     Q    Now, when you got to the intersection of

19  the alley and St. Louis, which direction did the

20  car go?

21     A    North towards Wabansia.

22     Q    Oh, so the car went away from North

23  Avenue?

24     A    Yes.

F55

JGS_MAYSONET 4330

GONZALEZ 0165442

1    Q    Where did the car go once it was on St.

2   Louis going towards Wabansia?

3    A    On Wabansia we turned towards Kedzie.

4    Q    And how many blocks -- strike that.

5         How far did you go on Wabansia?

6    A    Towards Kedzie.

7    Q    About how many blocks did you go?

8    A    Around four blocks.

9    Q    Then what did you do.

10   A    Went towards Kedzie, went all the way

11  towards Lemoyne.

12   Q    Now, when you turned by, turned towards

13  Lemoyne, what direction were you going?

14   A    South.

15   Q    Did you cross North Avenue again?

16   A    Yes.

17   Q    At the time that you crossed North Avenue

18  going towards Lemoyne, how many blocks were you

19  from the intersection of St. Louis and North Avenue

20  about?

21   A    Four or five blocks.

22   Q    What happened then.  Where did you go

23  then?

24   A    Towards Lemoyne and Spalding.

F56

JGS_MAYSONET 4331
GONZALEZ 0165443

1       Q    When you got to Lemoyne and Spalding, what

2    happened then?

3       A    I got out the car.

4       Q    Now, Mr. Cruz, you knew that you, Alfredo

5    Gonzalez, Fro or Chis Hernandez and Juan Maysonet

6    were going to do a drug sale --

7       MR. WIENER:  Objection.

8       THE COURT:  Basis?

9       MR. WIENER:  Leading.

10      THE COURT:  Well, all of that has been

11   testified to.  So I'm assuming he is doing a

12   foundation for a question, is that correct?

13      MR. LEIGHTON:  Yes, Judge, that's correct.

14      THE COURT:  Well, then get to the question.

15      MR. LEIGHTON:  Q  You knew that the four of you

16   were going to do a drug sale and that there was a

17   gun in the car, correct?

18      A    Yes.

19      Q    Why did you go with Alfredo Gonzalez, Juan

20   Maysonet and Fro?

21      MR. WIENER:  Objection.

22      THE COURT:  Basis?

23      MR. WIENER:  As to why.  Calls for state of

24   mind, it calls for self-serving statements.

F57

JGS_MAYSONET 4332
GONZALEZ 0165444

1   MR. LEIGHTON: Excuse me, Judge. Objection to

2 comments by counsel, Judge.

3   THE COURT: Overruled. He may answer. You may

4 cross-examine.

5   THE WITNESS: Excuse me.

6   MR. LEIGHTON: Could I have the question read

7 back to the witness?

8          (Record read)

9   THE WITNESS: Because we all Latin Kings.

10   MR. LEIGHTON: Q Before this day had you ever

11 been involved in a drug sale?

12   A  Yes.

13   Q  Had Alfredo Gonzalez ever been involved in

14 a drug sale?

15   MR. WIENER: Objection.

16   THE COURT: Sustained.

17   MR. WIENER: Ask the jury be instructed to

18 disregard that question.

19   THE COURT: There is nothing for them to

20 disregard because I did not allow the answer. The

21 question is not evidence, counsel.

22   MR. WIENER: The question raised --

23   THE COURT: Counsel, let's not argue before

24 this jury. I have sustained the objection. The

F58

JGS_MAYSONET 4333

GONZALEZ 0165445

1      question was not answered.

2          MR. LEIGHTON:   Q  Mr. Cruz, I'm going to direct

3      your attention to about 10:30 in the evening on

4      August the 23rd, 1990.  Where were you?

5          A     On North Avenue and Kimball.

6          Q     What were you doing?

7          A     Waiting for the bus stop.

8          Q     And at that time did anybody pull up?

9          A     Two police officers.

10         Q     And were they in plainclothes or in

11     uniform?

12         A     Plainclothes.

13         Q     And did they take you anywhere?

14         A     To Area 5.

15         Q     And that's the headquarters at Area 5

16     Violent Crimes located at Grand and Central,

17     correct?

18         A     Yes.

19         MR. LEIGHTON:  If I might have one moment?

20         Q     At the time that you arrived at Area 5

21     Violent Crimes, was anybody else that you knew

22     there?

23         A     Yes.

24         Q     Who?

F59

JGS_MAYSONET 4334
GONZALEZ 0165446

1      A      Alfredo and Maysonet.

2      Q      They were in the offices of Area 5 Violent

3  Crimes?

4      A      Yes.

5      MR. LEIGHTON:  May I approach the witness, your

6  Honor?

7      THE COURT:  Yes, you may.  Please tender to

8  counsel.

9      MR. WIENER:  I don't know what he is showing.

10      MR. LEIGHTON:  These have already been

11  published to the jury.  These are People's 15 and

12  People's 13.

13      MR. WIENER:  Thank you.

14      THE COURT:  All right.

15      MR. LEIGHTON:  Q  Now, Mr. Cruz, I'm going to

16  show you what's been marked People's Exhibit Number

17  15 for identification.  Take a look at that

18  photograph.  Tell the ladies and gentlemen of the

19  jury, if you recognize what that photograph shows?

20      A      Yes.

21      Q      What does it show?

22      A      The empty lot where we was at.

23      Q      And which view or which direction does

24  that photo show?

F60

```
 1      A     Going towards North Avenue.

 2      Q     Can you see where -- can you see the

 3   location that you were standing at in that

 4   photograph?

 5      A     Yes.

 6      Q     Do you see the garage that you were

 7   standing next to in that photograph?

 8      A     Yes.

 9      Q     Which side of the lot does that photo

10   show?

11      A     The left side.

12      Q     Is that the left side on the photograph?

13      A     Yes.

14      Q     Would that be your right side as your

15   looking at it?

16      A     No.  That would be my left side.  The

17   right side of the photo.

18      Q     Okay.

19            Now, I'm going to show you what's

20   previously been marked People's Exhibit Number 13

21   for identification.  Take a look at that.

22            Do you recognize what that photo is?

23      A     Yeah.  The empty lot.

24      Q     And which view of the empty lot does that
```

F61

JGS_MAYSONET 4336

GONZALEZ 0165448

1    show?

2        A    Front of the empty lot, North Avenue.

3        Q    Is that from the alley going towards North

4    Avenue?

5        A    Yes.

6        Q    And can you see the side of the garage

7    next to which you were standing?

8        A    No.

9        Q    Can you see the side of the building that

10   was near the garage?

11       A    Yes.

12       Q    Now, were those photographs taken during

13   the day or at night?

14       A    Day.

15       Q    And is there snow on the ground on those

16   photos?

17       A    Yes.

18       Q    Other than the fact that the photos were

19   taken during the day and the fact that there is

20   snow on the ground, do those photos truly and

21   accurately depict that portion of the lot and the

22   view you had of North Avenue?

23       A    No.

24       Q    What do they show?

F62

JGS_MAYSONET 4337
GONZALEZ 0165449

1     A    It shows snow.

2     Q    Other than the snow and the daylight, does

3  the photo show the view you had?

4     A    Yes.

5     Q    By the way, this was at night, correct?

6     A    Yes.

7     Q    What was the lighting like out there?

8     A    Bright.  Light from North Avenue.

9     Q    When you say "bright light from North

10  Avenue."  Do you mean street lights?

11     A    Yes.

12     MR. WIENER:  Judge, may I have your permission

13  to move over here?

14     THE COURT:  Absolutely.

15     MR. LEIGHTON:  Judge, at this time I would ask

16  leave to have the witness step down from the

17  witness stand.

18     THE COURT:  Very well.

19                   (Witness leaving the stand)

20     MR. LEIGHTON:  Q  Mr. Cruz, take a look at

21  this.  Do you recognize what's shown on this chart?

22     A    Yes.

23     Q    What do you recognize this to be?

24     A    North Avenue going towards the empty lot.

JGS_MAYSONET 4338

GONZALEZ 0165450

1    The alley.

2         THE COURT:  Mr. Leighton, it might be good for

3    the record to identify that by number.  Whatever is

4    that your showing.

5         MR. LEIGHTON:  Yes, Judge.  If I might have one

6    moment.

7         THE COURT:  To the witness.

8         MR. LEIGHTON:  This would be People's 21 for

9    identification.

10        THE COURT:  Very well.

11        MR. LEIGHTON:  Q  Does this chart truly and

12   accurately depict the area behind the vacant lot

13   and the two alleys and North Avenue?

14        A    Yes.

15        Q    Now, Mr. Cruz, I would like you to show

16   the ladies and gentlemen of the jury, with your

17   hand, how the car first came to enter the alley

18   behind North Avenue?

19        A    Towards St. Louis.

20        Q    And point which direction you were first

21   traveling in?

22        A    This way.  We turned this way.

23        Q    Now, point for the ladies and gentlemen of

24   the jury, to the area where the defendant Maysonet

F64

JGS_MAYSONET 4339
GONZALEZ 0165451

1    turned the car around?

2        A    Turned this alley.  T-alley, went back

3    this way towards the lot.

4        Q    Could you demonstrate slowly with your

5    hand exactly how he maneuver the car?

6        A    This alley turn, came back this way and

7    parked.

8        Q    Now, could you show the ladies and

9    gentlemen with your finger where it was that

10   defendant Maysonet parked the car?

11       A    Right here.

12       Q    At the time that he parked the car, show

13   the ladies and gentlemen of the jury, with your

14   hand where you were standing?

15       A    On the side of the building right here.

16       Q    With your finger, show where the defendant

17   Alfredo Gonzalez and Fro went?

18       A    Came down, walking down the empty lot

19   towards North Avenue.

20       Q    Show the ladies and gentlemen of the jury,

21   where you saw the two black men?

22       A    Right here.

23       Q    And where did the conversation between Fro

24   and the defendant Alfredo Gonzalez and the two

F65

JGS_MAYSONET 4340
GONZALEZ 0165452

```
 1    black men take place, approximately?

 2        A    Right around here.

 3        Q    Mr. Cruz, show to ladies and gentlemen of

 4    the jury, where the one, approximately with your

 5    finger, where was the one black man laying after

 6    you heard the shots?

 7        A    Around here.

 8        MR. LEIGHTON:  May I have the witness resume

 9    his seat?

10        THE COURT:  Yes, you may.

11        MR. LEIGHTON:  Mr. Cruz.

12                            (Witness resuming the

13                             stand).

14        MR. LEIGHTON:  If I might have one moment, your

15    Honor.

16        THE COURT:  Yes, you may.

17        MR. LEIGHTON:  No further questions of this

18    witness at this time.

19        THE COURT:  Will counsel please approach the

20    bench.

21                            (Conference at the bench

22                             out of the hearing of the

23                             jury and the reporter,

24                             after which time the
```

F66

JGS_MAYSONET 4341
GONZALEZ 0165453

1                      following proceedings had

2                      in their hearing)

3    THE COURT: Deputy Tenant. Would you see if

4 Roz is back there. Deputy Tenant.

5    THE SHERIFF: Yes, Judge.

6    THE COURT: We are going to break now for the

7 jury to have lunch.

8    THE SHERIFF: Everyone please rise.

9    THE COURT: You will just notify me when your

10 back.

11                   (Whereupon, jury excused

12                   from the courtroom for

13                   lunch)

14    THE COURT: Sir, would you mind just shutting

15 that door. Have a seat just for a second, Mr.

16 Cruz.

17      Mr. Cruz, I want first to speak to you.

18 We are going to be breaking for lunch. Your

19 examination is not over yet. There is still to be

20 had cross-examination and perhaps re-direct.

21      During the period of the lunch period you

22 may not speak with the attorneys for either side or

23 no one else. And in who's custody he is presently?

24    MR. MAREK: Investigator Stevens.

JGS_MAYSONET 4342
GONZALEZ 0165454

1      THE COURT:  He is in Investigator Stevens

2   custody.

3          You can't discuss your testimony with

4   anyone.  You can't talk to anyone.  We're going to

5   try to arrange to get you some lunch.  I'll talk to

6   the deputy about that as soon as we can.

7          Where has he been sitting?

8      MR. MAREK:  I would suggest back in the little

9   room there.

10     THE COURT:  Very well.  That's fine.

11         So you may get down.  You understand you

12  may not discuss your testimony with anyone or allow

13  anyone to say anything to you and you understand

14  that he is presently in your custody as a Cook

15  County Sheriff's Police Officer, is that correct?

16     SHERIFF STEVENS:  Yes.

17     THE COURT:  Very well.

18                         (Witness excused from the

19                         stand)

20     THE COURT:  What I'm trying to figure out, the

21  jury is going up.  Recess for lunch.

22                         (Whereupon, a recess was

23                         taken to 2:45 o'clock p.m.

24                         of the same day, Friday,

F68

JGS_MAYSONET 4343

GONZALEZ 0165455

1          March 27th, 1992)*
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

F69

JGS_MAYSONET 4344

GONZALEZ 0165456

```
STATE OF ILLINOIS )
                  ) ss.
COUNTY OF C O O K )

        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE   )
STATE OF ILLINOIS   )   Indictment No. 90-21787
                    )
        VS          )   Before JUDGE LORETTA HALL
                    )   MORGAN
                    )   (and a Jury)
ALFREDO GONZALEZ    )   Friday, March 27th, 1992

                        2:45 o'clock p.m.


        Court convened pursuant to recess.


    PRESENT:

        Hon. Jack O'Malley,
            State's Attorney of Cook County, by
        Mr. Frank Marek, and
        Mr. Joel Leighton,
            Assistant State's Attorneys,
            appeared for the People.

        Mr. David Wiener,
            appeared for the Defendant.

            - - - - - - - -
```

24

JGS_MAYSONET 4345
GONZALEZ 0165457

1    THE CLERK: Alfredo Gonzalez.

2    (Following proceedings in

3    chambers)

4    THE COURT: Let the record show that we're in

5    chambers with all counsel for all parties being

6    present as well as the juror Daniel Donahue.

7    Deputy Tenant did come in and recount to me what

8    you had said to her and I, of course, 'am obliged

9    to share that with the attorneys and to do whatever

10    I think is reasonable under those circumstances.

11    If you would just very briefly recount

12    exactly what happened and just relax. There is

13    nothing to be upset about. Just something I have

14    to deal with and we need to put it on the record.

15    That's all.

16    JUROR DONAHUE: Just basically as we were

17    walking out being lead by the deputy through the

18    hallway --

19    THE COURT: Q This is last night, yesterday at

20    the close of court?

21    A Right. And we were getting ready to go

22    home to be let out at the front door, there was a

23    fella on the phone I noticed who happened to cut in

24    the line into our group right behind me and

F71

JGS_MAYSONET 4346
GONZALEZ 0165458

1   basically didn't think anything of it at first.

2       Q    Was this someone you had seen before?

3       A    No.  Never seen the person, haven't seen

4   him today.

5       Q    Okay.  All right.  I had understood he was

6   someone you had noticed in the gallery.  That's not

7   true?

8       A    No.  No.  I had never seen him in the

9   gallery.

10      Q    All right?

11      A    But because of his proximity right behind

12  me just how he followed me out the door and then,

13  of course, I stopped once I got outside the door

14  and stood by the railing, watched him go down the

15  steps and as he looked back, he turned around when

16  he got down by the curb, he looked back up at me at

17  the steps.  Of course, that's when I thought I

18  better make my exit to my truck and take off.

19  That's all there was to it.

20      Q    Where was your truck?

21      A    Parked on California.  Not the regular --

22      Q    You were not in the parking lot?

23      A    No.  Unfortunately.

24      Q    Okay.  All right?

F72

JGS_MAYSONET 4347
GONZALEZ 0165459

1     A   I really didn't think anything of it.

2  Then I thought maybe I should just mention.

3     Q   Okay. Okay. That's why it is good to

4  bring you in because what I understood it was

5  someone who had been in the gallery?

6     A   No. I never seen the person.

7     Q   Okay?

8     A   But just the way he got off the phone and

9  cut in the line right behind. It seems like you

10  wouldn't cut somebody off like that. He just like

11  cut into the group.

12     Q   Which your not supposed to do anyway and

13  the deputy are not supposed to allow anybody?

14     A   There were so many people moving about the

15  hallway.

16     Q   So how are you feeling about that?

17     A   Fine. I feel fine.

18     Q   Okay.

19      Are you feeling threatened, are you

20  feeling uneasy?

21     A   No. Not at all.

22      I accidently mentioned this to another

23  juror. I was told not to. I think you better go

24  tell the folks. I say it's nothing. If I were

JGS_MAYSONET 4348
GONZALEZ 0165460

```
 1    you, I would go tell him.

 2         Q    Who did you mention it too?

 3         A    You know, I'm not to familiar with his

 4    name.

 5         Q    Would you know him if you saw him?

 6         A    Yes.

 7         Q    It was a man?

 8         A    Yes.  The fellow that sits to my left in

 9    the jury box.

10         Q    Just to his left.  Your in the front row?

11         A    Yes.

12         Q    To your left in the jury box.  If I

13    describe him?

14         A    Tall guy, mustache.

15         Q    Heavy?

16         A    He works for the postal service too.

17         Q    Mr. Sullivan?

18         A    Could be.  Could be.  Postal sales

19    representative.

20         Q    Yes.  Postal sales representative?

21         A    Right.

22         Q    That's Mr. Sullivan?

23         A    Right.  That's the fella.

24         Q    Is there anything about this incident
```

F74

JGS_MAYSONET 4349

GONZALEZ 0165461

1  creating any problem for you?

2      A    No.  Not al all.

3      Q    In terms of the trial, in terms of being

4  fair?

5      A    Like I said I thought I was make something

6  out of nothing.  He encouraged me to talk to one of

7  the deputy.

8      Q    Okay.  All right.

9          Counsel for either side.

10     Q    Was it only Mr. Sullivan that you

11  mentioned this to?

12     A    Right.

13     THE COURT:  Anything counsel for either side

14  would want me too put to Mr. Donahue?

15     MR. WIENER:  No, Judge.

16     MR. MAREK:  No.

17     THE COURT:  If you would go back.  Mr. Donahue,

18  I would ask you however, not to discuss this with

19  another juror and it's not that we're secretive, it

20  is just obviously I have to worry about the

21  integrity of that jury.  And the jury getting off

22  on things that don't have any substance, that kind

23  of thing.  I think we do need to speak to Mr.

24  Sullivan.

F75

JGS_MAYSONET 4350
GONZALEZ 0165462

1              So Deputy Soto, if as you return Mr.

2     Donahue to the jury room, if you would then bring

3     us Mr. Sullivan.

4                         (Juror Sullivan brought

5                         into chambers)

6         THE COURT:   Q  Mr. Sullivan.

7         A    Yes.

8         Q    We have simply called you in because we

9     have talked with Mr. Donahue and Mr. Donahue

10    indicated that he had had some conversation with

11    you about an incident that happened last evening.

12    And we have talked with him and I asked him had he

13    mentioned this to any other juror, because that is

14    a of grave concern.  Whatever is going on with any

15    individual juror, they certainly need to report it

16    and he did the proper thing.  But the thing one

17    shouldn't be doing is talking to other jurors about

18    it.  If it's going to be talked about, it needs to

19    be talked about to the deputy sheriff and then

20    reported to the court.

21             What exactly did he tell you to the best

22    of your ability to remember?

23        A    He mentioned when he was leaving the

24    building he thought he saw an individual on the pay

F76

JGS_MAYSONET 4351
GONZALEZ 0165463

1    phone who then followed him out toward the lobby

2    and out.  When he thought he was being followed he

3    stopped and turned around and that individual then

4    stopped.  So at that point he wasn't sure.

5         Q    Yes.  Okay.

6              Anything about this recounting to you by

7    Mr. Donahue.  Anything about that incident or his

8    talking to you about it create any problem for you

9    in terms of you being fair and impartial juror?

10        A    No, your Honor.

11        Q    You sure?

12        A    Yes.

13        THE COURT:  Again, I would ask the parties

14   whether there are --

15        Q    Let me ask in one other question.  Have

16   you now talked to any other juror --

17        A    No.

18        Q    -- about it?

19             When did he report this to you?

20        A    Just before we went on the elevators on

21   the other side to go up.  On the main floor.

22        Q    For lunch?

23        A    Right.  Just before lunch.

24        THE COURT:  I see.  Counsel for either side any

F77

JGS_MAYSONET 4352
GONZALEZ 0165464

1     other questions.

2          MR. WIENER:  No.

3          THE COURT:  Thank you very much, Mr. Sullivan.

4               Return him to the jury room.

5                         (Juror Sullivan leaving the

6                          chambers)

7          THE COURT:  Well, why don't we see how we get

8     through the rest of the day.  I think it's a bit

9     more nebulous than it appeared at first.

10         MR. LEIGHTON:  Judge, may we go off the record

11    for a minute?

12         THE COURT:  Sure.

13                        (Off the record, after

14                         which time the following

15                         proceedings had on record)

16         THE COURT:  Okay.  Let's go.

17         MR. MAREK:  Judge, we want to just reopen with

18    Cruz for like two additional questions.  We haven't

19    started the cross yet.

20         THE COURT:  All right.

21              Where is Mr. Cruz.  Did he get something

22    to eat?

23         MR. MAREK:  So the record is clear, I called

24    Sandy Chavez of our victim witness and she

F78

JGS_MAYSONET 4353
GONZALEZ 0165465

1    arranged.  She brought something up for him and

2    Phil Stevens.  So we have had no contact with him

3    at all.

4        THE COURT:  Okay.

5                         (Following proceedings in

6                          open court)

7        THE COURT:  Very well.  I think the defendant

8    is here.  Very well.

9        I think it might be a good idea to have

10   the witness placed back on the stand and then bring

11   the jury in.

12       MR. MAREK:  Yes.

13       THE COURT:  I think that's the better way to

14   proceed with that.

15                         (Whereupon, witness

16                          resuming the stand)

17       THE COURT:  Very well.

18       Mr. Cruz, if you would just take the stand

19   again.  If you would turn on the microphone and

20   both sides are ready.  May we commence?

21       MR. WIENER:  Yes, Judge.

22       THE COURT:  Very well.

23                         (Whereupon, jury returned

24                          to open court)

F79

JGS_MAYSONET 4354
GONZALEZ 0165466

1      THE COURT: Very good.

2        State.

3    MR. LEIGHTON: May I proceed, your Honor?

4    THE COURT: Yes, you may.

5    MR. LEIGHTON: Q Mr. Cruz, I want to direct

6  your attention back to when you were riding in the

7  car towards the alley behind North Avenue. Did

8  anyone in the car do anything with regard to their

9  clothes?

10    A    Put on their hoodies.

11    Q    Now, when you say put on their hoodies.

12  Do you mean pull their hoods over their heads?

13    A    Yes.

14    Q    Did you pull your hoody up?

15    A    Yes.

16    Q    And did everyone in the car pull the hoods

17  up on their sweatshirts?

18    A    Yes.

19    Q    What was the purpose of pulling the hoods

20  on the sweatshirts up?

21    A    Wasn't for anything.

22    Q    Well, what purpose does the -- why did you

23  pull the hood your sweatshirt over your head?

24    A    To cover your face.

F80

JGS_MAYSONET 4355
GONZALEZ 0165467

1     MR. WIENER:  I'm sorry.  I didn't hear the

2  answer, Judge.

3     THE COURT:  Would you read it back.

4                       (Record read)

5     MR. LEIGHTON:  Q  Now, when you pulled --

6  strike that.  What significance does it have in

7  your experience as a Latin King when the hoodies

8  are pulled up?

9     A     When stick-up.  When you go stick somebody

10  up, selling drugs, cover our face, nobody will see

11  it.

12     Q     So no one can see the side of your face?

13     MR. WIENER:  Objection to parapharasing of the

14  witnesses answer.

15     THE COURT:  Sustained.  That will be stricken

16  and the jury is instructed to disregard it.  The

17  witnesses answer will stand.

18     MR. LEIGHTON:  Q  Now, after you heard the

19  shots as you were standing in the alley, did anyone

20  come running back to the car?

21     MR. WIENER:  Objection.  That question had been

22  asked and answered.

23     THE COURT:  Sustained.

24     MR. LEIGHTON:  Judge, may I be heard?

JGS_MAYSONET 4356
GONZALEZ 0165468

1      THE COURT: That question has been asked and

2  answered. The objection has been sustained.

3      MR. LEIGHTON: Q You have already testified

4  that the defendant Alfredo --

5      MR. WIENER: Objection.

6      THE COURT: Just put a question, Mr. Leighton.

7      MR. LEIGHTON: Q At the time that Alfredo

8  Gonzalez came running back to the car after the

9  shooting, did he have anything in his hand?

10    A    Yes.

11    Q    What did he have?

12    A    A gun.

13    Q    Which hand did he have it in?

14    A    Righthand.

15    Q    And did -- strike that.

16      No other questions of this witness.

17      MR. WIENER: May I inquire, your Honor?

18      THE COURT: Yes, you may.

19            CROSS EXAMINATION

20            BY MR. WIENER:

21      MR. WIENER: Q Mr. Cruz, I believe you

22  testified that in January of this year when the

23  State's Attorneys Office approached you through

24  your attorney Mr. Vahey, you said you would not

JGS_MAYSONET 4357
GONZALEZ 0165469

1    testify, is that true?

2       A    Yes.

3       Q    And when they approached you at that time

4    they didn't make you an offer of 22 years, did

5    they?

6       A    No.

7       Q    They made you an offer of higher than 22

8    years, didn't they?

9       A    Yes.

10       Q    In fact, they made you an offer of 25

11    years, didn't they?

12       A    Yes.

13       Q    And so it was on March 13th of 1992, that

14    your lawyer Mr. Vahey, conveyed to you the State's

15    offer of 22 years, isn't that true?

16       A    Yes.

17       Q    And that's when you agreed to testify,

18    isn't that true?

19       A    Yes.

20       Q    Now, sir, I want the ladies and gentlemen

21    of the jury, to understand the particulars of this

22    deal.  In return for your truthful testimony sir,

23    the State is going to recommend to Judge Morgan

24    that you receive 22 years in the Illinois

F83

JGS_MAYSONET 4358
GONZALEZ 0165470

1    Department of Corrections, is that true?

2         A    Yes.

3         Q    And of the two persons that were victims

4    of the homicide, one of those persons, either

5    Torrence Wiley or his brother, those charges will

6    be dismissed so you will only be pleading guilty to

7    one of the two charges, is that true?

8         A    Yes.

9         Q    And you correctly stated I believe, when

10   Mr. Leighton asked you is that before you were

11   approached with this offer that the only two

12   sentences you could receive if you went to trial

13   and were convicted were life imprisonment or the

14   death penalty, is that true, sir?

15        A    Yes.

16        Q    Now, in making this deal sir, do you

17   expect if in fact Judge Morgan goes along with the

18   State's recommendation to serve 22 years in the

19   Illinois State Penitentiary?

20        A    Yes.

21        Q    Well, you do you expect to serve the

22   entire 22 years?

23        A    No.

24        Q    How many years do you expect to serve in

F84

JGS_MAYSONET 4359
GONZALEZ 0165471

1 the Illinois State Penitentiary if Judge Morgan

2 accepts the State's offer of 22 years?

3  A Eleven or more.

4  Q And in fact re you aware that good time is

5 also taken off of a sentence assuming that a person

6 earns that good time while he is in the

7 penitentiary?

8  A Yes.

9  Q So it's a fact, isn't it, that in return

10 for this truthful testimony that if the Judge,

11 Judge Morgan accepts the State's recommendation

12 that all told, including the time that you have in

13 custody will be serving less than 11 years in the

14 Illinois State Penitentiary, isn't that true?

15  MR. MAREK:  Objection.

16  MR. WIENER:  Q  Assuming that you earn your

17 good time?

