*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 52

Identify and describe all property or possible evidence recove  the end of the Narrative in column form. Show exactly where found,   found, who found it and its description (include Property
Inventory numbers). If property taken was scribed for Operat    entification, indicate I.D. number at end of Narrative. Offender's app    ate description, if possible, should include name if known,
nickname, ex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 4. DATE OF ORIG. OCCURRENCE–TIME | | |
|---|---|---|
| * DAY | MO. | YR. |
| 25 May | 1990 | 0100 |

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1. UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE ⬚1 VERIFIED ⬚2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 3428 W. North Ave. | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒1 YES ⬚2 NO | IF NO, CORRECT ALL VICTIM INFOR-MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED ⬚1 YES ☒2 NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | | | | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | 4 |

| CIRCUMSTANCE | 11. ☒☒VERI- FIED ⬚ UPDATE TO | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | | 17. SAFE BURGLARY METHOD | | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NOS. | | CODE NO. | | CODE NO. |

| 19. PROPERTY | ⬚ VERIFIED ⬚ UPDATE TO | DESCRIBE PROPERTY IN NARRATIVE. T = TAKEN;    R = RECOVERED | | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT. | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1 MONEY ⬚ T  $ ⬚ R | 2 JEWELRY ⬚ T  $ ⬚ R | 3 FURS ⬚ T  $ ⬚ R | 4 CLOTHING ⬚ T  $ ⬚ R | 7 OFFICE EQUIPMENT ⬚ T  $ ⬚ R | 8 TV, RADIO, STEREO ⬚ T  $ ⬚ R |
| | | 5 HOUSEHOLD GOODS ⬚ T  $ ⬚ R | 6 CONSUM. GOODS ⬚ T  $ ⬚ R | (1) FIREARMS ⬚ T  $ ⬚ R | 8 NARC./DANGEROUS DRUGS ⬚ T  $ ⬚ R | 5 OTHER ⬚ T  $ ⬚ R | 9 NONE ⬚ T ⬚ R |

| VICTIMS UPDATE ONLY | | 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN-JURED YES  NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|---|
| | 1. | | | | | | | | |
| | 2. | | | | | | | | |
| | 3. | | | | | | | | |

| OFFENDERS UPDATE ONLY | | 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|---|---|
| | 1. | GOSENS, Christopher | Illinois State Penitentiary | M/4/20 | 6-00 | 175 | Brn | Blk | Med |
| | 2. | | Menard | | | | | | |

| | 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | IOFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|---|
| OFF. 1 | 9097-674 | 885625 | OFF. 2 | | | 1 | | 652 |

| 33. OFF'S. VEHICLE  YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|
| ⬚ USED ⬚ STOLEN | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☒ DNA | ⬚ 2 VERIFIED | ⬚ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS | | |
|---|---|---|---|---|---|---|---|
| DNA | | | ☒1 FIELD ⬚ 3 SUMMARY | 652 | ⬚0 PROGRESS | ⬚1 SUSPENDED | ⬚2 UNFOUNDED |

| STATUS CONT'D. | | | | | 54. IF CASE CLEARED, HOW CLEARED | | | |
|---|---|---|---|---|---|---|---|---|
| ☒3 CLRD. CLOSED | ⬚4 CLRD. OPEN | 5 EXC. ⬚ CLRD. CLOSED | 6 EXC. ⬚ CLRD. OPEN | 7 CLSD. ⬚ NON-CRIM. | ☒1 ARREST & PROSEC. | ⬚2 DIRECTED TO JUV. CRT. | ⬚3 COMPL. RFUSD. TO PROSECUTE | ⬚4 COMMUNITY ADJUSTMENT | ⬚5 OTHER EXCEPT. | ☒ADULT ⬚JUV. |

| 55. FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION. |
|---|

80. NARRATIVE

IN CUSTODY:                          GOSENS, Christopher  M/WH/Age 20, DOB ▮▮▮▮

                                     AKA FERNANDEZ, Christopher, known member of the

                                     Latin Kings Street Gang, nickname of "FRO", Currently

                                     incarcerated at the Illinois State Penitentiary Menard,

                                     Inmate #B-19893

ARRESTING DETECTIVES:                Det. E. HALVORSEN #20692, Area Five Violent Crimes

                                     Det. R. GUEVARA  #20861,              "

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED | | | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|---|---|
| | * DAY 1 | MO. May | YR. 92 | 1700 | BIEBEL | 1545 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| * Det. E. HALVORSEN | #20692 | * Det. R. GUEVARA | #20861 | Biebel |

| SIGNATURE | SIGNATURE | 95. DATE APPROVED (DAY–MO.–YR.) | TIME |
|---|---|---|---|
| | | 02 MAY 1992 | 1045 |

CPD-11.411-8 (Rev. 8/86)          * MUST BE COMPLETED IN ALL CASES

RFC-AGonzalez 000035

```
DETECTIVE DIVISION                                            1 MAY 1992
AREA FIVE VIOLENT CRIMES                                     RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                                 PAGE (2)
VICTIM: WILEY, Torrence
```

| | |
|---|---|
| DATE, TIME, LOCATION OF ARREST: | 14 April 92, 1200 hrs.  2600 S. California |
| CHARGES, COURT BRANCH AND DATE: | First Degree Murder, Chp. 38-9-1a2, per Warrant CT8697, Br. 66, 14 Apr. 92, A.S.A. REGIS, Felony Review approving. |
| NOTIFICATIONS: | A.S.A. Sue REGIS, Felony Review |
| INVESTIGATION: | On 14 April 92, the R/Dets. took custody of Christopher GOSENS at Br. 66, 2600 S. California.  GOSENS was |

arrest processed on the previously issued warrant, charging him with First Degree Murder in the homicides of Torrence and Kevin WILEY.  A.S.A. Sue REGIS, Felony Review was contacted and gave final approval for these charges.

With the arrest of Christopher GOSENS, all four persons involved in the murders of Torrence and Kevin WILEY have been arrested and charged.

It is requested that this case be filed, CLEARED BY ARREST/CLOSED.

```
Det. E. HALVORSEN #20692
Det. R. GUEVARA   #20861
```

RFC-AGonzalez 000036

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operati... ntification, indicate I.D. number at end of Narrative. Offender's app... ate description, if possible, should include name if known, nickname, 2£>, race code, age, height, weight, color eyes & hair, ...lexion, scars, marks, etc. If suspect is arrested, give name, sex, race c... ge, C.B. or I.R. number, if known, and state "In Custody."

# SUPPLEMENTARY REPORT
## CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**4. DATE OF ORIG. OCCURRENCE—TIME**
DAY · MO. · YR.
25 May 1990 | 0100

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | 3. BEAT OF OCCUR. |
|---|---|---|---|
| Homicide/First Degree Murder | 0110 | 3428 W. North Ave. | 1422 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| WILEY, Torrence | ☒ YES ☐ NO | | ☐ YES ☒ NO | 5535 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Street | 304 | 2 | 4 |

| 11. ☐ VERIFIED | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP |
|---|---|---|---|---|---|---|---|
| ☐ UPDATE TO | CODE NOS. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. | CODE NO. |

19. DESCRIBE PROPERTY IN NARRATIVE. T – TAKEN;  R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| PROPERTY ☐ VERIFIED | 1 MONEY ☐ T $ ☐ R | 2 JEWELRY ☐ T $ ☐ R | 3 FURS ☐ T $ ☐ R | 4 CLOTHING ☐ T $ ☐ R | 7 OFFICE EQUIPMENT ☐ T $ ☐ R | 8 TV, RADIO, STEREO ☐ T $ ☐ R |
|---|---|---|---|---|---|---|
| ☐ UPDATE TO | 9 HOUSEHOLD GOODS ☐ T $ ☐ R | 0 CONSUM. GOODS ☐ T $ ☐ R | I-I FIREARMS ☐ T $ ☐ R | & NARC./DANGEROUS DRUGS ☐ T $ ☐ R | 5 OTHER ☐ T $ ☐ R | 6 NONE ☐ T ☐ R |

### VICTIMS UPDATE ONLY

| | 20. NAME (LAST—FIRST—M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN JURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | |
| 2. | | | | | | | | |
| 3. | | | | | | | | |

### OFFENDERS UPDATE ONLY

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A NO. | OFFENDER I REL CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A NO. | OFFENDER 32. NO. ARREST, REL. CODE RSTED/UNIT NO. |
|---|---|---|---|---|---|
| OFF 1 | | | | | |
| | | OFF. 2 | | | |

DATA ENTERED DD AREA 5

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| ☐ USED ☐ STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | ☒ 1 DNA | ☐ 2 VERIFIED | ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | | | ☒ 1 FIELD ☐ 3 SUMMARY | 652 | ☐ 0 PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |

STATUS CONT'D.
| ☐ 3 CLRD. CLOSED | ☒ 4 CLRD. OPEN | 5 EXC. CLRD. CLOSED | 6 EXC. CLRD. OPEN | 7 CLSD. NON-CRIM. | 54. IF CASE CLEARED, HOW CLEARED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | ☒ 1 ARREST & PROSEC. | ☐ 2 DIRECTED TO JUV. CRT. | ☐ 3 COMPL. RFUSD. TO PROSECUTE | ☐ 4 COMMUNITY ADJUSTMENT | ☐ 5 OTHER EXCEPT. | ☒ ADULT ☐ JUV. |

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

### 80. NARRATIVE

WANTED:    GOSENS, Christopher, AKA FERNANDEZ, Christopher, M/B/Age 20

DOB ▓▓▓▓▓▓   Known member of the Latin Kings Street Gang,

Nickname of "FRO",   Currently incarcerated at Illinois

State Penitentiary, Menard, Inmate #B-19893

WARRANT INFORMATION:    On 24 Mar. 92, the R/Dets. appeared before Judge

Robert BASTONE, presiding in Branch 66, and obtained

an arrest warrant for Christopher GOSENS.

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED DAY · MO. · YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| | 1 April 1992 | 1700 | John A. Kozamir | |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Det. E. HALVORSEN | #20692 | Det. R. GUEVARA | #20861 | |

SIGNATURE

95. DATE APPROVED (DAY–MO.–YR.) TIME
2 April 92 1300

CPD-11.411-B (Rev. 8/85)    *MUST BE COMPLETED IN ALL CASES

35. R.D. NO. N–234297

RFC-AGonzalez 000037

```
DETECTIVE DIVISION                                          1 APRIL 1992
AREA FIVE VIOLENT CRIMES                                    RD# N-234297

HOMICIDE/FIRST DEGREE MURDER                                PAGE (2)
VICTIM: WILLEY, Torrence
```

WARRANT INFORMATION:                     The warrant charged Christopher GOSENS
                                         with (2) counts of First Degree Murder.
                                         Warrant #CT8697, Docket #92CR-112381,
                                         Bond, none, Returnable to Br. 66.
                                         Warrant approved by A.S.A. Chris DONELLY,

NOTIFICATIONS:                           A.S.A. Chris DONELLY, Felony Review

INVESTIGATION:                           On 24 Mar. 92, the R/Dets. were informed
                                         by A.S.A. Frank MAREK of the Felony Trial
Division, that Justino CRUZ had agreed to testify for the state in the murder trial
of his uncle Alfredo GONZALEZ. Justino CRUZ also agreed to testify against Christopher
GOSENS.  Christopher GOSENS had previously been implicated in this case, but insuffici-
ent evidence existed at that time to bring charges.

                                         Armed with the testimony of Justino CRUZ,
                                         A.S.A. Frank MAREK instructed the R/Dets.
to obtain an arrest warrant for Christopher GOSENS.

                                         On 24 Mar. 92, the R/Dets. obtained approval
                                         for an arrest warrant from A.S.A. Chris DONELY,
Felony Review.  The R/Dets. then had this warrant signed by Judge Robert BASTONE.

                                         The R/Dets. were aware that Christopher GOSENS
                                         was currently an inmate at Menard State Prison,
serving a sentence for an un-related murder.  The R/Dets. contacted the Writs Unit of
the States Attorney's Office, and obtained Writ #18-49. to have Christopher GOSENS
brought to Branch 66.

                                         Christopher GOSENS is writed into Branch 66,
                                         on 14 Apr. 92. At that time he will be taken
into custody for the new warrant, and arrest processed at the States Attorney's Office.


Det. E. HALVORSEN #20692
Det. R. GUEVARA   #20861

RFC-AGonzalez 000038

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 53

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

FILED

AUG 4 1992

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

#14853

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS    )
    )
          vs.    )  NO.:  90 CR 21787
    )
JOSE MAYSONETT    )

<u>MOTION TO SUPPRESS STATEMENTS</u>

NOW COMES the Defendant, JOSE MAYSONETT, by and through his attorney, NEIL A. SPECTOR, and moves this Honorable Court to suppress as evidence herein any and all oral or written communications, confessions, statements, or admissions, whether inculpatory or exculpatory, made by the Defendant prior to, at the time of, or subsequent to his arrest in the above-entitled cause. In support thereof, the Defendant states as follows:

1. That the Defendant was arrested on August 22, 1990 in the vicinity of 2600 S. California, Chicago, IL.

2. That at relevant times, the Defendant was interrogated by law enforcement officials or a person or persons acting on their behalf.

3. That prior to such interrogation, the Defendant was not:

      a.    Informed that he had a right to remain silent;

1

CCSAO000722

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

    b.    Informed that anything he might say or do could be used against him in court;

    c.    Informed that he had a right to consult with a lawyer;

    d.    Informed that he had a right to have a lawyer present with him during the interrogation; and

    e.    Informed that, if he was indigent, he would nonetheless be provided with a lawyer by the State to be present during his interrogation.

4.    That the statements sought to be suppressed were obtained as a result of interrogation which continued after the Defendant had elected to remain silent and/or had elected to consult with an attorney prior to further questioning.

5.    That the statements sought to be suppressed were obtained as a result of interrogation which took place outside the presence of counsel and after the Defendant had been formally charged with an offense and after the appearance of counsel had been entered of record.

6.    That due to the physical, physiological, mental, educational, emotional, and/or psychological state, capacity and condition of the Defendant, he was incapable and unable to appreciate and understand the full meaning of his _Miranda_ rights and any statement was therefore not the free and

2

CCSAO000723

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

rational choice of the accused and was not made voluntarily, knowingly and intelligently in that, specifically:

a. Defendant had inhaled substantial quantities of cocaine for a sustained period of time immediately prior to his questioning; and

b. Defendant ingested an unknown quantity of the prescription drug "Lorazepam" after being taken into custody.

7. That the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against the Defendant and that such statements were, therefore, involuntary. Specifically, officers placed black leather gloves on their hands. They then placed a telephone book to the Defendant's left side, top of his head and the middle of his chest. The officers would then slam the telephone directory with a flashlight. This would cause the Defendant enormous pain while leaving no marks.

8. That the statements sought to be suppressed were obtained as a result of psychological and mental coercion illegally directed against the Defendant and that such statements were, therefore, involuntary.

9. That the statements sought to be suppressed were obtained as the product of and as the result of confronting the accused with certain evidence which had been obtained in

3

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

derogation of the Defendant's Fourth Amendment protection against illegal search and seizure.

10. That the statements sought to be suppressed were obtained as the product of and as the direct and proximate result of confronting the accused with certain material misrepresentations.

11. Therefore, that any and all communications, confessions, statements, admissions, or tests executed by the Defendant were elicited in violation of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and the Constitution of the State of Illinois.

WHEREFORE, Defendant prays as follows:

A. That the Court conduct a pretrial hearing to determine if the nature of such statements were voluntary; and

B. That this Court suppress as evidence herein any and all communications, confessions, statements, admissions, or tests, inculpatory, or exculpatory, written or oral, made

4

CCSAO000725

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

by him at the time of and/or subsequent to his being taken into custody.

Respectfully submitted,

Neil A. Spector
Attorney for Defendant Maysonett

NEIL A. SPECTOR, #14853
Attorney at Law
2020 N. Halsted Street
Chicago, IL 60614
(312) 477-0020

5

CCSAO000726

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 54

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS  )
              )
    VS         )  No. 90 CR 18187
              )
JUAN MAYSONETT      )

*FILED*
APR 22 1994
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

## MOTION TO QUASH ARREST AND TO SUPPRESS STATEMENTS

  The Defendant, Jose Maysonett, by his attorneys, Richard M. Beuke & Associates,

moves this Honorable Court to suppress as evidence in this cause any and all oral and written

communication, confessions, statements, admissions or tests, whether inculpatory or

exculpatory, alleged to have been made by the Defendant prior to, at the time of, or

subsequent to his arrest in this cause, and in support of this Motion, the following is offered:

  1.  Defendant was arrested on July 15, 1990, and charged with the offense of

attempted murder under indictment 90 CR 18419.  Defendant was housed in the Cook

County jail pursuant to that arrest until August 22, 1990, when his family posted bond and

he was released from custody.  The arresting officer on case 90 CR 18419 was Detective

Paulnitsky, Star 6503, assigned to Area 5 violent crimes.

  2.  Defendant was scheduled to and did appear in Room 101 in front of Chief

Judge Thomas Fitzgerald for arraignment on case 90 CR 18419 on August 22, 1990.  Judge

Robert Bastone assigned the Defendant's case to this Honorable Court at approximately 9:05

a.m. on August 22nd of 1990.  Prior to August 22, 1990, the Defendant had retained

attorney William Swano to represent him in that indictment.  The Defendant was instructed

to appear for his arraignment on that date in front of the Chief Judge by Mr. Swano, and he

JGS_MAYSONET 000490

would subsequently meet Mr. Swano in whatever courtroom the case was ultimately assigned to later that morning.  Pursuant to being told that his case was assigned to Judge Morgan, the Defendant in the presence of his wife, Rosa Bella, left Room 101 and while on his way to Judge Morgan's courtroom in Room 302.  Defendant was approached by Detective Paulnitsky in the hallway of the Criminal Court's Building, first floor, and placed under arrest for this case.  The Defendant was handcuffed and taken to a room on the first floor at 2650 S. California along with his wife, Rosa Bella, and subsequently transported to Area 5 violent crimes by Detective Paulnitsky.  Upon being taken into custody, the Defendant informed Detective  Paulnsky that he was scheduled to appear in Room 302 in front of this Honorable Court pursuant to his arraignment and was to meet his attorney, William Swano, in that courtroom at that time.  The Defendant requested an opportunity to go to that courtroom and meet or wait for his attorney to be present so he could discuss with his attorney the circumstances surrounding Detective Paulnitsky taking him into custody.  That request was subsequently refused, and the Defendant was transported to Area 5 violent crimes.

3.    The detention, arrest, and seizure of the Defendant was without probable cause, without a warrant, without consent, and was, therefore, illegal.

4.    At the time of his arrest, Defendant was not observed in the commission of a crime, nor did said police officer have reasonable grounds to believe that Defendant had committed an offense.

5.    Said police officer did not have reasonable grounds to believe that a warrant for the arrest of Defendant had been issued in this state or in any other jurisdiction.

6.    Subsequent to the Defendant's arrest at approximately 9:30 a.m. on August

JGS_MAYSONET 000491

22, 1990, the Defendant was interrogated by law enforcement officials or by person or persons acting in their behalf.

7.  The statements sought to be suppressed were a result of <u>physical coercion</u> <u>illegally</u> directed against the Defendant, and as such, were, therefore, involuntarily given. More specifically, Police Officers Fred Montilla and Ray Guevara placed black leather gloves on their hands, and placed a telephone book to the Defendant's left side as well as the top of his head and the middle of his chest, upon which time said officers would slam the telephone directory with a large police style flashlight causing the Defendant enormous pain. The statements sought to be suppressed were obtained as a product of and as a direct and proximate result of confronting the accused with certain material represented as fact known to the interrogator to be misrepresentations. To wit:  The Defendant was told that he had been <u>implicated as the shooter in this offense by other individuals not named</u>; and that <u>if he</u> <u>wanted to protect both his wife and his child</u>, he would have to provide the detectives with information concerning the names of the individual involved in this crime.

8.  The statements made by the Defendant after his arrest were the product of coercion, were induced by <u>direct and indirect promises and threats</u>, and are, therefore, <u>impermissible, unreliable for any use at trial</u>.  The promises include suggestions of offers of leniency, inferences that charges would be "dropped", and inferences that in exchange for statement and self incriminating actions, the number and severity of possible charges against the Defendant would be limited, as well as the immediate release of his wife, Rosa Bella, from custody at Area 5 Violent Crimes.

9.  Prior to his interrogation, the Defendant did not, and was not, afforded the opportunity to knowingly waive his Constitutional rights.

JGS_MAYSONET 000492

a.      Particularly his right to remain silent;

b.      his right to consult with a lawyer at any time;

c.      his right to have a lawyer present during any interrogation;

d.      his right to have a lawyer provided if he was indigent;

e.      his right to have any interrogation consented to terminate at any time he requested; and

f.      that what he said could be used against him in court, either as evidence or to impeach him if he were to testify.

The Defendant, on several occasions both while at 2650 S. California immediately after his arrest and subsequent to his arrival at Area 5 Violent Crimes made numerous requests to contact either family members or his attorney, William Swano, for the purpose of seeking his counsel and advise in this case. all requests of law enforcement authorities to that end were denied.

10.     That, due to the physical, physiological, mental, emotional, educational and/or psychological capacity and condition of the Defendant, he was incapable and unable to understand the full meaning of his Miranda Rights, and that any relinquishment of such rights was, therefore, not a free and rational choice of the accused and was not made voluntarily, knowingly, and intelligently.

11.     The statements sought to be suppressed were obtained as a result of interrogations made outside the presents of counsel; and after the defendant had been formally charged with an offense, 90 CR 18419, and after the appearance of counsel, had ben entered of record.  It is clear that as of August 22, 1990, the appearance of the public defender of Cook County as Mr. Maysonett's attorney was of record in case #90 CR 18419

and Police Officer Roland Paulnitsky was aware of that fact in light of his being present in court on several dates prior to August 22, 1990, that therefore, any and all confessions, admissions, or tests executed by Defendant at the time of, prior to, and after his formal arrest were elicited in violation of Constitutional Rights under the 4th, 5th, 6th, and 14th Amendments to the United States Constitution.

Wherefore, Defendant prays that this Court suppress as evidence in this case any and all communication, confessions, statements, admissions or tests, whether inculpatory or exculpatory, written, or oral, made by Defendant at the time of or subsequent to his arrest in this cause.

Respectfully submitted,

Richard M. Beuke

Richard M. Beuke & Associates
53 W. Jackson; 1410
Chicago, IL 60604
(312) 427-3050
Atty No 55502

JGS_MAYSONET 000494

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 55

**In The Matter Of:**

*Maysonet v.*
*Guevara*

---

*Richard M. Beuke*
*October 30, 2019*
*Video Deposition*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Video Deposition

1

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3      JOSE JUAN MAYSONET, JR.,            )
                                           )
4              Plaintiff,                  )
                                           )
5              vs.                         ) No. 18 CV 02342
                                           )
6      REYNALDO GUEVARA, ERNEST            )
       HALVORSEN, EDWARD MINGEY,           )
7      LEE EPPLEN, FERNANDO                )
       MONTILLA, ROLAND PAULNITSKY,        )
8      FRANK DIFRANCO, CITY OF             )
       CHICAGO and COOK COUNTY,            )
9                                          )
               Defendants.                 )
10

11

12          The videotaped deposition of RICHARD M. BEUKE,

13     called by the Plaintiff for examination, pursuant to

14     notice and pursuant to the Federal Rules of Civil

15     Procedure for the United States District Courts

16     pertaining to the taking of depositions, taken before

17     Mary Maslowski, Certified Shorthand Reporter and Notary

18     Public within and for the County of Cook and State of

19     Illinois at 141 West Jackson Boulevard, Suite 1240A,

20     Chicago, Illinois, commencing at the hour of

21     10:23 o'clock on October 30, 2019.

22

23

24

25

Video Deposition

2

```
 1   A P P E A R A N C E S:

 2

 3        BONJEAN LAW GROUP, PLLC
          BY MS. JENNIFER BONJEAN and MS. ASHLEY COHEN
          467 Saint Johns Place
 4        Brooklyn, New York 11238
          (718) 875-1850
 5        jennifer@bonjeanlaw.com
          ashley@bonjeanlaw.com
 6
                and
 7
          GREENBERG TRIAL LAWYERS
 8        BY MR. NICK BURRIS
          53 West Jackson Boulevard, Suite 1260
 9        Chicago, Illinois 60604
          (815) 488-3473
10        nick@greenbergcd.com

11            On behalf of Plaintiff;

12        LEINENWEBER BARONI & DAFFADA, LLC
          BY MR. JUSTIN L. LEINENWEBER
13        120 North LaSalle Street, Suite 2000
          Chicago, Illinois 60602
14        (312) 380-6635
          justin@ilesq.com
15
              On behalf of Defendant Reynaldo Guevara;
16
          THE SOTOS LAW FIRM, P.C.
17        BY MS. CAROLINE P. GOLDEN
          141 West Jackson Boulevard, Suite 1240A
18        Chicago, Illinois 60604
          (312) 735-3314
19        cgolden@jsotoslaw.com

20            On behalf of Defendants Ernest Halvorsen,
              Edward Mingey, Lee Epplen, Fernando Montilla
21            and Roland Paulnitsky;

22

23

24

25
```

Video Deposition

3

```
 1   A P P E A R A N C E S: (Cont'd.)

 2

 3        ROCK FUSCO & CONNELLY, LLC
          BY MS. EILEEN E. ROSEN
          321 North Clark Street
 4        Chicago, Illinois 60654
          (312) 494-1000
 5        erosen@rfclaw.com

 6             On behalf of the Defendant City of Chicago;

 7        ASSISTANT STATE'S ATTORNEY OF COOK COUNTY
          BY MS. SARA SPIVY
 8        500 Richard J. Daley Center
          Chicago, Illinois 60602
 9        (312) 603-3278
          sara.spivy@cookcountyil.gov
10
               On behalf of Defendants Frank DiFranco and
11             Cook County;

12        MICHAEL D. KREJCI & ASSOCIATES, LLC
          BY MR. MICHAEL D. KREJCI
13        53 West Jackson Boulevard, Suite 1401
          Chicago, Illinois 60604
14        (630) 388-0600
          krejcilaw@gmail.com
15
               On behalf of the Witness.
16

17
     A L S O   P R E S E N T:
18

19             MR. ADAM NELSON, Videographer.

20

21

22

23   CSR License No. 084-003278.

24

25
```

Video Deposition

4

```
1                          I N D E X

2    WITNESS                          DX   CX  RDX   RCX

3    RICHARD BEUKE

4    By Ms. Bonjean                   6        225

5    By Mr. Leinenweber                    201

6    By Ms. Rosen                          208

7    By Ms. Spivy                          223

8    By Ms. Golden                         226

9


10                      E X H I B I T S
     DEPOSITION EXHIBIT                   MARKED FOR ID
11
        No. 1                             59
12      No. 2                             61
        No. 3                             64
13      No. 4                             65
        No. 5                             79
14      No. 5 (remarked)                  80
        No. 6                             98
15      No. 7                             114
        No. 8                             134
16      No. 9                             138
        No. 10                            143
17      No. 11                            148
        No. 12                            150
18      No. 13                            153
        No. 14                            156
19      No. 15                            171
        No. 16                            172
20      No. 17                            176
        No. 18                            188
21      No. 19                            188
        No. 20                            196
22      No. 21                            217

23

24

25
```

**Video Deposition**

5

```
 1              THE VIDEOGRAPHER:  We're now on the
 2      record in the matter of Maysonet vs. Guevara
 3      in the United States District Court for the Northern
 4      District of Illinois, Eastern Division.  Case number
 5      is 18-CV-02342.  Today's date is October 30, 2019
 6      and the time is 10:23 a.m.
 7                      This is the video-recorded
 8      deposition of Richard Beuke.  We're located at
 9      the Sotos Law Firm, 141 West Jackson, Suite 1240A,
10      Chicago, Illinois.  My name is Adam Nelson.  I'm
11      the video specialist.  The court reporter is Mary
12      Maslowski.  We're both in association with Chimniak
13      Court Reporting & Video, Incorporated.
14                      For the record, would counsel
15      please introduce themselves and who they represent.
16              MS. BONJEAN:  Jennifer Bonjean,
17      B-o-n-j-e-a-n, on behalf of the plaintiff, Jose
18      Maysonet.
19              MS. COHEN:  Ashley Cohen, C-o-h-e-n, on
20      behalf of the plaintiff, Jose Maysonet.
21              MS. SPIVY:  Sara Spivy, assistant state's
22      attorney on behalf of Cook County and Frank DiFranco.
23              MR. LEINENWEBER:  Justin Leinenweber on
24      behalf of Defendant Guevara.
25              MS. GOLDEN:  Caroline Golden for the
```

Video Deposition

6

```
 1      individual officer defendants.
 2             MS. ROSEN:  Eileen Rosen for Defendant
 3      City of Chicago.
 4             MR. KREJCI:  Mike Krejci, K-r-e-j-c-i, on
 5      behalf of Richard Beuke.
 6             THE VIDEOGRAPHER:  The court reporter will
 7      now swear in the witness.
 8                    RICHARD M. BEUKE,
 9   called as a witness herein, having been first duly sworn,
10   was examined and testified as follows:
11                    DIRECT EXAMINATION
12   BY MS. BONJEAN:
13      Q    Good morning, Mr. Beuke.
14      A    Morning, Ms. Bonjean.
15      Q    My name is Jennifer Bonjean.  I think
16   you know that.
17      A    I do.
18      Q    I represent Jose Maysonet in a
19   federal civil action that has been brought
20   against a number of defendant officers and the
21   City of Chicago.  My associate, Ashley Cohen, is
22   also an attorney on the case.  And as I think you
23   know, Steve Greenberg is an attorney of record as
24   well.
25      A    I do.
```

**Video Deposition**

7

```
1        Q    Have you had a chance to read the

2    complaint in the case, sir?

3        A    A couple weeks ago.

4        Q    And do you know by name who the

5    defendants are in this case?

6        A    I'd be guessing on all of them.  I know

7    Mr. Guevara is.  I know Mingey I think is, Montilla,

8    Sergeant Epplen, Mr. DiFranco.  I'm not sure who

9    else.

10       Q    Okay.  Halvorsen?

11       A    Halvorsen.

12       Q    Detective Halvorsen, retired

13   Detective Halvorsen and retired Detective -- or

14   I guess it would be Sergeant Paulnitsky.  Do you

15   know those individuals at least by name?

16       A    I do.

17       Q    Okay.  We'll get back to that in a

18   second.  I assume you've had your deposition

19   taken before, correct?

20       A    A few times.

21       Q    Okay.  Are you able to estimate how many

22   times?

23       A    Maybe less than five, I would say.

24       Q    Okay.  And you certainly have testified

25   under oath in a court of law previously, right?
```

**Video Deposition**

8

1        A    I have.

2        Q    I assume as a Cook County state's

3   attorney you've had the -- I don't know if

4   opportunity is the right word, but you've had the

5   responsibility at certain points to testify under

6   oath in court?

7        A    Correct.

8        Q    And do you understand you're under oath

9   here today, sir?

10       A    I do.

11       Q    And you understand it's the same

12  oath you would take as if you were in a court of

13  law, correct?

14       A    I do.

15       Q    I know this is not your first rodeo,

16  so I will not belabor all of the guidelines.

17  I would just ask, though, that if there's any

18  question you don't understand, would you let me

19  know?

20       A    Sure will.

21       Q    I will do my best to rephrase until

22  we understand each other.  I also ask that even

23  if you anticipate my question and know where I'm

24  going, that you wait until I finish so that the

25  court reporter can take my question down fully

**Video Deposition**

9

```
 1    and then your answer as well, okay?
 2         A    Fair.
 3         Q    Yeah.  And can we agree that if
 4    you answer one of my questions, you understood my
 5    question?
 6         A    I think so.
 7         Q    Well, again, if you don't understand
 8    a question --
 9         A    I'll make sure I tell you.
10         Q    Okay.  Now, did you review any documents
11    in preparation for your deposition here today?
12         A    I took a look at the Appellate Court
13    opinion in Mr. Maysonet's case.  I took a look at the
14    Appellate Court opinion in Mr. -- the co-defendant,
15    I believe, Mr. Gonzalez's case.  And I reached out
16    and called Mr. DiFranco's office to see if there
17    was any way I could get any depositions that had
18    been taken, and he was able to forward over to my
19    office the copy of the deposition and we got that
20    yesterday, and I forwarded it to Mike's office.
21    I didn't get really a chance to read it, but I got
22    a chance to look at half of it.
23         Q    Okay.  So let me just recap.  You had
24    a chance to look at the Appellate Court opinion
25    in the Maysonet case?
```

**Video Deposition**

10

1    A    Yes.

2    Q    Are you referring to the direct appeal

3    opinion?

4    A    The direct appeal opinion, right.

5    Q    And you did the same with the

6    co-defendant, Alfredo Gonzalez's case, correct?

7    A    Correct.

8    Q    Okay.  And what was your interest in

9    looking at the Appellate Court opinions in both

10   Mr. Maysonet and Mr. Gonzalez's case?

11   A    Just to try to refresh my recollection

12   about, you know, the trial itself, what was

13   happening.  I know there were two separate trials

14   and just try to get my memory refreshed as to who

15   was involved and how they were involved.

16   Q    Got it.  So the facts of the case?

17   A    Kind of, yes.

18   Q    Yeah.  Can I assume then that you do

19   not have any trial file that you prepared and/or

20   maintained in connection with your representation

21   of Mr. Maysonet?

22        MS. ROSEN:  Objection, compound.  Go ahead.

23   A    I did have one.  It was -- I think we're

24   required to keep them for seven years or eight years.

25   And I'm sure after the eight years expired, we

**Video Deposition**

11

1    probably destroyed it because we destroyed a couple,

2    you know, a group of files every year when that time

3    limit comes up.  So I looked for it.  I didn't have

4    it.

5   BY MS. BONJEAN:

6        Q    Understood.  You did take efforts

7    to actually see if you had it, though, right?

8        A    Yes, I did.

9        Q    Okay.  And do you know when you looked

10   for it?

11       A    I think it would have been when the ARDC

12   complaint was filed against myself and Mr. Rueckert.

13       Q    And upon receiving notification

14   that an ARDC complaint had been filed against

15   you and Mr. Rueckert, am I correct to assume you

16   went and looked to see if you had it somewhere,

17   correct?

18       A    Yes.

19       Q    Okay.  And you were unable to find it,

20   right?

21       A    Did not find it.

22       Q    And it's your practice or I guess

23   it is not -- strike that.  You believe, your best

24   guess is that it was probably destroyed in the

25   normal course of business, is that fair to say?

**Video Deposition**

12

1       A      Fair to say.

2       Q      So --

3               MS. ROSEN:  Can you put your mic up a little

4    bit?

5               THE WITNESS:   (Witness complies).

6    BY MS. BONJEAN:

7       Q      Did you have an opportunity to speak

8    with any of the defendants' attorneys in the

9    case prior to your deposition today?  And let me

10   clarify that.  I want to put a better foundation

11   on that.  Since becoming aware that a federal

12   civil action had been brought by Mr. Maysonet,

13   have you had an opportunity to speak to any

14   attorneys who represent any of the defendants

15   we've discussed earlier?

16      A      Not that I recall.

17      Q      Okay.  So none of the attorneys from the

18   Sotos Law Firm you've had an opportunity to speak

19   with, again, since the lawsuit was filed?

20      A      Right.

21      Q      As best as you remember?

22      A      Yeah.

23      Q      Okay.  Now, obviously I'm not

24   looking for any communications or any information

25   that you've exchanged with your own attorney, but

**Video Deposition**

13

1       you did reach out to former Assistant State's

2       Attorney DiFranco, is that correct?

3              A     I did, yes.

4              Q     And do you know when you reached out to

5       him?

6              A     Today's Wednesday.  I think it was Monday.

7              Q     And when did you first learn that

8       Mr. DiFranco was a defendant in this action?

9              A     I think it was recently.  Probably within

10      this year, this calendar year 2019.

11             Q     Okay.  How did you first find out

12      that -- well, strike that.  Let me go back a

13      little bit.  I assume at some point you learned

14      that Mr. Maysonet's convictions and sentence had

15      been vacated?

16             A     I'm not sure when I learned that.  I had

17      learned that that was an issue that was in front of

18      one of the judges at 26th and California, and I know

19      I learned of it.  I'm not sure where I learned of it

20      from, though.

21             Q     Okay.  You don't have a distinct memory

22      of when you learned of it, is that fair?

23             A     That's fair.

24             Q     At some point you were aware, though,

25      that there had been allegations made related to

**Video Deposition**

14

```
 1    you, is that right?
 2              MR. KREJCI:  Objection, foundation as to
 3       what we're referring to.
 4   BY MS. BONJEAN:
 5         Q    Sure.  At some point you knew that there
 6      had been conflict of interest allegations made
 7      against you by Mr. Maysonet, right?
 8         A    Yeah, I think I learned that when the ARDC
 9      complaint was filed.
10         Q    Okay.  So is it your best recollection
11      that the first time you recall that there had
12      been a claim by Mr. Maysonet that you had labored
13      under a conflict of interest is when you received
14      notification from the ARDC?
15         A    That's fair.
16         Q    Did you ever have any conversations with
17      Jim Papa?
18         A    Only in passing just to see if, you know --
19      it was maybe once or twice, maybe three times as
20      you'd see each other in the hallway at 26th Street,
21      what the status of the case was.
22         Q    Okay.  And did you just ask him what's
23      going on with the Maysonet case?
24         A    Yes.
25         Q    And what did he tell you, to the best of
```

**Video Deposition**

15

1      your recollection?

2          A    You know, that it was still ongoing

3      and they -- I think the initial time I spoke with

4      him he said it was their intention to retry him, and

5      then that apparently changed.  I'm not sure how or

6      why.

7          Q    Did you have any conversations with

8      Celeste Stack?

9          A    Not about this case, no.

10         Q    Did anyone from the Cook County State's

11     Attorney's Office ever reach out to interview you

12     on the conflict of interest issue, if that makes

13     sense?

14         A    No.  The current state's attorney's office

15     or any --

16         Q    Well, yeah.  So let's put a time frame

17     on it.  Since 2015, let's say, did any assistant

18     from the Cook County State's Attorney's Office

19     reach out and ask to interview you regarding the

20     scope of your representation, the time you were

21     retained, that type of thing?

22         A    Not that I recall.

23         Q    Did any of the Cook County state's

24     attorneys that we've mentioned or any other

25     state's attorney indicate that they sought to

have you testify at any point in Mr. Maysonet's post-conviction proceedings?

A Again, I don't recall it.

Q Did you speak to any judges about the issue?

A No.

Q And when I say "the issue," I mean the issue of Mr. Maysonet's post-conviction petition and specifically as it relates to his claims of conflicts of interest.

A No.

Q Okay. So back to Mr. DiFranco. You learned in the last year that DiFranco was a defendant in this case, right?

A Yes.

Q Did you remember that Mr. DiFranco had played a role in the prosecution of Mr. Maysonet?

A I didn't initially, but I think after the ARDC complaint was filed, I did some research. I looked at the opinions and things like that, and in the opinion it states that Mr. DiFranco was the person who took the court-reported statement. I have some recollection of him testifying at the trial I think.

Q All right. And aside from having

Video Deposition

1    this conversation with Mr. DiFranco this week,

2    did you have any conversations with him prior to

3    this week, again, related to this lawsuit?

4        A    I read in his deposition that there

5    was a conversation in the Maywood parking lot or

6    something that I do not recall.

7        Q    Okay.

8        A    And I would occasionally see him,

9    never at Maywood that I recall, but occasionally when

10   I was in the Skokie courthouse.  But we never had

11   conversations about the case.

12       Q    Okay.  And then this week you spoke with

13   him, correct?

14       A    Yes.

15       Q    And how long was the conversation?

16       A    It was brief.  It was on the phone, and I

17   think I explained to him that Mike was representing

18   me and we were scheduled to give a deposition.

19   I didn't know who or when people had been deposed,

20   if I was the first guy in the lineup or the last guy

21   in the lineup, and he said he had been deposed.  And

22   I asked him does he have a copy of his transcript,

23   and he said he didn't.  So I think Frank may have

24   reached out to his attorney and the attorney may have

25   sent it to Frank, Frank sent it to our office and

**Video Deposition**

18

1    then I emailed it to Mike.

2        Q    Okay.  Did you have an opportunity to

3    review his transcript?

4        A    I did.  I didn't --

5        Q    Study it?

6        A    I didn't, no.

7        Q    Okay.  And anything else during your

8    conversation with Mr. DiFranco other than what

9    you've identified?

10       A    No.

11       Q    Okay.  And he didn't mention to you any

12   specifics about how his deposition -- how he felt

13   his deposition went or anything like that?

14       A    No.

15       Q    Okay.

16       A    We talked about his campaign for judge.

17       Q    Okay.  That's interesting.  So any --

18   did you look at any other documents apart from

19   the two direct appeal opinions for Maysonet and

20   Gonzalez and the deposition of Mr. DiFranco?

21       A    I had from before a copy -- I think I got it

22   in 2015 maybe -- of the FBI 302, the interview with

23   Mr. Omar.  That's one I had also.

24       Q    Okay.  By the way, did Mr. DiFranco send

25   you any other depositions or just his?

**Video Deposition**

19

```
 1        A    No, just his.
 2        Q    Anything else you had a chance to look
 3    at?
 4        A    No, that's it.
 5        Q    Have you had any conversations
 6    with any of the defendants themselves in the
 7    last, let's say, five years?
 8        A    No.
 9        Q    Do you know when the last time you spoke
10    to Ray Guevara is?
11        A    It would be a guess, but I would say in the
12    early 2000s maybe, 20 years ago.
13        Q    All right.  I want to just go through
14    a little bit of background.  We won't belabor it.
15    But you are Richard Michael Beuke, right?
16        A    Yes, ma'am.
17        Q    Okay.  And you are an attorney, of
18    course, correct?
19        A    Yes.
20        Q    What jurisdictions are you licensed in?
21        A    In Illinois, in the federal courts
22    in Illinois.  I've been admitted into practice in
23    the Eastern District of Wisconsin, Western District,
24    Michigan federal court, both on the east and the
25    west, Indiana in the federal courts.  I think I was
```

**Video Deposition**

20

1    admitted in Florida as well as possibly California

2    pro hac vice on cases that brought me out there.

3         Q    Okay.  What percentage of your law

4    practice is devoted to criminal defense work?

5         A    A guess, it would probably be 80 to 90.

6         Q    Where did you attend law school?

7         A    Kent.

8         Q    What year did you graduate?

9         A    I graduated in 1980.

10        Q    And while you were in law school did you

11   participate in any internships or externships?

12        A    I did.

13        Q    What were those?

14        A    I was an unpaid law clerk at the Cook

15   County Assistant State's Attorney's Office at 26th

16   and California.

17        Q    Did you work in a courtroom?

18        A    Right.  I worked both in Judge Frank

19   Barbaro's courtroom.  I was also detailed -- not

20   detailed, but I was on loan to Judge Bailey's

21   courtroom for a while.

22        Q    Did you have any connections in the

23   Cook County Assistant State's Attorney's Office

24   prior to interning there?

25        A    No.

**Video Deposition**

1           MS. ROSEN:  Objection, form.  Go ahead.

2    BY MS. BONJEAN:

3        Q    Any members of your immediate family

4    who are lawyers?

5        A    No.

6        Q    Now, would that be then that you took

7    the bar exam in July of 1980?

8        A    Correct.

9        Q    And I assume you passed, correct?

10       A    Passed, sworn in in November.

11       Q    November.  And what did you do

12   between June or July of 1980 after taking the bar

13   exam to November 1980 by way of employment or did

14   you hang out or what did you do?

15       A    Bartended.

16       Q    Okay.  Where did you bartend?

17       A    Smilin' Jack's on Rush Street.

18       Q    At some point you applied for a position

19   with the Cook County State's Attorney's Office,

20   I assume, right?

21       A    I think I did that prior to graduating and

22   taking the bar, you know.  We had put applications in

23   I think when we were in our last semester of law

24   school.

25       Q    And --

**Video Deposition**

22

```
1          A     Hoping to be hired for that new class.

2          Q     Right.  And you were, right?

3          A     Yes.

4          Q     So what would have been your

5    official first day of employment in the Cook

6    County State's Attorney's Office, if you know, or

7    just the month?

8          A     It would have been November of '80.

9          Q     Okay.  I want to just briefly go through

10   your assignments.  What was your first assignment

11   in the Cook County State's Attorney's Office?

12         A     I was assigned to the Chief Judge

13   Richard Fitzgerald's courtroom at 26th Street,

14   and essentially our responsibilities there were

15   to handle all the arraignments for each individual

16   day and make sure the files were then brought up to

17   the trial courtrooms that they had been assigned to,

18   and there were some administrative details that

19   I would do for the chief judge's people also.

20         Q     How long did you hold that assignment?

21         A     I think I was there probably until that

22   next March, maybe March of '81.

23         Q     And who was your supervisor during that

24   period, if you know?

25         A     At the chief judge's courtroom?
```

**Video Deposition**

23

```
 1        Q    Yeah.

 2        A    An 83-year-old named Sam Grossman.

 3   Great guy.

 4        Q    So as of March of '81 you were

 5   reassigned to somewhere else, right?

 6        A    Yes.

 7        Q    Where did you go?

 8        A    I went to the First Municipal Division.

 9        Q    Where was First Municipal in 1981?

10        A    11th and State.

11        Q    Was that a trial assignment?

12        A    It was.  There were three misdemeanor

13   courtrooms back in those days at 11th and State,

14   and then throughout the city there were surrounding

15   misdemeanor courtrooms.  I spent my first two months

16   in Branch 26 at 11th and State.  Then I was

17   transferred to the misdemeanor jury courtrooms, which

18   got moved from 321 LaSalle to 1340 South Michigan.

19        Q    And did you try misdemeanors while you

20   were assigned --

21        A    Yes.

22        Q    How long were you at First Municipal?

23        A    I think I was probably there maybe a little

24   less than a year.

25        Q    So from -- until like --
```

**Video Deposition**

24

1      A    Until the end of the year maybe.  Maybe

2    into '82.

3      Q    Okay.  Do you remember who your

4    supervisor was at First Municipal?

5      A    Yes.  The head supervisor was A.C.

6    Cunningham and the deputy chief was Brian Collins.

7      Q    Okay.  In 1982 then you went where?

8      A    Juvenile court, and I was in the

9    delinquency side.  It's divided into an abuse and

10    neglect side and a delinquency side.  I was assigned

11    to the delinquency side.

12      Q    And there I assume you also conducted

13    trials?

14      A    Yes.

15      Q    And were you assigned to a courtroom?

16      A    Yes.

17      Q    Whose courtroom?

18      A    Originally Judge Marsalek and then

19    I think I worked for Judge Yates and then for the

20    third judge, African-American judge.  Great guy.

21    I forget his name.

22      Q    Okay.  How long were you at Juvenile?

23      A    I think I was there less than a year.

24      Q    Did you leave in 1982 or do you think it

25    was beginning of 1983?

**Video Deposition**

25

```
 1        A    I think I left in -- I've got to back up
 2    because I left in I want to say May of '82 because
 3    I got married in June of '82 and I was on Felony
 4    Review when I got married.
 5        Q    Got it.  And who was your supervisor
 6    at Juvenile?
 7        A    Sister Catherine Ryan.
 8        Q    Okay.
 9        A    I was in the timeout chair a lot over there.
10        Q    Does not surprise me.  Did she --
11    corporal punishment?
12        A    She took it seriously.
13        Q    Okay.  So in roughly May of 1982
14    then you went to Felony Review, is that right?
15        A    Yes, ma'am.
16        Q    Okay.  Felony Review in 1982, are you
17    able to summarize for me how it was structured?
18        A    I'll try.  We had six-person teams in
19    the city.  Two people were assigned to each division
20    or each area of the city.  There was a North Side
21    area, which encompassed Area 5 and Area 6 on the
22    North Side of Chicago.  The West Side area
23    encompassed Area 2 and Area -- or Area 3 and Area 4,
24    and the South Side area encompassed Area 1 and
25    Area 2.  The state's attorney's Felony Review offices
```

**Video Deposition**

1    for Areas 1 and 2 was a small office over at 51st

2    and Wentworth.  When you were assigned to the West

3    Side, Areas 3 and 4, your base was out of 26th and

4    California.  And when you were assigned to the North

5    Side, Areas 5 and 6, the base office was out of

6    Belmont and Western.  So you would -- normally when

7    you came in for your 12-hour shift, you would check

8    in to the area, meet the two assistants who were

9    getting off, try to exchange information as to what

10   if anything was still going on or where the cars were

11   or things like that.

12        Q    Okay.  So you worked in teams of six.

13   What does that mean exactly?

14        A    I wouldn't say you worked in teams of

15   six.  You worked in teams of two.  And like if it

16   was Mike and I, our responsibility would be Areas 5

17   and 6.

18        Q    I see.

19        A    When the phone calls would come in

20   where detectives were requesting an assistant

21   state's attorney's assistance in some way, you would

22   either drive out to the area or there were certain

23   cases that you were allowed to handle over the phone.

24        Q    So let me see if I understand this.

25   There were six detective areas, right?

**Video Deposition**

27

1      A      Correct.

2      Q      And those were 1 through 6, right?

3      A      Right.

4      Q      And for the purposes of Cook County

5   state's attorneys assigned to Felony Review, you

6   would be assigned to one of three headquarters,

7   is that right?

8      A      Yes.

9      Q      Okay.  One of the headquarters was 51st

10   and Wentworth?

11      A      Right.

12      Q      And that covered Areas 1 and 2?

13      A      1 and 2.

14      Q      And one of the headquarters was 26th and

15   Cal, right?

16      A      Right.

17      Q      And that covered 3 and 4?

18      A      3 and 4.

19      Q      And then Belmont and Western covered 5

20   and 6, right?

21      A      5 and 6, correct.

22      Q      And Belmont and Western in 1982 was

23   actually Area 5, right?

24      A      No, Belmont and Western was Area 6.

25      Q      Oh, Area 6.  Got it.

**Video Deposition**

28

1       A    Grand and Central was Area 5.

2       Q    Okay.  I wasn't sure if Grand and

3  Central was in 1982 Area 5.  It was, though?

4       A    Yeah.

5       Q    Okay.  So when you said 6, what you

6  meant was -- or what I understand that to mean is

7  that there were two assistant state's attorneys

8  for each of those headquarters, if you will,

9  right?

10      A    Right, yes.

11      Q    And did you rotate or were you sort of

12  always in a particular --

13      A    No.  I think back then the bosses tried

14  to, you know, make sure everybody wasn't working the

15  same area every shift.  So you would rotate either

16  North Side, South Side or West Side.

17      Q    And back then were there areas that were

18  I guess more desirable than others for whatever

19  reason?

20      A    I don't know if I'd say desirable.

21  Certainly there was some areas that were more active

22  than others, busy.

23      Q    Right.  I guess it depends on your

24  personality --

25      A    Yeah.

**Video Deposition**

1      Q     -- if that's desirable or not, right?

2      A     Yes.

3            MS. ROSEN:  Object to the form.

4   BY MS. BONJEAN:

5      Q     Belmont and Western was an active area?

6      A     Yeah, back then they were all pretty

7   active.  Probably the most active were Areas 1 and 2.

8      Q     Okay.  How long were you in Felony

9   Review?

10     A     I want to say 18 months.

11     Q     And can I assume that when you're

12  working Felony Review, you have an opportunity to

13  meet a lot of different detectives that --

14     A     Sure.

15     Q     Did you meet Commander Burge at 51st and

16  Wentworth?

17     A     I didn't meet him until later on

18  in my tour in Felony Review.  The commander worked,

19  you know, my recollection is the commander worked --

20  he could work whenever he wanted to work.  So he

21  wasn't always there or available, like all the

22  commanders.

23     Q     My understanding, he worked a lot,

24  though, is that fair, if you know?

25            MS. ROSEN:  Object to the form, foundation

**Video Deposition**

30

1       and relevance.

2               MR. KREJCI:  Relevance, objection.

3       A    I'm sure that would be his probably

4    characteristic, yeah.

5    BY MS. BONJEAN:

6       Q    Do you know when you met him?

7               MS. ROSEN:  Objection, relevance.

8               MR. KREJCI:  Same objection.

9               MS. BONJEAN:  It is relevant.  I'm not

10    going to connect the dots right now but --

11              MS. ROSEN:  I'm making my objection.

12              MS. BONJEAN:  No, that's fair.  That's fair.

13    I'm not going to go down that road right now for too

14    long.  Just some preliminary questions.

15       A    I would say probably 198 -- late '83, '84.

16    That would be a guess, though.

17       Q    Okay.  And do you know when you first

18    met Ray Guevara?

19       A    I don't.  I know I met him sometime

20    in the '80s.  I'm not sure early, mid or late '80s.

21       Q    Were you in Felony Review when you met

22    him, you think?

23       A    I don't think so.  I think I met him

24    when I was -- after I left Felony Review I went to

25    the Gang Unit.  So I think it would have been at some

**Video Deposition**

1    point after I had gotten to the Gang Unit.

2        Q    Okay.  So after Felony Review you went

3    to Gangs, is that right?

4        A    Yes.

5        Q    And am I correct that that was your

6    first trial assignment at 26th and California?

7        A    Yes.  It was a little different

8    than a trial assignment because the trial -- each

9    trial courtroom had three assistants assigned only

10   to that courtroom.  And in the Gang Unit we were

11   given cases that could be assigned to any of the

12   courtrooms in the building at 26th Street.  So I got

13   the benefit and the opportunity to work in front of

14   a lot of different judges as opposed to just one

15   judge every day.

16       Q    What type of cases did the Gang Crimes

17   Unit handle?

18           MS. ROSEN:  Objection, form.

19       A    I would say primarily murders, attempt

20   murders.  There were some sexual assault cases that

21   we took.  If the individuals that were charged were

22   considered to be known, high-ranking gang members and

23   if it happened to be a sex case, we would take those

24   too, but it was pretty much more violent crimes.

25

**Video Deposition**

32

1    BY MS. BONJEAN:

2         Q    And how many attorneys were assigned

3    to the Gang Crimes Unit back in 1983, if you can

4    approximate?

5         A    I'm going to say nine.

6         Q    Nine.  That assignment was a pretty --

7    I would imagine that would have been a nice

8    assignment for you.  Was it?

9              MS. ROSEN:  Objection to form.

10             MR. KREJCI:  Join.

11        A    Yes, I liked it.

12   BY MS. BONJEAN:

13        Q    Yeah.  I mean, you went from Felony

14   Review to Gang Crimes.  Was that usual or

15   customary?

16             MS. ROSEN:  Objection, form, foundation.

17        A    What happened was when I was a law

18   clerk back in '78, '79, '80, I had law clerked for

19   a gentleman by the name of Ernie DiBenedetto, and

20   sometime in '8 -- well, I think when Mr. Daley came

21   in in 1980, he began or organized the Gang Unit that

22   were originally organized under Greg -- Greg --

23   what's the last name.

24   BY MS. BONJEAN:

25        Q    If it comes to you, you can let us know.

**Video Deposition**

33

1      A      Yeah.   And he put -- he started the

2   Gang Unit together in 1980 after Mr. Daley took

3   over.  I was, like I said, working my way through

4   the office.  And sometime in I think early '83

5   Mr. DiBenedetto was promoted to the head of the

6   Gang Unit.  And, you know, given that I had worked

7   for him and we got along, when he had an opening

8   he asked me if I'd be interested in coming up there,

9   and I was.

10     Q      Okay.  So by virtue of this connection

11  or relationship --

12     A      Yeah.

13     Q      -- you had made prior in the office, you

14  were fortunate enough to get that opportunity?

15     A      I think it helped, yes.

16     Q      Just to remind you, try not to talk over

17  me --

18     A      Don't talk over, okay.

19     Q      -- because she will not like that.

20  Okay.  Do you recall who the other attorneys

21  were assigned to the Gang Crimes Unit when you

22  were given the opportunity to work in there?

23     A      When I first got there, I want to say it was

24  Larry Wharrie, Art Hill, Paul Tsukuno, Bill Gamboney.

25  I think eventually Jack Hynes came in with us, Mike

**Video Deposition**

34

1    O'Donnell and Randy Rueckert, and Mr. DiBenedetto

2    was the head.

3        Q    Were you the -- were those assistant

4    state's attorneys the original Gang Crime Unit?

5        A    No.

6        Q    Okay.

7        A    Several had moved on when Mr. DiBenedetto

8    and his predecessor had left.

9        Q    I see.  Do you know when there was a

10   Gang Crime Unit formed?

11       A    Yeah.  I think when Mr. Daley was elected

12   state's attorney, I think it was 1980, and one of

13   the things that he -- I think he campaigned on and

14   one of the first things he initiated when he took

15   over the office was establishing a Gang Crimes Unit.

16   He may have also started the narcotics unit and

17   things like -- some specialized units that were

18   designed to deal with specific crime problems.

19       Q    Okay.  And was DiBenedetto your

20   supervisor?

21       A    Yes.

22       Q    Now, did you know any of these state's

23   attorneys that you just mentioned prior to being

24   asked to join the Gang Crimes Unit?

25       A    I knew Mr. Wharrie.  I didn't know

**Video Deposition**

1    Mr. Gamboney.  Mr. Hynes and O'Donnell and I had

2    gone to law school together.  I don't believe I knew

3    the other -- there was a Chris Cronson too.

4        Q    Okay.  So you attended law school with

5    Hynes and O'Donnell, so you knew them?

6        A    Yes.

7        Q    And you didn't know Mr. Gamboney until

8    you joined the unit?

9        A    Right.

10       Q    Was he already on the unit?

11       A    I think he was -- he wasn't already

12   on the unit, but he was a first chair in one of the

13   courtrooms.  And one of the first spots that opened

14   up, I think Mr. Gamboney was one of the first round

15   draft picks of Mr. DiBenedetto.

16       Q    Gotcha.  And what about Randy Rueckert,

17   when did you meet him?

18       A    I met Randy when we were misdemeanor

19   assistants.  I think Randy's a little older than me.

20   He came -- he had worked for the public defender's

21   office and then came over to the state's attorney's

22   office.  So I think Randy may have started in the

23   office a little ahead of me, and we worked in Felony

24   Review not together but, you know, we met in Felony

25   Review and he never went to Juvenile.  And I think

**Video Deposition**

36

```
1    at some point when a spot came open, Mr. DiBenedetto

2    brought Randy in too.  I think he started shortly

3    after me.

4        Q    Where was the Gang Crimes office back

5    in 1983?

6        A    It was on the 13th Floor.

7        Q    And can you describe it briefly for me?

8        A    Sure.  When you first would walk in

9    from the reception area, to the right straight down

10   was the head of the Special Prosecutions Division,

11   and I believe back then it was Mr. Jeff Kent.  And

12   next to his office was I want to say Mr. DeBoni's

13   office.  And then you'd go further down the hall and

14   there was a large office area where detectives who

15   were assigned specifically to our gang unit had their

16   desks, and there was a small office where Mr. Hynes

17   and O'Donnell sat there.  And Mr. DiBenedetto's

18   office was just off of that big secretarial area

19   and the detective area, and Mr. Hill and Mr. -- and

20   I want to say Mr. Wharrie were in that area.  And

21   then there was a third office that was around the

22   corner, and that's where myself and Mr. Gamboney

23   and Mr. Rueckert were.

24       Q    So the three of you shared an office

25   together?
```

**Video Deposition**

37

```
 1        A    We did.

 2        Q    And the detectives that you said worked

 3    in the office, these are Cook County state's

 4    attorney detectives, correct?

 5        A    No.  Two of them were actually detailed

 6    to the office, to the state's attorney's office but

 7    they were actually Chicago police officers.

 8        Q    Do you remember who they were?

 9        A    One was a Lieutenant Danny Sampilla,

10    S-a-m-p-i-l-l-a, and I think a Sergeant Bob Guthrie,

11    G-u-t-h, I think, r-i-e.  There were two assistant --

12    or two investigators from the Cook County Sheriff's

13    Police and I think we had one or two from the

14    Illinois State Police that were up there.

15        Q    Okay.  So it was like a multi --

16        A    Yeah.

17        Q    -- law enforcement task force of sorts,

18    is that fair to say?

19        A    I think so.

20        Q    And did they have any particular

21    specialty in gang crimes?  Is that how they ended

22    up there?

23        A    I know the two from --

24            MS. ROSEN:  Object to the foundation.  Sorry.

25        A    I know Mr. Sampilla and Mr. Guthrie
```

**Video Deposition**

38

1    had worked at Gang Crimes North before they

2    came over to become part of that unit.  The other

3    gentlemen I don't think had any per se gang crimes

4    experience.

5  BY MS. BONJEAN:

6        Q    Okay.  When you left Gang Crimes,

7    you left the office altogether, is that right?

8        A    Correct.

9        Q    And was that August of '87?

10       A    Yes, sounds right.

11       Q    And you started in I think you said

12   roughly --

13       A    November of '83.

14       Q    November of '83, okay.  I just want

15   to put a time frame on that.  So between November

16   of 1983 and August of '87 you were assigned to

17   the Gang Crimes Unit.  That entire period of

18   time, were there always Chicago police officers

19   detailed in that unit, if you know?

20       A    Sampilla and Guthrie I think were that

21   entire time.

22       Q    For that entire time, as best you

23   recollect?

24       A    Yeah, I think they were there the whole

25   time I was there.

**Video Deposition**

39

1      Q    Okay.  And they were former gang crime

2    specialists at Gang Crimes North?

3           MS. ROSEN:  Object to form and foundation.

4      A    I think they were at -- on their career

5    rise they were gang crime specialists, but I think

6    Danny became a lieutenant and Bobby may have been

7    promoted to sergeant.

8  BY MS. BONJEAN:

9      Q    Okay, that's fair.  By the time that you

10   met them in Gang Crimes, they were a lieutenant

11   and a --

12     A    They had some stripes on their shirts.

13     Q    Right.  But it sounds like that they

14   spent some part of their ascent in Gang Crimes

15   North, is that right?

16     A    Yes, they did.

17     Q    And were they a useful resource for

18   the Cook County state's attorneys who worked in

19   that unit?

20          MS. SPIVY:  Objection, form.

21     A    I think so.

22  BY MS. BONJEAN:

23     Q    I mean, did they know a lot about the

24   gangs?

25     A    They did.

**Video Deposition**

40

1     Q   And did they have a specialty in sort

2  of gangs that would have been operating mostly in

3  Gang Crimes North?

4     A   I think they had a specialty targeting

5  in terms of the North Side gangs, but they also were

6  very knowledgeable about gang crime specialists that

7  were in Gang Crimes South or in Gang Crimes West and

8  they were able to communicate with those gentlemen

9  if they needed information or there was some

10  investigation that needed to get some attention.

11  So they knew all of the people in Gang Crimes

12  Specialists Unit, and I think they were familiar

13  with a lot of detectives also.

14     Q   Gotcha, that makes sense.  So if they

15  had a question about something, they had numerous

16  people they could reach out to potentially to get

17  that question answered?

18     A   I would say that's fair, yeah.

19     Q   And any reason why there was a Cook

20  County Sheriff investigator assigned to the unit,

21  if you know?

22     A   I don't know.

23         MS. ROSEN:  Object to the form.

24     A   I don't know.

25

**Video Deposition**

41

1  BY MS. BONJEAN:

2       Q   And you said there were some State

3  police possibly as well?

4       A   Yes.

5       Q   And did they bring much to the table?

6        MS. ROSEN:  Object to the form.

7        MR. KREJCI:  Objection.

8        MS. SPIVY:  Join.

9  BY MS. BONJEAN:

10      Q   I'm just wondering.

11       MS. ROSEN:  Perhaps the question is what

12   did they do as opposed to did they bring much to the

13   table, but it's your dep so ...

14       MS. BONJEAN:  Potato, potato.

15      A   Should I answer?

16  BY MS. BONJEAN:

17      Q   Yeah, if you understand it.

18      A   Yeah.  I think the Illinois State

19  Police guys were valuable in the sense that they

20  had contacts in the various penitentiaries, you know.

21  And if there was information that might be able to be

22  obtained by somebody at Menard or, you know, I think

23  they knew the people at those institutions certainly

24  better than, you know, the Gang Crimes guys or the

25  Cook County sheriffs.  So I think that was their

**Video Deposition**

42

```
 1    value to the unit.
 2        Q    Understood.  And the Gang Crimes Unit
 3    prosecuted gang crimes not just in the city of
 4    Chicago I assume, right?
 5        A    No, it was countywide.
 6        Q    Okay.  So it's almost like you had your
 7    own intelligence unit a little bit?
 8            MS. ROSEN:  Object to the form.
 9            MS. SPIVY:  Objection to form.
10    BY MS. BONJEAN:
11        Q    I mean, is that fair?
12        A    I think it's fair.  I mean, they were
13    very valuable and very hard workers and, you know,
14    very helpful in us prosecuting cases.
15        Q    Did you ever work with John Dillon?
16        A    No.
17        Q    What about --
18            MS. ROSEN:  I'm going to object to you
19    doing discovery in this case for other cases.
20            MS. SPIVY:  Join.
21            MS. BONJEAN:  I don't know why you think
22    you know what's in my head.  I really don't know why
23    you think --
24            MS. ROSEN:  Is Dillon somewhere on paper
25    in this case that I don't know anything about?
```

**Video Deposition**

43

1          MS. BONJEAN:  That does not indicate

2     what makes it relevant because his name appears --

3     and, by the way, his name appears all over the paper

4     in this case.

5          MS. ROSEN:  Okay, fine.  Objection, same

6     objection.

7          MS. BONJEAN:  And he doesn't know anyways.

8          MS. ROSEN:  I can -- don't get upset about

9     objections.  They're just objections.

10          MS. BONJEAN:  I'm not getting upset, but you

11     accused me of conducting discovery and I'm --

12          MS. ROSEN:  That's an objection.  I'm

13     saying I object to you doing discovery in this case

14     for other cases.  It's an objection.  It doesn't need

15     to be a dispute.

16   BY MS. BONJEAN:

17     Q    All right.  Well, what about Matt

18   Coghlan?

19          MS. ROSEN:  Same objection.

20   BY MS. BONJEAN:

21     Q    Did you work with him?

22     A    No.

23          MS. GOLDEN:  What was the answer?

24          THE WITNESS:  No.

25

**Video Deposition**

44

1   BY MS. BONJEAN:

2        Q    How about Tom Henley, did you work with

3   him?

4        A    No.

5        Q    Anthony Calabrese?

6        A    No.  Those guys were all kind of younger

7   than me.

8        Q    They were what?

9        A    Younger than me.

10       Q    Oh, okay.

11            MS. BONJEAN:  See, I'm complimenting him.

12       Q    Now, as a Cook County state's attorney

13   working in the Gang Crimes Unit, how did you get

14   assigned to a case?

15       A    Mr. DiBenedetto was the one responsible for

16   assigning certain cases to anybody.

17       Q    And would you get a case after

18   arraignment typically or after an indictment?

19   How did it work?

20       A    It varied.  Sometimes the cases, we were

21   contacted actually by the Felony Review people.  If

22   it was a gang, you know, a member of -- you know,

23   a high-ranking member and we'd be apprised of what

24   the status of the investigation was and we could

25   occasionally get involved, even before the indictment

Video Deposition

1    or even before the arraignment.  But normally

2    it would be after everybody had been charged and

3    the case had gone to Branch 66 and then to the chief

4    judge's call.

5        Q   And do you know how a case became

6    designated a gang crime case?

7        A   You know, I thought about that for a while.

8    There was a -- back in the '80s there was a letter

9    called a Townsend letter, and I remember -- I think

10    the way it was supposed to work, Mr. Townsend was a

11    lieutenant I believe on the Chicago Police Department

12    and he may have had some responsibility in terms

13    of known gang members who'd get arrested on any

14    given day and you'd get a Townsend letter -- or

15    Mr. DiBenedetto would get a Townsend letter that

16    Joe Blow was arrested in the 25th District and he

17    was charged with so and so.  This might be somebody

18    that you guys are interested in.

19        Q   So was it the designation of an

20    individual as a gang member that made it a gang

21    crime or the motive of the crime --

22        MS. ROSEN:  Object to the form, foundation.

23  BY MS. BONJEAN:

24        Q   -- or both?

25        A   I think both.

**Video Deposition**

46

1      Q    Because obviously gang members could

2    commit crimes that were not motivated I suppose,

3    right?

4      A    Exactly.

5      Q    But it was -- I assume that there

6    was some discretion involved in whether the unit

7    would take the case, right?

8      A    There was because we were only nine

9    guys and, you know, resources were a little limited

10    but ...

11      Q    And during your career in Gang Crimes

12    from, again, '83 to '87, did you learn a fair

13    amount about the inner workings of the various

14    gangs that operated in the city of Chicago?

15           MR. LEINENWEBER:  Objection, form.

16      A    I tried to.

17  BY MS. BONJEAN:

18      Q    I mean, like did you know who called

19    it for each gang?

20      A    No.

21           MS. ROSEN:  Object to the form.

22           MR. LEINENWEBER:  Same.

23      A    I mean, I think if I were assigned a

24    case, you know, it's possible that you did a little

25    more research on that gang and tried to get as much

**Video Deposition**

47

1     information about the hierarchy and things like that

2     in order to help you, you know, in your prosecution

3     of the case, but I didn't have a working knowledge of

4     all the street gangs that were ongoing in the city.

5   BY MS. BONJEAN:

6         Q    Okay.  So to the extent that it

7     would be relevant for prosecuting your case, you

8     might try to learn more about a particular gang,

9     is that fair?

10        A    That's fair.

11        Q    But it wasn't like you had monthly

12    inservices just about the gangs that operated in

13    the city.  Today we're going to talk about Latin

14    Kings over on Beach and Spaulding or something

15    like that?

16        A    No.

17        Q    Okay.  You left the Cook County State's

18    Attorney's Office in August of '87?

19        A    Correct.

20        Q    And why did you leave the Cook County

21    State's Attorney's Office?

22        A    We had had our first baby and we were

23    looking to have a second and, you know, we were

24    hoping to get into something where I could make

25    maybe a little more money than I was making as a

**Video Deposition**

48

```
1     prosecutor, and I had tried a bunch of cases.
2     I'd done everything I really wanted to do.  It was
3     time to move on.
4          Q    Do you know how many cases you tried
5     when you were in Gang Crimes?  I understand it's
6     an estimate.
7          A    Yeah.  In terms of juries, probably
8     35, 40.  And benches, I don't know, more than that.
9     Maybe a hundred or so.
10         Q    Okay.  Now, when you left the office
11    in '87, you set up shop somewhere, is that fair?
12         A    Yes.
13         Q    Where did you go?
14         A    The Monadnock Building at 1410,
15    Suite 1410.
16         Q    Did you partner up with somebody or did
17    you work solo?
18         A     I did.  Originally I was partners with
19    a gentleman by the name of John Kogut, K-o-g-u-t.
20    John was in the state's attorney's office with us,
21    and he was in the arson unit I think when he left.
22    He left a little before me I think.
23         Q    So he left a little before you and then
24    you decided to partner, is that right?
25         A    Yes.
```

**Video Deposition**

49

1      Q   So it was a true partnership in the

2   sense that you were partners in your business,

3   right?

4      A   It was, yes.

5      Q   And that was at Monadnock that you

6   opened your offices?

7      A   Yes.

8      Q   And how long did you work with

9   Mr. Kogut?

10      A   I want to say it was into the '90s,

11   maybe '91, '92.

12      Q   And did Mr. Kogut do criminal defense as

13   well?

14      A   He did some.  I mean, the way that we tried

15   to structure the practice was I would concentrate on

16   the criminal part of the practice and John was trying

17   to develop the civil part of the practice to see if

18   we could be involved in, you know, personal injury

19   type work and workers comp, things like that.

20      Q   I see.  How did you get your clients

21   as a -- your criminal defense clients once you

22   left the office?

23          MR. KREJCI:  Objection.

24      A   I don't know.  We didn't advertise,

25   but I'm not sure.  I'm sure there were people who

**Video Deposition**

50

1    referred people to us.  We sent out announcements

2    to friends, family members and everybody that we

3    were opening up our practice.  It started slow, as

4    it always does, and then it grew a little bit.

5  BY MS. BONJEAN:

6        Q    Did you do a -- you did a lot of gang

7    crimes defense, right?

8        A    I would say I did a fair amount of it, yes.

9        Q    And then in '91 you and Mr. Kogut split?

10       A    Yes.

11       Q    And you went solo?

12       A    Right.

13       Q    And was it on amicable terms or was

14   there something that led up to the split?

15       A    It was.  We had had our second son

16   and, you know, John knew I needed to try to make a

17   little -- you know, my expenses had gone up with the

18   second son and I was probably working a little harder

19   than John, but it was a very amicable split.

20       Q    And have you been a solo practitioner

21   since then?

22       A    Until my oldest son joined me.

23       Q    And when did that happen?

24       A    Four years ago.

25       Q    Okay.  Did you stay at the Monadnock

**Video Deposition**

1    Building after you and Kogut separated?

2         A    I did.  I stayed there until I want to say

3    maybe 2012, '13.

4         Q    You were there for quite some time then?

5         A    I was.

6         Q    And while you were there working

7    as a solo practitioner -- strike that.  While

8    you were working as a solo practitioner, did you

9    collaborate with other criminal defense attorneys

10   who worked in the building?

11            MS. ROSEN:  Object to the form.

12        A    I'm sure I did.

13   BY MS. BONJEAN:

14        Q    Okay.  How about share space, office

15   space?

16        A    In the office that John and I originally

17   started in there were three fairly large offices and

18   one very small office.  There was a secretarial area

19   and a little kitchenette area and a little seating

20   area.  So, yes, we had other people that were using

21   those other offices and tried to keep them rented as

22   best we could, keep down our expenses.

23        Q    And do you know the names of lawyers

24   who worked or shared your space, say, from '91 to

25   '95?

**Video Deposition**

52

1     A   I want to say that Tom Doherty was one of

2  the gentlemen who was in there with us.  Dave Peilet

3  eventually came in.  May have been Tom Epach was

4  there for a while.

5     Q  Was he a first assistant with the Cook

6  County State's Attorney's Office?

7     A   I don't know if he ever made first

8  assistant.  I know he was up there.

9     Q   Under Devine?

10     A   Under Devine, right.

11     Q   What about Rueckert, Randy Rueckert?

12     A   Randy came -- when Randy left the state's

13  attorney's office, I want to say it was in '88 or

14  '89, but he went and took a job with the NCAA.  He

15  was investigating infraction allegations against

16  various universities.  And whenever it was that he

17  left that job, then -- and that may have been right

18  at the same time that John was leaving, because Randy

19  ultimately took John's office.  So I would say '91,

20  '92.

21     Q   Okay.  Anybody else that comes to mind

22  that you shared office space with?

23     A   There was -- Sam Shim had that little

24  office area for a while when he left the prosecutor's

25  office.  His brother Mike was there for a little

**Video Deposition**

53

```
1    while.  My sister-in-law was in there for a while.

2         Q    Is your sister-in-law an attorney?

3         A    Yes.  Jack Byrne had come in there, I'm

4    not sure, I think in the '90s, in that time period.

5         Q    And Jack Byrne is the former

6    Sergeant Byrne --

7         A    Yes.

8         Q    -- under John Burge?

9         A    Yes.

10        Q    Same guy?

11        A    Um-hmm.

12        Q    He became a lawyer, right?

13        A    He did.

14        Q    What kind of work did he practice?

15        A    He did everything.  Jack was involved

16   in every -- you know, anything that he could try to

17   make some money on, he did.

18        Q    And did you share expenses with these

19   individuals?

20        A    Yes.

21        Q    Office expenses?

22        A    We did.

23        Q    But you didn't partner in the sense

24   of sharing your -- well, strike that.  Let me ask

25   it this way.  You didn't have a formal business
```

**Video Deposition**

54

1    organization with any of these individuals,

2    is that right?

3       A    Right.

4       Q    And did you refer cases to each other?

5       A    I don't specifically recall, but I'm

6    sure we did.  You know, if a closing came in or if

7    something else came in that I didn't want to do or I

8    didn't know anything about, I'd ask one of the other

9    guys are you interested in doing this.  If they were,

10    they were.

11       Q    There were some other attorneys

12    who worked in the building that you would have

13    known or I think knew.  What about like John

14    DeLeon?

15       A    Yes, knew him well.

16       Q    And did he share space with you or he

17    was just in the building?

18       A    He was across the hall.

19       Q    Across the hall.  What about Tom Breen?

20       A    He was in the building on the 14th floor,

21    but I've just seen that it's been changed.  There was

22    a wall that divided the south side of the building

23    from the north side, so we couldn't walk over to

24    Tom's space on 14.  We had to go down in the

25    elevator, go to the other elevator and take the

**Video Deposition**

55

1     other, but he was there on 14.

2          Q     Gotcha.  What about any other gang

3     crimes -- or former gang crimes prosecutors, did

4     any others come over to the Monadnock Building

5     that you recollect during the time period of,

6     I don't know, '87 to '97?

7          A     No, not that I recall.

8          Q     Did you share support staff, the

9     people that you -- strike that.  Let me ask this

10    question a little better.  The individuals with

11    whom you shared office space, did you also share

12    support staff?

13         A     We had a secretary that we shared her

14    expenses, you know, her paycheck.

15         Q     Her salary, okay.  Any other employees

16    that worked in the office that you shared with

17    any of your officemates?

18         A     Not that I recall.

19         Q     All right.  How did you come to

20    represent Jose Maysonet?

21         A     I'm not really sure.  I know I didn't

22    represent him from the origin of the case.  I think

23    Mr. Swano had represented him, and then I'm not sure

24    how he contacted me or how I got involved.  I'm not

25    really positive.

**Video Deposition**

```
 1          Q     Did you know Marty Abrams?

 2          A     I didn't know him very well.  I knew

 3     he was a defense attorney who practiced primarily

 4     at 26th Street.

 5          Q     Okay.  Did you know William Swano?

 6          A     I did.

 7          Q     Okay.

 8          A     Didn't like him.

 9          Q     And did he work at the Monadnock

10     Building?

11          A     No.

12          Q     No.  Where was his office, do you know?

13          A     I don't know.

14          Q     Did you know him as a defense attorney

15     when you worked in the Cook County State's

16     Attorney's Office?

17          A     I think I would have.  I met Mr. Swano

18     sometime in the mid '80s, you know, probably.

19          Q     And you said you didn't like him.  Why

20     didn't you like him?

21          A     I don't know.  He had an arrogance about

22     him.

23          Q     Did you ever work any cases either as

24     his adversary or --

25          A     No.
```

**Video Deposition**

57

```
 1        Q    Never was a Cook County state's attorney
 2    on a case where he was defending the defendant?
 3        A    Not that I recall.
 4        Q    What about co-defendants when you were
 5    both defense attorneys?
 6        A    No.
 7        Q    You knew, of course, he was indicted at
 8    some point?
 9        A    Yeah, at some point.
10        Q    Okay.  And that would have been one of
11    the reasons he couldn't represent Mr. Maysonet?
12        A    I was trying to figure that out,
13    the timeline.  I'm not sure when he got indicted
14    and when he ceased practicing law, but it seems to
15    me it would have been sometime in that time frame.
16        Q    It was.  Do you know whether it
17    was Mr. Swano who called you to retain you or
18    let you know, you know, I have a case or were you
19    retained directly by either Mr. Maysonet and/or
20    his family?
21        A    I think it would have been the latter
22    because Swano would have never called me for
23    anything.
24        Q    Okay.  So you weren't friends with him
25    where he's trying to refer his cases out because
```

**Video Deposition**

58

1    he's facing criminal charges?

2         A     Yeah, I wasn't friends with him.

3         Q     You wouldn't have been on the list for

4    that?

5               MS. ROSEN:  Object to the --

6         A     Hmm-um.

7    BY MS. BONJEAN:

8         Q     But you don't have a specific

9    recollection of how it was that you ultimately

10   came to represent Mr. Maysonet, right?

11        A     I don't.

12        Q     Do you know what you charged

13   Mr. Maysonet to represent him?

14        A     I don't.

15        Q     In reviewing the materials were you

16   able to -- strike that.  In reviewing the cases

17   that you looked at, were you able to refresh your

18   recollection that the underlying crime that

19   occurred and resulted in the indictment against

20   Mr. Maysonet for murder occurred in May of 1990?

21        A     Yes.

22        Q     Sound about right?

23        A     Yes.

24        Q     And I assume you don't know the date

25   on which you filed your appearance in the case,

**Video Deposition**

59

```
1    is that right?

2         A    I believe it was sometime in '92, '93.

3         Q    Okay.  I'm going to have you look at

4    this.

5              MS. BONJEAN:  Mark that, please.

6              (Whereupon Deposition Exhibit No. 1 was

7     marked for identification.)

8              (Discussion off the record.)

9         Q    I handed you Exhibit 1, Mr. Beuke.  Do

10   you recognize this?

11        A    Yes, my writing.

12        Q    Okay.  You recognize your signature

13   I assume, right?

14        A    Correct.

15        Q    And you can see it purports to be

16   an appearance form for Jose Maysonet filed by you

17   on November 5, 1992?

18        A    Yes.

19             MS. ROSEN:  Object to the form.

20   BY MS. BONJEAN:

21        Q    And does this comport with your

22   recollection of about the time that you filed

23   your appearance in the case?

24        A    I think so, yes.

25        Q    Okay.  You have no reason to quarrel
```

**Video Deposition**

60

1    with that --

2        A    No.

3        Q    -- November 5, 1992 file stamp, right?

4        A    No.

5        Q    Do you recall whether Mr. Maysonet

6    was charged with another case or another -- he

7    had another case at the time that you came in on

8    the murder case?

9        A    My recollection is that he did.  There

10    were two separate cases.  One I believe was a triple

11    attempt murder and the double murder.

12        Q    And you filed an appearance in the

13    double murder case, right?

14        A    I know -- I wasn't sure if I filed one

15    in the other one too.  I didn't think I did, but

16    I could be wrong.

17        Q    We'll get to that.  I've been unable

18    to find a formal appearance form.  But this seems

19    to relate to the double murder, right?

20        A    Yes.

21            MS. BONJEAN:  Now I'm going to have

22    you mark --

23            (Discussion off the record.)

24

25

**Video Deposition**

61

1          (Whereupon Deposition Exhibit No. 2 was

2       marked for identification.)

3          (Discussion off the record.)

4     Q    Mr. Beuke, I'm handing you what has

5    been marked as Exhibit 2.  It is a multipage

6    document and the first page has a Bates stamp

7    that begins Maysonet 12706, the last page 12746,

8    and it purports to be a report of proceedings for

9    his case with a number of different indictment

10   numbers.  Do you see that?

11    A    I do.

12    Q    Do you remember Mr. Maysonet's double

13   murder case getting reindicted?

14    A    Yes, I remember that it -- I think it

15   was reindicted and that they added Mr. Goosens or

16   something.

17    Q    Yeah, that's correct.  And you can see

18   on your appearance form it's a '92 number?

19    A    Right.

20    Q    But on his transcript there is -- there

21   are only '90 CR numbers?

22    A    Right, I see that.

23    Q    And you know, of course, that the case

24   happened in '90 and he was indicted in '90.  So

25   does that all sound familiar?

**Video Deposition**

62

1      A    That sounds familiar, right.

2      Q    Okay.  Now, this particular transcript

3  is from October 16, 1995.  Do you see that?

4      A    I see that.

5      Q    And the front -- first page indicates

6  who the Cook County state's attorneys were that

7  were assigned to the case as well as the defense,

8  Mr. Maysonet's attorneys, yourself and

9  Mr. Spector.  Does that sound --

10     A    I see that.

11     Q    And also indicated on the first

12  page of this transcript present was a Spanish

13  interpreter.  Do you see that?

14     A    Yes.

15     Q    Do you know whether or not you

16  used -- or a Spanish interpreter was used for

17  all of the proceedings with Mr. Maysonet or just

18  the substantive ones?  What's your recollection

19  of the Spanish interpreter use?

20     A    My recollection is they were used for all

21  of them.

22     Q    Okay.  And certainly this indicates

23  that there was a Spanish interpreter for this

24  proceeding, right?

25     A    Yes, it does.

**Video Deposition**

63

1       Q    Now, if you'd turn the page, I'm
2    going to just draw your attention to your remarks
3    at the bottom of the page there.
4       A    Page 2?
5       Q    Yes.  It says good morning,
6    Judge.  Your Honor, for the record, Rick Beuke.
7    I'm here on behalf of Mr. Maysonet.  Judge,
8    we are here before you today initially for
9    post-trial motions.  I have filed previously a
10   motion for a new trial.  I'd ask leave to file
11   today defendant's additional motion for new
12   trial.  Essentially I added two points that I
13   neglected to put in my first motion.  I tendered
14   a copy to the State.
15                 And does this refresh your
16   recollection of being present for Mr. Maysonet's
17   post-trial motions and sentencing?
18       A    It doesn't, but I'm sure I was there.
19   I know I handled the post-trial motions.
20       Q    Yeah.  Did you handle the case through
21   sentencing, to the best of your knowledge?
22       A    Yes, and I think I filed a notice
23   of appeal form and made sure the state appellate
24   defender was appointed.
25       Q    So we can agree then that

**Video Deposition**

64

1    you represented Mr. Maysonet on the double

2    murder case from the date of your appearance,

3    which was November 5, 1992, at least up until his

4    sentencing hearing, which occurred on October 16,

5    1995?  Does that sound right?

6        A    That's fair.

7        Q    I'm going to come back to that, but you

8    can put it aside for a minute.

9        A    (Witness complies).

10            MS. BONJEAN:  This is Exhibit 3.

11            (Whereupon Deposition Exhibit No. 3 was

12     marked for identification.)

13            (Discussion off the record.)

14        Q    I've handed you Exhibit 3, which is a

15    motion to quash arrest and suppress statements.

16    Do you see that?

17        A    Yeah, I do.

18        Q    And if you look at the last page, do you

19    see your signature there?

20        A    Yes, ma'am.

21        Q    Do you remember filing this motion,

22    Mr. Beuke?

23        A    I don't remember filing it specifically,

24    but my signature, and I know we filed a motion to

25    quash arrest and suppress evidence.  I remember that.

**Video Deposition**

```
 1        Q     Okay.  And you see there's two
 2   indictment numbers there on the front page?
 3        A     Yes.
 4        Q     Okay.  It looks like the original and
 5   then the superseding indictment?
 6        A     Right.
 7        Q     Do you -- there's no date on here
 8   when it was filed.  I assume you do not remember
 9   when you filed the motion to quash and suppress
10   statements, right?
11        A     I don't.
12        Q     I'm going to have you look at --
13              (Whereupon Deposition Exhibit No. 4 was
14       marked for identification.)
15        Q     I've handed you Exhibit 4, Mr. Beuke.
16   And I'm going to just ask that you look at --
17        A     4, bottom?
18        Q     Yeah, um-hmm.  Well, let's see.
19              MS. GOLDEN:  Do you have the Bates?
20              MS. BONJEAN:  Give me a second.  Okay.
21       Maysonet 5 is the Bates stamp, but it says C4 at the
22       bottom.
23        A     Okay.  Is that this (indicating)?  Because
24   I have Maysonet 4.
25        Q     Oh, that's the exhibit number.  If you
```

**Video Deposition**

66

```
 1      look at the Bates stamp in the lower right-hand

 2      corner, it's Maysonet 5, the page.

 3          A    Oh, okay.  Got it.

 4          Q    And at the very bottom, Mr. Beuke,

 5      the bottom entry, if you notice it says -- you've

 6      looked at half-sheets before, right?

 7          A    I have.

 8          Q    And do you see the indication that there

 9      was an attorney-filed motion to quash arrest and

10      suppress evidence?

11          A    I think you want to go up to 4/25/94.  It

12      says Beuke --

13          Q    Oh, yeah.  I was on the wrong

14      co-defendant.

15          A    Yeah, I think I filed the motions it looks

16      like 4/25/94.

17          Q    Thank you.

18          A    I think that may have been --

19          Q    The co-defendant.

20          A    -- the co-defendant.

21          Q    Okay.  So April 25, 1994, according

22      to the half-sheet, is when you filed the motion

23      to quash arrest and suppress evidence?

24          A    Yes, ma'am.

25          Q    Okay.  Sounds right?
```

**Video Deposition**

67

1       A    Sounds right.

2       Q    Now, prior to filing a motion

3  to suppress statements in this case I assume

4  you had conversations with Mr. Maysonet, is that

5  right?

6       A    I'm sure I did, Counsel.

7       Q    Do you have a recollection of having

8  conversations with Mr. Maysonet?

9       A    I knew he was in custody, or I believe he

10 was and I know I went to see him.  My recollection

11 is the conversations, Mr. Maysonet spoke some

12 English, at least enough to try to communicate with

13 me in just a meeting at the jail or at -- but I know

14 that -- I remember he was more comfortable in Spanish

15 and speaking Spanish.  And that's I think why we

16 asked for an interpreter when he was brought to

17 court in front of the judge.

18      Q    Was it your practice to be able to

19 use the interpreter in the backup with him if you

20 needed to talk to him outside the presence of the

21 judge?

22           MS. ROSEN:  In the backup?

23      A    In the lockup?

24           MR. KREJCI:  You mean in the lockup?

25           MS. BONJEAN:  Yeah.  Did I say backup?

**Video Deposition**

68

1             MR. KREJCI:  Yeah.

2             THE WITNESS:  Yes.

3    BY MS. BONJEAN:

4         Q    I apologize.  I misspoke.  I'll

5    ask it again.  Was it your practice to utilize

6    the services of the Spanish interpreters in the

7    lockup when you communicated with your clients?

8         A    Yes.

9         Q    And --

10        A    If they had time and ...

11        Q    Right.  If they were willing and they

12   had time, correct?

13        A    Yeah, but they were always very good.

14        Q    And do you have a specific recollection

15   of speaking to Mr. Maysonet in the lockup with

16   the use of a Spanish interpreter?

17        A    No.

18        Q    So -- but it was your practice to do so

19   when it was possible, is that fair?

20        A    When it was possible, yes, fair.

21        Q    And I assume that prior to filing this

22   motion to quash arrest and suppress statements

23   you had some interview with Mr. Maysonet at some

24   point?

25        A    I'm sure I did.

**Video Deposition**

69

```
 1        Q    Okay.  You didn't obviously get this
 2    information from out of thin air.  You had to
 3    have gotten it from Mr. Maysonet, right?
 4        A    And possibly some of the family members
 5    I think.
 6        Q    Okay.  And -- but if I'm understanding
 7    you correctly, you don't have a specific
 8    recollection of the date and time and place where
 9    you sat down and had that conversation, is that
10    right?
11        A    That's fair.
12        Q    And you would not have included
13    information in a motion to quash arrest and
14    suppress statements that didn't have a factual
15    basis, right?
16        A    I would not have.
17        Q    And I understand that the factual basis
18    can come from a number of different sources, but
19    one of those sources would be your client,
20    correct?
21        A    Sure.
22        Q    Now, I'm going to just focus
23    here on the motion for a minute.  Do you recall
24    the theory that Mr. Maysonet had been arrested
25    by Detective Paulnitsky in 26th Street or at
```

**Video Deposition**

70

```
1    26th Street in the building?
2              MR. KREJCI:  Objection to form.
3              MS. ROSEN:  Object to the form.
4   BY MS. BONJEAN:
5         Q    If you understand.
6         A    I think I understand that he was
7    there for an arraignment on another case and he
8    was taken from 26th Street by Detective Paulnitsky.
9         Q    Right.
10        A    I remember, you know, I read that in
11   a transcript.
12        Q    You can -- I'll have you look at the --
13        A    Yeah.
14        Q    If you want to look through and read
15   your motion, you can do that.
16             MS. GOLDEN:  Which exhibit is this again,
17    motion to quash?
18             MS. ROSEN:  Motion to quash.
19             MR. KREJCI:  Do you need a break, Rick,
20    to review that or --
21             THE WITNESS:  No, I'm good.
22   BY MS. BONJEAN:
23        Q    Okay.  So do you recall filing this
24   motion and -- that contained the allegation that
25   Mr. Maysonet --
```

**Video Deposition**

1          MS. GOLDEN:  Well, I don't think he's done

2     reading it.  Are you done reading it?

3          THE WITNESS:  No, I think I'm good.

4          MR. KREJCI:  Just point him to an area

5     that --

6          MS. BONJEAN:  Right, that's fine.

7     Q    We'll start at the beginning.

8     A    Okay.

9     Q    And then if you need to look at

10    the remainder of it, that's fine.  One of the

11    theories that was set out in the motion to quash

12    arrest was that he was arrested without probable

13    cause, right?

14    A    Yes.

15    Q    Okay.  And, again, you included in

16    here facts related to Mr. Maysonet's claims that

17    he was arrested while at 26th Street after he had

18    made bail on the other case, right?

19    A    Yes.

20    Q    And, again, that was information you got

21    from Mr. Maysonet, correct?

22    A    Mr. Maysonet I think and Rosa Bello and

23    his sister Rose.

24    Q    Right, okay.  Do you remember Rose also

25    testifying that she was there when that happened?

**Video Deposition**

72

```
 1        A     Yes.
 2        Q     So during the course of your
 3   representation of Mr. Maysonet, you did speak to
 4   his family members, is that right?
 5        A     I don't have a specific recollection of it,
 6   but I'm sure that would be my practice.
 7        Q     Okay.  Now, there's also a separate
 8   allegation that Mr. Maysonet's court-reported
 9   statement was involuntary.  And those allegations
10   start I believe at the bottom of -- well,
11   paragraph 6.  So if you want to go ahead and take
12   a look at that and let me know when you've had
13   a chance.
14        A     Okay.
15        Q     Okay.  Starting at paragraph 6 it says
16   subsequent to defendant's arrest at approximately
17   9:30 a.m. on August 22nd, the defendant was
18   interrogated by law enforcement officials or by
19   person or persons acting in their behalf.  The
20   next paragraph reads the statements sought to
21   be suppressed were a result of physical coercion
22   illegally directed against the defendant and as
23   such were, therefore, involuntarily given.  More
24   specifically, Police Officers Fred Montilla and
25   Ray Guevara placed black leather gloves on their
```

**Video Deposition**

1    hands and placed a telephone book to the

2    defendant's left side, as well as the top of his

3    head and the middle of his chest, upon which time

4    said officers had slammed the telephone directory

5    with a large police-style flashlight, causing the

6    defendant enormous pain.  Do you see that

7    allegation?

8        A    I do.

9        Q    Do you know where you received that

10   information?

11       A    I don't specifically recall from

12   where, but I would think it would have been both

13   from Mr. Maysonet and family members.

14       Q    Okay.  Again, this is not information

15   that you would have concocted on your own, right?

16       A    No, ma'am.

17       Q    And do you know whether you had

18   any conversations with Detectives or Officers

19   Montilla and Ray Guevara prior to filing this

20   motion in which they admitted to doing that?

21       A    I don't.

22       Q    It also alleges in the motions

23   that the statements sought to be suppressed

24   were obtained as a product of and as a direct and

25   proximate result of confronting the accused with

**Video Deposition**

74

1    certain material represented as fact known to the

2    interrogator to be misrepresentations.

3                    Do you remember that allegation?

4        A    I see that, yes.

5        Q    And there's even a to wit here,

6    a specific the defendant was told that he had

7    been implicated as the shooter in this offense by

8    other individuals not named and that if he wanted

9    to protect both his wife and his child, he would

10   have to provide the detectives with information

11   concerning the names of the individuals involved

12   in this crime.  Do you see that allegation?

13       A    I do.

14       Q    And those statements, again, were not

15   statements that you concocted yourself, right?

16       A    No.

17       Q    And you would not have included

18   this information in this motion unless there was

19   a factual basis for it, right?

20       A    Had I not been confident that there

21   was some merit to the allegations, I wouldn't have

22   included them.

23       Q    If you had no witness who would

24   testify to any of this, you would not have

25   been -- you would not have included it into the

**Video Deposition**

1    motion, right?

2         A    Correct.

3         Q    But as you sit here today, do you know

4    the sources of this information?

5         A    I do not.  I can't tell you yes, but

6    I believe it would have been part from Juan and

7    part from family -- there were members at Area 5,

8    if I recall also.

9         Q    Okay.  Moving on, it says the

10   statements made by the defendant after his

11   arrest were the product of coercion, were induced

12   by direct and indirect promises of threats --

13   and threats and are, therefore, impermissible,

14   unreliable for any use at trial.  The promises

15   included suggestions of offers of leniency,

16   inferences that charges would be dropped and

17   inferences that in exchange for statements and

18   self-incriminating actions, the number and

19   severity of possible charges against the

20   defendant would be limited, as well as the

21   immediate release of his wife Rosa Bello from

22   custody in Area 5, Violent Crimes.

23                    Again, the statements that

24   are contained here in paragraph 8 are statements

25   that you included in here because you had some

**Video Deposition**

1    factual basis to do so, correct?

2        A    Yes, ma'am.

3        Q    You didn't actually make this up

4    yourself as the attorney assigned to the case,

5    right?

6        A    No.

7        Q    And although you don't know the

8    specific sources of the information, is it your

9    best guess that it came from Juan and his family

10   members?

11       A    Yes, ma'am.

12       Q    There's also an allegation that he did

13   not knowingly waive Miranda.  Do you recollect

14   that allegation?

15       A    Yes.

16       Q    Again, this is information that would

17   have come from him or his family members if they

18   were privy to that, right?

19       A    I believe so, yes.

20       Q    We can get to that.  The motion

21   also alleges that the defendant on several

22   occasions immediately after his arrest made

23   numerous requests to contact family members or

24   his attorney, William Swano, for the purpose of

25   seeking counsel and advice and those requests

**Video Deposition**

77

1    were denied.  Do you see that?

2         A    Yes.

3         Q    You were aware that he actually had

4    an attorney at the time he was arrested, right?

5         A    When I got in the case, yes, I was aware

6    that Swano was his lawyer from the beginning.

7         Q    Right.  And, again, this statement

8    that's contained in the motion is premised on

9    facts that you developed as Mr. Maysonet's

10   attorney, right?

11        A    Yes.

12        Q    Without -- I assume, again, you don't

13   know the precise source of the information, but

14   fair to say that it came from either Juan or

15   family members?

16        A    That's fair.

17        Q    And then the remainder of the

18   motion essentially requests that the statement

19   be suppressed as a result of it being a product

20   of physical and psychological coercion, right?

21        A    Correct.

22        Q    Now, there ultimately was a hearing that

23   was held on this motion to suppress -- motion to

24   quash arrest and suppress statements.  You're

25   aware of that, right?

**Video Deposition**

78

```
 1        A     I am.
 2        Q     Okay.  You did not conduct the hearing,
 3     is that right?
 4        A     Right.
 5        Q     And do you remember that?  I mean,
 6     as you sit here today, is this something that
 7     you remember specifically or were you refreshed
 8     by this -- by some bit of information?
 9             MS. ROSEN:  Object to the form.
10   BY MS. BONJEAN:
11        Q     If you understand.
12        A     I do.  And I think after the ARDC
13     complaint was filed I did some thinking, not
14     only myself but with my wife.  And what was happening
15     in January of 1995, two things:  My third son was
16     getting -- was close to being ready to be born and
17     I was also having surgery, an osteotomy procedure
18     on my right knee.  And it had been a couple months
19     and a lot of testing that was done in order to set
20     up that procedure, and Ricky I think was born on
21                         .  And that's when I think
22     prior -- a month or two prior to that is when I asked
23     Mr. Rueckert if he could help me and get involved
24     in the case.  And that's how Randy, I believe, got
25     involved in the case.
```

**Video Deposition**

1      Q     Got it.

2             (Whereupon Deposition Exhibit No. 5 was

3      marked for identification.)

4             MS. BONJEAN:  We'll take a quick break so

5      you can have a copy.

6             MR. KREJCI:  Thank you.

7             THE VIDEOGRAPHER:  Going off the record.

8      The time is 11:57.

9             (Whereupon a recess was taken from

10     11:57 a.m., to 12:09 p.m., after which the following

11     proceedings were had:)

12            THE VIDEOGRAPHER:  We're back on the record.

13     The time is 12:09 p.m.

14   BY MS. BONJEAN:

15     Q     You can thumb through that, Mr. Beuke.

16     I will direct you to sections so -- but just so

17     you have some overall familiarity.  And I was

18     going to put on the record the Bates stamp for

19     the appearance form.

20            MS. ROSEN:  Okay.

21            MS. BONJEAN:  It is Maysonet 19955.

22            MS. GOLDEN:  Can you read that number again?

23            MS. BONJEAN:  19955.

24            MR. LEINENWEBER:  That's for the appearance.

25            MS. BONJEAN:  It probably has multiple

**Video Deposition**

1    Bates stamps because it was in the record a number

2    of times, but that's --

3              MS. ROSEN:  One of them.

4              MS. BONJEAN:  That's one of them.

5              MS. ROSEN:  Thank you.

6              MS. BONJEAN:  You know what, let me do

7    this to make it easier on you.  I'm going to switch

8    this to the single-sided copy for him.  I think it's

9    just easier for you to look through.

10             (Whereupon Deposition Exhibit No. 5 was

11   remarked for identification.)

12      Q    So, Mr. Beuke, I'm going to hand

13   you Exhibit 5.  It's a single-sided copy and

14   it is a transcript of report of proceedings.  The

15   top page is Bates stamped Maysonet 219, if you

16   see in the right-hand corner.

17      A    I see it.

18      Q    And there's a couple of dates in here

19   and there's an index.  I'm going to specifically

20   draw your attention to what would be, I guess,

21   Bates Stamp Maysonet 229.

22             MR. KREJCI:  Can I interrupt you just for

23    a second for the lunch menu thing they're passing

24    around?

25             MS. BONJEAN:  Oh, sure.

**Video Deposition**

1          (Discussion off the record.)

2    Q    Mr. Beuke, why don't you --

3    A    Look at this while you guys order lunch?

4    Q    -- starting at Maysonet 229, and just

5  if you want to just sort of thumb through it and

6  then I'll ask you some specific questions.  We

7  won't get into too much detail, but just so you

8  have some familiarity, okay?

9    A    (Witness complies).

10    Q    Mr. Beuke, can I just turn your

11  attention to Maysonet 229?

12    A    Yes.

13    Q    And at any point if you want to read

14  more, just let me know, okay?

15    A    Okay.

16    Q    This is the front, I guess, cover

17  page to the report of proceedings for the 31st

18  day of January of 1995.  Do you see that?

19    A    I do.

20    Q    And as you can see, the appearances on

21  the record were the Cook County State's Attorneys

22  Frank Marek and Ellen Mandeltort.  Do you see

23  that?

24    A    I do.

25    Q    And for the defendant it was Randy

**Video Deposition**

82

1    Rueckert.  Do you see that?

2        A    Correct, yes.

3        Q    And at the top this indicates that

4    this is a hearing on the motion to suppress

5    statements, correct?

6        A    Correct.

7        Q    Now, I asked you earlier before we

8    broke and you started to answer, but I'll ask you

9    again.  Do you know when Mr. Rueckert came into

10   the case to assist you?

11       A    I think we would have initially spoken

12   about it sometime in -- maybe a few months earlier in

13   November or October of '94.

14       Q    Was Mr. Rueckert an officemate of yours

15   at this particular time?

16       A    He was.

17       Q    And you started to explain, and if you

18   can indulge me, what is your best recollection of

19   why it was that Mr. Rueckert came into the case?

20       A    My son was born on                    It

21   was kind of a complicated birth.  My wife was in the

22   hospital with the baby for several days, and I was

23   to go in at some point to have this knee surgery.

24   So I think that's why I knew -- because Judge Morgan

25   was -- the case was five years old at the time.

**Video Deposition**

83

1    She wanted the case to proceed.  And that's when I

2    kind of reached out for Randy to see if Randy could

3    get involved and I'll bring him up to speed on the

4    case as best I can, and he agreed to do that.  That's

5    my best recollection.

6         Q    All right.  Do you know if Mr. Rueckert

7    and Mr. Maysonet ever had a face-to-face meeting?

8         A    I'm not sure but I believe they did.

9         Q    Okay.  And I'm correct that Mr. Rueckert

10   filed an appearance as, I guess, co-counsel with

11   you on this case.  He obviously didn't replace

12   you as counsel, right?

13        A    Right, correct.

14        Q    And the hearing was a hearing on

15   the written motion that you had filed on behalf

16   of Mr. Maysonet that has been previously marked

17   in this case, right?

18        A    That's correct.

19        Q    And, by the way, did you know Mr. Frank

20   Marek before this case?

21        A    I knew him but I didn't know him well.

22        Q    Okay.  Do you know if you were in the

23   state's attorney's office with him?

24        A    I'm not sure.  I think he was maybe a little

25   bit younger than me.

**Video Deposition**

84

1      Q    Okay.  You weren't in Gang Crimes

2   together, though, right?

3      A    No.  He was, to my knowledge, never in

4   there.

5      Q    What about --

6         MS. ROSEN:  Did you say never in Gang Crimes?

7         THE WITNESS:  I don't think he was in

8    Gang Crimes.

9   BY MS. BONJEAN:

10     Q    What about Ms. Mandeltort, did you

11   work with her ever at the Cook County State's

12   Attorney's Office?

13     A    I didn't, never worked with her.  I knew

14   her better than I knew Mr. Marek, and I don't think

15   she was ever in Gang Crimes either.

16     Q    Now, I'd like to draw your attention to

17   Maysonet 240.

18     A    Okay.

19     Q    Do you see -- if you'd take a look

20   at that page.  When you get there, just peruse

21   it and let me know when you've had a chance to

22   look at it.

23     A    Okay.

24     Q    Is it correct that based on what I've

25   shown you, that there was a Spanish interpreter

**Video Deposition**

85

```
 1    that was used during these proceedings?
 2         A    Appears that way.
 3         Q    And does that comport with your
 4    recollection of the proceedings that took place
 5    in court or with Mr. Maysonet for the most part?
 6         A    Yes.
 7         Q    You can put that aside for now.  We may
 8    get back to it.
 9         A    (Witness complies).
10         Q    Did you ever have an opportunity to read
11    these transcripts prior to trial?
12         A    I don't know if we had these
13    transcripts or we may have also had the Alfredo
14    Gonzalez transcripts.
15         Q    Okay.  I assume that you spoke
16    with Mr. Rueckert about what happened at the
17    suppression hearing, right?
18         A    Yes, I'm sure -- I don't have any
19    independent recollection of it, but I'm sure we did.
20         Q    Right.  And you're aware that
21    Mr. Maysonet testified at the suppression
22    hearing, right?
23         A    Yes, as did I think his sister.
24         Q    Correct.  I believe some family members
25    and, of course, certain detectives --
```

**Video Deposition**

1      A    Police.

2      Q    -- testified, right?  And you're aware

3  that Mr. Guevara or Detective Guevara testified

4  as well, right?

5      A    I believe so, yes.

6      Q    And if I hear you correctly, you're not

7  sure if you actually read the transcripts, but

8  you at least remember speaking to Mr. Rueckert

9  about who testified and generally what was

10  testified to at the suppression hearing?

11      A    That would probably be right.  I don't

12  remember specifically talking to him about it, but

13  I think you're right.  I would have talked to him.

14      Q    You did the trial, right?

15      A    Yes.

16      Q    So chances are you probably would have

17  familiarized yourself with prior testimony in the

18  case, right?

19      A    Right.

20      Q    Do you know if Mr. Rueckert

21  did this sort of as a favor for you or was he

22  compensated or do you have any recollection of

23  how that happened?

24      A    I don't have any recollection

25  specifically.  But I'm sure, you know, if I asked

**Video Deposition**

87

```
1    him to get involved and he did get involved in

2    November, I would have tried to make sure he was

3    compensated.

4         Q    Okay.  I assume you had respect for

5    Mr. Rueckert as an attorney, right?

6         A    I do.

7         Q    Did you consider him a friend?

8         A    Yes.  Still do.

9         Q    And is Mr. Rueckert the type of lawyer

10   who would suborn perjury, to the best of your

11   knowledge?

12        A    Never.

13             MS. ROSEN:  Object to the form.

14   BY MS. BONJEAN:

15        Q    I'm sorry?

16        A    No.

17        Q    Is in your experience Mr. Rueckert the

18   type of attorney who would purposefully have a

19   witness or a defendant testify to something

20   false?

21        A    No.

22             MS. ROSEN:  Object to the form.

23   BY MS. BONJEAN:

24        Q    And I assume you yourself would not

25   suborn perjury from one of your clients, correct?
```

**Video Deposition**

88

```
 1        A     No, ma'am.

 2        Q     And the same would hold true for

 3    a witness, right?

 4        A     True.

 5        Q     If you had reason to believe that a

 6    client was prepared to testify to something

 7    untruthfully, you would not elicit such

 8    testimony, correct?

 9        A     I wouldn't put him on the stand.

10        Q     And would that be true as it relates to

11    witnesses as well?

12        A     Yes.

13        Q     I am now going to have you go back to --

14    I think it's been marked as Exhibit 2.  It's the

15    other transcript.

16        A     Got it.

17        Q     Is that 2?

18        A     Yes.

19        Q     Yeah.

20              MS. BONJEAN:  Do you have that one,

21     Mr. Krejci?

22              MR. KREJCI:  Let's see.  What is this the

23     transcript of?

24              MS. BONJEAN:  It's the sentencing transcript.

25              MR. KREJCI:  Let's see.  Is that the -- is it
```

**Video Deposition**

89

1      in the -- would it be in this --

2              MS. ROSEN:  I'm not sure.

3              (Discussion off the record.)

4  BY MS. BONJEAN:

5      Q    Okay.  This is -- as you recall,

6   I had you look at it.  This is the one that has

7   the front page that says Also present:  Spanish

8   Interpreter and Neil Spector was there as well.

9      A    Yes.

10             MS. GOLDEN:  I'm sorry to interrupt, but

11   this is 2, right?

12             MS. BONJEAN:  Exhibit 2.

13             MS. ROSEN:  Maysonet 12706.

14             MS. GOLDEN:  Got it.

15  BY MS. BONJEAN:

16     Q    First I want to draw your attention,

17   Mr. Beuke, to an issue that you raised.  And I

18   don't know if you remember it, but if you could

19   look at -- it's, let's see, Bates stamped

20   Maysonet 12712.  And I'll just have you review

21   sort of the middle of the page where it says

22   Judge, as to the testimony of Dr. Thampy.  Do you

23   see that?

24     A    Yes.

25     Q    If you want to go ahead and read

**Video Deposition**

90

1    through that page on to mid of the next page,

2    mid page.

3        A    Okay.

4        Q    Does this refresh your recollection

5    about whether or not you had raised an issue

6    related to presenting testimony about

7    Mr. Maysonet's ability to understand Miranda in

8    English versus Spanish?

9        A    I don't recollect it specifically, but

10    I read it here.

11        Q    Okay.  And I'd also have you look

12    at -- I'm going to have you look at page Maysonet

13    12723, and let me know when you're there.

14        A    I have it.

15        Q    Okay.  And mid page there are some

16    remarks, I guess some post-sentencing remarks

17    by yourself.  And I want to draw your attention

18    to the second paragraph where it says it has

19    been a trying experience at times because of the

20    difficulty in the language and the ability to

21    communicate with him.  Do you see that?

22        A    I do.

23        Q    And does that comport with your

24    recollection of, again, how easily it was --

25    how easy it was to communicate with Mr. Maysonet

**Video Deposition**

1    in between court dates?

2         A    It does.

3         Q    And, again, you wouldn't have put

4    that on the record if it was not true, correct?

5         A    Correct.

6         Q    Lastly, I would like to draw your

7    attention to the next page beginning at Maysonet

8    12724.

9         A    Have it.

10        Q    And at the bottom the Court says,

11   thank you, Mr. Beuke.  I think, actually, before

12   that you said, Judge, I don't have anything else

13   to say.  I don't know if Mr. Maysonet wants to

14   address the Court, but it's been a privilege to

15   be in front of you too, Judge.  The Court says

16   thank you, Mr. Beuke.  Mr. Maysonet, anything

17   you want to say to the Court before I impose

18   sentence?  And the defendant -- that would be

19   Mr. Maysonet -- says I want to say that I am

20   innocent in this case.  You can take that out of

21   my heart, for the lady, the state's attorney or

22   the man.  I know -- I know I got myself into this

23   case and I lied and everything's a lie.  The only

24   thing I'm saying is that in spite of everything,

25   you can't see my innocence or you can see my

**Video Deposition**

1     family that's there, that they're suffering,

2     you know.  They know I'm innocent.  I've been

3     with them all this time.  All this time they've

4     been at my side because they know I'm innocent.

5     What I'm saying here, and I'm not saying it on a

6     written piece of paper to play games, pretend I'm

7     innocent.  Everything that I'm saying comes from

8     my heart, and I hope you have consideration with

9     me.  Not only for me, but look at my mother.

10     She's dying.  She suffers so much, so much

11     because she knows her son is locked up for

12     something that he did not do.  I know that you're

13     a mother just like my mother is, and I hope you

14     have a little bit of consideration, you know.

15     And my son also, in spite of me being in this

16     situation, I've never been able to have him in

17     my arms.  I've never been able to get to know

18     him because of this situation.  I know that you

19     can understand what I'm trying to say.  Mr. Beuke

20     that's here, in spite of us being together for a

21     time, he knows that I am innocent too.  The truth

22     is out there on the street, and in spite of all

23     this the truth is out on the street.  Alfredo

24     Gonzalez or Justino Cruz, they are all innocent

25     as well as I am.  The only thing is is that they

**Video Deposition**

93

1      lie better.  I know that I lied and I hope

2      that someday the truth, the truth will be found

3      outside somewhere.  Then you can be satisfied or

4      convinced that I'm innocent.  Thank you, your

5      Honor.

6                      Do you remember Mr. Maysonet

7      making those remarks during the sentencing

8      hearing?

9          A    I specifically don't but --

10         Q    But you have no reason to quarrel that

11     he made those remarks?

12         A    No.

13         Q    And did Mr. Maysonet profess to you,

14     again, to the best of your recollection, that he

15     was innocent?  And I'm not talking about on the

16     record but --

17              MR. KREJCI:  We're kind of getting

18      into that gray area of attorney-client privileged

19      communications.  I know he indicated he doesn't

20      recall specifically --

21              MS. BONJEAN:  Okay.

22              MR. KREJCI:  -- but I don't think there's

23      been any waiver by Mr. Maysonet, correct?

24              MS. BONJEAN:  I think Mr. Maysonet's probably

25      waived his attorney-client privilege.

**Video Deposition**

94

```
 1              MR. KREJCI:  I understand but I just --
 2              MS. ROSEN:  It has to be -- I mean, you
 3        have to make it clear that it's express.  And if it's
 4        express, then --
 5              MS. BONJEAN:  I will be happy to make
 6        it express at this point, that Mr. Maysonet does
 7        expressly waive his attorney-client privilege.
 8        I suspect there would have been an implicit
 9        waiver before this, but I am happy to do that.
10        And if Mr. Beuke recalls, that's fine, whatever
11        he recollects.
12              MR. KREJCI:  That's fine.
13     BY MS. BONJEAN:
14        Q    Okay.  So, Mr. Beuke, as you read in the
15        transcript, Mr. Maysonet professed his innocence
16        at sentencing.  Did you see that?
17        A    I did.
18        Q    Okay.  And do you have a recollection of
19        Mr. Maysonet professing his innocence in private
20        to you prior to -- at any point during your
21        representation of him?
22              MR. KREJCI:  For the record, same objection.
23        A    I have a recollection of him professing
24        his innocence.  My recollection, though, is that
25        his -- there was some discussion about the law
```

**Video Deposition**

95

1    of accountability and things like that.  I think

2    my best recollection is he had no idea what these

3    guys were going to do when they went over there.

4    He was never told, wasn't aware of it, had nothing

5    to do with the shooting and wasn't involved in that

6    in any way, shape or form.

7  BY MS. BONJEAN:

8        Q    Is it your recollection that he admitted

9    to being there?

10       A    That I don't have a recollection of

11   one way or the other.  But I recall, you know,

12   in prepping for trial I think that we were always

13   concerned that Alfredo Gonzalez had already been

14   convicted, had testified in his case that

15   Mr. Maysonet was the shooter.  His wife, Rosa,

16   had testified that they came to their house and

17   got a gun and she saw him load the gun and all leave

18   together.  So she was on paper under oath.  And the

19   other guy, Justino Cruz, was also on paper under

20   oath.  I would think, you know, maybe that's what

21   he's referring to when he says they lied better.

22       Q    Do you know what he was referring to

23   when he said they lied better?

24       A    I mean, I don't.

25       Q    But your recollection -- or strike

**Video Deposition**

96

1    that.  You don't have a specific recollection

2    of whether Mr. Maysonet told you he was there at

3    the scene -- at the scene of the crime?

4        A    I don't.  I know what was contained

5    in his court-reported statement, but we always took

6    issue with the court-reported statement I think.

7        Q    Okay.  Do you remember any

8    other conversations with Mr. Maysonet about

9    factually -- strike that.  Do you remember any

10    other conversations about the factual accuracy of

11    his court-reported statement?

12           MR. KREJCI:  Again, just for the record,

13     objection as to --

14           MS. BONJEAN:  Sure.

15        A    I don't specifically, no.

16        Q    Do you remember Mr. Maysonet telling

17    you that he was paying protection money to Ray

18    Guevara?

19        A    No.

20        Q    Is that something you think you would

21    have remembered?

22        A    I would think I would have remembered

23    that, yes.

24        Q    You don't remember him telling you

25    that Ray Guevara was extorting money from him?

**Video Deposition**

97

1      A      No.

2              MR. KREJCI:  Again, just along these lines,

3       a continuing objection as far as the attorney-client.

4              MS. BONJEAN:  Sure.

5      Q    And just to be clear, you

6    indicated that you were able to have sort of

7    a basic conversation with him in English.  I'm

8    guessing very basic.

9      A    That's my recollection, Ms. Bonjean.

10   I grew up in a -- with my Italian grandmother and

11   grandfather living upstairs, who spoke very broken

12   English.  So I was -- I was accustomed to being able

13   to get through a conversation with somebody who

14   wasn't, you know, artful in the English language.

15   I'd done it all my life with my grandpa and grandma,

16   and that's my recollection of what it was like with

17   Mr. Maysonet.  He clearly wasn't comfortable in an

18   English conversation.  He was much more comfortable

19   with an interpreter, and I'm pretty sure that's why

20   we insisted that there be an interpreter at the trial

21   and for our conversations.

22     Q    And if you were to have any substantive

23   conversations with Mr. Maysonet that included

24   language that was more sophisticated or complex,

25   you would have opted to use an interpreter,

**Video Deposition**

98

1    I assume?

2         A    Sure, I would have.

3         Q    All right.  You can put that aside

4    for the moment.

5         A    (Witness complies).

6              MR. KREJCI:  You want it back?

7              MS. BONJEAN:  Yeah, I'll take it back.

8         Q    Actually, before we do that, let me have

9    you look at Exhibit 5 again.

10        A    Okay.

11        Q    Hold on.  I may be wrong about this.

12   Let me just see.

13             MR. KREJCI:  Pull the transcript?

14             MS. BONJEAN:  Yeah, hold on.  You know

15    what, put it aside.  That's fine.  Let's mark this.

16             (Whereupon Deposition Exhibit No. 6 was

17    marked for identification.)

18             (Discussion off the record.)

19        Q    Mr. Beuke, I'm handing you what's been

20   marked as Exhibit 6.  In the lower right-hand

21   corner it has a Bates stamp of Maysonet 739.  If

22   you'd turn to the next page, it's a cover page of

23   this report of proceedings that indicates jury

24   trial that is under way in the case against

25   Mr. Maysonet and the date of August 10, 1995.

**Video Deposition**

99

1    Do you see that?

2        A    I do.

3        Q    And it also reflects that you are

4    the attorney that is appearing on Mr. Maysonet's

5    behalf, right?

6        A    Yes, ma'am.

7        Q    Okay.  And then if we go to the

8    next page it has the list of witnesses, including

9    Montilla, DiFranco, Guevara and then Rose

10   Maysonet.  Do you see that?

11       A    I do.

12       Q    All right.  We didn't include all

13   of the transcripts here because of the size, but

14   I wanted to specifically draw your attention --

15   if you'd go to the next page, it has a Bates

16   stamp of Maysonet 774 in the right-hand corner.

17       A    Right.

18       Q    And it is your cross-examination of

19   Fernando Montilla.

20       A    Um-hmm, I see that.

21       Q    Do you have a recollection of what

22   Montilla's testimony involved?

23       A    I don't.

24       Q    Okay.  Do you recall that there were

25   allegedly oral statements made by Mr. Maysonet

**Video Deposition**

100

1    prior to the court-reported statement?

2         A    I remember reading that in the opinion

3    review, yes.

4         Q    Okay.  And --

5         A    At the Cook County Jail you mean?

6         Q    There was one at Area 5 allegedly that

7    was witnessed by Montilla and Mingey and then

8    another one at Cook County Jail.

9         A    Okay.

10        Q    Does that sound right?

11        A    Sounds right.

12        Q    Okay.  And you can go ahead and take

13   your time looking through this, and I will tell

14   you specifically where I want you to focus but go

15   ahead and take your time.  I'm going to have you

16   pause at Maysonet 787 whenever you get there.

17        A    87?

18        Q    787 in the right-hand corner.

19        A    Okay.

20        Q    Let me know when you have a chance to

21   review your Q and A there.

22        A    Okay.

23        Q    Okay.  And starting at the top of the

24   page on Maysonet 787 you asked Detective Montilla

25   if he took any notes regarding his conversation

**Video Deposition**

1    with Mr. Maysonet on the 15th, which preceded

2    his court reported -- and he responded he did

3    not, right?

4        A    Right.

5        Q    And you did a cross-examination about

6    the use of general progress reports.  Do you see

7    that?

8        A    Yes.

9        Q    And on the next page you asked -- you

10   asked him, you know, the important stuff and why

11   detectives use them.  And going to Maysonet 789,

12   starting at the top of the page you ask the

13   question -- let me know when you're there.

14       A    I'm there.

15       Q    And those notes are always maintained

16   at Area 5 for any detective team that works in

17   any case, correct?  Answer, yes, they go with the

18   street files.  By the way, do you -- what do you

19   understand a street file to be?

20       A    It was a file that was kept internally

21   within each area on open investigations, I believe.

22   And then after the investigations were closed in

23   whatever way, either cleared without prosecution

24   or cleared with prosecution, I think they were moved

25   from one file cabinet to the other one so they would

**Video Deposition**

102

1    have it available to tender in discovery or tender

2    to the state's attorney who was prosecuting the case.

3         Q    Have you heard street files referred to

4    in any other name?

5              MS. ROSEN:  Object to the form.

6    BY MS. BONJEAN:

7         Q    Or with any other name?

8              MS. ROSEN:  Same objection.

9         A    Investigative files maybe.

10   BY MS. BONJEAN:

11        Q    Okay.  So you would use investigative

12   files and street files interchangeably?

13        A    I think so.

14        Q    Okay.  What about area files?

15             MS. ROSEN:  Objection, form, foundation.

16        A    No, I haven't heard area files.

17   BY MS. BONJEAN:

18        Q    Have you ever heard the term office

19   files?

20        A    Office files, I've heard that term.

21        Q    And what do you understand office files

22   to be?

23        A    I think it's basically the same thing.

24        Q    Okay.  So -- and then you know there's

25   a permanent retention file, of course, right?

**Video Deposition**

103

```
1        A    Right.

2        Q    Okay.  So the permanent retention

3   file you would agree is different than the

4   investigative file, correct?

5            MS. ROSEN:  Objection, form, foundation.

6            MS. BONJEAN:  Let me strike that.

7    Eileen actually had a good objection there.  I will

8     rephrase it.

9            MS. ROSEN:  Write it down, everybody, write

10    it down.

11  BY MS. BONJEAN:

12       Q    Would you agree that the permanent

13  retention file does not always have all the

14  documents that might be seen or observed in an

15  investigative file?

16            MS. ROSEN:  Objection, form and foundation.

17  BY MS. BONJEAN:

18       Q    If you know.

19       A    Yeah, I'm not sure.  I'm not sure if

20  they're one and the same or if there's a separate

21  file for all the actual reports that are actually

22  prepared by the detectives working on the case that

23  stays in one file and all the GPRs or the general

24  progress report notes that are in a different file.

25  I thought they were all in the same file, but I could
```

**Video Deposition**

104

1    be wrong.

2        Q    Okay.  So you understand that there's

3    a permanent retention file, right?

4        A    Yes, I do.

5        Q    And you understand that there's also

6    an investigative file or street file that was

7    maintained at the area while a case was open,

8    right?

9        A    Yes.

10       Q    Okay.  Are you familiar with any

11   other filing system used by area detectives in

12   and around 1990?

13       A    No.

14       Q    Okay.  So moving on here --

15            MS. ROSEN:  Can you tell me what page you're

16    on?

17            MS. BONJEAN:  Yeah, 789.

18       Q    -- Question, have you had an opportunity

19   to review the general progress report notes as

20   they apply to this case?  Answer, no.  Have you

21   ever seen the general progress report prepared by

22   any of the detectives that worked on this case?

23   No.  You didn't -- your work on this case on

24   the 15th in terms of your conversation with

25   Mr. Maysonet was never reduced to any general

**Video Deposition**

105

```
 1    progress report note, was it?  Answer, that's
 2    correct.  Do you see that?
 3         A    Are we on 787?
 4              MR. KREJCI:  789.  Paragraph 9 it starts.
 5              THE WITNESS:  Okay.
 6         A    Yes.
 7         Q    Okay.  Do you see that?
 8         A    Um-hmm.
 9         Q    And is it your recollection that
10    you had not received general progress reports for
11    whatever investigative activity happened on the
12    15th?
13         A    If they existed.
14              MS. ROSEN:  Object to the form.
15         A    And certainly based on the tone of the
16    questions, I hadn't received them.
17    BY MS. BONJEAN:
18         Q    And you had no reason to believe
19    that the Cook County state's attorneys who were
20    working the case would have concealed GPRs from
21    you, right?
22         A    No.
23         Q    In your experience the Cook County
24    state's attorneys specific to this case are not
25    the type of Cook County state's attorneys that
```

**Video Deposition**

106

```
 1     would conceal --

 2          A     These two --

 3               MS. SPIVY:  Objection, form.

 4          A     Yeah.  These two state's attorneys were

 5     ethical and, you know, upfront with their discovery,

 6     very straight shooters.

 7   BY MS. BONJEAN:

 8          Q     Okay.  So you would have had every

 9     expectation that if general progress reports had

10     been produced to them, you would have received

11     copies of them, correct?

12          A     Yes.

13          Q     Was it your practice to also subpoena

14     the Chicago Police Department directly in these

15     cases or did you rely on the State to produce all

16     discovery to you?

17          A      It was.  I'd sent subpoenas in numerous

18     cases and sometimes I'd just work with the state's

19     attorneys.  If I believed there were reports that

20     you would expect to be in the packet of discovery

21     that you had gotten and they weren't there, I'd bring

22     it to their attention or file a motion for some

23     supplemental discovery and let them explain why

24     they're not in existence or why they don't exist.

25          Q      So, for instance, if the detectives had
```

**Video Deposition**

1    testified -- or strike that.  If a detective --

2    I'm going to strike that.  Let's keep going with

3    this and then I'll come back to that.  Next page

4    you continue to question him.  In any event,

5    Detective, between the 15th and August 1st would

6    it be fair to say that you may have worked on 50,

7    60 cases?  Answer, on both, yes, sir.  Question,

8    on August 1st Detective Mingey came to you again,

9    correct?  Correct.  And on August 1st you had a

10   conversation with Mingey in Area 5?  Yes, sir.

11   He asked you to go with him to the Cook County

12   Jail, correct?  Yes, sir.  Now, is it your

13   understanding, Officer, that -- well, obviously,

14   Detective, you went to the Cook County Jail

15   because Mr. Maysonet was in custody, correct?

16   Answer, yes.  There's an objection.  Question,

17   well, that's where he was at, correct?  Answer,

18   yes.  The Court wants you to move on, as they

19   tend to do.  Let's see.

20        A    I think they were expecting a smart-ass

21   question.

22        Q    I know a little bit about that.

23   You questioned Mr. Montilla about the fact that

24   Mr. Maysonet was represented at that time --

25        A    Yes.

**Video Deposition**

1      Q    -- or at least it was a fair assumption

2    since he was in Cook County Jail, right?

3      A    Sure.

4      Q    Let's see.  Okay.  And then if you could

5    look at Maysonet -- at the bottom of page 798,

6    Maysonet 798.

7      A    (Witness complies).

8      Q    And you asked, Question, and did you

9    and Mingey prepare a police report concerning

10    your visit to the County jail?  Answer, no, sir.

11    Did you prepare any sort of report that

12    documented that you and Sergeant Mingey had a

13    conversation with Mr. Maysonet or any contents

14    of the conversation on August 1st?  Answer, no,

15    sir.  On August 2nd?  No, sir.  You never

16    prepared a report about it?  No.  Did you

17    or Mingey take any notes again during that

18    conversation?  No, sir.  Question, general

19    progress report notes I mean?  No.  So as far

20    as you know, the only people who knew about the

21    conversation that you had with Mr. Maysonet

22    either on the 15th or August 1st were you and

23    Mingey?  Answer, yes, sir.  Question, there were

24    no reports that were prepared that could have

25    been reviewed by any other detectives working

**Video Deposition**

1    on this case, fair to say?  Right.

2                    Do you have any reason to quarrel

3    with these transcripts?

4         A    None.

5         Q    And does this lead you to believe

6    that you had no general progress reports or any

7    reports that documented Mr. Mingey and

8    Mr. Montilla's conversations with Mr. Maysonet on

9    July 15th and August 1st?

10        A    I was a little outraged.  No, I don't.

11   That was the point I think of the cross.

12        Q    Right.  Thank you.  Now, you may not

13   remember but you didn't -- Mr. Maysonet did not

14   testify at the trial.  Do you recollect that?

15        A    I've seen that in my review.

16        Q    Okay.  And since he did not testify,

17   he didn't testify about the circumstances under

18   which he made his statement that he previously

19   testified to at the suppression hearing.  Do you

20   remember that?

21        A    Because he did not testify, yeah, that

22   through him didn't come out.

23        Q    Right.  Do you have any recollection

24   of why it was that Mr. Maysonet did not testify

25   at his trial?

**Video Deposition**

110

1      A    I don't have any specific recollection, but

2    I know we were -- I was probably concerned about --

3    well, I knew we were going to put Rose Maysonet on

4    the stand and Rose had actually -- I don't remember

5    her testimony specifically, but she was going to

6    get this ridiculous story that, you know, as to how

7    he was taken from area -- or 26th and California to

8    the area and that she was able to see him in custody.

9    And I think she even may have testified that he had

10    told her he was being beaten or something by the

11    police.  And I think it may have been a strategic

12    decision that rather than, you know, have to go

13    through a whole nother explanation as to the

14    court-reported statement and things like that,

15    that we just tried to beat up the detectives and

16    the report-writing and the whole, I mean, the story

17    as to how he gets there and requests for his lawyer.

18    Hopefully it would be enough if it came out from

19    Rose.

20      Q    Okay.  And is this your best guess about

21    what --

22      A    That's my best guess, yeah.

23      Q    Okay.  So this is your best guess

24    about what your strategic reason was for him not

25    testifying, right?

**Video Deposition**

111

```
 1        A      Yes.
 2        Q      But is it fair to say you don't have
 3   an independent recollection of speaking to him
 4   about whether or not he was going to testify?
 5        A      I don't.
 6        Q      Okay.  Do you recall what investigative
 7   efforts, if any, you took in connection with the
 8   case prior to trial?
 9        A      I don't.  I know I was -- we were
10   always very concerned about there was some deal
11   with Justino Cruz and there was some deal with Rosa
12   Bello, I mean, kind of deals that I had not been
13   privy to or kind of heard of before where you'd cut
14   a deal with one co-defendant in the case and you
15   would essentially tell him that you don't have to
16   testify against that guy.  We just want you to
17   testify against that guy.  That's something that
18   I'd never experienced in my, you know, work as a
19   state's attorney or as a defense attorney.
20        Q      Right, and you raise a good point.  Just
21   for the record, Rosa Bello did testify against
22   Alfredo Gonzalez, right?
23        A      Alfredo Gonzalez, right.  So she was
24   locked in under oath, and her story was a story that
25   was not very helpful to Juan's case.
```

**Video Deposition**

112

1     Q    Right.

2     A    And we didn't want her to testify if we

3  could keep her off the stand.

4     Q    Right.  And Justino Cruz testified

5  against Alfredo Gonzalez as well, right?

6     A    He testified also and he testified,

7  you know, kind of -- my recollection was that he

8  was consistent with Juan's statement.  And I didn't

9  want to -- one of the concerns was taking the chance

10  if we put him on the stand, Juan Maysonet, that the

11  State was sandbagging us and that we were going to

12  come back and bring either of those two witnesses in.

13     Q    And Alfredo Gonzalez went to trial

14  before Jose Maysonet, right?

15     A    Three years before, yeah.

16     Q    All right.

17     A    They could have called him.

18     Q    Do you know why the State did not call

19  Rosa Bello to testify at Jose Maysonet's case?

20     A    I don't have a specific recollection of

21  it, but I think there's something in the appellate

22  transcript that -- you know, of Mr. Gonzalez that

23  they made an agreement with her that she would only

24  have to testify against Alfredo Gonzalez.  She

25  wouldn't have to testify against her husband.

**Video Deposition**

113

1    Now, I know they were -- she was with child and

2    I'm sure she never wanted to testify against Juan,

3    but I hadn't heard of that kind of deal before.

4        Q   Right.  You had no independent knowledge

5    from her that she wasn't going to testify, right?

6        A   No.

7        Q   And you said you got this information

8    from the appellate division, which would have

9    been --

10       A   Yeah.

11       Q   -- afterwards.  Do you remember being

12    told by the state's attorney that they weren't

13    going to call her to testify?

14       A   I don't have a specific recollection

15    of that, but it's likely that I would have talked

16    to them before we started as to, okay, who are we

17    calling, who's going on, you know --

18       Q   Right.

19       A   -- what's the case going to be, you know.

20       Q   And they might have left themselves a

21    door open to call her?

22       A   Sure, yeah.  I couldn't have -- if they

23    wanted to call her, if they wanted to call Gonzalez

24    or Tino Cruz, that was certainly a possibility that

25    I was always worried about.

Video Deposition

114

1      Q    Okay.  And you're not aware of any

2    specific agreement that the State had with any

3    of those individuals that would prevent them from

4    testifying against Mr. Maysonet, is that right?

5      A    I'm not aware of any specific agreement,

6    but I think there is something in the opinion maybe

7    that when Rosa Bello testified in Gonzalez's case --

8    somehow it must have come up and I wasn't there.  I

9    don't specifically know where, but I think something

10   came up about the fact that she had agreed to testify

11   against Gonzalez but she -- as part of her agreement

12   to testify against Gonzalez, she was not going to be

13   called to testify against Maysonet.

14      Q    Okay.

15      A    I don't know if it was a written agreement

16   or just a promise or what.

17           (Whereupon Deposition Exhibit No. 7 was

18     marked for identification.)

19           MS. BONJEAN:  He can look at mine

20     (tendering).

21           MR. KREJCI:  Thank you.

22   BY MS. BONJEAN:

23      Q    Mr. Beuke, do you remember any

24   conversations specifically with Rosa Bello?

25      A    I don't specifically.

**Video Deposition**

1    Q    Do you remember whether or not she

2    explained the circumstances of her handwritten

3    statement to you at all?

4    A    We may -- if I did speak with her,

5    I'm sure I did talk to her about that, but I don't

6    have any independent recollection of that.

7    Q    Without the benefit of your file as

8    well, do you --

9    A    Yeah.  I remember seeing in the Appellate

10   Court opinion that the state's attorneys I think had

11   moved her or given her some sort of hotel allowance

12   before Gonzalez's trial --

13   Q    Right.

14   A    -- because somebody tried to kill her or --

15   yeah, I don't know if she was in witness protection

16   then or -- I know they had --

17   Q    Right.

18   A    -- they had that ability to do that

19   back then.

20   Q    Do you know whether she and Mr. Maysonet

21   were communicating with one another at the time

22   of his trial?

23   A    I don't remember.

24   Q    And as you sit here today, you

25   don't recall speaking with her specifically

**Video Deposition**

116

1    about the circumstances under which she made her

2    handwritten statement, correct?

3        A   I don't specifically recall, no.

4        Q   Okay.  Like, for instance, do you

5    recall whether or not she ever communicated to

6    you that there had been threats made against --

7        A   Her?

8        Q   -- her children or taking her children

9    away?

10          MS. ROSEN:  Object to the form.

11        A   I don't have, again, a specific recollection

12    of that.  But I'm sure if I talked to her, that's

13    something that would have come up because that was

14    one of the allegations in the motion.

15  BY MS. BONJEAN:

16        Q   I'm going -- I'm just putting this

17    in front of you to just draw your attention to

18    a few names.  Give me one second.  I'll represent

19    to you that the City of Chicago has represented

20    this document to be the investigative file in the

21    case.

22        A   Okay.

23        Q   Sorry.  Give me a second, since I'm

24    working on a computer.

25          MR. KREJCI:  Do you want to use this?

**Video Deposition**

117

1              MS. BONJEAN:  Yeah, it's easier for me.

2              MR. KREJCI:  Sure (tendering).

3              MS. BONJEAN:  I'm actually old school too.

4        Q    Okay.  I'm going to specifically draw

5    your attention towards the back of the document,

6    Mr. Beuke.  And in the right-hand corner that's

7    Bates stamped RFC-Maysonet starting 1 and then

8    I'm going to have you go to page 51, if you

9    would, please.

10       A    Okay.

11       Q    In the middle of the page it says

12   on August 22, 1990 at 2000 hours Jose Maysonet

13   was interviewed by Detective Guevara, who speaks

14   Spanish.  During this interview Jose Maysonet

15   agreed to tell all he knew.  Do you see that?

16       A    Yes.

17       Q    And then there's a summary of what

18   Mr. Maysonet allegedly told Detective Guevara.

19   Do you see that?

20       A    I do.

21       Q    Okay.  I just want to ask you a few

22   questions.  Lluvia you know was a co-defendant,

23   correct?

24       A    Yes.

25       Q    Did you ever have an opportunity to

**Video Deposition**

1    speak with him prior to Jose's trial?

2        A    No, he was -- he had already been convicted

3    and sentenced.  Is that Gonzalez?

4        Q    Yeah.

5        A    Yes.

6        Q    Okay.  What about -- we talked about

7    Rosa Bello.  What about, if you keep going down,

8    do you know -- well, I'll read from -- do you see

9    where it says he walked out of his apartment and

10   they asked him if he wanted to drive the car they

11   had?

12            MR. LEINENWEBER:  Which page are we on?

13            MS. BONJEAN:  51.

14            MR. LEINENWEBER:  Oh, still on 51?

15            MS. BONJEAN:  Yeah.

16       Q    He recognized the car as being

17   the older model light blue over dark blue Pontiac

18   Bonaventure, I guess?

19       A    Bonneville.

20       Q    Bonneville that belonged to another

21   Latin King named Jeffery.  Do you have a

22   recollection of determining who Jeffery was?

23       A    I don't.

24       Q    Okay.  Do you know whether Mr. Maysonet

25   ever told you who Jeffery was?

**Video Deposition**

119

1      A    I don't have a specific recollection of him
2    telling me that, no.
3      Q    Or who --
4      A    Yeah, whether he was a real person or not.
5      Q    Right, or who --
6      A    This is the detective sup as to what --
7      Q    Correct.
8      A    -- Jose told them.
9      Q    Right.  But you were never able
10   to determine who Jeffery was, to the best of your
11   recollection, right?
12     A    No.
13     Q    And -- or even whether Jeffery existed,
14   right?
15     A    Right.
16     Q    He agreed to drive the car.  He
17   drove down Homan.  You can go to the next page.
18   Lluvia, Fro and Tino all got out of the car.  Do
19   you see that?
20     A    I do.
21     Q    Do you know who Fro is?
22     A    As I sit here, no.
23     Q    Okay.  Does Christopher Goosens'
24   nickname sound --
25     A    Christopher -- yeah, I was thinking it may

**Video Deposition**

1   have been Goosens, but I wasn't sure.

2       Q   Okay.  Were you aware that Goosens was

3   acquitted?

4       A   Yes.

5       Q   Okay.

6       A   He was there during our trial.

7       Q   Okay.  And did you consider calling

8   Goosens as a witness or -- if you remember?

9       A   I don't -- I don't believe that was ever

10   a strategy we had thought about.

11       Q   Okay.  And --

12       A   Because he wasn't sure he was going to --

13   I mean, I think everybody expected that there really

14   wasn't any evidence against him and he was going to

15   be a bench trial, not guilty.

16       Q   There were no statements -- he made no

17   statements, right?

18       A   No, no.

19       Q   What about Tino, do you know if you ever

20   had any conversations with Justino Cruz?

21       A   I don't remember specifically.

22   I recall us trying -- I think he was placed

23   somewhere in protective custody within the Illinois

24   State Department of Corrections because he had agreed

25   to testify in the first trial, and we weren't able

**Video Deposition**

1    to get access to where he was.  And when -- I think

2    at some point during preparation they were indicating

3    that they weren't going to call him, and we were

4    fairly happy about that I think.

5        Q    Were you -- did you find it curious

6    that they weren't going to call him?

7        A    Yes.

8        Q    And you weren't able to really figure

9    out why they didn't call him, right?

10        A    No.  I think in my own mind, you know,

11    there are prosecutorial decisions that you make, and

12    sometimes you're going to try a statement-only case

13    when the statement is pretty good.  And, you know, I

14    think they made a judgment -- this is just opinion --

15    but they made a judgment that the statement was good

16    enough to state's attorneys, court reporters, you

17    know, detectives, you know.  They were willing to

18    try the case that way.

19        Q    That's -- you're speculating, though,

20    about that?

21        A    I'm speculating, yes.

22        Q    You said two state's attorneys.  Why do

23    you say two state's attorneys?

24        A    No, I meant a statement to the state's

25    attorneys.

**Video Deposition**

122

```
 1        Q    Oh, to the state's attorneys?

 2        A    Yes.

 3        Q    Okay, my apologies.  And I meant to

 4    ask you this.  I know you didn't call Gossens or

 5    Goosens as a witness.  Do you remember speaking

 6    to him or interviewing him prior to

 7    Mr. Maysonet's trial?

 8        A    I don't specifically recall, but I'm sure

 9    when we were -- during the trial when we were back in

10    the lockup, Randy was representing Mr. Goosens.  And

11    when we were in the back together, I'm sure we spoke

12    about how the trial was going and, you know --

13        Q    Right.

14        A    -- I can't recollect anything that was said,

15    but I'm sure we had those conversations.

16        Q    Do you know whether Mr. Rueckert

17    represented Goosens before he represented

18    Maysonet in the hearing or after?

19        A    I don't know.

20        Q    Okay.  Obviously representing co-

21    defendants can potentially bring about conflict

22    issues, right?

23        A    Oh, sure.

24        Q    Can I assume that Mr. Rueckert, to

25    the best of your understanding, felt comfortable
```

**Video Deposition**

123

1     representing both Mr. Maysonet and Mr. Gossens or

2     Goosens because their -- at least at trial their

3     defenses were consistent with one another?

4            MS. GOLDEN:  Foundation.

5            MS. ROSEN:  Object to the form, foundation.

6            MR. LEINENWEBER:  Join.

7  BY MS. BONJEAN:

8     Q    If you know.

9     A    Yeah, I don't know.  But my recollection

10    is is that at the -- when we decided to go to

11    trial -- or when we were going to trial, I think it

12    was fairly clear that Mr. Goosens didn't have a whole

13    lot to worry about.  There was nothing tying him to

14    the scene, nothing tying him to the crime.  He had no

15    statement.  The only thing that he had, you know, he

16    didn't have any evidence that was going to link him

17    to these murders.

18     Q    Right.  But if Mr. Rueckert had

19    information that might potentially -- I guess

20    strike that.  It might be a question better left

21    for Mr. Rueckert.

22     A    Yeah, I --

23     Q    But you'd agree, though, that

24    Mr. Rueckert did represent two co-defendants in

25    this case, correct?

**Video Deposition**

124

1      A      He represented Maysonet for the motion.

2      Q      Right.

3      A      And then he took over for Mr. Goosens.

4      Q      Right.  After, is that right?

5      A      After.

6      Q      And Mr. --

7      A      I think the public defender had Mr. Goosens,

8      Kevin Foster or something, up to then.

9      Q      And we can agree that Mr. Maysonet

10     had implicated Christopher Goosens in his court-

11     reported statement, right?

12     A      If he said in the court-reported

13     statement Fro.  I'm not sure if it was Fro Goosens

14     or Christopher Goosens.  I don't know.

15     Q      Well, that's a good point.  At least

16     from the state's attorneys' perspectives he had

17     implicated Christopher Goosens --

18     A      Could have been.

19     Q      -- right?

20             MS. ROSEN:  Object to the form.

21     BY MS. BONJEAN:

22     Q      If you remember.

23     A      Yeah, I don't remember.

24     Q      I think the statement has a different

25     name, Christopher Fernandez or Hernandez or

**Video Deposition**

125

1      something like that.

2                  MS. ROSEN:  Object to the form.

3      BY MS. BONJEAN:

4          Q     You're not aware of any other

5      Christophers who were indicted on this double

6      murder, are you?

7          A     No.

8          Q     Okay.  Making our way down on page 52,

9      that first chunky paragraph, if you go to the --

10     let's go to the -- towards the end of it where

11     it says that same day, about 2200 hours.

12         A     Under Maysonet's statement?

13         Q     Yeah.

14         A     Yes, got it.

15         Q     Are you there?

16         A     Yes.

17         Q     Okay.  It says Lluvia, Fro, Tino,

18     Cisco and King all came by his house.  Tino

19     and King are brothers.  King showed Maysonet

20     that he was carrying a gun, the same gun used

21     in the murders.  King put the gun to Maysonet's

22     head and told him that if he talked about the two

23     murders, he would be 6 feet under.  Do you see

24     that?

25         A     I do.

**Video Deposition**

126

1     Q    Okay.  Did you ever determine who Cisco

2   was or if you recall having done so?

3     A    I don't know if we ever were able to

4   determine who it was.  I don't have any specific

5   recollection of that.

6     Q    And what about King, were you ever able

7   to determine who King was?

8     A    I don't believe so.  I don't have

9   a recollection of that either.

10    Q    Okay.

11    A    But I think we -- I think that was part

12  of the -- part of the strategy to use that in order

13  to explain why he may have said certain things, that

14  they had threatened to kill him, you know, his own

15  fellow gang members.

16    Q    Okay.  And, again, are you -- is this --

17    A    Because I think we got that out through

18  Montilla also, maybe Mingey, that he was telling them

19  I've been threatened by these guys.

20    Q    Well, you got that out through Montilla?

21    A    Yeah.

22    Q    Mr. Maysonet didn't testify?

23    A    No, it came -- I got it out through

24  Montilla.

25    Q    That was a strategy that you used to

**Video Deposition**

127

1    cross-examine Mr. Montilla, right?

2         A    Right.

3         Q    But, again, do you have a specific

4    recollection of discussing either of these

5    individuals with Mr. Maysonet?

6         A    I don't.

7         Q    Okay.  And --

8         A    Could have but I don't.

9         Q    And you don't have a specific

10   recollection of speaking to either of these

11   individuals, King or Cisco, directly, right?

12        A    Yeah.  Again, I could have, but I don't have

13   any specific recollection.

14        Q    And you don't have your file obviously

15   to --

16        A    Right.

17        Q    -- look at to determine whether

18   in fact you may have made a note of interviewing

19   them, right?

20        A    Correct.

21        Q    And if you go to the next page here,

22   we're able to maybe clear this up a little bit.

23   Page 53, first full paragraph.

24        A    Right.

25        Q    At the very bottom it says at

**Video Deposition**

128

1    Area 5 Maysonet was shown loose, candid photos

2    of Latin King members.  He identified a photo of

3    Christopher Fernandez as being Fro.  Do you see

4    that?

5         A    I do.

6         Q    Okay.  And that's -- again, I know

7    you don't remember specifically, but if Chris

8    Fernandez turned out to be Christopher Goosens,

9    would you agree that Mr. Maysonet did in fact

10   implicate Mr. Goosens in his alleged oral

11   statement and then court-reported statement to

12   Detective Guevara?

13             MR. LEINENWEBER:  Objection to form.

14        A    I don't know.  That's a little bit of a

15   stretch I think but ...

16  BY MS. BONJEAN:

17        Q    I mean, if the photo is Goosens?

18        A    Oh, if the photo is Goosens?  Oh, okay.

19        Q    Yeah.

20        A    Did Mr. Maysonet sign the photos?  Did they

21   have him sign those?

22        Q    I think that there are some signed

23   photos.  If I had them easily accessible, I would

24   let you --

25        A    Yeah.

**Video Deposition**

129

1    Q    And I'm not trying to withhold it.  I

2    just don't think we have copies of it.  Maybe we

3    do.  And if you don't remember, that's okay too.

4        A    I don't remember.

5        Q    Can you go to the next page or page 55?

6        A    55?

7        Q    Yeah.

8        A    First page of the sup?

9        Q    Yep.  Do you see this is a canvass

10    report that was prepared by a Detective Willie

11    Ware?

12        A    Um-hmm.

13        Q    Do you know Detective Ware?

14        A    I don't.

15        Q    All right.  And it appears to be

16    prepared very close in time to the occurrence,

17    May 25, 1990?

18        A    Right.

19        Q    Do you see that?

20        A    I do.

21        Q    Signed off by Sergeant Mingey?

22        A    Um-hmm, yes.

23        Q    And there's -- I'm sorry.  There's a

24    statement by Alma Preceeo there?

25        A    Yes.

**Video Deposition**

130

1      Q   It says that she -- well, first of all,

2   she has an address of 3419 West North Avenue.  Do

3   you see?

4      A   Yes.

5      Q   And the shooting happened at 3428 West

6   North Avenue?

7      A   Right.

8      Q   And she said that she was awakened

9   at 2400 hours by the sound of two male English

10   voices that were engaged in an argument.  Preceeo

11   stated that she could only hear bits of the

12   conversation, I'm trying to help you, I'm going

13   to kill you, I'm going to kill you first, you

14   said that we would get the last bus.  The total

15   argument lasted for about an hour.  After hearing

16   four shots, Preceeo called the police.  Preceeo

17   then gave reporting detectives her sister's,

18   Carmen Macias' business telephone number, who was

19   also home when the incident occurred.  Do you see

20   that?

21      A   Yes.

22      Q   Do you know if you spoke to Alma Preceeo

23   prior to Mr. Maysonet's trial?

24      A   That I remember -- I remember us going

25   to the scene and looking for these people.  I'm not

**Video Deposition**

131

1    sure if we ever found them.

2        Q    Okay.  You don't have a recollection of

3    interviewing Ms. Preceeo, though, right?

4        A    I don't.  But none of them were called by

5    the State at trial.

6        Q    Right.  Would you have been interested

7    in talking to Ms. Preceeo, since she details this

8    argument directly before the shooting?  And if

9    you can't answer that question, that's fine.  I'm

10   just trying to --

11       A    Yeah.  I think my -- in terms of the

12   defense's strategy, if the State didn't present

13   anybody from the scene and there were people that

14   they conceivably could have called, I think that's

15   something that I would use in an argument as to why

16   the State's, you know, evidence fails.

17       Q    Um-hmm, okay.

18       A    So I think we went out and looked for them.

19   I know we went to the scene a few times.

20       Q    Okay.  So you don't remember talking to

21   her, right?

22       A    I do not, no.

23       Q    And same with her sister, Carmen Macias,

24   on the next page?

25       A    Same.

**Video Deposition**

132

1        Q    She was contacted by telephone at

2    place of employment and related that she was

3    awakened at about 11 o'clock or 2400 hours by the

4    sound of two male blacks having an argument.  One

5    had a calm voice.  The second had a loud,

6    abrasive type voice and sounded as if he may

7    have been drunk.  Macias was only able to hear

8    parts of the argument that lasted for at least

9    an hour.  Both subjects referred a number of

10   times to someone called Lulu Dog and also had

11   some agreement about a bus.  Macias did not call

12   the police after hearing shots because she did

13   not have a telephone in her apartment but

14   considered going downstairs to her father.

15   Do you see that?

16        A    I do.

17        Q    Same answers to my prior questions?

18   Do you -- or strike that.  I'll just ask you.  Do

19   you remember talking to Carmen Macias?

20        A    I don't but I could have.

21        Q    Okay.  Do you remember -- do you

22   remember this statement in this report

23   independently or --

24        A    I don't.

25        Q    Okay.  And you don't recollect whether

**Video Deposition**

133

1    you were able to locate her, is that fair?

2         A    I don't recall if we did.  Like I said,

3    I know we went to the scene specifically to try to

4    see if anybody could give us any information, and

5    I don't specifically remember talking to either of

6    these two ladies.

7         Q    Okay.  Do you have a recollection

8    as you sit here today regarding what the motive

9    of this crime was?

10        A    I don't think so.  I mean, I don't

11   think that either of the victims, if I recall, were

12   rival gang members.  That was, you know, it was a big

13   popular one back then --

14        Q    Right.

15        A    -- but I don't know if either of the two

16   victims were into anything, Black Gangster Disciple

17   or some rival gang.

18        Q    Do you remember seeing their rap sheets?

19        A    I don't.  Well, I'm sure I did, but

20   I don't remember now.  I remember that at least in

21   the statements that were given by the co-defendants

22   and Juan, I think there was some reference to some

23   drug deal that was supposed to happen or --

24        Q    Right.

25        A    -- they needed a gun for some drug deal

**Video Deposition**

134

1      or something.

2          Q    Do you remember if their criminal

3      histories reflected any type of history of drug

4      convictions or serious drug convictions?

5          A    I don't remember.

6              MS. BONJEAN:  Can you mark this.

7              (Whereupon Deposition Exhibit No. 8 was

8        marked for identification.)

9          Q    Okay.  So Exhibit 8, the front page is

10     Torrence Wiley's criminal history?

11         A    Right.

12         Q    Pretty --

13         A    Clean.

14         Q    Pretty clean, right?

15         A    Yes.

16         Q    No indication of --

17         A    Drug dealing.

18         Q    -- drug dealing or drug -- even drug

19     use, right?

20         A    No.

21         Q    And apart from this, I guess, mob

22     action, which I don't even know if -- I don't

23     know if that was struck down as Constitutional or

24     not but --

25              MS. ROSEN:  I object to the editorializing.

**Video Deposition**

135

1  BY MS. BONJEAN:

2        Q    Well, I think one of them was -- gang

3    loitering was struck down, wasn't it?

4              MS. ROSEN:  I'd just object to the

5      editorializing.

6              MS. BONJEAN:  That was a question.

7        Q    But no --

8        A    Yeah.

9        Q    This sheet doesn't reflect much of a --

10   doesn't look like a hardened gang criminal, does

11   it?

12             MS. ROSEN:  Object to the form, foundation.

13       A    They were older gentlemen too --

14  BY MS. BONJEAN:

15       Q    Right.

16       A    -- 26 and 27, no.

17       Q    Yeah, right.  And that's -- and Kevin's

18   has got a couple more entries, but same type of

19   thing, right?

20       A    Yes.

21       Q    Not real reflective of someone who is

22   heavily involved in either gang -- or, I'm sorry,

23   heavily involved in drug use or drug sales,

24   right?

25       A    Right.

**Video Deposition**

136

1           MS. ROSEN:  Objection, form, foundation.

2    BY MS. BONJEAN:

3        Q    And same would be true as to heavily

4    involved in gang activity, right?

5           MS. ROSEN:  Objection, form, foundation.

6        A    I've seen a lot worse.

7    BY MS. BONJEAN:

8        Q    Okay.  Now, let me get my bearings

9    here.  I'm going to switch subject matters a

10   little bit.  Mr. Beuke, at the time that you

11   represented Mr. Maysonet, which we established

12   was I think -- I wrote it down -- between

13   November of '92 and his sentencing hearing,

14   which was in '95?

15       A    I think October.

16       Q    Is that right?

17       A    October of '95.

18       Q    Yeah.  You obviously knew who

19   Mr. Guevara was, right?

20       A    I did.

21       Q    Okay.  Would you consider him or did you

22   consider him a friend at that time?

23       A    I know I think at a prior deposition or

24   at some prior statement I said he was a friend, but

25   I can tell you he wasn't -- it was probably a poor

**Video Deposition**

137

1    choice of words.  He was an acquaintance.  He was

2    someone I knew through our practice, you know, of

3    going to 26th Street almost every day and -- but

4    I never saw him socially or didn't hang around with

5    him outside of work.  He was an acquaintance.

6        Q    However you characterized your

7    relationship or friendship, or however you

8    want to characterize your relationship with

9    Mr. Guevara, do you specifically remember talking

10   to Mr. Maysonet about that relationship with

11   Mr. Guevara at any point when you were

12   representing him?

13       A    I don't have any independent recollection

14   of that.

15       Q    Okay.  And do you have any recollection

16   of discussing with Juan during the time that you

17   represented him about your prior contacts with

18   him, with Mr. Guevara?

19       A    No independent recollection, no.

20       Q    Okay.  And you would admit that at

21   certain points in the '90s you did represent

22   Mr. Guevara on a couple of legal matters, right?

23       A    There was the child support issue that,

24   you know, I've seen my appearance on or I think Randy

25   filed my appearance on a child support matter, so

**Video Deposition**

138

1    yes.

2        Q    Okay.  Well, I'm just going to have

3    you identify a couple documents and see if they

4    refresh your recollection about some things.

5              (Whereupon Deposition Exhibit No. 9 was

6     marked for identification.)

7        Q    Mr. Beuke, do you see a document

8    in front of you with a caption of Minerva Benitez

9    vs. Reynaldo Guevara?

10       A    I do.

11       Q    And it has a docket number --

12             MR. LEINENWEBER:  Sorry.  Can I just ask,

13    is it on the Dropbox --

14             MS. COHEN:  I'm putting it on there now.

15             MR. LEINENWEBER:  If we can just wait until

16    she does that.

17             MS. BONJEAN:  Okay.

18             THE WITNESS:  Guys, can we take a quick

19    break?  I just got a call from my wife.

20             MS. BONJEAN:  Yeah, sure.

21             MR. KREJCI:  Thank you.

22             THE VIDEOGRAPHER:  Going off the record.

23    The time is 1:29 p.m.

24

25

Video Deposition

139

1              (Whereupon a recess was taken from 1:29 p.m.,

2        to 2:01 p.m., after which the following proceedings

3        were had:)

4              THE VIDEOGRAPHER:  We're back on the record.

5        The time is 2:01 p.m.

6    BY MS. BONJEAN:

7        Q    Okay.  Mr. Beuke, I'm handing you what

8        I've marked as Exhibit 9, which is a document

9        with a caption Minerva Benitez vs. Reynaldo

10       Guevara.  Do you see that?

11       A    I do.

12       Q    And do you know who Minerva Benitez was

13       or is?

14       A    I don't.

15       Q    You know who Reynaldo Guevara is, right?

16       A    I do.

17       Q    The docket number it looks like is

18       87 D -- is that D as in "dog"?

19       A    I believe so, yes.

20       Q    -- 063057.  Do you see that?

21       A    Yes.

22       Q    Is that a -- does the D stand for

23       domestic?

24       A    I believe it does, yes.

25       Q    Okay.  And do you see your signature

**Video Deposition**

140

1    there at the certification at the bottom?

2        A    Yes.

3        Q    Okay.  And you see Reynaldo Guevara's

4    next to yours?

5        A    I do.

6        Q    And this purports to be a petition to

7    stay service or order for withholding and notice

8    of delinquency.  Do you see that?

9        A    I see that.

10       Q    What is that, do you know?

11       A    I really don't.  I think it's something

12   to do with child support.

13       Q    Child support payments, okay.  And the

14   caption says now comes the petitioner or obligor,

15   who is Reynaldo Guevara, in the above-entitled

16   case and states that -- it's cut off, serve of

17   the proposed order for withholding.  It's not

18   dated and the attached notice of delinquency

19   which -- for the date of September 30, 1994.

20   Do you see that?

21       A    I do.

22       Q    Okay.  So it looks like this must have

23   been a domestic case that was initiated in '87.

24   Does that seem right to you?

25       A    Sounds right.

**Video Deposition**

141

1      Q   Okay.  And then there was obviously

2   some type of issue related to child support that

3   was raised in and around September of '94?

4      A   I think it may have been earlier.

5      Q   Okay.  Do you know -- do you know

6   when there was an issue raised as to child

7   support?

8      A   I don't.  But is the dated -- where

9   it says parentheses dated and then there's no date

10  there, is there anything whited -- was that whited

11  out or something?

12     Q   I did not redact or white anything out.

13     A   Yeah.  I just think he -- if my recollection

14  is correct, he had gotten this delinquency notice or

15  something, and maybe that would have been when he got

16  it.  My recollection is it was before 9/30/94.

17     Q   But the notice of delinquency was dated

18  September 30th of '94, right?

19     A   Yes.

20     Q   Okay.  Do you remember representing

21  Mr. Guevara on this case?

22     A   I don't.

23     Q   Do you remember appearing for him or

24  doing any legal representation, however small it

25  may have been, in connection with this matter?

**Video Deposition**

142

1      A   Yes, I think we had agreed to file this

2   on his behalf to try to make sure -- I don't even

3   know if they were going to --

4          MR. LEINENWEBER:  I'm going to insert

5    an objection at this point to the extent it calls

6    for information protected by the attorney-client

7    privilege and instruct the witness not to reveal

8    any communications you had with Mr. Guevara.

9      A   What do I do?

10  BY MS. BONJEAN:

11      Q   Well, to the extent that you're --

12   when you said we, I thought you were talking

13   about you and another attorney.  I don't know if

14   you were talking about Mr. Guevara or not but

15   maybe --

16      A   No, Mr. Rueckert.

17      Q   Yeah.

18      A   I think Randy had helped me.  And my

19   recollection is is that he was behind in support

20   payments for a number of different women, and

21   I believe we were trying to -- I was trying to

22   consolidate his support payments so they would

23   all be taken out of his police check every other --

24   twice a month as opposed to him running around and

25   him giving people, you know, their money for the

Video Deposition

1    support.

2         Q    Understood.  And is that handwriting

3    on this petition right here yours in the middle?

4         A    In the middle it's mine.

5         Q    Okay.  And do you know if that's

6    Reynaldo Guevara's signature down there in the

7    right-hand corner?

8         A    I don't know.

9         Q    Okay.  You can put that to the side.

10        A    (Witness complies).

11             (Whereupon Deposition Exhibit No. 10 was

12    marked for identification.)

13        Q    I've handed you what's been marked as

14    Exhibit 10.

15        A    Got it.

16        Q    And do you see this appearance form?

17        A    I do.

18        Q    Okay.  And this has a caption of Eva

19    Maldonado and Reynaldo Guevara.  Do you see that?

20        A    I do.

21        Q    Do you know who Eva Maldonado is?

22        A    I don't.

23        Q    Okay.  Did you ever meet -- well, if

24    you don't know her, I assume you don't remember

25    meeting her, right?

**Video Deposition**

144

1      A    I don't.

2      Q    All right.  And this also appears to be

3    a domestic -- have a domestic number associated

4    with it, right?

5      A    It does.

6      Q    But it's a different domestic, right?

7      A    Right, '92.

8      Q    Reynaldo wasn't married more than once,

9    correct?

10     A    I don't know --

11          MS. ROSEN:  Objection, foundation.

12          MR. LEINENWEBER:  Objection to form,

13      foundation.

14   BY MS. BONJEAN:

15     Q    Do you know how many times he was

16    married?

17     A    I don't.

18     Q    Do you know how many kids he has?

19          MR. LEINENWEBER:  Objection, form,

20      foundation.

21     A    The number eight keeps creeping into my

22    head, but I'm not sure about that.

23   BY MS. BONJEAN:

24     Q    Yeah, it's definitely double digits.

25    I was --

**Video Deposition**

145

1          A     Oh, it is?

2          Q     -- just wondering how many, but I will

3     strike that.  I don't have personal knowledge of

4     how many children --

5               MS. ROSEN:  Well, it sounds like you

6      were representing you had personal knowledge.

7               MS. BONJEAN:  Well, I've seen testimony

8      that would support my position, but it's not a --

9          Q     This appearance form was filed on

10    February 17, 1993.  Do you see that?

11         A     I do.

12         Q     It's an appearance for Ray Guevara

13    and it's a substitution of counsel it looks like?

14    At least that's what's reflected on this?

15         A     Oh, okay.  I see it.

16         Q     Yeah.  And it says, correct me if

17    I'm wrong, Steve C. Rueckert for Rick Beuke?

18         A     Yes.

19         Q     Okay.  You did not prepare this

20    document, is that right?

21         A     No.

22         Q     Okay.  Mr. Rueckert did, right?

23         A     It's his writing.  I recognize his writing.

24         Q     And did he file an appearance on your

25    behalf?  Is that what happened?

**Video Deposition**

146

1      A    I'm not sure.  It appears like that's what

2    happened or -- yeah, I'm not positive.  But I think

3    Randy may have ran over there, wherever the courtroom

4    was, and filed an appearance.

5      Q    Okay.  Do you have any independent

6    recollection of this matter?

7      A    I don't.  I think it was -- I'm not sure,

8    but it may be part and parcel with the other domestic

9    order.  We were trying to consolidate everything in

10   his support payments.

11     Q    Okay.  Different caption, though, right?

12     A    Yes, yes.

13     Q    And this was filed prior to the

14   delinquency notice that was issued to Mr. Guevara

15   by Ms. Benitez, right?

16     A    Yes.

17          MS. ROSEN:  Object to the form.

18   BY MS. BONJEAN:

19     Q    At least according to the dates that are

20   reflected on these papers, right?

21     A    Yes.

22          MS. ROSEN:  Object to the form.

23   BY MS. BONJEAN:

24     Q    Do you remember talking to Mr. Rueckert

25   at all about this matter?

**Video Deposition**

147

```
 1        A    I don't.
 2        Q    Do you have a specific recollection of
 3   asking Randy to appear for you?
 4        A    I don't.
 5        Q    So apart from this particular
 6   piece of paper we're looking at, do you have any
 7   recollection about what the allegations or what
 8   the case was about?
 9        A    The only independent recollection I have is
10   it had to do with Ray's responsibility to pay support
11   for a number of his children that the mothers were
12   claiming he wasn't paying.  And he was -- I think
13   we had tried to, you know, consolidate everything
14   so it could -- each payment to each individual woman
15   could be taken from his police check and sent to
16   them directly.  That's my recollection.
17        Q    Okay.  And do you remember how this case
18   got resolved?
19        A    I don't.
20        Q    Do you remember how the Minerva Benitez
21   case got resolved?
22        A    I don't.  Branch 3 -- on Exhibit 10
23   does it say Branch 33?  I'm trying to remember where
24   Branch 33 was.
25        Q    I don't -- I would help you out
```

**Video Deposition**

148

1    if I knew.  But you don't remember specifically?

2        A    I don't.  I'm sorry.

3            MS. BONJEAN:  Okay.  I'm going to have this

4     one marked.

5            (Whereupon Deposition Exhibit No. 11 was

6     marked for identification.)

7            MS. BONJEAN:  I'm sorry.  Can I see which

8     one I gave you?

9            MR. KREJCI:  The PI case.

10           THE WITNESS:  11.

11           MS. BONJEAN:  Okay, that's right.  Here's

12    an extra for you guys.

13       Q    All right.  This is Exhibit 11.

14       A    Okay.

15       Q    Which take a second to look at and tell

16    me if you can identify what type of document this

17    is.

18       A    It's an electronic data search of personal

19    injury case.

20       Q    Is it an electronic docket search from

21    the Circuit Court of Cook County?

22       A    Yes.

23       Q    Okay.  And the parties are -- the

24    plaintiff is Arman Magneset.  Do you see that?

25       A    I do.

**Video Deposition**

149

```
1        Q    Do you know who that is?

2        A    I don't.

3        Q    Do you remember representing or

4    filing an appearance on behalf of Arman Magneset?

5        A    I don't.

6        Q    And you're not saying you -- well,

7    strike that.  Do you know whether Arman Magneset

8    was a wife or significant other of Ray Guevara?

9             MS. ROSEN:  Object to the form.

10            MR. LEINENWEBER:  Join.

11       A    I don't know.  Certainly could have been.

12   BY MS. BONJEAN:

13       Q    You don't know one way or the other,

14   right?

15       A    I don't, right.

16       Q    And you're not quarreling with the fact

17   that you are Richard M. Beuke who filed this --

18       A    I am not.

19       Q    -- appearance?  All right.  But you just

20   don't have an independent recollection of this

21   incident, right?

22       A    I don't.

23       Q    Okay.  Put that aside.

24            MR. LEINENWEBER:  Counsel, can I just ask

25    a question?
```

Video Deposition

150

1           MS. BONJEAN:  Sure.

2           MR. LEINENWEBER:  Where -- you just said

3      filed this appearance.

4           MS. BONJEAN:  I don't -- I'm not getting

5      that either.

6           MR. LEINENWEBER:  I don't have an appearance.

7      I have just an electronic docket.

8           MS. BONJEAN:  Right.  Well --

9           MR. LEINENWEBER:  I'm sure I'm missing

10     something.

11          MS. BONJEAN:  Well, I mean, just the

12     attorney --

13          MS. COHEN:  That's my fault.  Go to the

14     docket for Magneset.

15          (Discussion off the record.)

16          MS. BONJEAN:  Can you mark this one too.

17          (Whereupon Deposition Exhibit No. 12 was

18     marked for identification.)

19     Q    Let me know when you have it.  Do you

20     have it?

21     A    I have it.

22     Q    Exhibit 12, okay.  This is also a

23     personal injury case involving Reynaldo Guevara

24     and Arman Magneset.  Do you see that?

25     A    I do.

**Video Deposition**

151

```
1              MS. ROSEN:  I object to the form.

2              MS. BONJEAN:  I'm sorry?

3              MS. ROSEN:  I'm just objecting to the

4       form because of the "also" because the first one

5       did not have Guevara.  Just because there's

6       confusion --

7              MS. BONJEAN:  Understood.  I'll clarify.

8              MS. ROSEN:  Yep.

9    BY MS. BONJEAN:

10        Q    There are two plaintiffs in this

11      particular case that's being reflected on this

12      electronic docket sheet, right?

13        A    Yes.

14        Q    According to this, Reynaldo Guevara is

15      a plaintiff and Arman Magneset.  Do you see that?

16        A    I do.

17        Q    You are not the attorney that -- at

18      least reflected here, right?

19        A    Correct.

20        Q    Do you know whether you had any

21      involvement in this particular case?

22        A    No.

23        Q    Do you know who Ricky Niswonger is,

24      Niswonger?

25        A    I don't.
```

**Video Deposition**

152

1      Q    Okay.  You can put that to the side too.

2      A    Okay.

3      Q    All right.  And specific to the Minerva

4   Benitez and Eva Maldonado cases, I meant to ask

5   you one question.

6           MR. KREJCI:  This one?

7           MS. BONJEAN:  Yeah.

8      Q    Hang on.  Here, let me get it for you.

9   Here, just look at those two right there.  I know

10  I asked this more generally, but I'm just going

11  to ask specifically.

12     A    Okay.

13     Q    As you sit here today, do you have a

14  recollection of ever discussing with Mr. Maysonet

15  any contact or representation you had with

16  respect to Reynaldo Guevara in the Minerva

17  Benitez case?

18     A    No.

19     Q    And as you sit here today,

20  do you have any recollection of discussing with

21  Mr. Maysonet your representation or involvement

22  with Mr. Guevara in the Eva Maldonado vs. Guevara

23  case?

24     A    No.

25     Q    Okay.  Now we can put those aside.

**Video Deposition**

153

1    Thank you.

2        A    (Witness complies).

3        Q    You remember being the subject of a

4    motion to disqualify in the Hernandez brothers

5    case, right?

6        A    I do.

7        Q    You represented Juan Hernandez, right?

8        A    Juan, right.

9        Q    But Rosendo Hernandez brought a suit

10    against you, right?

11        A    The father?

12        Q    Oh, is that the father, Rosendo?

13        A    The father, yeah, not the --

14        Q    Because there's a brother Rosendo as

15    well, right?

16        A    Right.  He was a co-defendant, I believe,

17    on this.

18        Q    Right.  You didn't represent Rosendo

19    the -- Junior, right?

20        A    No.

21        MS. BONJEAN:  All right.  I will mark this,

22    and I just have a couple questions.

23        (Whereupon Deposition Exhibit No. 13 was

24    marked for identification.)

25        Q    Okay.  Mr. Beuke, you can see the top

**Video Deposition**

154

1    page is a -- this is a March 9, 2000 transcript.

2    Do you see that?

3         A    I do.

4         Q    It says motion to disqualify defense

5    counsel?

6         A    Yes.

7         Q    I assume you have some recollection

8    of Mr. Shlifka moving to disqualify you in this

9    case?

10        A    I do.

11        Q    And I know you've been questioned about

12   it before.  I just had a couple questions about

13   it.  I'm going to give you also your response

14   because I think you had an affidavit attached

15   maybe that you may want to look at.

16        A    Our memo and --

17        Q    What's that?

18        A    Our memo?

19        Q    Yeah, there was a pleading.

20        A    Yeah.

21        Q    So let me ask you questions.  If you

22   don't remember or you want to look at it, we'll

23   make sure you have the access to it.

24        A    Thank you.

25        Q    So Mr. Shlifka made a motion

**Video Deposition**

1    to disqualify you mid trial, is that right?

2        A    Yes.

3        Q    And he did so based on an alleged

4    conflict of interest related to your relationship

5    with Reynaldo Guevara.  Do you remember this?

6        A    I do.

7        Q    How is it -- do you remember how you

8    came to represent Mr. Hernandez, Juan Hernandez?

9        A    I think Juan's brother had gone to trial

10   and was convicted, similar to Maysonet and Gonzalez.

11   He went to trial first.  They severed the cases.

12   Juan's brother went to trial I want to say maybe

13   eight or ten months I think before we started our

14   trial, and I think both brothers were being

15   represented by Kent Brody.  And when the brother,

16   first brother -- I think his name was Rosendo also --

17   was convicted, I think that's when Juan began to look

18   to see if he could hire somebody else to represent

19   him.  I don't remember how he reached out for me or

20   who did but ...

21       Q    You recall that Detective Guevara was

22   one of the detectives in the case, right?

23       A    I do.

24       Q    And sometime after, I guess, jury

25   selection and even some witness testimony,

**Video Deposition**

1    Mr. Shlifka filed a motion to disqualify?

2         A    Yes.  I think first day we did openings

3    and put one witness on.  There were four lineup IDs.

4    One of the witnesses had testified and we come back

5    the next morning ready to, you know, go with the next

6    witnesses.

7         Q    Right.  And so he put on the record

8    a number of contacts that he alleged you had had

9    with Detective Guevara, and I'm providing you

10   with the transcript so you can --

11        A    Thank you.

12        Q    -- see it yourself.  And I just want to

13   ask you --

14        A    What page is that on?

15        Q    Yeah, it's on 2038.

16        MS. BONJEAN:  And I'm also going to have

17    you mark this as well, if you don't mind.

18        (Whereupon Deposition Exhibit No. 14 was

19    marked for identification.)

20        Q    Mr. Beuke, I'm also handing you

21   what I've marked as Exhibit 14.  And this is a

22   document you filed, right?

23        A    Yes.

24        Q    And it's entitled motion to strike the

25   prosecution's motion to disqualify defendant's

**Video Deposition**

157

1    attorney of record based on conflict of interest.

2    Do you see that?

3       A    Yes.

4       Q    And attached to it is an affidavit

5    that you prepared?  Do you want to take a look at

6    that?

7       A    I see it.  I see it.

8       Q    Let me know when you've had a chance to

9    look at the exhibit.

10       MS. BONJEAN:  Did you find it, Mike?

11       A    Yeah, I have it right -- I've got it.

12       Q    Okay.  So if you need -- I just wanted

13    you to have the benefit of seeing this before I

14    questioned you about Mr. Shlifka's statements on

15    the record, okay?

16       A    Okay.

17       Q    Mr. Shlifka represented that he spoke to

18    Detective Guevara, and this would be at Maysonet

19    20388, and that Mr. Guevara I guess indicated to

20    him that he had -- that you had represented him

21    in the past on the following matters.  First he

22    mentions a child support matter, which to the

23    best of Guevara's recollection was between '90

24    and '92.  I know we've looked already at some

25    paper related to child support matters.

**Video Deposition**

158

1           Do you know whether you

2    represented Mr. Guevara in any other child

3    support matters other than -- well, strike that.

4    Other than Eva Maldonado and Minerva Benitez

5    cases that we've looked at earlier, do you know

6    whether you represented Mr. Guevara in any other

7    child support matters?

8         A    I don't.

9         Q    Okay.  He also mentioned a

10   motorcycle accident from 1985.  Did you represent

11   Mr. Guevara in connection with a motorcycle

12   accident from 1985?

13        A    No, I was still a prosecutor back then.

14        Q    Okay.  Would you have been permitted to

15   represent him, do you know?

16        A    No.

17        Q    Okay.  Do you know whether -- without,

18   again, revealing communications with Mr. Guevara,

19   do you know whether he retained you for some

20   other purpose in connection with a motorcycle

21   accident from 1985?

22        A    I have no recollection.

23        Q    There's also reference to an accident

24   involving Detective Guevara and a squad car

25   sometime after 1995.  Do you have a recollection

**Video Deposition**

159

1    of representing Detective Guevara in connection

2    with an accident involving a squad car after

3    1995?

4        A    I don't.

5        Q    Whether or not your -- strike that.

6    Let me start over.  Do you know whether

7    Detective Guevara consulted with you in the

8    context of an attorney-client relationship

9    regarding a squad car incident after 1995?

10            MR. LEINENWEBER:  Objection to form,

11        foundation.

12        A    I don't.

13   BY MS. BONJEAN:

14        Q    What about this -- Mr. Shlifka

15   represents Detective Guevara informed me that

16   he was jumped on by several people and sued the

17   persons responsible about five or six years ago

18   and Mr. Beuke was his lawyer for that.

19        A    No recollection of that.

20        Q    Do you know what Detective Guevara would

21   be referencing?

22        A    No.

23            MS. ROSEN:  Objection, form, foundation.

24            MR. LEINENWEBER:  Join.

25

**Video Deposition**

160

1   BY MS. BONJEAN:

2       Q    So you have no recollection of

3   representing Guevara in connection with what

4   sounds like some type of assault by five or six

5   people?

6            MR. LEINENWEBER:  Objection to form,

7    foundation, asked and answered.

8       A    I don't.

9   BY MS. BONJEAN:

10      Q    Do you think Detective -- and, again,

11  I'm asking you to speculate.  Do you think it's

12  possible Detective Guevara was confused or is --

13           MS. ROSEN:  Objection.

14  BY MS. BONJEAN:

15      Q    Do you have some other explanation?

16           MS. ROSEN:  Objection, form, foundation,

17   calls for speculation.

18      A    What's possible?

19           MR. LEINENWEBER:  Same objections.

20      A    That he was confused?

21  BY MS. BONJEAN:

22      Q    Well, right.  I mean, did you have any

23  falling out with Detective Guevara prior to this?

24      A    No, I don't think I ever had a falling

25   out with him.  But Detective Guevara was a guy who

**Video Deposition**

161

1    was always complaining about things, you know,

2    his life, you know.  That's what I remember.  And he

3    was -- would complain to everybody.

4          Q    Did you witness him complaining to other

5    people?

6          A    Nobody that I could specifically recall,

7    but --

8          Q    It's generally his reputation?

9          A    Generally.

10              MS. ROSEN:  Object to the form.

11              MR. LEINENWEBER:  Join.

12   BY MS. BONJEAN:

13         Q    And is that -- was that true when

14   you were in the Cook County State's Attorney's

15   Office?

16         A    I don't -- I can't remember if --

17              MR. LEINENWEBER:  Objection to form,

18    foundation.

19         A    -- if we had -- I do think that

20   there were cases when I was in the Gang Unit

21   that Detective Guevara was involved in.  I don't

22   specifically remember any of them but, yeah, I think

23   he had a little bit of a reputation of always -- his

24   life was always in flux.

25

**Video Deposition**

162

 1  BY MS. BONJEAN:

 2       Q    Did you ever loan him any money?

 3       A    Never.

 4       Q    Were you aware that he had money

 5    struggles?

 6            MS. ROSEN:  Object to form.

 7            MR. LEINENWEBER:  Object to form, foundation,

 8     calls for speculation.

 9       A    I wasn't aware of that.

10            MS. GOLDEN:  I'm sorry.  The answer was?

11            THE WITNESS:  I was not aware of that.

12  BY MS. BONJEAN:

13       Q    Okay.  He also alleges Mr. Beuke

14    handled Detective Guevara's wife's personal

15    injury accident approximately two years ago.

16    First let me ask you, do you have an independent

17    recollection of that?

18       A    I don't.

19       Q    All right.  In your affidavit, I think

20    paragraph G --

21       A    Um-hmm.

22       Q    -- you represented on September 28,

23    1994 Magneset Arman was involved in a motor

24    vehicle accident with an individual by the name

25    of Refugio Estrada.  Do you see that?

Video Deposition

163

1      A    I do.

2      Q    Okay.  And that she on November 1st

3  retained you, the Law Firm of Richard M. Beuke,

4  in her claim arising from the incident.  Do you

5  see that?

6      A    I do.

7      Q    And that you negotiated a settlement

8  of that claim with Attorney Steven Rueckert.  Do

9  you see that?

10      A    I do, yes.

11      Q    Okay.  And this was --

12      A    Well, it says the lawsuit and the

13  negotiated settlement of that claim was handled by --

14      Q    Oh, I'm sorry.

15      A    -- Attorney Steven Rueckert.

16      Q    My apologies.  Okay.  Yeah, you're

17  right.  Is there a reason -- let me start over.

18  Does this refresh your recollection about whether

19  Magneset Arman was Reynaldo Guevara's wife?

20      A    It doesn't, but I've seen two documents

21  now with her name on it.  I can't recall her, but it

22  wouldn't surprise me.

23      Q    Okay.  You're not suggesting that

24  what you represented here in your affidavit is

25  somehow --

**Video Deposition**

164

```
 1        A     No, ma'am.

 2        Q     -- false, right?

 3        A     No.

 4        Q     Do you know why the case was

 5   ultimately negotiated to settlement by Steven

 6   Rueckert rather than yourself?

 7        A     I don't know.

 8        Q     Okay.

 9        A     I know Randy did more personal injury

10   work than any of us did so ...

11        Q     Going back to the transcript,

12   the last paragraph is Detective Guevara further

13   informed me that he has discussed other matters

14   with Mr. Beuke but was not retained but did

15   discuss them as his lawyer, to which Mr. Beuke

16   indicated that he would find another lawyer for

17   Detective Guevara, those I believe involving

18   some domestic relations problems.

19                    Do you recall referring

20   any cases to other lawyers after consulting

21   with Mr. Guevara about other domestic relations

22   issues?

23        A     I don't.

24        Q     We learned today in chambers

25   that Mr. Beuke has also conferred with
```

**Video Deposition**

165

```
1     Detective Guevara regarding the potential filing

2     of a libel suit by Detective Guevara against

3     others who had apparently claimed some sort of

4     police misconduct against Detective Guevara.

5                    Do you remember consulting with

6     Mr. Guevara about filing a libel suit against a

7     group that was alleging that he had engaged in

8     a pattern of misconduct as it relates to men in

9     Humboldt Park?

10              MR. LEINENWEBER:  Objection to form,

11      foundation.

12      A    I don't remember conferring with

13    Detective Guevara.  I do remember that there was

14    something that was out there about Guevara and his

15    actions as a police officer.  I don't know if it was

16    a newspaper article or something.  I do have some

17    recollection of Guevara complaining that people were,

18     you know, slurring his name or whatever.

19    BY MS. BONJEAN:

20      Q    Was he complaining just sort of

21    generally complaining or in the context of

22    seeking legal advice from you?

23      A    Generally complaining.

24      Q    Okay.  And --

25              MR. LEINENWEBER:  I'm going to object to
```

**Video Deposition**

1    the form and foundation.

2  BY MS. BONJEAN:

3        Q    And do you remember him complaining

4    that there was a group of mothers and sisters and

5    women that had organized to challenge his

6    investigative work?

7            MR. LEINENWEBER:  Same objection.

8        A    I don't remember -- I remember that

9    specifically happening, but I don't remember if that

10   was at this time.

11  BY MS. BONJEAN:

12       Q    Okay.  Mr. Shlifka further

13   represented that there may have been some legal

14   advice dispensed regarding paternity issues.  Do

15   you remember ever dispensing any legal advice to

16   Mr. Guevara regarding paternity issues?

17       A    No.

18       Q    And what was the end result of this

19   motion to disqualify?

20       A    I read some of the remarks in here,

21   so some of it's coming back to me.  The trial was

22   ongoing back in, what, March and the heating and

23   air conditioning had been off in the building.  And

24   in the courtroom it was -- my recollection is it was

25   80, 90 degrees in the courtroom.  And we had started

**Video Deposition**

1    the trial, gave an opening statement.  I think

2    my opening was designed at attacking Guevara and

3    Guevara's police procedures on conducting these

4    lineups and things like that.  And then the first

5    witness hit the stand and I remember feeling --

6    Mr. Shim and I worked on the case together -- feeling

7    good about how that had gone.  And we were ready

8    to do, you know, do the same thing in the morning.

9    And then at 10:30 in the morning as we were seated

10   in the cafeteria getting ready to go back

11   upstairs, I got a call from Shlifka, who tells me

12   that I needed -- he wants me to come over to court

13   because of something.  He didn't tell me what.  And

14   when we got to court, that's when he dropped this on

15   us.

16                    So I think we went on for several

17   hours during the morning and into the afternoon and

18   had conversations with Mr. Hernandez.  And nobody was

19   really -- my recollection is nobody had a real clear

20   understanding of what the case law said or didn't say

21   on this particular issue, and Mr. Hernandez didn't

22   want us to get off the case and he didn't want to

23   get off the case because I think we were winning at

24   the time.  And, you know, this went on and on and

25   Judge Schultz I think in the later afternoon, after

**Video Deposition**

1      the poor jury had been sitting in the jury room

2      in about 90 degree temps, he said, well, I'm going

3      to -- I think we can do a voluntary mistrial here

4      without prejudice and we can brief the issue and

5      we can come back and we can start from scratch and

6      see if you're going to stay on the case or not.  And

7      I think ultimately we agreed to do that.

8          Q     And so there was an agreement amongst

9      the parties to discharge the jury and declare a

10     mistrial for the purpose of determining whether

11     or not there was --

12         A     Any conflict.

13         Q     -- an actual conflict of interest?

14         A     Yes, that's my recollection.

15         Q     Or -- and/or a waivable conflict of

16     interest?

17         A     Yes.

18         Q     And after that occurred, what happened?

19         A     I think we had proposed all of those things,

20     that Mr. Shim could cross-examine Detective Guevara,

21     that Mr. Hernandez was willing to waive any potential

22     conflict, you know, in front of the judge.  And the

23     judge did some research, you know, very quickly over

24     the lunch hour I think, and he was concerned that

25     that may not satisfy the potential problem.  And

**Video Deposition**

1    I think he told us, you know, if you guys want

2    to come back and brief this, my suggestion is that

3    you voluntarily, you know, declare a mistrial and

4    then we'll come back and address the issue at another

5    day.  And that's what we did.

6         Q    And you did come back and address the

7    issue?

8         A    Yeah, we filed a brief in support of our

9    petition.  I don't know if the state's attorneys

10   filed a response.  But in the meantime, and I don't

11   remember how that happened, but Juan Hernandez had

12   hired a different lawyer or brought somebody else in

13   to take over the murder case.  So I don't know if

14   Judge Schultz ever actually ruled on the issue.

15        Q    It may have been mooted by Juan deciding

16   to retain new counsel?

17        A    Yes.

18        Q    Now, do you recollect having any

19   discussions with Juan about your prior contacts

20   with Mr. Guevara leading up to his trial?

21        A    I don't have any specific recollections

22   of the conversations.  Just in the back of my mind

23   I know that day Juan was prepared to tell the judge,

24   you know, I'll waive the conflict if there's a

25   conflict.  Leading up to the trial I think we --

**Video Deposition**

170

1    I'm sure when we went to see Juan at the jail it

2    was discussed because we had known what happened in

3    his brother's case and how the identification issues

4    were handled by the other attorney.  And, you know,

5    I think -- I don't think I spoke with Juan directly

6    about any relationship or knowledge I had about

7    Guevara.  I just -- I never thought Guevara was

8    a good witness.

9        Q    So if I'm understanding you, you don't

10   recollect speaking with Juan about your prior

11   handling of child support issues, is that right?

12       A    I don't.

13            MS. GOLDEN:  Juan Hernandez?

14            MS. BONJEAN:  Yes, yes.

15       Q    I guess we can make that clear.

16       A    Yes.

17       Q    You don't have a specific recollection

18   of informing Juan Hernandez about your prior

19   representation of Mr. Guevara on those child

20   support matters, correct?

21       A    Prior to the trial I don't have

22   a specific recollection.  I mean, I could have but

23   I don't have a specific recollection.

24       Q    Okay.  And then I'm correct that

25   later Juan and Rosendo Junior's father filed a

**Video Deposition**

1      suit against you, right?

2          A     Yes.

3          Q     Do you know what happened to that suit?

4          A     I think it was ultimately dismissed.

5          Q     All right.  I'll just have you identify

6      it, if you could.

7                (Whereupon Deposition Exhibit No. 15 was

8       marked for identification.)

9          Q     Okay.  Do you recognize this as

10     the, at least, first amended complaint that

11     Rosendo Hernandez filed against you in connection

12     with your representation of his son?

13         A     I see that, yes.

14         Q     Okay.  And you said you think the case

15     was dismissed or --

16         A     I know a gentleman by the name of

17     Andy Miller had represented me down there, and

18     we had come to court on a couple occasions ready

19     to go to trial, and Mr. Hernandez wasn't there and

20     then it ultimately got dismissed.  And I think it

21     may have gotten reinstated because Mr. Hernandez had

22     a problem getting to court one day or something, and

23     then it was set down again for trial I think.  And

24     I don't know if Mr. Hernandez was able to show up

25     there, but that's my recollection.  It was dismissed

**Video Deposition**

172

1    a second time.  I'm not positive.

2         Q    Okay.  You don't remember paying any

3    money to the Hernandezes, do you?

4         A    No, no.

5         Q    You can put that aside.

6         A    (Witness complies).

7         Q    I'll try not to keep you here too

8    much longer, but I have a couple questions about

9    some other cases.

10        A    Okay.

11        Q    Do you recall as a gang crimes

12   prosecutor interviewing a defendant by the name

13   of Daniel Pena?

14        A    No.

15             (Discussion off the record.)

16             (Whereupon Deposition Exhibit No. 16 was

17    marked for identification.)

18        Q    Mr. Beuke, I'm handing you an Appellate

19   Court decision entitled People vs. Pena.

20        A    I have it.

21        Q    And if you can go to the opinion part --

22        A    Okay.

23        Q    -- the second paragraph indicates

24   that this was involving the murder of a victim

25   by the name of Angel Velez on October 6, 1984.

**Video Deposition**

173

1    Do you see that?

2         A    I do.

3         Q    And that on January 22, 1986 Daniel Pena

4    was arrested by a number of officers, including

5    Officer Guevara.  Do you see that, according to

6    the opinion, anyway?

7         A    Yes.

8         Q    Does this refresh your recollection

9    at all?

10        A    It doesn't.

11        Q    Okay.  And if you go to the second

12   column of that same page where I believe you'll

13   see your name highlighted where it says Richard

14   Beuke, assistant state's attorney?

15        A    I have it.

16        Q    Do you see it?

17        A    I see it, yes.

18        Q    It indicates that you testified in

19   this case.  Again, not ringing a bell thus far

20   for you?

21        A    No.  I just --

22        Q    Okay.

23        A    I would have been in the Gang Unit.

24        Q    Right, um-hmm.  It says Richard Beuke,

25   an assistant state's attorney, testified that he

**Video Deposition**

```
 1      spoke with the defendant on January 24, 1986 at
 2      1 o'clock p.m.  Defendant had been involved with
 3      Beuke on a prior occasion and indicated he
 4      remembered Beuke.
 5                  Do you remember interacting
 6      with Daniel Pena at any time prior to January 24,
 7      1986?
 8          A    I don't.
 9          Q    According to your testimony, he told
10      you that, quote, when the arrest went down, he
11      was trying to flee.  One of the officers grabbed
12      him, spun him around and he spun into the vehicle
13      that they were in when they were arrested.  I
14      think either -- I remember either the passenger
15      door or the driver's door is what he told me --
16      his nose or his forehead had hit when he was
17      arrested.
18              MS. GOLDEN:  Object to the form.  I think
19       you flipped two sentences.  I think you misspoke.
20              MS. BONJEAN:  No, this is Beuke's testimony
21       of what defendant told him.
22              MS. GOLDEN:  Defendant told Beuke?
23              MS. BONJEAN:  Yes.
24              MS. GOLDEN:  Okay.  I think you said --
25       you flipped it.
```

**Video Deposition**

1          A     I see that.

2     BY MS. BONJEAN:

3          Q     Yeah.  Do you see that?

4          A     Yes.

5          Q     Do you remember interviewing Daniel Pena

6     and Daniel Pena telling you this?

7          A     I don't independent -- have any independent

8     recollection.

9          Q     Do you remember Guevara bringing Daniel

10    Pena to the 13th floor of the Gang Crimes Unit

11    at any point?

12               MS. ROSEN:  Object to the form.

13               MR. LEINENWEBER:  Join.

14         A     I'm just looking at another paragraph.

15               MR. KREJCI:  Do you want to finish reading

16     it?

17    BY MS. BONJEAN:

18         Q     Yeah, yeah.  I'm sorry.  Take your time,

19    read it, and then let me know if it triggers any

20    memory for you.

21         A     Detective -- or Pat McCarthy and John

22    Leonard and Guevara arrested him.  Is it possible

23    that people were brought to the Gang Unit during the

24    course of an investigation?  Sure, it was possible.

25    I don't remember this guy.

**Video Deposition**

1       Q     You don't remember this.

2             MS. BONJEAN:  Let me mark this.  This is

3     going to be Exhibit 17.

4             (Whereupon Deposition Exhibit No. 17 was

5     marked for identification.)

6       Q     Now I'll hand you Exhibit 17.

7       A     Okay.

8       Q     This is a report of proceedings for

9     a case that was litigated on July 14, 1986.  Do

10    you see that?

11      A     I do.

12      Q     That was -- you were still in the Gang

13    Crimes Unit, correct?

14      A     Yes, ma'am.

15      Q     And it was actually litigated by Randy

16    Rueckert for the State, right?

17      A     I see that.

18      Q     And he was your colleague, correct?

19      A     He was.

20      Q     And it looks like the defendant was

21    represented by a Michael Johnson?

22      A     Right.

23      Q     Do you know who that was?

24      A     I do.

25      Q     Who was Michael Johnson?

**Video Deposition**

177

1      A    He's a -- I think he's probably

2    around late 50s, early 60s now, curly-ish hair.

3      Q    Okay.  Do you remember whether or not

4    Daniel Pena had any injuries to his face when he

5    was brought to the Gang Crimes Unit?

6              MS. ROSEN:  Objection, foundation.

7              MR. LEINENWEBER:  Join.

8      A    Independently I do not.  I just

9    looked at something in the opinion that said

10   I noticed a cut on his nose or a cut on his forehead

11   or something and I asked him about that.

12   BY MS. BONJEAN:

13     Q    But none of this is ringing a bell for

14   you, right?

15     A    No.

16     Q    Okay.  And I guess your testimony

17   is your testimony.  You have no reason to believe

18   that --

19     A    No.

20     Q    -- it doesn't reflect -- your

21   testimony is not accurately reflected in the

22   transcripts, right?

23             MS. ROSEN:  Object to the form.

24     A    I think my testimony, if I read the

25   transcript, would be accurate.

**Video Deposition**

1    BY MS. BONJEAN:

2          Q    Yeah, and I should represent that this

3      is actually not your testimony that I've handed

4      to you.  This is Mr. Pena's testimony.

5          A    It is, okay.

6          Q    But it sounds like you don't really have

7      much of a recollection that --

8          A    No.

9          Q    Okay, that's fine.  Well, you can

10     put it aside.  I mean, would you have fabricated

11     a statement alleged -- would you have fabricated

12     a statement of Mr. Pena in order to justify or

13     explain physical evidence of coercion by Guevara?

14         A    No.

15              MR. LEINENWEBER:  Objection to form,

16       foundation, compound question.

17   BY MS. BONJEAN:

18         Q    And I'll represent that Daniel

19     Pena, as you can tell from the opinion I think,

20     in his court-reported statement said that he was

21     mistreated by the police.

22              Do you have a recollection

23     of Detective Guevara ever reaching out to you

24     to seek your assistance in how to handle the fact

25     that he had told a court reporter that he had

**Video Deposition**

179

1    been mistreated?

2        A    No, I don't.

3        Q    If Detective Guevara had called

4    you up at your offices on the 13th floor and said

5    I have a problem, I have a suspect who has made

6    statements indicating that I physically abused

7    him, what can I do, would you have helped him out

8    of that situation?

9            MR. LEINENWEBER:  I have an objection

10    and a clarification.  Objection to form and

11    foundation.  When are we talking about, when he

12    was with -- when the witness was with the state's

13    attorney's office or after?  I'm confused.

14            MS. BONJEAN.  Good question.  And I guess --

15            MR. KREJCI:  I think it's a hypothetical

16    question.

17            MS. BONJEAN:  Yeah, he doesn't --

18        Q    Let me ask you this.  Do you remember

19    Detective Guevara seeking your assistance in

20    either obtaining a confession from Daniel Pena --

21    first I'll ask that question.

22        A    I don't.

23        Q   Okay.

24        A    It appears like he had given a statement

25    before he was brought to our -- to the Gang Unit,

**Video Deposition**

180

```
 1      if I'm getting this right.

 2           Q      And --

 3           A      To Mr. Connelly, State's Attorney Connelly.

 4           Q      And do you have a recollection of

 5      Mr. Guevara ever asking you to help essentially

 6      cover up physical abuse that he had used against

 7      Daniel Pena to exert a confession?

 8           A      No.

 9                  MR. LEINENWEBER:  Same objection.

10           A      No.

11                  MS. ROSEN:  Object to the form.

12                  MR. LEINENWEBER:  I'm sorry.  What was the

13        answer?  I didn't hear.

14                  THE WITNESS:  No.

15                  MR. LEINENWEBER:  I assumed so.

16    BY MS. BONJEAN:

17           Q      Do you remember ever discussing

18      the Daniel Pena case with Randy Rueckert during

19      the course of representing Mr. Maysonet?

20           A      No.

21           Q      Do you remember ever discussing with

22      Randy Rueckert, oh, I remember this guy Daniel

23      Pena who had previously alleged that Guevara beat

24      him up or anything of that nature?

25           A      I don't.  You mean when Randy was
```

**Video Deposition**

181

1    prosecuting the case or subsequently when we

2    represented --

3          Q    Yeah.  When you were representing

4    Mr. Maysonet --

5          A    No.

6          Q    -- did you ever have any discussions

7    with Randy Rueckert about the fact that Daniel

8    Pena had made allegations against Reynaldo

9    Guevara?

10         A    Not that I recall, no.

11         Q    Okay.  And I'll ask it this way.

12   Do you remember ever discussing with Mr. Maysonet

13   the fact that Daniel Pena had previously alleged

14   that Guevara had used physical force during an

15   interrogation against him?

16         A    I don't.

17         Q    Do you know a gentleman by the name of

18   Sam Perez or Spanky?

19         A    I know Sam Perez.

20         Q    He was a Spanish Cobra, right?  Do you

21   know?

22         A    I'm not sure.

23         Q    Did you meet Sam Perez as a Cook County

24   state's attorney or when you went into private

25   practice?

Video Deposition

182

1       A    Oh, it was when I first went into private

2    practice.

3       Q    In fact, you represented him in

4    private practice pretty shortly after you left

5    the Cook County State's Attorney's Office, right?

6       A    Yeah, probably one of my first cases.

7       Q    And that was a -- you beat a murder case

8    for him, right?

9       A    I did.

10       Q    And that was in, what, 1987, 1988?

11       A    I want to say in there, yeah.

12       Q    Do you remember who the judge was?

13       A    I want to say Judge Cousins.

14       Q    Do you know if it was a bench trial?

15       A    Jury.

16       Q    Oh, it was a jury.  Did you guarantee

17    Sam Perez an acquittal on that case?

18       A    No.

19       Q    Have you ever guaranteed a client an

20    acquittal?

21       A    Never.

22       Q    Have you ever charged a client

23    an additional fee on top of your normal fee in

24    exchange for a guaranteed not guilty?

25       A    No.

**Video Deposition**

183

1        Q    Did you know that Sam Perez was doing

2    business with Joseph Miedzianowski in the late

3    '80s when you represented him?

4        A    I did not.

5              MS. ROSEN:  Object to the form, foundation.

6    BY MS. BONJEAN:

7        Q    Did you know that Sam Perez by

8    his own admission was helping Joe rip off drug

9    dealers in the Humboldt Park area and elsewhere,

10    I think?

11              MS. ROSEN:  Objection, form, foundation.

12        A    I didn't know that.

13    BY MS. BONJEAN:

14        Q    You didn't know that then I assume,

15    right?

16        A    Right.

17        Q    Did you ever --

18              MS. ROSEN:  Objection to form.

19    BY MS. BONJEAN:

20        Q    Did you ever come -- I'm sorry.

21    When you were representing Spanky or Sam Perez

22    in the late '80s, did you -- you did not know

23    that he was assisting Joe Miedzianowski in these

24    rip-off schemes, right?

25              MS. ROSEN:  Objection, form, foundation.

**Video Deposition**

184

1           A     I didn't know.

2    BY MS. BONJEAN:

3           Q     Okay.  Did you ever come to learn

4      that Sam Perez was involved or assisting Joe

5      Miedzianowski in ripping off drug suppliers?

6           A     No.

7                 MS. GOLDEN:  Form.

8                 MS. ROSEN:  Objection, form, foundation.

9    BY MS. BONJEAN:

10          Q     Did you have a chance to ever read about

11     that in the 302 report?

12          A     I did.  I don't know if it said that

13     Perez was working with Miedzianowski -- or I think it

14     did say that, yeah.  No, I didn't know that.  I saw

15     that in the 302.

16          Q     Okay.  In fact, as you may recall

17     in the 302, there was an allegation that Sam had

18     arranged for you to call a drug supplier with the

19     last name Velez.  Does that sound familiar?

20                MS. ROSEN:  Object to the form.

21   BY MS. BONJEAN:

22          Q     The allegation.  I'm not --

23          A     Yeah.  No, I know.  I haven't read the

24     302 in a while, but it's certainly something -- there

25     were things to that effect in there.  I don't know

**Video Deposition**

185

```
 1    Velez but ...
 2         Q    Okay.  Maybe we'll take a look at it
 3    in a minute.  But, you know, the 302 of course
 4    documents a proffer session with Mohammed Omar,
 5    right?
 6         A    I do.
 7         Q    Did you know Mohammed Omar?
 8         A    I knew him.
 9         Q    And when did you know Mohammed Omar?
10         A    I want to say in the early '90s possibly.
11    They had all -- not they had all, but Mr. Omar
12    and several other individuals I think were arrested
13    pursuant to a -- I think it was a possible drug
14    rip-off.  And the people that they ultimately were
15    trying to rip off I think turned out to be undercover
16    agents, and they all had -- I think there were five
17    defendants in the case, four or five defendants in
18    the case and Mohammed Omar was one of the defendants.
19         Q    Right.  Sam Perez was another one of the
20    defendants, right?
21         A    Sam Perez was and Sam's brother Javier.
22         Q    Right.
23         A    Yeah.
24         Q    And, in fact, did Mohammed Omar
25    actually want to try to hire you to represent him
```

**Video Deposition**

186

1    in that case?

2         A     I don't know.  I know I represented Javier.

3         Q     Javier or Spanky?

4         A     No, Javier.

5         Q     You didn't represent Sam in that case?

6         A     No.

7         Q     And do you know who -- what judge that

8    was in front of?

9         A     I want to say Danny Weber in Maywood,

10   I think.

11        Q     And did you guarantee a particular

12   outcome for Javier Perez in that case?

13        A     No, I think we worked out a plea in the

14   case.

15        Q     They were looking at serious time,

16   though, right?

17              MR. LEINENWEBER:  Objection to form,

18    foundation.

19        A     Well, I think it was a Class X, 6 to 30.

20   But given the fact that there were undercover agents

21   involved and I forget if there were shots fired and

22   something, it was a crazy, crazy scenario.  But they

23   were looking at 6 to 30 I think.

24   BY MS. BONJEAN:

25        Q     Do you recall what Javier got pursuant

**Video Deposition**

1    to the plea deal that you negotiated?

2         A    I think it was ten.

3         Q    And what about -- do you know what Sam

4    got?

5         A    I don't.  I don't.  Somebody was found not

6    guilty.  I'm not sure who it was.  And other people

7    pled out too with a couple pleas.

8         Q    You didn't represent Javier and Sam,

9    did you?

10        A    No.

11        Q    Just Javier?

12        A    Just Javier.

13        Q    What was his nickname, do you remember?

14    If you do --

15        A    I don't.

16        Q    Okay.  Do you remember representing

17    an individual by the name of Marcos Gonzalez in a

18    bench trial before Judge Morrissey?

19        A    No.

20             MR. KREJCI:  Can you spell that name?

21             MS. BONJEAN:  Yeah, it's M-a-r-c-o-s

22     G-o-n-z-a-l-e-z.

23             MR. KREJCI:  Gonzalez.

24             MR. LEINENWEBER:  Who's the judge you

25     referenced?

Video Deposition

188

1          MS. BONJEAN:  Judge John Morrissey.

2          MR. LEINENWEBER:  Morrissey.

3          MS. BONJEAN:  I'm just going to have him

4     look at the transcript to see if it refreshes his

5     recollection.

6          (Whereupon Deposition Exhibit No. 18 was

7     marked for identification.)

8          MS. BONJEAN:  Here, let's mark this too while

9     we're at it.

10          (Whereupon Deposition Exhibit No. 19 was

11     marked for identification.)

12     Q    Mr. Beuke, first I'll have you look

13     at Exhibit 19.  This is a motion to reduce bail.

14     The case number is 90 CR 6626.  Do you see that?

15     A    I do.

16     Q    And the second page reflects your

17     signature, correct?

18     A    It does.

19     Q    And it looks like you were still

20     partners with Kogut at the time?

21     A    Yes.

22     Q    Okay.  Does this document refresh your

23     recollection of having represented a gentleman by

24     the name of Marcos Gonzalez?

25     A    It doesn't.  I'm sorry.

**Video Deposition**

189

1          Q     That's okay.  And then if you'd

2     look at Exhibit 18, do you see these report of

3     proceedings?

4          A     I do.

5          Q     The first page has you as attorney for

6     Defendant Gonzalez?

7          A     Yes.

8          Q     And State's Attorneys Cummings and

9     Besbekos or bakos?

10          A     Besbekos.

11          Q     Do you know who those individuals are?

12          A     I don't know Cummings.  I know Besbekos.

13          Q     And the judge was John Morrissey?

14          A     John Morrissey.

15          Q     And there was a co-defendant by the name

16     of David Sanchez?

17          A     Yes.

18          Q     Does this at all refresh your

19     recollection of having represented Marcos

20     Gonzalez?

21          A     It doesn't.

22          Q     And it looks like --

23          A     Julie Harmon represented Mr. Sanchez.

24          Q     Yeah.  And she was and is a public

25     defender, right?

**Video Deposition**

1        A     Retired.

2        Q     Retired.  This trial is from January

3     of 1991, it looks like.  Do you recall securing

4     an acquittal for Mr. Gonzalez?

5        A     I don't.

6              MS. GOLDEN:  Form, object to foundation.

7        A     I don't.  I won this one.

8     BY MS. BONJEAN:

9        Q     You seem to have won a lot of these.

10             MS. ROSEN:  Is that a question?

11             MS. BONJEAN:  No, no.  It's a compliment.

12             MS. ROSEN:  Yeah, that's what it is.

13             MS. BONJEAN:  It was.

14       Q     So this, again, none of this refreshes

15    your recollection of having represented him?

16       A     It doesn't.

17       Q     And do you know if it does -- and I'm

18    assuming you don't know whether Marcos Gonzalez

19    was in a gang, correct?

20       A     I don't.

21       Q     Okay, put that aside.  And you, of

22    course, don't have a recollection of guaranteeing

23    a result for Marcos Gonzalez, right?

24             MS. ROSEN:  Object to the form.

25             MR. LEINENWEBER:  Objection to form.

**Video Deposition**

191

1        A      No.

2    BY MS. BONJEAN:

3        Q      Were you friendly with John Morrissey?

4        A      John was in the state's attorney's

5    office with us.  I would say friendly.  He was a

6    public defender I think when I was still a law clerk,

7    and at some point John came over to the prosecutor's

8    office and he became a judge.  Yeah, I wasn't his

9    biggest fan, but friendly.

10       Q      Did you work in the same unit with him?

11       A      I seem to remember when we were in --

12   when I was in Felony Review, I think John was

13   in Felony Review because I seem to recall when

14   he got the notification that he was going to be

15   made a judge, we happened to be working that same

16   shift together.

17       Q      I see.

18       A      Yeah.

19       Q      Did you ever socialize with John

20   Morrissey when he was on the bench?

21       A      Socialize, go for a beer?

22       Q      Yeah.  Did you ever spend any time with

23   him outside of 26th Street?

24       A      I'm sure I did.

25       Q      Okay.  And ever have a beer at Gene's

**Video Deposition**

192

1    with him, for instance?

2        A    Probably.

3        Q    Did you ever attend any of his -- any

4    parties or anything at his home?

5        A    No.

6        Q    Have you ever been in his home?

7        A    No.

8        Q    Any weddings or any other --

9        A    No.

10        Q    -- affairs like that?  Did you ever golf

11    with him?

12        A    I have.  Very painful.

13        Q    Are you a golfer?

14        A    Well, I was until the back surgery.

15        Q    Would you golf with Mr. Morrissey on a

16    regular basis or occasionally?

17        A    No, just occasionally.

18        Q    And where did you golf at?

19        A    I want to say Timber Trails.  It was a club

20    out West.

21        Q    West suburbs?

22        A    Western Springs I think.  I played

23    a few times, if I recall, at Columbus Park.  John

24    one time when he was golfing there apparently was the

25    victim of an armed robbery.

**Video Deposition**

```
 1        Q    Really?

 2        A    Yeah.

 3        Q    Were you a witness?

 4        A    No, I wasn't.  I wasn't there that day.

 5        Q    Did you represent the accused?

 6        A    I didn't, no.

 7        Q    Do you know in what period of time you

 8   played golf with Mr. Morrissey?

 9        A    It was -- could have been maybe once

10   or twice a summer for a period of 10 or 15 years.

11        Q    Okay.  And this would have been --

12        A    It would be at golf outings together

13   occasionally.

14        Q    And this would have been when you were

15   in private practice and he was on the bench?

16        A    I think also when we were still in the

17   office.

18        Q    I see.  So --

19        A    He was an avid golfer.  He loved to play.

20        Q    Gotcha.  So when you were both

21   still Cook County state's attorneys, you might

22   play a round of golf together, is that right?

23        A    Sure.

24        Q    And then that tradition, if you will,

25   carried on when he went to the bench and you went
```

**Video Deposition**

194

1    into private practice?

2         A    Yes.

3              MS. ROSEN:  Object to the form.

4    BY MS. BONJEAN:

5         Q    And was Judge Reyna part of that

6    foursome as well?

7         A    Judge Reyna was another avid golfer

8    who was painful to golf with.  But, yeah, I've played

9    golf with Judge Reyna.

10        Q    Was he a good golfer or --

11        A    Pretty good.

12        Q    Yeah.  Did you play golf with

13   Judge Reyna, again, on sort of a regular basis?

14        A    No.

15        Q    No.  Was Judge Reyna a Cook County

16   state's attorney?

17        A    He was.

18        Q    Any time -- crossover time with you?

19        A    He was.  I think Judge Reyna started in

20   the office in the mid '70s maybe, and at some point

21   he left the state's attorney's office while I was

22   still in the office.  And then he went into private

23   practice I think for a short period of time and then

24   went on the bench in the '80s.

25        Q    And did you work in the same unit at

**Video Deposition**

195

1      all?

2          A     No.

3          Q     All right.  Did you represent Roland

4      Otero?

5          A     Rolando.

6          Q     Rolando Otero?

7          A     Yes.  I didn't represent him in the

8      federal case.  I had represented him on a case at

9      26th Street.  Narcotics case, I believe.

10         Q     His name appears in that 302, right?

11         A     It does.

12         Q     And as I understand it, you were

13     interviewed by Brian Nettles?

14         A     Brian Nettles.

15         Q     Was it in relation to your

16     representation of Rolando Otero?

17         A     I haven't read any transcripts, but my

18     recollection is it was.

19         Q     Was he involved with Joe Miedzianowski

20     as well and Mohammed Omar?

21         A     I think he was --

22               MS. ROSEN:  Object to the form.

23         A     I think he was charged in that indictment

24     too.

25

**Video Deposition**

196

1   BY MS. BONJEAN:

2        Q    Let me see if you remember this.  In

3    approximately 1988 do you remember being retained

4    by the family or father of an Ibrahim Omar,

5    unrelated to Mohammed Omar?

6        A    No.

7        Q    You're not saying you weren't.  You just

8    don't remember it?

9        A    Yes.

10       Q    Okay.  How about George Laureano,

11   you represented him, right?

12       A    You know, I think I was asked that

13   at the other dep.  I don't specifically remember

14   representing him, but I think someone showed me an

15   appearance or something.

16       Q    Yeah, I'll show it to you again.

17       A    Yeah.

18            (Whereupon Deposition Exhibit No. 20 was

19    marked for identification.)

20       Q    This is an appearance form signed by

21   you, correct?

22       A    Yes.

23       Q    And it was file stamped December 16,

24   1991.  Do you see that?

25       A    I do.

**Video Deposition**

1     Q    And it appears to have a case No. 91-

2     121964, defendant's named George Laureano, right?

3     A    Yes.  Is that the right number?

4     Q    That's what it reflects.

5     A    Yeah, it does.

6     Q    The file stamp is December 16,

7     1991.  Does this refresh your recollection of

8     ever having represented Mr. Laureano?

9     A    It doesn't.

10    Q    And --

11    A    I certainly could have.

12    Q    Do you recall there being a co-defendant

13    by the name of Daniel Rodriguez --

14    A    I don't.

15    Q    -- in this case?  Do you recall this

16    case involving Detective Guevara?

17    A    No, I don't.

18    Q    And you presumably don't recall

19    prevailing at a bench trial before Judge Reyna on

20    behalf of George Laureano, is that right?

21    A    I don't.

22    Q    All right.  You can put that aside.

23    Thank you.

24    A    (Witness complies).

25         MS. ROSEN:  Wherever it's convenient

**Rizman Rappaport (973)992-7650**
**"When every word counts"**

**Video Deposition**

1      for you to take a break, just to use the restroom.

2              MS. BONJEAN:  Sure.  I mean, we can do it

3      now.  I am coming to an end.  So we'll take another

4      break, and then I think I'll be able to finish up.

5              THE WITNESS:  Okay.

6              MR. KREJCI:  Thank you.

7              MS. ROSEN:  And I think some of us will have

8      some questions.

9              THE VIDEOGRAPHER:  Going off the record.

10     The time is 3:17 p.m.

11             (Whereupon a recess was taken from 3:17 p.m.,

12     to 3:28 p.m., after which the following proceedings

13     were had:

14             THE VIDEOGRAPHER:  We're back on the record.

15     The time is 3:28 p.m.

16   BY MS. BONJEAN:

17       Q    I just have a few more questions

18     for you.  Did you represent Ricardo Rodriguez?

19             MR. KREJCI:  Foundation.  What time?

20   BY MS. BONJEAN:

21       Q    It would have been in the '90s, but

22     I don't know the exact date and that's probably

23     a pretty common name.

24       A    Yeah.  I don't remember, but I do --

25     the name --

**Video Deposition**

```
 1        Q    Sounds familiar?

 2        A    -- sounds familiar.

 3        Q    Let me see if I can get some

 4   better information.  How about do you recall

 5   representing Gilberto Flores?

 6        A    I don't.  But, again, that's a name that --

 7        Q    His nickname was Bam Bam?

 8        A    No.

 9        Q    No?  It's not a good -- there are worse

10   nicknames.  And he was a -- his co-defendant was

11   Anthony Rosario?

12        A    No.

13        Q    Doesn't ring a bell?

14        A    No.

15        Q    And do you remember winning, again, a

16   bench trial in front of Judge Morrissey on behalf

17   of Gilberto Flores?

18        A    No.

19        Q    And do you know whether that was --

20        A    In the '90s?

21        Q    Yeah.  Do you know whether that was

22   a case that involved Reynaldo Guevara as well?

23        A    I don't know.

24        Q    Okay.  I've heard rumors that you beat

25   up Andrew Kokoraleis, is that true?
```

**Video Deposition**

200

```
 1              MR. KREJCI:  Objection, form of the question.
 2   BY MS. BONJEAN:
 3        Q     Did you interrogate Andrew Kokoraleis?
 4        A     I think I had -- I interviewed Eddie
 5   Spreitzer and Tommy Kokoraleis.  I don't think
 6   I interviewed Andrew, but that was Judge Bastone.
 7        Q     Andrew's the one that ended up on death
 8   row, right?
 9        A     Death row, yes.
10        Q     In fact, he was executed, right?
11        A     He was.  He was the last --
12        Q     Wasn't he the last execution in the
13   State of Illinois?
14        A     Last execution, yes.
15        Q     And the three of them were part of
16   some --
17        A     The Ripper Crew.
18        Q     Yeah, the Ripper Crew, right?  And
19   Andrew Kokoraleis was an alleged serial killer,
20   right?
21        A     Was.
22        Q     I guess convicted serial killer?
23        A     Yes.
24        Q     Did you question any of those
25   individuals when you were in Felony Review?
```

Video Deposition

201

1      A    Yes, I want to say that was '9 --

2    I think it was before I got married, '9 -- or '82

3    I mean.

4           MS. BONJEAN:  Okay.  Let me just look

5      and I may have nothing further.

6           (Discussion off the record.)

7           MS. BONJEAN:  I have nothing further for

8      Mr. Beuke.

9           MS. ROSEN:  Why don't you go first.

10          MR. LEINENWEBER:  Yeah, that's fine.

11               CROSS-EXAMINATION

12   BY MR. LEINENWEBER:

13     Q    Mr. Beuke, I just have a handful of

14   questions for you.  I apologize.  I'm going to

15   have to refer to my computer screen here, so I

16   may not be looking directly at you.  But if you

17   have any trouble hearing me, just let me know.

18     A    Understood.

19     Q    I'll just go backwards actually,

20   I guess.  So you said you have no recollection of

21   representing Andrew Kokoraleis, Eddie Spreitzer,

22   Tommy Kokoraleis?

23     A    No, I didn't represent them.

24     Q    Okay.

25     A    I did -- I questioned Tommy Kokoraleis

**Video Deposition**

202

1    and Edward Spreitzer.  My partner in Felony Review,

2    if I recall, was Judge Bastone, Bob Bastone.  He

3    questioned Robin Gecht and Andy Kokoraleis.

4       Q   Okay.  And did you pay anyone any

5    money in order to get a favorable outcome for any

6    of those individuals?

7          MR. KREJCI:  Objection to the form of the

8     question.

9       A   I was a state's attorney at the time.

10  BY MR. LEINENWEBER:

11      Q   What about Gilberto Flores a/k/a

12    Bam Bam?  You said that you had no recollection

13    of representing him, but opposing counsel

14    represented that you won a bench trial for him in

15    front of Judge Morrissey.  Do you remember that

16    testimony?

17       A   I remember her asking me that, yeah.

18       Q   Sure.  Do you remember, did you

19    pay anyone any money in order to get a favorable

20    outcome for Gilberto Flores?

21       A   No.

22       Q   Did you pay --

23       A   If I represented him on it.  I still --

24       Q   Did you pay any money to

25    Defendant Guevara in order to get a favorable

**Video Deposition**

203

1    outcome for Mr. Flores?

2         A    No.

3         Q    What about Roberto -- sorry, Ricardo

4    Rodriguez?  There wasn't much information about

5    that, but I'd ask the same questions.  Did you

6    pay anyone any money on behalf of Ricardo

7    Rodriguez in order to get a favorable outcome

8    for Ricardo Rodriguez?

9         A    If I did represent him, I paid nobody any

10   money to get --

11        Q    Sure.

12        A    -- a favorable outcome.

13        Q    George Laureano, you said you had

14   no recollection of representing him.  If you did

15   represent him, so assuming you did represent him,

16   did you pay anyone any money to get a favorable

17   outcome for him?

18        A    No, no.

19        Q    Let's see.  Ibrahim Omar, I think you

20   had said that you didn't recall being retained by

21   him but that you possibly did represent him?

22        A    No, I'm not sure if I had any involvement

23   in his case.  I just knew -- he's not the brother of

24   Mohammed Omar, right?

25             MS. BONJEAN:  I can represent that

**Video Deposition**

204

```
 1      it's my understanding that they are not brothers.

 2          A    Because I know -- I think Mohammed Omar

 3     had a brother, but I don't --

 4              MS. BONJEAN:  I believe he did too, and it's

 5      not Ibrahim Omar.

 6          A    Okay.  No.

 7   BY MR. LEINENWEBER:

 8          Q    Did you pay any money to anyone to get a

 9     favorable outcome for Mr. Omar --

10          A    No.

11          Q    -- Ibrahim Omar?

12          A    No.

13          Q    What about Rolando Otero?  Opposing

14     counsel indicated that you had represented him

15     on a case -- or I think you had said that you

16     represented him on a case at 26th Street, right?

17          A    My recollection is is that he had

18     the case pending at 26th Street.  I think it was

19     in narcotics court.  And while we were defending

20     that case the indictment came down on all of those

21     individuals, in addition to Officer Miedzianowski,

22     and they transferred Rolando Omar over to the federal

23     building.  And then after his case was resolved

24     by whoever represented him in federal court, I think

25     they dismissed our case in state court.
```

**Video Deposition**

205

1      Q    And just to clarify, you had said

2    Rolando Omar.  I think you meant Rolando Otero?

3      A    Rolando Otero, you're right.

4      Q    Okay.  And did you pay any money

5    to anyone to influence the outcome of any legal

6    matters that Rolando Otero was involved in?

7      A    No, sir.

8      Q    What about Marcos Gonzalez?  Opposing

9    counsel indicated that was a bench trial before

10   Judge Morrissey.  Did you -- do you remember that

11   testimony?

12     A    I remember the questions, yes.

13     Q    Sure.  And did you pay any money or any

14   benefits to anyone to get any kind of influence

15   on Mr. Gonzalez's case at all?

16     A    No, sir.

17     Q    Did you pay any money to

18   Defendant Guevara in order to have any kind of

19   influence over Mr. Gonzalez's case?

20     A    No.

21     Q    So I was a little bit confused

22   about Sam Perez and Javier Perez.  I think you

23   indicated you represented Javier Perez?

24     A    I represented Sam Perez on a murder case.

25     Q    Okay.

**Video Deposition**

206

1       A    And then when -- there was a second

2    case where Sam Perez and his brother Javier Perez,

3    Mohammed Omar, I think Mohammed Omar's brother was

4    also charged, and there may have been a fifth or a

5    sixth defendant too.  But I didn't represent Sam on

6    that case.  I represented his brother Javier.

7       Q    Okay.  So the first case you represented

8    Sam; the second case you represented Javier?

9       A    Javier, right.

10       Q    Either of those cases, did you pay any

11    money or benefits to anyone to influence those

12    proceedings at all?

13       A    No.

14       Q    Daniel Pena, you saw that your name is

15    mentioned in I think it was an appellate decision

16    there.  Did you have -- do you remember that?

17       A    I remember seeing it, sure.

18       Q    You saw that, sure.  Did you pay

19    any monies or benefits to anyone to influence any

20    kind of proceeding involving Daniel Pena?

21       A    No.

22       Q    Mr. Juan Hernandez, we talked about that

23    case a little bit.  That was the one involving

24    the motion to disqualify?

25       A    Right.

**Video Deposition**

207

1      Q    Did you at any time pay any money or
2    benefits to anyone to influence Mr. Hernandez's
3    proceedings?
4      A    No.
5      Q    What about did you pay any money or
6    any kind of benefits to Mr. Guevara to influence
7    Mr. Hernandez's proceedings?
8      A    No, sir.
9      Q    Give me just one second and I may be
10   through.
11     A    Sure.
12     Q    I think I said Marcos Gonzalez.  If I
13   changed that name to Marco Gonzalez, would that
14   make any difference for your answer?
15     A    No.
16     Q    Did you ever pay any money to any
17   judge to influence any of these cases or any
18   case?
19     A    Never.
20     Q    What about to Detective Guevara,
21   did you ever pay any money to Detective Guevara
22   to influence any case?
23     A    Never.
24     Q    Did you ever see Detective Guevara hit
25   anyone?

**Video Deposition**

208

1      A      No.

2      Q      Did you ever see Detective Guevara

3   ever put a telephone book on someone and hit the

4   telephone book with a large metal flashlight?

5      A      Did I see him do that?  I didn't see him

6   do that, no.

7              MR. LEINENWEBER:  I have no further

8    questions.

9              MS. ROSEN:  I just have a couple.

10              MR. LEINENWEBER:  Thank you I just wanted

11    to say.

12                   CROSS-EXAMINATION

13   BY MS. ROSEN:

14      Q      Going back to Mr. Pena for a moment,

15   Ms. Bonjean asked you some questions about

16   whether or not you were covering up in any way

17   for Mr. Guevara, but I want to ask you a little

18   more specific question about that.

19                   Did Mr. Guevara during the course

20   of that particular case -- and you were a state's

21   attorney at that point, right?

22              MS. BONJEAN:  Objection, form.

23   BY MS. ROSEN:

24      Q      An assistant state's attorney during

25   Mr. Pena's criminal prosecution?

**Video Deposition**

209

1      A     That's what I read in the Appellate Court

2      opinion.

3          Q     Okay.

4      A     It would have been in the time period when

5      I was still in the office.

6          Q     Okay.  And as you've said before

7      I think, you have no specific recollection of

8      that particular case, correct?

9          A     Correct.

10         Q     Okay.  Do you recall Mr. --

11     Detective Guevara or I guess Gang Crime

12     Specialist Guevara at the time calling you and

13     telling you that an individual that he had been

14     interrogating had been injured while in police

15     custody and he needed your help?

16         A     In that Pena case?

17         Q     Correct.

18         A     No, I don't.

19         Q     In any case do you recall

20     Detective Guevara or Gang Crime Specialist

21     Guevara, or whatever rank he held at whatever

22     point in time, calling you when you were an

23     assistant state's attorney and telling you that

24     during the course of whatever the criminal

25     prosecution was the particular suspect was

Video Deposition

210

1     injured in his custody and he needed your help?

2            MS. BONJEAN:  Objection to the form,

3       compound.

4            A    No.

5    BY MS. ROSEN:

6            Q    With respect to Mr. Pena's case,

7       do you recall telling Detective or Gang Crime

8       Specialist Guevara that he should bring Mr. Pena

9       to the 13th floor of the state's attorney's

10      office so that you could document that Mr. Pena

11      was interviewed at the state's attorney's office?

12           A    No.

13           Q    With respect to Mr. Pena, do you

14      recall devising a plan with Mr. Guevara where you

15      would indicate that you had interviewed Mr. Pena

16      and during the course of your interview you would

17      lie about what Mr. Pena told you about how he got

18      his injuries in an effort to help Mr. Guevara?

19           A    No.

20           Q    Do you recall ever devising a plan with

21      Mr. Guevara in any case that you were involved in

22      with him where you and he would come up with a

23      lie explaining away injuries for a particular

24      suspect that was in Mr. Guevara's custody?

25           A    No, ma'am.

**Video Deposition**

211

1      Q    Did you ever do such a thing?

2      A    No.

3      Q    Did you ever witness Mr. Guevara beating

4   anybody in your presence?

5      A    No.

6      Q    With respect to the Juan Hernandez

7   matter that we talked about, the motion to

8   disqualify --

9      A    Right.

10     Q    -- did you and Mr. Guevara have

11   a conversation about the fact that you had a 15-

12   to 20-year relationship but that you would keep

13   that secret from Mr. Hernandez so that you could

14   represent Mr. Hernandez?

15     A    No.

16     Q    Did you ever have a conversation

17   with Mr. Guevara wherein you and he agreed to

18   keep secret your relationship so that you could

19   represent some criminal defendant?

20     A    No.

21     Q    With respect to Ibrahim Omar, did you

22   ever pay Detective Guevara for anything that you

23   did in connection with that case?

24     A    I don't know if I was connected with the

25   case.  If I was, I didn't.

**Video Deposition**

212

1      Q    Did you ever pay Detective Guevara for
2    anything?
3      A    No.
4      Q    Do you know Joe Miedzianowski?
5      A    I know him.  I know who he is.
6      Q    Did you ever have any interaction
7    with him when he was a Chicago police officer?
8      A    No, I don't think I ever prosecuted a case
9    that he was involved in.
10     Q    Were you ever involved in any kind of
11   conspiracy with Mr. Guevara or Mr. Miedzianowski
12   and anybody else to fix trials in any way?
13     A    No.
14     Q    Did you funnel any money to Joe
15   Miedzianowski?
16     A    Never.
17     Q    Did Joe Miedzianowski ever funnel any
18   money to you?
19     A    No.
20     Q    You answered some questions
21   earlier about whether or not you had any
22   conversations with Mr. Maysonet about -- and
23   wherein Mr. Maysonet told you that he was
24   innocent.  Remember Ms. Bonjean was asking you
25   some questions many, many hours ago about that

Video Deposition

1    topic?

2         A    Yes.

3         Q    And you mentioned something about you

4    had a discussion with him in connection with the

5    discussion about his innocence, about the law of

6    accountability.  Do you recall that testimony?

7         A    I know it was something that we --

8    I don't have a specific recollection of it, but I

9    think it was something that we discussed or would

10   have discussed given that -- in terms of strategizing

11   on a defense.  I don't have a specific recollection

12   of it.

13        Q    And what was it about the facts as you

14   knew them that led you to have this conversation

15   with Mr. Maysonet about the law of

16   accountability?

17             MS. BONJEAN:  Objection to the form.

18        A    I think what my knowledge of the

19   facts were was that Mr. Maysonet had agreed to

20   drive three individuals over to a certain location,

21   but in order -- without any knowledge that they had

22   some sort of a plan or idea to commit murder or

23   something like that.  If the state's attorneys

24   couldn't establish his knowledge of what was going

25   to happen, that I thought conceivably gives us a

**Video Deposition**

214

1    chance to win.  And, you know, if they couldn't

2    establish that, I think it was -- or we could

3    throw enough garbage on the police investigation,

4    I think, you know, that would give us a chance also.

5    That's -- I don't have a specific recollection of

6    that, but it's something I would typically talk about

7    with my clients.

8  BY MS. ROSEN:

9        Q    Okay.  And did Mr. Maysonet tell

10   you that he had agreed to drive the vehicle?

11       A    I mean, can I answer that?

12       Q    She's waived privilege, yeah.

13       A    Okay.  I don't remember him telling me

14   that.  I remember him -- I remember going over the

15   statement, where he says that in his statement, but

16   I don't ever remember Mr. Maysonet acknowledging that

17   that was true.

18       Q    Did he deny it?

19       A    I don't remember him denying it.

20       Q    Okay.  I've heard that some

21   criminal defense attorneys have their clients

22   take polygraph exams.  Have you ever heard of

23   that practice?

24       A    I have.

25       Q    Is that something you engaged in?

**Video Deposition**

215

1     A     No.

2     Q     Okay.  Now, you told us earlier

3  that Mr. Maysonet was not comfortable speaking

4  English, is that correct?

5     A     My recollection is, yes, he was much more

6  comfortable speaking Spanish.

7     Q     Does that mean he could speak no

8  English at all or he was just more comfortable in

9  Spanish?

10    A     Again, my recollection is he could

11 communicate to a certain degree in English, but

12 certainly the language he would prefer to have a

13 conversation in I think would be Spanish.

14    Q     Okay.

15    A     That's my recollection.

16    Q     Okay.  Now, I want to direct

17 your attention back to some testimony that

18 Ms. Bonjean showed you earlier regarding your

19 cross-examination.  I think it was yours.  It

20 might have been Mr. Rueckert's, but I think it

21 was yours of Mr. Montilla.  Do you recall that

22 testimony?

23    A     I do.

24    Q     And if you need to refer to the

25 transcript, you can.  If you don't remember,

**Video Deposition**

216

1   it's at page 789.  But there was a series of

2   questions asked of Detective Montilla about

3   whether or not he prepared general progress

4   reports in connection with interviews he

5   conducted.  Do you remember that testimony?

6        A    Yes, I do.

7        Q    Okay.  And he told you he prepared no

8   general progress report, correct?

9        A    He did not.

10        Q    He did not prepare one?

11        A    Right.

12        Q    Okay.  So if he did not prepare

13   one, there would have been no report for the

14   prosecutors to produce, correct?

15        A    Yes, that there wouldn't have been

16   any report to produce.  But that's my point.

17   If it was something that was that important to

18   the investigation as his -- part of his statement,

19   why wouldn't you put it in a progress report note.

20        Q    Okay.  And he admitted repeatedly that

21   he prepared no report, correct?

22        A    He did not, yes.

23        Q    So he agreed that he did not prepare

24   a report?

25        A    I think that's fair.

Video Deposition

1      Q     Okay.  And in your time as a -- both a

2   prosecutor and a criminal defense attorney, you

3   were familiar with, generally speaking, with

4   Chicago Police Department documents, correct?

5      A     Yeah.

6           MS. ROSEN:  Okay.  I don't remember what

7    number we're on.

8           (Whereupon Deposition Exhibit No. 21 was

9    marked for identification.)

10     Q     I'm handing you what we've marked as

11  Exhibit No. 21, and it's a group exhibit and

12  it's Bates stamped CCSAO 874 through 881.  And

13  I'll represent to you that these were documents

14  that were produced in this case by the Cook

15  County State's Attorney's Office in connection

16  with Mr. -- the prosecution of Mr. Maysonet,

17  okay?

18     A     Okay.

19     Q     And do you recognize, first of all,

20  generally what types of documents these are?

21     A     I do.

22     Q     And what are they?

23     A     They're GPRs.

24     Q     And is that a shorthand for a general

25  progress report?

**Video Deposition**

218

1       A     Yes.

2       Q     And are these the types of reports that

3    detectives within the Chicago Police Department

4    use to take notes?

5       A     Yes.

6       Q     Okay.  And these are distinguishable

7    from supplementary reports, correct?

8       A     Yes.

9       Q     And during your time as a state's

10   attorney and as a criminal defense attorney,

11   have you seen hundreds of thousands of these

12   types of documents?

13      A     I have.

14      Q     And do you recognize these specific

15   general progress reports as having been produced

16   to you in connection with your representation of

17   Mr. Maysonet?

18      A     I don't, but I see some of the similar

19   names, the reports, the Wiley brothers.

20      Q     Okay.  And as you sit here today,

21   are you confident that during the course of your

22   representation of Mr. Maysonet that the state's

23   attorney's office would have produced to you

24   everything they had obtained from the Chicago

25   Police Department?

**Video Deposition**

1      A     With the two prosecutors I dealt with on

2    that case, yes.

3      Q     Okay.  So if these particular general

4    progress reports are contained within the CCSAO

5    file as it exists today, it's safe to assume you

6    would have gotten them back in the day when you

7    were representing Mr. Maysonet?

8      A     I believe so.

9            MS. BONJEAN:  I'm going to object to form,

10     but okay.

11   BY MS. ROSEN:

12     Q     You were asked some questions earlier

13   about some particular names of individuals that

14   were identified in a sup report.  Jeffery was one

15   of the names.  Do you remember those questions

16   earlier today?  We can go back to the --

17           MR. KREJCI:  Refer to what case?

18           MS. ROSEN:  For Mr. Maysonet's case, sorry.

19     A     Jeffery?

20     Q     Yeah.  So if you want to take a

21   look at Exhibit No. 7 and if you look at page 51

22   of Exhibit No. 7.  So if you look at 51, it's the

23   sup report.

24     A     000007?

25     Q     No, 51.

**Video Deposition**

220

```
1        A      Oh, 51.

2        Q      Look at RFC-51.

3        A      Bates 51?

4        Q      Yeah, Bates 51.

5        A      Got it.

6        Q      Okay.  And so in there there's the

7    name Jeffery.  Do you see that somewhere?  I

8    think it was the second or third paragraph.  No?

9            MS. GOLDEN:  It could be the next page too.

10           MS. ROSEN:  Let me pull that up.  I don't

11     have that in front of me.  I was trying to do this

12     quickly.

13       Q   Yeah, I could be referring you to the

14   wrong page.  So just give me one second.

15           MR. LEINENWEBER:  I think it's around

16     page 51.

17           MS. ROSEN:  That's what I said.

18           MR. LEINENWEBER:  Oh, I'm sorry.

19           MS. ROSEN:  No, yeah, but it might be

20     the next page.  It might be page 52.  That's the

21     problem with electronic functions.  I'm not as adept.

22       Q   Yeah, okay.  So a Latin King named

23   Jeffery.  So if you look towards the bottom of

24   page 51, it's four lines from the bottom.  Do you

25   recognize --
```

**Video Deposition**

221

1      A    Oh, I'm sorry.  Yes.

2      Q    Yeah.  So a Latin King named Jeffery.

3   And Ms. Bonjean asked you questions about whether

4   or not you figured out who Jeffery was.  Do you

5   remember those questions earlier today?

6      A    He was in reference to the Pontiac

7   Bonneville.

8      Q    Correct, and whether or not you

9   ever located him or figured out if he was a real

10   person or not.  You were asked those questions

11   earlier today.  Do you recall that?

12      A    Yes.

13      Q    Did you ever ask Mr. Maysonet if

14   he knew who this Latin King named Jeffery was?

15      A    I don't recall.

16      Q    Okay.  If you had asked Mr. Maysonet

17   whether or not he knew a Latin King named

18   Jeffery, as is recorded here in the police

19   report, and he told you no, that that was not

20   a real person and that this was made up by the

21   police, would you have done something with that

22   information?

23      MS. BONJEAN:  I'm going to object to the

24    incomplete hypothetical.

25

**Video Deposition**

222

```
 1   BY MS. ROSEN:

 2        Q    Okay.

 3        A    If he had told me that Jeffery was just

 4   a name that he made up and gave to the police?

 5        Q    Or if he told you that he never gave

 6   that name to the police.

 7        A    Would I have tried to do something with

 8   it?  I suppose I would tell you yes, but I'm not

 9   sure.  The issue that we were attacking in the case

10   was the credibility to be given to Mr. Maysonet's

11   statement given the whole crazy way the police

12   went about investigating this case.

13        Q    So you're not -- so I guess the bottom-

14   line answer is you're not sure?

15        A    I'm not sure, yes.

16        Q    Okay.

17        A    Because I don't think there was any

18   evidence that the police ever did anything to try

19   to locate Jeffery or a blue Pontiac Bonneville.

20        Q    Did you ever discuss with Mr. Maysonet

21   his gang affiliation?

22        A    I don't have any specific recollection

23   of that, but it's certainly something I would expect

24   to talk with a client about.

25        Q    Okay.  As you sit here today, do you
```

**Video Deposition**

223

1    recall whether or not he admitted or denied being

2    affiliated with any particular street gang?

3         A    I don't.

4              MS. ROSEN:  I don't have any more questions.

5              MS. SPIVY:  I have just a couple.

6                      CROSS-EXAMINATION

7    BY MS. SPIVY:

8         Q    Mr. Beuke --

9              MR. LEINENWEBER:  Hang on.  She needs

10    the mic.  This one here.

11    BY MS. SPIVY:

12         Q    Mr. Beuke, you don't speak Spanish,

13    do you?

14         A    Two years of Spanish at Brother Rice High

15    School.  I didn't do so good.

16         Q    Okay.  You're not fluent in Spanish?

17         A    I'm not.

18         Q    You don't know any like legal terms of

19    art in Spanish?

20         A    No.

21         Q    And when you would have had

22    this conversation concerning the meaning

23    of accountability and the definition of

24    accountability, that would have been in English,

25    correct?

**Video Deposition**

224

```
 1        A     Sure.

 2        Q     And you never used an interpreter

 3   in any of your conversations at the jail with

 4   Mr. Maysonet, is that correct?

 5        A     I don't ever remember asking permission to

 6   bring an interpreter into the jail.  I mean, it's a

 7   process.  So if I did, it should be on the visiting

 8   records.

 9        Q     And you would have made it a court

10   order, correct?

11        A     I don't know if I would have made it a

12   court order back then.

13        Q     But you might have?

14        A     You may have.

15        Q     And when you spoke with Mr. DiFranco

16   earlier this week, he didn't tell you what to say

17   today?

18        A     No.

19        Q     And he didn't tell you to lie for him?

20        A     No.

21              MS. SPIVY:  Nothing else.

22              MS. GOLDEN:  Do you want to take a quick

23    break before --

24              MS. ROSEN:  Do you have followup?

25              MS. BONJEAN:  I just have one question.
```

**Video Deposition**

225

1          MS. ROSEN:  Okay.  Why don't you ask your

2     question and then let us just talk real quick and

3     then --

4                     REDIRECT EXAMINATION

5   BY MS. BONJEAN:

6          Q    Mr. Beuke, you were asked about whether

7     or not you ever witnessed Detective Guevara

8     committing any misconduct during interrogations.

9     Do you remember that?

10         A    Yes.

11         Q    I think specifically you were asked

12    whether you saw him ever use physical force or

13    abuse in the context of an interrogation?

14         A    Yes.

15         Q    Have you ever been present during any

16    interrogations conducted by Detective Guevara?

17         A    I don't recall ever being present, no.

18              MS. BONJEAN:  Thank you.

19              THE VIDEOGRAPHER:  We're going off the

20    record.  The time is 4:03 p.m.

21              (Whereupon a recess was taken from 4:03 p.m.,

22    to 4:10 p.m., after which the following proceedings

23    were had:)

24              THE VIDEOGRAPHER:  We're back on the record.

25    The time is 4:10 p.m.

**Video Deposition**

226

```
1                       CROSS-EXAMINATION
2    BY MS. GOLDEN:
3         Q    Sir, we've talked about a few
4    judges today I think, Mr. -- or Judge Morrissey,
5    Judge Reyna and Judge Cousins I think it was.
6    Have there been any other judges that we
7    discussed by name today?
8         A    I remember Judge Cousins I think was
9    the judge in Sam Perez's murder trial.  Judge Reyna
10   and Judge Morrissey were two other ones.
11        Q    And those are not the only three judges
12   you've practiced in front of, correct?
13        A    No.
14        Q    There's a lot of judges in Cook County,
15   correct?
16        A    Yes.
17        Q    There's, in fact, hundreds of them,
18   right?
19        A    Hopefully you one day.
20        Q    I agree.  And there's also hundreds of
21   state's attorneys, correct?
22        A    Yes.
23        Q    So -- and there's how many sitting
24   judges right now would you say have spent some
25   time in the state's attorney's office?
```

**Video Deposition**

1      A     It would be a guess.  I'm not sure.

2      Q     More than 50?

3      A     Oh, yes.

4      Q     More than a hundred maybe even?

5      A     Probably.

6      Q     How many, by the way, people have you

7   golfed with over the years?

8            MR. KREJCI:  Can you be specific?  How many

9    people did he golf with?

10           MS. GOLDEN:  Yeah, yeah.

11     Q     I mean, we talked about you golfing

12   with --

13     A     I golfed with him.

14     Q     -- Judge Reyna and Judge Morrissey,

15   right?

16     A     Yeah, no idea.

17     Q     And with Judge Morrissey more than

18   Judge Reyna?

19     A     Probably.

20     Q     These are not the only two people that

21   you've golfed with?

22     A     Oh, no, no.  I've golfed with hundreds --

23     Q     And those are probably not the only

24   two judges you've ever golfed with either, right?

25   You go to professional functions?

**Video Deposition**

228

```
 1        A     Yeah, golf outings.

 2        Q     And lawyers and judges golf together --

 3        A     Occasionally, yes.

 4        Q     -- at golf outings?  Did you ever --

 5              MS. GOLDEN:  I think that's it.  Yeah,

 6     I think that's it.

 7              MS. BONJEAN:  Nothing based on that.

 8              MR. KREJCI:  Reserve.

 9              MS. BONJEAN:  All right.  Thank you.

10              MR. KREJCI:  Thank you.

11              THE WITNESS:  Thank you.

12              MS. ROSEN:  Thank you.

13              THE VIDEOGRAPHER:  Going off the record.

14     The time is 4:13 p.m.

15                    (WITNESS EXCUSED)

16                    (Reporter retained exhibits.)

17

18

19

20

21

22

23

24

25
```

Video Deposition

229

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    JOSE JUAN MAYSONET, JR.,          )
                                        )
 4              Plaintiff,              )
                                        )
 5              vs.                     ) No. 18 CV 02342
                                        )
 6    REYNALDO GUEVARA, ERNEST          )
      HALVORSEN, EDWARD MINGEY,         )
 7    LEE EPPLEN, FERNANDO              )
      MONTILLA, ROLAND PAULNITSKY,      )
 8    FRANK DIFRANCO, CITY OF           )
      CHICAGO and COOK COUNTY,          )
 9                                      )
                Defendants.             )
10

11

12         I, RICHARD M. BEUKE, do hereby certify that
      I have read the foregoing transcript of my deposition
13    given on October 30, 2019, consisting of pages 1 to 231,
      inclusive, and I do again subscribe and make oath that
14    the same is a true, correct and complete transcript of my
      deposition so given as aforesaid, and includes changes,
15    if any, so made by me.

16
                          Corrections have been submitted
17                        No corrections have been
                          submitted
18

19
                          RICHARD M. BEUKE, Deponent
20
      Subscribed and sworn to
21    before me this    day of
                      , 20
22
      Notary Public
23

24

25
```

**Video Deposition**

230

```
1    NORTHERN DISTRICT OF ILLINOIS  )
     EASTERN DIVISION               )
2    STATE OF ILLINOIS              )
                                    )     SS.
3    COUNTY OF COOK                 )

4

5          I, Mary Maslowski, Certified Shorthand Reporter

6    and Notary Public in and for the County of Cook, State of

7    Illinois, do hereby certify that on October 30, 2019, at

8    10:23 a.m., the deposition of the witness, RICHARD M.

9    BEUKE, called by the Plaintiff, was taken before me,

10   reported stenographically and was thereafter transcribed

11   by me.

12         The said witness, RICHARD M. BEUKE, was first

13   duly sworn to tell the truth, the whole truth, and

14   nothing but the truth, and was then examined upon oral

15   interrogatories.

16         I further certify that the foregoing is a true,

17   accurate and complete record of the questions asked of

18   and answers made by the said witness, at the time and

19   place hereinabove referred to.

20         The signature of the witness was not waived by

21   agreement.

22         The deposition terminated at 4:13 p.m.

23         Pursuant to Rule 30(e) of the Federal

24   Rules of Civil Procedure for the United States District

25   Courts, if deponent fails to read and sign this
```

**Video Deposition**

231

1    deposition transcript within 30 days or make other

2    arrangements for reading and signing thereof, this

3    deposition transcript may be used as fully as though

4    signed, and the instant certificate will then evidence

5    such failure to read and sign this deposition transcript

6    as the reason for signature being waived.

7              The undersigned is not interested in the within

8    case, nor of kin or counsel to any of the parties.

9              Witness my official signature and seal as Notary

10   Public, in and for Cook County, Illinois on this 5th day

11   of November, A.D., 2019.

12

13

14                         Mary Maslowski, CSR, RPR
                           Notary Public
15

16

17

18

19

20

21

22

23

24

25

## A

**a/k/a (1)**
202:11
**ability (3)**
90:7,20;115:18
**able (23)**
7:21;9:18;25:17;
40:8;41:21;58:16,17;
67:18;92:16,17;97:6,
12;110:8;119:9;
120:25;121:8;126:3,
6;127:22;132:7;
133:1;171:24;198:4
**above-entitled (1)**
140:15
**Abrams (1)**
56:1
**abrasive (1)**
132:6
**abuse (3)**
24:9;180:6;225:13
**abused (1)**
179:6
**AC (1)**
24:5
**access (2)**
121:1;154:23
**accessible (1)**
128:23
**accident (7)**
158:10,12,21,23;
159:2;162:15,24
**according (5)**
66:21;146:19;
151:14;173:5;174:9
**accountability (5)**
95:1;213:6,16;
223:23,24
**accuracy (1)**
96:10
**accurate (1)**
177:25
**accurately (1)**
177:21
**accused (3)**
43:11;73:25;193:5
**accustomed (1)**
97:12
**acknowledging (1)**
214:16
**acquaintance (2)**
137:1,5
**acquittal (3)**
182:17,20;190:4
**acquitted (1)**
120:3
**across (2)**
54:18,19
**acting (1)**
72:19
**action (4)**
6:19;12:12;13:8;
134:22
**actions (2)**
75:18;165:15
**active (4)**
28:21;29:5,7,7
**activity (2)**
105:11;136:4
**actual (2)**
103:21;168:13
**actually (19)**
11:7;27:23;37:5,7;
44:21;76:3;77:3;86:7;
91:11;98:8;103:7,21;
110:4;117:3;169:14;
176:15;178:3;185:25;
201:19
**Adam (1)**
5:10
**added (2)**
61:15;63:12
**addition (1)**
204:21
**additional (2)**
63:11;182:23
**address (4)**
91:14;130:2;169:4,
6
**adept (1)**
220:21
**administrative (1)**
22:18
**admission (1)**
183:8
**admit (1)**
137:20
**admitted (6)**
19:22;20:1;73:20;
95:8;216:20;223:1
**adversary (1)**
56:24
**advertise (1)**
49:24
**advice (4)**
76:25;165:22;
166:14,15
**affairs (1)**
192:10
**affidavit (4)**
154:14;157:4;
162:19;163:24
**affiliated (1)**
223:2
**affiliation (1)**
222:21
**African-American (1)**
24:20
**afternoon (2)**
167:17,25
**afterwards (1)**
113:11
**again (40)**
9:7;12:19;16:3;

**17:3;46:12;68:5;
70:16;71:15,20;
73:14;74:14;75:23;
76:16;77:7,12;79:22;
82:9;90:24;91:3;
93:14;96:12;97:2;
98:9;107:8;108:17;
116:11;126:16;127:3,
12;128:6;158:18;
160:10;171:23;
173:19;190:14;
194:13;196:16;199:6,
15;215:10**
**against (31)**
6:20;11:12,14;14:7;
52:15;58:19;72:22;
75:19;98:24;111:16,
17,21;112:5,24,25;
113:2;114:4,11,12,13;
116:6;120:14;153:10;
165:2,4,6;171:1,11;
180:6;181:8,15
**agents (2)**
185:16;186:20
**ago (6)**
7:3;19:12;50:24;
159:17;162:15;
212:25
**agree (8)**
9:3;63:25;103:3,12;
123:23;124:9;128:9;
226:20
**agreed (11)**
83:4;114:10;
117:15;119:16;
120:24;142:1;168:7;
211:17;213:19;
214:10;216:23
**agreement (7)**
112:23;114:2,5,11,
15;132:11;168:8
**ahead (7)**
10:22;21:1;35:23;
72:11;89:25;100:12,
15
**air (2)**
69:2;166:23
**Alfredo (9)**
10:6;85:13;92:23;
95:13;111:22,23;
112:5,13,24
**allegation (9)**
70:24;72:8;73:7;
74:3,12;76:12,14;
184:17,22
**allegations (8)**
13:25;14:6;52:15;
72:9;74:21;116:14;
147:7;181:8
**alleged (7)**
128:10;155:3;
156:8;178:11;180:23;
181:13;200:19

**allegedly (3)**
99:25;100:6;117:18
**alleges (3)**
73:22;76:21;162:13
**alleging (1)**
165:7
**allowance (1)**
115:11
**allowed (1)**
26:23
**Alma (2)**
129:24;130:22
**almost (2)**
42:6;137:3
**along (2)**
33:7;97:2
**although (1)**
76:7
**altogether (1)**
38:7
**always (14)**
28:12;29:21;38:18;
50:4;68:13;95:12;
96:5;101:15;103:13;
111:10;113:25;161:1,
23,24
**amended (1)**
171:10
**amicable (2)**
50:13,19
**amongst (1)**
168:8
**amount (2)**
46:13;50:8
**and/or (3)**
10:19;57:19;168:15
**Andrew (5)**
199:25;200:3,6,19;
201:21
**Andrew's (1)**
200:7
**Andy (2)**
171:17;202:3
**Angel (1)**
172:25
**announcements (1)**
50:1
**answered (3)**
40:17;160:7;212:20
**Anthony (2)**
44:5;199:11
**anticipate (1)**
8:23
**anyways (1)**
43:7
**apart (3)**
18:18;134:21;147:5
**apartment (2)**
118:9;132:13
**apologies (2)**
122:3;163:16
**apologize (2)**
68:4;201:14

**apparently (3)**
15:5;165:3;192:24
**appeal (4)**
10:2,4;18:19;63:23
**appear (1)**
147:3
**appearance (23)**
58:25;59:16,23;
60:12,18;61:18;64:2;
79:19,24;83:10;
137:24,25;143:16;
145:9,12,24;146:4;
149:4,19;150:3,6;
196:15,20
**appearances (1)**
81:20
**appearing (2)**
99:4;141:23
**appears (9)**
43:2,3;85:2;129:15;
144:2;146:1;179:24;
195:10;197:1
**Appellate (11)**
9:12,14,24;10:9;
63:23;112:21;113:8;
115:9;172:18;206:15;
209:1
**applications (1)**
21:22
**applied (1)**
21:18
**apply (1)**
104:20
**appointed (1)**
63:24
**apprised (1)**
44:23
**approximate (1)**
32:4
**approximately (3)**
72:16;162:15;196:3
**April (1)**
66:21
**ARDC (6)**
11:11,14;14:8,14;
16:19;78:12
**area (46)**
25:20,21,21,22,22,
23,23,23,23,24,24,25;
26:8,22;27:23,24,25;
28:1,3,15;29:5,36:9,
14,18,19,20;51:18,19,
20;52:24;71:4;75:7,
22;93:18;100:6;
101:16,21;102:14,16;
104:7,11;107:10;
110:7,8;128:1;183:9
**Areas (9)**
26:1,3,5,16,25;
27:12;28:17,21;29:7
**argument (6)**
130:10,15;131:8,
15;132:4,8

**arising (1)**
163:4
**Arman (7)**
148:24;149:4,7;
150:24;151:15;
162:23;163:19
**armed (1)**
192:25
**arms (1)**
92:17
**around (9)**
36:21;80:24;
104:12;137:4;141:3;
142:24;174:12;177:2;
220:15
**arraignment (3)**
44:18;45:1;70:7
**arraignments (1)**
22:15
**arranged (1)**
184:18
**arrest (12)**
64:15,25;66:9,23;
68:22;69:13;71:12;
72:16;75:11;76:22;
77:24;174:10
**arrested (11)**
45:13,16;69:24;
71:12,17;77:4;173:4;
174:13,17;175:22;
185:12
**arrogance (1)**
56:21
**arson (1)**
48:21
**Art (2)**
33:24;223:19
**artful (1)**
97:14
**article (1)**
165:16
**ascent (1)**
39:14
**Ashley (2)**
5:19;6:21
**aside (11)**
16:25;64:8;85:7;
98:3,15;149:23;
152:25;172:5;178:10;
190:21;197:22
**assault (2)**
31:20;160:4
**assigned (21)**
22:12,17;23:20;
24:10,15;25:19;26:2,
4;27:5,6;31:9,11;
32:2;33:21;36:15;
38:16;40:20;44:14;
46:23;62:7;76:4
**assigning (1)**
44:16
**assignment (7)**
22:10,20;23:11;

**assignments (1)**
22:10
**assist (1)**
82:10
**assistance (3)**
26:21;178:24;
179:19
**assistant (15)**
5:21;13:1;15:17;
20:15,23;26:20;28:7;
34:3;37:11;52:5,8;
173:14,25;208:24;
209:23
**assistants (3)**
26:8;31:9;35:19
**assisting (2)**
183:23;184:4
**associate (1)**
6:21
**associated (1)**
144:3
**association (1)**
5:12
**assume (26)**
7:18;8:2;10:18;
11:15;13:13;21:9,20;
24:12;29:11;42:4;
46:5;58:24;59:13;
65:8;67:3;68:21;
77:12;85:15;87:4,24;
98:1;122:24;143:24;
154:7;183:14;219:5
**assumed (1)**
180:15
**assuming (2)**
190:18;203:15
**assumption (1)**
108:1
**attached (3)**
140:18;154:14;
157:4
**attacking (2)**
167:2;222:9
**attempt (2)**
31:19;60:11
**attend (2)**
20:6;192:3
**attended (1)**
35:4
**attention (13)**
40:10;63:2;80:20;
81:11;84:16;89:16;
90:17;91:7;99:14;
106:22;116:17;117:5;
215:17
**attorney (49)**
5:22;6:22,23;8:3;
12:25;13:2;15:25;
17:24,24;19:17;
34:12;37:4;44:12;
53:2;56:3,14;57:1;
76:4,24;77:4,10;87:5,

18;91:21;99:4;102:2;
111:19,19;113:12;
142:13;150:12;
151:17;157:1;163:8,
15;170:4;173:14,25;
180:3;181:24;189:5;
194:16;202:9;208:21,
24;209:23;217:2;
218:10,10
**attorney-client (6)**
93:18,25;94:7;97:3;
142:6;159:8
**attorney-filed (1)**
66:9
**attorneys (34)**
12:8,14,17;15:24;
27:5;28:7;32:2;33:20;
34:4,23;39:18;51:9;
54:11;57:5;62:6,8;
81:21;105:19,24,25;
106:4,19;115:10;
121:16,22,23,25;
122:1;169:9;189:8;
193:21;213:23;
214:21;226:21
**attorneys' (1)**
124:16
**Attorney's (30)**
15:11,14,18;20:15,
23;21:19;22:6,11;
25:25;26:21;35:21;
37:6;47:18,21;48:20;
52:6,13;56:16;83:23;
84:12;161:14;179:13;
182:5;191:4;194:21;
210:9,11;217:15;
218:23;226:25
**August (13)**
38:9,16;47:18;
72:17;98:25;107:5,8,
9;108:14,15,22;
109:9;117:12
**available (2)**
29:21;102:1
**Avenue (2)**
130:2,6
**avid (2)**
193:19;194:7
**awakened (2)**
130:8;132:3
**aware (15)**
12:11;13:24;77:3,5,
25;85:20;86:2;95:4;
114:1,5;120:2;125:4;
162:4,9,11
**away (2)**
116:9;210:23

**B**

**baby (2)**
47:22;82:22
**back (46)**

7:17;13:12;16:12;
23:13;23:15;1;28:13,17;
29:6;32:3,18;36:4,11;
45:8;64:7;79:12;85:8;
88:13;98:6,7;107:3;
112:12;115:19;117:5;
122:9,11;133:13;
139:4;156:4;158:13;
164:11;166:21,22;
167:10;168:5;169:2,
4,6,22;192:14;
198:14;208:14;
215:17;219:6,16;
224:12;225:24
**background (1)**
19:14
**backup (3)**
67:19,22,25
**backwards (1)**
201:19
**bail (2)**
71:18;188:13
**Bailey's (1)**
20:20
**bakos (1)**
189:9
**Bam (4)**
199:7,7;202:12,12
**bar (3)**
21:7,12,22
**Barbaro's (1)**
20:19
**bartend (1)**
21:16
**Bartended (1)**
21:15
**base (2)**
26:3,5
**based (5)**
84:24;105:15;
155:3;157:1;228:7
**basic (2)**
97:7,8
**basically (1)**
102:23
**basis (6)**
69:15,17;74:19;
76:1;192:16;194:13
**Bastone (3)**
200:6;202:2,2
**Bates (15)**
61:6;65:19,21;66:1;
79:18;80:1,15,21;
89:19;98:21;99:15;
117:7;217:12;220:3,4
**Beach (1)**
47:14
**bearings (1)**
136:8
**beat (4)**
110:15;180:23;
182:7;199:24
**beaten (1)**

110:10
**beating (1)**
211:3
**became (4)**
39:6;45:5;53:12;
191:8
**become (1)**
38:2
**becoming (1)**
12:11
**beer (2)**
191:21,25
**began (2)**
32:21;155:17
**beginning (4)**
24:25;71:7;77:6;
91:7
**begins (1)**
61:7
**behalf (15)**
5:17,20,22,24;6:5;
63:7;72:19;83:15;
99:5;142:2;145:25;
149:4;197:20;199:16;
203:6
**behind (1)**
142:19
**belabor (2)**
8:16;19:14
**bell (3)**
173:19;177:13;
199:13
**Bello (8)**
71:22;75:21;
111:12,21;112:19;
114:7,24;118:7
**Belmont (5)**
26:6;27:19,22,24;
29:5
**belonged (1)**
118:20
**bench (11)**
120:15;182:14;
187:18;191:20;
193:15,25;194:24;
197:19;199:16;
202:14;205:9
**benches (1)**
48:8
**benefit (3)**
31:13;115:7;157:13
**benefits (5)**
205:14;206:11,19;
207:2,6
**Benitez (8)**
138:8;139:9,12;
146:15;147:20;152:4,
17;158:4
**Besbekos (3)**
189:9,10,12
**best (21)**
8:21;11:23;12:21;
14:10,25;38:22;

51:22;63:21;76:9;
82:18;83:4,5;87:10;
93:14;95:2;110:20,
22,23;119:10;122:25;
157:23
**better (9)**
12:10;41:24;55:10;
84:14;93:1;95:21,23;
123:20;199:4
**Beuke (50)**
5:8;6:5,8,13;19:15;
59:9;61:4;63:6;64:22;
65:15;66:4,12;79:15;
80:12;81:2,10;89:17;
91:11,16;92:19;
94:10,14;98:19;
114:23;117:6;136:10;
138:7;139:7;145:17;
149:17;153:25;
156:20;159:18;
162:13;163:3;164:14,
15,25;172:18;173:14,
24;174:3,4,22;
188:12;201:8,13;
223:8,12;225:6
**Beuke's (1)**
174:20
**big (2)**
36:18;133:12
**biggest (1)**
191:9
**Bill (1)**
33:24
**birth (1)**
82:21
**bit (15)**
12:4;13:13;19:14;
42:7;50:4;78:8;83:25;
92:14;107:22;127:22;
128:14;136:10;
161:23;205:21;
206:23
**bits (1)**
130:11
**black (2)**
72:25;133:16
**blacks (1)**
132:4
**Blow (1)**
45:16
**blue (3)**
118:17,17;222:19
**Bob (2)**
37:10;202:2
**Bobby (1)**
39:6
**Bonaventure (1)**
118:18
**Bonjean (188)**
5:16,16;6:12,14,15;
11:5;12:6;14:4;21:2;
29:4;30:5,9,12;32:1,
12,24;38:5;39:8,22;

41:1,9,14,16;42:10,
21;43:1,7,10,16,20;
44:1,11;45:23;46:17;
47:5;50:5;51:13;58:7;
59:5,20;60:21;64:10;
65:20;67:25;68:3;
70:4,22;71:6;78:10;
79:4,14,21,23,25;
80:4,6,25;84:9;87:14,
23;88:20,24;89:4,12,
15;93:21,24;94:5,13;
95:7;96:14;97:4,9;
98:7,14;102:6,10,17;
103:6,11,17;104:17;
105:17;106:7;114:19,
22;116:15;117:1,3;
118:13,15;123:7;
124:21;125:3;128:14;
134:6;135:1,6,14;
136:2,7;138:17,20;
139:6;142:10;144:14,
23;145:7;146:18,23;
148:3,7,11;149:12;
150:1,4,8,11,16;
151:2,7,9;152:7;
153:21;156:16;
157:10;159:13;160:1,
9,14,21;161:12;162:1,
12;165:19;166:2,11;
170:14;174:20,23;
175:2,17;176:2;
177:12;178:1,17;
179:14,17;180:16;
183:6,13,19;184:2,9,
21;186:24;187:21;
188:1,3,8;190:8,11,
13;191:2;194:4;
196:1;198:2,16,20;
200:2;201:4,7;
203:25;204:4;208:15,
22;210:2;212:24;
213:17;215:18;219:9;
221:3,23;224:25;
225:5,18;228:7,9
**B-o-n-j-e-a-n (1)**
5:17
**Bonneville (4)**
118:19,20;221:7;
222:19
**book (3)**
73:1;208:3,4
**born (3)**
78:16,20;82:20
**bosses (1)**
28:13
**both (15)**
5:12;10:9;19:24;
20:18;45:24,25;57:5;
73:12;74:9;107:7;
123:1;132:9;155:14;
193:20;217:1
**bottom (12)**
63:3;65:17,22;66:4,

5;72:10;91:10;108:5;
127:25;140:1;220:23,
24
**bottom- (1)**
222:13
**Branch (5)**
23:16;45:3;147:22,
23,24
**break (6)**
70:19;79:4;138:19;
198:1,4;224:23
**Breen (1)**
54:19
**Brian (3)**
24:6;195:13,14
**brief (4)**
17:16;168:4;169:2,
8
**briefly (2)**
22:9;36:7
**bring (8)**
41:5;12;83:3;
106:21;112:12;
122:21;210:8;224:6
**bringing (1)**
175:9
**Brody (1)**
155:15
**broke (1)**
82:8
**broken (1)**
97:11
**brother (13)**
52:25;153:14;
155:9,12,15,16;
185:21;203:23;204:3;
206:2,3,6;223:14
**brothers (5)**
125:19;153:4;
155:14;204:1;218:19
**brother's (1)**
170:3
**brought (11)**
6:19;12:12;20:2;
22:16;36:2;67:16;
153:9;169:12;175:23;
177:5;179:25
**building (13)**
31:12;48:14;51:1,
10;54:12,17,20,22;
55:4;56:10;70:1;
166:23;204:23
**bunch (1)**
48:1
**Burge (2)**
29:15;53:8
**bus (2)**
130:14;132:11
**business (5)**
11:25;49:2;53:25;
130:18;183:2
**busy (1)**
28:22

5;72:10;91:10;108:5; *(col 3 top)*
**Byrne (3)**
53:3,5,6

## C

**C4 (1)**
65:21
**cabinet (1)**
101:25
**cafeteria (1)**
167:10
**Cal (1)**
27:15
**Calabrese (1)**
44:5
**calendar (1)**
13:10
**California (6)**
13:18;20:1,16;26:4;
31:6;110:7
**call (14)**
45:4;112:18;
113:13,21,23,23;
121:3,6,9;122:4;
132:11;138:19;
167:11;184:18
**called (13)**
6:9;9:16;45:9;
46:18;57:17,22;
112:17;114:13;
130:16;131:4,14;
132:10;179:3
**calling (4)**
113:17;120:7;
209:12,22
**calls (4)**
26:19;142:5;
160:17;162:8
**calm (1)**
132:5
**came (26)**
26:7;32:20;33:25;
35:20,21;36:1;38:2;
52:3,12;54:6,7;58:10;
60:7;76:9;77:14;82:9,
19;95:16;107:8;
110:18;114:10;
125:18;126:23;155:8;
191:7;204:20
**campaign (1)**
18:16
**campaigned (1)**
34:13
**can (72)**
8:25;9:3;10:18;
12:3;29:11;32:3,25;
36:7;43:8;59:15;
61:17;63:25;64:8;
69:18;70:12,15;
76:20;79:5,15,22;
80:22;81:10,20;
82:18;83:4;85:7;
91:20,25;92:19;93:3;

98:3;100:12;104:15;
114:19;119:17;
122:21,24;124:9;
129:5;134:6;136:25;
138:12,15,18;143:9;
148:7,16;149:24;
150:16;152:1,25;
153:25;156:10;168:3,
4,5,5;170:15;172:5,
21;178:9,19;179:7;
187:20;197:22;198:2;
199:3;203:25;214:11;
215:25;219:16;227:8
**candid (1)**
128:1
**canvass (1)**
129:9
**caption (5)**
138:8;139:9;
140:14;143:18;
146:11
**car (7)**
118:10,16;119:16,
18;158:24;159:2,9
**career (2)**
39:4;46:11
**Carmen (3)**
130:18;131:23;
132:19
**Caroline (1)**
5:25
**carried (1)**
193:25
**carrying (1)**
125:20
**cars (1)**
26:10
**Case (162)**
5:4;6:22;7:2,5;9:13,
15,25;10:6,10,16;
12:9;14:21,23;15:9;
16:14;17:11;31:23;
42:19,25;43:4,13;
44:14,17;45:3,5,6;
46:7,24;47:3,7;55:22;
57:2,18;58:25;59:23;
60:6,7,8,13;61:9,13,
23;62:7;63:20;64:2;
67:3;70:7;71:18;76:4;
77:5;78:24,25;82:10,
19,25;83:1,4,11,17,
20;86:18;91:20,23;
95:14;98:24;101:17;
102:2;103:22;104:7,
20,22,23;105:20,24;
109:1;111:8,14,25;
112:19;113:19;114:7;
116:21;121:12,18;
123:25;140:16,23;
141:21;147:8,17,21;
148:9,19;150:23;
151:11,21;152:17,23;
153:5;154:9;155:22;

164:4;167:6,20,22,23;
168:6;169:13;170:3;
171:14;173:19;176:9;
180:18;181:1;182:7,
17;185:17,18;186:1,5,
12,14;188:14;195:8,8,
9;197:1,15,16;
199:22;203:23;
204:15,16,18,20,23,
25;205:15,19,24;
206:2,6,7,8,23;
207:18,22;208:20;
209:8,16,19;210:6,21;
211:23,25;212:8;
217:14;219:2,17,18;
222:9,12
**cases (29)**
  20:2;26:23;31:11,
  16,20;42:14,19;
  43:14;44:16,20;48:1,
  4;54:4;56:23;57:25;
  58:16;60:10;106:15,
  18;107:7;152:4;
  155:11;158:5;161:20;
  164:20;172:9;182:6;
  206:10;207:17
**Catherine (1)**
  25:7
**cause (1)**
  71:13
**causing (1)**
  73:5
**CCSAO (2)**
  217:12;219:4
**ceased (1)**
  57:14
**Celeste (1)**
  15:8
**Central (2)**
  28:1,3
**certain (9)**
  8:5;26:22;44:16;
  74:1;85:25;126:13;
  137:21;213:20;
  215:11
**certainly (11)**
  7:24;28:21;41:23;
  62:22;105:15;113:24;
  149:11;184:24;
  197:11;215:12;
  222:23
**certification (1)**
  140:1
**chair (2)**
  25:9;35:12
**challenge (1)**
  166:5
**chambers (1)**
  164:24
**chance (13)**
  7:1;9:21,22,24;
  19:2;72:13;84:21;
  100:20;112:9;157:8;

184:10;214:1,4
**chances (1)**
  86:16
**changed (3)**
  15:5;54:21;207:13
**characteristic (1)**
  30:4
**characterize (1)**
  137:8
**characterized (1)**
  137:6
**charged (8)**
  31:21;45:2,17;
  58:12;60:6;182:22;
  195:23;206:4
**charges (3)**
  58:1;75:16,19
**check (3)**
  26:7;142:23;147:15
**chest (1)**
  73:3
**Chicago (15)**
  5:10;6:3,21;25:22;
  37:7;38:18;42:4;
  45:11;46:14;106:14;
  116:19;212:7;217:4;
  218:3,24
**Chief (5)**
  22:12,19,25;24:6;
  45:3
**child (14)**
  74:9;113:1;137:23,
  25;140:12,13;141:2,
  6;157:22,25;158:2,7;
  170:11,19
**children (4)**
  116:8,8;145:4;
  147:11
**Chimniak (1)**
  5:12
**choice (1)**
  137:1
**Chris (2)**
  35:3;128:7
**Christopher (8)**
  119:23,25;124:10,
  14,17,25;128:3,8
**Christophers (1)**
  125:5
**chunky (1)**
  125:9
**Circuit (1)**
  148:21
**circumstances (3)**
  109:17;115:2;116:1
**Cisco (3)**
  125:18;126:1;
  127:11
**City (10)**
  6:3,21;23:14;25:19,
  20;42:3;46:14;47:4,
  13;116:19
**civil (3)**

6:19;12:12;49:17
**claim (4)**
  14:12;163:4,8,13
**claimed (1)**
  165:3
**claiming (1)**
  147:12
**claims (2)**
  16:9;71:16
**clarification (1)**
  179:10
**clarify (3)**
  12:10;151:7;205:1
**class (2)**
  22:1;186:19
**Clean (2)**
  134:13,14
**clear (6)**
  94:3;97:5;123:12;
  127:22;167:19;
  170:15
**cleared (2)**
  101:23,24
**clearly (1)**
  97:17
**clerk (3)**
  20:14;32:18;191:6
**clerked (1)**
  32:18
**client (5)**
  69:19;88:6;182:19,
  22;222:24
**clients (6)**
  49:20,21;68:7;
  87:25;214:7,21
**close (2)**
  78:16;129:16
**closed (1)**
  101:22
**closing (1)**
  54:6
**club (1)**
  192:19
**co- (1)**
  122:20
**Cobra (1)**
  181:20
**co-counsel (1)**
  83:10
**co-defendant (11)**
  9:14;10:6;66:14,19,
  20;111:14;117:22;
  153:16;189:15;
  197:12;199:10
**co-defendants (3)**
  57:4;123:24;133:21
**coercion (4)**
  72:21;75:11;77:20;
  178:13
**Coghlan (1)**
  43:18
**COHEN (5)**
  5:19,19;6:21;

138:14;150:13
**C-o-h-e-n (1)**
  5:19
**collaborate (1)**
  51:9
**colleague (1)**
  176:18
**Collins (1)**
  24:6
**Columbus (1)**
  192:23
**column (1)**
  173:12
**comfortable (7)**
  67:14;97:17,18;
  122:25;215:3,6,8
**coming (3)**
  33:8;166:21;198:3
**Commander (3)**
  29:15,18,19
**commanders (1)**
  29:22
**commit (2)**
  46:2;213:22
**committing (1)**
  225:8
**common (1)**
  198:23
**communicate (5)**
  40:8;67:12;90:21,
  25;215:11
**communicated (2)**
  68:7;116:5
**communicating (1)**
  115:21
**communications (4)**
  12:24;93:19;142:8;
  158:18
**comp (1)**
  49:19
**compensated (2)**
  86:22;87:3
**complain (1)**
  161:3
**complaining (7)**
  161:1,4;165:17,20,
  21,23;166:3
**complaint (7)**
  7:2;11:12,14;14:9;
  16:19;78:13;171:10
**complex (1)**
  97:24
**complicated (1)**
  82:21
**complies (10)**
  12:5;64:9;81:9;
  85:9;98:5;108:7;
  143:10;153:2;172:6;
  197:24
**compliment (1)**
  190:11
**complimenting (1)**
  44:11

**comport (3)**
  59:21;85:3;90:23
**compound (3)**
  10:22;178:16;210:3
**computer (2)**
  116:24;201:15
**conceal (1)**
  106:1
**concealed (1)**
  105:20
**conceivably (2)**
  131:14;213:25
**concentrate (1)**
  49:15
**concerned (4)**
  95:13;110:2;
  111:10;168:24
**concerning (3)**
  74:11;108:9;223:22
**concerns (1)**
  112:9
**concocted (2)**
  73:15;74:15
**conditioning (1)**
  166:23
**conduct (1)**
  78:2
**conducted (3)**
  24:12;216:5;225:16
**conducting (2)**
  43:11;167:3
**conferred (1)**
  164:25
**conferring (1)**
  165:12
**confession (1)**
  179:20;180:7
**confident (2)**
  74:20;218:21
**conflict (12)**
  14:6,13;15:12;
  122:21;155:4;157:1;
  168:12,13,15,22;
  169:24,25
**conflicts (1)**
  16:10
**confronting (1)**
  73:25
**confused (4)**
  160:12,20;179:13;
  205:21
**confusion (1)**
  151:6
**connect (1)**
  30:10
**connected (1)**
  211:24
**connection (14)**
  10:20;33:10;111:7;
  141:25;158:11,20;
  159:1;160:3;171:11;
  211:23;213:4;216:4;
  217:15;218:16

**connections (1)**
20:22
**Connelly (2)**
180:3,3
**consider (4)**
87:7;120:7;136:21,
22
**consideration (2)**
92:8,14
**considered (2)**
31:22;132:14
**consistent (2)**
112:8;123:3
**consolidate (3)**
142:22;146:9;
147:13
**conspiracy (1)**
212:11
**Constitutional (1)**
134:23
**consulted (1)**
159:7
**consulting (2)**
164:20;165:5
**contact (2)**
76:23;152:15
**contacted (3)**
44:21;55:24;132:1
**contacts (4)**
41:20;137:17;
156:8;169:19
**contained (5)**
70:24;75:24;77:8;
96:4;219:4
**contents (1)**
108:13
**context (3)**
159:8;165:21;
225:13
**continue (1)**
107:4
**continuing (1)**
97:3
**convenient (1)**
197:25
**conversation (21)**
17:1,5,15;18:8;
69:9;97:7,13,18;
100:25;104:24;
107:10;108:13,14,18,
21;130:12;211:11,16;
213:14;215:13;
223:22
**conversations (21)**
14:16;15:7;17:2,11;
19:5;67:4,8,11;73:18;
96:8,10;97:21,23;
109:8;114:24;120:20;
122:15;167:18;
169:22;212:22;224:3
**convicted (5)**
95:14;118:2;
155:10,17;200:22

**convictions (3)**
13:14;134:4,4
**convinced (1)**
93:4
**Cook (41)**
5:22;8:2;15:10,18,
23;20:14,23;21:19;
22:5,11;27:4;37:3,12;
39:18;40:19;41:25;
44:12;47:17,20;52:5;
56:15;57:1;62:6;
81:21;84:11;100:5,8;
105:19,23,25;107:11,
14;108:2;148:21;
161:14;181:23;182:5;
193:21;194:15;
217:14;226:14
**copies (2)**
106:11;129:2
**copy (7)**
9:19;17:22;18:21;
63:14;79:5;80:8,13
**corner (3)**
36:22;66:2;80:16;
98:21;99:16;100:18;
117:6;143:7
**corporal (1)**
25:11
**Corrections (1)**
120:24
**correctly (2)**
69:7;86:6
**counsel (11)**
5:14;67:6;76:25;
83:12;145:13;149:24;
154:5;169:16;202:13;
204:14;205:9
**County (42)**
5:22;8:2;15:10,18,
23;20:15,23;21:19;
22:6,11;27:4;37:3,12;
39:18;40:20;41:25;
44:12;47:17,20;52:6;
56:15;57:1;62:6;
81:21;84:11;100:5,8;
105:19,23,25;107:11,
14;108:2,10;148:21;
161:14;181:23;182:5;
193:21;194:15;
217:15;226:14
**countywide (1)**
42:5
**couple (14)**
7:3;11:1;78:18;
80:18;135:18;137:22;
138:3;153:22;154:12;
171:18;172:8;187:7;
208:9;223:5
**course (15)**
11:25;19:18;57:7;
61:23;72:2;85:25;
102:25;175:24;
180:19;185:3;190:22;

208:19;209:24;
210:16;218:21
**Court (38)**
5:3,11,13;6:6;7:25;
8:6,12,25;9:12,14,24;
10:9;19:24;24:8;
67:17;85:5;91:1,10,
14,15,17;101:2;
107:18;115:10;
121:16;148:21;
167:12,14;171:18,22;
172:19;178:25;
204:19,24,25;209:1;
224:9,12
**court- (1)**
124:10
**courthouse (1)**
17:10
**court-reported (10)**
16:22;72:8;96:5,6,
11;100:1;110:14;
124:12;128:11;
178:20
**courtroom (12)**
20:17,19,21;22:13,
25;24:15,17;31:9,10;
146:3;166:24,25
**courtrooms (6)**
22:17;23:13,15,17;
31:12;35:13
**courts (2)**
19:21,25
**Cousins (3)**
182:13;226:5,8
**cover (3)**
81:16;98:22;180:6
**covered (3)**
27:12,17,19
**covering (1)**
208:16
**CR (2)**
61:21;188:14
**crazy (3)**
186:22,22;222:11
**credibility (1)**
222:10
**creeping (1)**
144:21
**Crew (2)**
200:17,18
**Crime (7)**
34:4,10,18;39:1,5;
40:6;45:6,21,21;
58:18;74:12;96:3;
123:14;133:9;209:11,
20;210:7
**Crimes (39)**
31:16,24;32:3,14;
33:21;34:15,24;36:4;
37:21;38:1,3,6,17;
39:2,10,14;40:3,7,7,
11;41:24;42:2,3;
44:13;46:2,11;48:5;

50:7;55:3,3;75:22;
84:1,6,8,15;172:11;
175:10;176:13;177:5
**criminal (15)**
20:4;49:12,16,21;
51:9;58:1;134:2,10;
135:10;208:25;
209:24;211:19;
214:21;217:2;218:10
**Cronson (1)**
35:3
**cross (1)**
109:11
**cross-examination (7)**
99:18;101:5;
201:11;208:12;
215:19;223:6;226:1
**cross-examine (2)**
127:1;168:20
**crossover (1)**
194:18
**Cruz (6)**
92:24;95:19;
111:11;112:4;113:24;
120:20
**Cummings (2)**
189:8,12
**Cunningham (1)**
24:6
**curious (1)**
121:5
**curly-ish (1)**
177:2
**current (1)**
15:14
**custody (8)**
67:9;75:22;107:15;
110:8;120:23;209:15;
210:1,24
**customary (1)**
32:15
**cut (4)**
111:13;140:16;
177:10,10

**D**

**Daley (3)**
32:20;33:2;34:11
**Daniel (17)**
172:13;173:3;
174:6;175:5,6,9;
177:4;178:18;179:20;
180:7,18,22;181:7,13;
197:13;206:14,20
**Danny (3)**
37:9;39:6;186:9
**dark (1)**
118:17
**data (1)**
148:18
**date (9)**
5:5;58:24;64:2;

65:7;69:8;98:25;
140:19;141:9;198:22
**dated (4)**
140:18;141:8,9,17
**dates (3)**
80:18;91:1;146:19
**Dave (1)**
52:2
**David (1)**
189:16
**day (14)**
22:5,16;31:15;
45:14;81:18;125:11;
137:3;156:2;169:5,
23;171:22;193:4;
219:6;226:19
**days (2)**
23:13;82:22
**deal (8)**
34:18;111:10,11,
14;113:3;133:23,25;
187:1
**dealers (1)**
183:9
**dealing (2)**
134:17,18
**deals (1)**
111:12
**dealt (1)**
219:1
**death (2)**
200:7,9
**DeBoni's (1)**
36:12
**December (2)**
196:23;197:6
**decided (2)**
48:24;123:10
**deciding (1)**
169:15
**decision (3)**
110:12;172:19;
206:15
**decisions (1)**
121:11
**declare (2)**
168:9;169:3
**Defendant (27)**
5:24;6:2,20;13:8;
16:14;57:2;72:17,22;
73:6;74:6;75:10,20;
76:21;81:25;87:19;
91:18;172:12;174:1,
2,21,22;176:20;
189:6;202:25;205:18;
206:5;211:19
**defendants (9)**
6:1;7:5;12:14;19:6;
122:21;185:17,17,18,
20
**defendants' (1)**
12:8
**defendant's (5)**

63:11;72:16;73:2;
156:25;197:2
**defender (4)**
63:24;124:7;
189:25;191:6
**defender's (1)**
35:20
**defending (2)**
57:2;204:19
**defense (15)**
20:4;49:12,21;50:7;
51:9;56:3,14;57:5;
62:7;111:19;154:4;
213:11;214:21;217:2;
218:10
**defenses (1)**
123:3
**defense's (1)**
131:12
**definitely (1)**
144:24
**definition (1)**
223:23
**degree (2)**
168:2;215:11
**degrees (1)**
166:25
**DeLeon (1)**
54:14
**delinquency (8)**
24:9,10,11;140:8,
18;141:14,17;146:14
**denied (2)**
77:1;223:1
**deny (1)**
214:18
**denying (1)**
214:19
**dep (2)**
41:13;196:13
**Department (6)**
45:11;106:14;
120:24;217:4;218:3,
25
**depends (1)**
28:23
**deposed (2)**
17:19,21
**deposition (33)**
5:8;7:18;9:11,19;
12:9;17:4,18;18:12,
13,20;59:6;61:1;
64:11;65:13;79:2;
80:10;98:16;114:17;
134:7;136:23;138:5;
143:11;148:5;150:17;
153:23;156:18;171:7;
172:16;176:4;188:6,
10;196:18;217:8
**depositions (2)**
9:17;18:25
**deputy (1)**
24:6

**describe (1)**
36:7
**designated (1)**
45:6
**designation (1)**
45:19
**designed (2)**
34:18;167:2
**desirable (3)**
28:18,20;29:1
**desks (1)**
36:16
**destroyed (3)**
11:1,1,24
**detail (1)**
81:7
**detailed (4)**
20:19,20;37:5;
38:19
**details (2)**
22:18;131:7
**Detective (58)**
7:12,13,13;26:25;
36:19;69:25;70:8;
86:3;100:24;101:16;
107:1,5,8,14;117:13,
18;119:6;128:12;
129:10,13;155:21;
156:9;157:18;158:24;
159:1,7,15,20;160:10,
12,23,25;161:21;
162:14;164:12,17;
165:1,2,4,13;168:20;
175:21;178:23;179:3,
19;197:16;207:20,21,
24;208:2;209:11,20;
210:7;211:22;212:1;
216:2;225:7,16
**detectives (20)**
26:20;29:13;36:14;
37:2,4;40:13;73:18;
74:10;85:25;101:11;
103:22;104:11,22;
106:25;108:25;
110:15;121:17;
130:17;155:22;218:3
**determine (5)**
119:10;126:1,4,7;
127:17
**determining (2)**
118:22;168:10
**develop (1)**
49:17
**developed (1)**
77:9
**Devine (2)**
52:9,10
**devising (2)**
210:14,20
**devoted (1)**
20:4
**DiBenedetto (9)**
32:19;33:5;34:1,7,

19;35:15;36:1;44:15;
45:15
**DiBenedetto's (1)**
36:17
**difference (1)**
207:14
**different (12)**
29:13;31:7,14;61:9;
69:18;103:3,24;
124:24;142:20;144:6;
146:11;169:12
**difficulty (1)**
90:20
**DiFranco (14)**
5:22;7:8;13:2,8;
16:12,13,16,21;17:1;
18:8,20,24;99:9;
224:15
**DiFranco's (1)**
9:16
**digits (1)**
144:24
**Dillon (2)**
42:15,24
**DIRECT (8)**
6:11;10:2,4;18:19;
73:24;75:12;79:16;
215:16
**directed (1)**
72:22
**directly (7)**
57:19;106:14;
127:11;131:8;147:16;
170:5;201:16
**directory (1)**
73:4
**discharge (1)**
168:9
**Disciple (1)**
133:16
**discovery (8)**
42:19;43:11,13;
102:1;106:5,16,20,23
**discretion (1)**
46:6
**discuss (2)**
164:15;222:20
**discussed (6)**
12:15;164:13;
170:2;213:9,10;226:7
**discussing (7)**
127:4;137:16;
152:14,20;180:17,21;
181:12
**Discussion (13)**
59:8;60:23;61:3;
64:13;81:1;89:3;
94:25;98:18;150:15;
172:15;201:6;213:4,5
**discussions (2)**
169:19;181:6
**dismissed (5)**
171:4,15,20,25;

204:25
**dispensed (1)**
166:14
**dispensing (1)**
166:15
**dispute (1)**
43:15
**disqualify (9)**
153:4;154:4,8;
155:1;156:1,25;
166:19;206:24;211:8
**distinct (1)**
13:21
**distinguishable (1)**
218:6
**District (5)**
5:3,4;19:23,23;
45:16
**divided (2)**
24:9;54:22
**Division (7)**
5:4;23:8;25:19;
36:10;113:8
**docket (6)**
138:11;139:17;
148:20;150:7,14;
151:12
**document (10)**
61:6;116:20;117:5;
138:7;139:8;145:20;
148:16;156:22;
188:22;210:10
**documented (2)**
108:12;109:7
**documents (10)**
9:10;18:18;103:14;
138:3;163:20;185:4;
217:4,13,20;218:12
**Dog (2)**
132:10;139:18
**Doherty (1)**
52:1
**domestic (8)**
139:23;140:23;
144:3,3,6;146:8;
164:18,21
**done (7)**
48:2;71:1,2;78:19;
97:15;126:2;221:21
**door (3)**
113:21;174:15,15
**dots (1)**
30:10
**double (7)**
60:11,13,19;61:12;
64:1;125:5;144:24
**down (20)**
8:25;30:13;36:9,13;
51:22;54:24;69:9;
103:9,10;118:7;
119:17;125:8;134:23;
135:3;136:12;143:6;
171:17,23;174:10;

204:20
**downstairs (1)**
132:14
**Dr (1)**
89:22
**draft (1)**
35:15
**draw (5)**
63:2;80:20;84:16;
89:16;90:17;91:6;
99:14;116:17;117:4
**drive (5)**
26:22;118:10;
119:16;213:20;
214:10
**driver's (1)**
174:15
**Dropbox (1)**
138:13
**dropped (2)**
75:16;167:14
**drove (1)**
119:17
**drug (14)**
133:23,25;134:3,4,
17,18,18,18;135:23,
23;183:8;184:5,18;
185:13
**drunk (1)**
132:7
**duly (1)**
6:9
**during (26)**
18:7;22:23;46:11;
55:5;72:2;85:1;93:7;
94:20;108:17;117:14;
120:6;121:2;122:9;
137:16;167:17;
175:23;180:18;
181:14;208:19,24;
209:24;210:16;218:9,
21;225:8,15
**dying (1)**
92:10

**E**

**earlier (13)**
12:15;82:7,12;
141:4;158:5;212:21;
215:2,18;219:12,16;
221:5,11;224:16
**early (5)**
19:12;30:20;33:4;
177:2;185:10
**easier (3)**
80:7,9;117:1
**easily (2)**
90:24;128:23
**east (1)**
19:24
**Eastern (2)**
5:4;19:23

**easy (1)**
90:25
**Eddie (2)**
200:4;201:21
**editorializing (2)**
134:25;135:5
**Edward (1)**
202:1
**effect (1)**
184:25
**effort (1)**
210:18
**efforts (2)**
11:6;111:7
**eight (4)**
10:24,25;144:21;
155:13
**Eileen (2)**
6:2;103:7
**either (22)**
26:22;28:15;56:23;
57:19;77:14;84:15;
101:23;108:22;
112:12;126:9;127:4,
10;133:5,11,15;
135:22;150:5;174:14,
14;179:20;206:10;
227:24
**elected (1)**
34:11
**electronic (5)**
148:18,20;150:7;
151:12;220:21
**elevator (2)**
54:25,25
**elicit (1)**
88:7
**Ellen (1)**
81:22
**else (11)**
7:9;18:7;19:2;23:5;
52:21;54:7;91:12;
155:18;169:12;
212:12;224:21
**elsewhere (1)**
183:9
**emailed (1)**
18:1
**employees (1)**
55:15
**employment (3)**
21:13;22:5;132:2
**encompassed (3)**
25:21,23,24
**end (4)**
24:1;125:10;
166:18;198:3
**ended (2)**
37:21;200:7
**enforcement (2)**
37:17;72:18
**engaged (3)**
130:10;165:7;

214:25
**English (11)**
67:12;90:8;97:7,12,
14,18;130:9;215:4,8,
11;223:24
**enormous (1)**
73:6
**enough (5)**
33:14;67:12;
110:18;121:16;214:3
**entire (3)**
38:17,21,22
**entitled (2)**
156:24;172:19
**entries (1)**
135:18
**entry (1)**
66:5
**Epach (1)**
52:3
**Epplen (1)**
7:8
**Ernie (1)**
32:19
**essentially (5)**
22:14;63:12;77:18;
111:15;180:5
**establish (2)**
213:24;214:2
**established (1)**
136:11
**establishing (1)**
34:15
**estimate (2)**
7:21;48:6
**Estrada (1)**
162:25
**ethical (1)**
106:5
**Eva (5)**
143:18,21;152:4,
22;158:4
**even (11)**
8:22;44:25;45:1;
74:5;110:9;119:13;
134:18,22;142:2;
155:25;227:4
**event (1)**
107:4
**eventually (2)**
33:25;52:3
**everybody (6)**
28:14;45:2;50:2;
103:9;120:13;161:3
**everything's (1)**
91:23
**evidence (8)**
64:25;66:10,23;
120:14;123:16;
131:16;178:13;
222:18
**exact (1)**
198:22

**exactly (2)**
26:13;46:4
**exam (2)**
21:7,13
**EXAMINATION (2)**
6:11;225:4
**examined (1)**
6:10
**exams (1)**
214:22
**exchange (3)**
26:9;75:17;182:24
**exchanged (1)**
12:25
**EXCUSED (1)**
228:15
**executed (1)**
200:10
**execution (2)**
200:12,14
**exert (1)**
180:7
**Exhibit (50)**
59:6,9;61:1,5;
64:10,11,14;65:13,15,
25;70:16;79:2;80:10,
13;88:14;89:12;98:9,
16,20;114:17;134:7,
9;138:5;139:8;
143:11,14;147:22;
148:5,13;150:17,22;
153:23;156:18,21;
157:9;171:7;172:16;
176:3,4,6;188:6,10,
13;189:2;196:18;
217:8,11,11;219:21,
22
**exhibits (1)**
228:16
**exist (1)**
106:24
**existed (2)**
105:13;119:13
**existence (1)**
106:24
**exists (1)**
219:5
**expect (2)**
106:20;222:23
**expectation (1)**
106:9
**expected (1)**
120:13
**expecting (1)**
107:20
**expenses (5)**
50:17;51:22;53:18,
21;55:14
**experience (4)**
38:4;87:17;90:19;
105:23
**experienced (1)**
111:18

**expired (1)**
10:25
**explain (4)**
82:17;106:23;
126:13;178:13
**explained (2)**
17:17;115:2
**explaining (1)**
210:23
**explanation (2)**
110:13;160:15
**express (3)**
94:3,4,6
**expressly (1)**
94:7
**extent (3)**
47:6;142:5,11
**externships (1)**
20:11
**extorting (1)**
96:25
**extra (1)**
148:12

## F

**fabricated (2)**
178:10,11
**face (1)**
177:4
**face-to-face (1)**
83:7
**facing (1)**
58:1
**fact (16)**
74:1;107:23;
114:10;127:18;128:9;
149:16;178:24;181:7,
13;182:3;184:16;
185:24;186:20;
200:10;211:11;
226:17
**facts (5)**
10:16;71:16;77:9;
213:13,19
**factual (5)**
69:14,17;74:19;
76:1;96:10
**factually (1)**
96:9
**fails (1)**
131:16
**Fair (31)**
9:2;11:25;12:1;
13:22,23;14:15;
29:24;30:12,12;
37:18;39:9;40:18;
42:11,12;46:12;47:9,
10;48:11;50:8;64:6;
68:19,20;69:11;
77:14,16;107:6;
108:1;109:1;111:2;
133:1;216:25

**fairly (3)**
51:17;121:4;123:12
**falling (2)**
160:23,24
**false (2)**
87:20;164:2
**familiar (8)**
40:12;61:25;62:1;
104:10;184:19;199:1,
2;217:3
**familiarity (2)**
79:17;81:8
**familiarized (1)**
86:17
**family (14)**
21:3;50:2;57:20;
69:4;72:4;73:13;75:7;
76:9,17,23;77:15;
85:24;92:1;196:4
**fan (1)**
191:9
**far (3)**
97:3;108:19;173:19
**father (6)**
132:14;153:11,12,
13;170:25;196:4
**fault (1)**
150:13
**favor (1)**
86:21
**favorable (7)**
202:5,19,25;203:7,
12,16;204:9
**FBI (1)**
18:22
**February (1)**
145:10
**federal (8)**
6:19;12:11;19:21,
24,25;195:8;204:22,
24
**fee (2)**
182:23,23
**feeling (2)**
167:5,6
**feet (1)**
125:23
**fellow (1)**
126:15
**Felony (19)**
25:3,14,16,25;27:5;
29:8,12,18;30:21,24;
31:2;32:13;35:23,24;
44:21;191:12,13;
200:25;202:1
**felt (2)**
18:12;122:25
**Fernandez (3)**
124:25;128:3,8
**Fernando (1)**
99:19
**few (8)**
7:20;82:12;116:18;

117:21;131:19;
192:23;198:17;226:3
**fifth (1)**
206:4
**figure (2)**
57:12;121:8
**figured (2)**
221:4,9
**file (27)**
10:19;60:3;63:10;
101:19,20,25;102:25;
103:3,4,13,15,21,23,
24,25;104:3,6,6;
106:22;115:7;116:20;
127:14;142:1;145:24;
196:23;197:6;219:5
**filed (32)**
11:12,14;12:19;
14:9;16:19;58:25;
59:16,22;60:12,14;
63:9,22;64:24;65:8,9;
66:15,22;78:13;
83:10,15;137:25;
145:9;146:4,13;
149:17;150:3;156:1,
22;169:8,10;170:25;
171:11
**files (12)**
11:2;22:16;101:18;
102:3,9,12,12,14,16,
19,20,21
**filing (10)**
64:21,23;67:2;
68:21;70:23;73:19;
104:11;149:4;165:1,6
**find (7)**
11:19,21;13:11;
60:18;121:5;157:10;
164:16
**fine (9)**
43:5;71:6,10;94:10,
12;98:15;131:9;
178:9;201:10
**finish (3)**
8:24;175:15;198:4
**fired (1)**
186:21
**Firm (3)**
5:9;12:18;163:3
**first (51)**
6:9;8:15;13:7,11;
14:11;17:20;22:5,10;
23:8,9,15,22;24:4;
30:17;31:6;33:23;
34:14;35:12,13,14;
36:8;47:22;52:5,7;
61:6;62:5,11;63:13;
89:16;120:25;125:9;
127:23;129:8;130:1,
13;151:4;155:11,16;
156:2;157:21;162:16;
167:4;171:10;179:21;
182:1,6;188:12;

189:5;201:9;206:7;
217:19
**Fitzgerald's (1)**
22:13
**five (7)**
7:23;19:7;82:25;
159:17;160:4;185:16,
17
**fix (1)**
212:12
**flashlight (2)**
73:5;208:4
**flee (1)**
174:11
**flipped (2)**
174:19,25
**Floor (5)**
36:6;54:20;175:10;
179:4;210:9
**Flores (5)**
199:5,17;202:11,
20;203:1
**Florida (1)**
20:1
**fluent (1)**
223:16
**flux (1)**
161:24
**focus (2)**
69:22;100:14
**following (5)**
79:10;139:2;
157:21;198:12;
225:22
**follows (1)**
6:10
**followup (1)**
224:24
**force (3)**
37:17;181:14;
225:12
**forehead (2)**
174:16;177:10
**forget (2)**
24:21;186:21
**form (87)**
21:1;29:3,25;31:18;
32:9,16;39:3,20;
40:23;41:6;42:8,9;
45:22;46:15,21;
51:11;59:16,19;
60:18;61:18;63:23;
70:2,3;78:9;79:19;
87:13,22;95:6;102:5,
15;103:5,16;105:14;
106:3;116:10;123:5;
124:20;125:2;128:13;
135:12;136:1,5;
143:16;144:12,19;
145:9;146:17,22;
149:9;151:1,4;
159:10,23;160:6,16;
161:10,17;162:6,7;

165:10;166:1;174:18;
175:12;177:23;
178:15;179:10;
180:11;183:5,11,18,
25;184:7,8,20;
186:17;190:6,24,25;
194:3;195:22;196:20;
200:1;202:7;208:22;
210:2;213:17;219:9
**formal (2)**
53:25;60:18
**formed (1)**
34:10
**former (4)**
13:1;39:1;53:5;
55:3
**fortunate (1)**
33:14
**forward (1)**
9:18
**forwarded (1)**
9:20
**Foster (1)**
124:8
**found (3)**
93:2;131:1;187:5
**foundation (36)**
12:10;14:2;29:25;
32:16;37:24;39:3;
45:22;102:15;103:5,
16;123:4,5;135:12;
136:1,5;144:11,13,20;
159:11,23;160:7,16;
161:18;162:7;165:11;
166:1;177:6;178:16;
179:11;183:5,11,25;
184:8;186:18;190:6;
198:19
**Four (5)**
50:24;130:16;
156:3;185:17;220:24
**foursome (1)**
194:6
**frame (3)**
15:16;38:15;57:15
**Frank (7)**
5:22;17:23,25,25;
20:18;81:22;83:19
**Fred (1)**
72:24
**friend (3)**
87:7;136:22,24
**friendly (3)**
191:3,5,9
**friends (3)**
50:2;57:24;58:2
**friendship (1)**
137:7
**Fro (6)**
119:18,21;124:13,
13;125:17;128:3
**front (17)**
13:17;31:13;62:5;

65:2;67:17;81:16;
89:7;91:15;116:17;
134:9;138:8;168:22;
186:8;199:16;202:15;
220:11;226:12
**full (1)**
127:23
**fully (1)**
8:25
**functions (2)**
220:21;227:25
**funnel (2)**
212:14,17
**further (6)**
36:13;164:12;
166:12;201:5,7;208:7

## G

**Gamboney (5)**
33:24;35:1,7,14;
36:22
**games (1)**
92:6
**Gang (75)**
30:25;31:1,10,16,
22;32:3,14,21;33:2,6,
21;34:4,10,15,24;
36:4,15;37:21;38:1,3,
6,17;39:1,2,5,10,14;
40:3,6,7,7,11;41:24;
42:2,3;44:13,22;45:6,
13,20,20;46:1,11,19,
25;47:8;48:5;50:6;
55:2,3;84:1,6,8,15;
126:15;133:12,17;
135:2,10,22;136:4;
161:20;172:11;
173:23;175:10,23;
176:12;177:5;179:25;
190:19;209:11,20;
210:7;222:21;223:2
**Gangs (7)**
31:3;39:24;40:2,5;
46:14;47:4,12
**Gangster (1)**
133:16
**garbage (1)**
214:3
**gave (5)**
130:17;148:8;
167:1;222:4,5
**Gecht (1)**
202:3
**general (14)**
101:6;103:23;
104:19,21,25;105:10;
106:9;108:18;109:6;
216:3,8;217:24;
218:15;219:3
**generally (8)**
86:9;152:10;161:8,
9;165:21,23;217:3,20

**Gene's (1)**
191:25
**gentleman (5)**
32:19;48:19;
171:16;181:17;
188:23
**gentlemen (4)**
38:3;40:8;52:2;
135:13
**George (4)**
196:10;197:2,20;
203:13
**gets (1)**
110:17
**Gilberto (4)**
199:5,17;202:11,20
**given (12)**
31:11;33:6,22;
45:14;72:23;115:11;
133:21;179:24;
186:20;213:10;
222:10,11
**gives (1)**
213:25
**giving (1)**
142:25
**gloves (1)**
72:25
**GOLDEN (22)**
5:25,25;43:23;
65:19;70:16;71:1;
79:22;89:10,14;
123:4;162:10;170:13;
174:18,22,24;184:7;
190:6;220:9;224:22;
226:2;227:10;228:5
**golf (13)**
192:10,15,18;
193:8,12,22;194:8,9,
12;227:9;228:1,2,4
**golfed (5)**
227:7,13,21,22,24
**golfer (4)**
192:13;193:19;
194:7,10
**golfing (2)**
192:24;227:11
**Gonzalez (26)**
18:20;85:14;92:24;
95:13;111:22,23;
112:5,13,22,24;
113:23;114:11,12;
118:3;155:10;187:17,
23;188:24;189:6,20;
190:4,18,23;205:8;
207:12,13
**G-o-n-z-a-l-e-z (1)**
187:22
**Gonzalez's (7)**
9:15;10:6,10;114:7;
115:12;205:15,19
**Good (17)**
6:13;63:5;68:13;

70:21;71:3;103:7;
111:20;121:13,15;
124:15;167:7;170:8;
179:14;194:10,11;
199:9;223:15
**Goosens (19)**
61:15;120:1,2,8;
122:5,10,17;123:2,12;
124:3,7,10,13,14,17;
128:8,10,17,18
**Goosens' (1)**
119:23
**Gossens (2)**
122:4;123:1
**Gotcha (4)**
35:16;40:14;55:2;
193:20
**GPRs (3)**
103:23;105:20;
217:23
**grabbed (1)**
174:11
**graduate (1)**
20:8
**graduated (1)**
20:9
**graduating (1)**
21:21
**Grand (2)**
28:1,2
**grandfather (1)**
97:11
**grandma (1)**
97:15
**grandmother (1)**
97:10
**grandpa (1)**
97:15
**gray (1)**
93:18
**Great (2)**
23:3;24:20
**Greenberg (1)**
6:23
**Greg (2)**
32:22,22
**grew (2)**
50:4;97:10
**Grossman (1)**
23:2
**group (4)**
11:2;165:7;166:4;
217:11
**guarantee (2)**
182:16;186:11
**guaranteed (2)**
182:19,24
**guaranteeing (1)**
190:22
**guess (29)**
7:14;11:22,24;
19:11;20:5;28:18,23;
30:16;76:9;80:20;

81:16;83:10;90:16;
110:20,22,23;118:18;
123:19;134:21;
155:24;157:19;
170:15;177:16;
179:14;200:22;
201:20;209:11;
222:13;227:1
**guessing (2)**
7:6;97:8
**Guevara (111)**
5:2,24;7:7;19:10;
30:18;72:25;73:19;
86:3,3;96:18,25;99:9;
117:13,18;128:12;
136:19;137:9,11,18,
22;138:9;139:10,15;
140:15;141:21;142:8,
14;143:19;145:12;
146:14;149:8;150:23;
151:5,14;152:16,22,
22;155:5,21;156:9;
157:18,19;158:2,6,11,
18,24;159:1,7,15,20;
160:3,12,23,25;
161:21;164:12,17,21;
165:1,2,4,6,13,14,17;
166:16;167:2;168:20;
169:20;170:7,7,19;
173:5;175:9,22;
178:13,23;179:3,19;
180:5,23;181:9,14;
197:16;199:22;
202:25;205:18;207:6,
20,21,24;208:2,17,19;
209:11,12,20,21;
210:8,14,18,21;211:3,
10,17,22;212:1,11;
225:7,16
**Guevara's (7)**
140:3;143:6;
157:23;162:14;
163:19;167:3;210:24
**guidelines (1)**
8:16
**guilty (3)**
120:15;182:24;
187:6
**gun (6)**
95:17,17;125:20,
20,21;133:25
**G-u-t-h (1)**
37:11
**Guthrie (3)**
37:10,25;38:20
**guy (11)**
17:20,20;23:3;
24:20;53:10;95:19;
111:16,17;160:25;
175:25;180:22
**guys (12)**
41:19,24;44:6;
45:18;46:9;54:9;81:3;

95:3;126:19;138:18;
148:12;169:1

## H

**hac (1)**
20:2
**hair (1)**
177:2
**half (1)**
9:22
**half-sheet (1)**
66:22
**half-sheets (1)**
66:6
**hall (3)**
36:13;54:18,19
**hallway (1)**
14:20
**Halvorsen (4)**
7:10,11,12,13
**hand (2)**
80:12;176:6
**handed (5)**
59:9;64:14;65:15;
143:13;178:3
**handful (1)**
201:13
**handing (6)**
61:4;98:19;139:7;
156:20;172:18;
217:10
**handle (5)**
22:15;26:23;31:17;
63:20;178:24
**handled (4)**
63:19;162:14;
163:13;170:4
**handling (1)**
170:11
**hands (1)**
73:1
**handwriting (1)**
143:2
**handwritten (2)**
115:2;116:2
**hang (4)**
21:14;137:4;152:8;
223:9
**happen (3)**
50:23;133:23;
213:25
**happened (15)**
31:23;32:17;61:24;
71:25;85:16;86:23;
105:11;130:5;145:25;
146:2;168:18;169:11;
170:2;171:3;191:15
**happening (3)**
10:13;78:14;166:9
**happy (3)**
94:5,9;121:4
**hard (1)**

42:13
**hardened (1)**
135:10
**harder (1)**
50:18
**Harmon (1)**
189:23
**head (8)**
24:5;33:5;34:2;
36:10;42:22;73:3;
125:22;144:22
**headquarters (4)**
27:6,9,14;28:8
**hear (4)**
86:6;130:11;132:7;
180:13
**heard (9)**
102:3,16,18,20;
111:13;113:3;199:24;
214:20,22
**hearing (16)**
64:4;77:22;78:2;
82:4;83:14,14;85:17,
22;86:10;93:8;
109:19;122:18;
130:15;132:12;
136:13;201:17
**heart (2)**
91:21;92:8
**heating (1)**
166:22
**heavily (3)**
135:22,23;136:3
**held (2)**
77:23;209:21
**help (8)**
47:2;78:23;130:12;
147:25;180:5;209:15;
210:1,18
**helped (3)**
33:15;142:18;179:7
**helpful (2)**
42:14;111:25
**helping (1)**
183:8
**Henley (1)**
44:2
**herein (1)**
6:9
**Here's (1)**
148:11
**Hernandez (20)**
124:25;153:4,7,9;
155:8,8;167:18,21;
168:21;169:11;
170:13,18;171:11,19,
21,24;206:22;211:6,
13,14
**Hernandezes (1)**
172:3
**Hernandez's (2)**
207:2,7
**hierarchy (1)**

47:1
**High (1)**
223:14
**highlighted (1)**
173:13
**high-ranking (2)**
31:22;44:23
**Hill (2)**
33:24;36:19
**hire (2)**
155:18;185:25
**hired (2)**
22:1;169:12
**histories (1)**
134:3
**history (2)**
134:3,10
**hit (2)**
167:5;174:16;
207:24;208:3
**Hmm-um (1)**
58:6
**hold (4)**
22:20;88:2;98:11,
14
**Homan (1)**
119:17
**home (3)**
130:19;192:4,6
**Honor (2)**
63:6;93:5
**hope (3)**
92:8,13;93:1
**Hopefully (2)**
110:18;226:19
**Hoping (2)**
22:1;47:24
**hospital (1)**
82:22
**hotel (1)**
115:11
**hour (3)**
130:15;132:9;
168:24
**hours (6)**
117:12;125:11;
130:9;132:3;167:17;
212:25
**house (2)**
95:16;125:18
**Humboldt (2)**
165:9;183:9
**hundred (2)**
48:9;227:4
**hundreds (4)**
218:11;226:17,20;
227:22
**husband (1)**
112:25
**Hynes (4)**
33:25;35:1,5;36:16
**hypothetical (2)**
179:15;221:24

# I

**Ibrahim (5)**
196:4;203:19;
204:5,11;211:21
**idea (3)**
95:2;213:22;227:16
**identification (23)**
59:7;61:2;64:12;
65:14;79:3;80:11;
98:17;114:18;134:8;
138:6;143:12;148:6;
150:18;153:24;
156:19;170:3;171:8;
172:17;176:5;188:7,
11;196:19;217:9
**identified (3)**
18:9;128:2;219:14
**identify (3)**
138:3;148:16;171:5
**IDs (1)**
156:3
**illegally (1)**
72:22
**Illinois (8)**
5:4,10;19:21,22;
37:14;41:18;120:23;
200:13
**imagine (1)**
32:7
**immediate (2)**
21:3;75:21
**immediately (1)**
76:22
**impermissible (1)**
75:13
**implicate (1)**
128:10
**implicated (3)**
74:7;124:10,17
**implicit (1)**
94:8
**important (2)**
101:10;216:17
**impose (1)**
91:17
**incident (4)**
130:19;149:21;
159:9;163:4
**include (1)**
99:12
**included (8)**
69:12;71:15;74:17,
22,25;75:15,25;97:23
**including (2)**
99:8;173:4
**incomplete (1)**
221:24
**Incorporated (1)**
5:13
**independent (12)**
85:19;111:3;113:4;

115:6;137:13,19;
146:5;147:9;149:20;
162:16;175:7,7
**independently (2)**
132:23;177:8
**index (1)**
80:19
**Indiana (1)**
19:25
**indicate (3)**
15:25;43:1;210:15
**indicated (9)**
62:11;93:19;97:6;
157:19;164:16;174:3;
204:14;205:9,23
**indicates (6)**
62:5,22;82:3;98:23;
172:23;173:18
**indicating (3)**
65:23;121:2;179:6
**indication (2)**
66:8;134:16
**indicted (4)**
57:7,13;61:24;
125:5
**indictment (8)**
44:18,25;58:19;
61:9;65:2,5;195:23;
204:20
**indirect (1)**
75:12
**individual (7)**
6:1;22:15;45:20;
147:14;162:24;
187:17;209:13
**individuals (17)**
7:15;31:21;53:19;
54:1;55:10;74:8,11;
114:3;127:5,11;
185:12;189:11;
200:25;202:6;204:21;
213:20;219:13
**induced (1)**
75:11
**indulge (1)**
82:18
**inferences (2)**
75:16,17
**influence (9)**
205:5,14,19;
206:11,19;207:2,6,17,
22
**information (24)**
12:24;26:9;40:9;
41:21;47:1;69:2,13;
71:20;73:10,14;
74:10,18;75:4;76:8,
16;77:13;78:8;113:7;
123:19;133:4;142:6;
199:4;203:4;221:22
**informed (2)**
159:15;164:13
**informing (1)**

170:18
**infraction (1)**
52:15
**initial (1)**
15:3
**initially (3)**
16:18;63:8;82:11
**initiated (1)**
34:14;140:23
**injured (2)**
209:14;210:1
**injuries (3)**
177:4;210:18,23
**injury (5)**
49:18;148:19;
150:23;162:15;164:9
**inner (1)**
46:13
**innocence (5)**
91:25;94:15,19,24;
213:5
**innocent (9)**
91:20;92:2,4,7,21,
24;93:4,15;212:24
**insert (1)**
142:4
**inservices (1)**
47:12
**insisted (1)**
97:20
**instance (3)**
106:25;116:4;192:1
**institutions (1)**
41:23
**instruct (1)**
142:7
**intelligence (1)**
42:7
**intention (1)**
15:4
**interacting (1)**
174:5
**interaction (1)**
212:6
**interchangeably (1)**
102:12
**interest (9)**
10:8;14:6,13;15:12;
16:10;155:4;157:1;
168:13,16
**interested (4)**
33:8;45:18;54:9;
131:6
**interesting (1)**
18:17
**internally (1)**
101:20
**interning (1)**
20:24
**internships (1)**
20:11
**interpreter (14)**
62:13,16,19,23;

67:16,19;68:16;
84:25;89:8;97:19,20,
25;224:2,6
**interpreters (1)**
68:6
**interrogate (1)**
200:3
**interrogated (1)**
72:18
**interrogating (1)**
209:14
**interrogation (2)**
181:15;225:13
**interrogations (2)**
225:8,16
**interrogator (1)**
74:2
**interrupt (2)**
80:22;89:10
**interview (6)**
15:11,19;18:22;
68:23;117:14;210:16
**interviewed (6)**
117:13;195:13;
200:4,6;210:11,15
**interviewing (5)**
122:6;127:18;
131:3;172:12;175:5
**interviews (1)**
216:4
**into (20)**
19:22;24:2,9;47:24;
49:10;74:25;81:7;
82:9,19;91:22;93:18;
133:16;144:21;
167:17;174:12;
181:24;182:1;194:1,
22;224:6
**introduce (1)**
5:15
**investigating (2)**
52:15;222:12
**investigation (5)**
40:10;44:24;
175:24;214:3;216:18
**investigations (2)**
101:21,22
**Investigative (9)**
102:9,11;103:4,15;
104:6;105:11;111:6;
116:20;166:6
**investigator (1)**
40:20
**investigators (1)**
37:12
**involuntarily (1)**
72:23
**involuntary (1)**
72:9
**involved (29)**
10:15,15;44:25;
46:6;49:18;53:15;
55:24;74:11;78:23,

25;83:3;87:1,1;95:5;
99:22;135:22,23;
136:4;161:21;162:23;
174:2;184:4;186:21;
195:19;199:22;205:6;
210:21;212:9,10
**involvement (3)**
151:21;152:21;
203:22
**involving (8)**
150:23;158:24;
159:2;164:17;172:24;
197:16;206:20,23
**issue (17)**
13:17;15:12;16:5,7,
8;89:17;90:5;96:6;
137:23;141:2,6;
167:21;168:4;169:4,
7,14;222:9
**issued (1)**
146:14
**issues (6)**
122:22;164:22;
166:14,16;170:3,11
**Italian (1)**
97:10

# J

**Jack (4)**
33:25;53:3,5,15
**Jack's (1)**
21:17
**Jackson (1)**
5:9
**jail (10)**
67:13;100:5,8;
107:12,14;108:2,10;
170:1;224:3,6
**January (8)**
78:15,21;81:18;
82:20;173:3;174:1,6;
190:2
**Javier (15)**
185:21;186:2,3,4,
12,25;187:8,11,12;
205:22,23;206:2,6,8,9
**Jeff (1)**
36:11
**Jeffery (15)**
118:21,22,25;
119:10,13;219:14,19;
220:7,23;221:2,4,14,
18;222:3,19
**Jennifer (2)**
5:16;6:15
**Jim (1)**
14:17
**job (2)**
52:14,17
**Joe (2)**
45:16;183:8,23;
184:4;195:19;212:4,

14,17
**John (20)**
42:15;48:19,20;
49:16;50:16,19;
51:16;52:18;53:8;
54:13;175:21;188:1;
189:13,14;191:3,4,7,
12,19;192:23
**John's (1)**
52:19
**Johnson (2)**
176:21,25
**Join (10)**
32:10;34:24;41:8;
42:20;123:6;149:10;
159:24;161:11;
175:13;177:7
**joined (2)**
35:8;50:22
**Jose (10)**
5:17,20;6:18;55:20;
59:16;112:14,19;
117:12,14;119:8
**Joseph (1)**
183:2
**Jose's (1)**
118:1
**Juan (23)**
75:6;76:9;77:14;
112:10;113:2;133:22;
137:16;153:7,8;
155:8,17;169:11,15,
19,23;170:1,5,10,13,
18,25;206:22;211:6
**Juan's (4)**
111:25;112:8;
155:9,12
**judge (55)**
18:16;20:18,20;
22:12;24:18,19,20,20;
31:15;63:6,7;67:17,
21;82:24;89:22;
91:12,15;167:25;
168:22,23;169:14,23;
182:12,13;186:7;
187:18,24;188:1;
189:13;191:8,15;
194:5,7,9,13,15,19;
197:19;199:16;200:6;
202:2,15;205:10;
207:17;226:4,5,5,8,9,
9,10;227:14,14,17,18
**judges (10)**
13:18;16:4;31:14;
226:4,6,11,14,24;
227:24;228:2
**judge's (3)**
22:19,25;45:4
**judgment (2)**
121:14,15
**Julie (1)**
189:23
**July (4)**

21:7,12;109:9;
176:9
**jumped (1)**
159:16
**June (2)**
21:12;25:3
**Junior (1)**
153:19
**Junior's (1)**
170:25
**juries (1)**
48:7
**jurisdictions (1)**
19:20
**jury (8)**
23:17;98:23;
155:24;168:1,1,9;
182:15,16
**justify (1)**
178:12
**Justin (1)**
5:23
**Justino (5)**
92:24;95:19;
111:11;112:4;120:20
**Juvenile (4)**
24:8,22;25:6;35:25

## K

**keep (9)**
10:24;51:21,22;
107:2;112:3;118:7;
172:7;211:12,18
**keeps (1)**
144:21
**Kent (3)**
20:7;36:11;155:15
**kept (1)**
101:20
**Kevin (1)**
124:8
**Kevin's (1)**
135:17
**kids (1)**
144:18
**kill (4)**
115:14;126:14;
130:13,13
**killer (2)**
200:19,22
**Kind (15)**
10:17;44:6;53:14;
82:21;83:2;93:17;
111:12,13;112:7;
113:3;205:14,18;
206:20;207:6;212:10
**King (13)**
118:21;125:18,19,
19,21;126:6,7;
127:11;128:2;220:22;
221:2,14,17
**Kings (1)**

47:14
**kitchenette (1)**
51:19
**knee (2)**
78:18;82:23
**knew (27)**
14:5;34:25;35:2,5;
40:11;41:23;50:16;
54:13;15;56:2;57:7;
67:9;82:24;83:21;
84:13,14;108:20;
110:3;117:15;136:18;
137:2;148:1;185:8;
203:23;213:14;
221:14,17
**knowingly (1)**
76:13
**knowledge (11)**
47:3;63:21;84:3;
87:11;113:4;145:3,6;
170:6;213:18,21,24
**knowledgeable (1)**
40:6
**known (5)**
31:22;45:13;54:13;
74:1;170:2
**knows (2)**
92:11,21
**Kogut (6)**
48:19;49:9,12;50:9;
51:1;188:20
**K-o-g-u-t (1)**
48:19
**Kokoraleis (8)**
199:25;200:3,5,19;
201:21,22,25;202:3
**KREJCI (46)**
6:4,4;14:2;30:2,8;
32:10;41:7;49:23;
67:24;68:1;70:2,19;
71:4;79:6;80:22;
88:21,22,25;93:17,22;
94:1,12,22;96:12;
97:2;98:6,13;105:4;
114:21;116:25;117:2;
138:21;148:9;152:6;
175:15;179:15;
187:20,23;198:6,19;
200:1;202:7;219:17;
227:8;228:8,10
**K-r-e-j-c-i (1)**
6:4

## L

**labored (1)**
14:12
**ladies (1)**
133:6
**lady (1)**
91:21
**language (4)**
90:20;97:14,24;

215:12
**large (4)**
36:14;51:17;73:5;
208:4
**Larry (1)**
33:24
**LaSalle (1)**
23:18
**last (14)**
16:13;17:20;19:7,9;
21:23;32:23;61:7;
64:18;130:14;164:12;
184:19;200:11,12,14
**lasted (2)**
130:15;132:8
**Lastly (1)**
91:6
**late (5)**
30:15,20;177:2;
183:2,22
**later (3)**
29:17;167:25;
170:25
**Latin (7)**
47:13;118:21;
128:2;220:22;221:2,
14,17
**latter (1)**
57:21
**Laureano (5)**
196:10;197:2,8,20;
203:13
**Law (22)**
5:9;7:25;8:13;
12:18;20:3,6,10,14;
21:23;32:17,18;35:2,
4;37:17;57:14;72:18;
94:25;163:3;167:20;
191:6;213:5,15
**lawsuit (3)**
12:19;17:3;163:12
**lawyer (8)**
53:12;77:6;87:9;
110:17;159:18;
164:15,16;169:12
**lawyers (4)**
21:4;51:23;164:20;
228:2
**lead (1)**
109:5
**leading (2)**
169:20,25
**learn (4)**
13:7;46:12;47:8;
184:3
**learned (9)**
13:13,16,17,19,19,
22;14:8;16:13;164:24
**least (5)**
7:15;64:3;67:12;
86:8;108:1;123:2;
124:15;132:8;133:20;
145:14;146:19;

151:18;171:10
**leather (1)**
72:25
**leave (4)**
24:24;47:20;63:10;
95:17
**leaving (1)**
52:18
**led (2)**
50:14;213:14
**left (20)**
25:1,2;30:24;34:8;
38:6,7;47:17;48:10,
21,22,23;49:22;52:12,
17,24;73:2;113:20;
123:20;182:4;194:21
**legal (7)**
137:22;141:24;
165:22;166:13,15;
205:5;223:18
**Leinenweber (49)**
5:23,23;46:15,22;
79:24;118:12,14;
123:6;128:13;138:12,
15;142:4;144:12,19;
149:10,24;150:2,6,9;
159:10,24;160:6,19;
161:11,17;162:7;
165:10,25;166:7;
175:13;177:7;178:15;
179:9;180:9,12,15;
186:17;187:24;188:2;
190:25;201:10,12;
202:10;204:7;208:7,
10;220:15,18;223:9
**leniency (1)**
75:15
**Leonard (1)**
175:22
**less (3)**
7:23;23:24;24:23
**letter (4)**
45:8,9,14,15
**libel (2)**
165:2,6
**licensed (1)**
19:20
**lie (5)**
91:23;93:1;210:17,
23;224:19
**lied (4)**
91:23;93:1;95:21,
23
**Lieutenant (4)**
37:9;39:6,10;45:11
**life (3)**
97:15;161:2,24
**light (1)**
118:17
**liked (1)**
32:11
**likely (1)**
113:15

**limit (1)**
11:3
**limited (2)**
46:9;75:20
**line (1)**
222:14
**lines (2)**
97:2;220:24
**lineup (3)**
17:20,21;156:3
**lineups (1)**
167:4
**link (1)**
123:16
**list (2)**
58:3;99:8
**litigated (2)**
176:9,15
**little (32)**
12:3;13:13;19:14;
23:23;31:7;35:19,23;
42:7;46:9,24;47:25;
48:22,23;50:4,17,18;
51:19,19;52:23,25;
55:10;83:24;92:14;
107:22;109:10;
127:22;128:14;
136:10;161:23;
205:21;206:23;
208:17
**living (1)**
97:11
**Lluvia (3)**
117:22;119:18;
125:17
**load (1)**
95:17
**loan (2)**
20:20;162:2
**locate (2)**
133:1;222:19
**located (2)**
5:8;221:9
**location (1)**
213:20
**locked (2)**
92:11;111:24
**lockup (5)**
67:23,24;68:7,15;
122:10
**loitering (1)**
135:3
**long (7)**
17:15;22:20;23:22;
24:22;29:8;30:14;
49:8
**longer (1)**
172:8
**look (46)**
9:12,13,22,24;
18:18;19:2;59:3;
64:18;65:12,16;66:1;
70:12,14;71:9;72:12;

80:9;81:3;84:19,22;
89:6,19;90:11,12;
92:9;98:9;108:5;
114:19;127:17;
135:10;148:15;152:9;
154:15,22;155:17;
157:5,9;185:2;188:4,
12;189:2;201:4;
219:21,21,22;220:2,
23
**looked (10)**
11:3,9,16;16:20;
58:17;66:6;131:18;
157:24;158:5;177:9
**looking (10)**
10:9;12:24;47:23;
100:13;130:25;147:6;
175:14;186:15,23;
201:16
**looks (9)**
65:4;66:15;139:17;
140:22;145:13;
176:20;188:19;
189:22;190:3
**loose (1)**
128:1
**lot (13)**
17:5;25:9;29:13,23;
31:14;39:23;40:13;
50:6;78:19;123:13;
136:6;190:9;226:14
**loud (1)**
132:5
**loved (1)**
193:19
**lower (2)**
66:1;98:20
**Lulu (1)**
132:10
**lunch (3)**
80:23;81:3;168:24

**M**

**ma'am (12)**
19:16;25:15;64:20;
66:24;73:16;76:2,11;
88:1;99:6;164:1;
176:14;210:25
**Macias (4)**
131:23;132:7,11,19
**Macias' (1)**
130:18
**Magneset (8)**
148:24;149:4,7;
150:14,24;151:15;
162:23;163:19
**maintained (3)**
10:20;101:15;104:7
**makes (3)**
15:12;40:14;43:2
**making (4)**
30:11;47:25;93:7;

125:8
**Maldonado (5)**
143:19,21;152:4,
22;158:4
**male (2)**
130:9;132:4
**man (1)**
91:22
**Mandeltort (2)**
81:22;84:10
**many (12)**
7:21;32:2;48:4;
144:15,18;145:2,4;
212:25,25;226:23;
227:6,8
**March (5)**
22:22,22;23:4;
154:1;166:22
**Marco (1)**
207:13
**Marcos (7)**
187:17;188:24;
189:19;190:18,23;
205:8;207:12
**M-a-r-c-o-s (1)**
187:21
**Marek (3)**
81:22;83:20;84:14
**Mark (9)**
59:5;60:22;98:15;
134:6;150:16;153:21;
156:17;176:2;188:8
**marked (30)**
59:7;61:2,5;64:12;
65:14;79:3;83:16;
88:14;98:17,20;
114:18;134:8;138:6;
139:8;143:12,13;
148:4,6;150:18;
153:24;156:19,21;
171:8;172:17;176:5;
188:7,11;196:19;
217:9,10
**married (5)**
25:3,4;144:8,16;
201:2
**Marsalek (1)**
24:18
**Marty (1)**
56:1
**Mary (1)**
5:11
**Maslowski (1)**
5:12
**material (1)**
74:1
**materials (1)**
58:15
**Matt (1)**
43:17
**matter (7)**
5:2;137:25;141:25;
146:6,25;157:22;

211:7
**matters (9)**
136:9;137:22;
157:21,25;158:3,7;
164:13;170:20;205:6
**may (40)**
17:23,24;25:2,13;
34:16;35:22;39:6;
45:12;52:3,17;58:20;
66:18;85:7,13;98:11;
107:6;109:12;110:9,
11;115:4;119:25;
126:13;127:18;
129:17;132:6;141:4,
25;146:3,8;154:15;
166:13;168:25;
169:15;171:21;
184:16;201:5,16;
206:4;207:9;224:14
**Maybe (29)**
7:23;14:19,19;
18:22;19:12;22:22;
23:23;24:1,1;47:25;
48:9;49:11;51:3;
82:12;83:24;95:20;
102:9;114:6;126:18;
127:22;129:2;141:15;
142:15;154:15;
155:12;185:2;193:9;
194:20;227:4
**Maysonet (133)**
5:2,18,20;6:18;
9:25;10:10,21;12:12;
14:7,12,23;16:17;
18:19;55:20;57:11,
19;58:10,13,20;
59:16;60:5;61:7;
62:17;63:7;64:1;
65:21,24;66:2;67:4,8,
11;68:15,23;69:3,24;
70:25;71:21,22;72:3;
73:13;79:21;80:15,
21;81:4,11;83:7,16;
84:17;85:5,21;89:13,
20;90:12,25;91:7,13,
16,19;93:6,13,23;
94:6,15,19;95:15;
96:2,8,16;97:17,23;
98:21,25;99:10,16,25;
100:16,24;101:1,11;
104:25;107:15,24;
108:5,6,13,21;109:8,
13,24;110:3;112:10,
14;114:4,13;115:20;
117:12,14,18;118:24;
122:18;123:1;124:1,
9;125:19;126:22;
127:5;128:1,9,20;
136:11;137:10;
152:14,21;155:10;
157:18;180:19;181:4,
12;212:22,23;213:15,
19;214:9,16;215:3;

217:16;218:17,22;
219:7;221:13,16;
222:20;224:4
**Maysonet's (20)**
9:13;13:14;16:1,8;
61:12;62:8;63:16;
71:16;72:8;77:9;90:7;
93:24;99:4;112:19;
122:7;125:12,21;
130:23;219:18;
222:4
**Maywood (3)**
17:5,9;186:9
**McCarthy (1)**
175:21
**mean (32)**
16:7;26:13;28:6;
32:13;39:23;42:11,
12;46:18,23;49:14;
67:24;78:5;94:2;
95:24;100:5;108:19;
110:16;111:12;
120:13;128:17;
133:10;150:11;
160:22;170:22;
178:10;180:25;198:2;
201:3;214:11;215:7;
224:6;227:11
**meaning (1)**
223:22
**meant (5)**
28:6;121:24;122:3;
152:4;205:2
**meantime (1)**
169:10
**meet (7)**
26:8;29:13,15,17;
35:17;143:23;181:23
**meeting (3)**
67:13;83:7;143:25
**member (3)**
44:22,23;45:20
**members (17)**
21:3;31:22;45:13;
46:1;50:2;69:4;72:4;
73:13;75:7;76:10,17,
23;77:15;85:24;
126:15;128:2;133:12
**memo (2)**
154:16,18
**memory (3)**
10:14;13:21;175:20
**men (1)**
165:8
**Menard (1)**
41:22
**mention (1)**
18:11
**mentioned (5)**
15:24;34:23;158:9;
206:15;213:3
**mentions (1)**
157:22

**menu (1)**
80:23
**merit (1)**
74:21
**met (9)**
30:6,18,19,21,23;
35:18,24;39:10;56:17
**metal (1)**
208:4
**mic (2)**
12:3;223:10
**Michael (3)**
19:15;176:21,25
**Michigan (2)**
19:24;23:18
**mid (7)**
30:20;56:18;90:1,2,
15;155:1;194:20
**middle (5)**
73:3;89:21;117:11;
143:3,4
**Miedzianowski (10)**
183:2,23;184:5,13;
195:19;204:21;212:4,
11,15,17
**might (12)**
41:21;45:17;47:8;
103:14;113:20;
123:19,20;193:21;
215:20;220:19,20;
224:13
**Mike (7)**
6:4;17:17;18:1;
26:16;33:25;52:25;
157:10
**Mike's (1)**
9:20
**Miller (1)**
171:17
**mind (4)**
52:21;121:10;
156:17;169:22
**mine (2)**
114:19;143:4
**Minerva (7)**
138:8;139:9,12;
147:20;152:3,16;
158:4
**Mingey (11)**
7:7;100:7;107:8,10;
108:9,12,17,23;109:7;
126:18;129:21
**minute (3)**
64:8;69:23;185:3
**Miranda (2)**
76:13;90:7
**misconduct (3)**
165:4,8;225:8
**misdemeanor (4)**
23:12,15,17;35:18
**misdemeanors (1)**
23:19
**misrepresentations (1)**

74:2
**missing (1)**
150:9
**misspoke (2)**
68:4;174:19
**mistreated (2)**
178:21;179:1
**mistrial (3)**
168:3,10;169:3
**mob (1)**
134:21
**model (1)**
118:17
**Mohammed (11)**
185:4,7,9,18,24;
195:20;196:5;203:24;
204:2;206:3,3
**moment (2)**
98:4;208:14
**Monadnock (5)**
48:14;49:5;50:25;
55:4;56:9
**Monday (1)**
13:6
**money (25)**
47:25;53:17;96:17,
25;142:25;162:2,4;
172:3;202:5,19,24;
203:6,10,16;204:8;
205:4,13,17;206:11;
207:1,5,16,21;212:14,
18
**monies (1)**
206:19
**month (3)**
22:7;78:22;142:24
**monthly (1)**
47:11
**months (5)**
23:15;29:10;78:18;
82:12;155:13
**Montilla (14)**
7:7;72:24;73:19;
99:9,19;100:7,24;
107:23;126:18,20,24;
127:1;215:21;216:2
**Montilla's (2)**
99:22;109:8
**mooted (1)**
169:15
**more (24)**
28:18,21;31:24;
46:25;47:8,25;48:8;
67:14;72:23;81:14;
97:18,24;135:18;
144:8;152:10;164:9;
198:17;208:18;215:5,
8;223:4;227:2,4,17
**Morgan (1)**
82:24
**morning (7)**
6:13,14;63:5;156:5;
167:8,9,17

**Morrissey (16)**
187:18;188:1,2;
189:13,14;191:3,20;
192:15;193:8;199:16;
202:15;205:10;226:4,
10;227:14,17
**most (2)**
29:7;85:5
**mostly (1)**
40:2
**mother (3)**
92:9,13,13
**mothers (2)**
147:11;166:4
**motion (41)**
63:10,11,13;64:15,
21,24;65:9;66:9,22;
67:2;68:22;69:13,23;
70:15,17,18,24;71:11;
73:20;74:18;75:1;
76:20;77:8,18,23,23;
82:4;83:15;106:22;
116:14;124:1;153:4;
154:4,25;156:1,24,25;
166:19;188:13;
206:24;211:7
**motions (5)**
63:9,17,19;66:15;
73:22
**motivated (1)**
46:2
**motive (2)**
45:21;133:8
**motor (1)**
162:23
**motorcycle (3)**
158:10,11,20
**move (2)**
48:3;107:18
**moved (4)**
23:18;34:7;101:24;
115:11
**Moving (3)**
75:9;104:14;154:8
**much (13)**
31:24;41:5,12;
46:25;81:7;92:10,10;
97:18;135:9;172:8;
178:7;203:4;215:5
**multi (1)**
37:15
**multipage (1)**
61:5
**multiple (1)**
79:25
**Municipal (4)**
23:8,9,22;24:4
**murder (15)**
58:20;60:8,11,11,
13,19;61:13;64:2;
125:6;169:13;172:24;
182:7;205:24;213:22;
226:9

**murders (5)**
31:19,20;123:17;
125:21,23
**must (2)**
114:8;140:22
**myself (4)**
11:12;36:22;78:14;
91:22

# N

**name (38)**
5:10;6:15;7:4,15;
24:21;32:19,23;43:2,
3;48:19;102:4,7;
124:25;155:16;
162:24;163:21;
165:18;171:16;
172:12,25;173:13;
181:17;184:19;
187:17,20;188:24;
189:15;195:10;
197:13;198:23,25;
199:6;206:14;207:13;
220:7;222:4,6;226:7
**named (8)**
23:2;74:8;118:21;
197:2;220:22;221:2,
14,17
**names (6)**
51:23;74:11;
116:18;218:19;
219:13,15
**narcotics (3)**
34:16;195:9;204:19
**nature (1)**
180:24
**NCAA (1)**
52:14
**need (5)**
43:14;70:19;71:9;
157:12;215:24
**needed (8)**
40:9,10;50:16;
67:20;133:25;167:12;
209:15;210:1
**needs (1)**
223:9
**neglect (1)**
24:10
**neglected (1)**
63:13
**negotiated (4)**
163:7,13;164:5;
187:1
**Neil (1)**
89:8
**Nelson (1)**
5:10
**Nettles (2)**
195:13,14
**new (4)**
22:1;63:10,11;

169:16
**newspaper (1)**
165:16
**next (19)**
22:22;36:12;72:20;
90:1;91:7;98:22;99:8,
15;101:9;107:3;
119:17;127:21;129:5;
131:24;140:4;156:5,
5;220:9,20
**nice (1)**
32:7
**nickname (3)**
119:24;187:13;
199:7
**nicknames (1)**
199:10
**nine (3)**
32:5,6;46:8
**Niswonger (2)**
151:23,24
**Nobody (4)**
161:6;167:18,19;
203:9
**none (5)**
12:17;109:4;131:4;
177:13;190:14
**normal (2)**
11:25;182:23
**normally (2)**
26:6;45:1
**North (12)**
25:20,22;26:4;
28:16;38:1;39:2,15;
40:3,5;54:23;130:2,6
**Northern (1)**
5:3
**nose (2)**
174:16;177:10
**note (3)**
105:1;127:18;
216:19
**notes (7)**
100:25;101:15;
103:24;104:19;
108:17,19;218:4
**nother (1)**
110:13
**notice (7)**
63:22;66:5;140:7,
18;141:14,17;146:14
**noticed (1)**
177:10
**notification (3)**
11:13;14:14;191:14
**November (14)**
21:10,11,13;22:8;
38:13,14,15;59:17;
60:3;64:3;82:13;87:2;
136:13;163:2
**number (22)**
5:4;6:20;61:9,18;
65:25;69:18;75:18;

79:22;80:1;130:18;
132:9;138:11;139:17;
142:20;144:3,21;
147:11;156:8;173:4;
188:14;197:3;217:7
**numbers (3)**
  61:10,21;65:2
**numerous (3)**
  40:15;76:23;106:17

## O

**oath (7)**
  7:25;8:6,8,12;
95:18,20;111:24
**Object (47)**
  29:3,25;37:24;39:3;
40:23;41:6;42:8,18;
43:13;45:22;46:21;
51:11;58:5;59:19;
70:3;78:9;87:13,22;
102:5;105:14;116:10;
123:5;124:20;125:2;
134:25;135:4,12;
146:17,22;149:9;
151:1;161:10;162:6,
7;165:25;174:18;
175:12;177:23;
180:11;183:5;184:20;
190:6,24;194:3;
195:22;219:9;221:23
**objecting (1)**
  151:3
**Objection (62)**
  10:22;14:2;21:1;
30:2,7,8,11;31:18;
32:9,16;39:20;41:7;
42:9;43:5,6,12,14,19;
46:15;49:23;70:2;
94:22;96:13;97:3;
102:8,15;103:5,7,16;
106:3;107:16;128:13;
136:1,5;142:5;
144:11,12,19;159:10,
23;160:6,13,16;
161:17;165:10;166:7;
177:6;178:15;179:9,
10;180:9;183:11,18,
25;184:8;186:17;
190:25;200:1;202:7;
208:22;210:2;213:17
**objections (3)**
  43:9,9;160:19
**obligor (1)**
  140:14
**observed (1)**
  103:14
**obtained (3)**
  41:22;73:24;218:24
**obtaining (1)**
  179:20
**obviously (9)**
  12:23;46:1;69:1;

83:11;107:13;122:20;
127:14;136:18;141:1
**occasion (1)**
  174:3
**occasionally (7)**
  17:8,9;44:25;
192:16,17;193:13;
228:3
**occasions (2)**
  76:22;171:18
**occurred (5)**
  58:19,20;64:4;
130:19;168:18
**occurrence (1)**
  129:16
**o'clock (2)**
  132:3;174:2
**October (7)**
  5:5;62:3;64:4;
82:13;136:15,17;
172:25
**O'Donnell (4)**
  34:1;35:1,5;36:17
**off (26)**
  26:9;36:18;59:8;
60:23;61:3;64:13;
79:7;81:1;89:3;98:18;
112:3;129:21;138:22;
140:16;150:15;
166:23;167:22,23;
172:15;183:8;184:5;
185:15;198:9;201:6;
225:19;228:13
**offense (1)**
  74:7
**offers (1)**
  75:15
**office (71)**
  9:16,19,20;15:11,
14,18;17:25;20:15,
23;21:19;22:6,11;
26:1,5;33:4,13;34:15;
35:21,22,23;36:4,12,
13,14,16,18,21,24;
37:3,6,6;38:7;47:18,
21;48:10,20;49:22;
51:14,16,18;52:6,13,
19,22,24,25;53:21;
55:11,16;56:12,16;
83:23;84:12;102:18,
20,21;161:15;179:13;
182:5;191:5,8;
193:17;194:20,21,22;
209:5;210:10,11;
217:15;218:23;
226:25
**officemate (1)**
  82:14
**officemates (1)**
  55:17
**officer (3)**
  6:1;107:13;165:15;
173:5;204:21;212:7

**officers (8)**
  6:20;37:7;38:18;
72:24;73:4,18;173:4;
174:11
**offices (5)**
  25:25;49:6;51:17,
21;179:4
**official (1)**
  22:5
**officials (1)**
  72:18
**old (2)**
  82:25;117:3
**older (3)**
  35:19;118:17;
135:13
**oldest (1)**
  50:22
**Omar (20)**
  18:23;185:4,7,9,11,
18,24;195:20;196:4,
5;203:19,24;204:2,5,
9,11,22;205:2;206:3;
211:21
**Omar's (1)**
  206:3
**once (4)**
  14:19;49:21;144:8;
193:9
**one (73)**
  9:4;10:23;13:18;
18:23;27:6,9,14;
31:14;34:12,14;
35:12,13,14;37:9,13;
44:15;51:18;52:1;
54:8;57:10;60:10,14,
15;69:19;71:10;80:3,
4;87:25;88:20;89:6;
95:11;100:6,8;
101:25,25;103:20,23;
111:14;112:9;115:21;
116:14,18;123:3;
132:4;133:13;135:2;
148:4,8;149:13;
150:16;151:4;152:5,
6;155:22;156:3,4;
171:22;174:11;182:6;
185:18,19;190:7;
192:24;200:7;206:23;
207:9;216:10,13;
219:14;220:14;
223:10;224:25;
226:19
**ones (2)**
  62:18;226:10
**ongoing (3)**
  15:2;47:4;166:22
**Only (17)**
  14:18;31:9;46:8;
61:21;78:14;91:23;
92:9,25;108:20;
112:23;123:15;
130:11;132:7;147:9;

226:11;227:20,23
**open (4)**
  36:1;101:21;104:7;
113:21
**opened (2)**
  35:13;49:6
**opening (4)**
  33:7;50:3;167:1,2
**openings (1)**
  156:2
**operated (2)**
  46:14;47:12
**operating (1)**
  40:2
**opinion (15)**
  9:13,14,24;10:3,4;
16:21;100:2;114:6;
115:10;121:14;
172:21;173:6;177:9;
178:19;209:2
**opinions (3)**
  10:9;16:20;18:19
**opportunity (12)**
  8:4;12:7,13,18;
18:2;29:12;31:13;
33:14,22;85:10;
104:18;117:25
**opposed (3)**
  31:14;41:12;142:24
**opposing (3)**
  202:13;204:13;
205:8
**opted (1)**
  97:25
**oral (2)**
  99:25;128:10
**order (16)**
  47:2;78:19;81:3;
126:12;140:7,17;
146:9;178:12;202:5,
19,25;203:7;205:18;
213:21;224:10,12
**organization (1)**
  54:1
**organized (3)**
  32:21,22;166:5
**origin (1)**
  55:22
**original (2)**
  34:4;65:4
**Originally (4)**
  24:18;32:22;48:18;
51:16
**osteotomy (1)**
  78:17
**Otero (7)**
  195:4,6,16;204:13;
205:2,3,6
**others (4)**
  28:18,22;55:4;
165:3
**out (48)**
  9:15;13:1,4,11;

15:11,19;17:24;20:2;
21:14;26:3,5,22;
40:16;50:1;57:12,25;
69:2;71:11;83:2;
91:20;92:22,23;
109:22;110:18;118:9;
119:18;121:9;126:17,
20,23;128:8;131:18;
141:11,12;142:23;
147:25;155:19;
160:23,25;165:14;
178:23;179:7;185:15;
186:13;187:7;192:20;
221:4,9
**outcome (9)**
  186:12;202:5,20;
203:1,7,12,17;204:9;
205:5
**outings (3)**
  193:12;228:1,4
**outraged (1)**
  109:10
**outside (4)**
  67:20;93:3;137:5;
191:23
**over (29)**
  9:18;25:9;26:1,23;
33:3,16,18;34:15;
35:21;38:2;43:3;
47:14;54:23;55:4;
95:3;118:17;124:3;
146:3;159:6;163:17;
167:12;168:23;
169:13;191:7;204:22;
205:19;213:20;
214:14;227:7
**overall (1)**
  79:17
**own (6)**
  12:25;42:7;73:15;
121:10;126:14;183:8

## P

**packet (1)**
  106:20
**page (56)**
  61:6,7;62:5,12;
63:1,3,4;64:18;65:2;
66:2;80:15;81:17;
84:20;89:7,21;90:1,1,
2,12,15;91:7;98:22,
22;99:8,15;100:24;
101:9,12;104:15;
107:3;108:5;117:8,
11;118:12;119:17;
125:8;127:21,23;
129:5,5,8;131:24;
134:9;154:1;156:14;
173:12;188:16;189:5;
216:1;219:21;220:9,
14,16,20,20,24
**paid (1)**

203:9

**pain (1)**
  73:6
**painful (2)**
  192:12;194:8
**Papa (1)**
  14:17
**paper (7)**
  42:24;43:3;92:6;
  95:18,19;147:6;
  157:25
**papers (1)**
  146:20
**paragraph (13)**
  72:11,15,20;75:24;
  90:18;105:4;125:9;
  127:23;162:20;
  164:12;172:23;
  175:14;220:8
**parcel (1)**
  146:8
**parentheses (1)**
  141:9
**Park (3)**
  165:9;183:9;192:23
**parking (1)**
  17:5
**part (15)**
  38:2;39:14;49:16,
  17;75:6,7;85:5;
  114:11;126:11,12;
  146:8;172:21;194:5;
  200:15;216:18
**participate (1)**
  20:11
**particular (17)**
  28:12;37:20;47:8;
  62:2;82:15;147:5;
  151:11,21;167:21;
  186:11;208:20;209:8,
  25;210:23;219:3,13;
  223:2
**parties (3)**
  148:23;168:9;192:4
**partner (4)**
  48:16,24;53:23;
  202:1
**partners (3)**
  48:18;49:2;188:20
**partnership (1)**
  49:1
**parts (1)**
  132:8
**passed (2)**
  21:9,10
**passenger (1)**
  174:14
**passing (2)**
  14:18;80:23
**past (1)**
  157:21
**Pat (1)**
  175:21

**paternity (2)**
  166:14,16
**pattern (1)**
  165:8
**Paul (1)**
  33:24
**Paulnitsky (3)**
  7:14;69:25;70:8
**pause (1)**
  100:16
**pay (19)**
  147:10;202:4,19,
  22,24;203:6,16;
  204:8;205:4,13,17;
  206:10,18;207:1,5,16,
  21;211:22;212:1
**paycheck (1)**
  55:14
**paying (3)**
  96:17;147:12;172:2
**payment (1)**
  147:14
**payments (4)**
  140:13;142:20,22;
  146:10
**Peilet (1)**
  52:2
**Pena (25)**
  172:13,19;173:3;
  174:6;175:5,6,10;
  177:4;178:12,19;
  179:20;180:7,18,23;
  181:8,13;206:14,20;
  208:14;209:16;210:8,
  10,13,15,17
**Pena's (3)**
  178:4;208:25;210:6
**pending (1)**
  204:18
**penitentiaries (1)**
  41:20
**people (26)**
  17:19;22:19;25:19;
  40:11,16;41:23;
  44:21;49:25;50:1;
  51:20;55:9;108:20;
  130:25;131:13;
  142:25;159:16;160:5;
  161:5;165:17;172:19;
  175:23;185:14;187:6;
  227:6,9,20
**per (1)**
  38:3
**percentage (1)**
  20:3
**Perez (18)**
  181:18,19,23;
  182:17;183:1,7,21;
  184:4,13;185:19,21;
  186:12;205:22,22,23,
  24;206:2,2
**Perez's (1)**
  226:9

**Perhaps (1)**
  41:11
**period (8)**
  22:24;38:17;53:4;
  55:5;193:7,10;
  194:23;209:4
**perjury (2)**
  87:10,25
**permanent (4)**
  102:25;103:2,12;
  104:3
**permission (1)**
  224:5
**permitted (1)**
  158:14
**person (5)**
  16:22;72:19;119:4;
  221:10,20
**personal (7)**
  49:18;145:3,6;
  148:18;150:23;
  162:14;164:9
**personality (1)**
  28:24
**persons (2)**
  72:19;159:17
**perspectives (1)**
  124:16
**peruse (1)**
  84:20
**petition (4)**
  16:8;140:6;143:3;
  169:9
**petitioner (1)**
  140:14
**phone (3)**
  17:16;26:19,23
**photo (3)**
  128:2,17,18
**photos (3)**
  128:1,20,23
**physical (6)**
  72:21;77:20;
  178:13;180:6;181:14;
  225:12
**physically (1)**
  179:6
**PI (1)**
  148:9
**picks (1)**
  35:15
**piece (2)**
  92:6;147:6
**place (3)**
  69:8;85:4;132:2
**placed (3)**
  72:25;73:1;120:22
**plaintiff (4)**
  5:17,20;148:24;
  151:15
**plaintiffs (1)**
  151:10
**plan (3)**

**play (4)**
  92:6;193:19,22;
  194:12
**played (4)**
  16:17;192:22;
  193:8;194:8
**plea (2)**
  186:13;187:1
**pleading (1)**
  154:19
**pleas (1)**
  187:7
**please (3)**
  5:15;59:5;117:9
**pled (1)**
  187:7
**pm (16)**
  79:10,13;138:23;
  139:1,2,5;174:2;
  198:10,11,12,15;
  225:20,21,22,25;
  228:14
**point (27)**
  13:13,24;14:5;16:1;
  21:18;31:1;36:1;57:8,
  9;68:24;71:4;81:13;
  82:23;94:6,20;
  109:11;111:20;121:2;
  124:15;137:11;142:5;
  175:11;191:7;194:20;
  208:21;209:22;
  216:16
**points (3)**
  8:5;63:12;137:21
**police (32)**
  37:7,13,14;38:18;
  41:3,19;45:11;72:24;
  86:1;106:14;108:9;
  110:11;130:16;
  132:12;142:23;
  147:15;165:4,15;
  167:3;178:21;209:14;
  212:7;214:3;217:4;
  218:3,25;221:18,21;
  222:4,6,11,18
**police-style (1)**
  73:5
**polygraph (1)**
  214:22
**Pontiac (3)**
  118:17;221:6;
  222:19
**poor (2)**
  136:25;168:1
**popular (1)**
  133:13
**position (2)**
  21:18;145:8
**positive (3)**
  55:25;146:2;172:1
**possibility (1)**
  113:24

**possible (9)**
  46:24;68:19,20;
  75:19;160:12,18;
  175:22,24;185:13
**possibly (5)**
  20:1;41:3;69:4;
  185:10;203:21
**post-conviction (2)**
  16:2,8
**post-sentencing (1)**
  90:16
**post-trial (3)**
  63:9,17,19
**Potato (2)**
  41:14,14
**potential (3)**
  165:1;168:21,25
**potentially (3)**
  40:16;122:21;
  123:19
**practice (21)**
  11:22;19:22;20:4;
  49:15,16,17;50:3;
  53:14;67:18;68:5,18;
  72:6;106:13;137:2;
  181:25;182:2,4;
  193:15;194:1,23;
  214:23
**practiced (2)**
  56:3;226:12
**practicing (1)**
  57:14
**practitioner (3)**
  50:20;51:7,8
**preceded (1)**
  101:1
**Preceeo (7)**
  129:24;130:10,16,
  16,22;131:3,7
**precise (1)**
  77:13
**predecessor (1)**
  34:8
**prefer (1)**
  215:12
**prejudice (1)**
  168:4
**preliminary (1)**
  30:14
**premised (1)**
  77:8
**preparation (2)**
  9:11;121:2
**prepare (6)**
  108:9,11;145:19;
  216:10,12,23
**prepared (13)**
  10:19;88:6;103:22;
  104:21;108:16,24;
  129:10,16;157:5;
  169:23;216:3,7,21
**prepping (1)**
  95:12

**presence (2)**
67:20;211:4
**present (6)**
62:12;63:16;89:7;
131:12;225:15,17
**presenting (1)**
90:6
**presumably (1)**
197:18
**pretend (1)**
92:6
**pretty (10)**
29:6;31:24;32:6;
97:19;121:13;134:12,
14;182:4;194:11;
198:23
**prevailing (1)**
197:19
**prevent (1)**
114:3
**previously (6)**
7:25;63:9;83:16;
109:18;180:23;
181:13
**primarily (2)**
31:19;56:3
**prior (31)**
12:9;17:2;20:24;
21:21;33:13;34:23;
67:2;68:21;73:19;
78:22,22;85:11;
86:17;94:20;100:1;
111:8;118:1;122:6;
130:23;132:17;
136:23,24;137:17;
146:13;160:23;
169:19;170:10,18,21;
174:3,6
**private (7)**
94:19;181:24;
182:1,4;193:15;
194:1,22
**privilege (5)**
91:14;93:25;94:7;
142:7;214:12
**privileged (1)**
93:18
**privy (2)**
76:18;111:13
**pro (1)**
20:2
**probable (1)**
71:12
**probably (25)**
11:1,24;13:9;20:5;
22:21;23:23;29:7;
30:3,15;48:7;50:18;
56:18;79:25;86:11,
16;93:24;110:2;
136:25;177:1;182:6;
192:2;198:22;227:5,
19,23
**problem (4)**

168:25;171:22;
179:5;220:21
**problems (2)**
34:18;164:18
**procedure (2)**
78:17,20
**procedures (1)**
167:3
**proceed (1)**
83:1
**proceeding (2)**
62:24;206:20
**proceedings (17)**
16:2;61:8;62:17;
79:11;80:14;81:17;
85:1,4;98:23;139:2;
176:8;189:3;198:12;
206:12;207:3,7;
225:22
**process (1)**
224:7
**produce (3)**
106:15;216:14,16
**produced (4)**
106:10;217:14;
218:15,23
**product (3)**
73:24;75:11;77:19
**profess (1)**
93:13
**professed (1)**
94:15
**professing (2)**
94:19,23
**professional (1)**
227:25
**proffer (1)**
185:4
**progress (15)**
101:6;103:24;
104:19,21;105:1,10;
106:9;108:19;109:6;
216:3,8,19;217:25;
218:15;219:4
**promise (1)**
114:16
**promises (2)**
75:12,14
**promoted (2)**
33:5;39:7
**proposed (2)**
140:17;168:19
**prosecuted (2)**
42:3;212:8
**prosecuting (4)**
42:14;47:7;102:2;
181:1
**prosecution (7)**
16:17;47:2;101:23,
24;208:25;209:25;
217:16
**Prosecutions (1)**
36:10

**prosecution's (1)**
156:25
**prosecutor (4)**
48:1;158:13;
172:12;217:2
**prosecutorial (1)**
121:11
**prosecutors (3)**
55:3;216:14;219:1
**prosecutor's (2)**
52:24;191:7
**protect (1)**
74:9
**protected (1)**
142:6
**protection (2)**
96:17;115:15
**protective (1)**
120:23
**provide (1)**
74:10
**providing (1)**
156:9
**proximate (1)**
73:25
**psychological (1)**
77:20
**public (4)**
35:20;124:7;
189:24;191:6
**Pull (2)**
98:13;220:10
**punishment (1)**
25:11
**purports (3)**
59:15;61:8;140:6
**purpose (3)**
76:24;158:20;
168:10
**purposefully (1)**
87:18
**purposes (1)**
27:4
**pursuant (2)**
185:13;186:25
**put (29)**
12:3,10;15:16;
21:22;33:1;38:15;
63:13;64:8;79:18;
85:7;88:9;91:3;98:3,
15;110:3;112:10;
125:21;143:9;149:23;
152:1,25;156:3,7;
172:5;178:10;190:21;
197:22;208:3;216:19
**putting (2)**
116:16;138:14

## Q

**quarrel (3)**
59:25;93:10;109:2
**quarreling (1)**

149:16
**quash (11)**
64:15,25;65:9;66:9,
23;68:22;69:13;
70:17,18;71:11;77:24
**quick (4)**
79:4;138:18;
224:22;225:2
**quickly (2)**
168:23;220:12
**quite (1)**
51:4
**quote (1)**
174:10

## R

**raise (1)**
111:20
**raised (4)**
89:17;90:5;141:3,6
**ran (1)**
146:3
**Randy (24)**
34:1;35:16,18,22;
36:2;52:11,12,12,18;
78:24;81:25;83:2,2;
122:10;137:24;
142:18;146:3;147:3;
164:9;176:15;180:18,
22,25;181:7
**Randy's (1)**
35:19
**rank (1)**
209:21
**rap (1)**
133:18
**rather (2)**
110:12;164:6
**Ray (8)**
19:10;30:18;72:25;
73:19;96:17,25;
145:12;149:8
**Ray's (1)**
147:10
**reach (4)**
13:1;15:11,19;
40:16
**reached (5)**
9:15;13:4;17:24;
83:2;155:19
**reaching (1)**
178:23
**read (20)**
7:1;9:21;17:4;
70:10,14;79:22;
81:13;85:10;86:7;
89:25;90:10;94:14;
118:8;166:20;175:19;
177:24;184:10,23;
195:17;209:1
**reading (4)**
71:2,2;100:2;

175:15
**reads (1)**
72:20
**ready (5)**
78:16;156:5;167:7,
10;171:18
**real (6)**
119:4;135:21;
167:19;221:9,20;
225:2
**really (11)**
9:21;42:22;48:2;
55:21,25;120:13;
121:8;140:11;167:19;
178:6;193:1
**reason (10)**
28:19;40:19;59:25;
88:5;93:10;105:18;
109:2;110:24;163:17;
177:17
**reasons (1)**
57:11
**reassigned (1)**
23:5
**recall (57)**
12:16;14:11;15:22;
16:3;17:6,9;33:20;
54:5;55:7,18;57:3;
60:5;69:23;70:23;
73:11;75:8;89:5;
93:20;95:11;99:24;
111:6;115:25;116:3,
5;120:22;122:8;
126:2;133:2,11;
155:21;161:6;163:21;
164:19;172:11;
181:10;184:16;
186:25;190:3;191:13;
192:23;197:12,15,18;
199:4;202:2;203:20;
209:10,19;210:7,14,
20;213:6;215:21;
221:11,15;223:1;
225:17
**recalls (1)**
94:10
**recap (1)**
9:23
**received (5)**
14:13;73:9;105:10,
16;106:10
**receiving (1)**
11:13
**recently (1)**
13:9
**reception (1)**
36:9
**recess (4)**
79:9;139:1;198:11;
225:21
**recognize (2)**
59:10,12;145:23;
171:9;217:19;218:14;

220:25
**recognized (1)**
118:16
**recollect (9)**
38:23;55:5;76:13;
90:9;109:14;122:14;
132:25;169:18;
170:10
**recollection (112)**
10:11;14:10;15:1;
16:23;29:19;58:9,18;
59:22;60:9;62:18,20;
63:16;67:7,10;68:14;
69:8;72:5;82:18;83:5;
85:4,19;86:22,24;
90:4,24;93:14;94:18,
23,24;95:2,8,10,25;
96:1;97:9,16;99:21;
105:9;109:23;110:1;
111:3;112:7,20;
113:14;115:6;116:11;
118:22;119:1,11;
123:9;126:5,9;127:4,
10,13;131:2;133:7;
137:13,15,19;138:4;
141:13,16;142:19;
146:6;147:2,7,9,16;
149:20;152:14,20;
154:7;157:23;158:22,
25;159:19;160:2;
162:17;163:18;
165:17;166:24;
167:19;168:14;
170:17,22,23;171:25;
173:8;175:8;178:7,
22;180:4;188:5,23;
189:19;190:15,22;
195:18;197:7;201:20;
202:12;203:14;
204:17;209:7;213:8,
11;214:5;215:5,10,
15;222:22
**recollections (1)**
169:21
**recollects (1)**
94:11
**record (34)**
5:2,14;6:23;59:8;
60:23;61:3;63:6;
64:13;79:7,12,18;
80:1;81:1,21;89:3;
91:4;93:16;94:22;
96:12;98:18;111:21;
138:22;139:4;150:15;
156:7;157:1,15;
172:15;198:9,14;
201:6;225:20,24;
228:13
**recorded (1)**
221:18
**records (1)**
224:8
**redact (1)**

141:12
**REDIRECT (1)**
225:4
**reduce (1)**
188:13
**reduced (1)**
104:25
**refer (5)**
54:4;57:25;201:15;
215:24;219:17
**reference (3)**
133:22;158:23;
221:6
**referenced (1)**
187:25
**referencing (1)**
159:21
**referred (3)**
50:1;102:3;132:9
**referring (6)**
10:2;14:3;95:21,22;
164:19;220:13
**reflect (2)**
135:9;177:20
**reflected (6)**
134:3;145:14;
146:20;151:11,18;
177:21
**reflective (1)**
135:21
**reflects (3)**
99:3;188:16;197:4
**refresh (10)**
10:11;58:17;63:15;
90:4;138:4;163:18;
173:8;188:22;189:18;
197:7
**refreshed (2)**
10:14;78:7
**refreshes (2)**
188:4;190:14
**Refugio (1)**
162:25
**regarding (8)**
15:19;100:25;
133:8;159:9;165:1;
166:14,16;215:18
**regular (2)**
192:16;194:13
**reindicted (2)**
61:13,15
**reinstated (1)**
171:21
**relate (1)**
60:19
**related (8)**
13:25;17:3;71:16;
90:6;132:2;141:2;
155:4;157:25
**relates (3)**
16:9;88:10;165:8
**relation (1)**
195:15

**relations (2)**
164:18,21
**relationship (9)**
33:11;137:7,8,10;
155:4;159:8;170:6;
211:12,18
**release (1)**
75:21
**relevance (3)**
30:1,2,7
**relevant (3)**
30:9;43:2;47:7
**rely (1)**
106:15
**remainder (2)**
71:10;77:17
**remarked (1)**
80:11
**remarks (6)**
63:2;90:16,16;93:7,
11;166:20
**remember (126)**
12:21;16:16;24:3;
37:8;45:9;61:12,14;
64:21,23,25;65:8;
67:14;70:10;71:24;
74:3;78:5,7;86:8,12;
89:18;93:6;96:7,9,16,
24;100:2;109:13,20;
110:4;113:11;114:23;
115:1,9,23;120:8,21;
122:5;124:22,23;
128:7;129:3,4;
130:24,24;131:20;
132:19,21,22;133:5,
18,20,20;134:2,5;
137:9;141:20,23;
143:24;146:24;
147:17,20,23;148:1;
149:3;153:3;154:22;
155:5,7,19;161:2,16,
22;165:5,12,13;166:3,
8,8,9,15;167:5;
169:11;172:2;174:5,
14;175:5,9,25;176:1;
177:3;179:18;180:17,
21,22;181:12;182:12;
187:13,16;191:11;
196:2,3,8,13;198:24;
199:15;202:15,17,18;
205:10,12;206:16,17;
212:24;214:13,14,14,
16,19;215:25;216:5;
217:6;219:15;221:5;
224:5;225:9;226:8
**remembered (3)**
96:21,22;174:4
**remind (1)**
33:16
**rented (1)**
51:21
**repeatedly (1)**
216:20

**rephrase (2)**
8:21;103:8
**replace (1)**
83:11
**report (27)**
61:8;80:14;81:17;
98:23;103:24;104:19,
21;105:1;108:9,11,16,
19;129:10;132:22;
176:8;184:11;189:2;
216:8,13,16,19,21,24;
217:25;219:14,23;
221:19
**reported (2)**
101:2;124:11
**reporter (5)**
5:11;6:6;8:25;
178:25;228:16
**reporters (1)**
121:16
**Reporting (2)**
5:13;130:17
**reports (14)**
101:6;103:21;
105:10;106:9,19;
108:24;109:6,7;
216:4;218:2,7,15,19;
219:4
**report-writing (1)**
110:16
**represent (35)**
5:15;6:18;12:14;
55:20,22;57:11;
58:10,13;116:18;
123:24;137:21;
153:18;155:8,18;
158:10,15;178:2,18;
185:25;186:5;187:8;
193:5;195:3,7;
198:18;201:23;203:9,
15,15,21,25;206:5;
211:14,19;217:13
**representation (12)**
10:20;15:20;72:3;
94:21;141:24;152:15,
21;170:19;171:12;
195:16;218:16,22
**represented (42)**
55:23;64:1;74:1;
107:24;116:19;
122:17,17;124:1;
136:11;137:17;153:7;
155:15;157:17,20;
158:2,6;162:22;
163:24;166:13;
171:17;176:21;181:2;
182:3;183:3;186:2;
188:23;189:19,23;
190:15;195:8;196:11;
197:8;202:14,23;
204:14,16,24;205:23,
24;206:6,7,8
**representing (20)**

17:17;122:10,20;
123:1;137:12;141:20;
145:6;149:3;159:1;
160:3;180:19;181:3;
183:21;187:16;
196:14;199:5;201:21;
202:13;203:14;219:7
**represents (1)**
159:15
**reputation (2)**
161:8,23
**requesting (1)**
26:20
**requests (4)**
76:23,25;77:18;
110:17
**required (1)**
10:24
**research (3)**
16:19;46:25;168:23
**Reserve (1)**
228:8
**resolved (3)**
147:18,21;204:23
**resource (1)**
39:17
**resources (1)**
46:9
**respect (6)**
87:4;152:16;210:6,
13;211:6,21
**responded (1)**
101:2
**response (2)**
154:13;169:10
**responsibilities (1)**
22:14
**responsibility (4)**
8:5;26:16;45:12;
147:10
**responsible (2)**
44:15;159:17
**restroom (1)**
198:1
**result (5)**
72:21;73:25;77:19;
166:18;190:23
**resulted (1)**
58:19
**retain (2)**
57:17;169:16
**retained (8)**
15:21;57:19;
158:19;163:3;164:14;
196:3;203:20;228:16
**retention (4)**
102:25;103:2,13;
104:3
**retired (4)**
7:12,13;190:1,2
**retry (1)**
15:4
**reveal (1)**

142:7
**revealing (1)**
  158:18
**review (27)**
  9:10;18:3;25:4,14,
  16,25;27:5;29:9,12,
  18;30:21,24;31:2;
  32:14;35:24,25;
  44:21;70:20;89:20;
  100:3,21;104:19;
  109:15;191:12,13;
  200:25;202:1
**reviewed (1)**
  108:25
**reviewing (2)**
  58:15,16
**Reyna (11)**
  194:5,7,9,13,15,19;
  197:19;226:5,9;
  227:14,18
**Reynaldo (15)**
  138:9;139:9,15;
  140:3,15;143:6,19;
  144:8;150:23;151:14;
  152:16;155:5;163:19;
  181:8;199:22
**RFC-51 (1)**
  220:2
**RFC-Maysonet (1)**
  117:7
**Ricardo (4)**
  198:18;203:3,6,8
**Rice (1)**
  223:14
**Richard (9)**
  5:8;6:5,8;19:15;
  22:13;149:17;163:3;
  173:13,24
**Rick (3)**
  63:6;70:19;145:17
**Ricky (2)**
  78:20;151:23
**ridiculous (1)**
  110:6
**r-i-e (1)**
  37:11
**right (278)**
  7:25;8:4;10:4;11:7,
  20;12:20;14:1,7;
  16:14,25;19:13,15;
  20:18;21:20;22:2,2;
  23:5;25:14;26:25;
  27:2,3,7,11,15,16,20,
  23;28:9,10,23;29:1;
  30:10,13;31:3;35:9;
  36:9;38:7,10;39:13,
  15;42:4;43:17;46:3,7;
  48:24;49:3;50:7,12;
  52:10,17;53:12;54:2,
  3;55:19;58:10,22;
  59:1,13;60:3,13,19;
  61:19,22;62:1,24;
  64:5;65:6,10;66:6,25;

67:1,5;68:11;69:3,10,
15;70:9;71:6,13,18,
24;72:4;73:15;74:15,
19;75:1;76:5,18;77:4,
7,10,20,25;78:3,4,18;
83:6,12,13,17;84:2;
85:17,20,22;86:2,4,
11,13,14,18,19;87:5;
88:3;89:11;98:3;99:5,
12,17;100:10,11;
101:3,4;102:25;
103:1;104:3,8;
105:21;108:2;109:1,
12,23;110:25;111:20,
22,23;112:1,4,5,14,
16;113:4,5,18;114:4;
115:13,17;119:5,9,11,
14,15;120:17;121:9;
122:13,22;123:18;
124:2,4,4,11,19;
127:1,2,11,16,19,24;
129:15,18;130:7;
131:3,6,21;133:14,24;
134:11,14,19;135:15,
17,19,24,25;136:4,16,
19;137:22;139:15;
140:24,25;141:18;
143:3,25;144:2,4,6,7;
145:20,22;146:11,15,
20;148:11,13;149:14,
15,19,21;150:8;
151:12,18;152:3,9;
153:5,7,8,10,15,16,18,
19,21;155:1,22;156:7,
22;157:11;160:22;
162:19;163:17;164:2;
170:11;171:1,5;
173:24;176:16,22;
177:14,22;180:1;
181:20;182:5,8;
183:15,16,24;185:5,
19,20,22;186:16;
189:25;190:23;
193:22;195:3,10;
196:11;197:2,3,20,22;
200:8,10,18,20;
203:24;204:16;205:3;
206:9,25;208:21;
211:9;216:11;226:18,
24;227:15,24;228:9
**right-hand (7)**
  66:1;80:16;98:20;
  99:16;100:18;117:6;
  143:7
**ring (1)**
  199:13
**ringing (2)**
  173:19;177:13
**rip (2)**
  183:8;185:15
**rip-off (2)**
  183:24;185:14
**Ripper (2)**

200:17,18
**ripping (1)**
  184:5
**rise (1)**
  39:5
**rival (2)**
  133:12,17
**road (1)**
  30:13
**robbery (1)**
  192:25
**Roberto (1)**
  203:3
**Robin (1)**
  202:3
**rodeo (1)**
  8:15
**Rodriguez (5)**
  197:13;198:18;
  203:4,7,8
**Roland (1)**
  195:3
**Rolando (9)**
  195:5,6,16;204:13,
  22;205:2,2,3,6
**role (1)**
  16:17
**room (1)**
  168:1
**Rosa (9)**
  71:22;75:21;95:15;
  111:11,21;112:19;
  114:7,24;118:7
**Rosario (1)**
  199:11
**Rose (6)**
  71:23,24;99:9;
  110:3,4,19
**ROSEN (106)**
  6:2,2;10:22;12:3;
  21:1;29:3,25;30:7,11;
  31:18;32:9,16;37:24;
  39:3;40:23;41:6,11;
  42:8,18,24;43:5,8,12,
  19;45:22;46:21;
  51:11;58:5;59:19;
  67:22;70:3,18;78:9;
  79:20;80:3,5;84:6;
  87:13,22;89:2,13;
  94:2;102:5,8,15;
  103:5,9,16;104:15;
  105:14;116:10;123:5;
  124:20;125:2;134:25;
  135:4,12;136:1,5;
  144:11;145:5;146:17,
  22;149:9;151:1,3,8;
  159:23;160:13,16;
  161:10;162:6;175:12;
  177:6,23;180:11;
  183:5,11,18,25;184:8,
  20;190:10,12,24;
  194:3;195:22;197:25;
  198:7;201:9;208:9,

13,23;210:5;214:8;
217:6;219:11,18;
220:10,17,19;222:1;
223:4;224:24;225:1;
228:12
**Rosendo (7)**
  153:9,12,14,18;
  155:16;170:25;
  171:11
**rotate (2)**
  28:11,15
**roughly (2)**
  25:13;38:12
**round (2)**
  35:14;193:22
**row (2)**
  200:8,9
**Rueckert (36)**
  11:12,15;34:1;
  35:16;36:23;52:11,
  11;78:23;82:1,9,14,
  19;83:6,9;85:16;86:8,
  20;87:5,9,17;122:16,
  24;123:18,21,24;
  142:16;145:17,22;
  146:24;163:8,15;
  164:6;176:16;180:18,
  22;181:7
**Rueckert's (1)**
  215:20
**ruled (1)**
  169:14
**rumors (1)**
  199:24
**running (1)**
  142:24
**Rush (1)**
  21:17
**Ryan (1)**
  25:7

## S

**safe (1)**
  219:5
**salary (1)**
  55:15
**sales (1)**
  135:23
**Sam (22)**
  23:2;52:23;181:18,
  19,23;182:17;183:1,7,
  21;184:4,17;185:19,
  21;186:5;187:3,8;
  205:22,24;206:2,5,8;
  226:9
**same (31)**
  8:11;10:5;28:15;
  30:8;43:5,19;46:22;
  52:18;53:10;88:2;
  94:22;102:8,23;
  103:20,25;125:11,20;
  131:23,25;132:17;

135:18;136:3;160:19;
166:7;167:8;173:12;
180:9;191:10,15;
194:25;203:5
**Sampilla (3)**
  37:9,25;38:20
**S-a-m-p-i-l-l-a (1)**
  37:10
**Sam's (1)**
  185:21
**Sanchez (2)**
  189:16,23
**sandbagging (1)**
  112:11
**Sara (1)**
  5:21
**sat (2)**
  36:17;69:9
**satisfied (1)**
  93:3
**satisfy (1)**
  168:25
**saw (6)**
  95:17;137:4;
  184:14;206:14,18;
  225:12
**saying (7)**
  43:13;91:24;92:5,5,
  7;149:6;196:7
**scenario (1)**
  186:22
**scene (7)**
  96:3,3;123:14;
  130:25;131:13,19;
  133:3
**scheduled (1)**
  17:18
**schemes (1)**
  183:24
**school (7)**
  20:6,10;21:24;35:2,
  4;117:3;223:15
**Schultz (2)**
  167:25;169:14
**scope (1)**
  15:20
**scratch (1)**
  168:5
**screen (1)**
  201:15
**se (1)**
  38:3
**search (2)**
  148:18,20
**seated (1)**
  167:9
**seating (1)**
  51:19
**second (20)**
  7:18;47:23;50:15,
  18;65:20;80:23;
  90:18;116:18,23;
  132:5;148:15;172:1,

23;173:11;188:16;
206:1,8;207:9;220:8,
14
**secret (2)**
211:13,18
**secretarial (2)**
36:18;51:18
**secretary (1)**
55:13
**sections (1)**
79:16
**securing (1)**
190:3
**seeing (4)**
115:9;133:18;
157:13;206:17
**seek (1)**
178:24
**seeking (3)**
76:25;165:22;
179:19
**seem (4)**
140:24;190:9;
191:11,13
**seems (2)**
57:14;60:18
**selection (1)**
155:25
**self-incriminating (1)**
75:18
**semester (1)**
21:23
**send (1)**
18:24
**sense (5)**
15:13;40:14;41:19;
49:2;53:23
**sent (5)**
17:25,25;50:1;
106:17;147:15
**sentence (2)**
13:14;91:18
**sentenced (1)**
118:3
**sentences (1)**
174:19
**sentencing (7)**
63:17,21;64:4;
88:24;93:7;94:16;
136:13
**separate (4)**
10:13;60:10;72:7;
103:20
**separated (1)**
51:1
**September (4)**
140:19;141:3,18;
162:22
**Sergeant (7)**
7:8,14;37:10;39:7;
53:6;108:12;129:21
**serial (2)**
200:19,22

**series (1)**
216:1
**serious (2)**
134:4;186:15
**seriously (1)**
25:12
**serve (1)**
140:16
**service (1)**
140:7
**services (1)**
68:6
**session (1)**
185:4
**set (4)**
48:11;71:11;78:19;
171:23
**settlement (3)**
163:7,13;164:5
**seven (1)**
10:24
**Several (6)**
34:7;76:21;82:22;
159:16;167:16;
185:12
**severed (1)**
155:11
**severity (1)**
75:19
**sex (1)**
31:23
**sexual (1)**
31:20
**shape (1)**
95:6
**share (5)**
51:14;53:18;54:16;
55:8,11
**shared (6)**
36:24;51:24;52:22;
55:11,13,16
**sharing (1)**
53:24
**sheet (2)**
135:9;151:12
**sheets (1)**
133:18
**Sheriff (1)**
40:20
**sheriffs (1)**
41:25
**Sheriff's (1)**
37:12
**shift (3)**
26:7;28:15;191:16
**Shim (3)**
52:23;167:6;168:20
**shirts (1)**
39:12
**Shlifka (7)**
154:8,25;156:1;
157:17;159:14;
166:12;167:11

**Shlifka's (1)**
157:14
**shooter (2)**
74:7;95:15
**shooters (1)**
106:6
**shooting (3)**
95:5;130:5;131:8
**shop (1)**
48:11
**short (1)**
194:23
**shorthand (1)**
217:24
**shortly (2)**
36:2;182:4
**shots (3)**
130:16;132:12;
186:21
**show (2)**
171:24;196:16
**showed (3)**
125:19;196:14;
215:18
**shown (2)**
84:25;128:1
**side (20)**
24:9,10,10,11;
25:20,22,22,24;26:3,
5;28:16,16,16;40:5;
54:22,23;73:2;92:4;
143:9;152:1
**sign (2)**
128:20,21
**signature (6)**
59:12;64:19,24;
139:25;143:6;188:17
**signed (3)**
128:22;129:21;
196:20
**significant (1)**
149:8
**similar (2)**
155:10;218:18
**single-sided (2)**
80:8,13
**Sister (4)**
25:7;71:23;85:23;
131:23
**sister-in-law (2)**
53:1,2
**sisters (1)**
166:4
**sister's (1)**
130:17
**sit (9)**
75:3;78:6;115:24;
119:22;133:8;152:13,
19;218:20;222:25
**sitting (2)**
168:1;226:23
**situation (3)**
92:16,18;179:8

**six (5)**
26:12,15,25;
159:17;160:4
**six-person (1)**
25:18
**sixth (1)**
206:5
**size (1)**
99:13
**Skokie (1)**
17:10
**slammed (1)**
73:4
**slow (1)**
50:3
**slurring (1)**
165:18
**small (4)**
26:1;36:16;51:18;
141:24
**smart-ass (1)**
107:20
**Smilin' (1)**
21:17
**socialize (2)**
191:19,21
**socially (1)**
137:4
**solo (5)**
48:17;50:11,20;
51:7,8
**somebody (8)**
41:22;45:17;48:16;
97:13;115:14;155:18;
169:12;187:5
**someday (1)**
93:2
**somehow (2)**
114:8;163:25
**someone (5)**
132:10;135:21;
137:2;196:14;208:3
**sometime (9)**
30:19;32:20;33:4;
56:18;57:15;59:2;
82:12;155:24;158:25
**Sometimes (3)**
44:20;106:18;
121:12
**somewhere (7)**
11:16;23:5;42:24;
48:11;93:3;120:23;
220:7
**son (8)**
50:15,18,22;78:15;
82:20;92:11,15;
171:12
**sophisticated (1)**
97:24
**Sorry (20)**
37:24;87:15;89:10;
116:23;129:23;
135:22;138:12;148:2,

**7**;151:2;162:10;
163:14;175:18;
180:12;183:20;
188:25;203:3;219:18;
220:18;221:1
**sort (12)**
28:11;40:1;81:5;
86:21;89:21;97:6;
108:11;115:11;165:3,
20;194:13;213:22
**sorts (1)**
37:17
**Sotos (2)**
5:9;12:18
**sought (3)**
15:25;72:20;73:23
**Sound (9)**
58:22;61:25;62:9;
64:5;100:10;119:24;
130:9;132:4;184:19
**sounded (1)**
132:6
**sounds (12)**
38:10;39:13;62:1;
66:25;67:1;100:11;
140:25;145:5;160:4;
178:6;199:1,2
**source (1)**
77:13
**sources (4)**
69:18,19;75:4;76:8
**South (5)**
23:18;25:24;28:16;
40:7;54:22
**space (7)**
51:14,15,24;52:22;
54:16,24;55:11
**Spanish (20)**
62:12,16,19,23;
67:14,15;68:6,16;
84:25;89:7;90:8;
117:14;181:20;215:6,
9,13;223:12,14,16,19
**Spanky (3)**
181:18;183:21;
186:3
**Spaulding (1)**
47:14
**speak (9)**
12:7,13,18;16:4;
72:3;115:4;118:1;
215:7;223:12
**speaking (11)**
67:15;68:15;86:8;
111:3;115:25;122:5;
127:10;170:10;215:3,
6;217:3
**speaks (1)**
117:13
**Special (1)**
36:10
**specialist (4)**
5:11;209:12,20;

210:8
**specialists (4)**
  39:2,5;40:6,12
**specialized (1)**
  34:17
**specialty (3)**
  37:21;40:1,4
**specific (35)**
  34:18;58:8;68:14;
  69:7;72:5;74:6;76:8;
  81:6;96:1;105:24;
  110:1;112:20;113:14;
  114:2,5;116:11;
  119:1;126:4;127:3,9,
  13;147:2;152:3;
  169:21;170:17,22,23;
  208:18;209:7;213:8,
  11;214:5;218:14;
  222:22;227:8
**specifically (36)**
  16:9;36:15;54:5;
  64:23;72:24;73:11;
  78:7;80:19;86:12,25;
  90:9;93:9,20;96:15;
  99:14;100:14;110:5;
  114:9,24,25;115:25;
  116:3;117:4;120:21;
  122:8;128:7;133:3,5;
  137:9;148:1;152:11;
  161:6,22;166:9;
  196:13;225:11
**specifics (1)**
  18:12
**Spector (2)**
  62:9;89:8
**speculate (1)**
  160:11
**speculating (2)**
  121:19,21
**speculation (2)**
  160:17;162:8
**speed (1)**
  83:3
**spell (1)**
  187:20
**spend (1)**
  191:22
**spent (3)**
  23:15;39:14;226:24
**spite (4)**
  91:24;92:15,20,22
**SPIVY (11)**
  5:21,21;39:20;41:8;
  42:9,20;106:3;223:5,
  7,11;224:21
**split (3)**
  50:9,14,19
**spoke (12)**
  15:3;17:12;19:9;
  67:11;85:15;97:11;
  122:11;130:22;
  157:17;170:5;174:1;
  224:15

**spoken (1)**
  82:11
**spot (1)**
  36:1
**spots (1)**
  35:13
**Spreitzer (3)**
  200:5;201:21;202:1
**Springs (1)**
  192:22
**spun (2)**
  174:12,12
**squad (3)**
  158:24;159:2,9
**Stack (1)**
  15:8
**staff (2)**
  55:8,12
**stamp (9)**
  60:3;61:6;65:21;
  66:1;79:18;80:21;
  98:21;99:16;197:6
**stamped (5)**
  80:15;89:19;117:7;
  196:23;217:12
**stamps (1)**
  80:1
**stand (6)**
  88:9;110:4;112:3,
  10;139:22;167:5
**start (5)**
  71:7;72:10;159:6;
  163:17;168:5
**started (13)**
  33:1;34:16;35:22;
  36:2;38:11;50:3;
  51:17;82:8,17;
  113:16;155:13;
  166:25;194:19
**Starting (5)**
  72:15;81:4;100:23;
  101:12;117:7
**starts (1)**
  105:4
**State (18)**
  23:10,13,16;37:14;
  41:2,18;63:14,23;
  106:15;112:11,18;
  114:2;120:24;131:5,
  12;176:16;200:13;
  204:25
**stated (1)**
  130:11
**statement (35)**
  16:22;72:9;77:7,18;
  96:5,6,11;100:1;
  109:18;110:14;112:8;
  115:3;116:2;121:13,
  15,24;123:15;124:11,
  13,24;125:12;128:11,
  11;129:24;132:22;
  136:24;167:1;178:11,
  12,20;179:24;214:15,

15;216:18;222:11
**statement-only (1)**
  121:12
**statements (21)**
  64:15;65:10;67:3;
  68:22;69:14;72:20;
  73:23;74:14,15;
  75:10,17,23,24;77:24;
  82:5;99:25;120:16,
  17;133:21;157:14;
  179:6
**States (3)**
  5:3;16:21;140:16
**state's (78)**
  5:21;8:2;13:1;
  15:10,14,18,23,25;
  20:15,23;21:19;22:6,
  11;25:25;26:21;27:5;
  28:7;34:4,12,22;
  35:21;37:3,6;39:18;
  44:12;47:17,21;
  48:20;52:6,12;56:15;
  57:1;62:6;81:21;
  83:23;84:11;91:21;
  102:2;105:19,24,25;
  106:4,18;111:19;
  113:12;115:10;
  121:16,22,23,24;
  122:1;124:16;131:16;
  161:14;169:9;173:14,
  25;179:12;180:3;
  181:24;182:5;189:8;
  191:4;193:21;194:16,
  21;202:9;208:20,24;
  209:23;210:9,11;
  213:23;217:15;218:9,
  22;226:21,25
**status (2)**
  14:21;44:24
**stay (3)**
  50:25;140:7;168:6
**stayed (1)**
  51:2
**stays (1)**
  103:23
**Steve (2)**
  6:23;145:17
**Steven (3)**
  163:8,15;164:5
**still (13)**
  15:2;26:10;87:8;
  118:14;158:13;
  176:12;188:19;191:6;
  193:16,21;194:22;
  202:23;209:5
**story (4)**
  110:6,16;111:24,24
**straight (2)**
  36:9;106:6
**strategic (2)**
  110:11,24
**strategizing (1)**
  213:10

**strategy (4)**
  120:10;126:12,25;
  131:12
**Street (23)**
  14:20;21:17;22:13;
  31:12;47:4;56:4;
  69:25;70:1,8;71:17;
  92:22,23;101:18,19;
  102:3,12;104:6;
  137:3;191:23;195:9;
  204:16,18;223:2
**stretch (1)**
  128:15
**strike (18)**
  11:23;13:12;51:7;
  53:24;55:9;58:16;
  95:25;96:9;103:6;
  107:1,2;123:20;
  132:18;145:3;149:7;
  156:24;158:3;159:5
**stripes (1)**
  39:12
**struck (2)**
  134:23;135:3
**structure (1)**
  49:15
**structured (1)**
  25:17
**struggles (1)**
  162:5
**Study (1)**
  18:5
**stuff (1)**
  101:10
**subject (2)**
  136:9;153:3
**subjects (1)**
  132:9
**suborn (2)**
  87:10,25
**subpoena (1)**
  106:13
**subpoenas (1)**
  106:17
**subsequent (1)**
  72:16
**subsequently (1)**
  181:1
**substantive (2)**
  62:18;97:22
**substitution (1)**
  145:13
**suburbs (1)**
  192:21
**sued (1)**
  159:16
**suffering (1)**
  92:1
**suffers (1)**
  92:10
**suggesting (1)**
  163:23
**suggestion (1)**

169:2
**suggestions (1)**
  75:15
**suit (5)**
  153:9;165:2,6;
  171:1,3
**Suite (2)**
  5:9;48:15
**summarize (1)**
  25:17
**summary (1)**
  117:17
**summer (1)**
  193:10
**sup (4)**
  119:6;129:8;
  219:14,23
**superseding (1)**
  65:5
**supervisor (5)**
  22:23;24:4,5;25:5;
  34:20
**supplemental (1)**
  106:23
**supplementary (1)**
  218:7
**supplier (1)**
  184:18
**suppliers (1)**
  184:5
**support (21)**
  55:8,12;137:23,25;
  140:12,13;141:2,7;
  142:19,22;143:1;
  145:8;146:10;147:10;
  157:22,25;158:3,7;
  169:8;170:11,20
**suppose (1)**
  46:2;222:8
**supposed (2)**
  45:10;133:23
**suppress (11)**
  64:15,25;65:9;
  66:10,23;67:3;68:22;
  69:14;77:23,24;82:4
**suppressed (3)**
  72:21;73:23;77:19
**suppression (4)**
  85:17,21;86:10;
  109:19
**sure (87)**
  7:8;8:20;9:9;10:25;
  13:16,19;14:5;15:5;
  22:16;28:2,14;29:14;
  30:3,20;36:8;49:25,
  25;51:12;53:4;54:6;
  55:21,23;57:13;
  60:14;63:18,23;67:6;
  68:25;69:21;72:6;
  80:25;83:8,24;85:18,
  19;86:7,25;87:2;89:2;
  96:14;97:4,19;98:2;
  103:19,19;108:3;

113:2,22;115:5;
116:12;117:2;120:1,
12;122:8,11,15,23;
124:13;131:1;133:19;
138:20;142:2;144:22;
146:1,7;150:1,9;
154:23;170:1;175:24;
181:22;187:6;191:24;
193:23;198:2;202:18;
203:11,22;205:13;
206:17,18;207:11;
222:9,14,15;224:1;
227:1
**surgery (3)**
78:17;82:23;192:14
**surprise (2)**
25:10;163:22
**surrounding (1)**
23:14
**suspect (4)**
94:8;179:5;209:25;
210:24
**Swano (7)**
55:23;56:5,17;
57:17,22;76:24;77:6
**swear (1)**
6:7
**switch (2)**
80:7;136:9
**sworn (2)**
6:9;21:10
**system (1)**
104:11

## T

**table (2)**
41:5,13
**talk (8)**
33:16,18;47:13;
67:20;115:5;214:6;
222:24;225:2
**talked (10)**
18:16;86:13;
113:15;116:12;118:6;
125:22;206:22;211:7;
226:3;227:11
**talking (11)**
86:12;93:15;131:7,
20;132:19;133:5;
137:9;142:12,14;
146:24;179:11
**targeting (1)**
40:4
**task (1)**
37:17
**team (1)**
101:16
**teams (4)**
25:18;26:12,14,15
**telephone (7)**
73:1,4;130:18;
132:1,13;208:3,4

**telling (9)**
96:16,24;119:2;
126:18;175:6;209:13,
23;210:7;214:13
**tells (1)**
167:11
**temps (1)**
168:2
**ten (2)**
155:13;187:2
**tend (1)**
107:19
**tender (2)**
102:1,1
**tendered (1)**
63:13
**tendering (2)**
114:20;117:2
**term (2)**
102:18,20
**terms (8)**
40:5;45:12;48:7;
50:13;104:24;131:11;
213:10;223:18
**testified (19)**
6:10;7:24;85:21;
86:2,3,9,10;95:14,16;
107:1;109:19;110:9;
112:4,6,6;114:7;
156:4;173:18,25
**testify (26)**
8:5;16:1;74:24;
87:19;88:6;109:14,
16,17,21,24;111:4,16,
17,21;112:2,19,24,25;
113:2,5,13;114:10,12,
13;120:25;126:22
**testifying (4)**
16:23;71:25;
110:25;114:4
**testimony (22)**
86:17;88:8;89:22;
90:6;99:22;110:5;
145:7;155:25;174:9,
20;177:16,17,21,24;
178:3,4;202:16;
205:11;213:6;215:17,
22;216:5
**testing (1)**
78:19
**Thampy (1)**
89:22
**theories (1)**
71:11
**theory (1)**
69:24
**therefore (2)**
72:23;75:13
**thin (1)**
69:2
**thinking (2)**
78:13;119:25
**third (4)**

24:20;36:21;78:15;
220:8
**though (14)**
8:17;11:7;13:20,24;
28:3;29:24;30:16;
84:2;94:24;121:19;
123:23;131:3;146:11;
186:16
**thought (6)**
45:7;103:25;
120:10;142:12;170:7;
213:25
**thousands (1)**
218:11
**threatened (2)**
126:14,19
**threats (3)**
75:12,13;116:6
**three (10)**
14:19;23:12;27:6;
31:9;36:24;51:17;
112:15;200:15;
213:20;226:11
**throughout (1)**
23:14
**throw (1)**
214:3
**thumb (2)**
79:15;81:5
**thus (1)**
173:19
**Timber (1)**
192:19
**timeline (1)**
57:13
**timeout (1)**
25:9
**times (9)**
7:20,22;14:19;80:2;
90:19;131:19;132:10;
144:15;192:23
**Tino (5)**
113:24;119:18;
120:19;125:17,18
**today (22)**
8:9;9:11;12:9;
47:13;63:8,11;75:3;
78:6;115:24;133:8;
152:13,19;164:24;
218:20;219:5,16;
221:5,11;222:25;
224:17;226:4,7
**Today's (2)**
5:5;13:6
**together (13)**
33:2;35:2,24;36:25;
84:2;92:20;95:18;
122:11;167:6;191:16;
193:12,22;228:2
**told (22)**
74:6;95:4;96:2;
110:10;113:12;
117:18;118:25;119:8;

125:22;169:1;174:9,
15,21,22;178:25;
210:17;212:23;215:2;
216:7;221:19;222:3,5
**Tom (4)**
44:2;52:1,3;54:19
**Tommy (3)**
200:5;201:22,25
**Tom's (1)**
54:24
**tone (1)**
105:15
**took (7)**
9:12,13;16:22;21:6;
25:12;31:21;33:2;
34:14;52:14,19;85:4;
96:5;100:25;111:7;
124:3
**top (7)**
73:2;80:15;82:3;
100:23;101:12;
153:25;182:23
**topic (1)**
213:1
**Torrence (1)**
134:10
**total (1)**
130:14
**tour (1)**
29:18
**towards (3)**
117:5;125:10;
220:23
**Townsend (4)**
45:9,10,14,15
**tradition (1)**
193:24
**Trails (1)**
192:19
**transcript (19)**
17:22;18:3;61:20;
62:2,12;70:11;80:14;
88:15,23,24;94:15;
98:13;112:22;154:1;
156:10;164:11;
177:25;188:4;215:25
**transcripts (8)**
85:11,13,14;86:7;
99:13;109:3;177:22;
195:17
**transferred (2)**
23:17;204:22
**trial (55)**
10:12,19;16:23;
22:17;23:11;31:6,8,8,
9;63:10,12;75:14;
85:11;86:14;95:12;
97:20;98:24;109:14,
25;111:8;112:13;
115:12,22;118:1;
120:6,15,25;122:7,9,
12;123:2,11,11;
130:23;131:5;155:1,

9,11,12,14;166:21;
167:1;169:20,25;
170:21;171:19,23;
182:14;187:18;190:2;
197:19;199:16;
202:14;205:9;226:9
**trials (3)**
10:13;24:13;212:12
**tried (12)**
28:13;46:16,25;
48:1,4;49:14;51:21;
87:2;110:15;115:14;
147:13;222:7
**triggers (1)**
175:19
**triple (1)**
60:10
**trouble (1)**
201:17
**true (9)**
49:1;88:2,4,10;
91:4;136:3;161:13;
199:25;214:17
**truth (4)**
92:21,23;93:2,2
**try (7)**
10:11,14;23:19;
25:18;26:9;33:16;
47:8;50:16;53:16;
67:12;121:12,18;
133:3;142:2;172:7;
185:25;222:18
**trying (16)**
49:16;57:12,25;
90:19;92:19;120:22;
129:1;130:12;131:10;
142:21,21;146:9;
147:23;174:11;
185:15;220:11
**Tsukuno (1)**
33:24
**turn (3)**
63:1;81:10;98:22
**turned (2)**
128:8;185:15
**twice (3)**
14:19;142:24;
193:10
**two (38)**
10:13;18:19;23:15;
25:19;26:8,15;28:7;
37:5,11,12,13,23;
60:10;63:12;65:1;
78:15,22;106:2,4;
112:12;121:22,23;
123:24;125:22;130:9;
132:4;133:6,15;
151:10;152:9;162:15;
163:20;174:19;219:1;
223:14;226:10;
227:20,24
**tying (1)**
123:13,14

**type (12)**
15:21;31:16;49:19;
87:9,18;105:25;
132:6;134:3;135:18;
141:2;148:16;160:4
**types (3)**
217:20;218:2,12
**typically (2)**
44:18;214:6

## U

**ultimately (8)**
52:19;58:9;77:22;
164:5;168:7;171:4,
20;185:14
**Um-hmm (9)**
53:11;65:18;99:20;
105:8;129:12,22;
131:17;162:21;
173:24
**unable (2)**
11:19;60:17
**under (16)**
7:25;8:5,8;14:13;
32:22;52:9,10;53:8;
95:18,19;98:24;
109:17;111:24;116:1;
125:12,23
**undercover (2)**
185:15;186:20
**underlying (1)**
58:18
**understood (6)**
9:4;11:6;42:2;
143:2;151:7;201:18
**Unit (39)**
30:25;31:1,10,17;
32:3,21;33:2,6,21;
34:4,10,15,16,24;
35:8,10,12;35:5;
38:2,17,19;39:19;
40:12,20;42:1,2,7;
44:13;46:6;48:21;
161:20;173:23;
175:10,23;176:13;
177:5;179:25;191:10;
194:25
**United (1)**
5:3
**units (1)**
34:17
**universities (1)**
52:16
**unless (1)**
74:18
**unpaid (1)**
20:14
**unrelated (1)**
196:5
**unreliable (1)**
75:14
**untruthfully (1)**

88:7
**up (41)**
11:3;12:3;22:16;
25:1;33:8;35:14;
37:14,22;48:11,16;
50:3,14,17;52:8;64:3;
66:11;76:3;78:20;
83:3;92:11;97:10;
110:15;114:8,10;
116:13;124:8;127:22;
169:20,25;171:24;
179:4;180:6,24;
198:4;199:25;200:7;
208:16;210:22;
220:10;221:20;222:4
**upfront (1)**
106:5
**upon (2)**
11:13;73:3
**upset (2)**
43:8,10
**upstairs (2)**
97:11;167:11
**use (16)**
62:19;67:19;68:16;
75:14;97:25;101:6,
11;102:11;116:25;
126:12;131:15;
134:19;135:23;198:1;
218:4;225:12
**used (10)**
62:16,16,20;85:1;
104:11;125:20;
126:25;180:6;181:14;
224:2
**useful (1)**
39:17
**using (1)**
51:20
**usual (1)**
32:14
**utilize (1)**
68:5

## V

**vacated (1)**
13:15
**valuable (2)**
41:19;42:13
**value (1)**
42:1
**varied (1)**
44:20
**various (3)**
41:20;46:13;52:16
**vehicle (3)**
162:24;174:12;
214:10
**Velez (3)**
172:25;184:19;
185:1
**versus (1)**

90:8
**vice (1)**
20:2
**victim (2)**
172:24;192:25
**victims (2)**
133:11,16
**video (2)**
5:11,13
**VIDEOGRAPHER (11)**
5:1;6:6;79:7,12;
138:22;139:4;198:9,
14;225:19,24;228:13
**video-recorded (1)**
5:7
**violent (2)**
31:24;75:22
**virtue (1)**
33:10
**visit (1)**
108:10
**visiting (1)**
224:7
**voice (2)**
132:5,6
**voices (1)**
130:10
**voluntarily (1)**
169:3
**voluntary (1)**
168:3
**vs (5)**
5:2;138:9;139:9;
152:22;172:19

## W

**wait (2)**
8:24;138:15
**waivable (1)**
168:15
**waive (4)**
76:13;94:7;168:21;
169:24
**waived (2)**
93:25;214:12
**waiver (2)**
93:23;94:9
**walk (2)**
36:8;54:23
**walked (1)**
118:9
**wall (1)**
54:22
**wants (3)**
91:13;107:18;
167:12
**Ware (2)**
129:11,13
**way (24)**
9:17;18:24;21:13;
26:21;33:3;43:3;
45:10;49:14;53:25;

83:19;85:2;95:6,11;
98:24;101:18,23;
121:18;125:8;149:13;
181:11;208:16;
212:12;222:11;227:6
**Weber (1)**
186:9
**weddings (1)**
192:8
**Wednesday (1)**
13:6
**week (4)**
17:1,3,12;224:16
**weeks (1)**
7:3
**Wentworth (3)**
26:2;27:10;29:16
**weren't (9)**
57:24;84:1;106:21;
113:12;120:25;121:3,
6,8;196:7
**West (10)**
5:9;19:25;25:22;
26:2;28:16;40:7;
130:2,5;192:20,21
**Western (7)**
19:23;26:6;27:19,
22,24;29:5;192:22
**Wharrie (3)**
33:24;34:25;36:20
**what's (10)**
14:22;32:23;42:22;
62:18;98:19;113:19;
143:13;145:14;
154:17;160:18
**whenever (3)**
29:20;52:16;100:16
**wherein (2)**
211:17;212:23
**Whereupon (26)**
59:6;61:1;64:11;
65:13;79:2,9;80:10;
98:16;114:17;134:7;
138:5;139:1;143:11;
148:5;150:17;153:23;
156:18;171:7;172:16;
176:4;188:6,10;
196:18;198:11;217:8;
225:21
**wherever (2)**
146:3;197:25
**white (1)**
141:12
**whited (2)**
141:10,10
**who'd (1)**
45:13
**whole (5)**
38:24;110:13,16;
123:12;222:11
**who's (2)**
113:17;187:24
**Whose (1)**

24:17
**wife (8)**
74:9;75:21;78:14;
82:21;95:15;138:19;
149:8;163:19
**wife's (1)**
162:14
**Wiley (1)**
218:19
**Wiley's (1)**
134:10
**William (2)**
56:5;76:24
**Willie (1)**
129:10
**willing (3)**
68:11;121:17;
168:21
**win (1)**
214:1
**winning (2)**
167:23;199:15
**Wisconsin (1)**
19:23
**wit (1)**
74:5
**withhold (1)**
129:1
**withholding (2)**
140:7,17
**within (5)**
13:9;101:21;
120:23;218:3;219:4
**without (7)**
71:12;77:12;
101:23;115:7;158:17;
168:4;213:21
**witness (41)**
6:7,9;12:5,5;43:24;
64:9;68:2;70:21;71:3;
74:23;81:9;84:7;85:9;
87:19;88:3;98:5;
105:5;108:7;115:15;
120:8;122:5;138:18;
142:7;143:10;148:10;
153:2;155:25;156:3;
161:4;162:11;167:5;
170:8;172:6;179:12;
180:14;193:3;197:24;
198:5;211:3;228:11,
15
**witnessed (2)**
100:7;225:7
**witnesses (5)**
88:11;99:8;112:12;
156:4,6
**woman (1)**
147:14
**women (2)**
142:20;166:5
**won (3)**
190:7,9;202:14
**wondering (2)**

41:10;145:2

**word (1)**
8:4
**words (1)**
137:1
**work (26)**
20:4,17;29:20,20;
31:13;33:22;42:15;
43:21;44:2,19;45:10;
48:17;49:8,19;53:14;
56:9,23;84:11;
104:23;106:18;
111:18;137:5;164:10;
166:6;191:10;194:25
**worked (24)**
20:18;24:19;26:12,
14,15;29:18,19,23;
33:6;35:20,23;37:2;
38:1;39:18;51:10,24;
54:12;55:16;56:15;
84:13;104:22;107:6;
167:6;186:13
**workers (2)**
42:13;49:19
**working (14)**
28:14;29:12;33:3;
44:13;47:3;50:18;
51:6,8;103:22;
105:20;108:25;
116:24;184:13;
191:15
**workings (1)**
46:13
**works (1)**
101:16
**worried (1)**
113:25
**worry (1)**
123:13
**worse (2)**
136:6;199:9
**Write (2)**
103:9,9
**writing (3)**
59:11;145:23,23
**written (3)**
83:15;92:6;114:15
**wrong (6)**
60:16;66:13;98:11;
104:1;145:17;220:14
**wrote (1)**
136:12

---

**Y**

**Yates (1)**
24:19
**year (8)**
11:2;13:10,10;
16:13;20:8;23:24;
24:1,23
**years (13)**
10:24,24,25;19:7,

---

12;50:24;82:25;
112:15;159:17;
162:15;193:10;
223:14;227:7
**Yep (2)**
129:9;151:8
**yesterday (1)**
9:20
**younger (3)**
44:6,9;83:25

---

**0**

**000007 (1)**
219:24
**063057 (1)**
139:20

---

**1**

**1 (10)**
25:24;26:1;27:2,12,
13;29:7;59:6,9;117:7;
174:2
**1:29 (2)**
138:23;139:1
**10 (5)**
98:25;143:11,14;
147:22;193:10
**10:23 (1)**
5:6
**10:30 (1)**
167:9
**11 (4)**
132:3;148:5,10,13
**11:57 (2)**
79:8,10
**11th (3)**
23:10,13,16
**12 (2)**
150:17,22
**12:09 (2)**
79:10,13
**121964 (1)**
197:2
**1240A (1)**
5:9
**12706 (2)**
61:7;89:13
**12712 (1)**
89:20
**12723 (1)**
90:13
**12724 (1)**
91:8
**12746 (1)**
61:7
**12-hour (1)**
26:7
**13 (2)**
51:3;153:23
**1340 (1)**
23:18

---

**13th (4)**
36:6;175:10;179:4;
210:9
**14 (5)**
54:24;55:1;156:18,
21;176:9
**141 (1)**
5:9
**1410 (2)**
48:14,15
**14th (1)**
54:20
**15 (2)**
171:7;193:10
**15- (1)**
211:11
**15th (6)**
101:1;104:24;
105:12;107:5;108:22;
109:9
**16 (5)**
62:3;64:4;172:16;
196:23;197:6
**17 (4)**
145:10;176:3,4,6
**18 (3)**
29:10;188:6;189:2
**18-CV-02342 (1)**
5:5
**18th (2)**
78:21;82:20
**19 (2)**
188:10,13
**198 (1)**
30:15
**1980 (7)**
20:9;21:7,12,13;
32:21;33:2;34:12
**1981 (1)**
23:9
**1982 (6)**
24:7,24;25:13,16;
27:22;28:3
**1983 (4)**
24:25;32:3;36:5;
38:16
**1984 (1)**
172:25
**1985 (3)**
158:10,12,21
**1986 (4)**
173:3;174:1,7;
176:9
**1987 (1)**
182:10
**1988 (2)**
182:10;196:3
**1990 (4)**
58:20;104:12;
117:12;129:17
**1991 (3)**
190:3;196:24;197:7
**1992 (3)**

---

59:17;60:3;64:3
**1993 (1)**
145:10
**1994 (3)**
66:21;140:19;
162:23
**1995 (8)**
62:3;64:5;78:15;
81:18;98:25;158:25;
159:3,9
**19955 (2)**
79:21,23
**1st (7)**
107:5,8,9;108:14,
22;109:9;163:2

---

**2**

**2 (13)**
25:23,25;26:1;
27:12,13;29:7;61:1,5;
63:4;88:14,17;89:11,
12
**2:01 (2)**
139:2,5
**20 (2)**
19:12;196:18
**2000 (2)**
117:12;154:1
**2000s (1)**
19:12
**2012 (1)**
51:3
**2015 (2)**
15:17;18:22
**2019 (2)**
5:5;13:10
**2038 (1)**
156:15
**20388 (1)**
157:19
**20-year (1)**
211:12
**21 (2)**
217:8,11
**219 (1)**
80:15
**22 (2)**
117:12;173:3
**2200 (1)**
125:11
**229 (3)**
80:21;81:4,11
**22nd (1)**
72:17
**24 (2)**
174:1,6
**240 (1)**
84:17
**2400 (2)**
130:9;132:3
**25 (2)**
66:21;129:17

---

**25th (1)**
45:16
**26 (2)**
23:16;135:16
**26th (19)**
13:18;14:20;20:15;
22:13;26:3;27:14;
31:6,12;56:4;69:25;
70:1,8;71:17;110:7;
137:3;191:23;195:9;
204:16,18
**27 (1)**
135:16
**28 (1)**
162:22
**2nd (1)**
108:15

---

**3**

**3 (8)**
25:23;26:3;27:17,
18;64:10,11,14;
147:22
**3:17 (2)**
198:10,11
**3:28 (2)**
198:12,15
**30 (4)**
5:5;140:19;186:19,
23
**302 (7)**
18:22;184:11,15,
17,24;185:3;195:10
**30th (1)**
141:18
**31st (1)**
81:17
**321 (1)**
23:18
**33 (2)**
147:23,24
**3419 (1)**
130:2
**3428 (1)**
130:5
**35 (1)**
48:8

---

**4**

**4 (8)**
25:23;26:3;27:17,
18;65:13,15,17,24
**4/25/94 (2)**
66:11,16
**4:03 (2)**
225:20,21
**4:10 (2)**
225:22,25
**4:13 (1)**
228:14
**40 (1)**

---

48:8

**5**

**5 (23)**
25:21;26:5,16;
27:19,21,23;28:1,3;
59:17;60:3;64:3;
65:21;66:2;75:7,22;
79:2;80:10,13;98:9;
100:6;101:16;107:10;
128:1
**50 (2)**
107:6;227:2
**50s (1)**
177:2
**51 (11)**
117:8;118:13,14;
219:21,22,25;220:1,3,
4,16,24
**51st (3)**
26:1;27:9;29:15
**52 (2)**
125:8;220:20
**53 (1)**
127:23
**55 (2)**
129:5,6

**6**

**6 (17)**
25:21;26:5,17;27:2,
20,21,24,25;28:5;
72:11,15;98:16,20;
125:23;172:25;
186:19,23
**60 (1)**
107:7
**60s (1)**
177:2
**66 (1)**
45:3
**6626 (1)**
188:14

**7**

**7 (3)**
114:17;219:21,22
**70s (1)**
194:20
**739 (1)**
98:21
**774 (1)**
99:16
**78 (1)**
32:18
**787 (4)**
100:16,18,24;105:3
**789 (4)**
101:11;104:17;
105:4;216:1

**79 (1)**
32:18
**798 (2)**
108:5,6

**8**

**8 (4)**
32:20;75:24;134:7,
9
**80 (4)**
20:5;22:8;32:18;
166:25
**80s (7)**
30:20,20;45:8;
56:18;183:3,22;
194:24
**81 (2)**
22:22;23:4
**82 (4)**
24:2;25:2,3;201:2
**83 (5)**
30:15;33:4;38:13,
14;46:12
**83-year-old (1)**
23:2
**84 (1)**
30:15
**87 (9)**
38:9,16;46:12;
47:18;48:11;55:6;
100:17;139:18;
140:23
**874 (1)**
217:12
**88 (1)**
52:13
**881 (1)**
217:12
**89 (1)**
52:14

**9**

**9 (6)**
105:4;138:5;139:8;
154:1;201:1,2
**9/30/94 (1)**
141:16
**9:30 (1)**
72:17
**90 (8)**
20:5;61:21,24,24;
157:23;166:25;168:2;
188:14
**90s (6)**
49:10;53:4;137:21;
185:10;198:21;
199:20
**91 (4)**
49:11;50:9;51:24;
52:19
**91- (1)**

197:1
**92 (7)**
49:11;52:20;59:2;
61:18;136:13;144:7;
157:24
**93 (1)**
59:2
**94 (3)**
82:13;141:3,18
**95 (4)**
51:25;78:21;
136:14,17
**97 (1)**
55:6

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 56

```
 1  STATE OF ILLINOIS   )
                        )    SS.
 2  COUNTY OF C O O K   )

 3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
    THE PEOPLE OF THE   )
 5  STATE OF ILLINOIS   )
                        )    Case No. 92-10146
 6      VS              )
                        )    Before JUDGE LORETTA H. MORGAN
 7  JOSE MAYSONET       )                (And a Jury)

 8                      AUGUST 11, 1995

 9

10      Court convened pursuant to adjournment.

11      Present:

12          HONORABLE JACK O'MALLEY,
                State's Attorney of Cook County, by
13          MS. ELLEN MANDELTORT, and
            MR. FRANK MAREK,
14              Assistant State's Attorneys,
                appeared for the People;

15          MR. RICHARD BEUKE,
                appeared for the defendant.

16

17

18

19

20

21

22

23  Paul P. Marzano, CSR, RPR
    Official Court Reporter
24  2650 S. California, Room 4C02
    Chicago, IL  60608
```

P-1

MAYSONET 1029

&

1                    I N D E X

2

3 DATE:   8/11/95

4

5 PAGES:   P-1 through P-99

6

7 Jury Trial

8

9 Exhibit Conference.....3

10

11 Closing Argument by:

12

13         Mr. Marek....7

14         Mr. Beuke......25

15         Ms. Mandeltort......58

16

17 Verdict.....94

18

19

20

21

22

23

24

                P-2

```
1                              INDEX

2    Date: September 8, 1995

3    Page: Q-1 through Q-5

4

5

6    Continuance------------------------3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Q 2

MAYSONET 1031

Ñk12.6H

```
1                        I N D E X

2    CASE NAME: PEO VS. JOSE MAYSONET

3    CASE NUMBER: 92 CR 10146

4    DATE HEARD: 9/28/95

5    PAGES: R-1 TO R-4

6

7    CONTINUED BY AGREEMENT TO 10/6/95....PG. 3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24


                         R-2
```

MAYSONET 1032

1   Date of Hearing:   10-6-95

2   Page No.   1-S to 5-S

3

4                                   I-N-D-E-X

5

6   Continuance.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

S-2

MAYSONET 1033

1                                    I N D E X

2

3 DATE:   10/16/95

4

5 PAGES:   T-1 through T-33

6

7 Sentencing

8

9 Motion for New Trial.....4

10

11 Aggravation....20

12

13 Mitigation.....22

14

15 Sentence......25

16

17

18

19

20

21

22

23

24

MAYSONET 1034

1          THE SHERIFF:  Court is in session.

2          THE COURT:   We do need to get one thing on the

3    record.

4               This is the People versus Jose Maysonet.

5    To recap, People's 1 through 26 and 28 through 31

6    were received by the Court in evidence.

7               We did have an informal conference last

8    night relative to which of those exhibits was going

9    to be allowed to go back to the jury.

10              Everybody sort of check with their own list

11   to make sure I get this right.

12              People's 1, 2 and -- 1, 2, 3, and 4 are

13   going back to the jury with no objection.

14              People's 5 is going back to the jury over

15   the objection of the Defense.  People's 6 is going

16   back.  People's 9 is going back.

17        MR. BEUKE:    Judge, over our objection,

18   People's 6.

19        THE COURT:   Oh, I'm sorry.

20        MR. BEUKE:    That's the close-up, right.

21        THE COURT:   Didn't we resolve that somehow?

22   Why are we letting--

23        MS. MANDELTORT:    Which one?

24        MR. BEUKE:    Six.

MAYSONET 1035

1    THE COURT:    That's the chest wound.

2    MR. MAREK:    Six is Kevin, Judge.

3    MR. BEUKE:    Our objection was to the blood.

4    THE COURT:    The blood.

5    MR. BEUKE:    Yes.

6    THE COURT:    People's 6 is going back over the

7 objection of the Defense.    People's 9 is going back

8 over the objection of the Defense.

9         People's 12 and 13 is going back, no

10 objection.

11         People's 14 is going back, no objection.

12 People's 16 is going back over the objection of the

13 Defense.    17, 18, and 19, going back, no objection,

14 24 going back, no objection.    25 and 26, going back,

15 no objection.    And 28 through 31 inclusive going

16 back, no objection, noting that People's 29, A and B

17 and C, that's a Group Exhibit.

18         Does that reflect the results of our

19 conference last night according to everybody else's

20 notes?

21    MR. MAREK:    Yes.

22    MR. BEUKE:    Yes, Judge.

23    THE COURT:    Very well.    I believe that the

24 deputy sheriff has informed the people in the

MAYSONET 1036

1  courtroom that I'm going to be hearing closing

2  arguments in the jury case before I do the regular

3  call.

4            If there's anyone in the courtroom that is

5  here for their regular court date or a case that's on

6  the regular call, be aware that you're certainly

7  welcome to be present during the closing argument.

8            But once the closing arguments have begun,

9  you will not be able to leave.  It's distracting to

10 the jury, distracting to the attorneys.

11           So, if you don't want to sit through,

12 approximately, an hour-and-a-half of closing

13 argument, you should go now because otherwise you're

14 trapped until the closing arguments are over.

15           There has been an agreement that each side

16 will have 45 minutes for closing argument.  I will,

17 as is my practice, give a five-minute warning if you

18 use up all of your time.

19           All right.  Is everyone in place and ready

20 to go?

21     MS. MANDELTORT:    The State's ready.

22     MR. BEUKE:    Ready.

23     THE COURT:    Let's have the jury.

24     THE SHERIFF:  All rise for the jury.

MAYSONET 1037

 1                    (The following proceedings were

 2                    had in the hearing and the

 3                    presence of the jury:)

 4        THE COURT:   Very well.

 5             Everyone may be seated.  Good morning,

 6   ladies and gentlemen.

 7        THE JURORS:   Good morning.

 8        THE COURT:   We have concluded the taking of

 9   evidence in this case, and this morning we are going

10   to be hearing the closing arguments by the attorneys

11   for each side.

12             You should, of course, remember that the

13   arguments by the attorneys are not evidence.  You've

14   heard all of the evidence, but they are important.

15             They deserve your full attention because

16   the attorneys are going to be discussing with you

17   what they feel the evidence has shown.

18             The State is going to proceed first in what

19   is called opening closing argument.

20             The Defense will then have an opportunity

21   to address you in closing argument, and then the

22   State will address you again in what is called

23   rebuttal argument.

24             Once the arguments have been concluded, the

MAYSONET 1038

1  Court will be instructing you on the law that is

2  applicable to this case, and you will be charged to

3  deliberate upon your verdicts.

4          State, are you ready to proceed?

5                  CLOSING ARGUMENT

6                  BY MR. MAREK:

7      MR. MAREK:    We are, your Honor.  Good morning,

8  ladies and gentlemen.

9      THE JURORS:    Good morning.

10     MR. MAREK:    Ladies and gentlemen, in the early

11 morning hours of May 25, 1990, two young men,

12 Torrence Wiley and Kevin Wiley, were shot to death in

13 a burst of gunfire by a Latin Kings death squad.  Two

14 more victims of urban violence, two more victims

15 gunned down on the mean streets of Chicago, two more

16 victims left to lie on the street and die in their

17 own blood.

18          One of the individuals responsible for

19 those two murders is in this courtroom, and his name

20 is Jose Maysonet.

21          Ladies and gentlemen, you heard testimony

22 about how Mr. Wiley was shot to death by the Latin

23 King death squad.  He was shot once in the neck.

24 That bullet penetrated the larynx, and he then

P-7

MAYSONET 1039

1    drowned in his own blood.  And this is how Mr. Kevin

2    Wiley was left to die at Kimball and North Avenue.

3              You also heard testimony how Mr. Torrence

4    Wiley was shot, first in the chest, and then later in

5    the genital area.  This is how Mr. Torrence Wiley was

6    left to die on the street.

7              You know, ladies and gentlemen, from the

8    evidence the sequence of events here.  Kevin Wiley

9    was shot in the neck at close range.

10             Doctor Lifschultz told you there was

11   evidence of close range firing.  You can certainly

12   infer from that that Mr. Kevin Wiley was shot first.

13   He then went to the ground.

14             The gun in the hands of his partner in

15   crime, Alfredo Gonzalez, was then turned on Torrence

16   Wiley.  Torrence Wiley was shot first in the chest.

17   And then after he fell to the ground, it wasn't

18   enough to shoot Torrence Wiley to death.  He had to

19   be mutilated as well, and then the second shot, the

20   shot to the groin area, was inflicted.

21             You know that that was very -- that that

22   was most likely inflicted while he was on the ground

23   because the bullet that strikes the groin area exits

24   the hip and is later recovered in his clothing.

MAYSONET 1040

1      Ladies and gentlemen, it's because that

2  that bullet struck the ground shortly after exiting

3  through the hip that it immediately lost its momentum

4  and remained in the victim's clothing.

5      Ladies and gentlemen, by shooting to death

6  each of these individuals, the death squad deprived

7  us of the two best witnesses against them.  The two

8  best witnesses to this crime would have been Kevin

9  and Torrence Wiley, but they're not here because they

10 were shot dead.

11      And, ladies and gentlemen, there are no

12 conventional witnesses.  There are no conventional

13 eyewitnesses to this crime.

14      It was late at night.  There was virtually

15 no vehicular or pedestrian traffic on North Avenue.

16      You heard that from the officers who

17 responded to the scene almost immediately, no

18 civilian bystanders standing on a bus stop looking

19 out of a window who happened to see the individuals

20 involved.

21      There are no witnesses in the conventional

22 or traditional sense of the word, and that's because

23 they're good at what they do.

24      This was an operation, a well-executed

MAYSONET 1041

1  operation carried out by a street gang organization,

2  and they're good at what they do.

3          The weapon was chosen by Mr. Maysonet and

4  his partners in crime.  The victims were chosen by

5  Mr. Maysonet and his partners in crime.

6          The sight of this double homicide was

7  chosen by Mr. Maysonet and his partners in crime, and

8  there are no witnesses because they didn't choose to

9  leave any behind.

10         But, ladies and gentlemen, there's one very

11 essential fact that you have to keep in mind

12 throughout the rest of this case, and that is this.

13 The criminal is always a witness to his own crime.

14     MR. BEUKE:    Objection, Judge.

15     THE COURT:    Overruled.

16     MR. MAREK:    And, ladies and gentlemen, in the

17 form of Mr. Maysonet's court-reported statement, you

18 will have a chance to read an account given by a

19 witness to this crime.

20         Is it everything that happened?  No.  It is

21 everything he chose to reveal.

22         It is what he was willing to give up as far

23 as his own participation and the participation of his

24 partners, his fellow Latin King gang members.

MAYSONET 1042

1      And, ladies and gentlemen, keep in mind why
2  it is that he gives this statement.
3      Initially, he's trying to exchange, he's
4  trying to exchange the fact that he has knowledge
5  about this crime.
6      You bet he has knowledge about this crime,
7  but he is cynically trying to exchange his knowledge
8  about this double homicide in exchange for his own
9  release from custody.
10      And then later on, when he realizes that
11  I've revealed too much, because now I've gotten
12  myself arrested and now I'm likely to take the blame
13  all by myself, Jose Maysonet is going to take the
14  blame all by his lonesome self for this double
15  homicide, and maybe it will be inferred that Jose
16  Maysonet was the shooter.
17      So, what does he immediately set about
18  doing?  Oh, no, no, Jose Maysonet is not going to
19  take the blame all by himself.
20      Jose Maysonet is going to set out on a
21  course of conduct to shift the blame onto somebody
22  else as much as he possibly can do, and that's what
23  he has continued to do, ladies and gentlemen.
24      He reveals different information at

MAYSONET 1043

1  different times, but it is always for the same

2  purpose, and that purpose is to help Mr. Jose

3  Maysonet.  It is to help himself.

4          Ladies and gentlemen, among the

5  instructions Her Honor, Judge Morgan, will give you,

6  at the end of this case, is you should consider all

7  of the evidence in the light of your own observations

8  and experience in life.  This is often called the

9  common sense instruction because that's what your --

10  excuse me -- that's what jury service is, common

11  sense business.

12          And, ladies and gentlemen, there are

13  certain features of this statement that we should

14  look at in the light of common sense.  It makes it

15  absolutely clear that this is the statement of a

16  witness to his own crime.  It is the statement of a

17  witness who is saying what he chooses to reveal.

18          On page -- page 3, after he identifies his

19  fellow offenders, his fellow partners in crime,

20  Lluvia, Fro, and Tino, he's asked, are these

21  individuals the member of any gang?  Answer:  Latin

22  Kings.  Were you a member of the Latin Kings?

23  Answer:  I was a member.

24          Now, keep in mind the crime happens on May

P-12

MAYSONET 1044

1    25, 1990.  Well, he was a member on May 25 of 1990,

2    but we are to believe that somehow between May 25 of

3    1990--

4         MR. BEUKE:    Judge?

5         MR. MAREK:    -- and August the 23rd of 1990,

6    he's resigned his membership in this organization?

7         THE COURT:    Is there an objection?

8         MR. BEUKE:    There is, Judge.  There is no

9    evidence of that, that he was a member in 1990.

10        THE COURT:    Reasonable inferences from the

11   direct evidence may be had.  This is closing

12   argument.  Overruled.

13        MR. MAREK:    Well, I submit to you, ladies and

14   gentlemen, if he's not a member, what is he doing out

15   there with them?

16        He says in this written statement -- he's

17   asked a question by former assistant state's attorney

18   DiFranco.

19        What happened when you got home?  Answer:

20   When I got back home, I got out of the car.  Lluvia

21   jumped in the driver's side, and he left with the

22   car.  That's what he says during the court-reported

23   version, but then he adds when he's reading this

24   over, Lluvia jumped in the driver's side, and he left

MAYSONET 1045

1   with the car and the gun.

2           Once again, he is doing everything he can

3   to distance himself from Lluvia and the gun and his

4   participation in this double homicide.

5           Ladies and gentlemen, the statement must be

6   read with that in mind.  It must be viewed that way.

7   It is the statement of a witness to the crime, giving

8   up what he chose to give up for his own selfish

9   purposes.

10          Ladies and gentlemen, among the law Her

11  Honor, Judge Morgan, will give you at the conclusion

12  of this case is this:

13          A person is legally responsible for the

14  conduct of another person when either before or

15  during the commission of an offense and with the

16  intent to promote or facilitate the commission of an

17  offense, he knowingly solicits, aids, abets, agrees

18  to aid, or attempts to aid the other person in the

19  planning or commission of an offense.

20          The word, conduct, includes any criminal

21  act done in furtherance of the planned and intended

22  act.

23          Ladies and gentlemen, whether the planned

24  and intended act, whether the criminal purpose was to

P-14

MAYSONET 1046

1 go there to kill, to rob, or even to sell drugs--

2     MR. BEUKE:    Objection.

3     THE COURT:    Overruled.

4     MR. MAREK:    -- Mr. Maysonet is responsible for

5 everything that happens, everything that is done in

6 furtherance of that purpose.

7     The word, conduct, includes any criminal

8 act done in furtherance of the planned and intended

9 act.

10     Now, did he know -- did he know that that

11 was the law that he was going to be held responsible

12 for? We don't know, and it doesn't matter.

13     That is the law that holds him responsible,

14 and that's the law that has him here today, ladies

15 and gentlemen. Whether he knew -- whether he knew

16 that by giving the statement that he gave he would be

17 responsible for the double murder is really not an

18 issue before you.

19     Ladies and gentlemen, the law, that portion

20 of the law which I just read for you is called the

21 law of criminal responsibility. And the reason it is

22 the law is because the law recognizes that no person

23 is an island onto themselves.

24     Two people, when they combine together, can

F-15

MAYSONET 1047

1  always accomplish more than one.

2          Three people, when they combine together,

3  can always accomplish more than two, and on and on.

4          And just as people get together and form

5  business partnerships, corporate organizations, well

6  so also individuals get together and form criminal

7  enterprises, and that's what we have here, ladies and

8  gentlemen.

9          We have a criminal enterprise. We have

10 four individuals combined together for an illicit

11 purpose, into a criminal enterprise.

12         Ladies and gentlemen, when two people form

13 together in a business partnership, if the business

14 does very well, everybody shares in the profit. If

15 the business is a failure, everybody shares in the

16 loss. Well, likewise in a criminal enterprise. Each

17 person -- each person is responsible for the acts of

18 the other person.

19         Each person is responsible if somebody is

20 shot dead during your criminal enterprise, just as he

21 would have shared in whatever profit or gain that

22 enterprise would have acquired, he likewise must

23 share in the responsibility.

24         There's an old saying which sort of covers

MAYSONET 1048

1  this, and it's in for a penny, in for a pound.  The

2  law does not allow one criminal partner, one member

3  of the enterprise to limit his responsibility.

4  Whatever is done in furtherance of the criminal

5  enterprise, all of the partners are responsible for.

6          Ladies and gentlemen, let me just

7  illustrate that with an example.

8          Three individuals get together and decide

9  to rob a bank.  One person drives the car, parks in

10  front of the bank.  Two other individuals go inside.

11          One holds the gun on the teller, and the

12  other one takes the money from behind the counter.

13  If they walk outside, get into the car and drive

14  away, all three are responsible for bank robbery,

15  including the get-away man who just sat in the car

16  and never set foot inside the bank.

17          They are all responsible for bank robbery.

18  They are all sharing in the same criminal purpose,

19  and they are all playing a role.  They are all acting

20  toward that ultimate end.

21          Ladies and gentlemen, if while inside the

22  bank, the man with the gun shoots the guard, all

23  three, including the get-away driver, are responsible

24  for murder.

MAYSONET 1049

```
 1        MR. BEUKE:     Objection.

 2        THE COURT:     Overruled.

 3        MR. MAREK:     Likewise, ladies and gentlemen,

 4   Mr. Maysonet here is responsible for all of the

 5   actions of his partners in crime.

 6            When Alfredo Gonzalez pulls the trigger and

 7   shoots to death Torrence and Kevin Wiley, it's just

 8   as if his hand is on that trigger because he's in for

 9   a penny, in for a pound.  And he cannot limit his

10   responsibility, ladies and gentlemen.  That's the

11   law.

12            What is his role?  Does he play an

13   essential, integral role in this criminal

14   enterprise?  Oh, you bet he does.

15            He, first of all, supplies the murder

16   weapon, the nine millimeter weapon, the gang gun,

17   which they've taken to his house, and he has

18   concealed it there for a good five days, until it's

19   needed.

20            Well, now on May 25 of 1990, it's needed,

21   and they go to his house, and they get it, and he

22   turns it over, and he goes with as additional muscle,

23   as additional support, as an additional gang member

24   to be present.  And he chauffeurs the death squad to
```

MAYSONET 1050

1  the sight of the crime, and he sits in the car, and

2  then he chauffeurs the death squad away from the

3  scene.

4          He is an integral part of this homicide,

5  ladies and gentlemen.

6          In his own words, if there's any doubt --

7  if there's any doubt that he knows exactly what's

8  going on here and what's going down, look at his own

9  words.

10          He's asked -- he's asked how Lluvia is

11  dressed that night.  Well, what was Lluvia wearing

12  that evening?  A black hooded sweat shirt.

13          What significance does it have when a Latin

14  King wears a black hooded sweat shirt?  Kills

15  somebody, rob somebody, or rob a car.  He knows

16  darned well he's going there to kill or rob.

17          And if they're not going there to kill or

18  rob, ladies and gentlemen, why do they need the gun?

19  If they're going there for anything other than an

20  illicit purpose, why do they need the gun?

21          Why do they need him along to drive?

22  They're in the car already.  They're not capable of

23  driving themselves to Kimball and North Avenue to go

24  about whatever business it is that they could

MAYSONET 1051

1   accomplish?  They couldn't do it without him?

2           Does he just come along to keep his gun

3   company, ladies and gentlemen?  And, ladies and

4   gentlemen, ask yourselves this.

5           But for his participation, but for the role

6   of Mr. Maysonet, the man who holds the gun, the man

7   who supplies the gun, the man who drives the car, but

8   for his actions in supplying that weapon, might not

9   both of these victims be alive?

10          They certainly wouldn't have been shot to

11  death, not not with that gun.  His role is absolutely

12  essential to this criminal enterprise, ladies and

13  gentlemen.

14          Now, as he sits here in this courtroom, Mr.

15  Maysonet is the latest contribution to the don't

16  blame me society that we all live in, ladies and

17  gentlemen.

18          What he's saying to you?  Don't blame me

19  for this.  I just held the gun for my fellow gang

20  members.  Don't blame me for this.

21          I just supplied the gun that was used to

22  murder two young men.  Don't blame me, I just

23  chauffeured the hit team around town.  Don't blame

24  me.  I just waited in the car, and then drove them

MAYSONET 1052

1 from the scene and back to safety.  Don't blame me,

2 ladies and gentlemen.

3          What is he asking you to do?  What he is

4 asking you to do, ladies and gentlemen, is to carve

5 out an exception to the law of criminal

6 responsibility for Jose Maysonet.  He's asking an

7 exception for himself.

8          We could call it the Jose Maysonet

9 exception to the law of criminal responsibility.

10          Everybody else who participates in a

11 criminal enterprise and somebody is killed is guilty

12 of murder, except Jose Maysonet, because we have the

13 Jose Maysonet exception to the law of criminal

14 responsibility.

15          Well, ladies and gentlemen, who does he

16 think he is?  Who does he think he is?

17          The law applies to Jose Maysonet like it

18 applies to every other citizen in this community,

19 ladies and gentlemen.  There is no Jose Maysonet

20 exception to the law of criminal responsibility.

21          When you run with the pack, you share the

22 responsibility when the pack kills.

23          Ladies and gentlemen, Her Honor, Judge

24 Morgan, will read to you what it is -- what it is

P-21

MAYSONET 1053

1  necessary for the State to prove to sustain the

2  charge of first degree murder of Kevin Wiley and

3  Torrence Wiley against this defendant.

4          To sustain the charge of first degree

5  murder of Torrence Wiley and Kevin Wiley, the State

6  must prove the following propositions:

7          First:  That the defendant or one for whose

8  conduct he is legally responsible performed the acts

9  which caused the death of Torrence Wiley and Kevin

10 Wiley, and

11         Second:  That the defendant or one for

12 whose conduct -- second:  That when the defendant or

13 one for whose conduct he is legally responsible did

14 so, he intended to kill or do great bodily harm to

15 Torrence Wiley and Kevin Wiley, or he knew that his

16 acts would cause death to Torrence Wiley and Kevin

17 Wiley, or he knew that his acts created a strong

18 probability of death or great bodily harm to Torrence

19 Wiley and Kevin Wiley.

20         Ladies and gentlemen, these -- the last

21 three propositions are in the alternative.

22         There does not even have to be an intent by

23 the shooter -- by the shooter to kill these victims

24 when they were shot.


                        P-22

1          All there has to be is an intent to cause

2     death or -- excuse me -- all the shooter has to know

3     is that there is a strong probability of death or

4     great bodily harm when he goes about shooting Mr.

5     Kevin and Mr. Torrence Wiley and you know from the

6     evidence here that, ladies and gentlemen, there is no

7     issue at all about that.

8          When you shoot somebody and you fire that

9     many shots and shoot two people, you know that your

10    acts, at the very least, create a strong probability

11    of death or great bodily harm.

12         And the issue, of course, which this

13    instruction incorporates is Mr. Maysonet is

14    responsible for the actions of Alfredo Gonzalez.  He

15    is one for whose conduct Alfredo Gonzalez is a person

16    for whose conduct Mr. Maysonet is legally

17    responsible.

18         Ladies and gentlemen, as I said before,

19    jury service is common sense business.  I'm going to

20    ask each of you to rely upon your experience, your

21    observations in life, and carefully assess the

22    evidence here.

23         When you do that, I submit to you that you

24    will come to the conclusion that there is only one

P-23

1 | verdict supported by this evidence.

2 |       By that verdict, ladies and gentlemen, you

3 | will have a chance to say to Mr. Maysonet and others

4 | situated like him--

5 |     MR. BEUKE:   Objection, Judge.

6 |     MR. MAREK:   You will be able to say to him

7 | that our laws, the laws of a decent, civilized

8 | society apply to you, Mr. Maysonet, and they apply at

9 | Kimball and North Avenue, just as they apply on every

10 | street corner in our community.

11 |       Ladies and gentlemen, where there is a

12 | violent crime such as this, where is our

13 | civilization?  Where has it gone?  And where there is

14 | a violent crime such as this and all of those

15 | responsible -- all of those responsible are not held

16 | responsible, where is justice?

17 |       Ladies and gentlemen, on behalf of the

18 | People of the State of Illinois, I ask you to return

19 | with the only verdict supported by the evidence in

20 | this case, the law and the evidence, and that is

21 | guilty of the first degree murder of Kevin Wiley and

22 | guilty of the first degree of Torrence Wiley.  Thank

23 | you.

24 |     THE COURT:   Thank you, Mr. Marek.

P-24

1                    CLOSING ARGUMENT

2                    BY MR. BEUKE:

3        MR. BEUKE:     Your Honor, Judge Morgan,

4   prosecution, Mr. Maysonet, ladies and gentlemen of

5   the jury.

6            You have, as I think I told you a few days

7   ago, had an opportunity now to get some semblance of

8   what a criminal trial is all about, how a criminal

9   trial works, how a criminal trial proceeds through

10  its various stages.

11           You've had an excellent tutor in that

12  experience in Judge Morgan.  She has given you the

13  opportunity to hear in an orderly fashion the way

14  that a trial is supposed to proceed.  You have two

15  very capable prosecutors who have attempted to give

16  you some evidence of what happened in this case.

17           You have now or are about to get some idea

18  of another tool that is going to be essential for you

19  people to use as you continue down your path in your

20  role as jurors, and that will be the law.

21           You have or are about to get an opportunity

22  to hear from lawyers.  Some of you like to hear from

23  lawyers.  Some of you probably are sick of hearing

24  from lawyers.

                            P-25

1          But as I told you originally, what Mr.

2     Marek and what myself and what Miss Mandeltort say to

3     you really isn't evidence.

4          You have heard the evidence in this case.

5     The evidence is over in this case, in terms of

6     everything that came from that witness stand.

7          I sat and I listened to Mr. Marek for the

8     last half hour or so and I -- I gathered that we've

9     got a lecture on the urban plight in our cities, the

10    mean streets of Chicago, the fact that there's death

11    squads running wild on the streets of our city, the

12    fact that we've got a little education on corporate

13    America, and criminal enterprises, and things like

14    that.

15          We've got a description of a bank robbery.

16    We got a description of where our civilization is

17    going, don't blame me society, chauffeuring people

18    around.

19          He spoke for 20 or 25 minutes about all of

20    these other brilliant points, but failed to touch for

21    even a minute on the evidence in this case.

22          I submit to you, ladies and gentlemen, that

23    there's a very calculated reason behind that because

24    when you sit there and you start to examine the

P-26

1 evidence that you heard from the witness stand, then

2 you begin to see what this case is all about.

3       He showed you some pictures of two young

4 men who should not obviously -- this shouldn't have

5 happened to anybody.

6       Hopefully, I think Mr. Marek is hoping that

7 when you see those pictures, you are going to get

8 angry, you are going to want somebody to pay for

9 that.

10       Nobody should be left on the street at 1:00

11 in the morning like that with bullets riddled through

12 their body. That's what he's hoping to evoke from

13 you.

14       Did he show you any of these other

15 pictures? Did he show you this plat that you know

16 Detective Guevara told you about? Any of that

17 evidence did he talk about? No.

18       We got our lectures on all of these other

19 things that happened in our society. Well, I'd like

20 to stop now, folks, and I'd like to talk to you about

21 the evidence, okay, the evidence that you heard and

22 also some of the evidence that you didn't hear

23 because both are crucial in your examination of what

24 in the heck went on here.

P-27

MAYSONET 1059

1          1:00 in the morning, shots fired, North

2   Avenue, just west of Kimball.  You heard first from

3   Officer Dones, I believe his name was.

4          He's the gentleman who was the first

5   witness who sat here and told you he was less than

6   maybe a block, block-and-a-half from the crime.  He

7   heard the shots.

8          Their call came over the radio almost

9   immediately.  Either he was on his way down to North

10  Avenue or made a quick U-turn, and he told you he got

11  to the scene within a half a minute.

12         Think about that, folks.  Think about that

13  when you think about where the state's attorney and

14  Guevara told you that this car was parked, that the

15  car was parked in this alley behind -- between Saint

16  Louis and Kimball.

17         Think about it when you know where Mr.

18  Maysonet told you that he drove the car back to.  If

19  you go right down this alley to Kimball and go down

20  Homan, these guys, if Maysonet was telling the truth,

21  or if Maysonet would have been -- if they believed

22  their own statement, he would have driven right past

23  this policeman.

24      MS. MANDELTORT:    Objection, Judge.  There is

                          P-28

1  no evidence on how this defendant left the scene.

2  There is no evidence in the record, Judge.

3      MR. BEUKE:    We'll talk about that.

4      THE COURT:   Hold on just a second.  There is an

5  objection.

6          Ladies and gentlemen, any argument by the

7  attorney that is not based on the evidence should be

8  disregarded.  You may proceed, Mr. Beuke.

9      MR. BEUKE:    You know, ladies and gentlemen,

10 I'm glad Miss Mandeltort brought that up because you

11 have this young man who's in custody for 28 hours or

12 so.

13         You have this young man who's visited on

14 July 15 by Mingey and Montilla who they come to the

15 jail to talk to, who they have, who, all of a sudden,

16 according to Guevara, is cooperating like a good

17 little boy.

18         And did they ask him, how did you leave the

19 scene, Mr. Maysonet?  Did Mr. DiFranco, when he has a

20 court reporter in front of him, and can ask any

21 question he wants, anything, and it's going to be

22 taken down, and Mr. Maysonet's answer is going to be

23 taken down?

24         Did Mr. DiFranco take the time to say,

P-29

MAYSONET 1061

1  well, after you pulled away, Mr. Maysonet, where did

2  you go?  He spent a whole lot of time, ladies and

3  gentlemen, on trying to find out how he got there,

4  and we´ll go back to that.

5        But I took Homan to Potomac, Potomac down

6  to Saint Louis, Saint Louis to North Avenue, North

7  Avenue to Drake, and I parked in the alley.  He took

8  a whole lot of time about asking him how he got

9  there, but lo and behold, he doesn´t ask him how he

10  left.  Why?

11       Is it possible because if he had gotten

12  those answers, it may have broken down their case

13  because he knows a policeman is coming right down --

14  down the street.  Would that have been that much to

15  ask?

16       Please.  You have, ladies and gentlemen,

17  hopefully an understanding from the beat officer

18  about what happened on the scene.  He got there

19  almost immediately.  He found the two young men where

20  he told you, where the photos will show you.

21       The photos show that I believe that Kevin

22  Wiley was found on the side of the building, and

23  Torrence Wiley was found on the street.

24       The position of the bodies, ladies and

P-30

MAYSONET 1062

1 gentlemen, I also submit to you, is crucial for

2 your -- for your people's determination in this

3 case.

4          You heard that DiFranco and somebody went

5 out to the scene and that Maysonet in his statement

6 said he saw the second or Mr. Gonzalez standing over

7 the body with the gun, that person as he lays in that

8 position by the street.

9          And you get an idea, I think DiFranco told

10 you in People's Exhibit Number 30 that the car was

11 parked in the most westerly position, closest to that

12 building. Put your -- use your common sense, folks.

13          If you are in that position, if what

14 DiFranco is telling you is true, is there anyway when

15 you look at this photograph where the bodies lay on

16 the street that he could see that body? It's

17 impossible.

18          But, you know, that could have all -- those

19 questions could have all been asked and could have

20 all been cleared up.

21          The beat officer told you that the

22 detectives arrived on the scene, that it wasn't his

23 job to interview witnesses really, and he turned that

24 portion of the job over to the initial responding

P-31

1  detectives.

2          Well, where are they?  The prosecutors can

3  call anybody that they see fit to call or choose not

4  to call.  That's their decision.

5          They've chosen to put this case on to you

6  in their own way.  But did you hear from one

7  detective who came here and said, I was the initial

8  responding officer, responding detective on the

9  scene?  It was my responsibility to go out and talk

10  to people?

11          I didn't hear anything about that.  Would

12  that have been something that you people would have

13  liked to have known about?  I submit to that you that

14  that would have been something that's crucial in this

15  case.

16          This is moments after the case happens.

17  Instead, you get a beat officer who says I get there,

18  and I'm trying to preserve the scene.  And after

19  that, I turn everything over to the -- over to the

20  detectives.

21          What does that mean?  What does that tell

22  you about what's being told to you and what's not

23  being told to you?

24          Well, it's clear, I think to all of us,

P-32

MAYSONET 1064

1 folks, that had you had any information about

2 eyewitnesses to this killing, these killings, you

3 would have heard from them.  I don't think there's

4 any secret about that.  That would have been their

5 best evidence.

6          But instead, there was nothing like that.

7 I don't know if Mr. Marek's lecture to you about how

8 good these people are at their craft or these death

9 squads and all of that nonsense, maybe some of you

10 will buy into that.  I don't think you should, but I

11 think again these appeals to your emotions, you have

12 to use your common sense, folks.  That's the most

13 important tool that you have.

14          You're going to find out, I think, ladies

15 and gentlemen, or you know that between May 25 and

16 July 15, the police officers had absolutely no

17 information on this case.

18          On July 15, Mr. Maysonet was at Area 5 on

19 an unrelated case, and he spoke with the detectives.

20          Now, Mr. Marek, you know, makes this guy

21 out to be somebody like Monty Hall.  Let's make a

22 deal.

23          I mean, he could have been in there and

24 said absolutely nothing.  The police officers

P-33

MAYSONET 1065

1 wouldn't have had any information.  He's the one who
2 called them in.
3         Ladies and gentlemen, you now know the
4 first thing he told them was, listen, I know
5 something about -- remember Montilla because he's
6 crucial to your consideration of this evidence.
7         Detective Montilla is a 23-year veteran of
8 the Chicago Police Department.  He's been a
9 detective, I think he told you, for almost 18 of
10 those years.
11        He told you that he was called in at the
12 request of Sergeant Mingey to talk with Maysonet.
13 What was his purpose?  I think he told you, well, I
14 speak Spanish fluently, and Mingey needed me to speak
15 Spanish with Mr. Maysonet.
16        Now, does that tell you that Mr. Maysonet
17 is this crafty, wiley criminal?  Or does it tell you
18 that there's some -- a little bit of a language
19 problem?
20        I don't think there is any secret that this
21 gentleman feels more comfortable speaking in Spanish
22 because that's his native tongue, than he does in
23 English, and that's why Montilla was there, and you
24 saw Montilla.  I think he was the only person who

P-34

MAYSONET 1066

1 told the truth in this case.

2      Ladies and gentlemen, he told you that they
3 had a conversation.  It didn't last all that long,
4 but Mr. Maysonet basically told him, listen, I know
5 something about these murders.

6      There were a couple of guys killed on North
7 Avenue.  I didn't know the date.  He didn't know the
8 date.  He didn't know the exact location, but he
9 heard about the two kids getting killed on North
10 Avenue.

11      Mr. -- Detective Montilla told him, well,
12 you know, what do you -- what else can you tell us?
13 Who did it?

14      Well, he said, I can't tell you.  You know,
15 can you talk to me -- is there anything you can do to
16 help me a little bit?  No, we can't do anything for
17 you.  Well, I've got Latin Kings that you're asking
18 me to tell you about that could probably take me out,
19 my wife, my child, what about that?  Well, no deals.
20 He goes along his way.

21      Now, you know from Rose Maysonet that Mr.
22 Maysonet went to court two days later, Belmont and
23 Western, appeared in front of a judge, had retained
24 an attorney, a Mr. Abrams to represent him, made that

P-35

1 appearance that day.

2        The case was continued until August 8, and

3 Mingey and Montilla go back to the jail.

4        Now, Montilla told you, you know, I didn't

5 make any attempt to find his lawyer. I don't know

6 whether he should or he should have. That's for you

7 people to decide.

8        But Mr. Maysonet talked to them again. He

9 signed this waiver. He said, no, I don't need my

10 attorney here. I'll talk with you guys. You know,

11 he did that freely and voluntarily.

12        Now, at that point, ladies and gentlemen, I

13 submit to you that that's crucial for you to

14 determine because you have to determine if this other

15 piece of the puzzle fits. You know, this thing about

16 him going with these people and driving the car.

17 Detective Montilla, what did -- what did Mr. Maysonet

18 tell you in the Cook County Jail when he had an had

19 an attorney representing him?

20    MS. MANDELTORT:   Objection, Judge.

21    THE COURT:   Basis?

22    MS. MANDELTORT:   Judge, if I may have a

23 sidebar? Judge, as to--

24    THE COURT:   We don't need a sidebar, but I

P-36

MAYSONET 1068

1  think counsel understands what the objection is, and

2  that objection is sustained.

3      MR. BEUKE:    When Mr. Maysonet sat with those

4  two police detectives, he talked with them again.

5          Detective Montilla, would you tell the

6  ladies and gentlemen what he told you then?  He told

7  me basically again that I know something about the

8  two kids who got killed on North Avenue.

9          Well, Detective, did he tell you he knew

10 exactly when it happened?  No.  Did he tell you he

11 knew exactly where it happened?  No.

12         Did he tell you, or did he give you the

13 names of the people?  Well, again, he was reluctant

14 to give us the names unless we could help him.  He

15 was in jail.  We're not helping him.  Okay.

16         On the 8th, he goes to court again.  He has

17 a new lawyer.  He is told to come back on August 22.

18 His sister told you about the family raising money to

19 make bond.

20         In his court-reported statement, he tells

21 you the day after he made bond, he was visited by

22 Lluvia, Fro, Tino, Cisco, King.  They came out to my

23 house.

24         What happened when they came to your

P-37

1 house?  They put a nine millimeter to my head.  Who

2 put a nine millimeter to your head?  King.  What did

3 he say?  You know about the two murders.  If you

4 talk, we're going to put you six feet under.

5          Detective Montilla told you that after Mr.

6 Maysonet spoke with him the afternoon or the late

7 morning hours of August 22 that he was told by these

8 people that they would kill him, his wife, and his

9 child if he mentioned anything about the people who

10 came to his house and got the gun.

11          Now, remember that it was always Maysonet's

12 statement to Montilla and Mingey both, on the 15th of

13 July and August 1, that three guys came over to his

14 house and asked him for this gun that they had given

15 to him to hold.  That was always his statement to

16 them.  Nothing changed about that, you know, but that

17 wasn't good enough for the police.

18          Now, let's move on a little bit to August

19 22, and lo and behold, there's another missing piece

20 to this puzzle.

21          Detective Paulnitsky.  Where is he?  Where

22 is the man who for all intents and purposes kidnapped

23 this kid from this building?

24     MS. MANDELTORT:    Objection, Judge.


P-38

1      THE COURT:  Overruled.  Closing argument.

2      MR. BEUKE:   You have a detective who takes

3 a -- a person from this building in these halls of

4 justice that he is with his family.

5      He´s told to go to a courtroom.  He´s on

6 his way to that courtroom by the order of another

7 judge.  And Paulnitsky decides, you´re not going

8 anywhere, you´re coming with me.  And lo and behold,

9 he´s chauffeured, as Mr. Marek would tell you,

10 chauffeured down to Area 5 to be a guest of the

11 Chicago Police Department for the next 26 hours.

12      He was now in their house.  He was now in

13 their control again.  He was now in their custody.

14 And lo and behold, Paulnitsky takes him into a room,

15 hooks him to a wall, doesn´t allow his family to see

16 him, doesn´t allow anybody to talk to him, doesn´t

17 allow him to make any phone calls, and he brings in

18 Montilla again.

19      Think about it.  Montilla is the only one

20 to that point that´s probably in the station who has

21 spoken to Maysonet again.

22      And he tells Detective Montilla again, you

23 know, the three guys, they came to my house.  I gave

24 them the gun that they had given to me.  They went

P-39

MAYSONET 1071

1 out.

2          I heard the next day that two kids got
3 killed on North Avenue with a nine millimeter.  The
4 gun I gave to these guys was a nine millimeter.  It
5 might be those guys.  Well, that´s not enough.

6          Well, Detective Montilla, these guys told
7 me if I give up their names, they´re going to kill
8 me, my wife, and my baby.  You´re charged with the
9 murders.  You´re charged.  That´s at 11:30 in the
10 morning.

11         Think about this kid now.  Now, he´s left
12 to sit.  He sits 12:00, 1:00 2, 3, 4:00, 5, 6:00,
13 7:00, 8:00.  In that six, seven, eight hours we´ll
14 start to talk about that.  Because according to
15 Guevara, you know, Pope Reynaldo Guevara who this guy
16 decides to bare his sole to, he has absolutely no
17 involvement or contact in this case, doesn´t know
18 anything about this case.

19         Well, Montilla tells you, I left him,
20 okay?  I went home.  I got some sleep, and then I
21 came back.

22         When I came back to work, well, do you
23 recall speaking or meeting a young lady by the name
24 of Rose Maysonet?  Yes, I do.

P-40

MAYSONET 1072

1       Did she identify herself as his sister?  I
2  don't recall that.  Well, did you speak with her?
3  Yes.

4       How many times did you talk with her?  On
5  several occasions.  Think about what Rose told you.

6       She went home.  She waited in room 302 for
7  all of those hours.  She went downstairs in front of
8  the building.  She waited in front of the building
9  for a couple of hours, hoping to find her brother
10 with with his wife.  And Paulnitsky had, you know,
11 done a perfect end-around and gotten him out of here
12 and over to Area 5.  Well, she didn't know that.

13      She finally went home.  She made phone
14 calls.  She found out that he was at Area 5, and her
15 family went there.

16      They asked to see him.  No.  Go back
17 downstairs.  They then talk to him again.  You know,
18 we're calling my lawyer.  I'm trying to get ahold of
19 the lawyer.  No, stay downstairs.

20      Well then, ladies and gentlemen, she told
21 you something happened at around 5:30 or 6:00.  She
22 told you that Montilla came back downstairs and
23 remember that in conjunction with what Montilla told
24 you.


                    P-41


MAYSONET 1073

1          Montilla came downstairs and said, Rose,
2    does your brother have nervous pills, or he had a
3    breakdown upstairs.
4          Does he have any pills at home?  Montilla
5    verifies that.  Well, if he's got pills, go get
6    them.  And at that point, you weren't there.  I
7    wasn't there.  The prosecutors weren't there, but you
8    know darned well something was wrong because she gets
9    in a car, drives to her house, gets nerve pills, and
10   comes back to the station, and they bring her up into
11   the room.
12         Guevara, you know, Pope Guevara is around
13   there.  They bring him -- bring her into the room and
14   gives him these pills.
15         Now, think about it, folks.  Did the police
16   take the time to make sure what's in those pills -- I
17   mean, something was obviously wrong here.  You know,
18   this kid was obviously having some sort of
19   breakdown.
20      MS. MANDELTORT:    Objection, Judge.
21      THE COURT:    Overruled.
22      MR. BEUKE:    Well, I asked Detective Montilla,
23   did he appear to you to be having some sort of
24   reaction?  Yes.

P-42

MAYSONET 1074

1       Okay. That´s the whole purpose for this.
2 You know, do you think for a minute, use your common
3 sense, that police officers are going to let a family
4 member go home and get some sort of prescription drug
5 or other God knows what drug and bring it to the
6 station and give it to the defendant while he´s in
7 their custody unless it´s needed?
8       Your common sense has got to tell you,
9 folks, something was breaking bad for these coppers
10 back then.
11       Well, now Rose tells you about an hour
12 later, Montilla came back downstairs, and he took
13 Rose Bella upstairs, and Rose Bella was upstairs for
14 more than -- or about an hour.
15       Rose Bella comes back downstairs. And then
16 a little while later, Montilla comes downstairs again
17 and says, you can go home. He´s going to be released
18 in 72 hours. We asked Montilla that. Do you recall
19 that? He says, no, I don´t recall.
20       Now, think about that. Rose Maysonet was
21 on the witness stand. Did either Mr. Marek or Miss
22 Mandeltort ask her one question?
23       If that isn´t what was said, they have an
24 opportunity to bring any detective up here as Her

P-43

1  Honor, Judge Morgan, told you in rebuttal to say, no,

2  that didn't happen.  I never told her that.  Nobody

3  came up here.

4          I submit to you, ladies and gentlemen, use

5  your common sense.  That's what happened.  Rose

6  Maysonet and Rosa went home, fully expecting this guy

7  to come home in maybe a day or two.  They are not

8  lawyers.  They are not police officers.

9          I submit to you that they are not

10 intelligent people in the skills of the Chicago

11 Police and the laws of our city and state and

12 country, but they put some faith in Montilla.

13         Well, ladies and gentlemen, you heard from

14 Detective Guevara who tells you out of the clear blue

15 sky, he walks into the room, advises him in Spanish

16 and in English of his rights.  And after being

17 advised of his rights, Mr. Maysonet goes into a

18 40-minute dissertation on his involvement in this

19 crime.

20         Now, that's interesting.  This entire

21 question and answer session with Mr. DiFranco took,

22 according to him, ten minutes.  I've read it a number

23 of times, question and answer.  I think it takes a

24 lot less, but you read it when you're back there.

P-44

1          What was happening in that room for the

2 other 30 or 35 minutes or 25 minutes or 20 minutes?

3 You know, Guevara went on this rendition.  He said,

4 no, Maysonet just laid this all out to me.  I wasn't

5 asking questions.  He just told me all of this

6 stuff.  That took him about -- I think I timed it,

7 three minutes.  Well, how long did the conversation

8 last, Detective?  40 minutes.

9          Okay.  Was anybody else in the room?  No.

10 Did you take one note?  Mr. Beuke, I haven't taken a

11 note in 23 years on the police department.

12          Does that give you people the kind of

13 confidence that you need to find him guilty of two

14 murders?

15          Is that the kind of police work that you

16 can feel comfortable with and these prosecutors can

17 ask you to sign a guilty verdict for two murders when

18 you got that kind of an answer from that kind of a

19 witness?

20          I submit to you they should be ashamed to

21 put that guy on the witness stand.  It's

22 embarrassing.

23          How this happened, ladies and gentlemen, in

24 conjunction with the wife and the nerve pills and all

P-45

MAYSONET 1077

1 of this stuff, use your common sense.  But then we go

2 further.

3          Montilla tells you he's present for all of

4 these other conversations.  There's a conversation

5 with a state's attorney, Jennifer Borowitz, at 4:30

6 in the morning.

7          State's attorney Borowitz is in Area 5,

8 spoken to by the detectives.  Montilla and Guevara.

9 She goes in to speak with Maysonet.  The rights are

10 advised to him in English and in Spanish.

11          Montilla tells you there's this

12 conversation in the presence of Jennifer Borowitz,

13 and, lo and behold, they leave.  They come back about

14 15, 20 minutes later.

15          There's another conversation with Jennifer

16 Borowitz.  Lo and behold, Montilla says that she's

17 taking notes.  She's taking notes during all of

18 this.  And lo and behold, that conversation ends.

19          Apparently, Jennifer Borowitz falls off the

20 planet because Mr. Marek and Miss Mandeltort decided,

21 well, she's not somebody that these people should

22 hear from.  She's not somebody who might be -- that

23 testimony might be interesting, too.  Her testimony

24 probably has no relevance in this case.

P-46

1          Well, wouldn't you like to know, ladies and
2  gentlemen, what he told Jennifer Borowitz?  Montilla
3  didn't tell you anything.
4          Isn't it peculiar that the people who are
5  chosen to come here by the prosecutors --  and
6  remember all throughout this, folks, Judge Morgan
7  took great time when you first were picked to explain
8  to you the burden of proof.
9          The burden of proof in this case is at this
10 table.  It doesn't ever go -- we are not playing
11 tennis here.  It doesn't ever go to this table.
12         These prosecutors have the burden of
13 proving him guilty beyond a reasonable doubt.  That's
14 a burden that they never give up.  How they choose to
15 present their case is their own business.  I don't,
16 you know, make it my point to get into their
17 decisions.
18         They decided Jennifer Borowitz was not
19 going to come in here and testify.  Ask yourself and
20 you have a right to ask yourself why.  Why?
21         Well, then we get to Mr. DiFranco.  Mr.
22 DiFranco, the state's attorney, comes in at 6:20.  He
23 says, I may have looked at a couple of reports.  I
24 may have read something, talked a little bit to the

                    P-47

MAYSONET 1079

1   detectives, and I run in and talk to Maysonet.

2           Now, I´m assuming, ladies and gentlemen,

3   that you people can figure out his breath of

4   knowledge about the case, at that point, probably

5   wasn´t exhaustive.  But I´m sure he had within his

6   working thoughts, at that point, the generals of the

7   case.

8           There´s two people killed.  They´re killed

9   on the street here.  This is the date it happened.

10  This is what Maysonet has told the detectives to that

11  point.

12          And so you know the only evidence about

13  what´s been told by Maysonet to that point is, you

14  know, three guys came to my house.  They asked me for

15  this gun.  I gave them the gun.  And when I gave them

16  the gun, they left, and I don´t want to tell them the

17  names, and these guys are going to kill me if I do.

18          Well, at 6:30, the conversation is had.  At

19  7:10, he´s apparently moved to another room, and

20  another interesting thing with Montilla and Guevara

21  and whoever else, Paulnitsky, who was involved in the

22  investigation, did anyone come in here and say, oh,

23  yeah, Maysonet, we fed him, we let him sleep, we

24  watched him sleep, we saw him asleep at this point in

                          P-48

1 time or that point in time.

2         Remember, this guy was, you know, taken

3 from this building at 9:00 the previous day. Nobody

4 told you about that. Why?

5         Is that something that you should consider

6 when you get this -- this instruction, and I believe

7 Judge Morgan will instruct you, you have before you

8 evidence that the defendant made statements relating

9 to the offenses charged in the indictment.

10         It is for you to determine whether the

11 defendant made the statements, and if so, the weight

12 that should be given to the statements.

13         In determining the weight to be given to a

14 statement, you should consider all of the

15 circumstances under which it was made. That's your

16 guide, ladies and gentlemen, when you're picking

17 apart this thing. That's your guide and remember,

18 this is the only written memorandum of Jose

19 Maysonet's discussions with anybody. All of this

20 other stuff is created by the police. This is Jose

21 Maysonet's eventual statement to the state's

22 attorney.

23         Well, DiFranco told you, yeah, what he told

24 me at 6:30 and what he told me at 7:00 was basically

P-49

MAYSONET 1081

1 the exact same thing that he told me in the

2 statement. Okay.

3        Now, is there anything, Mr. DiFranco, that

4 prevented you from asking any question you wanted?

5 Anything? No.

6        You could have asked Mr. Maysonet any

7 question about any particular piece of this puzzle

8 that you wanted to? Yes.

9        Okay. Ask yourself about that when you go

10 through this. Mr. Marek asked about what

11 significance does it have when a Latin King wears a

12 black hooded sweat shirt? Answer: Kill somebody,

13 rob somebody, or rob a car. All right.

14        And what were they going to do that

15 evening? He didn´t bring this to your attention.

16 Answer: What they were going to do that evening is

17 they were going to go to the two guys that were

18 waiting for dope, and then DiFranco told you that was

19 crossed out, and something was put in.

20        Now, ladies and gentlemen, first of all,

21 could he have followed that up with, well, wait a

22 minute, Mr. Maysonet?

23        Would you tell me about what else

24 transpired when these guys came to your house? When

P-50

MAYSONET 1082

1  they asked you for the gun, did they tell you what

2  they needed the gun for? Did they tell you what they

3  were going to do with the gun? Did you talk about

4  going over and shooting somebody? Could you have

5  asked all of that? Yes. Did you? No.

6          And is there an explanation? That's for

7  you people, I submit, to determine.

8          Again, I mean, you got there, you know,

9  these descriptions where everybody's at. And then we

10 get to some, I think, crucial parts of this thing.

11         Where were the two guys? By the corner.

12 By the corner. You'll see this map, ladies and

13 gentlemen. You'll know from Guevara's testimony that

14 the two bodies were found in the middle of the block,

15 okay?

16         Is that significant that when all four or

17 five prior statements to Montilla and Mingey, he says

18 that I don't really know where these guys were shot.

19 I know about where, but I don't know exactly where.

20 I don't know exactly the date or exactly the time.

21 Think about that. Does that make sense?

22         Now, what direction did you take? He

23 follows this route to North Avenue, and then we went

24 into Drake and turned in the alley.

P-51

MAYSONET 1083

1          Well, now there's a problem, folks, because

2    Guevara told you, when you turn in the alley on Drake

3    and as you -- if you park in the alley, you can't see

4    that front sidewalk.

5          You can't see the corner of Saint Louis and

6    North Avenue.  You can't see the corner of Drake and

7    North Avenue.  There are buildings.  There are

8    garages.  You can drive down that entire alley from

9    Drake to Saint Louis and not be able to see that

10   front sidewalk.  You can't.  He told you that.

11         Okay.  Well, how about if you cross Saint

12   Louis?  How about you get into the alley across Saint

13   Louis?  How about if you are at the first lot?  No,

14   you can't see it.  Second lot?  No, you can't.  There

15   is a building there.  Third lot?  No.  I think

16   there's three buildings, but then you come to this

17   vacant lot.

18         Okay.  Can you see the front sidewalk from

19   the vacant lot?  Well, yeah, you can see right

20   through.  There is a sidewalk, but I submit to you,

21   folks, you can't see where that second body was

22   found.

23         Is there a problem when Jose Maysonet says,

24   I drove down North Avenue to Drake and parked in the

P-52

MAYSONET 1084

1   alley?

2         Absolutely, because now this kid is given a

3   statement that basically he can't have seen what he

4   now he is saying that he saw.  Lo and behold, let's

5   take a trip.  Let's take a trip to the scene.

6         Montilla, DiFranco, everybody gets in the

7   car, and let's go out to the scene and, lo and

8   behold, let's take our -- go right to this parking

9   lot.

10        Okay.  Now, you know from all of the

11   evidence here that there were -- everybody had access

12   to photographs, okay?  That the photograph of Mr.

13   Maysonet after he gave his statement was taken that

14   morning, okay?

15        There's a camera at Area 5, correct, ladies

16   and gentlemen?  Could they have taken a camera out

17   with them and said, okay, Mr. Maysonet, you show me

18   where the car was parked.  Boom, photograph.

19        Mark on the photograph where the car was --

20   where in this photograph you parked that car.  Done.

21        Maybe, Guevara could have even taken a note

22   or two or DiFranco, another guy who doesn't take any

23   notes.

24        Well, Mr. Maysonet, show me where you saw

                       P-53

1 the bodies. Boom, take a photograph. Show me where

2 you saw these bodies, Mr. Maysonet. Could that have

3 been done? Would it have been that difficult?

4       No. Well, we get this photograph taken

5 when? I don't know. With snow on the ground that

6 now everybody says, no, Maysonet told us he went, you

7 know, down that alley to Saint Louis, through the

8 alley, past Saint Louis, now to this vacant lot.

9       Well, is that written down anywhere? Would

10 it have been that difficult for Mr. DiFranco to maybe

11 go back into Area 5 and say, Mr. Court Reporter, can

12 you stick around, we just want to clear up a couple

13 of other things? I want to take another statement

14 from Mr. Maysonet.

15       Mr. Maysonet, did we just go out to the

16 scene? Did you point out certain things to us at the

17 scene? I want to show you these photographs.

18       Is this where you parked the car? Is this

19 where you saw the bodies? Was it that difficult to

20 do? He had everybody there. Apparently so. Because

21 now they want to sit here, and they want to give you

22 this statement, and this is the only thing that Mr.

23 Marek talked about, this thing.

24       They want you to forget about Paulnitsky.


P-54

MAYSONET 1086

1  They want you to forget about Montilla on the 1st and

2  July 15 and the early morning hours.  That´s all

3  irrelevant.  And you know what?  They want you to buy

4  into Guevara.  Well, the guy who hasn´t taken a note

5  in 23 years.

6          Well, ladies and gentlemen, just to get to

7  this topic for a minute, I hope you weren´t bored

8  with my cross-examination of a couple of the other

9  people, the evidence technician, the coroner, the

10 firearms examiner.

11         Those are all professional people,

12 professional witnesses, who sat here and told you how

13 important it is in their doing their job on a daily

14 basis to write things down, to corroborate what they

15 see, to make sure they have an accurate record of

16 everything that happens.

17         That is how they do their job.  They´re

18 pros.  And I submit to you they demonstrated to you

19 that they are pros.  Yeah, I fill out everything.  I

20 take notes of everything, and then I use those notes

21 to prepare my reports.

22         How about the detectives at Area 5?

23 There´s not a note on the whole case.  This is a

24 double murder, maybe the most serious crime you have

P-55

MAYSONET 1087

1  out there.  That´s an embarrassment.

2      THE COURT:  Five minutes, Mr. Beuke.

3      MR. BEUKE:  Thank you, Judge.

4        Ladies and gentlemen, the statement that

5  Mr. Maysonet ultimately gave and ultimately signed to

6  Mr. DiFranco in the offices that day, remember what

7  led up to that.

8        But even getting past that, read the

9  statement.  Judge Morgan is going to give you the law

10  to guide you.

11        Read the statement to see if what Maysonet

12  even says he did makes any sense in light of the

13  physical evidence.

14        I submit to you it doesn´t.  It makes sense

15  in light of his prior statements to the police, in

16  light of what he told them about, you know, the fact

17  that, I know the guys who came to my house.  I know

18  the guys who got the gun.  I know the guys who left

19  my house, and then I heard that two kids were killed

20  on North Avenue.

21        Is it important that he gets the time

22  wrong?  Is it important that he gets where the bodies

23  are wrong?  Is it important that he gets, you know,

24  he´s told the date by Mr. DiFranco?  Is it important

P-56

MAYSONET 1088

1  that where he says that he parked the car, you can´t

2  see what he claims to have seen.

3          Are all of those things, ladies and

4  gentlemen, things that you should consider in light

5  of everything else that led up to that statement?

6          I submit to you, folks, that is paramount.

7  When you consider all of the evidence and I´m not

8  going to give any lectures now on the ills of

9  society, but when you consider all of the evidence in

10 this case and all of the people who weren´t called in

11 this case that I submit to you should have been

12 called, there is but one verdict that you people can

13 reach, and that this that this evidence is not

14 sufficient for you to find this man guilty beyond a

15 reasonable doubt.

16          As he sits here today, he is cloaked with

17 that shroud that Judge Morgan has told you about

18 called the presumption of innocence.  That never

19 leaves him.  You have to start out your

20 considerations with that as being your starting

21 point.

22          Ladies and gentlemen, I submit to you that

23 the case that they brought you does not take you past

24 beyond a reasonable doubt.  It doesn´t even come

P-57

MAYSONET 1089

1  close.  It´s a disgrace, and I would ask you to

2  return verdicts of not guilty.  Thank you, folks.

3      THE COURT:   Thank you, Mr. Beuke.

4                  REBUTTAL ARGUMENT

5                  BY MS. MANDELTORT:

6    MS. MANDELTORT:   Want someone to pay for it.

7  I guess that´s all we´re about this week.  We´ve been

8  all sitting around, you know, and I guess we have to

9  find someone to pay for it.  And of all of the people

10 in the City of Chicago, the Chicago Police and the

11 State´s Attorney´s Office chose Jose Maysonet.  That

12 isn´t exactly accurate.

13         Who we want to pay for a crime is who is

14 responsible for the crime.  Who should pay for the

15 crime are the people that had something to do with

16 the commission of that crime, and Jose Maysonet is

17 one of the people responsible for that crime, and

18 that is why he should pay for the crime.

19         Counsel stood up here and I guess gave you

20 a few reasons why he thinks you should find Mr.

21 Maysonet not guilty.

22         One of them, if I´ve got it right, is

23 because you didn´t hear from the initial detectives

24 who got out to the scene.

                    P-58

1        Well, if you remember back to Mr. Beuke´s

2  opening statement, he said there are no witnesses.

3  There were no witnesses at the scene.  It is

4  uncontested.  Everyone agrees; there were no

5  eyewitnesses.

6        Did you need to have a detective come up

7  here and tell you there were no witnesses?  It isn´t

8  an issue.

9        Everyone agrees that there was no one for

10 the police to talk to because there were no

11 witnesses.  There was no reason to call that

12 detective.  He added nothing and would assist you in

13 no way in terms of what your job is because everyone

14 agrees.

15        Likewise, I guess the defendant should be

16 found not guilty because you didn´t meet Detective

17 Paulnitsky.

18        Is there any dispute that the defendant was

19 arrested?  Counsel in opening statement told you how

20 his client was arrested.  Otherwise, we wouldn´t be

21 here.  There is no issue for you around the arrest of

22 the defendant.  He was arrested, and that is why we

23 are here.

24        Any testimony from Detective Paulnitsky

P-59

1  would not add anything or assist you in your

2  determination, and your determination is to determine

3  the facts from the evidence and apply the law to

4  those facts and determine if there is evidence to

5  prove this defendant guilty, and I submit that what

6  you heard in this Court is more than sufficient to

7  find this defendant guilty of both of those murders.

8         Counsel told you, I guess, he should

9  probably be found not guilty because you didn't meet

10 assistant state's attorney Borowitz.

11        Well, think about it.  What did Detective

12 Montilla tell you?  He said he translated for

13 assistant state's attorney Borowitz.

14        What could she come into court and tell

15 you?  All she could tell you is what Montilla told

16 you the defendant said.

17        Well, Detective Montilla was here and told

18 you.  All she would be doing is, well, the defendant

19 spoke some Spanish, Detective Montilla translated,

20 and this is what Montilla told me.  Well, Montilla

21 was here to tell you, she would add nothing other

22 than what Montilla was able to tell you.

23        I guess counsel has some concerns that we

24 don't know how the defendant left the crime scene.


P-60

1    Well, we know how he got there, and that´s important

2    because that´s how the case happened because they

3    started with where the gun was kept, how they drove

4    to that scene, that he parked in an alley, and that

5    the murders were committed.  That´s what´s

6    important.

7               I guess you should send the defendant home

8    and find him not guilty because nobody also asked him

9    what he ate for breakfast because these murders were

10   committed.

11              Certain things aren´t important and

12   significant.  What´s important is how he left the

13   crime scene.  No matter what route he chose to take

14   that day, whether it´s going down the alley, or going

15   down a street, or going the wrong way down a one-way

16   street, it doesn´t matter.  What´s important is that

17   it worked.  He got away, and he took his partners

18   with him.  That´s what´s important about that route.

19              Counsel stood up here and used some pretty

20   strong language, that we should be embarrassed, we

21   should be ashamed, it´s an absolute disgrace what the

22   Chicago Police did.

23              Let´s look at what the police did.  They

24   had a double homicide as of May 25, 1990.  That crime

P-61

MAYSONET 1093

1  was unsolved.  There were no witnesses.

2          On July 15, they did what they do on any

3  number of cases.  When someone is in custody at

4  Area 5, you ask them whether they have any

5  information on anything else and, lo and behold, on

6  July 15, that person was Jose Maysonet, and they

7  struck gold.

8          He had information.  He told them he knew

9  about the murders, that he had supplied the gun, but

10 he wouldn't tell them anything else.

11         Then, they continued to work the case, and

12 nothing else happened from July 15 to August 1 until

13 they spoke with him again.  And, at that time, he

14 said he wanted to make a deal.

15         What does your common sense tell you when

16 somebody says they want something in exchange for

17 something?  That it has some value.  He was telling

18 the police by offering that deal that he had

19 important information, and that information was

20 good.

21         Then, they arrest him on the 22nd, and he

22 confesses.  Now, he not only confesses to just his

23 involvement, but he confesses and he names the other

24 three people involved.  All of the murderers of

                        P-62

1  Torrence and Kevin Wiley were arrested.  What lousy

2  police work.  What absolutely disgraceful police work

3  that there was a double homicide in which four people

4  were responsible, and all four people were arrested.

5       MR. BEUKE:    Objection, Judge, no evidence of

6  that.

7       THE COURT:    Overruled.

8       MS. MANDELTORT:    Now, counsel stood up here

9  and told you how Frank failed to touch on the

10  evidence, but what´s important is this is the

11  evidence, and he stood up here, and he talked about

12  the evidence.

13           He talked about how the crime happened and

14  what the defendant said.  Now, what´s interesting is

15  counsel told you in opening statement what Mr.

16  Maysonet said doesn´t prove him guilty.

17           Now, he stood up here in closing argument

18  talking about the scene going, well, maybe, this

19  isn´t what he said at all because maybe he didn´t

20  know anything.

21       MR. BEUKE:    Objection.  That wasn´t my

22  argument.

23       THE COURT:    They heard the argument.

24  Overruled.

P-63

1      MS. MANDELTORT:    His argument is that his

2  client couldn´t see what he told the police he saw.

3  So, the inference from that is that those weren´t his

4  words.

5          Well, you can´t have it both ways.   They

6  aren´t his words.  Well, if they are his words, it´s

7  they´re not enough.

8          You may be wondering, why would he confess

9  on August 22?  What happened?

10         Well, think about it.  He was a source of

11 information on July 15 and August 1, but something

12 changed on August 22.

13         He was arrested for those murders.  He was

14 in a different position.  He had a problem that he

15 didn´t have on July 15 and August 1 because he hadn´t

16 been arrested on those cases yet.

17         And what was his solution?  He decided to

18 talk, and he spoke about what happened.  You´re like,

19 well, why would he say that to the police?  Because

20 you all know something now that he didn´t know that

21 day.

22         Jose Maysonet didn´t understand the law of

23 criminal responsibility when he spoke those words.

24 With those words, he tried to take himself out of

P-64

1 what happened that day, but as you will know after

2 you are instructed by the judge on the law, he put

3 himself right smack in it because those words, making

4 himself the driver and supplying the gun, as he did

5 in this court-reported statement, make him a killer.

6       They don't take him out of it.  They don't

7 make him go free.  They make him a killer, and he

8 didn't know that, but you now do.

9       Counsel talked a lot about how the police

10 handled Mr. Maysonet.  And if you think back to

11 Rose's testimony, she said that she saw him.  She

12 visited with him up there and his common law wife,

13 Rose Bella, got to visit with him up there.  Not only

14 that, they got to bring him some medication.

15       The interesting part is he wants you to

16 believe now that something treacherous was going on

17 in that room.  That somehow Mr. Maysonet, at that

18 time, was having some sort of atrocious nervous

19 breakdown.

20       Well, don't you think if there was

21 something really wrong with Jose Maysonet, Rose would

22 have told you that when I saw my brother, you

23 wouldn't believe what he looked like?  I couldn't

24 believe it; I've never seen him that nervous.  I've

P-65

 1  never seen him in that condition.  It´s a good thing
 2  I brought the pills.  She didn´t say anything about
 3  the way he looked because he was fine.
 4          Now, he may have needed some nerve pills,
 5  but I think your common sense will tell you if you
 6  confess to a double homicide, you have a great deal
 7  to be nervous about.  You have a great deal to be
 8  nervous about, and you might even be sweating a
 9  little bit.
10          Counsel talked about something being
11  wrong.  What was wrong is that he realized that he
12  had confessed to those murders, and he got a little
13  nervous.
14          The interesting thing is he was given the
15  medication.  And if -- if the police had chosen not
16  to do that, counsel would have been standing up here
17  ranting and raving, look how they deprived him of his
18  medicine.  Now, he is ranting and raving that they
19  gave it to him.
20          You know, counsel talked in opening
21  statement of the pressure to solve these cases, that
22  there´s a lot of pressure.  Well, there should be.
23          You have two dead bodies in the streets of
24  Chicago, and people want to know what happened when

                        P-66

MAYSONET 1098

1  people get killed.   They want to know what happened.

2          Now, the interesting thing is I guess he

3  wants you to believe that somehow these words aren't

4  really true, and that somehow Jose Maysonet got

5  picked out by the police as the person who should

6  start confessing and really do something about this

7  case.

8          Well, think about it.   If there was so much

9  pressure for the police to solve this case, there was

10 certainly an easier route.

11         They had Jose Maysonet.   He told them he

12 knew about the murders.   He had the gun.   Why don't

13 they solve the crime right there and then lock,

14 stock, and barrel?   Make it one killer, one gun, one

15 car.

16         Why not just say that Mr. Maysonet, not

17 only confessed to being the driver and supplying the

18 gun, but he actually did the murder, and he was all

19 by himself?   That could have been quite easy and

20 taken a lot of the pressure that counsel talked about

21 off the police.

22         The police didn't do that.   The police work

23 with what they have, which is the information from

24 Mr. Maysonet, and then they went with that

P-67

MAYSONET 1099

1  information, and they arrested other people after

2  they got that information.

3         Counsel talked about his client being

4  threatened and if he gave up the names, he'd be

5  killed.  Well, supposedly, he was threatened in May

6  of 1990 if he gave up those names, he'd be killed.

7         In August of 1990, he gave up those names.

8  He gave the police Alfredo Gonzalez.  He gave the

9  police Justino Cruz.  And he gave the police Fro.  It

10 is now August of 1995, and Mr. Maysonet is still

11 here.

12     MR. BEUKE:    Objection to that argument, Judge.

13     THE COURT:    Overruled.

14     MS. MANDELTORT:    Perhaps, he wasn't telling

15 the police the truth about that because those threats

16 never came to anything.

17     THE COURT:    Five minutes, Miss Mandeltort.

18     MS. MANDELTORT:    Rosa Maysonet talked to you a

19 lot about the attorney that he had on his unrelated

20 incident from Area 5.  That has nothing to do with

21 this case and this police investigation.

22         That attorney was on that other case, and

23 when he was advised of his rights as to this case, as

24 to the murders of the Wiley brothers, each and every

P-68

MAYSONET 1100

1  time in Spanish and in English, he waived his right

2  to his attorney.

3  He wanted to speak to the police without an

4  attorney.  He even signed an attorney waiver when

5  they talked to him in the jail.  That is not an issue

6  for you.

7  The evidence in this case is that this

8  defendant spoke both, English and Spanish.  He was

9  talked to by police officers in both, English and

10  Spanish, and he gave a court-reported statement in

11  English to the state's attorney.  He spoke English, I

12  submit to you, to the police, much like his sister

13  spoke English to you in court.

14  Your job, ladies and gentlemen, is to

15  determine the facts from the evidence that you've

16  heard in the courtroom, from the photographs, from

17  the live testimony and apply the law to those facts.

18  Counsel talked about the burden of proof.

19  We have the burden of proof to prove him guilty

20  beyond a reasonable doubt, not beyond all doubt, not

21  beyond a shadow of a doubt, but beyond a reasonable

22  doubt.

23  I submit to you that the evidence that you

24  heard in this courtroom and the evidence you will

P-69

1  take back with you is more than sufficient.  We have

2  met that burden, and we have overcome that burden

3  with competent evidence before you.

4         This defendant confessed his involvement in

5  the murders of Torrence and Kevin Wiley.  He did it

6  both, verbally to the police, and he did it in a

7  court-reported statement.

8         That statement, whether he realized it when

9  he spoke it or not, makes him legally responsible for

10 the murders of Torrence and Kevin Wiley.  The only

11 verdict is that he is guilty.

12        Now, throughout this trial, there was one

13 thing that Mr. Beuke and I agreed on.  In his opening

14 statement, he stated we are interested in having just

15 justice done.

16        There is only one way to have justice done

17 in this case, and that is to have a guilty verdict

18 for the first degree murder of Torrence Wiley and a

19 guilty verdict for the first degree murder of Kevin

20 Wiley.

21

22

23

24

P-70

```
 1        THE COURT:    Thank you, Miss Mandeltort.

 2            Members of the jury, the evidence and

 3  arguments in this case have been completed, and I now

 4  will instruct you as to the law.

 5            The law that applies to the case is

 6  contained in these instructions, and it is your duty

 7  to follow all of them.

 8            You must not single out certain

 9  instructions and disregard others.

10            When I use the word, he, in these

11  instructions, I mean a male or a female.

12            It is your duty to determine the facts and

13  to determine them only from the evidence in the

14  case.

15            You are to apply the law to the facts and

16  in this way decide the case.

17            Neither sympathy nor prejudice should

18  influence you.

19            You should not be influenced by any

20  person's race, color, religion, or national

21  ancestry.

22            From time to time, it has been the duty of

23  Court to rule on the admissibility of evidence.  You

24  should not concern yourselves with these rulings.
```

P-71

1    You should disregard questions and exhibits
2 which were withdrawn or to which objections were
3 sustained.

4    Any evidence that was received for a
5 limited purpose should not be considered by you for
6 any other purpose.

7    You should disregard testimony and exhibits
8 which the Court has refused or stricken.

9    The evidence which you should consider
10 consists only of the testimony of the witnesses and
11 the exhibits which the Court has received.

12    You should consider all the evidence in the
13 light of your own observations and experience in
14 life.

15    Neither by these instructions nor by any
16 ruling or remark which I have made do I mean to
17 indicate any opinion as to the facts or as to what
18 your verdicts should be.

19    Faithful performance by you of your duties
20 as jurors is vital to the administration of justice.

21

22

23

24

P-72

1          Only you are the judges of the
2  believability of the witnesses and of the weight to
3  be given to the testimony of each of them.
4          In considering the testimony of any
5  witness, you may take into account his ability and
6  opportunity to observe, his memory, his manner while
7  testifying, any interest, bias, or prejudice he may
8  have, and the reasonableness of his testimony
9  considered in the light of all the evidence in the
10 case.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

P-73

MAYSONET 1105

1           Opening statements are made by the

2   attorneys to acquaint you with the facts they expect

3   to prove.

4           Closing arguments are made by the attorneys

5   to discuss the facts and circumstances in the case,

6   and should be confined to the evidence and to

7   reasonable inferences to be drawn from the evidence.

8           Neither opening statements nor closing

9   arguments are evidence.  Any statement or argument

10  made by the attorneys which is not based on the

11  evidence should be disregarded.

12

13

14

15

16

17

18

19

20

21

22

23

24

P-74

MAYSONET 1106

```
1          The defendant is charged with the offenses
2  of first degree murder of Torrence Wiley and first
3  degree murder of Kevin Wiley.  The defendant has
4  pleaded not guilty.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

P-75

1    The charges against the defendant in this

2 case are contained in a document called the

3 indictment.

4    The document is the formal method of

5 charging the defendant and placing the defendant on

6 trial.  It is not any evidence against the

7 defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

P-76

MAYSONET 1108

```
1            The defendant is presumed to be innocent of
2   the charges against him.  This presumption remains
3   with him throughout every stage of the trial and
4   during your deliberations on the verdict and is not
5   overcome unless from all of the evidence in the case,
6   you are convinced beyond a reasonable doubt that he
7   is guilty.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

P-77

MAYSONET 1109

1          The State has the burden of proving the

2    defendant guilty beyond a reasonable doubt, and this

3    burden remains on the State throughout the case.  The

4    defendant is not required to prove his innocence.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

P-78

MAYSONET 1110

1          The fact that the defendant did not testify

2 must not be considered by you in any way in arriving

3 at your verdict.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

P-79

MAYSONET 1111

1        Circumstantial evidence is the proof of
2   facts or circumstances which give rise to a
3   reasonable inference of other facts which tend to
4   show the guilt or innocence of the defendant.
5        Circumstantial evidence should be
6   considered by you together with all of the other
7   evidence in the case in arriving at your verdict.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24


                         P-80


MAYSONET 1112

1           You have before you evidence that the

2   defendant made statements relating to the offenses

3   charged in the indictment.

4           It is for you to determine whether the

5   defendant made the statements and if so, what weight

6   should be given to the statements.

7           In determining the weight to be given to a

8   statement, you should consider all of the

9   circumstances under which it was made.

P-81

MAYSONET 1113

```
 1              A person is legally responsible for the
 2  conduct of another -- of another person when either
 3  before or during the commission of an offense, and
 4  with the intent to promote or facilitate the
 5  commission of an offense, he knowingly solicits,
 6  aids, abets, agrees to aid, or attempts to aid the
 7  other person in the planning or commission of an
 8  offense.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

P-82

MAYSONET 1114

1            The word, conduct, includes any criminal

2    act done in furtherance of the planned and intended

3    act.

P-83

MAYSONET 1115

1       A person who is legally responsible for the

2 conduct of another may be convicted for the offense

3 committed by the other person, even though the other

4 person who it is claimed committed the offense is not

5 on trial before you.

6       A person commits the offense of first

7 degree murder when he kills an individual if in

8 performing the acts which cause the death, he intends

9 to kill or do great bodily harm to that individual,

10 or he knows that such acts will cause death to that

11 individual, or he knows that such acts create a

12 strong probability of death or great bodily harm to

13 that individual.

14

15

16

17

18

19

20

21

22

23

24

P-84

MAYSONET 1116

1        To sustain the charge of first degree

2  murder of Torrence Wiley, the State must prove the

3  following propositions:

4        First:  That the defendant or one for whose

5  conduct he is legally responsible performed the acts

6  which caused the death of Torrence Wiley, and

7        Second:  That when the defendant or one for

8  whose conduct he is legally responsible did so, he

9  intended to kill or do great bodily harm to Torrence

10 Wiley, or he knew that his acts would cause death to

11 Torrence Wiley, or he knew that his acts created a

12 strong probability of death or great bodily harm to

13 Torrence Wiley.

14        If you find from your consideration of all

15 of the evidence that each one of these propositions

16 has been proved beyond a reasonable doubt, you should

17 find the defendant guilty.

18        If you find from your consideration of all

19 of the evidence that any one of these propositions

20 has not been proved beyond a reasonable doubt, you

21 should find the defendant not guilty.

22

23

24


P-85

1    　　　　To sustain the charge of first degree

2    murder of Kevin Wiley, the State must prove the

3    following propositions:

4    　　　　First:  That the defendant or one for whose

5    conduct he is legally responsible performed the acts

6    which caused the death of Kevin Wiley, and

7    　　　　Second:  That when the defendant or one for

8    whose conduct he is legal legally responsible did so,

9    he intended to kill or do great bodily harm to Kevin

10   Wiley, or he knew that his acts would cause death to

11   Kevin Wiley, or he knew that his acts created a

12   strong probability of death or great bodily harm to

13   Kevin Wiley.

14   　　　　If you find from your consideration of all

15   of the evidence that each one of these propositions

16   has been proved beyond a reasonable doubt, you should

17   find the defendant guilty.

18   　　　　If you find from your consideration of all

19   of the evidence that any one of these propositions

20   has not been proved beyond a reasonable doubt, you

21   should find the defendant not guilty.

22

23

24

　　　　　　　　　　　P-86

MAYSONET 1118

1          When you retire to the jury room, you will

2 first elect one of your members as your foreperson.

3 He or she will preside during your deliberations upon

4 your verdicts.

5          Your agreement upon a verdict must be

6 unanimous.

7          Your verdicts must be in writing and signed

8 by all of you, including your foreperson.

9          The defendant is charged with the offenses

10 of first degree murder of Torrence Wiley and the

11 first degree murder of Kevin Wiley.  You will receive

12 four forms of verdict.

13          As to each charge, you will be provided

14 with both, a not guilty and a guilty form of

15 verdict.

16          From these two verdict forms with regard to

17 a particular charge, you should select the one

18 verdict form that reflects your verdict on that

19 charge and sign it as I have stated.

20          Do not write on the other verdict form on

21 that charge.  Sign only one verdict form on that

22 charge.

23          There then follows, ladies and gentlemen,

24 the four verdict forms to which I have alluded, and

P-87

1  they are as follows:

2      We, the jury, find the defendant, Jose

3  Maysonet, not guilty of first degree murder of

4  Torrence Wiley.

5      There are then 12 lines for your respective

6  signatures.  A line on which the foreperson should

7  sign is so designated.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

P-88

MAYSONET 1120

1          The second verdict form.  We, the jury,

2  find the defendant, Jose Maysonet, guilty of first

3  degree murder of Torrence Wiley.  12 lines for your

4  signatures.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

P-89

1          We, the jury, find the defendant, Jose

2    Maysonet, not guilty of first degree murder of Kevin

3    Wiley.  12 lines for your signatures.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                    P-90

1          And we, the jury, find the defendant, Jose

2     Maysonet, guilty of first degree murder of Kevin

3     Wiley, again 12 signature lines.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                              P-91

MAYSONET 1123

```
 1        THE COURT:   Ladies and gentlemen, you will have
 2   a copy of the legal instructions that I've just read
 3   to you to take back with you to the jury room so that
 4   you may have them for your reference during your
 5   deliberations.
 6            May we have the deputies sworn, please?
 7        THE CLERK:   Raise your right hand.
 8            Do you and each of you solemnly swear you
 9   will take this jury to a safe and convenient place
10   provided by the Sheriff of Cook County, and there
11   keep them together and permit no person to speak to
12   them, nor speak to them yourselves about this cause,
13   and when they have agreed upon their verdict, you
14   will return them into open court?
15        THE SHERIFFS:   I will.
16        THE COURT:   Very well.
17            Miss Woodard, would you check with our
18   alternates to see if they have any personal
19   belongings in the jury room that they need to
20   retrieve before the 12 go in for deliberations?
21            If you would instruct them if they have
22   anything back there, they should get it.  If they
23   don't, then I would just like them to just remain
24   when the jury is taken out.  Very well.  The jury may
```

P-92

1 retire.

2     THE SHERIFF:  All rise for the jury.

3     THE COURT:   Alternates, please keep your seats

4 for the time being.

5                         (The following proceedings

6                         were had out of the

7                         hearing of the jury:)

8     THE COURT:   Very well.  Miss McClelland and Mr.

9 Keyes, if you would just approach the bench, please?

10 Would you come up to the bench, please?

11         Any counsels who leave, make sure you leave

12 numbers so we are sure where you can be reached.

13         I'm going to take about a five-minute

14 break, and then we will do the regular call.

15                         (Whereupon, there was a recess

16                         had in the above-entitled

17                         cause, after which the

18                         following proceedings were had:)

19     THE COURT:   Is the sheriff bringing the

20 defendant out?

21     THE CLERK:  Yes.

22     THE COURT:   The defendant being present in

23 open court, are both sides ready to bring the jury

24 out?


                        P-93

1    MS. MANDELTORT:    The State's ready.

2    MR. BEUKE:    Yes, Judge.

3    THE COURT:    All right.  Bring the jury out.

4    THE SHERIFF:    All rise for the jury.

5              (The following proceedings were

6              had in the hearing and the

7              presence of the jury:)

8    THE COURT:    You may be seated.

9        Ladies and gentlemen, my name is Lon

10   Shultz.  I'm a judge of the Circuit Court of Cook

11   County.  Judge Morgan was called away on another

12   matter, so in her stead, her place, I will take your

13   verdict.

14        Would the foreman, please, rise?  Mr.

15   Foreman, has the jury reached a verdict in this

16   case?

17   THE FOREMAN:    Yes, your Honor.

18   THE COURT:    Could you, please, hand it to the

19   deputy?  The Court has reviewed the verdict forms and

20   finds them to be in proper order.  I'll tender it to

21   the clerk for publication, at this time.

22   THE CLERK:  We, the jury, find the defendant,

23   Jose Maysonet, guilty of first degree murder of

24   Torrence Wiley.


                        P-94

1            We, the jury, find the defendant, Jose

2  Maysonet, guilty of first degree murder of Kevin

3  Wiley.

4       THE COURT:    Counsel, do you wish the jury to be

5  polled?

6       MR. BEUKE:    Please, Judge.

7       THE COURT:    Please poll the jury.

8       THE CLERK:

9       Q.   Eileen Potter, was this then and is this

10  now your verdict?

11      A.   Yes.

12      Q.   Jon Jetel?

13      A.   Yes.

14      Q.   Christina Pitt?

15      A.   Yes.

16      Q.   Mary Howard-Journey?

17      A.   Yes.

18      Q.   Tracy Cano?

19      A.   Yes.

20      Q.   Alexandra Stergios?

21      A.   Yes.

22      Q.   George Truckenmiller?

23      A.   Yes.

24      Q.   Dorothy Zakrzewski?

P-95

```
1       A.    Yes.

2       Q.    Grace McClelland?

3       A.    She was an alternate.

4       Q.    Selone Wolfe?

5       A.    Yes.

6       Q.    Martin Powers?

7       A.    Yes.

8       Q.    Martha Klauke?

9       A.    Yes.

10      Q.    Ezell Keyes?

11      A.    Alternate.

12      Q.    Michelle Yik?

13      A.    Yes.

14      THE COURT:   Has everyone been polled?

15      THE CLERK:   Yes, your Honor.

16      THE COURT:   Thank you.

17            Upon return of the verdict, I'll enter

18 judgment on the verdict of guilty.

19            Ladies and gentlemen, -- is there anything,

20 counsel?

21      MR. BEUKE:    No.

22      THE COURT:   Counsel, approach, please?

23            (Whereupon, there was a sidebar

24            discussion had out of the hearing of the
```

P-96

1          court reporter and jury, after which the

2          following proceedings were had:)

3     THE COURT:   Ladies and gentlemen, at this time,

4 your jury service is completed.  I´ll discharge you.

5          On behalf of Judge Morgan, I want to thank

6 you for your service.  Next to military service for

7 one´s country, it is perhaps one of the highest civic

8 duties that one can perform.

9          I´m sure you´ve been instructed by Judge

10 Morgan up to this time you were not to talk about the

11 case with anyone.  But now you are are free, if you

12 choose to, to discuss your thoughts or feelings.  If

13 you have questions, you are free to inquire of either

14 counsel or state´s attorney that may come back and

15 speak to you.

16          You are under no obligation to do so.

17 Again, I´ll discharge you at this time and thank you.

18     THE SHERIFF:   All rise for the jury.

19                    (The following proceedings

20                    were had out of the

21                    hearing of the jury:)

22     THE COURT:   At this time, I´ll order a

23 presentence investigation.  Any bond previously set

24 will be revoked.  I´ll set a date for sentencing.


                         P-97

MAYSONET 1129

1  What date would you request, counsel?

2        MR. BEUKE:     Judge, September 8.

3        THE COURT:    Is that agreeable to the State?

4        MR. MAREK:     Is that long enough?

5        THE COURT:    That's about a month.

6        MS. MANDELTORT:    September 8 is fine.

7        THE COURT:    Order of Court September 8 for

8  sentencing.

9                           (A continuance

10                          was taken to 9-8-95.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24


                        P-98

MAYSONET 1130

```
 1
 2  STATE OF ILLINOIS )
                      )  SS.
 3  COUNTY OF C O O K )

 4

 5

 6       I, PAUL P. MARZANO, CSR, RPR, Official Court

 7  Reporter for the Circuit Court of Cook County,

 8  Illinois Judicial Circuit of Illinois, do hereby

 9  certify that I reported in shorthand the proceedings

10  had in the above-entitled cause; that I thereafter

11  caused the foregoing to be transcribed, which I

12  hereby certify to be a true and accurate transcript

13  of the report of proceedings had before the Honorable

14  LORETTA H. MORGAN, Judge of said court.

15

16

17                        Official Court Reporter

18

19

20  Dated this  _ _ 8TH _day

21  of _ _ _ DECEMBER _ 1995.

22

23

24
```

P-99

MAYSONET 1131

*Maysonet v. Guevara, et al.*
Case No. 18 CV 2342
Our File No. 4088

# EXHIBIT 57

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

```
STATE OF ILLINOIS)
                 )  SS.
COUNTY OF COOK   )
```

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
                                  )
                 vs.              )  92CR-10146
                                    )
JOSE MAYSONET                       )

FILED

OCT 17 1995

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

## IMPOUNDING ORDER

IT IS HEREBY ORDERED that the below listed property used as Exhibit(s) for identification and or evidence in the trial of the above captioned cause which resulted in a finding of guilty be impounded by the Clerk of the Circuit Court, Criminal Division pending further order of this Court.

DESCRIPTION OF ITEMS

1. 3 SCENE PHOTOS (PEOPLES EXHIBIT #1-3)

2. 5 SCENE PHOTOS OF TORRENCE WILEY (PEOPLES EXHIBIT #4-8)

3. 3 SCENE PHOTOS OF KEVIN WILEY (PEOPLES EXHIBIT #9-11)

4. 4 9MM CARTRIDGE CASES (PEOPLES EXHIBIT #12)

5. 1 9MM FIRED BULLET FROM TORRENCE'S CLOTHING
(PEOPLES EXHIBIT #13)

6. 11 MORGUE PHOTOS (PEOPLES EXHIBIT #14-24)

7. 1 9MM FIRED BULLET FROM TORRENCE'S BODY (PEOPLES EXHIBIT #25)

8. 1 9MM FIRED BULLET FROM KEVIN WILEY'S BODY
(PEOPLES EXHIBIT #26)

9. 1 COOK COUNTY JAIL ATTORNEY WAIVER FORM (PEOPLES EXHIBIT #28)

10. 1 COURT REPORTED STATEMENT OF DEFENDANT (PEOPLES EXHIBIT #29)

11. 1 SCENE PHOTO (PEOPLES EXHIBIT #30)

12. 1 DIAGRAM (PEOPLES EXHIBIT #31)

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

ENTER: _Loretta Hall Morg_

JUDGE OF THE CIRCUIT COURT

DATED: 10-16-95

THE ABOVE LISTED ITEMS HAVE BEEN RECEIVED BY THE COUNTY CLERK'S
OFFICE.

AURELIA PUCINSKI (STAMP)

CLERK OF THE COURT

DEPUTY CLERK (STAMP)

CCSAO001356