18  MR. MAREK:  Objection.  That's not a fact.

19  THE COURT:  I don't even know how you compute

20 that.  I would object to the form of the question.

21 I would sustain the question to the form of the

22 question.

23  MR. WIENER:  Q  Well, the State asked you

24 certain questions about sentencing and what you

JGS_MAYSONET 4360
GONZALEZ 0165472

1   knew.

2         Are you aware that a person who gets

3   sentenced to the State Penitentiary gets day for

4   day time while he is in custody?

5     MR. MAREK:  Objection.  That's not a fact

6   either.

7     MR. WIENER:  It certainly is, Judge.

8     MR. MAREK:  May we be heard?

9     THE COURT:  It's not really a fact counsel, the

10   way that you have stated it.  There is that

11   position.

12     MR. WIENER:  All right.

13     Q   Are you aware then sir, that a person who

14   is sentenced to the Illinois State Penitentiary for

15   a determinant period of time has the possibility of

16   getting day for day credit for time served?

17     A   Yes.

18     Q   And so you expect to be in custody for

19   approximately how long from the time you were first

20   taken in custody if Judge Morgan decides to accept

21   the State's recommendation?

22     A   Excuse me.  Can you could explain that

23   better?

24     Q   How long do you expect to remain in

JGS_MAYSONET 4361
GONZALEZ 0165473

1    custody from the time you were first taken into

2    custody until the time your released if Judge

3    Morgan accepts the State's recommendation?

4        A    I don't know.

5        Q    You said Mr. Cruz, that on May the 24th of

6    1990, you were the nephew of Alfredo Gonzalez?

7        A    Yes.

8        Q    And you said that your a friend of Jose

9    Maysonet, is that true?

10       A    Yes.

11       Q    Now, you were a very close friend of Jose,

12   isn't that true?

13       A    No.

14       Q    Well, isn't it a fact that you had been

15   over to Jose and Bello's apartment on several

16   occasions prior to May 24th of 1990?

17       A    No.

18       Q    Well, how many times had you been there,

19   sir?

20       A    Once.  May 24th.

21       Q    Oh, I see.  That was the first time you

22   had been at this apartment?

23       A    The last time I went to their house that

24   was when they was living on Pierce.

F87

JGS_MAYSONET 4362
GONZALEZ 0165474

1      Q     So what your saying is then that the first

2    time you went to this apartment on, the apartment

3    that you visited on May 24th, was on that day?

4      A     Yes.

5      MR. LEIGHTON:  Judge, objection.  This is

6    misleading.  He just said that the first time,

7    previous time he went to the apartment was on

8    Pierce and the way that's phrased --

9      THE COURT:  I think the way that is phrased is

10   just fine.  The apartment that he went to on the

11   24th, that was the first time he went there.

12   That's what I understood Mr. Wiener to say.

13     MR. LEIGHTON:  I withdraw the objection, Judge.

14     THE COURT:  Very well.

15        You may answer the question if he

16   remembers it at this point.

17     THE WITNESS:  Just once.

18     MR. WIENER:  Q  How many times had you been to

19   other places where Jose and Bello Rosa were living?

20     A     When they were living on Potomac.  I mean

21   on Pierce a lot of times.

22     Q     And you knew and socialized with Jose and

23   Bello on many occasions prior to May the 24th of

24   1990, didn't you?

F88

JGS_MAYSONET 4363

GONZALEZ 0165475

1    MR. MAREK:  Judge, I'm going to object to the

2    reference to her as Bello.  It's Rosa Bello.  She

3    testified too that one time.

4        MR. WIENER:  Excuse me, excuse me.

5        Q    Rosa Bello?

6        A    No.

7        Q    Well, you just said that you were at their

8    other place on a number of occasions, isn't that

9    true?

10       A    Because we used to hang around there,

11   that's why.  Used to be outside together all the

12   time.

13       Q    Was Rosa Bello outside with you at that

14   time?

15       A    Once in awhile she used to be outside with

16   us.

17       Q    Now, when you were hanging with Jose and

18   Rosa Bello, Alfredo gonzales wasn't hanging around

19   with you, was he?

20       A    Yes.

21       Q    He was.

22            In was year -- by the way, when did Rosa

23   Bello and Jose live on that apartment on Pierce?

24       A    Signs last time I know them in -- since I

F89

JGS_MAYSONET 4364
GONZALEZ 0165476

```
 1    started nothing them in '88, they been living

 2    there.

 3        Q    When did they move to the apartment you

 4    visited on May 24th of 1990?

 5        A    I don't know.

 6        Q    Well, when was the last time before May

 7    24th of 1989, that you visited them anywhere?

 8        A    On the streets.  When I saw 'em on the

 9    streets.  Talk to them.

10        Q    And when you talked to them on the street,

11    was Alfredo Gonzalez always there?

12        A    No.

13        Q    And how often would you see Jose Maysonet

14    during the year and a half you knew him prior to

15    May 24th of 1990?

16        A    On the streets.

17        Q    How often, everyday?

18        A    Once in awhile.

19        Q    Well, every week?

20        A    I can't tell.  I can't say.

21        Q    Okay.

22             Can't say.

23        MR. LEIGHTON:  Object to counsel's little

24    comment and ask it be stricken.
```

F90

JGS_MAYSONET 4365
GONZALEZ 0165477

1      THE COURT:  The jury will disregard anything

2   said by counsel.

3      MR. WIENER:  I apologize Judge, if I said

4   anything.

5      Q    You said on the witness stand that you had

6   left work, taken an L and were on your way to your

7   lady's house when you saw an automobile with Fro

8   and Alfredo Gonzalez in it, is that true?

9      A    Yes.

10     Q    And you said that you, Fro and Alfredp

11  Gonzalez then went off to Jose's apartment, isn't

12  that true?

13     A    Yes.

14     Q    Jose wasn't with you, was he?

15     A    No.

16     Q    But on August the 24th of 1990, at the

17  Area 5 Violent Crimes Police Department, you talked

18  to an Assistant State's Attorney by the name of

19  Perkaus, didn't you?

20     A    Yes.

21     Q    And you told him that day, didn't you,

22  that Justino, Alfredo, Chris Hernandez and Jose

23  Maysonet went to Jose's house that evening, didn't

24  you?

F91

JGS_MAYSONET 4366

GONZALEZ 0165478

1      A    No.

2      Q    You didn't.  Excuse me for a second,

3  Judge.

4           Well, you said in answer to Mr. Leighton's

5  question that you went to Jose's house with Mr.

6  Gonzalez and Fro, isn't that true?

7      A    Yes.

8      Q    But you told on August the 24th of 1990,

9  Detective Smitka and Detective Shack that you and

10  the other offenders, Maysonet, Gonzalez and

11  Hernandez, all meet at Maysonet's residence that

12  evening, didn't you?

13     A    No.

14     MR. MAREK:  I'll object.  That's not

15  impeaching.

16     MR. WIENER:  Certainly is.

17     THE COURT:  Sustained, counsel.  This court

18  does not find that to be impeaching.

19     MR. WIENER:  Q  Was --

20     THE COURT:  That last testimony will be

21  stricken and will be disregarded by the jury.

22     MR. WIENER:  Q  Was Jose Maysonet with you when

23  you went to his apartment on May the 24th of 1990?

24     A    No.

F92

JGS_MAYSONET 4367
GONZALEZ 0165479

1      Q    Where was he when you went to his
2 apartment?
3      A    He was already at his house.
4      Q    And you hadn't seen him earlier in the
5 day?
6      A    No.  Because I was at work.
7      Q    Okay.
8           And you all went to the front door of his
9 house, right?
10     A    Yes.
11     Q    And you went into his house, you, and
12 Alfredo and Fro, isn't that right?
13     A    Yes.
14     Q    And where was Rosa Bello at the time?
15     A    She was in the kitchen.
16     Q    Did Rosa Bello go into the bedroom after
17 you were there?
18     A    Yeah.  When Alfredo and Fro -- when
19 Alfredo and Juan went in there.
20     Q    Now, Rosa Bello didn't go into the bedroom
21 by herself, did she?
22     A    No.
23     Q    Alfredo and Fro went into the bedroom with
24 her, didn't they?

F93

JGS_MAYSONET 4368
GONZALEZ 0165480

1     A   No.

2     Q   Well, were they in the bedroom at the same

3  time she was?

4     A   It was Alfredo and Juan in the bedroom.

5     Q   Excuse me.  Alfredo and Juan.

6          Did Alfredo and Juan go into the bedroom

7  with Rosa Bello when she went into the bedroom?

8     A   No.  Alfredo and Juan was already in the

9  bedroom.

10     Q   They were in the bedroom?

11     A   Yeah.

12     Q   And then she came into the bedroom?

13     A   Yes.

14     Q   So at the time that she went into the

15  bedroom, Alfredo and Juan weren't in the frontroom

16  having a conversation, were they?

17     A   They were in the bedroom.

18     Q   Okay.

19          Now, the gun that was, you said that

20  Alfredo Gonzalez had wasn't at Alfredo Gonzalez's

21  house on May the 24th of 1990, was it?

22     A   No.

23     Q   The gun was at Jose's house, wasn't it?

24     A   Yes.

F94

JGS_MAYSONET 4369
GONZALEZ 0165481

1     Q    And when Jose and you and Alfredo and Fro

2  left, Jose got into the driver seat of that car,

3  didn't he?

4     A    Yes.

5     Q    And he drove the car, didn't he?

6     A    Yes.

7     Q    And in fact, it's your testimony that

8  before going over there, Fro or Alfredo was driving

9  the car, isn't it?

10     A    Yeah.  At first, yes.

11     Q    Pardon me?

12     A    At first, yes.

13     Q    Who at first was driving the car?

14     A    Fro.

15     Q    Okay.

16         And when -- by the way, how long were you

17  in Jose's apartment before you left and got into

18  the car?

19     A    Around 10 minutes.

20     Q    And when you left, did Jose start the car

21  up?

22     A    We all walked down together and he turned

23  on the car.

24     Q    And he drove?

F95

JGS_MAYSONET 4370
GONZALEZ 0165482

1      A     Yes.

2      Q     Did he seem to know where he was going?

3      A     Yes.

4      Q     He drove to the area there which you

5 eventually looked at State's Exhibit Number 21, he

6 turned around and he parked the car, isn't that

7 right?

8      A     Yes.

9      Q     And you never heard anybody tell him where

10 to drive, did you?

11      A     No.

12      Q     By the way, everybody that night was

13 wearing hooded sweatshirts, is that right?

14      A     Yes.

15      Q     Were they all the same color?

16      A     No.

17      Q     Okay.

18          What color was the sweatshirt worn by

19 Alfredo Gonzalez?

20      A     I don't remember.

21      Q     What color was the sweatshirt worn by

22 Jose?

23      A     I don't remember.

24      Q     What color was the sweatshirt by Fro?

JGS_MAYSONET 4371
GONZALEZ 0165483

1    A    I don't remember.

2    Q    Okay.

3         Now, you say that when the car was finally

4    stopped, that Jose stayed in the car?

5    A    Yes.

6    Q    And you got out of the car and stood by

7    the car?

8    A    Yes.

9    Q    And Fro and Alfredo Gonzalez went to talk

10   to the two black men, isn't that true?

11   A    Yes.

12   Q    And you say that when Alfredo Gonzalez got

13   back to to car, he said "I just shot two guys,"

14   isn't that right?

15   A    Yes.

16   Q    But on August 24th of 1990, when you were

17   interviewed and talked to about this by Officers

18   Smitka and officer, and Detective Shack, you never

19   told them that Alfredo Gonzalez said anything, did

20   you?

21   A    Repeat that question again.

22   Q    Yes.

23        On August 24th of 1990, at Area 5 Violent

24   Crimes when you were interviewed by Detective

F97

JGS_MAYSONET 4372

GONZALEZ 0165484

1   Smitka and Detective Shack and you told them what

2   happened that night.  You never told them that

3   Alfredo Gonzalez got into the car and said "I had

4   shot two people," did you?

5        A    I don't remember.

6        Q    Well, on August the 24th of 1990, when

7   Assistant State's Attorney Perkaus was questioning

8   you, you never told Assistant State's Attorney

9   Perkaus that Alfredo Gonzalez said "I just shot two

10  people," did you?

11       MR. MAREK:   Judge, I'm going to object.  If we

12  may be heard.

13                        (Conference at the bench

14                        out of the hearing of the

15                        jury and the reporter,

16                        after which time the

17                        following proceedings had

18                        in their hearing)

19       MR. WIENER:  Q  You never told Assistant

20  State's Attorney Perkaus that Alfredo Gonzalez had

21  said "I just shot two people," did you?

22       A    No.

23       Q    In fact, the first time you ever told

24  anyone about that statement that Alfredo Gonzalez

F98

JGS_MAYSONET 4373
GONZALEZ 0165485

1   made was when you made your deal with the State's

2   Attorneys after March 13th of 1992, isn't it?

3       A    No.

4       Q    Who did you tell before that?

5       A    My lawyer knew about it.

6       Q    Oh, your lawyer.  Did you tell any police

7   officers?

8       A    Yes.

9       Q    What police officers did you tell?

10      A    Police officers from the police station.

11      Q    Okay.

12           Do you remember their names?

13      A    No, I don't.

14      Q    Okay.

15           Now, after everybody got into the car you

16  saw a, one of those black men on the sidewalk next

17  to the vacant lot, didn't you?

18      A    Yes.

19      Q    And you drove around for awhile, right?

20      A    No.

21      Q    Well, did you just go right home?

22      A    Yes.

23      Q    I thought you drove around the area for a

24  little while before you went home?

F99

JGS_MAYSONET 4374

GONZALEZ 0165486

1      MR. LEIGHTON:  Objection.  Argumentative.

2      THE COURT:  Sustained.

3      MR. WIENER:  Q  Did you drive around the area

4  before you went home?

5      MR. LEIGHTON:  Objection to the

6  characterization.

7      THE COURT:  Counsel, I'm going to sustain it

8  just because it is not clear if the witness fully

9  understands the vernacular "drive around."  Maybe

10  you could rephrase it.

11      MR. WIENER:  Q  Where did Jose drive the car

12  after everybody got into the car?

13      A    To St. Louis, and from St. Louis we went

14  toward Wabansia.  From Wabansia towards Kedzie.

15  Kedzie, he dropped me off by Lemoyne and Spalding.

16      Q    And you didn't tell anybody about what

17  happened in terms of police officers or State's

18  Attorneys until August the 24th of 1990, isn't that

19  true?

20      A    Yes.

21      Q    And during that time you discussed what

22  happened on that night with Jose Maysonet, didn't

23  you?

24      A    No.

F100

JGS_MAYSONET 4375

GONZALEZ 0165487

1      Q    Between May the 25th and August the 24th

2    of 1990, did you discuss what occurred that night

3    with Jose Maysonet?

4      A    No.

5      MR. LEIGHTON:  Objection.  Asked and answered.

6    Unless there is some way counsel is going to prove

7    up some kind of impeachment.

8      THE COURT:  Sustained.

9      MR. WIENER:  I would ask --

10     THE COURT:  Asked and answered.  Same objection

11   as to the second question, it is sustained.  The

12   first question would stand.

13     MR. WIENER:  Q  Between May the 25th of 1990,

14   and August the 24th of 1990, how many times did you

15   meet with and talk to Jose Maysonet?

16     MR. MAREK:  Objection.  It assumes a fact not

17   in evidence that in fact he did meet with Maysonet.

18     THE COURT:  That is correct.  But I will let

19   him answer it.

20         You may answer.

21     THE WITNESS:  I didn't.

22     MR. WIENER:  Q  So you never saw and met with

23   and talked to about anything with Jose Maysonet

24   between May 25th of 1990, and August 24th of 1990?

F101

JGS_MAYSONET 4376

GONZALEZ 0165488

1      A    No.

2      Q    So when you told police officers on August

3    24th of 1990, that Jose stayed in the car and you

4    stood by the car, you never discussed that version

5    of events with Jose, is the that your testimony?

6      MR. LEIGHTON:  Objection.

7          Objection.  This is about the fourth time

8    he has asked that.

9      THE COURT:  Sustained, counsel.  He really has

10   answered that question.

11     MR. WIENER:  Q  Before May 24th of 1990, you

12   saw Jose Maysonet several times each week, didn't

13   you?

14     A    On the streets, yeah.

15     Q    And after that time you never saw him on

16   the streets, did you?

17     A    No.

18     MR. WIENER:  I have nothing further.

19     THE COURT:  Any re-direct, State?

20     MR. LEIGHTON:  Could we have one moment, Judge?

21     THE COURT:  Okay.

22     MR. LEIGHTON:  If I might, your Honor?

23     THE COURT:  Yes, you may.

24

JGS_MAYSONET 4377
GONZALEZ 0165489

RE-DIRECT EXAMINATION

BY MR. LEIGHTON:

MR. LEIGHTON:  Q  Mr. Cruz, on August 24th, 1990, you gave a statement to Assistant State's Attorney Perkaus at Area 5 Violent Crimes, correct?

A    Yes.

Q    And in that statement -- strike that.

And your statement was reduced to a handwritten summary by the Assistant State's Attorney, correct?

A    Yes.

Q    And you read that statement and you signed it at that time, correct?

A    Yes.

MR. LEIGHTON:  May I approach the witness?

THE COURT:  Have you tendered?

MR. WIENER:  I have seen it.

MR. LEIGHTON:  Q  Mr. Cruz, I want you to take a look at that.  Tell the ladies and gentlemen of the jury, if you recognize what that is?

THE COURT:  Would you like to give that an exhibit number?

MR. LEIGHTON:  Judge, I believe it's People's 22.

JGS_MAYSONET 4378
GONZALEZ 0165490

1    THE COURT:  Very well.

2    THE WITNESS:  Yes.

3    MR. LEIGHTON:  Q  I'm sorry, could you repeat

4  the answer?

5    A    Yes.

6    Q    And what do you recognize that to be?

7    A    Statement.

8    Q    And is that the -- and is that the

9  handwritten summary of your statement that was

10  prepared by the Assistant State's Attorney after

11  you told him what you knew about this incident?

12    A    Yes.

13    Q    And do you see your signature on that

14  document?

15    A    Yes.

16    Q    Okay.

17    Could you check each page and see if your

18  signature appears on each page?

19    A    Yes.

20    Q    And is this document in the same condition

21  today as it was when you signed it?

22    A    Yes.

23    Q    And you signed this document on August

24  24th of 1990, correct?

JGS_MAYSONET 4379
GONZALEZ 0165491

1     A   Yes.

2     MR. LEIGHTON:  Nothing else.

3     MR. WIENER:  May I approach the witness, Judge?

4                RE-CROSS EXAMINATION

5                BY MR. WIENER:

6     MR. WIENER:  Q  Showing you what's been marked

7   as People's Exhibit Number 22 --

8     MR. MAREK:  Excuse me, counsel.  Here is the

9   exhibit.

10     MR. WIENER:  Thank you.

11     Q   Is this the same document that you looked

12  at?

13     A   Yes.

14     Q   And this is the same document that you

15  signed the pages?

16     A   Yes.

17     Q   And is this the same document that says

18  "that on May 24th of 1990, at about 1:30, Justino,

19  Alfredo, Chris Hernandez and Jose Maysonet went to

20  Jose's house at 1320 South Homan to pick up a gun?"

21     A   Yes.

22     Q   Isn't that what you told --

23     MR. LEIGHTON:  Objection.

24     MR. WIENER:  Q  Well, did you sign your name to

JGS_MAYSONET 4380
GONZALEZ 0165492

1    that first page?

2        A    Yes.

3        Q    And in signing your name to that first

4    page, does that mean that you had read that first

5    page and what you saw there was what you said?

6        A    Yes.

7        MR. WIENER:  No further questions.

8        THE COURT:  Anything, State?

9        MR. MAREK:  No.

10       MR. LEIGHTON:  No.

11       MR. MAREK:  Nothing else.

12       THE COURT:  Thank you, Mr. Cruz.  You may step

13   down.

14                           (Witness excused)

15       THE COURT:  State, are you ready for your next

16   witness?

17       MR. MAREK:  Yes, we are, Judge.

18       THE COURT:  Very good.

19       THE CLERK:  Yes, sir.  Raise your righthand,

20   sir.

21                    ERNEST WARNER,

22   called as a witness on behalf of the People of the

23   State of Illinois, having been first duly sworn,

24   was examined and testified as follows:

F106

JGS_MAYSONET 4381
GONZALEZ 0165493

DIRECT EXAMINATION

BY MR. LEIGHTON:

MR. LEIGHTON:  May I proceed, your Honor.

THE COURT:  Yes, you may you may.

MR. LEIGHTON:  Q  Sir, could you state your name for the ladies and gentlemen of the jury, and spell your last name for the court reporter?

A    My name is Ernest Warner.  W A R N E R.

Q    What is your occupation and how long have you been so employed?

A    I'm a firearms examiner for the Chicago Police Department Crime Laboratory and I have been employed in that capacity for 25 years.

Q    What are your duties at the laboratory?

A    My duties at the laboratory include receiving fired evidence, assigning control numbers to fired evidence, examining fired evidence, receiving weapons, test firing weapons, microscopically examining the tests from weapons, comparing tests from weapons with fired evidence and in the case of positive findings, preparing a written report to that affect.

Q    What is your experience relative to firearms and firearms identification?

JGS_MAYSONET 4382
GONZALEZ 0165494

1     A   I estimate that I have examined over 30000

2    weapons during the course of my employment and I

3    have made alike number of microscopic comparisons.

4     Q   Have you studied under a recognized expert

5    in the field of firearms identification?

6     A   Yes.  I studied under John Staffer, the

7    former Chief Firearms Examiner at the Chicago

8    Police Department Crime Laboratory when I joined

9    the laboratory staff.

10     Q   Have you read textbooks in the field of

11    firearms identification?

12     A   Yes.  I have read the textbooks in the

13    field, including Firearms Identification by

14    Matthews, Firearms Identification and Investigation

15    and Evidence by Hatcher.  Firearms Identification

16    by Bernard.  Firearms Identification from the

17    Ammunition Fired therein by Gunther and Gunther.

18     Q   Do you belong to any professional

19    organizations?

20     A   Yes.  I'm a member of the Midwester

21    Association of Forensic Scientists.  I'm a member

22    of the International Association for Identification

23    and I'm a charter member of the Association of

24    Firearms and Tool Mark Examiners.

JGS_MAYSONET 4383
GONZALEZ 0165495

1    MR. LEIGHTON:  At this time I would tender Mr.

2  Warner as an expert in the field of firearms

3  identification.

4    MR. WIENER:  No objection.

5    THE COURT:  Very well.

6        There being no objection, the witness will

7  be found to be an expert in the field of firearms

8  examination and identification.

9    MR. LEIGHTON:  Q  Mr. Warner, I am going to

10  show you what's previously been marked as People's

11  Group Exhibit Number 20.  I would ask you to take a

12  look at that and tell the ladies and gentlemen of

13  the jury, if you recognize what that is?

14    A    The plastic envelope is an envelope I

15  prepared on the 30th of May, 1990, to contain

16  evidence in the investigation of the Wiley

17  homicides.

18    Q    How do you recognize this evidence?

19    A    I recognize the envelope by the, by my

20  handprinting which is on the envelope.  The

21  contents of the envelope, the plastic envelope are

22  two manilla envelopes which I signed and dated on

23  the 30th of May, 1990, and cut open through my

24  signature.

JGS_MAYSONET 4384
GONZALEZ 0165496

1    Q    Is this -- did you find anything in the

2    envelope when you cut it open?

3    A    Yes, I did.

4    Q    What did you find?

5    A    In one envelope I found a nine millimeter

6    caliber fired bullet which I marked with the

7    laboratory control number 90-830 and the letter C.

8    And the other envelope I found four nine millimeter

9    caliber discharge cartridge cases.

10    Q    Did you examine this evidence?

11    A    Yes, I did.

12    Q    And what procedure did you follow in your

13    examination?

14    A    For the fired bullet I weighed the bullet,

15    I compared it with laboratory standards.  I

16    determined that it was a nine millimeter caliber

17    bullet that had been fired in a weapon rifled with

18    five lands and grooves inclined to the right.

19    Q    What about, what, if anything, did you

20    do -- strike that.

21         What is the basis for the identification

22    of firearms evidence?

23    A    The basis for the identification of

24    firearms evidence is the similarity and the

F110

JGS_MAYSONET 4385

GONZALEZ 0165497

1    reporduction of class and individual

2    characteristics on fired ammunition components.

3         Q    And would you please describe the, these

4    characteristics for the court and jury?

5         A    Class characteristics are characteristics

6    that are common to any number of weapons.  They

7    include the caliber which is the nominal diameter

8    of the barrell of the weapon or nominal diameter of

9    a fired bullet.

10        Within the barrel of weapons spiral

11   grooves are cut to impart spin to the bullet as the

12   bullet travels through the barrel.

13        The number of these grooves varies from

14   manufacturer to manufacturer.  That number is a

15   class characteristic.  Any number of weapons can

16   have five grooves cut in the barrel, any number of

17   weapons could have six grooves cut in the barrel.

18        Whether these grooves spiral to the left

19   or right is also a class characteristic.  So in

20   total in speaking about fired bullets and weapon

21   barrels, the class characteristics consist of the

22   caliber of the bullet or barrel, the number of

23   lands and grooves in the barrel or inscribed on the

24   bullet and the direction of twist of these lands

JGS_MAYSONET 4386
GONZALEZ 0165498

1    and grooves.

2        Q    What instrument do you use in these

3    comparison, and will you describe it?

4        A    The instrument used to compare fired

5    ammunition components is called a comparison

6    microscope.  It's a microscope with two independent

7    stages and matched optical systems which allows the

8    user to examine items on each stage simultaneously

9    side by side under magnification.

10       Q    Now, did you examine the fired bullet in

11   this case on the comparison microscope?

12       A    Yes.

13       Q    Mr. Warner, I would like to direct your

14   attention to the four fired cartridge cases which

15   you received.  Did you examine these items?

16       A    Yes, sir.

17       Q    And what, if any characteristics did you

18   observe about them?

19       A    The characteristic I observed about the

20   discharge cartridge cases was they were nine

21   millimeter caliber and they were center fire

22   ammunition.

23       Q    Did you also examine the cartridge cases

24   under the comparison microscope?

JGS_MAYSONET 4387
GONZALEZ 0165499

1      A    I did.

2      Q    From this comparison -- strike that.

3           From this examination of the four

4  cartridge cases, were you able to arrive at a

5  conclusion regarding a comparison of the four

6  cartridge cases among each other?

7      A    Yes, I was.

8      Q    And what were you able to determine?

9      A    On the basis of the reproduction of class

10  characteristics and individual characteristics on

11  the base of each of the four cartridge cases it's

12  my opinion that these four discharge cartridge

13  cases were fired in one weapon.

14      Q    What individual characteristics did you

15  note that brought you to that conclusion

16  specifically?

17      A    I did not make a listing of the individual

18  characteristics that I saw at the time I saw them.

19      Q    But based on your examination it was then

20  your opinion and is now your opinion that those

21  four cartridge cases were fired from the same gun?

22      A    Yes.

23      Q    Now, did you have an opportunity to

24  examine the shells or what are called extractor

JGS_MAYSONET 4388
GONZALEZ 0165500

1    marks?

2        A    I don't recall if I did or did not, sir.

3        Q    Now, would those shells casings be

4    consistent with being fired from a nine millimeter

5    semi-automatic handgun?

6        A    They would be consistent with being fired

7    from such a weapon.

8            Yes, sir.

9        MR. LEIGHTON:  At this time Judge, there will

10   be a stipulation between the parties, the People of

11   the State of Illinois and the defendant through his

12   attorney, that People's Group 23 consists of a

13   plastic bag containing a Cook County Medical

14   Examiner forensic bullet envelope in turn

15   containing one deformed partially metal jacketed

16   medium caliber lead bullet.

17           There would be a further stipulation that

18   the deformed bullet contained in the bullet

19   envelope which is part of People's Group 23, was

20   the bullet removed from Kevin Wiley by Doctor Barry

21   Lifschultz of the Cook County Medical Examiner on

22   May the 25th, 1990.

23       MR. WIENER:  That would be the stipulation,

24   Judge.

F114

JGS_MAYSONET 4389
GONZALEZ 0165501

1       THE COURT:  Very well.

2       MR. LEIGHTON:  There would be a further

3   stipulation by and between the parties, that

4   People's Group Exhibit Number 24, comprising a

5   clear plastic bag containing a Cook County Medical

6   Examiner bullet envelope which inturn contains one

7   medium caliber fired bullet was in fact the fired

8   bullet recovered from the body of Torrence Wiley by

9   Doctor Barry Lifschultz of the Cook County Medical

10  Examiners Office on May the 25th, 1990.

11      MR. WIENER:  So stipulated.

12      MR. LEIGHTON:  If I may approach the witness,

13  your Honor.

14      THE COURT:  Yes.

15      MR. LEIGHTON:  Q  Mr. Warner, I'm going to

16  direct your attention to People's Group Number 23

17  and Number 24.  I would ask you to take a look at

18  first People's Group Exhibit Number 23.

19          With regard to People's Group Exhibit

20  Number 23, have you ever seen that evidence before?

21      A    Yes, I did.

22      Q    And when was that?

23      A    I saw it on the 30th of May, 1990.

24      Q    And how do you recognize this evidence?

F115

JGS_MAYSONET 4390

GONZALEZ 0165502

1      A    I recognize the blue medical examiners

2    envelope by my signature and the date I placed on

3    it on 30 May, 1990.  I recognize the manilla

4    envelope that was in the medical examiners envelope

5    by my signature and the date 30 May, 1990.  I

6    recognize the item that was within the manilla

7    envelope by the laboratory control number 90-830

8    and the letter A which I inscribed on that item

9    when I removed it from the manilla envelope.

10      Q    Did you examine that piece of evidence?

11      A    Yes, I did.

12      Q    And how did you examine it?

13      A    I weighed it, I compared it with

14    laboratory standards and I microscopically compared

15    it with other fired bullets submitted in this

16    investigation.

17      Q    I'm going to direct your attention to

18    People's Group Exhibit Number 24.  Have you ever

19    seen that evidence before?

20      A    Yes, I have.

21      Q    And where did you see that?

22      A    At the Chicago Police Laboratory Firearms

23    Unit.

24      Q    And do you recognize -- and how do you

F116

JGS_MAYSONET 4391

GONZALEZ 0165503

1   recognize that evidence?

2      A   I recognize the plastic envelope by my

3   printing on it that I placed on there in

4   preparation of forwarding it to Evidence Recovered

5   Property for storage. I recognize the blue Medical

6   Examiners Office by my signature and the date 30

7   May, 1990, which I placed on there. I cut that

8   envelope open through my signature and I removed

9   the manilla envelope. I recognize the manilla

10   envelope by my signature and the date 30 May, 1990,

11   which I placed on there. I cut that envelope open

12   through my signature and I removed a fired bullet

13   from that manilla envelope. I recognized the fire

14   bullet by the laboratory control number 90-830 and

15   the letter B which I inscribed on that fired bullet

16   when I removed it from the envelope.

17      Q   Did you examine that fired bullet?

18      A   Yes, I did.

19      Q   And did you do that on the comparison

20   microscope?

21      A   Yes, sir, I did.

22      Q   Were you able to form an opinion regarding

23   a comparison of all three fired bullets that you

24   received in this case?

F117

JGS_MAYSONET 4392

GONZALEZ 0165504

1    A    Yes, sir, I was.

2    Q    And what is that opinion?

3    A    In my opinion all three fired bullets

4  submitted in this investigation are nine millimeter

5  caliber.  All three bullets were fired in a weapon

6  rifled with five lands and grooves inclined to the

7  right.  And on the basis of the reproduction of

8  individual characteristics microscopically

9  reproducing from fired bullet to fired bullet, each

10  of these three fired bullets was in fact fired

11  through the same gun barrel.

12    MR. LEIGHTON:  One moment, your Honor.

13         Nothing else of this witness.

14    MR. WIENER:  Judge, I have no questions of Mr.

15  Warner.

16    THE COURT:  Very well.

17         Mr. Warner, you may step down.

18    THE WITNESS:  Thank you, your Honor.

19                         (Witness excused)

20    MR. MAREK:  Your Honor, the People call doctor

21  Barry Lifschultz.

22

23    THE CLERK:  Yes, sir.  Raise your righthand,

24  sir.

F118

JGS_MAYSONET 4393
GONZALEZ 0165505

```
 1                    BARRY LIFSCHULTZ,
 2    called as a witness on behalf of the People of the
 3    State of Illinois, having been first duly sworn,
 4    was examined and testified as follows:
 5                    DIRECT EXAMINATION
 6                    BY MR. MAREK:
 7        MR. MAREK:  Q   Doctor, Lifschultz, would you
 8    state your name for the record, please?
 9        A    My name is Doctor Barry Lifschultz.
10    That's spelled L I F as in Frank, S C H U L T Z.
11        Q    And Doctor Lifschultz, what is your
12    profession or occupation?
13        A    I'm a staff forensic pathologist at the
14    Cook County Medical Examiners Office.
15        Q    And Doctor Lifschultz, are you licensed to
16    practice medicine in the State of Illinois?
17        A    Yes, I am.
18        Q    Would you just briefly describe for the
19    ladies and gentlemen of the jury, your educational
20    background starting with medical school and -- let
21    me withdraw that.
22            Would you state your work experience from
23    medical school up to the present time?
24        A    In 1977, I began a four year residency at
```

JGS_MAYSONET 4394
GONZALEZ 0165506

1    Northwestern University Medical School in the field

2    of medicine called general anatomic pathology.

3    Then in 1981, I began a one year residency in a

4    subspecialty general anatomic pathology called

5    forensic pathology which ended in 1982.

6         In 1982 then, I received a job as a staff

7    forensic pathologist at the Cook County Medical

8    Examiners Office and I have been employed there

9    ever since as a staff forensic pathologist.

10       Q    And Doctor Lifschultz, in the course of

11   your employment at the Cook County Medical

12   Examiners Office as a staff pathologist, have you

13   performed what are known as post-mortem

14   examinations or autopsies?

15       A    Yes, I have.

16       Q    And on approximately how many occasions

17   have you performed autopsies for the Cook County

18   Medical Examiners Office?

19       A    I have been there approximately 10 years.

20   Slightly over 10 years and I perform about 300

21   autopsies every year.  So I performed over 3000

22   autopsies.

23       Q    Doctor, when is, or when do you perform an

24   autopsy?

JGS_MAYSONET 4395

GONZALEZ 0165507

1      A    We perform an autopsy when it's necessasry

2    as a part of an investigation of a sudden and

3    unexpected or possibly violent death and we perform

4    these examinations or autopsies to help us

5    determine what the cause of the death was.

6      Q    Doctor, are you board certified in any

7    specialty?

8      A    Yes, I am.

9      Q    And what is that?

10      A    I'm Board Certified in general anatomic

11    pathology and then I'm also Board Certified in

12    forensic pathology.

13      Q    Doctor, what is anatomic pathology?

14      A    Basically, general anatomic pathology is

15    the study of injuries and diseases as they appear

16    in tissues.  Whether we look at the tissues with

17    our naked eye or whether we look at this them with

18    the aid of a microscope.

19      Q    And what is forensic pathology?

20      A    Forensic pathology essentially uses the

21    principals of all anatomic pathology to investigate

22    sudden and unexpected or possibly violent deaths.

23      Q    Doctor, are you a member of any

24    professional organizations?

JGS_MAYSONET 4396
GONZALEZ 0165508

1        A    Yes, I am.

2        Q    And what are some of those?

3        A    I'm a fellow of the American Academy of

4   the Forensic Sciences and then I'm also a fellow of

5   the American societ of Clinical Pathologists.

6        MR. MAREK:  Your Honor, at this time I would

7   tender Doctor Lifschultz to the court as an expert

8   in the field of forensic pathology.

9        MR. WIENER:  Without objection.

10       THE COURT:  All right.

11            Doctor Lifschultz will be found by this

12   court to be an expert in the field of forensic

13   pathology.

14       MR. MAREK:  Q  Doctor Lifschultz, I want to

15   direct your attention to May the 25th of 1990.  On

16   that date did you perform an autopsy upon the

17   remains of Mr. Kevin Wiley?

18       A    Yes, I did.

19       Q    And doctor, during the course of

20   performing that autopsy, did you find any evidence

21   of injury?

22       A    Yes, I did.

23       Q    And what evidence of injury did you find?

24       A    There was one main injury on Kevin Wiley.

F122

JGS_MAYSONET 4397
GONZALEZ 0165509

1 On the left back of his neck there was a gunshot

2 wound and the course of this gunshot wound

3 perforated the skin of the left back of the neck

4 and then it went through the larynx or voice box

5 and then finally we recovered a medium caliber

6 partially metal jacketed lead bullet from the right

7 jaw.

8  The course of the wound was basically from

9 left to right and back to front and around the

10 wound there were some small punctate or point like

11 abrasions which are consistent with the type of

12 markings we see when there is close range firing of

13 a handgun.

14 Q Doctor, were there any other pertinent

15 findings by you during the course of your autopsy

16 of Mr. Kevin Wiley?

17 A The only other finding was that when we

18 examined the airways of the lungs, which in medical

19 terms is called the trachea bronchial, free the

20 airways to the lungs were filled up with fluid and

21 clotted blood.

22 Q Doctor Lifschultz, based upon your autopsy

23 of Mr. Kevin Wiley and based upon your expertise in

24 the field of forensic pathology together with your

JGS_MAYSONET 4398
GONZALEZ 0165510

1   experience as a forensic pathologist, do you have

2   an opinion to a reasonable degree of scientific and

3   medical certainty as to the cause of death of Kevin

4   Wiley?

5       A    Yes, I do.

6       Q    And what is that opinion, doctor?

7       A    Kevin Wiley died as a result of a gunshot

8   wound of the neck.

9       Q    Doctor Lifschultz, would you just briefly

10  explain to us how exactly did this gunshot wound to

11  the neck kill Kevin Wiley?

12      A    Well, the mechanism of death, the way that

13  this gunshot wound killed Kevin Wiley was probably

14  in two parts.  One part would be that the gunshot

15  wound as it went through the neck would have hit

16  major blood vessels which would have caused

17  bleeding outside the body.

18          Additionally, this gunshot wound would

19  have caused bleeding in the larynx or voice box

20  that I described and then this blood would then

21  have be inhaled into the airways so Kevin Wiley

22  probably died as a result of bleeding to death as

23  well as basically drowning in his own blood.

24      Q    Doctor Lifschultz, I'm going to show you

F124

JGS_MAYSONET 4399
GONZALEZ 0165511

1  what has been marked previously as People's Exhibit

2  Number 1 for identification and I'll ask you

3  doctor, if you recognize what is depicted in this

4  that photo?

5      A    Yes, I do.

6      Q    And what or who is shown in that photo?

7      A    This is a picture of the face of the man

8  who was identified to me as Kevin Wiley.

9      Q    And I'm going to show you -- doctor, I'm

10  going to show you what has been marked People's

11  Exhibit Number 25 for identification.  And I'll ask

12  you if you recognize what is shown in that photo?

13      A    Yes, I do.

14      Q    What is shown in that photo?

15      A    There is a picture of the left back of the

16  neck of Kevin Wiley.  And it shows the gunshot

17  wound of entrance on the left back of the neck just

18  behind the left ear.

19      Q    Doctor Lifschultz, I'm also going to show

20  you what has been marked People's Exhibit Number 26

21  for identification and I'll ask you if you

22  recognize what is shown in that photo?

23      A    Yes, I do.

24      Q    And what is shown in that photo?

F125

JGS_MAYSONET 4400
GONZALEZ 0165512

1      A     This is a close-up picture of the same

2    gunshot wound that was shown in the other photo.

3    It shows the gunshot wound and it also much better

4    shows several of the small point like abrasions

5    that are consistent with the gun being fired at

6    close range.

7      Q     And doctor, do each of these photos,

8    People's Exhibit Number 1, People's Exhibit Number

9    25 for identification and People's Exhibit Number

10   26 for identification truly and accurately depict

11   the Kevin Wiley and the injuries you have testified

12   too as you observed them during the course of your

13   autopsy back in May of 1990?

14     A     Yes, they do.

15     Q     Doctor Lifschultz, again directing your

16   attention to May the 25th of 1990, on that day did

17   you have occasion to also perform an autopsy upon

18   the remains of Mr. Torrence Wiley?

19     A     Yes, I did.

20     Q     And doctor, during the course of your

21   autopsy upon Mr. Torrence Wiley, did you find any

22   evidence of injury?

23     A     Yes, I did.

24     Q     And what evidence of injury did you locate

F126

JGS_MAYSONET 4401
GONZALEZ 0165513

1    on Torrence Wiley?

2        A    On Torrence Wiley I found two injuries.

3    First of all, there was a gunshot wound of the left

4    chest.  The course of this wound perforated the

5    skin of the left chest.  It then perforated the

6    heart, then it perforated the right lung and then

7    finally from beneath the skin of the right chest we

8    recovered again a medium caliber partially metal

9    jacketed lead bullet.  The course of this wound was

10   from front to back and left to right.

11           Additionally there was a second gunshot

12   wound.  The course of this wound perforated the

13   skin of the penis, then it went through the

14   abdominal organs.  It didn't strike any major

15   abdominal organ and finally on the right hip there

16   was an exit wound and no bullet was recovered from

17   the body of Torrence Wiley.

18       Q    Doctor, based upon your autopsy of the

19   remains of Torrence Wiley and based upon your

20   experience as a clinical pathologist.  Do you have

21   an opinion to a reasonable degree of scientific and

22   medical certainty as to the cause of death of

23   Torrence Wiley?

24       A    Yes, I do.

F127

JGS_MAYSONET 4402

GONZALEZ 0165514

1      Q      And what is that opinion?

2      A      Torrence Wiley died as a result of the two

3   gunshot wounds that I just described.

4      MR. WIENER:  Thank you.

5      MR. MAREK:   Q  Doctor Lifschultz, I'm going to

6   show you what has previously been marked People's

7   Exhibit Number 2 for identification, or People's

8   Exhibit Number 2 for identification an I'll ask you

9   if you recognize the person who is depicted in that

10  photo?

11     A      Yes, I do.

12     Q      And who is depicted in that photo?

13     A      This is the face of the man who was

14  identified to me as Torrence Wiley.

15     Q      And does this photo truly and accurately

16  depict Torrence Wiley as he appeared to you on May

17  25th, 1990, at the time of the autopsy?

18     A      Yes, it does.

19     Q      Doctor Lifschultz, I'm going to show you

20  what has been marked People's Exhibit Number 27 for

21  identification an I'll ask you if you recognize

22  what is depicted in that photograph?

23     A      Yes, I do.

24     Q      And what is depicted in that photo?

F128

JGS_MAYSONET 4403
GONZALEZ 0165515

1      A      This is a picture of the left chest of

2    Torrence Wiley and it shows the gunshot wound of

3    entrance of the left chest.

4      Q      Doctor Lifschultz, I'm going to show you

5    what has been marked People's Exhibit Number 28 for

6    identification and I'll ask you if you recognize

7    what is shown in People's Exhibit Number 28 for

8    identification?

9      A      Yes, I do.

10      Q      And what do you recognize that to be?

11      A      This is a close-up picture of the same

12    gunshot wound of the left chest that was shown in

13    the other picture.

14      Q      Now, Doctor Lifschultz, did you ever

15    observe any evidence of close range firing with

16    respect to that particular gunshot wound?

17      A      I didn't see any visible evidence of close

18    range firing either on the skin or the clothing

19    over that wound.

20            But I'm not an expert in clothing

21    examination.  So I couldn't be positive.

22      Q      Doctor Lifschultz, I'm going to show you

23    what has been marked People's Exhibit Number 29 for

24    identification.  Do you recognize what is shown in

F129

JGS_MAYSONET 4404

GONZALEZ 0165516

1    that photo?

2        A    Yes, I do.

3        Q    And what is shown in that photo?

4        A    This is a picture of the gunshot wound on

5    the left penis of Torrence Wiley and it also shows

6    several small abrasions or lacerations just above

7    the gunshot wound.

8        Q    Now, the small abrasions which are shown

9    in that photo above the gunshot wound.  Would those

10   abrasions be consistent with being caused by bullet

11   fragments?

12       A    Yes.  They could have been caused by

13   either bullet fragments or fragments of some

14   intermediary target.

15       Q    And Doctor Lifschultz, I'm going to show

16   you what has been marked as People's Exhibit Number

17   30 for identification and I'll ask you if you

18   recognize what is shown in that photo?

19       A    Yes, I do.

20       Q    And what is depicted in that photo?

21       A    This is a picture of the right hip of

22   Torrence Wiley and it shows the exit gunshot wound

23   on the right hip.

24       Q    Doctor Lifschultz, I'm going to finally

JGS_MAYSONET 4405
GONZALEZ 0165517

1    show you what has been marked People's Exhibit

2    Number 31 for identification and I'll ask you if

3    you recognize what is shown in that photo?

4         A    Yes, I do.

5         Q    And what do you recognize to be depicted

6    in that photo?

7         A    this is a close-up picture of the gunshot

8    wound of exit on the right hip.

9         Q    Doctor Lifschultz, do each of these

10   photos, specifically People's Exhibit's Number 27

11   through 31 inclusive for identification, do each of

12   them truly and accurately depict Torrence Wiley and

13   the gunshot wounds to his person as you observed

14   them during your autopsy on May 25th, 1990?

15        A    Yes, they do.

16   MR. MAREK:  If I may have a moment, Judge.

17        No further questions, your Honor.

18   MR. WIENER:  Judge, I have no questions of

19   Doctor Lifschultz.

20   THE COURT:  Thank you, doctor.  You may step

21   down.

22   THE WITNESS:  Thank you, your Honor.

23                              (Witness excused)

24   MR. MAREK:  Judge, if we may approach the

F131

JGS_MAYSONET 4406
GONZALEZ 0165518

1  bench.

2                          (Conference at the bench

3                          out of the hearing of the

4                          reporter and the jury,

5                          after which time the

6                          following proceedings had

7                          in their hearing)

8      THE COURT:  Deputy Tenant, we are going to take

9  a break.  Let's try to be back and ready to go at

10  4:30.

11     THE SHERIFF:  Sure, Judge.

12        Everyone please rise.

13                          (Whereupon a short recess

14                          was had, after which time

15                          the following proceedings

16                          were had)

17     THE CLERK:  Alfredo Gonzalez.

18     MR. LEIGHTON:  Judge, before we do this, I'm

19  submitting People versus Rosario with regard to the

20  the prior consistent statement.

21        Judge, by way of offer of proof, it's our

22  intent at this time to call Assistant State's

23  Attorney Perkaus for purposes of basically

24  testifying to and publishing the handwritten

F132

JGS_MAYSONET 4407

GONZALEZ 0165519

1    summary statement taken from the defendant back in

2    August of 1990.  First, we would submit there are

3    really two separate and distinct basis for putting

4    it in.  First, Judge, we would point out that there

5    is the rule of completeness counsel --

6        THE COURT:  This is the rule that I think is

7    applicable.

8        MR. LEIGHTON:  Very well, Judge.  Under People

9    versus Rosario, it's a prior consistent statement

10    to rebut a claim of recent fabrication.  There is

11    testimony that the agreement was reached, I think

12    three weeks ago.

13        MR. MAREK:  Two weeks ago.

14        MR. LEIGHTON:  Two weeks ago today.  And the

15    statement pre-dates it by almost two years.

16        MR. WIENER:  Well, Judge, I have an objection.

17    I think that the only thing that the State can and

18    should get into evidence with respect to the

19    testimony of a co-defendant who has made a deal is

20    the evidence with respect to the statement that

21    goes to impeachment in which I brought out in my

22    cross-examination.  I have a strong objection to

23    the statement being published.

24        THE COURT:  I understand.  But I think Rosario

JGS_MAYSONET 4408

GONZALEZ 0165520

1   says quite the opposite. When there is a deal made

2   and the whole issue of the motive of recent

3   fabrication, the State is entitled to bring out and

4   to put in the statement made prior to the cutting

5   of that deal. I mean it's a broader issue. I

6   understand what your saying, counsel. But my

7   comment and I put it another way the case puts it,

8   the whole issue of the motive for recent

9   fabrication of his story, not just whether there

10  were three people in the car or two people in the

11  car. That's really the issue that is with us now

12  and I think it does, I think Rosario is the

13  applicable rule of law and based on Rosario, I will

14  allow them to put the statement in.

15      MR. WIENER: Okay.

16          I would like to know before Monday if you

17  are going to let me have that stipulation.

18      MR. MAREK: We will work on that right after

19  the jury goes home. We will work on what we will

20  stpiulate to, all right. I mean, how we're going

21  to phrase it.

22      THE COURT: Okay. We're all agreed that the

23  State, you don't have to rest today if you don't

24  want to.

F134

JGS_MAYSONET 4409
GONZALEZ 0165521

1      MR. MAREK:  We won't formally rest.

2      THE COURT:  I mean it is 20 minutes to five.

3  The jury has been here a long time.

4      MR. WIENER:  I would need a little time to

5  prepare him.  He asked me about 20 questions with

6  respect to Mr. Cruz testimony.

7      THE COURT:  In the event I wouldn't drag it

8  out, it is Friday night, they have been here all

9  day.  I have been here all day.  I think by the

10  time we hear two more witnesses, if none of the

11  other things pertained, I would break for the

12  night.

13      MR. WIENER:  I'm just not ready to put him on.

14      MR. MAREK:  We will not formally rest.  You

15  don't want to do the exhibits night.

16      THE COURT:  I wouldn't mind doing the exhibits

17  night.

18          The other thing I think we just need to

19  think about his the --

20      MR. WIENER:  Instructions.

21      MR. MAREK:  They are done.

22      THE COURT:  Instructions.

23      MR. LEIGHTON:  They are done.

24      THE COURT:  Because Monday is going to be

F135

JGS_MAYSONET 4410

GONZALEZ 0165522

1   fairly hectic.

2      MR. WIENER:  Can I take a copy home tonight?

3      MR. MAREK:  Sure.

4      MR. LEIGHTON:  Absolutely.

5      THE COURT:  I would be more than happy to do

6   the instructions.  Monday is going to be hectic.

7      MR. WIENER:  I want to do the instructions

8   tonight.

9      MR. MAREK:  We will send the jury home.

10      THE COURT:  The goal will be to get them out as

11   early on Monday as we can.  We can come in here

12   Monday not having to take time for that, your guy

13   testifies, whatever your going to do, they rest,

14   your case is in and we can just keep rolling and

15   instruct them and get them out so we all aren't

16   here til 10:00 o'clock Monday night.  I mean we're

17   here now.  I don't want to hold the jury.  I think

18   two more witnesses is about as reasonable.  I mean

19   it is not like we're falling off the edge in terms

20   of time.  I'm perfectly willing to get the

21   instructions done and I can have that all behind

22   us.

23      MR. LEIGHTON:  Well, Judge, we probably

24   anticipate arguing Monday.

JGS_MAYSONET 4411
GONZALEZ 0165523

```
 1        THE COURT:  Right.  Exactly.

 2        MR. LEIGHTON:  It's probably best.

 3        THE COURT:  Understanding I have a call to do

 4   and all the rest of it.  I'm just saying we can get

 5   that over with.

 6        MR. MAREK:  Alfredo and then our exhibits.

 7        MR. WIENER:  Stipulation to Alfredo.

 8        THE COURT:  In terms of the court reporter, it

 9   would be my inclination, unless counsels have some

10   violent objection, to let him go on.  We can do the

11   instruction conference informally.  I certainly

12   would keep copious notes and we can simply put it

13   on the record on Monday in terms of going through

14   them.  I just as soon do it tonight and have that

15   behind us.

16        MR. MAREK:  Then the rest of the exhibits.

17        THE COURT:  Yes.

18        MR. MAREK:  We will offer them.

19        THE COURT:  Get that administrative stuff out

20   of the way.  All you got to think about Monday is

21   putting on evidence and arguing.  You know what I'm

22   saying?

23        MR. LEIGHTON:  You know, Judge, it depends on

24   what our rebuttal is.
```

JGS_MAYSONET 4412
GONZALEZ 0165524

```
 1        MR. WIENER:  Are we on the record here, Judge?

 2        THE COURT:  We always are.

 3        MR. WIENER:  Right now.

 4        THE COURT:  Well, we don't have to be anymore.

 5   Now, we're just talking schedule.

 6                                  (Off the record)

 7        THE COURT:  All right.  Let's proceed.

 8                            (Following proceedings in

 9                            open court)

10        THE COURT:  All right.  We need the defendant.

11                            (Defendant returned to open

12                            court)

13        THE COURT:  We are ready for the jury.

14                            (Whereupon, jury returned

15                            to open court, seated in

16                            the jury box)

17        THE COURT:  State.  If you will call your next

18   witness.

19        MR. MAREK:  Your Honor, the People would call

20   Detective Ernest Halvorsen.

21        THE CLERK:  Sir, raise your righthand.

22                    ERNEST HALVORSEN,

23   called as a witness on behalf of the People of the

24   State of Illinois, having been first duly sworn,
```

JGS_MAYSONET 4413

GONZALEZ 0165525

1    was examined and testified as follows:

2                         DIRECT EXAMINATION

3                         BY MR. MAREK:

4         MR. MAREK:   Q   Detective, would you state your

5    full name for the record?

6         A     Detective Ernest Halvorsen.  H A L V O R S

7    E N.

8         Q     And Detective Halvorsen, by whom are you

9    employed?

10        A     Chicago Police Department.

11        Q     And what is your unit of assignment.

12        A     Detective Division Area 5 Violent Crimes.

13        Q     Detective Halvorsen, signs May of 1990,

14   have you been a signed at various times to assist

15   in the investigation of the homicide of Torrence

16   and Kevin Wiley?

17        A    I have.

18        Q     And Detective Halvorsen, I want to direct

19   your attention to this week Wednesday, March the

20   25th of 1992.  Did you at that time do anything in

21   connection with the investigation of the homicide

22   of Torrence and Kevin Wiley?

23        A    Yes, I did.

24        Q    And what did you do on that date?

JGS_MAYSONET 4414

GONZALEZ 0165526

1      A    I appeared in front of Judge Robert

2  Bastone, the presiding Judge in Branch 66, which is

3  located in this building.  I obtained an arrest

4  warrant for Christopher Guzman, also known as

5  Christopher Hernandez, also known as Fro, charging

6  him with the murder of the two Wiley brothers.

7      Q    Now, Detective Halvorsen, had you and

8  other personnel at Area 5 Violent Crimes identified

9  Fro prior to this week?

10     A    We have.

11     Q    And the securing of an arrest warrant for

12 Mr. Hernandez, also known as Fro, from Judge

13 Bastone was based upon what?

14     A    The fact that Justino Cruz had agreed to

15 testify for the People in this case.

16     MR. MAREK:  No further questions, your Honor.

17     MR. WIENER:  I have no questions.

18     THE COURT:  Thank you, detective.  You may step

19 down.

20                         (Witness excused)

21     MR. LEIGHTON:  May we approach the bench?

22                         (Conference at the bench

23                          out of the hearing of the

24                          jury and the reporter,

F140

JGS_MAYSONET 4415
GONZALEZ 0165527

```
1                              after which time the

2                              following proceedings had

3                              in their hearing)

4        THE CLERK:  Raise your righthand, sir.

5                    JOHN PERKAUS,

6   called as a witness on behalf of the People of the

7   State of Illinois, having been first duly sworn,

8   was examined and testified as follows:

9                    DIRECT EXAMINATION

10                   BY MR. LEIGHTON:

11       MR. LEIGHTON:  May I proceed, your Honor?

12       THE COURT:  Yes, you may.

13       MR. LEIGHTON:  Q  Sir, could you state your

14   name for the ladies and gentlemen of the jury, and

15   spell your last name for to court reporter?

16       A    My name is John Perkaus.  My last name is

17   spelled P as in Paul, E R K A U S.

18       Q    Sir, what's your occupation?

19       A    I'm an attorney.

20       Q    Are you licensed to practice law in

21   Illinois?

22       A    Yes, I am.

23       Q    How long have you been so licensed?

24       A    Since November of 1986.
```

F141

JGS_MAYSONET 4416

GONZALEZ 0165528

1    Q    Where are you employed?

2    A    I'm an Assistant State's Attorney here at

3    26th and California.

4    Q    Where are you currently assigned?

5    A    Judge Morrissey's courtroom.  Courtroom

6    number 700.

7    Q    I'm going to direct your attention to

8    August of 1990.  Where were you assigned within the

9    Cook County State's Attorneys Office at that time?

10   A    The Felony Review Unit.

11   Q    I would like you to explain to ladies and

12   gentlemen of the jury, what the Felony Review Unit

13   is?

14   A    Felony Review Unit is a unit of the

15   State's Attorneys Office which is called upon by

16   police officers to review cases of, felony cases

17   and make determinations based upon the evidence and

18   the witnesses of whether the individuals should be

19   charged or not.

20   Q    Now, Mr. Perkaus, drawing your attention

21   to August 24th, 1990, were you working in the

22   Felony Review Unit at that time?

23   A    Yes, I was.

24   Q    And directing your attention to about

F142

JGS_MAYSONET 4417

GONZALEZ 0165529

1    12:30 in the afternoon, did you have an occasion to

2    receive an assignment in the Felony Review Unit?

3        A    Yes, I did.

4        Q    What was that assignment?

5        A    I was assigned to Area 5 on a call of a

6    murder.

7        Q    And was that the double murder of Kevin

8    and Torrence Wiley?

9        A    Yes.

10       Q    Did you go to the offices of Area 5

11   Violent Crimes?

12       A    Yes, I did.

13       Q    What time approximately, did you arrive?

14       A    About 1:00 o'clock.

15       Q    And was that 1:00 o'clock in the

16   afternoon?

17       A    Yes.

18       Q    And that was on May 24th, 1990?

19       A    I believe it was August 24th.

20       Q    Strike that.  On August 24th, 1990?

21            I'm going to direct your attention to 2:00

22   p.m., did you have a conversation with anyone?

23       A    Yes, I did.

24       Q    And who was present for that conversation?

F143

JGS_MAYSONET 4418
GONZALEZ 0165530

1     A     Justino Cruz, Detective Shack and myself.

2     Q     Approximately -- what did that

3     conversation concise?

4     A     Justino Cruz gave me a statement regarding

5     the murders of Torrence and Kevin Wiley.

6     Q     And approximately how long did that

7     statement last?

8     A     Initially, approximately, 20 minutes.

9     Q     At the conclusion of that statement, what,

10    if anything, did you do?

11    A     I reduced the statement that Justino Cruz

12    had given me to writing.

13    Q     When you say "you reduced it to writing."

14    How did you do that?

15    A     I wrote up a summary of what he had told

16    me and had him sign that summary.

17    Q     Did he read that summary before signing

18    it?

19    A     Yes, he did.

20    Q     Did he sign it in your presence?

21    A     Yes, he did.

22    Q     Did you also sign it?

23    A     Yes, I did.

24    MR. LEIGHTON:  May I approach the witness, your

F144

JGS_MAYSONET 4419

GONZALEZ 0165531

1   Honor?

2       THE COURT:  Yes, you may.

3       MR. LEIGHTON:  Q  Mr. Perkaus, I'm going to

4   show you what's been marked for identification

5   People's Exhibit Number 22.  I want you to take a

6   look at that and tell the ladies and gentlemen of

7   the jury, if you recognize what is that?

8       A    Yes, I recognize this.

9       Q    What do you recognize that to be?

10      A    That is the statement that I took with

11  regards to Justino Cruz and the incident that we're

12  discussing.

13      Q    And do you recognize any signatures on

14  that document?

15      A    Yes, I do.

16      Q    And whose signatures do you recognize?

17      A    Min, Detective shack's and also Justino

18  Cruz.

19      Q    Where do those signatures appear?

20      A    They appear on the bottom of each page and

21  also initials where there have been any corrections

22  made.

23      Q    Is this handwritten statement in the same

24  condition today as it was when you prepared it and

F145

JGS_MAYSONET 4420
GONZALEZ 0165532

1    when the defendant signed it in your presence?

2       A    Yes.

3       MR. LEIGHTON:  At this time your Honor, I would

4    ask the identification mark be stricken.  I would

5    ask it be received in evidence as People's Exhibit

6    Number 22, and I would ask that Mr. Perkaus be

7    permitted to publish this to the jury.

8       THE COURT:  Very well.  The identifying marks

9    maybe stricken, it will be admitted as People's 22,

10    and it may be published.

11       THE WITNESS:  May I proceed, your Honor?

12       THE COURT:  Yes, you may.

13       THE WITNESS:  Thank you.

14       "Statement of Justino Cruz taken August

15    24th, 1990, at 2:45 p.m., Area 5.  Present for the

16    statement, Assistant State's Attorney Perkaus,

17    myself, Detectie Shack, star number 5333.

18    Statement taken regarding the fatal shooting of

19    Torrence Wiley and Kevin Wiley which occurred on

20    May 25th, 1990, at 3428 West North Avenue at 1:00

21    o'clock a.m.

22       After being advised of his rights and

23    stating he understood his rights, I told Justino

24    Cruz that I am an Assistant State's Attorney, an

JGS_MAYSONET 4421
GONZALEZ 0165533

1    attorney working with the police and not his

2    attorney.  Justino Cruz agreed to give the

3    following statement in summary.

4          Justino stated he is a graduate of

5    Clemente High School and can read and write.  He

6    further stated on the evening of May 24th of 1990,

7    at about 11:30 p.m., Justino, Alfredo Gonzalez,

8    Chris Hernandez and Jose Maysonet went to Jose's

9    house at 1302 North Homan to pick up a gun.  They

10   picked up the gun because Alfredo Gonzalez said

11   they were going to do a shooting.  The gun was a

12   nine millimeter automatic machine pistol and

13   Alfredo put it in his belt.

14         The four men got into the car with Jose

15   driving.  Alfredo next to him, Chris seated behind

16   Alfredo and Justino seated behind the driver.

17   Justino stated they drove around for a short while

18   and stopped in the vicinity of North and St. Louis

19   in the alley.  Chris Hernandez and Alfredo Gonzalez

20   got out of the car with Justino.  Chris and Alfredo

21   hooded up, meaning they put the hoods from their

22   sweatshsirts on their heads.

23         Justino stated this indicates they will

24   shoot or rob someone.  Chris and Alfredo approached

F147

JGS_MAYSONET 4422

GONZALEZ 0165534

```
 1    two black guys in a vacant lot on North Avenue.

 2    Alfredo had the gun in his front pocket.  While

 3    Chris and Alfredo were talking to the black guys,

 4    Jose was in the car with the car running and

 5    Justino was watching their backs.  Justino stated

 6    he was making sure no one, including the police,

 7    approached from the alley.

 8            Justino said he heard five to six shots

 9    and saw Chris and Alfredo running for the car.

10    Alfredo had the the gun in his hand.  Justino said

11    he jumped in the car and they drove away.  He

12    stated he went home.

13            Justino stated he has been treated well by

14    the police and the State's Attorney.  He was given

15    something to eat and drink and he was allowed to

16    use the bathroom.  He said no one had coerced or

17    threatened him in any way to give this statement.

18            Justino said he gave this statement

19    because it is the truth."

20       MR. LEIGHTON:  May I proceed further, Judge?

21       THE COURT:  Yes.

22       MR. LEIGHTON:  Q  Now, Mr. Perkaus, when you

23    recorded the statement, this is in your

24    handwriting, correct?
```

F148

JGS_MAYSONET 4423

GONZALEZ 0165535

1        A     Yes, it is.

2        Q     This is a summary, is that right?

3        A     Yes.

4        Q     Are these the exact -- did you take down

5    word for word what Justino Cruz said to you?

6        A     No.

7        Q     I'm going to direct your attention to the

8    portion of the statement where in you wrote "that

9    about 11:30 p.m., Justino, Alfredo Gonzalez and

10   Chris Hernandez and Jose Maysonet went to Jose's

11   house at 1302 North Homan to pick up a gun."  Are

12   those the exact words that he said to you?

13       A     I don't know.  I think he said they went

14   there, they met there, something of that nature.

15   Were those the exact words he used, I don't know.

16   It's a summary.

17       Q     Did you understand him to mean that they

18   met at the house?

19       A     Yes.

20       MR. WIENER:  Objection.

21            I'm, sorry.  Withdraw it.

22       THE COURT:  All right.

23       MR. LEIGHTON:  Nothing else.

24

F149

JGS_MAYSONET 4424
GONZALEZ 0165536

```
 1                    CROSS EXAMINATION

 2                  BY MR. WIENER:

 3        MR. WIENER:   Q  Do you have an independent

 4   recollection of the oral statement given to you

 5   prior to writing the written statement out, sir?

 6        A    A complete independent recollection, no.

 7        Q    Well, where does -- but you wrote down

 8   "that on May 24th of 1990, Justino, Alfredo

 9   Gonzalez, Chris and Jose Maysonet went to Jose's

10   house," didn't you?

11        A    Yes, sir.

12        Q    But you have an independent recollection

13   that they actually met there?

14        A    They went in, they met there.  I don't

15   have an independent recollection in regards to

16   that.  But it was something of that nature.

17        Q    How can you say today that's it's your

18   understanding when you wrote that they went there,

19   that they met there?

20        MR. LEIGHTON:  Objection.

21        MR. WIENER:  I have a right to cross-examine.

22        MR. LEIGHTON:  It's argumentative.

23        THE COURT:  Overruled.  He may answer.

24        THE WITNESS:  I remember what he said to a
```

JGS_MAYSONET 4425
GONZALEZ 0165537

1    certain extent as far as the statement that he gave

2    me.  He stated that he and his friends were at that

3    location to pick up a gun.  Whether he said they

4    went there or they met there, I can't be certain.

5        MR. WIENER:  Q  But you wrote it down on that

6    day they went there, didn't you?

7        A    That's correct, sir.

8            Yes, I did.

9        MR. WIENER:  Nothing further.

10       THE COURT:  Anything.

11       MR. LEIGHTON:  Nothing else, Judge.

12       THE COURT:  Thank you, Mr. Perkaus.  You may

13   step down.

14       THE WITNESS:  Thank you, your Honor.

15                               (Witness excused)

16       THE COURT:  Gentlemen, does that conclude the

17   witnesses you are prepared to present today?

18       MR. MAREK:  Yes, Judge, it does.

19       THE COURT:  Okay.

20           Ladies and gentlemen, we have run a little

21   bit later tonight, but we're making every effort to

22   remain on schedule based on what I had said to you

23   about the anticipated length of this trial.  I'm

24   happy to report that we are on schedule.  Having

JGS_MAYSONET 4426
GONZALEZ 0165538

1  run a little bit later today than we have the last

2  couple of days.

3          I'm going to be releasing you now.  Hoping

4  that you have a good weekend.  Again, I cannot

5  stress to much the admonitions that I have given

6  you on the two prior evenings, namely, you are not

7  to discuss the case with anyone and that means even

8  your fellow jurors.

9          If there is any media coverage, you are

10 not to avail yourself of it.  I think you know very

11 well now what the constrictions are on you during

12 the trial of this case.

13         At any rate, I'm going to release you now.

14 I'm going to ask you to be back at 10:30 on Monday

15 morning.  Having conferred with counsel, it's

16 fairly clear and I don't have any reason to expect

17 that the case will not be concluded on Monday and

18 given to you for your deliberation.

19         So we are on schedule.  I'm going to ask

20 you to come in just a little bit early on off

21 chance we can get under way as early as possible on

22 Monday so that we may conclude and you may

23 deliberate.

24         Have a wonderful weekend.  You are excused

F152

JGS_MAYSONET 4427
GONZALEZ 0165539

1    for this evening.

2

3                              (Further hearing continued

4                              to Monday, March 30th,

5                              1992)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

F153

JGS_MAYSONET 4428
GONZALEZ 0165540

1    STATE OF ILLINOIS )
                      ) SS.
2    COUNTY OF C O O K )

3          I, SAM C. MELE, Official Court Reporter OF

4    the Circuit Court of Cook County, County

5    Department, Criminal Division, do hereby certify

6    that I reported in shorthand the proceedings had

7    upon the trial in the above-entitled cause; that I

8    thereafter caused to be transcribed into

9    typewriting the above transcript, which I hereby

10    certify is a true and correct transcript of the

11    proceedings had before the  Honorable Loretta Hall

12    Morgan.

13

14

15

16

17    Official Court Reporter
18    Circuit Court of Cook County

19

20

21

22

23

24

F154

JGS_MAYSONET 4429
GONZALEZ 0165541

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 51

```
 1   STATE OF ILLINOIS )
                       )  SS:
 2   COUNTY OF COOK    )

 3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
     PEOPLE OF THE STATE )
 5   OF ILLINOIS         )Case 90 CR 21787-02
                         )
 6       -vs-            )Before: JUDGE LORETTA HALL
                         )                    MORGAN
 7   ALFREDO GONZALEZ    )Monday, March 30, 1992

 8                       JURY TRIAL

 9   Court having reconvened pursuant to adjournment.

10

11          HON. JACK O'MALLEY,
                State's Attorney of Cook County, by
12          MR. JOEL LEIGHTON and
            MR. FRANK MAREK,
13              Assistant State's Attorneys,
                appeared on behalf of the People of the
14              State of Illinois;

15
            MR. DAVID WIENER,
16              appeared on behalf of the Defendant.

17

18

19

20

21
     ROCHINA V. CHOLEWA
22   Official Court Reporter
     2650 S. California
23   Chicago, Illinois 60608

24
```

1

JGS_MAYSONET 4430
GONZALEZ 0170135

```
1    DATE OF HEARING:   March 30, 1992

2    PAGE NUMBERS:      1 to 128

3    LIST OF WITNESSES       DX    CX    RDX    RCX    RDX

4    STATE EXHIBITS OFFERED INTO EVIDENCE---------------3

5    STATE RESTS-------------------------------------------4

6    STIPULATION-------------------------------------------4

7    ALFREDO GONZALEZ       6     19     47     49

8    DEFENDANT RESTS-------------------------------------50

9    LUNCH RECESS----------------------------------------50

10   AFTERNOON SESSION----------------------------------51

11   MOTION FOR DIRECTED FINDING---------------------52

12   MOTION DENIED---------------------------------------55

13   INSTRUCTION CONFERENCE---------------------------58

14   REBUTTAL TESTIMONY:

15   DET. R. GUEVARA       59     65

16   STATE RESTS IN REBUTTAL--------------------------64

17   CLOSING ARGUMENT (Mr. Leighton)------------------69

18   CLOSING ARGUMENT (Mr. Wiener)--------------------84

19   REBUTTAL ARGUMENT (Mr. Marek)--------------------94

20   JURY INSTRUCTIONS--------------------------------112

21   JURY RETIRES-------------------------------------121

22   VERDICT OF THE JURY------------------------------121

23   JURY POLLED--------------------------------------122

24   PSI ORDERED--------------------------------------126
```

2

JGS_MAYSONET 4431
GONZALEZ 0170136

1    THE COURT:  Now, if we may have the defendant out

2    on the Gonzalez case?

3    MR. WIENER:  They are bringing him out right now,

4    Judge.

5    THE COURT:  Bring out the jury.

6

7    (Whereupon the jury was returned

8    to open court.)

9

10   (Whereupon the trial was resumed in

11   open court in the presence of the

12   jury.)

13

14   THE COURT:  Good morning to you all.

15   State, are you ready to proceed?

16   MR. MAREK:  We are, your Honor.

17   THE COURT:  Very well.

18   MR. MAREK:  At this time the People of the State

19   of Illinois would be offering into evidence what has

20   previously been marked People's Exhibit No. 1 and 2

21   for Identification; also what has been previously

22   marked People's 20 for Identification through 31 for

23   Identification, inclusive.

24   THE COURT:  Very well.

3

JGS_MAYSONET 4432
GONZALEZ 0170137

1          The aforementioned exhibits may have their

2    identifying marks stricken and they will be accepted

3    into evidence by the Court.

4      MR. MAREK: With the introduction into evidence of

5    those exhibits People of the State of Illinois rest

6    their case in chief.

7                    (State rests.)

8      THE COURT:  Thank you.

9          Mr. Wiener?

10     MR. WIENER:  Yes, Judge.

11         Just for the purposes of the record I would

12   reserve any argument I would have until the end of the

13   entire case.

14     THE COURT:  Very well.

15     MR. WIENER:  Thank you.

16         Ladies and gentlemen of the jury, first we

17   are going to proceed by way of stipulation.

18         We are going to stipulate that the People of

19   the State of Illinois through the State's Attorney's

20   office and the two representatives in court today, Mr.

21   Marek and Mr. Leighton, and the defendant, Alfredo

22   Gonzalez, through myself, his attorney, that on August

23   24, 1990 Det. Smith and Det. Shack (phonetic) of the

24   Chicago Police Department prepared a police report

4

JGS_MAYSONET 4433
GONZALEZ 0170138

1　which is essentially a summary of things they were

2　investigating in this particular case.

3　　　　　As part of that police report there was an

4　interview with Justino Cruz, a witness you heard on

5　the witness stand.

6　　　　　It will be stipulated between the parties in

7　this police report there is no mention of Justino Cruz

8　indicating that Mr. -- the defendant in this case,

9　Alfredo Gonzalez, said that he had killed two people.

10　　　　　So stipulated?

11　　MR. MAREK:  So stipulated.

12　　MR. WIENER:  With that I would call the defendant

13　to the witness stand now -- Alfredo Gonzalez.

14　　　　　Mr. Gonzalez.

15

16　　　　A L F R E D O　　G O N Z A L E Z,

17

18　called as a witness by the defense attorney herein,

19　having been first duly sworn, was examined and

20　testified as follows:

21

22

23　　　　　　　　DIRECT EXAMINATION

24　　　　　　　　By: Mr. Wiener

5

JGS_MAYSONET 4434
GONZALEZ 0170139

1    Q.   Mr. Gonzalez, I am going to ask you to speak

2  slowly and as loudly as you can so that everybody

3  hears you?

4         What is your name, sir?

5    A.   Alfredo Gonzalez.

6    MR. WIENER:  Can everybody hear?  Can counsel

7  hear?  Ladies and gentlemen?

8  BY MR. WIENER:

9    Q.   How old are you, sir?

10   A.   33.

11   Q.   Sir, before your arrest in August of 1990,

12 where did you live?

13   A.   I live 1835 North Kedzie.

14   Q.   That is in Chicago?

15   A.   Yes.

16   Q.   Who did you live there with?

17   A.   My mother.

18   Q.   Okay.

19        Sir, on August -- In August of 1990, were you

20 married?

21   A.   No.

22   Q.   Did you have any children?

23   A.   Yes.

24   Q.   How many children do you have?

6

JGS_MAYSONET 4435
GONZALEZ 0170140

```
 1      A.   Two.

 2      Q.   How old are they?

 3      A.   My son, the oldest, is eight years old.  The

 4   little girl is six years old.

 5      Q.   And in August of 1990, were you working?

 6      A.   No.

 7      Q.   Had you previously been working?

 8      A.   Yes.

 9      Q.   And where had you worked prior to your

10   arrest?

11      A.   Right on Hermitage; Power Label.

12      Q.   What is the name of the company?

13      A.   Power Label.

14      Q.   Power Label?

15      A.   Yes.

16      Q.   How long had you worked there?

17      A.   Eleven years.

18      Q.   What was your job?

19      A.   A slitter.

20      Q.   What is a slitter?

21      A.   A slitter to cut the paper.

22      Q.   And did you lose your job sometime in 1990?

23      A.   No.

24      Q.   Did you stop working sometime in 1990?
```

7

JGS_MAYSONET 4436
GONZALEZ 0170141

```
 1       A.    Closed in '89.

 2       Q.    Excuse me; they closed the company in  1989?

 3       A.    Yes.

 4       Q.    How were you supporting yourself in 1990?

 5       A.    I was collecting --

 6       Q.    Unemployment benefits?

 7       A.    Yes.

 8       Q.    In May of 1990, sir, did you know Justino

 9   Cruz?

10       A.    Yes.

11       Q.    Are you related to Justino Cruz?

12       A.    Yes.

13       Q.    What is that relation?

14       A.    My nephew.

15       Q.    In May of 1990, did you know Jose Maysonet?

16       A.    Yes.

17       Q.    In May of 1990, did you know Chris Hernandez,

18   otherwise known as Fro?

19       A.    Yes; by Fro I know him.

20       Q.    In May of 1990, were you a member of the

21   Latin Kings street gang?

22       A.    Yes.

23       Q.    How long were you a member of that street

24   gang?
```

8

JGS_MAYSONET 4437
GONZALEZ 0170142

```
 1        A.    About ten years.

 2        Q.    In May of 1990, tell the ladies and gentlemen

 3   of the jury if you can estimate how many members of

 4   the Latin Kings street gang there were in the Chicago

 5   area at that time?

 6        A.    Thousands.

 7        Q.    Describe your relationship with your nephew,

 8   Justino Cruz?

 9        A.    He is not close; not like family supposed to

10   be.  We apart.

11        Q.    And where did Justino Cruz live in May of

12   1990?

13        A.    House.

14        Q.    Where did you live -- Where do you believe

15   Jose Maysonet lived?

16        A.    Pierce Street.

17        Q.    That is where your nephew lived as well?

18        A.    Same street.

19        Q.    In May of 1990 -- Excuse me.

20              Before May of 1990, how far away did your

21   nephew Justino Cruz live from Jose Maysonet; if you

22   know?

23        A.    About half a block.

24        Q.    Would you describe to the ladies and
```

9

JGS_MAYSONET 4438

GONZALEZ 0170143

1    gentlemen of the jury in 1990, May, what the

2    relationship was between Justino Cruz and Jose

3    Maysonet?

4        A.   Real close friends.

5        Q.   When you say real close friends how do you

6    know that?

7        A.   They was always together.

8        Q.   And after May 24th of 1990 and before your

9    arrest did you ever see Jose Maysonet and Justino Cruz

10   together?

11       A.   Mostly every day.

12       Q.   Where did you see them if you saw them

13   together?

14       A.   Walking around or cruising around.

15       Q.   Now, sir, on May 24, 1990, at about midnight

16   tell the ladies and gentlemen of the jury where you

17   were?

18       A.   I was on -- in a girl's house.

19       Q.   What girl was that?

20       A.   Rhonda Beles.

21       Q.   Where did she live?

22       A.   DesMoines and -- LeMoyne and Homan.

23       Q.   About 12:00 o'clock did you leave her house?

24       A.   Yes.

JGS_MAYSONET 4439
GONZALEZ 0170144

1      Q.    Where did you go?

2      A.    I was walking to my house.

3      Q.    Again tell the ladies and gentlemen where you

4  lived?

5      A.    1835 North Kedzie.

6      Q.    About 12:00 o'clock did you see anyone that

7  you knew?

8      A.    Yes.  I seen a blue car.

9      Q.    Did you see anybody in that blue car?

10      A.    I recognized Fro.

11      Q.    By Fro do you mean Chris Hernandez?

12      A.    Guess so.

13      Q.    When you saw Fro did you have a conversation

14  with him?

15      A.    Yes.  I told him to stop.

16      Q.    Did the car stop?

17      A.    Yes.

18      Q.    Where was Fro in the car when you first saw

19  the car?

20      A.    What was that?

21      Q.    Where was Fro in the car when you saw him?

22      A.    In the passenger.

23      Q.    Front seat or back seat?

24      A.    Front seat.

11

JGS_MAYSONET 4440
GONZALEZ 0170145

1    Q.    When the car stopped what did you do?

2    A.    I asked him for a ride.

3    Q.    What happened at that time?

4    A.    He said to come inside.

5    Q.    Did you get inside the car?

6    A.    Yes.

7    Q.    When you got inside the car where did you sit

8    inside the car?

9    A.    I sit on the back seat.

10    Q.    Now on the back seat where?

11    A.    By Jose side; the driver.

12    Q.    You sat behind the driver?

13    A.    Yes.

14    Q.    Who was the driver?

15    A.    Jose.

16    Q.    And when you say Jose, do you mean Jose

17    Maysonet?

18    A.    Yes.

19    Q.    Who else was in the car at that time?

20    A.    Jose, Fro, and Tino in the back.

21    Q.    When you say Tino do you mean Justino Cruz?

22    A.    Yes.

23    Q.    Do you remember, sir, what you were wearing

24    on that evening?

12

JGS_MAYSONET 4441
GONZALEZ 0170146

1      A.   No.

2      Q.   Could you have been wearing a hooded

3   sweatshirt?

4      A.   I could have.  I don't know.

5      Q.   Do you remember if you were wearing a hooded

6   sweatshirt that night?

7      A.   I don't remember.

8      Q.   Do you remember what the other people

9   were wearing that night?

10     A.   Yes.

11     Q.   What was Jose Maysonet wearing?

12     A.   Dark blue hood; a dark blue hoodie.

13     Q.   What was Fro wearing?

14     A.   A black hoodie.

15     Q.   What was Justino Cruz wearing?

16     A.   White.

17     Q.   Is that a hoodie?

18     A.   Yes.

19     Q.   When you got in the car did they take you

20   home?

21     A.   No.

22     Q.   Where did they go?

23     A.   They were driving all over.  They went over

24   to St. Louis, and St. Louis they turn and then they

13

1    cross North Avenue back to St. Louis again.

2        Q.    Did the car ever stop?

3        A.    Yes; in the alley.

4        Q.    When you say the alley what alley do you

5    mean?

6        A.    The one between St. Louis and Kimball.

7        Q.    Okay.

8              And before the car stopped -- By the way

9    before the car stopped had you gone to Jose Maysonet's

10   house?

11       A.    No.

12       Q.    On May 24, 1990, did you know that Jose

13   Maysonet now lived at 1302 North Homan?

14       A.    No, I didn't know.

15       Q.    Where did you think he lived on that night?

16       A.    On Pierce.

17       Q.    On May 24, 1990, did you have a gun on you?

18       A.    No, sir.

19       Q.    On May 24, 1990, while you were in the car

20   did you see a gun?

21       A.    Yes.

22       Q.    How many guns did you see?

23       A.    I only see one.

24       Q.    Where did you see that gun?

14

JGS_MAYSONET 4443
GONZALEZ 0170148

1    A.    Jose took it out and under a seat and put it

2  back by the seat.

3    Q.    Could you see that from where you were

4  sitting in the back seat of the car?

5    A.    Yes.

6    Q.    Did you recognize what kind of gun that was?

7    A.    Yes.

8    Q.    What kind of a gun was it?

9    A.    .09 millimeter.

10   Q.    And how do you know it was a .09 millimeter?

11   A.    Because I seen those kind before.

12   Q.    And when you saw that gun was it handed to

13  you?

14   A.    No.

15   Q.    Did you touch that gun?

16   A.    No.

17   Q.    When the car stopped what did the people in

18  the car do?

19   A.    They jumped out of the car.

20   Q.    Did they do anything with their clothes

21  before they jumped out of the car?

22   A.    Jose and Fro, they put the hoodie on.

23   Q.    When they put their hoodie on -- Before they

24  put their hoodie on had they told you what they were

15

JGS_MAYSONET 4444
GONZALEZ 0170149

1    going to do?

2         A.    No.

3         Q.    When they put their hoodies on what did that

4    mean to you?

5         A.    They want to do something.

6         Q.    When you say something what did it mean?

7         A.    Go for something to kill; somebody or

8    something.

9         Q.    Before they did that had you any idea they

10   were going to do anything?

11        A.    No, I didn't know.

12        Q.    What happened?  Did they stay in the car or

13   get out of the car?

14        A.    Got out of the car.  Already out.

15        Q.    Who got out of the car?

16        A.    Jose, Fro, and Tino.

17        Q.    And where were you when they got out of the

18   car?

19        A.    Inside the car.

20        Q.    In what seat; front or back seat?

21        A.    Back seat.

22        Q.    Did you see where they went?

23        A.    I seen them walking by towards the lot and

24   disappear.

16

1    Q.   And did you see where Tino went?

2    A.   No.

3    Q.   What was the next thing that happened?

4    A.   I heard some shooting.

5    Q.   When you say you heard some shooting, how

6    many shots did you hear?

7    A.   About five or six.

8    Q.   What is the next thing that happened after

9    that?

10    A.   Tino jumped in the back seat.

11    Q.   And what happened after that?

12    A.   I asked him what was going on.  He said

13    nothing.

14    Q.   What was the next thing that happened after

15    that?

16    A.   Fro and Jose jumped in.

17    Q.   And when they jumped in where did they go

18    into the car if anywhere?  Where did Fro go into the

19    car?

20    A.   On the passenger side.

21    Q.   Where did Jose go into the car?

22    A.   Driver.

23    Q.   And did the car then move?

24    A.   Yes; he turned around.

17

JGS_MAYSONET 4446
GONZALEZ 0170151

1    Q.    Where did the car move?

2    A.    Towards Kimball.

3    Q.    And then where did it go?

4    A.    Kimball to North Avenue.

5    Q.    And did you see anything when the car was

6    going past North Avenue?

7    A.    Yes.

8    Q.    What did you see?

9    A.    Two bodies.

10   Q.    Where did you see these bodies?

11   A.    By North Avenue on the side.

12   Q.    Mr. Gonzalez, before Tino, Fro, and Jose got

13   out of the car did you know they were going to shoot

14   somebody?

15   A.    No, I didn't know.

16   Q.    Did you know there was a drug deal going

17   down?

18   A.    No.

19   Q.    Did you have anything to do with the shooting

20   of the Wiley brothers?

21   A.    No.

22   Q.    Where did they go after the car passed North

23   Avenue?

24   A.    Turn on -- Drive me home.

18

JGS_MAYSONET 4447
GONZALEZ 0170152

1    Q.   Then what happened?

2    A.   They drop me home.

3    Q.   Now, between May 25th and the day you were

4    arrested in August of 1990, did you go to the police?

5    A.   No.

6    Q.   Did you tell any police officer or law

7    enforcement officer about what you saw?

8    A.   No.

9    Q.   Why not?

10   A.   I was afraid something might happen to me or

11   my family.

12   Q.   What were you afraid of happening?

13   A.   Get killed.

14   MR. WIENER:  No further questions of the

15   defendant.

16

17                    CROSS EXAMINATION

18                    By: MR. MAREK

19

20   Q.   Are you composed now, Mr. Witness?

21        Mr. Witness are you ready?

22   A.   Yes, I am.

23   Q.   Now, you sat in the car the whole time; is

24   that correct?

19

1      A.    Yes, sir.

2      Q.    Now where was the car parked in the alley?

3      A.    In the alley between Kimball and St. Louis.

4      Q.    Was it behind the vacant lot or behind the

5  garage?

6      A.    It was closer to a place that -- a

7  restaurant, a Donald Ducks.  It was more close to

8  Donald Ducks.

9      Q.    I am going to show you Plaintiff's Exhibit

10  No. 15, sir.

11         I am going to ask you if it was parked by

12  that garage?

13      A.    I don't know.

14      Q.    You don't know where it was parked?

15      A.    It was parked by a -- the -- it is the alley.

16      Q.    Your testimony is that it was parked by the

17  alley; is that right?

18      A.    Yes.

19      Q.    Do you remember where the car was parked?

20      A.    Yes, I remember.

21      Q.    Okay.

22         I am going to show you what has been marked

23  People's Exhibit No. 21 for Identification.

24         This is the alley that you are referring to?

JGS_MAYSONET 4449
GONZALEZ 0170154

1    A.   Yes.

2    Q.   And you are saying it was in here in the

3  alley?

4    A.   Right here, around here.

5    Q.   Why don't you put a little X there, sir?

6    A.   Someplace over here.

7    Q.   Okay.

8  MR. WIENER:  May I see where he marked?

9  MR. MAREK:  Sure.

10  MR. WIENER:  Thank you.

11  BY MR. MAREK:

12    Q.   Now afterwards where did the car go?

13    A.   Towards Kimball.

14    Q.   Back to Kimball?

15    A.   Yes.

16    Q.   All the way to Kedzie?

17    A.   No.  It took Kimball to North Avenue.

18    Q.   Where did it go then?

19    A.   Then Arturo drive me home.

20    Q.   Well it went to the intersection of Kimball

21.  and North Avenue you say; right?

22    A.   Yes.

23    Q.   How did you get dropped home?  Which way did

24  it go from there?

JGS_MAYSONET 4450
GONZALEZ 0170155

1    A.   Because he went North Avenue and stop on the

2    light and says, I seen looking over there and so I

3    look and they turn.

4    Q.   Which way did they turn at the light?

5    A.   To the left.

6    Q.   So you didn't go back down North Avenue past

7    where these two men had been shot; right?

8    A.   No.

9    Q.   Now after your arrest you went out to the

10   scene with Det. Guevara and others; do you remember

11   that?

12   MR. WIENER:  Objection; beyond the scope of Direct

13   Examination.

14   THE COURT:  This is Cross Examination, counsel.

15   It is allowed.

16   BY MR. MAREK:

17   Q.   Do you remember that?

18   A.   What was that?

19   Q.   Do you remember that following your arrest in

20   this case in August of 1990, you went out to the scene

21   of this crime with Det. Guevara, an Assistant State's

22   Attorney, and another detective; is that right?

23   A.   Yes.

24   Q.   You pointed out at that time where the car

22

JGS_MAYSONET 4451
GONZALEZ 0170156

1    had been parked; did you not?

2        A.   Yes.

3        Q.   In fact at that time did you not indicate to

4    Det. Guevara that the car was parked over here behind

5    this garage?

6        A.   I don't remember.

7        Q.   You don't remember.

8             Your testimony, sir, is you don't remember

9    back in August where you indicated the car had been

10   parked, right; back in August of '90?

11       A.   Yes, I remember.

12       Q.   You do remember?

13       A.   Yes.

14       Q.   Where did you indicate the car had been

15   parked then back in August of '90?

16       A.   Back to the trip.

17       Q.   So the answer to my question, sir, is on

18   August 24, 1990, you did not indicate to Det. Guevara

19   that the car had been parked behind this garage; is

20   that your testimony?

21       A.   Yes.

22       Q.   Okay.

23            When you were in the car sitting in the alley

24   could you see a fence anywhere in the vacant lot?

JGS_MAYSONET 4452
GONZALEZ 0170157

1    A.    No, I couldn't tell.

2    Q.    Do you remember being asked by the State's

3    Attorney about this fence?

4    A.    I don't remember.

5    Q.    Okay.

6          Page 5.  Do you remember this series of

7    questions and answers?

8    A.    Yes.

9    Q.    All right.

10         First of all let me ask you this,

11   Mr. Gonzalez.

12         On August 24, 1990, you gave a court reported

13   statement to an Assistant State's Attorney; is that

14   correct?

15   A.    Yes.

16   Q.    Do you remember this series of questions

17   being asked and these answers being given?

18   A.    Yes.

19   Q.    Question:  "Now, after they put their hoodies

20         on where did Jose, Tino, and Fro go?"

21         Answer:  "They started walking.  All of a

22         sudden they disappeared."

23         Question:  "Where did they walk to?"

24         Answer:  "About a few steps."

24

1      Question:  "Okay.  Where did they walk to?"

2      Answer:  "To the side of the lot."

3      Question:  "To the side to the empty lot?

4      Answer: "Yes."

5      Question:  "Did they go over the fence or

6      around the fence?

7      Answer:  "I don't know because I couldn't

8      tell."

9    MR. WIENER:  Judge, that is not impeaching.  I

10   object.

11      He just said he didn't know if he could see a

12   fence.  That is not impeaching.

13   THE COURT:  Sustained.

14   BY MR. MAREK:

15   Q.   Well, sir, --

16   THE COURT:  Jury is instructed to disregard it.

17   BY MR. MAREK:

18   Q.   The only fence that is over in the vacant lot

19   is this fence over by the side of the garage; right?

20   MR. WIENER:  Judge, again he said he does not

21   remember a fence.  It is not impeaching.

22      The State is trying to tell him there is a

23   fence.

24   THE COURT:  Counsel, I ruled on the impeachment.

JGS_MAYSONET 4454
GONZALEZ 0170159

1    You may ask another question and show him an

2    exhibit.

3    Overruled as to that.

4    MR. WIENER:  Thank you.

5    BY MR. MAREK:

6    Q.   That is the only fence in there, isn't it?

7    A.   In this one?

8    Q.   Yes.

9    A.   That is the only one I see.

10   Q.   So when you were asked about the fence that

11   is the fence you were referring to?

12   MR. WIENER:  Judge, objection because the question

13   said the Officer asked about the fence.

14   THE COURT:  Counsel, please do not testify.

15   He may answer the question if he can.

16   BY MR. MAREK:

17   Q.   That is the fence you were referring to,

18   isn't it, sir?

19   A.   I don't see no fence.

20   Q.   Okay.  But that is not what you said when you

21   were asked about it; did you?

22   Let me ask you this.  Was this question

23   asked:  "Did they go over the fence or around the

24   fence?"

26

JGS_MAYSONET 4455
GONZALEZ 0170160

```
 1              Answer:  "I don't know because I couldn't
 2    tell."
 3         MR. WIENER:  Again, Judge, it is not impeaching.
 4         THE COURT:  Sustained.
 5    BY MR. MAREK:
 6         Q.    How long have you been a Latin King,
 7    Mr. Gonzalez?
 8         A.    About ten years.
 9         Q.    About ten years?
10         A.    Yes.
11         Q.    Since when?
12         A.    About '77, '78, something like that, '79.
13         Q.    Well, '77 or '78, that is about 14 years ago,
14    isn't it?
15         A.    Yes.
16         Q.    So it is more than ten years?
17         A.    Yes.
18         Q.    Now you testified that Jose Maysonet had on a
19    dark blue hooded sweatshirt; is that right?
20         A.    Yes.
21         Q.    You remember that vividly?
22         A.    Yes.
23         Q.    You testified that Fro had on a black hooded
24    sweatshirt.  Do you remember that vividly?
```

27

1      A.   Yes.

2      Q.   You testified that Justino Cruz had on a

3  white hooded sweatshirt.  You remember that vividly?

4      A.   Yes.

5      Q.   But you don't remember how you were dressed

6  that night; correct?

7      A.   Yes.

8      Q.   You could have had a hoodie on?

9      A.   I could have.

10     Q.   And if you did then all four of you would

11  have had hoodies on; right?

12     A.   Could have.

13     Q.   When the car pulled into the alley were the

14  lights turned off?

15     A.   Yes.

16     Q.   Was the engine kept running?

17     A.   No, it was off.

18     Q.   And so the car was shut off, the engine, the

19  lights -- the lights were shut off, the engine was

20  shut off, these three guys got out, put their hoodies

21  on; right?

22     A.   Yes.

23     Q.   And you said -- Well, let me ask you, what

24  did that mean to you when they got out with their

28

1    hoodies on?

2        A.    They were going to do something.

3        Q.    Do what?

4        A.    I don't know.  Could have been killed or

5    something.

6        Q.    I'm sorry?

7        A.    They could have do a shooting or something.

8        Q.    They could have?

9        A.    They could have.

10        Q.    So not only did you know they could do a

11    shooting but you knew they had a gun; right?

12        A.    Yes.

13        Q.    And you just sat there in the car?

14        A.    Yes.

15        Q.    And at this point you were about maybe two

16    blocks from your house?

17        A.    Kind of; maybe three.

18        Q.    Two to three blocks from your house?

19        A.    Yes.

20        Q.    When they got out of the car with their

21    hoodies up and one of them are armed with a gun you

22    didn't just get out of the car and walk home; right?

23        A.    No.

24        Q.    Although earlier that evening if you had not

29

JGS_MAYSONET 4458
GONZALEZ 0170163

```
 1    run into the car you would have walked the whole

 2    distance from the girl's house; right?

 3        A.    Yes; that is true.

 4        Q.    And you recognized -- This gun that you saw

 5    where did you see it?

 6        A.    Jose had on his arm.  He put it back by the

 7    seat.

 8        Q.    He had it in his arm when you got in the car?

 9        A.    No.

10        Q.    When did you first see it?

11        A.    He was going to the alley.

12        Q.    Where did it come from?

13        A.    From under the seat.

14        Q.    And you didn't say, "Hey, let me out guys;"

15    right?

16        A.    I didn't know what was going to happen.

17        Q.    You didn't know what was going to happen.

18    But when they got out with the hoodies you had a

19    pretty good idea; right?

20        A.    Kind of.

21        MR. WIENER:  Objection; asked and answered.

22        THE COURT:  Overruled.  It may stand.

23    BY MR. MAREK:

24        Q.    So how long did you see the weapon before
```

30

JGS_MAYSONET 4459
GONZALEZ 0170164

1   they got out of the car?

2       A.   Before?

3       Q.   Yes.  Well, let me ask you this.  Did you see

4   the weapon before Jose got out of the car?

5       A.   Yes.

6       Q.   For how long a period of time did you see it?

7       A.   About for a minute.

8       Q.   What kind of gun was it?

9       A.   .09 millimeter.

10      Q.   Automatic pistol?

11      A.   Yes.

12      Q.   And you were familiar with those kind of

13  weapons?

14      A.   Yes.

15      Q.   Recognized it as a .09 millimeter automatic;

16  right?

17      A.   Yes.

18      Q.   So your testimony is then after everybody got

19  in the car the car went down the alley to Kimball,

20  right, and then made a left onto North Avenue; is that

21  right?

22      A.   Yes.

23      Q.   And then where did you guys go?

24      A.   To my house.  They drop me off.

31

```
 1        Q.    You were dropped off first?

 2        A.    Yes.

 3        Q.    Did you talk to anybody about this

 4   afterwards?

 5        A.    No.

 6        Q.    Where were you seated, sir, when you saw the

 7   two bodies on North Avenue?

 8        A.    I was in the back seat.

 9        Q.    Where was the car at?

10        A.    What you mean?

11        Q.    When you looked up, when you say you looked

12   up and saw these two bodies on North Avenue where was

13   the car?

14        A.    North Avenue and Kimball.

15        Q.    Okay.

16              Sir, do you remember this series of questions

17   being asked and these answers being given during the

18   statement that you gave?

19        A.    Yes.

20        MR. WIENER:  Wait.

21              Could you tell me what page we are talking

22   about?

23        MR. MAREK:  Page 6.

24   BY MR. MAREK:
```

32

JGS_MAYSONET 4461
GONZALEZ 0170166

```
 1      Q.     Question:  "After they took their sweatshirt
 2             hoods off what did you do,  what did they do?
 3             Answer:  "They started driving.  I looked
 4             up."
 5             Question:  "When you looked up what did you
 6             see?"
 7             Answer:  "I seen two guys on the ground."
 8             Were those questions asked and those answers
 9   given?
10      A.     Yes.
11      Q.     So back then you said that you saw these two
12   guys on the ground as they started driving away;
13   correct?
14      MR. WIENER:  Objection, Judge, not complete.  May
15   I approach?
16
17             (Whereupon, a discussion was held
18              off the record.)
19
20   BY MR. MAREK:
21      Q.     Was this question also asked, sir:
22             "Where did you see the bodies?"
23             Answer:  "By the sidewalk on North Avenue."
24             That was asked, too; right?
```

33

JGS_MAYSONET 4462
GONZALEZ 0170167

1    A.   Yes.

2    Q.   But back then you were saying you saw the

3 bodies as the car started driving away; correct?

4    A.   Yes.

5    Q.   From the alley?

6    MR. WIENER:  Objection.  That is not what the

7 answer said.  Objection.

8    THE COURT:  Let him answer the question.  He can

9 answer the question.

10    THE WITNESS: Not from the alley.

11 BY MR. MAREK:

12    Q.   When the car first started driving away you

13 guys were still in the alley; right?

14    A.   To Kimball.

15    Q.   When the car first started driving away

16 everybody was still in the alley, weren't you?

17    A.   Yes.

18    Q.   Now you were brought into the police station

19 August 23rd of 1990; is that correct?

20    A.   Yes.

21    Q.   First thing you said to the police was you

22 didn't even know Jose Maysonet; is that correct?

23    A.   Yes, sir.

24    Q.   So you did not tell the police the truth at

34

JGS_MAYSONET 4463
GONZALEZ 0170168

1    that time, did you?

2        A.    I didn't know about the name.  I know him by

3    Juan.

4        Q.    I'm sorry?

5        A.    I didn't know by Jose Maysonet.  I know him

6    by Juan.

7        Q.    So when they asked you about Jose Maysonet

8    you didn't know who they were talking about; right?

9        A.    Not at first.

10       Q.    As a matter of fact when you got to the

11   police station you knew Juan or Jose Maysonet, or

12   however you knew him, was in the police station;

13   didn't you?

14       A.    Yes, because the police told me.

15       Q.    Okay.

16            So whatever his name was you deny that you

17   even knew him; right?

18       A.    Yes.

19       MR. WIENER:   Objection.  Not whatever his name

20   was.

21       THE COURT:  Overruled.

22   BY MR. MAREK:

23       Q.    Just so it is clear the guy that was in the

24   police station is the guy that you said you didn't

JGS_MAYSONET 4464
GONZALEZ 0170169

```
 1   know; correct?

 2       A.   Yes.

 3       Q.   So you did not tell the police the truth, did

 4   you?

 5       A.   I did tell them the truth.

 6       Q.   Well, the guy that was there that you knew as

 7   Juan you did know him; didn't you?

 8       MR. WIENER:  Objection, Judge.  Assumed that he

 9   saw him in the police station.

10       THE COURT:  Sustained.

11   BY MR. MAREK:

12       Q.   Didn't you just testify, Mr. Gonzalez, that

13   you knew he was there at the police station?

14       A.   I seen him.

15       Q.   You did see him and you did know he was

16   there?

17       A.   Yes.

18       Q.   And that guy you told the police you didn't

19   know; right?

20       A.   I didn't know him by Jose Maysonet.  I know

21   him by Juan.

22       Q.   You saw him?

23       A.   Yes.

24       Q.   You knew him?
```

36

JGS_MAYSONET 4465
GONZALEZ 0170170

1    A.    Yes.

2    Q.    You told the police you didn't know him;

3 correct?

4    MR. WIENER:  Objection, Judge; argumentative.  I

5 think the witness has answered the question.

6    THE COURT:  Overruled.  He may answer.

7 BY MR. MAREK:

8    Q.    Told the police you didn't know him, didn't

9 you?

10   A.    Yes.

11   Q.    So you didn't tell them the truth, did you,

12 sir?

13   A.    Because I didn't want to get involved with

14 this.

15   Q.    So you didn't tell them the truth; did you?

16   A.    I did tell them the truth.

17   Q.    You did know Mr. Maysonet; didn't you?

18   THE COURT:  Counsel, I think the point has been

19 made.

20   MR. MAREK:  Thank you, Judge.

21 BY MR. MAREK:

22   Q.    Now, what was the name of the lady whose

23 house you were coming from?

24   A.    Yolanda.

JGS_MAYSONET 4466
GONZALEZ 0170171

1    Q.   What is her last name?

2    A.   Beles?

3    Q.   Beles?

4    A.   Yes.

5    Q.   How do you spell that?

6    A.   B-e-l-e-s.

7    Q.   All right.

8         And is she still a friend of yours?

9    A.   Yes.

10   Q.   Was she your girlfriend at the time?

11   A.   Kind of.

12   Q.   Is she the mother of your children?

13   A.   No.

14   Q.   And what time did you leave her house?

15   A.   11:00 something.

16   Q.   11:00 something?

17   A.   Yah.  Could be 11:15, 11:20.

18   Q.   About 11:20.  That is p.m.

19        So we are talking about still on May 24th; is

20   that right?

21   A.   Yes.

22   Q.   Do you remember what day of the week that

23   was?

24   A.   No.

38

1     Q.   Well it wasn't a work day for you? You were

2  not working; right?

3     A.   No.

4     Q.   And how long were you walking before this car

5  came by?

6     A.   About a few minutes.

7     Q.   I'm sorry?

8     A.   A few minutes.

9     Q.   A few minutes.  How much is a few minutes?

10  Less than five?

11     A.   Yes; kind of.

12     Q.   She lived where?

13     A.   She lived close to Homan.

14     Q.   I'm sorry?

15     A.   She lived close to Homan.

16     Q.   Homan and what?

17     A.   LeMoyne.

18     Q.   And you are at Spaulding, the next block;

19  right?

20     A.   Yes.

21     Q.   So you are a -- within a block of her house

22  when this car comes by?

23     A.   Yes.

24     Q.   So if you left at 11:20 certainly by 11:25

JGS_MAYSONET 4468
GONZALEZ 0170173

1    these guys had come to pick you up; right?

2        A.    What you mean pick me up?

3        Q.    These guys who come by in the car by 11:25;

4    correct?

5        A.    Maybe.

6        Q.    Maybe?

7        A.    It could be.

8        Q.    Could be?

9        MR. WIENER:  Objection he keeps --

10   BY MR. MAREK:

11       Q.    Do you know?

12       A.    No.

13       Q.    After you got in the car how long did it take

14   to get to the alley behind North Avenue?

15       A.    I don't know.

16       Q.    Well, that is a distance maybe four or five

17   blocks?

18       A.    Could be.

19       Q.    Well you are familiar with this area; aren't

20   you?

21       A.    I live out there.

22       Q.    In fact you were walking through the area

23   that night; right?

24       A.    Yes.

40

JGS_MAYSONET 4469
GONZALEZ 0170174

1    Q.   And you were -- Had you not gotten a ride you

2    were going to walk the whole distance home by

3    yourself?

4    A.   I was; yes.

5    Q.   You do know this area?

6    A.   Yes.

7    Q.   Right?

8    A.   Yes.

9    Q.   So that is about four or five blocks away;

10   isn't it?

11   A.   Yes.

12   Q.   So how long could it have taken this car to

13   drive four or five blocks, sir?

14   A.   I don't know.

15   Q.   Well five minutes sound about; right?

16   A.   It could be.

17   Q.   Could be.

18        Now at this time of night there is not too

19   much traffic; right?  It is not rush hour?

20   A.   No.

21   Q.   So if it took five minutes from the time you

22   left Yolanda's at 11:20 and it took another five

23   minutes to get to the alley you would have been in the

24   alley about 11:30; right?

41

JGS_MAYSONET 4470
GONZALEZ 0170175

1     A.    Yes, it could have been.

2     Q.    Could have been.

3           And then these three guys were out of the car

4     for how long?

5     A.    A few minutes.

6     Q.    Okay.

7           And then after they got back in the car it

8     couldn't have taken five minutes to drive you home;

9     right?

10    A.    It could have been.

11    Q.    So you would have had to have been home by

12    11:40; right?

13    A.    Maybe.

14    Q.    When is the next time you saw these guys

15    after May 24, 1990?

16    A.    Well, after I go outside; almost two weeks.

17    Q.    You stayed in the house for two weeks?

18    A.    Yes.

19    Q.    But when is the next time you saw your

20    nephew?

21    A.    Cruising with Jose.

22    Q.    I'm sorry?

23    A.    Cruising around with Jose.

24    Q.    Okay.  When was that?

JGS_MAYSONET 4471
GONZALEZ 0170176

```
 1      A.    About two weeks later.

 2      Q.    Did you talk to him at that time about this?

 3      A.    No.

 4      Q.    How about Fro?  When is the next time you saw

 5   Fro?

 6      A.    Don't remember.  About maybe three weeks

 7   after that.

 8      Q.    You say there is no close family relationship

 9   between you and your nephew; is that right?

10      A.    Yes.

11      Q.    He is still your nephew; isn't he?

12      A.    Yes, he still.

13      Q.    He is the -- Your sister is his mother;

14   right?

15      A.    Yes.

16      Q.    You have known him all your life?

17      A.    Not really.

18      Q.    You have known your sister all of her life;

19   right?

20      A.    No.

21      Q.    How is that, sir?

22      A.    Because I lived in Puerto Rico.

23      Q.    When did you live in Puerto Rico?

24      A.    I been in Chicago about 18 years.
```

JGS_MAYSONET 4472
GONZALEZ 0170177

1       Q.   At least the last 18 years you have known

2  Mr. Cruz, your nephew; right?

3       A.   Yes.  I know him.

4       Q.   When the car went in the alley did anybody

5  ever say to you what they were going to do?

6       A.   No.

7       Q.   Did you ever ask?

8       A.   No.

9       Q.   So you had asked them for a ride home; right?

10       A.   Yes.

11       Q.   They refused?

12    MR. WIENER:  Objection.

13    MR. MAREK:  I will rephrase that.

14  BY MR. MAREK:

15       Q.   You got in the car because they offered you a

16  ride home; right?

17       A.   I asked them for a ride.

18       Q.   They agreed to give you a ride home?

19       A.   Yes.

20       Q.   But they didn't take you home?

21       A.   No.

22       Q.   They took you to a dark alley?

23       A.   Yes.

24       Q.   And got out with a gun?

JGS_MAYSONET 4473
GONZALEZ 0170178

```
 1      A.   Yes.

 2      Q.   With their hoodies up?

 3      A.   Yes.

 4      Q.   And you weren't the least bit interested in

 5   what they were going to be doing, Mr. Gonzalez?

 6      A.   No.

 7      Q.   Tino is 23 years of age; is that correct?

 8      A.   He could be; yes.

 9      Q.   Well, if he is 23 and you have known him the

10   last 18 years, so you have known him since he was

11   five; right?

12      A.   Yes; kind of.

13      Q.   And you have been a Latin King for 14 years;

14   right?

15      A.   Maybe.

16      Q.   So that would mean that you have been a Latin

17   King since Tino was nine?

18      MR. WIENER:  Objection.  What is the relevance of

19   that, Judge?

20      THE COURT:  I don't know, counsel.  I will allow

21   him to develop it.

22           If there is no relevance I will strike it.

23   BY MR. MAREK:

24      Q.   So you have been a Latin King since Tino was
```

45

JGS_MAYSONET 4474

GONZALEZ 0170179

1     about nine years old?

2        MR. WIENER:  Objection; asked and answered; Judge.

3        MR. MAREK:  He didn't answer.

4        THE COURT:  That is correct.  I didn't hear him

5     answer.

6          You may answer.

7        THE WITNESS:  No, because I wasn't living around

8     there.

9   BY MR. MAREK:

10       Q.  Sir, you have been a Latin King since about

11   '77 or '78; right?

12       A.  Yes.

13       Q.  And back then Tino would have been about nine

14   years of age; right?

15       A.  Yes.

16       Q.  How long has Tino been a Latin King?

17       A.  About three or four years.

18       Q.  So that means he has been a Latin King since

19   about 1988?

20       A.  Yes, kind of; maybe.

21       MR. MAREK:  If I may have a moment, Judge?

22          (Brief pause.)

23       MR. MAREK:  No further questions.

24       THE COURT:  Redirect Examination?

JGS_MAYSONET 4475
GONZALEZ 0170180

1    MR. WIENER: Thank you.

2

3                    REDIRECT EXAMINATION

4                    By: Mr. Wiener

5

6    Q.   Mr. Gonzalez, on May 24, 1990, were you

7  wearing a watch?

8    A.   No.

9    Q.   Did you know exactly what time it was when

10 you left your girlfriend's house?

11   A.   About 11:00 something.

12   Q.   How did you know that?

13   A.   Because I asked her for the time.

14   Q.   Okay.

15        Did you know exactly what time it was when

16 you saw the car?

17   A.   No, not exactly.

18   Q.   Did you know exactly what time it was when

19 you got to the alley?

20   A.   No.

21   Q.   Were you wearing a watch?

22   A.   No.

23   Q.   Did you ever get out of the car?

24   A.   No.

47

1    Q.   Did you ever see a fence?

2    A.   No.

3    Q.   I want you to look at what has been marked as

4    People's Exhibit No. 21 for Identification.

5         Would you put a zero where the car was, if

6    you would, when you saw the bodies that you saw on

7    North Avenue?

8    A.   Around here.

9    Q.   Mark it with a zero.

10   A.   Somewhere here.

11   Q.   A circle.

12        Where were you when you saw the bodies?

13   A.   In back seat.

14   Q.   What direction did you have to look to see

15   the bodies?

16   A.   Right side.

17   Q.   And where was the car at that time?

18   A.   It was on Kimball and North Avenue.

19   Q.   And was it before the car had turned left or

20   after the car had turned left that you had seen the

21   bodies?

22   A.   Before it turned left.

23   Q.   Now counsel asked you if you lied to the

24   police.

JGS_MAYSONET 4477
GONZALEZ 0170182

1          You did give a court-reported statement;
2     didn't you?
3          A.   Yes.
4          Q.   Did you tell the police the truth?
5          A.   Yes.
6          Q.   You also were interviewed by other police
7     officers; isn't that right?
8          A.   Yes.
9          Q.   Did you tell those police officers the truth?
10         A.   Yes.
11    MR. WIENER:  No further questions of the witness.
12
13                    RECROSS EXAMINATION
14                    By: MR. MAREK
15
16         Q.   When you asked your girlfriend for the time
17    what time did she give you?
18         A.   About 11:20.
19         Q.   That is when you left?
20         A.   Yes.
21         Q.   And you couldn't have been more than ten
22    minutes away from this; right?
23         A.   Maybe.
24    MR. MAREK:  Nothing else.

49

JGS_MAYSONET 4478
GONZALEZ 0170183

1    MR. WIENER:  Judge, I have no other questions of

2    the witness.

3    THE COURT:  Very well, sir.  You may step down.

4

5                    (Witness excused.)

6

7    MR. WIENER:  At this time we would rest our case.

8                    (Defendant rests.)

9    THE COURT:  Deputy Tennent, may I see you at the

10   bench for a moment?

11

12                    (Whereupon a discussion was had off the

13                    record.)

14

15   THE COURT:  Ladies and gentlemen, we are going to

16   break for lunch now.

17        I think the best procedure will be for you to

18   simply let me know when the jury has completed their

19   lunch.

20                    (Whereupon a lunch recess was

21                    taken.)

22

23

24

50

JGS_MAYSONET 4479
GONZALEZ 0170184

```
1   STATE OF ILLINOIS )
                      )  SS:
2   COUNTY OF COOK    )

3         IN THE CIRCUIT COURT OF COOK COUNTY
          COUNTY DEPARTMENT-CRIMINAL DIVISION
4
    THE PEOPLE OF THE  )
5   STATE OF ILLINOIS  )Case  90 CR 21787-02
                       )
6        -vs-          )Before: JUDGE LORETTA HALL
                       )                    MORGAN
7   ALFREDO GONZALEZ   )March 30, 1992

8
              JURY TRIAL (AFTERNOON SESSION)
9

10  Court having reconvened pursuant to recess.

11

12          HON. JACK O'MALLEY,
               State's Attorney of Cook County, by
13          MR. JOEL LEIGHTON and
            MR. FRANK MAREK,
14             Assistant State's Attorneys,
               appeared on behalf of the People;
15

16
            MR. DAVID WIENER,
17             appeared on behalf of the Defendant.

18

19

20  ROCHINA V. CHOLEWA
    Official Court Reporter
21  2650 S. California
    Chicago, Illinois 60608
22

23

24
```

51

JGS_MAYSONET 4480
GONZALEZ 0170185

1                (Whereupon, a discussion was had

2                   outside the presence of the

3                   jury.)

4

5    MR. WIENER:  May we bring the defendant out?

6    THE COURT:  Yes.  We can put matters on the record

7 that need to go on the record before we bring the jury

8 out.

9    MR. WIENER:  I wonder if I may be heard.

10     At the end of the State's case I didn't make

11 a motion for Directed Verdict of not guilty because

12 the jury was present.

13     Without any argument I would indicate that I

14 believe the State has not made a prima facia case and

15 not proved their case beyond a reasonable doubt and as

16 well has not sustained their burden of the testimony

17 of Rosa Bello and Justino Cruz, which really is the

18 only evidence the State has linking the defendant to

19 this case.  I don't think the State has in fact

20 sustained their burden and I ask for Directed Verdict

21 of not guilty.

22    THE COURT:  You wish to comment, State?

23    MR. MAREK:  No, Judge.  We would submit we have

24 sustained a prima facia case.

JGS_MAYSONET 4481
GONZALEZ 0170186

1     THE COURT:  The question is whether or not there

2  is evidence in this record which if believed by a jury

3  and taken in the light most favorable by the State

4  would be the basis for a reasonable trier of fact to

5  find that the State had established its case beyond a

6  reasonable doubt.

7          I feel they have met that prima facia burden.

8          Most respectfully the motion for directed

9  verdict will be denied.

10  MR. WIENER:  I have one other matter.  The State

11  has indicated they wish in closing argument -- in

12  closing argument to argue the issue of accountability

13  as it pertains to Justino Cruz and, Judge, I believe

14  that -- I am making a Motion in Limine to preclude the

15  State from doing that.

16          I believe the argument of accountability is

17  going to place in the jury's minds questions about the

18  accountability of the defendant when the State is

19  actually proceeding on the theory defendant was a

20  person who shot these two individuals.

21          I think it can only be confusing.  It can

22  only make the jury think about other issues in this

23  case which don't pertain to the guilt or innocence of

24  the defendant but pertain to the participation of

53

1   Justino Cruz.

2           It is quite clear from the record Justino

3   Cruz has plead guilty to murder.  No need to comment

4   how his participation --

5       THE COURT: I don't think it is clear from the

6   record that he has plead guilty.

7       MR. WIENER:  That he is about to in return for the

8   State recommending he serve 22 years.  Excuse me from

9   misstating.

10          I would ask to preclude the State from

11  arguing accountability with regard to Mr. Cruz in the

12  closing argument.

13      THE COURT:  State?

14      MR. MAREK:  We believe it has to be clear to the

15  jury why it is Mr. Cruz would be pleading guilty to

16  this crime even though he is not alleged under the

17  State's theory that he is in fact the one who pulled

18  the trigger and fired the fatal shots.

19          Obviously we don't intend to belabor the fact

20  but an argument along the line that he guilty because

21  he is a participant or co-participant or participated

22  along with the others.  I think it is would be an

23  accurate statement of the law.  I think it is

24  necessary to remove any confusion that the jury might

54

JGS_MAYSONET 4483
GONZALEZ 0170188

1    have that -- or any confusion that might be suggested

2    on the part of defense counsel that is why he was

3    charged unless the people thought he was the shooter

4    all along.

5        MR. WIENER:  Just in response, that is not going

6    to be my argument and I don't think the State need

7    anticipate my closing argument by in my opinion

8    muddying the record with this particular issue.

9        THE COURT:  Very well.

10           I don't think it would have to be your

11   argument for that question to be in the jury's mind

12   and I do feel that the State is always entitled to

13   argue as the defense is always entitled to argue the

14   evidence and any reasonable inferences from that

15   evidence.

16           The status of this record at this point

17   indicates that Justino Cruz has been charged in this

18   case, not in the case being tried but charged pursuant

19   to that incident.

20           The testimony concerning the events of that

21   evening do not place the gun in Justino Cruz's hand.

22           It is the State's theory that the gun was in

23   the defendant's, Mr. Gonzalez's hands.

24           There is nothing to suggest and even the

55

JGS_MAYSONET 4484
GONZALEZ 0170189

1   evidence put forth by the defense that the gun was in

2   the possession of Mr. Cruz.

3         I think they are entitled to clarify that

4   issue in that there is evidence before this jury that

5   he was charged in this murder.

6         I think I can't imagine not allowing the

7   State to clarify that issue as to how he could be

8   charged without having any accusation that he was the

9   person that pulled the trigger.

10        I did decline to allow the State to present

11   an instruction on the issue of accountability because

12   as far as I could tell the theory that the State has

13   proceeded on relative to Mr. Gonzalez has nothing to

14   do with accountability.

15        For that reason I thought that to instruct

16   this jury on a theory that is not advanced visa vie

17   this defendant would clearly be inappropriate.

18        That does not mean, however, I feel the State

19   should not have the opportunity to clarify succinctly,

20   briefly, a question that could reasonably rise in this

21   jury's mind, namely he didn't shoot him so how come he

22   is charged or whatever they might draw from that.

23        I don't think I can leave that jury with this

24   kind of question in their heads.

56

JGS_MAYSONET 4485
GONZALEZ 0170190

1          So my ruling on the Motion in Limine is to

2    deny it if by that Motion in Limine counsel seeks to

3    preclude the State from making any mention how it

4    comes to be that Justino Cruz is charged in a murder

5    in which he is not alleged to have been the person who

6    pulled the trigger.

7          I have instructed the State and I know the

8    State understood me clearly that they may simply make

9    a statement relative to the fact that because he

10   participated and the way that he participated that he

11   is chargeable with that murder.

12         Without using the terms accountability, not

13   getting into a long drawn out discussion of the law of

14   the accountability or the policy behind it or any of

15   those things that you would normally say when

16   accountability of the defendant on trial is at issue I

17   have no reason to believe the State would not follow

18   this Court's instructions but I am going to allow them

19   to explain why Mr. Justino Cruz could be charged

20   without having been alleged by any of the evidence

21   heard by this Court and by this jury to have been the

22   actual shooter.

23         Now we also, outside the hearing of the court

24   reporter as it were, did have an instruction

57

JGS_MAYSONET 4486
GONZALEZ 0170191

1  conference and I just want to put on the record the

2  results of that conference.

3  It was my understanding, Mr. Wiener, and I am

4  just double checking before I misspeak of those that

5  have been accepted by the Court, I don't believe there

6  were any that you raised objections to.

7  If I go through and misspeak let me know.

8  People's 1, I.P.I. 1.01; People's 2, I.P.I.

9  1.02; People's 3 is I.P.I. 1.03; People's 4 is I.P.I.

10  2.01; People's 5 is I.P.I. 2.02; People's 6 is I.P.I.

11  2.03; People's 7 is I.P.I. 3.02; People's 8 is I.P.I.

12  3.10.

13  Defendant's 1 is I.P.I. 3.17; People's -- I

14  misnumbered these -- 9 is I.P.I. 7.01A; People's 10 is

15  7.02A; People's 11 is 7.02A; People's 12 is 26.01.

16  Then there follows the four verdict forms;

17  not guilty, Kevin Wiley; not guilty, Torrence Wiley;

18  guilty, Kevin Wiley; guilty, Torrence Wiley.

19  There having been no objections to any of

20  these instructions that I have just enumerated.  Those

21  are the instructions that will be given to this jury

22  at the appropriate time.

23  The defendant is out.  All right.

24  May we have the jury, please?

58

JGS_MAYSONET 4487
GONZALEZ 0170192

```
 1                     (Whereupon the trial was resumed in

 2                     open court in the presence of the

 3                     jury.)

 4

 5      THE COURT:  Very well. Mr. Marek and the State?

 6      MR. MAREK:  At this time the People would call

 7   Det. Guevara in rebuttal.

 8

 9      D E T.   R E N A L D O   G U E V A R A,

10

11   as a witness by the State's Attorney herein, having

12   been first duly sworn, was examined and testified as

13   follows:

14

15                     DIRECT EXAMINATION

16                     By: MR. MAREK

17

18      Q.   Detective Guevara, state your name for the

19   record?

20      A.   Detective Renaldo Guevara, G-u-e-v-a-r-a.

21   Star No. 20861.

22      Q.   Det. Guevara, you are the same Det. Guevara

23   who testified earlier in this cause?

24      A.   Yes, I am.
```

59

JGS_MAYSONET 4488
GONZALEZ 0170193

1      Q.   Detective Guevara, I want to direct your

2  attention to August 24, 1990, shortly after midnight.

3      Were you working on the homicide

4  investigation of the murder of Torrence and Kevin

5  Wiley at that time?

6      A.   Yes.

7      Q.   In connection with your investigation of the

8  homicide of the Wiley brothers did you go to the scene

9  of the crime with the defendant, Alfredo Gonzalez, at

10  approximately that time?

11      A.   Yes, I did.

12      Q.   When you went to the scene of the crime with

13  the defendant, Alfredo Gonzalez, did he indicate to

14  you where the car that the offenders were riding in

15  was parked?

16      A.   Yes, he did.

17      Q.   And where did he indicate at that time that

18  the car was parked?

19      A.   He indicated that the car was parked behind

20  3428, behind the garage, facing westbound.

21      Q.   Now, Det. Guevara, I am going to show you

22  what has been marked People's Exhibit No. 21 for

23  identification.

24      I will ask you if you see on this chart the

JGS_MAYSONET 4489
GONZALEZ 0170194

1    point or the spot where the defendant indicated at

2    that time the car was parked in the alley?

3         A.   Yes, I do.

4         Q.   I would ask you to draw a square at that

5    location.

6         MR. WIENER:   May I approach?

7         THE COURT:   Certainly.

8    BY MR. MAREK:

9         Q.   And did he indicate which direction the car

10   was facing?

11        A.   Yes, he did.

12        Q.   Which direction was the car facing?

13        A.   Westbound.

14        Q.   That would be towards St. Louis?

15        A.   That is correct.

16        Q.   Not toward Kimball?

17        A.   That is correct; not toward Kimball.

18        Q.   Det. Guevara, I am going to show you what has

19   been marked People's Exhibit No. 15 and I will ask you

20   if you recognize what is shown in that photo?

21        A.   Yes, I do.

22        Q.   What is shown in that photo?

23        A.   This shows where -- the garage behind 3428,

24   which is where the car was parked facing westbound.

JGS_MAYSONET 4490
GONZALEZ 0170195

1    Q.   So the garage depicted in that photo is the

2    garage that the defendant indicated the car was parked

3    behind?

4    A.   That is correct.

5    Q.   Detective Guevara, did the defendant indicate

6    to you where the car was when he allegedly saw the

7    bodies of the two victims?

8    A.   Right there as they were driving off.

9    Q.   Now you were in the alley with him at this

10   time; is that correct?

11   A.   That is correct.

12   Q.   Det. Guevara, were you able to see in front

13   of the 3428 building on North Avenue from where the

14   defendant indicated the car was?

15   A.   No way.

16   MR. MAREK:  Nothing further.

17   MR. WIENER:   May I just have a moment, your

18   Honor?

19   THE COURT:  Sure.

20

21              CROSS EXAMINATION

22              By:  MR. WIENER

23

24

62

JGS_MAYSONET 4491
GONZALEZ 0170196

1      Q.   Officer Guevara, you prepared a police report

2   with respect to your investigation in this matter?

3      A.   Yes, we did.

4      Q.   In your police report does it show that you

5   took Mr. Gonzalez to the scene?

6      A.   No, it doesn't show that.

7      Q.   In your police report does it show

8   Mr. Gonzalez told you that the car was parked

9   westbound?

10      A.   No.

11      Q.   In the police report does it show Mr. Guevara

12   told you that the car was parked next to a garage?

13      A.   Not me, sir.

14      Q.   In fact, Officer, I am going to show you

15   again what you marked with a square as to where the

16   defendant said that the car was parked.

17           Does this diagram show or spell out garage on

18   it in any place that you can see?

19      A.   No, sir, it doesn't.

20      Q.   So when you look at this diagram are you

21   saying the defendant actually used the words 3428 as

22   to where the car was parked?

23      A.   No. I'm saying I used 3428.  I am saying he

24   said behind the garage.

JGS_MAYSONET 4492
GONZALEZ 0170197

1    Q.   That is not in any of your police reports

2  with regard to your interviewing of the defendant, is

3  it, sir?

4    A.   No, sir.

5    MR. WIENER:  I have nothing further of this

6  officer.

7    MR. MAREK:  No redirect.

8    THE COURT:  Thank you, Officer.  You may step

9  down.

10               (Witness excused.)

11

12    MR. MAREK:  Your Honor, the People rest in

13  rebuttal.

14               (State rests in Rebuttal.)

15    THE COURT:  All right.

16         Ladies and gentlemen, if you would think back

17  for a moment to the first day of these proceedings

18  when I gave you that little birdseye view of the order

19  in which the trial would proceed.

20         We are now at that point that I referred to

21  when I talked about the close of all the evidence.

22         All the evidence that is going to be

23  presented in this case has been presented at this

24  point.

64

JGS_MAYSONET 4493
GONZALEZ 0170198

1        We are at the point where the parties through

2   their attorneys are going to be speaking to you in

3   what is called closing argument.

4        If you recall I indicated to you that the

5   State will argue to you first.  You will recall that I

6   told you closing argument is an opportunity for the

7   attorneys to speak to you relative to what they feel

8   the evidence has shown.

9        Again I want to caution and remind you that

10  the closing arguments of counsel are not evidence,

11  that they are for summarizing the evidence and in

12  arguing of the respective theories of the case.

13       The State will proceed first.  The defense

14  will then present its closing argument.  And the State

15  will have an opportunity then to speak to you again in

16  rebuttal argument.

17       Once all the arguments have been completed

18  this Court will be instructing you in the law

19  applicable to this case and you will be charged to

20  deliberate upon your verdict.

21       State, are you ready to begin in opening

22  close?

23       MR. LEIGHTON:  Yes, your Honor, we are.

24       THE COURT:  Very well.

65

1    MR. LEIGHTON:  May I proceed, your Honor?

2    THE COURT:  Yes, you may.

3

4              CLOSING ARGUMENT

5              By: Mr. Leighton

6

7

8    MR. LEIGHTON:  May it please the Court, ladies and

9    gentlemen of the jury, Mr Marek.

10        On May 25, 1990 at about 1:20 in the morning

11   this guy right here turned a stretch of a major street

12   in your city, the 3400 west block on North Avenue,

13   into his killing ground, his killing field.

14        Ladies and gentlemen, you heard Justino Cruz,

15   who was out there that night also, who was a lookout

16   for this guy when he did his killing that night.  He

17   came in here, he got on the witness stand, and he

18   testified.  He testified against this guy right here.

19        And, in doing so he also testified against

20   himself.  He admitted his participation as a lookout

21   in that horrible crime.

22        And You now know that he is going to accept

23   responsibility for his part in that crime, his

24   responsibility as the lookout, the responsibility for

JGS_MAYSONET 4495
GONZALEZ 0170200

1  the assistance that he gave to this man that night by

2  pleading guilty to murder in exchange for a

3  recommendation from us for 22 years in the Illinois

4  Department of Corrections.

5        Ladies and gentlemen, Judge Morgan is going

6  to instruct you that are the sole judges of the

7  believability of the witnesses and of the weight to be

8  given to the testimony of each of them.

9        In considering the testimony of any witness

10 you may take into account his ability and opportunity

11 to observe, his memory, his manner while testifying,

12 any interest, bias, or prejudice he may have, and the

13 reasonableness of his testimony in light of all the

14 other evidence in the case.

15       You should judge the testimony of the

16 defendant in the same manner as you judge the

17 testimony of any other witness.

18       Now, Judge Morgan will also instruct you that

19 when a witness says he was involved in the commission

20 of a crime with the defendant the testimony of that

21 witness is subject to suspicion and should be

22 considered by you.

23       It should be carefully examined again in the

24 light of the other evidence in the case.

67

JGS_MAYSONET 4496
GONZALEZ 0170201

1      When you assess the credibility of a witness,

2  any witness, what you do is you look at all of the

3  evidence together, everything you heard from that

4  witness stand, everything you saw in this courtroom

5  and will see when you go back into the jury room.  You

6  determine whether or not that witness' testimony makes

7  sense, whether it fits.

8      This case is not about one witness or another

9  witness.  It is about all of the evidence together.

10      Examine the testimony of Justino Cruz in

11  light of everything else you heard in this courtroom.

12      Justino Cruz tells you that he got off work

13  that night in Schiller Park at about 11:00 o'clock

14  that night.  He took the el around Belmont, he got off

15  the el, he got on a bus. He took the bus and he took

16  the bus to LeMoyne and Spaulding.

17      At that time he sees a blue car at LeMoyne

18  and Spaulding.  He sees individuals in that car.  He

19  sees Fro, who you now know is Chris Hernandez or Chris

20  Goens (phonetic), and he sees his uncle, Alfredo

21  Gonzalez.  They stop and they talk.

22      Does that make sense?  Sure it does.  He

23  knows Fro and that guy, his uncle.

24      He gets into the car.  As they are driving in

JGS_MAYSONET 4497
GONZALEZ 0170202

1    the car Fro says, "We are going to go do a drug sale."

2    Then this guy says, "We need to go to Juan's house, to

3    Maysonet's house, to get a gun."

4         Well consider that in light of the testimony

5    you heard from Ernest Warner.  The defendant says, "We

6    need to get the gun" -- a gun, one gun.

7         What do you know from the ballistics evidence

8    in this case?  You know there was one gun out there.

9    Why do you know that, because Ernest Warner did

10   microscopic comparisons of the three bullets that come

11   out of the two Wiley brothers. All of them were fired

12   in his opinion through the same gun barrel.

13        He also did a microscopic comparison of the

14   four shell casings that are recovered at the scene --

15   the only four recovered.

16        All of those shell casings are from the same

17   gun.  Does that make sense?  Yes.  They needed a gun.

18   They needed one gun.  Where did they go?   They went

19   to Maysonet's house.

20        Justino Cruz tells you they go to Maysonet's

21   house. They ring the bell and somebody answers the

22   door and that someone is Rosa Bello, the live-in

23   girlfriend of Jose Maysonet, another defendant in this

24   case, who has a child by him.

69

JGS_MAYSONET 4498
GONZALEZ 0170203

1    He says that they went in there; Justino Cruz

2    went in there, Alfredo Gonzalez went in there, Fro or

3    Chris Hernandez went in there and met up with Jose

4    Maysonet.

5    What did Rosa Bello tell you; "I was at home.

6    It was getting on 12:00 o'clock.  I opened the door.

7    There is Alfredo Gonzalez, or Lluvia, Justino Cruz,

8    and Fro, and they all came inside."

9    Justino Cruz tells you that Alfredo Gonzalez

10   asks Maysonet for the gun and that the two of them

11   then go into a bedroom.

12   He also tells you that Rosa Bello was at

13   first in the kitchen of the apartment and then she

14   went into the bedroom.

15   Well think back on what Rosa Bello told you.

16   "We are in the apartment, Maysonet told me get the

17   gun."

18   Where did she get it from?  From the bedroom

19   closet.

20   MR. WIENER:  Objection.  That is not the

21   testimony.  She said Maysonet told her to get a

22   package, not a gun.

23   THE COURT:  Overruled, counsel.

24   MR. LEIGHTON:  She goes, the gun is in a box in

JGS_MAYSONET 4499
GONZALEZ 0170204

the closet, it is wrapped in the towel.  It is wrapped
in plastic.  She gets it.  And, who does she give it
to?  She gives it to Alfredo Gonzalez.

What does Justino Cruz say?  When Alfredo
Gonzalez and Juan Maysonet came out of the bedroom
Alfredo had the gun in his pants.

Rosa Bello told you what he did with the gun
was he put it in his pants and he started to put -- at
some point he started to put his hoodie, his hooded
sweatshirt over the gun.

What does Justino Cruz tell you that all of
the four of them were wearing that night?  They were
wearing sweatshirts with hoods -- hoodies as they are
called.

What does Rosa Bello tell us?  That Justino
Cruz, this defendant, Maysonet, and Fro are wearing
when they come to that apartment?  Hoodies.  Hooded
sweatshirts.

Justino Cruz tells you, "We then left
Maysonet's apartment."

Well, think back on the testimony of Rosa
Bello.  Justino Cruz tells you "We went down, got in
the car, we got over to St. Louis and we started to go
to St. Louis, on St. Louis, and we were going

JGS_MAYSONET 4500
GONZALEZ 0170205

1   northbound and then we crossed North Avenue.  The next

2   street over after you cross North Avenue is Wabansia

3   but we never got there because there is an alley right

4   behind North Avenue.  When we got to that alley we

5   turned.  We turned right and we started to go down the

6   alley east.  Then we passed by the vacant lot.  We

7   went to a t-alley and that is where Maysonet pulled

8   the car into the t-alley, backed out, and started

9   coming back towards St. Louis.

10       Well, here you have the alley and here you

11  have the t-alley.  So you know that is there.

12       Justino Cruz tells you "We stopped by a

13  garage."  Think back.  He pointed out.  He pointed out

14  to where that garage was behind 3428.

15       Well, take a look, ladies and gentlemen,

16  there it is, the garage.

17       Justino Cruz then says -- strike that.  He

18  also says, "We have hoodied up or pulled our hoods up

19  over our heads so that people won't be able to see our

20  faces."

21       That is not the only place you hear about

22  hoods being pulled up, ladies and gentlemen.  You

23  heard it out of his mouth earlier today.

24       Does it make sense that they would if they

72

JGS_MAYSONET 4501
GONZALEZ 0170206

1    are on their way to sell drugs?  Yes.

2           Justino Cruz was also asked on the witness

3    stand:

4           "You knew they had a gun and you knew they

5       were going to sell drugs why did you go with them?

6       Why did you participate."

7           "Because I'm a Latin King and my uncle is a

8       member of the Latin Kings street gang and Jose

9       Maysonet is a Latin King and Fro is a Latin King."

10          And what else do you know about this guy

11   based on what he told you today?  "I have been a Latin

12   King for 14 years."

13          Does that corroborate what Justino Cruz told

14   you?  Does what Justino Cruz told you make sense in

15   light of that?

16          Justino Cruz, the defendant, Alfredo

17   Gonzalez, and Juan Maysonet get out of the car --

18   strike that -- and Fro get out of the car.  Juan

19   Maysonet stays in the car.  When they are getting out

20   of the car Fro says, "Stay in the alley; watch to see

21   no one is coming down the alley."

22          Does that make sense in light of your own

23   common sense and experience in everyday life?  Yes, it

24   does, I would submit, so that nobody like the police

73

JGS_MAYSONET 4502
GONZALEZ 0170207

1   or somebody else comes rolling down that alley while

2   they are doing whatever they are doing in that vacant

3   lot.

4         Justino Cruz tells you that Alfredo Gonzalez

5   has the .09 millimeter with him when he goes into that

6   vacant lot.

7         Remember Rosa Bello described that gun as a

8   .09 millimeter.  Think back again to the testimony of

9   Ernest Warner.  The bullets that are recovered from

10   the Wileys, all three of them are.09 millimeters.  The

11   shell casings that are found at the scene are.09

12   millimeters.

13         Both the bullets and the shell casings are

14   consistent with being fired from a .09 millimeter

15   semiautomatic handgun.

16         Justino Cruz tells you that the defendant,

17   Alfredo Gonzalez, and Fro walked through the vacant

18   lot and while walking through the vacant lot he can

19   see two black guys at the other end of the lot by

20   North Avenue and he can see a conversation going on

21   between the defendant, Alfredo Gonzalez, and Fro, and

22   the two black guys.

23         Ladies and gentlemen take a look at People's

24   Exhibit No. 13 and 15.  Take a look at the view he

74

JGS_MAYSONET 4503
GONZALEZ 0170208

1    had.  Could he see what he said he saw -- his

2    opportunity to observe?

3            You be the judges for yourselves back there

4    but there it is.

5            Justino Cruz also tells you that they're

6    talking and "I am looking up and down the alley and

7    all of a sudden I hear three or four gunshots."

8            What else do you know about the other

9    evidence in the case?

10            What did Dr. Lifschultz tell you about Kevin

11    Wiley and about his wound?

12            Kevin Wiley was shot behind the ear.  Dr.

13    Lifschultz told you about these little black raised

14    marks.  He told you that those are consistent with

15    close range firing, not from across the lot, not from

16    the other side of the lot, but close range, those

17    little black dots around the bullet hole.

18            A close range gunshot behind the ear of one

19    of the victims is consistent with this defendant being

20    right up on them, being right there with him like he

21    would be if he were talking to them before he starts

22    shooting, which is what Justino Cruz tells you is what

23    happened.

24            Justino Cruz tells you that he comes running

JGS_MAYSONET 4504
GONZALEZ 0170209

1    back, that the defendant, Alfredo Gonzalez, and Fro

2    come running back to the car, and at the time they

3    come running back to the car the defendant, Alfredo

4    Gonzalez, has that same .09 millimeter pistol in his

5    right hand.  And he says, "I just shot two guys; let's

6    get out of here."

7         Does that make sense?  Does it make sense

8    that that conversation could have occurred -- "Let's

9    get out of here!  I just shot two guys"  Sure it does.

10        What is the next thing Justino Cruz tells

11   you?  He tells you after they say that, after the

12   defendant, Alfredo Gonzalez, says, "I just shot two

13   guys; let's get out of here," the defendant gets back

14   in the car and then he tells you the route they take.

15        He tells you they go west down the alley to

16   St. Louis; they turn right onto St. Louis so they are

17   going north, they are going away from North Avenue.

18   They are going up and over to Wabansia.  When they get

19   to Wabansia they turn right again and they go four or

20   five blocks east until they get to another major

21   street, until they get to another street and then

22   cross over going south and cross North Avenue but they

23   cross North Avenue four or five blocks from the

24   intersection of North Avenue and St. Louis.

76

JGS_MAYSONET 4505
GONZALEZ 0170210

1        Does that make sense in light of the other

2  evidence that you have heard in this case?

3        What did you hear from Officer Montalvo and

4  Officer Gawrys?  "We got a call of shots fired and we

5  were there in a matter of seconds.  We were on North

6  Avenue and we didn't see a soul."

7        Why is that?  Because that blue car with this

8  defendant, Cruz, Maysonet, and Fro didn't go to North

9  Avenue.  They went to Wabansia.  They went blocks away

10  and then crossed over North Avenue again.  And that's

11  why the officers never saw him.

12        Remember how fast the officers had to be

13  there.  Officer Montalvo told you both victims were

14  still alive on the scene when they first rolled up and

15  that they then watched the two victims die right in

16  front of them before the fire department showed up.

17        But consider something else.  Consider the

18  statement that Justino Cruz made on the 24th of

19  August, 1990, to Assistant State's Attorney Perkaus.

20  You all had an opportunity to hear that.

21        In that statement he laid out everything he

22  testified to in this courtroom.  Remember the date he

23  did that.  That was in August of 1990.  He didn't

24  agree to become a witness for the People of the State

JGS_MAYSONET 4506

GONZALEZ 0170211

1   of Illinois until March 12th, 1992. He had already

2   laid out what happened here almost two years before

3   there was any agreement for his testimony.

4        When you evaluate Justino Cruz's testimony in

5   light of everything else you have heard in this case

6   -- the testimony of Warner, the testimony of the

7   medical examiner, the testimony of the first officers

8   on the scene, the testimony of the girlfriend of

9   Maysonet, Rosa Bello -- there can be no doubt that he

10  is telling you what happened.

11       Consider also the timeframe he gives you.  "I

12  got off work at 11:00 o'clock."  You know that this

13  shooting had to occur about 1:00 o'clock in the

14  morning.  Does that make sense?  Yes, because Justino

15  Cruz had to travel from Schiller Park on the el to

16  around Belmont and he had to take a bus and get picked

17  up, then had to go to Maysonet's house to get the gun,

18  and had to go to the alley behind North Avenue.

19       You know that that has to be the time.  It

20  has to be after 1:00 o'clock because the officers

21  again are rolling up at about 20 minutes after 1:00

22  and the victims are both still alive.

23       Does that time make sense?  Yes, it does.  It

24  fits.  It fits together.  The whole case fits

78

JGS_MAYSONET 4507
GONZALEZ 0170212

1    together.  That is how you know that Justino Cruz is

2    telling you the truth from that witness stand.

3          Judge Morgan is going to instruct you that to

4    sustain the charge of first degree murder against this

5    defendant for both Kevin and Torrence Wiley the State

6    must prove the following propositions:

7          First, that the defendant performed the acts

8    which caused the death.

9          All of the evidence in this case taken

10   together and looked at shows that this man over here

11   fired a bullet into the head of Kevin Wiley, shot

12   Torrence Wiley in the chest, and then shot him again

13   through the penis.

14         Second:  That when the defendant did so he

15   intended to kill or do great bodily harm or he knew

16   his acts would cause death or he knew his acts created

17   a strong probability of death or great bodily harm.

18         Ladies and gentlemen, use your common sense.

19   Look at what the defendant did to these two men.  Can

20   there be any question about what his purpose was?  He

21   was obviously trying to kill him.  The wound on Kevin

22   Wiley is behind the left ear as though he was trying

23   to execute him.  He shoots Torrence Wiley once through

24   the chest and then when he is down he shoots him

79

JGS_MAYSONET 4508
GONZALEZ 0170213

1    again.

2              Ladies and gentlemen, when we charged this

3    defendant with the murders of Kevin and Torrence Wiley

4    we assumed the responsibility of proving his guilt

5    beyond a reasonable doubt.

6              All of the evidence here taken together has

7    done that.

8              When you took the oath to be jurors you

9    assumed the responsibility of deciding this case.

10             Justino Cruz is accepting the responsibility

11   for what he was part of or what he was involved in

12   that night by pleading guilty to murder in exchange

13   for recommendation of 22 years.

14             And now it is time to make this man right

15   here accept the responsibility for what he did; for

16   pulling the trigger out there that night and for

17   taking two lives on the streets of our city.

18             So we are asking you to return the only

19   verdict that is justified by all of the evidence taken

20   together and we are asking you to find the defendant

21   guilty of the murders of Kevin and Torrence Wiley.

22             Thank you very much.

23        THE COURT:  Thank you, Mr. Leighton.

24             Mr. Wiener?

80

JGS_MAYSONET 4509
GONZALEZ 0170214

1    MR. WIENER:  Thank you, Judge.

2

3                    CLOSING ARGUMENT

4                    By: Mr. Wiener

5

6    MR. WIENER:  Your Honor, Mr. Leighton, Mr. Marek,

7    Mr. Gonzalez.

8         Mr. Leighton asked you to remember back to

9    what he talked about, what his partner talked about in

10   opening statement.

11        I am going to ask you to remember back to

12   what I talked to you about in opening statements.

13        My opening statement, you will remember, I

14   said is that testimony in this case will get down to

15   testimony of Rosa Bello, testimony of Justino Cruz,

16   and the testimony of Alfredo Gonzalez because the

17   pictures that you are going to receive of the victims

18   and of the scene do nothing to show that Alfredo

19   Gonzalez committed a crime.

20        The bullets that you are going to see do

21   nothing to show that Alfredo Gonzalez committed a

22   crime.

23        The shell casings that you are going to see

24   do nothing to show that Alfredo Gonzalez committed a

81

JGS_MAYSONET 4510
GONZALEZ 0170215

1    crime.

2            The testimony of the Medical Examiner as to

3    the cause of death do nothing to tie Alfredo Gonzalez

4    into the commission of this crime.

5            The testimony of police officers that said

6    they arrived at 1:20 when Mr. Leighton said that the

7    killings must have taken place around 1:00 o'clock,

8    merely because they said they came within seconds of a

9    call of shots fired and merely because the victims

10   were alive does nothing to prove that Alfredo Gonzalez

11   committed a crime.

12           No gun was recovered.  No fingerprints were

13   recovered.  Nothing.  No piece of physical evidence of

14   Alfredo Gonzalez was recovered to show that he

15   committed a crime.

16           Rosa Bello, though, testified to you on that

17   witness stand in answer to my question that she wanted

18   to do justice in this case.

19               "Miss Bello, since you want to do justice

20          will you testify against Jose Maysonet.

21               "No."

22               "Well, Miss Bello, since you want to do

23          justice tell us where was the gun that you said

24          was first taken by these individuals?"

82

JGS_MAYSONET 4511
GONZALEZ 0170216

1      "They were in my house."

2      The gun was not in Alfredo Gonzalez's house.

3  The gun that she says, this .09 millimeter -- by the

4  way that she recognized because of her studying of a

5  gun in a book -- was at Jose Maysonet's house.

6      What does she say happened?  She says that

7  this defendant, Mr. Gonzalez, and two other people

8  came to the house and that while they were in the

9  front room, she couldn't hear the conversation, and

10  Mr. Maysonet told her to get a package.

11      She says that she was the only person to

12  enter the bedroom.

13      Mr. Cruz, on the other hand, said that

14  Mr. Gonzalez and Jose entered the bedroom and then

15  Rosa Bello entered the bedroom and took this package

16  or this gun.

17      She says and Mr. Cruz say that they saw the

18  defendant, Mr. Gonzalez, place the gun in his pants,

19  in his right side here and then roll down his hoodie.

20  So we can assume that they both saw him beforehand

21  with his hoodie rolled up, his hoodie rolled up above

22  the waist where the gun was allegedly placed by

23  Mr. Gonzalez.

24      Mr. Cruz tells you that, as Miss Bello did,

83

JGS_MAYSONET 4512
GONZALEZ 0170217

1  that the three individuals, Fro, and Mr. Cruz, and

2  Mr. Gonzalez went to the location of Mr. Maysonet's

3  house and yet although the Assistant State's Attorney

4  that took Mr. Cruz's statement, Mr. Perkaus, said he

5  hasn't an independent recollection of what words were

6  taken down and although it is only a summary he said

7  that what he wrote down is what Justino Cruz said --

8  that Justino, Alfredo, Chris Hernandez, and Jose

9  Maysonet went to Jose's house at 1302 North Homan.

10      He also said, Justino Cruz did -- that when

11  they left the house Jose Maysonet seemed to know where

12  he was driving.  If they all went to Jose Maysonet's

13  house and if he wasn't a part of this plan to begin

14  with and they spent a couple of minutes in the house

15  and Mr. Cruz didn't testify to any other conversation

16  which takes place how does Jose Maysonet know to get

17  into that car and drive over to North Avenue where

18  this deal is going to go down?

19      Mr. Cruz tells you he was the lookout.  We

20  are supposed to believe him that he was a lookout.

21  Sure, he can tell you where the car was parked.  Sure

22  he can tell you what proximity the car had to the

23  alley.  Sure he can tell you all of those things.

24      Mr. Cruz was no lookout.  Mr. Cruz was right

84

JGS_MAYSONET 4513
GONZALEZ 0170218

1    there when the Wiley brothers were killed.  Mr. Cruz
2    was not standing by the car.  How do we know this?  We
3    know it in a number of ways.
4         First of all Mr. Cruz agreed to his truthful
5    testimony here in response to having one of the
6    murders dismissed and pleading guilty to another
7    murder with the State's recommendation of 22 years,
8    which the judge must decide.
9         I asked him when do you expect to get out of
10   jail and he said in about 11 years.
11        I said what were the two alternative
12   sentences that you could have gotten had you gone to
13   trial or had you plead guilty without an agreement
14   with the State?  Life imprisonment or death.
15        We know that he is telling the truth.  Eleven
16   years in the penitentiary in return for life
17   imprisonment or death.
18        We know of course he is telling the truth
19   when he told you that, "Oh, yes, I saw Mr. Maysonet,
20   you know, several times a week, sometimes every day
21   before May 25th of 1990, that is through May 25th of
22   1990.  And August 24th of 1990, he didn't see him
23   once.  He didn't meet with Mr. Maysonet once.
24        Isn't it wonderful, isn't it extra ordinary

85

JGS_MAYSONET 4514
GONZALEZ 0170219

1  that the statement that he gave to you and the

2  statement that was read by the Assistant State's

3  Attorney has Mr. Maysonet staying in the car and has

4  Mr. Cruz standing by the car when the other

5  individuals commit this crime?

6       You know, Mr. Leighton told you that the

7  Judge is going to read you an instruction.  The

8  instruction says "when a witness says he was involved

9  in the commission of a crime with the defendant the

10  testimony of that witness is subject to suspicion and

11  should be considered by you with caution. It should be

12  carefully examined in the light of the other evidence

13  in the case."

14       Well, the other evidence in the case is the

15  testimony of Alfredo Gonzalez.  He took the witness

16  stand.

17       Judge Morgan told you that the defendant

18  didn't have to prove his innocence.  He doesn't have

19  to present evidence.  He took the witness stand.  He

20  told you that he was not wearing a watch, that he was

21  at his girlfriend's house, she told him the time.  He

22  left, Not wearing a watch, not knowing the time, he

23  got to a corner.  He saw a car.  Who did he see in the

24  car?  He recognized Fro.  He asked for a ride home,

86

JGS_MAYSONET 4515
GONZALEZ 0170220

1    got in and didn't ride home.  They rode to the alley

2    and he told you that the car was parked in the alley

3    toward Kimball and he told you that three of the other

4    individuals in the car put their hoods up.

5           He knew something was going to happen.  He

6    knew there was a crime about to occur, a possible

7    killing.  He had not been told about it. He stayed in

8    the back of the car.  He didn't see Mr. Cruz after he

9    left the car.

10          Mr. Cruz said he stood by the car.

11          He didn't see the other two individuals.  He

12   heard five or six shots.  Then Mr. Cruz got into the

13   car first and other two individuals got in the car

14   next.

15          He told you that he could have been wearing a

16   hoodie that night and he could not have been.  He

17   didn't remember.

18          But he remembered the other three because he

19   was in the back seat of the car and he saw the hood up

20   before they got out of that car.

21          Now, Alfredo Gonzalez was the subject of

22   rebuttal testimony by Officer Guevara who said, "Oh,

23   no, I took him out there to the scene.  He said the

24   car was parked by a garage." Of course there is no

87

JGS_MAYSONET 4516
GONZALEZ 0170221

1   garage noted on here.

2        "He told me the car was parked, was facing

3   westbound, and that the car went out not towards

4   Kimball but towards St. Louis."

5        I said, "Officer Guevara, you made police

6   reports of this; right"  He said,"Yes."

7        "Does it say in there that the defendant

8   said the car was parked at a garage" "No."

9        "Does it say in there the car was parked

10   towards St. Louis" "No."

11        "Does it say in there that the defendant saw

12   or that the car went to St. Louis and then went in

13   another direction" "No."

14        He is using his independent recollection

15   without any police report on a double murder

16   investigation to tell you that that is what he

17   remembers, that is what the defendant said.

18        Although the police report is a summary and

19   although a police report summarizes things that a

20   policeman takes down in his investigation don't you

21   think that if he had taken Alfredo Gonzalez to the

22   scene he would have written that down?  Don't you

23   think if Alfredo Gonzalez had pinpointed the exact

24   place of the car which was different from his

JGS_MAYSONET 4517
GONZALEZ 0170222

1    testimony today he would have written that down?

2    Don't you think if Alfredo Gonzalez told him

3    the exact route that he had taken home different from

4    the testimony you heard from Alfredo today that he

5    would have written that down?

6    We had a stipulation before Alfredo Gonzalez

7    took the witness stand.  He stipulated that Officer

8    Smika (phonetic) and his partner interviewed the

9    defendant, excuse me, interviewed Mr. Cruz and Mr.

10   Cruz never said anything about the defendant coming to

11   the car and saying he killed anybody.

12   We also have Mr. Cruz's statement written

13   into the record and I know you can remember there was

14   nothing in the statement about Mr. Cruz making a

15   statement, about Mr. Gonzalez about making a statement

16   of killing anybody.

17   Ladies and gentlemen, what occurred here was

18   that after May 25th of 1990, Mr. Cruz and Mr. Maysonet

19   were close friends.  Now do you believe Mr. Cruz when

20   he said he didn't meet with a person he saw every day

21   on the street for three whole months after this

22   killing, didn't talk to them about these events?

23   What occurred here was Mr. Maysonet, Rosa

24   Bello, and Mr. Cruz talked about this case and Rosa

89

JGS_MAYSONET 4518
GONZALEZ 0170223

1 Bello told you she saw a .09 millimeter which she

2 recognized from a book.

3       Mr. Cruz told the State's Attorney "the four

4 of us went to that house." Mr. Cruz didn't tell

5 anybody that Mr. Gonzalez made a statement saying, "I

6 killed somebody."

7       What happened was they all got together, they

8 got their stories straight.

9   MR. MAREK: Objection. There is no evidence of

10 that.

11   MR. WIENER: It is a fair inference from the

12 evidence, Judge. I think I have a right to argue it.

13   THE COURT: There is no evidence they ever got

14 together. The evidence was quite the opposite.

15   MR. WIENER: The evidence was, Judge, that the

16 defendant saw them together on numerous occasions

17 after May 25th; he saw them cruising around and he saw

18 them on the street contrary to the testimony of Mr.

19 Cruz.

20   THE COURT: I believe the evidence was some two

21 weeks later.

22   MR. WIENER: Yes, and Mr. Cruz said he never was

23 with Maysonet after May 25th until the day of his

24 arrest.

90

JGS_MAYSONET 4519
GONZALEZ 0170224

1          THE COURT:  Jury instructed to disregard any

2     argument not based on the evidence or fair inferences

3     of the evidence.

4          You may proceed.

5          MR. WIENER:   Mr. Gonzalez told you that he saw

6     after two weeks of staying in the house Mr. Cruz and

7     Mr. Maysonet together on a number of occasions after

8     May 25th, 1990.

9          Mr. Cruz told you he was never with

10    Mr. Maysonet again.

11         I ask you to use your common sense, ladies

12    and gentlemen.

13         Mr. Maysonet, Mr. Cruz, not only were they

14    together but when they were arrested Mr. Cruz gave a

15    version of facts that he gave in this courtroom and

16    the State said that,"Oh, he didn't make a deal on

17    August 24th of 1990." But the State's own question to

18    him was:

19         "When did we first come to you through your

20         attorney, Mr. Vahey?"

21         "In January of 1992."

22         "Did you take the deal?"

23         "No."

24          "Mr. Cruz, why didn't you take the deal?

91

1      Was it because you just didn't want to testify or

2      was it before they offered you more years?"

3          "They offered me more years."

4           "How many more years did they offer you?"

5          "They offered me 25 years."

6          "And wasn't it until March 13th of 1992, that

7      they offered you 22 years?"

8          "Yah."

9           "That is when you decided to testify?"

10          "Yah."

11          Is he testifying to the truth or is he

12      testifying because he is not going to be put to death,

13      he won't have to spend the rest of his life in prison?

14          You know, you can talk about doing your

15      service to the community and giving a message to gangs

16      but this man's life is here before you --

17      MR. MAREK:  Objection.

18      MR. WIENER: -- he is the defendant.

19      THE COURT:  Sustained.

20          The jury is instructed to disregard.

21      MR. WIENER:  This is the defendant.  It is his

22      case.  He is on trial.  He took the witness stand.

23      There was no impeachment of what he said.

24          The State's Attorney who he said he testified

JGS_MAYSONET 4521

GONZALEZ 0170226

1    before was not brought forward to say that he said

2    something different.

3          The questions that Mr. Marek asked him about

4    a fence were questions that the Judge sustained

5    because there was no testimony and no questioning that

6    in any way indicated Mr. Gonzalez said anything about

7    a fence.

8          It was the State's Attorney's question, not

9    Mr. Gonzalez's answer.

10          Ladies and gentlemen, I ask you to view the

11    testimony of Mr. Cruz with more than suspicion, to

12    think about what he is getting in return for that

13    testimony.

14          He is -- He is a free man after 11 years in

15    custody compared to what he would have gotten had he

16    not testified here today.

17          Does that make it the truth?  No.  It makes

18    it a lifesaving experience for Mr. Cruz.

19          I ask you to go back to the jury room and

20    find Alfredo Gonzalez innocent.  That man, as

21    Mr. Leighton said, is a human being.  He is innocent

22    of the charges.

23          Thank you very much.

24    THE COURT:  Thank you very much, Mr. Wiener.

JGS_MAYSONET 4522
GONZALEZ 0170227

```
 1            State?

 2

 3                    REBUTTAL ARGUMENT

 4            By: MR. MAREK

 5

 6      MR. MAREK:  Ladies and gentlemen, let's get back

 7   to the reality of this situation.

 8            In the early morning hours of May 25th, 1990,

 9   two young men, Kevin Wiley and Torrence Wiley, were

10   both shot dead with a burst of gunfire by this man.

11   Two more victims of urban violence.  Two more victims

12   gunned down on the mean streets of Chicago by this

13   defendant and his fellow Latin Kings.  Two more

14   victims left to lie there and die in their own blood.

15            Now, ladies and gentlemen, among the

16   instructions that you are going to receive from her

17   Honor Judge Morgan, would be this:  "You should

18   consider all the evidence in the light of your own

19   observations and experience in life."

20            What that is often referred to is the common

21   sense instruction.

22            You have heard a lot already about common

23   sense and you will probably hear about it some more

24   but basically jury service is common sense.
```

94

1         Ask yourself the common sense questions that

2  arise, that this case is replete with.

3         First of all defendant comes into the police

4  station on August 23rd, 1990. Who is already there?

5  Jose Maysonet. Jose Maysonet is a witness to his

6  crime. So what does the thinking man's criminal do?

7  He makes himself a witness and makes Jose Maysonet the

8  shooter.

9         Good plan so far. The only problem is it

10  falls apart when Justino Cruz comes in and puts the

11  lie to what he has said.

12         Justino Cruz, his nephew, comes in and

13  identifies him as the shooter.

14         Ladies and gentlemen, they have yet to come

15  up with an explanation for why Justino Cruz would make

16  his uncle the shooter if it wasn't so.

17         Jose Maysonet and Mr. Gonzalez are both in

18  the police station. He can name either one as the

19  shooter. Who does he name? His uncle.

20         If he doesn't like one of those two why not

21  Fro, who is not there and can't put anything back on

22  him?

23         Of all the people he could possibly name he

24  picks his uncle?

JGS_MAYSONET 4524
GONZALEZ 0170229

1          Ladies and gentlemen, is that consistent with

2     common sense?  Is that consistent with your experience

3     in life?

4          If it is true that his uncle is only a

5     witness to this crime you would think that he would be

6     glad to tell the police that; wouldn't he?  No.  He

7     makes his uncle the shooter.

8          As my partner brought out, this is long

9     before there is any talk of him ever testifying as a

10    State's witness.  This is long before he can ever

11    possibly have contemplated that scenario.

12         Back then he is saying "my uncle; my uncle

13    had the gun as the shooter."

14         Ladies and gentlemen, the criminal has to be

15    kept in mind.  It has to be kept in mind that the

16    criminal or criminals are always witnesses to their

17    own crime.  Where there are no conventional witnesses

18    to a crime such as this and the only surviving

19    witnesses are fellow Latin Kings it is often necessary

20    to go into his ballpark for witnesses.

21         Yes, we did have to make an agreement with

22    Justino Cruz for his truthful testimony.  And, ladies

23    and gentlemen, we don't make any excuses for that.  We

24    don't make any apologies for that.   That was

96

JGS_MAYSONET 4525
GONZALEZ 0170230

1    necessary so that you could hear his testimony.

2          Keep in mind who chose Justino Cruz as a

3    witness.  Did the police choose him?  Did the State's

4    Attorney's Office choose him?  Who chose him?  This

5    guy did.  This guy thought he could commit a double

6    murder in front of Justino Cruz and his fellow Latin

7    King gang members and get away with it.

8          Ladies and gentlemen, you will decide if he

9    was right.  Whatever else, whatever else can be said

10   about Justino Cruz he at the very least has accepted

11   his responsibility for this crime.  His responsibility

12   does not have to be forced upon him like someone else

13   who is in this courtroom.

14         Ladies and gentlemen, when Mr. Gonzalez for

15   reasons known only to him fired the fatal bullet into

16   the neck of Kevin Wiley, a bullet which went through

17   the larynx causing him to drown in his own blood, when

18   Mr. Gonzalez fired a bullet into the chest of Torrence

19   Wiley, a bullet which pierced his heart, caused him to

20   fall to the ground and then as he was helpless and

21   defenseless, fired another shot -- it was not enough

22   to shoot him in the chest, he had to mutilate him as

23   well -- when he did that, ladies and gentlemen, he

24   deprived us of the best witnesses against him.

JGS_MAYSONET 4526
GONZALEZ 0170231

1      Because he deprived us of the best witnesses

2   it is easy, it is easy for him to come in here and

3   attack the evidence he left behind.

4      Counsel argues to you there is no physical

5   evidence to connect the defendant to the crime scene.

6   Well, first of all, ladies and gentlemen, after having

7   heard his testimony there is no doubt that he was at

8   the crime scene. He was there that night. There can

9   be no doubt about that.

10      MR. WIENER: I didn't argue to connect with him

11   the crime scene, Judge. That was not my argument. I

12   object.

13      THE COURT: The jury heard the arguments.

14      MR. MAREK: Keep in mind, ladies and gentlemen,

15   what evidence is left at the crime scene. Who decides

16   what evidence is left behind? The criminal decides

17   that, just like he decides who the witnesses will be.

18      The police don't decide what evidence is

19   going to be left behind.

20      The State's Attorney's office does not decide

21   what evidence is going to be left behind. He did,

22   together with his fellow offenders.

23      If there is no evidence left behind it is

24   because this was a well executed operation by a street

JGS_MAYSONET 4527
GONZALEZ 0170232

1   gang organization and they are good at what they do.

2          Counsel argues to you the pictures do nothing

3   to show that Alfredo Gonzalez committed a crime.

4   Well, let's see if that is true.

5          First off, first off, ladies and gentlemen,

6   you heard, just heard the testimony of Det. Guevara

7   about where this guy indicated the car was parked when

8   he went out to the crime scene and take a look.  Take

9   a look at the point of view.  It is obvious that you

10  can't see the second body.  You cannot see the body

11  which is on North Avenue in front of the building.

12         Now, why does it become important?  It

13  becomes important when now he gets on the witness

14  stand and says, "oh, no the car wasn't parked there at

15  all.  When I saw the bodies actually the car was

16  parked over by the T in the alley," and he marked

17  where it was,"and then we pulled out over here onto

18  Kimball and we stopped at the light and then I looked

19  over onto North Avenue and I saw the bodies."

20         Okay, okay.  Let's deal with that for a

21  second.  You are going to see this photo.  You have

22  seen it already.  You can look at the position of the

23  bodies.  Let's just go with that version for the

24  moment.

99

JGS_MAYSONET 4528
GONZALEZ 0170233

1      That means he is going to -- they are going
2  to be parked, the crosswalk is behind the buildings
3  here.  They are going to be parked back there.  There
4  is no way while, even if the car is the first car at
5  the light, there is no way he can see onto North
6  Avenue.  That is even if we assume that he has a view
7  unobstructed by Justino Cruz.
8      But remember, he is behind the driver which
9  means Cruz is to his right.  He has to look out onto
10 North Avenue past Justino Cruz.
11     Remember, why would he even look onto North
12 Avenue in the first place?  He doesn't know, he does
13 not know first of all if anybody has been shot.  Is he
14 looking at North Avenue for bodies?
15     I suggest to you he wouldn't be.  Let's buy,
16 let's buy what he says for a moment.  He is looking
17 onto here.  There is only one possibility and that
18 would be as the car comes by and makes its turn and
19 maybe he has a second.  That is if he has an
20 unobstructed view and that is if he even knows exactly
21 where to look for those two bodies.
22     Ladies and gentlemen, I submit to you the
23 pictures do show that Alfredo committed a crime.
24     Why is he able to say, why is he able to go

JGS_MAYSONET 4529
GONZALEZ 0170234

1  and point out that there is bodies?  He knows -- The

2  obvious reason he knows there are two bodies is

3  because he shot two men.  That is why he knows there

4  is two bodies.

5        Now contrast that with what Mr. Cruz told

6  you.  As I have said before that is his witness not

7  ours.  Contrast that -

8      MR. WIENER:  Objection, your Honor.

9        Mr. Cruz is a State witness and counsel knows

10  it.

11    THE COURT:  I am sure the jury knows that, too.

12  This is argument counsel.

13    MR. MAREK:  Contrast it with what Mr. Cruz says.

14  He says to you that this is basically the view of the

15  scene that he has.  He is standing by the garage.  The

16  car is parked a little bit west of this garage.

17        Doesn't it make sense they would park it

18  behind the garage so it can't be seen through the

19  vacant lot on North Avenue?

20        He is standing there.  He can see basically

21  this view on North Avenue.  He hears four or five

22  shots.  Then he looks and what does he see?  One body.

23  That is all he ever said he saw; one body.

24        If you look at the photo of the position of

101

JGS_MAYSONET 4530
GONZALEZ 0170235

1    the body you know from that point of view, from that

2    line of sight that is all he would have been able to

3    see.

4            Now doesn't that indicate that he is in fact

5    standing back here by the alley acting as the lookout

6    the way he said?

7            Do you think Justino Cruz if he really walked

8    up to both of these young men as this guy would have

9    you believe would know the sight lines in the alley so

10   well that he can make up a story, that he can come in

11   here and testify falsely and think ahead so much that

12   he can say "I could have only seen one body" when you

13   know if what Gonzalez says is true he would have had

14   to see both of them?

15      MR. WIENER:  Objection, Judge.  Mr. Gonzalez said

16   he didn't know where Mr. Cruz was.

17      THE COURT:  Counsel, this is argument.  The jury

18   will disregard any argument not based on the evidence.

19      MR. MAREK:  Ladies and gentlemen, if Mr. Cruz was

20   not exactly where he tells you he is he would have

21   fallen into the same trap the defendant fell into and

22   that is he would have said, I saw two bodies from

23   there because he would have known there were two

24   bodies.

JGS_MAYSONET 4531
GONZALEZ 0170236

1    The reason he says he saw two bodies is
2  because he knows there is two bodies and because he
3  shot them.

4    The pictures do nothing to show that Alfredo
5  Gonzalez committed a crime?  I suggest to you
6  otherwise.

7    Counsel asks how does Jose Maysonet possibly
8  know where to drive.  Well, keep in mind the testimony
9  is that Fro and Tino Cruz are in the living room
10 watching TV and Alfredo Gonzalez and Jose Maysonet are
11 together.

12    You don't think they had a chance to talk
13 together about what the plan was going to be, what
14 Maysonet's part was going to be?

15    Counsel argues to you Mr. Cruz, somehow Mr.
16 Cruz, he didn't see Jose Maysonet from May 24, 1990,
17 to August 24, 1990.

18    Well, is that a surprise?  You think maybe
19 Jose Maysonet is laying low?

20    Keep in mind who said he didn't go out on the
21 streets for two weeks after this?  The witness.  The
22 witness stays holed up for two whole weeks.  Why
23 wouldn't Jose Maysonet do likewise?

24    Ladies and gentlemen, jury service is common

103

1    sense business.

2           Now you heard and saw the defendant,

3    Gonzalez, get on the witness stand earlier today.  I

4    submit to you one of the few things on cross

5    examination that he gave a definite answer to was the

6    time he left his girlfriend's house.

7           Now put that together with all the evidence

8    in the case keeping in mind Officer Montalvo told you

9    that he got there at 1:20 a.m. and saw these victims

10   die.

11          If you can be reasonably sure that that time

12   is accurate, 1:20, and he is there, you know he is

13   there real soon after the crime occurred.

14          However long it took for somebody to hear

15   shots, call the police, and for him and his partner to

16   drive the distance which he said took maybe ten

17   seconds he is there within a few minutes and he is

18   there at 1:20.  What does he say?  "11:20 P.M. I left

19   my girlfriend's and I walked about a block and then I

20   got picked up."

21          Well, you think maybe it took at the most

22   five minutes to walk that block?  Not very likely.

23   Let's say it took him five minutes.  Maybe it took

24   five more minutes to drive to the crime scene.  Of

JGS_MAYSONET 4533

GONZALEZ 0170238

1    course he does not know; well he doesn't know.

2           It couldn't have taken more than that. You

3    are in a car at 11:30 and driving four or five blocks.

4    He would be at the crime scene within five, ten

5    minutes.

6           He would be there at 11:30, which is an

7    hour-and-a-half before it happened.

8           What is the significance of 11:30 p.m.? Put

9    that together with what you know must really have

10    happened based on the testimony of Mr. Cruz.

11           Mr. Cruz gets off at 11:00 o'clock and it is

12    close to midnight or later before he is in the

13    neighborhood.

14           Now you know, you know that when Mr. Cruz is

15    picked up by Fro and Alfredo Gonzalez they have had

16    contact with the victims already or at the very least

17    they have seen him there. So you know that he and Fro

18    are out in the neighborhood even before Justino Cruz

19    is picked up.

20           Then they have to go to Maysonet's house.

21    That takes a while. Then they have to drive to the

22    scene. So, yes, yes it probably was 11:30 when he

23    left his girlfriend's house.

24           Does that help him? It probably was 11:30,

JGS_MAYSONET 4534
GONZALEZ 0170239

1    yes.  He probably did ask her what time it was.  It is

2    one of the few things he was definite about.

3          Do you think, do you think he really

4    remembers the color of the hooded sweatshirt everybody

5    else wore but does not remember if he was wearing the

6    same type of attire?

7          I mean isn't it obvious he remembers what he

8    wants to remember and forgets what he wants to forget?

9          Keep in mind something else.  Who is the

10   veteran Latin King here?  Tino.  This guy is a 14-year

11   veteran of that organization, ladies and gentlemen.

12         He gets into a car with somebody who has a

13   gun, some guys who put their hoodies up, drive into a

14   dark alley, turn off the engine, turn off the lights

15   and get out and he would have you believe he is not

16   the least bit concerned about what is going to happen

17   -- this 14-year veteran of this organization?

18         Common sense, ladies and gentlemen.  It all

19   turns on common sense.

20         Now, let's look one more time at this route

21   that he now says, he now says they drove.

22      MR. WIENER:  Objection.  There is no testimony.

23   He said earlier that he didn't drive that route,

24   Judge.

JGS_MAYSONET 4535
GONZALEZ 0170240

1    THE COURT:  Counsel, this is argument.

2         Overruled.

3    MR. MAREK:  Now, ladies and gentlemen, remember

4    when he talked to -- Det. Guevara went out to the

5    crime scene, he indicated the car was pointed west

6    towards St. Louis?  And that is basically where

7    Justino Cruz says the car is and that is consistent

8    with the escape route he testified.

9         He said they told -- He said they went to St.

10   Louis, back to Wabansia, all the way back to Kedzie.

11        Now he says they came out here, stopped at

12   North Avenue and made a left onto North Avenue.

13        I suggest to you, ladies and gentlemen, if

14   that was the route they would have run right into

15   Montalvo and his partner responding to that call.

16        But also just look for a moment where he puts

17   his letter O.  If there is any doubt in your mind he

18   would have had an unobstructed view of North Avenue

19   even where he puts the O you wouldn't have seen those

20   bodies.  Just an aside.

21        Now Rosa Bello.  Rosa Bello, ladies and

22   gentlemen, once again is not somebody we choose as a

23   witness.

24   MR. WIENER:  Objection, your Honor.

107

1      THE COURT: Counsel, this is argument. He may

2    comment. Go ahead.

3      MR. MAREK: I submit to you that they believed

4    rightly or wrongly Rosa Bello was somebody that would

5    honor the Latin King code of silence.

6      MR. WIENER: I object. There is no evidence to

7    that statement by Mr. Marek at all.

8      THE COURT: Counsel, overruled.

9        Record is replete with Latin Kings.

10     MR. MAREK: She was somebody they thought they

11    could count on to keep her mouth shut so it was okay

12    for them to go over to her house and have her be a

13    witness as to who had the gun and who was all there.

14        Ladies and gentlemen, we didn't choose her,

15    but think about this. If she is protecting Jose

16    Maysonet as they would have you believe does she

17    really have to put Alfredo Gonzalez at her apartment

18    to protect Jose Maysonet? Is it really necessary to

19    do that? Who is that harmful to except the defendant?

20    And it is really only harmful to him because he says

21    he was never there.

22        I mean, that is the thrust of her testimony.

23    She puts him there. She puts him there leaving with

24    the gun. But the fact is he is there and there is no

JGS_MAYSONET 4537
GONZALEZ 0170242

1  reason for her to put him there if he wasn't there.
2  Think about it.

3      She was talked to after Jose Maysonet.
4  Detective Guevara told you that.  She was in the
5  police station before he was found -- before he was
6  found.  All she has to do is say, "I don't know what
7  you are talking about," or put it on somebody else if
8  her goal is to free Maysonet.

9      She doesn't have to pick somebody who wasn't
10  at the apartment and put him into it.  God only knows
11  where he could have been that night if he really
12  wasn't at her apartment.

13      Why doesn't he want to be there?  Ask
14  yourself that.  Again, common sense.  He does not want
15  to be there because it makes him part and parcel of
16  the plan.  He wants you to believe that he is just a
17  witness given a ride by a roving band of a assassins,
18  ladies and gentlemen.  This roving band of assassins
19  just happens to take him to the crime scene.

20      Of all the places in the universe he could
21  have been taken by this roving band of assassins they
22  happen to take him to the scene of a double homicide?

23      There was a bus he could have used.  There
24  was a cab he could have used.  But, he happened to get

JGS_MAYSONET 4538
GONZALEZ 0170243

1   a ride from a roving band of assassins.

2        They might have thought it was a neat idea;

3   let's pick up a passenger, drive to the scene, have a

4   double homicide and drop him off home.

5        Ladies and gentlemen, ask yourself what do

6   you think are the chances that you or anyone else is

7   going to climb into an automobile and then be driven

8   to the scene within minutes of a double homicide?  It

9   doesn't happen that way.

10        Ladies and gentlemen, this was written, this

11   was directed, this was choreographed and it was

12   masterminded by Mr. Gonzalez together with his

13   co-offenders.

14        Ladies and gentlemen, this is not

15   happenstance at work here.  This is homicide.  This is

16   not bad luck for Alfredo Gonzalez.  It was bad luck

17   for Torrence Wiley and Kevin Wiley.

18        Now, ladies and gentlemen, in any kind of a

19   case, in any kind of a prosecution the evidence is

20   like a house.  Like a house it is constructed brick by

21   brick and just like a house has to be viewed as the

22   sum total of all of the -- its bricks.

23        The evidence against the defendant has to be

24   viewed in its entirety;  be viewed as a whole.

JGS_MAYSONET 4539
GONZALEZ 0170244

1    Now, it is easy for the defense to pick apart

2    each of the bricks and say, huh, this is just a brick;

3    this isn't a house.  This is just a brick; this isn't

4    a house.  But you have to view it in its entirety.

5    You have to view the testimony of Rosa Bello together

6    with the testimony of Justino Cruz.  You have to view

7    the testimony of all the police officers including

8    Det. Guevara when he gets on the stand and tells you

9    where the defendant indicated he was looking back in

10   August.

11       Ladies and gentlemen, as I said before jury

12   service is common sense business.

13       At this time I ask each of you to rely upon

14   your experience and your observations in life,

15   carefully assess all of the evidence.

16       When you do that, ladies and gentlemen, I

17   submit to you that you will come to the conclusion

18   there is only one verdict supported by the evidence.

19   And, ladies and gentlemen, by that verdict you can say

20   to this defendant that our laws, the laws of the

21   decent, civilized people apply at North Avenue and

22   Kimball just like they apply on every street corner of

23   this community.

24       You can say to Mr. Gonzalez and his fellow

JGS_MAYSONET 4540
GONZALEZ 0170245

1   Latin Kings that our laws apply, not the laws of the
2   jungle, not the laws of the Latin King nation.
3           Ladies and gentlemen, on May 24th of 1990,
4   when Mr. Gonzalez turned North Avenue and Kimball into
5   a free fire zone he violated the law of the State of
6   Illinois against first degree murder.  He violated it
7   in the case of Torrence Wiley and he violated it in
8   the case of Kevin Wiley.  But he also, he also
9   violated a law as old as human civilization itself --
10  thou shalt not kill.  Thou shalt not kill.
11          Ladies and gentlemen, based upon the law,
12  based upon the evidence, I ask you to find the
13  defendant guilty of the first degree murder of Kevin
14  Wiley and guilty of the first degree murder of
15  Torrence Wiley, his brother.
16          Thank you.
17      THE COURT:  Thank you, Mr. Marek.
18          "Members of the jury, the evidence and
19  arguments in this case have been completed, and I now
20  will instruct you as to the law.
21          The law that applies to the case is stated in
22  these instructions and it is your duty to follow all
23  of them.  You must not single out certain instructions
24  and disregard others.  When I use the word "he" in

JGS_MAYSONET 4541
GONZALEZ 0170246

these instructions I mean a male or a female.

It is your duty to determine the facts, and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case.

You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberation. It is the function of the trial judge to determine the sentence should there be a verdict of guilty.

Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry.

From time to time it has been the duty of the court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. You should disregard questions and exhibits which were withdrawn or to which objections were sustained.

Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

You should disregard testimony and exhibits which the Court has refused or stricken.

113

JGS_MAYSONET 4542
GONZALEZ 0170247

1    The evidence which you should consider
2    consists only of the testimony of the witnesses and
3    the exhibits which the Court has received.
4    You should consider all the evidence in the
5    light of your own observations and experience in life.
6    Neither by these instructions nor by any
7    ruling or remark which I have made do I mean to
8    indicate any opinion as to the facts or as to what
9    your verdict should be.
10    Faithful performance by you of your duties as
11    jurors is vital to the administration of justice."
12
13    "You are the sole judges of the believability
14    of the witnesses and of the weight to be given to the
15    testimony of each of them.  In considering the
16    testimony of any witness you may take into account his
17    ability and opportunity to observe, his memory, his
18    manner while testifying, any interest, bias, or
19    prejudice he may have and the reasonableness of his
20    testimony considered in the light of all the evidence
21    in the case.
22    You should judge the testimony of the
23    defendant in the same manner as you judge the
24    testimony of any other witness."

114

JGS_MAYSONET 4543
GONZALEZ 0170248

1

2      "Opening statements are made by the attorneys
3  to acquaint you the facts they expect to prove.
4  Closing arguments are made by the attorneys to discuss
5  the facts and circumstances in the case, and should be
6  confined to the evidence and to reasonable inferences
7  to be drawn from the evidence.
8      Neither opening statements nor closing
9  arguments are evidence and any statement or argument
10 made by the attorneys which is not based on the
11 evidence should be disregarded."

12

13     "The defendant is charged with the offense of
14 First Degree Murder of Torrence Wiley and Kevin Wiley.
15 The defendant has pleaded Not Guilty."
16     "The indictment in this case is the formal
17 method of accusing the defendant of an offense and
18 placing him on trial.  It is not any evidence against
19 the defendant and does not create any inference of
20 guilt."

21

22     "The defendant is presumed to be innocent of
23 the charge against him.  This presumption remains with
24 him throughout every stage of the trial and during

115

JGS_MAYSONET 4544
GONZALEZ 0170249

1   your deliberations on verdict, and is not overcome

2   unless from all the evidence in the case you are

3   convinced beyond a reasonable doubt that the defendant

4   is guilty."

5

6          "The State has the burden of proving the

7   guilt of the defendant beyond a reasonable doubt and

8   this burden remains on the State throughout the case.

9   The defendant is not required to prove his innocence."

10

11         Circumstantial evidence is the proof of facts

12  or circumstances which give rise to a reasonable

13  inference of other facts which tend to show the guilt

14  or innocence of the defendant.  Circumstantial

15  evidence should be considered by you together with all

16  the other evidence in the case in arriving at your

17  verdict."

18

19         "An attorney has the right to interview a

20  witness for the purpose of learning the testimony the

21  witness will give.

22         When a witness says he was involved in the

23  commission of a crime with the defendant the testimony

24  of that witness is subject to suspicion and should be

116

JGS_MAYSONET 4545
GONZALEZ 0170250

1  considered by you and should be carefully examined in
2  the light of the other evidence in the case."

3

4      "A person commits the offense of First Degree
5  Murder when he kills an individual;
6      if in performing the acts which caused the
7  death he intends to kill or do great bodily harm to
8  that individual or another; or
9      he knows that such acts will cause death to
10 that individual or another; or
11     he knew that such acts create a strong
12 probability of death or great bodily harm to that
13 individual or another."

14

15     "To sustain the charge of First Degree Murder
16 of Kevin Wiley the State must prove the following
17 propositions:
18     First:  That the defendant performed the acts
19 which caused the death of Kevin Wiley; and
20     Second:  That when the defendant did so he
21 intended to kill or do great bodily harm to Kevin
22 Wiley or he knew that his acts would cause death to
23 Kevin Wiley or he knew that his acts created a strong
24 probability of death or great bodily harm to Kevin

117

1    Wiley.

2        If you find from your consideration of all

3    the evidence that each one of these propositions has

4    been proved beyond a reasonable doubt you should find

5    the defendant guilty.

6        If you find from your consideration of all

7    the evidence that any one of these propositions has

8    not been proved beyond a reasonable doubt you should

9    find the defendant not guilty."

10

11        "To sustain the charge of first degree murder

12    of Torrence Wiley the State must prove the following

13    propositions:

14        First:  That the defendant performed the acts

15    which caused the death of Torrence Wiley; and

16        Second:  That when the defendant did so he

17    intended to kill or do great bodily harm to Torrence

18    Wiley; or

19        he knew that his acts would cause death to

20    Torrence Wiley; or

21        he knew that his acts created a strong

22    probability of death or great bodily harm to Torrence

23    Wiley.

24        If you find from your consideration of all

118

JGS_MAYSONET 4547
GONZALEZ 0170252

1   the evidence that each one of these propositions has

2   been proved beyond a reasonable doubt you should find

3   the defendant guilty.

4       If you find from your consideration of all

5   the evidence that any one of those propositions has

6   not been proved beyond a reasonable doubt you should

7   find the defendant not guilty."

8

9       "When you retire to the jury room you will

10  first elect one of your members as a foreperson.  He

11  or she will preside upon your deliberations upon your

12  verdict.

13      Your agreement upon a verdict must be

14  unanimous.  Your verdicts must be in writing and

15  signed by all of you including your foreperson.

16      The defendant is charged with two counts of

17  the offense of First Degree Murder.  You will receive

18  four forms of verdict.  As to each charge you will be

19  provided with both a Not Guilty and a Guilty form of

20  verdict."

21      Here follows then, ladies and gentlemen, the

22  four verdict forms that have thus been mentioned.

23      The first is:  "We, the jury, find the

24  defendant, Alfredo Gonzalez, Not Guilty of First

119

JGS_MAYSONET 4548
GONZALEZ 0170253

1    Degree Murder of Kevin Wiley."

2

3         "We, the jury, find the defendant, Alfredo

4    Gonzalez, Not Guilty of the murder of Torrence Wiley."

5

6         "We, the jury, find the defendant, Alfredo

7    Gonzalez, Guilty of First Degree Murder of Kevin

8    Wiley."

9

10        "We, the jury, find the defendant, Alfredo

11   Gonzalez, Guilty of the murder of Torrence Wiley."

12

13        There are 12 respective lines for your

14   respective signatures on each of those forms.

15        In each case the first line, the signature

16   line is for the foreperson.  That line is designated.

17        May we have the deputies sworn; Deputy Soto,

18   Deputy -- and the other deputy?

19

20        (Whereupon the deputies were sworn.)

21

22     THE COURT:  Check and see if Mr. Anderson has

23   anything in the jury room before the jury is

24   sequestered and ask him to just step into the

JGS_MAYSONET 4549
GONZALEZ 0170254

```
 1    conference room briefly.

 2          I will be with you in a moment, Mr. Anderson.

 3       THE SHERIFF:  Everyone please rise.

 4

 5                   (Whereupon, jury retired to

 6                    deliberate upon its verdict.)

 7

 8                   (Whereupon, a discussion was had

 9                    outside the presence of the

10                    jury.)

11

12          THE COURT:  Counsel, leave your phone

13    numbers.

14

15                   *   *   *   *   *   *

16

17                   (Whereupon the jury was returned

18                    to open court.)

19

20       THE COURT:  Will the foreman please rise?

21          Mr. Foreman, has this jury reached a verdict?

22       THE FOREPERSON:  Yes, we have.

23       THE COURT:  Would you tender the verdict forms to

24    Deputy Tennent, please?
```

121

JGS_MAYSONET 4550

GONZALEZ 0170255

1          Would you publish the verdicts?

2     THE CLERK:  "We, the jury, find the defendant,

3  Alfredo Gonzalez, Guilty of First Degree Murder of

4  Torrence Wiley."

5          "We, the jury, find the defendant, Alfredo

6  Gonzalez, Guilty of First Degree Murder of Kevin

7  Wiley."

8     MR. WIENER:  Ask the jury be polled, Judge.

9     THE COURT:  Very well.

10         Poll the jury.

11    THE CLERK:  Steve Tucker, was this then and is

12  this now your verdict?

13    JUROR TUCKER:  Yes.

14    THE CLERK:  Virginia Cosby, was this then and is

15  this now your verdict?

16    JUROR COSBY:  Yes.

17    THE CLERK:  Daniel Donohue, was this then and is

18  this now your verdict?

19    JUROR DONOHUE:  Yes.

20    THE CLERK:  Carrie Burnside, was this then and is

21  this now your verdict?

22    JUROR BURNSIDE:  Yes.

23    THE CLERK:  James Sullivan, was this then and is

24  this now your verdict?

JGS_MAYSONET 4551
GONZALEZ 0170256

1     JUROR SULLIVAN:  Yes.

2     THE CLERK:  Juanita Owens, was this then and is

3     this now your verdict?

4     JUROR OWENS:  Yes.

5     THE CLERK:  Jerilynn Dorsey, was this then and is

6     this now your verdict?

7     JUROR DORSEY:  Yes.

8     THE CLERK: Ronald Kozinski, was this then and is

9     this now your verdict?

10    JUROR KOZINSKI:  Yes.

11    THE CLERK:  William Serritella, was this then and

12    is this now your verdict?

13    JUROR SERRITELLA:  Yes.

14    THE CLERK:  Daniel Hansen, was this then and is

15    this now your verdict?

16    JUROR HANSEN:  Yes.

17    THE CLERK:  Marian Egel, was this then and is this

18    now your verdict?

19    JUROR EGEL:  Yes.

20    CLERK:  Steve Wyczesany, was this then and is this

21    now your verdict?

22    JUROR WYCZESANY:  Yes.

23    THE COURT:  Ladies and gentlemen of the jury, let

24    me thank you on behalf of the Circuit Court of Cook

123

JGS_MAYSONET 4552
GONZALEZ 0170257

1    County for the jury service that you have rendered.

2          I hope that you take something away from this

3    experience in participating in your court system

4    because it is your court system.

5          We come here to work every day but the system

6    does belong to the people of the County of Cook of the

7    State of Illinois.

8          I know the jury service is inconvenient,

9    interrupts your personal lives, but it is a duty we

10   all share and I commend you for having been attentive

11   during this trial and deliberating upon your verdict

12   and determining your verdict.

13         I am going to be releasing you in just a very

14   few minutes.  I want to indicate just a few things to

15   you.

16         It sometimes happens, not always, it

17   sometimes happens that the attorneys from one side or

18   the other may want to speak with you.  If they do want

19   to speak with you you should understand now that you

20   are being excused and that they are doing nothing out

21   of the way.

22         It is the practice of trial law that no

23   matter how long you have been at it it is always a

24   learning experience.  Every trial is different; every

124

JGS_MAYSONET 4553
GONZALEZ 0170258

1    jury is different.  So it is not unusual for attorneys

2    to want to speak briefly with jurors to learn because

3    it is an ongoing learning process.  That is because

4    the law is organic; it is a living thing.

5           For that reason I want you to know that

6    should you be approached by one of the attorneys they

7    are not doing anything wrong.

8           You, on the other hand, you have the right to

9    speak with them or not speak with them as you choose.

10   That is completely up to you.

11          I hope that if ever again you find that

12   little missile in your mailbox asking you to take a

13   day or two or three or four out of your life to

14   contribute to the running of your court system that

15   you again do what you did this time, which is respond,

16   make yourself available and serve.

17          I am going to be coming back in a few minutes

18   to distribute to you very small tokens of our

19   appreciation for your participation in this trial in

20   the form of certificates of jury service.

21          If you have any questions of me as the judge

22   who presided over this trial I would be more than

23   happy to try to answer them at that time.

24          You are excused.

JGS_MAYSONET 4554
GONZALEZ 0170259

1     THE SHERIFF:  Everyone please rise.

2

3          (Whereupon the jury was excused.)

4

5     MR. WIENER:  We would be asking for a Pre-Sentence

6     investigation date and a date for post-trial motions

7     and date for the hearing --

8     THE COURT:  Absolutely.

9     MR. WIENER: -- with respect to punishment.

10    THE COURT:  Pursuant to the verdict returned by

11    this jury there is judgment entered on those verdicts

12    and a PSI ordered by order of Court.

13          All bonds revoked.  I don't know what his

14    bond is now but all bonds will be revoked.

15          This matter will go over order of court to

16    April 30 for the filing of post-trial motions and for

17    sentencing.

18          PSI is ordered.

19          Again, Mr. Marek, I know that you will be

20    back here tomorrow.  You will have to remember to let

21    probation know that there is a PSI --

22    MR. MAREK:  Yes, Judge.

23    THE COURT:  -- that needs to be done.

24          April 30th will be the date.

126

JGS_MAYSONET 4555
GONZALEZ 0170260

1      MR. WIENER:  May I have a moment with my client?

2      THE COURT:  Sure.

3

4                   (Which were all the proceedings had

5                   at the hearing of the above-entitled

6                   cause, at which time case was

7                   continued to April 30, 1992.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

127

JGS_MAYSONET 4556
GONZALEZ 0170261

1    STATE OF ILLINOIS   )

2                      )

COUNTY OF COOK     )

3

4       I, ROCHINA V. DeBartolo, Official Court

5  Reporter of the Circuit Court of Cook County, County

6  Department-Criminal Division, do hereby certify that I

7  reported in shorthand the proceedings had in the

8  above-entitled cause, that I thereafter caused to be

9  transcribed into typewriting the above Report of

10  Proceedings, which I hereby certify is a true and

11  correct transcript of the proceedings had before the

12  Honorable LORETTA HALL MORGAN, Judge of said Court.

13

14

15

16            Official Court Reporter of the

17            Circuit Court of Cook County

18

19

20

21

22

23

24

JGS_MAYSONET 4557

GONZALEZ 0170262